Jon M. Sands
Federal Public Defender
District of Arizona
Jennifer Y. Garcia (AZ No. 021782)
Emma L. Smith (IL Bar No. 6317192)
Assistant Federal Public Defenders
850 West Adams Street, Suite 201
Phoenix, Arizona 85007
Jennifer_Garcia@fd.org
Emma_Smith@fd.org
602.382.2816 Telephone
602.889.3960 Facsimile

Attorneys for Petitioner

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| Wendi Elizabeth Andriano,<br><br>                    Petitioner,<br><br>vs.<br><br><br>Charles L. Ryan, et al.,<br><br>                    Respondents. | CV-16-01159-PHX-SRB<br><br><br>DEATH-PENALTY CASE |

**PETITION FOR WRIT OF HABEAS CORPUS**

**28 U.S.C. § 2254**

1

**Table of Contents**

2    Introduction .......................................................................................... 1

3    I.    Facts and Procedural History ......................................................... 1

4         Personal History .......................................................................... 1

5              A.    Wendi's Parental Background .............................................. 1

              B.    Wendi Endured Extreme Neglect and Pervasive Psychological
6                   Stress Since Her Birth. ........................................................ 4

              C.    Wendi is Indoctrinated into a Strict Religion at an
7                   Impressionable Age ........................................................... 6

              D.    Wendi Meets and Marries Joe Andriano .............................. 14
8              E.    The Crime ........................................................................ 24

9         Procedural History ...................................................................... 25

10   II.   State Court Presumption of Correctness .......................................... 31

11   III.  Exhaustion .................................................................................... 32

12   IV.   The AEDPA Is UnconstitutionaL ..................................................... 32

13            A.    AEDPA Suspends the Writ of Habeas Corpus ...................... 33
              B.    AEDPA Violates the Separation of Powers Doctrine ............ 33
14            C.    Conclusion ........................................................................ 35

15   V.    Federal Constitutional Claims ......................................................... 35

16        CLAIM ONE ................................................................................. 35

17        The trial prosecutor engaged in repeated and pervasive misconduct,
18        violating Andriano's rights under the Fifth, Sixth, Eighth, and
          Fourteenth Amendments. ............................................................... 35

19            A.    Introduction ...................................................................... 36
              B.    State Court Rulings ........................................................... 37
20            C.    Prosecutorial Misconduct .................................................. 38
              D.    Ineffective Assistance ....................................................... 54
21

22        CLAIM TWO ................................................................................ 59

23        The trial attorney tasked with the responsibility of Andriano's penalty
          phase defense had an actual conflict of interest that rendered him
24        ineffective. As a result of his ineffective assistance of counsel,
          Andriano's Sixth and Fourteenth Amendment rights were violated. ......... 59
25

26        CLAIM THREE .............................................................................. 68

27        Andriano received ineffective assistance of counsel during the penalty
          phase of her capital trial proceedings, in violation of her Sixth, Eighth,
          and Fourteenth Amendment rights. .................................................. 68
28

A.   Trial counsel provided ineffective assistance when they failed to adequately investigate, develop, and present readily available evidence in mitigation of Andriano's crime. ................................... 72

B.   Trial counsel's failure to object to an instruction that incorrectly informed the jury that Andriano could be sentenced to life with the possibility of parole constituted ineffective assistance of counsel in violation of Andriano's rights under the Sixth and Fourteenth Amendments. ............................................................... 84

CLAIM FOUR .................................................................. 87

The introduction of extensive, irrelevant, and highly prejudicial evidence concerning Andriano's extramarital relationships and unsuccessful attempts to procure life insurance violated her Fifth, Sixth, and Fourteenth Amendment rights. ............................................. 87

A.   Introduction of irrelevant and unfairly prejudicial evidence of Andriano's extramarital activity so infected her trial that her due-process rights were violated. ....................................... 89

B.   The introduction of irrelevant and unfairly prejudicial evidence related to Andriano's unsuccessful attempts to obtain life insurance violated her due-process rights. ....................................... 99

CLAIM FIVE ................................................................... 102

Andriano's due-process rights were violated when the jury was incorrectly instructed that if given a life sentence she could be eligible for parole. ........................................................................ 102

CLAIM SIX .................................................................... 106

The introduction of unreliable evidence that sodium azide was present in food samples rendered Andriano's trial fundamentally unfair in violation of her rights under the Fourteenth Amendment. .......................................... 106

CLAIM SEVEN ................................................................. 110

The trial court's failure to instruct the jury that it had to find that the aggravating circumstance outweighed mitigating circumstances beyond a reasonable doubt violated Andriano's Sixth and Fourteenth Amendment Rights. ................................................................. 110

A.   Under clearly established Supreme Court precedent at the time of Andriano's appeal, she was entitled to relief based on the instructional error regarding the burden of proof at the penalty phase. ........................................................................ 111

B.   If *Hurst v. Florida* instead announced a new rule of constitutional law, it is retroactive to cases on collateral review. ... 113

C.   Conclusion ................................................................ 115

CLAIM EIGHT ................................................................. 116

The trial court failed to instruct the jury on the lesser-included offenses of second-degree murder and manslaughter, in violation of Andriano's Sixth, Eighth, and Fourteenth Amendment rights. ....................................... 116

CLAIM NINE ................................................................. 122

    The trial judge coerced a verdict at the penalty phase of Andriano's trial, violating her Sixth, Eighth, and Fourteenth Amendment Rights. .............. 122

CLAIM TEN ................................................................. 129

    Trial court improperly limited voir dire and rehabilitated jurors, in violation of Andriano's due process rights. ................................ 129

CLAIM ELEVEN ............................................................. 134

    The jury improperly considered possible sentencing outcomes during deliberations at the aggravation phase of Andriano's trial, in violation of her Sixth and Fourteenth Amendment rights. ............................ 134

CLAIM TWELVE ............................................................. 137

    The State failed to present sufficient evidence supporting the finding of cruelty under the (F)(6) aggravating circumstance in violation of Andriano's rights under the Fifth, Eighth, and Fourteenth Amendment.... 137

CLAIM THIRTEEN ........................................................... 143

    The trial court prevented the jury from considering mercy and residual doubt as mitigating circumstances, in violation of Andriano's Sixth, Eighth, and Fourteenth Amendment rights. ................................ 143

CLAIM FOURTEEN .......................................................... 147

    The trial court improperly instructed the jury at the penalty phase that it could only consider mitigation that was found to exist unanimously, in violation of Andriano's Sixth, Eighth, and Fourteenth Amendment rights. ................................................................. 147

CLAIM FIFTEEN ............................................................ 151

    The trial court erroneously permitted the State to use an unqualified witness as an expert to rebut evidence that Andriano was a victim of domestic violence, and the error was prejudicial. As a result, her due process rights were violated. ............................................ 151

CLAIM SIXTEEN ........................................................... 155

    The instructions defining cruelty given in this case were vague and overbroad, in violation of Andriano's rights under the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution. ................ 155

    A.   The jury instructions were vague and overbroad because they did not instruct the jury on what qualified as the "norm of first degree murders." ...................................................... 156

    B.   The instructions were vague and overbroad because they did not define "mental anguish." ............................................. 158

CLAIM SEVENTEEN ....................................................................... 160

The cruelty aggravating circumstance in Arizona Revised Statute § 13-703(F)(6) is vague because it fails to channel jurors' sentencing discretion and overbroad because it does not genuinely narrow the class of offenders eligible for the death penalty in violation of the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.... 160

    A.   The cruelty aggravator is vague because it fails to channel jurors' sentencing discretion. ......................................................... 161

    B.   The cruelty aggravator is overbroad because it does not narrow the class of death-eligible offenders............................................... 163

CLAIM EIGHTEEN ......................................................................... 165

The Arizona Supreme Court's decision affirming Andriano's death sentence denied Andriano meaningful appellate review by unconstitutionally relying on facts not found by the jury........................... 165

CLAIM NINETEEN .......................................................................... 167

Andriano received ineffective assistance of counsel during the guilt-phase of her first-degree murder trial, violating her rights under the Sixth and Fourteenth Amendments to the United States Constitution. ....... 167

    A.   Trial counsel's failure to adequately investigate sodium azide and retain a qualified expert constituted ineffective assistance of counsel and violated Andriano's Sixth and Fourteenth Amendment rights. .......................................................................... 170

    B.   Trial counsel's failure to investigate and present expert testimony regarding Andriano's mental-health history during the guilt phase of her trial constituted ineffective assistance of counsel in violation of her rights under the Sixth and Fourteenth Amendments............................................................................. 175

    C.   Trial counsel's failure to introduce evidence that victim Joe Andriano was severely depressed in the period leading up to his death constituted ineffective assistance of counsel and violated Andriano's Sixth and Fourteenth Amendment rights. ................... 181

    D.   Trial counsel's failure to identify corroborating evidence that the victim knew that Andriano was trying to obtain a life insurance policy constituted ineffective assistance and violated Andriano's Sixth and Fourteenth Amendment rights. ...................................... 185

    E.   Trial counsel's failure to request a limiting instruction on the proper use of evidence of Andriano's extramarital relationships and unsuccessful attempts to obtain life insurance constituted ineffective assistance of counsel in violation of Andriano's rights under the Sixth and Fourteenth Amendments...................... 190

    F.   Trial counsel's failure to seek a jury instruction on the lesser-included offenses of second-degree murder and manslaughter deprived Andriano of her Sixth Amendment and Fourteenth Amendment rights to the effective assistance of counsel during the guilt phase of her capital trial. ................................................. 193

CLAIM TWENTY ...................................................................................... 197

    Andriano received ineffective assistance of counsel during the aggravation phase of her capital trial proceedings, in violation of her Sixth and Fourteenth Amendment rights. .................................................... 197

    A.   In the aggravation phase, trial counsel's failure to object to the jury's consideration of evidence related to the alleged sodium azide poisoning as improper, inaccurate, and misleading constituted ineffective assistance of counsel in violation of Andriano's Sixth and Fourteenth Amendment rights. ................... 198

    B.   Trial counsel's failure to investigate and challenge juror misconduct at the aggravation phase constituted ineffective assistance of counsel in violation of Andriano's rights under the Sixth and Fourteenth Amendments. ...................................... 201

    C.   In the aggravation phase, trial counsel's failure to investigate and present expert testimony regarding Andriano's mental illness constituted ineffective assistance of counsel in violation of her rights under the Sixth and Fourteenth Amendment. ............ 204

    D.   Trial counsel's failure to properly move for the dismissal of the pecuniary gain aggravating circumstance, which was improperly presented, constituted ineffective assistance and violated Andriano's Sixth and Fourteenth Amendment rights. ................... 207

CLAIM TWENTY-ONE ......................................................................... 210

    Andriano's Sixth Amendment right to the effective assistance of counsel was violated by her direct appeal counsel's failure to raise meritorious claims on direct appeal ............................................................ 210

    A.   Appellate counsel failed to raise trial counsel's actual conflict of interest. ............................................................................... 212

    B.   Appellate counsel failed to challenge the trial court's improper exclusion of relevant, admissible testimony. .................................. 213

    C.   Appellate counsel failed to challenge the trial court's instruction that incorrectly informed the jury that Andriano could be sentenced to life with the possibility of parole. ............................. 213

    D.   Appellate counsel failed to challenge the trial court's error in permitting an unqualified expert to testify as to Andriano's status as a domestic violence victim. .............................................. 214

    E.   Appellate counsel failed to argue that mitigating circumstances are sufficient to merit life sentence under independent review. .... 215

    F.   Appellate counsel failed to challenge the admittance of unreliable scientific evidence. ........................................................ 218

    G.   Appellate counsel failed to challenge the trial court's improper limitations on voir dire and rehabilitation of jurors. ..................... 219

    H.   Appellate counsel failed to correct the Arizona Supreme Court's reliance on facts not in evidence in its direct appeal opinion. ........ 219

    I.   Appellate counsel failed to argue that execution of Andriano after years spent on death row would be cruel and unusual punishment. ................................................................................ 219

J.    Appellate counsel failed to challenge Arizona's jury selection
      process as unconstitutional...........................................................220

CLAIM TWENTY-TWO ...................................................................220

Capital punishment is categorically cruel and unusual, in violation of the
Eighth and Fourteenth Amendments. .......................................................220

CLAIM TWENTY-THREE...............................................................223

The death penalty violates Andriano's rights under the Eighth and
Fourteenth Amendments because it is irrationally and arbitrarily
imposed and it serves no purpose that is not adequately addressed by life
in prison........................................................................................223

CLAIM TWENTY-FOUR...................................................................225

Application of the death penalty on the facts of this case would
constitute cruel and unusual punishment in violation of the Eighth and
Fourteenth Amendments. ....................................................................225

CLAIM TWENTY-FIVE.....................................................................227

Arizona's capital-sentencing scheme violates the Eighth and Fourteenth
Amendments to the United States Constitution because it affords the
prosecutor unbridled discretion to seek the death penalty.........................227

CLAIM TWENTY-SIX ......................................................................228

The aggravating factors alleged by the State were not supported by
findings of probable cause at the indictment stage because the State
failed to allege the aggravating factors in the indictment, which is a
violation of Andriano's rights under the Fifth, Sixth, Eighth, and
Fourteenth Amendments.....................................................................228

CLAIM TWENTY-SEVEN ................................................................229

The application of Arizona's newly enacted death penalty statute,
promulgated after Ring, violated the ex post facto doctrine......................229

CLAIM TWENTY-EIGHT .................................................................232

Arizona's capital-sentencing scheme violates the Fifth, Eighth, and
Fourteenth Amendments to the United States Constitution because it
denies capital defendants the benefit of proportionality review of their
sentences. ...................................................................................232

CLAIM TWENTY-NINE....................................................................233

Arizona's capital-sentencing scheme is unconstitutional because it does
not require that the State prove that the death penalty is appropriate. .......233

vi

CLAIM THIRTY ...................................................................................235

    Arizona's capital-sentencing scheme violates the Eighth and Fourteenth Amendments to the United States Constitution because it does not set forth objective standards to guide the sentencer in weighing the aggravating circumstances against the mitigating circumstances. .............235

CLAIM THIRTY-ONE ..........................................................................236

    Arizona's capital-sentencing scheme violates the Eighth and Fourteenth Amendments because it does not sufficiently channel the discretion of the sentencing authority. ..........................................................................236

CLAIM THIRTY-TWO ..........................................................................239

    Execution by lethal injection is cruel and unusual punishment; accordingly, Andriano's sentence, if carried out, will violate her rights under the Eighth and Fourteenth Amendments. .........................................239

        A.    Arizona has a troublesome history of carrying out lethal-injection executions.................................................................239

        B.    Lethal injection as carried out by Arizona is cruel and unusual ....245

CLAIM THIRTY-THREE ......................................................................246

    Arizona's capital-sentencing scheme violates the Eighth and Fourteenth Amendments because it requires a death sentence whenever one aggravating circumstance and no mitigating circumstances are found with respect to an eligible defendant. .........................................................246

CLAIM THIRTY-FOUR ........................................................................247

    Andriano will be denied a fair clemency process in violation of the Eighth and Fourteenth Amendments. ..................................................247

CLAIM THIRTY-FIVE .........................................................................248

    Arizona's jury selection process violates the Sixth, Eighth, and Fourteenth Amendments...............................................................................248

        A.    Legal standards................................................................................249

        B.    Argument.........................................................................................253

CLAIM THIRTY-SIX ...........................................................................259

    It would violate Andriano's right to be free from cruel and unusual punishment for the State of Arizona to execute her after she has spent over twelve years on its death row.............................................................259

Prayer for Relief.................................................................................262

Certificate of Service .........................................................................264

vii

**INTRODUCTION**

Pursuant to 28 U.S.C. § 2254, Wendi Elizabeth Andriano respectfully petitions this Court for a writ of habeas corpus freeing her from the custody of Respondents, pursuant to the judgments and sentences of an Arizona state court, on the grounds that those judgments and sentences were obtained and affirmed in violation of her rights under the United States Constitution. Andriano is in the custody of the Arizona Department of Corrections ("ADC") because she was sentenced to death following her conviction in 2004 for first-degree murder.

**I.     FACTS AND PROCEDURAL HISTORY**

**Personal History**

Wendi Andriano was born Wendi Elizabeth Robertson[1] on August 26, 1970, in Groom, Texas; she was the first and only child born during the marriage of Shelby "Skip" Wayne Robertson and Donna (Worsham) Robertson Ochoa. (Tr. Oct. 25, 2004 at 4, 6.) Donna and Skip married in 1968 and divorced in 1974, when Wendi was only three years old. (Tr. Oct. 4, 2004 p.m. at 6-7.) A year after Wendi's parents divorced, Wendi had a new father—Donna married Alejo Ochoa, a man she had only known for six months. (Tr. Oct. 4, 2004 p.m. at 8-9.) As a result of extreme neglect, pervasive psychological stress, and a multigenerational family history positive for mood disorders and psychiatric illnesses, Wendi was not mentally and emotionally equipped to handle the physical, emotional, sexual, and religious trauma inflicted upon her throughout her life.

**A.     Wendi's Parents Were Damaged and Neglectful.**

Skip and Donna were inadequate caregivers to Wendi beginning at her birth. Their inadequacies caused Wendi to be neglected emotionally and physically, and to be consistently exposed to trauma. (Tr. Feb. 3, 2014 am at 34.)

---

[1] Wendi's name legally changed to Wendi Elizabeth Ochoa when her stepfather, Alejo Ochoa, formally adopted her on January 31, 1977. To avoid confusion between family members with the same last names, throughout this section Andriano will be referred to by her first name only.

1

1   Both Skip and Donna were damaged individuals who had suffered trauma in their
2   own lives.

3      By the time 19-year-old Skip married Donna in 1968, he had experienced
4   multiple traumas. When Skip was around 8 years old, his older brother had
5   approached him for sexual acts, but his mother protected him. At the age of 12,
6   Skip witnessed his mother have a sudden stroke on Christmas night, and
7   subsequently die several hours later. (PFR 8 Ex. 32 ¶ 6.) Following his mother's
8   death, Skip struggled with abandonment and suffered from severe depression,
9   which led to a suicide attempt. Skip joined the Marines in 1966, where he spent
10  one year in Vietnam, engaging in active combat during the war. (PFR 8 Ex. 32
11  ¶¶ 6-12.) Like most young men returning from Vietnam, Skip experienced
12  symptoms of Post-Traumatic Stress Disorder, which he treated by abusing alcohol
13  and drugs. Skip drank heavily on a daily basis and often to the point of
14  unconsciousness. (PFR 8 Ex. 32 ¶¶ 21-23; Tr. Feb. 4, 2014 at 85-86.) Skip spent
15  most of his young life drinking his memories away with his older brothers.
16  Unfortunately, when Skip was drunk, he was mean and antagonistic. (Tr. Feb. 4,
17  2014 at 86.)

18     Similarly, Donna did not have a conventional upbringing. Donna was the
19  daughter of an abusive and neglectful mother and an absent and alcoholic father.
20  (PFR 8 Ex. 27 ¶¶ 19, 29, 44-46.) Donna's childhood was not stable for several
21  reasons, but initially suffered because of her father's career in the Navy, which
22  required the family to move frequently. Furthermore, Donna was a sickly child,
23  suffering from rheumatic fever and a heart murmur until she was in the sixth
24  grade. Finally, when Donna was nine years old and her father got out of the
25  military, her family decided to move to Tucson, Arizona, which would become
26  their permanent home. (PFR 8 Ex. 27 ¶¶ 19, 21-22.) However, the move to
27  Tucson did not bring the stability Donna and her family had hoped for.

28     Donna's parents, Henry "Hank" Worsham, Jr. and La Verne "Ann" Tilley,

were expected to demonstrate what a healthy relationship looked like so Donna would grow up and emulate the same. Instead, while living in Tucson, Hank openly carried on an affair with a woman who was not his wife. Three children were born as a result of this affair during his marriage to Ann.[2] Ann spent much of her energy, and much of Donna's childhood, being obsessed with Hank's extramarital activities and violently fighting with him about it. They fought so hard that they broke windows in the family home and scared Donna enough that as a 12- or 13-year-old child she slept with a butcher knife under her bed. The only time Donna received attention from Ann was when she would lash out in anger at Donna. (PFR 8 Ex. 27 ¶¶ 37, 44.)

Donna was aware of Hank's cheating and the existence of his second family from the beginning because Ann did not attempt to shield Donna from this fact or to leave Hank. Rather than protect Donna and herself, Ann dragged Donna from hotel to hotel looking for Hank and his mistress. At times, Ann would take a gun with her and Donna as they looked for Hank. Once, Donna watched from the family car while her mother went into a hotel room, fired two shots, and returned to the car crying. Later, Donna learned from Hank that Ann had attempted to shoot Hank's mistress but had missed because she was not a good shot. (PFR 8 Ex. 27 ¶¶ 34-35, 49-50.)

By the time Donna was an adolescent, she had experienced a large amount of violence, instability, neglect, and abuse. She learned how to avoid dealing with issues, hide secrets, and act as if everything was fine. (PFR 8 Ex. 27 ¶ 302; Tr. Dec. 13, 2004 at 26.) These negative experiences prompted a mental breakdown in Donna, which was manifested through constant crying and an inability to respond to people when they talked to her. Donna stayed home from school for

---

[2] According to Donna, Hank frequently questioned the paternity of one of the three children he fathered with his mistress while still married to Ann. (PFR 8 Ex. 27 ¶ 49.)

two weeks in an attempt to recover. (PFR 8 Ex. 27 ¶ 48.) This would not be the last time Donna would experience such a mental breakdown.

Both Skip and Donna have multigenerational family histories replete with mental illnesses, including bipolar disorder, major and psychotic depression, and attention deficient disorder. Many family members were never officially diagnosed but reportedly exhibited psychiatric symptoms consistent with bipolar episodes, depression, mania, suicidal tendencies, suicide attempts, psychosis, obsessive compulsive disorder, and substance abuse. (PFR 8 Ex. 2 at ¶¶ 18, 27-28, 32.)

**B.      Wendi Endured Extreme Neglect and Pervasive Psychological Stress Since Her Birth.**

Wendi came into this world as a product of an already failing relationship between two damaged young adults. (PFR 8 Ex. 27 ¶¶ 112, 116.) Like Donna's parents, Skip and Donna fought frequently. Even though Donna and Skip drank alcohol and abused amphetamines together, Skip's chronic drinking, mistreatment of Donna, and womanizing were the root of their marital conflict. In addition, sometimes Skip worked as a truck driver, which kept him away from their family home for weeks at a time. (PFR 8 Ex. 27 ¶¶ 99, 109, 112, 120-21, 130.)

Like her mother, Donna knew her husband was cheating on her but did not leave him. (PFR 8 Ex. 27 ¶¶ 126, 130.) Despite their troubled and volatile relationship, Donna tried to repair their marriage by having a baby. However, Wendi ended up being a girl instead of the boy Skip wanted. (PFR 8 Ex. 27 ¶ 137.)

Wendi's birth should have been a joyous occasion for Donna, but the happiness was short-lived. Upon her return from the hospital after giving birth, Donna experienced another breakdown when she realized that her beloved dog, a gift from her father, was missing. Donna instantly became frantic and hysterical. Later Donna described the incident as a "breakdown" because she was unable to

tend to Wendi during this time. Donna's mother Ann, who had been visiting, and Skip cared for Wendi during this time. Donna completely shut down for a couple of days, unable to communicate or respond to anyone. Donna did not breastfeed Wendi during this time because she was unable to feed herself or even get out of bed. (PFR 8 Ex. 27 ¶¶ 142-43.) Donna was likely suffering from undiagnosed postpartum depression.

During the first few weeks of Wendi's life, Skip stayed around long enough to get Donna through her breakdown before resuming his normal routine of chasing women, drinking, and partying. Feeling hopeless and alone, 20-year-old Donna attempted to care for Wendi the best way she knew how, which was in a limited capacity because of Donna's fragile mental state and because she had no experience with babies. Furthermore, Wendi was a colicky baby who cried for hours at a time. Wendi's fussiness wore on Donna's patience. Sometimes when Wendi cried, Donna just held her and cried too. (PFR 8 Ex. 27 ¶¶ 146-49.)

Wendi's first few years of life were filled with constant fighting between her parents. Exposure to her parents' aggression and trauma would profoundly interfere with her ability to regulate her emotions later in life. (PFR 8 Ex. 4 ¶¶ 108, 542.) At times, Skip and Donna's fights would get physical because Donna would demand to know where Skip was going. At other times, things would be calmer because Skip was away from home driving his truck. (PFR 8 Ex. 27 ¶¶ 150-51, 155.) However, any calmness was usually short-lived because Skip took his drinking and partying behavior on the road. In the spring of 1971, when Wendi was about 10 months old, Skip was arrested in Bedford, Ohio, for burglarizing a home while the occupants were asleep. When the homeowner awoke and chased Skip out of the home with a baseball bat, Skip—drunk and under the influence of drugs—flagged down a police car. The local newspaper reported that Skip told the police that he "does screwy things" when he drinks. The police agreed with Skip's statement because they observed Skip trying to eat

5

dollar bills in the back of the patrol car.

The dysfunction Wendi was exposed to was not isolated to just her parents, but was pervasive throughout her extended family. In the early 1970s, rumors started circulating within the Robertson family that Skip's dad, Boyd Gravely "B.G." Robertson, was touching the granddaughters inappropriately. Skip and his brothers all denied that their father was capable of molesting the granddaughters, whose ages ranged from one to fourteen. Donna did not want to believe it because Wendi had been around her grandfather numerous times, but it was difficult to deny. Donna, like several of the Robertson brothers' wives, strongly suspected that the Robertson men sexually abused the girls but felt helpless to do anything about it. (PFR 8 Ex. 56 at ¶ 2; PFR 8 Ex. 27 ¶ 167.) Later, Skip would learn that the rumors about his father molesting his granddaughters were true. (PFR 8 Ex. 32 ¶ 57.) Twenty years later, Skip and one of his brothers would both go to prison for child molestation themselves. (PFR 8 Ex. 32 ¶ 67; PFR 8 Ex. 24 ¶ 165.)

Despite their many problems, Donna looked the other way and pretended she and Skip did not have problems for six years. (PFR 8 Ex. 27 ¶ 121.) Eventually, Donna decided to divorce Skip. Skip and Donna finalized their divorce in late May 1974.

### C.   Wendi is Indoctrinated into a Strict Religion at an Impressionable Age.

In December 1974, Donna met Alejo Ochoa while working at the Pinal Alcohol and Drug Abuse Center. Donna and Alejo began a sexual relationship and moved in together almost immediately. They began attending a Christian group at a local bookstore. Six months after meeting, Alejo and Donna married because two men who were part of their Christian group, Rick Miller and Al Farmer, suggested they get married because they were living in sin. (Tr. Oct. 4, 2004 p.m. at 8-9, 13; PFR 8 Ex. 27 ¶ 184.)

After Donna and Alejo married, they became strict Christians, often hosting

6

religious meetings in their home. These meetings were encouraged by Miller and Farmer, who at this time had started their own church in Walnut Creek, California. As the result of this switch, Alejo and Donna's belief system changed. They no longer believed in seeking medical treatment because they believed God would heal them when they were sick. Normal household items such as thermometers or aspirin were considered "devil stuff." When Wendi was five years old, she had a fever so severe that all she did was cry. She was unable to get out of bed, but Donna and Alejo refused to take Wendi to the doctor because it was against their beliefs. Instead, they treated Wendi with prayer and cold washcloths. After several hours, when Wendi's fever spiked, Donna had a moment of clarity and became fearful that Wendi would suffer brain damage. Donna decided she would take Wendi to the doctor, but five-year-old Wendi refused to go because she believed Jesus was going to heal her. Donna had mixed feelings about what to do, and Alejo was noncommittal. Ultimately, the decision not to seek medical care was left in five-year-old Wendi's hands. (PFR 8 Ex. 27 ¶¶ 185-90.)

By 1976, Donna and Alejo were fully committed to their faith and religious practices. They were true believers. They spoke in tongues and received word from God through prayer. Once, they received word from God that they should leave their home and give away their belongings to go into ministry and bring people to God. This revelation came to them while one member of the prayer group spoke in tongues and another member received the translation in English. (PFR 8 Ex. 27 ¶¶ 191, 193; PFR 8 Ex. 24 ¶ 38.) Donna and Alejo were very eager to do what they believed God wanted them to do, so they gave up their home and possessions and took 7-year-old Wendi out of school to go on the road with Miller and Farmer, whose church became known as the Fishers of Men Traveling Ministry. The Fishers of Men traveled to different churches to preach the gospel in a converted school bus and a makeshift fifth-wheeler. It was a patriarchal

group, where the women were subservient. The members referred to one another as brothers and sisters. Alejo, Donna, and Wendi, as well other members of the ministry group, were required to adhere to strict rules set forth by Miller. (PFR 8 Ex. 27 ¶¶ 203-04, 207; Tr. Oct. 4, 2004 p.m. at 14; Tr. Oct. 5, 2004 at 157; Tr. Feb. 4, 2014 at 136.)

Members of the Fishers of Men were required to get up early every day, and only the men worked outside of the makeshift home. All of the money earned would go to Miller, who controlled all of the spending. Members were not allowed to have contact with their family or friends outside the church or to buy things. The women tended to household chores and were not allowed to minister to the people. Donna was even unable to go to a laundromat without Miller or Alejo accompanying her. Wendi was not allowed to play with other children or get new shoes when she grew out of hers because Miller controlled the money for the group. (PFR 8 Ex. 27 ¶ 204; Tr. Oct. 4, 2004 p.m. at 16; Tr. Oct. 5, 2004 at 157.) Miller and Farmer often brought home food from dumpsters. If Wendi misbehaved, she was spanked by Alejo and Donna. If Wendi's parents were not around when Wendi misbehaved, any elder male would discipline Wendi. (Tr. Feb. 4, 2014 at 134, 136.)

For over two years, Wendi was completely immersed in this religious experience created by Miller and Farmer. She lived in a converted bus, was isolated, and was homeschooled by the subservient women in the group. (Tr. Oct. 4, 2004 p.m. at 14; Tr. Oct. 5, 2004 at 157; Tr. Feb. 4, 2014 at 133.) Wendi panhandled because they lived in extreme poverty, and she had daily chores and construction projects. (Tr. Feb. 3, 2014 a.m. at 76.) During this time, Wendi was noticeably withdrawn and acted like an adult, which Donna assumed was because she was around adults all day and not allowed to play with other children. (Tr. Feb. 4, 2014 at 137-38.) Wendi was conditioned to believe that if she was a good person and she gave all her worries to God, he will provide for her. However,

young Wendi constantly went hungry and worried about having a roof over her head. Consequently, when God did not provide for Wendi, she believed she must be a bad person because she had to go without basic necessities. (PFR 8 Ex. 168 Tab 3 at 96.)

Wendi's religious indoctrination was accomplished through a combination of neglect, fear, and abuse. Wendi was taught that she was born sinful and therefore needed saving. When Miller gave Wendi special attention by teaching her how to play his guitar, he used his lessons as a guise to touch her inappropriately and sexually abuse her. One of Wendi's earliest childhood memories is of Miller, the religious leader, exposing his genitals to her. (PFR 8 Ex. 168 Tab 3 at 172-73; Tr. Oct. 12, 2004 at 39.)

Donna had doubts early on about their involvement with this cult-like environment because Wendi went barefoot for the first year they were with the group, even though Miller had money to make a fifth wheel for their travels. However, Alejo said they could not leave the group until God told them they could leave. Wendi would endure extreme neglect, fear, and abuse for over two years until Donna and Alejo said God had told them they could leave. Once Alejo and Donna said they heard this from God, without any objection they simply told Miller it was time for them to head back to Arizona. (Tr. Feb. 4, 2014 at 136.)

When Alejo, Donna, and Wendi left Fishers of Men, they eventually relocated to Casa Grande, Arizona. They immediately joined a church, 91st Psalms Church. After leaving Miller's control, Donna did not feel the 91st Psalms Church was a strict religious atmosphere, but because the theology was the same the family embraced it. The congregation at 91st Psalms had the same religious convictions as the Fishers of Men and they, too, spoke in tongues. The gender roles were also the same—men were the head of the households and women were the helpmates. (Tr. Feb. 4, 2014 at 138-40.) Wendi's parents may have left Fishers of Men behind, but they did not leave their religious practices.

Donna and Alejo's strict religious beliefs controlled every aspect of Wendi's life as a child. Alejo's close childhood friend, Calvin "Cal" Lorts, owned the 91st Psalms Church and the affiliated Christian school in which Wendi was enrolled when she was nine years old. Cal was the pastor at the church and the principal at the school. The 91st Psalms School was a self-taught classroom, meaning the students worked out of Accelerated Christian Education ("A.C.E") packets called Pace.[3] The curriculum was biblically based and had only 10 to 12 students at the time of its conception. It grew to 50 students during Wendi's time there. The students were in a one-room learning center, which had study corrals. There were adults in the room, monitoring the students as they taught themselves. (Tr. Feb. 4, 2014 at 42-43; PFR 8 Ex. 27 ¶ 227.) If a child became unruly, or was unable to memorize scriptures, he or she would lose privileges and/or get the "rod." (Tr. Feb. 4, 2014 at 44; PFR 8 Ex. 23 ¶ 28.)

Alejo and Donna sought work at the 91st Psalms Church after Wendi began attending the church's school. (Tr. Feb. 4, 2014 at 138; Tr. Feb. 4, 2014 at 42, 141-42.) Alejo secured a job as a youth pastor teaching devotions at the church, and Donna worked at the school. (Tr. Feb. 4, 2014 at 44, 142.) Alejo abused his position as a youth pastor by using scriptures to teach the boys about sex. For example, verses in the The Bible's Song of Solomon discuss kissing and touching. Alejo would use this as an opportunity to verbally teach the boys how to touch breasts or kiss with their tongue. He would do this in front of the female students as well. (Tr. Feb. 4, 2014 at 45.) To Alejo, he was doing exactly what he was hired to do as a youth pastor—interpreting the scripture in a way that it could be

---

[3] According to their website, "Accelerated Christian Education Students are taught to see life from God's point of view, to take responsibility for their own learning, and to walk in Godly wisdom and character. Accelerated Christian Education is not just a publisher but a comprehensive Bible-based program that serves both the campus-based school and the homeschool." Accelerated Christian Education, *A.C.E. Curriculum Program: A.C.E. Distinctives*, *available at* https://www.aceministries.com/curriculum/?content=main&distinctive= biblical #Distinctive_1 (last visited Mar. 5, 2017).

applied in everyday life. (PFR 8 Ex. 24 ¶ 75.)

Once again, Wendi was immersed in an extremely religious environment. Wendi attended church on Sunday and was at the church's school Monday through Friday. Both parents worked at the church and school. Therefore, Wendi had no idea what life was like outside of this religious community. (Tr. Feb. 4, 2014 at 41-42.) Like in the Fishers of Men, Wendi and the other students were secluded from the outside world. (PFR 8 Ex. 24 ¶ 79.) The school taught academics and religion, but they did a poor job at socializing their students. (Tr. Oct. 21, 2004 at 58.)

In the mid-1980s, 91st Psalms Church changed hands when Pastor Tom King took over. (Tr. Oct. 4, 2004 p.m. at 24; Tr. Feb. 4, 2014 at 46.) Even the name changed, becoming the Harvest Family Church and Harvest Christian Academy. Pastor Tom was very strict and damning from the pulpit. (Tr. Feb. 4, 2014 at 46.) He put the weight of God behind everything he said, even when it was clear that it was his own opinion. (PFR 8 Ex. 34 ¶ 13.) Pastor Tom's control was far-reaching, extending to decisions parents made in their own homes. (PFR 8 Ex. 24 ¶¶ 83-84.) Pastor Tom encouraged parishioners to paddle or beat their children with the "Rod of Correction," which was a paddle with scriptures written on it. Alejo subscribed to Pastor's Tom's advice. (Tr. Feb. 5, 2014 at 13-14; PFR 8 Ex. 24 at ¶ 126.) Furthermore, Pastor Tom was adamant about male authority over women and that children should not watch television or movies or dance. The preteens and teens had to have at least 12 inches between them at all times to discourage hand holding or kissing. (PFR 8 Ex. 24 at ¶¶ 81-82.)

At home, Donna's lessons for Wendi on how to be subservient continued. Wendi learned what her role was in the home and how to care for a man. These lessons focused on how to tend to an angry man because throughout Wendi's childhood she bore witness to and dealt with Alejo's temper. Alejo was a volatile man. He would come home from his job at the church angry and take his anger

out on Donna and Wendi. (Tr. Feb. 4, 2014 at 150.) Alejo would scream so loudly that it could be heard down the street. He would ridicule them for not having dinner cooked before he got home, so Wendi learned at a young age to make sure she had dinner ready in time. (Tr. Oct. 25, 2004 at 36.) When Alejo would come home screaming, Donna and Wendi would often hide in the bathroom or bedroom because Alejo would calm down or would eventually leave if they were out of his sight. Other times, Donna taught Wendi how to soothe Alejo when he was mad by playing with his hair and talking softly to him. (Tr. Oct. 25, 2004 at 37-38.) Alejo demanded attention from both Wendi and Donna. Often they would have to "minister" to Alejo, which meant they spent time with him rubbing his shoulders, legs, back, and head. Eventually, Donna no longer wanted to "minister" to Alejo because she was tired from work; therefore, the task fell on Wendi's shoulders. At times, Wendi would have to rub Alejo's body for hours. When she was a teen he began resting his head on her lap as she rubbed him, both dressed in skimpy clothing. If she got tired, he would say, "touch me," or question whether she loved him. (Tr. Feb. 4, 2014 at 153, 155.)

When Wendi was thirteen years old, she expressed a desire to go to another school. When her parents would not allow it, she rebelled by doing little things like failing to meet her study goals, talking to boys, or begging her parents to put her in public school. According to her mother, Wendi did everything possible to get expelled from the school, but her parents got through this rebellion by spanking her several times a week as Pastor Tom had suggested in his sermons. In addition, her parents humiliated her by making her pull weeds at the Harvest Christian Academy, for all of the other students to see, instead of attending classes during the day. After this brief period of rebellion, Wendi no longer disobeyed— instead, she became completely obedient. In fact, Wendi became a model student at the Harvest Christian Academy. (PFR 8 Ex. 27 ¶¶ 323-28.)

Wendi graduated from the Harvest Christian Academy when she was 18

years old. At age 18, Wendi was allowed to finally date. Naturally, she dated the pastor's son, Shawn King, but the relationship ended abruptly. (Tr. Oct. 4, 2004 p.m. at 40-41; Tr. Oct. 6, 2004 at 24.) By this time, Wendi had learned to take care of others' needs before her own. She had also learned from her mother how to pretend things were fine even when they were not. (PFR 8 Ex. 12 ¶ 24; PFR 8 Ex. 4 ¶ 458.) Since Wendi's time with the Fishers of Men, she had experienced depression, struggled with memory problems, and sometimes slept for long periods of time. Significant negative events would occur, but family members noticed that Wendi would have no recollection of them. (Tr. Feb. 4, 2014 at 160-62; PFR 8; Ex. 27 at ¶¶ 329-33.)

This disconnect occurred because, rather than acknowledging those painful memories and coping with them, Wendi suffered from emotional dysregulation, attempting to hide the emotions these events caused from herself and others, or would "dissociate" and become disconnected from her own emotions. (PFR 8 Ex. 4 ¶¶ 247-48.) In contrast, when Wendi was a student at the church school, others saw her as a rising star and an excellent student. Wendi was thought to be compassionate and caring of others. Wendi's immersion into the cult-like environment had been successful because she fully submitted to authority and took care of others instead of herself. (PFR 8 Ex. 4 ¶ 395.) As a result, Wendi exhibited a lack of self-identity, meaning she acquiesced to the needs of others to such an extent that she reformed herself in the image others wanted for her, rather than maintaining a consistent identity for herself. (PFR 8 Ex. 2 at 17.) In fact, Wendi was unable to think or feel for herself because she was taught to give everything to God. Her church and school stressed obedience as of the highest value, while expressing her own thoughts or feelings was not.

Although at this time Wendi was a young adult and had more freedom, she continued to keep close ties with home and the church. After all, the church was Wendi's identity. After graduating, Wendi went to Mexico to volunteer with a

church group for over six months before returning and working at the school she graduated from. (Tr. Oct. 6, 2004 at 25-26.) This was the first time Wendi had some sense of independence, even though her missionary work in Mexico was connected to her church. (Tr. Oct. 25, 2004 at 60.) Even in Mexico, Wendi exhibited signs of depression when she spent several weeks in bed for no apparent reason. (PFR 8 Ex. 2 at 14.) Eventually, when Wendi returned to her hometown, she took some community college classes, got her own apartment, and got a new job as an assistant manager at an apartment complex. (Tr. Oct. 6, 2004 at 25.) Wendi's parents visited her frequently at her new apartment. (Tr. Oct. 25, 2004 at 69.) In addition, Wendi began hanging out with her cousin, Barbara Mitchell, who had attended Casa Grande High School. To Wendi, Barbara knew everyone because she went to a public school. (Tr. Oct. 25, 2004 at 69-70.)

### D.    Wendi Meets and Marries Joe Andriano

On St. Patrick's Day in 1992, 21-year-old Wendi met Joseph "Joe" Duane Andriano at a bar. (Tr. Oct. 4, 2004 p.m. at 41.) Like her mother had done with both Skip and Alejo, Wendi's relationship with Joe moved quickly despite obvious early signs of problems. Within weeks of Wendi meeting Joe, Joe moved in with Wendi. (PFR 8 Ex. 2 ¶¶ 30-35.) Family members witnessed Joe being physically abusive towards Wendi and asked her to slow down, but she decided to marry Joe anyway in January 1994. (Tr. Oct. 6, 2004 at 28-29.) Despite the verbal and physical abuse Joe inflicted on Wendi prior to their marriage, Wendi's only reservation about marrying Joe had to do with the fact that he was not a Christian man. Wendi felt shame because she was unable to be married by the pastor of her church, Pastor Tom King. At the time, Wendi was not concerned about the abuse because in her eyes Joe was not any different than her father. (Tr. Oct. 25, 2004 at 132.)

Wendi tended to her new husband as she was taught by her church and by her mother. Wendi was subservient. Their marriage was biblically focused in

1   many ways; for example, Joe controlled the money even though he worked
2   inconsistently.[4] (Tr. Oct. 6, 2004 at 39.) Wendi worked and brought her money
3   home to Joe because in her eyes, he was the head of the household. In addition to
4   working full time and overtime hours, Wendi cooked all the meals and cleaned
5   their home. She clipped Joe's fingernails and toenails and massaged his feet.
6   Every day Wendi submitted to sexual intercourse with Joe and washed, ironed,
7   and laid out all of Joe's clothes. (Tr. Sept. 7, 2004 at 112.)

8        Joe also isolated Wendi from her friends and family. For one reason or
9   another, Joe would say he did not like someone and Wendi would eventually stop
10  spending as much time with them. Eventually, Wendi only socialized with Joe's
11  friends, who liked to party at the lake on their boats. (Tr. Oct. 25, 2004 at 133-34;
12  Tr. Oct. 6, 2004 at 40-43.)

13       Shortly after Joe and Wendi married, Joe began having pain in his jaw and
14  felt a lump on his neck. The doctor he saw said it was some sort of growth and
15  removed it in 1994. The doctors were sure that it would not grow back, but it did
16  just a year later in 1995, and then again in 1997. (PFR 8 Ex. 168 Tab 4 at 39.)

17       Throughout their marriage, Joe and Wendi struggled financially. (PFR 8
18  Ex. 2 at 40-47.) The money they did receive or earn they tended to spend
19  unwisely, from buying a failed auto-glass repair business to purchasing a
20  timeshare they could not afford and purchasing fuel and upgraded parts for Joe's
21  racing boat hobby. (PFR 8 Ex. 2 ¶¶ 42-45; Tr. Oct. 26, 2004 at 41-42.) The
22  financial struggle became even more pronounced when Joe had his surgeries.
23  When he did work, he typically worked for himself, but he could not do so after
24  the surgeries, which incapacitated him for periods of time. (PFR 8 Ex. 168 Tab 4
25  at 39.)

26

27  _____
    [4] According to Social Security Administration Statement of Earnings Records for
28  Joe and Wendi, Wendi earned 100% of their family income in 1994, 1995, and
    1996. (PFR 8 Ex. 69.)

1        The financial stress became overwhelming for Wendi in 1996, and she was
2    caught stealing from an employer and was referred to psychological counseling.
3    Wendi had been employed at the Casa Grande Medical Center for three years
4    when she stole $2,000 dollars to pay off "personal debt." Wendi cried as she told
5    the counselor that she was extremely stressed at work with all of the deadlines,
6    was very depressed, and was angry at her husband even though she had not shared
7    that with him. Wendi reported problems with sleep, crying, and concentration.
8    The counselor recommended a mild anti-depressant medication, which Wendi
9    suffered side effects from and discontinued. The counselor attempted to work with
10   Wendi on ways to communicate better with her husband. (PFR 8 Ex. 46 at
11   PCR000116-000120.) However, the counselor was unaware that she was up
12   against years of Wendi's indoctrination about strict obedience in a patriarchal
13   society. Wendi would always have a hard time asserting herself because to do so
14   was a sin. Wendi was taught to obey God over law. In Wendi's mind, stealing
15   money from work was fraudulent, but was not as bad as disobeying your husband.
16   Wendi believed she was obeying God by making her husband happy and fixing
17   things.

18       Ultimately, Wendi was dismissed from her job. Joe's main worry was
19   whether they would lose access to their credit cards if Wendi attempted to contact
20   the credit card companies to resolve some of their debt through debt counseling.
21   Joe would not allow it. Despite trying a different anti-depressant medication,
22   Wendi reported to the counselor that she was still having problems with her
23   sleep.[5] (PFR 8 Ex. 46 at PCR000121.)

24       After Wendi was fired, Joe and Wendi acquired a partnership in a glass-

25

26   [5] It was not until Wendi's post-conviction proceedings that she was finally
27   diagnosed with bipolar disorder. This diagnosis explained some of the problems
     Wendi had while on anti-depressant medications, such as increased anxiety.
28   Anti-depressant medication can induce manic episodes in those with bipolar
     disorder if they are in a depressive state. (PFR 8 Ex. 2 at 3, 14.)

16

repair business, and Wendi became pregnant with their first child, Nicholas. Prior to Nicholas's birth in June 1997, Wendi and Joe were forced out of the glass business due to embezzlement and Joe's threats to kill his partner, Jerry Robles, who owned the majority of the business. (Tr. Oct. 26, 2004 at 4-8; Tr. Oct. 4, 2004 p.m. at 85.) Wendi's pregnancy was overshadowed by their financial problems because they had no income at all. Wendi's parents were frequently helping the couple financially by paying for Joe's medical bills and by buying clothes, diapers, and furniture for the baby. (Tr. Oct. 4, 2004 p.m. at 84-85; PFR 8 Ex. 2 at 43.)

Due to their financial problems, Joe and Wendi were forced to move back to a makeshift residence that they referred to as the "shop" on Joe's parents' farm. (Tr. Oct. 25, 2004 at 79; PFR 8 Ex. 2 at 47.) While they were living at the shop, Joe became violent with Wendi when she refused to have sex with him just three weeks after Nicholas was born. Joe became enraged when Wendi's dog growled at him because he raised his voice at Wendi, and he pinned the dog on the floor and grabbed the dog's snout. Joe told Wendi he was going to kill her dog if she did not do what he wanted. Wendi began to cry, which made three-week-old Nicholas cry as well. Wendi quickly breastfed Nicholas to get him back to sleep before going to the bedroom to give Joe what he wanted. It was painful for Wendi to have intercourse with Joe and she bled. Wendi did not know whether Joe ripped her episiotomy stitches because she was too embarrassed to go back to the doctor for the required follow-up. (Tr. Oct. 26, 2004 at 14-16.)

Frequently, Wendi regressed back to her childhood when Joe would become violent. When Joe began screaming at her, Wendi would run and hide in another room like she and Donna did when Alejo would act that way. However, there was no placating Joe like there was Alejo; Joe would follow Wendi. He would scream and put holes in the door, attempting to get to her. (Tr. Oct. 26, 2004 at 11.)

17

Joe was financially demanding of Wendi as well. He depended on her to work to support his expensive boat hobby, which he enjoyed doing most weekends even when he was not bringing in any income. (PFR 8 Ex. 24 ¶¶ 139-40.) Once Wendi became a mother, she had mixed feelings about her marriage to Joe. She did not want her baby to grow up in the same stressful and violent environment she had grown up in. More importantly, she did not want her son to grow up and be violent like his father. (Tr. Oct. 26, 2004 at 17-18.) However, Wendi was raised to be a good Christian wife and make her marriage work no matter what. (Tr. Oct. 12, 2004 at 115.)

Alejo and Donna attempted to alleviate some of Wendi's stress prior to Nicholas's birth by offering to financially support the family for one year while Wendi stayed home with the baby. However, things were not getting any better for Joe and Wendi. When Nicholas was four months old, Wendi and Joe's relationship was so bad that Wendi made a plan to leave Joe. She secured funds and a place to stay out of state, but Joe was able to convince her to stay. He made promises to change, but his attempts were fleeting. (Tr. Oct. 26, 2004 at 18-23; PFR 8 Ex. 45 at PCR000010.)

Just two months after she agreed to stay with Joe, Wendi found out she was pregnant with her daughter, Ashlee. According to witnesses, Wendi expressed concerns about being pregnant again because Nicholas was so little. Wendi was not ready to have another baby. (Tr. Dec. 13, 2004 at 128.) During Wendi's second pregnancy, the lump in Joe's neck came back, and he was in pain. Joe's doctor was baffled and referred Joe to a specialist. The specialist suggested that Joe send the pathology slides from his multiple surgeries to the Walter Reed Hospital in Washington, D.C., where it was eventually determined that Joe had Adenoid Cystic Carcinoma, which is a rare type of cancer.[6] By the time Joe was

---

[6] Adenoid cystic carcinoma is an uncommon form of malignant neoplasm that arises within secretory glands, most commonly the major and minor salivary

18

correctly diagnosed, the cancer had spread all through his lungs. (Tr. Oct. 26, 2004 at 110-115; PFR 8 Ex. 168 Tab 4 at 39.)

In May 1999, in the middle of all of this turmoil, Wendi started a new job as a community director at the Courtyard Apartments. With this new job, Wendi was able to secure a two-bedroom apartment and health insurance to help with both Joe's treatment and the pending birth of their second baby. However, the health insurance did not take effect until after Wendi's 90-day review. The company hired Wendi despite running a financial background check on her that spotlighted her and Joe's multiple delinquent credit accounts and collections.

In August 1998, Wendi and Joe saw a specialist at the Mayo Clinic, where the doctor noted that he "had a long, difficult, and complex discussion with the patient, his wife, parents and sisters, . . . [and] made them aware of the fact that there is no curative therapy for the disease." The doctor recommended Joe receive his care at the Mayo Clinic even though it is "outside the umbrella of his current HMO." In other words, the care provided to Joe would not be covered by Wendi's upcoming health insurance.

Days later, on August 22, 1998, Wendi completed her 90-day review period at work, where it was noted on her evaluation that although her attendance was below standards and that the company noticed that it had been hard for her to focus, they understood why. The evaluator described Wendi as cooperative, effective and organized, enthusiastic, and optimistic. Wendi's hard work was compensated with a 73-cent an hour raise. Five days later, on August 27, 1998, Joe had his fourth and most invasive surgery.

The misdiagnosis of Joe's cancer was a devastating blow to their family. Had Joe's doctors properly diagnosed his cancer after the first surgery in 1994, the

---

glands of the head and neck. *See* Oral Cancer Foundation, *Adenoid Cystic Carcinoma*, http://oralcancerfoundation.org/facts/rare/adenoid-cystic-carcinoma/ (last visited Mar. 5, 2017).

cancer would not have spread to his lungs. The doctors at the Mayo Clinic suggested Joe and Wendi seek legal advice. (Tr. Oct. 26, 2004 at 110-15; PFR 8 Ex. 168 Tab 4 at 39.) Subsequently, Wendi's obstetrician noted that Joe's terminal diagnosis was a risk factor for Wendi to have her baby prematurely.

Less than a month after Joe's surgery, Wendi gave birth to their second child, Ashlee. As predicted by Wendi's doctor, Ashlee was born almost two weeks early, on September 16, 1998. Concerned hospital staff sent a social worker to Wendi's bedside. As she was taught growing up, Wendi denied having any problems and told the social worker that she and Joe relied on their faith to give them hope. Wendi told the social worker she had the support of friends and family in the area and disclosed that Joe was planning to start radiation therapy soon. Wendi was discharged on September 18, 1998, and doctors noted in her hospital records that she had her baby in her arms when she left.

When Wendi was discharged from the hospital, her doctor signed a slip clearing her to return to work the same day of her release. Wendi had to return to work immediately, without any time for maternity leave, because she was the only source of income and she had recently started a new job. (Tr. Oct. 12, 2009 at 109.) During the first few weeks of Ashlee's life, Ashlee went to work with her mother so Wendi could care for and nurse her. (Tr. Dec. 13, 2004 at 10-11.) Wendi was attempting to make it all work.

There was an enormous amount of stress and pressure on Wendi throughout her pregnancies and the births of her two children, which increased the likelihood that Wendi suffered from postpartum depression. Wendi had a multitude of factors that put her at risk, including a personal and family history of bipolar disorder, and childhood exposure to sexual trauma, physical abuse, emotional abuse, and neglect. Wendi did not plan the birth of their second child, nor was she emotionally ready for it, which created an additional stressor for her. The births of Wendi's children were very close together, and both occurred during periods of

extreme financial stress and worries about her husband's terminal illness. In addition, Wendi's mother suffered from postpartum depression when Wendi was born, which genetically put Wendi at a greater risk to suffer from it as well. During these periods, Wendi's only support systems were her damaged parents and her cult-like church.

After Ashlee's birth, Joe and Wendi tried a number of non-traditional treatments for Joe, including a holistic healing center and faith-based healing. (Tr. Oct. 26, 2004 at 124-29.) As part of this, Joe and Wendi began attending Wendi's childhood church, Harvest Family Church, more regularly. Wendi and her church believed in religious healing, which meant that church members would lay hands on Joe and pray for him. Wendi and Joe believed God would take care of his illness. Within a week of people laying hands on Joe, the pain in his mouth did go away. However, towards the end of 1999, Joe's pain came back. He went back to the doctor and learned that the tumor had not disappeared—in fact, it had doubled in size. Joe was angry with Wendi for causing him to believe that God would heal him. He blamed Wendi for giving him false hope, and he quit attending Harvest Family Church. (Tr. Oct. 26, 2004 at 127-29.)

During this time, Wendi and Joe's relationship changed drastically. Their usual roles within the relationship and the family structure changed. Wendi's strict religious background taught her that the man was the head of the household, yet Wendi was the only one working and taking care of the children. Wendi worked full time and paid for a babysitter for her children. Joe was often frustrated because he only had his $500 a month disability check to put towards his expensive boat hobby. Wendi's money paid for the family's monthly bills and food. Due to his illness, Wendi went from being Joe's wife to being both his caretaker and the provider. The fighting became more frequent, and Joe spent his time at the lake boating. (PFR 8 Ex. 168 Tab 4 at 44-48; Tr. Oct. 26, 2004 at 130.)

Wendi was attempting to manage everything that going on in her life, but

she was not prepared for this level of devastation and stress. Wendi was unable to fix Joe's illness and to manage everything alone. Unsurprisingly, Wendi began decompensating. Once Joe blamed Wendi for God not healing him, she began drinking alcohol to excess as a way to avoid thinking about all of the stress. (Tr. Oct. 27, 2004 at 76-77.) Wendi believed that she must be to blame for everything that was happening; if God did not heal Joe, it must be because she did not have enough faith or her prayer was not good enough. Wendi believed there must be a reason God did not heal Joe, but her only way of understanding that idea was to internalize it. Just as when she was a child, Wendi thought that if God did not provide for her, it was because she was a bad person.

By September 1999, Wendi had lost her job (and accordingly, her health insurance) at the Courtyard Apartments for failing to follow company policy and procedure in personnel time management and paperwork management as well as failure to appropriately direct her subordinates. According to her employment records, Wendi had the property cleaning woman, Ana, cleaning her personal apartment and serving as a babysitter for her children during work hours. Ana essentially worked as Wendi's personal assistant but was paid by the company. Wendi also gave furniture from the property to her parents. Wendi went from a stellar employee to an ex-employee within a matter of a year, coinciding directly with the birth of her second child and the knowledge that Joe's illness was terminal. (Tr. Oct. 5, 2004 at 59.)

Wendi scrambled to find another position so her family could have health insurance and a roof over their heads. Wendi was able to secure a manager position at the San Rivas Apartment Complex in November 1999. At this time, Wendi had one child that was two-and-a-half years old and one child that was one year old, and she knew her husband was going to die. Within six months of beginning her employment at San Rivas, Wendi befriended her subordinates at work and began going out drinking with them. Wendi was spiraling out of control

and making poor decisions because she had no sense of self and no coping skills. Wendi had never been allowed to acknowledge her feelings to herself—whether it was anger, sadness, or disappointment—let alone express them. She was taught to give her worries to God, but never to deal with them. Therefore, Wendi continued to self-medicate by drinking alcohol and trying to maneuver through her life with an underdeveloped moral compass.[7] Wendi was never taught coping skills or how to handle stress by her parents or the church. Instead, her parents taught her to give everything to God, which took any actual responsibility away from her. She was not allowed to feel good about herself because that was a sin. Her parents taught her, and she believed, that if anything good happened to Wendi, it was because of God, but if anything bad happened to Wendi, it was because she was bad. All of this pain was too much for Wendi to handle, especially when combined with the day-to-day stress of the family's financial problems and Joe's cancer.

Despite her knowledge that Joe's illness was terminal, Wendi continued to hope that Joe would respond to chemotherapy, which he started in July 2000. However, chemotherapy actually made things worse for the couple because Joe had drastic mood changes. (PFR 8 Ex. 168 Tab 4 at 128.) Wendi continued to hide the truth of their relationship; no matter how bad or ugly things were at home, Wendi only described Joe as being, at worst, a "bear to live with." As always, Wendi did not share much when it came to her feelings. Wendi's mother Donna saw Joe become extremely moody and anxious, with escalating anger. Then, despair hit and Joe would become withdrawn. (Tr. Oct. 4, 2004 p.m. at 133.)

---

[7] Children's interactions with caregivers and peers have been shown to influence their development of moral understanding and behavior. Grazyna Kochanska & Nazan Aksan, *Children's Conscience and Self-Regulation*, 74 J. of Personality 6 (Dec. 2006), *available at* http://www.psy.miami.edu/ faculty/dmessinger /c_c/rsrcs/rdgs/emot/kochanskaaksan2006.conscienceoverview.pdf (last visited Mar. 5, 2017).

Wendi grew increasingly unable to maintain the façade of normalcy. Traumatic stress, financial burdens, an underdeveloped sense of morality, and an underlying and untreated mood disorder began to undermine Wendi's identity as the pleaser and fixer she was taught to be by her family and church. (PFR 8 Ex. 2 at 48-49.) Wendi began to behave in a way that was unlike her normal, conforming self. Wendi's impaired judgment and underdeveloped morality led her to affairs outside of her marriage because she was looking for emotional comfort. Wendi became a disconnected mother unable to handle it all. Wendi's drinking and affairs were symptoms augmented by her longstanding bipolar disorder and childhood trauma that would lead her family to a tragic end. (PFR 8 Ex. 2 at 49.)

### E.    The Crime

A few weeks prior to October 7, 2000, Wendi obtained sodium azide from Voit Global using the name "Anne Newton" and an altered business license. (Tr. Oct. 27, 2004 at 91-94.) The sodium azide arrived packaged in an amber brownish glass bottle as a white, powdery substance. (Tr. Oct. 27, 2004 at 104.) Some of the sodium azide was transferred into empty gelatin capsules. (Tr. Sept. 27, 2004 at 45.)

Joe and Wendi and their two young children attended a family dinner at Joe's parents' house in Casa Grande on October 7, 2000. (Tr. Nov. 10, 2004 at 141-42.) They returned to their apartment around midnight and put their children to bed. (Tr. Oct. 28, 2004 at 25-26; Tr. Nov. 10, 2004 at 143.)

At about 2:15 a.m. on October 8th, Chris Hashisaki, Wendi's neighbor and coworker, received a distressed call from Wendi. Wendi asked Chris to come watch the Andriano children while Wendi took Joe to the emergency room. Upon her arrival, Wendi told Chris that she had not yet called 9-1-1. (Tr. Sept. 8, 2004 (testimony) at 12-13.) Upon entering the apartment, Chris found Joe lying on the living room floor in a fetal position, with vomit pooled nearby. Chris stayed with Joe while Wendi went to the back room to call 9-1-1. (Tr. Sept. 8, 2004 at 14-18.)

24

Hearing approaching sirens, Chris went outside to direct the paramedics to the apartment as Joe began to vomit again. (Tr. Sept. 8, 2004 at 24-25.) When Chris returned to the apartment with the paramedics, they knocked on the apartment door, but there was no answer. After 5 to 6 minutes, the paramedics contacted their alarm room, and someone there made contact with Wendi. Wendi then approached the paramedics from the other side of the breezeway, and had a brief discussion with them. The paramedics did not go inside, and they left soon after. (Tr. Sept. 14, 2004 at 162-65.)

Wendi called 9-1-1 again at 3:39 a.m. The same paramedics responded and found Joe dead on the living room floor. (Tr. Sept. 14, 2004 at 175-76.) The living room was in disarray, and a broken bar stool, pieces of a lamp, a kitchen knife, and other objects were scattered across the room. (Tr. Sept. 13, 2004 at 107.)

The medical examiner determined that Joe suffered blows to the head—possibly with the bar stool—and a laceration to his carotid artery from a knife, which ultimately caused his death. (Tr. Sept. 16, 2004 at 74, 76.) Wendi suffered injuries to her neck and hands, with Joe's hands still holding hair that had been ripped from Wendi's head. (Tr. Sept. 16, 2004 at 57-58.) Trace amounts of sodium azide were found in Joe's blood and gastric contents, as well as in food recovered from the Andrianos' kitchen. (Tr. Sept. 27, 2004 at 34-35, 40-43.)

**Procedural History**

On October 19, 2004, Andriano was indicted on one count of first-degree murder. (ROA 3.) The State did not allege any aggravating circumstances in the indictment. (*Id.*) On December 21, 2000, the State provided notice that it intended to seek the death penalty. (ROA 23.)

After brief representation by other attorneys, Andriano's mother and step-father retained David DeLozier to represent Andriano. (PCR Pet. Ex. 6 ¶ 4; PCR Pet. Ex. 7 ¶ 3; PCR Pet. Ex. 61; PCR Pet. Ex. 62.) He had started working on criminal cases in the mid-1990s but had no first-chair experience in a murder case

and no capital case experience. (PCR Pet. Ex. 7 ¶ 2.) Simultaneously to his representation of Andriano, DeLozier represented the Ochoas in guardianship and adoption proceedings regarding Andriano's children. (PCR Pet. Ex. 77.) During the course of this representation, he was sanctioned by the court overseeing the custody matter for "intentionally and surreptitiously" avoiding the court's orders "with the intentions of permanently severing the paternal interest of the children" and intentionally disregarding the court's orders. (Minute Entry Ruling, *In the Matter of Andriano Minor Children*, No. AD200100058 (Pinal Co. Super. Ct. Oct. 16, 2002).)

DeLozier recognized that the Ochoas did not have sufficient funds to cover the expense of Andriano's representation, so in mid-2001 the Maricopa County Public Defender's Office was assigned to Andriano's case. (PCR Pet. Ex. ¶ 7.) Dan Patterson from the Public Defender's Office thereafter served as lead counsel with DeLozier serving as co-counsel pursuant to *Knapp v. Hardy*, 523 P.2d 1308 (Ariz. 1974). (PCR Pet. Ex. 6 ¶¶ 2, 4.) Patterson had recently joined the Public Defender's Office and was assigned to eight capital cases soon after he started his employment. (*Id.* ¶ 2.)

The defense moved to dismiss the State's notice of intent to seek the death penalty, arguing that in light of the United States Supreme Court's decision in *Ring v. Arizona*, 536 U.S. 584 (2002), the highest punishment Andriano could face was life in prison. (ROA 70.) On August 13, 2002, the State filed a notice of two aggravating circumstances: 1) that Andriano committed the offense in expectation of the receipt of anything of pecuniary value and 2) that the murder was committed in an especially heinous, cruel, or depraved manner. (ROA 82.) The defense then moved to remand the case to the grand jury for a finding of probable cause on the aggravating circumstances. (ROA 83.) The defense also renewed its motion to strike the aggravating circumstances, arguing that because Arizona did not have a constitutional death penalty statute in effect at the time of

the murder, application of the later enacted death penalty statute would violate the Constitution's prohibition on ex post facto laws. (ROA 86.) The court denied the defense's motions. (ROA 135.)

In March 2003, the defense again moved to dismiss both of the aggravating circumstances. (ROA 96; *see* Tr. Nov. 30, 2004 at 78.) The parties then agreed that any argument on these motions would be heard at the end of the aggravation phase of the trial. (ROA 133 at 2.) The defense also filed two motions in limine, seeking to preclude, among other things, evidence of Andriano's extramarital relationships and efforts to procure life insurance for Joe. (Tr. Sept. 7, 2004 at 9-10; ROA 100; ROA 125.) The trial court denied the defense's motions as to these categories of evidence. (Tr. Sept. 7, 2004 at 13; ROA 193 at 2.)

Jury selection began on August 23, 2004 and lasted for six days. (*See* Tr. Aug. 23, 2004 at 3; Tr. Sept. 1, 2004.) The guilt phase of the trial then commenced on September 7, 2004. (Tr. Sept. 7, 2004.) The State's case-in-chief extended for thirteen days. (*See* Tr. Sept. 29, 2004 at 101.) The prosecutor, Juan Martinez, focused on Andriano's infidelity, calling seven witnesses to testify on the subject. (Tr. Sept. 8, 2004 at 47-54, 59, 68-73; Tr. Sept. 9, 2004 at 5-7, 13-16, 46-48, 58-59, 70-71, 94; Tr. Sept. 13, 2004 at 15-72; Tr. Sept. 15, 2004 at 33-42, 81-82, 91, 98-99, 102-03; Tr. Sept. 16, 2004 at 89-111, 120, 126-31, 133, 151; Tr. Sep. 20, 2004 at 54.) In addition to calling Andriano and members of her family, the defense relied on two expert witnesses: William "Joe" Collier, who testified about the properties and effects of sodium azide (Tr. Oct. 20, 2004; Tr. Oct. 21, 2004), and Dr. Sharon Murphy, who testified that Andriano was the victim of domestic violence (Tr. Oct. 7, 2004; Tr. Oct. 12, 2004; Tr. Oct. 13, 2004; Tr. Oct. 14, 2004). To rebut the defense's argument that Andriano was the victim of domestic violence, the prosecutor called Michael Bayless. Defense counsel objected that Bayless was not qualified to make a determination on Andriano's status as a domestic-violence victim and sought to have his testimony excluded.

1   (Tr. Nov. 10, 2004 at 32-40.) When this was not successful, the defense called
2   Mindy Mechanic to testify about the deficiencies in Bayless's approach and
3   opinions. (Tr. Nov. 10, 2004 at 6; Tr. Nov. 15, 2004.) The jury found Andriano
4   guilty of first-degree murder on November 18, 2004. (Tr. Nov. 18, 2004; ROA
5   368.)

6         The aggravation phase commenced on November 30, 2004. The State
7   alleged that the murder had been committed in the expectation of the receipt of
8   anything of pecuniary value and was committed in an especially heinous, cruel, or
9   depraved manner. (Tr. Nov. 30, 2004 at 8.) At the completion of the State's
10   evidence, defense counsel moved to dismiss both aggravating circumstances. (*Id.*
11   at 77.) The court denied the motion. (*Id.* at 98-99.) After deliberations, the jury
12   found only that the murder was committed in an especially cruel manner. (Tr.
13   Dec. 6, 2004 at 3-4; ROA 393.)

14         DeLozier was tasked with the mitigation presentation. During the course of
15   the guilt phase, DeLozier had fasted and went without solid food for 70 days.
16   (PCR Pet. Ex. 7 ¶ 9.) Moreover, an attorney who worked in DeLozier's law firm
17   and had assisted in Andriano's case was murdered in a road-rage incident during
18   Andriano's trial, and DeLozier never fully regained his ability to focus. (*Id.* ¶ 10.)
19   During cross-examination of a defense expert witness that DeLozier was
20   questioning, DeLozier had to stop the trial because he felt ill and could not
21   focus. (*Id.* ¶ 11.) In addition, DeLozier's father fell ill during trial after suffering a
22   massive heart attack and was "expected to die at any minute," necessitating
23   another break in the trial. (Tr. Nov. 22, 2004 at 3-4.) When the time came for
24   DeLozier to prepare for the penalty phase of the trial, he sought the help of
25   Andriano's mother with the writing of his opening statement. She ultimately
26   found the task too difficult and contacted a friend who had grant writing
27   experience, asking her to assist DeLozier with his remarks. (PCR Tr. Feb. 4, 2014
28   at 192.) The only expert testimony presented at the penalty phase was that of

1    Dr. Murphy. (Tr. Dec. 9, 2004 at 47-83.)

2        The case was submitted to the jury on December 16, 2004. (Tr. Dec. 16,
3    2004 at 54.) After less than six hours of deliberation over two days, the jury sent
4    the court a note that read, "If we are unable to reach an unanimous verdict, what is
5    the procedure that will be followed?" (ROA 420; ROA 421; ROA 423 at 1; ROA
6    424.) The court, over defense counsel's objection, told the jury to continue
7    deliberating. (Tr. Dec. 20, 2004 at 5; ROA 423 at 2.) The jury deliberated for
8    approximately six hours more before returning a verdict imposing the death
9    penalty. (ROA 420; ROA 425; ROA 426; ROA 427.)

10        Following trial, defense counsel moved for a new penalty phase based on
11   the court's supplemental instruction in response to the jury's question concerning
12   procedures in the event of a non-unanimous verdict. (ROA 444.) Counsel
13   presented the court with a newspaper article for which six jurors and two alternate
14   jurors had been interviewed. (ROA 444A.) The article included that the fact that
15   "the jury was on the verge of a deadlock, with one holdout, a senior from Gilbert,
16   saying he was adamantly against the death penalty." (*Id.* at 4.) Counsel argued
17   that the court's response to the jury's question coerced the holdout juror into
18   agreeing to a death sentence and caused the jury to consider inappropriate bases
19   for the verdict, including the fact that Andriano would get an automatic appeal if
20   sentenced to death and that the jurors did not want the judge to be able to sentence
21   Andriano to life with parole. (Tr. Feb. 4, 2005 at 6-8.) The court denied the
22   motion. (ROA 448.)

23        Andriano appealed her conviction and sentence. (DA 1.) The Maricopa
24   County Public Defender's Office was also appointed to represent Andriano on
25   appeal, and Brent Graham was assigned as lead counsel, with Peg Green as co-
26   counsel. (DA 49.) Oral argument on Andriano's appeal was held before the
27   Arizona Supreme Court on April 24, 2007. (DA 72.) The Arizona Supreme Court
28   affirmed Andriano's conviction and sentence on July 9, 2007. *State v. Andriano*,

161 P.3d 540 (Ariz. 2007). Appellate counsel filed a motion for reconsideration (DA 75), which was denied on July 16, 2007 (DA 76). The United States Supreme Court denied Andriano's petition for certiorari on October 1, 2007. *Andriano v. Arizona*, 128 S. Ct. 297 (2007). On October 25, 2007, the Arizona Supreme Court issued its mandate in Andriano's direct appeal and directed the Clerk of the Court to file a Notice of Post-Conviction Relief on Andriano's behalf while the court attempted to locate qualified counsel to represent Andriano in state post-conviction proceedings. (DA 79.)

After a nearly two-year wait, Andriano finally returned to Maricopa County Superior Court for her post-conviction relief ("PCR") proceedings. On August 17, 2009, attorneys from the law firms Lewis and Roca and Foley & Lardner LLP entered appearances on behalf of Andriano; their representation of Andriano was pro bono. (PCR Notice of Appearance Aug. 17, 2009.) On February 17, 2012, Andriano's petition for post-conviction relief was filed. (PCR Pet. Feb. 17, 2012.) The court ordered an evidentiary hearing on Andriano's claims that she received ineffective assistance of counsel during the penalty phase of her trial and that DeLozier had an actual conflict of interest during his representation of her; the court denied Andriano's remaining claims. (PCR Minute Entry Oct. 31, 2012.) An eight-day evidentiary hearing commenced on February 3, 2014. (*See* Tr. Feb. 3, 2014; Tr. Feb. 14, 2014.) The court subsequently denied the claims that were the subject of the hearing. (PCR Min. Entry Nov. 3, 2014.) Andriano then filed a petition for review of the superior court's denial of the petition for post-conviction relief in the Arizona Supreme Court on April 3, 2015. (PFR 1.) On April 11, 2016, the Arizona Supreme Court issued a one-word denial of Andriano's petition for review. (PFR 39.)

Andriano filed a motion for appointment of federal habeas counsel on April 21, 2016. (Dist. Ct. Doc. No. 3.) On May 3, 2016, this Court appointed undersigned counsel to represent Andriano in her federal habeas proceedings.

(Dist. Ct. Doc. No. 5.) This petition is timely filed in accordance with this Court's order of January 25, 2017. (Dist. Ct. Doc. No. 16.)

## II.    STATE COURT PRESUMPTION OF CORRECTNESS

Andriano hereby provides notice of her intention to challenge the presumption of correctness of specific findings of fact made by the state court in her case. Certain factual findings of the state court in Andriano's case, if any are found to exist, are not entitled to the presumption of correctness under 28 U.S.C. § 2254(e)(1). These include, but are not limited to, factual findings made by the trial court in Andriano's trial and sentencing and the opinion by the Arizona Supreme Court on direct appeal. Pursuant to 28 U.S.C. § 2254(e)(1), Andriano asserts that certain findings of fact by the state court at trial, resentencing, or on direct appeal, if any are found to exist, are not fairly supported by the record. Andriano also intends to assert other exceptions to the presumption of correctness, including, but not limited to: that the procedures employed by the state courts in making findings of facts were not adequate to afford her a full and fair hearing of her claims; that material facts were not adequately developed in state court proceedings; that Andriano did not receive a full, fair and adequate hearing of her claims in the state court proceedings; and that Andriano was otherwise denied due process of law in the state court proceedings.

In addition, Andriano asserts that certain findings of fact by the state court in regard to her state post-conviction proceedings, if any are found to exist, are not entitled to the presumption of correctness under 28 U.S.C. § 2254(e)(1). These include, but are not limited to: any and all factual findings made by the trial court in regard to Andriano's state post-conviction proceeding, as well as the decision of the Arizona Supreme Court on petition for review. Pursuant to 28 U.S.C. § 2254(e)(1), Andriano intends to assert that certain findings of fact by the state court, concerning her state post-conviction proceedings, if any are found to exist, are not fairly supported by the record.

1    ## III.   EXHAUSTION

2         Most of the federal constitutional claims alleged herein have been

3    exhausted in proceedings before the Arizona courts. Some claims, however, were

4    not fully presented to the state court, were not ripe for review, or could only be

5    raised in this forum.

6         Andriano expressly reserves her right to amend this petition. In *McCleskey*

7    *v. Zant*, 499 U.S. 467, 498 (1991), the Supreme Court reaffirmed the "principle

8    that [a] petitioner must conduct a reasonable and diligent investigation aimed at

9    including all relevant claims and grounds for relief in the first federal habeas

10   petition." Referring to Habeas Rule 6 (discovery), Habeas Rule 7 (expansion of

11   the record) and Habeas Rule 8 (evidentiary hearing), the Supreme Court held that

12   a habeas petitioner has to have reasonable means and the ability to investigate to

13   form a sufficient basis to allege a claim in the first petition. *Id*. Andriano believes

14   additional claims may be identified following a thorough review of the record,

15   through investigation, after discovery is conducted and completed, or after an

16   evidentiary hearing is held. At the appropriate time during these proceedings,

17   Andriano will present any additional claims through amendments to the petition.

18   ## IV.   THE AEDPA IS UNCONSTITUTIONAL

19        Andriano's case is governed by the Antiterrorism and Effective Death

20   Penalty Act ("AEDPA"). 28 U.S.C. § 2254. However, AEDPA is unconstitutional

21   and its strictures should not apply here. Central to fundamental fairness and the

22   integrity of the United States' justice system is that every prisoner must have all of

23   her constitutional claims heard by a court. *See Bounds v. Smith*, 430 U.S. 817,

24   822-23 (1977). One method of ensuring that a prisoner's constitutional claims are

25   heard is through the writ of habeas corpus. However, the passage of AEDPA

26   substantially changed the law that governs habeas petitions. *See Felker v. Turpin*,

27   518 U.S. 651, 654 (1996). AEDPA's restrictions suspend the writ of habeas

28   corpus and violate the separation of powers, which results in prisoners remaining

in prison without review of alleged constitutional defects of their convictions and sentences.

### A.    AEDPA Suspends the Writ of Habeas Corpus

Congress cannot define prisoners' habeas rights so narrowly that Congress, in effect, suspends the writ. The writ of habeas corpus is guaranteed by the United States Constitution in the Suspension Clause, which provides that "[t]he Privilege of the Writ of Habeas Corpus shall not be suspended, unless when in Cases of Rebellion or Invasion the public Safety may require it." U.S. Const. art. I, § 9, cl. 2. The Suspension Clause is a structural limitation on the power of Congress. Like bills of attainder and ex post facto laws, which are also prohibited in Article I, section 9, the suspension of habeas (except in cases of rebellion or invasion) belongs to a "category of Congressional actions which the Constitution barred." *United States v. Lovett*, 328 U.S. 303, 315 (1946). The writ "can be preserved in practice no other way than through the medium of the courts of justice; whose duty it must be to declare all acts contrary to the manifest tenor of the Constitution void." *Id.* at 314 (quoting The Federalist No. 78 (Alexander Hamilton)).

Because AEDPA prevents federal courts in certain circumstances from granting relief when it is undisputed that the conviction or sentence was unconstitutional, it suspends the writ of habeas corpus. *See* 28 U.S.C. § 2254. Under the tenets of AEDPA, the federal court must determine whether a federal constitutional violation, in a capital case, was a "reasonable" or "unreasonable" constitutional violation.

### B.    AEDPA Violates the Separation of Powers Doctrine

Congress cannot impinge on the courts' duty to say what the law is, but Congress does so when it requires Article III courts to ignore any part of the Constitution and to instead give effect to a contrary law. *See Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 178 (1803).

Congress has the power to constrain courts' authority. *See Keene Corp. v.*

1   *United States*, 508 U.S. 200, 207 (1993). "The judicial Power of the United States

2   shall be vested in one supreme Court, and in such inferior Courts as the Congress

3   may from time to time ordain and establish." U.S. Const. art. III, § 1. However,

4   Congress must not manipulate the "test for determining the scope of [habeas

5   corpus]" because the writ "is designed to restrain" Congress, and because the writ

6   is "an indispensable mechanism for monitoring the separation of powers."

7   *Boumediene v. Bush*, 553 U.S. 723, 765-66 (2008).

8        The separation of powers doctrine found in Article III "serves both to

9   protect the role of the independent judiciary within the constitutional scheme of

10  tripartite government . . . and to safeguard litigants' right to have claims decided

11  before judges who are free from potential domination by other branches of

12  government." *Commodity Futures Trading Comm'n v. Schor*, 478 U.S. 833, 848

13  (1986) (internal citations and quotation marks omitted). When it was confronted

14  with an unconstitutional provision, the Supreme Court in *Marbury* asked whether

15  courts are bound by "an act of the legislature" that is "repugnant to the

16  constitution"; the Court answered that "[i]t is emphatically the province and duty

17  of the judicial department to say what the law is." 5 U.S. at 177.

18       "[I]f Congress does provide for habeas in the federal courts, Congress

19  cannot . . . instruct the federal courts, whether acting in a federal or in a state case,

20  how to think, how to ascertain law, how to judge." *Irons v. Carey*, 505 F.3d 846,

21  855 (9th Cir. 2007) (Noonan, J., concurring). Because AEDPA requires courts to

22  ignore unlawful detentions if the prisoner does not meet certain provisions, it

23  unconstitutionally violates the separation of powers doctrine. The question before

24  the federal court should simply be whether Andriano's constitutional rights were

25  violated in such a way that she is entitled to habeas relief. Adding the gloss of

26  "unreasonable" versus "reasonable" constitutional violations robs the courts of

27  their ability to remedy constitutional wrongs.

28

34

## C.    Conclusion

AEDPA suspends the writ of habeas corpus and violates the separation-of-powers doctrine because it dictates that courts must not "grant relief to citizens who are being held in prison in violation of their constitutional rights unless the constitutional error that led to their unlawful conviction or sentence is one that could not have been made by a reasonable jurist." *Irons*, 505 F.3d at 859 (Reinhardt, J., concurring). Also, AEDPA does not allow an appellate judge to correct an unlawful detention if a lower court's "error is understandable," which is inconsistent with a judge's duty "to enforce the laws and protect the rights of our citizens against arbitrary state action." *Id.* Therefore, AEDPA is unconstitutional, and this Court should review Andriano's claims de novo.

## V.    FEDERAL CONSTITUTIONAL CLAIMS

Andriano petitions this Court pursuant to 28 U.S.C. § 2254 for a writ of habeas corpus freeing her from the custody of Respondents pursuant to the judgment and sentence of the state courts of Arizona, on the grounds that the judgment and sentence were obtained and affirmed in violation of her rights under the Constitution of the United States. In support of this request, Andriano offers the following:

### CLAIM ONE

**The trial prosecutor engaged in repeated and pervasive misconduct, violating Andriano's rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments.**

Andriano raised some aspects of this claim in her post-conviction proceedings. (PCR Mem. at 63-69.) The PCR court denied the claim of ineffective assistance of counsel at trial and on appeal on the merits. (PCR Min. Entry Oct. 31, 2012 at 3.) Those holdings constituted an unreasonable determination of the facts pursuant to 28 U.S.C. § 2254(d)(2). In addition, the Arizona Supreme Court addressed a portion of this claim *sua sponte* on direct appeal, but that holding constituted an unreasonable application of clearly established federal law pursuant

1    to § 2254(d)(1). *Andriano*, 161 P.3d at 546.

2          To the extent that other portions of this claim were not raised in state court,

3    that failure is the result of appellate and post-conviction counsel's deficient

4    performance. The deficient performance of state appellate and post-conviction

5    counsel prejudiced Andriano and provides cause to excuse any procedural default.

6    *See Strickland v. Washington*, 466 U.S. 668, 688 (1984); *Evitts v. Lucey*, 469 U.S.

7    387, 397 (1985); *Martinez v. Ryan*, 132 S. Ct. 1309, 1315 (2012); *Nguyen v.*

8    *Curry*, 736 F.3d 1287, 1293 (9th Cir. 2013). Therefore, the Court may consider

9    the merits of this claim. Because the claim has not been adjudicated by the

10   Arizona state courts, the limitations on relief imposed by 28 U.S.C. § 2254(d) do

11   not apply to this Court's review, and the Court may consider the claim de novo.

12         **A.    Introduction**

13         A prosecutor occupies a unique position in the bar, and is subject to

14   uniquely rigorous standards. "[W]hile he may strike hard blows, he is not at

15   liberty to strike foul ones. It is as much his duty to refrain from improper methods

16   calculated to produce the wrongful conviction as it is to use every legitimate

17   means to bring about a just one." *Berger v. United States*, 295 U.S. 78, 88 (1935).

18   "Prosecutors are subject to constraints and responsibilities that don't apply to

19   other lawyers . . . [t]he prosecutor's job isn't just to win, but to win fairly, staying

20   well within the rules." *United States v. Kojayan*, 8 F.3d 1315, 1323 (9th Cir.

21   1993) (internal citations omitted).

22         To succeed on a claim of prosecutorial misconduct, Andriano must meet

23   one of two standards. Andriano must demonstrate either that the prosecutor's

24   misconduct prejudiced a substantive right, *see Donnelly v. DeChristoforo*, 416

25   U.S. 637, 644 (1974) (internal citations omitted), or that the prosecutor's

26   misconduct rendered the trial fundamentally unfair, *see Berger*, 295 U.S. 78.

27   Andriano will show that the prosecutor's conduct both prejudiced her substantive

28   rights and rendered the trial fundamentally unfair. Because the prosecutor's

1    misconduct "so infec[ted] the trial with unfairness as to make the resulting

2    conviction a denial of due process," the state court's denial of this claim was

3    contrary to, or involved an unreasonable application of, clearly established federal

4    law. *See Donnelly*, 416 U.S. at 643. The prosecutor in Andriano's case has a long

5    and egregious history of violating his ethical duties and flouting both the law and

6    propriety to obtain a conviction at all costs. This misconducted pervaded

7    Andriano's trial, and rendered it fundamentally unfair.

8          **B.     State Court Rulings**

9          On appeal, Andriano's counsel failed to raise a claim regarding the extreme

10   and pervasive prosecutorial misconduct that occurred in this case. *Andriano*, 161

11   P.3d at 546 n.3. However, the Arizona Supreme Court noted that the jury was

12   instructed that counsel's arguments were not evidence, thus the prejudicial

13   statements made by Juan Martinez did not require reversal. *Id.* at 548. This

14   holding was an unreasonable application of clearly established federal law. As

15   *Berger* made clear, when a prosecutor makes "improper insinuations and

16   assertions calculated to mislead the jury," reversal is required. 295 U.S. at 85. The

17   average juror has confidence in the prosecutor as a public servant, so improper

18   suggestions "are apt to carry much weight against the accused when they should

19   properly carry none." *Id.* at 88. The prosecutor's role is to "vindicate the public's

20   interest in punishing crime, not to exact revenge on behalf of an individual

21   victim." *Drayden v. White*, 232 F.3d 704, 713 (9th Cir. 2000). Most importantly,

22   general instructions that the arguments of counsel are not evidence are insufficient

23   to cure the prejudice. *Floyd v. Meachum*, 907 F.2d 347, 356 (2d Cir. 1990) (citing

24   *Donnelly v. DeChristoforo*, 416 U.S. 637, 644 (1974)). Accordingly, Andriano has

25   met the strictures of § 2254(d)(1) with regard to this aspect of the claim, and this

26   Court's review is de novo.

27         During the post-conviction proceedings, Andriano's counsel raised

28   prosecutorial misconduct as both trial and appellate ineffectiveness claims. (PCR

37

Mem. at 63-64.) The court referred to the Arizona Supreme Court's discussion of the improper argument by Martinez, and concluded that because a claim of prosecutorial misconduct could have been raised on appeal, it was then waived pursuant to Arizona Rule of Criminal Procedure 32.2(a)(3). (PCR Min. Entry Oct. 31, 2012 at 3.) While this would be true for due process claims, however, the ineffectiveness claims could not have been raised on direct appeal. *See, e.g.*, *Martinez*, 132 S. Ct. at 1320  (holding that in Arizona, trial ineffectiveness claims must be raised in collateral proceedings). Accordingly, although the PCR court failed to address these aspects of the prosecutorial misconduct claim, this Court must presume that they were denied on the merits as well. *Johnson v. Williams*, 133 S. Ct. 1088, 1095-96 (2013) (noting that when state courts fail to address a federal constitutional claim, federal habeas courts must presume that the claims were denied on the merits).  As discussed below, however, trial and appellate counsel's ineffectiveness is clear in this case, and thus the PCR court's denial of this claim constituted an unreasonable determination of the facts supporting this claim. The court could not have reasonably denied this claim based on the facts below. *See Taylor v. Maddox*, 366 F.3d 992, 1001, 1005 (9th Cir. 2004) (finding an unreasonable factual determination under § 2254(d)(2) where the state court "overlooked or ignored" "highly probative" evidence). In addition, when assessing and denying the underlying prosecutorial misconduct and ineffectiveness claims, the PCR court unreasonably applied clearly established federal law when it denied this claim.

### C.    Prosecutorial Misconduct

Prosecutorial misconduct may "so infect[] the trial with unfairness as to make the resulting conviction a denial of due process." *Donnelly*, 416 U.S. at 643. Prosecutorial misconduct is not evaluated from isolated instances alone; rather, the reviewing court must consider the cumulative effect of the harm. *Berger*, 295 U.S. at 89. In Andriano's case, the State's misconduct was not confined to a single

instance but was persistent. Andriano was already facing an uphill battle as her trial counsel were unprepared for her defense, and one of her lawyers had an actual conflict of interest affecting his representation of her. (*See* Claims Two, Three, Nineteen, and Twenty, *infra*.) The inequity of the battle was exacerbated when Andriano was pitted against a prosecutor with a history of ethical complaints and misconduct. Andriano's right to a fair trial was eviscerated by Martinez's repeated instances of misconduct.

Both federal and Arizona courts recognize that whether a prosecutor's misconduct is isolated or a consistent pattern is relevant to analysis of such a claim. *See Lincoln v. Sunn*, 807 F.2d 805, 809 (9th Cir. 1987); *State v. Minnitt*, 55 P.3d 774, 782 (Ariz. 2002) ("Like the misdeeds in *Pool* [*v. Superior Court*, 677 P.2d 261, 271 (Ariz. 1984)], Peasley's misdeeds were not isolated events but became a consistent pattern of prosecutorial misconduct that began in 1993 and continued through retrial in 1997."); *State v. Jorgenson*, 10 P.3d 1177, 1180 (Ariz. 2000) ("This is perhaps the third or fourth time that the conduct of this same prosecutor has raised the same type of problem. It is unfortunate that he was permitted to try so serious a case and, without proper supervision, permitted to try it in such an improper manner.").

The experience level of the prosecutor is also relevant. *See Minnitt*, 55 P.3d at 782 (reversing a conviction for prosecutorial misconduct, which permeated the trials in question, and noting, "Peasley is not an inexperienced prosecutor, but rather a veteran homicide prosecutor"). In disciplinary cases involving prosecutorial misconduct, the experience of the prosecutor renders conduct more egregious. *In re Peasley*, 90 P.3d 764, 774 (Ariz. 2004) ("[W]hen a lawyer's substantial experience places that lawyer in a position that would be unavailable to a less experienced lawyer, and that lawyer's experience also affords, or should afford, a greater appreciation of the advantages of eliciting false testimony, substantial experience may be considered a relevant aggravating factor."); *In re*

1    *Zawada*, 92 P.3d 862, 869 (Ariz. 2004) (citation omitted) ("Peasley's extensive

2    experience as a prosecutor helped him understand how a jury would react to

3    unfavorable evidence. Accordingly, he suborned perjured testimony to destroy the

4    negative inference the jury would otherwise have drawn.").

5         Juan Martinez, the prosecutor in Andriano's case, was experienced and has

6    a well-documented history of crossing ethical lines. Martinez has sent seven

7    Arizona men to death row since 1998. In all but one of those cases, prosecutorial

8    misconduct claims have been raised by defense counsel. Michael Kiefer,

9    *Objections Raised to Juan Martinez's Conduct in Jodi Arias Trial*, Ariz. Rep.

10   (Feb. 28, 2014), *available at* http://www.azcentral.com/news/articles/20131028

11   jodi-arias-juan-martinez-conduct-day3.html   (hereinafter   "Kiefer,   *Objections*

12   *Raised*"). While one might be tempted to write this off as a claim commonly

13   raised on appeal, his conduct has captured the attention of the Arizona Supreme

14   Court, and more recently, the State Bar of Arizona.

15        Most notably, at oral argument in *State v. Gallardo*, 242 P.3d 159 (Ariz.

16   2010), then-Justice Andrew Hurwitz asked the attorney general defending the

17   death sentence:

18            Can I ask you a question about something that nobody's
             discussed so far? The conduct of the trial prosecutor. It
19            seems to me that at least on several occasions, and by and
             large the objections were sustained, that the trial
20            prosecutor either ignored rulings by the trial judge or
             asked questions that the trial judges once ruled improper
21            and then rephrased the question in another improper way.
             . . . Short of reversing a conviction, how is it that we
22            can . . . stop inappropriate conduct?

23   Kiefer, *Objections Raised*; *see also State v. Gallardo*, No. CR 09-0171-AP, Oral

24   Argument   (Ariz.),   *available   at*   http://supremestateaz.granicus.com/Media

25   Player.php?view_id=2&clip_id=1216 (last visited Mar. 5, 2017). Justice Michael

26   Ryan also was aware of the continued issue with Martinez's conduct, stating:

27            Well, this prosecutor I recollect from several cases . . . .
             This same prosecutor has been accused of fairly serious
28

40

1          misconduct, but ultimately we decided it did not rise to
      the level of requiring a reversal . . . . There's something
2          about this prosecutor, Mr. Martinez.

3    *Id.*

4          Justice Ryan was correct, as Martinez's conduct had been before the
5    Arizona Supreme Court on several occasions. *State v. Dixon*, 250 P.3d 1174 (Ariz.
6    2011); *State v. Gallardo*, 242 P.3d 159 (Ariz. 2010); *State v. Lynch*, 234 P.3d 595
7    (Ariz. 2010); *State v. Morris*, 160 P.3d 203 (Ariz. 2007); Andriano, 161 P.3d at
8    546. As Justices Hurwitz and Ryan recognized, a review of these cases reveals
9    Martinez has a particular history of stepping over the line. As in this case,
10   numerous appellants have complained that Martinez misstated the nature of
11   evidence. *See Andriano*, 161 P.3d at 546 (alleging Martinez "took every
12   opportunity to infuse the trial with marginally relevant information about
13   Andriano's partying and man-chasing"); *see also Morris*, 160 P.3d at 215-16
14   (alleging that Martinez misstated evidence when arguing motive for murder);
15   *Lynch*, 234 P.3d at 607 (alleging several misstatements); *Gallardo*, 242 P.3d at
16   168 (alleging that Martinez misstated the nature of expert testimony about
17   payment and bias as inconsistent statements). The Arizona Supreme Court agreed
18   Martinez committed misconduct in *Gallardo*, although it relied upon the jury
19   instructions to deny relief. *Id*. Andriano's case was another in which the Arizona
20   Supreme Court found Martinez's statements to be improper, but not worthy of
21   reversal due to the jury instructions given. *Andriano*, 161 P.3d at 546. However,
22   this finding was an unreasonable application of clearly established federal law
23   because general instructions that the arguments of counsel are not evidence are
24   insufficient to cure the resulting prejudice. *Floyd*, 907 F.2d at 356 (citing
25   *DeChristoforo*, 416 U.S. at 644).

26         More recently, Martinez has been the subject of further misconduct
27   accusations in the Jodi Arias trial. In one example, the penalty phase was put on
28   pause to hold a hearing to determine if files on the victim's computer containing

pornography were destroyed. Arias's attorneys filed a motion to dismiss all charges as a result of this alleged prosecutorial misconduct. Michael Kiefer, *Jodi Arias Defense: Porn Evidence Destroyed on Travis Alexander Computer*, Ariz. Rep. (Nov. 11, 2014), *available at* http://www.azcentral.com/story/news/local/mesa/2014/11/10/jodi-arias-sentencing-trial-defense-says-evidence-destroyed-travis-alexander-computer-abrk/18828589/ (last visited Mar. 5, 2017). At least five bar complaints have been filed against Martinez regarding his conduct in the Arias case. Michael Kiefer, *Defense Attorneys File Complaints against Arias Prosecutor Juan Martinez*, Ariz. Rep. (Jan. 7. 2016), *available at* http://www.azcentral.com/story/news/local/arizona/2016/01/07/juan-martinez-arizona-state-bar-complaints-aacj-jodi-arias/78320668/ (last visited Mar. 5, 2017). While three were dismissed in 2015, *id.*, one has resulted in serious repercussions for Martinez.

On December 22, 2015, Arizona Attorneys for Criminal Justice ("AACJ")[8] filed a bar complaint against Martinez, alleging that he had "engaged in a long and continuing pattern of unethical and unprofessional conduct. Martinez's misconduct has gone unpunished and uncorrected, despite its being recognized numerous times by Arizona courts . . . ." AACJ noted the large number of capital cases in which the Arizona Supreme Court had reviewed alleged misconduct by Martinez, including Andriano's case, but failed to take action against Martinez. *See, e.g.*, *State v. Lynch ("Lynch II")*, 357 P.3d 119 (Ariz. 2015), *overruled on other grounds by Lynch v. Arizona*, 136 S. Ct. 1818 (2016); *State v. Lynch*

---

[8] AACJ is "a statewide not-for-profit membership organization of Criminal Defense Lawyers, law students and associated professionals dedicated to protecting the rights of the accused in the courts and in the legislature, promoting excellence in the practice of criminal law through education, training and mutual assistance, and fostering public awareness of citizens' rights, the criminal justice system and the role of the defense lawyer." AACJ, *About AACJ*, http://www.aacj.org/about (last visited Feb. 24, 2017). AACJ was founded in 1986, and is the Arizona state affiliate of the National Association of Criminal Defense Lawyers; its nearly 500 members include criminal-defense lawyers, law students, and associated professionals. *Id.*

1   (*"Lynch I"*), 234 P.3d 595 (Ariz. 2010); *State v. Gallardo*, 242 P.3d 159 (Ariz.

2   2010); *State v. Andriano*, 161 P.3d 540 (Ariz. 2007); *State v. Morris*, 160 P.3d

3   203 (Ariz. 2007).[9] The complaint also detailed Martinez's misconduct in several

4   high-profile non-capital cases. *State v. Beemon*, No. 1 CA-CR 05-1161 (Ariz. Ct.

5   App. Feb. 2, 2008) (memorandum decision); *State v. Hulsey*, No. CR2007-111635

6   (Maricopa Cty. Super. Ct.); *State v. Grant*, No. CR2005-032986 (Maricopa Cty.

7   Super. Ct.); *State v. Chrisman*, CR2010-153913 (Maricopa Cty. Super. Ct.); *State*

8   *v. Irizzarry*, No. CR2010-106178 (Maricopa Cty. Super. Ct.); *State v. Arias*, No.

9   CR2008-031021-001 (Maricopa Cty. Super. Ct.). These allegations fall into

10   several main categories, including arguing during opening statements, appealing

11   to passions and fear of the jury, misstating the evidence, misstating the law,

12   attacking expert witnesses, impugning the integrity or honesty of opposing

13   counsel, and presenting false testimony. Nearly all of these types of misconduct

14   appear in Andriano's case.

15       In September 2016, the State Bar of Arizona ordered that Martinez be

16   placed on probation for one year based on the complaint filed by AACJ. The order

17   states that Martinez engaged in unprofessional conduct, used means that had no

18   substantial purpose other than to embarrass, delay, or burden any other person, or

19   using methods of obtaining evidence that violate the legal rights of such a person

20   by, among other things, improperly attacking the defendant, and engaged in

21   professional misconduct that is prejudicial to the administration of justice. *See*

22   Ariz. R. Sup. Ct. 41(g); Ariz. R. Sup. Ct. 42 (Ethical Rules 4.4 and 8.4(d)). The

23   Arizona Republic reported that a statement from the State Bar said "simply that

24   the admonition was issued 'for inappropriate statements made by Mr. Martinez

25   during various trials or other legal proceedings. In some instances, these

---

26

27  [9] Martinez also prosecuted death-row prisoner Clarence Dixon, *see State v. Dixon*,
250 P.3d 1174 (Ariz. 2011), and there are numerous misconduct claims alleged

28  against him in that case as well, *see Dixon v. Ryan*, No. CV-14-258-PHX-DJW,
Petition for Writ of Habeas Corpus at 158-189 (D. Ariz. Dec. 19, 2014).

1   statements were found to be unprofessional or otherwise improper by the Arizona

2   Supreme Court but did not require a reversal of the underlying criminal cases.'"

3   Michael Kiefer, *State Bar Admonishes Jodi Arias Prosecutor Juan Martinez,*

4   *Places Him on Probation*, Ariz. Rep. (Sept. 30, 2016), *available at*

5   http://www.azcentral.com/story/news/local/phoenix/2016/09/30/jodi-arias-prosecu

6   tor-juan-martinez-admonished-state-bar-arizona/91332898/ (last visited Mar. 5,

7   2017).[10] Martinez has appealed the order to the Arizona State Bar Presiding

8   Disciplinary Judge, and that appeal is pending. Michael Kiefer, *Jodi Arias*

9   *Prosecutor Juan Martinez Appeals Discipline Handed Down by State Bar of*

10   *Arizona*, Ariz. Rep. (Oct. 3, 2016), *available at* http://www.azcentral.com

11   /story/news/local/phoenix/2016/10/03/jodi-arias-prosecutor-juan-martinez-appeals

12   -discipline-handed-down-state-bar-arizona/91499828/ (last visited Mar. 5, 2017).

13
14
#### 1.   Inappropriate Focus on Irrelevant and Salacious Information

15       As detailed in the AACJ complaint, one specific type of misconduct that

16   appears frequently in Martinez's cases is his inappropriate and improper focus on

17   irrelevant sexual aspects of a case. In *Morris*, Martinez argued repeatedly that the

18   defendant had killed the victims during sex and then had sex with the victims'

19   dead bodies, despite the complete lack of evidence supporting these allegations.[11]

20   160 P.3d at 215; *see also State v. Morris*, No. CR-15-0442-PC, Pet. for Review at

21   42-80 (Ariz. Apr. 22, 2016). During trial in another case, Martinez asked

22   witnesses whether they wore thong underwear, had performed oral sex in cars, or

23   engaged in "threesomes" with the defendant, despite presenting no evidence that

24   any of these things occurred or were relevant. *State v. Grant*, No. CR2005-032986

25   (Maricopa Cty. Super. Ct.). In a third case, Martinez asked witnesses about being

26

---

27   [10] The AACJ complaint and the State Bar order are available on this site as well.

28   [11] In this case, Martinez also invited jurors to put themselves in the place of the victims, *id.* at 216, and removed evidence from an evidence bag so the jury could smell the decomposition, *id.* at 217.

in a same-sex relationship, asked witnesses if they went to parties where those in attendance disrobed, and alleged that the defendant had engaged in "wifeswapping," again without any evidence that these allegations were relevant or true. *Chrisman*, CR2010-153913 (Maricopa Cty. Super. Ct.). Most prominently, Martinez engaged in this same behavior in the Arias case. *See, e.g.*, Michael Kiefer, *Objections Raised to Juan Martinez's Conduct in Jodi Arias Trial*, Ariz. Rep. (Feb. 28, 2014) (noting that Martinez "painted Arias as a sexual predator"); Colleen Curry, *Jodi Arias Trial's Focus Is Graphic Sex, Not Killing*," ABC News (Mar. 3, 2013), *available at* http://abcnews.go.com/US/jodi-arias-trial-graphic-sex-details-precedence-murder/ story?id=18658243 (last visited Mar. 5, 2017).

In Andriano's case, this kind of misconduct reached astonishing levels, and only the most egregious examples are cited here. The crime in Andriano's case was not sexual in nature, and Martinez acknowledged that in the beginning of his opening statement during the aggravation phase. (Tr. Nov. 30, 2004 at 20 ("She did it in expectation of pecuniary gain. . . . There is no other motive in this case other than that.").) However, Martinez's opening statement during the guilt phase quickly veered into other territory, focusing on allegations of Andriano's extramarital activities. (Tr. Sept. 7, 2004 at 25, 29, 31, 55.) Trial counsel filed a motion in limine to preclude evidence regarding these relationships (ROA 100), but it was denied (Tr. Sept. 7, 2004 at 13). The opening statement is the prosecutor's opportunity to tell the jury what evidence he intends to introduce. It has "a narrow purpose and scope" and is not a time to argue the inferences and conclusions that may be drawn from evidence not yet admitted (or in this case was not even relevant). *See United States v. Dinitz*, 424 U.S. 600, 612 (1976) (Burger, J., concurring). Martinez's opening statements did not comply with these requirements, but trial counsel did not object to any of these statements made during the opening statement.

During his closing argument in the guilt phase, Martinez strayed far from his stated purpose in bringing in evidence of Andriano's affairs. He discussed Andriano's virginity, stating:

> I mean, it's so basic that with regards to the virginity issue, something so private as that. She said, "Well, you know what, yes, I was chaste but, you know what, I didn't want to be. So what I did basically is make sort of an agreement with Dido Gamez to get rid of it because it wasn't my fault. Barbara Mitchell was kidding me about it.

(Tr. Nov. 16, 2004 at 37.) Even when discussing Andriano's relationship with Joe, Martinez focused on the sexual aspect, stating, "And one of the things she's quick to tell us, it wasn't a sexual relationship to start with." (*Id.* at 18.) He argued, "I wonder if she had to use a lubricant with Dido Gamez. I wonder if she had to use a lubricant with Vernon Barnes." (*Id.* at 75.) He chastised Andriano, stating, "But you weren't in love with him because you could not even bring yourself to the point of enjoying the most intimate thing that two people in love do, that's enjoy sexual intercourse." (*Id.* at 76.)

He went on to discuss Andriano's clothing and appearance, stating "You've seen what she looked like back then [in 2000], all sassed up in her pink little outfit. You've seen what she looked like." (*Id.* at 63.) He mischaracterized her testimony, arguing:

> Let's talk a little bit about Rick Freeland. . . . Why is it that she gets involved with him? Why is it that they engaged in the most intimate acts that two people can engage in? Well, because, according to her, she didn't want to be a tease. Wow. Just because you have a drink with somebody, just because a man is nice to you, you better be careful you're not a tease. But if you are, then you can have intercourse with him and you know what, it's not your fault. It really isn't your fault because that's not, according to the defendant, the way women should act. According to her, it's worse to be a tease than it is to be a cheat. I guess that's what she's telling us.

(*Id.* at 84-85.) When discussing Travis Black, Martinez stated, "She's the one that initiated—this demure little lotus blossom we have here—she's the one that is all

46

that." (*Id.* at 87-88.) He stated, "I guess the woman has needs and she's going to do something about it because she's so goal oriented and what ends up happening is he takes her home." (*Id.* at 88.) Trial counsel did not object to any of these statements.

The purpose of a closing argument "is to explain to the jury what it has to decide and what evidence is relevant to its decision." *Sandoval v. Calderon*, 241 F.3d 765, 776 (9th Cir. 2000) (citation omitted). Arguments that frustrate this purpose and are inflammatory or prejudicial to the defendant are improper. *Id.* Here, Martinez intended his argument to have an effect on the jury, and it did; the cumulative effect of his improper assertions infected the trial with unfairness so as to make the resulting conviction a denial of due process. A prosecutor commits misconduct during closing argument when the prosecutor manipulates or misstates the evidence at trial. *Darden v. Wainwright*, 477 U.S. 168, 181-82 (1986). Wide latitude is given to attorneys during closing arguments, however, counsel may not make arguments which appeal to the passions and fears of the jury. *United States v. Weatherspoon*, 410 F.3d 1142, 1149 (9th Cir. 2005). "When . . . jurors have been left the option of relying upon a legally inadequate theory, there is no reason to think that their own intelligence and expertise will save them from that error." *Griffin v. United States*, 502 U.S. 46, 59 (1991).

During his cross-examination of Andriano, Martinez continued to focus on her sexual behavior, asking her about sexual relationships that occurred before her marriage to Joe (Tr. Oct. 28, 2004 at 75, 76, 77; Tr. Nov. 1, 2004 at 106, 107, 108), her first experience with sexual intercourse (Tr. Oct. 28, 2004 at 76; Tr. Nov. 1, 2004 at 106 ("And you indicated that he's the individual that you were with first, correct?"); *id.* at 107 ("What that means is he met you at a bar one night and the two of you went home, right?")), her interactions with male friends (Tr. Oct. 28, 2004 at 98, 99; Nov. 1, 2004 at 109), the locations where Andriano had sexual intercourse (Tr. Nov. 1, 2004 at 53-54 ("In fact you had sexual intercourse

1    under a bridge. Do you remember that?"), and irrelevant details of occasions when
2    she had engaged in extramarital activity (*id.* at 57, 89-92; Tr. Nov. 2, 2004 at 35
3    ("It wasn't that you groped him at all?")). Trial counsel did not object to these
4    lines of questioning.

5        Martinez engaged in similar behavior when questioning other witnesses. In
6    his direct examination of Dr. Bayless, the two engaged in extraordinary and
7    inappropriate speculation about Andriano. Bayless testified that he "felt as though
8    Mrs. Andriano was being very flirtatious" (Tr. Dec. 15, 2004 at 14, 38), and then
9    stated that she had mentioned losing weight (*id.* at 21). Martinez stated, "Again,
10   we've been talking about her flirting with you. Now we're talking about wanting
11   to go to general population, not wanting to go to general population and now is
12   happy that her weight is dropped. What does that tell you about her?" (*Id.*) Trial
13   counsel did not object.

14       When questioning Travis Black, Martinez again focused on irrelevant and
15   salacious details regarding his relationship with Andriano. (Tr. Sept. 16, 2004 at
16   89-90 ("And so the kissing and the dancing was before you knew her name?"); *id.*
17   at 107; *id.* at 91 ("Q. Any—anything of note that happened while you guys were
18   sitting there having breakfast? A. Just some under the table groping. Just stuff like
19   that."); *id.* at 108 ("Q. Do you know whether or not she had hanky panky in her
20   thoughts? A. There was a lot of groping, so I'm guessing there was.").) He did the
21   same with Rick Freeland. (Tr. Sept. 13, 2004 at 21 ("Was that underneath a
22   bridge"); *id.* ("Now, when you were having these relations with her at your
23   apartment, did they take place during the day or did they usually take place at
24   night?"); *id.* at 66 ("Okay. Now, with regard to this one on one situation, when
25   you and she were alone in your bedroom having sex, was that one on one or
26   not?").

27       Martinez also repeatedly and inappropriately focused on Andriano's alleged
28   sexual activities when cross-examining domestic-violence expert Sharon Murphy,

as if the two subjects were mutually exclusive. Martinez went so far as to ask Dr. Murphy, "Do you know whether or not [Andriano] had to use any lubricant with regard to Rick Freeland?" (Tr. Oct. 13, 2004 at 68.) This outrageous questioning continued throughout his cross-examination. (*Id.* at 50, 67, 69, 73, 104, 123, 148; *id.* at 65 ("I'm asking you whether or not friends go and stand in front of each other's door and, the whole thing I laid out for you, wanting to get together with them and have sex?"); *id.* at 77 ("Wouldn't it be important to know if she was having sex, for example, with Rick Freeland today and her husband was then asking for sex in the evening because maybe she didn't want to have sex with her husband because she'd already had it. Wouldn't that be important to know?").) Trial counsel did not object to these questions.

Martinez continued this inappropriate line of questioning with Andriano's family and friends. When Andriano's mother Donna mentioned seeing bruises on Andriano, Martinez stated, "But you don't know [Joe] did that. For all you know, somebody named Rick Freeland did that while they were making love." (Tr. Oct. 5, 2004 at 98-99.) When discussing Andriano's breakup with an early boyfriend, Martinez asked Donna, "You didn't see perhaps she was caught in a compromising activity in skimpy clothing with a Hispanic male by Mr. King. You didn't see that, did you?" (*Id.* at 154-55.) When cross-examining Gia Palicki, the Andriano's babysitter, he repeatedly asked if Andriano had shared information about her sex life and problems with Joe, but was not satisfied with Palicki's answers until she specifically stated that Andriano had not discussed any sexual intercourse itself with her. (Tr. Dec. 13, 2004 at 60-61.)

The constitutional guarantee to due process is violated when evidence admitted is not relevant to an element of the crime charged and is so inflammatory as to prevent a fair trial. *See, e.g.*, *Duncan v. Henry*, 513 U.S. 364, 366 (1995); *Romano v. Oklahoma*, 512 U.S. 1, 12-13 (1994) (holding that the admission of irrelevant evidence violates due process if it so infected the proceeding as to

1   render the jury's determination a denial of due process); *Estelle v. McGuire*, 502

2   U.S. 62, 70 (1991). Martinez's actions here rise to that level.

3                    **2.     Misstatements of Facts**

4         In another category alleged in the AACJ bar complaint, Martinez also made

5   numerous statements that were not supported by the evidence in this case, and

6   asked questions that included information not before the jury. When a prosecutor

7   makes statements regarding information not in evidence, he essentially becomes

8   an unsworn witness in the case that is not subject to cross-examination. Comments

9   create prejudicial error if they constitute personal and institutional guarantees of

10  the trustworthiness of the government and its case. *United States v. Smith*, 962

11  F.2d 923, 933 (9th Cir. 1992). And, it is improper for a prosecutor to misstate the

12  evidence and an intentional misstatement is "a serious breach of the prosecutor's

13  duty." *State v. Cannon*, 713 P.2d 273, 278 (Ariz. 1985). Misstatements of

14  evidence are a form of prosecutorial misconduct. *See United States v. Robledo-*

15  *Vela*, 45 F. Appx. 567, 568 (9th Cir. 2002) ("[T]here was significant prosecutorial

16  misconduct in the form of misstating evidence, and . . . this error was not

17  harmless."); *see also State v. Mayhorn*, 720 N.W.2d 776, 788 (Minn. 2006) ("A

18  prosecutor commits misconduct by intentionally misstating evidence." (citation

19  omitted)).

20        One egregious example of this misconduct is the question above regarding

21  the purported reason an ex-boyfriend of Andriano's ended his relationship with

22  her. In addition to asking Donna about this issue, Martinez also asked Sharon

23  Murphy, "Did you know that part of the reason that Mr. King actually broke up

24  with [Andriano] was because he came over to the apartments which were the

25  Quail Apartments, and he caught her in front of the television in state of undress

26  with another male. Did you know that?" (Tr. Oct. 13, 2004 at 51.) This fact was

27  not in evidence, and was never put into evidence. Trial counsel did not object.

28        In another example, Andriano testified that she and Joe had consulted with

their friend Shawn King when researching sodium azide. (Tr. Oct. 27, 2004 at 87-91.) Martinez introduced no evidence regarding King, and did not call him as a witness. However, during closing, Martinez stated that the jury was not there to judge King's conduct, but "[i]f he were to be judged, he would be judged as an accomplice." (Tr. Nov. 17, 2004 at 81.) King was never charged with anything by the State, and Martinez had no additional evidence regarding King's conduct, but this argument implied that Martinez had undisclosed evidence implicating King along with Andriano. In fact, despite this implication to the jury, neither police nor Martinez ever contacted or interviewed King. (PCR Pet. Ex. 15 at 32.) Trial counsel did not object.

In perhaps the most outrageous example, Martinez vouched for his own witnesses and statements repeatedly throughout the trial. He prefaced an extraordinary number of unproven and disputed factual assertions with the phrase "we know" during his opening statements and closing arguments, creating the impression that these facts were beyond dispute. (*See* PCR Mem. at 67 (noting that this phrase is uttered more than 140 times in Martinez's opening statements and closing arguments).) The Ninth Circuit has addressed this exact issue in *United States v. Younger*, 398 F.3d 1179, 1191 (9th Cir. 2005), stating that such language "readily blurs the line between improper vouching and legitimate summary," by telling the jury what is true rather than allowing the jury to make that determination for itself. This possibility is highlighted in cases like this one, where Martinez used this language on statements that were far from clear or proven. "[T]he prosecutor's opinion carries with it the imprimatur of the Government and may induce the jury to trust the Government's judgment rather than its own view of the evidence." *United States v. Young*, 470 U.S. 1, 18-19 (1985); *Berger*, 295 U.S. at 88 (stating that the average juror has confidence in the prosecutor as a public servant seeking justice; therefore, assertions of personal knowledge, improper suggestions and insinuations "are apt to carry much weight

against the accused when they should properly carry none").

For example, when discussing the night of Joe's death, Martinez stated, "Well, [Joe] never used any physical force on her. We know that." (Tr. Nov. 16, 2004 at 140.) This statement was not proven, and Martinez never introduced any evidence proving how Andriano's injuries from that night were caused in any other way, or how Joe could have had Andriano's hair in his hands. The same is true of Martinez's statements regarding the sodium azide; Martinez stated that "we know" Joe ingested a large amount of sodium azide (Tr. Nov. 30, 2004 at 23-24), and stated that Andriano gave Joe ten times the lethal dose of sodium azide (Tr. Nov. 30, 3004 at 23; Tr. Dec. 1, 2004 at 18), even though his own expert witness had testified to the exact opposite information and was clear that there was no evidence of how much Joe had ingested (Tr. Sept. 23, 2004 at 59). He also argued that the poison would have killed Joe, but Andriano was too impatient to wait (Tr. Nov. 30, 2004 at 23), and stated that the fact that only a small amount of sodium azide was present in Joe's blood showed that there had been a large consumption a long time ago (Tr. Nov. 16, 2004 at 54). Neither statement was proven.

In situations like Andriano's, the inherent danger such comments pose is so great that the trial judge had a duty to *sua sponte* take curative action, even in the absence of an objection by trial counsel. *Young*, 470 U.S. at 12-13; *United States v. Roberts*, 618 F.2d 530, 534 (9th Cir. 1980) (stating that judges are not mere referees and they have a responsibility to step in because "vouching . . . in closing argument has often been held to be plain error," requiring reversal even without an objection).  The trial judge in this case took no action.

### 3.    Unfounded Attacks on Witnesses

Finally, in a third category of unethical behavior addressed in the AACJ complaint, Martinez repeatedly attacked defense expert Sharon Murphy through unproven and unfounded arguments regarding her supposed lack of credibility and

52

made wild allegations regarding her lack of ethics. Martinez never provided any evidence that Murphy testified falsely or made misstatements, but still argued that Murphy was "in [Andriano's] pocket" (Tr. Dec. 16, 2004 at 6), was a "liar" who could not "keep her story straight" (Tr. Dec. 1, 2004 at 61), made "misrepresentations . . . to everyone" (Tr. Nov. 16, 2004 at 153), and ignored her purported "ethical[] . . . duty to consider both sides" (Tr. Dec. 16, 2004 at 7). Martinez never pointed to a single piece of evidence supporting these allegations, and neither defense counsel nor the trial court intervened when he made these statements. Such argument is especially prejudicial if the comments are intended to attack the credibility of mental health experts whose testimony comprises the heart of the defense, even though there may be no dispute that the defendant killed the victim. *State v. Hughes*, 969 P.2d 1184, 1187-97 (Ariz. 1998); *State v. Bailey*, 647 P.2d 170, 172-77 (Ariz. 1982); *see also Davis v. Zant*, 36 F.3d 1538, 1549-50 n.17 (11th Cir. 1994) (finding prejudicial error where case depended upon credibility of witness and misconduct was aimed at undermining this core of the defense, noting that "prosecutorial misconduct is least acceptable under the Constitution when aimed [at] the core of the defense's case").

Nearly identical facts were at issue in *In re Zawada*, 92 P.3d 862 (Ariz. 2004), in which the prosecutor was suspended from the practice of law for unfounded attacks on a defense expert. The Arizona Supreme Court specifically outlined the misconduct as the following: 1) the prosecutor implied that the expert fabricated his diagnosis to coincide with the defendant's theory of the case; 2) that the expert was paid to fabricate a diagnosis; and that 3) mental health experts in general create excuses for criminals. *Id.* at 864-65; *see also The Florida Bar v. Schaub*, 618 So. 2d 202, 203-04 (Fla. 1993) (suspending prosecutor for eliciting improper testimony, and arguing in closing that expert was "hired gun", and for inserting his personal opinions on psychiatry and the defense into the proceedings).

1    Compounding these errors, Andriano's direct appeal counsel failed to raise

2    a claim regarding prosecutorial misconduct on appeal.

3    **D.    Ineffective Assistance**

4    The PCR court denied this claim by stating that the Arizona Supreme Court

5    found that the Rule 404(b) evidence was properly admitted and thus comment by

6    Martinez was appropriate. (PCR Min. Entry Oct. 31, 2012 at 3.) The court did not

7    address the other allegations raised in the PCR petition. However, as detailed

8    above, Andriano's trial counsel failed to object to almost every instance of

9    misconduct committed by Martinez. In addition, appellate counsel also failed to

10   raise this claim in Andriano's appellate proceedings.

11   This claim is subject to the two-prong standard established in *Strickland*:

12   counsel's performance must be deficient, and such deficient performance must

13   have prejudiced the defense. *Strickland*, 466 U.S. at 686-87. First, the inquiry

14   under the deficiency prong is "whether counsel's assistance was reasonable

15   considering all the circumstances." *Id.* at 688. Performance is deficient when the

16   attorney renders objectively unreasonable assistance. *Id*. at 687-88. Although

17   defense counsel has broad discretion when making strategic decisions, those

18   decisions must be reasonable and informed. *Id*. at 691; *see also Correll v. Ryan*,

19   539 F.3d 938, 949 (9th Cir. 2008) (holding that an "uninformed strategy" is "no

20   strategy at all"). The reasonableness of counsel's decisions is measured by the

21   reasonableness of the investigation done in making such a decision. *Cf. Wiggins v.*

22   *Smith*, 539 U.S. 510, 523 (2003) (focusing on "whether the investigation

23   supporting counsel's decision not to introduce mitigating evidence of Wiggins'

24   background was itself reasonable"). "[S]trategic choices made after less than

25   complete investigation are reasonable precisely to the extent that reasonable

26   professional judgments support the limitations on investigation." *Strickland*, 466

27   U.S. at 690-91. In other words, any strategic decision made by counsel must be

28   "reasonable and informed." *Jennings v. Woodford*, 290 F.3d 1006, 1014 (9th Cir.

1    2002).

2        When assessing the second prong, a court must decide whether "counsel's

3    errors were so serious as to deprive the defendant of a fair trial, a trial whose

4    result is reliable." *Strickland*, 466 U.S. at 687. A petitioner does not have to

5    demonstrate by a preponderance of the evidence that "the result in his case would

6    have been different but for counsel's errors," but only that there was a reasonable

7    probability that the errors undermined confidence in the outcome of his trial.

8    *Brown v. Myers*, 137 F.3d 1154, 1157 (9th Cir. 1998) (citing *Strickland*, 466 U.S.

9    at 694); *see also Jennings*, 290 F. 3d at 1016 (quoting *Strickland*, 466 U.S. at 694

10   (rejecting explicitly the preponderance standard)); *Lord v. Wood*, 184 F.3d 1083,

11   1085 (9th Cir. 1999). And "despite the strong presumption of reliability," the

12   question to be asked is whether "the result of the particular proceeding is

13   unreliable because of a breakdown in the adversarial process that our system

14   counts on to produce just results." *Strickland*, 466 U.S. at 696. Moreover,

15   "deficient performance and prejudice questions may be closely related." *Correll*,

16   539 F.3d at 951 (citations omitted). Indeed, counsel's performance in and of itself

17   could undermine a court's confidence in the outcome of the trial. *Id.*

18       "In making this [prejudice] determination, a court hearing an

19   ineffectiveness claim must consider the totality of the evidence before the judge or

20   jury." *Strickland*, 466 U.S. at 695; *see also Williams v. Taylor*, 529 U.S. 362, 397-

21   98 (2000); *Alcala v. Woodford*, 334 F.3d 862, 882-83 (9th Cir. 2003) (granting

22   relief on basis of cumulative impact of multiple errors by counsel); *Harris by and*

23   *through Ramseyer v. Wood*, 64 F.3d 1432, 1439 (9th Cir. 1995) (holding that the

24   cumulative impact of numerous deficiencies in defense counsel's performance

25   was prejudicial to the defense, rendering the proceedings improper and warranting

26   habeas relief). Even if this Court finds that no single error amounts to prejudice, it,

27   nonetheless, should apply cumulative error principles to grant relief. *See Boyde v.*

28   *Brown*, 404 F.3d 1159, 1176 (9th Cir. 2005) (quoting *Cooper v. Fitzharris*, 586

1    F.2d 1325, 1333 (9th Cir. 1978) (en banc)).

2       The effective assistance of appellate counsel is guaranteed by the Due
3 Process Clause of the Fourteenth Amendment. *Evitts*, 469 U.S. at 396 ("A first
4 appeal as of right . . . is not adjudicated in accord with due process of law if the
5 appellant does not have the effective assistance of an attorney."); *see id*. at 395
6 ("Because the right to counsel is so fundamental to a fair trial, the Constitution
7 cannot tolerate trials in which counsel, though present in name, is unable to assist
8 the defendant to obtain a fair decision on the merits."). As such, "nominal
9 representation" during an appeal "does not suffice to render the proceedings
10 constitutionally adequate." *Id.* at 396.

11       Ineffective assistance of appellate counsel claims are also governed by the
12 standard of review set forth in *Strickland*. 466 U.S. at 686-87. *See Smith v.*
13 *Robbins*, 528 U.S. 259, 285 (2000). Accordingly, Andriano must show that
14 appellate counsel's representation "fell below an objective standard of
15 reasonableness," *Strickland*, 466 U.S. at 688, and that "there is a reasonable
16 probability that, but for counsel's unprofessional errors, the result of the
17 proceeding would have been different," *id*. at 694. When appellate counsel fails to
18 raise meritorious issues that could have resulted in a reversal of conviction or a
19 sentence, counsel has necessarily caused prejudice to the defendant. *See, e.g.*,
20 *Strickland*, 466 U.S. at 694 (stating that prejudice occurs when, absent counsel's
21 deficiencies, there is a reasonable probability that the result of the proceeding
22 would have been different).

23       Here, trial counsel was plainly deficient for failing to object to the
24 pervasive and prejudicial prosecutorial misconduct that Martinez committed
25 throughout the phases of trial. Dan Patterson had no strategic reason for not
26 objecting to Martinez's tactics, and was aware that Martinez has a reputation for
27 "cheating." In fact, Patterson believed that Martinez was coaching his witnesses
28 following the defense interviews. Patterson did attempt to limit Martinez's ability

to introduce evidence by filing pretrial motions in limine, but when those motions were mostly denied, he took no additional steps to rein in Martinez's conduct. These failures deprived Andriano of a fair trial, and undermine confidence in the outcome. *See Zapata v. Vasquez*, 788 F.3d 1106, 1123-24 (9th Cir. 2015) (finding ineffective assistance of trial counsel for failing to object to prosecutor's misconduct).

However, Patterson believed he had done enough to preserve the claim for appeal, and he was surprised to learn that the appellate brief had been filed without lead appellate counsel Brent Graham ever discussing the case with him.[12] When Patterson received a copy of the opening brief and reviewed it, he was shocked that Graham and his co-counsel had not raised a claim of prosecutorial misconduct. Patterson called Graham to ask about the omission of this claim, and Graham stated, "I've seen worse."

In fact, Patterson was not the only one urging Graham to focus on Martinez's conduct. Andriano herself wrote to Graham repeatedly for over a year, asking him to come meet with her and discuss her case and asking him questions about Martinez's misconduct. Graham was not responsive to her requests, and did not discuss her case with her until he sent her a copy of the opening brief after it had been filed.

Andriano also contacted the Arizona Capital Representation Project through her counselor, and its then-director Jennifer Bedier offered her assistance to Graham with the opening brief as well. Graham sent a copy of the brief to the Project for review, but dismissed all the offered suggestions. Bedier suggested that Graham file a supplemental brief raising the prosecutorial misconduct claim and provided more than two pages of notes from the transcripts detailing the pervasive

---

[12] Graham had second counsel on the appeal with him, but this was her first capital appeal and she deferred to the more-experienced Graham on the issues to raise.

and offensive tactics employed by Martinez. Graham sent the notes from Bedier to Andriano with a letter in which he disparaged the comments, and he never took action on any of the Project's suggestions, including asking to file a supplemental brief raising this issue. Graham has stated that he did not see any reason to raise a prosecutorial misconduct claim in this case, and stated that such claims "never win in Arizona."

Graham's actions were plainly deficient. Even if Graham's actions could somehow be deemed strategic, that strategy was unreasonable and cannot be deferred to here. Most importantly, Graham should have known at the time of Andriano's appeal that meritorious prosecutorial misconduct claims did win in Arizona. As noted above, the Arizona Supreme Court had taken drastic action in several cases in the years immediately prior to Andriano's appeal. In 2002, the Arizona Supreme Court reversed the defendant's conviction and sentence in a capital appeal involving three murders, and barred retrial due to the extreme misconduct by the trial prosecutor. *Minnitt*, 55 P.3d at 776; *see also id.* at 781 ("Prosecutorial misconduct that permeates the process and intentionally destroys the ability of the tribunal to reach a fair verdict must necessarily be remedied."). This decision was based on other Arizona cases that reached similar results on the basis of prosecutorial misconduct. *See Pool*, 677 P.2d at 271-72; *Hughes*, 969 P.2d at 1186; *see also State v. Jorgenson*, 10 P.3d 1177 (Ariz. 2000). Further, the Arizona Supreme Court had recently ordered disbarment of the capital prosecutor whose conduct was at issue in *Minnitt*. *Peasley*, 90 P.3d at 779. And, it had suspended a second capital prosecutor for six months and a day for his actions in the *Hughes* case. *Zawada*, 92 P.3d at 871. The two disciplinary actions took place in the same year as Andriano's trial, and sent shockwaves through the legal community and the media. *See, e.g.*, Jeffrey Toobin, *Killer Instincts*, The New Yorker at 54 (Jan. 17, 2005); A.J. Flick, *Supreme Court Disbars Peasley*, Tucson Citizen (May 29, 2004), *available at* http://tucsoncitizen.com/morgue2

1  /2004/05/29/61891-supreme-court-disbars-peas ley/ (last visited Mar. 6, 2007).

2  Graham had no reasonable basis for his ignorance of these cases or their results,

3  especially in light of prevailing professional norms: an attorney in his own office

4  had presented a session on prosecutorial misconduct at the annual Arizona public

5  defender's seminar at the same time Graham was representing Andriano on

6  appeal, and she had discussed many of the topics at issue in this case. Her

7  materials were reproduced by popular demand in the public defender's quarterly

8  newsletter just two months before the opinion in Andriano's case was issued.

9      Based on the uncontroverted evidence of pervasive and outrageous

10 misconduct in this case and others prosecuted by Martinez, Andriano was

11 prejudiced by Graham's failure to raise this issue on appeal. The Arizona Supreme

12 Court has a history of reversing cases based on prosecutorial misconduct, and

13 Andriano's claim is meritorious. Martinez is an experienced prosecutor. Based

14 upon Martinez's history and experience, he knew he should not make improper

15 and unsupported arguments or misstate the evidence. Martinez's misconduct can

16 only be seen as intentional conduct aimed to secure another death verdict, and the

17 cumulative effect was undeniably prejudicial to Andriano, ultimately denying her

18 right to a fair trial. Accordingly, she is entitled to evidentiary development and

19 habeas relief.

20                              **CLAIM TWO**

21     **The trial attorney tasked with the responsibility of Andriano's**
   **penalty phase defense had an actual conflict of interest that**
22 **rendered him ineffective. As a result of his ineffective assistance of**
   **counsel, Andriano's Sixth and Fourteenth Amendment rights were**
23 **violated.**

24     Andriano raised this claim in her post-conviction proceedings. (PCR Mem.

25 at 61.) After an evidentiary hearing on the issue, the state court denied the claim

26 on the merits. (PCR Min. Entry Nov. 3, 2014 at 18-20.) The Arizona Supreme

27 Court summarily denied review. (PFR 39.) The state courts' rejection of this claim

28 was contrary to, or involved an unreasonable application of, clearly established

1    federal law, as determined by the United States Supreme Court. 28 U.S.C.
2    § 2254(d)(1). In addition, it constituted an unreasonable determination of the facts
3    in light of the evidence presented. 28 U.S.C. § 2254(d)(2).

4         The Supreme Court recognizes that a criminal defendant's Sixth
5    Amendment right to counsel includes the right to be represented by an attorney
6    who is free from conflicts of interest. *See Wood v. Georgia*, 450 U.S. 261, 271
7    (1981); *Murdaugh v. Ryan*, 724 F.3d 1104, 1123 (9th Cir. 2013). And, defense
8    attorneys have an "ethical obligation to avoid conflicting representations and to
9    advise the court promptly when a conflict of interest arises during the course of
10   trial." *Cuyler v. Sullivan*, 446 U.S. 335, 346 (1980). Unlike other Sixth
11   Amendment claims, "a defendant who shows that a conflict of interest actually
12   affected the adequacy of his representation need not demonstrate prejudice in
13   order to obtain relief," and harmless error analysis does not apply. *Cuyler*, 446
14   U.S. at 349-50. Moreover, even "[i]f a defendant fails to object to representation
15   by an attorney with a conflict, but shows on appeal that 'an actual conflict of
16   interest adversely affect his lawyer's performance' reversal is required." *Lockhart
17   v. Terhune*, 250 F.3d 1223, 1229-30 (9th Cir. 2001) (quotation and citation
18   omitted).

19        The attorney responsible for Andriano's penalty-phase defense had a
20   glaring actual conflict of interest that adversely affected his performance, and as a
21   result Andriano was deprived of her constitutional rights to counsel and due
22   process. *Mickens v. Taylor*, 535 U.S. 162, 171 (2002) (noting that "an actual
23   conflict of interest" means "a conflict that affected counsel's performance").
24   David DeLozier was the attorney responsible for Andriano's penalty-phase
25   presentation. At the same time he was representing Andriano and supposed to be
26   investigating and developing mitigation evidence, he was also representing
27   Andriano's mother and step-father ("the Ochoas") in their legal dispute with Joe's
28   family regarding the custody of Andriano's two children. (PCR Tr. Feb. 4, 2014 at

1   167-68.) Thus, DeLozier was "actively represent[ing] conflicting interests."

2   *Cuyler*, 446 U.S. at 350.

3       In Andriano's criminal case, DeLozier was responsible for penalty-phase

4   preparation and presentation, which "requires extensive and generally

5   unparalleled investigation into personal and family history" including instances of

6   childhood abuse, neglect, or deprivation. *See* ABA Guidelines for the

7   Appointment and Performance of Defense Counsel in Death Penalty Cases § 10.7,

8   cmt. (rev. ed. 2003), *reprinted in* 31 Hofstra L. Rev. 813, 1022 (2003) (hereinafter

9   "2003 ABA Guidelines"). Mitigation evidence is central to a defense attorney's

10  ability to humanize his client and present to the jury someone for whom they can

11  find mercy. *See, e.g.*, Gary Goodpaster, *The Trial For Life: Effective Assistance of*

12  *Counsel In Death Penalty Cases*, 58 N.Y.U. L.R. 299 (May 1983).

13      At the same time DeLozier was to be achieving this weighty task, he was

14  also tasked with portraying the Ochoas in the best possible light so that they could

15  adopt or obtain visitation rights with respect to Andriano's children. DeLozier's

16  investment in assisting the Ochoas in their custody case eventually lead to

17  allegations that he engaged in unethical behavior during his representation, and he

18  was sanctioned by the court overseeing the custody matter for "intentionally and

19  surreptitiously" avoiding the court's orders "with the intentions of permanently

20  severing the paternal interest of the children" and intentionally disregarding the

21  court's orders. (Minute Entry Ruling, *In the Matter of Andriano Minor Children*,

22  No. AD200100058 (Pinal Co. Super. Ct. Oct. 16, 2002).) DeLozier clearly had an

23  actual conflict—on one hand to represent Andriano's interests in the criminal case

24  against her, which included telling the jury about her family history of mental

25  illness and abuse, and on the other to represent the Ochoas in their custody battle,

26  which required portraying them as suitable caregivers for two young children. (*Id.*

27  at 168-70.) Further evidence of the conflict is the fact that the Ochoas retained

28  DeLozier to represent Andriano in her criminal case, and they compensated him

1    for his representation. (PCR Tr. Feb. 4, 2014 at 167-68.)

2          Because of his actual conflict, DeLozier failed to investigate areas of
3    Andriano's life that would have yielded compelling mitigation evidence. For
4    example, Andriano's step-father Alejo had a sexually inappropriate relationship
5    with her (PCR Pet. Ex. 3), but DeLozier never interviewed him about those
6    incidents. The story DeLozier should have told included that Alejo had been
7    accused of molesting other young girls and that Alejo had Andriano, wearing only
8    her underwear, give him nightly massages while he too only wore underwear.
9    (PCR Pet. Ex. 3 at 11.) DeLozier further neglected to tell the jury about Alejo
10   photographing Andriano in bikinis (PCR Pet. Ex. 3 at 12, Ex. 73, Ex. 74), or that
11   Andriano's mother left Andriano alone with her boss despite her knowledge of his
12   prior sexual abuse of girls (PCR Pet. Ex. 3 at 11).

13         Instead, DeLozier's penalty-phase narrative was that Andriano was the
14   product of a good family and good upbringing. He described Alejo as "loving but
15   yet oppressive and sometimes abusive" (Tr. Dec. 8, 2005 at 29), instead of
16   detailing Alejo's history of abuse, and his, at minimum, inappropriate and highly
17   sexualized relationship with Andriano. His opening statement provided the jury
18   with just a cursory glance of Andriano's tumultuous relationship with Joe and the
19   financial and emotional stress she was under at the time of the offense. (Tr. Dec.
20   15, 2004 at 91-93.) He briefly mentioned that Andriano was emotionally abused
21   by Alejo and would "go into the bathroom or bedroom and hide . . . until Alejo
22   calmed or left. What happened after that, neither of them ever mentioned what
23   happened." (*Id.* at 93.) And, DeLozier briefly told the jury that Andriano suffered
24   "various forms of sexual abuse . . . from members of [her mother's] own family
25   before the age of five" (*id*. at 95), but then undermined even that by immediately
26   stating that "both families supported this young family" by loaning them vehicles,
27   providing funds, and paying for various things (*id.* at 100).

28         Thus, the jury heard a superficial account of Andriano's childhood and

family history, and even that was contradicted with DeLozier's commendatory comments that Andriano's step-father was "loving" toward her and that the Ochoas supported Andriano and Joe in tough times. This depiction was consistent with the story DeLozier had an interest in portraying on the Ochoas' behalf in the child custody battle, but was both completely inaccurate and at odds with the needs of Andriano's mitigation case. He was clearly conflicted between the story he needed to tell in order to prevail in the battle over child custody and the history of abuse and mental illness that he needed to develop and present to the jury in order to give them a reason to find mercy and not impose a death sentence.

In addition to failing to present evidence related to the Ochoas, DeLozier did not investigate the fact that Andriano's family was heavily involved in a church group akin to a religious cult. (Tr. Dec. 8, 2004 at 29.) DeLozier assumed representation of Andriano after speaking with Pastor Andrew Cunningham, whose wife was a childhood friend of Andriano and a family friend of the Ochoas. (PCR Pet. Ex. 7 ¶ 8; PCR Pet. Ex. 9 ¶ 6.) Although DeLozier regularly met with Andriano, the meetings involved Bible study and were not related to the substance of her case or a mitigation investigation. (PCR Pet. Ex. 7 ¶ 8; PCR Pet. Ex. 9 ¶ 7.) Instead, he explained that the meetings "were primarily to discuss topics unrelated to her case, such as family and our belief in God. I viewed my role with Wendi as a combination of an attorney and a spiritual counselor." (PCR Pet. Ex. 7 ¶ 8.) Thus, instead of preparing Andriano's mitigation presentation, his goal was "to provide psychological and religious support." (*Id*.) Indeed, DeLozier informed Andriano that he "believed God was assisting in [her] defense case and would not allow [her] to be sentenced to death." (PCR Pet. Ex. 9 ¶ 8.) During their meetings, DeLozier also informed Andriano that he planned "to fast during the duration of [her] trial to seek God's favor and to give him a better spiritual connection with God and to make him more receptive to hearing God's instructions about how to defend [her] case." (*Id.* ¶ 10.) He in fact did so, going without solid food for 70

days. (PCR Pet. Ex. 7 ¶ 9.) Because DeLozier viewed his role as that of a "spiritual counselor" rather than a legal advisor, it is not surprising that he failed to investigate people from the Ochoas' church or Andriano's upbringing in what was essentially a religious cult. DeLozier was simply too divided by his representation of and religious connections to the Ochoas to provide Andriano with objective, competent representation in her criminal proceedings. DeLozier was thus obligated to remove himself from Andriano's capital case but failed to do so. Consequently, Andriano received ineffective assistance of counsel in violation of her Sixth and Fourteenth Amendment rights.

The conflict undeniably affected the adequacy of Andriano's representation. DeLozier did not ask Andriano or any of the Ochoa family about childhood abuse or mental-health history and did not investigate whether the Ochoas had mental-health or substance-abuse issues. Further, DeLozier asked Andriano's mother to help him write his penalty-phase opening statement. (PCR Tr. Feb. 4, 2014 at 192.) Thus, not only did he fail to investigate troubling family history, he asked Andriano's mother to take on the significant and complex undertaking of writing his opening statement and thereby setting the tone for the penalty phase of the trial. She ultimately found the task too difficult and contacted a friend who had grant writing experience, asking her to assist DeLozier with his remarks. (*Id.*) The fact that he was willing to let Andriano's mother, who was not a lawyer or mitigation specialist and had no relevant training or experience, handle such a critical part of the trial illustrates that DeLozier did not appreciate and was failing to execute the task at hand. As a result of his divided loyalties, DeLozier was unable to objectively investigate and present significant mitigation evidence at the penalty phase. Such a conflict is disconcerting in any criminal case, but is especially troubling because Andriano faced a sentence of death. *See Lockett v. Ohio*, 438 U.S. 586, 605 (1978) (noting that "the imposition of death by public authority is so profoundly different from all other penalties").

1  DeLozier neglected to conduct any meaningful investigation or convey to the jury
2  Andriano's compelling history that provided essential context for the offense and
3  her deservingness of leniency.

4      After an evidentiary hearing, the PCR court determined that DeLozier's
5  dual representation of Andriano in the criminal action and of the Ochoas in their
6  ongoing custody matter presented a "potential" conflict of interest to the extent
7  their interests diverged, but determined that the two parties' interests did not
8  actually diverge and there therefore was no actual conflict. (PCR Min. Entry Nov.
9  3, 2014 at 19.) The PCR court emphasized the fact that Andriano wanted her
10  children to be with the Ochoas and reasoned that therefore there was no issue with
11  counsel representing both parties because their interests aligned at the time of the
12  trial. (*Id.*) However, that Andriano wanted her children to be with her parents does
13  not absolve DeLozier of his duty to investigate mitigating evidence and present it
14  at trial in fulfillment of her interests as a criminal defendant. There is no evidence
15  that Andriano agreed to forgo the presentation of mitigation evidence to further
16  her family's chances of gaining custody. DeLozier's duties at her capital trial were
17  independent of Andriano's wishes for her children. The court unreasonably
18  rejected this claim based on the facts before it—that DeLozier was charged with
19  portraying the Ochoas as suitable guardians for Andriano's children while
20  simultaneously tasked with investigating and presenting facts about the Ochoas
21  that would be incredibly damaging in their child custody dispute. The court
22  determined that DeLozier "was familiar with sexual abuse victimology; he
23  attributed statements assailing his clients' (the defendant's parents) character to
24  the normal aspersions cast in domestic situations." (*Id.* at 20.) This assertion
25  supports the argument that DeLozier had an actual conflict. There was plenty of
26  evidence suggesting that Andriano's childhood and family life were not typical
27  domestic situations and that the Ochoas engaged in much more egregious conduct
28  than "normal aspersions cast in domestic situations." Thus, the court's

determination that there was no actual conflict constituted an unreasonable determination in light of the previously discussed facts showing that DeLozier had an actual conflict and that it affected Andriano's representation.

Further, the PCR court unreasonably applied *Cuyler*, which states that "prejudice is presumed only if the defendant demonstrates that counsel 'actively represented conflicting interests' and that 'an actual conflict of interest adversely affected his lawyer's performance.'" (PCR Min. Entry, Nov. 3, 2012 at 18-19 (citing *Cuyler*, 446 U.S. at 350).) Andriano has shown that DeLozier actively represented conflicting interests, and as a result she was deprived of an adequate mitigation presentation. In *Cuyler*, the Court explained that when counsel is burdened by an actual conflict of interest, "counsel breaches the duty of loyalty, perhaps the most basic of counsel's duties. Moreover, it is difficult to measure the precise effect on the defense of representation corrupted by conflicting interests," and thus, "given the obligation of counsel to avoid conflicts of interest . . . it is reasonable for the criminal justice system to maintain a fairly rigid rule of presumed prejudice for conflicts of interest." *Strickland*, 466 U.S. at 692 (citing *Cuyler*, 446 U.S. at 345-50). Here, the court unreasonably applied *Cuyler* in determining that because the parties' personal interests aligned, DeLozier's divided duty of loyalty was of no consequence. *Cuyler* provides no such exception.

Alternatively, even if DeLozier did not have an actual conflict, his conduct meets the higher bar for deficient performance under *Strickland*'s purview, and Andriano can show that his deficiency prejudiced her. In addition to DeLozier's representation of the Ochoas in their child custody case, other factors contributed to his deficient performance. As previously discussed, DeLozier fasted during trial and went without solid food for 70 days. (PCR Pet. Ex. 7 ¶ 9.) Moreover, an attorney who worked in DeLozier's law firm and had assisted in Andriano's case was murdered in a road-rage incident during Andriano's trial, and counsel never

1   fully regained his ability to focus. (*Id.* ¶ 10.) During cross-examination of a
2   defense expert witness that DeLozier was tasked with questioning, he had to stop
3   the trial because he felt ill and could not focus. (*Id.* ¶ 11.) In addition, his father
4   fell ill during trial after suffering a massive heart attack and was "expected to die
5   at any minute," necessitating another break in the trial. (Tr. Nov. 22, 2004 at 3-4.)
6   On top of the personal events that affected his representation, DeLozier had never
7   participated in a capital trial and was thus not qualified to have sole responsibility
8   for the mitigation phase. (PCR Pet. Ex. 7 ¶ 2.)

9        Although the PCR court did not find counsel's performance deficient, it
10  nonetheless addressed *Strickland*'s prejudice requirement. (PCR Min. Entry Nov.
11  3, 2014 at 20.) *See Strickland* 466 U.S. at 695 ("When a defendant challenges a
12  death sentence . . . the question is whether there is a reasonable probability that,
13  absent the errors, the sentencer . . . would have concluded that the balance of
14  aggravating and mitigating circumstances did not warrant death."). Andriano need
15  not show prejudice because an actual conflict existed as discussed above, but she
16  can nevertheless satisfy *Strickland*'s prejudice requirement because she has shown
17  that there is a reasonable probability that "but for counsel's unprofessional errors,
18  the result of the proceeding would have been different." *Id.* at 694. DeLozier's
19  theme at mitigation was that Andriano was a good person raised in a mostly good
20  environment who made a bad decision in response to spousal abuse. The
21  cumulative impact of Andriano's experiences affected her mental and behavioral
22  development, and the jury never heard a coherent account of this and how it
23  compounded with the stressors she faced leading up to the offense. Had the jury
24  been presented with a complete and accurate portrayal of Andriano's history as
25  well as her family's, there is a reasonable probability that the jury would have
26  concluded that Andriano deserved leniency, imposing a life sentence instead of
27  death. Thus, the PCR court unreasonably applied *Strickland* in its prejudice
28  determination.

1    The Arizona Supreme Court failed to correct the PCR court's incorrect

2  legal and factual determinations when it summarily denied Andriano's Petition for

3  Review. (PFR 39.) Consequently, she was deprived of her Sixth and Fourteenth

4  Amendment rights, and is thereby entitled to relief under either *Cuyler* or

5  *Strickland*.

6                                    **CLAIM THREE**

7       **Andriano received ineffective assistance of counsel during the**
        **penalty phase of her capital trial proceedings, in violation of her**
8       **Sixth, Eighth, and Fourteenth Amendment rights.**

9       Andriano has a constitutional right to the effective assistance of counsel at

10  sentencing. *See, e.g.*, *Rompilla v. Beard*, 545 U.S. 374, 393 (2005); *Wiggins v.*

11  *Smith*, 539 U.S. 510, 519-20 (2003); *Terry Williams v. Taylor*, 529 U.S. 362, 390

12  (2000). In fact, "[t]here is no more important hearing in law or equity than the

13  penalty phase of a capital trial." *Correll v. Ryan*, 539 F.3d 938, 946 (9th Cir.

14  2008) (quoting *Gerlaugh v. Stewart*, 129 F.3d 1027, 1050 (9th Cir. 1997)

15  (Reinhardt, J., concurring and dissenting)). As such, a capital sentencer must be

16  afforded the opportunity to assess "the character and record of the individual

17  offender." *Eddings v. Oklahoma*, 455 U.S. 104, 112 (1982) (internal quotation

18  marks and citation omitted). As the Supreme Court has explained, "[i]f the

19  sentencer is to make an individualized assessment of the appropriateness of the

20  death penalty, evidence about the defendant's background and character is

21  relevant because of the belief, long held by this society, that defendants who

22  commit criminal acts that are attributable to a disadvantaged background, or to

23  emotional and mental problems, may be less culpable than defendants who have

24  no such excuse." *Penry v. Lynaugh*, 492 U.S. 302, 319 (1989) (internal quotation

25  marks and citation omitted), *abrogated on other grounds by Atkins v. Virginia*,

26  536 U.S. 304 (2002); *Eddings*, 455 U.S. at 112 (explaining that consideration of

27  offender's life history is a "constitutionally indispensable part of the process of

28  inflicting the penalty of death" (internal quotation marks and citation omitted)).

In *Strickland*, 466 U.S. at 686-87, the Supreme Court outlined the standard for determining when counsel has provided ineffective assistance. As described by the Court, "the benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Id.* at 686. Under *Strickland*, counsel is ineffective if: (1) "representation fell below an objective standard of reasonableness," *id.* at 688; and (2) "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different," *id.* at 694. Effective assistance of counsel is ultimately concerned with the fundamental right to a fair trial, "a trial whose result is reliable." *Id.* at 687. A "reasonable probability that . . . the result of the proceeding would have been different" is simply "a probability sufficient to undermine confidence in the outcome," and is less than a preponderance of the evidence standard. *Id.* at 694. "Because of the potential consequences of deficient performance during capital sentencing, we must be sure not to apply a more lenient standard of performance to the sentencing phase than we apply to the guilt phase of trial." *Mak v. Blodgett*, 970 F.2d 614, 619 (9th Cir.1992).

The reasonableness of counsel's decisions is measured by the reasonableness of the investigation done in making such a decision. *Cf. Wiggins v. Smith*, 539 U.S. 510, 523 (2003) (focusing on "whether the investigation supporting counsel's decision not to introduce evidence of Wiggins' background was itself reasonable"). "[S]trategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Strickland*, 466 U.S. at 690-91. In other words, any strategic decision made by counsel must be "reasonable and informed." *Jennings*, 290 F.3d at 1014.

When assessing the second prong, a court must decide whether "counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose

result is reliable." *Strickland*, 466 U.S. at 687. A petitioner does not have to demonstrate by a preponderance of the evidence that "the result in his case would have been different but for counsel's errors," but only that there was a reasonable probability that the errors undermined confidence in the outcome of his trial. *Brown v. Myers*, 137 F.3d 1154, 1157 (9th Cir. 1998) (citing *Strickland*, 466 U.S. at 694); *see also Jennings*, 290 F. 3d at 1016 (quoting *Strickland*, 466 U.S. at 694 (rejecting explicitly the preponderance standard)); *Lord v. Wood*, 184 F.3d 1083, 1085 (9th Cir. 1999). And "despite the strong presumption of reliability," the question to be asked is whether "the result of the particular proceeding is unreliable because of a breakdown in the adversarial process that our system counts on to produce just results." *Strickland*, 466 U.S. at 696. Moreover, "deficient performance and prejudice questions may be closely related." *Correll v. Ryan*, 539 F.3d 938, 951 (9th Cir. 2008) (citations omitted). Indeed, counsel's performance in and of itself could undermine a court's confidence in the outcome of the trial. *Id.*

"In making this [prejudice] determination, a court hearing an ineffectiveness claim must consider the totality of the evidence before the judge or jury." *Strickland*, 466 U.S. at 695; *see also Terry Williams*, 529 U.S. at 397-98 (2000); *Alcala v. Woodford*, 334 F.3d 862, 882-83 (9th Cir. 2003) (granting relief on basis of cumulative impact of multiple errors by counsel); *Harris by and through Ramseyer v. Wood*, 64 F.3d 1432, 1439 (9th 1995) (holding that the cumulative impact of numerous deficiencies in defense counsel's performance was prejudicial to the defense, rendering the proceedings improper and warranting habeas relief). Even if this Court finds that no single error amounts to prejudice, it, nonetheless, should apply cumulative error principles to grant relief. *See Boyde v. Brown*, 404 F.3d 1159, 1176 (9th Cir. 2005) (quoting *Cooper v. Fitzharris*, 586 F.2d 1325, 1333 (9th Cir. 1978) (en banc)).

A critical aspect in assessing prejudice under *Strickland* is to consider

whether the combined errors by trial counsel impacted the trial in a manner that violated the Sixth Amendment. The Supreme Court did not instruct that each individual error should be reviewed for prejudice, but rather that the totality of the errors by counsel should be reviewed collectively for prejudice. In fact, *Strickland* established that assessing prejudice resulting from an ineffectiveness claim is identical to assessing materiality for a suppression-of-evidence claim under *United States v. Agurs*, 427 U.S. 97, 104, 112-13 (1976). *Strickland*, 466 U.S. at 694. And the Supreme Court has continually explained that when assessing materiality, the suppressed evidence must be "considered collectively, not item by item." *Kyles v. Whitley*, 514 U.S. 419, 436 (1995); *see also Strickland*, 466 U.S. at 695 ("In making this [prejudice] determination, a court hearing an ineffectiveness claim must consider the totality of the evidence before the judge or jury."); *Terry Williams*, 529 U.S. at 397 (holding that when assessing prejudice, reviewing court must consider "the totality of the available mitigation evidence—both that adduced at trial, and the evidence adduced in the [post-conviction] proceeding"); *Alcala*, 334 F.3d at 882-83 (granting relief on basis of cumulative impact of multiple errors by counsel); *Martin v. Grosshans*, 424 F.3d 588, 590-92 (7th Cir. 2005) ("[E]ven if [trial counsel's] errors, in isolation, were not sufficiently prejudicial, their cumulative effect prejudiced Martin's defense."); *Lindstadt v. Keane*, 239 F.3d 191, 194, 205 (2d Cir. 2001) (granting relief where petitioner was prejudiced by cumulative effect of errors committed by trial counsel). Accordingly, "[s]eparate errors by counsel at trial and at sentencing should be analyzed together to see whether their cumulative effect deprived the defendant of his right to effective assistance." *Sanders v. Ryder*, 342 F.3d 991, 1001 (9th Cir. 2003) (citation omitted). "They are, in other words, not separate claims, but rather different aspects of a single claim of ineffective assistance of trial counsel." *Id.* Even if prejudice does not result from an individual error, it may nevertheless result from cumulative errors. *See Boyde*, 404 F.3d at 1176 (quoting *Cooper*, 586

F.2d at 1333).

Patterson's and DeLozier's performance in Andriano's case fell below the applicable standard of care and they provided ineffective assistance of counsel. Accordingly, Andriano is entitled to relief.

### A. Trial counsel provided ineffective assistance when they failed to adequately investigate, develop, and present readily available evidence in mitigation of Andriano's crime.

Andriano raised this claim in her post-conviction proceedings. (PCR Mem. at 46; PFR 1 at 37.) The state court's rejection of this claim was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the United States Supreme Court. 28 U.S.C. § 2254(d)(1). In addition, it constituted an unreasonable determination of the facts in light of the evidence presented. 28 U.S.C. § 2254(d)(2). To the extent any aspects of this claim were not exhausted, that failure is attributable to the ineffective assistance of Andriano's appellate and post-conviction counsel. *See Strickland*, 466 U.S. at 668; *Evitts*, 469 U.S. at 397; *Martinez*, 132 S. Ct. at 1315; *Nguyen*, 736 F.3d at 1293-94. Andriano will demonstrate at an evidentiary hearing that appellate and post-conviction counsel fell below the standards of minimally competent capital attorneys and that those failures prejudiced her.

### 1.   Factual Background

As detailed at length in Andriano's post-conviction proceedings, trial counsel failed her in numerous ways. (PCR Mem. at 21-43, 46-55.) She was represented at trial by Dan Patterson from the Maricopa County Public Defender's Office, and by David DeLozier, an attorney who worked on the case with Patterson pursuant to *Knapp v. Hardy*, 523 P.2d 1308 (Ariz. 1974). (PFR 8 at 002427.) DeLozier was put in charge of Andriano's mitigation investigation by Patterson, and met with Andriano frequently. (PFR 8 at 002428.) However, just four months before trial, Patterson became aware that DeLozier's frequent meetings with Andriano were not in preparation for trial or part of his mitigation

investigation, but mainly consisted of discussions regarding faith and religion. (*Id.* at 002429.) Patterson became more involved in the mitigation development at this stage, but only a few months remained before the case would go to trial and DeLozier retained responsibility for the majority of the mitigation investigation and presentation.

DeLozier's main theme at Andriano's trial was that she was "an innocent young girl who lived a sheltered life." (Tr. Dec. 8, 2004 at 28.) His presentation focused on the fact that Andriano had loving parents who were supportive of her. (*See, e.g.*, Tr. Dec. 9, 2004 at 7-9, 92-99; Tr. Dec. 13, 2004 at 40-41.) He also presented evidence regarding "the stress of Joe's cancer, [Andriano's] good grades in school, missionary and community work, and strong religious convictions. In addition, . . . [Andriano] was a sexual abuse and domestic violence victim, a good mother to two children, married for six years, and a good inmate." *Andriano*, 161 P.3d at 554. The Arizona Supreme Court's opinion on direct appeal highlighted the problems with DeLozier's presentation; the shallow and unsupported nature of the evidence presented allowed the jury, and the court in its independent review, to ignore key issues in Andriano's life that led to the crime. For example, the court stated that "this is not a case in which Andriano suddenly 'cracked' under extreme stress." 161 P.3d at 555. It also stated that there was conflicting evidence as to whether Andriano was a good mother, that the evidence was simply that Andriano "may have been" a sexual abuse victim, and that she was expected to behave in prison. *Id.* Accordingly, the court affirmed Andriano's conviction and sentence. *Id.* at 555-56.

During Andriano's post-conviction proceedings, she presented abundant evidence of mitigating circumstances that had not been investigated or developed at the time of trial, and which was never presented to the jury or the Arizona Supreme Court. (*See, e.g.*, PCR Pet. Exs. 1-77; Tr. Feb. 3, 2014 a.m.; Tr. Feb. 3, 2014 p.m.; Tr. Feb. 4, 2014; Tr. Feb. 5, 2014; Tr. Feb. 6, 2014; Tr. Feb. 7, 2014;

1    Tr. Feb. 10, 2014; Tr. Feb. 11, 2014; Tr. Feb. 14, 2014; PCR Post-Hr'g Mem.

2    June 2, 2014.) This evidence includes Andriano's diagnoses of Bipolar Disorder

3    and complex Post-Traumatic Stress Disorder coupled with impairments in

4    executive functioning (PCR ME Nov. 3, 2014 at 13; PCR Pet. Exs. 2, 3, 4; *see*

5    *also* Tr. Feb. 5, 2014 at 102-03), her history of childhood trauma, poverty, and

6    neglect (*see, e.g.*, PCR Pet. Exs. 27, 28, 29; PCR Pet. Exs. 2, 3, 4), her stepfather's

7    inappropriate and damaging behavior (PCR Pet. Exs. 2, 3, 4), or her immersion in

8    a strict religious organization with cult-like characteristics (PCR Pet. Exs. 2, 3, 4).

9    After an eight-day hearing and supplemental briefing, the PCR court denied

10   Andriano's claim. (PCR ME Nov. 3, 2014.) The Arizona Supreme Court

11   subsequently denied review. (PFR 39.)

## 2.    Unreasonable Application of Clearly Established Law

13   Because the PCR court unreasonably applied clearly established federal law

14   during its analysis, Andriano has satisfied the strictures of § 2254(d)(1) on the

15   basis of the state court record, and this Court must review the merits of this claim

16   de novo. *See Frantz v. Hazey*, 533 F.3d 724, 736 (9th Cir. 2008) (en banc) (stating

17   that once 2254(d)'s limitation on relief has been satisfied, a federal court conducts

18   a de novo review of the underlying constitutional violation). Andriano is entitled

19   to relief on this claim.

20   The PCR court committed a number of errors in its analysis of Andriano's

21   claim. Perhaps most importantly, it applied incorrect standards when assessing the

22   credibility of Andriano's evidence. For example, while the court "accept[ed] as

23   true" the mental-health evidence offered during those proceedings, the court

24   further found that this evidence did not support a finding of theArizona Revised

25   Statutes § 13-751(G)(1) mitigating circumstance. (PCR ME Nov. 3, 2014 at 13.)

26   However, this is not the end of the analysis. While the court was free to conclude

27   that Andriano had not proven the existence of this statutory mitigating

28   circumstance, the evidence still proved the existence of compelling non-statutory

mitigating circumstances that directly affected Andriano's actions on the night of the crime. The PCR court's order does not reflect consideration of this evidence as non-statutory mitigation despite the fact that this evidence is exactly the type that courts have found prejudicial. *See, e.g.*, *Wiggins*, 539 U.S. at 534 ("In assessing prejudice, we reweigh the evidence in aggravation against the totality of available mitigating evidence."); *Terry Williams*, 529 U.S. at 397 (holding that when assessing prejudice, reviewing court must consider "the totality of the available mitigation evidence—both that adduced at trial, and the evidence adduced in the [post-conviction] proceeding"); *Strickland*, 466 U.S. at 695 ("In making this [prejudice] determination, a court hearing an ineffectiveness claim must consider the totality of the evidence before the judge or jury."); *Eddings*, 455 U.S. at 117 ("[T]he state courts must consider *all* relevant mitigating evidence and weigh it against the evidence of the aggravating circumstances." (emphasis added)); *see also Robinson v. Schriro*, 595 F.3d 1086 (9th Cir. 2010); *Bible v. Ryan*, 571 F.3d 860 (9th Cir. 2009); *Summerlin v. Schriro*, 427 F.3d 623 (9th Cir. 2005) (en banc).

In addition, while *Strickland* does not "prescribe a set of rules applicable to every capital sentencing," the court ignored both the prevailing professional norms and the case law interpreting *Strickland* in determining that it was reasonable for Andriano's counsel to act as they did. The Supreme Court has repeatedly made clear that the scope of trial counsel's penalty-phase investigation and presentation must fall within reasonable professional norms, and that simply making some presentation does not, on its own, satisfy those norms. *E.g.*, *Wiggins*, 539 U.S. at 528-29; *see also Hinton v. Alabama*, 134 S. Ct. 1081, 1089 (2014). In fact, the Supreme Court has stressed that "[c]riminal cases will arise where the only reasonable and available defense strategy requires consultation with experts or introduction of expert evidence." *Harrington v. Richter*, 131 S. Ct. 770, 788 (2011).

1   　　In addition, the court relied on the evidence presented at trial to decide that
2   the performance of counsel was not deficient, stating "the shortcomings were
3   neither apparent at trial nor captured in the record." (PCR ME Nov. 3, 2014 at 17.)
4   However, this is not the appropriate analysis for deficient performance. The fact
5   that the trial judge was not aware of problems within the defense team or that the
6   mitigation investigation had not been performed has nothing to do with whether
7   counsel had complied with their obligations to Andriano. Nowhere in the PCR
8   court's order does the court explain that counsel's performance was reasonable in
9   light of the circumstances and prevailing professional norms, as required by
10  *Strickland*.

11  　　　　　　**3.　　Unreasonable Determinations of Fact**

12  　　During Andriano's PCR proceedings, the state court based its decision that
13  trial counsels' performance was adequate and that Andriano could not show
14  prejudice on numerous unreasonable determinations of the facts. If this Court
15  finds that any one of these determinations of fact upon which the state court based
16  its decision is an "unreasonable determination of the facts in light of the evidence
17  presented in the State court proceeding," 28 U.S.C. § 2254(d)(2), this Court's
18  review of Andriano's claim is de novo. *See Frantz*, 533 F.3d at 736 (stating that
19  once § 2254(d)'s limitation on relief has been satisfied, a federal court conducts a
20  de novo review of the underlying constitutional violation).

21  　　Here, the PCR court's order contained numerous unreasonable
22  determinations of fact. In one compelling example, the PCR court ignored the
23  abundant evidence of prevailing professional norms and the duties of a capital
24  lawyer at sentencing when assessing the performance of counsel in this case.
25  (PCR ME Nov. 3, 2014 at 16-17.) The court acknowledged having "uncertainty"
26  about the extent of the investigation (*id.* at 17), but makes no actual findings
27  regarding the scope of the investigation here for reasonableness in light of
28  prevailing professional norms, or even reasonableness in light of the information

1   within counsel's knowledge. "[W]e focus on whether the investigation supporting

2   counsel's decision not to introduce mitigating evidence of [the defendant's]

3   background was itself reasonable." *Wiggins*, 539 U.S. at 523 (citing *Williams*, 529

4   U.S. at 415) (noting counsel's duty to conduct the "requisite, diligent"

5   investigation into his client's background). As discussed in the section above, the

6   court here ignored the evidence presented by PCR counsel in favor of reminiscing

7   about events at trial and pointing out that nothing seemed wrong. But, the point of

8   post-conviction proceedings is to review evidence outside the trial record. *See*

9   *Martinez*, 132 S. Ct. at 1317 (noting that ineffectiveness claims "often turn[] on

10  evidence outside the trial record"). Here, the court ignored the evidence outside

11  the court record in favor of the appearance of adequate assistance of counsel it

12  observed during the 2004 trial, essentially analyzing this claim in a manner

13  opposite to that demanded by clearly established federal law. *See Stankewitz*, 365

14  F.3d at 716 (stating that "a penalty phase ineffective assistance claim depends on

15  the magnitude of the discrepancy between what counsel did investigate and

16  present and what counsel could have investigated and presented").

17      One example of this error is obvious when evaluating the PCR court's

18  determination that the mitigation in this case was "front-loaded." (PCR ME Nov.

19  3, 2014 at 17.) The court made this finding despite Patterson's admission that the

20  mitigation investigation did not even begin until just a few months before trial,

21  and despite the fact that counsel was seeking court assistance in gathering

22  mitigation records after the jury had already convicted Andriano. (*See* PFR 1 at

23  47-48.) This failure constituted an unreasonable determination of facts. *See*

24  *Taylor*, 366 F.3d at 1008 ("Failure to consider key aspects of the record is a defect

25  in the fact-finding process.").

26      In addition, the PCR court repeatedly discounted the credibility of evidence

27  based on the fact that this evidence was different from what was presented at trial.

28  (PCR ME Nov. 3, 2014 at 8-13.) This is not an acceptable basis for a credibility

determination in a proceeding focused on the fact that what happened at trial was inadequate. The court acknowledged that it was uncertain about the scope of the mitigation investigation, but nonetheless repeatedly relied on the trial as the baseline for credibility. Andriano presented abundant evidence proving that counsels' actions at the time of trial were inadequate and compelling mitigation evidence that was never presented at trial. There is no authority for a court to decide that the fact that something was not presented at trial was a basis for a lack of credibility, and the PCR court cited none. Instead, the court ignored the evidence presented by Andriano in making these determinations. *See Taylor*, 366 F.3d at 1008 ("Failure to consider key aspects of the record is a defect in the fact-finding process."). While the court was "not required to address every jot and tittle of proof suggested to [it]," the evidence the court ignored here was "highly probative and central to [Andriano's] claim." *Id.* at 1001.

Further, the PCR court was unreasonable in its determination that the evidence presented in the post-conviction proceedings was not "available" at the time of trial based on Andriano's testimony. (PCR ME Nov. 3, 2014 at 15, 17.) There is no evidence that this is true, and Andriano's trial testimony does not negate counsel's responsibility pretrial to conduct a reasonable investigation. Counsel had numerous indications that would have lead a reasonable attorney to investigate further, but ignored them. The fact that Andriano's traumatic history and mental illnesses prevented her from discussing these events on the stand is not dispositive. *See Correll*, 539 F.3d at 950 n.3 ("[W]e have repeatedly held that counsel may render ineffective assistance if he is on notice that his client may be mentally impaired, yet fails to investigate his client's mental condition as a mitigating factor in a penalty phase hearing." (quoting *Caro v. Woodford*, 280 F.3d 1247, 1254 (9th Cir. 2002))).

Accordingly, this Court must consider Andriano's claim de novo, including the consideration of new evidence presented in federal court, because the state

1    court decision was unreasonable under § 2254(d). *See Taylor*, 366 F.3d at 1008

2    ("When we determine that state-court fact-finding is unreasonable, therefore, we

3    have an obligation to set those findings aside and, if necessary, make new

4    findings."). As discussed below, Andriano has proven that her counsel performed

5    deficiently and that she was prejudiced by that performance, and thus she merits

6    relief on this claim.

7                    **4.     Deficient Performance**

8           It is well-settled that when representing capital clients, "counsel has a duty

9    to make reasonable investigations or to make a reasonable decision that makes

10   particular investigations unnecessary." *Strickland*, 466 U.S. at 691; *see also id*.

11   ("In any ineffectiveness case, a particular decision not to investigate must be

12   directly assessed for reasonableness in all the circumstances, applying a heavy

13   measure of deference to counsel's judgments."). The Supreme Court later

14   reaffirmed this mandate, holding that trial counsel has an "obligation to conduct a

15   thorough investigation of the defendant's background." *Terry Williams*, 529 U.S.

16   at 396.

17          Subsequent decisions of the Supreme Court and the Ninth Circuit all affirm

18   the previous holding that counsel is required to conduct a reasonable and adequate

19   investigation of the defendant's history. *See, e.g.*, *Wiggins*, 539 U.S. at 521

20   (holding that the "deference owed such strategic judgments" of trial counsel is

21   "defined . . . in terms of the adequacy of the investigation supporting those

22   judgments"); *see also Allen v. Woodford*, 395 F.3d 979, 1001 (9th Cir. 2005)

23   (holding that "[c]ounsel's obligation to discover and appropriately present all

24   potentially beneficial mitigating evidence at the penalty phase should influence

25   everything the attorney does before and during trial . . . The timing of this

26   investigation is critical. If the life investigation awaits the guilt verdict, it will be

27   too late." (citation omitted; alteration in original)); *Stankewitz*, 365 F.3d at 716,

28   720 (holding that counsel's duty to conduct a thorough investigation at the penalty

phase "is not discharged merely by presenting some limited evidence[]" and stating that "tantalizing indications" in the record should have led counsel to investigate further); *Wallace v. Stewart*, 184 F.3d 1112, 1117 (9th Cir. 1999) (holding that "[i]t is imperative that all relevant mitigating information be unearthed for consideration at the capital sentencing phase" (alteration in original; citation omitted)).

Pursuant to *Strickland*, *Williams*, and *Wiggins*, in addition to the prevailing professional norms in Arizona, Andriano's counsel had an obligation to conduct a thorough investigation of her background in preparation for sentencing. In fact, in *Porter v. McCollum*, 558 U.S. 30 (2009), the Supreme Court described this obligation as "unquestioned" as of the time of Porter's 1988 sentencing. *Id.* at 38-39. Further, counsel's duty is not "discharged merely by conducting a limited investigation of these issues or by providing the sentencing court with a cursory or 'abbreviated' presentation of potentially mitigating factors." *Lambright v. Schriro*, 490 F.3d 1103, 1120 (9th Cir. 2007); *see also Wiggins*, 539 U.S. at 524 (finding deficient performance where "counsel abandoned their investigation of petitioner's background after having acquired only rudimentary knowledge of his history from a narrow set of sources"); *Douglas v. Woodford*, 316 F.3d 1079, 1090 (9th Cir. 2003) (finding ineffective assistance where trial counsel "introduced some of [the defendant's] social history, [but] did so in a cursory manner that was not particularly useful or compelling").

As the Ninth Circuit has observed, "Only after a thorough investigation can a less-than-complete presentation of mitigating evidence ever be deemed reasonable, and only to the extent that a reasonable strategy supports such a presentation." *Lambright*, 490 F.3d at 1120. That court has also made clear that "[a]n uninformed strategy is not a reasoned strategy. It is, in fact, no strategy at all." *Correll*, 539 F.3d at 949. Counsel's failures here cannot be excused as the product of a reasoned decision made after a thorough investigation. The huge

1   disparity between the mitigation evidence that counsel did present and what they
2   could have presented demonstrates the deficiencies of their performance.
3   *Stankewitz*, 365 F.3d at 716 (stating that "a penalty phase ineffective assistance
4   claim depends on the magnitude of the discrepancy between what counsel did
5   investigate and present and what counsel could have investigated and presented").

6        In Andriano's case, there is a tremendous disparity between the evidence
7   presented at trial and that presented in the post-conviction proceedings, and
8   counsel had no strategic reason for failing to conduct an appropriate investigation
9   or for failing to present this evidence. (*See* PCR Pet. Exs. 6, 7; *see also* PCR Pet.
10  Ex. 1.) As Larry Hammond explained in his declaration regarding the prevailing
11  professional norms and counsel's conduct in this case, "even with the very limited
12  knowledge that the defense had accumulated there were ample signs that should
13  have compelled a thorough investigation of the defendant's history, including her
14  psychological and mental state." (PCR Pet. Ex. 1 at 14.) Andriano presented
15  extensive arguments regarding the deficiencies of her trial counsel during the
16  post-conviction proceedings (s*ee* PCR Mem. at 21-43, 46-55; PCR Post-Hr'g
17  Mem. June 2, 2014 at 52-99; PFR 1 at 37-48) and incorporates those arguments
18  here. The PCR court ignored the vast majority of these allegations in deciding that
19  counsel was not deficient. As discussed above, this denial was based on an
20  unreasonable application of clearly established federal law and an unreasonable
21  determination of the facts, so this Court must review Andriano's claim de novo.

22           **5.    Prejudice**

23        "There is no more important hearing in law or equity than the penalty phase
24  of a capital trial." *Gerlaugh v. Stewart*, 129 F.3d 1027, 1050 (9th Cir. 1997)
25  (Reinhardt, J., concurring in part and dissenting in part). The Eighth Amendment
26  demands that all relevant evidence bearing on a defendant's character,
27  propensities, and record be considered by the sentencer in determining the
28  appropriateness of the penalty. *See, e.g.*, *Lockett*, 438 U.S. at 605. If the sentencer

is deprived of this evidence through the Sixth Amendment failings of counsel, the sentencing proceeding is unfair, the sentence itself is suspect, and one cannot have "confidence in the outcome" of the proceedings. *Strickland*, 466 U.S. at 694. A sentencing proceeding infected by constitutionally deficient investigation and presentation of mitigation establishes prejudice because the reviewing court cannot have "confidence in the outcome" of such a proceeding. *Id.* Cumulative prejudice from counsel's multiple deficiencies will also support a finding of ineffective assistance of counsel. *See, e.g.*, *id.* at 695; *Wood*, 64 F.3d at 1438.

Prejudice is not determined by a court on habeas review through a mere numerical weighing of the aggravation evidence adduced at trial against the mitigation evidence adduced at trial and in post-conviction, but must include a consideration of the appropriateness of the penalty as applied to an individual defendant in light of his record and character. *Williams* articulated this standard plainly, holding that although the newly-presented mitigation evidence, when combined with that presented to the sentencer at the time of trial "may not have overcome [the aggravating circumstance], the graphic description of Williams' childhood, filled with abuse and privation, or the reality that he was 'borderline mentally retarded,' might well have influenced the jury's appraisal of his moral culpability." *Williams*, 529 U.S. at 398 (citing *Boyde v. California*, 494 U.S. 370, 387 (1990)).

This Court must analyze how the mitigation evidence bears on the "development of the person who committed the crime," *Ainsworth v. Woodford*, 268 F.3d 868, 878 (9th Cir. 2001), how it affects "the individualized sentence required by the Constitution," *id.*, and how it "might well have influenced the [sentencer's] appraisal of . . . moral culpability," *Terry Williams*, 529 U.S. at 398. The Court must determine whether there is a reasonable probability that the mitigation evidence now proffered might have made a difference to at least one juror. *Stankewitz*, 365 F.3d at 718 n.6; *Douglas*, 316 F.3d at 1090.

1      In this case, Andriano's counsel failed to investigate, develop, and present

2  abundant and available evidence regarding "classic" mitigating factors that

3  affected Andriano's behavior throughout her life, including at the time of the

4  crime. (*See* Section I(A), *supra*, detailing Andriano's personal history and

5  background.)[13] All of this evidence is exactly the type of evidence that, if properly

6  presented and argued, could have affected the outcome at sentencing. *See, e.g.*,

7  *Wiggins*, 539 U.S. at 534-35 (finding counsel's performance deficient when,

8  among other things, counsel failed to investigate and present evidence of

9  Wiggins's poverty, homelessness, and diminished mental capacity). Had counsel

10  presented the evidence below to the jury, there is a reasonable probability of a

11  different result in the penalty phase. The state court's finding that Andriano was

12  not prejudiced by trial counsel's failures is objectively unreasonable and

13  unsupported by law. In fact, courts have repeatedly found prejudicial

14  ineffectiveness in cases where counsel neglected investigation of a capital

15  defendant's background and mental health. *See, e.g.*, *Stankewitz v. Wong*, 698

16  F.3d 1163 (9th Cir. 2012); *Robinson v. Schriro*, 595 F.3d 1086 (9th Cir. 2010);

17  *Hamilton v. Ayers*, 583 F.3d 1100 (9th Cir. 2009); *Libberton v. Ryan*, 583 F.3d

18  1147 (9th Cir. 2009); *Correll v. Ryan*, 539 F.3d 938 (9th Cir. 2008); *Lambright v.

19  Schriro*, 490 F.3d 1103 (9th Cir. 2007); *Frierson v. Woodford*, 463 F.3d 982 (9th

20  Cir. 2006); *Daniels v. Woodford*, 428 F.3d 1181 (9th Cir. 2005); *Summerlin v.

21  Schriro*, 427 F.3d 623 (9th Cir. 2005); *Boyde v. Brown*, 404 F.3d 1159 (9th Cir.

22  2005); *Jennings v. Woodford*, 290 F.3d 1006 (9th Cir. 2002); *Karis v. Calderon*,

23  283 F.3d 1117 (9th Cir. 2002); *Caro v. Woodford*, 280 F.3d 1247 (9th Cir. 2002);

24  *Ainsworth v. Woodford*, 268 F.3d 868 (9th Cir. 2001); *Smith v. Stewart*, 189 F.3d

25  1004 (9th Cir. 1999); *Seidel v. Merkle*, 146 F.3d 750 (9th Cir. 1998). These cases

26  control the analysis in Andriano's case as well, especially under a de novo

27

28  [13] To avoid repetition, Andriano incorporates Section I(A) into this claim.

1   standard of review where the strictures of 28 U.S.C. § 2254(d) do not apply.

2       Because Andriano's counsel failed to investigate and present available
3   mitigation evidence to the sentencing court, and because the mitigation evidence
4   they failed to present is substantial and sufficient to undermine confidence in the
5   result, the state courts were objectively unreasonable in determining that his
6   performance was reasonable and sufficient. Accordingly, Andriano's Sixth
7   Amendment right to the effective assistance of counsel was violated, and she is
8   entitled to relief.

9       **B.   Trial counsel's failure to object to an instruction that incorrectly
10          informed the jury that Andriano could be sentenced to life with
            the possibility of parole constituted ineffective assistance of
11          counsel in violation of Andriano's rights under the Sixth and
            Fourteenth Amendments.**

12      Andriano did not present this claim to the state courts as a result of post-
13   conviction counsel's deficient performance. The deficient performance of post-
14   conviction counsel prejudiced Andriano and provides cause to excuse any
15   procedural default. *See Martinez*, 132 S. Ct. at 1315; *Strickland*, 466 U.S. at 687-
16   88. Therefore, the Court may consider the merits of this claim. Because the claim
17   has not been adjudicated by the Arizona state courts, the limitations on relief
18   imposed by 28 U.S.C. § 2254(d) do not apply to this Court's review, and the
19   Court may consider the claim de novo.

20      The Arizona Legislature abolished parole for those convicted of the most
21   serious felonies in 1994. *See* Ariz. Rev. Stat. § 41-1604.09(I) (1994) (applying
22   parole-eligibility statutes only to one "who commit[s a] felony offense[] before
23   January 1, 1994"). As a result, those convicted of capital murder after 1993 could
24   be sentenced only to life imprisonment without the possibility of parole or to
25   death. The Supreme Court in *Simmons v. South Carolina*, 512 U.S. 154, 162
26   (1994), held that a defendant's due-process rights were violated when the jury was
27   not provided with "accurate information regarding petitioner's parole
28   ineligibility." *See also Lynch v. Arizona*, 136 S. Ct. 1818 (2016) (applying

84

1    *Simmons* to an Arizona case).

2    Andriano was convicted of a crime that occurred in 2000, and was thus

3    categorically ineligible for parole. (ROA 3.) *See Lynch*, 136 S. Ct. at 1819. For a

4    decade before Andriano's trial, the law therefore was clear that Andriano was not

5    eligible for parole and that failure to inform the jury of that fact would violate her

6    due-process rights. Nevertheless, the trial court instructed the jury at the penalty

7    phase of trial that:

8         If your verdict is that the defendant should be sentenced to
          death, the defendant will be sentenced to death. If your
9         verdict is that the defendant should be sentenced to life,
          the defendant will not be sentenced to death and the Court
10        will sentence the defendant to either life without parole
          until 25 calendar years in prison are served or natural life,
11        which means the defendant would never be released from
          prison.
12

13   (Tr. Dec. 16, 2004 at 50; ROA 419 at 11.) Defense counsel failed to object to this

14   instruction. (Tr. Dec. 7, 2004 at 6-8.) In fact, the prosecutor had filed a motion

15   seeking to "preclude evidence or argument claiming there is no possibility of

16   parole under Arizona law." (ROA 147.) Defense counsel responded that the

17   defense "agrees that the Court should properly instruct the jury on the legal

18   availability of parole, the circumstances involved in the determination of parole

19   eligibility and the process employed by the Arizona Department of Corrections

20   and/or the governor to determine an inmate's release or parole." (ROA 163.)

21   Counsel failed to draw the court's attention to the fact that Andriano was parole

22   ineligible and failed to object to the erroneous jury instruction informing the jury

23   otherwise.

24   Counsel's failure to object to the court's incorrect jury instruction

25   constituted deficient performance. In *Carpenter v. Vaughn*, 296 F.3d 138, 156-59

26   (3d Cir. 2002), then-judge Alito wrote for the court that counsel performed

27   deficiently by failing to object to the trial court's response to a jury question that

28   misleadingly suggested that the defendant may be eligible for parole. The

1   situation here is even more extreme, as the jury instruction was not just
2   susceptible to the interpretation that Andriano could be sentenced to life with the
3   possibility of parole; it was explicit on that point. Further, the trial in *Carpenter*
4   occurred before *Simmons* was decided. *See Carpenter*, 296 F.3d at 144. Here,
5   *Simmons* was decided a decade before Andriano's trial. And the prosecutor had
6   put Andriano's future dangerousness at issue throughout the guilt and aggravation
7   phases of the trial. *See* Claim 5 *infra*. Counsel should have been on notice that the
8   jury had to be instructed on Andriano's parole ineligibility. *See Hinton v.*
9   *Alabama*, 134 S. Ct. 1081, 1089 (2014) ("An attorney's ignorance of a point of
10  law that is fundamental to his case combined with his failure to perform basic
11  research on that point is a quintessential example of unreasonable performance
12  under *Strickland*.").

13      Counsel's deficient performance also prejudiced Andriano. During
14  penalty-phase deliberations, the jurors considered that if they did not return a
15  death sentence, then it would be the judge's decision whether to impose life with
16  or without the possibility of parole, and jurors did not want Andriano to be
17  eligible for parole in twenty-five years. (Tr. Feb. 4, 2005 at 7; ROA 444A at 5;
18  PCR Pet. Ex. 39 ¶ 8.) The jurors further improperly took into consideration that
19  Andriano would get an automatic appeal if they sentenced her to death; as one
20  juror explained, "We figured that the whole case was going to be reviewed by
21  other people who were more experienced than ourselves. If we made a mistake,
22  they would correct it." (Tr. Feb. 4, 2005 at 7; ROA 444A at 5; PCR Pet. Ex. 39
23  ¶ 9.) Because the jury at the penalty phase relied on inappropriate considerations,
24  there is a reasonable probability that if they had been properly instructed, the
25  result of the penalty phase would have been different. *See generally Hinton*,
26  134 S. Ct. at 1089.

27      The Arizona Supreme Court failed to correct the PCR court's incorrect
28  legal and factual determinations when it summarily denied Andriano's Petition for

86

Review. (PFR 39.) Consequently, she was deprived of her Sixth and Fourteenth Amendment rights, and has satisfied both prongs of the *Strickland* test. Counsel's ineffective performance violated Andriano's Sixth and Fourteenth Amendment rights, and she is entitled to a new penalty-phase hearing.

## CLAIM FOUR

**The introduction of extensive, irrelevant, and highly prejudicial evidence concerning Andriano's extramarital relationships and unsuccessful attempts to procure life insurance violated her Fifth, Sixth, and Fourteenth Amendment rights.**

Andriano raised this claim on direct appeal. (DA 57 at 32-48.) The Arizona Supreme Court denied the claim on the merits. *Andriano*, 161 P.3d at 545-47. The state court's rejection of this claim was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court. 28 U.S.C. § 2254(d)(1). In addition, it constituted an unreasonable determination of the facts in light of the evidence presented. 28 U.S.C. § 2254(d)(2).

Defense counsel filed two motions in limine seeking to preclude, among other things, evidence of Andriano's extramarital relationships and efforts to procure life insurance for Joe. (Tr. Sept. 7, 2004 at 9-10; ROA 100; ROA 125.) The prosecutor responded that "part of the motivation for the murder was greed shown by defendant's attempt to fraudulently obtain life insurance on Joe's life. Finally, per conversations with friends, once her husband was dead, Rick Freeland would be willing to resume the relationship with her." (ROA 106 at 5.) The trial court denied the defense's motions as to these categories of evidence. (Tr. Sept. 7, 2004 at 13; ROA 193 at 2.) No limiting instruction was offered. (ROA 364.)

The admission of evidence of Andriano's character and prior bad acts violated her rights to due process and a fair trial. *See* U.S. Const. amends. V, VI, XIV. One of the fundamental principles of American law is that evidence of other bad acts is not admissible to show a defendant's bad character. *See McKinney v.*

87

1   *Rees*, 993 F.2d 1378, 1380-81 (9th Cir. 1993); David P. Leonard, *In Defense of*
2   *the Character Evidence Prohibition: Foundation of the Rule Against Trial by*
3   *Character*, 73 Ind. L.J. 1161, 1162 (1998). This principle recognizes that character
4   evidence would have a highly prejudicial effect on a defendant's case because the
5   jury can use the character evidence to improperly conclude that the defendant is a
6   bad person, and is thus more likely to have engaged in the charged offense.
7   *See State v. McFarlin*, 517 P.2d 87, 90 (Ariz. 1973).

8        Accordingly, in Arizona "evidence of other crimes, wrongs, or acts is not
9   admissible to prove the character of a person in order to show action in
10  conformity therewith," but it may be admissible to show "motive, opportunity,
11  intent, preparation, plan, knowledge, identity, or absence of a mistake or
12  accident." Ariz. R. Evid. 404(b); *see State v. Terrazas*, 944 P.2d 1194, 1196 (Ariz.
13  1997). Even if evidence is admissible under Rule 404(b), it must still be relevant,
14  and all evidence is subject to Rule 403, which requires the exclusion of relevant
15  evidence "if its probative value is substantially outweighed by the danger of unfair
16  prejudice." *State v. Fernane*, 914 P.2d 1314, 1318 (Ariz. Ct. App. 1995) (internal
17  quotation marks omitted). "Unfair prejudice means an undue tendency to suggest
18  decision on an improper basis such as emotion, sympathy or horror." *State v.*
19  *Schurz*, 859 P.2d 156, 162 (Ariz. 1993) (internal quotation marks and citation
20  omitted).

21       Although "federal habeas corpus relief does not lie for errors of state law,"
22  relief is available if the error deprived the petitioner of a fundamentally fair trial
23  and therefore rose to the level of a violation of due process. *See Estelle v.*
24  *McGuire*, 502 U.S. 62, 67-68 (1991). The introduction of character or propensity
25  evidence violates due process if the evidence "is of no relevance, or if its potential
26  for prejudice far outweighs what little relevance it might have." *United States v.*
27  *LeMay*, 260 F.3d 1018, 1026-27 (9th Cir. 2001). Because evidence related to
28  Andriano's extramarital relationships and unsuccessful attempts to procure life

1    insurance infected the entire trial and "served only to prey on the emotions of the

2    jury," Andriano's constitutional rights were violated. *McKinney*, 993 F.2d at 1385.

3                **A.    Introduction of irrelevant and unfairly prejudicial evidence of**
                        **Andriano's extramarital activity so infected her trial that her**
4                        **due-process rights were violated.**

5           Andriano's character and her infidelity were the cornerstone of the

6    prosecution's case. The jury was asked to view Andriano, as defense counsel put

7    it, "as a trollop, some kind of unfaithful wife that is capable of plotting to kill her

8    husband." (Tr. Nov. 17, 2004 at 58.) The evidence of Andriano's infidelity was

9    highlighted for the jury starting with opening argument. The prosecutor argued,

10   relating to Andriano's relationship with Rick Freeland, that "[s]he was the

11   pursuer. He was the one that was being pursued. And she was doing just about

12   anything that she could do to get this individual," and that after Freeland ended

13   the relationship, "[n]ot only did she continue to pursue him, but at some point, she

14   decided that, you know, something had to be done." (Tr. Sept. 7, 2004 at 25-26.)

15   He further argued that Andriano would go out with her friends at night, and "as

16   soon as she got there and as soon as she started going and she saw a guy,

17   according to their accounts, she would start kissing on them. It was as if she

18   wasn't married." (*Id.* at 31.)

19          Evidence of Andriano's extramarital relationships then pervaded the trial

20   and fell into four main categories: Andriano's relationship with Rick Freeland;

21   Andriano's interactions with Travis Black; an alleged incident that occurred on

22   Andriano's birthday concerning a male acquaintance; and Andriano's general

23   flirtatiousness and perceived promiscuity. Some of the most egregious and

24   prejudicial instances follow as examples, but are in no way exhaustive of the

25   character evidence introduced related to Andriano's fidelity.

26          First, Andriano's relationship with Rick Freeland was a consistent area of

27   focus. In addition to calling Freeland to testify exclusively on this subject, four of

28   the State's witnesses were asked about the topic. (Tr. Sept. 8, 2004 at 47-54, 59,

68-73; Tr. Sept. 9, 2004 at 5-7, 46-48, 58-59, 70-71, 94; Tr. Sept. 13, 2004 at 15-72; Tr. Sept. 15, 2004 at 38-42, 81-82, 91, 98-99; Tr. Sept. 16, 2004 at 126-31, 133, 151.) During her testimony, Andriano had to explain her relationship with Freeland, who she said was a source of emotional support for her during a difficult time. (Tr. Oct. 27, 2004 at 47-74.) The prosecutor then pushed Andriano on the details of the relationship. (Tr. Nov. 1, 2004 at 46-57, 59-60, 130-32, 140-42; Tr. Nov. 2, 2004 at 58; Tr. Nov. 8, 2004 at 47.) In the context of a note Andriano wrote to Freeland after their romantic relationship ended, the prosecutor asked Andriano:

> Q: And in fact you and he had a sexual relationship, didn't you?
>
> A: But it was a friendship first.
>
> Q: Ma'am, you and he did have a sexual relationship, didn't you?
>
> A: Yes.
>
> Q: In fact you had sexual intercourse under a bridge. Do you remember that?
>
> A: No.
>
> Q: You never had sexual intercourse with him under a bridge near a golf course?
>
> A: No.
>
> Q: Oh, so all of the times that you had sexual relations with him, it was in his apartment, right?
>
> A: No. There was one time outside.
>
> Q: And so one time outside and the rest were inside of his apartment then, right?
>
> A: 4 or 5 times.
>
> Q: Some of them were really late, right?
>
> A: Yes.
>
> Q: When your kids were being either taken care of by Joe

1  or somebody else, right?

2  A: Not by Joe, no.

3  . . . .

4  Q: And you are not watching your kids at 2:00 in the
5  morning, at that time that you're having intercourse with
   him, right?

6  A: I am not.

7  Q: Somebody else is taking care of your kids, right?

8  A: Yes.

9  Q: These kids that you cried for on the witness stand these
10  last couple of days, that brought you to tears, right?

11  (Tr. Nov. 1, 2004 at 52-54.)

12      The prosecutor also raised Andriano's relationship with Freeland while

13  questioning Andriano's mother, who testified about bruises she observed on her

14  daughter. The prosecutor asked her, "But you don't know Joe did that. For all you

15  know, somebody named Rick Freeland did that while they were making love. You

16  don't know it wasn't him, do you?" (Tr. Oct. 5, 2004 at 99.) Defense counsel

17  successfully objected to this line of questioning. (*Id.*)

18      The prosecutor also inquired of defense expert Dr. Murphy: "Now, did you

19  know that the reason that she had to use this lubricant was because . . . she thought

20  Mr. Andriano was gross and skinny. Did you know that?" (Tr. Oct. 13, 2004 at

21  68.) The exchange continued:

22      Q: Do you know whether or not [Andriano] had to use
        any lubricant with regard to Rick Freeland.
23
        A: I don't know.
24
        Q: Don't you think it would have been important to this
25      inquiry [about Andriano being a victim of domestic
        violence] to see whether or not she actually needed
26      lubricant with Rick Freeland to determine whether or not
        it was just sex that she indicated or it was just sex with an
27      icky, gross guy?

28  (*Id.* at 68-69.) And later he asked Dr. Murphy:

91

1

2

3

> Wouldn't it be important to know if she was having sex, for example, with Rick Freeland today and her husband was then asking for sex in the evening because maybe she didn't want to have sex with her husband because she'd already had it. Wouldn't that be important to know?

4    (*Id.* at 77.)

5         Next, regarding Andriano's interactions with Travis Black, the prosecutor

6    called Black to testify exclusively on the topic of their single sexual encounter.

7    (Tr. Sept. 16, 2004 at 89-111.) He testified about provocative dancing, "under the

8    table groping," and the fact that they used a condom. (*Id.* at 89, 91-92.) Chris

9    Hashisaki and Stephanie Koeppen were also asked about Andriano's relationship

10   with Black. (Tr. Sept. 9, 2004 at 47-48, 94; Tr. Sept. 15, 2004 at 91, 99, 102-03.)

11   And Andriano and Dr. Murphy testified about the interaction as well. (Tr. Oct. 13,

12   2004 at 70-73, 89-90, 125; Tr. Oct. 14, 2004 at 33; Tr. Oct. 27, 2004 at 74-84; Tr.

13   Oct. 28, 2004 at 10, 69, 98-99; Tr. Nov. 1, 2004 at 40, 57-59, 91-95, 125; Tr. Nov.

14   2, 2004 at 6-7, 34-37; Tr. Nov. 3, 2004 at 3-4; Tr. Nov. 8, 2004 at 26.) Similarly,

15   the prosecutor questioned two witnesses about an incident on Andriano's birthday

16   when she allegedly kissed another man. (Tr. Sept. 9, 2004 at 13-16; Tr. Sept. 15,

17   2004 at 35-37.) Andriano had to refute this evidence during her testimony, and Dr.

18   Murphy was asked about it by the prosecutor. (Tr. Oct. 13, 2004 at 104, 123; Tr.

19   Oct. 26, 2004 at 72-74.)

20        Finally, the prosecutor put on evidence of Andriano's general perceived

21   promiscuity. For example, during the State's case-in-chief, Shannon Sweeney was

22   asked extensively about going out at night with Andriano and testified about

23   Andriano's general behavior around men, not linked to any particular relationship:

24   "Wendi liked attention from men, so she was always dancing with men. And if

25   she didn't feel like she was getting attention, she wasn't having a good

26   time. . . . She would kiss someone every night." (Tr. Sept. 15, 2004 at 33-34.) In a

27   similar vein, Erik Vaillant was asked about Andriano's "demeanor" when she

28   went out at night:

1
2

> A: She liked drinking her wine and, you know, she would meet guys there. She liked socializing.

3

> Q: Did any of that lead to any kissing or anything like that?

4
5
6

> A: Yeah. There's been a few occasions where she would have some wine and, you know, she would just grab a guy or start talking with a guy and it would end up in a kiss.

7   (Tr. Sept. 16, 2004 at 120.) And Cheryl Green testified that after a work event,

8   Andriano changed clothing before going out with coworkers and asked Green "not

9   to let anyone else know that she had been dancing with other men." (Tr. Sept. 20,

10  2004 at 54.)

11          During closing, the fact that evidence about Andriano's infidelity was used

12  to cast Andriano as morally corrupt because she was unfaithful to her husband

13  instead of for a proper purpose became explicit. For example, about Freeland, the

14  prosecutor argued:

15
16
17
18
19
20

> Why is it that she gets involved with him? Why is it that they engaged in the most intimate acts that two people can engaged [sic] in? Well, because, according to her, she didn't want to be a tease. Wow. Just because you have a drink with somebody, just because a man is nice to you, you better be careful you're not a tease. But if you are, then you can have intercourse with him and you know what, it's not your fault. It really isn't your fault because that's not, according to the defendant, the way women should act. According to her, it's worse to be a tease than it is to be a cheat.

21  (Tr. Nov. 16, 2004 at 84-85.)

22          He also attacked Andriano for not classifying her relationship with Black as

23  an affair:

24
25
26
27

> Because the intimate moment that she shared with Travis Black, outside of marriage, even though she's a good Christian woman, is not an affair. You can now all go home, those of you who are married, and say to your significant other, that's okay, I'm going to go a head [sic] and do that because that's not an affair.

28  (Tr. Nov. 16, 2004 at 83.)

He again talked about lubricant and discussed Andriano's sexual encounters with men who had not testified and whose relationships with Andriano were *before* her marriage to Joe:

> Well, what about Dido Gamez. I mean, he might be a little upset that he's not considered the first because the defendant says he was. I'm sure and Sharon Murphy was quick to point out every time that the defendant has sex with Mr. Andriano, she had to use a lubricant. I wander [sic] if she had to use a lubricant with Dido Gamez. I wonder if she had to use a lubricant with Vernon Barnes.

(Tr. Nov. 16, 2004 at 75.)

He cast the fact that Andriano went out at night with friends thus:

> What kind of marriage is that? Who is wearing the pants in that family? Husband is dying. Terminally ill with cancer. Rather than spending time with him, what do you do? Let's go out and look for the young bucks we have out here on the dance floor. Maybe we can take one home.

(Tr. Nov. 16, 2004 at 101.) Finally, he argued that Andriano's attitude was that "It's okay to cheat on your husband. It's okay to go to bars and kiss other men as long as in this fantasy world of hers, you don't tease the men. Because, that's an unforgivable sin to her; that's the teasing of men." (Tr. Nov. 17, 2004 at 4.) The prosecutor's closing argument explicitly cast the evidence of Andriano's infidelity in moral tones, asking the jury to make the inference that she should be condemned for being a bad wife and mother.

The fact that Andriano engaged in extramarital relationships, let alone the details of those relationships—including when, where, and how often they occurred—was irrelevant to the crime she was charged with. The Arizona Supreme Court found that the evidence was admissible to show motive, disagreeing with the trial court that it was intrinsic to the first-degree murder charge. *Andriano*, 161 P.3d at 546. The court reasoned that the evidence was admissible as "evidence of Andriano's motive for killing her husband—to be free

1    to pursue other relationships." *Id.* This ruling constituted an unreasonable
2    determination of the facts as there was no evidence put forth that Andriano killed
3    her husband in order to be with another man.

4         The prosecutor represented to the trial court in response to the defense's
5    motion in limine that after her husband was dead, Freeland would resume his
6    relationship with Andriano. (ROA 106 at 5.) No evidence of this fact was ever
7    introduced, and according to the prosecutor, Andriano's relationships were not the
8    motive for the crime. He admitted as much during the aggravation phase:

> And some of you may go back there and, say, well,
> perhaps the motive for this was that she wanted to be with
> Rick Freeland. You, Mr. Martinez, you presented us with
> e-mails dated as late as July—I'm sorry, September where
> she's asking him to join her for a drink. And, additionally,
> we also have the issue of Mr. Travis Black, a one-night
> stand, that she engaged in where perhaps that's what she
> wanted to do. . . . [T]he attraction or the love or whatever
> emotion she had, will, the friendship, whatever she wants
> to call it with Rick Freeland, wasn't so strong that it
> prevented her from finding other men. So that really
> couldn't be the motive.

16   (Tr. Dec. 1, 2004 at 10.) He continued:

> [S]he opens this account to kill him. There is no other
> motive in this case other than that. That is the overriding
> motive. Even though she wanted to go out with other men,
> it wasn't like they were the love of her life in the sense
> she was with one individual now and later she hooked up
> with another individual. So that really wasn't the main
> motivation. The motivation in this case for her to get rid
> of him is that he was worth more dead than alive.

22   (Tr. Nov. 30, 2004 at 20.) Contrary to the state court's finding, no evidence was
23   presented linking Andriano's infidelity or interactions with men to the crime.

24        Evidence of infidelity is not inherently relevant to motive in spousal
25   killings. *See Camm v. State*, 812 N.E.2d 1127, 1133 (Ind. Ct. App. 2004)
26   ("[E]vidence of a defendant's marital infidelity is not automatically admissible as
27   proof of motive in a trial for murder or attempted murder of the defendant's
28   spouse. . . . This court has previously discussed and acknowledged the high rate of

marital infidelity in this country, with some studies estimating that between thirty to fifty percent of women and fifty to seventy percent of men have been unfaithful to their spouses."). And no particularized reason for its relevance as related to motive was offered here. Andriano was not involved romantically with Freeland, Black, or anyone else at the time of the crime. (Tr. Sept. 13, 2004 at 22-23; Tr. Sept. 16, 2004 at 106-07.) *See id.* at 1134 (noting that evidence of extramarital relationships was not admissible because defendant was not involved in one at time of wife's murder); *Lesley v. State*, 606 So. 2d 1084, 1090 (Miss. 1992) (finding evidence not admissible because no evidence of contemporaneous affair and contrasting *Commonwealth v. Heller*, 87 A.2d 287, 289-90 (Penn. 1952)). Nor was anyone with whom Andriano had an extramarital relationship implicated in the crime. *See Hunt v. State*, 687 So. 2d 1154, 1163 (Miss. 1996) (citing *Lesley*, 606 So. 2d at 1090 (finding that evidence of woman's affairs with men other than co-conspirator irrelevant)). Evidence of Andriano's infidelity therefore was not relevant because it did not "make any fact of consequence more or less probable" and instead "lead only to impermissible inferences about the defendant's character." *McKinney*, 993 F.2d at 1380-81. As the Supreme Court of Mississippi explained in the case of a woman charged with conspiracy to murder her husband, "The fact that [the defendant] had extramarital affairs was offered to show that she was an immoral woman. The State intended to show that [the defendant] was an immoral woman and that she therefore tried to have her husband killed." *Lesley*, 606 So. 2d at 1090-91.

The Arizona Supreme Court further found that the evidence was admissible to rebut Andriano's contention that she was the victim of domestic violence. *Andriano*, 161 P.3d at 546. The court provided no explanation for its belief that an abused woman could not engage in extramarital activity, and there was no evidence introduced to support that assumption. *Cf. Duff v. Lineberger*, 616 S.E.2d 30, *5 (N.C. App. Ct. 2005) (unpublished) (finding in case involving

protective order that "adultery was not relevant to the issues involved in this domestic violence action"); Leigh Goodmark, *When Is A Battered Woman Not A Battered Woman? When She Fights Back*, 20 YALE J.L. & FEMINISM 75, 84-85, 94-95 (2008) (dismissing view of battered women as completely helpless as too simplistic and recognizing that "[w]omen who fight back undermine societal assumptions about appropriate gender roles and how a battered woman should respond to violence"); Marina Angel, *Criminal Law and Women: Giving the Abused Woman Who Kills A Jury of Her Peers Who Appreciate Trifles*, 33 AM. CRIM. L. REV. 229, 285 (1996) ("Abused women increase, rather than decrease, their help-seeking over time and become more assertive rather than more passive.") Indeed, Dr. Murphy was aware of Andriano's extramarital relationships and still found, in her expert opinion, that Andriano was the victim of domestic violence. (Tr. Oct. 12, 2004 at 117; Tr. Oct. 13, 2004 at 70.) Dr. Murphy explained that around the time of the crime it may have looked like Andriano "was stronger or empowered somehow, but in reality, she was still being controlled in every other aspect of her life." (Tr. Oct. 14, 2004 at 126.) The state court's finding that evidence of infidelity was relevant to rebut a claim of domestic violence was therefore also an unreasonable determination of the facts.

Even accepting that the evidence was relevant to either motive or to rebut the fact that Andriano was the victim of domestic violence, the state court's determination that the evidence was admissible and that Andriano's constitutional rights were accordingly not violated was still an unreasonable application of clearly established federal law and an unreasonable determination of the facts because the evidence was unfairly prejudicial. *See LeMay*, 260 F.3d at 1026-27. The strength of the evidence for the purposes set forth by the state court was minimal at best. Joe was dying of cancer at the time Andriano engaged in extramarital relationships, so Andriano's actions show that she was a woman struggling and coping, though imperfectly, with that fact. Because of the scope,

1  detail, and salacious quality of the evidence presented and its use to portray

2  Andriano as a depraved woman worthy of the jury's condemnation, any minimal

3  relevance was outweighed by the potential that the jury would convict her on an

4  impermissible basis. *See Fernane*, 914 P.2d at 1318.

5        In determining that the evidence was not unfairly prejudicial, the Arizona

6  Supreme Court looked at a few instances of character evidence in isolation and

7  found that they individually were not prejudicial. *Andriano*, 161 P.3d at 546-47.

8  The court failed to recognize that all of the evidence in combination pervaded the

9  trial with minimally relevant but highly inflammatory information. Even if

10 particular instances of Andriano's infidelity were relevant, the quantity and scope

11 of the evidence presented surpassed any permissible purpose. The introduction of

12 evidence of Andriano's infidelity "so infected the entire trial that the resulting

13 conviction violates due process." *Estelle*, 502 U.S. at 72 (internal quotation marks

14 and citations omitted).

15       Finally, the introduction of improper character evidence had a substantial

16 and injurious effect on the jury's verdict. *See Brecht v. Abrahamson*, 507 U.S. 619

17 (1993). Jury questions throughout the trial reveal that the jury was focusing on the

18 details of Andriano's extramarital activity as opposed to the facts of the crime. For

19 example, jurors asked, "Did Rick Freeland know you were married before the

20 affair" (Tr. Nov. 8, 2004 at 35), "Who initiated the sexual intercourse . . . with

21 Rick Freeland" (*id.* at 37), and as related to Travis Black, "Did you do any fooling

22 around in the car" (Tr. Sept. 16, 2004 at 109). Andriano's "trial was

23 impermissibly tainted by irrelevant evidence such that it is more than reasonably

24 likely that the jury . . . skipped careful analysis . . . and convicted [her] on the

25 basis of [her] suspicious character and previous acts, in violation of our

26 community's standards of fair play." *McKinney*, 993 F.2d at 1385 (conducting

27 analysis under *Brecht*).

28       The Arizona Supreme Court's determination that evidence of Andriano's

1  extramarital relationships was properly admitted at trial—and its implicit holding
2  that it did not violate her due-process rights—was an unreasonable application of
3  clearly established federal law and an unreasonable determination of the facts.
4  *See* 28 U.S.C. § 2254(d). Extensive evidence of Andriano's bad character and
5  failings as a woman infected her trial and violated her rights under the Fifth,
6  Sixth, and Fourteenth Amendments.

7        **B.**    **The introduction of irrelevant and unfairly prejudicial evidence**
8                **related to Andriano's unsuccessful attempts to obtain life insurance violated her due-process rights.**

9        The prosecutor argued that Andriano was motivated to kill her husband
10 because of greed. (Tr. Sept. 7, 2004 at 29, 31-32, 38-39, 44-45; ROA 106 at 5.) In
11 support of this assertion, he put on evidence that Andriano attempted to obtain a
12 life insurance policy on Joe. He called five witnesses whose sole purpose was to
13 testify about these attempts. (Tr. Sept. 27, 2004 at 70-95, 108-37; Tr. Sept. 28,
14 2004 at 63-119.) Jimmy Yost and Erik Vaillant were questioned extensively about
15 Andriano's alleged requests that they pose as Joe so that she could procure a
16 policy. (Tr. Sept. 15, 2004 at 119-23, 125-26; 130-32, 134, 136-37; Tr. Sept. 16,
17 2004 at 122-24, 133, 144-45.) Andriano again had to respond to and was
18 questioned about these accusations. (Tr. Oct. 27, 2004 at 30-47; Tr. Nov. 1, 2004
19 at 165-85; Tr. Nov. 8, 2004 at 32-33.) She testified that her attempts to procure a
20 life insurance policy were at Joe's direction. (Tr. Oct. 27, 2004 at 32-36, 38; Tr.
21 Nov. 8, 2004 at 33.) She acknowledged that she had requested Vaillant's help, at
22 Joe's suggestion, but denied approaching Yost. (Tr. Oct. 27, 2004 at 41-44.)
23 Finally, her stepfather testified about a conversation with Andriano and Joe
24 regarding their efforts. He testified that he told them that lying to insurance
25 companies about Joe's health was fraud. (Tr. Nov. 8, 2004 at 49-50.) Andriano
26 testified that she and Joe ceased their efforts to obtain a policy after this
27 conversation. (Tr. Oct. 27, 2004 at 45-46.)

28       Andriano never succeeded in obtaining a life insurance policy on Joe. The

1    only life insurance policy on Joe at the time of his death was held by his parents.

2    (Tr. Sept. 27, 2004 at 125-27; Tr. Oct. 27, 2004 at 31; Tr. Nov. 8, 2004 at 32.)

3    Therefore, Andriano did not stand to profit from Joe's death through a life

4    insurance payout. Despite the prosecutor's argument that Andriano's efforts to

5    obtain life insurance showed her motive to kill Joe, those efforts were in fact

6    irrelevant to any possible motive. *See, e.g.*, *State v. Beckham*, 513 S.E.2d 606, 610

7    (S.C. 1999) ("Evidence of a life insurance policy is properly admitted when there

8    is evidence of the defendant's knowledge of the policy's existence, its validity, or

9    believed validity, and that the defendant will benefit from it."); *State v. Stenson*,

10    940 P.2d 1239, 1259 (Wash. 1997) (explaining that evidence of life insurance on

11    the victim is relevant to motive if defendant stood to benefit).

12         The Arizona Supreme Court held that the evidence of Andriano's attempts

13    to obtain life insurance showed Andriano's "plan, knowledge, and intent to kill

14    Joe, and also to show that she premeditated Joe's murder." *Andriano*, 161 P.3d at

15    546. The court did not explain how the evidence supported any of these

16    categories, and the determination was based on an unreasonable determination of

17    the facts. Joe undisputedly was dying of terminal cancer, and Andriano was going

18    to be left alone to support two small children. Even accepting that Joe did not

19    participate in the efforts to procure insurance, Andriano's unsuccessful attempts

20    do not show ill intent towards Joe or preparation for his murder. Instead, evidence

21    of Andriano's desire for life insurance shows that she was aware at the time that

22    her husband would die of cancer. Her attempts to gain life insurance were

23    unsophisticated—as she thought either a physical examination would not be

24    required or could be completed by someone other than Joe—and ultimately

25    unsuccessful. The evidence of Andriano's actions was not relevant for a

26    permissible purpose.

27         Even if the state court's finding that the evidence was relevant for a

28    permissible purpose was not objectively unreasonable, its conclusion that the

evidence was admissible was nevertheless an unreasonable application of clearly established federal law and an unreasonable determination of the facts. Because Andriano did not in fact stand to benefit from a life insurance policy, any relevance toward a permissible purpose was minimal. The likelihood that the jury, spurred on by the prosecutor, would exaggerate the importance of this evidence and therefore convict Andriano on an impermissible basis outweighs its minimally probative value. *See State v. Haley,* 692 P.2d 858, 862 (Wash. Ct. App. 1984) (finding evidence of life insurance policy on victim unfairly prejudicial because defendant was not aware she was the beneficiary); *People v. Bush*, 148 Cal. Rptr. 430, 438 (Cal. Ct. App. 1978) (finding evidence that defendant charged with manslaughter who claimed self-defense was beneficiary of victim's life insurance policy unfairly prejudicial and acknowledging that "[i]t is a matter of common knowledge that husbands, and particularly those with children, normally carry insurance which names their wives as beneficiaries"). The prosecutor painted Andriano as greedy and motivated by her desire to profit from her husband's death. For example, he argued that "we also know that this issue of money, this issue of greed, isn't only manifested with regard to the lawsuit. It's also manifested with regard to the contact that the defendant has with the insurance company." (Tr. Nov. 16, 2004 at 30-31, 104-06.) He then extensively outlined Andriano's actions in closing argument, discussing seven witnesses he had paraded in front of the jury on the topic. (*Id.* at 31-36.) Painting Andriano as motivated by greed based on actions she could not and did not profit from "so infected the entire trial that the resulting conviction violates due process." *Estelle*, 502 U.S. at 72 (internal quotation marks and citations omitted).

Andriano's Fifth, Sixth, and Fourteenth Amendment rights were violated, and the state court's decision to the contrary was an unreasonable application of clearly established law and constituted an unreasonable determination of the facts. *See* 28 U.S.C. § 2254(d)(1).

101

1

**CLAIM FIVE**

2

3

**Andriano's due-process rights were violated when the jury was incorrectly instructed that if given a life sentence she could be eligible for parole.**

4

Andriano did not present this meritorious claim to the state courts as a

5

result of appellate and post-conviction counsel's deficient performance. The

6

deficient performance of state appellate counsel and post-conviction counsel

7

prejudiced Andriano and provides cause to excuse any procedural default.

8

*See Martinez v. Ryan*, 132 S. Ct. 1309, 1315 (2012); *Murray v. Carrier*, 477 U.S.

9

478, 488-89 (1986); *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984).

10

Alternatively, there was an absence of available state corrective process or

11

circumstances exist that rendered the process ineffective, thereby excusing the

12

failure to exhaust. *See* 28 U.S.C. § 2254(b)(1)(B). Therefore, the Court will be

13

able to consider the merits of this claim. Moreover, because the claim has not

14

been adjudicated by the Arizona state courts, the limitations on relief imposed by

15

28 U.S.C. § 2254(d) do not apply to this Court's review, and the Court may

16

consider the claim de novo. Andriano will demonstrate at an evidentiary hearing

17

that appellate and post-conviction counsel fell below the standards of minimally

18

competent capital attorneys and that those failures prejudiced her.

19

The Due Process Clause of the Fourteenth Amendment requires that a jury

20

be fully and correctly instructed regarding the law related to its sentencing

21

discretion and powers in order to prevent an unconstitutional and arbitrary

22

deprivation of a defendant's liberty. *See Hicks v. Oklahoma*, 447 U.S. 343, 346-47

23

(1980). A jury cannot be "affirmatively misled regarding its role in the sentencing

24

process." *Romano v. Oklahoma*, 512 U.S. 1, 9 (1994). Therefore, the Supreme

25

Court in *Simmons v. South Carolina*, 512 U.S. 154, 162 (1994), held that a

26

defendant's due-process rights were violated when the jury was not provided with

27

"accurate information regarding petitioner's parole ineligibility." *See also Shafer*

28

*v. South Carolina*, 532 U.S. 36, 39 (2001). The trial court in *Simmons* had not

102

1   instructed the jury that if it returned a life verdict in a capital case, the petitioner

2   was nevertheless parole ineligible. *Id.* at 159-60. The Court explained that "the

3   jury reasonably may have believed that petitioner could be released on parole if he

4   were not executed. To the extent this misunderstanding pervaded the jury's

5   deliberations, it had the effect of creating a false choice between sentencing

6   petitioner to death and sentencing him to a limited period of incarceration." *Id.* at

7   161.

8       In *Lynch v. Arizona*, 136 S. Ct. 1818 (2016), the Supreme Court reaffirmed

9   these principles in the context of Arizona's sentencing scheme. The Court said

10  that, "[u]nder *Simmons* and its progeny, where a capital defendant's future

11  dangerousness is at issue, and the only sentencing alternative to death available to

12  the jury is life imprisonment without possibility of parole, the Due Process Clause

13  entitles the defendant to inform the jury of his parole ineligibility." 136 S. Ct. at

14  1818 (alteration, internal quotation marks, and internal citation omitted). The

15  Court noted that Arizona felons whose crimes occurred after 1993 were statutorily

16  ineligible for parole, that the defendant in that case was convicted of a crime that

17  occurred in 2001, and that the state supreme court had acknowledged that the

18  defendant could not be paroled. *Id.* at 1819. *Lynch* therefore confirms that, under

19  *Simmons*, a defendant in Arizona is entitled to have the jury informed of her

20  parole ineligibility if (1) she is in fact ineligible for parole and (2) her future

21  dangerousness is at issue.

22      First, Andriano was ineligible for parole. The Arizona Legislature abolished

23  parole for those convicted of the most serious felonies in 1994. *See* Ariz. Rev.

24  Stat. § 41-1604.09(I) (1994) (applying parole-eligibility statutes only to one "who

25  commit[s] [a] felony offense[] before January 1, 1994"). As a result, those

26  convicted of capital murder after 1993 could be sentenced only to life

27  imprisonment without the possibility of parole or to death; they were categorically

28  ineligible for parole. *See Lynch*, 136 S. Ct. at 1819. Andriano was convicted of a

1   crime that occurred in 2000. (ROA 003.)

2          Second, Andriano's future dangerousness was put at issue throughout her
3   trial. At the guilt phase, Martinez hammered his depiction of Andriano as
4   unfeeling, manipulative, and a "master liar" who carried out a "massacre" or a
5   "slaughter." (Tr. Nov. 16, 2004 at 11, 25, 84, 116, 138; Tr. Nov. 17, 2004 at 4-5.)
6   He went so far as to say that Joe was "like a pig, he bled out right in the neck.
7   That's how they slaughter pigs. That's what she did to him." (Tr. Nov. 16, 2004 at
8   142.) Martinez continued this theme at the aggravation phase, portraying
9   Andriano as an unemotional woman who coldly and inhumanely inflicted
10   gratuitous violence, watching Joe suffer "like some sort of dog." (Tr. Nov. 30,
11   2004 at 31; Tr. Dec. 1, 2004 at 20, 31, 35, 38.) He argued that after Joe died,
12   "[w]e also know that when she finally exited, like the specter of death, went to
13   greet the paramedics after all of this was done, she wasn't crying. She was a
14   woman in control." (Tr. Dec. 1, 2004 at 31.) Leading into the penalty phase,
15   therefore, the State put Andriano's future dangerousness at issue by portraying her
16   as a person who was capable of great violence because she only cared about her
17   own goals and would "do just about anything to attain" them. (Tr. Nov. 16, 2004
18   at 15.)

19          Following this set-up, Andriano's alleged future dangerousness pervaded
20   the penalty phase of her trial, as her lack of future dangerousness was presented as
21   a mitigating factor that was vigorously contested by the prosecution. (ROA 396.)
22   Both defense counsel and Martinez asked several witnesses if they believed
23   Andriano would be a threat to the community or if the community would be worse
24   off without her. (Tr. Dec. 9, 2004 at 12-13, 28, 33, 42, 65, 115.) A state expert,
25   Dr. Bayless, further described Andriano as a manipulative woman who flirted and
26   cried to get others to do what she wanted. (Tr. Dec. 15, 2004 at 14-15, 26.)
27   Martinez, in both his opening and closing remarks, explicitly and extensively
28   argued that Andriano posed a future threat to the community. (Tr. Dec. 8, 2004 at

40, 49; Tr. Dec. 15, 2004 at 136-39.) He argued, for example, that "she is a threat to the community because she manipulates. She tries to get her way. . . . But let's talk about the violence . . . because she had a specific goal in mind, she did away with" Joe. (Tr. Dec. 15, 2004 at 138.) He emphasized that in light of her manipulations and willingness to use violence to get her way, "[s]he is a threat to the community. And continues to be and she will never not be a threat to the community." (*Id.* at 139.)

Andriano's future dangerousness was therefore explicitly at issue. *See Kelly v. South Carolina*, 534 U.S. 246, 255 (2002) (calling defendant a "'dangerous' 'bloody' 'butcher'" put future dangerousness at issue). Accordingly, Andriano was entitled to have the jury know that if it sentenced her to life in prison, she would never be eligible for parole. *See Lynch*, 132 S. Ct. at 1820. But the jury was not so informed. To the contrary, the trial court instructed the jury that:

> If your verdict is that the defendant should be sentenced to death, the defendant will be sentenced to death. If your verdict is that the defendant should be sentenced to life, the defendant will not be sentenced to death and the Court will sentence the defendant to either life without parole until 25 calendar years in prison are served or natural life, which means the defendant would never be released from prison.

(Tr. Dec. 16, 2004 at 50; ROA 419 at 11.) The jury was misinformed of the possible outcome of returning a life sentence, and there can be no doubt that this misinformation impacted deliberations. During penalty-phase deliberations, the jurors considered that if they did not return a death sentence, then it would be the judge's decision whether to impose life with or without the possibility of parole, and jurors did not want Andriano to be eligible for parole in twenty-five years. (Tr. Feb. 4, 2005 at 7; ROA 444A at 5; PCR Pet. Ex. 39 ¶ 8.) The jurors further improperly took into consideration that Andriano would get an automatic appeal if they sentenced her to death; as one juror explained, "We figured that the whole case was going to be reviewed by other people who were more experienced than

1   ourselves. If we had made a mistake, they would correct it." (Tr. Feb. 4, 2005 at 7;

2   ROA 444A at 5; PCR Pet. Ex. 39 ¶ 9.) The fact that the jury at the penalty phase

3   was relying on inappropriate considerations shows if it had been properly

4   instructed, a death verdict is far from assured. The jury was unquestionably

5   influenced by the judge's failure to inform it correctly of Andriano's parole

6   eligibility.

7        Andriano's due-process rights under the Fourteenth Amendment

8   accordingly were violated at the penalty phase of her trial, entitling her to a new

9   penalty hearing.

## CLAIM SIX

**The introduction of unreliable evidence that sodium azide was present in food samples rendered Andriano's trial fundamentally unfair in violation of her rights under the Fourteenth Amendment.**

14        Andriano did not present this claim to the state courts as a result of

15   appellate and post-conviction counsel's deficient performance. The deficient

16   performance of state appellate counsel and post-conviction counsel prejudiced

17   Andriano and provides cause to excuse any procedural default. *See Martinez*, 132

18   S. Ct. at 1315; *Carrier*, 477 U.S. at 488-89; *Strickland*, 466 U.S. at 687-88.

19   Because the claim has not been adjudicated by the Arizona state courts, the

20   limitations on relief imposed by 28 U.S.C. § 2254(d) do not apply to this Court's

21   review, and the Court may consider the claim de novo. Andriano will demonstrate

22   at an evidentiary hearing that appellate and post-conviction counsel fell below the

23   standards of minimally competent capital attorneys and that those failures

24   prejudiced her.

25        At Andriano's trial, the State presented evidence through the testimony of

26   Joseph Richmond that tests on several items revealed the presence of sodium

27   azide. (Tr. Sept. 27, 2004 at 28-69.) The Supreme Court "imposes a special

28   obligation upon a trial judge to ensure that any and all scientific testimony . . . is

1   not only relevant, but reliable." *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S.

2   137, 147 (1999) (alteration in original) (internal quotations omitted); *cf. United*

3   *States v. Martinez*, 3 F.3d 1191, 1197-98 (8th Cir. 1993) ("In order to determine

4   whether scientific testimony is reliable, the court must conclude that the testimony

5   was derived from the application of a reliable methodology or principle in the

6   particular case."). Because the testimony provided by Richmond was scientifically

7   unreliable, it should have been excluded. The admission of this evidence rendered

8   Andriano's trial fundamentally unfair, thus violating her due process rights. *See*

9   *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991); *Gimenez v. Ochoa*, 821 F.3d 1136,

10  1143-45 (9th Cir. 2016), *cert. denied*, 137 S. Ct. 503 (2016); *Han Tak Lee v.*

11  *Glunt*, 667 F.3d 397, 403-04 (3d Cir. 2012).

12          Joseph Richmond was a senior chemist at West Coast Analytical Services.

13  (Tr. Sept. 27, 2004 at 29.) He testified at trial that he tested several items for the

14  presence of sodium azide using a method called ion chromatography. (*Id.* at 32-

15  33, 37, 41.) He explained that:

16          The extracted fluid was analyzed on—on a form of liquid
            chromotograph called an ion chromatography
17          system. . . . [I]n a liquid chromatographic system, you
            have a stationary phase or column, as we call it, which is
18          in this case packed with an ion exchange—ion exchange
            resin. . . . And then you also have pumps that pump a—
19          what is called an eluent. . . . In the case of expressed
            conductive, there is an additional item in the line. That's
20          called—that's called an expressor.

21  (*Id.* at 33-34.) After this process, levels of sodium azide near the detection limit

22  were detected in Joe's blood, Joe's gastric contents, and food samples taken from

23  a kettle on the stove and two soup bowls. (*Id.* at 34, 37, 41-43.) Richmond

24  testified that he then did a "matrix spike" on these samples "with a higher level of

25  azide" and confirmed that each sample contained low levels of sodium azide (*Id.*

26  at 34-35, 40-43.) Richmond further testified that he tested gelatin capsules and

27  found they contained sodium azide. (*Id.* at 48.) For that test, he used the "ion

28  chromatography method used in the previous work" but used "a different

chromatography system column and eluent, but it was the same general idea. One was—one was one method, one was another." (*Id.* at 47-48.) Defense counsel asked if this method was generally accepted in the industry, and Richmond responded that "[i]t's based on a method promulgated by OSHA." (*Id.* at 48.) Counsel did not ask questions about the validity of the methodology used to test the blood, gastric contents, or food. (*Id.* at 45-61.)

The method Richmond used to test the blood, gastric contents, and food was scientifically unreliable. When testing those items, he utilized the AS10 column and the AG10 guard. Using that method does not account for the potential for interference from similar chemical compounds such as nitrate or bromide. *See generally* L.C. Westwood and E.L. Stokes, *Determination of Azide in Environmental Samples by Ion Chromatography*, *in* Ion Chromatographic Analysis of Environmental Pollutants 144-46, 149 (J.D. Mulik and Eugene Sawicki, eds., 1982) (discussing interference by bromide and nitrate in ion chromatography tests for azide); Occupational Safety and Health Administration, *Sodium Azide and Hydrazoic Acid in Workplace Atmospheres* ¶ 1.5 (Sept. 1992), https://www.osha.gov/dts/sltc/methods/inorganic/id211/id211.html    (hereinafter OSHA). The OSHA method Richmond testified that he used for the capsules was promulgated for industrial settings, for example the testing of air bags that used to contain sodium azide. *See* Eric A. Betterton, *Environmental Fate of Sodium Azide Derived from Automobile Airbags*, Critical Reviews in Environmental Science and Technology 2003, at 449. In a non-industrial setting, however, when it is unknown what chemical compounds are present in a sample, additional safeguards and proper columns—such as AS9 or AS15—must be used to differentiate between similar chemical compounds. *See id*; OSHA ¶ 3.2.4. Therefore, when Richmond performed a spike on the samples with sodium azide, the addition of the sodium azide could have spiked the nitrate or bromide, and the method used would not have been able to distinguish the difference. Nitrate is commonly found

in food because it is used as a preservative. *See, e.g.*, Jeffrey J. Sindelar and Andrew L. Milkowski, *Sodium Nitrate in Processed Meat and Poultry Meats: A Review of Curing and Examining the Risk/Benefit of Its Use*, Am. Meat Sci. Ass'n White Paper Series No. 3 (Nov. 2011). Without using a method that was capable of separating sodium azide from nitrate or bromide, the tests conducted by Richmond could not definitively establish that the chemical detected was sodium azide as opposed to a chemical compound expected in food.

The jury should have been told that Richmond's testimony was not scientifically reliable, and the admission of the evidence without challenge was highly prejudicial. The unreliable test results were relied on by the State's expert Edward French and defense expert William Collier. As a result of the testimony that sodium azide was detected in food, a great deal of time was spent questioning them on the taste and smell of sodium azide, how it reacts to heat, and if it could be disguised in food. (Tr. Sept. 23, 2004 at 10-11, 30-32, 46-47; Tr. Oct. 20, 2004 at 23-24, 37-38, 67-68.) Richmond was also questioned along these lines. (Tr. Sept. 27, 2004 at 56-58, 62-63.)

Andriano testified that Joe wanted to kill himself by consuming sodium azide. (Tr. Oct. 27, 2004 at 84-87, 90-91.) Together they emptied gelatin capsules that contained elderberry and filled them with sodium azide. (*Id.* at 104-09.) Joe ingested the sodium azide by swallowing a handful of capsules. (Tr. Oct. 28, 2004 at 29.) Andriano denied that she put sodium azide in the food left on the stove despite the test results Richmond testified to, and she could not explain its presence in the food. (Tr. Nov. 2, 2004 at 68, 74.) Andriano testified that the food was old soup that she had taken out of the refrigerator and placed on the stove. (Tr. Nov. 2, 2004 at 69.) The prosecutor questioned her extensively about removing the food from the refrigerator and leaving it on the stove in an attempt to show that only she could have put sodium azide in the food. (Tr. Nov. 2, 2004 at 69-75.) In closing argument, the prosecutor asserted:

1
2
3
4

> We also know that the poison is on the stove in some food stuff, looks like soup or something. And we know that she fed it to him. That's exactly how he ingested it. And she also gave him the pills. That's what happened. You can see it in the photograph, right there on [the] burner. She can't, of course, explain that to you. Just no way for her to explain that. Just no way to explain that to you.

5   (Tr. Nov. 16, 2004 at 54-55.)

6        The surreptitious poisoning was the cornerstone of the State's argument that

7   the murder was premeditated. (Tr. Nov. 16, 2004 at 135-36.) Because of the

8   presence of sodium azide in the soup, Andriano's testimony that Joe wanted to

9   commit suicide was undermined. Instead, the jury was left with the conclusion

10  that Andriano had secretly poisoned her husband by not only putting the sodium

11  azide in capsules but by putting it in food that was dangerously heated on the

12  stove, put in two soup bowls, and left out on the counter. Because Richmond was

13  allowed to testify without proper cross-examination on the testing method used or

14  a defense witness that could challenge the testimony, *see infra* Claim 19(A), the

15  jury believed there was uncontroverted and sound scientific evidence that there

16  was sodium azide in the soup. The admission of this unreliable evidence violated

17  Andriano's due-process rights, and she is entitled to a new trial.

18                              **CLAIM SEVEN**

19
20
21
**The trial court's failure to instruct the jury that it had to find that the aggravating circumstance outweighed mitigating circumstances beyond a reasonable doubt violated Andriano's Sixth and Fourteenth Amendment Rights.**

22       Andriano raised this claim on direct appeal. (DA 57 at 131.) The Arizona

23  Supreme Court did not address the claim on the merits, and instead summarily

24  dismissed it in an appendix at the end of its opinion. *Andriano*, 161 P.3d at 556.

25  The state court's rejection of the claim was contrary to, or involved an

26  unreasonable application of, clearly established federal law, as determined by the

27  Supreme Court. 28 U.S.C. § 2254(d)(1). In addition, it constituted an

28  unreasonable determination of the facts in light of the evidence presented. 28

1  U.S.C. § 2254(d)(2). Finally, if this Court determines that this claim is
2  unexhausted, Andriano reserves the right to seek to return to state court under the
3  stay and abeyance procedure outlined in *Rhines v. Weber*, 544 U.S. 269 (2005).

4        **A.**    **Under clearly established Supreme Court precedent at the time**
5  **of Andriano's appeal, she was entitled to relief based on the**
6  **instructional error regarding the burden of proof at the penalty**
      **phase.**

7        The trial court instructed Andriano's jurors that "[n]either the State nor the
8  Defendant has a burden of proving that the weight of the mitigation is or is not
9  sufficiently substantial to call for leniency." (ROA 419 at 9.) Jurors therefore were
10  not told that they must find beyond a reasonable doubt that aggravating
11  circumstances outweigh mitigating circumstances before rendering a verdict of
12  death. This failure violated Andriano's Sixth and Fourteenth Amendment rights.

13        The Supreme Court has repeatedly held that "any fact (other than a prior
14  conviction) that increases the maximum penalty for a crime must be charged in an
15  indictment, submitted to a jury, and proven beyond a reasonable doubt." *Jones v.*
16  *United States*, 526 U.S. 227, 243 n.6 (1999); *see also Apprendi v. New Jersey*, 530
17  U.S. 466, 476 (2000) (applying this principle to states through the Fourteenth
18  Amendment). The Court affirmed this principle in the context of a capital case in
19  *Ring v. Arizona*, 536 U.S. 584, 602 (2002):

20          If a State makes an increase in a defendant's authorized
21          punishment contingent on the finding of a fact, that fact—
no matter how the State labels it—must be found by a jury
22          beyond a reasonable doubt.

23  *See also id.* at 610 (Scalia, J., concurring) ("[T]he fundamental meaning of the
24  jury-trial guarantee of the Sixth Amendment is that all facts essential to
25  imposition of the level of punishment that the defendant receives—whether the
26  statute calls them elements of the offense, sentencing factors, or Mary Jane—must
27  be found by the jury beyond a reasonable doubt."). Because aggravating
28  circumstances must be found to outweigh mitigating circumstances before a death

sentence can be imposed in Arizona, under *Ring* and its antecedents it is a fact that must be found by a jury beyond a reasonable doubt. *See* Ariz. Rev. Stat. § 13-751(E); *Murdaugh v. Ryan*, 724 F.3d 1104, 1115 (9th Cir. 2013) ("In [*Ring*], the Supreme Court described several determinations that had to occur under Arizona law before a defendant became death-eligible, including the judge's determination that 'there are no mitigating circumstances sufficiently substantial to call for leniency.'").

The accuracy of Andriano's position on appeal was made explicit when the Supreme Court decided *Hurst v. Florida*, 136 S. Ct. 616, 621 (2016), in which the Court held that the failure to require a jury to determine the relative weight of aggravating and mitigating circumstances beyond a reasonable doubt violates the Sixth Amendment right to a jury trial as well as the Fourteenth Amendment's Due Process Clause. The Court reiterated the Sixth Amendment's basic requirement that "any fact that 'expose[s] the defendant to a greater punishment than that authorized by the jury's guilty verdict' is an 'element' that must be submitted to the jury." *Id.* (quoting *Apprendi*, 530 U.S. at 494). The Court also emphasized that under *Ring*, this principle applies with equal force to death penalty statutes: "The Sixth Amendment requires a jury, not a judge, to find each fact necessary to impose a sentence of death." *Id.* at 619. The Court recognized that under *Alleyne v. United States*, 133 S. Ct. 2151, 2156 (2013), "each element of a crime [must] be proved to a jury beyond a reasonable doubt." *Id.* at 621; *see also Apprendi*, 530 U.S. at 498 (Scalia, J., concurring) (stating that charges against the accused, and the corresponding maximum exposure he faces, must be determined "beyond a reasonable doubt by the unanimous vote of 12 of his fellow citizens").

In *Hurst*, the State of Florida argued that the weighing process fell outside the ambit of *Ring* and *Apprendi*, as the defendant was death eligible after the jury found at least one aggravating circumstance. *Hurst*, 136 S. Ct. at 622. The Court rejected this contention, and *Hurst* therefore stated what prior Sixth Amendment

1   precedent had already established: It is not constitutionally sufficient that a jury

2   find the existence of at least one aggravating circumstance beyond a reasonable

3   doubt because a determination regarding the relative weight of aggravating and

4   mitigating circumstances is also a factual finding necessary to a defendant's

5   eligibility for a sentence of death. *Id.*; *see also Rauf v. State*, 145 A.3d 430 (Del.

6   2016) (per curiam) (striking down Delaware's capital sentencing scheme on the

7   basis of *Hurst* and determining that the Sixth Amendment requires a jury to find,

8   beyond a reasonable doubt, each aggravating circumstance and that the

9   aggravation outweighs mitigation); *Hurst v. State*, 202 So.3d 40, 57 (Fla. 2016)

10  (finding that *Hurst* "mandates that all the findings necessary for the imposition of

11  a death sentence are 'elements' that must be found by a jury" and holding that

12  "before the trial judge may consider imposing a sentence of death, the jury in a

13  capital case must . . . unanimously find that the aggravating factors outweigh the

14  mitigating circumstances*).*

15      *Hurst* built upon *Ring* and *Apprendi* but did not create new law. Andriano is

16  therefore entitled to relief under either de novo review or § 2254(d)(1) because the

17  state court's failure to recognize the violation of her Sixth and Fourteenth

18  Amendment rights was an unreasonable application of *Ring* and *Apprendi*.

19          **B.    If *Hurst v. Florida* instead announced a new rule of constitutional
20          law, it is retroactive to cases on collateral review.**

21      In the alternative, if *Hurst* did not simply apply existing precedent and

22  instead created a new rule of constitutional law, that ruling applies retroactively

23  on collateral review. First, *Hurst* is retroactive because it is substantive. The

24  Supreme Court explained that under *Teague v. Lane*, 109 S. Ct. 1060 (1989),

25  "courts must give retroactive effect to new substantive rules of constitutional

26  law." *Montgomery v. Louisiana*, 136 S. Ct. 718, 728 (2016). *Hurst* is substantive

27  because it implicates the standard of proof by which the weighing finding must be

28  made. *See Hurst*, 136 S. Ct. at 621-22. "[T]he reasonable-doubt standard is

1   indispensable," *Ivan V. v. City of New York*, 407 U.S. 203, 205 (1972) (per

2   curiam), and "reflect[s] a profound judgment" about the justice system, *Apprendi*,

3   530 U.S. at 478 (alteration in original) (internal quotations omitted). Indeed, as

4   rules about the standard of proof lessen the "risk that a defendant . . . faces a

5   punishment that the law cannot impose upon him," they are substantive in nature.

6   *Summerlin*, 542 U.S. at 351-52; *cf. In re Winship*, 397 U.S. 358, 363 (1970). As a

7   result, the Supreme Court has deemed retroactive cases applying the beyond-a-

8   reasonable-doubt standard. See *Hankerson v. North Carolina*, 432 U.S. 233, 241-

9   42 (1977) (making retroactive the requirement that the prosecution prove beyond

10  a reasonable doubt each element of a crime); *Ivan V.*, 407 U.S. at 204 (making

11  retroactive the application of that standard of proof to juvenile adjudications).

12  Because *Hurst* extends the beyond a reasonable doubt standard to a capital jury's

13  weighing of aggravating and mitigating circumstances, it too is substantive and

14  retroactive.

15       Furthermore, *Hurst* is substantive because it prohibits the death penalty—a

16  category of punishment—for those made eligible for the penalty other than by a

17  jury finding beyond a reasonable doubt that aggravation outweighs mitigation—a

18  class of defendants. *See Montgomery*, 136 S. Ct. at 728 (quoting *Penry v.

19  Lynaugh*, 492 U.S. 302, 330 (1989)). It also imposes a new burden on the State

20  whenever it seeks a death sentence and places that punishment outside the power

21  of the State to impose unless that burden has been met. *See Summerlin*, 542 U.S.

22  at 352 (describing "substantive" rules as those that put particular punishments

23  beyond the power of the State to impose). Finally, *Hurst* narrowed the scope of

24  Arizona's capital sentencing statute, which does not impose any standard of proof

25  on a capital jury's weighing determination, by making it more difficult for juries

26  to return death verdicts. *See id.* at 351 (describing "substantive" rules as those that

27  "narrow the scope of a criminal statute by interpreting its terms").

28       Because *Hurst* is substantive, and therefore retroactive, Andriano is entitled

114

to relief under the new rule it announced. *See Montgomery*, 136 S. Ct. at 729 ("The Court now holds that when a new substantive rule of constitutional law controls the outcome of a case, the Constitution requires state collateral review courts to give retroactive effect to that rule."); *Summerlin*, 542 U.S. at 352 n.4 (explaining that substantive rules "are more accurately characterized as" not "subject to the bar" on retroactive application under *Teague*).

Even if it is deemed procedural and not substantive, *Hurst*'s beyond-a-reasonable-doubt holding would constitute a "watershed" procedural rule under *Teague*. *See Powell v. State*, No. 310, 2016, 2016 WL 7243546, *4 (Del. Sup. Ct. Dec. 15, 2016) (making retroactive its prior decision in *Rauf*, which invalidated Delaware's death penalty statute under *Hurst*, because it fell "squarely within the second exception set forth in *Teague* requiring retroactive application of 'new rules' of criminal procedure"). This is because *Hurst* "implicate[s] the fundamental fairness and accuracy," of sentencing, *Welch v. United States*, 136 S. Ct. 1257, 1264, by mandating the use of the beyond-a-reasonable-doubt standard, which "is a prime instrument for reducing the risk of convictions resting on factual error," *Ivan V.*, 407 U.S. at 203. *Hurst*, if deemed procedural, would therefore constitute a watershed new rule and would be retroactive.

Therefore, if the Court finds that *Hurst* announced a new rule of constitutional law, it is retroactive and Andriano is entitled to relief.

## C.   Conclusion

The trial court's error in failing to instruct the jury that it had to find that the aggravating circumstance of cruelty outweighed the mitigating circumstances beyond a reasonable doubt was structural error and therefore per se prejudicial. *See generally United States v. Gonzalez-Lopez*, 548 U.S. 140, 148-49 (2006) (explaining that structural errors "defy analysis by harmless error standards because they affect[t] the framework within which the trial proceeds" (internal quotation marks omitted)). The jury instructions violated Andriano's Sixth and

1   Fourteenth Amendment rights, and under any construction of the import of *Hurst*,
2   she is entitled to relief in the form of a new penalty phase hearing.

### CLAIM EIGHT

**The trial court failed to instruct the jury on the lesser-included offenses of second-degree murder and manslaughter, in violation of Andriano's Sixth, Eighth, and Fourteenth Amendment rights.**

7   Andriano raised this claim on direct appeal. (DA 57 at 49-53.) The Arizona
8   Supreme Court denied the claim on the merits. *Andriano*, 161 P.3d at 547-48. The
9   state court's rejection of this claim was contrary to, or involved an unreasonable
10  application of, clearly established federal law, as determined by the United States
11  Supreme Court. 28 U.S.C. § 2254(d)(1). In addition, it constituted an
12  unreasonable determination of the facts in light of the evidence presented. 28
13  U.S.C. § 2254(d)(2).

14  At the guilt phase of Andriano's trial, the trial court instructed the jury on
15  first-degree murder, but not on second-degree murder or manslaughter. (Tr. Nov.
16  17, 2004 at 98-112; ROA 364.) Defense counsel, when discussing the jury
17  instructions with the court, said that he was not requesting an instruction on a
18  lesser-included offense, but that the court was nevertheless required to give one if
19  it thought the evidence supported it. (Tr. Nov. 16, 2004 at 4.) As discussed *infra*
20  in Claim 19(F), defense counsel was ineffective for not requesting the lesser-
21  included offense instructions. But, counsel was correct that the court was
22  obligated to instruct on second-degree murder and manslaughter if the evidence
23  would support those verdicts. Because the evidence did, the failure to properly
24  instruct the jury violated Andriano's Sixth, Eighth, and Fourteenth Amendment
25  rights.

26  A criminal defendant "is entitled to an instruction on a lesser included
27  offense if the evidence would permit a jury rationally to find him guilty of the
28  lesser offense and acquit him of the greater." *Beck v. Alabama*, 447 U.S. 625, 635-

36 (1980) (quoting *Keeble v. United States*, 412 U.S. 205, 208 (1973)). If the defendant is made death eligible by the greater offense, then the court is required to instruct on the supportable lesser offense. *See id.* at 637-38 (1980); *Hopper v. Evans*, 456 U.S. 605, 611-12 (1982). This requirement eliminates an all-or-nothing choice between outright acquittal and conviction of an offense that carries the death penalty. *See Schad v. Arizona*, 501 U.S. 624, 646-47 (1991); *Beck*, 447 U.S. at 637.

The Arizona Supreme Court rejected Andriano's claim that the trial court's failure to instruct the jury on second-degree murder and manslaughter violated her due-process rights. It reasoned that because Andriano presented a self-defense theory, a lesser-included instruction would have been "impermissible." *Andriano*, 161 P.3d at 547-48. The Supreme Court has explicitly found that an instruction on a lesser-included offense to first-degree murder is not necessarily incompatible with the defense of self-defense. *Stevenson v. United States*, 162 U.S. 313, 322 (1896); *see Mathews v. United States*, 485 U.S. 58, 63-64 (1988) ("The principal holding of the [*Stevenson*] Court was that the evidence was sufficient to entitle the defendant to a manslaughter instruction, but the Court also decided that the defendant was entitled as well to have the jury instructed on self-defense. The affirmative defense of self-defense is, of course, inconsistent with the claim that the defendant killed in the heat of passion."); *United States v. Scafe*, 822 F.2d 928, 932 (10th Cir. 1987) ("[S]elf defense and voluntary manslaughter instructions are not always inconsistent."). The Arizona Supreme Court has also so held. *State v. McIntyre*, 477 P.2d 529, 536 (Ariz. 1970) ("Under the evidence presented, the jury might properly have reached the conclusion that [the defendant] was guilty of murder in the first degree, or of murder in the second degree, or of voluntary manslaughter, or, in the alternative, the jury may have acquitted the defendant on the ground of self-defense. Under these circumstances, it was incumbent upon the trial court to give instructions to the jury regarding the offenses of which [the

1  defendant] might reasonably be convicted . . ."). To the extent the Arizona

2  Supreme Court in this case found that because Andriano argued self-defense she

3  was categorically not entitled to an instruction on lesser-included offenses, the

4  Court's decision was contrary to clearly established federal law.

5  *See generally Terry Williams*, 529 U.S. at 412-13.

6      If the Arizona court's decision is instead read to find that Andriano was not

7  entitled to instructions on lesser-included offenses because the evidence at trial

8  did not support those instructions, then the Court's decision was based on an

9  unreasonable determination of the facts and an unreasonable application of clearly

10 established federal law. *See* 28 U.S.C. § 2254(d).

11     In Arizona, first and second-degree murder are distinguished by the element

12 of premeditation. *See State v. Christensen*, 628 P.2d 580, 583 (Ariz. 1981).

13 C*ompare* Ariz. Rev. Stat. § 13-1104(A), *with id.* § 13-1105. Premeditation is

14 further defined as requiring "either the intention or the knowledge that [the

15 defendant] will kill another human being, when such intention or knowledge

16 precedes the killing by any length of time to permit reflection." Ariz. Rev.

17 Stat. § 13-1101(1). Therefore, in order for an instruction on second-degree murder

18 to be required, the jury would have to be able to rationally find that premeditation

19 was not present. *See Beck*, 447 U.S. at 635-37; *Hopper*, 456 U.S. at 611-12;

20 *Murray v. Schriro*, 746 F.3d 418, 453 (9th Cir. 2014) (citing *State v. Krone*, 897

21 P.2d 621, 625 (1995); *State v. Detrich*, 873 P.2d 1302, 1305 (Ariz. 1994)).

22     Both under the State's theory of the case and according to Andriano's

23 testimony, the jury could have rationally found that the ultimate death of Joe was

24 not premeditated. Martinez argued that Andriano planned to poison her husband.

25 (Tr. Nov. 16, 2004 at 37-39.) He became sick, and Andriano called her friend,

26 Chris Hashisaki, to her apartment before calling 9-1-1. (*Id.* at 45-48.) While

27 Hashisaki was outside waiting for paramedics to arrive and speaking with the

28 paramedics, Andriano beat Joe with a stool and stabbed him in the neck. (*Id.* at

55-57.) The medical examiner testified that poison was not the cause of death. (Tr. Sept. 16, 2004 at 62.)

Conversely, Andriano testified that Joe voluntarily took the poison but was scared when he became sick. (Tr. Oct. 28, 2004 at 29-31.) She called Hashisaki to watch her children while she took Joe, who no longer wished to commit suicide, to urgent care. (*Id.* at 31-33.) At Hashisaki's urging, she instead called 9-1-1. (*Id.* at 35.) While Hashisaki was outside waiting for the paramedics, Joe felt better, regained his resolve to commit suicide, and told Andriano to send the paramedics away. (*Id.* at 38-41.) After the paramedics left, Joe asked Andriano if she had been unfaithful, as he often did. (*Id.* at 45.) She decided to be truthful, which sent him into a rage. (*Id.* at 46-47.) He attacked her, hitting her head against the wall and wrapping a telephone cord around her neck. (*Id.* at 49-53.) She testified that she managed to get a knife and cut the cord from around her neck. (*Id.* at 54.) After pointing the knife at Joe, she dropped it. (*Id.* at 54-57.) When Joe bent over to pick up the knife, Andriano testified that she hit him on the head with a stool and continued to do so until he stopped moving. (*Id.* at 58-61.) Andriano then ran and hid in the bathroom. (*Id.* at 61.) When she returned, Joe rolled over with the knife still in his hand and threatened to kill himself. (*Id.* at 61-62.) They struggled for the knife, her hand slipped in blood, and then there was blood everywhere. (*Id.* at 62.)

According to both the State and Andriano, there is a clear break in the chain of events when Andriano called Hashisaki and 9-1-1. Whether the jury believed the State that Andriano surreptitiously poisoned Joe or Andriano that he willingly took the poison, it could have rationally believed that when Andriano called Hashisaki to her apartment, the poisoning plan was abandoned. The State's only explanation for Andriano calling Hashisaki was implausible. Martinez argued in closing:

1

2

3

> What her motive is in calling her over is unclear. . . . She
> was getting ready for people to come over and pick up
> Joseph Andriano's body. That's why she was calling her
> over, so she could come view the body. So she could
> watch him die. That's why she was calling her over.

4 (Tr. Nov. 16, 2004 at 46.) If Andriano wanted Hashisaki to view Joe's body or

5 watch him die, as the prosecutor argued, then she would not have proceeded to

6 call 911. Nor would she have killed Joe in the manner the State argued she

7 ultimately did. The State argued that Andriano poisoned Joe with sodium azide

8 believing it would appear that he had a heart attack. (*Id.* at 50.) But the beating

9 and stabbing, which the medical examiner identified as the causes of the death,

10 could not be disguised as the effects of Joe's cancer, unlike a heart attack. (Tr.

11 Sept. 16, 2004 at 62.) Further, the State argued that Andriano killed Joe with

12 people outside of her apartment. (Tr. Nov. 16, 2004 at 55.) The jury could

13 reasonably have rejected the argument that Andriano called Hashisaki to view

14 Joe's body and death, as opposed to because she abandoned her plan to poison

15 Joe.

16        With the break in the chain of events, premeditation is called into question

17 because the poison was a basis of the State's assertion of premeditation. Indeed, in

18 response to the defense's motion for a judgment of acquittal or to reduce the

19 charge to second-degree murder, the prosecutor's arguments about premeditation

20 centered on the acquisition of the poison. (Tr. Sept. 29, 2004 at 101-02.) And in

21 closing the prosecutor argued that "in this case we have premeditation since July

22 26 that we can point to. That's when she started her effort to buy the poison." (Tr.

23 Nov. 16, 2004 at 135.) The jury therefore could rationally have believed that even

24 if Andriano had premeditated to poison Joe, she abandoned the plan when she

25 called Hashisaki and then 911. Then, a new chain of events occurred that, while

26 intentional or knowing, were not premeditated.

27        The same is certainly true of Andriano's testimony. If the jury believed

28 Andriano, then Joe's ultimate death was divorced from the suicide plan. Joe's

120

death instead resulted from a fight between Joe and Andriano. The jury could have believed that although the killing was not justified self-defense, it was nevertheless the result of a fight. For example, the jury could have thought the force used was "greater than reasonably necessary to defend against the apparent danger," but that nevertheless Andriano had not "reflected on the decision [to kill] before killing." (ROA 364 at 10, 12.)

Finally, the jury also rationally could have believed a combination of the two theories—that Andriano planned to surreptitiously poison her husband, abandoned the plan, and then the fight Andriano testified to ensued after the paramedics left, resulting in an unpremeditated killing. There are many rational views of the evidence under which the jury could have found that premeditation was not proven. This possibility is more than theoretical, as one juror wanted to convict Andriano of second-degree murder even absent the lesser-included offense instructions. (PCR Pet. Ex. 42 ¶ 7.) An instruction on second-degree murder was required.

Next, manslaughter in Arizona is committed "upon a sudden quarrel or heat of passion resulting from adequate provocation by the victim." Ariz. Rev. Stat. § 13-1103(A)(2). In addition to no premeditation requirement, malice, or intent to kill, is not an element of manslaughter, unlike murder. *See Christensen*, 628 P.2d at 583; *McIntyre*, 477 P.2d at 535. Again, under the State's theory, Andriano's testimony, or a combination of the two, the jury rationally could have returned a verdict for manslaughter due to the break in events when Andriano called Hashisaki. Under the State's theory, Andriano killed her husband while paramedics and Hashisaki were outside, a brief time period. Further, while the State contended that she had planned to kill him in a way that would look like he died from cancer, the killing instead was violent and chaotic. The circumstances of the crime in the end suggest that even if Andriano had a plan to poison her husband, the way he ultimately died was the result of heat of passion. Similarly, if

the jury believed Andriano that she and Joe fought, then Joe adequately provoked Andriano by attacking her and picking up the knife. Her response was because of a sudden quarrel or heat of passion. The jury therefore could also have reasonably found that malice was not proven, so an instruction on manslaughter was required.

The failure of the trial court to instruct the jury that it could find Andriano guilty of second-degree murder or manslaughter violated Andriano's due-process rights. The jury was faced with a choice between first-degree murder and acquittal. Believing that Andriano was responsible for the death of her husband and not wanting to acquit her, the jury could have convicted her of first-degree murder despite reservations that the State had in fact proven that the way the killing ultimately occurred was the result of premeditation:

> [W]hen the evidence unquestionably establishes that the defendant is guilty of a serious, violent offense—but leaves some doubt with respect to an element that would justify conviction of a capital offense—the failure to give the jury the "third option" of convicting on a lesser included offense would seem inevitably to enhance the risk of an unwarranted conviction. Such a risk cannot be tolerated in a case in which the defendant's life is at stake.

*Beck*, 447 U.S. at 637; *see also Keeble*, 412 U.S. at 212-13.

The state court's rejection of Andriano's claim was contrary to or an unreasonable application of clearly established federal law. *See* 28 U.S.C. § 2254(d). Andriano's Sixth, Eighth, and Fourteenth Amendment rights were violated by the trial court's failure to properly instruct the jury, and her conviction and death sentence therefore cannot stand.

### CLAIM NINE

**The trial judge coerced a verdict at the penalty phase of Andriano's trial, violating her Sixth, Eighth, and Fourteenth Amendment Rights.**

Andriano raised this claim on appeal. (DA 57 at 105-19.) The Arizona Supreme Court rejected the claim on the merits. *Andriano*, 161 P.3d at 552-53.

1   The state court's rejection of this claim was contrary to, or involved an

2   unreasonable application of, clearly established federal law, as determined by the

3   United States Supreme Court. 28 U.S.C. § 2254(d)(1). In addition, it constituted

4   an unreasonable determination of the facts in light of the evidence presented.

5   28 U.S.C. § 2254(d)(2).

6   During deliberations at the penalty phase of Andriano's trial, after less than

7   six hours of deliberation over two days, the jury sent the court a note that read, "If

8   we are unable to reach an unanimous verdict, what is the procedure that will be

9   followed?" (ROA 420; ROA 421; ROA 423 at 1; ROA 424.) The court

10  responded:

> It appears from your note that you are at a deadlock in
> your deliberations. I have some suggestions to help your
> deliberations, not to force you to reach a verdict. I am
> merely trying to be responsible [sic] to your apparent need
> for help. I do not wish or intend to force a verdict. Each
> juror has a duty to consult with one another, to deliberate
> with a view to reaching an agreement if it can be done
> without violence to individual judgment. No juror should
> surrender his or her honest conviction as to the weight or
> effect of the evidence solely because of the opinion of
> other jurors or for the purpose of reaching a verdict.
>
> However, you may want to identify areas of agreement
> and disagreement and discuss the law and evidence as
> they relate to the areas of disagreement.
>
> If you still disagree, you may wish to tell the attorneys
> and me which issues, questions, law, or facts you would
> like us to assist you with. If you decide to follow this
> suggestion, please write down the issues, questions, law
> or facts on which we can possibly help. Please give your
> note to the bailiff. We will then discuss your note and try
> to help.

24  (ROA 423 at 2.) Defense counsel objected to the supplemental instruction,

25  arguing that whether to impose the death penalty is a moral judgment and that the

26  jurors therefore have no duty to deliberate. Counsel argued that the charge given,

27  derived from *Allen v. United States*, 164 U.S. 492 (1896), is not appropriate at a

28  penalty phase. (Tr. Dec. 20, 2004 at 5.) The jury deliberated for approximately six

1   hours more before returning a verdict imposing the death penalty. (ROA 420;
2   ROA 425; ROA 426; ROA 427.)

3       Defense counsel then filed a motion for a new penalty phase based on the
4   court's supplemental instruction. (ROA 444.) Counsel presented the court with a
5   newspaper article for which six jurors had been interviewed (ROA 444A.) The
6   article included that the vote—after starting as three in support of a death
7   sentence, four in support of a life sentence, and five undecided—was at one point
8   eleven to one in favor of a death sentence: "[T]he jury was on the verge of a
9   deadlock, with one holdout, a senior from Gilbert, saying he was adamantly
10  against the death penalty." (*Id.* at 4.) Counsel argued that the court's response to
11  the jury's question coerced the holdout juror into agreeing to a death sentence and
12  caused the jury to consider inappropriate bases for the verdict, including the fact
13  that Andriano would get an automatic appeal if sentenced to death and that the
14  jurors did not want the judge to be able to sentence Andriano to life with parole.[14]
15  (Tr. Feb. 4, 2005 at 6-8.) The court denied the motion. (ROA 448.)

16      The decision whether to vote for a death sentence is an individual and
17  moral one. *See generally Kansas v. Carr*, 136 S. Ct. 633, 642 (2016) ("And of
18  course the ultimate question whether mitigating circumstances outweigh
19  aggravating circumstances is mostly a question of mercy . . . ."); *Penry v.*
20  *Lynaugh*, 492 U.S. 302, 319 (1989) ("Thus, the sentence imposed at the penalty
21  stage should reflect a reasoned moral response to the defendant's background,
22  character, and crime." (citation omitted)), *abrogated on other grounds by Atkins v.*
23  *Virginia*, 536 U.S. 304 (2002). The supplemental instruction here improperly told
24  the jurors that at the penalty phase they had an obligation to consult with other
25  jurors and seek agreement. Impasse instructions have been widely criticized as

---

[14] The jury's reliance on these considerations constituted juror misconduct.
*See* Claims 11 & 20(B), *infra*. Furthermore, the jury was incorrectly instructed
that Andriano could be sentenced to life with the possibility of parole. *See* Claims
3 & 5, *supra*.

coercive. *See, e.g.*, *United States v. Evanston*, 651 F.3d 1080, 1085 (9th Cir. 2011) (noting that the *Allen* charge "stand[s] at the brink of impermissible coercion" (citation omitted)); *Harrison v. Gillespie*, 640 F.3d 888, 903 (9th Cir. 2011) (citing scholarly sources); Samantha P. Bateman, *Blast It All: Allen Charges and the Dangers of Playing with Dynamite*, 32 U. Haw. L. Rev. 323, 333-38 (2010) (examining empirical studies and arguing that impasse instructions are inherently coercive, no matter how carefully crafted); Michael J. Crowley, *Jury Coercion in Capital Cases: How Much Risk Are We Willing to Take?*, 57 U. Cin. L. Rev. 1073, 1088 n.114 (1989) (collecting federal cases criticizing *Allen* charge). And the "qualitative difference between death and other penalties calls for a greater degree of reliability when the death sentence is imposed." *Lockett*, 438 U.S. at 604. Therefore, instructions that may be appropriate at the guilt or aggravation phase are not necessarily appropriate at the penalty phase of a capital trial, and extra care is required to ensure that the jury reliably imposes a death sentence. Jurors here had no duty to continue deliberating after individually determining that death was not appropriate, and the court's instruction to the contrary coerced a verdict and undermined the reliability of Andriano's death sentence.

Even if an impasse instruction can be appropriate at the penalty phase of a capital trial, the instruction given here was unconstitutionally coercive. The United States Supreme Court has clearly established that "[a]ny criminal defendant, and especially any capital defendant, being tried by a jury is entitled to the uncoerced verdict of that body." *Lowenfield v. Phelps*, 484 U.S. 231, 241 (1988). The Court explained that reviewing courts must examine the trial court's instruction in the context in which it was given and under the totality of the circumstances in order to determine whether it was coercive. *Id.* at 237 (citing *Jenkins v. United States*, 380 U.S. 445, 446 (1965) (per curiam)). The Court found that the supplemental instruction given in *Lowenfield* did not coerce the jury's verdict. 484 U.S. at 241. But the circumstances surrounding the instruction given

here differ from those in *Lowenfield* in important respects.

The instruction was coercive first because it did not respond directly to the jury's question. Unlike in *Lowenfield*, the jurors here were never given accurate information about the consequences of a hung jury despite specifically requesting it. In *Lowenfield*, the jury was initially instructed that if it could not reach a unanimous decision, the trial court would impose a life sentence. 484 U.S. at 234. After the jury informed the court that it was having difficulty reaching a unanimous decision, the court offered a supplemental instruction that again informed the jurors what would happen if they could not agree. *Id.* at 234-35. Here, the initial instructions emphasized that the jury must unanimously reach a decision but left a critical gap about what would occur if unanimity were impossible. The jurors were told that if they unanimously found no mitigation existed, then they had to return a death sentence. If they unanimously found mitigation existed, they then proceeded to weigh the aggravating circumstance of cruelty against the mitigating evidence. (ROA 419 at 10.) At this stage, the jury was not told what to do if some jurors believed mitigation existed but others did not. The instructions further informed the jurors that if they unanimously found the mitigation sufficiently substantial to outweigh the aggravator, they should impose life, but if they unanimously found the mitigation not sufficiently substantial, they should impose death. (*Id.*) Again, the jurors were not informed what procedure would be followed if they could not agree about the weight of the mitigating evidence.

The jury asked specifically about what would happen if a unanimous verdict was impossible, but instead of answering this question the court informed the jurors that they had a duty to continue deliberating. Because the court did not inform the jury that a hung jury was a legally acceptable outcome, the supplemental instruction effectively responded that a unanimous verdict was required and the only acceptable result. *See Hooks v. Workman*, 606 F.3d 715,

742, 749 (10th Cir. 2010) (including the fact that the jury was not informed of the consequences of failing to agree on a sentence as "one of the contextual circumstances bearing on the question of jury coercion" and finding instruction to resolve difference so that "case can be completed" coercive); *cf. United States v. Alvarez-Ulloa*, 784 F.3d 558, 568-69 (9th Cir. 2015) ("When the jury 'makes explicit its difficulties by, for example, asking a question, the trial court should clear [the jury's difficulties] away with concrete accuracy.'" (quoting *Bollenbach v. United States*, 326 U.S. 607, 612-13 (1946); *Jones v United States*, 527 U.S. 373, 381-82 (1999) (acknowledging Eighth Amendment requirement that jury be instructed of consequences of failure to agree on sentence if failure to do so would affirmatively mislead jury regarding role in sentencing process); *Arizona v. Johnson*, 351 F.3d 988, 994 (9th Cir. 2003)) (alteration in original)).

The wording of the instruction itself cannot be read apart from the context in which it was given. Although the supplemental instruction told the jurors that "no juror should surrender his or her honest conviction," they were also told that they had "a duty to consult with one another, to deliberate with a view to reaching an agreement." (ROA 423 at 2.) In light of the failure to answer the jury's question, the instruction to not abandon one's convictions did not offset the instruction that the jurors were required to continue deliberating. *See Tucker v. Catoe*, 221 F.3d 600, 611112 (4th Cir. 2000) ("Although the trial court in this case qualified its charge with: 'At the same time no juror is expected to give up an opinion based on reasoning satisfactory to himself or herself merely for the purpose of being in agreement with others,' this line did not sufficiently balance the charge." (internal citation omitted)). The instruction as a whole therefore "failed to inform the jurors of the possibility that they could remain deadlocked rather than surrender their conscientiously held beliefs." *Smalls v. Batista*, 191 F.3d 272, 281 (2d Cir. 1999) (upholding grant of habeas relief). The combination of the initial instructions, the jury's question, and the supplemental

instruction told the jurors that they must agree on a verdict and that they would not be released until agreement was reached. *Cf. Jenkins*, 380 U.S. at 446 (holding under Court's supervisory powers that instruction telling jury it had "to reach a decision in this case" was coercive).

Next, the Court in *Lowenfield* emphasized the fact that defense counsel did not object to the supplemental instruction, thus suggesting that the asserted coercive effect of the instruction in that case was subtle. 484 U.S. at 240. Here, defense counsel vigorously objected before the instruction was given and renewed the objection in a motion for a new penalty phase. (Tr. Dec. 20, 2004 at 5; ROA 444; ROA 444A.) The coercive effect of the instruction was thus immediately apparent.

Finally, it is significant that, as revealed by the newspaper article, there was one juror in the minority. *See Jiminez v. Myers*, 40 F.3d 976, 981 (9th Cir. 1994) (noting that where there is a single juror opposing the rest, "the most extreme care and caution were necessary in order that the legal rights of the defendant should be preserved" (quoting *Burton v. United States*, 196 U.S. 283, 307 (1905))). The juror was effectively instructed that the only procedure in place in the event a unanimous verdict could not be reached was more deliberations. Indeed, the jury was informed that after further deliberation, if there was still no unanimous decision, it could then again approach the court and identify points of contention. (ROA 423 at 2.) Even after further deliberation, the possibility of a hung jury was not contemplated by the instruction. The minority juror was therefore pressured to acquiesce to the majority as no alternative, other than convincing the other eleven jurors to change their votes, was presented. *See Tucker*, 221 F.3d at 611 (quoting *Smalls*, 191 F.2d at 280-81). Further, unlike in *Lowenfield*, the jury had not affirmatively informed the court that it was at an insurmountable impasse, instead inquiring into the procedural gaps left in the jury instructions. *See Lowenfield*, 484 U.S. at 234. The court's response that they should continue deliberating with

the goal of unanimity sent the signal to the minority juror that deliberations were taking too long. Since the fastest resolution was one juror changing his position, the lone juror in the minority was coerced into changing his vote.

Examining the totality of the circumstances, as dictated by *Lowenfield*, the supplemental jury instruction was coercive. The Arizona Supreme Court failed to examine the totality of the circumstances surrounding the giving of the instruction, and its determination that the instruction was not coercive was objectively unreasonable, as well as based on an unreasonable determination of the facts. *See* 28 U.S.C. § 2254(d); *Parker v. Small*, 665 F.3d 1143, 1148 (9th Cir. 2011) (explaining that inquiry under § 2254 is "(1) if the [Arizona Supreme Court] looked at the totality of the circumstances in determining whether the instruction given at [Andriano's] trial was coercive and (2) if its determination that it was not was objectively reasonable"). Andriano's Sixth, Eighth, and Fourteenth Amendment rights were violated, and she is entitled to a new penalty phase hearing.

## CLAIM TEN

**Trial court improperly limited voir dire and rehabilitated jurors, in violation of Andriano's due process rights.**

Andriano did not present this meritorious claim to the state courts as a result of appellate and post-conviction counsel's deficient performance. The deficient performance of state appellate counsel and post-conviction counsel prejudiced Andriano and provides cause to excuse any procedural default. *See Martinez*, 132 S. Ct. at 1315; *Carrier*, 477 U.S. at 488-89; *Strickland*, 466 U.S. at 687-88; *Evitts*, 469 U.S. at 397; *Nguyen*, 736 F.3d at 1293. Moreover, because the claim has not been adjudicated by the Arizona state courts, the limitations on relief imposed by 28 U.S.C. § 2254(d) do not apply to this Court's review, and the Court may consider the claim de novo. Andriano will demonstrate at an evidentiary hearing that appellate and post-conviction counsel fell below the

1    standards of minimally competent capital attorneys and that those failures
2    prejudiced her.

3        Andriano has a constitutional right to be tried by an impartial jury that was
4    not "uncommonly willing" to return a death verdict. *Witherspoon v. Illinois*, 391
5    U.S. 510, 521 (1968); *see also* U.S. Const. amend. VI. Under Supreme Court
6    precedent, a prospective juror "may not be challenged for cause based on his
7    views about capital punishment unless those views would prevent or substantially
8    impair the performance of his duties as a juror in accordance with his instructions
9    and his oath." *Adams v. Texas*, 448 U.S. 38, 45 (1980); *see also Wainwright v.*
10   *Witt*, 469 U.S. 412, 424 (1985) (concluding that the proper standard for
11   determining when a prospective juror may be excluded for cause based on her
12   views about the death penalty "is whether the juror's views would 'prevent or
13   substantially impair the performance of [the juror's] duties'" as dictated by the
14   court's instructions and the juror's oath (quoting *Adams*, 448 U.S. at 45)).
15   Additionally, in *Morgan v. Illinois*, 504 U.S. 719 (1992), the Supreme Court held
16   that any juror who would automatically impose the death penalty upon conviction
17   of the capital offense charged must be disqualified for cause, and that capital
18   defendants are constitutionally entitled to examine prospective jurors on voir dire
19   with enough specificity to identify and challenge any juror holding such views.

20       Thus, the inquiry under *Witherspoon* and *Witt* "does not end with a
21   mechanical recitation of a single question and answer"; rather courts must
22   "examine the context surrounding [the prospective juror's] exclusion" to
23   determine whether the prospective juror's beliefs would substantially impair the
24   performance of his or her duties. *Darden v. Wainwright*, 477 U.S. 168, 176
25   (1986). Here, the trial court unreasonably applied these clearly established
26   precepts when it impermissibly limited voir dire and denied trial counsel's
27   challenges for cause as to several prospective jurors whose ability to follow the
28   court's instructions and act impartially was substantially impaired by their strong

1   support for the death penalty.

2       The trial court impermissibly limited trial counsel's voir dire in several

3   ways. First, the trial court granted the State's motion to preclude trial counsel

4   from questioning prospective jurors regarding their views on specific mitigation

5   or aggravation. (ROA 152; Tr. July 30, 2004 at 4-5.) Additionally, the trial court

6   restricted trial counsel's ability to voir dire the prospective juror's individually

7   regarding their attitudes toward the death penalty, despite trial counsel's specific

8   request to do so. (*See* Tr. Aug. 30, 2004 at 91-92.) The trial court even interceded

9   and limited trial counsel's ability to thoroughly voir dire those prospective jurors

10  that he was able to question individually. (Tr. Aug. 30, 2004 at 169-73.) These

11  impermissible limitations on trial counsel's voir dire denied Andriano her

12  constitutional right to an impartial jury.

13      The trial court also erred by aggressively rehabilitating death-biased jurors.

14  One example of this error is demonstrated by the voir dire of Juror 48. During trial

15  counsel's questioning, the following exchange occurred:

16      Mr. Delozier:       Would you impose the death penalty?

17      Juror No. 48:       Yes.

18      Mr. Delozier:       In all cases?

19      Juror No. 48:       I can't say in all cases because—well,
                            I guess if I find them guilty, yes, I
                            would be—yes, I would.

20      The Court:          Let me make sure I understand you.
21                          You're saying if there's premeditation,
                            without listening to anymore or going
22                          into any other phase, automatically
                            you would vote for the death penalty
23                          on each and every case. Is that what—

24      Juror No. 48:       I understood it to be if I find somebody
                            guilty beyond a reasonable doubt then
25                          yes, I would invoke the death penalty.

26  (Tr. Aug. 31, 2004 at 52.) However, despite this clear bias in favor of the death

27  penalty, the trial court continued to question the prospective juror, attempting to

28  rehabilitate him. (*See id*. at 53-54.)

1    Nonetheless, Juror 48 made subsequent consistent statements, showing his
2    intention to impose the death penalty if a defendant was found guilty, saying,
3    "[r]egardless of what the facts are, whether I'm going to vote for the death penalty
4    or not, so when you say regardless of the facts, no. I'd have to hear the facts. Once
5    I had the facts then, yes, I would vote for the death penalty." (*Id*. at 54.) However,
6    despite Juror 48's continued statements that he would vote for the death penalty,
7    the trial court still pressed further, asking trial counsel to re-explain his initial line
8    of questioning and to discuss the issue of premedition. When this line of
9    questioning was unsuccessful, the trial court ultimately allowed the prosecutor to
10   step in and attempt to rehabilitate the juror, which, according to the trial court, he
11   did by asking, "Will you disregard those jury instructions and automatically
12   rubber stamp the death penalty at that time or will you follow the road map that is
13   mandated by the instructions?" (*Id.* at 57.) To which, Juror 48 replied, "I'm going
14   to follow the road map that's mandated." (*Id*. at 58.)

15   Thus, when the trial court began discussing for cause strikes, the prosecutor
16   argued that Juror 48 "indicated that he would be fair and impartial at each and
17   every one of the phases . . . [and] said at every phase he would follow the Court's
18   instruction." (*Id*. at 152.) Conversely, defense counsel, citing *Morgan v. Illinois*,
19   504 U.S. 719, 734 (1992), advocated that Juror 48 should be struck for cause
20   because he said he would presumptively impose the death penalty at the end of the
21   guilt phase. (Tr. Aug. 31, 2004 at 152-53.) The trial court denied defense
22   counsel's motion to strike for cause and Andriano was forced to use one of her
23   peremptory strikes to remove Juror 48 from the jury pool. (ROA 190 at 2.)

24   With respect to Juror 48 and several other similarly situated prospective
25   jurors, the prosecutor and trial court emphasized discrete responses that they
26   believed indicated that the prospective juror could follow the court's instructions
27   and set aside his or her own preconceived opinion about guilt and the death
28   penalty. (*See also* Tr. Aug. 30, 2004 at 123-29, 164-76, 220-23, 226; Tr. Aug. 31,

1   2004 at 47-69, 94-112, 152-53.) But, a review of the entirety of their colloquy
2   undermines those determinations. *See Witt*, 469 U.S. at 433-34 (explaining that
3   voir dire must be evaluated "as a whole"). When viewed "as a whole," the
4   prospective jurors' responses demonstrated that their strong, pro-death penalty
5   views would substantially impair their ability to follow the court's instructions.
6   The court's erroneous refusal to grant defense counsel's challenges biased the
7   panel of prospective jurors against Andriano and deprived her of a fair jury.
8   *See Irvin v. Dowd*, 366 U.S. 717, 721-22 (1961); *Gray v. Mississippi*, 481 U.S.
9   648 (1987).

10      Furthermore, the trial court's error deprived Andriano of the peremptory
11  challenges guaranteed by state law and therefore, of her rights under the Sixth,
12  Eighth, and Fourteenth Amendments. *See Ross v. Oklahoma* 487 U.S. 81, 89
13  (1988) ("[T]he right to peremptory challenges is denied or impaired only if the
14  defendant does not receive that which state law provides." (internal quotation
15  marks omitted)). Because the trial court erroneously denied defense counsel's
16  for-cause challenges to several of the prospective jurors, the defense had to use
17  peremptory challenges to cure the trial court's errors. *See People v. Bittaker*,
18  774 P.2d 659, 682 (Cal. 1989) ("[T]he erroneous denial of a challenge for cause
19  compels the defense to use a peremptory challenge."), *overruled on other grounds
20  by People v. Black*, 320 P.3d 800, 803-04 (Cal. 2014). The prosecutor did not
21  have to similarly expend his peremptory challenges. As a result, the rulings of the
22  trial court in this case effectively granted to the prosecution more challenges than
23  to the defense. Therefore, Andriano is entitled to relief. *See Ross*, 487 U.S. at 89;
24  *see also United State v. Harbin*, 250 F.3d 532, 541 (2001).

25
26
27
28

133

**CLAIM ELEVEN**

**The jury improperly considered possible sentencing outcomes during deliberations at the aggravation phase of Andriano's trial, in violation of her Sixth and Fourteenth Amendment rights.**

Andriano raised this claim in her post-conviction proceedings. (PCR Mem. Feb. 17, 2012 at 69-70.) The state court denied the claim on procedural grounds. (PCR Min. Entry Oct. 31, 2012 at 3.) Andriano can overcome any procedural default of the claim in this Court because the procedural bar used by the state court was not adequate and independent or by showing cause and prejudice or a miscarriage of justice. *See generally Wainwright v. Sykes*, 433 U.S. 72, 81-85 (1977). If this Court finds that any portion of the claim was not exhausted in state court, then there is an absence of available state corrective process or circumstances exist that rendered the process ineffective. *See* 28 U.S.C. § 2254(b)(1)(B). Andriano also alleges in the alternative that any unexhausted portion of the claim is due to the ineffective assistance of post-conviction counsel. *See Martinez*, 566 U.S. at 9. Because the state court did not address Andriano's challenge to juror misconduct on the merits, review in this Court on the merits of the claim is de novo. *See* 28 U.S.C. § 2254(d); *Dickens v. Ryan*, 740 F.3d 1302, 1321 (9th Cir. 2014) (en banc) (explaining that if procedural default is overcome, AEDPA restrictions do not apply and review is de novo). Andriano will demonstrate at an evidentiary hearing that appellate and post-conviction counsel fell below the standards of minimally competent capital attorneys and that those failures prejudiced her.

The Sixth and Fourteenth Amendments protect a criminal defendant's right to a fair trial based on the evidence presented and to an impartial jury. *See Parker v. Gladden*, 385 U.S. 363, 364 (1966); *Turner v. Louisiana*, 379 U.S. 466, 471-72 (1965). This includes the right to a jury free from misconduct, including the consideration of extrinsic facts. *See Remmer v. United States*, 347 U.S. 227, 229 (1954); *United States v. Bagnariol*, 665 F.2d 877, 884 (9th Cir. 1981) ("The

introduction of outside influences into the deliberative process of the jury is inimical to our system of justice. The jury should reach its decisions only upon the evidence produced at trial, unaffected by extrinsic facts." (internal citations omitted)). "The requirement that a jury's verdict 'must be based upon the evidence developed at the trial' goes to the fundamental integrity of all that is embraced in the constitutional concept of trial by jury." *Turner*, 379 U.S. at 472.

Andriano's jury improperly considered potential sentencing outcomes when deliberating during the aggravation phase. As recounted by one juror:

> At the end of the second phase, when we decided on the aggravator, we talked about what might happen if we didn't find an aggravating circumstance. We discussed how her sentencing would go back to the judge and agreed that none of us wanted that. We talked about how we didn't want to see Wendi get out of prison, and that was a key reason why we decided on the cruelty aggravator.

(PCR Pet. Ex. 41 ¶ 6.) According to a second juror:

> During deliberations at both the aggravation and mitigation phases of the trial, we discussed what the possible outcome would be if the aggravation outweighed the mitigation and vice versa. We considered what her punishment would be. It was hard for us to understand what our decision would mean, so we made a chart outlining the different possible outcomes and put it up, starting when we were determining the aggravator, prior to the sentencing phase. That helped a lot to make it clearer.

(PCR Pet. Ex. 39 ¶ 8.) The only question before the jury at the aggravation phase was whether the State had proven an aggravating circumstance beyond a reasonable doubt. The jury had been so instructed and had further been instructed not to consider possible punishment. (ROA 383 at 6.)

The consideration of the possible sentences based on the outcome of the aggravation phase was juror misconduct. "Juror misconduct typically occurs when a member of the jury has introduced into its deliberations [a] matter which was not in evidence or in the instructions." *Thompson v. Borg*, 74 F.3d 1571, 1574

(9th Cir. 1996). Therefore, the fact that the extrinsic consideration was introduced by a fellow juror instead of an outside influence is not constitutionally significant. *See, e.g.*, *Jeffries v. Wood*, 114 F.3d 1484, 1490 (9th Cir. 1997) ("[W]e find no defensible distinction to be made based solely on the source of the information."), *overruled on other grounds by Gonzalez v. Arizona*, 677 F.3d 383 (9th Cir. 2012); *United States v. Keating*, 147 F.3d 895, 900-01 (9th Cir. 1998) ("We have previously indicated that this type of intrajury communication constitutes extrinsic evidence . . . .").

Here, the sentences Andriano could face were not before the jury at this stage and therefore constituted extrinsic information. At the aggravation phase, the jury was not tasked with any sentencing duties and should not have considered the ultimate sentence. *Cf. Tuilaepa v. California*, 512 U.S. 967, 971-73 (1994) (distinguishing the jury's task at the aggravation and penalty phases of a capital trial); *Shannon v. United States*, 512 U.S. 573, 579 (1994) ("It is well established that when a jury has no sentencing function, it should be admonished to 'reach its verdict without regard to what sentence might be imposed.'" (quoting *Rogers v. United States*, 422 U.S. 35, 40 (1975))). Because possible sentences "did not essentially inhere in the verdict" concerning aggravating circumstances, their consideration constituted misconduct. *Tarango v. McDaniel*, 837 F.3d 936, 946 (9th Cir. 2016) (citation omitted); s*ee Bayramoglu v. Estelle*, 806 F.2d 880, 887-88 (9th Cir. 1986) (noting that during deliberations of guilt, juror's consideration of "extrinsic material concerning the possible penalty for first and second degree murder" was misconduct); *United States v. Greer*, 620 F.2d 1383, 1384-85 (10th Cir. 1980) (finding that "presenting information to the jury about possible sentencing is prejudicial" during deliberations as to guilt).

There is a presumption of prejudice when jurors consider extraneous information about a case. *See Tong Xiong v. Felker*, 681 F.3d 1067, 1076-78 (9th Cir. 2012) (applying standard in § 2254 case); *Caliendo v. Warden of Cal.*

*Men's Colony*, 365 F.3d 691, 695-99 (9th Cir. 2004) (applying rebuttable presumption of prejudice and granting relief under § 2254). Further, even if a showing of prejudice is required, only one juror need have been influenced by extrinsic considerations "because a defendant is 'entitled to be tried by 12 . . . impartial and unprejudiced jurors.'" *Tarango*, 837 F.3d at 946 (quoting *Parker*, 385 U.S. at 366). A juror here explicitly stated that the improper considerations were "a key reason why we decided on the cruelty aggravator." (PCR Pet. Ex. 41 ¶ 6.) The jury found only a single aggravator—that the offense was cruel. It did not find that the offense had been committed for pecuniary gain or that it was heinous or depraved. (Tr. Dec. 6, 2004 at 3-4; ROA 393.) And the evidence supporting the aggravating circumstance was insufficient. *See* Claim 12, *infra*.

By considering the sentences Andriano could face if an aggravating circumstance was not found, the jury was swayed by considerations other than if the State had proven an aggravating circumstance beyond a reasonable doubt. The Arizona Supreme Court failed to correct the PCR court's incorrect legal and factual determinations when it summarily denied Andriano's Petition for Review. (PFR 39.) Consequently, Andriano's Sixth and Fourteenth Amendment rights were violated by this conduct, and she is entitled to relief.

## CLAIM TWELVE

**The State failed to present sufficient evidence supporting the finding of cruelty under the (F)(6) aggravating circumstance in violation of Andriano's rights under the Fifth, Eighth, and Fourteenth Amendment.**

Andriano raised this claim on direct appeal. (DA 57 at 75-88.) The Arizona Supreme Court reviewed whether the State established the cruelty factor of the (F)(6) aggravating circumstance on independent review and concluded that the State proved cruelty beyond a reasonable doubt. *Andriano*, 161 P.3d at 549 n.5, 553-54. The state court's denial of this claim was contrary to, or involved an

1   unreasonable application of, clearly established federal law, as determined by the

2   United States Supreme Court. 28 U.S.C. § 2254(d)(1). In addition, it constituted

3   an unreasonable determination of the facts in light of the evidence presented. 28

4   U.S.C. § 2254(d)(2).

5           "[T]he Due Process Clause protects the accused against conviction except

6   upon proof beyond a reasonable doubt of every fact necessary to constitute the

7   crime with which he is charged." *In re Winship*, 397 U.S. 358, 364 (1970). In

8   order to establish an aggravating circumstance, the State bears the burden of

9   proving the circumstance beyond a reasonable doubt. *Summerlin*, 427 F.3d at 642;

10  *see also State v. Towery*, 920 P.2d 290, 309-10 (Ariz. 1996). When reviewing a

11  claim challenging the sufficiency of evidence, the inquiry demanded by due

12  process is "whether, after viewing the evidence in the light most favorable to the

13  prosecution, any rational trier of fact could have found the essential elements of

14  the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319

15  (1979); *see also Lewis v. Jeffers*, 497 U.S. 764, 782 (1990) (extending the rule in

16  *Jackson* to reviewing the sufficiency of evidence in a state court's finding of

17  aggravating circumstances). Habeas relief is appropriate when the state court's

18  denial of a sufficiency of the evidence claim is objectively unreasonable.

19  *See Cavazos v. Smith*, 132 S. Ct. 2, 4 (2011); *Boyer v. Belleque*, 659 F.3d 957,

20  964-65 (9th Cir. 2011).

21          In Arizona, it is considered an aggravating circumstance if the defendant

22  "committed the offense in an especially heinous, cruel or depraved manner." Ariz.

23  Rev. Stat. § 13-703(F)(6) (renumbered to § 13-751(F)(6)). The jury here found

24  that the crime was especially cruel only. (Tr. Dec. 6, 2004 at 3-4; ROA 393.)

25  Arizona courts have defined cruelty to exist "if the victim consciously

26  experienced physical or mental pain prior to death, and the defendant knew or

27  should have known that suffering would occur. Mental anguish includes a

28  victim's uncertainty about her ultimate fate." *State v. Trostle*, 951 P.2d 869, 883

1   (Ariz. 1997) (internal quotation marks and citations omitted).

2        The Arizona Supreme Court, in conducting its independent review here,

3   found that sufficient evidence supported the jury's finding of the aggravating

4   circumstance. The court recognized that because Joe was likely unconscious when

5   the wound to his neck was inflicted, the stabbing could not support the cruelty

6   finding. It relied on the evidence surrounding Joe's ingestion of sodium azide and

7   the infliction of the wounds to his head. *Andriano*, 161 P.3d at 554 & n.10.

8        The state court first found that the fact that Joe had ingested sodium azide

9   supported the finding of cruelty. The court reasoned that Joe suffered because he

10  "vomited at least twice, was too weak to sit or stand, and was having difficulty

11  breathing." *Andriano*, 161 P.3d at 554. These symptoms were similar to the side

12  effects of chemotherapy that Joe's doctor testified he would be experiencing. (Tr.

13  Sept. 28, 2004 at 25-27.) The pain the state court relied on was therefore not

14  greater than the pain Joe was already facing. This physical pain is not comparable

15  to the pain experienced in other cases where cruelty has been found.

16  *See, e.g.*, *State v. Tucker*, 68 P.3d 110, 121 (Ariz. 2003) (victim raped, beaten,

17  strangled, and shot after prolonged struggle). Accepting this level of pain—which

18  according to the State's theory would have seemed to Joe like the effects of

19  cancer—as sufficient to make a murder one of "the few cases in which [the death

20  penalty] is imposed" would fail narrow the class of offenders eligible for the

21  penalty. *Godfrey v. Georgia*, 446 U.S. 420, 427 (1980) (internal quotations and

22  citation omitted); *see Lowenfield v. Phelps*, 484 U.S. 231, 244 (1988).

23       The court also found that because Joe was conscious while feeling the

24  effects of the sodium azide, he "undoubtedly 'experienced significant uncertainty

25  as to [his] ultimate fate.'" *Andriano*, 161 P.3d at 554 (citation omitted). Under the

26  State's theory, however, Joe suffered mental anguish because he believed he was

27  dying from cancer. (Tr. Nov. 30, 2004 at 25.) Accepting that Joe did not know

28  that he was poisoned, he was not experiencing "uncertainty as to his fate" because

1    he did not know that he was being harmed by Andriano. *Cf. State v. Prince*, 75

2    P.3d 114, 116-17 (Ariz. 2003) (explaining that cases that have upheld a cruelty

3    finding "based primarily on the victim's contemplation" have involved the victim

4    seeing a loved one suffer, pleas for mercy, or prolonged captivity). Alternatively,

5    Andriano testified that Joe willingly ingested the sodium azide because he wanted

6    to commit suicide instead of suffering a more painful death from the cancer; Joe's

7    doctor had informed him that he would likely suffocate to death. (Tr. Oct. 27,

8    2004 at 84-87, 90-91; Tr. Sept. 28, 2004 at 14-15.) Then, Joe also would not have

9    been uncertain as to his fate, as the effects of the chemical were desired.

10         The state court finally found that Andriano knew or should have known that

11   the sodium azide would cause Joe to suffer pain and mental anguish. But

12   Andriano testified that she thought that because of the sodium azide, "your heart

13   would stop and it would be over" and that the death would be painless. (Tr. Oct.

14   28, 2004 at 30.) She further testified that she and Joe were surprised by the effect

15   the sodium azide was having on Joe, and they at one point intended to seek

16   medical intervention because "things were happening that [they] didn't have any

17   idea" would occur. (*Id.* at 30-32.) Andriano therefore did not intend that Joe

18   suffer. *Cf. State v. Walton*, 769 P.2d 1017, 1033 (Ariz. 1989), *aff'd*, 497 U.S. 639

19   (1990) (finding no intent or foreseeability when victim survived gunshot); *State v.*

20   *Smith*, 707 P.2d 289, 302 (Ariz. 1985) (finding no intent or foreseeability when

21   method of killing "seems intended to cause immediate death, not prolonged

22   suffering"). The sodium azide therefore could not have supported the finding of

23   cruelty.

24         Next, the state court concluded that the finding of cruelty was supported by

25   sufficient evidence because Joe "was conscious for at least some of the attack"

26   with the barstool. *Andriano*, 161 P.3d at 554. The Arizona Supreme Court has

27   consistently held that "[i]f the evidence is inconclusive on consciousness, the

28   factor of cruelty cannot exist." *State v. Fulminante*, 778 P.2d 602, 619-20 (Ariz.

1988); *see also, e.g.*, *State v. Amaya-Ruiz*, 800 P.2d 1260, 1285 (Ariz. 1990). The state court here relied on an unreasonable determination of the facts of the case when it did not acknowledge that the evidence of consciousness presented was inconclusive.

The medical examiner, Dr. Keen, testified at that approximately eight to ten of the hits to Joe's head could have independently rendered Joe unconscious. (Tr. Sept. 16, 2004 at 32; Tr. Nov. 30, 2004 at 56.) Dr. Keen could not determine at what point, or as the result of what hit, Joe lost consciousness. (Tr. Nov. 30, 2004 at 56-57.) The first hit to Joe's head could have rendered him unconscious. (*Id.* at 64.) And Dr. Keen confirmed that the injuries to Joe's head could have caused blood loss or swelling of the brain, and that unconsciousness as a result of either "could be almost instantaneous. It could be minutes." (Tr. Nov. 30, 2011 at 72.)

Dr. Keen did testify that there were wounds on Joe's hands that appeared to be defensive wounds. (Tr. Sept. 16, 2004 at 27-29; Tr. Nov. 30, 2004 at 54-55.) The prosecutor argued that these wounds proved consciousness, and the state court relied on this fact. (Tr. Nov. 30, 2004 at 30-31; Tr. Dec. 1, 2004 at 29.) *Andriano*, 161 P.3d at 554. Dr. Keen could not, however, definitively establish where Joe's hands were when the wounds were inflicted. (Tr. Nov. 30, 2004 at 64.) The wounds were minor (Tr. Exs. 206-09), and so were unlikely to have been inflicted by a later-in-time blow to the head. If Joe had been defending himself for any significant period of time, more extreme defensive wounds would be expected. *Cf. State v. Medrano*, 844 P.2d 560, 564 (Ariz. 1992) (finding sufficient evidence of cruelty and consciousness in part because victim had "numerous defensive wounds on her left forearm, the palm and thumb of her right hand, and fingers and thumb of her left hand" that were "consistent with Joe having attempted to grab the knife away from her attacker"). Dr. Keen agreed that Joe's hands could have been hit with the first blow, which could have rendered Joe unconscious. (Tr. Nov. 30, 2004 at 64.) Alternatively, Andriano testified that she

1    and Joe fought before his death, and Joe destroyed a glass cabinet and smashed a

2    family portrait (Tr. Oct. 28, 2004 at 48-49), both of which could have resulted in

3    wounds to Joe's hands.

4           The state court unreasonably determined that the evidence conclusively

5    showed that Joe was conscious during the attack. The Arizona Supreme Court has

6    found that cruelty was not proven in similar cases where consciousness had not

7    been established definitively. *See State v. Soto-Fong*, 928 P.2d 610, 626-27 (Ariz.

8    1996) (finding cruelty not proven where victims died of multiple gunshot wounds

9    but order of wounds as to one victim was not established and medical examiner

10   did not testify that second victim was conscious after first gunshot); *State v.

11   Wallace*, 728 P.2d 232, 237 (Ariz. 1986) (finding cruelty not proven because "the

12   record is inconclusive as to whether any of the victims were even conscious

13   following the initial blow to the head"); *State v. Zaragoza*, 659 P.2d 22, 28 (Ariz.

14   1983) (testifying medical examiner could not determine if the victim was

15   conscious when she received blows to the head that caused her death); *State v.

16   Harding*, 670 P.2d 383, 399 (Ariz. 1983) (medical examiner testified that one

17   victim lived up to twenty minutes after being shot, but the court found that there

18   was insufficient evidence that he and the other victim, who were bound and

19   bludgeoned, were conscious).

20          Further, Dr. Keen testified that it would have taken only minutes for Joe to

21   die, and that "[i]t wouldn't be a long protracted period of time at all." (Tr. Nov.

22   30, 2004 at 69.) The basis of the cruelty aggravating circumstance is that the

23   victim suffered. *See generally State v. Adamson*, 665 P.2d 972, 988 (Ariz. 1983).

24   The Arizona Supreme Court therefore has found that cruelty cannot be supported

25   by the fact that a victim "remains conscious for some moments," and that "where

26   shots, stabbings, or blows are inflicted in quick succession, one of them leading

27   rapidly to unconsciousness, a finding of cruelty, without any additional supporting

28   evidence, is not appropriate." *Soto-Fong*, 928 P.2d at 627-28; *see also State v.*

1   *Clark*, 616 P.2d 888, 896 (Ariz. 1980) ("The fatal wounds appear to have been
2   delivered at vital parts of the bodies of the victims, and death ensued swiftly.").
3   Finding that any moment of pain or anguish is sufficient to justify a finding of
4   cruelty fails to narrow the aggravating circumstance. *See, e.g.*, *Lowenfield v.*
5   *Phelps*, 484 U.S. 231, 244 (1988) (quoting *Zant*, 462 U.S. at 877); *see also Soto-*
6   *Fong*, 928 P.2d at 628 ("We do not mean to suggest a bright-line, arbitrary
7   temporal rule must be met before a finding of cruelty can be sustained. However,
8   the assumption underlying the trial court's alternative findings in this case and the
9   state's arguments on appeal would lead to findings of physical cruelty in all but
10  the most exact, most precise, and most uncommon of murders. This approach
11  would run counter to the constitutional narrowing function of (F)(6).").

12      Because the State failed to present sufficient evidence that Joe suffered as a
13  result of the sodium azide or was conscious during the infliction of the wounds to
14  his head, no rational trier of fact could have found the (F)(6) aggravator.
15  *See Jackson*, 443 U.S. at 319. Andriano's rights under the Fifth, Eighth, and
16  Fourteenth Amendment were accordingly violated. The Arizona Supreme Court's
17  conclusion that the State proved cruelty beyond a reasonable doubt was
18  objectively unreasonable, involving both an unreasonable application of clearly
19  established federal law and an unreasonable determination of the facts. Andriano
20  is therefore entitled to relief.

### CLAIM THIRTEEN

**The trial court prevented the jury from considering mercy and residual doubt as mitigating circumstances, in violation of Andriano's Sixth, Eighth, and Fourteenth Amendment rights.**

25      Andriano raised these claims on direct appeal. (DA 57 at 89-97.) The
26  Arizona Supreme Court denied the claims on the merits. *Andriano*, 161 P.3d at
27  549-50. The state court's rejection of these claims was contrary to, or involved an
28  unreasonable application of, clearly established federal law, as determined by the

1    United States Supreme Court. 28 U.S.C. § 2254(d)(1).

2        In a capital case, the sentencer cannot "be precluded from considering, *as a*
3    *mitigating factor*, any aspect of a defendant's character or record and any of the
4    circumstances of the offense that the defendant proffers as a basis for a sentence
5    less than death." *Lockett*, 438 U.S. at 604; *see also Eddings*, 455 U.S. at 110.
6    Upon meeting the low threshold for relevance, "the 'Eighth Amendment requires
7    that the jury be able to consider and give effect to' a capital defendant's mitigating
8    evidence." *Tennard v. Dretke*, 542 U.S. 274, 285 (2004) (quoting *Boyde v.*
9    *California*, 494 U.S. 370, 377-78 (1990)).

10       At the penalty phase, Andriano submitted as mitigating circumstances
11   mercy and residual doubt. (ROA 396 at 2.) The State objected to the inclusion of
12   both. (Tr. Dec. 7, 2004 at 6; ROA 144.) Defense counsel urged that the mitigating
13   circumstances be included and defined residual doubt as "that space between
14   beyond a reasonable doubt and beyond all doubt." (Tr. Dec. 7, 2004 at 5.) The
15   trial court ruled regarding mercy that witnesses could not provide an opinion on
16   the appropriate sentence. (Tr. Dec. 8, 2004 at 6.) The court also granted the
17   prosecution's motion to preclude residual doubt as a mitigating circumstance and
18   denied the defense's motion for reconsideration. (Tr. Dec. 8, 2004 at 5-6; ROA
19   174 at 2.) Neither mercy nor residual doubt was included in the jury instructions
20   as mitigating circumstances the jury should consider. (ROA 419 at 6-7.) Because
21   mercy and residual doubt were not included in the trial court's definition of
22   mitigation, jurors were precluded from taking them into consideration even if, in
23   that juror's view, mercy and residual doubt would have counseled against the
24   imposition of the death penalty.

25       First, by excluding mercy as a mitigating circumstance, the trial court
26   prevented the jury from considering all evidence relevant to the determination of
27   whether Andriano should be sentenced to death. Mercy is undeniably relevant to
28   the imposition of the death penalty. In *Kansas v. Marsh*, 548 U.S. 163 (2006), the

Supreme Court explained that Kansas juries are instructed as follows:

> *The appropriateness of the exercise of mercy can itself be a mitigating factor* you may consider in determining whether the State has proved beyond a reasonable doubt that the death penalty is warranted.

*Id.* at 176 (emphasis added). The Court noted that this instruction alone prevented a challenge to the Kansas death-penalty scheme based on *Furman v. Georgia*, 408 U.S. 238 (1972), that a "death sentence will be imposed in spite of facts calling for a lesser penalty." *Marsh*, 548 U.S. at 176 n.3. Pleading for mercy also has been approved of as a constitutionally sufficient mitigation strategy. *See Darden v. Wainwright*, 477 U.S. 168, 185-86 (1986). And the Supreme Court in *Kansas v. Carr*, 136 S. Ct. 633, 642 (2016), recently reaffirmed the proposition that mercy has a role in capital sentencing: "And of course the ultimate question whether mitigating circumstances outweigh aggravating circumstances is mostly a question of mercy."

The jury here, however, was not allowed to consider mercy because of the structure of the deliberations. The jury was instructed that if it found no mitigation, it had to impose death. If it found that the mitigation did not outweigh the aggravating circumstance, it also had to impose death. (ROA 419 at 10.) Therefore, unlike in other capital sentencing schemes, the jury could not consider whether to impose life after or independent of these steps. *See, e.g.*, *Gregg v. Georgia*, 428 U.S. 153, 197 (1976) (approving of system where "[t]he jury is not required to find any mitigating circumstance in order to make a recommendation of mercy that is binding on the trial court"); *Hollaway v. State*, 6 P.3d 987, 996 (Nev. 2000) ("Even if the jury as a whole finds aggravating circumstances and every juror determines that mitigating circumstances either do not exist or do not outweigh the aggravating, the defendant is only death-eligible. The jury must then decide on a sentence unanimously and still has discretion to impose a sentence less than death."); *People v. Brown*, 758 P.2d 1135, 1146-47 (Cal. 1988) ("By

directing that the jury 'shall' impose the death penalty if it finds that aggravating factors 'outweigh' mitigating, the statute should not be understood to require any juror to vote for the death penalty *unless*, upon completion of the weighing process, *he decides that death is the appropriate penalty under all the circumstances*." (quoting *People v. Allen*, 729 P.2d 115, 122 (1986) (emphasis in original)). The jury was instructed that it must confine its inquiry to whether mitigation has been proven and its relative weight. Because mercy was not included as a mitigating circumstance, the jury was precluded from determining whether the case warranted the exercise of mercy as an independent consideration.

The trial court's refusal to allow residual doubt as a mitigating circumstance also unconstitutionally limited the mitigation the jury was allowed to consider. The Arizona Supreme Court, in denying Andriano's claim on appeal, relied on the fact that the United States Supreme Court had not previously definitively decided whether a right to present evidence of residual doubt at the penalty phase exists. *Andriano*, 161 P.3d at 549 (citing *Oregon v. Guzek*, 546 U.S. 517 (2006)); *see also Franklin v. Lynaugh*, 487 U.S. 164 (1988). But the United States Supreme Court has clearly established that the jury cannot be precluded from considering "circumstances of the offense" in mitigation. *See Lockett*, 438 U.S. at 604. Residual doubt is an argument about the circumstances of the offense and can be understood as:

> (1) actual, reasonable doubt about guilt of any crime; (2) actual, reasonable doubt that defendant was guilty of a capital offense, as opposed to other offenses; (3) a small degree of doubt about (1) or (2), sufficient to cause the juror not to want to foreclose (by execution) the possibility that new evidence might appear in the future.

Christina S. Pignatelli, *Residual Doubt: It's a Life Saver*, 13 Capital Defense J. 307, 308 (2001) (quotation marks omitted). The utilization of the "residual doubt" strategy therefore can be an effective form of mitigation. *See* Stephen P. Garvey, *Aggravation and Mitigation in Capital Cases: What Do Jurors Think?*, 98 Colum.

L. Rev. 1538, 1563 (1998). Arizona courts have accordingly allowed residual doubt to be a mitigating circumstance. *See, e.g.*, *State v. Dann*, 79 P.3d 58, 61 (Ariz. 2003) (noting that residual doubt was offered as a mitigating circumstance); *State v. Nordstrom*, 77 P.3d 40, 45 (Ariz. 2003) (same); *State v. Jones*, 72 P.3d 1264, 1270 (Ariz. 2003) (same). An instruction including residual doubt as a mitigating circumstance would not give jurors leeway to reconsider their verdict, but instead would allow them to determine that capital punishment is inappropriate when the defendant's guilt was proven beyond a reasonable doubt, but not beyond any doubt.

The trial court prevented the jury from considering mercy and residual doubt as mitigation. As a result, the jury was unable to meaningfully consider all of the mitigating evidence put before it in violation of the Sixth, Eighth, and Fourteenth Amendments. The Arizona Supreme Court's decision otherwise was contrary to, or involved an unreasonable application of clearly established federal law, as determined by the United States Supreme Court. *See* 28 U.S.C. § 2254(d)(1). Andriano is therefore entitled to a new penalty phase.

## CLAIM FOURTEEN

**The trial court improperly instructed the jury at the penalty phase that it could only consider mitigation that was found to exist unanimously, in violation of Andriano's Sixth, Eighth, and Fourteenth Amendment rights.**

Andriano raised this claim on direct appeal. (DA 57 at 98-104.) The Arizona Supreme Court denied the claim on the merits. *Andriano*, 161 P.3d at 550-51. The state court's rejection of this claim was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the United States Supreme Court. 28 U.S.C. § 2254(d)(1). In addition, it constituted an unreasonable determination of the facts in light of the evidence presented. 28 U.S.C. § 2254(d)(2).

A jury cannot be "precluded from considering, *as a mitigating factor*, any

aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." *Eddings v. Oklahoma*, 455 U.S. 104, 110 (1982) (quoting *Lockett*, 438 U.S. at 604). Further, a jury "may not refuse to consider or be precluded from considering '*any relevant mitigating evidence*.'" *Skipper v. South Carolina*, 476 U.S. 1, 4 (1986) (quoting *Eddings*, 455 U.S. at 114) (emphasis added).

The Supreme Court applied these principles in *Mills v. Maryland*, 486 U.S. 367, 384 (1988), and held that they were violated when "reasonable jurors, upon receiving the judge's instructions . . . well may have thought they were precluded from considering any mitigating evidence unless all 12 jurors agreed on the existence of a particular such circumstance." Such an instruction would prevent an individual juror from considering all of the mitigating circumstances and evidence that the juror himself found. *See id.* at 380. Some jurors could have found only mitigating circumstance A, some only circumstance B, and some only circumstance C, but under an instruction that they only consider mitigating circumstances found unanimously, they would all be precluded from considering circumstance A, B, or C. *See Smith v. Spisak*, 558 U.S. 139, 144 (2010) (discussing *Mills*). "[I]f even *one* of the jurors believes that one of the three mitigating considerations exists, but that he is barred from considering it because the other jurors disagree, the Court held, the Constitution forbids imposition of the death penalty." *Id.*

In *McKoy v. North Carolina*, 494 U.S. 433 (1990), the United States Supreme Court applied *Mills* in rejecting a jury instruction where the jury was asked:

> Do you unanimously find from the evidence the existence of one or more of the following mitigating circumstances? . . .
>
> Do you unanimously find beyond a reasonable doubt that the mitigating circumstance or circumstances *found by*

148

*you* is, or are, insufficient to outweigh the aggravating circumstance or circumstances found by you?

494 U.S. at 436-37. The Court found that the second instruction "allows the jury to consider only mitigating factors that it unanimously finds" under the previous instruction. *Id.* at 439. The phrase "mitigating circumstance or circumstances found by you" was therefore read to mean the mitigation found unanimously under the previous instruction, not mitigation found by the individual jurors.

The jury instructions given in this case does not substantively differ in any meaningful respect from those rejected in *McKoy*. Here, over defense counsel's objection (Tr. Dec. 15, 2004 at 9), the jury was instructed: If you *unanimously find that mitigation exists*, each one of you must individually weigh *that mitigation* in light of the aggravating circumstance already found to exist . . . . (Tr. Dec. 16, 2004 at 49; ROA 419 at 10 (emphasis added).) Based on this instruction, a reasonable juror could have understood that the jury first had to unanimously determine if mitigating circumstances existed and that the jurors had to then individually weigh only those unanimously found mitigating circumstances. *See Mills*, 486 U.S. at 375-76. As in *McKoy*, the phrase "that mitigation" must be read in light of the previous instruction to mean mitigation found unanimously. Understanding the instruction in this way would have prevented individual jurors from considering all mitigation evidence, even evidence that the juror had found proven.

The rest of the jury instructions confuse rather than clarify matters. Elsewhere in the instructions, the jury was told that "the determination of what circumstances are mitigation is for each one of you to resolve, individually" (Tr. Dec. 16, 2004 at 45; ROA 419 at 6), and "you must individually determine the nature and extent of mitigating circumstances" (Tr. Dec. 16, 2004 at 47; ROA 419 at 9). Therefore at one point the jurors were told that they must individually determine what qualifies as mitigation but were later instructed that they had to

1  unanimously find mitigation. The jurors could have read these instructions in
2  combination to instruct them to first do an individual determination and then
3  debate those individual determinations in order to come to a list of unanimously
4  agreed upon mitigating circumstances. Alternatively, the jurors could have read
5  the instructions as contradictory and not known which to follow. The combination
6  of instructions at best resulted in inconsistent instructions that were impossible to
7  apply. *See Simmons*, 512 U.S. at 171 (recognizing "that in some circumstances the
8  risk that the jury will not, or cannot, follow instructions is so great, and the
9  consequences of failure so vital to the defendant, that the practical and human
10  limitations of the jury system cannot be ignored." (internal quotation marks
11  omitted)); *Mills*, 486 U.S. at 376-77.

12       Adding to the confusion, the instructions did not explain what the jury was
13  to do if at least one juror, but not all jurors, found that mitigation existed. The
14  instructions informed the jurors only that if they unanimously found no
15  mitigation, then they had to return a sentence of death; if they unanimously found
16  mitigation, they then went on to weigh the mitigation against the aggravating
17  circumstance. (Tr. Dec. 16, 2004 at 49; ROA 419 at 10.) The confusion over how
18  to proceed in the absence of unanimity is apparent from the jury question sent to
19  the judge: "If we are unable to reach a unanimous verdict what is the procedure
20  that will be followed?" (Tr. Dec. 20, 2004 at 4; ROA 423 at 1.) The judge did not
21  answer this question, instead instructing the jury to continue deliberating.[15] (ROA
22  423 at 2.) Finally, the verdict form did nothing to clarify the process the jury was
23  expected to follow, as it only reflected the ultimate determination of the jury.
24  (ROA 426.)

25       The possibility that one juror could have read the instructions to preclude
26  the consideration of mitigation not found unanimously renders the imposition of

27
28  [15] The trial court's response to the jury's question also violated Andriano's constitutional rights as discussed in Claim 9, *supra*.

the death sentence unconstitutional. *See Spisak*, 558 U.S. at 144 (citing *Mills*, 486 U.S. at 380, 384). Because it cannot be determined "with any degree of confidence" how the jury understood the flawed instructions, the errant instruction prejudiced Andriano. *See Mills*, 486 U.S. at 377, 383.

The Arizona Supreme Court instead found that the instructions as a whole "correctly advised the jurors that they did not have to agree upon the existence of any particular mitigating circumstance before each juror could individually assess whether the mitigation was sufficiently substantial to call for leniency." *Andriano*, 161 P.3d at 550-51. This was an unreasonable application of the clearly established law of *Mills* and *McKoy* as well as an unreasonable determination of the facts. *See* 28 U.S.C. § 2254(d). Andriano's rights under the Sixth, Eighth, and Fourteenth Amendments were violated, and she is therefore entitled to relief in the form of a new penalty hearing.

## CLAIM FIFTEEN

**The trial court erroneously permitted the State to use an unqualified witness as an expert to rebut evidence that Andriano was a victim of domestic violence, and the error was prejudicial. As a result, her due process rights were violated.**

This claim was not raised in Andriano's state-court proceedings as a result of appellate and post-conviction counsel's deficient performance. The deficient performance of state appellate and post-conviction counsel prejudiced Andriano and provides cause to excuse any procedural default. *See Strickland*, 466 U.S. at 688; *Evitts*, 469 U.S. at 397; *Martinez*, 132 S. Ct. at 1315; *Nguyen*, 736 F.3d at 1293. Therefore, the Court may consider the merits of this claim. Because the claim has not been adjudicated by the Arizona state courts, the limitations on relief imposed by 28 U.S.C. § 2254(d) do not apply to this Court's review, and the Court may consider the claim de novo. Andriano will demonstrate at an evidentiary hearing that appellate and post-conviction counsel fell below the standards of minimally competent capital attorneys and that those failures

1   prejudiced her.

2       A witness may testify as an expert if the witness's testimony is sufficiently
3   reliable to be considered by the trier of fact. The Supreme Court "imposes a
4   special obligation upon a trial judge to ensure that any and all scientific
5   testimony . . . is not only relevant, but reliable." *Kumho Tire Co., Ltd. v.*
6   *Carmichael*, 526 U.S. 137, 147 (1999) (alteration in original) (internal quotations
7   omitted). Proponents of an expert's testimony must demonstrate by a
8   preponderance of evidence that their opinions are reliable. *See In re Paoli R.R.*
9   *Yard PCB Litigation*, 35 F.3d 717, 744 (3d Cir. 1994). Although there is no
10  exhaustive test, federal courts have expounded several factors relevant in
11  determining whether expert testimony is sufficiently reliable to be considered by
12  the jury. *See General Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) (noting that a
13  trial court "may conclude that there is simply too great an analytical gap between
14  the data and the opinion proffered"); *see also Daubert v. Merrell Dow*
15  *Pharmaceuticals, Inc*., 43 F.3d 1311, 1317 (9th Cir. 1995) (noting that one factor
16  courts should consider is whether experts are "proposing to testify about matters
17  growing naturally and directly out of research they have conducted independent of
18  the litigation").

19      Here, the trial court permitted Michael "Brad" Bayless to testify, over trial
20  counsel's objection, that Andriano was not a domestic-violence victim even
21  though he was unqualified to make such a determination. (Tr. Nov. 10, 2004 at
22  37-38.) Bayless's educational and professional background lacked any relevant
23  training or experience in the topic of domestic violence. (Tr. Nov. 15, 2004 at 30-
24  31.) Indeed, his only attenuated connection was that in the clinic he ran, two
25  psychologists occasionally treated domestic violence victims. (Tr. Nov. 10, 2004
26  at 14.)

27      In addition to his lack of relevant background in the subject, Bayless's
28  conclusion that Andriano was not a domestic-violence victim was based on

completely irrelevant testing. Bayless rejected commonly used domestic-violence assessment tools and instead employed mental-health and intelligence assessment tools including the Minnesota Multiphasic Personality Inventory II, the Williamson Sentence Completion Test, and the Shipley Institute of Living Scale, none of which had any relevance to Andriano's status as a domestic-violence victim. (Tr. Nov. 15, 2004 at 39-41.) In rejecting the commonly used domestic-violence assessment tools, Bayless's only proffered explanation was that such assessments allow people "to make themselves appear one way or the other" because they "simply would just endorse the area as much as they could." (Tr. Nov. 10, 2004 at 29-32.)

As defense counsel's domestic-violence expert, Mindy Mechanic, explained, Bayless's rejection of self-reporting methods to discern whether a person is a domestic-violence victim was unfounded. (Tr. Nov. 15, 2004 at 42.) Mechanic testified that the Williamson Incomplete Sentences Test was notably missing from "any of the sources that documents standardized tests." (*Id.* at 39-40.) In fact, despite teaching a course on assessment tools for domestic violence, she had never heard of the test. (*Id.* at 40.) Bayless used the Shipley Institute of Living Scale, "a very brief IQ scan," to support his assertion that Andriano was not a domestic-violence victim. However, he failed to connect those test results to his ultimate conclusion that she was not a domestic-violence victim—probably because there is no association between intelligence and being a victim of domestic violence. (*Id.* at 39-40; Tr. Nov. 10, 2004 at 36.) Again, Bayless used an irrelevant test to draw a conclusion he was not qualified to make. The only information the Shipley Institute of Living Scale provided was Andriano's IQ score, which again is totally unrelated to her status as a victim. Finally, Bayless administered the MMPI II. (Tr. Nov. 10, 2004 at 74.) The MMPI II is a general standardized objective measure of determining a person's overall level of personality functioning. (Tr. Nov. 15, 2004 at 41.) While the test can be useful to

get a sense of how much distress someone is experiencing and specific symptoms they have, an MMPI depends greatly on the particular circumstances of the person at the time it is administered. (*Id.* at 41-42.) Mechanic testified that "there is no way you can use [the MMPI] to determine if somebody's been the victim of anything, not domestic violence, not a car accident, not a flood or earthquake or anything else." (*Id.* at 42-43.) Domestic violence is not a mental illness or something that correlates with intelligence; thus, Bayless's administration and reliance on these tests was inappropriate.

Bayless was thus unqualified to testify that Andriano was not a domestic-violence victim, and the trial court, in its "gatekeeper function" should have precluded him from presenting unfounded and misleading information. *See Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 597 (1993). Permitting Bayless to provide unreliable testimony violated Andriano's due-process rights because it undermined the fairness of the proceedings. Here, Bayless did more than overstate a conclusion; he presented to the jury a totally unfounded determination, all under the guise of being an expert on the subject. *See Rowe v. State Farm Mut. Auto. Ins. Co.*, 670 So.2d 718, 724-25 (3d Cir. 1996) (noting that "in instances where the basis of an expert opinion . . . is beyond the common knowledge of the jury, the jury can be deprived of the ability to objectively and rationally evaluate the merit of the expert's opinion"). Many misconceptions and stereotypes are associated with domestic violence. (Tr. Nov. 15, 2004 at 37.) For example, one common misconception among battered women is that if there was no physical violence or the physical violence was not so severe as to break bones, then they did not suffer domestic abuse. (*Id.*) The trial court's error only fueled these misconceptions, and because jurors tend to give undue weight to the perceived objectivity of expert testimony, permitting Bayless's testimony increased the risk of error in the fact-finding process. *See Roe*, 670 So.2d at 724-25. Consequently, the error violated Andriano's right to heightened

due process in a capital case, and to due process in any case, and she is entitled to relief. *See Beck v. Alabama*, 447 U.S. 625, 637-38 (1980).

## CLAIM SIXTEEN

**The instructions defining cruelty given in this case were vague and overbroad, in violation of Andriano's rights under the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.**

Andriano raised these claims on direct appeal. (DA 57 at 62-74.) The Arizona Supreme Court denied the claims on the merits. *Andriano*, 161 P.3d at 548-49. The state court's rejection of these claims on the merits was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the United States Supreme Court. 28 U.S.C. § 2254(d)(1). In addition, it constituted an unreasonable determination of the facts in light of the evidence presented. 28 U.S.C. § 2254(d)(2).

Over the objection of defense counsel (Tr. Nov. 30, 2004 at 77-86, 96-98; Tr. Dec. 1, 2004 at 3; ROA 96), Andriano's jury was presented with the aggravating circumstance that the murder was "especially heinous, cruel or depraved" (Tr. Dec. 1, 2004 at 91-93; ROA 383 at 10-12). *See* Ariz. Rev. Stat. § 13-703(F)(6) (renumbered to § 13-751(F)(6)). The jury found that the murder committed was cruel only. (Tr. Dec. 6, 2004 at 3-4; ROA 393.)

The United States Supreme Court has held that the language of Arizona's "especially heinous, cruel or depraved" aggravating circumstance is "facially vague" and that the state courts must provide ample "substance to the operative terms" for the aggravating circumstance to pass constitutional muster. *Walton v. Arizona*, 497 U.S. 639, 654 (1990), *overruled on other grounds by Ring v. Arizona*, 536 U.S. 584, 589 (2002). According to Arizona courts, the vagueness of the aggravating circumstance can be "remedied with appropriate narrowing instructions" given to a jury. *State v. Tucker*, 160 P.3d 177, 189 (Ariz. 2007). But the Supreme Court has clearly established that even if a state has adopted a

constitutionally valid limiting construction of an aggravating circumstance, given instructions can still be unconstitutional if the limiting construction is not applied. *See Lewis v. Jeffers*, 497 U.S. 764, 776-77, 779 (1990); *Godfrey v. Georgia*, 446 U.S. 420, 429, 432 (1980). Accepting that jury instructions can sufficiently narrow the cruelty aggravating circumstance, *see* Claim 17, *infra*, the instructions given to the jury here did not adequately do so. The instructions given in this case failed to channel the sentencing discretion of the jury and narrow the class of offenders who could qualify for a death sentence, resulting in the violation of Andriano's Sixth, Eighth, and Fourteenth Amendment rights. *See Tuilaepa v. California*, 512 U.S. 967, 972 (1994); *Gregg v. Georgia*, 428 U.S. 153, 195 n.46 (1976).

> ### A.   The jury instructions were vague and overbroad because they did not instruct the jury on what qualified as the "norm of first degree murders."

The given jury instructions did not provide jurors with a "meaningful basis for distinguishing the few cases in which [the penalty] is imposed from the many cases in which it is not." *Godfrey*, 446 U.S. at 427 (internal quotation marks omitted) (alterations in original). To give substance to the term "cruel," the trial court first instructed the jury that the murder had to be "especially cruel." (ROA 383 at 10.) This phrase alone does not help define what crimes qualify for the circumstance:

> The State's contention that the addition of the word "especially" somehow guides the jury's discretion, even if the term "heinous" does not, is untenable. To say that something is "especially heinous" merely suggests that the individual jurors should determine that the murder is more than just "heinous," . . . and an ordinary person could honestly believe that every unjustified, intentional taking of human life is "especially heinous."

*Maynard v. Cartwright*, 486 U.S. 356, 364 (1988) (citing *Godfrey*, 446 U.S. at 428-29).

The trial court went on to define "especially cruel" as "above the norm of

other first degree murders." (ROA 383 at 10.) But the jury was not instructed as to what qualified as "the norm of other first degree murders" in order for a murder to be "especially cruel" as opposed to just "cruel." Without any point of reference or comparison as to what first-degree murders were "the norm," the jury could not differentiate the case before it. The jurors here most likely had not previously participated in first-degree murder trials, so they also did not have the benefit of experience to help them discern if the case before them was not "the norm." *Cf. Gregg*, 428 U.S. at 192 ("Since the members of a jury will have had little, if any, previous experience in sentencing, they are unlikely to be skilled in dealing with the information they are given." (citations omitted)). This failure to narrow the aggravating circumstance rendered Andriano's death sentence unconstitutional under the Sixth, Eighth, and Fourteenth Amendments.

The Arizona Supreme Court held that this instruction did not require the jury to engage in proportionality review because "jurors must assess whether the murder was so cruel that it rose above the norm of first degree murders," which the rest of the cruelty instruction helped elucidate. *Andriano*, 161 P.2d at 549. This was objectively unreasonable. The term "above the norm of first degree murders" was used when Arizona courts engaged in proportionality review. *See, e.g.*, *State v. Moorman*, 744 P.2d 679, 688 (1987); *State v. Correll*, 715 P.2d 721, 738 (1986). A mandate that the murder at issue be above the norm necessarily requires that the jury conduct a comparison. The state court's determination that the given instruction sufficiently instructed the jurors on how to conduct this comparison, so that the instruction was not unconstitutionally vague, was an unreasonable determination of clearly established federal law and based on an unreasonable determination of the facts. *See* 28 U.S.C. § 2254(d). Andriano's rights under Sixth, Eighth, and Fourteenth Amendments were violated, and she is therefore entitled to a new hearing on the cruelty aggravating circumstance.

**B.    The instructions were vague and overbroad because they did not define "mental anguish."**

The definition of cruelty given to the jury also was vague and overbroad because it did not sufficiently define the mental suffering the victim had to experience in order for cruelty to qualify as "especial cruelty." The instruction read:

> "Cruelty" involves the infliction of physical pain and/or mental anguish on a victim before death. A crime is committed in an especially cruel manner when a defendant either knew or should have known that the manner in which the crime is committed would cause the victim to experience physical pain and/or mental anguish before death. The victim must be conscious for at least some portion of the time when the pain and/or anguish was inflicted.

(Tr. Dec. 1, 2004 at 91-92; ROA 383 at 10.)

When reviewing Andriano's claim that this instruction failed to sufficiently channel the jurors' discretion, the Arizona Supreme Court determined that the given instruction followed instructions previously approved of and therefore was not unconstitutionally vague. *Andriano*, 161 P.3d at 548-49. This was an unreasonable application of clearly established federal law and an unreasonable determination of the facts. *See* 28 U.S.C. § 2254(d)(1), (d)(2). To support its assertion that the given instruction sufficiently paraphrased previously approved of instructions, the Arizona Supreme Court cited *State v. Trostle*, 951 P.2d 869 (Ariz. 1997). There, the Arizona Supreme Court held that "[c]ruelty exists if the victim consciously experienced physical or mental pain prior to death, and the defendant knew or should have known that suffering would occur. *Mental anguish includes a victim's uncertainty about her ultimate fate*." *Trostle*, 951 P.2d at 883 (citations omitted) (emphasis added). The last sentence of the definition in *Trostle*, which defines "mental pain," was not included in Andriano's jury instructions. The Arizona Supreme Court therefore unreasonably determined that the instruction in Andriano's case followed that in *Trostle*.

The difference in the two instructions also means that the Arizona Supreme Court's decision that the given instruction was not unconstitutional was an unreasonable application of clearly established federal law. *See* 28 U.S.C. § 2254(d)(1). In *Walton*, the United States Supreme Court held that Arizona's vague "cruel, heinous, or depraved" aggravating circumstance was saved by the narrowing construction given to it by the Arizona Supreme Court: [A] crime is committed in an especially cruel manner when the perpetrator inflicts mental anguish or physical abuse before the victim's death, *and that mental anguish includes a victim's uncertainty as to his ultimate fate*. 497 U.S. at 654 (internal quotation marks omitted) (emphasis added). The constitutional narrowing construction approved of in *Walton* included a definition of "mental anguish." This qualifier—that the victim must suffer uncertainty as to his fate—was not included in Andriano's jury instructions.

The prosecutor extensively emphasized the mental anguish aspect of the cruelty instruction in both his opening and closing remarks at the aggravation phase. (Tr. Nov. 30, 2004 at 25-29; Tr. Dec. 1, 2004 at 21-26, 29, 32.) Without a definition of mental anguish, however, the jury was left with no guidance as to how to interpret the cruelty instruction because the phrase "mental anguish" alone could apply to any first-degree murder victim who was not immediately rendered unconscious before seeing his attacker. And the two instructions in conjunction— that the crime had to be above the norm of first-degree murders and that a conscious victim had to suffer mental anguish that was reasonably foreseeable— merely conveyed that the jury had to find that more mental anguish was inflicted in this case than in other first-degree murders. "[T]he jury's interpretation of [the cruelty circumstance] can only be the subject of sheer speculation" because the jurors were left not knowing what quantum of mental anguish was required to be "especially cruel." *Godfrey*, 446 U.S. at 428-29.

The decision of the Arizona Supreme Court was an unreasonable

1    determination of the facts and an unreasonable application of clearly established

2    federal law. *See* 28 U.S.C. § 2254(d). The definition of cruelty did not sufficiently

3    define "mental anguish" such that the jury would know whether the aggravating

4    circumstance was appropriate in this case, in violation of the Sixth, Eighth, and

5    Fourteenth Amendments. Andriano is therefore entitled to new aggravation-phase

6    and penalty-phase proceedings.

### CLAIM SEVENTEEN

**The cruelty aggravating circumstance in Arizona Revised Statute § 13-703(F)(6) is vague because it fails to channel jurors' sentencing discretion and overbroad because it does not genuinely narrow the class of offenders eligible for the death penalty in violation of the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.**

12    Andriano raised these claims on direct appeal. (DA 57 at 54-66, 132.) The

13   Arizona Supreme Court denied the claims on the merits. *Andriano*, 161 P.3d at

14   548-49, 556-57. The state court's rejection of the claims was contrary to, or

15   involved an unreasonable application of, clearly established federal law, as

16   determined by the United States Supreme Court. 28 U.S.C. § 2254(d)(1).

17    Under Arizona law, a person convicted of first-degree murder is eligible for

18   the death penalty if she "committed the offense in an especially heinous, cruel or

19   depraved manner." Ariz. Rev. Stat. § 13-703(F)(6) (renumbered to

20   § 13-751(F)(6)). Defense counsel moved to dismiss this aggravating circumstance

21   as facially vague and vague when applied by juries. (Tr. Nov. 30, 2004 at 77-86,

22   96-98; ROA 96 at 10-12.) The trial court denied the motion (Tr. Nov. 30, 2004 at

23   99), and Andriano's jury was instructed on this aggravating circumstance (Tr.

24   Dec. 1, 2004 at 91-93; ROA 383). The jury concluded that the State had proven

25   beyond a reasonable doubt that the crime was committed in an especially cruel

26   manner only. (Tr. Dec. 6, 2004 at 3-4; ROA 393.) Andriano's Sixth, Eighth, and

27   Fourteenth Amendment rights were violated by her prosecution for the especially

28   cruel aggravating circumstance because it is vague when applied by juries and

160

fails to narrow the class of those eligible for the death penalty. *See Tuilaepa*, 512 U.S. at 972 ("As we have explained, the aggravating circumstance must meet two requirements. First, the circumstance may not apply to every defendant convicted of a murder; it must apply only to a subclass of defendants convicted of murder. Second, the aggravating circumstance may not be unconstitutionally vague." (internal citations omitted)).

## A. The cruelty aggravator is vague because it fails to channel jurors' sentencing discretion.

The aggravating circumstance that a murder be especially cruel is unconstitutionally vague when applied by jurors because it does not sufficiently narrow the jurors' discretion. The death penalty cannot be imposed in an arbitrary and capricious manner. *See Furman v. Georgia*, 408 U.S. 238 (1972). Therefore, the Supreme Court has clearly established that a state must define death-penalty eligible crimes in a way that "obviates 'standardless [sentencing] discretion.'" *Godfrey v. Georgia*, 446 U.S. 420, 428 (1980); *see also Zant v. Stephens*, 462 U.S. 862, 874, 877 (1983). The "State must establish rational criteria that narrow the decisionmaker's judgment as to whether the circumstances of a particular defendant's case meet the threshold." *McCleskey v. Kemp*, 481 U.S. 279, 305 (1987). Vague sentencing standards are therefore unconstitutional because they fail to adequately "channel the sentencing decision patterns of juries with the result that a pattern of arbitrary and capricious sentencing like that found unconstitutional in *Furman* could occur." *Gregg v. Georgia*, 428 U.S. 153, 195 n.46 (1976).

The jury-sentencing process employed in Arizona following *Ring v. Arizona*, 536 U.S. 584 (2002), rendered Ariz. Rev. Stat. § 13-703(F)(6) unconstitutionally vague. *See generally Maynard v. Cartwright*, 486 U.S. 356, 361-62 (1988) (discussing appropriate constitutional framework for vagueness challenges to aggravating circumstances). The Supreme Court had previously held

1    that the aggravating circumstance as written was unconstitutionally vague but that

2    Arizona courts had given it sufficient substance by providing, through case law, a

3    narrowing construction. *Walton v. Arizona*, 497 U.S. 639, 652-55 (1990),

4    *overruled on other grounds by Ring*, 536 U.S. at 589. This decision, however,

5    depended on judges conducting the sentencing. *Id.* at 653 (distinguishing prior

6    cases that struck down similar aggravators under jury sentencing schemes because

7    the "logic of those cases has no place in the context of sentencing by a trial

8    judge"). The *Walton* Court presumed that Arizona trial judges could and were

9    applying the narrowed definition. *Id.* Such a presumption does not hold for juries.

10    *Walton* therefore is not the appropriate framework for Andriano's challenge to

11    § 13-703(F)(6) as enforced by juries; instead *Maynard* and *Godfrey* control.

12        In those cases, the United States Supreme Court found unconstitutionally

13    vague aggravating circumstances applied by juries. As there, in Arizona a juror

14    could reasonably believe that every intentional murder is especially cruel.

15    *See Maynard*, 486 U.S. at 364; *Godfrey*, 446 U.S. at 428-29. Jurors instructed in

16    accordance with *Walton* are left with only general terms, which are insufficient to

17    guide their discretion. The narrowed definition of cruelty approved of in *Walton*

18    read: "[A] crime is committed in an especially cruel manner when the perpetrator

19    inflicts mental anguish or physical abuse before the victim's death, and that

20    mental anguish includes a victim's uncertainty as to his ultimate fate." 497 U.S. at

21    654 (internal quotation marks omitted). This definition fails to inform a juror what

22    type, duration, or degree of physical pain qualifies as abuse and thus differentiates

23    a crime deserving of the death penalty from every first-degree murder. Indeed, the

24    prosecutor here told the jury that the measure was "any physical pain." (Tr. Nov.

25    30, 2004 at 22.) A juror could reasonably believe that any murder, except one in

26    which the victim dies instantaneously and therefore painlessly, would include

27    physical pain and therefore qualify as especially cruel. Jurors do not have the

28    knowledge that judges do of case law that explains when a murder is especially

1   cruel, knowledge that saved the aggravating circumstance from being

2   unconstitutionally vague in *Walton*. And juries, unlike judges, do not have the

3   benefit of experience with multiple cases so that they can discern if the case

4   before them is above the norm of first-degree murder cases. *See State v. Carlson*,

5   48 P.3d 1180, 1192 (Ariz. 2002) ("As we have repeatedly held, the death penalty

6   should not be imposed in every capital murder case but, rather, it should be

7   reserved for cases in which either the manner of the commission of the offense or

8   the background of the defendant places the crime 'above the norm of first-degree

9   murders.'" (citation omitted)); *cf. Gregg*, 428 U.S. at 192 ("Since the members of

10  a jury will have had little, if any, previous experience in sentencing, they are

11  unlikely to be skilled in dealing with the information they are given." (citations

12  omitted)). The instruction approved of for imposition by judges in *Walton* is

13  therefore vague when applied by juries.

14      The Arizona Supreme Court rejected Andriano's claim as having been

15  previously decided. *Andriano*, 161 P.3d at 548. The conclusion that the cruelty

16  aggravator is not unconstitutionally vague was an unreasonable application of

17  clearly established federal law. The shift to jury sentencing alters the landscape

18  and makes *Walton* no longer the controlling case on the issue. The cruelty

19  aggravating circumstance is vague under *Maynard* and *Godfrey*. Andriano's rights

20  under the Sixth, Eighth, and Fourteenth Amendments were violated, and she is

21  entitled to relief in the form of new aggravation-phase and penalty-phase

22  proceedings.

23  **B.    The cruelty aggravator is overbroad because it does not narrow

24          the class of death-eligible offenders.**

25      In addition to being vague, the cruelty aggravating circumstance does not

26  genuinely narrow the class of death-eligible offenders. *See, e.g.*, *Lowenfield v.

27  Phelps*, 484 U.S. 231, 244 (1988) (quoting *Zant*, 462 U.S. at 877). Aggravating

28  circumstances cannot be so broad that a jury "is incapable of imposing capital

1  punishment other than by arbitrariness or caprice," *Gregg*, 428 U.S. at 201 n.51,

2  and "the circumstance may not apply to every defendant convicted of a murder,"

3  *Tuilaepa*, 512 U.S. at 972; *see also Arave v. Creech*, 507 U.S. 463, 474 (1993).

4  Arizona's judicial interpretations of the cruelty aggravating circumstance have

5  resulted in the aggravating circumstance being found under conflicting

6  circumstances. *Compare State v. Summerlin*, 675 P.2d 686, 696 (Ariz. 1983)

7  (finding cruelty because defendant used excessive force); *with State v. Chaney*,

8  686 P.2d 1265, 1282 (Ariz. 1984) (finding cruelty because defendant used

9  insufficient force, causing victim to suffer). A jury could find the aggravating

10 circumstance in almost any first-degree murder. The cruelty aggravating

11 circumstance therefore does not ensure that "the imposition of a more severe

12 sentence on the defendant compared to others found guilty of murder" is justified.

13 *Lowenfield*, 484 U.S. at 244 (quoting *Zant*, 462 U.S. at 877).

14      The explanation of the cruelty aggravating circumstance offered by

15 Martinez in this case reveals its breadth. He attempted to explain to the jury that

16 not every first-degree murder is cruel because not every murder involves a

17 measure of pain: "Is there really a measure of pain if somebody takes a gun and

18 shoots somebody in the back of the head and they immediately lapse into

19 unconsciousness, is there really a measure of pain in every one of those cases?

20 There isn't." (Tr. Dec. 1, 2004 at 74-75.) This example of what would not qualify

21 as cruel instead shows just how broad the aggravating circumstance is. It is only

22 inapplicable if an unsuspecting victim does not see his assailant coming and either

23 dies or is rendered unconscious immediately. The aggravating circumstance

24 therefore does not provide jurors with a "meaningful basis for distinguishing the

25 few cases in which [the penalty] is imposed from the many cases in which it is

26 not." *Godfrey*, 446 U.S. at 427 (internal quotation marks omitted) (alterations in

27 original).

28      The Arizona Supreme Court summarily dismissed this claim as previously

1    decided. *Andriano*, 161 P.3d at 556-57. This was an unreasonable application of
2    clearly established federal law because the cruelty aggravating circumstance
3    applies to almost every first-degree murder and therefore does not genuinely
4    narrow those eligible for the death penalty. The result is the potential for the
5    arbitrary imposition of the death penalty. Andriano's sentence based on this
6    aggravating circumstance, the only one found by the jury, violated her Sixth,
7    Eighth, and Fourteenth Amendment rights. She is therefore entitled to new
8    aggravation-phase and penalty-phase proceedings.

### CLAIM EIGHTEEN

**The Arizona Supreme Court's decision affirming Andriano's death sentence denied Andriano meaningful appellate review by unconstitutionally relying on facts not found by the jury.**

13       This claim was not raised in Andriano's state-court proceedings as a result
14   of appellate and post-conviction counsel's deficient performance. The deficient
15   performance of state appellate and post-conviction counsel prejudiced Andriano
16   and provides cause to excuse any procedural default. *See Strickland*, 466 U.S. at
17   688; *Evitts*, 469 U.S. at 397; *Martinez v. Ryan*, 132 S. Ct. 1309, 1315 (2012);
18   *Nguyen v. Curry*, 736 F.3d 1287, 1293 (9th Cir. 2013). Therefore, the Court may
19   consider the merits of this claim. Because the claim has not been adjudicated by
20   the Arizona state courts, the limitations on relief imposed by 28 U.S.C. § 2254(d)
21   do not apply to this Court's review, and the Court may consider the claim
22   de novo. Andriano will demonstrate at an evidentiary hearing that appellate and
23   post-conviction counsel fell below the standards of minimally competent capital
24   attorneys and that those failures prejudiced her.

25       In *Apprendi v. New Jersey*, the United States Supreme Court concluded that
26   the Sixth Amendment does not allow a defendant to be "expose[d] . . . to a penalty
27   exceeding the maximum he would receive if punished according to the facts
28   reflected in the jury verdict alone." 530 U.S. 466, 483 (2000) (emphasis omitted).

1    Soon thereafter, the Court extended *Apprendi* to capital sentencing, holding that a
2    defendant is "entitled to a jury determination" of facts that can increase the
3    sentence she faces. *Ring v. Arizona*, 536 U.S. 584, 589 (2002). Moreover, a
4    defendant has a protected liberty interest in a state following its own procedural
5    laws regarding sentencing, and the arbitrary deprivation of such an interest is
6    prohibited by the Due Process Clause. *See Hicks v. Oklahoma*, 447 U.S. 343, 346
7    (1980).

8        To satisfy the heightened standard of reliability necessary in the
9    death-penalty context, *see Woodson v. North Carolina*, 428 U.S. 280, 305 (1976)
10   (joint opinion of Stewart, Powell, and Stevens, JJ.), the Supreme Court has
11   "emphasized repeatedly the crucial role of meaningful appellate review in
12   ensuring that the death penalty is not imposed arbitrarily or irrationally," *Parker v.
13   Dugger*, 498 U.S. 308, 321 (1991) (citations omitted); *see also Zant v. Stephens*,
14   462 U.S. 862, 890 (1983) (footnote omitted) ("Our decision in this case depends
15   in part on the existence of an important procedural safeguard, the mandatory
16   appellate review of each death sentence by the Georgia Supreme Court to avoid
17   arbitrariness and to assure proportionality."). As the purpose of appellate review is
18   to ensure the constitutionality of a death sentence, the review must itself be
19   constitutional. *Cf. Clemons v. Mississippi*, 494 U.S. 738, 748-51 (1990)
20   (evaluating constitutionality of appellate review).

21       During its independent review, the Arizona Supreme Court denied
22   Andriano meaningful appellate review when it unconstitutionally relied on two
23   facts not supported by the record and thus not found by the jury. First, the court
24   declared that Andriano "claimed that Joe ultimately slit his own throat." *Andriano*,
25   161 P.3d at 545. This mischaracterized Andriano's testimony that Joe had a knife
26   and "was going to [] kill himself" because "[Andriano] couldn't do it right." (Tr.
27   Oct. 28, 2004 at 62.) She further testified that Joe tried to "move the knife towards
28   his neck," while she told him "please don't do this." (*Id.*) They then "struggled

over the knife, but everything was so bloody [her] hand slipped off." (*Id.*) Thus, her testimony was quite different from "he slit his own throat," as the court characterized it. Second, the court stated that Joe had "lacerations on his head that exposed some brain matter." *Id.* at 544. However, this was incorrect. The medical examiner testified that "there was enough force applied to lacerate the skin, but not enough force applied to fracture the skull." (Tr. Sept. 16, 2004 at 51.) He further testified that "after [he] opened up the skull, [he] noted there was bleeding along the surface on the left side of the brain." (*Id.*) Joe's skull was not fractured and brain matter was only exposed after the medical examiner opened his skull as part of the autopsy. (*Id.*)

Thus, the Arizona Supreme Court improperly found facts beyond the jury's findings and took into account those improper facts when conducting its review of Andriano's sentence. In doing so, the court denied Andriano a constitutionally appropriate and meaningful appellate review, *see Parker*, 498 U.S. at 321, and violated her rights under the Sixth, Eighth, and Fourteenth Amendments. Andriano is accordingly entitled to relief.

## CLAIM NINETEEN

**Andriano received ineffective assistance of counsel during the guilt-phase of her first-degree murder trial, violating her rights under the Sixth and Fourteenth Amendments to the United States Constitution.**

Andriano's trial counsel committed errors during the guilt-phase proceedings of her capital trial, and as a result, the result of those proceedings is unreliable. This claim is subject to the two-prong standard established in *Strickland*: counsel's performance must be deficient, and such deficient performance must have prejudiced the defense. *Strickland*, 466 U.S. at 687. First, the inquiry under the deficiency prong is "whether counsel's assistance was reasonable considering all the circumstances." *Id.* at 688. Performance is deficient when the attorney renders objectively unreasonable assistance. *Id.* at 687-88.

Although defense counsel has broad discretion when making strategic decisions, those decisions must be reasonable and informed. *Id*. at 691; *see also Correll*, 539 F.3d at 949 (holding that an "uninformed strategy" is "no strategy at all"). In assessing counsel's performance, this Court should look to guides, such as the ABA standards at the time of trial, *Van Hook*, 558 U.S. at 7, as well as the standards of practice in the defense community in Arizona, *Pinholster*, 563 U.S. at 196. "[C]ounsel's function, as elaborated in prevailing professional norms, is to make the adversarial testing process work in the particular case." *Strickland*, 466 U.S. at 690. Moreover, "[t]rial lawyers have a 'duty to bring to bear such skill and knowledge as will render the trial a reliable adversarial testing process.'" *Connick v. Thompson*, 563 U.S. 51, 65 (2011) (quoting *Strickland*, 466 U.S. at 688).

The reasonableness of counsel's decisions is measured by the reasonableness of the investigation done in making such a decision. *Cf. Wiggins*, 539 U.S. at 523 (focusing on "whether the investigation supporting counsel's decision not to introduce evidence of Wiggins' background was itself reasonable"). "[S]trategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Strickland*, 466 U.S. at 690-91. In other words, any strategic decision made by counsel must be "reasonable and informed." *Jennings*, 290 F.3d at 1014.

When assessing the second prong, a court must decide whether "counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Strickland*, 466 U.S. at 687. A petitioner does not have to demonstrate by a preponderance of the evidence that "the result in his case would have been different but for counsel's errors," but only that there was a reasonable probability that the errors undermined confidence in the outcome of his trial. *Brown v. Myers*, 137 F.3d 1154, 1157 (9th Cir. 1998) (citing *Strickland*, 466 U.S. at 694); *see also Jennings*, 290 F. 3d at 1016 (quoting *Strickland*, 466 U.S. at 694

(rejecting explicitly the preponderance standard)); *Lord v. Wood*, 184 F.3d 1083, 1085 (9th Cir. 1999). And "despite the strong presumption of reliability," the question to be asked is whether "the result of the particular proceeding is unreliable because of a breakdown in the adversarial process that our system counts on to produce just results." *Strickland*, 466 U.S. at 696. Moreover, "deficient performance and prejudice questions may be closely related." *Correll*, 539 F.3d at 951 (citations omitted). Indeed, counsel's performance in and of itself could undermine a court's confidence in the outcome of the trial. *Id.*

"In making this [prejudice] determination, a court hearing an ineffectiveness claim must consider the totality of the evidence before the judge or jury." *Strickland*, 466 U.S. at 695; *see also Terry Williams*, 529 U.S. at 397-98; *Alcala*, 334 F.3d at 882-83 (granting relief on basis of cumulative impact of multiple errors by counsel); *Wood*, 64 F.3d at 1439 (holding that the cumulative impact of numerous deficiencies in defense counsel's performance was prejudicial to the defense, rendering the proceedings improper and warranting habeas relief). Even if this Court finds that no single error amounts to prejudice, it, nonetheless, should apply cumulative error principles to grant relief. *See Boyde*, 404 F.3d at 1176 (quoting *Cooper*, 586 F.2d at 1333).

A critical aspect in assessing prejudice under *Strickland* is to consider whether the combined errors by trial counsel impacted the trial in a manner that violated the Sixth Amendment. The Supreme Court did not instruct that each individual error should be reviewed for prejudice, but rather that the totality of the errors by counsel should be reviewed collectively for prejudice. In fact, *Strickland* established that assessing prejudice resulting from an IAC claim is identical to assessing materiality for a suppression-of-evidence claim under *Agurs*, 427 U.S. at 104, 112-13. *Strickland*, 466 U.S. at 694. And the Supreme Court has continually explained that when assessing materiality, the suppressed evidence must be "considered collectively, not item by item." *Kyles*, 514 U.S. at 436; *see also*

*Strickland*, 466 U.S. at 695 ("In making this [prejudice] determination, a court hearing an ineffectiveness claim must consider the totality of the evidence before the judge or jury."); *Terry Williams*, 529 U.S. at 397 (holding that when assessing prejudice, reviewing court must consider "the totality of the available mitigation evidence—both that adduced at trial, and the evidence adduced in the [post-conviction] proceeding"); *Alcala*, 334 F.3d at 882-83 (granting relief on basis of cumulative impact of multiple errors by counsel); *Martin*, 424 F.3d at 590-92 ("[E]ven if [trial counsel's] errors, in isolation, were not sufficiently prejudicial, their cumulative effect prejudiced Martin's defense."); *Lindstadt*, 239 F.3d at 194, 205 (granting relief where petitioner was prejudiced by cumulative effect of errors committed by trial counsel). Accordingly, "[s]eparate errors by counsel at trial and at sentencing should be analyzed together to see whether their cumulative effect deprived the defendant of his right to effective assistance." *Sanders*, 342 F.3d at 1001 (citation omitted). "They are, in other words, not separate claims, but rather different aspects of a single claim of ineffective assistance of trial counsel." *Id.* Even if prejudice does not result from an individual error, it may nevertheless result from cumulative errors. *See Boyde*, 404 F.3d at 1176 (quoting *Cooper*, 586 F.2d at 1333).

The following subparts of this claim detail the ways in which Andriano's trial counsel, Dan Patterson and David DeLozier, failed to render reasonably effective assistance of counsel throughout Andriano's first-degree murder trial. These errors "were so serious as to deprive [Andriano] of a fair trial, a trial whose result is reliable." *Strickland*, 466 U.S. at 687.

### A.    Trial counsel's failure to adequately investigate sodium azide and retain a qualified expert constituted ineffective assistance of counsel and violated Andriano's Sixth and Fourteenth Amendment rights.

Andriano did not present this claim to the state courts as a result of post-conviction counsel's deficient performance. The deficient performance of post-

conviction counsel prejudiced Andriano and provides cause to excuse any procedural default. *See Martinez*, 132 S. Ct. at 1315; *Strickland*, 466 U.S. at 687-88. Therefore, the Court may consider the merits of this claim. Because the claim has not been adjudicated by the Arizona state courts, the limitations on relief imposed by 28 U.S.C. § 2254(d) do not apply to this Court's review, and the Court may consider the claim de novo. Andriano will demonstrate at an evidentiary hearing that appellate and post-conviction counsel fell below the standards of minimally competent capital attorneys and that those failures prejudiced her.

At trial, the State presented evidence through the testimony of Joseph Richmond that sodium azide was detected in Joe's blood, his gastric contents, and three food items. (Tr. Sept. 27, 2004 at 33-34, 40-43.) The State primarily relied on Edward French, a professor of pharmacology from the University of Arizona College of Medicine, to testify about the effects of sodium azide. (Tr. Sept. 23, 2004 at 7-59.) The defense relied exclusively on William Collier. Collier, however, was not qualified to testify about sodium azide. He failed to recognize the flaw in the testing method used to detect sodium azide and gave incorrect, contradictory, and damaging testimony. Trial counsel rendered ineffective assistance by failing to adequately investigate sodium azide, leading to the hiring of an unqualified expert on an issue central to Andriano's defense. *See Hinton*, 134 S. Ct. at 1089 ("Criminal cases will arise where the only reasonable and available defense strategy requires consultation with experts or introduction of expert evidence." (quoting *Richter*, 562 U.S. at 106)); *Strickland*, 466 U.S. at 691 ("[C]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary."); *Duncan v. Ornoski*, 528 F.3d 1222, 1235 (9th Cir. 2008) ("Although it may not be necessary in every instance to consult with or present the testimony of an expert, when the prosecutor's expert witness testifies about pivotal evidence or directly contradicts

1   the defense theory, defense counsel's failure to present expert testimony on that
2   matter may constitute deficient performance.").

3       DeLozier had primary responsibility for retaining and preparing Collier,
4   whom he characterized as his "buddy." (PCR Tr. Feb. 7, 2014 at 32.) Despite test
5   results showing the presence of sodium azide in food seized from the Andrianos'
6   kitchen, Andriano denied putting sodium azide in the food. (Tr. Nov. 2, 2004 at
7   68, 74.) DeLozier recognized the importance of this fact and communicated to
8   Patterson that the presence of sodium azide in the food was an area Collier would
9   need to review. Because the medical examiner's office had to send the samples to
10  a specialized lab to be tested for sodium azide, it also should have been apparent
11  that the chemical was rare and not necessarily in a generalist's expertise. (Tr.
12  Sept. 16, 2004 at 42.)

13      Instead of investigating the specialized nature of sodium azide and seeking
14  someone with relevant experience, DeLozier turned to Collier, who had a
15  bachelor's of science in chemistry and was previously the director of the Phoenix
16  Police Crime Laboratory. (Tr. Oct. 20, 2004 at 4, 6, 69.) As Martinez exhaustively
17  hammered during trial, these experiences did not make Collier qualified to testify
18  about sodium azide. He had never analyzed sodium azide or testified about it
19  previously. (*Id.* at 61; Oct. 21, 2004 at 17-18.) He was a general chemist or
20  criminalist, and the breadth of his areas of "expertise" was brought out on
21  cross-examination; he had testified about blood spatter, ballistics, illicit drugs, and
22  crime scene analysis. (Tr. Oct. 20, 2004 at 50, 56-59; Tr. Oct. 21, 2004 at 48-49.)
23  Indeed, the initial request for funds to retain Collier said he would testify about
24  both the crime scene and sodium azide. Although failure to choose one qualified
25  expert over another does not constitute deficient performance, *see Harris v.*
26  *Vasquez*, 949 F.2d 1497, 1525 (9th Cir. 1990), here counsel failed to adequately
27  investigate and as a result retained an expert who was not qualified at all.

28      Because Collier was not an expert in sodium azide, he failed to recognize

the flaws in the laboratory's testing method. As discussed more fully in Claim 6, *supra*, the method used by the laboratory did not differentiate sodium azide from nitrate or bromide. As a result, the tests could not definitively establish that the chemical detected was sodium azide as opposed to a chemical compound expected in food. Collier failed to recognize this error and in fact testified that he did not even know what test the laboratory used on the samples. (Tr. Oct. 20, 2004 at 62.)

In addition to not presenting competent expert testimony, counsel was unable to effectively cross-examine the state's witnesses. *See Duncan*, 528 F.3d at 1235 ("It is especially important for counsel to seek the advice of an expert when he has no knowledge or expertise about the field."); *Driscoll v. Delo*, 71 F.3d 701, 709 (8th Cir. 1995) ("[A] reasonable defense lawyer would take some measures to understand the laboratory tests performed and the inferences that one could logically draw from the results."); *Dees v. Caspiri*, 904 F.2d 452, 455 (8th Cir. 1990) ("[C]ounsel had a duty to garner the expertise necessary to cross examine [the State's expert]."). During cross-examination, Richmond explained that he used "a different chromatography system column and eluent" when he tested the Elderberry capsules than when he tested the other items for sodium azide. (Tr. Sept. 27, 2004 at 47-48.) Patterson asked if this method was generally accepted in the industry. (*Id.* at 48.) But this testimony was not followed up with an inquiry into the column used to test the blood, gastric contents, and food. This line of questioning would have revealed that Richmond had utilized an improper method when testing those samples. Because neither counsel was sufficiently prepared, they could not bring this failure to the jury's attention through questioning of the state's witnesses.

The testimony that there was sodium azide in the food went unrebutted, and Andriano's testimony that Joe wanted to commit suicide therefore was undermined. (Tr. Oct. 28, 2004 at 29.) Andriano could not explain how sodium azide came to be in the food, and the prosecutor questioned her extensively on the

subject. (Tr. Oct. 28, 2004 at 14–15; Tr. Nov. 2, 2004 at 68–75.) The jury was left with the conclusion that Andriano had secretly poisoned her husband by not only putting the sodium azide in capsules but by putting it in food that she left out in her home. The fact that Andriano surreptitiously poisoned Joe was the cornerstone of the State's theory of premeditation, and the evidence supporting this theory went unchallenged. (Tr. Nov. 16, 2004 at 54-55, 135.) But for counsel's failures, there is a reasonable probability that at least one juror would have had a reasonable doubt about premeditation. *See Combs v. Coyle*, 205 F.3d 269, 291 (6th Cir. 2000) (finding prejudice when "[t]he two critical errors by defense counsel bolstered the State's case and made [the defendant]'s explanation of the events seem less likely.").

In addition to the prejudice as a result of the failure to question the testing method, Collier's testimony at trial was itself prejudicial. He testified that sodium azide decomposes when it interacts with moisture, including water in the air. (Tr. Oct. 20, 2004 at 20-21.) As a result, it would have decomposed when it was in the blood, gastric contents, or food. (Tr. Oct. 20, 2004 at 22, 70-71.) Therefore, Collier's testimony was that there was more sodium azide in Joe's blood and gastric contents as well as in the food than appeared in the laboratory results. (Tr. Oct. 21, 2004 at 44-45.) Aside from this testimony being inaccurate, no explanation was ever offered for why it was beneficial to the defense for Joe to have ingested more sodium azide, nor is an explanation readily apparent. Collier's testimony was also not internally logical. He testified that if someone ingested sodium azide in capsules, an "airbag" would be created in the stomach, causing the person to vomit immediately. (Tr. Oct. 20, 2004 at 27-28, 37.) Once the person vomited, he would recover. (*Id.* at 28–29.) But this theory of the effects of sodium azide does not conform with the testimony that the sodium azide in Joe's system was at a higher concentration when he died. If an airbag had been created in Joe's stomach immediately expelling all of the sodium azide, then it would not

1   remain in his system in a higher concentration than the trace amounts detected.

2   Collier's conclusions were therefore easily dismissed, and his testimony was

3   detrimental to the defense.[16] *See Bloom v. Calderon*, 132 F.3d 1267, 1278 (9th

4   Cir. 1997) (finding prejudice when defense expert's testimony "not only failed to

5   help the defense, it significantly hindered it").

6       Counsel performed deficiently by failing to properly investigate sodium

7   azide and hire a qualified expert. As a result, Andriano was prejudiced because

8   facts underlying the State's premeditation theory went unchallenged and her own

9   expert witness was detrimental. Counsel's ineffective performance violated

10  Andriano's Sixth and Fourteenth Amendment rights, and she is entitled to relief.

11
12      **B.    Trial counsel's failure to investigate and present expert
        testimony regarding Andriano's mental-health history during the
13      guilt phase of her trial constituted ineffective assistance of
        counsel in violation of her rights under the Sixth and Fourteenth
14      Amendments.**

15      Andriano raised this claim in her post-conviction proceedings. (PCR Mem.

16  Feb. 17, 2012, at 59.) The PCR court denied the claim on the merits, without

17  allowing discovery or holding an evidentiary hearing on this issue. (PCR Min.

18  Entry Oct. 31, 2012, at 5.) The Arizona Supreme Court summarily denied review.

19  (PFR 39.) The state courts' rejection of this claim was contrary to, or involved an

20  unreasonable application of, clearly established federal law, as determined by the

21  United States Supreme Court. 28 U.S.C. § 2254(d)(1).

22      In addition to counsel's duties set forth in *Strickland*, the Supreme Court

23  has reiterated that defense attorneys are required to conduct appropriate

24

25  _____

16  DeLozier conducted the questioning of Collier. (Tr. Oct. 20, 2004 at 3.) As
    discussed in Claim 2, *supra*, DeLozier was fasting during trial. (PCR Pet. Ex. 7 ¶
26  9.) Additionally, his law partner was murdered during trial, necessitating a break
    in the proceedings. (Tr. Oct. 18, 2004.) DeLozier was devastated by the loss.
27  (PCR Pet. Ex. 7 ¶ 10; Tr. Feb. 7, 2014 at 47; Tr. Feb. 10, 2004 at 141.) The
    examination of Collier began the first day the trial recommenced, but again had to
28  be halted because DeLozier felt ill during cross-examination. (Tr. Oct. 20, 2004 at
    76–81; Tr. Feb. 10, 2004 at 141.)

investigations. *Williams v. Taylor*, 529 U.S. 362, 395 (2000) (finding ineffectiveness and prejudice where counsel "failed to conduct an investigation that would have uncovered extensive records graphically describing [the defendant's] nightmarish childhood"). Trial counsel was thus "obliged to thoroughly investigate [Andriano's] case in order to determine whether a mental state defense might have been better than [or complementary to] the . . . defense" they settled on. *Jennings v. Woodford*, 290 F.3d 1006, 1015 (9th Cir. 2002); *see also Evans v. Lewis*, 855 F.2d 631, 636-37 (9th Cir. 1988); *Smith v. Stewart*, 189 F.3d 1004, 1009-14 (9th Cir. 1999).

"In assessing counsel's investigation, we must conduct an objective review of their performance, measured for 'reasonableness under prevailing professional norms,' which includes a context-dependent consideration of the challenged conduct as seen 'from counsel's perspective at the time.'" *Wiggins v. Smith*, 539 U.S. 510, 523 (citing *Strickland*, 466 U.S. at 688-89). "In judging the defense's investigation, as in applying *Strickland* generally, hindsight is discounted by pegging adequacy to 'counsel's perspective at the time' investigative decisions are made, and by giving a 'heavy measure of deference to counsel's judgments.'" *Rompilla v. Beard*, 545 U.S. 374, 381 (citations omitted); *see also Wiggins*, 539 U.S. at 533 (finding that "'strategic choices made after less than complete investigation are reasonable' only to the extent that 'reasonable professional judgments support the limitations on investigation'" (citations omitted)). When the Supreme Court reviews "the reasonableness of an attorney's investigation . . . [it] must consider not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further." *Wiggins*, 539 U.S. at 527. However, it will be unreasonable when counsel's "failure to investigate thoroughly stemmed from inattention, not strategic judgment." *Id.* at 512. Here, Andriano's trial counsel failed to investigate and present mental-health defenses, rendering them

1   "unreasonably and prejudicially ineffective under the standard set forth in
2   *Strickland.*" *Jennings*, 290 F.3d at 1008.

3        It is evident from the trial transcripts that Andriano's trial attorneys
4   unreasonably failed to investigate and develop evidence of her history of abuse in
5   conjunction with her mental-health history. Further, counsel failed to coordinate
6   an explanation for the circumstances surrounding the offense and consequently
7   missed a critical opportunity to present the jury with evidence that Andriano
8   lacked the requisite mental state essential to support a first-degree murder
9   conviction. Instead, counsel presented to the jury a scattered and incomplete
10  explanation for the offense including that Andriano assisted her husband in
11  committing suicide, or that she acted in self-defense, or that she was a victim of
12  domestic violence responding to years of spousal abuse. Trial counsel's failure to
13  adequately investigate Andriano's mental conditions and history only bolstered
14  the prosecutor's theory that Andriano lacked morals and was capable of planning
15  and carrying out a calculated murder. They failed to show that she was a woman
16  suffering from a "childhood characterized by substantial neglect and abuse—
17  emotional, physical, and sexual" and who "entered adulthood as a severely
18  traumatized and damaged person with a greatly increased likelihood of
19  developing—as she has—deficits in cognitive functioning, psychiatric disorders,
20  deficits in emotional functioning, and trauma-based patterns of relating to others."
21  (PCR Pet. Ex. 3 at 4.)

22       Trial counsel was inattentive to the need for investigation from the onset of
23  trial proceedings. On March 9, 2001, pursuant to a court order, Dr. Potts
24  completed Andriano's competency screening evaluation. (PCR Pet. Ex. 6A.)
25  Although Potts ultimately found her competent to stand trial, he cautioned that
26  defense counsel "may wish to independently retain an expert to evaluate
27  [Andriano's] state of mind around the time of the offense" because "[c]ertainly
28  there is something quite bizarre about what allegedly occurred," and thus her

criminal culpability at the time of the offense should be evaluated, independently, outside the scope of a Rule 11 evaluation. (PCR Pet. Ex. 6A at 3.) Trial counsel never did so. Rather than investigate Andriano's mental-health history and history of abuse, trial counsel focused solely on Andriano as a victim of her deceased husband's domestic violence.

Particularly telling is trial counsel's utilization of expert witness Sharon Murphy who was retained, despite no experience with capital cases, to assess whether and to what extent Andriano was a domestic-violence victim. (PFR 8, Ex. 20 ¶¶ 2-3.) Trial counsel did not ask Murphy to explore any sources of abuse other than Joe Andriano and did not provide her with any evidence of the abuse that Andriano suffered throughout her childhood. (*Id.* ¶ 2.) Murphy, who testified for four days, expressed to trial counsel that she was uncomfortable with their theory of the case, which focused solely on Andriano as a victim of spousal abuse. (*Id.* ¶ 4.) She was particularly concerned that the jury would have a difficult time comprehending this theory given the lack of stereotypical spousal abuse in Andriano's case, but her expressions of concern to trial counsel were to no avail. (*Id*.) In fact, during interviews, Andriano revealed information to Murphy that made her suspect that Andriano had suffered childhood sexual abuse or other trauma. (*Id.* ¶ 5.) Murphy ultimately viewed such topics as outside the scope of her narrow task, so she opted not to further pursue those topics with Andriano. However, Murphy raised the issue with trial counsel during a defense team meeting, encouraging the defense to conduct further investigation into Andriano's possible depression and/or PTSD. (*Id.* ¶¶ 6-7.)

Murphy was not alone in her suspicions. Kandy Rohde, a certified counselor who regularly met with Andriano during her pretrial incarceration, informed Murphy of her belief that Andriano likely suffered from childhood trauma and similarly urged trial counsel to retain a mental-health expert to conduct further investigation into her mental-health history. (*Id*.) Although such

information should have prompted a reasonable defense attorney to conduct further investigation, trial counsel failed to do so. Consequently, the jury never heard Andriano's complete story—that she suffered from the effects of a lifetime of abuse and trauma and that Joe Andriano's abuse was a continuation of a much longer pattern of abuse by other men in her life, including her father and step-father, that "likely would have made [her] more susceptible to severe reactions or 'lashing out' when subject to significant stress" and "[i]mpaired her ability to react to such stressors in ways that non-victims would consider to be rational." (*Id.* ¶ 8.) Without this context, the jury was left with an incomplete and woefully inadequate explanation for the offense as well as Andriano's behaviors, including her extramarital affairs, that was certainly not sufficient to combat the prosecutor's theory that she coldly committed the offense. The jury never heard that Andriano's emotional dysregulation caused her to attempt to hide her emotions from herself and others or to "dissociate" and become disconnected from them. (PCR Pet. Ex. 3 at 23.) Nor did they hear that her lifetime of abuse and neglect, in conjunction with her family's history and adherence to a religious cult, rendered her extremely vulnerable to developing psychiatric disorders such as bipolar disorder marked by abnormal manic and depressive states, complex post-traumatic stress disorder, and dependent personality disorder. (*Id.* at 8-9, 21.) Thus, trial counsel willfully ignored and failed to present credible and compelling evidence that Andriano's mental health disorders rendered her incapable of the mens rea required to commit first-degree murder.

By failing to conduct an investigation into Andriano's mental-health history and that of her family, trial counsel failed to fulfil their constitutional obligations. *See Williams*, 529 U.S. at 396. Counsel's deficient performance prejudiced Andriano within the meaning of *Strickland*, serving only to emphasize the prosecution's characterization of Andriano as promiscuous and premeditating—someone who carefully planned to kill her husband. Without the context her

mental-health background provided, the jury was deprived of critical evidence that would have undermined the prosecutor's theory of premeditation, an outcome-determinative factor.

The PCR court dismissed the claim and determined that counsel "was not ineffective for failing to seek admission of evidence precluded by Arizona law," reasoning that "evidence of mental illness was inadmissible to negate the *mens rea* element of the charge" because Andriano did not raise an insanity defense. (PCR Min. Entry Oct. 31, 2012, at 5.) Such a finding is contrary to Supreme Court law that "[r]ules excluding evidence from criminal trials[] . . . do not abridge the accused's rights to present a defense." *United States v. Scheffer*, 523 U.S. 303, 308 (1998). Moreover, here, the trial court did not exclude the evidence because the evidence was never presented at trial. Thus, the issue was not, as the PCR court phrased, whether the trial court improperly excluded evidence but whether trial counsel's failure to investigate obvious avenues of Andriano's mental-health history constituted deficient performance that prejudiced her.

In addition, the PCR court simply was wrong: such evidence is admissible in Arizona pursuant to *State v. Christensen*, 628 P.2d 580 (Ariz. 1981), which held that defendants charged with first-degree murder are allowed to present evidence of their impulsive and reflexive, rather than reflective, nature to negate evidence of premeditation. *See Vickers v. Ricketts*, 798 F.2d 369, 373 (9th Cir. 1986) ("The Arizona Supreme Court has held that the tendency to act on impulse is probative of an absence of premeditation." (citing *Christensen*, 628 P.2d at 582-83)). The Arizona Supreme Court failed to correct the PCR court's errors when it summarily denied Andriano's petition for review. (PFR 39.) Here, both prongs of the *Strickland* test are satisfied; accordingly, the state courts' determinations violated Andriano's constitutional rights, and she is entitled to relief.

1
2
3

**C.** **Trial counsel's failure to introduce evidence that Joe was severely depressed in the period leading up to his death constituted ineffective assistance of counsel and violated Andriano's Sixth and Fourteenth Amendment rights.**

4    Andriano raised this claim in her post-conviction proceedings. (PCR Mem.
5  at 60-61.) The PCR court denied the claim on the merits, without allowing
6  discovery or holding an evidentiary hearing on this issue. (PCR Min. Entry Oct.
7  31, 2012 at 5.) The Arizona Supreme Court summarily denied review. (PFR 39.)
8  The state courts' rejection of this claim was contrary to, or involved an
9  unreasonable application of, clearly established federal law, as determined by the
10  United States Supreme Court. 28 U.S.C. § 2254(d)(1). In addition, it constituted
11  an unreasonable determination of the facts in light of the evidence presented. 28
12  U.S.C. § 2254(d)(2).

13    In 1998, after a series of incorrect diagnoses, Joe was diagnosed with
14  malignant, terminal cancer. In 2000, doctors gave Joe a few months to a few years
15  to live and informed him that the cancer would ultimately cause him to suffocate
16  to death. (Tr. Sept. 28, 2004 at 11-12, 14-15.) At trial, Andriano testified that after
17  receiving that information, Joe became increasingly depressed and expressed his
18  desire to commit suicide in order to die on his own terms rather than suffer a
19  painful death caused by cancer. (Tr. Oct. 27, 2004 at 84-85.) Joe asked Andriano
20  to help him commit suicide. (*Id.*) Although at first she tried to change his mind,
21  she eventually acquiesced and began looking into ways to help him. (*Id.* at 84, 91-
22  93.) Proving Joe's increasing depressive state was critical to rebutting the State's
23  assertion that Andriano contrived Joe's suicidal thoughts and thus to undermining
24  the lynchpin of its theory of premeditation. Although two witnesses could have
25  provided corroborating testimony regarding Joe's depression and suicidal nature,
26  trial counsel failed to either elicit or present the evidence.

27    The first missed opportunity involved Phoenix attorney Jeffrey Miller, who
28  served as counsel for Andriano and Joe in their medical malpractice suit involving

Joe's cancer misdiagnoses. (Tr. Sept. 29, 2004 at 60-61.) Andriano phoned Miller on several occasions conveying concern over Joe's decompensation and expressions of intent to commit suicide and asking Miller to contact Joe and recommend a counselor. (PCR Pet. Ex. 19 ¶ 4.) Miller agreed and spoke with Joe about his declining mental state and recommended a counselor. (*Id.* ¶ 5.) The State called Miller as a witness, presumably in an attempt to establish a financial motive for the crime. On cross-examination, trial counsel attempted to elicit the aforementioned testimony regarding Joe's mental state and suicidal expressions, but drew a hearsay objection, which the court sustained. (Tr. Sept. 20, 2004 at 89-90.) Instead of restating the question in a manner that would not elicit hearsay or raising any applicable exceptions to the rule against hearsay, defense counsel dropped the subject entirely and moved on. (*Id.* at 89-91.)

Given the critical nature of Miller's testimony, any reasonable attorney would have rephrased the question or provided the court with an applicable hearsay exception. In fact, the court even provided trial counsel with one possible way to rephrase his question, telling him to "[j]ust ask— did you make a phone call?" (*Id.* at 89.) There were numerous ways trial counsel could have elicited at least some of Miller's corroborating knowledge via proper questioning because the testimony fell within a hearsay exception and was thus admissible. For example, both Miller's and Joe's statements fell under the present sense impression and then-existing mental, emotional, or physical condition exceptions to hearsay under Arizona Rules of Evidence 803(1) and 803(3). At side bar, trial counsel's only proffered argument against the sustained objection was that the State "could cross-examine" on Miller's knowledge that Joe was suicidal. (*Id.* at 90.)

Trial counsel's failure to introduce Miller's testimony regarding Joe's depression and resulting suicidal thoughts fell below objectively reasonable standards. *See Strickland*, 466 U.S. at 687; *see also Hinton v. Alabama*, 134 S. Ct.

182

1081, 1088-90 (2014) (noting that under *Strickland* "the proper measure of attorney performances remains simply reasonableness under prevailing professional norms" (internal quotation and citation omitted)). Trial counsel's performance was unreasonable under the circumstances given the significance of Miller's testimony to rebut the State's theory of premeditation and the available ways by which trial counsel could have gotten the testimony into evidence.

Counsel's deficient performance satisfies the second prong of the *Strickland* test, which requires that Andriano "show that there is a reasonable probability, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Hinton*, 134 S. Ct. at 1089 (internal quotation and citation omitted). Given that the State called Miller as its own witness, it was crucial that defense counsel elicit Miller's testimony as to Joe's mental state that undermined the State's assertion that Andriano had a financial motive for committing the offense, and had thus bought the poison to speed up his impending death rather than help him die on his own terms. (PCR Pet. Ex. 19 ¶ 8.) Although Andriano testified to Joe's depressive state and suicidal thoughts, failure to corroborate her testimony undermined her credibility to the jury and served only to bolster the State's depiction of the offense. Had her testimony been corroborated by Miller, there is a reasonable probability that the jury would have found the State did not meet its burden to prove premeditation, and thus rendered a verdict of not guilty.

Additionally, trial counsel briefly interviewed but never called as a witness Chris Weaver, Joe's long-time friend. (PCR Pet. Ex. 37 ¶¶ 1-2.) Weaver's testimony, like Miller's, would have corroborated Andriano's testimony that Joe was depressed and suicidal. In fact, Weaver had telephoned trial counsel's investigator to say that Joe had contacted him two to three weeks before his death asking him to help take care of Joe's family after he died. (PCR Pet. Ex. 58 at 18-

19.) Had trial counsel followed up with Weaver, they would have learned that he spoke with Joe in the months preceding his death. In those discussions, Joe uncharacteristically rejected long-term plans and that seemed as if nothing really mattered to him because he knew he was dying. (PCR Pet. Ex. 37 ¶ 4.) Trial counsel thus neglected another opportunity to bolster Andriano's testimony that Joe was depressed and requested assistance dying on his own terms. Counsel thus neglected their duty to conduct reasonable investigations by not following-up with Weaver, a witness who could have strengthened Andriano's testimony. *See Hinton*, 134 S. Ct. at 1088 (noting that under *Strickland*, "counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary").

The PCR court found no colorable claim of deficient performance or prejudice, which was an unreasonable determination of law and application of the facts. (PCR Min. Entry Oct. 31, 2012 at 5.) The PCR court improperly characterized the failures of trial counsel with respect to these witnesses as trial strategy. (*Id.*) But, under *Strickland*, strategic choices are made after thorough investigation of law and facts relevant to plausible options. *Hinton*, 134 S. Ct. at 1088-89. Here, trial counsel's errors were the result of neglect or ignorance of the law, not strategy. *Hinton*, 143 S. Ct. at 1089 ("An attorney's ignorance of a point of law that is fundamental to his case combined with his failure to perform basic research on that point is a quintessential example of unreasonable performance under *Strickland*."). For the reasons explained above, it was unreasonable for the PCR court to characterize counsel's deficient performance as "trial strategies."

Andriano can satisfy both prongs of *Strickland*, and thus the PCR court improperly dismissed her claim of ineffective assistance of counsel without so much as an evidentiary hearing. The Arizona Supreme Court failed to correct the PCR court's errors when it dismissed her Petition for Review. (PFR 39.) Consequently, the state courts' unreasonable application of federal law and

1    unreasonable application of the facts violated Andriano's constitutional rights, and
2    she is thereby entitled to relief.

3          **D.      Trial counsel's failure to identify corroborating evidence that Joe**
4                    **knew that Andriano was trying to obtain a life insurance policy**
                     **constituted ineffective assistance and violated Andriano's Sixth**
5                    **and Fourteenth Amendment rights.**

6          Andriano raised this claim in her post-conviction proceedings. (*See* PCR
7    Pet. at 2; PCR Mem. at 17-18, 37, 60; PFR 1 at 50-51.) The state court rejected
8    this claim as "not colorable" without allowing discovery or holding an evidentiary
9    hearing. (PCR Min. Entry Oct. 31, 2012 at 5.) The Arizona Supreme Court
10   summarily denied review (PFR 39.) The state court's denial of this claim was
11   contrary to, or involved and unreasonable application of, clearly established
12   federal law, as determined by the United States Supreme Court. 28 U.S.C. §
13   2254(d)(1). In addition, it constituted an unreasonable determination of the facts
14   in light of the evidence presented. 28 U.S.C. § 2254(d)(2).

15         Trial counsel rendered constitutionally deficient representation during the
16   guilt phase of Andriano's trial by failing to investigate and present corroborating
17   evidence that Joe was aware of Andriano's efforts to procure insurance on his life.
18   Andriano testified that she and her husband decided to attempt to secure insurance
19   on his life in May or June 2000. (Tr. Oct. 27, 2004 at 32-33.) Joe experienced
20   significant health challenges and medical difficulties during this time period and,
21   according to Andriano, asked her to "do some research" to "find out if there's a
22   company out there that we could get an insurance policy for him." (*Id.* at 34.)
23   According to Andriano, she made some preliminary inquiries and, with her
24   husband's knowledge and acquiescence, lied on life insurance applications about
25   his health and physical condition. (*Id.* at 38.) Andriano testified further that her
26   husband directed her to ask one of his friends, Erik Vaillant, to undergo the health
27   examination required by life insurance companies in his place. (Tr. Oct. 27, 2004
28   at 41-42.) These efforts came to an end, however, after Andriano informed her

1   step-father of their attempts to secure life insurance and he told them to "quit

2   doing that because that is highly illegal." (*Id.* at 45-46.) Subsequently, Andriano

3   "made no further contacts with the insurance companies." (*Id.*) Furthermore,

4   Andriano never obtained an insurance policy on her husband's life prior to his

5   death.

6        Trial counsel acted deficiently by failing to corroborate Andriano's

7   testimony that her husband knew about and, in fact, participated in her efforts to

8   obtain life insurance on his behalf with the available testimony of an impartial

9   witness. *See Vega v. Ryan*, 757 F.3d 960, 968 (9th Cir. 2014) (finding that trial

10  counsel performed deficiently by failing to investigate and present the testimony

11  of an uninterested witness who could have corroborated the testimony of

12  interested witnesses at trial that the defendant was not guilty of the crimes

13  charged); *Riley v. Payne*, 352 F.3d 1313, 1318 (9th Cir. 2003) (finding trial

14  counsel's performance deficient where he failed to interview and present the

15  testimony of a witness who could have corroborated defendant's sole testimony

16  that he acted in self-defense). Counsel had a duty to conduct a "thorough and

17  independent" investigation into Andriano's alleged *mens rea* and motive for

18  killing her husband, which was essential to her defense against the charge of first-

19  degree murder. *See* 2003 ABA Guidelines; *see also* American Bar Association,

20  *Criminal Justice Standards for the Defense Function*, Standard 4-4.1 (4th ed.

21  2015) ("Defense counsel has a duty to investigate in all cases . . . and should

22  explore appropriate avenues that reasonably might lead to information relevant to

23  the merits of the matter."); *Wiggins*, 539 U.S. at 522, 524 (explaining that the

24  ABA Standards for Criminal Justice and the ABA Guidelines for the Appointment

25  and Performance of Counsel in Death Penalty Cases are authorities "to which [the

26  Court] long ha[s] referred as guides to determining what is reasonable"

27  performance by defense counsel (internal quotations omitted)); Ariz. R. Crim. P.

28  6.8(c)(4) (instructing that capital counsel must "be familiar with and guided by the

performance standards" in the ABA Guidelines). But by trial counsel Patterson's own admission, he "did not conduct any follow-up interviews" with the witnesses associated with Andriano's attempts to obtain life insurance prior to trial. (PCR Pet. Ex. 6 ¶ 16.) Martinez lacked direct evidence to rebut Andriano's testimony but nonetheless urged the jury to disbelieve her statements. (Tr. Nov. 17, 2004 at 87.) In light of Martinez's painstaking efforts throughout trial to portray Andriano as a deceitful and lascivious woman, it was critical for trial counsel to investigate in order to corroborate her testimony on the key issue of her alleged premeditation and motive.

Had counsel done so, they would have learned that Gia Palicki, who cared for the Andrianos' children almost daily throughout the year leading up to Joe's death and who "became close friends" with the Andrianos, knew that "Joe was trying to obtain a life insurance policy" with Andriano's help. (PCR Pet. Ex. 31 ¶¶ 1, 8; *see also* Tr. Dec. 13, 2004 at 64.) Palicki was aware of this "because they told [her]," and "[o]ne of Joe's biggest concerns was that he might die before he obtained life insurance." (PCR Pet. Ex. 31 ¶ 8.) Rather than calling Palicki to testify to these facts during the guilt phase, trial counsel instead called her as a witness during the penalty phase. Palicki had so little contact with trial counsel that she initially thought that she was testifying at a custody hearing rather than at a capital murder trial. (*Id.* ¶ 26; *see also* Tr. Dec. 13, 2004 at 48.) Trial counsel questioned Palicki about Andriano's skills as a mother and did not broach the subject of life insurance with her. (Tr. Dec. 13, 2004 at 48-59, 68-69.) In this way, trial counsel did not function as the "reasonably competent" counsel to which Andriano was entitled under the Sixth Amendment. *Strickland*, 466 U.S. at 687 (quoting *McMann v. Richardson*, 397 U.S. 759, 770 (1970)) (internal quotations omitted).

This failure prejudiced Andriano during the guilt phase, as Martinez theorized that she was engaged in an "on-going scheme" to make her husband's

death "as financially lucrative . . . as possible" (ROA 130 at 5), and that her motive for killing him "was greed as shown by [her] attempt to fraudulently obtain insurance on [his] life" (ROA 106 at 5; *see also* ROA 130 at 4-5). Martinez declared outright during the aggravation phase that "[t]he motivation in this case for her to get rid of him is that he was worth more dead than alive . . . that's why she did it." (Tr. Nov. 30, 2004 at 20-21.) The prosecutor accordingly called five witnesses whose sole purpose was to emphasize Andriano's efforts to obtain life insurance. (Tr. Sept. 27, 2004 at 70-80, 1109-16, 19-27; Tr. Sept. 28, 2004 at 63-120.) On direct appeal, the Arizona Supreme Court recognized that the "[e]vidence of Andriano's attempts to obtain insurance on Joe's life" was "damaging evidence." *Andriano*, 161 P.3d at 546.

Had counsel rendered reasonably competent representation, the jury would have heard Palicki's testimony corroborating Andriano's testimony on the critical issue of her alleged motive to kill her husband. Palicki's testimony "would have been consistent with [Andriano's] account" and "would have created more equilibrium in the evidence presented to the jury." *Riley*, 352 F.3d at 1320 (citation and internal quotations omitted); *see also Vega*, 757 F.3d at 969 (explaining that the *Strickland* prejudice inquiry under AEDPA requires "compar[ing] the evidence that *actually* was presented to the jury with that which *could have been* presented had counsel acted appropriately" (emphasis added) (citation and internal quotations omitted)). By negating the State's "damaging evidence," there is a reasonable probability that Palicki's testimony would have raised a reasonable doubt in the mind of at least one juror that Andriano premeditated her husband's death. *Andriano*, 161 P.3d at 546; *see also Ryan*, 757 F.3d at 974 (noting that the *Strickland* prejudice inquiry asks whether "there is a reasonable probability that the [unpresented] evidence would have altered *at least one juror's assessment* [of the evidence]" (quoting *United States v. Kohring*, 637 F.3d 895, 905-06 (9th Cir. 2010) (alteration in original) (emphasis added)

(internal quotations omitted)). Furthermore, Palicki's testimony would have made Andriano, as well as her version of events in general, more credible to the jury.

The PCR court rejected this claim as "not colorable." It reasoned that "Gia Palicki's purported testimony relates to a conversation she had with defendant and Joe in the summer or fall of 1999 and therefore was remote in time to the murder and would not have rebutted the defendant's later attempts to obtain life insurance for Joe without his knowledge." (PCR Min. Entry Oct. 31, 2012 at 5.) The court's conclusion about the alleged "remote[ness]" of the conversation between Palicki and the Andrianos reflects an assumption unsupported by the facts before the court, rendering it unreasonable under 28 U.S.C. § 2254(d)(2). *See Taylor v. Maddox*, 366 F.3d 992, 999 (9th Cir. 2004) (noting that a challenge under the "unreasonable determination" clause "may be based on the claim that the finding is unsupported by sufficient evidence"); *id.* at 1001 (explaining that a state court decision is unreasonable where it "plainly misapprehend[s] or misstate[s] the record in making their findings, and the misapprehension goes to a material factual issue that is central to petitioner's claim"). Specifically, the court's analysis ignored the fact that Palicki stated that she was the nanny for the Andriano children for approximately *one year*—from the "late summer or early fall" of 1999 "until the time of Joe's death" in early October 2000. (PCR Pet. Ex. 31 ¶¶ 1, 8.). *See Taylor*, 366 F.3d at 1001 ("[T]he state-court fact-finding process is undermined where the state court has before it, yet apparently ignores, evidence that supports petitioner's claim."). Palicki's declaration does not make clear precisely *when* during this one-year period she "knew that Joe was trying to obtain a life insurance policy." (PCR Pet. Ex. 31 ¶ 8.) Yet, the post-conviction court assumed that because Palicki could have had a conversation with the Andrianos about their efforts to procure life insurance in the summer or fall of 1999, this was necessarily the *only* time during the one-year period that Palicki knew the Andrianos that she was aware of these efforts. This assumption is fatal to the

1   reasonableness of the post-conviction court's decision under 28 U.S.C.

2   § 2254(d)(2). Further, by "incorrectly consider[ing] [Palicki's] potential testimony

3   to be inconsequential," rather than critical to Andriano's credibility and to

4   establishing her lack of premeditation, the PCR court unreasonably applied

5   *Strickland*. *Riley*, 352 F.3d at 1323-24; *see* 28 U.S.C. § 2254(d)(1).

6       Andriano has satisfied both prongs of the *Strickland* test. Counsel's

7   ineffective performance violated Andriano's Sixth and Fourteenth Amendment

8   rights, and she is entitled to relief.

9
10  **E.     Trial counsel's failure to request a limiting instruction on the
        proper use of evidence of Andriano's extramarital relationships
11      and unsuccessful attempts to obtain life insurance constituted
        ineffective assistance of counsel in violation of Andriano's rights
12      under the Sixth and Fourteenth Amendments.**

13      Andriano did not present this claim to the state courts as a result of post-

14  conviction counsel's deficient performance. The deficient performance of post-

15  conviction counsel prejudiced Andriano and provides cause to excuse any

16  procedural default. *See Martinez*, 132 S. Ct. at 1315; *Strickland*, 466 U.S. at 687-

17  88. Therefore, the Court may consider the merits of this claim. Because the claim

18  has not been adjudicated by the Arizona state courts, the limitations on relief

19  imposed by 28 U.S.C. § 2254(d) do not apply to this Court's review, and the

20  Court may consider the claim de novo. Andriano will demonstrate at an

21  evidentiary hearing that appellate and post-conviction counsel fell below the

22  standards of minimally competent capital attorneys and that those failures

23  prejudiced her.

24      Defense counsel filed two motions in limine seeking to preclude, among

25  other things, evidence of Andriano's extramarital relationships and efforts to

26  procure life insurance for Joe. (Tr. Sept. 7, 2004 at 9-10; ROA 100; ROA 125.)

27  The prosecutor responded that "part of the motivation for the murder was greed

28  shown by defendant's attempt to fraudulently obtain life insurance on Joe's life.

Finally, per conversations with friends, once her husband was dead, Rick Freeland would be willing to resume the relationship with her." (ROA 106 at 5.) The trial court denied the defense's motions as to these categories of evidence. (Tr. Sept. 7, 2004 at 13; ROA 193 at 2.) Defense counsel did not request a limiting instruction, and none was given. (Tr. Nov. 16, 2004 at 3-4; ROA 364.)

Trial counsel's failure to request a limiting instruction on the proper use of the evidence of Andriano's extramarital relationships and attempts to procure life insurance constituted ineffective assistance. Even if evidence objected to under Rule 404(b) is ruled admissible as relevant for a proper purpose and not unfairly prejudicial, "the trial court is required to give a limiting instruction on its use if so requested." *State v. VanWinkle*, 285 P.3d 308, 314 (Ariz. 2012); *see also State v. Mott*, 931 P.2d 1046, 1055 (Ariz. 1997). The evidence of Andriano's extramarital affairs and unsuccessful attempts to procure life insurance pervaded the trial, as discussed *supra* in Claim 4. Counsel was obviously aware of its prejudicial impact because they had sought to preclude its introduction. After their concerns were born out during trial, the need for a limiting instruction should have been apparent. *See Albrecht v. Horn*, 485 F.3d 103, 127 (3d Cir. 2007) (finding deficient performance for failing to request limiting instruction when evidence of prior bad acts "was not briefly or fleetingly presented, but instead was a substantial portion of the Commonwealth's case").

Further, because Martinez focused on this evidence and specifically asked the jury to draw inferences about Andriano's character because of it, at the very least the prosecutor's closing argument should have alerted counsel of the need for an instruction telling the jury what limited purposes the evidence could properly be considered for. *See Musladin v. Lamarque*, 555 F.3d 830, 846 (9th Cir. 2009) (finding counsel performed deficiently by failing to ask for limiting instruction after prosecutor in closing argument "drew the jury's attention to the damaging statement and invited them to draw the precise inference that

limiting instruction would have forbidden"); *Albrecht*, 485 F.3d at 128 ("[T]he need for a limiting instruction was not hypothetical. In closing, the prosecutor improperly related the evidence of spousal abuse to [the defendant's] character . . . . In doing so, the prosecutor did not limit his use of the bad acts evidence to proving motive. Instead, he explicitly called upon the jury, by asking 'what type of man is [the defendant],' to view the evidence of prior bad acts as evidence of [the defendant's] bad character and propensity to commit this crime."). For example, the prosecutor in closing argument discussed the fact that Andriano went out with friends and argued:

> What kind of marriage is that? Who is wearing the pants in that family? Husband is dying. Terminally ill with cancer. Rather than spending time with him, what do you do? Let's go out and look for the young bucks we have out here on the dance floor. Maybe we can take one home.

(Tr. Nov. 16, 2004 at 101.) The prosecutor further characterized Andriano as "the person who has been described as being greedy, a person who has been described as being cold," and argued that "this issue of money, this issue of greed, isn't only manifested with regard to the lawsuit. It's also manifested with regard to the contact that the defendant has with the insurance company." (*Id.* at 25, 30.) The prosecutor therefore tied the evidence of Andriano's extramarital activity and attempts to procure life insurance to her character and did not limit its use or relevance. Counsel performed deficiently for not accordingly requesting a limiting instruction.

Counsel's deficient performance prejudiced Andriano. The quantity and scope of the evidence presented made Andriano's perceived promiscuity and greed central to the State's case. But no evidence was presented that Andriano's infidelity motivated the crime, and she never succeeded in obtaining a life insurance policy so did not stand to profit from one in the event of Joe's death. The relevance of the evidence was minimal, but due to its inflammatory and

salacious nature, there is a substantial probability that the jury would condemn Andriano for her bad character, as the prosecutor urged them to do. If the jury had been instructed that the evidence was only to be considered for the purpose the prosecutor offered it for—to show motive—there is a reasonable probability that the jury would have discounted the evidence as irrelevant to that point instead of being swayed by the prosecutor's general depiction of Andriano as an immoral woman worthy of condemnation. *See Hinton*, 134 S. Ct. at 1089 (defining prejudice as "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different"); *State v. Lehr*, 254 P.3d 379, 386 (Ariz. 2011) ("[C]ourts should specify in their limiting instruction the purposes for which Rule 404(b) evidence is being admitted.").

Andriano has satisfied both prongs of the *Strickland* test. Counsel's ineffective performance violated Andriano's Sixth and Fourteenth Amendment rights, and she is entitled to relief.

> **F.    Trial counsel's failure to seek a jury instruction on the lesser-included offenses of second-degree murder and manslaughter deprived Andriano of her Sixth Amendment and Fourteenth Amendment rights to the effective assistance of counsel during the guilt phase of her capital trial.**

Andriano raised this claim in her post-conviction proceedings. (PCR Pet. at 2; PCR Mem. at 61; PFR 1 at 50, 52.) The state court rejected this claim on the merits, without allowing discovery or holding an evidentiary hearing on the issue. (PCR Min. Entry Oct. 31, 2012 at 5.) The Arizona Supreme Court summarily denied review. (PFR 39.) The state court's rejection of this claim was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the United States Supreme Court. 28 U.S.C. § 2254(d)(1). In addition, it constituted an unreasonable determination of the facts in light of the evidence presented. 28 U.S.C. § 2254(d)(2).

Instructions on the lesser-included offenses of first-degree murder and

manslaughter were warranted by the evidence at Andriano's trial for first-degree murder, as discussed *supra* in Claim 8. Trial counsel's failure to seek such instructions fell below the professional norms that prevailed at the time. Pursuant to these norms, counsel had a duty to conduct a "thorough and independent" investigation into Andriano's guilt. *See* 2003 ABA Guidelines; *id.*at *Introduction* ("[N]otwithstanding the prosecution's burden of proof on the capital charge, defense counsel may need to investigate possible affirmative defenses" including "partial defenses that might bar a death sentence (e.g., guilt of a lesser-included offense)."); *see also* American Bar Association, *Criminal Justice Standards for the Defense Function*, Standard 4-4.1 (4th ed. 2015) ("Defense counsel has a duty to investigate in all cases . . . and should explore appropriate avenues that reasonably might lead to information relevant to the merits of the matter."); *Wiggins v. Smith*, 539 U.S. 510, 522, 524 (2003) (explaining that the ABA Standards for Criminal Justice and the ABA Guidelines are authorities "to which [the Court] long ha[s] referred as guides to determining what is reasonable" performance by defense counsel (internal quotations omitted)); Ariz. R. Crim. P. 6.8(c)(4) (instructing that capital counsel must "be familiar with and guided by the performance standards" in the ABA Guidelines). Yet trial counsel's investigation failed in many respects, including failing to adequately investigate Andriano's abusive childhood, her mental illness and mental state at the time of the crime, and evidence that corroborated Andriano's testimony that her husband directed her to attempt to procure life insurance and wanted to commit suicide. *See* Claims 3, 19(B), 19(C), 19(D), *supra*.

Both the State's theory of the case and Andriano's own testimony supported a jury instruction on second-degree murder and manslaughter. But because counsel knew so little about their own case and client, they could not competently make (or advise Andriano concerning) an informed decision about whether or not to seek lesser-included offense instructions. Trial counsel was also

deficient by ceding their responsibility to investigate and request a jury instruction on lesser-included offenses to the trial court. (Tr. Nov. 16, 2004 at 4.) By failing to conduct a "thorough and adequate" investigation into Andriano's guilt, counsel's decision not to seek lesser-included offense instructions cannot be deemed "strategic," for as the Supreme Court in *Wiggins* made clear, "'strategic choices made after less than complete investigation are reasonable' only to the extent that 'reasonable professional judgments support the limitations on investigation.'" 539 U.S. at 533 (citations omitted).

Had counsel rendered reasonably competent representation, Andriano's jury would not have been faced with the extreme choice of either convicting her of first-degree murder or setting her free. Such a limited choice, the Supreme Court has explained, exposes a criminal defendant to the "substantial risk" that she will be convicted, even where "the prosecution has not established beyond a reasonable doubt every element of the offense charged." *Keeble v. United States*, 412 U.S. 205, 212 (1973). Indeed, "[w]here one of the elements of the offense charged remains in doubt, but the defendant is plainly guilty of some offense, the jury is likely to resolve its doubts in favor of conviction." *Id.* at 212-13. This resolution is particularly problematic where conviction exposes a defendant to the ultimate and most severe sanction that the State can impose. *Beck*, 447 U.S. at 637 (explaining that the "safeguard" of a lesser included offense instruction is "especially important" when "the evidence unquestionably establishes that the defendant is guilty of a serious, violent offense" but "leaves some doubt with respect to an element that would justify conviction of a capital offense"); *id.* (noting that "the risk of an unwarranted conviction . . . cannot be tolerated in a case in which the defendant's life is at stake"). Because both the State's theory of the case and Andriano's own testimony supported lesser-included-offense instructions, there is a reasonable probability that had trial counsel sought a jury instruction on second-degree murder and manslaughter, the court would have

granted their request. This is especially so because under Arizona law, lesser-included instructions are appropriate whenever "'the jury could *rationally* fail to find the distinguishing element of the greater offense,'" *State v. Detrich*, 873 P.2d 1302, 1305 (Ariz. 1994) (quoting *State v. Noriega*, 690 P.2d 775, 782 (Ariz. 1984)) (emphasis added), which, in Andriano's case, was premeditation. As detailed in Claim 8, *supra*, Andriano's jury could have rationally found her guilty of either second-degree murder or manslaughter based on the evidence before it. In light of this, there is a reasonable probability that, properly and thoroughly instructed, Andriano's jury would have neither convicted her of first-degree murder nor sentenced her to death.

The state PCR court, in cursory fashion, rejected this claim on the grounds that "the defendant raised this issue on appeal and the [Arizona] Supreme Court held that the evidence did not support any lesser-included offenses . . . Therefore, defense counsel was not ineffective for failing to request such instructions." (PCR Min. Entry Oct. 31, 2012 at 5.) As detailed at length in Claim 8, *supra*, the Arizona Supreme Court's merits rejection of Andriano's lesser-included-instruction claim was contrary to and involved an unreasonable application of clearly established federal law and was based upon an unreasonable determination of the facts under 28 U.S.C. § 2254(d). For the same reasons, incorporated here by reference, the PCR court's rejection of Andriano's ineffective-assistance-of-counsel claim based solely upon the Arizona Supreme Court's rejection of the merits of the underlying instructional claim is not entitled to this Court's deference under either 28 U.S.C. § 2254(d)(1) or (d)(2). Andriano's rights under the Sixth and Fourteenth Amendments were violated, and she is entitled to relief.

The Arizona Supreme Court failed to correct the PCR court's incorrect legal and factual determinations when it summarily denied Andriano's Petition for Review. (PFR 39.) For the preceding reasons, Andriano has demonstrated that her trial counsel provided ineffective assistance of counsel during the guilt phase of

her capital trial, and that she was prejudiced by these failures. Even if the Court finds that certain individual errors do not rise to the level where relief is merited, it must consider the claimed errors cumulatively when deciding if Andriano has shown that the reliability of her trial was undermined by counsels' failures. Because the errors do rise to that level, Andriano should receive a new trial.

## CLAIM TWENTY

**Andriano received ineffective assistance of counsel during the aggravation phase of her capital trial proceedings, in violation of her Sixth and Fourteenth Amendment rights.**

Andriano's counsel also performed deficiently during the aggravation phase, and she was prejudiced as a result. The inquiry under the deficiency prong is "whether counsel's assistance was reasonable considering all the circumstances." *Strickland*, 466 U.S. at 688. Performance is deficient when the attorney fails to render the performance of a reasonably competent attorney. *Id.* at 687. Although defense counsel has broad discretion when making strategic decisions, those decisions must be reasonable and informed. *Id.* at 691; *see also Correll*, 539 F.3d at 949 (holding that an "uninformed strategy" is "no strategy at all"). In assessing counsel's performance, the United States Supreme Court has determined that the 1989 and 2003 ABA Guidelines are "guides to determining what is reasonable." *Rompilla*, 545 U.S. at 387; *Wiggins*, 539 U.S. at 524.

Capital defense counsel are charged with the duty to contest aggravating factors alleged by the State against their client. *See, e.g.*, *Correll*, 539 F.3d at 947-48 (finding deficient performance when, among other things, counsel failed to challenge three of five alleged aggravating factors); *see also Rompilla*, 545 U.S. at 387 (holding that a criminal defense attorney has a constitutional duty to investigate both relevant aggravating and mitigating circumstances). In this case, Andriano's counsel failed to perform according to prevailing professional norms with regard to multiple aspects of the aggravation phase, and Andriano was prejudiced as a result.

A.   **In the aggravation phase, trial counsel's failure to object to the jury's consideration of evidence related to the alleged sodium azide poisoning as improper, inaccurate, and misleading constituted ineffective assistance of counsel in violation of Andriano's Sixth and Fourteenth Amendment rights.**

Andriano raised this claim in her post-conviction proceedings. (PCR Mem. at 55-59; PFR 1 at 48-49.) The state court denied this claim on the merits, without allowing discovery or holding an evidentiary hearing on this issue. (PCR Min. Entry Oct. 31, 2012 at 4.) The state court's rejection of this claim was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the United States Supreme Court. 28 U.S.C. § 2254(d)(1). In addition, it constituted an unreasonable determination of the facts in light of the evidence presented. 28 U.S.C. § 2254(d)(2).

Capital defense counsel are charged with the duty to contest aggravating factors alleged by the State against their client. *See, e.g.*, *Correll*, 539 F.3d at 947-48 (finding deficient performance when, among other things, counsel failed to challenge three of five alleged aggravating factors); 2003 ABA Guidelines § 10.11(A) (discussing counsel's duty to investigate issues and seek information that establishes mitigation or rebuts aggravation); *id.* § 10.11(H) (requiring trial counsel to determine as quickly as possible what aggravating factors will be alleged and the evidence used to support them); *id.* § 10.11(I) (requiring counsel at all stages to consider whether evidence offered in aggravation is improper, inaccurate, misleading, or inadmissible).

Trial counsel was ineffective for failing to seek a court ruling—or at a minimum a limiting instruction—prior to the beginning of the aggravation phase to preclude the jury from considering the alleged "poisoning" as a factor in its consideration of the (F)(6) aggravator. As the instructions to Andriano's jury explained, the (F)(6) cruelty aggravator is intended to address when a "defendant either knew or should have known that the manner in which the crime is

committed would cause Joe to experience physical pain and/or mental anguish before death." (Tr. Dec. 1, 2004 at 91-92.) In this case, the evidence presented at trial clearly showed that Andriano's husband did not die as a result of the sodium azide. As a result, further discussion and testimony regarding the sodium azide was irrelevant to the question of whether she "knew or should have known" that "blunt force injuries and the stabbing wounds" would cause him to experience physical pain or mental suffering before his death. (Tr. Sept. 16, 2004 at 43.)

The evidence regarding the poison that had been presented during the guilt phase fell into two different theories. First, the State's theory was that Andriano was trying to poison her husband because she wanted him to die sooner. Second, the defense theory was that Andriano was helping her terminally ill husband commit suicide, at his request. Both theories contemplate Andriano researching and choosing a method of death that would be quick and painless and not appear to be anything other than a heart attack or the results of his cancer. In fact, based on the testimony offered, if Joe did not knowingly ingest the poison, it was just as likely that he would believe that the symptoms were the result of his chemotherapy or his cancer. (Tr. Sept. 16, 2004 at 62; Tr. Sept. 28, 2004 at 25-27.) Thus, neither Andriano nor her husband contemplated that he would experience any pain or mental anguish that was greater than the pain and mental anguish that he was already suffering while dying from cancer. As such, the evidence about the sodium azide was not relevant to the jury's aggravation deliberations about Joe's pain and suffering.

Nonetheless, trial counsel, by not seeking to preclude it prior to the start of the aggravation phase, allowed the prosecutor to "make a protracted record," not supported by any definitive evidence, about the anguish and pain that Joe experienced from the poison prior to his ultimate death. (Tr. Nov. 30, 2004 at 26.) Trial counsel was also obviously aware of the harmful nature of these irrelevant arguments, as evidenced by the objection that he made during the prosecutor's

opening statement. (*Id*.) However, if trial counsel had made a preliminary motion to preclude or at least limit this evidence in the aggravation phase, this impermissible argument would have been avoided. As a result, failing to seek to exclude the evidence of poisoning during the aggravation phase fell below an objective standard of reasonableness. *See, e.g., Girts v. Yanai*, 501 F.3d 743, 757 (6th Cir. 2007) (finding counsel ineffective for failing to object to improper argument when failure had "no conceivable benefit" to the defense and resulted in the jury hearing prejudicial arguments).

The state court's decision was an unreasonable determination of the facts in light of the evidence presented. While there was evidence presented at the guilt phase regarding the presence of sodium azide in the apartment, that poison was not the cause of death. Furthermore, there was no definitive evidence of any pain or suffering caused by Joe's ingestion of poison as opposed to his other, cancer-related symptoms. In fact, many of the symptoms—nausea, fainting, high blood pressure—would be virtually indistinguishable from the symptoms of chemotherapy. (Tr. Sept. 16, 2004 at 62; Tr. Sept. 28, 2004 at 25-27.) Finally, there was also very little sodium azide found in Joe's system. (Tr. Sept. 27, 2004 at 34-35, 40-41.) Nonetheless, the prosecutor spent significant time discussing the poison and resulting pain and suffering during his aggravation phase arguments. This argument was irrelevant to the jury's aggravation finding and clearly prejudicial to the jury's impression of Andriano and their consideration of the aggravating factors. Thus, trial counsel was ineffective for failing to attempt to limit this improper evidence and argument for the jury to consider in the aggravation phase. By failing to do so, Andriano's Sixth and Fourteenth Amendment rights were violated, and she is entitled to relief.

1
2
3

**B.    Trial counsel's failure to investigate and challenge juror misconduct at the aggravation phase constituted ineffective assistance of counsel in violation of Andriano's rights under the Sixth and Fourteenth Amendments.**

4    Andriano did not present this claim to the state courts as a result of post-

5    conviction counsel's deficient performance. The deficient performance of post-

6    conviction counsel prejudiced Andriano and provides cause to excuse any

7    procedural default. *See Martinez*, 132 S. Ct. at 1315; *Strickland*, 466 U.S. at 687-

8    88. Therefore, the Court will be able to consider the merits of this claim. Because

9    the claim has not been adjudicated by the Arizona state courts, the limitations on

10   relief imposed by 28 U.S.C. § 2254(d) do not apply to this Court's review, and the

11   Court may consider the claim de novo. Andriano will demonstrate at an

12   evidentiary hearing that post-conviction counsel fell below the standards of

13   minimally competent capital attorneys and that those failures prejudiced her.

14   After Andriano's trial, the Arizona Republic published a newspaper article

15   for which six jurors and two alternate jurors had been interviewed. (ROA 444A at

16   3.) The article reported that, according to one juror, "[w]hile jurors were

17   discussing whether to execute Andriano, they considered that they would have no

18   control over whether the trial judge . . . would give her life in prison with or

19   without parole . . . . Jurors did not want to see a 25 years to life sentence." The

20   juror also told the reporter that "[w]e also knew with the death penalty that she has

21   an automatic appeal." (ROA 444A at 5.) Trial counsel filed a motion for a new

22   penalty phase and argued that the article revealed that the trial court's response to

23   a jury question had coerced a verdict at the penalty phase. (Tr. Feb. 4, 2005 at 6-8;

24   ROA 444; ROA 444A.) Counsel cited the fact that the jury had considered the

25   impermissible bases of Andriano's parole eligibility and her right to an automatic

26   appeal to support this argument. (Tr. Feb. 4, 2005 at 7-8.)

27   Post-conviction counsel interviewed the same juror who was quoted in the

28   article about the consideration of Andriano's parole eligibility during penalty-

phase deliberations. She recounted that:

> At the end of the second phase, when we decided on the aggravator, we talked about what might happen if we didn't find an aggravating circumstance. We discussed how her sentencing would go back to the judge and agreed that none of us wanted that. We talked about how we didn't want to see Wendi get out of prison, and that was a key reason why we decided on the cruelty aggravator.

(PCR Pet. Ex. 41 ¶ 6.) According to a second juror:

> During deliberations at both the aggravation and mitigation phases of the trial, we discussed what the possible outcome would be if the aggravation outweighed the mitigation and vice versa. We considered what her punishment would be. It was hard for us to understand what our decision would mean, so we made a chart outlining the different possible outcomes and put it up, starting when we were determining the aggravator, prior to the sentencing phase. That helped a lot to make it clearer.

(PCR Pet. Ex. 39 ¶ 8.) Andriano then raised a claim in her PCR petition that the jurors had committed misconduct by considering possible sentencing outcomes at the aggravation phase. (PCR Mem. Feb. 17, 2012 at 69-70.) The state court denied the claim on procedural grounds, finding that the claim could have been raised earlier, including in a motion for a new trial or in a motion to vacate the judgment. (PCR Min. Entry Oct. 31, 2012 at 3.)

Trial counsel rendered ineffective assistance by failing to investigate and challenge, in a post-trial motion, juror misconduct at the aggravation phase. Trial counsel was alerted to the fact that Andriano's possible parole eligibility had been considered at the penalty phase because the newspaper article counsel relied on in the motion for a new penalty phase said as much. Armed with the knowledge that the jury had taken into account improper considerations at one stage of the trial, trial counsel acted deficiently by failing to pursue this lead. *See generally* 2003 ABA Guidelines 10.7 ("Counsel at every stage have an obligation to conduct thorough and independent investigations relating to the issues of both guilt and

1   penalty."). Trial counsel also should have been aware that investigation into the

2   aggravation phase was necessary because a post-trial motion for a new

3   aggravation phase is provided for under the same rule counsel relied on in the

4   motion for a new penalty phase. (ROA 444.) *See* Ariz. R. Crim. P. 24.1(c)(3). As

5   evidenced by the information PCR counsel was able to uncover, the fruits of such

6   an investigation would have been evidence that the jurors had considered

7   Andriano's possible parole eligibility at the aggravation phase in addition to at the

8   penalty phase.

9        Next, Andriano was prejudiced by counsel's deficient performance. The

10  claim of juror misconduct is a meritorious one, as discussed *supra* in Claim 11,

11  because the sentence Andriano could face was not before the jury at the

12  aggravation stage and therefore constituted extrinsic information. *See Tarango v.*

13  *McDaniel*, 837 F.3d 936, 946 (9th Cir. 2016). The PCR court found that this claim

14  could have been raised in a post-trial motion either for a new trial or to vacate the

15  judgment. (PCR Min. Entry Oct. 31, 2012 at 3.) *See* Ariz. R. Crim. P. 24.2(a)(3)

16  (authorizing court to vacate judgment if conviction obtained in violation of

17  constitution); *State v. Poland*, 645 P.2d 784, 797 (1982) (explaining that a new

18  trial is required under Arizona Rule of Criminal Procedure 24.1(c) "when jury

19  misconduct results in prejudicial influences on the jury"). And even if such a

20  motion had not been successful, the claim later would not have been procedurally

21  barred from further review and would have been adjudicated on the merits during

22  PCR proceedings. If the juror misconduct had been discovered and raised earlier,

23  there is a reasonable probability that Andriano would have received a new hearing

24  on the aggravating circumstance. *See Strickland*, 466 U.S. at 694.

25       Andriano has satisfied both prongs of the *Strickland* test. Counsel's

26  ineffective performance violated Andriano's Sixth and Fourteenth Amendment

27  rights, and she is entitled to a new hearing on the aggravating circumstance.

28

1
2
3

    **C.**    **In the aggravation phase, trial counsel's failure to investigate and present expert testimony regarding Andriano's mental illness constituted ineffective assistance of counsel in violation of her rights under the Sixth and Fourteenth Amendment.**

4          Andriano raised this claim in her post-conviction proceedings. (PCR Mem.

5   at 55; PFR 1 at 48-49.) The state court denied this claim on the merits, without

6   allowing discovery or holding an evidentiary hearing on this issue. (PCR Min.

7   Entry Oct. 31, 2012 at 4.) The state court's rejection of this claim was contrary to,

8   or involved an unreasonable application of, clearly established federal law, as

9   determined by the United States Supreme Court. 28 U.S.C. § 2254(d)(1). In

10  addition, it constituted an unreasonable determination of the facts in light of the

11  evidence presented. 28 U.S.C. § 2254(d)(2).

12         Capital defense counsel are charged with the duty to contest aggravating

13  factors alleged by the State against their client. *See, e.g.*, *Correll*, 539 F.3d at

14  947-48 (finding deficient performance when, among other things, counsel failed

15  to challenge three of five alleged aggravating factors); 2003 ABA Guidelines

16  § 10.11(A) (discussing counsel's duty to investigate issues and seek information

17  that establishes mitigation or rebuts aggravation); *id.* § 10.11(H) (requiring trial

18  counsel to determine as quickly as possible what aggravating factors will be

19  alleged and the evidence used to support them); *id.* § 10.11(I) (requiring counsel

20  at all stages to consider whether evidence offered in aggravation is improper,

21  inaccurate, misleading, or inadmissible).

22         The Supreme Court has also reiterated that defense attorneys are required to

23  conduct appropriate investigations. *See Terry Williams*, 529 U.S. at 395 (finding

24  ineffectiveness and prejudice where counsel "failed to conduct an investigation

25  that would have uncovered extensive records graphically describing [the

26  defendant's] nightmarish childhood"). "In assessing counsel's investigation, we

27  must conduct an objective review of their performance, measured for

28  'reasonableness under prevailing professional norms,' which includes a context-

dependent consideration of the challenged conduct as seen 'from counsel's perspective at the time.'" *Wiggins*, 539 U.S. at 523 (citing *Strickland*, 466 U.S. at 688-89). "In judging the defense's investigation, as in applying *Strickland* generally, hindsight is discounted by pegging adequacy to 'counsel's perspective at the time' investigative decisions are made, and by giving a 'heavy measure of deference to counsel's judgments.'" *Rompilla*, 545 U.S. at 381 (citations omitted); *see also Wiggins*, 539 U.S. at 533 (finding that "'strategic choices made after less than complete investigation are reasonable' only to the extent that 'reasonable professional judgments support the limitations on investigation'" (citations omitted)). When the Supreme Court reviews "the reasonableness of an attorney's investigation . . . [it] must consider not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further." *Wiggins*, 539 U.S. at 527. However, it will be unreasonable when counsel's "failure to investigate thoroughly stemmed from inattention, not strategic judgment." *Id.* at 512. Here, Andriano's trial counsel failed to investigate and present mental-health evidence during the aggravation phase, rendering them "unreasonably and prejudicially ineffective under the standard set forth in *Strickland*." *Jennings*, 290 F.3d at 1008.

It is evident from the trial transcripts that Andriano's trial counsel unreasonably failed to investigate and develop evidence of her history of abuse in conjunction with her mental-health history. Further, counsel failed to coordinate an explanation for the circumstances surrounding the offense and consequently missed a critical opportunity to present the jury with evidence throughout all phases of the trial that would more accurately explain Andriano's mental state on the night that her husband died.

In this case, the State alleged the (F)(6) aggravators of "especially heinous, cruel or depraved." Ariz. Rev. Stat. § 13-703(F)(6) (renumbered to 13-751(F)(6)). The State is obligated to prove beyond a reasonable doubt that the aggravating

1   circumstances are met. *See State v. Jimenez*, 799 P.2d 785, 794 (Ariz. 1990); Ariz.
2   Rev. Stat. § 13-751(B). In order to prove cruelty, the State had to prove that
3   Andriano "knew or should have known that the manner in which the crime is
4   committed would cause the victim to experience physical pain and/or mental
5   anguish before death." (Tr. Dec. 1, 2004 at 91-92.) Additionally, as the court
6   explained to the jurors, the "heinous" or "depraved" aggravators "focus on a
7   defendant's state of mind at the time of the offense." (*Id*. at 92.)

8       Despite the fact that the aggravating circumstance has a mental-state
9   requirement, counsel put on no evidence of Andriano's mental illnesses.
10  According to Dr. Woods, a defense expert during the PCR proceedings, the
11  manifestations of Andriano's mental illnesses, "likely played a substantial role in
12  the events that caused Joe's death" and "likely would have substantially impaired
13  [Andriano's] ability to accurately judge how to 'help' her terminally ill husband,
14  who was the focus of [her] pathological dependence needs." (PCR Pet. Ex. 2 at
15  57.) Specifically, her mental illness skewed her understanding of the situation, and
16  "in her head she said that she was helping" Joe. (PCR Pet. Ex. 45 at PCR000019.)
17  This evidence was all relevant to the jury's consideration of each of the
18  aggravators alleged by the State because it could have shed light on Andriano's
19  inability to form the requisite mental state. But for counsel's failure to present
20  such evidence, there is a reasonable probability that at least one juror would have
21  concluded that Andriano did not know or have the capacity to know that her
22  actions would cause Joe to suffer instead of alleviating any physical pain and
23  suffering that he was already experiencing.

24      The PCR court's rejection of this argument misapplies the relevant laws,
25  the facts of the case, and ignores the duty of trial counsel to investigate and to
26  contest aggravating factors. Although the PCR court is correct that the sole
27  aggravating circumstance found was "especially cruel," it was not the only
28  aggravator proposed to the jury and thus not the only aggravating circumstance

that trial counsel should have been presenting evidence to rebut. The PCR court's decision incorrectly ignores that the prosecutor also argued the aggravators of "especially heinous" and "depraved" to the jury. The same case cited by the state court for the proposition that Andriano's mental state was not relevant to the aggravation phase also specifically explains that "[h]einousness and depravity focus on the mental state of the defendant." *State v. Carlson*, 48 P.3d 1180, 1191 (Ariz. 2002); *see also Lewis v. Jeffers*, 497 U.S. 764, 769 (1990). As such, Andriano's mental state on the night of Joe's death was unquestionably relevant to the aggravation phase, and it was ineffective assistance for trial counsel to fail to conduct a thorough investigation and present this evidence to the jury to rebut the State's aggravation presentation. Furthermore, had the jury been presented with the evidence of Andriano's mental illnesses, there is a reasonably probability that the outcome of the aggravation phase would have been different. Here, both prongs of the *Strickland* test are satisfied; accordingly, the state courts' determinations violated Andriano's constitutional rights, and she is entitled to relief.

**D.    Trial counsel's failure to properly move for the dismissal of the pecuniary gain aggravating circumstance, which was improperly presented, constituted ineffective assistance and violated Andriano's Sixth and Fourteenth Amendment rights.**

Andriano did not present this claim to the state courts as a result of post-conviction counsel's deficient performance. The deficient performance of post-conviction counsel prejudiced Andriano and provides cause to excuse any procedural default. *See Martinez*, 132 S. Ct. at 1315; *Strickland*, 466 U.S. at 687-88. Therefore, the Court may consider the merits of this claim. Because the claim has not been adjudicated by the Arizona state courts, the limitations on relief imposed by 28 U.S.C. § 2254(d) do not apply to this Court's review, and the Court may consider the claim de novo. Andriano will demonstrate at an evidentiary hearing that post-conviction counsel fell below the standards of

1    minimally competent capital attorneys and that those failures prejudiced her.

2    Before trial, defense counsel filed a motion to dismiss the pecuniary-gain

3    aggravating circumstance. (*See* Tr. Nov. 30, 2004 at 78.[17]) The prosecutor

4    responded that Andriano's motive for the crime was greed, as evidenced by her

5    attempts to obtain a life insurance policy on Joe and her belief that the couple's

6    medical malpractice suit would be worth more if Joe died. (ROA 131.) The parties

7    then agreed that any argument on these motions would be heard at the end of the

8    aggravation phase of the trial. (ROA 133 at 2.) At the end of that phase of trial,

9    defense counsel renewed the motion to dismiss the aggravating circumstance. (Tr.

10   Nov. 30, 2004 at 81-83.) The court denied the motion. (*Id.* at 98-99.)

11   Trial counsel's failure to ensure that the motion to dismiss was ruled on

12   before the aggravation-phase hearing constituted ineffective assistance. For the

13   pecuniary gain aggravating circumstance, "the state must prove that the murder

14   would not have occurred but for the defendant's pecuniary motive." *State v.*

15   *Garza*, 163 P.3d 1006, 1017-18 (Ariz. 2007) (internal citation and quotation

16   marks omitted). The State could not prove this aggravating circumstance.

17   Andriano never succeeded in obtaining a life insurance policy on Joe. The only

18   life insurance policy on Joe at the time of his death was held by his parents. (Tr.

19   Sept. 27, 2004 at 125-27; Tr. Oct. 27, 2004 at 31; Tr. Nov. 8, 2004 at 32.) And

20   Andriano knew that if Joe did not die from cancer, she could not recover from

21   either a medical malpractice or wrongful death lawsuit. (Tr. Sept. 29, 2004 at 86;

22   Tr. Oct. 27, 2004 at 12.) Joe died from the wounds to his head and neck, which

23   could not be disguised as the effects of cancer. (Tr. Sept. 16, 2004 at 43.)

24   Andriano therefore did not stand to gain monetarily from Joe's death, and the

25   circumstance could not have been found. *See State v. Milke*, 865 P.2d 779, 787-88

26   _____

27   [17] Counsel's motion itself does not appear in the record on appeal. The motion is
     discussed by the court at the cited pages, and the responsive pleadings are present
28   in the record.

(Ariz. 1993) (finding pecuniary gain aggravating circumstance not proven because "conflicting inferences can be drawn" from evidence that defendant had life insurance policy on victim); *State v. Prince*, 772 P.2d 1121, 1129 (Ariz. 1989) (finding evidence that victim owed defendant money insufficient evidence of pecuniary gain aggravating circumstance).

Because the pecuniary gain aggravating circumstance was before the jury, Martinez could emphasize Andriano's greed and dishonesty at the aggravation stage of the trial. He repeatedly argued that Andriano viewed Joe as "worth more dead than alive" and that she was "just a little money hungry." (Tr. Nov. 30, 2004 at 9-10, 13, 16, 17; Tr. Dec. 1, 2004 at 8.) He argued that "it's important to her to get money. Because it's clear that that's what this is all about to her. Her husband really doesn't matter anymore." (Tr. Nov. 30, 2004 at 15.) He further stressed that:

> We wouldn't be standing here taking. We wouldn't be talking about Joseph Andriano. We wouldn't be doing any of that except that the defendant is a money-hungry woman who saw her husband as nothing more than a pot of gold. . . . The bottom line here is that this all happened because of money. Greed. That's all this is about for her.

(Tr. Dec. 1, 2014 at 9, 11.) Although the jury did not find that the pecuniary gain aggravating circumstance had been proven, Andriano was still prejudiced by the focus on her dishonesty and greed during the aggravation phase, which was permissible because the pecuniary gain circumstance had not been dismissed. (Tr. Dec. 6, 2004 at 3-4; ROA 393.) The jury found that the crime was cruel only. (Tr. Dec. 6, 2004 at 3-4; ROA 393.) And in reaching that determination, the jury focused on the fact that it did not want Andriano to be sentenced to life with the possibility of parole. (PCR Pet. Ex. 39 ¶ 8; PCR Pet. Ex. 41 ¶ 6.) The jury's determination that the cruelty aggravating circumstance had been proven was tainted by impermissible considerations and also was not supported by the evidence, as discussed *supra* in Claims 11, 12. If the jury had not been presented

with argument that Andriano was greedy, dishonest, and immoral in support of the improperly presented pecuniary gain aggravating circumstance, there is a reasonable probability that the jury would not have found any aggravating circumstance. *See generally Hinton*, 134 S. Ct. at 1089.

Andriano has satisfied both prongs of the *Strickland* test. Counsel's ineffective assistance violated Andriano's Sixth and Fourteenth Amendment rights, and she is entitled to relief.

When reviewing this claim, even if this Court finds that no single error by counsel in the aggravation phase amounts to prejudice, it, nonetheless, should apply cumulative error principles to grant relief. *See Boyde*, 404 F.3d at 1176. The Arizona Supreme Court failed to correct the PCR court's incorrect legal and factual determinations when it summarily denied Andriano's Petition for Review. (PFR 39.) Consequently, she was deprived of her Sixth and Fourteenth Amendment rights, and is thereby entitled to relief.

## CLAIM TWENTY-ONE

**Andriano's Sixth Amendment right to the effective assistance of counsel was violated by her direct appeal counsel's failure to raise meritorious claims on direct appeal.**

Andriano raised parts (A) and (B) of this claim in her post-conviction proceedings. (PCR Mem. at 70.) The state court dismissed these claims without holding an evidentiary hearing. (PCR Min. Entry Oct. 31, 2012 at 6.) The Arizona Supreme Court summarily denied review. (PFR 39.) The state courts' denial of these claims was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the United States Supreme Court. 28 U.S.C. § 2254(d)(1). In addition, it constituted an unreasonable determination of the facts in light of the evidence presented. 28 U.S.C. § 2254(d)(2).

Parts (C)-(J) of this ineffectiveness claim were not raised in Andriano's state-court proceedings. Andriano's failure to raise these claims previously can be excused by demonstrating cause and prejudice. The ineffective assistance of

1    Andriano's post-conviction counsel in failing to raise these claims constitutes

2    cause for the default and resulted in prejudice to Andriano. *See Martinez*, 132

3    S. Ct. at 1320.

4         The effective assistance of appellate counsel is guaranteed by the Due

5    Process Clause of the Fourteenth Amendment. *See Evitts v. Lucey*, 469 U.S. 387,

6    396 (1985) ("A first appeal as of right . . . is not adjudicated in accord with due

7    process of law if the appellant does not have the effective assistance of an

8    attorney."); *id.* at 395 ("Because the right to counsel is so fundamental to a fair

9    trial, the Constitution cannot tolerate trials in which counsel, though present in

10   name, is unable to assist the defendant to obtain a fair decision on the merits.").

11   As such, "nominal representation" during an appeal "does not suffice to render the

12   proceedings constitutionally adequate." *Id.* at 396.

13        Ineffective assistance of appellate counsel claims are governed by the

14   standard of review set forth in *Strickland*, 466 U.S. at 686-87. *See Smith v.

15   Robbins*, 528 U.S. 259, 285 (2000). Accordingly, Andriano must show that

16   appellate counsel's representation "fell below an objective standard of

17   reasonableness," and that "there is a reasonable probability that, but for counsel's

18   unprofessional errors, the result of the proceeding would have been different."

19   *Strickland*, 466 U.S. at 688, 694. In addition, the ABA Guidelines are instructive

20   in evaluating the reasonableness of counsel's conduct. *See Rompilla*, 545 U.S. at

21   387. Regarding appellate counsel's performance, the ABA Guidelines indicate

22   that "counsel should seek to litigate all issues . . . that are arguably meritorious."

23   10.15.1(C). Therefore, when appellate counsel fails to raise meritorious issues that

24   could have resulted in a reversal of a conviction or sentence, counsel has

25   necessarily caused prejudice to the defendant. *See*, *e.g.*, *Strickland*, 466 U.S. at

26   694.

27        Individually and cumulatively, the deficiencies raised below constitute

28   ineffective assistance of appellate counsel. *See Strickland*, 466 U.S. at 690

211

1    (allegations of ineffectiveness must be examined in light of all the circumstances);
2    *Rompilla*, 545 U.S. at 393 (evaluating prejudice based on the evidence "taken as a
3    whole").   Appellate counsel's deficient performance was prejudicial.   Thus,
4    Andriano is entitled to relief.

5
6    **A.    Appellate counsel failed to raise trial counsel's actual conflict of interest.**

7    As discussed in Claim Two, *supra*, the trial attorney responsible for
8    Andriano's mitigation investigation and penalty-phase presentation had an actual
9    conflict of interest that affected his representation of Andriano in her criminal
10   proceedings. Appellate counsel should have raised this meritorious claim on direct
11   appeal. Instead, the Arizona Supreme Court never heard that the sparse mitigation
12   evidence presented to the jury was the direct result of her attorney's divided
13   loyalties between her mother and step-father's child custody case and her capital
14   penalty-phase proceedings. The court's characterization of Andriano's mitigation
15   evidence as minimally relevant is telling and a consequence of counsel's conflict.
16   *Andriano*, 161 P.3d at 511-12. Andriano will demonstrate at an evidentiary
17   hearing that appellate and post-conviction counsel fell below the standards of
18   minimally competent capital attorneys and that those failures prejudiced her.

19   A competent appellate attorney would have raised this claim to provide the
20   justices with an explanation for the disjointed, incomplete mitigation evidence
21   presented at trial. Because the Arizona Supreme Court was unaware of trial
22   counsel's actual conflict, it was left with the same ineffectual facts as the jury.
23   There is a reasonable probability that, but for appellate counsel's unprofessional
24   error, the Arizona Supreme Court would have determined that trial counsel's
25   actual conflict rendered him ineffective and granted relief. Consequently,
26   Andriano was prejudiced by counsel's failure to raise this claim on direct appeal.
27   *See Strickland*, 466 U.S. at 694.

28

**B.     Appellate counsel failed to challenge the trial court's improper exclusion of relevant, admissible testimony.**

Additionally, as discussed in Claim 19(C), *supra*, the trial court excluded Jeffrey Miller's testimony on hearsay grounds. Miller's proffered testimony corroborated Andriano's testimony that Joe was depressed and suicidal leading up to the offense. The trial court improperly sustained the State's hearsay objection because the testimony was admissible under the present sense impression and then-existing mental, emotional, or physical condition exceptions to the rule prohibiting hearsay under Arizona Rules of Evidence 803(1) and 803(3). Despite the merit of raising a challenge to this ruling, appellate counsel failed to raise it on direct appeal, and thus the Arizona Supreme Court did not have an opportunity to correct the trial court's error. Given the significance of Miller's testimony, and the fact that it would have corroborated Andriano's testimony regarding Joe's depression and rebutted the State's theory of premeditation, failure to raise this meritorious claim prejudiced Andriano. *See Strickland*, 466 U.S. at 694. Andriano will demonstrate at an evidentiary hearing that appellate and post-conviction counsel fell below the standards of minimally competent capital attorneys and that those failures prejudiced her.

**C.     Appellate counsel failed to challenge the trial court's instruction that incorrectly informed the jury that Andriano could be sentenced to life with the possibility of parole.**

As discussed in Claim 5**,** *supra*, the trial court incorrectly instructed the jury that Andriano was eligible for parole. In *Simmons*, the Supreme Court held that a defendant's due process rights were violated when the jury was not provided with "accurate information regarding petitioner's parole eligibility." 512 U.S. at 162; *see Lynch v. Arizona*, 136 S. Ct. 1818 (2016) (reaffirming these principles in the context of Arizona's sentencing scheme). Andriano will demonstrate at an evidentiary hearing that appellate and post-conviction counsel fell below the standards of minimally competent capital attorneys and that those failures

1   prejudiced her.

2        Under Arizona law, Andriano was ineligible for parole. *See* Ariz. Rev. Stat.

3   § 41-1604.09(I) (1994) (applying parole-eligibility statutes only to one "who

4   commit[s] [a] felony offense[] before January 1, 1994"). And, her future

5   dangerousness was put at issue throughout her trial. (*See, e.g.*, Tr. Nov. 16, 2004

6   at 11, 25, 84, 116, 138; Tr. Nov. 17, 2004 at 4-5.) As a result of the trial court's

7   legally incorrect instructions, the jury was misinformed of the possible outcome of

8   returning a life sentence. Competent appellate counsel would have raised this

9   meritorious claim. Failure to do so constituted deficient performance, and there is

10  a reasonable probability that had this issue been placed before the Arizona

11  Supreme Court, the court would have determined that Andriano was entitled to a

12  new penalty phase hearing. Consequently, she was prejudiced by counsel's failure

13  to raise this claim on direct appeal. *See Strickland*, 466 U.S. at 694.

14      **D.    Appellate counsel failed to challenge the trial court's error in**
15      **permitting an unqualified expert to testify as to Andriano's**
        **status as a domestic violence victim.**

16      As discussed in Claim 15 *supra*, the trial court erred in permitting Bayless,

17  an unqualified expert, to opine that Andriano was not a domestic violence victim.

18  Because Bayless used inappropriate tests to support his conclusion, and lacked

19  domestic violence specific training, background, or education, the trial court

20  erroneously admitted his unreliable testimony. Appellate counsel failed to raise

21  this meritorious claim on direct appeal, and consequently, Andriano was

22  prejudiced. *See Strickland*, 466 U.S. at 694. Andriano will demonstrate at an

23  evidentiary hearing that appellate and post-conviction counsel fell below the

24  standards of minimally competent capital attorneys and that those failures

25  prejudiced her.

26

27

28

214

1
2

**E.   Appellate counsel failed to argue that mitigating circumstances are sufficient to merit life sentence under independent review.**

3
4
5
6
7
8
9
10

For any capital murder committed before August 1, 2002, the Arizona Supreme Court was required to "*independently* review the propriety of the death sentence." *State v. Grell*, 291 P.3d 350, 351 (Ariz. 2013) (emphasis added). The question in this independent review was "not whether the trial court properly imposed the death penalty, but whether, based upon the record before [the Arizona Supreme Court], we believe that the death penalty should be imposed." *State v. Trostle*, 951 P.2d 869, 888 (Ariz. 1997) (citation and internal quotation marks omitted).

11
12
13
14
15
16
17
18
19

For the defendant, the review was a second chance to argue her mitigation case—"something anathema in any other context." *State v. Stuard*, 863 P.2d 881, 902 (Ariz. 1993) (citation and internal quotation marks omitted). The Arizona Supreme Court was required to "independently reweigh and determine whether the proven mitigation is sufficiently substantial to warrant leniency." *Trostle*, 951 P.2d at 888 (citation omitted). "A finding merely that the imposition of the death penalty by the trial court was factually supported or justified by the evidence is not the separate and independent judgment by this court that the death penalty warrants." *Id.* (citation and internal quotation marks omitted).

20
21
22
23
24
25
26
27
28

This second chance has proven successful for many defendants. The Arizona Supreme Court has overturned death sentences based upon its independent review of aggravating and mitigating circumstances. *See, e.g.*, *Grell*, 291 P.3d at 351; *State v. Roque*, 141 P.3d 368, 405-06 (Ariz. 2006); *Trostle*, 951 P.2d at 888; *Stuard*, 863 P.2d at 902; *State v. Herrera*, 850 P.2d 100, 113 (Ariz. 1993); *State v. Jiménez*, 799 P.2d 785, 801 (Ariz. 1990); *State v. Rockwell*, 775 P.2d 1069, 1080 (Ariz. 1989); *State v. Mauro*, 766 P.2d 59, 81 (Ariz. 1988); *State v. Valencia*, 645 P.2d 239, 241 (Ariz. 1982); *State v. Watson*, 628 P.2d 943, 947 (Ariz. 1981).

1    In this case, the jury only found one aggravating circumstance existed.
2    When Andriano had her direct appeal before the Arizona Supreme Court, she had
3    a real opportunity to have her death sentence reduced to life in prison. But
4    appellate counsel passed up that opportunity by failing to brief the issue of
5    whether mitigation evidence was sufficient to call for leniency on independent
6    review.

7    The lack of argument prompted the Arizona Supreme Court to address the
8    issue in a footnote in its direct appeal opinion, stating that "Andriano did not
9    argue why the Court should find in its independent review that the mitigating
10   circumstances were sufficiently substantial to call for leniency." *Andriano*, 161
11   P.3d at 554 n.11 (internal quotation and citation omitted). The Court further
12   admonished that "[c]ounsel in capital cases should take advantage of all
13   appropriate opportunities to argue why death is not suitable punishment for their
14   particular client" per the ABA Guidelines. *Id.* Not only did appellate counsel fail
15   to argue the mitigation in a coherent, compelling way on direct appeal, as
16   discussed in Claim 18, *supra*, appellate counsel failed to alert the Arizona
17   Supreme Court that it relied on facts not supported by the record in its opinion.
18   *See Andriano*, 161 P.3d at 544, 555 (stating that Andriano testified that Joe "slit
19   his own throat" and that there were "lacerations on his head that exposed some
20   brain matter"). Appellate counsel filed a Motion for Reconsideration of the
21   Arizona Supreme Court's affirmation of Andriano's death sentence on direct
22   appeal, but made no mention of the unsupported facts. (DA 75.) A competent
23   appellate attorney would have alerted the Court to its incorrect statement of facts.
24   Without appellate counsel's guidance, the Court was left with a false depiction of
25   the offense.

26   Counsel's failure to argue that mitigation warranted leniency constituted
27   deficient performance. As the court's own opinion explains, under prevailing
28   professional norms, capital appellate counsel must make such an argument.

*Andriano*, 161 P.3d at 544 n.11. The Arizona Supreme Court, as well as the 2003 ABA Guidelines, emphasized that capital counsel should take advantage of every opportunity to argue for life. *See, e.g.*, Ariz. R. Crim. P. 6.8 (stating that counsel appointed in capital cases should be familiar with and guided by the 2003 ABA Guidelines); *State v. Speer*, 212 P.3d 787, 801 (Ariz. 2009) ("We have reminded capital defense counsel on two recent occasions of their professional obligation 'to take advantage of all appropriate opportunities to argue why death is not a suitable punishment' for their client, and not to 'simply rely on this Court's statutory duty to review the record.'" (citing ABA Guidelines)); *State v. Morris*, 160 P.3d 203, 219 n.10 (Ariz. 2007) (explaining that the court's duty of independent review "should not be understood to relieve death penalty counsel of the duty to raise meritorious arguments against a death sentence" (citation omitted)); *see also Penson v. Ohio*, 488 U.S. 75, 82 (1988) (rejecting argument that defendant suffered no prejudice from counsel's failure to submit a merits brief on colorable claims because the appellate court examined the record independently). Counsel performed deficiently by failing to brief this issue that is mandatorily reviewed. *See Delgado v. Lewis*, 223 F.3d 976, 980-81 (9th Cir. 2000); 2003 ABA Guideline 10.15.1(C) ("[C]ounsel should seek to litigate all issues . . . that are arguably meritorious."). When appellate counsel fails to raise meritorious issues that could have resulted in a reversal of a conviction or a sentence, counsel has necessarily caused prejudice to the defendant. *See, e.g.*, *Strickland*, 466 U.S. at 694. Since this was the only issue that the Court had carte blanche to decide, counsel had an obligation to make Andriano's best case before the justices.

As discussed in Claim 3, *supra*, trial counsel's mitigation presentation was riddled with issues. There was evidence that Andriano was raised by family members who left her in the care of child molesters, that her step-father engaged in highly inappropriate behavior, that she suffered from the isolation and emotional damage of growing up in a cult-like religion, and that she suffered from

217

mental illness. A competent appellate attorney would have been able to present this mitigation evidence in a coherent way and explain how the mitigating circumstances bore on Andriano's culpability and why they called for leniency. The Arizona Supreme Court need only have doubt "that the death sentence should be imposed" for the sentence to be reduced to life. *See Trostle*, 951 P.2d at 888. Had appellate counsel done so, there is a reasonable probability that in its review of the evidence, the Arizona Supreme Court would have reduced Andriano's sentence as it has in other cases. *See, e.g.*, *Trostle*, 951 P.2d at 888; *see also Strickland*, 466 U.S. at 694. Andriano will demonstrate at an evidentiary hearing that appellate and post-conviction counsel fell below the standards of minimally competent capital attorneys and that those failures prejudiced her.

### F. Appellate counsel failed to challenge the admittance of unreliable scientific evidence.

As discussed in Claim 6, *supra*, the testing method used to test Joe's blood and gastric contents and food items for the presence of sodium azide was scientifically unreliable. The method used could not definitively establish that the chemical compound detected was sodium azide. Because Andriano denied that she put sodium azide in the food found in her apartment and the State's theory of premeditation relied on Andriano surreptitiously poisoning Joe, appellate counsel should have challenged the due-process violation resulting from the admittance of the test results. Appellate counsel failed to raise this meritorious claim on appeal, and Andriano was prejudiced as a result. *See Strickland*, 466 U.S. at 694. Andriano will demonstrate at an evidentiary hearing that appellate and post-conviction counsel fell below the standards of minimally competent capital attorneys and that those failures prejudiced her.

**G.    Appellate counsel failed to challenge the trial court's improper limitations on voir dire and rehabilitation of jurors.**

As discussed in Claim 10, *supra*, the trial court violated Andriano's due-process rights during voir dire. The court did not allow the defense to question prospective jurors regarding their views on specific aggravating or mitigating circumstances and did not allow counsel to question all prospective jurors individually, further limiting the questioning of those who were questioned individually. The trial court also improperly rehabilitated death-biased jurors and allowed the State to do the same. Appellate counsel failed to challenge these errors on direct appeal, and Andriano was prejudiced as a result. *See Strickland*, 466 U.S. at 694. Andriano will demonstrate at an evidentiary hearing that appellate and post-conviction counsel fell below the standards of minimally competent capital attorneys and that those failures prejudiced her.

**H.    Appellate counsel failed to correct the Arizona Supreme Court's reliance on facts not in evidence in its direct appeal opinion.**

As discussed in Claim 18, *supra*, the Arizona Supreme Court relied on facts not in evidence, namely that Andriano testified that Joe slit his own throat and that the wounds on Joe's head exposed brain matter. Neither factual assertion was supported by the record. Appellate counsel filed a motion for reconsideration but failed to correct these errors. (DA 75.) Andriano was prejudiced as a result. *See Strickland*, 466 U.S. at 694. Andriano will demonstrate at an evidentiary hearing that appellate and post-conviction counsel fell below the standards of minimally competent capital attorneys and that those failures prejudiced her.

**I.    Appellate counsel failed to argue that execution of Andriano after years spent on death row would be cruel and unusual punishment.**

As discussed in Claim 36, *infra*, executing Andriano after she has been incarcerated on death row would violate the Eighth Amendment's prohibition on cruel and unusual punishment. Appellate counsel failed to raise this claim on

1    direct appeal, and Andriano was prejudiced as a result. *See Strickland*, 466 U.S. at
2    694. Andriano will demonstrate at an evidentiary hearing that appellate and post-
3    conviction counsel fell below the standards of minimally competent capital
4    attorneys and that those failures prejudiced her.

5    ### J.    Appellate counsel failed to challenge Arizona's jury selection process as unconstitutional.
6

7    As discussed in Claim 35, *infra*, Arizona's jury selection process in capital
8    cases produces a jury prone to convict and to reach a premature decision that
9    death should be imposed. Appellate counsel failed to challenge this practice on
10   appeal, and Andriano was prejudiced as a result. *See Strickland*, 466 U.S. at 694.
11   Andriano will demonstrate at an evidentiary hearing that appellate and post-
12   conviction counsel fell below the standards of minimally competent capital
13   attorneys and that those failures prejudiced her.

14   The Arizona Supreme Court failed to correct the PCR court's incorrect
15   legal and factual determinations when it summarily denied Andriano's Petition for
16   Review. (PFR 39.) Consequently, she was deprived of her Sixth and Fourteenth
17   Amendment rights, and is thereby entitled to relief.

18   ### CLAIM TWENTY-TWO

19   **Capital punishment is categorically cruel and unusual, in violation of the Eighth and Fourteenth Amendments.**
20

21   Andriano raised this claim on direct appeal. (DA 57 at 129.) The Arizona
22   Supreme Court did not address the claim on the merits, but only presented
23   verbatim the issue in its appendix. *Andriano*, 161 P.3d at 556. Because this claim
24   has not been adjudicated by the Arizona state courts on the merits, the limitations
25   on relief imposed by 28 U.S.C. § 2254(d) do not apply to this Court's review of
26   the claim. To the extent the court finds that any aspects of this claim were not
27   exhausted, that failure is attributable to the ineffective assistance of Andriano's
28   appellate counsel. *See Strickland*, 466 U.S. at 668; *Evitts*, 469 U.S. at 397;

1   *Martinez*, 132 S. Ct. at 1315; *Nguyen*, 736 F.3d at 1293-94.

2        The Eighth Amendment precludes the imposition of punishments that are
3   "cruel and unusual," as assessed according to the "evolving standards of decency
4   that mark the progress of a maturing society." *Trop v. Dulles*, 356 U.S. 86, 100,
5   101 (1958). The past forty years have demonstrated that capital punishment is
6   cruel and unusual and serves no penological purpose. Accordingly, it does not
7   comport with the dictates of the Eighth Amendment.

8        The death penalty is cruel for two distinct reasons: it is both unreliable and
9   arbitrarily imposed. First, in spite of the need for heightened reliability in a
10  proceeding when a sentence of death is at stake, *see Woodson v. North Carolina*,
11  428 U.S. 280, 305 (1976) (joint opinion of Stewart, Powell, and Stevens, JJ.),
12  capital punishment is unreliable because of the significant risk that an innocent
13  person will be sentenced to death or even executed. Between 1989 and 2012, there
14  were 115 exonerations from capital convictions; there were six more based on
15  actual innocence in 2014 alone. *Glossip v. Gross*, 135 S. Ct. 2726, 2757 (2015)
16  (Breyer, J., dissenting). Indeed, research suggests that 4.1% of the people on death
17  row are actually innocent. *See id.* at 2758 (citing Samuel R. Gross et al., *Rate of
18  False Conviction of Criminal Defendants Who Are Sentenced to Death*, 111 Proc.
19  of the Nat'l Acad. of Sci. 7230 (2014)). Moreover, there is compelling evidence
20  that innocent individuals have in fact been executed. *See, e.g.*, David Grann, *Trial
21  by Fire: Did Texas Execute an Innocent Man?*, The New Yorker, Sept. 7, 2009, at
22  42, *available at* http://www.newyorker.com/magazine/2009/09/07/trial-by-fire
23  (describing the conviction and execution of Cameron Todd Willingham for the
24  house fire that killed his children, despite the invalidity of the scientific analysis
25  deeming the fire intentional).

26       In addition to being unreliable, the death penalty is wholly arbitrary. The
27  imposition of the death penalty should turn on the crime and the offender's
28  culpability; capital punishment in this country is to be reserved for "those

offenders who commit 'a narrow category of the most serious crimes' and whose extreme culpability makes them 'the most deserving of execution.'" *Roper v. Simmons*, 543 U.S. 551, 568 (2005) (quoting *Atkins*, 536 U.S. at 319). But research demonstrates that a number of irrelevant factors, including the race and gender of Joe or defendant and the geographic location of the crime, have an impermissible bearing on the probability of a death sentence. *See, e.g.*, Steven F. Shatz & Terry Dalton, *Challenging the Death Penalty with Statistics:* Furman*, McCleskey*, and a Single County Case Study*, 34 Cardozo L. Rev. 1227, 1244-56 (2013) (citing studies finding gender, racial, and geographic disparities in the imposition of death sentences). That the death penalty is both unreliable and turns on constitutionally irrelevant factors renders it cruel. *Cf. Furman v. Georgia*, 408 U.S. 238, 309-10 (1972) (Stewart, J., concurring) (deeming "cruel and unusual" the "wanton[] and freakish[]" imposition of death sentences).

The death penalty has also become unusual. Both the number of death sentences and the number of executions nationally have plummeted over the last fifteen years. *See Glossip*, 135 S. Ct. at 2775 (Breyer, J., dissenting). Fewer and fewer states use the death penalty—thirty have abolished capital punishment or have not conducted an execution in over eight years—and the use of the death penalty is now concentrated in a handful of counties. *See Executions by State and Year*, The Death Penalty Information Center, http://www.deathpenaltyinfo.org/ node/5741(last visited August 5, 2015); *States With and Without the Death Penalty*, The Death Penalty Information Center, http://www.deathpenaltyinfo.org /states-and-without-death-penalty (last visited Mar. 3, 2017); Richard C. Dieter, *The 2% Death Penalty*, 1 (2013) ("Over half of the executions carried out since 1976 come from cases originating in 2% of U.S. counties."). Perhaps most striking is the "consistency of the direction of change." *Atkins v. Virginia*, 536 U.S. 304, 315 (2002). Seven states have abolished the death penalty in the last decade alone, making capital punishment singularly unusual. *See States With and*

1   *Without the Death Penalty*, *supra*.

2      Finally, capital punishment serves no permissible penological purpose. In
3   1976, the Supreme Court emphasized that the death penalty was "said to serve
4   two principal social purposes: retribution and deterrence of capital crimes by
5   prospective offenders." *Gregg v. Georgia*, 428 U.S. 153, 183 (1976) (joint opinion
6   of Stewart, Powell, and Stevens, JJ.). However, the Court recognized that a
7   "sanction imposed cannot be . . . totally without penological justification." *Id.*; *see*
8   *also Enmund v. Florida*, 458 U.S. 782, 798 (1982) ("Unless the death penalty
9   when applied . . . measurably contributes to one or both of these goals [retribution
10  and deterrence], it 'is nothing more than the purposeless and needless imposition
11  of pain and suffering,' and hence an unconstitutional punishment." (quoting *Coker*
12  *v. Georgia*, 433 U.S. 584, 592 (1977) (plurality opinion))). Over time, empirical
13  evidence and philosophical critiques have emerged that have eroded these two
14  justifications for the death penalty, leaving the death penalty with no discernible
15  purpose at all. *See, e.g.*, John J. Donohue & Justin Wolfers, *Uses and Abuses of*
16  *Empirical Evidence in the Death Penalty Debate*, 58 Stan. L. Rev. 791, 794, 843
17  (2005); Carol S. Steiker, *No, Capital Punishment Is Not Morally Required:*
18  *Deterrence, Deontology, and the Death Penalty*, 58 Stan. L. Rev. 751 (2005).

19     Because the death penalty is cruel and unusual, and because it serves
20  neither the goal of retribution nor that of deterrence, capital punishment is
21  unconstitutional. Accordingly, Andriano's sentence is constitutionally infirm
22  under the Eighth and Fourteenth Amendments, and she is entitled to relief.

23                          **CLAIM TWENTY-THREE**

24     **The death penalty violates Andriano's rights under the Eighth and**
25  **Fourteenth Amendments because it is irrationally and arbitrarily**
    **imposed and it serves no purpose that is not adequately addressed**
26  **by life in prison.**

27     Andriano raised this claim on direct appeal. (DA 57 at 129.) The Arizona
28  Supreme Court did not address the claim on the merits, but only presented

verbatim the issue in its appendix. *Andriano*, 161 P.3d at 556. Because this claim has not been adjudicated by the Arizona state courts on the merits, the limitations on relief imposed by 28 U.S.C. § 2254(d) do not apply to this Court's review of the claim. To the extent the court finds that any aspects of this claim were not exhausted, that failure is attributable to the ineffective assistance of Andriano's appellate counsel. *See Strickland*, 466 U.S. at 688; *Evitts*, 469 U.S. at 397; *Martinez*, 132 S. Ct. at 1315; *Nguyen*, 736 F.3d at 1293-94.

In 1972, the Supreme Court struck down all existing death-penalty statutes because the court concluded that the death penalty was being imposed in an arbitrary and irrational manner. *Furman v. Georgia*, 408 U.S. 238 (1972). The death penalty continues to be imposed in an arbitrary and irrational fashion by Arizona courts.

The arbitrary application of the death penalty in Andriano's case amounts to cruel and unusual punishment in violation of the Eighth Amendment and violates her right to due process under the Fourteenth Amendment. *See Glossip*, 135 S. Ct. at 2755-56 (Breyer, J., dissenting) ("Today's administration of the death penalty involves three fundamental constitutional defects: (1) serious unreliability, (2) arbitrariness in application, and (3) unconscionably long delays that undermine the death penalty's penological purpose."); *Callins v. Collins*, 510 U.S. 1141, 1144 (1994) (Blackmun, J., dissenting); *Jeffers v. Lewis*, 38 F.3d 411, 425 (9th Cir. 1994) (Noonan, J., dissenting) ("[T]he administration of the death penalty in Arizona is so arbitrary as to constitute cruel and unusual punishment in violation of the Eighth Amendment . . . "). Andriano's death sentence was imposed arbitrarily when compared with other cases involving either a sentence of death or a sentence of life imprisonment. There is still no rational, constitutionally permissible basis for distinguishing Andriano's case, or the few cases in which the death penalty has been imposed in Arizona and in the United States, from the many cases in which it has not been imposed. In fact, in Andriano's case, the

problem is even more apparent because Andriano, whose husband was already terminally ill, received a death sentence, despite the fact that female defendants, including those with more culpability, are rarely sentenced to death. This fact highlights the irrational and arbitrary imposition of the death penalty in Arizona. Because Andriano's sentence violates her Eighth and Fourteenth Amendment rights, she is entitled to relief.

**CLAIM TWENTY-FOUR**

**Application of the death penalty on the facts of this case would constitute cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments.**

Andriano raised this claim on direct appeal. (DA 57 at 129.) The Arizona Supreme Court did not address the claim on the merits, but only presented verbatim the issue in its appendix. *Andriano*, 161 P.3d at 556. Because this claim has not been adjudicated by the Arizona state courts on the merits, the limitations on relief imposed by 28 U.S.C. § 2254(d) do not apply to this Court's review of the claim. To the extent the court finds that any aspects of this claim were not exhausted, that failure is attributable to the ineffective assistance of Andriano's appellate counsel. *See Strickland*, 466 U.S. at 688; *Evitts*, 469 U.S. at 397; *Martinez*, 132 S. Ct. at 1315; *Nguyen*, 736 F.3d at 1293-94.

In light of the qualitative difference between a sentence of death and a sentence to a term of imprisonment, the Eighth Amendment demands a higher degree of "reliability in the determination that death is the appropriate punishment in a specific case." *Woodson*, 428 U.S. at 305. Thus, upon meeting the low threshold for relevance, "the 'Eighth Amendment requires that the jury be able to consider and give effect to' a capital defendant's mitigating evidence." *Tennard v. Dretke*, 542 U.S. 274, 285 (2004) (quoting *Boyde v. California*, 494 U.S. 370, 377-78). The purpose of this consideration is to ensure that all relevant factors of the offense are considered and that only those who are most deserving receive the death penalty.

1    The Arizona Supreme Court failed to conduct a comparative proportionality
2  review of Andriano's death sentence, rendering the sentence unconstitutional.
3  When the Supreme Court sanctioned the modern death-penalty scheme, it did so
4  based on the belief that state supreme courts would conduct careful and effective
5  proportionality reviews in individual cases to guard against the arbitrary and
6  capricious infliction of the death penalty. *See Gregg*, 428 U.S. at 203-06 (joint
7  opinion of Stewart, Powell, and Stevens, JJ.) (highlighting proportionality review
8  on appeal as an important protection against caprice in sentencing); *Proffitt v.*
9  *Florida*, 428 U.S. 242, 258 (1976) (joint opinion of Stewart, Powell, and Stevens,
10  JJ.) (same); *see also Glossip v. Gross*, 135 S. Ct. 2726, 2763 (2015) (Breyer, J.,
11  dissenting) (recognizing the importance of comparative proportionality review to
12  avoid arbitrary imposition of the death penalty). *But see Pulley v. Harris*, 465 U.S.
13  37, 50-51 (1984). The Arizona Supreme Court, however, has abandoned this
14  procedural safeguard. *See State v. Salazar*, 844 P.2d 566, 583-84 (Ariz. 1992).

15    Andriano was a damaged, mentally-ill woman, struggling to raise two
16  young children, and whose husband was terminally ill with cancer. Andriano was
17  damaged from childhood by sexual, psychological, and physical abuse. Her
18  mental illness, aggravated by stress, skewed her understanding of the situation and
19  "in her head she said that she was helping" Joe. (PCR Mem. In Support of Pet. Ex.
20  45 Feb. 17, 2012 at PCR000019.) In addition, the tenets of her strict, religious
21  upbringing limited her critical and independent thinking and impaired her
22  decision-making ability. As a result, Andriano is less culpable than a typical
23  offender. Considering proportionality would serve to assist in creating uniformity
24  in sentencing with the intent that similarly situated defendants be treated similarly.
25  As a result, Andriano is entitled to relief.

26

27

28

# CLAIM TWENTY-FIVE

**Arizona's capital-sentencing scheme violates the Eighth and Fourteenth Amendments to the United States Constitution because it affords the prosecutor unbridled discretion to seek the death penalty.**

Andriano raised this claim on direct appeal. (DA 57 at 129-30.) The Arizona Supreme Court did not address the claim on the merits, but only presented verbatim the issue in its appendix. *Andriano*, 161 P.3d at 556. Because this claim has not been adjudicated by the Arizona state courts on the merits, the limitations on relief imposed by 28 U.S.C. § 2254(d) do not apply to this Court's review of the claim. To the extent the court finds that any aspects of this claim were not exhausted, that failure is attributable to the ineffective assistance of Andriano's appellate counsel. *See Strickland*, 466 U.S. at 688; *Evitts*, 469 U.S. at 397; *Martinez*, 132 S. Ct. at 1315; *Nguyen*, 736 F.3d at 1293-94.

In Arizona, each prosecutor has the sole authority and complete discretion to determine whether to seek the death penalty as a sentencing option, following his unreviewable determination that one or more aggravating circumstances exist. This discretion is limited only by the whims of each individual prosecutor as to which cases are appropriate for the death penalty. *See State v. Harding*, 670 P.2d 383, 397 (Ariz. 1983). Arizona's scheme thus allows arbitrary and capricious charging decisions and creates a substantial risk of variation between similar cases. Such "arbitrary and wanton" discretion in seeking a death sentence, *Woodson*, 428 U.S. at 303, leads to the "wanton[] and freakish[]" imposition of the death sentence. *Furman*, 408 U.S. at 310 (Stewart, J., concurring). *But see Gregg*, 428 U.S. at 199. The fact that Arizona prosecutors have unbridled discretion to seek the death penalty violates the Eighth and Fourteenth Amendments. Andriano's death sentence must therefore be vacated.

**CLAIM TWENTY-SIX**

**The aggravating factors alleged by the State were not supported by findings of probable cause at the indictment stage because the State failed to allege the aggravating factors in the indictment, which is a violation of Andriano's rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments.**

Andriano raised this claim on direct appeal. (DA 57 at 130.) The Arizona Supreme Court did not address the claim on the merits, but only presented verbatim the issue in its appendix. *Andriano*, 161 P.3d at 556. Because this claim has not been adjudicated by the Arizona state courts on the merits, the limitations on relief imposed by 28 U.S.C. § 2254(d) do not apply to this Court's review of the claim. To the extent the court finds that any aspects of this claim were not exhausted, that failure is attributable to the ineffective assistance of Andriano's appellate counsel. *See Strickland*, 466 U.S. at 688; *Evitts*, 469 U.S. at 397; *Martinez*, 132 S. Ct. at 1315; *Nguyen*, 736 F.3d at 1293-94.

The Supreme Court has clearly established that any fact serving to increase the punishment for a crime must be treated as an element of the offense. *See Apprendi v. New Jersey*, 530 U.S. 466, 477 (2000); *Ring v. Arizona*, 536 U.S. 584, 609 (2002). In *Apprendi*, the Court noted that "any fact (other than prior conviction) that increases the maximum penalty for a crime must be *charged in an indictment*, submitted to a jury, and proven beyond a reasonable doubt." 530 U.S. at 476 (emphasis added). The necessity of alleging aggravating facts in an indictment arises from the understanding that "[an] aggravating fact is an element of the aggravated crime" and must, therefore, be included in the indictment and subject to a pretrial probable cause finding. *Id.* at 501 (Thomas, J., concurring).

Under Arizona law, first-degree murder is defined in Arizona Revised Statute § 13-1105. The maximum sentence for first-degree murder is life imprisonment unless a jury finds the presence of at least one aggravating circumstance and determines that there are no mitigating circumstances sufficiently substantial to warrant leniency. Ariz. Rev. Stat. § 13-703(E) (1989);

1    *id.* § 13-703.01(C); *id.* § 13-703.01(E). In Arizona, the aggravating factors
2    "operate as 'the functional equivalent of an element of a greater offense.'" *Ring*,
3    536 U.S. at 609 (quoting *Apprendi*, 530 U.S. at 494 n.19). As elements of the
4    offense of capital murder, the Fifth, Sixth, and Fourteenth Amendments require
5    aggravating factors to be included in the charging document. *See Apprendi*, 530
6    U.S. at 476 (stating that "any fact (other than prior conviction) that increases the
7    maximum penalty for a crime must be charged in an indictment"); *United States v.*
8    *Cruikshank*, 92 U.S. 542, 558, 566-69 (1875) (finding that the Sixth Amendment
9    requires an indictment to include "every ingredient of which the offence is
10   composed"). To be included in the charging document, each and every element of
11   the alleged offense must have been subjected to a probable cause determination
12   either by a grand jury, in the case of an indictment, or by a judicial officer, at a
13   preliminary hearing.

14       The State pursued charges against Andriano through an indictment, but
15   failed to allege any aggravating factors in the indictment. (*See* ROA 1 at 1-2.)
16   Because the aggravating circumstances alleged in Andriano's case were not
17   subject to a probable cause determination by a neutral arbiter, Andriano's death
18   sentence violates the Fifth, Sixth, and Eighth Amendments of the Constitution as
19   incorporated against the states by the Fourteenth Amendment. The violation of
20   Andriano's constitutional rights cannot be cured short of remanding to the grand
21   jury for further proceedings. Andriano's sentence is constitutionally infirm, and
22   she is entitled to relief.

23                          **CLAIM TWENTY-SEVEN**

24       **The application of Arizona's newly enacted death penalty statute,**
     **promulgated after *Ring*, violated the ex post facto doctrine.**
25

26       Andriano raised this claim on direct appeal. (DA 57 at 130.) The Arizona
27   Supreme Court did not address the claim on the merits, but only presented
28   verbatim the issue in its appendix. *Andriano*, 161 P.3d at 556. Because this claim

1    has not been adjudicated by the Arizona state courts on the merits, the limitations
2    on relief imposed by 28 U.S.C. § 2254(d) do not apply to this Court's review of
3    the claim. To the extent the court finds that any aspects of this claim were not
4    exhausted, that failure is attributable to the ineffective assistance of Andriano's
5    appellate counsel. *See Strickland*, 466 U.S. at 688; *Evitts*, 469 U.S. at 397;
6    *Martinez*, 132 S. Ct. at 1315; *Nguyen*, 736 F.3d at 1293-94.

7        On June 24, 2002, the Supreme Court invalidated Arizona's death penalty
8    statute after finding that it impermissibly permitted the judge, rather than the jury,
9    to find the facts that make a defendant eligible for the death penalty. *Ring v.*
10   *Arizona*, 536 U.S. 584 (2002). The Arizona legislature did not amend Arizona's
11   death penalty statute to comply with *Ring* until August 1, 2002. *See* Arizona Laws
12   2002, 5th S.S., Ch.1, § 3. Andriano's crime was committed during the time period
13   that the constitutionally infirm statute was in place. Andriano was charged with
14   first degree murder, and the State filed its notice to seek death under the statute
15   held unconstitutional under *Ring*.

16       Andriano's defense counsel filed a Motion to Dismiss because application
17   of the amended death penalty statute violated the *ex post facto* clause. (ROA 70,
18   86). The trial court's application of the newly enacted death penalty statute to
19   Andriano's case violated the prohibition on the retroactive application of
20   substantive changes in the law. *See Weaver v. Graham*, 450 U.S. 24, 28-29
21   (1981).

22       Article I, § 10 of the United States Constitution prohibits ex post facto laws.
23   In *Weaver*, 450 U.S. at 30, the Supreme Court noted that critical to the ex post
24   facto prohibition is a concern for "the lack of fair notice and governmental
25   restraint when the legislature increases punishment beyond what was prescribed
26   when the crime was consummated." *Weaver* set forth two critical elements when
27   examining whether a law is being applied in violation of the ex post facto clause
28   of the United States Constitution. Application of a newly enacted law violates the

ex post facto doctrine if: (1) the law is retrospective, meaning that it "appl[ies] to events occurring before its enactment"; and (2) the law disadvantages the defendant. *Id.* at 29.

The homicide at issue here occurred on October 8, 2000. (ROA 1.) The capital punishment statute applied to Andriano during her trial was not enacted until August 1, 2002. Arizona Laws 2002, 5th S.S., Ch.1, § 3. Therefore, the application of the newly enacted capital sentencing statute to Andriano was retrospective, applying to events occurring before its enactment. *See Weaver*, 450 U.S. at 29. The enactment of a new death penalty statute was also a substantive change in the law for several reasons. In *Ring*, 536 U.S. at 609 (citing *Apprendi*, 530 U.S. at 494 n.19), the Court found that Arizona's enumerated aggravating factors operate as "the functional equivalent of an element of a greater offense" and that the Sixth Amendment therefore required them to be found by a jury. Further, the new law allowed the state to no longer just rebut evidence of mitigation but to present "any evidence that demonstrates that the defendant should not be shown leniency." Ariz. Rev. Stat. § 13-703.01(G). Additionally, the new law allowed for victim impact evidence in any format and did not require a special verdict by the sentencing body. Questions of what acts violate a statute and what elements must be proven to convict a defendant of a particular crime are not procedural issues, but rather substantive. Application of the later enacted death penalty statute violated the prohibition against ex post facto laws and, as a result, Andriano should not have been sentenced under the new death penalty. Application of Arizona's newly enacted death penalty statute to those charged before it was enacted was contrary to the rule and conclusion articulated in *Weaver*, which held that the ex post facto doctrine prohibits the application of a new statute that increases the available punishment for conduct that occurred before the statute was enacted. *Weaver*, 450 U.S. at 29.

Because a reasonable application of the Supreme Court's jurisprudence on

the ex post facto application of new laws would have resulted in a finding that the newly enacted death penalty statute could not be applied to Andriano, she is entitled to relief.

## CLAIM TWENTY-EIGHT

**Arizona's capital-sentencing scheme violates the Fifth, Eighth, and Fourteenth Amendments to the United States Constitution because it denies capital defendants the benefit of proportionality review of their sentences.**

Andriano raised this claim on direct appeal as Claim 7 of Argument XII regarding the unconstitutionality of Arizona's death penalty scheme. (DA 57 at 130-31.) The Arizona Supreme Court did not address the claim on the merits, but only presented verbatim the issue in its appendix. *Andriano*, 161 P.3d at 556. Because this claim has not been adjudicated by the Arizona state courts on the merits, the limitations on relief imposed by 28 U.S.C. § 2254(d) do not apply to this Court's review of the claim. To the extent the court finds that any aspects of this claim were not exhausted, that failure is attributable to the ineffective assistance of Andriano's appellate counsel. *See Strickland*, 466 U.S. at 688; *Evitts*, 469 U.S. at 397; *Martinez*, 132 S. Ct. at 1315; *Nguyen*, 736 F.3d at 1293-94.

The Arizona Supreme Court failed to conduct a comparative proportionality review of Andriano's death sentence, rendering the sentence unconstitutional. When the Supreme Court sanctioned the modern death penalty scheme, it did so based on the belief that state supreme courts would conduct careful and effective proportionality reviews in individual cases to guard against the arbitrary and capricious infliction of the death penalty. *See Gregg v. Georgia*, 428 U.S. 153, 203-06 (1976) (joint opinion of Stewart, Powell, and Stevens, JJ.) (highlighting proportionality review on appeal as an important protection against caprice in sentencing); *Proffitt v. Florida*, 428 U.S. 242, 258 (1976) (joint opinion of Stewart, Powell, and Stevens, JJ.) (same); *see also Glossip v. Gross*, 135 S. Ct. 2726, 2763 (2015) (Breyer, J., dissenting) (recognizing the importance of

comparative proportionality review to avoid arbitrary imposition of the death penalty). *But see Pulley v. Harris*, 465 U.S. 37, 50-51 (1984). The Arizona Supreme Court, however, has abandoned this procedural safeguard. *See State v. Salazar*, 844 P.2d 566, 583-84 (Ariz. 1992). The discontinuation of proportionality review allows for the death penalty to be applied arbitrarily in Arizona and violates the Fifth, Eighth, and Fourteenth Amendments. Andriano's sentence, affirmed without a comparative proportionality review, is constitutionally unsound, and Andriano is entitled to relief.

## CLAIM TWENTY-NINE

**Arizona's capital-sentencing scheme is unconstitutional because it does not require that the State prove that the death penalty is appropriate.**

Andriano raised this claim on direct appeal. (DA 57 at 131.) The Arizona Supreme Court did not address the claim on the merits, but only presented verbatim the issue in its appendix. *Andriano*, 161 P.3d at 556. Because this claim has not been adjudicated by the Arizona state courts on the merits, the limitations on relief imposed by 28 U.S.C. § 2254(d) do not apply to this Court's review of the claim. To the extent the court finds that any aspects of this claim were not exhausted, that failure is attributable to the ineffective assistance of Andriano's appellate counsel. *See Strickland*, 466 U.S. at 688; *Evitts*, 469 U.S. at 397; *Martinez*, 132 S. Ct. at 1315; *Nguyen*, 736 F.3d at 1293-94.

In light of the qualitative difference between a sentence of death and a sentence to a term of imprisonment, the Eighth Amendment demands a higher degree of "reliability in the determination that death is the appropriate punishment in a specific case." *Woodson*, 428 U.S. at 305. To achieve that heightened reliability, states must embrace procedural measures that protect a defendant from the arbitrary and capricious imposition of the death penalty. *See California v. Ramos*, 463 U.S. 992, 998-99 (1983). The reasonable-doubt standard "is indispensable to command the respect and confidence of the community in

applications of the criminal law." *In re Winship*, 397 U.S. 358, 364 (1970). "It is critical that the moral force of the criminal law not be diluted by a standard of proof that leaves people in doubt whether innocent men are being condemned." *Id.* In addition, to avoid the arbitrary and inconsistent imposition of death on a "jury-by-jury" basis, a specified burden of proof is required to ensure that juries faced with similar evidence will return similar verdicts. *See Eddings v. Oklahoma*, 455 U.S. 104, 112 (1982) ("[C]apital punishment [must] be imposed fairly, and with reasonable consistency, or not at all.").

Before the jury may impose a death sentence, Arizona's capital sentencing scheme requires the jury to find the State has proven the aggravating circumstances beyond a reasonable doubt and also that the aggravating circumstances outweigh the mitigating circumstances, in the sense that the jury must conclude that the mitigating circumstances are not "sufficiently substantial to call for leniency." Ariz. Rev. Stat. § 13-703(E); *see also Ring v. Arizona*, 536 U.S. 584 (2002). Arizona's capital sentencing scheme does not impose any particular burden of persuasion on either party at the sentencing hearing. Therefore, the current sentencing scheme does not require the prosecution to prove beyond a reasonable doubt that aggravating circumstances outweigh mitigating circumstances or that the mitigating circumstances are insufficient to warrant a life sentence. *See State v. Gulbrandson*, 906 P.2d 579, 605 (Ariz. 1995).

Arizona's capital sentencing scheme is unconstitutional because it does not require the State to prove that the death penalty is appropriate. In essence, the State's rebuttal to mitigation evidence amounts to additional aggravation evidence. The purpose of the rebuttal is to persuade the jury that there is sufficient aggravation in a case to overwhelm the mitigation and to necessitate a capital punishment; however, there is no burden of proof placed on this evidence and no instruction to the jury about how to weigh and compare the evidence as a whole. Without a burden, the State is able to achieve two bites at the apple, but one

without the same high standard. Under the law, therefore, it is only logical and equitable that the same high burden of proof that applies to the State's aggravating circumstances, should also apply to the State's rebuttal to mitigation.

In *Kansas v. Marsh*, 548 U.S. 163 (2006), the Supreme Court indirectly questioned the constitutionality of Arizona's death penalty statute when it upheld the Kansas statute that permitted a death sentence when the aggravating circumstances and mitigating circumstances were found to be equal. In that decision, the Court noted that Arizona's statutes are comparable to those of Kansas, except that Arizona, "once the State has met its burden, tasks the defendant with the burden of proving sufficient mitigating circumstance to overcome the aggravating circumstances and that a sentence less than death is therefore warranted." *Id.* at 173. The Court further explained that:

> In contrast, the Kansas statute requires the State to bear the burden of proving to the jury, beyond a reasonable doubt, that aggravators are not outweighed by mitigators and that a sentence of death is therefore appropriate; it places no additional evidentiary burden on the capital defendant. This distinction operates in favor of Kansas capital defendants.

*Id.* It is because of this difference that the Court upheld Kansas's statute as constitutional. *Id.* Without such safeguards, Arizona's capital sentencing scheme is unconstitutional and violated Andriano's rights under the Fifth, Eighth, and Fourteenth Amendments to the United States Constitution. As a result, Andriano is entitled to relief.

## CLAIM THIRTY

**Arizona's capital-sentencing scheme violates the Eighth and Fourteenth Amendments to the United States Constitution because it does not set forth objective standards to guide the sentencer in weighing the aggravating circumstances against the mitigating circumstances.**

Andriano raised this claim on direct appeal. (DA 57 at 131.) The Arizona

1    Supreme Court did not address the claim on the merits, but only presented
2    verbatim the issue in its appendix. *Andriano*, 161 P.3d at 556. Because this claim
3    has not been adjudicated by the Arizona state courts on the merits, the limitations
4    on relief imposed by 28 U.S.C. § 2254(d) do not apply to this Court's review of
5    the claim. To the extent the court finds that any aspects of this claim were not
6    exhausted, that failure is attributable to the ineffective assistance of Andriano's
7    appellate counsel. *See Strickland*, 466 U.S. at 688; *Evitts*, 469 U.S. at 397;
8    *Martinez*, 132 S. Ct. at 1315; *Nguyen*, 736 F.3d at 1293-94.

9         Under the Eighth and Fourteenth Amendments, a capital defendant has a
10   right to an individualized sentencing determination. *See Zant v. Stephens*, 462
11   U.S. 862, 879 (1983). There was no individualized sentencing in Andriano's case
12   because the sentencing jury had no guidance in determining whether the
13   mitigating evidence presented was sufficiently substantial to call for leniency.
14   (*See* Tr. Dec. 16, 2004 at 41-53.) The fact that the jury asked a question about
15   being unable to reach a unanimous verdict further demonstrates why the need for
16   guidance was critical. (*See* Tr. Dec. 20, 2004 at 4.) In the absence of such
17   guidance, the risk that Andriano's death sentence was the result of unfettered
18   discretion is intolerably high. Andriano's sentence is constitutionally infirm.
19   *See Furman*, 408 U.S. at 239-40 (per curiam). These errors, individually and
20   cumulatively, violated Andriano's constitutional rights and prejudiced her.

## CLAIM THIRTY-ONE

**Arizona's capital-sentencing scheme violates the Eighth and Fourteenth Amendments because it does not sufficiently channel the discretion of the sentencing authority.**

25   Andriano raised this claim on direct appeal. (DA 57 at 132.) The Arizona
26   Supreme Court did not address the claim on the merits, but only presented
27   verbatim the issue in its appendix. *Andriano*, 161 P.3d at 556. Because this claim
28   has not been adjudicated by the Arizona state courts on the merits, the limitations

on relief imposed by 28 U.S.C. § 2254(d) do not apply to this Court's review of the claim. To the extent the court finds that any aspects of this claim were not exhausted, that failure is attributable to the ineffective assistance of Andriano's appellate counsel. *See Strickland*, 466 U.S. at 688; *Evitts*, 469 U.S. at 397; *Martinez*, 132 S. Ct. at 1315; *Nguyen*, 736 F.3d at 1293-94.

In *Furman v. Georgia*, the Supreme Court declared that a death-sentencing procedure is unconstitutional when it provides "no meaningful basis for distinguishing the few cases in which [death] is imposed from the many cases in which it is not." 408 U.S. 238, 313 (1972) (White, J., concurring); *see also*, *e.g.*, *Maynard*, 486 U.S. at 362; *Godfrey*, 446 U.S. at 427-28. "*Furman* mandates that where discretion is afforded a sentencing body on a matter so grave as the determination of whether a human life should be taken or spared, that discretion must be suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action." *Gregg*, 428 U.S. at 189.

The narrowing process must, moreover, be established by statute. *See id.* at 207 (stating that the selection of the persons eligible to be prosecuted and ultimately sentenced to death "[must] always [be] circumscribed by . . . legislative guidelines"). "Part of a State's responsibility in this regard is to define the crimes for which death may be the sentence in a way that obviates 'standardless [sentencing] discretion.'" *Godfrey*, 446 U.S. at 428 (alteration in original) (quoting *Gregg*, 428 U.S. at 196). Ultimately, "[t]o pass constitutional muster, a capital sentencing scheme must 'genuinely narrow the class of persons eligible for the death penalty and must reasonably justify the imposition of a more severe sentence on the defendant compared to others found guilty of murder.'" *Lowenfield v. Phelps*, 484 U.S. 231, 244 (1988) (quoting *Zant*, 462 U.S. at 877).

Arizona's death penalty statute violates these mandates of the Supreme Court. Under Arizona law, a broad range of conduct constitutes first-degree murder, including intentional killings, premeditated killings, killings committed in

the course of a number of other crimes, and the killings of law-enforcement officers in the line of duty. *See* Ariz. Rev. Stat. § 13-1105(A). This initial "pool" of individuals eligible for the death penalty is so broadly defined that it encompasses the vast majority of murders actually committed. This is seen both by a reading of the statute, which fails to meaningfully distinguish first-degree murder and second-degree murder, and through a review of the actual cases which demonstrates that almost all murders in Arizona could in fact be categorized as first-degree murder.

The narrowing function, then, is ostensibly performed by the aggravating factors; a jury must find at least one to make a first-degree-murder defendant death-eligible. However, the aggravating factors sweep so expansively that they do not meaningfully separate out a group of offenders whose crimes are so egregious they should be eligible for the death penalty. *See id.* § 13-703(F); *compare, e.g.*, *State v. Wallace*, 728 P.2d 232, 238 (Ariz. 1986) (stating that a murder with no apparent motive is death-eligible), *and State v. Chaney*, 686 P.2d 1265, 1282 (Ariz. 1984) (finding that the defendant used insufficient force and is therefore death-eligible), *with State v. Smith*, 687 P.2d 1265, 1266-67 (Ariz. 1984) (discussing crime committed with specific motive of eliminating a witness), *and State v. Summerlin*, 675 P.2d 686, 696 (Ariz. 1983) (finding that the defendant used excessive force and so was death-eligible). Under Arizona law, the sentencer must impose a death sentence whenever it "finds one or more of the aggravating circumstances . . . and then determines that there are no mitigating circumstances sufficiently substantial to call for leniency." Ariz. Rev. Stat. § 13-703(E) (current version at Ariz. Rev. Stat. § 13-751(E) (2012)).

Because both Arizona's definition of first-degree murder and its aggravating factors sweep so broadly, the Arizona statute fails to perform the constitutionally required function of channeling the sentencer's discretion toward

imposing a death sentence for only the most egregious of murders.[18] *See Lowenfield*, 484 U.S. at 244. Because Andriano was sentenced to death under Arizona's overbroad capital-sentencing scheme, her sentence is constitutionally infirm, and she is entitled to relief.

## CLAIM THIRTY-TWO

**Execution by lethal injection is cruel and unusual punishment; accordingly, Andriano's sentence, if carried out, will violate her rights under the Eighth and Fourteenth Amendments.**

Andriano raised this claim on direct appeal. (DA 57 at 132.) The Arizona Supreme Court did not address the claim on the merits, but only presented verbatim the issue in its appendix. *Andriano*, 161 P.3d at 556. Because this claim has not been adjudicated by the Arizona state courts on the merits, the limitations on relief imposed by 28 U.S.C. § 2254(d) do not apply to this Court's review of the claim. To the extent the court finds that any aspects of this claim were not exhausted, that failure is attributable to the ineffective assistance of Andriano's appellate counsel. *See Strickland*, 466 U.S. at 688; *Evitts*, 469 U.S. at 397; *Martinez*, 132 S. Ct. at 1315; *Nguyen*, 736 F.3d at 1293-94.

### A.   Arizona has a troublesome history of carrying out lethal-injection executions.

In December 2004, Andriano was sentenced to death by lethal injection. (ROA 6 at 426.) Arizona Revised Statutes § 13-757(A) provides that "[t]he penalty of death shall be inflicted by an intravenous injection of a substance or substances in a lethal quantity sufficient to cause death, under the supervision of the state department of corrections." There is no additional statutory guidance provided to the Arizona Department of Corrections ("ADC") in carrying out the execution. Instead, the Director of ADC is given unfettered discretion in selecting substances to be used in carrying out executions. *See* ADC, Dep't Order 710 at 1,

---

[18] This is further exacerbated by Arizona's abandonment of proportionality review. *See supra*, Claim 28.

https://corrections.az.gov/sites/default/files/policies/700/0710_011117.pdf    (last visited Mar. 3, 2017) (outlining execution procedures but noting that "deviation" or "adjustment" is permitted as determined by the Director of the Arizona Department of Corrections). The procedures implemented and the drugs used during the last five years demonstrate that Arizona's lethal-injection process is cruel and unusual.

Since the time that Andriano was sentenced to death, Arizona has carried out fifteen executions—all via lethal injection using various combinations of drugs. *See* ADC, Executions Prior to 1992 & Execution Methods, https://corrections.az.gov/public-resources/death-row/executions-prior-1992-execution-methods (last visited Mar. 3, 2017). Based on ADC's actions in these recent executions, there are three reasons that ADC cannot constitutionally carry out executions via lethal injection. First, ADC has not complied with the law in obtaining the substances to be used in executions. A state cannot violate the law while carrying out the law. Second, ADC has been unable to follow its written protocol time and time again. Therefore, there is no guarantee that lethal injection will occur as set forth in the written protocol. Third, ADC has selected drugs that result in human experimentation. These factors both individually and combined make Arizona's use of lethal injection inherently cruel and unusual and therefore a violation of the Eighth Amendment.

### 1.      Illegal importation

Arizona killed Jeff Landrigan on October 26, 2010, using the drug sodium thiopental obtained from, at that time, an unknown foreign source. *See Landrigan v. Brewer*, No. CV-10-02246-PHX-ROS, 2010 WL 4269559, at *4 (D. Ariz. Oct. 25, 2010) *stay of execution aff'd*, 625 F.3d 1144 (9th Cir. 2010) and *stay vacated*, 562 U.S. 996 (2010) ("During argument, counsel for the State declined to reveal where ADOC obtained the sodium thiopental for Plaintiff's execution but acknowledged that it was not obtained from or manufactured by Hospira, Inc.,

1  which Plaintiff alleges is the only manufacturer of sodium thiopental approved by
2  the Food and Drug Administration."). Several months later, on May 4, 2011,
3  eighteen hours before its scheduled execution of Donald Beaty, Arizona
4  announced that it intended to use a different drug because "the Department of
5  Justice informed ADC that its supply of sodium thiopental was imported without
6  compliance with the Controlled Substance Act." *See West v. Brewer*, Findings of
7  Fact and Conclusion of Law and Order, No. CV-11-1409-PHX-NVW, 2011 WL
8  6724628, at *10 (D. Ariz. Dec. 21, 2011). As was later shown, the drug sodium
9  thiopental used in Landrigan's execution (and the one carried out after his) was
10  imported in violation of federal law. *See, e.g.*, *Cook v. FDA*, 733 F.3d 1, 11-12
11  (D.C. Cir. 2013).

12      Again, recently, ADC imported sodium thiopental that has been detained
13  by the Food and Drug Administration. *See Wood v. Ryan*, No. 2:14-cv-01447-
14  NVW, Def's. Notice in Resp. to Ct. Order, at 1-2 (D. Ariz. filed Nov. 3, 2015).
15  Given ADC's past and current actions, it is cruel and unusual to permit the
16  government to carry out the law by violating the law.

17          **2.      Protocol violations**

18      In December 2011, the district court held a trial, issued an opinion, and
19  found that "[f]ive prisoners were executed by lethal injection between October
20  2010 and July 2011. At the direction of those responsible for administering these
21  executions, *ADC failed to follow certain components of its execution protocol*."
22  *West v. Brewer*, Findings of Fact and Conclusion of Law and Order, No. CV-11-
23  1409-PHX-NVW, 2011 WL 6724628, at *7 (D. Ariz. Dec. 21, 2011) (emphasis
24  added). In January 2012, ADC amended its protocol and removed many of the
25  provisions it was found to have violated—including minimum qualifications for
26  and training of the IV team members.

27      In February 2012, with execution dates pending, two prisoners, Robert
28  Moorman and Robert Towery, challenged the change to the protocol. On appeal,

the court noted, "[e]ven after the appeal was filed and hours before the argument, Arizona yet again changed course as to its plans for the executions." *Towery v. Brewer*, 672 F.3d 650, 652 (9th Cir. 2012). ADC changed the drug formula because it discovered at the last minute that one of the drugs had expired. *Id.* The court remarked: "How such a discovery escaped the State for the past six weeks is beyond us, and gives us pause as to the regularity and reliability of Arizona's protocols." *Id.* at 653. During that case, the court upheld the denial of a preliminary injunction but *only* based on the protocol "as amended by the State during oral argument" and it further noted that "the State's frequent changes to its protocol during litigation are not sustainable." *Id.*

After the Ninth Circuit allowed the executions to go forward, known problems occurred during the execution of Robert Towery. Those concerns were raised by another prisoner facing execution, Samuel Lopez. *See Lopez v. Brewer*, 680 F.3d 1068, 1073 (9th Cir. 2012) ("Towery's recent execution is the primary basis of Lopez's claim."). Those problems included concerns with setting the IV lines. *See id.* "Although [the court] uph[e]ld the district court's decision, [it] caution[ed], yet again, that Arizona's ad hoc approach risks going beyond *Baze*'*s* safe harbor." *Id.* at 1075. The court expressed grave concern with the State's method of changing its protocol hours before an execution, in which the State essentially asked the court to "trust that it will exercise its discretion in a constitutionally permissible manner." *Id.* at 1070.

Indeed, in response to the lawsuit brought related to Samuel Lopez's execution, several Ninth Circuit judges noted: "In case after case, [the court has] been forced to rely on the ad hoc representations of the state's counsel in conducting one of the gravest responsibilities that [it is] asked to perform: approving the state's plan to take a human life." *Lopez v. Brewer*, 680 F.3d 1091, 1095 (9th Cir. 2012) (Reinhardt, J., dissenting from denial of rehearing en banc). As explained, "[t]he trouble that plagued Towery's execution highlights the

1  practical problems this obsessive secrecy creates for any meaningful litigation in
2  the constricted time periods permitted by Arizona's moving target approach to
3  execution procedures." *Lopez*, 680 F.3d at 1083 (Berzon, J., concurring in part
4  and dissenting in part).

5      Arizona has made it impractical to determine the constitutionality of its
6  protocol and procedures by keeping the information secret and releasing it only
7  after a court orders it to do so. *See Schad v. Brewer*, Order, No. CV-13-2001-
8  PHX-ROS, 2013 WL 5551668, at *10 (D. Ariz. Oct. 7, 2013) (requiring
9  disclosure of information to plaintiff regarding lethal-injection drugs); *Wood v.
10  Ryan*, 759 F.3d 1076, 1088 (9th Cir. 2014), *stay of execution vacated*, 135 S. Ct.
11  21 (2014) (Ninth Circuit requiring ADC to disclose "(a) the name and
12  provenance of the drugs to be used in the execution and (b) the qualifications of
13  the medical personnel, subject to the restriction that the information provided will
14  not give the means by which the specific individuals can be identified"").
15  Moreover, ADC has evaded appropriate review before an execution by
16  maintaining a catch-all provision that allows ADC's Director to deviate from the
17  protocol at any time in any manner. *See* ADC, Dep't Order 710, at 1. In fact, the
18  most recent execution demonstrates this exact point, and provides further support
19  why Arizona's attempts at carrying out lethal injection constitute cruel and
20  unusual punishment.

21          **3.    Human experimentation**

22      Arizona's most recent execution occurred on July 23, 2014. Arizona
23  executed Joseph Wood using experimental drugs; it took nearly two hours for Mr.
24  Wood to die. *See Glossip v. Gross*, 135 S. Ct. 2726, 2783 (2015) (Sotomayor, J.,
25  dissenting) ("Despite being administered 750 milligrams of midazolam, Wood
26  had continued breathing and moving for nearly two hours . . . ."). The concoction
27  to be used—50 milligrams of hydromorphone and 50 milligrams of midazolam—
28  had never been used by Arizona and the combination (albeit in different amounts)

1   had been used *with problems* in January 2014 in Ohio. *See* Lawrence Hummer, *I*
2   *Witnessed Ohio's Execution of Dennis McGuire. What I Saw Was Inhumane*, The
3   Guardian, (Jan. 22, 2014), https://www.theguardian.com/commentisfree/2014/
4   jan/22/ohio-mcguire-execution-untested-lethal-injection-inhumane   (last   visited
5   Mar. 3, 2017). Arizona had no scientific or medical basis for its formula.

6       Mr. Wood's execution began at 1:52 p.m. Mr. Wood lay on the gurney
7   gasping for breath for over an hour. Around 3:00 p.m., one of his attorneys
8   contacted the district court and filed an emergency motion; the court held a
9   hearing while the execution was occurring. *See Wood v. Ryan*, No. 2:14-cv-
10  01447-NVW, Mot. for Emergency Stay of Execution, ECF No. 26 (D. Ariz. July
11  23, 2014); *Wood*, No. 2:14-cv-01447-NVW, Minute Entry, ECF No. 33 (D. Ariz.
12  July 23, 2014); *Wood*, No. 2:14-cv-01447-NVW, Order, ECF No. 34 (D. Ariz.
13  July 24, 2014).

14      During the emergency hearing, at 3:25 p.m., the attorney for the State
15  represented that Mr. Wood was given a "second dose of drugs." *Wood*, No. 2:14-
16  cv-01447-NVW, Tr. July 23, 2014, at 7:22. Mr. Wood was still alive, but died
17  during the hearing at 3:49 p.m. The State later revealed that Mr. Wood was given
18  fifteen doses of the drugs—and it had already administered *twelve* doses at the
19  time the State's attorney told the court that two doses had been given.
20  *See* Michael Kiefer, *Arizona inmate injected 15 times, records show*, The Arizona
21  Republic, (Aug. 21, 2014), http://www.azcentral.com/story/news/local/Arizona/
22  2014/08/01/arizona-botched-execution-report-injections/13492511   (last   visited
23  Mar. 3, 2017).[19]

24      The use of fifteen doses of the drug formula was *not* in the written
25  protocol, but the Director claimed that there was nothing wrong with the
26

---

27  [19]Documentation of Mr. Wood's execution is available here: http://archive.
28  azcentral.com/ic/pdf/wood-execution-documentation.pdf (last visited Mar. 3, 2017).

execution. In fact, in an ADC press release, the Department indicated that the administration of 750 milligrams of drugs was "permitted" under the protocol. *See* ADC Press Release, Independent Review Process for Wood Execution Underway, (Aug. 1, 2014), https://corrections.az.gov/article/independent-review-process-wood-execution-underway (last visited Mar. 3, 2017). Mr. Wood's execution resulted in human experimentation and failed to comply not only with ADC's written protocol but also with the Eighth Amendment.

### B.    Lethal injection as carried out by Arizona is cruel and unusual

As demonstrated above, the State of Arizona cannot carry out lethal injection in a manner that comports with the Constitution. As Circuit Judge Kozinski noted regarding lethal injection, "Whatever the hopes and reasons for the switch to drugs [from prior methods], they proved to be misguided. Subverting medicines meant to heal the human body to the opposite purpose was an enterprise doomed to failure." *Wood*, 759 F.3d at 1102 (Kozinski, J., dissenting). "The [lethal-injection] enterprise is flawed. Using drugs meant for individuals with medical needs to carry out executions is a misguided effort to mask the brutality of executions by making them look serene and peaceful—like something any one of us might experience in our final moments." *Id.* at 1102-03. But, as Judge Kozinski explained, executions are brutal, and "[i]f we as a society want to carry out executions, we should be willing to face the fact that the state is committing a horrendous brutality on our behalf." *Id.* at 1103.

In 2017, in Arizona, we have reached the point that lethal injection cannot be carried out in a manner consistent with principles of dignity, that does not impose a lingering death, and that avoids pain and suffering. For these reasons, lethal injection is unconstitutional, and Andriano's sentence of death should be vacated.

1

**CLAIM THIRTY-THREE**

2

3

4

**Arizona's capital-sentencing scheme violates the Eighth and Fourteenth Amendments because it requires a death sentence whenever one aggravating circumstance and no mitigating circumstances are found with respect to an eligible defendant.**

5    Andriano raised this claim on direct appeal. (DA 57 at 132.) The Arizona

6   Supreme Court did not address the claim on the merits, but only presented

7   verbatim the issue in its appendix. *Andriano*, 161 P.3d at 556. Because this claim

8   has not been adjudicated by the Arizona state courts on the merits, the limitations

9   on relief imposed by 28 U.S.C. § 2254(d) do not apply to this Court's review of

10   the claim. To the extent the court finds that any aspects of this claim were not

11   exhausted, that failure is attributable to the ineffective assistance of Andriano's

12   appellate counsel. *See Strickland*, 466 U.S. at 688; *Evitts*, 469 U.S. at 397;

13   *Martinez*, 132 S. Ct. at 1315; *Nguyen*, 736 F.3d at 1293-94.

14    Because death is the ultimate penalty, unlike any other, the sentencer must

15   provide an "individualized determination on the basis of the character of the

16   individual and the circumstances of the crime." *Zant v. Stephens*, 462 U.S. 862,

17   879 (1983); *see also Woodson*, 428 U.S. at 303 (plurality opinion)

18   (acknowledging that death is a punishment different from all other sanctions).

19   Under Arizona law, the trier of fact is required to impose a death sentence

20   whenever it "finds one or more of the aggravating circumstances . . . and then

21   determines that there are no mitigating circumstances sufficiently substantial to

22   call for leniency." Ariz. Rev. Stat. § 13-703(E) (current version at § 13-751(E)).

23   Arizona's statute effectively places a "'thumb [on] death's side of the scale,' thus

24   'creat[ing] the risk [of] treat[ing] the defendant as more deserving of the death

25   penalty.'" *Sochor v. Florida*, 504 U.S. 527, 532 (1992) (citations omitted;

26   alterations in original). In Arizona, a death sentence is the default sentence once at

27   least aggravating circumstance has been proven.

28    What is more, mitigating evidence is not considered because of the use of a

screening mechanism designed to prevent the sentencer from considering such evidence. *See, e.g.*, *State v. Ramirez*, 871 P.2d 237, 252-53 (Ariz. 1994) (requiring the defendant to prove mitigating evidence by a preponderance of the evidence before the sentencer must "accept" the evidence as mitigating). In Andriano's case, the jury was instructed consistently with this screening mechanism that the defendant must "prove the existence of mitigating circumstances by a preponderance of the evidence." (Tr. Dec. 16, 2004 at 44.) As a result, a sentencer is not free to consider any circumstance for a sentence less than death if it was not proven by the defendant by a preponderance of the evidence.

The use of such a screening mechanism, coupled with the statute where the default sentence is death, deprives the sentencer of discretion to impose a sentence other than death, in violation of the Eighth and Fourteenth Amendments. *See Woodson*, 428 U.S. at 302-03. Andriano's sentence is therefore constitutionally infirm, and she is entitled to relief.

## CLAIM THIRTY-FOUR

**Andriano will be denied a fair clemency process in violation of the Eighth and Fourteenth Amendments.**

Andriano has not yet presented this claim to the Arizona courts because her opportunity to seek executive clemency has not yet become ripe. Andriano presents this claim now in order to avoid difficulties with raising this claim in future federal habeas proceedings. *See Stewart v. Martinez-Villareal*, 523 U.S. 637, 643-46 (1998). Under Arizona law, Andriano has a right to seek executive clemency before execution. *See* Ariz. Const. art. V, § 5; Ariz. Rev. Stat. § 31-401 *et seq.* This should be part of the constitutional scheme that ensures the reliability of criminal convictions and the propriety of sentences. *See Herrera v. Collins*, 506 U.S. 390, 415 (1993). Accordingly, Andriano has a due process liberty interest in the impartiality of the system by which clemency may be afforded to her. *See generally Mathews v. Eldridge*, 424 U.S. 319 (1976).

Andriano's clemency proceedings will not be impartial. On information and belief, Andriano asserts that both the selection process for members of Arizona's Board of Executive Clemency ("the Board") and the conflicting roles of the State will work to deprive her of a fair clemency proceeding. Without judicial review of the bias inherent in Arizona's clemency process, Andriano will never have an opportunity to vindicate her right to a fair and impartial clemency process.

The Board consists of five members appointed by the Governor with input from the Director of the Department of Corrections, the Director of Public Safety, and three other individuals of his choosing. *See* Ariz. Rev. Stat. § 31-401(A). The Governor may remove members of the Board for cause. *See id*. § 31-401(E). On information and belief, Andriano asserts that the Attorney General's Office, the office that advocated for her death in state appellate and post-conviction proceedings and is currently advocating for her death before this Court, is responsible for training the members of the Board regarding their duties. On information and belief, Andriano asserts that she will neither have notice of the time and place of the hearing, the evidence the Governor will use when he decides whether to grant or deny clemency, or an opportunity to present evidence to him in favor of granting clemency. For all these reasons, Arizona's clemency procedures do not comport with the procedural due process protections guaranteed to her by the Fourteenth Amendment. Andriano is entitled to habeas corpus relief.

## CLAIM THIRTY-FIVE

**Arizona's jury selection process violates the Sixth, Eighth, and Fourteenth Amendments.**

Andriano did not present this claim to the state court as a result of appellate and post-conviction counsel's deficient performance. The deficient performance of state appellate and post-conviction counsel prejudiced Andriano and provides cause to excuse any procedural default. *See Strickland*, 466 U.S. at 687; *Evitts*, 469 U.S. at 396-97; *Martinez*, 132 S. Ct. at 1315; *Nguyen*, 736 F.3d at 1293.

Andriano will demonstrate at an evidentiary hearing that both her appellate and post-conviction counsel were ineffective and that both counsel fell below the standards of a minimally competent capital attorney when they failed to raise this meritorious claim.

Arizona's jury selection process, which includes death-qualification of jurors, produced a jury prone to convict and inclined to reach a premature decision that death should be imposed. Accordingly, the jury selection in this case violated Andriano's Sixth, Eighth, and Fourteenth Amendment rights.

## A.    Legal standards

Capital jurors have the responsibility of pronouncing both guilt and sentence. Death qualification then is a part of voir dire unique to capital cases. Prospective jurors are questioned about their capital punishment views and are struck for cause if their attitudes toward the death penalty would render them unable to be fair and impartial in deciding punishment. *See* Brook M. Butler & Gary Moran, *The Role of Death Qualification in Venirepersons' Evaluations of Aggravating and Mitigating Circumstances in Capital Trials*, 2 J. Law & Human Behav. 26, 176 (Apr. 2002).

### 1.    Disqualification of jurors based on anti-death penalty views is restricted.

Jury selection in capital cases has long been distinguished by this peculiar feature: each potential juror's eligibility to serve in such cases is conditioned on his or her ability to participate in the morally and religiously controversial practice of capital punishment. The Supreme Court, as well as lower courts around the country, have spent the last forty years tinkering with how to ensure individualized sentencing for the capital accused while limiting the potential for arbitrariness to infect the sentencing decision. The Supreme Court first grappled with this problem in *Witherspoon v. Illinois*, 391 U.S. 510, 520, n.16 (1968), a case decided just as opposition to the death penalty appeared to have gained

plurality support in the United States. In *Witherspoon*, the Court squarely addressed the implications of diminishing public support for capital punishment:

> A jury that must choose between life imprisonment and capital punishment can do little more—and must do nothing less—than express the conscience of the community on the ultimate question of life or death. Yet, in a nation less than half of whose people believe in the death penalty, a jury composed exclusively of such people cannot speak for the community. Culled of all who harbor doubts about the wisdom of capital punishment—of all who would be reluctant to pronounce the extreme penalty—such a jury can speak only for a distinct and dwindling minority.

391 U.S. at 519-20 (footnotes omitted).

*Witherspoon* resolved this conundrum by holding that the exclusion of prospective jurors from service solely because they held reservations or scruples regarding capital punishment violated capital defendants' due process right not to be placed on trial before a "tribunal organized to return a verdict of death." *Id.* at 521. Although *Wainwright v. Witt*, 469 U.S. 412 (1985), would later modify *Witherspoon*'s subsidiary holding that cause challenges could be granted only where jurors made it "unmistakably clear" that "they would *automatically* vote against the imposition of capital punishment without regard to any evidence that might be developed at the trial of the case before them," *id.* at 522 n.21 (emphasis added), *Witherspoon*'s basic principle remains good law today:

> [A] sentence of death cannot be carried out if the jury that imposed or recommended it was chosen by excluding veniremen for cause simply because they voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction. No defendant can constitutionally be put to death at the hands of a tribunal so selected.

*Id.* at 522-23. The Supreme Court has repeatedly held that when even a single juror has been excluded in violation of this rule, harmless error review is inapplicable, and the death penalty must be vacated. *Davis v. Georgia*, 429 U.S. 122 (1976) (per curiam); *Gray v. Mississippi*, 481 U.S. 648 (1987).

In *Wainwright v. Witt*, the Court reformulated *Witherspoon*'s constitutional

rule to forbid courts from disqualifying any juror on the basis of opposition to the death penalty unless that opposition was so categorical that it "would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." *Wainwright*, 469 U.S. at 420; *see also United States v. Chanthadara*, 230 F.3d 1237, 1268-72 (10th Cir. 2000) (reversing, on *Witherspoon* grounds, a sentence of death imposed pursuant to the Federal Death Penalty Act). And since *Wainwright*, the Court has consistently held that even strong opposition to capital punishment does not necessarily disqualify a prospective juror from serving on a capital case.

> It is important to remember that not all who oppose the death penalty are subject to removal for cause in capital cases; those who firmly believe that the death penalty is unjust may nevertheless serve as jurors in capital cases so long as they state clearly that they are willing to temporarily set aside their own beliefs in deference to the rule of law.

*Lockhart v. McCree*, 476 U.S. 162, 176 (1986). Reaffirming this principle in *Uttecht v. Brown*, 551 U.S. 1 (2007), the Court summarized its forty years of precedents as establishing "at least four principles of relevance here."

> First, a criminal defendant has the right to an impartial jury drawn from a venire that has not been tilted in favor of capital punishment by selective prosecutorial challenges for cause. Second, the State has a strong interest in having jurors who are able to apply capital punishment within the framework state law prescribes. Third, to balance these interests, a juror who is substantially impaired in his or her ability to impose the death penalty under the state-law framework can be excused for cause; but if the juror is not substantially impaired, removal for cause is impermissible. Fourth, in determining whether the removal of a potential juror would vindicate the State's interest without violating the defendant's right, the trial court makes a judgment based in part on the demeanor of the juror, a judgment owed deference by reviewing courts.

*Id.* at 9 (internal citations omitted). And restating the thirty-eight-year-old *Witherspoon* rule, the Court concluded, "Capital defendants have the right to be sentenced by an impartial jury. The State may not infringe this right by

eliminating from the venire those whose scruples against the death penalty would not substantially impair the performance of their duties." *Id.* at 22.

### 2. Jurors whose ability to consider mitigation or vote against the death penalty is substantially impaired must be disqualified.

At the other end of the spectrum, the difficulty of reliably identifying "substantial impairments" in prospective jurors' ability to vote for a life sentence is even more daunting. In *Morgan v. Illinois*, 504 U.S. 719 (1992), the Supreme Court held that any juror who would automatically impose the death penalty upon conviction of the capital offense charged must be disqualified for cause, and that capital defendants are constitutionally entitled to examine prospective jurors on voir dire with enough specificity to identify and challenge any juror holding such views. Certainly, there are easy cases: "eye-for-an-eye" jurors who simply declare that they would automatically impose the death penalty in every murder case, without regard to any mitigating evidence that might be adduced. But such jurors are but a small subset of the much larger group whose attitudes in favor of capital punishment would "substantially impair the performance of [their] duties as . . . juror[s] in accordance with [their] instructions and [their] oath." *Uttecht*, 551 U.S. at 7 (quoting *Witt*, 469 U.S. at 424 (internal quotation marks omitted)). This is so because life-qualification under *Morgan* requires that each juror have the capacity to weigh mitigating factors and to consider a sentence other than death *in the case to be tried*. *Morgan*, 504 U.S. at 725. And that is where much potential for confusion lies.

The Supreme Court has long held that a mandatory death penalty scheme—one mandating a death sentence without allowing for consideration of any reasons why death should not be imposed—violates the Eighth Amendment no matter how egregious or narrowly-defined the capital crime. *Sumner v. Shuman*, 483 U.S. 66 (1987) (invalidating mandatory death-sentencing statute applicable only to prison inmates who commit murder while serving life sentences). Even in the

1    most highly aggravated murder cases, then, every constitutional death-sentencing

2    scheme—including Arizona's—requires each juror to weigh all relevant

3    mitigating factors, and to fairly consider imposition of a sentence less than death.

4    **B.    Argument**

5        Death qualification—"the exclusion for cause, in capital cases, of jurors

6    opposed to capital punishment," *Wainwright*, 469 U.S. at 439 (Brennan, J.,

7    dissenting)—violates the Sixth and Fourteenth Amendments for two reasons.

8    First, it produces a biased jury. Second, by excluding a segment of the population,

9    death qualification violates the fair cross-section requirement of the Sixth

10   Amendment.

11       As discussed in Claim 10, *supra*, the death-qualification process in

12   Andriano's case was particularly problematic because the trial court improperly

13   limited trial counsel's ability to voir dire the prospective jurors and aggressively

14   rehabilitated death-biased jurors. (*See, e.g.,* Tr. Aug. 30, 2004 at 92, 105; Tr. Aug.

15   31, 2004 at 52.) Accordingly, the prosecution was able to ensure that every juror

16   in the case would have no problem sentencing someone to death. This was death

17   qualification of the jury to an extraordinary degree.

18       Death qualification produces juries that are both partial to the prosecution

19   and prone to convict. "Death-qualification works to the advantage of only the

20   prosecutor; if not carefully controlled, it is [a] tool with which the prosecutor can

21   create a jury perhaps predisposed to convict and certainly predisposed to impose

22   the ultimate sanction." *Wainwright*, 469 U.S. at 460 & n.11 (footnote omitted)

23   (citing research on the effects of death qualification on jury decision-making and

24   noting that "numerous studies have all but confirmed that death-qualified juries

25   are conviction-prone").

26       Moreover, social science research has established that even the process of

27   death qualification has a prejudicial effect on the jurors who end up serving on the

28   jury. *See, e.g.*, Craig Haney, *On the Selection of Capital Juries: The Biasing*

*Effects of the Death-Qualification Process*, 8 Law & Hum. Behav. 121 (1984). "Death qualification may bias capital juries not only because it alters the composition of the group 'qualified' to sit, but also because it exposes them to an unusual and suggestive legal process." *Id.* The "expectations and preconceptions" created for the jurors through the death-qualification process lead the jurors to digest and organize the evidence at trial in a way consistent with expectations produced by death qualification, to the detriment of the defendant. *Id.* at 122. Haney's study confirmed this:

> Exposure to death qualification increased subjects' belief in the guilt of the defendant and their estimate that he would be convicted. It also increased their estimate of the prosecutor, defense attorney, and judge's belief in the guilt of the defendant. The death qualification process led subjects to perceive both prosecutor and judge as more strongly in favor of the death penalty, and to believe that the law disapproves of people who oppose the death penalty. And it led jurors to choose the death penalty as an appropriate punishment much more frequently than persons not exposed to it. Thus, persons who had been exposed to death qualification not only differed from non-death-qualified subjects, but they differed in ways that were consistently prejudicial to the interests and rights of the defendants.

*Id.* at 128-29. Put another way, "[c]apital voir dire is the only voir dire that requires the penalty to be discussed before it is relevant." Brooke M. Butler & Gary Moran, *The Role of Death Qualification in Venirepersons' Evaluations of Aggravating and Mitigating Circumstances in Capital Trials*, 2 J. L. & Human Behav. 26, 176 (Apr. 2002). Thus, the presumption of innocence is muddled by discussion of post-conviction events. *Id.*

A defendant has the right to an unbiased and impartial jury. *Morgan v. Illinois*, 504 U.S. 719, 726-27 (1992) (identifying an impartial tribunal as a fundamental requirement of due process); *see also Groppi v. Wisconsin*, 400 U.S. 505, 509 (1971). The "'presence of a biased juror cannot be harmless; the error requires a new trial without a showing of actual prejudice.'" *United States v. Gonzalez*, 214 F.3d 1109, 1111 (9th Cir. 2000) (quoting *Dyer v. Calderon*, 151

F.3d 970, 973 n.2 (9th Cir. 1998)). Apart from generating a biased jury, death qualification violates the defendant's right to a jury pool that represents a fair cross-section of the community. A defendant in a capital case has a constitutional right to a jury that represents a fair cross-section of the community; a jury unlikely to reflect such community views violates the Sixth Amendment. *See Taylor v. Louisiana*, 419 U.S. 522, 537 (1975). However, the process of death qualification permits the broad exclusion of jurors, even though some may possess the ability to judge impartially, regardless of their beliefs about the death penalty. With the exclusion of a broad segment of the community, the right to a fair cross-section is lost.

While protecting against excluding impartial jurors who nonetheless may have strong views against the death penalty, the court must also protect against jurors whose ability to consider mitigation or a life verdict was impaired. In this case, the prosecutor moved the court to restrict the defense's ability to ask the jury about specific aggravating or mitigating circumstances, even as it was prepared to ask questions about the specific facts of the case. (ROA 3 at 152; *see also* Tr. Aug. 30, 2004 at 169-73.) The trial court granted that request. (Tr. July 30, 2004 at 4-5.) As a result of the limits placed on the defense, the voir dire of the jury was general and abstract and lacked specific information about the mitigation in this case to ferret out the jurors' potential biases.

Abstract and general voir dire questions risk eliciting answers that obscure disqualifying bias rather than exposing it. In a thorough discussion of the propriety of "case-specific" voir dire questions as part of the death- and life-qualification process in capital cases, *United States v. Johnson*, 366 F. Supp. 2d 822 (N.D. Iowa 2005), Judge Mark Bennett wrote:

> [T]his court's own experience with jury selection in the . . . federal death-penalty case against Dustin Honken, *United States v. Honken*, No. CR 01–3047–MWB (N.D. Iowa) . . . suggests the insufficiency of purely "abstract" questions to determine the ability of jurors to perform

their duties. In Honken, there were numerous examples of the phenomenon of jurors who agreed that they could "fairly consider" both life and death sentences in the abstract, but quickly acknowledged that they could only consider one penalty in a case involving certain facts. For example, in Honken, several potential jurors readily agreed that they could "fairly consider" both life and death sentences in the case if they found the defendant guilty. However, several of those same potential jurors stated that they were either doubtful that they could consider, or stated expressly that they could not consider, a life sentence if they found the defendant guilty of the murder of children. These responses highlight the ineffectiveness of purely ''abstract'' questions to probe, in these cases, whether or not a juror would be able to fulfill his or her duty to give fair consideration to both life and death sentences no matter what the facts are.

*Id.* at 847-48 (citing *Morgan*, 504 U.S. at 728); s*ee also United States v. Fell*, 372 F. Supp. 2d 766, 768 (D. Vt. 2005) (explaining why *Morgan* requires questioning concerning jurors' ability to consider both life and death as possible punishments in the context of the actual case before them).

The findings of the Capital Jury Project ("CJP") show that the type of juror misunderstanding that surfaced in *Johnson* is not rare but pervasive, and that it often goes undetected. The CJP is a federally funded research project involving in-depth interviews with hundreds of jurors who actually served on capital juries. *See generally* Valerie P. Hans, *How Juries Decide Death: The Contributions of the Capital Jury Project*, 70 Ind. L. J. 1233 (1995). CJP interviews with capital-case jurors in eleven states revealed that very large numbers of such jurors had been found qualified to serve—and actually rendered life-or-death decisions—despite views which should have caused their disqualification under *Morgan*. William J. Bowers, Marla Sandys & Benjamin Steiner, *Foreclosed Impartiality in Capital Sentencing: Jurors' Predispositions, Attitudes and Premature Decision-Making*, 83 Cornell L. Rev. 1476, 1504 (1998). For example, 912 former capital trial jurors were asked whether the death penalty was "the only acceptable punishment" for seven types of murder, as well as two other serious

1   violent crimes.

> Astonishingly, more than half of the jurors said that they believed that death was the only acceptable punishment for three of the seven kinds of murder: repeat murder, premeditated murder, and multiple murder. Nearly half of the jurors identified death as the only acceptable punishment for the killing of either a police officer or prison guard or for a murder by a drug dealer. Almost a quarter of the jurors said that death was the only acceptable punishment for three of the remaining four crimes—including rape without murder, for which the imposition of the death penalty would be un-constitutional. Only for a planned murder in which the victim survives did decidedly fewer than one in four jurors (15.7%) say that death was the only acceptable punishment.

*Id.* at 1504-05 (footnotes omitted).

It is also worth noting that these large numbers of jurors who believed only death to be an acceptable punishment were not "balanced out" by jurors at the other end of the spectrum—that is, by jurors who were allowed to serve despite believing that *life imprisonment* was the only acceptable punishment. Rather, the CJP researchers found that the number of jurors who held such hard-and-fast pro-life views was small—between 2.2% and 7.6% for each of the seven categories of murders. *Id.* at 1505. This indicates that the capital jury selection process has been much more effective at identifying and removing jurors who are biased in favor of life than at identifying jurors with disqualifying pro-death biases under *Morgan*. It is sobering, to say the least, that so many capital trial jurors entertained disqualifying beliefs in favor of the death penalty despite having undergone voir dire examination, and after having sat through entire trials, jury instructions, and sentencing deliberations. Even more disturbing is that these undetected biases have been shown to line up with the actual sentencing rationales offered by many jurors. In a follow-up analysis of interviews with 240 jurors in six states who had actually imposed death sentences, more than forty percent told CJP researchers that they regarded the death penalty in the cases on which they served to be *required by law* once the prosecution had proved one or another

1   aggravating factor. Ursula Bentele & William J. Bowers, *How Jurors Decide On*
2   *Death: Guilt Is Overwhelming; Aggravation Requires Death; And Mitigation Is*
3   *No Excuse*, 66 Brook. L. Rev. 1011, 1071-1073 (2001). Such evidence—and the
4   CJP findings have been replicated in state after state—underscores the necessity
5   for probing voir dire examination to ensure that no juror is seated despite a
6   categorical belief that only one of the two statutorily authorized punishments is
7   ever acceptable for the crimes charged in this case.

8          Finally, as the level of opposition to the death penalty increases, death
9   qualification results in a process where the jury no longer reflects the values of a
10  community in which it is tried. Because the jury in a death penalty sentencing trial
11  has a unique role in the criminal justice system, it is critical that its composition
12  "mirror the community and reflect the various distinctive groups in the
13  population." *Lockhart v. McCree*, 476 U.S. 162, 173 (internal citation omitted).
14  Thus, death qualification disqualifies a growing percentage of the community and
15  breaks the link between community values and the jury in a criminal case. The
16  Supreme Court has recognized that the "evolving standards of decency that mark
17  the progress of a maturing society" play a critical role in capital punishment. *Trop*
18  *v. Dulles*, 356 U.S. 86, 101 (1958). Exclusion of a large segment of the
19  community prevents this cornerstone of Eighth Amendment jurisprudence to play
20  a role in the jury that decides a capital defendant's fate.

21         Because Andriano's capital jury was selected using death qualification, her
22  convictions and sentences are unconstitutional under the Sixth, Eighth, and
23  Fourteenth Amendments, and she is entitled to relief.

24
25
26
27
28

**CLAIM THIRTY-SIX**

**It would violate Andriano's right to be free from cruel and unusual punishment for the State of Arizona to execute her after she has spent over twelve years on its death row.**

Andriano did not present this claim to the state courts as a result of appellate and post-conviction counsel's deficient performance. The deficient performance of state appellate counsel and post-conviction counsel prejudiced Andriano and provides cause to excuse any procedural default. *See Martinez v. Ryan*, 132 S. Ct. 1309, 1315 (2012); *Murray v. Carrier*, 477 U.S. 478, 488-89 (1986); *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984). Alternatively, there was an absence of available state corrective process or circumstances exist that rendered the process ineffective, thereby excusing the failure to exhaust. *See* 28 U.S.C. § 2254(b)(1)(B). Therefore, the Court will be able to consider the merits of this claim. Moreover, because the claim has not been adjudicated by the Arizona state courts, the limitations on relief imposed by 28 U.S.C. § 2254(d) do not apply to this Court's review, and the Court may consider the claim de novo. Andriano will demonstrate at an evidentiary hearing that appellate and post-conviction counsel fell below the standards of minimally competent capital attorneys and that those failures prejudiced her.

"By protecting even those convicted of heinous crimes, the Eighth Amendment reaffirms the duty of the government to respect the dignity of all persons." *Roper v. Simmons*, 543 U.S. 551, 560 (2005). It therefore forbids punishments that are excessive. *See id.* Andriano entered death row in December 2004. Executing Andriano after she has served over a decade under a death sentence would violate Andriano's Eighth and Fourteenth Amendment rights.

First, if Andriano is executed, she will be punished "both by death and also by more than a generation spent in death row's twilight." *Foster v. Florida*, 537 U.S. 990, 993 (2002) (Breyer, J., dissenting from denial of certiorari). Andriano's time on death row itself has been a severe punishment, making the additional

punishment of execution excessive. *See Davis v. Ayala*, 135 S. Ct. 2187, 2209 (2015) (Kennedy, J., concurring) (discussing years in solitary confinement as an "added punishment"); *Hutto v. Finney*, 437 U.S. 678, 685 (1978) ("Confinement in a prison or in an isolation cell is a form of punishment subject to scrutiny under Eighth Amendment standards."); *Williams v. Sec'y Pa. Dep't of Corr,* No. 14-1469, 2017 WL 526483, at *8-*9, *11-*13 (3d Cir. Feb. 9, 2017) (discussing the harsh conditions of death row, its deprivations compared to those of general population, and studies of the severe psychological consequences of solitary confinement). The United States Supreme Court in 1890 recognized time spent in solitary confinement awaiting execution as "an additional punishment of the most important and painful character," *In re Medley*, 134 U.S. 160, 171 (1890), and "research still confirms what [the] Court suggested over a century ago: Years on end of near-total isolation exact a terrible price." *Davis*, 135 S. Ct. at 2210 (Kennedy, J., concurring). Accordingly, the American Bar Association and the United Nations Special Rapporteur on Torture have recommended limitations on the use of solitary confinement. *See Glossip v. Gross*, 135 S. Ct. 2726, 2765 (2015) (Breyer, J., dissenting). Indeed, foreign courts have found that extended delay in the imposition of a death sentence "renders ultimate execution inhuman, degrading, or unusually cruel." *Knight v. Florida*, 528 U.S. 990, 995 (1999) (Breyer, J., dissenting from denial of certiorari); *see also Foster*, 537 U.S. at 992-93 (Breyer, J., dissenting from denial of certiorari).

The severity of the physical conditions of death row is not the only punishment Andriano has faced, for "[t]he dehumanizing effect of solitary confinement is aggravated by uncertainty as to whether a death sentence will in fact be carried out." *Glossip*, 135 S. Ct. at 2765 (Breyer, J., dissenting). The United States Supreme Court has recognized the toll that waiting for execution can take on a prisoner, writing over a century ago—of a delay of just four weeks—that "when a prisoner sentenced by a court to death is confined in the

1    penitentiary awaiting the execution of the sentence, one of the most horrible
2    feelings to which he can be subjected during that time is the uncertainty during the
3    whole of it." *Medley*, 134 U.S. at 172; *see also Valle v. Florida*, 564 U.S. 1067,
4    1067 (2011) (Breyer, J., dissenting from denial of stay); *Knight*, 528 U.S. at 994-
5    95 (Breyer, J., dissenting from denial of certiorari); *Furman v. Georgia*, 408 U.S.
6    238, 288-89 (1972) (Brennan, J., concurring). Andriano has been severely
7    punished through her imprisonment, and exacting the additional punishment of an
8    execution would be excessive.

9         Executing Andriano after her lengthy imprisonment also would be
10   unconstitutional because no penological justification would support the
11   punishment. The Supreme Court has recognized deterrence and retribution as the
12   justifications for the death penalty. *See Enmund v. Florida*, 458 U.S. 782, 798
13   (1982); *Gregg*, 428 U.S. at 183 (joint opinion of Stewart, Powell, and Stevens,
14   JJ.). But when these aims can no longer be advanced, an execution "is nothing
15   more than the purposeless and needless imposition of pain and suffering and
16   hence an unconstitutional punishment." *Atkins v. Virginia*, 536 U.S. 304, 319
17   (2002) (internal quotation marks and citation omitted); *see also Furman*, 408 U.S.
18   at 279-80 (Brennan, J., concurring). Executing Andriano would provide little, if
19   any, deterrent effect that is not achieved by a lifetime of imprisonment.
20   *See, e.g.*, *Valle*, 564 U.S. at 1068 (Breyer, J., dissenting from denial of stay) ("It is
21   difficult to imagine how an execution following so long a period of incarceration
22   could add significantly to that punishment's deterrent value."); *Coleman v.*
23   *Balkcom*, 451 U.S. 949, 952 (1981) (Stevens, J., concurring in denial of certiorari)
24   ("[T]he deterrent value of incarceration during that period of uncertainty
25   [confined under a death sentence] may well be comparable to the consequences of
26   the ultimate step itself."); *Lackey v. Texas*, 514 U.S. 1045, 1046 (Stevens, J.,
27   memorandum respecting denial of certiorari). Studies on the question of the death
28   penalty's deterrent value are contradictory and inconclusive, and therefore

insufficient to justify Andriano's execution. *See Glossip*, 135 S. Ct. at 2767-68 (Breyer, J., dissenting) (comparing sources); *Baze v. Rees*, 553 U.S. 35, 79 (2008) (Stevens, J., concurring); *Ring v. Arizona*, 536 U.S. 584, 614-15 (2002) (Breyer, J., concurring). Nor would retribution be a sufficient justification for Andriano's execution. *See Glossip*, 135 S. Ct. at 2769 (Breyer, J., dissenting); *Coleman*, 451 U.S. at 960 (Rehnquist, J., dissenting from denial of certiorari) ("There can be little doubt that delay in the enforcement of capital punishment frustrates the purpose of retribution."). Because neither penological justification for the death penalty has much, if any, force after an excessive period of confinement under a death sentence, such an execution would be gratuitous.

Execution under the circumstances of Andriano's case would be cruel and unusual in violation of the Eighth and Fourteenth Amendments. She is therefore entitled to relief.

## PRAYER FOR RELIEF

WHEREFORE, Andriano respectfully prays this Court to:

1.     Order that Andriano be granted leave to conduct discovery pursuant to Rule 6 of the Rules Governing § 2254 Cases and permit Andriano to utilize the processes of discovery set forth in Federal Rules of Civil Procedure 26-37, to the extent necessary to fully develop and identify the facts supporting her petition, and any defenses thereto raised by Respondents' Answer;

2.     Order that upon completion of discovery, Andriano be granted leave to amend her petition to include any additional claims or allegations not presently known to her or her counsel, which are identified or uncovered in the course of discovery and that Andriano be granted to leave to expand the record pursuant to Rule 7 of the Rules Governing § 2254 Cases to include additional materials related to the petition;

3.     Grant an evidentiary hearing pursuant to Rule 8 of the Rules Governing § 2254 Cases at which proof may be offered concerning the allegations of this

petition;

4.     Issue a writ of habeas corpus to have Andriano brought before it to the end that she may be discharged from her unconstitutional confinement and restraint;

5.     In the alternative to the relief requested in Paragraph 4, if this Court should deny the relief as requested in Paragraph 4, issue a writ of habeas corpus to have Andriano brought before it to the end that she may be relieved of her unconstitutional sentence;

6.     Grant such other relief as may be appropriate and dispose of the matter as law and justice require.

Respectfully submitted this 6th day of March, 2017

Jon M. Sands
Federal Public Defender
District of Arizona

Jennifer Y. Garcia
Emma L. Smith

s/ Jennifer Y. Garcia
Counsel for Petitioner

**CERTIFICATE OF SERVICE**

I hereby certify that on March 6, 2017, I electronically filed the foregoing Petition for Writ of Habeas Corpus with the Clerk's Office by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

s/ Robin Stoltze
Assistant Paralegal
Capital Habeas Unit