# TABLE OF CONTENTS (INTERACTIVE)

| | |
|---|---|
| A | Opening Brief |
| B | Answering Brief |
| C | Reply Brief |
| D | Notice of Post-Conviction Relief |
| E | Motion for 120 Day Briefing Schedule |
| F | M.E. 9-1-09 |
| G | Motion and Consent of Local Counsel.Arntsen |
| H | Motion and Consent of Local Counsel.Lynch |
| I | Motion and Consent of Local Counsel.Nickels |
| J | Notice of Appearance |
| K | Order 1-21-09 |
| L | Order.Arnsen 1-21-09 |
| M | Order.Lynch 1-21-09 |
| N | M.E. 10-26-09 |
| O | Order Lifting Stay 11-2-09 |
| P | M.E. 11-4-09 |
| Q | Motion to Allow Filing of Motions RE- Appointment |
| R | Motion for Extension of Time |
| S | Response to Motion to File Pleadings Ex Parte |
| T | M.E. Ruling 12-18-09 |
| U | Notice of Petitioner's Position RE - Future Motions |
| V | Motion for Appointment |
| W | Response to Motion for Appointment |
| X | Unopposed Motion for Extension |
| Y | Petitioner's Reply Brief RE _ Motion for Appointment |
| Z | Petitioner's Unopposed Motion for 60 Day Extension |

| AA | M.E. 1-27-10 |
|---|---|
| BB | Notice of Change of Firm and Substitution of Counsel |
| CC | Petitioner's Unopposed Motion for 30 Day Extension |
| DD | M.E. 3-4-10 |
| EE | M.E. 3-23-10 |
| FF | Motion to Reconsider Deadline |
| GG | M.E. Denying Motion for Reconsideration 5-10-10 |
| HH | Motion to Appoint Expert Witness |
| II | Order 5-28-10 |
| JJ | Response to Motion to Appoint Expert |
| KK | M.E. 5-28-10 |
| LL | Stipulation to Allow Confidential Contact Visits |
| MM | Order Allowing Contact Visits 7-19-10 |
| NN | M.E. 7-20-10 |
| OO | M.E. Hearing Set 8-23-10 |
| PP | Notice of Telephonic Appearance |
| QQ | M.Ed. 9-7-10 |
| RR | Stipulation to Allow Confidential Contact Visits |
| SS | Order Allowing Contact Visits 9-14-10 |
| TT | M.E. 9-14-10 |
| UU | Stipulation to Allow Confidential Contact Visits |
| VV | Order Allowing Contact Visits 11-1-10 |
| WW | Petitioner's Unopposed Motion to Appoint Expert |
| XX | M.E. 11-2-10 |
| YY | Stipulation to Allow Confidential Contact Visits |
| ZZ | Order Appointing Expert Witnesses |
| AAA | M.E. 11-15-10 |
| BBB | Order Allowing Contact Visits 11-18-10 |
| CCC | Stipulation to Allow Confidential Contact Visits |

| | |
|---|---|
| DDD | Order Allowing Contact Visits 12-2-10 |
| EEE | M.E. 12-6-10 |
| FFF | Stipulation to Modify Contact Visits |
| GGG | Motion for Issuance of Discovery Subpoenas |
| HHH | Notice of Telephonic Appearance |
| III | Order Authorizing Discovery Subpoenas |
| JJJ | Order Allowing Contact Visits 1-11-11 |
| KKK | M.E. 1-11-11 |
| LLL | Stipulation to Allow Contact Visits |
| MMM | Stipulation to Modify Contact Visits |
| NNN | Order Allowing Contact Visits 1-25-11 |
| OOO | Motion for Extension of Time |
| PPP | Stipulation to Modify Contact Visits |
| QQQ | Order Amending Contact 3-2-11 |
| RRR | M.E. Order Signed 3-3-11 |
| SSS | Stipulation to Allow Contact Visits |
| TTT | Stipulation to Modify Contact Visits |
| UUU | Order Allowing Contact Visits 3-23-11 |
| VVV | Order Amending Contact Visits 3-23-11 |
| WWW | Returned Mail |
| XXX | Stipulation to Modify Contact Visits |
| YYY | Order Amending Contact 4-22-11 |
| ZZZ | Motion for Extension of Time |
| AAAA | Motion for Issuance of Discovery Subpoena |
| BBBB | M.E. Status Conference 5-18-11 |
| CCCC | Response to Motion for Issuance of Discovery Subpoena |
| DDDD | Reply in Support of Motion for Issuance of Discovery Subpoena |
| EEEE | Order Authorizing Discovery Subpoena 6-6-11 |
| FFFF | M.E. 6-6-11 |

| GGGG | Stipulation to Allow Contact Visits |
|---|---|
| HHHH | Order Allowing Contact Visits |
| IIII | Motion for Court Order Prohibiting Juror Contact |
| JJJJ | Order to Seal 7-8-11 |
| KKKK | M.E. 7-7-11 |
| LLLL | Stipulation to Modify Contact Visits |
| MMMM | Stipulation to Allow Contact Visits |
| NNNN | Order Amending Contact Visits 8-4-11 |
| OOOO | Order Allowing Contact Visits 8-4-11 |
| PPPP | M.E. Order Signed 8-4-11 |
| QQQQ | Stipulation to Modify Contact Visits |
| RRRR | Unopposed Motion for Extension |
| SSSS | Order Extending Time to File 8-19-11 |
| TTTT | Order Amending Contact Visits 8-19-11 |
| UUUU | M.E. Order Signed 8-22-11 |
| VVVV | M.E. Motion for Extension 8-22-11 |
| WWWW | M.E. 8-24-11 |
| XXXX | Unopposed Motion for Extension |
| YYYY | Order Extending Time to File 9-29-11 |
| ZZZZ | M.E. Extending Time 9-30-11 |
| AAAAA | M.E. 10-26-11 |
| BBBBB | Motion for Extension of Page Limit |
| CCCCC | Petitioner's Motion to Allow Contact Visit |
| DDDDD | Unopposed Motion to File Petition Under Seal |
| EEEEE | Response to Motion to Exceed Page Limit |
| FFFFF | Response to Motion to File Petition Under Seal |
| GGGGG | Order Extending Page Limit 12-1-11 |
| HHHHH | M.E. 12-2-11 |

# EXHIBIT A

# IN THE SUPREME COURT
# STATE OF ARIZONA

| | |
|---|---|
| STATE OF ARIZONA, | No. CR-05-0005-AP |
|            Appellee, | |
| | Maricopa County Superior |
|    v. | Court No. CR-2000-096032 |
| WENDI ELIZABETH ANDRIANO, | |
|            Appellant. | |

## APPELLANT'S OPENING BRIEF

MARICOPA COUNTY PUBLIC DEFENDER

BRENT E. GRAHAM
State Bar Membership No. 011868

PEG GREEN
State Bar Membership No. 011222

Deputy Public Defenders
Attorneys for APPELLANT
11 West Jefferson, Suite 5
Phoenix, Arizona 85003
Telephone (602) 506-0924

## TABLE OF CONTENTS

**Page**

STATEMENT OF THE CASE ........................................................................ 1

STATEMENT OF FACTS ............................................................................ 7

ISSUES PRESENTED FOR REVIEW ........................................................ 30

ARGUMENT I ............................................................................................. 32

> **THE TRIAL COURT VIOLATED ANDRIANO'S RIGHT TO A FAIR TRIAL AND DUE PROCESS UNDER THE FIFTH, SIXTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND ARTICLE 2, §§ 4 AND 24 OF THE ARIZONA CONSTITUTION WHEN IT PERMITTED EVIDENCE OF ANDRIANO'S ATTEMPTS TO OBTAIN LIFE INSURANCE POLICIES AND EVIDENCE OF ANDRIANO'S EXTRAMARITAL ACTIVITIES AS INTRINSIC TO THE CHARGE OF PREMEDITATED MURDER.**

ARGUMENT II ............................................................................................. 49

> **THE TRIAL COURT COMMITTED FUNDAMENTAL ERROR BY FAILING TO INSTRUCT THE JURY ON THE LESSER-INCLUDED OFFENSES OF SECOND DEGREE MURDER AND MANSLAUGHTER WHERE EVIDENCE AT TRIAL SUBSTANTIATED THOSE LESSER-INCLUDED OFFENSES DENYING ANDRIANO A FAIR TRIAL AND DUE PROCESS UNDER THE SIXTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES**

CONSTITUTION AS WELL AS ARTICLE 2, §§ 4 AND 24 OF THE ARIZONA CONSTITUTION.

ARGUMENT III.................................................................54

THE CRUEL, HEINOUS, OR DEPRAVED AGGRAVATOR UNDER A.R.S. § 13-703(F)(6) IS FACIALLY VAGUE AND VAGUE AS APPLIED DENYING ANDRIANO A FAIR TRIAL, A FAIR SENTENCING, AND DUE PROCESS OF LAW UNDER THE SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AS WELL AS ARTICLE 2, §§ 4, 15, AND 24 OF THE ARIZONA CONSTITUTION.

ARGUMENT IV ...............................................................67

THE TRIAL COURT'S INSTRUCTION DEFINING CRUELTY UNDER A.R.S. § 13-703(F)(6) WAS INSUFFICIENT TO GUIDE THE JURY AND APPROPRIATELY CHANNEL THEIR DISCRETION IN VIOLATION OF THE SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AS WELL AS ARTICLE 2, §§ 4, 15, AND 24 OF THE ARIZONA CONSTITUTION.

ARGUMENT V .................................................................75

APPLICATION OF THE PROPER, NARROW CONSTRUCTION OF "ESPECIALLY CRUEL" DEMONSTRATES THAT THE EVIDENCE IS INSUFFICIENT TO SUPPORT THIS AGGRAVATING CIRCUMSTANCE.

**ARGUMENT VI** .................................................. 89

      THE TRIAL COURT'S REFUSAL TO PERMIT ANDRIANO TO PRESENT EVIDENCE OF RESIDUAL DOUBT DEPRIVED HER OF HER RIGHT TO DUE PROCESS, A FAIR TRIAL, AND A FAIR SENTENCING PROCEEDING UNDER THE SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AS WELL AS ARTICLE 2, §§ 4, 15 AND 24 OF THE ARIZONA CONSTITUTION.

**ARGUMENT VII** .................................................. 95

      THE TRIAL COURT'S REFUSAL TO PERMIT ANDRIANO TO PRESENT EVIDENCE OF MERCY DEPRIVED HER OF HER RIGHT TO DUE PROCESS, A FAIR TRIAL, AND A FAIR SENTENCING PROCEEDING UNDER THE SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AS WELL AS ARTICLE 2, §§ 4, 15 AND 24 OF THE ARIZONA CONSTITUTION.

**ARGUMENT VIII** .................................................. 98

      THE TRIAL COURT IMPROPERLY INSTRUCTED THE JURY IN THE PENALTY PHASE INSTRUCTIONS TO REQUIRE JURY UNANIMITY REGARDING THE EXISTENCE OF MITIGATING CIRCUMSTANCES. THE ERROR VIOLATED ANDRIANO'S RIGHT TO DUE PROCESS, A FAIR TRIAL, AND A FAIR SENTENCING PROCEEDING IN VIOLATION OF THE SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS TO THE UNITED STATES

CONSTITUTION AS WELL AS ARTICLE 2, §§ 8, 15 AND 24 OF THE ARIZONA CONSTITUTION.

ARGUMENT IX...................................................................... 105

THE TRIAL COURT IMPERMISSIBLY COERCED THE JURY WHEN IT GAVE AN IMPASSE INSTRUCTION DURING THE PENALTY PHASE WITHOUT KNOWING WHETHER THE JURY WAS DEADLOCKED.

ARGUMENT X ........................................................................ 115

THE TRIAL COURT INCORRECTLY INSTRUCTED THE JURY ABOUT ITS DUTY TO DELIBERATE DURING THE PENALTY PHASE. THE INSTRUCTION VIOLATED ANDRIANO'S DUE PROCESS, FAIR TRIAL AND EIGHTH AMENDMENT RIGHTS.

ARGUMENT XI....................................................................... 120

ARIZONA'S STATUTE PROVIDING FOR EXECUTION BY LETHAL INJECTION IS VAGUE BECAUSE IT FAILS TO SUFFICIENTLY SPECIFY THE MEANS TO BE USED TO ENSURE AN EXECUTION BY LETHAL INJECTION THAT IS NOT CRUEL AND UNUSUAL, THUS VIOLATING ANDRIANO'S DUE PROCESS AND EIGHTH AMENDMENT RIGHTS.

ARGUMENT XII ..................................................................... 129

ARIZONA'S DEATH PENALTY IS UNCONSTITUTIONAL.

CONCLUSION ........................................................................ 134

**CERTIFICATE OF RULE 31.13(b) COMPLIANCE**.....................................136

**CERTIFICATE OF SERVICE**.........................................................................137

**APPENDIX A**

**APPENDIX B**

# TABLE OF CITATIONS

**Page**

## UNITED STATES SUPREME COURT CASES

*Beck v. Alabama,*
    447 U.S. 625, 100 S.Ct. 2382 (1980)............................................................ 49

*Boyde v. California,*
    494 U.S. 370, 110 S.Ct. 1190 (1990)............................................................ 91

*Buchanan v. Angelone,*
    522 U.S. 269, 118 S.Ct. 757 (1998).............................................................. 93

*Caldwell v. Mississippi,*
    472 U.S. 320, 105 S.Ct. 2633 (1985).......................................................... 113

*California v. Brown,*
    479 U.S. 538, 107 S.Ct. 837 (1987).............................................................. 56

*Clemmons v. Mississippi,*
    497 U.S. 738, 110 S.Ct. 1441 (1990)............................................................ 75

*Eddings v. Oklahoma,*
    455 U.S. 104, 102 S.Ct. 869 (1982).............................................................. 89

*Estelle v. Gamble,*
    429 U.S. 97, 97 S.Ct. 285 (1976)................................................................ 125

*Franklin v. Lynaugh,*
    487 U.S. 164, 108 S.Ct. 2320 (1988)...................................................... 90, 91

*Godfrey v. Georgia,*
    446 U.S. 420, 100 S.Ct. 1759 (1980).................................................. 55, 59, 61

vi

*Gregg v. Georgia,*
    428 U.S. 153, 96 S.Ct. 2909 (1976)..................................................................55

*Kansas v. Marsh,*
    548 U.S. ___, 126 S.Ct. 2516 (2006)......................................................95-96

*Kotteakos v. U.S.,*
    328 U.S. 750, 66 S.Ct. 1239 (1946).............................................................47

*Lewis v. Jeffers,*
    497 U.S. 764, 110 S.Ct. 3092 (1990).....................................................57, 60

*Lockett v. Ohio,*
    438 U.S. 586, 98 S.Ct. 2954 (1978).................................89, 99-100, 106, 117

*Lowenfield v. Phelps,*
    484 U.S. 231, 108 S.Ct. 546 (1988)......................................................105-107

*Maynard v. Cartwright,*
    486 U.S. 356, 108 S.Ct. 1853 (1988)...............................................55, 59, 61

*McCleskey v. Kemp,*
    481 U.S. 279, 107 S.Ct. 1756 (1987).......................................................56, 89

*Mills v. Maryland,*
    486 U.S. 367, 108 S.Ct. 1860 (1988)....................................................101, 103

*Oregon v. Guzek,*
    ___ U.S. ___, 126 S.Ct. 1226 (2006)......................................................90-91

*Ring v. Arizona, (Ring II),*
    536 U.S. 584, 122 S.Ct. 2428 (2002).................1, 55, 58, 60, 91-92, 130-131

*Spaziano v. Florida,*
    468 U.S. 447, 104 S.Ct. 3154 (1984).......................................................50, 56

*Tuilaepa v. California,*
     512 U.S. 967, 114 S.Ct. 2630 (1994)..................................................................93

*United States v. Batchelder,*
     442 U.S. 114, 99 S.Ct. 2198 (1979)................................................................121

*Walton v. Arizona,*
     497 U.S. 639, 110 S.Ct. 3047 (1990)..........................54-55, 57-60, 62, 75-76

*Witherspoon v. Illinois,*
     391 U.S. 510, 88 S.Ct. 1770 (1968)...............................................................106

*Woodson v. North Carolina,*
     428 U.S. 280, 96 S.Ct. 2978 (1976)......................................................113, 117

*Zant v. Stephens,*
     462 U.S. 862, 103 S.Ct. 2733 (1983)..............................................................93

**OTHER FEDERAL CASES**

*Adamson v. Ricketts,*
     865 F.2d 1011 (9th Cir. 1988)...............................................................60, 64-65

*Beardslee v. Woodford,*
     395 F.3d 1064 (9th Cir. 2005)......................................................125-126, 128

*Cooper v. Rimmer,*
     379 F.3d 1029 (9th Cir. 2004)........................................................................124

*Jammal v. Van de Kamp,*
     926 F.2d 918 (9th Cir. 1991)............................................................................47

*LaGrand v. Lewis,*
     883 F.Supp. 469 (D.Ariz., 1995)...........................................................121-122

*McKinney v. Rees,*
     993 F.2d 1378 (9th Cir. 1993)..........................................................................47

*Morales v. Hickman,*
    438 F.3d 926 (9th Cir. 2006)...............................................................123-124

*United States v. Coleman,*
    78 F.3d 154 (5th Cir. 1996).......................................................................... 39

*United States v. DeGeorge,*
    380 F.3d 1203 (9th Cir. 2004)................................................................ 32, 44

*United States v. Woodley,*
    9 F.3d 774 (9th Cir. 1993)......................................................................... 120

*Woratzeck v. Lewis,*
    863 F.Supp 1079 (D.Ariz., 1994)...............................................................59-61

## ARIZONA SUPREME COURT CASES

*Kauffman v. Schroeder,*
    116 Ariz. 104, 568 P.2d 411 (1977)................................................................ 98

*McKaney v. Foreman,*
    209 Ariz. 268, 100 P.3d 18 (2004)............................................................... 130

*State v. Adamson,*
    136 Ariz. 250, 665 P.2d 972 (1983)......................................................56-57, 77

*State v. Anderson,*
    210 Ariz. 327, 111 P.3d 369 (2005)..................................54, 68, 70, 75-76, 98

*State v. Apelt (Michael),*
    176 Ariz. 349, 861 P.2d 634 (1993)................................................................ 73

*State v. Atwood,*
    171 Ariz. 576, 832 P.2d 593 (1992)................................................................ 92

*State v. Beaty,*
    158 Ariz. 232, 762 P.2d 519 (1988)............................................................. 129

*State v. Bishop*,
    127 Ariz. 531, 622 P.2d 478 (1981)..............................................................86

*State v. Bolton*,
    182 Ariz. 290, 896 P.2d 830 (1995)..............................................................78

*State v. Brewer*,
    170 Ariz. 486, 826 P.2d 783 (1992)..............................................................73

*State v. Brookover*,
    124 Ariz. 38, 601 P.2d 1322 (1979)..............................................................63

*State v. Carlson*,
    202 Ariz. 570, 48 P.3d 1180 (2002)..........................................................62, 83

*State v. Clark*,
    126 Ariz. 428, 616 P.2d 888 (1980)..............................................................87

*State v. Cromwell*,
    211 Ariz. 181, 119 P.3d 448 (2005)..........................................................69-71

*State v. Dann*,
    206 Ariz. 371, 79 P.3d 58 (2003)..................................................................91

*State v. Dickens*,
    187 Ariz. 1, 926 P.2d 468 (1996)........................................................32, 39, 49

*State v. Djerf*,
    191 Ariz. 583, 959 P.2d 1274 (1998)........................................................72-73

*State v. Dugan*,
    125 Ariz. 194, 608 P.2d 771 (1980)..............................................................50

*State ex rel. Thomas v. Granville*,
    211 Ariz. 468, 123 P.3d 662 (2005)................92, 98, 100-101, 115, 118-119

x

*State v. Gillies,*
    142 Ariz. 564, 691 P.2d 655 (1984)............................................................. 87

*State v. Glassel,*
    211 Ariz. 33, 116 P.3d 1193 (2005)........................................................... 98

*State v. Gretzler,*
    135 Ariz. 42, 659 P.2d 1 (1983).................................57, 60-61, 64-65, 76-77

*State v. Harrod,*
    200 Ariz. 309, 26 P.3d 492 (2001)....................................................91, 129-130

*State v. Hinchey,*
    181 Ariz. 307, 890 P.2d 602 (1994)........................................................... 132

*State v. Huerstel,*
    206 Ariz. 93, 75 P.3d 698 (2003).....................................................105, 110-111

*State v. Johnson,*
    212 Ariz. 425, 133 P.3d 735 (2006).................................................54, 57, 93

*State v. Jones,*
    205 Ariz. 445, 72 P.3d 1264 (2003)........................................................77, 91

*State v. Kiles,*
    175 Ariz. 358, 857 P.2d 1212 (1993)........................................................78-79

*State v. Knapp,*
    114 Ariz. 531, 562 P.2d 704 (1977)............................................................ 56

*State v. Krone,*
    182 Ariz. 319, 897 P.2d 621 (1995)............................................................ 50

*State v. Lavers,*
    168 Ariz. 376, 814 P.2d 333 (1991)............................................................ 77

xi

*State v. Lujan*,
          124 Ariz. 365, 604 P.2d 629 (1979)............................................................... 56

*State v. Mata*,
          185 Ariz. 319, 916 P.2d 1035 (1996)........................................................... 61

*State v. McCann*,
          200 Ariz. 27, 21 P.3d 845 (2001)........................................................... 89, 95

*State v. Medrano*,
          173 Ariz. 393, 844 P.2d 560 (1992)........................................................... 84

*State v. Miles*,
          186 Ariz. 10, 918 P.2d 1028 (1996)......................................................... 132

*State v. Moody*,
          208 Ariz. 424, 94 P.3d 1119 (2004)....................................................... 73, 78

*State v. Newell*,
          212 Ariz. 389, 132 P.3d 833 (2006).......................................................... 76

*State v. Nordstrom*,
          200 Ariz. 229, 25 P.3d 717 (2001)........................................................... 50

*State v. Nordstrom*,
          206 Ariz. 242, 77 P.3d 40 (2003)............................................................. 91

*State v. Orendain*,
          188 Ariz. 54, 932 P.2d 1325 (1997)................................................... 67, 89, 95

*State v. Pandeli*,
          200 Ariz. 365, 26 P.3d 1136 (2001)................................................ 92, 131-132

*State v. Poyson*,
          198 Ariz. 70, 7 P.3d 79 (2000)...................................................... 71-72, 131

*State v. Ring, (Ring I),*
    200 Ariz. 267, 25 P.3d 1139 (2001)............................................................ 131

*State v. Ring, (Ring III),*
    204 Ariz. 534, 65 P.3d 915 (2003)............................................................ 130

*State v. Roscoe,*
    184 Ariz. 484, 910 P.2d 635 (1996)............................................................ 77

*State v. Salazar,*
    173 Ariz. 399, 844 P.2d 566 (1992).................................................. 62, 64-65

*State v. Sansing,*
    200 Ariz. 347, 26 P.3d 1118 (2001)............................................................ 130

*State v. Sansing,*
    206 Ariz. 232, 77 P.3d 30 (2003)............................................................ 62

*State v. Schackart,*
    190 Ariz. 238, 947 P.2d 315 (1997)............................................................ 91

*State v. Smith,*
    146 Ariz. 491, 707 P.2d 289 (1985)............................................................ 83

*State v. Soto-Fong,*
    187 Ariz. 186, 928 P.2d 610 (1996)............................................................ 86

*State v. Spears,*
    184 Ariz. 277, 908 P.2d 1062 (1996)...................................................... 91-92

*State v. Stokley,*
    182 Ariz. 505, 898 P.2d 454 (1995)............................................................ 70

*State v. Terrazas,*
    189 Ariz. 580, 944 P.2d 1194 (1997)............................................................ 44

*State v. Wagner,*
    194 Ariz. 310, 982 P.2d 270 (1999)............................................................ 121

*State v. Wall,*
    212 Ariz. 1, 126 P.3d 148 (2006)............................................................ 50

*State v. Wallace,*
    151 Ariz. 362, 728 P.2d 232 (1986)......................................................79-80

**ARIZONA COURT OF APPEALS CASES**

*State v. Alvarez,*
    205 Ariz. 110, 67 P.3d 706 (App. 2003)...................................................... 120

*State v. Grijalva,*
    137 Ariz. 10, 667 P.2d 1336 (App. 1983).................................................45-46

*State v. McMahon,*
    201 Ariz. 548, 38 P.3d 1213 (App. 2002).................................................. 54

**OTHER STATE CASES**

*Commonwealth v. DeMarco,*
    444 Mass. 678, 830 N.E.2d 1068 (2005)....................................................... 43

*People v. Houston,*
    130 Cal.App. 4th 279, 29 Cal.Rptr.3d 818 (Cal.App. 2005)......................... 43

*State v. Camm,*
    812 N.E.2d 1127 (Ind. App. 2004)................................................................ 42

*State v. Kim,*
    897 A.2d 968 (NH 2006)........................................................................ 41

*State v. McKnight,*
    107 Ohio St.3d 101, 837 N.E.2d 315 (2005).................................................. 43

*State v. Rhodes,*
627 N.W.2d 74 (Minn. 2001)........................................................ 43

**CONSTITUTIONAL PROVISIONS**
**United States Constitution**

Article 1, § 10. ............................................................................ 130

Fifth Amendment................................................32, 38, 106, 115, 130-131

Sixth Amendment...........................32, 38, 49, 54, 66-67, 74, 89, 94-96, 98-99, 104,
.............................................................106, 115, 130

Eighth Amendment.........................31, 54, 61, 66-67, 74, 89-90, 94-96, 98-99, 104,
.............................................................106, 112-115, 117, 120-122, 125-126, 128-132

Fourteenth Amendment.................32, 38, 49, 54, 66-67, 74, 89-90, 94-96, 98-99,
.............................................................104, 106, 115, 129-132

**Arizona Constitution**

Article 2, § 1. ............................................................................129-130

Article 2, § 4. .......................................32, 38, 49, 54, 66-68, 74, 89, 94-95, 97, 106,
.............................................................115, 129-131

Article 2, § 8. ............................................................................98-99, 104

Article 2, § 15. ......................... 54, 66-67, 89, 94-95, 97-99, 104, 106, 115, 129-132

Article 2, § 24. ......................................32, 38, 49, 54, 66-68, 74, 89, 94-95, 97-99,
............................................................. 104, 106, 115, 130

Article 2, § 25. ............................................................................ 130

Article 6, § 5(3). ............................................................................ 6

xv

**STATUTES**
**Arizona Revised Statutes**

§ 13-703.........................................................................100, 131-132

§ 13-703(C). ...............................................................100, 103, 115

§ 13-703(D). ...........................................................................58

§ 13-703(E).............................................................................92

§ 13-703(F)...........................................................................1, 130

§ 13-703(F)(5). .......................................................................5

§ 13-703(F)(6). ................................3, 5, 30, 54, 56-58, 60-62, 64-69, 76

§ 13-703(H). ..........................................................................93

§ 13-703.01(K). .....................................................................113

§ 13-704................................................................................128

§ 13-704(A). ...................................................................121, 128

§ 13-1104(A)(1)......................................................................51

§ 13-1104(A)(2)......................................................................51

§ 13-4031..............................................................................6

**RULES**
**Arizona Rules of Criminal Procedure**

Rule 22.4.......................................................................106, 110

Rule 31.2(b)...........................................................................6

**Arizona Rules of Evidence**

Rule 105................................................................................................ 44

Rule 402................................................................................................ 44

Rule 403................................................................................................ 32

Rule 404(b). ................................................................... 3-4, 32-33, 41, 44

**OTHER AUTHORITIES**

*Judge Stays Killer's Execution over Lethal-injection
    Concerns,* Arkansas Democrat Gazette, June 27, 2006............................. 124

*When Legislatures Delegate Death: The Troubling
    Paradox Between the State's Uses of Electrocution
    and Lethal Injection and What it Says About Us,*
    Ohio State Law Journal, Vol. 63:63 (2002)........................................126-128

## STATEMENT OF THE CASE

The appellant, Wendi Elizabeth Andriano, was indicted for the first-degree premeditated murder of her husband, Joseph Andriano. (Record on Appeal, p. 1, hereinafter ROA.) On December 22, 2000, the state noticed its intention to seek the death penalty proposing, "To prove one or more of the enumerated factors in A.R.S. § 13-703(F)." (ROA, p. 23.)

On July 2, 2002, Andriano moved to dismiss the state's notice to seek the death penalty contending that pursuant to the United States Supreme Court's decision in *Ring v. Arizona*, 536 U.S. 584, 122 S.Ct. 2428 (2002), Arizona's maximum penalty for first degree murder was life in prison. (ROA, p. 70.) On July 16, 2002, the state acknowledged that *Ring* posed questions concerning Arizona's death penalty and the legislature would have to act in order to determine the effect on pending cases and the future of the death penalty in Arizona. (ROA, p. 73.) Thereafter, on July 19, 2002, the state moved for a stay of proceedings pending legislative action. (ROA, p. 75.) Andriano objected to the state's request. (ROA, p. 78.) The case continued.

On August 13, 2002, the state filed a notice of aggravating factors alleging that the offense was committed in consideration for the receipt of anything of pecuniary value, and the offense was committed in an especially heinous, cruel or

1

depraved manner. (ROA, p. 82.) Andriano filed a motion to remand to the grand jury for a specific finding of probable cause on the aggravating factors alleged, or alternatively, to dismiss the allegation of aggravating circumstances. (ROA, p. 83.) Andriano contended that Arizona's aggravating factors were like elements of the offense, thus they must be screened for probable cause by a grand jury. (Id.) The state responded that aggravating factors were not elements of the offense, but were standards to guide the making of the choice between death or life imprisonment. (ROA, p. 85.) On March 12, 2004, the trial court denied Andriano's motion to dismiss the state's intent to seek the death penalty. (ROA, p. 135.)

On September 10, 2002, Andriano filed a supplemental motion to strike the state's notice of intent to seek the death penalty contending that application of the renewed death penalty by the Arizona legislature violated the prohibition against *ex post facto* laws. (ROA, p. 86.) Andriano also argued that retroactive application of the new death penalty statute to her would violate her right to due process. (Id.) On March 12, 2004, the trial court denied Andriano's supplemental motion to strike the state's intent to seek the death penalty based on violation of the *ex post facto* laws. (ROA, p. 135.)

2

On March 18, 2003, Andriano moved to dismiss the aggravating factor of cruel, heinous or depraved under A.R.S. § 13-703(F)(6), as being unconstitutionally vague on its face and not able to be constitutionally narrowed for application by a sentencing jury. (ROA, p. 96.) On March 12, 2004, the trial court denied Andriano's motion. (ROA, p. 135.)

On January 29, 2004, Andriano moved to preclude the state's reference to, among other things, her misconduct in efforts to obtain additional life insurance policies on her husband. (ROA, p. 125.) Andriano urged that the information was not relevant, and was unfairly prejudicial in violation of Arizona Rules of Evidence, Rule 404(b). (Id.) The state responded that Andriano's attempts to obtain life insurance were relevant as part of her ongoing scheme to make her husband's death as lucrative as possible. (ROA, p. 130.) On September 7, 2004, the trial court denied Andriano's motion. (ROA, p. 193; Reporter's Transcript of Proceedings, 9/7/04, p. 13, hereinafter RT.)

Andriano also sought to exclude evidence of her extramarital affairs as inadmissible "bad acts" under Rule 404(b), thus not relevant, and, if relevant, unduly prejudicial. (ROA, p. 100; RT, 9/7/04, p. 9.) The state maintained that Andriano told her friends that she wanted her husband dead so she could enjoy the company of other men. (ROA, p. 106.) This was Andriano's motive according to

3

the state. (Id.) The state said that per her conversations with friends, Andriano said that once her husband was dead, a paramour, Rick Freeland, would be willing to resume the relationship with her. (Id.) The trial court denied Andriano's motion to preclude evidence of the relationships with both Rick Freeland and another man, Travis Black. (RT, 9/7/04, p. 13.) The court found that the evidence was intrinsic to the case, thus not 404(b) evidence at all. (Id., p. 14.)

On May 10, 2004, the state moved to preclude evidence regarding residual doubt. (ROA, p. 144.) Initially, Andriano did not object. (ROA, p. 165.) The trial court granted the state's motion. (ROA, p. 174; RT, 7/30/04, p. 5.) Later, however, Andriano included residual doubt on her list of mitigating factors. (ROA, p. 396.) The parties readdressed the issue. Andriano urged that residual doubt be included as a specific mitigator. (RT, 12/7/04, p. 5.) The prosecutor objected. (Id., pp. 5-6.) The trial court denied Andriano's motion for reconsideration on the issue of residual doubt, and affirmed its original ruling precluding evidence of residual doubt. (RT, 12/8/04, pp. 5-6.) Residual doubt was not included as a mitigating factor for the jury to consider.

Andriano also requested the court list "mercy" as a specific aggravating factor. (ROA, p. 396.) At hearing, the prosecutor also objected to this mitigator. (RT, 12/7/04, pp. 5-6.) Andriano asserted that mercy was synonymous with

4

leniency and, whereas mercy alone would perhaps not be sufficient to support a life sentence, mercy coupled with another mitigating factor would be sufficient. (Id., p. 6.)  Andriano asked that mercy be included.  (Id.)  The trial court ordered that no witness statements pertaining to the appropriate sentence be elicited with regard to mercy.  (RT, 12/8/04, p. 6.)  The court also did not permit mercy to be proffered as mitigation for the jury to consider.  (ROA, p. 419.)

The prosecutor moved to instruct the jury regarding the weighing of aggravating and mitigating factors.  (ROA, p. 149.)  Over Andriano's objection, (ROA, p. 169), the trial court granted the state's motion.  (RT, 7/30/04, p. 5.)

Andriano's trial began August 23, 2004, with jury selection.  (RT, 8/23/04, *passim*.)  It concluded November 18, 2004, when the jury found Andriano guilty of first-degree murder as charged in the indictment.  (RT, 11/18/04, p. 8.)

The aggravation phase began November 30, 2004.  (RT, 11/30/04, *passim*.)  The state sought to prove two aggravators, 1) the murder was committed in expectation of anything of pecuniary value pursuant to A.R.S. § 13-703(F)(5), and 2) the killing was done in an especially cruel, heinous or depraved fashion under A.R.S. § 13-703(F)(6).  (Id., p. 9.)  At the conclusion of the aggravation phase, the jury found that Andriano had committed the offense in an especially cruel manner. (ROA, p. 393; RT, 12/6/04, p. 3.)

5

The penalty phase began December 8, 2004.  (RT, 12/8/04, *passim*.)  The trial court instructed the jury as to twenty-three specific mitigating factors.  (ROA, pp. 399, 419.)  It concluded on December 22, 2004, when the jury found that Andriano should be sentenced to death.  (ROA, p. 426; RT, 12/22/04, p. 5.)  Based on the jury's finding, the trial court sentenced Andriano to be executed by lethal injection.  (RT, 12/22/04, p. 7.)

On December 29, 2004, Andriano filed a motion for a new trial for the penalty phase.  (ROA, p. 434A.)  On February 7, 2005, the trial court denied Andriano's motion for a new Phase III trial.  (Minute Entry, 2/7/05.)

On December 22, 2004, the clerk of the superior court timely filed a notice of appeal from Superior Court.  (ROA, p. 428.)  This Court has jurisdiction pursuant to Article 6, § 5(3) of the Arizona Constitution as well as A.R.S. § 13-4031 and Arizona Rules of Criminal Procedure, Rule 31.2(b).

## STATEMENT OF FACTS

Wendi Andriano's husband, Joe Andriano, had terminal cancer.  Only three months after their wedding, Joe found a painful lump in his neck.  (RT, 10/26/04, pp. 98-99.)  He had it removed and was told it was benign.  (Id., pp. 99-100.) Lumps grew back two more times and each time they were removed.  (Id., pp. 101-107.)  The fourth time a tumor grew, Joe went to a specialist.  (Id., pp. 110-111.) Eventually, he was diagnosed with a rare type of cancer.  (Id., p. 114.)  The doctors removed the tumor, but the cancer had spread to his brain and vital organs.  (Id., pp. 117, 121.)

His doctor, Christopher Kellogg, said Joe had a metastatic adenoid cystic carcinoma.  (RT, 9/28/04, p. 10.)  Dr. Kellogg opined that Joe could have lived any where from many months to a few years.  (Id., pp. 11-12.)  Dr. Kellogg treated Joe with chemotherapy.  He received four chemotherapy treatments all together.  (Id., p. 15.)  Dr. Kellogg thought that the chemotherapy might not have significantly impacted Joe's long-term survival.  (Id., p. 53.)  The autopsy confirmed that Joe's cancer was spreading.  (Id., pp. 40-41, 46-47.)

At the time of Joe's death, he and Andriano lived at the San Riva Apartments where Andriano worked as the manager.  (RT, 9/8/04, pp. 7-8.)  There, she worked with others in the office such as Chris Hashisaki, a bookkeeper and activities

7

director at the San Riva Apartments. (Id.) Hashisaki said that she and Andriano were professional working friends. (Id., p. 8.)

On October 8, 2000, at about 2:30 a.m., Andriano called Hashisaki. (Id., p. 10.) Hashisaki went to the Andriano's apartment where she found Andriano outside on the sidewalk holding a telephone, looking confused. (Id., p. 11.) Andriano told Hashisaki that her husband was inside on the floor dying and she had not yet called 911. (Id., p. 12.) As the two walked towards the apartment, Hashisaki told Andriano to call 911, but she could not get reception outside. (Id., p. 13.)

Andriano was dressed in a white t-shirt and dark shorts. (Id., p. 11.) Hashisaki did not see any stains or other color on the shirt. (Id.)

Inside the apartment, Hashisaki saw Joe lying on the living room floor on his left side in a fetal position. (Id., p. 14.) As Hashisaki knelt by him, she saw that he was weak and had vomited on the floor. (Id., pp. 14-15.) Joe recognized Hashisaki and was able to communicate with her. (Id.) He wondered what was taking Emergency so long to respond. (Id., pp. 15-16.) Joe continued to lay on the floor, unable to sit up. (Id., p. 16.) Hashisaki did not see any bruising or blood on him. (Id., p. 17.)

In a back bedroom, Hashisaki found Andriano on the phone. (Id., p. 18.) The two came out to the living room and Andriano knelt down beside Joe while on the phone. (Id.) Andriano appeared calm as she spoke to the Emergency dispatch operator. (Id., p. 19.) Andriano asked Hashisaki what Joe's color was like. (Id., p. 20.) Hashisaki said his color was fine, his lips were not blue, but he was having trouble breathing. (Id.)

Andriano hung up and said that they needed to get Joe to the car to get him to the hospital faster. (Id., p. 21.) Andriano was anxious. (Id.) As the two tried to lift Joe up, Andriano became irritated, telling him to get his ass up when he said he could not make it to the car. (Id., p. 22.) Hashisaki advised Andriano to call Emergency again and find out how far away they were. (Id., p. 24.) Upon hearing that Emergency was about a mile away, Hashisaki said that they would wait. (Id.) Hashisaki went outside to direct the responders. (Id.) As she took a cigarette and left, Hashisaki saw that Joe had begun to vomit again. (Id., p. 25.)

When rescue personnel approached Andriano's apartment, she told them to go away and would not let them in. (Id., p. 27.) Hashisaki told them that Andriano's husband had cancer and was inside dying on the floor. (Id., p. 28.) The firemen knocked for five to ten minutes with no response. (Id., p. 29.) Hashisaki heard nothing from inside. (Id.) Finally, a fireman got a call back from

9

dispatch telling them that Andriano said she was coming out. (Id., p. 30.) The firemen and Hashisaki were waiting by the front door of Andriano's apartment. (Id.) Instead, Andriano came around through the corridor of the front of the building on the north side. (Id.) Andriano could not have come through on the north side other than by going out the backdoor of her apartment. (Id., p. 35.)

As Andriano approached, Hashisaki noticed that Andriano was now wearing dark shorts and a striped t-shirt, and her hair was wet whereas it had been dry when Hashisaki first got there. (Id., pp. 37, 13.) Andriano walked past the firemen, stood by her front door and explained that her husband was dying, and this was not the way he wanted to go. (Id.) When asked whether Joe had requested to not be resuscitated in an emergency, Andriano told them that Joe's doctor had such an order on file. (Id., pp. 37-38.) Andriano told them that her father was on the way and she wanted them to leave. (Id., p. 38.) The firemen left. (Id.) Hashisaki said Andriano was calm as she spoke with them. (Id., p. 39.)

Hashisaki said as she stood outside the apartment waiting, she did not hear sounds of any kind of physical confrontation, or somebody being struck, or the sound of furniture breaking. (RT, 9/9/04, pp. 28-29.) She didn't hear any screaming, crying, or words said in anger. (Id., p. 29.)

10

Fireman Benjamin McKinnon also noticed that Andriano's hair was wet and that she looked like she had showered. (RT, 9/14/04, pp. 162-163.) He recounted that Andriano had a ten-minute conversation with them at the front door of her apartment. (Id., p. 164.) The firemen were not permitted to enter. (Id.)

About an hour later, the same fire truck and crew again responded to Andriano's apartment. (Id., p. 166.) This time they were permitted inside the apartment. (Id.) There, they found a man on his back, deceased. (Id., p. 167.) Fire personnel removed Andriano's two children from the apartment and gave them over to Andriano's step-father. (Id., p. 170.) McKinnon said while outside the apartment attempting to gain entry the first time, he heard no noises consistent with a struggle or a fight. (Id., p. 171.)

Around 3:30 a.m., Phoenix police officer Bryan Richards responded to a call at 2155 East Liberty Lane, #132, in Phoenix. (Id., p. 107.) When Richards arrived, other fire trucks and police cars were already there. (Id.) As Richards entered the apartment, he saw an individual on the floor, face up. (Id., p. 108.) He noticed there was a pool of blood off to the side of the individual's head that looked like it was already starting to dry. (Id., p. 109.)

11

McKinnon said Andriano, who was now wearing different clothes, had blood spattering on the front side of her shirt. (Id., p. 177.) In the first response, Andriano had no visible blood staining on her outfit. (Id.)

Fireman Richard Perrott was also present at both responses to the Andriano home. (RT, 9/15/04, p. 7.) The first time, Perrott estimated that the crew tried to gain entry to Andriano's apartment by knocking from five to seven minutes. (Id., p. 11.) Perrott said he could hear the phone ringing inside the apartment as they were standing out front. (Id., p. 12.) Perrott said that when Andriano came out and spoke to them, she was very sincere and calm. (Id., pp. 13-14.) She did not seem anxious or hysterical. (Id., p. 14.)

Perrott said the second time they were called to the apartment and permitted to enter, he saw that the victim was semi-face down, turned to his right side. (Id., p. 18.) He was facing toward the door. (Id., p. 19.)

Perrott also said he heard no sounds of a fight or physical confrontation to cause him concern as they stood in front of Andriano's apartment door on the first trip. (Id., p. 21.) Because he was able to hear the phone ring, he opined that had a confrontation been occurring, he would have been able to hear it. (Id., pp. 21-22.) Perrott also noticed the second outfit Andriano was wearing at the second response had blood on it. (Id., p. 24.)

12

The medical examiner, Dr. Philip Keen, said the face of the decedent showed a combination of abrasions and contusions and scrapes at the time of the autopsy. (RT, 9/16/04, p. 13.) There were abrasions across the decedent's cheek and hemorrhaging and bruising on the lips. (Id., p. 16.) He said the face bruises, the lip bruising, and cuts inside the mouth could have been caused by falling to the floor face forward. (Id., pp. 55, 57.)

Dr. Keen saw pattern contusions across the top of the head and some linear areas of redness that were contusions. (Id., p. 17.) Dr. Keen opined that the injuries were blunt force injuries. (Id.) He felt the injury patterns on the forehead were unlikely to be produced by a single impact. (Id., pp. 18-19.) They appeared to be repetitive injuries, with similar running-like pattern. (Id., p. 19.) Dr. Keen saw contusions and abrasions on the parietal, occipital, and mastoid areas of the head. (Id., p. 21.) Dr. Keen noted the back of the head showed multiple primary lacerations, which showed more lacerated than incised wounds, although some may have been true incised wounds. (Id., pp. 21-22.)

The injuries to the back of the head were almost all produced by blunt force injury. (Id., p. 22.) According to Dr. Keen, the decedent received no less than twenty-three strikes. (Id., pp. 22-23.) However, his skull was not fractured. (Id., p. 51.)

13

Dr. Keen found all of the injuries to have occurred before death. (Id., pp. 30-31.) He also found that it was not an instantaneous death. (Id., p. 31.) Dr. Keen said that between eight and ten of the injuries to the head would have rendered the decedent immediately unconscious. (Id., p. 32.)

Dr. Keen also observed a large gaping wound to the side of the decedent's neck. (Id., p. 25.) The wound measured 3 ¾ inches by 2 inches. (Id., p. 36.) It severed a portion of the carotid artery. (Id.) Dr. Keen said that the previous surgeries to the decedent's neck may have caused some weakness that contributed to the final dimensions of the neck wound. (Id., pp. 86-87.) Dr. Keen said that if the neck wound was not the first injury, then the severity of the injuries to the head were sufficient to render the decedent unconscious. (Id., p. 26.)

According to Dr. Keen, most of the blunt force injuries were concentrated in the occipital and parietal areas in an approximately 6 by 5 inch dimension. (Id., p. 50.) The focal point of the blunt trauma injuries were the back of the head. (Id.) Dr. Keen noted that bleeding along the surface of the left side of the brain suggested there was cardiac function after he received the blunt force trauma. (Id., p. 51.) Dr. Keen also saw some subarachnoid hemorrhage particularly over the left temporal lobe, which was secondary to the external head trauma. (Id., p. 34.)

14

Dr. Keen said in this particular case, once the decedent had been rendered unconscious, he probably would not have regained consciousness. (Id., p. 68.)

Dr. Keen opined that the decedent was killed by blunt force injuries and the stabbing wounds, but primarily the blunt force injuries. (Id., p. 43.) Dr. Keen later acknowledged that the decedent was still alive after the blunt force trauma. (Id., p. 51.) Thus, the blunt force trauma preceded the neck wound. (Id., pp. 51-52.) Dr. Keen said that the incised wound to the neck was the ultimate blow. (Id., p. 74.)

Dr. Keen could not tell if a knife caused a small laceration to the back of one of the decedent's ears. (Id., pp. 26-27.) Dr. Keen noted that there were cuts over the right knuckle and an incised wound on the dorsum of the right hand. (Id., p. 27.) Dr. Keen said the wounds were consistent with being defensive wounds. (Id., p. 28.) However, he described the incised wound as "superficial." (Id., p. 57.)

Similarly, Dr. Keen saw contusions and abrasions in the decedent's wrist area. (Id.) He also found those wounds to be consistent with defensive wounds. (Id.) Dr. Keen found two small superficial cuts on the decedent's left hand that could have been defensive wounds. (Id., pp. 28-29.) He noted that a bruise at the base of the decedent's left thumb could have been a defensive wound or could have been received from a fall. (Id., p. 29.)

15

Dr. Keen said the decedent had linear wounds on the left shoulder at the back, incised wounds between the upper back and medial to the scalp, but the doctor had difficulty distinguishing some of the small lacerations from incised wounds because there was some overlap. (Id., p. 30.) Dr. Keen acknowledged that the wood screws contained with the stool seized by police were sharp enough to have caused some of the incised wounds in the decedent's shoulder. (Id., p. 64.) Upon viewing the stool, Dr. Keen said, in the range of distances, it was possible to get two injuries from a single impact. (Id., p. 77.)

Dr. Keen observed no injuries from the upper torso down to the feet of the decedent. (Id., p. 33.) On both hands, Dr. Keen found fine caliber hairs stuck to the dried blood on the palmar and intertriginous surfaces of both hands and from the surface of the body. (Id., p. 58.)

In testing the decedent's stomach contents, Dr. Keen found 3.8 milligrams per liter of sodium azide. (Id., pp. 42-43.) Dr. Keen found that there was no sodium azide in the decedent's bloodstream. (Id., p. 60.) That suggested that he had ingested the sodium azide but it had not been in his system long enough to be absorbed into his bloodstream. (Id.)

Dr. Keen found the 3.8 milligrams of sodium azide a "small amount." (Id., p. 61.) Dr. Keen said a person who consumes sodium azide could have changes in

blood pressure, either higher or lower.  (Id., p. 62.)  A person could become

agitated and emotionally hyper. (Id., p. 63.)

Dr. Edward French, a professor of pharmacology, said that sodium azide is a

very simple organic chemical made up of sodium and nitrogen.  (RT, 9/23/04, p.

10.) It is used as a preservative, fungicide, insecticide and in explosives. (Id.) The

first symptoms of azide ingestion include a headache and increased heart rate. (Id.,

p. 13.) A person's blood pressure would drop and they would become faint.  (Id.)

They would have difficulty breathing.  (Id.)  Ingestion is associated with vomiting

and diarrhea. (Id., p. 14.)  If a person ingested enough sodium azide, they would

have respiratory failure, go into a coma, have convulsions, and die.  (Id.)  Sodium

azide works just like cyanide in that it poisons the energy generated by the body's

cells. (Id., p. 16.)  It usually renders a person unconscious because they have too

little oxygen getting to the brain.  (Id.)  A person who had been on the floor for

forty-five minutes vomiting would probably not have the strength to get up.  (Id.,

pp. 19-20.)

Dr. French opined that the medical examiner's finding that there was no

sodium azide in Andriano's blood was in error because West Coast Analytical

found that the blood contained two parts per million of sodium azide. (Id., pp. 22-

23.)  That led Dr. French to believe that the victim had either ingested a large

17

amount of sodium azide further back in time or had ingested a very small amount more recently. (Id., p. 26.) Dr. French said that sodium azide would supposedly not have a taste. (Id., p. 32.) If anything, it would taste salty. (Id., p. 47.)

Joseph Richmond was a senior chemist for West Coast Analytical Service. (RT, 9/27/04, p. 29.) He analyzed a blood sample labeled "Joe Andriano." (Id., p. 31.) Richmond found azide in the sample just at the limit of detection. (Id., p. 34.) Three gelatin capsules that Richmond received from the Maricopa County Public Defender's Office tested positive for azide. (Id., p. 45.)

Phoenix detective Dennis Olson processed the scene for evidence. (RT, 9/9/04, p. 115.) Detective Olson seized two barstools, one broken. (RT, 9/13/04, p. 86; Exs. 257, 258.) There were bloodstains at the bottom on each of the stools. (Id.)

Exhibit 29 shows blood drops on the top of the victim's feet described as "impact spatter." (Id., p. 93.) From Exhibit 29, Detective Olson opined that the victim was not standing up when the round blood drops hit because there is no directionality to them. (Id., pp. 98-99.) The victim was lying down; his feet were sticking straight out. (Id.) When he was being struck on the head with an object, the blood was spattering going in a north direction and some of the spatter caught on the top of the victim's foot. (Id., p. 99; Ex. 31.)

18

Olson explained that impact spatter occurs when an object sits in a blood source and the blood from that source travels and impacts another surface. (Id., p. 128, Ex. 54.)   Here, the stool hit the victim's head and the blood from that impacted against another surface. (Id., p. 129.)   Detective Olson opined that the point of convergence between stool and head was at floor level or just a little above it.   (Id.)   Several photographs depicted blood spatter, both impact and cast-off. (Exs. 50-52, 54, 60, 61-66, 76, 77, 98 (walls and floor), 58, 59, (trashcan), 69, 70, 71, 72 (chair and ottoman), 86, 87, 88 (ceiling fan), 92, 93, 94 (mirror), 99, 100 (child's chair).)

Detective Olson said the victim was laying on the ground or close to the ground when he was struck by the barstool or the lamp.   (RT, 9/14/04, p. 44.) Olson opined that the victim never got up after the blood began to flow.   (Id.) When the victim was stabbed, he was laying on his right side with his right arm extended away from his body; his face was lying on top of his right bicep.   (Id.)

This left void areas where there was not blood.   Olson explained that if the victim was lying on his right side and his left arm was across his chest and there was blood on top of the left arm, when the arm was moved it left a void area across the chest. (RT, 9/13/04, p. 100; Exs. 36, 41.)

19

Exhibit 49 shows the laceration to the victim's left side of his neck. (Id., p. 122.) Exhibit 39 shows the arterial blood spurt from the wound traveling in a northeast direction. (Id., p. 107.) That indicated that the victim was on his right side when the wound occurred. (Id., p. 108.) Olson opined that the victim was moved after the first blood pool had been caused. (RT, 9/14/04, p. 124.)

Detective Olson said a belt was placed in its position after the victim had bled. (Id., p. 45; Ex. 324.) Olson also opined that the victim did not cause any of the blood smears in the kitchen. (Id., p. 47; Exs. 101-108.) The victim did not walk around in the kitchen area or anywhere else after he was struck because he didn't have any blood on the bottom of his feet. (Id., p. 48.)

Olson said that while it was possible that the victim may have been moving at the same time as the assailant, that scenario was not probable. (Id., pp. 57, 59.) Detective Olson opined that the victim was in one position laying on the ground and the person swinging the object was the one moving around. (Id., p. 116.) His opinion was supported by the low height of the blood spatter which ranged from 18 to 31 inches from ground level. (Id., pp. 60-63.)

Andriano defended on the basis that she was an abused spouse defending herself from her husband's attack. She had a strict religious upbringing that taught that a woman acquiesced to her husband. (RT, 10/25/04, pp. 9-10, 21.) That's the

20

way it was with her mother and step-father. (Id., pp. 33-34.) Her step-father was a volatile man whose fits of anger frightened Andriano. (Id., pp. 35-42.) She and her mother would hide in the bedroom or bathroom until he calmed down. (Id., p. 37.)

When Andriano was twenty-one years old, she started socializing outside of the church with her cousin. (Id., p. 45.) She started drinking alcohol, dancing and dating. (Id., p. 46.) She met Joe in 1992 at a pizza place. (Id., p. 108.) Andriano and Joe eventually decided to get married.

Joe pressured Andriano to have frequent sex. (Id., p. 118.) In fact, Joe was so adamant about frequent intercourse that he pressured Andriano into having sex with him shortly after the birth of their first child before her stitches were healed. (RT, 10/26/04, pp. 13-16.)

Andriano recounted incidents of violence. Once, she made dinner and the corn tasted bad. (RT, 10/25/04, pp. 127-129.) Andriano discovered that the bowl used to microwave the corn had been washed with bleach and left a bleach aftertaste on the corn. (Id.) Angry, Joe slapped her. (Id.)

Another time, at a bar, Andriano saw Joe put his arm around another woman. (RT, 10/26/04, p. 38.) Upset, Andriano turned to leave the bar but Joe followed her. (Id., p. 39.) He grabbed her in a bear hug and squeezed her until she

21

could not breathe, and told her she wasn't going anywhere. (Id.) Everyone told him to let her go, so he did. (Id.)

The couple often had arguments and Andriano would hide in the bathroom as she did as a child when her step-father was angry. (Id., p. 11.) Joe would pound on doors, breaking them, or break furniture. (Id., pp. 11-12.) One time, he pinned her up against a wall and smashed a stone pot into the wall right next to her head. (Id., p. 12.) After these incidents, Andriano learned not to question Joe. (Id., p. 13.)

Abusive incidents were witnessed by Andriano's cousin, Brandon, who related the bleach incident along with other acts of violence by Joe. (RT, 10/21/04, pp. 52-82.) Andriano's mother and step-father also recounted such incidents. (RT, 10/4/04, vol. 2, pp. 46-47, 69, 78-79; RT, 10/6/04, pp. 28-29, 31, 34-36.) Andriano's cousin, Barbara, told of an incident involving a Las Vegas trip where Joe verbally and mentally abused Andriano. (RT, 10/21/04, pp. 166-173.)

Dr. Sharon Murphy received her PhD in 1999 from Arizona State University in the specialty area of Domestic Violence. (RT, 10/7/04, pp. 28-29.) As an expert in counseling and domestic violence, she examined Andriano and concluded that she was a victim of domestic violence. (RT, 10/13/04, p. 44.) On cross-examination, Dr. Murphy admitted she was missing some information. (RT,

22

10/13/04, pp. 49-51, 57-66, 68-72, 85-86, 96, 100-101, 104, 118, 161; RT, 10/14/04, pp. 4-6, 12.)  Notwithstanding the additional information, Dr. Murphy did not change her opinion. (RT, 10/14/04, p. 121.)  In rebuttal, the state called Dr. Brad Bayless.  Dr. Bayless opined that Andriano was not suffering from domestic violence. (RT, 11/10/04, p. 41.)

Andriano recounted an incident on her thirtieth birthday. (RT, 10/26/04, p. 66.)  She and her work friends went out in a limousine, to celebrate in nightclubs, but she was to be home by midnight. (Id., p. 69.)  On the way home, they stopped to pick up one of the women's boyfriend, and his friend. (Id., p. 71.)  Andriano described herself as very drunk. (Id., p. 75.)  She sat between the friend's legs as they drove back to the apartment complex and flirted with him. (Id., p. 73.)

Joe was there when they arrived at the complex. (Id., p. 74.)  Andriano said Joe grabbed a wine cooler out of her hand and threw it because he was angry that she turned her phone off. (Id., p. 75.)  He threw the phone too. (Id.)  She followed him back to the apartment. (Id.)  But Joe's sister was in the apartment, so he forced Andriano to sit in their vehicle while he yelled at her. (Id., p. 77.)

The incident was also described by Andriano's workmate, Shannon Sweeney. (RT, 9/15/04, pp. 34-37.)  However, Sweeney said it was Andriano's suggestion that they go pick up the woman's boyfriend and his friend. (Id., p. 35.)

23

During this time period, the couple decided to investigate a malpractice claim against the doctors who misdiagnosed Joe. (RT, 10/27/04, p. 4.) According to Andriano, Joe also asked her to investigate the possibility of getting additional life insurance policies. (Id., pp. 32-34.) With Joe's knowledge, Andriano lied on the forms about Joe's health. (Id., p. 38.) Andriano admitted asking friends to stand in for Joe at the health exam. (Id., pp. 41-42.) Finally, her step-father told her to stop trying to get a policy; that she was engaging in fraud. (Id., p. 46.) She stopped. (Id.) Two life insurance agents described Andriano's efforts to obtain life insurance. (RT, 9/27/04, pp. 70-80, 119-127.)

During the summer of 2000, Andriano engaged in extramarital relationships. She met Rick Freeland who was a tenant at her apartment complex. (RT, 10/27/04, p. 47.) Andriano also had a brief sexual relationship with Travis Black, who she met at a bar. (Id., p. 74.) Andriano said she was drinking heavily at the time so she did not have to think. (Id., p. 76.) Freeland and Black both testified in detail concerning the affairs. (RT, 9/13/04, pp. 19-62; RT, 9/16/04, pp. 89-107.) Additionally, Chris Hashisaki, Shannon Sweeney, Stephanie Koeppen-Moser, and Erik Vaillant all recounted aspects of the liaisons. (RT, 9/8/04, pp. 47-49, 51-52, 69-71; RT, 9/15/04, pp. 38-42, 91; RT, 9/16/04, pp. 126-130.)

Eventually, Joe told Andriano he wanted to commit suicide so he could die the way he wanted to die. (RT, 10/27/04, p. 84.)  She tried to change his mind. (Id.)  They originally searched for cyanide on the internet. (Id., p. 85.)  Andriano told Joe she could not find anything on cyanide. (Id., p. 86.)  She then turned to her old friend Shawn King for help. (Id., p. 87.)  He suggested the sodium azide. (Id., p. 90.)  Joe did not want anyone to know about the suicide because of his Catholic upbringing and because his grandfather committed suicide. (Id., pp. 92-93.)

Andriano obtained the sodium azide by creating fictitious business papers. (Id., pp. 94-95.)  She and Joe picked up the package and she brought it to her office. (Id., pp. 99-100.)  She took the box to her office for safekeeping from their two children. (Id., p. 101.)  The sodium azide arrived the Thursday before the Saturday night that Joe died. (Id., p. 101.)

Together she and Joe put the sodium azide powder into capsules that once held Elderberry powder. (Id., pp. 105-106.)  The capsules would make it easier for Joe to take the sodium azide. (Id., p. 105.)  Andriano said they filled fifteen capsules with the sodium azide. (Id., p. 108.)

On Saturday, the couple went to a swap meet with Joe's mom. (RT, 10/28/04, p. 16.)  Then, they went to Sam's Club where they bought a lamp. (Id.,

p. 18.)  They went home and she and the kids napped while Joe tried to put the lamp together.  (Id., pp. 20-21.)  Joe was upset because the lamp was broken.  (Id., p. 21.)

They went to dinner at Joe's parents that night.  (Id., p. 22.)  Andriano thought Joe acted normal but quiet.  (Id.)  He lay on the couch during the visit.  (Id., p. 24.)  On the way home, he told her he would commit suicide that night.  (Id., p. 25.)

Joe took the sodium azide.  (Id., p. 29.)  Andriano expected the poison to act quickly and painlessly.  (Id., p. 30.)  But after fifteen minutes Joe became ill.  (Id.)  Although testing indicated that there was also sodium azide in the food sitting on the counter in the kitchen, Andriano testified she had no idea how the sodium azide got into that food.  (RT, 11/2/04, p. 68.)

She offered to take Joe to the emergency room.  (RT, 10/28/04, p. 31.)  He fell to the floor in the living room and vomited.  (Id.)  Joe wanted to go, so the suicide plan was called off.  (Id., p. 32.)  Andriano called Chris Hashisaki to stay with the children.  (Id., pp. 33-34.)  When Hashisaki arrived, she told Andriano to call 911.  (Id., p. 35.)  After several tries, Andriano got through to 911 and told them Joe was having a heart attack.  (Id., pp. 35-37.)  Hashisaki went out front to wait for the paramedics.  (Id., p. 38.)  When the ambulance finally arrived, Joe said

26

he did not want their help. (Id., p. 39.) Joe told her to go out the back way and tell the paramedics to leave. (Id., p. 41.) She told them her husband was dying of cancer and did not want resuscitation. (Id., p. 42.)

She went back inside and waited for Joe to die. (Id., p. 44.) Hashisaki knocked on the door asking for her purse, so Andriano tossed it to Hashisaki. (Id., p. 43.) She held Joe's head in her lap but he was not acting sick anymore. (Id., p. 44.) He asked her to tell him the truth about a condom missing from his drawer. (Id., p. 45.) Andriano told him she used it with someone she met at Rockin' Rodeo because she wanted to be honest. (Id., p. 46.) She felt she owed it to him. (Id.)

Joe became angry, sat up and called her a whore. (Id., p. 47.) He was enraged. (Id.) He rammed himself into a glass wedding box, shattering it. (Id., p. 48.) He grabbed her by the hair and drove her head into the wall. (Id., p. 49.) He swore and smashed their family portrait on the kitchen floor. (Id.) When she dropped to her knees to save the picture, he came up behind her and put a phone cord around her neck. (Id., pp. 52-53.)

Andriano believed Joe would commit a murder-suicide. (Id., p. 54.) She was able to grab a knife from the kitchen drawer and use it to cut the cord from around her neck. (Id.) She turned around and pointed the knife at Joe. (Id.) She dropped the knife because she wanted Joe to calm down and she was disgusted at

27

their behavior. (Id., p. 57.) He picked up the knife so she grabbed a barstool and hit him while he was bending over. (Id., p. 60.) She hit him every time he moved. (Id.) Then, she dropped the broken barstool and ran into the bathroom. (Id., p. 61.) When it was quiet, she went back out to the living room where Joe lay. (Id., pp. 61-62.)

When she approached him, he rolled over, still with the knife in his hand, and told her he would kill himself. (Id., p. 62.) She grabbed his hand to stop him. (Id.) They struggled, but her hand slipped in the blood, and the next thing she knew there was blood all over her glasses. (Id.) Andriano said she did not cut Joe. (Id., pp. 62-63.)

She cried, went to the kitchen and called her step-father. (Id., p. 63.) Her step-father told her to call 911 so she did. (Id., p. 64.) They told her to roll Joe over and give him CPR. (Id.) She grabbed him around the ankles in order to roll him over. (Id., p. 65.) Then, she unlocked the door, and sat and waited for the paramedics. (Id.)

Andriano said she never hit Joe with a lamp. (Id., p. 66.) She hit Joe with the barstool because she thought he would kill her. (Id.) Andriano did not tell police about the sodium azide because Joe had instructed her not to let anyone know about the suicide plan. (Id., p. 67.) She admitted that during a break in the

28

police interrogation, she called a co-worker and asked her to hide from the police

documents in her office having to do with obtaining the sodium azide.   (RT,

11/2/04, pp. 56-57.)

## ISSUES PRESENTED FOR REVIEW

1.     Did the trial court err by permitting introduction of other "bad acts" evidence at trial?

2.     Did the trial court err by failing to *sua sponte* instruct on all lesser-included offenses supported by the evidence?

3.     Is A.R.S. § 13-703(F)(6) facially vague and vague as applied?

4.     Was the jury instruction defining "especially cruel" insufficient to guide the jury and channel their discretion?

5.     Is the evidence of the "especially cruel" aggravator insufficient to support the finding?

6.     Did the trial court improperly refuse to permit the mitigator of "residual doubt?"

7.     Did the trial court improperly refuse to permit the mitigator of "mercy?"

8.     In the penalty phase, did the trial court improperly instruct the jury so as to require the jury to unanimously find mitigators before individual weighing?

9.     In the penalty phase, did the trial court improperly give the jury an impasse instruction without knowing if the jury was deadlocked?

10.     Is an impasse instruction during the penalty phase regarding the jury's duty to deliberate improper?

30

11.    Is Arizona's lethal injection statute vague by not specifying proper execution protocol to ensure compliance with due process and the Eighth Amendment?

12.    Is Arizona's death penalty constitutional?

**Guilt/Innocence Phase Issues.**

**ARGUMENT I**

**THE TRIAL COURT VIOLATED ANDRIANO'S RIGHT TO A FAIR TRIAL AND DUE PROCESS UNDER THE FIFTH, SIXTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND ARTICLE 2, §§ 4 AND 24 OF THE ARIZONA CONSTITUTION WHEN IT PERMITTED EVIDENCE OF ANDRIANO'S ATTEMPTS TO OBTAIN LIFE INSURANCE POLICIES AND EVIDENCE OF ANDRIANO'S EXTRAMARITAL ACTIVITIES AS INTRINSIC TO THE CHARGE OF PREMEDITATED MURDER.**

*Standard of Review*

The Court first determines *de novo* whether the evidence falls within the scope of Rule 404(b). *United States v. DeGeorge*, 380 F.3d 1203, 1219 (9th Cir. 2004). If so, the Court applies a four-part balancing test under Rule 404(b). *Id.* If not, the trial court's decision to admit the evidence is reviewed for abuse of discretion under Rule 403. *Id. See also*, *State v. Dickens*, 187 Ariz. 1, 18, 926 P.2d 468, 485 (1996).

*Facts*

Defense counsel filed a motion *in limine* to preclude the state from introducing evidence of Andriano's attempts to obtain life insurance on the life of

32

her husband and evidence of her extramarital affairs.  (ROA, p. 100.)  Andriano argued that Rule 404(b) precluded this evidence as improper character evidence not admissible for any other purpose.  (Id.)  The state maintained that part of the motivation for the murder was greed evidenced by Andriano's attempt to fraudulently obtain insurance on Joe's life.  (ROA, p. 106.)  The state asserted that "per conversations with friends, once her husband was dead, Rick Freeland would be willing to resume the relationship with her."  (Id.)  The court denied the motion, ruling that the evidence of attempts to obtain life insurance and the evidence of extramarital relationships was intrinsic to the charge of premeditated murder.  (RT, 9/7/04, p. 14.)

According to Andriano, Joe asked her to check out the possibility of getting additional life insurance policies.  With Joe's support, Andriano lied on the forms about Joe's health.  Andriano asked their friends to stand in for Joe at the health exam.   Finally, she stopped because her step-father told her that she was committing fraud.

During the summer of 2000, Andriano engaged in extramarital relationships. She met Rick Freeland, a tenant at her apartment complex.  (RT, 10/27/04, p. 47.) Andriano said during this time period, Joe was always very angry and took it out on her.  (Id., p. 55.)  She considered Freeland a friend who listened to her and

33

shared her burden.  (Id., p. 61.)  Their relationship became sexual because

Andriano "couldn't imagine saying no.  It just wouldn't have been right."  (Id., p.

66.)  Freeland broke off the relationship after meeting Joe.  (Id., pp. 67-68.)

Andriano was hurt, felt like she lost her best friend, and did not understand.  (Id., p.

69.)  When Freeland ignored her at a bar one night, she followed him home and

pounded on his apartment door even though he told her to go away.  (Id.)

Andriano also had a brief sexual relationship with Travis Black, who she

met at a bar.  (Id., p. 74.)  Andriano said she was drinking heavily at the time so

she did not have to think.  (Id., p. 76.)  Andriano invited Black to her apartment the

night she met him.  (Id., p. 81.)  Joe was at the lake.  (Id., p. 74.)  Andriano took

one of Joe's condoms from their dresser and gave it to Black to use.  (Id., p. 83.)

She had sex with him because she felt "I'd led him on to this point, then how could

you turn around and just say no?"  (Id., p. 82.)  Joe noticed the missing condom

right away and kept asking her about it for the next week.  (RT, 10/28/04, pp. 11-

12.)  She denied knowing what happened to it.  (Id., p. 12.)  Both Freeland and

Black testified for the state.  (RT, 9/13/04, pp. 15-71; RT, 9/16/04, pp. 88-111.)

The prosecutor made constant references to the affairs at trial.  During cross

examination of defense expert Sharon Murphy:

34

Q: Now, did you know that the reason that she had to use this lubricant was because...she thought Mr. Andriano was gross and skinny. Did you know that?

A: No.

(RT, 10/13/04, p. 68.)

Shortly thereafter:

Q: Do you know whether or not she had to use any lubricant with regard to Rick Freeland?

A: I don't know.

Q: Don't you think it would have been important to this inquiry to see whether or not she actually needed lubricant with Rick Freeland to determine whether or not it was just sex that she indicated or it was just sex with an icky, gross guy?

A: As I recall, the purpose of my questioning her and interviewing her was to get a picture, and I didn't ask specifics about the nature of the sex acts with Rick Freeland.

(Id., pp. 68-69.)

During his guilt phase closing:

Well, what about Dido Gomez. I mean, he might be a little upset he's not considered the first because the defendant says he was. I'm sure and Sharon Murphy was quick to point out every time that the defendant has sex with Mr. Andriano, she had to use a lubricant. I wonder if she had to use a lubricant with Dido Gomez. I wonder if she had to use a lubricant with Vernon Barnes. These

35

> are issues they brought up because they wanted to paint
> her holier than thou....

(RT, 11/16/04, p. 75.)

He argued further:

> It's just amazing, given the fact that she has blamed him
> for everything that has ever gone wrong in her life.
> Blamed him for the affairs. Blamed him for having to go
> out. Blamed him for wanting to go out and kiss guys.
> Blamed him for sitting between guys' legs. Blamed him
> for kissing this guy.

(Id., p. 61.)

He also said: "You've seen what she looked like back then, all sassed up in

her pink little outfit." (Id., p. 63.)

On Andriano's relationship with Rick Freeland, the prosecutor contrasted

Freeland and Black's good health to Joe being "skinny" and "gross." (Id., p. 76.)

He compared Joe's fighting for his life and wanting to be with his family to

Andriano's running around at bars, getting drunk; a debauched adulteress. (Id., pp.

87-89.)

The prosecutor referred to yet another extramarital incident telling the jury:

> And what's happening is that perhaps the defendant is
> heading to Shannon Sweeney's, to her apartment, that
> direction to her apartment rather than going home.
> Perhaps she's going to experience another one of these
> dalliances that is not an affair. We don't know. But she

36

was certainly headed with another man to another
apartment at 1:30 or 2:00 in the morning, when, by her
own account she was blasted, she was drunk.  This is the
woman who kisses men on the way home.

(Id., pp. 92-93.)

The prosecutor argued further:

...the last couple two or three months of his life that for
two or three months, two times a week, minimum, the
defendant was going out; Tuesdays and Saturdays or
Fridays.    Remember that?   Rockin' Rodeo on the
weekends and Tijuana Country Club in the middle of the
week.  What kind of marriage is that?  Let's go out and
look for the young bucks we have out here on the dance
floor.  Maybe we can take one home.

(Id., p. 101.)

The prosecutor continued:

And then to have this woman come over in the same
living room, in the same sofa where on September 27th
she enjoyed the spoils, if you will, with Travis Black in
the same place.

(Id., p. 139.)

During closing argument of the aggravation phase, the county attorney

admitted to the jury:

Even though she wanted to go out with other men, it
wasn't like they were the love of her life in the sense she
was with one individual now and later she hooked up

> with another individual.  So that really wasn't the main
> motivation.

(RT, 11/30/04, p. 20.)

**Discussion**

The trial court admitted evidence of Andriano's attempts to obtain life

insurance and her extramarital activities as intrinsic to the charge of premeditated

murder.  The prosecutor made Andriano's promiscuous behavior the cornerstone of

his case when it had nothing to do with the premeditated murder of her husband.

This strategy permeated the trial with marginally relevant, unfairly prejudicial

evidence.

The trial court improperly characterized this evidence as intrinsic and

violated Andriano's due process and fair trial rights under the Fifth, Sixth, and

Fourteenth Amendments to the United States Constitution as well as Article 2, §§ 4

and 24 of the Arizona Constitution.  The evidence did not fall under the definition

of intrinsic evidence and was unfairly prejudicial, pervading every phase of this

trial.   By the time Andriano took the stand, the jury knew more about her

extramarital experiences than they knew about the events leading to Joe's death.

The prosecutor took every opportunity to infuse the trial with marginally relevant

information about Andriano's partying and man-chasing.

38

Other act evidence is intrinsic if 1) evidence of the other acts and evidence of the crime charged are inextricably intertwined or 2) both acts are part of a single criminal episode or 3) the other acts were necessary preliminaries to the crime charged. *State v. Dickens*, 187 Ariz. at 19, 926 P.2d at 486, *quoting United States v. Coleman*, 78 F.3d 154, 156 (5th Cir. 1996).

## Life Insurance.

Evidence of Andriano's attempts to obtain life insurance on her husband after learning of his cancer diagnosis was not inextricably intertwined with the charge of premeditated murder. Her unsophisticated attempts to get insurance relied on her hope that the insurance company would not do a thorough investigation before issuing a policy, as well as her hope that she could find someone to stand in for her husband during the physical exam. She abandoned her plan to try to secure her family's future when Andriano's step-father told her what she was doing was wrong and fraudulent and to stop it. She never did receive a policy on her husband's life and never went beyond initial exploratory stages. She would never have gained from a policy even if she received one. Her efforts to obtain insurance were distinct from any motive to kill her husband.

The attempts to obtain life insurance were not part of a single criminal episode or a necessary preliminary to the murder. Her efforts were not close in

39

time to the murder, nor were they necessary to commit the murder. They were completely separate from the murder. They were not relevant to the aggravating factor alleged by the state, pecuniary gain, because she did not gain monetarily from her husband's death. She had no reason to believe she would receive any monetary gain from his murder.

**Extramarital Activity.**

The evidence of extramarital affairs was not part of a single criminal episode or a necessary preliminary to the murder. The state used this evidence constantly throughout the trial to portray Andriano as a despicable person. At no time could the state connect any of her extramarital activities to the murder. Although at the outset of trial the state claimed otherwise, there was no evidence that Andriano engaged in an ongoing affair at the time of the incident.

There was no evidence that Andriano committed murder at the behest of a boyfriend. There was no evidence that a paramour assisted her in the planning or carrying out of the murder of her husband. There was no evidence that Andriano wanted to "get rid of" her husband to make way for a new person in her life. There was no connection at all between her promiscuous behavior and her husband's death.

Neither was the extramarital activity inextricably intertwined with the poisoning, beating or stabbing of her husband nor was it part of the chain of events leading up to her husband's death. In fact, the court had little information upon which to base its holding that this evidence was intrinsic. There was no evidentiary hearing, only motions and argument.

The state used this character evidence to convince the jury that Andriano was an uncaring, cold woman who went out to the bars two nights a week, kicking up her heels while her husband stayed home with the children as he died of cancer. Evidence of immorality does not tend to prove a propensity or predisposition to commit murder.

Courts in other states have addressed this issue, usually in the context of a 404(b) analysis, with varying results. Evidence of a defendant's lengthy extramarital affair was held to be admissible where the defendant's mistress testified in a robbery and murder case that shortly after the murder, the defendant met her in another state, gave her $35,000 in cash, slept at her apartment and left a suitcase of clothing there. *State v. Kim*, 897 A.2d 968 (NH 2006). These facts show a closer connection between the extramarital activities and the actual crime than the facts in the present case. There was no evidence that Andriano had a

41

paramour that assisted, collaborated or even knew of any plan to poison or otherwise kill her husband.

In a case where the state accused the defendant of murdering his wife and children, the appellate court held that the trial court abused its discretion when it allowed the state to introduce evidence of defendant's adulterous conduct in its case in chief. *State v. Camm*, 812 N.E.2d 1127 (Ind. App. 2004). The court found that the tie between such evidence and motive, or anything other than simply portraying the defendant as bad was too strained and remote to be reasonable. *Id.,* at 1131.

The *Camm* court held that to be admissible, evidence of a defendant's extramarital affairs should be accompanied by evidence that such activities had precipitated violence or threats between the defendant and the victim in the past or that the defendant was involved in an extramarital relationship at the time of the homicide. *Id.,* at 1133. The *Camm* rationale fits the facts of the present case. Here, any connection between the evidence of promiscuity and Andriano's motive to murder her husband is "too strained and remote as to be reasonable."

Although the state told the court before trial that Rick Freeland would be willing to resume his relationship with Andriano once her husband was dead, there was no evidence produced at trial to support that assertion. There was no evidence

42

indicating that Andriano was having an affair at the time of the incident. Andriano told the jury that her husband was suspicious that she might be having an affair, only in response to the state's inordinate focus on her extramarital affairs during its case in chief.

The Ohio Supreme Court held that evidence of extramarital affairs should have been excluded because there was little to no probative value of the evidence while the prejudicial effect was significant because of the scorn a jury was likely to feel toward the adulterer. *State v. McKnight*, 107 Ohio St.3d 101, 152, 837 N.E.2d 315, 366 (2005). By the time Andriano took the stand, the jury heard copious amounts of testimony painting her as a heartless, philandering woman who did not care about her dying husband. The state spent significant time and energy introducing witnesses and testimony in its effort to persuade the jury that Andriano deserved their scorn.

Other courts have upheld the admission of evidence of extramarital affairs because it was relevant to the pattern of defendant's disrespect and hostility toward the victim. *Commonwealth v. DeMarco*, 444 Mass. 678, 830 N.E.2d 1068 (2005); *People v. Houston*, 130 Cal.App. 4th 279, 29 Cal.Rptr.3d 818 (Cal.App. 2005); *State v. Rhodes*, 627 N.W.2d 74 (Minn. 2001).

43

Because Andriano never did obtain life insurance before her husband's death, this evidence was not intrinsic to premeditated murder. Even if she had obtained a policy, she surely would not collect on it if she murdered her husband. Therefore, it does not follow that her attempts to get life insurance showed a motivation to murder her husband. Likewise, evidence of Andriano's extramarital behavior was not intrinsic to premeditated murder because the tie between the evidence and the motive was too strained and remote to be reasonable.

**404(b) Analysis.**

The evidence was not intrinsic, so was subject to a Rule 404(b) analysis. *United States v. DeGeorge*, 380 F.3d 1203 (9th Cir. 2004). This requires an analysis of the following: 1) Rule 404(b) requires that the evidence be admitted for a proper purpose; 2) Rule 402 requires that the evidence be relevant; 3) the probative value of the evidence must substantially outweigh any unfair prejudice; and 4) Rule 105 allows for an appropriate limiting instruction, if the party requests one. *State v. Terrazas*, 189 Ariz. 580, 583, 944 P.2d 1194, 1197 (1997).

For the reasons previously argued, the attempt to get life insurance and the extramarital affairs both fail to support the state's argument that they proved Andriano's motive to kill her husband. Neither subject matter was relevant to any material issue related to the charge of premeditated murder. Any marginal

44

relevance that may have existed was substantially outweighed by the unfair prejudice suffered by admitting these topics into evidence, especially the extramarital relationships. Counsel did not request a limiting instruction and none was given.

Admitting the other act testimony into evidence when it was not intrinsic to the charge of premeditated murder, and so unfairly prejudicial, violated Andriano's right to due process and a fair trial. It tainted the entire trial. From the outset, the prosecutor introduced evidence of Andriano's promiscuous behavior calling eight witnesses who testified to her illicit behavior.

Extramarital activities continued as a theme throughout the state's closing arguments even though the prosecutor acknowledged there was no evidence that being free to see other men was the main motivation for the murder. Instead of weighing the facts and evidence material to the charge of premeditated murder, the jury was fed a barrage of irrelevant evidence intended to make the jury detest Andriano. The prosecutor constantly reminded them of reasons to loathe her, not for the crime of premeditated murder, but for being an unfaithful wife.

Prejudice resulting from the improper admission of other act evidence, to be reversible error, must make it reasonably probable that the verdict would have been different if the testimony had not been admitted. *State v. Grijalva*, 137 Ariz. 10,

45

14, 667 P.2d 1336, 1340 (App. 1983). The trial would have been a different trial in the absence of evidence of the loose behavior. Freeland and Black would not have been called as witnesses for the state. The testimony of many others would have been shorter and less scandalous.

The prosecutor's emphasis on whether or not Andriano used lubricant with her husband but not her paramours would not have been admitted for the jurors' consideration of whether she committed premeditated murder. Nor would the jury consider the prosecutor's various arguments referring to Andriano having affairs and kissing other men. The prosecutor would have been precluded from arguing that Andriano was "all sassed up" back then. Nor could he argue how Joe's appearance was unappealing to Andriano, so she sought out healthy, good looking men. The prosecutor would not have been able to refer to Andriano as a "demure little lotus blossom" who was out at the bar grabbing onto Travis Black. He would not have been able to argue, "I guess the woman has needs and she's going to do something about it...." so she invited Black into her home to have sex.

The prosecutor took every opportunity to inject Andriano's extramarital sex life into the trial but never once was able to tie it into what happened in that apartment that night that resulted in Joe's death. The prosecutor gratuitously used this ugly evidence against Andriano to make the jury despise her.

46

The testimony engendered a scornful attitude toward Andriano, yet it had only minimal, if any, connection to premeditated murder. Had the court precluded the evidence, the jury would not have focused on Andriano's extramarital sex life. The prosecutor's argument would have been limited to the salient facts surrounding the murder instead of exhibiting an inordinate focus on Andriano's sex life.

In *McKinney v. Rees*, 993 F.2d 1378, 1386 (9th Cir. 1993), the court said:

> His was not the trial by peers promised by the Constitution of the United States, conducted in accordance with centuries-old fundamental conceptions of justice. It is part of our community's sense of fair play that people are convicted because of what they have done, not who they are.

Here, as in *McKinney*, it is "highly probable that the error had substantial and injurious effect or influence in determining the jury's verdict." *Kotteakos v. U.S.*, 328 U.S. 750, 776, 66 S.Ct. 1239, 1253 (1946). Because there were no permissible inferences for the jury to draw from the evidence its admission violated due process. *Jammal v. Van de Kamp*, 926 F.2d 918, 920 (9th Cir. 1991).

The court improperly admitted the evidence of the attempts to get life insurance and the promiscuous behavior. The evidence was not inextricably intertwined with the charge of premeditated murder. It had minimal relevance to

47

premeditated murder.   It was unfairly prejudicial.   The result was a violation of Andriano's due process rights and her right to a fair trial.

## ARGUMENT II

**THE TRIAL COURT COMMITTED FUNDAMENTAL ERROR BY FAILING TO INSTRUCT THE JURY ON THE LESSER-INCLUDED OFFENSES OF SECOND DEGREE MURDER AND MANSLAUGHTER WHERE EVIDENCE AT TRIAL SUBSTANTIATED THOSE LESSER-INCLUDED OFFENSES DENYING ANDRIANO A FAIR TRIAL AND DUE PROCESS UNDER THE SIXTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AS WELL AS ARTICLE 2, §§ 4 AND 24 OF THE ARIZONA CONSTITUTION.**

### *Standard of Review*

The appellate court reviews for fundamental error when the defendant does not request a lesser-included offense. *State v. Dickens*, 187 Ariz. 1, 22-23, 926 P.2d 468, 489-490 (1996).

### *Discussion*

The trial court failed to instruct the jurors on lesser-included offenses supported by the evidence.  The jury did not have the opportunity to consider non-death eligible offenses that the evidence supported.  A sentence of death may not be imposed if the jury was not permitted to consider a lesser-included, non-capital offense and the evidence would have supported such a verdict. *Beck v. Alabama*, 447 U.S. 625, 627, 100 S.Ct. 2382 (1980).

49

The purpose of this rule is to ensure that the jury does not choose to convict the defendant of a death-eligible offense because it faces an all or nothing choice between that verdict and innocence. *Spaziano v. Florida*, 468 U.S. 447, 455 (1984). The failure of the court to instruct the jury on all lesser-included offenses supported by the evidence constitutes fundamental error. *State v. Krone*, 182 Ariz. 319, 323, 897 P.2d 621, 625 (1995); *State v. Nordstrom*, 200 Ariz. 229, 254, 25 P.3d 717, 742 (2001). Not only is it fundamental error, but it is a violation of due process. An offense is a "lesser-included" offense when the "greater offense cannot be committed without necessarily committing the lesser offense." *State v. Wall*, 212 Ariz. 1, 126 P.3d 148, 150 (2006), *quoting*, *State v. Dugan*, 125 Ariz. 194, 195, 608 P.2d 771, 772 (1980). The evidence supported instructions for second-degree murder and manslaughter.

In discussing final instructions, defense counsel told the court that he would not request any lesser-included offenses but noted that the court had a duty to instruct on all offenses supported by the evidence. (RT, 11/16/04, p. 4.) The court did not acknowledge this duty, nor did it instruct the jury on any lesser-included offenses. (Id., pp. 4-7; RT, 11/17/04, pp. 98-112.)

50

**Second-Degree Murder.**

A person commits second degree murder if without premeditation such person intentionally causes the death of another person or knowing that his conduct will cause death or serious physical injury, such person causes the death of another person. A.R.S. § 13-1104(A)(1) and (2). A reasonable jury could find Andriano abandoned her plan to kill her husband when she called her neighbor into her apartment and then called 911 to aid her husband. She would not call someone to her apartment to witness her crime and then call 911 if she planned to kill her husband.

Intentional second-degree murder is supported by evidence that between the time she called the neighbor and 911, and the time that the paramedics arrived, the Andrianos argued over Wendi's extramarital activities. A rational jury could have found Andriano guilty of second degree murder, that is, intentional but not premeditated. Although Andriano might have begun her actions with a premeditated plan to cause her husband's death with the poison, the poison was not the cause of death. She abandoned any plan to poison her husband when she called the neighbor to the apartment and dialed 911 for assistance. The argument that occurred while waiting for the paramedics began a new chain of events that while not premeditated, led to an intentional killing.

51

A rational jury could also have found a knowing second-degree murder. It could have found that Andriano knew that her conduct of hitting her husband on the head with the bar stool twenty-three times, along with the knife thrust to the neck would cause her husband's death. A knowing second-degree murder could be established if the jury believed that when the physical altercation began, Andriano did not start out to kill her husband. The jury could find that she knew that beating him in the head with a bar stool twenty-three times and stabbing him in the neck would cause his death.

**Manslaughter.**

The evidence also supported manslaughter premised upon a sudden quarrel or heat of passion resulting from adequate provocation of the victim. Joe provoked Andriano when, after her admission to having sex with another man, he approached her aggressively and reached for a fallen knife. In response, she grabbed the stool and struck him on the head with it several times. Then, they struggled some more with the end result of Joe being stabbed in the neck.

A rational jury could find the adequate provocation required for manslaughter when Andriano observed Joe pick up the knife. Little time passed between Hashisaki, speaking to a coherent Joe before going to wait for the paramedics and the paramedics speaking to a freshly showered Andriano. Enough

52

time existed for the altercation to have occurred in this manner supporting a manslaughter conviction.

The failure to give instructions on lesser-included offenses supported by the evidence forced the jury into an all or nothing choice where, if completely instructed on all options, the jury might have found Andriano guilty of second-degree murder or manslaughter. Because the judge failed to give these lesser-included offense instructions supported by the evidence, the jury did not have that option. As a result, their choice was to either find Andriano guilty of a capital offense, or not guilty.

The primary purpose of giving lesser-included offense instructions is to ensure that the jury does not choose to convict the defendant of a death-eligible offense because it faces an all or nothing choice between that verdict and innocence. This case is an example where lesser-included instructions were appropriate but not given. The jury had only two choices—either find Andriano guilty of a death-eligible offense or find her not guilty. This violation of Andriano's due process rights was fundamental error mandating reversal.

53

**Aggravation Phase Issues.**

**ARGUMENT III**

**THE CRUEL, HEINOUS, OR DEPRAVED AGGRAVATOR UNDER A.R.S. § 13-703(F)(6) IS FACIALLY VAGUE AND VAGUE AS APPLIED DENYING ANDRIANO A FAIR TRIAL, A FAIR SENTENCING, AND DUE PROCESS OF LAW UNDER THE SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AS WELL AS ARTICLE 2, §§ 4, 15, AND 24 OF THE ARIZONA CONSTITUTION.**

*Standard of Review*

The court reviews *de novo* the constitutionality of a statute.   *State v. McMahon*, 201 Ariz. 548, 38 P.3d 1213 (App. 2002).

*Discussion*

The sole aggravator found by the jury against Andriano was that the murder was especially cruel under A.R.S. § 13-703(F)(6).  (ROA, p. 393.)  Recently, in *State v. Johnson*, 212 Ariz. 425, 133 P.3d 735 (2006), this Court rejected Andriano's argument here, finding that the F.6 aggravator was not unconstitutionally vague. *Johnson*, 212 Ariz. at ___, 133 P.3d at 742. *See also*, *State v. Anderson*, 210 Ariz. 327, 352-53, 111 P.3d 369, 394-95 (2005). The Court has continued to adhere to the holding in *Walton v. Arizona*, that although facially

54

vague, the Arizona courts have given substance to the facially vague aggravator by providing a definitional narrowing construction which the sentencing judge was presumed to apply because judges "know the law and...apply it in making their decisions." *Walton v. Arizona*, 497 U.S. 639, 652-54, 110 S.Ct. 3047 (1990), *overruled in part on other grounds by Ring v. Arizona*, 536 U.S. 584, 122 S.Ct. 2428 (2002).   However, the Court has now extended that holding from well-informed judge sentencing to poorly-informed jury sentencing.  This change merits reexamination of the issue.

**Facial Vagueness.**

Where discretion is afforded a sentencing body on a matter so grave as the determination of whether a human life should be taken or spared, that discretion must be suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action. *Gregg v. Georgia*, 428 U.S. 153, 189, 96 S.Ct. 2909 (1976). Channeling and limiting the sentencer's discretion in imposing the death penalty is a fundamental constitutional requirement. *Maynard v. Cartwright*, 486 U.S. 356, 362, 108 S.Ct. 1853 (1988).  The states must furnish the sentencer with "clear and objective standards" that provide "specific and detailed guidance," and that "make rationally reviewable the process for imposing a sentence of death." *Godfrey v. Georgia*, 446 U.S. 420, 428, 100 S.Ct. 1759 (1980).  The state must establish

55

rational criteria that narrows the decision maker's judgment. *McCleskey v. Kemp*, 481 U.S. 279, 305, 107 S.Ct. 1756 (1987). The death penalty statutes must be structured so as to prevent the penalty from being administered in an arbitrary and unpredictable fashion. *California v. Brown*, 479 U.S. 538, 541, 107 S.Ct. 837 (1987). A state must administer the death penalty in a way that can rationally distinguish between those individuals for whom death is an appropriate sanction and those for whom it is not. *Spaziano v. Florida*, 468 U.S. 447, 460, 104 S.Ct. 3154 (1984).

The first published definition of the F.6 terms appeared in *State v. Knapp*, 114 Ariz. 531, 543, 562 P.2d 704, 716 (1977). "Cruel" was defined as "disposed to inflict pain esp. in a wanton, insensate or vindictive manner: sadistic." *Id.* In *State v. Lujan*, 124 Ariz. 365, 604 P.2d 629 (1979), the Court differentiated between the terms stating that "cruelty" went to whether the "victim suffered pain," while "heinous" and "depraved" focused on the "killer's state of mind at the time of the offense." *Id.*, at 372, 604 P.2d at 636.

In *State v. Adamson*, 136 Ariz. 250, 665 P.2d 972 (1983), the Court, without explanation, expanded the cruelty concept to include a component inquiring into the mental state of the defendant. *Id.*, at 266, 665 P.2d at 988. From *Adamson* on, a cruelty finding also required that the defendant must intend that the victim suffer

56

or reasonably foresee that there was a substantial likelihood that the victim would suffer as a consequence of the defendant's acts. *Id.* It is this definition of the facially vague term "cruel" that the Court has held provides the narrowing construction to save it from vagueness. However, both *Walton* and, most recently, *State v. Johnson*, suffer the same malady.

Neither the United States Supreme Court cases, nor the Arizona cases on this issue have engaged in an examination or analysis of the Arizona cases to see whether the construction itself is constitutionally sufficient and whether the construction has been consistently applied to narrow those eligible for the death penalty. On behalf of three other justices, and with far greater analysis than employed by the *Lewis* majority, Justice Blackmun, dissenting, wrote:

> The Arizona Supreme Court's opinion in *Gretzler* obviously did *not* announce a "narrowing construction" of the F6 circumstance...instead, the Arizona Supreme Court cited [dictionary] definitions with approval and then gave *examples* of their application...I do not see how the Arizona Supreme Court's *description* of the manner in which a vague aggravating factor has been applied can be regarded as the establishment of a constitutionally sufficient narrowing instruction.

*Lewis v. Jeffers*, 497 U.S. 764, 789, 110 S.Ct. 3092, 3107 (1990). (Emphasis in original).

57

Instead, the current approach has been to affirm the F.6 aggravator through its narrowed construction by simply proclaiming that the construction is narrow, thus constitutionally sufficient. Because the terms do not constitutionally narrow the F.6 aggravator, it remains facially vague.

**Vagueness as applied.**

Even if the Court finds that the F.6 aggravator has been narrowed by case law, two important changes in the sentencing process render the F.6 factor vague in its application—the increased role of the jury in the sentencing process and the abandonment of proportionality review.

**The Jury As Capital Sentencer.**

Following the invalidation of Arizona's death penalty in *Ring v. Arizona*, 536 U.S. 584, 122 S.Ct. 2428 (2002) (*Ring II*), the Arizona legislature passed a new capital statute. Although not required by *Ring II*, the legislature assigned the determination of whether the death penalty should be imposed to the jury. A.R.S. § 13-703(D). Prior to *Ring*, Arizona engaged in judge sentencing in capital cases. *See Walton v. Arizona*, 497 U.S. 639, 110 S.Ct. 3047 (1990), *overruled in part by Ring II*. The *Walton* Court observed that there was no serious argument that Arizona's "especially heinous, cruel or depraved" aggravating factor was not facially vague. *Walton*, 497 U.S. at 654, 110 S.Ct. 3047. However, the definition

58

given to the "especially cruel" provision by the Arizona Supreme Court was constitutionally sufficient because it gave meaningful guidance to the sentencer. *Id.*, at 655, 110 S.Ct. 3047. The *Walton* Court presumed that Arizona trial judges were applying the narrower definition. The Court observed that under the logic of *Maynard* and *Godfrey* the concept that it is not enough to instruct a jury in the bare terms of an aggravating circumstance that is unconstitutionally vague on its face had no place in the context of sentencing by a trial judge. *Id.*, at 653, 110 S.Ct. 3047. However, when a jury is the final sentencer, it is essential that the jurors be properly instructed regarding all facets of the sentencing process. *Id.*

In *Woratzeck v. Lewis*, 863 F.Supp 1079, 1087 (D.Ariz., 1994), the court found it of "critical significance" that a trial judge performed the sentencing calculus for "it would seem the necessity that a limiting construction specify what constitutes a heinous, cruel or depraved murder is directly proportional to the limited experience and resources upon which the sentencer may draw to evaluate the facts presented and make the required individualized determination as to the appropriateness of the death penalty." Consequently, in states where a jury determines the existence of aggravating factors, the narrowing construction must be specific in order to channel their discretion. *Id.*

The *Woratzeck* court observed that a review of *State v. Gretzler*, 135 Ariz. 42, 659 P.2d 1 (1983), disclosed that the Arizona Supreme Court did little more than review and summarize its previous F.6 death penalty decisions. *Id.*, at 1086. The *Woratzeck* court also noted that the Ninth Circuit acknowledged *Gretzler's* limited significance in *Adamson v. Ricketts*, 865 F.2d 1011, 1032 (9th Cir. 1988), *overruled by Walton v. Arizona, in turn, overruled by Ring II*. The *Adamson* court said, "*Gretzler* reviewed a large number of cases, it did not…state [ ] what specific factors are *necessary* for an (F)(6) finding. Moreover, the court did not include any instructions to limit future review to the enumerated factors." *Adamson*, at 1032. (Emphasis in the original). The *Woratzeck* court also noted the similar interpretation of *Gretzler* found in Justice Blackmun's dissent in *Lewis v. Jeffers*. *Woratzeck*, at 1086.

The *Woratzeck* court found that the mere number of cases listed in *Gretzler* could not itself effectively establish a narrowing construction, even if they were utilized to provide some additional understanding. *Id.*, at 1087. The court concluded that first, *Gretzler* was merely a comprehensive summation of existing case law and provided no new or required definition or interpretation of the F.6 factor. Second, because sentencing judges are presumed to know the law and apply it correctly, the narrowing constructions need not be as specific in states

60

where a judge is the final sentencer for Eighth Amendment purposes as long as "some guidance" is available. *Id.*

In *State v. Mata*, 185 Ariz. 319, 329, 916 P.2d 1035, 1045 (1996), the Arizona Supreme Court agreed with *Woratzeck v. Lewis* that the decisions prior to *Gretzler* provided adequate narrowing because in Arizona, the finding of aggravation is made by the trial judge, who requires less guidance than a jury.

Although juries need more specific channeling and guidance than do judges in construing facially vague aggravating factors, in Arizona they receive none. Here, the Arizona jury receives the same construction of the F.6 aggravator provided in *Gretzler* that the trial judges do. Yet, whereas a trial judge is presumed to know and apply the law, the same may not be said for a sentencing jury. Arizona juries are left with only the barest guidance in making their determinations. As a result, use of the *Gretzler* factors do not provide the clear and objective standards that give specific and detailed guidance to channel the jury's discretion as required by *Maynard* and *Godfrey*. Consequently, the jury cannot rationally distinguish between those individuals for whom death is an appropriate sanction and those for whom it is not. Therefore, instructing juries by reference to the *Gretzler* definitions alone does not provide the channeling required by the Eighth Amendment in a capital case.

61

**Abandonment of proportionality review.**

Even though juries need more specific guidance than judges when they act as the sentencer in capital cases, in Arizona, trial judges have an added advantage that juries do not—the ability to compare any case before them to other capital murders and other non-capital murders to determine if the case before them is one in which the death penalty is warranted. While trial judges may have been able to sufficiently narrow the F.6 aggravator by reference to other capital cases, a jury does not have the same benefit. Thus, application of the F.6 aggravator is also unconstitutionally vague as applied by the Court's decision to abandon proportionality review.

In *Walton v. Arizona*, the United States Supreme Court decided that proportionality review was not constitutionally required. 497 U.S. at 655-56, 110 S.Ct. 3047. In 1992, the Arizona Supreme Court abandoned proportionality review in *State v. Salazar*, 173 Ariz. 399, 416-17, 844 P.2d 566, 583-84 (1992). Nevertheless, Arizona law requires that the circumstances of the crime set the murder apart from other first degree murders. That is, the circumstances of the murder must raise it "above the norm" of other first degree murders. *See, State v. Sansing*, 206 Ariz. 232, 241, 77 P.3d 30, 39 (2003); *State v. Carlson*, 202 Ariz. 570, 582, 48 P.3d 1180, 1192 (2002) (The death penalty should not be imposed in

every capital murder case but, rather, it should be reserved for cases in which either the manner of the commission of the offense or the background of the defendant places the crime "above the norm of first degree murders."); *State v. Brookover*, 124 Ariz. 38, 40, 601 P.2d 1322, 1324 (1979) (What is intended to be included are those capital crimes where the actual commission of the capital felony was accompanied by such additional acts as to set the crime apart from the norm of capital felonies, the conscienceless or pitiless crime which is necessarily torturous to the victim.)

Here, the jury was instructed:

> All first degree murders are to some extent heinous, cruel or depraved. However, this aggravating circumstance cannot be found to exist unless the murder is especially heinous, cruel or depraved. *That is where the circumstances of the murder raise it above the norm of other first degree murders.*

(RT, 12/1/04, p. 91.) (Emphasis added).

While trial judges have a fund of knowledge and experience in seeing both capital and non-capital murders during their tenure, it is safe to say that, in general, and here specifically, this was this jury's first homicide. The trial court in its specific instruction, and this Court in its application, thus, requires the jury to determine whether the circumstances of the murder before them raise it above the

63

norm of other first degree murders without providing the jury anything to compare the murder to in making its determination. The jury is left only with the cold comfort of the *Gretzler* definitions.

Dissenting to this Court's decision to abandon proportionality review, then Chief Justice Feldman argued that one of the reasons that proportionality review was valuable was because the "especially cruel" aggravator is unclear. *Salazar*, 173 Ariz. at 418-419, 844 P.2d at 585-586 (Feldman, C.J., dissenting.) Justice Feldman's argument focused on the fact that there was no "real science" in determining which crimes are "especially cruel." *Id.* Feldman illustrated this argument with examples observing:

> One becomes death eligible if, hand trembling because of fear, mental illness, or drug use, one fails to aim accurately or kill with the first blow and the victim fortuitously suffers and dies slowly.

*Id.*, at 419, 844 P.2d at 586.

In *Adamson v. Ricketts*, the Ninth Circuit Court of Appeals observed that the "especially cruel" aggravator may be, and has been applied in contradicting manners:

> As one commentator concluded, the Arizona Supreme Court's exposition of the "especially cruel" component would make the F(6) criterion applicable to almost any first degree murder case unless it involved a single

64

> unsuspecting victim.   Moreover, since suffering may occur either before or after attack by the defendant, that single unsuspecting victim must die, or be rendered unconscious, instantaneously for this criterion to apply.

865 F.2d at 1033.

The illustrations of the *Adamson* court and Justice Feldman in *Salazar* become more important to the consideration when a jury, rather than a judge, determines if a death sentence should be imposed.   In such a setting, almost every murder is capital murder.

Even if it were to be determined that the F.6 aggravator had been constitutionally narrowed by the *Gretzler* definitions, the change to jury sentencing and the abandonment of proportionality review have rendered it unconstitutionally vague as applied.   Juries require more specific guidance to channel their discretion than trial judges who know the law require.   More importantly, if Arizona juries are mandated to decide if the murder is "above the norm" of other first degree murders, they must be provided some standard by which to measure and compare the case before them to other such cases in order to comply with the mandate.

As a result, the F.6 aggravating factor is unconstitutionally vague on its face and vague as applied.   In particular, here, the jury was not provided specific, objective guidance to channel its discretion, nor was it given any way to determine

65

if this murder was above the norm of other first degree murders, although commanded to do so by the trial judge.   Its discretion was not guided in a constitutionally sufficient manner.   Consequently, it was left to determine the sentencing on an *ad hoc* basis.   This is an unconstitutional application of the F.6 aggravating factor in violation of Andriano's right to a fair trial, fair sentencing process and due process under the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution as well as Article 2, §§ 4, 15, and 24 of the Arizona Constitution.   This Court should vacate the finding of the especial cruelty.

## ARGUMENT IV

**THE TRIAL COURT'S INSTRUCTION DEFINING CRUELTY UNDER A.R.S. § 13-703(F)(6) WAS INSUFFICIENT TO GUIDE THE JURY AND APPROPRIATELY CHANNEL THEIR DISCRETION IN VIOLATION OF THE SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AS WELL AS ARTICLE 2, §§ 4, 15, AND 24 OF THE ARIZONA CONSTITUTION.**

*Standard of Review*

The court reviews *de novo* whether instructions to the jury properly state the law. *State v. Orendain*, 188 Ariz. 54, 56, 932 P.2d 1325, 1327 (1997).

*Discussion*

If the Court determines that the facially vague F.6 aggravating factor can be narrowly construed and applied by juries to channel and limit their discretion to rationally distinguish between those individuals who deserve the death penalty and those who do not, nonetheless the trial court's instructions here were unconstitutionally vague and did not channel the jury's discretion by clear and objective standards that provided specific and detailed guidance and that made rationally reviewable the process of imposing a sentence of death in violation of Andriano's rights under the Sixth, Eighth, and Fourteenth Amendments to the

67

United States Constitution as well as Article 2, §§ 4 and 24 of the Arizona Constitution.

In *State v. Anderson*, 210 Ariz. 327, 111 P.3d 369 (2005), the Court rejected the defendant's challenge that the jury was not given a "limiting definition" of the F.6 aggravator. For the definition of "especially cruel," the trial court in *Anderson* instructed the jury:

> The term "cruel" focuses on the victim's state of mind. Cruelty refers to the pain and suffering the victim experiences before death. A murder is especially cruel when there has been the infliction of pain and suffering in an especially wanton and insensitive or vindictive manner. The defendant must know or should have known that the victim would suffer.
>
> A finding of cruelty requires conclusive evidence that the victim was conscious during the infliction of the violence and experienced significant uncertainty as to his or her ultimate fate. The passage of time is not determinative.

*Id.*, n. 19.

In upholding the court's jury instruction, this Court observed that the jury was instructed in detail as to what would support a finding that the murders were "especially heinous, cruel or depraved." *Anderson*, at 352, 111 P.3d at 394.

68

Likewise, in *State v. Cromwell*, 211 Ariz. 181, 119 P.3d 448 (2005), the

Court also found that the jury instruction on cruelty did not suffer from vagueness.

211 Ariz. at 190, 119 P.3d at 457.  The jury in *Cromwell* was instructed:

> Cruelty goes to mental and physical anguish suffered by
> the victim.   Mental anguish occurs when the victim
> experiences significant uncertainty about her fate.   In
> order to constitute cruelty, conduct must occur before
> death and while a victim is conscious.   Conduct
> occurring after death or while a victim is unconscious
> does not constitute cruelty.  Before conduct can be found
> to be cruel, the state must prove that the defendant knew
> or should have known that the conduct would cause
> suffering to the victim.

*Id.*, at 189, 119 P.3d at 459.

Here, Andriano objected to and moved to dismiss the F.6 aggravating factor.

(ROA, p. 96; mistakenly denominated (G)(6); RT, 11/30/04, pp. 77-86.)   Over

Andriano's objection, the trial court instructed the jury:

> "Cruelty" involves the infliction of physical pain and/or
> mental anguish on a victim before death.   A crime is
> committed in an especially cruel manner when a
> defendant either knew or should have known that the
> manner in which the crime is committed would cause the
> victim to experience physical pain and/or mental anguish
> before death.  The victim must be conscious for at least
> some portion of the time when the pain and/or anguish
> was inflicted.

(RT, 12/1/04, pp. 91-92.)

Accordingly, unlike *Anderson* and *Cromwell*, the trial court here did not instruct on the significant uncertainty a victim must have about their fate or the physical and mental anguish that a victim must experience in order to satisfy the definition of "especially cruel." The mental anguish that results when a victim experiences significant uncertainty as to their ultimate fate is a critical circumstance in determining whether a murder is especially cruel.

For instance, in *State v. Stokley*, 182 Ariz. 505, 517, 898 P.2d 454, 466 (1995), a cruelty finding was upheld where the trial court observed that the victims were alive for some minutes from the start of the fatal assaults. They experienced great physical pain and mental anguish as they fought to free themselves. There was frequent repositioning of the hands of the killers on the throats of the victims, and the reasserting of the pressure until they were unconscious. The Court noted the extent of physical injuries on the victim's bodies, much of which they must have experienced while conscious. The victims' deaths were due to asphyxia by manual strangulation; the pathologist testified that death usually takes 12 to 15 minutes to occur. Both victims suffered injuries, including bruises, abrasions, and stab wounds, one near or in the right eye that occurred while still alive or shortly after death. Stomp marks on one victim's body, face, and neck were caused while she was alive or shortly after death. She suffered a complete fracture of the

70

cranium and laceration of the skull.  Both victims had injuries indicative of a struggle.

In *State v. Cromwell*, the Court upheld a cruelty finding where the 11 year old victim suffered unspeakable mental anguish, given the medical examiner's finding that she was still alive at the time she was stabbed and sexually assaulted. Given her age of 11 years, she was made to suffer pre-death anguish by conduct indescribable except in the most repulsive terms.  211 Ariz. at ___, ¶ 55, 119 P.3d at 458.

In *State v. Poyson*, 198 Ariz. 70, 78, 7 P.3d 79, 87 (2000), the Court upheld a cruelty finding where after a victim's throat was slashed, he struggled with Poyson and his co-defendant, Frank Anderson, for some forty-five minutes before dying.  He had two defensive wounds on his left hand confirming he was conscious throughout the ordeal.  The victim repeatedly asked the co-defendants why they were trying to kill him.  After being shot in the mouth, another victim fought with the co-defendants for several minutes before he died.  During the attack, the victim begged the defendant not to hurt him.

These examples all demonstrate the mental anguish caused to the victims by the significant uncertainty of their ultimate fates.  In contrast, here, the trial court's instruction to the jury that cruelty involves the infliction of physical pain and/or

71

mental anguish on a victim before death, did not sufficiently distinguish acts that would separate the cruelty inherent in all first degree murders from the especial cruelty that raises this murder above the norm of other first degree murders. In this respect, the trial court's instruction failed to channel the jury's discretion and provide it guidance in making its determination.

Likewise, the cases illustrating the physical pain of the especially cruel aggravator describe significant physical abuse occurring while the victim was conscious that raised the murder above the norm of first degree murders. For instance, in *Poyson*, one victim's throat was slashed, and then his head slammed against the floor and pounded with a rock. 198 Ariz. 70, 79, 7 P.3d 79, 88. Later, the defendant drove a knife into the victim's ear while he was still conscious and struggling. *Id.* A second victim suffered a gunshot wound to the mouth that shattered several of his teeth. He was then struck in the head numerous times with a rifle, and was conscious during much of the attack. *Id.*

In *State v. Djerf*, 191 Ariz. 583, 596, 959 P.2d 1274, 1287 (1998), the victim was conscious during part or all of the initial beating with a baseball bat. He later regained consciousness and although suffering great pain from his wounds, struggled with the defendant. The defendant stabbed the victim so fiercely with a knife that the blade pierced his right forearm and penetrated his torso where it was

72

later found embedded. The trial court's finding of cruelty was upheld. *Id. See also, State v. Moody*, 208 Ariz. 424, 472, 94 P.3d 1119, 1167 (2004) (Victim's prolonged ordeal caused her physical anguish due to the restraints and immobility and mental anguish due to the uncertainty of her fate.); *State v. Apelt (Michael)*, 176 Ariz. 349, 367, 861 P.2d 634, 652 (1993) (Victim was conscious when struck repeatedly with great force and stabbed in the back and chest, and her throat was slashed.); *State v. Brewer*, 170 Ariz. 486, 501, 826 P.2d 783, 799 (1992) (Victim was conscious during 45 minute attack.)

Like mental anguish, the physical pain that warrants a finding of especially cruel is physical pain beyond that inherent in the physical pain of almost all first degree murders. It is significant physical anguish experienced by the victim that raises the murder above the norm of first degree murders.

Here, because the trial court did not define physical pain in such a manner as to separate it from the norm of first degree murders, the jury was without guidance, and had no clear and objective standards by which to measure and apply this aggravating factor. As a result, the jury's discretion was not channeled in a specific, objective manner. They did not have detailed guidance from which they could rationally distinguish whether death was warranted in this case based upon an appropriate consideration of the aggravating factor of cruelty. Thus, the trial

73

court's jury instructions defining "especially cruel" were unconstitutionally vague as applied to Andriano in violation of the Sixth, Eighth, and Fourteenth Amendments of the United States Constitution as well as Article 2, §§ 4 and 24 of the Arizona Constitution.

## ARGUMENT V

**APPLICATION OF THE PROPER, NARROW CONSTRUCTION OF "ESPECIALLY CRUEL" DEMONSTRATES THAT THE EVIDENCE IS INSUFFICIENT TO SUPPORT THIS AGGRAVATING CIRCUMSTANCE.**

### *Standard of Review*

The Arizona Supreme Court independently reviews all death sentences to determine if the aggravating factors are supported by the evidence. Review is *de novo*. *Anderson*, at 352, 111 P.3d at 394.

### *Discussion*

Assuming *arguendo* that the cruelty aggravator is capable of being constitutionally narrowed and constitutionally applied by the jury, application of the correct standard here demonstrates that the evidence does not support the existence of this aggravator.

If a trial judge fails to apply or instruct the jury on the constitutional construction of the aggravating factor or applies an improper construction, the constitution does not necessarily require that a state appellate court vacate a death sentence based on that factor. *Walton v. Arizona*, 497 U.S. at 653-54, 110 S.Ct. 3047. Rather, as the Court held in *Clemmons v. Mississippi*, 497 U.S. 738, 110 S.Ct. 1441 (1990), a state appellate court may itself determine whether the

75

evidence supports the existence of the aggravating circumstance as properly defined. *Id.*, 497 U.S. at 654, 110 S.Ct 3047; *State v. Anderson*, 210 Ariz. at 352, 111 P.3d at 394.   Here, proper application of the narrower construction of the "especially cruel" aggravator demonstrates that the evidence is insufficient to support this aggravating circumstance.

The jury unanimously found the single aggravating factor of cruelty.  (ROA, p. 393.)  A determination that the F.6 aggravator has been proven can be based on prongs that the murder was committed in an especially cruel, heinous, or depraved manner because they are in the disjunctive.  *State v. Newell*, 212 Ariz. 389, ___, 132 P.3d 833, 849-50 (2006); *State v. Gretzler*, 135 Ariz. 42, 51, 659 P.2d 1, 10 (1983).

The *Gretzler* Court observed: ·

> Our initial interpretations of this statutory phrase recognized that the words "especially heinous, cruel, or depraved" were not intended to apply to all first degree murders.   Rather they apply to "a killing wherein additional circumstances of the nature enumerated * * * set the crime apart from the usual or the norm."

*Gretzler*, at 50-51, 659 P.2d at 9-10.

The Court reiterated that it would not allow the F.6 provision to be used as a catch-all for those first degree murders where no other aggravating circumstance

76

applies. *Id.*, at 51, 659 P.2d at 10.  The Court defined cruel as, "disposed to inflict pain esp. in a wanton, insensate or vindictive manner:  sadistic." *Id.*  Cruelty involves the pain and distress visited upon the victim. *Id.*

A murder is especially cruel if the victim consciously suffers physical pain or mental anguish. *State v. Roscoe*, 184 Ariz. 484, 500, 910 P.2d 635, 651 (1996). The physical or mental pain suffered must be reasonably foreseeable by the defendant. *State v. Adamson*, 136 Ariz. 250, 266, 665 P.2d 972, 988 (1983).  The victim must have been conscious during at least some portion of the crime and the defendant either knew or should have known that the victim would suffer. *State v. Jones*, 205 Ariz. 445, 449, 72 P.3d 1264, 1268 (2003).

For instance, in *State v. Lavers*, 168 Ariz. 376, 382-383, 814 P.2d 333, 339-340 (1991), the Court upheld a cruelty finding where the defendant had stabbed his wife in the back causing paralysis below the level of the injury.  The defendant's wife was unable to stand, walk, or use her legs to crawl.  Despite the paralysis, she would have experienced pain after being stabbed and any movement would have exacerbated the pain.  The stab wound was not immediately fatal, and did not leave her unconscious.  She could have remained conscious for several hours or longer, and was still alive at the time she was shot.

In *State v. Moody*, 208 Ariz. 424, 94 P.3d 1119 (2004), the Court upheld a cruelty finding where the trial court found that the defendant tied the victim up with neckties and cords tightly enough to leave marks on her arms and wrists. Because the defendant went to the bank twice and communicated with the victim both times after returning, the trial court concluded that she must have been conscious and suffering for some period of time. *Id.*, at 472, 94 P.3d at 1167. The Court found that the prolonged ordeal caused her physical anguish due to the restraints and her immobility and mental anguish due to the uncertainty of her fate and the knowledge that the defendant was aware she could identify him as her attacker if she survived. *Id.*

In *State v. Bolton*, 182 Ariz. 290, 311, 896 P.2d 830, 851 (1995), the Court found that the murder was especially cruel where the physical evidence showed that the victim was conscious for a considerable period of time between the beginning of the crime and her death.

In *State v. Kiles*, 175 Ariz. 358, 370, 857 P.2d 1212, 1224 (1993), the Court found the murder of the defendant's girlfriend was especially cruel as demonstrated by the prolonged, vicious beating of the victim with a jack stem over a period of time during a portion of which the victim was clearly conscious. Although the defendant initially knocked his girlfriend unconscious with the jack

78

stem, she regained consciousness and asked why he did that. *Id.*, at 371, 857 P.2d at 1225. A struggle then ensued that resulted in the girlfriend's receiving numerous wounds including extensive blunt trauma to the face, head, neck, upper extremities, and trunk, extensive multiple lacerations, multiple skull fractures, puncture wounds to the left elbow, a fractured right forearm, and shattered teeth. *Id.* The doctor who performed the autopsy said that her broken arm and elbow punctures were indicative of defensive wounds. *Id.*

Conversely, the Court found no cruelty in *State v. Wallace*, 151 Ariz. 362, 728 P.2d 232 (1986). The day before the murder, the defendant and his girlfriend had argued about his continued use of alcohol and drugs. *Wallace*, 151 Ariz. at 364, 728 P.2d at 234. The next day, the defendant remained at his girlfriend's mobile home waiting for her and her children to return. Her daughter arrived first. As she entered, the defendant attacked her from behind with a baseball bat; he struck her numerous times about the head, eventually breaking the bat. Because she was moaning and still appeared to be alive, the defendant forced a portion of the broken bat through her throat until it hit the floor. *Id.*

The defendant obtained a pipe wrench and waited for his girlfriend's son to return home from school. When the boy came home, the defendant followed him into his bedroom, surprised him, and repeatedly struck him over the head with the

pipe wrench. The defendant used such force that the skull was fractured in several places and brain matter was clearly visible on the floor. *Id.*

When the defendant's girlfriend entered the mobile home, they had a brief discussion and then she went to the kitchen to put away groceries. As she turned to face the defendant, he struck her on the side of her head with the same wrench he used on her son. The defendant repeatedly struck her, even after she had collapsed to the floor. *Id.*

In rejecting cruelty, the Court found that defendant attacked each of his victims quickly and by surprise. The state offered no evidence to establish pain or suffering by the victims and the record was inconclusive as to whether any of the victims were even conscious following the initial blow to the head. *Id.*, at 367, 728 P.2d at 237.

Here, the murder was not especially cruel as construed by the narrowed definition and typified by the Arizona interpretations. According to her testimony, fifteen minutes or so after her husband ingested the capsules he started feeling dizzy and nauseous. He broke out in a sweat. (RT, 10/28/04, p. 30.) He lay down on the floor of the bedroom. (Id., p. 31.) He then put on his shorts and they walked out into the living room where another wave of nausea struck and he vomited on the living room floor. (Id.)

80

When Chris Hashisaki walked inside the apartment at around 2:30 a.m., she saw Joe lying on the living room floor on his left side in a fetal position. (RT, 9/8/04, p. 14.) Hashisaki said Joe was able to communicate with her. (Id., pp. 14-15.) Joe continued to lay on the floor, unable to sit up. (Id., p. 16.) When asked to describe his condition for Emergency dispatch, Hashisaki said that Joe's color was fine, his lips were not blue, but he was having trouble breathing. (Id., p. 20.) As Hashisaki left to wait for Emergency responders, she saw that Joe had vomited again. (Id., p. 25.)

Andriano said that Joe started feeling a little bit better. (RT, 10/28/04, p. 38.) He wasn't sweating anymore, and had thrown up a second time. (Id.) Joe told Andriano that he was starting to feel a little better. (Id., p. 39.) Andriano said that Joe's symptoms began to decrease. (Id., p. 44.) He was no longer sweating nor had heart palpitations. (Id., p. 45.)

Dr. Keen, who performed the autopsy, said that he found no sodium azide in Joe's blood. (RT, 9/16/04, p. 60.) He discovered 3.8 milligrams per liter in Joe's gastric contents. (Id., pp. 60-61.) Dr. Keen said consumption of sodium azide would cause changes in blood pressure and pulse rate. (Id., p. 62.) Dr. Keen said there is a possibility a person would become agitated and emotionally excited. (Id., p. 63.) He said once a person vomited, then their symptoms should become

81

better unless they ingested so large a quantity that vomiting wouldn't get rid of it. (Id., pp. 63-64.)

Dr. Edward French, University of Arizona, Pharmacology professor, confirmed that the ingestion of sodium azide would cause headache, increased heart rate, and blood pressure drop. (RT, 9/23/04, p. 13.) He said a person would have shortness of breath. (Id.) If a person took a sufficient amount of sodium azide, it would work like cyanide because too little oxygen would get to the brain. (Id., p. 16.) Dr. French confirmed that once the azide had been purged from the stomach, the symptoms would cease. (RT, 9/23/04, p. 34.) He acknowledged that two parts per million was a small amount of azide. (Id., p. 36.)

Joseph Richmond, senior chemist for West Coast Analytical Service, detected sodium azide in a sample of Joe's blood at two parts per million, which was right at the detection limit. (Id., pp. 34-35.) Joe's oncologist, Dr. Kellogg, observed that a person undergoing chemotherapy would experience nausea, fatigue, shortness of breath and diarrhea. (RT, 9/28/04, pp. 26-27.)

It is clear that Joe had not taken a lethal amount of sodium azide. A 170 pound person would need to consume 2086 milligrams of sodium azide to die and even then would only have a fifty percent chance. (RT, 9/21/04, pp. 27-28; Ex. 366.)

Although he was in obvious distress caused by the ingestion, it did not constitute the physical anguish as set forth in the Arizona cases defining especial cruelty. Joe didn't even know that he had been poisoned. Thus, he did not suffer the mental anguish contemplated by the cruelty cases over the uncertainty of his fate. It appears that his distress was actually very similar to the distress a person undergoing chemotherapy would normally feel. Under these circumstances, the poisoning evidence is insufficient to support an especially cruel finding.

Even if the Court finds that the poisoning was especially cruel, Joe's distress was not foreseeable by Andriano. The physical pain or mental anguish suffered by a victim before death must only be reasonably foreseeable, and foreseeability in connection with cruelty is based on an objective rather than subjective standard. *State v. Carlson*, 202 Ariz. 570, 582, 48 P.3d 1180, 1192 (2002); *State v. Smith*, 146 Ariz. 491, 504, 707 P.2d 289, 302 (1985).

According to Andriano, Joe directed her to call Shawn King to find out why Joe was sick and throwing up rather than his heart just stopping like was expected. (RT, 10/28/04, p. 68.) Andriano's expectation was that Joe's heart would just stop and it would be over, painlessly. (Id., p. 30.) Thus, her objective understanding was that the sodium azide would not cause pain or illness. As a result, Joe's physical distress was not reasonably foreseeable by Andriano.

Likewise, the injuries from the bludgeoning do not support the especially cruel aggravator. Dr. Keen found that all of these injuries occurred before Joe's death. (RT, 9/16/04, pp. 30-31.) He said it was not an instantaneous death. (Id., p. 31.) However, of the twenty-three or so strikes primarily to the back of the victim's head, eight or ten of the blows would have rendered him immediately unconscious. (Id., p. 32.)

Dr. Keen noted cuts over the victim's right knuckle, and an incised wound on the dorsum of the right hand. (Id., p. 27.) He also saw contusions and abrasions in the wrist area. (Id.) Dr. Keen found two small superficial cuts on the decedent's left hand. (Id., pp. 28-29.) Dr. Keen said the wounds on the right hand were consistent with defensive wounds and said the cuts on the left hand could have been defensive wounds. (Id.) He noted that a bruise at the base of the decedent's left thumb could be a defensive wound or could have been inflicted from a fall. (Id., p. 29.)

Defensive wounds can support a cruelty finding because they demonstrate that the victim was conscious when the wounds were inflicted, and often point to a physical struggle for survival that supports mental anguish. *See State v. Medrano*, 173 Ariz. 393, 397, 844 P.2d 560, 564 (1992). However, review of the exhibits demonstrates that the defensive wounds here were minor and are not indicative of a

84

great or prolonged struggle of any sort. (Exs. 206-209.) During the aggravation phase, Dr. Keen described the knuckle laceration as "superficial." (RT, 11/30/04, p. 54.) Dr. Keen also said that the injury could be consistent with a wood screw scraping or incising the hand. (Id.)

Dr. Keen said the victim was not conscious throughout the sequence of injuries that he sustained and Keen did not know at what point the victim became unconscious. (Id., pp. 56-57.) Dr. Keen said the blows to the back of Joe's head could have caused him to die. (Id., p. 59.) Dr. Keen said there were a number of possible scenarios. (Id., p. 65.) Joe's hands could have been struck with the first blow and been rendered unconscious. (Id., p. 64.) He could have been struck once, and then the second blow struck his hands and also rendered him unconscious. (Id., p. 65.) Dr. Keen said Joe had not sustained a mortal blow up to the point where his neck was cut. (Id.) Dr. Keen said Joe would have died within minutes from when the attack started until the point he died. (Id., p. 69.) Dr. Keen said given the magnitude of his injuries, if Joe were conscious he would have experienced some pain. (Id., pp. 69-70.)

Dr. Keen said that because of the swelling inside Joe's brain, his loss of consciousness could be almost instantaneous, or could be minutes. (Id., p. 72.)

85

Even given the uncertainty of the evidence, it appears that the attack was very quick and Joe succumbed just as quickly.

The state's theory, supported by the evidence, was that Andriano killed Joe in the five to ten minutes from when Hashisaki left the apartment to when Andriano came around from the back wearing different clothes with her hair wet. (RT, 11/16/04, pp. 49-54.)  Thus, under the state's own theory, Andriano had to have killed her husband, showered, changed clothes, spoke on the phone to the dispatcher who called into the apartment trying to gain entrance for the Emergency personnel, and exited the apartment coming around from the back to speak with Emergency response, all within a maximum of ten minutes.  By the state's own theory, Andriano's attack on her husband must have occurred very quickly.

In *State v. Soto-Fong*, 187 Ariz. 186, 203, 928 P.2d 610, 627 (1996), this Court rejected the assumption that an especially cruel finding was appropriate whenever the victim remains conscious for some moments [after being shot.]  The Court observed that where the evidence was inconclusive that the victim was conscious or unconscious of pain immediately after the blows to the head, a cruelty finding is not supported. *Id.* (Citing cases.)

In *State v. Bishop*, 127 Ariz. 531, 534, 622 P.2d 478, 481 (1981), the Court held that cruelty had not been established where the victim was killed with

86

multiple blows from a claw hammer and the medical expert testified that the victim was unconscious of pain "immediately after the blows to the head." In *State v. Clark*, 126 Ariz. 428, 436, 616 P.2d 888, 896 (1980), the Court found cruelty to be inappropriate because "the fatal wounds appeared to have been delivered at vital parts of the bodies of the victims, and death ensued swiftly."

So it is here. All the evidence indicates that the attack on Joe was swift, and he was rendered unconscious very quickly. The defensive wounds indicate a brief struggle that ended quickly. Under these circumstances, an especially cruel finding is not warranted.

Finally, it is clear that at the time Joe was stabbed in the throat, he was unconscious from the wounds suffered to the back of his head. Thus, the stabbing cannot support a finding of cruelty.

Viewing the totality of circumstances surrounding the murder, the evidence is insufficient to support a finding of the especially cruel aggravating factor. *See State v. Gillies*, 142 Ariz. 564, 570, 691 P.2d 655, 661 (1984). Andriano requests this Court vacate the jury's finding of especial cruelty.

If the Court concludes that especial cruelty was properly found by the jury, the mitigation is nevertheless sufficiently substantial to call for leniency. Andriano

87

requests this Court to independently review the aggravation and mitigation, vacate

her death sentence, and remand for imposition of a life sentence.

**Penalty Phase Issues.**

## ARGUMENT VI

**THE TRIAL COURT'S REFUSAL TO PERMIT ANDRIANO TO PRESENT EVIDENCE OF RESIDUAL DOUBT DEPRIVED HER OF HER RIGHT TO DUE PROCESS, A FAIR TRIAL, AND A FAIR SENTENCING PROCEEDING UNDER THE SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AS WELL AS ARTICLE 2, §§ 4, 15 AND 24 OF THE ARIZONA CONSTITUTION.**

*Standard of Review*

Constitutional issues are reviewed *de novo*. *State v. McCann*, 200 Ariz. 27, 28, 21 P.3d 845, 846 (2001). The Court reviews *de novo* whether instructions to the jury properly state the law. *State v. Orendain*, 188 Ariz. 54, 56, 932 P.2d 1325, 1327 (1997).

*Discussion*

The Eighth and Fourteenth Amendments require that the sentencer…not be precluded from considering, as a mitigating factor, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death. *Lockett v. Ohio*, 438 U.S. 586, 604, 98 S.Ct. 2954 (1978); *Eddings v. Oklahoma*, 455 U.S. 104, 102 S.Ct. 869 (1982); *McCleskey v. Kemp*, 481 U.S. 279, 306, 107 S.Ct. 1756 (1987).

In *Franklin v. Lynaugh*, 487 U.S. 164, 108 S.Ct. 2320 (1988), the United States Supreme Court found that its previous cases had not interpreted the Eighth Amendment to give a capital defendant the right to introduce evidence of "residual doubt" and found it "quite doubtful" that any such right existed. 487 U.S. at 173, n. 6, 108 S.Ct. 2320. Most recently, in *Oregon v. Guzek*, ___ U.S. ___, 126 S.Ct. 1226 (2006), the defendant sought to reintroduce at his sentencing proceeding his alibi defense for the jury to consider as a "residual doubt." The Supreme Court again observed that it could find nothing in the Eighth or Fourteenth Amendments that provided a capital defendant a right to introduce new evidence of this kind at sentencing. *Id.*, at ___, 126 S.Ct. at 1231.

However, the Court did not go so far as to preclude consideration of "residual doubt" evidence. The Court said, "We once again face a situation where we need not resolve whether such a right exists, for, even if it does, it could not extend so far as to provide the defendant with a right to introduce the evidence at issue." *Id.*, at ___, 126 S.Ct. at 1232. The Court noted that the Eighth Amendment does not deprive the state of its authority to set reasonable limits upon the evidence a defendant can submit, and to control the manner in which it is submitted. *Id.* "States are free to structure and shape consideration of mitigating evidence 'in an effort to achieve a more rational and equitable administration of the death

90

penalty.'" *Id.*, *quoting Boyde v. California*, 494 U.S. 370, 377, 110 S.Ct. 1190 (1990), *quoting Franklin*, at 181, 108 S.Ct. 2320.

Arizona has struggled with the issue of "residual doubt." In *State v. Harrod*, 200 Ariz. 309, 317 n. 7, 26 P.3d 492, 500 n. 7 (2001), *reversed on other grounds by Ring II*, the Court expressed doubt about "residual doubt" as a mitigating circumstance, but found in particular it wasn't warranted in Harrod's case. Likewise, in *State v. Schackart*, 190 Ariz. 238, 253, 947 P.2d 315, 330 (1997), the Court found that unsupported claims of innocence after a person is found guilty beyond a reasonable doubt did not constitute mitigation for sentencing purposes.

Yet, in other cases, defendants have presented residual doubt as a mitigator at trial. *See, e.g., State v. Dann*, 206 Ariz. 371, 374, 79 P.3d 58, 61 (2003); *State v. Nordstrom*, 206 Ariz. 242, 247, 77 P.3d 40, 45 (2003); *State v. Jones*, 205 Ariz. 445, 451, 72 P.3d 1264, 1270 (2003). And, this Court has considered residual doubt in its independent review of mitigation. As Justice Feldman (Ret.) observed in *Harrod*, the majority opinion's discomfiture with "residual doubt" appeared odd in light of the fact that other Arizona cases intimated, if not held, that residual doubt was a mitigating circumstance. *Harrod*, 200 Ariz. at 323-324, 26 P.3d 492, 506-207, (Feldman, J., specially concurring), *referring to State v. Spears*, 184 Ariz.

91

277, 908 P.2d 1062 (1996), and *State v. Atwood*, 171 Ariz. 576, 832 P.2d 593 (1992).

In *State v. Pandeli*, 200 Ariz. 365, 379, 26 P.3d 1136, 1150 (2001), *reversed on other grounds by Ring II*, the Court considered residual doubt, but found that when a jury verdict finding a defendant guilty beyond a reasonable doubt was supported by very strong evidence, the trial court properly refused to find the non-statutory mitigator of "residual doubt."

In *State ex rel. Thomas v. Granville*, 211 Ariz. 468, 123 P.3d 662 (2005), the Court discussed the defendant's burden to prove mitigating evidence. In *Granville*, the state conceded that A.R.S. § 13-703(E) did not create a "presumption of death" and acknowledged that a jury may return a verdict of life in prison even if the defendant decides to present no mitigation evidence at all. 211 Ariz. at 471, 123 P.3d at 665. The Court observed that even if a juror believed that the aggravating and mitigating factors were equally balanced, § 13-703(E) did not require the juror to impose the death penalty. Rather, each juror is permitted to vote for a sentence of life or death as each juror sees fit in light of the aggravating factors found by the jury and the mitigating evidence found by each juror. *Id.*, at 472, n. 3, 123 P.3d at 663, n. 3.

92

Recently, in *State v. Johnson*, 212 Ariz. 425, ___, 133 P.3d 735, 746-747 (2006), this Court upheld a trial court's refusal to instruct jurors on specifically requested mitigation not wishing to confine jurors' consideration of mitigation. The Court cited The United States Supreme Court's emphasis of the need for a broad inquiry into all relevant mitigating evidence to allow an individualized determination. *Citing, Buchanan v. Angelone*, 522 U.S. 269, 276, 118 S.Ct. 757 (1998).

"[The Supreme Court's] decisions suggest that complete jury discretion is constitutionally permissible." *Id.*, citing *Tuilaepa v. California*, 512 U.S. 967, 978-79, 114 S.Ct. 2630 (1994) ("at the [penalty] phase, the state is not confined to submitting specific propositional questions to the jury and may indeed allow the jury unbridled discretion."); *see also, Zant v. Stephens*, 462 U.S. 862, 875, 103 S.Ct. 2733 (1983) (finding that a scheme permitting jurors unbridled discretion in determining whether to impose the death penalty after eligibility for the death penalty is determined is not unconstitutional.) *Id.*

Thus the mitigating evidence to be found by each individual juror is broad and may include any relevant factor that serves as a basis for a juror to vote for a life verdict. Our mitigation statute recognizes this fact. Under A.R.S. § 13-703(H), the trier of fact shall consider as a mitigating circumstance any factors

proffered by the defendant or the state which are relevant in determining whether to impose a sentence less than death, including any aspect of the defendant's character, propensities or record and any of the circumstances of the offense.

As a result, "residual doubt" is a valid mitigating factor that may be considered by the trier of fact in considering the appropriate sentence to impose. Here, and with the consideration of "mercy" in Argument VII below, the trial court refused to permit Andriano to proffer important, relevant mitigation.

Andriano specifically requested the court to permit her to introduce evidence regarding "residual doubt." (RT, 12/7/04, p. 5.) Counsel phrased "residual doubt" as "that space between beyond a reasonable doubt and beyond all doubt" and urged that it was an area to be explored in terms of mitigation. (Id.) The trial court refused to permit Andriano to introduce evidence of residual doubt.

In this regard, the trial court erred and denied Andriano her right to present relevant mitigation, to have a fair sentencing proceeding, and to due process under the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution as well as Article 2, §§ 4, 15 and 24 of the Arizona Constitution. This Court should remand for a new penalty phase trial.

94

## ARGUMENT VII

**THE TRIAL COURT'S REFUSAL TO PERMIT ANDRIANO TO PRESENT EVIDENCE OF MERCY DEPRIVED HER OF HER RIGHT TO DUE PROCESS, A FAIR TRIAL, AND A FAIR SENTENCING PROCEEDING UNDER THE SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AS WELL AS ARTICLE 2, §§ 4, 15 AND 24 OF THE ARIZONA CONSTITUTION.**

*Standard of Review*

Constitutional issues are reviewed *de novo*. *State v. McCann*, 200 Ariz. 27, 28, 21 P.3d 845, 846 (2001). The Court reviews *de novo* whether instructions to the jury properly state the law. *State v. Orendain*, 188 Ariz. 54, 56, 932 P.2d 1325, 1327 (1997).

*Discussion*

As set forth in Argument VI above, Supreme Court precedents confer upon defendants the right to present sentencers with information relevant to the sentencing decision and oblige sentencers to consider that information in determining the appropriate sentence.

In *Kansas v. Marsh*, 548 U.S. ___, 126 S.Ct. 2516, ¶ 8 (2006), the Court observed that Kansas juries are permitted to consider any evidence relating to any mitigating circumstance in determining the appropriate sentence for a capital

95

defendant, so long as that evidence is relevant.  In reviewing the Kansas mitigation

statute, the Court took note of one of the jury instructions:

> The appropriateness of the exercise of mercy can itself be
> a mitigating factor you may consider in determining
> whether the state has proved beyond a reasonable doubt
> that the death penalty is warranted.

*Id.*  The Court commented that the "mercy" jury instruction alone foreclosed the

possibility of a *Furman*-type error as it eliminated the risk that a death sentence

would be imposed in spite of facts calling for a lesser penalty.  *Id.*, n. 3.

Thus, the *Marsh* Court expressed approval of mercy as a mitigating factor in

and of itself that may call for a sentence less than death.  The Arizona statute, like

the Kansas statute, permits broad consideration of mitigating circumstances in

determining the appropriate sentence for a capital defendant.  Mercy is such a

circumstance.

The trial court refused to include mercy as a mitigating factor for the jury to

consider.  (ROA, p. 419.)  This refusal failed to permit the jury to consider mercy

as a mitigator and give full effect to Andriano's proffered mitigation.  As a result,

the trial court denied Andriano's right to due process and a fair penalty phase trial

in violation of the Sixth, Eighth, and Fourteenth Amendments to the United States

96

Constitution as well as Article 2, §§ 4, 15 and 24 of the Arizona Constitution.  This

Court should remand for a new penalty phase trial.

## ARGUMENT VIII

**THE TRIAL COURT IMPROPERLY INSTRUCTED THE JURY IN THE PENALTY PHASE INSTRUCTIONS TO REQUIRE JURY UNANIMITY REGARDING THE EXISTENCE OF MITIGATING CIRCUMSTANCES. THE ERROR VIOLATED ANDRIANO'S RIGHT TO DUE PROCESS, A FAIR TRIAL, AND A FAIR SENTENCING PROCEEDING IN VIOLATION OF THE SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AS WELL AS ARTICLE 2, §§ 8, 15 AND 24 OF THE ARIZONA CONSTITUTION.**

*Standard of Review*

Whether an instruction to a jury following the penalty phase of a capital trial correctly states the law is reviewed *de novo*. *State ex rel. Thomas v. Granville*, 211 Ariz. 468, 471, 123 P.3d 662, 665 (2005), citing *State v. Glassel*, 211 Ariz. 33, 53, 116 P.3d 1193, 1213 (2005). Whether a trial court erred in giving or refusing to give a requested jury instruction is reviewed for abuse of discretion. *Id.*, citing *State v. Anderson*, 210 Ariz. 327, 343, 111 P.3d 369, 385 (2005). The jury instructions are read as a whole to ensure that the jury receives the information it needs to arrive at a legally correct instruction. *Id.*, citing *Kauffman v. Schroeder*, 116 Ariz. 104, 106, 568 P.2d 411, 413 (1977).

98

*Discussion*

In the penalty phase instructions, the trial court instructed the jury:

> Any verdict of death or life imprisonment must be unanimous. If you unanimously find that no mitigation exists, then you must return a verdict of death. If you unanimously find that mitigation exists, each one of you must individually weigh that mitigation in light of the aggravating circumstances already found to exist and if you unanimously find that the mitigation is not sufficiently substantial to call for leniency, you must return a verdict of death.

> If you unanimously find that mitigation exists and it is sufficiently substantial to call for leniency, you must return a verdict of life.

(RT, 12/16/04, p. 49.)

Andriano objected to the instruction. (RT, 12/15/04, p. 9.) Andriano said that the court's instruction was not an accurate recitation of death penalty law and the jury need not go through that process. (Id.) The trial court's instruction improperly required unanimity as to the existence of mitigation in violation of Andriano's right to due process, a fair trial, and a fair sentencing proceeding under the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution as well as Article 2, §§ 8, 15 and 24 of the Arizona Constitution.

A jury may not be precluded from considering any appropriate circumstances offered in mitigation. *Lockett v. Ohio*, 438 U.S. 586, 98 S.Ct. 2954

99

(1978).  In Arizona, the consideration of mitigating evidence is codified by A.R.S.

§ 13-703(C).  In relevant part:

> If the trier of fact is a jury, the jurors do not have to agree unanimously that a mitigating circumstance has been proven to exist.  Each juror may consider any mitigating circumstance found by that juror in determining the appropriate penalty.

Recently, in discussing the relative burdens of proof in a capital case, this

Court observed:

> The plan is carefully laid out in the statutes:  Once a defendant is "death eligible" – that is, once a jury has found beyond a reasonable doubt that the defendant is guilty of a capital offense and that at least one statutory aggravating factor exists – *the jurors must assess whether to impose the death penalty based upon each juror's individual, qualitative evaluation of the facts of the case, the severity of the aggravating facts, and the quality of any mitigating evidence.*

*State ex rel. Thomas v. Granville*, 211 Ariz. at 472, 123 P.3d at 666, citing to

A.R.S. § 13-703.  (Emphasis added).

The Court concluded:

> We therefore now clarify that the determination whether mitigation is sufficiently substantial to warrant leniency is not a fact question to be decided based on the weight of the evidence, but rather is a sentencing decision to be made by each juror based upon the juror's assessment of the quality and significance of the mitigating evidence that the juror has found to exist.

100

*Id.*, at 473, 123 P.3d at 667. The Court concluded, "[E]ach juror must determine whether in that juror's individual assessment, the mitigation is of such quality or value that it warrants leniency." *Id.*

In *Mills v. Maryland*, 486 U.S. 367, 384, 108 S.Ct. 1860, 1870 (1988), the Supreme Court held that if there was a substantial probability that reasonable jurors, upon receiving the judge's instructions in the case, well may have thought they were precluded from considering any mitigating evidence unless all twelve jurors agreed on the existence of a particular such circumstance, the death sentence must be vacated and the case remanded. The Court found that the possibility that a single juror could block consideration of all mitigating evidence and consequently require the jury to impose the death penalty is a possibility the Court would not risk. *Id.*

Here, viewing the jury instructions as a whole, the jury was told that the determination of what circumstances are mitigation was one for each of the jurors to resolve individually based on all the evidence presented during all phases of the trial. (RT, 12/16/04, p. 45.) The jury was instructed that they could consider any relevant mitigation presented during any phase of the trial, even if it wasn't proposed by either of the parties. (Id., p. 46.) In weighing the aggravating and

101

mitigating circumstances, the jury was instructed to individually determine the nature and extent of mitigating circumstances. (Id., p. 47.)

Utilizing the pronoun "you," the jurors were told that each of them were free to assign whatever value they deemed appropriate to each and all of the various factors they were permitted to consider. (Id., p. 48.) The jurors were instructed that neither the state nor the defendant had the burden of proving that the weight of the mitigation was or was not sufficiently substantial to call for leniency, and was advised that the law did not define "sufficiently substantial to call for leniency." (Id.)

The jury was next instructed, again using the pronoun "you," that if they found unanimously that no mitigation existed, they must return a verdict of death. (Id., p. 49.) Then:

> *If you unanimously find that mitigation exists*, each one of you must individually weigh that mitigation in light of the aggravating circumstances already found to exist and if you unanimously find that the mitigation is not sufficiently substantial to call for leniency, you must return a verdict of death.

(Id.) (Emphasis added).

A fair reading of this instruction, in light of the instructions as a whole, told the jury that before each of them could individually weigh particular mitigation in

light of aggravating circumstances, the jury had to unanimously find that the mitigation existed.   This instruction directly contradicted the law as set forth in *Mills v. Maryland*, and A.R.S. § 13-703(C).   Although other instructions advised the jury that what was mitigation was for each of them to resolve individually, they were still instructed that they must find unanimously that mitigation existed before each individual weighed the mitigation in light of the aggravation.

In *Mills v. Maryland*, the Court observed that in reviewing death sentences, the Court has demanded even greater certainty that the jury's conclusions rested on proper grounds.   *Mills*, 486 U.S. at 376, 108 S.Ct. at 1866.   The Court found that unless it could rule out the substantial possibility that the jury may have rested its verdict on the "improper" ground, it must remand for resentencing. *Id.*, at 377, 108 S.Ct. at 1867.

Here, there is a substantial probability that reasonable jurors in attempting to evaluate and analyze the mitigation in light of the judge's instructions, thought they were precluded from individually considering any mitigating evidence unless all twelve first unanimously agreed upon the existence of such mitigation.   That may have prevented individual jurors from considering all mitigation evidence because of the risk that the jurors may have misunderstood how to arrive at mitigation to be considered before individually weighing it, the trial court abused

103

its discretion in giving the offending instruction over Andriano's objection.  The error violated Andriano's right to due process, a fair trial, and a fair sentencing proceeding under the Sixth, Eighth and Fourteenth Amendments to the United States Constitution as well as Article 2, §§ 8, 15 and 24 of the Arizona Constitution.  The death sentence must be vacated and the matter remanded for further proceedings.

## ARGUMENT IX

**THE TRIAL COURT IMPERMISSIBLY COERCED THE JURY WHEN IT GAVE AN IMPASSE INSTRUCTION DURING THE PENALTY PHASE WITHOUT KNOWING WHETHER THE JURY WAS DEADLOCKED.**

### *Standard of Review*

Whether the jury was improperly coerced requires review of the supplemental charge in its context and under all the circumstances. *Lowenfield v. Phelps*, 484 U.S. 231, 237, 108 S.Ct. 546 (1988). We consider the premature giving of the impasse-instruction in the analysis of whether, under the totality of the circumstances, the trial court coerced the jury verdict. *State v. Huerstel*, 206 Ariz. 93, 100, 75 P.3d 698, 705 (2003).

### *Discussion*

The trial court gave an impasse instruction before the jury even indicated it was at an impasse. The instruction was coercive, signaling to the jury that it must come to a unanimous decision. Instead of answering the question that the jury asked, the court improperly used that opportunity to pressure the jurors to come to a unanimous decision.

A criminal defendant has a right to a fair jury trial, due process and the right to a reliable sentence of death under the federal and state constitutions. U.S.

105

Const., Amend. 5, 6, 8 and 14; Ariz. Const. Art. 2, §§ 4, 15 and 24.   If the jury advises the court that it has reached an impasse in its deliberations, the court may, in the presence of counsel, inquire of the jurors to determine whether and how the court and counsel can assist them in their deliberative process. 17 A.R.S. Rules of Crim. Proc., Rule 22.4.   After receiving the jurors' response, if any, the judge may direct that further proceedings occur as appropriate. *Id.*

It is generally true that the very object of the system is to secure unanimity by a comparison of views, and by arguments among the jurors.   *Lowenfield v. Phelps*, 484 U.S. at 237.   The state has a strong interest in a capital sentencing proceeding in having the jury "express the conscience of the community on the ultimate question of life or death." *Id.*, at 238, *quoting Witherspoon v. Illinois*, 391 U.S. 510, 519, 88 S.Ct. 1770 (1968).   However, it is important not to lose sight of the fact that the difference between death and other penalties calls for a greater degree of reliability when the death sentence is imposed.   *Id.*, at 239, *quoting Lockett v. Ohio*, 438 U.S. 586, 604 (1978).   Any criminal defendant and especially any capital defendant being tried by a jury is entitled to an un-coerced verdict. *Lowenfield v. Phelps*, 484 U.S. at 241.

The *Lowenfield* Court found that the instruction used in did not coerce the jury. *Id.*   However, the facts in *Lowenfield* differ from the facts here in that in

106

*Lowenfield*, the court told the jury before deliberations began that if they were unable to reach a unanimous decision that the court would impose life without probation, parole, or suspension of sentence. *Id.*, at 234.   Additionally, in *Lowenfield*, the jury informed the court that it was actually deadlocked and asked to again be instructed about its responsibilities. *Id.* The Supreme Court found that the trial court's polling of the jury as well as its further instructions were not coercive. *Id.*, at 241.

In contrast, here, after five hours of deliberations over two days, the jury sent the judge a note. (ROA, pp. 421, 424.) It read: "If we are unable to reach an unanimous verdict, what is the procedure that will be followed?" (RT, 12/20/04, p. 4.)

The court met with counsel and proposed answering the question by sending in a written response. (Id., pp. 4-5.) That response read:

> Monday, December 20, 2004.  It appears from your note that you are in deadlock in your deliberations.  I have some suggestions to help your deliberations, not to force you to reach a verdict.   I'm merely trying to be responsive to your apparent need for help.  I do not wish or intend to force a verdict.  Each juror has a duty to consult with one another, to deliberate with a view to reaching an agreement if it can be done without violence to individual judgment.

107

No juror should surrender his or her honest conviction as to the weight or effect of the evidence solely because of the opinion of other jurors or for the purpose of reaching a verdict.

However, you may want to identify areas of agreement and disagreement and discuss the law and the evidence as it relates to the areas of disagreement.  If you still disagree, you may wish to tell the attorneys and me which issues, questions, law and facts you would like us to assist you with.

If you decide to follow this suggestion, please write down the issues, questions, law or fact of which we can possibly help.  Please give your note to the bailiff.  We will then discuss your note and try to help.

(Id., pp. 4-5).

Defense counsel objected, saying, "Yes, I object to it in totality.  There's no duty for these folks to deliberate jointly at this stage of the process.  It's a moral decision held by each individualized juror.  That's in the nature of allan (sic) charge.  I think it's wholly inappropriate."  (Id., p. 5.)  The court gave the instruction.  (Id.)

The jury then deliberated another four hours on December 21, 2004.  (ROA, p. 425.)  They returned a death verdict on December 22, 2004, at approximately 2:25 p.m.  (ROA, p. 427.)  The jury asked no further questions after being given the impasse instruction.  (ROA, pp. 424, 425, 427.)

108

Andriano renewed her objection in a motion for new trial. (ROA, p. 434A.) Defense counsel argued to the court that its impasse instruction improperly coerced the jury. (Id.) Counsel referred to a newspaper article written after trial where jurors described their deliberations. (ROA, p. 444A; RT, 2/4/05, pp. 6-9.) He argued that the article showed the instruction coerced the jury. (RT, 2/4/05, pp. 7-9.) The six jurors who spoke to the journalist told him that at one point, the jury was on the verge of a deadlock with one elderly hold out. (Id., p. 7.) The hold out was adamantly against the death penalty. (Id.) Counsel argued that the impasse instruction obviously coerced the hold out into voting for death. (Id.)

Counsel also contended that the instruction coerced the jurors into using improper reasons or bases for their decisions. (Id.) The jurors improperly considered that Andriano might one day be paroled if they did not give her death, and improperly considered Andriano's right to an automatic appeal as a basis for their verdict. (Id.) Counsel reiterated that the hold out had no duty to continue to deliberate once he came to the conclusion that the death penalty was inappropriate. (Id., p. 8.) He was under no obligation to subject himself to the rationales of the other jurors. (Id.)

Finally, defense counsel asserted that the penalty phase of a capital trial is distinct from the guilt phase of a non-capital trial because there is no duty for each

109

juror to deliberate towards a consensus. (Id., p. 15.) He argued that the life or death decision is an individual, moral decision that is made by each individual juror. (Id.) The trial court denied the motion. (Minute Entry, 2/7/05.)

The court violated Rule 22.4 when it gave the jury the impasse instruction without any clear evidence that the jury needed help. Standing alone, the court's premature giving of the impasse instruction does not rise to the level of reversible error. *State v. Huerstel*, 206 Ariz. at 100, 75 P.3d at 705. But the court must consider the premature giving of the instruction in its analysis of whether, under the totality of the circumstances, the trial court coerced the jury verdict. *Id.* Instead of allowing a rash response to the juror's note, the rule requires an affirmative indication from the jury it is in need of help before assistance may be offered. *State v. Huerstel*, 206 Ariz. at 99, 75 P.3d at 704.

The jury's note did not declare an impasse. The court reacted hastily by treating the jury's note as if it declared an impasse. The jurors merely asked what would happen if they were deadlocked and the court responded by instructing them to deliberate with a view to coming to a unanimous decision. The clear message to the jurors was to reach a unanimous decision. The note from the jury to the judge merely asked what procedure would be followed if they could not reach a

110

unanimous decision. There was no affirmative indication from the jury that it was in need of help because it was at an impasse.

Giving the impasse instruction before the jury even indicated that it was at an impasse signaled to the jury that it was taking too long to reach a verdict. *State v. Huerstel*, 206 Ariz. at 101, 75 P.3d at 706. It was also coercive because it improperly instructed the jury regarding its duty to deliberate. In direct contradiction to its own instructions given before deliberation, the impasse instruction told the jurors that they had a duty to consult with one another and to deliberate with a view to reaching an agreement. *See*, Argument X.

Additionally, the instruction was coercive because it did not actually answer the jurors' question. To answer the jurors' question, the court should have told them not to concern themselves with legal procedures in place in the event of a deadlock. Instead, the court immediately jumped to the conclusion that the jury was deadlocked and instructed them not to make an individualized, moral judgment but to deliberate with a view to reaching an agreement.

Finally, the way the instruction coerced the jury became evident after the trial in comments made by the jury to a local journalist. According to six jurors, at one point the jury was on the verge of a deadlock with one elderly hold out. The

111

hold out was adamantly against the death penalty. The trial court's premature impasse instruction pressured this hold out into voting for death.

From their statements, it appears that the instruction forced the jurors into using improper reasons or bases for their decisions. The jurors improperly considered the alternate sentence of twenty-five years to life in reaching their verdict. They did not want Andriano to be eligible for parole. Moreover, the jury improperly considered the automatic appeal as a basis for their verdict. Presumably, the automatic appeal had the effect of a safety net for the jurors, thus their attempt to relieve the pressure of the court's instruction that they must deliberate with a view to reaching a unanimous verdict. The hold out had no duty to continue to deliberate once he came to the conclusion that the death penalty was inappropriate. Contrary to the court's instruction, he was under no obligation to subject himself to the rationales of the other jurors.

The court's premature impasse instruction violated Andriano's rights to due process, a fair trial and a reliable sentence under the Eighth Amendment by compelling the jury to reach a unanimous decision during the penalty phase of a capital trial. This phase is the most sensitive and stressful phase of the process, where the jurors are asked to decide whether another human being shall live or die. Belief in the truth of the assumption that sentencers treat their power to determine

112

the appropriateness of death as an "awesome responsibility" has allowed this Court to view sentencer discretion as consistent with—and indeed as indispensable to—the Eighth Amendment's "need for reliability in the determination that death is the appropriate punishment in a specific case." *Caldwell v. Mississippi*, 472 U.S. 320, 105 S.Ct. 2633 (1985), *quoting Woodson v. North Carolina*, 428 U.S. 280, 305, 96 S.Ct. 2978 (1976) (plurality opinion).

Because this phase of a capital trial is so crucial, it is imperative that the court take great care when dealing with concerns expressed by jurors and the court's response to those concerns. Arizona law specifically describes the court's duties if the jury announces that it is deadlocked. Not only that, but in a capital case, Arizona law provides for the selection of a second jury if the original jury is deadlocked. *See*, A.R.S. § 13-703.01(K).

Andriano's right to due process and a fair trial required the trial court to patiently let the jury's deliberations unfold without interference. The court violated Andriano's right to a reliable sentence to death under the Eighth Amendment when it jumped to the conclusion that the jury was at an impasse, and then compounded the problem by giving an instruction not specifically tailored to the penalty phase of a capital case. *See*, Argument X, below. By not waiting for the jury's deliberations to run their course, and advise it was at an impasse before

113

giving an improper instruction, the court pressured and coerced the jury. Andriano's rights to a fair trial, due process and a reliable sentence of death under the Eighth Amendment were violated and reversal is required.

114

## ARGUMENT X

**THE TRIAL COURT INCORRECTLY INSTRUCTED THE JURY ABOUT ITS DUTY TO DELIBERATE DURING THE PENALTY PHASE. THE INSTRUCTION VIOLATED ANDRIANO'S DUE PROCESS, FAIR TRIAL AND EIGHTH AMENDMENT RIGHTS.**

### *Standard of Review*

The appellate court reviews *de novo* whether the jury instructions properly state the law. *State ex rel. Thomas v. Granville*, 211 Ariz. 468, 471, 123 P.3d 662, 665.

### *Discussion*

The trial court's impasse instruction to the jury regarding their duty to deliberate during the penalty phase misstated the law. It contradicted the instructions given by the court before the jury began to deliberate during the penalty phase. This resulted in a violation of Andriano's due process rights, right to a jury trial and her Eighth Amendment right to a reliable verdict under the federal and state constitutions. U.S. Const., Amend. 5, 6, 8 and 14; Ariz. Const. Art. 2, §§ 4, 15 and 24.

Pursuant to A.R.S. § 13-703(C), jurors do not have to agree unanimously that a mitigating circumstance has been proven to exist. Each juror may consider

115

any mitigating circumstance found by that juror in determining the appropriate penalty.

As set forth in Argument VIII above, although the court instructed the jury somewhat consistently with the statute, nevertheless, the court also instructed them that they must unanimously find mitigation existed before each juror individually weighed it.   After fifteen hours of deliberation, the jury sent out a note.   The court's impasse instruction, given after fifteen hours of deliberation, and before the jury indicated that it was at an impasse, incorrectly instructed the jury regarding its duty to deliberate.  Instead of emphasizing the instructions that were already given, the court incorrectly instructed the jury that "[e]ach juror has a duty to consult with one another, to deliberate with a view to reaching an agreement if it can be done without violence to individual judgment."  Defense counsel appropriately objected by informing the court that "There is no duty for these folks to deliberate jointly *at this stage of the process*.  It's a moral decision held by each individualized juror." (RT, 12/20/04, p. 5.)  (Emphasis added).

The penalty phase of a capital case is different from deliberations in a non-capital felony case.   The standard impasse instruction in the judge's bench book does not apply in the penalty phase of a capital case.   Because the law and the previous instructions given to the jury instructed them to make individualized

116

decisions, the language of the impasse instruction used in this case is incorrect.  At the outset of deliberations, the court correctly instructed them to make a reasoned, moral judgment based on individual determinations.  The trial court should have repeated or referred the jury back to the instructions given before deliberations began.

The impasse instruction was incorrect because during the penalty phase, the jurors do not have a duty to consult with one another or to deliberate with a view to reaching an agreement.  This is the essence of the penalty phase.  The sentencing process must permit consideration of the "character and record of the individual offender and the circumstances of the particular offense as a constitutionally indispensable part of the process of inflicting the penalty of death," *Woodson v. North Carolina*, 428 U.S. 280, 304, 96 S.Ct. 2978 (1976), in order to ensure the reliability, under Eighth Amendment standards, of the determination that "death is the appropriate punishment in a specific case." *Id.*, at 305; *Lockett v. Ohio*, 438 U.S. 586, 601 (1978).

The court's incorrect instruction to the jurors that they must deliberate with a view to reaching a unanimous decision pressured the jurors to abandon their individualized moral decisions in an effort to reach a unanimous verdict.  It therefore jeopardized the reliability, under Eighth Amendment standards, of the

117

determination that Andriano's sentence to death was appropriate. The jurors' individualized and diligent consideration of every mitigating factor without interference from the court is essential to a reliable death sentence.

The Arizona Supreme Court recently discussed the jurors' individual duty to evaluate mitigating evidence in *State ex rel. Thomas v. Granville*, 211 Ariz. 468, 123 P.3d 662 (2005):

> ...the mitigation must be of such quality or value that it is adequate, in the opinion of an individual juror, to persuade that juror to vote for a sentence of life in prison. A mitigating factor that motivates one juror to vote for a sentence of life in prison may be evaluated by another juror as not having been proved or, if proved, as not significant to the assessment of the appropriate penalty. Each juror must determine whether, in that juror's individual assessment, the mitigation is of such quality of value that it warrants leniency in a particular case.

*Id.*, at 667.

The Court clarified that the determination of whether mitigation is sufficiently substantial to warrant leniency is not a fact question to be decided based on the weight of the evidence, but a sentencing decision to be made by *each juror* based upon the juror's assessment of the quality and significance of the mitigating evidence that the juror has found to exist. *Id.* The Court stated, "...each juror must determine whether, in that juror's *individual assessment*, the

118

mitigation is of such quality or value that it warrants leniency." *Id.* (Emphasis added).

This requirement of individual assessment during the deliberation process of the penalty phase is different and distinct from the deliberation process during a non-capital criminal trial. The impasse instruction that is appropriate for the guilt finding process of a non-capital trial is not appropriate for the unique task the jurors face during the penalty phase of a capital trial. Defense counsel properly objected to the court's instruction because it incorrectly instructed the jurors to deliberate with a view to reaching an agreement. Reversal and remand for a new penalty phase trial is warranted.

119

## ARGUMENT XI

**ARIZONA'S STATUTE PROVIDING FOR EXECUTION BY LETHAL INJECTION IS VAGUE BECAUSE IT FAILS TO SUFFICIENTLY SPECIFY THE MEANS TO BE USED TO ENSURE AN EXECUTION BY LETHAL INJECTION THAT IS NOT CRUEL AND UNUSUAL, THUS VIOLATING ANDRIANO'S DUE PROCESS AND EIGHTH AMENDMENT RIGHTS.**

*Standard of Review*

Imposition of an illegal sentence constitutes fundamental error. *State v. Alvarez*, 205 Ariz. 110, 116, 67 P.3d 706, 712 (App. 2003). Whether a statute is void for vagueness is reviewed *de novo*. *United States v. Woodley*, 9 F.3d 774, 778 (9th Cir. 1993).

*Discussion*

Arizona's lethal injection statute is vague. It does not detail with sufficient clarity the proper procedure for executing a person by lethal injection. It improperly leaves the procedure to the Department of Corrections. The proper procedure for lethal injection requires the appropriate type and amount of chemicals as well as qualified executioners. These requirements are beyond the expertise of the Department of Corrections. Without proper guidance and more

120

specificity regarding chemicals and procedures, Arizona's lethal injection law falls short of due process and Eighth Amendment requirements.

Vague sentencing provisions may pose constitutional questions if they do not state with sufficient clarity the consequences of violating a given criminal statute. *United States v. Batchelder*, 442 U.S. 114, 123, 99 S.Ct. 2198 (1979); *State v. Wagner*, 194 Ariz. 310, 312, 982 P.2d 270, 272 (1999). Arizona's statute reads: "The penalty of death shall be inflicted by an intravenous injection of a substance or substances in a lethal quantity sufficient to cause death, under the supervision of the state Department of Corrections." A.R.S. § 13-704(A). The statute does not specify the quantity or type of "substance" to be used in lethal injection. Nor does it specify the qualifications of the persons performing the execution. It does not meet the sufficient clarity standard set out in *Batchelder* because it designates the execution in a fashion that leaves too many variables unaddressed. Thus, problems arise during executions calling into question the constitutionality of lethal injection in Arizona.

Arizona appears to have no published administrative regulations or guidelines for proper execution by lethal injection. There is reason to believe that the Arizona Department of Corrections (ADOC) established "internal management procedures" regarding lethal injections. *LaGrand v. Lewis*, 883 F.Supp. 469, 470

121

(D.Ariz., 1995) (IMPs do not describe the exact protocol used in Arizona prisons,

but do require the participation of "knowledgeable personnel" and the presence of

a physician to monitor the inmate's vital signs, record the time of execution, the

time of cardiac arrest and issue an unofficial time of death.)[1]  However, ADOC has

published a general protocol for lethal injection:

> Inmates executed by lethal injection are brought into the
> injection room a few minutes prior to the appointed time
> of execution.  He/she is then strapped to a Gurney-type
> bed and two (2) sets of intravenous tubes are inserted-one
> (1) in each arm.   The three (3) drugs utilized include:
> Sodium Pentothal (a sedative intended to put the inmate
> to sleep), Pavulon (stops breathing and paralyzes the
> muscular system) and Potassium Chloride (causes the
> heart to stop).  Death by lethal injection is not painful and
> the inmate goes to sleep prior to the fatal effects of the
> Pavulon and Potassium Chloride.

www.azcorrections.gov/prisons/florenceHist.htm.

The protocol designates the drugs but not the quantities to be used during the

lethal injection.  It does not specify who shall insert the IV tubes or administer the

drugs.  It does not specify the qualifications of the persons involved in injecting the

---

[1] The United States District Court held in *LaGrand v. Lewis* that the Internal
Management Procedures promulgated by ADOC were not constitutionally infirm
simply because they failed to specify in explicit detail the execution protocol.
*LaGrand v. Lewis*, 883 F.Supp. 469, 470 (D.Ariz., 1995).   The 1995 opinion
addressed an Eighth Amendment challenge to lethal injection and found that lethal
injection comported with societal norms. *LaGrand v. Lewis*, 883 F.Supp. at 471.

substances into the inmate.  For these reasons, the statute does not state with sufficient clarity how a person shall be executed.

**Problems with the chemicals used to execute a person by lethal injection.**

A recent California case, *Morales v. Hickman*, 438 F.3d 926, 928 (9th Cir. 2006), describes the sequence of injections of the chemicals.  The California protocol for lethal injection which appears similar to, but more specific than, Arizona's published protocol:

> First, the condemned receives five grams of sodium thiopental (also known as sodium pentothal), which if administered properly, will render him unconscious and therefore insensible to pain.  Next, the injection team administers 100 milligrams of pancuronium bromide (also known as Pavulon), paralyzing the inmate's voluntary muscles.  Finally, 100 milligrams of potassium chloride are injected, resulting in cardiac arrest and death.

*Morales v. Hickman*, 438 F.3d at 928.

California's protocol is similar to Arizona's because the same drugs are used in the same sequence.  One problem with this protocol is that if the anesthetic is not administered properly, the inmate would experience the sensation of being suffocated as a result of the pancuronium bromide and excruciating pain from the potassium chloride activating nerve endings in the inmate's veins.  *Id.*  However, if

the sodium pentothal is administered correctly, most persons would be unconscious within 60 seconds and would experience no pain. *Id.*, at 929.

In *Morales*, the district court had "substantial questions" about the protocol. *Id.* California's execution logs suggested there was some doubt as to whether the protocol actually functioned as intended. *Id.* The district court found that evidence tended to show that many inmates continued to breathe long after they should have ceased to do so. *Id.* The court also expressed concerns that the state's administration of its protocol could result in a situation where the inmate who was rendered unconscious by sodium thiopental might regain consciousness during the administration of pancuronium bromide or potassium chloride. *Id.*, at 927. *See also*, Satter, *Judge Stays Killer's Execution over Lethal-injection Concerns*, Arkansas Democrat Gazette, June 27, 2006.

Again addressing California's protocol, the use of pancuronium bromide only masks the intense suffering that could be experienced in combination with the other chemicals that are used and that the combination of chemicals can fail to work properly. *Cooper v. Rimmer*, 379 F.3d 1029, 1031-32 (9th Cir. 2004). The concern that substantial pain and suffering can occur when the inmate receives an inadequate dose of sodium pentothal and therefore regains consciousness and sensation during the administration of the remaining two drugs arises again in

*Beardslee v. Woodford*, 395 F.3d 1064, 1074 (9th Cir. 2005). *Beardslee* also described problems that occur while establishing an intravenous connection. *Id.* Some prisoners have collapsed or inaccessible veins due to drug abuse or because the veins are too deep, too flat or below layers of fat. *Id.* Sometimes a "cut-down" procedure is needed to expose the vein. *Id.* Further, individuals have varying sensitivity and resistance to sodium pentothal. *Id.*

These conditions make it essential for a state statute mandating lethal injection as the form of execution of its death penalty to specifically state what drugs will be used, in what order and in what proportions. The type and amount of chemicals as well as the administration of this lethal cocktail by trained personnel are important factors because the execution of the death penalty must be done within the requirements of the Eighth Amendment. The Eighth Amendment proscribes torture and other barbarous methods of punishment. *Estelle v. Gamble*, 429 U.S. 97, 102, 97 S.Ct. 285 (1976). The Eighth Amendment embodies broad and idealistic concepts of dignity, civilized standards, humanity and decency. *Id.* Punishments that are incompatible with "the evolving standards of decency that mark the progress of a maturing society" violate the Eighth Amendment. *Id.* When a state statute does not take the necessary steps to outline a lethal injection

125

procedure that complies with the Eighth Amendment, there is great risk that the implementation of the death penalty will violate the Eighth Amendment.

The statute must address the inherent difficulties with individual issues in performing lethal injections such as vein accessibility and chemical resistances. Arizona's statute does not have the sufficient clarity needed to impose the death penalty by lethal injection within the requirements of due process and the Eighth Amendment.

**Problems that can arise due to the use of untrained personnel.**

Arizona's statute is deficient because it fails to prescribe the qualifications of the personnel who perform the lethal injection.  This is important because lethal injection requires insertion of IV tubes into the veins of the condemned.  Insertion of IV tubes is a medical procedure requiring medical expertise.  Lethal injection procedures are hampered by ethical restrictions on physicians who are prohibited from participating in executions.  *Beardslee v. Woodford*, 395 F.3d at 1074. Prisons may therefore rely on inexperienced and untrained personnel.  *Id.*  Reliance on unqualified personnel increases the chance of botched executions.

Inmates can experience substantial pain and suffering if they are given an inadequate dosage of sodium thiopental.  They could regain consciousness and sensation while being injected with the second and third chemicals. Denno, *When*

126

*Legislatures Delegate Death: The Troubling Paradox Between the State's Uses of Electrocution and Lethal Injection and What it Says About Us*, Ohio State Law Journal, Vol. 63:63 (2002), p. 17.   Executioners can ignore each prisoner's physical characteristics like age, body weight, and health even when these factors strongly affect a person's reaction to the chemicals.   *Id.*   Doctors have difficulty finding suitable veins among people with diabetes, heavily pigmented skin, obesity or extreme muscularity.   *Id.*   For untrained executioners, the problems are even greater.   *Id.*   Untrained executioners may resort to inserting the catheter into a sensitive area such as the hand or groin, or in the wrong direction, so that the chemicals flow away from the heart and hinder absorption, or intramuscularly instead of intravenously.   *Id.*

These problems are worth noting, since they result in botched executions. *Id.*

> In 1985, Stephen Peter Morin waited forty minutes while executioners probed both of his arms and legs to find a vein suitable for the injection; in 1988, Raymond Landry also endured forty minutes of needle probing, shortly after which the catheter popped out of his vein and spurted the chemicals toward witnesses two feet across the room; and in 1989 Stephen McCoy's violent physical reaction to the lethal injection drugs was so great that one witness fainted while others gasped.

*Id.*

127

Without proper statutory guidance, there is no assurance that executioners will inject sufficient quantities of the chemicals or that the chemicals are injected in the proper order. *Id.*, p. 19. There is no assurance that the executioners will give the full amount of chemicals necessary for a proper execution. *Id.*, p. 20.

Finally, Arizona's statute does not provide for public disclosure of detailed protocols of the lethal injection process or of records taken during executions. A.R.S. § 13-704 does not even require that records be maintained. It appears states can be loath to disclose this information to the inmate or to the public. *See, Beardslee v. Woodford*, 395 F.3d at 1076. Detailed information about lethal injection procedures may be considered confidential or may not even exist. Denno, *When Legislatures Delegate Death: The Troubling Paradox Between the State's Uses of Electrocution and Lethal Injection and What it Says About Us*, Ohio State Law Journal, Vol. 63:63 (2002), p. 19.

Arizona's general statute providing for lethal injection as the means for execution violates due process because it lacks sufficient clarity. It does not establish a detailed protocol of chemicals to be used in lethal injections. It does not establish standards for the training and expertise of persons involved in conducting the executions. A.R.S. § 13-704(A) is void for vagueness, violating Andriano's due process and Eighth Amendment rights, necessitating reversal.

128

## ARGUMENT XII

### ARIZONA'S DEATH PENALTY IS UNCONSTITUTIONAL.

1.      The death penalty is cruel and unusual under any circumstances and violates the Eighth and Fourteenth Amendments to the United States Constitution and Article 2, § 15 of the Arizona Constitution. *State v. Harrod*, 200 Ariz. 309, 320, 26 P.3d 492, 503 (2001).

2.      The death penalty is imposed arbitrarily and irrationally in Arizona in violation of the Eighth and Fourteenth Amendments to the United States Constitution and Article 2, § 15 of the Arizona Constitution, as well as Andriano's right to due process under the Fourteenth Amendment to the United States Constitution and Article 2, § 4 of the Arizona Constitution. *State v. Beaty*, 158 Ariz. 232, 762 P.2d 519 (1988).

3.      Application of the death penalty on the facts of this case would constitute cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments to the United States Constitution and Article 2, §§ 1, 4, and 15 of the Arizona Constitution.

4.      The prosecutor's discretion to seek the death penalty has no standards and therefore violates the Eighth and Fourteenth Amendments to the United States

129

Constitution and Article 2, §§ 1, 4, and 15 of the Arizona Constitution. *State v. Sansing*, 200 Ariz. 347, 361, 26 P.3d 1118, 1132 (2001).

5.      Aggravating factors under A.R.S. § 13-703(F) are elements of capital murder and must be alleged in an indictment and screened for probable cause. Arizona's failure to require this violates a defendant's right to due process and a fair trial under the Sixth and Fourteenth Amendments to the United States Constitution and Art. 2, §§ 4 and 24 of the Arizona Constitution. *McKaney v. Foreman*, 209 Ariz. 268, 100 P.3d 18 (2004).

6.      Application of the death penalty statutes promulgated after *Ring v. Arizona*, 536 U.S. 584 (2002) (*Ring II*), violates the prohibition against *ex post facto* laws. The changes altered the rules of evidence to permit different testimony than that required at the time of Andriano's offense. U.S. Const. Art. 1, § 10, Clause 1, Ariz. Const. Art. 2, § 25. *State v. Ring*, 204 Ariz. 534, 65 P.3d 915 (2003) (*Ring III*).

7.      The absence of proportionality review of death sentences by Arizona courts denies capital defendants due process of law and equal protection and amounts to cruel and unusual punishment in violation of the Fifth, Eighth, and Fourteenth Amendments to the United States Constitution and Article 2, § 15 of the Arizona Constitution. *Harrod*, 200 Ariz. at 320, 26 P.3d at 503. Proportionality review

serves to identify which cases are "above the norm" of first-degree murder thus narrowing the class of defendants who are eligible for the death penalty.

8.    Arizona's capital sentencing scheme is unconstitutional because it does not require that the State prove that the death penalty is appropriate. Failure to require this proof violates the Fifth, Eighth, and Fourteenth Amendments to the United States Constitution and Article 2, § 15 of the Arizona Constitution. *State v. Ring*, 200 Ariz. 267, 284, 25 P.3d 1139, 1156 (2001) (*Ring I*), *rev'd on other grounds by Ring II.*

9.    A.R.S. § 13-703 provides no objective standards to guide the sentencer in weighing the aggravating and mitigating circumstances and therefore violates the Eighth and Fourteenth Amendments of the United States Constitution and Article 2, § 15 of the Arizona Constitution. *State v. Pandeli*, 200 Ariz. 365, 382, 26 P.3d 1136, 1153 (2001).

10.    Arizona's death penalty scheme is unconstitutional because it does not require the sentencer to find beyond a reasonable doubt that the aggravating circumstances outweigh the accumulated mitigating circumstances, in violation of the Fifth, Eighth, and Fourteenth Amendments to the United States Constitution and Article 2, §§ 4 and 15 of the Arizona Constitution. *State v. Poyson*, 198 Ariz. 70, 83, 7 P.3d 79, 92 (2000).

131

11.    A.R.S. § 13-703 does not sufficiently channel the sentencer's.  Aggravating circumstances should narrow the class of persons eligible for the death penalty and reasonably justify the imposition of a harsher penalty.   The broad scope of Arizona's aggravating factors encompasses nearly anyone involved in a murder, in violation of the Eighth and Fourteenth Amendments to the United States Constitution and Article 2, § 15 of the Arizona Constitution.  *Pandeli*, 200 Ariz. at 382, 26 P.3d at 1153.

12.    Execution by lethal injection is cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments to the United States Constitution and Article 2, § 15 of the Arizona Constitution.  *State v. Hinchey*, 181 Ariz. 307, 315, 890 P.2d 602, 610 (1994).

13.    Arizona's death penalty unconstitutionally requires imposition of the death penalty whenever at least one aggravating circumstance and no mitigating circumstances exist, in violation of the Eighth and Fourteenth Amendments to the United States Constitution and Article 2, § 15 of the Arizona Constitution.  *State v. Miles*, 186 Ariz. 10, 19, 918 P.2d 1028, 1037 (1996).

Andriano recognizes that this Court has previously found these claims to be constitutional as evidenced by her citation to the cases previously rejecting these

132

claims.    However, Andriano requests this court re-examine these issues in determining the constitutionality of the death penalty in Arizona.

## CONCLUSION

The trial court denied Andriano a fair trial by erroneously permitting irrelevant "bad acts" evidence. This evidence had little if any probative value, but was highly prejudicial. The court also failed to *sua sponte* instruct the jury on all lesser-included offenses supported by the evidence.

The aggravator of "especially cruel" is vague on its face and as applied. The trial court failed to narrow the definition sufficiently to channel the jury's discretion. A proper examination of this aggravator reveals the evidence fails to support it.

The trial court improperly refused to allow Andriano to proffer the mitigating circumstances of "residual doubt" and "mercy." The court also erred by instructing the jury that it must unanimously find mitigation before each juror individually weighed the mitigation.

The court improperly gave an impasse instruction before the jury declared it was at an impasse. An impasse instruction at the penalty phase of a capital trial is improper in any event. Because penalty phase consideration is individual, an impasse instruction was unwarranted.

134

Arizona's lethal injection statute is unconstitutionally vague.  It does not specify the execution protocol nor set forth the necessary qualifications of execution personnel.

Based on the foregoing, Andriano requests this court reverse her conviction and remand for a new trial.

Respectfully submitted,

MARICOPA COUNTY PUBLIC DEFENDER

By _____
    BRENT E. GRAHAM
    Deputy Public Defender

By _____
    PEG GREEN
    Deputy Public Defender
    Attorneys for APPELLANT

## **CERTIFICATE OF RULE 31.13(b) COMPLIANCE**

The brief is double-spaced, uses a 14-point Times New Roman proportionately spaced typeface, and contains 28000 words, according to the processing system used to prepare this brief.

MARICOPA COUNTY PUBLIC DEFENDER

By _____
BRENT E. GRAHAM
Deputy Public Defender

By _____
PEG GREEN
Deputy Public Defender
Attorneys for APPELLANT

## CERTIFICATE OF SERVICE

**TWO COPIES** of Appellant's Opening Brief mailed this 17th day of July, 2006, to KENT E. CATTANI, Capital Litigation Section, Attorney General's Office, 1275 West Washington Street, Phoenix, Arizona 85007.

**ONE COPY** of Appellant's Opening Brief mailed this 17th day of July, 2006, to WENDI ELIZABETH ANDRIANO, #191593, Arizona State Prison Complex, Perryville - Lumley Unit, P.O. Box 3300, Goodyear, Arizona 85338.

MARICOPA COUNTY PUBLIC DEFENDER

By _____
    BRENT E. GRAHAM
    Deputy Public Defender
    Attorney for APPELLANT
    11 West Jefferson, Suite 5
    Phoenix, Arizona 85003
    Telephone (602) 506-0924
    State Bar Attorney No. 011868

KLBGPG071706P

137

# APPENDIX A

 **Arkansas Democrat 🦅 Gazette**

**NORTHWEST ARKANSAS EDITION**

# Judge stays killer's execution over lethal-injection concerns

BY LINDA SATTER
Posted on Tuesday, June 27, 2006
URL: http://www.nwanews.com/adg/News/158912/

Nine days before Don Williams Davis' scheduled execution for the 1990 killing of a Rogers woman, a federal judge granted a stay on Monday, citing concerns that Arkansas' lethal injection process is cruel.

"The Court finds that Davis has shown that he is personally under a threat of irreparable harm," U. S. District Judge Susan Webber Wright said in a written order. "If Davis remains or becomes conscious during the execution, he will suffer intense pain that will never be rectified.... If a stay is granted and Davis's allegations prove true, he and others will be spared subjection to an unconstitutional execution procedure.... If, on the other hand, a stay is granted and Davis's allegations are without merit, the State can carry out Davis's execution without the specter that the [Arkansas Department of Correction's ] protocol carries an unreasonable risk of inflicting unnecessary pain."

On May 4, seven days before Gov. Mike Huckabee scheduled Davis's execution date, Davis intervened in a federal lawsuit filed May 1 by another deathrow inmate, Terrick Terrell Nooner.

The lawsuit, filed by attorney Julie Brain of the federal public defender's office, contends that inmates who are put to death in Arkansas under the state's lethal injection protocol may be subjected to cruel and unusual punishment, in violation of the Eighth Amendment.

In 1992, Davis, now 43, was sentenced to death after being convicted of capital murder for shooting and killing Jane Martha Daniel, 62, while burglarizing her home Oct. 12, 1990. Her husband found her body in the basement of their home when he returned from a business trip.

Brain says that according to a board-certified anesthesiologist, Arkansas' three-pronged injection process fails to ensure that the first injection actually renders the inmate unconscious to the point that he will not experience intense pain and agony after the administration of the second and third drugs, which cause paralysis and stop the heart, respectively.

The lawsuit says that the statements of witnesses to various Arkansas executions indicate that perhaps the paralysiscausing drug merely prevents the condemned inmate from outwardly indicating the painful effects of the drugs.

The second drug causes difficulty breathing, while the third drug, potassium chloride, burns intensely as it travels through the veins to the heart, according to the suit.

The plaintiffs' expert, anesthesiologist Dr. Mark J. S. Heath of New York City, contends that the state's protocol fails to comply with medical standards for inducing and maintaining anesthesia, and "creates an unacceptable risk that condemned inmates will be conscious for the duration of the execution procedure," Wright's order notes.

While the state has defended its execution procedures, noting that Arkansas uses the same chemicals as other states that have withstood constitutional challenges, Wright said she plans to hold an evidentiary hearing on the lawsuit's claims.

"Crime victims and the general public have an important interest in the timely enforcement of criminal sentences," her order said.

"However, failure to consider Davis's allegations would ignore the equally important public interest in the humane and constitutional application of the State's lethal injection statute."

She said she will try to schedule a hearing quickly, and that the execution is stayed "until further notice."

Nooner's execution date has not been scheduled.

Copyright © 2001-2006 Arkansas Democrat-Gazette, Inc. All rights reserved.
Contact: webmaster@nwanews.com

# APPENDIX B

# When Legislatures Delegate Death: The Troubling Paradox Behind State Uses of Electrocution and Lethal Injection and What it Says About Us

## DEBORAH W. DENNO[*]

*This article discusses the paradoxical motivations and problems behind legislative changes from one method of execution to the next, and particularly moves from electrocution to lethal injection. Legislatures and courts insist that the primary reason states switch execution methods is to ensure greater humaneness for death row inmates. History shows, however, that such moves were prompted primarily because the death penalty itself became constitutionally jeopardized due to a state's particular method. The result has been a warped legal "philosophy" of punishment, at times peculiarly aligning both friends and foes of the death penalty alike and wrongly enabling legislatures to delegate death to unknowledgeable prison personnel. This article first examines the constitutionality of electrocution, contending that a modern Eighth Amendment analysis of a range of factors, such as legislative trends toward lethal injection, indicates that electrocution is cruel and unusual. It then provides an Eighth Amendment review of lethal injection, demonstrating that injection also involves unnecessary pain, the risk of such pain, and a loss of dignity. These failures seem to be attributed to vague lethal injection statutes, uninformed prison personnel, and skeletal or inaccurate lethal injection protocols.*

*The article next presents the author's study of the most current protocols for lethal injection in all thirty-six states where anesthesia is used for a state execution. The study focuses on a number of criteria contained in many protocols that are key to applying an injection, including: the types and amounts of chemicals that are injected; the selection, training, preparation, and qualifications of the lethal injection team; the involvement of medical personnel; the presence of general witnesses and media witnesses; as well as details on how the procedure is conducted and how much of it witnesses can see. The study emphasizes that the criteria in many protocols are far too vague to assess adequately. When the protocols do offer details, such as the amount and type of chemicals that executioners inject, they oftentimes reveal striking errors and ignorance about the procedure. Such inaccurate or missing information heightens the likelihood that a lethal injection will be botched and suggests that states are not capable of executing an inmate constitutionally. Even though executions have become increasingly hidden from the public, and therefore more politically palatable, they have not become more humane, only more difficult to monitor.*

## I. INTRODUCTION

The history of executions in this country is fraught with paradox about why legislatures change from one execution method to another.[1] This article focuses on the most recent versions of this quixotic dilemma—legislative moves from electrocution to lethal injection. Evidence suggests that state patterns of rejecting and retaining execution methods are diagnostic of the status of the death penalty process because they have gauged for more than a century how this country views executions, both literally and symbolically. Michel Foucault had long observed how methods of punishment and death were vibrant, social and political symbols.[2] The symbols have remained, but they have a disturbing modern twist. The death penalty in the United States "has thus been retained more as the symbol of a particular politics than as an instrumental aspect of penal policy."[3]

Generally, pro and con debates concerning the death penalty are divisively clear. Such predictability is not the hallmark of reactions to changes in execution methods, however. Oftentimes, friends and foes of the death penalty align both sides of the execution methods debate, despite their different goals. The result is a dangerous and distorted legal "philosophy" of punishment that erodes human rights and constitutional safeguards, most particularly the Eighth Amendment's Cruel and Unusual Punishments Clause.[4]

The core of this execution methods paradox lies, not surprisingly, on whether legal actors want to reject or retain the death penalty and which stance will ensure their success. On the one hand, legislatures and courts have consistently claimed that the change from one method of execution to another provides the condemned the most humane and decent means of death possible given our knowledge of human science.[5] At the same time, however, statutory and judicial behavior contradicts this purported rationale. For example, legislatures typically change an execution method only to stay one step ahead of a looming constitutional challenge to that method because the acceptability of the death penalty process itself therefore becomes jeopardized.[6] Moreover, legislative changes to new execution methods oftentimes have not been retroactive; inmates already on death row when the change occurs must be executed by the older, more problematic method or they are still allowed to "choose" that method.[7]

In more recent years, death penalty proponents and opponents have united against lethal injection specifically. For example, some proponents feel that the older, more questionable method, typically electrocution, better represents their

retributive sentiments than lethal injection,[8] some opponents believe that lethal injection will increase the number and acceptability of executions because the death penalty will be more palatable.[9] Paradoxically, the two sides also have united by promoting lethal injection because it appears more humane. For this reason, some proponents feel that injection can save the death penalty from abolition[10] while some opponents believe injection can save inmates from torture.[11] Public opinion polls occupy both camps: the public says it wants the death penalty,[12] but it also wants what it believes to be the most humane method of execution.[13] Occasionally, inmates fuel the frenzy by picking for their own death the older, more controversial, execution method if they are in a state that allows such a choice—just to make a point about the barbarity of the death penalty.[14] Of course, the media is allowed, if not required, to record whether the execution process is humane; yet, courts have routinely dismissed the media's accounts of botched executions in cases challenging the constitutionality of execution methods.[15]

Despite the overwhelming use of lethal injection in this country,[16] many of those individuals who are medically qualified to carry out a proper and humane injection—doctors and nurses—simply do not want to do it.[17] The nineteen percent who do[18] confront opposition by influential medical societies.[19] Legislatures delegate death to prison personnel and executioners who are not qualified to devise a lethal injection protocol, much less carry one out.[20] In an effort to present a medically sterile aura of peace, for example, executioners inject paralyzing drugs that serve no other purpose than to still a prisoner who, in reality, may be experiencing the hideous pains of dying but may not be able to express it.[21] The consequences suggest the most duplicitous irony of all: the very method that seems most appealing in the eyes of the public is also one of the most unjustifiably cruel. In their all-consuming haste to perpetuate the death penalty, legislatures and courts promote an uncontrolled brutality that should have no place in society or the law. The U.S. stance also starkly contrasts with the approach in the international community, where the number of abolitionist countries increases each year.[22]

Part II of this article describes the current distribution of execution methods in this country as a prelude to discussing the history and modern development of Eighth Amendment standards and an execution methods jurisprudence. The Part emphasizes the United States Supreme Court's complete constitutional disregard for how inmates are executed, irrespective of a century-long pattern of horrifying, and entirely preventable, mishaps linked to all execution methods. The Part contends that an Eighth Amendment analysis of execution methods requires a simultaneous examination of the behaviors of all three institutional decision makers—legislatures, courts, and prison officials. Even though a legislature may consider a particular method to be the most humane under ideal circumstances, prison officials may, in practice, continually misapply the method. If a pattern of inappropriate application exists, the court should find that method unconstitutional, and the legislature should abandon that punishment.

Part III examines the constitutionality of electrocution using four interrelated criteria derived from the Court's modern Eighth Amendment jurisprudence. These criteria emphasize the importance of pain, the risk of pain, human dignity, and legislative trends reflecting changing execution methods.[23] The Part notes that pain is only one of a range of factors for evaluating execution methods, although evidence suggests that even a routine or "properly performed" execution can cause intense pain and a lingering death. When an analysis of electrocution considers other Eighth Amendment factors, such as legislative trends toward lethal injection, there are strong arguments suggesting that electrocution is cruel and unusual. Lastly, the Part examines case studies in three states (Georgia, Nebraska, and Ohio) that illustrate paradoxical legislative problems with electrocution.

Part IV overviews the origins of lethal injection, the types of lethal injection statutes, the lethal injection procedure, and judicial challenges to injection. Given the problems in all of these areas, the Part is a prelude to questioning legislatures' and courts' presumptions that injection meets the Eighth Amendment's standards.

Part V provides a modern Eighth Amendment analysis of lethal injection relying on the same standards and criteria used to assess electrocution, in addition to a focus on media coverage. Although legislative trends are moving exclusively in the direction of lethal injection, there still are important issues that bear on "evolving standards of decency," most particularly the American Medical Association's prohibition of physicians' participation in lethal injections. The Part concludes that there is substantial evidence that lethal injection involves an "unnecessary and wanton infliction of pain," the risk of such pain, and a loss of dignity. These problems seem to be attributed to vague lethal injection statutes, uninformed prison personnel, and missing, skeletal, or inaccurate lethal injection protocols.

Part VI discusses the author's study of the most current protocols for lethal injection in all thirty-six states where anesthesia is used for state executions. The Part first emphasizes the author's difficulty in acquiring protocols or information on incomplete protocols. Of those states with prison officials who agreed to submit a protocol to the author or who had a

protocol publicly available (such as through a web site), only a limited number of protocols offered any details on the application of the lethal injection method itself in terms of key criteria, which include the following: (1) the amount of chemicals that are injected into the inmates, since the great majority of states used the standard three-injection chemicals (sodium thiopental, pancuronium bromide, and potassium chloride); (2) the preparation by the execution team for the lethal injection process; (3) the selection, training, and qualifications of the lethal injection team; (4) the involvement of medical personnel; (5) the extent to which guidelines are explicitly enumerated, written down, and made publicly available; (6) the availability of advice if there is a problem or a mistake during the execution procedure (for example, a tube becomes clogged), or instructions on how to revive an inmate if there is a stay in the execution; (7) the allowed or required presence of general witnesses or media witnesses; as well as (8) details on how the procedure is conducted and how much of it witnesses can see. When the protocols do provide details, such as the amount of chemicals that are injected, they oftentimes reveal ignorance and errors that heighten the likelihood that an execution will be botched. Such inaccurate or missing information suggests that states are not capable of executing an inmate humanely.

Part VII analyzes the paradoxical motivations behind legislative changes in execution methods. The Part notes that the conflicting goals of death penalty proponents and opponents alike ironically can merge when the topic is a switch in execution methods, particularly the move from electrocution to lethal injection. The Part illustrates these tensions and converges in the context of the 2001 federal execution of Timothy McVeigh. McVeigh's execution, which involved the traditional three-chemical lethal injection, was either too painless, humane enough, or too torturous, depending on the political eye and medical education of the observer.

As McVeigh's death indicates, execution procedures often have served as an underlying barometer of social attitudes toward the death penalty in general. Paradoxically, the seemingly serene and medically pristine application of lethal injection satisfies both friends and foes of the death penalty because it fuels the death penalty process for those who want it to continue, but also makes the process seem more humane for those who would like it to end. Perhaps Foucault would have agreed, however, that even though executions have become increasingly hidden from the public and therefore more politically acceptable, they have not become more humane, only more difficult to monitor.

This article contends that lethal injection appears to be unconstitutional given the science and faulty application of injections. However, the protocols are so sketchy, and the procedure so covert, that legislatures and courts are able to turn a blind eye toward the consequences. Moreover, prison officials are wrongly delegated a degree of discretion for which they have no training and knowledge.

This article does not recommend that prison officials acquire an expertise for killing people. Rather, the goal is three-fold—to expose yet one more line of evidence showing the failures of the death penalty process, to provide a possible explanation for why such failures exist, and to detail the difficulties and paradoxes surrounding the attempts to resolve these problems. While death penalty proponents may believe that the increasing refinement of execution methods, irrespective of their humaneness, rightly perpetuates the death penalty, there are no legal or social standards that support this agenda. "The Court has *never* accepted the proposition that notions of deterrence or retribution might legitimately be served through the infliction of pain beyond that which is minimally necessary to terminate an individual's life."[24] Unfortunately, however, it seems that legislatures have accepted this proposition through irresponsible delegation.

## II. THE EIGHTH AMENDMENT EXECUTION JURISPRUDENCE

### A. *Current Methods of Execution and "Choice" States*

An analysis of the execution methods paradox requires some perspective on the current distribution of execution methods in this country. Table 1[25] lists the execution methods currently enacted in the thirty-eight death penalty states. Lethal injection now is the predominant method of execution; it is the sole method of execution in twenty-seven states and one of the two methods in each of the nine choice states.[26] Likewise, lethal injection executions far exceed the numbers of executions conducted by any other method.[27] In contrast, electrocution is the sole method of execution in only two states—Alabama and Nebraska—and legislatures in both states are now considering bills challenging its use.[28] Electrocution is an option in three of the choice states (Florida, South Carolina, and Virginia).[29] Hanging, the firing squad, and lethal gas are no longer the sole method of execution in any state.[30] Although each of these three methods is included as an option in two choice states, the methods are rarely used.[31]

However, this capsule of the current distribution of execution methods is not the end of the legislative story. The following sections of this article discuss the circuitous path that led up to it. The sections will focus first on electrocution because it was the most widely used execution method and challenges to it have had the strongest impact on legislative

OHIO STATE LAW JOURNAL                [Vol. 63: 63 (2002)]

developments. Yet, this article examines most closely state uses of lethal injection in an effort to demonstrate how disturbingly errant legislative delegations of death continue to be.

## B. *The Impact of Eighth Amendment Standards*

A striking oddity of the American death penalty is the Court's complete constitutional disregard for how inmates are executed. While the Court continually recognizes the Eighth Amendment hazards associated with prison conditions,[32] it has never reviewed evidence on the constitutionality of execution conditions despite repeated, horrifying, and entirely preventable mishaps.[33] Indeed, the Court has recently agreed to hear challenges on the subject twice (involving California[34] and Florida[35]), only to drop the cases after state legislatures have changed their methods of execution.[36]

Explanations for these circumstances are baffling, yet one result seems clear: by refusing to acknowledge the problems with execution methods, the Court does not question the death penalty process itself. Moreover, states have aided this result through their systematic efforts to change to a new execution method whenever it seems likely that their current method is constitutionally vulnerable.[37] Increasing adoption of lethal injection by the great majority of death penalty states is the most visible evidence of this constitutional sidestepping.[38]

### 1. *An Historical Intertwining of Courts and Legislatures*

When the United States Constitution was being ratified, the Framers included in the Bill of Rights a prohibition of cruel and unusual punishments that was created expressly to proscribe the kinds of "torturous" and "barbarous" penalties associated with certain methods of execution.[39] To date, however, courts generally have provided only superficial and, at times, inaccurate Eighth Amendment review of the constitutionality of execution methods. Most commonly, courts dismiss the electrocution challenge entirely (often in one sentence) by relying on the century-old precedent of *In re Kemmler*.[40] In *Kemmler*, the Court held that the Eighth Amendment did not apply to the states and deferred to the New York legislature's conclusion that electrocution was not a cruel and unusual punishment under the state's Electrical Execution Act.[41] Courts have mostly relied on *Kemmler* to dismiss challenges to the constitutionality of electrocution, although the case also has been used to bolster challenges to the other four types of execution methods.[42]

*Kemmler*'s history, however, demonstrates how unique and problematic the case really is. The events surrounding *Kemmler* also suggest that political and financial forces outweighed the purported humanitarian concerns over how death row inmates were executed. For example, the New York Electrocution Act was a direct result of two major legislative events: (1) the Governor of New York's 1885 message to the legislature decrying the barbarity of hanging;[43] and (2) the Governor's appointment of a Commission to investigate "the most humane and practical method known to modern science" of carrying out executions.[44] Compelling evidence suggests that the Commission's ultimate recommendation of electrocution as the most humane method of effecting death was influenced heavily by a financial competition between Thomas Edison and George Westinghouse concerning whose current would dominate the electrical industry: Edison's DC current or Westinghouse's AC current.[45] Edison and his associates would have benefited by showing that George Westinghouse's AC current was so lethal it could kill someone. If AC current were applied in the electric chair, people would be afraid to use the current in their own homes.[46] Indeed, this Edison-Westinghouse rivalry existed within and throughout the New York Supreme Court's evidentiary hearings.[47] Yet, despite a cross-examination demonstrating Edison's ignorance of the effects of electrical currents on the human body as well as experimental results showing that electrocution did not quickly kill many of the animals tested, Edison's enormous reputation at the time outweighed revelation of his or any other expert's substantive flaws.[48] The New York legislature adopted electrocution and, with time, the medical community recommended AC current in particular.[49]

### 2. *A Lack of Proper Precedent*

For a range of reasons, *Kemmler*'s precedential value has diminished substantially over the last century. First, the *Kemmler* Court never specifically employed the Eighth Amendment's Cruel and Unusual Punishments Clause even though post-incorporation cases have continued mistakenly to cite *Kemmler* as an Eighth Amendment case.[50] Next, the *Kemmler* Court adopted an unusually stringent burden of proof standard[51] that has not been used since in death penalty cases.[52]

OHIO STATE LAW JOURNAL

Moreover, a court reviewing electrocution under the Eighth Amendment would not defer to the state's legislature to the same extent as the *Kemmler* Court.[53] Most critically, because *Kemmler* was decided before anyone had been electrocuted, the Court had limited evidence in reaching its conclusion apart from the law, science, and politics of the time.[54]

Scientifically, William Kemmler's 1890 electrocution failed. The media reported in graphic detail the confusion and mistakes that surrounded the executioners' attempts to regulate the newly tried electric chair, as well as the physical violence and mutilation that Kemmler experienced.[55] Regardless, Kemmler's mishap became a blight on the memory of state legislatures. Electrocution quickly became a popular means of execution in other states, despite comparable reports of mishaps and botches.[56] It appeared that the desire to perpetuate the death penalty outweighed any humanitarian goal to switch to a new method or to stop executions entirely.[57] Consequently, the Court relied on *Kemmler* decades later in *Malloy v. South Carolina*[58] and in *Louisiana ex rel. Francis v. Resweber*[59] to fuel states' uses of electrocution in the face of new kinds of legal challenges.

## C. *The Modern Development of Eighth Amendment Standards*

Since 1962, when the Court held in *Robinson v. California*[60] that the Eighth Amendment applies to the states,[61] the Court's Eighth Amendment doctrine has emphasized an "evolving standard of decency" of cruel and unusual punishment.[62] This evolution occurs because "[t]ime . . . brings into existence new conditions and purposes. Therefore, a principle to be vital must be capable of wider application than the mischief which gave it birth."[63] For these reasons, the Court has viewed the Eighth Amendment "in a flexible and dynamic manner,"[64] recognizing that the Clause "draw[s] its meaning from the evolving standards of decency that mark the progress of a maturing society."[65] Current claims of cruel and unusual punishment must therefore be assessed "in light of contemporary human knowledge."[66]

Aspects of *Kemmler* coincide with the "evolving standards of decency" jurisprudence. Although scientific evidence does not support the *Kemmler* Court's factual assumptions regarding the acceptability of electrocution,[67] one of the *Kemmler* Court's legal conclusions remains viable: "Punishments are cruel when they involve torture or a lingering death . . . . something more than the mere extinguishment of life."[68]

In conjunction with the "evolving standards of decency" and "torture and lingering death" guideposts, some courts also have considered whether a particular state's execution methods statute is unconstitutionally vague.[69] This approach recognizes that all three levels of decision makers (legislatures, courts, and prison personnel) are simultaneously involved in execution procedures, but that legislatures could play a greater role in either guiding or curtailing prison personnel's discretion in implementing executions.

Currently, five states can still apply electrocution. Two states use electrocution as their sole method of execution[70] and three states allow the condemned a choice between electrocution and lethal injection.[71] Yet, not one of these five states provides information on the voltage or amperage of the electrical current that should be applied, nor the way that current should be administered. Three of the five states specify nothing more than "death or punishment by electrocution."[72]

Overall, the electrocution statutes alone provide insufficient information to assess whether electrocution meets Eighth Amendment standards.[73] For that reason, this article focuses more directly on the behavior of prison officials.

The Court's Eighth Amendment jurisprudence suggests four interrelated criteria for determining the constitutionality of an execution method: (1) "the unnecessary and wanton infliction of pain";[74] (2) "nothing less than"[75] human dignity (for example, "a minimization of physical violence during execution"[76]); (3) the risk of "unnecessary and wanton infliction of pain",[77] and (4) "evolving standards of decency" as measured by "objective factors to the maximum extent possible,"[78] such as legislation passed by elected representatives[79] or public attitudes.[80] However, no court has reviewed the constitutionality of electrocution or lethal injection under modern Eighth Amendment standards that consider, as a substantial part of an "evolving standards of decency" analysis, legislative trends and related information, such as public opinion polls and execution protocols. The next Part of this article briefly attempts such an analysis.

## III. A MODERN EIGHTH AMENDMENT ANALYSIS OF ELECTROCUTION

The Court's modern Eighth Amendment jurisprudence suggests that pain is only one of a range of factors used to evaluate whether an execution method constitutes cruel and unusual punishment. This Part discusses the pain and physical violence of electrocution but then focuses on other Eighth Amendment criteria, especially the strong showing of legislative trends away from electrocution. The legislative trend criterion has been the most strongly ignored by courts, but is perhaps the most critical now.

## A. Electrocution Constitutes the "Unnecessary and Wanton Infliction of Pain"

The Court set forth general principles gauging what can be considered proper measures of excessive pain; however, other courts have provided substantially more detail. For example, in an effort to determine if an inmate experienced "unnecessary and wanton infliction of pain" while conscious, the Ninth Circuit has supported consideration of a wide range of evidence, including scientific research and eyewitness accounts of actual executions.[81]

The most recent research and eyewitness observations suggest that many factors associated with electrocution, such as severe burning, boiling body fluids, asphyxiation, and cardiac arrest, can cause extreme pain when unconsciousness is not instantaneous.[82] Table 8[83] lists brief summaries of nineteen botched electrocutions following *Gregg v. Georgia*,[84] when the Court ended its moratorium on the death penalty.[85] These botches provide considerable evidence that prisoners can experience extensive pain and suffering even when the electrocution is routine or "properly performed."[86]

On July 8, 1999, perhaps the most notorious botched electrocution occurred when Allen Lee Davis's execution in Florida's electric chair went terribly awry—an event that garnered worldwide notice and condemnation.[87] The Florida Supreme Court's color photos of the executed Davis (posted on the Internet as part of a case appendix)[88] received so many "hits" from the several millions of interested viewers that the court's computer system crashed and was disabled for months afterwards.[89]

The photos and witnesses' testimony detailed the horror. Davis suffered deep burns on his head, face, and body, as well as a nosebleed that poured blood down his face and shirt. More troubling was evidence that Davis was partially asphyxiated before and during the electrocution from the five-inch-wide mouth strap that belted him to the chair's head-rest.[90] There also was testimony that, after guards placed the mouth strap on him, Davis's face became red and he tried to get the guards' attention by making sounds[91]—noises described by witnesses as "'screams,' 'yells,' 'moans,' 'high-pitched murmurs,' 'squeals,' or 'groans,' or like 'a scream with someone having something over their—their mouth.'"[92] Execution team members stated that they "ignored" Davis's noises, however, because those kinds of sounds "were not unusual during an electrocution."[93] In the post-execution photos taken by Department of Corrections personnel,

> a sponge placed under [Davis's] head-piece obscures the top portion of his head down to his eyebrows; because of the width of the mouth-strap, only a small portion of Davis' face is visible above the mouth-strap and below the sponge, and that portion is bright purple and scrunched tightly upwards; his eyes are clenched shut and his nose is pushed so severely upward that it is barely visible above the mouth-strap. . . .[94]

Thomas Provenzano, who was scheduled to be executed in Florida State Prison the next day, filed a petition with the Florida Supreme Court seeking a stay of execution and argued that the state's electric chair was cruel and unusual punishment. The Florida Supreme Court remanded Provenzano's case to the circuit court to conduct an evidentiary hearing on the constitutionality of Florida's electric chair. After the hearing, the circuit court held that electrocution in Florida's electric chair "is not unconstitutional."[95] In *Provenzano v. Moore*, a 4–3 *per curiam* opinion, a plurality of the Florida Supreme Court affirmed in three pages the circuit court's "finding that the electric chair is not unconstitutional."[96] Moreover, the plurality reiterated its previous holding in *Jones v. State*[97] that had rejected the claim that Florida's use of electrocution violated "evolving standards of decency."[98] The court implied there was no need to readdress the "evolving standards of decency" issue.

In *Provenzano*, the Florida Supreme Court's skeletal *per curiam* opinion virtually ignored the great bulk of the Court's Eighth Amendment jurisprudence. Therefore, the Florida Supreme Court effectively begged the question of electrocution's continued propriety under an "evolving standards of decency" test.

In granting certiorari to review the issue in *Bryan v. Moore*,[99] the Court defied history and expectations. For the first time ever, it seemed willing to consider arguments concerning whether execution by electrocution in any state—in this case

Florida—violated the Eighth Amendment's Cruel and Unusual Punishments Clause.[100] The Court ultimately dismissed its certiorari grant in light of the Florida legislature's decision to switch to lethal injection.[101] Regardless, *Bryan* signifies the beginning of the final end to electrocution. *Bryan* also has fueled comparable constitutional challenges in the two remaining electrocution states, Alabama and Nebraska.[102]

Because the *Provenzano* court disregarded much of the existing Eighth Amendment jurisprudence, the *Bryan* Court's failure to provide guidance for evaluating execution methods leaves open the possibility that additional factors influenced the Court's decision to grant certiorari. As in *Provenzano*, other courts also have engaged in brief Eighth Amendment reviews that focus predominantly on the amount of pain inflicted while ignoring alternative Eighth Amendment standards.

## B. *Electrocution Constitutes "Physical Violence" and Offends "Human Dignity"*

Much of the attention directed toward Allen Lee Davis's execution concerned not only the pain he might have experienced but, without question, the mutilation that occurred when he and others before him were electrocuted. Evidence of mutilation resulting from electrocution is derived from three sources: (1) post-execution autopsies, which are required in some states; (2) observations provided by experts; and (3) witnesses' descriptions of executions, some of which are detailed in Table 8.[103] The effects of electrocution on the human body include the following: charring of the skin and severe external burning, such as the possible burning away of the ear; exploding of the penis; defecation and micturition, which necessitate that the condemned person wear a diaper; drooling and vomiting; blood flowing from facial orifices; intense muscle spasms and contractions; odors resulting from the burning of the skin and the body; and extensive sweating and swelling of skin tissue.[104]

Similar to Allen Lee Davis's execution, for example, the execution of Wilbert Lee Evans in Virginia resulted in substantial bleeding; blood poured from Evans's eyes and nose, drenching his shirt. Moreover, the flames witnessed during the 1990 execution of Jesse Joseph Tafero and the 1997 execution of Pedro Medina made the public explicitly aware of how a human body could be burned and distorted during an electrocution.[105]

## C. *Electrocution Constitutes the Risk of "Unnecessary and Wanton Infliction of Pain"*

When legislatures or courts validate the use of electrocution, it is implied that prison officials will perform executions properly and that equipment will not malfunction. A focus on electrocutions in all states and over time, however, reveals the potential for prison personnel to contribute to a risk of unnecessary pain.

In 1990, for example, Jesse Tafero's botched electrocution in Florida suggested there was a substantial likelihood the state's execution procedure could result in severe pain and prolonged agony. Subsequently, a pattern of consecutive malfunctions has been established with the botched Florida electrocutions of Pedro Medina and, now, Allen Lee Davis. Tafero's and Medina's executions shared similar problems (most particularly difficulties with the headset sponge), that created the flames, smoke, smell, and burning in both executions.[106] Notably, both of their executions closely resembled William Kemmler's over a century ago.[107] The new set of problems accompanying Davis's execution suggests that a continuing pattern of botches is highly foreseeable. Indeed, a pattern of consecutive botching also occurred in Virginia even after the state rewired the electric chair due to prior botching. These problems prompted Virginia to allow inmates a choice between electrocution and lethal injection.[108]

## D. *Electrocution Contravenes "Evolving Standards of Decency"*

Legislative trends are an established way to measure "evolving standards of decency."[109] Yet, courts, such as *Provenzano*,[110] have ignored such trends when they have evaluated the constitutionality of electrocution. A thorough assessment of this aspect of the Court's Eighth Amendment jurisprudence should consider legislative changes in execution methods in all states over the course of the twentieth century, starting with the New York legislature's 1888 selection of electrocution.

### 1. *The Marked Legislative Trends Away from Electrocution*

Legislative trends from 1888–2001 show three general patterns in the use of the five available execution methods in the United States. First, most state legislatures presumably change from one method of execution to another or to a "choice" between a state's old method of execution and lethal injection for humanitarian reasons, most typically because there have

OHIO STATE LAW JOURNAL [Vol. 63: 63 (2002)]

been problems with the method. However, other factors, such as cost, also are considered. Second, legislatures demonstrate a fairly consistent pattern of movement from one method of execution to another, suggesting that states take notice of the methods used, and the difficulties encountered, by other states. Third, since 1977, when lethal injection was first introduced, no state has changed to, or included as an additional "choice," any other method of execution but lethal injection. In general, states' changes in execution methods have occurred in the following order: from hanging to electrocution to lethal gas to lethal injection. The firing squad has been used sporadically in only a few states.[111]

In 1853, hanging, the "nearly universal form of execution," was used in forty-eight states and territories.[112] Nearly four decades later, however, concerns over the barbarity of hanging and the subsequent advent of electrocution prompted states to change their method of execution from hanging to electrocution.[113] Even though the first electrocutions were grotesquely botched,[114] by 1913, a total of thirteen states had changed to electrocution as a result of "a well-grounded belief that electrocution is less painful and more humane than hanging."[115] By 1949, twenty-six states had changed to electrocution, the largest number of states that had ever used electrocution at the same time.[116] Since 1949, however, no state legislature has selected electrocution as its method of execution.[117]

It appears that states stopped adopting electrocution initially because of the greater appeal of lethal gas. In 1921, Nevada was the first state to switch from its prior methods (hanging and shooting) to lethal gas in accordance with the state's new Humane Death Bill.[118] By 1955, eleven states were using lethal gas and twenty-two states were using electrocution. By 1973, twelve states were using lethal gas and twenty states were using electrocution. Since 1973, however, no state has selected lethal gas as a method of execution.[119]

With each new lethal gas statute came controversy and constitutional challenges, both before and after the Court's moratorium on capital punishment in *Furman v. Georgia*.[120] By 1994, there was a "national consensus" concluding that lethal gas was not an acceptable method of execution because of the cruelty involved.[121] Lethal gas continues to be available for use for executions in two states (California and Missouri),[122] and it continues to be controversial.

Recent research indicates that there is an even more striking national consensus rejecting electrocution. Since 1973, twelve states have abandoned lethal gas as their exclusive method of execution.[123] By contrast, since 1949, twenty-one states have abandoned electrocution as either an exclusive or choice method of execution.[124] Moreover, nine (or nearly one-half) of these states dropped electrocution in the last six years.[125]

Recent trends also suggest that state legislatures may have reached a "sufficient" degree of national consensus in rejecting both lethal gas and electrocution as execution methods. Although the Court has never specified how much of a consensus is considered "sufficient," it has rendered punishments unconstitutional with far less consensus than that shown for lethal gas or electrocution. In *Enmund v. Florida*,[126] for example, the Court held the death penalty unconstitutional for some kinds of felony murder, explaining that of the thirty-six death penalty jurisdictions, "only" eight, "a small minority," allowed capital punishment for such an offense.[127] Furthermore, even if the Court considered, along with these eight states, an additional nine jurisdictions that allowed the death penalty "for an unintended felony murder if . . . aggravating circumstances . . . outweigh[ed] mitigating circumstances," the Court emphasized that still *only about a third* of American jurisdictions" would allow a defendant to be sentenced to death for such offenses.[128] The Court noted that even though this trend was not "'wholly unanimous among state legislatures' . . . it nevertheless weighs on the side of rejecting capital punishment for the crime at issue."[129] Lastly, in those cases where the Court has rejected Eighth Amendment challenges to a particular punishment, there have been far more states employing that particular punishment than the number of states employing electrocution.[130]

## 2. *The Overwhelming Use of Lethal Injections for Executions*

Over time, lethal injection has become the overwhelmingly dominant method of execution.[131] Of those inmates executed by either electrocution or lethal injection between 1978 and 2001, 80% were executed by lethal injection and 20% were executed by electrocution.[132] As the total number of executions from these two methods increased over time (from 1 execution in 1979 to nearly 100 executions in 1999), the percentage of electrocution executions declined, albeit unevenly.[133] The percentage of electrocution executions dropped fairly steadily from 1981 to 1986 (from 100% to 39%), then increased

OHIO STATE LAW JOURNAL [Vol. 63: 63 (2002)]

briefly from 1987 to 1991 (up to 50%), then declined steadily thereafter.[134] From 1997 to 2000, electrocutions constituted less than 7% of all executions.[135] In 2001, there were no electrocutions—an unprecedented statistic.[136] Already a rarity, it is likely that electrocution will soon be extinct.

### 3. Other Evolving Standards of Decency Factors

There are other issues that bear on evolving standards of decency. For example, no country other than the United States uses electrocution.[137] Of the four electrocution states in this country that used electrocution with the most frequency from 1976–2000 (Alabama, Florida, Georgia, and Nebraska), Florida imposed the most electrocution executions. Since 1976, more than half of the electrocutions in this country—and thus in the world—have taken place in Florida.[138]

Electrocution also is not favored as a method of execution in recent public opinion polls. Polls show that lethal injection is preferred by most, if not the great majority, of respondents.[139] Floridians as a group demonstrated majority support for lethal injection after Davis's execution.[140]

The Florida Corrections Commission, the body responsible for overseeing Florida's electric chair, also had recommended that Florida change to lethal injection.[141] The Commission's state-wide survey of execution methods revealed that "numerous states had recently changed to lethal injection from electrocution because it was considered to be a 'more humane method of execution.'"[142] Lastly, the Humane Society of the United States and the American Veterinarian Medical Association consider electrocution a wholly unacceptable method of euthanasia for animals.[143]

In Provenzano,[144] the Florida Supreme Court failed to address these critical evolving standards of decency factors. Clearly, a modern Eighth Amendment analysis of electrocution reveals the court's unjustified conclusion that electrocution is constitutional. Most perplexing was the Provenzano court's failure to consider legislative trends away from electrocution towards lethal injection.

### E. Ongoing Legislative Problems with Electrocution: Three Current Case Studies

One of the most disturbing facets of electrocution is the extent to which it has remained a constitutional, legislative, and penal concern. Three cases in three different states illustrate the problems accompanying this persistence: (1) until 2001, the continuing application of electrocution for Georgia death row inmates sentenced before Georgia's enactment of lethal injection (in contrast to Louisiana, which has a similar statute, but declines to use electrocution); (2) the confusion in 2001 accompanying the extent to which the electrocution protocol in Nebraska corresponds with legislative intent; and (3) the difficulties that arise when an inmate unexpectedly decides to choose electrocution when lethal injection is the favored and more predictable choice—a problem Ohio confronted in 2001.

### 1. Georgia (and Louisiana)

In 2000, the Georgia legislature determined that all individuals sentenced to death for capital crimes committed on or after May 1, 2000, should be executed by lethal injection, while all condemned individuals sentenced to death before that date should be executed by electrocution. Previously, electrocution was the only execution method available in Georgia.[145] If this law had stayed in effect, 129 death row men and one woman in Georgia would have been electrocuted.[146]

The Georgia legislature's motivation for devising such a stringent, choice-less bifurcation between execution methods is not unique; other states have recommended this peculiar strategy, eventually switching to a lethal injection-only approach due to the onslaught of litigation over the controversial prior method.[147] The fact that Georgia appeared not to have incorporated the experiences of other states despite the decades-long attacks on electrocution suggests that old methods die hard, along with the punitive philosophies that accompany them. Until Dawson v. State[148] was decided in 2001, no appellate court had found electrocution unconstitutional,[149] although lower courts in Georgia[150] and Nebraska[151] had.

In Dawson, the Georgia Supreme Court ruled, 4–3, that the state could no longer use electrocution, explaining that the method's "specter of excruciating pain and its certainty of cooked brains" constitutes cruel and unusual punishment.[152] Dawson emphasized that the Georgia legislature had, since 2000, been moving in this direction.[153] Similarly, while the Dawson court focused on the "purposeless physical violence and needless mutilation" that characterize electrocution, the court

also stressed that "many states" had moved to lethal injection, "clearly" an "important factor" in determining the constitutionality of "an older method."[154]

Georgia's change spotlights the different kinds of relationships that exist between legislatures and prison personnel when the legislature has mandated a controversial execution method. For example, Louisiana's execution method statute is comparable to Georgia's.[155] Louisiana's inmates are to be executed by electrocution if they were sentenced to death before September 15, 1991, and they are to be executed by lethal injection if they were sentenced to death after that date.[156] However, in practice, Louisiana's prison officials have used only lethal injection since the change in statute because they dismantled the electric chair in 1991. Essentially, all judges issue death warrants specifying that lethal injection will be used.[157] No one has ever questioned the fact that Louisiana prison officials do not follow the law,[158] most likely because following it would create so many needless problems.

## 2. Nebraska

Two court rulings in 2000 and 2001, respectively, determined that Nebraska's four-jolt method of electrocution violates state law.[159] The first ruling found electrocution to be both illegal and unconstitutional, explaining that the gaps between jolts allow "the potential for the inmate to regain consciousness and experience substantial and unnecessary pain."[160] The second ruling upheld the constitutionality of electrocution and the 1980s protocol created for its use; however, the court concluded that the state statute requires that inmates be executed with one continuous jolt and not four separate jolts.[161] As the court explained, "[t]he state 'has the responsibility for following a protocol that will be consistent with the statute. . . . This is not the case at the present time.'"[162] On the other hand, the statute is read differently by lawyers with the Nebraska Attorney General's Office and the Director of Nebraska's Department of Correctional Services; they state that there is nothing in the statute's language suggesting one continuous current.[163]

While both sides continue to wrangle, one issue is clear: the Nebraska legislature's delegation of statutory interpretation to prison officials has caused a crisis over how executions should be carried out. Moreover, by revealing that prison officials may not be operating according to legislative intent, it seems likely that prisoners' Eighth Amendment rights might have been violated. In light of Nebraska's experience with electrocution, the prospect that the Nebraska legislature may ultimately adopt lethal injection[164] indicates that comparable kinds of problems may occur with that method.

## 3. Ohio

Ohio presents yet another variation on a theme in terms of the statutory problems associated with electrocution. Until November 2001, under the Ohio statute, condemned inmates were electrocuted unless they affirmatively chose lethal injection.[165] Unlike Georgia's statute, this bifurcation provided all death row inmates the same punishment, and all could choose lethal injection. Unpredictably, however, John Byrd, Jr. wanted to be executed by electrocution.[166] According to Ohio's prison director, who was concerned about the reliability of the state's 104-year-old electric chair, such a choice could have created great emotional stress and technical difficulty, and his staff was not prepared.[167] As a result, in July 2001, prison officials at Ohio's Department of Rehabilitation and Correction asked the Ohio Legislature to abolish the use of electrocution because they were concerned that the electric chair may malfunction.[168] With the support of the state governor, the Ohio legislature enacted an emergency bill eliminating electrocution.[169]

Such an ironic initiative contradicts the traditional sides that such parties take when the issue concerns the constitutionality of an execution method. The inmate, who does not want to be executed, is requesting the presumably harsher method to make a statement about the cruelty of electrocution and capital punishment. Prison officials clip that gesture entirely and the legislature reinforces them with a change in the statute. In the meantime, legislative change occurs because prison officials concede that they could not properly carry out the punishment that the inmate wanted and the legislature originally prescribed.

Ohio's situation, which is not unique,[170] highlights the paradoxical dilemma when friends and foes of the death penalty align on both sides of the execution method debate, albeit with different purposes in mind. Two state senators, both death penalty proponents, stood on either side of Ohio's debate: one senator argued to rid of electrocution in order to keep the death penalty, the other argued to keep the chair to show Ohio's law and order bent.[171] Others engaged in the debate—including a

non-legislator and opponent of the death penalty—wanted to keep electrocution because lethal injection "sanitizes" and "sugarcoats" killings; "putting someone to death (in any way) is cruel and unusual punishment."[172]

The incongruity of this dilemma is all the more pronounced when lethal injection is investigated more thoroughly. The next Part contends that lethal injection has just as many, if not more, medical and constitutional problems as electrocution.

## IV. QUESTIONING LETHAL INJECTION AS A LEGITIMATE ALTERNATIVE FOR EXECUTIONS

This Part questions legislatures' and courts' presumptions that lethal injection is a constitutional method of execution. Evidence suggests that lethal injection is following a similar constitutional path taken by other execution methods that were initially viewed as humane, but later rendered problematic when there was insurmountable evidence that executions were being botched. The Court's continuing avoidance of the execution method debacle unfortunately ensures that legislatures and courts will confront the problems with lethal injection only after countless numbers of individuals have been executed inhumanely.

This Part first examines lethal injection in the context of the applicable Eighth Amendment standards. It then analyzes some of the problems associated with lethal injection as well as the dubious and limited rationales that courts have offered for finding the method constitutional.

### A. *The Beginning of Lethal Injection*

Lethal injection was considered a potential method of execution as early as 1888.[173] The procedure was briskly rejected, however, predominantly because of the medical profession's belief that the public would begin to link the practice of medicine with death.[174] In 1953, the renowned British Royal Commission on Capital Punishment questioned both the humaneness and practicality of lethal injection because of the problems that could result from the peculiar physical attributes of many inmates (for example, abnormal veins) or the medical ignorance of the executioners.[175] Regardless, the United States commenced a renewed interest in lethal injection in 1976 after *Gregg v. Georgia*,[176] when the country again confronted the dilemma of executing people.[177]

There is a range of opinion concerning the source of the country's interest in lethal injection. Some scholars insist that legislatures at the time seemed to show no preference for a particular execution method.[178] However, others claim that lethal injection became popular along with the conservative shift in the nation's politics.[179] In 1973, for example, then-Governor Ronald Reagan of California recommended the idea of lethal injection for executions when he compared it to animal euthanasia, specifically, the ease of putting a horse to sleep.[180] Still others contend that legislatures favored lethal injection because it appeared more humane and palatable relative to other methods,[181] and it was cheaper.[182]

Irrespective of the origins of lethal injection, legislatures embraced the method quickly. In May 1977, Oklahoma became the first state to adopt lethal injection and by 1981, five states had adopted it.[183] However, the procedure was not even used until 1982, in the botched lethal injection of Charles Brooks, Jr.[184] The substantial numbers of other botched lethal injections, particularly at the start,[185] did not deter other states from adopting the method with relative confidence and speed.[186]

### B. *Types of Lethal Injection Statutes*

There are six general and overlapping types of lethal injection statutes.[187] These types illustrate the complex and peculiar ways in which states have introduced lethal injection as a new method of execution, particularly within the choice states, and how perpetuation of the death penalty appears to be a primary goal. Most striking are the distinctions between states that authorize either retroactive or nonretroactive applications of a new method of execution, depending on whether the amending statute was enacted after the prisoners were sentenced or convicted ("pre-enactment prisoners") or before they were sentenced or convicted ("post-enactment prisoners").

Table 10 shows that twenty-seven states provide no alternative method of execution for prisoners sentenced or convicted after the date the lethal injection statute was enacted or became effective (Type 1).[188] Six states allow the prisoner to choose between lethal injection and another execution method (Type 2);[189] three states allow someone other than the prisoner (such as the commissioner of corrections) to choose the method of execution (Type 3).[190] Type 3 statutes appear to be partly a

function of practicality, in case one method is difficult or unavailable. In turn, five states allow choices between lethal injection and another execution method only to pre-enactment prisoners who were sentenced or convicted prior to the statute's enactment (Type 4).[191]

Table 10's choice statutes (Types 2, 3, and 4)[192] illustrate legislatures' simultaneous efforts to change and retain methods of execution. Yet, such cross purposes result in nonsensical provisions that have no apparent penological or social policy justification. For example, states can allow either the prior method or the new, and purportedly more humane, method be the default if an inmate refuses to make a choice between methods. Most inmates decline, for whatever reason, to choose a particular method.[193] Consequently, they die by the least humane method in those states that have the least humane method as the default. This least humane default dilemma prompted the California litigation that the Court was going to address before the California legislature changed the default to lethal injection.[194] South Carolina's choice statute is even more perplexing. Both pre-enactment and post-enactment prisoners can choose their method of execution, although the no choice default for the former is electrocution whereas the no choice default for the latter is lethal injection.[195] Predictably, electrocution is the constitutional substitute if lethal injection is rendered unconstitutional.[196]

The one Type 5 statute for Louisiana is unusual because it does not allow any choice. Rather, it mandates that a pre-enactment prisoner use the method of execution that existed when the prisoner was sentenced to death—electrocution—although post-enactment prisoners receive lethal injection.[197] In *Malloy v. South Carolina*,[198] the Court held that it was not a violation of the Ex Post Facto Clause when a new, purportedly more humane, method of execution was retroactive.[199] Yet, Louisiana has a statute where the new, purportedly more humane, method is not retroactive.[200] What is unique about Louisiana, however, is that the state's statutory "appearances" are deceiving about what happens in practice. Ever since September 15, 1991, when lethal injection was first made available, Louisiana officials have executed all inmates by injection, regardless of what the statute says.[201] Perhaps those officials could foresee that at some point, the use of electrocution would become a source of litigation, similar to what Georgia experienced. Until 2001, Georgia officials executed pre-enactment inmates by electrocution under a statute nearly identical in language to Louisiana's.[202]

The legislative concern for ensuring the continuation of the death penalty process through execution methods, however, is perhaps most clearly illustrated by the constitutional substitute provisions of the ten states listed in the last category of Table 10 (Type 6).[203] These states have one or more constitutional substitutes in case lethal injection is deemed unconstitutional or invalid. In Oklahoma, for example, if lethal injection is rendered unconstitutional, the death sentence will be carried out by electrocution instead; yet, if both lethal injection and electrocution are rendered unconstitutional, the death sentence "shall be carried out by firing squad."[204] Presumably, the three execution methods are ordered in terms of their relative humaneness; but currently, both constitutional substitutes (electrocution and firing squad) are considered more inhumane or problematic than lethal injection. It appears that the state's interest is not with seeking the method that avoids unnecessary pain, but rather the constancy of the death penalty process itself, with a substitute initially considered to be second or third in a rank ordering of humaneness. States seem to have such a replacement to avoid any possible hiatus that may arise in applying the death penalty should lethal injection prove to be constitutionally troublesome.

## C. *The Lethal Injection Procedure*

The constitutional issues concerning lethal injection have as much to do with the substance of the chemicals, as with how they are administered. In line with the paradoxical tale of execution methods generally, the motivation behind the origins of the specific lethal injection procedure that most states follow in this country was linked with improving the humaneness and cost of executions, as well as the palatability of the death penalty. Moreover, it appears that a prominent doctor—Stanley Deutsch—may have had far more influence than he realized.

In 1977, the now-deceased Senator Bill Dawson of Oklahoma asked Dr. Deutsch, then head of Oklahoma Medical School's Anesthesiology Department, to recommend a method for executing prisoners through the administration of drugs intravenously.[205] Senator Dawson was concerned that it would cost the state $62,000 to fix its electric chair and $300,000 to build a gas chamber, and he had been informed that a lethal injection procedure would be substantially cheaper.[206] In his letter of reply to Dawson,[207] Deutsch advised that lethal injection was "[w]ithout question . . . extremely humane in comparison to" electrocution and lethal gas.[208] As Deutsch explained in a news article, "[f]rom what I had heard of electrocution, . . . it was pretty grotesque, with eyeballs popping out of their sockets and smoke coming out of the head helmet.

It seemed to me a lethal injection would be much more humane. I thought it was a pretty good idea, myself."[209]

The state adopted lethal injection based in part on Deutsch's recommendation that anesthetizing would be a "rapid[ly] pleasant way of producing unconsciousness" and ensuing death.[210] Indeed, Oklahoma's lethal injection statute, which is representative of other state statutes,[211] repeats nearly verbatim the terminology that Deutsch used in his letter to describe to Dawson the two main types of drugs that Deutsch recommended. According to Deutsch's letter, unconsciousness and then "*death*" would be produced by "[t]he *administration . . . intravenously . . . in* [specified] *quantities of . . . an ultra short acting barbiturate*" (for example, sodium thiopental) in "*combination*" with a "nueormuscular [sic] blocking drug[]" (for example, pancuronium bromide) to create a "long duration of *paralysis*."[212] According to Oklahoma's statute, "[t]he punishment of death must be inflicted by continuous, *intravenous administration* of a lethal *quantity of an ultrashort-acting barbiturate* in *combination* with a chemical *paralytic* agent until *death* is pronounced by a licensed physician according to accepted standards of medical practice."[213] Deutsch's recommendations of specific drugs also are incorporated in all of the latest lethal injection protocols in those states that identify the chemicals that executioners use.[214]

The typical lethal injection consists of three chemicals,[215] the first two of which were suggested by Deutsch;[216] the origins of the use of the third chemical are not clear.[217] The first chemical is a nonlethal dose of sodium thiopental, commonly known by its trademark name, Sodium Pentothal, a frequently used anesthetic for surgery.[218] This article uses the generic name sodium thiopental, unless it is referring to a particular state's protocol, in order to avoid partisanship toward companies that, theoretically, are competing in the same market.[219] Like the Oklahoma statute, other lethal injection statutes refer generally to an "ultrashort-acting barbiturate" or an "ultrafast-acting barbiturate,"[220] which appropriately characterize the brevity of sodium thiopental's effect.[221] Sodium thiopental is supposed to induce a deep sleep and the loss of consciousness, usually in about twenty seconds.[222]

The second chemical is pancuronium bromide, also known as Pavulon, a total muscle relaxant. Given in sufficient dosages, pancuronium bromide stops breathing by paralyzing the diaphragm and lungs.[223] Again, this article refers to the generic name, pancuronium bromide.

The third and last chemical, potassium chloride—which physicians most frequently use during heart bypass surgery—induces cardiac arrest and stops the inmate's heartbeat permanently.[224] Many states now use a saline solution[225] to flush the intravenous line before and after each chemical is administered so that the chemicals do not clog the tubing.[226]

It is not clear how or why this chemical combination has persisted, although increasingly, the chemical manufacturers have come under attack for their roles in lethal injections.[227] Sodium thiopental—an "ultra-short" acting drug as Deutsch and the statutes specify[228]—typically wears off very quickly; other similar drugs, such as pentobarbital, endure far longer.[229] The "fast acting" aspect of sodium thiopental can have horrifying effects if the inmate awakens while being administered the other two drugs.[230] Deutsch recommended a dosage that appears to some doctors sufficient to keep even a drug-resistant individual asleep for an adequately long time period.[231] However, most states do not specify the dosage that the executioners use,[232] so that it is unclear whether the amounts are proper. Most importantly, it is totally unnecessary for the barbiturate to be "fast acting" given the availability of longer acting chemicals.[233]

The third drug, potassium chloride, may have been recommended initially for use in lethal injections by two possible sources: (1) advising doctors, some of whom were involved in developing state execution protocols (such as New Jersey's), and/or (2) Fred Leuchter, the highly controversial and later-discredited creator of much, if not most, of the execution equipment in this country,[234] including lethal injection machines.[235] According to Leuchter, the New Jersey doctors agreed with his recommendation that potassium chloride be used as the third chemical in the machine Leuchter created for New Jersey's executions.[236] Because the medical literature did not have articles specifying what dosages of the drugs were adequate to be lethal, Leuchter relied on the information that was available for pigs and estimated accordingly.[237]

When Deutsch recommended to Dawson two chemicals rather than three,[238] the second chemical, pancuronium bromide (or a chemical similar to it),[239] was intended to cause death. However, when potassium chloride is used as an additional third chemical, pancuronium bromide serves no real purpose other than to keep the inmate still while potassium chloride kills.[240] Therefore, pancuronium bromide creates the serene appearance that witnesses often describe of a lethal injection execution,

because the inmate is totally paralyzed.[241] The calm scene that this paralysis ensures, despite the fact that the inmate may be conscious and suffering, is only one of the many controversial aspects of this drug combination.[242]

As the following sections discuss, from the start, lethal injection was fraught with constitutional challenges that courts regularly have dismissed, despite continuing evidence of egregious mishaps. Such challenges have focused on issues suggesting that lethal injection is cruel and unusual, including, the types of drugs used and their effects, the vagueness of the lethal injection statutes, and the substantial amount of discretion that prison officials have in administering injections.

### D. *Judicial Challenges to Lethal Injection*

Judicial dismissals of lethal injection challenges have resembled those cases dismissing electrocution challenges. However, the variations between the two types of execution methods have introduced some different legal issues as well. Of particular interest in this article are challenges concerning the extent to which a state can delegate to prison personnel the discretion and power to punish, a problem of greater relevance in lethal injection cases. In *Ex parte Granviel*,[243] for example, the Texas Court of Criminal Appeals rejected the first Eighth Amendment challenge to lethal injection by emphasizing that courts, such as *In re Kemmler*,[244] had upheld the constitutionality of other execution methods and that injection complied with "evolving standards of decency."[245] But, the *Granviel* court also countered a wide range of the appellant's additional claims, arguments that would be echoed by other courts over the next quarter century: (1) any possible pain associated with injection-related complications "could be characterized as a possible discomfort or suffering necessary to a method of extinguishing life humanely";[246] (2) the Texas statute's failure to specify the substances to be used in the injection was no less clear than those statutes pertaining to other execution methods, such as electrocution, which no court had declared unconstitutionally vague;[247] and (3) the fact that the Director of the Department of Corrections determined the lethal substance and procedure to be used did not constitute an improper delegation of the state's legislative power.[248]

Using *Granviel* as precedent, courts successfully thwarted two other lethal injection challenges[249] prior to the Court's consideration of a different line of argument in *Heckler v. Chaney*.[250] In *Heckler*, death row inmates claimed that the drugs used for lethal injection had been approved by the Food and Drug Administration (FDA) only for the medical purposes stated on their labels[251]—for example, animal euthanasia[252]—and not for the executions of humans.[253] Given this designation and the likelihood that the drugs would be applied by unknowledgeable prison personnel, "it was also likely that the drugs would not induce the quick and painless death intended."[254] Such practices constituted the "unapproved use of an approved drug" and therefore a violation of the prohibition against "misbranding" under the Federal Food, Drug, and Cosmetic Act.[255] Regardless, the Court steadfastly held that the FDA's discretionary authority in refusing to initiate proceedings according to the inmates' demands was not subject to judicial review.[256] One year later, the Fifth Circuit Court of Appeals relied on *Heckler* in *Woolls v. McCotter*[257] to deny Randy Woolls's claim that Congress failed to provide judicial review for the FDA's refusal to evaluate the use of sodium thiopental as a lethal drug; the court emphasized that the use of such a drug did not constitute cruel and unusual punishment.[258] Six days after his challenge, Woolls's execution was botched.[259]

After *Woolls*, courts have rejected a range of additional challenges to lethal injection,[260] including two group actions by inmates. In the first, a class action, Illinois death row inmates contended, among other things, that the State's use of Leuchter's lethal injection machine was unconstitutional because of Leuchter's lack of qualifications and because prison officials administered the wrong drugs.[261] Similar arguments condemning lethal injection were raised and dismissed prior to the execution of John W. Gacy.[262] Yet, Gacy's execution was notoriously botched.[263] In a second group suit, thirty-six Missouri death row inmates claimed that lethal injection is unconstitutional because of the nature and length of Emmitt Foster's 1995 execution.[264] Although a judge granted an order halting all executions in Missouri, the Eighth Circuit Court of Appeals overturned it.[265]

In *Sims v. State*[266] and a number of preceding cases,[267] the litigation focused again on many of the issues raised in *Ex parte Granviel*.[268] The Supreme Court of Florida discounted Sims's constitutional challenge to lethal injection based upon a range of arguments. First, Sims was not denied a full and fair evidentiary hearing because of "the State's failure to disclose the execution procedures or the chemicals to be used in administering the lethal injection."[269] According to the court, Sims received a copy

of the Florida Department of Corrections' "Execution Day Procedures," which disclosed the chemicals to be used during the execution, and the State presented at the evidentiary hearing three Department of Corrections (DOC) witnesses who gave more specific information about the lethal injection chemicals.[270]

Second, the Florida DOC's execution protocol provided adequate details and procedures for administering lethal injection.[271] The trial court was correct in ruling that lethal injection was neither cruel nor unusual and that "the Department of Corrections is both capable and prepared to carry out executions in a manner consistent with evolving standards of decency."[272] According to the *Sims* court, a comparable kind of challenge to lethal injection was "raised and rejected" by the United States District Court in *LaGrand v. Lewis*,[273] in which the court held that "the written procedures are not constitutionally infirm simply because they fail to specify in explicit detail the execution protocol."[274] Moreover, in *Sims*, the expert testimony offered by a sociologist documenting lethal injection botches "came from newspaper accounts of the execution and did not come from first-hand, eyewitness accounts or formal findings following a hearing or investigation into the matter."[275] The *Sims* court also discounted the expert testimony from a neuropharmacologist who provided examples of how a lethal injection execution could be botched if the chemicals were not injected properly or if prison personnel were not fit to administer them.[276] According to the court, the expert "admitted that lethal injection is a simple procedure and that if the lethal substances to be used by DOC are administered in the proper dosages and in the proper sequence at the appropriate time, they will 'bring about the desired effect.'"[277] The expert also stated that "at high dosages of the lethal substances intended [sic] be used by the DOC, death would certainly result quickly and without sensation."[278] As the *Sims* court concluded, "[o]ther than demonstrating a failure to reduce every aspect of the procedure to writing, Sims has not shown that the DOC procedures will subject him to pain or degradation if carried out as planned."[279]

Third, Florida's lethal injection statute does not violate the Separation of Powers Clause in the Florida Constitution due to the improper delegation of legislative power to an administrative agency.[280] Relying on *Granviel*,[281] the *Sims* court explained that the lethal injection statute "clearly defines the punishment to be imposed (i.e., death)" and "makes clear that the legislative purpose is to impose death."[282] While the statute allows the DOC to determine the methodology and chemicals to be used, the court thought that delegation was more preferable than relying on state legislators because the DOC "has personnel better qualified to make such determinations."[283]

The following sections of this article point out the weaknesses of the *Sims* court's analyses. The discussion first shows that the precedent the *Sims* court cited is grossly insufficient. For example, *Sims* turns to *Ex parte Granviel*,[284] the first case to challenge lethal injection. However, *Granviel* was decided in 1978, a quarter century ago and four years before lethal injection was ever used in this country.[285] Like *Kemmler* is to electrocution, *Granviel* is to lethal injection—entirely inappropriate as precedent scientifically.[286] The *Sims* court also relied heavily on *LaGrand v. Lewis*.[287] Yet, *Lewis*—a two-page court order that never involved an evidentiary hearing on lethal injection—presents merely a short and diluted look at lethal injection and cites comparably limited reviews of the method.[288]

As this article makes clear, an Eighth Amendment analysis of lethal injection also requires that inmates have a public and detailed protocol of the lethal injection procedure far in advance of litigation. The kind of notice the *Sims* court and other courts have found acceptable is out of touch with modern science. The following sections offer a further glimpse of what these courts have lacked.

## V. A MODERN EIGHTH AMENDMENT ANALYSIS OF LETHAL INJECTION

A modern Eighth Amendment assessment of lethal injection relies on the same kinds of standards that guide evaluations of electrocution: the "unnecessary and wanton infliction of pain," the "risk" of such pain, "physical violence," the offense to "human dignity," and the contravention of "evolving standards of decency."[289] Granted, there is an ironical dearth of literature available on how to execute people. Much of this article's, and the case law's, analysis of the constitutionality of lethal injection relies on the expert opinions of experienced anesthesiologists[290] because their profession is so involved in this country's execution industry.[291]

### A. *The Significance of Media Coverage of Executions*

This article's Eighth Amendment analysis of electrocution recognized judicial validation of a diversity of evidence to determine if an inmate experienced "unnecessary and wanton infliction of pain."[292] This evidence included scientific research and eyewitness accounts of actual executions.[293] More recent cases have, once again, emphasized the importance of eyewitness accounts of actual executions, this time in the context of lethal injection executions.[294] Courts have addressed in particular media witnesses[295] who "almost invariably now serve as the public's surrogate" to ensure that "no untoward conduct has occurred."[296] The majority of state protocols allow for media witnesses at lethal injection executions.[297]

In *California First Amendment Coalition v. Woodford*,[298] the United States District Court for the Northern District of California listed many of the reasons why it considered the media's viewing of executions to be significant: (1) the Eighth Amendment and the First Amendment both mandate the public's presence during the entire execution because the public's perception is needed to determine whether an execution protocol meets evolving standards of decency;[299] (2) courts assessing the constitutionality of execution methods partly rely on eyewitness testimony because it "is crucial to the review of execution protocols which the courts frequently undertake";[300] (3) the prevailing opinion that lethal injection is the most "humane and painless" available execution method may change with the evolution of technology and society's perceptions;[301] and (4) eyewitness media reports provide the documentation needed for society to make its judgments.[302] In a striking statement, the *Woodford* court made clear that "[e]xecution witnesses present by statute [were] entitled to view the entire execution, not just 'the dying.'"[303] Therefore, witnesses could observe "the condemned entering the chamber, his placement on the gurney and the installation of the intravenous device."[304]

Given such strong reliance on the presence of the media, the *Sims* court's dismissal of an expert sociologist's organization of newspaper accounts of botched lethal injection executions[305] makes no scientific or legal sense. Granted, the expert did not witness the executions; however, the reporters who wrote the newspaper articles did, oftentimes in accordance with statutes and state protocols either requiring or allowing media witnesses.[306] Moreover, the *Sims* court contradicts its own conclusions when it quotes for support a portion of *LaGrand v. Lewis*[307] which refers specifically to "eye-witness reports" of two lethal injections that confirm "the finding that the condemned lose consciousness within seconds, and death occurs with minimal pain within one to two minutes."[308] The *Sims* court's conclusions regarding newspaper accounts disregard two critical criteria: (1) accepted legal standards concerning the significance of media witnesses, and (2) the court's own evidence for finding lethal injection constitutional.[309]

## B. *An "Unnecessary and Wanton Infliction of Pain"*[310]

The most significant facet of the media case law on executions concerns the extent to which witnesses can see the earlier stages of the lethal injection process—specifically, the point at which the lethal chemicals begin to enter an inmate's body.[311] For example, California now allows witnesses to view the procedure from the point just prior to the inmate "being immobilized," i.e., strapped to the gurney, to the point just after the inmate dies.[312] However, acquiring this range in view was a legal struggle. Prison officials preferred that witnesses see the proceedings only after officials had strapped the inmate to the gurney and had inserted intravenous tubes.[313] Yet, the most serious problems with lethal injection executions oftentimes occur at the start of the procedure, especially when executioners try to find a suitable vein for the first injection.[314] Regardless, many execution protocols enforce strict limits on viewing witnesses.[315]

In general, executioners strap the inmate to a gurney in the execution chamber, insert a catheter into a vein, and inject a nonlethal solution. After the reading of a death warrant, a lethal mixture is injected by one or more executioners or, depending upon the state, by a machine.[316] This entire procedure involves potential Eighth Amendment concerns that have not been sufficiently addressed by courts or legislatures. Moreover, given the breadth and scope of the potential difficulties associated with lethal injection, witnesses for the public should be available to monitor the inmate's last twenty-four hours (with due privacy protections of course)—including the last meal, the walk to the gurney, the tie down, intravenous injections, the pronouncing of death, and the removal of the corpse.[317]

There are many practical reasons for suggesting a wide scope. First, prisoners differ in their physiological constitution as well as their drug tolerance and drug use histories; therefore, some prisoners may need a far higher dosage of sodium

thiopental than others "before losing consciousness and sensation."[318] Inmates can experience substantial pain and suffering if they receive an inadequate dosage of sodium thiopental and therefore regain consciousness and sensation while being injected with the second and third chemicals.[319] For example, the procedure initially applied in Illinois required an amount of sodium thiopental that would be insufficient to produce unconsciousness in approximately twenty percent of the population.[320] If the three chemicals are administered out of sequence—for example, pancuronium bromide is administered first—there is a near certainty that the inmate will experience excruciating pain during a lethal injection even without the outside appearance of pain because the pancuronium bromide paralyzes him.[321]

Second, the discretion allowed prison officials in administering every procedure[322] enables executioners to ignore each prisoner's physical characteristics (for example, age, body weight, health), even though these factors strongly affect an individual's reaction to the chemicals as well as the condition of their veins.[323] For example, physicians have particular difficulty finding suitable veins among individuals with diabetes, heavily pigmented skin, obesity, or extreme muscularity, as well as the very nervous or drug users.[324] Nearly one quarter of prison inmates' veins may be inaccessible "because they are deep, flat, covered by fat or damaged by drug use."[325]

Third, medically trained people have enough difficulty finding a vein with certain individuals; for untrained executioners, the problems are compounded substantially.[326] Executioners experiencing trouble finding a vein can unnecessarily insert the catheter: (1) into a sensitive area of the body, such as the groin[327] or hand;[328] (2) in the wrong direction so that chemicals flow away from the inmate's heart and therefore hinder their absorption;[329] (3) intramuscularly instead of intravenously.[330] In some cases, executioners must perform a "cutdown," a surgical procedure that exposes the vein if there is difficulty finding one.[331] In addition, if the inmate eats or drinks six-to-eight hours before the execution, he may choke or gag after the injection of sodium thiopental.[332]

Finally, lethal injection is considered the most humane method for the euthanasia of animals.[333] However, the Humane Society firmly states that the chemicals must be injected by "well trained and caring personnel"[334]—a sharp contrast to the qualifications available for those executing death row inmates.

Over time, such difficulties have resulted in a high risk of lethal injection botches,[335] which some experts contend "is the most commonly 'botched' method of execution in the United States."[336] Botches are particularly prevalent in Texas because of the state's frequent and early use of the method.[337] Even Leuchter contends that "about eighty percent" of the lethal injections in Texas "have had one problem or another,"[338] although he does not document this estimate.

The execution errors in Texas are glaring and repetitive. For example, in 1985, Stephen Peter Morin waited forty minutes while executioners probed both of his arms and legs to find a vein suitable for the injection; in 1988, Raymond Landry also endured forty minutes of needle probing, shortly after which the catheter popped out of his vein and spurted the chemicals toward witnesses two feet across the room; and in 1989, Stephen McCoy's violent physical reaction to the lethal injection drugs was so great (chest heaving, gasping, and choking) that one witnesses fainted while others gasped.[339]

The high percentage of botches in Texas appeared to be partly attributable to the dearth of written procedures provided to the executioners concerning how to perform an execution. Originally, these "procedures" listed little more than the chemicals to be used (in incorrect order of application) and a vague account of the content of the syringes. Moreover, there was no information specifying the nature and extent of the qualifications that executioners should have in order to perform an execution.[340] After Stephen Morin's 1985 botched execution, a prison spokesperson stated that the difficulty caused from inserting the needles "would probably prompt the Texas Department of Corrections to review its procedures for administering the drugs when the condemned person has a history of drug abuse."[341] Notably, the Texas Department of Corrections has never changed its procedures to accommodate the special injection problems associated with damaged veins.[342] Indeed, a botched execution attributable to an inmate's unsuitable veins occurred each year following Morin's execution until Landry's botched execution.[343] Texas continues to have difficulties starting intravenous injections in former drug users.[344] These problems also occur in other states.[345] Georgia is now the most pronounced example of the problems that can result when executioners are ignorant and inexperienced.[346]

C. *"Physical Violence" and Offends "Human Dignity"*

Lethal injection does not entail mutilation in the same way as electrocution. Yet, lethal injection does offend an inmate's dignity in light of the accounts of botched lethal injections listed in Table 9[347] and those discussed in this Part.

### D. *Evolving Standards and Legislative Trends*

Legislative trends are moving exclusively in the direction of lethal injection.[348] Regardless, there are significant issues concerning lethal injection that bear on the standards of decency factor. Most predominant is the ongoing stance by the American Medical Association's (AMA) Council on Ethical and Judicial Affairs, which prohibits physicians' participation in executions.[349] Although the Council's position pertains to all methods of execution, it is particularly applicable to lethal injection, which requires relatively more medical skill[350] and has long been affiliated with the medical profession.[351]

The question of what does and should constitute physician involvement in executions is controversial.[352] The AMA and state medical associations have publicly condemned physician participation in lethal injection executions, stating that a physician's role should be limited to the pronouncement of death.[353] In the past, some states had attempted to solve this dilemma by employing Leuchter's lethal injection machines in which syringes are activated by a mechanical plunger.[354] Yet, Leuchter's reputation has since been destroyed[355] and no state lethal injection protocol that this author studied mentions the use of a machine.[356] In turn, a number of state statutes are extremely vague on the subject of the procedure to be used and the involvement of medical personnel.[357]

This situation is unlikely to change, which raises a number of contentious issues. For example, is it unethical for the medical profession to loan its instruments to the state for the purposes of execution?[358] Is it wrong for physicians to be present at a lethal injection execution even if they could prevent a mishap that could prolong the pain and death of an inmate?[359] While some commentators raise concerns that medical involvement may inappropriately "sanitize or humanize executions,"[360] others warn that if physicians relinquish involvement in executions to less trained individuals, there could be far greater inhumanity.[361] A fringe of commentators compare the condemned inmate's situation to that of the terminally ill because neither has a recourse for living. Physicians are responsible for ensuring that the terminally ill die as smoothly and as painlessly as possible. Should inmates have comparable treatment?[362] Would it be cruel and unusual to afford anything less?

Regardless of these kinds of debates and the stance of the medical societies, physicians do participate in lethal injection executions in different ways.[363] Since 1977, for example, physicians have been part of every stage of an execution, "whether preparing for, participating in, or monitoring executions or attempting to harvest prisoners' organs for transplantation."[364] While physicians find some stages more acceptable than others, a substantial minority are involved in every possible stage. In 2001, a cross-sectional survey of 413 practicing physicians showed that forty-one percent of the respondents were willing to perform at least one action involving capital punishment by lethal injection that was disallowed by the American Medical Association.[365] The proportion agreeing to perform a disallowed action ranged from the 19% who were willing to administer the lethal chemicals to the 36% who were willing to determine death.[366]

The next Part of this article discusses in greater depth the medical problems with state delegation of death in the context of lethal injection by examining all lethal injection protocols in use in this country in the first half of 2001. The Part focuses on the problems that prison officials face in having to enforce a punishment deemed acceptable in theory by legislatures but extremely difficult to apply in practice.[367]

### VI. STATE DELEGATION OF LETHAL INJECTION

This Part reports the author's study of lethal injection protocols in the thirty-six states that used lethal injection as an execution method in 2001. Lethal injection protocols or information about them were gathered in at least one of three major ways, summarized in Tables 19 and 20:[368] (1) by mail, which was forwarded by a prison official; (2) by website, in those states that had them; and (3) by e-mail or phone communication, in those states that had no available protocol or when the protocol that was available had missing information that could not be obtained in any other way except by telephone or e-mail. This Part concludes that because of the extremely vague nature of lethal injection statutes, prison officials have far too much discretion in administering injections.

## A. Missing Protocols and Missing Information

One of the most striking aspects of studying lethal injection protocols concerns the sheer difficulty involved in acquiring them. As Table 11 shows, in four states, prison officials explained by phone or by e-mail that information concerning the types of chemicals used in their lethal injection executions was confidential.[369] Yet, two of these four states—Virginia and South Carolina—ranked high, second and eighth respectively, among those states with the most number of executions since 1976; indeed, Virginia was second only to Texas.[370] In three other states—Kansas, Kentucky, and New Hampshire—officials explained that the information on lethal injection chemicals does not exist; for Kansas and New Hampshire, there is no protocol because there is no prospect of having an execution any time soon.[371] While on the surface such a rationale seems understandable since neither state has executed anyone for decades,[372] it makes it impossible to conduct a complete evolving standards of decency analysis of execution methods. If a state is going to have a death penalty with a certain method of execution, the details of that execution method should be provided. Moreover, Kentucky does engage in executions with some regularity;[373] there is no reason why the state does not have a protocol.

As Tables 11 and 12 show, not surprisingly, the great majority (twenty-seven) of the states use the standard three lethal injection chemicals: sodium thiopental, pancuronium bromide, and potassium chloride. Nineteen, or 70% of these states and 53% of all states, also specifically mention the use of a saline solution in their protocol.[374] This is important because, if the lethal injection lines are not properly flushed through with a solution such as saline, "flocculation" (clogging) can occur, as some of the protocols warn.[375] Notably, North Carolina's and New Jersey's decision to use only two—rather than all three—chemicals, can have a bearing on how the execution proceeds.[376] Of particular interest is the fact that although both states use sodium pentothal as their first chemical, they do not use the same second chemical. In North Carolina, where the second chemical is pancuronium bromide, a prisoner would take far longer to die (as much as twenty minutes) because potassium chloride kills so much more quickly. In New Jersey, where the second chemical is potassium chloride, the prisoner may die far more quickly, but the death may not be as still or "serene" as in other states because the prisoner will not be paralyzed. At the same time, there is not the prospect that a prisoner will be paralyzed in pain and unable to scream out—a potential reality in every other state.[377]

A closer look at New Jersey's lethal injection practice suggests, however, that statutes may not reflect the reality of an execution when power is delegated to prison officials. For example, the New Jersey Department of Corrections has stated consistently over the years that it plans to use three drugs when administering a lethal injection, including one to stop breathing.[378] This approach indicates that, contrary to statute, pancuronium bromide or a chemical similar to it will in fact be administered.

## B. Problems with the Quantities of Lethal Injection Chemicals

Tables 13–15 show the additional kinds of details that states provide in their protocols beyond simply listing chemicals. According to Tables 13 and 14, only nine states—or one-quarter of all death penalty states—specify the quantity of the lethal injection chemicals that they use.[379] In other words, those states that merely list their chemicals give no indication of whether executioners are injecting sufficient quantities of those chemicals, much less whether they are injecting the chemicals in the correct order. Nor is there any indication that executioners are avoiding flocctuation and additional potential problems that witnesses may not be able to detect.

Table 15 lists the nine states that do specify the quantities of chemicals that executioners are supposed to use in lethal injection executions.[380] However, a close examination of Table 15 shows that simply because a state lists the quantities of chemicals that it uses does not mean that it provides such information properly. In order to determine the proper concentration of lethal injection chemicals, chemical quantities should be designated two ways: (1) by weight, which is indicated by grams (gm) or milligrams (mg), and (2) by volume, which is indicated by cubic centimeters (cc) or milliliters (ml). One needs to know both the weight of a chemical and the volume of diluent to determine the chemical's effectiveness. The volume of diluent for chemicals should be (1) at least large enough so that all the chemicals will be dissolved, and (2) sufficiently dilute so that it will not irritate the inmate's vein and cause that inmate pain. For example, 2.5 gm of thiopental sodium is lethal; however, that amount will merely end up as precipitated sludge if there is an attempt to dissolve it in 5 ml. If there is an attempt to dissolve the 2.5 gm of thiopental sodium in 50 ml, the resulting solution will be very irritating to the inmate's veins and therefore painful. However, dissolving 2.5 gm in 100 ml would create an effective concentration.

An examination of California's chemical quantities in Table 15 provides a good illustration of the limited amount of information that state lethal injection protocols offer. The California protocol indicates that the executioner first injects five grams of sodium pentothal (weight) in 20–25 cc of diluent (the diluent is a normal saline solution). This amount of sodium thiopental is more than enough to kill any human being. Thus, the concentration of the injection is "sufficient" at the very least; a twenty percent concentration of sodium thiopental can burn when it goes into the vein. Like most states, California has two additional chemicals to ensure death: pancuronium bromide and potassium chloride. As Table 15 shows, however, there is no designation of weight for either chemical, only volume (cc's). Therefore, it is impossible to know how much California executioners inject.

Similarly, all the chemical designations for Tennessee mention only volume (cc's) and not weight. There is not enough information to determine the adequacy of Tennessee's protocol.

Florida's chemical specifications are accurate, but incomplete, demonstrating a problem that is the converse to California and Tennessee. According to many anesthesiologists, "no less than" two grams of sodium pentothal is enough to put even a very resistant person into a long, deep, sleep;[381] however, Florida's protocol does not mention the volume of fluid used to dissolve the sodium pentothal. Nor does it mention the amount of fluid used to dissolve the pancuronium bromide and potassium chloride. Therefore, in Florida, the concentrations of all three chemicals are unknown.

In contrast to California, Florida, and Tennessee, the weights and volumes for all three lethal injection chemicals in the protocols for Connecticut, Mississippi, New Mexico, and Washington are predictably lethal. Of all the states included in Table 15, however, Connecticut has the most technically sophisticated protocol. The amounts provided are described in a scientific way and the protocol refers both to volume (ml) and to weight (mg), as well as to "mEq" (milliequivalent), a sound technical description. The doses administered in Connecticut are certainly enough to kill even a very resistant person.

For Mississippi, the amounts and descriptions of all three chemicals also seem lethal per syringe. However, the Mississippi protocol's reference to two syringes for pavulon and three syringes for potassium chloride creates considerable confusion regarding how officials actually administer the injection. The Mississippi Department of Corrections representative was unable to elaborate further,[382] making the protocol difficult to evaluate.

The North Carolina protocol specifies the weight for sodium pentothal (typically far more than sufficient). However, the rest of the protocol's description is very confusing. For example, the same protocol provides the unit of liquid for pavulon, but not the weight. The concentration is unknown.

In Montana, the amount of sodium pentothal is not a lethal dose; it is one-fourth or less than that used in other states. Therefore, if the pancuronium bromide is effective while the sodium penothal is wearing off, the inmate would be paralyzed but awake. In turn, the Montana protocol refers only to ampules for the pavulon and the potassium chloride, so that the concentration of either chemical is unknown.

Overall, there is inordinate variation and incompleteness across the nine states that provide quantities of lethal injection chemicals in Table 15. Note that Table 15 does not list those states where most lethal injection executions have been performed (those among the top five) and lists only two states that have had at least five lethal injection executions between 1977–1999 (North Carolina and California).[383] Whereas Montana and Washington have had two and one lethal injection executions, respectively, between 1977–1999, the remaining states listed in Table 15 did not have any (Connecticut, Florida, Mississippi, New Mexico, and Tennessee).[384] Paradoxically, then, those states with the most number of lethal injection executions are the least informative about how they perform executions. In contrast, those states that have among the fewest lethal injection executions, or who had not lethally injected anyone at all during this time period, are the most informative.

Simply because some states specify the amounts of their chemicals, however, does not mean that their efforts are valid and reliable. Those states that do provide quantities of injection chemicals vary so widely in terms of their doses and instructions, it is not surprising that botched executions result. Furthermore, with rare exceptions, there is no information available on who measures the chemicals or even whether the executioner gives the full amount of chemical quantities that are indicated. For example, even if an execution takes place in a state that appears to have some sophistication in listing its chemicals (for example, Connecticut), there is no assurance that the executioner actually injects what the Connecticut protocol lists. The practice in New Jersey suggests that prison officials may not even follow what the state legislature dictates, much less what the lethal injection protocol may describe.[385] As the following section discusses, protocols mention little to nothing about the medical expertise of the executioners.

## C. Executioners and Execution Procedures

The thirty-six lethal injection states provide minimal information in their protocols on the quality or training of those individuals selected to execute an inmate (Table 17). Fourteen states—or approximately 39% of all the states[386]—for example, mention "training" or "competency" or "preparation" or "practice" for the executioners. Moreover, even among

those states that mention some training, there is little to no indication of what kind of preparation the department of corrections offers. Likewise, only eight states give any direction concerning how an executioner should proceed if there are serious, foreseeable, or unexpected problems with the execution procedure or with the inmate: (1) Florida (if death does not occur initially), (2) Georgia (if a suitable vein cannot be found), (3) Indiana (if an inmate has "extremely small veins"), (4) New Jersey (if a vein cannot be found, warns that medication "must not be rapidly or sporadically injected," and directs that executioners should provide life saving techniques if a stay is called), (5) New Mexico (warns that flocculation can occur if sodium pentothal is not flushed from the line and recommends using the other injection tube), (6) New York (warns that if sodium pentothal is not flushed from the line, flocculation may occur if it mixes with the pavulon), (7) Tennessee (if death does not occur initially), and (8) Washington (notes that the "condemned's file is examined to see if any special instructions may be required").[387]

Ironically, the mere fact that the protocols in eight states warn executioners of problems, suggests that prison officials are aware of the hazards involved if ill-trained individuals administer a lethal injection. An experienced anesthetist would not need such warnings, or surely not in the context of a written protocol to be learned at the time of the execution. Furthermore, the remaining states basically say nothing about preventing problems.

Criteria for selecting or training executioners in these states appear to be nonexistent. In eight states, the executioners are anonymous department of corrections staff members,[388] whereas in five states, the warden or commissioner selects executioners without specifying if they are staff members.[389] Five other states simply mention the number of people on an execution team or the mere fact that there is a team.[390] Only Arkansas relies on "unpaid volunteers."[391] In turn, eight states[392] do not provide any information whatsoever. Regardless of such silence about training, state protocols also are lax on giving directions concerning what executioners should do if there is a stay of execution. For example, seventeen states do not indicate whether they have phone lines in effect for the governor or other individuals to call to stop an execution.[393]

In some states, it is unclear who is to pronounce death when the execution goes through, or whether there is any involvement of medical personnel, particularly physicians. Because of the significance of physician contributions, Table 17 examines lethal injection protocols as well as all state statutes specifying the involvement of medical personnel in executions. For most (twenty-seven) states, the protocols overlapped substantively with the statutes. In nine states, however, the statutes offered some additional information.[394] Regardless of the source (protocol or statute), in eight states, there is no mention that medical personnel are to participate in any way, even in pronouncing death.[395] If only protocols are examined for this information and not statutes, this figure would rise to fifteen states.[396] Relying on both protocols and statutes, Table 17 shows that physicians are present to declare or "pronounce" death in thirteen states,[397] a coroner pronounces death in five states,[398] and the warden or deputy commissioner in one state.[399] In South Dakota, there is a required post-mortem exam and report.[400] Only Florida states specifically that a pharmacist prepares the lethal injection.[401] In general, states allow for substantial physician participation, although the roles are limited, at least officially.

There is strikingly little information on the time of the last meal and the time of the execution (Table 16).[402] The length of time between the meal and the execution is important because if the inmate ingests food or drink six-to-eight hours before the execution, the inmate may choke or gag when sodium thiopental is injected.[403] There are six states that provide some information on this time frame:[404] (1) Indiana, five-to-six hour span; (2) New Jersey, not less than eight hours; (3) Ohio, approximately six hours; (4) Oregon, approximately six hours; (5) Texas, approximately two-to-three hours; and (6) Virginia, not less than four hours.[405] Ironically, Texas and Virginia, the states with the highest numbers of lethal injection executions,[406] have the shortest time span between the meal and the execution (of those states that mention any time span), and neither time span even approximates the six-to-eight hour parameter.

The next section examines the extent to which protocols allow or encourage witnesses to view an execution. This issue is particularly significant given the litigation brought by journalists concerning how much of a lethal injection they can watch.[407]

## D. *General Witnesses and Media Witnesses*

Table 18 shows how many states have "general witnesses" for executions—individuals who include anyone from a family member to a physician to a corrections officer—as well as "media witnesses"—individuals who represent one or more of a broad range of media.[408] The great majority of states specify that there should be general witnesses present for the execution,

although the types of witnesses vary substantially. Of the seven states that do not provide such specification, four have no protocol at all.[409] Only two states omit any mention of general witnesses from the protocols they do have and one state (Nevada) indicates that the information is confidential.[410] Most states also allow for media witnesses, although eight of the states that provide for general witnesses do not mention explicitly whether they allow for media witnesses as well.[411]

Altogether, fourteen state protocols specified what media witnesses could view during an execution. None of these protocols echoed the liberal scope upheld by the court in *California First Amendment Coalition v. Woodford*,[412] which allowed witnesses to see the entire lethal injection procedure, including the inmate being injected.[413] Rather, all fourteen protocols shield witnesses from the actual execution of the inmate and differ to the extent they cover most parts of the procedure. The protocols can be divided into four general categories (minor differences between them are presented in Table 18), ranging from the least restricted (1) to the most restricted (4) viewing:

(1) Witnesses arrive to view the execution before the execution team has inserted intravenous catheters into the inmate's arm. The curtain to the witness room is then closed only to be reopened after the intravenous catheters have been inserted into the inmate. The execution continues and, presumably, death is pronounced (Louisiana and Virginia).

(2) Witnesses arrive to view the execution after the execution team has inserted intravenous catheters into the inmate's arm and they stay to view until the inmate's death is pronounced (Colorado, Georgia, Mississippi, New Mexico, North Carolina, Oregon, South Dakota, and Texas).

(3) Witnesses arrive to view the execution after the execution team has inserted intravenous catheters into the inmate's arm and they stay to view until all the chemicals have been injected. The curtain is then closed and a physician is called in to pronounce death. After the physician pronounces death, the curtain is raised and there is an official pronouncement of death made to the witnesses (New York, Ohio, and Tennessee).

(4) Witnesses arrive to view the execution after the execution team has inserted intravenous catheters into the inmate's arm and they stay to view until all the chemicals have been injected. The curtain is then closed and the inmate's death is pronounced (Connecticut).

The four categories indicate that the primary distinction among them is whether witnesses are allowed to see the inmate die (categories one and two only). While this distinction may appear to be minor, the practical implications can be significant. Lethal injection botches can occur even if the injection procedure has been hidden from view or has seemingly gone smoothly (for example, the inmate may react to the chemicals). The following Part reviews the preceding sections of this article in the context of the Timothy McVeigh execution which, from most accounts, appeared quiet and serene except to some of those with a more trained eye.

## VII. DISCUSSION: LETHAL INJECTION AND TIMOTHY MCVEIGH

This article discusses the paradoxical motivations behind legislative changes from one method of execution to the next. Legislatures and courts have consistently stated that the primary reason states switch execution methods is to ensure greater humaneness and decency for death row inmates.[414] Throughout history, however, it appears that such moves were prompted primarily because the death penalty itself became jeopardized due to a state's particular method—be it hanging, electrocution, or lethal gas.[415] The result has been a warped legal "philosophy" of punishment, at times peculiarly aligning both friends and foes of the death penalty alike. This "death-penalty goal" also has wrongly enabled legislatures to delegate death to uninformed prison personnel.

What frames this paradox are the competing and contradictory efforts by legal actors to abolish or expand the death penalty. Such wrangling has become all the more acute as states increasingly drop electrocution in order to adopt lethal injection.[416] For example, some death penalty proponents feel that electrocution better represents the retributive goal of the death penalty and that lethal injection is far too soft on criminals. This perspective was stunningly represented by Bob Butterworth, the Attorney General of Florida, who stated that Pedro Medina's horrendously botched electrocution[417] would serve as both a means of retribution and as a deterrent.[418] "People who wish to commit murder, they better not do it in the state of Florida because we may have a problem with our electric chair."[419] Yet, Butterworth's pronouncements were consistent with this country's century-long tendency to use execution methods as a punishment device extending well beyond "death," both symbolically and politically.[420]

Other death penalty proponents claim that lethal injection is not cruel enough. As the mother of one crime victim stated in an interview preceding the execution of her daughter's killer, lethal injection "is too quick. . . . He would need to suffer a little bit more according to what he gave [my daughter], which was a lot of suffering."[421] Justice Scalia may have mirrored such

OHIO STATE LAW JOURNAL

views when describing a gruesome case he considered particularly eligible for the death penalty—the rape and murder of an eleven-year-old girl.[422] "How enviable a quiet death by lethal injection compared to that!"[423] At the same time, legislatures and courts are appealing to such anecdotal accounts from a vengeful minority; the majority of Americans in public opinion polls[424] as well as some prison officials[425] prefer lethal injection because they consider it to be the most humane method. Others view injection as an effective way to perpetuate the death penalty because it makes the process seem less gruesome.[426]

The dialogue surrounding the federal execution of Timothy McVeigh illustrates these tensions. The protocol for federal execution by lethal injection, which is not released to the public without a Freedom of Information Act request, uses the same three chemicals applied in most states.[427] Because McVeigh's death was so rapid,[428] some witnesses complained that it was too painless as compared to that of his victims. "He didn't suffer at all," recounts one witness, but rather "just went to sleep."[429] In general, witnesses appeared to believe that McVeigh's transition from life to death was "subtle";[430] the relaxing of his eyes and lips was the only indication of his "remarkably uneventful" death.[431]

Other witnesses' observations suggested, however, that McVeigh's death was slightly more difficult. As the first injection occurred, McVeigh's chest moved up and down, his lips puffed air out, his jaw clenched, and his eyes glassed over but remained open.[432] As the next two chemicals were injected, his skin turned pale yellow.[433] The most dramatic account came from a media witness who recalled McVeigh's eyes glassing over to the point of being watery as the injections were administered,[434] a sign to some anesthesiologists that McVeigh may have been tearing due to pain.[435]

The point here is not to invoke sympathy for McVeigh, but rather to scrutinize the process by which he was executed and the inconsistencies surrounding it. On the one hand, the public outrage against McVeigh seemed limitless and death in the form of lethal injection too good for him.[436] On the other hand, the impending execution educated the public about the lethal injection procedure itself and some of the potential hazards associated with it.[437] For these reasons, some death penalty opponents consider lethal injection to be inhumane and not the "deep sleep" it appears to be.[438] Although far less publicized, the events also gave some visibility to those who actually perform the executions and the toll it takes on them emotionally.[439] Regardless of what side the public was on, lethal injection appeared to be a paradox revealing the complexities of the execution process as well as the death penalty itself.

## VIII. CONCLUSION

The execution methods debate is played out in terms of legislative decision-makers, who oftentimes turn a blind eye to the concerns of those who actually have to kill.[440] In turn, a considerable portion of doctors, nurses, and other medical personnel willingly participate in executions. Prison officials face the worst of both worlds: they have limited political clout by which to make their choices known, and minimal guidance provided by those who make the choices for them. The process is made all the more perplexing because those who report the problems with the system—media witnesses—have questionable credibility when experts attempt to use their accounts in court. "As a result," in Foucault's words, "justice no longer takes public responsibility for the violence that is bound up with its practice."[441] The system becomes literally and symbolically unobservable. In the context of applying execution methods, when justice becomes unobservable, it ceases to exist.

\* Professor of Law, Fordham University School of Law. B.A., University of Virginia, 1974; M.A., University of Toronto, 1975; Ph.D., University of Pennsylvania, 1982; J.D., University of Pennsylvania, 1989. I am most grateful to the following individuals for their contributions to this article: Daniel Auld, Stephen Bright, Edward Brunner, Edward Chikofsky, Robert Cowey, Lawrence Egbert, Juan Fernandez, Bruce Green, Christopher Hale, Rick Halperin, John Hanusz, Roberta Harding, Mark Heath, Hunter Labovitz, Mathew Rubenstein, and Kevin Walsh. Any errors in this article are mine only. I give special thanks to Daniel Auld for creating most of this article's tables and for diligently collecting the information on lethal injection protocols. Numerous prison officials and administrators throughout the country graciously gave their time and resources to describe the execution procedures and protocols that this article discusses. The names and affiliations of these individuals are listed in Table 20 (Appendix I). I also appreciate the excellent research assistance provided by Janice Greer and Marianna Politzer, as well as the materials offered by the following organizations: the Fair Housing Center (New Jersey), the Georgia Resource Center, the Multicounty Public Defender (Georgia), and the Southern Center for Human Rights (Georgia). Lastly, I thank Fordham Law School for its characteristically generous research support, and the Institute for Advanced Legal Studies, University of London, for its helpful resources.

[1] Currently, five different types of execution methods are used in this country: hanging, firing squad, electrocution, lethal gas, and lethal injection. *See infra* app. 1, tbl.1. For a discussion of legislative changes in execution methods over time, see generally Deborah W. Denno, *Getting to Death: Are Executions Constitutional?*, 82 IOWA L. REV. 319 (1997) [hereinafter Denno, *Getting to Death*]; Deborah W. Denno, *Is Electrocution an Unconstitutional Method of Execution? The Engineering of Death over the Century*, 35 WM. & MARY L. REV. 551 (1994)

[hereinafter Denno, *Electrocution*].

2 *See generally* MICHEL FOUCAULT, DISCIPLINE AND PUNISH: THE BIRTH OF THE PRISON (Alan Sheridan trans., 1977) [hereinafter FOUCAULT, DISCIPLINE AND PUNISH]. According to Foucault, the history of punishment is marked by increasing secrecy in which penalties "become the most hidden part of the penal process" and, as a result, "justice no longer takes public responsibility for the violence that is bound up with its practice." *Id.* at 9. As a more modern commentator notes, what is considered "violent" is accompanied by limitations, even today. "Humane treatment simply does not offend human sensibilities, and therefore cannot be graphic, spectacular, or terroristic." John W. Murphy, *Technology, Humanism and Death by Injection*, 11 PHIL. & SOC. ACTION 55, 56 (1985). The less passionate the method, the more humane it becomes because society appears to be guided by the exercise of reason, and its members characterized as rational actors. *See* MICHEL FOUCAULT, MADNESS AND CIVILIZATION: A HISTORY OF INSANITY IN THE AGE OF REASON 78 (Richard Howard trans., 1965). Electrocution was considered relatively less passionate than hanging because it appeared to be more a product of engineering. *See generally* Denno, *Electrocution*, *supra* note 1. Lethal injection appears to be a product of medicine and sanitized conditions. *See generally* Denno, *Getting to Death*, *supra* note 1.

3 DAVID GARLAND, PUNISHMENT AND MODERN SOCIETY 245 (1990).

4 The Eighth Amendment provides that "[e]xcessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." U.S. CONST. amend. VIII.

5 *See infra* notes 111–17, 141–44, 152–54, 165–69, 210, 414, 424–25 and accompanying text.

6 *See infra* notes 9, 32–38, 57, 171, 203–04, 415 and accompanying text.

7 *See, e.g., infra* notes 145–58, 193–202 and accompanying text.

8 *See infra* notes 171, 417–20 and accompanying text.

9 *See infra* notes 172, 180–81, 210, 360, 426 and accompanying text; *see also* David Firestone, *Court to Rule on Method's Constitutionality*, N.Y. TIMES, March 7, 2001, at A12 (noting that national opponents of the death penalty held "mixed feelings" about challenging the constitutionality of electrocution; although they oppose electrocution, several emphasized that lethal injection has been approved so overwhelmingly "precisely to make capital punishment more acceptable to the public").

10 *See infra* notes 37–38, 171, 426 and accompanying text.

11 *See infra* notes 11, 180–81 and accompanying text; *see also* David Crary, *Electric Chair's Days Are Numbered as Cruelty Is Cited Punishment*, L.A. TIMES, Aug. 19, 2001, at A18.

12 *See infra* notes 139–40, 424–26 and accompanying text.

13 *See infra* notes 139–40, 142, 424–26, 440 and accompanying text.

14 *See infra* notes 165–72 and accompanying text.

15 *See infra* notes 87, 275, 303–09 and accompanying text.

16 *See infra* notes 109–36 and accompanying text; app. 1, tbls.1–6.

17 Neil J. Farber et al., *Physicians' Willingness to Participate in the Process of Lethal Injection for Capital Punishment*, 135 ANNALS INTERNAL MED. 884, 886 (2001); *see also infra* notes 349–64 and accompanying text.

18 Farber et al., *supra* note 17, at 886; *see also infra* notes 352, 363–66 and accompanying text.

19 Linda L. Emanuel & Leigh B. Bienen, *Physician Participation in Executions: Time to Eliminate Anonymity Provisions and Protest the Practice*, 135 ANNALS INTERNAL MED. 922, 922–24 (2001); *see infra* notes 349–62 and accompanying text.

20 *See infra* notes 386–401 and accompanying text.

21 *See infra* notes 230, 241–42, 258, 261, 318–21, 377, 435 and accompanying text.

22 Deborah W. Denno, *Capital Punishment and the Human Rights Norm*, 9 CRIM. L. FORUM 171, 171 (1999) (reviewing WILLIAM A. SCHABAS, THE DEATH PENALTY AS CRUEL TREATMENT AND TORTURE: CAPITAL PUNISHMENT CHALLENGED IN THE WORLD'S COURTS (1996)); *see also* note 87 and accompanying text (emphasizing the worldwide notice and condemnation of Allen Lee Davis's botched electrocution).

23 *See infra* notes 74–80 and accompanying text.

24 Glass v. Louisiana, 471 U.S. 1080, 1084 (1985) (Brennan, J., dissenting from denial of certiorari); *see also* Furman v. Georgia, 408 U.S. 238, 392 (1972) (Burger, C.J., dissenting) ("The dominant theme of the Eighth Amendment debates was that the ends of the criminal laws cannot justify the use of measures of extreme cruelty to achieve them.").

25 *See infra* app. 1, tbl.1.

26 *See infra* app. 1, tbl.1.

27 *See infra* app. 1, tbls.4–7; *see also infra* notes 131–36 and accompanying text.

28 *See infra* app. 2 (Alabama and Nebraska).

29 *See infra* app. 1, tbl.1; app. 2 (Florida, South Carolina, and Virginia).

30 *See infra* app. 1, tbl.1; app. 2.

Case 2:16-cv-01159-SRB   Document 28   Filed 08/28/17   Page 189 of 978   [Vol. 63: 63 (2002)]

OHIO STATE LAW JOURNAL

31 *See infra* app. 1, tbl.5 n.*, tbl.6 n.*.

32 *See* Denno, *Getting to Death*, *supra* note 1, at 321–27, 345–48.

33 *See generally* Deborah W. Denno, *Adieu to Electrocution*, 26 OHIO N.U. L. REV. 665 (2000); Denno, *Getting to Death*, *supra* note 1; Denno, *Electrocution*, *supra* note 1.

34 In *Fierro v. Gomez*, the Ninth Circuit unanimously held that California's statute authorizing execution by lethal gas was unconstitutionally cruel and unusual. 77 F.3d 301, 309 (9th Cir. 1996), *vacated on other grounds*, 519 U.S. 918 (1996) (remanding for reconsideration in light of the changed statute). *Fierro* marked the first time in this country's history that a federal appeals court had held any method of execution unconstitutional. *Id.* at 308 (stating that two circuit courts had found execution by lethal gas to be unconstitutional). Yet, the Court vacated the Ninth Circuit's holding that lethal gas was unconstitutional in light of the California legislature's subsequent amendment of the state's death penalty statute allowing lethal injection to be used unless the death row inmate specifically requested lethal gas. *See Gomez*, 519 U.S. at 918 (remanding for reconsideration in light of changed statute). In *Stewart v. LaGrand*, 526 U.S. 115 (1999), the Court held that the death row inmate waived his claim that execution by lethal gas violated the Eighth Amendment because the inmate chose to be executed by lethal gas rather than lethal injection. *Id.* at 118–19.

35 *See infra* notes 99–102 and accompanying text (discussing *Bryan v. Moore*, 528 U.S. 960 (1999) and *Bryan v. Moore*, 528 U.S. 1133 (2000)).

36 *See infra* app. 2 (California and Florida).

37 *See* Denno, *Getting to Death*, *supra* note 1, at 388–90.

38 *See id.* at 363–72, 385–86.

39 Furman v. Georgia, 408 U.S. 238, 263 (1972) (Brennan, J., concurring). The origin of the Eighth Amendment's Cruel and Unusual Punishments Clause has been described in detail. *See* Harmelin v. Michigan, 501 U.S. 957, 973–79 (1991); *Furman*, 408 U.S. at 316–28 (1972) (Marshall, J., concurring); RAOUL BERGER, DEATH PENALTIES: THE SUPREME COURT'S OBSTACLE COURSE 29–58 (1982); Anthony F. Granucci, *"Nor Cruel and Unusual Punishments Inflicted": The Original Meaning*, 57 CAL. L. REV. 839, 839–65 (1969) (examining the history of the Clause and the case law).

40 136 U.S. 436 (1890); *see also* Denno, *Getting to Death*, *supra* note 1, at 329–54; Denno, *Electrocution*, *supra* note 1, at 616–23.

41 *Kemmler*, 136 U.S. at 443.

42 Examples of such dismissals are categorized by execution method as follows. *Lethal gas:* Hernandez v. State, 32 P.2d 18, 24–25 (Ariz. 1934); People v. Davis, 794 P.2d 159, 173 (Colo. 1990); State v. Kilpatrick, 439 P.2d 99, 110 (Kan. 1968); Calhoun v. State, 468 A.2d 45, 70 (Md. 1983). *Lethal injection:* People v. Stewart, 528 N.E.2d 631, 639 (Ill. 1988); *Ex parte* Granviel, 561 S.W.2d 503, 510 (Tex. Crim. App. 1978). *Firing squad:* People v. Anderson, 493 P.2d 880, 890–91 (Cal. 1972); *Kilpatrick*, 439 P.2d at 110. *Hanging:* Anderson, 493 P.2d at 890; DeShields v. State, 534 A.2d 630, 640 (Del. 1987); *Kilpatrick*, 439 P.2d at 110.

43 In 1885, the Governor of New York announced in his annual message to the legislature that:

[t]he present mode of executing criminals by hanging has come down to us from the dark ages, and it may well be questioned whether the science of the present day cannot provide a means for taking the life of such as are condemned to die in a less barbarous manner.

*Kemmler*, 136 U.S. at 444.

44 1886 N.Y. Laws ch. 352, § 1.

45 CRAIG BRANDON, THE ELECTRIC CHAIR: AN UNNATURAL AMERICAN HISTORY 67–88 (1999); Denno, *Electrocution*, *supra* note 1, at 568–73.

46 Denno, *Electrocution*, *supra* note 1, at 571.

47 *See* BRANDON, *supra* note 45, at 89–133; Denno, *Electrocution*, *supra* note 1, at 577–83. Edison testified that death by electrocution would be quick and painless and that electricity would not mutilate the victim's body. In contrast, Westinghouse reportedly financed William Kemmler's appeal at a cost exceeding $100,000. Both Edison and Westinghouse also relied on a series of experiments testing the effects of electrocution on animals, albeit emphasizing differing results. BRANDON, *supra* note 45, at 89–133; Denno, *Electrocution*, *supra* note 1, at 573–83.

48 Denno, *Electrocution*, *supra* note 1, at 580–81.

49 *Id.* at 574–77.

50 *See* Denno, *Getting to Death*, *supra* note 1, at 334. For examples of cases that incorrectly state that *Kemmler* analyzed and applied the Eighth Amendment, see, for example, McCleskey v. Kemp, 481 U.S. 279, 299 (1987); Johnson v. Glick, 481 F.2d 1028, 1031 (2d Cir. 1973); Bailey v. Lally, 481 F. Supp. 203, 218 (D. Md. 1979); Thompson v. State, 542 So. 2d 1286, 1298 (Ala. Crim. App. 1988), *aff'd*, 542 So. 2d 1300 (Ala. 1988).

51 The New York courts had required the prisoner to show "beyond doubt" that the execution method was cruel and unusual. *In re* Kemmler, 136 U.S. 436, 442 (1890).

52 Courts, such as *Provenzano v. Moore*, typically fail to identify the burden of proof when reviewing the constitutionality of execution methods. 744 So. 2d 413, 416–19 (Fla. 1999) (per curiam). However, the burden of proof that courts cite most frequently—preponderance of the evidence—is far less stringent than the "beyond doubt" standard stated in *Kemmler*. *See* Denno, *Getting to Death*, *supra* note 1 at 335; *see also*

Walton v. Arizona, 497 U.S. 639, 649–51 (1990) (plurality opinion) (upholding Arizona's imposition on defendants the burden of establishing, "by a preponderance of the evidence, the existence of mitigating circumstances sufficiently substantial to call for leniency" in order to avoid the death penalty after the establishment of one or more aggravating factors); Blake v. Hall, 668 F.2d 52, 57 (1st Cir. 1981) (determining that plaintiffs had failed to establish by "a fair preponderance of the evidence" that cell conditions at a prison constituted cruel and unusual punishment); McGill v. Duckworth, 726 F. Supp. 1144, 1148–49 (N.D. Ind. 1989) (discussing the applicability of the preponderance of the evidence standard in suits against prison officials for failing to protect a prison inmate from attack by another inmate), *aff'd in part and rev'd in part*, 944 F.2d 344 (7th Cir. 1991); Martin v. Foti, 561 F. Supp. 252, 257 (E.D. La. 1983) (noting that plaintiffs had "failed to show by a preponderance of the evidence" that conditions were cruel and unusual).

53 *See Kemmler*, 136 U.S. at 442–43 (quoting the New York Supreme Court's explanation of why it deferred to the legislature).

54 *See generally* BRANDON, *supra* note 45; Denno, *Electrocution*, *supra* note 1, at 559–607.

55 *See generally* BRANDON, *supra* note 45, at 160–204. A *New York Times* reporter's account of Kemmler's August 6, 1890, execution explains some of the problems that occurred:

> After the first convulsion there was not the slightest movement of Kemmler's body. . . . Then the eyes that had been momentarily turned from Kemmler's body returned to it and gazed with horror on what they saw. The men rose from their chairs impulsively and groaned at the agony they felt. "Great God! he is alive?" some one said; "Turn on the current," said another . . . .
> Again came that click as before, and again the body of the unconscious wretch in the chair became as rigid as one of bronze. It was awful, and the witnesses were so horrified by the ghastly sight that they could not take their eyes off it. The dynamo did not seem to run smoothly. The current could be heard sharply snapping. Blood began to appear on the face of the wretch in the chair. It stood on the face like sweat. . . . An awful odor began to permeate the death chamber, and then, as though to cap the climax of this fearful sight, it was seen that the hair under and around the electrode on the head and the flesh under and around the electrode at the base of the spine was singeing. The stench was unbearable.

*Far Worse Than Hanging*, N.Y. TIMES, Aug. 7, 1890, at 1. For a fascinating historical account of the press's attempts to cover executions in New York, see Michael Madow, *Forbidden Spectacle: Executions, the Public and the Press in Nineteenth Century New York*, 43 BUFF. L. REV. 461 (1995).

56 *See* BRANDON, *supra* note 45, at 205–43; Denno, *Electrocution*, *supra* note 1, at 598–676.

57 *See* Denno, *Getting to Death*, *supra* note 1, at 388–94.

58 237 U.S. 180, 185 (1915) (concluding that the State's implementation of death through electrocution, rather than hanging, did not increase the punishment of murder but only changed its mode).

59 329 U.S. 459 (1947) (plurality opinion). In *Francis*, the issue was not whether electrocution was per se unconstitutional, but whether the State of Louisiana could constitutionally execute the appellant after the electric chair had malfunctioned during the first attempt. *Id.* at 461. In examining the circumstances of *Francis* "under the assumption, but without so deciding" that the Eighth Amendment applied, a plurality of four Justices interpreted the Cruel and Unusual Punishments Clause as prohibiting only the "inflict[ion of] unnecessary pain," not the suffering created in an "unforeseeable accident." *Id.* at 462, 464. The Justices thus assumed that state officials performed "their duties . . . in a careful and humane manner." *Id.* at 462. Justice Frankfurter explained, however, that his deciding fifth vote did "not mean that a hypothetical situation, which assumes a series of abortive attempts at electrocution . . . would not raise different questions." *Id.* at 471 (Frankfurter, J., concurring).

60 370 U.S. 660 (1962).

61 *Id.* at 666. In *Furman v. Georgia*, Justice Douglas relied on both *Robinson* and *Francis* to conclude that the Eighth Amendment's applicability to the states is "now settled." 408 U.S. 238, 241 (1972) (per curiam) (Douglas, J., concurring).

62 Trop v. Dulles, 356 U.S. 86, 101 (1985) (plurality opinion); *see also* Stanford v. Kentucky, 492 U.S. 361, 369 (1989); Denno, *Getting to Death*, *supra* note 1, at 337–38.

63 Weems v. United States, 217 U.S. 349, 373 (1910).

64 *Stanford*, 492 U.S. at 369 (quoting Gregg v. Georgia, 428 U.S. 153, 171 (1976)).

65 *Trop*, 356 U.S. at 101.

66 Robinson v. California, 370 U.S. 660, 666 (1962).

67 *See, e.g.*, Poyner v. Murray, 508 U.S. 931, 933 (1993) (Souter, J., joined by Blackmun & Stevens, JJ., concurring in denial of certiorari) (emphasizing that *Kemmler* was not "a dispositive response to litigation of the issue [of the constitutionality of electrocution] in light of modern knowledge").

68 *In re* Kemmler, 136 U.S. 436, 447 (1890).

69 For a discussion of how courts have assessed whether a state's particular execution method is unconstitutionally vague, see *infra* notes 73, 247, 273–74, 282–83, 357 and accompanying text. These unconstitutionally vague statute cases have focused primarily on lethal gas and lethal injection, discussed *infra* notes 247, 273–74, 282–83, 357 and accompanying text (lethal injection cases). The lethal gas cases are examined briefly in this footnote because challenges to the vagueness of lethal gas statutes have provided precedent for the challenges to the vagueness of lethal injection statutes. Regardless, no court has upheld a statutory vagueness challenge. For example, in *State v. Gee Jon*, 211 P. 676, 682 (Nev. 1923), the court emphasized two points: (1) the legislature "sought to provide a method of inflicting the death penalty in the most humane manner known to modern science," *id.*; *see also* Robert A. Maurer, *Death by Lethal Gas*, 9 GEO. L.J. 50, 51 (1921) (noting that "it would appear that the Nevada statute would be upheld as another attempt by a legislature to find a still more humane method of execution than by electrocution and the other methods now in use"); and (2) prison officials administering the gas would also "carefully avoid inflicting cruel punishment" when selecting the type of gas to use, because it was unspecified in the statute. *See Gee Jon*, 211 P. at 682; *see also* Hernandez v. State, 32 P.2d 18, 25 (Ariz. 1934)

("The fact that [lethal gas] is less painful and more humane than hanging is all that is required to refute completely the charge that it constitutes cruel and unusual punishment."); People v. Daugherty, 256 P.2d 911, 922 (Cal. 1953) (declining defendant's contention that lethal gas is cruel and unusual because executioners "could use a lethal gas which would cause long and cruel suffering"); Raymond Hartmann, *The Use of Lethal Gas in Nevada Executions*, 8 ST. LOUIS U. L.J. 167, 168 (1923) (expressing support for the Nevada statute despite concerns that the lack of specification for the type of gas might introduce error on the part of prison officials, who may inadvertently select a type of gas that would inflict pain and suffering).

[70] The two states are Alabama and Nebraska. ALA. CODE § 15-18-82(a) (1975) ("[T]he sentence shall be executed . . . by causing to pass through the body of the convict a current of electricity of sufficient intensity to cause death, and the application and continuance of such current through the body of such convict shall continue until such convict is dead."); NEB. REV. STAT. § 29-2532 (1943) ("[Death] shall be by causing to pass through the body . . . a current of electricity of sufficient intensity to cause death."); *see also infra* app. 1, tbl.1; app. 2 (Alabama and Nebraska).

[71] The three states—Florida, South Carolina, and Virginia—allow a choice between electrocution and lethal injection. *See infra* app. 1, tbl.1; app. 2 (Florida, South Carolina, and Virginia). Only the electrocution provisions in their respective statutes are cited here. *See* FLA. STAT. ANN. § 922.105(1) (West 2000) ("A death sentence shall be executed by lethal injection, unless the person sentenced to death affirmatively elects to be executed by electrocution."); S.C. CODE ANN. § 24-3-530 (A) (Law Co-op. 1993) (amended 1995) ("[The condemned] shall suffer the [death] penalty by electrocution . . . ."); VA. CODE ANN. § 53.1-233 (Michie 1994) ("The death chamber shall have all the necessary appliances for the proper execution of prisoners by electrocution."). Arkansas allows pre-enactment prisoners a choice between electrocution and lethal injection. *See infra* app. 1, tbl.10 (Type 4—Arkansas). However, only two inmates remain who can make that choice. *See infra* app. 2 (Arkansas). Because of the limited potential for the use of electrocution in Arkansas, this article does not consider Arkansas a choice state.

[72] *See supra* note 71 (The three states are Florida, South Carolina, and Virginia.).

[73] *See* Denno, *Getting to Death, supra* note 1, at 352–53 (reviewing the issue of statutory vagueness in the context of electrocution statutes).

[74] Gregg v. Georgia, 428 U.S. 153, 173 (1976); Louisiana *ex rel.* Francis v. Resweber, 329 U.S. 459, 463 (1947) (plurality opinion).

[75] Trop v. Dulles, 356 U.S. 86, 100 (1958) (plurality opinion).

[76] Glass v. Louisiana, 471 U.S. 1080, 1085 (1985) (Brennan, J., dissenting).

[77] Farmer v. Brennan, 511 U.S. 825, 842 (1994) (in terms of a standard of deliberate indifference, referring to a risk that is "longstanding, pervasive, well-documented, or expressly noted by prison officials in the past, and the circumstances suggest that the defendant-official . . . had been exposed to information concerning the risk and thus 'must have known about it.'"). Even though the *Farmer* Court's standard pertains to the risk of inmate attacks, the Court did not suggest that the standard should be limited only to this circumstance. Furthermore, the likelihood of a botched execution can be estimated far more accurately than the likelihood of an inmate attack, given that the former is based on more readily identifiable and objective criteria. *See also Glass*, 471 U.S. at 1093 (Brennan, J., dissenting) (noting that even if electrocution did not "invariably produce pain and indignities, the apparent century-long pattern of 'abortive attempts' and lingering deaths suggests that this method of execution carries an unconstitutionally high risk of causing such atrocities").

[78] Stanford v. Kentucky, 492 U.S. 361, 369 (1989) (quoting Coker v. Georgia, 433 U.S. 584, 592 (1977) (plurality opinion)).

[79] Fierro v. Gomez, 865 F. Supp. 1387, 1410 (N.D. Cal. 1994), *aff'd*, 77 F.3d 301 (9th Cir. 1996), *vacated on other grounds*, 519 U.S. 918 (1996) (remanding for reconsideration in light of the changed statute).

[80] *Fierro*, 865 F. Supp. at 1400-01.

[81] Fierro v. Gomez, 77 F.3d 301, 308 (9th Cir. 1996), *vacated on other grounds*, 519 U.S. 918 (1996) (remanding for reconsideration in light of the changed statute). Given the scientific uncertainty concerning measurements of pain and unconsciousness, the *Fierro* district court found to be probative, "to varying degrees," all the evidence of eyewitness observations of gas chamber executions. Fierro v. Gomez, 865 F. Supp. 1387, 1400 (N.D. Cal. 1994). The court particularly considered as "objective" and "reliable sources of clinical information," the San Quentin execution records produced contemporaneously with the actual executions by trained medical personnel closely observing the inmates. *Id.* at 1400-01. The execution records of two recently executed inmates were deemed "the most probative evidence of pain and consciousness" because the men were executed under the protocol being challenged. *Id.* at 1401.

[82] *See* Denno, *Getting to Death, supra* note 1, at 354–58 (summarizing available medical publications, eyewitness reports, and affidavit testimony).

[83] *See infra* app. 1, tbl.8.

[84] 428 U.S. 153 (1976).

[85] *Id.* at 168–207.

[86] Sherwin B. Nuland, M.D., *Cruel and Unusual*, N.Y. TIMES, Nov. 9, 1999, at A25 ("Even when it functions exactly as it should, the electric chair is a brutal killer."). *See generally* SHERWIN B. NULAND, HOW WE DIE: REFLECTIONS ON LIFE'S FINAL CHAPTER (1993) (discussing different methods of death and the pain associated with them).

[87] *Amnesty Calls for Death Penalty Abolition, Following Grisly Execution*, AGENCE FRANCE-PRESSE (Paris, Fr.), July 9, 1999, at 1; Joe Carroll, *US Death Sentence Ruling Defies Ratified UN Treaty*, IRISH TIMES (Dublin, Ir.), Nov. 3, 1999, at 12; Roberta Harrington, *Death Penalty Debate Sparked*, SUNDAY HERALD (Glasgow, Scot.), Nov. 28, 1999, at 16; Julie Hauserman, *Lethal Injection is Signed into Law*, ST. PETERSBURG TIMES, Jan. 5, 2000, at 1A; *Madrid Demonstrators Protest Death Sentence*, PRESS JOURNAL (Vero Beach, Fla.), Nov. 3, 1999, at A11; *Millions Flock to US Execution Site*, THE SCOTSMAN (Edinburgh, Scot.), Nov. 1, 1999, at 22; Michael Peltier, *Death Pictures Pique Interest Worldwide*, PRESS JOURNAL (Vero Beach, Fla.), Oct. 25, 1999, at A8; David Usborne, *Is the End in View for Old Sparky?*, THE INDEPENDENT (London, Eng.), Jan. 9, 2000, at 20.

88 Provenzano v. Moore, 744 So. 2d 413, 442–44 (Fla. 1999) (Shaw, J., dissenting).

89 *Millions Flock to US Execution Site, supra* note 87; Peltier, *supra* note 87; Usborne, *supra* note 87.

90 *Provenzano,* 744 So. 2d at 433–34 (Shaw, J., dissenting).

91 *Id.*

92 Brief for Petitioner at 3, Bryan v. Moore, 528 U.S. 960 (1999) (citations omitted).

93 *Id.*

94 *Provenzano,* 744 So. 2d at 434 (Shaw, J., dissenting).

95 *Id.* at 416.

96 *Id.*

97 701 So. 2d 76, 79 (Fla. 1997).

98 *Provenzano,* 744 So. 2d at 415.

99 528 U.S. 960 (1999).

100 *Id.* However, it was unclear why the Court made such a move after all these years. There were a range of views: (1) the Court wanted to declare electrocution constitutional once and for all, to end the seemingly ceaseless stream of appeals challenging the method's constitutionality over the years; (2) the Court in particular wanted to examine the constitutionality of Allen Lee Davis's execution in light of Florida's history of botched executions; or (3) the Court wanted to examine whether electrocution in general, as well as applied specifically in Florida, was constitutional. This broad scope necessitated a sufficiently wide focus for challenging the constitutionality of electrocution, beginning with the method's history.

101 Bryan v. Moore, 528 U.S. 1133 (2000); *see infra* app. 2 (Florida).

102 *See infra* app. 2 (Alabama and Nebraska).

103 *See infra* app. 1, tbl.8.

104 *See* Denno, *Getting to Death, supra* note 1, at 359.

105 *See infra* app. 1, tbl.8.

106 *See infra* app. 1, tbl.8.

107 *See supra* note 55 and accompanying text.

108 *See* Denno, *Getting to Death, supra* note 1, at 362 & n.262.

109 *See supra* notes 78–79; *infra* notes 126–30, 154 and accompanying text.

110 744 So. 2d 413 (Fla. 1999) (per curiam).

111 Denno, *Getting to Death, supra* note 1, at 363–408, 439–64; *see infra* app. 1, tbls.2–3; app. 2.

112 Campbell v. Wood, 511 U.S. 1119, 1119 (1994) (Blackmun, J., dissenting from denial of certiorari) (citing State v. Frampton, 627 P.2d 922, 934 (Wash. 1981)).

113 *See supra* notes 43, 56 and accompanying text.

114 *See supra* notes 55–56 and accompanying text.

115 Malloy v. South Carolina, 237 U.S. 180, 185 (1915) (noting the adoption of electrocution by eleven states following the decision of a New York commission that it was more humane, making the total number of states adopting electrocution thirteen, including the state at issue, South Carolina).

116 *See infra* app. 1, tbl.2; app. 2.

117 *See infra* app. 1, tbls.2–3; app. 2.

118 In 1921, in an attempt to prove the state humane, the Nevada legislature passed a law providing that lethal gas was to be administered "without warning and while [the inmate was] asleep in his cell." WILLIAM J. BOWERS, LEGAL HOMICIDE: DEATH AS PUNISHMENT IN AMERICA, 1864–1982, at 12 (1984). This procedure was never followed, however, because it was impossible to release the gas in a regular cell. *Id.* Yet, in *State v. Gee Jon,* the Nevada Supreme Court emphasized that the legislature "sought to provide a method of inflicting the death penalty in the most humane manner known to modern science." 211 P. 676, 682 (Nev. 1923). The legislature evaluated, but rejected, hanging and shooting in favor of lethal gas. *Id.* The 1921 lethal gas law did not expressly indicate retroactive operation. *Id.* at 681–82.

119 Denno, *Getting to Death, supra* note 1, at 366–67; *see infra* app. 2.

120 408 U.S. 238, 256–57 (1972) (holding that the discretionary statutes were unconstitutional as applied, violating the Equal Protection Clause). For an overview of these challenges, see Denno, *Getting to Death, supra* note 1, at 367–68.

121 Denno, *Getting to Death, supra* note 1, at 368.

122 *See* app. 1, tbl.1; app. 2 (California and Missouri).

123 Denno, *Getting to Death, supra* note 1, at 368–70.

124 These states are, in order of abandonment: Oklahoma (1951), Mississippi (1954), New Mexico (1955), Texas (1977), Massachusetts (1982), Arizona (1983), Illinois (1983), New Jersey (1983), South Dakota (1984), Louisiana (1990), Pennsylvania (1990), Ohio (1993, 2001), Virginia (1994), Connecticut (1995), Indiana (1995), New York (1995), South Carolina (1995), Kentucky (1998), Tennessee (1998), Florida (2000), and Georgia (2000). *See infra* app. 1, tbls.1–3.

125 *See supra* note 124; *infra* app. 1, tbls.1–3; app. 2. There are historical differences between the uses of electrocution and lethal gas that point to states' initial, relative reluctance to reject electrocution. First, over the course of the century, states have relied on *Kemmler* to support the retention of electrocution, whereas no court case has addressed the constitutionality of lethal gas. Next, electrocution was introduced three decades earlier than lethal gas during a time when science was substantially less advanced; therefore, lethal gas, which was also a considerably more visible method than electrocution, had the advantage of greater immediate scrutiny. Nonetheless, electrocution and lethal gas have comparable "legislative lifelines" (sixty-one years and fifty-one years respectively) in terms of the point at which they were introduced and the point at which they were no longer adopted, thereby suggesting comparable periods of tolerance (electrocution was first introduced in 1888 and last adopted in 1949; lethal gas was first introduced in 1921 and last adopted in 1973). Lastly, lethal gas is more expensive than electrocution, a factor that states have acknowledged when they have changed execution methods. *See infra* app. 2.

126 458 U.S. 782 (1982).

127 *Id.* at 792.

128 *Id.* (emphasis added).

129 *Id.* at 793.

130 *See, e.g.,* Stanford v. Kentucky, 492 U.S. 361, 370–71 (1989) (rejecting a challenge to the constitutionality of the death penalty for 16-year-olds, noting that ten of the thirty-seven death penalty jurisdictions allowed capital punishment for such youths); Penry v. Lynaugh, 492 U.S. 302, 334–35 (1989) (rejecting a challenge to the constitutionality of the death penalty for mentally retarded persons, emphasizing that only two states had prohibited it).

131 *See infra* app. 1, tbls.1–6.

132 *See infra* app. 1, tbl.4.

133 *See infra* app. 1, tbl.4.

134 *See infra* app. 1, tbl.4.

135 *See infra* app. 1, tbl.4.

136 *See infra* app. 1, tbl.4.

137 Provenzano v. Moore, 744 So. 2d 413, 436 (Fla. 1999) (Shaw, J., dissenting); Jones v. State, 701 So. 2d 76, 87 (Fla. 1997) (Shaw, J., dissenting); AMNESTY INTERNATIONAL, WHEN THE STATE KILLS 265–68 (1989).

138 *See infra* app. 1, tbl.7.

139 *See* Carla McClain, *Arizona Gas Chamber Stays*, GANNET NEWS SERV., Apr. 7, 1992, *available in* LEXIS, Nexis Library, Wires File (84% favoring lethal injection); George Skelton, *Death Penalty Support Still Strong in State*, L.A. TIMES, Apr. 29, 1992, at A1 (63% favoring lethal injection).

140 Steve Bousquet, *Eye on 2000: A State Poll, The Chair Out of Favor*, MIAMI HERALD, Nov. 7, 1999, at 1A (reporting the results of an October 1999 statewide poll conducted by *The Miami Herald* and *The St. Petersburg Times* in which 58% of the 600 people questioned supported a state law to replace the electric chair with lethal injection); *Poll: Electric Chair Unpopular in Florida*, OMAHA WORLD-HERALD, Nov. 7, 1999, at 22A.

141 *Provenzano*, 744 So. 2d at 436–37 (Shaw, J., dissenting) (citations omitted).

142 *Id.* at 437.

143 *Id.* at 436.

144 *Id.* at 413 (per curiam).

145 *See infra* app. 1, tbl.2; app. 2 (Georgia).

146 Dick Pettys, *Electrocution Argued in Court*, CHI. TRIB., July 10, 2001, § 1, at 12.

147 Denno, *Getting to Death*, *supra* note 1, at 378–79 (discussing Mississippi); *see infra* app. 2 (Mississippi).

148 554 S.E.2d 137 (Ga. 2001).

149 *Id.* at 144; *see also id.* at 146–47 (Thompson, J., dissenting) ("The majority claims that state imposed electrocution has fallen into disfavor in this country, but it does not cite a single case where an appellate court in another state or the federal system has held electrocution to be cruel and unusual under a state constitution or the federal constitution. *That is because there are no cases.*"); Henry Weinstein, *Georgia High Court Relegates Electric Chair to History*, L.A. TIMES, Oct. 6, 2001, at A21 (noting that the *Dawson* court's decision "marks the first time an appellate court has issued such a ruling against use of the electric chair").

150 *Dawson*, 554 S.E.2d at 139–41.

151 *See infra* notes 159–60.

152 *Dawson*, 554 S.E.2d at 144.

[153] *Id.*

[154] *Id.* at 143.

[155] *See infra* app. 2 (Louisiana).

[156] *See infra* app. 2 (Louisiana).

[157] *See infra* app. 2 (Louisiana).

[158] *See infra* app. 2 (Louisiana).

[159] Todd von Kampen, *Sticking with 4 Jolts for Now, Two Officials Say a Second Judge's Ruling Against How the Electric Chair is Used Won't Prompt Quick Changes*, OMAHA WORLD-HERALD, Feb. 23, 2001, at 9.

[160] *Id.* (quoting the May 2000 ruling by District Judge Robert Hippe in the 1999 murder case involving death row inmate Raymond Mata, Jr.).

[161] *Id.* (referring to the February 22, 2001, ruling by District Judge Randall Rehmeier in the case of convicted murderer Kimberly Sue Faust). Nebraska's electrocution statute refers to a continuous current. NEB. REV. STAT. § 29-2532 (1943) ("The mode of inflicting the punishment of death, in all cases, shall be by causing to pass through the body of the convicted person a current of electricity of sufficient intensity to cause death; and the application of such current shall be continued until such convicted person is dead."); *see also supra* note 70.

[162] von Kampen, *supra* note 159, at 9.

[163] *Id.*

[164] In January 2001, bills were introduced by Sens. Jon Bruning and Kermit Brashear to replace electrocution with lethal injection. L.B. 62, 97th Leg., 1st Reg. Sess. (Neb. 2001); L.B. 356, 97th Leg., 1st Reg. Sess. (Neb. 2001).

[165] *See infra* app. 2 (Ohio).

[166] Randy Ludlow, *"Old Sparky" Finale? Byrd Electrocution Maybe Chair's Last*, CIN. POST, Aug. 10, 2001, at 1A.

[167] *Id.* ("Some pretty nasty stuff has happened around the country, and that's not something I want to put our staff through. . . . It's stressful on me [too]." (quoting Ohio Corrections Director Reggie Wilkinson)); *see also* Randy Ludlow, *Old Sparky is Out of Work*, CIN. POST, Nov. 16, 2001, at 19A (noting that Ohio Corrections Director Reginald Wilkinson had wanted to "dismantle the oak chair to spare his volunteer execution team from witnessing the horror of electrocution").

[168] *National Briefing (Midwest)*, N.Y. TIMES, July 19, 2001, at A18.

[169] Am. H.B. 362, 124th Gen. Assem., Reg. Sess. (Ohio 2001) (eliminating electrocution as a means of executing the death sentence), *available at* http://www.legislature.state.oh.us/ bills.cfm?ID=124_HB_362; *see also* app. 2 (Ohio).

[170] A comparably peculiar circumstance arose when John Albert Taylor made a highly publicized choice to be executed by firing squad under Utah's choice statute, which has lethal injection as the default. *See infra* app. 2 (Utah); James Brooke, *Utah Debates Firing Squads in Clash of Past and Present*, N.Y. TIMES, Jan. 14, 1996, § 1, at 16; *Condemned Criminal in Utah Seeks Death by Firing Squad*, N.Y. TIMES, Dec. 11, 1995, at A14 [hereinafter *Condemned Criminal*]; *Firing Squad Executes Killer*, N.Y. TIMES, Jan. 27, 1996, at A22. Apparently motivated by a desire to embarrass the State, Taylor's decision accentuated current problems in administering the firing squad. *See* Brooke, *supra*; *Condemned Criminal*, *supra*. Regardless, the diminished publicity following Taylor's death appears to have also dimmed the political concern with the firing squad.

[171] Bill Cohen, *Ohio Considers Junking Electric Chair*, STATELINE.ORG (July 30, 2001), *at* http://www1.stateline.org/story.do?/storyId=138945.

[172] *Id.*

[173] In 1888, lethal injection was considered along with other execution methods when New York's governor-appointed commission was seeking the most humane means of implementing the death penalty. Denno, *Electrocution*, *supra* note 1, at 571–72; *see also supra* notes 43–44 and accompanying text (discussing the appointment of the New York commission).

[174] Denno, *Electrocution*, *supra* note 1, at 572–73; Patrick Malone, *Death Row and the Medical Model*, 9 HASTINGS CTR. REP., Oct. 1979, at 5; *see also* James W. Garner, *Infliction of the Death Penalty by Electricity*, 1 J. AM. INST. CRIM. L. & CRIMINOLOGY 626, 626 (1910) (stating that in the opinion of one Philadelphia physician, utilizing "the practice of medicine . . . for the purpose of putting criminals to death would arouse the unanimous protest of the medical profession"). This concern among physicians still exists. Jerome D. Gorman, M.D. et al., *The Case Against Lethal Injection*, 115 VA. MED. 576, 576–77 (1988) ("This use of a well-known medical tool, general anesthesia, for execution blurs the distinctions between healing and killing, between illness and guilt.").

[175] ROYAL COMMISSION ON CAPITAL PUNISHMENT 1949–1953 REPORT 258–61 (1973) [hereinafter ROYAL COMM'N REP.] (stating that attempts to make an injection into a vein often result in practical difficulties, rendering the method unsuitable for execution). The Royal Commission discussed four major problems that are still relevant to lethal injections today: (1) lethal injection could not be administered to individuals with certain "physical abnormalities" that make veins impossible to locate and that even "normal" veins can be flattened by cold or nervousness, conditions frequently characteristic of an execution setting; (2) lethal injection is difficult unless the subject fully cooperates and remains "absolutely still"; (3) lethal injection requires medical skill, although the medical profession was opposed to participating in the process; and (4) because of such problems, it was likely that executioners would have to implement an intramuscular (rather than intravenous) injection even though the intramuscular method would be slower and more painful. *Id.* at 258–60. In 1965, executions were abandoned entirely in Great Britain; consequently, there was no reason for the British to re-evaluate whether lethal injection would be preferable to other methods of execution. FRANKLIN E. ZIMRING & GORDON HAWKINS, CAPITAL PUNISHMENT AND THE AMERICAN AGENDA 109 (1986).

[176] 428 U.S. 153 (1976) (plurality opinion).

<u>177</u> ZIMRING & HAWKINS, *supra* note 175, at 109–10.

<u>178</u> *Id.* at 109–11.

<u>179</u> Ward Casscells, M.D. & William J. Curran, M.D., *Doctors, the Death Penalty, and Lethal Injection*, 307 NEW ENG. J. MED. 1532, 1532 (1982).

<u>180</u> Then-Governor Reagan explained the procedure as follows:

> Being a former farmer and horse raiser, I know what it's like to try to eliminate an injured horse by shooting him . . . . Now you call the veterinarian and the vet gives it a shot and the horse goes to sleep—that's it. I myself have wondered if maybe this isn't part of our problem [with capital punishment], if maybe we should review and see if there aren't even more humane methods now—the simple shot or tranquilizer.

Henry Schwarzschild, *Homicide by Injection*, N.Y. TIMES, Dec. 23, 1982, at A15 (quoting Ronald Reagan); *see also* Scott Christianson, *Corrections Law Developments: Execution by Lethal Injection*, 15 CRIM. L. BULL. 69, 70 (1979). Zimring and Hawkins claim, however, that the subsequent lure of lethal injection cannot be traced to any charismatic figure or special constituency. ZIMRING & HAWKINS, *supra* note 175, at 110.

<u>181</u> Daniel C. Hoover, *Injection Death Bill Endorsed by House*, NEWS & OBSERVER (Raleigh, N.C.), June 29, 1983, at 1A. The appearance of lethal injection also was important in light of an increasing public interest in the possibility of televised executions. *See, e.g.*, Garrett v. Estelle, 424 F. Supp. 468, 470–71 (N.D. Tex. 1977) (discussing an attempt by a Public Broadcasting Service television station to enjoin the Texas Department of Corrections from banning the broadcast of the first execution in Texas since 1964), *rev'd*, 556 F.2d 1274 (5th Cir. 1977); Jef I. Richards & R. Bruce Easter, *Televising Executions: The High-Tech Alternative to Public Hangings*, 40 UCLA L. REV. 381, 386–89 (1992) (discussing *Garrett* and related cases); *infra* note 206 and accompanying text (noting that the chemicals for a lethal injection execution are about $100 or less).

<u>182</u> Christianson, *supra* note 180, at 72 (contending that Oklahoma passed the lethal injection statute in part because of its economic benefits). Advocates of lethal injection present four major arguments on its behalf: (1) economy; (2) humaneness; (3) political feasibility; and (4) constitutional soundness. Herb Haines, *Primum Non Nocere: Chemical Execution and the Limits of Medical Social Control*, 36 SOC. PROBS. 442, 445–46 (1989); *see also* Gorman et al., *supra* note 174, at 577 (noting that lethal injection appears to be more humane and cheaper than electrocution).

<u>183</u> *See infra* app. 2 (The adopting states were: Oklahoma and Texas in 1977, Idaho in 1978, New Mexico in 1979, and Washington in 1981.).

<u>184</u> *See infra* app. 1, tbl.9 (Charles Brooks, Jr.).

<u>185</u> *See infra* app. 1, tbl.9.

<u>186</u> *See infra* app. 1, tbl.3; app. 2. The start of electrocution also was accompanied by large numbers of botched executions. *See supra* notes 55–56 and accompanying text.

<u>187</u> *See infra* app. 1, tbl.10. Additional types are possible; these six provide the most workable introduction to lethal injection statutes.

<u>188</u> These twenty-seven states are: Arizona, Arkansas, Colorado, Connecticut, Delaware, Georgia, Illinois, Indiana, Kansas, Kentucky, Louisiana, Maryland, Mississippi, Montana, Nevada, New Jersey, New Mexico, New York, North Carolina, Ohio, Oklahoma, Oregon, Pennsylvania, South Dakota, Tennessee, Texas, and Wyoming. *See infra* app. 1, tbl.10 (Type 1 statutes); *see also infra* app. 1, tbl.1.

<u>189</u> These six states are: California, Florida, South Carolina, Utah, Virginia, and Washington. *See infra* app. 1, tbl.10 (Type 2 statutes).

<u>190</u> These three states are: Idaho, New Hampshire, and Missouri. *See infra* app. 1, tbl.10 (Type 3 statutes).

<u>191</u> These five states are: Arizona, Arkansas, Delaware, Kentucky, and South Carolina. *See infra* app. 1, tbl.10 (Type 4 statutes).

<u>192</u> *See infra* app.1, tbl.10 (statutes of Types 2, 3, and 4).

<u>193</u> For example, one small survey showed that of the twenty-four California death row inmates who were provided a choice between lethal gas and lethal injection between January 1, 1993, and October 14, 1993, two-thirds (sixteen inmates) declined to make a choice. In turn, seven selected lethal injection and one chose lethal gas. Fierro v. Gomez, 865 F. Supp. 1387, 1391 (N.D. Cal. 1994), *aff'd*, 77 F.3d 301 (9th Cir. 1996), *vacated on other grounds*, 519 U.S. 918 (1996) (remanding for reconsideration in light of changed statute). The Royal Commission initially considered that giving a prisoner a choice between methods would provide a way of "introducing an untried system." However, the Commission ultimately decided otherwise because of the inmate's "tormenting vacillation" involved in making such a choice. ROYAL COMM'N REP., *supra* note 175, at 220.

<u>194</u> *See supra* note 34 and accompanying text; *infra* app. 2 (California).

<u>195</u> *See infra* app. 1, tbl.10; app. 2 (South Carolina).

<u>196</u> *See infra* app. 1, tbl.10 (Type 6 statutes); app. 2 (South Carolina).

<u>197</u> *See infra* app. 1, tbl.10 (Type 5 statutes).

<u>198</u> 237 U.S. 180 (1915).

<u>199</u> *Id.* at 182–84 (holding that a retroactive method of execution does not violate Article I, Section 10 of the Constitution, which bars ex post facto laws); *see also supra* notes 58, 115 and accompanying text (discussing *Malloy v. South Carolina*, 287 U.S. 180 (1915)).

<u>200</u> *See infra* app. 2 (Louisiana).

<u>201</u> *See supra* notes 155–58 and accompanying text.

<u>202</u> *See supra* notes 145–55 and accompanying text; *infra* app. 2 (Georgia).

203 These ten states are: Arkansas, California, Delaware, Florida, Illinois, New Hampshire, Ohio, Oklahoma, South Carolina, and Wyoming. *See infra* app. 1, tbl.10 (Type 6 statutes).

204 OKLA. STAT. ANN. tit. 22, § 1014(B), (C) (West 1986); *see also infra* app. 1, tbl.10.

205 *See* Don Colburn, *Oklahoma Was the First*, WASH. POST, Dec. 11, 1990, (Health Section), at 14; Frank Murray, *McVeigh to Die from Mixture of 3-Drug Cocktail; Execution Foes Say It Is Inhumane*, WASH. TIMES, April 25, 2001, at A4; Jeff Stryker, *The Role of Professions in the Execution Process*, THE RECORDER, Apr. 23, 1992, at 6.Telephone Interview with Dr. Stanley Deutsch, Professor of Anesthesiology, George Washington University School of Medicine and Health Sciences (July 25, 1995).

206 *See* Stryker, *supra* note 205, at 6; *see also supra* note 182 and accompanying text (commenting on the low cost appeal of lethal injection). Currently, the cost of lethal injection drugs averages about $100 or less, depending upon the state and other factors such as the supplier and the amount of chemicals used. *See, e.g.,* Lawrence D. Egbert, *Physicians and the Death Penalty*, AMERICA, Mar. 17, 1998, at 16 (stating that the cost of the "anesthesia equipment" in a Maryland execution in July 1997 "was about $75"); Frank Zoretich, *Clark Execution Cost More Than $40,000, Officials Say*, ALBUQUERQUE TRIBUNE, Feb. 16, 2002, at A3 (explaining that "the lethal injection cocktail of drugs cost taxpayers $91.49"); N.C. DEP'T OF CORR., EXECUTION METHODS, *at* http://www.doc.state.nc.us/DOP/deathpenalty/executio.htm (last updated Sept. 5, 2001) (noting that the cost of execution supplies in North Carolina averages about $105.63).

207 Letter from Stanley Deutsch, Ph.D., M.D., Professor of Anesthesiology, University of Oklahoma Health Sciences Center , to the Honorable Bill Dawson, Oklahoma state senator (Feb. 28, 1977) [hereinafter Deutsch Letter] (on file with the author). Deutsch's letter reads as follows:

Dear Senator Dawson:

This letter is written to review areas that we discussed regarding execution by administration of drugs intravenously. Without question this is, in my opinion, extremely humane in comparison to either electrocution or execution by the inhalation of poisonous gases.

The administration of an ultra short acting barbiturate such as Thiopental (Penthothal) or Methohexital (Brevital) in quantities of 2000 mg with 1000 mg of Succinylcholine intravenously would produce unconsciousness within 40 seconds and death of [sic] asphyxia. Other nueormuscular [sic] blocking drugs that could be employed include Pancuronium or Decamethonium in doses of 20 mg to produce long duration of paralysis and an effect similar to Succinylcholine. The effect of [sic] combination of ultra short acting barbiturate and neuromuscular blocking drugs would produce death in a predictable way and with certainty. These drugs have understandability of terminology in all medical and other biological circles and therefore there would be no probability of confusion with regard to which drugs would be used and the intent at the doses employed.

Administration of these drugs would necessitate the starting [of] an intravenous infusion of fluids through a plastic catheter as we commonly do in the operating room. In an uncooperative patient, this would require restraint of an arm, but this can be facilitated by oral sedation or intramuscularly prior to attempting to begin the intravenous solution. This is also commonly employed in patients who are apprehensive prior to arrival in the waiting room.

Having been anesthetized on several occasions with ultra short acting barbiturates and having administered these drugs for approximately 20 years, I can assure you that this is a rapid[ly] pleasant way of producing unconsciousness. If there is any further information that I can provide you, do not hesitate to call upon me.

Sincerely yours,

/s/

Stanley Deutsch, Ph.D., M.D.
Professor and Head
Department of Anesthesiology
[The University of Oklahoma Health Sciences Center]

*Id.*

208 *Id.*

209 Colburn, *supra* note 205, at 14.

210 Deutsch Letter, *supra* note 207 (providing specifics on how lethal injection could be carried out); *see also* Stryker, *supra* note 205, at 6 (summarizing Dr. Deutsch's opinion). Nancy Nunnally, a spokesperson for the Oklahoma Corrections Department, confirmed that the state changed to lethal injection for "humane" reasons. As she explained, "[p]eople don't realize it, but the electric chair can take 11 minutes to kill people. The first shock knocks you unconscious, but then it would just cook you. You would literally fry." Mary Thornton, *Death by Injection*, WASH. POST, Oct. 6, 1981, at A1.

211 *See infra* app. 1, tbl.10. *See generally* app. 2.

212 Deutsch Letter, *supra* note 207 (emphases added).

213 OKLA. STAT. ANN. tit. 22, § 1014 (A) (West 1996) (manner of inflicting punishment of death) (emphases added); *see also infra* app. 2 (Oklahoma).

214 *See infra* app. 1, tbls.11–12; app. 3.

215 *See infra* app. 1, tbls.11–12; app. 3. For an overview of the controversy concerning these chemicals, see Haines, *supra* note 182, at 445–46 (discussing whether lethal injection is a humane method of execution); Harold L. Hirsh, *Physicians as Executioners*, LEGAL ASPECTS OF MED. PRAC., Mar. 1984, at 1, 1–2 (describing the circumstances surrounding *Chaney v. Heckler*); Don Colburn, *Lethal Injection: Why Doctors Are Uneasy About the Newest Method of Capital Punishment*, WASH. POST, Dec. 11, 1990, (Health Section), at 12 (debating the role of physicians in

OHIO STATE LAW JOURNAL

execution by lethal injection); *Death Dealing Syringes*, TIME, Dec. 20, 1982, at 29 (reporting the execution of Charles Brooks by lethal injection); Ian Fisher, *Merits of Lethal Injection Are Questioned by Its Foes*, N.Y. TIMES, Feb. 17, 1995, at B5 (analyzing the controversy surrounding lethal injection as a humane method to induce death); Jacob Weisberg, *This is Your Death: Capital Punishment: What Really Happens*, NEW REPUBLIC, July 1, 1991, at 23 (explaining the debate over televised executions).

216 Deutsch Letter, *supra* note 207.

217 *See infra* notes 234–37 and accompanying text.

218 PHYSICIAN'S DESK REFERENCE 835 (55th ed. 2001); Malone, *supra* note 174, at 6.

219 *See infra* notes 261, 320, 375–77, 381, 387 and accompanying text.

220 *See infra* app. 1, tbl.10 (Type 1 statutes).

221 *See infra* note 222 and accompanying text.

222 *See* Malone, *supra* note 174, at 6. Because prisoners differ in their physiological constitution as well as their drug tolerance and drug use histories, some prisoners may need a far higher dosage of sodium pentathol than others "before losing consciousness and sensation." *See* Affidavit of Edward A. Brunner, M.D., Ph.D., ¶ 8G [hereinafter Brunner Affidavit], Exhibit B of Verified Complaint in Chancery, Gacy v. Peters, No. 94 CH (Ill. Apr. 1994) [hereinafter Gacy Complaint].

223 THE AM. COLL. OF PHYSICIANS ET AL., BREACH OF TRUST: PHYSICIAN PARTICIPATION IN EXECUTIONS IN THE UNITED STATES 20 (1994) [hereinafter BREACH OF TRUST]; PHYSICIAN'S DESK REFERENCE, *supra* note 218, at 1193. Other chemical paralyzing agents include tubocurarine chloride and succinylcholine chloride, the last of which Deutsch also recommended. Deutsch Letter, *supra* note 207.

224 Malone, *supra* note 174, at 6. Potassium chloride stops the heart; potassium induces cardiac arrest. Letter to Deborah W. Denno, Professor, Fordham University School of Law, from Lawrence Egbert, M.D., M.P.H., former Professor of Anesthesiology, University of Texas Southwestern Medical School, and current President, Maryland chapter of Physicians for Social Responsibility 6 (Nov. 2001) [hereinafter Egbert Letter] (on file with the author).

225 STEDMAN'S MEDICAL DICTIONARY 1566 (26th ed. 1995) (defining "saline" as "[a] salt solution, usually sodium chloride").

226 *See infra* note 375 and accompanying text.

227 Justine Sharrock, *Undercutting Executions*, MOTHER JONES, Dec. 28, 2001, *at* http://www.motherjones.com/web_exclusives/features/news/executions.html (targeting Bergen Brunswig, Cardinal Health, and Abbott Laboratories); Martin Yank, *Lethal Injection, Cardinal Health on the Hot Seat*, COLUMBUS ALIVE (Columbus, Ohio), Jan. 17, 2002, at 7 (implicating Abbott Laboratories, Cardinal Health, Inc., Bergen Brunswig, and Ross Products).

228 *See supra* notes 207, 210, 212–13, 220–21 and accompanying text.

229 Telephone and e-mail interview with Lawrence Egbert, M.D., M.P.H., former Professor of Anesthesiology, University of Texas Southwestern Medical School, and current President, Maryland chapter of Physicians for Social Responsibility (Aug. 13, 2001).

230 *See supra* note 21 and accompanying text; *infra* notes 230, 241–42, 258, 261, 318–21, 377, 435 and accompanying text.

231 Deutsch Letter, *supra* note 207 (referring to "an ultra short acting barbiturate such as Thiopental (Pentothal) or Methohexital (Brevital) in quantities of 2000 mg"); *see* Sims v. State, 754 So. 2d 657, 666 n.17 (Fla. 2000) (referring to a "lethal dose" of 2000 milligrams of sodium pentothal, "certain to cause rapid loss of consciousness (i.e., within 30 seconds of injection)"). *But see* Egbert, *supra* note 206, at 16 (stating that 2000 mg. of thiopental may not be lethal for some people).

232 *See infra* app. 1, tbls.11–15; app. 3.

233 Egbert Letter, *supra* note 224, at 6.

234 Denno, *Getting to Death*, *supra* note 1, at 354–58, 385 n.400; Denno, *Electrocution*, *supra* note 1, at 624–62; *see also infra* notes 261, 345, 355 (noting Leuchter's controversy and questionable credibility).

235 Denno, *Getting to Death*, *supra* note 1, at 377, 384–85; *see also infra* notes 261, 345 (noting the problems with Leuchter's lethal injection machines).

236 STEPHEN TROMBLEY, THE EXECUTION PROTOCOL: INSIDE AMERICA'S CAPITAL PUNISHMENT INDUSTRY 76–77 (1992).

237 *Id.* at 77–78; *see also infra* note 345 (discussing Leuchter's dubious "technique" for creating the chemical combinations necessary for a lethal injection).

238 Deutsch Letter, *supra* note 207.

239 The two drugs similar to pancuronium bromide were succinylcholine and decamethonium. *Id.*

240 *See infra* note 321.

241 *See infra* notes 261, 321.

242 Emanuel & Bienen, *supra* note 19, at 923.

243 561 S.W.2d 503 (Tex. Crim. App. 1978) (en banc).

244 136 U.S. 436, 447 (1890). For a discussion of *Kemmler*, see *supra* notes 40–70 and accompanying text.

245 *Ex parte Granviel*, 561 S.W.2d. at 509 (quoting *Trop v. Dulles*, 356 U.S. 86, 101 (1958)).

246 *Id.* at 510.

247 *Id.* at 511–13. The *Granviel* court set forth the standards for determining whether a statute is unconstitutionally vague:

> It is, of course, true that a law must be sufficiently definite that its terms and provisions may be known, understood, and applied. An Act of the legislature which violates either of said Constitutions (Federal or Texas), or an Act that is so vague, indefinite, and uncertain as to be incapable of being understood, is void and unenforcible [sic].

*Id.* at 511 (internal quotation marks omitted).

248 *Id.* at 514 (noting that a legislative body "may delegate to the administrative tribunal or officer power to prescribe details"). *See generally* John H. Gordon, Jr., Note, *Criminal Procedure—Capital Punishment—Texas Statutes Amended to Provide for Execution by Intravenous Injection of a Lethal Substance*, 9 ST. MARY'S L.J. 359, 361–65 (1977) (providing arguments for why the Texas lethal injection statute is constitutional).

249 *See* Earvin v. State, 582 S.W.2d 794, 799 (Tex. Crim. App. 1979) (en banc) (rejecting a lethal injection challenge in one sentence by citing to *Granviel*); Felder v. State, 564 S.W.2d 776, 779 (Tex. Crim. App. 1978) (en banc) (same).

250 470 U.S. 821 (1985).

251 *Id.* at 823.

252 Chaney v. Heckler, 718 F.2d 1174, 1177 n.5 (D.C. Cir. 1983), *rev'd*, 470 U.S. 821 (1985).

253 *Heckler*, 470 U.S. at 823.

254 *Id.*; *see also* Michele Stolls, Heckler v. Chaney: *Judicial and Administrative Regulation of Capital Punishment by Lethal Injection*, 11 AM. J.L. & MED. 251, 251–69 (1985) (discussing the *Heckler* Court's decision to decline to review the FDA's nonenforcement decision and its impact on the judicial regulation of death penalty cases).

255 *Heckler*, 470 U.S. at 823–24.

256 *See id.* at 837–38.

257 798 F.2d 695 (5th Cir. 1986).

258 *See id.* at 697–98. In support of his claim, Woolls provided testimony from several physicians contending that: (1) "the injection of sodium thiopental may cause physical and mental pain due to possible technical difficulties in administering the drug"; (2) "even if administered by a professional . . . the individual would be aware of the onset of loss of consciousness and the paralytic drug would produce a sense of shortness of breath and suffocation over a two to three minute period"; and (3) "the individual may also experience a sensation of multiple electric shocks over the entire body with erratic muscle twitching followed by acute paralysis and suffocation." *Id.*

259 *See infra* app. 1, tbl.9 (Randy L. Woolls).

260 *See, e.g.*, Hill v. Lockhart, 791 F. Supp. 1388, 1394 (E.D. Ark. 1992) (rejecting a claim that lethal injection is unconstitutional because it is not performed by medical doctors and therefore results in difficulties, such as an inability to locate a vein); People v. Stewart, 520 N.E.2d 348, 358 (Ill. 1988) (rejecting a claim that lethal injection constitutes cruel and unusual punishment because "defendant has submitted no evidence which indicates that execution by lethal injection results in protracted death or unnecessary pain"); *see also infra* notes 261–62, 264–79 and accompanying text.

261 In 1990, Charles Silagy and Walter Stewart brought a class action for injunctive relief against the State of Illinois and the Illinois Department of Corrections (DOC) contending that the lethal injection procedure used by the DOC violated the Illinois death penalty statute. Plaintiffs' Complaint at 1–2, Silagy v. Thompson, No. 90-C-5028 (N.D. Ill. Feb. 7, 1991). Plaintiffs emphasized that they were not challenging the constitutionality of lethal injection per se, but rather the particular procedure the defendants intended to use to implement it. *Id.* at 2–3. Although the Illinois statute authorized the injection of only two chemicals (a barbiturate and a paralytic agent), the defendants authorized the injection of three chemicals—sodium pentothal, pancuronium bromide, and potassium chloride. *Id.* at 1–2. According to the plaintiffs, "defendants' procedures create the substantial risk that plaintiffs will strangle or suffer excruciating pain during the three-chemical injection, but will be prevented by the paralytic agent from communicating their distress." *Id.* at 2. In addition, the DOC planned to use a lethal injection machine manufactured by Leuchter, despite the fact that the DOC had fired Leuchter because of his questionable qualifications. *Id.* at 6. Subsequently, Leuchter announced that his machine in Illinois was faulty and likely to fail. *Id.* at 6–7. The District Court for the Northern District of Illinois ultimately dismissed the plaintiffs' complaint. Silagy v. Thompson, No. 90-C-5028 (N.D. Ill. Feb. 7, 1991) (memorandum opinion and order).

262 Verified Complaint in Chancery, Gacy v. Peters, No. 94 CH (Ill. Apr. 1994).

263 *See infra* app. 1, tbl.9 (John W. Gacy).

264 Tom Jackman, *Death Penalty Resumes; Missouri Injection Case is With Supreme Court After Appellate Ruling*, KAN. CITY STAR, June 21, 1995, at C1; *see infra* app. 1, tbl.9 (Emmitt Foster).

265 Jackman, *supra* note 264.

266 754 So. 2d 657 (Fla. 2000).

267 LaGrand v. Lewis, 883 F. Supp. 469, 471 (D. Ariz. 1995), *aff'd sub nom*, LaGrand v. Stewart, 133 F.3d 1253 (9th Cir. 1998) (listing prior cases involving a constitutional challenge to lethal injection).

268 561 S.W.2d 503 (Tex. Crim. App. 1978); *see supra* notes 243–49 and accompanying text (discussing *Granviel*).

269 *Sims*, 754 So. 2d at 665.

270 *Id.* An edited version of this protocol can be found *infra* app. 3 (Florida).

271 *Sims*, 754 So. 2d at 665–66.

272 *Id.* at 668.

273 *Id.* at 666 (citing LaGrand v. Lewis, 883 F. Supp. 469 (D. Ariz. 1995), *aff'd sub nom*, LaGrand v. Stewart, 133 F.3d 1253 (9th Cir. 1998)).

274 *Id.* at 667 (quoting *LaGrand*, 883 F. Supp. at 470–71).

275 *Id.* at 667 n.19.

276 *Id.* at 667–68, 667 n.19.

277 *Id.* at 668 n.19.

278 *Id.* at 668.

279 *Id.*

280 *Id.*

281 *Id.* at 668–69 (citing *Ex parte Granviel*, 561 S.W.2d 503 (Tex. Crim. App. 1978)).

282 *Id.* at 670.

283 *Id.*

284 561 S.W.2d 503 (Tex. Crim. App. 1978).

285 In 1982, Charles Brooks was the first person to be executed by lethal injection. *See supra* note 184 and accompanying text; *infra* app. 1, tbl.9.

286 Notably, *Granviel* used *Kemmler* as precedent to find lethal injection constitutional. *Granviel*, 561 S.W.2d at 508–09; *see also supra* notes 243–48 and accompanying text (discussing *Granviel*'s reliance on *Kemmler*).

287 *Sims*, 754 So. 2d at 666–67 (citing LaGrand v. Lewis, 883 F. Supp. 469 (D. Ariz. 1995)).

288 *See generally* LaGrand v. Lewis, 883 F. Supp. 469 (D. Ariz. 1995).

289 *See supra* notes 74–80 and accompanying text (discussing Eighth Amendment standards in the context of evaluating electrocution).

290 In addition to the medical literature, this article relies on the expert opinions of two anesthesiologists, who also have provided expert testimony in court on challenges to the constitutionality of lethal injection: Edward A. Brunner, M.D., Ph.D., former Professor of Anesthesia at Northwestern University Medical School, and Lawrence Egbert, M.D., M.P.H., former Professor of Anesthesiology at the University of Texas Southwestern Medical School and current President of the Maryland chapter of Physicians for Social Responsibility.

291 Egbert, *supra* note 206, at 15. *See generally* TROMBLEY, *supra* note 236.

292 *See supra* notes 81–102 and accompanying text.

293 *See supra* notes 81–95 and accompanying text.

294 *See, e.g.*, California First Amendment Coalition v. Woodford, No. C-96-1291-VRW, 2000 WL 33173913 (N.D. Cal. July 26, 2000); California First Amendment Coalition v. Calderon, 88 F. Supp. 2d 1083 (N.D. Cal. 2000); California First Amendment Coalition v. Calderon, 956 F. Supp. 883 (N.D. Cal. 1997) ("Calderon I"), *rev'd* 150 F.3d 976 (9th Cir. 1998).

295 *Calderon I*, 956 F. Supp. at 890 (noting that the First Amendment protects public access to executions).

296 *Id.* at 889 ("Even though the historical basis for the media's witnessing of executions is somewhat less clear than that of the public generally, it is no stretch to suggest that the public's right of access includes a right of media access."); *see also* California First Amendment Coalition v. Calderon, 150 F.3d 976, 981 (9th Cir. 1998) (emphasizing that "the role of the media is important; acting as the 'eyes and ears' of the public, they can be a powerful and constructive force, contributing to remedial action in the conduct of public business" (quoting Houchins v. KQED, Inc., 438 U.S. 1, 8 (1978)).

297 *See infra* notes 408–11 and accompanying text.

298 No. C-96-1291-VRW, 2000 WL 33173913 (N.D. Cal. July 26, 2000).

299 *Id.* at *9.

300 *Id.*

301 *Id.*

302 *Id.*

303 *Id.*

304 *Id.*

305 *See supra* note 275 and accompanying text.

306 *See infra* notes 408–11 and accompanying text. The credibility of newspaper accounts of botched lethal injections also came up in

Connecticut's evidentiary hearing concerning the constitutionality of lethal injection. The 1997 Connecticut evidentiary hearing relied on this author's testimony as well as the testimony of Drs. Edward Brunner and Lawrence Egbert. State v. Breton, No. CR4-147941 (Conn. Super. Ct. Nov. 14, 1997); *see also supra* note 290 (describing the credentials of Drs. Brunner and Egbert). Yet, the *Breton* court focused on the evidence it wanted to hear. For example, the court merely mentioned both doctors' extended testimony concerning the risks inherent in the lethal injection process. In contrast, the court emphasized the fact that on cross examination "both doctors agreed . . . that the proper implementation of the state's procedures by lethal injection would result in a virtually painless death." *Breton*, No. CR4-147941, at 2. The court considered "reliable" the author's data and studies on botched lethal injection executions, and noted my opinion that there exists a substantial risk of the infliction of unnecessary pain in light of the number of botched executions (for example, at least one in nine of twenty-two states that have the lethal injection procedure). However, the court considered my "second and third hand reports [newspaper accounts of botched executions], substantially less reliable." *Id.* Remarkably, the court chose to credit instead the testimony of two State experts on this issue: (1) Dr. Jeffrey Gross, who testified about the "routine" and "ordinary" nature of the lethal injection process and the State's efforts to avoid mishaps; and (2) David Nunnelee, a witness who characterized the 121 Texas executions as "seemingly painless," and "with no outward signs of physical pain or torture." *Id.* at 3. Moreover, the court highlighted evidence that the Deputy Commissioner of Corrections had followed "appropriate steps" to ensure a safe and effective procedure that would avoid any possible mishaps experienced in other states. *Id.* at 5.

[307] 883 F. Supp. 469 (D. Ariz. 1995).

[308] Sims v. State, 754 So. 2d 657, 667 (Fla. 2000) (quoting LaGrand v. Lewis, 883 F. Supp. 469, 470–71 (D. Ariz. 1995)).

[309] The fact that other courts preceding *Sims* have reacted similarly to newspaper accounts of botched lethal injections presented by this author during evidentiary hearings provides only further evidence of how limited Eighth Amendment analyses of lethal injection have been. *See, e.g., supra* note 306 (discussing *State v. Breton* in Connecticut); *see also Ex parte* Richardson, No. 81-CR-1545 (175th Dist. Ct., Bexar County, Tex. Oct. 1, 1997) (concerning the evidentiary hearing on the constitutionality of lethal injection in Texas held on April 28–30, 1997; in that hearing, the prosecution also questioned the reliability of this author's testimony on botched lethal injection executions based on newspaper reports).

[310] *See supra* note 74 and accompanying text.

[311] *See* California First Amendment Coalition v. Woodford, No. C-96-1291-VRW, 2000 WL 33173913 (N.D. Cal. July 26, 2000); California First Amendment Coalition v. Calderon, 88 F. Supp. 2d 1083 (N.D. Cal. 2000); California First Amendment Coalition v. Calderon, 956 F. Supp. 883 (N.D. Cal. 1997) ("Calderon I"), *rev'd*, 150 F.3d 976 (9th Cir. 1998).

[312] *California First Amendment Coalition*, 2000 WL 33173913, at *10; *California First Amendment Coalition*, 88 F. Supp. 2d at 1084; *Calderon I*, 956 F. Supp. at 889–90.

[313] *California First Amendment Coalition*, No. C-96-1291-VRW, 2000 WL 33173913, at *10; *California First Amendment Coalition*, 88 F. Supp. 2d at 1084; *Calderon I*, 956 F. Supp. at 889–90.

[314] *See infra* app. 1, tbl.9 (detailing executioners' problems with finding a vein or keeping a needle inserted in a vein).

[315] *See infra* app. 1, tbl.18; notes 412–13 and accompanying text (analyzing statewide restrictions on witnesses viewing a lethal injection procedure).

[316] *See generally* TROMBLEY, *supra* note 236, at 105–16.

[317] Egbert Letter, *supra* note 224, at 7.

[318] Brunner Affidavit, *supra* note 222, ¶ 8G.

[319] Brunner Affidavit, *supra* note 222, ¶ 8G–H; Affidavit of Lawrence Deems Egbert, M.D., M.P.H., ¶ 13 [hereinafter Egbert Affidavit], Exhibit 3 of Petition for Post Conviction Writ of Habeas Corpus, *Ex parte* Sam Felder, Jr., No. 227815-B (Tex. Crim. App. May 12, 1994) [hereinafter Felder I Petition] (pet. denied); *see also* Chaney v. Heckler, 718 F.2d 1174, 1191 (D.C. Cir. 1983) ("Even a slight error in dosage or administration can leave a prisoner conscious but paralyzed while dying, a sentient witness of his or her own slow, lingering asphyxiation."), *rev'd*, 470 U.S. 821 (1985).

[320] Brunner Affidavit, *supra* note 222, ¶ 8G (Illinois Department of Correction's procedures typically recommended that 40cc of sodium pentothal be injected.).

[321] Brunner Affidavit, *supra* note 222, ¶ 8H. As Brunner explains:

> Under such circumstances, the prisoner will suffer an extremely painful sensation of crushing and suffocation, as the pancuronium bromide takes effect and stops his ability to breathe. The pancuronium bromide will paralyze the prisoner, rendering him unable to move or communicate in any way, while he is experiencing excruciating pain. As the third chemical, potassium chloride, is administered, the prisoner will experience an excruciating burning sensation in his vein. This burning sensation—equivalent to the sensation of a hot poker being inserted into the arm—will then travel with the chemical up the prisoner's arm and spread across his chest until it reaches his heart, where it will cause the heart to stop.

*Id.*

[322] *Id.* ¶ 7 (noting that under the Illinois procedure, "unlimited discretion to determine the dosages—and even to 'alter' the chemicals themselves—is given to unspecified 'qualified health care personnel'"); Egbert Affidavit, *supra* note 319, ¶ 7 (emphasizing the discretion under the Texas death penalty statute); *see infra* app. 3 (illustrating the amount of discretion in all state protocols).

[323] Thomas O. Finks, *Lethal Injection: An Uneasy Alliance of Law and Medicine*, 4 J. LEGAL MED. 383, 397 (1983); Hirsh, *supra* note 215, at 1.

[324] Finks, *supra* note 323, at 397 (explaining that "[l]ethal injections may not work effectively on diabetics, drug users, and people with heavily pigmented skins"); Hirsh, *supra* note 215, at 1 (noting that "if a person is nervous or fearful, his veins become constricted"); *On Lethal*

*Injections and the Death Penalty*, 12 HASTINGS CTR. REP., Oct. 1982, at 2 [hereinafter *On Lethal Injections*] (explaining that lethal injections are particularly difficult to administer "to people with heavily pigmented skins . . . and to diabetics and drug users"); *Another U.S. Execution Amid Criticism Abroad*, N.Y. TIMES, Apr. 24, 1992, at B7 [hereinafter *Another U.S. Execution*] (reporting that the difficulty in executing Billy Wayne White was due to his history as a heroin user); Weisberg, *supra* note 215, at 23 (describing the forty-five minutes required for technicians to find a serviceable vein in a former heroin addict).

[325] Finks, *supra* note 323, at 397 (quoting Kotulak, *Execution by Injection: The Doctor's Dilemma*, CHI. TRIB., Dec. 21, 1982, § 2, at 4).

[326] Egbert Affidavit, *supra* note 319, ¶ 11 ("Unskilled personnel may be unable to insert successfully the IV catheter in the prisoner. This may be because the prisoner was once an addict and used the veins carelessly so the veins clotted or because the prisoner is anxious and this causes the veins to constrict.").

[327] *Capital Punishment: Cruel and Unusual*, ECONOMIST, Jan. 23, 1993, at 86 (reviewing TROMBLEY, *supra* note 236, and quoting a death row inmate, "[t]hey put a catheter in your penis"); *see infra* app. 1, tbl.9 (George "Tiny" Mercer); *infra* app. 3 (Kentucky).

[328] *See infra* app. 1, tbl.9 (Rickey Ray Rector).

[329] Affidavit of Stephen M. Trombley, ¶ 20 [hereinafter Trombley Affidavit], Exhibit A of Gacy Complaint, *supra* note 222.

[330] Brunner Affidavit, *supra* note 222, ¶ 5; Egbert Affidavit, *supra* note 319, ¶ 9. If the catheter is improperly administered into the muscle, the prisoner will experience a severe burning sensation, and the drugs will take longer to absorb than if they had been directly inserted into the bloodstream. Brunner Affidavit, *supra* note 222, ¶ 8E; Egbert Affidavit, *supra* note 319, ¶ 9.

[331] TROMBLEY, *supra* note 236, at 261; Finks, *supra* note 323, at 397; Haines, *supra* note 182, at 448. Cutdowns are typically unnecessary if a technician is experienced and uses modern equipment. Interview with Edward A. Brunner, M.D., Ph.D., Professor of Anesthesia, Northwestern University Medical School (Apr. 29, 1997).

[332] Brunner Affidavit, *supra* note 222, ¶ 8E (noting that the risk of strangulation could be prevented by denying the prisoner food six-to-eight hours before execution).

[333] Humane Soc'y of the U.S., *General Statement Regarding Euthanasia Method for Dogs and Cats*, SHELTER SENSE, Sept. 1994, at 11.

[334] *Id.* at 11–12.

[335] *See infra* app. 1, tbl.9.

[336] Sims v. State, 754 So. 2d 657, 667 n.19 (Fla. 2000) (quoting the expert testimony of Professor Michael Radelet).

[337] *See infra* app. 1, tbl.9 (describing the lethal injection botches of eleven Texas inmates: Charles Brooks, Jr., James D. Autry, Thomas Andy Barefoot, Stephen Peter Morin, Randy L. Woolls, Elliot Rod Johnson, Raymond Landry, Stephen McCoy, Billy Wayne White, Justin Lee May, and Ronald Allridge). Perhaps for this reason, in 1997, a Texas district court held an evidentiary hearing on the constitutionality of lethal injection. *Ex parte* Richardson, No. 81-CR-1545 (175th Dist. Ct., Bexar County, Tex. Oct. 1, 1997); *see also supra* note 309 (discussing the Texas hearing). This hearing was followed shortly by a hearing in Connecticut because the state had just adopted, but never used, the method. State v. Breton, No. CR4-147941 (Super. Ct. Conn. Nov. 14, 1997). Both the Connecticut and Texas courts upheld the constitutionality of lethal injection. *See supra* notes 306, 309 (discussing, respectively, the outcomes of the hearings in Connecticut and Texas).

[338] TROMBLEY, *supra* note 236, at 73 (noting that, "[i]n the final analysis, it looks disgusting" because the inmates "routinely choke, cough, spasm, and writhe as they die").

[339] *See infra* app. 1, tbl.9.

[340] Richardson, No. 81-CR-1545 (testimony of Deborah W. Denno).

[341] *Murderer of Three Women Is Executed in Texas*, N.Y. TIMES, Mar. 14, 1985, at A22 [hereinafter *Murderer of Three Women*].

[342] *See infra* app. 3 (Texas).

[343] *See infra* app. 1, tbl.9 (Randy Woolls (1986) and Elliot Rod Johnson (1987)).

[344] *See infra* app. 1, tbl.9. The Texas executions of Billy Wayne White in 1992 and Ronald Allridge in 1995 also were botched because technicians experienced difficulties locating suitable veins. *See infra* app. 1, tbl.9.

[345] *See infra* app. 1, tbl.9. Also, at the time lethal injection machines malfunctioned in the states that used them. By 1990, four states had purchased Leuchter-created lethal injection machines. Denno, *Electrocution*, *supra* note 1, at 627–28 (listing Delaware, Illinois, Missouri, and New Jersey). However, Leuchter had no technical or medical expertise for devising the different mixtures of chemicals he recommended. For example, when one of the first states that switched to lethal injection contacted Leuchter for advice on that method, he began to study pharmacology and chemistry. Based upon the results of studies conducted on pigs and rabbits, Leuchter calculated the dosages of sodium thiopental, pancuronium bromide, and potassium chloride required for the lethal injection of human beings. Thereafter, he created a computer-controlled machine for injecting prisoners without, he explained, rupturing their veins or inducing "undue discomfort." *Dr. Death and His Wonderful Machine*, N.Y. TIMES, Oct. 18, 1990, at A24.

[346] *See infra* app. 1, tbl.9 (Jose Martinez High).

[347] *See infra* app. 1, tbl.9 (Joseph High, Nov. 7, 2001).

[348] *See supra* notes 1, 25–31, 131–36, 183–203 and accompanying text.

[349] Council on Ethical and Jud. Affairs, AMA, Council Rep., *Physician Participation in Capital Punishment*, 270 JAMA 365, 365 (1993) [hereinafter Council on Ethical and Jud. Affairs] ("A physician, as a member of a profession dedicated to preserving life when there is hope of doing

se, should not be a participant in a legally authorized execution." (quoting Council on Ethical and Jud. Affairs, AMA, Code of Med. Ethics, Current Op., Op. 2.06 (1994))); BREACH OF TRUST, *supra* note 223, at xi. The Hippocratic Oath that physicians take rests on an intention to "do no harm." *Id.* at 39. *See generally* W. Noel Keyes, *The Choice of Participation by Physicians in Capital Punishment*, 22 WHITTIER L. REV. 809, 812 (2001) (discussing the AMA's stance against physician participation and the long history of doctor involvement in executions). Capital punishment also contradicts nursing philosophy although the American Association of Nurse Anesthetists has not taken a formal stance concerning the participation of certified nurse anesthetists in capital punishment cases. Ann E. Aprile, *Ethical Issues Involving Medical Personnel and the Administration of Lethal Injection in Capital Punishment Cases*, CRNA: THE CLINICAL FORUM FOR NURSE ANESTHETISTS, Aug. 1996, at 116–17.

350 Christina Michalos, *Medical Ethics and the Executing Process in the United States of America*, 16 J. MED. & L. 125, 126 (1997) (noting that with a lethal injection execution, "[m]edical knowledge is required to order the drugs, insert the catheter and connect the monitoring equipment").

351 James K. Boehnlein et al., *Medical Ethics, Cultural Values, and Physician Participation in Lethal Injection*, 23 BULL. AM. ACAD. PSYCHIATRY LAW 129, 130 (1995) ("Lethal injection is an example of the medicalization of a complex social issue, yet it is unique because in this instance physicians' skills and procedures are being used to carry out government mandates that contradict established medical practice (i.e., the taking of a human life)."); David J. Rothman, *Physicians and The Death Penalty*, 4 J.L. & POL'Y 151 (1995) (discussing the historical role of physicians in executions); James Welsh, *Execution by Lethal Injection*, 348 LANCET 63 (1996) (emphasizing how the growing use of lethal injection internationally is drawing physicians into further involvement with capital punishment and therefore raising serious ethical and human rights issues); James Welsh, *The Medicine That Kills*, 351 LANCET 441 (1998) (discussing a 1998 Amnesty International report detailing the problems with lethal injection and medical involvement in it).

352 *See, e.g.*, Ronald Bayer, *Lethal Injections and Capital Punishment: Medicine in the Service of the State*, 4 J. PRISON & JAIL HEALTH 7, 7–14 (1984) (discussing the controversy surrounding physician participation in lethal injections); Casscells & Curran, *supra* note 179, at 1532–33 (same); *see also* Neil Farber et al., *Physicians' Attitudes About Involvement in Lethal Injection for Capital Punishment*, 160 ARCHIVES OF INTERNAL MED. 2912, 2912 (2000) (reporting the results of a survey of 482 physicians and concluding that, regardless of the statements of medical societies, "the majority of physicians surveyed approved of most disallowed actions involving capital punishment, indicating that they believed it is acceptable in some circumstances for physicians to kill individuals against their wishes"); *supra* note 18; *infra* notes 363–66 and accompanying text (discussing other survey results).

353 Council on Ethical and Jud. Affairs, *supra* note 349, at 366–67. "The AMA guidelines . . . specify that selecting injection sites, starting intravenous lines, prescribing, preparing or administering injection drugs, and consulting with lethal injection personnel constitute physician participation in executions and are unethical." BREACH OF TRUST, *supra* note 223, at 20. The presence of a physician at a lethal injection execution was required by some state statutes such as Oklahoma's. OKLA. STAT. ANN. tit. 22, § 1014 (1996). However, this arrangement has changed for two reasons: (1) the AMA's pronouncement and physicians' complaints that states were turning executions into medical procedures, see Gorman et al., *supra* note 174, at 576; and (2) claims that physicians were blurring the line between their role as a healer and as a killer, see Fisher, *supra* note 215 (reporting that, in several states, doctors are present at executions, but do not administer the injections). As a result, states with lethal injection no longer require the services of a physician, except to pronounce death. *See generally* BREACH OF TRUST, *supra* note 223.

354 Denno, *Electrocution*, *supra* note 1, at 627–28 (listing Delaware, Illinois, Missouri, and New Jersey); *see supra* note 345 and accompanying text (discussing those states that apply Leuchter's machines).

355 Denno, *Electrocution*, *supra* note 1, at 664–62; *see supra* notes 234, 261, 345 and accompanying text (discussing some of the problems Leuchter has encountered).

356 *See infra* app. 3.

357 BREACH OF TRUST, *supra* note 223, at 18–20; *see infra* app. 3; *infra* notes 386–407 and accompanying text.

358 Aprile, *supra* note 349, at 116 (noting that the equipment loaning issue is in controversy). Some doctors have likened such involvement to the physician participation in the torture and murder of Nazi prisoners and concentration camp victims. Gorman et al., *supra* note 174, at 577.

359 Fred Leuchter claims that in lethal injection executions, doctors will knowingly watch prison personnel mix or inject chemicals incorrectly but not say anything because they do not want to get involved. TROMBLEY, *supra* note 236, at 74–77.

360 Aprile, *supra* note 349, at 116. Three doctors recently explained the problem:

> Lethal injection looks more like therapy than punishment. It involves a traditional and familiar therapeutic modality, intravenous general anesthesia, typically with Pentothal and a muscle relaxant. The only difference is that the "patient," once "put to sleep," is not recovered. By wrapping punishment in a therapeutic cloak, the whole process leading to that final moment feels less aversive to those who are required to participate and is therefore more bearable.

Gorman et al., *supra* note 174, at 576 (noting that lethal injection appears to be more humane and cheaper than electrocution).

361 According to one author, for example, physicians in such a situation could be viewed as reneging on their "contract with their patients." Aprile, *supra* note 349, at 117. Yet, others view the situation far differently.

> Even though lethal injection is 'medicalized' by society, there is no doctor-patient relationship and, consequently, no give and take between physician and patient. Yet even when there is no defined doctor-patient relationship, the doctor is using knowledge and skills attained during medical education and is thus recognized by society as possessing and using those specific skills that are normally used to sustain and enhance life.

Boehnlein et al., *supra* note 351, at 132.

362 Aprile, *supra* note 349, at 117 (questioning whether "dignity in death and dying [are] denied as a personal right for the death-row inmate?"). *But see supra* note 351 and accompanying text (offering counter arguments).

363 This participation was thoroughly documented in BREACH OF TRUST, a report on physician participation in executions throughout the United States. *See* BREACH OF TRUST, *supra* note 223; *see also* Boehnlein et al., *supra* note 351, at 130; Farber et al., *supra* note 17, at 886; Farber et al., *supra* note 352, at 2912.

> As of 1991, Oklahoma required physicians to order the drugs used in the lethal injection, pronounce the prisoner dead, and inspect the intravenous line started by a technician to ensure its proper function. Physicians have been required to perform cutdowns on prisoners when adequate veins could not be found. As recently as 1997, twenty-three states required physicians to determine or pronounce death, and Illinois has passed statutes specifically to allow physicians to give lethal drugs for the purposes of capital punishment. Moreover, physicians are participating via indirect means such as providing technical advice, ordering drugs, supervising drug administration, or pronouncing death. A total of twenty-seven states require or permit physicians to be involved in some way in the process of capital punishment.

Farber et al., *supra* note 352, at 2912–13.

364 Emanuel & Bienen, *supra* note 19, at 922 (citing Robert D. Trogg & Troyen A. Brennan, *Participation of Physicians in Capital Punishment*, 329 NEW ENG. J. MED. 1346, 1346–50 (1993)).

365 Farber et al., *supra* note 17, at 886.

366 *Id.*; *see also* Farber et al., *supra* note 352, at 2912 (noting that in a recent survey of physicians, more than half approved of most disallowed medical actions involving capital punishment).

367 *See generally* DONALD A. CABANA, DEATH AT MIDNIGHT: THE CONFESSION OF AN EXECUTIONER (1996) (detailing former prison warden Cabana's account of the prison system and his personal problems with the administration of the death penalty); ROBERT JOHNSON, DEATH WORK: A STUDY OF THE MODERN EXECUTION PROCESS (1990) (exploring the details of the execution process from the perspectives of the death row prisoners, their guards, and the executioners).

368 *See infra* app. 1, tbls. 19–20.

369 *See infra* app. 3 (Nevada, Pennsylvania, South Carolina, and Virginia).

370 DEATH PENALTY INFO. CTR., STATE EXECUTIONS, *at* http://www.deathpenaltyinfo.org/ dpicreg.html (last updated on Feb. 19, 2002).

371 *See infra* app. 3 (Kansas, Kentucky, and New Hampshire).

372 DEATH PENALTY INFO. CTR., STATE BY STATE DEATH PENALTY INFO., *at* http:// www.deathpenaltyinfo.org/firstpage.html (indicating that Kansas and New Hampshire have had no executions since 1976) (last updated on Feb. 1, 2001).

373 DEATH PENALTY INFO. CTR., *supra* note 370, *at* http://www.deathpenaltyinfo.org/ dpicreg.html (last updated on Feb. 19, 2002); TRACY L. SNELL, BUREAU OF JUSTICE STATISTICS BULLETIN, CAPITAL PUNISHMENT 1999 at 10 tbl.10 (2000).

374 Virginia also mentions the use of saline, although prison officials will not specify the lethal injection chemicals. *See infra* app. 1, tbl.11.

375 *See infra* app. 1, tbl.17. The New York protocol, for example, states the following:

> 1. CAUTION: If all of the sodium pentothal has not been flushed from the line, mixture with the pavulon may create flocculation (solid particles) to block the flow of the liquid through the angiocath. If blockage occurs, the remaining injections must be made in the contingency line running to the alternate site.

*See infra* app. 3 (New York).

376 *See infra* notes 377–78 and accompanying text.

377 *See supra* notes 21, 230, 241–42, 258, 261, 318–21; *infra* note 435 and accompanying text.

378 Donald Janson, *Prisoners' Appeals Delay Jersey Executions*, N.Y. TIMES, March 9, 1986, at 42 ("The New Jersey law mandates death by successive injections of thiopental sodium, to render the person unconscious, pancuronium bromide to stop his breathing, and potassium chloride to end his heartbeat."); Michael Norman, *Site of Executions Ready in Trenton*, N.Y. TIMES, Aug. 21, 1983, at 43 (referring to syringes "filled with three drugs: thiopental sodium, a fast-acting barbiturate that causes unconsciousness; pancuronium bromide, a muscle relaxant that can induce respiratory failure, and potassium chloride, a salt compound that produces an abnormal heart rhythm and heart failure"); Meg Nugent, *Death Chamber Renovations Nearly Done—Corrections Chief Sorts Through Final Details for Execution of Martini*, STAR-LEDGER (Newark, N.J.), July 30, 1999, at 21 ("[Commissioner] Terhune said he wasn't prepared yesterday to release details on what drugs will be used, saying the decision had not yet been finalized. But he said one would serve as a relaxant while the other two would stop the heart and breathing."); Steve Strunsky, *N.J. Law; Death, After 36 Years, Is Back on Death Row*, N.Y. TIMES, Aug. 8, 1999, § 14, at 5 (describing a "cocktail of three drugs—a sedative and drugs to arrest Mr. Martini's heartbeat and breathing—that will kill Mr. Martini"); Joseph L. Zentner, *We Cannot Sanitize Execution*, THE RECORD (Bergen, N.J), Oct. 27, 1985, at 1 ("Two technicians stand behind stainless-steel trays. One tray holds syringes filled with saline; the other holds the 'hot' syringes, which are filled with: thiopental sodium, a fast-acting barbiturate that produces unconsciousness; pancuronium bromide, a muscle relaxant that causes respiratory failure; and potassium chloride, a salt compound that induces heart failure.").

379 *See infra* app. 1, tbls. 13–14.

380 *See infra* app. 1, tbl.15.

381 *But see* Egbert, *supra* note 206, at 16.

382 *See infra* app. 3 (Mississippi).

383 States with the highest number of lethal injection executions, from 1977–1999, rank as follows: Texas (199), Virginia (48), Missouri (41), Arkansas (20), Oklahoma (19), South Carolina (19), Arizona (17), North Carolina (13), Illinois (12), Delaware (9), Nevada (7), California (5), and Louisiana (5). SNELL, *supra* note 373, at 16 app. tbl.4.

384 SNELL, *supra* note 373, at 16 app. tbl.4.

385 *See supra* note 378 and accompanying text.

386 The fourteen states are: Arizona, Connecticut, Illinois, Louisiana, Montana, New Jersey, New Mexico, New York, Ohio, Oregon, Pennsylvania, Texas, Utah, and Washington. *See infra* app. 1, tbl.17.

387 *See infra* app. 1, tbl.17.

388 The eight states are: California, Colorado, Connecticut, Delaware, Georgia, Idaho, North Carolina, and Ohio. *See infra* app. 1, tbl.17.

389 The five states are: Florida, Maryland, Montana, New Jersey, and New Mexico. *See infra* app. 1, tbl.17.

390 The five states are: Arizona, Indiana, Mississippi, Oklahoma, and Utah. *See infra* app. 1, tbl.17.

391 *See* app. 1, tbl.17.

392 The eight states are: Kansas, Kentucky, Missouri, Nevada, New Hampshire, South Carolina, South Dakota, and Tennessee. *See infra* app. 1, tbl.17.

393 These seventeen states are: Delaware, Kansas, Kentucky, Louisiana, Maryland, Missouri, Nevada, New Hampshire, North Carolina, Oklahoma, South Carolina, South Dakota, Texas, Utah, Virginia, Washington, and Wyoming. *See infra* app. 1, tbl.17.

394 *See infra* app.1, tbl.17.

395 These eight states are: Arizona, Arkansas, Delaware, Illinois, Kansas, Maryland, Montana, and Utah. *See infra* app. 1, tbl.17.

396 The seven additional states are: Kentucky, Nevada, New Hampshire, Oklahoma, Pennsylvania, South Carolina, and Virginia. *See supra* note 395 for the other eight states.

397 These thirteen states are: California, Connecticut, Florida, Georgia, Indiana, Mississippi, New Hampshire, New Jersey, New Mexico, New York, Ohio, Oregon ("a medical professional"), and Washington. *See infra* app. 1, tbl.17.

398 These five states are: Colorado, Idaho, Louisiana, Montana, and Pennsylvania. *See infra* app. 1, tbl.17.

399 The single state is North Carolina. *See infra* app. 1, tbl.17.

400 *See infra* app. 1, tbl.17.

401 *See infra* app. 1, tbl.17.

402 *See infra* app. 1, tbl.16.

403 Brunner Affidavit, *supra* note 222, ¶ 8E (noting that the risk of strangulation could be prevented by denying the prisoner food six-to-eight hours before execution); *see supra* note 332 and accompanying text.

404 The six states are: Indiana, New Jersey, Ohio, Oregon, Texas, and Virginia. *See infra* app. 1, tbl.16.

405 *See infra* app. 1, tbl.16.

406 *See supra* note 383 and accompanying text.

407 *See supra* notes 294–313 and accompanying text.

408 *See infra* app. 1, tbl.18.

409 These four states are: Kansas, Kentucky, New Hampshire, and Pennsylvania. *See infra* app. 1, tbl.18; *see also infra* note 410 and accompanying text for the other three states.

410 The two states that omit any mention of general witnesses are Arizona and Nevada. *See infra* app. 1, tbl.18.

411 These eight states are: Arkansas, Florida, Idaho, Illinois, Indiana, Maryland, Missouri, and Wyoming. *See infra* app. 1, tbl.18.

412 *See supra* notes 294–313 and accompanying text (discussing all the stages of the litigation).

413 *See supra* notes 312–13 and accompanying text.

414 Denno, *Getting to Death, supra* note 1, at 439–64; *see also supra* notes 142, 152–54, 165–69, 210; *infra* notes 424–25 and accompanying text.

415 Denno, *Getting to Death, supra* note 1, at 388–98; *see also supra* notes 6, 9, 32–38, 57, 150–51, 171, 203–04 and accompanying text. Kentucky is a classic example of how a state legislature's decision to switch from electrocution to lethal injection sparked a debate about the acceptability of the death penalty itself. Michael Collins, *Bill Replaces Electrocution with Lethal Injection*, CIN. POST, Jan. 9, 1998, at 5K; Tom Loftus, *1998 Kentucky General Assembly; House Backs Execution by Injection*, COURIER-JOURNAL (Louisville, Ky.), Jan. 15, 1998, at 1B.

416 *See supra* notes 109–36 and accompanying text; *infra* app. 1, tbls.1–6.

417 *See infra* app. 1, tbl.8.

40 of 41

418 *Condemned Man's Mask Bursts Into Flame During Execution*, N.Y. TIMES, Mar. 26, 1997, at B9 [hereinafter *Condemned Man's Mask*].

419 *Id.*

420 *See generally* Denno, *Getting to Death*, *supra* note 1, at 391–98; Denno, *Electrocution*, *supra* note 1; *supra* notes 2–3 and accompanying text.

421 *Man Executed for 1986 Murder*, AUSTIN AMERICAN-STATESMAN, June 21, 1995, at B5.

422 Callins v. Collins, 510 U.S. 1141, 1143 (1994) (Scalia, J., concurring).

423 *Id.*

424 *See supra* notes 139–40 and accompanying text.

425 *See supra* note 141; *infra* note 440 and accompanying text.

426 *See supra* notes 10, 37–38, 171, 180–81 and accompanying text.

427 The protocol for a federal lethal injection consists of three ten-second injections into the saline running through the intravenous tube. The injections are one minute apart. The three drugs used in the lethal injection are sodium thiopental, pancuronium bromide, and potassium chloride. When all goes as planned, death takes less than two minutes after the final injection. The entire execution takes about four and a half minutes. Murray, *supra* note 205; Lois Romano, *McVeigh is Executed*, WASH. POST, June 12, 2001, at A13.

428 At 7:10 a.m. EDT, the first chemical was injected into the intravenous line in McVeigh's right leg, which was not visible to the witnesses. Romano, *supra* note 427. The next drug was administered at 7:11, and at 7:14 McVeigh was dead. *Witnesses Describe McVeigh's Last Moments*, CNN.COM LAWCENTER, (June 11, 2001), *at* http://www.cnn.com/2001/LAW/06/11/ mcveigh.witnesses/ [hereinafter *Witnesses Describe McVeigh's Last Moments*]. In total, the execution was four minutes long. Romano, *supra* note 427.

429 Pam Belluck, *The Scene: Calm at Execution Site and Silence by McVeigh Prove Unsettling for Some*, N.Y. TIMES, June 12, 2001, at A27.

430 *Id.*

431 *Witnesses Describe McVeigh's Last Moments*, *supra* note 428, *at* http://www.cnn.com/ 2001/LAW/06/11/mcveigh.witnesses; *see also* Romano, *supra* note 427. Most witnesses reported that McVeigh's eyes blinked a few times and then very slowly started to move back in his head. Rick Bragg, *McVeigh Dies for Oklahoma City Blast*, N.Y. TIMES, June 12, 2001, at A1; *see also* Paul Duggan, *Too Easy For Him: For Witnesses in Oklahoma, A Long Day Brought Little Relief*, WASH. POST, June 12, 2001, at A1; Alex Rodriguez, *U.S. Executes its Worst Terrorist*, CHI. TRIB., June 12, 2001, at A17; *Witnesses Describe McVeigh's Last Moments*, *supra* note 428, *at* http://www.cnn.com/ 2001/LAW/06/11/mcveigh.witnesses. Others observed McVeigh blow air out of his mouth twice before his eyes rolled back. Bragg, *supra*; *see also* Duggan, *supra*; Rodriguez, *supra*. These accounts agree that the death seemed peaceful.

432 Caryn James, *The Coverage: The Oklahoma Bomber's Final Hours Are Hardly Television News's Finest*, N.Y. TIMES, June 12, 2001, at A26. Several witnesses observed McVeigh's eyes turning glassy. Bragg, *supra* note 431.

433 James, *supra* note 432; *see also* Bragg, *supra* note 431; Romano, *supra* note 427. Another victim witness observed a momentary lapse in McVeigh's otherwise blank expression—as the sedative took hold, McVeigh apparently clenched his mouth as if "he was trying to fight the sleep." Bragg, *supra* note 431. Another witness account also recalls McVeigh's pursed lips and a tight jaw. Romano, *supra* note 427.

434 Romano, *supra* note 427.

435 Telephone Interview with Edward Brunner, M.D., Ph.D., Professor of Anesthesiology, Northwestern University Medical School (Aug. 6, 2001); *see also* Bruce Shapiro, *Dead Man Waking*, TALK MAG., Oct. 2001, at 86 (discussing the observations of Mark Heath, an anesthesiologist and neuroscientist at Columbia Presbyterian Medical Center, stating that McVeigh's tear was "a classic sign of an anesthetized patient being awake").

436 *20/20 Friday: An Eye for an Eye, A Life for a Life; The Prosecutor; Joseph Hartzler Discusses Prosecuting Timothy McVeigh* (ABC television broadcast, May 4, 2001); *20/20 Friday: An Eye for an Eye, A Life for a Life; The Victims; Victims and Relatives Share Views on McVeigh's Execution* (ABC television broadcast, May 4, 2001).

437 Murray, *supra* note 205; *20/20 Friday: An Eye for an Eye, A Life for a Life; The Death House; Warden Burl Cain Describes Death by Lethal Injection* (ABC television broadcast, May 4, 2001).

438 Murray, *supra* note 205.

439 *20/20 Friday: An Eye for an Eye, A Life for a Life; The Executioners; Executions Take High Toll on People Who Perform Them* (ABC television broadcast, May 4, 2001).

440 *See supra* notes 165–69, 367 and accompanying text.

441 FOUCAULT, DISCIPLINE AND PUNISH, *supra* note 2, at 9.

R E C E I V E D
TUCSON

JUL 2 4 2006

CRIMINAL APPEALS
AZ. ATTORNEY GENERAL

R E C E I V E D

JUL 1 8 2006

CRIMINAL APPEALS
ATTORNEY GENERAL
PHOENIX, AZ

# EXHIBIT B

# ARIZONA SUPREME COURT

STATE OF ARIZONA,

             APPELLEE,

   –vs–

WENDI ELIZABETH ANDRIANO,

             APPELLANT.

CR–05-0005-AP

MARICOPA COUNTY
SUPERIOR COURT
NO. CR–2000-096032

### APPELLEE'S ANSWERING BRIEF

TERRY GODDARD
ATTORNEY GENERAL
(FIRM STATE BAR NO. 14000)

KENT E. CATTANI
CHIEF COUNSEL
CAPITAL LITIGATION SECTION

ROBERT J. GORMAN
ASSISTANT ATTORNEY GENERAL
CAPITAL LITIGATION SECTION
400 W. CONGRESS, S–315
TUCSON, ARIZONA  85701–1367
TELEPHONE: (520) 628–6520
(STATE BAR NUMBER 012728)

ATTORNEYS FOR APPELLEE

## QUESTIONS PRESENTED FOR REVIEW

1. Whether the trial court properly admitted evidence of Defendant's attempts to get life insurance on her husband and of her extramarital affairs.

2. Whether the trial court was correct in not *sua sponte* instructing on the lesser included offenses of second degree murder and manslaughter when the evidence did not support such instructions.

3. Whether the especially cruel aggravator set out in A.R.S. § 13-703(F)(6) is unconstitutionally vague.

4. Whether the trial court instruction properly defined "cruelty" so as to constitutionally channel the jury's sentencing discretion.

5. Whether the evidence presented at trial supported the jury's finding that the murder was especially cruel.

6. Whether the trial court's refusal to allow Defendant to present evidence of "residual doubt" at sentencing was unconstitutional.

7. Whether the trial court's instruction which partially defined mitigation in terms of "mercy" was constitutionally accurate.

8. Whether the trial court properly instructed the jury when it told them that each juror had to determine individually what constituted mitigation.

9. Whether the trial court act properly when it gave the approved "impasse" instruction.

10. Whether the trial court properly instructed the jurors concerning their duty to deliberate.

11. Whether Arizona's statute on lethal injection is unconstitutionally vague and whether lethal injection constitutes cruel and unusual punishment.

i

# TABLE OF CONTENTS

                                                                    PAGE

QUESTIONS PRESENTED FOR REVIEW . . . . . . . . . . . . . . . . . . . . . . . . .    i

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   iii

STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    1

ARGUMENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   17

I

  THE EVIDENCE OF DEFENDANT'S AFFAIRS AND HER ATTEMPTS
  TO OBTAIN LIFE INSURANCE ON HER HUSBAND WERE
  ADMISSIBLE UNDER MULTIPLE EVIDENTIARY THEORIES . . . . . . . . .   17

II

  NO RATIONAL JUROR COULD HAVE FOUND THIS MURDER OTHER
  THAN PREMEDITATED HENCE THE TRIAL COURT WAS CORRECT
  IN NOT "SUA SPONTE" INSTRUCTING ON ANY LESSER INCLUDED
  OFFENSES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   37

III, IV and V

  DEFENDANT'S CLAIM THAT THE § 13-703(F)(6) "CRUEL"
  AGGRAVATING CIRCUMSTANCE IS UNCONSTITUTIONALLY
  VAGUE HAS BEEN REJECTED BY THIS COURT AND THE U.S.
  SUPREME COURT; THE F(6) JURY INSTRUCTION GIVEN WAS A
  CORRECT STATEMENT OF THE LAW, AND THE EVIDENCE
  SUPPORTED THE JURY'S FINDING THAT THE MURDER WAS CRUEL
  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   43

VI

  NEITHER THIS COURT NOR THE UNITED STATES SUPREME COURT
  HAS EVER RECOGNIZED A RIGHT TO PRESENT EVIDENCE OF
  "RESIDUAL DOUBT" AT THE PENALTY PHASE AND DEFENDANT
  RESPONDED TO THE STATE'S MOTION TO EXCLUDE SUCH
  EVIDENCE BY STATING "RESIDUAL DOUBT IS NOT RELEVANT IN
  THIS CASE." . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   53

VII

    DEFENDANT ERRONEOUSLY ARGUES THAT THE TRIAL COURT
"REFUSED TO INCLUDE MERCY AS A MITIGATING FACTOR FOR
THE JURY TO CONSIDER" WHEN THE JUDGE ACTUALLY DEFINED
MITIGATING CIRCUMSTANCES IN TERMS OF MERCY . . . . . . . . . . . . 56

VIII

    DEFENDANT'S CLAIM THAT THE PENALTY-PHASE INSTRUCTIONS
REQUIRED JURORS TO AGREE UNANIMOUSLY ON THE EXISTENCE
OF MITIGATING CIRCUMSTANCES IS BASED ON ONE SMALL PART
OF THE COMPREHENSIVE MITIGATION INSTRUCTION ACTUALLY
GIVEN TAKEN OUT OF CONTEXT . . . . . . . . . . . . . . . . . . . . . . . . . 60

IX and X

    THE COURT DID NOT COERCE NOR INCORRECTLY INSTRUCT THE
JURORS WHEN IT GAVE THE APPROVED IMPASSE INSTRUCTION
WHEN THE JURY ASKED WHAT PROCEDURE WAS TO BE USED IF
THEY WERE UNABLE TO REACH A UNANIMOUS VERDICT . . . . . . . . 65

XI

    ARIZONA'S   SENTENCING   STATUTES   ARE   NOT
UNCONSTITUTIONALLY VAGUE AND LETHAL INJECTION IS NOT
UNCONSTITUTIONAL CRUEL AND UNUSUAL PUNISHMENT . . . . . . . . 72

XII . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 75

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 76

CERTIFICATE OF COMPLIANCE . . . . . . . . . . . . . . . . . . . . . . . . . . . 78

# TABLE OF AUTHORITIES

CASES                                                                      PAGE

Beck v. Alabama, 447 U.S. 625 (1980) . . . . . . . . . . . . . . . . . . . . . . . . . 37-38

Brown v. Commonwealth, 348 S.E.2d 849 (Va. App. 1986) . . . . . . . . . . . . . 18, 20

Buchanan v. Angelone, 522 U.S. 269 (1998) . . . . . . . . . . . . . . . . . . . . . 55

Camm v. State, 812 N.E.2d 1127 (Ind. App. 2004) . . . . . . . . . . . . . . . . 19-20

Chumbler v. Commonwealth., 905 S.W.2d 488 (Ky. 1995) . . . . . . . . . . 20, 36

Commonwealth v. De Marco, 830 N.E.2d 1068 (Mass. 2005) . . . . . . . . . . . . . . . . . 19

Commonwealth v. Littlejohn, 250 A.2d 811 (Pa. 1969) . . . . . . . . . . . . . . . 20

Cooper v. Rimmer, 379 F.3d 1029 (9th Cir. 2004) . . . . . . . . . . . . . . . . 73-74

Eddings v. Oklahoma, 455 U.S. 104 (1982) . . . . . . . . . . . . . . . . . . . . . 70

Faircloth v. State, 316 S.E.2d 457 (Ga. 1984) . . . . . . . . . . . . . . . . . . 20, 36

Felder v. Johnson, 180 F.3d 206 (5th Cir. 1999) . . . . . . . . . . . . . . . . . . 73

Franklin v. Lynaugh, 487 U.S. 164 (1988) . . . . . . . . . . . . . . . . . . . . . 54, 59

Givens v. State, 546 S.E.2d 509 (Ga. 2001) . . . . . . . . . . . . . . . . . . . 17, 19

Graham v. Collins, 506 U.S. 461 (1993) . . . . . . . . . . . . . . . . . . . . . . . 59

Hill v. McDonough, __U.S.__, 126 S. Ct. 2096 (2006) . . . . . . . . . . . . . 74

Howell v. Mississippi, 543 U.S. 440 (2005) . . . . . . . . . . . . . . . . . . . . . 39

Hunt v. Nuth, 57 F.3d 1327 (4th Cir. 1995) . . . . . . . . . . . . . . . . . . . . 73

Kansas v. Marsh, __ U.S. __, 126 S. Ct. 2516 (2006) . . . . . . . . . . . . . . 57-59

LaGrand v. Stewart, 133 F.3d 1253 (9th Cir. 1998) . . . . . . . . . . . . . . . 73-74

Lewis v. Jeffers, 497 U.S. 764 (1990) . . . . . . . . . . . . . . . . . . . . . . . . 44, 49

Lockett v. Ohio, 438 U.S. 586 (1978) . . . . . . . . . . . . . . . . . . . . . . . . . 70

Lowenfield v. Phelps, 484 U.S. 231 (1988) . . . . . . . . . . . . . . . . . . . . . 65, 72

Mills v. Maryland, 486 U.S. 367 (1988) . . . . . . . . . . . . . . . . . . . . . . . 60, 70

Oregon v. Guzek, __ U.S. __, 126 S. Ct. 1226 (2006) . . . . . . . . . . . . . . 54

People v. Branion, 265 N.E.2d 1 (Ill. 1970) . . . . . . . . . . . . . . . . . . . . 20, 36

People v. Ciervo, 123 A.D.2d 393 (N.Y. 1986) . . . . . . . . . . . . . . . . . . . 18

iv

People v. Houston, 29 Cal. Rptr.3d 818 (2005) . . . . . . . . . . . . . . . . . . . . . . . 19

People v. Pobliner, 298 N.E.2d 637 (N.Y. 1973) . . . . . . . . . . . . . . . . . . . . . 20

Ring v. Arizona, 536 U.S. 584 (2002) . . . . . . . . . . . . . . . . . . . . . 44

Romero v. People, 460 P.2d 784 (Colo. 1969) . . . . . . . . . . . . . . . . . . . 20, 36

Skipper v. South Carolina, 476 U.S. 1 (1986) . . . . . . . . . . . . . . . . . . 70

Springer v. Commonwealth, 998 S.W.2d 439 (Ky. 1999) . . . . . . . . . . . . . . . 18

State ex rel. Thomas v. Granville, 211 Ariz. 468, 123 P.3d 662 (2005) . . . . . . . . . . . . . 70

State v. Anderson, 210 Ariz. 327, 111 P.3d 369 (2005) . . . . . . . . . . . . . . . . 44, 47, 54

State v. Bolton, 182 Ariz. 290, 896 P.2d 830 (1995) . . . . . . . . . . . . . . . . . . . . 60

State v. Clabourne, 194 Ariz. 379, 983 P.2d 748 (1999) . . . . . . . . . . . . . . . 48

State v. Detrich, 178 Ariz. 380, 873 P.2d 1302 (1994) . . . . . . . . . . . . . . . . . 40

State v. Dickens, 187 Ariz. 1, 926 P.2d 468 (1996) . . . . . . . . . . . . . . . . 18-19

State v. Djerf, 191 Ariz. 583, 959 P.2d 1274 (1998) . . . . . . . . . . . . . . . . . . . 44

State v. Ellison, 213 Ariz. 116, 140 P.3d 899 (2006) . . . . . . . . . . . . . . . . 54, 63

State v. Flood, 301 So.2d 637 (La. 1974) . . . . . . . . . . . . . . . . . . . . 20

State v. Gomez, 211 Ariz. 494, 123 P.3d 1131 (2005) . . . . . . . . . . . . . . . . . 38

State v. Hinchey, 181 Ariz. 307, 890 P.2d 602 (1995) . . . . . . . . . . . . . . . . . 73

State v. Huerstal, 206 Ariz. 93, 75 P.3d 698 (2003) . . . . . . . . . . . . . . 65, 68-69

State v. Hull, 556 A.2d 154 (Conn. 1989) . . . . . . . . . . . . . . . . . . . . . 20, 36

State v. Johnson, 212 Ariz. 425, 133 P.3d 735 (2006) . . . . . . . . . . . . . . . . . 44, 55

State v. Jones, 205 Ariz. 445, 72 P.3d 1264 (2003) . . . . . . . . . . . . . . . . . . 46

State v. Kiles, 175 Ariz. 358, 857 P.2d 1212 (1993) . . . . . . . . . . . . . . . . . 48

State v. Kurtz, 564, S.W.2d 856 (Mo. 1978) . . . . . . . . . . . . . . . . . . 19

State v. McGill, 213 Ariz. 147, 140 P.3d 930 (2006) . . . . . . . . . . . . . . . . . 46, 73

State v. Montano, 206 Ariz. 296, 77 P.3d 1246 (2003) . . . . . . . . . . . . . . . . . 47

State v. Moody, 208 Ariz. 424, 94 P.3d 1119 (2004) . . . . . . . . . . . . . . . . . . 47

State v. Newell, 212 Ariz. 389, 132 P.2d 833 (2006) . . . . . . . . . . . . . . . . . 47

State v. Nordstrom, 200 Ariz. 229, 25 P.3d 717 (2001) . . . . . . . . . . . . . . . 19, 38

State v. Orendain, 188 Ariz. 54, 932 P.2d 1325 (1997) . . . . . . . . . . . . . . . . 57, 60

State v. Rienhardt, 190 Ariz. 579, 951, P.2d 454 (1997) . . . . . . . . . . . . . . . . . . . . . . 1

State v. Rhodes, 627 N.W.2d 74 (Minn. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . 20

State v. Roque, 213 Ariz. 193, 141 P.3d 368 (2006) . . . . . . . . . . . . . . . . . . . . . . 60

State v. Sabala, 189 Ariz. 416, 943 P.2d 776 (App. 1997) . . . . . . . . . . . . . . . . . . . 69

State v. Salazar, 173 Ariz. 399, 844 P.2d 566 (1992) . . . . . . . . . . . . . . . . . . . . . . 49

State v. Taylor, 673 P.2d 1140 (Kan. 1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

State v. Trostle, 191 Ariz. 4, 951 P.2d 869 (1997) . . . . . . . . . . . . . . . . . . . . . . . 45

State v. Van Adams, 194 Ariz. 408, 984 P.2d 16 (1999) . . . . . . . . . . . . . . . . . 17, 73

State v. Wagner, 194 Ariz. 310, 982 P.2d 270 (1999) . . . . . . . . . . . . . . . . . . . 72-73

State v. Walden, 183 Ariz. 595, 905 P.2d 974 (1995) . . . . . . . . . . . . . . . . . . . . . 75

State v. Wall, 212 Ariz. 1, 126 P.3d 148 (2006) . . . . . . . . . . . . . . . . . . . . . . . . 39

United States v. Batchelder, 442 U.S. 114 (1979) . . . . . . . . . . . . . . . . . . . . . . . 73

United States v. Coleman, 78 F.3d 154 (5th Cir. 1996) . . . . . . . . . . . . . . . . . . . . 18

United States v. Forcelle, 86 F.3d 838 (8th Cir. 1996) . . . . . . . . . . . . . . . . . . . . 18

United States v. Johnson, 463 F.3d 803 (8th Cir. 2006) . . . . . . . . . . . . . . . 18-19, 32

Vickers v. Stewart, 144 F.3d 613 (9th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . 73

Walton v. Arizona, 497 U.S. 639 (1990) . . . . . . . . . . . . . . . . . . . . 44-45, 48-49

Weeks v. Angelone, 528 U.S. 225 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . 57,59

Zant v. Stephens, 462 U.S. 862 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

STATUTES

42 U.S.C. § 1983 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 74

A.R.S. § 13–703(F)(6) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

A.R.S. § 13–703.01(E) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

A.R.S. § 13–703.01(H) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38, 54

A.R.S. § 13–1103 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

A.R.S. § 13–1104 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

A.R.S. § 13–1105 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

A.R.S. § 13–4031 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

A.R.S. § 13–4033(A) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

RULES

Rule 22.4, Ariz. R. Crim. P. . . . . . . . . . . . . . . . . . . . . . . . . . . . 67, 69

Rule 105, Ariz. R. Evid. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

Rule 403, Ariz. R. Evid. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20-21

Rule 404(b), Ariz. R. Evid. . . . . . . . . . . . . . . . . . . . . . . . . . . . 19-20

## STATEMENT OF FACTS

This Court views the evidence in the light most favorable to sustaining the verdict and resolves all reasonable inferences against the defendant. *State v. Rienhardt,* 190 Ariz. 579, 589-90, 951 P.2d 454, 464-65 (1997).

### A. Overview of the Evidence.

Factually this is an extremely convoluted case but legally it is straightforward. The prosecution presented overwhelming evidence that throughout the summer and early fall of the year 2000 Defendant carried out an intricate and thoroughly premeditated plan to murder Joe Andriano ("Joe") her cancer-stricken husband.

On June 15, 2000, an oncologist told Joe and Defendant that when the cancer in his lungs finally killed him he would basically suffocate to death—and that possibly his chemotherapy could cause heart failure. (R.T. 9/28/04, at 14-15, 21-22.) During July, August, and September of the year 2000, Defendant went to extraordinary lengths to carry out her murderous plan. She searched the internet for a poison that would mimic death either by suffocation or a heart attack. She set up a phoney e-mail account under an assumed name to communicate with a chemical company that sold the poison. She e-mailed the chemical company false information claiming to represent a legitimate agricultural firm that would use the poison for rodent control. She forged a business license and bought a money order under an assumed name—in order to purchase the poison anonymously.

On August 10, 2000, Defendant confided to Donna DeAngelis, her hairdresser, that she wished her cancer–stricken husband would die:

1

> "I wish he [husband Joe] were already dead so I could
> move on with my life."

(R.T. 9/20/04, at 74-75, 80, 82.)   Defendant related that she was interested in another man who lived in the same apartment complex but that he was "hesitant" because she was married. *Id.* She was referring to a six-month-long affair she had with a man named Rick Freeland. (R.T. 9/13/04, at 23-27; R.T. 9/15/04, at 39.) In July of 2000 Freeland learned that Defendant was married and tried to break off the affair, but she was persistent, for weeks afterwards she would yell and pound on his apartment door—sometimes for an hour at a time—demanding to be let in. *Id.* E-mail records showed that in late September, two weeks before the murder, she and Freeland were communicating again, and agreeing to meet for drinks. (R.T. 9/13/04, at 28-29.)

   Defendant also made several fraudulent attempts to buy life insurance on Joe during the same period she was trying to obtain the poison, July through September of 2000. ((R.T. 9/28/04, at 89-90;  R.T. 9/27/04, at 71-79, 119-123; Exhibit 213.)  She asked two different men to impersonate her husband and take life insurance physical exams in his stead.  She explained that Joe was "worth more dead than alive."  After Joe died the value of the malpractice suit against the doctors who had misdiagnosed his cancer would grow tremendously—to as much

2

as twenty million dollars.  However, Defendant said she would need the insurance proceeds to carry her through until the malpractice case settled.  Both men refused, but Defendant made at least three other attempts to fill out phoney life insurance applications via the internet.  (R.T. 9/15/04, at 119-120; R.T. 9/16/04, at 122-24.)

On October 5, 2000, Defendant picked up the box of poison using a false name and left it overnight in her office at work.  Two co-workers asked about the box the next morning.  While Defendant was on the phone with a new boyfriend,  she smiled broadly and said:

"It's a present for a friend."

(R.T. 9/8/04, at 68: R.T. 9/15/04, at 45.)

Thirty -six- hours later Joe was dead.  Defendant had placed the poison in his food.  When it incapacitated and sickened him terribly—but did not kill him as fast as she had planned—she savagely beat him over the head with a bar stool; then she cut his throat—all the way down to the spinal column.

The defense in this case was unusual.  Defendant claimed to be a battered spouse who obtained the poison because Joe wanted to commit suicide.  Why someone who was planning to kill himself should simultaneously put himself through painful chemotherapy, which could only prolong but not save his life, was never explained.  Defendant claimed that after Joe voluntarily took the poison he

3

became "sick" and had her call the paramedics.  Then, he felt "better" and asked her to send the paramedics away—so he could die in peace.  Then, to be "honest," Defendant told Joe that she had used his missing condom with a man she had recently met at a bar.  Enraged, Joe attacked her.  She then beat him with a barstool in self-defense.  Joe then stabbed himself in the neck—trying to commit suicide once more—as Defendant unsuccessfully tried to pull the blade away. (R.T. 10/28/04, at 26-63.)

## B. Detailed Chronology.

Because Defendant took so many convoluted and surreptitious measures over the course of an entire summer to execute her plan to murder Joe, the following detailed chronology of events may be more helpful to the Court than a standard statement of facts.

Joe Andriano could not work because he was dying from cancer—adenoid cystic carcinoma.  In 1994, shortly after his marriage to Defendant, Joe developed a lump on the left side of his neck; he had it surgically removed, and a local pathologist determined that the tumor was benign.  The tumor grew back in 1995. Joe had it removed, and again the biopsy showed it benign.  The same thing happened again in 1997; the tumor recurred; Joe had surgery, and a local pathologist found it to be non-cancerous.  Joe had a fourth biopsy in 1998; samples

4

from all four biopsies were sent to Walter Reed Medical Center, and all four came back positive for cancer. Amazingly, the three earlier biopsies had been bungled, and by now Joe's cancer had metastasized into his lungs. He had a fourth, radical surgery at the Mayo Clinic, where a significant portion of his shoulder, face and neck were removed in hope of delaying things, but the cancer had gotten well-established in his lungs, and he was terminal.(R.T. 9/15/04, at 13, 32, 93, 123; R.T. 9/16/04, at 124; R.T. 10/26/ 04, at 98-121.)

In December of 1999 Defendant became the resident manager of the Santa Riva Apartments, a brand-new, upscale complex in Awatukee. (R.T. 9/15/04, at 85.) She, husband Joe, and their two young children moved into a three-room two-bath apartment, number 132. (R.T. 10/25/04, at 87.)

On June 15, 2000, Joe's physician, Dr. Kellogg, told him and Defendant that the terminal cancer that he had would end up suffocating him, and that the chemotherapy he was taking might cause heart failure. On July 12, 2000, Joe and Defendant filed a medical malpractice suit against the doctors who had misdiagnosed his cancer for so long. Defendant told friends Joe was "worth more dead that alive" and estimated the suit would be worth millions after his death. Shortly thereafter, Defendant began searching for a poison whose effects would

5

mimic death by cancer or a heart attack.  (R.T. 9/28/04, at 14-15, 21-22; R.T. 9/15/04, 32-34, 123; 10/2/04, at 84-87.)

Defendant would normally go out to bars where she would meet men at least once, and on many occasions, twice a week, and this led to many arguments with Joe—who accused her of having affairs.  (R.T. 9/15/04, at 32-37; R.T. 9/8/04, at 9-10; R.T. 9/16/04, at 120; Exhibit 498, at 08:29 a.m., 08:48-49 a.m., 09:06-09 a.m.)

Rick Freeland became a resident of the same apartment complex that Defendant managed early in the year 2000.  (R.T. 9/13/04, at 17.)  A couple of months after that Freeland and Defendant were having sex together.  *Id.* at 20.  Defendant did not wear a ring when she was with him and did not mention that she was married, nor that she lived with her husband and kids in the same complex.  *Id.*  They would go out to nightclubs together, and then return to his apartment.  *Id.* 20.  In July of 2000, when she did admit that she was married, Freeland broke off the relationship saying: "Look, I don't want to be with you anymore because your married."  (R.T. 9/13/2004, at 23-24, 26-27; R.T. 9/15/04, at 39.)  Defendant was extremely upset about the situation for several weeks: going to Freeland's apartment, banging on the door and demanding to be let in.  (R.T. 9/13/04, at 23.)  She would wait

6

outside for half-an-hour, sometimes for an hour, screaming and wanting to be let in. *Id.* at 24-25.

Also in July of 2000, Defendant asked James Yost, her assistant manager, to stand in as Joe for a physical examination so that she could take out a life insurance policy. (R.T. 9/15/04, at 119-120.) She told Yost that when the cancer killed Joe, it would be like a heart attack, and that she would need the insurance proceeds to carry her until the medical malpractice suit was resolved. *Id.,* at 121-122. She also explained that once Joe died, the lawsuit would turn into a "wrongful death claim" and she opined that it would then be "tremendously" more valuable. *Id.* She told Yost that her husband was worth more dead than alive. *Id.,* at 123. She offered Yost $10,000.00, and then $50,000.00, to take part in her insurance scheme. Yost refused. *Id.,* at 119-120.

On July 26, 2000, Defendant opened a fake e-mail account, supposedly used by a party in Denver, under the name "Anne Newton" with usa.net. She would use this e-mail account, and the pseudonym to anonymously buy the poison she would use on Joe. (R.T. 9/21/04, at 57-63.)

On July 28, 2000, the maintenance supervisor at the San Riva Apartments observed Defendant and Erik Vaillant, Rick Freeland's friend, doing research on the office computer. A few days later the supervisor ran a diagnostic on that

computer and found that "someone" had been using it to access sites that sold poison. During this same time period, late July of 2000, Sharon Sweeney, the new assistant manager at the complex, heard that Defendant's husband had terminal cancer. Sweeney told Defendant that she was "there for her" if she ever needed anything. (R.T. 9/15/04, at 31.) In response, Defendant kind of giggled, saying that she had been "over it" for a long time. *Id.*

On August 10, 2000, Defendant told her hairdresser, that she wished Joe was dead. Specifically, she said: "I wish he were dead already so I could move on with my life." (R.T. 9/20/04, at 74-75, 80, 82.) Defendant stated that she was interested in another man who lived at the complex—but that he was hesitant because she was married. *Id.,* at 74. Within days of her confiding this information to her hairdresser, Defendant phoned an insurance broker, Ed Sandidge, and left a message that she wanted to increase her husband's coverage to five hundred thousand dollars. (R.T. 9/27/04, at 119-123; Exhibit 213.) Also in August of 2000, Defendant asked Erik Vaillant, Rick Freeland's friend, if he would use his personal computer to locate a firm known as Voigt Global, a distributor of chemicals—including sodium azide poison. (R.T. 9/16/04, at 120-21; R.T. 9/21/04, at 25-36.) Vaillant found the Voigt website then let Defendant alone to use the computer. *Id.*

8

On August 21, 2000, Defendant e-mailed Voigt Global using the fictitious e-mail address and the false name "Anne Newton," requesting prices for sodium azide poison.  ( R.T. 9/21/04, at 25-36; Exhibit 266.)  Voigt Global responded that same day asking numerous questions, including what the chemical was to be used for; wanting a business name and business license, and requesting a tax identification number.  *Id.*  Two days later, Defendant responded via e-mail, and lied, saying the sodium azide would be used to kill pests, *i.e.,* rodents.  (Exhibit 266.)

On August 28, 2000, Defendant submitted another insurance application on Joe's life to Karen Catalano of Amica Insurance Company.  On that application, Defendant avowed that Joe was not suffering from cancer—never mentioning his terminal illness. (R.T. 9/27/04, at 71-79.) The very next day, August 29, 2000, at 3:00 p.m., Defendant submitted a third life insurance application with another company, Eterm.com. (R.T. 9/28/04, at 89-90.)  That same day, using the same computer, "Anne Newton" e-mailed a phoney federal identification number to Voigt Global.  (Exhibit 266.)

In late August or early September of 2000, Defendant also told Eric Vaillant, her lover's buddy, that  she wanted to get life insurance on Joe, and asked him to pose as Joe for the required physical.  Vaillant refused, and she said that she would

9

get "another guy" to do it. (R.T. 9/16/04, at 122-23.) Vaillant accused Defendant of being "money hungry" when she told him about the malpractice suit "and that she would get 20 million dollars if -- when Joe passed." *Id.*, at 124. On other occasions during this period, Defendant confided in Vaillant that it "grossed her out" to have sex with Joe—because of how thin he was and because he was sick." *Id.*

Although Rick Freeland had tried to break off the affair with Defendant, in late July or early August, she encountered him and Vaillant at a bar in early September of 2000. (R.T. 9/15/06, at 30-40.) She tried to speak with Freeland, following him around the bar, he did his best to stay away from her, and then left. *Id.* Later that night, she caused another scene at his front door: banging on it, calling out his name, demanding he let her in. *Id.*, at 42. She screamed she would get the pass key from the office if he not let her come inside. *Id.* Sharon Sweeney, the assistant manager, had to tell her that she needed to leave. *Id.*

On September 6, 2000, an underwriter from Eterm.com insurance spoke with Joe on the telephone. Joe said that he did not want to apply for life insurance, and the company cancelled the application. (R.T. 9/28/04, at 91.) Amazingly, Defendant then e-mailed Eterm.com., requesting that the application be reinstated. The underwriter then had Defendant complete the application. *Id.* at 92-94.

10

Eterm.com set up an appointment to come out and draw Joe's blood and urine, but Defendant cancelled that appointment a week before the murder. *Id., at 95.*

On September 18, 2000, Defendant, still posing as "Anne Newton" faxed Voigt Global a forged business license—complete with a fictitious address—which she had manufactured by cutting and pasting another company's license. (R.T. 10/27/04, at 94-101; R.T. 9/21/04, at 30-34, 35, 37, 40, 44; R.T. 9/15/04, at 89-90 100; Exhibit 266.)

On September 19, 2000, "Newton" e-mailed Voigt Global confirming that she had faxed them a business license, and asking about the final price for the sodium azide. (R.T. 9/21/04, at 44.)

On September 20, 2000, Defendant e-mailed Rick Freeland wanting to have a drink with him. (R.T. 9/13/04, at 28-29.) Freeland agreed, but did not remember if they actually had a drink together. *Id.*

On September 22, 2000, Defendant had a conversation with Carolyn Catalano, of Amica Insurance, essentially canceling the insurance application with that company. On the same day, "Anne Novak" contacted Voigt Global, and confirmed that the poison was for killing rodents. (R.T. 9/21/04, at 35-36; R.T. 9/27/04, at 79.)

11

On September 25, 2000, Defendant, again  posing as "Newton" bought a money order payable to Voigt Global.  Three days later, a chemical distributor shipped 500 grams of sodium azide to her at a false address.  (R.T. 9/21/04, at 51.)  That same month Defendant told her new assistant manager what she had told James Yost in July—the malpractice lawsuit would be worth much more after Joe died.  (R.T. 9/15/04, at 31-32.)

One night two or three weeks before the murder, Defendant met a man named Travis Black at the Rocking Rodeo bar.  Later that morning they had sex at her apartment.  (R.T.  9/15/04, at 102.)

Defendant lied to Black, saying that she was a widow—her husband having died of cancer, she was "going through" a lawsuit.  Defendant phoned Black from her office pretty much on a daily basis for the next two weeks—and spoke with him for hours a day.  *Id.,* at 103.

On October 5, 2000, Defendant, still using the name "Anne Newton," picked up the sodium azide poison from Airborne Express and left it at her office.  She had attempted to get Erik Vaillant to pick up the shipment under the false name, but he refused.  Similarly, she had tried to get a co-worker to do it, be she also said no.  (R.T. 10/27/04, at 100-101; R.T. 9/16/04, at 125; R.T. 9/15/04, at 90.)  On October 6, 2000, the Friday before the murder, Defendant was not scheduled to

12

work—but she came into the office to talk on the phone with Black anyway. While

they spoke, two co-workers asked Defendant about the box:

> A. Shannon said to ask  what's in the box, so I asked
> [Defendant], "What's in the box?"  And she said,
> "It's a present."  And I said, "Who's the present for?"
> And she said, "It's a present for a friend."

(R.T. 9/8/04, at 67-68.)

Defendant was smiling broadly when she said, "It's a present for a friend." *Id.*

The following night Joe Andriano was dead.

On Saturday, October 7, Defendant, Joe, and their two children spent the

evening with Joe's parents, leaving the parent's home around 10:30 p.m.  About

2:30 a.m., Chris Hashisaki, a co-worker of Defendant's who lived in the complex,

got a call from Defendant asking her to come over to her apartment.  (R.T. 9/8/04,

at 10.)  When Chris arrived, Defendant was outside of her apartment with a phone

in her hand.  When asked what was the problem, Defendant said: "I have a

problem.  Don't ask any questions.  My husband's in on the floor dying and I

haven't called 911 yet." *Id.*, at 11-12.  Defendant admitted that Joe thought she

had called 911, but that she actually had not done so.  *Id.*  While they walked to

the apartment Chris told Defendant that she had to call 911, but Defendant claimed

she could not get any reception.  *Id.,* at 13.  Once inside, Chris saw that Joe was

lying on his left side on the living room floor in the fetal position, and was clad only in a pair of shorts. Joe looked weak, worn out, and had vomited on the floor. *Id.*, at 14-15, 19. Joe told her: "I need help." *Id.* When Chris told him that Defendant was calling 911, Joe said: "I've needed help for a long time." *Id.* Joe wondered aloud why help was taking the paramedics "45 f-ing minutes." *Id.*, at 15-16. After speaking with Joe for about three minutes, Chris went into the back bedroom and found Defendant, apparently on the phone with 911. Both women went back into the living room, and Defendant began to ask questions about Joe's color: "What's his color like? Are his lips blue?" *Id.*, at 18-20. Chris responded: "No his lips are not blue. He's having trouble breathing. They need to get here." *Id.*, at 20. Chris could see that Joe was having trouble breathing, in taking in air. *Id.*

Defendant hung up the phone and said that they needed to get Joe to the car and take him to the hospital because the paramedics were "on another call." *Id.*, at 21. This was, of course, a lie. Paramedics responded to the Santa Riva Apartments approximately three minutes after receiving her call. (R.T. 9/15/04, at 7.)

Nevertheless, Defendant tried to get Joe up, but he said: "I can't get up. I can't make it to the car." (R.T. 9/8/04, at 21.) Indeed, an expert on sodium azide poisoning opined that, at this point, Joe would have been so weak and dizzy that

14

he would not have been able to stand. (R.T. 9/23/04, at 20.) Defendant went behind Joe and tried to lift him up, saying: "Get your ass up." (R.T. 9/8/04, at at 22.) When Joe repeated that he could not get up, Defendant said: "Get you're f-ing ass up." *Id.* At this point, Chris heard the fire department sirens and walked outside the apartment to direct the paramedics to the apartment. As she looked back into the apartment she could see that Joe was still in the fetal position, vomiting. *Id.*, at 25. Defendant was in the dining room. *Id.* at 25. As the fire department arrived, Defendant screamed: "Go away, go away. Chris, tell them to go away." *Id.*, at 27. Chris responded by saying that they were coming in and also said her purse was still inside the apartment. At this point, Chris's purse "flew out the door and the door slammed." *Id.*

The paramedics knocked on the apartment door for five to ten minutes, with no response. *Id.* Finally, the fire dispatcher called the apartment, and Defendant came out—by the back door. *Id.*, at 30. She climbed over a low patio wall; over some landscaping rocks; walked past Chris and the paramedics, and stopped at the front door of the apartment. *Id.*, at 33-37. She had changed her clothes and her hair was wet. *Id.*, at 36-37. Defendant said that her husband was dying of cancer, and that he wanted them to leave. *Id.* The paramedics simply left and Chris went home. *Id.*, at 38-39.

15

About an hour later Defendant called 911 again. When paramedics and police arrived, they found Joe's body lying on the living room floor—with blood everywhere, and Defendant sitting at the kitchen counter. (R.T. 9/15/04, at 109. Aside from poisoning Joe—which apparently had not worked as fast as she thought it would—Defendant had savagely beaten him over the head with a barstool. The medical examiner counted at least 23 separate blows to the back of his head—and the bar stool had been shattered. (R.T. 9/16/04, at 10-43, 67-77.) Defendant also stabbed Joe in the neck, inflicting a gaping wound three-and-a-half inches across and two inches wide, that went all the way down to his spinal column. *Id.* Defensive wounds on both of his arms showed that Joe was conscious during at least some portion of the beating. (R.T. 9/16/04, at 27-32.) Blood-spatter analysis showed that Joe had been laying down on the floor the entire time she was bludgeoning him. It also showed that before calling 911 the second time Defendant had rearranged items in the living room and had smeared blood on the kitchen walls—in an attempt to help fabricate her claim of self-defense. (R.T. 9/14/04, at 43-123.)    After Defendant had been arrested, she called a co-worker from the jail and asked her to hide the papers referencing sodium azide that were in her desk. (R.T. 11/2/04, at 56-57.)

16

## ARGUMENTS

### I

### THE EVIDENCE OF DEFENDANT'S AFFAIRS AND HER ATTEMPTS TO OBTAIN LIFE INSURANCE ON HER HUSBAND WERE ADMISSIBLE UNDER MULTIPLE EVIDENTIARY THEORIES.

Defendant wrongly contends the trial court erred in admitting so-called "other act" evidence of her extramarital affairs with Rick Freeland and Travis Black, and of her many attempts to obtain life insurance on her husband during the three months when she was carrying out her convoluted plan to murder him. (R.O.A. at 100.) The trial court found the evidence admissible as "intrinsic" to the crime. (R.T. 9/7/04, at 14.)

Courts review the admission of evidence for abuse of discretion. *State v. Van Adams,* 194 Ariz. 408, 415, ¶ 20, 984 P.2d 16, 23 (1999).

The so-called "other act" evidence in question was probably admissible under a host of evidentiary theories given the peculiar facts of this case. It was certainly admissible to show Defendant's twin motives for murdering her husband, *i.e.,* her desire to be free to see other men and to collect on a lucrative malpractice suit once Joe was dead. *Givens v. State,* 546 S.E.2d 509, 512 (Ga. 2001) (evidence wife had relationship with another man admissible to prove motive to kill husband).

Concerning the lawsuit, Defendant literally told two different people that Joe was "worth more dead than alive," and told a third person that she "wished he were already dead" so that she could carry on an affair with a boyfriend. This evidence was also admissible because it was "intrinsic" to the case. *Brown v. Commonwealth*, 348 S.E.2d 849, 851 (Va. App. 1986) (in prosecution for murder of spouse evidence of defendant's recent infidelities admissible to show general marital disharmony); *see State v. Dickens*, 187 Ariz. 1, 19, n. 7, 926 P.2d 468, 486 n. 7 (1996)(definition of intrinsic evidence). The other act evidence was also probably admissible to rebut Defendant's contention that she was a "battered woman" who killed her debilitated, cancer-wracked husband in self-defense. *People v. Ciervo*, 123 A.D.2d 393, 464 (N.Y. 1986).

## A. The Law.

"Other act" evidence is "intrinsic" when that evidence and evidence of the crime charged are "inextricably intertwined" or both acts are part of a "single criminal episode" or the other acts were "necessary preliminaries" to the crime charged. *Dickens,* 187 Ariz. at 19, n. 7, 926 P.2d at 486 n. 7, citing *United States v. Coleman,* 78 F.3d 154, 156 (5th Cir. 1996). "Evidence of other wrongful conduct is considered intrinsic when it is offered for the purpose of providing the context in which the charged crime occurred." *United States v. Johnson,* 463 F.3d

803, 808 (8th Cir. 2006) (citing *United States v. Forcelle*, 86 F.3d 838, 842 (8th Cir. 1996)).[1]

Contrary to Defendant's assertion, many, many cases hold that in spousal murder cases evidence that a defendant spouse was having an affair is admissible to prove motive. *Givens, supra. v. State*, 546 S.E.2d 509, 512 (Ga. 2001)(evidence wife had relationship with another man admissible to prove motive to kill husband); *Springer v. Commonwealth*, 998 S.W.2d 439, 450 (Ky. 1999)(evidence that defendant romantically involved with another person admitted to establish motive for killing husband); *Commonwealth v. De Marco*, 830 N.E.2d 1068, 1072 n. 12 (Mass. 2005)(evidence that husband had sexual relations with another woman admissible to show motive to kill his wife even though affair ended four months prior to murder); *People v. Houston*, 29 Cal. Rptr.3d 818, 841 (2005)(evidence of accused's intimate relations with others relevant to his or her marital relationship with victim spouse and therefore to motive).[2] *See Camm v.*

---

1. Courts admit intrinsic evidence without going through a Rule 404(b) analysis. *State v. Nordstrom*, 200 Ariz. 229, 248, ¶ 56, 25 P.3d 717, 736 (2001) citing *Dickens*, 187 Ariz. at 19, n.7, 926 P.2d at 486, n. 7.

2. Other cases standing for the same proposition include: *State v. Kurtz*, 564 S.W. 2d 856, 858 (Mo. 1978)(fact that wife having an affair at time she murdered husband admissible to show motive); *State v. Taylor*, 673 P.2d 1140, 1146 (Kan. 1983)(evidence of marital discord probative of motive in murder of wife); *State*
(continued...)

19

*State,* 812 N.E.2d 1127, 1133 (Ind. App. 2004) ("to be admissible, evidence of a defendant's extramarital affairs should be accompanied by evidence that such activities precipitated violence or threats between the defendant and the victim in the past, or that defendant was involved in an extramarital relationship at the time of the completed or contemplated homicide."); Rule 404(b), Ariz. R. Evid., 404(b) (other act evidence admissible to show motive, preparation, plan, knowledge or absence of mistake.)  However, such evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice.  Rule 403,

---

2. (...continued)

*v. Flood,* 301 So.2d 637, 647 (La. 1974)(wife's affair properly admitted to show motive in murder of husband); *Commonwealth v. Littlejohn,* 250 A.2d 811, 817-18 (Pa. 1969)(well-settled that when victim of the crime is the spouse of the accused evidence of defendant's infatuation with another admissible on question of motive); *Chumbler v. Commonwealth.,* 905 S.W.2d 488, 492-93 (Ky. 1995)(evidence of homosexual relationship between defendant and co-defendant and extent of relationship properly admitted to show motive of co-defendant to murder his wife and for defendant to murder co-defendant's wife); *State v. Hull,* 556 A.2d 154, 165-66 (Conn. 1989); *Faircloth v. State,* 316 S.E.2d 457, 458 (Ga. 1984); *People v. Branion,* 265 N.E.2d 1, 8 (Ill. 1970)(in spousal murder case evidence defendant conducting an illicit affair proper evidence of motive); *Romero v. People,* 460 P.2d 784, 788 (Colo. 1969)(in marital homicide case any facts relating to ill-feeling, ill-treatment or jealousy relevant to show motive and malice);  *People v. Pobliner,* 298 N.E.2d 637 (N.Y. 1973) (evidence of defendant's affair with another woman admissible to show possible motive to murder his wife); *Brown v. Commonwealth,* 348 S.E.2d 849, 851 (Va. App. 1986)(in prosecution for murder of ones spouse evidence of defendant's recent infidelities generally admissible to show marital disharmony but inadmissible when evidence shows incidents occurred 4 and 8 years prior to murder); *State v. Rhodes,* 627 N.W.2d 74, 84 (Minn. 2001).

20

Ariz. R. Evid.  Tellingly, Defendant never requested a limiting instruction as to any of this evidence under Rule 105, Ariz. R. Evid. (the court, upon request, shall restrict the evidence to its proper scope and instruct the jury accordingly).

All of the requirements set out for the admission of motive evidence in *Camm, supra,* are met fully in this case.

**B. Intrinsic Evidence.**

One would usually think of a defendant's extramarital affairs, and her attempts to get life insurance on her deceased husband, primarily as "motive evidence" in a spousal-murder case, and it is surely that here.  However, Defendant orchestrated a complicated, highly-convoluted, three-month-long series of Machiavellian maneuvers carefully designed to "let her get away with murder," which makes this a very different kind of case. The "other acts" here are so tightly interwoven with the murder, *i.e.,* so "inextricably intertwined" with it, that they are necessarily intrinsic to any coherent presentation of the relevant evidence.

For example, while simultaneously carrying on her extramarital affairs and going out to bars on a weekly basis—which she admitted caused daily fights with her husband—Defendant used her lover's best friend, Erik Vaillant, to research poisons that would best mimic death from cancer or a heart attack.  She had Vaillant use his home computer to locate the website of the company from which

21

she actually bought the poison used on Joe.  She also asked co-worker James Yost,

to take the exam, telling him that Joe was worth more dead than alive.  Yost also

refused, even though Defendant offered him ten thousand of dollars to pose as Joe.

(R.T. 9/15/04, at 119-123.)

Similarly, Defendant's attempts to obtain a cancer or heart attack mimicking

poison, her attempts to get life insurance on her husband, and her affairs are

themselves intertwined with the murder both chronologically and in her own words.

On August 21, 2000, Defendant, under the pseudonym "Anne Newton," used

her office computer to e-mail the Global Voigt chemical company questions about

the price of sodium azide poison.  (R.T. 9/21/04, at 25-36, Exhibit 266.)  Within

a week she was also using that same computer, under her real name, to fill out a

fraudulent insurance application on Joe.  (R.T. 9/28/04, at 89-90).  Similarly, on

August 29, 2000, Defendant e-mailed Voigt Global confirming that she had faxed

them a business license, in this case a forged business license, that was required for

the purchase of sodium azide poison.  That same day Defendant made another

fraudulent life insurance application on her husband.

**C. Evidence Concerning Defendant's Affair With Rick Freeland And Her Other Attempts To Get Life Insurance.**

Rick Freeland had moved into the Santa Riva Apartments sometime early in the year 2000. (R.T. 9/13/04, at 17.)  A couple of months after that Freeland and Defendant began dating, and a short time later they began having sex. *Id.,* at 20. Defendant did not tell Freeland that she was married. *Id.*  They would go out to nightclubs together and then go to his apartment. *Id.,* 20.  In July of 2000, when she did admit that she was married, had children, and lived in the complex Freeland broke off the relationship and told her: "Look, I don't want to be with you anymore because you're married."  (R.T. 9/13/2004, at 23-24, 26-27; R.T. 9/15/04, at 39.)  Defendant was upset about the breakup and for the next two or three weeks would go to Freeland's apartment, bang on the door and demand to be let in.  (R.T. 9/13/04, at 23.)  Sometimes she would stand outside his door for half-an-hour, sometimes for an hour, wanting to be let in.  *Id.,* at 24-25.  Sometimes he would let her in.  *Id.*  Joe had been disfigured by cancer surgery and chemotherapy, and Defendant confided in Freeland's good friend, Erik Vaillant, that sex with her husband "grossed her out."  (R.T. 9/16/04, at 124.)

Defendant's "break up" with Freeland took place in late July and early August of the year 2000, *exactly* the period when she set in motion her plan to kill Joe.

23

On July 26, 2000, Defendant opened her fake e-mail account under the assumed name of Anne Newton, *i.e.*, the *same* account and the *same* named she would actually use to buy sodium azide poison that she used on Joe. (R.T. 10/27/04, at 91-96.)

On August 10, 2000, in a soap opera-like vignette, Defendant confided in her hair dresser that she wished that Joe was dead so she could get on with her life. Donna DeAngelis quoted Defendant as specifically saying:

> "I wish he were dead already so I could move on with my
> life."

(R.T. 9/20//04 at 74-75, 80, 82.)

In an obvious reference to Freeland, Defendant told DeAngelis that she was interested in another man who lived in the same complex but that he was "hesitant" because she was married. *Id.* Just ten days after Defendant had her hair appointment, she also tried to increase her husband's existing life insurance policy. (R.T. 9/27/04, at 119-123; Exhibit 213.)

In late August or early September of 2000, Defendant told Vaillant, her lover's friend, that she wanted to get a life insurance policy on Joe, and asked Vaillant to pose as her husband for purposes of taking the required physical exam. When Vaillant refused, Defendant said she that would ask another guy to do it. (R.T.

24

9/16/04, at 122-23.)  When Vaillant accused Defendant of being "money hungry"

she told him about the malpractice suit "and that she would get 20 million dollars

if -- when Joe passed." *Id.,* at 124.

Although Rick Freeland had tried to break off the affair with Defendant in late

July or early August, she saw him and his friend, Vaillant, at the Sanctuary Bar

one night in early September of 2000.  (R.T. 9/15/06, at 30-40.)  Defendant

immediately tried to speak with Freeland, following him around the bar—but he

avoided her. *Id.*  Later that night back at the Santa Riva Apartments, she caused

a scene in front of Freeland's apartment: banging on his door, calling out his name,

and demanding to be let in. *Id.*, at 42.  She even threatened to get a pass key to

his apartment when he would not let her in. *Id.*  However, computer records

showed that on September 20, 2000, two weeks before the murder, Defendant e-

mailed Rick Freeland asking him to have a drink with her, and he agreed.  (R.T.

9/13/04, at 28-29.)

During the entire time the affair with Freeland was going on, Defendant

conceded that she and Joe had fought physically many times—with Joe working

himself up into a rage and accusing her of cheating on him.  (Exhibit 498, at 08:29

a.m., 08:48-08:49 a.m.)

25

## D. Evidence Concerning Defendant's Affair With Travis Reed.

In late September of 2000, about two weeks before the murder, Defendant met Travis Black at the Rocking Rodeo Bar.  After a long night out, they returned to the Andriano apartment the following morning and engaged in sex.   (R.T. 9/15/04, at 102; R.T. 10/27/04, at 77-84.).)  Interestingly, Defendant told Black that she had a husband, but that he had died of cancer, and she was "going through" a lawsuit.  *Id.*  During the next ten days or so, Defendant phoned Black from her office on an almost daily basis—and spoke with him for hours  each day. *Id.,* at 103.

On the Friday preceding the murder, Defendant was speaking with Black on the phone when two co-workers asked her about the package on her desk, *i.e.,* the box of sodium azide poison.  Defendant smiled broadly:

"It's a present for a friend."

(R.T. 9/8/04, at 68; R.T. 9/15/04, at 45.)

At trial, Defendant testified that she had used one of Joe's condoms the night that she had sex with Travis Black.  She said that Joe had badgered her daily about the missing condom during the two weeks leading up to his death—wanting to know what had happened to the condom—and accusing her of having had an affair. (R.T. 10/28/04, at 10-12.)

26

Defendant testified that on the night of the killing, after Joe had been poisoned, and after she had turned the paramedics away from their door, she wanted to be "honest" with Joe. *Id.,* at 45-47. Because she wanted to be "honest," Defendant told her seemingly dying husband why the condom was missing—she had used it to have sex with someone from the Rocking Rodeo. *Id.,* at 46-48. According to Defendant, this was the catalyst for Joe's alleged attack on her that night, eventually leading to his death. (*Id.;* R.T. 11/2/04, at 46-53.)

Defendant's story about the alleged fight over the missing condom, believable or not, renders her affair with Travis Black as "inextricably intertwined" with the murder as anything could possibly be.

## E. Defendant's Statement To Police On The Day Of The Murder

Although the trial court did not explicitly say so, its determination that evidence concerning Defendant's extramarital affairs was "intrinsic" was no doubt based largely on Defendant's own videotaped account of the murder, and on the written report that defense domestic violence expert, Sharon Murphy, ("Murphy") made prior to trial.[3]  (Exhibit 498.)

---

3. A transcript of Defendant's statements to the police was proffered to the court at the voluntariness hearing. (R.T. 3/28/03, at 31-33.)

On the videotape, Defendant firmly "intertwined" her extramarital affairs with the events leading up to the killing from the very outset of the case. Defendant told a detective that, in August, a little over a month prior to the killing, her co-workers had taken her out for her birthday. When she returned home her husband, Joe, went "berserk"—breaking furniture and unjustly accusing her of having an affair. (Exhibit 498, at 08:37 a.m.). Joe kept "having fits" over the birthday incident from that day on—right up to the day of the killing. (*Id.* at 08:40 a.m.) Defendant also told the detective that Joe was always demanding sex from her, and she recounted many alleged acts of domestic violence: Joe had thrown her against a door; he had tried to hit her in the head with a stone pot; he had squeezed her around the waist so she could not breathe, and he had slammed her head against a wall. (*Id.* at 08:43-47 a.m., 08:58-59 a.m.) She said that Joe would often try to strangle her by putting something around her neck—clothes hangers, belts, or his hands. (*Id.* at 08:49-52 a.m.) Defendant said that during the past year, when they lived in Phoenix, they had fought physically many times—with Joe working himself up into a rage and accusing her of cheating. (*Id.* at 08:29 a.m., 08:48-08:49 a.m.) She quoted Joe as sometimes saying that he wanted to kill her, and related that she sometimes passed out from being choked. (*Id.* at 08:51-08:52 a.m.) Defendant said that their fights were an ongoing thing since the birthday incident, and that in

28

the week leading up to the killing Joe was getting "nasty." (*Id.* at 08:54-56 a.m.) She claimed that on the night of the killing, Joe was watching television in the bedroom when he began asking accusatory questions about the birthday night, *i.e.,* why she had not worn her ring, and that he kept wanting to have sex. ( *Id.* at 09:06-09:09 a.m.) Joe built himself into a rage—wanting to know why she bought new clothes, including a new pair of underwear, and wanting to know whether she was going to wear them out on a date. (*Id.* at 09:08-09:09.) Defendant told the detective that after an uneventful hour, they both got into the bathtub for sex—but started arguing again. (*Id.* at 09:10-11.) She got dressed. Joe started pushing her. According to Defendant's videotaped statement, the altercation eventually ended with Joe's death. (*Id.* at 09:10-09:20 a.m.)

Defendant's almost endless videotaped recitation of her ongoing fights with Joe over her alleged affairs, including one on the night of the killing, inextricably intertwined evidence about those affairs with the very core of this case. The State has found no appellate decision in which a murder defendant's videotaped description of *why* and *how* a killing took place has ever been held inadmissible, absent *Miranda* or voluntariness problems. Here, the defense *stipulated* that the statement was voluntary and raised no *Miranda* claim. (R.T. 3/28/03, at 31-33.)

29

**F. The Defense Expert's Report And Testimony.**

Defense expert Sharon Murphy ("Murphy") wrote a pre-trial report about her interviews with Defendant that recounted many alleged acts of violence by Joe. Murphy's report concluded that Defendant was a "subservient" victim of Joe's repeated domestic violence.  (R.T. 4/30/04, at 10-11, 24, 28-29, 31, 35-51; R.T. 10/12/04, at 32-35; R.T. 10/13/04, at 44, 123.)

At a pretrial hearing, Murphy conceded that most of Joe's "bad acts" were Defendant's self-reporting.  (R.T. 4/30/04, at 46-50, 51-52.)   In finding that Defendant met the criteria as a domestic violence victim, Murphy's report quoted Defendant concerning Joe's alleged threats against her for having affairs:

> Prosecutor:   And [Defendant] said to you, "[Joe] told me if I ever had an affair, he would never forgive me and make sure I couldn't do it again," and [Defendant] ended it by saying, "So I did my best never to make him upset."  And based on that you decided that prong, if you will, for the threats was met, right?
>
> Murphy:   Well, that's in corroboration with [Defendant's] story also.

(R.T. 4/30/04, at 50-51)

While the court forbade Murphy from testifying about murder, it did allow her to repeat many, many alleged bad acts that Defendant said Joe had committed.

(R.T.   10/12/04, at 90, 94, 97, 112; R.T.   10/13/04, at 58.)   Murphy also recounted Defendant's sixth-month affair with Rick Freeland in terms of its warmth, caring, and compassion in "counterpose" to Joe. (10/12/04, at 118-119.) Murphy testified that after Defendant's affair with Freeland, Joe became more and more agitated, and more and more suspicious that she was being unfaithful to him. *Id.* at 125.   Defendant had told Murphy that, "on a regular or daily basis [Joe] would ask her who she is sleeping with." *Id.* 126.   Murphy recounted that in the month before the murder Joe allegedly screamed at Defendant in front of her co-workers, broke drawers and a bed, all because he thought she was seeing other men. *Id.* at 127, 131-33.   Of course, she actually was seeing other men.

Defendant's videotaped version of the murder "inextricably intertwined" her extramarital activities with her husband's murder from the very beginning of the case.   She claimed to have acted in self defense—*after* Joe allegedly accused her of having extramarital affairs and *after* he tried to choke her.   Defendant also spoke of similar incidents in the past, claiming that Joe's jealous rages and physical attacks were part of an escalating pattern that led up to the day of the murder.   The pre-trial report of defense expert Sharon Murphy reiterated this theme—as did Murphy's trial testimony.   Thus, the evidence of Defendant's affairs with Freeland and Travis—and Defendant's almost frenetic attempts to get life insurance on

31

Joe—was inescapably "intrinsic" in this case.  It had to be admitted if there was going to be any kind of fair presentation of the most highly probative evidence, *i.e.,* it had to come in to provide "the context in which the charged crime occurred." *United States v. Johnson,* 463 F.3d at 808.

## G.  Motive.

The prosecution proved that Defendant had two motives for murdering Joe, and proved them primarily through her own words.  One motive was financial: she wanted what she thought would be million dollars—her estimate of the settlement from the malpractice suit against the doctors who had mis-diagnosed Joe's cancer. (R.T. 9/16/04, at 124.)  The second motive was personal: she wanted to be free to be with other men.  (R.T. 9/20/04, at 74-75, 80, 82.)  Defendant's own words, coupled with her own contemporaneous actions, make this plain.

On July 26, 2000,  Defendant opened a phoney e-mail account in the name of "Anne Newton"—the e-mail account and false name she would shortly use to begin the intricate, six-week-long  process of fraudulently obtaining the 500 grams of sodium azide that she would use on Joe.[4]  The same month that she opened the

---

4. Defendant posing as "Anne Newton" first e-mailed Voigt about purchasing sodium azide on August 21, 2000, and subsequently had numerous similar contacts with the firm throughout August and September of 2000, including faxing them a
(continued...)

32

phoney e-mail account, Defendant offered James Yost $10,000.00 to impersonate

Joe for a life insurance physical so that she could take out a policy on him.  (R.T.

9/15/04, at 119-122.)  She told Yost that Joe was worth more dead than alive; that

the lawsuit would be tremendously more valuable after his death, but that she

needed to get an insurance policy on Joe so she could use its proceeds to carry her

financially until the lawsuit settled.  *Id.*  Yost refused.  Defendant made a similar

request of Eric Vaillant in August, telling Vaillant the malpractice suit would be

worth twenty million dollars after Joe died.  (R.T. 9/16/04, at 122-23.)  When

Vaillant also refused to pose as Joe, Defendant said she would try to get another

man to do it.  *Id.*  During August and September of 2000, when Defendant was

trying to obtain sodium azide poison, she also filled out three separate applications

for life insurance on Joe—with three separate companies.  (R.T. 9/28/04, at 89-90;

R.T. 9/28/04, at 91-95).

Defendant's secondary motive for murdering Joe—that she wanted to be free

to be with other men—was also amply proven in her own words.  In August of

2000, she told Erik Vaillant, that because Joe was so skinny and ill, sex with him

---

4. (...continued)
forged business license; sending them a money order endorsed by "Anne Newton",
and finally obtaining the poison on October 5, 2000.  (Exhibit 266.)

"grossed her out." (R.T. 9/16/04, at 124.)   On August 10, 2000, when her plans

to obtain sodium azide poison were well in train, Defendant told Donna DeAngelis

that she wished that Joe were already dead:

> "I wish he were dead already so I could move on with my
> life."

(R.T. 9/20//04 at 74-75, 80, 82.)  She explained that to her "moving on" meant

continuing her affair with Rick Freeland.  *Id.*

Although Defendant never even asked for a limiting instruction, she now

contends that the prosecutor engaged in unfairly prejudicial questioning and

argument in discussing her extramarital activities.  (Opening Brief, at 35-39.)  By

far the most lurid of these is Defendant's discussion of the cross-examination of her

domestic violence expert, Sharon Murphy, on the question of whether Defendant

had to use "lubricant" when having sex with Joe.  *Id.,* at 35-36.  However, the

basic theme of Murphy's direct testimony was that Defendant had been victimized

by her Joe's alleged domestic violence and abusive desire for sex, and defense

witness Murphy brought up the subject of "lubricant" on direct examination.  The

prosecution's cross-examination of Murphy dealt directly with her earlier testimony

concerning Defendant's need to use "lubricant" with Joe because he was so

abusive.

34

Q. We were talking about how, and you [defense expert Murphy] indicated that --- that there were these issues that [Defendant] had with sex involving Mr. Andriano, do you remember that?

A. Yes.

Q. And you indicated she even had to use lubricant with him. Do you remember telling us that?

A. Yes.

Q. That's nowhere in your report is it?

A. I don't remember.

Q. It is your report, right?

. . . .

A. Yes. But I don't remember if I put lubricant in it.

Q. Now, did you know that the reason she had to use lubricant was because according to Erik Vaillant who had a conversation with her, the reason she had to use lubricant was she thought Mr. Andriano was gross and skinny. Did you know that?

A. No.

Q. That had nothing to do with domestic violence if in fact what she told Mr. Vaillant is true, right?

A. That's correct, if it's true.

35

R.T. 10/13/04, at 67-68.)  Similarly, the defense did contend that Joe was abusive to Defendant on those occasions when she came home after being with other men, and after picking up Travis Black and having sex with him in the Andriano apartment.  (R.T. 10/28/04, 10-12; R.T. 10/26/04, at 66-77).  Simply put, it was the testimony of Defendant's own domestic violence expert who initially brought the most personal aspects of Defendant's sexual activities before the jury in an attempt to portray her husband as an abuser.  (R.T. 10/12/04, at 96-133.)

The prosecutor was certainly well within legitimate bounds to bring up the ongoing marital discord between Defendant and Joe over her affairs—it was literally the most probative evidence possible of her contempt for him and of one of her motives for murdering him.  *See e.g., Chumbler v. Commonwealth.*, 905 S.W.2d 488, 492-93 (Ky. 1995)(evidence of homosexual relationship between defendant and co-defendant and extent of relationship properly admitted to show motive of co-defendant to murder his wife and for defendant to murder co-defendant's wife); *State v. Hull,* 556 A.2d 154, 165-66 (Conn. 1989); *Faircloth v. State,* 316 S.E.2d 457, 458 (Ga. 1984); *People v. Branion,* 265 N.E.2d 1, 8 (Ill. 1970)(in spousal murder case evidence defendant conducting an illicit affair proper evidence of motive); *Romero v. People,* 460 P.2d 784, 788 (Colo. 1969)(in marital

36

252abc Case 2:16-cv-01159-SRB   Document 28   Filed 08/28/17   Page 252 of 978

homicide case any facts relating to ill-feeling, ill-treatment or jealousy relevant to show motive and malice).

The prosecution presented overwhelming evidence of Defendant's twin motives for killing Joe, in her own words and in her contemporaneous actions, which inextricably intertwined them with the other evidence in this case.

## II

### NO RATIONAL JUROR COULD HAVE FOUND THIS MURDER OTHER THAN PREMEDITATED HENCE THE TRIAL COURT WAS CORRECT IN NOT "SUA SPONTE" INSTRUCTING ON ANY LESSER INCLUDED OFFENSES.

Defendant erroneously contends that the trial court violated the rule in *Beck v, Alabama,* 447 U.S. 625, 638 (1980), by not *sua sponte* giving the jury instructions on the lesser-included offenses of second degree murder and manslaughter. (Opening Brief, at 50-51.)[5]  *Beck* held unconstitutional an Alabama statute that

---

5. Defense counsel did not request any lesser-included instructions, but told the judge, "even if I don't request them and you feel they're justified under the circumstances you're required to give them." (R.T. 11/16/04, at 4.) However, in the next breath, when discussing whether a "dangerous offense" instruction should be given, defense counsel seems to argue that there was no basis for lesser-included instructions, at least for manslaughter or negligent homicide:

> In any event, I think it [giving a dangerous offense instruction] needlessly confuses the jury.  It asks them to do something that has
> (continued...)

prohibited a trial court from instructing jurors on any lesser included offense supported by the evidence in a capital murder prosecution. *State v. Gomez,* 211 Ariz. 494, 500, ¶ 28, 123 P.3d 1131, 1137 (2005). The rationale of *Beck* was to ensure that the jury does not choose to convict the defendant of a death-eligible offense because it faces and all-or-nothing choice between that verdict and innocence. *State v. Nordstrom,* 200 Ariz. 229, 253 ¶¶ 81-82, 25 P.3d 717, 741 (2001). Unlike Arizona, where juries now retain the option of sentencing a defendant convicted a death-eligible offense to life imprisonment, in *Beck* the jury was instructed that it must impose the death penalty if it found the defendant guilty. 447 U.S. at 639 n.15; *see* A.R.S. § 13-703.01(H). In a very recent capital habeas proceeding the U.S. Supreme Court expressed doubt, albeit in passing, about whether *Beck* applies to cases like the present one, where after returning a guilty verdict the jury still retains the option of imposing a life sentence.

> The Mississippi Supreme Court's interpretation of *Beck*, on the other hand, holds that case inapplicable where the jury has the additional option of life imprisonment, *see Jackson v. State,* 684 So.2d 1213, 1228 (1996)—a

---

5. (...continued)
no application in this particular case and only application if it were a potential for a manslaughter or negligent homicide verdict. That not being the case, I think it's unnecessary and confusing and potentially violates my client's right to a fair trial. *Id.*

conclusion that finds some support in our cases, *see Hopkins v. Reeves,* 524 U.S. 88, 98, 118 S.Ct. 1895, 141 L.Ed.2d 76 (1998)("In *Beck,* the death penalty was automatically tied to the conviction, and Beck's jury was told that if it convicted the defendant of the charged offense, it was required to impose the death penalty"); *Schad v. Arizona,* 501 U.S. 624, 646, 111 S.Ct. 2491, 115 L.Ed.2d 555 (1991)("Our fundamental concern in *Beck* was that a jury . . . might . . . vote for a capital conviction if the only alternative was to set the defendant free with no punishment at all").

*Howell v. Mississippi,* 543 U.S. 440, 444-45 (2005).

Even if Beck remains viable, given Arizona's present sentencing scheme, this claim fails because the evidence presented at trial did not support giving either a second degree murder or a manslaughter instruction—because there is no question that the prosecution proved that defendant premeditated the murder. Premeditation distinguishes first degree murder from second degree murder while premeditation and intent to kill both distinguish first degree murder from manslaughter. *See* A.R.S. §§ 13-1103, 13-1104, and 13-1105.

This Court deems the evidence sufficient to require a lesser-included offense instruction if two conditions are met: (1) The jury must be able to find the State failed to prove an element of the greater offense, and (2) The evidence is sufficient to support a conviction on the lesser offense. *State v. Wall,* 212 Ariz. 1, 4, ¶ 18, 126 P.3d 148, 151 (2006). It is not enough that, as a theoretical matter, "the jury

39

might simply disbelieve the state's evidence on one element of the crime;" instead, the evidence must be such that a "rational juror" could conclude that the defendant only committed the lesser offense. *Id.* Put simply, the test is "whether the jury could rationally fail to find the distinguishing element of the greater offense." *State v. Detrich,* 178 Ariz. 380, 383, 873 P.2d 1302, 1305 (1994).

Defendant's argument—that a rational jury might somehow have not found the state had proven that she premeditated Joe's murder—is absurd. Defendant does not dispute the fact that the prosecution proved conclusively that over the course of the summer of 2000 she went to extraordinary lengths to obtain sodium azide poison to murder Joe. Defendant does not deny that the State proved that she had researched various poisons on the internet looking for one that would mimic a heart attack, or that she set up a phoney e-mail address, assumed a false identity, and forged a business license in order to obtain the poison anonymously. She does not even contend that a rational juror could have failed to find that she actually poisoned Joe. Instead, Defendant simply manufactures a bizarre, virtually impossible scenario that was never even hinted at during trial. Defendant wants this Court to believe that between the time she called 911 and the arrival of paramedics she could have "unpremeditated" Joe's murder and committed second degree murder or manslaughter:

40

> Intentional second degree murder is supported by evidence
> that between the time she called the neighbor and 911, and
> the time the paramedics arrived, the Andrianos argued
> over Wendi's extramarital activities. A rational jury could
> have found Andriano guilty of second degree murder, that
> is, intentional but not premeditated. Although Andriano
> might have begun her actions with a premeditated plan to
> cause her husband's death by poison, the poison was not
> the cause of death. She abandoned any plan to poison her
> husband when she called the neighbor and dialed 911 for
> assistance. The argument begun while waiting for
> paramedics began a new chain of events that while not
> premeditated began a new chain of events  . . .

(Opening Brief, at 51.)

This is certainly not what Defendant testified to. She testified that well *after* the paramedics had been told to leave—supposedly at Joe's behest— she sat down and cradled Joe's head on a pillow. Because Defendant wanted to be "honest," she finally answered Joe's questions about the missing condom that she had used with Travis Black. (R.T. 10/28/04, at 42-46.) Only then did the argument start that Defendant claimed eventually resulted in Joe's death via suicide. *Id.* at 47

In fact, Phoenix fire paramedics in the have a goal of responding to calls in under four minutes. (R.T. 9/15/04, at 5.) Fire Department dispatch records documented the fact that on the night of the murder Defendant called 911 at 2:25 a.m., and that paramedics arrived at 2:28 a.m., *i.e.,* a response time of *three minutes. Id.* at 7. Chris Hashisaki testified that Defendant slammed the door

41

behind her and told her to tell the fire department to leave *as the paramedics were pulling up to the scene.* (R.T. 9/8/04, at 27.) The undisputed forensic evidence showed that Defendant beat Joe on the back of his head with a bar stool while he was lying on the floor, administering at least 23 separate blows, and shattering the bar stool. She cut his throat—opening a gaping three-and-three quarter by two-inch wound that went all way down to the spinal cord. (R.T. 9/16/04, at 22-23, 25.)

Simply put, the notion that a *rational* jury could have possibly believed that in the space of three or four minutes Defendant could really have abandoned her intricate, three-month-old-plan to murder Joe; then had gotten into a heated argument with him, and had then beat him over the head and stabbed him to death, is simply not tenable.[6]

_____

6. Two demonstrable lies that Defendant told at the time she called Chris Hashisaki to the apartment clearly demonstrate that she never gave up her plan to murder Joe, and that she simply wanted a witness present when Joe was beyond recovery who would tell authorities that there had been no overt foul play on her part. When Defendant actually did speak to 911 she told the dispatcher that Joe was suffering a heart attack—not that he had ingested poison. (R.T. 10/28/04, at 37.) Defendant also lied to Chris Hashisaki about the paramedics being on "another call" so that they would have to put Joe into the car so she could take him to urgent care instead. (R.T. 9/8/04, at 21-23.) At the time the paramedics were at their station only three minutes away. *Id.* at 5-7. Where Defendant actually would have taken Joe if she had succeeded in getting him into her car is known only to her.

Defendant did not request any lesser-included instructions, and the trial judge did not err by not *sua sponte* giving them.

## ARGUMENTS III, IV and V.

### DEFENDANT'S CLAIM THAT THE § 13-703(F)(6) "CRUEL" AGGRAVATING CIRCUMSTANCE IS UNCONSTITUTIONALLY VAGUE HAS BEEN REJECTED BY THIS COURT AND THE U.S. SUPREME COURT; THE F(6) JURY INSTRUCTION GIVEN WAS A CORRECT STATEMENT OF THE LAW, AND THE EVIDENCE SUPPORTED THE JURY'S FINDING THAT THE MURDER WAS CRUEL.

To avoid redundancy, Arguments III, IV, and V will be addressed together. Defendant's claim that Arizona's "especially cruel" aggravating circumstance is constitutionally vague has been explicitly rejected by this Court and the United States Supreme Court. The trial court's instruction defining especially "cruel" tracked the guidance in this Court's cases, and the evidence of cruelty presented at trial fully supported the jury's verdict.

A.R.S. § 13-703(F)(6) provides that a statutory aggravating circumstance exists if the "defendant committed the offense in an especially heinous, cruel, or depraved manner." The jury in this case only found that Defendant had murdered her

husband in an especially cruel manner.[7]  (R.O.A. at 393.)  The U.S. Supreme

Court has said that a "bare bones" rendition of § 13-703(F)(6) would be facially

vague.  *Walton v. Arizona*, 497 U.S. 639, 654 (1990), *overruled in part by Ring*

*v. Arizona*, 536 U.S. 584, 608-09 (2002).  Nevertheless, the Supreme Court has

rejected claims that Arizona's (F)(6) aggravating circumstance is constitutionally

vague because of this Court's "narrowing construction" clarifying the meaning of

especially "cruel."  *Walton*, 497 U.S. at 654; *see Lewis v. Jeffers*, 497 U.S. 764,

777-78 (1990)(affirming *Walton's* holding and finding the "heinous and depraved"

portion of the (F)(6) aggravator as construed by this Court also adequately

channeled the sentencer's discretion).

This Court has also rejected the argument that Arizona's change to jury

sentencing renders *Walton* inapplicable—because jury instructions now narrow the

meaning of "cruelty" and "heinous and depraved."  *State v. Anderson*, 210 Ariz.

327, 352-53, ¶¶ 109-114, 111 P.3d 369, 394-95 (2005); *see State v. Johnson*, 212

Ariz. 425, 432-33, ¶¶ 21-23, 133 P.3d 735, 742-43 (2006)("heinous and depraved"

---

7. This finding was sufficient to establish the (F)(6) aggravating circumstance
because the provision is written in the disjunctive.  *State v. Djerf*, 191 Ariz. 583,
595, ¶ 44, 959 P.2d 1274, 1286 (1998).

portion of (F)(6) aggravating circumstance not unconstitutionally vague given trial court's narrowing instruction to jury).

While "[r]ecognizing that the proper degree of definition of an aggravating factor is not susceptible to mathematical precision" the Supreme Court found that the following construction of "especially cruel" gave constitutionally sufficient guidance to a capital sentencer. *Walton*, 497 U.S. at 654-655.

> The Arizona Supreme Court stated that *"a crime is committed in an especially cruel manner when the perpetrator inflicts mental anguish or physical abuse before the victims's death,"* and that *"[m]ental anguish includes a victim's uncertainty as to his ultimate fate."* 159 Ariz. at 586, 769 P.2d at 1032. The court rejected the State's argument that the six days Powell suffered after being shot constituted cruelty within the meaning of the statute. *The court pointed out that it had limited the cruelty circumstance in prior cases to situations where the suffering of the victim was intended or foreseeable to the killer.*

*Id.* (Emphasis added.)

In *State v. Trostle*, 191 Ariz. 4, 18, 951 P.2d 869, 883 (1997), this Court adopted a somewhat narrower definition of "especially cruel" than that approved in *Walton*. *Trostle* did not just require proof that abuse was inflicted before the victim's death; rather, it required proof that the victim consciously suffered pain or mental anguish:

> Cruelty exists if the victim consciously experienced
> physical or mental pain prior to death. *State v. Kiles,* 175
> Ariz. 358, 371, 857 P.2d 1212, 1225 (1993), and the
> defendant knew or should have known that the suffering
> would occur. *State v. Apelt,* 176 Ariz. 369, 376, 861
> P.2d 654, 661 (1993). "Mental anguish includes a
> victim's uncertainty about her ultimate fate." *Kiles,* 175
> Ariz. at 371, 857 P.2d at 1225.

Subsequently, in *State v. Jones,* 205 445, 449, ¶ 12, 72 P.3d 1264, 1268

(2003), this Court stated:

> Cruelty refers to the suffering of the victim. *State v.
> Clark,* 126 Ariz. 428, 436, 616 P.2d 888, 896, (1980).
> To find that a victim suffered mental anguish or physical
> pain, the victim must have been conscious during at least
> some portion of the crime and the defendant either must
> have known or should have known that the victim would
> suffer. *State v. Trostle,* 191 Ariz. 4, 18, 951 P.2d 869,
> 883 (1997).

After *Jones,* this Court's capital cases defining the "especially cruel"

circumstance have typically quoted or cited *Trostle,* holding that cruelty includes:

(1) The victim suffered physical pain or mental anguish; (2) The victim must have

been conscious during some portion of the crime, and (3) The defendant knew or

should have known that the victim would suffer. *See State v. McGill,* 213 Ariz.

147, 155, ¶33, 140 P.3d 930, 938 (2006)("Cruelty exists if the victim consciously

experienced physical or mental pain prior to death, and the defendant knew or

should have known that suffering would occur.")( quoting *Trostle, supra.*) *State*

*v. Newell,* 212 Ariz. 389, 406, ¶ 85, 132 P.2d 833, 850 (2006)(quoting *Trostle*);

*State v. Anderson,* 210 Ariz. at 352 n. 18, 111 P.3d at 394 n. 18. (quoting *Trostle*);

*State v. Moody,* 208 Ariz. 424, 471, ¶ 222, 94 P.3d 1119, 1166 (2004); *State v.*

*Montano,* 206 Ariz. 296, 299, ¶ 15, 77 P.3d 1246, 1249 (2003). This construction

of the "especially cruel" circumstance is also narrower than that approved in

*Walton.* It requires more than the victim simply be alive when the abuse is

inflicted, it requires proof that the victim was actually *conscious* during some

portion of the killing.

    In the present case, the trial court gave the jury a similar instruction that closely

followed this Court's precedent.

> All first degree murders are to some extent heinous,
> cruel and depraved.    However, this aggravating
> circumstance cannot be found to exist unless the murder is
> especially heinous, cruel or depraved, that is, where the
> circumstances of the murder raise it above the norm of
> other first degree murders.

> The terms "cruel," "heinous" or "depraved" are to be
> considered separately, but proof of any one of these
> factors is sufficient to establish this aggravating
> circumstance.

> *"Cruelty" involves the infliction of physical pain
> and/or mental anguish on a victim before death. A crime
> is committed in an especially cruel manner when a
> defendant either knew or should have known that the
> manner in which the crime was committed would cause the*

47

> *victim to experience physical pain and/or mental anguish*
> *before death.  The victim must be conscious for at least*
> *some portion of the time when the pain and/or anguish was*
> *inflicted.*

(R.O.A. 383, at 10.) (emphasis added.) [8]  In meaning, if not in precise verbiage,

this instruction is similar to *but even narrower* than the one the Supreme Court

approved of in *Walton*. 497 U.S. at 654-655. This is so because it follows the more

precise and demanding requirement—that there be proof the victim was actually

conscious during at least a portion of the crime—as set out in *Trostle* and its

progeny.

Since the instructions in this case channeled the jury's sentencing discretion

even more narrowly than similar instructions already approved by the Supreme

---

8. Defendant reproduces the jury instructions set out in *Anderson and Cromwell* and posits that, unlike the instruction in this case, they are not unconstitutional because they instructed that mental anguish is the result of the victim being uncertain about their ultimate fate. (Opening Brief, at 69-70).  While a victim's uncertainty as to his or her fate is frequently given as an example of a potential source of mental anguish, it is hardly the only one that can be imagined. *See State v. Kiles,* 175 Ariz. 358, 371, 857 P.2d 1212, 1225 (1993)(victim witnesses killing of family members before she herself is killed); *State v. Clabourne,* 194 Ariz. 379, 384, 983 P.2d 748, 753 (1999)(mental anguish caused by forcing victim to undress; serve friends drinks and raping her).

Court Defendant's claim that the (F)(6) aggravator is unconstitutionally vague as applied to her is meritless.[9]

Defendant's claim that the evidence was insufficient to support the jury's finding of cruelty is completely without merit. Whether the evidence produced at trial adequately supports an aggravating circumstance is determined by asking "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jeffers,* 497 U.S. 764, 781 (1990)(quoting *Jackson v. Virginia,* 443 U.S. 307, 319 (1987)).

In this case Defendant first poisoned her husband, whose metastasized cancer was already terminal, with sodium azide, an agricultural poison which she believed would either mimic death by cancer—and she had been told by their doctor that Joe's cancer would end up suffocating him—or death via a heart attack which also can be excruciating. Sodium azide has exactly the same effects on the human body as cyanide. (R.T. 9/23/04, at 16.) Symptoms include: difficulty breathing, *i.e.,* suffocation, vomiting, increased heart rate, slowed reflexes, headache, faintness,

---

9. This Court has rejected Defendant's contention that it should engage in proportionality review. *See State v. Salazar,* 173 Ariz. 399, 416, 844 P.2d 566, 583 (1992). (Opening Brief, at 62-63, 70-73.) *See also Walton,* 497 U.S. at 655-56. (no constitutional requirement for proportionality review by federal courts).

respiratory failure, convulsions, coma, and death. *Id.* at 13-14. Simply put, sodium azide kills by cutting off the supply of oxygen to the brain: "Usually it renders the individual unconscious because of the blood flow to the brain and too little—there's too little oxygen getting to the brain." *Id.* at 16. In the present case, it is undisputed that Joe Andriano had collapsed onto his living room floor and lay in the fetal position—unable to breathe, unable to move, and occasionally vomiting —for at least 45 minutes—probably much longer. (R.T. 9/8/04, at 14-23.) Even Defendant's own testimony was that her husband was "very scared" at this point. (R.T. 11/2/04, at 105.) Indeed, it is undisputed that Joe was a terminal cancer patient who had recently been told by his doctor that the tumors in his lungs would kill him by suffocation. (R.T. 9/28/04, at 14-15, 21-22.) That is precisely what he must have thought was happening to him—because that is just how Defendant wanted his death to appear.

Well after her husband had plenty of time to ingest a fatal dose of poison, Defendant summoned Chris Hashisaki, almost certainly as a witness who would be able to say that there had been no overt foul play involved in Joe's death. When Chris asked what was going on, Defendant replied: "I have a problem. Don't ask any questions. My husband's in on the floor dying and I haven't called 911 yet." *Id.*, at 11-12. Defendant's real "problem," clearly, was that while Joe could not

50

breathe; could not move, and was nauseated and vomiting, he was not yet on death's door. Joe had been assured that Defendant had called 911, be she had lied to him while he lay on the floor, essentially suffocating. *Id.* Chris demanded that Defendant call 911, but she lied, claiming she could not get through. *Id.,* at 13. Chris observed Joe down on the floor, in the fetal position, wearing only his underwear. Joe was exhausted, worn out, and had vomited on the floor. *Id.,* at 14-15, 19. He told Chris: "I need help." *Id.* When told help was on the way, he said: "I've needed help for a long time." *Id.* He wondered what was taking the paramedics "45 fucking minutes." *Id.,* at 15-16. Several minutes later Chris found Defendant in a back bedroom "apparently" calling for the paramedics. Both women went back to where Joe was on the ground in the living room, and Defendant began to asking questions: "What's his color like? Are his lips blue?" *Id.,* at 18-20. Chris responded that he was having trouble breathing: "They need to get here." *Id.* at 20. Chris could see that Joe was suffocating. *Id.*

Defendant hung up the phone and played for time: saying that they needed to get Joe into the car and take him to urgent care because the paramedics were "on another call." *Id.* at 21. This was, of course, a lie. Paramedics responded to the Santa Riva Apartments approximately three minutes after receiving the call. (R.T. 9/15/04, at 7.)

51

Defendant still tried to get Joe up, but he said: "I can't get up.  I can't make it to the car." (R.T. 9/8/04, at 21.)  At this point, an expert opined later, the poison had made Joe so weak that he would not have been able to stand.  (R.T. 9/23/04, at 20.)  Still trying to keep Joe from getting help, Defendant tried to lift him up, saying: "Get your ass up." (R.T. 9/8/04, at 22.)  When Joe could not get up, Defendant yelled: "Get you're fucking ass up." *Id.*  At this point, Chris heard the fire department sirens and walked outside the apartment to direct the paramedics to the apartment.  As she looked back into the apartment Joe was still in the fetal position, vomiting. *Id.* at 25.  Defendant was in the dining room. *Id.* at 25.  As medical help for Joe finally arrived, Defendant screamed: "Go away, go away.  Chris, tell them to go away." *Id.,* at 27.  Defendant threw Chris's purse outside and slammed the door." *Id.*

After the paramedics arrived, and after she had slammed the front door shut, Defendant savagely beat Joe over the head with a barstool.  As noted *supra,* so savagely that the medical examiner counted at least 23 separate blows to the back of Joe's head.  Defensive wounds on both of Joe's arms showed he that he was conscious during at least some the beating.  If any of Defendant's, admittedly self-serving, testimony is to be believed he was conscious through most of the beating.  Moreover, there is simply no doubt that Joe suffered terribly, both physically and

emotionally: he could not breathe; he could not get up, and he was nauseosus and vomiting. He obviously thought he was suffocating to death from the cancer in his lungs—just as his doctor had predicted, and just as Defendant wanted it to look. Defendant turned away the only hope of relief that Joe had, the paramedics, when they were coming right to his front door. There is no question that Defendant "knew or should have known" that he would suffer terribly. She had researched the effects of sodium azide on her office computer. She had put the poison into his food. She was the one who turned the paramedics away. She was the one who then mercilessly beat her prostrate husband, and then stabbed him as he lay helpless.

Simply put, the evidence amply supported the jury's finding of cruelty.

## VI

**NEITHER THIS COURT NOR THE UNITED STATES SUPREME COURT HAS EVER RECOGNIZED A RIGHT TO PRESENT EVIDENCE OF "RESIDUAL DOUBT" AT THE PENALTY PHASE AND DEFENDANT RESPONDED TO THE STATE'S MOTION TO EXCLUDE SUCH EVIDENCE BY STATING "RESIDUAL DOUBT IS NOT RELEVANT IN THIS CASE."**

As this Court has recently stated there is no constitutional requirement that the sentencing proceeding jury revisit the prior guilty verdict by considering evidence

53

of residual doubt. *State v. Ellison,* 213 Ariz. 116, 136 ¶ 82, 140 P.3d 899, 919

(2006) citing *Oregon v. Guzek,* __ U.S. __, 126 S.Ct. 1226, 1230 (2006)

(acknowledging that federal precedent has not established such a right and that

whether or not such a right existed states could preclude such evidence at

sentencing proceeding); *Franklin v. Lynaugh,* 487 U.S. 164, 179 (1988).   This

Court has also noted that under Arizona's statutory scheme, "[d]uring the

aggravation and penalty phases, a jury may not revisit its initial guilty verdict. The

only issue at the aggravation phase is whether any aggravating circumstances have

been proved; the only issue at the penalty phase is whether death is the appropriate

sentence." *State v. Anderson,* 210 Ariz. 327, 348 ¶ 86, 111 P.3d 369, 390 (2005).

*See* A.R.S. § 13-703.01(E),(H).

Defendant's claim that the trial judge erred in excluding "residual doubt"

evidence is surprising in light of her response to the prosecution's motion *in limine*

to exclude such evidence at the penalty phase.   Defendant's entire response read:

> Defendant, Wendi E. Andriano, through counsel
> undersigned, pursuant to Rule 16 of the Arizona Rules of
> Civil Procedure, the Fifth, Sixth, Eighth and Fourteenth
> Amendments to the U.S. Constitution and Article 2, §§ 4,
> 23, and 24 of the Arizona Constitution, responds to the
> above-entitled motion and requests that said motion be
> denied.

> The issue of "residual doubt" is not relevant to this
> case and counsel does not intend to adduce evidence of
> residual doubt in the penalty phase of this proceeding.

(R.O.A. at 165.)  Defendant's brief claims she "specifically requested the court to

permit her to introduce evidence of 'residual doubt.'"  (Opening Brief, at 94.)

However, the request Defendant cites is for a jury instruction specifically listing

residual doubt as a mitigating factor.  (R.T. 12/7/04, at 5.)  As this Court has

recently observed, the United States Supreme Court has rejected the argument that

judges are required to instruct capital juries on specific mitigating factors.  *State*

*v. Johnson,* 212 Ariz. 425, 437 ¶¶42-44, 133 P.3d 735,  747 (2006) (citing

*Buchanan v. Angelone,* 522 U.S. 269, 270 (1998)(no Eighth Amendment

requirement "that a capital jury be instructed on the concept of mitigating evidence

generally, or on particular statutory mitigating factors")).

   The standard for reviewing jury instructions used during the penalty phase of

a capital sentencing proceeding is "'whether there is a reasonable likelihood that the

jury has applied the challenged instruction in a way that prevents the consideration

of constitutionally relevant mitigating evidence." *Id.* (citations omitted.) The most

pertinent part of the mitigation instruction actually given in this case reads:

> Mitigating circumstances are circumstances which do
> not justify or excuse the offense, but which in fairness and
> mercy, may extenuate or reduce the degree of blame or

55

moral culpability.  Such mitigating circumstances may be any evidence presented by either the Defendant or the State that would lead you to apply leniency in this case and find that death is not an appropriate sentence.

Although a final decision on a penalty of death or life imprisonment must be unanimous, the determination of what circumstances are mitigation is for you to resolve, individually, based on all the evidence that has been presented to you during this phase and any of the prior phases of the trial.

(R.O.A. 419, at 6; R.T. 12/16/04, at 44-45.)

There is no question that the instruction quoted satisfies the criteria set out by this Court and the United States Supreme Court.  This Court should reject this claim.

## VII

### DEFENDANT ERRONEOUSLY ARGUES THAT THE TRIAL COURT "REFUSED TO INCLUDE MERCY AS A MITIGATING FACTOR FOR THE JURY TO CONSIDER" WHEN THE JUDGE ACTUALLY DEFINED MITIGATING CIRCUMSTANCES IN TERMS OF MERCY.

In her heading to "Argument VII" Defendant unaccountably states that the trial court refused to permit her to present "evidence" of mercy—but then follows with a discussion in which she contends that the judge violated her rights by not giving a "mercy" jury instruction.  (Opening Brief, at 95-96.)  This Court normally reviews *de novo* the question of whether a jury instruction accurately states the

applicable law. *State v. Orendain,* 188 Ariz. 54, 56, 932 P.2d 1325, 1327 (1997).

The State has found no portion of the record wherein one could say that the court excluded "evidence" that the jury should treat Defendant with "mercy," and Defendant cites none.   Indeed, she does not even define what she means by "evidence of mercy."  *Id.*

The Eighth Amendment requires that the sentencer in a capital case not be precluded from considering, nor refuse to consider, any constitutionally relevant mitigating evidence.  *Weeks v. Angelone,* 528 U.S. 225, 232 (2000).  However, "the State may structure the jury's consideration of mitigation so long as it does not preclude the jury from giving effect to it."  *Id.*  The standard for determining whether jury instructions satisfy these principles is "whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence."  *Id.* (citations omitted.)*;*  As the United States Supreme Court stated in *Kansas v. Marsh,* __ U.S. __, 126 S.Ct. 2516, 2525 (2006):

> "[W]e have never held that a specific method of balancing mitigating factors and aggravating factors in a capital sentencing procedure is constitutionally required . . ." (citation omitted) ". . . [t]he requirement of individualized sentencing in capital cases is satisfied by allowing the jury to consider all relevant mitigating evidence;" (citation omitted) "[o]ur early mitigating cases may thus be read as

57

> doing little more than safeguarding the adversary process
> in sentencing proceedings by conferring on the defendant
> an affirmative right to place his relevant evidence before
> the sentencer."

Defendant notes that the *Marsh* opinion commented approvingly on what she terms a "mercy" jury instruction. (Opening Brief, at 96.) However, Defendant only quotes *part* of the instruction in the Supreme Court's opinion. *Id.* The entire instruction in *Marsh* reads:

> A mitigating circumstance is that *which in fairness and mercy* may be considered as extenuating or reducing the degree of moral culpability or blame or which justify a sentence of less than death, although it does not justify or excuse the offense. The determination of what are mitigating circumstances is for you as jurors to resolve under the facts and circumstances of this case.
>
> The appropriateness of the *exercise of mercy* can itself be a mitigating factor you may consider in determining whether the State has proved beyond a reasonable doubt that the death penalty is warranted.

*Marsh*, 126 S.Ct. at 2526. (emphasis added.)

The mitigation instruction actually given in this case—which Defendant does not bother to quote—in pertinent part reads:

> Mitigating circumstances are circumstances which do not justify or excuse the offense, but *which in fairness and mercy*, may extenuate or reduce the degree of blame or moral culpability. Such mitigating circumstances may be any evidence presented by either the Defendant or the

58

> State that would lead you to apply leniency in this case and find that death is not an appropriate sentence.
>
> Although a final decision on a penalty of death or life imprisonment must be unanimous, the determination of what circumstances are mitigation is for you to resolve, individually, based on all the evidence that has been presented to you during this phase and any of the prior phases of the trial.

(R.O.A. 419, at 6; R.T. 12/16/04, at 44-45.) (emphasis added.) The instruction actually given in the present case conveys precisely the same information as that endorsed in *Marsh* using *slightly* different words.

To reiterate, the States are free to structure a jury's consideration of mitigation as long as they do not preclude jurors from giving effect to it. *Weeks v. Angelone, supra; Kansas v. Marsh, supra; Graham v. Collins,* 506 U.S. 461, 484-490 (1993); *Franklin v. Lynaugh,* 487 U.S. at 179; *Zant v. Stephens,* 462 U.S. 862, 875-76 n. 13 (1983). The Supreme Court has never proclaimed the constitutional necessity of a "mercy" instruction in *Marsh* or any capital case. Nevertheless, the mitigation instruction given in the present case is, in meaning, virtually identical to the one cited with approval in *Marsh*.

## VIII

### DEFENDANT'S CLAIM THAT THE PENALTY-PHASE INSTRUCTIONS REQUIRED JURORS TO AGREE UNANIMOUSLY ON THE EXISTENCE OF MITIGATING CIRCUMSTANCES IS BASED ON ONE SMALL PART OF THE COMPREHENSIVE MITIGATION INSTRUCTION ACTUALLY GIVEN TAKEN OUT OF CONTEXT.

Defendant contends that the judge improperly instructed the jury that it could only consider mitigating factors that all jurors unanimously agreed existed. This argument is based entirely on taking one part of the last paragraph of the multi-page mitigation instruction actually given entirely out-of-context. *See Mills v. Maryland,* 486 U.S. 367, 375-77 (1988). (Opening Brief, at 99.) As this Court has repeatedly stated, "jury instructions must be considered as a whole." *State v. Roque,* 213 Ariz. 193, 215 ¶ 74, 141 P.3d 368, 390 (2006). To do otherwise is to mislead.

Courts review *de novo* the question of whether a jury instruction accurately states the applicable law. *State v. Orendain,* 188 Ariz. at 56, 932 P.2d at 1327. (1997). A trial court's refusal to give a jury instruction is reviewed for abuse of discretion. *State v. Bolton,* 182 Ariz. 290, 309, 896 P.2d 830, 849 (1995).

Because Defendant has seen fit to avoid providing the most pertinent provisions of the mitigation instruction in question—those provisions wherein the judge tells

60

the jurors they must individually determine mitigation—the State replicates the pertinent parts here:

## MITIGATING CIRCUMSTANCES

Mitigating circumstances are circumstances which do not justify or excuse the offense, but which, in fairness or mercy, may extenuate or reduce the degree of blame or moral culpability. Such mitigating circumstances may be any evidence presented by either the Defendant or the State that would lead you to apply leniency in this case and find that death is not an appropriate sentence.

*Although a final decision on a penalty of death or life imprisonment must be unanimous, the determination of what circumstances are mitigation is for each one of you to resolve, individually, based upon all the evidence that has been presented to you during this phase and at any of the prior phases of the trial.* The evidence to be considered by you in determining mitigation includes any aspect of the Defendant's background, character, propensity or record, and any of the circumstances of the offense that might justify a penalty less severe than death. The mitigating circumstances offered by the Defendant are as follows:

. . . .

You are not limited to considering these circumstances. You must also consider any other relevant mitigation evidence presented during any phase of the trial, even if it was not proposed by either of the parties. *As a juror and sentencer in a death penalty case, you must give consideration to all relevant mitigating evidence presented.* You may not consider any information presented during this [penalty] phase of the trial as a new aggravating factor.

. . . .

61

*You must make your decision about whether mitigation is sufficiently substantial to call for leniency based solely upon your weighing of any mitigation proven to you and the aggravating factor you have already found during the Aggravation Phase. To do this, you must individually determine the nature and extent of mitigating circumstances. Then, in light of the aggravating circumstance that has been proven to exist, you must individually determine if the totality of the mitigating circumstances is sufficiently substantial to call for leniency and a life sentence.*

The weighing of aggravating and mitigating circumstances does not mean a mere mechanical counting of factors on each side of an imaginary scale, or the arbitrary assignment of weights to any of them. *You are free to assign whatever value you deem appropriate to each and all of the various factors you are permitted to consider. In weighing the various circumstances, you determine, under the relevant evidence, which penalty is justified and appropriate by considering the totality of the aggravating circumstance with the totality of the mitigating circumstances.* In reaching the reasoned, moral judgment about which penalty is justified and appropriate, you must decide how compelling or persuasive the totality of the mitigating factors are when compared against the totality of the aggravating factor. You cannot be governed or influenced by mere sentiment, passion or prejudice; however, you may consider grounds for leniency and decline to impose the death penalty after a thoughtful consideration of the evidence.

Neither the State nor the Defendant has a burden of proving that the weight of the mitigation is or is not sufficiently substantial to call for leniency.

*The law does not define what is "sufficiently substantial to call for leniency." Each juror must determine for himself what is "sufficiently substantial to call for leniency."*

Any verdict of death or life imprisonment must be unanimous. If you unanimously find that no mitigation exists, then you must return a verdict of death. If you unanimously find that mitigation exists, each one of you must individually weigh that mitigation in light of the aggravating circumstance already found to exist, and

> if you unanimously find that the mitigation is not sufficiently
> substantial to call for leniency, you must return a verdict of death.
> If you unanimously find that mitigation exists and it is sufficiently
> substantial to call for leniency, you must return a verdict of life.
> If, after considering all the aggravating and mitigating evidence,
> you have a doubt whether a death sentence should be imposed,
> then you should resolve that doubt in favor of a life sentence.

(R.O.A. 419 at 6-10; R.T. 12/16/04, at 44-49.) (emphasis added.)

These instructions appear to be similar in meaning to ones recently upheld by this Court. *State v. Ellison,* 213 Ariz. 116, 139 ¶¶ 101-102, 140 P.3d 899, 922 (2006).[10] One part of the instructions provided that unanimity was required for the jury to return a verdict of either death or life, but other parts made it clear that the jury did not have to unanimously find the existence of a mitigating circumstance before a juror could individually consider it. *Id.*

Here, the judge explicitly stated: "the determination of what circumstances are mitigation is for each one of you to resolve, *individually*, based upon all the evidence that has been presented to you . . ." *Id.* (Emphasis added.) The judge then instructed that the determination of whether the mitigation was sufficiently substantial to call for leniency is: "based *solely* upon your weighing of any

---

10. The *Ellison* opinion did not quote the instructions upheld in that case, but a fair reading of the opinion suggests that they must have been very similar to the present ones.

mitigation proven to you and the aggravating factor you have already found during the Aggravation Phase.  To do this, you must *individually* determine the nature and extent of mitigating circumstances.  Then, in light of the aggravating circumstance that has been proven to exist, you must *individually* determine if the totality of the mitigating circumstances is sufficiently substantial to call for leniency and a life sentence."  *Id.*  (Emphasis added.)  Finally, the judge told them:  " *Each juror* must determine for *himself or herself* what is "sufficiently substantial to call for leniency."  *Id.*  (Emphasis added.)

Simply put, each juror had learned from the instructions that: (1) he or she, individually, must determine the "nature and extent" of the mitigating circumstances; (2) each juror must then, individually, determine whether the mitigation is sufficient to call for leniency in light of the aggravation already found to exist, and (3) that each juror must, individually, define the meaning of "sufficiently substantial to call for leniency" for themselves.  Defendant's contention, that after being so instructed, any rational juror could possibly have interpreted the phrase: "If you unanimously find that mitigation exists, each of you must individually weigh that mitigation in light of the aggravation . . . " to mean that he or she could not consider certain mitigation evidence unless all eleven of the others agreed that specific mitigation evidence had been proven, is absurd.

64

(Opening Brief, at  102-103.)  Read within the context of the entire mitigation instruction the trial court properly instructed the jury that if all the jurors agreed that  some, but not necessarily the same, mitigation exists, then each juror must consider that mitigation in light of the aggravation.  This is precisely why small portions of a jury instruction must not be taken out of context; rather, instructions must be considered in their entirety.  *Roque, supra.*

## IX AND X

**THE COURT DID NOT COERCE NOR INCORRECTLY INSTRUCT THE JURORS WHEN IT GAVE THE APPROVED IMPASSE INSTRUCTION WHEN THE JURY ASKED WHAT PROCEDURE WAS TO BE USED IF THEY WERE UNABLE TO REACH A UNANIMOUS VERDICT.**

In determining whether a trial court has coerced the jury's verdict this Court views the actions of the judge and comments made to the jury based on the "totality of the circumstances" and attempts to determine if the independent judgment of the jury was displaced.  *State v. Huerstal,*  206 Ariz. 93, 97, 75 P.3d 698, 702 (2003); *see Lowenfield v. Phelps,* 484 U.S. 231, 237 (1988)(in reviewing claim jury was coerced court must consider supplemental charge in its context and under all the circumstances).  Defendant's contention that the trial court "coerced" a verdict by giving an "impasse" instruction is meritless because she misleadingly discusses only

65

a small part of the   instruction actually given and none of the pertinent circumstances.  (Opening Brief, at 105-114.)

The jury in this case began deliberations in the penalty phase about 2:20 p.m. on December 16, 2004.  (R.O.A. 421, at 2.)  On December 20, 2004, the jury resumed their deliberations from December 16, 2004, and at about 2:10 p.m. that day the jury sent a note to the judge asking: "Is it possible to have a transcript of Wendy Andriano's statement to the jury?  Thank you."  (R.O.A. 424, at 1; R.T. 12/20/04, at 3.)  The note was signed by the foreperson.  (12/20/04, at 3.)  With the agreement of both parties the judge gave the following response:

> Monday December 20, 2004, you will not receive a transcript.
> Please rely on your collective memory.  Judge Brian Ishikawa.

*Id.*

At about 4:02 p.m. that afternoon the trial court received another note from the jury, again signed by the foreman:

> If we are unable to reach a unanimous verdict what is the
> procedure that will be followed?  Thank you.

(R.O.A. 424, at 2; R.T. 12/20/04, at 4.)

Over a defense objection the trial court gave the following response:

> Monday, December 20, 2004.  It appears from your note that you
> are in deadlock in your deliberations.  I have some suggestions to
> help your deliberations, not to force you to reach a verdict.  I'm

66

merely trying to be responsive to your apparent need for help.  I do not wish or intend to force a verdict.  Each juror has a duty to consult with one another, to deliberate with a view to reaching an agreement if it can be done without violence to individual judgment.

No juror should surrender his or her honest conviction as to the weight or effect of the evidence solely because of the opinion of other jurors or for the purpose of reaching a verdict.

However, you may want to identify areas of agreement or disagreement and discuss the law and the evidence as it relates to the area of disagreement.  If you still disagree, you may wish to tell the attorneys and me which issues, questions, law and facts you would like us to assist you with.

If you decide to follow this suggestion, please write down the issues, questions, law or fact of which we can possibly help.  Please give your note to the bailiff.  We will discuss your note and try to help.  Judge Brian Ishikawa.

(R.T. 12/20/04, at 5.)

The jury sent out no more notes at any time and deliberated through the following day, December 21, 2004.  (R.O.A. 424, at 2; R.O.A. 425.)  The jury again resumed deliberating at 1:00 p.m., on December 22, 2004, and returned a sentence of death sometime after 2:25 p.m.  (R.O.A. 427, at 1-2.)

The instruction given is similar to that suggested in the comment to Rule 22.4, Ariz. R. Crim. P.  However, the instruction not only contained the cautionary language set out in the comment, *i.e.,* "I have some suggestions to help your

deliberations, not to force you to reach a verdict," it contains additional, stronger cautionary language:

> No juror should surrender his or her honest conviction as to the weight or effect of the evidence solely because of the opinion of other jurors or for the purpose of reaching a verdict.

(R.T. 12/20/04, at 5.)

As this Court has noted, the rule gives the trial judge broad discretion in dealing with jurors at an impasse but "requires an affirmative indication from the jury it is in need of help before assistance may be offered." *Huerstal*, 206 Ariz. at 99, ¶ 17, 75 P.3d at 704. Here, the jury's question explicitly asked the judge what procedure was to be followed if they were unable to reach a unanimous verdict. At the very least the jurors were giving the court "an affirmative indication" that they were requesting help, as described in *Huerstal*. (R.O.A. 424, at 2.) Additionally, there are none of the other indicia of potential coercion that concerned the *Huerstal* court. 206 Ariz. at 98-100, ¶¶ 9-22, 75 P.3d at 703-705. The judge here had absolutely no indication whatever of how the jury was split—while in *Huerstal* the judge knew there was an eleven-to-one split with only one vote for acquittal. *Id.* There was no *ex parte* communication between the judge and any of the jurors and no indication that any one juror was a "hold out"

as occurred in *Huerstal*. *Id.* No juror had expressed an opinion that no further discussions would change that juror's mind, and the judge gave no further instructions after the one suggested by Rule 22.4. A very strong indication that the jurors felt no coercion is the fact that, after receiving the Rule 22.4 instruction, the jurors appear to have deliberated some more that afternoon, December 20, 2004; deliberated again the following day, December 21, 2004, and only came to a verdict on December 22, 2004. (R.O.A. 424, at 2; R.O.A. 425; R.O.A. 427, at 1-2.)

The giving of the Rule 22.4 instruction was perfectly proper in this case. Even if it had been premature, "standing alone, the court's premature giving of the instruction recommended by the comment to Rule 22.4 does not rise to the level of reversible error." *Huerstal*, 206 Ariz. at 99-100, ¶ 18, 75 P.3d at 704-705; *see also State v. Sabala*, 189 Ariz. 416, 420, 943 P.2d 776, 780 (App. 1997). This is so in the present case because *all* the judge did was give the Rule 22.4 instruction. He had no further communications with the jury of any sort until after the verdict came back two days later.

Defendant's reiteration of her earlier argument—that the court's instruction defining mitigation told jurors that they could only consider mitigation that they all agreed existed—is completely without merit. (Opening Brief, at 116.) As

69

discussed above, this argument is based entirely on taking one small portion of the mitigation instruction out-of-context and refusing to read the instruction as a whole, as mandated by this Court. *See Roque, supra. See discussion at* Argument VIII, *supra.* In fact, the mitigation instruction given explicitly informed the jurors several times that each of them had to assess mitigation individually. *Id.*

Similarly, Defendant's contention that the impasse instruction misstated the law is without merit. (Opening Brief, at 115-119.) It is well-settled that during the penalty phase of a capital case each juror must individually assess the mitigation and determine if it is sufficient to warrant leniency. *Mills v. Maryland,* 486 U.S. at 374-76, citing *Eddings v. Oklahoma,* 455 U.S. 104 (1982); *Lockett v. Ohio,* 438 U.S. 586, 604 (1978); *see Skipper v. South Carolina,* 476 U.S. 1, 4 (1986); *State ex rel. Thomas v. Granville,* 211 Ariz. 468, 473, ¶ 21, P.3d 662, 667 (2005); A.R.S. §13-703(E). However, this does not mean, as Defendant suggests, that the jurors cannot be instructed that they should consult with one another while making what is likely the most serious and important decision most of them will ever make. Indeed, the United States Supreme Court has said precisely this in *Lowenfield, supra,* wherein the trial court had given an *Allen-type* impasse instruction to jurors during the sentencing proceedings of a capital case. 484 U.S. at 235. That impasse instruction told the jurors to consult with and consider each other's views

70

with the object of reaching a verdict, if they could do so without violence to

individual judgment:

> Ladies and Gentlemen, as I instructed you earlier if the jury is unable to unanimously agree on a recommendation the Court shall impose a sentence of Life Imprisonment without benefit of Probation, Parole, or Suspension of Sentence.

> When you enter the jury room *it is your duty to consult with one another to consider each other's views and to discuss the evidence with the objective of reaching a just verdict if you can do so without violence to that individual judgment.*

> *Each of you must decide the case for yourself but only after discussion and impartial consideration of the case with your fellow jurors.* You are not advocates for one side or the other. Do not hesitate to reexamine your own views and to change your opinion if you are convinced you are wrong but do not surrender your honest belief as to the weight and effect of the evidence solely because of the opinion of your fellow jurors merely for the purpose of returning a verdict.

*Id.* (Emphasis added.) In upholding this instruction the Supreme Court quoted

with unqualified approval the following passage from the original *Allen* case:

> The very object of the jury system is to secure unanimity by a comparison of views, and by arguments among the jurors themselves. It certainly cannot be the law that each juror should not listen with deference to the arguments and with a distrust of his own judgment, if he finds a large majority of the jury taking a different view of the case from what he does himself. It cannot be that each juror

71

> should go to the jury room with a blind determination that the verdict shall represent his opinion of the case at that moment; or, that he should close his ears to the arguments of men who are equally honest and intelligent as himself.

*Lowenfield,* 484 U.S. at 237 (quoting *Allen v. United States,* 164 U.S. 492 (1896)).

The Supreme Court described these observations from *Allen* as "beyond dispute."

*Id.* Simply put, there is no basis for Defendant's claim that the impasse instruction in the present case misstated the law because it instructed the to jurors consult with one another with a view to reaching a verdict—if it could be done without violence to individual judgment. This is almost precisely the language approved of in *Lowenfield.*

Simply put, there is no legal merit to this claim and this Court should reject it.

## XI

## ARIZONA'S SENTENCING STATUTES ARE NOT UNCONSTITUTIONALLY VAGUE AND LETHAL INJECTION IS NOT UNCONSTITUTIONAL CRUEL AND UNUSUAL PUNISHMENT.

A statute is void for vagueness if it fails to give "the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he [or she] may act accordingly." *State v. Wagner,* 194 Ariz. 310, 312-313, ¶ 11, 982 P.2d 270, 272-273 (1999) (quoting *Grayned v. City of Rockford,* 408 U.S. 104, 108 (1972)). A criminal sentencing scheme can be challenged on vagueness grounds,

and the scheme found void for vagueness if it fails to state "with sufficient clarity the consequences of violating a given criminal statute." *United States v. Batchelder,* 442 U.S. 114, 123 (1979). Arizona's sentencing statutes are not void for vagueness because they state with clarity that one who commits first degree murder may be punished by either death, natural life or life in prison with the possibility of parole. *Wagner,* 194 Ariz. at 313, ¶ 11, 982 P.2d at 273. Thus, a person of ordinary intelligence can easily determine the range of punishment he or she faces for committing first degree murder. *Id.*

To the extent that Defendant is actually claiming that execution by lethal injection in general is cruel and unusual punishment, this Court has rejected that argument many times. *See, e.g., State v. McGill,* 213 Ariz. 147, 161, ¶ 82, 140 P.3d 930, 944 (2006); *State v. Van Adams,* 194 Ariz. 408, 422, ¶ 55, 984 P.2d 16, 30 (1999); *State v. Hinchey,* 181 Ariz. 307, 315, 890 P.2d 602, 610 (1995). No published opinion has ever held that lethal injection violates the Eighth Amendment. *See, e.g., Cooper v. Rimmer,* 379 F.3d 1029, 1033 (9th Cir. 2004); *Vickers v. Stewart,* 144 F.3d 613, 617 (9th Cir. 1998) ; *LaGrand v. Stewart,* 133 F.3d 1253, 1264-65 (9th Cir. 1998); *Felder v. Johnson,* 180 F.3d 206, 215 (5th Cir. 1999)(claim that lethal injection is cruel and unusual punishment borders on the legally frivolous); *Hunt v. Nuth,* 57 F.3d 1327, 1338 n. 16 (4th Cir.

1995)("[N]o court thus far has found execution by [lethal injection] unconstitutional . . . many states have switched to this method because it is perceived to be a more humane method of execution.").

Defendant questions the constitutionality of the Arizona Department of Correction's protocol for lethal injection; however, the protocol was held not to violate the Eighth Amendment. *LaGrand v Lewis,* 883 F. Supp. 469, 470-71 (D. Ariz. 1995). Arizona uses a similar protocol and similar chemicals to those that are used in California to execute inmates—sodium pentothal, pancuronium bromide, and potassium chloride. *Cooper v. Rimmer,* 379 F.3d at 1031-1033. The 9th Circuit rejected challenges to the California protocol that Defendant makes here, and upheld the use of that combination of chemicals. *Id.*

Additionally, the United States Supreme Court has recently decided *Hill v. McDonough*, __U.S.__, 126 S. Ct. 2096 (2006), finding that challenges to the lethal injection procedure may proceed under 42 U.S.C. § 1983. __U.S. at __, 126 S. Ct. at 2098. Arizona's execution protocol is subject to change and, because Defendant's execution is not imminent, she is free to challenge the procedures applicable to her execution by lethal injection under § 1983 when such a challenge is more timely.

The Court should deny this claim.

74

# ARGUMENT XII

Defendant raises in abbreviated format thirteen arguments concerning the alleged unconstitutionality of the death penalty that she concedes this Court has rejected in its previous decisions. The State assumes that this has been done for the purpose of avoiding preclusion in subsequent proceedings as has become routine in capital cases. *See State v. Walden,* 183 Ariz. 595, 605, 905 P.2d 974, 984 (1995). The State therefore rests on this Court's previous decisions as cited by Defendant.

## CONCLUSION

Based on the foregoing authorities and arguments, Appellee respectfully requests that this Court affirm Defendant's conviction and sentence.

Respectfully submitted,

TERRY GODDARD
ATTORNEY GENERAL

KENT E. CATTANI
CHIEF COUNSEL
CAPITAL LITIGATION SECTION

ROBERT J. GORMAN
ASSISTANT ATTORNEY GENERAL

ATTORNEYS FOR APPELLEE

76

## CERTIFICATE OF SERVICE

TWO COPIES of this Brief were deposited
for mailing this 15th day of December, 2006, to:

        BRENT E. GRAHAM
        Deputy Public Defender
        11 West Jefferson, Suite 5
        Phoenix, Arizona   85003

        Margaret M. Green
        Deputy Public Defender
        11 West Jefferson, Suite 5
        Phoenix, Arizona   85003

        Attorneys for APPELLANT

                                                       _____

                        LINDA YRRIZARRY
                        LEGAL SECRETARY
                        CAPITAL LITIGATION SECTION
                        400 W. CONGRESS, S–315
                        TUCSON, ARIZONA 85701–1367

CRM06-0395

## CERTIFICATE OF COMPLIANCE

Pursuant to Rule 31.13, Arizona Rules of Criminal Procedure, undersigned counsel certifies that this brief is double spaced, uses a 14-point CG Times proportionately-spaced typeface, and contains <17,934> words.

_____
ROBERT J. GORMAN

# EXHIBIT C

# IN THE SUPREME COURT
# STATE OF ARIZONA

STATE OF ARIZONA,

                Appellee,

        v.

WENDI ELIZABETH ANDRIANO,

                Appellant.

No. CR-05-0005-AP

Maricopa County Superior
Court No. CR-2000-096032

## APPELLANT'S REPLY BRIEF

MARICOPA COUNTY PUBLIC DEFENDER

BRENT E. GRAHAM
State Bar Membership No. 011868

PEG GREEN
State Bar Membership No. 011222

Deputy Public Defenders
Attorneys for APPELLANT
Downtown Justice Center
620 West Jackson, Suite 4015
Phoenix, Arizona 85003
Telephone (602) 506-7711

## TABLE OF CONTENTS

**Page**

STATEMENT OF THE CASE ..................................................................1

STATEMENT OF FACTS ......................................................................2

ARGUMENT I ...........................................................................................6

> THE TRIAL COURT VIOLATED ANDRIANO'S RIGHT TO A FAIR TRIAL AND DUE PROCESS UNDER THE FIFTH, SIXTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND ARTICLE 2, §§ 4 AND 24 OF THE ARIZONA CONSTITUTION WHEN IT PERMITTED EVIDENCE OF ANDRIANO'S ATTEMPTS TO OBTAIN LIFE INSURANCE POLICIES AND EVIDENCE OF ANDRIANO'S EXTRAMARITAL ACTIVITIES AS INTRINSIC TO THE CHARGE OF PREMEDITATED MURDER.

ARGUMENT II ........................................................................................10

> THE TRIAL COURT COMMITTED FUNDAMENTAL ERROR BY FAILING TO INSTRUCT THE JURY ON THE LESSER-INCLUDED OFFENSES OF SECOND DEGREE MURDER AND MANSLAUGHTER WHERE EVIDENCE AT TRIAL SUBSTANTIATED THOSE LESSER-INCLUDED OFFENSES DENYING ANDRIANO A FAIR TRIAL AND DUE PROCESS UNDER THE SIXTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AS WELL AS ARTICLE 2, §§ 4 AND 24 OF THE ARIZONA CONSTITUTION.

**ARGUMENT III** .................................................................................15

> THE CRUEL, HEINOUS, OR DEPRAVED AGGRAVATOR UNDER A.R.S. § 13-703(F)(6) IS FACIALLY VAGUE AND VAGUE AS APPLIED DENYING ANDRIANO A FAIR TRIAL, A FAIR SENTENCING, AND DUE PROCESS OF LAW UNDER THE SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AS WELL AS ARTICLE 2, §§ 4, 15, AND 24 OF THE ARIZONA CONSTITUTION.

**ARGUMENT IV** .................................................................................16

> THE TRIAL COURT'S INSTRUCTION DEFINING CRUELTY UNDER A.R.S. § 13-703(F)(6) WAS INSUFFICIENT TO GUIDE THE JURY AND APPROPRIATELY CHANNEL THEIR DISCRETION IN VIOLATION OF THE SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AS WELL AS ARTICLE 2, §§ 4, 15, AND 24 OF THE ARIZONA CONSTITUTION.

**ARGUMENT V** .................................................................................26

> APPLICATION OF THE PROPER, NARROW CONSTRUCTION OF "ESPECIALLY CRUEL" DEMONSTRATES THAT THE EVIDENCE IS INSUFFICIENT TO SUPPORT THIS AGGRAVATING CIRCUMSTANCE.

**ARGUMENT VI**..................................................................................31

> THE TRIAL COURT'S REFUSAL TO PERMIT
> ANDRIANO TO PRESENT EVIDENCE OF
> RESIDUAL DOUBT DEPRIVED HER OF HER
> RIGHT TO DUE PROCESS, A FAIR TRIAL, AND A
> FAIR SENTENCING PROCEEDING UNDER THE
> SIXTH, EIGHTH, AND FOURTEENTH
> AMENDMENTS TO THE UNITED STATES
> CONSTITUTION AS WELL AS ARTICLE 2, §§ 4, 15
> AND 24 OF THE ARIZONA CONSTITUTION.

**ARGUMENT VII**.................................................................................36

> THE TRIAL COURT'S REFUSAL TO PERMIT
> ANDRIANO TO PRESENT EVIDENCE OF MERCY
> DEPRIVED HER OF HER RIGHT TO DUE
> PROCESS, A FAIR TRIAL, AND A FAIR
> SENTENCING PROCEEDING UNDER THE SIXTH,
> EIGHTH, AND FOURTEENTH AMENDMENTS TO
> THE UNITED STATES CONSTITUTION AS WELL
> AS ARTICLE 2, §§ 4, 15 AND 24 OF THE ARIZONA
> CONSTITUTION.

**ARGUMENT VIII**...............................................................................38

> THE TRIAL COURT IMPROPERLY INSTRUCTED
> THE JURY IN THE PENALTY PHASE
> INSTRUCTIONS TO REQUIRE JURY UNANIMITY
> REGARDING THE EXISTENCE OF MITIGATING
> CIRCUMSTANCES. THE ERROR VIOLATED
> ANDRIANO'S RIGHT TO DUE PROCESS, A FAIR
> TRIAL, AND A FAIR SENTENCING PROCEEDING
> IN VIOLATION OF THE SIXTH, EIGHTH, AND
> FOURTEENTH AMENDMENTS TO THE UNITED

STATES CONSTITUTION AS WELL AS ARTICLE 2,
§§ 8, 15 AND 24 OF THE ARIZONA CONSTITUTION.

ARGUMENT IX...............................................................................42

THE TRIAL COURT IMPERMISSIBLY COERCED
THE JURY WHEN IT GAVE AN IMPASSE
INSTRUCTION DURING THE PENALTY PHASE
WITHOUT KNOWING WHETHER THE JURY WAS
DEADLOCKED.

ARGUMENT X ...............................................................................49

THE TRIAL COURT INCORRECTLY INSTRUCTED
THE JURY ABOUT ITS DUTY TO DELIBERATE
DURING THE PENALTY PHASE. THE
INSTRUCTION VIOLATED ANDRIANO'S DUE
PROCESS, FAIR TRIAL AND EIGHTH
AMENDMENT RIGHTS.

ARGUMENT XI...............................................................................52

ARIZONA'S STATUTE PROVIDING FOR
EXECUTION BY LETHAL INJECTION IS VAGUE
BECAUSE IT FAILS TO SUFFICIENTLY SPECIFY
THE MEANS TO BE USED TO ENSURE AN
EXECUTION BY LETHAL INJECTION THAT IS
NOT CRUEL AND UNUSUAL, THUS VIOLATING
ANDRIANO'S DUE PROCESS AND EIGHTH
AMENDMENT RIGHTS.

ARGUMENT XII ...............................................................................55

ARIZONA'S DEATH PENALTY IS
UNCONSTITUTIONAL.

**CONCLUSION**..........................................................................................56

**CERTIFICATE OF RULE 31.13(b) COMPLIANCE**.......................................57

**CERTIFICATE OF SERVICE**..........................................................................58

**APPENDIX A**

## <u>TABLE OF CITATIONS</u>

<u>Page</u>

**UNITED STATES SUPREME COURT CASES**

*Beck v. Alabama,*
     447 U.S. 625, 100 S.Ct. 2382 (1980).......................................................10, 11

*Buchanan v. Angelone,*
     522 U.S. 269, 118 S.Ct. 757 (1998)...........................................:...34, 35

*Godfrey v. Georgia,*
     446 U.S. 420, 100 S.Ct. 1759 (1980).....................................................17, 22

*Gregg v. Georgia,*
     428 U.S. 153, 96 S.Ct. 2909 (1976)...............................................................26

*Kansas v. Marsh,*
     548 U.S. ___, 126 S.Ct. 2516 (2006)..............................................................36

*Keeble v. United States,*
     412 U.S. 205, 93 S.Ct. 1993, 36 L.Ed.2d 844 (1973)....................................11

*Lockett v. Ohio,*
     438 U.S. 586, 98 S.Ct. 2954 (1978)........................................................47, 50

*Lowenfield v. Phelps,*
     484 U.S. 231, 108 S.Ct. 546 (1988)..............................................................45

*Maynard v. Cartwright,*
     486 U.S. 356, 108 S.Ct. 1853 (1988).....................................................17, 22

*Mills v. Maryland,*
     486 U.S. 367, 108 S.Ct. 1860 (1988).............................................................41

*Oregon v. Guzek,*
___ U.S. ___, 126 S.Ct. 1226 (2006)..............................................32

*Ring v. Arizona, (Ring II),*
536 U.S. 584, 122 S.Ct. 2428 (2002)...............................................21

*Spaziano v. Florida,*
468 U.S. 447, 104 S.Ct. 3154 (1984)..............................................17

*Walton v. Arizona,*
497 U.S. 639, 110 S.Ct. 3047 (1990)...................................... 21-23

*Woodson v. North Carolina,*
428 U.S. 280, 96 S.Ct. 2978 (1976.......................................46, 50

## OTHER FEDERAL CASES

*Adamson v. Rickets,*
865 F.2d 1011 (9th Cir., Ariz. 1988). ..............................................20

*Morales v. Tilton,*
465 F.Supp.2d 972 (N.D. Cal., 2006)..............................................54

*Tucker v. Zant,*
724 F.2d 882 (11th Cir. 1984). .......................................................34

## ARIZONA SUPREME COURT CASES

*Evans v. Pickett,*
102 Ariz. 393, 430 P.2d 413 (1967). ..............................................40

*State v. Anderson, (Anderson II),*
210 Ariz. 327, 111 P.3d 369 (2005). ..............................................27

*State v. Brookover,*
124 Ariz. 38, 601 P.2d 1322 (1979). ..............................................18

*State v. Carlson,*
    202 Ariz. 570, 48 P.3d 1180 (2002). ...........................................................17

*State v. Correll,*
    148 Ariz. 468, 715 P.2d 721 (1986). ..........................................................28

*State v. Cromwell,*
    211 Ariz. 181, 119 P.3d 448 (2005). .....................................................28, 29

*State v. Detrich,*
    178 Ariz. 380, 873 P.2d 1302 (1994). .......................................................12

*State v. Ellison,*
    213 Ariz. 116, 140 P.3d 899 (2006). ...............................................27, 38, 39

*State v. Gillies,*
    142 Ariz. 564, 691 P.2d 655 (1984). ..........................................................28

*State v. Greenway,*
    170 Ariz. 155, 823 P.2d 22 (1991). ......................................................18, 19

*State v. Huerstel,*
    206 Ariz. 93, 75 P.3d 698 (2003). ........................................................42, 43

*State v. Johnson,*
    212 Ariz. 425, 133 P.3d 735 (2006). ...................................................... 32-34

*State v. Knapp,*
    114 Ariz. 531, 562 P.2d 704 (1977). ......................................................18, 27

*State v. McGill,*
    213 Ariz. 147, 140 P.3d 930 (2006). ..........................................................28

*State v. Newell,*
    212 Ariz. 389, 132 P.3d 833 (2006). .....................................................28, 29

*State v. Salazar*,
    173 Ariz. 399, 844 P.2d 566 (1992). .......................................................16, 19

*State v. Sansing*,
    206 Ariz. 232, 77 P.3d 30 (2003). ..................................................................17

*State ex rel. Thomas v. Granville*,
    211 Ariz. 468, 123 P.3d 662 (2005). ...........................................47, 48, 50, 51

*State v. Thompson*,
    204 Ariz. 471, 65 P.3d 420 (2003). ...............................................................24

*State v. Wall*,
    212 Ariz. 1, 126 P.3d 148 (2006). ..................................................................11

## ARIZONA COURT OF APPEALS CASES

*Lay v. City of Mesa*,
    168 Ariz. 522, 815 P.2d 921 (App. 1991). .....................................................40

*State v. Alvarez*,
    205 Ariz. 110, 67 P.3d 706 (App. 2003). .......................................................53

*State v. Noriega*,
    187 Ariz. 282, 928 P.2d 706 (App. 1996). ................................................40, 41

*State v. Wagstaff*,
    161 Ariz. 66, 775 P.2d 1130 (App. 1988). .....................................................53

## OTHER STATE CASES

*Evans v. State*,
    914 A.2d 25 (Md. 2006). ................................................................................53

*Tedder v. State*,
    322 So.2d 908 (Fla. 1975). .............................................................................27

# CONSTITUTIONAL PROVISIONS

## United States Constitution

Fifth Amendment ........................................................................................6

Sixth Amendment........................................... 6, 9, 10, 15, 16, 24, 31, 35-38

Eighth Amendment .......................... 15, 16, 24, 31, 32, 35-38, 46, 47, 49, 50, 52, 54

Fourteenth Amendment................................. 6, 9, 10, 15, 16, 24, 31, 35-38

## Arizona Constitution

Article 2, § 4.............................................. 6, 9, 10, 15, 16, 24, 25, 31, 35-37

Article 2, § 8.................................................................................38

Article 2, § 15.............................................. 9, 15, 16, 25, 31, 35-38

Article 2, § 24.............................................. 6, 9, 10, 15, 16, 24, 25, 31, 35-38

# STATUTES

## United States Code

28 U.S.C. § 1983.............................................................................53

## Arizona Revised Statutes

§ 13-703(C). .......................................................................40, 45, 49

§ 13-703.01(K)............................................................................45

§ 13-703(F)(6)...........................................................15, 16, 20, 23, 27

§ 13-1104(A)(1). ....................................................................... 12

§ 13-1104(A)(2). ....................................................................... 12

§ 13-4033(A)(3). ....................................................................... 53

**RULES**

**Arizona Rules of Criminal Procedure**

Rule 22.4. ............................................................................... 42

**Arizona Rules of Evidence**

Rule 404(b). .............................................................................. 9

**SECONDARY MATERIALS**

www.dictionary.com (3/1/07). ................................................. 36

## <u>STATEMENT OF THE CASE</u>

Appellant adopts the statement of the case as set forth in her opening brief.

## STATEMENT OF FACTS

The pertinent facts are set forth in appellant's opening brief, but Andriano observes here the state's mischaracterization of the record in the Answering Brief.

Appellee characterized Andriano as continuing to pursue Freeland after they stopped their sexual relationship in late July.  Freeland testified that she was "aggressive" about staying together or talking to each other for two to three weeks after the sexual relationship ended. (RT, 9/13/04, p. 35.) On September 20, 2000, she suggested they get together for a drink, but Freeland did not remember if they ever did. (Id., p. 28.)  She would stand outside of his apartment and call him on the telephone. (Id., p. 24.)  Their sexual relationship only lasted two to three weeks.  (Id., p. 43.) Andriano never asked Freeland to participate in insurance fraud or to obtain the sodium azide.  (Id., p. 49.)

The state asserts that Andriano was on the phone with Travis Black when she was in her office the Friday before Joe died.  (Answering Brief, pp. 12-13, 26.)  The testimony that she was on the phone with Black was struck from the record as inadmissible hearsay.  (RT, 9/8/04, p. 68.)

The state's version of the facts claims that Andriano put the azide in Joe's food. (Answering Brief, p. 3.)  However, the record citation provided by the state does not

2

support this assertion.  In fact, no one testifie͓           ͏driano put azide in the food.
There was testimony that some food from thͤ.          ͏ showed a trace amount of azide.
(RT, 9/27/04, pp. 41-45.)  There were also capsules that showed the presence of azide.
(Id., p. 45.)  There was no testimony that the trace amount of azide found in the food
was enough to make a person sick or kill them.

In testing the decedent's stomach contents, Dr. Keen found 3.8 milligrams per
liter of sodium azide. (Id., pp. 42-43.)  Dr. Keen found that there was no sodium azide
in the decedent's bloodstream. (Id., p. 60.)  That suggested that he had ingested the
sodium azide but it had not been in his system long enough to be absorbed into his
bloodstream. (Id.)

Dr. Keen found the 3.8 milligrams of sodium azide a "small amount." (Id., p.
61.) Dr. Keen said a person who consumes sodium azide could have changes in blood
pressure, either higher or lower. (Id., p. 62.)  A person could become agitated and
emotionally hyper. (Id., p. 63.)

Dr. French opined that the medical examiner's finding that there was no sodium
azide in Andriano's blood was in error because West Coast Analytical found that the
blood contained two parts per million of sodium azide. (Id., pp. 22-23.)  That led Dr.
French to believe that the victim had either ingested a large amount of sodium azide

3

further back in time or had ingested a very small amount more recently.  (Id., p. 26.)

Dr. French said that sodium azide would supposedly not have a taste.  (Id., p. 32.)  If

anything, it would taste salty.  (Id., p. 47.)

Joseph Richmond, a senior chemist for West Coast Analytical Service analyzed

a blood sample labeled "Joe Andriano."  (RT, 9/27/04, pp. 29, 31.)  Richmond found

azide in the sample just at the limit of detection.  (Id., p. 34.)  Three gelatin capsules

that Richmond received from the Maricopa County Public Defender's Office tested

positive for azide.  (Id., p. 45.)

The state's version also claims Andriano went to her office on the Friday before

Joe's death so she could talk to Black on the phone.  (Answering Brief, p. 13.)  This is

not supported by the citation provided by the appellee.  It is not supported by the

record.

The state describes Andriano as "sitting at the kitchen counter" when the police

arrived at her apartment.  (Answering Brief, p. 16.)  More accurately, Officer Stevens

was one of the first officers on the scene.  (RT, 9/15/04, pp. 108-109.)  Upon entering

the apartment, he observed Joe's body on the floor.  (Id., p. 109.)  He saw a "...female

sitting with her back against the countertop wall that separates the living room from the

kitchen island area."  (Id.)  He saw her sitting on the floor.  (Id., pp. 113-114.)  Her

4

back was up against the wall of the kitchen counter.  (Id., p. 114.)  She was close to Joe, who was lying on the floor.  (Id.)  She had her knees up and was just staring.  (Id.)

## ARGUMENT I

**THE TRIAL COURT VIOLATED ANDRIANO'S RIGHT TO A FAIR TRIAL AND DUE PROCESS UNDER THE FIFTH, SIXTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND ARTICLE 2, §§ 4 AND 24 OF THE ARIZONA CONSTITUTION WHEN IT PERMITTED EVIDENCE OF ANDRIANO'S ATTEMPTS TO OBTAIN LIFE INSURANCE POLICIES AND EVIDENCE OF ANDRIANO'S EXTRAMARITAL ACTIVITIES AS INTRINSIC TO THE CHARGE OF PREMEDITATED MURDER.**

In its answering brief, the state argues that the "other acts" evidence was admissible as evidence of motive. (Answering Brief, p. 18.) Appellee makes this argument even though at trial, the prosecutor told the jury that pursuing other relationships was not Andriano's "main motivation." (RT, 11/30/04, p. 20.) Appellee lists cases where other state courts allowed evidence of extramarital affairs to show motive. (Answering Brief, pp. 18-21.) However, some of these cases are distinguishable factually: the affair was immediately prior to the death of the husband (*Kurtz*); homosexual co-defendants were having an affair and conspired together to murder the wife of one of the defendants (*Chumbler*); Defendant found his wife in bed with another man and killed her (*Faircloth*); Defendant admitted to beating his wife

6

before murdering her due to suspected infidelity (*Romero*); Defendant's relationship with his paramour took place up to two days before the murder of his wife (*Dobliner*).

In contrast here, not only were Andriano's affairs not intrinsic to the case, they weren't even relevant. Unlike the state's cited cases, the affairs were not the motive for the murder, did not show intent, or knowledge, or any other legitimate basis for admission. They only gave an air of salaciousness to the trial, and a basis for the prosecutor to impugn Andriano's character.

Appellee makes much of the hairdresser's testimony where Andriano confided to her that Joe was ill and she wished he were already dead. The hairdresser testified that Andriano told her that she was interested in another man but hesitated because she was married. The state overstates this testimony when arguing that Andriano's statement was that she "wished he were already dead" so that she could "carry on an affair with a boyfriend." (Answering Brief, p. 18.) The hairdresser did say Andriano said she wished Joe were already dead so she could move on with her life. (RT, 9/20/04, p. 74.) But, the hairdresser did not say Andriano told her she wanted Joe dead so she could have an affair with a boyfriend.

The state also urges that the evidence of extramarital activity was intrinsic to the crime of premeditated murder. (Answering Brief, p. 18.) Yet, the evidence adduced at

7

trial did not connect Andriano's relationships with Freeland or Black to her husband's death. When the police questioned her, she explained that her husband suspected she was seeing other men. He did not know for sure until she told him about using the condom with Black. His suspicions caused friction between them, and her disclosure about the condom initiated the fight that resulted in his death. Those statements may have an ancillary relationship to the murder that added some prurient appeal to the facts, however, they were only used by the state to show bad character, precisely the reason they are not admissible. Those statements certainly do not make Andriano's extramarital behavior inextricably intertwined with the murder.

Andriano's extramarital activity bore a strained and remote nexus to the death of her husband. The state could not link her relationships to the murder. There was no evidence that she engaged in an ongoing affair at the time of the incident. There was no paramour waiting in the wings for her to be free from her marriage. There was no evidence that she committed murder at the behest of a boyfriend, or that a paramour assisted her in planning or carrying out the murder of her husband.

Appellee argues that Andriano's attempts to get a fraudulent life insurance policy on Joe were tightly interwoven with the murder. Appellee persists in this argument even though Andriano abandoned her efforts to get the new policy after her

8

father admonished her that it was illegal. (RT, 10/27/04, p. 46.) Her last contact with insurance agent, Carolyn Catalano, was on September 22, 2000. (RT, 9/27/04, p. 79.) Andriano was cold to Catalano. (Id.) She said her husband was out of town and she did not know when he would return. (Id., p. 80.) The fact remains that at the time of Joe's death, there was no new life insurance policy in place and nothing to gain from his death. The jury implicitly rejected the state's argument when they did not find pecuniary gain as an aggravator. (ROA, p. 393.)

This evidence had minimal probative value, yet was highly prejudicial. It was not intrinsic to the murder, nor did it demonstrate motive. Its main purpose was to cast Andriano as a bad character. The admission of this evidence was error, violated Rule 404(b), and violated Andriano's rights to due process under the Fourteenth Amendment and her right to a fair trial under the Sixth Amendment as well as Article 2, §§ 4, 15, and 24 of the Arizona Constitution. This Court should reverse and remand for new trial.

9

## ARGUMENT II

**THE TRIAL COURT COMMITTED FUNDAMENTAL ERROR BY FAILING TO INSTRUCT THE JURY ON THE LESSER-INCLUDED OFFENSES OF SECOND DEGREE MURDER AND MANSLAUGHTER WHERE EVIDENCE AT TRIAL SUBSTANTIATED THOSE LESSER-INCLUDED OFFENSES DENYING ANDRIANO A FAIR TRIAL AND DUE PROCESS UNDER THE SIXTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AS WELL AS ARTICLE 2, §§ 4 AND 24 OF THE ARIZONA CONSTITUTION.**

Here, the state contends the trial court did not err by failing to instruct on all lesser-included offenses. According to appellee, *Beck v. Alabama*, 447 U.S. 625, 100 S.Ct. 2382 (1980), is distinguishable because there, the jury had no option but to impose death if it found the defendant guilty, while in Arizona, the jury can impose death or a life sentence if it finds the defendant guilty. (Answering Brief, p. 39.) The state's answer does not acknowledge that in *Beck*, the judge had the option of overruling the jury's decision.

*Beck* supports instructing the jury on all lesser-included degrees of homicide supported by the evidence. Failure to give the jury the third option of convicting on a lesser-included offense enhances the risk of an unwarranted conviction. *Beck*, 447

10

U.S. 625 at 637, 100 S.Ct. 2382 at 2389.  This risk cannot be tolerated in a case where the defendant's life is at stake.  *Id.*  There is a significant constitutional difference between the death penalty and lesser punishments.  *Id.*

Likewise, the state's passing criticism of the continued viability of *Beck* finds no real support in the law.  In fact, a recent Arizona Supreme Court opinion cited *Beck* with approval.  *State v. Wall*, 212 Ariz. 1, 4, 126 P.3d 148, 151 (2006) ("Where one of the elements of the offense charged remains in doubt, but the defendant is plainly guilty of *some* offense, [without lesser-included offense instructions] the jury is likely to resolve its doubts in favor of conviction." *Beck v. Alabama*, 447 U.S. 625, 634, 100 S.Ct. 2382, 65 L.Ed.2d 392 (1980) (*quoting Keeble v. United States*, 412 U.S. 205, 212-13, 93 S.Ct. 1993, 36 L.Ed.2d 844 (1973)).

In Arizona, the phases of a capital trial are distinct and carefully delineated.  During the innocence/guilt phase, the jury is instructed not to consider the penalty.  The focus on this phase is whether the state has sufficient proof beyond a reasonable doubt to overcome the presumption of innocence.  A properly instructed jury at this stage of the proceedings may have avoided the necessity of the second and third phases of the trial.

11

The state maintains that the evidence does not support a lesser-included offense of second-degree murder or manslaughter. (Answering Brief, p. 41.) The state argues that Andriano's plan was intricate and the product of three months of planning. (Answering Brief, p. 44.) The state's contention is incorrect.

An instruction on a lesser-included offense must be given if the jury could rationally find that the state failed to prove the distinguishing element of the greater offense. *State v. Detrich*, 178 Ariz. 380, 383, 873 P.2d 1302, 1305 (1994).

A person commits second degree murder if, without premeditation, such person intentionally causes the death of another person or knowing that his conduct will cause death or serious physical injury, such person causes the death of another person. A.R.S. § 13-1104(A)(1) and (2). A reasonable jury could have found Andriano abandoned her plan to kill her husband when she called her neighbor to her apartment and then called 911 to aid her husband. She would not have called someone to her apartment to witness the crime and also call 911 if she intended to continue with the "intricate" plan to kill her husband. Andriano asserted it was not an intricate plan at all, but instead, an unfortunate chain of events that spiraled out of control.

Intentional second-degree murder is supported by the evidence that between the time Andriano called the neighbor and 911, and the time that the paramedics arrived,

12

the Andrianos argued.  A rational jury could have found Andriano guilty of second degree murder, that is, intentional but not premeditated.  Even if Andriano started with a plan to cause her husband's death with the poison, the poison was not the cause of death.  The jury could rationally have found Andriano abandoned any plan to poison her husband when she called the neighbor to the apartment and dialed 911 for assistance.  The argument that occurred while waiting for the paramedics began a new chain of events that while not premeditated, led to an intentional killing.

A rational jury could also have found a knowing second-degree murder.  It could have found that Andriano's conduct would cause her husband's death.  A knowing second-degree murder would be established if the jury believed that when the physical altercation began, Andriano did not plan to kill her husband.  The jury could have reasonably found that Andriano knew that beating Joe and stabbing him in the neck would cause his death.

Similarly, the evidence supported a manslaughter instruction premised upon a sudden quarrel or heat of passion resulting from adequate provocation of the victim.  A jury could have rationally found that Joe provoked Andriano when he approached her aggressively and reached for the knife.  She then grabbed the stool in response to the

13

provocation and struck him with it.  The struggled continued with the end result of Joe being stabbed in the neck.

A reasonable jury could find the adequate provocation required for manslaughter when Andriano saw Joe pick up the knife.  Very little time passed between the time Hashisaki spoke to a coherent Joe before going to wait for the paramedics, and the time the paramedics spoke to a freshly showered Andriano.  Enough time existed for the altercation to have occurred in this manner supporting a manslaughter conviction.

The primary purpose of giving lesser-included offense instructions is to ensure that the jury does not choose to convict the defendant of a death-eligible offense because it faces an all or nothing choice between that verdict and innocence.  This case is an example where lesser-included instructions were appropriate but not given.  The jury had only two choices—either find Andriano guilty of a death-eligible offense or find her not guilty.  This violation of Andriano's due process rights was fundamental error mandating reversal and remand for a new trial.

14

## ARGUMENT III

**THE CRUEL, HEINOUS, OR DEPRAVED AGGRAVATOR UNDER A.R.S. § 13-703(F)(6) IS FACIALLY VAGUE AND VAGUE AS APPLIED DENYING ANDRIANO A FAIR TRIAL, A FAIR SENTENCING, AND DUE PROCESS OF LAW UNDER THE SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AS WELL AS ARTICLE 2, §§ 4, 15, AND 24 OF THE ARIZONA CONSTITUTION.**

In its answering brief, the state combined Andriano's arguments in sections III, IV, and V together to facilitate its arguments.  In as far as the state addressed Andriano's claims under this argument, Andriano disputes the state's assertions and relies on her opening brief in support of her claims.

15

## ARGUMENT IV

**THE TRIAL COURT'S INSTRUCTION DEFINING CRUELTY UNDER A.R.S. § 13-703(F)(6) WAS INSUFFICIENT TO GUIDE THE JURY AND APPROPRIATELY CHANNEL THEIR DISCRETION IN VIOLATION OF THE SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AS WELL AS ARTICLE 2, §§ 4, 15, AND 24 OF THE ARIZONA CONSTITUTION.**

In its answering brief, the state fails to adequately address Andriano's claim that the trial court's instruction to the jury on the aggravator of cruelty, was unconstitutional as a result of the interplay between this Court's abandonment of proportionality review and the Arizona Legislature's assignment of death determinations to the jury. The state only writes, "This Court has rejected Defendant's contention that it should engage in proportionality review." (Answering Brief, p. 49, n. 9 (citing to *State v. Salazar*, 173 Ariz. 399, 416, 844 P.2d 566, 583 (1992).) While the state is correct that this Court has rejected proportionality review, the state misaddresses Andriano's contention on two levels.

First, the state's argument reifies Andriano's position that the trial court erred when it instructed the jury to engage in a proportionality review. Second, recognizing this error, the state's argument fails to contradict Andriano's contention that the

16

instruction was unconstitutionally vague because it required the jury to engage in a proportionality review without adequate instruction as to what a "normal" first degree murder was.

The United States Supreme Court has consistently held, "the channeling and limiting of the sentencer's discretion in imposing the death penalty is a fundamental constitutional requirement for sufficiently minimizing the risk of wholly arbitrary and capricious action." *Maynard v. Cartwright*, 486 U.S. 356, 362, 108 S.Ct. 1853, 1858 (1988). A rule "must channel the sentencer's discretion by 'clear and objective standards' that provide 'specific and detailed guidance,' and that 'make rationally reviewable the process for imposing a sentence of death.'" *Godfrey v. Georgia*, 446 U.S. 420, 428, 100 S.Ct. 1759, 1764-65 (1980). Further, "[a state] must administer [the death] penalty in a way that can rationally distinguish between those individuals for whom death is an appropriate sanction and those for whom it is not." *Spaziano v. Florida*, 468 U.S. 447, 460, 104 S.Ct. 3154, 3162 (1984). To comport with these requirements, Arizona law condones capital punishment only when the circumstances of a murder set the crime apart from other first degree murders. *See State v. Sansing*, 206 Ariz. 232, 241, 77 P.3d 30, 39 (2003); *State v. Carlson*, 202 Ariz. 570, 582, 48 P.3d 1180, 1192 (2002) (employing the language that a murder must be "above the

17

norm of other first degree murders" to warrant the death penalty); *State v. Brookover*, 124 Ariz. 38, 40, 601 P.2d 1322, 1324 (1979); *State v. Knapp*, 114 Ariz. 531, 543, 562 P.2d 704, 716 (1977).

Here, the instruction given by the trial court reflects this policy that especial cruelty can only be found when the circumstances of a murder set the case apart from other first degree murders:

> All first degree murders are to some extent heinous, cruel and depraved. However, this aggravating circumstance cannot be found to exist unless the murder is especially heinous, cruel or depraved, *that is, where the circumstances of the murder raise it above the norm of other first degree murders.*

(RT, 12/1/04, p. 91.)

This instruction clearly asked the jury to determine whether the case before them was "above the norm of other first degree murders." In requesting the jury to determine whether this case was above the norm of other murders, the trial court called upon the jury to evaluate the aggravating circumstances of the present case against other first degree murders. In other words, the trial court called upon the jury to engage in a proportionality review. However, the Arizona Supreme Court directly disapproved of trial courts engaging in proportionality reviews in *State v. Greenway*,

18

170 Ariz. 155, 171-72, 823 P.2d 22, 38-39 (1991). The Arizona Supreme Court disapproved of proportionality reviews one year later in *State v. Salazar*, 173 Ariz. 399, 416-17, 844 P.2d 566, 583-84 (1992). Nonetheless, the trial court here instructed the jury to engage in such a proportionality review.

As set forth in Andriano's opening brief, while judges have a fund of knowledge by which they can compare murders to other first degree murders, jurors are ill-equipped to determine whether the circumstances of the case before them is above the norm of other first degree murders. Without proper instruction, jurors do not know what constitutes the norm of first degree murders. Thus, to instruct the jury to resolve whether this murder was above the norm of other first-degree murders without providing them a basis upon which to rationally make that determination was error. It did not provide clear and objective standards that gave the jury specific and detailed guidance to properly make that judgment. The instruction also required the jury to essentially conduct a proportionality review, in contravention of this Court's decisions in *Greenway* and *Salazar*.

Assuming *arguendo* the trial court's instruction was proper, the instruction was nonetheless unconstitutionally vague because it failed to adequately channel the jury's discretion. The trial court's full instruction to the jury was:

19

> All first degree murders are to some extent heinous, cruel and depraved. However, this aggravating circumstance cannot be found to exist unless the murder is especially heinous, cruel or depraved, that is, where the circumstances of the murder raise it above the norm of other first degree murders.
>
> The terms "cruel," "heinous" or "depraved" are to be considered separately, but proof of any one of these factors is sufficient to establish this aggravating circumstance.
>
> "Cruelty" involves the infliction of physical pain and/or mental anguish on a victim before death. A crime is committed in an especially cruel manner when a defendant either knew or should have known that the manner in which the crime was committed would cause the victim to experience physical pain and/or mental anguish before death. The victim must be conscious for at least some portion of the time when the pain and/or anguish was inflicted.

(ROA, p. 383, at 10.) This instruction is vague because it fails to clearly define for the jury what makes a murder "especially cruel" and because the instruction does not provide the jury adequate information to distinguish normal murders from those that are above the norm.

In her opening brief, Andriano articulated that the F(6) aggravator, as read to the jury, did not clearly define what constitutes "especial cruelty." The instruction was overly broad such that it would include nearly every first-degree murder. *See Adamson v. Rickets*, 865 F.2d 1011, 1033 (9th Cir., Ariz. 1988). Viewing this aggravator in

20

terms of essential elements as the state does in its answering brief, the trial court failed to instruct the jury on an essential element of especial cruelty. (Answering Brief, p. 52.) The fundamental question is whether the jury was properly instructed as to all of the essential elements of especial cruelty to support this aggravator. They were not.

As set forth in Argument V, below, an essential element of especial cruelty is that the victim suffered extreme pain or mental anguish, which includes significant uncertainty as to their ultimate fate. Because the jury here was only instructed that the victim had to have suffered physical pain or mental anguish before death, they were not adequately instructed how to distinguish the extent of physical and/or mental pain to differentiate between normal murders and those above the norm. Consequently, the trial court's instruction did not adequately channel the discretion of the jurors and provide sufficient guidance.

The state correctly observes in its answering brief that Arizona's especially cruel aggravator has been previously upheld against a challenge that it was vague. *Walton v. Arizona*, 497 U.S. 639, 110 S.Ct. 3047 (1990), *rev'd on other grounds*, *Ring v. Arizona*, 536 U.S. 584, 122 S.Ct. 2428 (2002) (*Ring II*). (Answering Brief, pp. 44-45.)

In *Walton*, the United States Supreme Court found that the "especially cruel" aggravating factor was facially vague. *Id.*, at 654, 110 S.Ct. at 3057. Nevertheless, the

21

Supreme Court "conclude[d] that the definition given to the 'especially cruel'

provision by the Arizona Supreme Court saved the facially vague aggravator because it

gave meaningful guidance to the sentencer." *Id.*, at 655, 110 S.Ct. at 3058.  However,

that was because trial judges, not juries were conducting the sentencing proceedings in

capital cases. *Id.*, at 653, 110 S.Ct. at 3057.  ("If the Arizona Supreme Court has

narrowed the definition of the 'especially heinous, cruel or depraved' aggravating

circumstance, we presume that Arizona trial judges are applying the narrower

definition.  It is irrelevant that the statute itself may not narrow the construction of the

factor.").

    At the same time, the *Walton* Court observed that the jury's role as sentencer

was of particular importance:

> When a jury is the final sentencer, it is essential that the
> jurors be properly instructed regarding all facets of the
> sentencing process.  It is not enough to instruct the jury in
> the bare terms of an aggravating circumstance that is
> unconstitutionally vague on its face.  That is the import of
> our holdings in *Maynard* [*v. Cartwright*, 486 U.S. 356, 108
> S.Ct. 1853 (1988)] and *Godfrey* [*v. Georgia*, 446 U.S. 420,
> 100 S.Ct. 1759 (1980)].  But the logic of those cases has no
> place in the context of sentencing by a trial judge.  Trial
> judges are presumed to know the law and to apply it in
> making their decisions.

*Walton*, at 653, 110 S.Ct. at 3057.

22

Accordingly, the holding in *Walton* was largely based on the difference between a trial judge and jury as sentencer. Arizona's jurisprudence sufficiently narrowed the discretion of trial judges according to the United States Supreme Court. Now, however, because jurors are responsible for sentencing, it is the discretion of jurors that must be narrowed. Particularly with the F(6) aggravator, the definition of cruelty that trial judges used as a starting point in their determinations, cannot simply be switched over to juries following *Ring*. This Court can no longer afford itself of the presumption that the narrowing definitions upheld by *Walton* for use by judges, are sufficient to narrow the discretion of, and provide proper guidance to juries. While trial judges have a fund of experience and information from which they can correctly make this determination, jurors have no such experience or information and are not adequately instructed of what constitutes a normal murder. A juror cannot, absent adequate instruction, determine what murders are above the "norm" of first-degree murders in order to distinguish those that are "cruel" from those that are "especially cruel."

Here, the trial court simply instructed the jury that it must determine whether the present murder rose above the level of other first degree murders, but it failed to give any assistance to help jurors understand what a normal murder was, or how to make

23

that distinction, between a normal murder, and one above the norm.  A jury is not capable of making such determinations without the proper guidance and instruction. Thus, the instruction here failed to adequately channel the discretion of the jury and is therefore unconstitutionally vague.

Because the jury instruction required jurors to engage in a proportionality review that is clearly disapproved of, and because the trial court provided no means for the jury to distinguish between a normal first-degree murder and one that was above the norm, the jury instruction failed to sufficiently channel and narrow the discretion of the jury, and properly guide them.    Thus, the trial court's instruction was unconstitutionally vague.

Without adequate instruction, the jury was left to decide the case on an *ad hoc* basis in violation of due process under the Fourteenth Amendment to the United States Constitution and Article 2, §§ 4 and 24 of the Arizona Constitution.  *See, State v. Thompson*, 204 Ariz. 471, 475, 65 P.3d 420, 424 (2003) (Laws must provide explicit standards for those charged with enforcing them and may not "impermissibly delegate [ ] basic policy matters to policemen, judges, and juries for resolution on an *ad hoc* and subjective basis.")  As a result, Andriano was denied her right to a fair trial, a fair sentencing hearing and due process of law under the Sixth, Eighth, and Fourteenth

24

Amendments to the United States Constitution as well as Article 2, §§ 4, 15, and 24 of the Arizona Constitution.  This Court should reverse and remand for a new sentencing trial.

## ARGUMENT V

**APPLICATION OF THE PROPER, NARROW CONSTRUCTION OF "ESPECIALLY CRUEL" DEMONSTRATES THAT THE EVIDENCE IS INSUFFICIENT TO SUPPORT THIS AGGRAVATING CIRCUMSTANCE.**

In its answer, the state contends that all that is required to satisfy the "especially cruel" aggravator is: 1) victim suffered physical pain or mental anguish; 2) victim was conscious for some portion of the crime; and, 3) the defendant knew or should have known that the victim would suffer.  (Answering Brief, p. 46.)  If that is all that is required, then it is difficult to imagine any murder that does not qualify for the death penalty.  While possible for a murder victim to not suffer, in almost every murder, the victim experiences physical pain.  It is rare that a victim is not conscious during *some* portion of the crime.  And, every person who intends to kill another and reflects on that decision knows or should know that their victim will suffer.  Perhaps, as time has gone by, the definition of cruelty has been summarized in such a manner that the true distinction between murders that are "cruel" and "especial cruelty" is being lost.

Not every murder can qualify as capital murder.  To comply with the dictates of *Gregg v. Georgia*, 428 U.S. 153, 96 S.Ct. 2909 (1976), the capital scheme must

26

suitably channel and limit the sentencer's discretion. As this Court said in *State v. Knapp*, 114 Ariz. 531, 543, 562 P.2d 704, 716 (1977):

> As has previously been commented upon by the Florida Supreme Court, 'all killings are atrocious.' *Tedder v. State*, 322 So.2d 908, 910 (Fla. 1975). What our legislature intended to include as an aggravating circumstance was a killing wherein additional circumstances of the nature enumerated above set the crime apart from the usual or the norm.

In consideration of the F(6) aggravator, physical pain or mental anguish, consciousness, and knowledge by the defendant are not the *sine qua non* of "especial cruelty." Instead, there must be something more that sets the case apart from other first degree murders.

For instance, in *State v. Ellison*, 213 Ariz. 116, ___, 140 P.3d 899, 921 (2006), the trial court instructed the jury that in order to find especial cruelty, the state had to prove that the murder was due to the infliction of either *extreme* physical pain or *extreme* mental anguish upon the victim. The trial judge also defined "extreme mental anguish" and "extreme physical pain." *Id.* (Emphasis added.) The extreme fear or extreme anxiety must be made from the victim's awareness that he or she was going to die. *Id.*, citing *State v. Anderson*, 210 Ariz. 327, 352-353 n. 19, 111 P.3d 369, 394 n. 19 (2005) (*Anderson II*).

27

In *State v. Newell*, 212 Ariz. 389, 406, 132 P.3d 833, 850 (2006), the court found the especially cruel aggravator was supported where the victim had suffered *serious* physical and mental *anguish* before she died. (Emphasis added.)  In *State v. Cromwell*, 211 Ariz. 181, 189, 119 P.3d 448, 456 (2005), the court observed that cruelty goes to mental and physical *anguish* suffered by the victim. (Emphasis added.) Cruelty involves mental as well as physical *suffering*. *State v. Correll*, 148 Ariz. 468, 480, 715 P.2d 721, 733 (1986). (Emphasis added.)

Review of the facts of cases upholding especial cruelty as an aggravator demonstrates the level of cruelty necessary to support the finding.  For instance, in *State v. Gillies*, 142 Ariz. 564, 569, 691 P.2d 655, 660 (1984), cruelty was established where the victim was raped during her eight hour captivity, pleaded for mercy, and was pushed over a 40-foot embankment and beaten to death with a rock.  More recently, in *State v. McGill*, 213 Ariz. 147, ___, 140 P.3d 930, 938 (2006), the court upheld a cruelty finding where the defendant not only set the conscious victim on fire, but enhanced the victim's suffering by concocting a napalm-like mixture of gasoline and styrofoam intended to stick to the victims and make it more difficult for rescuers to put out the fire.

28

In *Cromwell*, the court found the record replete with evidence of cruelty. 211 Ariz. 181, 191, 119 P.3d 448, 458. The victim was alive when police first responded to the scene. *Id.*, at 184, 119 P.3d at 451. When found, she was unclothed from the waist down. She had visible wounds on her face and blood coming out of her nose and lips, and out of her mouth. There was a huge pool of blood under her head and shoulders. She had visible evidence of severe vaginal trauma, and had suffered a head wound and multiple stab wounds to her back. *Id.*

In *Newell*, the court upheld a cruelty finding where the evidence showed the victim had bruising on her arms consistent with being grabbed. She had sexual assault related bruises and injuries. She was asphyxiated, and testimony showed that with asphyxiation, it normally took two minutes for death to occur. Marks showed that she was grasping at the ligature. These facts all showed that she had suffered serious physical and mental anguish before she died. 212 Ariz. 389, 406, 132 P.3d 833, 850.

These cases are testament to the level of extreme physical abuse and mental anguish suffered by the victims that raised the murders above the norm of first degree murders, and supported a finding of especial cruelty.

Here, the victim suffered physical pain. However, it was similar to the pain he would experience as a result of his disease and the chemotherapy he was undergoing.

29

It was not the extreme physical abuse that supports a cruelty finding.   Andriano repeatedly struck her husband on his head.   However, he was quickly rendered unconscious, and was unconscious at the time he was stabbed.  As a result, the acts here do not rise to the level necessary to substantiate especial cruelty.  Andriano requests this court find the especially cruel aggravator insufficient as a matter of law.

## ARGUMENT VI

**THE TRIAL COURT'S REFUSAL TO PERMIT ANDRIANO TO PRESENT EVIDENCE OF RESIDUAL DOUBT DEPRIVED HER OF HER RIGHT TO DUE PROCESS, A FAIR TRIAL, AND A FAIR SENTENCING PROCEEDING UNDER THE SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AS WELL AS ARTICLE 2, §§ 4, 15 AND 24 OF THE ARIZONA CONSTITUTION.**

In its answering brief, the state maintains that Andriano's claim here is "surprising" because earlier in the case Andriano had not challenged the state's motion *in limine* to preclude evidence of residual doubt at the penalty phase. (Answering Brief, p. 54; ROA, p. 165.) Certainly, the state is not challenging Andriano's right to change her mind and timely request the court permit her to argue residual doubt as a mitigator. Andriano's request came before the jury was instructed, thus timely made and preserved for appeal.

The state next asserts that there is no constitutional requirement that juries revisit prior guilty verdicts by considering evidence of residual doubt, and because Andriano's request was for a jury instruction, specifically listing residual doubt as a mitigating factor, it should be rejected because judges are not required to instruct

31

capital juries on specific mitigating factors. (Answering Brief, pp. 53-55.) Both arguments are unavailing.

In her opening brief, Andriano acknowledged that the United States Supreme Court has found there is no constitutional requirement that a jury consider residual doubt. (Opening Brief, p. 90.) However, the state fails to acknowledge that the Supreme Court also observed that the Eighth Amendment did not deprive a state of its authority to set reasonable limits on the evidence a defendant can submit and to control the manner in which it is submitted. (Id., citing *Oregon v. Guzek*, ___ U.S. ___, ___, 126 S.Ct. 1226, 1232 (2006).) And, as Andriano pointed out in her opening brief, Arizona has, in fact, permitted residual doubt to be considered as a mitigator. (Id., pp. 91-92.)

In *State v. Johnson*, 212 Ariz. 425, 437, 133 P.3d 735, 747 (2006), the Court noted the consistent concern in the penalty phase of a capital trial that juries not be precluded from giving effect to mitigating evidence. The Court also observed that a state may permit jurors unbridled discretion in determining whether to impose the death penalty. *Id.* If jurors in Arizona are to be permitted unbridled discretion in determining whether to impose the death penalty, then they must be allowed to consider residual doubt.

Moreover, jurors should not be confined to residual doubt about guilt. To have complete unbridled discretion in determining whether death is the appropriate sentence, jurors must be permitted to consider any residual doubts they may have about any aspect of the case. In other words, jurors must be permitted to consider not only residual doubts concerning the guilt of a defendant, but also residual doubts they may have about other aspects of the case such as the admission of certain evidence, the strength of a defendant's statements to police or others, or even doubts they may harbor concerning the strength of aggravating factors the jury may have found to exist. Unbridled discretion means that jurors may consider any aspect of the case they think is important to making the ultimate decision, including any residual doubts they may harbor.

The state also attempts to confuse the issue somewhat by declaring that Andriano made her request in the form of a jury instruction listing specific mitigators, where this Court has rejected instructing capital juries on specific mitigating factors. (Answering Brief, p. 55.) *State v. Johnson*, 212 Ariz. 425, 133 P.3d 735 (2006).

In its argument, the state presents the rejection of instructing capital juries on specific mitigating factors as if it were a restriction on presenting mitigation when, in actuality, the opposite is true. The *Johnson* Court's point in observing that the United

33

States Supreme Court has rejected that judges should instruct on specific mitigating factors was that a specific list of mitigating factors may impermissibly confine a juror's consideration of mitigating evidence. *Johnson*, at 437, 133 P.3d at 747. In doing so, the *Johnson* Court cited *Buchanan v. Angelone*, 522 U.S. 269, 118 S.Ct. 757 (1998). In *Buchanan*, the Supreme Court reiterated the need for a broad inquiry into all relevant mitigating evidence to allow an individualized determination. 522 U.S. at 276, 118 S.Ct. at 761. The *Buchanan* Court found the jury instruction at issue there did not violate constitutional principles because the jury was directed to base its decision on "all the evidence." *Id.*, at 277, 118 S.Ct. at 762. Thus, the instruction did not constrain the manner in which the jury was able to give effect to mitigation. *Id.*

Likewise, in *State v. Johnson*, the Court found that providing a list of specific mitigating factors to a jury "would be inharmonious with the Supreme Court's admonitions that the sentencer be free to consider *any* relevant mitigating factor." *Johnson*, at 437, 133 P.3d at 747, *quoting Tucker v. Zant*, 724 F.2d 882, 892 (11th Cir. 1984).

Hence, Andriano's argument is not at an end because she requested the opportunity to present residual doubt as part of a jury instruction. The important

34

question is whether the trial court prevented the jury from considering constitutionally relevant evidence. *Buchanan*, 522 U.S. at 276, 118 S.Ct. at 761.

Andriano requested the court permit the jury to consider evidence of residual doubt. The trial court prevented Andriano from presenting residual doubt as a mitigator. In doing so, the trial court prevented jurors from giving effect to a significant mitigating factor that they had every right to consider in determining the appropriate sentence. Because jurors did not know that they could consider any residual doubts they had about any aspect of the case in their unbridled decision in making the final determination, the trial court denied Andriano due process, the right to a fair trial, and a fair sentencing proceeding under the Sixth, Eighth and Fourteenth Amendments to the United States Constitution as well as Article 2, §§ 4, 15 and 24 of the Arizona Constitution. As a result, this Court should remand for a new sentencing phase trial with instructions that the court permit Andriano to introduce residual doubt as a specific mitigating factor.

35

## ARGUMENT VII

**THE TRIAL COURT'S REFUSAL TO PERMIT ANDRIANO TO PRESENT EVIDENCE OF MERCY DEPRIVED HER OF HER RIGHT TO DUE PROCESS, A FAIR TRIAL, AND A FAIR SENTENCING PROCEEDING UNDER THE SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AS WELL AS ARTICLE 2, §§ 4, 15 AND 24 OF THE ARIZONA CONSTITUTION.**

All of Andriano's arguments in Argument VI relating to the trial court's refusal to permit her to introduce evidence of residual doubt apply equally to Andriano's argument here that the trial court refused to permit her to introduce mercy as a mitigator. In its answering brief, the state attempts to equate the trial court's general instruction on mitigating circumstances here with the instruction submitted and approved by the Supreme Court in *Kansas v. Marsh*, 548 U.S. ___, 126 S.Ct. 2516 (2006). (Answering Brief, pp. 58-59.) In doing so, the state confuses the different meanings of mercy. As used in the court's instruction here, mercy means "the feeling that motivates compassion." As approved by *Marsh* Court, mercy means, "the leniency and compassion shown toward offenders…." www.dictionary.com. In *Marsh*, the Court properly instructed the jury that the exercise of mercy can itself be a mitigating factor, which is precisely what the trial court here refused to do.

36

In consequence, the state is incorrect that precisely the same information was conveyed using slightly different words. (Answering Brief, p. 59.) In fact, the different meanings make a critical difference in a jury's understanding. As instructed here, the jury understood that a mitigating factor was one that jurors could consider in showing compassion or kindness toward Andriano. They were not instructed that they could consider mercy alone as a mitigator to show compassion or kindly forbearance towards Andriano. As a result, the trial court prevented Andriano from presenting this significant mitigating factor for jurors to consider in their unbridled discretion to determine the appropriate sentence. As such, Andriano was deprived of her right to due process, fair trial, and a fair sentencing proceeding under the Sixth, Eighth and Fourteenth Amendments to the United States Constitution as well as Article 2, §§ 4, 15 and 24 of the Arizona Constitution. This Court should remand for a new sentencing hearing with instructions that the court permit Andriano to introduce mercy as a specific mitigating factor.

37

## ARGUMENT VIII

**THE TRIAL COURT IMPROPERLY INSTRUCTED THE JURY IN THE PENALTY PHASE INSTRUCTIONS TO REQUIRE JURY UNANIMITY REGARDING THE EXISTENCE OF MITIGATING CIRCUMSTANCES. THE ERROR VIOLATED ANDRIANO'S RIGHT TO DUE PROCESS, A FAIR TRIAL, AND A FAIR SENTENCING PROCEEDING IN VIOLATION OF THE SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AS WELL AS ARTICLE 2, §§ 8, 15 AND 24 OF THE ARIZONA CONSTITUTION.**

In its answer to this claim, the state maintains that Andriano has taken the complained of portion of the jury instruction here out of context and avoided the most pertinent portions. (Answering Brief, p. 60.) The state says that the instruction given here appears to be similar in meaning to the instructions recently upheld in *State v. Ellison*, 213 Ariz. 116, 140 P.3d 899 (2006). (Answering Brief, p. 63.) According to the state, when the instruction is viewed as a whole, the thought that any rational juror could interpret the phrase, "If you unanimously find that mitigation exists, each of you must individually weigh that mitigation in light of the aggravation…" to mean that jurors had to unanimously find that mitigation existed before they individually weighed it, to be "absurd." (Answering Brief, p. 64.) The state is not being candid. Andriano has not taken anything out of context nor misled the Court in any way.

38

In her opening brief, Andriano set forth that jury instructions are read as a whole to ensure that the jury receives the information it needs. (Opening Brief, pp. 98, 101.) Andriano acknowledged that the court instructed jurors that mitigation was determined by the jurors individually. (Id., p. 101.) She admitted the jury was instructed to individually determine the nature and extent of mitigating circumstances. (Id., p. 102.) As a result, Andriano has not misled the Court in any aspect.

The instructions in *State v. Ellison* were nothing like the instruction at issue here. In *Ellison*, the trial judge instructed the jurors that they were required to unanimously determine whether the death sentence should be imposed. *Ellison*, 213 Ariz. at ___, 140 P.3d at 922. That is in accordance with Arizona law. However, unlike the case here, in *Ellison*, additional jury instructions made clear that the jury did not have to unanimously find the existence of a mitigating circumstance before a juror could individually consider it in sentencing. *Id.* The state is simply not being forthright.

There is no question but that the jury instruction told the jury that before they could individually weigh mitigation in light of the aggravation, they must first unanimously find that the mitigation existed. (RT, 12/16/04, p. 49.) The problem was further exacerbated by the court's use of the word "you" to mean both "you" the jury

39

as a whole, and "you" the individual juror.  The fact that jurors were told in other portions of the instruction to individually determine the nature and extent of mitigating circumstances and that the determination of what circumstances are mitigation is for each one of "you" to resolve, only made a rational consideration of how to determine mitigating evidence impossible for any reasonable juror to understand.

The purpose of jury instructions is to inform the jury of the applicable law in understandable terms. *State v. Noriega*, 187 Ariz. 282, 284, 928 P.2d 706, 708 (App. 1996).  While instructions need not be faultless, "they must not mislead the jury *in any way and must give the jury an understanding of the issues*." *Id.* (Emphasis added.) "Jury instructions are, in essence, a guide to the proper verdict." *Id.*, *quoting Lay v. City of Mesa*, 168 Ariz. 522, 555, 815 P.2d 921, 924 (App. 1991).  The test of the propriety of an instruction "is whether the jury would be misled as to the proper rule of law." *Evans v. Pickett*, 102 Ariz. 393, 397, 430 P.2d 413, 417 (1967).

When read as a whole, the jury instruction here told jurors that before they could individually assess the mitigation, they had to unanimously find that it existed.  That is not the proper rule of law.  Jurors do not have to agree unanimously that a mitigating circumstance has been proven to exist. A.R.S. § 13-703(C).  The instruction here was not a guide to the proper verdict.  It did not convey with sufficient clarity all the legal

40

concepts necessary to permit the jury to arrive at a verdict consistent with the law. *Noriega*, at 284, 928 P.2d at 708.

The importance of a specific, correct understanding of this principle of law and its proper application by the jury at this particular stage in the proceedings cannot be overemphasized. This was the penalty phase of a capital murder trial. The decision to be made was whether the defendant would spend the rest of her life in prison, or be executed. A correct understanding of the principles of law to be applied is critical.

Here, the correct principle of law was not conveyed to jurors to give them a guide to the proper verdict. They were misled as to the proper rule of law. Because there is a substantial probability that reasonable jurors well may have thought they were precluded from individually assessing mitigation unless they first unanimously agreed on the existence of that mitigation, the death sentence must be vacated and the case remanded. *Mills v. Maryland*, 486 U.S. 367, 384, 108 S.Ct. 1860, 1870 (1988).

41

**ARGUMENT IX**

**THE TRIAL COURT IMPERMISSIBLY COERCED THE JURY WHEN IT GAVE AN IMPASSE INSTRUCTION DURING THE PENALTY PHASE WITHOUT KNOWING WHETHER THE JURY WAS DEADLOCKED.**

Appellee describes Andriano's argument regarding the impasse instruction as meritless and misleading. (Answering Brief, p. 70.) The state's position is belied by the opening brief which discusses the facts surrounding the giving of the impasse instruction and quotes the instruction itself. (Opening Brief, pp. 107-108.)

Appellee characterizes the juror's question, "If we are unable to reach an unanimous verdict, what is the procedure that will be followed?" as an affirmative indication that it was at an impasse. (Answering Brief, p. 72.) Ariz. R. of Crim. P., Rule 22.4 requires an affirmative indication from the jury it is in need of help before assistance may be offered. *State v. Huerstel*, 206 Ariz. 93, 99, 75 P.3d 698, 704 (2003). And, the jury must do so on its own. *Id.* There is nothing from the jury's question that affirmatively indicated it was at an impasse. Asking what procedure would be followed if it could not reach a unanimous verdict, does not tell the court that the jury was deadlocked.

And, although the jury continued to deliberate hours after the court gave them the impasse instruction, that is not the only factor to consider when determining whether the court coerced the verdict. The jury's note did not declare an impasse. The court reacted hastily by treating the jury's note as if it declared an impasse. Giving an impasse instruction prematurely sent a clear message to the jurors to reach a unanimous decision. However, there was no affirmative indication from the jury that it needed help because it was at an impasse.

Giving the impasse instruction before the jury even indicated that it was at an impasse signaled to the jury that it was taking too long to reach a verdict. *State v. Huerstel*, 206 Ariz. 93, 101, 75 P.3d 698, 706 (2003). It was also coercive because it improperly instructed the jury regarding its duty to deliberate. In direct contradiction to its own instructions given before deliberation, the impasse instruction told the jurors that they had a duty to consult with one another and to deliberate with a view to reaching an agreement. *See*, Argument X.

Additionally, the instruction was coercive because it did not actually answer the jurors' question. The court should have told them not to concern themselves with legal procedures in place in the event of a deadlock. Instead, the court immediately jumped

43

to the conclusion that the jury was deadlocked and instructed them *not* to make an individualized, moral judgment but to deliberate with a view to reaching an agreement.

Finally, the way the instruction coerced the jury became evident after the trial in comments made by the jury to a local journalist. (ROA, p. 444(A).)  According to six jurors, at one point, the jury was on the verge of a deadlock with one elderly holdout. The holdout was adamantly against the death penalty. (Id.) The trial court's premature impasse instruction may well have pressured this holdout into voting for death.

From their statements, it appears that the instruction forced the jurors into using improper reasons or bases for their decisions.  The jurors improperly considered the alternate sentence of twenty-five years to life in reaching their verdict.  They did not want Andriano to be eligible for parole.  Moreover, the jury improperly considered the automatic appeal as a basis for their verdict.  (Id.)  The automatic appeal acted as a safety net for the jurors, and allowed them to avoid the proper consideration of the case. The holdout had no duty to continue to deliberate once he came to the conclusion that the death penalty was not the appropriate sentence.  Contrary to the court's instruction, the holdout was under no obligation to subject himself to the rationales of the other jurors.

44

Because this phase of a capital trial is so crucial, it is imperative that the court take great care when dealing with concerns expressed by jurors and the court's response to those concerns. Arizona law specifically describes the court's duties if the jury announces that it is deadlocked. Not only that, but in a capital case, Arizona law provides for the selection of a second jury when the original jury is deadlocked. *See*, A.R.S. § 13-703.01(K).

The state maintains that the impasse instruction was proper and did not misstate the law. (Answering Brief, p. 74.) The state argues that it was appropriate to instruct the jurors to consult with each other during the penalty phase, relying on *Lowenfield v. Phelps*, 484 U.S. 231, 108 S.Ct. 546 (1988). (Answering Brief, pp. 74-75.) *Lowenfield* is distinguishable. There, the court told the jury before deliberations began that if they were unable to reach a unanimous decision that the court would impose life without probation, parole, or suspension of sentence. *Id.*, at 234, 108 S.Ct. 546. The jury informed the court that it was actually deadlocked and asked to again be instructed about its responsibilities. *Id.*

Conversely, here, pursuant to A.R.S. § 13-703(C), jurors do not have to agree unanimously that a mitigating circumstance has been proven to exist. Each juror may

45

consider any mitigating circumstance found by that juror in determining the appropriate penalty.

The penalty phase of a capital case is different from deliberations in a non-capital felony case. The standard impasse instruction in the judge's bench book does not apply in the penalty phase of a capital case. Because the law and the previous instructions given to the jury instructed them to make individualized decisions, the language of the impasse instruction used in this case is incorrect. At the outset of deliberations, the court correctly instructed them to make a reasoned, moral judgment based on individual determinations. The trial court should have repeated or referred the jury back to the instructions given before deliberations began.

The impasse instruction was incorrect because during the penalty phase, the jurors do not have a duty to consult with one another or to deliberate with a view to reaching an agreement. This is the essence of the penalty phase. The sentencing process must permit consideration of the "character and record of the individual offender and the circumstances of the particular offense as a constitutionally indispensable part of the process of inflicting the penalty of death," *Woodson v. North Carolina*, 428 U.S. 280, 304, 96 S.Ct. 2978 (1976), in order to ensure the reliability, under Eighth Amendment standards, of the determination that "death is the appropriate

46

punishment in a specific case." *Id.*, at 305; *Lockett v. Ohio*, 438 U.S. 586, 601, 98 S.Ct. 2954, 2963 (1978).

The court's incorrect instruction that the jurors must deliberate with a view to reaching a unanimous decision pressured them to abandon their individualized moral decisions in an effort to reach a unanimous verdict. It therefore jeopardized the reliability, under Eighth Amendment standards, of the determination that Andriano's sentence to death was appropriate. The jurors' individualized and diligent consideration of every mitigating factor without interference from the court is essential to a reliable death sentence.

The Arizona Supreme Court recently discussed the jurors' individual duty to evaluate mitigating evidence in *State ex rel. Thomas v. Granville*, 211 Ariz. 468, 123 P.3d 662 (2005):

> ...the mitigation must be of such quality or value that it is adequate, in the opinion of an individual juror, to persuade that juror to vote for a sentence of life in prison. A mitigating factor that motivates one juror to vote for a sentence of life in prison may be evaluated by another juror as not having been proved or, if proved, as not significant to the assessment of the appropriate penalty. Each juror must determine whether, in that juror's individual assessment, the mitigation is of such quality of value that it warrants leniency in a particular case.

47

*Id.*, at 667.

The Court clarified that the determination of whether mitigation is sufficiently substantial to warrant leniency is not a fact question to be decided based on the weight of the evidence, but a sentencing decision to be made by *each juror* based upon the juror's assessment of the quality and significance of the mitigating evidence that the juror has found to exist. *Id.* The Court stated, "…each juror must determine whether, in that juror's *individual assessment*, the mitigation is of such quality or value that it warrants leniency." *Id.* (Emphasis added.)

This requirement of individual assessment during the deliberation process of the penalty phase is different and distinct from the deliberation process during a non-capital criminal trial. The impasse instruction that is appropriate for the guilt finding process of a non-capital trial is not appropriate for the unique task the jurors face during the penalty phase of a capital trial. Defense counsel properly objected to the court's instruction because it incorrectly instructed the jurors to deliberate with a view to reaching an agreement. Reversal and remand for a new penalty phase trial is warranted.

48

## ARGUMENT X

### THE TRIAL COURT INCORRECTLY INSTRUCTED THE JURY ABOUT ITS DUTY TO DELIBERATE DURING THE PENALTY PHASE. THE INSTRUCTION VIOLATED ANDRIANO'S DUE PROCESS, FAIR TRIAL AND EIGHTH AMENDMENT RIGHTS.

Pursuant to A.R.S. § 13-703(C), jurors are not required to agree unanimously that a mitigating circumstance has been proven to exist. Each juror may consider any mitigating circumstance found by that juror in determining the appropriate penalty.

The law governing the penalty phase of a capital case is different from the law governing deliberations in a non-capital felony case. The standard impasse instruction to the judge's bench book does not apply in the penalty phase of a capital case. Because the law and the previous instructions given to the jury instructed them to make individualized decisions, the language of the impasse instruction used in this case is incorrect. The trial court should have repeated or referred the jury back to the instructions given before deliberations began.

The impasse instruction was incorrect because during the penalty phase, the jurors do not have a duty to consult with one another or to deliberate with a view to reaching an agreement. This is the essence of the penalty phase. The sentencing

49

process must permit consideration of the "character and record of the individual offender and the circumstances of the particular offense as a constitutionally indispensable part of the process of inflicting the penalty of death," *Woodson v. North Carolina*, 428 U.S. 280, 304, 96 S.Ct. 2978 (1976), in order to ensure the reliability, under Eighth Amendment standards, of the determination that "death is the appropriate punishment in a specific case." *Id.*, at 305; *Lockett v. Ohio*, 438 U.S. 586, 601, 98 S.Ct. 2954, 2963 (1978).

The court's incorrect instruction that the jurors must deliberate with a view to reaching a unanimous decision pressured them to abandon their individualized moral decisions in an effort to reach a unanimous verdict. It jeopardized the reliability of Andriano's death sentence. The jurors' *individualized* consideration of every mitigating factor without interference from the court is essential to a reliable death sentence.

The Arizona Supreme Court recently discussed the jurors' individual duty to evaluate mitigating evidence in *State ex rel. Thomas v. Granville*, 211 Ariz. 468, 123 P.3d 662 (2005). The Court highlighted the importance of the individual determination of each juror in assessing the appropriate penalty. *Id.*, at ___, 123 P.3d at 667. The Court explained that the determination of whether mitigation is sufficiently substantial

50

to warrant leniency was not a fact question to be decided based on the weight of the evidence. *Id.* Rather, it is a sentencing decision to be made by *each juror* based upon the juror's assessment of the quality and significance of the mitigating evidence that the juror has found to exist. *Id.* The Court stated, "…each juror must determine whether, in that juror's *individual assessment*, the mitigation is of such quality or value that it warrants leniency." *Id.* (Emphasis added).

This requirement of individual assessment during the deliberation process of the penalty phase differs from the deliberation process during a non-capital criminal trial. The impasse instruction that is appropriate for a non-capital trial is not appropriate for the penalty phase of a capital trial. The trial court erred by giving the impasse instruction at the penalty phase. Reversal and remand for a new penalty phase trial is warranted.

51

## ARGUMENT XI

**ARIZONA'S STATUTE PROVIDING FOR EXECUTION BY LETHAL INJECTION IS VAGUE BECAUSE IT FAILS TO SUFFICIENTLY SPECIFY THE MEANS TO BE USED TO ENSURE AN EXECUTION BY LETHAL INJECTION THAT IS NOT CRUEL AND UNUSUAL, THUS VIOLATING ANDRIANO'S DUE PROCESS AND EIGHTH AMENDMENT RIGHTS.**

The state argues that Arizona's lethal injection statute is not cruel and unusual. (Answering Brief, p. 77.) Of course, Andriano never argued that the statute was cruel and unusual; the crux of her argument is that the statute is vague. (Opening Brief, p. 120.) The state also argues that Arizona's lethal injection statute does not violate the Eighth Amendment. (Answering Brief, p. 77.) Again, Andriano's objection to Arizona's lethal injection statute is that it is vague. (Opening Brief, p. 120.) Andriano mentioned the Eighth Amendment in her opening brief in reference to the fact that an execution must be performed within the requirements of the Eighth Amendment. (Opening Brief, p. 125.) Arizona's vague lethal injection falls short of taking the necessary steps to outline a protocol that complies with the Eighth Amendment, risking that the implementation of the death penalty will violate the Eighth Amendment.

52

The state points out that Andriano can address the sufficiency of the lethal injection statute and the way it is applied by way of a lawsuit under 28 U.S.C. § 1983 at a time closer to her execution. The state implies that Andriano's objection as to the application of the lethal injection statute is not ripe. However, this issue may be addressed on appeal because the court sentenced Andriano under this statute, and an illegal sentence may be raised and addressed on appeal. Imposition of an illegal sentence constitutes fundamental error. *State v. Alvarez*, 205 Ariz. 110, 116, 67 P.3d 706, 712 (App. 2003). This issue may be addressed on appeal because appellants are entitled to appeal from sentences which are excessive or illegal. A.R.S. § 13-4033(A)(3); *State v. Wagstaff*, 161 Ariz. 66, 69, 775 P.2d 1130, 1133 (App. 1988).

Recently, three states have halted executions by lethal injection for different reasons. In Maryland, the court determined that the lethal injection protocol had not been subjected to the notice and comment requirements that must be met before enacting a regulation. Thus, the court found that these lethal injection regulations must be reviewed and approved according to administrative procedure before executions could resume. *Evans v. State*, 914 A.2d 25 (Md. 2006) (reconsideration denied, Feb. 2, 2007).

In California, a federal district judge found that California's lethal injection protocol, as implemented, violated the Eighth Amendment. *Morales v. Tilton*, 465 F.Supp.2d 972 (N.D. Cal., 2006).

Finally, Florida's governor called a moratorium on executions by lethal injection due to the botched execution of Angel Diaz. (National Public Radio, December 15, 2006, Appendix A, attached). It is expected that executions will resume once the procedure is reviewed and approved by a committee that reports to the governor.

The claim is ripe because the court imposed the sentence pursuant to the lethal injection statute. Even though Andriano may have other options for litigation down the road, this does not preclude this court from addressing her attack on the constitutionality of the sentencing statute that applies in her case.

54

# ARGUMENT XII

## ARIZONA'S DEATH PENALTY IS UNCONSTITUTIONAL.

Andriano relies on her arguments on this issue as set forth in her opening brief.

## CONCLUSION

Based on the foregoing, Andriano requests this court reverse her conviction and remand for a new trial.

Respectfully submitted,

MARICOPA COUNTY PUBLIC DEFENDER

By _____
BRENT E. GRAHAM
Deputy Public Defender

By _____
PEG GREEN
Deputy Public Defender
Attorneys for APPELLANT

56

## <u>CERTIFICATE OF RULE 31.13(b) COMPLIANCE</u>

The brief is double-spaced, uses a 14-point Times New Roman proportionately

spaced typeface, and contains 10714 words, according to the processing system used to

prepare this brief.

MARICOPA COUNTY PUBLIC DEFENDER

By _____
     BRENT E. GRAHAM
     Deputy Public Defender


By _____
     PEG GREEN
     Deputy Public Defender
     Attorneys for APPELLANT

57

## CERTIFICATE OF SERVICE

**TWO COPIES** of Appellant's Reply Brief mailed this 8th day of March, 2007, to ROBERT J. GORMAN, Assistant Attorney General, Attorney General's Office, 400 West Congress, Suite 315, Tucson, Arizona 85701-1367.

**ONE COPY** of Appellant's Reply Brief mailed this 8th day of March, 2007, to WENDI ELIZABETH ANDRIANO, #191593, Arizona State Prison Complex, Perryville - Lumley Unit, P.O. Box 3300, Goodyear, Arizona 85338.

MARICOPA COUNTY PUBLIC DEFENDER

By _____
BRENT E. GRAHAM
Deputy Public Defender
Attorney for APPELLANT
Downtown Justice Center
620 West Jackson, Suite 4015
Phoenix, Arizona 85003
Telephone (602) 506-7711
State Bar Membership No. 011868

KLBG030807P

58

# APPENDIX A



February 26, 2007

Nation
## Florida Suspends Executions for Medical Review

by Greg Allen

*All Things Considered,* December 15, 2006 · An execution in Florida this week that took more than twice as long as usual has prompted Gov. Jeb Bush to ask for an investigation. Gov. Bush took the step after a preliminary autopsy showed how much went wrong with the execution this week of Angel Diaz.

The governor has ordered the suspension of all executions in the state until the state's lethal injection procedures are reviewed.

Diaz was sentenced to die after being convicted of a 1979 murder.

Wednesday, Diaz was strapped to a gurney and wheeled into the execution chamber at the Florida State prison. Department of Corrections employees then administered three drugs that are part of the state's lethal injection cocktail. But Diaz didn't die.

The executioner was forced to inject a second round of lethal drugs; Diaz was finally declared dead 34 minutes after the process began. Death by lethal injection normally takes 15 minutes.

Corrections officials say Diaz had a liver disease, and they believe that may have accounted for the lengthy death process and the need for a second round of drugs.

Diaz's family and some doctors dispute that. But because of the unusual circumstances, Gov. Bush ordered Corrections Secretary James McDonough to conduct a thorough review of the execution, complete with an autopsy and interviews with those who were in the death chamber.

The Florida Supreme Court has ordered the state to preserve all evidence and records related to Diaz's execution and to make them available to attorneys in a lawsuit that's challenging the use of lethal injection in Florida.

### Related NPR Stories

Dec. 15, 2006
U.S. Death Sentences Hit 30-Year Low

Dec. 15, 2006
U.S. Judge: California Executions Unconstitutional

Sep. 28, 2006
Inmate Questions California's Lethal Injections

Sep. 21, 2006
Roundtable: Florida Execution, 'Whiteness' Study

Aug. 17, 2006
Judge Orders Medical Supervision for Executions

# EXHIBIT D

SUPREME COURT OF ARIZONA

| | | |
|---|---|---|
| STATE OF ARIZONA, | ) | Arizona Supreme Court |
| | ) | No. CR-05-0005-AP |
| Appellee, | ) | |
| | ) | Maricopa County |
| v. | ) | Superior Court |
| | ) | No. CR2000-096032 |
| WENDI ELIZABETH ANDRIANO, | ) | |
| | ) | |
| Appellant. | ) | |
| | ) | |
| | ) | |

**NOTICE FOR POST-CONVICTION RELIEF (Death Penalty)**

TO:  Maricopa County Superior Court

CLERK: Michael K Jeanes

This Notice for Post-Conviction Relief is presented for filing
pursuant to Rule 32.4(a), Arizona Rules of Criminal Procedure.

    Date of sentence according to the Superior Court Record:
    **December 22, 2004**

    Defendant's Trial Court Attorneys:  Daniel Patterson, Maricopa
    Count Public Defender's Office, Homicide Div., 620 W. Jackson
    Suite 4015, Phoenix, AZ  85003 and David Delozier, 4016 E.
    Forest Pleasant Place, Cave Creek, AZ  85331

    Date of Mandate of the Arizona Supreme Court affirming the
    defendant's conviction and sentence of death: **October 25, 2007**

    Defendant's Appellate Court Attorney: Margaret M Green, Maricopa
    County Public Defender's Office, 11 W. Jefferson, Suite 5,
    Phoenix, AZ  85003

DATED this  25th  day of October, 2007.

                                    Rachelle m. Resnick
                                    Rachelle M. Resnick
                                    Clerk of the Court

Supreme Court No. CR-05-0005-AP
Page 2 of 2


TO:
Kent Cattani, Arizona Attorney General's Office
Robert J Gorman Jr, Arizona Attorney General's Office, Tucson
Andrew Thomas, Maricopa County Attorney
Margaret M Green, Maricopa County Public Defender's Office
Wendi Elizabeth Andriano, ADOC #191593, Arizona State Prison,
     Perryville - Lumley/San Juan Unit
Jennifer Bedier, Arizona Capital Representation Project
     [Information copy]
Diane Alessi, Arizona Death Penalty Judicial Assistance Program
     [Information copy]
Hon Barbara R Mundell, Presiding Judge, Maricopa County Superior
     Court
Hon Anna M Baca, Criminal Presiding Judge, Maricopa County Superior
     Court
Hon Brian K Ishikawa, Judge, Maricopa County Superior Court
James Logan, Director, Office of Public Defense Services
Marcus Reinkensmeyer, Court Administrator, Maricopa County Superior
     Court
bjd

# EXHIBIT E

**LEWIS**
AND
**ROCA**
— LLP —
L A W Y E R S

1    40 North Central Avenue
     Phoenix, Arizona 85004-4429

2    Todd E. Hale, State Bar No. 015771
       Direct Dial: (520) 629-4433
       Direct Fax: (520) 879-4708
       EMail: THale@LRLaw.com
3    Scott M. Bennett, State Bar No. 022350
       Direct Dial: (602) 262-5338
       Direct Fax: (602) 734-3816
4      EMail: SBennett@LRLaw.com

5    Attorneys for Wendi Andriano

MICHAEL K. JEANES, CLERK
RECEIVED CCC #5
DOCUMENT DEPOSITORY

**09 AUG 21  PM 3: 58**

**FILED**
BY L. SAM, DEP

6                SUPERIOR COURT OF ARIZONA
7                  COUNTY OF MARICOPA

8    State of Arizona,                    )
                                          )
9                        Plaintiff,       )    No. CR2000-096032-A
                                          )
10   vs.                                  )    **MOTION FOR 120-DAY BRIEFING**
                                          )    **SCHEDULE PURSUANT TO ARIZ.**
11   Wendi Andriano,                      )    **R. CRIM. P. 32.4**
                                          )
12                       Defendant.       )
                                          )

13

14        Wendi Andriano moves this Court to institute the standard 120-day briefing

15   schedule as set forth in Ariz. R. Crim. P. 32.4.  The order of mandate and notice of

16   postconviction relief were entered on November 6, 2007.  But counsel was never

17   appointed for Ms. Andriano.

18        Ms. Andriano now has attorneys who have agreed to represent her *pro bono*.  They

19   filed their notice of appearance in this Court on August 17, 2009.  Accordingly, Ms.

20   Andriano requests that the Court grant her the standard 120 days to file her petition, which

21   would make it due on December 15, 2009 (120 from the filing of the notice of

22   appearance).

23        A proposed order accompanies this motion.

24

25

26

27

28
                                                              2086248_1

LEWIS
AND
ROCA
— LLP —
L A W Y E R S

1    RESPECTFULLY SUBMITTED August 21, 2009.

2                                    LEWIS AND ROCA LLP

3                             By _____
4                                    Todd E. Hale
5                                    Scott M. Bennett
                                     Attorneys for Defendant
6

7    ORIGINAL filed August 21, 2009,
     with the Clerk of the Maricopa
8    County Superior Court.

9    COURTESY COPY hand-delivered August 21, 2009, to:
10   Judge Brian Ishikawa
     Maricopa County Superior Court
11   Southeast Facility
     1810 S. Lewis, 2E
12   Mesa, AZ  85210

13   COPY mailed August 21, 2009, to:
14

15   Mr. Juan Martinez
     Office of the Maricopa County Attorney
16   301 W. Jefferson, 4th Floor
     Phoenix, AZ 85003-2191
17   *Attorney for the State of Arizona*

18

19

20

21

22

23

24

25

26

27

28                                    2

MADI_2017959.1                                             2079173.1

Michael K. Jeanes, Clerk of Court
*** Electronically Filed ***
09/02/2009 8:00 AM

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CR 2000-096032                                    09/01/2009


                                         CLERK OF THE COURT
HON. GARY E. DONAHOE                          S. Yoder
                                              Deputy


STATE OF ARIZONA                         JUAN M MARTINEZ
                                         KENT E. CATTANI

v.

WENDI ELIZABETH ANDRIANO (A)             TODD E HALE
                                         SCOTT M BENNETT

                                         AZ SUPREME COURT
                                         CAPITAL CASE MANAGER
                                         COURT ADMIN-CRIMINAL-PCR
                                         VICTIM SERVICES DIV-CA-SE



                         MINUTE ENTRY


        The Court has received a Notice of Appearance filed by Scott M. Bennett and Todd E.
Hale, and a Motion for 120-Day Briefing Schedule Pursuant to Ariz.R.Crim.P. 32.4. In the
Notice of Appearance, counsel state that all the attorneys have agreed to represent the defendant
*pro bono* in Rule 32 proceedings and are not seeking appointment to represent her, however,
they will seek court funds for "reasonably necessary investigative and expert services."

        On October 25, 2007, the Arizona Supreme Court issued the mandate affirming the
judgment of conviction and sentence of death. In the mandate, the Supreme Court also ordered
suspension of the time limit in Rule 32.4(c)(1), Arizona Rules of Criminal Procedure,  "until
qualified counsel agrees to accept appointment and is appointed by the Supreme Court."
(Emphasis added). Contemporaneously with the mandate, the clerk of the Supreme Court
prepared the Notice of Post-Conviction Relief, which was filed in this court on November 6,
2007. The Rule 32 time limits have been suspended since that time per the Supreme Court's
order. This Court cannot *sua sponte* reinstate the Rule 32 time limits; it must await further order
from the Supreme Court.

Docket Code 023                    Form R000A                              Page 1

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CR 2000-096032                                          09/01/2009


     IT IS THEREFORE ORDERED directing the clerk to forward to the Arizona Supreme Court the Notice of Appearance and Motion for 120-Day Briefing Schedule Pursuant to Ariz.R.Crim.P. 32.4.

# EXHIBIT G

2085307.1

LEWIS
AND
ROCA
—LLP—
L A W Y E R S

MICHAEL K. JEANES, CLERK
RECEIVED F C LOBBY
DOCUMENT DEPOSITORY

09  OCT -2  PM 4: 37

FILED
BY L. SAM, DEP

1   40 North Central Avenue
    Phoenix, Arizona 85004-4429

2   Todd E. Hale, State Bar No. 015771
       Direct Dial: (520) 629-4433
       Direct Fax: (520) 879-4708
3      EMail: THale@LRLaw.com
    Scott M. Bennett, State Bar No. 022350
       Direct Dial: (602) 262-5338
4      Direct Fax: (602) 734-3816
       EMail: SBennett@LRLaw.com

5   Attorneys for Wendi Andriano

6                    SUPERIOR COURT OF ARIZONA
                        COUNTY OF MARICOPA
7

8   State of Arizona,                    )
9                          Plaintiff,    )    No. CR2000-096032-A
                                         )
10             vs.                       )    **MOTION AND CONSENT OF**
                                         )    **LOCAL COUNSEL FOR PRO HAC**
11   Wendi Andriano,                     )    **VICE ADMISSION OF ALLEN A.**
                                         )    **ARNTSEN**
12                         Defendant.    )
                                         )
13  ─────────────────────────────────────

14         Scott Bennett and Todd Hale, both of the law firm Lewis and Roca, move this

15  Court to admit Allen A. Arntsen as counsel *pro hac vice* in this action, pursuant to Rule

16  38(a), Rules of the Supreme Court.

17         The following exhibits are attached hereto:

18         1.      the original Verified Application;

19         2.      the original Certificate(s) of Good Standing; and

20         3.      the State Bar of Arizona Notice of Receipt.

21         The required filing fee has been submitted to the State Bar of Arizona.

22         Scott Bennett and Todd Hale hereby agree to serve as designated local counsel for

23  the defendant in the subject case.

24         A proposed order admitting Allen A. Arntsen accompanies this motion.

25

26

27

28

LEWIS
AND
ROCA
——LLP——
L A W Y E R S

1    RESPECTFULLY SUBMITTED this 2nd day of October, 2009.

2                                        LEWIS AND ROCA LLP

3

4                            By _____

5                                        Todd E. Hale
                                         Scott M. Bennett
6                                        Attorneys for Defendant

7    ORIGINAL filed October 2, 2009,
8    with the Clerk of the Maricopa
     County Superior Court.
9
     COURTESY COPY hand-delivered October 2, 2009, to:
10   Judge Emmet J. Ronan
11   Maricopa County Superior Court
     Southeast Facility
12   1810 S. Lewis, 2E
13   Mesa, AZ  85210

14   COPY mailed October 2, 2009, to:

15   Mr. Juan Martinez
16   Office of the Maricopa County Attorney
     301 W. Jefferson, 4th Floor
17   Phoenix, AZ 85003-2191
18   *Attorney for the State of Arizona*

19

20

21

22

23

24

25

26

27

28
                                    2                        2085307.1

**Superior Court**
**Maricopa County**

| | |
|---|---|
| State of Arizona,<br>    Plaintiff, | )<br>)<br>) |
| v. | )<br>)<br>) |
| Wendi Elizabeth Andriano,<br>    Defendant. | )<br>)<br>)<br>) |

CASE # **2000 096032**

SBA App # 1004913

**NOTICE OF RECEIPT OF**
**COMPLETE APPLICATION**

NOTICE IS HEREBY given by THE STATE BAR OF ARIZONA that it has received the verified application and fee from Allen Arntsen .

In addition to this application, applicant has made the following applications to appear pro hac vice, pursuant to Rule38 (a), within the previous three (3) years:

| Title of Matter | Court/Agency | Date | Granted? |
|---|---|---|---|
| | | | ☐ Yes  ☐ No |
| | | | ☐ Yes  ☐ No |

Exhibit A, the original verified application and Exhibit B, the original Certificate(s) of Good Standing are attached hereto.

DATED this 1st day of October 2009

Fabiola Perez
Resource Center
State Bar of Arizona

Original Mailed on this 1st day of October 2009 to:

Mr Scott Bennett
Lewis and Roca LLP
40 N Central Ave Ste 1900
Phoenix, AZ 85004-4429

-1-



**STATE BAR OF ARIZONA**



For Official Use Only
App# *1004913*
Bar Number# *P122399*

RECEIVED

SEP 2 2 2009

State Bar Of Arizona

Attn: Pro Hac Vice Dept
PO Box 53099
Phoenix, AZ 85072-3099
Phone: 602-340-7239

**Application for Appearance Pro Hac Vice**

**PART I: Applicant Information**

Name of Applicant:   Allen A. Arntsen

Firm/Company Name:   Foley & Lardner LLP

Office Address:   150 E. Gilman Street, P.O. Box 1497, Madison, WI  53701-1497

Telephone:   (608) 258-4293     Fax:   (608) 258-4258     Email Address:   aarntsen@foley.com

Residence Address:   2817 Milwaukee Street, Madison, WI  53704

Title of cause or case where applicant seeks to appear:   State of Arizona v. Wendi Elizabeth Andriano

Docket Number:   2000-096032

Court, Board, or Administrative Agency:   Superior Court of Arizona  *Maricopa*

Party on whose behalf applicant seeks to appear:   Wendi Elizabeth Andriano

**Pursuant to Arizona Supreme Court Rule 38(i)(3), the applicant shall complete the information below:**

| Courts to Which Applicant Has Been Admitted: *(Attach additional pages if needed)* | Date of Admission: | Bar Number: |
|---|---|---|
| Wisconsin State Courts | 5/18/81 | 1015038 |
| Western District of Wisconsin | 5/18/81 | |
| Eastern District of Wisconsin | 5/30/81 | |
| Seventh Circuit Court of Appeals | 2/18/83 | |
| Federal Circuit Court of Appeals | 11/30/93 | |
| Tenth Circuit Court of Appeals | 5/19/97 | |

☑ Applicant is a member in good standing in such courts.

☑ Applicant is not currently disbarred or suspended in any court.

Applicant ☐ is / ☒ is not **(select one)** currently subject to any pending disciplinary proceeding or investigation by any court, agency or organization authorized to discipline attorneys at law.

In the preceding three (3) years, applicant has filed applications to appear as counsel under AZ ST S.Ct., Rule 38(a) in the following:

| Title of Matter: | Docket #: | Court or Agency: | App Granted? (Y/N) |
|---|---|---|---|
| | | | |
| | | | |

This case or cause ☐ is / ☒ is not **(select one)** a related or consolidated matter for which applicant has previously applied to appear pro hac vice in Arizona. If this matter is a related or consolidated with any previous application, Applicant certifies that he/she will review and comply with appropriate rules of procedure as required in the underlying cause.

If applicable, please provide related or consolidated matter application or docket#

Revised 01/15/09

RECEIVED

SEP 2 1 2009

MAD 2046344.1

PART II: Local Counsel Information

Name of Arizona Local Counsel: _____ Scott M. Bennett _____

State Bar of Arizona Number: _____ 022350 _____

Address: _____ 40 N. Central Avenue, Suite 1900, Phoenix, AZ  85004-4429 _____

Telephone: ____ (602) 262-5338 _____ Fax: ____ (602) 734-3816 _____ Email Address: __sbennett@lrlaw.com

☑ Local Counsel is a member in good standing.

☑ Local Counsel associating with a nonresident attorney in a particular cause shall accept joint responsibility with the nonresident attorney to the client, to opposing parties and counsel, and to court, board, or administrative agency in that particular cause.

**PART III: Parties and Certification**

Name(s) of each party in this cause and name and address of all counsel of record:

| Party: | Counsel of Record: | Address: |
|---|---|---|
| Wendi Andriano | Scott M. Bennett | 40 N. Central Ave., Phoenix, AZ  85004 |
| Wendi Andriano | Todd E. Hale | 40 N. Central Ave., Phoenix, AZ  85004 |
| State of Arizona | Juan M. Martinez | 301 W. Jefferson, Phoenix, AZ  85003 |
| State of Arizona | Kent E. Cattani | 1275 W. Washington, Phoenix, AZ  85007 |

☑ Applicant is including with this application a nonrefundable application fee, payable to the State Bar of Arizona, in the amount of $460.00. Fifteen percent of the non-refundable application fee paid pursuant to this section shall be deposited into a civil legal services fund to be distributed by the Arizona Foundation for Legal Services and Education entirely to approved legal services organizations, as that term is defined in subparagraph (f) of this rule.

☑ Applicant is furnishing a certificate from the state bar or from the clerk of the highest admitting court of each state, territory, or insular possession of the United States in which the nonresident attorney has been admitted to practice law certifying the nonresident attorney's date of admission to such jurisdiction and the current status of the nonresident attorney's membership or eligibility to practice therein. The certificate furnished shall be no more than forty-five (45) days old.

Applicant certifies the following:

1.  Applicant shall be subject to the jurisdiction of the courts and agencies of the State of Arizona and to the State Bar of Arizona with respect to the law of this state governing the conduct of attorneys to the same extent as an active member of the State Bar of Arizona, as provided in Rule 46(b) Rules of the Supreme Court.
2.  Applicant will review and comply with appropriate rules of procedure as required in the underlying cause.
3.  Applicant understands and shall comply with the standards of conduct required of members of the State Bar of Arizona.

## Verification

STATE OF _____ Wisconsin _____ )

County of _____ Dane _____ ) ss.

I, _____ Allen A. Arntsen _____, swear that all statements in the application are true, correct and complete to the best of my knowledge and belief.

Dated: __9|17|09__          Applicant's Signature: _____

SUBSCRIBED AND SWORN TO before me this _17th_ day of _September_, 20 _09_, by

_____ Allen A. Arntsen _____.

Name of Applicant

_____
Notary Public

Revised 01/15/09

MADI_2046344.1



# WISCONSIN SUPREME COURT
## OFFICE OF THE CLERK
110 E. Main Street, Suite 215
P.O. Box 1688
Madison, WI 53701-1688

Telephone: 608-266-1880
TTY: 800-947-3529
Fax: 608-267-0640
http://www.wicourts.gov

David R. Schanker
Clerk

# *CERTIFICATE OF GOOD STANDING*

*I, Christopher J. Paulsen, Chief Deputy Clerk of the Supreme Court of Wisconsin certify that the records of this office show that:*

## *ALLEN A. ARNTSEN*

*was admitted to practice as an attorney within this state on May 18, 1981 and is presently in good standing in this court.*

*Dated: July 27, 2009*

*CHRISTOPHER J. PAULSEN*
*Chief Deputy Clerk of Supreme Court*

AP-7000, 03/2005 Certificate of Good Standing

# EXHIBIT H

**LEWIS**
**AND**
**ROCA**
——LLP——
L A W Y E R S

40 North Central Avenue
Phoenix, Arizona 85004-4429

Todd E. Hale, State Bar No. 015771
 Direct Dial: (520) 629-4433
 Direct Fax: (520) 879-4708
 EMail: THale@LRLaw.com
Scott M. Bennett, State Bar No. 022350
 Direct Dial: (602) 262-5338
 Direct Fax: (602) 734-3816
 EMail: SBennett@LRLaw.com

Attorneys for Wendi Andriano

MICHAEL K. JEANES, CLERK
RECEIVED F C LOBBY
DOCUMENT DEPOSITORY

09  OCT -2  PM 4: 38

**FILED**
**BY L. SAM, DEP**

SUPERIOR COURT OF ARIZONA
COUNTY OF MARICOPA

| | | |
|---|---|---|
| State of Arizona, | ) | |
| | ) | |
| Plaintiff, | ) | No. CR2000-096032-A |
| | ) | |
| vs. | ) | **MOTION AND CONSENT OF** |
| | ) | **LOCAL COUNSEL FOR PRO HAC** |
| Wendi Andriano, | ) | **VICE ADMISSION OF MATTHEW** |
| | ) | **R. LYNCH** |
| Defendant. | ) | |

        Scott Bennett and Todd Hale, both of the law firm Lewis and Roca, move this

Court to admit Matthew R. Lynch as counsel pro hac vice in this action, pursuant to Rule

38(a), Rules of the Supreme Court.

        The following exhibits are attached hereto:

        1.        the original Verified Application;

        2.        the original Certificate(s) of Good Standing; and

        3.        the State Bar of Arizona Notice of Receipt.

        The required filing fee has been submitted to the State Bar of Arizona.

        Scott Bennett and Todd Hale hereby agree to serve as designated local counsel for

the defendant in the subject case.

        A proposed order admitting Matthew R. Lynch accompanies this motion.

2085313.1

**LEWIS AND ROCA LLP LAWYERS**

1    RESPECTFULLY SUBMITTED this 2nd day of October, 2009.

2                                    LEWIS AND ROCA LLP

3

4    By _____

5                                    Todd E. Hale

                                     Scott M. Bennett

6                                    Attorneys for Defendant

7    ORIGINAL filed October 2, 2009,

8    with the Clerk of the Maricopa

     County Superior Court.

9

10   COURTESY COPY hand-delivered October 2, 2009, to:

     Judge Emmet J. Ronan

11   Maricopa County Superior Court

     Southeast Facility

12   1810 S. Lewis, 2E

13   Mesa, AZ  85210

14   COPY mailed October 2, 2009, to:

15

     Mr. Juan Martinez

16   Office of the Maricopa County Attorney

     301 W. Jefferson, 4th Floor

17   Phoenix, AZ 85003-2191

18   *Attorney for the State of Arizona*

19

20

21

22

23

24

25

26

27

28

                                    2

                                                       2085313.1

**Superior Court**
**Maricopa County**

| | | |
|---|---|---|
| State of Arizona, | ) | |
|        Plaintiff, | ) | **CASE # 2000 096032** |
| | ) | |
|        v. | ) | SBA App # 1004915 |
| | ) | |
| Wendi Elizabeth Andriano, | ) | |
|        Defendant. | ) | **NOTICE OF RECEIPT OF** |
| _____ | ) | **COMPLETE APPLICATION** |

      NOTICE IS HEREBY given by THE STATE BAR OF ARIZONA that it has received the verified application and fee from Matthew  Lynch .

      In addition to this application, applicant has made the following applications to appear pro hac vice, pursuant to Rule38 (a), within the previous three (3) years:

| Title of Matter | Court/Agency | Date | Granted? |
|---|---|---|---|
| _____ | _____ | _____ | ☐ Yes  ☐ No |
| _____ | _____ | _____ | ☐ Yes  ☐ No |

      Exhibit A, the original verified application and Exhibit B, the original Certificate(s) of Good Standing are attached hereto.

DATED this 1st day of October 2009

*Fabi Perez*

Fabiola Perez
Resource Center
State Bar of Arizona

Original Mailed on this 1st day of October 2009 to:

Mr Scott Bennett
Lewis and Roca  LLP
40 N Central Ave Ste 1900
Phoenix, AZ 85004-4429


**STATE BAR OF ARIZONA**

| For Official Use Only |
|---|
| App# _1004915_ |
| Bar Number# _P172429_ |

Attn: Pro Hac Vice Dept
PO Box 53099
Phoenix, AZ 85072-3099
Phone: 602-340-7239

### Application for Appearance Pro Hac Vice

**PART I: Applicant Information**
Name of Applicant:_____ Matthew R. Lynch _____

Firm/Company Name:_____ Foley & Lardner LLP _____

Office Address:_____ 150 East Gilman Street, Madison, WI  53701 _____

Telephone: 608-258-4268 ____ Fax: 608-258-4258 ____ Email Address: mlynch@foley.com ___

Residence Address:_____ 822 Cabot Lane, Madison, WI  53711 _____

Title of cause or case where applicant seeks to appear:____ State of Arizona v. Wendi Elizabeth Andriano ___

Docket Number: _2000-096032_____

Court, Board, or Administrative Agency:__ Superior Court of Arizona  Maricopa ____

Party on whose behalf applicant seeks to appear:__ Wendi Elizabeth Andriano _____

**Pursuant to Arizona Supreme Court Rule 38(i)(3), the applicant shall complete the information below:**

| Courts to Which Applicant Has Been Admitted:<br>*(Attach additional pages if needed)* | Date of Admission: | Bar Number: |
|---|---|---|
| Wisconsin Supreme Court | 10/15/2007 | 1066370 |
| Illinois Supreme Court | 11/09/2006 | 6290099 |
| Western District of Wisconsin | 11/13/2007 | |
| Eastern District of Wisconsin | 11/13/2007 | |

[X] Applicant is a member in good standing in such courts.

[X] Applicant is not currently disbarred or suspended in any court.

Applicant ☐ is / [X] is not **(select one)** currently subject to any pending disciplinary proceeding or investigation by any court, agency or organization authorized to discipline attorneys at law.

In the preceding three (3) years, applicant has filed applications to appear as counsel under AZ ST S.Ct., Rule 38(a) in the following:

| Title of Matter: | Docket #: | Court or Agency: | App Granted? (Y/N) |
|---|---|---|---|
| | | | |
| | | | |
| | | | |

This case or cause ☐ is / [X] is not **(select one)** a related or consolidated matter for which applicant has previously applied to appear pro hac vice in Arizona. If this matter is a related or consolidated with any previous application, Applicant certifies that he/she will review and comply with appropriate rules of procedure as required in the underlying cause.
If applicable, please provide related or consolidated matter application or docket#_____

Revised 01/15/09

Page 2

**PART II: Local Counsel Information**

Name of Arizona Local Counsel:_____Scott M. Bennett_____

State Bar of Arizona Number:_____022350_____

Address:__40 N. Central Avenue, Suite 1900, Phoenix, AZ  85004-4429_____

Telephone:_602/262-5338____ Fax:_602/734-3816____ Email Address:__sbennett@lrlaw.com___

☒ Local Counsel is a member in good standing.

☒ Local Counsel associating with a nonresident attorney in a particular cause shall accept joint responsibility with the nonresident attorney to the client, to opposing parties and counsel, and to court, board, or administrative agency in that particular cause.

**PART III: Parties and Certification**

Name(s) of each party in this cause and name and address of all counsel of record:

| Party: | Counsel of Record: | Address: |
|---|---|---|
| Wendi Andriano | Scott M. Bennett | 40 N. Central Ave., Phoenix, AZ 85004 |
| Wendi Andriano | Todd E. Hale | 40 N. Central Ave., Phoenix, AZ 85004 |
| State of Arizona | Juan M. Martinez | 301 W. Jefferson, Phoenix, AZ 85003 |
| State of Arizona | Kent E. Cattani | 1275 W. Washington,Phoenix, AZ 85007 |

☒ Applicant is including with this application a nonrefundable application fee, payable to the State Bar of Arizona, in the amount of $460.00. Fifteen percent of the non-refundable application fee paid pursuant to this section shall be deposited into a civil legal services fund to be distributed by the Arizona Foundation for Legal Services and Education entirely to approved legal services organizations, as that term is defined in subparagraph (f) of this rule.

☒ Applicant is furnishing a certificate from the state bar or from the clerk of the highest admitting court of each state, territory, or insular possession of the United States in which the nonresident attorney has been admitted to practice law certifying the nonresident attorney's date of admission to such jurisdiction and the current status of the nonresident attorney's membership or eligibility to practice therein. The certificate furnished shall be no more than forty-five (45) days old.

Applicant certifies the following:

1. Applicant shall be subject to the jurisdiction of the courts and agencies of the State of Arizona and to the State Bar of Arizona with respect to the law of this state governing the conduct of attorneys to the same extent as an active member of the State Bar of Arizona, as provided in Rule 46(b) Rules of the Supreme Court.
2. Applicant will review and comply with appropriate rules of procedure as required in the underlying cause.
3. Applicant understands and shall comply with the standards of conduct required of members of the State Bar of Arizona.

## Verification

STATE OF     Wisconsin                                    )

County of     Dane                                         ) ss.

I,__Matthew R. Lynch_____, swear that all statements in the application are true, correct and complete to the best of my knowledge and belief.

Dated:_Sept. 17, 2009_____   Applicant's Signature:_____

SUBSCRIBED AND SWORN TO before me this __7th__ day of September, 20_09_, by

__Matthew R. Lynch_____.

Name of Applicant

_____
Notary Public

Revised 01/15/09

Matthew R. Lynch – Application for Appearance Pro Hac Vice

Additional Court Admittances:

U.S. Court of Appeals – 8th Circuit      03/26/07
U.S. Court of Appeals – 7th Circuit      12/21/07



**WISCONSIN SUPREME COURT**

OFFICE OF THE CLERK

110 E. Main Street, Suite 215

P.O. Box 1688

Madison, WI 53701-1688

Telephone: 608-266-1880
TTY: 800-947-3529
Fax: 608-267-0640
http://www.wicourts.gov

David R. Schanker
Clerk

# *CERTIFICATE OF GOOD STANDING*

*I, Christopher J. Paulsen, Chief Deputy Clerk of the Supreme Court of Wisconsin
certify that the records of this office show that:*

### *MATTHEW LYNCH*

*was admitted to practice as an attorney within this state on October 15, 2007 and
is presently in good standing in this court.*

*Dated July 27, 2009*

*CHRISTOPHER J. PAULSEN*
*Chief Deputy Clerk of Supreme Court*

# EXHIBIT I

LEWIS
AND
ROCA
—— LLP ——
L A W Y E R S

40 North Central Avenue
Phoenix, Arizona 85004-4429

Todd E. Hale, State Bar No. 015771
Direct Dial: (520) 629-4433
Direct Fax: (520) 879-4708
EMail: THale@LRLaw.com
Scott M. Bennett, State Bar No. 022350
Direct Dial: (602) 262-5338
Direct Fax: (602) 734-3816
EMail: SBennett@LRLaw.com

Attorneys for Wendi Andriano

MICHAEL K. JEANES, CLERK
RECEIVED F C LOBBY
DOCUMENT DEPOSITORY

09  OCT -2  PM 4: 38
FILED
BY L. SAM, DEP

SUPERIOR COURT OF ARIZONA
COUNTY OF MARICOPA

State of Arizona,

                              Plaintiff,

vs.

Wendi Andriano,

                              Defendant.

No. CR2000-096032-A

**MOTION AND CONSENT OF
LOCAL COUNSEL FOR PRO HAC
VICE ADMISSION OF STEPHAN J.
NICKELS**

Scott Bennett and Todd Hale, both of the law firm Lewis and Roca, move this Court to admit Stephan J. Nickels as counsel *pro hac vice* in this action, pursuant to Rule 38(a), Rules of the Supreme Court.

The following exhibits are attached hereto:

1.     the original Verified Application;

2.     the original Certificate(s) of Good Standing; and

3.     the State Bar of Arizona Notice of Receipt.

The required filing fee has been submitted to the State Bar of Arizona.

Scott Bennett and Todd Hale hereby agree to serve as designated local counsel for the defendant in the subject case.

A proposed order admitting Stephan J. Nickels accompanies this motion.

2085311.1

LEWIS
AND
ROCA
—LLP—
LAWYERS

1       RESPECTFULLY SUBMITTED this 2nd day of October, 2009.

2                     LEWIS AND ROCA LLP

3

4                  By

5                     Todd E. Hale
                    Scott M. Bennett

6                Attorneys for Defendant

7 ORIGINAL filed October 2, 2009,

8 with the Clerk of the Maricopa
County Superior Court.

9

10 COURTESY COPY hand-delivered October 2, 2009, to:
Judge Emmet J. Ronan

11 Maricopa County Superior Court
Southeast Facility

12 1810 S. Lewis, 2E

13 Mesa, AZ  85210

14 COPY mailed October 2, 2009, to:

15 Mr. Juan Martinez

16 Office of the Maricopa County Attorney
301 W. Jefferson, 4th Floor

17 Phoenix, AZ 85003-2191

18 *Attorney for the State of Arizona*

19

20

21

22

23

24

25

26

27

28

                          2

1

**Superior Court
Maricopa County**

2

3

4  | Pst-conviction relief, t obe filed after       )
   | Admission.                                     )

5  |           Plaintiff,                           )     CASE # **CR2000 096032**
   |                                                )

6  |                v.                              )     SBA App # 1004914
   |                                                )                          )

7  |           Defendant.                           )     **NOTICE OF RECEIPT OF**
   |                                                )     **COMPLETE APPLICATION**

8

9          NOTICE IS HEREBY given by THE STATE BAR OF ARIZONA that it has

10  received the verified application and fee from Stephan  Nichels .
           In addition to this application, applicant has made the following applications to appear

11  pro hac vice, pursuant to Rule38 (a), within the previous three (3) years:

12  | Title of Matter                 | Court/Agency |  Date |  Granted? |

13  _____   _____   _____    ☐     ☐
                                                                    Yes    No

14  _____   _____   _____    ☐     ☐
                                                                    Yes    No

15         Exhibit A, the original verified application and Exhibit B, the original Certificate(s) of

16  Good Standing are attached hereto.

17  DATED this 1ˢᵗ day of October 2009

18                                                  _Fab Perez_
                                                    Fabiola Perez

19                                                  Resource Center
                                                    State Bar of Arizona

20

21  Original Mailed on this 1ˢᵗ day of October 2009 to:

22  Mr Scott Bennett
    Lewis and Roca  LLP

23  40 N Central Ave Ste 1900
    Phoenix, AZ 85004-4429

24

25



STATE BAR OF ARIZONA

Attn: Pro Hac Vice Dept
PO Box 53099
Phoenix, AZ 85072-3099
Phone: 602-340-7239

For Official Use Only
App# *1004914*
Bar Number# *P172428*



RECEIVED

SEP 22 2009

**Application for Appearance Pro Hac Vice** State Bar Of Arizona

__PART I: Applicant Information__
Name of Applicant:_____Stephan J. Nickels_____

Firm/Company Name:___Foley & Lardner LLP_____

Office Address:_____150 East Gilman Street, P.O. Box 1497, Madison, WI 53701-1497___

Telephone:___608-258-4238_____Fax:___608-258-4258_____Email Address:snickels@foley.com
Residence Address:___737 Oneida Pl., Madison, WI 53711___

Title of cause or case where applicant seeks to appear:_____Pst-conviction relief, t obe filed after admission___

Docket Number : ____CR2000-096032_____

Court, Board, or Administrative Agency:___Superior Court of Arizona, Maricopa County___

Party on whose behalf applicant seeks to appear:____Wendi Andriano_____

**Pursuant to Arizona Supreme Court Rule 38(i)(3), the applicant shall complete the information below:**

| Courts to Which Applicant Has Been Admitted: *(Attach additional pages if needed)* | Date of Admission: | Bar Number: |
|---|---|---|
| U.S. Supreme Court of Wisconsin | | 1036591 |
| U.S. District Court, Western District of Wisconsin | 5/28/2002 | |
| U.S. District Court, Eastern District of Wisconsin | 1/28/2003 | |
| U.S. District Court, District of Minnesota | | 0304761 |

☑ Applicant is a member in good standing in such courts.

☑ Applicant is not currently disbarred or suspended in any court.

Applicant ☐ is / ☒ is not **(select one)** currently subject to any pending disciplinary proceeding or investigation by any court, agency or organization authorized to discipline attorneys at law.

In the preceding three (3) years, applicant has filed applications to appear as counsel under AZ ST S.Ct., Rule 38(a) in the following:

| Title of Matter: | Docket #: | Court or Agency: | App Granted? (Y/N) |
|---|---|---|---|
| | | | |
| | | | |
| | | | |

This case or cause ☐ is / ☒ is not **(select one)** a related or consolidated matter for which applicant has previously applied to appear pro hac vice in Arizona. If this matter is a related or consolidated with any previous application, Applicant certifies that he/she will review and comply with appropriate rules of procedure as required in the underlying cause.
If applicable, please provide related or consolidated matter application or docket#_____

RECEIVED

SEP 21 2009

By_____

Revised 01/15/09

Page 2

## PART II: Local Counsel Information

Name of Arizona Local Counsel: _____ Scott M. Bennett

State Bar of Arizona Number: _____ 022350

Address: _____ 40 N. Central Avenue, Suite 1900, Phoenix, AZ 85004-4429

Telephone: _____ 602-262-5338 _____ Fax: _____ 602-734-3816 _____ Email Address: sbennett @ lrlaw.com

☑ Local Counsel is a member in good standing.

☑ Local Counsel associating with a nonresident attorney in a particular cause shall accept joint responsibility with the nonresident attorney to the client, to opposing parties and counsel, and to court, board, or administrative agency in that particular cause.

## PART III: Parties and Certification

Name(s) of each party in this cause and name and address of all counsel of record:

| Party: | Counsel of Record: | Address: |
|---|---|---|
| Juan M. Martinez | State of Arizona | 301 W. Jefferson, 4th Fl., Phoenix, AZ |
| Kent E. Cattani | State of Arizona | 1275 W. Washington, Phoenix, AZ |
| Todd E. Hale | Counsel for Defendant | 1 S. Church Avenue, Tucson, AZ |
| Scott M. Bennett | Counsel for Defendant | 40 N. Central Avenue, Phoenix, AZ |

☑ Applicant is including with this application a nonrefundable application fee, payable to the State Bar of Arizona, in the amount of $460.00. Fifteen percent of the non-refundable application fee paid pursuant to this section shall be deposited into a civil legal services fund to be distributed by the Arizona Foundation for Legal Services and Education entirely to approved legal services organizations, as that term is defined in subparagraph (f) of this rule.

☑ Applicant is furnishing a certificate from the state bar or from the clerk of the highest admitting court of each state, territory, or insular possession of the United States in which the nonresident attorney has been admitted to practice law certifying the nonresident attorney's date of admission to such jurisdiction and the current status of the nonresident attorney's membership or eligibility to practice therein. The certificate furnished shall be no more than forty-five (45) days old.

Applicant certifies the following:

1. Applicant shall be subject to the jurisdiction of the courts and agencies of the State of Arizona and to the State Bar of Arizona with respect to the law of this state governing the conduct of attorneys to the same extent as an active member of the State Bar of Arizona, as provided in Rule 46(b) Rules of the Supreme Court.
2. Applicant will review and comply with appropriate rules of procedure as required in the underlying cause.
3. Applicant understands and shall comply with the standards of conduct required of members of the State Bar of Arizona.

## Verification

STATE OF _____ WISCONSIN _____ )

County of _____ DANE _____ ) ss.

I, _____ Stephan J. Nickels _____, swear that all statements in the application are true, correct and complete to the best of my knowledge and belief.

Dated: _____ 9/14/09 _____ Applicant's Signature: _____

SUBSCRIBED AND SWORN TO before me this 14th day of September , 2009, by

Stephan J. Nickels _____
Name of Applicant

_____
Notary Public

Revised 01/15/09

## Application for Appearance Pro Hac Vice

**Applicant:** Stephan J. Nickels

## --Continuation of Courts to Which Applicant Has Been Admitted:

| | |
|---|---|
| U.S. Court of Appeals, Federal Circuit | 7/06/2005 |
| U.S. Court of Appeals, Seventh Circuit | 12/02/2005 |



**David R. Schanker**
Clerk

# WISCONSIN SUPREME COURT
## OFFICE OF THE CLERK
110 E. Main Street, Suite 215
P.O. Box 1688
Madison, WI 53701-1688

Telephone: 608-266-1880
TTY: 800-947-3529
Fax: 608-267-0640
http://www.wicourts.gov

## *CERTIFICATE OF GOOD STANDING*

*I, Christopher J. Paulsen, Chief Deputy Clerk of the Supreme Court of Wisconsin
certify that the records of this office show that:*

*STEPHAN J. NICKELS*

*was admitted to practice as an attorney within this state on August 31, 2000 and
is presently in good standing in this court.*

*Dated: July 27, 2009*

*CHRISTOPHER J. PAULSEN*
*Chief Deputy Clerk of Supreme Court*

AP-7000, 03/2005 Certificate of Good Standing

# EXHIBIT J

Michael K. Jeanes, Clerk of Court
*** Electronically Filed ***
Isabel Osuna
Filing ID 445209
10/19/2009 4:10:14 PM

TERRY GODDARD
ATTORNEY GENERAL
(FIRM STATE BAR NO. 14000)

LACEY STOVER GARD
ASSISTANT ATTORNEY GENERAL
CRIMINAL APPEALS/CAPITAL LITIGATION SECTION
400 WEST CONGRESS, BLDG. S–315
TUCSON, ARIZONA 85701–1367
TELEPHONE: (520) 628–6520
LACEY.GARD@AZAG.GOV
(STATE BAR NUMBER 22714)

ATTORNEYS FOR PLAINTIFF

# SUPERIOR COURT OF ARIZONA

## COUNTY OF MARICOPA

| | |
|---|---|
| State of Arizona, | CR2000-096032-A |
| Plaintiff, | |
| -vs- | |
| Wendi Andriano, | NOTICE OF APPEARANCE |
| Defendant. | |

Respondents hereby notice the appearance of LACEY STOVER GARD, Assistant Attorney General as Plaintiff's counsel of record for these proceedings. Please send all orders and other correspondence to undersigned counsel at the address indicated at the top of this page.

DATED this 19th day of October, 2009.

RESPECTFULLY SUBMITTED,

TERRY GODDARD
ATTORNEY GENERAL

/S/LACEY STOVER GARD
ASSISTANT ATTORNEY GENERAL
ATTORNEYS FOR DEFENDANT

1  Copy of the foregoing mailed
   this 19th day of October, 2009, to:
2

3  Scott M. Bennett
   Lewis and Roca LLP
4  40 N. Central Ave., Suite 1900
   Phoenix, AZ   85004
5
   Todd E. Hale
6  Lewis and Roca LLP
   One S. Church Avenue, Suite 700
7  Tucson, AZ   85701

8  Allen A. Arntsen
   Foley & Lardner LLP
9  150 East Gilman Street
   P.O. Box 1497
10 Madison, WI   53701-1497

11 Stephen J. Nickels
   Foley & Lardner LLP
12 150 East Gilman Street
   P.O. Box 1497
13 Madison, WI   53701-1497

14 Matthew R. Lynch
   Foley & Lardner LLP
15 150 East Gilman Street
   P.O. Box 1497
16 Madison, WI   53701-1497

17 Attorneys for Defendant

18
   s/Linda Yrrizarry
19

20

21 #591572

22

23

24

25

26

27

28

                            2

# EXHIBIT K

LEWIS
AND
ROCA
——LLP——
LAWYERS

1    40 North Central Avenue
     Phoenix, Arizona 85004-4429

2    Todd E. Hale, State Bar No. 015771
        Direct Dial: (520) 629-4433
        Direct Fax: (520) 879-4708
3       EMail: THale@LRLaw.com
     Scott M. Bennett, State Bar No. 022350
        Direct Dial: (602) 262-5338
4       Direct Fax: (602) 734-3816
        EMail: SBennett@LRLaw.com

5    Attorneys for Wendi Andriano

                                    FILED
                         10/26/2009 @ 8:56am
                         MICHAEL K. JEANES, Clerk
                         By___S. Yoder_____
                               S. Yoder, Deputy

6                    SUPERIOR COURT OF ARIZONA
                        COUNTY OF MARICOPA
7

8    State of Arizona,                )
9                                     )
                         Plaintiff,   )    No. CR2000-096032-A
10                                    )
          vs.                         )    **ORDER**
11                                    )
     Wendi Andriano,                  )
12                                    )
                         Defendant.   )
13                                    )

14          Based on the Motion for Admission Pro Hac Vice of Stephan J. Nickels and the

15   consent to appear as local counsel by Scott Bennett and Todd Hale, it is hereby ordered

16   that Stephan J. Nickels is admitted *pro hac vice* as counsel for defendant, Wendi

17   Andriano, in this case.

18          DATED this 21st day of _____Oct._____, 2009.

19

20                                    _____
                                      The Honorable ~~Emmet J. Ronan~~
21
                                           **GARY E. DONAHOE**
22

23

24

25

26

27

28

                                                              2085315.1

# EXHIBIT L

LEWIS
AND
ROCA
—LLP—
L A W Y E R S

40 North Central Avenue
Phoenix, Arizona 85004-4429

Todd E. Hale, State Bar No. 015771
    Direct Dial:  (520) 629-4433
    Direct Fax:  (520) 879-4708
    EMail: THale@LRLaw.com
Scott M. Bennett, State Bar No. 022350
    Direct Dial:  (602) 262-5338
    Direct Fax:  (602) 734-3816
    EMail: SBennett@LRLaw.com

Attorneys for Wendi Andriano

FILED
10/26/2009 @ 8:56 a.m.
MICHAEL K. JEANES, Clerk
By _____
S. Yoder, Deputy

SUPERIOR COURT OF ARIZONA
COUNTY OF MARICOPA

| | | |
|---|---|---|
| State of Arizona, | ) | |
| | ) | |
| Plaintiff, | ) | No. CR2000-096032-A |
| | ) | |
| vs. | ) | **ORDER** |
| | ) | |
| Wendi Andriano, | ) | |
| | ) | |
| Defendant. | ) | |

Based on the Motion for Admission Pro Hac Vice of Allen A. Arntsen and the

consent to appear as local counsel by Scott Bennett and Todd Hale, it is hereby ordered

that Allen A. Arntsen is admitted *pro hac vice* as counsel for defendant, Wendi Andriano,

in this case.

DATED this 21ST day of OCT. , 2009.

_____
The Honorable ~~Emmet J. Ronan~~
**GARY E. DONAHOE**

2085314.1

# EXHIBIT M

LEWIS
AND
ROCA
——LLP——
L A W Y E R S

1

40 North Central Avenue
Phoenix, Arizona 85004-4429

2

Todd E. Hale, State Bar No. 015771
   Direct Dial: (520) 629-4433
   Direct Fax: (520) 879-4708
   EMail: THale@LRLaw.com
Scott M. Bennett, State Bar No. 022350
   Direct Dial: (602) 262-5338
   Direct Fax: (602) 734-3816
   EMail: SBennett@LRLaw.com

3

4

5

Attorneys for Wendi Andriano

**FILED**

10/26/2009 @ 8:56 am
MICHAEL K. JEANES, Clerk

By _S. Yoder_
S. Yoder, Deputy

6

7

### SUPERIOR COURT OF ARIZONA
### COUNTY OF MARICOPA

8

State of Arizona,

9

          Plaintiff,

10

   vs.

11

Wendi Andriano,

12

          Defendant.

13

No. CR2000-096032-A

**ORDER**

14

     Based on the Motion for Admission Pro Hac Vice of Matthew R. Lynch and the

15

consent to appear as local counsel by Scott Bennett and Todd Hale, it is hereby ordered

16

that Matthew R. Lynch is admitted *pro hac vice* as counsel for defendant, Wendi

17

Andriano, in this case.

18

     DATED this 21ST day of ____OCT.____, 2009.

19

20

                  The Honorable ~~Emmet J. Ronan~~

21

                **GARY E. DONAHOE**

22

23

24

25

26

27

28

2085316.1

# EXHIBIT N

Michael K. Jeanes, Clerk of Court
*** Electronically Filed ***
10/27/2009 8:00 AM

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CR 2000-096032                                      10/26/2009


                                        CLERK OF THE COURT
HON. GARY E. DONAHOE                          S. Yoder
                                               Deputy


STATE OF ARIZONA                        JUAN M MARTINEZ
                                        KENT E. CATTANI

v.

WENDI ELIZABETH ANDRIANO (A)            TODD E HALE
                                        SCOTT M BENNETT

                                        CAPITAL CASE MANAGER
                                        COURT ADMIN-CRIMINAL-PCR
                                        VICTIM SERVICES DIV-CA-SE



                         MINUTE ENTRY



        The Court has considered the three separate Motion(s) and Consent of Local Counsel for
*Pro Hac Vice* Admission.  Good cause appearing,

        IT IS HEREBY ORDERED admitting Matthew R. Lynch, Allen A. Arntsen and
Stephan J. Nickels *pro hac vice* as counsel for Defendant, all in accordance with the formal
written Order(s) signed by the Court on October 21, 2009 and entered (filed) by the Clerk on
October 26, 2009.


        This case is eFiling eligible: http://www.clerkofcourt.maricopa.gov/efiling/default.asp

# EXHIBIT O

FILED

NOV 0 2 2009

RACHELLE M. RESNICK
CLERK SUPREME COURT
BY

SUPREME COURT OF ARIZONA

STATE OF ARIZONA,                    )    Arizona Supreme Court
                                     )    No. CR-05-0005-AP
                    Appellee,  )
                                     )    Maricopa County
          v.                         )    Superior Court
                                     )    No. CR2000-096032
WENDI ELIZABETH ANDRIANO,            )
                                     )
                    Appellant.  )    O R D E R
                                     )

          A Notice of Appearance and Motion for 120-Day Briefing
Schedule Pursuant to Ariz. R. Crim. P. 32.4 has been filed in
the Maricopa County Superior Court. The superior court referred
the matter to this Court due to the Court's prior order
"suspending the time limit in Rule 32.4(c)(1) until qualified
counsel agrees to accept appointment and is appointed by this
Court." The Notice of Appearance states that Scott M. Bennett
and Todd E. Hale of Lewis and Roca LLP and three attorneys from
an out-of-state law firm[1] will represent Wendi Andriano in her
first Rule 32 post-conviction relief proceeding. The Notice
further states that all of these attorneys will represent Ms.
Andriano *pro bono* and are not seeking appointment to represent
her, but they will seek funds from the superior court for
reasonably necessary investigative and expert services under
A.R.S. § 13-4041(I). Ms. Andriano has submitted a signed
statement acknowledging that the Court has not determined
whether any of her attorneys are qualified under Rule 6.8(c),
Ariz. R. Crim. P. Therefore,

          IT IS ORDERED lifting the stay on the time limit in
Rule 32.4(c)(1), Ariz. R. Crim. P., imposed by the Court's order

_____

[1]    Allen A. Arntsen, Stephen J. Nickels and Matthew R. Lynch of Foley
& Lardner LLP, Madison, Wisconsin.

dated October 25, 2007.

IT IS FURTHER ORDERED referring this matter back to the superior court for a ruling on the Motion for 120-Day Briefing Schedule and further proceedings pursuant to Rule 32.

DATED this 2nd day of November, 2009.

_Joh_ _Velander_
JOHN PELANDER
Duty Justice

TO:
Kent E Cattani, Chief Counsel, Criminal Appeals/Capital
 Litigation, Arizona Attorney General's Office
Wendi Elizabeth Andriano, ADOC 191593, Arizona State Prison,
 Perryville - Lumley/San Juan Unit
Scott M Bennett, Lewis and Roca LLP
Todd E Hale, Lewis and Roca LLP
Hon. Gary E Donahoe, Criminal Presiding Judge, Maricopa County
 Superior Court, Central Court Building
Hon. Brian K Ishikawa, Judge, Maricopa County Superior Court,
 East Court Building
Michael K Jeanes, Clerk, Maricopa County Superior Court, Central
 Court Building
Amy Armstrong,     Arizona Capital Representation Project
Diane Alessi, Capital Case Staff Attorney, Arizona Death Penalty
 Judicial Assistance Program
Dale A Baich, Federal Public Defender's Office, Phoenix Office
Martin Lieberman, Director, State Capital Post Conviction
 Defender
James Logan, Director, Office of Public Defense Services

# EXHIBIT P

Michael K. Jeanes, Clerk of Court
*** Electronically Filed ***
11/05/2009 8:00 AM

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CR 2000-096032                                      11/04/2009


                                            CLERK OF THE COURT
HON. GARY E. DONAHOE                              S. Yoder
                                                   Deputy


STATE OF ARIZONA                          KENT E. CATTANI

v.

WENDI ELIZABETH ANDRIANO (A)              SCOTT M BENNETT
                                          TODD E HALE

                                          APPEALS-PCR
                                          COURT ADMIN-CRIMINAL-PCR
                                          VICTIM SERVICES DIV-CA-SE



RULE 32 PCR (Capital Case)


        The Court has received the Supreme Court's Order dated November 2, 2009 lifting the stay on the time limit in Rule 32.4(c)(1), Arizona Rules of Criminal Procedure, imposed by its order dated October 25, 2007. In accordance with the Supreme Court's Order,

        IT IS ORDERED as follows:

        1) Granting the defendant's Motion for 120-Day Briefing Schedule Pursuant to Ariz.R.Crim.P. 32.4.

        2) A copy of all pleadings filed in this matter shall be served only upon the Criminal Presiding Judge/Rule 32 Management Unit until this matter is assigned to a judge for ruling.

        3) The Petition for Post-Conviction Relief shall be filed within 120 days of the date of this order. Ariz.R.Crim.P. 32.4(c)(1).

        4) The State's response to the petition shall be filed within 45 days after the petition is filed.

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CR 2000-096032                                         11/04/2009


5) The defendant may file a reply within 15 days after the response is filed.

6) When all pleadings have been filed, the matter will be assigned to Judge Ishikawa to determine whether to dismiss the petition summarily, set it for an informal conference, or set an evidentiary hearing. Ariz.R.Crim.P. 32.6(c), 32.7, 32.8.


This case is eFiling eligible: http://www.clerkofcourt.maricopa.gov/efiling/default.asp

# EXHIBIT Q

LEWIS
AND
ROCA
—— LLP ——
L A W Y E R S

MICHAEL K. JEANES, CLERK
RECEIVED CCC #B
DOCUMENT DEPOSITORY

09 NOV 24  PM 3:13

FILED
BY L. SAM, DEP

1   40 North Central Avenue
    Phoenix, Arizona 85004-4429

2   Todd E. Hale, State Bar No. 015771
    Direct Dial: (520) 629-4433
    Direct Fax: (520) 879-4708
3   EMail: THale@LRLaw.com
    Scott M. Bennett, State Bar No. 022350
4   Direct Dial: (602) 262-5338
    Direct Fax: (602) 734-3816
    EMail: SBennett@LRLaw.com

5   FOLEY & LARDNER LLP
    150 E. Gilman Street
6   Madison, WI 53703
    Telephone: (608) 257-5035
    Fax:        (608) 258-4258

7   Allen A. Arntsen, Admitted *Pro Hac Vice*
    Stephan J. Nickels Admitted *Pro Hac Vice*
    Matthew R. Lynch Admitted *Pro Hac Vice*

8   *Attorneys for Petitioner*
    Wendi Andriano

9

10              SUPERIOR COURT OF ARIZONA
                 COUNTY OF MARICOPA
11

12   State of Arizona,                    )
                                          )
13                     Respondent,        )   No. CR2000-096032-A
                                          )
14         vs.                            )   (Assigned to the Hon. Gary E. Donahoe)
                                          )
15                                        )
     Wendi Elizabeth Andriano,            )   **PETITIONER WENDI**
16                                        )   **ANDRIANO'S MOTION TO**
                       Petitioner.        )   **ALLOW FILING OF MOTIONS**
17                                        )   **RELATING TO THE**
                                          )   **APPOINTMENT AND FUNDING OF**
18                                        )   **EXPERTS *EX PARTE* AND UNDER**
                                          )   **SEAL**
19                                        )
                                          )
20   _____)

21         Petitioner Wendi Andriano moves for an order that allows her to file all motions

22   relating to the appointment and funding of experts (such as an investigator, mitigation

23   specialist, and expert witnesses) *ex parte* and under seal.  Ms. Andriano makes this motion

24   under Ariz. R. Crim. P. 15.9(b); Amendments 5, 6 and 14 to the U.S. Constitution; and

25   Article II, Sections 4 and 24 of the Arizona Constitution.

26         Allowing the filing of funding-related motions *ex parte* and under seal is necessary

27   to allow Ms. Andriano's attorneys to adequately represent her in these proceedings for

28

                                                                              2121899.1



1  post-conviction relief. If Ms. Andriano's attorneys must file these motions in the public

2  court file, and provide a copy to the State, they will face an impossible choice. In order to

3  fully explain to the Court why the appointment and funding of certain experts is necessary,

4  Ms. Andriano's attorneys would have to reveal their legal theories and strategy to the

5  State. Ms. Andriano's attorneys would therefore have to choose between presenting the

6  best possible case to this Court for the appointment and funding of experts, or providing

7  less information in order to safeguard their legal theories and strategy. That choice would

8  violate Ms. Andriano's constitutional rights to due process, compulsory process to obtain

9  witnesses in her favor, and adequate legal representation.

10  The Court can avoid this unconstitutional dilemma by allowing Ms. Andriano's

11  attorneys to file motions relating to experts *ex parte* and under seal. That procedure would

12  not harm the State, which has no stake in the appointment and funding of Ms. Andriano's

13  experts.

14  A proposed order accompanies this motion.

15  RESPECTFULLY SUBMITTED November 24, 2009.

16  LEWIS AND ROCA LLP

17  By _____

18  Todd E. Hale
    Scott M. Bennett

19

20  FOLEY & LARDNER LLP
    Allen A. Arntsen, *Pro Hac Vice*

21  Stephan J. Nickels, *Pro Hac Vice*
    Matthew R. Lynch, *Pro Hac Vice*

22

23  *Attorneys for Petitioner Wendi Andriano*

24

25  ORIGINAL filed November 24, 2009,

26  with the Clerk of the Maricopa
    County Superior Court.

27

28                                        2

2121899.1

COURTESY COPY hand-delivered November 24, 2009, to:
Judge Gary E. Donahoe
Maricopa County Superior Court
East Court Building-511
101 W. Jefferson
Phoenix, AZ 85003-2243

COPY e-mailed and mailed November 24, 2009, to:

Lacey Stover Gard, Esq.
Arizona Attorney General's Office
400 West Congress
South Building, Suite 315
Tucson, AZ 85701-1367
*Attorney for the State of Arizona*

3

2121899.1

# EXHIBIT R

Michael K. Jeanes, Clerk of Court
*** Electronically Filed ***
Kathleen Curtner
Filing ID 471169
11/30/2009 3:14:29 PM

1

TERRY GODDARD
ATTORNEY GENERAL
(FIRM STATE BAR NO. 14000)

2

3

LACEY STOVER GARD
ASSISTANT ATTORNEY GENERAL
CRIMINAL APPEALS/CAPITAL LITIGATION SECTION
400 WEST CONGRESS, BLDG. S–315
TUCSON, ARIZONA  85701–1367
TELEPHONE: (520) 628–6520
LACEY.GARD@AZAG.GOV
(STATE BAR NUMBER 22714)

4

5

6

7

ATTORNEYS FOR PLAINTIFF

8

# SUPERIOR COURT OF ARIZONA

9

## COUNTY OF MARICOPA

10

11

State of Arizona,

CR2000-096032-A

12

        Plaintiff/Respondent,

13

        -vs-

MOTION FOR EXTENSION OF
TIME TO RESPOND TO
MOTION TO FILE PLEADINGS
UNDER SEAL.

14

Wendi Andriano,

15

        Defendant/Petitioner.

16

17

        On November 24, 2009, Petitioner Wendi Andriano filed a motion for

18

permission to file all motions relating to the appointment and funding of experts *ex*

19

*parte* and under seal.   Respondents calculate that their response is due on

20

December 4, 2009.  Respondents hereby request a 5-day extension of time, until

21

December 9, 2009, to file their response.  Respondents require a brief extension

22

because undersigned counsel will be attending an out-of-state training seminar

23

from December 1, 2009, through December 4, 2009.  Opposing counsel, Allen

24

Arntsen, does not oppose this request.

25

. . . .

26

. . . .

27

. . . .

28

1  DATED this 30th day of November, 2009.

2                                      RESPECTFULLY SUBMITTED,

3                                      TERRY GODDARD
                                       ATTORNEY GENERAL
4

5

6                                      /S/LACEY STOVER GARD
                                       ASSISTANT ATTORNEY GENERAL
7                                      ATTORNEYS FOR DEFENDANT

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1  Copy of the foregoing mailed
   this 30th day of November, 2009, to:
2

3  Scott M. Bennett
   Lewis and Roca LLP
4  40 N. Central Ave., Suite 1900
   Phoenix, AZ   85004
5
   Todd E. Hale
6  Lewis and Roca LLP
   One S. Church Avenue, Suite 700
7  Tucson, AZ   85701

8  Allen A. Arntsen
   Foley & Lardner LLP
9  150 East Gilman Street
   P.O. Box 1497
10 Madison, WI   53701-1497

11 Stephen J. Nickels
   Foley & Lardner LLP
12 150 East Gilman Street
   P.O. Box 1497
13 Madison, WI   53701-1497

14 Matthew R. Lynch
   Foley & Lardner LLP
15 150 East Gilman Street
   P.O. Box 1497
16 Madison, WI   53701-1497

17 Attorneys for Defendant

18
   s/Linda Yrrizarry
19

20

21 #630954

22

23

24

25

26

27

28

3

# EXHIBIT S

Michael K. Jeanes, Clerk of Court
*** Electronically Filed ***
Isabel Osuna
Filing ID 476968
12/8/2009 2:26:41 PM

1

2

TERRY GODDARD
ATTORNEY GENERAL
(FIRM STATE BAR NO. 14000)

3

4

5

6

LACEY STOVER GARD
ASSISTANT ATTORNEY GENERAL
CRIMINAL APPEALS/CAPITAL LITIGATION SECTION
400 WEST CONGRESS, BLDG. S–315
TUCSON, ARIZONA 85701–1367
TELEPHONE: (520) 628–6520
Lacey.Gard@azag.gov
(STATE BAR NUMBER 22714)

7

ATTORNEYS FOR PLAINTIFF/RESPONDENT

8

9

10

# SUPERIOR COURT OF ARIZONA
## COUNTY OF MARICOPA

11

12

13

14

15

State of Arizona,

      Plaintiff/Respondent,

      -vs-

Wendi Andriano,

      Defendant/Petitioner.

CR2000-096032-A

RESPONSE TO MOTION TO
FILE PLEADINGS *EX PARTE*
AND UNDER SEAL.

16

17

18

19

20

21

22

23

      On November 24, 2009, Petitioner Wendi Andriano filed a motion for leave to file "all motions relating to the appointment and funding of experts . . . *ex parte* and under seal." (Motion, at 1.) Andriano contends that *ex parte* filing is necessary to prevent the State from learning her "legal theories and strategy," and to protect her rights under the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution; Article II, Sections 4 and 24 of the Arizona Constitution; and Arizona Rule of Criminal Procedure 15.9(b). (*Id.* at 1–2.) This Court should deny Andriano's motion.

24

25

26

27

      In a decision that binds this Court, the Arizona Supreme Court rejected Andriano's position and concluded that a trial court may not consider a defendant's funding requests *ex parte*. *See State v. (Michael) Apelt*, 176 Ariz. 349, 364–65, 861 P.2d 634, 649–50 (1993). In *Michael Apelt*, the court recognized that Cannon

28

3(A)(4) of the Code of Judicial Conduct prohibits state court judges from engaging in *ex parte* proceedings "except where authorized by law,"[1] and observed that no authority existed for such proceedings under Arizona law "regarding [a defendant's] need for expert assistance." *Michael Apelt*, 176 Ariz. at 365, 861 P.2d at 650. The court further rejected the defendant's claim that the federal Constitution entitled him to seek expert funding *ex parte*:

> [W]e do not believe that the Fourteenth Amendment's guarantees of due process and equal protection encompass such a right. Neither due process nor equal protection requires that the state equalize the resources of the indigent and the wealthy defendant. *Ross v. Moffitt*, 417 U.S. 600, 616, 94 S.Ct. 2437, 2447, 41 LEd.2d 341 (1974). Rather, they guarantee the indigent an opportunity to present his or her claims adequately and fairly. *Id.* To put it another way, they assure the indigent defendant access to the "basic tools" of an adequate defense. *Ake v. Oklahoma*, 470 U.S. 68, 77, 105 S.Ct. 1087, 1093, 84 L.Ed.2d 53 (1985).

*Id.*; *see also State v. (Rudi) Apelt*, 176 Ariz. 369, 374, 861 P.2d 654, 659 (1993) ("In [*Michael Apelt*], we rejected the claim that a defendant has a constitutionally guaranteed right to present requests for expert assistance *ex parte*."). After weighing the few benefits of *ex parte* filing against its many detriments, the court concluded that the trial court had properly refused the defendant's request for an *ex parte* hearing:

> Arizona affords the criminal defendant the right to expert assistance at county expense upon a showing of need. Given the broad disclosure required by the Arizona Rules of Criminal Procedure, an *ex parte* hearing on the defendant's request for

---

[1] This provision has been renumbered and is now located in Canon 3(B)(7)(e). The current Code contains several exceptions under which *ex parte* communication is permitted, none of which apply here. *See* Ariz. R. Sup. Ct. 81, Code of Judicial Conduct, Canon 3(B)(7).

assistance would be potentially helpful to the indigent defendant only when the expert's analysis turns out to support a position contrary to that of the defendant.

When we balance the potential benefit in some few cases against the harm inherent in *ex parte* proceedings, we cannot conclude such a proceeding is constitutionally required.  It is not one of the "basic tools" of an adequate defense.  We therefore hold that the trial court did not err by refusing to hold an *ex parte* hearing on defendant's need for expert assistance.

*Michael Apelt*, 176 Ariz. at 365, 861 P.2d at 650.  *Michael Apelt* therefore disposes of Andriano's motion, and establishes that a defendant has no right, constitutional or otherwise, to file her requests for expert funding *ex parte* and under seal.[2]

Andriano, however, cites Arizona Rule of Criminal Procedure 15.9(b), which governs the appointment of investigators and experts for indigent defendants.  (Motion, at 1.)  But this provision does not authorize this Court to

_____

[2]   Although *Michael Apelt* did not specifically address the Arizona Constitution, Andriano has offered no reason why that Constitution should provide broader protection in this arena than the United States Constitution.  In most other contexts, this Court has held that the Arizona Constitution provides the same degree of protection as the federal constitution.  *See, e.g., Martin v. Reinstein*, 195 Ariz. 293, 317, ¶ 76, 987 P.2d 779, 802 (App. 1999) (Arizona Constitution does not provide greater due process protection than United States Constitution to individuals facing commitment as Sexually Violent Persons); *id.* at 307, ¶ 40, 987 P.2d at 793 (observing that, although Arizona Constitution provides greater double jeopardy protection than federal constitution in context of prosecutorial misconduct, it does not provide more expansive protection to individuals facing civil commitment following a term of incarceration); *State v. Wedding*, 171 Ariz. 399, 407, 831 P.2d 398, 406 (App. 1992) (recognizing that Article 2, section 10 of Arizona Constitution does not provide greater protection than Fifth Amendment to United States Constitution and collecting cases where Arizona Constitution provides more expansive protection than United States Constitution in Fourth Amendment context involving warrantless entry into home).

engage in *ex parte* proceedings under the facts of this case.  In fact, Rule 15.9(b) expressly forbids *ex parte* proceedings unless a defendant can show a special need for confidentiality:

> **b. Ex Parte Proceeding.** *No ex parte proceeding, communication, or request may be considered pursuant to this rule* unless a proper showing is made concerning the need for confidentiality. Any such proceeding, communication, or request shall be recorded verbatim and made a part of the record available for appellate review.

(Emphasis added).

In support of her motion for permission to file expert funding requests *ex parte*, Andriano identifies only her general desire to avoid revealing her defense strategy to the State—she does not set forth a persuasive, case-specific reason why her requests must remain confidential.  (Motion, at 1–2.)  As stated above, under *Michael Apelt*, a defendant's desire to avoid "tipping her hand" to the prosecution is insufficient to justify an *ex parte* proceeding.  Moreover, permitting *ex parte* proceedings based solely on a defendant's concern about revealing her defense strategy would render meaningless Rule 15.9(b)'s requirement that the defendant make a "proper showing" regarding the need for confidentiality, as any defendant could easily satisfy the rule merely by highlighting such concerns.  Because she proffers no special need for confidentiality that would permit this Court to consider her funding requests *ex parte* under Rule 15.9(b), Andriano has failed to make a "proper showing . . . concerning the need for confidentiality."  *Id.*   For the foregoing reasons, this Court should deny Andriano's motion.

. . . .

. . . .

. . . .

1     DATED this 8th day of December, 2009.

2                           RESPECTFULLY SUBMITTED,

3                           TERRY GODDARD
                            ATTORNEY GENERAL

4

5

6                           /S/LACEY STOVER GARD
                          ASSISTANT ATTORNEY GENERAL

7                           ATTORNEYS FOR DEFENDANT

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Copy of the foregoing mailed
this 8th day of December, 2009, to:

Scott M. Bennett
Lewis and Roca LLP
40 N. Central Ave., Suite 1900
Phoenix, AZ   85004

Todd E. Hale
Lewis and Roca LLP
One S. Church Avenue, Suite 700
Tucson, AZ   85701

Allen A. Arntsen
Foley & Lardner LLP
150 East Gilman Street
P.O. Box 1497
Madison, WI   53701-1497

Stephen J. Nickels
Foley & Lardner LLP
150 East Gilman Street
P.O. Box 1497
Madison, WI   53701-1497

Matthew R. Lynch
Foley & Lardner LLP
150 East Gilman Street
P.O. Box 1497
Madison, WI   53701-1497

Attorneys for Defendant

/s/Linda Yrrizarry


#637639

6

# EXHIBIT T

Michael K. Jeanes, Clerk of Court
*** Electronically Filed ***
12/21/2009 8:00 AM

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CR 2000-096032                                      12/18/2009


                                          CLERK OF THE COURT
HON. SALLY S. DUNCAN                            S. Yoder
                                                 Deputy



STATE OF ARIZONA                        KENT E. CATTANI

v.

WENDI ELIZABETH ANDRIANO (A)            TODD E HALE
                                        SCOTT M BENNETT

                                        CAPITAL CASE MANAGER
                                        COURT ADMIN-CRIMINAL-PCR
                                        VICTIM SERVICES DIV-CA-SE
                                        LACEY STOVER GARD
                                        ASSISTANT ATTORNEY GENERAL
                                        400 W CONGRESS BLDG S 315
                                        TUCSON AZ  85701



MINUTE ENTRY

        The Court has reviewed the defendant's Motion to Allow Filing of Motions Relating to
the Appointment and Funding of Experts *Ex Parte* and Under Seal, and the State's response. The
defendant's claim that if she is required to file her motion in the public court file she would
reveal defense tactics and strategy is insufficient to justify an *ex parte* request in this Rule 32
proceeding. *See*, *State v. Apelt*, 176 Ariz. 349, 365 (1993)(rejecting claim by trial defendant that
*ex parte* hearing concerning need for expert assistance was necessary in order to avoid revealing
defense strategy to the prosecution). See also, Ariz.R.Crim.Pro. 15.9(b)(requiring proper
showing concerning need for confidentiality).


        IT IS THEREFORE ORDERED denying the defendant's Motion to Allow Filing of
Motions Relating to the Appointment and Funding of Experts *Ex Parte* and Under Seal.

        This case is eFiling eligible: http://www.clerkofcourt.maricopa.gov/efiling/default.asp

# EXHIBIT U

**LEWIS**
**AND**
**ROCA**
—— LLP ——
L A W Y E R S

HICHAEL K. JEANES, CLERK
RECEIVED CCC #8
DOCUMENT DEPOSITORY

09 DEC 23  PM 4: 12
FILED
BY M. McGEE. DEP

1

40 North Central Avenue
Phoenix, Arizona 85004-4429

2

Todd E. Hale, State Bar No. 015771
   Direct Dial: (520) 629-4433
   Direct Fax: (520) 879-4708
   EMail: THale@LRLaw.com

3

Scott M. Bennett, State Bar No. 022350
   Direct Dial: (602) 262-5338
   Direct Fax: (602) 734-3816
   EMail: SBennett@LRLaw.com

4

5

FOLEY & LARDNER LLP
150 E. Gilman Street
Madison, WI 53703
Telephone: (608) 257-5035
Fax:        (608) 258-4258

6

7

Allen A. Arntsen, Admitted *Pro Hac Vice*
Stephan J. Nickels Admitted *Pro Hac Vice*
Matthew R. Lynch Admitted *Pro Hac Vice*

8

*Attorneys for Petitioner*
Wendi Andriano

9

10

# SUPERIOR COURT OF ARIZONA
## MARICOPA COUNTY

11

12

13    State of Arizona,                )
                                       )
14              Respondent,            )   No. CR2000-096032-A
                                       )
15       vs.                           )   **NOTICE OF PETITIONER'S**
                                       )   **POSITION REGARDING FUTURE**
16    Wendi Elizabeth Andriano,        )   **MOTIONS RELATING TO THE**
                                       )   **APPOINTMENT AND FUNDING OF**
17              Petitioner.            )   **EXPERTS**
                                       )
18                                     )   (Assigned to the Hon. Sally S. Duncan)
                                       )
19 _____)

20

21         Petitioner Wendi Elizabeth Andriano hereby submits the following position

22    statement:

23         1.     On November 24, 2009, Petitioner Wendi Andriano filed a motion to allow

24    filing of motions relating to the appointment and funding of experts *ex parte* and under

25    seal.

26

27

28

MADI_2135266.1

2.     On December 7, 2009, the Honorable Gary E. Donahoe granted the State an extension to file a response by December 9, 2009.  This order also provided: "The defendant may file a reply within 15 days after the response is filed." (12/7/09 Order.)

3.     The State filed its response on December 8.  Accordingly, Petitioner's reply brief was due on December 23.

4.     On December 18, 2009, the Honorable Sally S. Duncan denied the Petitioner's motion prior to Petitioner filing her reply brief.  (12/18/09 Order)

5.     As the Court has already ruled on Petitioner's motion, and in the interest of moving the case along, Petitioner will not file a reply brief.

6.     However, Petitioner anticipates that similar issues regarding filing *ex parte* and under seal might need to be raised in the future, when Petitioner cannot adequately explain her position to the Court without divulging her attorneys' legal theories and strategies to the State.  Petitioner does not waive the right to raise such issues as necessary.

RESPECTFULLY SUBMITTED this 23rd day of December, 2009.


LEWIS AND ROCA LLP

By _____
       Todd E. Hale
       Scott M. Bennett

FOLEY & LARDNER LLP
       Allen A. Arntsen, *Pro Hac Vice*
       Stephan J. Nickels, *Pro Hac Vice*
       Matthew R. Lynch, *Pro Hac Vice*

       *Attorneys for Petitioner*

2

MADI_2135266.1

LEWIS
AND
ROCA
—LLP—
L A W Y E R S

1    ORIGINAL filed December 23, 2009,
     with the Clerk of the Maricopa
2    County Superior Court.

3
     COURTESY COPY hand-delivered December 23, 2009, to:
4    Judge Sally S. Duncan
     Maricopa County Superior Court
5    East Court Building-511
     101 W. Jefferson
6    Phoenix, AZ 85003-2243
7
8    COPY mailed December 23, 2009, to:

9    Lacey Stover Gard
     Office of the Attorney General
10   400 W. Congress, Suite S-315
     Tuscon, AZ 85701-1367
11   *Attorney for the State of Arizona*

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28
                                        3

MADI_2135266.1

# EXHIBIT V

LEWIS
AND
ROCA
— LLP —
LAWYERS

40 North Central Avenue
Phoenix, Arizona 85004-4429

Todd E. Hale, State Bar No. 015771
  Direct Dial: (520) 629-4433
  Direct Fax: (520) 879-4708
  EMail: THale@LRLaw.com
Scott M. Bennett, State Bar No. 022350
  Direct Dial: (602) 262-5338
  Direct Fax: (602) 734-3816
  EMail: SBennett@LRLaw.com

FOLEY & LARDNER LLP
150 E. Gilman Street
Madison, WI 53703
Telephone: (608) 257-5035
Fax:      (608) 258-4258

Allen A. Arntsen, Admitted *Pro Hac Vice*
Stephan J. Nickels Admitted *Pro Hac Vice*
Matthew R. Lynch Admitted *Pro Hac Vice*

*Attorneys for Petitioner*
Wendi Andriano

MICHAEL K. JEANES, CLERK
RECEIVED COG #8
DOCUMENT DEPOSITORY

09 DEC 23  PM 4: 12

**FILED**
**BY J. GAMEZ, DEP**

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

State of Arizona,                )
                                        )
                  Respondent,  )
                                          )
vs.                            )
                                        )
Wendi Elizabeth Andriano,   )
                                        )
                  Petitioner.   )
                                        )
                                        )

No. CR2000-096032-A

**MOTION FOR APPOINTMENT OF
AND AUTHORIZATION OF
PAYMENT FOR EXPERTS**

(Assigned to the Hon. Sally S. Duncan)

      Petitioner Wendi Andriano, through her undersigned *pro bono* counsel, moves this

Court for the appointment of, and authorization of payment of reasonable fees for, the

following experts:

      (1)     mitigation specialist Sita Jo-Ann Sovin and her office, Capital Case Project-
              Diversified Legal Services;

      (2)     investigator Mike Torres; and

      (3)     Larry Hammond, Esq., an expert in claims of ineffective assistance of
              counsel.

MADI_2099650.1

LEWIS
AND
ROCA
—LLP—
L A W Y E R S

1       Ms. Andriano makes this motion under A.R.S. §§ 13-4013(B) and 13-4041(I); *Ake*

2 *v. Oklahoma*, 470 U.S. 68 (1985) and its progeny; *Strickland v. Washington*, 466 U.S. 688

3
4 (1984); the Due Process and Equal Protection Clauses of the 14th Amendment to the

5 United States Constitution; the 5th, 6th, and 8th Amendments to the United States

6 Constitution; and Article 2, sections 4, 15, and 24 of the Arizona Constitution.

7
8      **1.**    **Mitigation Specialist Sita Sovin, Capital Case Project-Diversified Legal Services.**

9       Ms. Sovin and her staff will assist and consult with counsel, interview potential

10 mitigation witnesses, interface with expert witnesses, conduct and assist in gathering

11 records and documentary evidence, and conduct additional fact investigation work. The

12 services of Ms. Sovin are necessary for counsel to properly present Petitioner's evidence

13 in support of Petitioner's post-conviction relief (PCR) petition.

14       The United States Supreme Court has held that a capital defendant has "a

15 constitutionally protected right to provide mitigating evidence." *Williams v. Taylor*, 529

16 U.S. 362, 363 (2000). In a capital case, this could include "anything in the life of a

17 defendant which might militate against the appropriateness of the death penalty."

18 American Bar Association, GUIDELINES FOR THE APPOINTMENT AND PERFORMANCE OF

19 DEFENSE COUNSEL IN DEATH PENALTY CASES ("ABA GUIDELINES"), Guidelines 10.7, p.

20 82 (Feb. 2003). In this case, Petitioner's trial counsel failed to conduct a sufficient inquiry

21 into mitigating evidence. Accordingly, the appointment of Ms. Sovin and her office is

22 necessary in order to allow Petitioner to demonstrate the mitigating evidence that her trial

23 counsel should have developed and used at trial.

24       Ms. Sovin is well qualified to ensure that Petitioner's constitutional rights are

25 protected. Ms. Sovin is an experienced mitigation specialist with 13 years experience

26 working on capital cases. Ms. Sovin's *curriculum vitae*, which describes her education

27 and professional experience, is attached to this Motion as **Exhibit A**.

28                                   2

LEWIS
AND
ROCA
——LLP——
L A W Y E R S

1    As noted in her *curriculum vitae*, Ms. Sovin is well qualified to assist counsel based

2    on her extensive experience and expertise working on capital cases in different

3    jurisdictions, including Maricopa County.  For example, on October 24, 2008, Ms. Sovin

4    was appointed as a mitigation specialist in another PCR proceeding pending in Maricopa

5    County.  (*See* 10/24/08 Order in *Arizona v. Carreon*, CR2001-090195-A (Keppel, J.,

6    presiding), attached as **Exhibit B**.)

7    Ms. Sovin's usual and customary charge for her services is $100 per hour.

8    Petitioner's pro bono counsel has underwritten the expense of her office's billings to date.

9    Going forward, Petitioner requests that this Court authorize the payment of reasonable

10    fees,[1] expenses, and travel costs by Mr. James Logan, Esq., the Director of the Maricopa

11    County Office of Public Defense Services.

12    **2.    Investigator Mark Torres**

13    Mr. Torres will conduct fact investigation, including reviewing police reports,

14    examining physical evidence, and locating and interviewing material witnesses.  The

15    services of Mr. Torres are necessary for counsel to properly present Petitioner's evidence

16    in support of her PCR petition.

17    As a former Phoenix Police Department detective, Mr. Torres is well-qualified to

18    investigate factual matters for petitioner.  Mr. Torres's *curriculum vitae*, which describes

19    his education and professional experience is attached to this Motion as **Exhibit C**.

20    Mr. Torres's usual and customary charge for his services is $100 per hour.

21    Petitioner's pro bono counsel has underwritten the expense of his billings to date.  Going

22    forward, Petitioner requests that this Court authorize the payment of Mr. Torres's

23

24

25

26    ――――――――――
[1]    Defendant requests reimbursement for Ms. Sovin's fees at the mitigation

27    specialist contract rate established by the Maricopa County Office of Public Defense

28    Services.

3



LEWIS
AND
ROCA
—LLP—
LAWYERS

1    reasonable fees[2] and expenses by Mr. James Logan, Esq., the Director of the Maricopa

2    County Office of Public Defense Services.

3        **3.    Larry Hammond, Esq.**

4        Attorney Hammond has been retained to assess the adequacy and effectiveness of

5    Petitioner's trial and direct appeal counsel. The services of Mr. Hammond are necessary

6    for counsel to properly present Petitioner's evidence in support of her PCR petition.

7        Mr. Hammond is well-qualified to serve as an expert concerning performance of

8    Petitioner's counsel. Mr. Hammond has been a practicing lawyer for close to 40 years,

9    and engaged in criminal defense work continuously for the last 29 years. From 1981 to

10   the present, Mr. Hammond has spent at least some portion of his time every year on capital

11   cases. Over that period, he has been involved in capital litigation at every stage, including

12   trial, sentencing, direct appeal, post-conviction review and federal habeas corpus. The

13   majority of his work in this area has been on cases involving Arizona defendants and

14   Arizona state prosecutions.

15       Over the years, Mr. Hammond has served on various committees concerning capital

16   representation and/or ineffective assistance of counsel claims, including the Arizona

17   Capital Representation Project, the Arizona State Bar's Indigent Defense Task Force, the

18   Arizona Supreme Court's Committee for the Appointment of Counsel, and the Justice

19   Project of Arizona Attorneys for Criminal Justice. Mr. Hammond has also authored

20   several articles, given presentations, and taught classes at ASU Law School concerning

21   capital defense. Lastly, Mr. Hammond has previously served as an expert witness on

22   ineffective assistance of counsel in post-conviction relief proceedings in Arizona. Mr.

23   Hammond's *curriculum vitae*, which further describes his education and professional

24   experience is attached to this Motion as **Exhibit D**.

25

26

---

27       [2] Defendant requests reimbursement for Mr. Torres's fees at the investigator
28   contract rate established by the Maricopa County Office of Public Defense Services.

4

1   Although Mr. Hammond's usual and customary charge for his services is $500 per

2   hour, he has agreed to assist in this matter at a discounted rate of $250 per hour.

3   Petitioner's pro bono counsel has underwritten the expense of his billings to date.  Going

4   forward, Petitioner requests that this Court authorize the payment of Mr. Hammond's

5   reasonable fees and expenses by Mr. James Logan, Esq., the Director of the Maricopa

6   County Office of Public Defense Services.

7         If this Court requires any additional information to explain why it is necessary to

8   appoint of these three experts, Petitioner requests a hearing where her attorneys can

9   provide this information to the Court.

10        RESPECTFULLY SUBMITTED this 23rd day of December, 2009.

11

12                      LEWIS AND ROCA LLP

13                      By _____

14                         Todd E. Hale
                           Scott M. Bennett

15

16                      FOLEY & LARDNER LLP
                           Allen A. Arntsen, *Pro Hac Vice*

17                         Stephan J. Nickels, *Pro Hac Vice*
                           Matthew R. Lynch, *Pro Hac Vice*

18

19                      *Attorneys for Petitioner*

20  ORIGINAL filed December 23, 2009,

21  with the Clerk of the Maricopa
    County Superior Court.

22

23  COURTESY COPY hand-delivered December 23, 2009, to:
    Judge Sally S. Duncan

24  Maricopa County Superior Court
    East Court Building-511

25  101 W. Jefferson

26  Phoenix, AZ 85003-2243

27  COPY mailed December 23, 2009, to:

28                       5

LEWIS
AND
ROCA
—LLP—
L A W Y E R S

1

2   Lacey Stover Gard
    Office of the Attorney General
3   400 W. Congress, Suite S-315
    Tuscon, AZ 85701-1367
4   *Attorney for the State of Arizona*

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

MADI_2099650.1

# EXHIBIT A

Sita Jo-Ann Sovin                    Capital Case Project - Diversified Legal Services

19528 Ventura Boulevard #520
Tarzana, California 91356
Tel: 818/345-9585 - Fax: 818/345-9584
JASovin@aol.com

**MITIGATION SPECIALIST**                    06/98 - Present; 06/94 - 03/96
**DIRECTOR - CAPITAL CASE PROJECT**

Assist attorneys in team settings to prepare for capital trials and habeas corpus proceedings on behalf of death-sentenced prisoners.  Serve as a mitigation specialist in capital cases.  Appointed by state and federal courts. Responsibilities and duties include review and summary of discovery, trial, appellate and habeas documents; assist in developing facts to support legal claims and theories of defense; collect and analyze records concerning the client, client's family members and socially and otherwise significant witnesses; consult with experts; draft declarations; brief mental health professionals; investigate facts relevant to mental health claims; prepare and maintain detailed case chronologies including social history chronologies; prepare family trees and genealogy reports; interview witnesses; prepare witnesses to testify and oversee the work of law clerks and other staff who perform court searches and who collect, review and summarize documents.

**INVESTIGATOR**                                        11/86 - Present
**PROPRIETOR - Diversified Legal Services**
California Private Investigator License No. 21536

Assist state and federal public defenders and criminal defense attorneys. Provide court appointed and privately contracted investigator services including client and witness interviews; review and analysis of discovery; review wiretaps and transcriptions; examine and analyze evidence; utilizing experts where needed; assist with evidence, exhibits and witnesses prior to and during trial.

**STAFF INVESTIGATOR / MITIGATION SPECIALIST**
Office of The Federal Public Defender - Capital Habeas Unit
Los Angeles, California                              03/96 - 06/98

Assisted in the creation of the investigation department, designing and implementing procedures in the first office devoted to federal post-conviction death penalty cases.  Duties and responsibilities involved all aspects of investigation including developing and investigating claims for relief; identifying, locating and interviewing witnesses; preparing declarations; preparing social histories and briefing experts.

**PARALEGAL / LEGAL AUDITOR**
Knapp Petersen & Clarke, Glendale, California              12/91 - 06/94

Provided both paralegal and investigative services to a legal team representing two death-sentenced prisoners pursuing federal and state post-conviction relief.  As an auditor, reviewed, analyzed and audited legal bills; researched and wrote memoranda and reports regarding the efficiency of legal services rendered.

**CRIMINAL DEFENSE INVESTIGATOR**                                      11/86 - 12/91

Assisted state and federal public defenders and criminal defense attorneys. Provided court appointed and privately contracted investigator services including client and witness interviews; reviewing and analyzing discovery; reviewing wiretaps and transcriptions; examining and analyzing evidence; utilizing experts where needed; assisting with evidence, exhibits and witnesses prior to and during trial.

**WORKER'S COMPENSATION MANAGER**                                      06/89 - 12/89
**INSURANCE / FRAUD INVESTIGATOR**                                     11/87 - 11/88
Craig S. Rogers Investigations, Sherman Oaks, CA

Developed and managed a workers' compensation unit within the company. Researched current law, provided relevant information to investigators and clients, reviewed cases, researched and wrote reports, trained and supervised four investigators. Worked extensively on claims related to stress, psychological impairments and psychiatric disorders. Conducted field investigations, took witness statements, reviewed and analyzed psychiatric reports, investigated life histories.

**EDUCATION, COURSES, SEMINARS, PRESENTATIONS**

US BJA Training on Representation in Death Penalty Cases -
                                  Workshop Facilitator, Teacher and Presenter - 2005 - 2009
CACJ/CPDA Annual Death Penalty Defense Seminar
            Planning Committee 2001-2007; Presenter 2001 - 2007
CACJ / CPDA Annual Death Penalty Defense Seminar; 1992 - 2007
The National Seminar on Mental Illness and the Criminal Law, Washington, D.C. 1999
CALI Annual Defense Seminar - 1999
Habeas Fact Development Workshop - 1993, 1995, 1997
Immigration Law - 1991
CALI Periodic Workers' Compensation Seminars - 1988, 1989
Paralegal Studies - 1986
Temple University, 1982, Honors Program
Temple University Health Sciences Center 1980 - 1981, Respiratory Therapy Technician
Mansfield State College, Mansfield Pennsylvania 1977 - 1978

# EXHIBIT B

GALLAGHER & KENNEDY, P.A.
TOM HENZE (Bar No. 03262)
2575 East Camelback Road
Phoenix, Arizona 85016-9225
Telephone:     (602) 530-8000
Facsimile:      (602) 530-8500

MANATT, PHELPS & PHILLIPS, LLP
DAVID ELSON (Pro Hac Vice No. P163763)
DAVID T. MORAN (Pro Hac Vice No. P163315)
11355 West Olympic Boulevard
Los Angeles, California 90064-1614
Telephone:     (310) 312-4000
Facsimile:      (310) 312-4224

*Attorneys for Petitioner*
ALBERT MARTINEZ CARREON

## IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

## IN AND FOR THE COUNTY OF MARICOPA

| | |
|---|---|
| STATE OF ARIZONA, | CR2001-090195-A |
| Respondent, | Hon. James H. Keppel |
| vs. | **[PROPOSED] ORDER RE APPOINTMENT OF MITIGATION SPECIALIST SITA JO-ANN SOVIN** |
| ALBERT MARTINEZ CARREON, | |
| Petitioner. | |

The Court having considered Petitioner's *Ex Parte* Under Seal Motion for Appointment of Mitigation Specialist Sita Jo-Ann Sovin and good cause appearing therefore,

IT IS HEREBY ORDERED appointing Sita Jo-Ann Sovin (and her office) as a mitigation specialist in this matter and authorizing payment of reasonable fees and costs for her services.

Dated: 10/24/08

Hon. James H. Keppel
James H. Keppel
Judge of the Superior Court

41329673.1

# EXHIBIT C



ARIZONA INVESTIGATIVE ASSOCIATES, PLLC

Mike@AZPrivateInvestigator.com
Arizona License 1567829
O: (602) 252-2474
C: (602) 620-0423
F: (602) 235-0530

## Mike  Torres
### Private Investigator/Consultant

### Arizona Investigative Associates, PLLC
### 23844 S. Power Road  Suite 102-231
### Queen Creek, Arizona 85242

## *CURRICULUM  VITAE*

**2006 - Present**    **ARIZONA INVESTIGATIVE ASSOCIATES, PLLC**
In 2006, I started doing private investigative work for attorneys and businesses under
the sole proprietorship of *Torres Investigations.* In 2007, I co-founded
*Arizona Investigative Associates, PLLC* with my managing partner, Justin Yentes. I
have functioned as a private investigator handling a wide array of investigations in both
the criminal and civil arenas. I am fluent in Spanish and have completed many investi-
gations where the Spanish language was needed.

The experience I gained after 31 years with the Phoenix Police Department (1975 to
2006) is invaluable. As a Phoenix Police detective, I investigated and/or supervised
investigations of major felonies of all types, to include homicides, sex crimes,
kidnappings, robberies, aggravated assaults, and drug offenses. I have been able to take
this experience to the private investigative field to provide a work product that has
produced desired results for my clients. I have performed work in criminal defense, civil
litigation, investigative consultation, family law, missing persons locates, and security
management. I have been retained by law firms, insurance companies, State and Federal
Governments, businesses, and private individuals for my services. I also function as a
consultant in the area of police supervision, covert operations, management of
informants, crime analysis, and police tactics.

I am an adjunct instructor for MESA COMMUNITY COLLEGE and have been for the
last 10 years, teaching classes in the administrative justice studies section of the college.

Since retiring, I have maintained my peace officer certification.

**2004 - 2006**    **PHOENIX POLICE DEPARTMENT CONSPIRACY UNIT**
For three years, I was the supervisor responsible for overseeing and managing wiretap
investigations (Title III Investigations) for the department. Most of these investigations
cost the city over a million dollar each to investigate. Though the majority of the cases
were drug-related, many cases involved major crimes such as homicides, robberies, and
kidnappings. Because the Phoenix Police Department is one of only a handful of law
enforcement agencies equipped to do such investigations, many of the investigations
that I oversaw were conducted for other agencies, including federal law enforcement
agencies.

While assigned to the unit, I was charged with the responsibility to supervise eight detectives who acted as case agents for conspiracy investigations that involved large scale drug-trafficking organizations. These duties included drafting wiretap affidavits with the case agents and ensuring that these investigations stayed within the confines of all legal parameters. Additional duties included supervision in the management of informants, management of covert operations, management of surveillance operations, interfacing with the prosecuting agencies, overseeing the R.I.C.O. seizures, and managing investigative funding. I was also responsible in assisting other agencies and/ or other Phoenix Police Department units with enhancing ongoing investigations with electronic surveillance techniques.

During my assignment, the unit successfully prosecuted hundreds of suspects, completed dozens of successful wiretap cases, and seized drugs and/or assets worth millions of dollars. In 2006, the unit was awarded the ARIZONA'S INVESTIGATIVE UNIT OF THE YEAR AWARD.

**2004 - 2006**
**and**
**1989 - 1994**
**PHOENIX POLICE DEPARTMENT SPECIAL ASSIGNMENTS UNIT** I was assigned to this unit for two terms of five years, serving a total of ten years. I served as a working supervisor in this assignment. My duties were two-fold, provide tactical support for Phoenix Police Department operations and assist other investigative units with their respective investigations. As an SAU (SPECIAL ASSIGNMENTS UNIT) supervisor, my duties were to train officers in the use of special tactics and weaponry, and to deploy such officers in tactical operations under my supervision. Each squad was comprised of eight detectives and a working supervisor. The Phoenix Police Department had four full-time SAU teams to manage tactical situations throughout a 24-hour day.

This unit was also charged to provide investigative support to other units and/or agencies. These investigations were investigations of major crimes. The investigative techniques that were usually employed in conducting these investigations were covert in nature. As a result, I was responsible for overseeing hundreds of major felony crime investigations and logged thousands of hours in covert police investigations.

**1994 - 1999**
**PHOENIX POLICE DEPARTMENT MEDIA RELATIONS UNIT** I was in this assignment for five years as a supervisor. My job was two-fold, keep the department in compliance with the public records law and use the media to further ongoing Phoenix Police Department investigations. During my tenure, the department was averaging over 250,000 public records requests per year. Many of these requests came from the media and needed follow-up media interviews. I had one investigative detective assigned to me. Between the two of us, we averaged the supervision of 10,000 media interviews per year. We were responsible for doing many of these interviews ourselves. Because I am bilingual, I was responsible for all media interviews in Spanish.

The second function of the assignment was to further ongoing investigations. What is not well known is that the media is an excellent source for information. Reporters have contacts in the community. This is because the public is always calling media outlets with information that is useful toward police investigations. We used the media in the disbursement of police information for the purpose of furthering ongoing investigations. We accomplished this by meeting with investigators on a daily basis to go over their cases to see if the unit could help their investigations through the dissemination of information via the media. This resulted in useful information coming in from media audiences. We would meet with reporters on a daily basis to glean information from them. As a result, several hundred cases were furthered because of our efforts.

**1989 - 1994**
**(Previously stated in the SPECIAL ASSIGNMENTS UNIT section)**

**1987 - 1989**  **PHOENIX POLICE DEPARTMENT STREET CRIMES UNIT** I was assigned to this unit for two years. I was tasked with the responsibility to investigate property crimes, street-level drug offenses, and vice-related crimes. I supervised hundreds of self-initiated investigations through the use of informants, surveillances, and crime analysis. I had in my charge eight detectives who were tasked to be the case agents of such cases. The majority, if not all, of these cases were done through covert investigative techniques. We bought illicit drugs and stolen property. I supervised the gathering of electronic evidence through audio and video recordings. I supervised the development and management of informants. While assigned to the unit for these two years, we recovered several millions of dollars worth of property and hundreds of thousands of dollars worth of drugs. This was coupled with successful indictments and prosecution of hundreds of suspects who were responsible for these crimes.

**1986 - 1987**  **PHOENIX POLICE DEPARTMENT MARYVALE PRECINCT** In 1986, I was promoted to the rank of Sergeant. In this assignment, I was tasked to investigate crime at the patrol level, manage crime, and manage calls for service, all within a geographical area. Fifteen patrol officers were assigned to me for the purpose of managing crime in a specific area of the Maryvale Precinct. My duties included the supervision and development of these officers. This squad was also a training squad for officers that had just graduated from the police academy. I was also tasked with the development of these officers through real-world experiences.

It should be noted, that the moment I became a Phoenix Police Department supervisor, it was incumbent upon me to investigate any employee misconduct as part of my ongoing duties. These investigations varied. Some were criminal in nature, some were violations of policy, and some were both. As a result, I was involved in several hundred internal investigations that spanned my 20+ years as a supervisor.

**1981 - 1986**  **PHOENIX POLICE DEPARTMENT COMMUNITY RELATIONS BUREAU** It was in this assignment that I was certified as a detective by completing the department's 80-HOUR INVESTIGATORS' SCHOOL. In this assignment, I was tasked to investigate gang-related criminal activity, primarily in the inner city. I did so by being assigned to the PAL PROGRAM, the CONFRONTATION SQUAD, and the GANG SQUAD. All of these units were at that time assigned to the COMMUNITY RELATIONS BUREAU. I investigated several hundred gang-related crimes and "sensitive" crimes throughout the greater Phoenix area while in this assignment (crimes that were sensitive in nature to a particular section of the community such as a "hate" crime).

**1976 - 1981**  **PHOENIX POLICE DEPARTMENT TOWER PLAZA PRECINCT** This was my first duty assignment as a police officer for the city of Phoenix. After graduating from the police academy, I was assigned to this precinct working various squads and various shifts as a patrol officer. In this assignment I learned to do patrol level criminal and traffic investigations. In the five years that I served in this assignment, I conducted thousands of patrol level investigations. Toward the end of my assignment at this precinct, I was assigned to a specialty squad that investigated specific crimes that were affecting the precinct at any given time. It was here that I started to hone my investigative skills.

**1975 - 1976**  **PHOENIX POLICE DEPARTMENT POLICE ACADEMY** I was hired by the city of Phoenix on November 25, 1975 as a patrol officer without any certifiable training. I was assigned to do menial tasks for Phoenix Police detectives until the next academy class started in January of 1976. When the class started, I was re-assigned to the police academy where I successfully completed four months of training, finishing as the TOP OVERALL RECRUIT.

## EDUCATION

| 1997 - 1999 | **Northern Arizona University**<br>*Master's of Education Degree (with Honors)* | **Flagstaff, AZ** |
|---|---|---|
| 1987 - 1990 | **Northern Arizona University**<br>*Bachelor's Degree in General Studies (cum laude)* | **Flagstaff, AZ** |
| 1973 - 1975 | **University of Nevada at Reno** | **Reno, NV** |
| 1971 - 1973 | **Phoenix College** | **Phoenix, AZ** |
| Class of 1971 | **Phoenix Union High School** | **Phoenix, AZ** |

## TRAINING AND CERTIFICATIONS

- AZ P.O.S.T. Certified Peace Officer
- Lifetime Instructor Certification for the Arizona Community College System
- Investigator's School
- Mark IV G.C.I. Operator's Course
- Doppler's Radar Operator's Course
- Supervisory Development School
- A.P.O.S.T. Basic Instructor School
- How To Supervise People Seminar
- Staff Skills Program
- F.B.I. Hostage Negotiations Course
- Observer/Sniper School
- Resource Interview Pool Course
- Smith & Wesson Academy Chemical Agents Instructor School
- AAI Corporation Chemical Agents & Munitions Course
- Def-Tec Distraction Device Instructor's Course
- Def-Tec Chemical Munitions Instructor's Course
- State & Local Fugitive Investigator's School
- Aerosol Subject Restraint Instructor's Course
- AR-15 Carbine School
- Heckler & Koch, Inc. MP-5 Submachine Pistol Course
- Asset Forfeitures & Seizures Course
- Tactical Operations Course
- Firearms Instructor's School
- F.B.I. Chemical Agents in Law Enforcement School
- Glock Armorer's School
- Narcotics & Dangerous Drugs Recognition Course
- Innovative Approaches to Media Contacts Seminar
- Risk Assessment Seminar
- Soundbytes Media Seminar
- L.A.P.D. Advanced SWAT School
- Self-Contained Breathing Apparatus Course
- F.B.I. Fundamentals of Crisis Negotiations Course
- Mesa's Basic SWAT School
- DEA Analyst School
- ATF Firearms Investigations Course
- NTOA Dignitary Protection School
- State Department Dignitary Protection School
- Fingerprinting Certification
- Forming Disaster Response Partnerships Conference
- Biological Evidence Collection Training
- Graduate of VALLEY LEADERSHIP, CLASS XIX
- Graduate of the HISPANIC LEADERSHIP INSTITUTE

## AWARDS

- Recipient of the Phoenix Police Department's <u>Medal of Valor</u>

- <u>2006 Investigative Unit of the Year Award</u> for the State of AZ

- Recipient of the <u>Phoenix Rotary 100 Club's Heroism Award</u>

- Recipient of the <u>City of Phoenix Excellence Award</u>

- Recipient of work performance commendations too numerous to list

# EXHIBIT D

 



**The Phoenix Plaza**
**2929 North Central Avenue**
**Twenty-First Floor**
**Phoenix, AZ 85012-2793**

Phone: (602) 640-9361
Fax: (602) 640-6076
lhammond@omlaw.com

# Larry A. Hammond

Larry has spent over 30 years practicing in the private sector, but regards his two tours with the Department of Justice as among his most satisfying professional experiences. He served as an Assistant Watergate Special Prosecutor in 1973-1974 and then returned to Justice during the Carter Administration where he worked in the Office of Legal Counsel as the First Deputy Assistant Attorney General under both Attorneys General Griffin Bell and Ben Civiletti.

### Education

- J.D., University of Texas, 1970; *Texas Law Review*, Editor-in-Chief, 1969-1970; Order of the Coif
- B.A., University of Texas, 1967

### Clerkships

- U.S. Supreme Court, Justice Lewis F. Powell, Jr., 1971-1973
- U.S. Supreme Court, Justice Hugo L. Black, 1971
- U.S. Court of Appeals, District of Columbia Circuit, Judge Carl McGowan, 1970-1971

### Professional Recognitions and Awards

- Larry Hammond Endowed Criminal Law Scholarship at the James R. Rogers College of Law at the University of Arizona, established in 2008
- Justice Award, The American Judicature Society, 2008
- John Flynn Award, Arizona Attorneys for Criminal Justice, 2008
- Maricopa County Hall of Fame, 2008
- Distinguished Honorary Alumnus Award, University of Arizona Law School, May, 2004
- Judge Learned Hand Award for Community Service, Arizona Chapter of American Jewish Committee, March, 2003
- Arizona State Bar Foundation Walter E. Craig Award for Career Service, 2001
- President's Commendation, Arizona Attorneys for Criminal Justice, January, 1997 and 1999
- Civil Libertarian of the Year, Arizona Civil Liberties Union, 1993, 2000

 

A PROFESSIONAL ASSOCIATION
ATTORNEYS AT LAW

# Larry A. Hammond (cont'd)

- Pro Bono Service Award, State Bar of Arizona, 1991
- Exceptional Service Award, U.S. Justice Department, 1980
- Federal Younger Lawyer of the Year, 1980
- Chambers USA, *America's Leading Lawyers for Business*, Litigation: White-Collar Crime & Government Investigations, 2004-2009
- *The Best Lawyers in America*®, Appellate Law, Bet-the-Company Litigation, Commercial Litigation, White-Collar Criminal Defense, editions 1995-2010
- Best of the Bar, *Business Journal*, Pro Bono, 2005
- *Southwest Super Lawyers*, Top 50 Arizona Attorneys, 2007-2008
- *Southwest Super Lawyers*, Criminal Defense: White Collar, 2007-2009

## Practice Areas

- Civil Rights Litigation
- Criminal Defense
- False Claims Act Litigation
- Healthcare
- Internal and Governmental Investigations
- Litigation

## Bar Admissions

- Arizona, 1975
- California, 1971

## Court Admissions

- U.S. Court of Appeals for the Tenth Circuit, 2004
- U.S. Supreme Court, 1977
- U.S. Court of Appeals for the Sixth Circuit, 1984
- U.S. Court of Appeals for the Ninth Circuit, 1984
- U.S. District Court, District of Arizona, 1975
- Arizona Supreme Court, 1975
- California Supreme Court, 1971




A PROFESSIONAL ASSOCIATION
ATTORNEYS AT LAW

# Larry A. Hammond (cont'd)

### Professional Activities

- American Judicature Society, President and member of Executive Committee, 2003-2005, Board of Directors, 1995-2007, Criminal Justice Reform Committee, Chair 1992-present
- Arizona Attorneys for Criminal Justice, Justice Project Chair, 1998-present
- American Bar Association, Biological Evidence Task Force, 2003-2005
- American Bar Association, Task Force on War Crimes in the Former Yugoslavia, 1993-1995
- Arizona Capital Representation Project, of Directors, 1988-present, Vice President, 1988-present
- Arizona State Bar Association, Indigent Defense Task Force, 1995-present
- Human Rights First, Lawyer Steering Committee (formerly known as the Lawyers' Committee for Human Rights)
- Elon University College of Law (Visiting Professor; Advanced Criminal Procedure) 2008
- Sandra Day O'Connor College of Law at Arizona State University (Adjunct Professor of Law: Advanced Criminal Procedure, Death Penalty, Presidential Powers, Advanced Civil Discovery, and Ethics)
- University of Arizona College of Law (Adjunct Professor of Law: Presidential Powers), 1995
- Arizona State University Undergraduate School (Guest Faculty Member: Death Penalty, Practicum re: The Justice Project)
- St. John's College, Santa Fe, New Mexico (Tutor: Seventeenth Century Literature - 1983)
- University of New Mexico School of Law (Trial Practice - 1983)

### Publications and Presentations

- *Protecting Moscow from the Soviets – Book Review,* Experience, 2009
- *Sotomayor is Newest Face in a Long Line of Heroes,* The Arizona Republic, August 10, 2009 (author)




A PROFESSIONAL ASSOCIATION
ATTORNEYS AT LAW

# Larry A. Hammond (cont'd)

- Editorial for Judicature, *Setting Forensic Science on a New Path*, March-April 2009 (unsigned editorial co-authored with Dr. Barry Fisher of the Los Angeles County Crime Laboratory)
- *Counsel for The Indigent Accused in Death Penalty Cases*, The Defender (Winter 2006), co-author
- Presentation: Speech to the Harris County Bar *The Landscape of Criminal Justice: Texas and Beyond*, May 21, 2004
- Justice Project Editorial, *Why Gideon Mattered to Hugo Black*, The Champion, January/February 2003 (reprinted in The Defender, April 2003)
- Editorial, *Justice Project: 5 Year Report*, The Defender, January 2003
- Editorial, *Restoring Confidence in the Criminal Justice System*, Judicature, 2002 (unsigned)
- *Justice Project: Status Report and Update*, The Defender, July 2002
- *Scrutiny a Must in Criminal Cases*, The Arizona Republic, January 2002 (Co-author)
- *Capital Punishment in Arizona and The "New" Death Penalty Debate*, The Defender, June 2001 (Co-author)
- *Popular Culture and The Death Penalty*, The Defender, July 2000 (Co-author)
- *Aiding the Incarcerated*, Litigation Magazine, Winter 2000 (Co-author)
- *Aryan Brother's legacy is safer prison system*, The Arizona Republic, February 6, 2000 (Co-author)
- *The Justice Project: Y2 OK!*, The Defender, January 2000 (Co-author)
- *Worldwide Concern: We Should Offer Global Support to Those Fighting for Human Rights Anywhere*, Arizona Journal, August 9, 1999 (Co-author)
- Editorial on Felony Murder: *Bad Law Needs Reining in for Sake of Fairness*, Arizona Republic, May 14, 1999
- *May God Have Mercy: A True Story of Crime and Punishment*, Judicature, November-December 1998





A PROFESSIONAL ASSOCIATION
ATTORNEYS AT LAW



## Larry A. Hammond (cont'd)

- *U.S. Has Everything to Gain From an International Criminal Court*, Nov. 9, 1998 Arizona Journal (reprinted in the Colorado Journal, Nevada Journal, and Washington Journal)
- *Prisons Lack Commitment to Safety*, Arizona Republic, April 12, 1998 (Co-author)
- *Arizona's Crisis in Indigent Capital Representation*, Arizona Attorney, March 1998 (Co-author)
- *Observations on the Mock Impeachment Trial of Abraham Lincoln*, 40 Ariz.L.Rev. 351 (1998)
- Editorial on Capital Execution: *Jose Ceja Didn't Deserve to Die*, Arizona Republic, January 25, 1998
- *New Rules, on Indigent Representations*, Arizona Attorney, February, 1997 (Co-author)

# EXHIBIT W

Michael K. Jeanes, Clerk of Court
*** Electronically Filed ***
Belva Nasingoetewa
Filing ID 489195
12/28/2009 3:26:20 PM

1  TERRY GODDARD
   ATTORNEY GENERAL
2  (FIRM STATE BAR NO. 14000)

3  LACEY STOVER GARD
   ASSISTANT ATTORNEY GENERAL
   CRIMINAL APPEALS/CAPITAL LITIGATION SECTION
4  400 WEST CONGRESS, BLDG. S–315
   TUCSON, ARIZONA 85701–1367
5  TELEPHONE: (520) 628–6520
   LACEY.GARD@AZAG.GOV
6  (STATE BAR NUMBER 22714)

7  ATTORNEYS FOR PLAINTIFF/RESPONDENT

8
                SUPERIOR COURT OF ARIZONA
9
                  COUNTY OF MARICOPA
10

11  State of Arizona,                    CR2000-096032-A

12          Plaintiff/Respondent,

13          -vs-                         RESPONSE TO MOTION FOR
                                         APPOINTMENT OF AND
14  Wendi Andriano,                      AUTHORIZATION OF
                                         PAYMENT FOR EXPERTS.
15          Defendant/Petitioner.

16          On December 23, 2009, Petitioner Wendi Andriano filed a motion to appoint

17  (1) mitigation specialist Sita Jo-Ann Sovin; (2) investigator Mike Torres; and (3)

18  Attorney Larry Hammond, as an expert on claims of ineffective assistance of

19  counsel.   Respondent takes no position on Petitioner's requests to appoint a

20  mitigation specialist and an investigator.   Respondent, however, opposes

21  Petitioner's request to appoint an ineffective assistance of counsel expert on the

22  ground that any opinion such an expert offers would be irrelevant and would not

23  assist the trier of fact.  This response is supported by the following memorandum

24  of points and authorities.

25

26

27

28

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I.**       *Appointment of mitigation specialist.*

Respondent takes no position on Andriano's motion to appoint mitigation specialist Sita Jo-Ann Sovin and her office, Capital Case Project-Diversified Legal Services.

**II.**       *Appointment of investigator.*

Respondent takes no position on Andriano's motion to appoint investigator Mike Torres.

**III.**       *Appointment of ineffective assistance of counsel expert.*

Respondents oppose Andriano's motion to appoint Attorney Larry Hammond as an expert on ineffective assistance of counsel (IAC) claims. Any opinion Mr. Hammond offers would be irrelevant because (1) whether counsel performed reasonably under prevailing professional norms is a legal, not a factual, issue; and (2) such opinion would not assist the trier of fact to resolve Andriano's forthcoming IAC claim(s).

Rule 702 of the Arizona Rules of Evidence permits expert testimony under limited circumstances to help the trier of fact resolve factual issues:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to *understand the evidence or to determine a fact in issue*, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

(Emphasis added.)

In order to prevail on an IAC claim, Andriano must satisfy the two-prong test set forth in *Strickland v. Washington*, 466 U.S. 668, 687–88 (1984), by proving that (1) counsel rendered deficient performance under prevailing professional standards, and (2) Andriano suffered prejudice. To establish deficient performance,

Andriano must show that "counsel's representation fell below an objective standard of reasonableness."  *Id.* at 687–88.  Expert testimony is irrelevant to this inquiry, for two reasons.

First, as numerous courts have recognized, whether counsel's trial tactics are reasonable under prevailing professional norms is a question of *law*, not a question of *fact*.  *See United States v. Swanson*, 943 F.2d 1070, 1072 (9th Cir. 1991); *Horton v. Zant*, 941 F.2d 1449, 1462 (11th Cir. 1991); *Smith v. Ylst*, 826 F.2d 872, 875 (9th Cir. 1987); *Lytle v. Jordan*, 22 P.3d 666, 679 (N.M. 2001); *Jefferson v. Zant*, 431 S.E.2d 110, 112 (Ga. 1993).  As the United States Court of Appeals for the Eleventh Circuit observed:

> Inquiries into strategic or tactical decisions challenged as ineffective assistance of counsel involve both a factual and a legal component.  The question of whether an attorney's actions were actually the product of a tactical or strategic decision is an issue of fact . . . .  By contrast, the question of whether the strategic or tactical decision is reasonable enough to fall within the wide range of professional competence is an issue of law not one of fact . . . .

*Provenzano v. Singletary*, 148 F.3d 1327, 1330 (11th Cir. 1998).  Because expert testimony is admissible only to help the trier of fact resolve *factual* issues, *see* Ariz. R. Evid. 702, such testimony is inappropriate to establish that counsel's actions fell below the relevant standard of care.  *See Provezano*, 148 F.3d at 1331–32 ("[I]it would not matter if a petitioner could assemble affidavits from a dozen attorneys swearing that the strategy used at his trial was unreasonable.  The question is not one to be decided by plebiscite, by affidavits, by deposition or by live testimony.  It is a question of law to be decided by the . . . courts . . . ."); *Lytle*, 22 P.3d at 680 ("We believe it is superfluous for expert witnesses to advise a court . . . about the proper application of existing law to the established historical facts

and about the ultimate issue of trial counsel's effectiveness."); *Jefferson*, 431 S.E.2d at 112 ("[T]he court correctly determined that opinion testimony from other attorneys concerning the performance of [the defendant's] trial attorneys was irrelevant.").

Second, even if the reasonableness of trial counsel's performance is a factual issue, expert testimony on that point is nonetheless inappropriate because it would not assist the trier of fact.  *See* Ariz. R. Evid. 702.  Although his career has been long and distinguished, Mr. Hammond is, respectfully, no more qualified than this Court—which is undoubtedly familiar with the standard of care for a capital defense attorney at the time of Andriano's trial—to determine whether counsel's acts or omissions were objectively reasonable under prevailing professional norms. *See Clemmons v. State*, 785 S.W.2d 524, 531 (Mo. 1990) ("A motion court is at least as capable as another attorney in reaching a decision [on counsel's alleged ineffectiveness] based on the evidence presented, and therefore the opinion of an attorney on the same subject is irrelevant and incompetent."); *Parkus v. State*, 781 S.W.2d 545, 548 (Mo. 1989) (same); *State v. Ohler*, 366 N.W.2d 771, 775 (Neb. 1985) (rejecting defendant's argument that lower court erred in refusing to permit expert testimony "regarding what a 'reasonably prudent criminal trial attorney would have done'" and concluding that "[g]enerally, expert testimony is not admissible as proof that the assistance of counsel in a criminal case was ineffective").  To resolve the deficient performance element of Andriano's forthcoming IAC claim(s), this Court must simply apply governing law to the relevant facts.  Mr. Hammond's opinion would not facilitate this exercise and is therefore irrelevant.

Because expert testimony on *Strickland*'s deficient performance prong would not "assist the trier of fact to understand the evidence or to determine a fact in issue," Ariz. R. Evid. 702, Mr. Hammond's opinion is irrelevant, and Respondent

respectfully requests that this Court deny Andriano's motion to appoint him as an IAC expert.

DATED this 28th day of December, 2009.

RESPECTFULLY SUBMITTED,

TERRY GODDARD
ATTORNEY GENERAL


/S/LACEY STOVER GARD
ASSISTANT ATTORNEY GENERAL
ATTORNEYS FOR DEFENDANT

1  Copy of the foregoing mailed
   this 28th day of December, 2009, to:
2

3  Scott M. Bennett
   Lewis and Roca LLP
4  40 N. Central Ave., Suite 1900
   Phoenix, AZ   85004
5
   Todd E. Hale
6  Lewis and Roca LLP
   One S. Church Avenue, Suite 700
7  Tucson, AZ   85701

8  Allen A. Arntsen
   Foley & Lardner LLP
9  150 East Gilman Street
   P.O. Box 1497
10 Madison, WI   53701-1497

11 Stephen J. Nickels
   Foley & Lardner LLP
12 150 East Gilman Street
   P.O. Box 1497
13 Madison, WI   53701-1497

14 Matthew R. Lynch
   Foley & Lardner LLP
15 150 East Gilman Street
   P.O. Box 1497
16 Madison, WI   53701-1497

17 Attorneys for Defendant

18
   /s/Linda Yrrizarry
19

20

21 #655053

22

23

24

25

26

27

28

6

# EXHIBIT X

LEWIS
AND
ROCA
——LLP——
LAWYERS

HIGH ??? ??? ??? CLERK ???
??? ??? ??? #5
DOCUMENT DEPOSITORY

10 JAN -4  PM 4:33

FILED
BY J. HARBOUR, DEP

1    40 North Central Avenue
     Phoenix, Arizona 85004-4429

2    Todd E. Hale, State Bar No. 015771
        Direct Dial: (520) 629-4433
3        Direct Fax: (520) 879-4708
        EMail: THale@LRLaw.com
     Scott M. Bennett, State Bar No. 022350
        Direct Dial: (602) 262-5338
4        Direct Fax: (602) 734-3816
        EMail: SBennett@LRLaw.com

5    FOLEY & LARDNER LLP
     150 E. Gilman Street
     Madison, WI 53703
6    Telephone: (608) 257-5035
     Fax:          (608) 258-4258

7    Allen A. Arntsen, Admitted *Pro Hac Vice*
     Stephan J. Nickels Admitted *Pro Hac Vice*
     Matthew R. Lynch Admitted *Pro Hac Vice*

8    *Attorneys for Petitioner*
     Wendi Andriano

9

10                        SUPERIOR COURT OF ARIZONA
                              COUNTY OF MARICOPA
11

12

13   State of Arizona,                    )
                                          )
14                        Respondent,     )    No. CR2000-096032-A
                                          )
15        vs.                             )    **UNOPPOSED MOTION FOR**
                                          )    **EXTENSION OF TIME**
16   Wendi Elizabeth Andriano,            )
                                          )    (Assigned to the Hon. Sally S. Duncan)
17                                        )
                          Petitioner.     )
18                                        )
                                          )
19   _____ )

20        Petitioner Wendi Elizabeth Andriano moves for a three-day extension of time to file

21   a reply in support of her Motion for Appointment of and Authorization of Payment for

22   Experts. The reply is currently due tomorrow, January 5. Ms. Andriano moves to extend

23   that deadline by three days, to Friday, January 8, 2010.

24        Ms. Andriano requests this extension because her attorneys need additional time to

25   collect factual materials to support their reply, and also because of the New Year's holiday

26   that fell between the filing of the State's response and the original deadline for the reply.

27

28

LEWIS
AND
ROCA
—— LLP ——
L A W Y E R S

1    Ms. Andriano's attorneys have confirmed, through an exchange of e-mail with the

2    attorney for the State, Ms. Lacey Stover Gard, that the State has no objection to this brief

3    extension.

4    A proposed order accompanies this motion.

5    RESPECTFULLY SUBMITTED January 4, 2010.

6

7                                          LEWIS AND ROCA LLP

8                                    By _____
                                          Todd E. Hale
9                                         Scott M. Bennett

10                                         FOLEY & LARDNER LLP
11                                         Allen A. Arntsen, *Pro Hac Vice*
                                           Stephan J. Nickels, *Pro Hac Vice*
12                                         Matthew R. Lynch, *Pro Hac Vice*

13
                                           *Attorneys for Petitioner*
14

15   ORIGINAL filed January 4, 2010,
     with the Clerk of the Maricopa
16   County Superior Court.

17   COURTESY COPY hand-delivered January 4, 2010, to:

18
     Judge Sally S. Duncan
19   Maricopa County Superior Court
     East Court Building-511
20   101 W. Jefferson
21   Phoenix, AZ 85003-2243

22   COPY mailed January 4, 2010, to:

23
     Ms. Lacey Stover Gard
24   Office of the Attorney General
     400 W. Congress, Suite S-315
25   Tuscon, AZ 85701-1367
26   *Attorney for the State of Arizona*

27   _____

28                                         2

MADI_2141447.1

# EXHIBIT Y

LEWIS
AND
ROCA
——LLP——
L A W Y E R S

MICHAEL K. JEANES, CLERK
RECEIVED CCC #1
NIGHT DEPOSITORY

10 JAN -8 PM 6: 16

FILED
BY J. HARBOUR, DEP

1   40 North Central Avenue
    Phoenix, Arizona 85004-4429

2   Todd E. Hale, State Bar No. 015771
      Direct Dial: (520) 629-4433
      Direct Fax: (520) 879-4708
3     EMail: THale@LRLaw.com
    Scott M. Bennett, State Bar No. 022350
4     Direct Dial: (602) 262-5338
      Direct Fax: (602) 734-3816
      EMail: SBennett@LRLaw.com

5   FOLEY & LARDNER LLP
    150 E. Gilman Street
6   Madison, WI 53703
    Telephone: (608) 257-5035
    Fax:        (608) 258-4258

7   Allen A. Arntsen, Admitted *Pro Hac Vice*
    Stephan J. Nickels Admitted *Pro Hac Vice*
8   Matthew R. Lynch Admitted *Pro Hac Vice*

    *Attorneys for Petitioner*
9   Wendi Andriano

10              SUPERIOR COURT OF ARIZONA
                  COUNTY OF MARICOPA
11

12

13   State of Arizona,                      )
                                            )
14                       Respondent,        )   No. CR2000-096032-A
                                            )
15          vs.                             )   **PETITIONER'S REPLY BRIEF IN**
                                            )   **SUPPORT OF MOTION FOR**
16                                          )   **APPOINTMENT OF AND**
     Wendi Elizabeth Andriano,              )   **AUTHORIZATION OF PAYMENT**
17                                          )   **FOR EXPERTS**
                         Petitioner.        )
18                                          )
                                            )   (Assigned to the Hon. Sally S. Duncan)
19                                          )

20

21   _____

22          Petitioner Wendi Elizabeth Andriano respectfully submits this reply brief in further

23   support of her Motion for Appointment of and Authorization of Payment for Experts.

24                                **ARGUMENT**

25          With regard to the present Motion, the State and Ms. Andriano disagree on very

26   little.  The State does not oppose the appointment of Ms. Sita Jo-Ann Sovin as a mitigation

27   specialist.  The State does not oppose the appointment of Mr. Mike Torres as an

28

MADI_2142344.1                                                           MADI_2141447.1

LEWIS
AND
ROCA
—— LLP ——
L A W Y E R S

1   investigator. The State does not question the qualifications of Mr. Larry Hammond as an

2   expert on the standard of care, and in fact acknowledges his "long and distinguished"

3   career as a litigator. (State Br. at 4.) The State does not challenge the reasonableness of

4   any proposed experts' rates.

5          The State's *only* bone of contention is that Mr. Hammond's opinion would not

6   assist the Court in determining whether the performance of Ms. Andriano's trial counsel

7   was "objectively reasonable under prevailing professional norms." (*Id.*) In essence, the

8   State is using Ms. Andriano's indigent status as the springboard for a premature *Daubert-*

9   type challenge to prevent Mr. Hammond from opining in this matter.

10         In doing so, the State's opposition relies entirely upon the assertion that "expert

11   testimony is admissible only to help the trier of fact resolve *factual* issues," and "whether

12   counsel's trial tactics are reasonable under prevailing professional norms is a question of

13   *law*, not a question of *fact*." (*Id.* at 3 (emphasis in original).) But as the United States

14   Supreme Court has firmly established, "both the performance and prejudice components of

15   the [Sixth Amendment] ineffectiveness inquiry are mixed questions of law and fact"

16   dependent upon "reasonableness under prevailing professional norms." *Strickland v.*

17   *Washington*, 466 U.S. 668, 688, 698 (1984). Indeed, several cases cited by the State

18   acknowledge that an inquiry into the reasonableness of trial counsel's actions involves

19   questions of fact and mixed questions of law and fact. *See, e.g.*, *Provenzano v. Singletary*,

20   148 F.3d 1327, 1330 (11th Cir. 1998) ("The question of whether an attorney's actions

21   were actually the product of a tactical or strategic decision is an issue of fact[.]"); *Horton*

22   *v. Zant*, 941 F.2d 1449, 1462 (11th Cir. 1991) ("The question of whether a decision was a

23   tactical one is a question of fact."); *Lytle v. Jordan*, 22 P.3d 666, 679 (N.M. 2001) ("The

24   issues of whether defense counsel performed below the level of a reasonably competent

25   attorney and whether deficient performance affected the result of the trial 'are mixed

26   questions of law and fact[.]'") (quoting *Strickland*, 466 U.S. at 698).

27

28                                              2

LEWIS
AND
ROCA
—— LLP ——
L A W Y E R S

Case 2:06-cv-01159-SRB   Document 28   Filed 08/28/17   Page 472 of 978

1    Further, expert testimony on the reasonableness of trial counsel's actions has been

2    routinely admitted in post-conviction proceedings. *See, e.g.*, *State v. Tapia*, 151 Ariz. 62,

3    64-65, 725 P.2d 1096, 1098-99 (1986) (discussing testimony of petitioner's expert witness

4    attorney in support of claim of ineffective assistance of counsel, finding that trial counsel's

5    representation fell below the required standard, and reversing petitioner's conviction and

6    sentence); *Hamilton v. Ayers*, 583 F.3d 1100, 1114 (9th Cir. 2009) (noting that defendant

7    presented testimony by "an [attorney] expert on ineffective assistance of counsel claims"

8    at a habeas evidentiary hearing); *Belmontes v. Ayers*, 529 F.3d 834, 848 (9th Cir. 2008)

9    (noting that the defendant "presented the testimony of two [attorney] experts on ineffective

10   assistance of counsel who opined that [trial counsel] had not prepared for the penalty

11   phase in a reasonably competent manner"), *rev'd on other grounds*, *Wong v. Belmontes*,

12   130 S.Ct. 383 (2009).  In fact, Mr. Hammond and his law firm have served as Court-

13   appointed experts on Sixth Amendment issues in several cases, including *State v.*

14   *Murdaugh*, No. 1995-006472, *Lacy v. Arizona*, No. CR1995-000713, and *Arizona v.*

15   *Kayer*, No. 94-0694.  Mr. Hammond has also served as lead defense counsel in capital

16   cases, including *United States v. Moore*, No. CR-03-00764-PHX-JAT, and *United States*

17   *v. Cisneros, et al.*, No. CR-03-00730-PHX-SRB, among others.

18       For example, in *Murdaugh*, the State filed (and Court rejected) a Motion to

19   preclude Mr. Hammond from testifying that was basically a carbon copy of the State's

20   Opposition Brief here, word for word.  The State's Motion in *Murdaugh* is attached as

21   **EXHIBIT 1**, while the Court's Order denying it is attached as **EXHIBIT 2**.

22       The need for expert testimony by attorneys in post-conviction relief proceedings

23   raising ineffective assistance of counsel claims is well-established.  Even in routine legal

24   malpractice actions, "expert testimony is generally required to establish the standard of

25   care[.]" *Asphalt Engineers, Inc. v. Galusha*, 160 Ariz. 134, 135, 770 P.2d 1180, 1181 (Ct.

26   App. 1989).  In reviewing the performance of capital counsel, the need for expert

27   testimony is magnified.  "[D]eath is [] different," *Gardner v. Florida*, 430 U.S. 349, 357

28                                         3



1  (1977), and "[t]he differences [between capital cases and other criminal cases] are so
2  fundamental that counsel quite able to try a complex criminal case may not be competent
3  to handle a penalty trial in a capital case." Gary Goodpaster, *The Trial for Life: Effective*
4  *Assistance of Counsel in Death Penalty Cases*, 58 N.Y.U. L. Rev. 299, 303 (1983). As a
5  result, the Arizona Supreme Court has identified two appropriate sources in analyzing
6  whether trial counsel utilized the special skills and performance necessary in capital cases:
7  (1) the American Bar Association standards, and (2) "expert testimony [regarding]
8  whether counsel's performance was reasonable under all the circumstances." *State v.*
9  *Nash*, 143 Ariz. 392, 397, 694 P.2d 222, 227 (1985). There is no reason to deprive Ms.
10 Andriano and the Court of Mr. Hammond's expertise on the critical and complex question
11 of whether Ms. Andriano was deprived of her Sixth Amendment rights.

<u>CONCLUSION</u>

12
13     For the foregoing reasons, Ms. Andriano respectfully asks this Court to grant her
14 Motion for Appointment of and Authorization of Payment for Experts.
15     RESPECTFULLY SUBMITTED January 8, 2010.
16
17                         LEWIS AND ROCA LLP
18                         By _____
19                            Todd E. Hale
                               Scott M. Bennett
20
21                         FOLEY & LARDNER LLP
                               Allen A. Arntsen, *Pro Hac Vice*
22                             Stephan J. Nickels, *Pro Hac Vice*
                               Matthew R. Lynch, *Pro Hac Vice*
23
24                             *Attorneys for Petitioner*
25
26
27
28

4

LEWIS
AND
ROCA
——— LLP ———
L A W Y E R S

1  ORIGINAL filed January 8, 2010,
   with the Clerk of the Maricopa
2  County Superior Court.

3
   COURTESY COPY hand-delivered January 8, 2010, to:
4

5  Judge Sally S. Duncan
   Maricopa County Superior Court
6  East Court Building-511
   101 W. Jefferson
7  Phoenix, AZ 85003-2243

8
   COPY mailed January 8, 2010, to:
9

10 Ms. Lacey Stover Gard
   Office of the Attorney General
11 400 W. Congress, Suite S-315
   Tuscon, AZ 85701-1367
12 *Attorney for the State of Arizona*

13 _____

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28                            5

# **Exhibit 1**

RFC'D. OSBORN MALEDON P.A.

OCT 3 1 2007

TERRY GODDARD
ATTORNEY GENERAL
(FIRM STATE BAR NO. 14000)

SHERRI TOLAR ROLLISON
ASSISTANT ATTORNEYS GENERAL
CAPITAL LITIGATION SECTION
1275 W. WASHINGTON
PHOENIX, ARIZONA 85007–2997
TELEPHONE: (602) 542–4686
(STATE BAR NUMBER 013657)

ATTORNEYS FOR RESPONDENT

# ARIZONA SUPERIOR COURT
## COUNTY OF MARICOPA

| | |
|---|---|
| STATE OF ARIZONA,<br><br>RESPONDENT/PLAINTIFF,<br><br>–VS–<br><br>MICHAEL J. MURDAUGH,<br><br>PETITIONER/DEFENDANT. | CR-95-006472<br><br>MOTION TO PRECLUDE EXPERT TESTIMONY CONCERNING INEFFECTIVE ASSISTANCE OF COUNSEL.<br><br>THE HON. WARREN J. GRANVILLE |

Pursuant to Rule 32.8 of the Arizona Rules of Criminal Procedure and Rule 702 of the Arizona Rules of Evidence, Respondent respectfully requests that this Court preclude expert testimony concerning ineffective assistance of counsel. This motion is supported by the accompanying memorandum of points and authorities.

. . . .
. . . .

1

Exhibit 1

Respectfully submitted this 18th day of October, 2007.

TERRY GODDARD
ATTORNEY GENERAL

SHERRI TOLAR ROLLISON
ASSISTANT ATTORNEY GENERAL

## MEMORANDUM OF POINTS AND AUTHORITIES

On October 2, 2007, Petitioner noticed Larry Hammond as an expert witness on ineffective assistance of counsel for Petitioner's upcoming post-conviction relief evidentiary hearing. Respondent requests that this Court preclude expert testimony concerning ineffective assistance of counsel. Such testimony is not necessary to assist the trier of fact, and is therefore, irrelevant.

Rule 702 of the Arizona Rules of Evidence permits expert testimony under limited circumstances:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to *understand the evidence or to determine a fact in issue,* a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

(Emphasis added.)

In order to prevail on an ineffective assistance of counsel claim, Petitioner must satisfy the two-prong test enunciated in *Strickland v. Washington*, 466 U.S. 668, 687–88 (1984), by proving that (1) counsel rendered deficient performance

2

under prevailing professional standards, and (2) Petitioner suffered prejudice. And, to prove deficient performance, Petitioner must convince this Court that "counsel's representation fell below an objective standard of reasonableness." *Strickland*, 466 U.S. at 687–88. As numerous courts have recognized, whether counsel's trial tactics are reasonable is a question of law, not a question of fact. *See United States v. Swanson*, 943 F.2d 1070, 1072 (9th Cir. 1991); *Horton v. Zant*, 941 F.2d 1449, 1462 (11th Cir. 1991); *Smith v. Ylst*, 826 F.2d 872, 875 (9th Cir. 1987); *Lytle v. Jordan*, 22 P.3d 666, 679 (N.M. 2001); *Jefferson v. Zant*, 431 S.E.2d 110, 112 (Ga. 1993). As the United States Court of Appeals for the Eleventh Circuit stated:

> Inquiries into strategic or tactical decisions challenged as ineffective assistance of counsel involve both a factual and a legal component. The question of whether an attorney's actions were actually the product of a tactical or strategic decision is an issue of fact . . . . By contrast, the question of whether the strategic or tactical decision is reasonable enough to fall within the wide range of professional competence is an issue of law not one of fact . . . .

*Provenzano v. Singletary*, 148 F.3d 1327, 1330 (11th Cir. 1998).

In this case, expert testimony to establish *Strickland*'s deficient-performance prong would be irrelevant and would not "assist the trier of fact." Ariz. R. Evid. 702. As noted above, the question whether an attorney's performance fell below objective standards of reasonableness is one of *law* for this Court to determine. *See Swanson*, 943 F.2d at 1072; *Horton*, 941 F.2d at 1462; *Smith*, 826 F.2d at 875; *Lytle*, 22 P.3d at 679; *Jefferson*, 431 S.E.2d at 112. Expert testimony is admissible only to assist the trier of fact in resolving *factual* issues; legal questions are

3

inappropriate for such testimony. *See generally* Ariz. R. Evid. 702. In *Provenzano*, for example, the Eleventh Circuit rejected a defendant's attempt to secure an evidentiary hearing on the reasonableness of counsel's decision not to seek a change of venue. 148 F.3d at 1330–31. The defendant supported his argument with an affidavit from a defense attorney questioning trial counsel's decisions. *Id.* at 1331. The Eleventh Circuit concluded that the affidavit did not entitle the defendant to an evidentiary hearing:

> [T]he reasonableness of a strategic choice is a question of law to be decided by the court, not a matter subject to factual inquiry and evidentiary proof. Accordingly, it would not matter if a petitioner could assemble affidavits from a dozen attorneys swearing that the strategy used at his trial was unreasonable. The question is not one to be decided by plebiscite, by affidavits, by deposition or by live testimony. It is a question of law to be decided by the . . . courts . . . .

*Provenzano*, 148 F.3d at 1331–32; *see also Lytle*, 22 P.3d at 680 ("We believe it is superfluous for expert witnesses to advise a court . . . about the proper application of existing law to the established historical facts and about the ultimate issue of trial counsel's effectiveness."); *Jefferson*, 431 S.E.2d at 112 ("[T]he court correctly determined that opinion testimony from other attorneys concerning the performance of [the defendant's] trial attorneys was irrelevant.").

Additionally, expert testimony on *Strickland*'s deficient performance prong would not "assist the trier of fact to understand the evidence or to determine a fact in issue." Ariz. R. Evid. 702. As a retired Yavapai County Superior Court judge, this Court is undoubtedly familiar with the standard of care for a defense attorney,

4

and does not require expert testimony to resolve Petitioner's ineffective assistance of counsel claims. *See Clemmons v. State*, 785 S.W.2d 524, 531 (Mo. 1990) ("A motion court is at least as capable as another attorney in reaching a decision [on counsel's alleged ineffectiveness] based on the evidence presented, and therefore the opinion of an attorney on the same subject is irrelevant and incompetent."); *Parkus v. State*, 781 S.W.2d 545, 548 (Mo. 1989) (same); *State v. Ohler*, 366 N.W.2d 771, 775 (Neb. 1985) (rejecting defendant's argument that lower court erred in refusing to permit expert testimony "regarding what a 'reasonably prudent criminal trial attorney would have done'" and concluding that "[g]enerally, expert testimony is not admissible as proof that the assistance of counsel in a criminal case was ineffective"). To resolve the deficient performance aspect of Petitioner's ineffective assistance of counsel claim, this Court must apply the governing law to the facts elicited at the evidentiary hearing. Expert testimony would not facilitate this exercise.

Thus, expert testimony regarding the reasonableness of counsel's decisions is irrelevant and would not assist this Court in determining whether counsel was ineffective. For the foregoing reasons, Respondent respectfully requests that this Court preclude such testimony.

5

RESPECTFULLY SUBMITTED this 18th day of October, 2007.

TERRY GODDARD
ATTORNEY GENERAL

SHERRI TOLAR ROLLISON
ASSISTANT ATTORNEY GENERAL
CAPITAL LITIGATION SECTION

ATTORNEYS FOR RESPONDENT

COPIES of the foregoing were deposited for mailing this 18th day of October, 2007.

Thomas J. Phalen
45 W. Jefferson, Suite 506
Phoenix, Arizona 85003

Gilbert H. Levy
2001 Western, Suite 200
Seattle, Washington 98121-2114

Attorneys for PETITIONER/DEFENDANT

Barbara Lindsay

CRM01-1027
78134

6

# Exhibit 2

13381, 1 Order

PAGE 02

11/07/2007 13:37 602258..08 THOMAS PHALEN

Michael K. Jeanes, Clerk of Court
*** Electronically Filed ***
11/02/2007 8:00 AM

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CR 1995-006472 11/01/2007

CLERK OF THE COURT
HONORABLE WARREN J. GRANVILLE J. Kosaka
Deputy

STATE OF ARIZONA SHERRI T ROLLISON

v.

MICHAEL JOE MURDAUGH (A) THOMAS J PHALEN

VICTIM WITNESS DIV-AG-CCC
GILBERT LEVEY
2001 WESTERN, SUITE 200
SEATTLE WASHINGTON 98121-2114

ORDER ENTERED BY COURT

The Court having received and considered State's Motion to Preclude Expert Testimony
Concerning Ineffective Assistance of Counsel.

IT IS ORDERED denying State's motion.

Docket Code 023 Form R000A Page 1

Exhibit 2

# EXHIBIT Z

LEWIS
AND
ROCA
———LLP———
L A W Y E R S

MICHAEL K. JEANES, CLERK
RECEIVED CCC #1
NIGHT DEPOSITORY

10 JAN -8 PM 6: 16
FILED
BY J. HARBOUR, L

1   40 North Central Avenue
    Phoenix, Arizona 85004-4429

2   Todd E. Hale, State Bar No. 015771
        Direct Dial: (520) 629-4433
3       Direct Fax: (520) 879-4708
        EMail: THale@LRLaw.com
    Scott M. Bennett, State Bar No. 022350
4       Direct Dial: (602) 262-5338
        Direct Fax: (602) 734-3816
        EMail: SBennett@LRLaw.com

5   FOLEY & LARDNER LLP
    150 E. Gilman Street
6   Madison, WI 53703
    Telephone: (608) 257-5035
    Fax:        (608) 258-4258

7   Allen A. Arntsen, Admitted *Pro Hac Vice*
    Stephan J. Nickels Admitted *Pro Hac Vice*
    Matthew R. Lynch Admitted *Pro Hac Vice*

8   *Attorneys for Petitioner*
    Wendi Andriano

9

10                  SUPERIOR COURT OF ARIZONA
                     COUNTY OF MARICOPA
11

12

13  State of Arizona,                    )
                                         )
14                      Respondent,      )   No. CR2000-096032-A
                                         )
15       vs.                             )   **PETITIONER'S UNOPPOSED**
                                         )   **MOTION FOR 60-DAY**
16                                       )   **EXTENSION OF TIME TO FILE**
    Wendi Elizabeth Andriano,            )   **PETITION FOR POST-**
17                                       )   **CONVICTION RELIEF**
                        Petitioner.      )
18                                       )   (Assigned to the Hon. Sally S. Duncan)
19                                       )
                                         )
20                                       )
                                         )
21  ————————————————————————  )

22          Petitioner Wendi Andriano, by and through her attorneys of record, hereby file this

23  unopposed motion for an extension in which to file her Petition for Post-Conviction Relief.

24  The Petition is currently due on March 4, 2010.  Ms. Andriano requests an additional 60

25  days to file her Petition, until May 3, 2010, as provided by Ariz. R. Crim. P. 32.4(c)(1).

26  Ms. Andriano's counsel has contacted the State, and the State has no objection to a 60 day

27  extension.

28



1    Ms. Andriano requests additional time because of the size of the trial and appeal

2    record, the number and complexity of the issues in this case, and the status of Ms.

3    Andriano's continuing investigation into those issues.

4        Ms. Andriano's trial was held in September-December 2004.  The liability phase of

5    the trial lasted for over two months, during which 62 witnesses testified.  After the liability

6    phase ended, the penalty phase of the trial lasted for roughly three weeks, during which 19

7    witnesses testified.

8        Given the large record, there are many complex issues which must be analyzed

9    before Ms. Andriano can file a proper Petition for Post-Conviction Relief.  Although the

10   attorneys and Ms. Andriano's investigative team (including an ABA approved mitigation

11   expert and a private investigator) have already identified several potential issues, the

12   process of reviewing the facts and interviewing witnesses is ongoing.  Ms. Andriano's

13   legal and investigative team is working as quickly as possible, but must identify and

14   pursue all reasonable arguments so that Ms. Andriano receives the representation that is

15   required by Arizona R. Crim. P. 6.8(c)(3) and the ABA Guidelines for the Appointment

16   and Performance of Defense Counsel in Death Penalty Cases.

17       For these reasons, Ms. Andriano respectfully requests that the Court grant a 60 day

18   extension pursuant to Ariz. R. Crim. P. 32.4(c)(1).

19       RESPECTFULLY SUBMITTED January 8, 2010.

20

21                                    LEWIS AND ROCA LLP

22                                    By _____

23                                        Todd E. Hale
                                         Scott M. Bennett

24

25                                    FOLEY & LARDNER LLP
                                         Allen A. Arntsen, *Pro Hac Vice*
26                                       Stephan J. Nickels, *Pro Hac Vice*
                                         Matthew R. Lynch, *Pro Hac Vice*

27

28                                         2

1          *Attorneys for Petitioner*

2     ORIGINAL filed January 8, 2010,
3     with the Clerk of the Maricopa
      County Superior Court.
4
5     COURTESY COPY hand-delivered January 8, 2010, to:

6     Judge Sally S. Duncan
      Maricopa County Superior Court
7     East Court Building-511
8     101 W. Jefferson
      Phoenix, AZ 85003-2243
9
10    COPY mailed January 8, 2010, to:

11    Ms. Lacey Stover Gard
      Office of the Attorney General
12    400 W. Congress, Suite S-315
13    Tuscon, AZ 85701-1367
      *Attorney for the State of Arizona*
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

                    3

MADI_2144950.2

MADI_2141447.1

# EXHIBIT AA

Michael K. Jeanes, Clerk of Court
\*\*\* Electronically Filed \*\*\*
01/29/2010 8:00 AM

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CR 2000-096032                                                01/27/2010

CLERK OF THE COURT
HON. SALLY S. DUNCAN                                          S. Yoder
Deputy

STATE OF ARIZONA                       LACEY ALEXANDRA STOVER GARD

v.

WENDI ELIZABETH ANDRIANO (A)           SCOTT M BENNETT
                                       TODD E HALE

                                       CAPITAL CASE MANAGER
                                       COURT ADMIN-CRIMINAL-PCR
                                       OFFICE OF PUBLIC DEFENSE
                                       SERVICES-CCC
                                       VICTIM SERVICES DIV-CA-SE
                                       VICTIM WITNESS DIV-AG-CCC

MINUTE ENTRY

        The Court has reviewed the defendant's motions for extension of time and to appoint experts to assist in developing and presenting claims for Rule 32 relief, the State's response, and the defendant's reply. Good cause appearing,

        IT IS ORDERED as follows:

        1)  Granting the defendant an extension of time to and including May 3, 2010 in which to file the Petition for Post-Conviction Relief.

        2)  Appointing Sita Jo-Ann Sovin, Capital Case Project-Diversified Legal Services, as mitigation specialist for the defendant in this matter, pursuant to A.R.S. §13-4013. Ms. Sovin shall be compensated at the mitigation specialist contract rate established by the Office of Public Defense Services (OPDS). She shall keep detailed time records and submit billings on a monthly basis to OPDS.

Docket Code 197                      Form R000A                           Page 1

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CR 2000-096032                                     01/27/2010


3)  Appointing Larry Hammond as an expert for the defendant in this matter, pursuant to A.R.S. §13-4013. Mr. Hammond shall be compensated at the rate of $250 per hour. He shall keep detailed time records, and submit billings on a monthly basis to OPDS.

4)  Appointing Mark Torres as investigator for the defendant in this matter, pursuant to A.R.S. §13-4013.  Mr. Torres shall be compensated at the investigator contract rate established by OPDS. He shall keep detailed time and expense records, and submit billings on a monthly basis to OPDS.

This case is eFiling eligible: http://www.clerkofcourt.maricopa.gov/efiling/default.asp

# EXHIBIT BB

MICHAEL K. JEANES, CLERK
BY _____ DEP

FILED

10 MAR -4 PM 4: 50

1  James J. Belanger (011393)
2  Scott M. Bennett (022350)
   Coppersmith Schermer & Brockelman PLC
3  2800 North Central Avenue, Suite 1200
   Phoenix, Arizona  85004
4  (602) 224-0999 (office)
5  (602) 224-6020 (fax)
   sbennett@csblaw.com
6
7  Allen A. Arntsen, Admitted *Pro Hac Vice*
   Stephan J. Nickels, Admitted *Pro Hac Vice*
8  Matthew R. Lynch, Admitted *Pro Hac Vice*
   FOLEY & LARDNER LLP
9  150 E. Gilman Street
   Madison, WI  53703
10 (608) 257-5035 (Telephone)
11 (608) 258-4258 (Fax)

12 *Attorneys for Petitioner Wendi Elizabeth Andriano*

13

14                    SUPERIOR COURT OF ARIZONA

15                       COUNTY OF MARICOPA

16 STATE OF ARIZONA,                )   No. CR2000-096032-A
                                    )
17                    Respondent,   )   **NOTICE OF (1) CHANGE OF FIRM**
                                    )   **OF ONE OF MS. ANDRIANO'S**
18         vs.                      )   **ATTORNEYS AND (2)**
                                    )   **SUBSTITUTION OF ANOTHER OF**
19                                  )   **HER ATTORNEYS**
20 WENDI ELIZABETH ANDRIANO,        )
                                    )
21                    Petitioner.   )   (Assigned to the Hon. Gary Donahoe)
                                    )
22 _____)

23       Petitioner Wendi Andriano gives notice of a change of firm for one of her attorneys.

24 Attorney Scott M. Bennett has moved to a new firm.  Mr. Bennett's new contact information

25 is:

26

1
2
3
4

Scott M. Bennett
Coppersmith Schermer & Brockelman PLC
2800 N. Central Ave, Suite 1200
Phoenix, Arizona 85004
Direct phone: (602) 381-5476
Direct fax: (602) 772-3776
sbennett@csblaw.com

5

There has also been a substitution of one attorney for Ms. Andriano.  Todd Hale of

6

Lewis and Roca no longer represents Ms. Andriano.  Taking his place is attorney

7

James J. Belanger.  Mr. Belanger's contact information is:

8
9
10
11
12

James J. Belanger
Coppersmith Schermer & Brockelman PLC
2800 North Central Avenue, Suite 1200
Phoenix, AZ 85004
Direct phone: (602) 381-5485
Direct fax: (602) 772-3785
jbelanger@csblaw.com

13

14

RESPECTFULLY SUBMITTED March 4, 2010.

15
16

COPPERSMITH SCHERMER &
BROCKELMAN, PLC

17
18
19
20

By _____
    James J. Belanger
    Scott M. Bennett

21
22
23

FOLEY & LARDNER LLP
    Allen A. Arntsen, *Pro Hac Vice*
    Stephan J. Nickels, *Pro Hac Vice*
    Matthew R. Lynch, *Pro Hac Vice*
*Attorneys for Petitioner*

24
25
26

- 2 -

1  ORIGINAL filed March 4, 2010, with the Clerk of the Maricopa County Superior Court.

2  COURTESY COPY hand-delivered March 4, 2010, to:

3  Judge Gary Donahoe
4  Maricopa County Superior Court
   East Court Building-511
5  101 W. Jefferson
   Phoenix, AZ  85003-2243
6

7  COPY e-mailed and mailed March 4, 2010, to:

8  Ms. Lacey Stover Gard
9  Office of the Attorney General
   400 W. Congress, Suite S-315
10 Tuscon, AZ  85701-1367
   *Attorney for the State of Arizona*
11

12

13 *Elizabeth James*

14

15

16

17

18

19

20

21

22

23

24

25

26

- 3 -

# EXHIBIT CC

MICHAEL K. JEANES, CLERK
BY *[signature]* DEP
FILED

10 MAR -4 PM 4: 50

1   Scott M. Bennett (022350)
    Coppersmith Schermer & Brockelman PLC
2   2800 North Central Avenue, Suite 1200
    Phoenix, Arizona  85004
3   (602) 381-5476 (Direct)
    (602) 772-3776 (Direct Fax)
4   sbennett@csblaw.com

5
    Allen A. Arntsen, Admitted *Pro Hac Vice*
6   Stephan J. Nickels, Admitted *Pro Hac Vice*
    Matthew R. Lynch, Admitted *Pro Hac Vice*
7   FOLEY & LARDNER LLP
    150 E. Gilman Street
8   Madison, WI  53703
    (608) 257-5035 (Telephone)
9   (608) 258-4258 (Fax)

10  *Attorneys for Defendant*
    *Wendi Elizabeth Andriano*
11

12                    SUPERIOR COURT OF ARIZONA

13                      COUNTY OF MARICOPA

14

15  STATE OF ARIZONA,              )   No. CR2000-096032-A
                                   )
16                  Respondent,    )   **PETITIONER'S UNOPPOSED**
                                   )   **MOTION FOR 30-DAY**
17      vs.                        )   **EXTENSION OF TIME TO FILE**
                                   )   **PETITION FOR POST-**
18  WENDI ELIZABETH ANDRIANO,      )   **CONVICTION RELIEF**
                                   )
19                  Petitioner.    )   (Assigned to the Hon. Gary Donahoe)
                                   )
20                                 )
                                   )
21  _____)

22         Petitioner Wendi Andriano files this <u>unopposed</u> motion for an extension to file her

23  Petition for Post-Conviction Relief.  The Petition is currently due on May 3, 2010.  Ms.

24  Andriano requests an additional 30 days to file her Petition, until June 2, 2010, as provided

25  by Ariz. R. Crim. P. 32.4(c)(1).  Ms. Andriano's counsel has contacted the State, and the

26  State has no objection to a 30-day extension.

## MEMORANDUM OF POINTS AND AUTHORITIES

Ms. Andriano requests additional time because of the size of the trial and appeal record, the number and complexity of the issues in this case, and the status of Ms. Andriano's continuing investigation into those issues.

Ms. Andriano's trial was held from September through December of 2004. The liability phase of the trial lasted for more than two months, during which 62 witnesses testified. After the liability phase ended, the penalty phase of the trial lasted for roughly three weeks, during which 19 witnesses testified.

As noted in Ms. Andriano's January 8, 2010 motion before this Court, given the large record, there are many complex issues that must be analyzed before Ms. Andriano can file a proper Petition for Post Conviction Relief. The attorneys and Ms. Andriano's investigative team (including an ABA-approved mitigation expert and a private investigator) are continuing to identify several potential issues, review the facts, and interview witnesses. For example, the mitigation expert has interviewed several witnesses, including Ms. Andriano and certain family members, and the private investigator is working to locate additional relevant facts and witnesses.

Ms. Andriano's attorneys have retained a forensic psychiatrist who is working on a preliminary analysis of the many issues in this case. Based on the extensive ongoing investigation, it may be necessary to retain other experts as well.

In summary, Ms. Andriano's legal, investigative, and expert witness teams are working as quickly and diligently as possible, but must identify and pursue all reasonable arguments so that Ms. Andriano receives the representation that is required by Ariz. R. Crim. P. 6.8(c)(3) and the ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases.

For these reasons, Ms. Andriano respectfully requests that the Court grant a 30-day extension pursuant to Ariz. R. Crim. P. 32.4(c)(1).

-2-

1    RESPECTFULLY SUBMITTED March 4, 2010.

2                                    COPPERSMITH SCHERMER &
3                                    BROCKELMAN, PLC

4

5                                    By _____
6                                         Scott M. Bennett

7                                    FOLEY & LARDNER LLP
8                                         Allen A. Arntsen, *Pro Hac Vice*
                                          Stephan J. Nickels, *Pro Hac Vice*
9                                         Matthew R. Lynch, *Pro Hac Vice*

10                                        *Attorneys for Petitioner*

11

12   ORIGINAL filed March 4, 2010, with the Clerk of the Maricopa County Superior Court.

13   COURTESY COPY hand-delivered March 4, 2010, to:

14   Judge Gary Donahoe
15   Maricopa County Superior Court
     East Court Building-511
16   101 W. Jefferson
     Phoenix, AZ  85003-2243
17

18   COPY e-mailed and mailed March 4, 2010, to:

19   Ms. Lacey Stover Gard
20   Office of the Attorney General
     400 W. Congress, Suite S-315
21   Tuscon, AZ  85701-1367
     *Attorney for the State of Arizona*
22

23

24   *Elizabeth James*
25

26

# EXHIBIT DD

Michael K. Jeanes, Clerk of Court
*** Electronically Filed ***
03/05/2010 8:00 AM

## SUPERIOR COURT OF ARIZONA
## MARICOPA COUNTY

CR 2000-096032                                    03/04/2010


                                          CLERK OF THE COURT
HON. GARY E. DONAHOE                            S. Yoder
                                                 Deputy


STATE OF ARIZONA                          LACEY ALEXANDRA STOVER GARD

v.

WENDI ELIZABETH ANDRIANO (A)              SCOTT M BENNETT
                                          TODD E HALE

                                          CAPITAL CASE MANAGER
                                          COURT ADMIN-CRIMINAL-PCR
                                          VICTIM SERVICES DIV-CA-SE
                                          VICTIM WITNESS DIV-AG-CCC
                                          ALLEN A ARNSTEN
                                          FOLEY AND LARDNER LLP
                                          PO BOX 1497
                                          MADISON WI  53701-1497


### INFORMAL CONFERENCE SET


Pursuant to Rule 32.7, Arizona Rules of Criminal Procedure,

**IT IS HEREBY ORDERED** setting an informal conference before this Court on **March 23, 2010 at 10:30 a.m.** to review the status of this case and, if not already set, to establish a briefing schedule.

The Defendant will not be transported to this informal conference.

This case is eFiling eligible: http://www.clerkofcourt.maricopa.gov/efiling/default.asp


Docket Code 028                    Form R000A                    Page 1

# EXHIBIT EE

Michael K. Jeanes, Clerk of Court
*** Electronically Filed ***
03/26/2010 8:00 AM

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CR 2000-096032                                              03/23/2010


                                              CLERK OF THE COURT
HON. GARY E. DONAHOE                                S. Yoder
                                                    Deputy


STATE OF ARIZONA                         LACEY ALEXANDRA STOVER GARD

v.

WENDI ELIZABETH ANDRIANO (A)             JAMES J BELANGER
                                         SCOTT M BENNETT

                                         CAPITAL CASE MANAGER
                                         COURT ADMIN-CRIMINAL-PCR
                                         VICTIM SERVICES DIV-CA-SE



### STATUS CONFERENCE


10:30 a.m.  This is the time set for informal Status Conference.

| | |
|---|---|
| State's Attorney: | Lacy A. Stover Gard (appears telephonically) |
| Defendant's Attorney: | James J. Belanger |
| | Scott M. Bennett |
| | Allen A. Arntsen, *pro hac vice* (appears telephonically) |
| Defendant: | Not Present (presence waived) |
| Court Reporter: | Brenda Brown |

The Court is advised of the status of petition for post-conviction relief.

Argument is heard on Petitioner's request for a date certain to file the petition.

**IT IS HEREBY ORDERED** that the petition for post-conviction relief be filed on or before June 1, 2011.

Docket Code 029                    Form R000A                          Page 1

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CR 2000-096032                                    03/23/2010


**IT IS FURTHER ORDERED** that the State's Response shall be filed on or before August 1, 2011.

**IT IS FURTHER ORDERED** that Defendant's Reply shall be filed on or before September 1, 2011.

**IT IS FURTHER ORDERED** that Petitioner's Unopposed Motion for 30-Day Extension of Time to File Petition for Post-Conviction Relief is deemed moot.

10:48 a.m.  Matter concludes.

This case is eFiling eligible: http://www.clerkofcourt.maricopa.gov/efiling/default.asp

# EXHIBIT FF

Michael K. Jeanes, Clerk of Court
*** Electronically Filed ***
Isabel Osuna
Filing ID 562149
4/2/2010 4:02:06 PM

1

TERRY GODDARD
ATTORNEY GENERAL
(FIRM STATE BAR NO. 14000)

2

3

LACEY STOVER GARD
ASSISTANT ATTORNEY GENERAL
CRIMINAL APPEALS/CAPITAL LITIGATION SECTION
400 WEST CONGRESS, BLDG. S–315
TUCSON, ARIZONA  85701–1367
TELEPHONE: (520) 628–6520
LACEY.GARD@AZAG.GOV
(STATE BAR NUMBER 22714)

4

5

6

7

ATTORNEYS FOR PLAINTIFF/RESPONDENT

8

9

# SUPERIOR COURT OF ARIZONA

## COUNTY OF MARICOPA

10

11

12

13

14

15

| State of Arizona, | CR2000-096032-A |
| Plaintiff/Respondent, | |
| -vs- | MOTION TO RECONSIDER DEADLINE FOR FILING PETITION FOR POST-CONVICTION RELIEF. |
| Wendi Andriano, | |
| Defendant/Petitioner. | |

16

17

18

19

20

21

        On March 23, 2010, this Court conducted an informal conference pursuant to Arizona Rule of Criminal Procedure 32.7.  At the conclusion of that conference, this Court ordered Petitioner Wendi Andriano to file her petition for post-conviction relief on or before June 1, 2011.  For the reasons expressed in the following memorandum of points and authorities, the State of Arizona respectfully requests that this Court reconsider that ruling.

22

                                RESPECTFULLY SUBMITTED,

23

                                TERRY GODDARD
                                ATTORNEY GENERAL

24

25

                                /S/ KENT CATTANI

26

                                /S/LACEY STOVER GARD

27

                                ASSISTANT ATTORNEYS GENERAL
                                ATTORNEYS FOR PLAINTIFF

28

**MEMORANDUM OF POINTS AND AUTHORITIES**

On March 23, 2010, this Court conducted an informal scheduling conference pursuant to Arizona Rule of Criminal Procedure 32.7.   During the conference, Petitioner Wendi Andriano requested a firm deadline for the filing of her post-conviction relief (PCR) petition, and asked to be exempted from the requirement, set forth in Arizona Rule of Criminal Procedure 32.4(c)(1), that she request continuances in 30-day increments.  (Exhibit A, at 3.)  Andriano asked this Court to set June 1, 2011, as the deadline for her petition.  (*Id.*)

In support of her request, Andriano described the diligent investigation completed thus far by her team of six attorneys, a paralegal, a mitigation specialist, and a fact investigator.  (*Id.* at 4–5.)  Andriano explained that the team had, to date, reviewed trial counsel's case file, interviewed trial counsel, retained a psychologist to conduct a life history, and discovered "substantial [mitigating] evidence that was not presented at the initial trial."  (*Id.* at 5.)  Andriano argued, however, that the mitigation specialist required additional time to complete her investigation because she had to interview and "re-interview" individuals.  (*Id.* at 5–6.)  Additionally, Andriano's counsel stated that Andriano's case was the first capital PCR proceeding they had handled, and thus they were not as "efficient as [they] should be."  (*Id.* at 6.)  Noticeably absent from the request for additional time was any explanation regarding the mitigation investigation that was done for trial and sentencing.  Andriano was represented in those proceedings by two qualified attorneys, appointed pursuant to Arizona Rule of Criminal Procedure 6.8.  Andriano also had the assistance of mental health experts and, presumably, an investigator.

Although the State did not object to setting a firm deadline for the petition's filing, the State objected to the June 1, 2011, proposal, and asked that the petition be filed no later than August 2, 2010.  (*Id.* at 6–7.)  The State noted that, based on

Andriano's avowals, her team had made significant progress investigating her PCR claims. (*Id.* at 6–7.) The State further noted that Andriano's counsel had filed their notices of appearance in August 2009, and that her mitigation specialist had been appointed on January 27, 2010. (*Id.* at 6–7; *see* M.E. dated 1/27/10.) Upon this Court's inquiry, Andriano admitted that her mitigation specialist had begun working on the case in late 2009—before she was formally appointed—and, although she had been simultaneously working on another case, had interviewed several witnesses and had met with Andriano repeatedly. (*Id.* at 7–8.)

This Court noted that Andriano's defense team had been "diligently working the case," but nonetheless found the June 1, 2011, date "not unreasonable." (*Id.* at 10.) This Court pointed to information it had obtained at conferences that an adequate mitigation investigation takes between 1 year and 18 months to complete, because the mitigation specialist must research the case "from the ground up." (*Id.* at 9–10.) Accordingly, this Court adopted Andriano's proposed deadline and ordered that the PCR petition be filed no later than June 1, 2011. (*Id.* at 10.) This Court further ordered that the deadline would not be continued. (*Id.*)

The State respectfully requests that this Court reconsider its order setting the PCR petition's deadline as June 1, 2011. Arizona Rule of Criminal Procedure 32.4(c) provides:

> On the first notice in capital cases, appointed counsel for the defendant shall have one hundred twenty days from the filing of the notice to file a petition raising claims under Rule 32.1. . . . On a showing of good cause, a defendant in a capital case may be granted a sixty day extension in which to file the petition. Additional extensions of thirty days may be granted for good cause. *If a petition for post-conviction relief is not filed within one hundred and eighty days from the date of appointment of counsel, or one hundred and eighty days from the date the notice is filed . . . the defendant or counsel for the defendant shall file a notice in the Supreme Court, advising the court of the status of the proceedings. Thereafter, defendant or counsel for the defendant shall file status reports in the Supreme Court every sixty days until the petition for post-conviction relief is filed.*

In this case, as in all capital cases, the Arizona Supreme Court filed Andriano's PCR notice in this Court immediately after her direct appeal concluded on November 6, 2007.  (Notice of PCR, filed 11/6/07.)   The supreme court immediately stayed Rule 32.4(c)(1)'s time limits, pending the appointment of qualified PCR counsel.  (Order of Mandate, filed 11/6/07.)   On November 2, 2009,[1] after Andriano's counsel filed their notice of appearance and announced their intention to represent Andriano *pro bono*, the court lifted the stay and reinstated Rule 32.4(c)(1)'s timeline.  (Arizona Supreme Court order lifting stay, filed 11/4/09).  This Court thereafter ordered Andriano to file her petition within 120 days, on or before March 4, 2010.  (M.E. dated 11/4/09.)

On January 27, 2010, this Court granted Andriano's motion for a first, 60-day extension of time to file the PCR petition, resulting in a deadline of May 3, 2010 (M.E. dated 1/27/10)—182 days after the Arizona Supreme Court lifted the stay on Rule 32.4(c)(1)'s timeline.  As stated at the scheduling conference, the State does not object to a final, 90-day extension, until August 2, 2010, within which to file the PCR petition.   The State's proposed deadline would permit Andriano a total of 349 days since counsel filed their notices of appearance, and 273 days since the supreme court lifted the stay on Rule 32.4(c)(1)'s deadlines, to file her petition.   Such time is more than adequate to prepare the petition, particularly in light of the investigation counsel described at the scheduling conference.

"Rule 32 . . . is not intended to unnecessarily delay the renditions of justice or add a third day in court when fewer days are sufficient to do substantial justice." *State v. Carriger*, 143 Ariz. 142, 145, 692 P.2d 991, 994 (1984).   Rather, it is

_____

[1] The Supreme Court's order was dated November 2, 2009, but not filed in this Court until November 4, 2009.

"designed to accommodate the unusual situation where justice ran its course and yet went awry." *Id.* (quotations omitted).   A PCR petitioner should not reinvestigate her case or conduct a scorched-earth mitigation investigation in a PCR proceeding, particularly where she presented substantial mitigating evidence trial. *See State v. Andriano*, 215 Ariz. 497, 511–12, ¶¶ 69–77, 161 P.3d 540, 554 –55 (2007).   Permitting Andriano until June 1, 2011, to file her petition would offend the State's interest in finality, and would permit this PCR proceeding to devolve into a second sentencing hearing.

At a minimum, Andriano should be required to detail what mitigation investigation was done at trial and sentencing, with some explanation why that investigation was inadequate or how her case differs from all other capital cases that are subject to Rule 32.4's time constraints.   Accordingly, the State requests that this Court require Andriano to file her petition on August 2, 2010, with leave to subsequently amend it upon a showing of good cause.   *See* Ariz. R. Crim. P. 32.6(d); *see also Canion v. Cole*, 210 Ariz. 598, 601, ¶ 16, 115 P.3d 1261, 1264 (2005) ("Rule 32.6(d) . . . adopts a liberal policy toward amendment of PCR pleadings.").

DATED this 2nd day of April, 2010.

RESPECTFULLY SUBMITTED,

TERRY GODDARD
ATTORNEY GENERAL


/S/ KENT CATTANI
/S/LACEY STOVER GARD
ASSISTANT ATTORNEYS GENERAL
ATTORNEYS FOR PETITIONER

1  Copy of the foregoing mailed
   this 2nd day of April, 2010, to:
2

3  Scott M. Bennett
   Coppersmith Schermer & Brockelman PLC
4  2800 N. Central Ave., Suite 1200
   Phoenix, Arizona 85004
5
   James J. Balanger
6  Coppersmith Schermer & Brockelman PLC
   2800 North Central Avenue, Suite 1200
7  Phoenix, AZ 85004

8  Allen A. Arntsen
   Foley & Lardner LLP
9  150 East Gilman Street
   P.O. Box 1497
10 Madison, WI   53701-1497

11 Stephen J. Nickels
   Foley & Lardner LLP
12 150 East Gilman Street
   P.O. Box 1497
13 Madison, WI   53701-1497

14 Matthew R. Lynch
   Foley & Lardner LLP
15 150 East Gilman Street
   P.O. Box 1497
16 Madison, WI   53701-1497

17 Attorneys for Defendant

18
   /s/Linda Yrrizarry
19

20

21 #722465

22

23

24

25

26

27

28

6

EXHIBIT A

ANDRIANO.V1

1

```
1           IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

2              IN AND FOR THE COUNTY OF MARICOPA

3
    STATE OF ARIZONA,              )
4                                  )
                    Plaintiff,     )
5                                  )
           vs.                     )     NO. CR2000-096032A
6                                  )
    WENDI ELIZABETH ANDRIANO,      )
7                                  )
                    Defendant.     )
8   _____)

9

10

11                    Phoenix, Arizona

12                    March 23, 2010

13                      10:30 AM

14

15
    BEFORE:    HONORABLE GARY DONAHOE
16

17

18            REPORTER'S TRANSCRIPT OF PROCEEDINGS

19

20
    Prepared For:                  By:  Brenda J. Brown
21  Lacey Gard,                         Court Reporter
    Attorney at Law                     Cert. No. 50323
22

23

24

25
```

BRENDA J. BROWN, CSR, RPR

2

ANDRIANO.V1

1               A P P E A R A N C E S

2          MS. LACEY GARD

3          THE COURT:  This is CR2000-096032A, in the

4     matter of Wendi Andriano.

5               This is the time for informal conference

6     regarding the Rule 32 Petition for Post-Conviction Relief.

7               Counsel, perhaps I could start with counsel

8     on the phone.

9               Who do I have on the phone?

10         MS. GARD:  Lacey Gard.

11         THE COURT;  Miss Gard is on the phone.

12              Do we have anybody else on the phone?

13              Technology is great when it works.

14              Is there somebody on the phone?

15         THE BAILIFF:  She hasn't transferred it, judge.

16              I'm sure they will be calling back.

17         THE COURT:  I hear something.

18              Is somebody on the phone?

19         MR. ARNTSEN:  This is Allen Arntsen.

20              I can hear very faintly.

21         MS. GARD:  Same thing for me, your Honor.

22              This is Lacy Gard.

23         THE COURT:  I can hear you perfectly.

24              I'll reset by the mic.

25              Counsel in the courtroom, could I have you

BRENDA J. BROWN, CSR, RPR

3

Page 2

ANDRIANO.V1

1   announce your appearances.

2          MR. BELANGER:  Scott Bennett and Jim Belanger on

3   behalf of Miss Andriano.

4          THE COURT:  As I said, this is a Status

5   Conference, and my notes reflect that the petition for

6   Post-Conviction Relief is due on May 3rd of this year.

7              Mr. Arntsen, can you give me the status of

8   the case?

9          MS. ARNTSEN:  Yes, your Honor.

10             Again, unfortunately, I can barely hear

11  you.

12             What I heard is that you are asking me to

13  give the status of the case.

14         THE COURT:  Correct.  And just my notes reflect

15  that the petition for Post-Conviction relief is due on May

16  3rd of this year, and I just wondered if that was a date

17  that was going to be met.

18         MR. ARNTSEN:  No, it's not, your Honor.

19             What we would request is that the Court,

20  rather than -- and we have been filing the 30-day extensions

21  pursuant to the statute.  What we would ask is that the

22  Court set a date certain for the petition.

23             The date that we would request is June 1st,

24  2011.

25             And just so the Court is aware, I have


BRENDA J. BROWN, CSR, RPR

0

1   spoken with Attorney Gard, and she has no objection to

2   setting a date certain so that we don't need to be filling

Page 3

ANDRIANO.V1

3   these motions every 30 days, if the Court is agreeable to

4   that.

5              She does agree with the June, 2011 date.

6   And she'll speak in a moment as to why she thinks it should

7   be a sooner date.

8              The reason why we are asking for 2011 -- we

9   have given a lot of thought to this, and we recognize and

10  respect the Court's concern with moving this case and these

11  cases generally along.  What we would submit to the Court is

12  that Foley & Lardner's agreement to represent Miss Andriano

13  on a pro bono basis, I think the Office of the ADA Penalty

14  Post-Conviction Program (phonetic), we believe that does

15  contribute to that goal.

16             We submit that had we not entered the

17  appearance on behalf of Miss Andriano, she may still be

18  waiting for a lawyer -- and who knows how long she would

19  still be waiting for a lawyer -- and that the matter would

20  be delayed even further.

21             Since we have been appointed, we have been

22  working very diligently.  We have a team here of six lawyers

23  and a paralegal working on this case; obviously, not all

24  full-time because we have our day jobs, but, working hard on

25  this case.  We have retained the mitigation specialist, who

BRENDA J. BROWN, CSR, RPR

5

1   has been out investigating and has interviewed a number of

2   witnesses, has spoken with Miss Andriano on a couple of

3   occasions, and has other appointments scheduled to speak

Page 4

ANDRIANO.V1

4    with Miss Andriano.  That's a little cumbersome just working

5    through the visit with Perryville in terms of, you know,

6    working out at the prison, but we are making good progress

7    with that.

8              We retained an investigator, who has been

9    working and has interviewed a number of people.  And one of

10   the concerns is we have had difficulty getting in touch with

11   some of the defense team in the underlying trial, but we are

12   pushing on that. We have affiliated with good local counsel,

13   Antner (sic), Spencer and Bennett, who are also going to

14   take this matter on a pro bono basis.

15             We reviewed the entire case record from the

16   Public Defender's Office.  We have interviewed trial

17   counsel.  We just selected and retained a psychologist life

18   history expert.   We just spoke with our mitigation and

19   confirmed with our mitigation specialist this morning how

20   much time she believes she would need to do an adequate

21   mitigation investigation.

22             And I can represent to the Court that our

23   initial representation, we believe we have come up with

24   substantial evidence that was not presented at the initial

25   trial.  And we believe we could make a compelling argument

BRENDA J. BROWN, CSR, RPR

6

1    that would lead to a different result.

2              However, this is -- I mean, you know, both

3    given the fact we are looking at events that happened

4    between 10 and 35 years ago, you know, in fact, when Miss

5    Andriano -- just in terms of looking at some psychological
                              Page 5

ANDRIANO.V1

6   issues, the mitigation -- our mitigation specialist tells us

7   it just takes a while. You have to do interviews; you have

8   to do re-interviews, get additional information, and as you

9   find things out from people or peoples' recollections are

10  refreshed and not all witnesses are cooperative -- the State

11  has been cooperative with us in connection with this matter,

12  both attorney Gard and, you know, working with Perryville.

13  And quite frankly, -- and I'm not using this as an excuse,

14  but this is the first time we have done this. We want to

15  make sure we do it right.  And so, we are probably not as

16  efficient as we should be, but hopefully, we are getting

17  more so.  And we would submit that a firm deadline of June,

18  2011 is -- would be reasonable and appropriate for this

19  case.

20           THE COURT:  All right.   Thank you.

21              Miss Gard.

22           MS. GARD:  Thank you, your Honor. I would,

23  obviously, object to the deadline that's currently being

24  proposed. I think that's a rather lengthy period of time to

25  prepare the petition.


BRENDA J. BROWN, CSR, RPR

1           And according to the document, it looks

2   like counsel filed this Notice of Appearance back in August

3   of last year, and their mitigation specialist was appointed

4   in January of this year. So the date that I would propose

5   for a deadline -- and I have no problem setting it if a firm

6   deadline -- would be 90 days from the current deadline,

ANDRIANO.V1

7    which would be August 2nd of this year.

8              And it sounds like, from what I just heard,

9    the investigation is ongoing and has made schedule progress.

10   So, I think the 90 days would be a reasonable deadline.

11            THE COURT:  Did you say the mitigation

12   specialist was retained in January of this year.

13            MS. GARD:  Your Honor, according to the Minute

14   Entry appointing the mitigation specialist, the date on

15   there is January 27th, 2010.  Judge Duncan a /STHORDZ

16   authored that Minute Entry.

17            THE COURT:  Okay.

18              Mr. Arntsen, did you have anything else

19   else you wanted to add.

20            MR. ARNTSEN:   No, I have nothing to add, your

21   Honor.

22            THE COURT:   Did your mitigation specialist get

23   started in late January, early February, or did he or she --

24            MR. ARNTSEN:   No.  She was started earlier,

25   your Honor.  I believe she got started late last year

BRENDA J. BROWN, CSR, RPR

8

1    sometime. This was just when the appointment came through

2    appointing her.  I don't remember the exact date.

3            THE COURT:   You don't have any other cases

4    she's working on?

5              Do you know how many other cases she's

6    working on?

7            MS. ARNTSEN:   Yes.  She's actually been very

8    active working on another case, because it had some pretty

Page 7

ANDRIANO.V1

9   hard -- I believe the PCR deadline -- I believe it was an

10  Arizona case.  But the PCR deadline is somewhere around you

11  now, I think.  So, again, she's interviewed Miss Andriano on

12  a couple of occasions. She's interviewed several other

13  witnesses, but she's not -- she's been -- you know, this has

14  been the second -- kind of her secondary project because of

15  the more imminent deadline in the other matter which she's

16  been working on a couple of years, I believe.  But I believe

17  that deadline is about, either just now or is about to have

18  passed, and this will be her primary focus starting out --

19  starting soon

20          THE COURT:   So, if my math is right, your June

21  1st date would have given her, approximately, 18 months of

22  working up the mitigation, correct?

23          MR. ARNTSEN:   Correct, your Honor.

24              And again, that's -- you know, we are doing

25  -- we have just retained a psychologist life history expert,


BRENDA J. BROWN, CSR, RPR

9

1   who we are now, essentially, messing with the mitigation

2   specialist to help; and also, to help direct the work and

3   interpret the results.

4               Obviously, the date we are asking for is

5   also building in time to write the Post-Conviction Relief

6   petition and do the briefing.

7           THE COURT:   Again, Miss Gard, anything else you

8   want to add?

9           MS. GARD:   No, your Honor.

Page 8

ANDRIANO.V1

10      THE COURT:   All right.

11           And then, let me ask, Miss Gard, if I set a

12   firm date for the petition, how many -- what schedule would

13   you like, then, for the State's response.

14           MS. GARD:  Your Honor, I think the Rule gives

15   four for five days to do a response.

16           If the deadline is set at the beginning of

17   August, I would ask -- and I haven't discussed this with

18   counsel -- ask for 60 additional days, simply because I'm

19   going to most likely be on maternity leave until the end of

20   August.  So that would accommodate my schedule better, but I

21   don't think I'd need anymore than 60 days.

22           THE COURT:  Sixty days total?

23           MS. GARD:   Sixty days to file a response from

24   the date the petition is filed

25           THE COURT:  Well, actually, I don't think that

BRENDA J. BROWN, CSR, RPR

                                                    10

1    June 1st, 2011 -- or 2011 date is unreasonable.

2           The mitigation specialist is working.

3    They've got the psychologist helping direct the mitigation.

4    It sounds like they have been diligently working the case.

5    They have retained an investigator, interviewed people,

6    interviewed the file, defense counsel.

7           It sounds like to me the June 1st date is

8    not unreasonable, not only from what they have done but what

9    I have heard in general about the mitigation specialist at

10   various conferences, saying it takes a year to 18 months to

11   complete a mitigation workup.  And from what I understand,

                         Page 9

ANDRIANO.V1

12    on these petitions for Post-Conviction Relief, the

13    mitigation specialist, basically, has to do it from the

14    ground up to see what was not done that perhaps should have

15    been done, compared to what was done and then, say, "Okay.

16    This is what additionally we found and perhaps would have

17    changed the outcome."

18              So I'm not so sure the 18 months is

19    unreasonable, particularly, to set a deadline that's -- it's

20    not going to be continued beyond that date.  And it sounds

21    like, from Mr. Arntsen, that's fine with the Defendant, to

22    set a firm date.

23              So, for all of those reasons, I'm going to

24    agree to this June 1, 2011 date, and I'm going to order that

25    the Petition for Post-Conviction Relief be filed on or

BRENDA J. BROWN, CSR, RPR

11

1     before June 1st, 2011.  That's a Wednesday.

2               And then, it's further ordered that the

3     State's response be filed on or before August 1st, 2011.

4               It's further ordered that the Defendant's

5     reply be filed in -- on or before  the September 1st date,

6     2011.

7               This case was sentenced by Judge Ishikawa.

8     So he's still on the bench.  So if he's still around in

9     September of next year, he would be your assigned judge on

10    the PCR.  So we'll wait and see if he retires or anything

11    before then.

12              So, Mr. Arntsen, anything that you want me

Page 10

ANDRIANO.V1

13    to do to assist in the mitigation review efforts or sending

14    you orders; help you get set, anything like that?

15              MR. ARNTSEN:   Not right now, your Honor.

16              And again, we may -- you know, with a

17    couple of things, we are working on scheduled contact visits

18    with the Department of Corrections.  So far that's working

19    okay.

20              We are working to identify and get

21    cooperative interviews from people involved in the case

22    earlier.  If we are not successful and may be coming up on

23    moving the Court for the issuance of a subpoena -- we'll

24    probably be moving the Court shortly, just as soon as we

25    have the appearance letter nailed down with our

BRENDA J. BROWN, CSR, RPR

12

1    psychologist, for the appointment of our psychologist. I

2    expect that's coming in shortly.

3              Again, so far we have worked well with the

4    State on this.  And we'll continue to attempt to reach

5    agreements on these kinds of things, but not -- so you may

6    be getting some motions shortly.  Hopefully none of them

7    will be controversial, but nothing we need right now.

8              THE COURT:  And, just kind of a heads-up, if

9    it's a motion, and you say in there that this is not opposed

10    by the State or is consented to by the State, I'll review

11    it, and, if possible, send the order up within a few days

12    after it's submitted.

13              If it doesn't say that, then I'll tickle it

14    for response and reply so it doesn't delay it, if you don't

Page 11

ANDRIANO.V1

15  tell me the says has consented or doesn't oppose it.

16          MR. ARNTSEN:   Thank you.

17              Actually, what we'll do with each of our

18  motion letters, we'll represent this as part of the motion

19  text.  We'll indicate whether the State opposes it or

20  whether the State doesn't oppose it.

21          THE COURT:  Right.  And that tells me what

22  time-line to put it on.

23          MR. ARNTSEN:  Thank you.

24          THE COURT:  Miss Gard, anything else you want to

25  talk about today?


            BRENDA J. BROWN, CSR, RPR

                                        13


1           MS. GARD:  No, your Honor.

2           THE COURT:  All right.

3               Counsel, in the courtroom, anything you want

4  to talk about?

5           MR. BELANGER:  Nothing, your Honor.

6           THE COURT:  They are saying no.

7               I'll let you all go, then.

8               Thank you.

9           MS. GARD:  Thank you.

10          MR. ARNTSEN:  Thank you, your Honor.

11              (which were all the proceedings had on the

12  day and date aforesaid.)

13

14

15

                    Page 12

ANDRIANO.V1

16
17
18
19
20
21
22
23
24
25


BRENDA J. BROWN, CSR, RPR

14


1
2
3   STATE OF ARIZONA        )
                           )  ss.
4   COUNTY OF MARICOPA      )
5
6          I, BRENDA J. BROWN, Certified Shorthand Reporter
7   and Notary Public in and for the County of Maricopa, State
8   of Arizona, do hereby certify that the foregoing transcript
9   constitutes a full, true and accurate transcript of the
10  proceedings had in the foregoing matter, all done to the
11  best of my skill and ability.
12
13
14                              _____
15                              BRENDA J. BROWN, CERT. NO. 50323
16
17
                        Page 13

# EXHIBIT GG

Michael K. Jeanes, Clerk of Court
*** Electronically Filed ***
05/12/2010 8:00 AM

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CR 2000-096032                                          05/10/2010


                                              CLERK OF THE COURT
JUDGE DOUGLAS L. RAYES                         H. O'Shaughnessy
                                                   Deputy



STATE OF ARIZONA                          LACEY ALEXANDRA STOVER GARD
                                          KENT E. CATTANI

v.

WENDI ELIZABETH ANDRIANO (A)              JAMES J BELANGER
                                          SCOTT M BENNETT

                                          CAPITAL CASE MANAGER
                                          COURT ADMIN-CRIMINAL-PCR
                                          VICTIM WITNESS DIV-AG-CCC




                              MINUTE ENTRY

        The Court, having considered the State's Motion to Reconsider Deadline for Filing
Petition for Post-Conviction Relief, finds no grounds to reconsider its ruling.

        IT IS THEREFORE ORDERED denying the State's motion.

        This case is eFiling eligible: http://www.clerkofcourt.maricopa.gov/efiling/default.asp




Docket Code 023                    Form R000A                              Page 1

# EXHIBIT HH

Michael K. Jeanes, Clerk of Court
*** Electronically Filed ***
Isabel Osuna
Filing ID 601138
5/24/2010 3:11:23 PM

1  James J. Belanger (011393)
   Scott M. Bennett (022350)
2  Coppersmith Schermer & Brockelman PLC
   2800 North Central Avenue, Suite 1200
3  Phoenix, Arizona  85004
   (602) 224-0999 (office)
4  (602) 224-6020 (fax)
   sbennett@csblaw.com
5

6  Allen A. Arntsen, (Admitted *Pro Hac Vice*)
   Stephan J. Nickels (Admitted *Pro Hac Vice*)
7  Matthew R. Lynch (Admitted *Pro Hac Vice*)
   Foley & Lardner LLP
8  150 East Gilman Street
   Madison, Wisconsin  53703
9  (608) 257-5035 (office)
   (608) 258-4258 (fax)
10 aarntsen@foley.com

11
   *Attorneys for Petitioner Wendi Andriano*
12

13                 SUPERIOR COURT OF ARIZONA

14                    COUNTY OF MARICOPA

15 STATE OF ARIZONA,                 )   No. CR2000-096032-A
                                     )
16                    Respondent,    )   **PETITIONER'S MOTION TO**
                                     )   **APPOINT EXPERT WITNESS**
17        vs.                        )   **JAMES W. HOPPER, PH.D.**
                                     )
18                                   )
   WENDI ELIZABETH ANDRIANO,         )   (Hon. Gary Donahoe)
19                                   )
                                     )
20                    Petitioner.    )
                                     )
21 ——————————————————————————

22        Petitioner Wendi Andriano, through her undersigned *pro bono* counsel, moves this

23 Court, pursuant to Arizona Revised Statutes §§ 13-4013(B), 13-4041(I), *Ake v. Oklahoma*,

24 470 U.S. 68 (1985) and its progeny, *Strickland v. Washington*, 466 U.S. 688 (1984), the

25 Due Process and Equal Protection Clauses of the 14th Amendment to the United States

26 Constitution, and the 5th, 6th and 8th Amendments to the United States Constitution, for

27 the appointment and authorization of payment of reasonable fees for James W. Hopper,

28 Ph.D., 9 Henderson Street, Arlington, MA 02474.

Counsel is representing Petitioner on a *pro bono* basis based on a referral from the American Bar Association's Death Penalty Representation Project.  This Court has previously found Petitioner to be indigent.  Accordingly, Petitioner is entitled to court-appointed "investigators and expert witnesses as are reasonably necessary to present a defense at trial and at any subsequent proceeding."  Ariz. Rev. Stat. § 13-4013(B); *see also* Ariz. Rev. Stat. § 13-4041(I) ("The trial court may authorize additional monies to pay for investigative and expert services that are reasonably necessary to adequately litigate those claims that are not precluded by section 13-4232.").

Dr. Hopper has been retained to conduct a psycho-social history of Ms. Andriano. As part of this history, Dr. Hopper will conduct a multi-generational inquiry aimed at identifying the genetic predispositions and environmental influences which molded Ms. Andriano's life and defined her range of choices.  A psycho-social history was not conducted as part of Petitioner's mitigation case at trial.  As such, the services of Dr. Hopper are necessary for counsel to properly present Petitioner's evidence in support of her PCR petition.

Dr. Hopper is a psychologist with extensive experience in trauma.  Dr. Hopper has been appointed to conduct psycho-social histories in other capital cases in other jurisdictions.  Dr. Hopper's *curriculum vitae*, which further describes Dr. Hopper's education and professional experiences, is attached to this Motion as **Exhibit A**.

Dr. Hopper's usual and customary charge for his services is $250.00 per hour. Petitioner requests that this Court authorize the payment of Dr. Hopper's reasonable fees and expenses by James Logan, Esq., the Director of the Maricopa County Office of Public Defense Services.

Should this Court require any additional factual foundation for the necessity of the appointment of Dr. Hopper, Petitioner requests a hearing with the Court.

RESPECTFULLY SUBMITTED May 24, 2010.

COPPERSMITH SCHERMER &
BROCKELMAN PLC


By /s/ *Scott M. Bennett*
        James J. Belanger
        Scott M. Bennett

FOLEY & LARDNER LLP
        Allen A. Arntsen, *Pro Hac Vice*
        Stephan J. Nickels, *Pro Hac Vice*
        Matthew R. Lynch, *Pro Hac Vice*

        *Attorneys for Petitioner*


ORIGINAL electronically filed May 24, 2010.

COPY mailed May 24, 2010, to:

The Honorable Douglas Rayes
Maricopa County Superior Court
101 West Jefferson, Room 411
Phoenix, Arizona  85003-2243

COPY e-mailed and mailed
May 24, 2010, to:

Ms. Lacey Stover Gard
Office of the Attorney General
400 West Congress, Suite S-315
Tuscon, Arizona  85701-1367
*Attorney for the State of Arizona*



/s/ *Sheri McAlister*

3

# Exhibit A

## CURRICULUM VITAE

**Date Prepared**: February 16, 2010

**Name:** James W. Hopper, Ph.D.

**Office Address:** 9 Henderson Street
Arlington, MA  02474

**Work Phone:** 617-821-3197

**Work Email:** hopper@nmr.mgh.harvard.edu          **Work Fax:** 888-316-2125

**Place of Birth:** Mountain View, California

**Education:**

| | | | |
|---|---|---|---|
| 1988 | B.A. | History | University of Rochester |
| 1997 | Ph.D. | Clinical Psychology | University of Massachusetts Boston |

**Postdoctoral Training**

| | |
|---|---|
| 1997-1999 | Fellow, The Trauma Center & Boston University School of Medicine |
| 2003-2006 | Fellow, Behavioral Psychopharmacology Research Laboratory McLean Hospital & Harvard Medical School, |

**Faculty Academic Appointments**

| | |
|---|---|
| 1995-2000 | Adjunct Instructor, Department of Psychology University of Massachusetts Boston |
| 2001- | Adjunct Instructor, Department of Psychiatry Faculty of Medicine and Dentistry, University of Western Ontario |
| 2006- | Instructor in Psychology, Department of Psychiatry, Harvard Medical School |

**Appointments at Hospitals/Affiliated Institutions**

**Past**

| | |
|---|---|
| 1992-1993 | Half-time Predoctoral Psychology Intern, Counseling Center The New England Conservatory of Music, Boston, MA |
| 1993-1994 | Half-time Predoctoral Psychology Intern, Outpatient Psychiatry Department The Cambridge Hospital |
| 1994-1995 | Psychology Testing Fellow, Outpatient Psychiatry Department The Cambridge Hospital |
| 1996-1997 | Predoctoral Intern, University Health Services Mental Health Division University of Massachusetts Amherst |
| 1997-1999 | Fellow, The Trauma Center & HRI Hospital |
| 1997-1999 | Assistant Director of Research, The Trauma Center & HRI Hospital |

**Current**

| | |
|---|---|
| 2008- | Research Associate, Department of Psychiatry Massachusetts General Hospital |

**Other Professional Positions**

| | | |
|---|---|---|
| 2007 | Board of Directors | 1in6, Inc. |
| 2008- | Advisory Board | 1in6, Inc. |
| 2009- | Leadership Council | Transforming Trauma Initiative, Garrison Institute |
| 2010- | Board of Directors | Stop It Now! |

**Committee Services**

**National**

| | | |
|---|---|---|
| 2004 | Member, Publications Review Committee | International Society for Traumatic Stress Studies |
| 2005-2006 | Member, Website Committee | International Society for Traumatic Stress Studies |

**Professional Societies**

| | |
|---|---|
| 1991-2009 | Member, American Psychological Association |
| 1996- | Member, International Society for Traumatic Stress Studies |
| 1997- | Member, National Organization on Male Sexual Victimization |
| 1999-2009 | Member, Society for Psychophysiological Research |

**Editorial Activities**

| | | |
|---|---|---|
| 2005- | Ad hoc reviewer | Journal of Traumatic Stress |
| 2005- | Ad hoc reviewer | Psychological Bulletin |
| 2007- | Ad hoc reviewer | Drug and Alcohol Dependence |
| 2008- | Ad hoc reviewer | Biological Psychology |
| 2008- | Ad hoc reviewer | Journal of Psychiatric Research |

**Honors and Prizes**

| | | |
|---|---|---|
| 1986 | Donald Park's "Dexter Perkins Prize" in History, | University of Rochester |
| 1994 | "Book Award" for Excellence on the Comprehensive Exam | University of Massachusetts Boston |
| 2004-2005 | Livingston Fellowship | Department of Psychiatry, Harvard Medical School |

## Report of Invited Teaching and Presentations

**Local**

Undergraduate Courses, Department of Psychology, University of Massachusetts Boston

| | |
|---|---|
| **1994** | Personality Theory, Course Director/Instructor (Fall Term) |
| **1995** | Personality Theory, Course Director/Instructor (Spring Term) |
| **1995** | Personality Theory, Course Director/Instructor (Fall Term) |
| **1995** | Abnormal Psychology, Course Director/Instructor (Fall Term) |
| **1996** | Personality Theory, Course Director/Instructor (Summer, First Term) |
| **1996** | Personality Theory, Course Director/Instructor (Summer, Second Term) |
| **1998** | Psychological Trauma, Course Director/Instructor (Summer, First Term) |

2010

| | |
|---|---|
| **1998** | Psychological Trauma, Course Director/Instructor (Summer, Second Term) |
| **1999** | Psychological Trauma, Course Director/Instructor (Spring Term) |
| **2000** | Psychological Trauma, Course Director/Instructor (Summer, First Term) |
| **2002** | Psychological Trauma, Course Director/Instructor (Fall Term) |

Presentations

| | |
|---|---|
| **2000** | Lecture, "The Biology of Trauma: Dysregulation of the Embodied Self," Core Seminar for the Certificate Program in Traumatic Stress Studies of The Trauma Center, Brookline, MA. |
| **2000** | Lecture, "Frameworks for Connecting the Biology of Trauma to Clinical Practice," opening presentation of a one-day public workshop, "Integrative and Eclectic Approaches to Psychological Trauma," Provincetown, MA. |
| **2001** | Lecture, "Clinical Implications of Traumatic Memory Research: Phenomenology, Symptoms, and Biology," Public Lecture Series, The Trauma Center, Brookline, MA. |
| **2001** | Lecture, "Posttraumatic Stress Disorder: Diagnosis, Clinical Phenomenology and Treatment," Pfizer-sponsored Clinician Education Series, Beth Israel Hospital, Brookline, MA. |
| **2001** | Lecture, "Psychological Trauma and Biology," New England Region Public Lecture Series, Ben Gurion University, Public Library, Newton, MA. |
| **2002** | Lecture, "A Perspective on the Brain and Trauma," Public Lecture Series, The Trauma Center, Brookline, MA. |
| **2002** | Lecture, "Clinical Implications of Psychophysiology and Neuroimaging and Findings in PTSD," Annual Conference on Psychological Trauma, Boston University School of Medicine, Boston, MA. |
| **2003** | Lecture, "The Biology of Trauma: Dysregulation of the Embodied Self," Postdoctoral Seminar Series, Victims of Violence Program, Central Hospital, Somerville, MA. |
| **2004** | Lecture, "Neurobiology of Trauma," Annual Conference on Psychological Trauma, Boston University School of Medicine, Boston, MA. |
| **2004** | Lecture, "The Biology of Trauma: Dysregulation of the Embodied Self," Postdoctoral Seminar Series, Victims of Violence Program, Central Hospital, Somerville, MA. |
| **2005** | Lecture, "Clinical Implications of Neuroscience Research for the Treatment of Traumatized Adults," Annual Conference on Psychological Trauma, Boston University School of Medicine, Boston, MA. |
| **2005** | Lecture, "Psychobiological Measures and Methodologies in Psychological Trauma Research," Postdoctoral Research Seminar Series, Victims of Violence Program, Central Hospital, Somerville, MA. |
| **2006** | Lecture, "Marijuana Intoxication and 'Cognitive Disinhibition' – An Integrative Model and Clinical Implications," Neurophysiology Seminar Series, Center for Sleep & Cognition, Beth Israel Deaconess Medical Center & Harvard Medical School, Boston, MA. |
| **2006** | One-day workshop, "Transforming Trauma with Mindfulness and Lovingkindness: Psychological Practices and Brain Processes," with Drs. Deborah Rozelle and Elizabeth Call, The Trauma Center & Boston University School of Medicine, Brookline, MA. |

**Regional**

**2005**     Lecture, "Child Abuse-related PTSD, Self-Regulation Deficits and Substance Use in Women." Substance Abuse Seminar Series, Department of Psychiatry, Yale University School of Medicine, New Haven, Connecticut.

**2008**     One-day workshop, "Trauma and PTSD: Implications for Getting Accurate Victim Testimony." Annual Sexual Assault Investigative Training for law enforcement officers and prosecutors in the Upper Connecticut River Valley of New Hampshire and Vermont, co-hosted by WISE and the Lebanon Police Department, Lebanon, New Hampshire.

**2008**     Lecture, "Successes and Innovations in Treating Trauma: EMDR and Mindfulness." For mental health professionals in the Upper Connecticut River Valley of New Hampshire and Vermont, hosted by WISE, Lebanon, New Hampshire.

**2009**     Lecture, "The Marijuana High and How It Work: Cognitive and Brain Processes," Neurobiology Lecture Series, Worcester State College, Worcester, Massachusetts.

**2009**     Lecture and case conference, "Trauma and Affect Regulation: The Embodied Self, Aversion and Reward," Training Seminar, University Health Services mental Health Division, University of Massachusetts Amherst.

**National**

**2004**     Two-day workshop, "Child Abuse and Problems with Self-Regulation: Research and Treatment." Department of Counseling, Idaho State University, Pocatello, Idaho.

**2006**     Plenary, "Male Sexual Assault Victims: Special Issues." Sexual Assault Response Coordinator Conference, United States Department of Defense Sexual Assault Prevention and Response Office, St. Louis, Missouri.

**2006**     Plenary, Dr. Frank Giesber Lecture, "From Posttraumatic Aversion and Addiction to Healing and Love: Brain Processes and Disciplined Practices to Recondition Them." Annual Krost Symposium, Texas Lutheran University, Seguin, Texas.

**2008**     Lecture, "The Neurobiology of Trauma," Michigan Victims Assistance Academy, United States Office for Victims of Crime Training and Technical Assistance Center, Ann Arbor, Michigan.

**2009**     Plenary, "Male Victims of Sexual Assault: Emotion, Masculinity, and Values." 2nd Annual United States Army Sexual Harassment/Assault Prevention Summit, Arlington, Virginia.

**2009**     Panel presentation, "Outcome: Neurobiological Perspectives." Neurobiology panel of the Transforming Trauma Leaders Forum, Garrison Institute, Garrison, New York.

**2010**     Workshop (90 minutes), "Discovering Evidence of Trauma / Interviewing for Complex Trauma," Capital Case Defense Seminar, sponsored by California Attorneys for Criminal Justice and California Public Defenders Association, Monterey, California

**International**

**2007**     Plenary, "Ecological Momentary Assessment in Substance Abuse Research." NIDA International Forum, Technological Innovations to Build International Research Capacity, Quebec City, Canada.

**2008**          Lecture, "Reconditioning Traumatized Minds and Brains: Parallels Between Neuroscience and Buddhism." Bi-annual conference in "Brain, Mind and Body: Trauma, Neurobiology, and the Healing Relationship," School of Medicine and Dentistry, University of Western Ontario, London, Ontario.

## Report of Clinical Activities

### Current Licensure

2000          Clinical Psychologist, Massachusetts License 7763-PR

### Practice Activities

Psychotherapy          Cambridge, Massachusetts
I have a small private practice focusing on treatment of PTSD and complex posttraumatic sequelae associated with child abuse.

### Report of Forensic Activities

Expert Witness          Since 2003 I have conducted psychological and psychosocial history assessments on men accused and convicted of crimes. I have focused on evidence of trauma-related mitigation, especially sexual and physical abuse, to be considered during sentencing at trial and upon appeal.

## Report of Scholarship

### Peer Reviewed Publications

1.  Lisak D, **Hopper J**, Song P. Factors in the cycle of violence: Gender rigidity and emotional constriction. J Trauma Stress 1996;9:721-743.

2.  Lisak D, Conklin A, **Hopper J**, Miller P, Altschuler L, Smith B. The Abuse-Perpetration Inventory: Development of an assessment instrument for research on the cycle of violence. Family Viol Sexual Assault Bull 2000;16:21-30.

3.  **Hopper JW**, van der Kolk BA. Retrieving, assessing, and classifying traumatic memories. J Aggression, Maltreatment, Trauma 2001;4:33-71.

4.  Osterman JE, **Hopper J**, Heran WJ, Keane TM, van der Kolk BA. Awareness under anesthesia and the development of posttraumatic stress disorder. Gen Hosp Psychiatry 2001;4:198-204.

5.  van der Kolk BA, **Hopper JW**, Osterman JE. Exploring the nature of traumatic memory. J Aggression, Maltreatment, Trauma 2001;4:9-31.

6.  Lanius RA, Williamson PC, **Hopper JW**, Boksman K, Densmore M, Gupta MA, Neufeld RWJ, Gati JS, Menon R. Recall of emotional states in posttraumatic stress disorder: An fMRI investigation. Biol Psychiatry 2003;53:204-210.

7.  Lanius RA, **Hopper JW**, Menon RS. Individual differences in a husband and wife who developed PTSD after a motor vehicle accident: A functional MRI case study. Am J Psychiat 2003;160:667-669.

8.  Sack M, **Hopper JW**, Lamprecht F. Low respiratory sinus arrhythmia and prolonged psychophysiological arousal in PTSD: Heart rate dynamics and individual differences in arousal regulation. Biol Psychiatry 2004;55:284-290.

9.  **Hopper JW**, Karlsgodt KH, Adler CM, Macklin EA, Lukas SE, Elman I. Effects of acute cortisol and cocaine administration on attention, recall and recognition task performance in individuals with cocaine dependence. Hum Psychopharmacol 2004;19:1-6.

10. **Hopper JW**, Spinazzola J, Simpson WB, van der Kolk BA. Preliminary evidence for parasympathetic influence on basal heart rate in posttraumatic stress disorder. J Psychosom Res 2006;60:83-90.

11. **Hopper JW**, Su Z, Looby AR, Ryan ET, Penetar DM, Palmer CM, Lukas SE. Incidence and patterns of polydrug use and craving for ecstasy in regular ecstasy users: An ecological momentary assessment study. Drug Alcohol Depend 2006;85:221-235.

12. van der Kolk BA, Spinazzola J, Blaustein M, **Hopper J**, Hopper E, Korn D, Simpson W. A randomized clinical trial of EMDR, fluoxetine and pill placebo in the treatment of PTSD: Treatment effects and long-term maintenance. J Clin Psychiatry 2007;68:37-46.

13. **Hopper JW**, Frewen PA, Sack M, Lanius RA, van der Kolk BA. The Responses to Script-Driven Imagery Scale (RSDI): Assessment of state posttraumatic symptoms for psychobiological and treatment research. J Psychopathol Behav Assess 2007;20:249-268.

14. **Hopper JW**, Frewen PA, van der Kolk BA, Lanius RA. Neural correlates of reexperiencing, avoidance, and dissociation in PTSD: Symptom dimensions and emotion dysregulation in responses to script-driven trauma imagery. J Trauma Stress 2007;22:713-725.

15. Frewen PA, Lanius RA, Dozois DJA, Neufeld RWJ, Pain C, **Hopper JW**, Densmore M, Steven TK. Clinical and neural correlates of alexithymia in PTSD. J Abnorm Psychol 2008;117:171-181.

16. **Hopper JW**, Pitman RK, Zhaohui S, Heyman GM, Lasko NB, Macklin LM, Orr SP, Lukas SE, Elman IE. Probing reward function in posttraumatic stress disorder: Expectancy and satisfaction with monetary gains and losses. J Psychiatr Res 2008;42:802-807.

# EXHIBIT II

FILED
*May 28, 2010* 4:47 pm
MICHAEL K. JEANES, Clerk

By ___ *H. O'Shaughnessy* ___
H. O'Shaughnessy Deputy

James J. Belanger (011393)
Scott M. Bennett (022350)
Coppersmith Schermer & Brockelman PLC
2800 North Central Avenue, Suite 1200
Phoenix, Arizona 85004
(602) 224-0999 (office)
(602) 224-6020 (fax)
sbennett@csblaw.com

Allen A. Arntsen, (Admitted *Pro Hac Vice*)
Stephan J. Nickels (Admitted *Pro Hac Vice*)
Matthew R. Lynch (Admitted *Pro Hac Vice*)
Foley & Lardner LLP
150 East Gilman Street
Madison, Wisconsin 53703
(608) 257-5035 (office)
(608) 258-4258 (fax)
aarntsen@foley.com

*Attorneys for Petitioner Wendi Andriano*

SUPERIOR COURT OF ARIZONA

COUNTY OF MARICOPA

| | |
|---|---|
| STATE OF ARIZONA, | No. CR2000-096032-A |
| Respondent, | **ORDER APPOINTING EXPERT JAMES W. HOPPER, PH.D.** |
| vs. | (Hon. Gary Donahoe) |
| WENDI ELIZABETH ANDRIANO, | **Douglas L. Rayes** |
| Petitioner. | |

Based on the motion by petitioner Wendi Andriano, and for good cause,

IT IS ORDERED appointing Dr. James Hopper as an expert for Ms. Andriano, and *Conditioned on approval*

authorizing payment for the work of Dr. Hopper, at an hourly rate of $250 by James

Logan, Esq., the Director of the Maricopa County Office of Public Defense Services.

It is further ordered that counsel for Petitioner obtain determination from James Logan whether this expert is approved by OPDS. If there is an issue of approval, then counsel shall contact this court and a hearing will be set.

1   DATED this _28_ of May, 2010.

2

3

4                                              Gary Donahoe   Douglas L. Rayes
5                                              Maricopa County Superior Court Judge

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT JJ

Michael K. Jeanes, Clerk of Court
*** Electronically Filed ***
Isabel Osuna
Filing ID 607293
6/2/2010 11:23:34 AM

1  TERRY GODDARD
   ATTORNEY GENERAL
2  (FIRM STATE BAR NO. 14000)

3  LACEY STOVER GARD
   ASSISTANT ATTORNEY GENERAL
   CRIMINAL APPEALS/CAPITAL LITIGATION SECTION
4  400 WEST CONGRESS, BLDG. S–315
   TUCSON, ARIZONA 85701–1367
5  TELEPHONE: (520) 628–6520
   LACEY.GARD@AZAG.GOV
6  (STATE BAR NUMBER 22714)

7  ATTORNEYS FOR PLAINTIFF/RESPONDENT

8
               SUPERIOR COURT OF ARIZONA
9
                 COUNTY OF MARICOPA
10

11 State of Arizona,                    CR2000-096032-A

12        Petitioner/Defendant,

13        -vs-                          RESPONSE TO MOTION TO
                                        APPOINT EXPERT WITNESS
14 Wendi Andriano,                      JAMES W. HOPPER, Ph.D.

15        Defendant/Petitioner.

16

17        On May 24, 2010, Petitioner Wendi Andriano filed a motion to appoint expert

18 witness James W. Hopper, Ph.D., as an expert on claims of ineffective assistance of

19 counsel.   The State takes no position on Petitioner's requests to appoint expert

20 witness James W. Hopper, Ph.D.

21        DATED this 2d day of June, 2010.

22
                             RESPECTFULLY SUBMITTED,
23
                             TERRY GODDARD
24                           ATTORNEY GENERAL

25

26                           /S/LACEY STOVER GARD
                             ASSISTANT ATTORNEY GENERAL
27                           ATTORNEYS FOR DEFENDANT

28

1   Copy of the foregoing mailed
    this 2d day of June, 2010, to:
2

3   Scott M. Bennett
    Lewis and Roca LLP
4   40 N. Central Ave., Suite 1900
    Phoenix, AZ   85004
5
    Todd E. Hale
6   Lewis and Roca LLP
    One S. Church Avenue, Suite 700
7   Tucson, AZ   85701

8   Allen A. Arntsen
    Foley & Lardner LLP
9   150 East Gilman Street
    P.O. Box 1497
10  Madison, WI   53701-1497

11  Stephen J. Nickels
    Foley & Lardner LLP
12  150 East Gilman Street
    P.O. Box 1497
13  Madison, WI   53701-1497

14  Matthew R. Lynch
    Foley & Lardner LLP
15  150 East Gilman Street
    P.O. Box 1497
16  Madison, WI   53701-1497

17  Attorneys for Defendant

18
    /s/Linda Yrrizarry
19

20

21  #844442

22

23

24

25

26

27

28

2

# EXHIBIT KK

Michael K. Jeanes, Clerk of Court
*** Electronically Filed ***
06/03/2010 8:00 AM

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CR 2000-096032                                        05/28/2010


                                          CLERK OF THE COURT
JUDGE DOUGLAS L. RAYES                        H. O'Shaughnessy
                                                  Deputy



STATE OF ARIZONA                          LACEY ALEXANDRA STOVER GARD

v.

WENDI ELIZABETH ANDRIANO (A)              JAMES J BELANGER
                                          SCOTT M BENNETT

                                          CAPITAL CASE MANAGER
                                          COURT ADMIN-CRIMINAL-PCR
                                          OFFICE OF PUBLIC DEFENSE
                                          SERVICES-CCC
                                          VICTIM WITNESS DIV-AG-CCC
                                          STEPHAN J NICKELS (PRO HAC VICE)
                                          FOLEY & LARNER LLP
                                          150 E GILMAN STREET
                                          MADISON WI  53703
                                          MATTHEW R LYNCH (PRO HAC VICE)
                                          FOLEY & LARDNER LLP
                                          150 E GILMAN STREET
                                          MADISON WI  53703
                                          ALLEN A ARNSTEN (PRO HAC VICE)
                                          FOLEY & LARDNER
                                          150 E GILMAN STREET
                                          MADISON WI  53703



                           ORDER SIGNED


        The Court having received and considered Petitioner's Motion to Appoint Expert Witness
James W. Hopper, PH.D. and good cause appearing,

Docket Code 022                    Form R000A                           Page 1

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CR 2000-096032                                              05/28/2010


        IT IS ORDERED appointing Dr. James Hopper as an expert for Ms. Andriano, and
authorizing payment for the work of Dr. Hopper, at an hourly rate of $250 conditioned on
approval by James Logan, Esq., the Director of the Maricopa County Office of Public Defense
Services.

        IT IS FURTHER ORDERED that counsel for Petitioner obtain determination from James
Logan whether this expert is approved by OPDS.  If there is an issue of approval, then counsel
shall contact this Court and a hearing will be set all in accordance with formal written order
signed by the Court on May 28, 2010 and Filed by the Clerk this date

        This case is eFiling eligible: http://www.clerkofcourt.maricopa.gov/efiling/default.asp

# EXHIBIT LL

Michael K. Jeanes, Clerk of Court
*** Electronically Filed ***
Lisa Smith
Filing ID 638447
7/14/2010 12:05:33 PM

James J. Belanger (011393)
Scott M. Bennett (022350)
Coppersmith Schermer & Brockelman PLC
2800 North Central Avenue, Suite 1200
Phoenix, Arizona  85004
(602) 224-0999 (office)
(602) 224-6020 (fax)
sbennett@csblaw.com

Allen A. Arntsen, Admitted *Pro Hac Vice*
Stephan J. Nickels, Admitted *Pro Hac Vice*
Matthew R. Lynch, Admitted *Pro Hac Vice*
Foley & Lardner LLP
150 East Gilman Street
Madison, WI  53703
(608) 257-5035 (office)
(608) 258-4258 (fax)
aarntsen@foley.com

*Attorneys for Petitioner Wendi Andriano*

SUPERIOR COURT OF ARIZONA
COUNTY OF MARICOPA

| STATE OF ARIZONA, | ) | No. CR2000-096032-A |
|---|---|---|
| Respondent, | ) | **STIPULATION TO ALLOW CONFIDENTIAL CONTACT VISITS BETWEEN WENDI ELIZABETH ANDRIANO AND HER EXPERTS** |
| vs. | ) | |
| WENDI ELIZABETH ANDRIANO, | ) | |
| Petitioner. | ) | (Assigned to the Hon. Douglas Rayes) |

Petitioner Wendi Elizabeth Andriano**,** through undersigned counsel, requests this Court to issue an order directing the Arizona Department of Corrections (hereinafter "ADOC") to allow confidential contact visits between Petitioner and Ms. Sita Jo-Ann Sovin, a mitigation specialist and/or her associate, Ms. Alexis Boothby, and between Petitioner and Dr. James W. Hopper, a clinical psychologist (together, "the experts").

1   Charles Ryan, Director of the ADOC, through undersigned counsel, does not object to the

2   confidential contact visits between Ms. Andriano and the experts.

3         Counsel for the parties have agreed to terms and conditions for the contact visits

4   and those terms and conditions are listed and contained in the accompanying proposed

5   order.  Counsel for the parties further agree and stipulate that the proposed contact visit

6   order should issue.

7         Respectfully submitted July 14, 2010.

8                COPPERSMITH SCHERMER & BROCKELMAN PLC

9                By /s/ Scott M. Bennett

10                  James J. Belanger
                    Scott M. Bennett

11               FOLEY & LARDNER LLP

12                  Allen A. Arntsen, *Pro Hac Vice*
                    Stephan J. Nickels, *Pro Hac Vice*

13                  Matthew R. Lynch, *Pro Hac Vice*

14               *Attorneys for Petitioner*

15

16               OFFICE OF THE ATTORNEY GENERAL

17               By /s/ Amy Pignatella Cain (by permission)

18                  Amy Pignatella Cain
                    Lacey Stover Gard

19               *Attorney for State of Arizona*

20

21               OFFICE OF THE ATTORNEY GENERAL

22               By /s/ Michael Brodsky (by permission)
                    Michael Brodsky

23               *Attorney for Arizona Department of Corrections*

24

25

26    [1] Assistant Attorney General Michael Brodsky appears solely for the purpose of representing the
    interests of ADOC.

1  ORIGINAL electronically filed July 14, 2010.

2  COPY hand delivered July 14, 2010, to:

3  The Honorable Douglas Rayes
   Maricopa County Superior Court
4  101 West Jefferson, Courtroom 411
   Phoenix, Arizona  85003-2243
5

6  COPIES mailed July 14, 2010, to:

7  Michael Brodsky, Assistant
   Assistant Attorney General
8  1275 West Washington
   Phoenix, Arizona  85007-2997
9

10 Lacey Stover Gard
   Assistant Attorney General
11 1275 West Washington
   Phoenix, Arizona  85007-2997
12
   Deputy Warden Lacy L. Scott
13 Arizona State Prison – Perryville
   P.O. Box 3000
14 Goodyear, Arizona  85395

15

16 /s/ Sheri McAlister_____

17

18

19

20

21

22

23

24

25

26

3

# EXHIBIT MM

FILED
July 19, 2010   9:30 am
MICHAEL K. JEANES, Clerk
By _____
H. O'Shaughnessy Deputy

1   James J. Belanger (011393)
    Scott M. Bennett (022350)
2   Coppersmith Schermer & Brockelman PLC
    2800 North Central Avenue, Suite 1200
3   Phoenix, Arizona  85004
    (602) 224-0999 (office)
4   (602) 224-6020 (fax)
    sbennett@csblaw.com
5

6   Allen A. Arntsen, Admitted *Pro Hac Vice*
    Stephan J. Nickels, Admitted *Pro Hac Vice*
7   Matthew R. Lynch, Admitted *Pro Hac Vice*
    Foley & Lardner LLP
8   150 East Gilman Street
    Madison, WI  53703
9   (608) 257-5035 (office)
    (608) 258-4258 (fax)
10  aarntsen@foley.com

11
    *Attorneys for Petitioner Wendi Andriano*
12

13              SUPERIOR COURT OF ARIZONA
                  COUNTY OF MARICOPA
14

15  STATE OF ARIZONA,                )   No. CR2000-096032-A
                                     )
16             Respondent,           )   **ORDER ALLOWING CONTACT**
                                     )   **VISITS (Death Penalty Case)**
17                                   )
        vs.                          )   (Assigned to the Hon. Douglas Rayes)
18                                   )
19  WENDI ELIZABETH ANDRIANO,        )
                                     )
20             Petitioner.           )
                                     )
21  ─────────────────────────────────

22        Pending before the Court is Petitioner and Respondents' Stipulation for Order to

23  Allow Confidential Contact Visits, and a Request to have such an Order be certified,

24  between Petitioner Wendi Elizabeth Andriano and Sita Jo-Ann Sovin, a mitigation

25  specialist, and/or her associate Ms. Alexis Boothby, and between Petitioner and Dr. James

26

W. Hopper, a clinical psychologist (together the "experts").  After due consideration of said stipulation, and the relevant pleadings on file,

IT IS ORDERED that the parties' Stipulation for Order to Allow Confidential Contact Visits between Wendi Elizabeth Andriano and the experts is **GRANTED**.

IT IS FURTHER ORDERED that the experts be permitted to have confidential contact visits with Wendi Elizabeth Andriano, ADC# 191593, under the following terms:

1) Visitations may take place on the following dates at the time indicated: July 21, 2010 from 10:00 a.m. to 1:00 p.m. with Alexis Boothby and Sita Jo-Ann Sovin; August 4, 2010 from 10:00 a.m. to 1:00 p.m. with Alexis Boothby and Sita Jo-Ann Sovin; August 17, 2010 from 9:00 a.m. to 12:00 p.m. with Alexis Boothby and Sita Jo-Ann Sovin; August 24, 2010 from 10:00 a.m. to 1:00 p.m. with Alexis Boothby and Sita Jo-Ann Sovin; August 31, 2010 from 10:30 a.m. to 2:30 p.m. with Sita Jo-Ann Sovin and Dr. James W. Hopper; and, September 1, 2010 from 9:30 a.m. to 2:30 p.m. with Sita Jo-Ann Sovin and Dr. James W. Hopper.

2) Petitioner's counsel or the experts shall make arrangements with Warden, Arizona State Prison - Perryville, or her designee, to schedule such visits.

3) The Warden, through her staff, may require the experts to subject all instruments, equipment, manuals and the like to an inspection and inventory prior to and subsequent to any meeting with Wendi Elizabeth Andriano.

4) ADOC may require inmate Wendi Elizabeth Andriano to wear leg restraints or a stun belt during the meetings.

5) Both Petitioner and Respondent recognize that Petitioner's decision not to contest ADOC's practice of using a stun belt on Petitioner, should it use one, is due to the time constraints placed upon Petitioner's counsel and in no way constitutes a waiver of the "stun belt issue" in any future request for a contact visit in this case or in any other case.  Respondents' willingness to stipulate hereto should not be considered a waiver of any aspect of ADOC's non-contact visitation policy.

6) The experts shall be allowed to have physical contact with Petitioner as is necessary during the course of the interviews.  Dr. Hopper shall be allowed to conduct written psychological testing and evaluation of Petitioner.

7)      The interviews must be confidential. The meetings between Petitioner and the experts shall take place in a room that allows for privacy.

8)      Before being allowed the contact visit authorized herein, the visiting experts shall certify in a written release to ADOC that they have investigated and ascertained the risks to their personal safety associated with the visit as authorized by and under the circumstances described in this order; that they agree to assume those risks; and that they release and hold harmless ADOC, the State of Arizona, and their officers and employees from any claim arising from death or injury associated with the risks assumed. However, such release shall not operate as a release of gross negligence on the part of ADOC.

IT IS FURTHER ORDERED that the Clerk of the Court forward a copy of this Order to counsel of record for Petitioner, Scott Bennett; counsel of record for the State of Arizona, Lacey Stover Gard; Michael Brodsky, Office of the Attorney General; Karyn Klausner, ADOC General Counsel; Ms. Sita Jo-Ann Sovin; and Deputy Warden Lacy M. Scott.

IT IS SO ORDERED this _19_ day of _____July_____, 2010.

_____
THE HONORABLE DOUGLAS RAYES

# EXHIBIT NN

Michael K. Jeanes, Clerk of Court
*** Electronically Filed ***
07/21/2010 8:00 AM

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CR 2000-096032                                                07/20/2010


                                              CLERK OF THE COURT
JUDGE DOUGLAS L. RAYES                          H. O'Shaughnessy
                                                     Deputy


STATE OF ARIZONA                              MICHAEL L BRODSKY
                                              LACEY ALEXANDRA STOVER GARD

v.

WENDI ELIZABETH ANDRIANO (A)                  JAMES J BELANGER
                                              SCOTT M BENNETT

                                              CAPITAL CASE MANAGER
                                              VICTIM WITNESS DIV-AG-CCC
                                              DEPUTY WARDEN LACY L SCOTT
                                              ARIZONA STATE PRISON-
                                              PERRYVILLE
                                              PO BOX 3000
                                              GOODYEAR AZ  85395
                                              KAREN KLAUSNER
                                              ADOC GENERAL COUNSEL
                                              1601 W JEFFERSON
                                              PHOENIX AZ  85007
                                              ALLEN ARNTSEN STEPHAN NICKELS
                                              MATTHEW LYNCH
                                              FOLEY & LARDNER LLP
                                              150 E GILMAN STREET
                                              MADISON WI  53703
                                              SITA JO-ANNE SOVIN
                                              CAPITAL CASE PROJECT-
                                              DIVERSIFIED LEGAL S
                                              19528 VENTURA BLVD #520
                                              TARZANA CA  91356


                            ORDER SIGNED

Docket Code 022                  Form R000A                    Page 1

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CR 2000-096032                                                07/20/2010


Pending before the Court is Petitioner and Respondents' Stipulation for Order to Allow Confidential Contact Visits, and a Request to have such an Order be certified, between Petitioner Wendi Elizabeth Andriano and Sita Jo-Ann Sovin, a mitigation specialist, and/or her associate Ms. Alexis Boothby, and between Petitioner and Dr. James W. Hopper, a clinical psychologist (together the "experts").  After due consideration of said stipulation, and the relevant pleadings on file,

IT IS ORDERED that the parties' Stipulation for Order to Allow Confidential Contact Visits between Wendi Elizabeth Andriano and the experts is GRANTED.

IT IS FURTHER ORDERED that the experts be permitted to have confidential contact visits with Wendi Elizabeth Andriano, ADC# 191593, under the following  terms:

1)       Visitations may take place on the following dates at the time indicated: July 21, 2010 from 10:00 a.m. to 1:00 p.m. with Alexis Boothby and Sita Jo-Ann Sovin; August 4, 2010 from 10:00 a.m. to 1:00 p.m. with Alexis Boothby and Sita Jo-Ann Sovin; August 17, 2010 from 9:00 a.m. to 12:00 p.m. with Alexis Boothby and Sita Jo-Ann Sovin; August 24, 2010 from 10:00 a.m. to 1:00 p.m. with Alexis Boothby and Sita Jo-Ann Sovin; August 31, 2010 from 10:30 a.m. to 2:30 p.m. with Sita Jo-Ann Sovin and Dr. James W. Hopper; and, September 1, 2010 from 9:30 a.m. to 2:30 p.m. with Sita Jo-Ann Sovin and Dr. James W. Hopper.

2)       Petitioner's counsel or the experts shall make arrangements with Warden, Arizona State Prison - Perryville, or her designee, to schedule such visits.

3)       The Warden, through her staff, may require the experts to subject all instruments, equipment, manuals and the like to an inspection and inventory prior to and subsequent to any meeting with Wendi Elizabeth Andriano.

4)       ADOC may require inmate Wendi Elizabeth Andriano to wear leg restraints or a stun belt during the meetings.

5)       Both Petitioner and Respondent recognize that Petitioner's decision not to contest ADOC's practice of using a stun belt on Petitioner, should it use one, is due to the time constraints placed upon Petitioner's counsel and in no way constitutes a waiver of the "stun belt issue" in any future request for a contact visit in this case or in any other case.  Respondents' willingness to stipulate hereto should not be considered a waiver of any aspect of ADOC's non-contact visitation policy.

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CR 2000-096032                                              07/20/2010

6)      The experts shall be allowed to have physical contact with Petitioner as is necessary during the course of the interviews.  Dr. Hopper shall be allowed to conduct written psychological testing and evaluation of Petitioner.

7)      The interviews must be confidential. The meetings between Petitioner and the experts shall take place in a room that allows for privacy.

8)      Before being allowed the contact visit authorized herein, the visiting experts shall certify in a written release to ADOC that they have investigated and ascertained the risks to their personal safety associated with the visit as authorized by and under the circumstances described in this order; that they agree to assume those risks; and that they release and hold harmless ADOC, the State of Arizona, and their officers and employees from any claim arising from death or injury associated with the risks assumed. However, such release shall not operate as a release of gross negligence on the part of ADOC.

IT IS FURTHER ORDERED that the Clerk of the Court forward a copy of this Order to counsel of record for Petitioner, Scott Bennett; counsel of record for the State of Arizona, Lacey Stover Gard; Michael Brodsky, Office of the Attorney General; Karyn Klausner, ADOC General Counsel; Ms. Sita Jo-Ann Sovin; and Deputy Warden Lacy M. Scott.

This done all in accordance with formal written order signed by the Court on July 19, 2010 and filed by the Clerk on July 19, 2010.

This case is eFiling eligible: http://www.clerkofcourt.maricopa.gov/efiling/default.asp

# EXHIBIT OO

Michael K. Jeanes, Clerk of Court
*** Electronically Filed ***
08/25/2010 8:00 AM

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CR 2000-096032                                            08/23/2010


                                                    CLERK OF THE COURT
JUDGE DOUGLAS L. RAYES                                 H. O'Shaughnessy
                                                           Deputy



STATE OF ARIZONA                             MICHAEL L BRODSKY
                                             LACEY ALEXANDRA STOVER GARD

v.

WENDI ELIZABETH ANDRIANO (A)                 JAMES J BELANGER
                                             SCOTT M BENNETT

                                             CAPITAL CASE MANAGER
                                             VICTIM SERVICES DIV-CA-SE
                                             VICTIM WITNESS DIV-AG-CCC



                            MINUTE ENTRY



        IT IS ORDERED setting status conference on September 7, 2010 at 10:30 a.m. before the
Honorable Douglas Rayes.

        This case is eFiling eligible: http://www.clerkofcourt.maricopa.gov/efiling/default.asp

# EXHIBIT PP

Michael K. Jeanes, Clerk of Court
*** Electronically Filed ***
Mary Martin
Filing ID 675171
9/1/2010 11:14:04 AM

James J. Belanger (011393)
Scott M. Bennett (022350)
Coppersmith Schermer & Brockelman PLC
2800 North Central Avenue, Suite 1200
Phoenix, Arizona  85004
(602) 224-0999 (office)
(602) 224-6020 (fax)
sbennett@csblaw.com

Allen A. Arntsen, Admitted *Pro Hac Vice*
Stephan J. Nickels Admitted *Pro Hac Vice*
Matthew R. Lynch Admitted *Pro Hac Vice*
Foley & Lardner LLP
150 East Gilman Street
Madison, WI 53703
(608) 257-5035 (office)
(608) 258-4258 (fax)
aarntsen@foley.com

*Attorneys for Petitioner Wendi Elizabeth Andriano*

## SUPERIOR COURT OF ARIZONA
## COUNTY OF MARICOPA

| | |
|---|---|
| STATE OF ARIZONA, | No. CR2000-096032-A |
| Respondent, | **NOTICE OF TELEPHONIC APPEARANCE AT 9/7/2010 STATUS CONFERENCE** |
| vs. | |
| WENDI ELIZABETH ANDRIANO, | (Assigned to the Hon. Douglas Rayes) |
| Petitioner. | |

Pursuant to the Court's Minute Entry, dated August 23, 2010, counsel for petitioner Wendi Elizabeth Andriano gives notice that her out-of-state counsel at Foley & Lardner will appear telephonically at the status conference scheduled for 10:30 a.m. on September 7, 2010.  Ms. Andriano's local counsel at Coppersmith, Schermer & Brockelman PLC will appear in person.  Counsel for the State of Arizona, Lacy Stover Gard, will also appear in person.

RESPECTFULLY SUBMITTED September 1, 2010.

**COPPERSMITH SCHERMER & BROCKELMAN PLC**

By /s/ *Scott M. Bennett*
      James J. Belanger
      Scott M. Bennett

**FOLEY & LARDNER LLP**
      Allen A. Arntsen
      Stephan J. Nickels
      Matthew R. Lynch

*Attorneys for Petitioner*

ORIGINAL electronically filed September 1, 2010.

COPY e-mailed and mailed September 1, 2010, to:

Lacey Stover Gard
Office of the Attorney General
400 West Congress, Suite S-315
Tucson, AZ  85701-1367

*Attorneys for the State of Arizona*

/s/ *Sheri McAlister*

# EXHIBIT QQ

Michael K. Jeanes, Clerk of Court
*** Electronically Filed ***
09/10/2010 8:00 AM

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CR 2000-096032                                           09/07/2010


                                              CLERK OF THE COURT
JUDGE DOUGLAS L. RAYES                         H. O'Shaughnessy
                                                    Deputy


STATE OF ARIZONA                          LACEY ALEXANDRA STOVER GARD

v.

WENDI ELIZABETH ANDRIANO (A)              SCOTT M BENNETT
                                          JAMES J BELANGER

                                          CAPITAL CASE MANAGER
                                          COURT ADMIN-CRIMINAL-PCR
                                          VICTIM SERVICES DIV-CA-SE
                                          VICTIM WITNESS DIV-AG-CCC
                                          ALLEN ARNSTEN
                                          150 E GILMAN STREET
                                          MADISON WI  53703


                          MINUTE ENTRY


        10:32 a.m.

        Courtroom ECB 411

        State's Attorney:         Kent Cattani for Lacey Stover Gard
        Defendant's Attorney:     Scott Bennett, Allen Arnsten (appears telephonically)
        Defendant:                Not Present (presence waived)
        Court Reporter:           Cindy Lineburg

        A record of the proceedings is also made by audio and/or videotape.

        Court and counsel discuss matters re Petition for Post-Conviction Relief.

Docket Code 056                    Form R000D                         Page 1

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CR 2000-096032                                          09/07/2010


        IT IS ORDERED setting Informal Conference on January 11, 2011 at 9:00 a.m. before
the Honorable Douglas Rayes.

        This case is eFiling eligible: http://www.clerkofcourt.maricopa.gov/efiling/default.asp

        10:42 a.m.  Matter concludes.

# EXHIBIT RR

Michael K. Jeanes, Clerk of Court
*** Electronically Filed ***
Isabel Osuna
Filing ID 682224
9/10/2010 1:47:00 PM

1   James J. Belanger (011393)
    Scott M. Bennett (022350)
    Coppersmith Schermer & Brockelman PLC
2   2800 North Central Avenue, Suite 1200
    Phoenix, Arizona  85004
3   (602) 224-0999 (office)
    (602) 224-6020 (fax)
    sbennett@csblaw.com

4   Allen A. Arntsen, Admitted *Pro Hac Vice*
    Stephan J. Nickels Admitted *Pro Hac Vice*
5   Matthew R. Lynch Admitted *Pro Hac Vice*
    Foley & Lardner LLP
    150 E. Gilman Street
6   Madison, WI 53703
    (608) 257-5035 (office)
    (608) 258-4258 (fax)
7   aarntsen@foley.com

    *Attorneys for Petitioner Wendi Andriano*

8
                    SUPERIOR COURT OF ARIZONA
9                     COUNTY OF MARICOPA

10  State of Arizona,                )    No. CR2000-096032-A
                                     )
11                    Respondent,    )    **STIPULATION TO ALLOW**
                                     )    **CONFIDENTIAL CONTACT**
12  v.                               )    **VISITS BETWEEN WENDI**
                                     )    **ELIZABETH ANDRIANO AND**
13  Wendi Elizabeth Andriano,        )    **HER EXPERTS**
                                     )
14                    Petitioner.    )
                                     )    (Assigned to Hon. Gary E. Donahoe)
15                                   )
                                     )
16                                   )
                                     )
17

18           Petitioner Wendi Elizabeth Andriano**,** through undersigned counsel, requests this

19  Court to issue an order directing the Arizona Department of Corrections (hereinafter

20  "ADOC") to allow confidential contact visits between Petitioner and Ms. Sita Jo-Ann

21  Sovin, a mitigation specialist and/or her associates, Ms. Alexis Boothby and Christopher

22  Darren Butler (together, "the experts").   Charles Ryan, Director of the ADOC, through

23  undersigned counsel,[1] does not object to the confidential contact visits between Ms.

24  Andriano and the specialists.

25  _____

26  [1] Assistant Attorney General Michael Brodsky appears solely for the purpose of representing the interests of ADOC
    and is not a counsel of record.

2408102.1

1   Counsel for the parties have agreed to terms and conditions for the contact visits
2   and those terms and conditions are listed and contained in the accompanying proposed
3   order.  Counsel for the Petitioner and ADOC further agree and stipulate that the proposed
4   contact visit order should issue.

5   Respectfully submitted this 10th day of September, 2010.

6   COPPERSMITH SCHERMER & BROCKELMAN PLC

7
    By /s/ Scott M. Bennett
8       James J. Belanger
        Scott M. Bennett
9
10  FOLEY & LARDNER LLP
        Allen A. Arntsen, *Pro Hac Vice*
11      Stephan J. Nickels, *Pro Hac Vice*
        Matthew R. Lynch, *Pro Hac Vice*
12
13  *Attorneys for Petitioner*

14

15  OFFICE OF THE ATTORNEY GENERAL

16  By /s/ Lacey Gard [by permission]
17      Lacey Stover Gard

18  *Attorney for State of Arizona*

19

20  OFFICE OF THE ATTORNEY GENERAL

21  By  /s/ Michael Brodsky [by permission]
22      Michael Brodsky

23  *Attorney for Arizona Department of Corrections*

24

25

26

2

WABI_2408102.1

1   ORIGINAL e-filed September 10, 2010:

2   COPY delivered via Maricopa County Superior
3   Court's e-filing system this 10th day of September
    2010, to:
4

5   The Hon. Douglas Rayes
    East Court Building-411
6   101 W. Jefferson
    Phoenix, AZ. 85003-2243
7

8   COPIES mailed September 10, 2010, to:

9   Lacey Stover Gard
    Assistant Attorney General
10  1275 West Washington
11  Phoenix, Arizona   85007-2997
    *Attorney for State of Arizona*
12

13  Michael Brodsky, Assistant
    Assistant Attorney General
14  1275 West Washington
    Phoenix, Arizona   85007-2997
15

16  Deputy Warden Lacy L. Scott
    Arizona State Prison – Perryville
17  P.O. Box 3000
    Goodyear, AZ  85395
18

19

20  By   /s/ Elizabeth A. James

21

22

23

24

25

26

# EXHIBIT SS

FILED
Sept 14, 2010  10:31am
MICHAEL K. JEANES, Clerk
By ____ O'Shaughnessy ____
H. O'Shaughnessy Deputy

1  James J. Belanger (011393)
   Scott M. Bennett (022350)
   Coppersmith Schermer & Brockelman PLC
2  2800 North Central Avenue, Suite 1200
   Phoenix, Arizona 85004
   (602) 224-0999 (office)
3  (602) 224-6020 (fax)
   sbennett@csblaw.com

4  Allen A. Arntsen, Admitted *Pro Hac Vice*
   Stephan J. Nickels Admitted *Pro Hac Vice*
   Matthew R. Lynch Admitted *Pro Hac Vice*
5  Foley & Lardner LLP
   150 E. Gilman Street
   Madison, WI 53703
6  (608) 257-5035 (office)
   (608) 258-4258 (fax)
   aarntsen@foley.com

7
   *Attorneys for Petitioner Wendi Andriano*

8
## SUPERIOR COURT OF ARIZONA
9
## COUNTY OF MARICOPA
10

| | | |
|---|---|---|
| 11 | State of Arizona,              )  | NO. CR2000-096032-A |
| 12 |                                )  |  |
|    |          Respondent,           )  | ORDER ALLOWING CONTACT |
| 13 | v.                             )  | VISITS (Death Penalty Case) |
|    |                                )  |  |
| 14 | Wendi Elizabeth Andriano,      )  |  |
|    |                                )  |  |
| 15 |          Petitioner.           )  |  |
| 16 |                                   |  |

17      Pending before the Court is the parties' Stipulation for Order to Allow Confidential

18  Contact Visits between Petitioner Wendi Elizabeth Andriano and Sita Jo-Ann Sovin, a

19  mitigation specialist, and/or her associates Ms. Alexis Boothby and Christopher Darren

20  Butler (together the "experts").    After due consideration of said stipulation, and the

    relevant pleadings on file,
21
22      IT IS ORDERED that the Stipulation for Order to Allow Confidential Contact

    Visits between Wendi Elizabeth Andriano and the experts is **GRANTED**.
23
        IT IS FURTHER ORDERED that the experts be permitted to have confidential
24
    contact visits with Wendi Elizabeth Andriano, ADC# 191593, under the following terms:

25      1)    Visitations may take place on the following dates at the time indicated:
26            September 15, 2010 from 10:00 a.m. to 2:00 p.m. with Kristen Powers and

Alexis Boothby; September 29, 2010 from 10:30 a.m. to 2:30 p.m. with Sita Jo-Ann Sovin and Christopher Darren Butler; October 13, 2010 from 10:30 a.m. to 2:30 p.m. with Sita Jo-Ann Sovin, Kristen Power and Christopher Darren Butler; and, October 27, 2010 from 10:30 a.m. to 2:30 p.m. with Sita Jo-Ann Sovin and Christopher Darren Butler.

2)   Petitioner's counsel or the experts shall make arrangements with Warden, Arizona State Prison - Perryville, or her designee, to schedule such visits.

3)   The Warden, through her staff, may require the experts to subject all instruments, equipment, manuals and the like to an inspection and inventory prior to and subsequent to any meeting with Wendi Elizabeth Andriano.

4)   ADOC may require inmate Wendi Elizabeth Andriano to wear leg restraints or a stun belt during the meetings.

5)   Both Petitioner and Respondent recognize that Petitioner's decision not to contest ADOC's practice of using a stun belt on Petitioner, should it use one, is due to the time constraints placed upon Petitioner's counsel and in no way constitutes a waiver of the "stun belt issue" in any future request for a contact visit in this case or in any other case. Respondents' willingness to stipulate hereto should not be considered a waiver of any aspect of ADOC's non-contact visitation policy.

6)   The experts shall be allowed to have physical contact with Petitioner as is necessary during the course of the interviews.

7)   The interviews must be confidential. The meetings between Petitioner and the experts shall take place in a room that allows for privacy.

8)   Before being allowed the contact visit authorized herein, the visiting experts shall certify in a written release to ADOC that they have investigated and ascertained the risks to their personal safety associated with the visit as authorized by and under the circumstances described in this order; that they agree to assume those risks; and that they release and hold harmless ADOC, the State of Arizona, and their officers and employees from any claim arising from death or injury associated with the risks assumed. However, such release shall not operate as a release of gross negligence on the part of ADOC.

1    IT IS FURTHER ORDERED that the Clerk of the Court forward a copy of this

2  Order to counsel of record for Petitioner, Scott Bennett; counsel of record for the State of

3  Arizona, Lacey Stover Gard; Karyn Klausner, ADOC General Counsel; Ms. Sita Jo-Ann

4  Sovin; Deputy Warden Lacy M. Scott; and Michael Brodsky, who is appearing solely for

5  the purpose of representing the ADOC and is not a counsel of record.

6

7    IT IS SO ORDERED this 14 day of September, 2010.

8

9

10              THE HONORABLE DOUGLAS RAYES

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

# EXHIBIT TT

Michael K. Jeanes, Clerk of Court
*** Electronically Filed ***
09/21/2010 8:00 AM

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CR 2000-096032                                              09/14/2010


                                              CLERK OF THE COURT
JUDGE DOUGLAS L. RAYES                          H. O'Shaughnessy
                                                    Deputy



STATE OF ARIZONA                          LACEY ALEXANDRA STOVER GARD

v.

WENDI ELIZABETH ANDRIANO (A)              JAMES J BELANGER
                                          SCOTT M BENNETT
                                          MICHAEL L BRODSKY

                                          CAPITAL CASE MANAGER
                                          COURT ADMIN-CRIMINAL-PCR
                                          VICTIM SERVICES DIV-CA-SE
                                          VICTIM WITNESS DIV-AG-CCC
                                          ALAN A ARNSTEN
                                          FOLEY & LARNER LLP
                                          150 E GILMAN STREET
                                          MADISON WI  83703



MINUTE ENTRY


        The Court has received and considered Stipulation to Allow Confidential Contact Visits
Between Wendi Elizabeth Andriano and Her Experts.  Good cause appearing,

        IT IS ORDERED that the Stipulation for Order to Allow Confidential Contact Visits
between Wendi Elizabeth Andriano and the experts is granted.

        IT IS FURTHER ORDERED that the experts be permitted to have confidential contact
visits with Wendi Elizabeth Andriano, ADC# 191593, under the following terms:

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CR 2000-096032                                                  09/14/2010

1)      Visitations may take place on the following dates at the time indicated:
        September 15, 2010 from 10:00 a.m. to 2:00 p.m. with Kristen Powers and
        Alexis Boothby; September 29, 2010 from 10:30 a.m. to 2:30 p.m. with Sita Jo-
        Ann Sovin and Christopher Darren Butler; October 13, 2010 from 10:30 a.m.
        to 2:30 p.m. with Sita Jo-Ann Sovin, Kristen Power and Christopher Darren
        Butler; and, October 27, 2010 from 10:30 a.m. to 2:30 p.m. with Sita Jo-Ann
        Sovin and Christopher Darren Butler.

2)      Petitioner's counsel or the experts shall make arrangements with Warden,
        Arizona State Prison-Perryville, or her designee, to schedule such visits.

3)      The Warden, through her staff, may require the experts to subject all
        instruments, equipment, manuals and the like to an inspection and inventory
        prior to an subsequent to any meeting with Wendi Elizabeth Andriano.

4)      ADOC may require inmate Wendi Elizabeth Andriano to wear leg restraints or
        a stun belt during the meetings.

5)      Both Petitioner and Respondent recognize that Petitioner's decision not to
        contest ADOC's practice of using a stun belt on Petition, should it use one, is
        due to the time constraints placed upon Petitioner's counsel and in no way
        constitutes a waiver of the "stun belt issue" in any future request for a contact
        visit in this case or in any other case.  Respondents' willingness to stipulate
        hereto should not be considered a waiver of any aspect of ADOC's non-
        contact visitation policy.

6)      The experts shall be allowed to have physical contact with Petitioner as is
        necessary during the course of the interviews.

7)      The interviews must be confidential.  The meetings between Petitioner and the
        experts shall take place in a room that allows for privacy.

8)      Before being allowed the contact visit authorized herein, the visiting experts
        shall certify in a written release to ADOC that they have investigated and
        ascertained the risks to their personal safety associated with the visit as
        authorized by an under the circumstances described in this order; that they
        agree to assume those risks; and that they release and hold harmless ADOC,
        the State of Arizona, and their officers and employees from any claim arising
        from death or injury associated with the risks assumed.  However, such release
        shall not operate as a release of gross negligence on the part of ADOC.

        IT IS FURTHER ORDERED that the Clerk of the Court forward a copy of this Order to
counsel of record for Petitioner, Scott Bennett; counsel of record for the State of Arizona, Lacey
Stover Gard; Karen Klausner, ADCO General Counsel; Ms. Sita Jo-Ann Sovin; Deputy Warden
Lacy M. Scott; and Michael Brodsky, who is appearing solely for the purpose of representing the

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CR 2000-096032                                        09/14/2010


ADOC and is not a counsel of record all in accordance with formal written order signed by the
Court on September 14, 2010 and filed by the Clerk this date.

    FILED:  Order.

# EXHIBIT UU

Michael K. Jeanes, Clerk of Court
*** Electronically Filed ***
Belva Nasingoetewa
Filing ID 720273
11/1/2010 9:43:52 AM

James J. Belanger (011393)
Scott M. Bennett (022350)
Coppersmith Schermer & Brockelman PLC
2800 North Central Avenue, Suite 1200
Phoenix, Arizona  85004
(602) 224-0999 (office)
(602) 224-6020 (fax)
sbennett@csblaw.com

Allen A. Arntsen, Admitted *Pro Hac Vice*
Stephan J. Nickels Admitted *Pro Hac Vice*
Matthew R. Lynch Admitted *Pro Hac Vice*
Foley & Lardner LLP
150 E. Gilman Street
Madison, WI 53703
(608) 257-5035 (office)
(608) 258-4258 (fax)
aarntsen@foley.com

*Attorneys for Petitioner Wendi Andriano*

## SUPERIOR COURT OF ARIZONA
## COUNTY OF MARICOPA

| | | |
|---|---|---|
| State of Arizona, | ) | No. CR2000-096032-A |
| | ) | |
| Respondent, | ) | **STIPULATION TO ALLOW** |
| | ) | **CONFIDENTIAL CONTACT** |
| v. | ) | **VISITS BETWEEN WENDI** |
| | ) | **ANDRIANO AND HER EXPERTS** |
| Wendi Elizabeth Andriano, | ) | |
| | ) | |
| Petitioner. | ) | (Assigned to Hon. Douglas Rayes) |
| | ) | |

The parties, as well as the Arizona Department of Corrections ("ADOC"), stipulate to the entry of an order that allows confidential contact visits between Petitioner Wendi Andriano and experts who are assisting in her defense.  The proposed order authorizes contact visits with the following experts:

- Mitigation specialist Sita Jo-Ann Sovin, and her associates (Alexis Boothby, Kristen Powers and Christopher Darren Butler).

1

- Clinical psychologist Dr. James W. Hopper.

2

- Clinical psychiatrist Dr. George Woods.

3

4      Counsel for the parties have agreed to terms and conditions for the contact visits

5   and those terms and conditions are listed and contained in the accompanying proposed

6   order.  Charles Ryan, Director of the ADOC, through undersigned counsel,[1] does not

7   object to the proposed confidential contact visits between Ms. Andriano and the experts.

8      Counsel for the State (Lacey Stover Gard) and the ADOC (Michael Brodsky) have

9   given Ms. Andriano's attorneys permission to sign on their behalf.

10      Respectfully submitted this 1st day of November, 2010.

11  COPPERSMITH SCHERMER
12   & BROCKELMAN PLC

13  By /s/ Scott M. Bennett
14      James J. Belanger
        Scott M. Bennett

15
16  FOLEY & LARDNER LLP
        Allen A. Arntsen, *Pro Hac Vice*
17      Stephan J. Nickels, *Pro Hac Vice*
        Matthew R. Lynch, *Pro Hac Vice*
18
19  *Attorneys for Petitioner*

20
21  OFFICE OF THE ATTORNEY GENERAL

22  By /s/ Lacey Stover Gard (w/permission)
        Lacey Stover Gard
23
24  *Attorney for State of Arizona*

25

26
_____
[1] Assistant Attorney General Michael Brodsky appears solely for the purpose of representing the interests of ADOC.

1   OFFICE OF THE ATTORNEY GENERAL

2   By /s/ Michael Brodsky (w/permission)

3        Michael Brodsky

4   *Attorney for nonparty Arizona Department of Corrections*

5

6   ORIGINAL electronically filed November 1, 2010.

7

8   COPY hand delivered November 1, 2010, to:

9   The Hon. Douglas Rayes
10  East Court Building-411
    101 W. Jefferson
11  Phoenix, AZ. 85003-2243

12

13  COPIES mailed November 1, 2010, to:

14  Lacey Stover Gard
15  Assistant Attorney General
    1275 West Washington
16  Phoenix, Arizona  85007-2997

17  Michael Brodsky, Assistant
18  Assistant Attorney General
    1275 West Washington
19  Phoenix, Arizona  85007-2997

20  Deputy Warden Lacy L. Scott
21  Arizona State Prison – Perryville
    P.O. Box 3000
22  Goodyear, AZ  85395

23

24  /s/ Sheri McAlister

25

26

3

# EXHIBIT VV

FILED
Nov 1, 2010  1:46pm
MICHAEL K. JEANES, Clerk
By_____
H: O'Shaughnessy Deputy

1   James J. Belanger (011393)
    Scott M. Bennett (022350)
2   Coppersmith Schermer & Brockelman PLC
    2800 North Central Avenue, Suite 1200
3   Phoenix, Arizona 85004
    (602) 224-0999 (office)
4   (602) 224-6020 (fax)
    sbennett@csblaw.com
5
    Allen A. Arntsen, Admitted *Pro Hac Vice*
6   Stephan J. Nickels Admitted *Pro Hac Vice*
    Matthew R. Lynch Admitted *Pro Hac Vice*
7   Foley & Lardner LLP
    150 E. Gilman Street
8   Madison, WI 53703
    (608) 257-5035 (office)
9   (608) 258-4258 (fax)
    aarntsen@foley.com
10
    *Attorneys for Petitioner Wendi Andriano*
11

12              **SUPERIOR COURT OF ARIZONA**
                 **COUNTY OF MARICOPA**
13

14   State of Arizona,                )    No. CR2000-096032-A
                                      )
15              Respondent,           )    **ORDER ALLOWING CONTACT**
                                      )    **VISITS (Death Penalty Case)**
16   v.                               )
                                      )
17   Wendi Elizabeth Andriano,        )    (Assigned to Hon. Douglas Rayes)
                                      )
18              Petitioner.           )
                                      )
19   _____)

20

21       Based on a stipulation by the parties, and for good cause, IT IS ORDERED

22   authorizing confidential contact visits between Petitioner Wendi Andriano and her experts,

23   as follows:

24       1.      Visitations may take place on the following dates at the time indicated:

25       A.      <u>November 2, 2010</u>          10:30 a.m. to 2:30 p.m.
                 Authorized visitors: Sita Jo-Ann Sovin and Dr. Jim Hopper
26

B.    November 3, 2010            10:30 a.m. to 2:30 p.m.
      Authorized visitors: Sita Jo-Ann Sovin and Dr. Jim Hopper

C.    November 9, 2010            10:30 a.m. to 2:30 p.m.
      Authorized visitors: Sita Jo-Ann Sovin, Alexis Boothby, Kristen
      Powers and Christopher Darren Butler

D.    November 10, 2010           10:30 a.m. to 2:30 p.m.
      Authorized visitors: Sita Jo-Ann Sovin, Alexis Boothby, Kristen
      Powers and Christopher Darren Butler

E.    November 23, 2010           10:30 a.m. to 2:30 p.m.
      Authorized visitors: Sita Jo-Ann Sovin, Alexis Boothby, Kristen
      Powers, Christopher Darren Butler and Dr. George Woods

F.    November 24, 2010           10:30 a.m. to 2:30 p.m.
      Authorized visitors: Sita Jo-Ann Sovin, Alexis Boothby, Kristen
      Powers and Christopher Darren Butler

G.    December 7, 2010            10:30 a.m. to 2:30 p.m.
      Authorized visitors: Kristen Powers, Alexis Boothby, and Dr. George
      Woods

H.    December 8, 2010            10:30 a.m. to 2:30 p.m.
      Authorized visitors: Kristen Powers, Alexis Boothby, and Dr. George
      Woods

I.    December 21, 2010           10:30 a.m. to 2:30 p.m.
      Authorized visitors: Sita Jo-Ann Sovin, Alexis Boothby, Kristen
      Powers and Christopher Darren Butler

J.    December 22, 2010           10:30 a.m. to 2:30 p.m.
      Authorized visitors: Sita Jo-Ann Sovin, Alexis Boothby, Kristen
      Powers and Christopher Darren Butler

2.    Petitioner's counsel or the experts shall make arrangements with Warden,

      Arizona State Prison - Perryville, or her designee, to schedule such visits.

3.    The Warden, through her staff, may require the experts to subject all

      instruments, equipment, manuals and the like to an inspection and inventory

      prior to and subsequent to any meeting with Wendi Elizabeth Andriano.

2

4.	ADOC may require inmate Wendi Elizabeth Andriano to wear leg restraints or a stun belt during the meetings.

5.	Both Petitioner and Respondent recognize that Petitioner's decision not to contest ADOC's practice of using a stun belt on Petitioner, should it use one, is due to the time constraints placed upon Petitioner's counsel and in no way constitutes a waiver of the "stun belt issue" in any future request for a contact visit in this case or in any other case. Respondents' willingness to stipulate hereto should not be considered a waiver of any aspect of ADOC's non-contact visitation policy.

6.	The experts shall be allowed to have physical contact with Petitioner as is necessary during the course of the interviews.

7.	The interviews must be confidential. The meetings between Petitioner and the experts shall take place in a room that allows for privacy.

8.	Before being allowed the contact visit authorized herein, the visiting experts shall certify in a written release to ADOC that they have investigated and ascertained the risks to their personal safety associated with the visit as authorized by and under the circumstances described in this order; that they agree to assume those risks; and that they release and hold harmless ADOC, the State of Arizona, and their officers and employees from any claim arising from death or injury associated with the risks assumed. However, such release shall not operate as a release of gross negligence on the part of ADOC.

IT IS FURTHER ORDERED that the Clerk of the Court forward a copy of this Order to counsel of record for Petitioner, Scott Bennett; counsel of record for the State of Arizona, Lacey Stover Gard; Karyn Klausner, ADOC General Counsel; Ms. Sita Jo-Ann

3

Sovin; Deputy Warden Lacy M. Scott; and Michael Brodsky, who is appearing solely for
the purpose of representing the ADOC and is not a counsel of record.

IT IS SO ORDERED this ___1___ day of November, 2010.

_____
THE HONORABLE DOUGLAS RAYES

Copies of the foregoing provided this
___ day of _____, to:

Lacey Stover Gard
Assistant Attorney General
1275 West Washington
Phoenix, AZ 85007

Michael Brodsky
Office of the Attorney General
Arizona Department of Corrections
1275 West Washington
Phoenix, AZ 85007

Deputy Warden Lacy L. Scott
Arizona State Prison – Perryville
P.O. Box 3000
Goodyear, AZ 85395

Scott Bennett
Attorney for Petitioner
Coppersmith Schermer & Brockelman PLC
2800 North Central Ave, Suite 1200
Phoenix, AZ 85004

Karyn Klausner
ADOC General Counsel
1601 W. Jefferson
Phoenix, AZ 85007

Sita Jo-Ann Sovin
Alexis Boothby
Kristen Powers
Christopher Darren Butler
Capital Case Project – Diversified Legal Services
19528 Ventura Boulevard #520
Tarzana, CA   91356

# EXHIBIT WW

Michael K. Jeanes, Clerk of Court
*** Electronically Filed ***
Isabel Osuna
Filing ID 726924
11/9/2010 12:40:25 PM

James J. Belanger (011393)
Scott M. Bennett (022350)
Coppersmith Schermer & Brockelman PLC
2800 North Central Avenue, Suite 1200
Phoenix, Arizona  85004
(602) 224-0999 (office)
(602) 224-6020 (fax)
sbennett@csblaw.com

Allen A. Arntsen, Admitted *Pro Hac Vice*
Stephan J. Nickels Admitted *Pro Hac Vice*
Matthew R. Lynch Admitted *Pro Hac Vice*
Foley & Lardner LLP
150 E. Gilman Street
Madison, WI 53703
(608) 257-5035 (office)
(608) 258-4258 (fax)
aarntsen@foley.com

*Attorneys for Petitioner Wendi Andriano*

## SUPERIOR COURT OF ARIZONA
## COUNTY OF MARICOPA

| | | |
|---|---|---|
| State of Arizona, | ) | No. CR2000-096032-A |
| | ) | |
| Respondent, | ) | **PETITIONER'S UNOPPOSED** |
| | ) | **MOTION TO APPOINT EXPERT** |
| vs. | ) | **WITNESSES GEORGE W. WOODS,** |
| | ) | **JR., M.D., and MYLA YOUNG,** |
| Wendi Elizabeth Andriano, | ) | **Ph.D., ABN** |
| | ) | |
| Petitioner. | ) | (Assigned to Hon. Douglas Rayes) |
| | ) | |

Petitioner Wendi Andriano, through her undersigned *pro bono* counsel, moves this

Court, pursuant to Arizona Revised Statutes §§ 13-4013(B), 13-4041(I), *Ake v. Oklahoma*,

470 U.S. 68 (1985) and its progeny, *Strickland v. Washington*, 466 U.S. 688 (1984), the

Due Process and Equal Protection Clauses of the 14th Amendment to the United States

Constitution, and the 5th, 6th and 8th Amendments to the United States Constitution, for

the appointment and authorization of payment of reasonable fees for Dr. George W.

Woods, Jr., M.D., 1511-M Sycamore Avenue #258, Hercules, California 94547, and

Dr. Myla H. Young, Ph.D., ABN, 1475 North Broadway #335, Walnut Creek, CA 94596.

Counsel is representing Petitioner in a *pro bono* capacity based on a referral from

the American Bar Association's Death Penalty Representation Project.  This Court has

previously found Petitioner to be indigent.  Accordingly, Petitioner is entitled to court-appointed "investigators and expert witnesses as are reasonably necessary to present a defense at trial and at any subsequent proceeding."  Ariz. Rev. Stat. § 13-4013(B); *see also* Ariz. Rev. Stat. § 13-4041(I) ("The trial court may authorize additional monies to pay for investigative and expert services that are reasonably necessary to adequately litigate those claims that are not precluded by section 13-4232.").

Dr. Woods has been retained to identify the environmental and neuropsychiatric factors that may have adversely affected Ms. Andriano's early childhood and adolescent development, resulting in psychological and behavioral alterations and impairments that persist into adulthood.  Dr. Woods will supplement the findings of Dr. James Hopper, who has been previously retained by counsel and appointed by this Court to conduct a psycho-social history of Ms. Andriano.  Dr. Woods will provide the important perspective of the neurological impact of Ms. Andriano's environmental background and as such, the services of Dr. Woods are necessary for counsel to properly present Petitioner's evidence in support of her PCR petition.

Dr. Woods is a licensed physician with a specialty in clinical and forensic psychiatry.  Dr. Woods has been appointed by courts in other capital cases to identify psychological and behavioral alterations as a result of environmental stressors. Dr. Woods's *curriculum vitae*, which further describes Dr. Woods's education and professional experiences, is attached to this Motion as **Exhibit A**.

Dr. Woods's usual and customary charge for his services is $350.00 per hour. Petitioner requests that this Court authorize the payment of Dr. Woods's reasonable fees and expenses by James Logan, Esq., the Director of the Maricopa County Office of Public Defense Services.

Dr. Young has been retained to conduct neuropsychological testing of Ms. Andriano, which will describe Ms. Andriano's neurological functioning in important areas such as memory, reasoning, impulse control, and behavior modification.  The results of these tests are critical to and will be used in connection with Dr. Woods' psychiatric

analysis, as they will provide tangible evidence of any neurological alterations and deficits that may have influenced Ms. Andriano's past behaviors and choices.  As such, the services of Dr. Young are necessary for counsel to properly present Petitioner's evidence in support of her PCR petition.

Dr. Young is a licensed psychologist with certification in neuropsychology by the American Board of Professional Neuropsychology.  Dr. Woods has been appointed by courts in other capital cases to conduct neuropsychological testing.  Dr. Young's *curriculum vitae*, which further describes her education and professional experiences, is attached to this Motion as **Exhibit B**.

Dr. Young's usual and customary charge for her services is $275.00 per hour. Petitioner requests that this Court authorize the payment of Dr. Young's reasonable fees and expenses by James Logan, Esq., the Director of the Maricopa County Office of Public Defense Services.

In past practice, pro bono counsel have coordinated with Mr. Logan and have assumed the cost of travel time and travel expenses for out-of-state experts.  Pro bono counsel will engage in the same dialogue with Mr. Logan and is prepared to assume such expenses of Dr. Woods and Dr. Young.

Should this Court require any additional factual foundation for the necessity of the appointment of Dr. Woods and Dr. Young, Petitioner requests a hearing with the Court.

Counsel for Ms. Andriano has communicated with counsel for the State (Ms. Gard) regarding this motion.  Ms. Gard stated that the State takes no position on this motion.

RESPECTFULLY SUBMITTED November 9, 2010.

COPPERSMITH SCHERMER &
BROCKELMAN PLC

By /s/ Scott M. Bennett
        James J. Belanger
        Scott M. Bennett

3

FOLEY & LARDNER LLP
Allen A. Arntsen, *Pro Hac Vice*
Stephan J. Nickels, *Pro Hac Vice*
Matthew R. Lynch, *Pro Hac Vice*

*Attorneys for Petitioner*

ORIGINAL electronically
filed on November 9, 2010,

COURTESY COPY hand-delivered
on November 9, 2010, to:

Judge Douglas Rayes
Maricopa County Superior Court
101 W. Jefferson, Room 411
Phoenix, AZ  85003-2243

COPY e-mailed and mailed on
November 9, 2010, to:

Ms. Lacey Stover Gard
Office of the Attorney General
400 W. Congress, Suite S-315
Tuscon, AZ  85701-1367
*Attorney for the State of Arizona*


/s/ Sheri McAlister

4

# Exhibit A

**CURRICULUM VITA**
**George W. Woods, Jr., M.D.**

EDUCATION

1981-1982:  American Psychiatric Association/National Institute of Mental Health Fellowship Pacific Medical Center
San Francisco, California (Jeanne Spurlock, M.D., Chair)

1981:  Residency- Psychiatric - Pacific Medical Center
  San Francisco, California (Allen Enelow, M.D., Chair)

1977-1978:    Internship—Medical/Surgical, Highland Hospital
  Oakland, California

1977:  MD, University of Utah
  Salt Lake City, Utah

1969:  BA, Westminster College
  Salt Lake City, Utah


LICENSES & CERTIFICATIONS


2009: Secretary General, International Academy of Law and Mental Health

2008: Certified Mediation Specialist, California State University, Sacramento, California

2004-2005: Interim License, Zanzibar Revolutionary Government

2004:  Fellow: American Psychiatric Association

1992:  Certified by the American Board of Psychiatry and Neurology

1979:  Licensed Physician in California

CLINICAL EXPERIENCE & CONSULTATION

2010: Task Force on Mental Retardation and the Death Penalty, American Association for Individuals with Intellectual Disabilities.

2006-2009: Projects Among African Americans Explore Risks for Schizophrenia (PAARTNERS), Consensus Diagnosis Group, Minority Mental Health Research Group, Department of Psychiatry and Behavioral Sciences, Morehouse School of Medicine, Atlanta, Georgia

1996-present: Individual Private Practice, Oakland, California

2006: National Consortium on Disaster Response for the Poor and Underserved, Developmental Task Force for the Minority Mental Health Professions Foundation, Atlanta, Georgia

2006: Georgia Congressional Representative Cynthia McKinney's Post-Katrina Working Task Force

1998-2004: Consultant-the Board of Directors, Crestwood Behavioral Health Systems, Stockton, California

1996: Individual Private Practice, San Francisco, California

1994-1996: Senior Consulting Addictionologist, New Beginnings Programs, San Ramon and Pinole, California

1988-1996: Individual Private Practice, Pinole, California

1994-1995: Chemical Dependency Consultant, Physicians' Advisory Committee, Alameda Contra Costa Medical Association

1990-1995: Consultant, Insomnia Division of the Sleep Disorders Center, Doctors Hospital, Pinole, California

1992-1994: Qualified Medical Examiner, Industrial Medical Council, State of California

1990-1994: Medical Director, Pain Management Program, Doctors Hospital, Pinole, California

1991-1993: Psychiatric/Pharmacologic Consultant, Triumph Over Pain (TOP Program), Kentfield Rehabilitation Hospital, Kentfield, California

1991-1993: Psychiatric Consultation, NeuroCare Corporation, Concord, California

1989-1994: Clinical Director, New Beginnings Chemical Dependency Program, Doctors Hospital, Pinole, California

1988-1993: Private Practice, Comprehensive Psychiatric Services, Walnut Creek

1983-1990: Staff Psychiatrist, Crestwood Manor, Vallejo, California

1982-1983: Medical Director, Westside Geriatric Services of Family Service Agency of San Francisco

1982-1983: Staff Psychiatrist, Villa Fairmount Psychiatric Facility, San Leandro, California

1981-1982: Assistant Director of the Inpatient Center, Director of Geriatric Services, Pacific Medical Center, San Francisco, California

1980-1981: Medical Director, Clinica De La Raza, Blythe, California

1979-1981:  Emergency Room Physician, Medical Emergency Services, Fairmount Hospital, San Leandro, California

INTERNATIONAL CLINICAL EXPERIENCE & CONSULTATIONS

2006-2008: Adjunct Professor, Makerere University, Department of Psychiatry, Kampala, Uganda

2006-present: Human Rights Committee, International Academy of Law and Mental Health, Montreal, Quebec, Canada

2006: Visiting Staff Psychiatrist, Butabika National Hospital, Kampala, Uganda

2004: Clinical Consultant, Kidongo Chekundu Mental Hospital, Zanzibar, Tanzania

2004: Scientific Committee, International Academy of Law and Mental Health

1998-2004: Technical Advisor, Documentation Committee, Operation Recovery, Kenya Medical Association

1999-2003: Advisor - the Jomo Kenyatta National Hospital, PTSD Project, Nairobi, Kenya

1998-2003: Technical Advisor- Recovery Services, Ministry of Health, United Republic of Tanzania

ADVISORY BOARDS

2006-present: Executive Committee, International Academy of Law and Mental Health

2004-2007: Advisory Board, Health Law Institute, DePaul University, College of Law

2004-present: Advisory Board, Human Dignity and Humiliation Studies, University of Trondheim, Norway

2004-present: Board of Directors, The Center for African Peace and Conflict Resolution, College of Health and Human Services, California State University, Sacramento

2003-present: International Board of Directors, International Academy of Law and Mental Health

FACULTY AND PROFFESIONAL APPOINTMENTS

2008: Secretary, American Psychiatric Association's Africa Action Committee

2003-present: Adjunct Professor, California State University, Sacramento, Department of Educational Leadership and Public Policy, Sacramento, California

2002-present: Adjunct Professor, Morehouse College School of Medicine, Atlanta, Georgia

1999-2004: Affiliate Professor, University of Washington, Bothell Campus, Interdisciplinary Arts and Sciences

1986-2002: Adjunct Professor, University of Nebraska, Omaha, College of Public Affairs

1996-2000: Adjunct Professor, University of California, Davis, Department of Psychiatry, Forensic Fellowship

1992: Summer Faculty, North Central Educational Research Laboratory, Northeastern University

CLINICAL LECTURES

2010: Psychiatric Manifestations of Physical Disease. Morehouse School of Medicine, Department of Family Practice, Atlanta, Georgia.

2009:  Sleep Disorders in Psychiatric Practice: Morehouse School of Medicine,  Department of Psychiatry, Atlanta, Georgia

2008: Moderator: The Impact of Mental Health Issues on Aging, Particularly as it Relates to Alzheimer, Dementia, and Parkinson Disease, National Medical Association, Atlanta, Georgia

2008: Aging and Mental Health: What is Wellness and What is Pathology? National Medical Association, Atlanta, Georgia

2007: The Price of Leadership and the Cost of Success: Urban Leadership Program, Graduate School of Educational Leadership and Public Policy, California State University, Sacramento

2007: Cognitive Assessment and Curriculum, Department of Educational Policy, Urban Leadership Program, Graduate School of Educational Leadership, California State University, Sacramento

2007:  Complex disorders of trauma and torture: The neurological bases examined through sleep disorders, Padua, Italy

2006: Clinical Aspects of Forensic Evaluation, Makerere University, Department of Psychiatry, Kampala, Uganda

2006: Memory, Medications, and Aging, Crockett, California Women's Club

2006: Cultural Differences: Ethics or Efficacy, Mental Health, Ethics and Social Policy, University of Montreal, Quebec, Canada

2006: An Update on Memory Function, Grand Rounds, Morehouse School of Medicine, Atlanta, Georgia

2006:  Moderator & Respondent (Representing Morehouse School of Medicine)
 Consortium for the Poor and Underserved- Cultural Factors, DePaul University School of Law and Health, Health Law Institute

 2005: Constitutional Theory and Medical Rights, Montreal, Quebec, Canada

2005: Medical Diseases with Psychiatric Manifestations: Morrison and Foerster, LLP

2004: Diagnosis and Treatment of Malaria-Induced Altered Mental States: Kidongo Chekundo Mental Hospital, Zanzibar, Tanzania

2003:  Law, Mental Health, and Popular Culture: University of San Francisco College of Law

2003: Accommodating Mental Illness in the Workplace: The 28th International Conference, International Academy of Law and Mental Illness, Sydney, Australia

2002: Cultural and Psycho-biological Factors In the Assessment and Treatment of Trauma: Don't Believe Everything You Think: Traumatology 1003, The Trauma Recovery Institute, Morgantown, West Virginia

2002: Trauma, Recovery and Resiliency: University of Washington, Bothell, 2002

2001: Understanding the Relationship Between Neuroimaging, Neuropsychology, and Behavior: National Medical Association 2001 Annual Convention and Scientific Assembly, Nashville, Tennessee, 2001

2001: The Thrill is Gone: Keynote Address, African American History Month, Loras College, Dubuque, Iowa

2001: Disparate Access- Healthcare: University of Washington, Bothell Campus Nursing Program

2000: Anger Management: West Contra Costa Stroke and Aphasia Support Group, Doctors Hospital, San Pablo, California, 2000

2000: Race, Culture and Bioethics: American Society for Bioethics Annual Conference, Panel Discussion, Salt Lake City, Utah

2000: Globalization and Postmodernism: International Congress on Law and Mental Health, Siena, Italy

2000: Globalization and Neuropsychiatry: Answers that Transcend Culture? International Congress on Law and Mental Health, Sienna, Italy

1998: Managed Care in the Kenyan Medical Environment: Kenyan Medical Environment: Kenyan Medical Association, Aga Khan Hospital, Nairobi, Kenya

1994: The Relationship Between Holidays and Mood Disorders: Doctors Hospital Pinole, California

1994: The Role of the Mental Health Expert as a Liaison Between Chemical Dependency and Pain Management Programs: American Academy of Pain Management, Vancouver, Canada

1994: Chemical Dependency: Selected Topics: Critical Care Conference, Doctors Hospital, Pinole California

1993: Detox: The First Step to Recovery: National Medical Enterprises Management Services Division Annual Conference, Colorado Springs, Colorado

1993: Substance Use and Substance Induced Organic Mental Disorders: National Medical Enterprises Management Services Division Annual Conference, Colorado Springs, Colorado

1993: Dual Diagnosis in the Inpatient Setting- Professional Seminar, Doctors Hospital, Pinole, California

1993: Depression and Strokes: Brookside Hospital, San Pablo, California

1992: Drug Interactions in the ICU: Clinical Care Rounds, Doctors Hospital, Pinole, California

1992: Overview of Sleep Disorders: Grand Rounds, Doctor  Hospital, Pinole, California

1991: Benzodiazepines: Uses and Abuses: Grand Rounds, Brookside Hospital, San Pablo, California

1990: Sleep Disorders in Schizophrenia: Quarterly Medical Staff Meeting, East Bay Hospital

1987: Afro-Centricity in Psychology: Grand Rounds, San Francisco General Hospital, San Francisco, California

1982: Geriatric Psychiatry-University of Southern California, 1982


PROFESSIONAL AFFILIATIONS

Northern California Psychiatric Society

American Society of Addition Medicine

American Psychiatric Association

Black Psychiatrists of America

American Neuropsychiatric Association

American Psychological Association

American  Association for Intellectual and Developmental Disabilities


CLINICAL PROFESSIONAL ACTIVITIES

2010: American Association for Intellectual and Developmental Disabilities, Task Force

2007-2009: Neurocognitive Committee, PAARTNERS

2004-present: Scientific Committee, International Academy of Law and Mental Health

1993-1996: Medical Privileges Committee, Doctors Hospital, Pinole, California

1991-1996: Physicians' Advisory Committee, Doctors Hospital, Pinole, California
(Chair, 1994- 1995)

1993-1995: Physicians' Advisory Committee, Alameda Contra Costa Medical Association, Oakland, California

1993-1994: Board of Directors, Solano Park Hospital, Fairfield, California

1992-1993: Board of Directors, East Bay Hospital, Richmond, California

1992: Chief of Staff, East Bay Hospital, Richmond, California

1992: Chairman, Medical Executive Committee, East Bay Hospital, Richmond, California

1992: Allied Health Committee, Doctors Hospital, Pinole, California

1992: Pharmacy & Therapeutics Committee, Doctors Hospital, Pinole, California

1991: Professional Activities Committee, Easy Bay Hospital, Richmond, California

1990: Psychiatry Committee, Chairman, East Bay Hospital, Richmond, California

HONORS

2009: Secretary General, International Academy of Law and Mental Health

2009: Co-Chair, International Academy of Law and Mental Health Congress, New York University Law School,

2007: Co-Chair, International Academy of Law and Mental Health Congress, University of Padua, Padua, Italy.

2007: Executive Committee, International Academy of Law and Mental Health

1993: Outstanding Professor Award, Goodrich Program, Department of Public Policy, University of Nebraska at Omaha

1992: National Medical Enterprises' Outstanding Medical Director of Psychiatric, Rehabilitation and Recovery Hospitals

1992: Chief of Staff Award for Outstanding Service, East Bay Hospital, Richmond, California

CLINICAL PUBLICATIONS

Bradford, Fresh, Woods: Not all patients are alike:  Ethnopsychopharmacology of Bipolar Disorder in African Americans. Psychiatric Times, February, 2007.

Abueg, Woods, Watson: Disaster Trauma; Cognitive-Behavioral Strategies in Crisis Intervention: Second Edition, Guilford Press, New York and London; p. 73-290, 2000.

FORENSIC PRACTICE

1981-present: Psychiatric Consultant (Civil, Criminal and Appellate Judicial Proceedings)

1993-2001: Consultant- the Victims' Assistance Program, State Board of Control, State of California, Sacramento, California

1983-2000: Medical Examiner Panel, San Francisco County, Marin County and Contra Costa County Superior Courts

FORENSIC PROFESSIONAL LECTURES

2009:  Treatment of Mentally Ill Offenders in the United States, Canada, and Japan; Japanese Association of Forensic Psychiatry, Tokyo, Japan

1998-2007: In Association With The National Institute of Trial Advocacy Training, Notre Dame University, South bend, Indiana; Georgia State Law School, Atlanta, Georgia; New York University Law School, New York City, University of North Carolina Law School, Chapel Hill, North Carolina; University of Houston Law School, Houston, Texas; University of Tennessee Law School, Knoxville, Tennessee; Atlanta, Georgia; University of Texas Law School, Austin, Texas; Temple University School of Law, Philadelphia, Pennsylvania

2006: Aligning Clinical Services with Correctional Treatment, Luzira Prison, Kampala, Uganda

2006: Decision Tree for Forensic Evaluations, Butabika Hospital, Kampala, Uganda

2006: Neuropsychiatry and The Courts: The University of Texas Law School, Austin Texas

2002: Demystifying Emotional Damages Claims: Paul, Hastings, Janofsky & Walker, San Francisco, California

2000: An Introduction-Multi-Axial Assessment and DSM-IV: Second National Seminar on Mental Illness and the Criminal Law, Miyako Hotel, San Francisco, California

2000: Psychiatric Manifestations of Mental Disorders: Second National Seminar on Mental Illness and the Criminal Law, Miyako Hotel, San Francisco, California

1999: An Introduction-Multi-Axial Assessment and DSM-IV: First National Seminar on Mental Illness and the Criminal Law, Radisson Hotel, Washington, D.C.

1999: Psychiatric Manifestations of Medical Disorders: First National Seminar of Mental Illness and the Criminal Law, Radisson Hotel, Washington, D.C.

1999: The Kenya/Tanzania Embassy Bombings: When Forensic Science, Politics, and Cultures Collide: International Academy on Law and Mental Health, Toronto, Quebec, Canada

1999:  Research Collaboration Between East Africa and the United States: World Psychiatric Association/Kenya Psychiatric Association, First Annual East African Conference, Nairobi, Kenya

1999: Trauma/Resiliency In East Africa Workshop: World Psychiatric Association/Kenya Psychiatric Association, First Annual East African Conference, Nairobi, Kenya

1998: Mental Health Litigation and the Workplace: Sponsored by the University of California Davis Health System, Division of Forensic Psychiatry, Department of Psychiatry, and Continuing Medical Education, Napa, California

1998: Psychological Disabilities: Charting A Course Under the ADA and Other Statutes: Yosemite Labor and Employment Conference, Yosemite, California

1998: Current Trends in Psychiatry and the Law: Developing a Forensic Neuro-Psychiatric Team: CLE, Federal Public Defenders for the District of Oregon, Portland, Oregon

1997: The Changing Picture of Habeas Litigation: The National Habeas Training Conference, New Orleans, Louisiana

1997: Accommodating Mental Illness in the Workplace: Employment Law Briefing, Orange County

1997: Accommodating Mental Illness in the Workplace: Employment Law Briefing, Palo Alto, California

1997: Accommodating Mental Illness in the Workplace: Employment Law Briefing, Morrison & Foerster, San Francisco

1997: Psychiatric Evaluations in the Appellate Process: Emory University, Department of Psychiatry, Forensic Fellowship, Atlanta, Georgia

1997: So You Wait Until Discovery Is Over to Consult with a Psychiatrist?  Can You Tell Me More About That? Morrison and Foerster Labor Law College, Los Angeles, California

1997: The Changing Cultural Perspectives in Forensic Psychiatry, San Francisco General Hospital Grand Rounds, San Francisco, California

1996: Evaluations of an Elementary School Child: Criminal Competency and Criminal Responsibility, Stanford University School of Medicine, Department of Psychiatry and Behavioral Sciences, Division of Child, Psychiatry and Child Development, Grand Rounds, Palo Alto, California

1996: Forensic Psychiatry: Cultural Factors in Criminal Behavior, Malingering, and Expert Testimony: The Black Psychiatrists of America Transcultural Conference, Dakar, Senegal, West Africa

1996:  Dangerousness; Evaluation of Risk Assessment: Grand Rounds, Department of Psychiatry, University of California, Davis

1995: Violence in the Workplace: A Psychiatric Perspective of Its Causes and Remedies: The Combined Claims Conference of Northern California, Sacramento, California

1995:  Experts: New Ways To Assess Competency- Neurology and Psychopharmacology: Santa Clara University Death Penalty College, Santa Clara, California

1995: Multiple Diagnostic Categories in Children Who Kill: Psychological and Neurological Testing and Forensic Evaluation:  The American College of Forensic Psychiatry 13th Annual Symposium, San Francisco, California

1995: Mock Trial: Client Competence in a Criminal Case: Testing the Limits of Expertise, The American College of Forensic Psychiatry 13th Annual Symposium, San Francisco, California

1995: The Use of Psychologists In Judicial Proceedings: The California Attorneys for Criminal Justice/California Public Defenders Association Capital Case Seminar, Monterey, California

1994: Commonly Seen Mental Disorders in Death Row Populations: The California Appellate Project, Training Session for Legal Fellows and Thurgood Marshall Investigative Interns, San Francisco, California

1994: Anatomy of a Trial: Mock Trial Participant, The California State Bar Annual Convention, Anaheim, California

1994: Developing a Forensic Neuropsychiatric Team: The American College of Forensic Psychiatry 12th Annual Symposium in Forensic Psychiatry, Montreal, Quebec, Canada

1994: Responsibility in Forensic Psychiatry: Department of Criminology Faculty Seminar, University of Nebraska, Omaha

1994: Attorney/Investigator Workshop: Brain Function: The 1994 California Attorneys for Criminal Justice/California Public Defenders Association Capital Case Seminar, Long Beach, California

1994: Appellate and Habeas Attorney/Investigator Workshop: Evaluating Mental Health Issues in Post-Conviction Litigation: The 1994 California Attorneys for Criminal Justice/California Public Defenders Association Capital Case Defense Seminar, Long Beach, California

1993: Psychological Issues in Police Misconduct: Police Misconduct Litigation, National Lawyers Guild, San Francisco

1993: Neuropsychiatry, Neuropsychology and Criminal Law: Maricopa County Office of the Public Defender, Seminar on Investigation for Mitigation and Capital Cases, Phoenix, Arizona

1993: Working With Experts: California Appellate Project, San Francisco, California

1991: Forensic Psychiatry and Ethnicity-Black District Attorneys Association, National Convention


PROFESSIONAL FORENSIC PUBLICATIONS

Psychiatry and Criminal Law, Contra Costa Lawyer, Volume II, No. 8, August 1998.

Mock Trial: Client Competence in a Criminal Case: Testing the Limits of Expertise, The Psychiatrist's Opinion as Scientific, The Expert's Foundation As Sufficient, 1995
(Available from The American College of Forensic Psychiatry and on Audiotape.)

Multiple Diagnostic Categories in Children Who Kill: Psychological and Neurological Testing and Forensic Evaluation, 1995.  (Available from the American College of Forensic Psychiatry and on Audiotape).

Developing a Forensic Neuropsychiatric Team,1994. (Available from the American College of Forensic Psychiatry on Audiotape).

Anatomy of a Trial: 1994 (Available for the California State Bar).

PROFESSIONAL AFFILIATIONS

• International Academy of Law and Mental Health

PROFESSIONAL DEVELOPMENT & CORPORATE SERVICES

2009: AgeServe  Communications, LLC: Director of Research/Director of Government Programs

2004: Consultant, Corporate Structure, Tostan, Non Governmental Organization, Theis, Senegal

2004: Toward Effective Retention Efforts: The use of narratives in understanding the experiences of racially diverse college students., Narrative Matters, Fredericton, New Brunswick, Canada

2003:     In Association with the Council on Education in Management, Charlotte, North Carolina, Accommodating Psychiatric Disabilities: Avoiding the Legal Pitfalls of the ADA, Human Resources Conference, Palm Springs, California

2001-2003: Consultant, Vulcan Inc., Seattle, Washington

1999: In Association with Matthew Bender Legal Publishing, New York: Psychiatric Disabilities and California Workplace Requirement, With the Bar Association of San Francisco, San Francisco

1998: Psychiatric Disabilities under the Americans With Disabilities Act: Without Pretrial Strategy, Atlanta, Georgia

1998: Psychiatric Disabilities under the Americans With Disabilities Act: Without Pretrial Strategy, Los Angeles, California

THE CRITICAL MOMENTS CONSULTING GROUP

2001: Part I- Responding Creatively to Cultural Diversity through Case Stories and Part II- Strategies and Challenges for Campus-wide Diversity Project: Models of Integrating Critical Moments, Fourteenth, Annual Conference on Race and Ethnicity in American Higher Education, Seattle Washington

2001: Teaching Complex Case Stories, Faculty Development, Loras College, Dubuque, Iowa

2000: Critical Moments:  Creating a Diversity Leadership Learning Community, 13th Annual National Conference on Race and Ethnicity in American Higher Education (sponsored by the University of Oklahoma, Southwestern Center for Human Relations Studies), Santa Fe, New Mexico

2000: Critical Moments: Practicum on Teaching Diversity Through Case Stories, 13th Annual National Conference on Race and Ethnicity in American Higher Education (sponsored by the University of Oklahoma, Southwestern Center for Human Relations Studies), Santa Fe, New Mexico

2000: Improving Undergraduate Education: Teaching and Learning in the Context of Cultural Differences, The Washington Center for Improving the Quality of Undergraduate Education, Thirteenth Annual Conference, Seattle, Washington

1999: Critical Moments: Deepening Our Understanding of Cultural Diversity through Critical Analysis, Effective Interviewing, Case Writing, and Case Teaching, The Washington Center, Evergreen State College, Olympia, Washington

1999: Teaching Complex Issues with Case Studies: A Workshop for Faculty and Graduate Teaching Assistants, University of Nebraska at Lincoln, Teaching and Learning Center and Critical Moments Project

1999: Critical Moments: Writing the Stories of Diverse Students, Washington Center for Improving the Quality of Undergraduate Education Workshop for College and University Faculty, Administrators, Staff and Students, Evergreen State College, Bothell, Washington

1999: Critical Moments: A Case Study Approach for Easing the Cultural Isolation for Under-represented College Students, Presented at Transforming Campuses Through Learning Communities, National Learning Communities Conference, Seattle, Washington

1993: Contextualism and Multi-Cultural Psychology-Graduate Seminar, University of Nebraska, Omaha, Nebraska

1992: Curriculum and Developmental Stages-North Central Educational Research Lab, Northwestern University

CRITICAL MOMENTS PUBLICATIONS

Diane Gillespie, Ph.D., Gillies Malnarich, and George Woods, M.D. (2006).  Critical Moments: Using College Students' Border Narratives as Sites for Cultural Dialogue, In M.B. Lee (Ed.), Ethnicity Matters: Rethinking How Black, Hispanic and Indian Students Prepare for and Succeed in College.  (pp. 99-116). New York: Peter Land Publishing Group.

Diane Gillespie, Ph.D. and George Woods, Jr., M.D. (2000).  Critical Moments: Responding Creatively Cultural Diversity Through Case Stories; Third Edition.


Updated  October 12, 2010

# Exhibit B

**MYLA H. YOUNG, Ph.D., ABN**

**Diplomate – American Board of Professional Neuropsychology**

**PSY 11916**

### Curriculum Vitae

*Office:*                           *Mailing:*

**1475 North Broadway # 335      1630 North Main Street #357**

**Walnut Creek, CA 94596        Walnut Creek, CA 94596**

**(925) 952-4350**

**925  945-8991 (FAX)**

mylayoung@sbcglobal.net

**LICENSE-Psychology**

California      August, 1990        PSY 11916

**CERTIFICATION**

Board Certification in Neuropsychology – American Board of
    Professional Neuropsychology (ABPN)

Certification in Hare Psychopathy Checklist-#99-20
    Robert Hare, Ph.D.

**EDUCATION**

Ph.D.           Alliant International University
                (Formerly California School of Professional
                Psychology)
                  San Francisco, California
                  Doctor of Philosophy/Clinical Psychology
                  January, 1988

M.A.            Towson State University
                  Baltimore, Maryland
                  Master of Arts/Experimental Psychology
                  June, 1977

B.A.            University of Guam
                  Agana, Guam
                  Bachelor of Arts/Psychology
                  June, 1975

**POST-DOCTORAL FELLOWSHIP**

University of California/San Francisco General Hospital
     San Francisco, California

January 1988 – January 1990

**PRE-DOCTORAL INTERNSHIPS**

McAuley Neuropsychiatric Institute of St. Mary's Hospital
       San Francisco, California

July 1985 - July 1987

Garfield Geropsychiatric Hospital
       Oakland, California

October 1984 - July 1985

**PROFESSIONAL WORK EXPERIENCE - Current**

Private          Neuropsychological Assessment
Practice            Forensic Neuropsychological Evaluation

2005 – Present

Private          Neuropsychological Assessment
Practice          Child, Adolescent and Adult
                   Forensic, Medical, Psychiatric, Medico-
                     Legal, Educational Neuropsychological
                     Evaluation

March 1992 – 2005

Continuing       University of California-Berkeley
Education        Neuropsychological Evaluation of Criminal
Faculty            Offenders
                 Introduction to Neuropsychological
                   Assessment

2005 – Present

2

**PROFESSIONAL WORK EXPERIENCE – Prior**

Senior            California Department of Mental Health
Supervising       Correctional Medical Facility
Psychologist      Vacaville, California

                    Psychology Consultant to Executive Director,
                     Medical Director and Program Directors
                    Principal Investigator for Research Project
                    Program Evaluation, Program Development,
                     Treatment Outcome Measurement
                    Director-American Psychological Association
                     (APA) Psychology Intern Training Program
                    Director-Psychology Fellowship Training
                     Program
                     Standards of Practice/Quality Assurance
                     -Psychology Service
                    Staff Selection/Evaluation - Psychology
                     Service
                    Clinical Supervision and Consultation -
                    Psychology Service

            Staff Psychologist – January 1990 – June 1995
            Program Consultant – June 1995 – January 2000
            Senior Psychologist - January 2000 – July 2005


Adjunct           Alliant University - Berkeley/Alameda
Faculty             Instructor: Neuropsychological Assessment
                            Cognitive Bases of Behavior

                  Dissertation Chairperson:
                        -Neuropsychological Assessment of
                          Psychotic and Non-Psychotic
                          Inmate/Patients
                        -Neuropsychiatric Description of
                          Children in Day Treatment
                        -HIV/AIDS-Affected Children:  A
                       Study Utilizing the Rorschach To
                          Identify Depression
                      -Self Mutilation:  Analysis of
                         a Psychiatric Forensic
                       Population
                       -Relationships of Rorschach and
                         MMPI2 to the PCL-R among
                       Mentally Ill Felons

3

Dissertation Committee:
-Development of Special
    Aggression Content Scales for
    Rorschach Test Administration
    within a Prison Population
-Neuropsychological and Cognitive
    Correlates of Academic
    Achievement in a Child
    Psychiatric Sample
-Emotional Descriptors of
    Adolescents Who Have
    Committed Homicide
-Rorschach Responses/Piagetian
    Cognitive Development in Eight
    to Twelve Year Old Children
-Understanding Malingering:
    Theory and Treatment

1990 - 2005

Training,          Oaks Children's Center
Assessment,          San Francisco, California
Consultation       Training and Supervision of Pre-Doctoral
                     Psychology Intern
                   Seminars in Neuropsychological and
                   Personality Assessment of Children
                     1992 - 1995

Training,          McAuley Institute of St. Mary's Hospital
Assessment,          San Francisco, California
Consultation       Training and Supervision of Pre/Post-
                     Doctoral Psychology Interns/Fellows
                     Seminars in Neuropsychological Assessment
                       Of Children, Adolescents, Adults

                           1992 - 1995

Research           University of California-San Francisco
Training             NIDA Research Grant:  Longitudinal
                     Study of HIV Related Cognitive
                     Impairment in Groups of Gay Men and IV
                     Drug Users

                           1988 - 1990

4

| Child &<br>Family<br>Counselor | Florida United Methodist Children's Home<br>  Enterprise, Florida<br>Child & Family Counselor at a Residential<br>  Treatment Facility for Children/Adolescents<br>Individual and Group Counseling<br>Parent Education<br>Court Liaison<br>Consultation to Residential Group Home<br>Consultation to Children in Foster Care |
|---|---|

                        1978 - 1980

| Adjunct<br>Faculty | University of Central Florida<br>Valencia Community College<br>Seminole Community College<br>Lake-Sumter Community College<br> Orlando, Florida<br>   General Psychology<br>   Developmental Psychology<br>   Child & Adolescent Psychology<br>   Research Methods<br>   Learning Theory and Animal Behavioral<br>     Training Laboratory |
|---|---|

                        1980 - 1984


**RESEARCH EXPERIENCE**

| Principal<br>Investigator | California Department of Mental Health<br>  Correctional Medical Facility-Vacaville<br>  Prospective description of demographic,<br>  neuropsychological and emotional<br>  functioning in psychiatrically hospitalized<br>  males |
|---|---|

            1994 - 2005 (Project Completed)

| Principal<br>Investigator | California Department of Mental Health<br>  Correctional Medical Facility-Vacaville<br>     Multimethod description of inmates<br>     referred for psychiatric treatment from<br>     Pelican Bay State Prison |
|---|---|

            1994 - 1997 (Project Completed)

| | |
|---|---|
| Principal Investigator | California Department of Mental Health Correctional Medical Facility-Vacaville Development and Evaluation of a Behavioral Milieu Program in a Forensic Psychiatric Treatment Program |

1990 – 1993 (Project Completed)

| | |
|---|---|
| Participant | Spine Institute of San Francisco - Medtronic Spinal Cord Stimulator Project Principal Investigator: J. Schofferman, M.D. |

1996 – 1998 (Project Completed)

| | |
|---|---|
| Post Doctoral Research Assistant | University of California-San Francisco Psychiatric Aspects of AIDS Dementia in Gay Men and IV Drug Abusers Principal Investigators: Alicia Boccellari, Ph.D. J. Dilley, M.D. |

1988 – 1990 (Project Completed)

| | |
|---|---|
| Post Doctoral Research Assistant | McAuley Neuropsychiatric Institute of St. Mary's Hospital Longitudinal Study of Infant Attachment Principal Investigators: H. Massey, M.D. J. Afterman, M.D. |

1988 -1990 (Project Completed)

| | |
|---|---|
| Doctoral Dissertation | Neuropsychological and Piagetian Cognitive Development:  A comparison of children's responses to the Luria-Nebraska Neuropsychological Battery-Children's Revision, Piagetian Tasks, and the WISC-R |

| | |
|---|---|
| Master's Thesis | Piagetian Moral Development:  A comparison of children's responses to Piagetian Moral Intentionally stories presented in both verbal and videotaped versions |

| | |
|---|---|
| Graduate Research Assistant | Towson State University Piagetian Cognitive Development Behavioral Treatment |

6

**PROFESSIONAL PRESENTATIONS**

Contra Costa Department of Defense Seminar Martinez,
California.  *When juvenile offenders become adult
offenders:  A prospective description* (July, 2006)

California Psychological Association Conference San Jose,
California. *The sexual offender in prison psychiatric
treatment: A multimethod description* (April, 2003)

Forensic Mental Health Association of California Conference
Asilomar, California. *The sexual offender in prison
psychiatric treatment: A multimethod description*
(March, 2003)

International Organization of Psychophysiology Montreal,
Canada  *Profiles of Violent Mentally Ill Incarcerated
Males: Neuropsychology and Psychophysiology* (August,
2002)

California Psychological Association Conference Pasadena,
California *Research in Prison Psychiatric Treatment*
(May, 2002)

American Correctional Health Services Association
Conference Costa Mesa, California *Profiles in Violence*
(September, 2001)

Forensic Mental Health Association of California Conference
Asilomar, California *Profiles in Violence* (March,
2001)

Behavioral Health Institute Conference – Los Angeles, CA.
*Latinos is Forensic Psychiatric Treatment* (September,
2000)

Forensic Social Work Conference – Palm Springs, California
*The Violent Psychopath in Treatment* (May, 2000)

Forensic Mental Health Association of California Conference
Asilomar, California *Danger to Self and Danger to
Others:  A description of Inmates Who Harm Themselves
or Harm Others* (March, 2000)

California Psychological Association Conference, San Jose,
     California
         *Neuropsychological and Psychological Evaluations in
         A Forensic Psychiatric Setting* (March, 2000)

Forensic Mental Health Association of California Conference
        Asilomar, California  *The Violent Psychopath in
        Psychiatric Treatment* (March, 1999)

Patton State Hospital Mental Health Conference, Patton,
     California *The Violent Psychopath in Psychiatric
     Treatment* (September, 1999)

Patton State Hospital Mental Health Conference, Patton,
        California *Psychopathy in a Forensic Psychiatric
        Population*(September, 1998)

Forensic Mental Health Association of California Conference
        Asilomar, California *A Multimethod Approach to
        Understanding Psychopathy* (March, 1998)

Patton State Hospital Mental Health Conference, Patton,
        California *Violence in the Community and Assaut in
        Prison:  A Multimethod Approach*(September, 1997)

Forensic Mental Health Association of California Conference
        Asilomar, California *Patterns of Violence:
        Demographic, neurocognitive, diagnostic, and emotional
        descriptions of inmates with high and low violence
        histories.* (April, 1997)

California Department of Corrections-Pelican Bay-Pelican
        Bay, California *Description of Inmate/Patient
        Populations Demographic, Cognitive,
        Neuropsychological, and Psychological Correlates with
        Violence* (July, 1996)

California Department of Corrections-Preston School for
        Boys - Ione, California *Demographic, Cognitive,
        Neuropsychological, and Psychological Correlates with
        Age of Offense* (July, 1996)

California Department of Corrections-Director's Cabinet
        Meeting - Sacramento, California *Description of
        Inmate/Patient Population* (July, 1996)

California Department of Corrections-Northern Regional
    Warden's Meeting - Folsom State Prison *Description of
    Inmate/Patient Population* (July, 1996)


California Department of Corrections-Warden's Meeting - CMF
    Vacaville, California *Description of Inmate/Patient
    Population* (June, 1996)

Patton State Hospital Forensic Mental Health Conference.
    *Development of a Forensic Psychiatric Treatment
    Program Based on Empirical Description of the
    Population* (October, 1995)

Patton State Hospital Forensic Mental Health Conference.
    *Opening Address - The Changing Face of Forensic Mental
    Health:  The Challenge Described* (October, 1994)


**PUBLICATIONS**

Young, M. H., Justice, J., & Erdberg P. (2010). *Sex
    offenders in prison psychiatric treatment: A
    biopsychosocial description.*  International Journal of
    Offender Therapy and Comparative Criminology, 54, 92-
    112.

Schofferman, J. & Young, M. H.  (2010).  *Previously
    unrecognized cognitive and psychological disorders in
    patients with chronic neck pain due to whiplash and
    other forms of cervical trauma.* Pain Medicine,
    (Manuscript in revision).

Young, M. H., Justice J., & Erdberg, P. (2010). *A
    comparison of rape and molest offenders in prison
    psychiatric treatment*. (Manuscript in preparation).

Young, M. H., Justice, J., & Erdberg, P. (2007). *The
    Rorschach Test in a prison population.* In C. Gacano
    and B. Evans (Eds.).  Handbook of forensic Rorschach
    assessment. New York: Routledge Press.

Young, M. H.,Justice, J., & Erdberg, P. (2006).  Risk of
    harm:  Inmates who harm themselves while in prison
    psychiatric treatment.  *Journal of Forensic Sciences,
    51*(1), 154-162.

Young, M. H., & Justice, J. (2003). Risk Factors for
     assault while in Prison Psychiatric Treatment. *Journal
     of Forensic Sciences, 49*(1), 141-149.

Justice, J. & Young, M. H. (2002).  *Managing violence in a
     Supermax facility:  A discussion of research findings
     and their application to reducing violence in supermax
     institutions and beyond.* In D. Neal (ed.) Supermax
     Prisons (pp. 99 – 118). Lanham, MD. American
     Correctional Association.

Young, M. H., Siemsen, R., & Roman, T. (2000).  Neuro-
     psychological and personality assessment in a forensic
     psychiatric setting.  *California Psychological
     Association Convention Abstracts.*

Young, M.H., Justice, J., & Erdberg, P. (2000).  A multi-
     method description of psychopathy among forensic
     psychiatric inmates. In C. Gacono(Ed.) *The Clinical
     Forensic Assessment of Psychopathy:  A Practitioner's
     Guide* (pp. 313-332).  Mahwah, New Jersey, Erlbaum.

Young, M.H., Justice, J., & Erdberg, P. (1999).  Risk
     factors for violence among incarcerated male
     psychiatric patients:  A multimethod approach.
     *Assessment, 6*, 243-258.

Young, M. H. & Justice, J. (1997). Neuropsychological
     functioning of inmates referred for psychiatric
     treatment.  *Archives of Clinical Neuropsychology, 13*,
     303 – 318.

Dilley, J., Boccellari, A., Davis, A., Young, M., &
     Bacchetti, P.  (1989).  Relationships between neuro-
     psychological and immune variables in HIV positive
     asymptomatic men. *IV International Conference on
     AIDS. Montreal, Canada.*

Dilley, J., Boccellari, A., Davis, A., Young, M. &
     Bacchetti, P.  (1989).  Relationships between neuro-
     _psychological and immune variables in HIV positive
     asymptomatic men.  *Abstract and oral presentation.
     American Psychiatric Association, May 11, 1989.
     San Francisco, CA.*

Young, M.H. (1977). Visual Modality as a Preferred Mode
     presentation for Piagetian Moral Intentionally.
     *Monographs of Lida Lee Tall Learning Research Center*.
     Towson State University

**PROFESSIONAL AWARDS**

| | |
|---|---|
| University of Guam | Graduation - Magna Cum Laude<br>June, 1975 |
| Towson State<br>University | Graduation - Magna Cum Laude<br>June, 1978 |
| California School of<br>Professional Psychology | Superior Accomplishment Award<br>Dissertation<br>June, 1988 |
| State of California | Superior Accomplishment Award |
| Department of Mental Health<br>Correctional Medical<br>Facility | Exceptional Job Performance<br>April, 1993 |
| State of California<br>Department of Mental Health<br>Correctional Medical | Superior Accomplishment Award<br>Exceptional Job Performance<br>April, 1995 |
| State of California<br>Award<br>Department of Mental Health<br>Correctional Medical<br>Facility | Outstanding Accomplishment<br><br>Exceptional Job Performance<br>September, 1999 |

**PROFESSIONAL ASSOCIATIONS**

-American Board of Professional Neuropsychology (ABPN)
-American Psychological Association (APA)
    Division 40:  Clinical Neuropsychology
    Division 42:  Forensic Psychology
-California Psychological Association (CPA)
-National Academy of Neuropsychology (NAN)
-International Neuropsychological Society (INS)
-Society for Personality Assessment (SPA)

                                        May, 2010

# EXHIBIT XX

Michael K. Jeanes, Clerk of Court
*** Electronically Filed ***
11/12/2010 8:00 AM

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CR 2000-096032                                      11/02/2010


                                         CLERK OF THE COURT
JUDGE DOUGLAS L. RAYES                    H. O'Shaughnessy
                                              Deputy



STATE OF ARIZONA                    LACEY ALEXANDRA STOVER GARD

v.

WENDI ELIZABETH ANDRIANO (A)        JAMES J BELANGER
                                    SCOTT M BENNETT

                                    CAPITAL CASE MANAGER
                                    COURT ADMIN-CRIMINAL-PCR
                                    VICTIM SERVICES DIV-CA-CCC
                                    VICTIM WITNESS DIV-AG-CCC
                                    ALAN ARNSTEN
                                    FOLEY & LARNER LLP
                                    150 E GILMAN STREET
                                    MADISON WI  83703



                        MINUTE ENTRY


        The Court has received and considered Stipulation to Allow Confidential Contact Visits
Between Wendi Elizabeth Andriano and Her Experts. Good cause appearing,

        IT IS ORDERED that the Stipulation for Order to Allow Confidential Contact Visits
between Wendi Elizabeth Andriano and the experts is granted.

        IT IS FURTHER ORDERED that the experts be permitted to have confidential contact
visits with Wendi Elizabeth Andriano, ADC# 191593, under the terms in the signed order.

        FILED:  Order.

Docket Code 022                    Form R000A                              Page 1

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CR 2000-096032                                         11/02/2010


ISSUED:  Certified copy.


This case is eFiling eligible: http://www.clerkofcourt.maricopa.gov/efiling/default.asp

# EXHIBIT YY

Michael K. Jeanes, Clerk of Court
*** Electronically Filed ***
Isabel Osuna
Filing ID 730823
11/15/2010 3:33:55 PM

James J. Belanger (011393)
Scott M. Bennett (022350)
Coppersmith Schermer & Brockelman PLC
2800 North Central Avenue, Suite 1200
Phoenix, Arizona 85004
(602) 224-0999 (office)
(602) 224-6020 (fax)
sbennett@csblaw.com

Allen A. Arntsen, Admitted *Pro Hac Vice*
Stephan J. Nickels Admitted *Pro Hac Vice*
Matthew R. Lynch Admitted *Pro Hac Vice*
Foley & Lardner LLP
150 E. Gilman Street
Madison, WI 53703
(608) 257-5035 (office)
(608) 258-4258 (fax)
aarntsen@foley.com

*Attorneys for Petitioner Wendi Andriano*

## SUPERIOR COURT OF ARIZONA
## COUNTY OF MARICOPA

| | |
|---|---|
| State of Arizona, | No. CR2000-096032-A |
| Respondent, | **STIPULATION TO ALLOW CONFIDENTIAL CONTACT VISITS BETWEEN WENDI ELIZABETH ANDRIANO AND HER EXPERTS** |
| v. | |
| Wendi Elizabeth Andriano, | |
| Petitioner. | (Assigned to Hon. Douglas Rayes) |

Petitioner Wendi Elizabeth Andriano**,** through undersigned counsel, requests this Court to issue an order directing the Arizona Department of Corrections (hereinafter "ADOC") to allow confidential contact visits between Petitioner and Ms. Sita Jo-Ann Sovin, a mitigation specialist and/or her associates, Ms. Alexis Boothby, Ms. Kristen Powers and Mr. Christopher Darren Butler, as well as between Petitioner and Dr. James W. Hopper, a clinical psychologist, and Dr. George Woods a clinical psychiatrist, and Dr. Myla Young, a neuropsychologist.   Charles Ryan, Director of the ADOC, through

undersigned counsel[1], does not object to the confidential contact visits between Ms. Andriano and the experts.

Counsel for the parties have agreed to terms and conditions for the contact visits and those terms and conditions are listed and contained in the accompanying proposed order. Counsel for the State and ADOC have given counsel for Ms. Andriano permission to sign this stipulation on their behalf.

This is a modification of the order entered by the Court on November 1, 2010. The parties have agreed to add one additional visit (on December 6), and extend by 2 hours each of the other four, previously authorized visits (on December 7, 8, 21, and 22).

Respectfully submitted this 15th day of November, 2010.

COPPERSMITH SCHERMER & BROCKELMAN PLC

By /s/Scott M. Bennett
    James J. Belanger
    Scott M. Bennett

FOLEY & LARDNER LLP
    Allen A. Arntsen, *Pro Hac Vice*
    Stephan J. Nickels, *Pro Hac Vice*
    Matthew R. Lynch, *Pro Hac Vice*

*Attorneys for Petitioner*


OFFICE OF THE ATTORNEY GENERAL

By /s/ Lacey Stover Gard (w/permission)
    Lacey Stover Gard

*Attorney for State of Arizona*

---

[1] Assistant Attorney General Michael Brodsky appears solely for the purpose of representing the interests of ADOC.

2

1    OFFICE OF THE ATTORNEY GENERAL

2    By /s/ Michael Brodsky (w/permission)

3         Michael Brodsky

4    *Attorney for Arizona Department of Corrections*

5

6

7    ORIGINAL filed November 15, 2010.

8

9    COPY hand delivered November 15, 2010, to:

10   The Hon. Douglas Rayes
11   Maricopa County Superior Court
     101 West Jefferson, Room 411
12   Phoenix, Arizona  85003-2243

13   COPIES mailed November 15, 2010, to:

14   Michael Brodsky, Assistant
15   Assistant Attorney General
     1275 West Washington
16   Phoenix, Arizona  85007-2997

17   Lacey Stover Gard
18   Assistant Attorney General
     Office of the Attorney General
19   400 West Congress, Suite S-315
     Tucson, Arizona  85701-1367
20

21   Deputy Warden Lacy L. Scott
     Arizona State Prison – Perryville
22   P.O. Box 3000
     Goodyear, AZ  85395
23

24

25   /s/ Sheri McAlister

26

3

# EXHIBIT ZZ

FILED
~~NOV 15 2010~~ 2:18PM
MICHAEL K. JEANES, Clerk
By _H. O'Shaughnessy_ Deputy

1   James J. Belanger (011393)
    Scott M. Bennett (022350)
2   Coppersmith Schermer & Brockelman PLC
    2800 North Central Avenue, Suite 1200
3   Phoenix, Arizona 85004
    (602) 224-0999 (office)
    (602) 224-6020 (fax)
4   sbennett@csblaw.com

5   Allen A. Arntsen, (Admitted *Pro Hac Vice*)
    Stephan J. Nickels (Admitted *Pro Hac Vice*)
6   Matthew R. Lynch (Admitted *Pro Hac Vice*)
    Foley & Lardner LLP
7   150 East Gilman Street
    Madison, Wisconsin 53703
    (608) 257-5035 (office)
8   (608) 258-4258 (fax)
    aarntsen@foley.com

9   *Attorneys for Petitioner Wendi Andriano*

10              SUPERIOR COURT OF ARIZONA
11                 COUNTY OF MARICOPA

12  State of Arizona,                )   No. CR2000-096032-A
                                     )
13              Respondent,          )   **ORDER GRANTING**
                                     )   **APPOINTMENT OF EXPERT**
14          vs.                      )   **WITNESSES GEORGE W. WOODS,**
                                     )   **JR., M.D., and MYLA YOUNG,**
15                                   )   **Ph.D., ABN**
    Wendi Elizabeth Andriano,        )
16                                   )
                                     )
17              Petitioner.          )   (Assigned to Hon. Douglas Rayes)
                                     )
18  ─────────────────────────────────

19       The Court having received and considered Petitioner's Motion to Appoint Expert

20  Witnesses George W. Woods, Jr., M.D. and Myla H.Young, Ph.D., ABN, and good cause

21  appearing,

22       IT IS ORDERED appointing Dr. George Woods as an expert for Ms. Andriano, and

23  authorizing payment for the work of Dr. Woods, at an hourly rate ~~of $350 conditioned on~~ *to be approved*

24  ~~approval~~ by James Logan, Esq., the Director of the Maricopa County Office of Public

25  Defense Services.

26       IT IS FURTHER ORDERED appointing Dr. Myla H. Young as an expert for

27  Ms. Andriano, and authorizing payment for the work of Dr. Young, at an hourly rate ~~of~~

28

*to be approved*

1   ~~$275.00 conditioned on approval~~ by James Logan, Esq., the Director of the Maricopa

2   County Office of Public Defense Services.

3           IT IS FURTHER ORDERED that counsel for Petitioner obtain determination from

4   James Logan whether these experts are approved by OPDS.  If there is an issue of

5   approval, then counsel shall contact this Court and a hearing will be set all in accordance

6   with formal written order signed by the Court on November  10, 2010 and Filed by the

7   Clerk this date.

8           DATED this  10th  of November, 2010.

9

10

11                                          Douglas Rayes
                                            Maricopa County Superior Court Judge
12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT AAA

Michael K. Jeanes, Clerk of Court
*** Electronically Filed ***
11/16/2010 8:00 AM

## SUPERIOR COURT OF ARIZONA
## MARICOPA COUNTY

CR 2000-096032                                             11/15/2010


                                              CLERK OF THE COURT
JUDGE DOUGLAS L. RAYES                           H. O'Shaughnessy
                                                      Deputy



STATE OF ARIZONA                          LACEY ALEXANDRA STOVER GARD

v.

WENDI ELIZABETH ANDRIANO (A)              JAMES J BELANGER

                                          CAPITAL CASE MANAGER
                                          COURT ADMIN-CRIMINAL-PCR
                                          VICTIM SERVICES DIV-CA-SE
                                          VICTIM WITNESS DIV-AG-CCC



                            MINUTE ENTRY



        The Court has received and considered Petitioner's Unopposed Motion to Appoint Expert
Witnesses George W. Woods, Jr., M.S. and Myla Young, Ph.D., ABN.  Good cause appearing,

        IT IS ORDERED appointing George W. Woods, Jr., M.S. and Myla Young, Ph.D., ABN
George W. Woods, Jr., M.S. and Myla Young, Ph.D., ABN at an hourly rate to be approved by
James Logan, Esq., the Director of the Maricopa County Office of Public Defense Services.

        All in accordance with formal written order signed by the Court and filed by the Clerk.

        FILED:  Order.

        This case is eFiling eligible: http://www.clerkofcourt.maricopa.gov/efiling/default.asp


Docket Code 022                    Form R000A                         Page 1

# EXHIBIT BBB

FILED
NOV 19 2010  11:15am
MICHAEL K. JEANES, Clerk
By _____
H. O'Shaughnessy Deputy

1   James J. Belanger (011393)
    Scott M. Bennett (022350)
2   Coppersmith Schermer & Brockelman PLC
    2800 North Central Avenue, Suite 1200
    Phoenix, Arizona 85004
3   (602) 224-0999 (office)
    (602) 224-6020 (fax)
4   sbennett@csblaw.com

5   Allen A. Arntsen, (Admitted *Pro Hac Vice*)
    Stephan J. Nickels (Admitted *Pro Hac Vice*)
6   Matthew R. Lynch (Admitted *Pro Hac Vice*)
    Foley & Lardner LLP
    150 East Gilman Street
7   Madison, Wisconsin 53703
    (608) 257-5035 (office)
    (608) 258-4258 (fax)
8   aarntsen@foley.com

9   *Attorneys for Petitioner Wendi Andriano*

10                      SUPERIOR COURT OF ARIZONA
11                        COUNTY OF MARICOPA

12  State of Arizona,              )   No. CR2000-096032-A
                                   )
13                  Respondent,    )   **ORDER ALLOWING CONTACT**
                                   )   **VISITS (Death Penalty Case)**
14          vs.                    )
                                   )   (Assigned to Hon. Douglas Rayes)
15                                 )
    Wendi Elizabeth Andriano,      )
16                                 )
                                   )
17                  Petitioner.    )
                                   )
18  _____)

19          Pending before the Court is the parties' Stipulation for an Order to Allow

20  Confidential Contact Visits between Petitioner and Ms. Sita Jo-Ann Sovin, a mitigation

21  specialist and/or her associates, Ms. Alexis Boothby, Ms. Kristen Powers and Mr.

22  Christopher Darren Butler, as well as between Petitioner and Dr. James W. Hopper, a

23  clinical psychologist, and Dr. George Woods a clinical psychiatrist, and Dr. Myla Young,

24  a neuropsychologist.   After due consideration of said stipulation, and the relevant

25  pleadings on file,

26          IT IS ORDERED that the Stipulation for Order to Allow Confidential Contact

27  Visits between Wendi Elizabeth Andriano and the experts is **GRANTED**.

28

IT IS FURTHER ORDERED that the experts be permitted to have confidential contact visits with Wendi Elizabeth Andriano, ADC# 191593, under the following terms:

1.    Visitations may take place on the following dates at the time indicated:

     A.    December 6, 2010          8:30 a.m. to 2:30 p.m.
         Dr. Myla Young, Dr. George Woods, Dr. Jim Hopper, Sita Jo-Ann Sovin, Kristen Powers, Alexis Boothby, and Christopher Butler

     B.    December 7, 2010          8:30 a.m. to 2:30 p.m.
         Dr. Myla Young, Dr. George Woods, Dr. Jim Hopper, Sita Jo-Ann Sovin, Kristen Powers, Alexis Boothby, and Christopher Butler

     C.    December 8, 2010          8:30 a.m. to 2:30 p.m.
         Dr. Myla Young, Dr. George Woods, Dr. Jim Hopper, Sita Jo-Ann Sovin, Kristen Powers, Alexis Boothby, and Christopher Butler

     D.    December 21, 2010        8:30 a.m. to 2:30 p.m.
         Dr. Myla Young, Dr. George Woods, Dr. Jim Hopper, Sita Jo-Ann Sovin, Kristen Powers, Alexis Boothby, and Christopher Butler

     E.    December 22, 2010        8:30 a.m. to 2:30 p.m.
         Dr. Myla Young, Dr. George Woods, Dr. Jim Hopper, Sita Jo-Ann Sovin, Kristen Powers, Alexis Boothby, and Christopher Butler

2.    Petitioner's counsel or the experts shall make arrangements with Warden, Arizona State Prison - Perryville, or her designee, to schedule such visits.

3.    The Warden, through her staff, may require the experts to subject all instruments, equipment, manuals and the like to an inspection and inventory prior to and subsequent to any meeting with Wendi Elizabeth Andriano.

4.    ADOC may require inmate Wendi Elizabeth Andriano to wear leg restraints or a stun belt during the meetings.

5.    Both Petitioner and Respondent recognize that Petitioner's decision not to contest ADOC's practice of using a stun belt on Petitioner, should it use one, is due to the time constraints placed upon Petitioner's counsel and in no way constitutes a waiver of the "stun belt issue" in any future request for a contact visit in this case or in any other case.  Respondents' willingness to

2

1    stipulate hereto should not be considered a waiver of any aspect of ADOC's

2    non-contact visitation policy.

3    6.    The experts shall be allowed to have physical contact with Petitioner as is

4          necessary during the course of the interviews.

5    7.    The interviews must be confidential. The meetings between Petitioner and

6          the experts shall take place in a room that allows for privacy.

7    8.    Before being allowed the contact visit authorized herein, the visiting experts

8          shall certify in a written release to ADOC that they have investigated and

9          ascertained the risks to their personal safety associated with the visit as

10         authorized by and under the circumstances described in this order; that they

11         agree to assume those risks; and that they release and hold harmless ADOC,

12         the State of Arizona, and their officers and employees from any claim arising

13         from death or injury associated with the risks assumed. However, such

14         release shall not operate as a release of gross negligence on the part of

15         ADOC.

16    IT IS FURTHER ORDERED that the Clerk of the Court forward a copy of this

17    Order to counsel of record for Petitioner, Scott Bennett; counsel of record for the State of

18    Arizona, Lacey Stover Gard; Karyn Klausner, ADOC General Counsel; Ms. Sita Jo-Ann

19    Sovin; Deputy Warden Lacy M. Scott; and Michael Brodsky, who is appearing solely for

20    the purpose of representing the ADOC and is not a counsel of record.

22    IT IS SO ORDERED this _18_ day of November, 2010.

24    _____

      Douglas Rayes

25    Maricopa County Superior Court Judge

3

1  Copies of the foregoing provided
   this ___ day of _____to:
2

3  Lacey Stover Gard
   Assistant Attorney General
4  1275 West Washington
   Phoenix, AZ  85007
5

6  Michael Brodsky
   Office of the Attorney General
7  Arizona Department of Corrections
   1275 West Washington
8  Phoenix, Arizona  85007

9
   Deputy Warden Lacy L. Scott
10 Arizona State Prison – Perryville
   P.O. Box 3000
11 Goodyear, AZ  85395

12
   Scott Bennett
13 Attorney for Petitioner
   Coppersmith Schermer & Brockelman PLC
14 2800 N. Central Ave, Suite 1200
   Phoenix, AZ  85004
15

16
   Karyn Klausner, ADOC General Counsel
17 1601 W. Jefferson
   Phoenix, AZ 85007
18

19 Sita Jo-Ann Sovin
   Alexis Boothby
20 Kristen Powers
   Christopher Darren Butler
21 Capital Case Project – Diversified Legal Services
   19528 Ventura Boulevard #520
22 Tarzana, CA   91356

23

24

25 _____

26

27

28
                                    4

# EXHIBIT CCC

Michael K. Jeanes, Clerk of Court
*** Electronically Filed ***
Mary Martin
Filing ID 741681
11/30/2010 3:20:41 PM

James J. Belanger (011393)
Scott M. Bennett (022350)
Coppersmith Schermer & Brockelman PLC
2800 North Central Avenue, Suite 1200
Phoenix, Arizona  85004
(602) 224-0999 (office)
(602) 224-6020 (fax)
sbennett@csblaw.com

Allen A. Arntsen, Admitted *Pro Hac Vice*
Stephan J. Nickels Admitted *Pro Hac Vice*
Matthew R. Lynch Admitted *Pro Hac Vice*
Foley & Lardner LLP
150 East Gilman Street
Madison, WI  53703
(608) 257-5035 (office)
(608) 258-4258 (fax)
aarntsen@foley.com

*Attorneys for Petitioner Wendi Andriano*

SUPERIOR COURT OF ARIZONA
COUNTY OF MARICOPA

| | |
|---|---|
| State of Arizona, | No. CR2000-096032-A |
| Respondent, | **STIPULATION TO ALLOW CONFIDENTIAL CONTACT VISITS BETWEEN WENDI ELIZABETH ANDRIANO AND HER EXPERTS** |
| v. | |
| Wendi Elizabeth Andriano, | |
| Petitioner. | (Assigned to Hon. Douglas Rayes) |

Petitioner Wendi Elizabeth Andriano**,** through undersigned counsel, requests this Court to issue an order directing the Arizona Department of Corrections (hereinafter "ADOC") to allow confidential contact visits between Petitioner and Ms. Sita Jo-Ann Sovin, a mitigation specialist and/or her associates, Ms. Alexis Boothby, Ms. Kristen Powers and Mr. Christopher Darren Butler, as well as between Petitioner and Dr. James W. Hopper, a clinical psychologist, Dr. George Woods, a clinical psychiatrist, and Dr.

1  Myla Young, a neuropsychologist.  Charles Ryan, Director of the ADOC, through

2  undersigned counsel[1], does not object to the confidential contact visits between Ms.

3  Andriano and the experts.

4        Counsel for the parties have agreed to terms and conditions for the contact visits

5  and those terms and conditions are listed and contained in the accompanying proposed

6  order.

7        The attorneys for the State and the ADOC have given Ms. Andriano's attorneys

8  permission to sign this stipulation on their behalf.

9        Respectfully submitted November 30, 2010.

10  COPPERSMITH SCHERMER & BROCKELMAN PLC

11  By  /s/ Scott M. Bennett

12      James J. Belanger
    Scott M. Bennett

13  FOLEY & LARDNER LLP

14      Allen A. Arntsen, *Pro Hac Vice*
    Stephan J. Nickels, *Pro Hac Vice*

15      Matthew R. Lynch, *Pro Hac Vice*

16  *Attorneys for Petitioner*

17  OFFICE OF THE ATTORNEY GENERAL

18  By  /s/ Lacey Stover Gard (w/permission)

19      Lacey Stover Gard

20  *Attorney for State of Arizona*

21

22  OFFICE OF THE ATTORNEY GENERAL

23  By  /s/ Michael Brodsky (w/permission)
    Michael Brodsky

24  *Attorney for Arizona Department of Corrections*

25  [1] Assistant Attorney General Michael Brodsky appears solely for the purpose of representing the
26  interests of ADOC.

2

1  ORIGINAL electronically filed November 30, 2010.

2  COPY hand delivered December 1, 2010, to:

3
4  Honorable Douglas Rayes
   Maricopa County Superior Court
5  101 W. Jefferson, Room 411
   Phoenix, Arizona  85003-2243

6

7  COPIES mailed November 30, 2010, to:

8  Michael Brodsky
9  Assistant Attorney General
   1275 West Washington
10 Phoenix, Arizona  85007-2997

11
   Lacey Stover Gard
12 Office of the Attorney General
   400 West Congress, Suite S-315
13 Tucson, Arizona  85701-1367

14
   Deputy Warden Lacy L. Scott
15 Arizona State Prison – Perryville
   P.O. Box 3000
16 Goodyear, Arizona  85395

17

18 /s/ Sheri McAlister
19
20
21
22
23
24
25
26

3

# EXHIBIT DDD

FILED

Dec 6, 2010   8:47 am

MICHAEL K. JEANES, Clerk

By _____
H. O'Shaughnessy Deputy

1   James J. Belanger (011393)
    Scott M. Bennett (022350)
2   Coppersmith Schermer & Brockelman PLC
    2800 North Central Avenue, Suite 1200
3   Phoenix, Arizona 85004
    (602) 224-0999 (office)
4   (602) 224-6020 (fax)
    sbennett@csblaw.com
5
    Allen A. Arntsen, Admitted *Pro Hac Vice*
6   Stephan J. Nickels Admitted *Pro Hac Vice*
    Matthew R. Lynch Admitted *Pro Hac Vice*
7   Foley & Lardner LLP
    150 East Gilman Street
8   Madison, WI 53703
    (608) 257-5035 (office)
9   (608) 258-4258 (fax)
    aarntsen@foley.com
10
    *Attorneys for Petitioner Wendi Andriano*
11

12              SUPERIOR COURT OF ARIZONA
                   COUNTY OF MARICOPA
13

14   State of Arizona,                )   No. CR2000-096032-A
                                       )
15                       Respondent,   )   **ORDER ALLOWING CONTACT**
                                       )   **VISITS (Death Penalty Case)**
16   v.                                )
                                       )
17   Wendi Elizabeth Andriano,         )   (Assigned to Hon. Douglas Rayes)
                                       )
18                       Petitioner.   )
                                       )
19   _____)

20

21       Pending before the Court is the parties' Stipulation for an Order to Allow

22   Confidential Contact Visits between Petitioner and Ms. Sita Jo-Ann Sovin, a mitigation

23   specialist and/or her associates, Ms. Alexis Boothby, Ms. Kristen Powers and

24   Mr. Christopher Darren Butler, as well as between Petitioner and Dr. James W. Hopper, a

25   clinical psychologist, Dr. George Woods, a clinical psychiatrist, and Dr. Myla Young, a

26

1    neuropsychologist. After due consideration of said stipulation, and the relevant pleadings

2    on file,

3         IT IS ORDERED that the Stipulation for Order to Allow Confidential Contact

4    Visits between Wendi Elizabeth Andriano and the experts is **GRANTED**.

5         IT IS FURTHER ORDERED that the experts be permitted to have confidential

6    contact visits with Wendi Elizabeth Andriano, ADC# 191593, under the following  terms:

7    1.    Visitations may take place on the following dates at the time indicated:

8    A.    January 4, 2011            10:30 a.m. to 2:30 p.m.
9          Dr. Myla Young, Dr. George Woods, Dr. Jim Hopper, Sita Jo-Ann
           Sovin, Kristen Powers, Alexis Boothby, and Christopher Butler

10
11   B.    January 5, 2011            10:30 a.m. to 2:30 p.m.
           Dr. Myla Young, Dr. George Woods, Dr. Jim Hopper, Sita Jo-Ann
12         Sovin, Kristen Powers, Alexis Boothby, and Christopher Butler

13   C.    January 18, 2011           10:30 a.m. to 2:30 p.m.
           Dr. Myla Young, Dr. George Woods, Dr. Jim Hopper, Sita Jo-Ann
14         Sovin, Kristen Powers, Alexis Boothby, and Christopher Butler

15   D.    January 19, 2011           10:30 a.m. to 2:30 p.m.
           Dr. Myla Young, Dr. George Woods, Dr. Jim Hopper, Sita Jo-Ann
16         Sovin, Kristen Powers, Alexis Boothby, and Christopher Butler
17
     E.    February 1, 2011           10:30 a.m. to 2:30 p.m.
18         Dr. Myla Young, Dr. George Woods, Dr. Jim Hopper, Sita Jo-Ann
19         Sovin, Kristen Powers, Alexis Boothby, and Christopher Butler

20   F.    February 2, 2011           10:30 a.m. to 2:30 p.m.
           Dr. Myla Young, Dr. George Woods, Dr. Jim Hopper, Sita Jo-Ann
21         Sovin, Kristen Powers, Alexis Boothby, and Christopher Butler

22   G.    February 15, 2011          10:30 a.m. to 2:30 p.m.
           Dr. Myla Young, Dr. George Woods, Dr. Jim Hopper, Sita Jo-Ann
23         Sovin, Kristen Powers, Alexis Boothby, and Christopher Butler
24
     H.    February 16, 2011          10:30 a.m. to 2:30 p.m.
25         Dr. Myla Young, Dr. George Woods, Dr. Jim Hopper, Sita Jo-Ann
26         Sovin, Kristen Powers, Alexis Boothby, and Christopher Butler

2:16-cv-01159-SRB   Document 28   Filed 08/28/17   Page 646 of 978

2.    Petitioner's counsel or the experts shall make arrangements with Warden, Arizona State Prison - Perryville, or her designee, to schedule such visits.

3.    The Warden, through her staff, may require the experts to subject all instruments, equipment, manuals and the like to an inspection and inventory prior to and subsequent to any meeting with Wendi Elizabeth Andriano.

4.    ADOC may require inmate Wendi Elizabeth Andriano to wear leg restraints or a stun belt during the meetings.

5.    Both Petitioner and Respondent recognize that Petitioner's decision not to contest ADOC's practice of using a stun belt on Petitioner, should it use one, is due to the time constraints placed upon Petitioner's counsel and in no way constitutes a waiver of the "stun belt issue" in any future request for a contact visit in this case or in any other case. Respondents' willingness to stipulate hereto should not be considered a waiver of any aspect of ADOC's non-contact visitation policy.

6.    The experts shall be allowed to have physical contact with Petitioner as is necessary during the course of the interviews.

7.    The interviews must be confidential. The meetings between Petitioner and the experts shall take place in a room that allows for privacy.

8.    Before being allowed the contact visit authorized herein, the visiting experts shall certify in a written release to ADOC that they have investigated and ascertained the risks to their personal safety associated with the visit as authorized by and under the circumstances described in this order; that they agree to assume those risks; and that they release and hold harmless ADOC, the State of Arizona, and their officers and employees from any claim arising from death or injury associated with the risks assumed. However, such

3

1    release shall not operate as a release of gross negligence on the part of

2    ADOC.

3    IT IS FURTHER ORDERED that the Clerk of the Court forward a copy of this

4    Order to counsel of record for Petitioner, Scott Bennett; counsel of record for the State of

5    Arizona, Lacey Stover Gard; Karyn Klausner, ADOC General Counsel; Ms. Sita Jo-Ann

6    Sovin; Deputy Warden Lacy L. Scott; and Michael Brodsky, who is appearing solely for

7    the purpose of representing the ADOC and is not a counsel of record.

8

9    IT IS SO ORDERED this __2__ day of _____*Dec*_____, 2010.

10

11

12                                THE HONORABLE DOUGLAS RAYES

13

14    Copies of the foregoing mailed

15    this ___ day of _____ to:

16    Lacey Stover Gard
      Office of the Attorney General

17    400 West Congress, Suite S-315

18    Tucson, AZ  85701-1367

19    Michael Brodsky
      Office of the Attorney General

20    Arizona Department of Corrections

21    1275 West Washington
      Phoenix, AZ  85007

22

23    Deputy Warden Lacy L. Scott
      Arizona State Prison – Perryville

24    P.O. Box 3000
      Goodyear, AZ  85395

25

26

4

1   Scott Bennett
    Coppersmith Schermer & Brockelman PLC
2   2800 North Central Avenue, Suite 1200
3   Phoenix, AZ  85004
    Attorney for Petitioner
4
5   Karyn Klausner, ADOC General Counsel
    1601 W. Jefferson
6   Phoenix, AZ 85007

7   Sita Jo-Ann Sovin
8   Alexis Boothby
    Kristen Powers
9   Christopher Darren Butler
10  Capital Case Project – Diversified Legal Services
    19528 Ventura Boulevard #520
11  Tarzana, CA   91356

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

5

# EXHIBIT EEE

Michael K. Jeanes, Clerk of Court
*** Electronically Filed ***
12/07/2010 8:00 AM

### SUPERIOR COURT OF ARIZONA
### MARICOPA COUNTY

CR 2000-096032                                            12/06/2010


                                              CLERK OF THE COURT
JUDGE DOUGLAS L. RAYES                          H. O'Shaughnessy
                                                    Deputy



STATE OF ARIZONA                        LACEY ALEXANDRA STOVER GARD

v.

WENDI ELIZABETH ANDRIANO (A)            JAMES J BELANGER

                                        CAPITAL CASE MANAGER
                                        COURT ADMIN-CRIMINAL-PCR
                                        VICTIM SERVICES DIV-CA-SE
                                        VICTIM WITNESS DIV-AG-CCC



                           MINUTE ENTRY



        The Court has received and considered Stipulation to Allow Confidential Contact Visits
Between Wendi Elizabeth Andriano and Her Experts.  Good cause appearing,

        IT IS ORDERED allowing contact visits as outlined in the order signed by the Court on
December 2, 2010 and filed by the Clerk on December 6, 2010.

        FILED:  Order.

        LET THE RECORD REFLECT that Certified copies are mailed to Sita Jo-Ann Sovin,
Karyn Klausner, Scott Bennett, Deputy Warden Lacy Scott, Michael Brodsky and Lacey Stover
Gard this date.

        This case is eFiling eligible: http://www.clerkofcourt.maricopa.gov/efiling/default.asp

Docket Code 022                     Form R000A                            Page 1

# EXHIBIT FFF

Michael K. Jeanes, Clerk of Court
*** Electronically Filed ***
Isabel Osuna
Filing ID 769545
1/7/2011 2:05:56 PM

1   James J. Belanger (011393)
    Scott M. Bennett (022350)
2   Coppersmith Schermer & Brockelman PLC
    2800 North Central Avenue, Suite 1200
3   Phoenix, Arizona  85004
    (602) 224-0999 (office)
4   (602) 224-6020 (fax)
    sbennett@csblaw.com
5
    Allen A. Arntsen, Admitted *Pro Hac Vice*
6   Stephan J. Nickels Admitted *Pro Hac Vice*
    Matthew R. Lynch Admitted *Pro Hac Vice*
7   Foley & Lardner LLP
    150 East Gilman Street
8   Madison, WI  53703
    (608) 257-5035 (office)
9   (608) 258-4258 (fax)
    aarntsen@foley.com
10
    *Attorneys for Petitioner Wendi Andriano*
11
                SUPERIOR COURT OF ARIZONA
12                 COUNTY OF MARICOPA

13
    State of Arizona,                    )  No. CR2000-096032-A
14                                        )
                     Respondent,          )  **STIPULATION TO MODIFY PREVIOUSLY**
15   v.                                   )  **AUTHORIZED, CONFIDENTIAL**
                                          )  **CONTACT VISITS BETWEEN WENDI**
16                                        )  **ELIZABETH ANDRIANO AND HER**
    Wendi Elizabeth Andriano,            )  **EXPERTS**
17                                        )
                     Petitioner.          )
18   ─────────────────────────────────    )  (Assigned to Hon. Douglas Rayes)
19

20          On December 2, 2010, this Court signed an Order authorizing confidential contact

21   visits between Petitioner, Wendi Elizabeth Andriano, and several of the experts assisting

22   with her case.  (The Order was filed on December 6, 2010.)  The experts authorized to visit

23   Ms. Andriano are mitigation specialist Ms. Sita Jo-Ann Sovin; Ms. Sovin's associates, Ms.

24   Alexis Boothby, Ms. Kristen Powers and Mr. Christopher Darren Butler; clinical

25   psychologist Dr. James W. Hopper; clinical psychologist Dr. George Woods, and

26   neuropsychologist Dr. Myla Young.

2473516.2

1    The parties now stipulate to two slight modifications to the December 2 Order

2 (which was filed on December 6, 2010).  The revised Order allows the visits on February

3 15 and 16 to start at 8:30 a.m., rather than at 10:30 a.m. as specified in the December 2

4 Order.

5    The State has agreed to this modification to the visitation schedule, as well as

6 Charles Ryan, Director of the ADOC, through undersigned counsel.[1]

7    A proposed Order with the revised visitation schedule accompanies this stipulation.

8 RESPECTFULLY SUBMITTED this 7th day of January, 2011.

9                      COPPERSMITH SCHERMER & BROCKELMAN PLC

10                     By /s/ Scott M. Bennett
                           James J. Belanger
11                         Scott M. Bennett

12                     FOLEY & LARDNER LLP
                           Allen A. Arntsen, *Pro Hac Vice*
13                         Stephan J. Nickels, *Pro Hac Vice*
                           Matthew R. Lynch, *Pro Hac Vice*
14

15                     *Attorneys for Petitioner*

16                     OFFICE OF THE ATTORNEY GENERAL

17                     By /s/ Lacey Stover Gard (w/permission)
                           Lacey Stover Gard
18

19                     *Attorney for State of Arizona*

20
                       OFFICE OF THE ATTORNEY GENERAL
21
                       By /s/ Michael Brodsky (w/permission)
22                         Michael Brodsky

23                     *Attorney for Arizona Department of Corrections*

24

25

26   [1]   Assistant Attorney General Michael Brodsky appears solely for the purpose of representing the
     interests of ADOC.

                                        2

WDC_2473516.2

1  ORIGINAL electronically filed January 7, 2011.

2  COPY hand delivered January 7, 2011, to:

3
   The Hon. Douglas Rayes
4  Maricopa County Superior Court
   101 W. Jefferson, Room 411
5  Phoenix, AZ  85003-2243

6

7  COPIES mailed January 7, 2011, to:

8  Michael Brodsky
   Office of the Attorney General
9  Arizona Department of Corrections
   1275 West Washington
10 Phoenix, Arizona  85007

11

12 Lacey Stover Gard
   Office of the Attorney General
13 400 West Congress, Suite S-315
   Tuscon, Arizona  85701-1367
14

15 Deputy Warden Lacy L. Scott
   Arizona State Prison – Perryville
16 P.O. Box 3000
   Goodyear, Arizona  85395
17

18 /s/ Dana S. Austin

19

20

21

22

23

24

25

26

3

# EXHIBIT GGG

Michael K. Jeanes, Clerk of Court
*** Electronically Filed ***
Isabel Osuna
Filing ID 769905
1/7/2011 4:45:03 PM

James J. Belanger (011393)
Scott M. Bennett (022350)
Coppersmith Schermer & Brockelman PLC
2800 North Central Avenue, Suite 1200
Phoenix, Arizona  85004
(602) 224-0999 (office)
(602) 224-6020 (fax)
sbennett@csblaw.com

Allen A. Arntsen, Admitted *Pro Hac Vice*
Stephan J. Nickels Admitted *Pro Hac Vice*
Matthew R. Lynch Admitted *Pro Hac Vice*
Foley & Lardner LLP
150 East Gilman Street
Madison, WI  53703
(608) 257-5035 (office)
(608) 258-4258 (fax)
aarntsen@foley.com

*Attorneys for Petitioner Wendi Andriano*

## SUPERIOR COURT OF ARIZONA
## COUNTY OF MARICOPA

| | | |
|---|---|---|
| State of Arizona, | ) | |
| | ) | |
| Respondent, | ) | No. CR2000-096032-A |
| | ) | |
| vs. | ) | **PETITIONER'S MOTION FOR** |
| | ) | **ISSUANCE OF DISCOVERY** |
| Wendi Elizabeth Andriano, | ) | **SUBPOENAS** |
| | ) | |
| Petitioner. | ) | (Assigned to the Hon. Douglas Rayes) |
| | ) | |
| | ) | |

Pursuant to Rule 15.3 of the Arizona Rules of Criminal Procedure and the Court's supervisory powers, Petitioner Wendi Andriano moves for entry of the following discovery-related orders, which are relevant and necessary to her petition for post-conviction relief in this matter:

MADI_2197929.5

- A subpoena ordering Scott A. Mac Leod, who served as Ms. Andriano's mitigation specialist before and during the trial that resulted in her conviction and death sentence, to submit to a deposition by counsel for Ms. Andriano;

- A subpoena *duces tecum* ordering the Maricopa County Public Defender's Office to provide Ms. Andriano's counsel with access to all written employment records for Mr. Mac Leod, including records of any performance reviews and disciplinary actions or reports.

For the reasons stated in the following Memorandum of Points and Authorities, the Court should issue these subpoenas so that Ms. Andriano's counsel can adequately review Mr. Mac Leod's role in the case and the adequacy of his investigation into potentially mitigating evidence.

Counsel understands that Arizona generally disallows pre-petition discovery, instead permitting discovery only after the filing of the petition, accompanied by a "liberal policy" for amending the petition thereafter. *Canion v. Cole*, 210 Ariz. 598, 600-01, 115 P.3d 1261 (2005). At the September 7, 2010 Status Conference in this matter, the Court nevertheless invited counsel to raise such pre-petition requests now in order to identify any potential objections and move the investigation forward. Counsel therefore raises this motion now in the interest of economy, so that any objections on grounds other than those expressed in *Canion* may be identified and addressed expeditiously.

### MEMORANDUM OF POINTS AND AUTHORITIES
### <u>Background</u>

In 2004, a jury convicted Ms. Andriano of the first-degree murder of her husband, Joseph Andriano, and subsequently sentenced her to death. Ms. Andriano timely filed her direct appeal, which was denied by the Arizona Supreme Court on July 9, 2007. Presently, Ms. Andriano's petition for post-conviction relief is due June 1, 2011.

Ms. Andriano's pro bono legal team, including attorneys from Coppersmith Schermer & Brockelman PLC and Foley & Lardner LLP, has been reviewing Ms. Andriano's case for some time in order to determine the appropriate bases to seek post-

2

1    conviction relief on her behalf.  As that investigation has progressed, the team has been

2    aided by the candor of a number of relevant witnesses regarding sensitive and traumatic

3    events, including witnesses disclosing information that they had never disclosed to anyone

4    else (and had never been asked about).

5         The team's efforts have been severely hindered and delayed by a persistent lack of

6    cooperation by Mr. Scott Mac Leod, who was assigned by the Maricopa County Public

7    Defender's Office to serve as Ms. Andriano's mitigation specialist before and during her

8    trial, but was subsequently removed from employment there and has recently become a

9    member of the Arizona State Bar.  Mr. Mac Leod has persistently refused to communicate

10   with Ms. Andriano's team concerning the details of mitigation work he performed for Ms.

11   Andriano's trial, including several strange attempts to evade any communication.

12        As detailed in the Affidavit of Matthew R. Lynch filed concurrently with this

13   motion, Attorney Lynch first contacted in Mr. Mac Leod by telephone in early 2009, when

14   Ms. Andriano's attorneys were making a preliminary investigation to determine whether

15   they would represent her in seeking post-conviction relief.  Mr. Mac Leod indicated he

16   was willing to discuss the matter and asked Attorney Lynch to call back the next day.

17   When Attorney Lynch called back the next day, he received a message from the operator

18   informing him the line had been disconnected.  Attorney Lynch tried this line several more

19   times in the following days, receiving the same message each time.  He then contacted Mr.

20   Mac Leod's father, who assured Attorney Lynch he would pass Attorney Lynch's contact

21   information on to Mr. Mac Leod.  After not receiving any return phone call from Mr. Mac

22   Leod, Attorney Lynch made further calls to his parents and left at least two messages,

23   which were not returned.

24        After several other efforts to contact individuals likely to know Mr. Mac Leod and

25   his availability, Attorney Lynch was able to reach Mr. Mac Leod's father again in late

26   2009.  Mr. Mac Leod's father informed Attorney Lynch that he had not heard from his son

27   in months, did not know if he was even in the country and had no way to contact him.

28                                          3

MADI_2197929.5

1    Attorney Lynch then contacted the Phoenix School of Law, from which Mr. Mac

2    Leod had graduated in the spring of 2009, according to that school's Web site.  The school

3    had no contact information for Mr. Mac Leod other than his school email address, which

4    was still active.  Attorney Lynch emailed Mr. Mac Leod at that school email address but

5    did not receive a return email.  Other efforts to locate him through state bar or other legal

6    directories were unsuccessful.

7    In late 2009, Attorney Lynch then asked Ms. Andriano's post-conviction case

8    investigator, Mr. Mike Torres, to attempt to locate Mr. Mac Leod.  Though Mr. Torres did

9    obtain new contact information for Mr. Mac Leod, and Attorney Lynch called the updated

10   phone numbers and left multiple messages, Mr. Mac Leod did not answer either his home

11   or cellular phone and did not respond to any messages.

12   The subsequently effort of a member of Ms. Andriano's legal team to meet with

13   Mr. Mac Leod at his residence was strangely and abruptly rebuffed.  Upon answering the

14   door, Mr. Mac Leod at first denied that he was, in fact Scott Mac Leod.  Upon further

15   inquiry, he admitted his identity and the fact that he had worked on Ms. Andriano's case as

16   her mitigation specialist.  He flatly refused to discuss the case, however, and

17   unequivocally declared that he was not interested in assisting Ms. Andriano or her post-

18   conviction relief legal team in any way.  He confirmed that he would comply with a

19   subpoena if issued.

20   Finally, in recent weeks, Attorney Lynch noted that the Arizona State Bar Directory

21   had been updated to include a contact number for Mr. Mac Leod and called that number to

22   inform Mr. Mac Leod of this motion and ascertain whether he had might have had a

23   change of heart regarding his refusal to cooperate.  Mr. Mac Leod acknowledged the legal

24   team's prior attempts to contact him and his refusal to cooperate and stated that he did not

25   have time to discuss the matter; he did, however, take Attorney Lynch's phone number

26   and agreed to call back later that day to let him know whether this Motion would be

27   necessary.  Mr. Mac Leod has not returned that call.

28                                              4

1      In short, as of the date of this motion, despite multiple phone calls and/or emails to

2    Mr. Mac Leod, his parents, his neighbors, his alma mater, and his former employers and

3    co-workers, as well as efforts to speak to him in person regarding the case, Mr. Mac Leod

4    has refused to provide Ms. Andriano's representatives with any information and his

5    indicated that he will not do so unless compelled by court order.  In addition, the Maricopa

6    County Public Defender has denied an informal request by counsel for Ms. Andriano to

7    obtain a copy of Mr. Mac Leod's employment file, indicating as a matter of practice that it

8    does not make such records available absent a court order.

9       Therefore, Ms. Andriano seeks the issuance of such orders compelling Mr. Mac

10    Leod to submit to a deposition and requiring the Maricopa County Public Defender to

11    release its employee files pertaining to Mr. Mac Leod for review by Ms. Andriano's

12    counsel.

13

14                **<u>Discussion</u>**

15       This Court has the inherent authority to order discovery in postconviction relief

16    proceedings upon a showing of good cause.  *Canion v. Cole*, 210 Ariz. 598, 115 P.3d

17    1261, 1263 (2005).  Rule 15.3 authorizes depositions whenever the defendant "shows [1]

18    that the person's testimony is material to the case **<u>or</u>** necessary adequately to prepare a

19    defense **<u>or</u>** investigate the offense, [2] that person was not a witness at the preliminary

20    hearing … and [3] that the person will not cooperate in granting a personal interview."

21    Ariz. R. Crim. P. 15.3(a)(2) (emphasis added); *see also id.* 15.3(a)(1) (permitting

22    deposition of witness with material testimony whenever there is a substantial likelihood

23    that the witness will be unavailable at trial).  All three requirements clearly have been met

24    as they relate to Mr. Mac Leod.

25       First, as demonstrated above, the materiality of his testimony to Ms. Andriano's

26    case cannot be questioned.  Mr. Mac Leod is likely the most knowledgeable person with

27    respect to the defense team's investigation of mitigating circumstances prior to Ms.

28                           5

Andriano's trial.  Due to his assigned role in the proceedings, Mr. Mac Leod necessarily possesses information vital to review of Ms. Andriano's case.  Indeed, without this information, Ms. Andriano's attorneys cannot fulfill their duties to provide adequate representation or make informed decisions regarding the appropriate requests for post-conviction relief on Ms. Andriano's behalf.

Second, Mr. Mac Leod was not a witness at a preliminary hearing or any other proceeding.

Third, and finally, personal interviews have been repeatedly requested but ignored. *See, e.g., Murphy v. Super. Ct.*, 142 Ariz. 273, 277-78, 689 P.2d 532, 536-37 (1984) (reversing refusal to order depositions and noting the importance of Rule 15.3 in relation to the defendant's rights of cross-examination and meaningful opportunity to prepare a defense); *Kanuck v. Meehan*, 165 Ariz. 282, 285, 798 P.2d 420, 423 (App. 1990) (reversing refusal to order deposition of probation officer who filed petition to revoke probation).  As detailed by Attorney Lynch in his attached affidavit, post-conviction relief counsel for Ms. Andriano have made multiple good faith attempts to communicate with Mr. Mac Leod, all without avail.

In light of these facts, Ms. Andriano respectfully requests that this Court order Mr. Mac Leod to submit to a deposition pursuant to Rule 15.3 of the Arizona Rules of Criminal Procedure.  Ms. Andriano further requests that this Court order him to bring and produce any written or electronic documents, records, or communications, within his control relating in any way to Ms. Andriano's alleged offense, trial or appeal, and to order Mr. Mac Leod's former employer (the Maricopa County Office of the Public Defender) to provide Ms. Andriano's counsel with access to his written employment files.  *See* Ariz. R. Crim. P. 15.3(c).

6

MADI_2197929.5

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## <u>Conclusion</u>

For the foregoing reasons, this Court should order the requested subpoenas in aid of Ms. Andriano's petition for post-conviction relief.


RESPECTFULLY SUBMITTED January 7, 2011.


COPPERSMITH SCHERMER &
BROCKELMAN PLC

By /s/ Scott M. Bennett
       James J. Belanger
       Scott M. Bennett

FOLEY & LARDNER LLP
       Allen A. Arntsen, *Pro Hac Vice*
       Stephan J. Nickels, *Pro Hac Vice*
       Matthew R. Lynch, *Pro Hac Vice*

       *Attorneys for Petitioner*

7

1  ORIGINAL filed January 7, 2011,
2  with the Clerk of the Maricopa
   County Superior Court.

3
   COURTESY COPY hand-delivered January 7, 2011, to:
4

5  Judge Douglas Rayes
   Maricopa County Superior Court
6  East Court Building-511
   101 W. Jefferson
7  Phoenix, AZ 85003-2243

8
   COPY mailed January 7, 2011, to:
9

10 Ms. Lacey Stover Gard
   Office of the Attorney General
11 400 W. Congress, Suite S-315
   Tuscon, AZ 85701-1367
12 *Attorney for the State of Arizona*

13
   /s/Tina Johannesen
14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

8

MADI_2197929.5

1   COPPERSMITH SCHERMER & BROCKELMAN PLC
    2800 North Central Avenue
    Suite 1200
2   Phoenix, Arizona 85004
    (602) 224-0999
    Scott M. Bennett, State Bar No. 022350
3
    FOLEY & LARDNER LLP
    150 E. Gilman Street
4   Madison, WI 53703
    Telephone:  (608) 257-5035
    Fax:         (608) 258-4258
5
    Allen A. Arntsen, Admitted *Pro Hac Vice*
6   Stephan J. Nickels, Admitted *Pro Hac Vice*
    Matthew R. Lynch, Admitted *Pro Hac Vice*
7   *Attorneys for Petitioner*
    Wendi Andriano

8                    SUPERIOR COURT OF ARIZONA
9                        COUNTY OF MARICOPA

10

11  State of Arizona,                    )
12                      Respondent,      )     No. CR2000-096032-A
                                         )
13      vs.                              )     **AFFIDAVIT OF MATTHEW R.**
14                                       )     **LYNCH**
    Wendi Elizabeth Andriano,            )
15                                       )     (Assigned to the Hon. Douglas Rayes)
16                      Petitioner.      )
                                         )
17  _____ )

18

19  STATE OF WISCONSIN      )
                            )      SS.
20  COUNTY OF DANE          )

21
        MATTHEW R. LYNCH, being first duly sworn upon oath deposes and states:
22
            1.     I am an attorney with Foley & Lardner LLP, and one of the attorneys
23
    of record for Petitioner.  I have personal knowledge of the matters stated below.
24
            2.     Based on my review of the case file and interviews in furtherance of
25
    my representation of Ms. Andriano in this post-conviction relief proceeding, I learned that
26
    Scott Mac Leod was the mitigation specialist assigned to investigate all aspects of Ms.
27

28
MADI_2189268.3

Andriano's life prior to her trial in order to identify potential mitigating circumstances that weigh against imposition of the death penalty.

3.      Because trial counsel delegated most or all of the mitigation investigation to Mr. Mac Leod, and because the case file provides little documentation of work performed by Mr. Mac Leod, it was and remains imperative to speak with him regarding his role in Ms. Andriano's defense at trial.  In addition, our independent mitigation investigation continues to find additional evidence that was not introduced at trial, as well as evidence showing that fundamental steps and procedures in a standard mitigation investigation were not followed.  It is important to hear from Mr. Mac Leod regarding his investigation and responsibilities, his explanation of steps not taken, avenues not explored, and procedures not followed, and his statements regarding any other facts or details of Ms. Andriano's trial representation that could be relevant to this proceeding.

4.      In early 2009, I called Mr. Mac Leod at a phone number listed in public records.  I spoke with Mr. Mac Leod and confirmed that he had worked as a mitigation specialist for the Maricopa County Public Defender's Office at the time of Ms. Andriano's trial, and that he was the mitigation specialist assigned to Ms. Andriano's case. I also informed him that I was legal counsel for Ms. Andriano and that I wished to interview him regarding his experience, his recollection of events leading up to her trial and sentencing, and his role in her case.

5.      Mr. Mac Leod informed me that he was willing to discuss the matter, but he did not have time at the moment.  He asked me to call back at the same time at the

2

same number the next day.  I left my number with Mr. Mac Leod and informed him that he could call anytime to discuss the matter.

6.     I called Mr. Mac Leod back at the same time the next day.  The operator informed me that the line had been disconnected.  I tried back several times over the next week, with the same message that the line had been disconnected.

7.     After a week or so, I contacted Mr. Mac Leod's father.  I identified myself to Mr. Mac Leod's father and explained the reason for my call.  He stated that he knew about the phone line disconnection and claimed that Mr. Mac Leod was working it out with the phone company.  Mr. Mac Leod's father assured me that he would pass my contact information along to his son.  I did not receive any return call from Mr. Mac Leod or his father.

8.     After a number of attempts to obtain new contact information with Mr. Mac Leod were unsuccessful, I made further calls to his parents and left at least two messages over the next two months.  My messages were not returned.

9.     Following that, I called and left messages identifying myself and my reason for calling with a number of individuals who, according to public records, were neighbors of Mr. Mac Leod.  None were returned.  I did reach one neighbor on the phone who said that he knew Mr. Mac Leod and promised to pass along my contact information, but I did not receive any return call from Mr. Mac Leod.

10.     In late 2009, I again called Mr. Mac Leod's parents and his father answered the phone.  His father claimed that he had not heard from Mr. Mac Leod for months and that he did not even know which state or country in which his son was

3

MADI_2189268.3

residing.  He promised he would pass along my contact information if he heard from his son, but I did not receive any return call from Mr. Mac Leod.

11.    Around the same time, I contacted the Phoenix School of Law, from which Mr. Mac Leod had graduated the past spring according to that school's Web site. After several calls, I learned that the school had no records of his employment, no records of him having taken or passed the bar, and no contact information other than his former school email address.  Shortly thereafter, I emailed Mr. Mac Leod at his school email address, identifying myself and explaining the need to interview him regarding this matter. The email did not bounce back—thus indicating that the address was still active—but I did not receive any return email from Mr. Mac Leod.

12.    Also in late 2009, I asked our investigator, Mr. Mike Torres, to attempt to locate Mr. Mac Leod.  Initially, Mr. Torres could not find a current employer for Mr. Mac Leod, nor identify a working phone number for him.  He did identify some former employers, however, subsequent to Mr. Mac Leod's employment at the Public Defender's Office.  In late 2009, I contacted those former employers of Mr. Mac Leod, identified myself and my reason for calling, and requested any information they may have regarding Mr. Mac Leod or his whereabouts.  I received no new information.

13.    In January 2010, Mr. Torres informed me that he had discovered two new phone numbers for Mr. Mac Leod (a cell phone and a land line) and a new home address.  Mr. Torres verified that the numbers belonged to Mr. Mac Leod, but informed me that several attempts to call him had gone unanswered.

4

MADI 2189268.3

14.     On February 19, 2010, I called Mr. Mac Leod's home phone number and left a message identifying myself, telling Mr. Mac Leod that I sought his personal interview in conjunction with our representation of Ms. Andriano in her post-conviction relief proceedings, and informing him that we would seek to procure an interview through a subpoena if he was unwilling to grant one voluntarily. On February 22, 2010, I called both his home phone number and cellular phone number. His cell phone's voicemail was not functional, but I left another message on his home answering machine identifying myself and my reason for calling, asking Mr. Mac Leod to call me back to arrange a convenient time to talk, and again stating that it was important to our representation of Ms. Andriano that we interview him. Again, I received no response.

15.     In March of 2010, I received a report from Ms. Sita Sovin, our mitigation specialist, regarding her visit to Mr. Mac Leod's residence. The report indicated that Mr. Mac Leod initially denied that he was, in fact, Scott Mac Leod; that he admitted his identity only when pressed further; that he had no interest in "getting involved" or cooperating with the investigation of Ms. Andriano's post-conviction relief counsel; and that he refused to speak with Ms. Andriano's counsel or their investigators about the case unless compelled to do so.

16.     Hoping for a change in heart that would avoid the need for this motion, I again attempted to contact Mr. Mac Leod by telephone during the week of July 12 of this year. After calling his cellular phone number as of February 2010, an automated message informed me that the number was no longer in service. Calls to his land-line telephone number as of February went unanswered.

5

MADI_2189268.3

17.     In July 2010, I also attempted to locate an employer for Mr. Mac

Leod.  I was aware from the Arizona State Bar Web site that he had passed the Arizona

Bar Exam administered earlier in 2010, so I believed it was possible that he had found

legal employment and could be reached by phone at work.  The online directory for the

Arizona State Bar Association did not list Mr. Mac Leod as a member, and I was unable to

otherwise find any evidence of Mr. Mac Leod's present employment, if any, through

Internet and media searches.  Since that time, I have periodically monitored the Arizona

Bar directory other publicly available sources in an effort to ascertain other means.

18.     On December 23, 2010, I noted that the Arizona Bar directory had

been updated to include a listing for of Mr. Mac Leod, with a phone number.  I called that

number and reached a man who identified himself as Scott Mac Leod.  After identifying

myself and asking to arrange a time for an interview, Mr. Mac Leod stated that he did not

have time to talk, but again took my phone number and stated that he would call me back.

He also acknowledged awareness of our legal team's prior attempts to contact him, and his

reluctance to speak with us regarding Ms. Andriano's case.  I told Mr. Mac Leod that I

wished to hear back from him that day regarding his willingness or unwillingness to

provide a voluntary interview, as we had an upcoming status conference with the court at

which we expected to raise discovery issues.

19.     Although Mr. Mac Leod assured me that he would return my call of

December 23, he has not done so.

20.     Since the date of my initial phone call to Mr. Mac Leod in 2009, in

which he told me that he was presently busy but that he would be available to talk the next

6

day, efforts to communicate informally with him regarding his role in Wendi Andriano's

defense have been stifled in every respect.  As a former mitigation specialist, Mr. Mac

Leod is almost certainly familiar with post-conviction relief proceedings and aware of the

need for post-conviction relief counsel to interview all members of the trial defense team,

including mitigation specialists, in investigating the grounds for post-conviction relief.

The perplexing and intentional manner in which he has avoided or refused all

communications with post-conviction relief counsel only increases the likelihood that Mr.

Mac Leod may have information or insight relevant to Ms. Andriano's representation that

post-conviction relief counsel has not learned from other sources.

   21. In my investigation of Mr. Mac Leod, I also contacted his former

employer, the Maricopa County Public Defender's Office, regarding his employment

history.  Although I was able to ascertain general background information regarding his

employment from co-workers—including statements indicating that he was dismissed

from employment at the Public Defender's Office after Ms. Andriano's trial—I was told

by the Public Defender that as a matter of policy the office would not release copies of Mr.

Mac Leod's employment records from his time there to Ms. Andriano's counsel absent an

order requiring such disclosure.


   DATED this 6th day of January, 2011.


Matthew R. Lynch

7

1  Subscribed and sworn to before me
2  this 6th day of January, 2011.
3  Jo A. Cooper
   Notary Public, State of Wisconsin.
4  My Commission: 7/24/11
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

8

# EXHIBIT HHH

Michael K. Jeanes, Clerk of Court
*** Electronically Filed ***
Isabel Osuna
Filing ID 770305
1/10/2011 10:34:29 AM

James J. Belanger (011393)
Scott M. Bennett (022350)
Coppersmith Schermer & Brockelman PLC
2800 North Central Avenue, Suite 1200
Phoenix, Arizona  85004
(602) 224-0999 (office)
(602) 224-6020 (fax)
sbennett@csblaw.com

Allen A. Arntsen, Admitted *Pro Hac Vice*
Stephan J. Nickels Admitted *Pro Hac Vice*
Matthew R. Lynch Admitted *Pro Hac Vice*
Foley & Lardner LLP
150 East Gilman Street
Madison, WI 53703
(608) 257-5035 (office)
(608) 258-4258 (fax)
aarntsen@foley.com

*Attorneys for Petitioner Wendi Elizabeth Andriano*

## SUPERIOR COURT OF ARIZONA
## COUNTY OF MARICOPA

| | | |
|---|---|---|
| STATE OF ARIZONA, | ) | No. CR2000-096032-A |
| | ) | |
| Respondent, | ) | **NOTICE OF TELEPHONIC** |
| | ) | **APPEARANCE AT 1/11/2011** |
| vs. | ) | **STATUS CONFERENCE** |
| | ) | |
| WENDI ELIZABETH ANDRIANO, | ) | (Assigned to the Hon. Douglas Rayes) |
| | ) | |
| Petitioner. | ) | |
| | ) | |

Counsel for petitioner Wendi Elizabeth Andriano gives notice that her out-of-state counsel at Foley & Lardner, as well as the attorney for the State, will appear telephonically at the status conference scheduled for 9 a.m. tomorrow, January 11.  All of the attorneys who are appearing telephonically will make a single, joint phone call to the Court.

Ms. Andriano's local counsel at Coppersmith, Schermer & Brockelman PLC will appear in person.

RESPECTFULLY SUBMITTED January 10, 2011.

**COPPERSMITH SCHERMER & BROCKELMAN PLC**

By /s/ Scott M. Bennett
James J. Belanger
Scott M. Bennett

**FOLEY & LARDNER LLP**
Allen A. Arntsen
Stephan J. Nickels
Matthew R. Lynch

*Attorneys for Petitioner*

ORIGINAL electronically filed January 10, 2011.

COPY e-mailed and mailed January 10, 2011, to:

Lacey Stover Gard
Office of the Attorney General
400 West Congress, Suite S-315
Tucson, AZ  85701-1367

*Attorneys for the State of Arizona*

/s/ Sheri McAlister

2

# EXHIBIT III

FILED
MICHAEL K. JEANES, Clerk
By _W O Shaughnessy_
Deputy

1   Past James J. Belanger (011393)
    Scott M. Bennett (022350)
    Coppersmith Schermer & Brockelman PLC
2   2800 North Central Avenue, Suite 1200
    Phoenix, Arizona 85004
    (602) 224-0999 (office)
3   (602) 224-6020 (fax)
    sbennett@csblaw.com

4   Allen A. Arntsen, Admitted *Pro Hac Vice*
    Stephan J. Nickels Admitted *Pro Hac Vice*
    Matthew R. Lynch Admitted *Pro Hac Vice*
5   Foley & Lardner LLP
    150 E. Gilman Street
    Madison, WI 53703
6   (608) 257-5035 (office)
    (608) 258-4258 (fax)
    aarntsen@foley.com
7
    *Attorneys for Petitioner Wendi Andriano*

8
                    **SUPERIOR COURT OF ARIZONA**
9                       **COUNTY OF MARICOPA**

10

11  State of Arizona,                    )      NO. CR2000-096032-A
                                         )
12              Respondent,              )      ORDER AUTHORIZING
                                         )      DISCOVERY SUBPOENAS
13  v.                                   )
                                         )
14  Wendi Elizabeth Andriano,            )
                                         )
15              Petitioner.              )
    _____)

16

17          Based on the motion filed by petitioner Wendi Andriano, and for good cause, IT IS

18  ORDERED:

19      1.  Authorizing the issuance of a subpoena requiring Scott A. Mac Leod to submit to a
20          deposition by counsel for Ms. Andriano.

21      2.  Authorizing the issuance of a subpoena duces tecum ordering the Maricopa County
            Public Defender's Office to provide Ms. Andriano's counsel with access to all
22          written employment records for Mr. Mac Leod, including records of any
23          performance reviews and disciplinary actions or reports.

24          IT IS SO ORDERED this _11_ day of _Jan._, 2011.

25

26                                  _____
                                    THE HONORABLE DOUGLAS RAYES

2473516.2

1  Copies of the foregoing provided
2  this ____ day of _____to:

3  Lacey Stover Gard
   Assistant Attorney General
4  400 West Congress, Suite S-315
5  Tucson, Arizona 85701-1367

6  Scott Bennett
7  Coppersmith Schermer & Brockelman PLC
   2800 N. Central Ave, Suite 1200
8  Phoenix, AZ 85004

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

2

# EXHIBIT JJJ

FILED
_1/11/11_   _9:13am_
MICHAEL K. JEANES, Clerk
By _____
Deputy

1   James J. Belanger (011393)
    Scott M. Bennett (022350)
2   Coppersmith Schermer & Brockelman PLC
    2800 North Central Avenue, Suite 1200
3   Phoenix, Arizona 85004
    (602) 224-0999 (office)
    (602) 224-6020 (fax)
4   sbennett@csblaw.com

5   Allen A. Arntsen, Admitted *Pro Hac Vice*
    Stephan J. Nickels Admitted *Pro Hac Vice*
6   Matthew R. Lynch Admitted *Pro Hac Vice*
    Foley & Lardner LLP
    150 E. Gilman Street
7   Madison, WI 53703
    (608) 257-5035 (office)
    (608) 258-4258 (fax)
8   aarntsen@foley.com

9   *Attorneys for Petitioner Wendi Andriano*

10              **SUPERIOR COURT OF ARIZONA**
                  **COUNTY OF MARICOPA**
11

12   State of Arizona,                    )   No. CR2000-096032-A
                                          )
13              Respondent,               )   **ORDER ALLOWING CONTACT**
                                          )   **VISITS (Death Penalty Case)**
14   v.                                   )
                                          )
15   Wendi Elizabeth Andriano,            )
                                          )
16   _____Petitioner._____ )

17

18        Pending before the Court is the parties' Stipulation for an Order to Allow

19   Confidential Contact Visits between Petitioner and Ms. Sita Jo-Ann Sovin, a mitigation

20   specialist and/or her associates, Ms. Alexis Boothby, Ms. Kristen Powers and Mr.

21   Christopher Darren Butler, as well as between Petitioner and Dr. James W. Hopper, a

22   clinical psychologist, Dr. George Woods, a clinical psychiatrist, and Dr. Myla Young, a

23   neuropsychologist. After due consideration of said Stipulation, and for good cause,

24        IT IS ORDERED that the Stipulation for Order to Allow Confidential Contact

25   Visits between Wendi Elizabeth Andriano and the experts is **GRANTED.**

26        IT IS FURTHER ORDERED that the experts be permitted to have confidential

473516.2

contact visits with Wendi Elizabeth Andriano, ADC# 191593, under the following terms:

1.    Visitations may take place on the following dates at the time indicated:

A.    January 4, 2011            10:30 a.m. to 2:30 p.m.
      Dr. Myla Young, Dr. George Woods, Dr. Jim Hopper, Sita Jo-Ann Sovin,
      Kristen Powers, Alexis Boothby, and Christopher Butler

B.    January 5, 2011            10:30 a.m. to 2:30 p.m.
      Dr. Myla Young, Dr. George Woods, Dr. Jim Hopper, Sita Jo-Ann Sovin,
      Kristen Powers, Alexis Boothby, and Christopher Butler

C.    January 18, 2011           10:30 a.m. to 2:30 p.m.
      Dr. Myla Young, Dr. George Woods, Dr. Jim Hopper, Sita Jo-Ann Sovin,
      Kristen Powers, Alexis Boothby, and Christopher Butler

D.    January 19, 2011           10:30 a.m. to 2:30 p.m.
      Dr. Myla Young, Dr. George Woods, Dr. Jim Hopper, Sita Jo-Ann Sovin,
      Kristen Powers, Alexis Boothby, and Christopher Butler

E.    February 1, 2011           10:30 a.m. to 2:30 p.m.
      Dr. Myla Young, Dr. George Woods, Dr. Jim Hopper, Sita Jo-Ann Sovin,
      Kristen Powers, Alexis Boothby, and Christopher Butler

F.    February 2, 2011           10:30 a.m. to 2:30 p.m.
      Dr. Myla Young, Dr. George Woods, Dr. Jim Hopper, Sita Jo-Ann Sovin,
      Kristen Powers, Alexis Boothby, and Christopher Butler

G.    February 15, 2011          8:30 a.m. to 2:30 p.m.
      Dr. Myla Young, Dr. George Woods, Dr. Jim Hopper, Sita Jo-Ann Sovin,
      Kristen Powers, Alexis Boothby, and Christopher Butler

H.    February 16, 2011          8:30 a.m. to 2:30 p.m.
      Dr. Myla Young, Dr. George Woods, Dr. Jim Hopper, Sita Jo-Ann Sovin,
      Kristen Powers, Alexis Boothby, and Christopher Butler

2.    Petitioner's counsel or the experts shall make arrangements with Warden,
      Arizona State Prison - Perryville, or her designee, to schedule such visits.

3.    The Warden, through her staff, may require the experts to subject all
      instruments, equipment, manuals and the like to an inspection and inventory
      prior to, and subsequent to, any meeting with Wendi Elizabeth Andriano.

4.    ADOC may require inmate Wendi Elizabeth Andriano to wear leg restraints or a stun belt during the meetings.

5.    Both Petitioner and Respondent recognize that Petitioner's decision not to contest ADOC's practice of using a stun belt on Petitioner, should it use one, is due to the time constraints placed upon Petitioner's counsel and in no way constitutes a waiver of the "stun belt issue" in any future request for a contact visit in this case or in any other case. Respondent's willingness to stipulate hereto should not be considered a waiver of any aspect of ADOC's non-contact visitation policy.

6.    The experts shall be allowed to have physical contact with Petitioner as is necessary during the course of the interviews.

7.    The interviews must be confidential. The meetings between Petitioner and the experts shall take place in a room that allows for privacy.

8.    Before being allowed the contact visit authorized herein, the visiting experts shall certify in a written release to ADOC that they have investigated and ascertained the risks to their personal safety associated with the visit as authorized by and under the circumstances described in this order; that they agree to assume those risks; and that they release and hold harmless ADOC, the State of Arizona, and their officers and employees from any claim arising from death or injury associated with the risks assumed. However, such release shall not operate as a release of gross negligence on the part of ADOC.

IT IS FURTHER ORDERED that the Clerk of the Court forward a copy of this Order to counsel of record for Petitioner, Scott Bennett; counsel of record for the State of Arizona, Lacey Stover Gard; Karyn Klausner, ADOC General Counsel; Ms. Sita Jo-Ann

3

1   Sovin; Deputy Warden Lacy L. Scott; and Michael Brodsky, who is appearing solely for

2   the purpose of representing the ADOC and is not a counsel of record.

3         IT IS SO ORDERED this __11__ day of January, 2011.

4

5                   THE HONORABLE DOUGLAS RAYES

6   COPIES of the foregoing provided

7   this _____ day of January, 2011, to:

8   Lacey Stover Gard
    Assistant Attorney General

9   1275 West Washington
    Phoenix, AZ  85007

10

    Michael Brodsky

11   Office of the Attorney General
    Arizona Department of Corrections

12   1275 West Washington
    Phoenix, AZ  85007

13

14   Deputy Warden Lacy L. Scott
    Arizona State Prison – Perryville

15   P.O. Box 3000
    Goodyear, AZ  85395

16

    Scott Bennett

17   Coppersmith Schermer & Brockelman PLC
    2800 N. Central Ave, Suite 1200

18   Phoenix, AZ  85004
    Attorney for Petitioner

19

20   Karyn Klausner, ADOC General Counsel
    1601 W. Jefferson

21   Phoenix, AZ 85007

22   Sita Jo-Ann Sovin
    Alexis Boothby

23   Kristen Powers
    Christopher Darren Butler

24   Capital Case Project – Diversified Legal Services
    19528 Ventura Boulevard #520

25   Tarzana, CA  91356

26

4

2473516.2

# EXHIBIT KKK

Michael K. Jeanes, Clerk of Court
*** Electronically Filed ***
01/14/2011 8:00 AM

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CR 2000-096032                                          01/11/2011


                                            CLERK OF THE COURT
JUDGE DOUGLAS L. RAYES                          H. O'Shaughnessy
                                                    Deputy



STATE OF ARIZONA                        LACEY ALEXANDRA STOVER GARD

v.

WENDI ELIZABETH ANDRIANO (A)            JAMES J BELANGER
                                        SCOTT M BENNETT
                                        ALLEN A ARNTSEN
                                        MATTHEW R LYNCH
                                        STEPHAN J NICKELS

                                        CAPITAL CASE MANAGER
                                        COURT ADMIN-CRIMINAL-PCR
                                        VICTIM SERVICES DIV-CA-SE
                                        VICTIM WITNESS DIV-AG-CCC



            MINUTE ENTRY



      9:06 am.

      Courtroom ECB 411

      State's Attorney:        Lacey Gard (appears telephonically)
      Defendant's Attorney:    Scott Bennett, James Belanger; Allen Arntsen and Matthew
                               Lynch (appear telephonically)
      Defendant:              Not Present

      Court Reporter, Cindy Lineburg, is present.

      A record of the proceeding is also made by audio and/or videotape.

Docket Code 028                    Form R000D                              Page 1

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CR 2000-096032                                            01/11/2011


LET THE RECORD REFLECT that Juan Martinez is present with next of kin.

The Court addresses Mr. Arntsen as to Mitigation Specialist Scott MacLeod and Motion for Order Authorizing Discovery Subpoenas.

Ms. Gard objects to the signing the order.

Over objection of the State,

The Court grants Order Authorizing Discovery Subpoenas and signs the order this date.

FILED:  Order.

IT IS ORDERED setting Status Conference on March 8, 2011 at 9:30 a.m. before the Honorable Douglas Rayes.

This case is eFiling eligible: http://www.clerkofcourt.maricopa.gov/efiling/default.asp

9:11 a.m.  Matter concludes.

# EXHIBIT LLL

Michael K. Jeanes, Clerk of Court
*** Electronically Filed ***
Isabel Osuna
Filing ID 781096
1/24/2011 1:45:47 PM

1   James J. Belanger (011393)
    Scott M. Bennett (022350)
2   Coppersmith Schermer & Brockelman PLC
    2800 North Central Avenue, Suite 1200
3   Phoenix, Arizona  85004
    (602) 224-0999 (office)
4   (602) 224-6020 (fax)
    sbennett@csblaw.com
5
6   Allen A. Arntsen, Admitted *Pro Hac Vice*
    Stephan J. Nickels Admitted *Pro Hac Vice*
7   Matthew R. Lynch Admitted *Pro Hac Vice*
    Foley & Lardner LLP
8   150 E. Gilman Street
    Madison, WI 53703
9   (608) 257-5035 (office)
    (608) 258-4258 (fax)
10  aarntsen@foley.com
11  *Attorneys for Petitioner Wendi Andriano*

12              SUPERIOR COURT OF ARIZONA
                  COUNTY OF MARICOPA
13

14  State of Arizona,                    )    No. CR2000-096032-A
                                         )
15              Respondent,              )    **STIPULATION TO ALLOW**
                                         )    **CONFIDENTIAL CONTACT**
16  v.                                   )    **VISITS BETWEEN WENDI**
                                         )    **ELIZABETH ANDRIANO, AND**
17  Wendi Elizabeth Andriano,            )    **HER EXPERTS AND**
                                         )    **ATTORNEYS**
18              Petitioner.              )
                                         )
19                                       )
                                         )    (Assigned to Hon. Douglas Rayes)
20  _____     )
21

22          The parties stipulate to the issuance of an order that directs the Arizona Department

23  of Corrections (hereinafter "ADOC") to allow confidential contact visits between

24  Petitioner Wendi Andriano and: Ms. Sita Jo-Ann Sovin, a mitigation specialist and/or her

25  associates, Ms. Alexis Boothby, Ms. Kristen Powers and Mr. Christopher Darren Butler;

26  Dr. James W. Hopper, a clinical psychologist; Dr. George Woods, a clinical psychiatrist;

2526779.1

1   Dr. Myla Young, a neuropsychologist; and three of Ms. Andriano's attorneys, Mr. Allen

2   Arntsen, Mr. Matthew Lynch, and Ms. Krista Sterken.

3          Counsel for the parties have agreed to terms and conditions for the contact visits

4   and those terms and conditions are listed and contained in the accompanying proposed

5   order.   Charles Ryan, Director of the ADOC, through undersigned counsel[1], does not

6   object to the confidential contact visits between Ms. Andriano and the experts.

7          Respectfully submitted January 24, 2011.

8   COPPERSMITH SCHERMER & BROCKELMAN PLC

9
10  By /s/Scott M. Bennett_____
        James J. Belanger
11      Scott M. Bennett

12  FOLEY & LARDNER LLP
        Allen A. Arntsen, *Pro Hac Vice*
13      Stephan J. Nickels, *Pro Hac Vice*
        Matthew R. Lynch, *Pro Hac Vice*
14

15  *Attorneys for Petitioner*

16

17  OFFICE OF THE ATTORNEY GENERAL

18  By /s/Lacey Stover Gard_____
        Lacey Stover Gard
19

20  *Attorney for State of Arizona*

21  OFFICE OF THE ATTORNEY GENERAL

22
    By /s/Michael Brodsky_____
23      Michael Brodsky

24
    *Attorney for Arizona Department of Corrections*
25

---

26  [1] Assistant Attorney General Michael Brodsky appears solely for the purpose of representing the interests of ADOC.

2

WABM_2526779.1

1

2

3  ORIGINAL filed January 24, 2011.

4  COPY hand delivered January 24, 2011, to:

5
6  The Hon. Douglas Rayes
   East Court Building-411
7  101 W. Jefferson
   Phoenix, AZ. 85003-2243

8
   COPIES mailed January 24, 2011, to:
9

10 Michael Brodsky, Assistant
   Assistant Attorney General
11 1275 West Washington
   Phoenix, Arizona  85007-2997
12

13 Lacey Stover Gard
   Assistant Attorney General
14 1275 West Washington
   Phoenix, Arizona  85007-2997
15

16 Deputy Warden Lacy L. Scott
   Arizona State Prison – Perryville
17 P.O. Box 3000
   Goodyear, AZ  85395
18

19          /s/Michelle T. Gallegos
   _____

20

21

22

23

24

25

26

# EXHIBIT MMM

Michael K. Jeanes, Clerk of Court
*** Electronically Filed ***
Isabel Osuna
Filing ID 781100
1/24/2011 1:49:48 PM

James J. Belanger (011393)
Scott M. Bennett (022350)
Coppersmith Schermer & Brockelman PLC
2800 North Central Avenue, Suite 1200
Phoenix, Arizona  85004
(602) 224-0999 (office)
(602) 224-6020 (fax)
sbennett@csblaw.com

Allen A. Arntsen, Admitted *Pro Hac Vice*
Stephan J. Nickels Admitted *Pro Hac Vice*
Matthew R. Lynch Admitted *Pro Hac Vice*
Foley & Lardner LLP
150 East Gilman Street
Madison, WI  53703
(608) 257-5035 (office)
(608) 258-4258 (fax)
aarntsen@foley.com

*Attorneys for Petitioner Wendi Andriano*

## SUPERIOR COURT OF ARIZONA
## COUNTY OF MARICOPA

| | |
|---|---|
| State of Arizona, | No. CR2000-096032-A |
| Respondent, | **STIPULATION TO MODIFY PREVIOUSLY AUTHORIZED, CONFIDENTIAL CONTACT VISITS BETWEEN WENDI ELIZABETH ANDRIANO AND HER EXPERTS** |
| v. | |
| Wendi Elizabeth Andriano, | |
| Petitioner. | |
| | (Assigned to Hon. Douglas Rayes) |

On December 2, 2010, this Court signed an order authorizing confidential contact visits between petitioner Wendi Elizabeth Andriano and several of the experts assisting with her case.  The order was filed on December 6, 2010.  The parties later stipulated to two slight modifications to that order, and the modified order was filed on January 11, 2011.

The parties now stipulate to a slight modification to the January 11 order.  The modification adds three attorneys for Ms. Andriano—Allen Arntsen, Matthew Lynch, and Krista Sterken—as approved visitors on February 1 and February 2.

The State has agreed to this modification to the visitation schedule.  So has Charles Ryan, Director of the ADOC, through undersigned counsel.[1]

A proposed order with the revised visitation schedule accompanies this stipulation.

Respectfully submitted January 24, 2011.

COPPERSMITH SCHERMER & BROCKELMAN PLC

By /s/ Scott M. Bennett
    James J. Belanger
    Scott M. Bennett

FOLEY & LARDNER LLP
    Allen A. Arntsen, *Pro Hac Vice*
    Stephan J. Nickels, *Pro Hac Vice*
    Matthew R. Lynch, *Pro Hac Vice*

*Attorneys for Petitioner*

OFFICE OF THE ATTORNEY GENERAL

By /s/ Lacey Stover Gard (w/permission)
    Lacey Stover Gard

*Attorney for State of Arizona*

OFFICE OF THE ATTORNEY GENERAL

By /s/ Michael Brodsky (w/permission)
    Michael Brodsky

*Attorney for Arizona Department of Corrections*

---

[1] Assistant Attorney General Michael Brodsky appears solely for the purpose of representing the interests of ADOC.

2

1    ORIGINAL filed January 24, 2011.

2    COPY hand delivered January 24, 2011, to:

3
     The Hon. Douglas Rayes
4    East Court Building-411
     101 W. Jefferson
5    Phoenix, AZ. 85003-2243

6
     COPIES mailed January 24, 2011, to:
7

8    Michael Brodsky, Assistant
     Assistant Attorney General
9    1275 West Washington
     Phoenix, Arizona  85007-2997
10

11   400 West Congress, Suite S-315
     Tucson, Arizona  85701-1367
12

13   Deputy Warden Lacy L. Scott
     Arizona State Prison – Perryville
14   P.O. Box 3000
     Goodyear, Arizona  85395
15

16
     /s/ Michelle T. Gallegos
17

18

19

20

21

22

23

24

25

26

                                  3

# EXHIBIT NNN

FILED
Jan 26, 2011 4:19 pm
MICHAEL K. JEANES, Clerk

By _X/ O'Shaughnessy_
H. O'Shaughnessy Deputy

1  James J. Belanger (011393)
   Scott M. Bennett (022350)
2  Coppersmith Schermer & Brockelman PLC
   2800 North Central Avenue, Suite 1200
3  Phoenix, Arizona 85004
   (602) 224-0999 (office)
4  (602) 224-6020 (fax)
   sbennett@csblaw.com
5
   Allen A. Arntsen, Admitted *Pro Hac Vice*
6  Stephan J. Nickels Admitted *Pro Hac Vice*
   Matthew R. Lynch Admitted *Pro Hac Vice*
7  Foley & Lardner LLP
   150 E. Gilman Street
8  Madison, WI 53703
   (608) 257-5035 (office)
9  (608) 258-4258 (fax)
   aarntsen@foley.com
10

11 *Attorneys for Petitioner Wendi Andriano*

12                **SUPERIOR COURT OF ARIZONA**
                      **COUNTY OF MARICOPA**
13

14

15 State of Arizona,              )    NO. CR2000-096032-A
                                  )
16          Respondent,           )    **ORDER ALLOWING CONTACT**
   v.                             )    **VISITS (Death Penalty Case)**
17                                )
                                  )
18 Wendi Elizabeth Andriano,      )
                                  )
19          Petitioner.           )
   _____  )
20

21      Based on a stipulation by the parties, and for good cause,

22      IT IS ORDERED that the Stipulation for Order to Allow Confidential Contact

   Visits between Wendi Elizabeth Andriano, and Her Experts and Attorneys (filed on
23
   January 24, 2011) is **GRANTED**.
24
        IT IS FURTHER ORDERED that the Arizona Department of Corrections shall
25 allow confidential contact visits with Wendi Elizabeth Andriano, ADC# 191593, under the

26 following terms:

1.  Visitations may take place on the following dates at the time indicated:

   A.  February 28, 2011      10:30 a.m. to 2:30 p.m.
Dr. Myla Young, Dr. George Woods, Dr. Jim Hopper, Sita Jo-Ann Sovin,
Kristen Powers, Alexis Boothby, Christopher Butler, Allen Arntsen,
Matthew Lynch, Krista Sterken

   B.  March 1, 2011     10:30 a.m. to 2:30 p.m.
Dr. Myla Young, Dr. George Woods, Dr. Jim Hopper, Sita Jo-Ann Sovin,
Kristen Powers, Alexis Boothby, Christopher Butler, Allen Arntsen,
Matthew Lynch, Krista Sterken

   C.  March 2, 2011     10:30 a.m. to 2:30 p.m.
Dr. Myla Young, Dr. George Woods, Dr. Jim Hopper, Sita Jo-Ann Sovin,
Kristen Powers, Alexis Boothby, Christopher Butler, Allen Arntsen,
Matthew Lynch, Krista Sterken

   D.  March 15, 2011     10:30 a.m. to 2:30 p.m.
Dr. Myla Young, Dr. George Woods, Dr. Jim Hopper, Sita Jo-Ann Sovin,
Kristen Powers, Alexis Boothby, Christopher Butler, Allen Arntsen,
Matthew Lynch, Krista Sterken

   E.  March 16, 2011     10:30 a.m. to 2:30 p.m.
Dr. Myla Young, Dr. George Woods, Dr. Jim Hopper, Sita Jo-Ann Sovin,
Kristen Powers, Alexis Boothby, Christopher Butler, Allen Arntsen,
Matthew Lynch, Krista Sterken

   F.  March 29, 2011     10:30 a.m. to 2:30 p.m.
Dr. Myla Young, Dr. George Woods, Dr. Jim Hopper, Sita Jo-Ann Sovin,
Kristen Powers, Alexis Boothby, Christopher Butler, Allen Arntsen,
Matthew Lynch, Krista Sterken

   G.  March 30, 2011     10:30 a.m. to 2:30 p.m.
Dr. Myla Young, Dr. George Woods, Dr. Jim Hopper, Sita Jo-Ann Sovin,
Kristen Powers, Alexis Boothby, Christopher Butler, Allen Arntsen,
Matthew Lynch, Krista Sterken

   H.  April 12, 2011     10:30 a.m. to 2:30 p.m.
Dr. Myla Young, Dr. George Woods, Dr. Jim Hopper, Sita Jo-Ann Sovin,
Kristen Powers, Alexis Boothby, Christopher Butler, Allen Arntsen,
Matthew Lynch, Krista Sterken

   I.  April 13, 2011     10:30 a.m. to 2:30 p.m.
Dr. Myla Young, Dr. George Woods, Dr. Jim Hopper, Sita Jo-Ann Sovin,

Kristen Powers, Alexis Boothby, Christopher Butler, Allen Arntsen, Matthew Lynch, Krista Sterken

J.    April 26, 2011       10:30 a.m. to 2:30 p.m.
Dr. Myla Young, Dr. George Woods, Dr. Jim Hopper, Sita Jo-Ann Sovin, Kristen Powers, Alexis Boothby, Christopher Butler, Allen Arntsen, Matthew Lynch, Krista Sterken

K.    April 27, 2011       10:30 a.m. to 2:30 p.m.
Dr. Myla Young, Dr. George Woods, Dr. Jim Hopper, Sita Jo-Ann Sovin, Kristen Powers, Alexis Boothby, Christopher Butler, Allen Arntsen, Matthew Lynch, Krista Sterken

2.  Petitioner's counsel or the experts shall make arrangements with Warden, Arizona State Prison - Perryville, or her designee, to schedule such visits.

3.  The Warden, through her staff, may require the experts to subject all instruments, equipment, manuals and the like to an inspection and inventory prior to and subsequent to any meeting with Wendi Elizabeth Andriano.

4.  ADOC may require inmate Wendi Elizabeth Andriano to wear leg restraints or a stun belt during the meetings.

5.  Both Petitioner and Respondent recognize that Petitioner's decision not to contest ADOC's practice of using a stun belt on Petitioner, should it use one, is due to the time constraints placed upon Petitioner's counsel and in no way constitutes a waiver of the "stun belt issue" in any future request for a contact visit in this case or in any other case. Respondents' willingness to stipulate hereto should not be considered a waiver of any aspect of ADOC's non-contact visitation policy.

3

6.  The experts shall be allowed to have physical contact with Petitioner as is necessary during the course of the interviews.

7.  The interviews must be confidential. The meetings between Petitioner and the experts shall take place in a room that allows for privacy.

8.  Before being allowed the contact visit authorized herein, the visiting experts shall certify in a written release to ADOC that they have investigated and ascertained the risks to their personal safety associated with the visit as authorized by and under the circumstances described in this order; that they agree to assume those risks; and that they release and hold harmless ADOC, the State of Arizona, and their officers and employees from any claim arising from death or injury associated with the risks assumed. However, such release shall not operate as a release of gross negligence on the part of ADOC.

IT IS FURTHER ORDERED that the Clerk of the Court forward a copy of this Order to counsel of record for Petitioner, Scott Bennett; counsel of record for the State of Arizona, Lacey Stover Gard; Karyn Klausner, ADOC General Counsel; Ms. Sita Jo-Ann Sovin; Deputy Warden Lacy L. Scott; and Michael Brodsky, who is appearing solely for the purpose of representing the ADOC and is not a counsel of record.

IT IS SO ORDERED this _25_ day of _____Jan.____, 2011.

_____
THE HONORABLE DOUGLAS RAYES

4

526779.1

1

2   Copies of the foregoing provided

3   this ___ day of _____to:

4   Lacey Stover Gard

5   Assistant Attorney General
    1275 West Washington

6   Phoenix, AZ  85007

7   Michael Brodsky

8   Office of the Attorney General
    Arizona Department of Corrections

9   1275 West Washington

10  Phoenix, Arizona  85007

11  Deputy Warden Lacy L. Scott
    Arizona State Prison – Perryville

12  P.O. Box 3000

13  Goodyear, AZ  85395

14  Scott Bennett

15  Attorney for Petitioner
    Coppersmith Schermer & Brockelman PLC

16  2800 N. Central Ave, Suite 1200
    Phoenix, AZ  85004

17

18  Karyn Klausner, ADOC General Counsel
    1601 W. Jefferson

19  Phoenix, AZ 85007

20  Sita Jo-Ann Sovin

21  Alexis Boothby
    Kristen Powers

22  Christopher Darren Butler

23  Capital Case Project – Diversified Legal Services
    19528 Ventura Boulevard #520

24  Tarzana, CA   91356

25

26

# EXHIBIT OOO

MICHAEL K. JEANES, CLERK
BY *[signature]*   DEP
FILED

11 FEB 23 PM 4: 19

1  COPPERSMITH SCHERMER & BROCKELMAN PLC
   2800 North Central Avenue
   Suite 1200
2  Phoenix, Arizona 85004
   (602) 224-0999
   Scott M. Bennett, State Bar No. 022350
3

4  FOLEY & LARDNER LLP
   150 E. Gilman Street
   Madison, WI 53703
   Telephone: (608) 257-5035
5  Fax:        (608) 258-4258

6  Allen A. Arntsen, Admitted *Pro Hac Vice*
   Stephan J. Nickels Admitted *Pro Hac Vice*
   Matthew R. Lynch Admitted *Pro Hac Vice*

7  *Attorneys for Petitioner*
   Wendi Andriano

8              SUPERIOR COURT OF ARIZONA
9                  COUNTY OF MARICOPA

10

11  State of Arizona,                    )
12                                       )
                       Respondent,       )   No. CR2000-096032-A
13                                       )
14      vs.                              )   **MOTION FOR EXTENSION OF**
                                         )   **TIME TO FILE POST-**
15  Wendi Elizabeth Andriano,            )   **CONVICTION RELIEF PETITION**
                                         )
16                     Petitioner.       )   (Assigned to the Hon. Douglas Rayes)
                                         )
17                                       )
                                         )
18  ─────────────────────────────────────

19       Pursuant to Rule 32.4(c)(1) of the Arizona Rules of Criminal Procedure and the
20  Court's supervisory powers, Petitioner Wendi Andriano moves for a 180-day extension of
21  time to file her petition for post-conviction relief. Counsel for Ms. Andriano has contacted
22  the State, which objects to the extension sought. For the following reasons, however, an
23  extension is appropriate and necessary under the circumstances to ensure that Ms.
24  Andriano receives the post-conviction representation required by Rule 6.8(c) of the
25  Arizona Rules of Criminal Procedure, as well as the American Bar Association Guidelines
26  for the Appointment and Performance of Defense Counsel in Death Penalty Cases (the
27  "ABA Guidelines").

28
MADI_2560622.2

## POST-CONVICTION RELIEF COUNSEL'S INVESTIGATION TO DATE

Shortly after their appearance as post-conviction relief counsel ("PCR counsel") on November 4, 2009, the undersigned attorneys sought, and this Court granted, an extension to June 1, 2011, for filing the petition for post-conviction relief, in recognition of the substantial investigation necessary for this capital case. Since that time, PCR counsel have pursued the case diligently and have emphasized the June 1, 2011 deadline to all experts retained to investigate issues and aspects of the case. (*See* attached Affidavit of Allen A. Arntsen ("Arntsen Aff.") ¶ 3.)

As a result, the collective time invested in this case by both PCR counsel and those working under their direction has been substantial in the 14 months since appearance. PCR counsel have made diligent and extensive efforts to investigate this case and the grounds for post-conviction relief, including:

- reviewing transcripts spanning four months of trial and files of trial counsel collected over a cumulative span of six years;

- interviewing trial counsel, pre-trial investigators and others who participated in Petitioner's defense at trial;

- interviewing fact witnesses;

- engaging and consulting with experts;

- communicating with the client;

- coordinating with the Arizona Attorney General's Office and the Perryville State Prison to arrange for contact visits with and testing of Ms. Andriano by mental health professionals;

- conferring with those experts and other investigators regarding the status of their investigations; and

- assessing potential grounds for relief in light of facts unearthed by investigators and preliminary opinions of experts, prior proceedings and the restrictions on grounds for post-conviction relief.

2

MADI_2560622.2

(Arntsen Aff. ¶ 4.)

Since their appearance as counsel on November 4, 2009, Foley & Lardner attorneys have invested more than 1,250 documented hours on the case, and Foley & Lardner paralegals have invested more than 220 documented hours on the case. (Arntsen Aff. ¶ 5.) This does not include the hours spent by local counsel, attorney Scott M. Bennett of Coppersmith Schermer & Brockelman PLC, on the case. (*Id.*) PCR counsel recognizes that "substantial hours" is a relative term in the post-conviction relief context. While this has been a significant undertaking by the attorneys involved, we note that the average number of attorney hours for even the most qualified counsel to take a post-conviction case from appointment through any appeals is more than 3,300. (Guideline 6.1 cmt., at 41.)

In addition, PCR counsel have sought, interviewed, and retained necessary experts to investigate discrete elements of the case that warranted and continue to warrant further review, primarily in the areas of mental health and mitigation. Those experts have also worked diligently during the same time frame, spending a collective total of more than 5,000 hours on the case in the past 14 months. (Arntsen Aff. ¶ 7.)

The reason for this substantial amount of time to date is threefold. *First*, as they must under Arizona law (Ariz. R. Crim. P. 6.8(c), PCR counsel recognize the significant obligations imposed upon post-conviction relief counsel by the Guidelines. Under the Guidelines, post-conviction relief counsel "cannot rely on the previously compiled record but must conduct a thorough, independent investigation" of both "the facts underlying the conviction and sentence" and mitigating evidence, "not only to discover mitigation that was not presented previously, but also to identify mental-health claims which potentially reach beyond sentencing[.]" (Guideline 10.15.1 cmt.) The Guidelines also require post-conviction counsel to "litigate all issues . . . that are arguably meritorious under the standards applicable to high quality capital defense representation." (Guideline 10.15.1(C).)

3

MADI_2560622.2

1    *Second*, investigation of the case itself has been an extensive undertaking. Ms.
2    Andriano was on trial from September through December 2004, after four years enduring
3    a revolving door of legal professionals who at one time or another worked on her case.
4    None of those professionals was involved in the case from its commencement through
5    trial, and none assumed full responsibility for the investigation and trial planning until
6    2003. (Arntsen Aff. ¶ 8.) The shifting involvement of members of her trial team—some
7    with varying involvement over different periods of time and varying aspects of the case,
8    and many performing isolated work with little coordination with the others—has rendered
9    it a time-consuming challenge to obtain complete information regarding the pre-trial
10   efforts of her defense team. (*Id.*) Further, following the Supreme Court decision in *Ring*
11   *v. Arizona*, 536 U.S. 584 (2002), Ms. Andriano's trial was among the first in Arizona to
12   have all three phases—guilt, aggravation, and mitigation—decided back-to-back-to-back
13   by the same jury. This circumstance of timing has required additional investigation into
14   the adequacy of Ms. Andriano's representation in response to this landmark shift in capital
15   sentencing, including seeking interviews with investigators and mitigation specialists who
16   were delegated responsibilities relating to the presentation of evidence in the second and
17   third trial phases. A number of those paraprofessionals are no longer employed in the
18   same capacity in Arizona, and at least two (one of whom is out-of-state) have been
19   unresponsive to interview requests. (Arntsen Aff. ¶ 9.)

20        *Third*, more than 75 witnesses were called in Ms. Andriano's trial, some of whom
21   offered forensic opinions and conflicting testimony that has required substantial time to
22   review. The sheer number of witnesses called do not tell the whole story of the scope of
23   necessary investigation, however.

24        While more than 60 witnesses testified in the guilt/innocence phase of the trial, only
25   nine witnesses were called by the defense,[1] most of whom spent equal or more time on

26
27
[1] One of these witnesses was a State witness recalled by the defense.
28

MADI_2560622.2

4

1   cross-examination than direct or re-direct.   Only two witnesses (both for the State)

2   testified at the aggravation phase of the trial, and only a dozen witnesses testified for the

3   defense at the penalty/mitigation phase (including four family friends who admitted they

4   had not had interacted with Ms. Andriano since the early 1990s, and three prison

5   employees).  The defense did not call any evaluating psychiatrist or psychologist at any

6   phase, or any forensic, medical, or other expert capable of testifying regarding the physical

7   evidence and its relation to the timing of events as testified to by other witnesses.

8         Given the dearth of expert testimony presented by the defense at the guilt/innocence

9   phase, the lack of any testimony at the aggravation phase, and the superficial presentation

10  of evidence in the post-*Ring* mitigation phase, PCR counsel's investigation into several

11  fundamental aspects of the case is not merely reviewing or revisiting prior trial testimony

12  or investigation by trial counsel, but actively venturing into uncharted territory.

13        To date, those efforts have been diligent.  The mitigation firm retained by PCR

14  counsel has located roughly 150 witnesses and conducted over 150 interviews of more

15  than 50 relatives, friends, and others involved in key stages of Ms. Andriano's life, almost

16  none of whom had been contacted or interviewed by trial counsel. (Arntsen Aff. ¶ 10.)

17  With the assistance of this Court's contact visit orders, PCR counsel's mental health

18  professionals have commenced evaluation, assessment, and testing of Ms. Andriano that

19  has been informed by their review of the mitigation investigation, including the

20  identification of a number of symptoms of serious mental psychiatric issues that were

21  never examined pre-trial and never presented in any form to the jury.  (*Id.* ¶ 11.)  The fact

22  investigator, a former police detective, has reviewed voluminous police reports, identified

23  areas for further inquiry, and assisted in locating and interviewing potential witnesses who

24  were not called at trial, but might have material information regarding the evidence in the

25  record.  (*Id.* ¶ 12.)

26

27

28

5

MADI_2560622.2

## AN EXTENSION OF TIME IS NECESSARY AND APPROPRIATE.

PCR counsel have operated under the principle that all such evidence should be fully gathered and prepared for presentation to the Court no later than June 1 of this year. In the last month, however, it has become clear that more time is needed for PCR counsel to meet their obligations under the Guidelines.

Specifically, PCR counsel have identified eight general areas of investigation that have become increasingly material with respect to prior investigation and expert review, and for which additional time is required:

- Further interviews of relatives of Ms. Andriano, as well as further family medical information;

- Further investigation relating to potential sources of trauma and abuse experienced by Ms. Andriano, none of which was previously investigated or presented at the mitigation phase or any other stage of the trial;

- Further investigation into potential mental health problems of Ms. Andriano that were not raised or pursued at trial;

- Further interviews of key witnesses, including initial interviews of previously unavailable or uncooperative witnesses and follow-ups with a limited number of previously interviewed, key witnesses in light of substantial new facts discovered subsequent to their initial interviews;

- Evaluations of forensic and other evidence in light of new facts obtained in the ongoing investigation;

- Evaluation of such relevant facts in light of experts' individual assessments of Ms. Andriano;

- Ongoing assessment of the investigation in light of the work of trial counsel and issues previously raised; and

- Presentation of legally available, meritorious grounds for post-conviction relief in the Petition.

6

MADI_2560622.2

(Arntsen Aff. ¶ 13.)[2]

The requested extension is necessary for PCR counsel to fulfill their duty to continue to diligently investigate "all issues . . . that are arguably meritorious under the standards applicable to high quality capital defense representation" (Guideline 10.15.1(C)), particularly given the unique facts and circumstances of this case as described in this motion.

## CONCLUSION

For the foregoing reasons, Petitioner respectfully requests that the deadline for filing her Petition for Review be extended 180 days, from June 1, 2011 to November 28, 2011.

---

[2] Should the Court want more detailed justification for the extension, PCR counsel are willing to provide further details regarding these particular challenges and any other specifics of this request *ex parte*.  (Arntsen Aff. ¶ 13.)

7

RESPECTFULLY SUBMITTED February 23, 2011.

COPPERSMITH SCHERMER &
BROCKELMAN PLC

By _____
         Scott M. Bennett

FOLEY & LARDNER LLP
         Allen A. Arntsen, *Pro Hac Vice*
         Stephan J. Nickels, *Pro Hac Vice*
         Matthew R. Lynch, *Pro Hac Vice*

         *Attorneys for Petitioner*

ORIGINAL filed February 23, 2011,
with the Clerk of the Maricopa
County Superior Court.

COURTESY COPY hand-delivered February 23, 2011, to:

Judge Douglas Rayes
Maricopa County Superior Court
East Court Building-511
101 W. Jefferson
Phoenix, AZ 85003-2243

COPY emailed and mailed February 23, 2011, to:

Ms. Lacey Stover Gard
Office of the Attorney General
400 W. Congress, Suite S-315
Tuscon, AZ 85701-1367
*Attorney for the State of Arizona*

8

MADI_2560622.2

# EXHIBIT

1  COPPERSMITH SCHERMER & BROCKELMAN PLC
   2800 North Central Avenue
   Suite 1200
2  Phoenix, Arizona 85004
   (602) 224-0999
   Scott M. Bennett, State Bar No. 022350
3  FOLEY & LARDNER LLP
   150 E. Gilman Street
4  Madison, WI 53703
   Telephone: (608) 257-5035
   Fax:        (608) 258-4258
5  Allen A. Arntsen, Admitted Pro Hac Vice
   Stephen J. Nickels Admitted Pro Hac Vice
6  Matthew R. Lynch Admitted Pro Hac Vice
   Attorneys for Petitioner
7  Wendi Andriano

8                    SUPERIOR COURT OF ARIZONA
9                      COUNTY OF MARICOPA

10

11  State of Arizona,                    )
                                         )
12                    Respondent,        )    No. CR2000-096032-A
                                         )
13                                       )
          vs.                            )    **AFFIDAVIT OF ALLEN A.**
14                                       )    **ARNTSEN IN SUPPORT OF**
    Wendi Elizabeth Andriano,            )    **MOTION FOR EXTENSION OF**
15                                       )    **TIME TO FILE POST-**
                                         )    **CONVICTION RELIEF PETITION**
16                    Petitioner.        )
                                         )
17                                       )    (Assigned to the Hon. Douglas Rayes)

18

19

20

21  STATE OF WISCONSIN        )
                              )    SS.
22  COUNTY OF DANE            )

23       ALLEN R. ARNTSEN, being first duly sworn upon oath deposes and states:

24            1.     I am an attorney with Foley & Lardner LLP, and one of the attorneys

25  of record for Petitioner.  I have personal knowledge of the matters stated below.

26

27

28
MADI_2560625.1

2.      I and other Foley attorneys were appointed as counsel for Petitioner on November 4, 2009. In 2010, we were granted an extension of time to June 1, 2011 to file the Petition for Review in this matter.

3.      Since that time, we have pursued the case under the assumption that no further extensions would be sought or granted, and have emphasized that understanding to all experts retained to investigate issues and aspects of the case as they have arisen during the course of the investigation.

4.      The collective time invested in this case by both counsel and those working under our direction has been substantial in the fourteen months since appointment. We have made diligent and extensive efforts to investigate this case and the grounds for post-conviction relief, including: review of the trial transcripts and files of trial counsel, interviews with trial counsel, paraprofessionals and investigators, interviews with fact witnesses, engagement of and consultation with experts, communications with the client, coordinating with the Arizona Attorney General's Office and the Perryville State Prison to arrange for contact visits with and testing of Petitioner by mental health professionals, conferring with those experts and other investigators regarding the status of their investigations, and assessing potential grounds for relief in light of facts unearthed by investigators and preliminary opinions of experts, prior proceedings and the restrictions on grounds for post-conviction relief.

5.      Since our appointment on November 4, 2009, Foley & Lardner attorneys have invested more than 1,250 documented hours on the case, and Foley & Lardner paraprofessionals have invested more than 220 documented hours on the case.

2

1   The documented hours, had they been billed at these professionals' customary rates, would

2   have exceeded $500,000 in fees.  This does not include hundreds of hours spent studying

3
    Arizona and federal law to identify the state of the relevant law governing post-conviction
4

5   proceedings and available claims prior to accepting the appointment.

6           6.      In addition, Attorney Scott M. Bennett of Coppersmith Schermer &

7   Brockelman PLC, our local counsel, has also spent a number of hours advising us on local

8   practice and procedure relating to the case.
9

10          7.      In addition, we have sought, interviewed, and retained necessary

11  qualified experts to investigate discrete elements of the case that warranted and continue to

12  warrant further review, primarily in the area of mental health.  Based on their statements

13
    sent to the firm, these experts have spent a collective total of more than 5,000 hours on the
14

15  case in the past fourteen months.

16          8.      Investigation of the case itself has been an extensive undertaking.

17  Ms. Andriano was on trial from September through December 2004, after four years

18
    enduring a revolving door of legal professionals who at one time or another worked on her
19

20  case.  None of those professionals was involved in the case from its commencement

21  through trial, and none assumed full responsibility for the investigation and trial planning

22  until 2003.  The shifting involvement of members of her trial team—some with varying

23
    involvement over different periods of time and over varying aspects of the case, and many
24

25  performing isolated work with little coordination with the others—has rendered it a time-

26  consuming challenge to obtain complete information regarding the pre-trial efforts of her

27  defense team.

28                                      3

MADI_2560625.1

9.      I understand that Petitioner's trial was one of the first full capital trials conducted in Arizona following the Supreme Court's ruling in *Ring v. Arizona*, 536 U.S. 584 (2002). This fact has also required additional investigation into the adequacy of Ms. Andriano's representation in response to this landmark shift in capital sentencing, including seeking interviews with paraprofessionals who were delegated responsibilities relating to the presentation of evidence in the second and third trial phases. A number of those paraprofessionals are no longer employed in the same capacity in Arizona, and at least two (one of whom is out-of-state) have been unresponsive to interview requests.

10.     In addition, the presentation of evidence relating to mitigation at Petitioner's trial was sparse, and numerous relatives and other witnesses whose relevance to the mitigation phase was obvious were never even interviewed by trial counsel. As a result, we have made extensive efforts to contact and interview those witnesses. To date, the mitigation firm we retained has located and interviewed more than 50 relatives, friends, and others involved in key stages of Ms. Andriano's life in more than 150 separate interviews, almost all of whom were never been previously interviewed by trial counsel despite attesting to their availability around the time of the trial.

11.     With the assistance of this Court's contact visit orders, our mental health professionals have commenced evaluation, assessment, and testing of Ms. Andriano that has been informed by their review of the mitigation investigation, including the identification of a number of tell-tale symptoms of serious mental psychiatric issues that were never examined pre-trial and never presented in any form to the jury.

4

MADI_2560625.1

1          12.    The fact investigator, a former police detective, has reviewed

2    voluminous police reports, identified areas for further inquiry, and assisted in locating and

3    interviewing potential witnesses who were not called at trial and may have material

4

5    information regarding the evidence in the record.

6          13.    Despite these diligent efforts, it is now clear that we will be unable to

7    complete several key areas of the investigation by the June 1, 2011 deadline in place.

8

9    Specifically, we have identified eight general areas of investigation that have become

10    increasingly material with respect to prior investigation and expert review, but are not

11    completed and are unlikely to all be completed by June 1 of this year:

12
13              Further interviews of relatives of Ms. Andriano, as well as
                 further family medical information;

14              Further investigation relating to potential sources of trauma
                 and abuse experienced by Ms. Andriano, none of which was
15              previously investigated or presented at the mitigation phase or
16              any other stage of the trial;

17              Further investigation into potential mental health problems of
                 Ms. Andriano that were not raised or pursued at trial;
18

19              Further interviews of key witnesses, including initial
                 interviews of heretofore unavailable or uncooperative
20              witnesses and follow-ups with a limited number of previously
                 interviewed, key witnesses in light of substantial new facts
21              discovered subsequent to their initial interviews;

22              Evaluations of forensic and other evidence in light of new facts
23              obtained in the ongoing investigation;

24              Evaluation of such relevant facts in light of experts' individual
                 assessments of Ms. Andriano;
25

26

27

28                                       5

MADI_2560625.1

1    Ongoing assessment of the investigation in light of the work of
     trial counsel and issues previously raised; and
2

3    Presentation of legally available, meritorious grounds for post-
     conviction relief in the Petition.
4

5    I am willing and able to discuss such tasks more specifically *in camera* and *ex parte*, should

6    the Court desire more details regarding the status of the investigation and the materiality of

7    this further investigation.

8          14.    An extension of 180 days from the present June 1, 2011 deadline

9    should be sufficient to enable us and our experts to complete this investigation in
10
     conformity with the American Bar Association Guidelines for the Appointment and
11
12   Performance of Defense Counsel in Death Penalty Cases, and to include all potentially

13   meritorious grounds for relief in the Petition.

14

15   DATED this 22 day of February, 2011.
16

17

18                               Allen A. Arntsen

19

20   Subscribed and sworn to before me
     this 22 day of February, 2011.
21

22
     Notary Public, State of Wisconsin.
23   My Commission: expires 2/17/13

24

25

26

27

28                            6

MADI_2660625.1

# EXHIBIT PPP

MICHAEL K. JEANES. CLERK
·BY S. Keunow DEP.

FILED

11 MAR -1 PM 4: 44

1   James J. Belanger (011393)
    Scott M. Bennett (022350)
2   Coppersmith Schermer & Brockelman PLC
    2800 North Central Avenue, Suite 1200
3   Phoenix, Arizona 85004
    (602) 224-0999 (office)
4   (602) 224-6020 (fax)
    sbennett@csblaw.com
5
    Allen A. Arntsen, Admitted *Pro Hac Vice*
6   Stephan J. Nickels Admitted *Pro Hac Vice*
    Matthew R. Lynch Admitted *Pro Hac Vice*
7   Foley & Lardner LLP
    150 East Gilman Street
8   Madison, WI 53703
    (608) 257-5035 (office)
9   (608) 258-4258 (fax)
    aarntsen@foley.com
10
    *Attorneys for Petitioner Wendi Andriano*
11
                    SUPERIOR COURT OF ARIZONA
12                      COUNTY OF MARICOPA
13
    State of Arizona,               )     No. CR2000-096032-A
14                                  )
                    Respondent,     )     **STIPULATION TO MODIFY**
15   v.                             )     **PREVIOUSLY AUTHORIZED,**
16                                  )     **CONFIDENTIAL CONTACT**
                                    )     **VISITS BETWEEN WENDI**
17   Wendi Elizabeth Andriano,      )     **ELIZABETH ANDRIANO AND**
                                    )     **HER EXPERTS**
18                  Petitioner.     )
                                    )
19                                  )     (Assigned to Hon. Douglas Rayes)
                                    )
20   _____)
21
            On January 25, 2011, this Court signed an order authorizing confidential contact
22
    visits between petitioner Wendi Elizabeth Andriano and several of the experts assisting
23
    with her case.
24
            The parties now stipulate that the date of the previously-stipulated March 15, 2011
25
    visit will be changed to March 8, 2011.
26

2473516.2
2576407.1

1    The parties further stipulate to the addition of Scott Bennett, one of the attorneys for

2    Ms. Andriano, to all of the visits listed in the January 25, 2011 stipulation, including the

3    March 8, 2011 visit.

4    The State has agreed to this modification to the visitation schedule.  So has Charles

5    Ryan, Director of the ADOC, through undersigned counsel.[1]

6    A proposed order with the revised visitation schedule accompanies this stipulation.

7

8    Respectfully submitted March 1, 2011.

9    COPPERSMITH SCHERMER & BROCKELMAN PLC

10   By _____

11   James J. Belanger
     Scott M. Bennett

12

13   FOLEY & LARDNER LLP
     Allen A. Arntsen, *Pro Hac Vice*

14   Stephan J. Nickels, *Pro Hac Vice*
     Matthew R. Lynch, *Pro Hac Vice*

15

16   *Attorneys for Petitioner*

17   OFFICE OF THE ATTORNEY GENERAL

18   By _____

19   Lacey Stover Gard

20   *Attorney for State of Arizona*

21

22   OFFICE OF THE ATTORNEY GENERAL

23   By _____

24   Michael Brodsky

25   *Attorney for Arizona Department of Corrections*

26   _____

[1] Assistant Attorney General Michael Brodsky appears solely for the purpose of representing the interests of ADOC.

2

2473516.2
2576407.1

1

2   ORIGINAL filed March 1, 2011.

3   COPY hand delivered March 1, 2011, to:

4   The Hon. Douglas Rayes
    East Court Building-411
5   101 W. Jefferson
6   Phoenix, AZ. 85003-2243

7   COPIES mailed March 1, 2011 to:

8
    Michael Brodsky, Assistant
9   Assistant Attorney General
    1275 West Washington
10  Phoenix, Arizona 85007-2997

11
    Ms. Lacey Stover Gard
12  Office of the Attorney General
13  400 West Congress, Suite S-315
    Tucson, Arizona 85701-1367
14
15  Deputy Warden Lacy L. Scott
    Arizona State Prison – Perryville
16  P.O. Box 3000
    Goodyear, Arizona 85395
17

18

19

20

21

22

23

24

25

26

3

# EXHIBIT QQQ

FILED
Mar 3, 2011 3:36pm
MICHAEL K. JEANES, Clerk
By___XL O'Shay(ness___
H. O'Shaughnessy Deputy

**SUPERIOR COURT OF ARIZONA**
**COUNTY OF MARICOPA**

| | |
|---|---|
| State of Arizona, | NO. CR2000-096032-A |
| Respondent, | ORDER AMENDING CONTACT |
| v. | VISITS (Death Penalty Case) |
| Wendi Elizabeth Andriano, | |
| Petitioner. | |

Pending before the Court is the parties' Stipulation to Modify Previously Authorized, Confidential Contact Visits between Wendi Elizabeth Andriano and Her Experts. After due consideration of said stipulation, and the relevant pleadings on file,

IT IS ORDERED that the Stipulation to Modify Previously Authorized, Confidential Contact Visits between Wendi Elizabeth Andriano and Her Experts, incorporated into this order, is **GRANTED**.

IT IS FURTHER ORDERED that the previous Order Allowing Contact Visits is amended to change the date of the March 15, 2011 visit to a March 8, 2011 visit.

IT IS FURTHER ORDERED adding attorney Scott Bennett to the list of authorized visitors for all previously-authorized contact visits in March and April of 2011.

IT IS FURTHER ORDERED that contact visits with Wendi Andriano may take place on the following dates at the time indicated:

A.    March **8**, 2011          10:30 a.m. to 2:30 p.m.
Dr. Myla Young, Dr. George Woods, Dr. Jim Hopper, Sita Jo-Ann Sovin, Kristen Powers, Alexis Boothby, Christopher Butler, Allen Arntsen, Matthew Lynch, Krista Sterken, **Scott Bennett**

B.    March 16, 2011          10:30 a.m. to 2:30 p.m.
Dr. Myla Young, Dr. George Woods, Dr. Jim Hopper, Sita Jo-Ann Sovin, Kristen Powers, Alexis Boothby, Christopher Butler, Allen Arntsen, Matthew Lynch, Krista Sterken, **Scott Bennett**

2473516.2
2576407.1

C.    March 29, 2011                10:30 a.m. to 2:30 p.m.
      Dr. Myla Young, Dr. George Woods, Dr. Jim Hopper, Sita Jo-Ann Sovin,
      Kristen Powers, Alexis Boothby, Christopher Butler, Allen Arntsen,
      Matthew Lynch, Krista Sterken, **Scott Bennett**

D.    March 30, 2011                10:30 a.m. to 2:30 p.m.
      Dr. Myla Young, Dr. George Woods, Dr. Jim Hopper, Sita Jo-Ann Sovin,
      Kristen Powers, Alexis Boothby, Christopher Butler, Allen Arntsen,
      Matthew Lynch, Krista Sterken, **Scott Bennett**

E.    April 12, 2011                10:30 a.m. to 2:30 p.m.
      Dr. Myla Young, Dr. George Woods, Dr. Jim Hopper, Sita Jo-Ann Sovin,
      Kristen Powers, Alexis Boothby, Christopher Butler, Allen Arntsen,
      Matthew Lynch, Krista Sterken, **Scott Bennett**

F.    April 13, 2011                10:30 a.m. to 2:30 p.m.
      Dr. Myla Young, Dr. George Woods, Dr. Jim Hopper, Sita Jo-Ann Sovin,
      Kristen Powers, Alexis Boothby, Christopher Butler, Allen Arntsen,
      Matthew Lynch, Krista Sterken, **Scott Bennett**

G.    April 26, 2011                10:30 a.m. to 2:30 p.m.
      Dr. Myla Young, Dr. George Woods, Dr. Jim Hopper, Sita Jo-Ann Sovin,
      Kristen Powers, Alexis Boothby, Christopher Butler, Allen Arntsen,
      Matthew Lynch, Krista Sterken, **Scott Bennett**

H.    April 27, 2011                10:30 a.m. to 2:30 p.m.
      Dr. Myla Young, Dr. George Woods, Dr. Jim Hopper, Sita Jo-Ann Sovin,
      Kristen Powers, Alexis Boothby, Christopher Butler, Allen Arntsen,
      Matthew Lynch, Krista Sterken, **Scott Bennett**

IT IS FURTHER ORDERED that the Clerk of the Court forward a copy of this

Order to counsel of record for Petitioner, Scott Bennett; counsel of record for the State of

Arizona, Lacey Stover Gard; Karyn Klausner, ADOC General Counsel; Ms. Sita Jo-Ann

Sovin; and Deputy Warden Lacy L. Scott.

IT IS SO ORDERED this _2_ day of _March_, 2011.

_____
THE HONORABLE DOUGLAS RAYES

2

1  Copies of the foregoing provided
2  this ____ day of _____to:

3  Lacey Stover Gard
   Assistant Attorney General
4  1275 West Washington
5  Phoenix, AZ  85007

6  Deputy Warden Lacy L. Scott
   Arizona State Prison – Perryville
7  P.O. Box 3000
8  Goodyear, AZ  85395

9  Scott Bennett
   Attorney for Petitioner
10 Coppersmith Schermer & Brockelman PLC
11 2800 N. Central Ave, Suite 1200
   Phoenix, AZ  85004
12

13 Karyn Klausner, ADOC General Counsel
   1601 W. Jefferson
14 Phoenix, AZ 85007

15
   Sita Jo-Ann Sovin
16 Alexis Boothby
   Kristen Powers
17 Christopher Darren Butler
18 Capital Case Project – Diversified Legal Services
   19528 Ventura Boulevard #520
19 Tarzana, CA   91356

20

21

22

23

24

25

26

3

# EXHIBIT RRR

Michael K. Jeanes, Clerk of Court
*** Electronically Filed ***
03/07/2011 8:00 AM

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CR 2000-096032                                          03/03/2011


                                              CLERK OF THE COURT
JUDGE DOUGLAS L. RAYES                         H. O'Shaughnessy
                                                  Deputy



STATE OF ARIZONA                          LACEY ALEXANDRA STOVER GARD

v.

WENDI ELIZABETH ANDRIANO (A)              JAMES J BELANGER

                                          CAPITAL CASE MANAGER
                                          COURT ADMIN-CRIMINAL-PCR
                                          VICTIM SERVICES DIV-CA-SE
                                          VICTIM WITNESS DIV-AG-CCC



                         MINUTE ENTRY



        The Court has received and considered Stipulation to Modify Previously Authorized
Confidential Contact Visits between Wendi Elizabeth Andriano and her Experts.  Good cause
appearing,

        IT IS ORDERED granting Order Amending Contact Visits all in accordance with formal
written order signed by the Court on March 2, 2011 and filed by the Clerk March 3, 2011.

        FILED: Order.
        ISSUED:  Certified Copies.

        This case is eFiling eligible: http://www.clerkofcourt.maricopa.gov/efiling/default.asp.
Attorneys are encouraged to review Supreme Court Administrative Orders 2010-117 and 2011-
10 to determine their mandatory participation in eFiling through AZTurboCourt.

# EXHIBIT SSS

MICHAEL K. JEANES, CLERK
BY S. Keinon DEP.

FILED

.11 MAR 22 PM 3: 53

1   Scott M. Bennett (022350)
    Coppersmith Schermer & Brockelman PLC
2   2800 North Central Avenue, Suite 1200
    Phoenix, Arizona 85004
3   (602) 224-0999 (office)
    (602) 224-6020 (fax)
4   sbennett@csblaw.com

5   Allen A. Arntsen, Admitted *Pro Hac Vice*
6   Stephan J. Nickels Admitted *Pro Hac Vice*
    Matthew R. Lynch Admitted *Pro Hac Vice*
7   Foley & Lardner LLP
    150 East Gilman Street
8   Madison, WI 53703
    (608) 257-5035 (office)
9   (608) 258-4258 (fax)
    aarntsen@foley.com
10

11  *Attorneys for Petitioner Wendi Elizabeth Andriano*

12              SUPERIOR COURT OF ARIZONA
                  COUNTY OF MARICOPA
13

14  STATE OF ARIZONA,                )   No. CR2000-096032-A
                                     )
15              Respondent,          )   **STIPULATION TO ALLOW**
                                     )   **CONFIDENTIAL CONTACT VISITS**
16  vs.                              )   **BETWEEN WENDI ELIZABETH**
                                     )   **ANDRIANO AND HER EXPERTS**
17  WENDI ELIZABETH ANDRIANO,        )   **AND ATTORNEYS**
                                     )
18              Petitioner.          )   (Assigned to the Hon. Douglas Rayes)
19                                   )
                                     )
20                                   )
21  _____)

22      Petitioner Wendi Elizabeth Andriano, through undersigned counsel, requests this

23  Court to issue an order directing the Arizona Department of Corrections (hereinafter

24  "ADOC") to allow confidential contact visits between Petitioner and Ms. Sita Jo-Ann

25  Sovin, a mitigation specialist and/or her associates, Ms. Alexis Boothby, Ms. Kristen

26  Powers and Mr. Christopher Darren Butler, as well as between Petitioner and Dr. James

    W. Hopper, a clinical psychologist, Dr. George Woods, a clinical psychiatrist, and Dr.

1  Myla Young, a neuropsychologist, and her attorneys Mr. Allen Arntsen, Mr. Matthew
2  Lynch, Mr. Scott Bennett, and Ms. Krista Sterken.  Charles Ryan, Director of the ADOC,
3  through undersigned counsel[1], does not object to the confidential contact visits between
4  Ms. Andriano and the experts.
5        Counsel for the parties have agreed to terms and conditions for the contact visits
6  and those terms and conditions are listed and contained in the accompanying proposed
7  order.  Counsel for the Petitioner and ADOC further agree and stipulate that the proposed
8  contact visit order should issue.
9        RESPECTFULLY SUBMITTED this 22 day of March, 2011.
10  OFFICE OF THE ATTORNEY GENERAL    COPPERSMITH SCHERMER &
11                                                                BROCKELMAN PLC
12  By _____          By _____
13        Lacey Stover Gard                      Scott M. Bennett
      *Attorney for State of Arizona*
14                                                      FOLEY & LARDNER LLP
15                                                         Allen A. Arntsen
                                                          Stephan J. Nickels
16                                                         Matthew R. Lynch
17                                                      *Attorneys for Petitioner*
18  OFFICE OF THE ATTORNEY GENERAL
19
20  By _____
21        Michael Brodsky
      *Attorney for Arizona Department of*
22  *Corrections*
23
24
25  _____
26  [1] Assistant Attorney General Michael Brodsky appears solely for the purpose of
   representing the interests of ADOC.

2

1

2   ORIGINAL filed with the Clerk of the Court
    On March 22, 2011.

3

4   COPY hand-delivered on March 22, 2011 to:

5   The Honorable Douglas Rayes
    East Court Building #411

6   101 W. Jefferson
    Phoenix, AZ 85003-2243

7

8   COPIE mailed on March 22, 2011 to:

9   Michael Brodsky
    Assistant Attorney General

10  1275 West Washington

11  Phoenix, AZ 85007-2997
    *Attorney for Arizona Department of Corrections*

12

13  Ms. Lacey Stover Gard
    Office of the Attorney General

14  400 West Congress, Suite S-315
    Tucson, Arizona 85701-1367

15  *Attorneys for the State of Arizona*

16

17  Deputy Warden Lacy L. Scott
    Arizona State Prison – Perryville

18  P.O. Box 3000
    Goodyear, AZ 85395

19

20

21

22

23

24

25

26

3

# EXHIBIT TTT

MICHAEL K. JEANES, CLERK
BY S. Keinon DEP.
FILED

11 MAR 22  PM 3: 53

1   Scott M. Bennett (022350)
    Coppersmith Schermer & Brockelman PLC
2   2800 North Central Avenue, Suite 1200
    Phoenix, Arizona  85004
3   (602) 224-0999 (office)
    (602) 224-6020 (fax)
4   sbennett@csblaw.com

5
    Allen A. Arntsen, Admitted *Pro Hac Vice*
6   Stephan J. Nickels Admitted *Pro Hac Vice*
    Matthew R. Lynch Admitted *Pro Hac Vice*
7   Foley & Lardner LLP
    150 East Gilman Street
8   Madison, WI 53703
    (608) 257-5035 (office)
9   (608) 258-4258 (fax)
    aarntsen@foley.com
10

11  *Attorneys for Petitioner Wendi Elizabeth Andriano*

12              SUPERIOR COURT OF ARIZONA
                   COUNTY OF MARICOPA
13

14  STATE OF ARIZONA,                )   No. CR2000-096032-A
                                     )
15              Respondent,          )   **STIPULATION TO MODIFY**
                                     )   **PREVIOUSLY AUTHORIZED,**
16      vs.                          )   **CONFIDENTIAL CONTACT VISITS**
                                     )   **BETWEEN WENDI ELIZABETH**
17  WENDI ELIZABETH ANDRIANO,        )   **ANDRIANO AND HER EXPERTS**
                                     )
18              Petitioner.          )   (Assigned to the Hon. Douglas Rayes)
                                     )
19                                   )
                                     )
20  ─────────────────────────────── )

21

22          On January 25, 2011, this Court signed an order authorizing confidential contact

23  visits between petitioner Wendi Elizabeth Andriano and several of the experts assisting

24  with her case.

25          The parties now stipulate that the date of the previously-stipulated March 16, 2011

26  visit will be changed to an April 11, 2011 visit. The April 11, 2011 visit will be held from

    12:00-3:00 pm.

1       The parties also stipulate that the previously scheduled visit for April 26, 2011 will

2 begin at 8:30 am rather than 10:30 am. The April 26, 2011 visit will be held from 8:30 am

3 to 2:30 pm.

4       The State has agreed to this modification to the visitation schedule. So has Charles

5 Ryan, Director of the ADOC, through undersigned counsel.[1]

6       A proposed order with the revised visitation schedule accompanies this stipulation.

7       RESPECTFULLY SUBMITTED this 22 day of March, 2011.

8 OFFICE OF THE ATTORNEY GENERAL    COPPERSMITH SCHERMER &
                                     BROCKELMAN PLC

10 By _____     By _____

11     Lacey Stover Gard                Scott M. Bennett
    *Attorney for State of Arizona*

12                            FOLEY & LARDNER LLP
                           Allen A. Arntsen

13                            Stephan J. Nickels
                           Matthew R. Lynch

15                            *Attorneys for Petitioner*

16 OFFICE OF THE ATTORNEY GENERAL

18 By _____

19     Michael Brodsky
    *Attorney for Arizona Department of*

20 *Corrections*

25 _____

26 [1] Assistant Attorney General Michael Brodsky appears solely for the purpose of
representing the interests of ADOC.

2

1    ORIGINAL filed with the Clerk of the Court
     On March 22, 2011.
2

3    COPY hand-delivered on March 22, 2011 to:

4    The Honorable Douglas Rayes
     East Court Building #411
5    101 W. Jefferson
6    Phoenix, AZ 85003-2243

7    COPIE mailed on March 22, 2011 to:

8
     Michael Brodsky
9    Assistant Attorney General
     1275 West Washington
10   Phoenix, AZ 85007-2997
11   *Attorney for Arizona Department of Corrections*

12   Ms. Lacey Stover Gard
13   Office of the Attorney General
     400 West Congress, Suite S-315
14   Tucson, Arizona 85701-1367
     *Attorneys for the State of Arizona*
15

16   Deputy Warden Lacy L. Scott
     Arizona State Prison – Perryville
17   P.O. Box 3000
18   Goodyear, AZ 85395

19

20

21

22

23

24

25

26

# EXHIBIT UUU

**FILED**
*March 24, 2011  2:46pm*
MICHAEL K. JEANES, Clerk

By_____
H. O'Shaughnessy Deputy

1  Scott M. Bennett (022350)
   Coppersmith Schermer & Brockelman PLC
2  2800 North Central Avenue, Suite 1200
   Phoenix, Arizona 85004
3  (602) 224-0999 (office)
   (602) 224-6020 (fax)
4  sbennett@csblaw.com

5  Allen A. Arntsen, Admitted *Pro Hac Vice*
6  Stephan J. Nickels Admitted *Pro Hac Vice*
   Matthew R. Lynch Admitted *Pro Hac Vice*
7  Foley & Lardner LLP
   150 East Gilman Street
8  Madison, WI 53703
   (608) 257-5035 (office)
9  (608) 258-4258 (fax)
   aarntsen@foley.com
10

11  *Attorneys for Petitioner Wendi Elizabeth Andriano*

12              SUPERIOR COURT OF ARIZONA
                 COUNTY OF MARICOPA
13

14  STATE OF ARIZONA,                    )  No. CR2000-096032-A
                                          )
15              Respondent,               )  ORDER ALLOWING CONTACT
                                          )  VISITS (Death Penalty Case)
16      vs.                               )
                                          )  (Assigned to the Hon. Douglas Rayes)
17  WENDI ELIZABETH ANDRIANO,            )
                                          )
18              Petitioner.               )
19                                        )
                                          )
20                                        )
   _____)
21

22  Pending before the Court is the parties' Stipulation for an Order to Allow Confidential

23  Contact Visits between Petitioner and Ms. Sita Jo-Ann Sovin, a mitigation specialist

24  and/or her associates, Ms. Alexis Boothby, Ms. Kristen Powers and Mr. Christopher

25  Darren Butler, as well as between Petitioner and Dr. James W. Hopper, a clinical

26  psychologist, Dr. George Woods, a clinical psychiatrist, and Dr. Myla Young, a

   neuropsychologist, and her attorneys Mr. Allen Arntsen, Mr. Matthew Lynch, Mr. Scott

1  Bennett, and Ms. Krista Sterken..  After due consideration of said stipulation, and the

2  relevant pleadings on file,

3     IT IS ORDERED that the Stipulation for Order to Allow Confidential Contact

4  Visits between Wendi Elizabeth Andriano and the experts is **GRANTED**.

5     IT IS FURTHER ORDERED that the experts be permitted to have confidential

6  contact visits with Wendi Elizabeth Andriano, ADC# 191593, under the following  terms:

7     1.     Visitations may take place on the following dates at the time indicated:

8           A.     May 10, 2011_____ 10:30 a.m. to 2:30 p.m.
                   Dr. Myla Young, Dr. George Woods, Dr. Jim Hopper, Sita Jo-Ann Sovin,
9                  Kristen Powers, Alexis Boothby, Christopher Butler, Allen Arntsen,
                   Matthew Lynch, Scott Bennett, Krista Sterken
10

11          B.     May 11, 2011_____ 10:30 a.m. to 2:30 p.m.
                   Dr. Myla Young, Dr. George Woods, Dr. Jim Hopper, Sita Jo-Ann Sovin,
12                 Kristen Powers, Alexis Boothby, Christopher Butler, Allen Arntsen,
                   Matthew Lynch, Scott Bennett, Krista Sterken
13

14          C.     May 24, 2011_____ 10:30 a.m. to 2:30 p.m.
                   Dr. Myla Young, Dr. George Woods, Dr. Jim Hopper, Sita Jo-Ann Sovin,
15                 Kristen Powers, Alexis Boothby, Christopher Butler, Allen Arntsen,
                   Matthew Lynch, Scott Bennett, Krista Sterken
16

17          D.     May 25, 2011_____ 10:30 a.m. to 2:30 p.m.
                   Dr. Myla Young, Dr. George Woods, Dr. Jim Hopper, Sita Jo-Ann Sovin,
18                 Kristen Powers, Alexis Boothby, Christopher Butler, Allen Arntsen,
                   Matthew Lynch, Scott Bennett, Krista Sterken
19

20          E.     June 7, 2011_____ 10:30 a.m. to 2:30 p.m.
                   Dr. Myla Young, Dr. George Woods, Dr. Jim Hopper, Sita Jo-Ann Sovin,
21                 Kristen Powers, Alexis Boothby, Christopher Butler, Allen Arntsen,
                   Matthew Lynch, Scott Bennett, Krista Sterken
22          F.     June 8, 2011_____ 10:30 a.m. to 2:30 p.m.
                   Dr. Myla Young, Dr. George Woods, Dr. Jim Hopper, Sita Jo-Ann Sovin,
23                 Kristen Powers, Alexis Boothby, Christopher Butler, Allen Arntsen,
                   Matthew Lynch, Scott Bennett, Krista Sterken
24

25          G.     June 21, 2011_____ 10:30 a.m. to 2:30 p.m.
                   Dr. Myla Young, Dr. George Woods, Dr. Jim Hopper, Sita Jo-Ann Sovin,
26                 Kristen Powers, Alexis Boothby, Christopher Butler, Allen Arntsen,
                   Matthew Lynch, Scott Bennett, Krista Sterken

H.  June 22, 2011          10:30 a.m. to 2:30 p.m.
Dr. Myla Young, Dr. George Woods, Dr. Jim Hopper, Sita Jo-Ann Sovin, Kristen Powers, Alexis Boothby, Christopher Butler, Allen Arntsen, Matthew Lynch, Scott Bennett, Krista Sterken

2.     Petitioner's counsel or the experts shall make arrangements with Warden, Arizona State Prison - Perryville, or her designee, to schedule such visits.

3.     The Warden, through her staff, may require the experts to subject all instruments, equipment, manuals and the like to an inspection and inventory prior to and subsequent to any meeting with Wendi Elizabeth Andriano.

4.     ADOC may require inmate Wendi Elizabeth Andriano to wear leg restraints or a stun belt during the meetings.

5.     Both Petitioner and Respondent recognize that Petitioner's decision not to contest ADOC's practice of using a stun belt on Petitioner, should it use one, is due to the time constraints placed upon Petitioner's counsel and in no way constitutes a waiver of the "stun belt issue" in any future request for a contact visit in this case or in any other case. Respondents' willingness to stipulate hereto should not be considered a waiver of any aspect of ADOC's non-contact visitation policy.

6.     The experts shall be allowed to have physical contact with Petitioner as is necessary during the course of the interviews.

7.     The interviews must be confidential. The meetings between Petitioner and the experts shall take place in a room that allows for privacy.

8.     Before being allowed the contact visit authorized herein, the visiting experts shall certify in a written release to ADOC that they have investigated and ascertained the risks to their personal safety associated with the visit as authorized by and under the circumstances described in this order; that they agree to assume those risks; and that they release and hold harmless ADOC, the State of Arizona, and their officers and employees

3

1   from any claim arising from death or injury associated with the risks assumed. However,

2   such release shall not operate as a release of gross negligence on the part of ADOC.

3       IT IS FURTHER ORDERED that the Clerk of the Court forward a copy of this

4   Order to counsel of record for Petitioner, Scott Bennett; counsel of record for the State of

5   Arizona, Lacey Stover Gard; Karyn Klausner, ADOC General Counsel; Ms. Sita Jo-Ann

6   Sovin; Deputy Warden Lacy L. Scott; and Michael Brodsky, who is appearing solely for

7   the purpose of representing the ADOC and is not a counsel of record.

8

9       IT IS SO ORDERED this *23* day of *March*, 2011.

10

11                          THE HONORABLE DOUGLAS RAYES

12

13   Copies of the foregoing provided

14   this ___ day of _____to:

15   Ms. Lacey Stover Gard

16   Office of the Attorney General
     400 West Congress, Suite S-315

17   Tucson, Arizona  85701-1367

18   *Attorneys for the State of Arizona*

19   Michael Brodsky
     Assistant Attorney General

20   1275 West Washington

21   Phoenix, AZ  85007-2997
     *Attorney for Arizona Department of Corrections*

22

23   Deputy Warden Lacy L. Scott
     Arizona State Prison – Perryville

24   P.O. Box 3000

25   Goodyear, AZ  85395

26

4

1

2   Scott Bennett
    Attorney for Petitioner
3   Coppersmith Schermer & Brockelman PLC
    2800 N. Central Ave, Suite 1200
4   Phoenix, AZ 85004
5   *Attorneys for Petitioner*

6   Karyn Klausner, ADOC General Counsel
    1601 W. Jefferson
7   Phoenix, AZ 85007

8
    Sita Jo-Ann Sovin
9   Alexis Boothby
    Kristen Powers
10  Christopher Darren Butler
11  Capital Case Project – Diversified Legal Services
    19528 Ventura Boulevard #520
12  Tarzana, CA  91356

13  _____

14

15

16

17

18

19

20

21

22

23

24

25

26

5

# EXHIBIT VVV

**FILED**
*March 24, 2011  2:47pm*
MICHAEL K. JEANES, Clerk
By_____
H. O'Shaughnessy Deputy

1   Scott M. Bennett (022350)
    Coppersmith Schermer & Brockelman PLC
2   2800 North Central Avenue, Suite 1200
    Phoenix, Arizona 85004
3   (602) 224-0999 (office)
    (602) 224-6020 (fax)
4   sbennett@csblaw.com

5
    Allen A. Arntsen, Admitted *Pro Hac Vice*
6   Stephan J. Nickels Admitted *Pro Hac Vice*
    Matthew R. Lynch Admitted *Pro Hac Vice*
7   Foley & Lardner LLP
    150 East Gilman Street
8   Madison, WI 53703
    (608) 257-5035 (office)
9   (608) 258-4258 (fax)
    aarntsen@foley.com
10

11  *Attorneys for Petitioner Wendi Elizabeth Andriano*

12                  SUPERIOR COURT OF ARIZONA
                      COUNTY OF MARICOPA
13

14  STATE OF ARIZONA,              )   No. CR2000-096032-A
                                   )
15              Respondent,        )   ORDER AMENDING CONTACT
                                   )   VISITS (Death Penalty Case)
16      vs.                        )
                                   )   (Assigned to the Hon. Douglas Rayes)
17  WENDI ELIZABETH ANDRIANO,      )
                                   )
18              Petitioner.        )
                                   )
19                                 )
                                   )
20                                 )
    _____)
21

22          Pending before the Court is the parties' Stipulation to Modify Previously

23  Authorized, Confidential Contact Visits between Wendi Elizabeth Andriano and Her

24  Experts. After due consideration of said stipulation, and the relevant pleadings on file,

25          IT IS ORDERED that the Stipulation to Modify Previously Authorized,

    Confidential Contact Visits between Wendi Elizabeth Andriano and Her Experts,
26
    incorporated into this order, is **GRANTED**.

1        IT IS FURTHER ORDERED that the previous Order Allowing Contact Visits is

2   amended to change the date of the March 16, 2011 visit to an April 11, 2011 visit.  This

3   visit will be held from 12:00 to 3:00 pm.

4        IT IS FURTHER ORDERED that the previous Order Allowing Contact Visits is amended

5   to change the start time of the previously scheduled April 26th visit from 10:30 am to 8:30 am.

6   This visit will be held from 8:30 am to 2:30 pm.

7       1.    Visitations may take place on the following dates at the time indicated:

8
9       A.    March 29, 2011         10:30 a.m. to 2:30 p.m.
            Dr. Myla Young, Dr. George Woods, Dr. Jim Hopper, Sita Jo-Ann Sovin,
10          Kristen Powers, Alexis Boothby, Christopher Butler, Allen Arntsen,
            Matthew Lynch, Krista Sterken, Scott Bennett

11      B.    March 30, 2011         10:30 a.m. to 2:30 p.m.
12          Dr. Myla Young, Dr. George Woods, Dr. Jim Hopper, Sita Jo-Ann Sovin,
            Kristen Powers, Alexis Boothby, Christopher Butler, Allen Arntsen,
13          Matthew Lynch, Krista Sterken, Scott Bennett

14      C.    April 11, 2011         12:00 to 3:00 p.m.
            Dr. Myla Young, Dr. George Woods, Dr. Jim Hopper, Sita Jo-Ann Sovin,
15          Kristen Powers, Alexis Boothby, Christopher Butler, Allen Arntsen,
16          Matthew Lynch, Krista Sterken, Scott Bennett

17      D.    April 12, 2011         10:30 a.m. to 2:30 p.m.
            Dr. Myla Young, Dr. George Woods, Dr. Jim Hopper, Sita Jo-Ann Sovin,
18          Kristen Powers, Alexis Boothby, Christopher Butler, Allen Arntsen,
            Matthew Lynch, Krista Sterken, Scott Bennett
19
20      E.    April 13, 2011         10:30 a.m. to 2:30 p.m.
            Dr. Myla Young, Dr. George Woods, Dr. Jim Hopper, Sita Jo-Ann Sovin,
21          Kristen Powers, Alexis Boothby, Christopher Butler, Allen Arntsen,
            Matthew Lynch, Krista Sterken, Scott Bennett
22
        F.    April 26, 2011         8:30 a.m. to 2:30 p.m.
23          Dr. Myla Young, Dr. George Woods, Dr. Jim Hopper, Sita Jo-Ann Sovin,
            Kristen Powers, Alexis Boothby, Christopher Butler, Allen Arntsen,
24          Matthew Lynch, Krista Sterken, Scott Bennett

25      G.    April 27, 2011         10:30 a.m. to 2:30 p.m.
26          Dr. Myla Young, Dr. George Woods, Dr. Jim Hopper, Sita Jo-Ann Sovin,
            Kristen Powers, Alexis Boothby, Christopher Butler, Allen Arntsen,
            Matthew Lynch, Krista Sterken, Scott Bennett

1       IT IS FURTHER ORDERED that the Clerk of the Court forward a copy of this

2  Order to counsel of record for Petitioner, Scott Bennett; counsel of record for the State of

3  Arizona, Lacey Stover Gard; Karyn Klausner, ADOC General Counsel; Ms. Sita Jo-Ann

4  Sovin; and Deputy Warden Lacy L. Scott.

5

6       IT IS SO ORDERED this _23_ day of ___March___, 2011.

7

8                THE HONORABLE DOUGLAS RAYES

9

10  Copies of the foregoing provided

11  this ___ day of _____ to:

12  Ms. Lacey Stover Gard

13  Office of the Attorney General
    400 West Congress, Suite S-315

14  Tucson, Arizona 85701-1367
    *Attorneys for the State of Arizona*

15

16  Michael Brodsky
    Assistant Attorney General

17  1275 West Washington
    Phoenix, AZ 85007-2997

18  *Attorney for Arizona Department of Corrections*

19

20  Deputy Warden Lacy L. Scott
    Arizona State Prison – Perryville

21  P.O. Box 3000
    Goodyear, AZ 85395

22

23  Scott Bennett
    Attorney for Petitioner

24  Coppersmith Schermer & Brockelman PLC
    2800 N. Central Ave, Suite 1200

25  Phoenix, AZ 85004
    *Attorneys for Petitioner*

26

3

1   Karyn Klausner, ADOC General Counsel
    1601 W. Jefferson
2   Phoenix, AZ 85007

3
    Sita Jo-Ann Sovin
4   Alexis Boothby
5   Kristen Powers
    Christopher Darren Butler
6   Capital Case Project – Diversified Legal Services
    19528 Ventura Boulevard #520
7   Tarzana, CA   91356

8

9   _____

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

4

# EXHIBIT WWW

RETURN SERVICE REQUESTED

**Michael K. Jeanes**
Clerk of the Superior Court
Maricopa County
201 W. Jefferson
Phoenix, Arizona 85003

Mail Code: _____

RETURN SERVICE REQUESTED

RETURN TO SENDER
MULTI-OFFICE BUILDING
SUITE NUMBER OR
FIRM NAME REQUIRED

RECEIVED

MAR 23 2011

CLERK OF COURT
MAILROOM

FIRST CLASS
PRESORTED

MICHAEL K. JEANES, CLERK
BY J. Gamez DEF
FILED

11 APR -6  AM 8: 00

File Stamp

# CLERK OF THE COURT
## SUPERIOR COURT OF ARIZONA
Michael K. Jeanes, Clerk

**Returned Mail**

Case No.:
## CR 2000-096032-A

Brief Caption:

## STATE

vs.

## WENDI ANDRIANO

Docket Code:  **RTM**

**PAGE 1**  *lrd: 08/26/05*

Michael K. Jeanes, Clerk of Court
\* \*\*\* Electronically Filed \*\*\*
03/14/2011 8:00 AM

## SUPERIOR COURT OF ARIZONA
## MARICOPA COUNTY

CR 2000-096032                                03/08/2011

                                              CLERK OF THE COURT
JUDGE DOUGLAS L. RAYES                         H. O'Shaughnessy
                                                   Deputy


STATE OF ARIZONA                      LACEY ALEXANDRA STOVER GARD

v.

WENDI ELIZABETH ANDRIANO (A)          JAMES J BELANGER
                                      SCOTT M BENNETT
                                      ALLEN A ARNTSEN
                                      MATTHEW R LYNCH
                                      STEPHAN J NICKELS

                                      CAPITAL CASE MANAGER
                                      COURT ADMIN-CRIMINAL-PCR
                                      VICTIM SERVICES DIV-CA-SE
                                      VICTIM WITNESS DIV-AG-CCC


## CAPITAL POST-CONVICTION RELIEF STATUS CONFERENCE


9:40 a.m.

Courtroom ECB 411

State's Attorney:        Lacey Gard (appears telephonically)
Defendant's Attorney:    Scott Bennett, Allen Arntsen and Matthew Lynch
Defendant:               Not Present

Court Reporter, Cindy Lineburg, is present.

A record of the proceeding is also made by audio and/or videotape.

LET THE RECORD REFLECT the victim's parents are present.

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CR 2000-096032                                          03/08/2011


This is the time for Capital Case PCR status conference.

Defense is requesting an Extension of Time for Filing of Petition for Post-Conviction
Relief.

The State objects due to the length of time Defense team has been assigned to the matter.

The Court questions Defense counsel as to the nature and scope of the discovery left.

Defense counsel explains mental health experts are needed for interviews and
examinations and there are some outstanding reluctant witness interviews.

IT IS ORDERED denying Defendant's Motion for Extension of Time for Filing.  The
Court will leave the Petition due date at June 1, 2011.  Defense is free to file another Motion for
Extension of Time for Filing Petition when the due date is closer.

IT IS FURTHER ORDERED setting a telephonic status conference on May 18, 2011 at
9:00 a.m. to determine the status of the Petition.

This case is eFiling eligible: http://www.clerkofcourt.maricopa.gov/efiling/default.asp.
Attorneys are encouraged to review Supreme Court Administrative Orders 2010-117 and 2011-
10 to determine their mandatory participation in eFiling through AZTurboCourt.

10:07 a.m.  Matter concludes.

ALLEN A ARNTSEN
FOLEY AND LARDNER LLP
150 E GILMAN ST - POB 1497
MADISON WI  53701-1497

# EXHIBIT XXX

MICHAEL K. JEANES, CLERK
BY S. Keirnon  DEP
FILED

**11 APR 21  PM 1: 51**

1 | Scott M. Bennett (022350)
Coppersmith Schermer & Brockelman PLC
2 | 2800 North Central Avenue, Suite 1200
Phoenix, Arizona 85004
3 | (602) 224-0999 (office)
(602) 224-6020 (fax)
4 | sbennett@csblaw.com

5 | Allen A. Arntsen, Admitted *Pro Hac Vice*
6 | Stephan J. Nickels Admitted *Pro Hac Vice*
Matthew R. Lynch Admitted *Pro Hac Vice*
7 | Foley & Lardner LLP
150 East Gilman Street
8 | Madison, WI 53703
(608) 257-5035 (office)
9 | (608) 258-4258 (fax)
aarntsen@foley.com
10

11 | *Attorneys for Petitioner Wendi Elizabeth Andriano*

12 | SUPERIOR COURT OF ARIZONA
COUNTY OF MARICOPA
13

14 | STATE OF ARIZONA,                    )   No. CR2000-096032-A
                                       )
15 |            Respondent,              )   **STIPULATION TO MODIFY**
                                       )   **PREVIOUSLY AUTHORIZED,**
16 | vs.                                  )   **CONFIDENTIAL CONTACT VISITS**
                                       )   **BETWEEN WENDI ELIZABETH**
17 | WENDI ELIZABETH ANDRIANO,            )   **ANDRIANO AND HER EXPERTS**
                                       )
18 |            Petitioner.              )   (Assigned to the Hon. Douglas Rayes)
19                                        )
                                       )
20                                        )
     ——————————————————————————————      )
21

22 | On January 25, 2011, this Court signed an order authorizing confidential contact

23 | visits in March and April, 2011 between petitioner Wendi Elizabeth Andriano and several

24 | of the experts and attorneys assisting on her case. On March 23, 2011, this Court signed

25 | another order authorizing confidential contact visits in May and June, 2011, also between

26 | petitioner Wendi Elizabeth Andriano and several of the experts and attorneys assisting

with her case.

1     The parties now stipulate to the addition of Jodi K. Newman as an authorized

2  visitors for all of the visits authorized by the January 25, 2011 and March 23, 2011 orders.

3     The State has agreed to this modification to the visitation schedule.  So has Charles

4  Ryan, Director of the ADOC, through undersigned counsel.

5     RESPECTFULLY SUBMITTED this 21st day of April, 2011.

6                                      COPPERSMITH SCHERMER &
                                       BROCKELMAN PLC
7

8                                      By _____
                                           Scott M. Bennett
9

10                                     FOLEY & LARDNER LLP
                                           Allen A. Arntsen
11                                         Stephan J. Nickels
                                           Matthew R. Lynch
12

13                                     *Attorneys for Petitioner*

14                                     OFFICE OF THE ATTORNEY GENERAL

15

16                                     By _____
                                           Lacey Stover Gard
17

18                                     *Attorney for the State of Arizona*

19                                     OFFICE OF THE ATTORNEY GENERAL

20

21                                     By _____
                                           Michael Brodsky
22

23                                     *Attorney for Arizona Department of
                                       Corrections*

24

25

26

                                       2

1 | ORIGINAL filed with the Clerk of the Court on April 21, 2011.

2 | COPY hand-delivered on April 21, 2011, to:

3

The Honorable Douglas Rayes
4 | East Court Building #411
5 | 101 W. Jefferson
Phoenix, AZ 85003-2243

6

COPIE mailed on April 21, 2011, to:
7

8 | Michael Brodsky
Assistant Attorney General
9 | 1275 West Washington
Phoenix, AZ 85007-2997
10 | *Attorney for Arizona Department of Corrections*

11

Ms. Lacey Stover Gard
12 | Office of the Attorney General
13 | 400 West Congress, Suite S-315
Tucson, Arizona 85701-1367
14 | *Attorneys for the State of Arizona*

15

Deputy Warden Lacy L. Scott
16 | Arizona State Prison – Perryville
P.O. Box 3000
17 | Goodyear, AZ 85395

18

19

20

21

22

23

24

25

26

3

# EXHIBIT YYY

FILED
*Aprl 25, 2011* 2:13 pm
MICHAEL K. JEANES, Clerk

By ___*XL O'Shaughnessy*___
H. O'Shaughnessy Deputy

1   Scott M. Bennett (022350)
    Coppersmith Schermer & Brockelman PLC
2   2800 North Central Avenue, Suite 1200
    Phoenix, Arizona 85004
3   (602) 224-0999 (office)
    (602) 224-6020 (fax)
4   sbennett@csblaw.com

5   Allen A. Arntsen, Admitted *Pro Hac Vice*
6   Stephan J. Nickels Admitted *Pro Hac Vice*
    Matthew R. Lynch Admitted *Pro Hac Vice*
7   Foley & Lardner LLP
    150 East Gilman Street
8   Madison, WI 53703
    (608) 257-5035 (office)
9   (608) 258-4258 (fax)
    aarntsen@foley.com
10

11  *Attorneys for Petitioner Wendi Elizabeth Andriano*

12                SUPERIOR COURT OF ARIZONA
                   COUNTY OF MARICOPA
13

14  STATE OF ARIZONA,                    )   No. CR2000-096032-A
                                         )
15               Respondent,             )   **ORDER AMENDING CONTACT**
                                         )   **VISITS (Death Penalty Case)**
16      vs.                              )
                                         )   (Assigned to the Hon. Douglas Rayes)
17  WENDI ELIZABETH ANDRIANO,            )
                                         )
18               Petitioner.             )
                                         )
19                                       )
                                         )
20                                       )
    _____)
21

22          Pending before the Court is the parties' Stipulation to Modify Previously

23  Authorized, Confidential Contact Visits between Wendi Elizabeth Andriano and Her

24  Experts. After due consideration of said stipulation, and the relevant pleadings on file,

25          IT IS ORDERED that the Stipulation to Modify Previously Authorized,

    Confidential Contact Visits between Wendi Elizabeth Andriano and Her Experts,
26  incorporated into this order, is **GRANTED**.

IT IS FURTHER ORDERED adding Jodi K. Newman to the list of authorized visitors for all visits authorized in the January 25, 2011 and March 23, 2011 Orders Allowing Contact Visits.

IT IS FURTHER ORDERED that the Clerk of the Court forward a copy of this Order to counsel of record for Petitioner, Scott Bennett; counsel of record for the State of Arizona, Lacey Stover Gard; Karyn Klausner, ADOC General Counsel; Ms. Sita Jo-Ann Sovin; and Deputy Warden Lacy L. Scott.

IT IS SO ORDERED this _22_ day of _April_, 2011.

_____

THE HONORABLE DOUGLAS RAYES

2

# EXHIBIT ZZZ

Michael K. Jeanes, Clerk of Court
*** Electronically Filed ***
Kathleen Curtner
Filing ID 866170
5/2/2011 12:51:11 PM

Scott M. Bennett (022350)
COPPERSMITH SCHERMER & BROCKELMAN PLC
2800 North Central Avenue, Suite 1200
Phoenix, Arizona  85004
(602) 224-0999
(602) 224-6020 (Fax)
sbennett@csblaw.com

Allen A. Arntsen, Admitted *Pro Hac Vice*
Stephan J. Nickels Admitted *Pro Hac Vice*
Matthew R. Lynch Admitted *Pro Hac Vice*
FOLEY & LARDNER LLP
150 E. Gilman Street
Madison, WI 53703
(608) 257-5035
(608) 258-4258 (Fax)
aarntsen@foley.com

*Attorneys for Petitioner Wendi Andriano*

SUPERIOR COURT OF ARIZONA

COUNTY OF MARICOPA

| | |
|---|---|
| State of Arizona,<br><br>            Respondent,<br><br>vs.<br><br>Wendi Elizabeth Andriano,<br><br>            Petitioner. | No. CR2000-096032-A<br><br>**MOTION FOR EXTENSION OF TIME TO FILE POST-CONVICTION RELIEF PETITION**<br><br>(Assigned to the Hon. Douglas Rayes) |

Pursuant to Rule 32.4(c)(1) of the Arizona Rules of Criminal Procedure and the Court's supervisory powers, Petitioner Wendi Andriano moves for a 30-day extension of the June 1, 2011 deadline to file her petition for post-conviction relief.  Counsel for Ms. Andriano ("PCR counsel") have contacted the State, which objects to the extension sought.  For the following reasons, however, an extension is appropriate and necessary under the circumstances to ensure that Ms. Andriano receives the post-conviction representation required by Rule 6.8(c) of the Arizona Rules of Criminal Procedure and the

{00007245.1 }

1  American Bar Association Guidelines for the Appointment and Performance of Defense

2  Counsel in Death Penalty Cases (the "ABA Guidelines").

3      At its March 8, 2011 hearing in this matter, the Court denied PCR counsel's

4  February 23, 2011 motion for a 180-day extension of time from the current June 1

5  deadline (the "February Motion"), invited PCR counsel to request an extension closer to

6  the filing deadline, and instructed PCR counsel to seek future extensions in 30-day

7  increments, as contemplated by Rule 32(c)(1).  Despite accelerated efforts of PCR counsel

8  since the February Motion to resolve several outstanding issues and complete its

9  investigation, an extension remains necessary to ensure that Ms. Andriano receives the

10  level of post-conviction representation required by the ABA Guidelines.[1]

11      This Motion is intended to supplement the February Motion.  Rather than reiterate

12  the February Motion in describing the context of the case, the need for thorough

13  investigation of previously unexplored evidence in light of that context, and the remaining

14  steps necessary to complete that investigation, this Motion incorporates the February

15  Motion by reference.  A copy of the February Motion is attached, for the Court's

16  convenience, as **Exhibit A**.  This Motion is limited to addressing the efforts of PCR

17  counsel since the February Motion, and the remaining work that will require an extension

18  of time to complete.

19      In support of this Motion, PCR counsel have also provided an affidavit from one of

20  Ms. Andriano's attorneys, Allen Arntsen.  That affidavit is attached as **Exhibit B**.

21      **PCR COUNSEL'S ACTIVITIES SINCE FEBRUARY 23, 2011**

22      As the June 1 deadline has approached, PCR counsel have redoubled their

23  commitment of time and resources toward the *pro bono* representation of Ms. Andriano

24

25  _____

26  [1] For many of the same reasons expressed in the February Motion, PCR counsel anticipate
   that further time beyond the 30-day extension sought in this Motion might be necessary to

27  complete their investigation of all potentially meritorious claims and present the petition to
   this Court.  PCR counsel will seek any further extensions in 30-day increments.

28  {00007245.1}                                    2

during these post-conviction relief proceedings.  Since filing the February Motion, PCR counsel have devoted more than 444 hours of documented attorney time, or an average of more than 49 hours per week, to working on completing the investigation and bringing Ms. Andriano's petition closer to finality.

PCR counsel's mitigation firm and experts have also accelerated their efforts to conduct all necessary fact-gathering and interviews, obtain all relevant materials and other information to inform their final reports, and draft those reports.  Since the February Motion, these experts have spent an additional 400 hours in furtherance of those efforts.

It is difficult to describe these efforts in extensive detail due to pre-filing concerns regarding privilege and work-product, the sensitive and presently confidential nature of certain key components of the investigation, and the need to provide context without burdening the Court with excessive background discussion.  The bullet points below provide a general summary of the tasks PCR counsel and the experts have undertaken since the February Motion.  As before, PCR counsel are willing to provide more specifics and context on an *ex parte* basis should the Court want more detailed information.

PCR counsel have engaged in the following activities since the February Motion:

- *Expending significant additional time in evidence management.*  Given the scope of the case, the State's pre-trial investigation, and the post-conviction investigation to date, there is a massive amount of source documents, reports, leads, recordings, testimony and other materials relating to the case.  PCR counsel have continued to review, assess, and add to this material in light of new facts and information.  In the past two months, much of PCR counsel's work has involved managing this material for the experts.  Rather than dumping the entire universe of available documents and information upon these experts, PCR counsel have endeavored to establish some level of efficiency by continually providing each expert with available and relevant information as their evaluations and analyses take fuller shape and inform additional areas of inquiry.  Because

{00007245.1 }

3

PCR counsel lack the background of these experts in their particular areas of expertise, this process requires substantial and time-consuming coordination.

For example, an expert analyzing an interview of Ms. Andriano may find that she displayed symptoms of a certain disorder.  To determine the presence of that disorder and Ms. Andriano's history with it, the experts may request materials evidencing prior symptoms and mental health treatment.  Because Ms. Andriano's trial counsel did not retain any mental-health experts to make such diagnoses prior to her trial, the materials are typically raw, first-hand observations of symptomatic behavior reflected in trial testimony, subsequent interviews of family members and third-party witnesses by PCR counsel, and other sources.  This process has demanded significant time for both PCR counsel and the experts.

In the last two months, the mitigation firm has compiled significant amounts of source material into a comprehensive social history chronology of Ms. Andriano.  Although that history is incomplete in certain respects, the resource will prove a substantial aid to PCR counsel in presenting the petition.

- *Increasing communications with experts generally in working toward completion of their investigations and reports*.  Because PCR counsel anticipate that the mental-health expert reports will constitute a key basis for the granting of post-conviction relief (and a key portion of the petition), they have increased their oversight of and engagement with the experts.  PCR counsel have made certain that the experts are fully cognizant of the time constraints on their work, and have worked with them to prioritize the remaining tasks necessary to complete their reports.  In addition, Ms. Andriano's forensic psychiatrist recently completed a three-day, intensive interview of Ms. Andriano.

Moreover, because defense trial counsel did not present alternative theories of the guilt-phase evidence (except through the testimony of Ms. Andriano, the only witness to her husband's death), PCR counsel have retained and utilized relevant experts to investigate issues relating to the guilt phase of the trial.  Since the February Motion, those

{00007245.1 }

4

1    experts have continued their investigations of relevant areas of inquiry never explored by

2    any members of Ms. Andriano's trial defense team.

3         •    *Obtaining statements from previously interviewed witnesses.* While the

4    investigation has uncovered substantial amounts of new evidence, a great deal of that

5    evidence consists of witness statements that are not yet in the form of an affidavit or

6    declaration. There are three reasons why they have yet to be reduced to an affidavit or

7    declaration: (1) PCR counsel and their mitigation firm anticipate that follow-up interviews

8    will be necessary depending on the evolving assessments of the mental-health experts, (2)

9    the witnesses are often reluctant to reduce their testimony to a sworn statement, due to the

10   sensitive nature of some of their testimony, the desire to avoid "getting involved" in a

11   complex legal proceeding with the highest possible stakes, and the desire to put past

12   traumatic events behind them, and (3) in some cases, their socio-economic circumstances

13   and transiency render it difficult to make and maintain contact. PCR counsel and their

14   mitigation firm have made multiple attempts to regain contact with witnesses to conduct

15   follow-up, in-person interviews and drafting of affidavits, and it remains a work in

16   progress.

17        •    *Locating and conducting interviews of remaining fact witnesses.* In addition

18   to following up with previously contacted witnesses, PCR counsel have also moved

19   forward to identify, locate, and, in a few cases, interview new witnesses who were

20   previously unavailable or unknown until additional fact development made it clearer that

21   they may have relevant information.

22        •    *Reviewing legal developments and engaging in communications with state*

23   *and national capital defense assistance programs.* At various points in this proceeding,

24   PCR counsel have consulted with non-profit groups consisting of experienced capital and

25   habeas counsel to ensure the non-waiver of potentially meritorious issues and compliance

26   with the ABA Guidelines. Since the February Motion, PCR counsel's contact with these

27   groups has increased as they prepare to file the petition. PCR counsel have also spent time

28   {00007245.1 }                                    5

1 reviewing and analyzing recent legal developments, namely the United States Supreme

2 Court's decision in *Cullen v. Pinholster*, No. 09-1088 (Apr. 4, 2011), to determine any

3 potential impact on this case.

4 **AN EXTENSION OF TIME IS NECESSARY AND APPROPRIATE.**

5 As noted in the February Motion, PCR counsel have operated under the principle

6 that all evidence should be fully gathered and all arguments prepared for presentation to

7 the Court no later than June 1 of this year. The urgency of that deadline has not changed,

8 and PCR counsel have adamantly strived to meet it. Unfortunately, it is now clear that too

9 much work remains, with too many variables outside the control of the lawyers and

10 experts working on the case, for PCR counsel to meet the obligations imposed by the ABA

11 Guidelines and Arizona law, Ariz. R. Crim. P. 6.8(c)(4), by the current June 1 deadline.

12 The following non-exhaustive list of remaining tasks includes:

13 • For the mental-health experts, (1) completing their review of the materials

14 received from PCR counsel, in light of the experts' interviews and assessments of Ms.

15 Andriano, (2) coordinating with PCR counsel to obtain any additional information that

16 will assist in diagnosis, evaluation, or assessment, and (3) drafting their reports with

17 reference to the evidence.

18 • For the fact investigators, completing an initial evaluation of the finite

19 amount of available evidence relating to the crime scene to determine whether

20 Ms. Andriano's trial counsel missed any potential areas of inquiry, as well as completing

21 interviews with witnesses regarding the State's circumstantial evidence of liability.

22 • For the expert on standards for defense counsel in capital cases, continuing

23 and completing a review of the performance of trial counsel, the pre-trial investigation,

24 and the evidence presented at trial in light of the evidence now known to have been

25 available, among other factors.

26 • For PCR counsel, (1) working with the mitigation firm to contact remaining

27 witnesses to arrange initial and follow-up interviews, (2) reducing the substance of those

28 {00007245.1 }                                          6

interviews to evidentiary form, with the witnesses' consent, (3) coordinating the work of the experts and ensuring their access to materials relevant to the substance of their reports; (4) reviewing the expert reports once they are received and analyzing how to frame arguments for post-conviction relief in light of the experts' findings; and (5) most importantly, drafting the petition in reference to the present state of the law, reports of the experts, the affidavits obtained, the materials presented at trial, and other materials and evidence that was or would have been available to Ms. Andriano's trial counsel had her trial counsel pursued it.  While PCR counsel have compiled much of the legal background relating to the petition, much of the substance of the petition awaits a number of remaining tasks, including the expert reports and determining whether certain witnesses will be amenable to reducing their verbal accounts to sworn, written statements.

The requested extension is necessary for PCR counsel to fulfill their duty to continue to diligently investigate "all issues . . . that are arguably meritorious under the standards applicable to high quality capital defense representation" (ABA Guideline 10.15.1(C)), particularly given the unique facts and challenges of this case as described in this Motion and the attached February Motion.

## CONCLUSION

For the foregoing reasons, Petitioner respectfully requests that the deadline for filing her Petition for Review be extended 30 days, from June 1, 2011 to July 1, 2011.

RESPECTFULLY SUBMITTED May 2, 2011.

COPPERSMITH SCHERMER & BROCKELMAN PLC

By /s/ *Scott M. Bennett*
    Scott M. Bennett

FOLEY & LARDNER LLP
    Allen A. Arntsen, *Pro Hac Vice*
    Stephan J. Nickels, *Pro Hac Vice*
    Matthew R. Lynch, *Pro Hac Vice*

    *Attorneys for Petitioner*

ORIGINAL efiled May 2, 2011.

COURTESY COPY hand-delivered May 2, 2011, to:

Judge Douglas Rayes
Maricopa County Superior Court
East Court Building-511
101 W. Jefferson
Phoenix, AZ 85003-2243

COPY mailed May 2, 2011, to:

Lacey Stover Gard
Office of the Attorney General
400 West Congress, Suite S-315
Phoenix, AZ  85701-1367


/s/ *Dana S. Austin*

{00007245.1 }

8

# Exhibit A

1   COPPERSMITH SCHERMER & BROCKELMAN PLC
    2800 North Central Avenue
    Suite 1200
2   Phoenix, Arizona 85004
    (602) 224-0999
    Scott M. Bennett, State Bar No. 022350
3
    FOLEY & LARDNER LLP
4   150 E. Gilman Street
    Madison, WI 53703
    Telephone: (608) 257-5035
5   Fax:       (608) 258-4258

6   Allen A. Arntsen, Admitted *Pro Hac Vice*
    Stephan J. Nickels Admitted *Pro Hac Vice*
    Matthew R. Lynch Admitted *Pro Hac Vice*

7   *Attorneys for Petitioner*
    Wendi Andriano

8                    SUPERIOR COURT OF ARIZONA
9                      COUNTY OF MARICOPA

10

11   State of Arizona,                      )
12                                          )
                        Respondent,         )   No. CR2000-096032-A
13                                          )
                                            )
14   vs.                                    )   **MOTION FOR EXTENSION OF**
                                            )   **TIME TO FILE POST-**
15   Wendi Elizabeth Andriano,              )   **CONVICTION RELIEF PETITION**
                                            )
16                        Petitioner.       )   (Assigned to the Hon. Douglas Rayes)
                                            )
17                                          )
                                            )
18

19        Pursuant to Rule 32.4(c)(1) of the Arizona Rules of Criminal Procedure and the

20   Court's supervisory powers, Petitioner Wendi Andriano moves for a 180-day extension of

21   time to file her petition for post-conviction relief. Counsel for Ms. Andriano has contacted

22   the State, which objects to the extension sought. For the following reasons, however, an

23   extension is appropriate and necessary under the circumstances to ensure that Ms.

24   Andriano receives the post-conviction representation required by Rule 6.8(c) of the

25   Arizona Rules of Criminal Procedure, as well as the American Bar Association Guidelines

26   for the Appointment and Performance of Defense Counsel in Death Penalty Cases (the

27   "ABA Guidelines").

28
MADI_2560622.2

## POST-CONVICTION RELIEF COUNSEL'S INVESTIGATION TO DATE

Shortly after their appearance as post-conviction relief counsel ("PCR counsel") on November 4, 2009, the undersigned attorneys sought, and this Court granted, an extension to June 1, 2011, for filing the petition for post-conviction relief, in recognition of the substantial investigation necessary for this capital case.  Since that time, PCR counsel have pursued the case diligently and have emphasized the June 1, 2011 deadline to all experts retained to investigate issues and aspects of the case.  (*See* attached Affidavit of Allen A. Arntsen ("Arntsen Aff.") ¶ 3.)

As a result, the collective time invested in this case by both PCR counsel and those working under their direction has been substantial in the 14 months since appearance. PCR counsel have made diligent and extensive efforts to investigate this case and the grounds for post-conviction relief, including:

- reviewing transcripts spanning four months of trial and files of trial counsel collected over a cumulative span of six years;

- interviewing trial counsel, pre-trial investigators and others who participated in Petitioner's defense at trial;

- interviewing fact witnesses;

- engaging and consulting with experts;

- communicating with the client;

- coordinating with the Arizona Attorney General's Office and the Perryville State Prison to arrange for contact visits with and testing of Ms. Andriano by mental health professionals;

- conferring with those experts and other investigators regarding the status of their investigations; and

- assessing potential grounds for relief in light of facts unearthed by investigators and preliminary opinions of experts, prior proceedings and the restrictions on grounds for post-conviction relief.

2

MADI_2560622.2

(Arntsen Aff. ¶ 4.)

Since their appearance as counsel on November 4, 2009, Foley & Lardner attorneys have invested more than 1,250 documented hours on the case, and Foley & Lardner paralegals have invested more than 220 documented hours on the case. (Arntsen Aff. ¶ 5.) This does not include the hours spent by local counsel, attorney Scott M. Bennett of Coppersmith Schermer & Brockelman PLC, on the case. (*Id.*) PCR counsel recognizes that "substantial hours" is a relative term in the post-conviction relief context. While this has been a significant undertaking by the attorneys involved, we note that the average number of attorney hours for even the most qualified counsel to take a post-conviction case from appointment through any appeals is more than 3,300. (Guideline 6.1 cmt., at 41.)

In addition, PCR counsel have sought, interviewed, and retained necessary experts to investigate discrete elements of the case that warranted and continue to warrant further review, primarily in the areas of mental health and mitigation. Those experts have also worked diligently during the same time frame, spending a collective total of more than 5,000 hours on the case in the past 14 months. (Arntsen Aff. ¶ 7.)

The reason for this substantial amount of time to date is threefold. *First*, as they must under Arizona law (Ariz. R. Crim. P. 6.8(c), PCR counsel recognize the significant obligations imposed upon post-conviction relief counsel by the Guidelines. Under the Guidelines, post-conviction relief counsel "cannot rely on the previously compiled record but must conduct a thorough, independent investigation" of both "the facts underlying the conviction and sentence" and mitigating evidence, "not only to discover mitigation that was not presented previously, but also to identify mental-health claims which potentially reach beyond sentencing[.]" (Guideline 10.15.1 cmt.) The Guidelines also require post-conviction counsel to "litigate all issues . . . that are arguably meritorious under the standards applicable to high quality capital defense representation." (Guideline 10.15.1(C).)

MADI_2560622.2

3

*Second*, investigation of the case itself has been an extensive undertaking. Ms. Andriano was on trial from September through December 2004, after four years enduring a revolving door of legal professionals who at one time or another worked on her case. None of those professionals was involved in the case from its commencement through trial, and none assumed full responsibility for the investigation and trial planning until 2003. (Arntsen Aff. ¶ 8.) The shifting involvement of members of her trial team—some with varying involvement over different periods of time and varying aspects of the case, and many performing isolated work with little coordination with the others—has rendered it a time-consuming challenge to obtain complete information regarding the pre-trial efforts of her defense team. (*Id.*) Further, following the Supreme Court decision in *Ring v. Arizona*, 536 U.S. 584 (2002), Ms. Andriano's trial was among the first in Arizona to have all three phases—guilt, aggravation, and mitigation—decided back-to-back-to-back by the same jury. This circumstance of timing has required additional investigation into the adequacy of Ms. Andriano's representation in response to this landmark shift in capital sentencing, including seeking interviews with investigators and mitigation specialists who were delegated responsibilities relating to the presentation of evidence in the second and third trial phases. A number of those paraprofessionals are no longer employed in the same capacity in Arizona, and at least two (one of whom is out-of-state) have been unresponsive to interview requests. (Arntsen Aff. ¶ 9.)

*Third*, more than 75 witnesses were called in Ms. Andriano's trial, some of whom offered forensic opinions and conflicting testimony that has required substantial time to review. The sheer number of witnesses called do not tell the whole story of the scope of necessary investigation, however.

While more than 60 witnesses testified in the guilt/innocence phase of the trial, only nine witnesses were called by the defense,[1] most of whom spent equal or more time on

---

[1] One of these witnesses was a State witness recalled by the defense.

4

MADI_2560622.2

1    cross-examination than direct or re-direct.   Only two witnesses (both for the State)

2    testified at the aggravation phase of the trial, and only a dozen witnesses testified for the

3    defense at the penalty/mitigation phase (including four family friends who admitted they

4    had not had interacted with Ms. Andriano since the early 1990s, and three prison

5    employees).  The defense did not call any evaluating psychiatrist or psychologist at any

6    phase, or any forensic, medical, or other expert capable of testifying regarding the physical

7    evidence and its relation to the timing of events as testified to by other witnesses.

8            Given the dearth of expert testimony presented by the defense at the guilt/innocence

9    phase, the lack of any testimony at the aggravation phase, and the superficial presentation

10   of evidence in the post-*Ring* mitigation phase, PCR counsel's investigation into several

11   fundamental aspects of the case is not merely reviewing or revisiting prior trial testimony

12   or investigation by trial counsel, but actively venturing into uncharted territory.

13           To date, those efforts have been diligent.  The mitigation firm retained by PCR

14   counsel has located roughly 150 witnesses and conducted over 150 interviews of more

15   than 50 relatives, friends, and others involved in key stages of Ms. Andriano's life, almost

16   none of whom had been contacted or interviewed by trial counsel. (Arntsen Aff. ¶ 10.)

17   With the assistance of this Court's contact visit orders, PCR counsel's mental health

18   professionals have commenced evaluation, assessment, and testing of Ms. Andriano that

19   has been informed by their review of the mitigation investigation, including the

20   identification of a number of symptoms of serious mental psychiatric issues that were

21   never examined pre-trial and never presented in any form to the jury.  (*Id.* ¶ 11.)  The fact

22   investigator, a former police detective, has reviewed voluminous police reports, identified

23   areas for further inquiry, and assisted in locating and interviewing potential witnesses who

24   were not called at trial, but might have material information regarding the evidence in the

25   record.  (*Id.* ¶ 12.)

26

27

28                                              5

MADI_2560622.2

1

## AN EXTENSION OF TIME IS NECESSARY AND APPROPRIATE.

2   PCR counsel have operated under the principle that all such evidence should be

3 fully gathered and prepared for presentation to the Court no later than June 1 of this year.

4 In the last month, however, it has become clear that more time is needed for PCR counsel

5 to meet their obligations under the Guidelines.

6   Specifically, PCR counsel have identified eight general areas of investigation that

7 have become increasingly material with respect to prior investigation and expert review,

8 and for which additional time is required:

9
10
- Further interviews of relatives of Ms. Andriano, as well as further family medical information;

11
12
13
- Further investigation relating to potential sources of trauma and abuse experienced by Ms. Andriano, none of which was previously investigated or presented at the mitigation phase or any other stage of the trial;

14
15
- Further investigation into potential mental health problems of Ms. Andriano that were not raised or pursued at trial;

16
17
18
19
- Further interviews of key witnesses, including initial interviews of previously unavailable or uncooperative witnesses and follow-ups with a limited number of previously interviewed, key witnesses in light of substantial new facts discovered subsequent to their initial interviews;

20
21
- Evaluations of forensic and other evidence in light of new facts obtained in the ongoing investigation;

22
23
- Evaluation of such relevant facts in light of experts' individual assessments of Ms. Andriano;

24
- Ongoing assessment of the investigation in light of the work of trial counsel and issues previously raised; and

25
26
- Presentation of legally available, meritorious grounds for post-conviction relief in the Petition.

27
28

6

MADL_2560622.2

(Arntsen Aff. ¶ 13.)[2]

The requested extension is necessary for PCR counsel to fulfill their duty to continue to diligently investigate "all issues . . . that are arguably meritorious under the standards applicable to high quality capital defense representation" (Guideline 10.15.1(C)), particularly given the unique facts and circumstances of this case as described in this motion.

## CONCLUSION

For the foregoing reasons, Petitioner respectfully requests that the deadline for filing her Petition for Review be extended 180 days, from June 1, 2011 to November 28, 2011.

---

[2] Should the Court want more detailed justification for the extension, PCR counsel are willing to provide further details regarding these particular challenges and any other specifics of this request *ex parte*.  (Arntsen Aff. ¶ 13.)

7

MADI_2560622.2

1    RESPECTFULLY SUBMITTED February 23, 2011.

2
                                    COPPERSMITH SCHERMER &
3                                   BROCKELMAN PLC

4                                   By _____
5                                        Scott M. Bennett

6                                   FOLEY & LARDNER LLP
7                                        Allen A. Arntsen, *Pro Hac Vice*
                                         Stephan J. Nickels, *Pro Hac Vice*
8                                        Matthew R. Lynch, *Pro Hac Vice*

9                                        *Attorneys for Petitioner*

10
     ORIGINAL filed February 23, 2011,
11   with the Clerk of the Maricopa
12   County Superior Court.

13   COURTESY COPY hand-delivered February 23, 2011, to:

14
     Judge Douglas Rayes
15   Maricopa County Superior Court
     East Court Building-511
16   101 W. Jefferson
17   Phoenix, AZ 85003-2243

18   COPY emailed and mailed February 23, 2011, to:

19
     Ms. Lacey Stover Gard
20   Office of the Attorney General
     400 W. Congress, Suite S-315
21   Tuscon, AZ 85701-1367
22   *Attorney for the State of Arizona*

23

24

25

26

27

28                                      8

# Exhibit B

COPPERSMITH SCHERMER & BROCKELMAN PLC
2800 North Central Avenue
Suite 1200
Phoenix, Arizona 85004
(602) 224-0999
Scott M. Bennett, State Bar No. 022350

FOLEY & LARDNER LLP
150 E. Gilman Street
Madison, WI 53703
Telephone:  (608) 257-5035
Fax:        (608) 258-4258

Allen A. Arntsen, Admitted *Pro Hac Vice*
Stephan J. Nickels Admitted *Pro Hac Vice*
Matthew R. Lynch Admitted *Pro Hac Vice*

*Attorneys for Petitioner*
Wendi Andriano

## SUPERIOR COURT OF ARIZONA
## COUNTY OF MARICOPA

| | |
|---|---|
| State of Arizona, | ) |
| Respondent, | ) No. CR2000-096032-A |
| vs. | ) **AFFIDAVIT OF ALLEN A.** |
| | ) **ARNTSEN IN SUPPORT OF** |
| Wendi Elizabeth Andriano, | ) **MOTION FOR EXTENSION OF** |
| | ) **TIME TO FILE POST-** |
| Petitioner. | ) **CONVICTION RELIEF PETITION** |
| | ) |
| | ) (Assigned to the Hon. Douglas Rayes) |

STATE OF WISCONSIN     )
                       )  SS.
COUNTY OF DANE         )

ALLEN R. ARNTSEN, being first duly sworn upon oath deposes and states:

1.      I am an attorney with Foley & Lardner LLP, and one of the attorneys

of record for Petitioner.  I have personal knowledge of the factual substance of Petitioner's

Motion for Extension of Time to File Post-Conviction Relief Petition (the "Motion"),

which accompanies this affidavit.

MADI_2657784.1

1          2.    I have reviewed the Motion and the factual statements made therein

2    relating to the efforts of Petitioner's counsel and experts to date and the necessity for an

3    extension of time to file the petition for post-conviction relief.  I affirm that such

4
     statements are true and correct to the best of my knowledge, as informed by time records
5
6    prepared in the normal course of business, routine communications with other attorneys

7    and experts in this matter, and my supervisory role in the representation of Petitioner.

8

9
     DATED this 29th day of April, 2011.
10

11

12                                     Allen A. Arntsen

13

14   Subscribed and sworn to before me
     this 29th day of April, 2011.
15

16

17   Notary Public, State of Wisconsin.
     My Commission: expires 2/17/13
18

19

20

21

22

23

24

25

26

27

28                                        2

MADI_2657784.1

# EXHIBIT AAAA

Michael K. Jeanes, Clerk of Court
*** Electronically Filed ***
Isabel Osuna
Filing ID 879798
5/16/2011 1:35:40 PM

1  Scott M. Bennett (022350)
   Coppersmith Schermer & Brockelman PLC
2  2800 North Central Avenue, Suite 1200
   Phoenix, Arizona  85004
3  (602) 224-0999 (office)
   (602) 224-6020 (fax)
4  sbennett@csblaw.com

5
   Allen A. Arntsen, Admitted *Pro Hac Vice*
6  Stephan J. Nickels Admitted *Pro Hac Vice*
   Matthew R. Lynch Admitted *Pro Hac Vice*
7  Foley & Lardner LLP
   150 East Gilman Street
8  Madison, WI 53703
   (608) 257-5035 (office)
9  (608) 258-4258 (fax)
   aarntsen@foley.com
10

11 *Attorneys for Petitioner Wendi Elizabeth Andriano*

12              SUPERIOR COURT OF ARIZONA
                  COUNTY OF MARICOPA
13

14 State of Arizona,                    )   No. CR2000-096032-A
                                        )
15                   Respondent,        )   **PETITIONER'S MOTION FOR**
                                        )   **ISSUANCE OF DISCOVERY**
16        vs.                           )   **SUBPOENA**
                                        )
17                                      )
18 Wendi Elizabeth Andriano,            )   (Assigned to the Hon. Douglas Rayes)
                                        )
19                   Petitioner.        )
                                        )
20 _____  )

21        Pursuant to Rule 15.3 of the Arizona Rules of Criminal Procedure and the Court's

22 supervisory powers, Petitioner Wendi Andriano moves for entry of the following

23 discovery-related order, which is relevant and necessary to her petition for post-

24 conviction relief in this matter:

25        •    A subpoena for the deposition of Shawn King, who was mentioned
   repeatedly at the trial of Ms. Andriano (*see, e.g.*, 10/04/04 Testimony of Donna Ochoa;
26 10/13/04 Testimony of Sharon Murphy; 10/25/04, 10/27/04, 10/28/04, 11/02/04, and
   11/08/04 Testimony of Wendi Andriano; 11/16/04 and 11/17/04 Closing Argument of
27 Attorney Martinez), but was never called as a witness at trial and never even interviewed
28 by police.

- • A subpoena that requires Mr. King to bring all documents in his possession or under his control, and which relate to Ms. Andriano or her trial, to the deposition.

**1. Shawn King Has Material Knowledge Relevant to the Petition.**

Mr. King has relevant, material evidence in at least one area of investigation, and may have additional relevant evidence in another.

*First*, Mr. King knew Ms. Andriano from childhood: he was a classmate and friend of Ms. Andriano, he was the son of the pastor at Ms. Andriano's parochial school, he was Ms. Andriano's first serious boyfriend, and he had contact with Ms. Andriano through the date of her arrest. Thus, throughout most of Ms. Andriano's life, Mr. King was in a position to have unique insight into her behavioral patterns, social functioning, and other manifestations of her mental and psychological health over time in a variety of settings. Mr. King may also have been in a position to corroborate statements of other witnesses pertaining to Ms. Andriano's suffering from certain traumatic events, her display of symptoms arising out of those experiences, and her relationship with her husband.

*Second*, according to uncontroverted trial testimony, Mr. King researched and identified the chemical (sodium azide) that Mr. Andriano ingested on the night of his death. Ms. Andriano further testified that Mr. King performed this research at the behest of Mr. Andriano, who sought to end his life in mid-2000 following a CT scan indicating that his terminal cancer was progressively worsening.

Despite his possession of relevant evidence, Mr. King was never called to testify by either defense counsel or the State, and was never interviewed by the State in connection with the investigation of Mr. Andriano's death.[1] The jury took notice of this fact, as evidenced by some of its questions at the conclusion of Ms. Andriano's

---

[1] Petitioner bases this assertion on the State's response to her two recent requests for copies of any interviews or other correspondence relating to Mr. King. The State has told counsel for Petitioner that such materials do not exist. (Exhibit A, Affidavit of Matthew Lynch ("Lynch Aff.") ¶ 14.)

1    testimony, such as, "Do you know where Shawn King is[?]  How many years have you

2    been friends with Shawn King?" and "Did Shawn King know why you wanted

3    information on sodium azide?"  (11/08/04 Tr. at 36:19-22, 41:12-15.)  The prosecutor

4    took notice, as well, in his closing argument:

5              The other thing they said is, well, why isn't it that Shawn
               King isn't here.  He was involved in this.  I mean, this is
6              somebody else they should have brought in here.  Do we need
               Shawn King with regard to this particular case?  If he were
7              brought in, he may be somebody who's an accomplice, who
               may be charged with it.  But that's for another day.  That's
8              not an issue for here. . . .

9

10             We're not here to judge his conduct.  If he were to be judged,
               he would be judged as an accomplice.
11

12   (11/17/04 Tr. at 81:10-16.)

13            In short, the jury was not given an opportunity to hear from Mr. King; it was only

14   told by the State (which had never even interviewed him) that Mr. King would be

15   "judged as an accomplice" if "he were brought in" to testify.  The State did not

16   differentiate for the jury as to what kind of accomplice liability Mr. King would face—an

17   accomplice to an attempted suicide (which would support Ms. Andriano's defense and

18   undermine the State's evidence of premeditation), or an accomplice to attempted murder.

19   But the prosecutor's statements in the context of the case likely left jurors with the

20   impression that the State had already investigated Mr. King, had determined that he was

21   an accomplice to murder, and was prepared to establish his guilt on "another day."

22            These issues are important.  Mr. King was close to Ms. Andriano for many years

23   and had the opportunity to directly observe her behavior and social environment over

24   time, which will aid Ms. Andriano's experts in their evaluation of any mitigating

25   psychological conditions.  Moreover, Mr. King may have unique knowledge of facts

26   relevant to the offense for which she was convicted.  Frankly, in a case in which the State

27   called more than 50 witnesses over the course of four months—from Ms. Andriano's

28   former lovers to her hairdresser to the pest exterminators at her apartment complex—it is

3

baffling that Mr. King was not included among them, if the State had indeed concluded that he was an accomplice to the crime.

### 2.     Shawn King Has Refused to Grant an Interview with PCR Counsel.

In light of the State's threat of prosecution of Mr. King as accomplice to some crime—whether murder or suicide—if he were to testify, counsel for Petitioner ("PCR counsel") have repeatedly attempted to solicit Mr. King's cooperation in an interview outside the presence of counsel for the State.  As detailed in the Lynch Affidavit, throughout 2010 and 2011, PCR counsel and their investigators have made numerous attempts to speak with Mr. King by phone and in person, all without avail.  (Lynch Aff. ¶¶ 2-12.)  The investigators made brief contact with Mr. King on two occasions.  In both instances, Mr. King indicated that he possessed relevant information he was willing to disclose, but refused to do so because his former attorney told him not to discuss Ms. Andriano or her case.[2]  (*Id.* ¶¶ 6, 8.)  Further attempts to speak with him were rebuffed, and PCR counsel believes there is no reasonable likelihood that Mr. King will voluntarily speak with them regarding this case.  (*Id.* ¶ 13.)

In light of the compulsive nature of the deposition, Mr. King will be protected by his right to assert his Fifth Amendment rights in response to any questions that could give rise to self-incriminating answers.  Even if Mr. King exercises those rights in regard to certain questions pertaining to the procurement of sodium azide, his testimony as it relates to Ms. Andriano's social history is material and is unlikely to raise any concerns of self-incrimination.

_____

[2] To the best of PCR counsel's knowledge, Mr. King was referring to Robert Jung, who served as Mr. King's attorney in 2002.  According to Arizona State Bar records, Mr. Jung's license to practice law is presently suspended, and Mr. King did not state whether he currently has legal representation.  (Lynch Aff. ¶ 6.)

**3.      A Subpoena Compelling the Deposition of Shawn King is Appropriate under the Circumstances.**

This Court has the inherent authority to order discovery in postconviction relief proceedings upon a showing of good cause.  *Canion v. Cole*, 210 Ariz. 598, 115 P.3d 1261, 1263 (2005).  Rule 15.3 authorizes depositions whenever the defendant "shows [1] that the person's testimony is material to the case **_or_** necessary adequately to prepare a defense **_or_** investigate the offense, [2] that person was not a witness at the preliminary hearing … and [3] that the person will not cooperate in granting a personal interview." Ariz. R. Crim. P. 15.3(a)(2) (emphasis added); *see also id.* 15.3(a)(1) (permitting deposition of witness with material testimony whenever there is a substantial likelihood that the witness will be unavailable at trial).  All three requirements exist here.

First, the materiality of Mr. King's testimony to Ms. Andriano's case is clear, for the reasons described above.

Second, Mr. King was not a witness at a preliminary hearing or any other proceeding.

Third, personal interviews have been requested but ignored or denied.  *See, e.g., Murphy v. Super. Ct.*, 142 Ariz. 273, 277-78, 689 P.2d 532, 536-37 (1984) (reversing refusal to order depositions and noting the importance of Rule 15.3 in relation to the defendant's rights of cross-examination and meaningful opportunity to prepare a defense); *Kanuck v. Meehan*, 165 Ariz. 282, 285, 798 P.2d 420, 423 (App. 1990) (reversing refusal to order deposition of probation officer who filed petition to revoke probation).

In light of these facts, Ms. Andriano respectfully requests that this Court order Mr. King to submit to a deposition pursuant to Rule 15.3 of the Arizona Rules of Criminal Procedure.  Ms. Andriano further requests that this Court authorize a subpoena that requires Mr. King to bring to the deposition any written or electronic documents, records, or communications within his control that relate to Ms. Andriano.

1

<u>Conclusion</u>

2
For the foregoing reasons, this Court should order the requested subpoenas in aid

3
of Ms. Andriano's petition for post-conviction relief.

4

5
RESPECTFULLY SUBMITTED May 16, 2011.

6

7
COPPERSMITH SCHERMER &
BROCKELMAN PLC

8

9
By  <u>s/ Scott M. Bennett</u>
      Scott M. Bennett

10
FOLEY & LARDNER LLP

11
      Allen A. Arntsen, *Pro Hac Vice*
      Stephan J. Nickels, *Pro Hac Vice*

12
      Matthew R. Lynch, *Pro Hac Vice*

13
*Attorneys for Petitioner*

14

15
ORIGINAL efiled May 16, 2011

16
COPY mailed and emailed May 16, 2011, to:

17

18
Ms. Lacey Stover Gard
Office of the Attorney General

19
400 W. Congress, Suite S-315
Tuscon, AZ  85701-1367

20
Lacey.Gard@azag.gov
*Attorney for the State of Arizona*

21

22

23
<u>s/ Sheri McAlister</u>

24

25

26

27

28

6

# Exhibit A

1

COPPERSMITH SCHERMER & BROCKELMAN PLC
2800 North Central Avenue
Suite 1200

2

Phoenix, Arizona  85004
(602) 224-0999
Scott M. Bennett, State Bar No. 022350

3

4

FOLEY & LARDNER LLP
150 E. Gilman Street
Madison, WI 53703
Telephone:  (608) 257-5035

5

Fax:          (608) 258-4258

6

Allen A. Arntsen, Admitted *Pro Hac Vice*
Stephan J. Nickels Admitted *Pro Hac Vice*
Matthew R. Lynch Admitted *Pro Hac Vice*

7

*Attorneys for Petitioner*
Wendi Andriano

8

9

SUPERIOR COURT OF ARIZONA
COUNTY OF MARICOPA

10

11

State of Arizona,                                        )

12

                                                         )
                              Respondent,                )        No. CR2000-096032-A

13

                                                         )

14

     vs.                                                 )        **AFFIDAVIT OF MATTHEW R.**
                                                         )        **LYNCH IN SUPPORT OF**

15

Wendi Elizabeth Andriano,                                )        **PETITIONER'S MOTION FOR**
                                                         )        **ISSUANCE OF DISCOVERY**

16

                              Petitioner.                )        **SUBPOENA**

17

                                                         )

18

_____                 )        (Assigned to the Hon. Douglas Rayes)

19

STATE OF WISCONSIN              )

20

                               )        SS.

21

COUNTY OF DANE                 )

22

          Matthew R. Lynch, being first duly sworn upon oath deposes and states:

23

          1.          I am an attorney with Foley & Lardner LLP, and one of the attorneys of

24

record for Petitioner Wendi Andriano.  I coordinate with the mitigation firm and investigators

25

appointed to assist counsel for Ms. Andriano, and have reviewed contemporaneous records of

26

their activities kept in the ordinary course of business.  Thus, I have personal knowledge of the

27

activities of Ms. Andriano's legal team.

28

MADI_2673888.1

2.      Over the course of 2010 and 2011, I have personally made multiple phone calls to the number listed for Shawn King.  None have been answered.

3.      On February 24, 2010 a member of Ms. Andriano's defense team attempted to contact Mr. King in person at his residence, 2102 North Hill, Mesa, Arizona 85203.  There was no answer.

4.      On March 16, 2010 a member of Ms. Andriano's defense team made multiple attempts to contact Mr. King in person at his residence.  There was no answer.

5.      On March 17, 2010 a member of Ms. Andriano's defense team attempted to contact Mr. King in person at his residence.  There was no answer.  A business card was left for Mr. King.

6.      On March 17, 2010, subsequent to the visit, a member of Ms. Andriano's defense team received a phone call from Shawn King.  On the phone call Mr. King represented that his former attorney instructed him not to talk to anyone about Ms. Andriano.  To the best of my knowledge, Mr. King's references to an attorney are references to Robert Jung, who served as Mr. King's attorney in 2002.  According to Arizona State Bar records, Mr. Jung's license to practice law is presently suspended, and Mr. King has not stated whether he currently has legal representation.

7.      On January 6, 2011 a member of Ms. Andriano's defense team made four attempts to contact Mr. King in person at his residence.  A roommate at the residence who provided the name of "James" indicated that Mr. King was not home, and that he typically arrives home in the late evening and wakes up in the late morning.

8.      On January 7, 2011 a member of Ms. Andriano's defense team made two attempts to contact Mr. King in person at his residence.  At approximately 12 noon Mr. King was contacted.  Mr. King expressed that he had information he wanted to share, but stated that his former attorney advised him not to speak to anyone about Ms. Andriano, and therefore he would not grant an interview.

2

MADL_2673888.1

1          9.      On March 7, 2011, prior to the Court's March 8, 2011 conference in this

2   matter, Attorney Arntsen and I attempted to contact Mr. King in person at his residence to

3   determine whether Mr. King was presently represented and to ascertain the nature of his concerns

4   regarding an interview.  There was no answer.  We left a business card and a note indicating our

5   continued interest in a personal interview.

6          10.     On April 25, 2011 a member of Ms. Andriano's defense team attempted to

7   contact Mr. King in person at his residence.  There was no answer at the door of the residence.

8   While present in the vicinity, a member of Ms. Andriano's defense team observed occupants of

9   Mr. King's residence answer the door for other visitors.

10          11.     On April 26, 2011 a member of Ms. Andriano's defense team attempted to

11   contact Mr. King in person at his residence.  There was no answer.

12          12.     As of today's date, Mr. King has not agreed to a voluntary interview.

13          13.     I believe there is no reasonable likelihood that Mr. King will voluntarily

14   speak with our defense team regarding this case.

15          14.     I and Attorney Arntsen have sought materials relating to Shawn King from

16   the State, through two requests for copies of any interviews or other correspondence relating to

17   Mr. King.  The State responded that such materials do not exist.

18

19   DATED this 13th day of May, 2011.

20

21

22

23                                                                  Matthew R. Lynch

24   Subscribed and sworn to before me
     this 13th day of May, 2011.
25

26

27

28                                                  3

MADI_2673888.1

1    Notary Public, State of Wisconsin.

2    My Commission: __7/14/13__

         Expires:

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

4

MADI_2673888.1

# EXHIBIT BBBB

Michael K. Jeanes, Clerk of Court
*** Electronically Filed ***
05/26/2011 8:00 AM

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CR 2000-096032                                           05/18/2011


                                              CLERK OF THE COURT
JUDGE DOUGLAS L. RAYES                            H. O'Shaughnessy
                                                      Deputy



STATE OF ARIZONA                        LACEY ALEXANDRA STOVER GARD

v.

WENDI ELIZABETH ANDRIANO (A)            JAMES J BELANGER
                                        SCOTT M BENNETT
                                        MATTHEW R LYNCH

                                        CAPITAL CASE MANAGER
                                        COURT ADMIN-CRIMINAL-PCR
                                        VICTIM SERVICES DIV-CA-SE
                                        VICTIM WITNESS DIV-AG-CCC



                        MINUTE ENTRY



        9:11 a.m.

        Courtroom ECB 411

        State's Attorney:       Lacey Gard appears telephonically
        Defendant's Attorney:   Scott Bennett, Allen Arntsen and Matthew Lynch appear
                                telephonically
        Defendant:              Not Present

        Court Reporter, Cindy Lineburg, is present.

        A record of the proceeding is also made by audio and/or videotape.



Docket Code 028                 Form R000D                        Page 1

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CR 2000-096032                                      05/18/2011


The Court reviews Defendant's Motion for Extension of Time for Filing Petition for Post-Conviction Relief.

The State objects.

Mr. Arntsen addresses the Court as to relevance of Motion for Extension of Time.

IT IS ORDERED granting Defendant's Motion for Extension of Time for Filing Petition for Post-Conviction Relief.

IT IS ORDERED Defendant's Petition is due by October 14, 2011.

IT IS FURTHER ORDERED the State's Response is due by November 28, 2011.

IT IS FURTHER ORDERED Defendant's Reply is due by December 13, 2011.

IT IS ORDERED setting Status Conference on August 24, 2011 at 9:30 a.m. before the Honorable Douglas Rayes.

Mr. Arntsen addresses the Court as to the Petitioner's Motion for Issuance of Discovery Subpoena.

IT IS ORDERED the State file a Response by June 3, 2011.

IT IS FURTHER ORDERED the Defense may file a Reply by June 10, 2011.

This case is eFiling eligible: http://www.clerkofcourt.maricopa.gov/efiling/default.asp. Attorneys are encouraged to review Supreme Court Administrative Orders 2010-117 and 2011-10 to determine their mandatory participation in eFiling through AZTurboCourt.

9:16 a.m.  Matter concludes.

# EXHIBIT CCCC

Michael K. Jeanes, Clerk of Court
*** Electronically Filed ***
Lisa Smith
Filing ID 892473
5/27/2011 2:13:56 PM

1  THOMAS C. HORNE
   ATTORNEY GENERAL
2  (FIRM STATE BAR NO. 14000)

3  LACEY STOVER GARD
   ASSISTANT ATTORNEY GENERAL
   CRIMINAL APPEALS/CAPITAL LITIGATION SECTION
4  400 WEST CONGRESS, BLDG. S–315
   TUCSON, ARIZONA 85701–1367
5  TELEPHONE: (520) 628–6520
   LACEY.GARD@AZAG.GOV
6  (STATE BAR NUMBER 22714)

7  ATTORNEYS FOR PLAINTIFF/RESPONDENT

8              SUPERIOR COURT OF ARIZONA
9                  COUNTY OF MARICOPA
10

11 State of Arizona,                    CR2000-096032-A

12         Plaintiff/Respondent,

13         -vs-                         RESPONSE TO MOTION FOR
                                        ISSUANCE OF DISCOVERY
14 Wendi Andriano,                      SUBPOENA.

15         Defendant/Petitioner.

16         On May 16, 2011, Defendant Wendi Andriano filed a motion seeking (1) a

17 subpoena to depose Mr. Shawn King, and (2) a subpoena *duces tecum* directing

18 King to produce all documents in his possession or under his control relating to

19 Andriano.  For the reasons expressed in the following memorandum of points and

20 authorities, this Court should deny Andriano's motion.

21         DATED this 27th day of May, 2011.

22                               RESPECTFULLY SUBMITTED,

23                               THOMAS C. HORNE
                                 ATTORNEY GENERAL
24

25                               /S/LACEY STOVER GARD
26                               ASSISTANT ATTORNEY GENERAL
                                 ATTORNEYS FOR PLAINTIFF
27

28

## MEMORANDUM OF POINTS AND AUTHORITIES

Defendant Wendi Andriano asks this Court to order a deposition of Shawn King, and issue a subpoena *duces tecum* requiring Mr. King to produce at the deposition all documents in his possession or under his control relating to Andriano or her trial.  (Motion, at 1–2.)  *See* Ariz. R. Crim. P. 15.3.  Andriano argues that Mr. King may possess information about her childhood, certain "traumatic events" that allegedly occurred therein, and her relationship with her husband (the victim).  (*Id.* at 2.)   She further argues that Mr. King "researched and identified" the sodium azide poison that the victim ingested the night of his death.   (*Id.*)   And, she contends that a deposition is necessary because Mr. King has refused her repeated requests for an informal interview.[1]  (*Id.* at 4.)

This Court should deny Andriano's request because she is not entitled to a court-ordered deposition at this stage of the proceedings.  *See Canion v. Cole*, 210 Ariz. 598, 600–01, ¶¶ 10–19, 115 P.3d 1261, 1263–64 (2005).  Andriano contends that Mr. King "may" have relevant mitigating information about her background or the procurement of sodium azide.  (Motion, at 2.)  However, because Andriano has

---

[1] The State is cognizant of counsel's need to thoroughly investigate Andriano's case and the requirement that they ascertain, prior to seeking a deposition, that Mr. King would not grant a personal interview.  *See* Ariz. R. Crim. P. 15.3(2).  However, the State is concerned with the defense team's persistence in contacting Mr. King.   In an affidavit submitted in support of the motion, Andriano's counsel avows that, in addition to making "multiple phone calls" to Mr. King, the defense team has attempted to contact Mr. King in person at his residence on twelve separate occasions, four of which occurred on the same day and two of which occurred on a different day.  (Motion, at Exh. A.)  More troubling is the fact that nine of the defense team's visits to Mr. King's residence occurred *after* Mr. King had refused to speak to them, citing his former counsel's advice.  (*Id.* at ¶¶ 6–11.)  Although the State understands the defense team's desire to convince Mr. King to participate in an informal interview prior to seeking a deposition, this type of repeated contact borders on harassment.

1    not yet filed a post-conviction relief (PCR) petition, she cannot show that Mr.

2    King's testimony is relevant to a claim for relief, and cannot establish good cause

3    to compel a deposition to elicit it.  *See id.* at 600, ¶ 10, 115 P.3d at 1263 ("Before [a

4    defendant] may be permitted to show good cause to compel disclosure of the

5    material he seeks … he must file a PCR petition to provide context for his

6    request.").  "Only when a petition has been filed can [this court] … properly

7    consider [a] request for discovery in light of [the] asserted grounds for relief."  *Id.*

8    at 601, ¶ 14, 115 P.3d at 1264.

9        This Court should therefore deny Andriano's motion as premature.  If

10   necessary, she can renew her motion after the petition's filing and, if successful in

11   compelling a deposition, seek leave to amend the petition based on the testimony

12   given.  *See id.* at 601, ¶¶ 15–16, 115 P.3d at 1264 (rejecting argument that

13   discovery is necessary to investigate and present potential grounds for relief

14   because Arizona Rule of Criminal Procedure 32.6(d) "adopts a liberal policy

15   toward amendment of PCR pleadings," and the court could allow amendment if the

16   defendant obtained new or exculpatory evidence after the petition's filing).  At this

17   point, however, Andriano is not entitled to an order compelling discovery.

18       Alternatively, if this Court grants Andriano's motion, it should appoint

19   counsel to represent Mr. King.[2]  Andriano's anticipated questions could expose Mr.

20   King to criminal liability—in fact, Mr. King has twice informed Andriano's

21   defense team that he would not speak "to anyone" about Andriano based on his

22   former counsel's advice.  (Motion, at Exh. A, ¶¶ 6, 8.)  One of the matters about

23

24   _____

25       [2] Andriano's counsel state that they are uncertain whether Mr. King is
     presently represented by counsel, and have attempted unsuccessfully to obtain this
26   information directly from Mr. King.  (Motion, at 4 n.2 & Exh. A ¶ 9.)  However,
     the record reflects that Mr. King has not been appointed counsel for the purposes of
27   the present PCR proceeding.

28

which Andriano wishes to question Mr. King is his alleged involvement in procuring the sodium azide the victim ingested. (Motion, at 2.) Andriano concedes that Mr. King could validly assert the Fifth Amendment privilege with respect to these questions. (*Id.* at 4.) Mr. King therefore requires counsel to advise him of his rights and options in this matter, and to represent him during any deposition.

DATED this 27th day of May, 2011.

RESPECTFULLY SUBMITTED,

THOMAS C. HORNE
ATTORNEY GENERAL


/S/LACEY STOVER GARD
ASSISTANT ATTORNEYS GENERAL
ATTORNEYS FOR PETITIONER

1   Copy of the foregoing mailed
2   this 27th day of May, 2011, to:

3   Scott M. Bennett
4   Coppersmith Schermer & Brockelman PLC
    2800 N. Central Ave., Suite 1200
5   Phoenix, Arizona 85004

6
7   James J. Balanger
    Coppersmith Schermer & Brockelman PLC
8   2800 North Central Avenue, Suite 1200
    Phoenix, AZ 85004
9

10  Allen A. Arntsen
    Foley & Lardner LLP
11  150 East Gilman Street
12  P.O. Box 1497
    Madison, WI   53701-1497
13

14  Stephen J. Nickels
    Foley & Lardner LLP
15  150 East Gilman Street
16  P.O. Box 1497
    Madison, WI   53701-1497
17

18  Matthew R. Lynch
    Foley & Lardner LLP
19  150 East Gilman Street
20  P.O. Box 1497
    Madison, WI   53701-1497
21

22  Attorneys for Defendant

23

24  /s/Linda Yrrizarry

25  #1900049
26

27

28

# EXHIBIT DDDD

1   COPPERSMITH SCHERMER & BROCKELMAN PLC
    2800 North Central Avenue
    Suite 1200
2   Phoenix, Arizona 85004
    Direct:   (602) 381-5476
3   Fax:      (602) 772-3776
    Scott M. Bennett, State Bar No. 022350

4
    FOLEY & LARDNER LLP
5   150 E. Gilman Street
    Madison, WI 53703
    Telephone: (608) 257-5035
6   Fax:      (608) 258-4258

    Allen A. Arntsen, Admitted *Pro Hac Vice*
7   Stephan J. Nickels, Admitted *Pro Hac Vice*
    Matthew R. Lynch, Admitted *Pro Hac Vice*

8   *Attorneys for Petitioner* Wendi Andriano

9                   SUPERIOR COURT OF ARIZONA
10                    COUNTY OF MARICOPA

11

12   State of Arizona,                        )
13                                            )
                          Respondent,         )   No. CR2000-096032-A
14                                            )
15         vs.                                )   **PETITIONER'S REPLY IN**
                                              )   **SUPPORT OF HER**
16   Wendi Elizabeth Andriano,                )   **MOTION FOR ISSUANCE OF**
                                              )   **DISCOVERY SUBPOENA**
17                        Petitioner.         )
                                              )   (Assigned to the Hon. Douglas Rayes)
18                                            )
                                              )
19

20         Pursuant to Rule 15.3 of the Arizona Rules of Criminal Procedure and the Court's

21   supervisory powers, Petitioner Wendi Andriano submits the following reply in support of

22   her request for this Court to authorize a subpoena for the deposition of Mr. Shawn King, a

23   witness with information relevant to the grounds for post-conviction relief in this matter.

24         The background and grounds for issuing the subpoena are set forth in Ms.

25   Andriano's Motion.  This reply merely addresses the State's sole argument in opposition

26   to the Motion—namely, that it is premature and the issue should be postponed until Ms.

27

28

{00012867 1 }      MADI_2697844.1

1  Andriano files her petition for post-conviction relief, pursuant to *Canion v. Cole*, 210 Ariz.

2  598, 115 P.3d 1261 (2005).

3        The State's reading of *Canion* is understandable—as the Court may recall, counsel

4  for Ms. Andriano initially hesitated in seeking a subpoena to depose another witness, Mr.

5  Scott Mac Leod, on the basis of that case. But the case is distinguishable on its facts from

6  the present situation, and its application here would not serve its rationale.

7        First, *Canion* concerned a request for "various materials used at his trial or

8  available at that time, alleging, without elaboration, that they were 'needed to present an

9  effective defense.' " *Id.* at 601. Here, by contrast, Ms. Andriano's Motion specifically

10  detailed why Mr. King is a relevant witness, what areas of testimony he will likely have

11  foundation to provide, and how that testimony relates to Ms. Andriano's anticipated claims

12  for post-conviction relief.

13        Second, the State argues that the request should be denied because *Canion*

14  establishes Ms. Andriano "is not entitled to an order compelling discovery" at this stage of

15  the proceedings. That point may be true, but is irrelevant. Ms. Andriano's Motion did not

16  seek a subpoena of Mr. King as a matter of right; it sought a subpoena as a matter of the

17  Court's discretion in furtherance of the orderly and efficient disposition of this case. Mr.

18  King's deposition will be necessary and relevant to Ms. Andriano's petition; absent an

19  unlikely change of heart by Mr. King, Ms. Andriano will renew her Motion following the

20  filing of her petition if the Motion is denied now. There is no rational basis to await the

21  petition before allowing the deposition of a third-party witness whose testimony will

22  almost certainly have relevance to certain claims that Ms. Andriano knows she will be

23  making in her petition, and other claims that she might raise in her petition.

24        Third, denying the motion now as premature will only lead to inefficiencies and

25  delays later, which conflicts with the State's prior positions regarding the schedule for this

26  proceeding. If Mr. King is deposed prior to the petition filing date, his testimony can be

27  incorporated into expert reports, it can inform claims raised in the petition, and it can be

28  {00012867.1 }                                                     2

MADI_2697844.1

1   used by Ms. Andriano's counsel to investigate or follow up on new information or leads

2   prior to the petition filing deadline. If the Court does not allow a deposition of Mr. King

3   until after Ms. Andriano has filed her petition, his deposition will likely necessitate later

4   requests for leave to amend the petition and/or expert reports, requests for time to make

5   these amendments, an allowance of time for the State to respond to these new arguments,

6   and so forth. Moreover, service of the deposition subpoena on Mr. King may prove

7   difficult and time-consuming in light of his avoidance of Ms. Andriano's counsel and

8   investigators thus far,[1] a variable that is more easily accounted for now than in the midst of

9   briefing on the petition.

10      In sum, the State provides *no persuasive basis for postponing a decision* on Ms.

11   Andriano's Motion until after she has filed her petition.

12      Finally, the State requests the Court appoint counsel to represent Mr. King at his

13   deposition, if the Motion is granted. Mr. King is certainly entitled to have counsel present

14   if he so chooses. Whether such counsel should be appointed by this Court, however, is an

15   administrative matter upon which Ms. Andriano takes no position.

16                                **Conclusion**

17      For the foregoing reasons, this Court should order the requested subpoena in aid of

18   Ms. Andriano's petition for post-conviction relief.

19

20

21

22

23   _____

24   [1] The State notes that it is "concerned with the defense team's persistence in contacting
     Mr. King," alleging that it "borders on harassment." (State's Br. at n.1.) In reality, the

25   problem that Ms. Andriano's counsel has encountered hass not been repetitive contacts
     that resulted in unequivocal refusals by Mr. King to speak. Instead, he made two

26   equivocal statements that he did not want to be interviewed ("My former attorney told me
     I should not talk") sandwiched around avoidance of numerous other attempts to contact

27   him.

28   {00012867.1}                              3

MADI_2697844.1

1    RESPECTFULLY SUBMITTED June 1, 2011.

2

3                                              COPPERSMITH SCHERMER &
                                               BROCKELMAN PLC

4
                                               By _____
5                                                    Scott M. Bennett

6
                                               FOLEY & LARDNER LLP
7                                                    Allen A. Arntsen, *Pro Hac Vice*
                                                     Stephan J. Nickels, *Pro Hac Vice*
8                                                    Matthew R. Lynch, *Pro Hac Vice*

9
                                                     *Attorneys for Petitioner*
10

11   ORIGINAL filed June __, 2011.

12   COURTESY COPY hand-delivered June __, 2011, to:

13   Judge Douglas Rayes

14   Maricopa County Superior Court
     East Court Building-511

15   101 W. Jefferson
     Phoenix, AZ 85003-2243

16

17   COPY mailed June 1, 2011, to:

18   Ms. Lacey Stover Gard

19   Office of the Attorney General
     400 W. Congress, Suite S-315

20   Tuscon, AZ 85701-1367
     *Attorney for the State of Arizona*

21

22

23

24

25

26

27

28   {00012867.1 }                                    4

     MADI_2697844.1

# EXHIBIT EEEE

FILED
*June 8, 2011  11:06am*
MICHAEL K. JEANES, Clerk
By *H. O'Shaughnessy*
H. O'Shaughnessy Deputy

1   Scott M. Bennett (022350)
    Coppersmith Schermer & Brockelman PLC
2   2800 North Central Avenue, Suite 1200
    Phoenix, Arizona  85004
3   (602) 224-0999 (office)
    (602) 224-6020 (fax)
4   sbennett@csblaw.com

5   Allen A. Arntsen, Admitted *Pro Hac Vice*
6   Stephan J. Nickels Admitted *Pro Hac Vice*
    Matthew R. Lynch Admitted *Pro Hac Vice*
7   Foley & Lardner LLP
    150 E. Gilman Street
8   Madison, WI 53703
    (608) 257-5035 (office)
9   (608) 258-4258 (fax)
    aarntsen@foley.com
10

11  *Attorneys for Petitioner Wendi Andriano*

12                **SUPERIOR COURT OF ARIZONA**
13                  **COUNTY OF MARICOPA**

14  State of Arizona,                    )  No. CR2000-096032-A
                                         )
15               Respondent,             )  **ORDER AUTHORIZING**
16  v.                                   )  **DISCOVERY SUBPOENAS**
                                         )
17  Wendi Elizabeth Andriano,            )  (Assigned to the Hon. Douglas Rayes)
                                         )
18               Petitioner.             )
                                         )  the State's Response &
19  ─────────────────────────           )  Defendant's Reply
          *The court has considered*
20       ~~Based on~~ the motion filed by petitioner Wendi Andriano∧and for good cause, IT

21  IS ORDERED:

22      1. Authorizing the issuance of a subpoena requiring Shawn King to submit to a
23         deposition by counsel for Ms. Andriano.

24      2. Authorizing the issuance of a subpoena duces tecum ordering Shawn King to
           produce to counsel for Ms. Andriano all documents in Mr. King's possession or
25         under his control relating to Ms. Wendi Andriano and/or her trial for murder,
26         including without limitation, all communications to or from Ms. Andriano, her

{00010685.1 }

1    relatives, witnesses, police officers, investigators, prosecutors, attorneys and any
     other person in regard to Ms. Andriano and/or her trial for murder.

2    3. It is further ordered appointing counsel to represent Mr. King during
       the interview process through ⊘ PDS

3    IT IS SO ORDERED this ___6___ day of May, 2011.
                                              June

4

5

6    _____
     Douglas Rayes

7    Maricopa County Superior Court Judge

8

9

10   Copies of the foregoing provided
     this ___ day of _____ to:

11

12   Lacey Stover Gard
     Assistant Attorney General

13   400 West Congress, Suite S-315
     Tucson, Arizona  85701-1367

14

15   Scott Bennett
     Coppersmith Schermer & Brockelman PLC

16   2800 North Central Avenue, Suite 1200
     Phoenix, Arizona  85004

17

18   Jim Logan
19   OPDS
20

21

22

23

24

25

26

# EXHIBIT FFFF

Michael K. Jeanes, Clerk of Court
*** Electronically Filed ***
06/07/2011 8:00 AM

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CR 2000-096032                                              06/06/2011


                                              CLERK OF THE COURT
JUDGE DOUGLAS L. RAYES                         H. O'Shaughnessy
                                                   Deputy



STATE OF ARIZONA                          LACEY ALEXANDRA STOVER GARD

v.

WENDI ELIZABETH ANDRIANO (A)              JAMES J BELANGER
                                          ALLEN A ARNTSEN
                                          STEPHAN J NICKELS
                                          MATTHEW R LYNCH
                                          JAMES LEO LOGAN

                                          CAPITAL CASE MANAGER
                                          COURT ADMIN-CRIMINAL-PCR
                                          OFFICE OF PUBLIC DEFENSE
                                          SERVICES-CCC
                                          VICTIM SERVICES DIV-CA-SE
                                          VICTIM WITNESS DIV-AG-CCC



                        MINUTE ENTRY



        The Court has received Petitioner's Motion for Issuance of Discovery Subpoena, State's
Response and Petitioner's Reply.  Good cause appearing,

        IT IS ORDERED:

        1)      Authorizing the issuance of a subpoena requiring Shawn King to submit to a
                deposition by counsel for Ms. Andriano.
        2)      Authorizing the issuance of a subpoena duces tecum ordering Shawn King to
                produce to counsel for Ms. Andriano all documents in Mr. King's possession
                or under his control relating to Ms. Wendi Andriano and/or her trial for

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CR 2000-096032                                      06/06/2011

       murder, including without limitation, all communications to or from Ms.
Andriano, her relatives, witnesses, police officers, investigators, prosecutors,
attorneys and any other person in regard to Ms. Andriano and/or her trial fur
murder.

     3)     IT IS FURTHER ORDERED appointing counsel to represent Mr. Kind during the
interview process through the Office of Public Defense Services.

     All in accordance with formal written order signed by the Court and filed by the Clerk on
June 6, 2011.

     FILED:  Order.

     This case is eFiling eligible: http://www.clerkofcourt.maricopa.gov/efiling/default.asp.
Attorneys are encouraged to review Supreme Court Administrative Orders 2010-117 and 2011-
10 to determine their mandatory participation in eFiling through AZTurboCourt.

# EXHIBIT GGGG

1  Scott M. Bennett (022350)
   Coppersmith Schermer & Brockelman PLC
2  2800 North Central Avenue, Suite 1200
   Phoenix, Arizona 85004
3  (602) 224-0999 (office)
   (602) 224-6020 (fax)
4  sbennett@csblaw.com

5  Allen A. Arntsen, Admitted *Pro Hac Vice*
6  Stephan J. Nickels Admitted *Pro Hac Vice*
   Matthew R. Lynch Admitted *Pro Hac Vice*
7  Foley & Lardner LLP
   150 East Gilman Street
8  Madison, WI 53703
   (608) 257-5035 (office)
9  (608) 258-4258 (fax)
   aarntsen@foley.com
10

11 *Attorneys for Petitioner Wendi Elizabeth Andriano*

MICHAEL K. JEANES, CLERK
RECEIVED F C LOBBY
DOCUMENT DEPOSITORY

11 JUN 14  PM 3: 51

FILED
BY S. KENNOW, DEP

12            SUPERIOR COURT OF ARIZONA
                 COUNTY OF MARICOPA
13

14 | STATE OF ARIZONA, | ) | No. CR2000-096032-A |
   | | ) | |
15 | Respondent, | ) | **STIPULATION TO ALLOW** |
   | | ) | **CONFIDENTIAL CONTACT VISITS** |
16 | vs. | ) | **BETWEEN WENDI ELIZABETH** |
   | | ) | **ANDRIANO AND HER EXPERTS** |
17 | WENDI ELIZABETH ANDRIANO, | ) | **AND ATTORNEYS** |
   | | ) | |
18 | Petitioner. | ) | (Assigned to the Hon. Douglas Rayes) |
   | | ) | |
19 | | ) | |
   | | ) | |
20 | | ) | |

21

22        Petitioner Wendi Elizabeth Andriano requests that the Court issue an order

23 directing the Arizona Department of Corrections ("ADOC") to allow confidential contact

24 visits between Petitioner and:

25    • Ms. Sita Jo-Ann Sovin, a mitigation specialist, and/or Ms. Sovin's associates, Ms.
        Alexis Boothby, Ms. Kristen Powers and Mr. Christopher Darren Butler;

26    • Dr. James W. Hopper, a clinical psychologist;

{00014443.1 }

- Dr. George Woods, a clinical psychiatrist;

- Dr. Myla Young, a neuropsychologist; and

- her attorneys Mr. Allen Arntsen, Mr. Matthew Lynch, Mr. Scott Bennett, Ms. Krista Sterken, and Ms. Jodi Newman.

Charles Ryan, Director of the ADOC, through undersigned counsel[1], does not object to the proposed, confidential contact visits between Ms. Andriano and the experts.

Counsel for the parties have agreed to terms and conditions for the contact visits, and those terms and conditions are listed and contained in the accompanying proposed order.

The attorneys for the State and the ADOC have given counsel for Ms. Andriano permission to sign on their behalf.

RESPECTFULLY SUBMITTED June 14, 2011.

COPPERSMITH SCHERMER &
BROCKELMAN PLC

By _____
Scott M. Bennett

FOLEY & LARDNER LLP
Allen A. Arntsen
Stephan J. Nickels
Matthew R. Lynch

*Attorneys for Petitioner*

---

[1] Assistant Attorney General Michael Brodsky appears solely for the purpose of representing the interests of ADOC.

OFFICE OF THE ATTORNEY GENERAL

By _____
        Lacey Stover Gard

*Attorney for the State of Arizona*

OFFICE OF THE ATTORNEY GENERAL

By _____
        Michael Brodsky

*Attorney for Arizona Department of
Corrections*

ORIGINAL filed with the Clerk of the Court
on June 14, 2011.

COPY hand-delivered on June 14, 2011 to:

The Honorable Douglas Rayes
East Court Building #411
101 W. Jefferson
Phoenix, AZ  85003-2243

COPIES mailed on June 14, 2011 to:

Michael Brodsky
Assistant Attorney General
1275 West Washington
Phoenix, AZ  85007-2997
*Attorney for Arizona Department of Corrections*

Ms. Lacey Stover Gard
Office of the Attorney General
400 West Congress, Suite S-315
Tucson, Arizona  85701-1367

1 | *Attorneys for the State of Arizona*

2 | Deputy Warden Lacy L. Scott
3 | Arizona State Prison – Perryville
   | P.O. Box 3000
4 | Goodyear, AZ 85395

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

# EXHIBIT HHHH

FILED
June 15, 2011   2:36 pm
MICHAEL K. JEANES, Clerk
By _____
H. O'Shaughnessy Deputy

1   Scott M. Bennett (022350)
    Coppersmith Schermer & Brockelman PLC
2   2800 North Central Avenue, Suite 1200
    Phoenix, Arizona 85004
3   (602) 224-0999 (office)
    (602) 224-6020 (fax)
4   sbennett@csblaw.com

5   Allen A. Arntsen, Admitted *Pro Hac Vice*
6   Stephan J. Nickels Admitted *Pro Hac Vice*
    Matthew R. Lynch Admitted *Pro Hac Vice*
7   Foley & Lardner LLP
    150 East Gilman Street
8   Madison, WI 53703
    (608) 257-5035 (office)
9   (608) 258-4258 (fax)
    aarntsen@foley.com
10

11  *Attorneys for Petitioner Wendi Elizabeth Andriano*

12              SUPERIOR COURT OF ARIZONA
                   COUNTY OF MARICOPA
13

14  STATE OF ARIZONA,              )   No. CR2000-096032-A
                                   )
15                Respondent,      )   **ORDER ALLOWING**
                                   )   **CONFIDENTIAL CONTACT VISITS**
16       vs.                       )   **(Death Penalty Case)**
                                   )
17  WENDI ELIZABETH ANDRIANO,      )   (Assigned to the Hon. Douglas Rayes)
                                   )
18                Petitioner.      )
                                   )
19                                 )
                                   )
20  _____ )

21

22       Pending before the Court is the parties' Stipulation for an Order to Allow

23  Confidential Contact Visits between Petitioner and various experts and attorneys.

24  After due consideration of said stipulation, and the relevant pleadings on file,

        IT IS ORDERED that the Stipulation for Order to Allow Confidential Contact
25
    Visits between Wendi Elizabeth Andriano and Her Experts and Attorneys is **GRANTED**.
26

{00014446.1 }

1    IT IS FURTHER ORDERED that the experts and attorneys be permitted to have
2  confidential contact visits with Wendi Elizabeth Andriano, ADC# 191593, under the
3  following terms:

4        1.      Visitations may take place on the following dates at the time indicated, and
5  with the listed experts and attorneys:

6

7        A.    <u>July 12, 2011</u>          <u>10:30 a.m. to 2:30 p.m.</u>
              Dr. Myla Young, Dr. George Woods, Dr. Jim Hopper, Sita Jo-Ann Sovin,
8             Kristen Powers, Alexis Boothby, Christopher Butler, Allen Arntsen,
              Matthew Lynch, Scott Bennett, Krista Sterken, Jodi Newman
9

10       B.    <u>July 13, 2011</u>          <u>10:30 a.m. to 2:30 p.m.</u>
              Dr. Myla Young, Dr. George Woods, Dr. Jim Hopper, Sita Jo-Ann Sovin,
11            Kristen Powers, Alexis Boothby, Christopher Butler, Allen Arntsen,
              Matthew Lynch, Scott Bennett, Krista Sterken, Jodi Newman
12

13       C.    <u>July 26, 2011</u>          <u>10:30 a.m. to 2:30 p.m.</u>
              Dr. Myla Young, Dr. George Woods, Dr. Jim Hopper, Sita Jo-Ann Sovin,
14            Kristen Powers, Alexis Boothby, Christopher Butler, Allen Arntsen,
              Matthew Lynch, Scott Bennett, Krista Sterken, Jodi Newman
15

16       D.    <u>July 27, 2011</u>          <u>10:30 a.m. to 2:30 p.m.</u>
              Dr. Myla Young, Dr. George Woods, Dr. Jim Hopper, Sita Jo-Ann Sovin,
17            Kristen Powers, Alexis Boothby, Christopher Butler, Allen Arntsen,
              Matthew Lynch, Scott Bennett, Krista Sterken, Jodi Newman

18       E.    August 9, 2011                <u>10:30 a.m. to 2:30 p.m.</u>
              Dr. Myla Young, Dr. George Woods, Dr. Jim Hopper, Sita Jo-Ann Sovin,
19            Kristen Powers, Alexis Boothby, Christopher Butler, Allen Arntsen,
              Matthew Lynch, Scott Bennett, Krista Sterken, Jodi Newman
20

21       F.    August 10, 2011                 <u>10:30 a.m. to 2:30 p.m.</u>
              Dr. Myla Young, Dr. George Woods, Dr. Jim Hopper, Sita Jo-Ann Sovin,
22            Kristen Powers, Alexis Boothby, Christopher Butler, Allen Arntsen,
              Matthew Lynch, Scott Bennett, Krista Sterken, Jodi Newman
23

24       G.    August 16, 2011                <u>10:30 a.m. to 2:30 p.m.</u>
              Dr. Myla Young, Dr. George Woods, Dr. Jim Hopper, Sita Jo-Ann Sovin,
25            Kristen Powers, Alexis Boothby, Christopher Butler, Allen Arntsen,
              Matthew Lynch, Scott Bennett, Krista Sterken, Jodi Newman
26

H.   August 17, 2011                10:30 a.m. to 2:30 p.m.
     Dr. Myla Young, Dr. George Woods, Dr. Jim Hopper, Sita Jo-Ann Sovin,
     Kristen Powers, Alexis Boothby, Christopher Butler, Allen Arntsen,
     Matthew Lynch, Scott Bennett, Krista Sterken, Jodi Newman

I.   August 30, 2011                10:30 a.m. to 2:30 p.m.
     Dr. Myla Young, Dr. George Woods, Dr. Jim Hopper, Sita Jo-Ann Sovin,
     Kristen Powers, Alexis Boothby, Christopher Butler, Allen Arntsen,
     Matthew Lynch, Scott Bennett, Krista Sterken, Jodi Newman

J.   August 31, 2011                10:30 a.m. to 2:30 p.m.
     Dr. Myla Young, Dr. George Woods, Dr. Jim Hopper, Sita Jo-Ann Sovin,
     Kristen Powers, Alexis Boothby, Christopher Butler, Allen Arntsen,
     Matthew Lynch, Scott Bennett, Krista Sterken, Jodi Newman

2.   Petitioner's counsel or the experts shall make arrangements with Warden, Arizona State Prison - Perryville, or her designee, to schedule such visits.

3.   The Warden, through her staff, may require the experts to subject all instruments, equipment, manuals and the like to an inspection and inventory prior to and subsequent to any meeting with Wendi Elizabeth Andriano.

4.   ADOC may require inmate Wendi Elizabeth Andriano to wear leg restraints or a stun belt during the meetings.

5.   Both Petitioner and Respondent recognize that Petitioner's decision not to contest ADOC's practice of using a stun belt on Petitioner, should it use one, is due to the time constraints placed upon Petitioner's counsel and in no way constitutes a waiver of the "stun belt issue" in any future request for a contact visit in this case or in any other case. Respondents' willingness to stipulate hereto should not be considered a waiver of any aspect of ADOC's non-contact visitation policy.

6.   The experts shall be allowed to have physical contact with Petitioner as is necessary during the course of the interviews.

7.   The interviews must be confidential. The meetings between Petitioner and the experts shall take place in a room that allows for privacy.

8.    Before being allowed the contact visit authorized herein, the visiting experts shall certify in a written release to ADOC that they have investigated and ascertained the risks to their personal safety associated with the visit as authorized by and under the circumstances described in this order; that they agree to assume those risks; and that they release and hold harmless ADOC, the State of Arizona, and their officers and employees from any claim arising from death or injury associated with the risks assumed. However, such release shall not operate as a release of gross negligence on the part of ADOC.

IT IS FURTHER ORDERED that the Clerk of the Court forward a copy of this Order to counsel of record for Petitioner, Scott Bennett; counsel of record for the State of Arizona, Lacey Stover Gard; Karyn Klausner, ADOC General Counsel; Ms. Sita Jo-Ann Sovin; Deputy Warden Lacy L. Scott; and Michael Brodsky, who is appearing solely for the purpose of representing the ADOC and is not a counsel of record

IT IS SO ORDERED this _14_ day of _June_, 2011.

_____
THE HONORABLE DOUGLAS RAYES

{00014446.1 }

4

# EXHIBIT IIII

Michael K. Jeanes, Clerk of Court
*** Electronically Filed ***
Isabel Osuna
Filing ID 928803
7/6/2011 11:48:15 AM

THOMAS C. HORNE
ATTORNEY GENERAL
(FIRM STATE BAR NO. 14000)

LACEY STOVER GARD
ASSISTANT ATTORNEY GENERAL
CRIMINAL APPEALS/CAPITAL LITIGATION DIVISION
400 WEST CONGRESS, BLDG. S–315
TUCSON, ARIZONA 85701–1367
TELEPHONE: (520) 628–6520
Lacey.Gard@azag.gov
CADOCKET@AZAG.GOV
(STATE BAR NUMBER 22714)

ATTORNEYS FOR PLAINTIFF/RESPONDENT

# SUPERIOR COURT OF ARIZONA

## COUNTY OF MARICOPA

| | |
|---|---|
| State of Arizona, | CR2000-096032-A |
|     Plaintiff/Respondent, | |
|     -vs- | MOTION FOR COURT ORDER PROHIBITING DEFENDANT FROM CONTACTING JURORS. |
| Wendi Andriano, | |
|     Defendant/Petitioner. | |

On July 5, 2011, the State learned that Petitioner Wendi Andriano has contacted at least one trial juror at her residence.  The State respectfully requests that this Court order Andriano's defense team not to engage in any further contact with the trial jurors without prior authorization from this Court, based upon a showing of good cause that such contact is necessary to develop a post-conviction relief claim.  This motion is supported by the following Memorandum of Points and Authorities.

. . . .

. . . .

. . . .

. . . .

DATED this 6th day of July, 2011.

RESPECTFULLY SUBMITTED,

THOMAS C. HORNE
ATTORNEY GENERAL


/S/LACEY STOVER GARD
ASSISTANT ATTORNEY GENERAL
ATTORNEYS FOR PLAINTIFF

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.  Factual and procedural background.

On July 5, 2011, this Court notified the parties that it had received a letter from a trial juror, R.M., reporting that she had been contacted at her residence by a member of Andriano's defense team on June 20, 2011.  The juror informed this Court that she was distressed and frightened by the contact.

### II.  This Court should enter an order precluding Andriano's defense team from engaging in any further contact with trial jurors, absent prior authorization from this Court.

The Court's intervention is necessary to prevent Juror R.M., and her fellow jurors, from being drawn against their will into Andriano's pending post-conviction relief (PCR) proceeding.  The jurors rendered their verdict of death in December 2004.  Over 6 years later, Andriano has contacted at least one juror, despite the fact that, as discussed below, evidence from trial jurors is admissible only under strictly limited circumstances.  If, prior to service, potential jurors in capital cases were aware that they could be tracked down and contacted without warning—at their residence—years later by counsel for the inmate they sentenced to death, they would understandably be hesitant to serve, adversely impacting the criminal justice system.  In fact, in her letter, Juror R.M. expresses this very sentiment.

Protecting jurors from unnecessary involvement in collateral proceedings would not adversely affect a defendant's rights in any significant way.  Arizona law *strictly limits* the admissibility of juror evidence.  Rule 24.1(d) of the Arizona Rules of Criminal Procedure provides in part that:

> No testimony or affidavit shall be received which inquires into the subjective motives or mental processes which led a juror to assent or dissent from the verdict.

Specifically, juror evidence is only admissible upon a claim of one of the following grounds of juror misconduct:

> (1)    Receiving evidence not properly admitted during the trial or the aggravation or penalty hearing;
>
> (2)    Deciding the verdict by lot;
>
> (3)     Perjury by a juror, or the willful failure of a juror to respond fully to a direct question posed during the *voir dire* examination;
>
> (4)    Receiving a bribe or pledging a vote;
>
> (5)    Intoxication during the course of the deliberations; or
>
> (6)    Discussing the case with any interested party before delivering the verdict.

Ariz.R.Crim.P. 24.1(c)(3), (d). As the Arizona Supreme Court has explained:

> Inquiry into jury misconduct was limited at common law by the rule that a juror who has agreed to the verdict in open court may not later impeach his own verdict. *State v. Cookus*, 115 Ariz. 99, 563 P.2d 898 (1977). The policy was to protect the process of frank and conscientious jury deliberations and the finality of jury verdicts. *See* Carlson and Sumberg, Attacking Jury Verdicts: Paradigms for Rule Revision, 1977 Ariz. State L.J. 247. However, when jury misconduct results in prejudicial influences on the jury, the defendant might be deprived of procedural safeguards afforded by a trial, the right to counsel, to confront witnesses against him, and to choose not to take the stand on his own behalf. *Parker v. Gladden*, 385 U.S. 363, 87 S.Ct. 468, 17 L.Ed.2d 420 (1966); *Turner v. Louisiana*, 379 U.S. 466, 85 S.Ct. 546, 13 L.Ed.2d 424 (1965); *State v. Skinner*, 108 Ariz. 553, 503 P.2d 381 (1972). Therefore, our rules now provide that juror testimony is admissible to impeach a verdict, but only for the types of jury misconduct enumerated in Rule 24.1(c)(3), Arizona Rules of Criminal Procedure, 17 A.R.S., and in the manner provided by subsection (d), *supra. See* Comment to Rule 24.1; *State v. Rose*, 121 Ariz. 131, 589 P.2d 5 (1978). *See also* American Bar Association

Standards Relating to Trial by Jury, § 5.7 (Approved Draft, 1968); *State v. Landrum*, 25 Ariz.App. 446, 544 P.2d 270 (1975).

*State v. Poland*, 132 Ariz. 269, 282, 645 P.2d 784, 797 (Ariz. 1982). Similarly, in civil actions, juror evidence is not admissible to impeach a verdict unless it is offered to prove that "extraneous prejudicial information was improperly brought to the jury's attention or [that] any outside influence was improperly brought to bear upon any juror." Ariz.R.Evid. 606(b).

Thus, it is reasonable to require that post-trial contact with jurors by Andriano's agents be allowed only through leave of court upon a showing of good cause. Such an order will allow this Court to monitor the contact and ensure that 1) jurors are not harassed; 2) jurors are fully informed that they need not cooperate with—or even speak to—Andriano's representatives, absent a court order to the contrary; and 3) that if they do choose to meet with the Andriano's defense team, they may request to have a representative from the State present. The United States District Court for the District of Arizona has enacted such a rule:

> Interviews with jurors after trial by or on behalf of parties involved in the trial are prohibited except on condition that the attorney or party involved desiring such an interview file with the Court written interrogatories proposed to be submitted to the juror(s), together with an affidavit setting forth the reasons for such proposed interrogatories, within the time granted for a motion for a new trial. Approval for the interview of jurors in accordance with the interrogatories and affidavit so filed will be granted only upon the showing of good cause. *See* Federal Rules of Evidence, Rule 606(b). Following the interview, a second affidavit must be filed indicating the scope and results of the interviews with jurors and setting out the answers given to the interrogatories.

LRCiv. 39.2(b). Additionally, the District Court's local rules specifically set out the jurors' right not to cooperate with defense counsel:

> Except in response to a Court order, no juror is compelled to communicate with anyone concerning any trial in which the juror has been a participant.

LRCiv. 39.2(c).

The State does not necessarily suggest that this Court adopt a procedure equivalent to the District Court's local rule. Rather, the State believes that the interests of justice, and the protection of jurors, can reasonably be served in this case by requiring that any juror contact by Andriano's team be made only upon leave of Court, based on a good faith showing that she reasonably believes that one of the grounds of juror misconduct, as enumerated in Arizona Rule of Criminal Procedure 24.1(c)(3), applies.  Upon such a showing, this Court could properly monitor and control the nature of the juror contact.[1]

DATED this 6th day of July, 2011.

RESPECTFULLY SUBMITTED,

THOMAS C. HORNE
ATTORNEY GENERAL


/S/LACEY STOVER GARD
ASSISTANT ATTORNEYS GENERAL
ATTORNEYS FOR PETITIONER

---

[1] At a minimum, this Court should ensure that no additional jurors are contacted in person at their residences, resulting in the feelings of fear and intimidation Juror R.M. experienced.

1  Copy of the foregoing mailed
2  this 6th day of July, 2011, to:

3  Scott M. Bennett
4  Coppersmith Schermer & Brockelman PLC
   2800 N. Central Ave., Suite 1200
5  Phoenix, Arizona 85004

6
7  James J. Belanger
   Coppersmith Schermer & Brockelman PLC
8  2800 North Central Avenue, Suite 1200
   Phoenix, AZ 85004
9

10 Allen A. Arntsen
   Foley & Lardner LLP
11 150 East Gilman Street
12 P.O. Box 1497
   Madison, WI   53701-1497
13

14 Stephen J. Nickels
   Foley & Lardner LLP
15 150 East Gilman Street
16 P.O. Box 1497
   Madison, WI   53701-1497
17

18 Matthew R. Lynch
   Foley & Lardner LLP
19 150 East Gilman Street
20 P.O. Box 1497
   Madison, WI   53701-1497
21

22 Attorneys for Defendant

23

24 /s/Linda Yrrizarry

25
   #1900049
26

27

28

                                    7

# EXHIBIT JJJJ

# IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

# IN AND FOR THE COUNTY OF MARICOPA

CAUSE NO. *CR2007-096032 A*

FILED
*July 8, 2011 4:32 pm*
MICHAEL K. JEANES, Clerk
By _____
Deputy

CAPTION: *State*
*v*
*Wendi Andriano*

## SEALED DOCUMENT

IT IS ORDERED sealing the following document(s); same not to be opened without prior order of the court:

*Confidential Correspondence from trial juror*

Dated: *July 8, 2011*

*Douglas L. Rayes*

Judge/~~Commissioner~~ of the Superior Court

**Douglas L. Rayes**

DISCOVERY AND CONFIDENTIAL MATERIAL

# EXHIBIT KKKK

Michael K. Jeanes, Clerk of Court
*** Electronically Filed ***
07/11/2011 8:00 AM

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CR 2000-096032                                         07/07/2011


                                        CLERK OF THE COURT
JUDGE DOUGLAS L. RAYES                         H. O'Shaughnessy
                                                   Deputy



STATE OF ARIZONA                        LACEY ALEXANDRA STOVER GARD

v.

WENDI ELIZABETH ANDRIANO (A)            SCOTT M BENNETT
                                        ALLEN A ARNTSEN
                                        MATTHEW R LYNCH

                                        CAPITAL CASE MANAGER
                                        VICTIM SERVICES DIV-CA-SE
                                        VICTIM WITNESS DIV-AG-CCC



                        MINUTE ENTRY



        9:30 a.m.

        Courtroom  ECB 411

        State's Attorney:           Lacey Gard appears telephonically
        Defendant's Attorney:       Scot Bennet, Allen Arntsen and Matthew Lynch appear
telephonically
        Defendant:                  Not Present

        Court Reporter, Cindy Lineburg, is present.

        A record of the proceeding is also made by audio and/or videotape.

        The Court addresses counsel as to a letter received from a juror re concerns of Defense
team contact.

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CR 2000-096032                                            07/07/2011

IT IS ORDERED the remaining jurors are to be contacted by mail explaining the Defense teams intention of contacting the juror.  Content of the letter will include information that a juror's choice to talk with Defense team members is purely voluntary.  If jurors do not contact the Defense team as to their willingness to participate in the contact, a follow-up phone call may be made to jurors.

IT IS FURTHER ORDERED that the juror who wrote the letter to the Court will not be contacted again under any circumstances.

Ms. Gard addresses the Court as to her Motion to Preclude Further Juror Contact.

IT IS ORDERED denying said Motion.

IT IS ORDERED affirming telephonic Status Conference set for August 24, 2011 at 9:30 a.m. before the Honorable Douglas Rayes.

This case is eFiling eligible: http://www.clerkofcourt.maricopa.gov/efiling/default.asp. Attorneys are encouraged to review Supreme Court Administrative Orders 2010-117 and 2011-10 to determine their mandatory participation in eFiling through AZTurboCourt.

9:42 a.m.  Matter concludes.

# EXHIBIT LLLL

MICHAEL K. JEANES, CLERK
BY
S. Keinon DEP.

FILED

11 AUG -1 PM 3: 59

1   Scott M. Bennett (022350)
    Coppersmith Schermer & Brockelman PLC
2   2800 North Central Avenue, Suite 1200
    Phoenix, Arizona 85004
3   (602) 224-0999 (office)
    (602) 224-6020 (fax)
4   sbennett@csblaw.com

5   Allen A. Arntsen, Admitted *Pro Hac Vice*
6   Stephan J. Nickels Admitted *Pro Hac Vice*
    Matthew R. Lynch Admitted *Pro Hac Vice*
7   Foley & Lardner LLP
    150 East Gilman Street
8   Madison, WI 53703
    (608) 257-5035 (office)
9   (608) 258-4258 (fax)
    aarntsen@foley.com
10

11  *Attorneys for Petitioner Wendi Elizabeth Andriano*

12              SUPERIOR COURT OF ARIZONA
                   COUNTY OF MARICOPA
13

    STATE OF ARIZONA,                )   No. CR2000-096032-A
14                                   )
                    Respondent,      )   **STIPULATION TO MODIFY**
15                                   )   **PREVIOUSLY AUTHORIZED,**
                                     )   **CONFIDENTIAL CONTACT VISITS**
16      vs.                          )   **BETWEEN WENDI ELIZABETH**
                                     )   **ANDRIANO AND HER ATTORNEYS**
17  WENDI ELIZABETH ANDRIANO,        )   **AND EXPERTS**
                                     )
18                  Petitioner.      )
                                     )   (Assigned to the Hon. Douglas Rayes)
19                                   )
                                     )
20                                   )
                                     )
21  _____

22          On June 14, 2011, this Court signed an order authorizing confidential contact visits

23  between petitioner Wendi Elizabeth Andriano and several of the experts and attorneys

24  assisting with her case.

25          The parties now stipulate that the date of the previously stipulated August 30 and

26  31 visits will be changed to August 23 and 24 visits.

{00020790.1 }

1    The State has agreed to this modification to the visitation schedule. So has Charles

2    Ryan, Director of the ADOC, through undersigned counsel.[1]

3        A proposed order with the revised visitation schedule accompanies this stipulation.

4

5        RESPECTFULLY SUBMITTED August 1, 2011.

6                                          COPPERSMITH SCHERMER &
                                           BROCKELMAN PLC
7
8                                          By _____
                                               Scott M. Bennett
9
10                                         FOLEY & LARDNER LLP
                                               Allen A. Arntsen
11                                             Stephan J. Nickels
                                               Matthew R. Lynch
12
13                                         *Attorneys for Petitioner*

14                                         OFFICE OF THE ATTORNEY GENERAL

15
16                                         By _____
                                               Lacey Stover Gard
17
18                                         *Attorney for the State of Arizona*

19                                         OFFICE OF THE ATTORNEY GENERAL

20
21                                         By _____
                                               Michael Brodsky
22
23                                         *Attorney for Arizona Department of
                                           Corrections*
24

25   _____

26   [1] Assistant Attorney General Michael Brodsky appears solely for the purpose of
     representing the interests of ADOC.

{00020790.1 }                       2

1

2  ORIGINAL filed with the Clerk of the Court
   on August 1, 2011.

3

4  COPY hand-delivered on August 1, 2011 to:

5  The Honorable Douglas Rayes
   East Court Building #411

6  101 W. Jefferson
   Phoenix, AZ 85003-2243

7

8  COPIES mailed on August 1, 2011 to:

9  Michael Brodsky
   Assistant Attorney General

10 1275 West Washington

11 Phoenix, AZ 85007-2997
   *Attorney for Arizona Department of Corrections*

12

13 Ms. Lacey Stover Gard
   Office of the Attorney General

14 400 West Congress, Suite S-315
   Tucson, Arizona 85701-1367

15 *Attorneys for the State of Arizona*

16

17 Deputy Warden Lacy L. Scott
   Arizona State Prison – Perryville

18 P.O. Box 3000
   Goodyear, AZ 85395

19

20

21

22

23

24

25

26

# EXHIBIT MMMM

MICHAEL K. JEANES, CLERK
BY S. Keirson DEP.

FILED

11 AUG -1 PM 3: 59

1   Scott M. Bennett (022350)
    Coppersmith Schermer & Brockelman PLC
2   2800 North Central Avenue, Suite 1200
    Phoenix, Arizona 85004
3   (602) 224-0999 (office)
    (602) 224-6020 (fax)
4   sbennett@csblaw.com

5
    Allen A. Arntsen, Admitted *Pro Hac Vice*
6   Stephan J. Nickels Admitted *Pro Hac Vice*
    Matthew R. Lynch Admitted *Pro Hac Vice*
7   Foley & Lardner LLP
    150 East Gilman Street
8   Madison, WI 53703
    (608) 257-5035 (office)
9   (608) 258-4258 (fax)
    aarntsen@foley.com
10

11  *Attorneys for Petitioner Wendi Elizabeth Andriano*

12              SUPERIOR COURT OF ARIZONA
                  COUNTY OF MARICOPA
13

14  STATE OF ARIZONA,                )   No. CR2000-096032-A
                                     )
15              Respondent,          )   **STIPULATION TO ALLOW**
                                     )   **CONFIDENTIAL CONTACT VISITS**
16      vs.                          )   **BETWEEN WENDI ELIZABETH**
                                     )   **ANDRIANO AND HER EXPERTS AND**
17  WENDI ELIZABETH ANDRIANO,        )   **ATTORNEYS**
                                     )
18              Petitioner.          )
                                     )
19                                   )   (Assigned to the Hon. Douglas Rayes)
                                     )
20                                   )
                                     )
21  _____

22      The parties stipulate to the issuance of an order that directs the Arizona Department

23  of Corrections (hereinafter "ADOC") to allow confidential contact visits between

24  Petitioner Wendi Elizabeth Andriano and:

25      • Ms. Sita Jo-Ann Sovin, a mitigation specialist and/or her associates, Ms. Alexis

26        Boothby, Ms. Kristen Powers and Mr. Christopher Darren Butler;

{00020793.1 }

1      • Dr. James W. Hopper, a clinical psychologist;

2      • Dr. George Woods, a clinical psychiatrist;

3      • Dr. Myla Young, a neuropsychologist; and

4      • Ms. Andriano's attorneys Mr. Allen Arntsen, Mr. Matthew Lynch, Mr. Scott

5      Bennett, Ms. Krista Sterken, and Ms. Jodi Newman.

6    Charles Ryan, Director of the ADOC, through undersigned counsel[1], does not

7 object to these proposed, confidential contact visits.

8    Counsel for the parties have agreed to terms and conditions for the contact visits

9 and those terms and conditions are listed and contained in the accompanying proposed

10 order.

11    RESPECTFULLY SUBMITTED August 1, 2011.

12                  COPPERSMITH SCHERMER &
BROCKELMAN PLC

By _____
Scott M. Bennett

FOLEY & LARDNER LLP
Allen A. Arntsen
Stephan J. Nickels
Matthew R. Lynch

*Attorneys for Petitioner*

OFFICE OF THE ATTORNEY GENERAL

By _____
Lacey Stover Gard

*Attorney for the State of Arizona*

[1] Assistant Attorney General Michael Brodsky appears solely for the purpose of representing the interests of ADOC.

2

OFFICE OF THE ATTORNEY GENERAL

By _____
Michael Brodsky

*Attorney for Arizona Department of Corrections*

ORIGINAL filed with the Clerk of the Court
on August 1, 2011.

COPY hand-delivered on August 1, 2011 to:

The Honorable Douglas Rayes
East Court Building #411
101 W. Jefferson
Phoenix, AZ 85003-2243

COPIES mailed on August 1, 2011 to:

Michael Brodsky
Assistant Attorney General
1275 West Washington
Phoenix, AZ 85007-2997
*Attorney for Arizona Department of Corrections*

Ms. Lacey Stover Gard
Office of the Attorney General
400 West Congress, Suite S-315
Tucson, Arizona 85701-1367
*Attorneys for the State of Arizona*

Deputy Warden Lacy L. Scott
Arizona State Prison – Perryville
P.O. Box 3000
Goodyear, AZ 85395

{00020793.1 }

3

# EXHIBIT NNNN

FILED
8-4-11  3:16 pm
MICHAEL K. JEANES, Clerk
By _____
K. Schermerhorn, Deputy

1   Scott M. Bennett (022350)
    Coppersmith Schermer & Brockelman PLC
2   2800 North Central Avenue, Suite 1200
    Phoenix, Arizona 85004
3   (602) 224-0999 (office)
    (602) 224-6020 (fax)
4   sbennett@csblaw.com

5   Allen A. Arntsen, Admitted *Pro Hac Vice*
6   Stephan J. Nickels Admitted *Pro Hac Vice*
    Matthew R. Lynch Admitted *Pro Hac Vice*
7   Foley & Lardner LLP
    150 East Gilman Street
8   Madison, WI 53703
    (608) 257-5035 (office)
9   (608) 258-4258 (fax)
    aarntsen@foley.com
10
11  *Attorneys for Petitioner Wendi Elizabeth Andriano*

12              SUPERIOR COURT OF ARIZONA
                   COUNTY OF MARICOPA
13

14  STATE OF ARIZONA,                    )   No. CR2000-096032-A
                                         )
15                    Respondent,        )   **ORDER AMENDING CONTACT**
                                         )   **VISITS (Death Penalty Case)**
16        vs.                            )
                                         )   (Assigned to the Hon. Douglas Rayes)
17  WENDI ELIZABETH ANDRIANO,            )
                                         )
18                                       )
                      Petitioner.        )
19                                       )
                                         )
20                                       )
                                         )
21

22        Pending before the Court is the parties' Stipulation to Modify Previously

23  Authorized, Confidential Contact Visits between Wendi Elizabeth Andriano and Her

24  Experts. After due consideration of said stipulation, and the relevant pleadings on file,

25

26

{00020791.1 }

1

2          IT IS ORDERED that the Stipulation to Modify Previously Authorized,

3   Confidential Contact Visits between Wendi Elizabeth Andriano and Her Experts,

    incorporated into this order, is **GRANTED**.
4
          IT IS FURTHER ORDERED that the previous Order Allowing Contact Visits is
5
    amended to change the date of the August 30 and 31 visits to August 23 and 24 visits.
6
          IT IS FURTHER ORDERED that the Clerk of the Court forward a copy of this
7
    Order to counsel of record for Petitioner, Scott Bennett; counsel of record for the State of
8
    Arizona, Lacey Stover Gard; Karyn Klausner, ADOC General Counsel; Ms. Sita Jo-Ann
9
    Sovin; and Deputy Warden Lacy L. Scott.
10

11         IT IS SO ORDERED this  4  day of   Aug   , 2011.

12

13                                    THE HONORABLE DOUGLAS RAYES

14

15

16

17

18

19

20

21

22

23

24

25

26

{00020791.1 }                              2

# EXHIBIT OOOO

8-4-1 FILED 3:07 pm
MICHAEL K. JEANES, Clerk
By _K. Schermerhorn_
K. Schermerhorn, Deputy

1   Scott M. Bennett (022350)
    Coppersmith Schermer & Brockelman PLC
2   2800 North Central Avenue, Suite 1200
    Phoenix, Arizona 85004
3   (602) 224-0999 (office)
    (602) 224-6020 (fax)
4   sbennett@csblaw.com

5   Allen A. Arntsen, Admitted *Pro Hac Vice*
6   Stephan J. Nickels Admitted *Pro Hac Vice*
    Matthew R. Lynch Admitted *Pro Hac Vice*
7   Foley & Lardner LLP
    150 East Gilman Street
8   Madison, WI 53703
    (608) 257-5035 (office)
9   (608) 258-4258 (fax)
    aarntsen@foley.com
10

11  *Attorneys for Petitioner Wendi Elizabeth Andriano*

12              SUPERIOR COURT OF ARIZONA
                   COUNTY OF MARICOPA
13

14  STATE OF ARIZONA,                )   No. CR2000-096032-A
                                     )
15                   Respondent,      )   **ORDER ALLOWING CONTACT**
                                     )   **VISITS (Death Penalty Case)**
16          vs.                       )
                                     )   (Assigned to the Hon. Douglas Rayes)
17  WENDI ELIZABETH ANDRIANO,         )
                                     )
18                                    )
                    Petitioner.       )
19                                    )
                                     )
20  _____  )

21
22          Pending before the Court is the parties' Stipulation for an Order to Allow

23  Confidential Contact Visits between Petitioner and several of her experts and attorneys.

24  After due consideration of said stipulation, and the relevant pleadings on file,

25          IT IS ORDERED that the Stipulation for Order to Allow Confidential Contact

26  Visits between Wendi Elizabeth Andriano and her experts and attorneys is **GRANTED**.

{00020794.1 }

IT IS FURTHER ORDERED that the experts and attorneys be permitted to have confidential contact visits with Wendi Elizabeth Andriano, ADC# 191593, under the following terms:

1.    Visitations may take place on the following dates at the time indicated, and with the visitors indicated:

    A.    <u>September 13, 2011</u>        <u>10:30 a.m. to 2:30 p.m.</u>
Dr. Myla Young, Dr. George Woods, Dr. Jim Hopper, Sita Jo-Ann Sovin, Kristen Powers, Alexis Boothby, Christopher Butler, Allen Arntsen, Matthew Lynch, Scott Bennett, Krista Sterken, Jodi Newman

    B.    <u>September 14, 2011</u>        <u>10:30 a.m. to 2:30 p.m.</u>
Dr. Myla Young, Dr. George Woods, Dr. Jim Hopper, Sita Jo-Ann Sovin, Kristen Powers, Alexis Boothby, Christopher Butler, Allen Arntsen, Matthew Lynch, Scott Bennett, Krista Sterken, Jodi Newman

    C.    <u>September 27, 2011</u>        <u>10:30 a.m. to 2:30 p.m.</u>
Dr. Myla Young, Dr. George Woods, Dr. Jim Hopper, Sita Jo-Ann Sovin, Kristen Powers, Alexis Boothby, Christopher Butler, Allen Arntsen, Matthew Lynch, Scott Bennett, Krista Sterken, Jodi Newman

    D.    <u>September 28, 2011</u>        <u>10:30 a.m. to 2:30 p.m.</u>
Dr. Myla Young, Dr. George Woods, Dr. Jim Hopper, Sita Jo-Ann Sovin, Kristen Powers, Alexis Boothby, Christopher Butler, Allen Arntsen, Matthew Lynch, Scott Bennett, Krista Sterken, Jodi Newman

    E.    <u>October 11, 2011</u>        <u>10:30 a.m. to 2:30 p.m.</u>
Dr. Myla Young, Dr. George Woods, Dr. Jim Hopper, Sita Jo-Ann Sovin, Kristen Powers, Alexis Boothby, Christopher Butler, Allen Arntsen, Matthew Lynch, Scott Bennett, Krista Sterken, Jodi Newman

    F.    <u>October 12, 2011</u>        <u>10:30 a.m. to 2:30 p.m.</u>
Dr. Myla Young, Dr. George Woods, Dr. Jim Hopper, Sita Jo-Ann Sovin, Kristen Powers, Alexis Boothby, Christopher Butler, Allen Arntsen, Matthew Lynch, Scott Bennett, Krista Sterken, Jodi Newman

    G.    <u>October 25, 2011</u>        <u>10:30 a.m. to 2:30 p.m.</u>
Dr. Myla Young, Dr. George Woods, Dr. Jim Hopper, Sita Jo-Ann Sovin, Kristen Powers, Alexis Boothby, Christopher Butler, Allen Arntsen, Matthew Lynch, Scott Bennett, Krista Sterken, Jodi Newman

    H.    <u>October 26, 2011</u>        <u>10:30 a.m. to 2:30 p.m.</u>
Dr. Myla Young, Dr. George Woods, Dr. Jim Hopper, Sita Jo-Ann Sovin,

Kristen Powers, Alexis Boothby, Christopher Butler, Allen Arntsen, Matthew Lynch, Scott Bennett, Krista Sterken, Jodi Newman

2.    Petitioner's counsel or the experts shall make arrangements with Warden, Arizona State Prison - Perryville, or her designee, to schedule such visits.

3.    The Warden, through her staff, may require the experts to subject all instruments, equipment, manuals and the like to an inspection and inventory prior to and subsequent to any meeting with Wendi Elizabeth Andriano.

4.    ADOC may require inmate Wendi Elizabeth Andriano to wear leg restraints or a stun belt during the meetings.

5.    Both Petitioner and Respondent recognize that Petitioner's decision not to contest ADOC's practice of using a stun belt on Petitioner, should it use one, is due to the time constraints placed upon Petitioner's counsel and in no way constitutes a waiver of the "stun belt issue" in any future request for a contact visit in this case or in any other case. Respondents' willingness to stipulate hereto should not be considered a waiver of any aspect of ADOC's non-contact visitation policy.

6.    The experts shall be allowed to have physical contact with Petitioner as is necessary during the course of the interviews.

7.    The interviews must be confidential. The meetings between Petitioner and the experts shall take place in a room that allows for privacy.

8.    Before being allowed the contact visit authorized herein, the visiting experts shall certify in a written release to ADOC that they have investigated and ascertained the risks to their personal safety associated with the visit as authorized by and under the circumstances described in this order; that they agree to assume those risks; and that they release and hold harmless ADOC, the State of Arizona, and their officers and employees from any claim arising from death or injury associated with the risks assumed. However, such

{00020794.1 }

3

1    release shall not operate as a release of gross negligence on the part of

2    ADOC.

3        IT IS FURTHER ORDERED that the Clerk of the Court forward a copy of this

4    Order to counsel of record for Petitioner, Scott Bennett; counsel of record for the State of

5    Arizona, Lacey Stover Gard; Karyn Klausner, ADOC General Counsel; Ms. Sita Jo-Ann

6    Sovin; Deputy Warden Lacy L. Scott; and Michael Brodsky, who is appearing solely for

7    the purpose of representing the ADOC and is not a counsel of record.

8

9        IT IS SO ORDERED this __4__ day of __Aug_____, 2011.

10

11                         THE HONORABLE DOUGLAS RAYES

# EXHIBIT PPPP

Michael K. Jeanes, Clerk of Court
*** Electronically Filed ***
08/09/2011 8:00 AM

## SUPERIOR COURT OF ARIZONA
## MARICOPA COUNTY

CR 2000-096032                                          08/04/2011


                                              CLERK OF THE COURT
JUDGE DOUGLAS L. RAYES                            K. Schermerhorn
                                                     Deputy



STATE OF ARIZONA                        LACEY ALEXANDRA STOVER GARD

v.

WENDI ELIZABETH ANDRIANO (A)            JAMES J BELANGER

                                        VICTIM WITNESS DIV-AG-CCC



                          ORDERS SIGNED



        The Court has reviewed and considered Defense Motion to Allow Contact Visits
Between Wendi Elizabeth Andriano and Her Experts and Attorneys and good cause appearing,

        IT IS ORDERED granting the Motion, all in accordance with the formal written Order
signed by the court on 8/4/11 and filed with the Clerk on 8/4/11.

        The Court has also reviewed and considered Defense Stipulation to Modify Previously
Authorized Contact Visits Between Wendi Elizabeth Andriano and Her Attorneys and Experts
and good cause appearing,

        IT IS ORDERED granting the Motion, all in accordance with the formal written Order
signed by the court on 8/4/11 and filed with the Clerk on 8/4/11.

        This case is eFiling eligible: http://www.clerkofcourt.maricopa.gov/efiling/default.asp.
Attorneys are encouraged to review Supreme Court Administrative Orders 2010-117 and 2011-
10 to determine their mandatory participation in eFiling through AZTurboCourt.



Docket Code 022                    Form R000A                          Page 1

# EXHIBIT QQQQ

MICHAEL K. JEANES, CLERK
BY
S. Keinan DEP.

FILED

11 AUG 17 PM 3: 55

1   Scott M. Bennett (022350)
    Coppersmith Schermer & Brockelman PLC
2   2800 North Central Avenue, Suite 1200
    Phoenix, Arizona 85004
3   (602) 224-0999 (office)
    (602) 224-6020 (fax)
4   sbennett@csblaw.com

5   Allen A. Arntsen, Admitted *Pro Hac Vice*
6   Stephan J. Nickels Admitted *Pro Hac Vice*
    Matthew R. Lynch Admitted *Pro Hac Vice*
7   Foley & Lardner LLP
    150 East Gilman Street
8   Madison, WI 53703
    (608) 257-5035 (office)
9   (608) 258-4258 (fax)
    aarntsen@foley.com
10

11  *Attorneys for Petitioner Wendi Elizabeth Andriano*

12              SUPERIOR COURT OF ARIZONA
                   COUNTY OF MARICOPA
13

14  STATE OF ARIZONA,                    )   No. CR2000-096032-A
                                         )
15              Respondent,              )   **STIPULATION TO MODIFY**
                                         )   **PREVIOUSLY AUTHORIZED,**
16      vs.                              )   **CONFIDENTIAL CONTACT VISITS**
                                         )   **BETWEEN WENDI ELIZABETH**
17  WENDI ELIZABETH ANDRIANO,            )   **ANDRIANO AND HER ATTORNEYS**
                                         )   **AND EXPERTS**
18              Petitioner.              )
                                         )   (Assigned to the Hon. Douglas Rayes)
19                                       )
                                         )
20  _____)

21
22      On June 14, 2011, this Court signed an order authorizing confidential contact visits

23  between petitioner Wendi Elizabeth Andriano and several of the experts and attorneys

24  assisting with her case. On August 4, 2011, this Court signed an order modifying the

25  contact visit schedule, changing the date of the August 30 and 31 visits to August 23 and

26  24.

{00022302.1 }

1    The parties now stipulate that Keith Rohman, a mitigation expert assisting on Ms.

2  Andriano's case, will be added as an approved visitor for the visits scheduled with Ms.

3  Andriano on August 23 and August 24.

4    The State has agreed to this modification.  So has Charles Ryan, Director of the

5  ADOC, through undersigned counsel.[1]

6

7    RESPECTFULLY SUBMITTED August 17, 2011.

8                                    COPPERSMITH SCHERMER &
                                     BROCKELMAN PLC
9

10                                   By _____
                                            Scott M. Bennett
11

12                                   FOLEY & LARDNER LLP
                                         Allen A. Arntsen
13                                       Stephan J. Nickels
                                         Matthew R. Lynch
14

15                                   *Attorneys for Petitioner*

16                                   OFFICE OF THE ATTORNEY GENERAL

17                                   By _____
                                            Lacey Stover Gard
18

19                                   *Attorney for the State of Arizona*

20                                   OFFICE OF THE ATTORNEY GENERAL

21

22                                   By _____
                                            Michael Brodsky
23                                   *Attorney for Arizona Department of*
                                     *Corrections*
24

25   _____

26
[1] Assistant Attorney General Michael Brodsky appears solely for the purpose of
representing the interests of ADOC.

1

2    ORIGINAL filed with the Clerk of the Court
3    on August 17, 2011.

4    COPY hand-delivered on August 17, 2011 to:

5    The Honorable Douglas Rayes
6    East Court Building #411
     101 W. Jefferson
7    Phoenix, AZ  85003-2243

8    COPIES mailed on August 17, 2011 to:
9
10   Michael Brodsky
     Assistant Attorney General
11   1275 West Washington
     Phoenix, AZ  85007-2997
12   *Attorney for Arizona Department of Corrections*

13   Ms. Lacey Stover Gard
14   Office of the Attorney General
     400 West Congress, Suite S-315
15   Tucson, Arizona  85701-1367
16   *Attorneys for the State of Arizona*

17   Deputy Warden Lacy L. Scott
18   Arizona State Prison – Perryville
     P.O. Box 3000
19   Goodyear, AZ  85395

20

21

22

23

24

25

26

{00022302.1 }                              3

# EXHIBIT RRRR

FILED 2:53pm
MICHAEL K. JEANES, Clerk
By _____
Deputy

1  Scott M. Bennett (022350)
   Coppersmith Schermer & Brockelman PLC
   2800 North Central Avenue, Suite 1200
2  Phoenix, Arizona 85004
   (602) 224-0999 (office)
   (602) 224-6020 (fax)
3  sbennett@csblaw.com

4  Allen A. Arntsen, Admitted *Pro Hac Vice*
   Stephan J. Nickels Admitted *Pro Hac Vice*
   Matthew R. Lynch Admitted *Pro Hac Vice*
5  Foley & Lardner LLP
   150 East Gilman Street
6  Madison, WI 53703
   (608) 257-5035 (office)
   (608) 258-4258 (fax)
7  aarntsen@foley.com

8  *Attorneys for Petitioner Wendi Elizabeth Andriano*

9          **SUPERIOR COURT OF ARIZONA**
               **COUNTY OF MARICOPA**
10

11  STATE OF ARIZONA,              )   No. CR2000-096032-A
                                   )
12              Respondent,        )   **PETITIONER'S <u>UNOPPOSED</u>**
                                   )   **MOTION FOR EXTENSION OF**
13      vs.                        )   **TIME TO FILE PETITION FOR**
                                   )   **POST-CONVICTION RELIEF**
14  WENDI ELIZABETH ANDRIANO,      )
                                   )   (Assigned to the Hon. Douglas Rayes)
15              Petitioner.        )
                                   )
16                                 )
                                   )
17  _____)

18          Pursuant to Rule 32.4(c)(1) of the Arizona Rules of Criminal Procedure, and the

19  Court's supervisory powers, Petitioner Wendi Andriano presents an unopposed motion for

20  a one month extension of time – from October 15, 2011 until November 14, 2011 – to file

21  her petition for post-conviction relief because of health issues relating to Larry Hammond,

22  one of Ms. Andriano's key experts on her claim of ineffective assistance of counsel.

23          **<u>MEMORANDUM OF POINTS AND AUTHORITIES</u>**

24          Ms. Andriano requests a one month extension of the current October 15, 2011

25  deadline, to November 14, 2011, to file her petition for post conviction relief. The basis

26  for this motion is that attorney Larry Hammond, one of the experts retained by Ms.

{00022500.1 }

1   Andriano's post-conviction relief counsel ("PCR Counsel"), has suffered serious health

2   problems that have delayed his work on this matter. (*See* Affidavit of Krista Sterken

3   ("Sterken Aff.").)

4   　　　Mr. Hammond had expected to review materials and prepare a declaration this

5   summer, with the goal of completing his declaration, which petitioner's counsel expect to

6   be central to the Petition, by early September. (Sterken Aff. at ¶ 5.) This would have

7   allowed adequate time to incorporate its conclusions into the Petition.  Due to an

8   unexpected severe illness, attorney Hammond has been able to spend little time on this

9   matter over the past month. (Sterken Aff. at ¶ 3.)  He has advised PCR Counsel that his

10  illness will impose substantial limitations on his ability to work on this matter during the

11  remainder of August and the first two weeks of September. (Sterken Aff. at ¶ 4.)

12  　　　Given these circumstances, which are both unexpected and beyond the control of

13  Ms. Andriano and PCR Counsel, Ms. Andriano requests a 30-day extension to file her

14  petition for post-conviction relief.  The State does not oppose this extension.

15  　　　RESPECTFULLY SUBMITTED August 18, 2011.

16  　　　　　　　　　　　　　　　COPPERSMITH SCHERMER &
　　　　　　　　　　　　　　　　BROCKELMAN PLC
17

18  　　　　　　　　　　　　　　　By _____
19  　　　　　　　　　　　　　　　　　Scott M. Bennett

20  　　　　　　　　　　　　　　　FOLEY & LARDNER LLP
　　　　　　　　　　　　　　　　　Allen A. Arntsen
21  　　　　　　　　　　　　　　　　Stephan J. Nickels
　　　　　　　　　　　　　　　　　Matthew R. Lynch
22

23  　　　　　　　　　　　　　　　*Attorneys for Petitioner*

24

25

26

1    ORIGINAL filed with the Clerk of the Court
     on August 18, 2011.
2

3    COPY hand-delivered on August 18, 2011 to:

4    The Honorable Douglas Rayes
     East Court Building #411
5    101 W. Jefferson
6    Phoenix, AZ  85003-2243

7    COPIES mailed on August 18, 2011 to:

8
     Michael Brodsky
9    Assistant Attorney General
     1275 West Washington
10   Phoenix, AZ  85007-2997
11   *Attorney for Arizona Department of Corrections*

12   Ms. Lacey Stover Gard
13   Office of the Attorney General
     400 West Congress, Suite S-315
14   Tucson, Arizona  85701-1367
15   *Attorneys for the State of Arizona*

16   Deputy Warden Lacy L. Scott
     Arizona State Prison – Perryville
17   P.O. Box 3000
18   Goodyear, AZ  85395

19   *Michelle Halley*
20

21

22

23

24

25

26

{00022500.1 }                          3

# EXHIBIT SSSS

FILED
8-28-11
MICHAEL K JEANES, Clerk
By
T. HENNINGER, Deputy

1   Scott M. Bennett (022350)
    Coppersmith Schermer & Brockelman PLC
2   2800 North Central Avenue, Suite 1200
    Phoenix, Arizona 85004
    (602) 224-0999 (office)
3   (602) 224-6020 (fax)
    sbennett@csblaw.com

4   Allen A. Arntsen, Admitted *Pro Hac Vice*
    Stephan J. Nickels Admitted *Pro Hac Vice*
5   Matthew R. Lynch Admitted *Pro Hac Vice*
    Foley & Lardner LLP
    150 East Gilman Street
6   Madison, WI 53703
    (608) 257-5035 (office)
7   (608) 258-4258 (fax)
    aarntsen@foley.com

8   *Attorneys for Petitioner Wendi Elizabeth Andriano*

9                 **SUPERIOR COURT OF ARIZONA**
                   **COUNTY OF MARICOPA**
10

11  STATE OF ARIZONA,              )   No. CR2000-096032-A
                                   )
12              Respondent,        )   **PROPOSED ORDER RE**
                                   )   **PETITIONER'S <u>UNOPPOSED</u>**
13       vs.                       )   **MOTION FOR EXTENSION OF**
                                   )   **TIME TO FILE PETITION FOR**
14  WENDI ELIZABETH ANDRIANO,      )   **POST-CONVICTION RELIEF**
                                   )
15              Petitioner.        )   (Assigned to the Hon. Douglas Rayes)
                                   )
16                                 )
                                   )
17  _____    )

18        Based on the unopposed motion by Ms. Andriano, and for good cause, IT IS

19  ORDERED extending the deadline for Ms. Andriano's petition for post-conviction relief

20  to November 14, 2011.

21

22        DATED ____8-19-1____

23                                 _____
                                   The Honorable Douglas Rayes
24

25

26

{00022603.1 }

1

2    COPIES mailed to:

3
     Scott M. Bennett
4    Coppersmith Schermer & Brockelman PLC
     2800 N. Central Avenue, Suite 1200
5    Phoenix, AZ  85004
6    *Attorneys for Petitioner*

7    Ms. Lacey Stover Gard
     Office of the Attorney General
8    400 West Congress, Suite S-315
9    Tucson, Arizona  85701-1367
     *Attorneys for the State of Arizona*
10

11

12    ────────────────────────────────

13

14

15

16

17

18

19

20

21

22

23

24

25

26

# EXHIBIT TTTT

MICHAEL K JEANES, Clerk

By _____
T. HENNINGER, Deputy

Scott M. Bennett (022350)
Coppersmith Schermer & Brockelman PLC
2800 North Central Avenue, Suite 1200
Phoenix, Arizona 85004
(602) 224-0999 (office)
(602) 224-6020 (fax)
sbennett@csblaw.com

Allen A. Arntsen, Admitted *Pro Hac Vice*
Stephan J. Nickels Admitted *Pro Hac Vice*
Matthew R. Lynch Admitted *Pro Hac Vice*
Foley & Lardner LLP
150 East Gilman Street
Madison, WI 53703
(608) 257-5035 (office)
(608) 258-4258 (fax)
aarntsen@foley.com

*Attorneys for Petitioner Wendi Elizabeth Andriano*

SUPERIOR COURT OF ARIZONA
COUNTY OF MARICOPA

| | |
|---|---|
| STATE OF ARIZONA, | No. CR2000-096032-A |
| Respondent, | **ORDER AMENDING CONTACT VISITS (Death Penalty Case)** |
| vs. | (Assigned to the Hon. Douglas Rayes) |
| WENDI ELIZABETH ANDRIANO, | |
| Petitioner. | |

Pending before the Court is the parties' Stipulation to Modify Previously Authorized, Confidential Contact Visits between Wendi Elizabeth Andriano and Her Experts. After due consideration of said stipulation, and the relevant pleadings on file,

IT IS ORDERED that the Stipulation to Modify Previously Authorized, Confidential Contact Visits between Wendi Elizabeth Andriano and Her Experts, incorporated into this order, is **GRANTED**.

{00022303.1 }

1      IT IS FURTHER ORDERED that the previous Order Allowing Contact Visits is

2 amended to add Keith Rohman as an approved visitor for the visits scheduled on August

3 23 and August 24.

4      IT IS FURTHER ORDERED that the Clerk of the Court forward a copy of this

5 Order to counsel of record for Petitioner, Scott Bennett; counsel of record for the State of

6 Arizona, Lacey Stover Gard; Karyn Klausner, ADOC General Counsel; Ms. Sita Jo-Ann

7 Sovin; and Deputy Warden Lacy L. Scott.

8      IT IS SO ORDERED this _19_ day of _____Aug____, 2011.

10      THE HONORABLE DOUGLAS RAYES

12 COPIES mailed on August 17, 2011 to:

13 Scott M. Bennett
Coppersmith Schermer & Brockelman PLC
14 2800 N. Central Ave, Suite 1200
15 Phoenix, AZ  85004
*Attorney for Petitioner*

17 Michael Brodsky
Assistant Attorney General
18 1275 West Washington
19 Phoenix, AZ  85007-2997
*Attorney for Arizona Department of Corrections*

20
Ms. Lacey Stover Gard
21 Office of the Attorney General
22 400 West Congress, Suite S-315
Tucson, Arizona  85701-1367
23 *Attorneys for the State of Arizona*

24 Deputy Warden Lacy L. Scott
25 Arizona State Prison – Perryville
P.O. Box 3000
26 Goodyear, AZ  85395

Karyn Klausner, ADOC General Counsel
1601 W. Jefferson
Phoenix, AZ 85007

Sita Jo-Ann Sovin
Alexis Boothby
Kristen Powers
Christopher Darren Butler
Capital Case Project – Diversified Legal Services
19528 Ventura Boulevard #520
Tarzana, CA   91356

---

# EXHIBIT UUUU

Michael K. Jeanes, Clerk of Court
*** Electronically Filed ***
08/23/2011 8:00 AM

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CR 2000-096032                                      08/22/2011


                                          CLERK OF THE COURT
JUDGE DOUGLAS L. RAYES                          T. Henninger
                                                  Deputy



STATE OF ARIZONA                          LACEY ALEXANDRA STOVER GARD

v.

WENDI ELIZABETH ANDRIANO (A)              JAMES J BELANGER
                                          SCOTT M BENNETT
                                          ALLEN A ARNTSEN
                                          STEPHAN J NICKELS
                                          MATTHEW R LYNCH

                                          CAPITAL CASE MANAGER
                                          COURT ADMIN-CRIMINAL-PCR
                                          VICTIM WITNESS DIV-AG-CCC


                          ORDER SIGNED


       The Court has reviewed and considered Defendant's Stipulation to Modify Previously
Authorized, Confidential Contact Visits between Wendi Elizabeth Andriano and Her Attorneys
and Experts.

       Good cause appearing,

       IT IS ORDERED granting Defendant's motion.

       IT IS FURTHER ORDERED that the previous Order allowing contact visits is amended to
add Keith Rohman as an approved visitor for the visits scheduled on August 23 and August
24, 2011, all in accordance with the formal written order signed by the Court on August 19,
2011.

       This case is eFiling eligible: http://www.clerkofcourt.maricopa.gov/efiling/default.asp.
Attorneys are encouraged to review Supreme Court Administrative Orders 2010-117 and 2011-
10 to determine their mandatory participation in eFiling through AZTurboCourt.

# EXHIBIT VVVV

Michael K. Jeanes, Clerk of Court
*** Electronically Filed ***
08/23/2011 8:00 AM

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CR 2000-096032                                    08/22/2011


                                          CLERK OF THE COURT
JUDGE DOUGLAS L. RAYES                        T. Henninger
                                               Deputy



STATE OF ARIZONA                        LACEY ALEXANDRA STOVER GARD

v.

WENDI ELIZABETH ANDRIANO (A)            JAMES J BELANGER
                                        SCOTT M BENNETT
                                        ALLEN A ARNTSEN
                                        STEPHAN J NICKELS
                                        MATTHEW R LYNCH

                                        CAPITAL CASE MANAGER
                                        COURT ADMIN-CRIMINAL-PCR
                                        VICTIM SERVICES DIV-CA-SE



                         MINUTE ENTRY


        The Court having received and considered Defendant's Unopposed Motion for Extension
of Time to File Petition for Post-Conviction Relief and good cause appearing,

        IT IS ORDERED granting Defendant's motion and extending the deadline for Ms.
Andriano's petition for post-conviction relief to November 14, 2011, all in accordance with the
formal written order signed by the Court on August 19, 2011.

        This case is eFiling eligible: http://www.clerkofcourt.maricopa.gov/efiling/default.asp.
Attorneys are encouraged to review Supreme Court Administrative Orders 2010-117 and 2011-
10 to determine their mandatory participation in eFiling through AZTurboCourt.

# EXHIBIT WWWW

Michael K. Jeanes, Clerk of Court
*** Electronically Filed ***
08/26/2011 8:00 AM

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CR 2000-096032                                    08/24/2011


                                        CLERK OF THE COURT
JUDGE DOUGLAS L. RAYES                        T. Henninger
                                                Deputy



STATE OF ARIZONA                        LACEY ALEXANDRA STOVER GARD

v.

WENDI ELIZABETH ANDRIANO (A)            JAMES J BELANGER
                                        SCOTT M BENNETT
                                        MATTHEW R LYNCH
                                        ALLEN A ARNTSEN

                                        CAPITAL CASE MANAGER
                                        COURT ADMIN-CIVIL-CCC
                                        COURT ADMIN-CRIMINAL-PCR
                                        VICTIM SERVICES DIV-CA-SE
                                        VICTIM WITNESS DIV-AG-CCC



                        MINUTE ENTRY



        9:44 a.m.

        Courtroom ECB 411

        State's Attorney:        Lacey Gard, telephonically
        Defendant's Attorney:    Scott Bennett, telephonically
                                 Matthew Lynch, telephnically
                                 Allen Arntsen, telephonically
        Defendant:               Not Present

        Court Reporter, Cindy Lineburg, is present.


Docket Code 083                 Form R000D                      Page 1

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CR 2000-096032                                            08/24/2011

A record of the proceeding is also made by audio and/or videotape.

The victims are also present telephonically.

The Court questions counsel as to the status of PCR petition.

IT IS ORDERED affirming the filing deadline of November 14, 2011.

IT IS FURTHER ORDERED setting telephonic Status Conference on October 26, 2011 at 9:30 a.m. before the Honorable Douglas Rayes.

This case is eFiling eligible: http://www.clerkofcourt.maricopa.gov/efiling/default.asp. Attorneys are encouraged to review Supreme Court Administrative Orders 2010-117 and 2011-10 to determine their mandatory participation in eFiling through AZTurboCourt.

9:52 a.m.  Matter concludes.

# EXHIBIT XXXX

1   Scott M. Bennett (022350)
    Coppersmith Schermer & Brockelman PLC
    2800 North Central Avenue, Suite 1200
2   Phoenix, Arizona 85004
    (602) 224-0999 (office)
    (602) 224-6020 (fax)
3   sbennett@csblaw.com

4   Allen A. Arntsen, Admitted *Pro Hac Vice*
    Stephan J. Nickels Admitted *Pro Hac Vice*
5   Matthew R. Lynch Admitted *Pro Hac Vice*
    Foley & Lardner LLP
    150 East Gilman Street
6   Madison, WI 53703
    (608) 257-5035 (office)
    (608) 258-4258 (fax)
7   aarntsen@foley.com

8   *Attorneys for Petitioner Wendi Elizabeth Andriano*

- MICHAEL K. JEANES, CLERK
RECEIVED F. C. LOBBY
DOCUMENT DEPOSITORY

11 SEP 28  PM 3: 35

FILED
BY S. KENNOW, DEP

9   **SUPERIOR COURT OF ARIZONA**
    **COUNTY OF MARICOPA**

10
11  STATE OF ARIZONA,                )   No. CR2000-096032-A
                                     )
12              Respondent,          )   **PETITIONER'S UNOPPOSED**
                                     )   **MOTION FOR EXTENSION OF**
13      vs.                          )   **TIME TO FILE PETITION FOR**
                                     )   **POST-CONVICTION RELIEF**
14  WENDI ELIZABETH ANDRIANO,        )
                                     )   (Assigned to the Hon. Douglas Rayes)
15              Petitioner.          )
                                     )
16                                   )
                                     )
17  _____ )

18      Pursuant to Rule 32.4(c)(1) of the Arizona Rules of Criminal Procedure, and the

19  Court's supervisory powers, Petitioner Wendi Andriano presents an unopposed motion for

20  a one month extension of time – from November 14, 2011 until December 14, 2011 – to

21
22  file her petition for post-conviction relief because of continuing health issues relating to

23  Larry Hammond, Ms. Andriano's primary expert on her claim for ineffective assistance of

24  counsel.

25
26

{00026807.1 }

## ONE MONTH EXTENSION OF TIME TO FILE

Ms. Andriano requests a one month extension of the current November 14, 2011 deadline, to December 14, 2011, to file her petition for post conviction relief. The basis for this motion is that attorney Larry Hammond, one of the experts retained by Ms. Andriano's post-conviction relief counsel ("PCR Counsel"), has continued to suffer serious health problems that have delayed his work on this case. (*See* Affidavit of Krista Sterken ("Sterken Aff.")).

On August 24, 2011, this Court granted Ms. Andriano's previous request for a one month extension of time to file her petition for post-conviction relief. Since this time, Mr. Hammond has experienced continuing health problems that have substantially limited his ability to spend time on this matter. (Sterken Aff. at ¶ 3.) He has advised PCR Counsel that his illness will continue to impose substantial limitations on his ability to work on this matter over the next few months and that he will therefore be unable to complete his declaration until mid-November. (Sterken Aff. at ¶¶ 4-5.)

## CONCLUSION

Given these circumstances beyond the control of Ms. Andriano and PCR Counsel, Ms. Andriano requests a 30-day extension to file her petition for post-conviction relief. As previously stated, the State does not oppose this extension.

1

2      RESPECTFULLY SUBMITTED September 28, 2011.

3                          COPPERSMITH SCHERMER &
                           BROCKELMAN PLC
4

5                          By _____
                                  Scott M. Bennett
6

7                          FOLEY & LARDNER LLP
                                  Allen A. Arntsen
8                                 Stephan J. Nickels
                                  Matthew R. Lynch
9

10                         *Attorneys for Petitioner*

11

12     ORIGINAL filed with the Clerk of the Court
       on September 28, 2011.
13
       COPY hand-delivered on September 28, 2011, to:
14

15     The Honorable Douglas Rayes
       East Court Building #411
16     101 W. Jefferson
       Phoenix, AZ 85003-2243
17

18     COPIES mailed on September 28, 2011, to:

19     Michael Brodsky
20     Assistant Attorney General
       1275 West Washington
21     Phoenix, AZ 85007-2997
       *Attorney for Arizona Department of Corrections*
22

23     Ms. Lacey Stover Gard
       Office of the Attorney General
24     400 West Congress, Suite S-315
       Tucson, Arizona 85701-1367
25     *Attorneys for the State of Arizona*
26

{00026807.1}                    3

1  Deputy Warden Lacy L. Scott
2  Arizona State Prison – Perryville
   P.O. Box 3000
3  Goodyear, AZ  85395

4  
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

1
2
3
4
5
6
7
8
9
10

SUPERIOR COURT OF ARIZONA
COUNTY OF MARICOPA

State of Arizona,

              Respondent,

v.

Wendi Elizabeth Andriano,

              Petitioner.

)
)
)
)
)
)
)
)
)
)
)
)

No. CR2000-096032-A

**AFFIDAVIT OF KRISTA STERKEN IN SUPPORT OF PETITIONER'S MOTION FOR EXTENSION**

(Assigned to Hon. Douglas Rayes)

11

I, Krista J. Sterken, declare under penalty of perjury as follows:

12
13
14

1.    I am an attorney representing Wendi Andriano in her petition for post-conviction relief before this Court.

15
16

2.    Larry Hammond is a court-appointed expert providing a declaration regarding the effectiveness of Ms. Andriano's trial counsel.

17
18
19

3.    Mr. Hammond has informed me that his illness has continued to substantially limit his ability to work on this and other matters over the past month.

20
21
22
23

4.    Mr. Hammond has also informed me the anticipated recovery schedule from his illness will continue to impose substantial limitations on his ability to perform necessary work on this matter over the next few months.

24
25

5.    As a result of his illness, Mr. Hammond has informed me that he will not be able to complete his declaration until mid-November.

26

2824672.1

1   I declare under penalty of perjury that the foregoing is true and correct.

2

3

4   Dated: September 26, 2011                        _Krista J. Sterken_

5                                                    Krista J. Sterken

6

7   Subscribed and sworn to me before this 26 day of September, 2011.

8

9   Notary Public HILARY WILLIAMS

10

11  Commission Expires Aug. 19, 2012

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

2

# EXHIBIT YYYY

MICHAEL K JEANES, Clerk

By
T. HENNINGER, Deputy

Scott M. Bennett (022350)
Coppersmith Schermer & Brockelman PLC
2800 North Central Avenue, Suite 1200
Phoenix, Arizona 85004
(602) 224-0999 (office)
(602) 224-6020 (fax)
sbennett@csblaw.com

Allen A. Arntsen, Admitted *Pro Hac Vice*
Stephan J. Nickels Admitted *Pro Hac Vice*
Matthew R. Lynch Admitted *Pro Hac Vice*
Foley & Lardner LLP
150 East Gilman Street
Madison, WI 53703
(608) 257-5035 (office)
(608) 258-4258 (fax)
aarntsen@foley.com

*Attorneys for Petitioner Wendi Elizabeth Andriano*

## SUPERIOR COURT OF ARIZONA
## COUNTY OF MARICOPA

STATE OF ARIZONA,

Respondent,

vs.

WENDI ELIZABETH ANDRIANO,

Petitioner.

No. CR2000-096032-A

**ORDER EXTENDING TIME TO FILE PETITION FOR POST-CONVICTION RELIEF**

(Assigned to the Hon. Douglas Rayes)

Based on the unopposed motion by Ms. Andriano, and for good cause, IT IS ORDERED extending the deadline for Ms. Andriano's petition for post-conviction relief to December 14, 2011.

DATED _Sep. 29, 2011_

_____
The Honorable Douglas Rayes

{00026808.1 }

1
2   COPIES mailed to:
3
    Scott M. Bennett
4   Coppersmith Schermer & Brockelman PLC
    2800 N. Central Avenue, Suite 1200
5   Phoenix, AZ 85004
6   *Attorneys for Petitioner*
7   Ms. Lacey Stover Gard
8   Office of the Attorney General
    400 West Congress, Suite S-315
9   Tucson, Arizona 85701-1367
10  *Attorneys for the State of Arizona*
11
12  _____
13
14
15
16
17
18
19
20
21
22
23
24
25
26

# EXHIBIT ZZZZ

Michael K. Jeanes, Clerk of Court
*** Electronically Filed ***
10/03/2011 8:00 AM

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CR 2000-096032                                          09/30/2011


                                                CLERK OF THE COURT
JUDGE DOUGLAS L. RAYES                              T. Henninger
                                                      Deputy



STATE OF ARIZONA                         LACEY ALEXANDRA STOVER GARD

v.

WENDI ELIZABETH ANDRIANO (A)             JAMES J BELANGER
                                         SCOTT M BENNETT
                                         ALLEN A ARNTSEN
                                         STEPHAN J NICKELS
                                         MATTHEW R LYNCH

                                         CAPITAL CASE MANAGER
                                         COURT ADMIN-CRIMINAL-PCR
                                         VICTIM SERVICES DIV-CA-SE



                         MINUTE ENTRY



       The Court having considered Petitioner's Unopposed Motion for Extension of Time to
File Petition for Post-Conviction Relief,

       IT IS ORDERED extending the deadline for filing the Defendant's petition for post-
conviction relief to December 14, 2011, all in accordance with the formal written order signed by
the Court on September 29, 2011.

       This case is eFiling eligible: http://www.clerkofcourt.maricopa.gov/efiling/default.asp.
Attorneys are encouraged to review Supreme Court Administrative Orders 2010-117 and 2011-
10 to determine their mandatory participation in eFiling through AZTurboCourt.



Docket Code 197                    Form R000A                           Page 1

# EXHIBIT AAAAA

Michael K. Jeanes, Clerk of Court
*** Electronically Filed ***
10/27/2011 8:00 AM

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CR 2000-096032                                    10/26/2011


                                        CLERK OF THE COURT
JUDGE DOUGLAS L. RAYES                        T. Henninger
                                                Deputy


STATE OF ARIZONA                    LACEY ALEXANDRA STOVER GARD

v.

WENDI ELIZABETH ANDRIANO (A)        JAMES J BELANGER
                                    SCOTT M BENNETT
                                    ALLEN A ARNTSEN
                                    MATTHEW R LYNCH

                                    CAPITAL CASE MANAGER
                                    COURT ADMIN-CRIMINAL-PCR
                                    VICTIM SERVICES DIV-CA-SE
                                    VICTIM WITNESS DIV-AG-CCC



                    MINUTE ENTRY



        9:41 a.m.

        Courtroom ECB 411

        State's Attorney:       Lacey Gard - Telephonically
        Defendant's Attorney:   Matthew Lynch - Telephonically
        Defendant:              Not Present

        Court Reporter, Cindy Lineburg, is present.

        A record of the proceeding is also made by audio and/or videotape.

        Victims, Jeanette and Joe Adriano are present telephonically.

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CR 2000-096032                                            10/26/2011

This is the time set for Status Conference on Defendant's Rule 32 petition.

Court and counsel discuss matters.

On Defendant's oral request for extension of time to file Rule 32 petition and there being no objection by the State,

THE COURT FINDS extraordinary circumstances exist and that it is in the interest of justice.

IT IS ORDERED extending the deadline for the filing of Defendant's Rule 32 petition to January 17, 2012.

IT IS FURTHER ORDERED setting a Telephonic Status Conference on December 5, 2012 at 9:00 before the Honorable Douglas Rayes.

This case is eFiling eligible: http://www.clerkofcourt.maricopa.gov/efiling/default.asp. Attorneys are encouraged to review Supreme Court Administrative Orders 2010-117 and 2011-10 to determine their mandatory participation in eFiling through AZTurboCourt.

9:47 a.m.  Matter concludes.

# EXHIBIT BBBBB

Michael K. Jeanes, Clerk of Court
*** Electronically Filed ***
Mary Martin
Filing ID 1083382
11/23/2011 3:04:37 PM

1  Scott M. Bennett (022350)
   Coppersmith Schermer & Brockelman PLC
2  2800 North Central Avenue, Suite 1200
   Phoenix, Arizona  85004
   (602) 224-0999 (office)
3  (602) 224-6020 (fax)
   sbennett@csblaw.com

4  Allen A. Arntsen, Admitted *Pro Hac Vice*
   Stephan J. Nickels Admitted *Pro Hac Vice*
   Matthew R. Lynch Admitted *Pro Hac Vice*
5  Foley & Lardner LLP
   150 East Gilman Street
6  Madison, WI 53703
   (608) 257-5035 (office)
   (608) 258-4258 (fax)
7  aarntsen@foley.com

8  *Attorneys for Petitioner Wendi Elizabeth Andriano*

9                  **SUPERIOR COURT OF ARIZONA**
                   **COUNTY OF MARICOPA**
10

11  STATE OF ARIZONA,            )     No. CR2000-096032-A
                                 )
12           Respondent,         )     **MOTION FOR EXTENSION OF**
                                 )     **POST-CONVICTION RELIEF**
13     vs.                       )     **PETITION PAGE LIMIT**
                                 )
14  WENDI ELIZABETH ANDRIANO,    )     (Assigned to the Hon. Douglas Rayes)
                                 )
15           Petitioner.         )
                                 )
16                               )
                                 )
17  _____)

18          Pursuant to Rule 32.5 of the Arizona Rules of Criminal Procedure, Rule 5.2(d) of

19  the Arizona Rules of Civil Procedure, and the Court's supervisory powers, Petitioner

20  Wendi Andriano moves for an extension of the page limit for her petition for post-

21  conviction relief.  The State has indicated that it opposes this Motion.

22

23          For the following reasons, this motion is appropriate and necessary to submit all

24  issues to the court as required under the American Bar Association Guidelines for the

25  Appointment and Performance of Defense Counsel in Death Penalty Cases (the "ABA

26

{00034201.1 }

Guidelines"), and to assist the Court in its review of the issues and the voluminous declarations and other evidence to be submitted in support of the petition.

## EXTENSION OF PAGE LIMIT

Rule 32.5 of the Arizona Rules of Criminal Procedure sets a 40-page limit on petitions for post-conviction relief.  As post-conviction relief  counsel ("PCR counsel") have moved forward from the investigation stage to their preparation for filing the petition, it has become clear that they cannot adequately perform their duty to present all arguable, meritorious grounds for post-conviction relief in the pages permitted by the rule.  PCR counsel therefore respectfully request permission in advance to file a petition of no more than 100 pages.

As the Court is aware, the investigation of Ms. Andriano's case has been an extensive undertaking.  Under the ABA Guidelines, PCR counsel "cannot rely on the previously compiled record but must conduct a thorough, independent investigation" of both "the facts underlying the conviction and sentence" and mitigating evidence, "not only to discover mitigation that was not presented previously, but also to identify mental-health claims which potentially reach beyond sentencing[.]"  (ABA Guideline 10.15.1 cmt.) Thus, the mitigation firm retained by PCR counsel has conducted more than 150 interviews of individuals involved in key stages of Ms. Andriano's life.  PCR counsel have retained the services of complementary mental health professionals who have evaluated, assessed, and tested Ms. Andriano.  The sheer volume of gathered documentation that will be offered in support of the petition is substantial.

Allowing PCR counsel to file a petition of no more than 100 pages in length will serve the Court in two ways.

First, ABA Guidelines require PCR counsel to "litigate all issues . . . that are arguably meritorious under the standards applicable to high quality capital defense representation." (ABA Guideline 10.15.1(C).) In addition, PCR counsel are required to "make every professionally appropriate effort to present issues in a manner that will preserve them for subsequent review." *Id.* While certain areas of the petition are expected to garner greater attention, PCR counsel have an affirmative duty to raise *everything* that can meritoriously be raised to ensure that it will be preserved for subsequent review. In addition, Rule 32.5 of the Arizona Rules of Criminal Procedure requires a defendant to raise every ground known to her. Doing so in a cursory superficial fashion—as PCR counsel have determined would be necessary to a large extent if they were limited to 40 pages—would not adequately protect the interests of Ms. Andriano. Presenting the issues in such an abbreviated manner would also be less efficient for the Court, which would lack the factual and legal detail necessary to fully understand and evaluate the issues.

Second, PCR counsel are in the best position to summarize and synthesize supporting materials for the Court. Additional pages will allow room for this synthesis and summary, which will simplify the Court's job of reviewing and understanding the supporting materials. Rather than limit reference to the supporting materials to nothing more than mere citations, additional pages will provide PCR counsel the ability to provide context and explain why the materials support the petition's arguments. Allowing for

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

lengthier discussion of supporting materials beyond mere citation will assist the Court in performing a more efficient review of all materials.

Finally, it goes without saying that the stakes in this proceeding are the highest imposed under criminal law.  Petitioner is not *pro se*. She is represented by PCR counsel who routinely represent paying business clients, who demand efficiency and economy in all written work on their behalf, including court filings.  PCR counsel can assure the Court that they will not treat this Court's permission to file a 100-page brief as a license to engage in unnecessary redundancy, irrelevant discussion of law or facts, or other inefficient use of the additional pages.  We simply want to provide Ms. Andriano with quality PCR representation and recognize that we cannot do so in 40 pages given the facts and legal issues in this case, as well as the high stakes.


RESPECTFULLY SUBMITTED November 23, 2011.

COPPERSMITH SCHERMER &
BROCKELMAN PLC

By   ___/s/Scott M. Bennett_____
        Scott M. Bennett

FOLEY & LARDNER LLP
        Allen A. Arntsen
        Stephan J. Nickels
        Matthew R. Lynch

*Attorneys for Petitioner*

ORIGINAL filed with the Clerk of the Court
on November 23, 2011.

COPY hand-delivered on November 23, 2011, to:

The Honorable Douglas Rayes
East Court Building #411
101 W. Jefferson
Phoenix, AZ  85003-2243

COPY mailed on November 23, 2011, to:

Ms. Lacey Stover Gard
Office of the Attorney General
400 West Congress, Suite S-315
Tucson, Arizona  85701-1367
*Attorneys for the State of Arizona*

/s/Michelle T. Gallegos

# EXHIBIT CCCCC

Michael K. Jeanes, Clerk of Court
*** Electronically Filed ***
Mary Martin
Filing ID 1083383
11/23/2011 3:07:21 PM

1

Scott M. Bennett (022350)
Coppersmith Schermer & Brockelman PLC

2

2800 North Central Avenue, Suite 1200
Phoenix, Arizona  85004

3

(602) 224-0999 (office)
(602) 224-6020 (fax)

4

sbennett@csblaw.com

5

Allen A. Arntsen, Admitted *Pro Hac Vice*

6

Stephan J. Nickels Admitted *Pro Hac Vice*
Matthew R. Lynch Admitted *Pro Hac Vice*

7

Foley & Lardner LLP
150 East Gilman Street

8

Madison, WI 53703
(608) 257-5035 (office)

9

(608) 258-4258 (fax)
aarntsen@foley.com

10

11

*Attorneys for Petitioner Wendi Elizabeth Andriano*

12

SUPERIOR COURT OF ARIZONA
COUNTY OF MARICOPA

13

14

STATE OF ARIZONA,                              )   No. CR2000-096032-A
                                               )

15

                          Respondent,          )   **PETITIONER'S MOTION TO**
                                               )   **ALLOW CONTACT VISIT**

16

        vs.                                    )
                                               )   (Assigned to the Hon. Douglas Rayes)

17

WENDI ELIZABETH ANDRIANO,                      )
                                               )

18

                          Petitioner.          )
                                               )

19

                                               )

20

                                               )
_____ )

21

22

        Petitioner Wendi Andriano respectfully requests that the Court order that she be

23

allowed a contact visit at the Perryville Correctional Facility on December 12, 2011 with

24

attorney Allen Arntsen, one of the attorneys representing Ms. Andriano in the above

25

captioned matter, and attorney Larry Hammond, a court-appointed expert providing an

26

opinion regarding the constitutional effectiveness of Ms. Andriano's trial counsel.

{00034142.1 }

1     Since July 2010, the Arizona Department of Corrections has agreed to and this

2 Court has granted 65 such contact visits between Ms. Wendi Andriano and various

3 attorneys, mitigation specialists, and mental health experts who are assisting her in

4 connection with her petition for post-conviction relief.  See July 19, 2010, September 14,

5 2010, November 1, 2010, December 2, 2010, January 26, 2011, March 24, 2011, June 15,

6 2011, and August 4, 2011 Orders granting contact visits, attached hereto as Exhibits 1-8.

7 Although Deputy Warden Lacy Scott approved the requested December 12 contact visit

8 with Attorneys Arntsen and Hammond, Assistant Attorney General Terry Harrison

9 subsequently denied approval for the requested contact visit.  See Deputy Warden Lacy

10 Scott's November 9, 2011 email, attached as Exhibit 9 and the email chain between

11 Attorney Krista Sterken and Attorney Harrison, attached as Exhibit 10.

12     The purpose of the requested December 12 contact visit is to allow Attorneys

13 Arntsen and Hammond to review multiple sensitive, voluminous mental health expert

14 reports with Ms. Andriano.  This review would be substantially impeded by a non-contact

15 visit, during which Ms. Andriano would be separated from Attorneys Arntsen and

16 Hammond by a glass barrier and would be unable to review the reports concurrently with

17 Attorneys Arntsen and Hammond and to communicate freely with them about the content

18 of these materials.  Notably, the attorneys, mitigation specialists, and medical experts

19 involved in Ms. Andriano's case have had regular, frequent contact visits with Ms.

20 Andriano over more than a year without incident.

21     For the above reasons, Petitioner Wendi Andriano respectfully requests that the

22 Court authorize a contact visit on December 12, 2011 with Attorneys Arntsen and

23 Hammond

24

25

26

RESPECTFULLY SUBMITTED November 23, 2011.

COPPERSMITH SCHERMER &
BROCKELMAN PLC

By ___/s/Scott M. Bennett_____
     Scott M. Bennett

FOLEY & LARDNER LLP
     Allen A. Arntsen
     Stephan J. Nickels
     Matthew R. Lynch

*Attorneys for Petitioner*

ORIGINAL filed with the Clerk of the Court
on November 23, 2011.

COPY hand-delivered on November 23, 2011 to:

The Honorable Douglas Rayes
East Court Building #411
101 W. Jefferson
Phoenix, AZ  85003-2243

COPIES mailed on November 23, 2011 to:

Michael Brodsky
Assistant Attorney General
1275 West Washington
Phoenix, AZ  85007-2997
*Attorney for Arizona Department of Corrections*

Ms. Lacey Stover Gard
Office of the Attorney General
400 West Congress, Suite S-315
Tucson, Arizona  85701-1367
*Attorneys for the State of Arizona*

1   Deputy Warden Lacy L. Scott
2   Arizona State Prison – Perryville
    P.O. Box 3000
3   Goodyear, AZ  85395

4

5   /s/Michelle T. Gallegos

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

# Exhibit 1

FILED
July 19, 2010  9:30am
MICHAEL K. JEANES, Clerk
By _____ H. O'Shaughnessy Deputy

CERTIFIED COPY

1   James J. Belanger (011393)
    Scott M. Bennett (022350)
2   Coppersmith Schermer & Brockelman PLC
    2800 North Central Avenue, Suite 1200
3   Phoenix, Arizona  85004
    (602) 224-0999 (office)
4   (602) 224-6020 (fax)
    sbennett@csblaw.com
5
6   Allen A. Arntsen, Admitted *Pro Hac Vice*
    Stephan J. Nickels, Admitted *Pro Hac Vice*
7   Matthew R. Lynch, Admitted *Pro Hac Vice*
    Foley & Lardner LLP
8   150 East Gilman Street
    Madison, WI  53703
9   (608) 257-5035 (office)
    (608) 258-4258 (fax)
10  aarntsen@foley.com

11  *Attorneys for Petitioner Wendi Andriano*

12
                    SUPERIOR COURT OF ARIZONA
13                     COUNTY OF MARICOPA

14

15  STATE OF ARIZONA,                )   No. CR2000-096032-A
                                     )
16              Respondent,          )   **ORDER ALLOWING CONTACT**
                                     )   **VISITS (Death Penalty Case)**
17      vs.                          )
                                     )   (Assigned to the Hon. Douglas Rayes)
18                                   )
    WENDI ELIZABETH ANDRIANO,        )
19                                   )
                                     )
20              Petitioner.          )
                                     )
21  ─────────────────────────────────)

22          Pending before the Court is Petitioner and Respondents' Stipulation for Order to

23  Allow Confidential Contact Visits, and a Request to have such an Order be certified,

24  between Petitioner Wendi Elizabeth Andriano and Sita Jo-Ann Sovin, a mitigation

25  specialist, and/or her associate Ms. Alexis Boothby, and between Petitioner and Dr. James

26

1   W. Hopper, a clinical psychologist (together the "experts").   After due consideration of

2   said stipulation, and the relevant pleadings on file,

3       IT IS ORDERED that the parties' Stipulation for Order to Allow Confidential

4   Contact Visits between Wendi Elizabeth Andriano and the experts is **GRANTED**.

5       IT IS FURTHER ORDERED that the experts be permitted to have confidential

6   contact visits with Wendi Elizabeth Andriano, ADC# 191593, under the following terms:

7       1)    Visitations may take place on the following dates at the time indicated: July
8             21, 2010 from 10:00 a.m. to 1:00 p.m. with Alexis Boothby and Sita Jo-Ann
          Sovin; August 4, 2010 from 10:00 a.m. to 1:00 p.m. with Alexis Boothby
9             and Sita Jo-Ann Sovin; August 17, 2010 from 9:00 a.m. to 12:00 p.m. with
          Alexis Boothby and Sita Jo-Ann Sovin; August 24, 2010 from 10:00 a.m. to
10            1:00 p.m. with Alexis Boothby and Sita Jo-Ann Sovin; August 31, 2010
11            from 10:30 a.m. to 2:30 p.m. with Sita Jo-Ann Sovin and Dr. James W.
          Hopper; and, September 1, 2010 from 9:30 a.m. to 2:30 p.m. with Sita Jo-
12            Ann Sovin and Dr. James W. Hopper.

13      2)    Petitioner's counsel or the experts shall make arrangements with Warden,
14            Arizona State Prison - Perryville, or her designee, to schedule such visits.

15      3)    The Warden, through her staff, may require the experts to subject all
16            instruments, equipment, manuals and the like to an inspection and inventory
17            prior to and subsequent to any meeting with Wendi Elizabeth Andriano.

18      4)    ADOC may require inmate Wendi Elizabeth Andriano to wear leg restraints
          or a stun belt during the meetings.

19
20      5)    Both Petitioner and Respondent recognize that Petitioner's decision not to
          contest ADOC's practice of using a stun belt on Petitioner, should it use one,
21            is due to the time constraints placed upon Petitioner's counsel and in no way
          constitutes a waiver of the "stun belt issue" in any future request for a
22            contact visit in this case or in any other case.   Respondents' willingness to
          stipulate hereto should not be considered a waiver of any aspect of ADOC's
23            non-contact visitation policy.

24
25      6)    The experts shall be allowed to have physical contact with Petitioner as is
          necessary during the course of the interviews.   Dr. Hopper shall be allowed
26            to conduct written psychological testing and evaluation of Petitioner.

2

7)    The interviews must be confidential. The meetings between Petitioner and the experts shall take place in a room that allows for privacy.

8)    Before being allowed the contact visit authorized herein, the visiting experts shall certify in a written release to ADOC that they have investigated and ascertained the risks to their personal safety associated with the visit as authorized by and under the circumstances described in this order; that they agree to assume those risks; and that they release and hold harmless ADOC, the State of Arizona, and their officers and employees from any claim arising from death or injury associated with the risks assumed. However, such release shall not operate as a release of gross negligence on the part of ADOC.

IT IS FURTHER ORDERED that the Clerk of the Court forward a copy of this Order to counsel of record for Petitioner, Scott Bennett; counsel of record for the State of Arizona, Lacey Stover Gard; Michael Brodsky, Office of the Attorney General; Karyn Klausner, ADOC General Counsel; Ms. Sita Jo-Ann Sovin; and Deputy Warden Lacy M. Scott.

IT IS SO ORDERED this 19th day of July, 2010.

_____
THE HONORABLE DOUGLAS RAYES

3

The foregoing instrument is a full, true and correct copy of
the original document.

Attest ____ July 20, 2010 ____

MICHAEL K. JEANES, Clerk of the Superior Court of the
State of Arizona, in and for the County of Maricopa

By ____ X. O'Shaughnessy ____ Deputy

# Exhibit 2

FILED
Sept 14, 2010 10:31am
MICHAEL K. JEANES, Clerk

By _____
H. O'Shaughnessy Deputy

CERTIFIED COPY

1    James J. Belanger (011393)
     Scott M. Bennett (022350)
2    Coppersmith Schermer & Brockelman PLC
     2800 North Central Avenue, Suite 1200
3    Phoenix, Arizona  85004
     (602) 224-0999 (office)
     (602) 224-6020 (fax)
     sbennett@csblaw.com

4    Allen A. Arntsen, Admitted *Pro Hac Vice*
     Stephan J. Nickels Admitted *Pro Hac Vice*
5    Matthew R. Lynch Admitted *Pro Hac Vice*
     Foley & Lardner LLP
     150 E. Gilman Street
6    Madison, WI 53703
     (608) 257-5035 (office)
     (608) 258-4258 (fax)
7    aarntsen@foley.com

     *Attorneys for Petitioner Wendi Andriano*

8
                 SUPERIOR COURT OF ARIZONA
9                   COUNTY OF MARICOPA

10

11   State of Arizona,                )    NO. CR2000-096032-A
                                       )
12               Respondent,           )    ORDER ALLOWING CONTACT
     v.                                )    VISITS (Death Penalty Case)
13                                     )
                                       )
14   Wendi Elizabeth Andriano,         )
                                       )
15               Petitioner.           )
     _____ )

16

17         Pending before the Court is the parties' Stipulation for Order to Allow Confidential

18   Contact Visits between Petitioner Wendi Elizabeth Andriano and Sita Jo-Ann Sovin, a

19   mitigation specialist, and/or her associates Ms. Alexis Boothby and Christopher Darren

20   Butler (together the "experts").    After due consideration of said stipulation, and the

     relevant pleadings on file,
21
           IT IS ORDERED that the Stipulation for Order to Allow Confidential Contact
22
     Visits between Wendi Elizabeth Andriano and the experts is **GRANTED**.
23
           IT IS FURTHER ORDERED that the experts be permitted to have confidential
24
     contact visits with Wendi Elizabeth Andriano, ADC# 191593, under the following terms:
25
           1)    Visitations may take place on the following dates at the time indicated:
26               September 15, 2010 from 10:00 a.m. to 2:00 p.m. with Kristen Powers and

2408102.1

Alexis Boothby; September 29, 2010 from 10:30 a.m. to 2:30 p.m. with Sita Jo-Ann Sovin and Christopher Darren Butler; October 13, 2010 from 10:30 a.m. to 2:30 p.m. with Sita Jo-Ann Sovin, Kristen Power and Christopher Darren Butler; and, October 27, 2010 from 10:30 a.m. to 2:30 p.m. with Sita Jo-Ann Sovin and Christopher Darren Butler.

2)   Petitioner's counsel or the experts shall make arrangements with Warden, Arizona State Prison - Perryville, or her designee, to schedule such visits.

3)   The Warden, through her staff, may require the experts to subject all instruments, equipment, manuals and the like to an inspection and inventory prior to and subsequent to any meeting with Wendi Elizabeth Andriano.

4)   ADOC may require inmate Wendi Elizabeth Andriano to wear leg restraints or a stun belt during the meetings.

5)   Both Petitioner and Respondent recognize that Petitioner's decision not to contest ADOC's practice of using a stun belt on Petitioner, should it use one, is due to the time constraints placed upon Petitioner's counsel and in no way constitutes a waiver of the "stun belt issue" in any future request for a contact visit in this case or in any other case. Respondents' willingness to stipulate hereto should not be considered a waiver of any aspect of ADOC's non-contact visitation policy.

6)   The experts shall be allowed to have physical contact with Petitioner as is necessary during the course of the interviews.

7)   The interviews must be confidential. The meetings between Petitioner and the experts shall take place in a room that allows for privacy.

8)   Before being allowed the contact visit authorized herein, the visiting experts shall certify in a written release to ADOC that they have investigated and ascertained the risks to their personal safety associated with the visit as authorized by and under the circumstances described in this order; that they agree to assume those risks; and that they release and hold harmless ADOC, the State of Arizona, and their officers and employees from any claim arising from death or injury associated with the risks assumed. However, such release shall not operate as a release of gross negligence on the part of ADOC.

1       IT IS FURTHER ORDERED that the Clerk of the Court forward a copy of this

2    Order to counsel of record for Petitioner, Scott Bennett; counsel of record for the State of

3    Arizona, Lacey Stover Gard; Karyn Klausner, ADOC General Counsel; Ms. Sita Jo-Ann

4    Sovin; Deputy Warden Lacy M. Scott; and Michael Brodsky, who is appearing solely for

5    the purpose of representing the ADOC and is not a counsel of record.

6

7       IT IS SO ORDERED this ___ day of September, 2010.

8

9

10          THE HONORABLE DOUGLAS RAYES

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

3

The foregoing instrument is a full, true and correct copy of
the original document.

Attest _____ Sept 14, 2010 _____

MICHAEL K. JEANES, Clerk of the Superior Court of the
State of Arizona, in and for the County of Maricopa.

By _____ Deputy

# Exhibit 3

FILED
Nov 1, 2010  1:46pm
MICHAEL K. JEANES, Clerk
By ___ XL O'Rxaughneuy
H. O'Shaughnessy Deputy

CERTIFIED COPY

1  James J. Belanger (011393)
   Scott M. Bennett (022350)
2  Coppersmith Schermer & Brockelman PLC
   2800 North Central Avenue, Suite 1200
3  Phoenix, Arizona  85004
   (602) 224-0999 (office)
4  (602) 224-6020 (fax)
   sbennett@csblaw.com
5
   Allen A. Arntsen, Admitted *Pro Hac Vice*
6  Stephan J. Nickels Admitted *Pro Hac Vice*
   Matthew R. Lynch Admitted *Pro Hac Vice*
7  Foley & Lardner LLP
   150 E. Gilman Street
8  Madison, WI 53703
   (608) 257-5035 (office)
9  (608) 258-4258 (fax)
   aarntsen@foley.com
10
   *Attorneys for Petitioner Wendi Andriano*
11

12              SUPERIOR COURT OF ARIZONA
                  COUNTY OF MARICOPA
13

14  State of Arizona,                )   No. CR2000-096032-A
                                     )
15              Respondent,          )   **ORDER ALLOWING CONTACT**
                                     )   **VISITS (Death Penalty Case)**
16  v.                               )
                                     )
17  Wendi Elizabeth Andriano,        )   (Assigned to Hon. Douglas Rayes)
                                     )
18              Petitioner.          )
                                     )
19  _____ )

20

21         Based on a stipulation by the parties, and for good cause, IT IS ORDERED

22  authorizing confidential contact visits between Petitioner Wendi Andriano and her experts,

23  as follows:

24      1.    Visitations may take place on the following dates at the time indicated:

25      A.    November 2, 2010         10:30 a.m. to 2:30 p.m.
              Authorized visitors: Sita Jo-Ann Sovin and Dr. Jim Hopper
26

B.   November 3, 2010          10:30 a.m. to 2:30 p.m.
     Authorized visitors: Sita Jo-Ann Sovin and Dr. Jim Hopper

C.   November 9, 2010          10:30 a.m. to 2:30 p.m.
     Authorized visitors: Sita Jo-Ann Sovin, Alexis Boothby, Kristen
     Powers and Christopher Darren Butler

D.   November 10, 2010          10:30 a.m. to 2:30 p.m.
     Authorized visitors: Sita Jo-Ann Sovin, Alexis Boothby, Kristen
     Powers and Christopher Darren Butler

E.   November 23, 2010          10:30 a.m. to 2:30 p.m.
     Authorized visitors: Sita Jo-Ann Sovin, Alexis Boothby, Kristen
     Powers, Christopher Darren Butler and Dr. George Woods

F.   November 24, 2010          10:30 a.m. to 2:30 p.m.
     Authorized visitors: Sita Jo-Ann Sovin, Alexis Boothby, Kristen
     Powers and Christopher Darren Butler

G.   December 7, 2010          10:30 a.m. to 2:30 p.m.
     Authorized visitors: Kristen Powers  Alexis Boothby, and Dr. George
     Woods

H.   December 8, 2010          10:30 a.m. to 2:30 p.m.
     Authorized visitors: Kristen Powers, Alexis Boothby, and Dr. George
     Woods

I.   December 21, 2010          10:30 a.m. to 2:30 p.m.
     Authorized visitors: Sita Jo-Ann Sovin, Alexis Boothby, Kristen
     Powers and Christopher Darren Butler

J.   December 22, 2010          10:30 a.m. to 2:30 p.m.
     Authorized visitors: Sita Jo-Ann Sovin, Alexis Boothby, Kristen
     Powers and Christopher Darren Butler

2.   Petitioner's counsel or the experts shall make arrangements with Warden,
Arizona State Prison - Perryville, or her designee, to schedule such visits.

3.   The Warden, through her staff, may require the experts to subject all
instruments, equipment, manuals and the like to an inspection and inventory
prior to and subsequent to any meeting with Wendi Elizabeth Andriano.

2

4.   ADOC may require inmate Wendi Elizabeth Andriano to wear leg restraints or a stun belt during the meetings.

5.   Both Petitioner and Respondent recognize that Petitioner's decision not to contest ADOC's practice of using a stun belt on Petitioner, should it use one, is due to the time constraints placed upon Petitioner's counsel and in no way constitutes a waiver of the "stun belt issue" in any future request for a contact visit in this case or in any other case. Respondents' willingness to stipulate hereto should not be considered a waiver of any aspect of ADOC's non-contact visitation policy.

6.   The experts shall be allowed to have physical contact with Petitioner as is necessary during the course of the interviews.

7.   The interviews must be confidential. The meetings between Petitioner and the experts shall take place in a room that allows for privacy.

8.   Before being allowed the contact visit authorized herein, the visiting experts shall certify in a written release to ADOC that they have investigated and ascertained the risks to their personal safety associated with the visit as authorized by and under the circumstances described in this order; that they agree to assume those risks; and that they release and hold harmless ADOC, the State of Arizona, and their officers and employees from any claim arising from death or injury associated with the risks assumed. However, such release shall not operate as a release of gross negligence on the part of ADOC.

IT IS FURTHER ORDERED that the Clerk of the Court forward a copy of this Order to counsel of record for Petitioner, Scott Bennett; counsel of record for the State of Arizona, Lacey Stover Gard; Karyn Klausner, ADOC General Counsel; Ms. Sita Jo-Ann

1   Sovin; Deputy Warden Lacy M. Scott; and Michael Brodsky, who is appearing solely for

2   the purpose of representing the ADOC and is not a counsel of record.

3

4        IT IS SO ORDERED this ____1____ day of November, 2010.

5

6                    _____

7                  THE HONORABLE DOUGLAS RAYES

8

9

10  Copies of the foregoing provided this

11  ____ day of _____, to:

12  Lacey Stover Gard
    Assistant Attorney General

13  1275 West Washington

14  Phoenix, AZ  85007

15  Michael Brodsky
    Office of the Attorney General

16  Arizona Department of Corrections

17  1275 West Washington
    Phoenix, AZ  85007

18

19  Deputy Warden Lacy L. Scott
    Arizona State Prison – Perryville

20  P.O. Box 3000
    Goodyear, AZ  85395

21

22  Scott Bennett
    Attorney for Petitioner

23  Coppersmith Schermer & Brockelman PLC

24  2800 North Central Ave, Suite 1200
    Phoenix, AZ  85004

25

26

1  Karyn Klausner
   ADOC General Counsel
2  1601 W. Jefferson
3  Phoenix, AZ 85007

4  Sita Jo-Ann Sovin
5  Alexis Boothby
   Kristen Powers
6  Christopher Darren Butler
   Capital Case Project – Diversified Legal Services
7  19528 Ventura Boulevard #520
8  Tarzana, CA   91356

9

10 ────────────────────────────

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

The foregoing instrument is a full, true
and correct copy of the original document.
Attest _NOV 1_____ 20 _10_

MICHAEL K. JEANES, Clerk of the
Superior Court of the State of Arizona, in
and for the County of Maricopa.

By_____Deputy

# Exhibit 4

FILED
Dec 6, 2010 8:47am
MICHAEL K. JEANES, Clerk
By_____ H. O'Shaughnessy
H. O'Shaughnessy Deputy

1   James J. Belanger (011393)
    Scott M. Bennett (022350)
2   Coppersmith Schermer & Brockelman PLC
    2800 North Central Avenue, Suite 1200
3   Phoenix, Arizona 85004
    (602) 224-0999 (office)
4   (602) 224-6020 (fax)
    sbennett@csblaw.com
5
    Allen A. Arntsen, Admitted *Pro Hac Vice*
6   Stephan J. Nickels Admitted *Pro Hac Vice*
    Matthew R. Lynch Admitted *Pro Hac Vice*
7   Foley & Lardner LLP
    150 East Gilman Street
8   Madison, WI 53703
    (608) 257-5035 (office)
9   (608) 258-4258 (fax)
    aarntsen@foley.com
10
11  *Attorneys for Petitioner Wendi Andriano*

12          SUPERIOR COURT OF ARIZONA
13              COUNTY OF MARICOPA

14  State of Arizona,                    )   No. CR2000-096032-A
                                         )
15              Respondent,              )   **ORDER ALLOWING CONTACT**
                                         )   **VISITS (Death Penalty Case)**
16  v.                                   )
                                         )   (Assigned to Hon. Douglas Rayes)
17  Wendi Elizabeth Andriano,            )
                                         )
18              Petitioner.              )
                                         )
19  _____     )
20
21          Pending before the Court is the parties' Stipulation for an Order to Allow
22  Confidential Contact Visits between Petitioner and Ms. Sita Jo-Ann Sovin, a mitigation
23  specialist and/or her associates, Ms. Alexis Boothby, Ms. Kristen Powers and
24  Mr. Christopher Darren Butler, as well as between Petitioner and Dr. James W. Hopper, a
25  clinical psychologist, Dr. George Woods, a clinical psychiatrist, and Dr. Myla Young, a
26

neuropsychologist.  After due consideration of said stipulation, and the relevant pleadings on file,

IT IS ORDERED that the Stipulation for Order to Allow Confidential Contact Visits between Wendi Elizabeth Andriano and the experts is **GRANTED**.

IT IS FURTHER ORDERED that the experts be permitted to have confidential contact visits with Wendi Elizabeth Andriano, ADC# 191593, under the following terms:

1.  Visitations may take place on the following dates at the time indicated:

   A.  January 4, 2011             10:30 a.m. to 2:30 p.m.
       Dr. Myla Young, Dr. George Woods, Dr. Jim Hopper, Sita Jo-Ann Sovin, Kristen Powers, Alexis Boothby, and Christopher Butler

   B.  January 5, 2011             10:30 a.m. to 2:30 p.m.
       Dr. Myla Young, Dr. George Woods, Dr. Jim Hopper, Sita Jo-Ann Sovin, Kristen Powers, Alexis Boothby, and Christopher Butler

   C.  January 18, 2011            10:30 a.m. to 2:30 p.m.
       Dr. Myla Young, Dr. George Woods, Dr. Jim Hopper, Sita Jo-Ann Sovin, Kristen Powers, Alexis Boothby, and Christopher Butler

   D.  January 19, 2011            10:30 a.m. to 2:30 p.m.
       Dr. Myla Young, Dr. George Woods, Dr. Jim Hopper, Sita Jo-Ann Sovin, Kristen Powers, Alexis Boothby, and Christopher Butler

   E.  February 1, 2011            10:30 a.m. to 2:30 p.m.
       Dr. Myla Young, Dr. George Woods, Dr. Jim Hopper, Sita Jo-Ann Sovin, Kristen Powers, Alexis Boothby, and Christopher Butler

   F.  February 2, 2011            10:30 a.m. to 2:30 p.m.
       Dr. Myla Young, Dr. George Woods, Dr. Jim Hopper, Sita Jo-Ann Sovin, Kristen Powers, Alexis Boothby, and Christopher Butler

   G.  February 15, 2011           10:30 a.m. to 2:30 p.m.
       Dr. Myla Young, Dr. George Woods, Dr. Jim Hopper, Sita Jo-Ann Sovin, Kristen Powers, Alexis Boothby, and Christopher Butler

   H.  February 16, 2011           10:30 a.m. to 2:30 p.m.
       Dr. Myla Young, Dr. George Woods, Dr. Jim Hopper, Sita Jo-Ann Sovin, Kristen Powers, Alexis Boothby, and Christopher Butler

2.     Petitioner's counsel or the experts shall make arrangements with Warden, Arizona State Prison - Perryville, or her designee, to schedule such visits.

3.     The Warden, through her staff, may require the experts to subject all instruments, equipment, manuals and the like to an inspection and inventory prior to and subsequent to any meeting with Wendi Elizabeth Andriano.

4.     ADOC may require inmate Wendi Elizabeth Andriano to wear leg restraints or a stun belt during the meetings.

5.     Both Petitioner and Respondent recognize that Petitioner's decision not to contest ADOC's practice of using a stun belt on Petitioner, should it use one, is due to the time constraints placed upon Petitioner's counsel and in no way constitutes a waiver of the "stun belt issue" in any future request for a contact visit in this case or in any other case.  Respondents' willingness to stipulate hereto should not be considered a waiver of any aspect of ADOC's non-contact visitation policy.

6.     The experts shall be allowed to have physical contact with Petitioner as is necessary during the course of the interviews.

7.     The interviews must be confidential. The meetings between Petitioner and the experts shall take place in a room that allows for privacy.

8.     Before being allowed the contact visit authorized herein, the visiting experts shall certify in a written release to ADOC that they have investigated and ascertained the risks to their personal safety associated with the visit as authorized by and under the circumstances described in this order; that they agree to assume those risks; and that they release and hold harmless ADOC, the State of Arizona, and their officers and employees from any claim arising from death or injury associated with the risks assumed. However, such

3

1    release shall not operate as a release of gross negligence on the part of

2    ADOC.

3        IT IS FURTHER ORDERED that the Clerk of the Court forward a copy of this

4    Order to counsel of record for Petitioner, Scott Bennett; counsel of record for the State of

5    Arizona, Lacey Stover Gard; Karyn Klausner, ADOC General Counsel; Ms. Sita Jo-Ann

6    Sovin; Deputy Warden Lacy L. Scott; and Michael Brodsky, who is appearing solely for

7    the purpose of representing the ADOC and is not a counsel of record.

8

9        IT IS SO ORDERED this _2ND_ day of _December_, 2010.

10

11

12        THE HONORABLE DOUGLAS RAYES

13

14    Copies of the foregoing mailed

15    this ___ day of _____ to:

16    Lacey Stover Gard
      Office of the Attorney General
17    400 West Congress, Suite S-315
18    Tucson, AZ  85701-1367

19    Michael Brodsky
      Office of the Attorney General
20    Arizona Department of Corrections
21    1275 West Washington
      Phoenix, AZ  85007
22

23    Deputy Warden Lacy L. Scott
      Arizona State Prison – Perryville
24    P.O. Box 3000
      Goodyear, AZ  85395
25

26

4

1   Scott Bennett
    Coppersmith Schermer & Brockelman PLC
2   2800 North Central Avenue, Suite 1200
3   Phoenix, AZ  85004
    Attorney for Petitioner
4
5   Karyn Klausner, ADOC General Counsel
    1601 W. Jefferson
6   Phoenix, AZ 85007

7   Sita Jo-Ann Sovin
8   Alexis Boothby
    Kristen Powers
9   Christopher Darren Butler
    Capital Case Project – Diversified Legal Services
10  19528 Ventura Boulevard #520
11  Tarzana, CA   91356
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

5

The foregoing instrument is a full, true
and correct copy of the original document.
Attest _DEC___6_____20_10_
MICHAEL K. JEANES, Clerk of the
Superior Court of the State of Arizona, in
and for the County of Maricopa.
By_____Deputy

# Exhibit 5

FILED
Jan 26, 2011 4:19 pm
MICHAEL K. JEANES, Clerk
By _XL O'Shaughnessy_
H. O'Shaughnessy Deputy

CERTIFIED COPY

1   James J. Belanger (011393)
    Scott M. Bennett (022350)
2   Coppersmith Schermer & Brockelman PLC
    2800 North Central Avenue, Suite 1200
3   Phoenix, Arizona 85004
    (602) 224-0999 (office)
4   (602) 224-6020 (fax)
    sbennett@csblaw.com
5

6   Allen A. Arntsen, Admitted *Pro Hac Vice*
    Stephan J. Nickels Admitted *Pro Hac Vice*
7   Matthew R. Lynch Admitted *Pro Hac Vice*
    Foley & Lardner LLP
8   150 E. Gilman Street
    Madison, WI 53703
9   (608) 257-5035 (office)
    (608) 258-4258 (fax)
10  aarntsen@foley.com

11  *Attorneys for Petitioner Wendi Andriano*

12              **SUPERIOR COURT OF ARIZONA**
13                 **COUNTY OF MARICOPA**

14

15  State of Arizona,                 )   NO. CR2000-096032-A
                                      )
16              Respondent,           )   **ORDER ALLOWING CONTACT**
                                      )   **VISITS (Death Penalty Case)**
17  v.                                )
                                      )
18  Wendi Elizabeth Andriano,         )
                                      )
19              Petitioner.           )

20

21      Based on a stipulation by the parties, and for good cause,

        IT IS ORDERED that the Stipulation for Order to Allow Confidential Contact
22
    Visits between Wendi Elizabeth Andriano, and Her Experts and Attorneys (filed on
23
    January 24, 2011) is **GRANTED**.

24      IT IS FURTHER ORDERED that the Arizona Department of Corrections shall

25  allow confidential contact visits with Wendi Elizabeth Andriano, ADC# 191593, under the

26  following terms:

2526779.1

1.   Visitations may take place on the following dates at the time indicated:

A.   February 28, 2011          10:30 a.m. to 2:30 p.m.
Dr. Myla Young, Dr. George Woods, Dr. Jim Hopper, Sita Jo-Ann Sovin,
Kristen Powers, Alexis Boothby, Christopher Butler, Allen Arntsen,
Matthew Lynch, Krista Sterken

B.   March 1, 2011          10:30 a.m. to 2:30 p.m.
Dr. Myla Young, Dr. George Woods, Dr. Jim Hopper, Sita Jo-Ann Sovin,
Kristen Powers, Alexis Boothby, Christopher Butler, Allen Arntsen,
Matthew Lynch, Krista Sterken

C.   March 2, 2011          10:30 a.m. to 2:30 p.m.
Dr. Myla Young, Dr. George Woods, Dr. Jim Hopper, Sita Jo-Ann Sovin,
Kristen Powers, Alexis Boothby, Christopher Butler, Allen Arntsen,
Matthew Lynch, Krista Sterken

D.   March 15, 2011          10:30 a.m. to 2:30 p.m.
Dr. Myla Young, Dr. George Woods, Dr. Jim Hopper, Sita Jo-Ann Sovin,
Kristen Powers, Alexis Boothby, Christopher Butler, Allen Arntsen,
Matthew Lynch, Krista Sterken

E.   March 16, 2011          10:30 a.m. to 2:30 p.m.
Dr. Myla Young, Dr. George Woods, Dr. Jim Hopper, Sita Jo-Ann Sovin,
Kristen Powers, Alexis Boothby, Christopher Butler, Allen Arntsen,
Matthew Lynch, Krista Sterken

F.   March 29, 2011          10:30 a.m. to 2:30 p.m.
Dr. Myla Young, Dr. George Woods, Dr. Jim Hopper, Sita Jo-Ann Sovin,
Kristen Powers, Alexis Boothby, Christopher Butler, Allen Arntsen,
Matthew Lynch, Krista Sterken

G.   March 30, 2011          10:30 a.m. to 2:30 p.m.
Dr. Myla Young, Dr. George Woods, Dr. Jim Hopper, Sita Jo-Ann Sovin,
Kristen Powers, Alexis Boothby, Christopher Butler, Allen Arntsen,
Matthew Lynch, Krista Sterken

H.   April 12, 2011          10:30 a.m. to 2:30 p.m.
Dr. Myla Young, Dr. George Woods, Dr. Jim Hopper, Sita Jo-Ann Sovin,
Kristen Powers, Alexis Boothby, Christopher Butler, Allen Arntsen,
Matthew Lynch, Krista Sterken

I.   April 13, 2011          10:30 a.m. to 2:30 p.m.
Dr. Myla Young, Dr. George Woods, Dr. Jim Hopper, Sita Jo-Ann Sovin,

V...\_2526779.1

1           Kristen Powers, Alexis Boothby, Christopher Butler, Allen Arntsen,
        Matthew Lynch, Krista Sterken

2

3       J.    <u>April 26, 2011</u>       <u>10:30 a.m. to 2:30 p.m.</u>
        Dr. Myla Young, Dr. George Woods, Dr. Jim Hopper, Sita Jo-Ann Sovin,

4           Kristen Powers, Alexis Boothby, Christopher Butler, Allen Arntsen,
        Matthew Lynch, Krista Sterken

5

6       K.   <u>April 27, 2011</u>       <u>10:30 a.m. to 2:30 p.m.</u>
        Dr. Myla Young, Dr. George Woods, Dr. Jim Hopper, Sita Jo-Ann Sovin,

7           Kristen Powers, Alexis Boothby, Christopher Butler, Allen Arntsen,
        Matthew Lynch, Krista Sterken

8     2.    Petitioner's counsel or the experts shall make arrangements with Warden,

9

10         Arizona State Prison - Perryville, or her designee, to schedule such visits.

11    3.    The Warden, through her staff, may require the experts to subject all

12         instruments, equipment, manuals and the like to an inspection and inventory

13         prior to and subsequent to any meeting with Wendi Elizabeth Andriano.

14    4.    ADOC may require inmate Wendi Elizabeth Andriano to wear leg restraints

15

16         or a stun belt during the meetings.

17    5.    Both Petitioner and Respondent recognize that Petitioner's decision not to

18         contest ADOC's practice of using a stun belt on Petitioner, should it use one,

19         is due to the time constraints placed upon Petitioner's counsel and in no way

20

21         constitutes a waiver of the "stun belt issue" in any future request for a contact

22         visit in this case or in any other case.  Respondents' willingness to stipulate

23         hereto should not be considered a waiver of any aspect of ADOC's

24

25         non-contact visitation policy.

26

6.   The experts shall be allowed to have physical contact with Petitioner as is necessary during the course of the interviews.

7.   The interviews must be confidential. The meetings between Petitioner and the experts shall take place in a room that allows for privacy.

8.   Before being allowed the contact visit authorized herein, the visiting experts shall certify in a written release to ADOC that they have investigated and ascertained the risks to their personal safety associated with the visit as authorized by and under the circumstances described in this order; that they agree to assume those risks; and that they release and hold harmless ADOC, the State of Arizona, and their officers and employees from any claim arising from death or injury associated with the risks assumed. However, such release shall not operate as a release of gross negligence on the part of ADOC.

IT IS FURTHER ORDERED that the Clerk of the Court forward a copy of this Order to counsel of record for Petitioner, Scott Bennett; counsel of record for the State of Arizona, Lacey Stover Gard; Karyn Klausner, ADOC General Counsel; Ms. Sita Jo-Ann Sovin; Deputy Warden Lacy L. Scott; and Michael Brodsky, who is appearing solely for the purpose of representing the ADOC and is not a counsel of record.

IT IS SO ORDERED this 25TH day of January, 2011.

THE HONORABLE DOUGLAS RAYES

4

VP_IDOL_2526779.1

1

2   Copies of the foregoing provided

3   this ___ day of _____to:

4   Lacey Stover Gard

5   Assistant Attorney General
    1275 West Washington

6   Phoenix, AZ  85007

7   Michael Brodsky

8   Office of the Attorney General
    Arizona Department of Corrections

9   1275 West Washington

10  Phoenix, Arizona  85007

11  Deputy Warden Lacy L. Scott
    Arizona State Prison – Perryville

12  P.O. Box 3000

13  Goodyear, AZ  85395

14  Scott Bennett

15  Attorney for Petitioner
    Coppersmith Schermer & Brockelman PLC

16  2800 N. Central Ave, Suite 1200
    Phoenix, AZ  85004

17

18  Karyn Klausner, ADOC General Counsel
    1601 W. Jefferson

19  Phoenix, AZ 85007

20  Sita Jo-Ann Sovin

21  Alexis Boothby
    Kristen Powers

22  Christopher Darren Butler
    Capital Case Project – Diversified Legal Services

23  19528 Ventura Boulevard #520

24  Tarzana, CA   91356

25

26

The foregoing instrument is a full, true
and correct copy of the original document.
Attest _____ Jan 26 _____ 20 11

MICHAEL K. JEANES, Clerk of the
Superior Court of the State of Arizona, in
and for the County of Maricopa.

By _____ Deputy

FILED 4:20 pm
Jan 26, 2011
MICHAEL K. JEANES, Clerk
By H. O'Shaughnessy Deputy

*CERTIFIED COPY*

1  James J. Belanger (011393)
   Scott M. Bennett (022350)
2  Coppersmith Schermer & Brockelman PLC
   2800 North Central Avenue, Suite 1200
3  Phoenix, Arizona 85004
   (602) 224-0999 (office)
4  (602) 224-6020 (fax)
   sbennett@csblaw.com
5
6  Allen A. Arntsen, Admitted *Pro Hac Vice*
   Stephan J. Nickels Admitted *Pro Hac Vice*
7  Matthew R. Lynch Admitted *Pro Hac Vice*
   Foley & Lardner LLP
8  150 E. Gilman Street
   Madison, WI 53703
9  (608) 257-5035 (office)
   (608) 258-4258 (fax)
10 aarntsen@foley.com

11 *Attorneys for Petitioner Wendi Andriano*

12                   **SUPERIOR COURT OF ARIZONA**
13                       **COUNTY OF MARICOPA**

14 State of Arizona,                  )  No. CR2000-096032-A
                                      )
15              Respondent,           )  **ORDER ALLOWING CONTACT**
16 v.                                 )  **VISITS (Death Penalty Case)**
                                      )
17 Wendi Elizabeth Andriano,          )
                                      )
18              Petitioner.           )
19

20        Based on a stipulation by the parties, and for good cause,

21        IT IS ORDERED that the Stipulation to Modify Previously Authorized,

22 Confidential Contact Visits Between Wendi Elizabeth Andriano and Her Experts is

23 **GRANTED**.

24        IT IS FURTHER ORDERED directing the Arizona Department of Corrections to

25 allow confidential contact visits with Wendi Elizabeth Andriano, ADC# 191593, under the

26 following terms:

2473516.2

1.   Visitations may take place on the following dates, at the time indicated, and

with the individuals indicated:

    A.   <u>January 4, 2011</u>            10:30 a.m. to 2:30 p.m.
Dr. Myla Young, Dr. George Woods, Dr. Jim Hopper, Sita Jo-Ann Sovin, Kristen Powers, Alexis Boothby, and Christopher Butler

    B.   <u>January 5, 2011</u>            10:30 a.m. to 2:30 p.m.
Dr. Myla Young, Dr. George Woods, Dr. Jim Hopper, Sita Jo-Ann Sovin, Kristen Powers, Alexis Boothby, and Christopher Butler

    C.   <u>January 18, 2011</u>          10:30 a.m. to 2:30 p.m.
Dr. Myla Young, Dr. George Woods, Dr. Jim Hopper, Sita Jo-Ann Sovin, Kristen Powers, Alexis Boothby, and Christopher Butler

    D.   <u>January 19, 2011</u>          10:30 a.m. to 2:30 p.m.
Dr. Myla Young, Dr. George Woods, Dr. Jim Hopper, Sita Jo-Ann Sovin, Kristen Powers, Alexis Boothby, and Christopher Butler

    E.   <u>February 1, 2011</u>          10:30 a.m. to 2:30 p.m.
Dr. Myla Young, Dr. George Woods, Dr. Jim Hopper, Sita Jo-Ann Sovin, Kristen Powers, Alexis Boothby, Christopher Butler, Allen Arntsen, Matthew Lynch, and Krista Sterken

    F.   <u>February 2, 2011</u>          10:30 a.m. to 2:30 p.m.
Dr. Myla Young, Dr. George Woods, Dr. Jim Hopper, Sita Jo-Ann Sovin, Kristen Powers, Alexis Boothby, Christopher Butler, Allen Arntsen, Matthew Lynch, and Krista Sterken

    G.   <u>February 15, 2011</u>          8:30 a.m. to 2:30 p.m.
Dr. Myla Young, Dr. George Woods, Dr. Jim Hopper, Sita Jo-Ann Sovin, Kristen Powers, Alexis Boothby, and Christopher Butler

    H.   <u>February 16, 2011</u>          8:30 a.m. to 2:30 p.m.
Dr. Myla Young, Dr. George Woods, Dr. Jim Hopper, Sita Jo-Ann Sovin, Kristen Powers, Alexis Boothby, and Christopher Butler

2.   Petitioner's counsel or the experts shall make arrangements with Warden,

Arizona State Prison - Perryville, or her designee, to schedule such visits.

Vi_..\_2473516.2

3.    The Warden, through her staff, may require the experts to subject all instruments, equipment, manuals and the like to an inspection and inventory prior to, and subsequent to, any meeting with Wendi Elizabeth Andriano.

4.    ADOC may require inmate Wendi Elizabeth Andriano to wear leg restraints or a stun belt during the meetings.

5.    Both Petitioner and Respondent recognize that Petitioner's decision not to contest ADOC's practice of using a stun belt on Petitioner, should it use one, is due to the time constraints placed upon Petitioner's counsel and in no way constitutes a waiver of the "stun belt issue" in any future request for a contact visit in this case or in any other case. Respondent's willingness to stipulate hereto should not be considered a waiver of any aspect of ADOC's non-contact visitation policy.

6.    The experts shall be allowed to have physical contact with Petitioner as is necessary during the course of the interviews.

7.    The interviews must be confidential. The meetings between Petitioner and the experts shall take place in a room that allows for privacy.

8.    Before being allowed the contact visit authorized herein, the visiting experts shall certify in a written release to ADOC that they have investigated and ascertained the risks to their personal safety associated with the visit as authorized by and under the circumstances described in this order; that they agree to assume those risks; and that they release and hold harmless ADOC, the State of Arizona, and their officers and employees from any claim arising from death or injury associated with the risks assumed. However, such release shall not operate as a release of gross negligence on the part of ADOC.

3

1        IT IS FURTHER ORDERED that the Clerk of the Court forward a copy of this

2   Order to counsel of record for Petitioner, Scott Bennett; counsel of record for the State of

3   Arizona, Lacey Stover Gard; Karyn Klausner, ADOC General Counsel; Ms. Sita Jo-Ann

4   Sovin; Deputy Warden Lacy L. Scott; and Michael Brodsky, who is appearing solely for

5   the purpose of representing the ADOC and is not a counsel of record.

6        IT IS SO ORDERED this __25__ day of January, 2011.

7

8                            THE HONORABLE DOUGLAS RAYES

9   COPIES of the foregoing provided

10  this ____ day of January, 2011, to:

11  Lacey Stover Gard

12  Assistant Attorney General
    1275 West Washington

13  Phoenix, AZ  85007

14
    Michael Brodsky

15  Office of the Attorney General
    Arizona Department of Corrections

16  1275 West Washington

17  Phoenix, AZ  85007

18  Deputy Warden Lacy L. Scott
    Arizona State Prison – Perryville

19  P.O. Box 3000

20  Goodyear, AZ  85395

21  Scott Bennett

22  Coppersmith Schermer & Brockelman PLC
    2800 N. Central Ave, Suite 1200

23  Phoenix, AZ  85004
    Attorney for Petitioner

24

25  Karyn Klausner, ADOC General Counsel
    1601 W. Jefferson

26  Phoenix, AZ  85007

V...._2473516.2

4

1

2   Sita Jo-Ann Sovin
    Alexis Boothby
3   Kristen Powers
    Christopher Darren Butler
4   Capital Case Project – Diversified Legal Services
    19528 Ventura Boulevard #520
5   Tarzana, CA   91356

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

5

The foregoing instrument is a full, true and correct copy of the original document.

Date _____ Jan 26 _____ 20 __11__

MICHAEL K. JEANES, Clerk of the Superior Court of the State of Arizona, in and for the County of Maricopa.

By _____ Deputy

# **Exhibit 6**

Michael K. Jeanes, Clerk of Court
*** Electronically Filed ***
03/28/2011 8:00 AM

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CR 2000-096032                                      03/24/2011

                                          CLERK OF THE COURT
JUDGE DOUGLAS L. RAYES                       H. O'Shaughnessy
                                                 Deputy


STATE OF ARIZONA                          LACEY ALEXANDRA STOVER GARD

v.

WENDI ELIZABETH ANDRIANO (A)              JAMES J BELANGER
                                          SCOTT M BENNETT
                                          ALLEN A ARNTSEN
                                          STEPHAN J NICKELS
                                          MATTHEW R LYNCH

                                          CAPITAL CASE MANAGER
                                          COURT ADMIN-CRIMINAL-PCR
                                          VICTIM SERVICES DIV-CA-SE
                                          VICTIM WITNESS DIV-AG-CCC


MINUTE ENTRY

The Court has received Stipulation to Allow Confidential Contact Visits between Wendy Elizabeth Andriano and her Experts and Attorney's and Stipulation to Modify Previously Authorized Confidential Contact Visits Between Wendi Elizabeth Andriano and Her Experts.

Good cause appearing, the Court signs both Orders on March 23, 2011.

FILED: Orders.

ISSUED: Certified Copies to all parties.

This case is eFiling eligible: http://www.clerkofcourt.maricopa.gov/efiling/default.asp. Attorneys are encouraged to review Supreme Court Administrative Orders 2010-117 and 2011-10 to determine their mandatory participation in eFiling through AZTurboCourt.

Docket Code 022                    Form R000A                         Page 1

# Exhibit 7

FILED
_Jene 15, 2011  2:36 pm_
MICHAEL K. JEANES, Clerk

By_____
H. O'Shaughnessy Deputy

_CERTIFIED COPY_

1   Scott M. Bennett (022350)
    Coppersmith Schermer & Brockelman PLC
2   2800 North Central Avenue, Suite 1200
    Phoenix, Arizona  85004
3   (602) 224-0999 (office)
    (602) 224-6020 (fax)
4   sbennett@csblaw.com

5   Allen A. Arntsen, Admitted _Pro Hac Vice_
6   Stephan J. Nickels Admitted _Pro Hac Vice_
    Matthew R. Lynch Admitted _Pro Hac Vice_
7   Foley & Lardner LLP
    150 East Gilman Street
8   Madison, WI 53703
    (608) 257-5035 (office)
9   (608) 258-4258 (fax)
    aarntsen@foley.com
10

11  _Attorneys for Petitioner Wendi Elizabeth Andriano_

12              SUPERIOR COURT OF ARIZONA
                   COUNTY OF MARICOPA
13

14  STATE OF ARIZONA,                )   No. CR2000-096032-A
                                     )
15              Respondent,          )   **ORDER ALLOWING**
                                     )   **CONFIDENTIAL CONTACT VISITS**
16      vs.                          )   **(Death Penalty Case)**
                                     )
17  WENDI ELIZABETH ANDRIANO,        )   (Assigned to the Hon. Douglas Rayes)
                                     )
18              Petitioner.          )
                                     )
19                                   )
                                     )
20                                   )
                                     )
21  _____)

22      Pending before the Court is the parties' Stipulation for an Order to Allow

23  Confidential Contact Visits between Petitioner and various experts and attorneys.

24  After due consideration of said stipulation, and the relevant pleadings on file,

        IT IS ORDERED that the Stipulation for Order to Allow Confidential Contact
25
    Visits between Wendi Elizabeth Andriano and Her Experts and Attorneys is **GRANTED**.
26


{00014446.1 }

1    IT IS FURTHER ORDERED that the experts and attorneys be permitted to have

2   confidential contact visits with Wendi Elizabeth Andriano, ADC# 191593, under the

3   following terms:

4        1.      Visitations may take place on the following dates at the time indicated, and

5

6   with the listed experts and attorneys:

7           A.    July 12, 2011        10:30 a.m. to 2:30 p.m.
                  Dr. Myla Young, Dr. George Woods, Dr. Jim Hopper, Sita Jo-Ann Sovin,
8                 Kristen Powers, Alexis Boothby, Christopher Butler, Allen Arntsen,
                  Matthew Lynch, Scott Bennett, Krista Sterken, Jodi Newman
9

10          B.    July 13, 2011        10:30 a.m. to 2:30 p.m.
                  Dr. Myla Young, Dr. George Woods, Dr. Jim Hopper, Sita Jo-Ann Sovin,
11                Kristen Powers, Alexis Boothby, Christopher Butler, Allen Arntsen,
                  Matthew Lynch, Scott Bennett, Krista Sterken, Jodi Newman
12

13          C.    July 26, 2011        10:30 a.m. to 2:30 p.m.
                  Dr. Myla Young, Dr. George Woods, Dr. Jim Hopper, Sita Jo-Ann Sovin,
14                Kristen Powers, Alexis Boothby, Christopher Butler, Allen Arntsen,
                  Matthew Lynch, Scott Bennett, Krista Sterken, Jodi Newman
15
            D.    July 27, 2011        10:30 a.m. to 2:30 p.m.
16                Dr. Myla Young, Dr. George Woods, Dr. Jim Hopper, Sita Jo-Ann Sovin,
                  Kristen Powers, Alexis Boothby, Christopher Butler, Allen Arntsen,
17                Matthew Lynch, Scott Bennett, Krista Sterken, Jodi Newman

18          E.    August 9, 2011            10:30 a.m. to 2:30 p.m.
                  Dr. Myla Young, Dr. George Woods, Dr. Jim Hopper, Sita Jo-Ann Sovin,
19                Kristen Powers, Alexis Boothby, Christopher Butler, Allen Arntsen,
                  Matthew Lynch, Scott Bennett, Krista Sterken, Jodi Newman
20

21          F.    August 10, 2011           10:30 a.m. to 2:30 p.m.
                  Dr. Myla Young, Dr. George Woods, Dr. Jim Hopper, Sita Jo-Ann Sovin,
22                Kristen Powers, Alexis Boothby, Christopher Butler, Allen Arntsen,
                  Matthew Lynch, Scott Bennett, Krista Sterken, Jodi Newman
23

24          G.    August 16, 2011           10:30 a.m. to 2:30 p.m.
                  Dr. Myla Young, Dr. George Woods, Dr. Jim Hopper, Sita Jo-Ann Sovin,
25                Kristen Powers, Alexis Boothby, Christopher Butler, Allen Arntsen,
                  Matthew Lynch, Scott Bennett, Krista Sterken, Jodi Newman
26

{00014446.1}

H.   August 17, 2011                    10:30 a.m. to 2:30 p.m.
     Dr. Myla Young, Dr. George Woods, Dr. Jim Hopper, Sita Jo-Ann Sovin,
     Kristen Powers, Alexis Boothby, Christopher Butler, Allen Arntsen,
     Matthew Lynch, Scott Bennett, Krista Sterken, Jodi Newman

I.   August 30, 2011                    10:30 a.m. to 2:30 p.m.
     Dr. Myla Young, Dr. George Woods, Dr. Jim Hopper, Sita Jo-Ann Sovin,
     Kristen Powers, Alexis Boothby, Christopher Butler, Allen Arntsen,
     Matthew Lynch, Scott Bennett, Krista Sterken, Jodi Newman

J.   August 31, 2011                    10:30 a.m. to 2:30 p.m.
     Dr. Myla Young, Dr. George Woods, Dr. Jim Hopper, Sita Jo-Ann Sovin,
     Kristen Powers, Alexis Boothby, Christopher Butler, Allen Arntsen,
     Matthew Lynch, Scott Bennett, Krista Sterken, Jodi Newman

2.   Petitioner's counsel or the experts shall make arrangements with Warden,
     Arizona State Prison - Perryville, or her designee, to schedule such visits.

3.   The Warden, through her staff, may require the experts to subject all
     instruments, equipment, manuals and the like to an inspection and inventory
     prior to and subsequent to any meeting with Wendi Elizabeth Andriano.

4.   ADOC may require inmate Wendi Elizabeth Andriano to wear leg restraints
     or a stun belt during the meetings.

5.   Both Petitioner and Respondent recognize that Petitioner's decision not to
     contest ADOC's practice of using a stun belt on Petitioner, should it use one,
     is due to the time constraints placed upon Petitioner's counsel and in no way
     constitutes a waiver of the "stun belt issue" in any future request for a
     contact visit in this case or in any other case.  Respondents' willingness to
     stipulate hereto should not be considered a waiver of any aspect of ADOC's
     non-contact visitation policy.

6.   The experts shall be allowed to have physical contact with Petitioner as is
     necessary during the course of the interviews.

7.   The interviews must be confidential. The meetings between Petitioner and
     the experts shall take place in a room that allows for privacy.

{00014446.1 }

3

8.    Before being allowed the contact visit authorized herein, the visiting experts shall certify in a written release to ADOC that they have investigated and ascertained the risks to their personal safety associated with the visit as authorized by and under the circumstances described in this order; that they agree to assume those risks; and that they release and hold harmless ADOC, the State of Arizona, and their officers and employees from any claim arising from death or injury associated with the risks assumed. However, such release shall not operate as a release of gross negligence on the part of ADOC.

IT IS FURTHER ORDERED that the Clerk of the Court forward a copy of this Order to counsel of record for Petitioner, Scott Bennett; counsel of record for the State of Arizona, Lacey Stover Gard; Karyn Klausner, ADOC General Counsel; Ms. Sita Jo-Ann Sovin; Deputy Warden Lacy L. Scott; and Michael Brodsky, who is appearing solely for the purpose of representing the ADOC and is not a counsel of record

IT IS SO ORDERED this 14 day of June, 2011.

THE HONORABLE DOUGLAS RAYES

The foregoing instrument is a full, true and correct copy of the original document.
Attest June 15, 20 11
MICHAEL K. JEANES, Clerk of the Superior Court of the State of Arizona, in and for the County of Maricopa.
By _____ Deputy

{00014446.1 }

4

# Exhibit 8

8-4-11 FILED 3:07 pm
MICHAEL K. JEANES, Clerk
By _K. Schermerhorn_
K. Schermerhorn, Deputy

1   Scott M. Bennett (022350)
    Coppersmith Schermer & Brockelman PLC
2   2800 North Central Avenue, Suite 1200
    Phoenix, Arizona  85004
3   (602) 224-0999 (office)
    (602) 224-6020 (fax)
4   sbennett@csblaw.com

5   Allen A. Arntsen, Admitted *Pro Hac Vice*
6   Stephan J. Nickels Admitted *Pro Hac Vice*
    Matthew R. Lynch Admitted *Pro Hac Vice*
7   Foley & Lardner LLP
    150 East Gilman Street
8   Madison, WI 53703
    (608) 257-5035 (office)
9   (608) 258-4258 (fax)
    aarntsen@foley.com
10

CERTIFIED COPY

11  *Attorneys for Petitioner Wendi Elizabeth Andriano*

12              SUPERIOR COURT OF ARIZONA
                  COUNTY OF MARICOPA
13

14  STATE OF ARIZONA,              )    No. CR2000-096032-A
                                    )
15              Respondent,         )    **ORDER ALLOWING CONTACT**
                                    )    **VISITS (Death Penalty Case)**
16      vs.                         )
                                    )    (Assigned to the Hon. Douglas Rayes)
17  WENDI ELIZABETH ANDRIANO,       )
                                    )
18              Petitioner.         )
                                    )
19                                  )
                                    )
20                                  )
                                    )
21  _____ )

22      Pending before the Court is the parties' Stipulation for an Order to Allow

23  Confidential Contact Visits between Petitioner and several of her experts and attorneys.

24  After due consideration of said stipulation, and the relevant pleadings on file,

25      IT IS ORDERED that the Stipulation for Order to Allow Confidential Contact

26  Visits between Wendi Elizabeth Andriano and her experts and attorneys is **GRANTED**.

{00020794.1 }

IT IS FURTHER ORDERED that the experts and attorneys be permitted to have confidential contact visits with Wendi Elizabeth Andriano, ADC# 191593, under the following terms:

1.    Visitations may take place on the following dates at the time indicated, and with the visitors indicated:

    A.    September 13, 2011        10:30 a.m. to 2:30 p.m.
Dr. Myla Young, Dr. George Woods, Dr. Jim Hopper, Sita Jo-Ann Sovin, Kristen Powers, Alexis Boothby, Christopher Butler, Allen Arntsen, Matthew Lynch, Scott Bennett, Krista Sterken, Jodi Newman

    B.    September 14, 2011        10:30 a.m. to 2:30 p.m.
Dr. Myla Young, Dr. George Woods, Dr. Jim Hopper, Sita Jo-Ann Sovin, Kristen Powers, Alexis Boothby, Christopher Butler, Allen Arntsen, Matthew Lynch, Scott Bennett, Krista Sterken, Jodi Newman

    C.    September 27, 2011        10:30 a.m. to 2:30 p.m.
Dr. Myla Young, Dr. George Woods, Dr. Jim Hopper, Sita Jo-Ann Sovin, Kristen Powers, Alexis Boothby, Christopher Butler, Allen Arntsen, Matthew Lynch, Scott Bennett, Krista Sterken, Jodi Newman

    D.    September 28, 2011        10:30 a.m. to 2:30 p.m.
Dr. Myla Young, Dr. George Woods, Dr. Jim Hopper, Sita Jo-Ann Sovin, Kristen Powers, Alexis Boothby, Christopher Butler, Allen Arntsen, Matthew Lynch, Scott Bennett, Krista Sterken, Jodi Newman

    E.    October 11, 2011        10:30 a.m. to 2:30 p.m.
Dr. Myla Young, Dr. George Woods, Dr. Jim Hopper, Sita Jo-Ann Sovin, Kristen Powers, Alexis Boothby, Christopher Butler, Allen Arntsen, Matthew Lynch, Scott Bennett, Krista Sterken, Jodi Newman

    F.    October 12, 2011        10:30 a.m. to 2:30 p.m.
Dr. Myla Young, Dr. George Woods, Dr. Jim Hopper, Sita Jo-Ann Sovin, Kristen Powers, Alexis Boothby, Christopher Butler, Allen Arntsen, Matthew Lynch, Scott Bennett, Krista Sterken, Jodi Newman

    G.    October 25, 2011        10:30 a.m. to 2:30 p.m.
Dr. Myla Young, Dr. George Woods, Dr. Jim Hopper, Sita Jo-Ann Sovin, Kristen Powers, Alexis Boothby, Christopher Butler, Allen Arntsen, Matthew Lynch, Scott Bennett, Krista Sterken, Jodi Newman

    H.    October 26, 2011        10:30 a.m. to 2:30 p.m.
Dr. Myla Young, Dr. George Woods, Dr. Jim Hopper, Sita Jo-Ann Sovin,

Kristen Powers, Alexis Boothby, Christopher Butler, Allen Arntsen, Matthew Lynch, Scott Bennett, Krista Sterken, Jodi Newman

2.  Petitioner's counsel or the experts shall make arrangements with Warden, Arizona State Prison - Perryville, or her designee, to schedule such visits.

3.  The Warden, through her staff, may require the experts to subject all instruments, equipment, manuals and the like to an inspection and inventory prior to and subsequent to any meeting with Wendi Elizabeth Andriano.

4.  ADOC may require inmate Wendi Elizabeth Andriano to wear leg restraints or a stun belt during the meetings.

5.  Both Petitioner and Respondent recognize that Petitioner's decision not to contest ADOC's practice of using a stun belt on Petitioner, should it use one, is due to the time constraints placed upon Petitioner's counsel and in no way constitutes a waiver of the "stun belt issue" in any future request for a contact visit in this case or in any other case.  Respondents' willingness to stipulate hereto should not be considered a waiver of any aspect of ADOC's non-contact visitation policy.

6.  The experts shall be allowed to have physical contact with Petitioner as is necessary during the course of the interviews.

7.  The interviews must be confidential. The meetings between Petitioner and the experts shall take place in a room that allows for privacy.

8.  Before being allowed the contact visit authorized herein, the visiting experts shall certify in a written release to ADOC that they have investigated and ascertained the risks to their personal safety associated with the visit as authorized by and under the circumstances described in this order; that they agree to assume those risks; and that they release and hold harmless ADOC, the State of Arizona, and their officers and employees from any claim arising from death or injury associated with the risks assumed. However, such

{00020794 1 }

3

1    release shall not operate as a release of gross negligence on the part of

2    ADOC.

3    IT IS FURTHER ORDERED that the Clerk of the Court forward a copy of this

4    Order to counsel of record for Petitioner, Scott Bennett; counsel of record for the State of

5    Arizona, Lacey Stover Gard; Karyn Klausner, ADOC General Counsel; Ms. Sita Jo-Ann

6    Sovin; Deputy Warden Lacy L. Scott; and Michael Brodsky, who is appearing solely for

7    the purpose of representing the ADOC and is not a counsel of record.

8

9    IT IS SO ORDERED this 4th day of August, 2011.

10

11   THE HONORABLE DOUGLAS RAYES

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

The foregoing instrument is a full, true and correct copy of the original document.

Attest _____ 8-4 _____ 20 11

MICHAEL K. JEANES, Clerk of the Superior Court of the State of Arizona, in and for the County of Maricopa.

By _____ Deputy

{00020794 1 }                    4

FILED 8-4-11 3:11pm
MICHAEL K. JEANES, Clerk
By _K. Schormerhorn_
K. Schormerhorn, Deputy

CERTIFIED COPY

1   Scott M. Bennett (022350)
    Coppersmith Schermer & Brockelman PLC
2   2800 North Central Avenue, Suite 1200
    Phoenix, Arizona  85004
3   (602) 224-0999 (office)
    (602) 224-6020 (fax)
4   sbennett@csblaw.com

5   Allen A. Arntsen, Admitted *Pro Hac Vice*
6   Stephan J. Nickels Admitted *Pro Hac Vice*
    Matthew R. Lynch Admitted *Pro Hac Vice*
7   Foley & Lardner LLP
    150 East Gilman Street
8   Madison, WI 53703
    (608) 257-5035 (office)
9   (608) 258-4258 (fax)
    aarntsen@foley.com
10

11  *Attorneys for Petitioner Wendi Elizabeth Andriano*

12              SUPERIOR COURT OF ARIZONA
                 COUNTY OF MARICOPA
13

14  STATE OF ARIZONA,              )    No. CR2000-096032-A
                                   )
15              Respondent,        )    **ORDER AMENDING CONTACT**
                                   )    **VISITS (Death Penalty Case)**
16       vs.                       )
                                   )    (Assigned to the Hon. Douglas Rayes)
17  WENDI ELIZABETH ANDRIANO,      )
                                   )
18              Petitioner.        )
                                   )
19                                 )
                                   )
20                                 )
                                   )
21  _____)

22       Pending before the Court is the parties' Stipulation to Modify Previously

23  Authorized, Confidential Contact Visits between Wendi Elizabeth Andriano and Her

24  Experts.  After due consideration of said stipulation, and the relevant pleadings on file,

25

26

{00020791.1}

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

IT IS ORDERED that the Stipulation to Modify Previously Authorized, Confidential Contact Visits between Wendi Elizabeth Andriano and Her Experts, incorporated into this order, is **GRANTED**.

IT IS FURTHER ORDERED that the previous Order Allowing Contact Visits is amended to change the date of the August 30 and 31 visits to August 23 and 24 visits.

IT IS FURTHER ORDERED that the Clerk of the Court forward a copy of this Order to counsel of record for Petitioner, Scott Bennett; counsel of record for the State of Arizona, Lacey Stover Gard; Karyn Klausner, ADOC General Counsel; Ms. Sita Jo-Ann Sovin; and Deputy Warden Lacy L. Scott.

IT IS SO ORDERED this 4ᵗʰ day of *August*, 2011.

_____

THE HONORABLE DOUGLAS RAYES

{00020791 1 }

2

The foregoing instrument is a full, true and correct copy of the original document.

Attest_____ 8-4 _____ 20 11

MICHAEL K. JEANES, Clerk of the Superior Court of the State of Arizona, in and for the County of Maricopa.

By_____ Deputy

# Exhibit 9

**Sterken, Krista J.**

| | |
|---|---|
| **From:** | SCOTT, LACY [LSCOTT@azcorrections.gov] |
| **Sent:** | Wednesday, November 09, 2011 9:15 AM |
| **To:** | Sterken, Krista J. |
| **Subject:** | RE: Andriano Contact Visit - December |

Approved, your all set

**From:** Sterken, Krista J. [mailto:KSterken@foley.com]
**Sent:** Tuesday, November 08, 2011 7:51 AM
**To:** SCOTT, LACY
**Subject:** Andriano Contact Visit - December

Deputy Warden Scott,

Attached is a stipulation and order, requesting a contact visit with Wendi Andriano on December 12, 2011.  Do you approve?

Thank you,
~ Krista Sterken

Krista J. Sterken
Foley & Lardner LLP - Madison
150 East Gilman Street
Post Office Box 1497
Madison, Wisconsin 53701
Telephone: (608) 258-4227
Facsimile: (608) 258-4258
Email: ksterken@foley.com

The preceding email message may be confidential or protected by the attorney-client privilege. It is not intended for transmission to, or receipt by, any unauthorized persons. If you have received this message in error, please (i) do not read it, (ii) reply to the sender that you received the message in error, and (iii) erase or destroy the message. Legal advice contained in the preceding message is solely for the benefit of the Foley & Lardner LLP client(s) represented by the Firm in the particular matter that is the subject of this message, and may not be relied upon by any other party.

Internal Revenue Service regulations require that certain types of written advice include a disclaimer. To the extent the preceding message contains advice relating to a Federal tax issue, unless expressly stated otherwise the advice is not intended or written to be used, and it cannot be used by the recipient or any other taxpayer, for the purpose of avoiding Federal tax penalties, and was not written to support the promotion or marketing of any transaction or matter discussed herein.

11/22/2011

# Exhibit 10

## Sterken, Krista J.

| | |
|---|---|
| **From:** | Harrison, Terry [Terry.Harrison@azag.gov] |
| **Sent:** | Monday, November 21, 2011 3:14 PM |
| **To:** | Sterken, Krista J.; Reaves, Alan |
| **Cc:** | KLAUSNER, KARYN |
| **Subject:** | RE: Andriano Contact Visit - December |

Krista,

The visits you refer to in your email were represented to us, ADC, and the court to be visits by experts, including Dr. Mayla Young, Dr. George Woods, and Dr. Jim Hooper on March 1st and on June 7th, which may also be attended by you and other counsel for Andriano.   Neither the stipulation or order authorize you or other counsel to have a contact visit with Andriano; you and other counsel are authorized to be present for a contact visit between Andriano and the named experts.  I think this is clear from the stip and order.  I will find out whether ADC will investigate the visits described in your email below.

ADC will not enter the stipulation you recently presented for a contact visit between only Andriano and counsel.

Terry Harrison

**From:** Sterken, Krista J. [mailto:KSterken@foley.com]
**Sent:** Thursday, November 17, 2011 4:30 PM
**To:** Harrison, Terry; Reaves, Alan
**Cc:** KLAUSNER, KARYN
**Subject:** RE: Andriano Contact Visit - December

Terry,

The two most recent visits in which we had contact visits with Wendi attended only by attorneys were June 7, 2011 and March 1, 2011.

~ Krista

Krista J. Sterken
Foley & Lardner LLP - Madison
150 East Gilman Street
Post Office Box 1497
Madison, Wisconsin 53701
Telephone: (608) 258-4227
Facsimile: (608) 258-4258
Email: ksterken@foley.com

**From:** Harrison, Terry [mailto:Terry.Harrison@azag.gov]
**Sent:** Thursday, November 17, 2011 3:22 PM
**To:** Sterken, Krista J.; Reaves, Alan
**Cc:** KLAUSNER, KARYN
**Subject:** RE: Andriano Contact Visit - December

Krista,

Please do provide me with a list of these multiple dates where counsel had contact visits with the inmate without the presence of an expert witness.

Terry

---

**From:** Sterken, Krista J. [mailto:KSterken@foley.com]
**Sent:** Thursday, November 17, 2011 2:12 PM
**To:** Harrison, Terry; Reaves, Alan
**Cc:** KLAUSNER, KARYN
**Subject:** RE: Andriano Contact Visit - December

Terry,

We have actually had multiple contact visits with Wendi over the past year in which only attorneys were present.  I would be happy to locate the specific dates on which these visits occurred, if that information would be helpful.

~ Krista

Krista J. Sterken
Foley & Lardner LLP - Madison
150 East Gilman Street
Post Office Box 1497
Madison, Wisconsin 53701
Telephone: (608) 258-4227
Facsimile: (608) 258-4258
Email: ksterken@foley.com

---

**From:** Harrison, Terry [mailto:Terry.Harrison@azag.gov]
**Sent:** Thursday, November 17, 2011 11:40 AM
**To:** Sterken, Krista J.; Reaves, Alan
**Cc:** 'KLAUSNER, KARYN'
**Subject:** RE: Andriano Contact Visit - December

Krista,

We intend to discuss your request with ADC.  I read your email and it's my understanding the "contact visits" you reference as having taken place for the past year were actually visits with expert witnesses.  The attorneys may have tagged along but the purpose of the visits was to provide the experts the opportunity to fully evaluate your client and the representation was made that the expert required a contact visit.

As I understand the latest request, it is for a legal visit.  All confidential attorney visits for inmates on non-contact visitation are conducted in Lumly Unit and are non-contact.  You may provide copies of documents to your client before any meeting so that she may review them before the meeting and have them with her during the meeting.

We'll contact you after we speak to ADC.

11/22/2011

Terry

**From:** Sterken, Krista J. [mailto:KSterken@foley.com]
**Sent:** Wednesday, November 16, 2011 3:15 PM
**To:** Reaves, Alan
**Cc:** Harrison, Terry
**Subject:** RE: Andriano Contact Visit - December

Alan,

We have been scheduling contact visits between Wendi and her attorneys for the past year because there is no facility for legal visits for women inmates on death row.  During the visit on December 12, Wendi and her attorneys will be reviewing multiple documents together, which is not feasible to do through a glass barrier.

Please let us know if you will not approve this visit, as we will need to file a motion with the court seeking to be granted a contact visit for December 12.

~ Krista

Krista J. Sterken
Foley & Lardner LLP - Madison
150 East Gilman Street
Post Office Box 1497
Madison, Wisconsin 53701
Telephone: (608) 258-4227
Facsimile: (608) 258-4258
Email: ksterken@foley.com

---

**From:** Reaves, Alan [mailto:Alan.Reaves@azag.gov]
**Sent:** Wednesday, November 16, 2011 10:57 AM
**To:** Sterken, Krista J.
**Cc:** Harrison, Terry
**Subject:** RE: Andriano Contact Visit - December

Krista,

Can you provide me a short explanation as to why the area designated by ADC for your noncontact attorney/client confidential visitation with Ms. Andriano at Perryville does not meet the legal standard for attorney/client confidentiality.  Thanks Alan

**From:** Sterken, Krista J. [mailto:KSterken@foley.com]
**Sent:** Monday, November 14, 2011 8:25 AM
**To:** Reaves, Alan
**Cc:** Gard, Lacey
**Subject:** FW: Andriano Contact Visit - December

Alan,

Have you had a chance to take a look at the attached stipulation and order?

11/22/2011

Thanks,
~ Krista

Krista J. Sterken
Foley & Lardner LLP - Madison
150 East Gilman Street
Post Office Box 1497
Madison, Wisconsin 53701
Telephone: (608) 258-4227
Facsimile: (608) 258-4258
Email: ksterken@foley.com

---

**From:** Sterken, Krista J.
**Sent:** Wednesday, November 09, 2011 2:12 PM
**To:** 'Reaves, Alan'
**Cc:** 'Gard, Lacey'; 'Brodsky, Michael'
**Subject:** RE: Andriano Contact Visit - December

Alan,

I have attached the proposed stipulation and order.

Thanks,
~ Krista

Krista J. Sterken
Foley & Lardner LLP - Madison
150 East Gilman Street
Post Office Box 1497
Madison, Wisconsin 53701
Telephone: (608) 258-4227
Facsimile: (608) 258-4258
Email: ksterken@foley.com

---

**From:** Reaves, Alan [mailto:Alan.Reaves@azag.gov]
**Sent:** Wednesday, November 09, 2011 2:08 PM
**To:** Gard, Lacey; Sterken, Krista J.; Brodsky, Michael
**Subject:** RE: Andriano Contact Visit - December

Ms Sterken,

Michael Brodsky will not be returning to this office.  Please provide me with your proposed stipulation and order and I will get back with you today if possible.  Thanks Alan

---

**From:** Gard, Lacey

11/22/2011

**Sent:** Wednesday, November 09, 2011 1:01 PM
**To:** 'Sterken, Krista J.'; Brodsky, Michael
**Cc:** Reaves, Alan
**Subject:** RE: Andriano Contact Visit - December

Krista, I think Michael Brodsky is still out of the office.  I believe Alan Reaves is the new contact person, or he can point you to that person.  I've copied him here.

**From:** Sterken, Krista J. [mailto:KSterken@foley.com]
**Sent:** Wednesday, November 09, 2011 12:37 PM
**To:** Brodsky, Michael
**Cc:** Gard, Lacey
**Subject:** FW: Andriano Contact Visit - December

Mr. Brodsky,

Deputy Warden Scott has approved our request for a contact visit with Wendi Andriano on December 12, 2011.  A copy of the stipulation and order is attached.  May we sign for you?

Thank you,
~ Krista Sterken


Krista J. Sterken
Foley & Lardner LLP - Madison
150 East Gilman Street
Post Office Box 1497
Madison, Wisconsin 53701
Telephone: (608) 258-4227
Facsimile: (608) 258-4258
Email: ksterken@foley.com



**From:** SCOTT, LACY [mailto:LSCOTT@azcorrections.gov]
**Sent:** Wednesday, November 09, 2011 9:15 AM
**To:** Sterken, Krista J.
**Subject:** RE: Andriano Contact Visit - December

Approved, your all set

**From:** Sterken, Krista J. [mailto:KSterken@foley.com]
**Sent:** Tuesday, November 08, 2011 7:51 AM
**To:** SCOTT, LACY
**Subject:** Andriano Contact Visit - December

Deputy Warden Scott,

Attached is a stipulation and order, requesting a contact visit with Wendi Andriano on December 12, 2011.  Do you approve?

Thank you,

~ Krista Sterken

Krista J. Sterken
Foley & Lardner LLP - Madison
150 East Gilman Street
Post Office Box 1497
Madison, Wisconsin 53701
Telephone: (608) 258-4227
Facsimile: (608) 258-4258
Email: ksterken@foley.com

The preceding email message may be confidential or protected by the attorney-client privilege. It is not intended for transmission to, or receipt by, any unauthorized persons. If you have received this message in error, please (i) do not read it, (ii) reply to the sender that you received the message in error, and (iii) erase or destroy the message. Legal advice contained in the preceding message is solely for the benefit of the Foley & Lardner LLP client(s) represented by the Firm in the particular matter that is the subject of this message, and may not be relied upon by any other party.

Internal Revenue Service regulations require that certain types of written advice include a disclaimer. To the extent the preceding message contains advice relating to a Federal tax issue, unless expressly stated otherwise the advice is not intended or written to be used, and it cannot be used by the recipient or any other taxpayer, for the purpose of avoiding Federal tax penalties, and was not written to support the promotion or marketing of any transaction or matter discussed herein.

The preceding email message may be confidential or protected by the attorney-client privilege. It is not intended for transmission to, or receipt by, any unauthorized persons. If you have received this message in error, please (i) do not read it, (ii) reply to the sender that you received the message in error, and (iii) erase or destroy the message. Legal advice contained in the preceding message is solely for the benefit of the Foley & Lardner LLP client(s) represented by the Firm in the particular matter that is the subject of this message, and may not be relied upon by any other party.

Internal Revenue Service regulations require that certain types of written advice include a disclaimer. To the extent the preceding message contains advice relating to a Federal tax issue, unless expressly stated otherwise the advice is not intended or written to be used, and it cannot be used by the recipient or any other taxpayer, for the purpose of avoiding Federal tax penalties, and was not written to support the promotion or marketing of any transaction or matter discussed herein.

The preceding email message may be confidential or protected by the attorney-client privilege. It is not intended for transmission to, or receipt by, any unauthorized persons. If you have received this message in error, please (i) do not read it, (ii) reply to the sender that you received the message in error, and (iii) erase or destroy the message. Legal advice contained in the preceding message is solely for the benefit of the Foley & Lardner LLP client(s) represented by the Firm in the particular matter that is the subject of this message, and may not be relied upon by any other party.

Internal Revenue Service regulations require that certain types of written advice include a disclaimer. To the extent the preceding message contains advice relating to a Federal tax issue, unless expressly stated

11/22/2011

otherwise the advice is not intended or written to be used, and it cannot be used by the recipient or any other taxpayer, for the purpose of avoiding Federal tax penalties, and was not written to support the promotion or marketing of any transaction or matter discussed herein.

The preceding email message may be confidential or protected by the attorney-client privilege. It is not intended for transmission to, or receipt by, any unauthorized persons. If you have received this message in error, please (i) do not read it, (ii) reply to the sender that you received the message in error, and (iii) erase or destroy the message. Legal advice contained in the preceding message is solely for the benefit of the Foley & Lardner LLP client(s) represented by the Firm in the particular matter that is the subject of this message, and may not be relied upon by any other party.

Internal Revenue Service regulations require that certain types of written advice include a disclaimer. To the extent the preceding message contains advice relating to a Federal tax issue, unless expressly stated otherwise the advice is not intended or written to be used, and it cannot be used by the recipient or any other taxpayer, for the purpose of avoiding Federal tax penalties, and was not written to support the promotion or marketing of any transaction or matter discussed herein.

The preceding email message may be confidential or protected by the attorney-client privilege. It is not intended for transmission to, or receipt by, any unauthorized persons. If you have received this message in error, please (i) do not read it, (ii) reply to the sender that you received the message in error, and (iii) erase or destroy the message. Legal advice contained in the preceding message is solely for the benefit of the Foley & Lardner LLP client(s) represented by the Firm in the particular matter that is the subject of this message, and may not be relied upon by any other party.

Internal Revenue Service regulations require that certain types of written advice include a disclaimer. To the extent the preceding message contains advice relating to a Federal tax issue, unless expressly stated otherwise the advice is not intended or written to be used, and it cannot be used by the recipient or any other taxpayer, for the purpose of avoiding Federal tax penalties, and was not written to support the promotion or marketing of any transaction or matter discussed herein.

The preceding email message may be confidential or protected by the attorney-client privilege. It is not intended for transmission to, or receipt by, any unauthorized persons. If you have received this message in error, please (i) do not read it, (ii) reply to the sender that you received the message in error, and (iii) erase or destroy the message. Legal advice contained in the preceding message is solely for the benefit of the Foley & Lardner LLP client(s) represented by the Firm in the particular matter that is the subject of this message, and may not be relied upon by any other party.

Internal Revenue Service regulations require that certain types of written advice include a disclaimer. To the extent the preceding message contains advice relating to a Federal tax issue, unless expressly stated otherwise the advice is not intended or written to be used, and it cannot be used by the recipient or any other taxpayer, for the purpose of avoiding Federal tax penalties, and was not written to support the promotion or marketing of any transaction or matter discussed herein.

11/22/2011

# EXHIBIT DDDDD

Michael K. Jeanes, Clerk of Court
*** Electronically Filed ***
Mary Martin
Filing ID 1083391
11/23/2011 3:09:26 PM

1   Scott M. Bennett (022350)
    Coppersmith Schermer & Brockelman PLC
2   2800 North Central Avenue, Suite 1200
    Phoenix, Arizona  85004
3   (602) 224-0999 (office)
    (602) 224-6020 (fax)
    sbennett@csblaw.com

4   Allen A. Arntsen, Admitted *Pro Hac Vice*
    Stephan J. Nickels Admitted *Pro Hac Vice*
5   Matthew R. Lynch Admitted *Pro Hac Vice*
    Foley & Lardner LLP
6   150 East Gilman Street
    Madison, WI 53703
    (608) 257-5035 (office)
7   (608) 258-4258 (fax)
    aarntsen@foley.com

8   *Attorneys for Petitioner Wendi Elizabeth Andriano*

9                   **SUPERIOR COURT OF ARIZONA**
                      **COUNTY OF MARICOPA**

10

11  STATE OF ARIZONA,              )    No. CR2000-096032-A
                                   )
12              Respondent,        )    **UNOPPOSED MOTION TO**
                                   )    **FILE PETITION FOR**
13      vs.                        )    **POST-CONVICTION RELIEF**
                                   )    **UNDER SEAL**
14  WENDI ELIZABETH ANDRIANO,      )
                                   )    (Assigned to the Hon. Douglas Rayes)
15              Petitioner.        )
                                   )
16                                 )
                                   )
17  _____)

18          Pursuant to Rule 123(c)(1) of the Arizona Rules of the Supreme Court, and the

19  Court's supervisory powers, Petitioner Wendi Andriano moves to file her petition for post-

20  conviction relief and its accompanying documents under seal.  This motion is unopposed

21
    by the State, subject to certain conditions upon which the parties have reached agreement.
22

23                       **FILING UNDER SEAL**

24          Arizona Supreme Court Rule 123(c)(1) states that "the records in all courts and

25  administrative offices of the Judicial Department of the State of Arizona are presumed to

26  be open to any member of the public . . . . However, in view of the possible countervailing

{00034204.1 }

interests of confidentiality, privacy or the best interests of the state public access to some court records may be restricted . . . ."  *See also Martin v. Reinstein*, 195 Ariz. 293, 321, ¶ 101, 987 P.2d 779, 807 (App. 1999) ("If petitioners need additional protection, they may request that information be submitted to the court under seal or that the file be sealed."); *Catrone v. Miles*, 215 Ariz. 446, 450, 458, ¶¶ 6, 31, 160 P.3d 1204, 1208, 1216 (App. 2007) (approving a procedure permitting sensitive information to be filed under seal).

The voluminous supporting information that will be filed with Ms. Andriano's petition consists, in large part, of confidential or highly sensitive materials.  Those materials include medical records of non-party individuals such as Ms. Andriano's family, which were utilized by mental health professionals, as well as sworn declarations discussing childhood abuse, mental health, and other sensitive information, sometimes involving individuals not a party to this matter.  Given the need to protect the confidential medical records of individuals not a party to this suit, and the sensitivity of even the most tangential discussions of child abuse by an adult, filing the petition and its supporting materials under seal will help protect the privacy of all individuals who were willing to share their information or knowledge with PCR counsel.

Counsel for Ms. Andriano and the State have conferred on this issue, and the State has stipulated to Ms. Andriano filing documents under seal with the condition that three categories of individuals will have access: attorneys for the State; experts retained and relied upon by the State; and the "victims" as that term is defined under Arizona law.  Ms.

1    Andriano has agreed to those conditions, and the parties have agreed that the individuals

2    with access to the sealed documents will keep them confidential.

3                                          **CONCLUSION**

4

5            For the foregoing reasons, Petitioner respectfully requests that this Court: (1) allow

6    Petitioner to file her petition and supporting materials under seal; (2) order that materials

7    filed under seal shall be available to the State, (3) the State may disclose those materials

8    only to counsel and administrative staff working on this case, to experts engaged to opine

9

10   on matters pertaining to this case, or the victims; and (4) those persons receiving the

11   materials filed under seal shall keep the documents and information contained therein

12   confidential from others who do not have such access to the materials.

13           RESPECTFULLY SUBMITTED November 23, 2011.

14                                           COPPERSMITH SCHERMER &
15                                           BROCKELMAN PLC

16                                           By ____/s/Scott M. Bennett_____
17                                               Scott M. Bennett

18                                           FOLEY & LARDNER LLP
19                                               Allen A. Arntsen
                                                 Stephan J. Nickels
20                                               Matthew R. Lynch

21                                           *Attorneys for Petitioner*

22

23   ORIGINAL filed with the Clerk of the Court
     on November 23, 2011.
24

25

26

1

2     COPY hand-delivered on November 23, 2011, to:

3     The Honorable Douglas Rayes
      East Court Building #411
4     101 W. Jefferson
      Phoenix, AZ  85003-2243
5

6     COPIES mailed on September 28, 2011, to:

7     Ms. Lacey Stover Gard
      Office of the Attorney General
8     400 West Congress, Suite S-315
      Tucson, Arizona  85701-1367
9     *Attorneys for the State of Arizona*
10

11

12     /s/Michelle T. Gallegos

13

14

15

16

17

18

19

20

21

22

23

24

25

26

# EXHIBIT EEEEE

Michael K. Jeanes, Clerk of Court
*** Electronically Filed ***
Mary Martin
Filing ID 1086628
11/29/2011 11:46:08 AM

THOMAS C. HORNE
ATTORNEY GENERAL
(FIRM STATE BAR NO. 14000)

LACEY STOVER GARD
ASSISTANT ATTORNEY GENERAL
CRIMINAL APPEALS/CAPITAL LITIGATION DIVISION
400 WEST CONGRESS, BLDG. S–315
TUCSON, ARIZONA 85701–1367
TELEPHONE: (520) 628–6520
Lacey.Gard@azag.gov
CADOCKET@AZAG.GOV
(STATE BAR NUMBER 22714)


ATTORNEYS FOR PLAINTIFF/RESPONDENT

# SUPERIOR COURT OF ARIZONA

## COUNTY OF MARICOPA

| | |
|---|---|
| State of Arizona, | CR2000-096032-A |
| Plaintiff/Respondent, | |
| -vs- | RESPONSE TO MOTION TO EXCEED PAGE LIMIT. |
| Wendi Andriano, | |
| Defendant/Petitioner. | |

On November 23, 2011, Defendant Wendi Andriano filed a motion to exceed the page limitation on post-conviction relief petitions.  For the reasons stated in the following Memorandum of Points and Authorities, the State opposes that motion.

DATED this 29th day of November, 2011.


RESPECTFULLY SUBMITTED,

THOMAS C. HORNE
ATTORNEY GENERAL


/S/LACEY STOVER GARD
ASSISTANT ATTORNEY GENERAL
ATTORNEYS FOR PLAINTIFF

**MEMORANDUM OF POINTS AND AUTHORITIES**

On November 23, 2011, Defendant Wendi Andriano filed a motion to exceed the 40-page page limitation on her post-conviction relief petition by up to 60 pages.  *See* Ariz. R. Crim. P. 32.5.  Andriano argues that expansion of the page limit is necessary for her counsel to 1) meet their "affirmative dut[ies]" under the American Bar Association's Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases ("ABA Guidelines"), and 2) adequately summarize and discuss the petition's supporting materials.  For the reasons that follow, the State objects to expansion of the page limit, and asks this Court to deny Andriano's motion.

Page limitations ensure that the appellate system functions smoothly and efficiently.  *See, e.g., N/S Corp. v. Liberty Mut. Ins. Co.*, 127 F.3d 1145, 1146 (9th Cir. 1997) ("In order to give fair consideration to those who call upon us for justice, we must insist that parties not clog the system by presenting us with a slubby mass of words . . . .").  The Arizona Supreme Court has recognized that a defendant's rights are better served by a concise brief that presents only the most persuasive issues than an oversized brief that contains every conceivable one.  *See State v. Bolton*, 182 Ariz. 290, 299, 896 P.2d 830, 839 (1995) ("Reasonable limits placed on appellate briefs neither inhibit nor detract from effective appellate advocacy."); *State v. Atwood*, 171 Ariz. 576, 659 n.28, 832 P.2d 593, 675 (1992) ("Winnowing the record and making discriminating choices concerning the fact or law to be emphasized are essential elements of the art of appellate advocacy. . . . a defendant's rights are more likely to be disserved by an excessively long brief than they are by an appropriately condensed one."), *disapproved on other grounds by State v. Nordstrom*, 200 Ariz. 229, 25 P.3d 717 (2001).

Expanded pagination is therefore inappropriate absent a compelling, case-related showing of necessity.  Andriano has made no such showing.  The ABA Guidelines do not impose affirmative duties on counsel.  *See Bobby v. Van Hook*,

__ U.S. __, 130 S.Ct. 13, 16–17 (2009).   And, as set forth above, the Arizona Supreme Court disfavors the "kitchen sink" approach to appellate advocacy.  *See Bolton*, 182 Ariz. at 299, 896 P.2d at 839; *Atwood*, 171 Ariz. at 659 n.28, 832 P.2d at 675.   Further, the petition's exhibits speak for themselves, and an extensive summary of such material by Andriano's counsel is unnecessary to this Court's evaluation of her claims.   The Arizona Supreme Court has deemed 40 pages sufficient for a capital defendant to adequately develop her claims.  Andriano has not shown that her case is any more complicated than any other capital case subject to the page limitation.  This Court should deny her motion.

DATED this 29th day of November, 2011.

RESPECTFULLY SUBMITTED,

THOMAS C. HORNE
ATTORNEY GENERAL


/S/LACEY STOVER GARD
ASSISTANT ATTORNEYS GENERAL
ATTORNEYS FOR PETITIONER

1  Copy of the foregoing mailed
2  this 29th day of November, 2011, to:

3  Scott M. Bennett
4  Coppersmith Schermer & Brockelman PLC
   2800 N. Central Ave., Suite 1200
5  Phoenix, Arizona 85004

6
7  James J. Belanger
   Coppersmith Schermer & Brockelman PLC
8  2800 North Central Avenue, Suite 1200
   Phoenix, AZ 85004
9

10  Allen A. Arntsen
    Foley & Lardner LLP
11  150 East Gilman Street
12  P.O. Box 1497
    Madison, WI   53701-1497
13

14  Stephen J. Nickels
    Foley & Lardner LLP
15  150 East Gilman Street
16  P.O. Box 1497
    Madison, WI   53701-1497
17

18  Matthew R. Lynch
    Foley & Lardner LLP
19  150 East Gilman Street
20  P.O. Box 1497
    Madison, WI   53701-1497
21

22  Attorneys for Defendant

23

24  /s/Linda Yrrizarry

25  #2452502
26

27

28

4

# EXHIBIT FFFFF

Michael K. Jeanes, Clerk of Court
*** Electronically Filed ***
Belva Nasingoetewa
Filing ID 1087256
11/29/2011 3:11:36 PM

THOMAS C. HORNE
ATTORNEY GENERAL
(FIRM STATE BAR NO. 14000)

LACEY STOVER GARD
ASSISTANT ATTORNEY GENERAL
CRIMINAL APPEALS/CAPITAL LITIGATION DIVISION
400 WEST CONGRESS, BLDG. S–315
TUCSON, ARIZONA 85701–1367
TELEPHONE: (520) 628–6520
Lacey.Gard@azag.gov
CADOCKET@AZAG.GOV
(STATE BAR NUMBER 22714)


ATTORNEYS FOR PLAINTIFF/RESPONDENT

# SUPERIOR COURT OF ARIZONA
## COUNTY OF MARICOPA

| | |
|---|---|
| State of Arizona,<br><br>      Plaintiff/Respondent,<br><br>      -vs-<br><br>Wendi Andriano,<br><br>      Defendant/Petitioner. | CR2000-096032-A<br><br><br>RESPONSE TO MOTION TO FILE PETITION FOR POST-CONVICTION RELIEF UNDER SEAL. |

On November 23, 2011, Defendant Wendi Andriano moved to file her post-conviction relief petition and supporting exhibits under seal.  For the reasons stated in the following Memorandum of Points and Authorities, the State opposes that motion, in part.

DATED this 29th day of November, 2011.


RESPECTFULLY SUBMITTED,

THOMAS C. HORNE
ATTORNEY GENERAL

/S/LACEY STOVER GARD
ASSISTANT ATTORNEY GENERAL
ATTORNEYS FOR PLAINTIFF

**MEMORANDUM OF POINTS AND AUTHORITIES**

On November 23, 2011, Defendant Wendi Andriano filed a motion to file her post-conviction relief (PCR) petition under seal.  Andriano characterizes her request as unopposed, "subject to certain conditions" relating, among other things, to the victims' access to the material.

As an initial matter, it appears that a miscommunication occurred between Andriano's counsel and undersigned counsel during their discussion of this topic. In conversations with Andriano's counsel, undersigned counsel agreed that the medical records of certain third parties, which Andriano intends to file as exhibits in support of her position, may be filed under seal, so long as the State is permitted to disclose them to the victims and any experts they may retain in this matter. Undersigned counsel believed that the request to seal was limited to the foregoing documents, and did not intend to agree that the entire PCR petition, and all supporting documents, be sealed.

As stated previously, the State does not oppose sealing the medical records of third parties not involved in this proceeding, subject to the conditions set forth above.  Additionally, the State does not object to Andriano redacting the names of certain minor child abuse victims from publicly-filed declarations, and filing the unredacted copies under seal.  However, the State opposes sealing the PCR petition itself.  Moreover, if Andriano seeks to file exhibits to the petition (other than the aforementioned exhibits) under seal, this Court should require her to file a motion explaining specifically why confidentiality is necessary for each exhibit. Permitting the entire petition and all its exhibits to be filed under seal, where some of the material may not impact genuine privacy or confidentiality interests, would be inappropriate and violate the Arizona Supreme Court's presumption of public access to court documents.  *See* Ariz. Sup. Ct. Rule 123(c)(1) (establishing that "the records in all courts and administrative offices of the Judicial Department of the State of Arizona are presumed to be open to any member of the public" unless

1   concerns of privacy, confidentiality, or the State's best interests outweigh this
2   policy).  Further, sealing the entire petition would hamper the State's ability to
3   respond to it:  for example, the State would be precluded, absent prior court
4   authorization, from forwarding the petition to individuals, such as Andriano's prior
5   counsel or the trial prosecutor, who may possess information relevant to the
6   response.  And, as a logical extension, it would require the State to file its response
7   under seal.  Andriano's request is overly broad and unnecessarily restrictive.

8        Accordingly, while the State does not object to filing third-party medical
9   records under seal, it does not agree to Andriano's request to conduct her entire
10  post-conviction proceeding under seal, and this Court should deny that request.

11       DATED this 29th day of November, 2011.

12                               RESPECTFULLY SUBMITTED,

13                               THOMAS C. HORNE
14                               ATTORNEY GENERAL

15

16                               /S/LACEY STOVER GARD
                                 ASSISTANT ATTORNEYS GENERAL
17                               ATTORNEYS FOR PETITIONER

18

19

20

21

22

23

24

25

26

27

28

1   Copy of the foregoing mailed
2   this 29th day of November, 2011, to:

3   Scott M. Bennett
4   Coppersmith Schermer & Brockelman PLC
    2800 N. Central Ave., Suite 1200
5   Phoenix, Arizona 85004

6
7   James J. Belanger
    Coppersmith Schermer & Brockelman PLC
8   2800 North Central Avenue, Suite 1200
    Phoenix, AZ 85004
9

10  Allen A. Arntsen
    Foley & Lardner LLP
11  150 East Gilman Street
12  P.O. Box 1497
    Madison, WI   53701-1497
13

14  Stephen J. Nickels
    Foley & Lardner LLP
15  150 East Gilman Street
16  P.O. Box 1497
    Madison, WI   53701-1497
17

18  Matthew R. Lynch
    Foley & Lardner LLP
19  150 East Gilman Street
20  P.O. Box 1497
    Madison, WI   53701-1497
21

22  Attorneys for Defendant

23

24  /s/Linda Yrrizarry

25
    #2452502
26

27

28

4

# EXHIBIT GGGGG

FILED
*Dec 2, 2011  1:29 pm*
MICHAEL K. JEANES, Clerk
By *H. O'Shaughnessy*
H. O'Shaughnessy Deputy

1  Scott M. Bennett (022350)
   Coppersmith Schermer & Brockelman PLC
2  2800 North Central Avenue, Suite 1200
   Phoenix, Arizona 85004
3  (602) 224-0999 (office)
   (602) 224-6020 (fax)
   sbennett@csblaw.com

4  Allen A. Arntsen, Admitted *Pro Hac Vice*
   Stephan J. Nickels Admitted *Pro Hac Vice*
5  Matthew R. Lynch Admitted *Pro Hac Vice*
   Foley & Lardner LLP
6  150 East Gilman Street
   Madison, WI 53703
   (608) 257-5035 (office)
7  (608) 258-4258 (fax)
   aarntsen@foley.com

8  *Attorneys for Petitioner Wendi Elizabeth Andriano*

9              **SUPERIOR COURT OF ARIZONA**
                 **COUNTY OF MARICOPA**
10

11 STATE OF ARIZONA,            )  No. CR2000-096032-A
                                )
12           Respondent,        )  **ORDER EXTENDING PAGE LIMIT**
                                )  **FOR PETITION FOR POST-**
13     vs.                      )  **CONVICTION RELIEF**
                                )
14 WENDI ELIZABETH ANDRIANO,    )  (Assigned to the Hon. Douglas Rayes)
                                )
15           Petitioner.        )
                                )  *and having considered the*
16                              )  *State's Response*
17 _____  )

18     Based on the Motion for by Ms. Andriano, and for good cause, IT IS ORDERED

19 authorizing Ms. Andriano to file a petition for post-conviction relief of up to ~~100~~ *70 own* pages.

20

21

22 DATED  *12-1-11*

23                                  The Honorable Douglas Rayes

24

25

26

{00034203.1 }

# EXHIBIT HHHHH

Michael K. Jeanes, Clerk of Court
*** Electronically Filed ***
12/06/2011 8:00 AM

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CR 2000-096032                                          12/02/2011


                                          CLERK OF THE COURT
JUDGE DOUGLAS L. RAYES                       H. O'Shaughnessy
                                                 Deputy


STATE OF ARIZONA                          LACEY ALEXANDRA STOVER GARD

v.

WENDI ELIZABETH ANDRIANO (A)              SCOTT M BENNETT
                                          ALLEN A ARNTSEN
                                          STEPHAN J NICKELS
                                          MATTHEW R LYNCH

                                          CAPITAL CASE MANAGER
                                          COURT ADMIN-CRIMINAL-PCR
                                          VICTIM SERVICES DIV-CA-SE
                                          VICTIM WITNESS DIV-AG-CCC


MINUTE ENTRY

        The Court has received and considered Petitioner's Motion for Extension of Post-Conviction Relief Page Limit and the State's Response.  Good cause appearing,

        IT IS ORDERED authorizing Ms. Andriano to file a petition for post-conviction relief of up to 70 pages all in accordance with formal written order signed by the Court on December 1, 2011 and filed by the Clerk on December 2, 2011.

        FILED:  Order.

        This case is eFiling eligible: http://www.clerkofcourt.maricopa.gov/efiling/default.asp. Attorneys are encouraged to review Supreme Court Administrative Orders 2010-117 and 2011-10 to determine their mandatory participation in eFiling through AZTurboCourt.


Docket Code 022                    Form R000A                         Page 1