# TABLE OF CONTENTS (INTERACTIVE)

| | |
|---|---|
| IIIII | Response to Motion to Allow Contact Visit |
| JJJJJ | M.E. Denying Motion to File Under Seal 12-2-11 |
| KKKKK | M.E. 12-5-11 |
| LLLLL | M.E. Ruling on Motion to Allow Contact Visit 12-8-11 |
| MMMMM | Stipulated Motion for Order Filing of Documents Under Seal |
| NNNNN | Order Authorizing Filing of Documents Under Seal 2-13-12 |
| OOOOO | Memorandum in Support of Petition |
| PPPPP | M.E. 2-13-12 |
| QQQQQ | Petition for Post-Conviction Relief |
| RRRRR | Order Authorizing Filing Documents Under Seal 3-7-12 |
| SSSSS | M.E. Order Signed 3-2-12 |
| TTTTT | Motion to Extend Motion to Seal PCR Petition and Exhibits |
| UUUUU | Supplement to Motion to Extend |
| VVVVV | Motion to Unseal Petition and Exhibits |
| WWWWW | Order Extending Time 3-20-12 |
| XXXXX | Order Extending Time 3-20-12 |
| YYYYY | Response to Motion to Unseal Petition |
| ZZZZZ | M.E. Order Signed 3-16-12 |
| AAAAAA | M.E. Order Signed 3-22-12 |
| BBBBBB | Unopposed Motion to Extend Time to Respond to Motion to Unseal |
| CCCCCC | Order Granting Extension to Respond 4-3-12 |
| DDDDDD | M.E. Order Signed 4-11-12 |
| EEEEEE | M.E. 4-16-12 |
| FFFFFF | Reply to Response to Motion to Unseal Petition and Exhibits |
| GGGGGG | M.E. 4-27-12 |
| HHHHHH | Motion for Extension of Time to Respond to Petition |
| IIIIII | Order Extending Time to File Response |

| | |
|---|---|
| JJJJJJ | M.E. Order Signed 5-29-12 |
| KKKKKK | Motion for Extension of Time to Respond |
| LLLLLL | M.E. Status Conference e 6-26-12 |
| MMMMMM | Motion to Exceed Page Limit |
| NNNNNN Part 1 | Response to Petition |

# EXHIBIT IIIII

MICHAEL K JEANES, CLERK
BY A Narbaur DEP.

FILED

11 DEC -7 PM 3:45

1  Thomas C. Horne
   Attorney General
2  Firm State Bar No. 14000

3  Michael E. Gottfried, Bar No. 010623
   Assistant Attorney General
4  1275 W. Washington
   Phoenix, Arizona 85007-2926
5  Phone: (602) 542-4951
   Fax:    (602) 542-7670
6  michael.gottfried@azag.gov

7  *Attorneys for*

**SUPERIOR COURT OF ARIZONA**

8
**COUNTY OF MARICOPA**
9

| | |
|---|---|
| STATE OF ARIZONA, | No. CR2000-096032 DT |
| Respondent, | |
| v. | **RESPONSE TO PETITIONER'S MOTION TO ALLOW CONTACT VISIT** |
| WENDI ELIZABETH ANDRIANO, | |
| Petitioner. | (Assigned to the Honorable Douglas Rayes) |

15      Charles Ryan, Director of the Arizona Department of Corrections ("ADC"), through

16  undersigned counsel, responds to and opposes Petitioner (hereinafter "Andriano's")

17  Motion to Allow Contact Visit.   This Response is supported by the following

18  Memorandum of Points and Authorities.

19          **MEMORANDUM OF POINTS AND AUTHORITIES**

20  **I.     INTRODUCTION.**

21      Wendi Andriano, a Death Row inmate housed at the Arizona State Prison Complex

22  ("ASPC"), Perryville, Lumley Unit, seeks an Order from this Court permitting her a

23  contact visit on December 12, 2011, with Allen Arntsen, one of the attorneys representing

24  her in her current petition for post-conviction relief, along with local attorney Larry

25  Hammonds, whom Petitioner asserts is "a court-appointed expert providing an opinion

26  regarding the constitutional effectiveness of Andriano's trial counsel." (Motion p. 1, ll.

1

2

25-26.)  In support of her request, Andriano identifies three reasons the Court should grant her request.

3

First, she represents that Director Charles Ryan, since July 2010, "has agreed to and this Court has granted 65 such contact visits between Ms. Wendi Andriano and various attorneys, mitigation specialists, and mental health experts . . . " (Motion p. 2, ll. 1-3). As described herein, by regulation, ADC does not allow contact visits with Death Row inmates.  Limited exceptions to this policy have been made for experts, typically medical or psychological, *requiring* contact with the inmate to do their job.  The contact visits previously allowed here were meant to fit within this limited exception:  mental health experts and the mitigation specialist.  In hindsight, allowing contact visitation for the mitigation expert, while arguably needing contact to do their job, was probably in error.

4

5

6

7

8

9

10

11

12

However, no contact visits have been approved with just attorneys.  If attorneys had contact visits without a mental health or mitigation expert it was in violation of the language, and certainly the intent, of the stipulated visitation order.  There is no argument made, or logical reason why, Mr. Hammond needs physical contact with Petitioner to develop an opinion about the effectiveness of trial counsel.

13

14

15

16

17

Second, they argue that "Deputy Warden Lacy Scott [Lumley Unit] approved the requested December 12 contact visit with . . . Arntsen and Hammond . . . on November 9, 2011"     and that it was Assistant Attorney General Terry Harrison[1] that subsequently denied the approval. *Id.* p. 2, ll. 7-10. *All* exceptions to the contact visitation ban must be, and have been, approved by the Attorney General's Office on behalf of the ADC.  A deputy warden's primary concern in these matters is scheduling; the intent of the department as a whole and security at the unit is determined in conjunction with the ADC

18

19

20

21

22

23

24

25

26

---

[1] At the time of the denial of Petitioner's request, Assistant Attorney General Terry Harrison, was the Attorney for Charles Ryan, Director, Arizona Department of Corrections.

in the form of the Attorney General's approval.  Thus, the warden's approval is only one part of the process and is not any type of waiver of the Department's final approval.

Third, they argue that the purpose of the requested contact visit is to "review multiple sensitive, voluminous mental health expert reports" and that the review "would be substantially impeded by a non-contact visit" because of the "glass barrier" and inability to "communicate freely".  *Id.* p. 2, ll. 13-17.  Convenience is not a valid reason to allow contact visitation.  Andriano's third reason in effect argues that denial of contact visitation is synonymous with denial of access to the courts.  ADC provides appropriate and effective means for Andriano to review her legal material and communicate with her attorneys and experts.  If counsel and Mr. Hammond need additional time they can get it.[2]  Any claim here that the failure to grant relief denies Andriano her constitutional right to access the court or to effective assistance of counsel is speculative and unsupported by the record.

## II.   BACKGROUND.

All visitations with Death Row inmates at both the ASPC – Eyman – Browning Unit (male prisoners) and at the ASPC – Perryville – Lumley (Special Management Area) (female prisoners) are mandated non-contact pursuant to ADC Department Order ("DO") 911.[3]  As shown below, ADC's non-contact visitation policy at its high security prisons is rationally related to its legitimate penological concerns of prevention of escape, assault, hostage-taking, and the introduction of contraband.

---

[2] Counsel argued that additional time is difficult because they are from out-of-state; it is unclear why they need to be physically present while an independent expert prepares his report.

[3] *See* Department Order 911 – at 911.04 1.6.1 and 1.6.5 & 911.05 1.3.1 attached hereto as Exhibit A.

In the early 2000s the argument was put forward by various attorneys for Death Row inmates that for their clinical psychologists, clinical psychiatrist, neuropsychologist and psychiatrist and other experts in the medical sciences to properly perform mental health tests and adequately evaluate the inmate, limited contact with the inmate was clinically required. ADC considered the arguments and through a series of informal agreements, including considerations related to the criminal appellant process, compromises and various court rulings, a format and process was developed whereby the clinical experts retained for a Death Row inmate would be permitted limited contact visitation with the inmate for the purpose of administering tests and conducting evaluations that "required" contact with the inmate. The process to secure limited contact visitation for clinical experts also incorporated a strict set of rules and guidelines designed to provide for the safety and security of the visitor, staff and penal institution.

Along with the limited contact visitation with the Death Row inmate by the clinical expert, ADC agreed that upon request and subject to the same rules and guidelines, the inmate's attorney would also be permitted to accompany the clinical expert into the contact visitation area to do introductions and answer any preliminary concerns of his/her client. The attorney would then leave the visitation room and the clinical expert would administer the tests and conduct the evaluation as required.

III. **FACTS.**

A. **ASPC Perryville Lumley Unit Death Row is Non-Contact Visitation.**

Arizona's Death Row for women is located at the ASPC – Perryville, Lumley ("Special Management Area"). The Special Management Area is the most secure and structured prison facility within ADC for female inmates and is reserved for Death Row inmates like Andriano, and the most violent and incorrigible inmates within the prison system, including validated prison gang members and associates.

4

The Special Management Area is designated as non-contact.[4]  Legal visits with inmates are governed by Department Order 902.13.[5]  Non-contact attorney visitation at the Special Management Area is conducted through a glass barrier using a telephone type arrangement for communication.  Non-contact attorney visitation is confidential and not recorded in any way.  (Declaration of Claudia Ponce, attached as Exhibit C, at paragraph 10) (Hereinafter "Ponce at __.")  ADC Department Order 902 provides inmates with access to the courts and, specifically, access to legal boxes (902.10), legal telephone calls (902.12) and legal visits (902.13).[6]

## III.   ANALYSIS.

### A.   ADC Policy.

Restricting physical access to Death Row inmates implicates operational security, officer and inmate safety, as well as the safety of the people that come into contact with the Death Dow inmates.  Nonetheless, restricting contact visitation with Andriano does not unconstitutionally restrict her access to his attorneys, experts, legal materials or access to the courts generally.  ADC Policy DO 902.10 sets out an orderly process to insure inmate access to their legal supplies, property, mail, telephone and legal counsel.

### B.   The Problems of Prison Security Are Extraordinarily Difficult and Are Left to Prison Administrators.

The U.S. Supreme Court has acknowledged the paramount importance of prison security and the extreme difficulty prison authorities face in maintaining it.  *Hudson v. Palmer*, 468 U.S. 517, 526 (1984).  Prison officials therefore have an unenviable task in maintaining prison security.

---

[4]  *See* Exhibit A.

[5]  Department Order 902, attached hereto as Exhibit B.

[6]  See Exhibit A.

1

2
3
4
5
6
7
8

> Within this volatile "community," prison administrators are to take all necessary steps to ensure the safety of not only the prison staffs and administrative personnel, but also visitors. They are under an obligation to take reasonable measures to guarantee the safety of the inmates themselves. They must be ever alert to attempts to introduce drugs and other contraband into the premises which, we can judicially notice, is one of the most perplexing problems of prisons today; they must prevent, so far as possible, the flow of illicit weapons into the prison; they must be vigilant to detect escape plots, in which drugs or weapons may be involved, before the schemes materialize.

9   *Id.* at 526–27; *accord Bell v. Wolfish*, 441 U.S. 520, 547 (1979); *Large v. Superior Court*,

10  148 Ariz. 229, 236, 714 P.2d 399, 406 (1986).

11      The Supreme Court recognizes that security considerations may trump

12  constitutional rights that inmates would otherwise enjoy:

13
14
15
16
17
18
19

> "[C]entral to all other corrections goals is the institutional consideration of internal security within the corrections facilities themselves." Prison officials must be free to take appropriate action to ensure the safety of inmates and corrections personnel and to prevent escape or unauthorized entry. Accordingly, we have held that even when an institutional restriction infringes a specific constitutional guarantee, such as the First Amendment, the practice must be evaluated in the light of the central objective of prison administration, safeguarding institutional security.

20  *Wolfish*, 441 U.S. at 546 –47 (1979) (quoting *Pell v. Procunier*, 417 U.S. 817, 823 (1974))

21  (citations omitted). In short, security is the paramount concern of prison officials.

22      **C.    Prison Administration Is Generally Left to Prison Administrators, Not the Courts.**

23

24      The heavy nature of these problems has led the Supreme Court to grant prison

administrators wide latitude when reviewing the solutions they have adopted:

25
26

> [T]he problems that arise in the day-to-day operation of a corrections facility are not susceptible of easy solutions.

6

1

2

3

> Prison administrators therefore should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security.

4  *Wolfish*, 441 U.S. at 547. This deference flows not only from the recognition that prison

5  officials are better suited to run prisons than are judges, but also from the fact that, under

6  our constitutional system of separation of powers, running the prison is the prison

7  administrator's job, not the judge's. *Id.* at 547–48; *accord id.* at 547 n.29; *Turner v.*

8  *Safley*, 482 U.S. 78, 84–85 (1987).

9       In harmony with the deference to be shown to prison administrators, the Supreme

10  Court has also admonished the judiciary to adopt a hands-off attitude when it comes to

11  reviewing prison policies and interfering in prison operations. *Procunier v. Martinez*, 416

12  U.S. 396, 404–05 (1974) (footnotes omitted), *overruled on other grounds, Thornburgh v.*

13  *Abbot*, 490 U.S. 401. ("The court might disagree with the choice of means to effectuate

14  those interests [in prison security], but it should not "second-guess the expert

15  administrators on matters on which they are better informed.") Thus, courts must be

16  extremely hesitant to interfere with the decisions of prison officials and must accord them

17  great deference.

18

19

**D.     In Concert with the Judiciary's Limited Role in Prison Administration, Courts May Not Interfere Without First Determining that a Prison Policy Impinges Constitutional Rights.**

20       The ADC has an administrative regulation prohibiting attorney-client contact visits

21  on Death Row. This regulation has the force of law, unless unconstitutional. *Kamen v. Az.*

22  *Bd. of Regents*, 217 Ariz. 147, 155, 171 P.3d 599, 607 (App. 2007). The Supreme Court

·23  has adopted a standard for the courts to apply in reviewing the constitutionality of prison

24  policies which accommodates its admonitions to the courts to generally keep out of prison

25  management:

26

7

1

2

3

4

5

6

7

8

9

10

11

12

> [W]hen a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests. In our view, such a standard is necessary if prison administrators ..., and not the courts, [are] to make the difficult judgments concerning institutional operations. Subjecting the day-to-day judgments of prison officials to an inflexible strict scrutiny analysis would seriously hamper their ability to anticipate security problems and to adopt innovative solutions to the intractable problems of prison administration. The rule would also distort the decision making process, for every administrative judgment would be subject to the possibility that some court somewhere would conclude that it had a less restrictive way of solving the problem at hand. Courts inevitably would become the primary arbiters of what constitutes the best solution to every administrative problem, thereby "unnecessarily perpetrating the involvement of the federal courts in affairs of prison administration." *Procunier v. Martinez*, 416 U.S., at 407, 94 S.Ct., at 1808.

13

14

15

*Turner*, 482 U.S. at 89 (alteration in original) (citation omitted); *accord Martinez*, 416 U.S. at 405–06 ("When a prison regulation or practice offends a fundamental constitutional guarantee, federal courts will discharge their duty to protect constitutional rights.")

16

17

18

19

20

21

22

Thus, the Supreme Court has set forth a specific procedural order to the determination of constitutional issues such as are presented here. The courts may not interfere in prison administration, such as the non-contact visitation policy related to Death Row inmates, by inquiring into the wisdom of prison regulations unless and until constitutional rights are implicated.[7] Otherwise, the courts become super-administrators in prison operations, a task for which they are not suited and a task that is not theirs in our constitutional system.

23

24

25

26

---

[7] Andriano's challenge to ADC's authority to deny contact visitation with a Death Row inmate is tantamount to a challenge to the constitutionality of Department Order 911 and to a lesser extent the constitutionality of Department Order 902.

1
2
3
4
5
6
7
8
9
10

In order to withstand a constitutional challenge, including a First Amendment challenge, a prison regulation must be "reasonably related to legitimate penological interests." *Turner*, 482 U.S. at 89. The Court developed a four-pronged test (the *Turner* test) to determine whether a prison regulation or policy is reasonably related to legitimate penological interests: "(1) whether there is a valid, rational connection between the policy and the legitimate governmental interest put forward to justify it; (2) whether there are alternative means of exercising the right; (3) whether the impact of accommodating the asserted constitutional right will have a significant negative impact on prison guards, other inmates and the allocation of prison resources generally; and (4) whether the policy is an 'exaggerated response' to the [prison's] concerns." *Turner*, 482 U.S. at 89-90.

11
12
13
14
15

First Prong:  In order to determine whether there is a rational connection between a prison regulation and a governmental interest justifying the regulation, a court must find the following: (1) the governmental interest is legitimate; (2) the governmental interest is neutral; and (3) the logical connection between the regulation and the interest is close enough to be rational and not arbitrary. *Turner*, 482 U.S. at 89-90.

16
17
18
19
20
21

Without going into an extended discussion of the factors relevant to the first prong, the Ninth Circuit has held that ADC's non-contact visit policy at its high security prisons is rationally related to its legitimate penological concerns and constitutionally valid. *Casey v. Lewis*, 4 F.3d 1516, 1523 (9th Cir. 1993) ("The ADOC policy is a reasonable response to the legitimate institutional concerns posed by full contact visitation: prevention of escape, assault, hostage-taking, and the introduction of contraband.")[8]

22
23
24

Second Prong: The second prong of the *Turner* test is whether there are alternative means of exercising the right.  Where other avenues remain available for the exercise of

25
26

---

[8] *See e.g.,* history of weapons manufactured by former Death Row inmate Robert Comer, detailed in 1/31/01 Motion to Stay/Vacate filed in CV94-1469-PHX-ROS, U.S.D.C (Ariz.).

9

the asserted right, courts should be particularly conscious of the measure of judicial deference owed to corrections officials in gauging the validity of the regulation. *Turner*, 482 U.S. at 90. In applying this factor, the right in question must be viewed sensibly and expansively. *Thornburgh*, 490 U.S. at p. 417.

ADC recognizes that the constitutional right allegedly infringed by denying contact visitation to attorneys and others retained by the attorneys that do not have an identifiable clinical or other specific need for a contact visit with a Death Row inmates is related to an inmate right to access the courts under the First Amendment. Although the regulation mandates Death Row visits as non-contact, it does not ban confidential legal visits, telephone calls, written communication or the confidential exchange of documents. Therefore, there is clearly alternative means available to an inmate to communicate with his/her legal counsel and exercise their right to access the courts. *See* Exhibit B, DO 902.

Third Prong: The third *Turner* prong is whether the accommodation of the asserted constitutional right will have a significant negative impact on prison guards, other inmates and the allocation of prison resources generally. Under this prong considerable deference should be given to the determination of prison administrators who, in the interest of security, regulate the relations between prisoners and the outside world. *Thornburgh v. Abbott* 490 U.S. 401, 408 (1989).

Permitting Death Row inmates gratuitous contact visitation with attorneys and others for the sake of convenience and without an identifiable clinical need would have a significant negative impact on staff, other inmates and the allocation of prison resources generally. When a Death Row inmate is out of his/her cell everyone associated with prison security is significant impacted, including on prison guards, other inmates and the allocation of prison resources generally.

<u>Fourth Prong</u>: *Turner's* fourth prong asks whether the regulation is an exaggerated response to Department's concerns. For all of the reasons identified *supra*, mandating non-contact legal and non-legal visits because of contact with Death Row inmates constitutes a direct and immediate threat to the security, safety or order of the institution is not an exaggerated response to the security concern these inmates pose within the prison institutions.

For these reasons set forth above DO 911 is reasonably related to the legitimate penological interests of ADC and is therefore constitutional. *Casey*, 4 F.3d at 1523.

### E.    Andriano Bears the Burden of Establishing the Denial of a Contact Visit Denies Her Access to the Courts.

Andriano has the burden of establishing that the regulation barring non-contact visitation is unreasonable under *Turner. Casey*, 4 F.3d at 1520. Andriano concludes in her motion that being separated from her attorney by a glass barrier when reviewing documents hinders their ability to communicate freely and therefore denies her access to the courts. As set forth in the Declaration of Officer Ponce, attached as Exhibit C, the non-contact visitation area at Lumley provides for confidential communications between Andriano and her attorneys, a process for the exchange of documents before and during the non-contact visit and the ability to receive legal mail and telephone calls all pursuant to DO 902.[9] Because Andriano bears the burden of establishing a non-contact visit under these circumstances violates her right to access the courts and she provides no facts or legal argument, other than the conclusion that a non-contact visit is, essentially, inconvenient, her motion should be summarily dismissed.

## IV.   CONCLUSION.

Except for visits *requiring* contact, all visitation with Death Row inmates, including with attorneys, is non-contact. Non-contact visitation does not prevent an attorney, nor an

---

[9]   Declaration of CO II Claudia Ponce attached hereto as Exhibit C.

11

expert retained to opine on the potential ineffectiveness of trial counsel, from doing his job, Petitioner does not support any hardships other than inconvenience and possible additional time required to do that job because of this policy.  This is not enough to overcome the validity of this regulation. Petitioner's motion should be denied.

RESPECTFULLY SUBMITTED this 7th day of December, 2011.

Thomas C. Horne
Attorney General

Michael E. Gottfried
Assistant Attorney General
*Attorneys for the Arizona Department of Corrections*

**CERTIFICATE OF SERVICE**

I hereby certify that on this 7th day of December, 2011, the attached document was hand-delivered to the Clerk's Office for filing and a copy mailed and e-mailed to:

Honorable Douglas Rayes
Maricopa County Superior Court .
101 West Jefferson, #411
Phoenix, AZ 85003-2243
drayes@superiorcourt.maricopa.gov

Scott M. Bennett
Coppersmith, Schermer & Brockelman PLC
2800 North Central Avenue, Ste. 1200
Phoenix, AZ 85004
sbennett@csblaw.com

12

1   Allen A. Arntsen
2   Stephen J. Nickels
    Matthew R. Lynch
3   Foley & Lardner LLP
    150 East Gilman Street
4   Madison, WI 53703
5   aarntsen@foley.com

6   Lacey Stover Gard
    Office of Attorney General
7   400 W. Congress, Ste. 315
8   Tucson, AZ 85701
    *Attorneys for State of Arizona*
9   lacey.gard@azag.gov

10

11

12  Legal Secretary to:  Michael E. Gottfried
    Amr:2502944

13

14

15

16

17

18

19

20

21

22

23

24

25

26

13

# EXHIBIT A



| ARIZONA DEPARTMENT OF CORRECTIONS | CHAPTER: 900 INMATE PROGRAMS AND SERVICES | OPR: OPS |
|---|---|---|
| DEPARTMENT ORDER MANUAL | DEPARTMENT ORDER: 911 *INMATE VISITATION* | SUPERSEDES: DO 911 (02/24/11) |
| | | EFFECTIVE DATE: JULY 20, 2011 |
| | | REPLACEMENT PAGE REVISION DATE: SEPTEMBER 23, 2011 |

# TABLE OF CONTENTS

**PURPOSE**

**RESPONSIBILITY**

**APPLICABILITY**

**PROCEDURES**                                                                                        **PAGE**

911.01    VISITATION APPLICATION PROCESS.................................................................................. 1
911.02    VISITATION PROCESS........................................................................................................ 10
911.03    SEARCHES......................................................................................................................... 17
911.04    NON-CONTACT VISITATION ............................................................................................ 19
911.05    SPECIAL CIRCUMSTANCE VISITATION.......................................................................... 21
911.06    SUSPENSION OF VISITATION.......................................................................................... 21
911.07    SECURITY REQUIREMENTS ............................................................................................ 21
911.08    VISITATION PRIVILEGES – REGULAR, HOLIDAY AND FOOD VISITS ........................ 21
911.09    SIGNAGE ............................................................................................................................ 21
          IMPLEMENTATION ............................................................................................................. 21
          DEFINITIONS ...................................................................................................................... 21
          AUTHORITY......................................................................................................................... 33
          ATTACHMENTS

CHAPTER 900 – INMATE PROGRAMS AND SERVICES
DEPARTMENT ORDER – 911 – INMATE VISITATION

# PURPOSE

This Department Order establishes procedures authorizing family members and others to visit inmates for the purpose of maintaining family and community ties.

# RESPONSIBILITY

Except where noted, the Warden, unit Deputy Wardens, unit Associate Deputy Wardens, or the Deputy Warden for Contract Beds, possess discretionary authority and shall be responsible for the management of Visitation in their area. Specific responsibilities include:

- Screening and approval of visitors.

- Placement of inmates into Non-Contact Visitation.

- Suspension of visits.

- Approval of special circumstance visitation.

The Department retains the authority to deny any individual visitation privileges. The decision of the parent or legal guardian shall always be the determining factor when rendering a determination to permit a minor's visitation.

# APPLICABILITY

This Department Order applies to all Department Prisons. Visitation for inmates assigned to Contract Beds shall be in compliance with this Department Order and any applicable Department contract.

# PROCEDURES

911.01      **VISITATION APPLICATION PROCESS** - Persons with a disability may request reasonable accommodation, e.g., a sign language interpreter, in accordance with Department Order #108, Americans with Disabilities Act (ADA) Compliance, by contacting the Department. Requests should be made as early as possible to allow time to arrange the accommodation.

   1.1      Initial Processing

      1.1.1      During intake processing, inmates who choose to have visits shall complete and submit a Visitation List, Form 911-1, to the designated staff. Inmates are permitted to have a maximum of 20 approved visitors on their Visitation List form.

      1.1.2      Inmates who submit a Visitation List shall list the full name and relationship of each potential visitor.

      1.1.3      Persons wishing to visit an inmate may complete and submit the Application to Visit an Inmate form on line at www.azcorrections.gov, or print, complete and mail the form as outlined in 1.1.3.3 of this section. In Contract Bed facilities or institutions not listed on the website as able to receive the electronic form the inmate shall be responsible for mailing an Application to Visit an Inmate, Form 911-4, to each person listed on the Visitation List.

1.1.3.1    Inmates shall be responsible for postage expenses associated with mailing the applications.

1.1.3.2    The Department shall pay the postage for mailing applications for all inmates verified as indigent by the appropriate Business Office.

1.1.3.3    All applications shall be legible, fully completed, signed by the potential visitor (unless submitted electronically), and returned by mail with the envelope reading "Attention Visitation Officer" or via the internet directly to the unit Visitation Officer where the inmate is assigned. The one-time $25.00 background check fee shall be mailed in accordance with 1.2.2.1 of this section.

     1.1.3.3.1    Applications to visit on behalf of a minor child may only be submitted by a non-incarcerated parent, legal guardian or temporary custodian of that minor child, and when someone other than a parent submits the visitation application, the application shall include documentation from a court establishing legal guardianship and/or temporary custody of the minor child.

     1.1.3.3.2    A non-incarcerated parent, legal guardian or temporary custodian of record of a minor child may authorize a third party to accompany and be responsible for the minor child at visitation, as long as that third party has a notarized statement from the non-incarcerated parent, legal guardian or temporary custodian of record and is also an approved visitor.

1.1.4    Former Department employees:

     1.1.4.1    Shall be prohibited visitation with an inmate for a period of two years from the date of separation of employment, except when the inmate is an immediate family member or relative.

     1.1.4.2    Employees terminated or who resigned while under investigation for inappropriate behavior with an inmate or possession and/or introduction of contraband are permanently ineligible to visit any inmate.

1.1.5    Former inmates shall be prohibited visitation with an inmate for a period of two years from the date of release, except when the inmate is an immediate family member or relative.

1.2    Background Check Fee - A one-time, non-refundable, $25.00 background check fee must be paid at the time the application is submitted for all adult visitors applying for visitation on or after July 20, 2011. The fee is applicable regardless of the outcome, unless the visitor is exempt from the fee as set forth below in 1.2.1. The Director shall deposit all background check fees into the Department's Building Renewal Fund, established by A.R.S. 41-797.

     1.2.1    The following persons are exempt from the one-time $25.00 background check fee:

      1.2.1.1      Children under the age of 18.

      1.2.1.2      Inmates' attorneys of record and their agents.

      1.2.1.3      Foster parents or court appointed legal guardians of the inmates' minor child(ren), as outlined in 1.3.5.2 of this section.

      1.2.1.4      Persons applying for telephone-only contact.

1.2.2      Applications received by mail and on-line for adult visitors shall not be processed until the background check fee is received.

      1.2.2.1      Money Orders – The Money order must be payable to "Arizona Department of Corrections – Visitation". The visitor's name, the inmate's name and ADC Number must be written in the memo section of the money order. Separate money orders must be completed for each applicant. Money orders shall be sent by mail with the envelope reading "Attention Visitation Officer – Background Check Fee" directly to the unit Visitation Officer where the inmate is assigned. Money orders shall not be accepted in person.

      1.2.2.2      Electronic Payment – An electronic payment method is available through the on-line Visitation Application process.  Separate electronic payments must be completed for each applicant.

            1.2.2.2.1      Should the applicant be denied and the decision appealed, an additional $25.00 background check fee shall not be imposed, whether the Administrator's decision is overturned or upheld.

            1.2.2.2.2      In the event an inmate recommits and the visitor has previously paid the $25.00 background check fee, an additional $25.00 background check fee shall not be imposed.

1.2.3      The Visitation Officer shall annotate receipt of payment in AIMS and forward all money orders to the Complex Business Office for processing the same date they are received accompanied by a Visitation Money Order Tracking Log listing all money orders received.

1.3      <u>Approval of Visitors</u> - The Warden, unit Deputy Warden or Associate Deputy Warden, Deputy Warden for Contract Beds, or designee shall approve visitation for inmates assigned to the unit.

      1.3.1      An improper and/or incomplete visiting application shall be returned to the person submitting the application. The potential visitor shall have an opportunity to properly complete the <u>returned</u> visitor application(s) and return it through the mail to the unit where the inmate is assigned.

      1.3.2      All visitor applications shall be forwarded to the receiving unit when an inmate is transferred.

      1.3.3      All visitor applications not received directly from the applicant through the mail or via internet shall be denied.

1.3.4    Staff shall verify the accuracy of all information provided on each visitor application submitted. A complete criminal history background check of all potential visitors, including infants and minors, using the Arizona Criminal Information Center/National Crime Information Center (ACIC/NCIC) system, shall be completed prior to submitting the application to the approving authority for final approval/disapproval of the visitation.

1.3.5    All minors and infants shall be run through the ACIC/NCIC Wants and Warrants and Missing Persons data bases. Minors, ages 7 – 17, shall also be run through the Juvenile Online Tracking System (JOLTS).

    1.3.5.1    The one-time background check fee will not be applicable to minors. Upon reaching their 18th birthday, an ACIC/NCIC Wants and Warrants check will be run. Minors turning 18 will be required to apply for visitation privileges, and pay the one-time, $25.00 background check fee.

    1.3.5.2    The parent, legal guardian, or temporary custodian of all minor children applying to visit an inmate, shall submit a copy of the minor's birth certificate for review. The copy shall be retained on file for future reference. Additionally, documentation of legal guardianship and/or temporary custody from adults who are not a non-incarcerated parent of the minor child, shall be submitted in the form of a court order or other legal record from a court of law that establishes the adult's legal responsibility to the minor, as outlined in 1.1.3.3.1 of this section.

1.3.6    All Process Servers shall undergo a complete criminal history background check, using the ACIC/NCIC system, prior to approval being granted by the institution's Chief of Security, or, if applicable, the Deputy Warden for Contract Beds, to permit the process server access to the facility and/or inmate.

1.3.7    A properly completed visitation application shall be processed and approved or denied within 60 days of receipt of background check fee or verification of previous payment. If the visitation application cannot be finalized within this time frame, written notification explaining the delay, shall be provided to the applicant within three work days after the expiration period.

1.3.8    Approved minors, including the inmate's natural, step or adopted children, shall be permitted to visit when accompanied by an approved adult listed on the inmate's Visitation List, unless the inmate has lost or forfeited parental rights, or the minor is the victim of a crime perpetrated by the inmate. (See section 911.01, 1.5.1.2).

    1.3.8.1    A notarized letter from the parent or legal guardian, authorizing the visit, is required if the minor is escorted by someone other than a parent or legal guardian. A notarized letter from the inmate shall not be accepted.

    1.3.8.2    Both the minor and the accompanying adult shall be listed on the inmate's approved visitation list prior to the visit.

    1.3.8.3    A copy of the minor's birth certificate is required to be on file prior to the visit.

    1.3.8.4    In instances where documented proof of the minor's legal marriage to the inmate is presented, the minor shall not require supervision by a parent or legal guardian.

1.3.9    Visitors shall be approved for only one inmate's Visitation List. A person shall be permitted visitation with only one inmate, unless the person is an immediate family member to other inmates incarcerated in the Department's institutions. The person may be approved and placed on the approved Visitation List of each inmate verified as an immediate family member.

    1.3.9.1    A visitor applying to visit multiple immediate family members shall only be required to pay one background check fee. If a visitor is already approved to visit one immediate family member, the Administrator may run an ACIC/NCIC background to determine continuation as an approved visitor.

        1.3.9.1.1    If the Administrator discovers a current felony or recent criminal activity which may constitute a denial or a threat to the safe and orderly operation of the institution, the Administrator or designee shall notify the other institution where the visitor is currently approved to determine if the visitor shall continue to be approved as a current visitor. .The outcome shall be at the discretion of the Administrators to approve/deny visitation privileges.

1.3.10    A copy of all decisions related to visitation authorizations shall be retained in the inmate's visitation file.

1.3.11    A current Visitation List for each inmate choosing to have visits shall be maintained in the Visitation file at the assigned unit and updated as necessary.

1.3.12    Each inmate shall initially be provided a copy of the approved Visitation List.

1.4    Processing Visitation Applications - Visitation Staff shall:

1.4.1    Stamp the reverse side of the application "RECEIVED," including the date of receipt.

1.4.2    Verify receipt of application payment in AIMS.

1.4.3    Compare the applicant's name against the submitted visitation list to ensure the potential visitor is identified on the inmate's Visitation List.

    1.4.3.1    If an applicant is not identified on the inmate's Visitation List, staff shall provide written notification to the inmate that an Application to Visit an Inmate has been received, but cannot be processed until a change is made to his/her visitation list. The inmate has 30 days to provide the change to the Visitation List.

    1.4.3.2    A copy of the notification shall be retained in the inmate's visitation file.

1.4.4    Initiate a criminal history background investigation for all potential visitors (including minors) by submitting a Criminal History Information Request, Form 121-1, or the ACJIS Information Request List, Form 121-6, to the Arizona Criminal Justice Information System (ACJIS) Terminal Operator.

    1.4.4.1    If the criminal history background investigation reveals no criminal history, the ACJIS operator shall record the results on the written request and return it to Visitation staff. The unit Deputy Warden or unit Associate Deputy Warden shall check the ACJIS Information Request List for the clearances, verify the information and sign and date the bottom of the form.

    1.4.4.2    If the criminal history background investigation reveals a warrant for arrest, the ACJIS operator shall provide the results to the local Criminal Investigations Unit (CIU) for further investigation. The results of this investigation shall be provided to the Warden or Deputy Warden that requested the background investigation.

    1.4.4.3    If the criminal history background investigation reveals a criminal history, the ACJIS operator shall forward all documentation to the Warden, unit Deputy Warden, or for Contract Beds, the Deputy Warden for Contracts Beds, for review and final decision to approve or deny the application. The Warden, Deputy Warden or Associate Deputy Warden shall:

        1.4.4.3.1    Return approved visitation applications to the Visitation Officer for processing.

        1.4.4.3.2    Return all denied visitation applications and copies of denial letters to the Visitation Officer for processing.

        1.4.4.3.3    Destroy all ACJIS related documentation after determining action to be taken.

1.4.5    Ensure that criminal history information remains confidential.

1.4.6    Ensure that all inmates are provided written notification of all visitation actions. An updated copy of all approved changes to the inmate's Visitation List shall be provided. The inmate shall be advised of his or her responsibility to inform the potential visitor of their visitation status.

1.4.7    Ensure that potential visitors are provided written notification when visitation is denied.

    1.4.7.1    Criminal history background information shall not be included in the written notification.

    1.4.7.2    A copy of the written notification shall be retained in the inmate's visitation file.

1.5    Denial or Removal of Visitors from Visitation List - The Warden, unit Deputy Warden, unit Associate Deputy Warden, or for Contract Beds, the Deputy Warden for Contract Beds, shall be responsible for:

     1.5.1    Denial of visitation or removal of a person(s) from an inmate's approved Visitation List, when the person:

         1.5.1.1    Poses a direct threat to the safety, security and/or orderly operation of the institution.

         1.5.1.2    Is the victim of the inmate. A person identified as the victim and who seeks visitation status with the inmate that victimized him/her, shall submit a written request listing the reason(s) for visitation. The entire circumstances shall be reviewed, prior to visitation being authorized. If the victim is a minor, the minor's parent(s) and/or legal guardian shall submit a notarized request listing the reason(s) for visitation. A minor identified as a victim of a sex offense shall not be permitted to visit that sex offender.

         1.5.1.3    Is discovered to have a previously undisclosed felony conviction or is convicted of a new felony.

         1.5.1.4    Has previously introduced illegal contraband into a correctional/confinement facility.

         1.5.1.5    Is listed as an approved visitor on another inmate's Visitation List, except as outlined in 1.3.9 of this section.

         1.5.1.6    Has felony charges or other active warrants pending. The person shall be reconsidered for visitation after the criminal charges/warrants have been resolved, the appropriate documentation submitted, and a review conducted.

         1.5.1.7    Provided false information on the visitation application.

         1.5.1.8    Is currently suspended at any of the Department's institutions.

         1.5.1.9    Has been prohibited from visiting pursuant to section 911.06 of this Department Order.

         1.5.1.10    Has not been properly cleared due to Department employee(s) failure to follow policy.

     1.5.2    Providing written notification of the action taken to any person denied or involuntarily removed from an inmate's approved Visitation List.

         1.5.2.1    Persons denied visitation may appeal the decision. Those persons that do not appeal may not apply again for visitation for a period of six months from the date of denial.

### 1.6    Visitation Denial/Removal Appeals

     1.6.1    A person appealing the denial or removal of visitation privileges shall submit a written appeal, within 10 work days of the action taken, to the Warden of the institution where the inmate is assigned.

         1.6.1.1    For inmates assigned to Contract Beds, the Deputy Warden for Contract Beds shall be responsible for reviewing the appeal and initiating appropriate action.

1.6.2   The Warden or the Deputy Warden for Contract Beds, if applicable, shall be responsible for providing written notification of the outcome of the appeal to the visitor within 10 work days of receipt of the written appeal. Appeal decisions shall be final.

1.6.2.1   When an appeal is denied, the person may not apply for Visitation reinstatement for a period of six months after the date of initial denial or removal action, or until the threat posed by the person ceases to exist.

1.6.2.2   Upheld appeals shall result in visitation being granted or reinstated immediately.

## 1.7   Visitation List Changes

1.7.1   An inmate may request the addition or deletion of approved persons to the Visitation List by submitting a Request to Change Visitation/Telephone Listing, Form 911-3 and the Visitation List, Form 911-1, to Visitation staff.

1.7.1.1   After authorized changes have been entered in AIMS by staff, a copy of the Visitation List shall be provided to the inmate in a timely manner. Changes may be made once every 90 days to the current Visitation List.

1.7.2   After an approved person has been entered on an inmate's visitation list, the person shall not be removed by the inmate for a minimum period of 90 days.

1.7.3   A person seeking voluntary removal from an inmate's Visitation List shall submit a notarized request for removal. All voluntary removals shall remain in effect for a minimum of 90 days. The person who was removed shall not be placed on any inmate's visitation list during this period.

1.7.4   All persons under visitation suspension shall require written approval for reinstatement as described in the initial application process.

## 1.8   Visitation Files

1.8.1   Visitation staff shall establish and maintain an inmate visitation file for each inmate assigned to the unit and shall enter all required visitor/visit information in the Adult Information Management System (AIMS.) Each inmate's Visitation File shall contain the following information:

1.8.1.1   Section One

1.8.1.1.1   All Background Information Forms.

1.8.1.1.2   A Visitation List.

1.8.1.1.3   Visitation Waiver, Form 911-2 - All waivers.

1.8.1.1.4   Request To Change Visitation/Telephone Listing.

|  |  |  |
|---|---|---|
| | 1.8.1.1.5 | All visitation notifications relating to the approval, denial, or removal of visitation privileges. |
| 1.8.1.2 | <u>Section Two</u> - All completed Applications to Visit an Inmate. | |
| 1.8.1.3 | <u>Section Three</u> | |
| | 1.8.1.3.1 | All copies of inmate marriage certificates. |
| | 1.8.1.3.2 | All legal guardianship documentation, including notarized correspondence from a parent(s)/legal guardian(s) authorizing a minor to be escorted by another adult to visit an inmate. |
| 1.8.1.4 | <u>Section Four</u> | |
| | 1.8.1.4.1 | Preliminary Notice of Visitation Suspension, Form 911-5. All copies. |
| | 1.8.1.4.2 | Documentation for all special circumstance visits. |
| | 1.8.1.4.3 | Special Visit Request, Form 911-6 - All requests. |
| | 1.8.1.4.4 | Inmate correspondence regarding visitation. |
| | 1.8.1.4.5 | Responses to inmate correspondence regarding visitation. |
| | 1.8.1.4.6 | Information Reports regarding an inmate's visitation. |
| | 1.8.1.4.7 | All visitor suspension correspondence. |
| | 1.8.1.4.8 | All inmate non-contact assignment correspondence. |
| | 1.8.1.4.9 | Visitor medical/special needs information. |

1.8.2    A daily Visitor Sign-In, Form 911-8, shall be completed for each day visits are conducted. The daily record shall be retained a minimum of 30 days in a separate filing system by the unit.

1.8.3    A visitation file shall be established for all inmates, including inmates electing not to participate in visitation activity. The file shall contain all completed inmate Visitation Waivers.

1.8.4    Visitation staff shall maintain a permanent record log reflecting receipt and/or transfer of all inmate visitation files for a period of one year.

1.8.5    An inmate's visitation file shall be forwarded when the inmate is transferred to another unit. Upon notification, visitation staff shall deliver the visitation file to the institution Offender Information staff, who shall ensure the visitation file is transferred with the inmate.

CHAPTER 900 – INMATE PROGRAMS AND SERVICES
DEPARTMENT ORDER – 911 – INMATE VISITATION

1.8.6    When unforeseen emergency movement of inmates occurs, visitation staff shall forward the visitation files to the inmate's receiving unit. This activity shall occur on the first work day following the emergency movement.

    1.8.6.1    If an inmate's visitation file was not forwarded with the transferring inmate, the receiving unit shall notify the sending unit, by email or fax, that the file was not transferred. A copy of the notification shall be retained for file.

    1.8.6.2    A temporary visitation file for each inmate shall be established when the inmate's permanent file is not available.

    1.8.6.3    All persons currently listed on AIMS as approved for visitation may visit the inmate at <u>any</u> Department unit without being subjected to re-qualifying through the Visitation Application process.

1.9    <u>Annual Background Review</u>

    1.9.1    Visitation staff shall annually:

        1.9.1.1    Run all approved adult visitors through the ACIC/NCIC system to determine continued visitation privileges and admittance to ADC institutions. Any criminal or felonious activity, to include warrants deemed to pose a threat to safe, orderly operations of an institution may constitute suspension or denial of visit privileges, as outlined in 1.4.4 of this section.

        1.9.1.2    Run all minors and infants through the ACIC/NCIC Wants and Warrants and Missing Persons data bases. Minors, ages 7 - 17, shall also be run through the Juvenile Online Tracking System (JOLTS), as outlined in 1.4.4 of this section.

    1.9.2    The ACJIS operator, shall run an annual background report. If a new felony, criminal activity, etc. is discovered, the ACJIS operator shall forward the information to the Unit requesting the annual background. The unit Deputy Warden shall determine if visitation privileges shall continue for the visitor. If there is no new activity from the last annual approval date, visitation privileges shall continue.  The same process shall apply for denials/removals of visitation privileges as outlined in 1.4, through 1.6 of this section.

**911.02    VISITATION PROCESS**

1.1    Upon each visit, visitors shall be required to register by fully-completing the daily Visitor Sign-In at the Visitation Office.

1.2    Visitation staff shall establish and maintain an AIMS visitation record for each inmate. The record shall contain each visitor's complete name and the date(s) of each visit.

1.3    Persons shall be denied visitation at <u>all</u> Department institutions if conditions outlined in section 911.01, 1.5.1.1 through 1.5.1.10 of this Department Order, apply.

1.4     An inmate may refuse visitation from anyone, except a Department employee conducting official business or a person(s) acting under a court order. An inmate refusing visitation with any other persons shall be required to complete a Visitation Waiver for each instance of refusal. Inmates may visit, space permitting, with a maximum of six persons at one time, regardless of age, during each visitation. Inmates requesting visitation with more than six persons at one time shall complete a Special Visit Request at least 15 days in advance of the visit.

1.5     Visitors are prohibited from visiting more than one inmate during visitation, unless the other inmate is an immediate family member and the visitor is approved to visit the inmate as outlined in section 911.01, 1.3.9 of this Department Order. Nor may inmates visit with another inmate's visitors, unless the inmates are immediate family members of the visitor, and the visitors have been approved to visit both inmates.

1.6     Only one group shall sit at a table, except when the Visitation Area is experiencing space shortages. Visitation staff may allow more than one group to occupy a table if it is unlikely to create a problem.

      1.6.1    In the event the Visitation Area is at maximum capacity, Visitation staff shall ask visitors, on a voluntary basis, to end their visit. If a sufficient number of visitors fail to volunteer, staff shall terminate visits, beginning with the first visitors processed, until the required seating/space is available for incoming visitors.

         1.6.1.1     Visitors shall be permitted a two-hour visitation period prior to termination due to capacity issues.

         1.6.1.2     The Warden or unit Deputy Warden at remote facilities may alter minimum visitation time standards prior to terminating visits due to capacity issues. All changes to visitation periods shall be written and posted.

1.7     Breast-feeding during visitation is an acceptable practice when requested by the mother.

      1.7.1     Reasonable accommodation shall be made to provide privacy to the mother and infant in an area near, but separate from, the general visitation area.

      1.7.2     If a physically-separate area is unavailable or is not conducive to sound correctional practice, a privacy screen may be utilized within the general visitation area.

      1.7.3     For additional information, refer to the Visitation Post Order.

1.8     Visitation staff shall terminate visitation when an inmate or visitor becomes unruly and/or disruptive, with authorization from the shift commander, chief of security, or duty officer.

1.9     Denial of Entry - Approved visitors shall be denied entry to the unit and/or visitation area, if the person:

      1.9.1     Is currently suspended from visiting any Department institution.

      1.9.2     Fails to provide proper identification.

      1.9.3     Does not meet the Department's dress and/or grooming standards.

    1.9.4        Is reasonably suspected of being under the influence of alcohol and/or drugs.

    1.9.5        Possesses contraband or illegal contraband.

    1.9.6        Uses abusive language and/or engages in actions which disrupt the safety, security, and/or orderly operation of the unit.

    1.9.7        Is a minor/young child not accompanied by an adult and listed on the inmate's approved visitation list.

    1.9.8        Is the subject of a Service Dog alert, a positive Ion Scan reading, or fails to clear the metal detector.

1.10     Visitor Identification - Adult visitors shall present acceptable evidence of identification upon entering and exiting the unit's visitation processing area.

    1.10.1    Identification shall include the visitor's name, a photograph, and date of birth. Visitation staff shall ensure this information is the same as that listed on the visitor's application and in AIMS.

    1.10.2    Acceptable photographic identification for adult visitors shall include, but is not limited to:

        1.10.2.1    Military Identification Card.

        1.10.2.2    Passport.

        1.10.2.3    Valid state driver's license.

        1.10.2.4    Official photographic identification cards originating from any U.S. state or federal agency, including government employee identification cards and Immigration and Custom Enforcement Agency (ICE) documentation cards. The Department shall not accept consular identification cards issued by a foreign government as a valid form of identification, pursuant to A.R.S 41-5001.

1.11     Conduct in the Visitation Area

    1.11.1    Inmates and visitors shall conduct themselves in accordance the rules of conduct outlined in section 911.09 of this Department Order.

    1.11.2    Reporting Misconduct - An Information Report and/or Disciplinary Report, documenting unusual and/or misconduct incidents occurring in the Visitation Area, shall be submitted by the observing staff member(s).

        1.11.2.1    Suspensions and appeals due to misconduct shall be handled as described in section 911.06 of this Department Order.

        1.11.2.2    All violations and warnings shall be noted and entered on the AIMS Offender Comments/Visitation screen on a daily basis.

1.12     Allowable Property

    1.12.1    Visitors shall be permitted only the items listed below. All other items shall remain secured in the visitor's vehicle or in pay lockers, if applicable.

1.12.1.1    Personal identification. For security reasons, personal identification shall be held by the Visitation office.

1.12.1.2    Prescription medication, in the original container, and only in a limited amount needed during the visitation period. For safety reasons, prescription medications shall be held by the Visitation office, with exception to inhalers and nitroglycerin medication in case of emergency.

    1.12.1.2.1    Visitation staff shall attach the prescription medication to the visitors Personal Identification and place in an envelope. Prescription medications shall be kept in a secured location, within the Visitation office as determined by the Unit administration.

1.12.1.3    One unopened package of cigarettes. A flameless electric cigarette lighter shall be located in the designated smoking sections of the visitation area. The lighter shall be protected from the weather and shall be out of children's easy reach. The lighter shall be identified by a sign that includes a warning to keep children away.

    1.12.1.3.1    Smoking may be prohibited in some Visitation areas in accordance with Department Order #109, Smoking and Tobacco Regulations.

1.12.1.4    Possession of coins totaling a maximum of $30.00 per visitor.

1.12.1.5    One wedding/engagement ring, one religious medallion, one wristwatch and one pair of earrings or two observable body piercing adornments. The visitor shall wear all items brought into visitation throughout the visit.

1.12.1.6    Two vehicle keys or one key and a vehicle remote control entry device.

1.12.1.7    One handheld baby carrier per infant. The carrier shall be subjected to a thorough search prior to entry. Strollers or carriers with wheels shall not be permitted. Toys shall be prohibited, except as outlined in 1.15.2.1.1 through 1.15.2.1.3 of this section.

1.12.1.8    One clear plastic diaper bag, per infant, that shall be subjected to a thorough search prior to entry. A diaper bag may contain only the following items:

    1.12.1.8.1    Three clear-plastic baby bottles of milk/formula or equivalent size unopened, commercially sealed containers of juice.

    1.12.1.8.2    Four small clear plastic containers of soft food or baby food such as Tupperware containers.

    1.12.1.8.3    One diaper for each hour of visitation.

        1.12.1.8.4      One clear container or Ziploc bag of baby sani-wipes.

        1.12.1.8.5      One blanket, measuring no larger than 4' by 4'. The blanket cannot be tan in color.

        1.12.1.8.6      One small plastic spoon used to feed an infant.

        1.12.1.8.7      One baby pacifier.

        1.12.1.8.8      One change of baby clothing.

        1.12.1.8.9      One baby bib.

        1.12.1.8.10     One small tube of diaper rash medication.

1.12.1.9      With the exception of cigarettes and disposable baby items (diapers, wipes), each visitor shall leave the visitation area with the exact property items possessed at the time the visitor was processed to visit.

1.12.2      Inmate permitted items in the visitation area:

    1.12.2.1      An inmate is required to wear and provide the Department-issued identification (ID) card at all times, including during the visitation period.

    1.12.2.2      An inmate may take in/out of the visitation area the following items only:

        1.12.2.2.1      One-wedding/engagement ring, one religious medallion, and required medication in an amount sufficient for the length of the visit.

        1.12.2.2.2      A locker key or room key, if applicable.

        1.12.2.2.3      A reasonable quantity of tobacco products sufficient for the length of the visit. Absolutely no tobacco products shall be permitted to return to the unit from the visitation area.

        1.12.2.2.4      One pair of regular prescription eyeglasses or reading eyeglasses. Sunglasses are prohibited unless prescription sunglasses are authorized.

    1.12.2.3      An inmate is prohibited from possessing any coins or currency. An inmate shall be permitted to take absolutely no money in or out of the visitation area.

    1.12.2.4      Only vending machine items and the permitted tobacco products may be exchanged between an inmate and visitor during visitation. All other exchange of personal property and items is prohibited.

1.13    Food and Beverage

    1.13.1    Visitors are prohibited from taking any food or beverages into the visitation area, except as outlined in this section and section 911.08 of this Department Order.

    1.13.2    Vending machines may be provided for hot/cold beverages and snacks for inmate and visitor convenience in the visitation area.

1.14    Visitor Dress Code

    1.14.1    All clothing shall be clean, worn in good repair, be non-offensive, and within the bounds of common decency.

    1.14.2    Visitors shall not wear any article of clothing fabricated with spandex-like material or clothing that is orange in color. Sheer, see through and/or open-netted clothing is prohibited.

    1.14.3    Visitors are prohibited from wearing any brown-colored clothing that resembles the clothing worn by Department security staff, including khaki-colored clothing, solid light tan or light brown-colored shirts or dark brown-colored pants or slacks.

    1.14.4    A visitor who has been determined, during initial registration, not to be in compliance with the Visitor Dress Code shall be given an opportunity to leave the prison grounds and return dressed appropriately, in compliance with the dress code requirements. No additional opportunities to gain compliance shall be extended for that specific visitation day.

    1.14.5    The dress code for female visitors (age eight and over) is:

        1.14.5.1    Shorts shall be knee length, when standing. Jogging shorts, cut-offs, or hip huggers are prohibited.

        1.14.5.2    Skirts and dresses shall be knee length, when standing. Slits in skirts and dresses shall not extend above mid-thigh when seated.

        1.14.5.3    Sleeveless tops or dresses; tank, tube, and halter tops; tops that are strapless; tops that allow display of bare midriff; mesh clothing; body suits; and swimsuits are prohibited.

        1.14.5.4    Tops of clothing shall be no lower than the person's collarbone in the front and back. No cleavage shall be exposed.

        1.14.5.5    Undergarments shall be worn at all times.

        1.14.5.6    Shoes shall be worn at all times.

        1.14.5.7    A wig or clip-on hair piece may be worn if medical documentation is provided and justifies the need.

    1.14.6    The dress code for male visitors (age eight and over) is:

        1.14.6.1    Shorts shall be knee length, when standing. Jogging shorts, cut-offs, or hip huggers are prohibited.

1.14.6.2 Shirts shall be worn at all times. Muscle shirts; sleeveless shirts; tank-style shirts; mesh shirts; or shirts that display bare midriff are prohibited.

1.14.6.3 Undershorts shall be worn at all times.

1.14.6.4 Shoes shall be worn at all times.

1.14.6.5 A wig or clip-on hair piece may be worn if medical documentation is provided and justifies the need.

1.15 Visitation Area Recreational Activities

1.15.1 Recreational opportunities for visitors shall be provided in contact visitation areas.

1.15.2 In accordance with Department Order #303, Bank Accounts/Petty Cash System, table/board games shall be purchased with available Activities and Recreation Funds.

1.15.2.1 Authorized recreational items are:

1.15.2.1.1 Appropriate board games such as "Candyland," "Chutes and Ladders," 'Connect 4," Memory games, Dominos, Scrabble and "Pictionary."

1.15.2.1.2 Simple playing card games such as "Uno," "Racko," "Old Maid," "Skip Bo' and regular playing cards.

1.15.2.1.3 Small simple illustrated children books, coloring books and crayons.

1.15.2.2 Prohibited recreational items include:

1.15.2.2.1 Any toy or game containing or having any metal or glass pieces as its parts.

1.15.2.2.2 Games that include play/fake currency or dice.

1.15.2.2.3 All stuffed animals, "Nerf-type" sports equipment, and animated books.

1.15.2.2.4 All items designated by the Warden or unit Deputy Warden or where specific written justification for exclusion has been provided.

1.16 Visitor Guidelines -To enhance visitation, Attachment C, Visitor Guidelines, provides basic information concerning proper identification and dress code requirements, searches, allowable property and visitor conduct. A duplex-sided copy of the attachment shall be made available to all inmates and visitors. Inmates are responsible for providing a copy of the attachment to prospective visitors when mailing the Application to Visit an Inmate.

1.17 Animals are prohibited on prison property except for service animals accompanying an individual with a disability.

**911.03        SEARCHES**

1.1       Visitor Searches - All visitors, their personal possessions, and vehicles are subject to search by one or more of the methods listed below.

1.1.1     All visitors and their possessions are subject to physical search by staff, electronic metal detection devices, barrier sniff screening (Narcotics Detection) by a Department Service Dog, and/or Ion Scanning.

1.1.1.1   All visitors and their possessions shall successfully pass scanning by electronic detection devices/equipment.

1.1.1.1.1   All visitors shall remove their shoes. All shoes shall be passed through and clear the metal detector and shall be physically inspected/searched before returning to the visitor. Special attention shall be paid to athletic shoes worn by visitors, inspecting the inner sole and heel of the shoe to ensure no contraband is concealed. If shoes are unable to clear the metal detector, a secondary physical inspection/search shall occur to determine the reason the shoes are unable to clear. If no contraband is discovered during the physical inspection/search, the On-Site Duty Officer shall make the determination to allow the visitor in to visit.

1.1.1.1.2   If a visitor does not pass the scan, they will be notified they can return to their vehicle and remove any objects which may alert the scanner and return to pass through the electronic metal detector a second time.

1.1.1.1.3   If they do not clear the electronic metal detector on the second attempt, staff may elect to hand wand the area activating the electronic metal detector.

1.1.1.1.4   If they do not clear the electronic metal detector after hand wand, they will be asked to leave the facility and will not be permitted access to visitation for the day.

1.1.1.1.5   Under NO circumstances will a minor child (anyone under the age of 18) be searched with a hand wand. If the minor child does not pass the electronic metal detector, the child and accompanying legal guardian may be allowed to leave and return for a second attempt. If the minor child cannot pass the electronic metal detector after the second attempt, they will not be allowed to visit.

1.1.1.2   A visitor, with a special medical condition possibly affecting the reading of electronic detection equipment, shall advise Visitation staff prior to undergoing scanning by electronic detection devices/equipment. Examples may include a prosthesis, an embedded metal surgical pin or plate. The visitor shall be required to provide documentation of the existing medical condition prior to the second visit.

       1.1.2     Visitors refusing to submit to a search shall be denied visitation. The Duty Officer, or in the absence of the Duty Officer, the Shift Commander shall be notified of all Service Dog alerts, positive Ion Scan readings and contraband recoveries.

       1.1.3     All persons denied visitation shall be required to depart Department property immediately.

1.2     Inmate Searches

       1.2.1     Prior to entering the visitation area, all inmates shall be thoroughly pat-searched by staff.

       1.2.2     When reasonable suspicion exists that an inmate may be the recipient of contraband during visitation, a strip search shall be conducted prior to the inmate entering the visitation area to preclude entry of items facilitating the introduction of contraband, including the use of lubricants and balloons.

       1.2.3     Upon completion of visitation, all inmates shall be strip searched by staff prior to exiting the visitation area and returning to their unit.

1.3     Vehicle Searches - All vehicles on Department property are subject to search. The owner/user shall be present during the search.

       1.3.1     A Service Dog or Ion Scanning shall be deployed to screen the vehicle, when available.

            1.3.1.1     All vehicle occupants shall be required to exit the vehicle.

            1.3.1.2     If contraband or illegal contraband is detected during the search of a vehicle, staff shall confiscate the item(s). When illegal contraband is detected, the appropriate CIU shall be notified immediately. CIU shall be responsible for determining if local law enforcement is to be notified.

                  1.3.1.2.1     The person(s) responsible for the illegal contraband shall be denied visitation by the on-site Duty Officer. If no one in the vehicle claims responsibility for the contraband the driver of the vehicle will assume responsibility.

                  1.3.1.2.2     A Preliminary Notice of Visitation Suspension shall be issued to the person(s), pending review by the unit Deputy Warden. The owner/user and the vehicle shall be required to depart Department property immediately.

                  1.3.1.2.3     All other occupants in the vehicle will be suspended for the day.

            1.3.1.3     A Department Service Dog alert or positive Ion Scan reading involving a vehicle in which no contraband is found shall result in all occupants of the vehicle being suspended for the day.

1.3.1.4     In accordance with Department Order #708, Searches, if a visitor is the subject of a Service Dog alert or a positive Ion Scan reading, and extraordinary circumstances exist, the Warden may authorize non-contact visitation for the visitor, who is the subject of the alert or the positive reading, as outlined in section 911.04 of this Department Order. Examples of extraordinary conditions include an alert or positive scan on an out-of-state visitor or an individual who is seriously ill or impaired, etc.

1.4     Reporting and Documenting Incidents - An Information Report and all related documents pertaining to the incident shall be completed and forwarded to the unit Deputy Warden. The unit Deputy Warden shall review all information related to the Service Dog alert or positive Ion Scan reading, including Ion Scan printouts, and within five work days, provide the affected person(s) with written notification of the outcome of the review.

    1.4.1     All incidents shall be fully-documented on an Information Report.

    1.4.2     Circumstances of the incident shall be entered on the appropriate AIMS screen.

## 911.04     NON-CONTACT VISITATION

1.1     The unit Deputy Warden shall determine visitation status relative to non-contact visitation. Deciding factors shall include consideration of:

    1.1.1     Past behavior of the inmate and/or visitor during visitation.

    1.1.2     An inmate's disciplinary record.

    1.1.3     Other available information relating to sound correctional practice.

1.2     Non-contact visitation may be imposed:

    1.2.1     To maintain the safety, security, and orderly operation of the unit.

    1.2.2     For the well-being of visitors, staff, and inmates.

    1.2.3     When an inmate is suspected of trafficking in contraband.

    1.2.4     For repeated violation of visitation rules.

    1.2.5     For purposes of investigation, when a visitor is found to possess a substance believed illicit or unauthorized.

       1.2.5.1     Placement on non-contact visitation status, for investigative purposes, shall not exceed 30 calendar days.

       1.2.5.2     Final determination that a substance(s) is illicit or unauthorized shall result in an additional suspension of the person(s) visitation, in accordance with section 911.06, 1.7 and 1.8 of this Department Order.

1.3     An inmate may be placed on non-contact visitation status for suspected drug activity until an investigation has been completed and appropriate disciplinary action taken.

1.3.1     Non-contact visitation for suspected drug activity shall not exceed 30 calendar days.

1.3.2     Should the substance(s) be determined to be illicit or unauthorized, further suspension of visitation shall be enacted in accordance with section 911.06, 1.7 and 1.8 of this Department Order.

1.4     An inmate who refuses to provide a urine specimen or whose urine specimen tests positive for drugs shall be placed on Non-Contact Visitation status, regardless of any disciplinary action.

1.4.1     First Incident – Suspension for 90 days and 180 days of non-contact visitation status.

1.4.2     Second Incident – Suspension for 180 days and one year of non-contact visitation status.

1.4.3     Third Incident – Suspended indefinitely and indefinite non-contact visitation. The Warden or unit Deputy Warden may impose permanent suspension of visitation.

1.5     The unit Deputy Warden shall establish a review date for each inmate assigned non-contact visitation status identified in 1.4.1 and 1.4.2 of this section. The review date shall be entered into the AIMS.

1.6     Inmate populations designated for non-contact visitation are:

1.6.1     Special Management Units.

1.6.2     Inmates in or on Detention status.

1.6.3     Reception Centers.

1.6.4     Central Unit - Florence.

1.6.5     Special Management Area - Perryville.

1.6.6     Those in any other status designated by the Warden or unit Deputy Warden.

1.7     An inmate shall be provided written notification of placement on non-contact visitation status in a timely manner (See Attachment A.)

1.7.1     The written notification shall contain a statement advising that the inmate has 14 calendar days to provide information, which may impact the decision, to the unit Deputy Warden.

1.7.2     Inmates assigned to a unit identified in 1.6.1 though 1.6.6 of this section shall not receive written notification of placement on non-contact visitation status.

1.8     An inmate placed on non-contact visitation status shall remain on that status until removed by the unit Deputy Warden where the inmate is assigned.

1.9     A decision by the unit Deputy Warden for placement into non-contact visitation may be appealed to the Warden within ten work days of the date of the notice. A decision by the Warden is final and cannot be appealed.

1.10    Visitation staff shall maintain a record of all inmates designated as non-contact visitation status. The record shall reflect the date of placement on non-contact visitation status for each inmate. Visitation staff shall submit, by the 28th day of each month, to the Warden through the chain of command, an informational memorandum listing all inmates currently on non-contact visitation status for the month. Information required includes:

    1.10.1    Inmate's full name.

    1.10.2    Inmate's Arizona Department of Corrections (ADC) number.

    1.10.3    Initial placement date.

    1.10.4    Review date.

    1.10.5    Status termination date.

    1.10.6    Reason or purpose for status.

1.11    Visitation staff shall document the non-contact visitation status for each inmate, including appropriate information being entered in AIMS on Offender Comments and Visitation screens.

1.12    All non-contact visitation is subject to space limitations, and prior reservations are required. The location and duration of the visitation shall be determined by the unit Deputy Warden.

## 911.05    SPECIAL CIRCUMSTANCE VISITATION

1.1    Hospitalized Inmates - Visits for hospitalized inmates shall be permitted for immediate family members when specifically authorized, in writing, by the Warden or unit Deputy Warden, with the concurrence of the attending physician and the Facility Health Administrator and one of the following criteria has been met:

    1.1.1    The inmate has been hospitalized for a period of 30 days or more.

    1.1.2    The inmate's death has been determined by medical staff to be imminent.

1.2    Law Enforcement Visitation - A law enforcement official(s) seeking to interview an inmate on official business shall be required to present proper identification (e.g., badge and identification card) for review by the Criminal Investigations Unit (CIU) staff prior to being granted visitation.

    1.2.1    CIU staff shall:

        1.2.1.1    Determine and document the purpose of the visit.

        1.2.1.2    Provide the law enforcement official(s) with appropriate Departmental policies and procedures for review prior to granting visitation to ensure the law enforcement official(s) is knowledgeable and in compliance with Department Orders during the interview process, specifically as it relates to providing/supplying an inmate an item(s) not issued or authorized by the Department.

1.2.2    Law enforcement officers serving as routine transportation officers are exempt from requirements of 1.2.1 through 1.2.1.2 of this section.

1.2.3    *Should the Department be a party to a criminal or civil investigation, where a law enforcement official(s) is requesting admittance to conduct interviews with staff and/or inmates, or is requesting access to investigative reports, the official(s) shall be referred to the Department's Inspector General. Interviews shall not be conducted, nor reports released, until the request(s) has been authorized by the Inspector General.*

1.2.4    Federal Bureau of Investigation agents, or other federal agency employees requesting visitation for conducting an interview(s) with Department staff or inmates for the purpose of investigating an alleged civil rights violation(s) are required to advise and consult with the Director, pursuant to the United States Code 42, Civil Rights Institutional Persons Act, Sub-chapter 1997b. The agent(s) shall be referred to the Inspector General. Admittance and/or interviews shall not be granted until the request(s) has been authorized by the Inspector General.

1.3    Special Needs Inmate Visitation - A special visitation area shall be designated for an inmate with special management needs, such as those inmates assigned to the Department's Reception Centers, the Special Management Units, Death Row, Administrative Detention, Protective Segregation, and Special Programs Unit.

1.3.1    Special Management Units are mandated as non-contact visitation for all visitations.

1.3.2    All inmates pending Protective Segregation classification action shall be closely supervised and physically separated from all other inmate visitation while participating in visitation activities and during escorts to and from visitation.

1.4    Religious Visitation - Religious visits shall be conducted in accordance with Department Order #904, Inmate Religious Activities/Marriage Requests.

1.5    Department Employee Visitation - Department employees, conducting official business, shall contact appropriate unit staff to schedule a visit with an inmate.

1.6    Court Order Visitation - Persons acting under a court order shall contact the appropriate unit staff to arrange/schedule a visit with an inmate. A copy of the court order shall be provided to appropriate unit staff for inclusion in the inmate's Visitation, Institution and Master files.

1.6.1    Court ordered visitation will be facilitated on the 1st and 3rd Friday of each month.

1.6.2    Department of Economic Security (DES) caseworkers must call the unit where the inmate is assigned to request a visitation time slot at least seven days prior to the Friday visit. DES caseworkers must bring their state identification card (with photo) to gain access to the facility.

1.7    Special Visitation - Inmates shall submit a Special Visit Request to their assigned Correctional Officer III at least 30 days prior to the date of the requested visit.

1.7.1    Only the unit Deputy Warden or designee may authorize special visits for:

        1.7.1.1      Exceptionally large families to facilitate all members visiting as a group with the inmate.

        1.7.1.2      Out-of-state visitors.

        1.7.1.3      Visitors unable to visit on a regular basis.

        1.7.1.4      Extraordinary circumstances.

1.7.2      Inmates shall complete a Special Visit Request prior to the visit and the Special visitors shall be required to clear the ACIC/NCIC criminal history background check.

        1.7.2.1      A one-time background check fee of $25.00 will be assessed for all adult visitors, not already approved, wishing to visit for special circumstances.

        1.7.2.2      The unit Deputy Warden may waive the 30 day time frame and/or the $25.00 background check fee for a one-time special visit due to extraordinary circumstances.

1.8      Legal Visits - Legal visits shall be conducted in accordance with Department Order #902, Inmate Legal Access to the Courts. As noted in Department Order #915, Inmate Phone Calls, inmates may include foreign consulates on their Visitation List.

1.9      Holiday Visits - Visitation may be scheduled during the normal work week when the following holidays occur during a week day. Those holidays that fall on a weekend day shall be considered the actual holiday and not the day before or after the weekend. For information regarding holiday visits, custody and phase eligibility, and dates held see Department Order #809, Earned Incentive Program.

    1.9.1      New Years Day

    1.9.2      Valentine's Day

    1.9.3      Mother's Day

    1.9.4      Father's Day

    1.9.5      Independence Day (4th of July)

    1.9.6      Labor Day

    1.9.7      Veteran's Day

1.10      Inmate Photographs – Inmates are authorized to have photographs taken of themselves and/or their family members on identified holidays during specified time periods.

    1.10.1      Visitation Photograph Schedule:

        1.10.1.1      New Years Day

        1.10.1.2      Mother's Day

| | | |
|---|---|---|
| | 1.10.1.3 | Independence Day (4th of July) |
| | 1.10.1.4 | Veteran's Day |

1.10.2  Visitation Process - Photographs:

1.10.2.1  Only inmates who are authorized contact visits will be eligible to participate in the photograph process.

1.10.2.2  The unit Deputy Warden shall designate one location in each visitation area where all photographs shall be taken.

1.10.2.3  Maximum Custody and Special Management Areas are excluded from the photograph process.

1.10.2.4  Inmates wishing to participate in the process will be required to complete an Inmate Request for Withdrawal, Form 905-1, for the cost of the photos (currently $2.00 each with a limit of 4 photos). The Inmate Requests for Withdrawal form will be accepted two (2) weeks prior to the holiday.

1.10.2.5  No refunds will be issued for photographs that are seized or destroyed in accordance with this Department Order or for photographs not taken.

1.10.2.6  Prior to photographs being taken, inmates and visitors must be in full grooming and clothing compliance in accordance with Department policy and procedures.

1.10.2.7  Inmates and their visitors are prohibited from displaying excessive touching, kissing, or any hand gestures, gang signs, sexual acts or innuendos, simulated sexual acts or innuendos, or blatant display of tattoos.

1.10.2.8  Photographs will only be taken with approved digital equipment purchased by the institution or through the A & R Fund.

1.10.2.9  Staff designated by the unit Deputy Warden shall print and review all photographs for appropriateness and forward photos to the appropriate inmate who may retain or send the photo(s) out through mail and property.

1.10.2.10  Any photograph deemed inappropriate or in violation of this Department Order will be considered nuisance contraband and will be processed in accordance with Department policy and procedures.  Inmate is also subject to disciplinary proceedings.

1.10.2.11  Photographs will only be taken during regular visitation hours.

1.10.2.12  Inmates who are eligible for contact visitation who did not receive a visit shall be permitted to participate in the program during the time periods specified by the unit Deputy Warden. Photographs shall only be taken in the designated area of visitation.

1.10.2.13    Inmates receiving special visits may take photos only if the visit is on the authorized weekend or if the unit Deputy Warden approves an exception.

1.10.2.14    Inmates are prohibited from making copies of the visitation photographs. At no time should copies be made by staff for the inmates.

1.10.2.15    Inmate visitation photographs cannot be altered and sent back into the institution through the mail. Visitation photographs cannot be mailed from one inmate to another inmate.

1.10.2.16    Photographs will only be permitted on the day of the designated holiday and the weekend attached to that holiday.

## 911.06    SUSPENSION OF VISITATION

1.1    Cause for suspension includes:

1.1.1    Introduction and/or attempted introduction of contraband or illegal contraband, or discussion of contraband introduction.

1.1.2    Escape, attempted escape, or discussion of escape.

1.1.3    Any action, attempted action, or discussion of action(s) that may jeopardize the unit safety and/or security. This includes infractions of the inmate disciplinary system.

1.1.4    Any criminal activity, attempted criminal activity or discussion of criminal activity.

1.1.5    Any discussion of graphic, detailed descriptions of sexual acts.

1.1.6    Any misconduct, attempted misconduct or discussions of misconduct, as outlined in section 911.02 of this Department Order.

1.1.7    A Service Dog alert or positive Ion Scan reading.

1.2    Visitation Suspension Periods (See Attachment B):

1.2.1    Suspension periods for a Service Dog Alert or positive Ion Scan reading are:

1.2.1.1    First Incident - Visitor shall be suspended for the day.

1.2.1.2    Second Incident - Suspension for 30 days and 90 days of non-contact visitation status for the visitor following reinstatement.

1.2.1.2.1    If the visitor visits more than one inmate, the non-contact visitation shall also apply to visits with other inmates.

1.2.1.2.2    When a non-contact status visitor visits an inmate, the visit shall be non-contact, even if an inmate's other approved visitors are present.

CHAPTER 900 – INMATE PROGRAMS AND SERVICES
DEPARTMENT ORDER – 911 – INMATE VISITATION

          1.2.1.3      Third Incident - Suspension for 90 days and 180 days of non-contact visitation status for the <u>visitor</u> if visitation privileges are reinstated.

          1.2.1.4      Fourth Incident - Suspension for one year and indefinite non-contact visitation status for the <u>visitor</u> if visitation privileges are reinstated.

    1.2.2      Suspension periods for possession of contraband and/or violation of standards of behavior are:

          1.2.2.1      First Incident - Suspension for 90 days and 180 days of non-contact visitation status for the visitor following reinstatement.

          1.2.2.2      Second Incident - Suspension for 180 days and one year of non-contact visitation status for the visitor following reinstatement.

          1.2.2.3      Third incident - Suspended indefinitely and indefinite non-contact visitation for the visitor if visitation privileges are subsequently reinstated. The Warden or unit Deputy Warden may impose permanent suspension of visitation.

    1.2.3      Suspension period for possession of illegal contraband. Suspension for 180 days, minimally, and one year of non-contact visitation status for the visitor if visitation privileges are subsequently reinstated. Indefinite suspension and/or non-contact visitation status for the visitor may be considered based on the circumstances and type of illegal contraband detected.

1.3      Visitor appeals relating to visitation suspensions shall be addressed to, reviewed by, and decided by the Warden and not a designee. The Warden shall forward the appeal to the appropriate Regional Operations Director for review. The Regional Operations Director's decision is final.

1.4      Inmate visitation suspensions may be addressed through the inmate disciplinary system. Inmate appeals involving visitation suspensions may be addressed through the inmate disciplinary system appeals process.

1.5      Suspension of a person(s) visitation privileges shall also result in that person's telephone privileges being suspended. Suspension of visitation and telephone privileges shall be handled in the same manner.

    1.5.1      When the telephone number of a suspended telephone call recipient is the same as another approved person, the unit Deputy Warden or designee may permit an inmate to call the person not under suspension at that number, provided that person is an immediate family member.

1.6      The visitor may submit a written statement to the Warden or unit Deputy Warden for review within five work days of the incident.

1.7      After reviewing all available information, the Warden or Deputy Warden shall determine appropriate action based on the specific circumstances and/or types of contraband detected.

1.8      A suspension may be extended, based on the issues and circumstances related to the incident. For standards of behavior, refer to Department Order #915, <u>Inmate Phone Calls</u>.

1.9    Visitation and/or telephone privileges may be reinstated at the completion of the person's suspension period. A new visitation application shall be completed and shall be approved by the Warden or unit Deputy Warden prior to reinstatement.

**911.07    SECURITY REQUIREMENTS**

1.1    The Warden or unit Deputy Warden at any Department facility may suspend all visitation activities upon determining the safety, security, and/or orderly operation of the unit is jeopardized.

1.2    _Physical Security Requirement_ - The Warden and unit Deputy Warden shall ensure:

    1.2.1    Visitation areas and buildings conform to physical security, access controls and security supervision consistent with the control needs of the inmate population of the unit being served.

    1.2.2    Sufficient security staff is assigned to ensure the safe, secure and orderly operation of each visitation area.

    1.2.3    40 hours of formalized, on-the-job training, including 16 hours of AIMS computer training, is provided to staff newly-assigned as a Visitation officer.

1.3    In visitation areas where contact visitation occurs, the inmate and visitor restrooms shall be equipped with exterior locking mechanisms at the discretion of the Warden or unit Deputy Warden. Visitation staff shall control access to the restrooms.

1.4    Shift Commanders shall tour the visitation area, minimally once per shift during scheduled visiting hours.

1.5    On-site duty officers shall conduct a tour of the visitation area, at least once during scheduled visiting hours.

1.6    Computer terminals shall be secured from both public and inmate access. Visual display monitors at the visitation registration offices shall be located and positioned to preclude viewing by inmates and/or visitors.

**911.08    VISITATION PRIVILEGES – REGULAR, HOLIDAY AND FOOD VISITS** - This section establishes procedures for the provisions of an inmate's earned incentive plan based on the inmate's Earned Incentive Program Phase and custody level as outlined in Department Order #809, Earned Incentive Program.

1.1    Visitation periods will be in four-hour blocks each weekend, starting at 8:00 A.M. to 12:00 P.M. and 12:00 P.M. to 4:00 P.M. Frequencies for regular visitation, and food visitation will be based on the inmate's Phase level as outlined in this section.

1.2    Food for the food visitation will be provided by the inmate's visitors (home cooked or family purchased), for all inmate custody levels except Maximum Custody, and on the approved holiday food visits according to the inmate's Phase. See Department Order #809, Earned Incentive Program, for holiday visitation hours and restrictions.

1.3     <u>Maximum Custody Inmates</u> - Maximum custody inmates shall be allowed to visit a maximum of one, 2-hour block per week with exception to Death Row inmates. Visitation shall be by appointment only. All maximum custody inmate visitations shall be for one block, and is always non-contact regardless of what phase the inmate is in, unless a court order authorizes a contact visit and is approved by the Department's Legal Services Division. The following phase requirements shall be for male Death Row inmates (female Death Row inmates are exempt from phase visitation):

    1.3.1     Phase I – Death Row inmates shall be allowed to visit one, non-contact 2-hour block per week.

    1.3.2     Phase II – Death Row inmates shall be allowed to visit two, non-contact 2-hour block per week.

    1.3.3     Phase III – Death Row inmates shall be allowed to visit three, non-contact 2-hour block per week.

1.4     <u>Close Custody Inmates</u> - See Department Order #809, <u>Earned Incentive Program</u>, Attachment B, for information regarding food visits for inmate in Close Custody.

    1.4.1     Phase I - Close custody inmates shall be allowed to visit one block per week.

    1.4.2     Phase II - Close custody inmates shall:

       1.4.2.1     Be allowed to visit two blocks per week.

       1.4.2.2     Not be eligible for food visitation.

    1.4.3     Phase III - Close custody inmates shall:

       1.4.3.1     Be allowed to visit three blocks per week.

       1.4.3.2     Be allowed food visitation on the following two holidays:

          1.4.3.2.1     Mother's Day.

          1.4.3.2.2     Labor Day.

1.5     <u>Medium Custody Inmates</u>

    1.5.1     Phase I - Medium custody inmates shall be allowed to visit one block per week.

    1.5.2     Phase II - Medium custody inmates shall:

       1.5.2.1     Be allowed to visit three blocks per week.

       1.5.2.2     Be allowed food visitation on the following two holidays:

          1.5.2.2.1     Mother's Day.

          1.5.2.2.2     Father's Day.

    1.5.3     Phase III - Medium custody inmates shall:

       1.5.3.1     Be allowed to visit four blocks per week.

CHAPTER 900 – INMATE PROGRAMS AND SERVICES
DEPARTMENT ORDER – 911 – INMATE VISITATION

    1.5.3.2    Be allowed food visitation on the following recognized holidays:

        1.5.3.2.1    Valentine's Day.

        1.5.3.2.2    Mother's Day.

        1.5.3.2.3    Father's Day.

        1.5.3.2.4    Veteran's Day.

1.6    <u>Minimum Custody Inmates</u>

    1.6.1    Phase I - *Minimum custody inmates shall be allowed to visit one block per week.*

    1.6.2    Phase II - Minimum custody inmates shall:

        1.6.2.1    Be allowed to visit three blocks per week.

        1.6.2.2    Be allowed food visitation on the following two holidays:

            1.6.2.2.1    Mother's Day.

            1.6.2.2.2    Father's Day.

    1.6.3    Phase III - Minimum custody inmates shall:

        1.6.3.1    Be allowed to visit four blocks per week.

        1.6.3.2    Be allowed food visitation on the following four holidays:

            1.6.3.2.1    Valentine's Day.

            1.6.3.2.2    Mother's Day.

            1.6.3.2.3    Father's Day.

            1.6.3.2.4    Veteran's Day.

1.7    <u>Food Visit Regulations</u> – Families shall provide all food for the food visits, either home cooked or purchased by the family.

    1.7.1    No beverages shall be allowed into visitation on food visit days. Beverages may be purchased as normal inside of visitation.

    1.7.2    All food containers and utensils, per group, must fit into one ice chest/container, which shall be no larger than 36-quart size and must be able to clear the metal detector.

    1.7.3    No more than two different groups of visitors may visit the same inmate at the same time and no more than two different ice chests/containers may be with an entire group of visitors during the visit.

1.7.4    Permissible food items shall be pre-cooked and/or properly prepared prior to arrival, wrapped in plastic or wax paper, or stored in a plastic see-through container. Visitors shall provide their own plastic bags/containers. These items will not be provided by the units.

1.7.5    No food shall be cut on site. All food must be cut and pre-packaged into serving portions prior to arrival.

1.7.6    Allowable items are as follows:

   1.7.6.1    Meat - must be prepared and properly packed prior to entering the unit. Meat shall be deboned, sliced, shredded, diced, or minced.

   1.7.6.2    Salad – Dressing may be brought in a separate, see-through plastic container.

   1.7.6.3    Vegetables - shall·be shredded, sliced, or diced. No corn-on-the-cob, but corn may be brought in a see through plastic container.

   1.7.6.4    Baked potatoes - shall be cut in half prior to entering the unit.

   1.7.6.5    Fruits - shall be peeled and quartered/sliced. No whole fruit will be permitted with exception to small fruit such as grapes, cherries, or berries.

   1.7.6.6    Pre-cooked casseroles - in serving portions.

   1.7.6.7    Tamales - must be husked and cut in half.

   1.7.6.8    Bread - must be pre-sliced.

   1.7.6.9    Cheese - must be sliced or grated.

   1.7.6.10    Tortillas.

   1.7.6.11    Pre-packaged chips. Must be transferred into a clear plastic container or bag.

   1.7.6.12    Pie(s) and cake(s) - must be pre-cut into serving portions.

   1.7.6.13    Ice cream - must be in original sealed/unopened container not to exceed one pint per person.

   1.7.6.14    Ice - limited to one bag. Ice may be kept in the bag or loose in the cooler.

   1.7.6.15    Condiments - (salt, pepper, etc.) in pre-packaged, single serving packets.

   1.7.6.16    Utensils - forks and spoons only; shall be light-weight and disposable (plastic).

   1.7.6.17    Paper plates and cups only. No Styrofoam.

1.7.7     Prohibited items are as follows:

      1.7.7.1     Glass, metal, or non see-through containers.

      1.7.7.2     Appliances of any type.

      1.7.7.3     Cardboard food boxes of any type, such as Pizza, etc.

1.7.8     All food not consumed during the visit shall be removed by the visitor.

## 911.09    SIGNAGE

1.1     Each visitation room shall prominently post the following rules for visitors and inmates:

1.1.1     Conduct by inmates and visitors shall be quiet and orderly at all times.

1.1.2     Visitors and inmates are responsible for the conduct of young children and minors and shall be required to monitor and exercise proper control of them during the visit.

1.1.3     A brief kiss and/or embrace shall only be permitted at the beginning and end of the visitation period.

1.1.4·     Inmates and visitors shall maintain a distance of at least two feet from any fence.

1.1.5     All clothing shall remain properly fastened at all times.

1.1.6     Inmates and visitors shall remain in an upright position.

1.1.7     Visitors or inmates shall not place their hands inside the other's clothing.

1.1.8     The following conduct is prohibited during visitation:

      1.1.8.1     Exposing the genitals or breasts.

      1.1.8.2     Lying on the floor or ground, upon seats or tables or under tables, or attempting to conceal the visitor and/or inmate from staff.

      1.1.8.3     Sitting on a visitor's lap or holding the visitor on the inmate's lap, with the exception of the inmate's young child, 6 years or younger.

      1.1.8.4     Gyrating or thrusting with the pelvic regions, in a standing or sitting position.

      1.1.8.5     Sitting with legs entwined or overlapping with another person's legs.

      1.1.8.6     Fondling and/or touching the breasts, buttocks, and/or genital area of another person in any manner.

1.1.8.7      Using hostile, vulgar, or profane language, unruly behavior, engaging in activities that disrupt or disturb others, creating loud noises, creating unsanitary conditions, etc. Information detected during the monitoring of an inmate telephone call, relating to misconduct occurring during visitation, shall be documented as outlined in section 911.02, 1.11.2 of this Department Order.

1.1.8.8      Straddling bench seats.

1.1.8.9      Parent or legal guardian failing to properly control or accompany minors/young children while on prison property, including parking lot areas, approach walks, lobby areas, restrooms, and visitation areas.

1.1.8.10      Walking side-by-side with arms around the visitor, e.g., arms around waist or shoulders. Inmates may hold one hand of a visitor while walking side-by-side. Inmates may hold one hand of a visitor while sitting at a table but hands must remain above the table and visible to staff.

1.1.8.11      Inmates and visitors failing to keep their hands visible at all times.

1.1.8.12      Engaging in cuddling activities, laying heads on the shoulders of each other, massaging one another, etc.

# IMPLEMENTATION

The Visitation Schedule shall be posted in the registration, visitation and designated inmate bulletin boards.

# DEFINITIONS

**BACKGROUND CHECK FEE** – The background check fee is a one-time, non-refundable fee for conducting background checks on adult visitation applications, as authorized by Senate Bill 1621 (Laws 2011, Chapter 33), signed into law and effective July 20, 2011.

**CONTACT VISITATION** - A visit between an inmate and his/her visitor that is conducted under staff supervision in an open area, allowing for limited physical contact and movement within the area.

**CONTRABAND** - Any item considered a detriment to the safety, security, and orderly operation of the unit. Contraband includes, but is not limited to:

- Any item which could be used as an aid to escape.

- Any item which could be used to disguise or alter an inmate's appearance.

- Any item of clothing or other item(s) for personal use or consumption that is not preauthorized through security or the unit's property room.

- Cameras, video, audio or other related equipment.

- The introduction and/or possession of any separate components that may aid in the use of wireless devices and/or multimedia storage devices. This includes, but may not be limited to:

    - Cell phone chargers.

- Mobile chargers.
- Cell phone batteries.
- Any other item that staff reasonably determines may aid in the use of wireless devices and/or multimedia storage devices.

**ILLEGAL CONTRABAND** - Any item, the possession of which in the community or on prison grounds is a felony or misdemeanor, i.e., weapons, explosive devices, drugs, wireless communication devices, multimedia storage devices or other statutorily prohibited item(s).

**INFANT** - A newborn child to 24 months of age.

**MINOR** - A person between 7 and 17 years of age.

**NON-CONTACT VISITATION** - A visit between an inmate and visitor conducted with a barrier between them, thereby preventing any physical contact.

**RELATIVE OR IMMEDIATE FAMILY** - An inmate's spouse; parent or stepparent; grandparent; grandchildren; mother-in-law or father-in-law; sibling; natural, adopted or step child; aunt or uncle; or any other person who had the primary responsibility of raising the inmate in the absence of parents.

**VISITATION LIST** - Each inmate's list of approved visitors, consisting of no more than 20 persons, including immediate family members, other relatives and friends.

**YOUNG CHILD** - A person from birth through six years of age.

{Original Signature on File}

_____

Charles L. Ryan
Director

**ATTACHMENTS**
Attachment A - Sample Letter, Non-Contact Visits
Attachment B - Visitor Suspension Sanction Chart
Attachment C - Visitor Guidelines

**FORMS LIST**
911-1, Visitation List
911-2, Visitation Waiver
911-3, Request to Change Visitation/Telephone Listing
911-4, Application to Visit an Inmate
911-5, Preliminary Notice of Visitation Suspension
911-6, Special Visit Request
911-8, Visitor Sign-In

# AUTHORITY

Laws 2011, Chapter 33 - A.R.S 41-1604, Duties and Powers of Director

DEPARTMENT ORDER 911
ATTACHMENT A

## ARIZONA DEPARTMENT OF CORRECTIONS

### UNIT

DATE:

sTO:

FROM:           (Unit Deputy Warden)

SUBJECT:        **NOTIFICATION OF TEMPORARY NON-PUNITIVE ASSIGNMENT TO
                NON-CONTACT VISITATION STATUS PENDING ADMINISTRATIVE REVIEW**

In accordance with Department and Institution Orders concerning an incident occurring on (Insert Date), you
have been placed on temporary non-punitive, Non-Contact Visitation status. This placement is the result of the
following:

### (INSERT SUFFICIENT INFORMATION TO ALLOW FOR A RESPONSE,
### e.g., having marijuana in your possession, using cocaine,....)

Due to the seriousness the incident posed to the safety, security, and/or good order of the Unit, this temporary
status has been imposed pending administrative review.

The administrative review shall include a determination to reinstate, modify, or revoke authorization permitting
you to participate in Contact Visitation. You hereby have an opportunity to provide any relevant information
which could assist in this decision. This information must be submitted in written form, mailed to this office, in
compliance with Department Order #916, Staff/Inmate Communications, and received no later than fourteen
(14) calendar days from the date of this memorandum. **Following receipt of your written response to this
notice, you will be provided written notice of the decision within 30 days.**

For your information, all Non-Contact Visitation is subject to space limitations and staff availability. It is your
responsibility to notify your visitors of your temporary visitation status. Should visitors wish to visit you on this
status, please advise them to call your Unit's Visitation Officer, 24-hours-in-advance, for proper scheduling
purposes.

A decision regarding Non-Contact Visitation may be appealed to the Complex Warden within ten (10) work
days. The decision of the Warden is final.

**DISTRIBUTION:**

Inmate - Original
Visitation File

**DEPARTMENT ORDER 911**
**ATTACHMENT B**

## VISITOR SUSPENSION SANCTION CHART

|  | Suspension | Non-Contact |
|---|---|---|
| Alert/Ion Scan - First Incident | Visit suspended for that day | N/A |
| Alert/Ion Scan - Second Incident | 30 days | 90 days |
| Alert/Ion Scan - Third Incident | 90 days | 180 days |
| Alert/Ion Scan - Fourth Incident | One year | Indefinite |

| | | |
|---|---|---|
| Contraband - First Incident | 90 days | 180 days |
| Contraband - Second Incident | 180 days | One year |
| Contraband - Third Incident | Indefinite | Indefinite |

| | | |
|---|---|---|
| Illegal Contraband - First Incident | 180 days | One year |
| Illegal Contraband - Second Incident | Indefinite | Indefinite |
| Illegal Contraband - Third Incident | Indefinite | Indefinite |

## ARIZONA DEPARTMENT OF CORRECTIONS
## VISITOR GUIDELINES

Effective: July 20, 2011

The following information is intended to serve as a guideline to assist you when visiting an inmate and is not all-inclusive. Complete rules and regulations are listed in Arizona Department of Corrections Department Order #911, Inmate Visitation, which may be accessed through the Department's Web Site at www.azcorrections.gov or in the Public Access Manual available in the Prison Administration area, Monday through Friday (holidays excluded), from 7:30 a.m. to 5:00 p.m. Additionally, excerpts of the Department Order are posted at the prison entrance and in the Unit Visitation Areas.

### GENERAL INFORMATION

All persons, their personal belongings, and vehicles are subject to search while on Department property. All visitors and their possessions are subject to physical search by staff, electronic metal detection devices, barrier sniff screening (Narcotics Detection) by a Department Service Dog, and/or Ion Scanning. All visitors and their possessions must successfully pass scanning by electronic detection devices/equipment. A visitor, with a special medical condition possibly affecting the reading of electronic detection equipment, will be required to provide documentation of the existing medical condition. Persons refusing to submit to any search will be denied visitation and required to leave Department property immediately and are subject to subsequent suspension.

Contraband is not allowed on State property, including but not limited to: weapons or ammunition of any type, illegal drugs or drug paraphernalia, alcoholic beverages (empty or full), ladders, rope, cable, power tools, wire cutters, rakes, cameras, etc. Cell phones must remain secured in the visitor's vehicle. Visitors must present photo identification (ID) upon entering the visitation checkpoint. Acceptable forms of ID are: a valid driver's license, a military identification card, a passport, an official photo identification card of any U.S. state or federal agency, or Immigration and Naturalization documentation. Minors turning 18 will be required to apply for visitation privileges, and pay the one-time, $25.00 background check fee. The Department shall not accept a consular identification card that is issued by a foreign government as a valid form of identification, pursuant to A.R.S. 41-5001.

### DRESS CODE

- All clothing shall be clean, worn in good repair, be non-offensive, and within the bounds of common decency.
- Visitors are prohibited from wearing any brown-colored clothing that resembles the clothing worn by Department security staff, including khaki-colored clothing, solid light tan or light brown-colored shirts or dark brown-colored pants or slacks.
- Skirts and dresses shall be knee-length, when standing. Slits in skirts and dresses shall not extend above mid-thigh when seated.
- Shorts shall be knee-length, when standing. Jogging shorts, cut-offs or hip huggers are prohibited.
- Visitors shall not wear any article of clothing fabricated with spandex-like material, or clothing that is orange in-color.
- Sheer, see-through and/or open-netted clothing is prohibited.
- Sleeveless tops/shirts or dresses; tank, tube, and halter tops; tops that are strapless; tops that allow display of bare midriff; mesh clothing; body suits; "muscle" shirts; and swimsuits are prohibited.

- Tops of clothing shall be no lower than the person's collarbone in the front and back.
- Undergarments and shoes shall be worn at all times.

## ALLOWABLE PROPERTY

- Personal identification.
- Prescription eyeglasses.
- Prescription medication, in the original container, and only in a limited amount needed during the visitation period.
- One unopened package of cigarettes.  A flameless electric lighter shall be located in the designated smoking section of the Visitation Area.
- A maximum of $30.00 in coins, in a clear plastic bag/container, per visitor.
- One engagement/wedding ring, one religious medallion, one wristwatch and one pair of earrings or two observable body piercing adornments.
- Two vehicle keys or one key and a vehicle remote control entry device.
- Infant items:
  - One handheld baby carrier per infant.  Strollers or carriers on wheels will not be permitted.
  - One clear-plastic diaper bag per infant, which may only contain: one diaper for each hour of visitation; one change of baby clothing; one blanket no larger that 4 ft x4 ft.; one clear container or Ziploc bag of baby sani-wipes; one small tube of diaper rash medication; one baby bib; one small plastic spoon used to feed an infant; three clear-plastic baby bottles of milk/formula or equivalent-size unopened, commercially-sealed containers of juice; and four small plastic containers of soft or baby food; and one baby pacifier.

## VISITATION CONDUCT

- Conduct by visitors and inmates shall be quiet, orderly and respectful of others; unruly behavior and the use of profanity is prohibited.
- A brief kiss and/or embrace shall only be permitted at the beginning and end of the visitation period.
- Visitors are prohibited from visiting more than one inmate at a time, unless the other inmate is an immediate family member and the visitor is on the inmate's approved visitation list.
- The accompanying adult must properly control minor children while on prison property.
- Visitors and inmates shall remain in an upright position at all times.
- Inmates may visit with a maximum of six persons at one time.

The Department recognizes the importance of and encourages maintaining relationships while a person is incarcerated.  We ask for and expect your full cooperation in following the above-established visitation rules in order that visitation is a positive and pleasant experience for all concerned.

If you need assistance or clarification pertaining to the Visitation program during your visit, please contact a staff member for assistance.

**ENJOY YOUR VISIT.**

# EXHIBIT B

| ARIZONA DEPARTMENT OF CORRECTIONS | CHAPTER:  900 INMATE PROGRAMS AND SERVICES | OPR: DIR |
|---|---|---|
| DEPARTMENT ORDER MANUAL | DEPARTMENT ORDER:  902 *INMATE LEGAL ACCESS TO THE COURTS* | SUPERSEDES: DO 902 (08/15/07) DI 84 (9/18/98) |
| | | EFFECTIVE DATE: FEBRUARY 4, 2011 |
| | | REPLACEMENT PAGE REVISION DATE: MAY 28, 2011 |

# TABLE OF CONTENTS

**PURPOSE**

**RESPONSIBILITY**

**PROCEDURES**                                                                                    **PAGE**

902.01          SYSTEM OVERVIEW ................................................................................ 1

902.02          LEGAL RESOURCES AND ACCOMMODATIONS ........................................... 2

902.03          GENERAL RESPONSIBILITY ...................................................................... 3

902.04          PARALEGAL ASSISTANCE ...................................................................... 6

902.05          QUALIFIED LEGAL CLAIMS COPYING ....................................................... 9

902.06          CHARGES - QUALIFIED LEGAL CLAIMS ................................................... 11

902.07          NON-QUALIFIED LEGAL CLAIMS SERVICES.............................................. 12

902.08          SPECIAL NEEDS INMATES ...................................................................... 13

902.09          LEGAL SUPPLIES .................................................................................. 14

902.10          LEGAL PROPERTY ................................................................................ 14

902.11          LEGAL MAIL ........................................................................................ 15

902.12          LEGAL PHONE CALLS ........................................................................... 17

902.13          LEGAL VISITS ...................................................................................... 18

                 IMPLEMENTATION ............................................................................... 19

                 DEFINITIONS......................................................................................... 19

                 AUTHORITY........................................................................................... 21

                 ATTACHMENTS

# PURPOSE

The Department of Corrections ensures that all inmates have direct access to the courts in all legal claims involving direct appeals from the conviction for which they are incarcerated, habeas petitions, civil rights actions, or conditions of confinement. The Department facilitates this access by making forms and specific legal assistance available to the inmate population. The system is designed to maximize inmates' opportunity to present legal claims pertaining to the aforementioned legal claims to the State or Federal court, in a quick, efficient manner, with no barriers. This Department Order establishes the process to be used by inmates for gaining access to the courts and also describes the role of all parties involved. This Department Order sets forth all affirmative steps that the Department shall take to assist inmates in obtaining access to the courts. This process does not affect the inmates' ability to independently pursue actions on their own or to obtain outside counsel to represent them.

# RESPONSIBILITY

The Legal Access Monitor shall monitor this inmate legal access to the courts system in all facilities to ensure that the assistance provided to inmates by contract Paralegals conforms to all Department written instructions and contract provisions, and ensure staff are complying with the provisions of this Department Order.

# PROCEDURES

902.01      **SYSTEM OVERVIEW** - Inmates shall have direct access to the courts through the mail.

1.1      Qualified Legal Claims (See DEFINITIONS) - Inmates who do not feel able to draft pleadings or to complete District Court/state forms without assistance may:

1.1.1      Contact an attorney directly, at the inmate's expense.

1.1.2      Request the court to appoint an attorney to represent them.

1.1.3      Obtain active assistance through the Department from contract Paralegals. (See section 902.04 of this Department Order)

1.2      Non-Qualified Legal Claims - The Department may not actively assist inmates in the filing of documents not involving civil rights, conditions of confinement, appeals from conviction or habeas petitions. Inmates who desire assistance filing pleadings or petitions in matters not related to civil rights or conditions of confinement, appeals from conviction or habeas petitions may seek assistance of counsel, the courts or other assistance outside the Department. The Department may provide passive assistance as noted below:

1.2.1      Inmates may use legal texts and resource materials, as provided in section 902.02 of this Department Order and identified in Attachment A.

1.2.2      Inmates may request from the Paralegal or designated staff the address of any Arizona Court above the level of Justice of the Peace courts and selected Federal Courts. (See Attachment C for Federal Courts. State Court material is in the Forms packet as identified in Attachment B.)

1.3      Legal Research - No provision is made in this system for extensive, generalized legal research.

1.4     Inmate Legal Assistants and Law Clerks - There is no provision in this Department Order for an inmate legal assistance program. The Department shall take no affirmative steps to assist inmates helping other inmates with qualified legal claims. Inmates are prohibited from assisting other inmates with non-qualified legal claims.

1.5     Right to Retain Counsel - This system does not interfere with an inmate's right to retain counsel, to the extent that the inmate can afford counsel and is willing to pay for the services of an attorney.

    1.5.1     Inmates may, of course, avail themselves of pro bono services of a court-appointed attorney.

    1.5.2     Nothing in this system suggests that inmates may retain someone other than a licensed attorney for legal purposes.

1.6     Access to Legal Resources - All institutions shall provide access to the required legal resources. Smaller stand-alone units such as SACRC and Picacho may transport inmates to an institution that has the required legal resources, or shall provide storage areas for legal resources and materials in addition to the required work space, in accordance with the local Institution Order.

1.7     Approved Department Forms and Other Documentation - Staff and inmates shall only use the Department forms authorized by this Department Order to request services or report information about this legal access system. Any other forms are null and void. If additional forms are required, they shall be developed and approved only in accordance with Department Order #114, Forms Management System.

## 902.02     LEGAL RESOURCES AND ACCOMMODATIONS

1.1     The Legal Resources identified in Attachment A are presently available for inmate use. Any additions or deletions to the legal texts and resource material identified in Attachment A shall be subject to the Director's approval.

1.2     All legal reference texts and manuals available for use by inmates shall be kept in the Reserve/Reference section of the Unit Library, under the control of designated staff, and shall be used only in the Unit Library, with the exception noted in 1.3.2 of this section.

    1.2.1     Legal Resource Centers shall provide no legal resource material except for such material set forth in this Department Order.

    1.2.2     The units are not required to possess and shall not possess older versions of the law. The centers do not provide archive services. Therefore, inmates requesting older versions of the law, for whatever reason, should be encouraged to contact the courts.

1.3     Inmates who visit the library may check out legal texts, manuals, and other legal reference material for a specified period of time within a given day, for use only in the library, in accordance with the Institution Order.

    1.3.1     Each book shall have a check out card, on which inmates shall write their name and ADC number.

        1.3.1.1     Inmates shall leave their identification card with designated staff, to be returned to them when they return the book.

          1.3.2     Under special circumstances and in accordance with the local Institution Order, an inmate who is unable to visit the library may obtain legal texts and resources for use outside the library. Complex Detention Units (CDUs) and Protective Segregation Units shall maintain a legal resource library as prescribed in section 902.08, 1.3 and 1.3.1 of this Department Order.

1.4     The Legal Access Monitor shall provide designated staff with a supply of current court forms as identified in Attachment B. The inmate shall pay for copies of these court documents in accordance with section 902.06 of this Department Order.

     1.4.1     Inmates may draft their own pleadings, motions and other legal documents.

     1.4.2     Handwritten forms that are left incomplete shall not be considered qualified for copying.

1.5     The Department shall not supply inmates with forms, documents or any legal materials from other states. It shall be the duty of the inmate to contact the out-of-state court to request any forms, documents or legal materials from that state.

1.6     The Department shall ensure that inmates have access to the name and address of the Arizona State Courts and Federal District/Appellate Courts. These addresses shall be made readily available to inmates, and shall be posted on library bulletin boards in each unit. One or more copies shall be kept in the Reserve/Reference section of the Unit Library for referral by inmates. These copies are not to be taken from the Reserve/Reference desk; however, if an inmate requires a copy, it may be purchased in accordance with section 902.07 of this Department Order.

1.7     The Unit Deputy Warden may set aside a private room for the use of the Paralegal.

     1.7.1     If requested by the Paralegal, a telephone with a speaker may be provided for use in tele-conferencing.

     1.7.2     In all instances, designated staff, together with security staff, shall ensure that inmates who are meeting with Paralegals have space to prepare their legal actions.

1.8     The Department shall not make computers or typewriters available to inmates in the Unit Library for the purpose of enabling inmates to do legal work. Only inmates who have a qualifying disability may be provided a personal typewriter pursuant to a court order.

**902.03**     **GENERAL RESPONSIBILITY** - This inmate legal access to the courts system relies on five specific groups of individuals, with general responsibility as follows:

1.1     Designated Staff - These staff members shall be responsible for:

     1.1.1     Cataloging and maintaining legal resources in the Reserve/Reference section of the Unit Library; signing out legal texts to inmates for use only in the library; keeping track of legal texts to prevent/minimize loss; making texts available for inmates who have limited access to the library; and maintaining records in accordance with Department Order #103, Correspondence/Records Control.

          1.1.1.1     A monthly inventory of legal resources shall be completed and a copy sent via interoffice mail to the Legal Access Monitor during the first week of the following month.

1.1.2    Coordinating, with institution staff and the Paralegal, the scheduling of appointments for inmates to meet with Paralegals (See Section 902.04, of this Department Order) and ensuring that inmates are made aware of the date and time of their appointment.

    1.1.2.1    Designated staff shall work closely with security/other staff to arrange for meetings between Paralegals and inmates. Paralegals shall be allowed to remain and work in the facilities in order to complete appointments.

1.1.3    Photocopying or supervising the photocopying of all qualified and non-qualified legal claims.

1.1.4    Processing inmate requests for services including: notary services, copies of the court forms identified in Attachment B and other chargeable services in accordance with section 902.06 and 902.07 of this Department Order.

1.1.5    Facilitating the delivery of notary services, copies or other chargeable services in accordance with section 902.06 and 902.07 of this Department Order.

1.1:6    Providing assistance to the inmate in properly completing Department forms, requesting assistance or having photocopies made.

1.1.7    Maintaining the Contract Paralegals – Unit Sign-In Log, Form 902-4 at each unit for the ingress and egress of the Contract Paralegals. Designated staff shall collect data regarding paralegal visits and provide the information to the Legal Access Monitor on a monthly basis to use in verifying on-site hours worked by the paralegal contractors. The Contract Paralegals – Unit Sign-In Log shall be maintained for a period of three years.

1.2    Paralegals - Although not required to do so by law, the Department provides inmates with an opportunity to obtain assistance from qualified Paralegals (see definition), to facilitate their access to the courts.

1.2.1    Contract Paralegals shall be responsible for:

    1.2.1.1    Assisting inmates who request assistance in the actual preparation of their initial pleadings or petitions for filing with the courts.

    1.2.1.2    Providing bilingual services as required.

        1.2.1.2.1    A tele-conference with a bilingual interpreter is permissible.

        1.2.1.2.2    Certified interpretation is not required.

    1.2.1.3    Providing notary services, paid for by the inmate, in accordance with section 902.06, to the extent required by court rules.

        1.2.1.3.1    Non-qualified legal materials shall be notarized by authorized staff in accordance with the local Institution Order.

1.2.1.4    Making the determination as to what legal documents require photocopying and the number of copies to be made in matters involving qualified legal claims where the inmate is indigent. The Paralegal shall consult with the Legal Access Monitor if a question or problem arises. (See section 902.05, of this Department Order)

1.2.1.5    Contacting the Legal Access Monitor if they have any questions themselves pertaining to the inmate access to the courts system.

1.2.1.6    Contacting the Warden or designee with questions concerning institutional activity, coordination, etc.

1.2.1.7    Providing inmates with copies of Court names and addresses at a cost of $.10 per printed side.

1.2.1.8    Complying with Department Orders and other Department written instructions, as identified in their contract, as well as the terms and conditions of their contract.

1.2.1.9    Recording their time in hours to the nearest tenth using the Paralegal Activity Log, Form 902-3, on a weekly basis, and forwarding a copy to the Legal Access Monitor on a bi-weekly basis.

1.2.1.10   Reviewing questionable outgoing legal mail to determine if it is actually legal mail. (Mail not addressed to an attorney, judge or court, but may be required by court order or statute.)

1.2.2    Contract Paralegals shall not:

1.2.2.1    Practice law, give legal advice, conduct legal research, represent an inmate or make referrals.

1.2.2.2    Aid inmates in any matter, legal or non-legal that does not involve qualified legal claims. The contract paralegal may direct inmates to where they may find information in the resource center.

1.2.2.3    Assist inmates in qualified legal claims beyond the initial filing of their pleadings with the courts.

1.3    Legal Access Monitor - The Legal Access Monitor shall be responsible for:

1.3.1    Providing system-wide monitoring and operational oversight of the inmate legal access to the courts system.

1.3.2    Ensuring that the contract Paralegals are assisting inmates on matters involving qualified legal claims only and only at the initial pleading stage.

1.3.3    Resolving questions Paralegals and designated staff may have concerning the inmate legal access to the courts system.

1.3.4    Ensuring that the Paralegals are adhering to all contract provisions and Department written instructions in assisting inmates.

1.3.5     Visiting selected prison facilities to monitor the activities of the Paralegals, *overseeing the operations of the inmate access to courts system, and* reviewing legal resource material to ensure that it is up to date and complete.

1.3.6     Ensuring that accommodations and arrangements are being made for special needs inmates. (See section 902.08, of this Department Order)

1.3.7     Making recommendations to the Director to either purchase additional sets of legal resource materials or eliminate resource materials, as appropriate.

1.3.8     Reviewing Paralegal Activity Logs and billings for accuracy and determining the proper amount to be paid for work completed.

1.3.9     Reordering legal texts, as necessary, to replace missing texts and ordering updates as they become available from the publisher.

1.3.10     Performing other duties, as assigned.

1.4     ADC Attorneys shall be responsible for overseeing the tasks of the Legal Access Monitor and providing the Legal Access Monitor with direction.

1.5     Inmates - Inmates may use the resources available through this inmate legal access to the courts system.

1.5.1     The Department shall not establish an inmate legal assistant/inmate law clerk program, nor shall the Department take any affirmative steps in assisting inmates in helping other inmates with qualified legal claims.

1.5.1.1     Inmates who have been found charging or bartering in exchange for services, or who have been found to be creating a security problem or assisting inmates with non-qualified legal claims shall be disciplined and shall be precluded from helping other inmates in the future. No inmate shall be allowed to assist another inmate if the Warden or Deputy Warden determines that a potential or existing security problem has developed or may develop, or that allowing such assistance may detrimentally impact institutional resources.

1.5.1.2     Inmates shall not possess or store other inmates' legal paperwork in their cell or housing area.

1.5.2     Inmates shall mail legal materials in accordance with section 902.11 of this Department Order.

1.5.3     Inmates shall attempt to resolve issues related to this inmate legal access to the courts system through designated staff before contacting the Legal Access Monitor.

**902.04**     **PARALEGAL ASSISTANCE** - Inmates may receive active assistance in the <u>initial filing</u> of pleadings involving qualified legal claims from contract Paralegals provided by the Department. (See Attachment D, Paralegal Assistance Request Process.)

1.1     Inmates desiring legal assistance from a contract Paralegal shall complete an Inmate Request for Paralegal Assistance, Form 902-1, available only from designated staff. The request shall include a plain, concise description of the qualified legal claim and the type of assistance requested. The Inmate Request for Paralegal Assistance form is not to be used to ask legal questions, only to request to meet with the Paralegal regarding their qualified issues. The Inmate Request for Paralegal Assistance form shall also be available in Spanish. Illiterate inmates shall contact designated staff, who shall help them complete the form. Inmates serving sentences pursuant to Interstate Corrections Compact and concurrent custody agreements shall make the request in accordance with 1.11 of this section.

   1.1.1     If the issue involves Section 1983 civil rights or conditions of confinement, the inmate shall have first attempted to resolve the issue through the inmate grievance process, in accordance with Department Order #802, Inmate Grievance System. The inmate shall attach a copy of the final disposition of the grievance to the initial request for assistance. If the inmate has not attempted to resolve the issue through the inmate grievance process, the Paralegal shall advise the inmate that the court will likely dismiss the inmate's suit if the *inmate fails to exhaust the administrative remedies available through the* inmate grievance system.

   1.1.2     If the issue involves Notice of Appeal from the Superior Court, a Rule 32 or habeas petition, the inmate shall include the appropriate legal documents/orders of the court out of the trial court record.

1.2     Once the inmate has completed his/her portion of the form, the form shall be given directly to designated staff or placed in a designated drop box or tray at the direction of designated staff in accordance with the local Institution Order.

1.3     Designated staff shall accept, sign and date the Inmate Request for Paralegal Assistance form, provide a copy to the inmate, and forward the request along with any attached documents to the Paralegal. Designated staff:

   1.3.1     May fax the request and attachments (if any) to the Paralegal, using the designated fax machine. Material to be faxed shall not exceed 20 pages. Staff may also scan the request and send an electronic copy to the Paralegal via e-mail.

   1.3.2     Shall charge the inmate the actual cost of faxing as determined by the Institution Order. The charge shall be the actual cost of the telephone connection.

      1.3.2.1     The inmate shall prepare and submit an Inmate Request for Withdrawal, Form 905-1, to the designated staff prior to faxing. Inmates without the necessary funds shall be handled as specified in section 902.06, 1.1 of this Department Order.

   1.3.3     Shall not intercept or delay Inmate Requests for Assistance.

1.4     The Paralegal shall review each request and determine whether the matter described involves a qualified legal claim.

   1.4.1     If it is unclear whether the issue involves a qualified legal claim and/or the Paralegal determines a meeting is appropriate, the Paralegal shall request that designated staff, in consultation with the Paralegal, schedule a meeting with the requesting inmate to resolve the issue(s).

    1.4.2    If the request does not involve a qualified legal claim, the Paralegal shall not provide assistance and shall return the request for assistance to the inmate through designated staff. If possible, the Paralegal shall direct the inmate to where assistance for a non-qualified claim exists.

1.5    The Paralegal shall keep a copy of the request.

1.6    Designated staff shall work with security staff and the Paralegal in scheduling days and hours when the Paralegal is scheduled to meet with inmates, based upon inmate population, the volume of requests, quick access, court deadlines and appropriate attention to security issues.

1.7    Designated staff shall schedule an appointment, in consultation with the Paralegal, and notify both the Paralegal and the inmate by completing the appointment section of the Inmate Request for Paralegal Assistance form and forwarding a notification copy to the inmate and to the Paralegal. Designated staff shall keep the file copy of the request and forward a copy to the Legal Access Monitor.

    1.7.1    Turn-outs for scheduled Paralegal meetings shall not be suspended except when a legitimate security concern exists to do so.

1.8    Paralegals shall meet with inmates to provide necessary assistance with preparation of the initial pleading for filing. However, for Arizona inmates in other states who are serving sentences pursuant to Interstate Corrections Compact or concurrent custody agreements and who, in accordance with 1.11 of this section, request assistance with the preparation of an initial pleading, the contract Paralegal shall ensure that one copy of the appropriate sections of legal references, forms and instructions are mailed to the inmate. The mailings shall be made by Interstate Corrections Compact staff at the Offender Operations expense.

    1.8.1    Paralegals shall not provide assistance beyond the initial filing stage. (See section 902.03, 1.2 of this Department Order for details concerning assistance provided by Paralegals.)

    1.8.2    The Paralegal may authorize designated staff to copy documents in accordance with section 902.05 of this Department Order by completing the appropriate authorization requests.

    1.8.3    The Paralegal may request additional meetings, as necessary. If additional meetings are required, designated staff shall schedule the meeting using a Paralegal Meeting Notification, Form 902-8.

    1.8.4    The Paralegal shall be available on an as needed basis, based on number of requests, type of request and possible deadlines. The schedule shall be determined by the Paralegal and designated staff.

1.9    Staff shall not retaliate against an inmate for requesting assistance from a Paralegal or for exercising any other legal privilege pursuant to this Department Order nor shall they retaliate against an attorney, agent of an attorney or any other person for exercising any privilege pursuant to this Department Order.

1.10    Designated staff and/or Paralegals shall:

    1.10.1    Direct questions concerning this inmate access to the courts system to the Legal Access Monitor.

    1.10.2    Immediately report suspected abuses of this inmate access to the courts system to the Warden or Deputy Warden for review and resolution, ensuring that the Legal Access Monitor is also advised.

1.11    Arizona inmates in other states who are serving sentences pursuant to Interstate Corrections Compact and concurrent custody agreements may, upon written request addressed to the Offender Services Bureau Administrator, receive Paralegal assistance for a qualified claim. Upon receipt of the inmate's written request, the Administrator shall notify the Legal Access Monitor. The Legal Access Monitor shall forward the inmate's request to a contract Paralegal, who shall provide assistance, via the mail, for post-conviction relief claims and condition of confinement/civil rights claims that arose in Arizona. Any claim pertaining to conditions of confinement outside of Arizona shall be filed in the state where the inmate is confined. The mailings shall be made by Interstate Corrections Compact staff at the expense of Offender Operations.

**902.05**    **QUALIFIED LEGAL CLAIMS COPYING** - (See Attachment E, Qualified Legal Claims Copying Process.) All requests for copying involving qualified legal claims, except as provided in section 902.05, 1.10, shall be reviewed by the Paralegal prior to copying by using the following process:

1.1    To request photocopies, the inmate shall complete the appropriate section of a Request/Authorization for Qualified Legal Claim Copying, Form 902-2, and shall submit the request with the documents to be copied attached (including a copy of the pleading if the documents to be copied are intended as an attachment), in person, to designated staff. Failure to attach sufficient documentation to enable the Paralegal to determine if documents are qualified may result in a delay or return of the request to the inmate. The Paralegal shall deny a request that is vague or does not substantiate a qualified legal claim. It shall then be necessary for the inmate to submit another request with sufficient documentation.

    1.1.1    In the event that the inmate is obtaining active assistance from the Paralegal and has completed the pleading in the presence of the Paralegal, the Paralegal shall complete the Request/Authorization for Qualified Legal Claim Copying form and submit it with the pleading directly to designated staff for photocopying.

1.2    Designated staff shall sign and date the form and provide the inmate a copy of the request as a receipt.

1.3    Designated staff shall forward the packet to the Paralegal, pursuant to the local Institution Order.

1.4    The Paralegal shall review the packet to determine which documents shall be copied and how many copies are to be made. Documents that violate prison rules (i.e., gang symbols, instructions regarding illegal activities, etc.) shall not be copied.

1.5    If Department Order compliance interpretation is needed then the Paralegal shall consult with the Legal Access Monitor.

1.6    The Paralegal shall complete the request and, within three work days of receipt, shall return the packet to designated staff.

1.7 Designated staff shall:

1.7.1 Make photocopies in accordance with the Paralegal's notation on the request form, ensuring that the inmate has paid for the copies or that the account has been placed on hold in accordance with section 902.06 of this Department Order. Photocopies shall be made, if possible, within three work days of designated staff receiving the request form back from the Paralegal. Extra time may be necessary for extensive copying requests.

1.7.1.1 All legal documents, such as, but not limited to, pleadings, briefs, motions, affidavits, copies of case law, and licenses submitted for photocopying shall not be censored, but may be read to the extent required to establish that the contents of the document do not contain contraband.

1.7.1.2 All legal matters, other than legal documents, namely and especially letters to or from an inmate's attorney, to or from a judge, or to or from a court of law, that are submitted for photocopying, shall not be read or censored, but may be scanned to the extent necessary to establish that the letters do not contain contraband.

1.7.2 Refrain from photocopying any documents, if so instructed by the Paralegal.

1.7.3 Arrange for a meeting between the Paralegal and the inmate, if so instructed by the Paralegal.

1.8 Designated staff shall keep a copy of the request and:

1.8.1 Forward a copy of the Request/Authorization for Qualified Legal Claim Copying form, together with the photocopied material, to the inmate.

1.8.2 Return the material, above, to the inmate if the request was denied.

1.8.3 Forward the Inmate Request for Withdrawal, Form 905-1, to the Business Office in accordance with section 902.06 of this Department Order, if the material is to be photocopied.

1.8.4 Forward a copy of all requests for qualified legal claim copying to the Legal Access Monitor on a monthly basis.

1.9 The Paralegal's decision is final. Inmates may present concerns regarding qualified legal claim copying to the Legal Access Monitor through designated staff using the Inmate Letter, Form 916-1.

1.10 The inmate shall be responsible for payment for copies in accordance with section 902.06 of this Department Order, except that the inmate may choose to pay for copies relating to qualified legal claims in accordance with section 902.07 of this Department Order. In this event, the documents do not require the Paralegal's review.

1.11 If the copies do not relate to a qualified legal claim, the inmate may request that copies be made in accordance with section 902.07 of this Department Order as non-qualified legal documents or non-legal documents.

1.12    Telephonic review of qualified legal copying requests may be done when designated staff and the Paralegal determine it necessary based upon time frames (e.g., verified impending court deadlines, date of Paralegal's next visit to the unit, etc.)

1.13    There is no requirement that the paralegal meet in person with the inmate to review a qualified legal copy request.

1.14    Requests for copies of Exhibits/Attachments shall have a legitimate pleading to support the copying of those documents. Exhibits/Attachments shall also relate to the pleading. The contract Paralegal may deny copying of documents if they do not relate to a pleading in an active court case.

**902.06**    **CHARGES - QUALIFIED LEGAL CLAIMS** - All inmates shall be responsible for payment for services related to qualified legal claims.

1.1    For issues relating to qualified legal claims, the service requested shall be provided in accordance with the Paralegal's notation on the request regardless of the inmate's ability to pay. However, if the inmate has funds available, the cost of the service shall be deducted from the inmate's account. If funds are not available, the inmate's account shall be placed on hold in accordance with Department Order #905, Inmate Banking/Money System, until such time as the debt is paid.

1.2    Chargeable services include, but are not limited to:

    1.2.1    Qualified legal claim photocopying, including required court forms, other attachments or other documentation.

    1.2.2    Notary services related to qualified legal claims, or as required by statute or court rules.

    1.2.3    Court forms listed on Attachment B. (There is no charge for the initial form requested, or for one subsequent request on the same pleading.)

1.3    An inmate who is requesting any service relating to qualified legal claims shall complete and deliver to designated staff an Inmate Request for Withdrawal form in the amount necessary to completely pay for the requested service at the time designated staff perform the service or arrange for delivery of the service. For photocopies, the Request/Authorization for Qualified Legal Claim Copying form shall be required.

1.4    Designated staff shall submit the Inmate Request for Withdrawal form to the Business Office when the service has been provided to the inmate. Designated staff shall indicate on the Inmate Request for Withdrawal that the service is for qualified legal claims.

1.5    The Business Office shall:

    1.5.1    Upon receipt of the Inmate Request for Withdrawal form, ensure that if funds are available the inmate's account is debited or that the inmate's account is placed on hold.

    1.5.2    Ensure that the Inmate Request for Withdrawal form serves as documentation for the hold or request for payment.

    1.5.3    Ensure that funds collected are deposited in the appropriate account in accordance with Department Order #905, Inmate Banking/Money System.

1.6     The charge for any document is $.10 per printed side (excluding those provided at no charge as outlined in 1.2.3 of this section), including copies of court forms listed on Attachment B, a photocopy of a document or form, or any other form published by another agency or court (normally available and provided by the Department).

1.7     The charge for notary public services shall be $1.00 per notarized document, pursuant to A.R.S. 41-316. Notaries related to statute or court required purposes shall be treated the same as qualified legal claims. The contract paralegal or Legal Access Monitor can assist in determining these types of notaries.

1.8     The price charged for individual services, forms or copies shall be subject to periodic review and adjustment by the Director.

**902.07      NON-QUALIFIED LEGAL CLAIMS SERVICES** - (See Attachment F, Non-Qualified Legal Claims Copying Process.) Inmates shall be charged for all non-qualified legal claim photocopies as well as other services provided for in this section. Non-legal copying shall be done in accordance with Department Order # 910, Inmate Education and Resource Center Services.

1.1     Inmates who do not have sufficient funds to pay for the copies/service at the time requested shall be denied the service or copies.

1.2     All documents submitted for copying shall be in compliance with Department Order #909, Inmate Property, and are not to violate any other written instructions.

1.3     Chargeable items include:

    1.3.1     Non-qualified legal claim photocopies.

    1.3.2     Qualified legal claims photocopies that were not copied, in accordance with the Paralegal's notation on the request.

    1.3.3     Names and address lists for federal or state courts. (See Attachment C for federal courts. State courts are available in the Legal Resource Center.)

    1.3.4     Notary Services related to non-qualified claims.

1.4     An inmate who wishes to purchase non-qualified claim photocopies or other immediately chargeable services shall complete an Inmate Request for Withdrawal form and request that the assigned Correctional Officer III verify that funds are available.

1.5     The Correctional Officer III shall verify the availability of funds and sign and date the Inmate Request for Withdrawal form in accordance with Department Order #905, Inmate Banking/Money System.

1.6     The inmate shall deliver the Inmate Request for Withdrawal form to designated staff within two work days of verification by the Correctional Officer III, together with the material to be photocopied. An inmate who wishes to copy non-qualified legal material shall complete a Request for Non-Qualified/Non-Legal Copying, Form 902-7, as well as the Inmate Request for Withdrawal form, and deliver the Request for Non-Qualified/Non-Legal Copying form, the Inmate Request for Withdrawal form and the documents to be photocopied to designated staff.

1.7     Designated staff shall determine if the copies are authorized in accordance with Department Order #909, Inmate Property, or other written instructions. If there is any question about the suitability of the copies, designated staff may consult with:

    1.7.1     His/her supervisor, the Unit Deputy Warden or the Unit Chief of Security.

1.7.2     The Legal Access Monitor or Paralegal if it appears that the copying may be legal in nature.

1.8     Any attempt by the inmate to have contraband documents copied shall result in denial of the request for copies and shall subject the inmate to disciplinary action.

1.9     Designated staff shall arrange for delivery of the service, copies or forms and submit the Inmate Request for Withdrawal form to the Institution Business Office where the appropriate deduction from the inmate's account shall be made. Designated staff shall ensure that the Inmate Request for Withdrawal form indicates that it is for payment of non-qualified services or photocopies.

1.10    If at any time an inmate requests and receives copies or other service for which payment is due and the inmate's account has insufficient funds to pay, the account shall be placed on hold in accordance with Department Order #905, Inmate Banking/Money System. The hold shall remain in place until such time as the inmate has satisfied the obligation.

1.11    At no time shall non-qualified legal claims copying or non-legal copying take precedence over copying of documents relating to qualified legal claims.

1.12    All non-qualified legal matter copies shall be sold at $.10 per printed side.

1.13    Any other form published by another agency relating to a non-qualified legal claim, or to be utilized by the inmate for non-qualified legal claim purposes, that the inmate may require and that the Department normally provides, may be sold at a charge of $.10 per printed side.

1.14    Court name and address documents shall be copied at a charge of $.10 per printed side.

1.15    The Notice of Claim required for property claims in accordance with Department Order #909, Inmate Property, shall be sold to inmates at a cost of $.10 per copy. This form is not to be used for any other purpose than that outlined in Department Order #909, Inmate Property.

1.16    Inmates who request Notary Public Services for non-qualified/non-legal matters shall be charged $1.00 per notarized document.

## 902.08     SPECIAL NEEDS INMATES

1.1     Accommodations shall be made, as needed, to ensure access to the courts for inmates with special needs, to include inmates who are illiterate, non-English speaking, and disabled.

1.1.1     Accommodation may include providing a tele-conference with a bilingual interpreter and the Paralegal.

1.2     Arrangements shall be made for inmates who have limited access to the Unit Library to meet with Paralegals, to review legal resource materials, or to obtain forms or photocopies.

1.3     CDUs and Protective Segregation Units shall establish and maintain, within the unit, a collection of the required legal resource materials as identified in Attachment A.

1.3.1     The Warden shall designate a staff member to be responsible for those functions identified in section 902.03, 1.1 through 1.1.6 of this Department Order.

**902.09        LEGAL SUPPLIES**

1.1     Inmate stores shall stock only those items authorized by Department Order #909, Inmate Property. There shall be no special order items.

1.2     Inmates shall be provided legal supplies regardless of their ability to pay. If the inmate does not have funds available, a hold shall be placed on the inmate's account.

1.3     Inmates shall be charged the current inmate store price for any item received.

1.4     The amount of other supplies provided per month to inmates who request them and do not have the funds to pay shall be:

    1.4.1     Pens - 1

    1.4.2     Pencils – 2

    1.4.3     Legal pad (size 8 1/2" x 11") - 2

    1.4.4     Regular envelopes - 10

    1.4.5     Manila envelopes - 6

1.5     Additional legal supplies may be provided after a showing is made by the inmate that additional supplies are necessary in order to present or support a qualified claim. These additional items shall be issued on an individual basis.

    1.5.1     The contract paralegal shall verify that the inmate is actually working on a qualified legal issue before additional legal supplies are provided.

1.6     Legal supplies are those supplies actually used for qualified and non-qualified legal claims. The Department is not required to provide supplies for personal/private use.

1.7     In order for indigent inmates to receive or continue to receive monthly legal supplies they must demonstrate that the supplies they have received are actually being used for qualified legal purposes. The Paralegal can assist in verifying actual qualified use of legal supplies.

**902.10        LEGAL PROPERTY** - Inmates shall be permitted to maintain personal legal books and materials in their housing location. Inmates shall be provided with legal boxes regardless of their ability to pay. If the inmate does not have funds available, a hold shall be placed on the inmate's account. Inmates shall only be provided with sufficient boxes to properly store specific legal documents.

1.1     Inmates are authorized to keep no more than three boxes of legal materials in their living area.

    1.1.1     The dimensions of each box shall not exceed 17-1/2" in length x 10-1/4" in height x 11-1/2" in width.

    1.1.2     The weight of each box shall not exceed 20 pounds.

    1.1.3     Each box of legal material shall be numbered in sequential order.

1.2    Legal materials in excess of the three boxes shall be stored by the Department. In order to store excess legal materials, inmates shall, in the presence of staff:

    1.2.1    Seal legal materials in a box, after staff inspection for contraband.

    1.2.2    Place their name and ADC number on the top and side of the box.

1.3    Inmates shall store and possess only their own personal legal materials. If staff discovers that an inmate is storing or possessing other inmate's legal materials, staff shall return the legal materials to the owner regardless of whether or not disciplinary action is taken.

    1.3.1    If it is determined that an inmate has drafted legal documents on behalf of another inmate, and those documents are being stored or possessed by the inmate who drafted them, those documents shall be confiscated and not given to the inmate whose name may be listed on the documents.

1.4    When an inmate wishes to exchange one box of legal material for another, the inmate shall:

    1.4.1    Notify the Property Officer by Inmate Letter.

    1.4.2    Clearly indicate by number the box(es) to exchange.

1.5    The Property Officer shall exchange the box(es) of legal materials within three work days from the date of receipt of the request, which shall be date stamped as received.

1.6    The legal materials to be exchanged shall be inspected for contraband by staff and sealed in the presence of staff prior to exchange.

    1.6.1    Only sealed boxes shall be exchanged.

    1.6.2    A Checklist for Storage of Inmate Legal Materials, Form 902-9, shall be used any time legal materials are stored or exchanged.

    1.6.3    Completed forms shall be placed in the Inmate Property File within five work days.

1.7    Possession of legal material and/or legal texts or books shall be subject to the quantity limitations in accordance with Department Order #909, Inmate Property.

1.8    Compact discs sent in from attorneys shall be considered as legal materials and barring any security concerns shall be stored in the inmate's legal boxes.

### 902.11    LEGAL MAIL

1.1    Inmates shall identify outgoing legal mail by writing "Legal Mail" on the lower left-hand corner of the envelope. (See Definitions for guidance on what constitutes "Legal Mail".)

1.2    Outgoing mail not labeled as legal mail shall be processed as regular mail.

1.3    All legal mail, outgoing or incoming, shall be logged.

1.4    Staff who process incoming or outgoing inmate mail shall:

    1.4.1    Generally identify all legal mail and record it on a log by indicating the inmate's name and the sender's name.

1.4.2      Inspect such mail for contraband, stamp the envelope **"LEGAL MAIL, ARIZONA DEPARTMENT OF CORRECTIONS"** using a commercial stamp, and log it before it is placed in the envelope and sealed by the inmate.

      1.4.2.1      All incoming mail, letters, memoranda, and documents, from an inmate's attorney or from a judge or court, shall be opened for inspection purposes in the presence of the inmate. Such incoming mail may be scanned in the conducting of an inspection for contraband, but shall not be read or censored by staff.

      1.4.2.2      All outgoing letters to an inmate's attorney or to a judge or court shall be brought to the mail room by the inmate, where the letter shall not be read or censored but shall be inspected for contraband and sealed in the presence of the inmate. All outgoing legal documents to an inmate's attorney or to a judge or court (other than letters to an inmate's attorney or to a judge or court, such as pleadings, briefs and motions) shall not be censored, but staff are not prohibited from reading such documents to the extent necessary to establish the absence of contraband.

1.4.3      Send legal mail as first class mail regardless of the inmate's ability to pay the required postage.

1.4.4      Submit names of inmates claiming to have inadequate funds for postage to the Business Office, indicating postage due from the inmate. The Business Office shall either debit the inmate account or, if there are insufficient funds to pay the postage, place a hold on the inmate account.

1.4.5      Return the mail to the inmate if he/she requests mail to be sent as legal mail and it is not to an attorney, judge or court. The inmate may request to have the contract Paralegal review the mail to determine whether it may be approved as legal mail. The contract Paralegal may contact the Legal Access Monitor for direction.

1.5      Designated staff who process incoming mail shall attempt to make a determination, based on an inspection of the envelope, whether the contents constitute legal mail. The return address may be indicative of whether the contents of the envelope constitute legal mail. Designated staff shall not rely solely on the words "legal mail" having been stamped on the envelope. If there is any serious doubt as to whether the contents of the envelope contain legal mail, designated staff shall contact the Legal Access Monitor for direction.

1.6      Staff suspecting abuse of the legal mail designation shall advise the Warden or Deputy Warden who shall take appropriate action following consultation with the Department's General Counsel. An inmate who intentionally sends personal mail to a private address and falsely claims that it is legal mail shall be subject to disciplinary action in accordance with Department Order #803, Inmate Disciplinary System.

1.7      When applicable, staff shall take the following steps to locate inmates to whom legal mail is addressed and to forward such mail to the inmate.

      1.7.1      Use the Adult Information Management System (AIMS) and inmate records to locate any addressee of legal correspondence who is not located at the institution that received the correspondence, and to locate any inmate who has received legal mail that does not have an ADC number as part of the address.

1.7.1.1 Staff shall have inmates verify that they are the person to whom the legal mail is addressed utilizing the inmate's identification card.

1.7.2 Forward any legal correspondence to any inmate addressee who is under commitment to or supervised by the Department.

1.7.2.1 Inmates, releasees and parolees receiving forwarded legal correspondence shall notify the sender of their new address.

1.7.3 When legal mail is forwarded, in addition to the requirements outlined in section 902.11, 1.4.1 of this section, the inmate's forwarding address and the date forwarded shall be logged.

1.7.4 Return legal correspondence to the sender only if the addressee is no longer an inmate, releasee or parolee, in which case the sender shall be advised of this fact.

902.12 **LEGAL PHONE CALLS** - Inmates who have retained counsel may make legal phone calls in accordance with the following:

1.1 Inmates shall communicate legal matters through the mail whenever possible.

1.2 Legal phone calls may be approved, according to the established Institution Order, when it is reasonable and necessary to do so. Staff shall approve court-ordered telephonic conferences and ensure that the inmate is provided the opportunity to participate in the conference.

1.2.1 Legal phone calls should not exceed 30 minutes in length. Additional time is permitted at the discretion of the Deputy Warden. Time limits do not apply to court-ordered telephonic conferences.

1.3 The Department shall not pay, reimburse or be responsible for the placement of inmate legal calls. All outgoing legal calls shall be collect.

1.3.1 Court-ordered telephonic conferences shall be placed at the Department's expense, using the in-state long-distance telephone service when necessary.

1.4 Inmates shall request legal calls 24 hours in advance, by submitting a Legal/Emergency Telephone Call Request, Form 915-2, through staff designated by the Warden or Deputy Warden.

1.4.1 Upon approval, the call shall be scheduled according to the applicable Institution Order.

1.5 Legal phone calls shall only be denied or suspended due to security concerns, provided that an effective method of legal communication remains available to the inmate.

1.5.1 Legal phone calls shall not be denied as a form of discipline.

1.6 Legal phone calls shall not be monitored or recorded.

1.7 Staff shall not listen to the conversation, but shall maintain visual contact of the inmate when the inmate is in an area where security or information may be compromised.

1.8     Inmates who are acting Pro Se are not entitled to make legal calls unless instructed by the courts.

1.9     If an attorney requests a legal phone call with an inmate, staff shall contact the inmate first to determine if the inmate wishes the call.  Staff shall have the inmate complete the Legal/Emergency Telephone Call Request form to accept or refuse a legal call from the requesting attorney.

## 902.13     LEGAL VISITS

1.1     Attorney/Agent of an Attorney Visits

1.1.1     Attorney or agent visits shall be held in a location within the institution designated by the Warden, Deputy Warden or Administrator of the institution.

1.1.2     Attorneys or their agents shall contact the Warden, Deputy Warden or Administrator at least 48 hours in advance of the requested visit and provide their name and date of birth. Attorneys shall also provide their Bar number.

1.1.3     Contact or non-contact visits by attorneys or their agents shall be allowed (consistent with the safe, secure and orderly operation of the institution) only when they are approved in advance by the Warden, Deputy Warden or Administrator.

1.1.4     In an emergency, the Warden, Deputy Warden or Administrator may waive the advance notice requirement.

1.1.4.1     In such cases, the attorney or agent shall provide, at the time of the visit, written justification for the emergency.

1.1.4.2     When a justified emergency exists, space for the visit shall be provided, consistent with the safe, secure and orderly operation of the institution.

1.1.5     Attorneys and agents shall be advised that the inmate shall be questioned to determine if the inmate wishes to meet with the requesting attorney or agent.

1.1.6     If the inmate agrees to meet with the attorney or agent, the visit shall be approved and scheduled.

1.1.7     If the inmate does not wish to meet with the attorney or agent, the attorney or agent shall be contacted within the same 48 hour period of the initial request and informed that the visit has been denied. The appropriate staff member shall ensure that a Visitation Waiver, Form 911-2, is completed in accordance with Department Order #911, Inmate Visitation.

1.2     Agents of an Attorney Restrictions - The attorney shall understand that he or she is ultimately responsible for the actions of his or her agent.

1.2.1     The Warden, Deputy Warden or Administrator may exercise his or her discretion in permitting an agent to meet with an inmate. Any denial shall be for good cause and the Warden, Deputy Warden or Administrator shall be prepared to provide a reason for the denial.

1.3     Visits Under Court Order - Persons acting under a court order shall contact the appropriate unit staff to arrange a visit with an inmate. An original certified copy of the court order shall be provided by such person to the appropriate unit staff for inclusion in the inmate's Visitation, Institutional and Master File.

# IMPLEMENTATION

Wardens shall maintain an Institution Order that addresses the following, at a minimum:

- Identification of designated staff for carrying out responsibilities and processes required by this Department Order.

- Specific process for copying qualified, non-qualified, and non-legal materials.

- Specific process for submission of the Inmate Request for Paralegal Assistance and related documents to include charging for fax service.

- Process for legal resource and text check-out and monitoring, to include a specified period of time for check out.

- Allocation of space for Paralegal activities and/or storage of materials.

The Deputy Director for Offender Operations shall provide a copy of all such Institution Orders to the Legal Access Monitor for final approval prior to implementation.

# DEFINITIONS

**ACCESS TO THE COURTS** - Inmates shall not be barred from the courts and the Department shall, when written requests are made, actively assist inmates in the preparation and initial filing of (1) direct appeals from the convictions for which they were incarcerated, (2) Habeas petitions, (3) ' 1983 civil rights actions, and (4) conditions of confinement actions.

- Active Assistance - Assistance provided to inmates by contract Paralegals.

- Passive Assistance - Assistance available to inmates through resource materials to which they are directed.

**AGENTS OF AN ATTORNEY** - Individuals who are authorized by a licensed attorney to act on behalf of, for or in place of the attorney, and who are directed to visit an inmate on behalf of, or in place of an attorney.

- To demonstrate a bonafide agency relationship with an attorney, pursuant to this Order, an individual shall have documented (written) authorization by the attorney to act on behalf of, for or in place of the attorney. The written authorization, signed and dated by the attorney shall:

    - Expressly set forth the specific nature of the duty or duties in accordance with which the agent purports to act on behalf of, for or in place of the attorney.

    - Outline the general nature of the visit.

    - Be notarized.

- Agents may include private investigators, licensed in accordance with A.R.S. section 32-2401 et. seq.; Paralegals; law students; secretarial staff and duly appointed process servers.

- Agents shall not include anyone who is on an inmate's visiting list.

**ATTORNEY** - An attorney-at-law licensed to practice in any state or federal jurisdiction.

- Who has entered into or may in the future enter into an attorney-client relationship with the inmate or has been appointed to represent the inmate, as evidenced by court record, court order or by the inmate's written authorization.

- Shall not include anyone who is on the inmate's visiting list.

**CIVIL RIGHTS** - Rights guaranteed by the United States Constitution.

**DEBIT** - An immediate withdrawal of funds from an inmate's account.

**DESIGNATED STAFF** - Any Department Employee(s) appointed by the Warden to be responsible for such duties as outlined in this Department Order.

**HABEAS CORPUS** - A writ by which a party attempts to obtain release from confinement.

**HOLD** - An obligation owed by an inmate that restricts inmate funds until the obligation is collected.

**INITIAL FILING** - The filing of a pleading or petition with a court of law to begin a legal action in that court. An initial filing also includes the filing of all notices or other documents that may be required prior to the filing of the pleading or petition, including the initial filing of amended complaints or petitions.

**LEGAL ACCESS MONITOR** - A Department employee with paralegal training, located in the Legal Services Unit at Central Office.

**LEGAL CALL** - Unmonitored telephone calls made by an inmate to the inmate's attorney or an agent of the attorney, for legal purposes, which have been scheduled according to Institution Orders as legal calls. Court-ordered telephonic conferences with the court are also unmonitored calls and are made at the Department's expense on the state's long-distance service, when necessary.

**LEGAL MAIL** - Any letters to or from an inmate's attorney as defined above, or to or from a judge or to or from a court of law.

**NON-QUALIFIED LEGAL CLAIMS** - Any legal claims that do not fall under the definition of QUALIFIED LEGAL CLAIMS. These include divorce, child custody, paternity, name change, etc.

**PARALEGAL** - An independent contractor who has obtained a diploma/degree/certificate from an accredited Paralegal school that has met American Bar Association (ABA) approval, or possesses three or more years verifiable full-time paralegal experience. The Department shall contract in accordance with Department Order #302, Contracts and Procurement, to obtain the services of qualified Paralegals. Individuals who have graduated from law school but have never been licensed to practice law in any jurisdiction may serve as Paralegals.

**PETITION** - A written request that the court exercise its authority to redress a wrong.

**PLEADING** - For the purpose of this Department Order, a pleading refers to a Notice of Appeal pursuant to Ariz.R.Crim.P. 31.2; the initial filing of a Petition for Post-Conviction and related forms, pursuant to Ariz.R.Crim.P. 32; a Petition for Review pursuant to Ariz.R.Crim.P. 31.19; a Petition for Review pursuant to Ariz.R.Crim.P. 32.9(c); a Petition for Review pursuant to Ariz.R.Crim.P.31.19 and 32.9(g); a Petition for Writ of Habeas Corpus in state or federal court; and a civil rights complaint or condition of confinement complaint in state or federal court.

**POST-CONVICTION RELIEF (RULE 32, ARIZONA RULES OF CRIMINAL PROCEDURE)** - The process through which a party seeks relief from a sentence imposed on the party by a court of law.

**QUALIFIED LEGAL CLAIMS** - In the direct appeal, any claim of error; in the Post Conviction Relief proceeding, any non-precluded claim set forth in Ariz.R.Crim.P.32; and in federal court, any claim of error based on a violation of the federal constitution or law. Forms include the Notice of Appeal from the Superior Court (Ariz.R.Crim.P.31.2(a); Notice of Post-Conviction Relief, Request for Preparation of Post-Conviction Relief Record, and Petition for Post-conviction Relief (Ariz.R.Crim.P. 32);Petition for Review (Ariz.R.Crim.P. 32.9(c)); *Petition for Review (Ariz.R.Crim.P. 31.19 and 32.9(g)); Petition for a Writ of Habeas Corpus in* state or federal court; and a civil rights action or condition of confinement claim (42 U.S.C. ' 1983).

**WRIT** - A written judicial order to perform a specified act or giving authority to have a specified act done.

Charles L. Ryan
Director

**FORMS LIST**
902-1, Inmate Request for Paralegal Assistance
902-1S, Solicitud De Preso Para Ayuda De Paralegal
902-2, Request/Authorization for Qualified Legal Claim Copying
902-3, Paralegal Activity Log
902-4, Contract Paralegals – Unit Sign-In Log
902-7, Request/Authorization for Non-Qualified/Non-Legal Copying
902-8, Paralegal Meeting Notification
902-9, Checklist for Storage of Inmate Legal Materials

**ATTACHMENTS**
Attachment A, Legal Texts and Resource Material
Attachment B, Court Forms Packets
Attachment C, Federal Appellate/District Courts and State Appellate Courts
Attachment D, Paralegal Assistance Request Process
Attachment E, Qualified Legal Claims Copying Process
Attachment F, Non-Qualified Legal Claims/Non-Legal Copying Process

# AUTHORITY
*Lewis v. Casey,* 116 S. Ct. 2174 (1996)

**Attachment A**
**Department Order 902**

### LEGAL TEXTS AND RESOURCE MATERIAL

The following legal texts and legal resource material may remain for use by inmates and shall be placed in the Reserve/Reference section of the General Library of each unit:

1.     A complete set of Arizona Revised Statutes (non-annotated)
2.     Arizona Revised Statutes (annotated), Volumes 5, 5A, 5B and 5C
3.     Arizona Rules of Court - State
4.     Arizona Rules of the Court - Federal
5.     Federal Civil Judicial Procedure and Rules
6.     Federal Criminal Code and Rules
7.     A complete set of Department Orders or access to authorized computer-generated copies (General Access Department Orders only)
8.     The Classification Manual
9.     U.S. Code: 28 U.S.C. Section 2254
10.    U.S. Code: 42 U.S.C. Section 1981 through 42 U.S.C. Section 2000d-7
11.    Black's Law Dictionary
12.    Rights of Prisoners 4th
13.    The Law and Policy of Sentencing and Corrections 7th
14.    Post-Conviction Remedies (Yackle)
15.    U.S. Constitution (articles and amendments)
16.    Arizona Legal Forms Book - Criminal Procedure.
17.    Lewis v. Casey
18.    Prisoner's Handbook (Rule 32) (Petitions for Post-Conviction Relief)
19.    The Civil Rights of Institutionalized Persons Act (CRIPA) settlement agreement (Female units only)

Note: Any deletions or additions to the above list will be subject to the approval of the Director of the Department of Corrections.

**ATTACHMENT B**
**Department Order 902**

**COURT FORMS PACKETS**

The following court documents and forms shall be available in Legal Resource Centers. The Legal Access Monitor will provide current copies to Designated Staff as needed.

1.    Arizona State Courts - Self-Help Resources
2.    Federal Section 1983 Forms Packet
3.    Federal Petition for Wit of Habeas Corpus by a Person in State Custody Forms Packet
4.    State Notice of Post-Conviction relief (Pursuant to Rule 32 of the Rules of Criminal Procedure)
5.    State Notice of Appeal from Superior Court
6.    State Petition for Post-Conviction Relief (Pursuant to Rule 32 of the Rules of Criminal Procedure)
7.    State Request for Preparation of Post-Conviction Relief Record
8.    State Court Complaint
9.    Petition for Review, Arizona Rules of Criminal Procedure, Rule 31.19(a)
10.   Petition for Review, Arizona Rules of Criminal Procedure, Rule 32.9(c)
11.   Petition for Review, Arizona Rules of Criminal Procedure, Rule 31.19 & 32.9(g)
12.   State and Federal Notice of Change of Address Forms
13.   State Certificate of Compulsory Arbitration
14.   State Deferral or Waiver of Court Fees and Costs (State) Forms
15.   State Deferral or Waiver of Appellate Court Fees and Costs Forms
16.   Mandatory Civil Cover Sheet (Maricopa County)

## ATTACHMENT C
## DEPARTMENT ORDER 902

**ARIZONA DEPARTMENT OF CORRECTIONS**
**Federal Appellate/District Courts and State Appellate Courts**

### UNITED STATES COURTS

Supreme Court of the United States
1 First Street, N.E.
Washington, D.C. 20543

#### Phoenix:

United States Ninth Circuit Court of Appeals
401 W. Washington Street
Phoenix, AZ 85003-2118
          OR

P.O. Box 193939
San Francisco, CA 94119-3939

United States Bankruptcy Court
401 W. Washington Street
Phoenix, AZ 85003-2118

District Court of Arizona
United States Courthouse
401 W. Washington Street
Phoenix, AZ 85003-2118

#### Tucson:

District Court of Arizona
United States Courthouse
405 W. Congress Blvd
Tucson, AZ 85701-1711

### STATE APPELLATE COURTS

Supreme Court of Arizona
State Courts Building
1501 W. Washington
Phoenix, AZ 85007

#### Phoenix:

Court of Appeals Division 1
State Courts Building
1501 W. Washington, Second Floor
Phoenix, AZ B5007

#### Tucson:

Court of Appeals Division 2
State Office Building
400 W. Congress
Tucson, AZ 85701-1374

ATTACHMENT D
DEPARTMENT ORDER 902

# PARALEGAL ASSISTANCE REQUEST PROCESS



(1) Qualified Legal Claim at the initial filing stage

(2) If the Paralegal is unsure whether issue meets
the criteria he/she will request a preliminary
meeting with the inmate to discuss the issue
prior to approving or denying the request.

(3) See DO 902, section 902.07, Non-Qualified/Non-Legal
Claims.

\* Copy of form to inmate

\*\* Paralegal keeps copy of form

\*\*\* Copy of form to inmate, Paralegal, file and
Legal Access Monitor

Attachment E
Department Order 902

## QUALIFIED LEGAL CLAIMS COPYING PROCESS



\* Return one copy of the form to the inmate

\*\* Keep copy of form

\*\*\* Copy of form to inmate, copy to Legal Access Monitor, copy to file

ATTACHMENT F
DEPARTMENT ORDER 902

## NON-QUALIFIED LEGAL CLAIM/NON-LEGAL COPYING PROCESS



(1) Item requested for copying does not
violate any requirements or prohibitions
established in Department Orders,
Institution Orders or other written instructions.

\* Copy of form to inmate, copy for file.

# EXHIBIT C

1  Thomas C. Horne
   Attorney General
2  Firm State Bar No. 14000

3  Michael E. Gottfried, Bar No. 010623
   Assistant Attorney General
4  1275 W. Washington
   Phoenix, Arizona 85007-2926
5  Phone: (602) 542-4951
   Fax:    (602) 542-7670
6  michael.gottfried@azag.gov

7  *Attorneys for the Arizona Department of Corrections*

8                 **SUPERIOR COURT OF ARIZONA**

9                  **COUNTY OF MARICOPA**

10  STATE OF ARIZONA,

11          Respondent,                      No. CR2000-096032 DT

12  v.                                       **DECLARATION OF CORRECTIONAL**
                                             **OFFICER II CLAUDIA PONCE**
13  WENDI ELIZABETH ANDRIANO,
                                             (Assigned to the Honorable
14          Petitioner.                              Douglas Rayes)

15

16      I, CLAUDIA PONCE, declare under penalty of perjury that the following

17  information is true to the best of my information, knowledge and belief:

18      1.   I have been employed by the Arizona Department Corrections ("ADC")

19  since November 2006.  Since February, 2011, I have been assigned as a Correctional

20  Officer ("CO") II at the Arizona State Prison Complex (hereinafter "ASPC") Perryville,

21  Lumley Unit, visitation that includes the Perryville Special Management Area (hereinafter

22  "SMA") and Death Row.   I am responsible for several security related functions

23  including monitoring of contact and non-contact visitation with inmates housed on Death

24  Row.

25

26

1

2    2.    I am competent to testify to the matters contained herein, and this

3 Declaration is made from my personal knowledge, review of all applicable ADC policies

and consultation with ADC staff.

4

5    3.    There are approximately six hundred (600) inmates housed at the Lumley

6 Unit, ASPC, Perryville, including the SMA, which a level 5, maximum security unit that

also houses female inmates condemned to Death Row.

7

8    4.    Visitation with Death Row inmates is mandated as non-contact by ADC

9 Department Order (hereinafter "DO") 911.05 1.3.1 for both legal and non-legal visitation.

10    5.    Both legal and non-legal non-contact visitation at ASPC Lumley takes place

at the Lumley Administration Building.

11

12    6.    The non-contact visitation area consists of six (6) stations with telephones

13 handsets used to communicate between the visitor and the inmate with dividers between

the visitation stations.

14

15    7.    For non-contact visitation, the inmate is placed in an expanded metal

enclosure with a work table and one end of the telephone communication system.

16

17    8.    Death Row inmate are restrained by means of leg restraints and belly chain

18 until secured in the enclosure at which time the hands are removed from the cuffs of the

belly chain.

19

20    9.    To ensure confidential communications with their counsel, for Death Row

21 inmate non-contact legal visits, only one legal visit is conducted at a time in the visitation

area.

22

23    10.    The telephone conversations for legal visits are not recorded.

24    11.    The visitation side of the glass is approximately 100 to 125 feet long and 12

feet wide and also contains the security CO II's office at one end.

25

26

2

12. During non-contact legal visitations with Death Row inmates the visitation station furthest from the security office is utilized.

13. During the non-contact legal visitation with Death Row inmates, I or another security staff visitation officer is stationed in the security office for observation purposes.

14. During the non-contact legal visitation I cannot hear the inmate side of the conversation and can only hear distant muddled voices from the visitation side of the glass but I cannot discern any of the conversation.

15. Because the Lumley Administration building visitation area does not have a small room adequate (security/observation/confidentiality) for Death Row contact visitation with medical experts or special circumstance visitation – contact visitation is conducted on the visitation side of the glass in the non-contact visitation area as previously describes as being approximately 100 to 125 feet long and 12 feet wide and containing the security CO II's office.

16. For contact legal visitation with Death Row inmates a table is placed in the area with one chair on one side of the table for the inmate and one or two chairs on the other side of the table for the visitor.

17. The Death Row inmate remains restrained during the contact legal visit by means of leg restraints and belly chain and cuffs.

18. Through the entirety of the contact legal visit a security officer, in mandated attire, i.e., stab vest, etc., must remain in line of sight contact with the inmate and in a position to react to a security threat if needed.

19. The use of a stun belt is also authorized but generally not employed to date.

20. The physical location of security staff to the inmate and visitors during a contact legal visit is closer to the parties than they are during non-contact visitation.

3

1

2   21. Death Row inmates may receive all of the legal documents in the mail for

3   review that they and their attorneys want and staff will ensure that they are able to possess

    those documents at the time of legal visit.

4

5   22. Death Row inmate requests for different or expanded attorney visitation

6   times are processed through the Deputy Warden's office and are considered as special

7   circumstances visitation. To my knowledge, none have been requested to date for inmate

    Andriano.

8

9   23. Numerous attorneys have had non-contact-visitation with clients in the area

10  described above since my assignment to Perryville and I am not aware of any complaints

11  about problems or issues with attorney non-contact visitation. Since I am responsible for

12  monitoring contact and non-contact visitation with inmates housed at Lumley Unit and the

    Special Management Area, I would be aware of any such complaints.

13

    I declare under penalty of perjury that the foregoing is true and correct.

14

15

16                                              CLAUDIA PONCE          12/6/11
                                                                        DATE
17

18  LMS10-0345
    Amr/2491063
19

20

21

22

23

24

25

26

                                     4

# EXHIBIT JJJJJ

Michael K. Jeanes, Clerk of Court
*** Electronically Filed ***
12/09/2011 8:00 AM

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CR 2000-096032                                    12/02/2011


                                        CLERK OF THE COURT
JUDGE DOUGLAS L. RAYES                     H. O'Shaughnessy
                                               Deputy



STATE OF ARIZONA                        LACEY ALEXANDRA STOVER GARD

v.

WENDI ELIZABETH ANDRIANO (A)            SCOTT M BENNETT
                                        ALLEN A ARNTSEN
                                        STEPHAN J NICKELS
                                        MATTHEW R LYNCH

                                        CAPITAL CASE MANAGER
                                        COURT ADMIN-CRIMINAL-PCR
                                        VICTIM SERVICES DIV-CA-SE
                                        VICTIM WITNESS DIV-AG-CCC



                        MINUTE ENTRY

        The Court has received Petitioner's <u>Unopposed</u> Motion to File Petition for Post-
Conviction Relief Under Seal.

        IT IS ORDERED denying Petitioner's Motion.

        This case is eFiling eligible: http://www.clerkofcourt.maricopa.gov/efiling/default.asp.
Attorneys are encouraged to review Supreme Court Administrative Orders 2010-117 and 2011-
10 to determine their mandatory participation in eFiling through AZTurboCourt.

        LATER:

        The Court understands that the Parties have reached an agreement and will file the
complete Petition under seal with a redacted copy to be filed unsealed.

        IT IS ORDERED allowing a sealed and redacted unsealed Petition to be filed.

# EXHIBIT KKKKK

Michael K. Jeanes, Clerk of Court
*** Electronically Filed ***
12/09/2011 8:00 AM

## SUPERIOR COURT OF ARIZONA
## MARICOPA COUNTY

CR 2000-096032                                    12/05/2011


                                          CLERK OF THE COURT
JUDGE DOUGLAS L. RAYES                        H. O'Shaughnessy
                                                   Deputy



STATE OF ARIZONA                          LACEY ALEXANDRA STOVER GARD
                                          MICHAEL E GOTTFRIED

v.

WENDI ELIZABETH ANDRIANO (A)              SCOTT M BENNETT
                                          ALLEN A ARNTSEN
                                          MATTHEW R LYNCH

                                          CAPITAL CASE MANAGER
                                          COURT ADMIN-CRIMINAL-PCR
                                          VICTIM SERVICES DIV-CA-SE
                                          VICTIM WITNESS DIV-AG-CCC



### CAPITAL CASE PCR STATUS CONFERENCE



        9:16 a.m.

        Courtroom ECB 411

        State's Attorney:        Lacey Gard appear telephonically
        Defendant's Attorney:    Scott Bennett, Alan Arntsen, Matt Lynch appear
telephonically
        AZDOC Counsel:           Michael Gottfried
        Defendant:               Not Present

        Court Reporter, Cindy Lineburg, is present.

        A record of the proceeding is also made by audio and/or videotape.

Docket Code 028                      Form R000D                        Page 1

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CR 2000-096032                                    12/05/2011


The Court discusses Petitioner's counsel and their progress with completing the Petition for filing.

Counsel address the Court with the pending issues.

The parties may have stipulation to 2 of the pending issues.

The 3rd issue remaining goes to contact visits with the Petitioner in the prison.

Counsel present argument to the Court.

The Court will take this matter under advisement.

Pursuant to stipulation,

IT IS ORDERED extending time for filing of Petition.

NEW DUE DATE:  February 17, 2012.

IT IS FURTHER ORDERED setting Status Conference on February 13, 2012 at 9:30 a.m. before the Honorable Douglas Rayes.

9:45 a.m.  Matter concludes.

This case is eFiling eligible: http://www.clerkofcourt.maricopa.gov/efiling/default.asp. Attorneys are encouraged to review Supreme Court Administrative Orders 2010-117 and 2011-10 to determine their mandatory participation in eFiling through AZTurboCourt.

# EXHIBIT LLLL

Michael K. Jeanes, Clerk of Court
*** Electronically Filed ***
12/09/2011 8:00 AM

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CR 2000-096032                                    12/08/2011

                                          CLERK OF THE COURT
JUDGE DOUGLAS L. RAYES                       H. O'Shaughnessy
                                                Deputy

STATE OF ARIZONA                          LACEY ALEXANDRA STOVER GARD

v.

WENDI ELIZABETH ANDRIANO (A)              SCOTT M BENNETT
                                          ALLEN A ARNTSEN
                                          MATTHEW R LYNCH

                                          CAPITAL CASE MANAGER
                                          COURT ADMIN-CRIMINAL-PCR
                                          VICTIM SERVICES DIV-CA-SE
                                          VICTIM WITNESS DIV-AG-CCC

CAPITAL PCR RULING

        This matter was taken under advisement after oral argument on Petitioner's Motion to
Allow Contact Visit.  The Court has considered Petitioner's Motion, the arguments of counsel
and Arizona Department of Corrections ("ADC") Response, received by the Court on December
7, 2011.

        Petitioner's Motion argues for the contact visit on the basis that the glass barrier would
hinder free communication about the content of mental health expert reports.  Petitioner's
Motion also argues that up to this point, attorneys, mitigation specialists and medical experts
have had regular, frequent contact visits.  At oral argument, Petitioner's counsel argued that the
communications through the glass barrier are recorded by ADC and thus inhibiting
communication with counsel in violation of Petitioner's 6th Amendment right to counsel.

        ADC's Response attached, as exhibits, ADC Department Order 911 and 902.  These
orders provide for non-contact attorney visitation at the Special Management Area where
Petitioner is housed.  Although the Court is persuaded that non-contact visits are inconvenient

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CR 2000-096032                                        12/08/2011

for counsel, take more time and are less efficient than contact visits, Petitioner has not shown that non-contact visits in her case will interfere with a constitutional right.  There is no showing that counsel and Petitioner cannot conduct the business necessary to prepare her case.  There has been no showing that communications will be inhibited.  There has been no showing that communications will be tape recorded.

      IT IS ORDERED denying Petitioner's Motion to Allow Contact Visits.

      This case is eFiling eligible: http://www.clerkofcourt.maricopa.gov/efiling/default.asp. Attorneys are encouraged to review Supreme Court Administrative Orders 2010-117 and 2011-10 to determine their mandatory participation in eFiling through AZTurboCourt.

# EXHIBIT MMMMM

Michael K. Jeanes, Clerk of Court
*** Electronically Filed ***
Isabel Osuna
Filing ID 1173274
2/10/2012 10:37:46 AM

1  Scott M. Bennett (022350)
   Coppersmith Schermer & Brockelman PLC
2  2800 North Central Avenue, Suite 1200
   Phoenix, Arizona 85004
   (602) 224-0999 (office)
3  (602) 224-6020 (fax)
   sbennett@csblaw.com

4  Allen A. Arntsen, Admitted *Pro Hac Vice*
   Stephan J. Nickels Admitted *Pro Hac Vice*
5  Matthew R. Lynch Admitted *Pro Hac Vice*
   Foley & Lardner LLP
6  150 East Gilman Street
   Madison, WI 53703
   (608) 257-5035 (office)
7  (608) 258-4258 (fax)
   aarntsen@foley.com

8  *Attorneys for Petitioner Wendi Elizabeth Andriano*

9                    **SUPERIOR COURT OF ARIZONA**

10                     **COUNTY OF MARICOPA**

11  STATE OF ARIZONA,                 )   No. CR2000-096032-A
                                      )
12                 Respondent,        )   **STIPULATED MOTION FOR**
                                      )   **ORDER AUTHORIZING FILING**
13       vs.                          )   **OF DOCUMENTS UNDER SEAL**
                                      )
14                                    )
    WENDI ELIZABETH ANDRIANO,         )   (Assigned to the Hon. Douglas Rayes)
15                                    )
                   Petitioner.        )
16                                    )
    _____  )
17

18          Pursuant to Rule 123(c)(1) of the Arizona Rules of the Supreme Court, and the

19  Court's supervisory powers, Petitioner Wendi Andriano moves to file certain documents

20  associated with her petition for post-conviction relief under seal.  Counsel for Petitioner

21  and counsel for the State have stipulated to a procedure permitting Petitioner to file certain

22  documents under seal, in whole or in part.  The State reserves the right to challenge any

23  under-seal designation after such documents have been filed.

24          Petitioner seeks the entry of the attached proposed order to formalize this

25  stipulation and expressly authorize the filing of documents under seal in the first instance.

26

{00043485.1 }

1  It is the understanding of counsel for Petitioner that, absent such a formal order, the clerk's

2  office may reject the filing of sealed documents.

3       Counsel for Petitioner and counsel for the State have conferred and are in

4  agreement on the form of the proposed order.

5       RESPECTFULLY SUBMITTED February 10, 2012.

6                  COPPERSMITH SCHERMER &

7                  BROCKELMAN PLC

8                  By    /s/Scott M. Bennett        

9                       Scott M. Bennett

10                 FOLEY & LARDNER LLP

11                    Allen A. Arntsen

                   Stephan J. Nickels

12                    Matthew R. Lynch

13                 *Attorneys for Petitioner*

14

15 ORIGINAL filed with the Clerk of the Court
   on February 10, 2012.

16

17 COPY hand-delivered on February 10, 2012, to:

18 The Honorable Douglas Rayes
   East Court Building #411

19 101 W. Jefferson
   Phoenix, AZ  85003-2243

20

21 COPIES mailed on February 10, 2012, to:

22 Ms. Lacey Stover Gard

23 Office of the Attorney General
   400 West Congress, Suite S-315

24 Tucson, Arizona  85701-1367
   *Attorneys for the State of Arizona*

25

26

*/s/Michelle T. Gallegos*          

# EXHIBIT NNNNN

FILED
2/13/12  12:00 pm
MICHAEL K. JEANES, Clerk
By_____ Dep
H. O'Shaughnessy

1  Scott M. Bennett (022350)
   Coppersmith Schermer & Brockelman PLC
   2800 North Central Avenue, Suite 1200
2  Phoenix, Arizona 85004
   (602) 224-0999 (office)
3  (602) 224-6020 (fax)
   sbennett@csblaw.com

4  Allen A. Arntsen, Admitted *Pro Hac Vice*
   Stephan J. Nickels, Admitted *Pro Hac Vice*
5  Matthew R. Lynch Admitted *Pro Hac Vice*
   Foley & Lardner LLP
   150 East Gilman Street
6  Madison, WI 53703
   (608) 257-5035 (office)
7  (608) 258-4258 (fax)
   aarntsen@foley.com

8  *Attorneys for Petitioner Wendi Elizabeth Andriano*

9           IN THE SUPERIOR COURT OF THE STATE OF ARIZONA
                 IN AND FOR THE COUNTY OF MARICOPA
10

11

12  State of Arizona,                          )
                                               )
13                          Respondent,        )   No. CR2000-096032-A
                                               )
14       vs.                                   )   **ORDER AUTHORIZING FILING**
                                               )   **OF DOCUMENTS UNDER SEAL**
15  Wendi Elizabeth Andriano,                  )
                                               )
16                                             )
                                               )
17                          Petitioner.        )
                                               )
18  _____

19       Based on the Stipulated Motion by Petitioner Wendi Andriano, and for good cause

20  shown, IT IS ORDERED that, in connection with the filing of her Petition for Post-

21  Conviction Relief, Petitioner may file documents under seal.

22       IT IS FURTHER ORDERED that Petitioner shall serve counsel for the State with a

23  copy of all documents filed under seal.  Counsel for the State may provide a copy of such

24  documents to the victims, as that term is defined under Arizona law, and to any outside

25  experts or consultants retained in connection with this proceeding.  All persons receiving

26  documents filed under seal shall maintain their confidentiality.

27

28
{00043459.1}        4834-4267-5214.1

1       Nothing in this Order shall preclude the parties from seeking relief to unseal any

2  document(s) or portions thereof.

3       DATED: _2-13-12_

4

5                                     The Honorable Douglas Rayes

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT OOOOO

FEB 1 7 2012   **FILED**

MICHAEL K. JEANES, Clerk
By _____
         Deputy

5:00 pm

1  Scott M. Bennett (Bar No. 022350)
2  COPPERSMITH SCHERMER & BROCKELMAN PLC
   2800 North Central Avenue
3  Phoenix, Arizona 85004
   (602) 224-0999 (office)
4  (602) 224-6020 (fax)
5  sbennett@csblaw.com

6  Allen A. Arntsen, admitted *pro hac vice*
   Matthew R. Lynch, admitted *pro hac vice*
7  FOLEY & LARDNER LLP
8  150 E. Gilman Street
   Madison, WI 53703-1481
9  (608) 257-5035 (office)
10 (608) 258-4258 (fax)

11 *Attorneys For Petitioner Wendi Andriano*

12

13                  **SUPERIOR COURT OF ARIZONA**
                    **COUNTY OF MARICOPA**
14

15 STATE OF ARIZONA                    )  CASE NO: CR2000-096032-A
                                       )
16        RESPONDENT,                  )
                                       )  **MEMORANDUM IN SUPPORT OF**
17     V.                              )  **PETITION FOR POST-CONVICTION**
                                       )  **RELIEF**
18 WENDI ELIZABETH ANDRIANO            )
                                       )
19        PETITIONER.                  )
                                       )
20

21

22

23

24

25

26

27

28            MEMORANDUM IN SUPPORT OF PETITION FOR POST-CONVICTION RELIEF
                         CASE NO. CR2000-096032-A

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES..................................................................................... v

INTRODUCTION .................................................................................................... 1

CASE BACKGROUND........................................................................................... 2

I.      OVERVIEW................................................................................................... 2

II.     WENDI ANDRIANO'S LIFE ....................................................................... 2

        A.      CHILDHOOD ...................................................................................... 2

                1.      Wendi Was Born Into A Family Marked By Mental Illness,
                        Substance Abuse And Violence............................................... 2

                2.      Wendi Was Raised By A Series Of Child Molesters And
                        Pedophiles ................................................................................ 3

                3.      Wendi Was Physically And Psychologically Abused
                        Her Entire Childhood ................................................................ 5

                4.      Wendi Was Raised In Poverty ................................................. 7

        B.      WENDI DEVELOPED PSYCHIATRIC DISORDERS ............................. 7

                1.      Impaired Cognitive Development.............................................. 8

                2.      Impaired Emotional Functioning Due To Childhood Trauma.......... 9

                3.      Wendi Suffers From Severe Psychiatric Disorders, Which
                        Became Worse Leading Up To Joe's Death ................................... 11

                        a.      Bipolar Disorder................................................... 11

                        b.      Complex PTSD ..................................................... 12

                        c.      Dependent Personality Disorder ........................... 12

        C.      ADULT LIFE AND MARRIAGE ........................................................ 13

        D.      JOE ANDRIANO'S DEATH............................................................... 17

        E.      WENDI'S MENTAL STATE DURING THE NIGHT OF JOE'S DEATH ............... 20

i

4838-2894-9006

**TABLE OF CONTENTS (cont'd)**

Page

III.   PRE-TRIAL REPRESENTATION.................................................................. 21

    A.   DEFENSE TEAM.................................................................................. 21

    B.   DEFENSE TEAM'S DYSFUNCTION ................................................... 22

        1.   The Failure To Investigate Wendi's Mental Illness........................ 23

        2.   The Failure To Conduct A Meaningful Investigation...................... 26

            a.   Patterson's Non-Involvement ............................................. 26

            b.   DeLozier's Role as Spiritual Advisor .................................. 27

            c.   Mac Leod's Lack of Experience ........................................... 28

        3.   The Failure To Identify And Interview Mitigation Witnesses........ 29

        4.   The Failure To Adequately Prepare For Trial................................. 30

IV.   THE TRIAL AND VERDICT ........................................................................ 32

    A.   GUILT PHASE .................................................................................. 32

        1.   The Defense's Case ....................................................................... 32

            a.   The State's Focus on Wendi's Sexual Behavior.................. 33

            b.   Wendi's Dissociation and Repression ................................. 35

        2.   The State's Case ............................................................................ 37

    B.   AGGRAVATION PHASE ..................................................................... 39

    C.   PENALTY PHASE ............................................................................. 40

LEGAL STANDARD ........................................................................................ 43

CLAIMS ........................................................................................................... 45

ii

4838-2894-9006

## TABLE OF CONTENTS (cont'd)

**Page**

I.   WENDI'S RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL WAS
VIOLATED BY DEFENSE COUNSEL'S DEFICIENT PERFORMANCE
AND RESULTING PREJUDICE DURING ALL PHASES OF THE
TRIAL ................................................................................................... 46

A.   PENALTY PHASE ............................................................................. 46

1.   Defense Counsel's Failure To Investigate And Present Expert
Testimony Regarding Wendi's Mental Illness................................. 46

a.   Deficient Performance ........................................... 46

b.   Prejudice.................................................................. 48

2.   Defense Counsel's Failure To Investigate And Present
Evidence Regarding Wendi's Harrowing Childhood ...................... 50

a.   Deficient Performance ........................................... 50

b.   Prejudice.................................................................. 52

B.   AGGRAVATION PHASE ................................................................... 55

1.   Defense Counsel's Failure To Investigate And Present Expert
Testimony Regarding Wendi's Mental Illness................................. 55

2.   Defense Counsel's Failure To Object To The Jury's
Consideration Of Evidence Related To The Alleged Sodium
Azide Poisoning as Improper, Inaccurate, and Misleading ............. 55

C.   GUILT PHASE .................................................................................. 59

1.   Defense Counsel's Failure To Investigate And Present Expert
Testimony Regarding Wendi's Mental Illness................................. 59

2.   Defense Counsel's Failure To Identify Corroborating
Evidence That Joe Knew That Wendi Was Trying To Obtain
A Life Insurance Policy ................................................................... 60

3.   Defense Counsel's Failure To Introduce Evidence That Joe
Was Severely Depressed In The Period Leading Up To His
Death ................................................................................................ 60

iii

4838-2894-9006

**TABLE OF CONTENTS (cont'd)**

Page

4.   Defense Counsel's Failure To Seek A Jury Instruction As To Lesser Included Offenses .................................................. 61

II.   THE DEFENSE COUNSEL IN CHARGE OF WENDI'S PENALTY PHASE DEFENSE HAD AN ACTUAL CONFLICT OF INTEREST THAT AFFECTED THE ADEQUACY OF WENDI'S REPRESENTATION ............................................................. 61

III.   DEFENSE COUNSEL'S FAILURE TO OBJECT TO PERVASIVE INSTANCES OF PROSECUTORIAL MISCONDUCT DEPRIVED WENDI OF DUE PROCESS AND VIOLATED HER RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL ...................................... 63

IV.   THE JURY'S CONSIDERATION OF A NON-STATUTORY AGGRAVATING FACTOR VIOLATED DUE PROCESS ................... 69

V.   WENDI WAS DENIED THE EFFECTIVE ASSISTANCE OF COUNSEL ON HER DIRECT APPEAL ......................................................... 70

CONCLUSION .................................................................................... 70

iv

4838-2894-9006

# TABLE OF AUTHORITIES

**Page**

**FEDERAL CASES**

*Ainsworth v. Woodford,*
  268 F.3d 868 (9th Cir. 2001) ..................................................................51, 54

*Arave v. Creech,*
  507 U.S. 463 (1993)..........................................................................................70

*Bean v. Calderon,*
  163 F.3d 1073 (9th Cir. 1998) .......................................................................52, 58

*Bloom v. Calderon,*
  132 F.3d 1267 (9th Cir. 1997) .............................................................................48

*Bobby v. Van Hook,*
  130 S. Ct. 13 (2009).....................................................................................44, 47

*Caro v. Woodford,*
  280 F.3d 1247 (9th Cir. 2002) .............................................................................45

*Correll v. Ryan,*
  539 F.3d 938 (9th Cir. 2008) ......................................................................43-44, 52

*Cuyler v. Sullivan,*
  446 U.S. 335 (1980)...................................................................................61-63

*Douglas v. Woodford,*
  316 F.3d 1079 (9th Cir. 2003) ................................................................45, 54, 62

*Evans v. Lewis,*
  855 F.2d 631 (9th Cir. 1988) ..............................................................................59

*Evitts v. Lucy,*
  469 U.S. 387 (1985)...........................................................................................70

*Florida v. Nixon,*
  543 U.S. 175 (2004)...........................................................................................44

*Frierson v. Woodford,*
  463 F.3d 982 (9th Cir. 1999) .........................................................................44, 52

*Girts v. Yanai,*
  501 F.3d 743 (6th Cir. 2007) ...............................................................................57

v

1

**TABLE OF AUTHORITIES (cont'd)**

2

**Page**

3

*Glasser v. United States,*
    315 U.S. 60 (1942)...................................................................................................62

4

5

*Harris ex rel. Ramseyer v. Wood,*
    64 F.3d 1432 (9th Cir. 1995) ...............................................................................45

6

*Jennings v. Woodford,*
    290 F.3d 1006 (9th Cir. 2002) .............................................................................59

7

8

*Lockett v. Ohio,*
    438 U.S. 586 (1978).............................................................................................43

9

*Lockhart v. Terhune,*
    250 F.3d 1223 (9th Cir. 2001) .............................................................................62

10

11

*Padilla v. Kentucky,*
    130 S. Ct. 1473 (2010).........................................................................................44

12

13

*Porter v. McCollum,*
    130 S. Ct. 447 (2009)...........................................................................................54

14

*Robinson v. Schriro,*
    595 F.3d 1086 (9th Cir. 2010) ......................................................................45, 58

15

16

*Rompilla v. Beard,*
    545 U.S. 374 (2005).......................................................................................54, 58

17

18

*Sears v. Upton,*
    130 S. Ct. 3259 (2010).........................................................................................53

19

*Smith v. Stewart,*
    189 F.3d 1004 (9th Cir. 1999) .............................................................................59

20

21

*Strickland v. Washington,*
    466 U.S. 668 (1984)....................................................................................*Passim*

22

23

*United States v. Lopez-Avila,*
    --- F.3d ---, 2012 WL 450314 (9th Cir. Feb. 14, 2012) .......................................63

24

*United States v. Younger,*
    398 F.3d 1179 (9th Cir. 2005) .............................................................................67

25

26

*Wiggins v. Smith,*
    539 U.S. 510 (2003)....................................................................................*Passim*

27

vi

28

PETITION FOR POST-CONVICTION RELIEF
CASE NO. CR2000-096032-A

4838-2894-9006

**TABLE OF AUTHORITIES (cont'd)**

Page

*Williams v. Taylor*,
  529 U.S. 362 (2000)......................................................................................... 44-45, 58

*Wood v. Georgia*,
  450 U.S. 261 (1981)........................................................................................................61

*Woodson v. North Carolina*,
  428 U.S. 280 (1976)........................................................................................................69

*Zant v. Stephens*,
  462 U.S. 862 (1983)....................................................................................................69-70

**STATE CASES**

*Knapp v. Hardy*,
  111 Ariz. 107, 523 P.2d 1308 (1974).......................................................... 21, 23-25

*State v. Andriano*,
  215 Ariz. 497, 161 P.3d 540 (2007)..................................................................*Passim*

*State v. Bocharski*,
  218 Ariz. 476, 189 P.3d 403 (2008).....................................................51, 54, 58, 64

*State v. Greenawalt*,
  128 Ariz. 150, 624 P.2d 828 (1981)..........................................................................69

*State v. Hughes*,
  193 Ariz. 72, 969 P.2d 1184 (1998)...........................................................64, 66, 68

*State v. Jimenez*,
  165 Ariz. 444, 799 P.2d 785 (1990)..........................................................................55

*State v. Ring*,
  204 Ariz. 534, 65 P.3d 915 (2003)............................................................................70

**STATE STATUTES**

A.R.S. § 13-703 .............................................................................................................39

A.R.S. § 13-751 .....................................................................................................*Passim*

A.R.S. § 13-752(H).........................................................................................................45

PETITION FOR POST-CONVICTION RELIEF
CASE NO. CR2000-096032-A

4838-2894-9006

**TABLE OF AUTHORITIES (cont'd)**

Page

**RULES**

Ariz. R. Evid. 803(3)............................................................................................38

Ariz. R. Crim. Proc. 32.6 .....................................................................................70

Ariz. R. Crim. Proc. 32.8 .....................................................................................70

**CONSTITUTIONAL PROVISIONS**

Ariz. Const. Art. 2, §§ 4, 15, 24 ...........................................................46, 55, 59

U.S. Const. Amend. XIV .................................................................................55, 70

U.S. Const. Amend. VI ...............................................................................43, 55, 61

U.S. Const. Amend. V ...............................................................................46, 55, 59

U.S. Const. Amends. VIII ..........................................................................46, 55, 59

U.S. Const. Amend. XIV .................................................................................55, 70

**OTHER AUTHORITIES**

American Bar Association, *Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases* (2003) .......................................26, 44, 47, 58, 62

Corr. Death Row Demographics, http://www.azcorrections.gov/inmate_datasearch /Minh_NewDeathRow.aspx (last visited Feb. 7, 2012)............................................46

Victor L. Streib, *Death Penalty for Female Offenders, January 1, 1973, Through December 31, 2011*, at 3 (2012), available at http://deathpenaltyinfo.org/documents/FemDeathDec2011.pdf (last visited Feb. 7, 2012)................................................................................................................46

*State v. Gallardo*, No. 09-0171-AP, Video of Nov. 2, 2010 Oral Argument, *available at* http://supremestateaz.granicus.com/MediaPlayer.php?view ...................................63

viii

4838-2894-9006

## INTRODUCTION

Wendi Andriano[1] was born into a family plagued by mental illness and substance abuse, was raised in abject poverty by child molesters, was physically abused her entire childhood at home and in the cult-like school she attended, and was subjected to the perverted impulses of her pedophile stepfather while her mother turned a blind eye.

Every mental-health professional who saw Wendi from 1996 through the present recognized that she showed symptoms of potentially serious psychological disorders, and many suspected that she was the victim of major childhood trauma. As explained below, these suspicions understated the severity: Wendi has several serious psychiatric disorders, which likely played a substantial role in the events that led to the death of her terminally ill husband (Joe), and impaired her ability to control and manage her feelings and reactions as the events on the night of the offense unfolded.

The jury, however, heard *none* of this information before sentencing Wendi to death for Joe's murder. Defense counsel inexplicably failed to investigate the depth of Wendi's horrific childhood, to ascertain the extent and manifestations of her mental illness, or to present expert testimony at trial showing that Wendi's worsening mental state was a significant contributing factor in Joe's death. Defense counsel's failure to present the evidence set forth in this Petition[2] was not the product of strategic planning or measured deliberation. Defense counsel's representation fell below "an objective standard of reasonableness," and their errors were "so serious as to deprive [Wendi] of a fair trial[.]" *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984).[3]

---

[1]  For ease of reference, this Petition will refer to Petitioner and members of her family by their first names (*e.g.*, Wendi, Joe, Donna, Skip and Alejo).

[2]  The accompanying expert reports, declarations and documents are separately identified by Tab number. The two exhibits attached to this Memorandum (without Tabs) are referred to as EXHIBITS 1 and 2.

[3]  Wendi reserves the right to supplement her Petition in the event that additional facts and legal violations are later discovered.

1

4838-2894-9006

# CASE BACKGROUND

## I.    OVERVIEW

In 2004, Wendi was convicted of murdering Joe and sentenced to death. Her conviction and sentence were affirmed by the Arizona Supreme Court. *State v. Andriano*, 215 Ariz. 497, 161 P.3d 540 (2007).

The scant mitigation evidence offered at trial suggested that Wendi was a product of a good family and home life. That story, however, is completely inaccurate, the product of a cursory investigation that treated mitigation as an afterthought, and failed to explore the extent of Wendi's mental illness and her mental state on the night of Joe's death. The jury that sentenced Wendi to death never heard the harrowing story of her life or the relationship between her psychiatric disorders and the crime, which would have undercut the Prosecutor's central themes in the case, and presented a compelling case for leniency.

## II.   WENDI ANDRIANO'S LIFE

### A.   CHILDHOOD

#### 1.    Wendi Was Born Into A Family Marked By Mental Illness, Substance Abuse And Violence

Wendi came from a severely dysfunctional family, plagued by multigenerational mental illness, childhood physical and sexual abuse, and substance abuse on both sides of her family, including her biological parents, Shelby Robertson ("Skip") and Donna Worsham Alejo ("Donna"). (*See* Tab 2B and Tab 4 at 6-61 (describing the extent of the dysfunction in Wendi's family and the factors that cause higher incidence of mental illness in such families).)

Attached as **EXHIBIT I** to this Petition are Robertson/Worsham family trees, which show the extent to which mental illness, substance abuse, and childhood physical and sexual abuse affected generations of relatives on both sides of Wendi's family.

4838-2894-9006

## 2. Wendi Was Raised By A Series Of Child Molesters And Pedophiles

Wendi's father (Skip), his father (Boyd Gravely Robertson), and Skip's brothers (Burl Boyd ("Buck"), Glen, Jerry Don, AV and Tommie), were all child molesters.

- According ████████████████, Buck, "his father, and all of his brothers, including Skip[], his youngest brother, raped ██ from the time I was ten until ██████████████████████ the age of eighteen." (████████ ¶ 1.)

- Skip himself stated that his "father molested ███████████████" and ███████████████, and that his brother "AV molested ████████████.████████████." (Tab 32 ¶¶ 57, 60.)

- Skip sexually molested ██████████████████ before Wendi was born in 1970. (Tab 27 ¶ 104.)

- In 1992, Skip had sex with ███████████████ 12 year old ███████████: "Back then, I felt like I loved her in the way I felt love for an adult woman." (Tab 32 ¶ 64).) Skip was convicted of child molestation, and spent 17 years (1993-2010) in prison in Arizona. (Tab 70.)

- In 1993, Skip's brother, Tommie, was arrested because he had Polaroid pictures, "taken in the sleeper compartment of his truck," of ████████████, then 13 years old, and "in them it looked like she was sleeping and Tommie was holding his penis in front of her face." (Tab 32 ¶ 65.) Tommie was convicted of sexual exploitation of a minor, and spent 4 years in prison. (Tab 71.)

Skip, his father, and his five brothers all had access to Wendi at various times when she was an infant and young child. (Tab 27 ¶ 161, 165; Tab 32 ¶ 47.)

- When Wendi was an infant and toddler, she was left alone with Skip's father, and it was a foregone conclusion among the Robertson family women that he molested Wendi. (Tab 27 ¶ 167.)

- Skip stated that, "[a]round the time Donna and I were going through our divorce [1974] . . . Tommie and I took Wendi on the road in our rig to Texas. . . . We were gone for a few days. I did not think anything of it at the time but Wendi, who was *three, maybe four years old*, was in the sleeper compartment of the truck, in bed with Tommie. Looking back on it, *I would not be surprised if Tommie molested her*." (Tab 32 ¶ 50 (emphasis added).)

After divorcing Skip, Donna married Alejo Ochoa ("Alejo"), who sexualized Wendi from an early age until she left home as a young adult, and treated Wendi as his

3

4838-2894-9006

girlfriend/spouse rather than a daughter.  (Tab 27 ¶¶ 246-47; Tab 12 ¶ 14; Tab 13 ¶ 6.)

- From age 10 or 11 until Wendi left the house as a young adult, Wendi spent a couple of hours rubbing Alejo's head, back, and legs almost every night.  "Alejo really liked to have his head in Wendi's lap while she rubbed him beginning when she was nine years old and throughout her teens."  (Tab 27 ¶¶ 276-77.)

- During these sessions, which they characterized as Wendi "ministering" to him, Alejo began with his shirt off, then stripped down to his briefs.  Alejo required Wendi to be scantily clad as well while at home (whether "ministering" to him or not).  She often wore only an old T-shirt and "little tiny, sexy underwear," which Alejo bought for her on frequent father-daughter shopping trips.  By the time Wendi was a teen, lacy, sexy underwear was the only kind of underwear Wendi owned.  (Tab 27 ¶¶ 276-79.)

- Alejo bought inappropriate clothing for Wendi when she was a pre-teen and, by the time she was 12 years old, Alejo was taking her to stores like Frederick's of Hollywood and Victoria's Secret to buy her lingerie, including garter belts, nylons and high heels.  (Tab 27 ¶¶ 259, 262, 266-67, 270.)

- By the time Wendi was 14 or 15 years old, she looked older than she really was and Alejo began "dragg[ing] Wendi into hard-core porn stores."  He "always took Wendi right into the main part of the store where the triple-x and hardcore sex magazines, videos, toys, and other hardcore items were displayed and sold."  (Tab 27 ¶¶ 280-82.)

- At least by the time Wendi was 15 or 16, Alejo (an amateur photographer) began taking photos of Wendi posed in lingerie or bikinis.  (Tab 34 ¶ 7.)  A few examples of such photographs still exist.  (*See* Tab 67 ¶¶ 4-5; Tabs 72-74.)

- When Wendi's adopted brother, Brandon, found six sheets of proofs of pictures in Alejo's photography cabinet showing a teenage Wendi posed in "Victoria's Secret type stuff" in the desert, he recalls that "Donna slapped me across the face and Alejo beat me . . . more severe[ly] than usual.  I was all bruised and bloody."  (Tab 26 ¶ 18.)

- 

  (Tab 12 ¶ 18.)

- One former principal of the high school Wendi attended noted: "There were things about Alejo's dynamic with Wendi that did not

4

sit right with me. I used to live in an A-frame house on the church property with [my wife]. One night, I was standing on the balcony as I got ready for Wednesday night services. I looked into the parking lot and I saw Wendi and Alejo. Wendi leaned into Alejo and they kissed on the mouth. Something was weird about it. It was not a father-daughter kiss. After the kiss, Wendi went in one direction and Alejo went in the other direction. This stuck out in my mind so much, I told [my wife] about it." (Tab 13 ¶ 6.)

- A member of the church stated, that around 1987, when Wendi was 17 years old, "I was concerned that Alejo had been sexually molesting Wendi. I was so upset with Alejo's behavior, I called him up on the phone and arranged a meeting between us. When I spoke with Alejo, I told him the reason I was calling and I asked him to meet me at church to discuss it further. He agreed to come meet me. When I arrived at the church, Alejo was standing outside. . . . At the beginning of our conversation, Alejo denied everything. He denied it several times until he finally confessed to his inappropriate behavior and admitted he had a problem sexually. Alejo asked me, 'What should I do? Should I resign from the church?' Looking back on it, I wish I would have just told him to resign, but instead I told him that he needed to ask forgiveness . . . ." (Tab 11 ¶ 10.)

Donna also turned a blind eye to Alejo's inappropriate sexual behavior toward Wendi because:

I didn't see myself as being able to do anything about it and I never let myself become aware that it might be a problem. Alejo was the head of our household and one of the main ten[e]ts of our religion was that as the head of the household he set the rules and it was our place to obey the rules, so that's what we did.

(Tab 27 ¶ 283.)

### 3. Wendi Was Physically And Psychologically Abused Her Entire Childhood

From her infancy, Skip trained Wendi *"like she was a dog,* not a baby." (Tab 27 ¶ 164 (emphasis added).)

He spanked her from the time she was an infant and toddler, including when he was potty training her from the time she was a few months old until she was ten months old. If she didn't obey or do something right when he told her to, for example if she was crying and he told her to stop, he spanked her, a good smack with his hand on her butt.

(*Id.*) Donna also physically abused Wendi, noting that she gave Wendi swats with a wooden spoon from the time she was a toddler until age 6 or 7—remembering to "pull

5

4838-2894-9006

1   down the diaper to hit [her]; always hit [her] with the diaper off." (Tab 27 ¶ 236.)

2   The physical and psychological abuse of Wendi continued throughout her

3   childhood.

4   • Alejo and Donna started using a paddle on Wendi when she was six or seven years old. Donna stated: "Since Wendi was born, I've

5   always been to-the-letter, black-and-white when it comes to following church rules, including rules about disciplining kids, by

6   which we meant spanking or swatting them. If the church authorities say to spank the kids, I spank them, and do it how I'm

7   told to do it. *You have to spank them hard enough so that they're not just angry; it has to go beyond that so you break them.*" (Tab 27

8   ¶ 237 (emphasis added); *see* Tab 24 ¶ 126.)

9   • In 1977, Donna, Alejo and Wendi sold all of their possessions, gave up their house, cut off all contacts with everyone they had previously

10   known, and traveled with the Fishers of Men traveling ministry[4] for over two years. (Tab 27 ¶ 204.) During that time, Donna and Alejo

11   swatted Wendi about once per week, "hard enough so it made an impression and so she knew it was serious." The leaders of that cult

12   also had permission to swat kids. "They taught that you should swat kids hard and fast, and pull the paddle away after you hit, not swat

13   them heavy or slow so the paddle stays on them after you hit them." (Tab 27 ¶ 238.)

14   • After they left Fishers of Men in 1979, Donna and Alejo continued to swat Wendi during her pre-teen and teen years, using a sixteen

15   inch long, four inch wide paddle etched with scripture." (Tab 27 ¶¶ 239-241.)

16

17   • Wendi also was beaten with a paddle over many years at the Harvest (formerly 91st Psalm) church/school, which she attended from 1980

18   until she left home as a young adult. According to Donna, Harvest members believed "that physical punishment of children was

19   necessary to drive sin from them. . . . You name it and we swatted them for it . . . ." (Tab 27 ¶¶ 231-33; Tab 34 ¶ 9.)

20   • The abuse and isolation of children at Harvest was pervasive. (Tab 12 ¶ 6; Tab 23 ¶ 28; Tab 26 ¶ 16; Tab 27 ¶¶ 231-32; Tab 34 ¶¶ 25-

21   26; Tab 35 ¶¶ 11-12; Tab 38 ¶ 12.)

22   • Alejo, the "teen and children's pastor" at Harvest (Tab 24 ¶ 76), was particularly abusive to the children there; he would "whoop" them

23

24   [4]  One former member of Fishers of Men noted: "We did not subscribe to organized religion, rather, we took to the streets preaching, singing songs, and living communally

25   with each other. We gave up our material possessions and sold them to fund the ministry. In hindsight, the group was pretty far out there and today I would describe it as a cult."

26   (Tab 36 ¶ 3; *see also* Tab 27 ¶ 212 ("It got so that we never really thought about anything, just did what we were told all day, from one day to the next. I can see in

27   retrospect how it got to be like a cult.").)

6

28

4838-2894-9006

during the week and during Sunday school.  (Tab 23 ¶ 33.)

- Tom King, the leader at Harvest, taught Alejo to drill holes in the paddle in order to make the paddling hurt more.  (Tab 26 ¶ 16.)

- Wendi was kicked out of school for months at a time and forced to pull weeds for minor infractions.  (Tab 10 ¶ 7; Tab 27 ¶ 324.) Wendi was frequently punished, and was required to do manual labor where no one was allowed to speak to her.  (Tab 10 ¶ 7.)

### 4.    Wendi Was Raised In Poverty

Between 1975 (when Wendi was age 4-5), and 1988 (when she was age 17-18), Donna and Alejo's total annual income averaged $5,617 per year.  (Tab 68.)  In three of those years (1980, 1981 and 1982), they reported no annual income.  In two others (1975 and 1979), their annual income was less than $2,000.  (*Id.*)

- While Donna worked at a drug treatment center starting in late 1974, Wendi (then age 4) went out into the streets to panhandle.  "She was a cute little blonde and people gave her money when she begged. *She was by herself* but people in the area knew her."  (Tab 27 ¶¶ 183, 245 (emphasis added); Tab 24 ¶ 50; Tab 34 ¶ 3.)

- While traveling with Fishers of Men, Donna, Alejo and Wendi were often hungry, eating "old food out of the trash" or searching for money on the street to buy a bag of beans.  (Tab 27 ¶ 213.)

- Donna and Alejo didn't believe in getting Wendi medical treatment because they thought God would heal her.  (Tab 27 ¶¶ 185-90.)

### B.    WENDI DEVELOPED PSYCHIATRIC DISORDERS

By the time Wendi reached age 18, her childhood had profound effects on her brain circuitry and emotional state.  Childhood trauma stunted Wendi's cognitive and emotional development in certain key areas and gave rise to chronic psychiatric disorders that would impair her functioning throughout her adult life.  These disorders and organic brain deficits explain her abnormal actions and reactions to trauma as an adult.  As described below, several events and conditions of Wendi's adult life, combined with the disorders she suffered, led to her acute psychiatric deterioration in the last year of Joe's life, culminating in her extreme, dissociated actions on the night of his death.

7

4838-2894-9006

### 1.    Impaired Cognitive Development

Persistent childhood abuse, neglect and anxiety disrupts and damages cognitive development in several fundamental ways. (Tab 5 at 6-7.) The primary damage threat arises in the prefrontal cortex and related areas responsible for what neuropsychologists call "executive functioning"—the ability to guide and direct one's thoughts and regulate one's emotions. (*Id.* at 6-7, 11-12.) "Adequate and mature prefrontal cortex development is required for just about every aspect of adult functioning—judgment, self-awareness, decision making, planning, organizing, flexible thinking, and initiating, monitoring, and controlling impulses and actions." (*Id.* at 11-12.)

In late 2010 and early 2011, neuropsychologist Myla Young evaluated Wendi, administering tests aimed at isolating and assessing certain functions of her brain to identify specific deficits in brain functioning.

Dr. Young noted significant impairment in each of the regions most likely to be affected by childhood and adolescent abuse and neglect. (Tab 5 at 8-13.) Most pronounced, however, was Wendi's impairment in executive functioning. (*Id.* at 11-13.) Wendi's performance on tests requiring the use of executive functioning—namely, the ability to guide, direct, and manage thinking, actions, and emotions—were "quite severely impaired," as low as the 2nd to 5th percentile in some areas. (*Id.*) The speed of her mental processing and visual-perceptual skills were so impaired (the 5th percentile) as to qualify as borderline mentally disabled in that specific brain function. (*Id.* at 8.)

As an adult, particularly in the last year before her arrest, these fundamental impairments would impede Wendi's ability to respond appropriately to increasingly severe external stressors and to regulate her own emotional responses, including responses arising out of other psychiatric disorders described below. Notably, the last person to see Joe and Wendi together—who saw Wendi call 911 from their apartment—

8

4838-2894-9006

1  described Wendi's demeanor in a single word: "Confused." (9/8/04 Tr.[5] at 11.)

2  **2.  Impaired Emotional Functioning Due To Childhood Trauma**

3  Wendi's childhood experiences affected the content of her brain as well as its

4  functional development. Specifically, her childhood trauma embedded certain responses

5  and dysfunctional emotional reactions—"trauma-based ways of relating to others"—that

6  rendered her unable to function in psychologically healthy ways as an adult. (Tab 3 at

7  15-17, 24-26.) These effects manifested themselves in several detrimental ways over the

8  course of Wendi's life, causing inflexible neuroses and self-defeating coping mechanisms

9  that rendered the impact of her psychiatric disorders more profound.

10  Dr. James Hopper, a clinical psychologist and instructor at Harvard Medical

11  School whose research and clinical work focuses on the long-term effects of childhood

12  abuse, conducted interviews of Wendi and others, reviewed materials relevant to Wendi's

13  social history, and has submitted a summary report (Tab 3) and a comprehensive report

14  (Tab 4) regarding Wendi's childhood and its profound impact on her psychological and

15  social functioning as an adult. Dr. Hopper concluded that Wendi "entered adulthood as a

16  severely traumatized and damaged person" who was and remains "extremely traumatized

17  from childhood neglect and abuse." (Tab 4 at 131, 251.)

18  Dr. Hopper identified five general categories of childhood abuse that had

19  traumatizing effects on Wendi: (1) neglect by her mother; (2) physical abuse, including

20  Wendi being "beaten into submission;" (3) emotional abuse; (4) sexual abuse; and

21  (5) traumatizing relationship patterns with caregivers from a very early age. (*See*

22  *generally* Tab 3 at 4-17.)

23  The impact of this abuse on her emotional development is extensively detailed in

24  Dr. Hopper's reports, but a few general categories of effects warrant special emphasis

25

26  [5]  Cites to the trial transcript are given as "[Date of Proceeding] Tr. at [Page]." The date of this particular citation, 9/8/04, is the sole date where there are two transcript volumes—one for opening statements, and one for testimony.

27  9

28  MEMORANDUM IN SUPPORT OF PETITION FOR POST-CONVICTION RELIEF
CASE NO. CR2000-096032-A

here. *First*, Alejo's abuse and relentless sexualizing of Wendi as a child (coupled with her mother's willful neglect) had predictably severe effects. (Tab 3 at 21-22, Tab 4 at 215-18, 246-47.)  As Dr. Hopper notes, "[c]hildren need to be *protected* from the sexuality of adults, and not to have it used against them in exploitative and abusive ways" because it can lead them to focus on sexualized attention as a substitute for healthy affection, caring and love. (Tab 4 at 106.)  As an adult, Wendi exhibited "classic symptoms" of such childhood sexual exploitation, including the subconscious, incessant need for men's sexual attention, despite feeling disgust, shame, and a lack of pleasure in sex itself. (Tab 4 at 132-33.)

Second, the trauma accompanying such abuse damaged Wendi's ability to break away from reliving her past torment through self-regulation of negative emotions and impulses. (Tab 3 at 24; Tab 4 at 247-49.)  Rather than acknowledging those painful memories and coping with them, Wendi suffers from emotional dysregulation, causing her to attempt to hide the emotions they cause from herself and others, or to "dissociate" and become disconnected from them. (Tab 4 at 247-48.)  In damaged individuals, dissociation can sometimes include "whole realms of experience and identity, such that personality and identity are highly fragmented." (*Id.* at 130.)  Throughout her life, Wendi's brain has engaged in "pathological alterations of consciousness," such that, when confronted with traumatic experiences or the memory of them, "her mind temporarily [goes] blank and she [is] unable to feel any emotions or even sensations in her body." (*Id.* at 248; *see also id.* at 129-31; Tab 27 ¶¶ 329-35.)

For Wendi, this dissociation is pervasive. (Tab 4 at 131.)  In Dr. Hopper's words, "*I have never before encountered a patient or defendant with such a severe disturbance of the capacity to recall autobiographical memories, not only of specific incidents but . . . of the kinds of experiences she typically had.*" (*Id.* (emphasis added).)

10

MEMORANDUM IN SUPPORT OF PETITION FOR POST-CONVICTION RELIEF
CASE NO. CR2000-096032-A

4838-2894-9006

### 3.   Wendi Suffers From Severe Psychiatric Disorders, Which Became Worse Leading Up To Joe's Death

The accumulation of abuse and neglect, coupled with her family history, rendered Wendi highly vulnerable to developing psychiatric disorders.  (Tab 4 at 251.)

In his report (Tab 2), Dr. George Woods describes how Wendi developed multiple psychiatric disorders by age 18, including the cognitive disorder identified by Dr. Young as well as three others:  bipolar disorder; complex post-traumatic stress disorder ("complex PTSD"); and dependent personality disorder.  These disorders are "co-morbid" in Wendi—meaning that "their effects and symptoms intensified in combination and in aggregate," particularly "in times of extreme stress and novel circumstances." (Tab 2 at 3.)  As Dr. Woods explains, "[a]ll were in play at the time of the offense, a synergy of trauma, cognitive deficits, and mood defects, impairing her ability to conform her behavior to the requirements of the law."  (*Id.* at 7.)

These disorders went untreated until Wendi's arrest (and were misdiagnosed thereafter), but their symptoms were increasingly evident leading up to and including the time of Joe's death.  (Tab 2 at 46-60.)  The reason for this lack of prior diagnosis rests in part on the fact that "the substantiation of many of Wendi's symptoms" depended upon a thorough inquiry into her social history.  (Tab 2 at 49.)  Because it had never been investigated by defense counsel, neither Wendi's family history of mental illness nor the full extent of her childhood trauma was made available to diagnosing psychiatrists prior to being presented to Dr. Woods in this post-conviction proceeding.

#### a.   Bipolar Disorder

Wendi had bipolar disorder, marked by abnormal manic and depressive states. (Tab 2 at 12-15; Tab 4 at 245-46.)  In addition, the development of bipolar disorder is strongly related to traumatic stress and genetic vulnerability.  (Tab 2 at 15; Tab 2B at 1.) Both correlating factors existed for Wendi.  (*See* Tab 4; Tab 2B; EXHIBIT 1).

11

4838-2894-9006

1    Wendi's erratic behavior in the period leading up to Joe's death—including

2    extramarital affairs and hyper-sexual behavior, inappropriate relationships with

3    subordinate employees and tenants at the apartment complex she managed, wide mood

4    swings, increased alcohol use and public displays of drunkenness, and openly engaging in

5    unlawful activity at her workplace—were textbook symptoms of a severe manic bipolar

6    state. (Tab 2 at 15-16, 48-57.) The extreme stress of Joe's terminal cancer, and the self-

7    created stresses of her own manic behavior, further "unleashed her mood symptoms" and

8    exacerbated her mania—which, in combination with other disorders, created "atypical

9    and more severe behavior than would be seen in a given disorder alone." (Tab 2 at 50.)

10                    **b.      Complex PTSD**

11    While PTSD refers to the effects of exposure to a single traumatic incident,

12   "complex PTSD" is characterized by ongoing, chronic exposure to a traumatic stressor.

13   (Tab 2 at 16-17.) Symptoms of complex PTSD include emotional numbing and

14   dissociation, affective dysregulation (*e.g.*, failing to register emotional responses in

15   situations where normal people would do so, or overreacting emotionally in situations

16   where normal people would be calm), extreme acquiescence (the inability to break free

17   from actual or perceived controls of others), and becoming easily overwhelmed by even

18   slightly stressful situations. (*Id.* at 17-19.)

19    Wendi exhibits all of these effects of complex PTSD (*id.*), and its presence

20   functioned to increase the severity of her bipolar disorder in her acutely manic state

21   leading up to Joe's death. (Tab 2 at 48-49, 54-60.) Wendi's complex PTSD symptoms at

22   the time of Joe's death were "pronounced," including affective numbing and significant

23   dissociation. (*Id.* at 56-60.)

24                    **c.      Dependent Personality Disorder**

25    Dependent personality disorder is characterized by pervasive psychological

26   dependence upon and acquiescence to other people, to the extent that a sufferer's own

27                                    12

28

4838-2894-9006

1   identity is lost. (Tab 2 at 21.)  The dependence on approval and reassurance from others

2   creates exaggerated fears of being left alone.  (*Id.*)  Sufferers may respond with

3   pathological anger when their dependency needs are thwarted—that is, when they are

4   incapable of pleasing or "fixing" others through whom they define themselves—leaving

5   them feeling "caught in the grips of powerful forces with which they cannot deal" and

6   "vulnerable to spiraling into a homicidal state." (Tab 2 at 22-23 (internal quotations

7   omitted); *see also id.* at 61 n.92.)

8       Like her other psychiatric problems, Wendi's dependent personality disorder

9   stems from her upbringing. (Tab 2 at 22; Tab 4 at 248.)  Being trained "like she was a

10  dog" to give total obedience to her caregivers had psychiatric consequences:  Wendi

11  became "terrified" of losing relationships (Tab 4 at 248), particularly her relationships

12  with men (Tab 2 at 53-54).  These symptoms permeated the early years of Wendi's

13  marriage to Joe (*id.* at 32-35), and became more detrimental as her "dependence, her need

14  to not be alone and maintain a dependent relationship, was turned upside down" in the

15  face of Joe's worsening cancer (*id.* at 48).

16      **C.  ADULT LIFE AND MARRIAGE**

17      After graduating high school in 1989, Wendi volunteered for roughly six months

18  at a Mexican church. (10/25/04 Tr. at 59.)  She spent her time there in a funk, staying in

19  bed for weeks at a time, consistent with a depressed bipolar state. (Tab 2 at 14.)

20      After her return from Mexico, and a brief stint working for a family friend while

21  living with her parents, Wendi took a position as an on-site apartment leasing agent in

22  Casa Grande. (10/25/04 Tr. at 66.)  She began drinking (10/21/04 Tr. at 180-81) and

23  engaged in repeated hyper-sexual behavior (Tab 15 at 18-23)—both symptoms of a

24  manic bipolar state. (Tab 2 at 15.)

25      Wendi also was "gullible and trusting . . . to the point of sheer stupidity[.]" (Tab

26  27 ¶ 365.)  Wendi gave away possessions, freely loaned what little money she had to

27                                          13

28

4838-2894-9006

people making empty promises of repayment, and became an easy target for
manipulation (*id.* ¶¶ 361-69)—all indicators of dependent personality disorder. (Tab 2 at
22.) Wendi also continued to experience dissociation regarding unpleasant events,
"blanking out" a large number of negative memories, ranging from how she acquired a
scar to remembering that her jacket was stolen. (Tab 27 ¶¶ 329-35.)

In early 1992, Wendi met and began dating Joe. Within a matter of weeks, Joe
moved in with her—which is consistent with Wendi's dependent personality disorder—
and they were married in 1994. (Tab 2 at 30-35.)

Wendi and Joe struggled for money throughout their marriage. (Tab 2 at 40-47;
Tab 69.) The money they did acquire they tended to squander, from buying a failed glass
repair business, to buying a timeshare they could not afford, to purchasing fuel and
upgraded parts for Joe's racing boats, his weekend hobby. (Tab 2 at 42-45; Tab 24 ¶ 139;
10/26/04 Tr. at 41-42.)

The jury heard evidence of Joe physically intimidating or verbally abusing Wendi
during their marriage. As Dr. Woods noted, Wendi's response to those incidents of
abuse—as well as Wendi's other behavior in their relationship—"mirrored, in many
ways" her relationship with her stepfather Alejo and were manifestations of her disorders.
(Tab 2 at 33-34.) This included Wendi's sexual acquiescence. Joe permitted her to go
out with her friends on condition that she "participate in whatever he had planned when
she returned home"—typically sex, including the use of sex toys against her will.
(10/26/04 Tr. at 88-93.)

In 1996, Wendi was caught stealing from an employer, and was referred for
psychological counseling. (Tab 2 at 40.) Treatment notes indicate that Wendi was
depressed and had problems sleeping and focusing. (Tab 46 at PCR117.) She was
prescribed an anti-depressant, but that only made her sleep problems *worse* (*id.* at
PCR121); because Wendi was bi-polar (rather than suffering from depression alone), the

14

4838-2894-9006

1  anti-depressant likely triggered a manic episode, a common reaction of bi-polar
2  individuals to such medication.  (Tab 2 at 40-41.)

3      After her firing, Wendi and Joe obtained an interest in a glass-repair business.
4  Within a year, they were forced out due to their embezzlement, accompanied by Joe's
5  threats to kill the majority owner.  (10/26/04 Tr. at 6-8.)  Amid this turmoil, Wendi and
6  Joe had their first child, Nicholas, in 1997, and a daughter, Ashlee, the next year.

7      Between the births of their children, a recurring lump on Joe's neck that had been
8  surgically removed three times previously was finally diagnosed as malignant cancer.
9  Joe had surgery in mid-1998, but by that time the cancer had spread to Joe's lungs and his
10  prognosis was terminal.  (10/26/04 Tr. at 110-15.)  Joe and Wendi hired a local attorney,
11  Jeffrey Miller, to represent them in a medical malpractice action against the providers
12  who had failed to correctly diagnose his cancer.  (Tab 19 ¶ 1.)

13      Joe and Wendi tried a number of nontraditional treatments in 1998 and 1999,
14  including a trip to a holistic healing center in Colorado and faith-based healing.
15  (10/26/04 Tr. at 124-29.)  However, a CT scan in early 2000 indicated that the
16  nontraditional therapies had not slowed Joe's cancer, and he was given "a few months to
17  a few years to live," even with chemotherapy, before the cancer would cause him to
18  suffocate to death.  (9/28/04 Tr. at 11-15.)

19      Although Joe agreed to undergo chemotherapy (10/26/04 at 132-33), Wendi
20  testified that he also expressed to her his desire to "die the way [he] want[s] to die,"
21  rather than suffering the agonizing suffocation from cancer foretold by his doctors.
22  (10/27/04 Tr. at 84-85.)  He told her of his intent to commit suicide (*id.* at 84), and took
23  trips to visit out-of-state relatives in Tennessee and Oklahoma to "say[] goodbye to
24  everybody without saying goodbye."  (*Id.* at 111-16.)

25      The news sent Wendi on a downward spiral.  In the midst of raising a toddler and
26  infant, bearing the full weight of supporting the family financially, and caring for a

27                                    15

28      MEMORANDUM IN SUPPORT OF PETITION FOR POST-CONVICTION RELIEF
                    CASE NO. CR2000-096032-A

4838-2894-9006

1   terminally ill and increasingly depressed husband, Wendi developed a psychiatric

2   condition known as "caregiver burden"—a state of psychological distress and

3   hopelessness often linked to caring for the terminally ill, which magnifies any underlying

4   preexisting psychiatric disorders of the caregiver.  (Tab 2 at 24-28.)

5          Wendi began to drink more heavily.  (Tab 2 at 52.)  Several months earlier, she

6   had obtained a position as a resident manager of the new San Riva apartment complex in

7   Phoenix, with supervision over employees and responsibility for relationships with

8   tenants.  (*Id.* at 47.)  She placed her job in jeopardy by regularly going to bars with her

9   co-workers and tenants, and by providing unauthorized discounts and incentives to them.

10  (*Id.* at 52-54.)  Faced with the certain death of her husband and unable to meet her

11  dependency needs—a panic-inducing situation for one suffering from dependent

12  personality disorder (*id.* at 22-23, 48)—Wendi began to seek new relationships.

13         Predictably, Wendi fulfilled this dependency crisis by reverting to hyper-sexual

14  behavior, the same type of behavior she learned from a young age as a means to

15  effectively meet the needs of Alejo.  In the summer of 2000, she had an affair with a

16  tenant at the complex, Rick Freeland (9/8/04 Tr. at 53; 9/13/04 Tr. at 42-43), who

17  provided the emotional attachment Wendi's dependent personality disorder craved.  (Tab

18  2 at 48-49, 53-54.)  When asked why she became sexually intimate with Freeland, Wendi

19  testified at her trial: "I didn't want to be a tease. . . .  I couldn't imagine saying no.  It just

20  wouldn't have been right."  (10/27/04 Tr. at 66.)  After Freeland broke off the affair in

21  July 2000, Wendi responded with extreme efforts to "fix" the relationship: she persisted

22  in trying to talk with Freeland, including pounding on his door loud enough for neighbors

23  to hear (9/8/04 Tr. at 47-48, 54), "causing a scene" and threatening to obtain an office

24  key to get into his apartment (9/15/04 Tr. at 42).

25         Wendi subsequently had a one-night stand with a man she met at a bar—again, in

26  her words, "because I know that's what guys like" and "how could you turn around and

27                                                16

28  MEMORANDUM IN SUPPORT OF PETITION FOR POST-CONVICTION RELIEF
                            CASE NO. CR2000-096032-A

4838-2894-9006

1  say no" (10/27/04 Tr. at 82-83)—and generally engaged in overly flirtatious behavior

2  while out with her co-workers throughout the summer and early fall of 2000. (*See, e.g.*,

3  9/8/04 Tr. at 8-9; 9/9/04 Tr. at 14-15; 9/15/04 Tr. at 33-36.) In their totality, Wendi's

4  "affairs, her drinking, and her impaired judgment were the products of her emerging

5  bipolar disorder, symptoms augmented by her longstanding trauma and pathological

6  dependency." (Tab 2 at 49.)

7         **D.    JOE ANDRIANO'S DEATH**

8         At the same time the effects of Wendi's disorders were becoming more and more

9  profound, Joe's own depression and sense of foreboding deepened. (Tab 37 ¶ 4;

10  10/27/04 Tr. at 13-14.) Since the spring of 2000, Wendi had tried to talk Joe out of his

11  plan to commit suicide before his cancer worsened (10/27/04 Tr. at 13-14, 84, 89), going

12  so far as to contact their lawyer to tell him of Joe's suicidal state, and to urge him to

13  speak with Joe to (1) recommend a counselor and (2) remind Joe that suicide would

14  eliminate the possibility of any recovery on the malpractice claim. (Tab 19 ¶¶ 4-5.)

15         After further discussions with Joe, Wendi testified that she acquiesced in Joe's

16  desire to commit suicide, and began researching cyanide at his suggestion. (10/27/04 Tr.

17  at 85.) Unable to purchase cyanide over the Internet, Wendi obtained the name of an

18  alternative chemical available for purchase—sodium azide—that would "accomplish

19  what he was trying to do." (*Id.* at 86, 91.) In the stated hope of possibly preserving the

20  malpractice suit for his family, and to meet Joe's wishes of sparing his parents and

21  siblings from knowledge of his suicide, Wendi purchased the sodium azide over the

22  Internet using a fictitious name and business license. (*Id.* at 92-93.)

23         Around the same time (August/September 2000), Wendi also attempted to obtain

24  additional life insurance for Joe—at his behest, according to Wendi and others.

25  (10/27/04 Tr. at 32-36; Tab 31 ¶ 8.) Wendi made some preliminary inquiries, including

26  having a conversation with a resident as to whether he would stand-in for Joe's insurance

27                                      17

28

4838-2894-9006

1  physical, but was unsuccessful. (10/27/04 Tr. at 38-42.)

2  The sodium azide arrived on Thursday, October 5, 2000. (10/27/04 Tr. at 101.)

3  According to Wendi, the next day she and Joe emptied the contents of gelatin capsules

4  containing elderberry (an herbal supplement), and, using plastic bowls from the kitchen,

5  filled roughly 15 of the capsules with sodium azide. (*Id.* at 103-110.)

6  On the evening of Saturday, October 7, 2000, Wendi, Joe, and their children went

7  to a family gathering at Joe's parents' home in Casa Grande. (10/28/04 Tr. at 22-25.) On

8  the late-night drive back to their apartment, while the children were asleep in the vehicle,

9  Joe told Wendi that "it was . . . time," and he planned on committing suicide that night.

10  (*Id.* at 25-26.) They returned home to their apartment around midnight and put the

11  children to bed. (*Id.* at 26-27.)

12  Thereafter, Joe took the elderberry bottle from the bedroom closet, poured a

13  handful of capsules into his palm, said "here it goes," and ingested them with Gatorade.

14  (10/28/04 Tr. at 29.) Wendi believed that they would stop his heart and cause a painless

15  death within minutes. (*Id.* at 30.)

16  Contrary to those expectations, Joe began experiencing dizziness and nausea

17  within 15 to 20 minutes. (10/28/04 Tr. at 30.) He began vomiting, and Wendi called co-

18  workers who lived at the apartment complex for help. She eventually reached Chris

19  Hashisaki, and asked her to come over to watch the kids while Wendi and Joe went to the

20  emergency room. (*Id.* at 32-33.) After several minutes, Hashisaki arrived, observed Joe,

21  and urged Wendi to call 911. (*Id.* at 33-36.) Wendi did so, telling dispatchers that she

22  believed her husband was having a heart attack, and Chris left the apartment to wait for

23  the paramedics. (*Id.* at 37.) The paramedics were dispatched at 2:25 a.m., and arrived at

24  2:33 a.m. (Tab 65A at PCR354.)

25  In the interim, Wendi recalls that Joe began feeling better, regained his resolve to

26  commit suicide, and ultimately determined to let the sodium azide "finish doing what [it]

27  18

28  MEMORANDUM IN SUPPORT OF PETITION FOR POST-CONVICTION RELIEF
CASE NO. CR2000-096032-A

1   was doing to him." (10/28/04 Tr. at 38-39.) Wendi later testified that Joe instructed her

2   not to open the door for the paramedics; after minutes of knocking, Wendi slipped out the

3   patio door to inform the paramedics that Joe was refusing service. (*Id.* at 39-43.) The

4   paramedics and Chris then left by 2:45 a.m. (*Id.* at 43-44; Tab 65A at PCR354.)

5         They returned less than an hour later, to find Joe dead on the floor, beaten and

6   bloody, and Wendi curled up nearby against the wall, staring into space. (9/15/04 Tr. at

7   114.) The living room was in disarray: a wedding display cabinet was smashed, a bar

8   stool lay broken, a garbage can and items from their countertop were knocked to the

9   floor, and a blood-smeared kitchen knife rested next to Joe's body. (9/9/04 Tr. at 109,

10   9/13/04 Tr. at 77, 79-81, 84, 108.)

11         The medical examiner later determined that Joe suffered repeated blows to the

12   head—possibly with the bar stool—and a laceration to his carotid artery from the knife,

13   which ultimately caused his death. (Tab 65.) The examiner also noted that Joe's cancer

14   had spread to his brain and kidneys. (Tab 65 at PCR346-47.) Wendi suffered injuries to

15   her neck and hands; multiple acrylic fingernails were torn off, and Joe's hand still

16   clutched her hair, ripped out from the roots. (Tab 66; 9/13/04 Tr. at 121; 9/14/04 Tr. at

17   41; 9/23/04 Tr. at 107-08.)

18         No one knows the full story of what occurred to cause this scene, including Wendi

19   herself. Wendi experienced dissociation to such an extent that many of her memories of

20   the incident are intermittent and non-temporal. (Tab 2 at 56-59.) She recalls Joe

21   questioning her about affairs with other men, her confession to him, Joe's resulting rage,

22   and a violent physical confrontation between them. (10/28/04 Tr. at 45-63; Tab 45 at

23   PCR20, PCR26, PCR91-94, PCR111.)

24         The State would later posit a different theory. It contended that Wendi

25   surreptitiously poisoned Joe with a lethal dose of 21 grams of sodium azide (the

26   equivalent of 21 packets of Sweet and Low); then, after calling Hashisaki and the

27                           19

28   

1  paramedics ("We don't know exactly why," admitted the prosecutor (11/30/04 Tr. at

2  32)), Wendi simply got impatient waiting for the sodium azide to work and beat Joe with

3  the stool, then stabbed him with the knife. (12/1/04 Tr. at 23, 31-32.)  The prosecutor

4  argued that Wendi staged the damage to the apartment, and that her wounds were self-

5  inflicted. (11/16/04 at 71, 115-16.)

6        **E.**     **WENDI'S MENTAL STATE DURING THE NIGHT OF JOE'S DEATH**

7       Because defense counsel never investigated Wendi's family history of mental

8  illness or her harrowing childhood, and because they never retained mental-health experts

9  to determine the effect of such abuse on her psychiatric health and how it may have

10  affected her mental state at the time of the offense, the jury never heard that Wendi

11  suffered from *any* psychiatric disorders—let alone a combination of them, all of which

12  were acute leading up to and including the night of Joe's death.  Dr. Woods concluded

13  that the collective impact of all of these disorders—cognitive disorder, bipolar disorder,

14  complex PTSD, dependent personality disorder and caregiver burden—likely had a

15  substantial impact on her actions the night of Joe's death:

16      Wendi was experiencing pronounced symptoms of her mental
illness during the period leading up to Joe's death, and the

17  night of the offense involved the convergence of severe
symptoms of each of Wendi's disorders, which, because of

18  their co-morbid nature, would have fed off each other to
exponentially worsen their collective severity.  The

19  manifestations of her psychiatric disorders, including
dissociation, likely played a substantial role in the events that

20  caused Joe's death.  A person in Wendi's state would have
been unable to control and manage her emotions and

21  responses to the events as they unfolded.  Moreover, those
disorders in conjunction—and particularly dependent

22  personality disorder when the sufferer's dependency needs
are thwarted—likely would have substantially impaired

23  Wendi's ability to accurately judge how to "help" her
terminally ill husband, who was the focus of Wendi's

24  pathological dependence needs.  Her ability to judge whether
her behavior was right was marred by her multiple mental and

25  cognitive symptoms.

26  (Tab 2 at 56-57.)  As described below, defense counsel's failure to discover such crucial

27                   20

28

4838-2894-9006

1   evidence, applicable to all three phases of Wendi's capital murder trial, was inexcusable.

2   **III.   PRE-TRIAL REPRESENTATION**

3       **A.   DEFENSE TEAM**

4           For the first five months after her arrest, Wendi was at various points represented

5   by Bethanne Klopp-Bryant, Gerald Gavin, and Wes Peterson of the Public Defender's

6   Office; private practitioner Leon Thikoll, a Tucson lawyer who had previously

7   represented Joe and Wendi in connection with a failed business venture; and private

8   practitioner David DeLozier. (Tab 6 ¶ 4; Tab 7 ¶ 3; Tab 9 ¶ 6; Tab 62.)

9           By early 2001, DeLozier was the only attorney still on the case. (Tab 7 ¶ 3.)

10  DeLozier had started taking criminal cases in the mid-1990s. (Tab 7 ¶ 2.) He had no

11  first-chair experience in any murder case, no death-penalty experience in any capacity,

12  and no experience in any criminal matter comparable in magnitude to Wendi's case. (*Id.*)

13  DeLozier learned about the case from one of Donna and Alejo's friends and, in late 2000,

14  Donna and Alejo retained DeLozier to represent Wendi in her capital trial (and agreed to

15  pay DeLozier's legal bills). (Tab 61.)

16          Concurrent with his representation of Wendi in her capital trial, DeLozier also

17  represented Donna and Alejo with respect to guardianship and adoption proceedings in

18  which Donna and Alejo were seeking visitation rights and/or custody of Wendi and Joe's

19  two children. (*See generally* Tab 77.)

20          DeLozier eventually recognized that Wendi's family lacked sufficient resources to

21  pursue the criminal case solely with private counsel. (Tab 7 ¶¶ 3-4); Tab 6 ¶ 4.) In mid-

22  2001, the Public Defender's Office resumed its representation and assigned Wendi's case

23  to the newest member of its office, Dan Patterson, who would serve as lead counsel with

24  DeLozier as private co-counsel pursuant to *Knapp v. Hardy*, 111 Ariz. 107, 523 P.2d

25  1308 (1974). (Tab 6 ¶¶ 2, 4.)

26          Patterson had a full plate upon commencing his employment at the Public

27                                          21

28

1   Defender's Office in 2001.  Wendi's case was one of seven capital cases he was assigned

2   upon joining the office, and two months later he was assigned to represent Frank Roque,

3   a man charged with  murder purportedly motivated by retaliation for the 9/11 terrorist

4   attacks.  (Tab 6 ¶¶ 2-3.)  The *Roque* case garnered national media headlines and a Court

5   TV camera during trial, and demanded a substantial amount of Patterson's time between

6   2001 and Roque's trial in the fall of 2003.  (Tab 6 ¶ 3.)  As a result, Patterson performed

7   only "minimal" work on Wendi's case before the end of 2003.  (Tab 6 ¶ 3.)

8        Even after Patterson became more engaged in the matter, he was never actively

9   engaged in the investigation of mitigating evidence.  He did not personally investigate

10  mitigating circumstances, and he "largely left the development of the mitigation case"—

11  including the investigation of Wendi's childhood ––to DeLozier and/or non-lawyer

12  mitigation specialist Scott Mac Leod.  (Tab 6 ¶¶ 17, 21-22.)

13       **B.    DEFENSE TEAM'S DYSFUNCTION**

14       Throughout the time between Wendi's arrest and trial, Wendi's defense team was

15  a dysfunctional unit.  Patterson and DeLozier had no regularly scheduled meetings and

16  communicated "rarely" and "infrequently" until 2004.  (Tab 6 ¶ 9; Tab 7 ¶ 6.)  According

17  to DeLozier, "Attorney Patterson frequently failed to return my calls and correspondence

18  when I attempted to contact him about Wendi's case.  Attorney Patterson did not inform

19  me which witnesses he wanted me to examine until after the trial was underway."  (Tab 7

20  ¶ 6; *see also* Tabs 63-64.)

21       The formation of a properly coordinated and functioning defense team is

22  fundamental to the defense of a capital case, and Wendi's representation in this case

23  presents numerous examples of the pitfalls when a defense team is not functioning as

24  such.  (*See generally* Tab 1.)  The adverse consequences were abundant, and fall into at

25  least four categories.

26

27                                          22

28  MEMORANDUM IN SUPPORT OF PETITION FOR POST-CONVICTION RELIEF
    CASE NO. CR2000-096032-A

1

### 1.    The Failure To Investigate Wendi's Mental Illness

2   Patterson, DeLozier and Mac Leod, the non-lawyer mitigation specialist, all admit

3 that they did not investigate Wendi's mental health, childhood abuse, or related issues,

4 other than possible spousal abuse. (Tab 6 ¶¶ 15-17, 30-32; Tab 7 ¶¶ 23-24; Tab 8 ¶¶ 19-

5 20, 26.) They also acknowledge that there was no strategic reason not to investigate

6 those issues. (Tab 6 ¶¶ 30-32; Tab 7 ¶¶ 23-24; Tab 8 ¶¶ 11, 23.)  Given the numerous

7 indications that such investigation would be fruitful, as described below, there was no

8 constitutionally sound basis for neglecting such an investigation.

9   Roughly three months after Wendi's arrest, Wendi began meeting with private

10 counselor Kandy Rohde,[6] who was retained by the Ochoas.  In February 2001, Rohde

11 wrote DeLozier to inform him that she believed:  (1) Wendi exhibited symptoms of

12 personality disorder; (2) Wendi dissociated in a manner that suggested childhood sexual

13 abuse; and (3) Wendi should be comprehensively examined by a psychiatrist.  (Tab 7A.)

14 One month later, after eight counseling sessions with Wendi, Rohde again wrote

15 DeLozier to request the retention of a psychiatrist.  (Tab 7B.)  She informed DeLozier

16 that Wendi's dissociation was extensive and may have stemmed from childhood

17 molestation, and concluded: "I think Wendi suffers from serious psychological disorders

18 and am anxious to have her examined by another professional for a second opinion."

19 (*Id.*)  In February 2002, Rohde informed the Public Defender's Office (and ultimately

20 Patterson) that she believed Wendi had suffered childhood physical and/sexual abuse and

21 neglect, as well as dissociative amnesia and a personality disorder.  (Tab 6D.)

22   Rohde stayed on as Wendi's counselor through trial and frequently contacted

23 DeLozier regarding Wendi's mental health.  (Tab 7 ¶ 15.)  Rohde took copious notes of

24 her sessions with Wendi, which she forwarded to DeLozier and Patterson.  (Tab 7 ¶ 17;

25 Tab 45 (notes); Tab 43 ¶ 4.)  Though those notes repeatedly describe symptoms of one or

26 ─────────────────────
[6] Rohde died in 2006.

27                                        23

28

1   more psychiatric disorders, Patterson and DeLozier failed to act upon them.

2      Numerous other medical professionals outlined the need for a comprehensive pre-

3   trial psychiatric evaluation of Wendi. In March 2001, Dr. Jack Potts completed his court-

4   ordered competency evaluation of Wendi, which was sent to DeLozier and provided to

5   Patterson after he became involved in the case. (Tab 7 ¶ 18; Tab 6 ¶ 23.) Potts found

6   Wendi competent to stand trial, but noted the presence of a family history of suicide and

7   Wendi's amnesia regarding certain events. (Tab 6A) He concluded:

8      Defense counsel may wish to independently retain an expert to evaluate his
       client's state of mind around the time of the offense. *Certainly there is*
9      *something quite bizarre about what allegedly occurred.* If Ms. Rhode [sic]
       is accurate in her diagnostic assessment, *then the criminal culpability of the*
10     *defendant and her state of mind at the time of the alleged offense should be*
       *evaluated independently,* outside the scope of a Rule 11 examination.

11  (Tab 6A at 2-3. (emphasis added).)

12     This request was never fulfilled, at least not by a comprehensive psychiatric

13  evaluation. Instead, the Public Defender's Office engaged Dr. Richard Rosengard for a

14  single visit with Wendi, which he summarized in an August 2002 report to Patterson.

15  (Tab 6C.) Like Potts before him, Rosengard found Wendi competent to stand trial but

16  also noted: (1) she had been prescribed psychotropic medications while incarcerated;

17  (2) Wendi suffered from symptoms of major affective disorder and probable post-

18  traumatic stress disorder; (3) there were indications of childhood sexual abuse; and (4)

19  her inability to clearly remember certain events (namely her husband's death) is a

20  phenomenon that "occurs in both children and adults who have been physically or

21  sexually attacked and more than explains the Defendant's response, particularly in light

22  of the fact that she had a past history, apparently, of being abused and symptoms

23  consistent with posttraumatic stress disorder." (*Id.*) Trial counsel did not pursue the

24  mental health investigation or signs of childhood sexual abuse (Tab 6 ¶ 30; Tab 7 ¶¶ 23-

25  24), and Rosengard was not retained to pursue the issues further or testify at trial.

26     Instead, defense counsel retained domestic violence expert Sharon Murphy, who

27                                              24

28

4838-2894-9006

1   was given the narrow charge of assessing whether Wendi was a victim of domestic

2   violence by Joe and determining the effects of *that* abuse, rather than any preexisting

3   conditions or disorders Wendi had prior to her marriage. (Tab 20 ¶¶ 2, 7.) Despite her

4   limited role, Murphy began to suspect that: (1) Wendi was suffering from one or more

5   psychiatric disorders, and (2) Wendi had suffered sexual abuse or other trauma as a

6   child.[7] (Tab 20 ¶¶ 5, 7; Tab 52 at PCR266.) Murphy did not pursue either line of inquiry

7   because they were outside the scope of her charge from Patterson and her expertise. (*Id.*)

8   But she passed her suspicions along to Patterson and other members of the defense team,

9   who failed to investigate further.[8] (*Id.*)

10      In September 2003, Wendi was admitted to the Durango Jail psychiatric unit after

11  being found on the floor of her jail cell, bleeding severely following an attempt to commit

12  suicide by slitting her wrist. (Tab-47 at PCR123-126.) Jail personnel found a suicide

13  note in her cell. (*Id.* at PCR124.) After months of treatment, the mental-health

14  professionals at the Durango psychiatric unit determined that her mental state justified

15  keeping her there until after her trial. (*Id.* at PCR130-31; Tab 48.)

16      Defense counsel knew that Wendi had been "feeling suicidal on occasion" prior to

17  her suicide attempt (Tab 52 at PCR267), and they learned of Wendi's attempted suicide

18  and placement in the psychiatric unit. (Tab 6 ¶ 28; Tab 7 ¶ 17.) They had also obtained

19  numerous medical record releases on at least seven different dates from January 2002 to

20

21  [7] Even the State's expert, Dr. Michael Bayless—who rebutted Murphy's testimony that
    Wendi was a battered spouse—disclosed to defense counsel before trial that he had

22  diagnosed Wendi with a depressive disorder and a personality disorder, and noted the
    possibility of childhood sexual abuse. (Tab 6E at 2, 9.)

23  [8] Murphy noted two anecdotal incidents of possible sexual abuse at trial: that a man with
    the Fishers of Men group exposed himself to Wendi, and that Wendi may have been

24  sexually abused by one of the Robertsons when she was young. (10/12/04 Tr. at 39-40.)
    Murphy admitted on cross-examination that she failed to investigate or develop any

25  concrete basis for the latter incident of abuse, and she was savaged for it on cross-
    examination; according to the prosecutor, the failure to investigate further rendered the

26  abuse allegation no more reliable than a statement that Wendi had been "attacked by
    Bigfoot." (10/14/04 Tr. at 81-83.)

27  25

4838-2894-9006

April 2004, authorizing them to obtain and review Wendi's medical records, including jail records. (Tab 53.) But defense counsel made no effort to obtain those records—which detail (among other things) Wendi's dissociation, her prescriptions for psychotropic medication, and her use of those medications from her arrest through the time of trial (Tabs 47-49)—until *after* the jury found her guilty. (11/23/04 Tr. at 6-7.)

In sum, defense counsel did not merely fail to recognize red flags of possible abuse or mental health problems warranting further investigation. They neglected repeated requests and invitations to investigate further, made by every mental health professional who came in contact with Wendi, as well as Wendi herself. Defense counsel could not make a strategic decision whether such evidence would be a part of Wendi's case—as it plainly should have been—because they did not make the effort to determine whether the preliminary diagnoses of these professionals were well-founded.

### 2.     The Failure To Conduct A Meaningful Investigation

Defense counsel's failure to conduct a meaningful investigation is highlighted by the following fact: even though Joe's death occurred in October 2000, defense counsel waited until November 19, 2004—*after* the jury found Wendi guilty of first-degree murder, and *before* the start of the aggravation and penalty phases of her trial, the latter of which began on December 7, 2004—to file a "Motion for Court Order to Assist Mitigation Investigation," requesting access to certain medical and other records. (Tab 54.) *See ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases*, Guideline 10.7, cmt. (Tab 76 at PCR 482) ("ABA Guidelines") ("[t]he mitigation investigation should begin as quickly as possible, because it may affect the investigation of first phase defenses").

### a.     Patterson's Non-Involvement

Patterson, who had the primary responsibility for the guilt phase investigation, did not perform any investigation into potentially mitigating evidence. (Tab 6 ¶¶ 17, 30-32.)

26

4838-2894-9006

1  By early 2004, Patterson gave DeLozier primary responsibility for preparing and
2  presenting Wendi's mitigation case, and Scott Mac Leod, was assigned to assist DeLozier
3  in investigating mitigating evidence. (Tab 6 ¶¶ 17, 22; Tab 7 ¶ 12.) From there, the
4  defense team members' understandings of their roles diverge.

5  According to Patterson, he "gave limited direction to Mr. Linderman [the prior
6  mitigation specialist] and Mr. MacLeod as to developing themes and theories of
7  mitigation," leaving "the development of the mitigation case to the discretion of
8  Mr. Mac Leod and Attorney DeLozier, who had the primary relationship with Wendi and
9  her family." (Tab 6 ¶ 21.)

10  According to Mac Leod, however, he lacked such discretion; Mac Leod saw his
11  role as simply "tak[ing] direction from the lawyers," who would tell him "what they
12  wanted in terms of mitigation evidence, and [he] would investigate accordingly." (Tab 8
13  ¶¶ 11-12.) Mac Leod took the narrow scope of his role seriously. For example, despite
14  having "some sense" that Wendi's childhood church/school "had what some might
15  consider to be strange teachings," he did not investigate further "because no one on the
16  case asked [him] to do so." (Tab 8 ¶ 25.)

17  DeLozier did not provide direction to Mac Leod, either. According to DeLozier,
18  he and Mac Leod communicated infrequently before trial and did not coordinate what
19  they were doing on the mitigation investigation. (Tab 7 ¶ 14.)

20  **b.    DeLozier's Role as Spiritual Advisor**

21  Although DeLozier met regularly with Wendi, the meetings involved Bible study
22  and were not related to the substance of her case or a mitigation investigation. (Tab 7
23  ¶ 8; Tab 9 ¶¶ 7, 21-22.) As DeLozier explained:

24  These meetings were primarily to discuss topics unrelated to her case, such
       as family and our belief in God. *I viewed my role with Wendi as a*
25     *combination of an attorney and a spiritual counselor. One of the primary*
       *goals of my meetings with Wendi was to provide psychological and*
26     *religious support.* Because I was not routinely kept "in the loop" on case

27
                          27

4838-2894-9006

1
2

> strategy and progress by Attorney Patterson, *I generally did not
> communicate with her regarding matters relating to the substance of her
> case.*

3

(Tab 7 ¶ 8 (emphasis added); *see also* Tab 6 ¶ 12; Tab 9 ¶ 7.)

4
5
6
7

Although he was in charge of the mitigation case (Tab 6 ¶ 22), DeLozier spoke to only a limited number of Wendi's friends and family, and he performed no investigation of Wendi's personal and family history of mental health problems or childhood abuse. (Tab 7 ¶¶ 15, 23-24.)

8

### c.    Mac Leod's Lack of Experience

9
10

Mac Leod, a non-lawyer, was in no position to fill the void left by Patterson's non-involvement and DeLozier's failure to investigate mental health and abuse issues.

11
12
13
14
15
16
17
18

Prior to Wendi's case, Mac Leod had no experience or training in death penalty cases or jury sentencing. (Tab 8 ¶¶ 5-6, 9.) Indeed, shortly before trial, he admitted he "did not know how to do his job" after Arizona's implementation of a jury sentencing regime. (Tab 29 ¶ 3.) Even though Mac Leod characterized mitigation-specialist training in the Public Defender's Office as "on-the-job" with the involvement of more senior mitigation specialists, Patterson did not assign any senior capital mitigation specialist to assist Mac Leod, and he declined at least one other mitigation specialist's offer to help Mac Leod. (Tab 20 ¶ 14.)

19
20
21
22
23

Mac Leod had joined the Public Defender's Office as a mitigation specialist in mid-2001, without any educational background in sociology, social work or other behavioral sciences, and no formal training in mitigation work once he began. (Tab 8 ¶¶ 2-5.) When he took over as mitigation specialist, Mac Leod handled standard felonies, "very few" of which went to trial. (Tab 8 ¶¶ 6-7.)

24
25
26

In doing mitigation work for standard felonies without jury sentencing, Mac Leod typically reviewed the police reports, interviewed the client, family members, and wrote reports advocating sentences focused on rehabilitative options, typically submitted to the

27

28

28

MEMORANDUM IN SUPPORT OF PETITION FOR POST-CONVICTION RELIEF
CASE NO. CR2000-096032-A

1   sentencing judge months after the verdict.  (Tab 8 ¶¶ 2, 6.)  He viewed his role in capital

2   cases no differently; in his words, "there is nothing that I would not have done in

3   standard felony cases that I would otherwise do in capital cases."  (Tab 8 ¶ 10.)

4        Mac Leod does not recall performing a number of other tasks integral to the role

5   of a capital mitigation specialist under the ABA Guidelines, such as preparing a

6   comprehensive life history and/or psycho-social history, recommending the use of

7   experts, providing social history information to such experts, and developing mitigation

8   themes based on factual investigation.  (Tab 8 ¶¶ 18-26.)  Mac Leod simply submitted

9   evidence that fit the themes he was provided by the lawyers: "Wendi's good upbringing

10  and character and her good behavior in jail."  (Tab 6 ¶ 33; Tab 8 ¶ 23.)  Indeed, Mac

11  Leod does not specifically recall doing anything beyond meeting with Wendi and her

12  parents to review family photographs for a presentation depicting Wendi's good character

13  and happy upbringing.  (Tab 8 ¶ 16.)

14       Mac Leod never asked the tough questions of Wendi, Donna and Alejo.  When he

15  met with Wendi, they "talked more gossip about the Public Defender's Office and his

16  plans to go to law school than [they] discussed [the] case."  (Tab 9 ¶ 17.)  When he did

17  discuss the case with Wendi or her parents, Mac Leod again focused on identifying

18  family photographs, and did not inquire into any possible childhood trauma or abuse, or

19  the mental health history of Wendi and her family.  (Tab 8 ¶¶ 19-20; Tab 9 ¶¶ 18, 20-21;

20  Tab 25 ¶ 2; Tab 29 ¶ 2.)

21            **3.    The Failure To Identify And Interview Mitigation Witnesses**

22       As a result of Patterson's non-involvement in mitigation-related issues, DeLozier's

23  focus on non-case-related issues (and his concurrent conflict in representing Donna and

24  Alejo in adoption and guardianship proceedings), and Mac Leod's inexperience, the

25  majority of the witnesses who are submitting declarations in support of this Petition were

26

27                                             29

28

4838-2894-9006

1  never interviewed by defense counsel as part of their pre-trial investigation.[9]  Other

2  witnesses spoke with DeLozier or Mac Leod, but their conversations were "very brief"

3  and did not touch on mental health or childhood abuse issues.[10]

4        Among the potential mitigation witnesses, the failure to interview Wendi's

5  biological father, Skip, stands out.  Even though defense counsel knew that Skip was

6  Wendi's father, knew that he was in prison in Arizona for child molestation, knew that

7  Wendi may have been sexually abused by him (or members of his family), and had even

8  been provided his prison contact information by Donna (Tab 57), no one ever interviewed

9  Skip or any other members of the Robertson family.[11]  (Tab 32 ¶ 74.)  If they had, they

10  would learned of Skip's physical abuse of Wendi, the scope of the Robertson family's

11  mental health problems, the rampant child molestation in his family, and those molesters'

12  access to Wendi at a very young age. (*See generally* Tab 32.)

13              **4.     The Failure To Adequately Prepare For Trial**

14        Defense counsel also neglected to properly prepare for trial.  *First*, they engaged

15  in minimal witness preparation.  They spent no time preparing Donna and Alejo to testify

16  (Tab 25 ¶ 6; Tab 29 ¶ 11), and no time with Wendi on the allocution she prepared for

17  sentencing (Tab 9 ¶¶ 14-15).  The defense team called Gia Palicki, a key witness who had

18  a close relationship with both Joe and Wendi as their babysitter, without even explaining

19  to her what the proceeding was about; while on the stand, Palicki *thought she was*

20  *testifying at a custody proceeding* rather than a capital murder trial.  (Tab 31 ¶ 26.)

21        *Second*, defense counsel paid no attention to Wendi's medication regimen while

22  incarcerated (Tab 6 ¶ 29, Tab 7 ¶ 21), and failed to take steps to address her extreme

23  _____

24  [9]  *See* Tab 10 ¶ 44; Tab 11 ¶ 16; Tab 12 ¶ 26; Tab 13 ¶ 15; Tab 14 ¶ 18; Tab 17 ¶ 20; Tab
    18 ¶ 15; Tab 22 ¶ 19; Tab 23 ¶ 60; Tab 30 ¶ 21; Tab 32 ¶ 74; Tab 33 ¶ 24; Tab 36 ¶ 14;
25  Tab 38 ¶ 16.

    [10]  *See* Tab 21 ¶ 31; Tab 35 ¶ 36-37.
26
    [11]  Skip did not learn of Wendi's arrest and conviction until 2009, and expressed disbelief
27  that he was never contacted regarding Wendi's murder charge.  (Tab 32 ¶¶ 1-2.)

                                       30

28        MEMORANDUM IN SUPPORT OF PETITION FOR POST-CONVICTION RELIEF
                        CASE NO. CR2000-096032-A

4838-2894-9006

1   schedule during the course of the trial.  Wendi took three psychotropic medications

2   during trial (Tab 47 at PCR131-32; Tab 49 at PCR257-63), and, the weekend before her

3   testimony, was given an *increased* dose of the very drug (Seroquel) that caused her

4   grogginess and disrupted cognitive function when taking it previously.  (Tab 47 at

5   PCR128, PCR132.)  Moreover, her grueling trial schedule involved waking up at 1 a.m.

6   at the Durango psychiatric unit to prepare for transportation to the Madison jail, waiting

7   in a holding cell in Madison for five hours before going to court, waiting in a holding cell

8   at the courthouse until trial, then finally participating in her trial until the end of the

9   day—all without food other than a sack lunch provided at the Madison jail.  (Tab 7F; Tab

10  9 ¶¶ 23-24.)  Both Wendi and her healthcare providers at the psychiatric unit noted that

11  this schedule impeded her "ability to maintain her physical and mental health throughout

12  the . . . trial," including her ability to focus.  (Tab 7G; Tab 9 ¶ 24.)

13          Given the combination of psychotropic medications, hunger, and sleep

14  deprivation, it is not surprising that jurors found her to be expressionless and not

15  "engaged" in her own trial.  (Tab 40 ¶ 10; Tab 39 ¶ 4.)  That impression was both

16  foreseeable and avoidable before trial, by meeting with Wendi's mental-health providers

17  well in advance of trial, moving the trial court for some form of relief from her schedule,

18  or at least introducing testimony to explain Wendi's cold and uninvolved affect to the

19  jurors.  Defense counsel did not take these steps.

20          *Third*, DeLozier voluntarily impaired his own physical health upon the

21  commencement of Wendi's trial.  He fasted for *70 days* during Wendi's trial to, in his

22  words, "*provide spiritual insight*," eating no solid food during that period.  (Tab 7 ¶ 9

23  (emphasis added).)  With his only calories coming from fruit juices (*id.* ¶ 9), DeLozier

24  became "increasingly thin and weak" over the course of the trial (Tab 7 ¶ 13), to the point

25  where his suits no longer fit him and he "did not appear to be functioning on all

26  cylinders."  (Tab 34 ¶¶ 41-42; *see also* Tab 9 ¶ 10; Tab 29 ¶ 12.)  DeLozier's mental

27                                              31

4838-2894-9006

1    condition became worse when a colleague was tragically murdered in October 2004,

2    midway through Wendi's trial. (Tab 7 ¶ 10.) The loss devastated DeLozier and made it

3    "very difficult to focus on Wendi's case" afterward. (*Id.*) During the guilt phase of the

4    trial, DeLozier felt weak to such an extent that he began to trail off during direct

5    examination of a witness, and was unable to follow along during the prosecutor's cross-

6    examination. (*Id.* ¶ 11.)

7        DeLozier asked Donna to write the closing argument for the penalty phase, the last

8    opportunity to make Wendi's case for avoiding a death sentence. Because Donna already

9    was on "emotional overload at that point" and felt unqualified to write a closing

10   argument, she referred DeLozier to her friend Cindy Schaider, "because she had

11   experience *writing requests for grants at her work.*" (Tab 29 ¶ 10 (emphasis added); Tab

12   34 ¶ 44.) According to Schaider,

13       David DeLozier[] approached me and my husband, Steve, in the hallway
     after court. He said that *he needed help,* that *he was having trouble*

14   *knowing what to say. . . .* I spent a couple of hours working on the closing
     argument the evening before David had to use it, and then emailed it to

15   him. It was very affirming for me to get to do that, but it is an example of
     how inadequate David was. In court the next day, he read it like a grocery

16   list. There was no passion or emphasis.

17   (Tab 34 ¶ 44 (emphasis added); *see also* Tab 35 ¶ 34 (DeLozier read the closing to the

18   jury "as if he was reading from the Encyclopedia Brittanica.").)

19   **IV.   THE TRIAL AND VERDICT**

20       **A.   GUILT PHASE**

21           **1.   The Defense's Case**

22       At the guilt phase, virtually all of the evidence focused on the question of *mens*

23   *rea.* Defense counsel focused almost exclusively on attempting to show that Joe was

24   physically and/or emotionally abusive to Wendi, and that she ultimately killed Joe out of

25   fear for her own safety. To support this theory, the defense presented numerous incidents

26   of emotional abuse, intimidation, and sexual coercion by Joe during their marriage, and a

27                         32

28

1   handful of incidents of moderate physical abuse.[12]

2       The defense's theory of the case had several holes, however, because defense

3   counsel did not perform a sufficient pre-trial investigation of her social history and

4   psychiatric disorders.  The State exploited all of these holes, using what we now know

5   are symptoms of Wendi's mental illness to incessantly attack her character and veracity,

6   without any meaningful response from defense counsel.  Had defense counsel uncovered

7   Wendi's history of abuse and psychiatric disorders stemming from childhood—and

8   thereby recognized that Wendi's deteriorating relationship with Joe was not just a product

9   of a dysfunctional marriage but also an outgrowth of chronic, deep-rooted disorders—

10  their responses to the State's evidence would have been compelling.  Because they did

11  not perform these fundamental tasks, defense counsel instead presented essentially no

12  response at all.

13      **a.**    **The State's Focus on Wendi's Sexual Behavior**

14      The prosecutor endeavored at every opportunity to paint Wendi as an abuser

15  through her promiscuity.  The jury was inundated with talk of Wendi's hyper-sexual

16  behavior before and during her marriage to Joe.  **EXHIBIT 2** offers dozens of excerpts

17  from the trial transcript, in all three phases, highlighting the pervasiveness of the

18  prosecutor's attacks.

19      Even a limited subset, taken from the first day of the prosecutor's guilt phase

20  closing, gives a sense of the State's thematic bent and the severe implications of defense

21  counsel's failure to conduct an adequate investigation.  For starters, the prosecutor

22  argued, in reference to Wendi, "But you weren't in love with Joe because you could not

23  even bring yourself to the point of enjoying the most intimate thing that two people in

---

25  [12] As explained below, there would have been no strategic reason for defense counsel to
    avoid introducing evidence that Wendi was affected by severe psychiatric disorders at the
26  time of this violent confrontation with Joe.  Such evidence would have complemented
    and bolstered the self-defense claim.

27  33

28  MEMORANDUM IN SUPPORT OF PETITION FOR POST-CONVICTION RELIEF
    CASE NO. CR2000-096032-A

4838-2894-9006

1    love do, that's enjoy sexual intercourse. Couldn't do it." (11/16/04 Tr. at 76.)  The

2    prosecutor further asked the jury to ponder whether Wendi had to use lubricants during

3    sex with other partners, as she had with Joe.  (*Id.* at 75.)  Had defense counsel done a

4    proper investigation, it could have responded simply and powerfully: after a childhood

5    fraught with sexualization and molestation, Wendi was incapable of enjoying intercourse

6    with *anyone*.  (Tab 4 at 132, 217.)

7         The prosecutor further argued, in numerous ways, that Wendi was sex-crazed,

8    "never missing an opportunity" to kiss other men and take them home.  (11/16/04 Tr. at

9    91.)  This argument persisted through almost every day of the trial, and was especially

10   reinforced during closing argument.  In the prosecutor's words:

11       "And before the song is over, probably before he even knows her name,
         they're kissing. . . . And when she started to grab him in the various places,
12       he, again, responded accordingly.  She's the one that initiated—this demure
         little lotus blossom we have here—she's the one that is all that." (*Id.* at 87.)

13       "What's happening is that she starts to grope him under the table.  I guess
14       the woman has needs and she's going to do something about it . . . ." (*Id.* at
         88.)

15       "Perhaps she's going to experience another one of these dalliances that is
         not an affair. . .  This is the woman who kisses men on the way home." (*Id.*
16       at 93.)

17       "You've seen what she looked like back then, all sassed up in her pink little
         outfit." (*Id.* at 63.)

18       Describing Wendi's supposed thought process, "Let's go out and look for
         the young bucks we have out here on the dance floor.  Maybe we can take
19       one home.  That's exactly what's going on." (*Id.* at 101.)

20       "You've seen it, how she's all sassed up over there by the pool.  And you
         know she's going out . . . .  Going over to the dance floor." (*Id.* at 152.)

21       Wendi "[w]ants to be out on the dance floor.  Wants to be out kissing guys.
         Wants to be out in this fantasy world that seems so real to her with the
22       strobe lights going on." (*Id.* at 151.)

23       "Why is it that she gets involved with [another man]?  Why is it that they
         engaged in the most intimate acts that two people can engage in?  Well,
24       because, according to her, she didn't want to be a tease.  Wow." (*Id.* at 84-85.)

25   The defense offered no substantive response, and issued no objections to any of the above

26   statements.

27                                      34

28   MEMORANDUM IN SUPPORT OF PETITION FOR POST-CONVICTION RELIEF
                     CASE NO. CR2000-096032-A

4838-2894-9006

1   The prosecutor argued that Wendi's sexual behavior was especially abhorrent

2   because of her religious upbringing. (*Id.* at 14 (prefacing insinuations of promiscuity by

3   stating, "Let's take a look at what this incredibly quote, unquote religious person did"),

4   18 ("Of course, when they're married, it's all right to go out and have affairs. But right

5   now, it's against the wishes of my God to do that."), 97 ("It doesn't matter . . . if it's her

6   God that's telling you 'you shall not go out and cheat with other men.' She doesn't care.

7   She's going to do whatever she wants. What does she care about the Ten

8   Commandments?").) If the jury had known that Wendi's religious upbringing was not a

9   traditional Christian education—but rather a cult-like atmosphere of psychological

10  control, physical abuse and sexual perversion (Tab 4 at 146-69, 226-30)—then the

11  prosecutor's flippant argument that "she didn't care" about her soul would not have been

12  effective. (11/16/04 Tr. at 97.)

13  In sum, had defense counsel performed an adequate investigation, they could have

14  provided a compelling response to the prosecutor's primary theme in arguing for her

15  *mens rea* and in attacking her credibility and morality. Having failed to do so, defense

16  counsel offered no direct response to the prosecutor's attacks, leaving jurors to conclude

17  that Wendi was in reality more assertive and confident than she appeared in court (Tab 39

18  ¶ 3, Tab 41 ¶ 4, Tab 42 ¶ 4)—when, in fact, the opposite was true. (Tab 2 at 13-29.)

19  **b.    Wendi's Dissociation and Repression**

20  Wendi's psychiatric disorders caused her to repress and dissociate from traumatic

21  experiences in her life, and to act in a manner consistent with her disorders but

22  inconsistent with the psychologically healthy person her defense counsel portrayed her to

23  be. Rather than explain these symptoms to the jury in the context of her disorders—as

24  defense counsel could have done had they followed through on a comprehensive

25  psychiatric evaluation—they stood idly by while the prosecutor took full advantage.

26  Throughout the trial (particularly during Wendi's cross-examination) the

27  35

28

4838-2894-9006

1   prosecutor used Wendi's lack of memory of traumatic events against her, repeatedly

2   questioning her about lapses in memory of traumatic moments, and how her memory

3   could improve over time. (*See, e.g.,* 10/28/04 Tr. at 113; 11/1/04 Tr. at 77, 81-82, 85;

4   11/2/04 Tr. at 91-93, 162; 11/3/04 Tr. at 9-12, 15, 48.)  In closing, the prosecutor

5   hammered these issues home, summing up his purpose (twice) in his closing argument:

6   "With the truth ya ain't got to remember nothing." (11/16/04 Tr. at 22, 78.)  To

7   punctuate this point, he asked the jury, in regard to her testimony: "If that's the truth and

8   that was such a traumatic event when that happened at the end of August of the year

9   2000, don't you think she would have remembered?" (*Id.* at 95.)

10      Had defense counsel properly investigated Wendi's mental health, they could have

11   answered simply, "No," for all the reasons described in the reports of Dr. Woods and

12   Dr. Hopper.  They could have noted she suffered these disorders without treatment for

13   years before her police interrogation the morning after the most traumatic event

14   imaginable, and had received more than a year of treatment at the Durango psychiatric

15   ward between her arrest and her testimony.  But again, because defense counsel did not

16   investigate and therefore did not know the extent of Wendi's mental disorders, the

17   prosecutor could argue these points unchecked.  Indeed, the prosecutor noted that the

18   defense had not presented testimony of any witnesses who employed a "scientific

19   psychiatric approach." (11/16/04 Tr. at 86.)

20      The prosecutor concluded his argument to the jury by listing off numerous actions

21   by Wendi in the months before Joe's death that appeared contrary to reality, asserting that

22   she was living in "a fantasy world" with her affairs and frequent visits to bars. (*Id.* at

23   152-54.)  As Dr. Woods notes, the actions identified by the prosecutor were in fact

24   symptoms of Wendi's worsening psychiatric state.  Had defense counsel performed an

25   adequate investigation, all of these positions of the State at trial would have aided

26   Wendi's defense, rather than undermining it.

27                                     36

4838-2894-9006

## 2.   The State's Case

Having undermined Wendi's credibility without rebuttal, the State contended that the jury should disbelieve her testimony that Joe sought and knew about her efforts to assist him in committing suicide, and to obtain life insurance to help the family after his death.  These were crucial statements that the State could not rebut with direct evidence of its own.  Corroborating evidence supporting Wendi's testimony on these two key points existed, but defense counsel failed to either find or present it.

*First*, regarding the applications for life insurance, babysitter Gia Palicki—who cared for the Andrianos' children "almost every day" during the year before Joe's death and "developed a close friendship with both Wendi and Joe"—"knew that Joe was trying to obtain a life insurance policy"  because "[b]oth Joe and Wendi talked to her about it." (Tab 31 ¶ 8.)  At the time, Palicki observed that Joe "wanted all of that taken care of before he passed" because he wanted to help his family financially.  (*Id.*)

But defense counsel did not call Palicki to testify at the guilt phase of the trial. When she finally *was* called to testify (at the penalty phase), it was after so little contact with defense counsel that she thought she was testifying at a custody hearing rather than a murder trial.  (*Id.* ¶ 26.)  Defense counsel questioned her about Wendi's skills as a mother; they did not ask her about the life insurance issue.

*Second*, the State attempted to rebut Wendi's statements that Joe sought to commit suicide and enlisted Wendi's help in doing so by offering testimony of witnesses who did not perceive Joe to be suicidal.  On this point, defense counsel could have responded with the testimony of two witnesses with unimpeachable credibility, both of whom would have supported the reasonable conclusion that Joe was contemplating suicide.

Phoenix attorney Jeffrey Miller served as counsel for Joe and Wendi in their malpractice suit, and had periodic contact with both Joe and Wendi from the fall of 1998 through the time of Joe's death.  (Tab 19 ¶¶ 1, 4.)  In the months prior to Joe's death,

37

4838-2894-9006

1  Miller received multiple distressed calls from Wendi expressing concern over Joe's
2  worsening depression and expressions of his intent to take his own life, and she asked
3  Miller to contact Joe and recommend a counselor. (*Id.* ¶ 4.) Miller did so: he contacted
4  Joe directly and told him that Joe's family members were concerned about his mental
5  state and worried he was contemplating suicide. (*Id.* ¶ 5 & Tab 19A at 1.) Joe was
6  neither surprised nor dismissive; he acknowledged the concerns, and did not deny that he
7  was or had been contemplating suicide. (Tab 19 ¶ 5.) Miller provided Joe with a
8  recommendation for a counselor to address these issues. (*Id.*)

9  　　Miller was called as a witness by the State (presumably in an attempt to establish a
10  financial motive for the crime). On cross-examination, defense counsel attempted to
11  elicit this important testimony regarding Joe's mental state, but drew a hearsay objection,
12  which was sustained. Rather than restating the questions in a manner that would not
13  elicit hearsay, or laying the groundwork for the applicability of an exception to the
14  hearsay rule that would apply to the conversations at issue,[13] defense counsel dropped the
15  subject entirely and moved on.

16  　　In addition, defense counsel briefly interviewed but never called as a witness Chris
17  Weaver, a longtime friend of Joe dating back to high school. (Tab 37 ¶ 1.) Weaver had
18  telephoned an investigator for defense counsel to say that Joe had contacted Weaver two
19  to three weeks before his death to ask Weaver to help take care of Joe's family after he
20  died. (Tab 58 at PCR327-30; Tab 59.) Despite knowledge of this key fact, there is no
21  indication from their files that defense counsel ever contacted Weaver to follow-up on
22  this information, and they never called him as a witness. Had they done so, Weaver
23  would have told defense counsel and the jury that he spoke with Joe in the months
24  preceding his death; in those discussions, Joe uncharacteristically rejected long-term

25  _____
[13] Joe's response to Miller's questions about his state of mind were necessarily
26  representations of Joe's then-existing state of mind, an exception to the hearsay rule,
    Ariz. R. Evid. 803(3).
27  
28  
MEMORANDUM IN SUPPORT OF PETITION FOR POST-CONVICTION RELIEF
CASE NO. CR2000-096032-A

4838-2894-9006

1    plans with Weaver because, in Joe's words, "I only have a few weeks to live." (Tab 37

2    ¶ 4.) According to Weaver, "it appeared to me that Joe knew he was dying and it didn't

3    really matter to him anymore." (*Id.*)

4        Without hearing the evidence outlined in this Petition, the jury found Wendi guilty

5    of first-degree murder on November 18, 2004. Defense counsel had not requested or

6    received instructions on lesser-included offenses.

7    **B.   AGGRAVATION PHASE**

8        At the aggravation phase, the State presented two aggravating factors:  that the

9    murder was committed for pecuniary gain, A.R.S. § 13-751(F)(4), and the murder was

10   committed in an especially heinous, cruel, or depraved manner, A.R.S. § 13-751(F)(6).[14]

11   The State called only one witness—medical examiner Phillip Keen, who performed the

12   autopsy—while the defense called none. Keen testified as to the manner of Joe's death.

13   He believed any one of eight to ten blows from the barstool would have been sufficient to

14   render Joe unconscious (11/30/04 Tr. at 58-59, 63-66), and that Joe died "within a matter

15   a minutes" (*id.* at 69).

16       Though not relevant to any aggravating factor, the prosecutor again referenced

17   Wendi's affairs during his closing argument at this phase. (12/1/04 Tr. at 15, 16, 38.)

18       The jury did not find that Wendi committed the murder for pecuniary gain, or that

19   the murder was especially heinous or depraved. The jury did find that the murder was

20   especially cruel, but not for any reason relating to the manner of the crime. During

21   deliberations at the aggravation phase, the jurors "made a chart outlining the different

22   possible outcomes" for Wendi depending on whether they found an aggravator, which

23   made their decision "a lot clearer." (Tab 39 ¶ 8.) According to one juror,

24           [W]hen we decided on the aggravator, we talked about what

25

26   [14]  Citations to statutory aggravating and mitigating factors are to the current versions of
     the statutes (at A.R.S. § 13-751) rather than the historical versions (at A.R.S. § 13-703).

27   39

28   MEMORANDUM IN SUPPORT OF PETITION FOR POST-CONVICTION RELIEF
     CASE NO. CR2000-096032-A

1                      might happen if we didn't find an aggravating circumstance.
                      We discussed how her sentencing would go back to the judge
2                       and agreed that none of us wanted that.  We talked about how
                      we didn't want to see Wendi get out of prison, and that was a
3                       key reason we decided on the cruelty aggravator.

4 (Tab 41 ¶ 6.)

5      **C.**     **PENALTY PHASE**

6      One week later, the penalty phase of the trial commenced.  Because they did not

7 know about Wendi's childhood abuse, dysfunctional upbringing, or deep-rooted

8 disorders, defense counsel called no witnesses to testify about those issues.  Instead, they

9 focused on three themes:  (1) Wendi had a good upbringing and good character;

10 (2) Wendi was a good candidate for rehabilitation; and (3) Joe was abusive to Wendi.

11      Even as to those generic themes, defense counsel's mitigation presentation was

12 superficial.  *First*, with regard to Wendi's character and upbringing, they called Donna

13 and Alejo; Jimmy and Linda Galyon (a couple who used Wendi as a babysitter in the late

14 1980s and early 1990s and had no contact with her since); and two friends of Donna and

15 Alejo who knew Wendi for limited periods in the 1980s and testified that she was an

16 obedient and bright teenager (Chris Vargas and Lonnie Inskeep).  Defense counsel also

17 called Gia Palicki and Wendi's cousin, Barbara Mitchell, to testify that Wendi was a

18 good mother and cared about others.  None of these witnesses were asked about

19 childhood abuse or other trauma.

20      *Second*, with regard to Wendi's prospects for rehabilitation, defense counsel called

21 three current or former members of the healthcare staff at the Durango psychiatric unit:

22 Gerald Perry, Joyce Van Every and Laura King.  They testified that Wendi was a

23 cooperative inmate and helpful to prison staff, which the prosecutor characterized as

24 being a "snitch."  (12/15/04 Tr. at 134.)  They also testified that Wendi suffered from

25 depression and severe anxiety; without knowing Wendi's full family history and

26 childhood, they attributed these effects as a response to being incarcerated rather than a

27                                     40

28                MEMORANDUM IN SUPPORT OF PETITION FOR POST-CONVICTION RELIEF
                               CASE NO. CR2000-096032-A

4838-2894-9006

1   major mental illness stemming from her childhood.  (12/8/04 Tr. at 122.)

2          Finally, Sharon Murphy testified again, essentially rehashing her testimony that

3   Wendi was a victim of domestic violence by Joe.

4          In the 75 minutes the prosecutor was allotted for closing argument (12/15/04 Tr. at

5   74), he asserted that Wendi "laughed coquettishly" during her interrogation and was

6   "having affairs," "going out with other men," "goof[ing] around with other men,"

7   "kiss[ing] lots of guys," "fraterniz[ing] with other men," "dancing and kissing men," and

8   "having the time of her life" doing it.  (*Id.* at 108, 130, 111, 121, 126; 12/16/04 Tr. at 16,

9   9, 11.)  The prosecutor further used evidence of Wendi's purportedly "good upbringing"

10  against her, contending that Wendi should have known better.  (12/15/04 Tr. at 131-32.)

11         Despite defense counsel's failure to present any compelling mitigation evidence,

12  however, the sentencing decision was not a slam-dunk death-penalty conviction for the

13  State.  The jurors became deadlocked at one point in the deliberations (12/20/04 Tr. at 4),

14  and at least one alternate juror would not have imposed the death penalty.  As she stated,

15         If given the opportunity to make a decision at the penalty phase, I would
       not have sentenced Wendi to death, but not because the defense was
16     compelling in any way.  I thought their performance was horrid.  [But] I
       personally felt the crime that Wendi was found guilty of was the result of
17     Wendi cracking under the pressure of her overwhelming life.

18  (Tab 40 ¶ 2.)  The alternate juror only reached that conclusion, however, by *rejecting*

19  defense counsel's mitigation themes:  "It sounded like Wendi was raised like a gypsy,

20  never had a stable home, and wasn't afforded a decent education, but the defense lawyers

21  didn't drive any of that home.  The defense lawyers kept focusing on how great Wendi's

22  family was."  (*Id.* ¶ 9.)

23         Other jurors confirmed they would have been open to evidence of childhood abuse

24  and psychiatric problems, had it been put forth:  "For example, if we had been presented

25  with evidence that Wendi had been sexually abused in her childhood, or that she had a

26  history of psychiatric problems, we would have given those things consideration, because

27                                      41

28              MEMORANDUM IN SUPPORT OF PETITION FOR POST-CONVICTION RELIEF
                              CASE NO. CR2000-096032-A

1  they would have explained some of the negative facts that were out there." (Tab 39 ¶ 11;

2  Tab 41 ¶ 7.)

3       In affirming Wendi's conviction and death sentence, the Arizona Supreme Court

4  highlighted the superficial and limited nature of the mitigating evidence presented by

5  defense counsel at trial, including:

6      the stress of Joe's cancer, [Wendi's] good grades in school, missionary and
7      community work, and strong religious convictions[,] . . . evidence that she
    was a sexual abuse and domestic violence victim, a good mother to two
8      children, married for six years, and a good inmate.

9  *Andriano*, 215 Ariz. 497, 511, ¶ 69, 161 P.3d 540, 554 (2007).

10       The Court rejected the evidence in the record because it was:  (a) undeveloped;

11  (b) inconsequential; or (c) directly contradicted by the murder for which Wendi had been

12  convicted.  With respect to the stress related to Joe's cancer, the Court noted:

13      [*t*]*he record does not indicate*. . . that at the time of the offense, [Wendi's]
    stress was any greater than it had been two years earlier when she and Joe
14      first learned he was terminally ill . . . .  Moreover, *this is not a case in*
    *which Andriano suddenly "cracked" under extreme stress*. . . .
15

16  *Id.* at 512, ¶ 71, 161 P.3d at 555 (emphasis added).

17       Likewise, the limited and anecdotal evidence of sexual abuse offered at trial—that

18  Wendi "'may have been' sexually abused by her biological father when she was around

19  the age of two" and "a member of the traveling ministry to which her family belonged

20  exposed himself to Andriano when she was between six and eight years old"—was

21  accorded minimal significance because "the events [we]re remote in time to the offense"

22  and there was no attempt to relate those events to the person Wendi was at the time of the

23  crime.  *Id.* at 512, ¶ 72, 161 P.3d at 555.

24       The Court also found that the fact that Wendi "maintained good grades in school

25  and participated in missionary and community work" and "was a good inmate in jail"

26  were inconsequential.  *Id.* at 512, ¶¶ 72, 74, 161 P.3d at 555.

27                    42

28

4838-2894-9006

1    Finally, other evidence offered as mitigating circumstances merely highlighted

2   how disconnected the mitigation case was from the crime for which Wendi had been

3   convicted:

> . . . whether Andriano was a good mother . . . [is of] minimal value in light of the fact that Andriano murdered her children's father while the children were present in the apartment.  Moreover, neither the fact of Andriano's marriage nor its six-year duration is mitigating considering that she would have remained married and the marriage would have lasted longer had she not killed her husband.
>
> \*   \*   \*
>
> Although Andriano had what might be considered a strict religious upbringing, many of her actions, such as killing her husband and having extramarital affairs, appear inconsistent with holding strong religious convictions.

10   *Id.* at 512, ¶¶ 73, 75, 161 P.3d at 555.

11                              **LEGAL STANDARD**

12    The Sixth Amendment to the United States Constitution guarantees a person

13   accused of a crime the right to the effective assistance of counsel.  *Strickland*, 466 U.S. at

14   685-686.[15]  "This right extends to 'all critical stages of the criminal process,' including

15   capital sentencing."  *Correll v. Ryan*, 539 F.3d 938, 942 (9th Cir. 2008) (internal citation

16   and quotation marks omitted).

17    To prove a claim of ineffective assistance of counsel, Petitioner must show that:

18   (1) "counsel's performance was deficient"; and (2) "the deficient performance prejudiced

19   the defense."  *Strickland*, 466 U.S. at 687.

20    To satisfy the "deficiency" prong of the *Strickland* test, a petitioner must show that

21   "counsel's representation fell below an objective standard of reasonableness . . . under

22   prevailing professional norms."  *Id.* at 688.  The United States Supreme Court has

23   recognized that "prevailing norms of practice as reflected in American Bar Association

24

25   [15]  The Eighth and Fourteenth Amendments also demand that all relevant evidence bearing on a defendant's character, propensities, and record be considered by the
26   sentencer in determining the appropriateness of the penalty in capital cases.  *Lockett v. Ohio*, 438 U.S. 586, 604-605 (1978).

27

28

4838-2894-9006

1   standards and the like . . . are guides to determining what is reasonable . . . ." *Id.*; *Bobby*
2   v. *Van Hook*, 130 S. Ct. 13, 16-17 (2009); *Florida* v. *Nixon*, 543 U.S. 175, 191 n.6
3   (2004); *Wiggins* v. *Smith*, 539 U.S. 510, 524 (2003); *Williams* v. *Taylor*, 529 U.S. 362,
4   396 (2000).  Although they are "only guides," *Strickland*, 466 U.S. at 688, and not
5   "inexorable commands," *Bobby*, 130 Sup. Ct. at 17, "these standards may be valuable
6   measures of the prevailing professional norms of effective representation[.]" *Padilla v.*
7   *Kentucky*, 130 S. Ct. 1473, 1482 (2010).

8       According to the ABA standards in effect at the time of Wendi's trial, "[c]ounsel's
9   duty to investigate and present mitigating evidence is now well established."  ABA
10  Guideline 10.7 cmt. (Tab 76 at PCR480).  Such investigations "should comprise efforts to
11  discover *all reasonably available* mitigating evidence and evidence to rebut any
12  aggravating evidence that may be introduced by the prosecutor." *Wiggins*, 539 U.S. at
13  524; *see also Correll*, 539 F.3d at 942.

14      "The imperative to cast a wide net for all relevant mitigating evidence is
15  heightened at a capital sentencing hearing because '[t]he Constitution prohibits
16  imposition of the death penalty without adequate consideration of factors which might
17  evoke mercy.'" *Frierson v. Woodford*, 463 F.3d 982, 989 (9th Cir. 1999) (quoting *Caro*
18  *v. Calderon*, 165 F.3d 1223, 1227 (9th Cir. 1999)).

19      "Because the sentencer in a capital case must consider in mitigation, 'anything in
20  the life of a defendant which might militate against the appropriateness of the death
21  penalty for the defendant,' 'penalty phase preparation requires *extensive* and generally
22  *unparalleled* investigation into personal and family history.'" ABA Guideline 10.7 cmt.
23  (Tab 76 at PCR481) (emphasis added, citations omitted); *id.* at PCR483. "Evidence
24  regarding social background and mental health is significant, as there is a 'belief, long
25  held by this society, that defendants who commit criminal acts that are attributable to a
26  disadvantaged background or to emotional and mental problems, may be less culpable

27                                           44

1    than defendants who have no such excuse.'" *Douglas v. Woodford*, 316 F.3d 1079, 1090

2    (9th Cir. 2003).

3           Counsel has a duty to retain and consult with the appropriate experts to assess their

4    client's mental health. *Caro v. Woodford*, 280 F.3d 1247, 1254 (9th Cir. 2002).  Expert

5    testimony should be introduced to explain the effects of defendants' background on their

6    behavior.  (*Id.* at 1255-57.)

7           To satisfy the "prejudice" prong of the *Strickland* test, a petitioner "must show that

8    there is a reasonable probability that, but for counsel's unprofessional errors, the result of

9    the proceeding would have been different."  466 U.S. at 694.  "A reasonable probability

10   is a probability sufficient to undermine confidence in the outcome."  (*Id.*)  In a capital

11   case, this requires a determination of "whether there is a reasonable probability that,

12   absent the errors, the sentencer . . . would have concluded that the balance of aggravating

13   and mitigating circumstances did not warrant death."  (*Id.* at 695.)  This inquiry requires

14   evaluating "the totality of the available mitigation evidence—both that adduced at trial,

15   and the evidence adduced in the [post-conviction] proceeding—in reweighing it against

16   the evidence in aggravation." *Williams*, 529 U.S. at 397–98.[16]  The ultimate question is

17   whether, taking into account all the mitigating and aggravating evidence, "there is a

18   reasonable probability that at least one juror would have struck a different balance."

19   *Wiggins*, 539 U.S. at 537; *see* A.R.S. § 13-752(H) (requiring a unanimous jury verdict to

20   impose a death sentence).

**CLAIMS**

21

22          Wendi's constitutional right to counsel was violated by multiple acts and

23   omissions that fell well below the standard of care and prejudiced her in a capital case.

24   [16] *See Robinson v. Schriro*, 595 F.3d 1086, 1111 (9th Cir. 2010) ("[I]t is not necessary
     for the . . . petitioner to demonstrate that the newly presented mitigation evidence would
25   necessarily overcome the aggravating circumstances.").  Even if counsel's errors, viewed
     independently, do not demonstrate prejudice, "prejudice may result from the cumulative
26   impact of multiple deficiencies." *Harris ex rel. Ramseyer v. Wood*, 64 F.3d 1432, 1438
     (9th Cir. 1995).

27                                                      45

28

1   U.S. Const. Amends. V, VI, VIII, XIV; Ariz. Const. Art. 2, §§ 4, 15, 24.  Weighing all of

2   the available evidence discussed below cumulatively, there is more than a reasonable

3   probability that Wendi would not have been sentenced to death.[17]

4   I.    **WENDI'S RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL WAS
         VIOLATED BY DEFENSE COUNSEL'S DEFICIENT PERFORMANCE**
5        **AND RESULTING PREJUDICE DURING ALL PHASES OF THE TRIAL**[18]

6        Patterson, DeLozier and Mac Leod all admit that they did not investigate Wendi's

7   mental health, childhood abuse, or related issues, other than spousal abuse.  (Tab 6 ¶¶ 17,

8   21-22, 30-32; Tab 7 ¶¶ 23-24; Tab 8 ¶¶ 19-20, 26.)  They also acknowledge that there

9   was no strategic reason not to investigate those issues.  (Tab 6 ¶¶ 30-32; Tab 7 ¶¶ 23-24;

10  Tab 8 ¶¶ 11, 23, 25.)

11       **A.   PENALTY PHASE**

12            **1.    Defense Counsel's Failure To Investigate And Present Expert
                     Testimony Regarding Wendi's Mental Illness**
13

14            **a.    Deficient Performance**

15       Every mental health professional that interviewed or examined Wendi concluded

16  that she was likely suffering from mental illness and/or childhood sexual abuse.  For

17  example, Dr. Potts stated that, given the bizarre nature of the crime and Kandy Rohde's

18  _____

19  [17]  In the United States, it is an infrequent occurrence for a woman who has been
    convicted of murder to be sentenced to death.  Women account for about 10% of murder
20  arrests annually, but account for only 2.1% (174 out of 8,392) of the death sentences
    imposed at the trial level between 1973 and 2011.  *See* Victor L. Streib, *Death Penalty*
20  *for Female Offenders, January 1, 1973, Through December 31, 2011*, at 3 (2012),
    available at http://deathpenaltyinfo.org/documents/FemDeathDec2011.pdf (last visited
21  Feb. 7, 2012).  Of the 167 women sentenced to death in the United States during this
    period, 83 (49.7%) had their conviction or sentence reversed, and 12 (7.1%) others had
22  their sentence commuted.  (*Id.* at 10-16 (App'x A).)  As of the end of 2011, only 58
    women (1.8% of all inmates) remained on death row in the United States.  (*Id.* at 9 &
23  Table 5.)  There are presently three women (2.3% of the 130 inmates) on Arizona's death
    row. *See* Ariz. Dept. of Corr. Death Row Demographics,
24  http://www.azcorrections.gov/inmate_datasearch/Minh_NewDeathRow.aspx (last visited
25  Feb. 7, 2012).

    [18]  Attorney Larry Hammond has submitted a "*Strickland*" expert declaration describing
26  how defense counsel's performance failed to meet the applicable standard of care for
    Arizona practitioners in a capital case.  (Tab 1.)

27                                            46

28        MEMORANDUM IN SUPPORT OF PETITION FOR POST-CONVICTION RELIEF
                          CASE NO. CR2000-096032-A

4838-2894-9006

1   treatment notes, *"the criminal culpability of the defendant and her state of mind at the*

2   *time of the alleged offense should be evaluated independently*[.]" (Tab 6D (emphasis

3   added).) Given the numerous indications that such investigation would be fruitful, "any

4   reasonably competent attorney would have realized that pursuing" the leads suggested by

5   this information "was necessary to making an informed choice among possible defenses."

6   *Wiggins*, 539 U.S. at 525. Yet defense counsel failed to retain a psychiatrist to

7   thoroughly examine Wendi to determine if she suffered from any mental diseases or

8   defects as a result of sexual abuse, physical abuse, and neglect of her childhood, and

9   failed to perform the social history investigation required for an informed diagnosis.

10      As a result, defense counsel did not learn that Wendi's erratic behavior in the

11   period leading up to Joe's death, was evidence of her worsening psychiatric disorders,

12   each compounding the symptoms of the other and converging to affect her actions on the

13   night of the crime. (Tab 2 at 3, 7, 15-16, 55-59.) In light of the co-morbid nature of her

14   disorders, by which they "fed off each other to exponentially worsen their collective

15   severity" leading up to the offense, Dr. Woods explains:

16      The manifestations of her psychiatric disorders, including dissociation,
        *likely played a substantial role in the events that caused Joe's death.* A
17      person in Wendi's state would have been *unable to control and manage her
        emotions and responses* to the events as they unfolded. Moreover, those
18      disorders in conjunction—and particularly dependent personality disorder
        when the sufferer's dependency needs are thwarted—*likely would have
19      substantially impaired Wendi's ability to accurately judge how to "help"
        her terminally ill husband,* who was the focus of Wendi's pathological
20      dependence needs. *Her ability to judge whether her behavior was right
        was marred by her multiple mental and cognitive symptoms.*
21

22   (Tab 2 at 56-57 (emphasis added).) *See* ABA Guideline 10.11 cmt. (Tab 76 at PCR508)

23   ("[E]xpert testimony may explain the permanent neurological damage caused by . . .

24   childhood abuse, or the hereditary nature of mental illness, and the effects of these

25   impairments on the client's judgment and impulse control."). Put simply, counsel "failed

26   to act while potentially powerful mitigating evidence stared them in the face." *Bobby,*

27                                              47

28

4838-2894-9006

1   130 S. Ct. at 19 (citing *Wiggins*, 539 U.S. at 525).

2       The defense theory of the case was that Joe wanted to commit suicide, and that his

3   murder arose out of a violent confrontation between Wendi and Joe that followed his

4   voluntary ingestion of poison. There is no reason why such a defense would have

5   precluded defense counsel from also presenting evidence regarding the manifestations of

6   Wendi's mental illness both before and on the night of Joe's death. Having failed to

7   undertake the requisite investigation, defense counsel had no basis to make a strategic

8   decision whether to introduce such evidence at trial. *See Bloom v. Calderon*, 132 F.3d

9   1267, 1277 (9th Cir. 1997) ("Describing [counsel's] conduct as 'strategic' strips that term

10  of all substance."). The deficiency prong under *Strickland* is met.

11              **b.   Prejudice**

12      There is a reasonable probability that, but for defense counsel's errors in failing to

13  develop evidence relating to Wendi's mental illness, "the result of the proceeding would

14  have been different." *Strickland*, 466 U.S. at 694.

15      Section 13-751(G)(1) is a statutory mitigating factor, which requires the sentencer

16  to consider whether Wendi's "capacity to appreciate the wrongfulness of h[er] conduct or

17  to conform h[er] conduct to the requirements of law was significantly impaired, but not

18  so impaired as to constitute a defense to prosecution." A.R.S. § 13-751(G)(1). As

19  explained above, but for defense counsel's ineffective assistance, the jury would have

20  heard expert testimony (such as that contained in Tabs 2 through 5) proving this statutory

21  mitigating factor by a preponderance of the evidence. A.R.S. § 13-751(C).[19]

22      The Arizona Supreme Court's decision in *Andriano* highlights the prejudicial

23  effect of defense counsel's failure to adequately investigate and present expert testimony

24  regarding Wendi's mental illness. Specifically, the Court noted:

25  _____

26  [19]  The extent and manifestations of Wendi's mental illness also is a non-statutory
    mitigating factor.

27                                          48

4838-2894-9006

> [*t*]*he record does not indicate. . .* that at the time of the offense, [Wendi's] stress was any greater than it had been two years earlier when she and Joe first learned he was terminally ill . . . . Moreover, *this is not a case in which Andriano suddenly "cracked" under extreme stress. . . .*

*Andriano,* 215 Ariz. at 512, ¶ 71, 161 P.3d at 555 (emphasis added). However, the reason the "record [did] not indicate" that Wendi was under increasing stress at the time of Joe's death, and the reason the Supreme Court was left with the misimpression that "this is not a case in which Andriano suddenly 'cracked[,]'" is because defense counsel inexplicably failed to develop the social history evidence (family mental health, childhood abuse and neglect) needed for a complete and accurate diagnosis of her disorders, and failed to present any expert testimony addressing those topics. (*Id.*)

Furthermore, the expert testimony of Dr. Woods and Dr. Hopper directly address two core prosecution themes at trial: (1) that Wendi was a liar who selectively forgot details, including the details surrounding Joe's death; and (2) that Wendi was a promiscuous adulteress who deserved to be condemned.

*First,* as Dr. Hopper explained, psychological dissociation is a disconnection from painful memories, sometimes including "whole realms of experience and identity, such that personality and identity are highly fragmented." (Tab 4 at 130.) Wendi has the most severe dissociation that Dr. Hopper has ever seen. (Tab 4 at 131 ("*I have never before encountered a patient or defendant with such a severe disturbance of the capacity to recall autobiographical memories . . . .*") (emphasis added).)

*Second,* Wendi's promiscuity and inability to say "no" to sexual advances are "classic symptoms" of childhood sexual exploitation and a manic bipolar state. (*Id.* at 132-33.) Had defense counsel performed an adequate investigation, the prosecutor's efforts to paint Wendi as detestably promiscuous would have fallen flat, or at least been met with greater understanding, in light of evidence that Wendi was raised by child molesters and pedophiles and treated by her own stepfather as a sexual plaything from the time she was a young child. Instead, the prosecutor's grossly improper characterizations

49

4838-2894-9006

1  went largely unanswered and unexplained.

2  Thus, but for defense counsel's errors, Wendi would have presented powerful

3  evidence that her mental illness contributed to her actions before and on the night of Joe's

4  death, and would have rebutted two core attacks on her veracity and credibility.  There is

5  a reasonable probability that a jury hearing this evidence would not have sentenced

6  Wendi to death.

7
8
### 2. Defense Counsel's Failure To Investigate And Present Evidence Regarding Wendi's Harrowing Childhood

9  As explained above, the two attorneys (Patterson and DeLozier) and the mitigation

10  specialist (Mac Leod) failed to work in a coordinated fashion.  Patterson, who was

11  occupied until late 2003 with a high-profile death penalty case, focused on the guilt phase

12  of Wendi's trial and delegated (without instructions) the mitigation investigation of the

13  case to DeLozier and Mac Leod.  DeLozier spent his time with Wendi reading the Bible.

14  Mac Leod did little more than identify facts to show "Wendi's good upbringing and

15  character and her good behavior in jail." (Tab 6 ¶ 33; Tab 8 ¶ 23.)  In other words, rather

16  than undertake an in-depth look at Wendi's life—and base the mitigation case on the life

17  story that emerged—Mac Leod was instructed to look for evidence (*e.g.*, family vacation

18  pictures) that supported the defense team's preconceived, superficial and *completely*

19  *inaccurate* story of Wendi's upbringing.

20
### a. Deficient Performance

21  Defense counsel failed to interview key witnesses—including Skip, members of

22  his family, Wendi's childhood friends, people who were members of the Fishers of Men

23  cult, and people who knew Wendi and her family at the Harvest school—and did not

24  even request Wendi's jail records until after the guilt phase of her trial was over.  As a

25  result, defense counsel failed to uncover:

26      • the extent and manifestations of Wendi's mental illness;

27      • the extent of the mental illness, substance abuse and multi-

50

28

4838-2894-9006

generational violence that plagued both sides of Wendi's family;

- Wendi was raised by—and spent her entire childhood in the company of—child molesters and pedophiles, including her father (Skip), his father, his brothers, and Alejo, who treated her as a sexual object and shaped her into the promiscuous, hyper-sexualized adult that the State vilified at trial;

- Wendi was subject to physical abuse from the day she was born: trained like "a dog" by Skip, who spanked her to get her to stop crying and to obey; physically beaten with wooden paddles by Donna and Alejo throughout her childhood, the object of which was to "break her"; indoctrinated in environments (Fishers of Men, and then Harvest) where the abuse of children was pervasive ("You name it and we swatted them for it"); and

- Wendi was raised in abject poverty, isolation and neglect, and was panhandling on her own at the age of 4.

The information set forth above—which defense counsel failed to learn or present to the jury—is precisely the type of evidence that historically has convinced juries to not impose the death penalty. *See, e.g., State v. Bocharski*, 218 Ariz. 476, 189 P.3d 403 (2008); *Ainsworth v. Woodford*, 268 F.3d 868, 877 (9th Cir. 2001) ("[E]vidence about the defendant's background and character is relevant because of the belief, long held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background, or to emotional and mental problems, may be less culpable than defendants who have no such excuse.") (quoting *Penry v. Lynaugh*, 492 U.S. 302, 319 (1989)).

Finally, "[t]he record of the actual sentencing proceedings underscores the unreasonableness of counsel's conduct by suggesting that their failure to investigate thoroughly resulted from inattention, not reasoned strategic judgment." *Wiggins*, 539 U.S. at 526. Defense counsel neglected to make basic inquiries into their client's background, such as her family mental health history and history of abuse, inexplicably ignored clear indications that such an investigation would be fruitful, and failed to respond to the pleas of numerous professionals to examine those issues further. They did not even request Wendi's full jail records (including medical records) until after she had been convicted.

51

4838-2894-9006

1     The mitigation case that counsel eventually put on can be described, at best, as

2   "halfhearted." *Wiggins*, 539 U.S. at 526.  Wendi's closing was given by DeLozier, who

3   had been fasting for 70 days, who was still traumatized by the murder of a co-worker in

4   the midst of Wendi's trial, and who was *at such a loss to know what to say in Wendi's*

5   *defense* that he asked two non-lawyers to write the closing argument the day before he

6   read it to the jury as if it were a grocery list.  The text of the closing argument contained

7   no rebuttal to the State's arguments—that Wendi was a conniving, selectively forgetful,

8   promiscuous adulteress whose life was not worth sparing—because defense counsel

9   never investigated the extent of the sexual and physical abuse, isolation and neglect that

10  Wendi experienced throughout her childhood, which made her the person she was at the

11  time of the crime.

12     Defense counsel admit that their shortcomings were not based on a reasonable

13  strategic judgment, nor could they have been.  "An uninformed strategy is not a reasoned

14  strategy.  It is, in fact, no strategy at all."  *Correll*, 539 F.3d at 949; *see also Bean v.*

15  *Calderon*, 163 F.3d 1073, 1079 (9th Cir. 1998) ("[F]ailure to develop a penalty phase

16  presentation can only be characterized as a deficiency in trial preparation, *not a strategic*

17  *decision*[.]") (emphasis added).  Accordingly, no "reasoned professional judgment" could

18  be offered to support defense counsel's minimal investigation.  *Frierson*, 463 F.3d at 992

19  ("Because strategy presupposes investigation, [defense counsel's] actions cannot be

20  attributed to strategy").

21              **b.     Prejudice**

22     As discussed above (and detailed in **EXHIBIT 2**), the prosecution theme that

23  permeated all three phases of Wendi's trial related to her extramarital affairs and

24  promiscuity.  The prosecutor vilified Wendi over and over again for the casual nature

25  with which she would kiss or sleep with people she met in bars (while Joe was at home

26  dying of cancer), and made Wendi's immorality and hyper-sexual behavior the

27              52

28

1    centerpiece of the State's closing argument during the penalty phase.

2    But there is a rebuttal that explains Wendi's behavior and testimony, a rebuttal that

3    defense counsel missed entirely.  Consider the facts regarding her sexuality in view of the

4    mitigation evidence presented in this Petition: that Wendi was raised by child molesters

5    and pedophiles, was treated as a sexual plaything by Alejo, and was physically and

6    sexually abused from the day she was born, with profound effects on her sexuality and

7    relationships with men as an adult.  Viewed through that lens, Wendi's testimony

8    expressing wonderment about how she could say no to a man who wanted to have sex

9    (10/27/04 at 66), only proves her mental illness and history of abuse. [20]  (*See, e.g.*, Tab 2

10   at 22, 34, 48-49; Tab 4 at 132-33, 248-51.)  At a minimum, such rebuttal evidence would

11   have explained to the jury how Wendi became the person she was, and would have made

12   her a much less likely candidate for the jury's condemnation.  *See Sears v. Upton*, 130 S.

13   Ct. 3259, 3264 (2010) ("This evidence might not have made Sears any more likable to

14   the jury, but it might well have helped the jury understand Sears, and his horrendous

15   acts—especially in light of his purportedly stable upbringing").

16   Had defense counsel performed reasonably, the compelling mitigating evidence

17   discussed in this Petition would have been discovered and presented to the jury.  This

18   evidence would have placed Wendi's life story before the jury and enabled them to make

19

---

20   [20] To illustrate the prejudice arising from defense counsel's failure to investigate her
     childhood sexual abuse and its impact on her sexuality, consider the following example.
21   As noted above, Wendi testified that she "couldn't imagine saying no" to sex with Rick
     Freeland and Travis Black, because it "wouldn't have been right" and she "didn't want to
22   be a tease."  (10/27/04 Tr. at 66, 82-83.)  The prosecutor mocked these statements in
     various ways throughout trial, most pointedly in his guilt-phase closing: "Why is it that
23   she gets involved with [other men]?  Why is it that they engaged in the most intimate acts
     that two people can engage in?  Well, because, according to her, she didn't want to be a
24   tease.  *Wow*. . . .  According to her, it's worse to be a tease than it is to be a cheat.  I guess
     that's what she's telling us."  (11/16/04 Tr. at 84-85.)  Thus, because of defense counsel's
25   failure to investigate the childhood and resulting psychiatric disorders of their client, the
     jury was left to conclude that Wendi's inability to say "no" was the product of
26   condemnable immorality, rather than a tell-tale symptom of her childhood sexual abuse
     and psychiatric disorders.

27                                                53

4838-2894-9006

1    an individualized assessment of the appropriateness of the death penalty. It is precisely

2    the type of evidence that has been found "critical for a jury to consider when deciding

3    whether to impose a death sentence." *Douglas v. Woodford*, 316 F.3d at 1090.[21]

4         *State v. Bocharski*, 218 Ariz. 476, 189 P.3d 403 (2008), is on point. In *Bocharski*,

5    the Arizona Supreme Court reduced defendant's death sentence to life imprisonment

6    because "[t]estimony from numerous witnesses supports the conclusion that Bocharski

7    suffered severe physical, mental and sexual abuse during his childhood[,]" Bocharski

8    "came from a severely dysfunctional family" with "evidence of multigenerational

9    violence in both his mother's and father's families[,]" and Bocharski presented evidence

10   of a nexus between the mitigating factors and the crime:

11               [Dr. Beaver] testified that Bocharski's emotional and
             alcoholic state likely played a substantial role in the events
12           that led to the murder of Brown and that a person in his state
             would have been far less able than others to control and
13           manage his feelings and reactions.

14   *Bocharski*, 218 Ariz. at 497-499, ¶¶ 101-02, 104-05, 110, 189 P.3d at 424-26.[22]

15        Likewise, Wendi suffered a childhood and family history that is markedly similar

16   to Bocharski's (although evidence of such was entirely missed by defense counsel) and,

17   as explained by Dr. Woods, Wendi's mental illness likely played a substantial role in

18   Joe's murder, which again, is an issue that defense counsel entirely missed.

19   _____

20   [21] Applying *Strickland*, the United States Supreme Court has found "[a] reasonable
     probability," 466 U.S. at 694, that the sentencer would have reached a different result had
21   counsel presented similar evidence. *See, e.g., Porter v. McCollum*, 130 S. Ct. 447, 454
     (2009) (evidence of the defendant's childhood history of physical abuse, brain
22   abnormality, limited schooling and military service); *Rompilla v. Beard*, 545 U.S. 374,
     392 (2005) (evidence of severe abuse and neglect as a child, as well as brain damage);
23   *Wiggins*, 539 U.S. at 535 (evidence of the defendant's "severe privation and abuse" as a
     child, homelessness, and "diminished mental capacities").

24   [22] *See also Ainsworth*, 268 F.3d at 878 (Based on defense counsel's failure "to
     investigate, develop and present the wealth of evidence available concerning Ainsworth's
25   troubled background and his emotional stability and what led to the development of the
     person who committed the crime," the prejudice prong under *Strickland* was satisfied
26   because "there is a reasonable probability that the jury would have rendered a [different]
     verdict.").

27                                          54

4838-2894-9006

1    Wendi is entitled to an evidentiary hearing at minimum, and ultimately, a new

2   sentencing. *Strickland*, 466 U.S. 668; *Wiggins*, 539 U.S. 510; U.S. Const. Amend. V, VI,

3   VIII, XIV; Ariz. Const. Art. 2, §§4, 15, 24.

4    **B.    AGGRAVATION PHASE**

5    **1.    Defense Counsel's Failure To Investigate And Present Expert
          Testimony Regarding Wendi's Mental Illness**

6

7    Expert testimony regarding Wendi's mental illness on the night of Joe's death also

8   would have undermined the one aggravating factor that was found to exist.

9    "The jury found one aggravating factor—that Andriano committed the murder in

10   an especially cruel manner. A.R.S. § 13-7[51](F)(6)." *Andriano*, 215 Ariz. at 510, ¶ 64,

11   161 P.3d at 553. "The cruelty prong of the (F)(6) aggravating circumstance may be

12   proved by showing that the defendant *knew or should have known* that the manner in

13   which the crime was committed would cause the victim to consciously experience either

14   physical pain or mental anguish before death." *Id.* at 511, ¶ 65, 161 P.3d at 554

15   (emphasis added, citation omitted). To properly find cruelty, the State must prove

16   beyond a reasonable doubt that the aggravating circumstance is met. *State v. Jimenez,*

17   165 Ariz. 444, 453, 799 P.2d 785, 794 (1990) (citation omitted); A.R.S. 13-751(B).

18   In view of the manifestations of Wendi's mental illness on the night of the crime,

19   discussed by Dr. Woods, there is more than a reasonable probability that at least one juror

20   would have concluded that Wendi did not know or have the capacity to have known that

21   her actions would cause Joe to suffer (rather than alleviate) further physical pain or

22   mental anguish. (Tab 2 at 57 (combination of acute disorders "likely would have

23   substantially impaired Wendi's ability to accurately judge how to 'help' her terminally ill

24   husband, who was the focus of her dependence needs"); Tab 45 at PCR20 ("In her head

25   she said she was helping him.").)

26    **2.    Defense Counsel's Failure To Object To The Jury's
          Consideration Of Evidence Related To The Alleged Sodium**

27                                    55

28

### Azide Poisoning as Improper, Inaccurate, and Misleading

In Wendi's direct appeal, the Arizona Supreme Court placed significant weight on the alleged sodium azide poisoning in concluding that the (F)(6) cruelty aggravator was met.

> The evidence showed that Andriano poisoned Joe with sodium azide and left him to suffer for what felt to Joe like a "long time." During that period, Joe vomited at least twice, was too weak to sit or stand, and was having difficulty breathing. After pretending to call 911, Andriano stood by for approximately forty-five minutes as Joe suffered from the effects of sodium azide poisoning. . . . Joe, who was conscious during this time . . . undoubtedly "experienced significant uncertainty as to [his] ultimate fate."

*Andriano*, 215 Ariz. at 511, ¶ 65, 161 P.3d at 554 (citations omitted).

However, because the State never introduced evidence—consistent with its "poisoning" theory—explaining how the sodium azide got into Joe's system, defense counsel should have sought a court ruling precluding the jury from considering the alleged "poisoning" in deciding whether the (F)(6) cruelty aggravator was satisfied.

In the State's opening statement during the aggravation phase, the prosecutor argued:

> [Joe] Andriano was given this poison. And we know the amount of poison that is unaccounted for is approximately 21 grams which is the equivalent o[f] 21 packets of Sweet and Low. That's sort of what you can get a feel to what's missing.
>
> We also know that that's ten times what they call the lethal do[s]e in 50 percent of the people that may take it and weigh that much. *So we know she gave him at least ten times the amount that was necessary to kill him.*
>
> \*   \*   \*
>
> . . . the poison would have killed him. We know that from Dr. French, there's ten times the amount of lethal dose missing. *So it's in his body, that's where it is. So he would have died from it anyway.*

(11/30/04 Tr. at 23, 32 (emphasis added).)[23]

Wendi testified that, as part of Joe's decision to commit suicide, he took a handful

---

[23]   As discussed below, the lack of evidentiary support for the prosecutor's assertion—that Joe consumed ten times the dose of sodium azide needed to kill him—supports Wendi's claim of prosecutorial misconduct.

56

of the approximately 15 capsules that Wendi and Joe together had filled with sodium azide, and he voluntarily ingested a handful of them with Gatorade.  (10/24/04 Tr. at 29.)

The State presented *no alternate explanation* for how the sodium azide got into Joe's system.

- The State's witness, Joseph Richmond, found that there was "a trace amount" of sodium azide in a pot of beef stew (25 parts per million (ppm)), and clarified that the amount observed was "near the detection limit" and was at "a very small level.  It's at very small quantities." (9/27/04 Tr. at 41, 54-55, 66.)

  To illustrate how small of a quantity this is, consider how much stew Joe would have had to eat in order to consume *one* gram of sodium azide, the equivalent of just *one* Sweet and Low packet.  (9/22/04 Tr. at 142.)  Given that 25 ppm is the same as 25 milligrams per kilogram (a milligram is one-millionth of a kilogram), and one gram is a thousand milligrams, Joe would have had to have consumed *40 kilograms* of stew (roughly 88 pounds) to ingest the equivalent of just a single Sweet and Low packet of sodium azide.  Defense counsel indicated that Wendi's explanation for Joe's ingestion of the sodium azide made sense, but never pointed out the impossibility of the State's alternative theory.

- There was no evidence that Joe ate the stew on the night of his death.

- There also was no explanation by the State as to how Wendi could have either *forced* or *tricked* Joe into taking what the prosecutor argued in the aggravation phase was an amount of sodium azide that was the equivalent of "*21 packets of Sweet and Low.*"

Because the State failed to prove—under any standard, and certainly not beyond a reasonable doubt (*see* A.R.S. § 13-751(B))—that Joe was poisoned (without his knowledge) by Wendi, the jury should not have been permitted to consider the alleged poisoning as part of its deliberation during the aggravation phase.

The failure of the defense counsel to object to the introduction of evidence or argument relating to the alleged poisoning during the aggravation phase deprived Wendi of a fair trial under *Strickland.  First*, given the prominent role the issue of whether Joe had been poisoned played during the guilt phase, defense counsel's error in failing to seek to exclude evidence of poisoning during the aggravation phase fell below an objective standard of reasonableness. *See, e.g., Girts v. Yanai*, 501 F.3d 743, 757 (6th

57

4838-2894-9006

1    Cir. 2007) (counsel ineffective for failing to object to improper argument; failure had "no

2    conceivable benefit" to the defense and resulted in the jury hearing prejudicial

3    arguments); ABA Guideline 10.8 cmt. (Tab 76 at PCR489).

4         *Second*, there is a reasonable probability that, but for counsel's error, the jury

5    would not have found that the (F)(6) cruelty aggravator was met. As noted above, the

6    State emphasized the alleged "poisoning" in it opening statement in the aggravation

7    phase, and the Arizona Supreme Court did as well in its *de novo* review of the

8    aggravation phase. Moreover, if the evidence of "poisoning" had properly been

9    excluded, the only testimony as to the (F)(6) aggravator was medical examiner Keen's

10   testimony that he believed any one of eight to ten blows from the barstool were sufficient

11   to render Joe unconscious, and that he died "within a matter a minutes." (11/30/04 Tr. at

12   58-59, 63-66, 69).[24] Because at least one juror could have concluded that those facts, on

13   their own, did not support the "especially cruel" aggravator, Wendi is entitled to a new

14   trial as to aggravation and sentencing. *See Bean*, 163 F.3d at 1081 (citing as one of the

15   factors undermining confidence in the outcome of trial, the fact that "this is not a case in

16   which a death sentence was inevitable because of the enormity of the aggravating

17   circumstances").

18        Finally, confidence in the jury's imposition of the death sentence is further

19   undermined when the addition of new evidence to the mitigation side of the ledger

20   (discussed above) is coupled with the removal of evidence from the aggravation side of

21   the ledger. *Robinson*, 595 F.3d at 1113 (finding prejudice where the state court weighed

22

23   ---

[24] This aggravation evidence is no stronger than the evidence in *Rompilla*, *Williams* or

24   *Bocharski*. *See Rompilla*, 545 U.S. at 378, 383 (the defendant committed murder by
     torture and had a significant history of violent felonies, including a rape); *Williams*, 529

25   U.S. at 418 (Rehnquist, C. J., concurring in part and dissenting in part) (the defendant had
     a lifetime of crime, and after the murder he "savagely beat an elderly woman," set a home

26   on fire, and stabbed a man (citations and internal quotation marks omitted)); *Bocharski*,
     218 Ariz. at 494, ¶ 86, 189 P.3d at 421 ("Bocharski inflicted twenty-four knife wounds to

27   the head and face of Brown").

                                              58

28

1   the proffered evidence against two statutory aggravating circumstances when it should

2   have only weighed against one).  But for defense counsel's deficient performance, the

3   abundance of mitigation evidence identified in this Petition would have been balanced

4   against far less compelling evidence relating to the "especially cruel" (F)(6) aggravator,

5   and there is more than a reasonable probability that at least one juror would have weighed

6   these considerations differently.  *Wiggins*, 539 U.S. at 537.

7       Wendi is entitled to relief under *Strickland*, U.S. Const. Amends. V, VI, VIII,

8   XIV, and Ariz. Const. Art. 2, §§ 4, 15, 24.

9   **C.    GUILT PHASE**

10          **1.    Defense Counsel's Failure To Investigate And Present Expert
                    Testimony Regarding Wendi's Mental Illness**

11      The manifestations of Wendi's mental illness on the night of the crime, as

12  described by Dr. Woods, also call into question whether she formulated the mental state

13  necessary to be convicted of first-degree murder.  Defense counsel was "obliged to

14  thoroughly investigate [Wendi's] case in order to *determine* whether a mental state

15  defense might have been better than [or complementary to] the . . . defense" they had

16  settled on. *Jennings v. Woodford*, 290 F.3d 1006, 1015 (9th Cir. 2002); *see also Evans v.*

17  *Lewis*, 855 F.2d 631, 636-37 (9th Cir. 1988); *Smith v. Stewart*, 189 F.3d 1004, 1009-1014

18  (9th Cir. 1999).

19      In *Jennings*, prior counsel had engaged a psychiatrist who conducted a 2-hour

20  "preliminary interview" with Jennings that "was meant as a preliminary assessment of

21  Mr. Jennings' competency and as a tool to establish a baseline for Mr. Jennings shortly

22  after his arrest." *Jennings*, 290 F.3d at 1013.  Trial counsel never pursued a possible

23  mental health defense, despite being aware of drug and mental health issues.  (*Id.* at

24  1013-14.)  The Ninth Circuit found ineffective assistance and ordered *habeas* relief under

25  such circumstances.  (*Id.* at 1019-20.)  Likewise, Dr. Potts urged defense counsel to

26  evaluate Wendi's mental state at the time of the crime, and they failed to do so.  If they

27                                      59

28

4838-2894-9006

1    had, then the expert testimony would have called into question whether Wendi had the

2    requisite mental state for premeditated murder.

3          **2.**      **Defense Counsel's Failure To Identify Corroborating Evidence That Joe Knew That Wendi Was Trying To Obtain A Life**

4                 **Insurance Policy**

5       The Arizona Supreme Court noted the significance and damaging nature of the

6    evidence that Wendi attempted to obtain insurance on Joe's life:

7          Evidence of Andriano's attempts to obtain insurance on Joe's life was admissible to show her plan, knowledge, and intent to kill Joe, and also to

8          show that she premeditated Joe's murder.  Moreover, the *significant probative value* of *such damaging evidence* is not substantially outweighed

9          by the danger of unfair prejudice to Andriano.

10   *Andriano*, 215 Ariz. at 503, ¶ 23, 161 P.3d at 546 (emphasis added).

11       Gia Palicki, Wendi and Joe's babysitter, testified during the penalty phase about

12   Wendi's attributes as a mother, but defense counsel failed to learn that Palicki "*knew* that

13   *Joe* was trying to obtain a life insurance policy" with Wendi's help, because both Joe and

14   Wendi had discussed it with her.  (Tab 31 ¶ 8 (emphasis added).)  But for defense

15   counsel's ineffective assistance, the jury would have heard Palicki's testimony

16   corroborating Wendi's testimony on that critical point.  Palicki's testimony would have

17   negated "such damaging evidence" that Wendi was surreptitiously attempting to obtain

18   insurance on Joe's life, which the State emphasized was the motive for Joe's murder.

19   (11/30/04 Tr. at 20-21 ("The motivation in this case for her to get rid of him is that he

20   was worth more dead than alive.").)  The failure of defense counsel to identify and

21   present this evidence prejudiced Wendi and denied her a fair trial.

22          **3.**      **Defense Counsel's Failure To Introduce Evidence That Joe Was Severely Depressed In The Period Leading Up To His Death**

23

24       Wendi's testimony that Joe was depressed and had decided to commit suicide by

25   consuming sodium azide was uncorroborated at trial.  If defense counsel had called Chris

26   Weaver as a witness, and had prepared Jeff Miller properly to get his testimony admitted,

27                             60

28

4838-2894-9006

1  the jury would have heard evidence that Joe was in fact depressed in the period leading

2  up to his death.  There is no strategic reason why defense counsel failed to call Weaver or

3  to make further efforts to get his testimony admitted into evidence.

### 4.   Defense Counsel's Failure To Seek A Jury Instruction As To Lesser Included Offenses

6  At trial, defense counsel did not seek a lesser-included offense instruction.  But

7  because defense counsel's numerous inadequacies—failing to adequately investigate

8  Wendi's abusive childhood, failing to present expert testimony regarding Wendi's mental

9  illness and mental state at the time of the crime, failing to object to the jury's

10  consideration of the alleged poisoning during the aggravation phase, failing to identify or

11  elicit key testimony from Palicki, Miller and Weaver, and generally failing to adequately

12  prepare for trial—defense counsel knew too little about their own case and client to make

13  (or advise their client regarding) an informed decision on whether to seek lesser-included

14  offense instructions.  Had they done a proper investigation, they would have requested

15  such an instruction; and, for the reasons stated in this Petition and the accompanying

16  reports, declarations, and other evidence undercutting premeditation, they would have

17  received such an instruction.

18  In sum, in view of the cumulative errors during the guilt phase, Wendi is entitled

19  to a new guilt phase trial.

20  **II.   THE DEFENSE COUNSEL IN CHARGE OF WENDI'S PENALTY PHASE DEFENSE HAD AN ACTUAL CONFLICT OF INTEREST THAT AFFECTED THE ADEQUACY OF WENDI'S REPRESENTATION**

22  A criminal defendant's Sixth Amendment right to counsel includes the right to be

23  represented by an attorney with undivided loyalty.  *See Wood v. Georgia*, 450 U.S. 261,

24  271 (1981).  This guarantee is so important that, unlike other Sixth Amendment claims,

25  "a defendant who shows that a conflict of interest actually affected the adequacy of his

26  representation need not demonstrate prejudice in order to obtain relief," *Cuyler v.*

27  61

4838-2894-9006

1   *Sullivan*, 446 U.S. 335, 350 (1980), and harmless error analysis does not apply. *Id.* at

2   349; *see also Glasser v. United States*, 315 U.S. 60, 76 (1942). "If a defendant fails to

3   object to representation by an attorney with a conflict, but shows on appeal that 'an actual

4   conflict of interest adversely affected his lawyer's performance,' reversal is required."

5   *Lockhart v. Terhune*, 250 F.3d 1223, 1229-30 (9th Cir. 2001) (quotation omitted).

6      In this case, DeLozier was the lawyer who was responsible for investigating

7   mitigation issues for Wendi's defense during the penalty phase of the trial. At the same

8   time he was supposed to be conducting that investigation, however, DeLozier also was

9   representing Wendi's mother and stepfather (Donna and Alejo) in legal disputes with

10  Joe's family regarding the custody of Wendi and Joe's two children. (*See* Tab 77.)

11     *First,* DeLozier was "actively represent[ing] conflicting interests." *Cuyler*, 446

12  U.S. at 350.

13
    • In Wendi's capital case, DeLozier was charged with penalty phase
14    preparation, which "requires *extensive* and generally *unparalleled*
      investigation into personal and family history[,]" including instances
15    of childhood abuse, neglect or deprivation. ABA Guideline 10.7
      cmt. (Tab 76 at PCR 481) (emphasis added, citations omitted); *id.* at
      PCR483; *Douglas*, 316 F.3d at 1090.
16
    • In Donna and Alejo's adoption and guardianship cases, DeLozier
17    was charged with portraying Donna and Alejo in the best possible
      light, as they were seeking to adopt or obtain visitation rights
18    regarding Wendi and Joe's children.

19  This conflict was further compounded by the fact that Donna and Alejo retained

20  DeLozier to represent Wendi in her capital case, and they paid DeLozier in that matter.

21  (Tab 61; *see also* Tab 29 ¶ 10 (DeLozier asked Donna to write his closing argument for

22  the penalty phase of Wendi's trial).)

23     *Second*, DeLozier's conflict "actually affected the adequacy of" Wendi's

24  representation. *Cuyler*, 446 U.S. at 349; *see also Lockhart*, 250 F.3d at 1231 (requiring

25  petitioner to show "that the attorney's behavior seems to have been influenced by the

26  conflict"). DeLozier simply did not ask Donna, Alejo or Wendi about childhood abuse or

27                                62

28  _____
       MEMORANDUM IN SUPPORT OF PETITION FOR POST-CONVICTION RELIEF
                        CASE NO. CR2000-096032-A

4838-2894-9006

1   mental health history.  (Tab 29 ¶¶ 4-8; Tab 25 ¶¶ 3-5; Tab 9 ¶¶ 21-22.)  DeLozier did not

2   investigate whether Donna or Alejo had mental health or substance abuse issues.  Even

3   though an interview with Wendi's childhood friends or Harvest school officials would

4   have exposed the fact that Alejo had a sexually abusive and perverse relationship with

5   Wendi (*see* Tab 7 ¶¶ 23-24; Tab 11 ¶ 10; Tab 12 ¶¶ 15, 18; Tab 13 ¶ 6), DeLozier never

6   asked the "hard questions" to uncover that readily available evidence.

7       In view of DeLozier's conflict of interest (and his general lack of competence), it

8   is not surprising that the mitigation story that was told at Wendi's capital trial was that

9   she was the product of a good family and a good upbringing—which while consistent

10  with the story DeLozier had an interest in presenting on Donna and Alejo's behalf in their

11  child custody battle, was *completely inaccurate* (and led to Wendi's death sentence).

12      Because Wendi "need not demonstrate prejudice in order to obtain relief," *Cuyler*,

13  446 U.S. at 349-50, she is entitled to a new sentencing hearing under *Cuyler*.

14  **III.   DEFENSE COUNSEL'S FAILURE TO OBJECT TO PERVASIVE**
15  **INSTANCES OF PROSECUTORIAL MISCONDUCT DEPRIVED WENDI**
    **OF DUE PROCESS AND VIOLATED HER RIGHT TO EFFECTIVE**
16  **ASSISTANCE OF COUNSEL**

17      "Prosecutors, as servants of the law, are subject to constraints and responsibilities

18  that do not apply to other lawyers; they must serve truth and justice first.  Their job is not

19  just to win, but to win fairly, staying within the rules." *United States v. Lopez-Avila*, ---

20  F.3d ---, 2012 WL 450314, at *1 (9th Cir. Feb. 14, 2012).  The prosecutor in this case did

21  not "win fairly," and it was not the first time.  In a recent oral argument, Justice Ryan of

22  the Arizona Supreme Court (retired, sitting by designation) observed:  "Well, this

23  prosecutor I recollect from several cases.  This same prosecutor has been accused of

24  fairly serious misconduct but ultimately we decided it did not rise to the level of requiring

25  a reversal. . . .  There's something about this prosecutor, Mr. [Juan] Martinez."[25]

26

27  [25] *State v. Gallardo*, No. 09-0171-AP, Video of Nov. 2, 2010 Oral Argument at 30:50 to

28

1    As described below, the prosecutor's conduct in this trial pushed well beyond the

2   limits of fairness, at times bordering on the outrageous.  Having failed to adequately

3   investigate the case and prepare for trial, defense counsel was ill-suited to protect Wendi

4   from the prosecutor's incessant and pervasive misconduct.  The trial court also was in no

5   position to control the misconduct, because most instances *did not even draw an*

6   *objection* from defense counsel.  Moreover, appellate counsel inexplicably failed to raise

7   prosecutorial misconduct as an appellate issue, even as an issue for fundamental error

8   review—which the Arizona Supreme Court noted in the direct appeal. *See Andriano*, 215

9   Ariz. at 503, ¶ 28 n.3, 161 P.3d at 546 n.3.

10    "To prevail on a claim of prosecutorial misconduct, a defendant must demonstrate

11   that the prosecutor's misconduct 'so infected the trial with unfairness as to make the

12   resulting conviction a denial of due process.'" *State v. Hughes*, 193 Ariz. 72, 79, ¶ 26,

13   969 P.2d 1184, 1191 (1998) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643

14   (1974)).  "Even if the alleged acts of misconduct do not individually warrant reversal, we

15   must determine whether the acts 'contribute to a finding of persistent and pervasive

16   misconduct.'" *Bocharski*, 218 Ariz. at 491-92, ¶ 74, 189 P.3d at 418-19 (citation

17   omitted).  "We will reverse a conviction because of prosecutorial misconduct if the

18   cumulative effect of the alleged acts of misconduct 'shows that the prosecutor

19   intentionally engaged in improper conduct and did so with indifference, if not a specific

20   intent, to prejudice the defendant." (*Id.* (citation omitted).)

21    The prosecutor's misconduct here fell into three general categories:  (1) references

22   to the details of Wendi's hyper-sexual behavior and related disparagement of her

23   character, in all three phases of the trial; (2) asserting or implying that the State possessed

24   evidence of factual matters that was never introduced at trial; and (3) making unfounded

25   _____

26   31:20, *available at* http://supremestateaz.granicus.com/MediaPlayer.php?view
    _id=2&clip_id=566.  The Court's full discussion of the prosecutor's alleged misconduct
    is addressed at 29:05 to 37:50 of the video.

27                                          64

28

4838-2894-9006

1    accusations that a defense expert was unethical.[26]

2    *First*, as explained above, a central theme of the prosecutor's case against Wendi

3    was to attack her for her promiscuity.  Before trial, the State successfully opposed a

4    motion *in limine* to preclude evidence "relating to the relationship the defendant allegedly

5    had with regard to Rick Freeland and Travis Black" (9/7/07 Tr. at 13), purportedly

6    because those relationships were "motivation, if you will, or the reason why she wanted

7    her husband dead" (2/27/04 Tr. at 17).  From his opening statement forward, however,

8    the prosecutor went far beyond this limited purpose.  He inundated the jury with

9    discussion of those affairs and a host of other hyper-sexual conduct *not* to prove

10   motive—indeed, the prosecutor unequivocally argued to the jury that the affairs "couldn't

11   really be the motive" (11/30/04 Tr. at 20; 12/1/04 Tr. at 10-11)—but rather to show that

12   Wendi was a person worthy of punishment for offenses other than the crime itself.

13   Because it is difficult to appreciate the full extent and improper nature of the

14   prosecutor's comments and questions without reading them for one's self, **EXHIBIT 2** to

15   this Petition provides relevant excerpts from the prosecutor's opening statements, closing

16   arguments, and questioning of witnesses.  As that exhibit shows, the breadth and

17   pervasiveness of the prosecutor's statements and questions pertaining to Wendi's

18   sexuality go far beyond merely establishing that she had affairs with Freeland and Black.

19   Indeed, the prosecutor's questioning ranged from details regarding each sexual encounter

20   with both men (for example, asking whether Wendi had sex with Freeland under a bridge,

21   or whether she used lubricants in her sexual encounters with them), to the details of

22   sexual encounters with other men *before* Wendi even met Joe, to whether she wore

23   provocative clothing on a given night.  In many of his questions (and all of his opening

24   statements and closing arguments), the prosecutor invited the jury's moral condemnation

25   ────────────────────

26   [26] These categories cover the most blatant instances of prosecutorial misconduct at trial,
     but are by no means exhaustive of the various improper statements and arguments the
     prosecutor made to the jury.

27                                        65

4838-2894-9006

1  of Wendi as a promiscuous adulteress—even attempting to create the impression that the
2  affairs themselves were an aggravating factor.[27]

3       The prosecutor's repeated statements emphasizing the same conduct or testimony
4  over and over again (literally dozens of separate references to her promiscuity in his
5  statements and arguments, and an even greater number of questions of witnesses on the
6  subject) were objectionable because they were cumulative and because any probative
7  value was outweighed by the prejudicial effect of the statements.  Given that Wendi was
8  not on trial for adultery (or promiscuity), the prominence the prosecutor placed upon
9  Wendi's sexual conduct could not help but confuse the jury and inject improper character
10  considerations into its deliberations.

11       *Second*, the prosecutor on multiple occasions ignored the fundamental requirement
12  that his "questioning and argument, however, cannot make insinuations that are not
13  supported by the evidence." *Hughes*, 193 Ariz. at 85, 969 P.2d at 1197.  Going well
14  beyond "insinuations" not based on the evidence, the prosecutor here essentially injected
15  himself as a witness by either prefacing questions with assertions of fact never introduced
16  into evidence (*e.g.*, "Did you know that part of the reason that [an ex-boyfriend] actually
17  broke up with [Wendi] was because . . . he caught her in front of the television in a state
18  of undress with another male?" (10/13/04 Tr. at 51)), or by asserting that the State was in
19  possession of additional facts or evidence not presented to the jury.

20       For example, at trial, Wendi testified that Shawn King had assisted her and Joe in
21  researching sodium azide (10/27/04 Tr. at 87-91), and the State introduced no evidence
22  regarding King's alleged role in the crime and did not call him as a witness.
23  Nevertheless, in his guilt phase closing argument, the prosecutor addressed King's

24  

---

25  [27] In his aggravation phase closing argument, the prosecutor repeatedly implied that the
affairs themselves were aggravating factors, noting that the murder was "way beyond"
senseless because she made "life miserable for [Joe] by going out, by having affairs" and
26  "[n]ot only is she out there being the belle of the ball" and "having affairs doing whatever
she wants . . . but does she need to kill him?"  (12/1/04 Tr. at 16, 38.)

27  66

4838-2894-9006

1   absence at trial by stating: "We're not here to judge his conduct.  If he were to be judged,
2   he would be judged as an accomplice." (11/17/04 Tr. at 81.)

3        Thus, the prosecutor implied that the State had some undisclosed evidence that
4   Wendi and King conspired together to murder Joe, and that the evidence was sufficiently
5   strong that King would be convicted if the State filed charges against him.  The jury was
6   left to ponder what undisclosed evidence the State might possess that made the
7   prosecutor so certain of their conspiracy to commit murder (and thus undermine Wendi's
8   defense).  The prosecutor's statement was particularly outrageous because the resulting
9   inference of additional investigatory knowledge was plainly false:  Shawn King was
10  never charged with any crime in connection to Wendi's case, and he was *never even*
11  *interviewed* by anyone associated with the prosecutor's office or law enforcement
12  regarding his alleged involvement in Joe's death.  (Tab 15 at 32.)

13       The prosecutor also improperly implied the State's inside knowledge of the facts
14  in other ways.  Courts have "emphasize[d] that prosecutors should not use 'we know'
15  statements in closing argument" because it "readily blurs the line between improper
16  vouching and legitimate summary," in that "the question for the jury is not what a
17  prosecutor believes to be true or what 'we know,' [but] rather, the jury must decide what
18  may be inferred from the evidence." *United States v. Younger*, 398 F.3d 1179, 1191 (9th
19  Cir. 2005).  Here, the prosecutor prefaced factual assertions with "we know" *more than*
20  *140 times* in his openings and closings.  Worse, he often applied the "we know"
21  imprimatur to factual assertions that lacked evidentiary support or were wholly
22  contradicted by the evidence.

23       For example, with regard to the night of the offense the prosecutor stated, "Well,
24  [Joe] never used any physical force on her.  We know that." (11/16/04 Tr. at 140.)  Yet
25  the State introduced no evidence explaining how the State "kn[ew] that" some other
26  physical force caused Wendi's substantial injuries from the night of Joe's death (*see* Tab

27                      67

28

4838-2894-9006

66), or how Joe could have been clutching Wendi's hair in his hands when he died, without having used physical force on her. Similarly, the prosecutor repeatedly used the "we know" phraseology when asserting that Joe ingested a "large dose" of sodium azide that absorbed into his tissues, even in some cases attributing that fact to his expert witness (*see, e.g.*, 11/30/04 Tr. at 23-24)—even though that expert witness testified that the chemical's absorption properties were unknown and had never been studied, and that "one conclusion that we can draw is that we have no idea how much was ingested." (9/23/04 Tr. at 27, 59.) The sheer number of instances where the prosecutor used "you know" to add weight to the State's evidence, and to vouch for alleged facts not in evidence, highlights the extent to which his misconduct permeated the entire trial.

*Third*, the prosecutor not only *implied* unethical conduct by the defense's expert witness, Sharon Murphy, without an evidentiary basis for doing so—which in itself constitutes prosecutorial misconduct, *see Hughes*, 193 Ariz. at 86, 969 P.2d at 1194—but he also expressly impugned her ethics to the jury. Without pointing to a single instance in which Sharon Murphy testified falsely, the prosecutor argued that Murphy was "in the defendant's pocket," (12/16/04 Tr. at 6) and a "liar" who "can't keep her story straight" (12/01/04 Tr. at 61) and "made misrepresentations to everyone" (11/16/04 Tr. at 153). After noting the fact that Murphy refused to change her opinions following his cross-examination of her, the prosecutor further asserted that she failed to live up to her "ethical[] . . . duty to consider both sides." (*Id.* at 7.) While the source of that purported ethical duty is unclear (and was never explained by the prosecutor or any witness), the prosecutor presented absolutely no evidence that she had violated it. In essence, he disparaged her as unethical because she found the questions posed by prosecutor—which included delving into such issues as whether Wendi used lubricants with Freeland, whether "she was constantly kissing on men," and whether her one-night stand with Black should be characterized as an affair or something else (10/13/04 Tr. at 68-69,

68

4838-2894-9006

1    157)—to be irrelevant to her opinion in the case.

2       In sum, defense counsel's (and appellate counsel's) failure to object to the

3 prosecutor's misconduct was unreasonable, and deprived Wendi of a fair trial under

4 *Strickland.* Wendi is entitled to the reversal of her conviction based on prosecutorial

5 misconduct or, at a minimum, a new trial.

6 **IV. THE JURY'S CONSIDERATION OF A NON-STATUTORY AGGRAVATING FACTOR VIOLATED DUE PROCESS**

7       Due process requires that aggravating factors "must genuinely narrow the class of

8 persons eligible for the death penalty and must reasonably justify the imposition of a

9 more severe sentence on the defendant compared to others found guilty of murder." *Zant*

10 *v. Stephens*, 462 U.S. 862, 877 (1983); *Woodson v. North Carolina*, 428 U.S. 280, 305

11 (1976) ("Because of th[e] qualitative difference [in the penalty of death from a sentence

12 of imprisonment], there is a corresponding difference in the need for reliability in the

13 determination that death is the appropriate punishment in a specific case.")

14       Arizona's death penalty statute enumerates fourteen aggravating circumstances

15 that the trier of fact is permitted to consider in determining whether to impose the death

16 penalty. A.R.S. § 13-751(E), (F). Jurors are not permitted to consider non-statutory

17 aggravating factors, outside of the fourteen expressly enumerated. *State v. Greenawalt*,

18 128 Ariz. 150, 174, 624 P.2d 828, 852 (1981) ("[O]ur death penalty is carried out [by

19 statute] and not by any judicially imposed penalty.").

20       In finding that the murder was "especially cruel" under the (F)(6) aggravator, the

21 jury improperly considered, and was influenced by, an impermissible consideration

22 unrelated to the nature of the crime. During deliberations at the aggravator phase, the

23 jurors "made a chart outlining the different possible outcomes" for Wendi depending on

24 whether they found an aggravator, which made their decision "a lot clearer." (Tab 39

25 ¶ 8.) According to one juror,

26       [W]hen we decided on the aggravator, we talked about what might happen

27 69

28 MEMORANDUM IN SUPPORT OF PETITION FOR POST-CONVICTION RELIEF<br>CASE NO. CR2000-096032-A

4838-2894-9006

1

2

    if we didn't find an aggravating circumstance.  We discussed how her sentencing would go back to the judge and agreed that none of us wanted that.  We talked about how we didn't want to see Wendi get out of prison, and that was a key reason we decided on the cruelty aggravator.

3

(Tab 41 ¶ 6.)  Consideration of such a non-statutory factor—not wanting Wendi to get

4

out of prison—is impermissible under Arizona's death penalty scheme.  A.R.S. §13-

5

751(E), (F); *State v. Ring*, 204 Ariz. 534, 562, ¶ 89, 65 P.3d 915 (2003) (noting that

6

"[n]either a judge, under the superseded statutes, nor the jury, under the new statutes, can

7

impose the death penalty" outside the legislatively defined scheme).  Moreover, this

8

consideration does not genuinely narrow the class of persons eligible for the death

9

penalty and is therefore constitutionally infirm.  *Arave v. Creech*, 507 U.S. 463, 474

10

(1993); *Zant*, 462 U.S. at 877.

11

**V.**        **WENDI WAS DENIED THE EFFECTIVE ASSISTANCE OF COUNSEL ON HER DIRECT APPEAL**

12

13

    Due process under the Fourteenth Amendment requires that a defendant receive

14

effective assistance of counsel on appeal.  *Evitts v. Lucy*, 469 U.S. 387, 396 (1985).

15

Appellate counsel's failure to raise DeLozier's actual conflict of interest, prosecutorial

16

misconduct, and the exclusion of Jeffrey Miller's testimony in Wendi's direct appeal was

17

constitutionally deficient and was prejudicial.

18

    To the extent this Court ultimately decides any of Wendi's meritorious

19

constitutional claims for relief are waived on account of Andriano's appellate counsel's

20

failure to raise them, Wendi has suffered undeniable prejudice.

21

**CONCLUSION**

22

    For the reasons stated above, this Petition should be granted.  Moreover, the

23

evidence submitted in support of this Petition satisfies the requirement pursuant to Rules

24

32.6 and 32.8 that a colorable claim be made in order for the Court to grant an

25

evidentiary hearing.

26

27

70

28

1

2   DATE: February 17, 2012          By: _____

3                                        Scott M. Bennett (022350)
                                         COPPERSMITH SCHERMER & BROCKELMAN PLC
4                                        2800 North Central Avenue
                                         Phoenix, Arizona  85004
5                                        (602) 224-0999 (office)
                                         (602) 224-6020 (fax)
6                                        sbennett@csblaw.com

7
                                         Allen A. Arntsen, admitted *pro hac vice*
8                                        Matthew R. Lynch, admitted *pro hac vice*
9                                        FOLEY & LARDNER LLP
                                         150 E. Gilman Street
10                                       Madison, WI 53703-1481
                                         (608) 257-5035 (Office)
11                                       (608) 258-4258 (Fax)

12
                                         *Attorneys For Petitioner Wendi Andriano*
13

14  ORIGINAL filed February 17, 2012, with:

15  Clerk of the Arizona Supreme Court
    1501 West Washington, Suite 402
16  Phoenix, AZ 85007-3232

17  COURTESY COPY hand-delivered February 17, 2012, to:

18  Judge Douglas Rayes
    Maricopa County Superior Court
19  101 W. Jefferson St., Room 511
    Phoenix, AZ  85003-2243
20

21  COPY mailed February 17, 2012 (courtesy copy of Petition and Memorandum emailed),
    to:
22
    Lacey Stover Gard
23  Office of the Attorney General
    400 W. Congress, Suite S-315
24  Tucson, AZ  85701-1367

    *Attorney for the State of Arizona*
25

26

27                                       71

28      MEMORANDUM IN SUPPORT OF PETITION FOR POST-CONVICTION RELIEF
                        CASE NO. CR2000-096032-A

*I:*                       ∤

## EXHIBIT 2

**EXAMPLES OF PROSECUTOR'S STATEMENTS AND LINES OF QUESTIONING RELATING TO WENDI ANDRIANO'S SEXUAL BEHAVIOR, FLIRTATIOUSNESS, ATTIRE AND OTHER ISSUES PERTAINING TO HER SEXUALITY**

### TABLE OF CONTENTS

I.       PREFACE:  ARGUMENT BY PROSECUTOR REGARDING IRRELEVANCE
         OF AFFAIRS TO DEFENDANT'S MOTIVE.................................................................. 1

II.      PROSECUTOR'S STATEMENTS AND ARGUMENT................................................. 1

         a.      Prosecutor's Opening Statement (Guilt Phase)....................................... 1

         b.      Prosecutor's Closing Argument (Guilt Phase) – Day 1 .......................... 2

         c.      Prosecutor's Closing Argument (Guilt Phase) – Day 2 .......................... 6

         d.      Prosecutor's Closing Argument (Aggravation Phase)........................... 7

         e.      Prosecutor's Closing Argument (Penalty Phase) – Day 1 ..................... 8

         f.      Prosecutor's Closing Argument (Penalty Phase) – Day 2 ..................... 9

III.     PROSECUTOR'S QUESTIONING OF WITNESSES.................................................. 10

         a.      Examination of Wendi Andriano ......................................................... 11

                 i.       Cross Examination of Wendi Andriano (October 28, 2004) .................... 11

                 ii.      Cross Examination of Wendi Andriano (November 1, 2004) .................. 13

                 iii.     Cross Examination of Wendi Andriano (November 2, 2004) .................. 20

         b.      Direct Examination of Michael Brad Bayless (December 15, 2004) .................. 21

         c.      Direct and Redirect Examination of Travis Clinton Black (September 16,
                 2004) ..................................................................................................... 22

         d.      Direct Examination of  Rick Freeland (September 13, 2004) .............................. 24

         e.      Examination of Chris Hashisaki ........................................................... 25

                 i.       Direct Examination of Chris Hashisaki (September 8, 2004).................... 25

                 ii.      Direct and Redirect Examination of Chris Hashisaki (September 9,
                          2004) ......................................................................................... 26

f.      Cross Examination of Barbara Mitchell ............................................................. 27

      i.      Cross Examination of Barbara Mitchell (October 21, 2004).................... 27

      ii.     Cross Examination of  Barbara Mitchell (December 13, 2004) .............. 28

g.      Cross Examination of Sharon Murphy ................................................................ 29

      i.      Cross Examination of  Sharon Murphy (October 13, 2004)..................... 29

      ii.     Continued Cross-Examination of Sharon Murphy (October 14, 2004) ............................................................................................................. 32

      iii.    Cross-Examination of  Sharon Murphy (December 9, 2004).................. 32

h.      Cross Examination of Donna Ochoa (October 5, 2004) ....................................... 33

i.      Cross-Examination of Gia Palicki (December 13, 2004) ..................................... 34

j.      Direct and Redirect Examination of Shannon Sweeney (September 15, 2004) ..................................................................................................................... 35

I.    **PREFACE:  ARGUMENT BY PROSECUTOR REGARDING IRRELEVANCE OF AFFAIRS TO DEFENDANT'S MOTIVE**

The following is an excerpt from the prosecutor's opening statement in the aggravation phase of the trial of Wendi Andriano, taken from the official transcript of the proceedings for November 30, 2004:

> And the only reason that she's doing all of this is because she wants the money.  That's why she did all this.  She did it in expectation of pecuniary gain. . . .
>
> *There is no other motive in this case other than that.*  That is the overriding motive.  Even though she wanted to go out with other men, it wasn't like they were the love of her life in the sense she was with one individual now and later she hooked up with another individual.

(20:9-22 (emphasis added).)

II.   **PROSECUTOR'S STATEMENTS AND ARGUMENT**

   a.    **Prosecutor's Opening Statement (Guilt Phase)**

The following excerpts of the prosecutor's opening statement in the guilt phase of the trial of Wendi Andriano are taken from the official transcript of the proceedings for September 7, 2004:

> And then somewhere around, oh, March of the year 2000, there was an individual by the name of Rick Freeland who moved into the San Riva Apartments, and this individual and the defendant first, of course, got to know each other and it seemed that the defendant took a liking to this individual.  She was the pursuer.  He was the one being pursued.
>
> And she was doing just about anything she could do to get this individual.  And some of the things that she would do, for example, . . . [include getting him] a sofa.  She wants him comfortable.  She wants him comfortable because they begin to have a sexual relationship, the two of them.

(25:2-19.)

-------------------------------

> At about 2:00 or 3:00 in the morning, she's banging away on the door, "Rick, I want you to let me in.  Rick, I want you to let me in.  I want—you know, I want to talk to you.  I want to be with you."

(29:23-30:1.)

---------------------------------

> According to the witnesses, as soon as she got [to the bars] and as
> soon as she started going and she saw a guy, according to their
> accounts, she would start kissing on them.

(31:17-20.)

---------------------------------

> [T]hat night she goes out to a bar called the Rockin' Rodeo. And
> now she needs a new individual, even though she's still interested
> in, as you have seen, Rick Freeland, and asking for a drink. She
> sees this Travis Clinton Black. And Travis will tell you as soon as
> he got out there, she got out on the dance floor with him, she
> started grabbing him all over the place, started kissing him, started
> doing all kinds of things, so he decided to just go and keep dancing
> with her.
>
> At some point he left the bar with her and a friend of his, and they
> went to a Denny's to have breakfast. Well, after having breakfast
> they dropped off the friend and he went to take her over to her
> apartment over at the San Riva apartments, number 132. He was
> walking her to the door and she asked him to go inside, and there
> in that apartment on the floor, on the couch, they had sex.

(55:2-17.)

### b.    Prosecutor's Closing Argument (Guilt Phase) – Day 1

The following excerpts of the prosecutor's closing argument in the guilt phase of the trial
of Wendi Andriano are taken from the official transcript of the proceedings for November 16,
2004:

> So then she has Joseph Andriano move in [with her]. And one of
> the things she's quick to tell us, it wasn't a sexual relationship to
> start with. Again, she's minimizing. They're living together.
> ["]And no, it wasn't a sexual relationship. I don't want you to
> think anything bad. I don't want you to think I'm going against the
> wishes of my God. Of course, when they're married, it's all right
> to go out and have affairs. But right now, it's against the wishes of
> my God to do that. I'm not going to do that. Plus, my father
> would be really upset with me even though I am living with this
> boy Joseph Andriano. ["]

2

(18:10-20.)

--------------------------------

Well, it didn't take long, we don't know exactly how long, for the defendant and Joseph Andriano to become intimate. That's a very telling sort of sordid little story that she told you because according to her and according to Sharon Murphy, what happened after this wondrous experience as she put it, she cried.

(18:21-19:1.)

--------------------------------

I mean, it's so basic that with regards to the virginity issue, something so private as that. She said, "Well, you know what, yes, I was chaste but, you know what, I didn't want to be. So what I did basically is make sort of an agreement with Dido Gamez to get rid of it because [sic] it wasn't my fault. Barbara Mitchell was kidding me about it." . . .

Even the most private of things, the most things that happen between a man and woman, even that's not her fault because Barbara Mitchell was teasing her about it. And she needed to get rid of it like it was some sort of bad thing that was hanging around her neck.

(37:6-20.)

--------------------------------

I'm sure and Sharon Murphy was quick to point out every time that the defendant has sex with Mr. Andriano, she had to use a lubricant. I wonder if she had to use a lubricant with Dido Gamez. I wonder if she had to use a lubricant with Vernon Barnes.

(75:18-22.)

--------------------------------

You [Wendi] may us [you loved Joe] right now. But you weren't in love with him because you could not even bring yourself to the point of enjoying the most intimate thing that two people in love do, that's enjoy sexual intercourse. Could do it.

(76:5-9.)

--------------------------------

3

Certainly [Joe] wasn't like Rick Freeland, right?  That good looking guy that she really loved from her little statement.  That guy that was her best friend and that would listen to her.  Yeah, he wasn't like [Joe] at all.  He was real healthy.  Certainly [Joe] wasn't like Travis Black who has arms the size of legs that she met one night and had a one-night stand.

(76:11-17.)

--------------------------------

Blamed him for the affairs.  Blamed him for having to go out. Blamed him for wanting to go out dancing.  Blamed him for wanting to go out and kiss guys.  Blamed him for sitting between guys' legs.  Blamed him for kissing this guy.

(61:9-15.)

--------------------------------

You've seen what she looked like back then [in 2000], all sassed up in her pink little outfit.  You've seen what she looked like.

(63:17-19.)

--------------------------------

[T]he last couple two or three months of [Joe's] life that for two or three months, two times a week, minimum, the defendant was going out; Tuesdays and Saturday or Fridays.  Remember that? Rockin' Rodeo on the weekends and Tijuana Country Club in the middle of the week.  What kind of marriage is that? . . . Rather than spending time with [Joe], what do you do?  Let's go out and look for the young bucks we have out here on the dance floor. Maybe we can take one home.  That's exactly what's going on.

(101:15-25.)

--------------------------------

You've seen it, how she's all sassed up out there by the pool.  And you know how she's out, changing clothing from Rustler's Roost according to Mrs. Green.  Going over to the dance floor.

(152:7-152:12)

--------------------------------

4

Let's talk about the affair. Well, she indicated that she only had
one affair. That's all she had. That's all she said she had.
Because the intimate moment she shared with Travis Black,
outside of marriage, even though she's a good Christian woman, is
not an affair. You can now all go home, those of you who are
married, and say to your significant other, ["]that's okay, I'm
going to go ahead and do that because it's not an affair. I was in
court and I heard that.["]

(83:10-18.)

------------------------------

Let's talk a little bit about Rick Freeland. . . . Why is it that she
gets involved with him? Why is it that they engaged in the most
intimate acts that two people can engage in? Well, because,
according to her, she didn't want to be a tease. Wow. Just because
you have a drink with somebody, just because a man is nice to you,
you better be careful you're not a tease. But if you are, then you
can have intercourse with him and you know what, it's not your
fault. It really isn't your fault because that's not, according to the
defendant, the way women should act. According to her, it's
worse to be a tease than it is to be a cheat. I guess that's what
she's telling us.

(84:16-85:9.)

------------------------------

And what did she do? She goes to dancing at Rockin' Rodeo[, a
bar]. . . . What happens is there's a last dance that they have. And
at this last dance, there's a good-looking guy. Let me go on over.
And before the song is over, probably before he even knows her
name, they're kissing. . . . The bottom line is she starts kissing him
and he returns the favor. That's what he said. And when she
started to grab him in the various places, he, again, responded
accordingly. She's the one that initiated—this demure little lotus
blossom here—she's the one that is all that.

(87:13-88:3.)

------------------------------

So they leave the night club. . . When they're [at a Denny's
restaurant] things are happening. What's happening is that she
starts to grope him under the table. I guess the woman has needs
and she's going to do something about it because she's so goal-
oriented and what ends up happening is he takes her home.

5

(88:7-15.)

--------------------------------

> So, on their way back they stop in Tempe and they picked [two men] up. And one of the things we know is that the defendant, never missing an opportunity, starts to make out, kiss, whatever term you want to use.

(91:12-15.)

--------------------------------

> How about the people that she was most intimate with, her paramours. I'm talking about Rick Freeland and Travis Black. Was she honest with them?

(111:1-3.)

--------------------------------

> Just for an example, we'll pick Travis Black. One of the things she said is that, no, I got the condom. He's absolutely wrong, I did. According to him he's on the dance floor by himself and she comes up to him and starts kissing him.

(155:12-16.)

--------------------------------

> But she's in a fantasy world. . . . Wants to be out on the dance floor. Wants to be out kissing guys. Wants to be out in this fantasy world that seems so real to her with the strobe lights going on. That's where she wants to be.

(151:8-16.)

### c.  Prosecutor's Closing Argument (Guilt Phase) – Day 2

The following excerpts of the prosecutor's closing argument in the guilt phase of the trial of Wendi Andriano are taken from the official transcript of the proceedings for November 17, 2004:

> And on the other hand, she tells us, well, it's okay to be unfaithful. It's okay to cheat on your husband. It's okay to go to bars and kiss other men as long as in this fantasy world of hers, you don't tease


the men. Because, that's an unforgivable sin to her; that's the
teasing of men.

(4:2-7.)

--------------------------------

Even at some point, it appears she went almost as far as to attempt
to flirt with Detective David Lucero, the person that was
questioning her.

(5:13-15.)

--------------------------------

[Y]es, she did have an affair with Rick Freeland, they said. ["]But
you know what, that's different than the tryst, that one-night stand,
she had with Travis Black. Nobody would call that an affair.["]
That's what they told you.

(78:12-16.)

--------------------------------

They want you to start looking at this and say, well, you know,
maybe what she did wasn't so bad. You know, the affairs weren't
so bad. Maybe her conduct in front of the police wasn't so bad.

(82:16-19.)


### d.   Prosecutor's Closing Argument (Aggravation Phase)

The following excerpts of the prosecutor's closing argument in the aggravation phase of
the trial of Wendi Andriano are taken from the official transcript of the proceedings for
December 1, 2004:

And some of you may go back there and say, ["]well, perhaps the
motive for this was that she wanted to be with Rick Freeland.
You, Mr. Martinez, you presented us with e-mails dated as late as
July—I'm sorry, September—where she's asking him to join her
for a drink. And additionally, we also have the issue of Mr. Travis
Black, a one-night stand, that she engaged in where perhaps that's
what she wanted to do. ["]

The point—there are two points to be made with regard to that.
Number one, the attraction or the love or whatever emotion she
had, will, the friendship, whatever she wants to call it with Rick

7



Freeland, wasn't so strong that it prevented her from finding other men. So that couldn't really be the motive.

(10:9-10:22.)

------------------------------------

Additionally, during that time she's making life miserable for [Joe] by going out, by having affairs, by being with other people and embarrassing him in front of other people.

(16:15-18.)

------------------------------------

All murder is senseless. But this one goes way beyond that. Of course.

Not only is she out there being the belle of the ball, not only is he being a house husband, if you will, not only is she having total freedom, having affairs doing whatever she wants, going out with her friends, not only is she doing all of that . . . but does she need to kill him?

(38:6-13.)

### e.    Prosecutor's Closing Argument (Penalty Phase) – Day 1

The following excerpts of the prosecutor's closing argument in the penalty phase of the trial of Wendi Andriano are taken from the official transcript of the proceedings for December 15, 2004:

You saw it when she spoke to the police officer. We don't need to sit here and discuss the fact that she was trying to manipulate the police officer, that she laughed coquettishly with him.

(108:9-12.)

------------------------------------

The facts and circumstances indicate to you that she added, if you will, salt to the wound. And the way that she did that was by going out on him, by going out with other men.

(111:20-23.)

------------------------------------

8



> A good mother, even if she wants to go out and goof around with other men says, ["]you know what, play with them honey.["]

(121:18-20.)

--------------------------------

> Additionally, not only were there two affairs, Gia Palicki, their own witness, came in and told you when they went to bars, she kissed lots of guys. According to Chris Hashisaki, that's the same thing that happened. Do you give her Brownie points for going out and kissing guys and having affairs with them? Well, that certainly governs this particular thing and indicates that no you do not do that sort of thing.

(126:13-20.)

--------------------------------

> Additionally, [Wendi]'s the same one who says, "You know, when I was riding home in the limo"—she denied it was her request to pick up this other individual—"there was no other place for me to sit other than between Chris's legs," the young man. And that, you know, "I may have been kissing him but I didn't mean any disrespect."
>
> No disrespect to the marriage. That's okay.

(127:17-23.)

--------------------------------

> [H]ow can she say that she has strong religious convictions when she's going out and committing adultery, she's lying, cheating and she's being violent. For example, Rick Freeland.

(130:3-6.)


      f.      **Prosecutor's Closing Argument (Penalty Phase) – Day 2**

The following excerpts of the prosecutor's closing argument in the penalty phase of the trial of Wendi Andriano are taken from the official transcript of the proceedings for December 16, 2004:

> But how affected was she [by Joe's cancer]? Well, she was affected to the point to say, you know what, I'm going to go out every night or two, to be honest, two nights a week, at least. . . .

9

Was she affected so much she didn't go out even though her husband had just had a chemotherapy treatment[?]  There is no effect on her.

(9:4-11.)

--------------------------------

She had to wait for him to die and would stop her from being this woman that could go out and fraternize with other men.  Maybe. And, of course, I'm being tongue-in-cheek when I say that.

(9:16-20.)

--------------------------------

What was she doing?  Do you think she's carrying that cross out there at the Rockin' Rodeo?  Do you think she was carrying his cross as she was kissing Rick Freeland?  Do you think that she was carrying his cross as she's having sexual intercourse with Travis Black?  Absolutely not.  She was having a gay old time on her birthday, coming home late . . . giggling, even though she had just been kissing another guy.  But that's no disrespect.  No disrespect at all.

(9:25-10:9.)

--------------------------------

And if it's so stressful, why is she going out and hanging out at bars[?] . . . We know that she's having a pretty a good time of her life right then.

(11:9-14.)

--------------------------------

You know, do you think that when she was out there dancing and kissing men, do you think she was thinking about her kids just like they show here?  Do you think that she was thinking about anyone other than self-gratification, making herself feel good?  That's all she cared about.

(16:1-6.)

**III.   PROSECUTOR'S QUESTIONING OF WITNESSES**

a.   **Examination of Wendi Andriano**

i.   **Cross Examination of Wendi Andriano (October 28, 2004)**

Q.   Now, the other thing that you told us previously was that the reason that you decided to have sexual intercourse with Dido Gamez was because, well, you indicated that Barbara Mitchell was chiding you about it. In other words, sort of teasing you about it. Do you remember that?

A.   Yes.

Q.   And that you decided that you would go ahead and have sexual intercourse with Dido Gamez, right?

A.   Yes, sir.

(75:13-21.)

-------------------------------

Q.   Actually, do you know someone by the name of Pete Munoz?

A.   Yes, I do.

\*       \*       \*

Q.   As a matter of fact, you and he developed a friendship, didn't you?

A.   Not really.

Q.   Well, isn't it true that you may not have developed a friendship in the traditional sense, but he was actually the first person that you had intercourse with. Isn't that true?

A.   That is not.

Q.   Isn't it true you and he talked because you indicated that you were tired of being that way and you wanted to know what actually was going on?

A.   Absolutely not.

Q.   So that's not true then, right?

A.   That is not.

(76:11-13, 76:19-77:7.)

-------------------------------

Q.   But you do agree that you did have intercourse with Vernon Barnes, right?

A.   Yes, sir.

(77:8-10.)

11

--------------------------------

Q.      How about Jonathon Householder?  Did you tell us about him?

A.      Never had sex with him.

(77:11-13.)

--------------------------------

Q.      Did you also forget to tell us about Chris Barnes?  Did you tell us about him?

A.      No.  There was no need to.

Q.      Actually, after you were married, didn't you have occasion to be with him in July of 1996, ma'am?

A.      With him in what manner?

Q.      Intimate?

A.      No.

(77:16-23.)

--------------------------------

Q.      And so one of the other things that we know is that you were kissing Chris on the way in right?

A.      No.

Q.      Well, you did tell us that you were pretty much toasted that night, didn't you?

A.      Yes, I was.

Q.      And you did indicate to us further on down the line that you were in a similar circumstance involving Travis Black.  Do you remember this?

A.      Similar?  No, it is not similar.

Q.      You weren't drunk when you were with Travis Black?

A.      Yes, I was drunk.

Q.      He is a male, right?

A.      Yes.

Q.      And so is – so is Chris, isn't he?

A.      Yes, he is.

12

Q.     And so could it be that you just don't remember since you, according to your description, your own description, you were really pretty drunk and that maybe you were kissing Chris?

A.     No. I said there might have been some flirtatious stuff, but no, I did not kiss Chris.

(98:18-99:15.)

--------------------------------

Q.     And – but you did say something else yesterday about sitting between his legs and sort of flirting with him was no – was not meant as a sign of disrespect at all, was it?

A.     No.

Q.     It was nothing to you, right?  I mean, it was just good old fun, right?

A.     It wasn't – no it was not – it wasn't anything.

Q.     Right.  It was anything.  It was just you being a girl, right?

A.     I don't know if I'd phrase it like that, but –

Q.     It was no big deal to you.

A.     No, it was not.

Q.     And the reason it wasn't any big deal to you is because when you would go out – you would go out and start kissing guys.  It's something you did all the time, right?

A.     That is incorrect.

(99:21-100:13.)

### ii.     Cross Examination of Wendi Andriano (November 1, 2004)

Q.     In fact you had sexual intercourse [with Rick Freeland] under a bridge.  Do you remember that?

A.     No.

Q.     You never had sexual intercourse with him under a bridge near a golf course?

A.     No.

Q.     Oh, so all of the times that you had sexual relations with him, it was in his apartment, right?

A.     No.  There was one time outside.

Q.     And so one time outside and the rest were inside of his apartment then, right?

A.     4 or 5 times.

13

Q.  Some of them were really late, right?

A.  Yes.

Q.  When your kids were being either taken care of by Joe or somebody else, right?

A.  Not by Joe, no.

Q.  Well, the third time, where was it that you had sexual intercourse?

A.  In his apartment.

Q.  What time of the night was it?

A.  Around 2:00.

Q.  In the morning then, right?

A.  Yes.

Q.  And you are not watching your kids at 2:00 in the morning, at that time that you're having intercourse with him, right?

A.  I am not.

Q.  Somebody else is taking care of your kids, right?

A.  Yes.

Q.  These kids that you cried for on the witness stand these last couple days, that brought you to tears, right?

A.  Yes.

Q.  Those are the same ones, right?

A.  Yes.

Q.  And it was the same – you had the same reaction about your husband.  That brought you to tears when you were telling us how cute he was, right?

A.  Yes.

Q.  And yet you were still out there with this other individual, right?

A.  Yes.

Q.  Because you didn't love him anymore, right?

A.  I loved Joe very much.

Q.  That's how you showed for your Joe going and having sex with another person?

(53:2-54:24.)

14

--------------------------------

Q.    And so you are taking the opportunity when your husband's out of town to ask another man to have a drink with you, right?

A.    Not like you said, no.

(57:9-12.)

--------------------------------

Q.    You were still interested in [Travis Black] at that time, weren't you?

A.    No, I was not.

Q.    And it was just seven days after that that you and Travis Black became friends, right?

A.    We were not necessarily friends.

Q.    You were just lovers then?

A.    It was a one-night stand.

(57:21-25.)

--------------------------------

Q.    Okay. One of the other things that you told or that you talked to Sharon Murphy about was – was your extramarital affairs, right? Do you remember talking to her about that?

A.    An affair, yes.

Q.    And according to you, having intercourse then calling the individual sometime after that and receiving calls from that individual, and then meeting them at a bar after that, that does not, in your mind, constitute an affair, right?

A.    No.

Q.    Because in your mind the only thing that constitutes an affair is the emotional involvement, right?

A.    For me, yes.

Q.    So you could go out and have sex with a bunch of guys on one-night stands and those would not be affairs, right, by your definition?

A.    Yes, sir.

(89:23-90:15.)

--------------------------------

Q.    Now, did you have an emotional bond to somebody named Chris Barnes back in July of 1996?

15

A.    An emotional bond?

Q.    Well, you were friends, weren't you?

A.    He was Joe's friend. I—I would call him a friend, an acquaintance.

Q.    Right now I'm just asking specifically about you. You did know Chris Barnes back in July of 1996, right?

A.    Yes.

Q.    And you and he were friends, right?

A.    Yes.

Q.    And when Joe would go to the lake, you and he got together, didn't you?

A.    No.

Q.    You weren't in a parking lot in a truck at 4:00 the morning on July of 1996?

A.    No, I was not.

(90:16-91:7.)

--------------------------------

Q.    I'm going to show you Exhibit Number 454. I want you to take a look at what is there, Number 161. Do you see the listing there involving extramarital affairs?

A.    On 161?

Q.    Let me show you.

A.    Yes.

Q.    Okay. And you did list that you had one extramarital affair, right?

A.    Yes.

Q.    And the reason that you didn't list Travis Black is because you didn't have an emotional attachment to him, right?

A.    As I said before, it was a one-night stand. It was not an affair.

Q.    And you're not denying that you had sexual intercourse with him, are you?

A.    I'm not denying that.

(91:8–91:24.)

--------------------------------

16

Q.      And it's your definition that we're talking about as to why there is only one mentioned rather than two or three, right?

A.      There was never three.

Q.      Well, according to you, there was never two, right?

A.      There was one affair and one one-night stand.

(92:5-11.)

---------------------------------

Q.      And she was also asked on cross-examination about the issue about crying and – actually, she was asked on direct examination by Mr. Patterson. She was asked was that her first sexual experience, and do you remember Sharon Murphy saying yes?

A.      No, I don't remember that.

Q.      So if everybody else's recollection – let's do it this way. Why did you cry with Mr. Andriano?

A.      As I indicated to her, I didn't know why either. It was—it was really strange.

Q.      Did you cry with Didos Gamez?

A.      No.

Q.      Did you cry with Didos Gamez all the times you made love to him or had sex with him?

A.      I didn't have sex with him. I only had sex with him once.

Q.      Ma'am, didn't you have sex with him over four times, between four and five times?

A.      I don't recall. I—I'm just not – I don't recall.

Q.      Do you remember that in the – when it was very late at night you would go over to his apartment. You went over to his apartment on at least two occasions and had sex with him?

A.      No, I don't recall.

Q.      Do you recall that on at least two occasions he came over to your apartment at night and had sex with you?

A.      No. I recall one time that he did.

Q.      So you only remember having sex with him one time total?

A.      Yes.

Q.      And you indicated that he's the individual that you were with first, correct?

A.      Yes.

17

Q.    But he was before Mr. Andriano, correct?

A.    Yes.

(105:12-106:22.)

-------------------------------

Q.    And somebody else that you indicated that you may have been intimate with was Vernon Barnes, right?

A.    Yes.

Q.    And he was also before Mr. Andriano, right?

A.    Yes.

Q.    You didn't cry with him either, right?

A.    No.

(106:23-107:4.)

-------------------------------

Q.    And with regard to Mr. Gamez, he never took you out to the movies, did he?

A.    No, Our—it was a bar thing.

Q.    Well, he—he never took you out to dinner, right?

A.    No. I think we would just eat fast food together.

Q.    Actually, you indicate—you just indicated it was a bar thing between you and him, right?

A.    Uh-huh, yes.

Q.    What that means is he met you at a bar one night and the two of you went home, right?

A.    That's not what that means.

(107:5-17.)

-------------------------------

Q.    And with regard to Vernon Barnes, he never took you out to dinner either, did he?

A.    No, we didn't go out to dinner.

Q.    Never went out to a movie or anything like that, right?

A.    No.

18

Q. And you indicated that with him it was the girls or whatever girls may have been that caused you two to break up, right?

A. Me finding out he had a girlfriend, yes.

(107:18-108:2.)

--------------------------------

Q. And after meeting [Vernon Barnes] at Mel's Bar, didn't you go home with him? Or whatever bar it was, didn't you go home with him that night?

A. No.

Q. And didn't you have sex with him that night?

A. No, I did not.

Q. And the reason that you broke up actually was because he found you or caught you, whatever term you want to use, having relations or in bed with Jonathan Householder, didn't he?

A. No, not at all. I've never had a relationship with Jonathan Householder.

(108:22-109:8.)

--------------------------------

Q. How about Pete Munoz? Do you know him?

A. I do.

Q. And he also lived at the Quail Garden Apartments, didn't he?

A. Yes.

Q. And you also had relations with him, didn't you?

A. No, I did not.

Q. Isn't it true that you never went to the movies with him either, right?

A. That's correct.

Q. You never went to dinner with him?

A. That's correct.

Q. But you did enjoy a drink with him, right?

A. No.

Q. And for two or three months you and he did not enjoy having—you and he did not have sexual relations?

19

A.    No, we did not.

(109:17-110:8.)


### iii.    Cross Examination of Wendi Andriano (November 2, 2004)

Q.    One thing that you said, with regard to Mr. Black, I just want to clear that up, you
      indicated that you met him at the Rockin' Rodeo, right?

A.    Yes.

Q.    And that you were there and somehow the two of you met, right?

A.    Chris introduced us, yes.

Q.    It wasn't the case that he was out there dancing and you approached him, was it?

A.    No.

Q.    It wasn't the case that it was next or close to the last song of the evening, was it, when
      you approached him on the dance floor, was it?

A.    No, it wasn't.

Q.    And it wasn't while you were out there dancing on the dance floor and before the song
      was over you kissed him.  It wasn't like that, right?

A.    Yes, sir.

Q.    It wasn't that you groped him at all?

A.    No, sir.

Q.    And it wasn't that when he went to drop you off at your house, it wasn't that you asked
      him to come up to your apartment?

A.    Yes, I did ask him in.

Q.    Is that when you became the tease or when did you become the tease as you told us?

A.    As the evening progressed.

Q.    So it's just flirtation that's going on at the Rockin' Rodeo?

A.    Yes.

Q.    There's a flirtation continuing on at Denny's when you're having breakfast?

A.    Actually, we had more conversation there than flirting.

20

Q.    But even—if you were intoxicated by the time you got to Denny's and you had breakfast, the effects of the alcohol were wearing off, weren't they?

A.    Starting to.

Q.    And so then you asked him or he took you to your apartment, right?

A.    Yes.

Q.    You asked him in, didn't you?

A.    Yes, I did.

(34:15 – 36:7.)


### b.    Direct Examination of Michael Brad Bayless (December 15, 2004)

Q.    And tell me what happened that you considered to be unusual?

A.    When we were leaving the interview, Dr. Amico—

Q.    No, not what do you think happened.  Tell us what you saw?

A.    Okay.  I felt as though Mrs. Andriano was being very flirtatious.

(14:8-14.)

--------------------------------

Q.    Let me be more direct.  Did she flirt with you?

A.    Yes.

(38:20-21.)

--------------------------------

Q.    Okay.  What does it say after the S?

A.    "I'm down to 112 pounds.  I'm so happy." States "Zoloft is helping."

Q.    Okay.  I'm going to have some questions about that statement.  She indicates that she's happy that she's losing weight, doesn't she?

A.    Yes.

Q.    Again, we've been talking about her flirting with you.  Now we're talking about wanting to go to general population, not wanting to go to general population and now is happy that her weight is dropped.  What does that tell you about her?

*    *    *

21

A.   What that tells me is that there's, just by simply that note alone, it tells me there is some, typically some reason why she wants to be down to 112 pounds.  One could speculate—

Q.   —Don't speculate.  But there is a reason why she wants to go down.  That's what it appears to be, right?

A.   Yes.

Q.   And we don't know the reason, but it appears that there is a secondary motive here, right?

A.   Yes.

(21:2-13, 21:23-8.)


###### c.   Direct and Redirect Examination of Travis Clinton Black (September 16, 2004)

.Q.   And why don't you describe for me how it was that the two of you met?

A.   I had been drinking, dancing, very intoxicated.  I was dancing.  She came up to me.  I was dancing on the dance floor and she just came out of nowhere and we just started dancing.

Q.   What happened then?

A.   We danced a little, very provocatively, and then before the dance was finished, she was – we were kissing.

Q.   So this was during the first song that you danced, correct?

A.   Yes.

Q.   The woman's name, did you learn it during the dance or after the dance?

A.   It was after.

Q.   And how much after the dance did you learn her name?

A.   Probably two minutes.

Q.   And so the kissing and the dancing was before you knew her name?

A.   Yes.

(89:14-90:10.)

-------------------------------

Q.   Did you at any time go out of your way to go get that woman to come over and kiss you?

A.   No, sir.

22

Q.    Had you even seen her before she came up to you and started dancing and kissing you?

A.    I would say I walked by her a couple of times, but that's about it. I didn't—

Q.    When you walked by her, did you say anything to her?

A.    No, sir.

Q.    So did you ever ask her to dance before she came over to you?

A.    No, sir.

Q.    So you're dancing and your friend is also out on the dance floor as I understand it, right?

A.    Yes, sir.

Q.    And then describe for me what happened.

A.    We're out there dancing. She just comes out of nowhere and grabs me and just starts dancing with me.

Q.    Okay. Go ahead. And was there any kissing that occurred during that song?

A.    Yes, sir, right at the end.

Q.    Did she kiss you or did you kiss her?

A.    She kissed me.

(107:15-108:13.)

--------------------------------

Q.    So you and the defendant have now had this dance. What happens afterwards?

A.    We ended up leaving the bar, going to breakfast.

                    *       *       *

Q.    Any—anything of note that happened while you guys were sitting there having breakfast?

A.    Just some under the table groping. Just stuff like that.

(90:25-91:3, 91:19-22.)

--------------------------------

Q.    You were asked about whether or not there was any hanky panky thoughts, in your thoughts, in your mind, as you drove in the truck. Do you remember that question?

A.    Yes, sir.

Q.    Do you know whether or not she had hanky panky in her thoughts?

23

A.      There was a lot of groping, so I'm guessing there was.

(108:14-21.)


      **d.      Direct Examination of Rick Freeland (September 13, 2004)**

Q.      So you indicated that you started to have this relationship with her. Would you – as part of that relationship, did that include going out to dinner?

A.      I don't believe that we went to – went out to dinner.

Q.      Did that include going out to nightclubs?

A.      Yes.

(20:14-20.)

-------------------------------

Q.      And this—these instances that you were with her, can—can you put a number on them, how many times you were together?

A.      Around 5, 7.

Q.      And where did they take place?

A.      My apartment.

Q.      Did any of them take place outside?

A.      Yes.

Q.      Where?

A.      Right beside the [apartment] complex.

Q.      Was that underneath a bridge?

A.      Yes.

Q.      And describe a little bit more what this bridge has to do with the complex?

A.      I don't think it has anything to do with the complex.

Q.      Is it associated with a golf course?

A.      It's just right next to the complex.

(21:3-20.)

-------------------------------

24

Q.   Now, when you were having these relations with her at your apartment, did they take place during the day or did they usually take place at night?

A.   Mainly at night, evening.

Q.   Did any of them take place during the day?

A.   I don't believe so.

Q.   And did any of them take place deep into the night, somewhere around midnight or thereafter, or were they all in the early evening?

A.   No. It was evening up to midnight, I think, 1:00 a.m.

Q.   Was that a couple of times it took place that late or was it earlier?

A.   I think probably a couple of times.

Q.   Okay. And the others were in the earlier evening then, correct?

A.   Yes.

(21:21-22:12.)

--------------------------------

Q.   Okay. Now, with regard to this one on one situation, when you and she were alone in your bedroom having sex, was that one on one or not?

A.   Yes, one on one.

(66:14-17.)


### e.   Examination of Chris Hashisaki

#### i.   Direct Examination of Chris Hashisaki (September 8, 2004)

Q.   When you went to these places, were you able to see the defendant's actions while she was out there that June—sorry, that July or August of the year 2000 when she was out there interacting on that social basis?

A.   Yes.

Q.   And how was she with the other men that were there?

A.   Flirtatious.

Q.   Would she ever have any physical contact with them, for example kissing them?

A.   Yes, she would.

Q.      Would she have other physical contact, for example touching then, that sort of thing?

A.      Yes.

Q.      Would they touch her back?

A.      Yes.

(9:10-25.)

-------------------------------

Q.      And when you went out, was there some dancing that took place?

A.      Yes.

Q.      Did you see the defendant's demeanor?

A.      Yes.

Q.      And you indicated previously that when you'd gone out with her she would kiss men and perhaps touch them. Did that happen that night?

A.      Yes.

(44:12-20.)


##                   ii.      Direct and Redirect Examination of Chris Hashisaki (September 9, 2004)

.Q.     And when you were coming back that night, was the defendant and this individual doing anything?

A.      Yes. They were kissing in the limo.

Q.      And was this throughout the whole ride back or just a couple pecks on the cheek, or was it the amorous kind of kissing?

(14:7-12.)

-------------------------------

Q.      And during that 20 minutes, was there this kissing going on with the defendant?

A.      Correct.

Q.      Did she ever make any statements herself as to what she thought about what she was doing?

A.      We asked her what she was doing.

Q.    What was her response?

A.    She said, "We're just kissing."

Q.    Pardon?

A.    She said, "We're just kissing."

(14:25-15:9.)

---------------------------------

Q.    One of the things you were telling defense counsel or he was asking about was the defendant's demeanor when she was out with the girls. Do you remember talking about that?

A.    Yes.

Q.    What were the terms that were used? I can't even remember those—

A.    Sweet, outgoing, flirty.

Q.    Had she been drinking when she was quote, unquote, sweet, outgoing and flirty?

A.    Yes.

(74:12-22.)

---------------------------------

Q.    Was her husband present when she was kissing on this guy that was a friend of Shannon's boyfriend?

A.    No.

Q.    Was her husband present when she was flirty with the men at this bar?

A.    No.

(75:1-6.)

### f.    Cross Examination of Barbara Mitchell

#### i.    Cross Examination of Barbara Mitchell (October 21, 2004)

Q.    You indicated that when she was dating you were familiar with her dating somebody by the name of Shawn King, right?

A.    Yes.

Q.    And did you know her to ever go out with somebody by the name of Didos Gamez?

A.      Yes.

Q.      How about Pete Munoz.  She also went out with him too, didn't she?

A.      No.  I don't recall him.

Q.      How about Vernon Barnes.  She also went out with him?

A.      No.

Q.      Not that you know?

A.      Not that I know.

(181:14-182:6.)


### ii.      Cross Examination of  Barbara Mitchell (December 13, 2004)

Q.      She didn't tell you of the affairs she was having, did she?

A.      Yes, she did.

Q.      What did she tell you about?

A.      His name was Ricky or Rick.

Q.      When did she tell you about him?

A.      During the Vegas trip, which would have been in 2000.

Q.      In May of 2000?

A.      Yes.

Q.      Was she happy about the affair she was having?

A.      No.

Q.      She was just being forced to have an affair, is that what's going on?

A.      No.

Q.      Subsequent to that, did she ever tell you about any other affair she was having?

A.      No.

Q.      Did she tell you about Travis Black?

A.      No.

Q.   Did she tell you about going out and kissing other men while she was out at bars?  Did she tell you about that?

A.   No.

(76:13-77:11.)

g.   **Cross Examination of Sharon Murphy**

i.   **Cross Examination of Sharon Murphy (October 13, 2004)**

Q.   Right.  Well, ma'am, did you know that actually when [Wendi] was dating the pastor's son, she was also having sex with other individuals?

A.   No.  I did not know that.

Q.   Did you know that it was more than one?

A.   No.

Q.   Did you know that it was more than two?

A.   No.

Q.   Did you know that part of the reason that Mr. King actually broke up with her was because he came over to the apartments, which were the Quail Apartments, and he caught her in front of the television in a state of undress with another male.  Did you know that?

A.   No.

(50:20-51:8.)

--------------------------------

Q.   Now, you also said that, well, you know, it was a sad day for her when she broke up with Mr. Freeland because it was as if—as if she'd lost a friend, right?

A.   Right.

Q.   Wouldn't you agree that this conduct that we're talking about is not one that friends do amongst each other when they obsess over them, they want to be with them?

A.   I think you're asking me about friendship and how one person might affect a person.  Is that what your question is?

Q.   I'm asking you whether or not friends go and stand in front of each other's door and, the whole thing I laid out for you, wanting to get together with them and have sex?

(65:7-20.)

--------------------------------

29

Q.    We were talking about how, and you indicated that—that there were these issues that she had with sex involving Mr. Andriano, do you remember that?

A.    Yes.

Q.    And you indicated, you became very graphic, and you indicated she even had to use lubricant with him.  Do you remember telling us that?

A.    Yes.

                              *        *        *

Q.    Do you know whether or not she had to use any lubricant with regard to Rick Freeland?

A.    I don't know.

Q.    Don't you think it would have been important to this inquiry to see whether or not she actually needed lubricant with Rick Freeland to determine whether or not it was just sex that she indicated or it was just sex with an icky, gross guy?

A.    As I recall, the purpose of my questioning her and interviewing her was to get a picture, and I didn't ask specifics about the nature of the sex acts with Rick Freeland.

(67:14-21, 68:23-69:9.)

--------------------------------

Q.    Okay.  While we're talking about sex and the defendant, did you know that when she went out to bars that she was constantly kissing on men?

A.    No.

Q.    Did you know that according to the women that she went out with that they almost became embarrassed because, according to then, Wendi had to be the center of attention, and if she wasn't, then she was coming on to men?

(69:13-69:20.)

--------------------------------

Q.    And one of the things you also indicated in the power and control wheel, she would do anything because that's what the Bible tells her to do?

A.    Yes.

Q.    But it's clear, ma'am, if she's doing what she's doing with Mr. Black, she's not taking care of him in a Christian sense as she defined it to you, is she?

A.    That's correct.

(73:2-9.)

--------------------------------

30

Q.      How about when she was having sex from Rick Freeland?  Did [Joe] also ask for sex on a daily basis then?

A.      I don't believe I asked her for dates of when – when it was daily and when it wasn't.

Q.      Would it be important to know if she was having sex, for example, with Rick Freeland today and her husband was then asking for sex in the evening because maybe she didn't want to have sex with her husband because she'd already had it.  Wouldn't that be important to know?

A.      Yes.

Q.      Because it wouldn't be—then it wouldn't be domestic violence.  It would then be that she'd already had her fill, right, one of the reasons, right?

A.      It's just the way you said that.

Q.      Ma'am, why don't you go ahead and answer the question for me.

A.      That she may not want to engage in sex for a second time in a day, yes.

Q.      Okay.  And you indicated that you didn't like the way that I said it.  Ma'am, the bottom line is, let's be open about this.  She was having sex with Rick Freeland, wasn't she?

A.      Yes.

Q.      And you did say that Mr. Andriano did want sex on a daily basis, right?

A.      Yes.

(77:1-78:1.)

-------------------------------

Q.      Did you know that on the way home that the defendant actually stopped and picked up another man?

A.      No.

Q.      Per the other witnesses, did you know that on the way home that she was kissing this other man?

A.      No.

(104:1-6.)

-------------------------------

Q.      And you—you have two examples of where she had sexual intercourse with men, right?

A.      Correct.

Q.      And there are many examples of her kissing men on dance floors.  You knew about that, right?

31

A.   I'm not sure I know that.

Q.   And you don't know anything about the limo of her kissing anybody in the limo, right?

A.   No, sir.

(123:14-22.)

--------------------------------

Q.   You would agree based on your discussions with her that's what happened?

A.   Say it again to me.

Q.   That she had affairs with Rick Freeland and Travis?

A.   Yes.

Q.   Okay.  Let's call it seeing other men.  Social contact.

(148:14-21.)


### ii.   Continued Cross-Examination of Sharon Murphy (October 14, 2004)

Q.   And, for example, with regard to sexual abuse, she wrote "I never liked to have sex," right?

A.   Right.

Q.   She doesn't describe how many partners she had before him or anything like that.  She just tells you she doesn't like sex, right?

A.   Right.

Q.   That would presumably include sex with Travis Black and Rick Freeland, right?

A.   Right.

(33:14-23.)


### iii.   Cross-Examination of Sharon Murphy (December 9, 2004)

Q.   One of the other things that we know from the people that were there was that on the ride home that night she was kissing another man.  She didn't tell you that.  That's a lie by omission.

A.   She did not tell me that.

32

Q.   Right.  One of the other things that she didn't tell you, per the witnesses, was that she was the one that night that sort of precipitated the incident by walking after the person, the man that she was with.  She didn't tell you that, did she?

A.   No.

(69:22- 70:7.)


### h.   Cross Examination of Donna Ochoa (October 5, 2004)

Q.   You can't remember it, can you?

A.   I remember I told about—about the bruises I saw—

Q.   No—

A.   —in 2000.

Q.   But you don't know [Joe] did that.  For all you know, somebody named Rick Freeland did that while they were making love.  You don't know it wasn't [Rick], do you?

(98:22-99:4.)

--------------------------------

Q.   Okay.  And, ma'am, did she ever confide in you and every say to you, you know, "I'm having this religious epiphany, I'm being unfaithful."  Did she ever come to you with that?

A.   No.

Q.   Did she ever come to you and say, you know, "I'm just going out all the time every—you know, twice a week."  Did she ever come and tell you about that?

A.   No.

Q.   Did she ever come to you and say, "You know what?  In addition to staying out late at night, I go and stand outside my boyfriend's door for up to an hour until I get him to answer the door.  Can you help me?"  Did she ever ask you for any help like that?

A.   No.

(151:21 – 152:10.)

--------------------------------

Q.   I'm asking about, you know, "I'm having issues with other men, I want to leave him, I think that Joseph is icky and gross and I don't want to be with him."  Did she ever tell you that?

A.   No.  She told me—

33

Q.     The answer is "yes" or "no," ma'am.

A.     No, she—

Q.     The—"yes" or "no"?

A.     No.

(153:18-154:1.)

-------------------------------

Q.     Ma'am while we're still talking about it, you indicated that she broke up with Shawn King.  Do you know why she broke up with Shawn King?

A.     I—only what she told me.

Q.     So you didn't see anything with your eyes, right?

A.     I saw the windshields and the window.

Q.     But you didn't see what led up to it, did you?

A.     No.

Q.     You didn't see perhaps she was caught in a compromising activity in skimpy clothing on with a Hispanic male by Mr. King.  You didn't see that, did you?

A.     I don't know that happened.

(154:21-155:8.)


### i.     Cross-Examination of Gia Palicki (December 13, 2004)

Q.     Did she also talk to you about the sex life and problems, yes or no?

A.     Yes.

Q.     Did she also tell you that she was also going out and having affairs with other men?

A.     She told me about going out, yes.

Q.     No.  No.  No.  Having affairs, sexual intercourse with other men.  Did she tell you about that?

A.     I'm confused.  I don't – she didn't tell me the physical details.  But I know she went out and saw other men.

Q.     I'm asking you whether or not she ever told you she had sexual intercourse with other men while she was still married to Joe?

34

A.    No.

Q.    So she didn't go that far?

A.    No.

Q.    Did she tell you that she would, at least on one occasion that we know, she brought them home to Apartment 132 and had sex with another man?  Did she tell you about that?

A.    No.

Q.    But that she met him at the Rockin' Rodeo and brought him home that night?

A.    No.

Q.    Did she tell you that when she would go out, at those times, did she tell you she would kiss other men?

A.    Yes.

Q.    And this was when she would actually go out to bars, right?

A.    Yes.

(61:4 - 62:9.)


        **j.    Direct and Redirect Examination of Shannon Sweeney (September 15, 2004)**

Q.    Both of them?  And at these nights when you would go out, would you observe the defendant's demeanor and how she interacted with other men while she was at the [Tijuana Country Club and Rockin Rodeo]?

A.    Yes.

Q.    Tell me about it.

A.    Wendi liked attention from men, so she was always dancing with men.  And if she didn't feel like she was getting attention, she wasn't having a good time.

(33:20-34:2.)

-------------------------------

Q.    In terms of this issue of how many times you may or may not have gone out, the term often was thrown around.  Putting that term aside, back then how many times would the defendant go out on a weekly basis?

A.    Twice a week.

Q.    And that twice a week would be, I think you said, what day of the week?

A.    Tuesday and then at least one weekend night.

Q.    And Tuesdays – I think there as a special term.  I think – was that ladies night?

A.    Yes.

Q.    During this time when you were asked about ladies night, did any men go with you guys?

A.    Sometimes.

Q.    Who would be the men that would go with you?

A.    Erik Vaillant in particular, my boyfriend Ryan, his roommate, and Rick would be there sometimes.

Q.    At any of those times that these people may have been present at ladies night, did Joseph Andriano go with you guys?

A.    No.

(73:22-74:17.)

--------------------------------

Q.    Was there any physical—during these times, was there physical contact between her and these men?

A.    Very much, yes.

Q.    Describe the physical contact.

A.    She would kiss someone every night.

(34:3-7.)

--------------------------------

Q.    And would there also be other type of touching?

A.    While they were dancing, she—yes, she would grab people in different places.

(34:8-10.)

--------------------------------

Q.    Did you see whether or not there was any physical contact between Chris and Wendi?

A.    Yes.

Q.    What kind of physical contact was there?

A.    They began kissing.

Q.    And this is a person that had just gotten into the car?

36

A.      Yes.

(36:7-36:14.)

# EXHIBIT PPPPP

Michael K. Jeanes, Clerk of Court
*** Electronically Filed ***
02/27/2012 8:00 AM

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CR 2000-096032                                      02/13/2012


                                          CLERK OF THE COURT
JUDGE DOUGLAS L. RAYES                        H. O'Shaughnessy
                                                 Deputy



STATE OF ARIZONA                          LACEY ALEXANDRA STOVER GARD

v.

WENDI ELIZABETH ANDRIANO (A)              ALLEN A ARNTSEN
                                         MATTHEW R LYNCH
                                         SCOTT M BENNETT

                                         CAPITAL CASE MANAGER
                                         COURT ADMIN-CRIMINAL-PCR
                                         VICTIM SERVICES DIV-CA-SE
                                         VICTIM WITNESS DIV-AG-CCC



                CAPITAL PCR STATUS CONFERENCE



        9:40 a.m.

        Courtroom ECB 411

        State's Attorney:        Lacey Gard appear telephonically
        Defendant's Attorney:    Alan Arntsen, Matt Lynch appear telephonically
        Defendant:               Not Present

        Court Reporter, Cindy Lineburg, is present.

        A record of the proceeding is also made by audio and/or videotape.

        LET THE RECORD REFLECT that victim's Jeanette and Joe Andriano appear
telephonically.

Docket Code 028                    Form R000A                         Page 1

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CR 2000-096032                                    02/13/2012

The Court questions Petitioner's counsel and their progress with completing the Petition for filing.

Counsel address the Court with the pending issues.

IT IS ORDERED granting Petitioner's Motion to File Documents Seal.

FILED:  Stipulated Motion to file documents.

IT IS ORDERED setting deadline for challenge of filing sealed documents to March 13, 2012.

Petitioner's Reply is due by March 26, 2012.

IT IS ORDERED setting telephonic status conference to April 16, 2012 at 10:00 a.m. before the Honorable Douglas Rayes.

This case is eFiling eligible: http://www.clerkofcourt.maricopa.gov/efiling/default.asp. Attorneys are encouraged to review Supreme Court Administrative Order 2011-140 to determine their mandatory participation in eFiling through AZTurboCourt.

# EXHIBIT QQQQQQ

MICHAEL K. JEANES, CLERK
BY _____ DEP
FILED

12 JUL 26  AM 11: 32

COPPERSMITH SCHERMER & BROCKELMAN PLC
2800 North Central Avenue
Suite 1200
Phoenix, Arizona 85004
(602) 224-0999
Scott M. Bennett, State Bar No. 022350

FOLEY & LARDNER LLP
150 E. Gilman Street
Madison, WI 53703
Telephone:  (608) 257-5035
Fax:          (608) 258-4258

Allen A. Arntsen, Admitted *Pro Hac Vice*
Stephan J. Nickels Admitted *Pro Hac Vice*
Matthew R. Lynch Admitted *Pro Hac Vice*

*Attorneys for Petitioner*
Wendi Andriano

# SUPERIOR COURT OF ARIZONA

# COUNTY OF MARICOPA

|  |  |
|---|---|
| State of Arizona, | ) |
|  | ) |
| Respondent, | ) No. CR2000-096032-A |
|  | ) |
| vs. | ) **UNOPPOSED MOTION FOR** |
|  | ) **EXTENSION OF PAGE LIMITS** |
| Wendi Elizabeth Andriano, | ) **AND TIME TO FILE REPLY IN** |
|  | ) **SUPPORT OF POST-CONVICTION** |
| Petitioner. | ) **RELIEF PETITION** |
|  | ) |
|  | ) (Assigned to the Hon. Douglas Rayes) |

Pursuant to Rule 32.5 of the Arizona Rules of Criminal Procedure, Rule 5.2(d) of the Arizona Rules of Civil Procedure, and the Court's supervisory powers, Petitioner Wendi Andriano moves for a 15-page extension of page limits and a four-week extension of time, from August 7, 2012 to September 4, 2012, to file her reply in support of the petition for post-conviction relief. The State has indicated that it does not oppose this Motion.

The grounds supporting this Motion are as follows:

1

4821-5800-1104.1

1      1.     In recognition of the numerous grounds for post-conviction relief,

2  the extent of the post-conviction investigation and supporting materials, and the

3  significance of the stakes for Petitioner, Petitioner moved in November 2011 for

4  leave to submit a Petition of 100 pages.  On December 1, 2011, this Court granted

5  that relief in part over the State's objection, allowing Petitioner to file a 70-page

6  Petition.  That Petition was filed on February 17, 2012.

7      2.     Due in part to the "complicated and fact-intensive" nature of the case

8  and the Petition, the State moved for and was granted four extensions of time to

9  file its response brief.  Petitioner understood and appreciated that basis for the

10  requests, and did not oppose them.

11      3.     The State filed its response brief two days ago, on July 23, 2012.

12  Because the State's response was 25 pages over the 40-page limit for responses,

13  that response was accompanied by the State's motion *instanter* to extend the page

14  limits for its response.  Though the State had not sought Petitioner's consent for

15  this relief, Petitioner nevertheless does not oppose it, again in recognition of the

16  number of claims at issue and their fact-intensive nature, as well as the expansive

17  trial record and evidence submitted in support of the Petition.

18      4.     By rule, Petitioner's reply is presently due on August 7, 2012, and is

19  limited to 15 pages.

20      5.     By this motion, and for the reasons stated above, Petitioner seeks a

21  15-page extension of page limits and a four-week extension of time, until

22  September 4, 2012, to file her reply the to the State's response brief.

23      6.     Since receiving the State's response brief, Petitioner's counsel has

24  been working diligently to identify the issues warranting a reply.  Based on

25  Petitioner's counsel's initial review of the State's response and the counter-

26  arguments that must be raised in reply to adequately correct certain factual

27  misconceptions and defend her claims, Petitioner's counsel has reasonably

2

1    determined that it cannot adequately address the State's 65-page response within

2    the 15 pages and two weeks permitted by Rule 32.5 of the Arizona Rules of

3    Criminal Procedure.  As with any 65-page brief, there is simply too much material

4    to which to reply within those limitations.  Specifically, Petitioner's counsel has

5    identified several misconstructions of Petitioner's claims, numerous areas where

6    the State glosses over key factual information or argues unreasonable implications

7    from it, and statements of law that warrant discussion or distinction.  Such

8    discussion will assist the Court in addressing Ms. Andriano's claims and help to

9    ensure a full and fair opportunity for each side to respond to the other's position

10   on the merits.

11       7.      Given that this is a death-penalty case, and that it is a post-

12   conviction relief proceeding in which waiver and preclusion carry especially harsh

13   consequences, the requested extensions are necessary in the interests of justice to

14   ensure that Petitioner has an adequate opportunity to respond to counter-arguments

15   raised by the State.

16       8.      Absent extraordinary circumstances unrelated to the State's brief or

17   the nature of the claims in this case, Petitioner does not anticipate the need for

18   further extensions of the time or page limits for the reply.

19       9.      As noted above, Petitioner's counsel has contacted counsel for the

20   State regarding this Motion, who indicated that the State does not oppose it.

21

22

23

24

25

26

27

3

1  RESPECTFULLY SUBMITTED July 25, 2012.

2

3                                    FOLEY & LARDNER LLP

4

    By _____

5          Allen A. Arntsen, *Pro Hac Vice*

6          Stephan J. Nickels, *Pro Hac Vice*
           Matthew R. Lynch, *Pro Hac Vice*

7

8   COPPERSMITH SCHERMER &
    BROCKELMAN PLC

9          Scott M. Bennett

10                                  *Attorneys for Petitioner*

11

12

13  ORIGINAL filed July 26, 2012,
    with the Clerk of the Maricopa County Superior Court.

14

15  COURTESY COPY hand-delivered July 26, 2012, to:

16  Judge Douglas Rayes
    Maricopa County Superior Court

17  East Court Building-511
    101 W. Jefferson

18  Phoenix, AZ 85003-2243

19
    COPY mailed July 26, 2012, to:

20

21  Ms. Lacey Stover Gard
    Office of the Attorney General

22  400 W. Congress, Suite S-315
    Tuscon, AZ 85701-1367

23  *Attorney for the State of Arizona*

24

25  *Michelle Daly*

26

27

                                    4

# EXHIBIT RRRRR

FILED
March 6, 2012 3:24 pm
MICHAEL K. JEANES, Clerk

By _XL O'Shaughnessy_
H. O'Shaughnessy Deputy

1   Scott M. Bennett (022350)
    *Coppersmith Schermer & Brockelman PLC*
    2800 North Central Avenue, Suite 1200
2   Phoenix, Arizona 85004
    (602) 224-0999 (office)
3   (602) 224-6020 (fax)
    sbennett@csblaw.com

4   Allen A. Arntsen, Admitted *Pro Hac Vice*
    Stephan J. Nickels Admitted *Pro Hac Vice*
5   Matthew R. Lynch Admitted *Pro Hac Vice*
    Foley & Lardner LLP
    150 East Gilman Street
6   Madison, WI 53703
    (608) 257-5035 (office)
7   (608) 258-4258 (fax)
    aarntsen@foley.com

8   *Attorneys for Petitioner Wendi Elizabeth Andriano*

9           IN THE SUPERIOR COURT OF THE STATE OF ARIZONA
10             IN AND FOR THE COUNTY OF MARICOPA

11

12  State of Arizona,                    )
                                         )
13                    Respondent,        )   No. CR2000-096032-A
                                         )
14       vs.                             )   **ORDER AUTHORIZING FILING**
                                         )   **OF DOCUMENTS UNDER SEAL**
15                                       )
    Wendi Elizabeth Andriano,            )
16                                       )
                                         )
17                    Petitioner.        )
                                         )
18  _____

19          Based on the Stipulated Motion by Petitioner Wendi Andriano, and for good cause

20  shown, IT IS ORDERED that, in connection with the filing of her Petition for Post-

21  Conviction Relief, Petitioner may file documents under seal. *And the Court with a list*

22          IT IS FURTHER ORDERED that Petitioner shall serve counsel for the State with a

23  copy of all documents filed under seal.  Counsel for the State may provide a copy of such

24  documents to the victims, as that term is defined under Arizona law, and to any outside

25  experts or consultants retained in connection with this proceeding.  All persons receiving

26  documents filed under seal shall maintain their confidentiality.

27

28

{00043453.1}        4834-4267-5214.1

1        Nothing in this Order shall preclude the parties from seeking relief to unseal any

2  document(s) or portions thereof.

3        DATED: _3-1-12_

4

5                          The Honorable Douglas Rayes

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

{00043459.1}

4834-4267-5214.1

2

# EXHIBIT SSSSS

Michael K. Jeanes, Clerk of Court
*** Electronically Filed ***
03/09/2012 8:00 AM

## SUPERIOR COURT OF ARIZONA
## MARICOPA COUNTY

CR 2000-096032                                            03/02/2012


                                                CLERK OF THE COURT
JUDGE DOUGLAS L. RAYES                              H. O'Shaughnessy
                                                        Deputy



STATE OF ARIZONA                        LACEY ALEXANDRA STOVER GARD

v.

WENDI ELIZABETH ANDRIANO (A)            SCOTT M BENNETT
                                        ALLEN A ARNTSEN
                                        MATTHEW R LYNCH
                                        STEPHAN J NICKELS

                                        CAPITAL CASE MANAGER
                                        COURT ADMIN-CRIMINAL-PCR
                                        VICTIM SERVICES DIV-CA-SE
                                        VICTIM WITNESS DIV-AG-CCC



MINUTE ENTRY


        The Court has received and considered the Stipulated Motion by Petitioner Wendi
Andriano.  Good cause appearing,

        IT IS ORDERED that in connection with the filing of her Petition for Post-Conviction
Relief, Petitioner may file documents under seal all in accordance with formal written order
signed by the Court on March 1, 2012 and filed by the Clerk this date.

        FILED:  Order.

        This case is eFiling eligible: http://www.clerkofcourt.maricopa.gov/efiling/default.asp.
Attorneys are encouraged to review Supreme Court Administrative Order 2011-140 to determine
their mandatory participation in eFiling through AZTurboCourt.

Docket Code 022                        Form R000A                              Page 1

# EXHIBIT TTTTT

Michael K. Jeanes, Clerk of Court
*** Electronically Filed ***
Mary Martin
Filing ID 1214600
3/15/2012 4:24:00 PM

1

THOMAS C. HORNE
ATTORNEY GENERAL
(FIRM STATE BAR No. 14000)

2

3

LACEY STOVER GARD
ASSISTANT ATTORNEY GENERAL
CAPITAL LITIGATION SECTION
400 WEST CONGRESS, BLDG. S–315
TUCSON, ARIZONA  85701–1367
TELEPHONE: (520) 628–6520
LACEY.GARD@AZAG.GOV
CADOCKET@AZAG.GOV
(STATE BAR NUMBER 22714)

4

5

6

7

8

ATTORNEYS FOR PLAINTIFF/RESPONDENT

9

# SUPERIOR COURT OF ARIZONA

10

## COUNTY OF MARICOPA

11

12

State of Arizona,

            Plaintiff/Respondent,

13

            -vs-

14

Wendi Andriano,

15

            Defendant/Petitioner.

16

CR2000-096032-A


MOTION TO EXTEND
DEADLINE FOR FILING
MOTION TO UNSEAL PCR
PETITION AND EXHIBITS.

17

18

        The State requests a brief, 3-day extension of its deadline to file a motion to

19

unseal Petitioner Wendi Andriano's post-conviction relief (PCR) petition and

20

accompanying exhibits.   The present deadline is March 16, 2012.   The State

requires 3 additional days to prepare and file its motion due to undersigned

21

counsel's ongoing preparation for an upcoming post-conviction evidentiary hearing

22

involving an *Atkins v. Virginia*, 536 U.S. 304 (2002), claim in *State v. Angel*

23

*Mayora Medrano* (Pima County Nos. CR–22423 and CR–23865), and a response

24

to the petitioner's motion for evidentiary development in a capital habeas

25

proceeding, *John Edward Sansing v. Charles Ryan*, District of Arizona No. CV 11–

26

1035–PHX–SRB, which is due on March 16, 2012.   Opposing counsel, Matthew

27

Lynch, does not oppose this request.   Accordingly, the State respectfully requests

28

that this Court extend its deadline for filing a motion to unseal Andriano's PCR petition and accompanying exhibits until March 21, 2012.

DATED this 15th day of March, 2012.

RESPECTFULLY SUBMITTED,

THOMAS C. HORNE
ATTORNEY GENERAL


/S/LACEY STOVER GARD
ASSISTANT ATTORNEY GENERAL
ATTORNEYS FOR PLAINTIFF

Copy of the foregoing mailed
this 15th day of March, 2012, to:

Scott M. Bennett
Coppersmith Schermer & Brockelman PLC
2800 N. Central Ave., Suite 1200
Phoenix, Arizona 85004

James J. Belanger
Coppersmith Schermer & Brockelman PLC
2800 North Central Avenue, Suite 1200
Phoenix, AZ 85004

Allen A. Arntsen
Foley & Lardner LLP
150 East Gilman Street
P.O. Box 1497
Madison, WI   53701-1497

Stephen J. Nickels
Foley & Lardner LLP
150 East Gilman Street
P.O. Box 1497
Madison, WI   53701-1497

Matthew R. Lynch
Foley & Lardner LLP
150 East Gilman Street
P.O. Box 1497
Madison, WI   53701-1497

Attorneys for Defendant


/s/Linda Yrrizarry

#2627277

3

# EXHIBIT UUUUU

Michael K. Jeanes, Clerk of Court
*** Electronically Filed ***
Isabel Osuna
Filing ID 1218543
3/20/2012 10:18:51 AM

1

THOMAS C. HORNE
ATTORNEY GENERAL
(FIRM STATE BAR NO. 14000)

2

3

LACEY STOVER GARD
ASSISTANT ATTORNEY GENERAL
CAPITAL LITIGATION SECTION
400 WEST CONGRESS, BLDG. S–315
TUCSON, ARIZONA 85701–1367
TELEPHONE: (520) 628–6520
LACEY.GARD@AZAG.GOV
CADOCKET@AZAG.GOV
(STATE BAR NUMBER 22714)

4

5

6

7

ATTORNEYS FOR PLAINTIFF/RESPONDENT

8

9

# SUPERIOR COURT OF ARIZONA

## COUNTY OF MARICOPA

10

11

12

13

14

15

16

| | |
|---|---|
| State of Arizona, | CR2000-096032-A |
|     Plaintiff/Respondent, | |
|     -vs- | SUPPLEMENT TO MOTION TO EXTEND DEADLINE FOR MOVING TO UNSEAL POST-CONVICTION RELIEF PETITION AND EXHIBITS. |
| Wendi Andriano, | |
|     Defendant/Petitioner. | |

17

18

On March 16, 2012, the State filed a motion for a 3-day extension of its

19

deadline for moving to unseal Defendant Wendi Andriano's post-conviction relief

20

petition and exhibits. The State had calendared the motion's original deadline as

21

March 16, 2012, which was the date undersigned counsel had written down during

22

the February 13, 2012, status conference. The State realized today, after reviewing

23

this Court's February 13, 2012, minute entry while working on the motion to

24

unseal, that it had incorrectly calendared the deadline; according to this Court's

25

minute entry, the deadline was actually March 13, 2012. Accordingly, the State's

26

motion to extend was filed 3 days late.

27

The State apologizes for this calendaring error, and respectfully requests that

28

this Court accept its late-filed motion to extend. Undersigned counsel contacted

Andriano's counsel, Allen Arntsen, advised him of the calendaring error, and confirmed that he did not object to the requested extension notwithstanding the error.    Accordingly, the State respectfully requests that this Court extend its deadline for moving to unseal Andriano's PCR petition and exhibits to March 21, 2012, as requested in their original motion.

DATED this 20th day of March, 2012.

RESPECTFULLY SUBMITTED,

THOMAS C. HORNE
ATTORNEY GENERAL


/S/LACEY STOVER GARD
ASSISTANT ATTORNEY GENERAL
ATTORNEYS FOR PLAINTIFF

1  Copy of the foregoing mailed
2  this 20th day of March, 2012, to:

3  Scott M. Bennett
4  Coppersmith Schermer & Brockelman PLC
   2800 N. Central Ave., Suite 1200
5  Phoenix, Arizona 85004

6
   James J. Belanger
7  Coppersmith Schermer & Brockelman PLC
8  2800 North Central Avenue, Suite 1200
   Phoenix, AZ 85004
9

10 Allen A. Arntsen
   Foley & Lardner LLP
11 150 East Gilman Street
12 P.O. Box 1497
   Madison, WI   53701-1497
13

14 Stephen J. Nickels
   Foley & Lardner LLP
15 150 East Gilman Street
16 P.O. Box 1497
   Madison, WI   53701-1497
17

18 Matthew R. Lynch
   Foley & Lardner LLP
19 150 East Gilman Street
20 P.O. Box 1497
   Madison, WI   53701-1497
21

22 Attorneys for Defendant

23

24 /s/Linda Yrrizarry

25
   #2629738
26

27

28

3

# EXHIBIT VVVVV

Michael K. Jeanes, Clerk of Court
*** Electronically Filed ***
Isabel Osuna
Filing ID 1221516
3/21/2012 4:55:24 PM

THOMAS C. HORNE
ATTORNEY GENERAL
(FIRM STATE BAR NO. 14000)

LACEY STOVER GARD
ASSISTANT ATTORNEY GENERAL
CAPITAL LITIGATION SECTION
400 WEST CONGRESS, BLDG. S–315
TUCSON, ARIZONA  85701–1367
TELEPHONE: (520) 628–6520
Lacey.Gard@azag.gov
CADOCKET@AZAG.GOV
(STATE BAR NUMBER 22714)

ATTORNEYS FOR PLAINTIFF/RESPONDENT

# SUPERIOR COURT OF ARIZONA

## COUNTY OF MARICOPA

| | |
|---|---|
| State of Arizona, | CR2000-096032-A |
| Plaintiff/Respondent, | |
| -vs- | MOTION TO UNSEAL POST-CONVICTION RELIEF PETITION AND SUPPORTING EXHIBITS. |
| Wendi Andriano, | |
| Defendant/Petitioner. | |

Pursuant to this Court's order of March 6, 2012, the State hereby moves to unseal certain portions of Defendant Wendi Andriano's post-conviction relief (PCR) petition and supporting exhibits.  This motion is supported by the following Memorandum of Points and Authorities.

. . . .

. . . .

. . . .

. . . .

. . . .

. . . .

1        DATED this 21st day of March, 2012.

2
3                                    RESPECTFULLY SUBMITTED,

4                                    THOMAS C. HORNE
                                     ATTORNEY GENERAL
5
6                                    /S/LACEY STOVER GARD

7                                    ASSISTANT ATTORNEY GENERAL
                                     ATTORNEYS FOR PLAINTIFF
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## MEMORANDUM OF POINTS AND AUTHORITIES

On February 17, 2012, Andriano filed a PCR petition and three volumes of supporting exhibits.  Pursuant to the parties' stipulation and this Court's Order of March 6, 2012, Andriano filed several portions of the petition and its exhibits under seal, and filed redacted copies in the public record.  The parties' stipulation and this Court's Order permits the State to move to unseal any portions of the record it considers improperly sealed.  As set forth below, the State hereby moves to unseal portions of the exhibits listed below, and pages 3 and 4 of the PCR petition.

The Arizona Supreme Court has established an open records policy for Arizona courts:

> Historically, this state has always favored open government and an informed citizenry.  In the tradition, the records in all courts and administrative offices of the Judicial Department of the State of Arizona are presumed to be open to any member of the public for inspection or to obtain copies at all times during regular office hours at the office having custody of the records.  However, in view of the possible countervailing interests of confidentiality, privacy or the best interests of the state public access to some court records may be restricted or expanded in accordance with the provision of this rule, or other provisions of law.

Ariz. Sup. Ct. Rule 123(c)(1).

Rule 123 "recognizes the public's significant interest in access to information regarding the courts," "implements the public's interest in seeing that the courts perform efficiently and effectively by providing access to court records," and "helps further the democratic value of having knowledgeable and informed citizens."  *London v. Broderick*, 206 Ariz. 490, 492–93, ¶¶ 8–9, 80 P.3d 769, 771–72 (2003).  However, "sometimes the benefits of public disclosure must yield to

the burden imposed on private individuals or the government itself by disclosure" and, in such circumstances, public disclosure may be limited "to protect privacy interests, confidential information, and certain governmental interests." *Id.*

The State does not oppose maintaining the following documents under seal, with redacted public copies, and does not challenge the scope of the redactions:

- **Volume 2, Tab 6B:** E-mail between Daniel Patterson and Patrick Linderman regarding referrals for mental health experts, from which the name of a defendant in an unrelated case has been redacted;

- **Volume 2, Tab 13:** Declaration of Mark Keating, from which the identity of a third-party molestation victim has been redacted;

- **Volume 2, Tab 14:** Declaration of Nancy Keating, from which the identity of a third-party molestation victim has been redacted;

- **Volume 2, Tab 16:** Declaration of Barry Lorts, from which the names of third-party molestation victims have been redacted;

- **Volume 2, Tab 33:** Declaration of Stuart Wade Robertson, from which information relating to an act of child molestation has been redacted;

- **Volume 2, Tab 34:** Declaration of Cynthia Schaider, from which information regarding an act of child molestation has been redacted;

- **Volume 2, Tab 38:** Declaration of Kimberly Wilson, from which the names of child molestation victims have been redacted;

- **Volume 3, Tab 68A:** Social Security earnings statement of Alejo Ochoa, from which Mr. Ochoa's social security number has been redacted;

- **Volume 3, Tab 68B:** Social Security earnings statement of Donna Ochoa, from which Ms. Ochoa's social security number has been redacted;

4

1
2
3

- **Volume 3, Tab 69A:**  Social Security earnings statement of Joe Andriano, from which Mr. Andriano's social security number has been redacted; and

4
5

- **Volume 3, Tab 69B:**  Social Security earnings statement of Wendi Andriano, from which Ms. Andriano's social security number has been redacted.

6   However, the State hereby moves to unseal the following portions of the

7   PCR petition and exhibits.  The information Andriano seeks to remove from the

8   public record in the documents below is of the type commonly presented in open

9   court in capital cases.  As set forth below, any interest in confidentiality regarding

10  these documents does not outweigh the "benefits of public disclosure."  *London*,

11  206 Ariz. at 492–93, ¶¶ 8–9, 80 P.3d at 772.

12

13  - **Page 3 of the PCR petition:**  The State moves to unseal the first
14     bulleted paragraph on page 3, as the individual involved has given
15     a declaration in support of the PCR petition and thus impliedly
        waived her confidentiality interest.  *Cf. State v. Archibeque*, 223
16     Ariz. 231, 236, ¶ 18, 221 P.3d 1045, 1050 (App. 2009).  ("Th[e]
17     common law doctrine of implied waiver holds that an evidentiary
        privilege is waived by any "course of conduct inconsistent with
18     observance of the privilege.") (quotations omitted).  The State does
19     not object to the remainder of the redactions on the remainder of
        page 3, as they relate to child molestation victims.

20  - **Page 4 of the PCR petition:**  The State moves to unseal the
21     redacted portion of paragraph 4, as the individual involved has
        given a declaration in support of the PCR petition and thus
22     impliedly waived any confidentiality interest she held.  *Cf. State v.*
23     *Archibeque*, 223 Ariz. at 236, ¶ 18, 221 P.3d at 1050.

24  - **Volume 1, Tab 2:**  This document is a report authored by a
25     psychiatrist, Dr. George Woods, from which the names of several
        of Andriano's family members have been redacted.  The redacted
26     information should be public record.  At least one of the
        individuals was interviewed by Dr. Woods, and two others filed
27     declarations in support of the PCR petition.  Additionally, Dr.

28

5

Woods' discussion of other individuals appears to be derived from his review of their medical and mental health records. Presumably, these individuals voluntarily disclosed such records, and thereby implicitly waived any privacy or confidentiality interest they held. *Cf. Archibeque*, 223 Ariz. at 236, ¶ 18, 221 P.3d at 1050. (*See* Volume 1, Tab 2A (list of records reviewed).) The records themselves are not attached to the report. Any confidentiality interest does not outweigh the interest in public disclosure of the information that forms the basis for Dr. Wood's opinion. *See London*, 206 Ariz. at 492–93, ¶¶ 8–9, 80 P.3d at 772.

- **Volume 1, Tab 2B:** This document is a biosocial and psychiatric history of Andriano and her family prepared by Dr. Woods, which Andriano has filed entirely under seal, without a public, redacted copy. While some information in this document may arguably impact the privacy rights of third parties, other information is not protected by a legitimate confidentiality interest. This Court should require Andriano to identify the specific information in this document that she considers protected, and to move to redact that information alone. Otherwise, this Court should unseal this document.

- **Volume 1, Tab 3:** This document is a summary of psychological report authored by Dr. James Hopper. The identities of four potential sexual abuse or child molestation victims have been redacted; however, three of these apparent victims were interviewed by Dr. Hopper. Because they have voluntarily disclosed their alleged experience to Dr. Hopper, no reason exists to redact their information. The State does not object to redacting the identity of the molestation victim set forth on page 7, whose molestation resulted in a criminal prosecution. The document also contains references to psychiatric conditions suffered by Andriano's family members; this information should be unsealed and made public record for the reasons stated in connection with Tab 2, *supra*.

- **Volume 1, Tab 4:** This document is Dr. Hopper's full, 252-page report. The State moves to unseal several portions of the document or and modify several redactions, as follows:

o The name of the individual named in paragraph 6, 392, 406–412, 416, 418, 419, 471, 472, 482, 483, 489 (whose name begins with the letter J) and the events she reported should not be redacted, as she was interviewed by Dr. Hopper and provided a declaration in support of the PCR petition, and thus waived any confidentiality interest she possessed. *Cf. Archibeque*, 223 Ariz. at 236, ¶ 18, 221 P.3d at 1050;

o The name of the individuals named in paragraphs 21, 23, 24–28, 30–33, 35, 40, 45, 98, 101, 104, 189 (whose first names begin with the letters De, Do, and K), and the events they reported, should not be redacted, as they have provided declarations in support of Andriano's PCR petition and Dr. Hopper relied on those declarations. The third individual (whose first name begins with the letter C) mentioned in some of these paragraphs is deceased, and her name should not be redacted because she no longer possesses a privacy interest, let alone one sufficient to outweigh the benefits of public disclosure, *see London*, 206 Ariz. at 493, ¶ 9, 80 P.3d at 772;

o The State does not object to redacting the name of the individual mentioned in paragraph 29;

o The State does not object to redacting the identity of the child molestation victims mentioned in paragraph 33, 45, 47, 48, 49, 59, 60, 128, 136, 193, and 504, and that of one victim's mother, mentioned in paragraphs 49 and 50;

o The name of the male individual discussed in paragraphs 36 and 61 and the material referenced should not be redacted, as he has given a declaration in support of the PCR petition, was interviewed by Dr. Hopper, and has thus waived any confidentiality interest. *Cf. Archibeque*, 223 Ariz. at 236, ¶ 18, 221 P.3d at 1050.

o The incident redacted from paragraph 55 should be unsealed;

o The psychological evaluation discussed in paragraphs 52–54, 56, and 128 should be unsealed, as it was generated during a separate criminal prosecution involving a person

who has given a declaration, and is thus presumably public record.  If Andriano shows that this evaluation was sealed in the prior prosecution, the State does not object to the redactions.

o  Paragraph 128 should be unsealed, with the exception of information identifying the minor child abuse victim;

o  The State does not object to the redactions in paragraph 133 or 186, which involve allegations of child molestation;

o  The information redacted from paragraphs 244–249, 253, 254, 265, and 266, should be unsealed, as the declarant has voluntarily disclosed it and thus waived any privacy interest.  *Cf. Archibeque*, 223 Ariz. at 236, ¶ 18, 221 P.3d at 1050;

o  The State does not object to the redactions in paragraph 356;

o  The State does not object to the redactions in paragraph 371;

o  The information redacted from paragraphs 380 and 400 should be unsealed, because the individual involved voluntarily disclosed the information to Dr. Hopper, and thereby waived any applicable privacy interest.  *Cf. Archibeque*, 223 Ariz. at 236, ¶ 18, 221 P.3d at 1050;

o  The State does not object to the redacting the name of the individual (beginning with the letter L) in paragraphs 472 and 521;

o  The State objects to redacting the photograph located on page 226, for the reasons stated in connection with Volume 3, Tab 72, *infra*;

o  The State objects to redacting the names in paragraph 538, for the reasons stated in connection with Volume 1, Tabs 2 and 2B, *supra*.

-  **Volume 2, Tab 10 (Declaration of Constance Boys):**  The State does not object to redacting the name and other identifying information of the minor discussed in paragraph 20, 21, 22, and 42, but objects the remainder of the redactions, including the description of the incidents involved, as overly broad;

8

- **Volume 2, Tab 12 (declaration of Jeri Lynn Cunningham):**
  The State moves to unseal this document in its entirety, as the
  information redacted from the public record relates to incidents
  that purportedly happened to Ms. Cunningham.  By voluntarily
  disclosing this information, she has impliedly waived any
  confidentiality interest.  *Cf. Archibeque*, 223 Ariz. at 236, ¶ 18,
  221 P.3d at 1050;

- **Volume 2, Tab 17 (declaration of Kelsey Leon McGuffee):**  The
  State moves to unseal the information redacted in paragraph 11, as
  it relates to an individual identified as deceased in another
  declaration; paragraphs 12 and 13, insofar as it relates to the
  individuals identified by their first initials as D (who has provided
  a declaration in this case), and C (who is deceased); paragraph 15;
  and paragraph 17.

- **Volume 2, Tab 18 (declaration of Majorie Micek):**  The State
  moves to unseal the information redacted in this document, as it
  either relates to a deceased individual who possesses no privacy
  interest (paragraph 3), is not unduly prejudicial and is outweighed
  by the presumption of public access (paragraphs 4, 8, 10, and 13),
  or relates to aspects of Ms. Micek's personal background, which
  she has voluntarily disclosed (last line of paragraph 13).  *Cf.
  Archibeque*, 223 Ariz. at 236, ¶ 18, 221 P.3d at 1050;

- **Volume 2, Tab 24 (declaration of Alejo Ochoa):**  The State
  moves to unseal the information redacted in paragraphs 21, 26, and
  158, as it consists of Mr. Ochoa's personal experiences and
  background, which he has voluntarily disclosed.  *Cf. Archibeque*,
  223 Ariz. at 236, ¶ 18, 221 P.3d at 1050.  The State also moves to
  unseal the information redacted from paragraph 100, as it is not
  overly prejudicial, and the declaration indicates it is public
  knowledge; and the information redacted from paragraphs 101 and
  132, as it is not prejudicial and any confidentiality interest is
  outweighed by the need for public access.  *See London*, 206 Ariz.
  at 493, ¶ 9, 80 P.3d at 772.  The State does not object to the
  redactions in paragraph 106.

- **Volume 2, Tab 27:**  Andriano has sealed this document in its
  entirety, and has not filed a public, redacted copy.  Much of the

9

information in this document does not appear to be protected by a legitimate privacy or confidentiality interest that would outweigh the presumption of public access. *London*, 206 Ariz. at 492–93, ¶¶ 8–9, 80 P.3d at 772.   This Court should require Andriano to identify the specific information in this document that she considers protected, and to move to redact that information. Otherwise, this Court should unseal this document.

- **Volume 2, Tab 28:**   Andriano has sealed this document in its entirety, and has not filed a public, redacted copy.  While some information in this document may arguably impact the privacy rights of third parties, other information is not protected by a legitimate confidentiality interest.   Further, other information relates to Andriano and matters she has put at issue, and should therefore not be kept confidential.  *Cf. Archibeque*, 223 Ariz. at 236, ¶ 18, 221 P.3d at 1050.   This Court should require Andriano to identify the specific information in this document that she considers protected, and to move to redact that information alone. Otherwise, this Court should unseal this document.

- **Volume 2, Tab 29:**   Andriano has sealed this document in its entirety, and has not filed a public, redacted copy.  This Court should unseal this document because it relates entirely to matters Andriano has put at issue, and does not affect a privacy or confidentiality interest held by a third party.  *Cf. Archibeque*, 223 Ariz. at 236, ¶ 18, 221 P.3d at 1050.

- **Volume 2, Tab 30 (declaration of Deblen Oke):**   This Court should unseal this document in its entirety, because the redacted information relates to events Ms. Oke experienced personally and has voluntarily disclosed.  *Cf. Archibeque*, 223 Ariz. at 236, ¶ 18, 221 P.3d at 1050.  Further, the redactions in paragraph 11 refer to a third party who is deceased and therefore possesses no privacy or confidentiality interest.   Moreover, the information is not overly prejudicial.

- **Volume 2, Tab 32 (declaration of Skip Robertson):**   The State moves to unseal the information that is redacted from paragraphs 15 and 16, as it consists of Mr. Robertson's personal experiences, which he has voluntarily disclosed.  *Cf. Archibeque*, 223 Ariz. at 236, ¶ 18, 221 P.3d at 1050.  The State does not object to redacting

the names and identifying information of the third party minors discussed in paragraphs 57, 60, 64, 65, and 66.  However, the State objects to the scope of the redactions in these paragraphs; while the minors' identities many remain confidential, the acts described are not protected by a legitimate confidentiality interest and should not be redacted.

- **Volume 3, Tab 58 (interview with Chris Weaver):**  This document is a transcript of a pretrial defense interview with Chris Weaver, a friend of Joe Andriano.  It has been redacted on page 4 to remove a reference to an elective medical procedure undergone by a third party connected to Joe Andriano.  The procedure is not so prejudicial as to warrant sealing the reference to it.  Moreover, because Weaver was aware of the procedure and communicated it to Andriano's trial counsel, it appears to be public knowledge among the social circle involved.  No legitimate reason exists to seal this information.

- **Volume 3, Tab 72:**  This document purports to be a photograph of Andriano.  However—at least in the copy provided to the State— the quality of the black and white image is too poor to ascertain the subject's identity.  In the State's copy, the outline of an individual (apparently a female), is visible, silhouetted against a lightning storm.  No need for confidentiality is readily apparent from the photograph; if the subject is nude or scantily clad, that fact is not evident.  Moreover, Andriano has placed this photograph at issue, and has disclosed it voluntarily.  She has therefore waived any interest in confidentiality she may have held regarding the photograph.  *Cf. Archibeque*, 223 Ariz. at 236, ¶ 18, 221 P.3d at 1050.

- **Volume 3, Tab 73:**  This document is a photocopy of a series of small photographs, purportedly of Andriano.  The images are less-than-clear in the State's copy, but they appear to depict Andriano in a two-piece bathing suit.  This image should be unsealed for the reasons argued in connection with Tab 72, *supra*.

- **Volume 3, Tab 74:**  This document is also a photocopy of a series of small photographs, some of which are unclear, others of which depict what appears to be the defendant in a bathing suit, and others of which depict other fully-clothed individuals.  This

11

document should be unsealed for the reasons set forth in connection with Tabs 72 and 73, *supra*.

- **Volume 3, Tab 75:** This document is a photocopy of the exterior and interior of a greeting card. The photocopy quality is again poor, but it appears that a crass, sexually-themed message is written on the interior of the card. This document should be unsealed because there is no legitimate privacy or confidentiality interest protecting it. Moreover, it was filed openly, without redactions, within the report located at Volume 1, Tab 4, page 118.

For the foregoing reasons, this Court should unseal the portions of Andriano's PCR petition and supporting exhibits, or modify the redactions on the publicly-filed copies, as requested above.

1       Copy of the foregoing mailed

2   this 21st day of March, 2012, to:

3   Scott M. Bennett

4   Coppersmith Schermer & Brockelman PLC
    2800 N. Central Ave., Suite 1200

5   Phoenix, Arizona 85004

6
    James J. Belanger
7   Coppersmith Schermer & Brockelman PLC

8   2800 North Central Avenue, Suite 1200
    Phoenix, AZ 85004

9

10  Allen A. Arntsen
    Foley & Lardner LLP

11  150 East Gilman Street

12  P.O. Box 1497
    Madison, WI   53701-1497

13

14  Stephen J. Nickels
    Foley & Lardner LLP

15  150 East Gilman Street

16  P.O. Box 1497
    Madison, WI   53701-1497

17

18  Matthew R. Lynch
    Foley & Lardner LLP

19  150 East Gilman Street

20  P.O. Box 1497
    Madison, WI   53701-1497

21

22  Attorneys for Defendant

23

24  /s/Linda Yrrizarry

25  #2627277

26

27

28

                                13

# EXHIBIT WWWWW

FILED
March 22, 2012   10:44 am
MICHAEL K. JEANES, Clerk

By: H. Shaughnessy Deputy

# MARICOPA COUNTY SUPERIOR COURT

STATE OF ARIZONA,

      Plaintiff/Respondent,

      -vs-

WENDI ANDRIANO,

      Defendant/Petitioner.

CR 2000-096032-A

ORDER

Upon motion duly made, *there being no objection* and for good cause appearing,

IT IS HEREBY ORDERED that the State's Motion for Extension of Time to Respond to Petition for Post-Conviction Relief is GRANTED with a due date of May 25, 2012.

DATED this _7_ day of March, 2012.

_____
JUDGE DOUGLAS L. RAYES

1

# EXHIBIT XXXXX

FILED
*March 20, 2012 10:35 am*
MICHAEL K. JEANES, Clerk
By _____
H. O'Shaughnessy Deputy

1
2
3
4

# MARICOPA COUNTY SUPERIOR COURT

5
6  STATE OF ARIZONA,

7           Plaintiff/Respondent,                 CR 2000-096032-A

8           -vs-

9  WENDI ANDRIANO,                               ORDER

10          Defendant/Petitioner.

11
12       Upon motion duly made, and for good cause appearing,

13       IT IS HEREBY ORDERED that the State's Supplement to Motion to Extend

14  Deadline for Moving to Unseal Post-Conviction Relief Petition and Exhibits is

15  GRANTED.

16       DATED this _20_ day of March, 2012.

17
18                                          _____
                                            JUDGE DOUGLAS L. RAYES
19
20
21
22
23
24
25
26
27
28

1

# EXHIBIT YYYYY

Michael K. Jeanes, Clerk of Court
*** Electronically Filed ***
03/23/2012 8:00 AM

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CR 2000-096032                                                03/16/2012


                                                CLERK OF THE COURT
JUDGE DOUGLAS L. RAYES                           H. O'Shaughnessy
                                                       Deputy


STATE OF ARIZONA                                LACEY ALEXANDRA STOVER GARD

v.

WENDI ELIZABETH ANDRIANO (A)                    JAMES J BELANGER
                                                SCOTT M BENNETT
                                                ALLEN A ARNTSEN
                                                STEPHAN J NICKELS
                                                MATTHEW R LYNCH

                                                CAPITAL CASE MANAGER
                                                COURT ADMIN-CRIMINAL-PCR
                                                VICTIM SERVICES DIV-CA-SE
                                                VICTIM WITNESS DIV-AG-CCC



                            MINUTE ENTRY


        The Court has received and considered State's Motion to Extend Deadline for Filing
Motion to Unseal PCR Petition and Exhibits.  Good cause appearing,

        IT IS ORDERED that the State's Motion to Extend Deadline for Filing Motion to Unseal
PCR Petition and Exhibits is granted to and including March 21, 2012 all in accordance with
formal written order signed by the Court on March 16, 2012 and filed by the Clerk on March 19,
2012.

        FILED:  Order.

        This case is eFiling eligible: http://www.clerkofcourt.maricopa.gov/efiling/default.asp.
Attorneys are encouraged to review Supreme Court Administrative Order 2011-140 to determine
their mandatory participation in eFiling through AZTurboCourt.

# EXHIBIT ZZZZZ

Michael K. Jeanes, Clerk of Court
*** Electronically Filed ***
03/23/2012 8:00 AM

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CR 2000-096032                                       03/16/2012


                                        CLERK OF THE COURT
JUDGE DOUGLAS L. RAYES                      H. O'Shaughnessy
                                               Deputy



STATE OF ARIZONA                        LACEY ALEXANDRA STOVER GARD

v.

WENDI ELIZABETH ANDRIANO (A)            JAMES J BELANGER
                                        SCOTT M BENNETT
                                        ALLEN A ARNTSEN
                                        STEPHAN J NICKELS
                                        MATTHEW R LYNCH

                                        CAPITAL CASE MANAGER
                                        COURT ADMIN-CRIMINAL-PCR
                                        VICTIM SERVICES DIV-CA-SE
                                        VICTIM WITNESS DIV-AG-CCC




                            MINUTE ENTRY


        The Court has received and considered State's Motion to Extend Deadline for Filing
Motion to Unseal PCR Petition and Exhibits.  Good cause appearing,

        IT IS ORDERED that the State's Motion to Extend Deadline for Filing Motion to Unseal
PCR Petition and Exhibits is granted to and including March 21, 2012 all in accordance with
formal written order signed by the Court on March 16, 2012 and filed by the Clerk on March 19,
2012.

        FILED:  Order.

        This case is eFiling eligible: http://www.clerkofcourt.maricopa.gov/efiling/default.asp.
Attorneys are encouraged to review Supreme Court Administrative Order 2011-140 to determine
their mandatory participation in eFiling through AZTurboCourt.

Docket Code 022                    Form R000A                          Page 1

# EXHIBIT AAAAAA

Michael K. Jeanes, Clerk of Court
*** Electronically Filed ***
03/28/2012 8:00 AM

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CR 2000-096032                                        03/22/2012


                                              CLERK OF THE COURT
JUDGE DOUGLAS L. RAYES                            H. O'Shaughnessy
                                                     Deputy



STATE OF ARIZONA                          LACEY ALEXANDRA STOVER GARD

v.

WENDI ELIZABETH ANDRIANO (A)              JAMES J BELANGER
                                         SCOTT M BENNETT
                                         ALLEN A ARNTSEN
                                         MATTHEW R LYNCH

                                         CAPITAL CASE MANAGER
                                         COURT ADMIN-CRIMINAL-PCR
                                         VICTIM SERVICES DIV-CA-SE
                                         VICTIM WITNESS DIV-AG-CCC



                        MINUTE ENTRY


        The Court having received and considered the State's Supplement to Motion to Extend
Deadline for Moving to Unseal Post-Conviction Relief Petition and Exhibits and good cause
appearing,

        IT IS ORDERED granting the State's Supplement to Motion to Extend Deadline for
Moving to Unseal Post-Conviction Relief Petition and Exhibits all in accordance with formal
written order signed by the Court on March 20, 2012 and filed by the Clerk on March 22, 2012.

        FILED:  Order.

        The Court having received and considered the State's Motion for Extension of Time to
Respond to Petition for Post-Conviction Relief, no objection from Petitioner and good cause
appearing,

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CR 2000-096032                                      03/22/2012


IT IS ORDERED granting State's Motion for Extension of Time to Respond to Petition for Post-Conviction Relief all in accordance with formal written order signed by the Court on March 20, 2012 and filed by the Clerk on March 22, 2012.

FILED:  Order.

This case is eFiling eligible: http://www.clerkofcourt.maricopa.gov/efiling/default.asp. Attorneys are encouraged to review Supreme Court Administrative Order 2011-140 to determine their mandatory participation in eFiling through AZTurboCourt.

# EXHIBIT BBBBBB

MICHAEL·A JEANES, CLERK
BY  Harbaur  DEP

FILED

'12·MAR 29  PM 4: 01

COPPERSMITH SCHERMER & BROCKELMAN PLC
2800 North Central Avenue
Suite 1200
Phoenix, Arizona 85004
(602) 224-0999
Scott M. Bennett, State Bar No. 022350

FOLEY & LARDNER LLP
150 E. Gilman Street
Madison, WI 53703
Telephone: (608) 257-5035
Fax:          (608) 258-4258

Allen A. Arntsen, Admitted *Pro Hac Vice*
Stephan J. Nickels Admitted *Pro Hac Vice*
Matthew R. Lynch Admitted *Pro Hac Vice*

*Attorneys for Petitioner*
Wendi Andriano

## SUPERIOR COURT OF ARIZONA

## COUNTY OF MARICOPA

| | |
|---|---|
| State of Arizona, | No. CR2000-096032-A |
| Respondent, | |
| vs. | **PETITIONER'S UNOPPOSED MOTION FOR EXTENSION OF TIME TO RESPOND TO MOTION TO UNSEAL POST-CONVICTION RELIEF PETITION AND SUPPORTING DOCUMENTS** |
| Wendi Elizabeth Andriano, | |
| Petitioner. | |
| | (Assigned to the Hon. Douglas Rayes) |

Petitioner Wendi Andriano presents an unopposed motion for a retroactive extension of time to file her response to the State's Motion to Unseal Post-Conviction Relief Petition and Supporting Exhibits. Petitioner's counsel was not served with the State's Motion, which was filed on March 21, 2012. They did not learn that it had been filed until their office discovered it through an administrative docket check yesterday, March 28, 2012. Therefore, Petitioner respectfully

4832-1247-2847.1

1    requests that the Court grant her until April 11, 2012 (two weeks from yesterday)

2    to respond to the State's Motion.

3         Petitioner's counsel has conferred with counsel for the State regarding this

4    request, and the State has no objection to granting it.  A proposed order granting

5    this relief is attached.

6    RESPECTFULLY SUBMITTED March 29, 2012.

7

8                                    FOLEY & LARDNER LLP

9
                                     By _____
10
                                        Allen A. Arntsen, *Pro Hac Vice*
11                                      Matthew R. Lynch, *Pro Hac Vice*

12                                   COPPERSMITH SCHERMER &
                                     BROCKELMAN PLC
13                                      Scott M. Bennett

14
                                        *Attorneys for Petitioner*
15

16   ORIGINAL filed March 29, 2012,
     with the Clerk of the Maricopa County Superior Court.
17
     COURTESY COPY hand-delivered March 29, 2012, to:
18

19   Judge Douglas Rayes
     Maricopa County Superior Court
20   East Court Building-511
     101 W. Jefferson
21   Phoenix, AZ 85003-2243

22
     COPY emailed March 29, 2012, to:
23

24   Ms. Lacey Stover Gard
     Office of the Attorney General
25   400 W. Congress, Suite S-315
     Tucson, AZ 85701-1367
26   *Attorney for the State of Arizona*

27

4832-1247-2847.1

# EXHIBIT CCCCCC

FILED
April 12, 20   10:53 am
MICHAEL K. JEANES, Clerk

By_____
H. O'Shaughnessy Deputy

1   COPPERSMITH SCHERMER & BROCKELMAN PLC
    2800 North Central Avenue
    Suite 1200
2   Phoenix, Arizona 85004
    (602) 224-0999
3   Scott M. Bennett, State Bar No. 022350

4   FOLEY & LARDNER LLP
    150 E. Gilman Street
    Madison, WI 53703
5   Telephone: (608) 257-5035
    Fax:        (608) 258-4258

6   Allen A. Arntsen, Admitted *Pro Hac Vice*
    Stephan J. Nickels Admitted *Pro Hac Vice*
    Matthew R. Lynch Admitted *Pro Hac Vice*

7   *Attorneys for Petitioner*
    Wendi Andriano

8

9               IN THE SUPERIOR COURT OF THE STATE OF ARIZONA
                  IN AN FOR THE COUNTY OF MARICOPA

10

11

12  State of Arizona,                        )
                                             )
13                     Respondent,           )   No. CR2000-096032-A
                                             )
14      vs.                                  )   Hon. Douglas Rayes
                                             )
15  Wendi Elizabeth Andriano,                )
                                             )   **ORDER GRANTING AN**
16                                           )   **EXTENSION TO RESPOND TO**
                       Petitioner.           )   **MOTION TO UNSEAL POST-**
17                                           )   **CONVICTION RELIEF PETITION**
                                             )   **AND SUPPORTING DOCUMENTS**
18                                           )
                                             )
19  _____ )

20

21      Based on the Motion by Petitioner Wendi Andriano, and for good cause, IT IS

22  ORDERED that the deadline for Ms. Andriano to respond to the State's Motion To Unseal

23  Post-Conviction Relief Petition And Supporting Documents is extended to April 11, 2012.

24      DATED: 4-3-12 _____

25

26                                           _____
                                             The Honorable Douglas Rayes
27

28
4823-2249-4223.1

# EXHIBIT DDDDD

Michael K. Jeanes, Clerk of Court
*** Electronically Filed ***
04/17/2012 8:00 AM

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CR 2000-096032                                            04/11/2012


                                                 CLERK OF THE COURT
JUDGE DOUGLAS L. RAYES                              H. O'Shaughnessy
                                                        Deputy



STATE OF ARIZONA                        LACEY ALEXANDRA STOVER GARD

v.

WENDI ELIZABETH ANDRIANO (A)            SCOTT M BENNETT
                                        ALLEN A ARNTSEN
                                        STEPHAN J NICKELS
                                        MATTHEW R LYNCH

                                        CAPITAL CASE MANAGER
                                        COURT ADMIN-CRIMINAL-PCR
                                        VICTIM SERVICES DIV-CA-SE
                                        VICTIM WITNESS DIV-AG-CCC



                          MINUTE ENTRY

        The Court has received Petitioner's Unopposed Motion for Extension of Time to
Respond to Motion to Unseal Post-Conviction Relief Petition and Supporting Documents.

        IT IS ORDERED that the deadline for Ms. Andriano to respond to the State's Motion to
Unseal Post-Conviction Relief Petition and Supporting Documents is extended to April 11, 2012
all in accordance with formal written order signed by the Court on April 3, 2012 and filed by the
Clerk on April 11, 2012.

        FILED:  Order.

        This case is eFiling eligible: http://www.clerkofcourt.maricopa.gov/efiling/default.asp.
Attorneys are encouraged to review Supreme Court Administrative Order 2011-140 to determine
their mandatory participation in eFiling through AZTurboCourt.

# EXHIBIT EEEEEE

Michael K. Jeanes, Clerk of Court
*** Electronically Filed ***
04/23/2012 8:00 AM

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CR 2000-096032                                04/16/2012


                                       CLERK OF THE COURT
JUDGE DOUGLAS L. RAYES                   H. O'Shaughnessy
                                             Deputy


STATE OF ARIZONA                  LACEY ALEXANDRA STOVER GARD

v.

WENDI ELIZABETH ANDRIANO (A)      SCOTT M BENNETT
                                  ALLEN A ARNTSEN
                                  MATTHEW R LYNCH

                                  CAPITAL CASE MANAGER
                                  COURT ADMIN-CRIMINAL-PCR
                                  VICTIM WITNESS DIV-AG-CCC


                     MINUTE ENTRY


         9:57 a.m.

         Courtroom SCT 5A

         State's Attorney:        Lacey Gard appears telephonically
         Defendant's Attorney:    Scott Bennett and Allen Arntsen appear telephonically
         Defendant:               Presence Waived

         Court Reporter, Cindy Lineburg, is present.

         A record of the proceeding is also made by audio and/or videotape.

         Pending is the State's Extension of Time for Reply re Current Filing.

         IT IS ORDERED granting State's Extension of Time for Reply to April 25, 2012.

Docket Code 028                   Form R000D                          Page 1

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CR 2000-096032                                      04/16/2012


        IT IS ORDERED setting Status Conference on June 26, 2012 at 10:00 a.m. before the
Honorable Douglas Rayes.

        10:03 a.m.  Matter concludes.

        This case is eFiling eligible: http://www.clerkofcourt.maricopa.gov/efiling/default.asp.
Attorneys are encouraged to review Supreme Court Administrative Order 2011-140 to determine
their mandatory participation in eFiling through AZTurboCourt.

# EXHIBIT FFFFFF

Michael K. Jeanes, Clerk of Court
*** Electronically Filed ***
Kathleen Curtner
Filing ID 1263655
4/25/2012 4:07:14 PM

THOMAS C. HORNE
ATTORNEY GENERAL
(FIRM STATE BAR NO. 14000)

LACEY STOVER GARD
ASSISTANT ATTORNEY GENERAL
CAPITAL LITIGATION SECTION
400 WEST CONGRESS, BLDG. S–315
TUCSON, ARIZONA 85701–1367
TELEPHONE: (520) 628–6520
LACEY.GARD@AZAG.GOV
CADOCKET@AZAG.GOV
(STATE BAR NUMBER 22714)

ATTORNEYS FOR PLAINTIFF/RESPONDENT

# SUPERIOR COURT OF ARIZONA

## COUNTY OF MARICOPA

| | |
|---|---|
| State of Arizona, | CR2000-096032-A |
| Plaintiff/Respondent, | |
| -vs- | REPLY TO RESPONSE TO MOTION TO UNSEAL POST-CONVICTION RELIEF PETITION AND SUPPORTING DOCUMENTS. |
| Wendi Andriano, | |
| Defendant/Petitioner. | |
| | Assigned to the Honorable Douglas Rayes. |
| | Capital Case |

Defendant Wendi Andriano opposes the State's motion to unseal the PCR petition and supporting exhibits, arguing that the motion is devoid of legal support and that the privacy interests of the third parties involved outweighs the public's right to view the material she seeks to seal. This Court should reject Andriano's arguments and grant the State's motion.

At various points in her motion, Andriano accuses the State of lacking sensitivity for the trauma suffered by child molestation victims, dismissing the privacy interests of Arizona citizens, and attempting to "punish" individuals "for

providing sworn statements in the interest of justice" and for "cooperating with a criminal investigation in a process designed to ensure that people are not wrongfully convicted or sentenced."   (Response, at 1–7, emphasis deleted.) However, the State has not challenged Andriano's redactions in their entirety.  In fact, the State has not moved to unseal the names of third-party molestation victims who have not provided declarations in this case and may not know they are being named publicly as victims. (Motion, at 4–12.)  It has also agreed that individuals' social security numbers may remain redacted, as public disclosure of such information could subject the individuals to identity theft.  (*Id.*)  For the most part, the State has moved to unseal information that Andriano's informants have directly, and presumably voluntarily, disclosed about their medical histories or prior victimization to Andriano's counsel and experts.  (*Id.*)

Strong policy concerns support unsealing this material:  this Court should not permit individuals to make statements in support of a defendant's attempt to evade responsibility and simultaneously insist that these statements be withheld from public scrutiny.  In the analogous realm of evidentiary privileges, the Arizona Court of Appeals has recognized that the courts' truth-seeking function requires public access to evidence:

> Privilege statutes, which impede the truth-finding function of the courts, are restrictively interpreted. *See, e.g.*, Udall & Livermore, § 71 at 124 ("[P]rivileges, being in derogation of the truth, are to be strictly construed."). Exceptions are few and narrow to the proposition that "the public ... has a right to every [person's] evidence." *Trammel v. United States*, 445 U.S. 40, 50, 100 S.Ct. 906, 912, 63 L.Ed.2d 186, 195 (1980) (quoting *United States v. Bryan*, 339 U.S. 323, 331, 70 S.Ct. 724, 730, 94 L.Ed. 884, 890–891 (1950)). Compelling privacy needs are served and confidential communications promoted by the recognized areas of evidentiary privilege. Yet, by the doctrine of implied waiver, the law recognizes that *the need for privilege dissolves and the public's evidentiary interest regains primacy once*

1
2

> *the privilege holder, the communicant, has abandoned privacy and*
> *confidentiality through inconsistent conduct.*

3   *Church of Jesus Christ of Latter-Day Saints v. Superior Court (Brown)*, 159 Ariz.

4   24, 29, 764 P.2d 759, 764 (App. 1988) (emphasis added).

5       Andriano criticizes the State for relying on the law relating to evidentiary

6   privileges, and for citing in its motion *State v. Archibeque*, 223 Ariz. 231, 236, 221

7   P.3d 1045, 1050 (App. 2009), which addresses implied waiver of such privileges.

8   (Response, at 2–3, 7–9.)  Notably, the State cited *Archibeque* as persuasive but not

9   directly on point.  (Motion, at 4–12.)  Regardless, Andriano seeks to seal medical

10  and other information that third parties have voluntarily disclosed in support of her

11  petition.  Although some of this information may ordinarily be privileged, the third

12  parties waived any privilege they held by revealing it.  By the same logic, they

13  impliedly waived any privacy interest they may have held.  *See Archibeque*, 223

14  Ariz. at 236, ¶ 18, 221 P.3d at 1050 (individual impliedly waives privilege when he

15  engages in a "course of conduct inconsistent with observance of the privilege").  If

16  the declarants were concerned with keeping the disputed information private and

17  confidential, they presumably would not have disclosed it to anyone—including

18  Andriano's counsel and experts—let alone memorialized it in written declarations.

19  Along these same lines, it is difficult to conceive how an individual would be

20  "punished" by others viewing information they have voluntarily provided.

21  Presumably, no one forced the individuals to write and sign their declarations, or

22  induced them to do so through assurances that their statements would not be made

23  public.

24      Andriano also faults the State for failing to focus on the "relevant issue,"

25  which she defines as "the law regarding public access to the evidence."  (Response,

26  at 2, 9–14, emphasis deleted.)  But contrary to Andriano's assertion, the State cited

27  and applied the governing standard for public access to court records, as set forth

28  in Rule 123 of the Rules of the Arizona Supreme Court and *London v. Broderick*,

206 Ariz. 490, 492–93, ¶¶ 8–9, 80 P.3d 769, 771–72 (2003).   Andriano cites *Schoeneweis v. Hamner*, 223 Ariz. 169, 173–76, 221 P.3d 48, 52–55 (App. 2009), for the proposition that public records may be sealed when privacy concerns outweigh the public's interest in disclosure.   (Response, at 2–3.)   Although Andriano accuses the State of overlooking this principle, both Rule 123 and *London* expressly recognize it; in fact, the State quoted passages from both Rule 123 and *London* setting forth this concept.   (Motion, at 3–4.)   Additionally, the State argued, with respect to certain specific exhibits it has asked to unseal, that any confidentiality interest the declarant held does not outweigh the public's interest in access.  (*Id.* at 4–11.)

In addition to the foregoing policy concerns, maintaining the disputed material under seal would lead to significant logistical problems in this case.  The State may be compelled to file its response at least partially under seal, so as not to disclose the content of the sealed material.  Moreover, as a practical matter, the material would have to be unsealed should this Court order an evidentiary hearing on one or more of Andriano's claims.   The individuals who have given declarations—including the "whistleblower" who provided the declarations at Tabs 27–29 and apparently does not wish to disclose even the fact that she has filed a declaration—would be required to appear, testify, and be cross-examined in open court.  Closing the courtroom and sealing these individuals' testimony would not only be unduly cumbersome, but would also run afoul of the Arizona Supreme Court's presumption of open access to court proceedings.  *See* Ariz. Sup. Ct. R. 123(d); *London*, 206 Ariz. at 492–93, ¶¶ 8–9, 80 P.3d at 771–72.

A major area of dispute appears to be the declarations located at Tabs 27 to 29.  Andriano classifies this declarant as a "whistleblower," and seems to suggest

that she is akin to a confidential informant who requires protection.[1]  (Response at 13–14; Lynch affidavit, at ¶ 4.)   Andriano is incorrect.   The individual who authored these declarations provided the type of information that is commonly presented in open court in capital cases; in fact, one of her three declarations concerns only counsel's performance, a topic that would not reasonably subject her to any "retaliation" by the family member she fears.  (PCR Petition, at Tab 29.) That this individual knowingly disclosed other information against the wishes of another family member—presumably voluntarily and not induced by threats or promises from a third party—was her decision.  As stated above, this individual should not be permitted to secretly make allegations against others and shield those allegations from public scrutiny.

_____

[1] In his affidavit supporting Andriano's response, counsel Matthew Lynch states that he informed undersigned counsel of his intent to redact material "[m]onths prior to filing."  (Lynch affidavit, at ¶ 7.)  He further states that, on February 7, 2012, he informed undersigned counsel that he intended to redact certain declarations in their entirety "to avoid the legitimate risk of retaliation against the declarant."  (*Id.*)  To the extent Lynch suggests that undersigned counsel consented to the specific redactions he has made, he is incorrect.  As this Court is aware, the parties agreed upon, and this Court adopted, the procedure currently being followed:  Andriano could file documents under seal, with publicly redacted copies, and the State could challenge the redactions and the under-seal filing.  Although Lynch accurately states that, on February 7, 2012, he informed undersigned counsel of his wish to file two declarations entirely under seal due to the declarant's fear of retribution, he omits the fact that undersigned counsel did not consent to the under-seal filing, but instead asked that the parties follow the procedure detailed above.  (*See* Exhibit A, email chain between Matthew Lynch and Lacey Gard, at 1.)  In response, Lynch stated that undersigned counsel's proposal made "perfect sense."  (*Id.*)

Finally, Andriano chastises the trial prosecutor for discussing her case on an episode of a "sensationalist" true-crime television program called *Snapped*.[2] (Response, at 3, 12; Lynch affidavit, at ¶ 9)  Andriano, however, does not clearly explained how the prosecutor's television interview relates to the present motion to unseal.  Nor does Andriano cite any ethical rule or other authority precluding a prosecutor from commenting on a case *after* the verdict and imposition of sentence, and *after* the case has become final on direct appeal.  Thus, the prosecutor's conduct was not improper, and Andriano's discussion of the program is gratuitous.  To the extent Andriano cites the *Snapped* episode to illustrate the media's interest in her case, such interest militates in *favor* of unsealing the post-conviction relief petition and making it available for public inspection.  For the foregoing reasons and those stated in the State's motion, this Court should grant the State's motion to unseal.

DATED this 25th day of April, 2012.

RESPECTFULLY SUBMITTED,

THOMAS C. HORNE
ATTORNEY GENERAL


/S/LACEY STOVER GARD
ASSISTANT ATTORNEY GENERAL
ATTORNEYS FOR PLAINTIFF

---

[2] Of some significance to this topic is the fact that Andriano does not shy away from the limelight, and has herself appeared on a television program:  in 2007, she appeared on an episode of *Kathy Griffin-My Life on the D List*, which was filmed at the Arizona Department of Corrections—Perryville, where she resides.

1  Copy of the foregoing mailed
2  this 25th day of April, 2012, to:

3  Scott M. Bennett
4  Coppersmith Schermer & Brockelman PLC
   2800 N. Central Ave., Suite 1200
5  Phoenix, Arizona 85004

6  James J. Belanger
7  Coppersmith Schermer & Brockelman PLC
8  2800 North Central Avenue, Suite 1200
   Phoenix, AZ 85004
9
10 Allen A. Arntsen
   Foley & Lardner LLP
11 150 East Gilman Street
12 P.O. Box 1497
   Madison, WI   53701-1497
13
14 Stephen J. Nickels
   Foley & Lardner LLP
15 150 East Gilman Street
16 P.O. Box 1497
   Madison, WI   53701-1497
17
18 Matthew R. Lynch
   Foley & Lardner LLP
19 150 East Gilman Street
20 P.O. Box 1497
   Madison, WI   53701-1497
21
22 Attorneys for Defendant

23
24 /s/Linda Yrrizarry

25 #2670933
26
27
28

7

EXHIBIT A

**Gard, Lacey**

| | |
|---|---|
| **From:** | Lynch, Matthew R. [MLynch@foley.com] |
| **Sent:** | Tuesday, February 07, 2012 3:26 PM |
| **To:** | Gard, Lacey; Scott Bennett; Arntsen, Allen A. |
| **Cc:** | Zick, Jeffrey |
| **Subject:** | RE: Andriano |

From the Desk of: Matthew R. Lynch



**FOLEY & LARDNER LLP**

My Location    My V-card    My Bio                                    www.foley.com

Lacey,

Understood, that makes perfect sense.  I'll draft up a proposed order and get it to you by Thursday at the latest.

Thanks,
Matt

**From:** Gard, Lacey [mailto:Lacey.Gard@azag.gov]
**Sent:** Tuesday, February 07, 2012 4:22 PM
**To:** Lynch, Matthew R.; Scott Bennett; Arntsen, Allen A.
**Cc:** Zick, Jeffrey
**Subject:** RE: Andriano

I have no preference between hard copies or discs; either is fine for me.  I also have no objection to the court entering an order relating to filing under seal that reflects the agreement we put on the record at the last hearing.  I would also like the order to make clear that the victims will have access to the under-seal material, as we agreed in court.  If you want to draft a proposed order and send it to me I can give you my position on it, or perhaps join in it to facilitate matters.

With respect to the two third-party affidavits described below, could we follow the same procedure that we are following with the rest of the exhibits:  you file redacted copies openly and unredacted copies under seal, and I reserve the right to challenge the redactions or move to unseal the document after receiving and reviewing the petition?  It's just hard to take a position on the propriety of sealing a document without seeing it first.

**From:** Lynch, Matthew R. [mailto:MLynch@foley.com]
**Sent:** Tuesday, February 07, 2012 11:35 AM
**To:** Gard, Lacey; Scott Bennett; Arntsen, Allen A.
**Cc:** Zick, Jeffrey
**Subject:** RE: Andriano

Lacey,

Thanks for the update.  Wendi remains hopeful that she will have an opportunity to meet with them, but she obviously understands and respects the Andrianos' decision-making process.

1

Just two questions from our end, in advance of Monday's status conference and next Friday's filing: (1) do you have a preference as between a hard copy or disk(s) for your version of the petition and accompanying documents, and (2) would you have any objection to us filing a motion requesting that Rayes confirm in an order that we can file certain documents under seal (with public, redacted versions) for information meeting the criteria we agreed to previously? The order wouldn't seek any changes to what we've already agreed - namely, we can file documents to protect the medical privacy and victimhood of third parties, with the State preserving the right to object to the scope of any redactions - but the court clerk's office says that it needs a copy of some kind of order from the judge to permit us to file under seal in the first instance. We recognize (and the order would make it clear) that the State does not waive its right to challenge any given redaction or seek to unseal any given document.

If those issues are OK, we have one additional issue that has come up in the course of making redactions. There are two non-party affiants who could face a substantial possibility of retribution by a family member if he were to view their affidavits. Would the State oppose sealing their affidavits on that basis? I'm happy to provide more details over the phone if you want them.

Thanks,
Matt

---

**From:** Gard, Lacey [mailto:Lacey.Gard@azag.gov]
**Sent:** Monday, February 06, 2012 12:09 PM
**To:** Lynch, Matthew R.; 'Scott Bennett'; Arntsen, Allen A.
**Cc:** Zick, Jeffrey
**Subject:** Andriano

Since we have a status conference Monday, I wanted to check in with you about your client's request to meet with the victims. According to the advocate, the Andrianos have not yet decided whether to grant your client's request.

Also, I wanted to let you know the court will be conferencing the victims in for the hearing.

Thanks,
Lacey Gard

The preceding email message may be confidential or protected by the attorney-client privilege. It is not intended for transmission to, or receipt by, any unauthorized persons. If you have received this message in error, please (i) do not read it, (ii) reply to the sender that you received the message in error, and (iii) erase or destroy the message. Legal advice contained in the preceding message is solely for the benefit of the Foley & Lardner LLP client(s) represented by the Firm in the particular matter that is the subject of this message, and may not be relied upon by any other party.

Internal Revenue Service regulations require that certain types of written advice include a disclaimer. To the extent the preceding message contains advice relating to a Federal tax issue, unless expressly stated otherwise the advice is not intended or written to be used, and it cannot be used by the recipient or any other taxpayer, for the purpose of avoiding Federal tax penalties, and was not written to support the promotion or marketing of any transaction or matter discussed herein.

📧INFO

The preceding email message may be confidential or protected by the attorney-client privilege. It is not intended for transmission to, or receipt by, any unauthorized persons. If you have received this message in error, please (i) do not read it, (ii) reply to the sender that you received the message in error, and (iii) erase or destroy the

message. Legal advice contained in the preceding message is solely for the benefit of the Foley & Lardner LLP client(s) represented by the Firm in the particular matter that is the subject of this message, and may not be relied upon by any other party.

Internal Revenue Service regulations require that certain types of written advice include a disclaimer. To the extent the preceding message contains advice relating to a Federal tax issue, unless expressly stated otherwise the advice is not intended or written to be used, and it cannot be used by the recipient or any other taxpayer, for the purpose of avoiding Federal tax penalties, and was not written to support the promotion or marketing of any transaction or matter discussed herein.

# EXHIBIT GGGGGG

Michael K. Jeanes, Clerk of Court
*** Electronically Filed ***
05/03/2012 8:00 AM

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CR 2000-096032                                        04/27/2012


                                        CLERK OF THE COURT
JUDGE DOUGLAS L. RAYES                      H. O'Shaughnessy
                                              Deputy


STATE OF ARIZONA                        LACEY ALEXANDRA STOVER GARD

v.

WENDI ELIZABETH ANDRIANO (A)            JAMES J BELANGER
                                        SCOTT M BENNETT
                                        ALLEN A ARNTSEN
                                        STEPHAN J NICKELS
                                        MATTHEW R LYNCH

                                        CAPITAL CASE MANAGER
                                        COURT ADMIN-CRIMINAL-PCR
                                        VICTIM WITNESS DIV-AG-CCC


MINUTE ENTRY

        The Court has considered the State's Motion to Unseal Post-Conviction Relief Petition and supporting Exhibits, Petitioner's Response and the State Reply.

        The parties in this matter stipulated and the Court ordered, pursuant to said stipulation, that portions of Petitioner's PCR may be filed under seal.  Pursuant to the Order, the State has the right to move to unseal portions of PCR it feels is improperly sealed.  After the PCR was filed, the State brought its Motion to Unseal Portions of the exhibits and pages 3 and 4 of the PCR.

        THE COURT FINDS that sealing/redacting document to protect the identity of child abuse victims, medical information of individuals other than the Petitioner, provocative photographs of a minor, social security numbers and statements tending to implicate a relative, with whom the declarant resides, of abuse, serves the compelling interests of protecting witnesses from the disclosure of private/embarrassing information, encouraging witnesses to disclose information involving relevant personal facts, protecting witnesses from retaliation,

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CR 2000-096032                                                04/27/2012

protecting witnesses from financial exploitation or identity theft, and protecting a victim of child exploitation from further exploitation by the public disclosure of provocative photographs.

THE COURT FURTHER FINDS that there is a substantial probability that in the absence of those redactions the witnesses who provided personal information of past abuses as a child and medical information would be subject to public embarrassments and shame, social security numbers would be misused and the owners subject to identity theft and witnesses still living with a past abuser would be harmed.

THE COURT FINDS that there is no alternative to redaction of those portions of the PCR and Exhibits that would adequately protect those compelling interests.

The Court agrees with the State that most if not all of what has been redacted by Petitioner is not privileged.  However, the compelling interests discussed above outweigh the public's right to access to the records in this matter.

IT IS ORDERED denying the State's Motion to Unseal except Tab 75.

This case is eFiling eligible: http://www.clerkofcourt.maricopa.gov/efiling/default.asp. Attorneys are encouraged to review Supreme Court Administrative Order 2011-140 to determine their mandatory participation in eFiling through AZTurboCourt.

# EXHIBIT HHHHHH

Michael K. Jeanes, Clerk of Court
*** Electronically Filed ***
Isabel Osuna
Filing ID 1296513
5/22/2012 4:20:52 PM

1

THOMAS C. HORNE
ATTORNEY GENERAL
(FIRM STATE BAR NO. 14000)

2

3

LACEY STOVER GARD
ASSISTANT ATTORNEY GENERAL
CAPITAL LITIGATION SECTION
400 WEST CONGRESS, BLDG. S–315
TUCSON, ARIZONA 85701–1367
TELEPHONE: (520) 628–6520
LACEY.GARD@AZAG.GOV
CADOCKET@AZAG.GOV
(STATE BAR NUMBER 22714)

4

5

6

7

ATTORNEYS FOR PLAINTIFF/RESPONDENT

8

# SUPERIOR COURT OF ARIZONA

9

## COUNTY OF MARICOPA

10

11

12

State of Arizona,

          Plaintiff/Respondent,

13

          -vs-

14

Wendi Andriano,

15

          Defendant/Petitioner.

16

17

18

CR2000-096032-A

MOTION FOR EXTENSION OF TIME TO RESPOND TO PETITION FOR POST-CONVICTION RELIEF (SECOND REQUEST)

Assigned to the Honorable Douglas Rayes

19

20

21

22

23

        Pursuant to Rule 32.6(a) of the Arizona Rules of Criminal Procedure, the State hereby requests a second, 30-day extension of time, until June 25, 2012, to respond to Petitioner Wendi Andriano's post-conviction relief petition.   The response is presently due May 25, 2012.   Counsel for Andriano, Allen Arntsen, does not oppose this request.

24

25

26

27

28

        The State requires an additional 30 days to prepare and file its response because of undersigned counsel's involvement in matters, which could not be easily extended, in other capital cases in the state and federal courts.   First, on May 8, 2012, undersigned counsel appeared for oral argument in *State v. Dale Shawn*

*Hausner*, Arizona Supreme Court Number CR 09–0077–AP, a complicated case that involved dozens of felony counts and six death sentences and that required substantial preparation time.  Second, undersigned counsel was ordered to file a supplemental brief addressing 10 uncertified issues, one of which was an ineffective-assistance-of-counsel claim involving 13 subclaims, in *Robert Jones v. Charles Ryan*, Ninth Circuit Court of Appeals No. 10–99006.   Undersigned counsel obtained a 1-week extension on the supplemental brief to accommodate *Hausner*, but was informed by the Court that no further extensions would be considered.  Counsel filed the supplemental brief on May 18, 2012.  Third, the court has set oral argument in *Jones* for June 14, 2012.  For the foregoing reasons, the State respectfully requests that this Court extend its deadline for responding to Andriano's PCR petition until June 25, 2012.

DATED this 19th day of March, 2012.


RESPECTFULLY SUBMITTED,

THOMAS C. HORNE
ATTORNEY GENERAL


/S/LACEY STOVER GARD
ASSISTANT ATTORNEY GENERAL
ATTORNEYS FOR PLAINTIFF

Copy of the foregoing mailed
this 22nd day of May, 2012, to:

Scott M. Bennett
Coppersmith Schermer & Brockelman PLC
2800 N. Central Ave., Suite 1200
Phoenix, Arizona 85004

James J. Belanger
Coppersmith Schermer & Brockelman PLC
2800 North Central Avenue, Suite 1200
Phoenix, AZ 85004

Allen A. Arntsen
Foley & Lardner LLP
150 East Gilman Street
P.O. Box 1497
Madison, WI   53701-1497

Stephen J. Nickels
Foley & Lardner LLP
150 East Gilman Street
P.O. Box 1497
Madison, WI   53701-1497

Matthew R. Lynch
Foley & Lardner LLP
150 East Gilman Street
P.O. Box 1497
Madison, WI   53701-1497

Attorneys for Defendant


/s/Linda Yrrizarry

#2707769

3

# EXHIBIT IIIII

FILED
May 23, 2012  3:31 pm
MICHAEL K. JEANES, Clerk
By H. O'Shaughnessy Deputy

# MARICOPA COUNTY SUPERIOR COURT

STATE OF ARIZONA,

        Plaintiff/Respondent,

        -vs-

WENDI ANDRIANO,

        Defendant/Petitioner.

CR 2000-096032-A

ORDER

Upon motion duly made, and for good cause appearing,

IT IS HEREBY ORDERED that the State's Motion for Extension of Time to Respond to Petition for Post-Conviction Relief (Second Request) is GRANTED for 30-days with a new due date of June 25, 2012.

DATED this _23_ day of May, 2012.

JUDGE DOUGLAS L. RAYES

1

# EXHIBIT JJJJJJ

Michael K. Jeanes, Clerk of Court
*** Electronically Filed ***
06/04/2012 8:00 AM

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CR 2000-096032                                          05/29/2012


                                               CLERK OF THE COURT
JUDGE DOUGLAS L. RAYES                            H. O'Shaughnessy
                                                     Deputy



STATE OF ARIZONA                          LACEY ALEXANDRA STOVER GARD

v.

WENDI ELIZABETH ANDRIANO (A)              SCOTT M BENNETT
                                         ALLEN A ARNTSEN
                                         STEPHAN J NICKELS
                                         MATTHEW R LYNCH

                                         CAPITAL CASE MANAGER
                                         COURT ADMIN-CRIMINAL-PCR
                                         VICTIM WITNESS DIV-AG-CCC



                          MINUTE ENTRY

        State has moved for an extension of time to file a response to the Petition for Post-
Conviction Relief.  Good cause appearing therefore,

        IT IS ORDERED granting the State an extension of time to and including June 23, 2012
to file the response.  No further extensions will be granted without a showing of extraordinary
circumstances.  Ariz.R.Crim.P. 32.4(c)(2).

        FILED:  Order.

        This case is eFiling eligible: http://www.clerkofcourt.maricopa.gov/efiling/default.asp.
Attorneys are encouraged to review Supreme Court Administrative Order 2011-140 to determine
their mandatory participation in eFiling through AZTurboCourt.

# EXHIBIT KKKKKK

Michael K. Jeanes, Clerk of Court
*** Electronically Filed ***
Isabel Osuna
Filing ID 1329472
6/19/2012 4:27:49 PM

THOMAS C. HORNE
ATTORNEY GENERAL
(FIRM STATE BAR NO. 14000)

LACEY STOVER GARD
ASSISTANT ATTORNEY GENERAL
CAPITAL LITIGATION SECTION
400 WEST CONGRESS, BLDG. S–315
TUCSON, ARIZONA 85701–1367
TELEPHONE: (520) 628–6520
LACEY.GARD@AZAG.GOV
CADOCKET@AZAG.GOV
(STATE BAR NUMBER 22714)

ATTORNEYS FOR PLAINTIFF/RESPONDENT

# SUPERIOR COURT OF ARIZONA

## COUNTY OF MARICOPA

| | |
|---|---|
| State of Arizona,<br><br>      Plaintiff/Respondent,<br><br>      -vs-<br><br>Wendi Andriano,<br><br>      Defendant/Petitioner. | CR2000-096032-A<br><br>MOTION FOR EXTENSION OF TIME TO RESPOND TO PETITION FOR POST-CONVICTION RELIEF (THIRD REQUEST)<br><br>Assigned to the Honorable Douglas Rayes |

Pursuant to Rule 32.6(a) of the Arizona Rules of Criminal Procedure, the State hereby requests a third, 21-day extension of time, until July 16, 2012, to respond to Petitioner Wendi Andriano's post-conviction relief petition. The response is presently due June 25, 2012. Counsel for Andriano, Matthew Lynch, does not oppose this request.

Although undersigned counsel has been working diligently on the State's response, she will be unable to complete it by the present deadline due to time-consuming matters in other capital cases. Counsel was recently assigned to file a Petition for Writ of Certiorari in the United States Supreme Court from a Ninth

Circuit Court of Appeals decision, *Steven James v. Charles Ryan*, No. 08–99016. The petition is due June 28, 2012; counsel did not handle the Ninth Circuit proceedings, and therefore must devote additional time to reviewing the record and familiarizing herself with the case.   Additionally, on June 11, 2012, counsel appeared for oral argument before the United States District Court in another capital case, *Frank Jarvis Atwood v. Dora Schriro*, No. CIV–98–116–TUC–JCC. On June 14, 2012, counsel appeared for oral argument before the Ninth Circuit Court of Appeals in *Robert Jones v. Charles Ryan*, No. 10–99006.

Further, counsel is presently drafting a response to a motion to remand another capital case, *Barry Jones v. Charles Ryan*, Ninth Circuit Court of Appeals No. 08–99033, to the district court for reconsideration in light of *Martinez v. Ryan*, 132 S.Ct. 1309 (2012); this response is due June 21, 2012.  Additionally, counsel is presently drafting a special action petition in another capital post-conviction case pending before this Court, *State v. Julius Jarreau Moore*, CR 1999–016742, which counsel plans to file by the end of the current week.  Counsel is also engaged in ongoing negotiations with Moore's attorney regarding his request to subject several items of evidence to forensic testing.

The State respectfully acknowledges that, in granting the State's most recent extension request, this Court stated that it would grant no further extensions "without a showing of extraordinary circumstances."   (Minute Entry, 5/29/12.) The State asserts that the foregoing circumstances qualify as extraordinary, and respectfully requests that this Court grant this relatively brief, unopposed extension.   Barring unforeseen and compelling circumstances outside of undersigned counsel's control, the State will request no further extensions in this matter.

DATED this 19th day of June, 2012.

RESPECTFULLY SUBMITTED,

THOMAS C. HORNE
ATTORNEY GENERAL


/S/LACEY STOVER GARD
ASSISTANT ATTORNEY GENERAL
ATTORNEYS FOR PLAINTIFF

Copy of the foregoing mailed
this 19th day of June, 2012, to:

Scott M. Bennett
Coppersmith Schermer & Brockelman PLC
2800 N. Central Ave., Suite 1200
Phoenix, Arizona 85004

James J. Belanger
Coppersmith Schermer & Brockelman PLC
2800 North Central Avenue, Suite 1200
Phoenix, AZ 85004

Allen A. Arntsen
Foley & Lardner LLP
150 East Gilman Street
P.O. Box 1497
Madison, WI   53701-1497

Stephen J. Nickels
Foley & Lardner LLP
150 East Gilman Street
P.O. Box 1497
Madison, WI   53701-1497

Matthew R. Lynch
Foley & Lardner LLP
150 East Gilman Street
P.O. Box 1497
Madison, WI   53701-1497

Attorneys for Defendant


/s/Linda Yrrizarry

#2749329

4

# EXHIBIT LLLLLL

Michael K. Jeanes, Clerk of Court
*** Electronically Filed ***
06/29/2012 8:00 AM

## SUPERIOR COURT OF ARIZONA
## MARICOPA COUNTY

CR 2000-096032                                        06/26/2012


                                          CLERK OF THE COURT
JUDGE DOUGLAS L. RAYES                            J. Arnold
                                                   Deputy



STATE OF ARIZONA                     LACEY ALEXANDRA STOVER GARD

v.

WENDI ELIZABETH ANDRIANO (A)         JAMES J BELANGER
                                     SCOTT M BENNETT
                                     ALLEN A ARNTSEN
                                     STEPHAN J NICKELS
                                     MATTHEW R LYNCH

                                     CAPITAL CASE MANAGER
                                     COURT ADMIN-CRIMINAL-PCR
                                     VICTIM WITNESS DIV-AG-CCC



MINUTE ENTRY


        9:55 a.m.  This is the time set for Status Conference on Petition for Post-Conviction
Relief.

        Courtroom 5A SCT

        State's Attorney:        Lacey Gard appears telephonically
        Defendant's Attorney:    Scott Bennett and Matthew Lynch appear telephonically
        Defendant:               Presence Waived

        Court Reporter, Cindy Lineburg, is present.

        A record of the proceeding is also made by audio and/or videotape.

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CR 2000-096032                                            06/26/2012

State has filed a Motion for Extension of Time to Respond to Petition for Post-Conviction Relief (Third Request).

Motion is discussed.

There being no objection by defendant and good cause having been shown,

IT IS ORDERED granting the State's motion and extending the time to respond to the petition for post-conviction relief to July 23, 2012.

IT IS FURTHER ORDERED setting Status Conference on August 8, 2012 at 9:30 a.m. before this division.

9:59 a.m.  Matter concludes.

This case is eFiling eligible: http://www.clerkofcourt.maricopa.gov/efiling/default.asp. Attorneys are encouraged to review Supreme Court Administrative Order 2011-140 to determine their mandatory participation in eFiling through AZTurboCourt.

# EXHIBIT MMMMM

Michael K. Jeanes, Clerk of Court
*** Electronically Filed ***
Isabel Osuna
Filing ID 1369460
7/23/2012 4:58:36 PM

1

THOMAS C. HORNE
ATTORNEY GENERAL
(FIRM STATE BAR NO. 14000)

2

3

LACEY STOVER GARD
ASSISTANT ATTORNEY GENERAL
CAPITAL LITIGATION SECTION
400 WEST CONGRESS, BLDG. S–315
TUCSON, ARIZONA 85701–1367
TELEPHONE: (520) 628–6520
LACEY.GARD@AZAG.GOV
CADOCKET@AZAG.GOV
(STATE BAR NUMBER 22714)

4

5

6

7

ATTORNEYS FOR PLAINTIFF/RESPONDENT

8

9

# SUPERIOR COURT OF ARIZONA

10

## COUNTY OF MARICOPA

11

12

| State of Arizona, | CR2000-096032-A |
|---|---|
| Plaintiff/Respondent, | |
| -vs- | MOTION TO EXCEED THE PAGE LIMIT. |
| Wendi Andriano, | |
| Defendant/Petitioner. | Assigned to the Honorable Douglas Rayes |

13

14

15

16

17

18

Pursuant to Rule 32.5 of the Arizona Rules of Criminal Procedure, the State

19

respectfully requests that this Court permit it to exceed the 40-page limit on

20

responses to petitions for post-conviction relief by 25 pages.  The petition for post-

21

conviction relief exceeded the page limit by 30 pages, for a total of 70 pages of

22

text.  The State requires an expanded page limit in order to adequately address the

23

claims in the petition.   The State therefore respectfully requests that this Court

24

accept its response as tendered, with a total of 65 pages of text.

25

26

27

28

DATED this 23rd day of July, 2012.


RESPECTFULLY SUBMITTED,

THOMAS C. HORNE
ATTORNEY GENERAL


/S/LACEY STOVER GARD
ASSISTANT ATTORNEY GENERAL
ATTORNEYS FOR PLAINTIFF

Copy of the foregoing mailed
this 23rd day of July, 2012, to:

Scott M. Bennett
Coppersmith Schermer & Brockelman PLC
2800 N. Central Ave., Suite 1200
Phoenix, Arizona 85004

James J. Belanger
Coppersmith Schermer & Brockelman PLC
2800 North Central Avenue, Suite 1200
Phoenix, AZ 85004

Allen A. Arntsen
Foley & Lardner LLP
150 East Gilman Street
P.O. Box 1497
Madison, WI   53701-1497

Stephen J. Nickels
Foley & Lardner LLP
150 East Gilman Street
P.O. Box 1497
Madison, WI   53701-1497

Matthew R. Lynch
Foley & Lardner LLP
150 East Gilman Street
P.O. Box 1497
Madison, WI   53701-1497

Attorneys for Defendant


/s/Linda Yrrizarry

#2802504

3

# EXHIBIT NNNNNN PART 1

Michael K. Jeanes, Clerk of Court
*** Electronically Filed ***
Isabel Osuna
Filing ID 1369543
7/23/2012 5:48:22 PM

THOMAS C. HORNE
ATTORNEY GENERAL
(FIRM STATE BAR NO. 14000)

LACEY STOVER GARD
ASSISTANT ATTORNEY GENERAL
CAPITAL LITIGATION DIVISION
400 WEST CONGRESS, BLDG. S–315
TUCSON, ARIZONA 85701–1367
TELEPHONE: (520) 628–6520
LACEY.GARD@AZAG.GOV
(STATE BAR NUMBER 22714)

ATTORNEYS FOR PLAINTIFF/RESPONDENT

# SUPERIOR COURT OF ARIZONA

## COUNTY OF MARICOPA

| | |
|---|---|
| State of Arizona,<br><br>     Plaintiff,<br><br>     -vs-<br><br>Wendi Elizabeth Andriano,<br><br>     Defendant. | CR2000-096032-A<br><br>RESPONSE TO PETITION FOR POST-CONVICTION RELIEF |

Pursuant to Rule 32.6(a) of the Arizona Rules of Criminal Procedure, the State hereby opposes Defendant/Petitioner Wendi Elizabeth Andriano's Petition for Post-Conviction Relief.  As set forth in the following Memorandum of Points and Authorities, Andriano's claims are either precluded or are not colorable claims for relief.  Accordingly, this Court should deny and dismiss the petition.

DATED this 23rd day of July, 2012.

RESPECTFULLY SUBMITTED,

THOMAS C. HORNE
ATTORNEY GENERAL

/S/LACEY STOVER GARD
ASSISTANT ATTORNEY GENERAL
ATTORNEYS FOR PLAINTIFF/RESPONDENT

1

**MEMORANDUM OF POINTS AND AUTHORITIES**

2

**I. FACTUAL AND PROCEDURAL BACKGROUND.**

3

On October 18, 2000, the Maricopa County Grand Jurors indicted

4

Defendant/Petitioner Wendi Elizabeth Andriano ("Andriano") for the first-degree,

5

premeditated murder of her husband, Joe Andriano ("Joe").  (Exh. A, at 1–4.[1])  A

6

jury found Andriano guilty as charged and, after finding the existence of the A.R.S.

7

§ 13–751(F)(6)[2] especially cruel aggravating factor and no mitigation sufficiently

8

substantial to warrant leniency, sentenced her to death on December 22, 2004.  (*Id.*

9

at 254, 289, 314.)  *See State v. Andriano*, 215 Ariz. 497, 500, ¶ 1, 161 P.3d 540, 543

10

(2007).

11

**A. *Facts of Joe's murder.***

12

In its opinion affirming Andriano's conviction and sentence on direct appeal,

13

the Arizona Supreme Court summarized the facts of Joe's murder as follows:

14

15

16

_____

17

[1] Throughout this document, the State will cite the exhibits to its response as

18

"Exh.," followed by the exhibit letter and the applicable Bates number.  The State refers to trial exhibits as "Trial Exh.," followed by the exhibit letter, and has

19

appended them to this response as exhibits where relevant.  The State cites the exhibits to Andriano's post-conviction relief (PCR) petition as "Petition, at Tab,"

20

followed by the tab number and any applicable page or paragraph number.  The

21

State has also attached as exhibits the trial transcripts cited in this response.  In undersigned counsel's experience, the Arizona Supreme Court retains custody of

22

the trial transcripts and does not transmit them back to superior court for PCR

23

proceedings.

24

[2] In 2008, the Arizona Legislature renumbered and reorganized Arizona's

25

capital sentencing statutes.  *State v. Chappell*, 225 Ariz. 229, 234, ¶ 7 n.3, 236 P.3d

26

1176, 1181 (2010).  Because the portions of the statute relevant to the present appeal do not differ materially from the previous version, the State cites the current

27

version.  *See id.*

28

Wendi Andriano, her terminally ill husband, Joe, and their two small children attended a barbeque on October 7, 2000. They returned to their apartment around midnight and put the children to bed.

At about 2:15 a.m. on October 8, Andriano called Chris, a coworker who also lived at the apartment complex, and asked her to watch the children while Andriano took Joe to the doctor. When Chris arrived, Andriano met her outside the apartment. She told Chris, "I have a problem. Don't ask any questions. My husband's in on the floor dying and I haven't called 911 yet." When Andriano cautioned, "He doesn't know I haven't called 911," Chris urged her to make the call.

Upon entering the apartment, Chris found Joe lying on the living room floor in the fetal position. He had vomited, appeared weak, and was having difficulty breathing. While Andriano was in another room calling 911, Joe told Chris that he needed help and had "for a long time." He asked why it was taking forty-five minutes for the paramedics to arrive.

Andriano returned to the room and told Chris she needed to get Joe to the car so she could drive him to the hospital because the paramedics were responding to another call. Joe said he could not get up, so Andriano tried to lift him. When she could not, she became irritated and yelled at Joe, using profanities. Hearing sirens approaching, Chris went out to direct the paramedics to the apartment as Joe began to vomit again.

As the paramedics were unloading their equipment, Andriano came out of the apartment screaming at them to go away. She then slammed the door. Chris and four paramedics knocked on the apartment door, but no one answered. After five to ten minutes of knocking, the Phoenix Fire Department alarm room called the Andrianos' home telephone in an attempt to get Andriano to open the door. The alarm room notified the paramedics that contact had been made with someone in the apartment who would come out to speak with them. Rather than coming through the front door, which opened to the living room, Andriano went out through her back door, climbed over the back patio wall, and walked around the apartment building to the front door, where Chris and the paramedics were standing. Andriano had changed her shirt and her hair was wet. She told the

3

paramedics that Joe was dying of cancer and had a do-not-resuscitate order. She explained that "this was not the way that he wanted to go." The paramedics and Chris left without going into the apartment.

Andriano called 911 again at 3:39 a.m. The same paramedics responded and saw Andriano, wearing a bloody shirt, standing outside the apartment talking to a police officer.

When the paramedics entered the apartment, they found Joe lying on the floor in a pool of blood. He had a deep stab wound to the left side of his neck and lacerations on his head that exposed some brain matter. A police detective observed at 3:52 a.m. that the blood surrounding Joe's head was already starting to dry. A broken bar stool covered in blood was found near Joe's body, as were pieces of a lamp,[3] a kitchen knife with blood on the sharp edge, a bloody pillow, and a belt.

A search of the Andrianos' storage unit revealed an open cardboard shipping box containing a 500-gram bottle of sodium azide,[4] two Tupperware containers containing sodium azide, nine Q-tips, a plastic knife and fork, and two pairs of latex gloves. Andriano's fingerprints were on the plastic knife and the vacuum-packed bag in

_____

[3] The remainder of this lamp was never found, although its shade remained in the apartment. (Exh. FF, at 16–17, 28–32.) Presumably, Andriano (or someone assisting her, suggested at trial to be her father) removed it from the apartment after she murdered Joe but before she reported her crime. As the supreme court found, the evidence suggested that "Andriano staged the scene of the murder to make it appear as though she acted in self-defense." *Andriano*, 215 Ariz. at 512, ¶ 76 n.12, 161 P.3d at 555. That the large quantity of blood inside the apartment was already beginning to dry when police arrived supports the inference that she killed Joe long before she called them; similarly, that she changed clothes and showered after Chris left the apartment, and exited the residence through the patio door to speak to paramedics, supports the inference that she killed Joe as the paramedics waited outside. *Id.* at 500–02, ¶¶ 2–14, 161 P.3d at 543–45.

[4] Andriano purchased this poison over the internet from a chemical distributer, using a fictitious name and shipping address and a falsified business license. (Exhs. EE, at 65–68; GG, at 29–115; HH, at 22–146; O, at 3–49.)

4

which the cardboard box was shipped. During a search of the Andrianos' apartment, the police found gelatin capsules filled with sodium azide in a bottle labeled for an herbal supplement. Trace amounts of sodium azide were also discovered in the contents of a pot and two soup bowls in the kitchen. In all, 20.8 grams of sodium azide could not be accounted for.

The medical examiner determined that Joe sustained brain hemorrhaging caused by no fewer than twenty-three blows to the back of his head, eight to ten of which independently could have rendered Joe unconscious. Defensive wounds on Joe's hands and wrists indicated, however, that he was conscious for at least part of the attack. Joe also sustained a 3 and 3/4-inch-long by 2-inch-wide stab wound to the left side of his neck that extended to his spine and severed his carotid artery. The medical examiner opined that the blows to the head were sustained before the stab wound to the neck and that Joe was still alive, although likely unconscious, when he was stabbed. Trace amounts of sodium azide were found in Joe's blood and gastric contents. The cause of death was attributed to blunt force trauma and the stab wound.[5]

Based on the blood spatter and other evidence, a Phoenix police detective opined that Joe was lying down while he was being struck and did not get up during the attack. He further opined, based on the absence of arterial spurting on the belt and the knife, that both items were placed beside Joe's body after he died. Blood spatter on the bar stool, on the other hand, suggested that the stool was present when the arterial spurting began.

After being taken into custody, Andriano called one of her coworkers and asked her to hide certain items that were in Andriano's business office. Andriano's adoptive father told a police detective on the day of the murder, "I remember [Andriano] telling me that she stabbed [Joe]."

---

[5] Additionally, a pillow found near Joe's body bore a blood pattern consistent with blood being exhaled.  (Exh FF, at 21–24.)  This pattern likely resulted from Andriano placing the pillow over Joe's face.

1   *Andriano*, 215 Ariz. at 500–02, ¶¶ 2–14, 161 P.3d at 543–45.   Based on the

2   foregoing facts, the jurors found Andriano guilty of first-degree murder.  *Id.* at 502,

3   ¶ 14, 161 P.3d at 545.

4   **B.  *Representation.***

5   Immediately  after  her  indictment,  Andriano,  who  was  indigent,  was

6   represented by Deputy Maricopa County Public Defenders Bethenne Klopp-Bryant

7   and Gerald Gavin.  (Petition, at Tab 6, ¶ 4.)  In November 2000, Attorney Leon

8   Thikoll—who  had  been  retained  to  represent  Andriano  by  her  parents,  Alejo  and

9   Donna Ochoa—filed  a  notice  of  appearance  as  co-counsel  pursuant  to  *Knapp v.*

10  *Hardy*, 111 Ariz. 107, 523 P.2d 1308 (1974).  (Exh. A, at 5–7.)  Andriano consented

11  in writing to this arrangement.  (*Id.* at 7.)

12  In  January  2001,  private  attorney  David  DeLozier  began  appearing  on

13  Andriano's behalf, filing various motions seeking funding for experts, including a

14  mental-health expert.  (*Id.* at 8–40.)  On February 13, 2001, DeLozier and Klopp-

15  Bryant  filed  a  formal  stipulation  substituting,  with  Andriano's  written  consent,

16  DeLozier as Andriano's counsel of record.[6]  (*Id.* at 41–42; *see* also Exh P, at 3–10.)

17  On  March  13,  2001,  DeLozier  filed  an  additional  motion  seeking  funding  for

18  various  additional  experts,  including  a  forensic  pathologist,  oncologist,

19  hematologist, forensic chemist, and forensic computer expert.  (Exh. A, at 51–55;

20  *see also id.*, at 66–71 (response), 72–86 (reply).)  In the same pleading, DeLozier

21  requested that the court order the Office of Court-Appointed Counsel (OCAC) to

22  appoint second-chair counsel, as Thikoll had withdrawn with the written consent of

23  Andriano and the Ochoas.  (*Id.* at 51–65, 79.)

24

25

26  _____

27  [6] This  stipulation  is  dated  December  18,  2000,  but  was  not  filed  until
    February 13, 2001.  (Exh. A, at 41–42.)

28

DeLozier's request for expert funding led to a dispute between him, OCAC, and the Public Defender's Office regarding which agency would pay for Andriano's experts.  (Petition, at Tab 6, ¶ 4; Tab 7, ¶ 3; Exhs. A, at 87–98; Q–S.)  At an April 13, 2001, status conference, DeLozier and the trial court[7] discussed the possibility of the Public Defender's Office assuming the role of lead counsel, and DeLozier continuing to appear as *Knapp* counsel.  (Exh. R, at 3–5.)  The Public Defender's Office, through attorney Wes Peterson, made clear that, if his office served as lead counsel, it—not DeLozier—would have the final authority to make all case-related decisions.  (*Id.* at 6–9.)  The court advised Andriano that, if she elected to proceed with DeLozier as retained counsel, it would not appoint second-chair counsel, as it considered that requirement to apply only to court-appointed counsel.  (*Id.* at 13.)  *See* Ariz. R. Crim. P. 6.2, 6.8.

Three days later, the trial court revisited the issue of Andriano's representation.  (Exh. S, at 2.)  Andriano initially declined to be represented by the Public Defender.  (*Id.*)  However, after the court expressed concern with affording privately-retained counsel public funding for experts, Andriano reversed her decision and accepted the Public Defender as her attorney.   (*Id.* at 27–28.)  DeLozier explained to the court that Andriano had previously declined the Public Defender's representation because the attorney initially assigned to her case had allegedly told Donna Ochoa that Andriano was "dead meat" and there was "no way to defend her."[8]  (*Id.* at 17–19.)  DeLozier remained on the case as *Knapp* counsel.  (*Id.* at 28.)

---

[7] The Honorable Daniel Barker, presiding.

[8] If this claim is true, which is questionable, it is certainly a realistic assessment of the case.  As discussed throughout this response, the evidence overwhelmingly shows that Andriano murdered Joe with premeditation.  From the beginning, there was no reasonable probability that counsel could have succeeded

(continued ...)

1    Shortly thereafter, Deputy Public Defender Daniel Patterson was assigned as

2  lead counsel.  (*See* Exh. T, at 4–5.)  Patterson was an experienced capital defense

3  attorney, and had represented a capital defendant in a post-*Ring*[9] jury sentencing

4  trial.[10]   (Petition, at Tab 6, ¶¶ 1–3, 10, 18.)   He was assisted for 3 years by

5  mitigation specialist Patrick Linderman and, beginning in 2004, by mitigation

6  specialist Scott MacLeod.  (*Id.* at ¶ 21; Petition, at Tab 8, ¶ 1; Exh. A, at 101–02;

7  Exh U, at 3–4.)

8    **C.  *Guilt phase.***

9    To establish Andriano's guilt for first-degree murder, the State presented the

10  evidence summarized in Section I(A), above.  Patterson and Delozier pursued a

11  battered-woman self-defense theory.  (*See* Exh. KK, at 16–74.)  During her 9 days

12  of testimony, Andriano painted Joe as verbally, sexually, physically, and

13  emotionally abusive and prone to "rages" in which he senselessly destroyed

14  inanimate objects, even while terminally ill.  (Exhs. V–DD.)  She described Joe's

15  murder as follows:

16    Andriano testified that she was attempting to assist Joe in committing
     suicide when they got scared and decided to call for help. She claimed
17    that after 911 was called and Chris left the apartment to meet the
     paramedics, Joe decided that he wanted to follow through with the
18

19  _____

      ( ... continued)

20  in defending against either the murder charge or the A.R.S. § 13–751(F)(6)

21  especially cruel aggravating factor.  (*See also* Petition, at Tab 34, ¶ 43 (family

    friend recalling Patterson's comment that Andriano's case was "a difficult case to
22  win").

23
      [9] *Ring v. Arizona*, 536 U.S. 584 (2002).
24

25    [10] Patterson represented Frank Roque.  (Petition, at Tab 6, at ¶¶ 3, 9, 18.)
    Although a jury sentenced Roque to death, the Arizona Supreme Court reduced his
26  sentence to life on independent review based on the mitigating evidence Patterson
    presented at trial.  *State v. Roque*, 213 Ariz. 193, 202, 230, ¶¶ 1, 166–71, 141 P.3d
27  368, 377, 405 (2006).

28

suicide. She testified that, after the paramedics left, she admitted to Joe that she had an affair. Joe then became violent and tried to choke her with a phone cord, but she was able to reach a knife, cut the cord, and free herself. When she put the knife down, Joe bent down to pick it up, so she hit him with the bar stool until he stopped moving. Ultimately, Joe picked up the knife and said he was going to kill himself. Andriano tried to stop him, but her hand slipped off the knife. Suddenly there was blood everywhere, but she had not stabbed Joe.

*Andriano*, 215 Ariz. at 504, ¶ 32, 161 P.3d at 547.  Dr. Sharon Murphy, a professor of social work and a domestic-violence expert, also testified for multiple days, and opined that Andriano was a domestic violence victim.  (Exh. NN–QQ.)

Counsel also presented testimony from Andriano's parents, brother, and cousin, who collectively described her sheltered and religious upbringing and what they characterized as years of abuse at Joe's hands.   (Exhs. KK–MM, SS.) Counsel also called William Joe Collier, a forensic scientist who opined that, because sodium azide is highly acidic, one cannot ingest it unknowingly, and that Joe would have had to ingest at least 13 of the tainted capsules to account for the amount of chemical missing from the bottle Andriano ordered.  (Exhs RR, SS.)

### D. *Aggravation phase.*

Prior to trial, the State alleged two aggravating factors:  Andriano murdered Joe with the expectation of receiving pecuniary gain, *see* A.R.S. § 13–751(F)(5), and Andriano murdered Joe in an especially cruel, heinous, or depraved manner, *see* A.R.S. § 13–751(F)(6).  (Exh A, at 94–95.)  With respect to the (F)(6) factor, the State alleged both cruelty and heinousness and depravity (as shown through the *Gretzler*[11] factors of mutilation and gratuitous violence).  (*Id.* at 284–86.)

The State relied primarily on the guilt-phase evidence to prove the aggravating factors, but recalled a detective and the medical examiner to establish,

_____

[11] *State v. Gretzler*, 135 Ariz. 42, 659 P.2d 1 (1983).

9

1   in support of the cruelty allegation, that Joe had died with his eyes open, increasing

2   the likelihood that he perceived Andriano striking him before he lost

3   consciousness.   (Exh. VV, at 40–48.)   The medical examiner also described

4   defensive wounds to Joe's hands that were consistent with strikes from the bar

5   stool and that reflected his consciousness during a portion of the bludgeoning.  (*Id.*

6   at 53–57.)   The jurors found cruelty proven beyond a reasonable doubt, but were

7   unable to reach a verdict on pecuniary gain or on heinousness or depravity.  (Exh.

8   A, at 289.)

9                      **E.  *Penalty phase.***

10          At the penalty phase, counsel offered evidence of several mitigating

11   circumstances, including Andriano's missionary work and religious convictions;

12   purported status as a domestic violence and abuse victim; stress of Joe's terminal

13   cancer, initial misdiagnosis, and the family's financial problems; purportedly being

14   a good mother; good behavior in jail; and potential for rehabilitation.   (Exh. A, at

15   290–92, 287–98, 306–08.)  To establish this mitigation, counsel relied partially on

16   the guilt-phase evidence, but also called several of Andriano's friends and recalled

17   her parents to offer additional information about her character and upbringing, and

18   describe how her execution would affect them.   (Exhs. ZZ, AAA.)   They also

19   characterized Andriano as an excellent mother, who was devoted to her children.

20   (Exhs. ZZ, AAA.)

21          Counsel also presented testimony from several individuals who knew

22   Andriano as a child and young adult, and described her as passive, meek, friendly,

23   and nonviolent.   (Exh. ZZ, at 7–45; Exh. AAA.)   Counsel further recalled Dr.

24   Murphy, who offered additional testimony on domestic violence, testified that

25   Andriano may have been sexually abused as a child and that a man exposed

26   himself to her as a child, and opined that she may have been dissociating during

27   her police interview.  (Exh. AAA, at 47–83.)

28

Andriano also presented testimony from three jail employees:  a mental health counselor, Laura King; a psychologist, Dr. Gerald Perry; and a psychiatric nurse, Joyce Van Every.[12]  Andriano was admitted to the jail's psychiatric unit after a suicide attempt in September 2003.  (Exh. YY, at 68.)  All three witnesses characterized Andriano as desperate to help others and to have others like her; if she were unable to help a person in need, she would became severely depressed. (*Id.* at 73–74; 85–85.)   They characterized Andriano as trusting and easily-deceived, and claimed that she was valuable to the unit because she helped troubled inmates and brought problems to the attention of the psychiatric staff.  (*Id.* at 81–83, 142–43)

However, both Dr. Perry[13] and King conceded that Andriano was never diagnosed with a serious mental illness in jail; she was treated only for depression and anxiety.  (*Id.* at 71–72, 92, 134, 111, 121–22.)  These conditions, King and Van Every opined, stemmed from the trauma of killing Joe.  (*Id.* at 111, 146.)  Dr. Perry opined that they resulted from the stress inherent in the jail environment.  (*Id.* at 122.)  Andriano was treated with Zoloft (an antidepressant), Ativan (an antianxiety medication) and Seroquel (an antipsychotic also used as a sleep aid).  (*Id.* at 139–40.)

In rebuttal, Joe's sister, Jana Clayton, described several instances on which Andriano had placed the burden of caring for her children on others; described her use of a paddle to discipline her son; and recalled Andriano's sadness when she became pregnant with her daughter, because she did not want to gain weight.

---

[12] These individuals testified as lay witnesses.

[13] Dr. Perry specifically did not diagnose Andriano with bipolar disorder. (Exh. YY, at 121–22.)  He also opined that she was the highest-functioning inmate in the unit.  (*Id.* at 135.)

1 (Exh. BBB, at 119–32.)  Likewise, Timothy Lee testified about Andriano's refusal

2 to leave work to attend to her seriously injured son, which directly contradicted her

3 trial testimony that she had immediately rushed to the hospital to see him.  (*Id.*)

4     The State also called Dr. Michael Brad Bayless (who had testified in the

5 guilt phase for the limited purpose of expressing his opinion that Andriano was not

6 a domestic violence victim), who opined that Andriano was a manipulative

7 individual and that her suicide attempt, helpful behavior in prison, frequent tears,

8 and general portrayal of herself as a victim were all goal-directed actions. (Exh.

9 CCC, at 10–16.)  And, two detention officers testified about Andriano's reputation

10 as a "control freak" in prison who upset other inmates; their belief that Andriano

11 was in charge of the other inmates; Andriano's discipline for possessing

12 contraband[14]; occasions on which Van Every, King, and Dr. Perry were caught

13 giving Andriano preferential treatment or violating policy to accommodate her; and

14 inappropriate contact between Andriano and her transsexual cellmate.[15]   (Exh.

15 BBB, at 48–111.)

16         **F. *Direct appeal.***

17     On direct appeal, Andriano raised eleven claims of error[16]:  1) this Court

18 violated Andriano's constitutional rights and the Arizona Rules of Evidence by

_____

21 [14] King admitted that Andriano had been disciplined, but implied that she

22 was only cited because the detention officers disliked her and wanted to return her

to general population.  (Exh. YY, at 81, 103–04, 115–16.)  Van Every expressed a

23 similar opinion.  (*Id.* at 144–45.)

24 [15] The inmate was transitioning from female to male.  (R.T. 12/14/04, at 48–

25 111.)

26 [16] Andriano also presented several previously-rejected constitutional

27 challenges to the death penalty in order to preserve them for federal review.  (Exh.

C, at 129–33.)

28

1  admitting evidence of her extramarital affairs and attempts to obtain life insurance;

2  2) fundamental error occurred when this Court failed to *sua sponte* instruct the jury

3  on second-degree murder and manslaughter as lesser-included offenses of first-

4  degree murder; 3) the A.R.S. § 13–751(F)(6) especially cruel aggravating factor is

5  facially vague; 4) this Court's jury instruction defining cruelty was insufficient to

6  channel the jurors' discretion; 5) the evidence was insufficient to support the jury's

7  finding of cruelty; 6) this Court violated Andriano's constitutional rights by

8  precluding evidence of residual doubt as mitigation; 7) this Court violated

9  Andriano's constitutional rights by refusing to permit mercy as mitigation; 8) this

10  Court violated Andriano's constitutional rights by erroneously instructing the

11  jurors regarding the need for finding mitigation unanimously; 9) this Court coerced

12  a death verdict by giving the jury an impasse instruction prematurely; 10) this

13  Court violated Andriano's constitutional rights by instructing the jury about its

14  duty to deliberate in the penalty phase; and 11) Arizona's statute providing for

15  execution by lethal injection constitutes cruel and unusual punishment.  (Exh. C.)

16  The Arizona Supreme Court rejected Andriano's conviction-related claims.

17  *Andriano*, 215 Ariz. at 502–04, ¶¶ 16–31, 161 P.3d at 545–47.  The court also

18  rejected Andriano's claims of trial court error at sentencing.  *Id.* at 505–10, ¶¶ 37–

19  60, 161 P.3d at 548–53.  After independently reviewing the aggravating and

20  mitigating circumstances, the court affirmed Andriano's death sentence, finding

21  the "quality and strength of Andriano's mitigation evidence … not sufficiently

22  substantial to call for leniency in light of the especially cruel manner in which

23  Andriano murdered her husband."  *Id.* at 510–13, ¶¶ 63–78, 161 P.3d at 553–56.

24  Andriano petitioned the United States Supreme Court for a writ of certiorari; the

25  Court denied certiorari on October 11, 2007.  *Andriano v. Arizona*, 552 U.S. 923

26  (2007) (mem.).

27

28

## II. APPLICABLE LAW.[17]

When evaluating a PCR petition, this Court should first "identify all claims that are procedurally precluded" under Rule 32.  Ariz. R. Crim. P. 32.6(c).  The preclusion rule "'prevent[s] endless or nearly endless reviews of the same case in the same trial court."  *State v. Shrum*, 220 Ariz. 115, 118, ¶ 12, 203 P.3d 1175, 1178 (2009) (quoting *Stewart v. Smith*, 202 Ariz. 446, 450, ¶ 11, 46 P.3d 1067, 1071 (2002)).  "Because the general rule of preclusion serves important societal interests, Rule 32 recognizes few exceptions."  *Shrum*, 220 Ariz. at 118, ¶ 13, 203 P.3d at 1178; *see* Ariz. R. Crim. P. 32.2(b) (enumerating exceptions).  The State must typically "plead and prove any ground of preclusion by a preponderance of the evidence," but this Court may find a claim precluded regardless whether the State raises that defense.  Ariz. R. Crim. P. 32.2(c).

Rule 32.2(a) states that a defendant "shall be precluded from relief under this rule based upon any ground":

(1) Raisable on direct appeal under Rule 31 or on post-trial motion under Rule 24;

(2) Finally adjudicated on the merits on appeal or in any previous collateral proceeding;

(3) That has been waived at trial, on appeal, or in any previous collateral proceeding.

*See also* Ariz. R. Crim. P. 32.2(a)(3), cmt. ("For most claims of trial error, the state may simply show that the defendant did not raise the error at trial, on appeal, or in

---

[17] The Legislature has codified a defendant's right to bring a PCR petition at A.R.S. §§ 13–4231 through 13–4239.  The language of Rule 32 tracks the statutory language, and the State cites only the Rule herein.

1  a previous collateral proceeding, and that would be sufficient to show that the
2  defendant has waived the claim.").

3    If, after excluding all precluded claims, this Court "determines that no
4  remaining claim presents a material issue of fact or law which would entitle the
5  defendant to relief under this rule," it should dismiss the petition.  Ariz. R. Crim. P.
6  32.6.  This Court should order an evidentiary hearing only if it finds that Andriano
7  has presented "a colorable claim, that is a claim which if [her] allegations are true
8  might have changed the outcome."  *State v. Schrock*, 149 Ariz. 433, 441, 719 P.2d
9  1049, 1057 (1986).   The decision whether Andriano has advanced a colorable
10  claim "is, to some extent, a discretionary decision" for this Court, and only when
11  doubt exists should this Court order a hearing "'to allow the defendant to raise the
12  relevant issues, to resolve the matter, and to make a record for review."  *State v.*
13  *Bowers*, 192 Ariz. 419, 422, ¶ 10, 966 P.2d 1023, 1026 (App. 1998) (quoting
14  *Schrock*, 149 Ariz. at 441, 719 P.2d at 1057).   This Court should not grant an
15  evidentiary hearing "based on mere generalizations and unsubstantiated claims."
16  *State v. Borbon*, 146 Ariz. 392, 399, 706 P.2d 718, 725 (1985).

17    If this Court orders an evidentiary hearing, the Arizona Rules of Evidence
18  apply, and Andriano bears the "burden of proving the allegations of fact by a
19  preponderance of the evidence."  Ariz. R. Crim. P. 32.8(b), (c).  If Andriano proves
20  at a hearing that a constitutional defect occurred, the State bears the burden of
21  proving that error harmless beyond a reasonable doubt.  Ariz. R. Crim. P. 32.8(c).

22  **III.   PRECLUDED CLAIMS (CLAIMS IV AND II).**

23    Andriano's claims that the jurors improperly found the A.R.S. § 13–
24  751(F)(6) cruelty factor in part so she would not be released from prison (Petition,

25

26

27

28

at 69–70) and that DeLozier labored under an actual conflict of interest (*Id.* at 61–63) are precluded under Rule 32.2(a)(3).[18]

### A. *Considering improper information to find cruelty (Claim IV).*

Andriano contends that, in finding the (F)(6) factor, the jurors were improperly influenced by their desire that she not receive a parole-eligible sentence, conduct that purportedly violates due process and the Eighth Amendment.[19]    (Petition, at 69–70.)    This claim is 1) precluded under Rule 32.2(a)(3); 2) not supported by competent evidence, as it rests entirely on inadmissible juror declarations that this Court should strike from the record; and 3) meritless, even assuming the juror declarations are admissible.

### 1. Preclusion.

This claim is precluded under Rule 32.2(a)(3).  With reasonable diligence, Andriano could have presented it in a motion for a new trial under Arizona Rule of Criminal Procedure 24.1(c), a motion to vacate the judgment under Rule 24.2(a), or on direct appeal.  Grounds for attacking the jurors' conduct during deliberations typically arise during trial or immediately thereafter, and should be addressed at

---

[18] Because these claims alternatively fail on their merits, appellate counsel was not ineffective for failing to raise them.  (*See* Petition, at 70 (attributing any claims found precluded to appellate counsel's ineffectiveness).)  *See Smith v. Robbins*, 528 U.S. 259, 285–86 (2000) (to show appellate counsel's ineffectiveness, defendant must establish that counsel "unreasonably failed to discover nonfrivolous issues and to file a merits brief raising them," and that, but for this failure, the defendant "would have prevailed on his appeal").

[19] Andriano refers in connection with this claim to the jury's purported consideration of a non-statutory aggravating factor. (Petition, at 69–70.) However, her claim is limited to the aggravation-phase deliberations and is more aptly characterized as asserting that the jurors were influenced by improper considerations in finding the *statutory* aggravating factor. (*Id.*)

1   that point.  In fact, Andriano was aware shortly after trial that, during the penalty-

2   phase deliberations, at least one juror may have been influenced by her desire that

3   Andriano not receive a parole-eligible sentence.

4       In support of her motion for a new trial under Rule 24.1,[20] Andriano attached

5   an Arizona Republic article dated January 24, 2005, for which juror L.P. (a

6   declarant in the present proceeding) and five other jurors were interviewed.  (Exh.

7   A, at 363–68.)  The article attributes to L.P. information that "[w]hile jurors were

8   discussing whether to execute Andriano, they considered that they would have no

9   control over whether the trial judge … would give her life in prison with or without

10   parole," and that the jurors "did not want to see a 25 years to life sentence."  (*Id.* at

11   367.)  Although L.P.'s statements to the reporter relate to the penalty phase, they

12   reasonably should have spurred Andriano to investigate the jurors' conduct in all

13   three phases and challenge it, if appropriate, in a post-trial motion.  By failing to do

14   so, Andriano waived her claim, and this Court should dismiss it as precluded under

15   Rule 32.2(a)(3).

16           **2. Inadmissibility of juror declarations.**

17       Preclusion aside, Andriano's claim is not supported by competent evidence

18   and thus fails on the merits.  The claim rests entirely on declarations from Jurors

19

20   _____

21

22       [20] This motion challenged as coercive this Court's impasse instruction to the
    jurors during the penalty phase.  (Exh. A, at 345–48, 359–68; Exh. P, at 6–7; *see*

23   Exh. A, at 49–54 (response).)  Andriano argued that the jurors' consideration of her

24   parole eligibility, as well as other factors mentioned in the article, was
    inappropriate and resulted from the purportedly coercive impasse instruction.

25   (Exh. A, at 345–48, 359–68; Exh. P, at 6–7; *see* Exh. A, at 49–54 (response).)  This
    Court denied the motion.  (Exh. B, at 24.)  The Arizona Supreme Court likewise

26   rejected Andriano's challenges to the impasse instruction.  *See Andriano*, 215 Ariz.

27   at 508–10, ¶¶ 53–60, 161 P.3d at 551–53.

28

1   L.P.[21] and B.B. describing the jury's deliberative process in finding the A.R.S. §

2   13–751(F)(6) factor.  (Petition, at 69–70 & Tabs 39, 41.)  This Court should strike

3   the jurors' declarations, as well as those authored by Jurors M.C.[22] and J.S.

4   (Petition, at Tabs 39–42), because they are inadmissible.  At a minimum, this Court

5   should refuse to consider the declarations.

6       A juror's testimony is not admissible to impeach a verdict.  *See State v. Cruz*,

7   218 Ariz. 149, 159, ¶ 33, 181 P.3d 196, 206 (2008); *State v. Dickens*, 187 Ariz. 1,

8   15, 926 P.2d 468, 482 (1996).  The purpose of this rule is to protect the finality of

9   jury verdicts and to ensure that jurors are not unduly disturbed, as at least one juror

10  _____

11  [21] While inadmissible, L.P.'s declaration nonetheless includes interesting

12  content.  She suggests that evidence of Andriano's alleged sexual molestation

13  could have affected the jury's decision-making process.  (Petition, at Tab 41, ¶ 7.)

    L.P. clearly did not draft her declaration, as the type-written document states that

14  molestation evidence "would have weighed heavily" on the decision-making

15  process, and L.P. crossed out the word "heavily" and initialed the alteration.  (*Id.*)

    This alteration makes sense, given that L.P. told the Arizona Republic that

16  Andriano's post-verdict conduct reassured her that death was the appropriate

17  punishment:

18      P[.] said a telling look from Andriano was reassuring after a

19      clerk read the verdict.

20      "She gave us a look like, 'How dare you?'" P[.] said.  "I

21      thought, 'I made the right decision.'"

22  (Exh. A, at 368.)

23

24  [22] M.C.'s declaration is even less relevant than the other three, as she served

    as an alternate and did not deliberate.  (Petition, at Tab 40, ¶ 1.)  This Court should

25  disregard Andriano's reference in her factual statement to M.C.'s comment that she

    would not have imposed the death penalty had she deliberated.  (Petition, at 41 &

26  Tab 40, ¶¶ 2, 9.)  Likewise, the jurors' various opinions regarding what mitigating

27  evidence they would have found compelling are neither admissible nor relevant.

    (Petition, at 41–42 & Tabs 39–42.)

28

was in this case.[23]  *See State v. Callahan*, 119 Ariz. 217, 219, 580 P.2d 355, 357 (App. 1978); *State v. Landrum*, 25 Ariz. App. 446, 448, 544 P.2d 270, 272 (1975). Juror evidence is admissible *only* when offered to prove a claim of jury misconduct, and then only to the extent that it does not disclose the jurors' motives or mental processes in reaching a verdict:

> Whenever the validity of a verdict is challenged under Rule 24.1(c)(3) [which sets forth grounds for finding juror misconduct], the court may receive the testimony or affidavit of any witness, including members of the jury, which relates to the conduct of a juror, official of the court, or third person. *No testimony or affidavit shall be received which inquires into the subjective motives or mental processes which led a juror to assent or dissent from the verdict.*

Ariz. R. Crim. P. 24.1(d) (emphasis added).

Andriano does not allege any type of juror misconduct enumerated in Rule 24.1(c)(3).  Nor does she argue that counsel was ineffective for failing to raise a jury misconduct claim in a post-verdict motion.   Rather, she presents juror declarations disclosing their "subjective motives or mental processes," Ariz. R. Crim. P. 24.1(c)(3), in finding the (F)(6) factor proven and asserts that such motives and mental processes violated her constitutional rights.  (Petition, at 69–70.)  By its express terms, Rule 24.1(d) precludes this Court from considering this evidence.  And, absent the jurors' declarations, Andriano's claim lacks a factual basis and should be dismissed.

### 3. Even if the declarations are admissible, the claim fails on the merits.

Even if this Court considers the juror declarations, Andriano's claim fails on the merits.  Juror L.P. claims that the jurors' desire that Andriano not receive a parole-eligible sentence was "a key reason" they found the (F)(6) factor.  (Petition

---

[23] *See* Minute Entry filed 7/11/11 and Sealed Juror Letter, filed 7/8/11.

1     at Tab 41, ¶ 6.)   Likewise, B.B. attests that the jurors discussed Andriano's

2     potential punishment in both the aggravation and penalty phase, and constructed a

3     chart "outlining the different possible [sentencing] outcomes." (Petition, at Tab 37,

4     ¶ 8.)   However, neither juror claims that the jury found the aggravating factor

5     proven solely to qualify Andriano for a death sentence, or that the elements of

6     cruelty were not proven beyond a reasonable doubt. (*Id.* at Tabs 37, 41.) Juror J.S.

7     likewise does not make that assertion. (*Id.* at Tab 42.) And, as set forth in Section

8     D, below, the evidence overwhelmingly showed cruelty. If not precluded and if

9     supported by competent evidence, Andriano's claim fails on the merits.

10          **B. *DeLozier's purported conflict of interest (Claim II).***

11          Relying on *Cuyler v. Sullivan*, 446 U.S. 335 (1980), Andriano contends that

12    second-chair counsel DeLozier labored under a conflict of interest because he

13    simultaneously represented her in her capital murder trial (which required him to

14    investigate her upbringing and present as mitigation any abusive or neglectful

15    parenting to which she was exposed) and the Ochoas in guardianship and adoption

16    proceedings involving Joe and Andriano's children, N. and A. (which required him

17    to present the Ochoas in the most favorable light possible). (Petition, at 61–63.)

18    This claim is precluded and, alternatively, is not a colorable claim for relief.

19          **1. Preclusion.**

20          Conflict of interest claims are cognizable on direct appeal. *See State v.*

21    *Moore*, 222 Ariz. 1, 16, ¶¶ 81–83, 213 P.3d 150, 165 (2009) (considering and

22    rejecting claim that counsel had a conflict of interest where he had formerly

23    represented a statutory victim who possessed information potentially helpful to

24    defendant). Andriano was aware that DeLozier was also representing her parents

25    in the guardianship proceeding; in fact, he appears to have simultaneously

26    represented Andriano and her parents in that proceeding for a period. (*See* Exh. D,

27    at  2 (first page of pleading in which DeLozier identifies himself as the attorney for

28    Andriano and the Ochoas).)  Andriano should have raised her conflict of interest

1    claim at trial or on direct appeal.  Because she did not do so, it is precluded under

2    Rule 32.2(a)(3).

3                        **2.  The claim fails on the merits.**

4           Even if not precluded, Andriano's claim fails on the merits.  As a preliminary

5    matter, the Arizona Supreme Court has interpreted *Cuyler* as limited to the joint

6    representation of co-defendants, which is not at issue here.  *See State v. Martinez-*

7    *Serna*, 166 Ariz. 423, 425, 803 P.2d 416, 418 (1990); *State v. Jenkins*, 148 Ariz.

8    463, 465, 715 P.2d 716, 718 (1986).  But to the extent *Cuyler* applies to the present

9    factual scenario, Andriano is not entitled to relief because she has failed to show

10   that DeLozier possessed an actual conflict of interest that adversely affected her

11   representation.

12          A defendant's constitutional right to the effective assistance of counsel may

13   be violated when his attorney operates under a conflict of interest.  *See Martinez-*

14   *Serna*, 166 Ariz. at 418, 803 P.2d at 425.  However, "absent an objection at trial, [a]

15   defendant must demonstrate that (1) an actual conflict existed; and (2) that the

16   conflict had an adverse effect on the representation."  *Id.*; *see Cuyler*, 446 U.S. at

17   349 (defendant must show that counsel "actively represented conflicting interests"

18   to establish constitutional violation).  "In order to establish an actual conflict of

19   interest, a defendant must demonstrate that some plausible alternative defense

20   strategy might have been pursued."  *See Martinez-Serna*, 166 Ariz. at 418, 803

21   P.2d at 425 (quotations and alterations omitted).  The defendant need not show that

22   the strategy would have been successful, but merely that it was a viable alternative.

23   *Id.*  The defendant must also establish that "the alternative defense was inherently

24   in conflict with the attorney's other loyalties or interests."  *Id.*

25          Beginning on June 11, 2001, DeLozier represented the Ochoas in the

26   guardianship proceeding between them and Joe's sister and brother-in-law (who

27   were the children's legal guardians, pursuant to Andriano's initial consent) in

28   Maricopa County Superior Court.  (Exh. D, at 1; Exh. E, at 90–94.)  He also

represented them in adoption proceedings in Pinal County Superior Court.  (Exh. E.)  However, attorney Daphne Budge replaced DeLozier as counsel of record for the Ochoas in the Maricopa County proceeding in July 2002—*over 2 years* before Andriano's trial—and continued representing them until November 2004, when they began appearing *in propria persona*.  (Exh. D, at 3–10.)  The Pinal County proceeding was dismissed on October 16, 2002, after the court found that DeLozier and the Ochoas had willfully violated a court order and engaged in deceitful conduct calculated to permanently sever Joe's family's legal relationship with the children.[24]  (Exh. E, at 105–06.)

Assuming for the sake of argument that Andriano's interests conflicted with her parents' (a fact Andriano has not convincingly established), DeLozier was not actively representing both parties during Andriano's trial and the 2 years preceding it; he was only representing Andriano.[25]  Further, neither Patterson nor DeLozier

---

[24] The Arizona Court of Appeals decision Andriano includes in her exhibits and cites in connection with this claim (Petition, at Tab 77) relates to DeLozier's appeal of a $6,000 personal sanction the Pinal County court imposed.  (Exh. E, at 106.)  The Ochoas do not appear to have been parties to that appeal.  (*See id.* at 115, 135.)  The Pinal County court's findings in the adoption matter are relevant here, as they bear on the credibility of more than one of Andriano's declarants, including DeLozier, who has "fallen on the sword" in this proceeding, as he did in the Pinal County proceeding.  (*Id.* at 7, 119.)  The court found that DeLozier "intentionally and surreptitiously avoided th[e] [c]ourt's orders with the intentions of permanently severing the paternal interest of the children and that he intentionally disregarded th[e] [c]ourt's orders."  (*Id.* at 105.)  And, the court found that the Ochoas knew that the court's orders "were not being abided by, [and] that the actions were done to thwart the orders of the Maricopa Superior Court."  (*Id.* at 106.)  The court sanctioned DeLozier monetarily, as set forth above, and sanctioned the Ochoas by dismissing their adoption petition with prejudice.  (*Id.*)

[25] DeLozier may arguably have been ethically-bound not to represent both Andriano and the Ochoas.  *See* Ariz. R. Sup. Ct. 42, E.R. 1.7–1.9.  However, a violation of the Arizona Rules of Professional Conduct does not automatically

(continued ...)

claim in their declarations that DeLozier's loyalty to the Ochoas prevented them from discovering or presenting additional mitigation; they imply instead that this failure was the result of their negligence.  (Petition, at Tabs 6, 7.)

Further, as discussed below, counsel presented at trial and sentencing extensive evidence of the oppressive religious environment in which Andriano was raised, of Alejo Ochoa's angry outbursts and arguably abusive behavior, and of Donna Ochoa's alleged neglect.  The evidence Andriano now claims counsel should have presented is cumulative to that evidence.  Although counsel did not present evidence that Alejo may have sexually abused Andriano, such evidence is speculative and refuted by Andriano's own testimony, in which she denied under oath that Alejo had ever touched her inappropriately.  Andriano therefore has failed to show that a plausible alternative mitigation strategy existed.  If not precluded, Andriano's conflict of interest claim is meritless.

## IV.   INEFFECTIVE ASSISTANCE OF COUNSEL CLAIMS (CLAIMS I(A)–(C), III, AND V).

Andriano contends that trial and appellate counsel were ineffective for multiple reasons.  (Petition, at 46–70.)  Andriano's claims are not colorable, and this Court should deny and dismiss them.

### A.   *Law of ineffective assistance of counsel.*

To merit relief under *Strickland v. Washington*, 466 U.S. 668, 686 (1984), Andriano must show that "counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result."   "'Surmounting *Strickland*'s high bar is never an easy task.'" *Harrington v. Richter*, __ U.S. __, 131 S.Ct. 770, 788 (2001) (quoting *Padilla v. Kentucky*, 559 U.S. __, __, 130 S.Ct. 1473, 1485 (2010)).  To do so, Andriano must

_____
( ... continued)

render counsel constitutionally ineffective.  *See Jenkins*, 148 Ariz. at 465, 715 P.2d at 718.

1   show that (1) counsel's performance was deficient under prevailing professional

2   standards and (2) he suffered prejudice as a result. *Strickland*, 466 U.S. at 687–88.

3   This Court "is not required to address both components of the *Strickland* test in

4   deciding an ineffective assistance of counsel claim 'if the defendant makes an

5   insufficient showing on one.'" *LaGrand v. Stewart*, 133 F.3d 1253, 1270 (9th Cir.

6   1998) (quoting *Strickland*, 466 U.S. at 697). Claims of trial and appellate

7   counsel's ineffectiveness are each reviewed under *Strickland*'s standard. *See*

8   *Robbins*, 528 U.S. at 285; *Cockett v. Ray*, 333 F.3d 938, 944 (9th Cir. 2003).

9   To establish deficient performance, Andriano must show "that counsel's

10  representation fell below an objective standard of reasonableness."[26] *Strickland*,

11  466 U.S. at 699; *see also State v. Santanna*, 153 Ariz. 147, 149, 735 P.2d 757, 759

12  (1987). Her allegations and supporting evidence must withstand this Court's

13  "highly deferential" scrutiny of counsel's performance, and overcome its "strong

14  presumption" that counsel "rendered adequate assistance and made all significant

15  decisions in the exercise of reasonable professional judgment." *Strickland*, 466

16  U.S. at 689–90; *see also State v. Gerlaugh*, 144 Ariz. 449, 454, 698 P.2d 694, 700

17  (1985). Under this deferential standard, Andriano bears the heavy burden of

18  showing that counsel's assistance was "neither reasonable nor the result of sound

19  trial strategy," *Murtishaw v. Woodford*, 255 F.3d 926, 939 (9th Cir. 2001), and

20  actions by counsel that "'might be considered sound trial strategy'" do not

21  constitute ineffective assistance. *Strickland*, 466 U.S. at 689 (quoting *Michel v.*

22  *Louisiana*, 350 U.S. 91, 101 (1955)); *see also Yarborough v. Gentry*, 540 U.S. 1, 5–

23  _____

24  [26] As Andriano acknowledges (Petition, at 43–45), the American Bar

25  Association's Guidelines for the Appointment and Performance of Defense

26  Counsel in Capital Cases ("ABA Guidelines") are guides to what constitutes
    reasonable conduct, and do not impose particular duties on defense counsel. *See,*

27  *e.g., Bobby v. Van Hook*, __ U.S. __, __, 130 S.Ct. 13, 16–17 (2009); *see also id.* at

28  20 (Alito, J., concurring).

6 (2003) ("When counsel focuses on some issues to the exclusion of others, there is a strong presumption that he did so for tactical reasons rather than through sheer neglect.").

Additionally, this Court should "neither second-guess counsel's decisions, nor apply the fabled twenty-twenty vision of hindsight." *Campbell v. Wood*, 18 F.3d 662, 673 (9th Cir. 1994) (en banc). Rather, as *Strickland* holds, "[a] fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Id.* at 689. The test for deficient performance "has nothing to do with what the best lawyers would have done. Nor is the test even what most good lawyers would have done." *Coleman v. Calderon*, 150 F.3d 1105, 1113 (9th Cir. 1998), *rev'd on other grounds*, 525 U.S. 141 (1998) (internal quotations omitted). Instead, this Court asks "only whether some reasonable lawyer at the trial could have acted, in the circumstances, as defense counsel acted at trial." *Id.*

Even if Andriano establishes that counsel performed deficiently, this Court should not grant relief unless she also proves prejudice. *Strickland*, 466 U.S. at 691–92 ("An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment."). The prejudice requirement recognizes that a defendant is entitled to "*effective* (not mistake-free) representation." *United States v. Gonzales-Lopez*, 548 U.S. 140, 147 (2006) (emphasis in original). This Court should not presume prejudice, *see Jackson v. Calderon*, 211 F.3d 1148, 1155 (9th Cir. 2000), but should require Andriano to affirmatively prove actual prejudice. *See Cooper v. Calderon*, 255 F.3d 1104, 1109 (9th Cir. 2001) ("[A petitioner] must 'affirmatively prove prejudice.' … This requires showing more than the possibility that he was prejudiced by counsel's errors; he must demonstrate that the errors

*actually* prejudiced him.") (quoting *Strickland*, 466 U.S. at 693) (emphasis in original)

To carry this burden, Andriano must show a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694; *see Lockhart v. Fretwell*, 506 U.S. 364, 372 (1993) (prejudice prong concerned with whether "counsel's deficient performance render[ed] the result of the trial unreliable or the proceeding fundamentally unfair … [u]nreliability or unfairness does not result if the ineffectiveness of counsel does not deprive the defendant of any substantive or procedural right"). A "reasonable probability" is one "sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694.

**B. *Preliminary matters.***

In support of her petition, Andriano submits declarations from defense attorney Larry Hammond and Andriano's trial counsel, Patterson and Delozier. (Petition, at Tabs 1, 6, 7.)  Hammond's declaration is irrelevant and should not be considered. Patterson and Delozier's declarations are not dispositive and are entitled to minimal weight in this Court's analysis.

**1. Declaration of Larry Hammond.**

Andriano offers a declaration from Larry Hammond to establish the standard of care applicable to defense attorneys at the time of Andriano's trial. (Petition, Tab 1.)  Hammond opines that Andriano "received constitutionally ineffective assistance of counsel at both the trial and sentencing phases of her case." (*Id.* at 9, ¶ 23.)  Hammond's opinion is irrelevant, as set forth below.

Rule 702 of the Arizona Rules of Evidence permits expert testimony under limited circumstances to help the trier of fact resolve factual issues:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert has reliably applied the principles and methods to the facts of the case.

The State does not contest that Hammond is an experienced and well-respected defense attorney; however, his opinion is immaterial. First, whether counsel's trial tactics were reasonable under prevailing professional norms is one of *law*, not one of *fact*. *See Provenzano v. Singletary*, 148 F.3d 1327, 1330 (11th Cir. 1998) ("The question of whether an attorney's actions were actually the product of a tactical or strategic decision is an issue of fact…. By contrast, the question of whether the strategic or tactical decision is reasonable enough to fall within the wide range of professional competence is an issue of law not one of fact…."); *see also Edwards v. Lamarque*, 475 F.3d 1121, 1126 (9th Cir. 2007); *United States v. Swanson*, 943 F.2d 1070, 1072 (9th Cir. 1991); *Horton v. Zant*, 941 F.2d 1449, 1462 (11th Cir. 1991); *Smith v. Ylst*, 826 F.2d 872, 875 (9th Cir. 1987); *Lytle v. Jordan*, 22 P.3d 666, 679 (N.M. 2001); *Jefferson v. Zant*, 431 S.E.2d 110, 112 (Ga. 1993).

Because expert testimony is admissible only to help the trier of fact resolve *factual* issues, *see* Ariz. R. Evid. 702, it is not admissible to establish that counsel's actions fell below the relevant standard of care. *See Provezano*, 148 F.3d at 1331–32 ("[I]it would not matter if a petitioner could assemble affidavits from a dozen attorneys swearing that the strategy used at his trial was unreasonable. The

1    question is not one to be decided by plebiscite, by affidavits, by deposition or by

2    live testimony.  It is a question of law to be decided by the … courts ….”); *Lytle*,

3    22 P.3d at 680 (“We believe it is superfluous for expert witnesses to advise a court

4    … about the proper application of existing law to the established historical facts

5    and about the ultimate issue of trial counsel’s effectiveness.”); *Jefferson*, 431

6    S.E.2d at 112 (“[T]he court correctly determined that opinion testimony from other

7    attorneys concerning the performance of [the defendant’s] trial attorneys was

8    irrelevant.”).

9         Second, even if the reasonableness of trial counsel’s performance is a factual

10   issue, expert testimony on that topic is nonetheless irrelevant in this case because it

11   would not assist the trier of fact.  *See* Ariz. R. Evid. 702.  Hammond is no more

12   qualified than this Court to determine whether counsel’s acts or omissions were

13   objectively reasonable under prevailing professional norms.  *See Clemmons v.*

14   *State*, 785 S.W.2d 524, 531 (Mo. 1990) (“A motion court is at least as capable as

15   another attorney in reaching a decision [on counsel’s alleged ineffectiveness] based

16   on the evidence presented, and therefore the opinion of an attorney on the same

17   subject is irrelevant and incompetent.”); *Parkus v. State*, 781 S.W.2d 545, 548 (Mo.

18   1989) (same); *State v. Ohler*, 366 N.W.2d 771, 775 (Neb. 1985) (rejecting

19   defendant’s argument that lower court erred by refusing to permit expert testimony

20   “regarding what a ‘reasonably prudent criminal trial attorney would have done’”

21   and concluding that “[g]enerally, expert testimony is not admissible as proof that

22   the assistance of counsel in a criminal case was ineffective”).  To resolve the

23   deficient performance element of Andriano’s IAC claims, this Court need only

24   apply governing law to the relevant facts.  Hammond’s opinion would not facilitate

25   this exercise.  His affidavit is therefore irrelevant and should not be considered.

26        **2.  Declarations of counsel.**

27        Patterson and DeLozier have submitted declarations claiming that they

28   lacked strategic reasons for various acts and omissions at trial.  (Petition, at Tabs 6,

28

7.)  This Court should view these declarations with skepticism.  *See Edwards*, 475 F.3d at 1126 (court is "not obligated to accept a self-proclaimed assertion by trial counsel of inadequate performance") (quotations omitted); *Allen v. Mullin*, 368 F.3d 1220, 1240 (10th Cir. 2004) (counsel's "about-face on the [disputed] issue strongly suggests a willingness to 'fall on the sword' in order to derail a death sentence"); *Hendricks v. Calderon*, 864 F. Supp. 929, 944 (N.D. Cal. 1994) ("The court recognizes that trial counsel may have an incentive to admit error in the hope of assisting a former client who has been sentenced to death.").

Moreover, the declarations, while relevant to the extent they disclose counsel's decision-making process, are not dispositive of *Strickland*'s inquiry.  *See, e.g., Atkins v. Singletary*, 965 F.2d 952, 959–60 (11th Cir. 1992) ("[Counsel's] affidavit alone establishes nothing. It admits no ineffective performance; and even if it did admit ineffectiveness, we would give the affidavit no substantial weight 'because ineffectiveness is a question which we must decide, [so] admissions of deficient performance by attorneys are not decisive.") (quoting *Harris v. Dugger*, 874 F.2d 756, 761 n.4); *see also Burris v. Parke*, 948 F.Supp. 1310, 1333 (N.D. Ind. 1996) (acknowledging counsel's testimony that he lacked a strategic reason for the challenged decision, but stating, "when the only record on which a claim of ineffective assistance is based is the trial record, every indulgence will be given to the possibility that a seeming lapse or error by defense counsel was in fact a tactical move, flawed only in hindsight") (quotations omitted).  Under *Strickland*, this Court must determine whether counsel's decisions were *objectively reasonable*. 466 U.S. at 688.  It should do so by determining—without applying the benefit of hindsight—whether any reasonable attorney could have made the decisions Patterson and Delozier made at trial.  *See Coleman*, 150 F.3d at 1113.

## C. *Failure to present mitigation (Claim I(A)).*

Andriano contends that Patterson and Delozier were ineffective at the penalty phase for failing to investigate and present as mitigation 1) expert

testimony regarding her purported mental illnesses, and 2) evidence of her "harrowing" childhood.  (Petition, at 50–55.)  Andriano's claims fail because she has shown neither deficient performance nor prejudice.

### 1.   Mental illness (Claim I(A)(1).

Andriano asserts that counsel was ineffective for failing to present expert testimony that she suffered from bipolar disorder, complex post-traumatic stress disorder ("Complex PTSD"), cognitive disorder not otherwise specified, and "caregiver burden."  (Petition, at 7–13, 46–50 & Tabs 2–5.)  She further asserts that counsel should have presented evidence of her family's mental health history, and explained how that history, combined with her purported childhood trauma, predisposed her to mental illness.  (*Id.*)  Additionally, she claims that counsel should have argued that the unforeseeable collision of her various mental disorders led her to murder Joe.  (*Id.*)  Andriano has not carried her burden under *Strickland*.

### a.   **Deficient performance.**

Andriano contends counsel was ineffective for failing to investigate and present mental health evidence because Dr. Jack Potts, who performed a competency evaluation pursuant to Arizona Rule of Criminal Procedure 11, and Andriano's personal counselor, the late Kandy Rhode,[27] suggested in 2001 that Andriano be assessed by other mental-health professionals to rule out serious mental illnesses and evaluate her mental state at the time she murdered Joe.

---

[27] Rhode was a private counselor funded by Andriano's parents who visited her frequently in jail.  (Exh. BBB, at 56–60.)  When Andriano was housed in the jail's psychiatric unit, detention officers became aware that Rhode had somehow obtained several contact visits with Andriano, an "unprecedented" occurrence that violated jail protocol.  (*Id.* at 57, 93–94.)  Jail staff had been incorrectly led to believe that Rhode was a member of Andriano's legal team.  (*Id.*)  The jail terminated Rhode's contact visits Andriano after officials discovered that she had furnished Andriano with pens and contraband cosmetic items, including a makeup compact with a glass mirror.  (*Id.* at 56–60, 63–65; *see also* Exh. H, at 2; Exh. L.)

(Petition, at 46–48.)   However, the record demonstrates that counsel thoroughly investigated Andriano's mental health based on Rhode's and Dr. Potts' recommendations.   The record further confirms what this Court should presume under *Strickland*:  that counsel made a strategic decision not to offer mental-health evidence and to instead focus on other areas of mitigation.

i.   *Mental-health investigation.*

DeLozier sought a Rule 11 evaluation in early 2001, and supported his request with a February 19, 2001, letter from Rhode containing the following impressions:

> I believe that [Andriano's] willingness to give up her will to others is a symptom of some kind of personality disorder.  I also suspect that her defense system includes dissociation.  Her mother's reference to possible abuse by [Andriano's] paternal grandfather could be the origin of that dissociation.  The intense sense of peace she describes since her arrest is sufficiently inappropriate to cause me to ask for collaboration from another professional.
>
> It would assist me greatly in diagnosis and treatment if she could be evaluated by a psychiatrist.  Ideally I would like to have him or her administer personality tests and perhaps interview [Andriano] under hypnosis.  I would also hope she could be evaluated for medication.

(*See* Exh. A, at 43–50.)

Approximately 1 month later, Rhode again wrote DeLozier, reaffirming her opinion that Andriano was prone to dissociation and had been molested by her grandfather.  (Petition, at Tab 7B.)  Rhode stated, "[i]n addition to my belief that she is the victim of sexual molestation and that she suffers from Depersonalization Disorder as well as Dissociative Amnesia, I believe she exhibits the symptoms of

the Cluster C Personality Disorders."[28]   (*Id.*)   She further opined that Andriano "was the victim of emotional abuse as well as some physical abuse during her marriage" and that she "was able to cope by dissociating and rationalizing."  (*Id.*)

Dr. Potts, a psychiatrist, performed the competency evaluation, and the defense team provided at least one of Rhode's letters to him to review.  (*See* Petition, at Tab 6A, p.1.)  Dr. Potts also consulted with one of Andriano's treating psychiatrists in jail, Dr. Leonardo Garcia-Bunuel.[29]   (*Id.*)   Ultimately, in a report authored March 28, 2001, Dr. Potts found Andriano competent to stand trial.  (*Id.* at pp. 1–3.)  Having apparently been apprised, perhaps from Rhode's letter, of a potential defense that Andriano suffered amnesia for the time of Joe's murder, Dr. Potts recommended that a second expert inquire into that possibility:

> Whether or not she has "amnesia" for the time around the alleged offense is something I cannot determine.  Defense counsel may wish to independently retain an expert to evaluate his client's state of mind around the time of the offense.  Certainly there is something quite bizarre about what allegedly occurred.  If Ms. Rhode is accurate in her diagnostic assessment, then the criminal culpability of the defendant and her state of mind at the time of the alleged offense should be evaluated independently, outside the scope of a Rule 11 evaluation.

(*Id.* at pp. 2–3.)

On December 20, 2001, Patterson emailed mitigation specialist Linderman and stated his intention to seek a mental health examination of Andriano "not because [he] believe[d] [she] suffere[d] from mental illness," but because, in a

---

[28] Consisting of obsessive-compulsive personality disorder, avoidant personality disorder, and dependent personality disorder.  (Exh. F, at 35–45.)

[29] Dr. Potts noted that Dr. Garcia-Bunuel was attempting to treat Andriano for a depressive disorder.  (Petition, at Tab 6A, p.3.)  In an apparent attempt to thwart this treatment, one of Andriano's early attorneys (not DeLozier or Patterson) had instructed her not to cooperate with Dr. Garcia-Bunuel.  (*Id.*)

death penalty case, "*a mental health exam can provide a source for mitigation.*" (Petition, at Tab 6B, emphasis added.)  Patterson thereafter engaged Dr. Richard Rosengard, a psychiatrist, to evaluate Andriano.[30]  (Petition, at Tab 6C.)  On June 23, 2002, Dr. Rosengard authored a report, which contains no compelling mitigation; in fact, the report is largely damaging and would have undercut counsel's trial and mitigation strategy of portraying Andriano as a good mother and a meek, dutiful woman who endured years of abuse from her terminally-ill husband.  (*Id.*)

Contrary to the detailed recollection of Joe's murder she recounted at trial, Andriano told Dr. Rosengard that she remembered fighting with Joe, and "[t]he next thing that [she] recalled was sitting on the living room floor with her husband.  Thereafter, she called her parents and told her father and then called the police." (Petition, at Tab 6C, p. 2.)  She "denied symptoms that would be consistent with manic episodes but did admit to panic attacks"; denied "symptoms consistent with phobias, obsessive-compulsive disorder, organicity, eating disorders, or thought process disorders"; denied hallucinations or paranoia; claimed that her mother and therapist had told her that her biological grandfather molested her as a toddler, but she could not recall that abuse; and denied having a family history of psychiatric disorders.  (*Id.* at pp. 3–4.)  Dr. Rosengard observed "no psychotic thought processes." (*Id.* at p. 5.)

Additionally—and in direct contrast to the image created at trial—Andriano reported having been expelled from school because she was "really hardheaded,"

---

[30] Both Patterson and DeLozier characterize Dr. Rosengard's evaluation as merely a competency assessment.  (Petition, at Tabs 6, ¶ 25; 7, ¶ 19.)  His report, however, is a comprehensive mental health assessment that contains psychiatric diagnoses; it is not limited to analyzing Andriano's understanding of the criminal proceeding.  (Petition, at Tab 6C.)

1    and having quit a job answering phones because she "had a temper."  (*Id.* at p.4.)

2    Ultimately, Rosengard diagnosed Andriano with depression, "[p]robable" PTSD,

3    and panic disorder.  (*Id.* at 5.)  Although Rosengard acknowledged the possibility

4    that Andriano suffered an "amnestic response" to Joe's murder and opined that the

5    murder was not premeditated, he also recognized, "Questions could arise as to how

6    somebody who *had a sound mind prior to and after the event* could now have

7    blocked what had occurred, specifically at that juncture, *and the issue of amnesia*

8    *for the subject appears all to convenient."*  (*Id.*, emphasis added.)

9                    ii.    *Strategic decision to focus elsewhere.*

10          In light of the foregoing, counsel's decision to forego additional mental

11   health investigation, evaluated from their perspective at the time, was objectively

12   reasonable.  *See Strickland*, 466 U.S. at 688.  Counsel followed Rhode's

13   recommendation by seeking a Rule 11 evaluation, and followed Dr. Potts'

14   recommendation by consulting with Dr. Rosengard.  In his report, Dr. Rosengard

15   did not recommend consulting with yet another expert.  (Petition, at Tab 6C.)

16   Counsel was not, as Andriano suggests, obligated to retain additional mental health

17   experts to in the hope they could offer a more favorable diagnosis for mitigation

18   purposes.  *See, e.g., Turner v. Calderon*, 281 F.3d 851, 875–76 (9th Cir. 1998)

19   ("The choice of what type of expert to use is one of trial strategy and deserves a

20   heavy measure of deference.  [Counsel's] reliance on Dr. Hamm, a properly

21   selected  expert,  was  within  the  wide  range  of  professionally  competent

22   assistance.") (quotations omitted); *see also Worthington v. Roper*, 631 F.3d 487,

23   501–02 (8th Cir. 2011) ("Where counsel has obtained the assistance of a qualified

24   expert on the issue of the defendant's sanity and nothing has happened that should

25   have alerted counsel to any reason why the expert's advice was inadequate, counsel

26   has no obligation to shop for a better opinion.").  When their mental-health

27   investigation failed to yield favorable results, there was no reason for counsel to

28   inquire further into that topic and their focus on other areas of mitigation—

1  including presenting extensive expert testimony that Andriano was a domestic

2  violence victim—was objectively reasonable. *See Strickland*, 466 U.S. at 688.

3  To the extent Andriano argues otherwise, counsel's decision not to present

4  Dr. Rosengard's testimony was also reasonable. During Dr. Rosengard's

5  evaluation, Andriano apparently attempted to lay the groundwork for an amnesia

6  theory that she abandoned when Dr. Rosengard did not accept it. She also told Dr.

7  Rosengard information that appeared to conflict with the weak-willed, meek, and

8  easily-victimized image she portrayed at trial. Such evidence would have

9  damaged, rather than helped, her case. It would also have shored up the State's

10  argument that she was a manipulative and chronically untruthful person, and that

11  neither her testimony nor her statements to Dr. Murphy could be believed.

12  Moreover, the record suggests that counsel declined to present mental health

13  evidence in part to limit the scope of Dr. Bayless' rebuttal testimony; as set forth

14  below, Dr. Bayless's opinions, if presented in full, would have devastated

15  Andriano's case. Prior to trial and over Andriano's objection (Exh. A, at 121), this

16  Court permitted Dr. Bayless, who the State had retained to conduct a domestic

17  violence assessment, to administer psychological tests (including the Minnesota

18  Multiphasic Personality Inventory-2 (MMPI-2)) during his evaluation to assist him

19  in forming an opinion on Andriano's veracity. (Exh. B, at 10.) Dr. Bayless

20  thereafter authored a report (discussed in detail below), containing several

21  psychological diagnoses. (Petition, at Tab 6E.) Patterson moved to preclude Dr.

22  Bayless as a witness in the penalty phase, arguing that *since counsel had not*

23  *presented psychological testimony*, that type of evidence was irrelevant in rebuttal.

24  (Exh. BBB, at 5–18, 33–46.) Patterson's argument succeeded, and this Court

25  precluded Dr. Bayless from testifying regarding his diagnoses. (*Id.* at 33–46.)

26  Patterson's assertion that he lacked a strategic decision for not further

27  investigating Andriano's mental health is not dispositive of the analysis. *See*

28  *Atkins*, 965 F.2d at 959–60; *Burns*, 948 F. Supp. at 1313. (Petition, at Tab 6, ¶ 30.)

1   Moreover, Patterson admits to having a strategic reason for focusing on areas of

2   mitigation other than mental health:  "Based on the information then known to me,

3   *I did not believe that there was a viable mitigation theme based on [Andriano's]*

4   *mental health.*"  (*Id.* at ¶ 30, emphasis added.)  *See Wright v. Hopper*, 169 F.3d

5   695, 707 (11th Cir. 1999) (although counsel denied strategic basis for decision, his

6   description of his reasoning revealed his "process of making strategic decisions").

7   Further, although he claims to have lacked a strategic reason for not further

8   *investigating* Andriano's personal and family mental health history, Patterson does

9   not admit that he lacked a strategic reason for not *presenting* the expert opinion he

10  had obtained from Dr. Rosengard.  (*Id.*)

11      DeLozier likewise disclaims a strategic reason for not investigating

12  Andriano's personal and familial mental health history.  (Petition, at Tab 7, ¶ 23.)

13  However, DeLozier's role in the case appears to have been limited.  Although he

14  claims to have been assigned primary responsibility for preparing the mitigation

15  case (*id.* at ¶ 12), he also states that his role, as a whole, was "passive" and limited

16  to following specific instructions from Patterson, the experienced capital defense

17  attorney.[31]  (*Id.* at ¶ 5.)  Likewise, mitigation specialist MacLeod states that he did

18  not identify or investigate mental health issues, recommend experts, provide

19  Andriano's social history to experts, or investigate the reasons for Andriano's "out-

20  of-character" affairs and other actions around the time she murdered Joe.[32]

21  _____

22      [31] Significantly, Delozier claims to have been unaware of Dr. Rosengard's

23  evaluation.  (Petition, at Tab 7, ¶ 19.)  This assertion is curious, as Dr. Murphy

24  relied on that report and it was the subject of the State's hotly-contested and

25  ultimately unsuccessful motion to compel disclosure.  (Exh. A, at 130–58; Exh. B,

    at 15.)

26      [32] One of Andriano's declarants attests that MacLeod told her that he had

27  forgotten to ask about Andriano's mental-health history, and advised the declarant

28  to tell Andriano's appellate counsel about this fact, presumably to lay the

    (continued ...)

36

1  (Petition, at Tab 8, ¶¶ 21–26.)  But MacLeod was not assigned to the case until

2  April 2004, only a few months before trial and approximately 2 years after the

3  retention of Dr. Rosengard; he therefore cannot speak to what may or may not have

4  transpired in the first few years of the investigation.  In light of the foregoing,

5  Andriano has not shown that counsel's performance fell below an objective

6  standard of reasonableness.  She has therefore failed to show deficient performance

7  under *Strickland*.

8  ### b.  <u>Prejudice.</u>

9  Andriano has also failed to show a reasonable probability of a different

10  result had counsel discovered and presented the expert opinions she proffers with

11  her PCR petition.  Andriano argues that testimony from Dr. James Hopper, a

12  psychologist specializing in the effects of child abuse, and Dr. George Woods, a

13  psychiatrist, could have established the A.R.S § 13–751(G)(1)[33] mitigating factor.

14  (Petition, at 48–50.)  She further asserts that these experts could have rebutted the

15  suggestion that she was untruthful and "was a promiscuous adulteress who

16  deserved to be condemned."[34]  (*Id.*)  This evidence would not have resulted in a life

17  sentence.

18  

19  _____

( ... continued)

20  groundwork for the present ineffective-assistance-of-counsel claim.  (Petition, at
Tab 29, ¶ 7.)

21  

22  [33] Establishing as a mitigating factor that the "defendant's capacity to
appreciate the wrongfulness of his conduct or to conform his conduct to the

23  requirements of law was significantly impaired, but not so impaired as to constitute

24  a defense to prosecution."  A.R.S. § 13–751(G)(1).

25  [34] Contrary to this assertion, the State did not encourage the jury to
"condemn" Andriano because of her promiscuity and multiple acts of adultery.  As

26  the Arizona Supreme Court found, her conduct in having extramarital relationships

27  with many men was relevant to establish her motive for killing Joe and to rebut the

28  claim that she was a domestic violence victim.  *Andriano*, 215 Ariz. at 503–04, ¶¶

(continued ...)

37

i.     *The mitigation is not weighty.*

Andriano's newly-proffered evidence does not establish the (G)(1) factor, and is not entitled to significant weight as non-statutory mitigation.   Andriano suggests that her alleged multiple comorbid mental disorders rendered her unable to control her actions and determine "how to 'help'" Joe.  (Petition, at 47 & Tab 2, at p. 56–57.)  As a result, she proposes, she was unable to conform her conduct to the law, thereby satisfying the A.R.S. § 13–751(G)(1) factor.

But the nature of Andriano's crime refutes the claim that she could not control her actions and did not know right from wrong.  Andriano meticulously planned Joe's murder over a substantial period of time, obtaining poison under a false identity and hiding it from Joe.  Although she claims otherwise, substantial evidence suggests that she administered the poison surreptitiously.  While Joe suffered the poison's effects, Andriano falsely told him that she had called the paramedics, and then summoned a friend, presumably to serve as a witness to Joe's ultimate "natural" death.

The plan went awry when the friend insisted that Andriano call the paramedics.  Andriano compensated for this hindrance by excluding her friend and the paramedics from the house, bludgeoning Joe with two separate instruments, placing a pillow over his face, and stabbing him in the neck.  Before interacting with paramedics, she washed her hair and changed out of her bloody clothes.  She exited her apartment through the back patio door and walked around the building to the front door to avoid allowing anyone to see Joe's body.  After she successfully

_____
( ... continued)

24–31, 161 P.3d at 546–47.  Andriano's conduct in having at least two extramarital affairs and aggressively pursuing at least one man who ended his relationship with her—banging on his door for an extended period late at night and threatening to obtain a master key and gain entry—were relevant to Andriano's motive and to rebut the image that she was a meek and oppressed victim who lived in fear of her husband.  *Id.*

convinced the paramedics to leave, she returned to the apartment and, as shown by the blood spatter evidence, staged the scene to make it appear as though a fight had occurred. She somehow discarded the lamp with which she had struck Joe. Then, although Joe's blood was starting to dry, she called police and pretended that the altercation had just occurred. The evidence set forth above shows Andriano's consciousness of guilt and ability to control her actions. The (G)(1) factor has not been satisfied.

For largely the same reasons, Andriano's mental-health evidence would have carried little weight as non-statutory mitigation. This Court should consider a claim of mental impairment—even when offered as non-statutory mitigation—"in proportion to a defendant's ability to conform or appreciate the wrongfulness of his conduct." *State v. Pandeli*, 215 Ariz. 514, 533, ¶ 81, 161 P.3d 557, 576 (2007). As set forth above, Andriano was well aware of her conduct's wrongfulness, and killed her husband in a carefully-planned, deliberate manner.

In an attempt to draw a causal nexus between her mitigation and the offense, and thereby increase the weight to which it is entitled, *see id.* at 532, ¶ 72, 161 P.3d at 575, Andriano suggests that her mental disorders had worsened in the weeks prior to Joe's death. As evidence of this fact, she cites her "extramarital affairs and hyper-sexual behavior, inappropriate relationships with subordinate employees and tenants at the apartment complex she managed, wide mood swings, increased alcohol use and public displays of drunkenness, and openly engaging in unlawful activity at her workplace." (Petition, at 12 & Tab 2.) But Andriano has engaged in this type of behavior her entire life; it did not arise suddenly in the fall of 2000 and unexpectedly result in Joe's murder.

Andriano's childhood friend and high school boyfriend, Shawn King, testified in a 2011 deposition that, from the time Andriano was a child, she was "devious" and appeared always to have "a plan underneath what she was doing." (Petition, at Tab 15, p.11.) She could "get [King] to do anything," including

1   disobey the rules of their strict religious school.  (*Id.* at 15.)  As adults, King

2   believed that he and Andriano were in a monogamous relationship, but later found

3   out she had been with "so many guys" while they were together; he also learned

4   that, at a party, she had had sexual intercourse with a man in front of others.  (*Id.* at

5   16–21.)  Although King personally caught Andriano in compromising positions

6   with two other men, she "g[o]t him to believe … that it was okay."  (*Id.* at 16.)  She

7   was adept at using "feminine wiles" for personal gain, and had a very convincing

8   and persuasive way about her.  (*Id.* at 35–45.)

9       Andriano's unlawful conduct and inappropriate work-place behavior is also

10  a consistent theme in her history.  She was fired from two jobs for stealing; she

11  stole $18,000 from one, and up to $30,000 from the other.  (Exhs. I, J.)  She lied

12  about her income on an application to reduce her student loan payments.  (Exh. M.)

13  She lied about having a Bachelor's Degree on an employment application.  (Exh.

14  N.)  During her incarceration—where she received mental-health treatment—she

15  was implicated in a check-cashing scheme that resulted in the theft of $40,000.

16  (Exh. K.)  She engaged in controlling, manipulative, and deceitful behavior in jail.

17  (Exh. H; Exh BBB, at 48–111.)  She is of above-average intelligence and has a

18  special talent for deception.  Andriano's behavior is not attributable to her mental

19  illness; it is attributable, as Dr. Bayless found (see below), to her anti-social traits

20  and lack of respect for the rights and welfare of others.

21      Moreover, despite being evaluated multiple times in multiple contexts, no

22  mental health professional has previously diagnosed Andriano with a serious

23  mental illness, until now, when she seeks to escape her death sentence in this

24  proceeding.  This fact—combined with Andriano's well-established talent for

25  manipulation—calls into question the diagnoses she now proffers.

26      On March 1, 1996, Andriano was assessed during therapeutic treatment,

27  which she commenced after she was terminated from one job for theft.  (Exh. G.)

28  The evaluating clinician diagnosed her with Adjustment Disorder with Mixed

Disturbance of Emotions and Conduct,[35] defined as a "psychological response to an identifiable stressor or stressors that results in the development of clinically significant emotional or behavioral symptoms." (*Id.*; Exh. F, at 7–11.)  Andriano's particular subtype involves emotional symptoms such as depression or anxiety, and conduct disturbance involving "*violation of the rights of others or of major age-appropriate social norms and rules*." (Exh. F, at 8, emphasis added.)  The doctor also recommended ruling out major depression. (Exh. G.)  The assessment contains no mention of bipolar disorder, caregiver burden,[36] PTSD, or cognitive impairment. (*Id.*)

Additionally, as previously stated, jail mental health officials diagnosed only depression and anxiety after her suicide attempt.  Neither Dr. Potts, nor Dr. Rosengard, nor Dr. Bayless diagnosed a severe or debilitating mental illness.  Even her personally-funded counselor, Rhode (who apparently supplied her with contraband in prison) did not diagnose bipolar disorder, as have her current experts.  In light of the foregoing, Andriano's newly-proffered mental health mitigation would have carried little weight, and the jury would still have sentenced her to death.

---

[35] The psychiatrist recorded the *Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition* (DSM-IV) diagnosis code of 309.40, which denotes Adjustment Disorder with Mixed Disturbance of Emotions and Conduct. (Exhs. G; F, at 7–11.)

[36] This diagnosis is particularly dubious, as the trial evidence establishes that Andriano avoided caring for Joe during his illness.  After his most invasive surgery, she declared herself unable to care for his open wounds and clean his drainage tube and left that responsibility to her parents.  Joe's family—not Andriano—took Joe to the majority of his chemotherapy treatments and cared for him thereafter.  Joe, Andriano's parents, a babysitter, or Joe's family cared for her children while she went out with friends, became intoxicated, and danced with, kissed, and had sex with other men.

1

2

ii.   *The evidence would have opened the door to damaging rebuttal.*

3   This Court precluded Dr. Bayless from testifying regarding his

4   psychological diagnoses because Andriano had not presented mental health

5   evidence and thus had not opened the door to that type of evidence in rebuttal.[37]

6   (Exh. B, at 22.)  Had counsel presented psychological evidence, they would have

7   opened the door to Dr. Bayless' full evaluation, in which he relied upon

8   Andriano's prior theft of $18,000 from an employer and opined that she had a

9   "tendency to be less than truthful" and the "ability to be manipulative."  (Petition,

10   at Tab 6E, p.7.)   He further opined that those with MMPI-2 profiles similar to

11   Andriano's "typically have behavioral problems in school and are likely to have

12   been in trouble with the law'"; have poor prognoses due to their resistance to

13   change; exhibit "poorly controlled anger and hostility that is expressed in cyclic

14   fashion"; and are often incarcerated for violent behavior.  (*Id.*) He summarized her

15   profile as follows:

16

17   Typically, these clients are quiet, withdrawn individuals, and their
     sudden outbursts come as a surprise to others.  They display poor

18   judgment under stress, but their emotional or violent outbursts may be
     only minimally related to external stress or provocation.  The cyclic

19   pattern of violent outbursts with intermittent periods of appropriate
     behavior represents a chronic and stable personality disorder that is

20   extremely difficult to change.

21

22   _____

23   [37] This Court ruled that the State's penalty-phase rebuttal evidence was

24   required to be directly relevant to the mitigation presented.  (Exhibit B, at ___.)
     Subsequent to this Court's ruling in Andriano's case (one of the first post-*Ring* jury

25   sentencing trials), the Arizona Supreme Court clarified that this is not an accurate
     statement of the law.  *See, e.g., State v. Prince*, 226 Ariz. 516, 526, ¶ 16, 250 P.3d

26   1145, 1155 (2011).   This Court's ruling limiting the scope of rebuttal was

27   therefore, respectfully, erroneous, but beneficial to Andriano and not prejudicial to
     her case.

28

1  (*Id.* at 8.)  Ultimately, Dr. Bayless diagnosed Andriano with Depressive Disorder
2  Not Otherwise Specified, and Personality Disorder Not Otherwise Specified, with
3  anti-social and borderline traits.  (*Id.* at 9; *see* Exh. F, at 18–30, 46.)

4         In addition, the newly-proffered mental health evidence would have opened
5  the door to the evidence set forth above, relating to Andriano's pre–and–post-
6  murder unlawful conduct.  And, in light of the exceptionally cruel manner in which
7  Andriano killed Joe, and the facts and circumstances of the offense as a whole, the
8  jury would still have imposed the death penalty, even if these factors had been
9  proved.  Any alleged mental illness would not have resulted in a life sentence in
10  light of these compelling facts.

11         **2.  "Harrowing" childhood (Claim I(A)(2)).**

12         Andriano contends that counsel was ineffective for failing to interview
13  extended family members and acquaintances and discover evidence of her 1)
14  alleged family history of mental illness, substance abuse, and violence; 2) early
15  exposure to "child molesters and pedophiles"; 3) physical abuse as a child; and 4)
16  impoverished and neglected early childhood.  But with the exception of the sexual-
17  abuse allegations against Alejo Ochoa, counsel already had presented evidence of
18  the above-listed factors at trial.  The omission of additional, cumulative evidence
19  was neither deficient nor prejudicial.  Similarly, the allegations now levied against
20  Alejo are speculative, unsubstantiated, refuted by Andriano's testimony at trial,
21  and, even if true, so remote and disconnected from Joe's murder that they would be
22  entitled to little mitigating weight.

23  . . . .

24  . . . .

25  . . . .

26  . . . .

27  . . . .

28

### a. **Evidence presented at trial and sentencing**

At the guilt phase,[38] Andriano, her parents, brother, and cousin testified at length regarding her childhood and the conditions in which she was raised; her parents also testified at sentencing.  Andriano's family described her early years with her "strict" biological father, who was a harsh disciplinarian.  Her biological father or grandfather may have molested her; however, Andriano learned of this event from her mother and does not remember it.[39]  After divorcing Andriano's father, Donna married Alejo Ochoa, who legally adopted Andriano.  (Exh. KK.)  When Andriano was very young, the Ochoas joined a traveling ministry, the Fishers of Men.  (*Id.* at 14–15.)  The ministry was a patriarchic organization, and the female members could take virtually no action without approval of the males.  (*Id.*; 10/5, at 157.)   During this period, the Ochoas lived a transient lifestyle, sleeping in a fifth-wheel trailer or a bus.  (*Id.* at 15.)  Also during this period, one of the ministry's adult male members exposed his genitals to Andriano.

After leaving the Fishers of Men, the Ochoas settled in Casa Grande and enrolled Andriano at the 91st Psalm Ministry School, which subsequently changed

---

[38] This Court properly instructed the jurors at the penalty phase to consider any mitigation they found in the guilt-phase evidence.  (Exh. A, at 308.)  The jurors are presumed to have followed this instruction.  *See State v. Newell*, 212 Ariz. 403, ¶ 68, 132 P.3d 833, 847 (2006).

[39] Notably, none of Andriano's PCR declarants claims to have witnessed this alleged molestation or have firsthand knowledge of it.  It appears that Andriano's family members speculate that this may have occurred because of unrelated acts of molestation performed by Andriano's biological father, grandfather, and other family members.  Although Andriano has submitted several declarations discussing these unrelated molestations, she does not persuasively explain their relevance or why they are entitled to significant mitigating weight, where she did not witness them and had been separated from her father's side of the family since she was a very young child.

its name to the Harvest Family Church School.  (Exh. KK, at 17.)  The school was very small (approximately 24 students), very traditional, very strict and, initially, had no extracurricular activities.  (*Id.* at 18–19).  Classes were held in a one-room school house and were of a self-study format; Andriano was the only student in her graduating class.  (*Id.* at 21.)  She was only permitted to socialize with children who belonged to the same church and, consequently, had very few friends.  (*Id.* at 20–21.)  As a result of this limited social contact, Andriano grew to be an overly-generous young adult, and would frequently give away her belongings to her peers to gain acceptance.  (*Id.* at 20.)

Alejo was the church's youth minister.  (*Id.* at 24.)  He did not allow Andriano to attend dances, wear makeup to school, or socialize with friends without an adult chaperone.  (*Id.* at 32.)  He also required her to dress modestly.  (*Id.* at 33.)  Alejo had a temper and was prone to angry outbursts; when this occurred, Donna and Andriano hid in another room until he calmed down, and then attempted to placate him.  (*Id.* at 36–38.)  He was not physically violent, aside from one instance where he grabbed Andriano by the arms and shook her.  (*Id.* at 36–39; Exh. LL, at 61–64, 73.)  Andriano testified that Alejo never touched her inappropriately.  (Exh. V, at 42.)  She told Dr. Murphy the same thing.  (Exh. OO, at 41.)

### b.  Cumulative childhood evidence.

As set forth above, counsel presented evidence that Andriano may have been molested by her biological father and grandfather, that she was exposed to Alejo's angry outbursts, that she lived a transient and impoverished early childhood, and that she was raised in an isolated religious community with strict rules.  The declarations she submits with her PCR petition offer more details of this upbringing, but they are cumulative to the evidence presented at trial.  Counsel is not ineffective for failing to present cumulative mitigation. *See Wong v. Belmontes*, ___ U.S. ___, 130 S.Ct. 383, 387–88 (2009).

1    Additionally, as the supreme court found, Andriano's childhood difficulties

2  are entitled to minimal mitigating weight because she killed Joe at the age of 30,

3  after she had lived an adult lifestyle for years and started a family of her own.

4  *Andriano*, 215 Ariz. at 512, ¶ 72, 161 P.3d at 555.  Presenting a greater magnitude

5  of childhood-related evidence would not have cured this defect or made the

6  mitigation any more weighty.  *See Prince*, 226 Ariz. at 543, ¶ 109, 250 P.3d at 1144

7  ("Difficult childhood circumstances … receive less weight as more time passes

8  between the defendant's childhood and the offense.").    And, for the reasons

9  previously stated, Andriano has failed to draw a persuasive connection between her

10  childhood, her alleged mental health issues, and the crime.

11    Moreover, the evidence at trial—and as set forth in her informants'

12  declarations—also shows that, despite their shortcomings, Andriano's family loved

13  her and that her parents were well-intentioned and raised her in the best way they

14  knew how.  For example, she had the opportunity to participate in music and

15  athletic activities, and excelled at those activities.  She also excelled academically.

16  Although Andriano's parents may not have been perfect, they were not so abusive

17  as to account for her pattern of antisocial behavior as an adult.  This evidence

18  would have been entitled to little weight in mitigation.

19             c.  **Alleged sexual abuse by Alejo Ochoa.**

20    Counsel was not ineffective for failing to present evidence that Alejo Ochoa

21  sexually abused Andriano.  That allegation is speculative and unsubstantiated, and

22  Andriano has given no reason—other than a reference to a general and non-

23  existent duty to conduct a "scorched-earth" mitigation investigation—that counsel

24  should have been aware of such information.  Despite extensive psychological

25  counseling and forensic evaluation by at least three mental-health experts and a

26  social worker, it does not appear that Andriano ever disclosed this alleged

27  molestation before trial.  DeLozier, Patterson, and MacLeod do not claim that

28

1  Andriano ever disclosed this fact to them.  Counsel was therefore not deficient for

2  failing to pursue this theory.

3      As a preliminary matter, Andriano's claim is couched in vague terms.  She

4  does not directly accuse Alejo of molesting her or touching her inappropriately;

5  rather, she makes nondescript allegations such as, "[Alejo] treated her as a sexual

6  plaything," and accuses him of purchasing inappropriate clothing and taking

7  inappropriate photographs.[40]  To support her claim in the PCR petition, Andriano

8  presents myriad declarants from individuals *speculating* that Alejo Ochoa may

9  have molested Andriano as a child.  It appears that these informants have deduced

10 the existence of impropriety between Andriano and Alejo based on four primary

11 factors:  1) Alejo's propensity to make inappropriate jokes with sexual undertones;

12 2) his arguably unusual father-daughter relationship with Andriano (the two

13 appeared to be friends, rather than father and child);, 3) his conduct in purchasing

14 clothing for her that the informants deem inappropriate and purportedly taking her

15 into pornography shops; and 4) the allegation that he molested other children.

16      Significantly,  none  of  the  declarants  observed  Alejo  sexually  abuse

17 Andriano.  Although two declarants claim to have personal knowledge that

18 Andriano was molested by Alejo, they give no specifics.  And, Andriano does not

19 attest in her declaration that Alejo molested her, although this would certainly be a

20 fact within her personal knowledge.  *See* Ariz. R. Crim. P. 32.5 ("Facts within the

21 defendant's personal knowledge shall be noted separately from other allegations of

22

23 _____

[40] The photographs Andriano has supplied with the PCR petition do not
24 support this assertion.  Some depict her clothed in a bathing suit and are not
25 exploitive or obscene.  Another is a black-and-white photograph showing her
   silhouette against a lightning storm.  Although Andriano's defense team believes
26 she is not wearing clothing, this is not evident from the photograph.  Moreover, as
27 noted above, Andriano does not substantiate this allegation claim in her
   declaration.  *See* Ariz. R. Crim. P. 32.5

28

fact and shall be under oath."). In fact, she testified otherwise at trial, and expressly denied that Alejo had ever touched her inappropriately. Andriano has therefore offered no evidence to substantiate her claim that Alejo molested her. This Court should not hold an evidentiary hearing on unsubstantiated claims. *Borbon*, 146 Ariz. at 399, 706 P.2d at 725.

But even assuming Alejo sexually abused Andriano, such evidence would not have resulted in a life sentence. As previously discussed, Andriano murdered Joe at the age of 30. Any childhood sexual abuse she suffered is so attenuated that it is entitled to minimal weight in mitigation. *See Prince*, 226 Ariz. at 543, ¶ 109, 250 P.3d at 1144. Counsel was not ineffective for failing to present such evidence.

### D. *Failure to present mental health evidence and object to sodium azide evidence in aggravation phase (Claim I(B)).*

Andriano asserts that counsel was ineffective in the aggravation phase for failing to present expert testimony relating to her alleged mental illness, and for failing to object to the admissibility of the sodium azide evidence to prove the cruelty under A.R.S. § 13–751(F)(6). (Petition, at 55–59.) Andriano has failed to meet her burden under *Strickland*.

### 1. Cruelty: applicable law and pertinent facts.

A.R.S. § 13–751(F)(6) establishes a capital aggravating factor where a defendant murders a victim in "an especially heinous, cruel or depraved manner." "A murder is especially cruel under A.R.S. § 13–751(F)(6) when the victim consciously suffered physical pain or mental anguish during at least some portion of the crime and the defendant knew or should have known that the victim would suffer." *State v. Dixon*, 226 Ariz. 545, 556, ¶ 61, 250 P.3d 1174, 1185 (2011). A victim need not be conscious for each wound for cruelty to exist. *State v. Sansing*, 206 Ariz. 232, 235, ¶ 7, 77 P.3d 30, 33 (2003). And, "[n]o set period of suffering is required" to establish cruelty. *State v. Cropper*, 223 Ariz. 522, 526, ¶ 13, 225 P.3d 579, 583 (2010).

On independent review in this case, the Arizona Supreme Court found that the following facts established cruelty beyond a reasonable doubt:

> The evidence showed that Andriano poisoned Joe with sodium azide and left him to suffer for what felt to Joe like a "long time." During that period, Joe vomited at least twice, was too weak to sit or stand, and was having difficulty breathing. After pretending to call 911, Andriano stood by for approximately forty-five minutes as Joe suffered from the effects of sodium azide poisoning. Andriano's Internet research on sodium azide and the warnings accompanying the shipped chemical demonstrate that she knew or should have known that poisoning her husband with sodium azide would cause him physical pain and mental anguish. Joe, who was conscious during this time, as evidenced by his interaction with Chris, undoubtedly experienced significant uncertainty as to his ultimate fate.

> Moreover, Andriano struck her terminally ill husband at least twenty-three times in the back of the head with a bar stool. Defensive wounds on Joe's hands and wrists indicate that he was conscious for at least some of the attack and thus knew his wife was attacking him as he lay on the floor, unable to defend himself. Andriano also knew or should have known that beating her husband with a bar stool would cause him physical pain and mental anguish. [FN10]

> > FN10. The evidence established that Joe was likely unconscious when his throat was slashed. We therefore do not consider whether the stabbing caused physical pain or mental anguish.

> Andriano asks us to require that the physical or mental pain experienced by the victim be "extreme." There is no such requirement for a cruelty finding. Nonetheless, the physical pain and mental anguish Joe experienced likely were "extreme" by any standards.

> Although Andriano argued at trial that she was assisting Joe in a suicide by poisoning, she argues on appeal that because Joe did not know he was being poisoned, mental anguish cannot be proved. While a victim's knowledge of the source of physical pain may be relevant to whether the victim experienced mental anguish, it is not a requisite for a finding of mental anguish. And on the facts of this case, mental

49

anguish is established even if Joe did not know he had been poisoned. Moreover, cruelty can be established upon a showing of either mental anguish or physical pain. We thus conclude that cruelty was established based on either—or both—mental anguish or physical pain.

*Andriano*, 215 Ariz. at 511, ¶¶ 65–68, 161 P.3d at 554 (quotations and citations omitted).

### 2. Failure to present expert testimony regarding mental illness (Claim I(B)(I)).

Andriano contends that counsel should have investigated and presented mental health evidence in the aggravation phase to show that she lacked "the capacity to have known that her actions would cause Joe to suffer (rather than alleviate) further physical pain or mental anguish." (Petition, at 55.) Counsel's failure to present this evidence was neither deficient performance nor prejudicial.

First, the mental-health evidence would have been irrelevant and inadmissible in the aggravation phase. Cruelty is determined by reference to an *objective* standard, and whether the defendant was aware or should have been aware of the victim's suffering is judged from the perspective of a *reasonable person* in the defendant's position. *See State v. Bocharski*, 218 Ariz. 476, 494, ¶ 85 n.15, 189 P.3d 403, 421 (2008) (recognizing the "knew or should have known" standard as cruelty's "intent requirement"); *see also State v. Wallace*, 229 Ariz. 155, 158, ¶ 10 n.5, 272 P.3d 1046, 1049 (2012) (rejecting argument that gratuitous violence *Gretzler* factor, which also contains a "knew or should have known" requirement, contained a "distinct element of 'actual knowledge and intent' in addition to [the] … requirement of actual or constructive knowledge or intent"); *see generally State v. Lefevre*, 193 Ariz. 385, 390, ¶ 21, 972 P.2d 1021, 1026 (1998) (phrase "having reason to know" "establishes an objective standard of guilt and

1 Defendant is guilty if a reasonable person would have known the relevant fact").[41]

2 Any factors that impaired Andriano relate to her moral culpability and are properly

3 considered in mitigation; they are not admissible to defend against the aggravating

4 factor.

5       Second, even if admissible, Andriano's mental-health evidence does not

6 establish that she did not know and could not have known that Joe consciously

7 suffered physical pain or mental anguish.  Andriano cites a portion of Dr. Wood's

8 report and portions of Rhode's notes to establish that she believed she was helping

9 Joe by killing him.  (Petition, at 55, citing Tabs 2, p.57, and 45, p.20.)  But even if

10 this is true, which is doubtful, it does not establish that Andriano could not

11 perceive Joe's conscious suffering; in fact, it establishes that she *knew* Joe was

12 suffering but, for reasons not relevant to the cruelty aggravator, perceived a need to

13 end that suffering, even if it caused additional suffering.

14       Further, Andriano's actions were inconsistent with those of someone

15 engaging in a "mercy killing."  Andriano watched Joe suffer the effects of the

16 poison—which involved vomiting, breathing difficulty, and extreme weakness—

17 for 45 minutes; during this period, she led Joe to believe that she had called 911

18 and that paramedics were en route.  *Andriano*, 215 Ariz. at 511, ¶¶ 65–68, 161 P.3d

19 at 554.  Stricken with cancer, undergoing chemotherapy treatment, and already

20 contemplating his mortality, Joe undoubtedly wondered, as he experienced the

21 poison's effects, whether his death were imminent.

22 _____

23

24 [41] *Cf. State v. Moody*, 208 Ariz. 424, 472, ¶ 226, 94 P.3d 1119, 1167 (2004)
(*Ring* error in cruelty finding prejudicial where jury may have arrived at different
decision than trial judge on "knew or should have known" prong in light of
defendant's potential mental and drug impairment at the time of the crime).  *Moody*

26 predates *Bocharski*.  It also involves a *Ring* harmless error review; not an

27 independent review or other construction of the aggravating factor.

28

After Andriano's friend arrived and forced Andriano to call paramedics, Andriano cursed at Joe as she tried to forcibly lift him from the floor under the pretense of taking him to the hospital.  *Id.* at 500, ¶ 5, 161 P.3d at 543.  As sirens approached and the friend went outside to meet the emergency responders, Joe unquestionably felt relieved and optimistic that he would be saved; when Andriano excluded the friend and the paramedics from the apartment and picked up the bar stool, he likely realized her malicious intentions.  *Id.* at 500–01, ¶¶ 5–56, 161 P.3d at 543–44.  Weakened by poison and chemotherapy, Joe could only raise his hands and attempt to deflect the blows his wife delivered.  *Id.* at 511, ¶ 66, 131 P.3d at 554.  Under these facts, Andriano has not shown a reasonable probability that the jurors would not have found cruelty proven had counsel presented mental-health evidence in the aggravation phase.[42]  This Court should reject this ineffective-assistance-of-counsel claim.

### 3.   Failure to object to sodium azide (Claim I(B)(2)).

Andriano asserts that counsel was ineffective for failing to ask this Court for an order "precluding the jury from considering" Joe's ingestion of sodium azide in determining whether cruelty was established.  (Petition, at 56–59.)  Andriano reasons that the State failed to prove conclusively how Joe came to ingest the poison, and presented no alternate explanation to her assertion that he had voluntarily ingested a handful of the poison-laced herbal capsules.  (*Id.*)  Because the State purportedly failed to show that Joe was poisoned without his knowledge, she continues, the sodium azide evidence should have been precluded in the aggravation phase.  (*Id.*)

---

[42] Given the facts set forth above, there was no reasonable theory available to defend against the cruelty factor.  However, counsel successfully defended against both the A.R.S. § 13–751(F)(5) pecuniary gain and the A.R.S. § 13–751(F)(6) heinous or depraved factors.

1    Counsel was not deficient for failing to seek an order precluding

2  consideration of the sodium azide.  Andriano does not contest that evidence of the

3  poison was properly admitted during the guilt phase; in fact, that evidence played a

4  key role in her self-defense theory.  Any evidence admitted in the guilt phase is

5  deemed admitted in the aggravation phase.  *See* A.R.S. § 13–752(I) ("If the trier of

6  fact at any prior phase of the trial is the same trier of fact at the subsequent phase,

7  any evidence that was presented at any prior phase of the trial shall be deemed

8  admitted as evidence at any subsequent phase of the trial.").  Precluding the jury

9  from considering the sodium azide evidence would thus have contravened the

10  relevant Arizona statute.

11    Counsel likewise did not perform deficiently by failing to move to preclude

12  evidence of the sodium azide on the ground that the State did not disprove that Joe

13  consumed it voluntarily.  Guilt may be established based "solely on circumstantial

14  proof."  *State v. Nash*, 143 Ariz. 392, 404, 694 P.2d 222, 234 (1985).  And, contrary

15  to Andriano's position, "it is unnecessary for the prosecution to negate every

16  conceivable hypothesis of innocence when guilt has been established by

17  circumstantial evidence."  *Id.*  Here, significant circumstantial evidence suggests

18  that Andriano administered the poison without Joe's knowledge.  Her

19  fingerprints—not Joe's—were on the packaging material for the poison and on a

20  plastic knife found with it in the storage unit where it was concealed.  *Andriano*,

21  215 Ariz. at 501, ¶ 9, 161 P.3d at 544.  When speaking to Andriano's friend as he

22  lay dying, Joe did not mention having consumed sodium azide, and appeared to

23  desperately want medical attention.  *Id.* at 500, ¶ 4, 161 P.3d at 543.  The question

24  whether Joe consumed the poison voluntarily or Andriano administered it

25  surreptitiously was one of fact for the jury to resolve, and abundant evidence

26  existed from which the jurors could have determined that Andriano poisoned Joe

27  without his knowledge.  Counsel did not perform deficiently by failing to move to

28  preclude this evidence.

1    Nor did Andriano suffer prejudice.  As set forth above, the sodium azide

2    evidence was relevant and admissible at the aggravation phase, and any motion to

3    preclude it would have failed.  Further, although the poison was important to the

4    finding of cruelty, it was not dispositive of it.  Andriano correctly observes that the

5    Arizona Supreme Court cited the poison's effects in finding the factor proven.

6    (Petition, at 56–59.)   But the court also noted Joe's defensive wounds, which

7    revealed his consciousness during the bludgeoning and his resultant knowledge

8    that he was being attacked by his wife while incapacitated and defenseless.  *See*

9    *Andriano*, 215 Ariz. at 511, ¶¶ 65–66, 161 P.3d at 554.  The court found that the

10   bludgeoning established both mental and physical cruelty.  *Id.*  And, with respect to

11   the sodium azide, the court concluded that Joe's knowledge of the source of his

12   physical pain was irrelevant and that mental anguish was established regardless

13   whether he knew he had been poisoned.  *Id.* at 511, ¶ 68, 161 P.3d at 554.  On the

14   basis of the foregoing, both the jurors and the Arizona Supreme Court would have

15   found cruelty proven, notwithstanding inferences that Andriano poisoned Joe.

16   Finally, in a footnote, Andriano cites the prosecutor's opening statement, in

17   which he noted that 21 grams of sodium azide were unaccounted for, observed that

18   21 grams is 10 times the lethal dose of that poison, and concluded from this

19   evidence that Andriano had given Joe 10 times the lethal dose of sodium azide.

20   (Petition, at 56–57 & n.23; Exh. VV, at 23, 32)  To the extent Andriano alleges

21   prosecutorial misconduct, that claim is precluded under Rule 32.2(a)(3) because

22   she should have raised it at trial or on direct appeal.[43]  To the extent Andriano

23   alleges counsel was ineffective for failing to object to the prosecutor's comments,

24   that claim likewise fails because the comments were supported by the evidence:

25

26   _____

27   [43] Alternatively, the claim is meritless for the reasons set forth above.  The
State has set forth the law governing prosecutorial misconduct, *infra*.

28

21 grams of sodium azide was unaccounted for, *see Andriano*, 215 Ariz. at 501, ¶ 10, 161 P.3d at 544, the lethal dose of sodium azide is 2.1 grams, and the amount Joe had ingested could not be quantified.  (Exh. HH, at 146).  The challenged statements were a reasonable inference from these facts.  This Court should reject Andriano's claim.

### E. *Guilt phase (Claim I(C)).*

Andriano argues that counsel were ineffective for failing to 1) present evidence of her purported mental illness to negate the *mens rea* for first-degree murder, 2) present testimony from Gia Palicki to establish hat Joe was aware of Andriano's efforts to obtain life insurance, 3) present testimony from Jeffrey Miller and Chris Weaver to establish that Joe was depressed, and 4) seek a jury instruction on lesser-included offenses.  (Petition, at 59–61.)

### 1. Mental-health evidence (Claim I(C)(1)).

Andriano claims that counsel was ineffective for failing to introduce evidence of her purported mental health difficulties in the guilt phase.  (Petition, at 59–60.)  She asserts that Dr. Woods' testimony could have established "whether she formulated the mental state necessary to be convicted of first-degree murder." (*Id.* at 59.)  This evidence would not have been admissible, and counsel was not ineffective for failing to present it.

"Arizona does not allow evidence of a defendant's metal disorder short of insanity either as an affirmative defense or to negate the *mens rea* element of a crime."[44]   *State v. Mott*, 187 Ariz. 536, 541, 931 P.2d 1046, 1051 (1997); *see also*

---

[44] A limited exception exists in the context of premeditation, where Arizona law permits "limited" expert testimony regarding "a *character trait* of acting reflexively in response to stress."  *Mott*, 187 Ariz. at 544, 931 P.2d at 1054 (citing *State v. Christensen*, 129 Ariz. 32, 34–36, 628 P.2d 580, 582–84 (1981)) (emphasis added).  Andriano does not cite *Christensen* or claim that she possesses such a character trait.  (Petition, at 59–60.)  Rather, she offers expert mental-health

(continued ...)

*Clark v. Arizona*, 548 U.S. 735, 756 (2006).   Expert testimony regarding a defendant's mental health is thus probative of guilt only if the defendant pursues an insanity defense, which requires her to prove by clear and convincing evidence that she "was afflicted with a mental disease or defect of such severity that [she] did not know the criminal act was wrong."  A.R.S. § 13–501(A), (C).

Andriano does not claim that counsel should have pursued an insanity defense.   Nor does Dr. Woods' report—or any other evidence—even remotely establish that she did not know that killing Joe was wrong, such that she could carry her burden under A.R.S. § 13–502.  Counsel's failure to offer mental-health evidence in the guilt phase was thus neither deficient nor prejudicial, and this Court should dismiss this ineffective-assistance-of-counsel claim.

## 2. Evidence of Joe's awareness of life insurance applications (Claim I(C)(2)).

Andriano faults counsel for failing to present testimony from Gia Palicki in the guilt phase.[45]   (Petition, at 60.)   Counsel was not ineffective for failing to present this testimony, because the incident Palicki recalls was remote in time from the murder and thus would not have cast doubt upon evidence that Andriano attempted to obtain a life insurance policy without Joe's knowledge.

In her declaration, Palicki explains that she met Joe sometime in the summer or fall of 1999, and became a nanny for the Andriano children shortly thereafter.

_____

( ... continued)

evidence to negate specific intent, which is precluded by *Mott*, 187 Ariz. at 544–45, 931 P.2d at 1054–55.

[45] Palicki testified in the penalty phase as a defense witness.  (*See* Petition, at Tab 31, ¶ 26.)   In her declaration, Palicki criticizes counsel for not properly preparing her for trial, and recalls being "under the impression that [she] was testifying at a custody hearing, not a criminal trial."  (*Id.*)   The relevance of this alleged failure is unclear, as Palicki presumably testified truthfully, and the truth would not depend on the type of court proceeding at issue.

1   (Petition, at Tab 31, ¶ 1.)   She also describes the couple's desire to obtain life

2   insurance:

3

4       I know that Joe was trying to obtain a life insurance policy.   Both
        [Andriano] and Joe talked to me about it.   *That was really soon after*

5       *we met*, because they told me about looking for life insurance and
        about a malpractice lawsuit when they first told me that Joe was sick

6       with cancer.   One of Joe's biggest concerns was that he might die

7       before he obtained life insurance or the malpractice suit went through.
        He wanted all of that taken care of before he passed.   Joe and

8       [Andriano] were trying to get a life insurance policy and they told me

9       they were running into difficulties because of Joe's cancer.   Joe[']s
        concern was that [Andriano] and the kids would not be financially set

10      after he was gone.

11

12  (*Id.* at ¶ 8, emphasis added.)   Thus, the life insurance conversation appears to have

13  occurred shortly after Palicki met Joe, which was in the summer or fall of 1999.

14      Conversely, Andriano made her clandestine attempts to obtain life insurance

15  in August and September of 2000.   *Andriano*, 215 Ariz. at 502, ¶ 20, 161 P.3d at

16  545.   An insurance agent contacted Joe in response to one of Andriano's inquiries,

17  and Joe stated he was not interested in insurance.   *Id.*   Three days later, Andriano

18  emailed the agent asking him to reinstate Joe's application and instructing the

19  agent to contact her with all future inquiries.   *Id.*   She also asked two friends to

20  pose as Joe and take a requisite physical, in order to conceal Joe's cancer from the

21  insurance company.   *Id.* In light of the foregoing, and the timing of the

22  conversation between Joe and Palicki, there is no reasonable probability that her

23  testimony would have changed the verdict.   Andriano has failed to carry her burden

24  under *Strickland*.

25          **3.  Evidence of Joe's depression (Claim I(C)(3)).**

26      Andriano contends that counsel should have presented testimony from

27  Jeffrey Miller (the attorney who represented the Andrianos in a medical

28  malpractice lawsuit) and Joe's friend Chris Weaver to corroborate her claim that

57

1    Joe was depressed and suicidal.  Andriano has failed to carry her burden under

2    *Strickland*.

3                    **a.  Jeffrey Miller.**

4            Miller, who also testified in the guilt phase as a State witness, has submitted

5    a declaration in support of the PCR petition, claiming that Andriano contacted him

6    on up to three occasions and reported that Joe was suicidal.[46]  (Petition, at Tab 19, ¶

7    4.)  Miller recalls that he contacted Joe about these concerns; Joe "acknowledged"

8    them and "did not deny" their accuracy, but told Miller he understood that his non-

9    cancer-related death would terminate the lawsuit and told Miller "not to worry."

10   (*Id.* at ¶ 5.)   Counsel did not *fail* to introduce this evidence at trial; rather, he

11   *attempted* to elicit it from Miller, but this Court properly sustained the State's

12   hearsay objection.  (Exh. O, at 89–91.)  Counsel was not deficient merely because

13   this Court ruled against him.[47]

14           Andriano has also failed to show prejudice under *Strickland*.  Miller does not

15   disclose in his declaration when Andriano reported her concerns about Joe; he

16   simply states that she did so "[i]n the months prior" to Joe's murder.  (Petition, at

17   Tab 19, ¶ 4.)  In any event, it is not surprising that Joe—diagnosed with terminal

18   cancer and undergoing tortuous chemotherapy treatments—would be depressed

19   and perhaps, at times, contemplate suicide.   However, Joe told Miller "not to

20   worry," suggesting that he did not intend to follow through with any suicidal

21   _____

22   [46] In these conversations, Andriano revealed her true motive in reporting

23   these concerns.  Miller recalls that she "asked [him] to remind Joe that, from a

     legal perspective, he would be hurting his family by committing suicide because

24   the malpractice claim would be dismissed."  (Petition, at Tab 19, ¶ 4.)

25   [47] Andriano suggests that counsel should have "prepared … Miller properly

26   to get his testimony admitted."  (Petition, at 60–61.)  Andriano does not explain,

27   however, what type of preparation would have succeeded in converting rank

     hearsay into admissible evidence.

28

1    ideation.   (*Id.* at ¶ 5.)   And, Joe's conduct in undergoing chemotherapy (which

2    served only to prolong, not save, his life) reveals his desire to continue living as

3    long as possible.   Further, even if counsel had corroborated Andriano's claim that

4    Joe had, at some point, spoke of suicide, that fact would not have established his

5    involvement in acquiring and ingesting the sodium azide.   Nor would it have

6    negated Andriano's conduct in bludgeoning and stabbing Joe, which caused his

7    death.   *See Andriano*, 215 Ariz. at 501, ¶10, 161 P.3d at 544.   Andriano has not

8    shown deficient performance or prejudice.

9                         **b.  Chris Weaver**

10   Andriano also faults counsel for failing to present testimony from Joe's

11   friend Chris Weaver to corroborate her claims that Joe was depressed.   In his

12   declaration, Weaver states that, in the last several months of his life, Joe

13   commented more than once on having limited time left to live, and gave the

14   impression that he "knew he was dying and it didn't really matter to him

15   anymore."   (Petition, at Tab 37, ¶ 4.)   Weaver's statements, however, do not

16   necessarily reflect Joe's depression; they are more reasonably construed as

17   reflecting his acceptance of an unavoidable fate.   Counsel was not ineffective for

18   failing to present Weaver's testimony at trial.

19   Moreover, counsel interviewed Weaver at length prior to trial, and Weaver

20   stated that Joe did not discuss suicide, but instead "always acted like he wasn't

21   gonna die" and remained "in super spirits."   (Petition, at Tab 58, p. 9.)   Weaver also

22   claimed that, approximately 2 months before the murder, Joe had called him,

23   informed him that he and Andriano were composing a will, and asked Weaver to

24   take care of his family after he died.   (*Id.* at 16–18.)   Joe did not indicate that he

25   believed his death was imminent, but thought "he'd better make [a will] so that he

26   would have one when he did die."   (*Id.*)   These comments also appear to reflect no

27   more than Joe's acceptance of his terminal illness and preparation for his inevitable

28

1   death.  They do not establish that he was depressed.[48]  Andriano has not carried her

2   burden under *Strickland*.

3                         **4.  Lesser-included offense instruction.**

4          Andriano contends that counsel was ineffective for failing to request that the

5   jury be instructed on lesser-included offenses to first-degree murder.  (Petition, at

6   61.)  However, counsel's failure to do so was neither deficient nor prejudicial

7   because—as the Arizona Supreme Court expressly concluded on direct appeal—

8   Andriano advanced an "all-or-nothing" defense, and the evidence did not support a

9   lesser-included instruction.  *Andriano*, 215 Ariz. at 504–05, ¶¶ 32–36, 161 P.3d at

10  547–58.

11         The  evidence  Andriano  offers  in  her  PCR  proceeding  allegedly

12  "undercutting premeditation" (Petition, at 61) is irrelevant:  *Strickland* requires this

13  Court to evaluate counsel's failure to request a lesser-included instruction from

14  their perspective at the time of trial, without the benefit of hindsight or subsequent

15  investigation.  466 U.S. at 689; *see also Coleman*, 150 F.3d at 1113; *Campbell*, 18

16  F.3d at 673.  Further, as discussed previously, Andriano's mental health evidence

17  would  not  have  been  admissible  at  the  guilt  phase.   And,  evidence  of  Joe's

18  purported depression and his alleged knowledge of Andriano's efforts to obtain life

19  insurance were minimally probative, as also set forth above.  This Court should

20  reject Andriano's claim.

21

22  _____

23

24        [48] Additionally, Weaver would have offered potentially damaging testimony
    on cross-examination.  During his interview, he told counsel that he had frequently

25  seen Andriano out at bars, that Joe believed she had a boyfriend, and that Andriano
    had called him in late August or early September 2000 and told him that Joe's

26  cancer was spreading and that he had approximately 1 month to live.  (Petition, at
    Tab 58, p.5–6, 8–9.)  Andriano "didn't really seem upset about" that news.  (*Id.* at

27  6.)

28

1      **F. *Failure to object to prosecutorial misconduct (Claim III).***

2      Andriano argues that counsel was ineffective for failing to object to

3   "pervasive instances of prosecutorial misconduct" at all three phases of trial.

4   (Petition, at 63–69.)  She further asserts that appellate counsel was ineffective for

5   failing to argue prosecutorial misconduct on appeal.   Specifically, Andriano

6   contends that the prosecutor behaved improperly by 1) portraying her as a

7   "promiscuous adulteress" and thus "disparaging" her character, 2) engaging in

8   vouching during his guilt-phase closing argument, and 3) improperly "impugning"

9   Dr. Murphy's ethics.[49]   (*Id.*)   The prosecutor's comments were supported by the

10  evidence and well within the bounds of permissible argument.   Counsel therefore

11  was not ineffective for failing to object to those comments, and appellate counsel

12  was not ineffective for failing to challenge them on appeal.

13      **1.  Applicable law.**

14      "To prevail on a claim of prosecutorial misconduct, a defendant must

15  demonstrate that the prosecutor's misconduct so infected the trial with unfairness

16  as to make the resulting conviction a denial of due process."  *State v. Morris*, 215

17  Ariz. 324, 335, ¶ 46, 160 P.3d 203, 214 (2007) (quotations omitted); *accord*

18  *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974).  "The misconduct must be so

19  pronounced and persistent that it permeates the entire atmosphere of the trial."

20  _____

21      [49] In connection with this argument, Andriano gratuitously cites comments

22  from the late Arizona Supreme Court Justice Michael Ryan during a direct appeal

23  oral argument in an unrelated capital case involving the same trial prosecutor.

24  (Petition, at 63–64.)  But the question when addressing a prosecutorial misconduct

    claim is the trial's fairness, not the prosecutor's culpability, even in this case.  The

25  prosecutor's alleged impropriety in another case is therefore of no consequence.

    Moreover, in the case in question, the Arizona Supreme Court—in an opinion in

26  which Justice Ryan joined—found only a single arguably improper act and no

27  pervasive prosecutorial misconduct.  *See State v. Gallardo*, 225 Ariz. 560, 568–70,

28  ¶¶ 34–47, 242 P.3d 159, 167–69 (2010).

1   *Morris*, 215 Ariz. at 335, ¶ 46, 160 P.3d at 214 (quotations omitted).  This Court

2   should not reverse based on prosecutorial misconduct unless "two conditions are

3   satisfied:  (1) misconduct is indeed present; and (2) a reasonable likelihood exists

4   that the misconduct could have affected the jury's verdict, thereby denying

5   defendant a fair trial."  *Anderson*, 210 Ariz. at 340–41, ¶ 45, 111 P.3d at 382–83

6   (quotations omitted).

7       Standing alone, neither legal error, negligence, mistake, or insignificant

8   impropriety constitutes prosecutorial misconduct.  *See State v. Aguilar*, 217 Ariz.

9   235, 238–39, ¶ 11, 171 P.3d 423, 426–27 (App. 2007).  Prosecutorial misconduct

10  only occurs when, "taken as a whole," the prosecutor engages in "intentional

11  conduct which the prosecutor knows to be improper and prejudicial, and which he

12  pursues for any improper purpose with indifference to a significant resulting

13  danger of mistrial.  *Id.* (quoting *Pool v. Superior Court*, 139 Ariz. 98, 108–09, 677

14  P.2d 261, 271–72 (1984)).

15      **2.  Andriano as "promiscuous adulteress."**

16      Andriano argues that the prosecutor improperly highlighted aspects of her

17  extensive sexual history; in particular, she laments references to her affairs with

18  Rick Freeland and Travis Black; "details" of her sexual encounters with Freeland

19  and Black, including that she did not use a personal lubricant; her sexual history

20  prior to meeting Joe; and whether she dressed in "provocative clothing."  (Petition,

21  at 65–66.)  Andriano suggests that the prosecutor unduly emphasized this evidence,

22  and that it was more prejudicial than probative.[50]  (*Id.*)  The prosecutor's

23

24  _____

25      [50] This argument is puzzling, as a central theme of Andriano's PCR petition

26  and expert reports is that she is "hyper-sexual" and that this behavior is somehow
    mitigating; in essence, she admits to being a "promiscuous adulteress" but attempts

27  to convince this Court that this quality warrants leniency.  The evidence was not
    unfairly prejudicial.  *See* Ariz. R. Evid. 403.

28

1   comments, however, were not inappropriate, and neither trial nor appellate counsel
2   was ineffective for failing to challenge them.

3        The prosecutor's discussion of Andriano's affairs was based on evidence
4   properly admitted at trial.  As Andriano concedes, the trial court denied her pretrial
5   motion to preclude evidence of her affairs with Freeland and Black.  (Petition, at
6   65.)  The Arizona Supreme Court affirmed this ruling on direct appeal, finding
7   Andriano's affairs relevant to prove both her motive for killing Joe, and to rebut
8   her claim that she "was a domestic violence victim who lived in fear of her abusive
9   husband, whom she bludgeoned to death in self-defense." *Andriano*, 215 Ariz. at
10  503–04, ¶¶ 24–31, 161 P.3d at 546–47.   Moreover, although prosecutorial
11  misconduct was not at issue on direct appeal, the Arizona Supreme Court found
12  that the *arguments* Andriano now attacks were "not evidence, as the jury was
13  instructed, and thus the comments do not render unfairly prejudicial evidence that
14  is otherwise properly admitted." *Id.* at 503, ¶ 28, 161 P.3d at 546.  Andriano has
15  not carried her burden under *Strickland*.

16       **3.  Vouching**

17       Andriano also contends that the prosecutor engaged in misconduct by
18  vouching during questioning and closing argument, and that counsel was
19  ineffective for failing to object to this impropriety.  (Petition, at 66–68.)  She first
20  claims that the prosecutor, in cross-examining Dr. Murphy, improperly asked her
21  whether an ex-boyfriend had caught Andriano undressed with another man.
22  (Petition, at 66–68.)  The prosecutor, however, had a good-faith basis for asking
23  this question; in fact, Shawn King has since confirmed the story is true.  (Petition,
24  at Tab 15.)  The prosecutor had already announced his intention to call Shawn King
25  as a witness in rebuttal; that he did not do so is of no moment.

26       Andriano also alleges that the prosecutor engaged in misconduct by stating
27  during closing that the jury was not here "to judge [King's] conduct.  If he were to
28  be judged, he would be judged as an accomplice." (Petition, at 67.)  This argument

1  was not improper, given that *Andriano* implicated King during her testimony,

2  claiming that he had helped her identify and locate the sodium azide.

3  Andriano also faults the prosecutor for using the term "we know" repeatedly

4  in closing argument.  But the prosecutor used "we know" to refer to the *evidence*

5  *presented*; not to refer to facts not presented to the jury.  This type of argument is

6  permissible and not objectionable.   Additionally, none of the acts above are

7  prejudicial because the trial court instructed the jurors that counsel's argument was

8  not evidence.  *Andriano*, 215 Ariz. at 503, ¶ 28, 161 P.3d at 546.  Andriano has not

9  carried her burden under *Strickland*.

10  **4.  Attack on Dr. Murphy**

11  Andriano contends that the prosecutor improperly impugned Dr. Murphy's

12  ethics, in violation of *State v. Hughes*, 193 Ariz. 72, 86, 969 P.2d 1184, 1198 (1998)

13  ("It is improper for counsel to imply unethical conduct on the part of an expert

14  witness without having evidence to support the accusation.").   He points to a

15  comment that Dr. Murphy violated her "ethical duty to consider both sides."  This

16  comment was a reasonable inference from the evidence, which suggested that Dr.

17  Murphy approached her evaluation with the preconceived notion that Andriano

18  was a domestic violence victim.  Dr. Bayless took issue with many of her methods.

19  Thus, unlike in *Hughes*, the prosecutor's argument was supported by the evidence.

20  And, even when confronted with dramatic discrepancies in Andriano's self-

21  reporting, Dr. Murphy did not change her opinion, and considered Andriano's

22  untruthfulness irrelevant.  This argument was not objectionable.

23  Andriano further claims that the prosecutor called Dr. Murphy a "liar" who

24  "can't keep her story straight."  But those statements referenced *Andriano*, whose

25  self-report had formed virtually the entire basis of Dr. Murphy's opinion.  And,

26  they were supported by the evidence, because Andriano told myriad different

27  versions of Joe's murder and of many other events in her life.  Notwithstanding

28  these inconsistencies, Dr. Murphy believed her wholeheartedly.  The prosecutor

1    was justified in highlighting this unreasonable reliance.  Finally, as stated above,

2    the acts of alleged misconduct are not prejudicial because the trial court instructed

3    the jurors that counsel's argument was not evidence.  *Andriano*, 215 Ariz. at 503, ¶

4    28, 161 P.3d at 546.  This Court should reject Andriano's claim.

5            **G.** ***Ineffective assistance of appellate counsel (Claim V).***

6            Andriano contends that appellate counsel was ineffective for failing to raise

7    on appeal any claims found precluded, and specifically for failing to raise 1)

8    DeLozier's alleged conflict of interest, 2) prosecutorial misconduct, and 3) this

9    Court's order sustaining the State's hearsay objection to Miller's testimony.

10   (Petition, at 70.)  As set forth above, these claims fail on their merits, and appellate

11   counsel is not ineffective for failing to raise meritless claims.  *See Pope v. Wood*,

12   93 F.3d 1434, 1445 (9th Cir. 1996)).  Any other ineffective-assistance-of-appellate-

13   counsel claim Andriano intends to present is waived for insufficient argument.  *See*

14   Ariz. R. Crim. P. 32.5; *Borbon*, 146 Ariz. at 399, 706 P.2d at 725.

15       **V.  CONCLUSION.**

16          For the foregoing reasons, this Court should deny and dismiss the PCR

17   petition.

18          DATED this 23rd day of July, 2012.

19                                        RESPECTFULLY SUBMITTED,

20                                        THOMAS C. HORNE
                                          ATTORNEY GENERAL
21

22

23                                        /S/LACEY STOVER GARD
                                          ASSISTANT ATTORNEY GENERAL
24                                        ATTORNEYS FOR DEFENDANT

25

26

27

28

                                        65

1  Copy of the foregoing mailed
   this 23rd day of July, 2012, to:

2

3  Scott M. Bennett
   Lewis and Roca LLP
4  40 N. Central Ave., Suite 1900
   Phoenix, AZ   85004

5
   Todd E. Hale
6  Lewis and Roca LLP
   One S. Church Avenue, Suite 700
7  Tucson, AZ   85701

8  Allen A. Arntsen
   Foley & Lardner LLP
9  150 East Gilman Street
   P.O. Box 1497
10 Madison, WI   53701-1497

11 Stephen J. Nickels
   Foley & Lardner LLP
12 150 East Gilman Street
   P.O. Box 1497
13 Madison, WI   53701-1497

14 Matthew R. Lynch
   Foley & Lardner LLP
15 150 East Gilman Street
   P.O. Box 1497
16 Madison, WI   53701-1497

17 Attorneys for Defendant

18
   /s/Linda Yrrizarry
19

20

21 #764873

22

23

24

25

26

27

28

66

# EXHIBIT LIST

Exhibit A:  Excerpts from Record on Appeal (Photostated Instruments).

Exhibit B:  Excerpts from Record on Appeal (Minute Entries)

Exhibit C:  Direct Appeal Opening Brief

Exhibit D:   Documents from Maricopa County guardianship proceeding (No. PB2000–004531).

Exhibit E:   Documents from Pinal County adoption proceeding (No. AD–20010058) and appeal (No. 2 CA–JV 2002–0127).

Exhibit F:  Excerpts from DSM–IV.

Exhibit G:  Trial Exhibit 544

Exhibit H:   Notes from Maricopa County Jail (including released Trial Exhibit 546)

Exhibit I:  Defendant's employment records from Casa Grande Regional Medical Center (personal identifying information redacted).

Exhibit J:  Defendant's employment records from Schomac Property Management (personal identifying information and third-party financial and termination information redacted).

Exhibit K:  Excerpts from Mesa Police Departmental Report (DR # 20011210670) and Maricopa County Superior Court documents (No. CR–2002–000712) regarding Cynthia Edwards prosecution

Exhibit L:  Trial Exhibit 548.

Exhibit M:  Trial Exhibit 472.

Exhibit N:  Trial Exhibit 487.

Exhibit O:  R.T. 9/29/04.

Exhibit P:  R.T. 2/4/05.

Exhibit Q:  R.T. 2/5/01.

Exhibit R:  R.T. 4/13/01.

Exhibit S:  R.T. 4/16/01.

Exhibit T:  R.T. 7/27/01.

Exhibit U:  R.T. 5/21/04.

Exhibit V:  R.T. 10/25/04.

Exhibit W:  R.T. 10/26/04.

Exhibit X:  R.T. 11/1/04.

Exhibit Y:  R.T. 11/2/04.

Exhibit Z:  R.T. 10/27/04.

Exhibit AA:  R.T. 10/28/04.

Exhibit BB:  R.T. 11/3/04.

Exhibit CC:  R.T. 11/4/04.

Exhibit DD:  R.T. 11/8/04.

Exhibit EE:  R.T. 9/8/04.

Exhibit FF:  R.T. 9/14/04.

Exhibit GG:  R.T. 9/21/04.

Exhibit HH:  R.T. 9/22/04.

Exhibit II:  R.T. 11/16/04.

Exhibit JJ:  R.T. 11/17/04.

Exhibit KK:  R.T. 10/4/04.

Exhibit LL:  R.T. 10/5/04.

Exhibit MM:  R.T. 10/6/04.

Exhibit NN:  R.T. 10/7/04.

Exhibit OO:  R.T. 10/12/04.

Exhibit PP:  R.T. 10/13/04.

Exhibit QQ:  R.T. 10/14/04.

Exhibit R:  R.T. 10/20/04.

Exhibit SS:  R.T. 10/21/04.

Exhibit TT:  R.T. 11/10/04.

Exhibit UU:  R.T. 11/15/04.

Exhibit VV:  R.T. 11/30/04.

Exhibit WW:  R.T. 12/1/04.

Exhibit XX:  R.T. 12/7/04.

Exhibit YY:  R.T. 12/8/04.

Exhibit ZZ:  R.T. 12/9/04.

Exhibit AAA:  R.T. 12/13/04.

Exhibit BBB:  R.T. 12/14/04.

Exhibit CCC:  R.T. 12/15/04.

Exhibit DDD:  R.T. 12/16/04.

Exhibit EEE:  R.T. 12/16/04.

## INDEX OF EXHIBITS TO STATE'S RESPONSE TO PCR

Exhibit A:  Excerpts from Record on Appeal (Photostatted Instruments)

Exhibit B:  Excerpts from Record on Appeal (Minute Entries)

Exhibit C:  Direct Appeal Opening Brief

Exhibit D:   Documents from Maricopa County guardianship proceeding (No. PB2000–004531)

Exhibit E:   Documents from Pinal County adoption proceeding (No. AD–20010058) and appeal (No. 2 CA–JV 2002–0127)

Exhibit F:  Excerpts from DSM–IV.

Exhibit G:  Trial Exhibit 544

Exhibit H:   Notes from Maricopa County Jail (including released Trial Exhibit 546)

Exhibit I:  Defendant's employment records from Casa Grande Regional Medical Center (personal identifying information redacted)

Exhibit J:  Defendant's employment records from Schomac Property Management (personal identifying information and third-party financial and termination information redacted)

Exhibit K:  Excerpts from Mesa Police Departmental Report (DR # 20011210670) and Maricopa County Superior Court documents (No. CR–2002–000712) regarding Cynthia Edwards prosecution

Exhibit L:  Trial Exhibit 548

Exhibit M:  Trial Exhibit 472

Exhibit N:  Trial Exhibit 487

Exhibit O:  R.T. 9/29/04 (guilt-phase testimony of John Hseuh and Jeffrey Miller)

Exhibit P:  R.T. 2/4/05 (status conference)

Exhibit Q:  R.T. 2/5/01 (status conference)

Exhibit R:  R.T. 4/13/01 (pretrial conference)

Exhibit S:  R.T. 4/16/01 (pretrial conference)

Exhibit T:  R.T. 7/27/01 (pretrial conference)

Exhibit U:  R.T. 5/21/04 (pretrial conference/argument on scope of Dr. Bayless' evaluation)

Exhibit V:  R.T. 10/25/04 (guilt-phase testimony of Wendi Andriano)

Exhibit W:  R.T. 10/26/04 (guilt-phase testimony of Wendi Andriano)

Exhibit X:  R.T. 11/1/04 (guilt-phase testimony of Wendi Andriano)

Exhibit Y:  R.T. 11/2/04 (guilt-phase testimony of Wendi Andriano)

Exhibit Z:  R.T. 10/27/04 (guilt-phase testimony of Wendi Andriano)

Exhibit AA:  R.T. 10/28/04 (guilt-phase testimony of Wendi Andriano)

Exhibit BB:  R.T. 11/3/04 (guilt-phase testimony of Wendi Andriano)

Exhibit CC:  R.T. 11/4/04 (guilt-phase testimony of Wendi Andriano)

Exhibit DD:  R.T. 11/8/04 (guilt-phase testimony of Wendi Andriano)

Exhibit EE:  R.T. 9/8/04 (opening statements and guilt-phase testimony of Chris Hashisaki)

Exhibit FF:  R.T. 9/14/04 (guilt-phase testimony of Benjamin McKinnon and Dennis Olson)

Exhibit GG:  R.T. 9/21/04 (miscellaneous guilt-phase testimony)

Exhibit HH:  R.T. 9/22/04 (miscellaneous guilt-phase testimony)

Exhibit II:  R.T. 11/16/04 (guilt-phase closing argument)

Exhibit JJ:  R.T. 11/17/04 (guilt-phase closing argument)

Exhibit KK:  R.T. 10/4/04 (guilt-phase testimony of Donna Ochoa)

Exhibit LL:  R.T. 10/5/04 (guilt-phase testimony of Donna Ochoa)

Exhibit MM:  R.T. 10/6/04 (guilt-phase testimony of Patty Rubio and Alejo Ochoa)

Exhibit NN:  R.T. 10/7/04 (guilt-phase testimony of Dr. Sharon Murphy)

Exhibit OO:  R.T. 10/12/04 (guilt-phase testimony of Dr. Sharon Murphy)

Exhibit PP:  R.T. 10/13/04 (guilt-phase testimony of Dr. Sharon Murphy).

Exhibit QQ:  R.T. 10/14/04 (guilt-phase testimony of Dr. Sharon Murphy)

Exhibit RR:  R.T. 10/20/04 (guilt-phase testimony of William Collier)

Exhibit SS:   R.T. 10/21/04 (guilt-phase testimony of William Collier, Barbara Mitchell, and Brandon Ochoa)

Exhibit TT:  R.T. 11/10/04 (guilt-phase testimony of Dr. Michael Brad Bayless, Justin Roberts, and Joe Andriano, Sr.)

Exhibit UU:  R.T. 11/15/04 (guilt-phase testimony of Dr. Mindy Mechanic)

Exhibit VV:  R.T. 11/30/04 (guilt-phase testimony of Dennis Olson and Dr. Philip Keen)

Exhibit WW:  R.T. 12/1/04 (aggravation-phase closing argument)

Exhibit XX:  R.T. 12/7/04 (argument re:  scope of State's rebuttal).

Exhibit YY:  R.T. 12/8/04 (penalty-phase testimony of Laura King, Gerald Perry, and Joyce van Every).

Exhibit ZZ:   R.T. 12/9/04 (penalty-phase testimony of Chris Vargas, Jimmy Gaylon, and Dr. Sharon Murphy[1])

Exhibit AAA:  R.T. 12/13/04 (penalty-phase testimony of Donna Ochoa, Lonnie Inskeep, Gia Palicki, Barbara Mitchell, Alejo Ochoa, and Jana Andriano Clayton)

Exhibit BBB:  R.T. 12/14/04 (penalty-phase testimony of Jana Andriano Clayton, Timothy Lee, Dawna Harris, and Bonnie Lose)

Exhibit CCC:   R.T. 12/15/04 (penalty-phase testimony of Dr. Michael Brad Bayless and closing argument)

Exhibit DDD:  R.T. 12/16/04 (penalty-phase closing argument)

Exhibit EEE:  R.T. 11/16/04 (guilt-phase closing argument)

---

[1] This transcript was unintentionally incomplete as attached to the State's response. The remainder of the transcript has been provided with the current disclosure, as set forth in the disclosure index.

# ANDRIANO EXHIBITS TO STATE'S PCR RESPONSE

EXHIBIT A



RICHARD M. ROMLEY
MARICOPA COUNTY ATTORNEY

JOHN R. DITSWORTH
DEPUTY COUNTY ATTORNEY
BAR ID #:  005669
MCAO Firm #:  00032000
Administration Building
301 W Jefferson St Ste 800
Phoenix, AZ 85003-2143
Telephone:   (602) 506-5780
Attorney for Plaintiff

QUADRANT UA/*COMPLEX CASE*          DR. 2000-01797849 PHOENIX PD

IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

IN AND FOR THE COUNTY OF MARICOPA

|  |  |
|---|---|
| STATE OF ARIZONA, | NO. CR2000-016163 |
| Plaintiff, | 259 GJ 82 |
| vs. | INDICTMENT |
| WENDI ELIZABETH ANDRIANO, | FIRST DEGREE MURDER, A CLASS 1 DANGEROUS FELONY |
| Defendant. | |

The Grand Jurors of Maricopa County, Arizona, accuse WENDI
ELIZABETH ANDRIANO, on this 18th day of October, 2000, charging that
in Maricopa County, Arizona:

WENDI ELIZABETH ANDRIANO, on or about the 8th day of October,
2000, intending or knowing that her conduct would cause death, with
premeditation caused the death of Joseph Andriano, in violation of
A.R.S. §§ 13-1101, 13-1105, 13-703, and 13-801.

The State of Arizona further alleges that the offense charged in
this count is a dangerous felony because the offense involved the
intentional or knowing infliction of serious physical injury upon
Joseph Andriano, in violation of A.R.S. § 13-604(P).

259 GJ 82

*A True Bill*

("A True Bill")

Date: October 18, 2000

RICHARD M. ROMLEY
MARICOPA COUNTY ATTORNEY

JOHN R. DITSWORTH
DEPUTY COUNTY ATTORNEY

TH\OK

~~AMY CARDENAS~~ Andrew Pereira
FOREMAN OF THE GRAND JURY

2

000003418

A000000002

Defendant's Name  WENDI  ANDRE  UO                    * WARRANT FACT SHEET *                    C.    NAL NUMBER _____

CR2000-0 16163

- ☐  * CURRENT WHEREABOUTS UNKNO
- ☐    TRANSIENT
- ☒    IN CUSTODY    ☐ DOC  ☒ JAIL          ☐ FELONY  ☐ MISDEMEANOR      LOCATION _____
         CHARGE  FIRST DEGREE MUDer        CR _____
- ☐    ON PROBATION   CHARGE _____    JURISDICTION _____
- ☐    ON PAROLE      CHARGE _____    JURISDICTION _____
- ☐    NATURE AND GRAVITY OF OFFENSE _____
- ☐    PRIOR FTA  NUMBER _____  JURISDICTION _____  DATES: _____
- ☐    PRIOR FELONY CONVICTIONS   NUMBER _____   CONVICTIONS FOR _____
         JURISDICTION _____                   DATES: _____
- ☐    PROTECTION OF VICTIM AND/OR WITNESSES (THREATS, ETC)
         NAMES _____
         EXPLAIN _____

- ☒    NON-BONDABLE

   - ☐    PURSUANT TO ARTICLE 2 SECTION 22 OF THE ARIZONA CONSTITUTION THE DEFENDANT IS NOT BONDABLE BECAUSE THE
           PROOF IS EVIDENT OR THE PRESUMPTION IS GREAT THAT THE DEFENDANT COMMITTED THE INSTANT OFFENSE.

   - ☐    DEFENDANT WAS ON RELEASE FOR ANOTHER FELONY CHARGE

           JURISDICTION _____
           CHARGE/CLASSIFICATION/CR #  _____
           DATE OF RELEASE/I.A. DATE  _____
           INSTANT OFFENSE - CHARGE & DOC  _____

☒    CAPITAL OFFENSE (ARS 13-3961) AGGRAVATING CIRCUMSTANCES: Δ SOUGHT TO PURCHASE 1 million
     Δ LIFE INS POLICY ON THE BAND THRO FRAUDULENT MEANS
     Δ PURCHASED POISON W FAKE ADDRESS
Tox Pending   Δ MAY HAVE POISONED VICTIM, HIT HIM W A LAMP + BAR STOOL.
CIRCUMSTANCES OF THE OFFENSE   WHILE VICT WAS ON FLOOR, SLIT HIS THROAT.   DRUG OFFENSES

1.   Was a firearm or other weapon used?                    1.   If the defendant is considered a major drug dealer, please state
     ☐ YES      ☒ NO                                             the supporting facts:
     Type of weapon: _____                              _____
                                                                 _____
     Was anyone injured by the defendant?                        _____
     ☒ YES      ☐ NO

     Was medical attention necessary?                       2.   What quantities and types of illegal drugs are directly involved
     ☒ YES      ☐ NO                                             in this offense?
     Nature of injuries:  DEATH                                  _____
     _____                             _____

OTHER INFORMATION                                                Approximate monetary value:
                                                                 _____
1.   What facts indicate the defendant will flee if released?
     Explain: _____             3.   Has any money been seized?
     _____                           ☐ YES  ☐ NO
     _____                           Amount: _____

2.   What facts does the State have to oppose a non-financial   4.   Were any fully automatic weapons in the possession of the
     release ?                                                      defendant at the time of the offense?
     Explain: _____                       ☐ YES  ☐ NO
     _____                                Quantity and type: _____
     _____

- ☐    State does not oppose a non-financial release if local residence
        is verified.                                          Charging Attorney  DITSWORTH

☒N    State recommends a bond in the amount of $ 500,600
        including surcharge.

COURT INFORMATION SUBMITTAL (C

County Attorney Case Number: CA200033668

STATE v. WENDI ELIZABETH ANDRIANO        Defendant Sequence:

  AKA: _____

Defendant's Address:    IN CUSTODY BOOKING #A631830

Defendant's Employer:   _____

                        _____
                        _____

Defendant's Attorney:   PUBLIC DEFENDER

**DEFENDANT'S DESCRIPTION:**

Race: <u>W</u>  Sex: <u>F</u>  Hair: <u>BLN</u>  Eyes: <u>BRO</u>  Hgt: <u>504</u>  Wgt: <u>110</u>  DOB: ▓▓▓▓

Soc Sec #: ▓▓▓▓▓▓▓▓    Old LEJIS #:    FBI #:

SID #: 1416962    JMS Booking #: A631830    JMS LEJIS #:

**FILING STATUS:**

___ JC Complaint   ___ Holding Complaint   XX Grand Jury Indictment   ___ Direct Complaint

  Justice Court #:   CR00-01701FE   Justice Court Precinct:  CHANDLER

    Date Complaint Filed: 10-11-00

  Grand Jury #:   259 GJ 82    Service Type: NSI

    Date Indictment Filed:  October 18, 2000

  Superior Court #:  <u>CR2000-</u>016163    <u>Adult</u>
                                          (Circle Appropriate Choice)

**ATTORNEY:**  John R. Ditsworth    Bar ID: 005669    Location: HOMICIDE-DOWNTOWN

**PRELIMINARY HEARING/GRAND JURY CHARGES:**

FIRST DEGREE MURDER, A CLASS 1 DANGEROUS FELONY
CT 1:   ARS CODE:  13-1105A1    Date of Crime: 10-8-00

**DEPARTMENTAL REPORTS:**

  DR 2000-01797849 PHOENIX PD

**EXTRADITE:**  OK

0002
A000000004



MICHAEL R. JEANES, C..
BY
FILED
2000 NOV 29 AM 11: 25

**LEON THIKOLL**
ATTORNEY AT LAW

239 N. MEYER
TUCSON, AZ 85701
TELEPHONE (520) 884-7997
State Bar No: 01467
Pima County Computer No: 57060

Attorney for

Defendant

IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

IN AND FOR THE COUNTY OF MARICOPA

| | | |
|---|---|---|
| STATE OF ARIZONA, | ) | NO. CR2000-096032 |
| | ) | |
| Plaintiff, | ) | NOTICE OF APPEARANCE |
| vs. | ) | PURSUANT TO "KNAPP" |
| | ) | |
| WENDI ELIZABETH ANDRIANO, | ) | |
| | ) | |
| Defendant. | ) | |

COMES NOW Leon Thikoll, duly licensed to practice law in the State of Arizona since February, 1963, and announces that he has been retained by Mr. and Mrs. Alejo Ochoa, parents of the Defendant, WENDI ANDRIANO. The scope of his representation is as indicated by the guidelines of the Knapp decision.

II.

At an appropriate juncture, after a trial judge has been chosen, a request will be made for LeonThikoll to be able to appear in court sessions and argue points of law and facts directly to the Court.



0011
A000000005

DATED this 27 day of November 2000.

_____
LEON THIKOLL

Copy of the foregoing mailed this
27th day of Nov , 2000, to:

Bethanne Klopp-Bryant, Esq.
Maricopa Public Defender
11 W. Jefferson, Suite 5
Phoenix, AZ 85003-2302

Gerald Gavin, Esq.
Maricopa Public Defender
11 W. Jefferson, Suite 5
Phoenix, AZ 85003-2302

John Ditsworth, Esq.
Deputy County Attorney
Administration Building
301 W. Jefferson St., Suite 800
Phoenix, AZ 85003-2143

**LEON THIKOLL**
ATTORNEY AT LAW
239 N. MEYER
TUCSON, AZ 85701

A000000006

000003422

<u>CONSENT</u>

I, WENDI ELIZABETH ANDRIANO, consent to appointing LEON THIKOLL as co-counsel to represent me as Advising Counsel with Bethanne Klopp-Bryant and Gerald Gavin, both of the Maricopa Public Defender's Office as my attorneys of record.

DATED this ___15___ day of November, 2000.

_____
WENDI ELIZABETH ANDRIANO

LEON THIKOLL
ATTORNEY AT LAW
239 N. MEYER
TUCSON, AZ 85701

A000000007



**G. DAVID DELOZIER. P.C.**
4016 East Forest Pleasant Place
Cave Creek, AZ 85331
Phone: (480) 575-6660
Fax: (480) 575-6661
E-Mail: gddelozier@aol.com

G. David DeLozier
State Bar of Arizona I.D: 005237
Attorney for Defendant

MICHAEL K. JEANES, CLERK
BY _____ DEP.
FILED

2001 JAN 22  AM 9: 36

IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

IN AND FOR THE COUNTY OF MARICOPA

*CR 2000 - 96032*

|  |  |
|---|---|
| STATE OF ARIZONA, | Case No. ~~CR2000-016163~~ |
| **Plaintiff,** | |
| | **APPLICATION FOR FUNDS TO PROPERLY REPRESENT DEFENDANT** |
| vs. | |
| | **(Expedited Consideration Requested)** |
| WENDI ELIZABETH ANDRIANO, | |
| **Defendant.** | |
| | (Assigned to the Honorable Daniel A. Barker, Judge) |

COMES NOW G. David DeLozier, as private counsel for Defendant Wendi Elizabeth Andriano, to apply to the Court for funds to properly represent the Defendant.

Defendant and her attorney are entitled to this relief because Defendant does not personally have, nor does she have access to, the funds necessary to properly represent the Defendant. Specifically, Defendant does not possess the financial resources necessary to hire the appropriate

-1-



0028
A000000008

000003424

investigators and expert witnesses needed to properly prepare a defense to the offenses asserted by the State.

This motion is based on the attached memorandum of points and authorities.

RESPECTFULLY SUBMITTED this _22nd_ day of January, 2001.

G. DAVID DELOZIER, P.C.

G. David DeLozier
Attorney for Defendant

## MEMORANDUM OF POINTS AND AUTHORITIES

Defendant, Wendi Elizabeth Andriano, has been indicted on one count of first degree murder. Upon the State's indication that it intends to seek the death penalty, the case was elevated to prosecution for a capital offense.  A.R.S. § 13-4013 provides:

> A. When counsel is appointed by the court and represents the defendant in either a criminal proceeding or insanity hearing, he shall be paid by the county in which the court presides, provided that in those matters where a public defender is appointed, no compensation shall be paid by the county. Compensation for such services rendered to defendant shall be such amount as the court in its discretion deems reasonable, considering the services performed.

> B. When a person is charged with a capital offense the court may on its own initiative and shall upon application of the defendant and a showing that the defendant is financially unable to pay for such services, appoint such investigators and expert witnesses as are reasonably necessary adequately to present his defense at trial and at any subsequent proceeding. Compensation for such investigators and expert witnesses shall be such amount as the court in its discretion deems reasonable and shall be paid by the county.

Additionally, with regard to the expenditure of public money for the appointment of investigators or experts, _State v. Knapp_, 114 Ariz. 531, 562 P.2d 704 (1977), cert. denied, 435

-2-

A000000009

U.S. 908, 98 S.Ct. 1458, 55 L.Ed.2d 500 (1978), holds that there must be a finding by the trial court:

> (1) that the defendant is unable to pay for such services himself and (2) that the appointment and expenditure is reasonably necessary to present an adequate defense. This determination, like so many others, rests in the sound discretion of the trial court. In the absence of a showing that the determination was an abuse of that discretion, it will not be disturbed on appeal. (citations omitted)

In the instant case, this Court is aware that the Defendant has been previously determined indigent, yet has retained private counsel upon the financial contributions of family and friends. Furthermore, as noted by the oral attestations of counsel for the State, the State is in possession of evidence, subject to analysis by experts, which is reasonably relevant to the presentation of an adequate defense, yet not likely to be timely analyzed by the State's experts.

Specifically, the defense has been made aware that the State is in possession of, among other things, fingerprints, hair and documentary evidence which are relevant to the defense, but not timely scheduled for examination and analysis by the State's experts. Although the State has made the Defendant aware that an autopsy of the victim has been performed, the Defendant has yet to receive the resulting autopsy report or autopsy photographs.

The defense has also provided the State with its notice of intent to raise, among other defenses, the defenses of lack of intent, self-defense and insanity. Hence, the Defendant must be subjected to psychiatric examinations and evaluations, in support of this defense.

Defendant and her counsel are also in need of investigative and paralegal assistance, in developing and interviewing witnesses, on site investigations, trial preparation and exhibit organization and compilation.

Upon the foregoing, the defense anticipates the need for analysis of fingerprints retrieved from the crime scene by the State. The defense feels such analysis is necessary to refute the

-3-

A000000010

State's assertions regarding the mobility of the defendant during the offensive conduct upon which these charges have been brought. The defense also anticipates the need to analyze hair retrieved from the hand(s) of the decedent, for comparison with known hair samples.

The defense is aware of the State's contentions regarding a particular money order, which was allegedly completed by the Defendant. The defense feels a comparison of the handwriting on this document, as well as any supporting documents in the State's possession, is necessary to refute this allegation.

In light of the Defendant's notice of intent to raise the defenses of lack of intent and insanity, the requisite psychiatric evaluations and examinations must be conducted in support of this defense.

The Defendant also anticipates the State's use of a forensic pathologist, or other equally trained and qualified experts to render opinions as to the circumstances surrounding the death of the decedent, as well as the cause of death. While the defense has yet to receive such a report, the defense anticipates the need to refute inculpating allegations, which may be contained within this report.

Finally, as this is a capital prosecution, the Defendant anticipates the need for investigative and paralegal assistance in developing and interviewing witnesses, research and trial preparation. Defendant's counsel customarily uses the services of Kathy O'Quinn, an attorney who is not licensed in this State, but also has extensive experience in criminal litigation. Defendant's counsel feels Ms. O'Quinn's services are necessary for effective evidence collection, trial preparation, and research assistance. The defense is aware of Ms. O'Quinn's previous appointment in this capacity by the Honorable Frank T. Galati, Maricopa County Superior Court Judge, in CR 98-15115, *State v. Eddy E. Engel*. A true and correct copy of the

-4-

A000000011

)

1  Minute Entry through which Judge Galati authorized the appointment of not only Ms. O'Quinn,

2  but other defense experts, is attached and incorporated herein as **Exhibit "A"**.

3     **WHEREFORE**, upon the foregoing, Defendant seeks approval of the expenses

4

5  necessary to properly represent the Defendant.   Undersigned counsel anticipates the aforesaid

6  expenses will not exceed $25,000.00.

7     **RESPECTFULLY SUBMITTED** this _22nd_ day of January, 2001.

8

9                                    G. DAVID DELOZIER, P.C.

10

11

12

13                                    G. David DeLozier
                                     Attorney for Defendant
14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

-5-

A000000012

1  Original of the foregoing filed this
2  _____ day of January, 2001, with:

3  Clerk of the Superior Court
   201 West Jefferson
4  Phoenix, AZ 85003

5  Copies of the foregoing delivered*/mailed** this
6  _____ day of January, 2001, to:

7  The Honorable Daniel A. Barker*
   Judge, Maricopa County Superior Court
8  222 E. Javelina
9  Mesa, Arizona 85210-6201

10 John R. Ditsworth, Esquire**
   Deputy County Attorney
11 301 West Jefferson
12 Phoenix, AZ 85003
   Attorney for the Plaintiff
13

14 By _____

15

16

17

18

19

20

21

22

23

24

25

26

27

28

-6-

A000000013

# EXHIBIT "A"

A000000014

FROM : G. David DeLozier,P.C.    PHONE NO. : 602 867 5894    Aug. 03 2000 01:48PM P1

SUPERIOR COURT OF ARIZONA          **COPY**
MARICOPA COUNTY

07/28/2000                         CLERK OF THE COURT
                                   FORM R000A

HON. FRANK T. GALATI               W. Echols
                                   Deputy

CR98-15115

                                   FILED: _____

STATE OF ARIZONA                   RACHEL C HERNANDEZ #016543

v.                                              *411 N. Central*
                                                *#900*
EDDY EUGENE ENGEL                  G DAVID DELOZIER #005237  *85004*

                                   OFFICE OF COURT APPOINTED  *506-4967*
                                   COUNSEL                    ~~201 W. Jefferson~~
                                                *201 W. Jefferson*
                                                *9th Floor Rm 906*

                    MINUTE ENTRY

        Certain motions were heard by the court on July 20, 2000.
Defendant's motion to suppress statements to private citizens
was denied at the conclusion of the hearing.  The remainder were
taken under advisement.  Those motions are ruled upon in the
following paragraphs.

        1. <u>Defendant's motion for pretrial ruling on admissibility</u>
           <u>of evidence/motion in limine.</u>

        It is the court's opinion that objections to testimony on
the basis of lack of personal knowledge or lack of foundation
can be made and ruled upon at trial.

        IT IS ORDERED denying this motion.

        2. <u>Defendant's motion to suppress defendant's statements to</u>
           <u>investigating officers.</u>

Docket Code 019                                    Page 1

A000000015

FROM : G. David DeLozier,P.C.         PHONE NO. : 602 867 5894         Aug. 03 2000 01:49PM P2

SUPERIOR COURT OF ARIZONA             **COPY**
MARICOPA COUNTY

07/28/2000                                    CLERK OF THE COURT
                                                  FORM R000A

HON. FRANK T. GALATI                           W. Echols
                                                 Deputy

CR98-15115

    The legal issues presented by this motion are simple:  1.
Was defendant subjected to custodial interrogation?  If so,
Miranda warnings were required and the failure to give them
mandates suppression of any statements made after defendant was
effectively "in custody".  2.  Was the defendant's statement
involuntarily given?  Certainly, if defendant's testimony is
true--that his request for a lawyer was denied and that his
request that the interrogation cease and the agents leave his
home was denied--this defendant's statement was the product of
coercion and duress and must be suppressed.  Moreover, if the
officers refused to leave, denied defendant the freedom to move
about, eat, use a restroom or otherwise restricted his liberty,
defendant was then in custody and Miranda warnings were
necessary.  Because the testimony of the state's and the defense
witnesses is so contrary, the court must resolve the most basic
of issues--whom to believe--and that decision will mandate the
result here.

    The court has no doubt that the arrival of the FBI at the
home of defendant and his wife was stressful to them and caused
great anxiety.  But the court finds the following to be true:
Defendant was interrogated at his home, not in the inherently
coercive atmosphere of a police station.  The only reason the
officers proceeded to defendant's private rooms or apartment was
because defendant's and the agent's attempts to find a place to
talk in the lobby of the hotel was unsuccessful; the lobby was
too crowded.  Defendant's wife was present, was free to come and
go as she pleased, brought defendant food, used the restroom
when she wished, and used the telephone to call whomever she
wished.  This evidence means that defendant was not isolated or
cutoff from the outside world.  In addition, no weapons were
displayed, no threats or promises were made.  One of the
officers left around noon.  And, very significantly, defendant
refused to talk to the officers about Mr. Gosnell until Mr.
Gosnell gave his permission.  Defendant knew his right to remain
silent and actually exercised it.  This is not surprising, since
Mr. Engel has a legal education of sorts.

Docket Code 019                                      Page 2

A000000016

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY                    **COPY**

07/28/2000                                    CLERK OF THE COURT
                                              FORM R000A

HON. FRANK T. GALATI                          W. Echols
                                              Deputy

CR98-15115

    The court rejects as untrue the defense testimony that the
agents refused to leave and denied defendant's requests to cease
questioning or to consult with a lawyer.  The court rejects this
testimony because it finds other aspects of Mr. Engel's
testimony to be unbelievable.  Specifically, the court finds
incredible Mr. Engel's testimony that he was denied permission
for 6 hours to use the restroom or to eat a piece of fruit that
his wife had brought to him and which was sitting on a table
within an arm's length of him.  The court finds that testimony
to be so "over-the-top" and beyond belief that it likewise
rejects defendant's claim that his request for counsel was
denied and that he allegedly attempted to terminate the
interview and evict the agents.  Specifically, the court finds
that defendant refused to speak and requested counsel once and
that happened when the subject was Mr. Gosnell.  The court
further finds that defendant withdrew those requests once Mr.
Gosnell gave defendant permission to talk to the agents about
Gosnell affairs.

    While the court has considered Ms. Engel's testimony, the
court notes that she was in-and-out of the room, was by her own
testimony highly stressed and distraught and was in a similar
condition during her testimony on the witness stand.  On the
issues discussed above, the court finds as true the testimony of
Agent Belongia.

    For these reasons,

    **IT IS ORDERED** denying defendant's motion to suppress
statements to the investigating officers.

    3.  <u>Defendant's motion to withdraw as private counsel, etc.</u>

    Pursuant to defendant's motion, the informal conference
held with both counsel on July 20, 2000, defendant's financial
affidavit and the specific contents of the information submitted
by Mr. Delozier, pursuant to the court's request on July 21 and
July 26,

Docket Code 019                                        Page 3

FROM : G. David DeLozier,P.C.        PHONE NO. : 602 867 5894        Aug. 03 2000 01:50PM P4

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

**COPY**

07/28/2000

CLERK OF THE COURT
FORM R000A

HON. FRANK T. GALATI

W. Echols
Deputy

CR98-15115

IT IS ORDERED as follows:

A.  Approving and appointing Leigh Strickman, EA, as a
defense accounting expert.  Mr. Strickman shall be compensated
as a county expense through OCAC.  Mr. Strickman's fee shall not
exceed $1,700.00.

B.  Approving and appointing Donald A. MacPherson, as an
offshore investment expert to aid defendant in the preparation
of his defense.  Mr. MacPherson is authorized for no more than
15 hours at no more than $300.00 per hour.  Mr. McPherson shall
be compensated by Maricopa County through OCAC.

C. Approving and appointing Kathy O'Quinn as a paralegal to
assist Mr. Delozier in trial preparation.  Ms. O'Quinn's
appointment is effective July 21, 2000, is prospective only and
is authorized for no more than 100 hours at $50.00 per hour.
Ms. O'Quinn shall be compensated for the services performed
pursuant to this order by Maricopa County through OCAC.

D. Denying all other relief sought pursuant to this defense
motion, including public compensation for defendant's privately
retained counsel and defendant's request that both he and
counsel be authorized to travel to St. Kitts at taxpayer
expense.

IT IS FURTHER ORDERED reaffirming the current trial date of
August 14, 2000 and reaffirming the court's prior admonition
that this late appointment of experts at defendants request does
not and will not constitute grounds to continue this trial.

Docket Code 019

Page 4

A000000018



1  G. DAVID DELOZIER. P.C.
   4016 East Forest Pleasant Place
2  Cave Creek, AZ 85331
   Phone: (480) 575-6660
3  Fax: (480) 575-6661
4  E-Mail: gddelozier@aol.com

5  G. David DeLozier
6  State Bar of Arizona I.D: 005237
   Attorney for Defendant
7

8          IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

9            IN AND FOR THE COUNTY OF MARICOPA

10

11  STATE OF ARIZONA,                    Case No. CR 00-096032

12          Plaintiff,
                                         APPLICATION FOR FUNDS TO
13                                       PROPERLY REPRESENT
                                         DEFENDANT
14  vs.

15                                       (Expedited Consideration Requested)

16

17  WENDI ELIZABETH ANDRIANO,

18          Defendant.

19

20                                       (Assigned to the Honorable
                                         Daniel A. Barker, Judge)
21

22          COMES NOW G. David DeLozier, as private counsel for Defendant Wendi Elizabeth

23  Andriano, to apply to the Court for funds to properly represent the Defendant.

24          Defendant and her attorney are entitled to this relief because Defendant does not personally

25  have, nor does she have access to, the funds necessary to properly represent the Defendant.

26  Specifically, Defendant does not possess the financial resources necessary to hire the appropriate

27

28

                                    -1-

0029
A000000019

investigators and expert witnesses needed to properly prepare a defense to the offenses asserted by the State.

This motion is based on the attached memorandum of points and authorities.

RESPECTFULLY SUBMITTED this ___ day of January, 2001.

G. DAVID DELOZIER, P.C.

G. David DeLozier
Attorney for Defendant

## MEMORANDUM OF POINTS AND AUTHORITIES

Defendant, Wendi Elizabeth Andriano, has been indicted on one count of first degree murder. Upon the State's indication that it intends to seek the death penalty, the case was elevated to prosecution for a capital offense. A.R.S. § 13-4013 provides:

A. When counsel is appointed by the court and represents the defendant in either a criminal proceeding or insanity hearing, he shall be paid by the county in which the court presides, provided that in those matters where a public defender is appointed, no compensation shall be paid by the county. Compensation for such services rendered to defendant shall be such amount as the court in its discretion deems reasonable, considering the services performed.

B. When a person is charged with a capital offense the court may on its own initiative and shall upon application of the defendant and a showing that the defendant is financially unable to pay for such services, appoint such investigators and expert witnesses as are reasonably necessary adequately to present his defense at trial and at any subsequent proceeding. Compensation for such investigators and expert witnesses shall be such amount as the court in its discretion deems reasonable and shall be paid by the county.

Additionally, with regard to the expenditure of public money for the appointment of investigators or experts, *State v. Knapp*, 114 Ariz. 531, 562 P.2d 704 (1977), cert. denied, 435

-2-

A000000020

U.S. 908, 98 S.Ct. 1458, 55 L.Ed.2d 500 (1978), holds that there must be a finding by the trial court:

> (1) that the defendant is unable to pay for such services himself and (2) that the appointment and expenditure is reasonably necessary to present an adequate defense. This determination, like so many others, rests in the sound discretion of the trial court. In the absence of a showing that the determination was an abuse of that discretion, it will not be disturbed on appeal. (citations omitted)

In the instant case, this Court is aware that the Defendant has been previously determined indigent, yet has retained private counsel upon the financial contributions of family and friends. Furthermore, as noted by the oral attestations of counsel for the State, the State is in possession of evidence, subject to analysis by experts, which is reasonably relevant to the presentation of an adequate defense, yet not likely to be timely analyzed by the State's experts.

Specifically, the defense has been made aware that the State is in possession of, among other things, fingerprints, hair and documentary evidence which are relevant to the defense, but not timely scheduled for examination and analysis by the State's experts. Although the State has made the Defendant aware that an autopsy of the victim has been performed, the Defendant has yet to receive the resulting autopsy report or autopsy photographs.

The defense has also provided the State with its notice of intent to raise, among other defenses, the defenses of lack of intent, self-defense and insanity. Hence, the Defendant must be subjected to psychiatric examinations and evaluations, in support of this defense.

Defendant and her counsel are also in need of investigative and paralegal assistance, in developing and interviewing witnesses, on site investigations, trial preparation and exhibit organization and compilation.

Upon the foregoing, the defense anticipates the need for analysis of fingerprints retrieved from the crime scene by the State. The defense feels such analysis is necessary to refute the

A000000021

State's assertions regarding the mobility of the defendant during the offensive conduct upon which these charges have been brought. The defense also anticipates the need to analyze hair retrieved from the hand(s) of the decedent, for comparison with known hair samples.

The defense is aware of the State's contentions regarding a particular money order, which was allegedly completed by the Defendant. The defense feels a comparison of the handwriting on this document, as well as any supporting documents in the State's possession, is necessary to refute this allegation.

In light of the Defendant's notice of intent to raise the defenses of lack of intent and insanity, the requisite psychiatric evaluations and examinations must be conducted in support of this defense.

The Defendant also anticipates the State's use of a forensic pathologist, or other equally trained and qualified experts to render opinions as to the circumstances surrounding the death of the decedent, as well as the cause of death. While the defense has yet to receive such a report, the defense anticipates the need to refute inculpating allegations, which may be contained within this report.

Finally, as this is a capital prosecution, the Defendant anticipates the need for investigative and paralegal assistance in developing and interviewing witnesses, research and trial preparation. Defendant's counsel customarily uses the services of Kathy O'Quinn, an attorney who is not licensed in this State, but also has extensive experience in criminal litigation. Defendant's counsel feels Ms. O'Quinn's services are necessary for effective evidence collection, trial preparation, and research assistance. The defense is aware of Ms. O'Quinn's previous appointment in this capacity by the Honorable Frank T. Galati, Maricopa County Superior Court Judge, in CR 98-15115, *State v. Eddy E. Engel*. A true and correct copy of the

-4-

A000000022

Minute Entry through which Judge Galati authorized the appointment of not only Ms. O'Quinn, but other defense experts, is attached and incorporated herein as **Exhibit "A"**.

WHEREFORE, upon the foregoing, Defendant seeks approval of the expenses necessary to properly represent the Defendant.  Undersigned counsel anticipates the aforesaid expenses will not exceed $25,000.00.

RESPECTFULLY SUBMITTED this _23_ day of January, 2001.

G. DAVID DELOZIER, P.C.

G. David DeLozier
Attorney for Defendant

-5-

A000000023

Original of the foregoing filed this
___ day of January, 2001, with:

Clerk of the Superior Court
201 West Jefferson
Phoenix, AZ 85003

Copies of the foregoing delivered*/mailed** this
___ day of January, 2001, to:

The Honorable Daniel A. Barker*
Judge, Maricopa County Superior Court
222 E. Javelina
Mesa, Arizona 85210-6201

John R. Ditsworth, Esquire**
Deputy County Attorney
301 West Jefferson
Phoenix, AZ 85003
Attorney for the Plaintiff

By _____

-6-

A000000024

# EXHIBIT "A"

A000000025

FROM : G. David DeLozier,P.C.        PHONE NO. : 602 857 5894        Aug. 03 2000 01:48PM P1

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY                     **COPY**

07/28/2000                                 CLERK OF THE COURT
                                              FORM R000A

HON. FRANK T. GALATI                        W. Echols
                                              Deputy

CR98-15115

                                     FILED: _____

STATE OF ARIZONA                     RACHEL C HERNANDEZ #016543

v.
                                                     *411 N. Central*
EDDY EUGENE ENGEL                    G DAVID DELOZIER #005237   *#900*
                                                              *85004*
                                     OFFICE OF COURT APPOINTED
                                     COUNSEL                   *506- 4967*
                                                              *301 W. ...*
                                                              *9th Floor ... 906*

                        MINUTE ENTRY

        Certain motions were heard by the court on July 20, 2000.
Defendant's motion to suppress statements to private citizens
was denied at the conclusion of the hearing.  The remainder were
taken under advisement.  Those motions are ruled upon in the
following paragraphs.

        1. Defendant's motion for pretrial ruling on admissibility
           of evidence/motion in limine.

        It is the court's opinion that objections to testimony on
the basis of lack of personal knowledge or lack of foundation
can be made and ruled upon at trial.

        IT IS ORDERED denying this motion.

        2. Defendant's motion to suppress defendant's statements to
           investigating officers.

Docket Code 019                                          Page 1

FROM : G. David DeLozier,P.C.        PHONE NO. : 602 867 5894        Aug. 03 2000 01:49PM P2

SUPERIOR COURT OF ARIZONA        **COPY**
MARICOPA COUNTY

07/28/2000                              CLERK OF THE COURT
                                        FORM R000A

HON. FRANK T. GALATI                 W. Echols
                                     Deputy

CR98-15115

   The legal issues presented by this motion are simple:  1.
Was defendant subjected to custodial interrogation?  If so,
Miranda warnings were required and the failure to give them
mandates suppression of any statements made after defendant was
effectively "in custody".  2.  Was the defendant's statement
involuntarily given?  Certainly, if defendant's testimony is
true--that his request for a lawyer was denied and that his
request that the interrogation cease and the agents leave his
home was denied--this defendant's statement was the product of
coercion and duress and must be suppressed.  Moreover, if the
officers refused to leave, denied defendant the freedom to move
about, eat, use a restroom or otherwise restricted his liberty,
defendant was then in custody and Miranda warnings were
necessary.  Because the testimony of the state's and the defense
witnesses is so contrary, the court must resolve the most basic
of issues--whom to believe--and that decision will mandate the
result here.

   The court has no doubt that the arrival of the FBI at the
home of defendant and his wife was stressful to them and caused
great anxiety.  But the court finds the following to be true:
Defendant was interrogated at his home, not in the inherently
coercive atmosphere of a police station.  The only reason the
officers proceeded to defendant's private rooms or apartment was
because defendant's and the agent's attempts to find a place to
talk in the lobby of the hotel was unsuccessful; the lobby was
too crowded.  Defendant's wife was present, was free to come and
go as she pleased, brought defendant food, used the restroom
when she wished, and used the telephone to call whomever she
wished.  This evidence means that defendant was not isolated or
cutoff from the outside world.  In addition, no weapons were
displayed, no threats or promises were made.  One of the
officers left around noon.  And, very significantly, defendant
refused to talk to the officers about Mr. Gosnell until Mr.
Gosnell gave his permission.  Defendant knew his right to remain
silent and actually exercised it.  This is not surprising, since
Mr. Engel has a legal education of sorts.

Docket Code 019                              Page 2

FROM : G. David DeLozier,P.C.          PHONE NO. : 602 867 5894          Aug. 03 2000 01:49PM P3

SUPERIOR COURT OF ARIZONA          **COPY**
MARICOPA COUNTY

07/28/2000                               CLERK OF THE COURT
                                         FORM R000A

HON. FRANK T. GALATI                     W. Echols
                                         Deputy

CR98-15115

       The court rejects as untrue the defense testimony that the
agents refused to leave and denied defendant's requests to cease
questioning or to consult with a lawyer.  The court rejects this
testimony because it finds other aspects of Mr. Engel's
testimony to be unbelievable.  Specifically, the court finds
incredible Mr. Engel's testimony that he was denied permission
for 6 hours to use the restroom or to eat a piece of fruit that
his wife had brought to him and which was sitting on a table
within an arm's length of him.  The court finds that testimony
to be so "over-the-top" and beyond belief that it likewise
rejects defendant's claim that his request for counsel was
denied and that he allegedly attempted to terminate the
interview and evict the agents.  Specifically, the court finds
that defendant refused to speak and requested counsel once and
that happened when the subject was Mr. Gosnell.  The court
further finds that defendant withdrew those requests once Mr.
Gosnell gave defendant permission to talk to the agents about
Gosnell affairs.

       While the court has considered Ms. Engel's testimony, the
court notes that she was in-and-out of the room, was by her own
testimony highly stressed and distraught and was in a similar
condition during her testimony on the witness stand.  On the
issues discussed above, the court finds as true the testimony of
Agent Belongia.

       For these reasons,

       **IT IS ORDERED** denying defendant's motion to suppress
statements to the investigating officers.

       3.   Defendant's motion to withdraw as private counsel, etc.

       Pursuant to defendant's motion, the informal conference
held with both counsel on July 20, 2000, defendant's financial
affidavit and the specific contents of the information submitted
by Mr. Delozier, pursuant to the court's request on July 21 and
July 26,

Docket Code 019                                         Page 3

A000000028

FROM : G. David DeLozier,P.C.          PHONE NO. : 602 867 5894          Aug. 03 2000 01:50PM P4

SUPERIOR COURT OF ARIZONA          **COPY**
MARICOPA COUNTY

07/28/2000                              CLERK OF THE COURT
                                        FORM R000A

HON. FRANK T. GALATI                     W. Echols
                                         Deputy

CR98-15115

    IT IS ORDERED as follows:

    A.  Approving and appointing Leigh Strickman, EA, as a
defense accounting expert.  Mr. Strickman shall be compensated
as a county expense through OCAC.  Mr. Strickman's fee shall not
exceed $1,700.00.

    B.  Approving and appointing Donald A. MacPherson, as an
offshore investment expert to aid defendant in the preparation
of his defense.  Mr. MacPherson is authorized for no more than
15 hours at no more than $300.00 per hour.  Mr. McPherson shall
be compensated by Maricopa County through OCAC.

    C.  Approving and appointing Kathy O'Quinn as a paralegal to
assist Mr. Delozier in trial preparation.  Ms. O'Quinn's
appointment is effective July 21, 2000, is prospective only and
is authorized for no more than 100 hours at $50.00 per hour.
Ms. O'Quinn shall be compensated for the services performed
pursuant to this order by Maricopa County through OCAC.

    D.  Denying all other relief sought pursuant to this defense
motion, including public compensation for defendant's privately
retained counsel and defendant's request that both he and
counsel be authorized to travel to St. Kitts at taxpayer
expense.

    IT IS FURTHER ORDERED reaffirming the current trial date of
August 14, 2000 and reaffirming the court's prior admonition
that this late appointment of experts at defendants request does
not and will not constitute grounds to continue this trial.

Docket Code 019                                    Page 4

A000000029

MICHAEL K. JEANES, CLERK
BY _____ DEP
FILED
2001 FEB -1 PM 1: 56

G. DAVID DELOZIER. P.C.
4016 East Forest Pleasant Place
Cave Creek, AZ 85331
Phone: (480) 575-6660
Fax: (480) 575-6661
E-Mail: gddelozier@aol.com

G. David DeLozier
State Bar of Arizona I.D: 005237
Attorney for Defendant

IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

IN AND FOR THE COUNTY OF MARICOPA

| STATE OF ARIZONA, | Case No. 2000-096032 |
|---|---|
| Plaintiff, | REQUEST FOR EXPEDITED CONSIDERATION OF APPLICATION FOR FUNDS TO PROPERLY REPRESENT DEFENDANT |
| vs. | (Expedited Consideration Requested) |
| WENDI ELIZABETH ANDRIANO, | |
| Defendant. | (Assigned to the Honorable Daniel A. Barker, Judge) |

COMES NOW G. David DeLozier, as private counsel for Defendant Wendi Elizabeth Andriano, to request expedited consideration of the Application for Funds to Properly Represent Defendant previously filed with this Court on January 23, 2001.

Defendant has been made aware that this Court has requested the Office of Court Appointed Counsel (OCAC) submit a response to Defendant's Application for Funds to Properly Represent

-1-



000003446

A000000030

Defendant. Although telephonic efforts were made to obtain the date by which OCAC would submit its response, Defendant's counsel has yet to receive a return phone call from the OCAC.

In view of the complexities of these proceedings, particularly in light of the State's intention to seek the death penalty, Defendant feels time is of the essence in obtaining the requisite expert witnesses , investigative and paralegal assistance necessary to mount a proper defense. Therefore, Defendant has made substantial progress in locating appropriate sources of assistance.

Specifically, should funds be approved, Defendant anticipates retaining Michael J. Sweedo, as an expert witness/consultant, who is qualified to testify in many areas of crime scene investigations, including crime scene reenactments, blood splatter analysis and fingerprint analysis. A true and correct copy of the "Customary Retainer Fee Agreement for Technical Expert Witness" which has been submitted on behalf of Mr. Sweedo is attached and incorporated herein as **Exhibit "1"**.

Defendant also anticipates retaining the services of Mark Jones of Jones Investigative Services, to assist in witness interviews and other forms of evidence collection. Mr. Jones is a retired Mesa Police Officer, quite aptly qualified and able to assist the defense. A true and correct copy of Mr. Jones' resume, as well as a letter indicating his hourly rate are attached and incorporated herein as **Exhibit "2"**.

Having previously indicated the desire to retain the services of Kathy O'Quinn, Esquire, to assist with evidence collection, trial preparation, and research assistance, upon the foregoing, the defense has named the first of several expert witnesses and investigators, necessary to properly defend this case. In an effort to wisely use the time allotted prior to the upcoming trial date, the defense has located these experts and taken affirmative steps to retain them. However, the defense is

-2-

A000000031

hamstrung in its efforts to move forward, in the absence of this Court's order granting the Defendant funds to retain these experts.

Additionally, should this Court be inclined to grant the funds requested by the Defendant, the defense requests clarification of the manner in which the funds are to be disbursed. The defense is aware that several expert witnesses may require advance payment of their fees. Defendant's counsel may therefore be forced to pay these fees in advance and then request reimbursement from the OCAC.

WHEREFORE, the Defendant respectfully requests this Court give expedited consideration to Defendant's Application of Funds to Properly Represent Defendant, and should this Court grant Defendant's application, in addition to the normal billing procedures used by the Office of Court Appointed Counsel, permit Defendant's counsel to advance funds to retain expert witnesses, as needed, and obtain reimbursement of these funds from the Office of Court Appointed Counsel.

RESPECTFULLY SUBMITTED this ___ day of February, 2001.

G. DAVID DELOZIER, P.C.

G. David DeLozier
Attorney for Defendant

-3-

000003448

A000000032

Original of the foregoing filed this
___/___ day of February, 2001, with:

Clerk of the Superior Court
201 West Jefferson
Phoenix, AZ 85003

Copies of the foregoing delivered*/mailed** this
___/___ day of February, 2001, to:

The Honorable Daniel A. Barker*
Judge, Maricopa County Superior Court
222 E. Javelina
Mesa, Arizona 85210-6201

John R. Ditsworth, Esquire**
Deputy County Attorney
301 West Jefferson
Phoenix, AZ 85003
Attorney for the Plaintiff

Office of Court Appointed Counsel*
411 N Central
Suite # 900
Phoenix, AZ 85004

By_____

-4-

A000000033

*EXHIBIT "1"*

A000000034



**PRO/CONSUL, INC.**
Technical & Medical Experts
1714 E. Bethany Home Road
Phoenix, AZ 85016-2536
(602) 279-2422   FAX (602) 604-9454
(888) 9EXPERT
experlcz@msn.com

**Technical**
ACCIDENT RECONSTRUCTION
ARCHITECT
AUTOMOTIVE ENGINEER
BIOMECHANICS
CONSTRUCTION DEFECT
ECONOMICS
ELECTRICAL
ENGINEERING
ENVIRONMENTAL
FAILURE ANALYSIS
FIRE INVESTIGATION
FORKLIFTS/CRANES
HUMAN FACTORS
METALLURGY
POLICE PROCEDURES
PRODUCT LIABILITY
QUESTIONED DOC'S EXAMINER
SAFETY
SCAFFOLDING
SECURITY

**Medical**
CHIROPRACTIC
DENTISTRY/ORAL SURGERY
EAR, NOSE, THROAT
EMERGENCY MEDICINE
GASTROENTEROLOGY
INTERNAL MEDICINE
LONG-TERM CARE
NEUROLOGY/NEUROSURGERY
NURSING CARE
OB/GYN
ONCOLOGY
OPHTHALMOLOGY
ORTHOPEDICS
PAIN MANAGEMENT
PATHOLOGY
PEDIATRICS
PSYCHOLOGY/PSYCHIATRY
REHABILITATION
TOXICOLOGY
UROLOGY

# FAX TRANSMITTAL

DATE: January 31, 2001                          FAX #: (480) 575-6661

ATTN: Dave Delozier, Esquire
FIRM:  Law Offices of Dave Delozier

FROM: Priya Das, Case Coordinator                  TOTAL PAGES: 2 INCLUDING COVER

CASE CAPTION: State v. Andriano, Wendy

RE: Michael J. Sweedo

Dear Mr. Delozier:

    Thank you for your interest in Mr. Sweedo. Appended, per your request, is our Fee Agreement. The retainer will cover 22 hours for an initial review, 2 hours travel, and 4 hours for trial testimony. In addition, Pro/Consul's $200 Case Fixed Cost Fee is included.

    As soon as I receive the signed agreement along with the retainer check I will notify Mr. Sweedo that he is officially retained and to expect records soon.

    Please let me know how I may be of further assistance.

                                        Best regards,

                                        Priya

A000000035

FROM : G. David DeLozier,P.C.        PHONE NO. : 602 867 5894        Jan. 31 2001 05:39PM P2

Jan-31-01 03:19P

P.02

TECHNICAL
Accident Reconstruction
Architecture
Automotive Engineering
Biomechanics
Construction Defect
Economics
Electrical
Engineering
Environmental
Failure Analysis
Fire Investigation
Forklifts/Cranes
Human Factors
Metallurgy
Police Procedures
Product Liability
Questioned Docs
Examiner
Safety
Scaffolding
Security

## Pro/Consul, Inc.

TECHNICAL AND MEDICAL EXPERTS
FOR ATTORNEYS & INSURANCE COMPANIES

1714 E. Bethany Home Road
Phoenix, AZ 85016-2536
Phone: (602) 279-2422    Fax: (602) 604-9454
expertez@msn.com

MEDICAL
Chiropractic
Dentistry/Oral Surgery
Ear, Nose, Throat
Emergency Medicine
Gastroenterology
Internal Medicine
Long-Term Care
Neurology/Neurosurgery
Nursing Care
OB/GYN
Oncology
Ophthalmology
Orthopedics
Pain Management
Pathology
Pediatrics
Psychology/Psychiatry
Rehabilitation
Toxicology
Urology

## CUSTOMARY RETAINER FEE AGREEMENT
### FOR TECHNICAL EXPERT WITNESSES

It is hereby agreed by and through Pro/Consul, Inc. and Law Offices of Dave Delozier that a retainer fee of *Three Thousand Eight Hundred Fifty Dollars ($3850.00)* shall be paid to Pro/Consul for the services of Michael J. Sweedo, as expert consultant and, if designated, as an expert witness in State v. Wendy Andriano. Said retainer fee(s) shall be paid in full prior to the right to designate any expert witness(es). The retainer fee shall be used to cover expenses and costs on behalf of the expert as per Pro/Consul fee schedule.

|   |   |
|---|---|
| Professional qualified as an expert witness: per hour | $130.00 |
| Deposition time: per hour, 2-hour min. | $180.00 |
| Arbitration/court time: per hour, 4-hour min. | $180.00 |
| Case Fixed Cost Fee: per expert, per case | $200.00 |
| Travel time: per hour plus $0.32 per mile. | $55.00 |

If deposition fees are not paid by the opposing counsel within 30 days, I will assume responsibility for payment.

In the event that the *Three Thousand Eight Hundred Fifty Dollars ($3850.00)* is not used to cover expenses and costs, the balance will be returned, less the case fixed cost fee. As some cases involve work over an extended period of time, the fee schedule might change. Work done at a later time may be billed at the fee prevailing at the time the work is done.

Dated: _____        _____
                              Dave Delozier, Esquire
                              Law Offices of Dave Delozier

Dated: _____        _____
                              Pro/Consul, Inc.

Please make check payable to Pro/Consul, Inc. - Tax ID #: 33-0436680

A000000036

000003452

# EXHIBIT "2"

000003453

A000000037

*mjinvestigations @msn.com*

*cell - (602) 568-9051*

## Jones Investigative Service
Post Office Box 228
Pine, Arizona 85544
(520) 476-5675
(480) 985-6152
Fax (480)854-3744

Date: January 31, 2001

David Delozier
Attorney at Law
4016 E. Forest Pleasent
Cave Creek, Arizona

Attention: Kim

Dear Mr. Delozier,

My name is Mark Jones, and I am the owner of Jones Investigative Service. I was in contact with your assistant, Kim this morning, and was informed that your firm is in need of an investigator, concerning a capital murder case.

I am sending a copy of my resume, for your review. After your have made an assessment of my training and abilities, I will be happy to set down with you and discuss the matter at hand.

My fee is sixty dollars ($60.00) per hour, plus any expenses incurred. I look forward to hearing from you in the near future.

Respectfully,

Mark Jones

*Mark Jones*

A000000038

FROM : G. David DeLozier,P.C.        PHONE NO. : 602 867 5894        Jan. 31 2001 03:31PM P2

3154 Ryside Way
Post Office Box 228
Pine, Arizona 85544
Phone 520-474-2006

# Mark B. Jones

| | | | |
|---|---|---|---|
| Education | 1990 - 1992 | LaSalle University | Mandeville, La |
| | Bachelor of Science/Business Management | | |
| | 1976 – 1982 | Mesa Community College | Mesa, Az |
| | Criminal Justice | | |
| | 1970 – 1972 | Black Hills State College | Spearfish, SD |
| | Criminal Justice | | |
| | 1982 – 1985 | Widefield High School | Widefield, Co |
| | High School | | |

Professional
experience

1993 - Present        Owner of Jones Investigative Service.
                      Conducts a Private Investigation service
for attorneys in the State of Arizona.

1973 – 1993 City of Mesa, Mesa, Arizona, 130 North Robson, Mesa,
Arizona, 85201.  Master Police Officer, Homicide.  Responsible for
overall investigations related to arson and death cases, homicides,
suicides, and suspicious deaths.  Department liaison when dealing with
other government agencies, County Attorney's Office and bereaved
families.

1969 – 1973 City of Rapid City, Rapid City Police Department, 300 West
Kansas City Street, Rapid City, South Dakota.  Uniformed Police Officer.
Routine patrol duties, investigations and apprehension of suspects.

A000000039

FROM : G. David DeLozier,P.C.          PHONE NO. : 602 857 5894          Jan. 31 2001 03:32PM P3

**Accreditation's**

1990 - The Southern Police Institute (University of Louisville), Louisville, Kentucky. School of Justice Administration. Studies in resolving unsolved homicides and advanced investigative techniques.

1985 - Northwestern University, Evanston, Illinois. Death Investigation. Studies relating to all types of death investigation and techniques to solve open cases.

1984 - ALEOAC Certified Instructor. Department of Public Safety, State of Arizona, Phoenix, Arizona. Certified in the State of Arizona to instruct in the areas of Fire, Arson, and death investigation techniques.

1980 - Hocking Technical Institute, Columbus, Ohio. Studies relating to various types of deaths and blood spatter interpretation.

1979 - Arizona Medico-Legal death investigation, State of Arizona, Phoenix, Arizona. Studies relating to various types of death investigations.

1979 - National Fire Academy, Sacramento, California. National certification for Fire and Arson investigations.

1979 - Bomb and Explosive Training, Bureau of Alcohol, Tobacco and Firearms. Studies relating to explosive devices and the post blast investigation.

1978-1979-1980 - State of Arizona, State Fire Marshall. Advanced Fire and Arson training.

1973 - Phoenix Regional Police Academy, Phoenix, Arizona. Obtained state certification and training as a Police Officer.

1959 - South Dakota Police Academy, Rapid City, South Dakota. Obtained state certification and training as a Police Officer.

A000000040

FROM : G. David DeLozier,P.C.          PHONE NO. : 602 867 5894          Dec. 15 2000 11:27AM P1

1    G. DAVID DELOZIER, P.C.
     4016 East Forest Pleasant Place
2    Cave Creek, Arizona 85331
     (480) 575-6660
3    (480) 575-6661
     Email: gddelozier@aol.com
4
     G. David DeLozier
5    State Bar of Arizona ID: #005237
     Attorney for Defendant
6

**FILED**
2-13-01   4:50 pm
MICHAEL K. JEANES, Clerk
By: G. Ruden
   Deputy

RECEIVED
FEB 13 '01
Judge of the Superior Court

7              IN THE SUPERIOR COURT OF THE STATE OF ARIZONA
8               IN AND FOR THE COUNTY OF MARICOPA

9    STATE OF ARIZONA,                      Case No. CR2000-096032
10              Plaintiff,
                 vs.                         STIPULATION FOR
11                                           SUBSTITUTION OF COUNSEL
     WENDI ELIZABETH ADRIANO,
12              Defendant
13
14
15          IT IS HEREBY STIPULATED, with the consent of the Defendant, that G. David DeLozier
16   of the Law Offices of G. David DeLozier, P.C., be substituted as counsel of record for Defendant,
17   Wendi Elizabeth Adriano, in the place of, Bethanne Klopp-Bryant, Esquire, of the Office of the
18   Maricopa County Public Defender , for all further proceedings in the above-captioned matter.
19          DATED this 12th day of December, 2000.
20
21   G. DAVID DELOZIER, P.C.                  OFFICE OF THE PUBLIC DEFENDER
22
23
24   G. David DeLozier                         Bethanne Klopp-Bryant
     4016 East Forest Pleasant Place          222 E. Javelina
25   Cave Creek, AZ 85331                      Mesa, AZ 85210
     480-575-6660                             602-506-2208
26
27
28

0034
A000000041

FROM : G. David DeLozier,P.C.        PHONE NO. : 602 867 5894        Dec. 15 2000 11:28AM P2

## CONSENT OF DEFENDANT, WENDI ELIZABETH ANDRIANO

I, Wendi Elizabeth Andriano, Defendant in the above captioned matter, hereby consent to the substitution of G. David DeLozier of the Law Offices of G. David DeLozier, P.C. for Bethanne Klopp-Bryant of the Office of the Maricopa County Public Defender for all further proceedings in this case.

Dated: 12-18-2000

Wendi E. Andriano
Wendi Elizabeth Andriano

ORIGINAL of the foregoing filed this
12th day of December, 2000 with:

Clerk of the Superior Court
222 East Javelina
Mesa, AZ 85210

COPIES of the foregoing delivered this
12th day of December, 2000, to:

The Honorable Daniel A. Barker
Judge, Maricopa County Superior Court
222 East Javelina
Mesa, AZ 85210

John R. Ditsworth, Esquire
Deputy County Attorney
301 West Jefferson
Phoenix, AZ 85003
Attorney for the Plaintiff

By _____

2

000003458

A000000042



**G. DAVID DELOZIER, P.C.**
4016 East Forest Pleasant Place
Cave Creek, AZ 85331
Phone: (480) 575-6660
Fax: (480) 575-6661
E-Mail: gddelozier@aol.com

G. David DeLozier
State Bar of Arizona I.D: 005237
Attorney for Defendant

**MICHAEL K. JEANES, CLERK**
**FILED**

2001 FEB 22 PM 4:14

IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

IN AND FOR THE COUNTY OF MARICOPA

| | |
|---|---|
| STATE OF ARIZONA, | Case No. 2000-096032 |
| Plaintiff, | |
| | **MOTION FOR DETERMINATION OF COMPETENCY PURSUANT TO RULE 11, ARIZONA RULES OF CRIMINAL PROCEDURE** |
| vs. | |
| WENDI ELIZABETH ANDRIANO, | |
| Defendant. | |
| | (Assigned to the Honorable Daniel A. Barker, Judge) |

COMES NOW G. David DeLozier, as private counsel for Defendant Wendi Elizabeth Andriano, pursuant to **Rule 11.2, Arizona Rules of Criminal Procedure**, requests that this Court have the Defendant examined to determine whether she is competent to stand trial, competent to assist defense counsel in her defense, and to invest6igate the defendant's mental condition at the time of the offense.

Further, pursuant to **Rule 11.3 §§ (a) and (b)(1)**, Defendant requests the exclusive appointment of physician psychiatric mental health experts. This request is predicated upon the

-1-

0035
A000000043

000003459

evaluation of H. Kande Rohde, C.P.C., a true and correct copy of which is included herein as Exhibit "1".

This motion is based on the following Memorandum of Points and Authorities.

**RESPECTFULLY SUBMITTED** this _22_ day of February, 2001.

G. DAVID DELOZIER, P.C.

G. David DeLozier
Attorney for Defendant

## MEMORANDUM OF POINTS AND AUTHORITIES

**Rule 11.2** provides that any party may move for an examination to determine whether the defendant is competent to stand trial, assist counsel in preparation of the defense of the case, and to investigate the defendant's mental condition at the time of the offense. Defendant's counsel believes that the there is sufficient evidence to warrant a determination of whether the Defendant (1) is competent to stand trial, (2) is able to assist him in the preparation of the defense of the case, and (3) the mental condition at the time of the offense.

Defendant's counsel's belief is based, in part, upon the report of H. Kande Rohde, Certified Professional Counselor, which indicates that in the course and scope of Ms. Rohde's attempts to diagnose and treat the Defendant, she has determined that the Defendant may suffer from a mental disorder, disease or defect, which is sufficient to call into question her sanity, not only at the time in which the alleged offense was committed, but also subsequent to the event which gives rise to this prosecution. Specifically, Ms. Rohde notes, "I would recommend that a psychiatrist be called in to examine her (Defendant). . . It would assist me greatly if she could be evaluated by a psychiatrist."

-2-

A000000044

1    A true and correct copy of the evaluation of Ms. Rohde, as well as her resume, are attached and

2    incorporated herein as **Exhibits "1" and "2"**, respectively.

3        Defense counsel therefore requests that this Court have the Defendant examined by

4

5    physician.psychiatrists to determine whether the Defendant is not only competent to stand trial, is

6    equally competent to assist counsel in her defense, and her mental condition at the time of the

7    offense.

8        **RESPECTFULLY SUBMITTED** this _20_ day of February, 2001.

9                                    G. DAVID DELOZIER, P.C.

10

11

12                                  G. David DeLozier
                                    Attorney for Defendant

13

14   Original of the foregoing filed this

15   _22_ day of February, 2001, with:

16   Clerk of the Superior Court
     201 West Jefferson

17   Phoenix, AZ 85003

18   Copies of the foregoing delivered*/mailed** this

19   _22_ day of February, 2001, to:

20   The Honorable Daniel A. Barker*

21   Judge, Maricopa County Superior Court
     222 E. Javelina

22   Mesa, Arizona 85210-6201

23   Juan Martinez, Esquire**

24   Deputy County Attorney
     301 West Jefferson

25   Phoenix, AZ 85003
     Attorney for the Plaintiff

26

27

28
     By _Kathy O'Quin_ _____

                                    -3-

A000000045

# EXHIBIT "1"

A000000046

FROM : G. David DeLozier,P.C.          PHONE NO. : 602 867 5894          Feb. 21 2001 12:47PM P2

Feb-21-01 07:28A                                          310 836 0695          P.01

H. Kandy Rohde, CPC
5507 East Shea Blvd.
Scottsdale AZ 85254
(480) 443-9313

Law Offices of G.David DeLozier
4016 East Forest Pleasant Place
Cave Creek, AZ 85331

February 19, 2001

Dear Mr. DeLozier,

    I have been meeting with Wendi Andriano, and I recommend that a psychiatrist be called in to examine her. I believe that her willingness to give up her will to others is a symptom of some kind of personality disorder. I also suspect that her defense system includes dissociation. Her mother's reference to possible abuse by Wendi's paternal grandfather could be the origin of that dissociation. The intense sense of peace she describes since her arrest is sufficiently inappropriate to cause me to ask for collaboration from another professional.

    It would assist me greatly in diagnosis and treatment if she could be evaluated by a psychiatrist. Ideally I would like to have him or her administer personality tests and perhaps interview Wendi under hypnosis. I would also hope she could be evaluated for medication.

    Please let me know if this is possible and if I can confer with the professional she chooses. Thank you.

Sincerely,

H.Kandy Rohde, CPC

A000000047

*EXHIBIT "2"*

A000000048

**Harriet Kandy Rohde**
*Certified Professional Counselor #CC2418*
5507 East Shea Boulevard
Scottsdale AZ 85254
(602) 443-9313
FAX (602) 368-0704

| | |
|---|---|
| **EDUCATION** | M.A. Counseling Psychology, May, 1997<br>Loyola Marymount University, Los Angeles CA<br><br>M.S. 1967, B.S. 1966<br>Northwestern University, Medill School of Journalism,<br>Evanston IL |
| **EXPERIENCE** | *Jewish Family & Children's Service*<br>*6376 W. Bell Road*<br>*Glendale, AZ 85308*<br>*March 1999 - Present*<br><br>Therapist specializing in individual, couples, and family therapy as well as case management, home-based therapy, assessment and discharge evaluation at a managed care facility.<br><br>*Private Practice*<br>*Scottsdale, AZ 85254*<br>*March 2000   Present*<br><br>Therapist specializing in individual, couples, family therapy. Treatment areas include parenting, conflict resolution, stress management, depression, anxiety, and grief work.<br><br>*Southern California Counseling Center*<br>*Los Angeles, California*<br>*January, 1996-August, 1998*<br><br>Counselor at privately funded clinic with diverse client population. Worked with individuals, couples, families and groups. Experience doing assessments and intakes. |

A000000049

*McManual Health Center*
*Manual Arts High School*
*Los Angeles, California*
*September, 1997– August, 1998*

Counselor for high risk students and students on probation in Los Angeles County Vision 2000 program. Worked in individual sessions and groups.

*Department of Social Services*
*Bronx, New York*
*December, 1967–October, 1969*

Caseworker. Conducted intake interviews, determined client needs, issued payments, made home visits, made referrals to other agencies

*MEMBERSHIPS*

California Association of Marriage and Family Therapists Los Angeles Chapter CAMFT

A000000050

MARSHALL K. JEANES, CLERK
_____ DEP
FILED
2001 MAR 13  PM 3: 39

1  G. DAVID DELOZIER. P.C.
2  4016 East Forest Pleasant Place
   Cave Creek, AZ 85331
   Phone: (480) 575-6660
   Fax: (480) 575-6661
   E-Mail: gddelozier@aol.com

5  G. David DeLozier
6  State Bar of Arizona I.D: 005237
7  Attorney for Defendant

8         IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

9             IN AND FOR THE COUNTY OF MARICOPA

10

11  STATE OF ARIZONA,                    Case No. CR2000-096032

12            Plaintiff,
                                         MOTION FOR, AND
13                                       REQUEST FOR EXPEDITED
                                         CONSIDERATION OF,
14  vs.                                  APPOINTMENT OF ADDITIONAL
                                         COUNSEL AND EXPERTS
15                                       FOR DEFENDANT
16
17  WENDI ELIZABETH ANDRIANO,            (Expedited Consideration Requested)
18            Defendant.
19
20                                       (Assigned to the Honorable
                                         Daniel A. Barker, Judge)
21

22        COMES NOW G. David DeLozier, as counsel for Defendant Wendi Elizabeth Andriano, to

23  file this Motion for, and Request for Expedited Consideration of, Appointment of Additional

24  Counsel and Experts for Defendant through the Office of Court Appointed Counsel.

25        Previously, on February 5, 2001, the Court ruled on Defendant's application for funds to

26  properly represent Defendant, granting in part and denying in part, without prejudice.  One of the

27  issues the Court requested clarification on was the status of Knapp counsel, Leon Thikoll.  Mr.

28

                                    -1-

                                                              0039

A000000051

1   Thikoll is withdrawing as Knapp counsel, with the consent of Defendant.  Mr. Thikoll forwarded

2   the Withdrawal to Defendant for her signature, which the attached **Exhibit "1"** contains, and it has

3   been returned by undersigned counsel to Mr. Thikoll for his signature and filing with the Court.

4          Based on the anticipated withdrawal of Mr. Thikoll as Knapp counsel, Defendant requests

5   that the Office of Court Appointed Counsel (OCAS) provide second chair counsel for the

6
7   Defendant.

8          Defendant also requests that the Court permit her to employ the services of a forensic

9   pathologist to review the medical examiner's report and any and all other medical files.  Since the

10  "time of death" was not suggested in the medical examiner's report, based on the police interviews,

11
12  the time of death is important in assisting in a determination of the sequence of events.

13  Additionally, the cause of death was reported as "blunt force trauma"; defendant is entitled to have

14  her expert render an opinion on this important matter.  Lastly, the medical examiner's report appears

15  inconsistent with statements by police officers attributed to the oncologist, Dr. Christopher Kellogg

16
17  regarding the advanced stages of cancer'; thus, Defendant is entitled to have her expert render an

18  opinion on this important matter.

19          Defendant also requests that the Court permit her to employ the services of a hematologist to

20  examine the blood evidence.  There was blood evidence in many areas in the home, and on many

21
22  items in the kitchen, dining area, and living room area.  The Defendant's defense may depend upon

23  whose blood it was and an explanation of how it got there.

24          Defendant also seeks the services of a forensic chemist to assist in the analysis of the issues

25  relating to the sodium azide and other technical substance issues.

26
27
28

-2-

A000000052

Defendant also seeks the assistance of an expert to determine if the knife found at the scene is the same knife that cut the telephone cord and provide an analysis of the cause of the severed condition of the cord, and whether the manner of cutting the phone charger cord can be determined..

It is the Defendant's expectation that the State will seek to introduce evidence obtained from computer hard drives which were used either by the Defendant or other witnesses. In that the Defendant possesses no independent expertise in determining the manner in which this information was downloaded or compiled by the State, Defendant believes the services of a computer expert may be necessary to evaluate this evidence, including the manner in which it was extracted from the particular computers.

Defendant believes time is of the essence in obtaining the requisite additional experts, especially in view of the facts the State is seeking the death penalty in this case.

WHEREFORE, the Defendant respectfully requests this Court give expedited consideration to Defendant's Motion for, and Request for Expedited Consideration of, Appointment of Additional Counsel and Experts for Defendant through the Office of Court Appointed Counsel.

RESPECTFULLY SUBMITTED this _13th_ day of March, 2001.

G. DAVID DELOZIER, P.C.

G. David DeLozier
Attorney for Defendant

-3-

000003469

A000000053

1   Original of the foregoing filed this
2   _12th_ day of March, 2001, with:

3   Clerk of the Superior Court
    201 West Jefferson
4   Phoenix, AZ 85003

5   Copies of the foregoing delivered*/mailed** this
6   _12th_ day of March, 2001, to:

7   The Honorable Daniel A. Barker*
    Judge, Maricopa County Superior Court
8   222 E. Javelina
9   Mesa, Arizona 85210-6201

10  Juan Martinez, Esquire**
    Deputy County Attorney
11  301 West Jefferson
12  Phoenix, AZ 85003
    Attorney for the Plaintiff
13
    Office of Court Appointed Counsel*
14  411 N. Central
15  Suite # 900
    Phoenix, AZ 85004
16

17

18

19  By _____

20

21

22

23

24

25

26

27

28

-4-

A000000054

1   Original of the foregoing filed this
    14th day of March, 2001, with:
2
3   Clerk of the Superior Court
    222 East Javelina
    Mesa, AZ 85210-6201
4
5   Copies of the foregoing delivered*/mailed** this
    14th day of March, 2001, to:
6
7   The Honorable Daniel A. Barker *
    Judge, Maricopa County Superior Court
    222 East Javelina
8   Mesa, AZ 85210-6201

9   Juan Martinez, Esquire**
    Deputy County Attorney
10  301 West Jefferson
    Phoenix, AZ 85003
11  Attorney for the Plaintiff

12

13  By

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

-4-

000003471

A000000055



**LEON THIKOLL**
ATTORNEY AT LAW

239 N. MEYER
TUCSON, AZ 85701

TELEPHONE (520) 884-7997
FAX  (520) 884-1122



FILED
3/23/01   4:10 p.m.
MICHAEL K. JEANES, Clerk
By Lydia U. Gonzales
Deputy

RECEIVED
MAR 15 2001
Judge of the Superior Court
DANIEL A. BARKER



March 13, 2001

Hon. Daniel A. Barker
Maricopa County Superior Court
222 E. Javelina, 3- B
Mesa, AZ 85210

Re: .    State of Arizona v. Wendi Elizabeth Andriano
Case No. 2000-096032

Dear Judge Barker:

Enclosed please find an original Petition for Withdrawal of Counsel: Leon Thikoll as "Knapp" Counsel with Consent of Defendant, along with the corresponding Order prepared for your signature.  Also enclosed are the Consents of G. David DeLozier, Alejo and Donna Ochoa, and Wendi Andriano.

Please sign the Order, and if you would file it and have a conformed copy sent to me, I would appreciate it.  Thank you for your cooperation.

Sincerely,

Leon Thikoll

LT/llg
Enclosures



A000000856



FILED
3/23/01   4:10 p.m.
MICHAEL K. JEANES, Clerk
By Lydia U. Gonzalez
Deputy

RECEIVED
MAR 15 2001
Judge of the Superior Court
DANIEL A. BARKER

**LEON THIKOLL**
ATTORNEY AT LAW

239 N. MEYER
TUCSON, AZ 85701
TELEPHONE (520) 884-7997

State Bar No: 01467
Pima County Computer No: 57060

Attorney for

IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

IN AND FOR THE COUNTY OF MARICOPA

| | |
|---|---|
| STATE OF ARIZONA, | CASE NO. 2000-096032 |
| Plaintiff, | |
| v. | PETITION FOR WITHDRAWAL OF COUNSEL: LEON THIKOLL AS "KNAPP" COUNSEL WITH CONSENT OF DEFENDANT |
| WENDI ELIZABETH ANDRIANO, | |
| Defendant. | |

COMES NOW Leon Thikoll, who previously filed Notice as "Knapp" counsel on the

27TH day of NOVEMBER, 2000, and pleads as follows.

I.

That is become apparent that it would be logistically difficult for Leon Thikoll to be of any

major help to attorney David De Lozier, who is presently attorney of record for Wendi Andriano.

II.

Leon Thikoll had previously been hired by Alejo and Donna Ochoa of Casa Grande,

Arizona. His clients, as well as the defendant, agree that it be best that Leon Thikoll withdraw as

A000000057

Knapp" counsel.  Therefore, an order of this court is sought that Leon Thikoll be withdrawn as

"Knapp" counsel.

DATED this ___ day of _____ March _____ 2001.

_____

Leon Thikoll

LEON THIKOLL
ATTORNEY AT LAW
239 N. MEYER
TUCSON, AZ 85701

000003474

A000000058

1   Copy of the foregoing mailed this __13__
    day of ___March___, 2001, to:

2

3   G. David DeLozier
    4016 E. Forest Pleasant
    Cave Creek, AZ 85331-5439

4

5   Alejo and Donna Ochoa
    1104 N. Park

6   Casa Grande, AZ 85222

7   Wendi Adriano  - #A631830
    *C/O ESTRELLA  JAIL*

8   Room # B-312
    2939 West Durango

9   Location Code: HANO

10  Phoenix, Arizona 85009-

11

**LEON THIKOLL**
ATTORNEY AT LAW
239 N. MEYER
TUCSON, AZ 85701

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

000003475

A000000059

IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

IN AND FOR THE COUNTY OF MARICOPA

STATE OF ARIZONA,                    )
                                     )
                    Plaintiff,       )     Case No. 2000-096032
                                     )
v.                                   )
                                     )     WITHDRAWAL OF COUNSEL:
WENDI ELIZABETH ANDRIANO, )                LEON THIKOLL, AS "KNAPP"
                                     )     COUNSEL
                    Defendant.       )
                                     )
_____)

COMES NOW Leon Thikoll, and with the agreement of the Defendant, WENDI

ANDRIANO, does hereby withdraw as Knapp counsel.

DATED this 5 day of March, 2001.

_____
Leon Thikoll


I, WENDI ANDRIANO, agree that Leon Thikoll be permitted to withdraw as counsel in
the case. I am represented by G. David DeLozier, and I understand that he will be my attorney in
my case.

Dated: 3-5-00          _____
                       Wendi Andriano

A000000060

Copy of the foregoing mailed this 5
day of _MarcL_, 2001, to:

G. David DeLozier
4016 E. Forest Pleasant
Cave Creek, AZ 85331-5439

Alejo and Donna Ochoa
1104 N. Park
Casa Grande, AZ 85222

Wendi Adriano  - #A631830
*C/O ESTRELLA  JAIL*
Room # B-312
2939 West Durango
Location Code: HANO
Phoenix, Arizona 85009-

A000000061

IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

IN AND FOR THE COUNTY OF MARICOPA

| | | |
|---|---|---|
| STATE OF ARIZONA, | ) | CASE NO. 2000-096032 |
| Plaintiff, | ) | |
| v. | ) | CONSENT OF PARENTS OF DEFENDANT |
| | ) | TO WITHDRAWAL OF |
| WENDI ELIZABETH ANDRIANO, | ) | LEON THIKOLL AS "KNAPP" |
| | ) | COUNSEL |
| Defendant. | ) | |
| | ) | |

**LEON THIKOLL**
ATTORNEY AT LAW
239 N. MEYER
TUCSON, AZ 85701

CONSENT

We, ALEJO AND DONNA OCHOA, having asked Leon Thikoll, Esq. to help our

daughter in her criminal defense, agree that he may be withdrawn as attorney for our daughter.

Date: 3-8-01                       Date: 3-8-01

_Donna Ochoa_                    _Alejo D. Ochoa_

DONNA OCHOA                    ALEJO OCHOA

A000000062

IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

IN AND FOR THE COUNTY OF MARICOPA

STATE OF ARIZONA,                    )
                                     )     CASE NO. 2000-096032
              Plaintiff,             )
                                     )     CONSENT OF G. DAVID DELOZIER
v.                                   )     TO WITHDRAWAL OF
                                     )     LEON THIKOLL AS "KNAPP"
WENDI ELIZABETH ANDRIANO, )              COUNSEL
                                     )
              Defendant.             )
                                     )

CONSENT

I, G. DAVID DELOZIER, attorney of record for Wendi Andriano, do not object to Leon

Thikoll being withdrawn as "Knapp" counsel. I am the attorney of record and will continue to act

as such.

Date: 02-10-01

G. DAVID DELOZIER, ESQ.

LEON THIKOLL
ATTORNEY AT LAW
239 N. MEYER
TUCSON, AZ 85701

000003479

A000000063

FILED
3/23/01   4:10 p.m.
~~~~~~~~~ Clerk
By _____
Deputy

**LEON THIKOLL**
ATTORNEY AT LAW

239 N. MEYER
TUCSON, AZ 85701
TELEPHONE  (520) 884-7997

State Bar No: 01467
Pima County Computer No: 57060

Attorney for

IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

IN AND FOR THE COUNTY OF MARICOPA

| | |
|---|---|
| STATE OF ARIZONA, | ) |
| | ) CASE NO. 2000-096032 |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| WENDI ELIZABETH ANDRIANO, | ) ORDER |
| | ) |
| Defendant. | ) |
| | ) |

Based on the foregoing Petition to Withdraw as Knapp Counsel,

IT IS HEREBY ORDERED that Leon Thikoll is hereby withdrawn as attorney of record

for Wendi Andriano in the above case.

3/23/01

Hon. Daniel A. Barker

_____
Judge of Superior Court, Maricopa County

Copy of the foregoing mailed this 19

day of March, 2001, to:

G. David DeLozier
4016 E. Forest Pleasant
Cave Creek, AZ 85331-5439

Alejo and Donna Ochoa
1104 N. Park
Casa Grande, AZ 85222

000003480

A000000064
0044

Wendi Adriano  - #A631830
*C/O ESTRELLA  JAIL*
Room # B-312
2939 West Durango
Location Code: HANO
Phoenix, Arizona 85009-

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27

LEON THIKOLL
ATTORNEY AT LAW
289 N. MEYER
TUCSON, AZ 857( )

000003481

A000000065

1    SACKS TIERNEY P.A.
     4250 North Drinkwater Blvd., 4th Floor
2    Scottsdale, Arizona 85251-3647
     Telephone: (480) 425-2600
3
     Dean M. Wolcott, Esq. (No. 002980)
4
     Attorneys for Maricopa County
5    Office of Court Appointed Counsel

6                    SUPERIOR COURT OF ARIZONA

7                        MARICOPA COUNTY

8    STATE OF ARIZONA,
                                            No. CR 2000-096032
9            Plaintiff,

10       v.                                 RESPONSE TO MOTION FOR
                                            CONSIDERATION OF
11   WENDI ELIZABETH ANDRIANO,              APPOINTMENT OF ADDITIONAL
                                            COUNSEL AND EXPERTS
12           Defendant.

13                                          (Assigned to the Honorable Daniel A.
                                            Barker, Judge)
14

15

16

17       The Maricopa County Office of Court Appointed Counsel (OCAC), by and through

18   the undersigned, hereby responds to the Motion of the Defendant for appointment of

19   additional counsel and experts.

20       Defendant has raised two issues, that is the appointment of additional counsel and

21   secondly a request for additional expert investigation. The request for additional counsel

22   will be addressed first. To begin, the Court's file reflects that Defendant was initially

23   represented by the Office of the Maricopa County Public Defender. At some point, Mr. G.

24   David DeLozier was retained and has entered appearances on behalf of the Defendant. In

25   addition to the notice of appearance by Mr. DeLozier, a written appearance was entered by

26   Mr. Leon Thikoll. Although the Court file does not reflect it, at some point, the Public

27   Defender withdrew or was excused from further representation of the Defendant.

28   DW/MA192-2/383143

1    In February this year, the Court entertained Defendant's Motion for Funds for the

2    retention of expert witnesses and paralegal assistance.  Mr. DeLozier prepared that Motion

3    and argued the matter.  While Mr. Thikoll was not present at the hearing, his notice of

4    appearance was a matter of record.

5    Mr. DeLozier has characterized Mr. Thikoll's appearance as "Knapp" counsel;

6    however, OCAC understands the term of "Knapp" counsel to be one who is retained by

7    someone other than the defendant for purposes of assisting "appointed" counsel.  OCAC

8    believes Mr. Thikoll to be retained counsel.  In any event, Mr. DeLozier now indicates that

9    Mr. Thikoll is withdrawing as counsel "with the consent of the defendant."  While the

10   consent of the defendant may be an ethical nicety, the crucial prerequisite is the consent of

11   the court.  Rules of Criminal Procedure 6.3 provide:

12       c.    No attorney shall be permitted to withdraw after a case has been set for
13       trial except upon motion accompanied by the name and address of another
         attorney, together with a signed statement by the substituting attorney that he
         or she is advised of the trial date and will be prepared for trial.

14   The case of State of Arizona v. Andriano was set for trial prior to the filing of the Motion to

15   Withdraw by Mr. Thikoll.

16   So far as OCAC can determine, there is (1) no "substituting attorney" in which case

17   the withdrawal should be denied or (2) Mr. DeLozier is the "substituting attorney" and,

18   accordingly, has rejected or waived any claim for a second chair attorney.

19   OCAC is mindful of the Rules of Criminal Procedure Rule 6.2 to the effect that

20   indigent persons charged with a capital offense are entitled to the appointment of two

21   attorneys.  However, since Mr. DeLozier was retained, Rule 6.2 may not be applicable to

22   this case.  But, in the event this Court believes Rule 6.2 is applicable, it must necessarily

23   find that Mr. Thikoll is unable to withdraw and/or that the Motion to Withdraw is legally

24   unsatisfactory.

25   In short, if this Court denies the attempt by Mr. Thikoll to withdraw as counsel in

26   this cause, Mr. DeLozier's motion is moot inasmuch as a second chair is present and

27   available for trial.  On the other hand, if this Court permits the withdrawal of Mr. Thikoll,

28

SACKS TIERNEY P.A., LAWYERS
4250 NORTH DRINKWATER BOULEVARD
FOURTH FLOOR
SCOTTSDALE, ARIZONA 85251-3647

1   the Court must then determine whether the Motion to Withdraw "substitutes" Mr. DeLozier

2   as counsel and whether Mr. DeLozier accepts the substitution.   If Mr. DeLozier has

3   accepted the substitution as contemplated by the Rules of Criminal Procedure and since Mr.

4   DeLozier is retained, Rule 6.2 requiring appointment of dual counsel is inapplicable.

5       Finally, OCAC respectfully reminds the Court that it may not appoint an OCAC

6   attorney to assist Mr. DeLozier absent a conflict of interest with the Office of the Maricopa

7   County Public Defender.   That is to say, if the interests of justice demand that Defendant be

8   appointed a second counsel; the Court is obligated to appoint the Public Defender.   Rule

9   6.5, Rules of Criminal Procedure says:

10       b.   · Appointment of Public Defender.   In counties which have a public
    defender, the public defender shall represent all persons entitled to appointed

11   counsel whenever he or she is authorized by law and able in fact to do so.

12       Defendant next requests the appointment of five expert witnesses to assist in the

13   defense.   The experts requested include a forensic pathologist, a hematologist, a forensic

14   chemist, an expert in knife mark comparisons and a computer expert.   OCAC notes that

15   Defendant's Motion for additional experts is based primarily on speculation.   For example,

16   Defendant's request for a pathologist notes that "the Medical Examiner's report appears

17   inconsistent with statements by police officers attributed to an oncologist" . . .   The

18   Defendant does not articulate the "inconsistent statements" nor does the Motion explain

19   how an expert opinion could resolve any inconsistent statements.   In addition, Defendant's

20   Motion does not indicate why "time of death" and/or the proof or absence of proof of

21   "blunt force trauma" cannot be resolved by interviewing the medical examiner.

22       Defendant has requested the services of a hematologist; however, the Motion simply

23   indicates that the defense "may depend" upon the results of blood analysis.

24       Defendant has requested the services of a forensic chemist but the Motion declines

25   to explain the relevance of such expert inquiry.

26       Similarly, there is no explanation of relevance for the proposed analysis of knife

27   marks on a phone charger cord.

28

SACKS TIERNEY P.A., LAWYERS
4250 NORTH DRINKWATER BOULEVARD
FOURTH FLOOR
SCOTTSDALE, ARIZONA 85251-3647

1    Lastly, Defendant's Motion reaches the bare conclusion that "Defendant believes the

2  services of a computer expert <u>may</u> be necessary.

3    Defendant's Motion is presumably based upon A.R.S. § 13-1673(B).  The Arizona

4  Supreme Court has analyzed this statute in <u>State v. Knapp</u>, 114 Ariz. 531, 562 P.2d 704.

5  The Court stated:

6    A.R.S. § 13-1673(B) is not to be construed as mandating, in every case, an
     appointment of investigators or experts nor the expenditure of public money
7    for their use, merely upon application.  There must be a finding, by the trial
     court <u>(1) that the defendant is unable to pay for such services himself, and (2)</u>
8    <u>that the appointment and expenditure is reasonably necessary</u> to present an
     adequate defense.  This determination, like so many others, rests in the sound
9    discretion of the trial court.  In the absence of a showing the determination
     was an abuse of that discretion, it will not be disturbed on appeal.  (citing
10   cases)

11   The Arizona Supreme Court went on to quote the Supreme Court of Indiana:

12   We recognize that the State could not provide each indigent or middle-
     income defendant with the same number of attorneys, investigators and
13   experts as a rich man might decide to employ.  A wealthy person may hire
     any number of people to aid in his defense, needlessly, or on a whim, or
14   foolishly, and the State does not control his expenditures.  But, when the
     Court is allocating State funds for the defense of a defendant, it is rational for
15   the court to use discretion in granting or denying the defendant's request . . .
     within the primary goal of the judicial process, which is due process of law
16   for each defendant, the Court may determine which expenses are probably
     needless, wasteful or extravagant.  <u>Magley v. State</u>, 335 N.E.2d, 811, 816
17   (1975).

18   OCAC is aware that the Court has found the Defendant to be indigent.  However,

19  under certain circumstances the Court may be obligated to reconsider the matter.  The test

20  of whether a defendant is indigent is specified under Rule 6.4, which says:

21   The term 'indigent' as used in these Rules means a person who is not
     financially able to employ counsel.

22

23   In this case, however, Defendant has, as noted above, not one but two retained

24  counsel.  This fact alone may warrant the Court's reconsideration of indigence pursuant to

Rules of Criminal Procedure 6.4(c).  OCAC by this pleading makes no assumptions or

25  allegations, but reminds the Court that unless the status of indigence is reconsidered, the

26  Court has no means of determining the first prong of the A.R.S. § 13-1673(B) test noted

27  above, to wit, that "the Defendant is unable to pay for such services himself."  For example,

28

SACKS TIERNEY P.A., LAWYERS
4250 NORTH DRINKWATER BOULEVARD
FOURTH FLOOR
SCOTTSDALE, ARIZONA 85251-3647

1   OCAC is aware of cases where other defense counsel retained by family and friends of an

2   indigent defendant have accepted retainers grossly inflated and disproportionate from the

3   compensation paid to publicly-funded lawyers and where such retained counsel have

4   petitioned the Court for the payment of expert fees and costs.  Such a circumstance begs the

5   question of indigence.

6        There is little guidance on the question of whether a given size of a retainer obviates

7   the initial determination of indigence.  We do know, however, that in <u>Knapp v. Hardy</u>, 111

8   Ariz. 107, 532 P.2d 1208 that counsel was retained in the amount of $5,000.00 – and that

9   such an amount (in the opinion of the majority) was insufficient to find that the defendant

10   was not indigent.

11        The Office of Court Appointed Counsel respectfully urges the Court to carefully

12   review the request for the retention and payment of additional expert witnesses in this

13   matter.

14        RESPECTFULLY SUBMITTED this _z_ day of April, 2001.

15            SACKS TIERNEY P.A.

16

17            By _____

18               Dean M. Wolcott, Esq.
                 Attorneys for Maricopa County
                 Office of Court Appointed Counsel

19

20   COPY OF THE FOREGOING HAND-DELIVERED

21   this _3rd_ day of April, 2001, to:

22   The Honorable Daniel A. Barker
     Maricopa County Superior Court
23   222 East Javelina
     Mesa, Arizona  85210-6201

24   COPY OF THE FOREGOING MAILED

25   this _2nd_ day of April, 2001, to:

26   Juan Martinez, Deputy County Attorney
     Maricopa County Attorney's Office
27   301 West Jefferson, 5th Floor
     Phoenix, Arizona  85003-2191
28   Attorney for the Plaintiff

SACKS TIERNEY P.A., LAWYERS
4250 NORTH DRINKWATER BOULEVARD
FOURTH FLOOR
SCOTTSDALE, ARIZONA 85251-3647

1   G. David DeLozier, Esq.
     4016 East Forest Pleasant Place
2   Cave Creek, Arizona  85331
     Attorney for Defendant
3

4   Mark W. Kennedy, Esq.
     Director
     Office of Court Appointed Counsel
5   45 West Jefferson, Suite 206
     Phoenix, Arizona  85003-2325

6

7   _Debra Lee Bokich_

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

SACKS TIERNEY P.A., LAWYERS
4250 NORTH DRINKWATER BOULEVARD
FOURTH FLOOR
SCOTTSDALE, ARIZONA  85251-3647

1  **G. DAVID DELOZIER, P.C.**
   4016 East Forest Pleasant Place
2  Cave Creek, Arizona 85331
   Phone: 480-575-6660
3  Facsimile: 480-575-6661
   E-mail: gddelozier@aol.com
4
   G. David DeLozier
5  State Bar of Arizona ID. # 005237
   Attorney for Defendant
6

7

8            IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

9                IN AND FOR THE COUNTY OF MARICOPA

10                                )
                                  )
11  STATE OF ARIZONA,             )
                                  )     CR 2000-096032
12            Plaintiff,          )
                                  )     **DEFENDANT'S REPLY RE:**
13        v.                      )     **APPOINTMENT OF COUNSEL AND**
                                  )     **EXPERTS**
14  WENDI ELIZABETH ANDRIANO,     )
                                  )     (Assigned to the Honorable
15            Defendant.          )      Daniel A. Barker, Judge)

16

17       Defendant, by and through undersigned counsel, hereby replies to the response filed by the

18  Office of Court Appointed Counsel (hereinafter "OCAC") regarding Defendant's Motion to

19  appoint second chair counsel in the instant capital case, as well as for the appointment of experts

20  to assist in the preparation of the defense.  Defendant respectfully requests this Honorable Court

21  grant the pending motion.  This reply is supported by the attached Memorandum of Points and

22  Authorities, incorporated herein by reference.

23       RESPECTFULLY SUBMITTED this 9th day of April, 2000.

24                                G. DAVID DELOZIER, P.C.

25

26                                G. David DeLozier
                                  Attorney for Defendant
27

28                                        1

## MEMORANDUM OF POINTS AND AUTHORITIES

### I. PROCEDURAL BACKGROUND:

It is clear that the Maricopa County Public Defender's Office was originally appointed to represent Defendant in the instant capital case following arraignment.   Thereafter, attorney Leon Thikoll was retained by Defendant's family members and thus entered an appearance pursuant to *Knapp v. Hardy, 111 Ariz. 107, 523 P.2d 1308 (1974)* to assist the Maricopa County Public Defender.   Subsequently, and in light of Mr. Thikoll's limited expertise[1], Defendant's family retained undersigned counsel to assist in the representation. At that time, the Maricopa County Public Defender's Office was removed from the case.   Mr. Thikoll subsequently moved to withdraw as counsel of record in the instant matter, which motion to withdraw was granted by the Court on March 23, 2001.  **See Exhibit "1"**.

OCAC correctly points out that the Court file does not reflect the withdrawal of the Maricopa County Public Defender on this case.  (See Response, 1:26-27: "Although the Court file does not reflect it, at some point, the Public Defender withdrew or was excused from further representation of the Defendant.") However, the court's case information sheet does reflect that on February 13, 2001 there was an entry entitled "Stipulation for Substitution of Counsel and a Minute Entry entitled "Substitution of Counsel".  **See Exhibit "2"**.  Thus, at least as of February 13, 2001, the Office of the Public Defender had been relieved of its duties in the case.

### II. LAW AND ANALYSIS:

#### A.  The Right To Counsel:

It is axiomatic that our criminal justice system demands that every defendant threatened with a loss of liberty be represented at trial and on appeal by competent counsel. *See Gideon v. Wainwright, 372 U.S. 335, 83 S.Ct. 792 (1963); Douglas v. California, 372 U.S. 353, 83 S.Ct.*

---

[1] Mr. Thikoll was retained primarily to represent the family's interests in the dependency action pending in Maricopa County Superior Court, Juvenile Division.  However, he also entered an appearance in the instant case for the purpose of being kept informed as to its developments, and to assist as best he could.

2

A000000073

1   *814 (1963);* Arizona Rules of Criminal Procedure, 6.1(b).  The sixth amendment to the United

2   States Constitution and article 2, §24 of the Arizona Constitution list the rights of those accused

3   of committing a crime, including the right to a defense by counsel.  In *Gideon, supra,* the United

4   States Supreme Court recognized the sixth amendment right to counsel as fundamental and

5   essential to a fair trial, and held that the fourteenth amendment makes the right to counsel

6   obligatory on the states.  *372 U.S. 335, 344, 83 S.Ct. 792 (1963).*  To effectuate this fundamental

7   right, the state must provide government-appointed counsel for those charged with a crime where

8   the accused is not able to themselves afford to hire counsel.  *State v. Anderson, 96 Ariz. 123, 131,*

9   *392 P.2d 784, 790 (1964).*  A person is indigent, and thereby entitled to state-provided counsel, if

10  that person "is not financially able to employ counsel."  Arizona Rules of Criminal Procedure,

11  Rule 6.4(a).  That Defendant is herself indigent is beyond contention.

12      **B. Defendant's Right to Two Court-Appointed Attorneys:**

13          In 1993, the Arizona Supreme Court promulgated Rule 6.2, mandating that "[i]n all capital

14  cases, the presiding judge *shall* appoint two attorneys pursuant to the standards set forth in Rule

15  6.8(b)."  Rule  6.8(b) requires counsel meet specific criterion in order to defend a capital case.

16  Rule 6.2 further indicates that "[a]t the time of his or her appointment, lead counsel *may select* co-

17  counsel, so long as co-counsel is willing to accept the appointment and meets all of the

18  requirements of Rule 6.8(b)(2).  If lead counsel does not name co-counsel, the court shall select

19  co-counsel."  Clearly, these rules were created to ensure effective assistance of counsel in capital

20  litigation.  In this case, the record reveals that when the Maricopa County Public Defender was

21  appointed to represent Defendant, *second counsel* was not selected by either the Public Defender

22  or the Court.

23      **C. Defendant's Right to *Knapp* Counsel *In Addition* to Court-Appointed Counsel:**

24          Like in a criminal case involving a *non-indigent* defendant, there exists no limit as to how

25  many lawyers may appear as counsel of record to assist in the defense of any given case.  *See*

26  *Knapp, 111 Ariz. 107, 111, 523 P.2d 1308 (1974)* ["A defendant may have more than one

27

28                                              3

A000000074

1  attorney, and the public defender's office may assign one or more attorneys to represent a

2  particular defendant depending upon the seriousness of the case and the competency and

3  experience of the attorneys assigned."] In fact, *Knapp* makes clear that *one or more* outside

4  counsel may be retained by an accused's family members or friends: "It is, of course, not improper

5  for a relative of the defendant to hire *people* to help and assist, and the fact that the indigent

6  defendant already has the aid of the public defender's office does not limit the help a defendant

7  may receive." *Ibid., emphasis* added.   Since both the undersigned and Mr. Thikoll were retained

8  *by Defendant's family*, both were affiliated with the case *via Knapp* to assist the public defender(s)

9  appointed to represent Defendant.[2]  Thus, contrary to the argument set forth by OCAC, the fact

10  that Defendant had *two* attorneys affiliated with the case pursuant to *Knapp* did not preclude

11  Defendant, an indigent, from representation by appointed counsel. As *Knapp* itself recognized,

12  "where private counsel is allowed to associate with the public defender" the public pays no more

13  than it is legally obligated to pay by State and federal law. *Knapp, supra, at 111*, citing *Gideon v.*

14  *Wainwright, supra.  A Knapp*-associated lawyer does not become "retained counsel", thereby

15  precluding a defendant's eligibility for a court appointed lawyer merely because appointed counsel

16  is withdrawn or "excused". Rather, where court appointed counsel was withdrawn, substitute

17  counsel must be appointed. By definition, undersigned counsel remains *Knapp* associated with

18  the case, as he was not employed by Defendant and thus did not "replace" court-appointed

19  counsel. The retention or withdrawal of Mr. Thikoll does not alter this conclusion in any respect.

20  **III. CONCLUSION:**

21         Based on the aforementioned, it is clear that Defendant is entitled to the appointment of

22  two attorneys, in addition to any *Knapp*-associated counsel, to represent her in the instant capital

23  case.  Consequently, undersigned counsel respectfully requests this Honorable Court appoint

24

25         [2] *Knapp* counsel is, of course, still "counsel of record" for purposes of the litigation.  See
  *Knapp, supra, at 111* ["We feel that it is preferable to have counsel thus assisting to be associated

26  and made a counsel of record with reciprocal rights and duties under our Rules of Criminal
  Procedure and subject to the direction of the court as to the particular case in which he is

27  involved."]

28                                                    4

A000000075

1 counsel to represent Defendant pursuant to Rules 6.2 and 6.8, Arizona Rules of Criminal

2 Procedure.   Defendant concedes that the source of the appointment--whether counsel be from the

3 Maricopa County Public Defender's Office, the Office of Court Appointed Counsel, or the Legal

4 Advocates Office remains solely within the province of the court, as guided by Rule 6.5, Arizona

5 Rules of Criminal Procedure.  The appointment of same will likely render Defendant's request for

6 court-appointed experts moot; however, in the event it does not, Defendant will seek the

7 appropriate relief at that time.

8 IV.   ADDITIONAL EXPERTS AND EXPENSES:

9          Previously, the Court appointed Michael Sweedo as the criminalist and permitted the

10 Defendant to employ private investigators from the Office of Court Appointed Cousel's list of

11 investigators.  Mr. Sweedo and two investigators, Mary Margaret Meyers and Ismael Urias, have

12 been actively involved in the case, since the appointments.  Mr. Sweedo's retention was under a

13 limitation of $3,500.00; however, his recent billing submission and an additional budget estimate

14 exceed this amount.  See Exhibit "3".  It would be most harmful to the Defendant is these

15 individuals were unable to continue to assist with the defense; however, the current orders limit

16 the ability of the defense to continue to receive the assistance of Mr. Sweedo.  And, regardless of

17 the office through which counsel is provided, the Defendant would request that Mr. Sweedo, Mary

18 Margaret Meyers and Ismael Urias be paid through the appropriate office, presumably OCAC.

19          The Response by OCAC also is critical of the defense in that it stated in its Motion that

20 additional experts "may" be required.  The purpose of such wording was to put the Court on

21 notice that these additional experts were likley to be required.  However, even at this date, the

22 defense is not certain which experts will be required.  The reason for such a position is that the

23 State has not produced the requested disclosure to the Defendant.  The Defendant believes it

24 inappropriate to employ experts until the results of the State's inquiries by the Defendant are

25 completed.  The Defendant believes, at this time, that the additional experts enumerated in her

26 Motion will be required.

27

28                                                        5

A000000076

RESPECTFULLY SUBMITTED this 9th day of April, 2000.

G. DAVID DELOZIER, P.C.

G. David DeLozier
Attorney for Defendant

ORIGINAL of the foregoing filed this
9TH day of April, 2001 with the
Clerk of the Maricopa County Superior Court;

and copies delivered*/mailed** to:

The Honorable Daniel A. Barker*
Judge, Maricopa County Superior Court
222 West Javelina
Mesa, Arizona 85210

Juan Martinez, Esquire**
Deputy County Attorney
301 West Jefferson Street, Fifth Floor
Phoenix, Arizona 85003

Dean M. Wolcott, Esquire**
Sacks Tierney PA
4250 North Drinkwater Blvd., 4th Floor
Scottsdale, Arizona 85251
Attorneys for OCAC

6

A000000077

_#1_

A000000078

SUPERIOR COURT OF ARIZONA   *** FILED ***
MARICOPA COUNTY   04/04/2001

03/23/2001                            CLERK OF THE COURT
                                           FORM R000A

HONORABLE DANIEL A. BARKER              L. Gonzales
                                           Deputy

CR 2000-096032

                                   FILED: _____

STATE OF ARIZONA                   JUAN M MARTINEZ

v.

WENDI ELIZABETH ANDRIANO           G DAVID DELOZIER JR
                                   LEON A THIKOLL

                                   DOCKET-SE
                                   VICTIM WITNESS DIV-CA-SE
                                   ALEJO AND DONNA OCHOA
                                   1104 NO. PARK
                                   CASA GRANDE AZ  85222
                                   WENDI ADRIANO--#A631830
                                   ESTRELLA JAIL--ROOM B-312
                                   2939 W. DURANGO
                                   PHOENIX AZ  85009


                        MINUTE ENTRY

        Pursuant to Petition for Withdrawal of Counsel: Leon Thikoll
as "Knapp" Counsel with Consent of Defendant, Consent of Parents
of Defendant to Withdrawal of Leon Thikoll as "Knapp" Counsel and
Consent of G. David DeLozier to Withdrawal of Leon Thikoll as
"Knapp" Counsel filed with the Clerk of the Court March 23, 2001,

        IT IS HEREBY ORDERED that Leon Thikoll is hereby withdrawn
as attorney of record for Wendi Andriano in the above case, in
accordance with the formal written Order signed by the Court
March 23, 2001 and filed with the Clerk of the Court March 23,
2001.


Docket Code 099                                    Page 1

                        000003495

                                              A000000079

#2

A000000080

Home | Clerk of the Court | Rules | Contact Us

# Superior Court of Arizona
## in Maricopa County

## Case Information

| | | | |
|---|---|---|---|
| Case Number: | CR2000-096032 | Judge: | BARKER |
| Plantiff: | STATE OF ARIZONA | Case Type: | CRIMINAL |
| Defendant: | WENDI ELIZABETH ANDRIANO | Filing Date: | 10/18/2000 |
| Defendant DOB: | 08/26/1970 | | |
| Location: | SOUTHEAST JUDICIAL DIST. | | |

## Party Information - (PROPER means self represented)

| P# | Name | Rel | S | BarID | Attorney |
|---|---|---|---|---|---|
| 001 | STATE OF ARIZONA | PLA | N | 005669 | JOHN R DITSWORTH |
| 002 | WENDI ELIZABETH ANDRIANO | DEF | F | 005237 | G DAVID DELOZIER JR |

## Case Documents

| Filing Date | Description | Docket Date |
|---|---|---|
| 04/04/2001 | ME: WITHDRAWAL OF COUNSEL | 04/04/2001 |
| 04/03/2001 | RESPONSE | 04/04/2001 2980 P1 |
| | TO MOTION FOR CONSIDERATION OF APPOINTMENT OF ADDITIONAL COUNSEL | |
| 04/02/2001 | ME: PRETRIAL CONFERENCE SET | 04/02/2001 |
| 03/28/2001 | LIST OF WITNESSES/EXH/EVIDENCE | 04/02/2001 9510 P1 |
| | SUPPLEMENTAL | |
| 03/26/2001 | ME: ORDER ENTERED BY COURT | 03/26/2001 |
| 03/23/2001 | ORDER | 04/05/2001 1467 P2 |
| | LEON THIKOLL IS WITHDRAW AS ATTY OF RECORD | |
| 03/23/2001 | PETITION | 04/05/2001 1467 P2 |
| | FOR WITHDRAWAL OF COUNSEL LEON THIKOLL AS KNAPP COUNSEL WITH CONS DEF | |
| 03/23/2001 | LETTER | 04/05/2001 C |
| 03/16/2001 | ME: ORD/PRESCREENING REPORT | 03/16/2001 |
| 03/14/2001 | NOT DEFENSES/REQ REBUTTAL WITS | 03/15/2001 5237 P2 |
| | 1ST SUPPLEMENTAL/& DISCLOSURE | |
| 03/13/2001 | MOTION | 03/15/2001 5237 P2 |
| | FOR & REQUEST FOR EXPEDITED CONSIDERATION OF APPOINTMENT OF ADDIT & EXPERTS FOR DEF | |
| 03/06/2001 | LIST OF WITNESSES/EXH/EVIDENCE | 03/08/2001 9510 P1 |
| | SUPPLEMENTAL | |
| 03/02/2001 | MOTION | 03/05/2001 9510 P1 |
| | IN LIMINE REGARDING DEF STATEMENTS | |
| 02/22/2001 | MOTION | 02/23/2001 5237 P2 |
| | FOR DETERMINATION OF COMPETENCY | |
| 02/13/2001 | STIPULATION | 02/21/2001 5237 P2 |
| | FOR SUBSTITUTION OF COUNSEL | |
| 02/13/2001 | ME: ORDER SIGNED | 02/13/2001 |
| 02/13/2001 | ME: SUBSTITUTION OF COUNCIL | 02/13/2001 |
| 02/05/2001 | ORDER | 02/09/2001 C |
| | WENDI ELIZABETH ANDRIANO SUBMIT TO TAKING OF HANDWRITING EXEMPLAR | |
| 02/01/2001 | REQUEST | 02/02/2001 5237 P2 |
| | FOR EXPEDITED CONSIDERATION OF APPLICATION FOR FUNDS TO PROPERLY DEF | |
| 01/29/2001 | ME: PRETRIAL CONFERENCE | 01/29/2001 |
| 01/23/2001 | APPLICATION | 01/24/2001 5237 P2 |
| | FOR FUNDS TO PROPERLY REPRESENT DEFENDANT | |
| 01/22/2001 | APPLICATION | 01/23/2001 5237 P2 |
| | FOIR FUNDS TO PROPERLY REPRESENT DEFENDANT | |
| 01/19/2001 | ORDER | 01/26/2001 5669 P1 |

000003497

A000000081

|   |   |   |
|---|---|---|
| | THAT WENDI ELIZABETH ANDRIANO SUBMIT TO THE TAKING OF BLOOD SALIV | |
| 01/16/2001 | LIST OF WITNESSES/EXH/EVIDENCE | 01/23/2001 5669 P1 |
| 12/22/2000 | NOTICE | 12/27/2000 5669 P1 |
| | OF INTENTION TO SEEK DEATH PENALTY | |
| 12/22/2000 | ME: CONFERENCE | 12/22/2000 |
| 12/14/2000 | RETURN RECEIPT FILE/EXH/TRANSC | 12/19/2000 18445 P2 |
| 12/14/2000 | RELEASE RECEIPT FILE/EXH/TRANS | 12/19/2000 18445 P2 |
| 12/14/2000 | ORDER TEMP REMOVAL CT FILE/EXH | 12/19/2000 18445 P2 |
| 12/14/2000 | MOT TEMP REMOVAL CT FILE/EXH | 12/19/2000 18445 P2 |
| 12/08/2000 | RELEASE RECEIPT FILE/EXH/TRANS | 12/13/2000 5669 P1 |
| 12/08/2000 | ORDER TEMP REMOVAL CT FILE/EXH | 12/13/2000 5669 P1 |
| 12/08/2000 | MOT TEMP REMOVAL CT FILE/EXH | 12/13/2000 5669 P1 |
| 12/08/2000 | RETURN RECEIPT FILE/EXH/TRANSC | 12/11/2000 5669 P1 |
| 12/05/2000 | MOTION | 12/11/2000 5669 P1 |
| | FOR TAKING PHYSICAL EVIDENCE | |
| 12/05/2000 | MOTION | 12/11/2000 5669 P1 |
| | FOR TAKING PHYSICAL EVIDENCE | |
| 11/29/2000 | NOTICE OF APPEARANCE | 12/05/2000 1467 P2 |
| | PURSUANT TO KNAPP | |
| 11/22/2000 | ME: CASE REASSIGNED | 11/22/2000 |
| 11/15/2000 | MOTION | 11/17/2000 5669 P1 |
| | FOR EXTENSION OF TIME TO ALLEGE DEATH PENALTY | |
| 11/06/2000 | DEFENDANT NOT CHANGE OF JUDGE | 11/08/2000 18445 P2 |
| 11/03/2000 | STATE NOTICE CHANGE OF JUDGE | 11/07/2000 5669 P1 |
| 11/02/2000 | ME: ORD ENTER PLEA/NOT GUILTY | 11/07/2000 |

000003498

A000000082

_#3_

A000000083




Payable to: **Pro/Consul, Inc.**

1714 E. Bethany Home Road
Phoenix, AZ 85016-2536
(888) 939-7378 ☎ (602) 279-2422
FAX (602) 604-9454
*Tax ID: 33-0436680*

## INVOICE
*for*
Expert Services Rendered

Date: 03/26/01    Invoice No. 1582A

Bill:

G. David DeLozier, Esquire
G. David DeLozier, Attorney at Law
4016 East Pleasant
Cave Creek, AZ 85331-5439

Case Caption: State v. Wendy Andriano

Pro/Consul Case #: 01AZ-011582
Case Coordinator: Priya Das

Expert Designated: Michael J. Sweedo

| DATE | SERVICE RENDERED | HOURS | RATE / HR | TOTAL |
|---|---|---|---|---|
| 2/10/01 | Review submitted materials. | 3.5 | $130.00 | $455.00 |
| 2/12/01 | Review evidence with attorney at Phoenix Police department property. | 5.5 | $130.00 | $715.00 |
| 2/17/01 | Review materials and photographs. | 5.8 | $130.00 | $754.00 |
| 2/20/01 | Review additional materials and photographs. | 1.0 | $130.00 | $130.00 |
| 2/24/01 | Review additional material and photographs. | 3.0 | $130.00 | $390.00 |
| 2/12/01 | Travel – Sonoita / Phoenix. | 6.0 | $55.00 | $330.00 |
| | TOTAL | 24.8 | SUBTOTAL | $2774.00 |

| | | |
|---|---|---|
| | EXPENSES | $0.00 |
| | MILEAGE | $131.10 |
| 2/12/01 – 380 miles at $0.345 per mile. | CASE FIXED COST FEE | $200.00 |
| | SUBTOTAL | $3105.10 |
| | RETAINER RECEIVED | $0.00 |
| | AMOUNT DUE | $3105.10 |

Client is to review all activities noted on this invoice.  If you have any questions, please contact us at your earliest convenience to discuss.

*SERVICES BILLING CATEGORY:*

☑ PROGRESS          FINAL

*TERMS:*  DUE UPON RECEIPT.


PRO/CONSUL, INC. - TECHNICAL & MEDICAL EXPERTS A00000008


000000003500

04/04/2001   09:00   6026049454         PRO CONSUL EXPERTS                    PAGE   01/02

## PRO/CONSUL, INC.

Technical & Medical Experts
1714 E. Bethany Home Road
Phoenix, AZ 85016-2536
(602) 279-2422   FAX (602) 604-9454
(888) 9EXPERT
experlcz@msn.com

**Technical**

ACCIDENT RECONSTRUCTION
ARCHITECT
AUTOMOTIVE ENGINEER
BIOMECHANICS
CONSTRUCTION DEFECT
ECONOMICS
ELECTRICAL
ENGINEERING
ENVIRONMENTAL
FAILURE ANALYSIS
FIRE INVESTIGATION
FORKLIFTS/CRANES
HUMAN FACTORS
METALLURGY
POLICE PROCEDURES
PRODUCT LIABILITY
QUESTIONED DOCS EXAMINER
SAFETY
SCAFFOLDING
SECURITY

**Medical**

CHIROPRACTIC
DENTISTRY/ORAL SURGERY
EAR, NOSE, THROAT
EMERGENCY MEDICINE
GASTROENTEROLOGY
INTERNAL MEDICINE
LONG-TERM CARE
NEUROLOGY/NEUROSURGERY
NURSING CARE
OB/GYN
ONCOLOGY
OPHTHALMOLOGY
ORTHOPEDICS
PAIN MANAGEMENT
PATHOLOGY
PEDIATRICS
PSYCHOLOGY/PSYCHIATRY
REHABILITATION
TOXICOLOGY
UROLOGY



# FAX TRANSMITTAL

DATE: April 4 2001                                FAX #: 480-575-6661

ATTN: G. David DeLozier, Esquire
FIRM:  G. David DeLozier, Attorney at Law

FROM: Karen Lee, Administrative Assistant          TOTAL PAGES: 2 INCLUDING COVER

CASE CAPTION:  State v. Wendy Andriano
               Pro/Consul Case #: 01AZ-011582

---

RE: Invoice 1582B – Budget estimate of future work by Michael J. Sweedo

---

Dear Mr. DeLozier:

Appended, please find Invoice 1582B, budget estimate of future work for services to be completed by Mr. Sweedo. This is a high estimate in order to avoid having to go back to the court for additional approval. Fees paid that have not been used at the close of the case will be reimbursed.

Thank you, and if you have any questions, please do not hesitate to call.

Best regards,

*Karen*

A000000085

04/04/2001   09:00   6026049454   PRO CONSUL EXPERTS   PAGE   02/02



**Payable to: Pro/Consul, Inc.**

1714 E. Bethany Home Road
Phoenix, AZ 85016-2536
(888) 939-7378 ☎ (602) 279-2422
FAX (602) 604-9454
*Tax ID: 33-0436680*
INVOICE
*for*
**Expert Services Rendered**

**Date: 04/04/01    Invoice No.  1582B-Budget Estimate of Future Work**

Bill:

Court Appointed Counsel
411 N. Central Ave., Suite 900
Phoenix, AZ 85004

Case Caption: State of Arizona v.
Wendy Elizabeth Andriano
Pro/Consul Case #: 01AZ-011582
Maricopa County Superior Court Case #: CR2000-096032

Expert Designated: Michael J. Sweedo

| DATE | SERVICE RENDERED | HOURS | RATE / HR | TOTAL |
|---|---|---|---|---|
| To Be Done | Meeting and consultation with Mr. DeLozier regarding evidence (2 days in Phoenix). | 12.0 | $130.00 | $1560.00 |
| To Be Done | Travel – Sonoita / Phoenix  for consultation and meeting with Mr. DeLozier (2 days in Phoenix). | 12.0 | $55.00 | $660.00 |
| To Be Done | Research (one day). | 8.0 | $130.00 | $1040.00 |
| To Be Done | Meeting (before and after) with Mr. DeLozier for deposition. | 3.0 | $130.00 | $390.00 |
| To Be Done | Deposition ( 2 hour minimum). | 2.0 | $175.00 | $350.00 |
| To Be Done | Travel – Sonoita / Phoenix – if the deposition is to occur in Phoenix. | 6.0 | $55.00 | $330.00 |
| To Be Done | Exhibit preparation (if needed for trial). | - | - | $475.00 |
| To Be Done | Trial preparation and meeting with Mr. DeLozier. | 5.0 | $130.00 | $650.00 |
| To Be Done | Trial testimony (4 hour minimum). | 4.0 | $175.00 | $700.00 |
| To Be Done | Travel – Sonoita / Phoenix – if the trial is to occur in Phoenix. | 6.0 | $55.00 | $330.00 |
| | TOTAL: | 58.0 | SUBTOTAL | $6485.00 |

| | | |
|---|---|---|
| | EXPENSES | $0.00 |
| Research, consultation, meetings (2 days in Phoenix) – 760 miles at $0.345 per mile = $262.20. Mileage for deposition (if it is to occur in Phoenix) – 380 miles at $0.345 per mile = $131.10. Mileage for trial (if it is to occur in Phoenix) – 380 miles at $0.345 per mile = $131.10. | MILEAGE | $524.40 |
| | SUBTOTAL | $7009.40 |
| | AMOUNT DUE | $7009.40 |

Client is to review all activities noted on this invoice.   If you have any questions, please contact us at your earliest convenience to discuss.

<u>*SERVICES BILLING CATEGORY:*</u>  ✓ PROGRESS.        FINAL
*TERMS:*  DUE UPON RECEIPT.



PRO/CONSUL, INC. - TECHNICAL & MEDICAL EXPERTS   1-888-939-7378

A000000086

MICH... ... EATES, CLERK

RECEIVED CCC
DOCUMENT DEPOSITORY

2001 AUG -1   AM 11: 36

1

**G. DAVID DELOZIER. P.C.**
2   4016 East Forest Pleasant Place
Cave Creek, AZ 85331
3   Phone: (480) 575-6660
Fax: (480) 575-6661
4   E-Mail: gddelozier@aol.com

5

G. David DeLozier
6   State Bar of Arizona I.D: 005237
An Attorney for Defendant
7

8

9             IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

10                 IN AND FOR THE COUNTY OF MARICOPA

11

12

13   STATE OF ARIZONA,                    Case No. CR2000-096032

14             Plaintiff,

                                          **NOTICE OF PREVIOUS PAYMENT**
15                                        **OF DEFENSE EXPERT MICHAEL J.**
                                          **SWEEDO BY OCAC**
16   Vs.

17

18

19   WENDI ELIZABETH ANDRIANO,

20             Defendant.

21                                        **(Assigned to the Honorable**
                                          **Linda A. Akers, Judge)**
22

23

24       COMES NOW G. David DeLozier, attorney for Defendant Wendi Elizabeth

25   Andriano, to file this Notice of Previous Payment of Defense Expert Michael J. Sweedo by

26   OCAC. **See Exhibit "1".**   At the status conferences held on July 20 and July 27, 2001,

27   representatives of the Office of the Maricopa County Public Defender led this Court to

28

                                          0059

                          -1-

A000000087

believe that Mr. Sweedo had submitted a statement to their offices for payment of services which they were not responsible for paying.  The only billing submitted by Mr. Sweedo has been paid.  **See Exhibit "1".**

    **RESPECTFULLY SUBMITTED** this _31st_ day of July, 2001.

                           G. DAVID DELOZIER, P.C.

                           G. David DeLozier
                           Attorney for Defendant

Original of the foregoing filed this
_31st_ day of July, 2001, with:

Clerk of the Superior Court
201 West Jefferson
Phoenix, AZ 85003

Copies of the foregoing delivered*/mailed** this
_31st_ day of July, 2001, to:

The Honorable Linda A. Akers*
Judge, Maricopa County Superior Court
222 E. Javelina
Mesa, Arizona 85210-6201

Juan Martinez, Esquire**
Deputy County Attorney
301 West Jefferson
Phoenix, AZ 85003
Attorney for the Plaintiff

Wesley A. Peterson, Esquire**
Office of the Public Defender
1750 South Mesa Drive
Mesa, AZ  85210

By

-2-

A000000088

#*1*

A000000089

PRO/CONSUL EXPERTS                                              PAGE  01/01

## PRO/CONSUL, INC.
Technical & Medical Experts
1714 E. Bethany Home Road
Phoenix, AZ 85016-2536
(602) 279-2422   FAX (602) 604-9454
(888) 9EXPERT
expertez@msn.com

**Technical**
ACCIDENT RECONSTRUCTION
ARCHITECT
AUTOMOTIVE ENGINEER
BIOMECHANICS
CONSTRUCTION DEFECT
ECONOMICS
ELECTRICAL
ENGINEERING
ENVIRONMENTAL
FAILURE ANALYSIS
FIRE INVESTIGATION
FORKLIFTS/CRANES
HUMAN FACTORS
METALLURGY
POLICE PROCEDURES
PRODUCT LIABILITY
QUESTIONED DOCS EXAMINER
SAFETY
SCAFFOLDING
SECURITY

**Medical**
CHIROPRACTIC
DENTISTRY/ORAL SURGERY
EAR, NOSE, THROAT
EMERGENCY MEDICINE
GASTROENTEROLOGY
INTERNAL MEDICINE
LONG-TERM CARE
NEUROLOGY/NEUROSURGERY
NURSING CARE
OB/GYN
ONCOLOGY
OPHTHALMOLOGY
ORTHOPEDICS
PAIN MANAGEMENT
PATHOLOGY
PEDIATRICS
PSYCHOLOGY/PSYCHIATRY
REHABILITATION
TOXICOLOGY
UROLOGY



## FAX TRANSMITTAL

DATE:  July 30, 2001                    FAX #:   480-575-6661

ATTN:  G. David DeLozier, Esquire
FIRM:  G. David DeLozier, Attorney at Law

FROM:  Karen Lee, Administrative Assistant        TOTAL PAGES:  1 INCLUDING COVER

CASE CAPTION:  State of Arizona v. Wendi Elizabeth Andriano
               Pro/Consul Case #:  01AZ-011582

RE: Invoice 1582A ($3105.10)

Dear Mr. DeLozier:

     This fax is to confirm that we received payment in the amount of $3105.10 for the above-referenced invoice on June 14, 2001 from the Court Appointed Counsel (Maricopa County). The invoice was for services completed by Michael J. Sweedo.

     If you have any questions, please do not hesitate to call.

                                             Best regards,

                                             Karen

A000000090



2001 AUG -1 PM 3: 19



WESLEY PETERSON
Deputy Public Defender
1750 S. Mesa Drive, Suite 150
Mesa, Arizona  85210-6211
(602) 506-2209
Bar No. 012311
Attorney for Defendant

IN THE SUPERIOR COURT OF THE STATE OF ARIZONA
IN AND FOR THE COUNTY OF MARICOPA

STATE OF ARIZONA,

                Plaintiff,

        v.

WENDI ELIZABETH ANDRIANO,

                Defendant.

No. CR 2000-096032

**RESPONSE TO NOTICE
OF PAYMENT**

(Hon. Linda A. Akers)

Mr. Delozier in his motion implied that representatives of the Office of the Public

Defender were less than candid with the Court.  The attached e-mail shows that there was

a request for payment that was not approved. (See Exhibit A.)  It appears that the Office

of Court Appointed Counsel has since paid the requested amount.

RESPECTFULLY SUBMITTED this ___3/___ day of July, 2001.

MARICOPA COUNTY PUBLIC DEFENDER

By _____

WESLEY PETERSON
Deputy Public Defender



0060
A000000091

Copy of the foregoing
delivered this _____ day of
July, 2001, to:

HON. LINDA A. AKERS
Judge of the Superior Court
Southeast Court Building, 3rd Floor
222 East Javelina
Mesa, Arizona  85210

JUAN MARTINEZ
Deputy County Attorney
Southeast Court Building
222 East Javelina, Suite 2400
Mesa, Arizona  85210

DAVID DELOZIER, P.C.
4016 East Forest Pleasant Place
Cave Creek, AZ  85331

By _____
    WESLEY PETERSON
    Deputy Public Defender

WPldc073101C

2

A000000092

## Ellen Hudak - PDX

| | |
|---|---|
| From: | Ellen Hudak - PDX |
| Sent: | Monday, May 14, 2001 11:23 AM |
| To: | Gerald Gavin - PDX |
| Cc: | Wes Peterson - PDX; Laura Collings - PDX |
| Subject: | ANDRIANO, WENDY |

Gerald, I have received an invoice from Michael Sweedo in the amount of $3,105.10. I do not find a request for expenditure of funds in this case. Am I to pay this invoice? If so, please submit a request for funds ASAP so I can pay this invoice. Also, if you are submitting a request please attach a copy of this e-mail so it can be pulled right away for payment. thanks.

1

A000000093

RICHARD M. ROMLEY
MARICOPA COUNTY ATTORNEY

RONALD K. JEANES, CLERK
BY C̲_____ DEP.

FILED

2002 AUG 13 PM 4: 49

Juan M. Martinez
Deputy County Attorney
Bar ID #:  009510
MCAO Firm #:  00032000
Administration Building
301 W Jefferson St Ste 500
Phoenix, AZ 85003-2143
Telephone:   (602) 506-5780
Attorney for Plaintiff

SE
19

IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

IN AND FOR THE COUNTY OF MARICOPA

|  |  |  |
|---|---|---|
| STATE OF ARIZONA, | ) | NO. CR 2000-096032 |
| Plaintiff, | ) ) | NOTICE OF AGGRAVATING FACTORS |
| vs. | ) ) | (Assigned to the Honorable |
| WENDI ELIZABETH ANDRIANO, | ) ) | Linda A. Akers) |
| Defendant. | ) ) ) |  |

The State of Arizona, by and through the undersigned Deputy
County Attorney, discloses the aggravating factors and evidence to
be presented in its request for imposition of the death penalty
should defendant be convicted of First Degree Murder.

AGGRAVATING FACTORS

    1.  A.R.S.  §13-703  (F)(5):   The defendant committed the
offense in consideration for the receipt, or in expectation of the
receipt, of anything of pecuniary value.

    2.  A.R.S.  §13-703  (F)(6):   The defendant committed the
offense in an especially heinous, cruel or depraved manner.

A000000094
0086

EVIDENCE IN SUPPORT OF AGGRAVATING FACTORS

    1.  Photographs of decedent, Joseph Andriano.  This includes photographs of the victim's injuries.

    2.  Evidence that was admitted at the trial which relates to any aggravating circumstance.  A.R.S. §13-703(D).

LIST OF WITNESSES

    1.  Philip E. Keen, M.D.

    2.  Any witness previously listed in the State's Witness and Evidence List and all supplements thereto.

The State reserves the right to supplement its notice to include additional witness and/or evidence.  Rebuttal witnesses and/or evidence will be disclosed upon defendant's disclosure of all mitigation evidence to be proffered.

Submitted August _13_, 2002.

                    RICHARD M. ROMLEY
                    MARICOPA COUNTY ATTORNEY

      BY  _Juan Martinez_____
                  Juan M. Martinez
                  Deputy County Attorney

A000000095

Copy of the foregoing
mailed\delivered this
_13_ day of August, 2002,
to:

The Honorable Linda A. Akers
Judge of the Superior Court

Daniel B. Patterson
1750 S. Mesa Drive, Ste 150
Mesa, Arizona   85210-6211

BY _Juan Martinez_____
    Juan M. Martinez
    Deputy County Attorney

    JMM/lm

3

A000000096

DANIEL B. PATTERSON
Deputy Public Defender
1750 S. Mesa Drive, Suite 150
Mesa, Arizona 85210-6201
(602) 506-2205
Bar No. 005743
Attorney for Defendant

MICHAEL K. JEANES, CLERK
BY _____ DEP
FILED

2003 MAR 25   PM 2: 54

IN THE SUPERIOR COURT OF THE STATE OF ARIZONA
IN AND FOR THE COUNTY OF MARICOPA

STATE OF ARIZONA,

Plaintiff,

v.

WENDI ANDRIANO,

Defendant.

No. CR 2000-096032

**MOTION IN LIMINE**

(Hon. Linda A. Akers)

(Oral Argument Requested)

Defendant Wendi Andriano, through counsel undersigned, pursuant to Rules 401,

402, 403, and 404 of the Rules of Evidence, moves this Court to issue its order precluding

the State from adducing at trial evidence pertaining to the following collateral

circumstances:

1) Efforts made by the defendant and victim to obtain sodium azide, receipt of

sodium azide by the defendant and victim, discovery of sodium azide in the

apartment of the defendant/victim or in the storage locker of the

defendant/victim, and discovery of the presence of sodium azide in the

body of the victim;



0100

A000000097

2)     A brief sexual relationship defendant had with Rick Freeland, a tenant at the apartment complex some six months prior to the death of the victim in this case; and,

3)     Efforts of the defendant to obtain additional life insurance policies with the victim as the insured.

This request is based upon the attached Memorandum of facts and law.

RESPECTFULLY SUBMITTED this 25th day of March, 2003.

MARICOPA COUNTY PUBLIC DEFENDER

By _____

DANIEL B. PATTERSON
Deputy Public Defender

A000000098

## MEMORANDUM

Defendant Wendi Andriano and her husband, Joe Andriano, were involved in a mutual, physical altercation inside their apartment on October 8, 2000. The fight was not observed by any eyewitness. Joe Andriano died as a result of the injuries sustained by him in that fight.

Joe Andriano was afflicted with cancer at the time of the incident and was not expected to survive. In anticipation of his death, both Wendi and Joe Andriano took steps to provide for the financial well-being of the family and to deal with the pain and uncertainty related to his final days.

In this regard, Joe and Wendi Andriano sought and obtained a chemical to assist him with suicide, if necessary, and explored the possibility of obtaining policies of life insurance that would provide financial security for the small children after his death. It was for these reasons that the sodium azide was obtained and insurance agents were contacted by telephone.

Wendi Andriano was the principal caretaker for her husband in the years before his death while he suffered from the physical effects of the cancer and the cancer treatments. She was the sole breadwinner for the family and was the primary parent responsible for the care of their two infant children. Some six months prior to the fatal fight, Wendi Andriano had a brief relationship with Rick Freeland, a tenant in one of the other apartments on site. It was an error in judgment committed as a result of the stressful events then a major component of her life. It had been over many months prior to the death of Joe Andriano.

3

A000000099

These three categories of evidence are completely collateral to the events of

October 8, 2000, and are not relevant pursuant to the Rules of Evidence.  Therefore,

Defendant Wendi Andriano requests that this Court preclude the State from adducing

evidence pertaining to sodium azide, life insurance acquisition, and a personal

relationship of the defendant with Rick Freeland at the trial of this case.

RESPECTFULLY SUBMITTED this _25th_ day of March, 2003.

                                   MARICOPA COUNTY PUBLIC DEFENDER

                                   By _____
                                        DANIEL B. PATTERSON
                                        Deputy Public Defender

Copy of the foregoing
delivered this _25th_ day of
March, 2003, to:

HON. LINDA A. AKERS
Judge of the Superior Court
Southeast Court Building, 3rd Floor
222 East Javelina
Mesa, Arizona  85210

JUAN MARTINEZ
Deputy County Attorney
301 West Jefferson, Suite 800
Phoenix, Arizona 85003

By _____
     DANIEL B. PATTERSON
     Deputy Public Defender

TCDBP032503C

4

A000000100



NICK  ⸱ ⸱ S. JEANES. CLERK
BY ⸱ ⸱ ⸱ ⸱ ⸱ ⸱ ⸱ ⸱ ⸱ DEP⸱
FILED:

2003 APR -3  PM 2: 42

DANIEL B. PATTERSON
Deputy Public Defender
1750 S. Mesa Drive, Suite 150
Mesa, Arizona  85210-6201
(602) 506-2205
Bar No. 005743
Attorney for Defendant

IN THE SUPERIOR COURT OF THE STATE OF ARIZONA
IN AND FOR THE COUNTY OF MARICOPA

| | |
|---|---|
| STATE OF ARIZONA, | No. CR 2000-096032 |
| Plaintiff, | **MOTION TO CONTINUE TRIAL** |
| v. | |
| WENDI ELIZABETH ANDRIANO, | (Hon. Linda A. Akers) |
| Defendant. | (Oral Argument Requested) |

Defendant Wendi Elizabeth Andriano, through counsel undersigned, pursuant to

Rule 8.5 of the Arizona Rules of Criminal Procedure, moves this Court to issue its order

continuing the trial in the above-captioned case from April 24, 2003 to a date and time

convenient to the Court, approximately four weeks later.

As grounds therefore, Dr. Sharon B. Murphy, a domestic violence expert and

professor at Arizona State University, requires additional time to be prepared to render

her opinions in this case, as disclosed more fully in a letter signed by her, dated April 1,

2003, and attached hereto.

Further, Mitigation Specialist, Patrick Linderman, has completed approximately

60 percent of his mitigation work for benefit of the defendant, and needs additional time.



0104

A000000101

He is also scheduled to begin a capital trial before Judge Keppel on April 7, 2003, and

will be unavailable for approximately three weeks.

This motion is made in good faith and not for the purpose of improper delay.  The

time period between the current trial date and the new date may be excluded pursuant to

the rule.

RESPECTFULLY SUBMITTED  this 3rd day of April, 2003.

MARICOPA COUNTY PUBLIC DEFENDER

By _____

DANIEL B. PATTERSON
Deputy Public Defender

Copy of the foregoing
delivered this ____ day of
April, 2003, to:

HON. LINDA A. AKERS
Judge of the Superior Court
Southeast Court Building, 3rd Floor
222 East Javelina
Mesa, Arizona  85210

JUAN MARTINEZ
Deputy County Attorney
301 West Jefferson, Suite 800
Phoenix, Arizona 85003

By _____

DANIEL B. PATTERSON
Deputy Public Defender

TCDBP0040303C

2

A000000102

04/01/03 05:00P  P.002

Sharon B. Murphy, PhD, CISW
P.O. Box 871802
Arizona State University, School of Social Work
Tempe, AZ 85287-1802
Email: sharon.murphy@asu.edu  Ph: (480) 965-3525

April 1, 2003

Dan Patterson, JD
Office of the Public Defender

Re: State v Andriano  CR2000-096032

Dear Dan:

I have currently completed 10 hours of interview time with Wendi Andriano and anticipate that I need an additional 10 more hours to interview her and complete the domestic violence assessment process. Additionally I have other witnesses to interview who are yet to be determined. I am certain that domestic violence is an integral part of this case based on the interview data and the assessment tests that I have administered to date. I do not believe that I can complete all of the interviews thoroughly in the remaining time prior to the assigned court date of late April.

Sincerely,

Sharon B. Murphy

A000000103



MICHAEL K. JEANES, CLERK
BY. _____ DEP.

FILED

2003 APR 10  PM 4: 56

RICHARD M. ROMLEY
MARICOPA COUNTY ATTORNEY

Juan M. Martinez
Deputy County Attorney
Bar ID #:  009510
MCAO Firm #:  00032000
Administration Building
301 W Jefferson St Ste 500
Phoenix, AZ 85003-2143
Telephone:   (602) 506-5780
Attorney for Plaintiff

IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

IN AND FOR THE COUNTY OF MARICOPA

|  |  |
|---|---|
| STATE OF ARIZONA, | NO. CR 2000-096032 |
| Plaintiff, | RESPONSE TO MOTION IN LIMINE |
| vs. | (Assigned to the Honorable Linda A. Akers) |
| WENDI ELIZABETH ANDRIANO, | |
| Defendant. | |

The State of Arizona, by and through the undersigned Deputy
County Attorney, requests that it be allowed to introduce evidence
at trial regarding defendant's efforts to poison the victim, obtain
additional life insurance and her infidelity with both Rick
Freeland and Travis Black.

This response is supported by the attached Memorandum of
Points and Authorities.

Submitted April  _9_ , 2003.

RICHARD M. ROMLEY
MARICOPA COUNTY ATTORNEY

BY  *Juan Martinez*
Juan M. Martinez
Deputy County Attorney

0106

A000000104



<u>MEMORANDUM OF POINTS AND AUTHORITIES</u>

FACTS

The defendant, Wendi Elizabeth Andriano, and victim, Joseph Andriano, were married with two children. The family lived in apartment 132 of the San Riva Apartments where defendant was employed as the office manager. The victim was suffering from terminal cancer at the time of his murder but, according to his treating physician, could survive for years.

On October 8, 2000, at 2:16 a.m., Chris Hashisaki, a book-keeper who was also employed by and lived at the San Riva Apartments, was awakened by a call from defendant asking her to come over. When she approached defendant's apartment, defendant was sitting in the parking lot on the curb holding a telephone in her hand. However, she had not called 911 to request assistance even though she claimed her husband was dying.

Once inside the apartment, Ms. Hashisaki saw the victim on the floor in a fetal position near a pool of vomit. Although he appeared to be fine except for labored breathing, Ms. Hashisaki convinced defendant to call 911. As defendant made the call, the victim indicated to Ms. Hashisaki that he needed help. After hanging up, defendant approached the victim and told him to "get his ass up".

When Ms. Hashisaki heard emergency response units approaching, she walked outside to show them the way to the apartment. As she stood outside, defendant yelled something out to her. When Ms. Hashisaki walked back to the front door, defendant asked her to

tell the fire department to leave. Defendant then threw Ms. Hashisaki's purse out of the apartment and shut the door.

Although fire department personnel knocked on the door for some time, defendant failed to open the door to let them in. Finally, the operator for the fire department called the apartment and convinced defendant to come outside and speak with the fire fighters. However, instead of coming out of the front door, defendant exited out the back, climbed the patio wall and walked to the front of the apartment. Suprisingly, she had changed her clothing and, it appeared, taken a shower. Defendant was able to convince the fire fighters to leave even though they had not gone inside to see the victim. Defendant then returned to her apartment via the circuitous back door route rather than walking in through the front door.

Approximately 20 minutes later, at approximately 3:38 a.m., defendant called police (911) to report that she had killed her husband.

Police determined that defendant beat the victim on the head repeatedly with a barstool and/or lamp while he was down on the floor. Thereafter, she slit his throat while he was still on the ground. Police also found that defendant altered the scene after she killed her husband by placing a belt and knife on the floor where the victim lay.

As part of the scene investigation, police seized a pot of soup on the stove which was later analyzed and found to be laced with sodium azide, a poison. Analysis also revealed that the vomit

3

A000000106

on the living room floor contained traces of the poison.  Finally, the medical examiner's office determined that the victim's gastric content was positive for sodium azide.

During the execution of a search warrant at one of defendant's storage sheds, #315, police found the original container of sodium azide.  Defendant's fingerprints were lifted from packing materials in the box with the poison.  Additionally, police discovered that the sodium azide had been ordered by defendant, via the internet, using the name Anne Newton.  She had asked that the poison be delivered to a non-existent business, Aztec Creations, after submitting an altered business license.

The investigation also revealed that on numerous occasions, without the victim's knowledge, defendant attempted to obtain life insurance on his life.  She went so far as to offer money to other men to stand in for her husband during the required physical examination.  Additionally, she is heard on a tape recording telling an insurance agent that the victim was in good health and did not suffer from cancer.

Defendant told her friends that she wanted her husband dead so that she could, amongst other things, enjoy the company of other men.  During these conversations, she detailed incidents of infidelity with both Rick Freeland and Travis Black.  She went as far as to tell them that Rick Freeland ended their tryst after he found out she was married.  Finally, she complained to her friends that her husband was very jealous when she went out.

A000000107

## ARGUMENT

It is clear that defendant planned to kill her husband by poisoning him. When the sodium azide proved to be ineffective, she beat him and slit his throat. She then manipulated the scene in an attempt to make it appear as if there had been a fight by placing a belt and knife on the floor. The killing was carried out so that, amongst other things, she could be free to enjoy the company of other men. Part of her plan included obtaining insurance policies on his life.

The evidence of the poisoning should be admitted at trial since it shows that defendant premeditated victim's killing. Additionally, part of the motivation for the murder was greed as shown by defendant's attempt to fraudulently obtain insurance on the victim's life. Finally, per conversations with friends, once her husband was dead, Rick Freeland would be willing to resume the relationship with her.

Submitted April ___9___, 2003.

RICHARD M. ROMLEY
MARICOPA COUNTY ATTORNEY


BY _____
Juan M. Martinez
Deputy County Attorney

5

A000000108

Copy of the foregoing
mailed\delivered this
__9__ day of April, 2003,
to:

The Honorable Linda A. Akers
Judge of the Superior Court

Daniel B. Patterson
1750 S. Mesa Drive, Ste 150
Mesa, Arizona   85210-6211


BY _____
   Juan M. Martinez
   Deputy County Attorney

   JMM/lm

6

A000000109

MICHAEL K. ... 'ES, CLERK
BY: ___ DEP.
FILED
2004 JAN 29  PH 3:59

*DANIEL B. PATTERSON*
Deputy Public Defender
11 West Jefferson, Suite 5
Phoenix, Arizona 85003-2302
(602) 506-3022
Bar No. 005743
Attorney for Defendant

## IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

## IN AND FOR THE COUNTY OF MARICOPA

STATE OF ARIZONA,

        Plaintiff,

        v.

WENDI E. ANDRIANO,

        Defendant.

No. CR2000-096032

**MOTION IN LIMINE**

(Hon. Brian Ishikawa)

(Oral Argument Requested)

(Evidentiary Hearing Requested)

Defendant Wendi E. Andriano, through counsel undersigned, pursuant to rule 401, 402, 403 and 404 of the Arizona Rules of Evidence, and the holding in *State v. Terrazas*, 189 Ariz. 580, 944 P.2d 1194 (1997), moves this Court to issue its order precluding the State from eliciting testimony from witnesses during the guilt/innocence phase (phase one) of the trial relating to the following areas of conduct involving the defendant. As grounds, therefore, the conduct is either not relevant, unfairly prejudicial, confusing or misleading to the jury, excludable pursuant to 404(b), or not provable by clear and convincing evidence.

A0000002150

RESPECTFULLY SUBMITTED this 20th day of January, 2004.

MARICOPA COUNTY PUBLIC DEFENDER

By _____
DANIEL B. PATTERSON
Deputy Public Defender

## MEMORANDUM

Defendant Wendi E. Andriano is accused of first degree murder in the death of her husband, Joe Andriano.  Her husband died as a result of injuries sustained in a fight with the defendant in their apartment on October 8, 2000.  Her husband had terminal cancer at the time.

Witnesses have been listed by the State and interviewed by the defense who claim to have information related to the conduct of the defendant that can be classified in the following categories:

I.     Financial misconduct of the defendant as resident manager of the apartment complex.

II.    Misconduct of the defendant relative to her efforts to obtain life insurance policies on the life of her husband.

III.   Misconduct of the defendant in obtaining sodium azide.

Evidence pertaining to the conduct of the defendant relating to these three categories should be precluded for reasons described more fully herein.

2

A000000111

I.   Financial misconduct of the defendant as resident manager of the apartment complex

Defendant Andriano was the resident manager of the San Riva Apartments. Witnesses believe that the defendant misappropriated funds and lap top computers from the owners of the apartment complex. They also claim that she allowed at least one tenant to live rent-free at the complex in violation of corporate rules. None of this conduct is related to the fight between the defendant and the decedent and is not relevant, is unfairly prejudicial, is excludable under Rule 404(b) and is not provable by clear and convincing evidence.

II.   Misconduct of the defendant relative to her efforts to obtain life insurance policies on the life of her husband.

No fraudulently obtained life insurance policies exist in this case. Witnesses claim, however, that the defendant contacted them and asked them to pose as the decedent for money and to apply for life insurance policies that the decedent could not obtain because of his terminal cancer. No meetings with insurance agents were ever conducted nor was any money ever exchanged between the defendant and these witnesses.

None of this conduct is related to the death of the decedent. It is not relevant, is unfairly prejudicial, and is excludable under Rule 404(b) of the Arizona Rules of Evidence.

III.   Misconduct of the defendant in obtaining sodium azide.

3

A000000112

Defendant Andriano obtained the chemical sodium azide from a supplier by forging various documents and establishing a fictitious business entity.  While the fact that the defendant did obtain the chemical may be relevant in this case, the misconduct she engaged in to obtain it is not relevant, and is unfairly prejudicial and is excludable pursuant to Rule 404(b) of the Arizona Rules of Evidence.

Therefore, for the reasons described herein, Defendant Wendi E. Andriano requests that those areas of testimony outlined herein be precluded at trial by order of the Court.

RESPECTFULLY SUBMITTED this 20 day of January, 2004.

MARICOPA COUNTY PUBLIC DEFENDER

By _____
DANIEL B. PATTERSON
Deputy Public Defender

4

A000000113

Copy of the foregoing mailed/
delivered this ___20___ day of DBC
January, 2004, to:

HON. BRIAN ISHIKAWA
Judge of the Superior Court


JUAN MARTINEZ
Deputy County Attorney
301 West Jefferson Street
Phoenix, Arizona 85003

DAVID DELOZIER Co-Counsel
4016 E. Forest Pleasant
Cave Creek, Arizona 85331

By _____
    DANIEL B. PATTERSON
    Deputy Public Defender

MP012004E

5

A000000114

000003530



RICHARD M. ROMLEY
MARICOPA COUNTY ATTORNEY

Juan M. Martinez
Deputy County Attorney
Bar ID #:  009510
MCAO Firm #:  00032000
Administration Building
301 W Jefferson St Ste 500
Phoenix, AZ 85003-2143
Telephone:   (602) 506-5780
Attorney for Plaintiff

MICHAEL K. JEANES, CLERK
BY: _____ DEP.
FILED
2004 FEB 24  PM 4: 58

IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

IN AND FOR THE COUNTY OF MARICOPA

| | |
|---|---|
| STATE OF ARIZONA,<br><br>    Plaintiff,<br><br>  vs.<br><br>WENDI ELIZABETH ANDRIANO,<br><br>    Defendant. | NO. CR 2000-096032<br><br>RESPONSE TO MOTION IN LIMINE<br><br>(Assigned to the Honorable<br>Brian K. Ishikawa) |

The State of Arizona, by and through the undersigned Deputy
County Attorney, requests that it be allowed to introduce evidence
at trial regarding defendant's misconduct in obtaining sodium
azide, her efforts to obtain life insurance on her husband's life
and financial misconduct.   This response is supported by the
attached Memorandum of Points and Authorities.

Submitted February _24_ , 2004.

      RICHARD M. ROMLEY
      MARICOPA COUNTY ATTORNEY

      BY _____
      Juan M. Martinez
      Deputy County Attorney



0130

A000000115

<u>MEMORANDUM OF POINTS AND AUTHORITIES</u>

FACTS

The defendant, Wendi Elizabeth Andriano, and victim, Joseph Andriano, were married with two children.   The family lived in apartment 132 of the San Riva Apartments where defendant was employed as the office manager.   The victim was suffering from terminal cancer at the time of his murder but, according to his treating physician, could survive for years.

On October 8, 2000, at 2:16 a.m., Chris Hashisaki, a book-keeper, who was also employed by and lived at the San Riva Apartments, was awakened by a call from defendant asking her to come over.   When she approached defendant's apartment, defendant was sitting in the parking lot on the curb holding a telephone in her hand.   However, she had not called 911 to request assistance even though she claimed her husband was dying.

Once inside the apartment, Ms. Hashisaki saw the victim on the floor in a fetal position near a pool of vomit.   Although he appeared to be fine except for labored breathing, Ms. Hashisaki convinced defendant to call 911.   As defendant made the call, the victim indicated to Ms. Hashisaki that he needed help.   After hanging up, defendant approached the victim and, as she grabbed him underneath both arms, told him to "get his ass up".   He was unable to do so.

When Ms. Hashisaki heard emergency response units approaching, she walked outside to show them the way to the apartment.   As she stood outside, defendant yelled something out to her.   When Ms.

A000000116

Hashisaki walked back to the front door, defendant asked her to tell the fire department to leave. Defendant then threw Ms. Hashisaki's purse out of the apartment into the breezeway and shut the door.

Although fire department personnel knocked on the door for some time, defendant failed to open the door to let them in. Finally, the dispatcher for the fire department called the apartment and convinced defendant to come outside and speak with the fire fighters. However, instead of coming out of the front door, she exited out the back, climbed the patio wall and walked to the front of the apartment. Suprisingly, she had changed her clothing and, it appeared, taken a shower. Defendant was able to convince the fire fighters to leave even though they had not gone inside to check the victim's welfare. Defendant then returned to her apartment via the circuitous back door route rather than walking in through the front door.

Approximately 20 minutes later, at approximately 3:38 a.m., defendant called police (911) to report that she had killed her husband.

Police determined that defendant beat the victim on the head repeatedly with a barstool and/or lamp while he was down on the floor. Thereafter, she slit his throat while he was still on the ground. Police also found that defendant altered the scene by placing a belt and knife on the floor where the victim lay.

As part of the scene investigation, police seized a pot of soup on the stove which was later analyzed and found to be laced

000003533

A000000117

with sodium azide, poison. Analysis also revealed that the vomit on the living room floor contained traces of the poison. Finally, the medical examiner's office determined that the victim's gastric content was positive for sodium azide.

During the execution of a search warrant at one of defendant's storage sheds, #315, police found the original container of sodium azide. Defendant's fingerprints were lifted from packing materials in the box with the poison. Additionally, police discovered that the sodium azide had been ordered by defendant, via the internet, using the name Anne Newton. She asked that the poison be delivered to a non-existent business, Aztec Creations, after submitting an altered business license.

The investigation also revealed that on numerous occasions, without the victim's knowledge, defendant attempted to obtain life insurance on his life. In fact, on one occasion, she is heard on a tape recording telling an insurance agent that the victim was in good health and did not suffer from cancer. Additionally, she went so far as to offer money to other men to stand in for her husband at the required physical examination. Specifically, James Yost, one of the men who was offered money, was also told that, if the victim were dead, the pending medical malpractice lawsuit would be worth more money to her. Later on in the same conversation, defendant reiterated that the victim was worth more dead than alive.

The investigation into defendant's employment history reveals that she was deceptive in her dealings with her employers. The

4

records show dei_idant stole money fr_ each of them. Additionally, the records also detail many instances where defendant was untruthful in dealings with her employers.

ARGUMENT

I. Sodium Azide

It is clear that defendant planned to kill her husband by poisoning him. Her misconduct in obtaining the poison is relevant to the issue of premeditation. She would not have concealed her identity, falsified a business license or requested that the poison be delivered to a non-existent address if the sodium azide had not been part of her nefarious plan to kill her husband. Her actions also speak against this case being characterized as an assisted suicide.

II. Life Insurance Policies

On a number of separate occasions, defendant attempted to obtain a life insurance policy on the life of her husband. These efforts were undertaken shortly before she murdered him on October 8, 2000. Each time she applied for a policy, defendant hid the truth of his medical condition. These underhanded efforts were part of her on-going scheme that her husband's death be as financially lucrative for her as possible. After all, according to her own words, her husband was worth more dead than alive.

III. Previous Employment

Although witnesses indicate that defendant misappropriated funds and lap top computers from the owners of the San Riva Apartments, her employment records are more expansive and detail

5

A000000119

instances where defendant was untruthful.  Additionally, records from other employers indicate that not only did defendant steal from each of them, she was also less than candid in her dealings while in their employ.  Should defendant or her expert, Sharon Murphy, Ph.D., testify at trial, specific instances of deceit are admissible for impeachment purposes, Rule 608(b), Ariz. R. Evid.

Submitted February _24_, 2004.

RICHARD M. ROMLEY
MARICOPA COUNTY ATTORNEY


BY _Juan Martinez_
Juan M. Martinez
Deputy County Attorney


Copy of the foregoing
mailed\delivered this
_24_ day of February, 2004,
to:

The Honorable Brian K. Ishikawa
Judge of the Superior Court

Daniel B. Patterson
11 W. Jefferson, Ste. 5
Phoenix, AZ  85003


BY_Juan Mart._
Juan M. Martinez
Deputy County Attorney

JMM:kj

6

000003536                                          A000000120

DANIEL B. PATTERSON
Deputy Public Defender
Luhrs Building, 1st Floor
11 West Jefferson Street, Suite 5
Phoenix, Arizona 85003-2302
Telephone: (602) 506-8276
Arizona State Bar Number 005743
Attorney for the Defendant

MICHAEL K. JEANES, CLERK
BY: _____ DEP
FILED
2004 APR 28 PM 4: 13

## IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

## IN AND FOR THE COUNTY OF MARICOPA

STATE OF ARIZONA,

              Plaintiff,

    v.

WENDI E. ANDRIANO,

              Defendant.

No. CR 2000-96032-001 DT

**MOTION TO LIMIT EVALUATION OF DEFENDANT BY STATE'S EXPERT DR. BAYLESS**

(Evidentiary Hearing and Oral Argument set for April 30, 2004)

(Hon. Brian K. Ishikawa)

       Defendant, Wendi E. Andriano, through counsel undersigned, pursuant to Rule 15 of the Arizona Rules of Criminal Procedure, the Fifth, Sixth and Fourteenth Amendments to the U.S. Constitution, and Article 2, sections four and ten of the Arizona Constitution, moves this court to issue an order precluding the state's expert, Br. Brad Bayless, from administering tests such as the MMPI § II designed to establish a psychological profile of the defendant. The state's expert has been granted a limited opportunity to meet and to evaluate the defendant in the context of ARS § 13 – 415, the domestic violence justification defense, and to potentially rebut the opinions of domestic abuse of the defense expert, Dr. Sharon Murphy. Psychological evaluations are not generally accepted in the field of



0141

000003537

A000000121

domestic violence evaluations and should be precluded, as will be more fully explained in

testimony to be adduced in the hearing of this motion now set for April 30, 2004 at 1:30 pm

in this division.

RESPECTFULLY SUBMITTED this 29th day of April, 2004.

MARICOPA COUNTY PUBLIC DEFENDER

By _____

DANIEL B. PATTERSON
Deputy Public Defender

Copy of the foregoing
delivered April, 2004, to:

HON. BRIAN K. ISHIKAWA
Southeast Court Building
222 East Javelina
Mesa, Arizona 85210

JUAN MARTINEZ
Deputy County Attorney
Administration Building
301 West Jefferson Street
Phoenix, Arizona 85003

DAVID DeLOZIER
4016 East Forest Pleasant
Cave Creek, Arizona 85331

By _____

DANIEL B. PATTERSON

DBP/slg-042804E

A000000122

MICHAEL K. JEANES, CLERK
BY: _____ DEPT.

FILED

2004 MAY 10  PM 3: 57

RICHARD M. ROMLEY
MARICOPA COUNTY ATTORNEY

Juan Martinez
Deputy County Attorney
State Bar No. 009510
State Bar Firm No. 0032000
301 West Jefferson Street, Suite 500
Phoenix, AZ  85003
Telephone: (602) 506-5790
FAX:  (602) 506-7950

Attorney for Plaintiff

IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

IN AND FOR THE COUNTY OF MARICOPA

| | |
|---|---|
| STATE OF ARIZONA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) |
| | ) |
| WENDI ELIZABETH ADRIANO, | ) No. CR 2000-096032 |
| | ) |
| | ) MOTION TO PRESENT EVIDENCE IN |
| Defendant. | ) REBUTTAL TO MITIGATION EVIDENCE |
| | ) |
| | ) (Assigned to the Honorable |
| | ) Brian Ishikawa Div. Crj05) |
| | ) |

The State of Arizona, by and through the undersigned Deputy

County Attorney, requests that it be allowed to present any

relevant evidence in rebuttal to defendant's mitigation evidence

0143
A000000123

during a capital sentencing procedure.   This motion is supported

by the attached Memorandum of Points and Authorities.

Submitted this ____7th____ day of ___MAy___, 2004.

RICHARD M. ROMLEY
MARICOPA COUNTY ATTORNEY


By_____
Juan Martinez
Deputy County Attorney

A000000124

MEMORANDUM OF POINTS AND AUTHORITIES

LAW AND ARGUMENT

1. Arizona Revised Statutes 13-703 and 13-703.01 allow the State to present any evidence in rebuttal to defendant's mitigation evidence.

The law is clear that the State is entitled to present "any evidence" relevant to mitigation. A.R.S. § 13-703.01(G). To assist the jury in determining whether there is mitigation sufficiently substantial to warrant leniency, "the state may present any evidence that demonstrates that the defendant should not be shown leniency." *Id.* That evidence may be used "regardless of its admissibility under the rules governing admission of evidence at criminal trials." A.R.S. § 13-703(C).

The new sentencing scheme only clarifies, but does not change, the standard for admissibility of rebuttal evidence. Under the previous capital sentencing scheme, the State was entitled to present any relevant evidence in rebuttal to a defendant's mitigation evidence in a capital case. *See State v. Ortiz*, 131 Ariz. 195, 208-09, 639 P.2d 1020, 1033-34 (1981), *vacated on other grounds, State v. Gretzler*, 135 Ariz. 42, 659 P.2d 1 (1983) (any relevant evidence may be used to rebut defendant's mitigation evidence, even if inadmissible at trial); *State v. Greenway*, 170 Ariz. 155, 161, 823 P.2d 22, 28 (State may offer hearsay statements to rebut defendant's mitigation

3

A000000125

evidence at sentencing phase of capital trial).   Thus, A.R.S. §§ 13-703 and 13-703.01 simply restate what previous case law had already decided.

Even if this portion of the new death penalty scheme is a change in the law, it is merely procedural and not an ex post facto law.   "[T]he general framework of a state's statutory capital sentencing scheme is procedural in nature."   *State v. Ring*, __Ariz.__, 65 P.3d 915,¶ 23, 396 Ariz. Adv. Rep. 23 (April 3, 2003) (*Ring III*).   The application of the new sentencing statutes does not violate either the federal or state ex post facto clause.

2. Case law also permits the State to present any evidence to rebut defendant's mitigation evidence.

In addition to the statutory scheme, Arizona case law is clear that once a defendant offers mitigation, the State is entitled to offer rebuttal evidence to put that evidence in perspective.

In *State v. Miller*, 186 Ariz. 314, 921 P.2d 1151(1996), the Arizona Supreme Court found that once a defendant offers his lack of a felony record as mitigation, the State is entitled to offer his entire criminal history as rebuttal.   *Id.* 186 Ariz. at 325, 921 P.2d at 1162.   The State may also offer the defendant's criminal history to rebut his claim that he was not ordinarily violent and only committed murder because of

4

A000000126

intoxication. *Id.* In *Miller*, that criminal history included information in a presentence report indicating that Miller had previously assaulted a group of students with a .22 caliber handgun. *Id.* *See State v. Rossi*, 171 Ariz. 276, 278-79, 830 P.2d 797, 799-800 (1992) (defendant's prior arrests may legitimately be considered as rebuttal to mitigation when the defendant advances lack of prior felony convictions as mitigating evidence); *State v. Lavers*, 168 Ariz. 376, 395, 814 P.2d 333, 352 (1991) (court properly admitted evidence of prior domestic violence arrests to rebut proffered mitigation evidence of lack of a criminal record).

The trier of fact may also consider character evidence in rebuttal to mitigation evidence. In *State v. Mann*, 188 Ariz. 220, 934 P.2d 784 (1997), for example, the Supreme Court found that the trial court properly considered the defendant's prior involvement in a fatal traffic accident, as well as his attitude about that accident, as rebuttal to mitigation. *Id.* 188 Ariz.at 230, 934 P.2d at 794. In *State v. Ortiz*, *supra*, 131 Ariz. At 208, 639 P.2d at 1033, the Arizona Supreme Court found that the trial court properly introduced the transcript of testimony by Ortiz's wife detailing physical abuse, assault with a weapon, and his affair with the murder victim. According to the Court, the trial court properly admitted this evidence as rebuttal to defendant's testimony in mitigation that he had a good

5

character, was a good father, and had no prior criminal record. *Id.*

Another type of evidence that is clearly admissible in rebuttal to mitigation evidence is victim impact evidence. *Mann, supra*, 188 Ariz. at 228, 934 P.2d at 792; (1997); *State v. Phillips*, 202 Ariz. 427, 438, ¶ 51, 46 P.3d 1048, 1059 (2002).

Additionally, the State is permitted to call witnesses in mitigation that did not testify at the guilt phase of the trial. *State v. Murray*, 184 Ariz. 9, 46, 906 P.2d 542, 579 (1995). Those witnesses may be called both to rebut specific mitigation evidence and to show that the mitigation evidence offered is not sufficiently substantial to call for leniency. *Id.*

CONCLUSION

Based on the above-stated reasons, the State requests that this court allow the State to present any relevant evidence in rebuttal to defendant's mitigation evidence.

Submitted this ____7th____ day of ____MAY____, 2004.

RICHARD M. ROMLEY
MARICOPA COUNTY ATTORNEY

By ___Juan Martinez___
Juan Martinez
Deputy County Attorney

6

A000000128

Copy of the foregoing
mailed\delivered this
_7_ day of _May_, 2004 to:


The Honorable Brian Ishikawa
Judge of the Superior Court

Daniel Patterson
Maricopa Public Defender
11 West Jefferson, Ste. 5
Phoenix, Arizona 85003
Attorney for Defendant


BY _Juan Martinez_
Juan Martinez
Deputy County Attorney


JM/ir

RICHARD M. ROMLEY
MARICOPA COUNTY ATTORNEY

Juan M. Martinez
Deputy County Attorney
Bar Id #: 009510
301 West Jefferson, 5th Floor
Phoenix, AZ 85003
Telephone: (602) 506-5780
MCAO Firm #: 00032000
Attorney for Plaintiff

MICHAEL K. JEANES, CLERK
BY
FILED

2004 AUG 16 PM 5:13

IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

IN AND FOR THE COUNTY OF MARICOPA

THE STATE OF ARIZONA,                )
                                     )
              Plaintiff,             )
                                     )
      vs.                            )
                                     )
WENDI ELIZABETH ANDRIANO,            )  CR 2000-096032
                                     )
              Defendant.             )  MOTION FOR DISCLOSURE
                                     )
                                     )  (Assigned to the Honorable
                                     )  Brian K. Ishikawa Div. Crj05)
                                     )
                                     )

The State of Arizona, by and through the undersigned Deputy
County Attorney, requests that the court order the disclosure of
both the psychiatric evaluation of defendant by Dr. R. Rosengard
and mental health case notes from H. Kandy Rohde, MA, CPC.
Attached as exhibit A is a copy of the report prepared by Sharon
B. Murphy, Ph.D. CISW indicating she relied on these materials in
her assessment. The State cannot be expected to fairly challenge
this expert if the basis of her opinion is kept secret.

The State also requests that the court reconsider its order
denying the disclosure of Dr. Sharon B. Murphy's notes. Rule
15.2(e)(2), Ariz.Crim.Pro., requires the disclosure of:

"Any completed written reports, statements and
examination notes made by experts listed in Rule



A000000130

15.2(c)(1) and (2) of this rule in connection with the particular case." (Emphasis added)

It is irrelevant that the notes may have been incorporated in the report. The rule specifically requires the disclosure of the notes.

Submitted August __16__, 2004.

RICHARD M. ROMLEY
MARICOPA COUNTY ATTORNEY

BY _Juan Martz._
Juan M. Martinez
Deputy County Attorney

Copy mailed\delivered
August __16__, 2004,
to:

The Honorable Brian K. Ishikawa
Judge of the Superior Court

Daniel B. Patterson
11 West Jefferson, Ste. 5
Phoenix, AZ 85003

BY _Juan Martz_
Juan M. Martinez
Deputy County Attorney

2

A000000131

# EXHIBIT A

A000000132

Sharon B. Murphy, Ph.D., CISW
AZ Certification No. SW-3428I
Domestic Violence Consultant

Ph: (602) 369-0192   Email: sbmurphyaz@yahoo.com

Domestic Violence Assessment

### Confidential

Client's Name:        Wendi Andriano
Case No.:              CR2000-096032
Assessment Date(s):   3/25/03; 3/26/03; 3/29/03; 3/30/03; 4/8/03; 4/11/03; 4/22/03,
                      6/4/03; total interview time = 20 hours
Date of Report:        9/22/03

Daniel Patterson, JD, Deputy Public Defender made a request for a Domestic Violence
Assessment of Wendi Andriano to this writer.

The purpose of this Assessment is:

1. to determine if Wendi Andriano was a victim of domestic violence/abuse by her
   husband Joseph Andriano consistent with generally accepted definitions of
   domestic violence,
2. if said claim is true then this assessment will determine the level of severity of the
   violence/abuse suffered by Ms Andriano,
3. to assist the court in understanding the circumstances of the death of Joseph
   Andriano

This Assessment includes the following:

1. Review of the following records:
   - Photographs of the crime scene provided by Daniel Patterson, J.D.
   - Autopsy report of Joe Andriano
   - Psychiatric evaluation of Wendi Andriano by Dr R. Rosengard
   - Videotape of Wendi Andriano's interview by Phoenix police detective
   - All Documents and photographs contained in Discovery Vol. I & II
     provided by Daniel Patterson, JD
   - Mental Health case notes from H. Kandy Rohde, MA, CPC

2. Unstructured Interview with Wendi Andriano – Purpose of this part of the
   assessment was to obtain Wendi's story of the pattern of abuse/victimization.
   This includes documentation of:

   a. Childhood history

A000000133

    b.  Education
    c.  Dating history
    d.  History of relationship with Joseph Andriano

3. Structured Interview with Wendi Andriano - Purpose of this part of the assessment was to obtain scores on tests of physical and non-physical abuse and to describe power and control tactics as well as abusive acts used by Joe Andriano against Wendi.  Additionally, this section reports ways in which Wendi tried to survive the abuse by Joe and reports the level of lethality of Joe's abuse of Wendi.  The following assessment tools were used:

    a.  Power and Control Wheel (Duluth Domestic Abuse Intervention Project)
    b.  Partner Abuse Scale:  Non-physical (Hudson, 1992)
    c.  Partner Abuse Scale:  Physical (Hudson, 1992)
    d.  Response to Violence Inventory:  Strategies to Escape, Avoid, and Survive Abuse  (Dutton, 1992)
    e.  Abusive Observation Checklist (Dutton, 1992)
    f.  Lethality Checklist (Arizona Coalition Against Domestic Violence)

4. Summary of Findings

5. Recommendations

**2.  Unstructured Interview with Wendi Andriano:**

    a.  **Childhood History:**  Wendi's earliest memory is of her grandmother. Wendi states that she remembers living with grandma and mom (Donna) in Phoenix as a very young child and that grandma was the primary caretaker because mom was a single parent and had to work.  She also remembers when mom began dating Alejo Ochoa.  She has only one memory of her biological father, Skip (no other name available).  She remembers around age 8 or 9 Skip took her to Tucson.

Donna married Alejo in 1976 and he adopted Wendi.  They lived in Casa Grande, AZ where mom worked as a counselor with Terros for a while and now works in the Human Resources Dept of the Casa Grande Regional Hospital.  Dad works in the family's tortilla factory in Casa Grande.

Wendi recalls that as a child/teen dad's temper was a part of her and mom's life.  She reports that dad did a lot of screaming and yelling, however, he did not swear or use physical violence.  Wendi reported that she would go into her bedroom and close the door, as would mom, when the screaming began.  If dad left the house then when he returned she and mom would be very nurturing toward him, making

A000000134

sure he was happy so that the screaming would not begin again.
Wendi also states that mom told her that when Wendi was a very
young child she may have been sexually molested by her biological
father who is currently serving a prison term for sexual molestation of
a mentally disabled female. Mom does not have any proof that this
happened to Wendi but has thought it might have been a possibility.

b. **Education**: Wendi was home-schooled for a while as a young child
while her parents worked as street ministers for a church called 91st
Psalms, a non-denominational Christian Church. Wendi attended
Evergreen School a public school in Casa Grande for kindergarten.
Wendi recalls at approximately age 5 or 6 there were two men who
traveled with her family as ministers. One of the men attempted to
expose himself to Wendi and she reports being frightened of him.
This church is now known as Harvest Family Church and is located in
Casa Grande. After Wendi and her parents stopped traveling as church
ministers, they settled in Casa Grande, AZ and she was enrolled in a
church-affiliated school called 91st Psalms. Wendi reports that her
religion was very strict and extreme. She further reports running away
with the pastor's daughter several times as young children. She states
that she just wanted to be like other kids, allowed to play at the park
etc. The 4th and final time Wendi reports running away she was about
15 years old and she recalls staying at a friend's home.

Wendi reports doing well in school, graduating from high school with
honors, and taking a few courses from Central Arizona College while
in high school. Wendi competed in music and poetry recitation and
achieved a 1st place trophy for memorization of the Book of Proverbs
from the Bible.

After marriage to Joe Andriano, Wendi took additional college courses
in Accounting at the University of Phoenix. Wendi had wanted to
finish her education (she was about 5-6 courses away from completing
a B.S. in Business) but Joe always had a reason why she couldn't
return to school.

c. **Dating History:** During high school Wendi did not date formally.
Her social group consisted of her peers at the church-affiliated high
school. Wendi reports that "for fun" most of the kids came to her
house where they played games, or rented movies. Sometimes they
went bowling, or ice-skating at Metro Center. Wendi's father was the
youth pastor for her church. Wendi did not begin dating until after
high school. Her first boyfriend was the pastor's son.

It is noteworthy that following high school Wendi went to work in
Mexico to perform missionary work. When she returned from Mexico

she decided to break-up with the pastor's son because she wanted to experience more of the world. **During the meeting in which she told him she wanted freedom to date others, the pastor's son pulled the ring he had given Wendi off of her finger, bit the ring causing the stone in the ring to fall out. He then smashed 2 of her car's windows with a rock. She did not report this incident to the police.**

### d.  History of Relationship with Joe Andriano:  Wendi met Joe
Andriano on St Patrick's Day 1992 while at Dell's Pizza in Casa Grande. Wendi was 21 years old at the time. Wendi states that Joe was part of the "in crowd" in Casa Grande, which consisted of kids from farm families. She was not part of this group and states that during the entire time they dated, his crowd did not like Joe to date someone from outside their group. Wendi reports not feeling accepted by Joe's friends and not feeling good enough for Joe.

Wendi states that her relationship with Joe began as a friendship. They quickly became good friends and spent a lot of time together. Very early in their relationship, Joe told Wendi that she was the only one who really understood him. He described to her an unsatisfying family life in which his father was alcoholic. Joe talked to Wendi about how poorly he felt life had treated him. One of the biggest problem areas that Joe described was his relationship with his father. He told Wendi that he felt his dad was willing to help Joe's friends but not Joe.

Wendi reports that she enjoyed being with Joe and felt like he needed her. Each time they were together she felt like she got to know him better and saw how "rotten" his home life had been. She reports feeling "driven" to make his life better. During their 3$^{rd}$ month of dating Joe moved in with Wendi stating that he couldn't stand living with his parents any longer. At this time Wendi and Joe did not have a sexual relationship but that changed around their 4$^{th}$ or 5$^{th}$ month of dating. Wendi reports that during their early days of dating, Joe helped her get caught up on her bills. She said that at the time she was 2 months late in making her car payment. During this time Wendi was employed as an Assistant Manager at an apartment complex and Joe had a welding business. Later she went to work in the Accounting Department at Casa Grande Regional Hospital and enrolled in accounting classes at the University of Phoenix. During the time that they were dating, Joe drank at least 10-12 bottles of beer in a night, and frequently became intoxicated when they were out. She reports that Joe was never emotionally available to her except when he had been drinking. When drinking Joe would cry about the loss of his grandfather (died by suicide) with whom he had been very close.

While they were dating Joe always wanted to keep up with his crowd and wanted a full-sized pick-up truck like the trucks owned by his buddies. Wendi felt badly for him so she gave him her car to use as a trade-in so he could buy the truck he wanted. At that point Wendi no longer had a vehicle so she would get rides home from work and then have to call around to find Joe so that she could join him after work.

Wendi reports that Joe was not romantic and not very communicative. He was a "screamer" according to Wendi, frequently yelling at others or about others. In October 1993 Joe gave up the welding business after a bad accident and went to Oklahoma to learn how to replace automobile windows. He wanted to start his own business. A few months after moving in with Wendi, Joe said, "lets get married". Wendi's mother took care of the plans for Wendi and Joe's wedding because Wendi was working full-time and taking accounting classes. Wendi reports as she looks back at that time in her life she really did not have a tremendous desire to marry Joe but felt that she had to because she had been living with Joe and felt dad's disapproval about living with a man without being married. Joe bought Wendi a fake diamond and had it set in a gold band. Wendi reports that Joe was "big on appearances" and asked her if she would mind wearing it and that someday he would buy her a real diamond. Wendi and Joe were married in January 1994. Joe's sister and her husband paid for a 3-day honeymoon for Joe and Wendi in Las Vegas.

Wendi recalls the first time she and Joe engaged in sexual relations. She states that she cried but couldn't really describe why she cried. She believed that sex was something that men enjoyed and women endured. Wendi states that Joe demanded sex daily and she, at first, pretended to enjoy it. She thought that she was supposed to give a man what he wanted. She states that all she really wanted was hugs and signs of affection but Joe was unable to provide her with affection.

A few months after their marriage, Joe and Wendi attended a friend's wedding. While at the wedding they saw Joe's ex-fiancé, Shelly, who had cheated on Joe while they were engaged. Joe told Wendi when they began dating about Shelly and what she had done to him (cheated). He also told Wendi that he had become enraged when he discovered her infidelity, and that he had wanted to hurt Shelly. In order to prevent this from happening, his parents sent him to California to cool off. Joe warned Wendi to never cheat on him.

Additionally, Joe's friends warned Wendi not to make Joe angry. They told her about a time when a man kicked Joe's truck tire and

A000000137

Joe ran him over.  According to Joe's friends, the man was taken to the hospital following that incident.  Wendi also was told about a time that Joe was at his parent's home for a party when Joe became enraged at his father and it took 2 men to pull him off of his father.  Joe's friends also told Wendi that Joe would chase his sister's boyfriends with a baseball bat.  She was also told that he had broken windows when he was mad.  Wendi stated that there was a joke around Casa Grande that Joe had a charge account at a local glass shop because he would spin out his truck in the parking lot of the Circle K causing gravel and stones to fly breaking the windows in the store.

Wendi understood Joe's anger as being focused on his dad who was an active alcoholic during Joe's youth.  She said he would often swear about his parents.  Wendi believed that with enough love from her Joe's anger would dissipate.

Beginning of Marriage:  During the first few months of their marriage Joe began to notice a lump in his jaw but didn't tell Wendi.  After the 1st six months when they could no longer afford the rent on the townhouse they had been living in, they moved to a building on Joe's family's farm.  Wendi described this building as having been used as a farm shop at one time with low ceilings and 3 rooms.  One of the rooms was filled with machinery parts.  Shortly after moving to the farm, Joe showed Wendi the lump and sought medical attention.  Prior to his first surgery they bought a car but a few months later they were unable to afford the payments so Joe had a friend of his steal the car so the insurance company would paid off the car.  Joe liked keeping up with "the Joneses" by trading in his truck every year for a new model.  All the while Wendi drove a 1974 Dodge Dart, which had belonged to her grandmother.

From the early days of their marriage Joe began to isolate Wendi from her friends.  She worked and went to school and took care of him and was careful not to upset him.  As long as Joe wasn't upset, things went along fairly smoothly.

Wendi states that Joe was often like a spoiled child who expected her to take care of him no matter what the cost.  He always felt the world owed him because of his difficult home life.  Wendi felt like she owed Joe a better life and performed numerous care taking tasks throughout their marriage.  For example, Wendi chose Joe's clothes daily and laid them out for him.  She clipped his toenails, did his washing and ironing, worked throughout their marriage supporting their household as well as Joe's very expensive hobby with his racing boat.

A000000138

She states that during this time, other than not enjoying sex, things were OK. They were buddies; she took care of him. Joe would sometimes cry on Wendi's mom's shoulder about his home life with his parents. Wendi asked Joe to accompany her to church, which he did along with Wendi's family.

<u>1st Physical Assault</u>:  Wendi reports that others saw Joe as the life of the party and that he could be very charming. There were numerous good times with Joe but there was also another side of Joe. The first physical assault of Wendi by Joe occurred in 1994, approximately 8-9 months into their marriage. Joe was angry and yelling at Wendi so she ran into their bedroom and shut the door. Joe threw his body against the door shattering the door with his body and scratching his arms and shoulders with the wood from the door. He got inside the bedroom, grabbed Wendi by the neck and pinned her against the wall. He then grabbed a stone pot and smashed it into the wall next to her head. He then let her go and smashed a coffee table. Finally, exhausted from his rage, he lie down on the bed and fell asleep. Wendi recalled the things that others had told her about Joe and his rages and the stories now began to make sense to her. Prior to this, she thought they were stories intended to frighten her.

The morning after the first physical assault, Joe bought a new bedroom door and they never talked about the incident. He also hung a picture over the hole in the wall that he had made by smashing a pot into the wall next to her head. Wendi states that she never talked about the attack with him because she was afraid to bring it up to him.

Wendi reports that during Joe's rages he would scream at her that things were her "fucking fault". She said that she would never say anything back to him because it would fuel his fire. She states that she had seen him "throwing fits" before by throwing his tools around or at an engine he was working on but previously he had not directed his rage at her directly.

<u>Joe's Health</u>:  In 1995 Joe had his first surgery. The doctor told them that the tumor was benign and that Joe would be fine. At this point Joe took a lot of time off from his auto glass business so another man took over the business. Less than 6 months after surgery the lump began growing back, Wendi became pregnant and Joe had surgery again in 1997. Again he was told that the tumor was benign. Between surgery #1 and #2, Joe took a job working for people he used to buy his glass from. Wendi estimated that they were approximately $100,000 in debt. She was employed at the Casa Grande Regional Hospital at the time earning about $13-$14 an hour. Wendi took money from the hospital for the first time in 1995. She stated that she always felt

A000000139

pressured by Joe to take care of him and all the household expenses even when he was spending a great deal of money on his boat, a very expensive toy. She said that Joe resented any constructive criticism about his spending habits but that "I'm not one who likes arguments so I just let it go." She said that she took money from the hospital a few times but does not know how much she took. She said that Joe never asked where she got the money to pay their bills. While still working at the hospital, she was experiencing enormous stress and her boss encouraged her to talk with an Employee Assistance person which she did. The EAP sent Wendi to seek counseling services at Casa Grande Counseling Services. Wendi states that she did not continue with this counselor for very long because the counselor blamed all of Wendi's problems on Joe and Wendi did not want to hear that.

<u>Work</u>

In order to begin his own automobile glass replacement business Joe borrowed the maximum allowable amount on their credit cards, obtained loans from his parents, borrowed money from a bank (loan co-signed by Brad's sister and her husband) and was given money by Wendi's parents. Joe had no income while trying to get the glass business operating. July 1996 Joe acquired AccuGlass and Wendi worked there also. Debt began to mount during this time often due to Joe's spending habits. Wendi states sometime in 1996 she was confronted by her boss and her boss's supervisor about the money. She states that she told them the truth and that they knew about Joe and what life was like with him so they did not press charges against her but she was forced to leave her job at the hospital. She states that she told Joe about taking money from the hospital and he became angry at her, yelling at her about how she would get money to support them.

Wendi went to Jerry Robles to ask for a loan and he gave them approximately $75,000 and became a partner in the glass business. Everything went well for a few months and then the pain began in Joe's neck again. At that point he was unable to keep up with the workload; he began drinking and playing more. Wendi became pregnant with Nicholas, the business was going downhill and Jerry needed to put in more money just to keep the business afloat. Joe had instructed Wendi from the beginning days of the business to only show a certain amount of work on the books. When Jerry wanted more information about the business Wendi was unable to give it to him. Jerry told Joe that he was going to take over the business because it was failing. Jerry and Joe argued about it. Wendi felt like she was in the middle of it. Joe contacted the man who stole his vehicle so that the insurance company would pay off on the vehicle and asked that man to "take care of Jerry". Wendi understood that to mean, "kill"

A000000140

Jerry. Joe had a collection of approximately 20 guns, which included AK 47's, handguns, and rifles. He kept them in the closet except the handgun was kept either in the nightstand or under the mattress.

Joe had gotten possession of a gun that had the ID numbers sawed off that Wendi believed he planned to have his friend use on Jerry. Wendi knew that they had made a mess out of the business and that Jerry had a right to take over the business. Wendi told her dad what Joe planned to do to Jerry. Mr Ochoa warned Joe not to do it. Joe also warned Wendi not to tell Jerry and he pulled out the handgun, pointing it at Wendi from across the room and said: "If you even think about doing that (telling Jerry about his plan to kill him) I'll use this on you instead of him." Despite Joe's threat, Wendi relayed the information to Jerry. Jerry chose to "disappear" so nothing more happened with Joe's plan.

On another occasion a man came to repossess Joe's van because he had fallen behind in making payments on the vehicle. Joe kept a gun in the van which he grabbed as it was being towed away. Joe put the gun to the driver's head to make him stop and forced him to drive it back to their apartment. The driver followed Joe's orders. Later Joe was laughing about it as he told other's the story.

Joe bought a 2$^{nd}$ racing boat with a $10,000 loan from a credit union. At that point, Wendi estimated that they owed approximately $70,000 in credit card loans, $10,000 to the credit union, $25,000 to the bank in Casa Grande which was borrowed to start the business, $10,000 to Joe's parents, approximately $550 a month in payments on their vehicle, $600-700 a month on their cell phones and $400 per month on life insurance. Wendi states that both Joe and his dad carried a lot of life insurance. As their debt increased and the business was going under Wendi felt like Joe was leaning more and more heavily on her. She stated that she felt like Joe was becoming depressed. Joe now had his third surgery and they had did not have any medical insurance to cover the cost. The hospital wanted the bill paid prior to the surgery so her parents gave her $2500 to give to the hospital. Each surgery was more intense than the previous one.

Wendi reported that Joe's mother gave her a baby shower and bought a lot of things for the first grandson. Nicholas was born June 1997 and Joe seemed to be recovering. Both Wendi and Joe were unemployed at this point and Wendi's parents were taking care of their bills. Joe began working for a boat shop in Tucson where he used to hang out and brought home approximately $200-$300 a week. He bought things for his boats on account so the owners took money from Joe's paycheck to cover his purchases. Wendi's parents continued to assist them with their living expenses. Wendi states that she continues to

believe that Joe needs love and acceptance so is non-confrontational with him. She also never said anything negative about Joe to her parents.

Joe never helped with the baby but would hold him or carry him to the car for Wendi. Shortly after Nicholas's birth Joe had an argument with his boss at the boat shop and did not want to go back to work. He began pressuring Wendi to go back to work while he continued "playing" at the lake with his boats. Joe was fully recovered from his most recent surgery and able to work but refused to do so. Joe continued to purchase more things on the credit card and had Wendi call an uncle to borrow $2500. He also insisted that Wendi call his sister in Tennessee to ask to borrow $1500 and had her tell his sister that she was unable to work at the time.

Wendi reports that if friends came over to see the baby Joe would become angry. He made demands on Wendi in front of visitors and was rude so that the visitor would leave. At one point in front of one visitor Joe stated: "What are you doing here right now? I need Wendi to iron my shirt right now."

At 3 weeks postpartum Joe told Wendi that he wanted sex and she refused saying that she was not healed yet from the birth. Wendi reports that Joe swore at her saying: "It can't be that fuckin' bad." He pulled her off of the couch while she was saying "No, Joe, not yet" and their dog, Max, started growling at Joe. Joe became furious and released Wendi. Joe grabbed the dog pinning him down by the neck with one hand while holding his mouth shut with the other hand. Wendi reports trying to pull Joe off the dog while Joe was screaming: "If you don't start doing what I tell you to do I'm gonna kill this fuckin' dog." Wendi reports that she was sobbing and saying "Please stop; I'll do whatever you want; Please stop". Joe released the dog and shoved him into the bathroom. Nicholas was crying so Wendi breastfed him and when she was finished Joe forced Wendi to have sex. She reports crying because of the discomfort but she reports that it was very quick, no affection or foreplay, just sexual intercourse.

In a short time the money borrowed from an uncle and Joe's sister was gone and once again Wendi had to ask her parents for help. A friend convinced Wendi to take a break from Joe by going to live with her in another state. Wendi went to Jerry Robles to ask for money again but this time so that she could leave Joe. Jerry gave her $1000. Joe was going to be away for 3 days so Wendi wrote Joe a letter saying she was leaving him and left it on his desk. Joe came home unexpectedly early one morning and discovered the letter. He shook her awake and

was screaming: "Why are you doing this to me?" Wendi reports that Joe was crying and begging her not to leave him and she felt so badly for him that she decided she couldn't go through with her plan. Things improved for a while. Wendi reports that Joe was nicer helped her with the baby and around the house. She thought that things had finally changed with Joe. She became pregnant again when Nicholas was 6 months old. She stopped breastfeeding and Joe convinced her to get a job. She got a job working for a former boss as an apartment manager.

Joe was happy that Wendi was working and they were able to move into one of the apartments where Wendi was employed. They moved out of the little building on the farm in the middle of the night because Joe didn't want his parents to know they were moving. Wendi reports that Joe used to hide things from them. For example he told his dad that he only owned 1 boat so that his dad would not expect him to use the money he spent on the 2nd boat to pay him back.

Around this time Joe began experiencing pain in his neck again and a lump quickly grew. Wendi now had medical insurance and a lung biopsy was performed. They were told that Joe had an aggressive benign tumor that was traveling to his neck. The doctor sent samples to Walter Reed Hospital in Washington DC for further testing and a report confirmed that Joe had adenoid cystic carcinoma. A physician at the Mayo Clinic recommended radical neck surgery with chemotherapy and radiation. They were told that there was a 30% chance that the tumor would not grow and that Joe had 1-2 years to live. The couple felt that there were many unknowns and not many studies conducted on this particular type of cancer and accompanying treatment. At this point Joe, Wendi and Nicholas were going to church regularly and praying for healing.

Joe had his 4th surgery on Wendi's birthday, August 1998 while Wendi was 8 months pregnant. A tracheotomy was performed and Joe became very angry and belligerent post op. Wendi reports that she stayed at the hospital with Joe and acted as a mediator between Joe and the nurses. At one point Joe threw a clipboard at a nurse who came in to assist them with something. Joe had a large section of his neck removed as part of the surgery to remove the tumor. When Joe came home from the hospital Wendi returned to work. Her parents came to their apartment 3x a day to care for the huge gaping wound on his neck. Joe had a feeding tube for about 2 weeks and he became increasingly angry and belligerent.

Joe had to decide on a course of treatment. He was told that the side effects of treatment were that the salivary glands would be burned, his

teeth would become badly decayed and would most likely need to be extracted, he would lose a great deal of weight and would be nauseous. He was told that radiation would protect the carotid artery from becoming cancerous.

Joe chose not to pursue radiation or chemotherapy because of the side effects and because he believed that he still had only a 30% chance of survival. Wendi reports that Joe's parents were very upset with Joe's decision. She also reports that many people from their church visited them and that her church believes in healing by God. A nurse from the hospital brought him a book on homeopathic remedies so they went to Colorado for 10 days of holistic treatments (diet, herbs, vitamins). Joe's sister offered to have a benefit to help pay for Joe's treatment. During the Fall 1998 a dinner dance was held at the Elks Club in Casa Grande in Joe's behalf. Wendi reports that this was very shaming for Joe. The benefit paid for the trip to Colorado. When Joe returned from Colorado he felt better physically and emotionally. The old pattern of daily sex also resumed.

Wendi encouraged Joe to resume life and she reports that he was fairly positive about recovery. Joe hired an attorney to assist with a medical malpractice case. They had been informed by the doctor at Walter Reed Hospital that the correct diagnosis should have been made right away. At this point (1999) Joe was eating healthily, and participating in Church. But by August of 1999 things began getting crazy again. They went on vacation with Wendi's parents and when they returned Wendi discovered that a new property management company had taken over and she no longer had a job and no place to live. She found another job managing but was not given an apartment as part of the job. Wendi states that Joe hounded her constantly about that so she gave up that job and found another one managing the San Riva Apartments in September 1999. They moved into an apartment at San Riva in October 1999.

Joe stopped eating healthily and stopped going to church, resumed partying and drinking all weekend. However he was still feeling good and seemed to have normal energy levels. Wendi continued working full-time and caring for the 2 babies. Wendi reports that Joe began giving her a difficult time if she didn't have time in the morning to pick out his clothing for him.

Joe would become very angry if Wendi wore black clothing even though one of her employers often required her to wear a black suit. She recalls Joe saying: "Those mother fuckin' bastards making you wear that shit…." He would not allow her to wear black socially.

A000000144

Just prior to having a CT Scan in the Fall 1999, Joe had been having terrible mouth pain. He sought the help of a dentist who took an x-ray which revealed a tumor. They went to a church event and the speaker put his hands over Joe's mouth and prayed for him. A few days later the pain disappeared. This event convinced Joe and Wendi that prayer would work but the CT Scan in the fall showed that the cancer had grown and by spring 2000 the tumors had doubled in size. Wendi reports that the "floor dropped out" for Joe with this news. He began taking out his rage on Wendi, saying it was her fault that God had failed him since she was the one who introduced him to God. Wendi reports her devastation that Joe was blaming her for his declining health as though the cancer's growth was her fault. She also stated that her bookkeeper, Chris, was beginning to realize Joe's treatment of Wendi. Wendi reported that she could no longer do anything right for Joe. Wendi came home from work to cook his dinner which he would dump in the trash. He told her that she didn't keep the kids quiet enough, that she didn't make enough money. Wendi reports that nothing she did was good enough. She states that he had given up on himself and seemed to be trying to make her miserable like him. Wendi also reports that he began pulling away from the children at this time also. Wendi reported that while working for San Riva her boss, Janice, encouraged her to seek counseling services because during weekly meetings Wendi would cry. Wendi stated that she did not seek counseling fearful that another counselor would just blame Joe like the first one did. Wendi believed that she wanted help making things better in her marriage, as a Christian wife, not heaping blame on her husband. She did not feel that would be helpful and would only contribute to the sense of abandonment Joe had felt from his family his entire life. She also recalled being told by Joe that Joe's family had sought counseling to patch things up and had wanted Joe to participate. He did go and was very upset by it and said that all they did was heap blame onto him so Joe left the session and did not return. Wendi did not want to repeat that experience for Joe.

During the Spring of 2000 Wendi met Rick Freeland who was renting an apartment at San Riva. Wendi reports that at the time she met Rick things were at a very low point for her. Her friend and co-worker, Chris, was encouraging her to give Joe an ultimatum about his behavior toward Wendi, her boss was encouraging her to seek counseling, her husband was incredibly mean and dying of cancer, and her job required a smiling face while at home she was very tearful.

Wendi recalls that Rick always found a reason to talk with her either in the office, or he would call her at work. One Sunday while Joe took the children to his parents home, Rick invited Wendi to a barbeque. Initially she said no but after a difficult telephone conversation with

Joe, she agreed to go with Rick. She left Joe a note and following the barbeque she and Rick went to Rock 'n Rodeo. Wendi reports that this was the first time she had ever done what she wanted to do. All of her life she had been following someone else's orders/wishes, her parents, her church, and Joe's orders. She recalls dancing with Rick, something that Joe wouldn't do with her, and having a great time. She felt that Rick was compassionate, again something completely different from Joe's behavior. Wendi returned home very late and lied to Joe about where she had been and with whom she had been. After that night, Wendi reports that Joe was always suspicious. A few weeks later Joe was planning a trip to Oklahoma. Wendi convinced Joe to take Nicholas with him and Wendi kept Ashley. Wendi reports that Joe had always favored Nicholas over Ashley and Nicholas enjoyed spending time with his dad. Wendi reports that while Joe was away she and Ashley had fun together. Wendi also saw Rick during that time and a sexual relationship developed. Wendi states: "Knowing men, you know that's what they want. If he hadn't wanted to have intercourse I would have been OK with that. For me, it was in exchange for what I really wanted. Someone who really listened and cared about me and showed me affection." Wendi reports that Rick helped her mentally and emotionally. The affair lasted approximately 6 weeks and Wendi reports feeling like she lost her best friend. Joe began chemotherapy in May 2000, became very ill from the chemo and his rage was on the surface constantly. He'd blow-up and then apologize which was not typical behavior (the apology). One time following a blow-up, Joe bought flowers and balloons. Wendi states that he would blow-up every few days over anything so the gifts did not mean anything. She recalls both of them sitting on their bed crying about what was happening and then Wendi would go to work and be told that she should leave him, Joe's sister would call and talk to them about a new expensive treatment that she had heard about knowing that they had no money for experiments. Her peers at work would invite Wendi for a night out so that she could take a break from the constant care giving and stress.

Wendi recalls asking her mother why she never left her dad after their fights. Mom told her that she had already left 1 marriage and couldn't do that again or she'd feel like a failure "making a habit of failing at marriage." Wendi also asked her mother-in-law why she had never left Joe's father and she said that she didn't want the stigma of being divorced and because her religion didn't recognize divorce. Wendi in response to "Why didn't you just leave him" states that she did not want anyone to talk badly about Joe because she felt like it was a reflection on her. She also states that she was the one who chose to marry him and if it's a bad decision then it was her fault. She also said that when she was walking down the aisle on her wedding day she had

A000000146

doubts but she went through with the marriage and now had to deal with it. Wendi also has talked repeatedly about her strong religious beliefs/convictions and that she believed that it was her job as a woman to make the marriage work.

By June 2000, Wendi was out of the relationship with Rick living on a daily basis with Joe's rage. She became increasingly fearful of his blow-ups since she has seen them increase over time. She would walk into the apartment from work wondering what she would find, what kind of mood Joe would be in that day. She learned to ask him many times what he wanted her to fix for him to eat that day so that she would cook the right thing and he wouldn't be upset with her. Her actions/decisions became ruled by: Is this going to upset Joe? Even the noise from the washing machine would set him off and he'd insist that she do laundry in the middle of the night if it interfered with his ability to hear the television.

With the 2nd chemotherapy treatment Joe began to lose his hair. He was a very vain man and so he asked Wendi to cut all of his hair off. After Wendi finished his hair cut Nicholas asked Joe what happened to his hair and he said: "Your mommy did this to me".

Shortly afterward Joe became ill, had difficulty moving and turned very pale. Wendi wanted to call 911 but Joe wouldn't let her. Instead she called her parents and got him into bed. He recovered but Wendi recalls this being the first big scare about his mortality.

Sometime during the summer of 2000, Joe's good friend was killed in a boat race accident that was supposed to be against Joe. Soon after his friend's death Joe began talking about not wanting to be hooked up to machines. By July 2000 Joe had contacted a medical malpractice attorney, Jeff Miller, about the misdiagnosis at the beginning of his cancer.

Now on a daily basis Joe was asking Wendi who she was sleeping with. Wendi does think that her behavior changed because she began going out in the evening after work with her girlfriends as a break from her life with Joe who was constantly demeaning, raging and belittling her. Wendi would ventilate to Chris whom Joe hated but who listened to her.

On her birthday, Joe refused to take Wendi out so she went out with her friends from work. She was 10 minutes late returning to the apartment and found Joe waiting for her in the office. He had left the children alone and asleep in the apartment so that he could wait for her in the office. Wendi had a cell phone and a wine cooler in her hands.

A000000147

He grabbed the bottle and smashed it while screaming in her face and then smashed her phone on the ground with his foot and then dragged her home. Wendi reports that she felt tremendous shame. In the past his abusive behavior had been done in the privacy of their home (she thinks that there may have been a few times when he acted out in front of her parents but to a lesser extent) but this time he did it in front of her employees.

On other occasions, Joe would call her at the office and if she was too busy at the time to talk with him he'd get in the car and park in front of her office laying on the horn until she'd come out to talk with him.

Wendi reports that the last few months prior to Joe's death were like a pressure cooker; she was on pins and needles waiting for the next explosion. She reports that she felt like she was walking on eggshells all the time. She states that when she opened the door to their apartment she never knew what would be awaiting her. She says that she always took responsibility for Joe's happiness but she no longer knew what to do to make him happy.

Also during the summer of 2000 Joe used credit to order parts for his boats. He asked Wendi for $6000 to pay for the parts. In the past Wendi would have found a way to get the money but this time she refused. Wendi reports that this was the $1^{st}$ time she had said no to Joe about helping him out of a financial bind. She believes that Joe sensed she was distancing herself by refusing and reacted very angrily.

During early fall 2000 Joe began talking about wanting to end it all. Wendi reports that he talked about suicide a lot and wanted her to get on the internet to find a way to purchase cyanide. At first Wendi didn't believe Joe was serious and she saw this as one more crazy scheme. Wendi began to see that Joe was serious and contacted Sean King a friend from high school who had had a near death experience and was a computer whiz. Sean found information on the internet which he sent to her via email. Wendi ordered sodium azide which she and Joe picked up at the address she had provided.

Approximately one month prior to Joe's death, he told Wendi to be home by 11:00 PM from watching a softball game. Wendi's friend, Chris, picked her up to take her to the game. Joe called Wendi's cell phone and he wanted her to go to the store to get him a cheese crisp. She asked him to get it himself because she was always interrupting her own schedule to do what he wanted. He kept calling her cell phone and started screaming at her to come home. She returned home and he started screaming at her about why did it take so long for her to get home and accused her of being with a man. She went into the

A000000148

bedroom to get away from the yelling but he followed her continuing the barrage of screaming and accusations. She tried to pacify him by saying: "I'm sorry, what do you want me to do." Meanwhile Wendi had gotten into bed and a few minutes later Joe dumped a pitcher of Kool Aid over her while continuing to yell at her. He began pounding on the dresser with his fists and punched holes in it breaking some of the drawers. He also broke the post on the bed and broke the footboard in half causing the bed to crash to the floor with her in it. Wendi became very fearful of what he would do next and tried to call Joe's sister for help. Joe grabbed the phone away from Wendi and told his sister that Wendi "was tripping". He became very calm as he talked on the phone but immediately afterward began screaming at Wendi again. Wendi reports that everything she did made him angry so she was afraid to speak.

**Ongoing Sexual Abuse**: Joe insisted on daily sex even though Wendi let him know that she did not want to participate. If she did not consent to have sex daily he would pout and complain that it was the least she could do for him. During the last year of their marriage Joe began bringing home sex toys and forced Wendi to engage in sex in ways that she was very uncomfortable. He forced her to perform oral sex until she began to gag. One night sometime during 1999-2000, Wendi told Joe that she wanted to go out with friends. He told her the only way she could go out was if he picked her up in 3 hours and that he would have a surprise waiting for her. She agreed and when they got home she discovered that he had purchased $130 worth of sex toys including objects, which he inserted into her vagina against her will.

3. **Structured Interview**:

   **a**. The following section illustrates the tactics that an abuser uses toward his victim through the **Power and Control Wheel** (developed by the Duluth, MN Domestic Abuse Intervention Program).

   There is no score associated with using this wheel. The purpose of showing the wheel to the individual being assessed for domestic violence is to get a basic understanding of the types and tactics of control that the individual's partner may have used against her. Once that is determined, a clear rationale is followed for choice of instruments to be used by the assessor.

   The Power and Control Wheel contains 8 tactics of control that an abuser can use against his/her partner. Wendi was shown this wheel without any explanation and asked to read the descriptions of each of the 8 sections. Next, she was asked to write any comments she might have about those 8 sections as they pertained to her relationship with her spouse. Wendi gave

examples for 7 of the 8 tactics which include: Emotional Abuse, Economic Abuse, Sexual Abuse, Threats, Using Male Privilege, Intimidation, and Isolation.

Examples of each of the 7 ways in which Joe tried to maintain power and control over Wendi are clearly stated in the section labeled "d" below.

**b.  Partner Abuse Scale – Non-Physical (Hudson, 1992) SCORE = 60**
SCORE INTERPRETATION: Evidence to date indicates that the clinical cutting score could be as low as 15. Therefore a score of 60 is well above the estimated clinical cutting score suggesting that there was a **severe level** of non-physical abuse of Wendi by Joe.
Definition of non-physical abuse used in this scale includes:
1.  verbal abuse
2.  emotional abuse
3.  sexual abuse

The following are some examples of areas in which Wendi scored the highest (7 on a scale of 1-7 where 7 equals All of the Time):
A.  My partner demands obedience to his whims.
B.  My partner demands that I perform sex acts that I do not enjoy or like.

Using the same scale as above, Wendi scored a 6 (with 6 equal to Most of the Time) on the following statements:
C.  My partner belittles me
D.  My partner does not want me to have any male friends.
E.  My partner acts like I am his personal servant.
F.  My partner does not want me to socialize with my female friends.
G.  My partner demands sex whether I want it or not.

**c.  Partner Abuse Scale – Physical (Hudson, 1992)   SCORE = 16.666**
This scale measures the degree or magnitude of perceived physical abuse by a partner. A clinical cutting score may be as low as 15, which would be the smallest score in which a finding of physical abuse could be made. A score of 11 indicates that there was not a significant finding of physical violence in this relationship. However, this does NOT mean that there was an absence of physical violence. Rather it indicates that there was a **low level of physical violence.** Wendi indicated on the Abusive Observation Checklist that Joe "pushed, grabbed or shoved her" 10–49 times, and punched her 10–49 times. Generally, speaking the less frequently the acts occurred the lower the score the participant will receive indicating less violence.

Definition of physical abuse used in this scale includes:
1.  partner physically forces sex

A000000150

2. partner hits, punches, kicks, beats, breaks bones etc
3. partner uses intimidation to the point of making person fear for her life
4. partner injures sexual parts of the body

On a scale of 1-7 with 7 equal to All of the Time, Wendi's highest score was a 4 which is equal to Some of the Time. Wendi gave a "4" in response to the following statements:

A. My partner pushes and shoves me around violently.
B. My partner physically throws me around the room.
C. My partner twists my fingers, arms or legs.
D. My partner tries to suffocate me with pillows, towels, or other objects.

Using the same scale as above, Wendi assigned a "3" which is equal to A Little of the Time in response to the following statements:

A. My partner beats me when he or she drinks.
B. My partner makes me afraid for my life.
C. My partner tries to choke or strangle me.
D. My partner badly hurts me while we are having sex.
E. My partner injures my breasts or genitals.

d. **Response to Violence Inventory: Strategies to Escape, Avoid, and Survive Abuse** (Dutton, 1992)

The questions in this assessment are designed to report the ways in which the victim responded to the violence/abuse and to explain those behaviors. It is important to note that many victims of violence and abuse DO NOT use the systems currently in place to assist battered and abused women. Those systems typically include: calling police, obtaining Orders of Protection, using domestic violence shelters, seeking counseling etc.

This is the case for Wendi. Of the 17 items listed in this assessment, Wendi used 3 ways to try to escape, avoid and survive Joe's abuse. They were:

A. Escaping threatening/violent situation (11-20 times). Wendi wrote: "I would hide in the bathroom until my husband's temper cooled."
B. Hiding/Disguising (11-20 times). Wendi wrote: "As long as I wasn't in his view, he would destroy furniture instead of putting his hands on me."
C. Compliance with demands/anticipation of demands (more than 20 times). Wendi wrote: "As long as I did everything he wanted, including sex, he wouldn't get upset."
D. When asked if there were any other strategies to escape, avoid, protect against abuse, Wendi wrote: "I would always try to pacify him and keep him calm. I would do my best to come up with a solution to whatever was bothering him."

In Summary, it appears that Wendi used several ways REPEATEDLY to protect self from Mr. Andriano's rages and mood swings.  However, nothing worked for any length of time.

e.  Abusive Observation Checklist (Dutton, 1992)
This checklist attempts to quantify the types and number of abusive and violent acts.

Physical Abuse:

| | |
|---|---|
| Pushed, grabbed or shoved you | 10-49 times |
| Punched you somewhere on the body not the face | 10-49 times |
| Pulled your hair | 10-49 times |
| Physically restrained you by holding | 10-49 times |
| Dragged you or pulled you | 10-49 times |
| Threw something at you | 3-10 times |
| Slapped you | 3-10 times |
| Hit or tried to hit you with something | 3-10 times |
| Wrestled you | 3-10 times |
| Attempted to smother, strangle or hang you with an object | 3-10 times |
| Minor bruises | 3-10 times |

Sexual Abuse:

| | |
|---|---|
| Vaginal intercourse | more than 50 times |
| Unwanted objects were inserted Into your vagina/rectum | 3-10 times |
| Threat of negative consequences | 10-49 times |
| Social pressure to comply sexually | more than 50 times |

Psychological Abuse

Coercion and threats:

| | |
|---|---|
| Attempted to get you to engage in illegal activities | 3-10 times |

Intimidation:

| | |
|---|---|
| Instilled fear in you by looks, gestures, actions | 10-49 times |
| Smashed objects | 10-49 times |
| Destroyed your property | 10-49 times |
| Abused family pets | 1-3 times |
| Displayed weapons | 1-3 times |

Emotional Abuse:

| | |
|---|---|
| Insulted you or used put-downs | 10-49 times |
| Humiliated you with words or gestures | 10-49 times |
| Attempted to make you feel guilty | 10-49 times |
| Verbally raged at you | 10-49 times |

A000000152

| | |
|---|---|
| Called you names | 3-10 times |
| Attempted to make you feel crazy | 3-10 times |
| Isolation: | |
| Attempted to control what you did | 10-49 times |
| Attempted to limit your involvement with others | more than 50 times |
| Restricted your use of the phone | 3-10 times |
| Restricted your leaving the house | 10-49 times |
| Minimization, Denial, Blaming: | |
| Minimized abuse and not take your concerns about it seriously | 10-49 times |
| Denied that the abuse happened | 10-49 times |
| Blamed you for the abuse | 10-49 times |
| Shifted responsibility for abusive behavior onto someone else | 10-49 times |
| Use of Male Privilege: | |
| Treated you like a servant | 10-49 times |
| Made major decisions without your equal participation | 10-49 times |
| Acted like the "master of the castle" | 10-49 times |
| Unilaterally defined male/female roles | 10-49 times |
| Economic/Resource Abuse: | |
| Required you to ask for money | 10-49 times |
| Controlled the money by giving you an allowance | 10-49 times |
| Took money from you | 10-49 times |
| Controlled your use of money | 10-49 times |
| Restricted your access to transportation | 10-49 times |
| Locked you out of the house | 10-49 times |

f. Lethality Assessment "Assessing Dangerousness Questions" (AZ Coalition Against Domestic Violence) Of the 14 items on this assessment, Wendi responded "Yes" to 10 of the 14. A "Yes" response indicates a measure of dangerousness. Wendi answered "Yes" to the following measures:

    a. Does the abuser seem preoccupied or obsessed with the victim (following, monitoring her whereabouts, stalking, very jealous)?

    b. Does the abuser own, carry, or have ready access to a gun?

    c. Have the abuser's assaults become more violent, brutal and/or dangerous?

    d. Has the abuser ever choked the victim?

    e. Has the abuser ever injured or killed a pet?

A000000153

   f.  Does the victim believe the abuser may seriously injure or kill her?

   g.  Is the victim extremely protective of the abuser (trying to change or withdraw statement to police, reduce bail, charges, etc)?

   h.  Has the victim separated or tried to separate from the abuser in the past 12 months? (only 1x about 3 years prior to Joe's death)

   i.  Does the abuser drink excessively?

   j.  Has the abuser ever threatened to kill the victim?

<u>Determining the veracity of the findings of this assessment</u>: Wendi was interviewed for 20 hours by this writer. The findings of each of the assessment tools are fully consistent with the interview data. Additionally, Wendi's story, and responses to the assessment tools were fully consistent with each of the collateral interviews conducted by this writer (an additional 5 hours of interviews). Results of those interviews are also attached to this document.

<u>4. Summary</u>

In response to the purpose of the assessment written on page 1:

1.  Wendi Andriano was a victim of domestic violence/abuse by Joseph Andriano as determined by generally accepted definitions. A definition of domestic violence taken from the National Council of Juvenile and Family Court Judges, 1998 follows: "Domestic Violence is a pattern of assaultive and coercive behaviors, often including physical, sexual, and psychological attacks, as well as economic coercion, that adults and adolescents use against their intimate partners."

2.  Wendi Andriano suffered from severe levels of emotional abuse (score was 60 – cutting score is 15) and a significant level of physical violence (score was 16.66 – cutting score is 15). Multiple examples of each type of abuse are documented within this report.

3.  Joseph Andriano appears to have died as a result of a struggle over the knife. Whether that happened as a result of Wendi's attempt at defending herself or as she struggled to stop him from killing himself is not clear.

Wendi Andriano clearly was a victim of abuse/violence at the hands of her husband, Joseph Andriano. Wendi was able to articulate why that night was more frightening than others. This case, like many others, shows the increase in frequency and severity of the violence/abuse over time.

As in most domestic violence cases, there were numerous opportunities for intervention into the lives of this couple that perhaps may have averted

the final outcome. It is highly probable that numerous individuals had the opportunity to witness Joe's treatment of Wendi. It appears that Wendi herself had not identified Joe's treatment of her as domestic violence. This also is not uncommon. Until the community-at-large is educated about what constitutes domestic violence and what can be done about it, domestic violence will continue to proceed at an alarming rate.

## 4. Recommendation

The death of Joseph Andriano appears to have occurred either in the act of self-defense of Wendi Andriano or during her failed attempt at stopping Joseph from killing himself. In either case it does not appear that Wendi should be held responsible for the death of Joseph Andriano.

Respectfully submitted,


Sharon B. Murphy, PhD

A000000155



MICHAEL K. JEANES, CLERK
BY
*m.mello*
DEP
FILED

2004 AUG 17  PM 4:40

DANIEL B. PATTERSON
Deputy Public Defender
1750 S. Mesa Drive, Suite 150
Mesa, Arizona  85210-6201
(602) 506-2205
Bar No. 005743
Attorney for Defendant

IN THE SUPERIOR COURT OF THE STATE OF ARIZONA
IN AND FOR THE COUNTY OF MARICOPA

STATE OF ARIZONA,

           Plaintiff,

    v.

WENDI ELIZABETH ANDRIANO,

           Defendant.

No. CR2000-096032

**RESPONSE TO STATE'S
MOTION FOR RECONSIDERATION**

(Honorable Brian Ishikawa)

(Oral Argument Requested)

      Defendant Wendi Elizabeth Andriano, through counsel undersigned, pursuant to

Rule 16.1 of the Arizona Rules of Criminal Procedure, Article 2, § 24 of the Arizona

Constitution, and the Fifth, Sixth, Eighth and Fourteenth Amendments to the United

States' Constitution, responds to the State's Motion for Reconsideration and requests that

said Motion be denied.

      RESPECTFULLY SUBMITTED this ___17th___ day of August, 2004.

                MARICOPA COUNTY PUBLIC DEFENDER

                By_____
                    DANIEL B. PATTERSON
                    Deputy Public Defender

0179
A000000158



DANIEL B. PATTERSON
Deputy Public Defender
1750 S. Mesa Drive, Suite 150
Mesa, Arizona  85210-6201
(602) 506-2205
Bar No. 005743
Attorney for Defendant

MICHAEL ~~~ ANES. CLERK
BY R. Irnjo  DEP
FILED

2004 AUG 20  PM 4: 10

IN THE SUPERIOR COURT OF THE STATE OF ARIZONA
IN AND FOR THE COUNTY OF MARICOPA

STATE OF ARIZONA,

Plaintiff,

v.

WENDI ELIZABETH ANDRIANO,

Defendant.

No. CR2000-096032

**RESPONSE TO MOTION
FOR DISCLOSURE**

(Honorable Brian Ishikawa)

Defendant Wendi Elizabeth Andriano, through counsel undersigned, pursuant to the Fifth Amendment to the United States' Constitution, responds to the State's Motion for Disclosure and requests that said Motion be denied.  As grounds therefore, defendant states that the written evaluations and notes of Dr. Richard Rosengard and H. Kandy Rohde are protected by the physician-patient privilege, A.R.S. § 13-4062, the Fifth Amendment to the United States' Constitution and Article 2, § 10 of the Arizona Constitution.  Ms. Rohde is a social worker retained by the parents of the defendant to address defendant's mental health issues while in custody.  Dr. Rosengard was retained by counsel to determine whether defendant suffered from significant mental health issues that may have served as a basis for potential defenses in the case or possible competency issues.  Neither person will be called upon to testify in the trial of this case.

F13  0180

000003573                                    A000000157

If counsel is compelled to disclose the notes of Ms. Rohde and the report of Dr. Rosengard, counsel reserves the right to redact all statements of the defendant that relate to the events of October 8, 2000 involving the defendant and her husband.

RESPECTFULLY SUBMITTED this __21st__ day of August, 2004.

MARICOPA COUNTY PUBLIC DEFENDER

By _____
DANIEL B. PATTERSON
Deputy Public Defender

Copy of the foregoing
delivered this __21st__ day of
August, 2004, to:

HONORABLE BRIAN ISHIKAWA
Judge of the Superior Court
Southeast Court Building, 4th Floor
222 East Javelina
Mesa, Arizona  85210

JUAN MARTINEZ
Deputy County Attorney
301 West Jefferson, Suite 800
Phoenix, Arizona 85003

DAVID DELOZIER
Attorney At Law
4016 E Forest Pleasant
Cave Creek   AZ   85331-5439

By _____
DANIEL B. PATTERSON
Deputy Public Defender
11 West Jefferson, Suite 5
Phoenix, AZ  85003

A000000158



FILED
9/1/04  2:52 PM
MICHAEL K. JEANES, Clerk
M. CESUGIK
Deputy



## IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

## IN AND FOR THE COUNTY OF MARICOPA

STATE OF ARIZONA,          )
                           )
            Plaintiff,     )        CR 2000-096032
                           )
                           )
vs.                        )
                           )    PRELIMINARY INSTRUCTIONS.
WENDI ELIZABETH ANDRIANO,  )         PHASE 1
            Defendant.     )
                           )
                           )
                           )
                           )
                           )

# INDEX FOR PRELIMINARY INSTRUCTIONS

PAGE

A.  INTRODUCTION ............................................... 4

B.  TRIAL SCHEDULE ............................................. 4

C.  PRELIMINARY INSTRUCTIONS CONCERNING
    JUROR CONDUCT ............................................. 5

    1.  NOTE TAKING ............................................. 5

    2.  DIFFICULTY HEARING OR SEEING ..................... 6

    3.  JUROR QUESTIONS ................................... 6

    4.  ADMONITIONS .......................................... 7

D.  BENCH CONFERENCES ................................... 10

E.  ORDER OF TRIAL ......................................... 11

F.  PRELIMINARY INSTRUCTIONS CONCERNING THE LAW ..12

    1.  DETERMINATION OF THE FACTS ................. 13

    2.  INSTRUCTIONS ...................................... 13

    3.  OBJECTIONS TO QUESTIONS ................... 13

    4.  STRICKEN EVIDENCE ............................... 14

    5.  DIRECT AND CIRCUMSTANTIAL EVIDENCE ......... 14

    6.  PRESUMPTION OF INNOCENCE/BURDEN OF PROOF
        ...........................................................14

2

A000000160

7.    PUNISHMENT ................................................... 15

8.    CREDIBILITY OF WITNESSES ................................ 16

9.    OPINIONS OF EXPERTS ..................................... 16

10.   EXCLUSION OF WITNESSES ................................ 16

G.  DEFINITION OF OFFENSE ........................................ 17

H.  VERDICT ............................................................... 18

I.  CONCLUSION ........................................................ 18

3

A000000161

A.   INTRODUCTION

Ladies and Gentlemen, the instructions that I am giving you are preliminary jury instructions. They are given to assist you as you undertake your duties as jurors on this case.

At the conclusion of the evidence I will give you a final set of instructions. They may differ from the preliminary instructions that I am giving you now. The final instructions will control your deliberations. They will also be given to you in writing and, at that time, this set of preliminary jury instructions will be collected by the bailiff.

B.   TRIAL SCHEDULE

The trial is expected to last for approximately 8 weeks. We will all do our best to move this case along, but delays may occur. Delays are not anyone's fault, so don't hold them against the defendant, the State or the attorneys. Delays usually occur because the attorneys and I often need to resolve certain legal matters before these matters may be presented to you in court.

The usual hours of trial will be from 1:00 p.m. to 5:00 p.m., Monday through Thursday. You will follow the normal trial schedule beginning at 1:00 p.m. each day unless a different starting time is announced prior to recessing for the evening. Jury deliberations will be conducted, Monday through Friday. You will be allowed to set the daily time schedules for your deliberations.

4

A000000162

At the beginning of each trial day, please assemble where instructed by the bailiff for this division. Please do not come into the courtroom until you are called by the bailiff.

## C.   PRELIMINARY INSTRUCTIONS CONCERNING JUROR CONDUCT

I will now advise you concerning juror conduct during the trial and during the entire time that you serve on this case.

### 1.   Note Taking:

You will not receive a transcript of the testimony.

You have each been provided with note pads and pens. You may take notes, but you are not required to take notes. You should do whatever will help you to recall the evidence. At the end of the trial, you will have to make your decision based on what you recall of the evidence. You should pay close attention to the testimony as it is given. If you do take notes, please keep them to yourself until you and your fellow jurors go to the jury room to decide the case. When you leave the jury box for a recess, or at the end of the day, you may take your notes with you or leave your notes on your chair in the courtroom. If you leave your notes on your chair, they will be secured by the bailiff.

Whether you take notes or not, you should rely upon your own memory of what was said and not be overly influenced by the

5

notes of other jurors.  Please do not be influenced at all by any notes that I may take at the bench.

2.    Difficulty Hearing or Seeing:

If at any time during the trial you have difficulty hearing or seeing something that you should be hearing or seeing, or if you have any personal distress for any reason, please raise your hand and let me know.

3.    Juror Questions:

You are permitted to ask questions of witnesses or the court, but are under no obligation to do so.  You are not to discuss questions for witnesses or the court among yourselves; rather, each juror must decide independently any question he or she may have for a witness or the court.

If you have a question, please write it down.  You each have forms for this purpose.  If you need additional forms, please let the bailiff or me know. Do not sign or put your juror number on the form.

I will ask you if you have any questions after each witness has completed his or her testimony.  If the question you have is for a witness, please raise your hand when the lawyers have finished asking their questions of the witness but before the witness is excused and leaves the courtroom.  If the question is for me,

6

please raise your hand at a convenient time. The bailiff or clerk will collect any questions and bring them to me at the bench.

After a question is submitted to me, each side has the opportunity to object to the question out of the presence of the jury. Questions from the jury are subject to the same rules of law as are questions from the lawyers. I will consider whether any question is appropriate to be asked. If a question is appropriate to be asked, I will read the question to the witness. The lawyers may then ask follow-up questions if they choose. If the question is not appropriate to be asked, the question will not be read. The individual juror who asked the question should disregard the question and not speculate as to what the answer may have been. A ruling that a question is not appropriate to be asked is not a reflection on the person asking it; rather it reflects my application of the pertinent rules of law.

4.   <u>Admonitions</u>:

I am now going to give you some do's and don'ts, mainly don'ts, which I will call "The Admonitions."

Do not talk to each other or anyone else, and do not let anyone talk to you, about the case, about any issues in the case, or about anyone who has anything to do with the case, until the end of the trial when you go to the jury room to decide on your verdict. Avoid even the appearance of improper conduct. Do not talk with

7

any of the parties, lawyers or witnesses about anything, until after the case is over.   Until then, don't even talk with them about matters that have nothing to do with the case.

This admonition applies to everyone, spouses and family members included.  Until the trial has ended, you may tell others that you are on a jury, and you may tell them the estimated schedule for the trial, but you cannot tell them anything else except to say that you can't talk about it until it is over.

Wear your juror badge at all times in and around the courthouse so everyone will know you are on a jury.  If someone should try to talk to you about the case, or if you should overhear others talking about it, stop them or walk away.  If anything like this does happen, report it to my staff or me as soon as you can.

Prior to this trial, each of you has gained knowledge and information from the experiences you have had during the course of your lives.   Once this trial has begun, however, you are to determine the facts of this case only from the evidence that is presented in this courtroom.   The Arizona Rules of Criminal Procedure prohibit a juror from receiving evidence not properly admitted at trial.   That means you are not permitted to do any research or make any investigation about the case on your own. This includes such seemingly innocuous things as looking in a dictionary or the Internet for the definition of a word, or looking in

8

A000000166

the newspaper or the Internet to see what the temperature was on a particular day.

One reason for these prohibitions is because the trial process works by each side knowing exactly what facts are being considered by you and what law you are applying to those facts. As you will learn from these instructions, the only evidence you are to consider in this matter is that which is introduced in the courtroom. The law which you are to apply is the law that I give you in the final instructions. This prohibits you from consulting any outside source.

Finally, as part of the admonitions, do not form an opinion about any fact or about the outcome of the case until you have heard and considered all the evidence, the closing arguments, and the final instructions I will give you on the law. Keep an open mind during the trial and form your opinions only after you have had an opportunity to discuss the case with each other in the jury room at the end of the trial.

There may or may not be news media coverage of the trial. If there is media coverage, you must avoid it during the trial. If you do encounter something about this case in the news media during the trial, end your exposure to it immediately and report it to me as soon as you can. If there are cameras in the courtroom during the trial, do not be concerned about them. Court rules require that the

9

proceedings be photographed or televised in such a way that no juror can be recognized.

Before each recess, I will not repeat the Admonitions I have just given you. I will probably refer to them by saying, "Please remember the Admonitions" or something to that effect. However, even if I forget to make any reference to them, remember that the Admonitions still apply at all times during the trial.

If you have any questions about parking, restaurants, or other personal matters relating to your jury service, please feel free to ask one of the court staff. Please remember that the Admonitions apply to court staff, as they do to everybody else, so do not try to discuss the case with court staff.

## D.   BENCH CONFERENCES

Sometimes legal matters come up during trial which the lawyers and I may need to discuss. Not all legal issues or other matters can be resolved prior to trial or out of your presence either before or after the trial day. When that happens, counsel will come to the bench and we will speak here. That is called a bench conference.

The only other option to a bench conference is for either the jury, or the judge and lawyers, to leave the courtroom. The most efficient way to proceed is usually by way of a bench conference rather than having one set of individuals leave the courtroom.

10

Please do not be concerned with what goes on at a bench conference. We will be trying to assure that the case is properly presented to you.

Because not all issues can be resolved either before trial, or before or after the regular trial day, delays sometimes occur. Please rest assured that I will move the case along as expeditiously as possible according to the schedule that I have described to you, but please also understand that I am required to take the appropriate time to resolve issues that arise as the trial proceeds. This sometimes means a delay, and for that I ask your indulgence in advance.

### E.   ORDER OF TRIAL

Trials generally proceed in the following order:

First, the prosecutor may make an opening statement giving a preview of the case. The defendant's attorney may make an opening statement outlining the defense case immediately after the prosecutor's statement or it may be postponed until after the State's case has been presented. What is said in opening statements is neither evidence nor argument. The purpose of an opening statement is to help you prepare for anticipated evidence.

Second, the State will present its evidence. After the prosecutor finishes, the defendant may present evidence. The defendant is not required to produce evidence. If the defendant does produce evidence, the State may present additional, or rebuttal, evidence.

11

With each witness, there is a direct examination, a cross examination by the opposing side, and finally a redirect examination. This usually ends the testimony of that witness.

Third, the attorneys will make closing arguments to tell you what they think the evidence shows and how they think you should decide the case. The prosecutor has the right to open and close the argument since the State has the burden of proof. Just as in opening statements, what is said in closing arguments is not evidence, but it may help you to understand the law and the evidence.

Fourth, after the closing arguments, I will read and give you copies of the final instructions, the rules of law that you must follow in reaching your verdict.

Fifth, the names of the alternate Jurors will be selected by lot. Only 12 of you will deliberate in the case.

Sixth, you will deliberate in the jury room about the evidence and rules of law and decide upon a verdict. Once you agree upon the verdict, it will be read in court with you and the parties present.

## F.   PRELIMINARY INSTRUCTIONS CONCERNING THE LAW

I am now going to tell you the rules of law you must follow to decide this case.

12

A000000170

1.   <u>Determination of the Facts:</u>

It is your duty to determine the facts.  "Facts" means what actually happened.  You must determine the facts only from the evidence produced in court.  You should not guess about any fact.  The evidence which you are to consider consists of exhibits and testimony of witnesses. You must not be influenced by sympathy or prejudice.  You must not be concerned with any opinion that you feel I have about the facts.  You are the sole judges of what happened.

2.   <u>Instructions:</u>

You must consider all of the instructions that I give you.  Do not pick out one instruction or part of one and disregard the others.  However, after you have determined the facts, you may find that some instructions no longer apply.

You must then consider the instructions that do apply, together with the facts as you have determined them.  Decide this case by applying these instructions to the facts which you find.

3.   <u>Objections to Questions:</u>

If a lawyer objects to a question and I do not allow the witness to answer, you must not try to guess what the answer might have been. You must also not try to guess the reason why the lawyer objected in the first place.

13

4.    Stricken Evidence:

Any testimony which I order stricken from the court record should not be considered.

5.    Direct and Circumstantial Evidence:

Evidence may be direct or circumstantial. Direct evidence is the testimony of a witness who saw, heard, or otherwise observed an event. Circumstantial evidence is the proof of a fact or facts from which you may find another fact. The law makes no distinction between direct and circumstantial evidence. It is for you to determine the importance to be given to the evidence, regardless of whether it is direct or circumstantial.

6.    Presumption of Innocence/Burden of Proof:

The charge against the defendant is not evidence against her. You must not think the defendant is guilty just because she has been accused of a crime.

The law does not require a defendant to prove innocence. Every defendant is presumed by law to be innocent. You must start with the presumption that the defendant is innocent. The State has the burden of proving the defendant guilty beyond a reasonable doubt. This means that the State must prove each element of the charge beyond a reasonable doubt.

In civil cases, it is only necessary to prove that a fact is more likely true than not or that its truth is highly probable. In criminal cases such as

14

this, the State's proof must be more powerful than that. It must be beyond a reasonable doubt.

Proof beyond a reasonable doubt is proof that leaves you firmly convinced of the defendant's guilt. There are very few things in this world that we know with absolute certainty, and in criminal cases the law does not require proof that overcomes every doubt. If, based on your consideration of the evidence, you are firmly convinced that the defendant is guilty of the crime charged, you must find the defendant guilty. If, on the other hand, you think there is a real possibility that the defendant is not guilty, you must give the defendant the benefit of the doubt and find the defendant not guilty.

The State must prove guilt beyond a reasonable doubt with its own evidence. The defendant is not required to testify or produce evidence of any kind. The decision on whether to testify or produce evidence is left to the defendant acting with the advice of an attorney. The defendant's decision not to testify or produce evidence is not evidence of guilt. You must not conclude that the defendant is likely to be guilty because the defendant does not testify or produce evidence. You must not let this choice affect your deliberations in any way.

7.    <u>Consideration of Punishment During Guilt Phase</u>:

In deciding whether the defendant is guilty or not guilty, you are not to consider the possible punishment.

<div align="center">15</div>

8.   Credibility of Witnesses:

You must decide the believability of witnesses. In doing so, take into account such things as their ability and opportunity to observe, their memory and manner while testifying, any motive or prejudice they might have, and any inconsistent statements. Consider each witness' testimony in light of all of the other evidence in the case.

9.   Opinions of Experts:

Ordinarily a witness may not give an opinion during testimony. However, an expert witness may state an opinion and the reasons for it. An expert witness is a person with special skill or education in a particular field.

Even though expert witnesses may give their opinions, you are not required to accept those opinions. To determine the value of an expert's opinion, you should take into account the expert's qualifications and believability. You should also consider how the conclusions or opinions were reached.

10.   Exclusion of Witnesses:

The rule of exclusion of witnesses is in effect and will be observed by all witnesses, except any alleged victim, until the trial is over and a result is announced.

This means that all witnesses will remain outside the courtroom during the entire trial except when one is called to the witness stand. The rule also forbids witnesses from telling anyone but the lawyers what they

16

A000000174

will testify about or what they have testified to. If witnesses do talk to the lawyers about their testimony, other witnesses and jurors should avoid being present or overhearing.

Each attorney may choose a person, such as an officer or investigator, to assist by sitting with them during trial.

The lawyers will inform all other witnesses of these rules and will remind them of their obligations from time to time as may be necessary. The parties and their lawyers should keep a careful lookout to prevent any potential witness from remaining in the courtroom if they inadvertently enter.

## G.   DEFINITION OF OFFENSE

The defendant has been charged with committing First Degree Murder, a Dangerous Offense.

## FIRST DEGREE MURDER

The crime of First Degree Murder requires proof of the following three things:

1.     The defendant caused the death of another person; and

17

2.      The defendant intended or knew that she would cause the death of another person; and

3.      The defendant acted with premeditation.

"Premeditation" means that the defendant intended to kill another human being or knew she would kill another human being, and that after forming that intent or knowledge, reflected on the decision before killing. It is this reflection, regardless of the length of time in which it occurs, that distinguishes first degree murder from second degree murder. An act is not done with premeditation if it is the instant effect of a sudden quarrel or heat of passion.

An offense is a Dangerous Offense if it involved the discharge, use, or threatening exhibition of a deadly weapon or dangerous instrument, and/or the intentional or knowing infliction of serious physical injury upon another person.

H.    **VERDICT**

Any verdict reached must be a unanimous verdict.   When you retire to the jury room you will choose a foreperson for your deliberations who will be in charge during your deliberations and who will sign any verdict.

I.    **CONCLUSION**

Thank you for your patience and participation in this trial.

18

A000000176

DANIEL B. PATTERSON
Deputy Public Defender
11 West Jefferson, Suite 5
Phoenix, Arizona 85003
(602) 506-6463
Bar No. 005743
Attorney for Defendant

FILED
11/8/04   1:10 PM
MICHAEL K. JEANES, Clerk
By  M. LESUEN
        Deputy

IN THE SUPERIOR COURT OF THE STATE OF ARIZONA
IN AND FOR THE COUNTY OF MARICOPA

STATE OF ARIZONA,

Plaintiff,

v.

WENDI ELIZABETH ANDRIANO,

Defendant.

No. CR 2000-096032

MOTION TO PRECLUDE
TESTIMONY OF
DR. MICHAEL B. BAYLESS

(Honorable Brian K. Ishikawa)

Defendant Wendi Elizabeth Andriano, through counsel undersigned, pursuant to

Rule 702 of the Arizona Rules of Evidence and the Fifth, Sixth and Fourteenth

Amendments to the U.S. Constitution, requests that this Court issue an order precluding

the State from adducing the testimony of Dr. Michael B. Bayless at the trial in this case.

This request is based upon the attached Memorandum, the affidavit of Dr. Mindy B.

Mechanic, the *curriculum vitae* of Dr. Bayless, and the evidence previously established

by witnesses in this trial.

Dated this ___8th___ day of ___November___, 2004.

By _____
        DANIEL B. PATTERSON
        Deputy Public Defender

0338

000003593                                          A000000177

## MEMORANDUM

Rule 702 of the Arizona Rules of Evidence establishes the rule for the admissibility of expert testimony at trial:

> If scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.
> Rule 702, Arizona Rules of Evidence

In State v. Speers, 98 P3d 560, (2004) the Arizona Court of Appeals construed Rule 702 as follows:

> To qualify for admission under this rule (Rule 702, Arizona Rules of Evidence) opinion testimony on human behavior must (a) be relevant to an issue in the case; (b) aid in understanding evidence outside the experience or knowledge of the average juror; and (c) come from a qualified witness. (Speer, sufra, citing Logerquist v. McVey, 196 Ariz. 470, 1 P.3d 113 (2000).

Applying the rule and the reasoning in Speers, the relevant issue requiring expert opinion in this case is whether the defendant is a victim of domestic violence and thus entitled to the justification defense afforded by A.R.S. § 13-415. A review of the credentials of Dr. Michael B. Bayless reveals that Dr. Bayless is not qualified to render an opinion on the issue of whether the defendant was a victim of domestic violence.

Dr. Bayless' *curriculum vitae* is attached hereto and incorporated by reference herein. His clinical practice is not devoted to the diagnosis and treatment of domestic violence victims. His internships prior to receiving his doctorate also did not address patients with domestic violence histories. He has never taught courses at the college level relating to domestic violence. While he has delivered some lectures on

psychological issues, he has never presented papers on the issues of domestic violence nor has he participated in seminars where domestic violence was a central issue.  He has done no research on the issue of domestic violence, except review of several articles on the internet from the year 2000, nor does he belong to any professional associations or agencies that deal with domestic violence.

By contrast, the *curriculum vitae* of the defense experts, Dr. Sharon Murphy and Dr. Mindy Mechanic, are rich in domestic violence experience, education, research and clinical practice.  Copies of their respective *curriculum vitae* are attached hereto and incorporated by reference herein.

Examination of the report rendered by Dr. Bayless discloses deficiencies in methodology and instruments employed by Dr. Bayless. He gave the defendant a psychological evaluation employing assessment tools not designed to elicit information about the central issue in this case as to whether the defendant is a victim of domestic violence.  There is no known correlation between a set of psychological symptoms or traits and a victim of domestic violence.  He devoted only two to three hours in a clinical interview with the defendant, a period of time woefully short of the standard of care of experts in the domestic violence field.  (Affidavit of Dr. Mindy Mechanic, pages 3 – 5.)

Dr. Bayless' testimony will not aid the average juror in understanding the evidence.  In fact, Dr. Bayless is merely substituting his judgment and opinion for that of the jurors in this case.  He is operating as a thirteenth juror, declaring that there is no evidence "to support Wendi Andriano's claim that she was a victim of domestic violence." This assertion is not based on his expertise, but is based upon his conclusion

having read the witness reports and reports of defendants' behaviors that there is no corroboration of her claims of domestic abuse. This is the process to be employed by the jury in this case and is not the proper function of an expert.

THEREFORE, Defendant, Wendi Andriano requests that Dr. Michael B. Bayless be precluded from testifying in this case because he is unqualified to render an opinion on the issue of domestic violence due to his lack of knowledge, skill, experience, training and/or education in the field of domestic violence and the methodology employed by him in this case is not accepted in the field of domestic violence assessment.

RESPECTFULLY SUBMITTED this _____ day of November, 2004.

MARICOPA COUNTY PUBLIC DEFENDER


By_____
        DANIEL B. PATTERSON
        Deputy Public Defender

A000000180

Copy of the foregoing
delivered this _____ day of
November, 2004, to:

HONORABLE BRIAN K. ISHIKAWA
Judge of the Superior Court
Southeast Court Building, 4th Floor
222 East Javelina
Mesa, Arizona  85210

JUAN MARTINEZ
Deputy County Attorney
301 West Jefferson, Suite 800
Phoenix, Arizona 85003

DAVID DELOZIER
Attorney At Law
4016 E Forest Pleasant
Cave Creek  AZ  85331-5439

By _____
    DANIEL B. PATTERSON
    Deputy Public Defender

DBPcb0110804H

Affidavit, Dr. Mindy B. Mechanic

1

*Affidavit*

*Mindy B. Mechanic, Ph.D.*

Dr. Mindy Mechanic upon her oath, deposes and states:

1. I hold a doctorate degree in Clinical Psychology from the University of Illinois at Urbana-Champaign. I am a licensed clinical psychologist in the States of Missouri and California. I am currently employed as an Assistant Professor in the Department of Psychology at California State University, Fullerton, California (CSUF). My complete *curriculum vitæ* is appended to this Affidavit.

2. I am an expert in the area of violence against women, particularly domestic violence. I have been employed as an Assistant Professor at CSUF since August 2002. One of my duties at CSUF includes teaching a graduate level course on methods of psychological and clinical assessment. I also teach a graduate level course on the "legal and ethical" issues in clinical psychology.

Prior to taking my current position at CSUF, I was employed at the Center for Trauma Recovery at the University of Missouri-St. Louis from 1992-2002. I held the title, Assistant Research Professor from 1996 until 2002. The Center for Trauma Recovery is a specialized center whose aim is to conduct research, teach and train graduate and undergraduate students and professionals, and provide specialized clinical services to traumatized and victimized individuals. Battered women and sexual assault survivors were the most frequently represented populations in the clinic's caseload. Battered women and sexual assault survivors were also the subject of several large, federally funded studies conducted at the Center. In my duties at the Center, I conducted research on sexual assault and domestic violence and co-authored two federally

A000000182

Affidavit, Dr. Mandy B. Mechanic
2

funded studies on these topics. I also provided direct clinical services to sexually assaulted and battered women, as well as supervised therapists in training at the center.

While at the Center, I taught courses on the psychological consequences of violence against women and conducted numerous trainings on domestic violence for community and professional organizations, including the Missouri Bar Association and the American College of Legal Medicine. I co-presented a conference session on defending battered women charged with crimes at a conference sponsored by the Missouri Bar Association.

I have numerous peer-reviewed scholarly publications and academic conference presentations on the topic of intimate partner violence and sexual assault. In the last several years I have also conducted workshops to train other professionals on how to use expert testimony in cases involving battered women (International Society for Traumatic Stress Studies, 2001; Illinois Coalition Against Domestic Violence, 2000; Missouri Coalition Against Domestic Violence, 2003; 2004)

Since obtaining my first license to practice psychology (1998), I have been qualified as an expert on nine occasions and have consulted on other legal cases that did not go to trial. Most of my legal consultation has been in cases involving battered women charged with crimes.

3. I have been retained as an expert in domestic violence by Mr. Daniel Patterson, in the case of State of Arizona v. Wendi E. Andriano.

4. I have been provided a copy of the Psychological Report on Ms. Andriano, dated August 4, 2004, prepared by Michael B. Bayless, Ph.D. It is my professional opinion that Dr. Bayless's report failed to meet basic standards of competence for conducting an assessment on "battering and effects" in a battered woman's criminal case. Support for this opinion is detailed below.

Affidavit, Dr. Mindy B. Mechanic
3

While high standards of competence should always be adhered to in all forms of psychological practice (American Psychological Association-APA, Sections 2.01a, b, & c; 2.04), the utmost diligence and care must be accorded those cases whose outcome includes the ultimate penalty, execution of the defendant. Further, APA ethical guidelines stipulate "Psychologists base the opinions contained in their recommendations, reports, and diagnostic, or evaluative statements, including forensic testimony, on *information and techniques sufficient to substantiate their findings*" (italics added for emphasis, Section 9.01). Because Dr. Bayless failed to adequately assess Ms. Andriano's history of domestic violence and the possible behavioral, emotional, cognitive, and physical consequences deriving there from, his conclusion that Ms. Andriano "was not a victim of domestic violence" is not valid.

According to the description provided in his report, Dr. Bayless conducted a standard psychological evaluation of Ms. Andriano. While a standard psychological evaluation is appropriate in many, if not most ordinary assessment contexts, such a strategy is insufficient and inadequate for evaluating the complex issues raised in this case, namely is the defendant a battered woman, and if so, in what ways did the experiences of battering influence her thoughts, behaviors, perceptions and actions in ways that are relevant to her behavior at the time of the death of her husband? Dr. Mary Ann Dutton one of the Nation's leading authorities in this area (1988) advocates the use of a series of extensive, in depth interviews of the woman, collection of data from collateral sources; and an extensive review of records. In-depth interviews cover the following domains; 1) psychosocial history; 2) medical history; 3) experiences of violence and responses to it; and 4) psychological history. Extensive in-depth interviews of battered women criminal defendants are generally quite lengthy, often taking place over a series of days. Most

Affidavit, Dr. Mindy B. Mechanic

4

experts who evaluate battered women criminal defendants report spending an average of 8-15 (or more) face-to-face hours with a defendant to conduct sufficiently in-depth interviews. Not including the time used to administer standardized psychological tests, Dr. Bayless reported spending only 2-3 face to face hours with Ms. Andriano. An adequate assessment of domestic violence history would be difficult, if not impossible to conduct in a 2-3 hour window. Dr. Bayless also administered unnecessary psychological tests that have no bearing on the focal questions of this assessment (e.g., Williamson Sentence Completion test, Shipley Institute of Living Scale). The use of inappropriate measures once more suggests that he lacks sufficient expertise to select a battery of relevant psychological assessment instruments that are tailored to the nature of the case (the referral questions).

Based on the information provided in his report, Dr. Bayless failed to adequately assess whether evidence exists to suggest that Ms. Andriano suffered abuse at the hands of her husband. In framing the purpose and focus of his evaluation of Ms. Andriano as, "evaluate intellect, personality and overall emotional stability," Dr. Bayless assessed ordinary dimensions of psychological functioning, but failed to incorporate standardized methods (like those articulated by Dr. Dutton) to evaluate whether Ms. Andriano was in fact, abused by her husband. Methods for assessing a history of domestic violence include the use of structured interviews, self-report measures, review of documents and interview of collateral sources. While Dr. Bayless did review the police records, he failed to conduct additional assessments that would help to determine whether evidence supports or fails to support Ms. Andriano's claim of abuse.

The use of a sound methodological strategy to assess a history of domestic violence permits the expert to conclude whether evidence supports or fails to support a defendant's abuse allegations. Moreover, while Dr. Bayless did offer diagnostic formulations of Ms. Andriano, the

existence of a valid diagnosis can neither confirm nor disconfirm a history of domestic violence. One cannot deduce whether domestic violence was present based on the presence or absence of a set of psychological (Axis I or II) symptoms, no matter how well assessed. Having failed to employ an adequate methodology, Dr. Bayless's opinion has no validity.

In sum, a review of the methodology of Dr. Bayless's evaluation indicates that he indeed failed to formally assess whether and in what ways Ms. Andriano experienced abuse at the hands of her husband. Absent a sound methodology to collect pertinent, reliable and valid data addressing the *appropriate* referral question, conclusions as to whether Ms. Andriano was battered and how abusive experiences affected her behaviors, thoughts, perceptions and actions can not be drawn. Therefore, the conclusion of Dr. Bayless that Ms. Andriano "was not a victim of domestic violence" is not valid.

5.  I have been furnished with a copy of the curriculum vitae (CV) of Michael B. Bayless, Ph.D. In reviewing whether Dr. Bayless's background is sufficient in education, training, or professional experience to evaluate a battered woman in a capital murder case, I consulted the work of national expert Dr. Mary Ann Dutton, who articulated the necessary background and training for experts conducting evaluations of battered women criminal defendants. She stated " serving as a forensic expert witness concerning battering and its effects demands expertise in the substantive areas of domestic violence, violence against women, traumatology, and the expert's social science discipline, generally as well as knowledge of the legal system....Direct experience with battered victims cannot be replaced by abstract knowledge and provides the foundation from which to integrate findings from the scientific literature with the specific case at issue..."

Dr. Bayless, while fully credentialed to practice psychology, does not appear to possess the requisite specialized training, education, or experience necessary to conduct a specialized

Affidavit, Dr. Mindy B. Mechanic
6

evaluation in a battered woman's homicide case. There is no evidence that Dr. Bayless

participated in any classes, workshops, or trainings on the topic of domestic violence. There is

no evidence that Dr. Bayless worked with battered women. There is no evidence that Dr.

Bayless reviewed the substantial scholarly literature on the subject. Finally, there is no evidence

that Dr. Bayless, aware of the limitations of his expertise, sought consultation from a noted

expert, so that he could conduct his case with the requisite sensitivity and expertise (APA Ethical

Guidelines Sections 2.01a, b, c; 2.04)

The implications of Dr. Bayless's lack of qualifications and the incompetence of his

report are especially dire in this case, considering that Ms. Andriano is charged with capital

murder, and may as a result of the evidence he proffers, be issued a sentence of death.

I certify under penalty of perjury that the foregoing Affidavit is true and correct.

Executed this 8th day of November 2004, in Fullerton, California.

_____          _____
Mindy B. Mechanic, Ph.D.                    11 8 04
                                           Date

000003603                                      A000000187

NOV-04-2004(THU) 10:21

# VITAE
## MICHAEL BRAD BAYLESS

**OFFICE ADDRESS:**

3620 N. 3rd Street
Phoenix, Arizona 85012
(602) 230-7373

**EDUCATIONAL BACKGROUND:**

B.S. - Northern Arizona University
(Psychology)

M.A. - Northern Arizona University
(School of Psychology)

Ph.D. - Arizona State University
(Counseling Psychology)

### DOCTORAL EXPERIENCE
#### 1985 through present

The corporation, Michael B. Bayless & Associates, Ph.D., P.C. was developed with emphasis on adult, adolescent, and child psychology, and forensic psychology. Currently, Michael B. Bayless & Associates is a full service out-patient rehabilitation clinic providing out-patient individual, group, and family therapy. My responsibilities include, but are not limited to, Director of clinical services, administrative duties, along with maintaining a full-time clinical practice specializing in forensic psychology. Expert testimony in both criminal and civil matters, jury selection, case consultation, psychological autopsy, diagnostic evaluations, etc., are areas in which attorneys (defense and prosecution) and Judges (state and federal) refer for consultation. I have been certified over 400 times as an expert in both criminal and civil proceedings.

Michael B. Bayless & Associates, Ph.D., P.C. also provides pre-employment evaluations and screening for corporations. The goal of the evaluations is to identify the problem applicant prior to employment, as well as helping employers place applicants in positions that fit their personalities and abilities.

### DOCTORAL EXPERIENCE
#### 1976 through 1984

In 1976 I began my clinical practice and the development of Bayless Psychological Center. Bayless Psychological Center offered services in the areas of individual and group psychotherapy, forensic psychology, and stress management. My responsibilities include supervisory and administrative duties along with maintaining a full-time clinical practice.

After extensive research and development, my partner and I created Behavior Data Systems, Ltd., a computerized Psychological Assessment Company. From 1982 through 1984, I was President of Behavior Data Systems, Ltd. My duties included, but were not limited to, supervision, administration, and development of psychological software for Diagnostic Evaluation.

P. 003/005

NOV-04-2004(THU) 10:22

2

DJ effect

## PRE-DOCTORAL INTERNSHIP
### 1975 through 1976

My pre-doctoral clinical training was obtained at the Jane Wayland Center, a community mental health center serving the City of Phoenix, Arizona. The Jane Wayland Center provided outpatient treatment for children and families who present a wide range of emotional/organic problems. Referrals are generally received from schools, family physicians or other social agencies. The internship experience involved supervised training in individual therapy, family therapy, group therapy, diagnostic evaluation and school consultation.

## CLINICAL EXPERIENCE:
### COUNSELOR - 1972 through 1974

My experience at the Phoenix Psychological Center was primarily individual therapy with adults. Treatment was provided on a weekly basis with length of contact varying from one month to two years. In addition, I gained experience in leading both adult and adolescent groups.

## TEACHING EXPERIENCE:
### 1974 through 1977

The Fall semester of 1971, I accepted the position of Instructor of Psychology at Scottsdale Community College. I taught courses in General Psychology, Child Development, Personal Adjustment, Abnormal Psychology, and Personality Development. After three (3) years of full-time employment at the College, I earned the position of Professor of Psychology. I was granted a leave of absence to pursue my Doctorate. After a year's leave of absence, I returned to Scottsdale Community College as a Professor of Psychology, teaching courses in the following areas: General Psychology, Abnormal Psychology, and Personality Development.

## RESEARCH AND PAPER PRESENTATIONS:

| | |
|---|---|
| 1974 - 76: | Research for Doctoral Thesis, "A Clinical Study of Specific Personality Traits of Enuretic children and Their Parents". |
| 1976: | Paper Presentation, "Neurosis - Fact and Fiction". The paper was presented at Scottsdale Community College. |
| 1977: | Paper Presentation, "Therapy with Sickle Cell Patients". The paper was presented at the Bureau of Health Education in Phoenix, Arizona. |
| 1978: | Paper Presentation, "Stress Management in the Work Place". The paper was presented at the Arizona Children's Hospital. |
| 1979: | Seminar: "Integrated Relaxation Training". The seminar was presented at the O.I.C. Regional Conference in Portland, Oregon. |
| 1979: | Seminar: "Holistic Fitness". The seminar was presented at the O.I.C. Regional Conference in Portland, Oregon. |
| 1980: | Paper Presentation: "Elimination of Self-Defeating Behavior". The paper was presented at the N.A.A.C.P. State Conference. |
| 1990: | Paper Presentation: "Parent Child Relationships, An African-American Perspective". This paper was presented at the Black Women's Task Force in Phoenix, Arizona. |

P. 004/005

NOV-04-2004(THU) 10:22

3

| 1991: | Seminar: "Experts on Experts: Preparing, Qualifying, and Attacking the Expert Witness". The seminar was sponsored by the Arizona State Bar Association in Phoenix, Arizona. |
| 1992: | Paper Presentation: "Blacks in the Juvenile Justice System". The paper was presented for the Maricopa County Office of the Public Defender. |
| 1992: | Paper Presentation: "Criminal Justice and the Black Child". The paper was presented at the National Association of Blacks in Criminal Justice. |
| 1992: | Publication: "Mitigation and the Forensic Expert". The Defender, July 1992. |
| 1993: | Paper Presentation: "Sex and Dating: Teenage Relationships". The paper was presented at the Arizona Youth Conference in Phoenix, Arizona |
| 1993: | Paper Presentation: "Family Dynamics" This paper was presented at the Black Woman's Task Force in Phoenix, Arizona. |
| 1995: | Paper Presentation: "Skill of Ethnographic Interviewing" This paper was presented at the National Association of Blacks in Criminal Justice Conference in Phoenix, Arizona |
| 1995: | Paper Presentation: "Expert Witness Testimony" This paper was presented at the Arizona State Bar Conference in Phoenix, Arizona |
| 1995: | Paper Presentation: "Child Abuse: Its Relationship to Substance Abuse" presented at the 14th annual CASA Conference in Phoenix, Arizona |
| 1996: | Paper Presentation: "Reclaiming our Families" Presented at the Black Youth Recognition Conference in Phoenix Arizona. |
| 1998: | Paper Presentation: "Issues for at Risk Minority Families" Presented at the Colorblind Justice-Minority Youth Over-Representation in Arizona's Juvenile Justice System Conference in Phoenix, Arizona |
| 1999: | Paper Presentation: "Psychological Assessment of the Impaired Attorney" Presented at the National Organization of Bar Counsel Conference in Los Angeles, California |
| 1999: | Publication: "Guilty But Insane V. Diminished Responsibility" The Defender, Arizona Attorneys for Criminal Justice, January 1999 |

## PROFESSIONAL ORGANIZATIONS:

Arizona State Psychological Association
American Psychological Association

## APPOINTMENTS:

| 1980: | Governor's appointment to the Arizona Board of Psychologist Examiners. (5 years) |

A000000190

P. 005/005

NOV-04-2004(THU) 10:22

4

| 1981: | Elected Secretary of the Arizona State Board of Psychologist Examiners. |
| 1982: | Appointed to the Board of Arizona Lung Association. |
| 1995: | Arizona Supreme Court Commission on Minorities |
| 1999: | Homebase Youth Services Board of Directors |

## SOCIAL ORGANIZATIONS:

N.A.A.C.P.
Kappa Alpha Psi Fraternity
Sigma Pi Phi Fraternity
Phoenix Urban League
Phoenix Medical Society

*REFERENCES PROVIDED UPON REQUEST.

A000000191

Sharon B. Murphy, PhD, ACSW
Assistant Professor, Department of Social Work
University of New Hampshire
Ph: (603) 995-1053 or (602) 369-0192
Fax: (603) 526-7009
E-mail: sharon.murphy@unh.edu

## EDUCATION

| | |
|---|---|
| 1998 | Doctor of Philosophy<br>Arizona State University, School of Social Work, Tempe, AZ |
| 1997 | Certificate of Completion from the Heideggerian Hermeneutic Institute,<br>University of Wisconsin, Madison |
| 1985 | Master of Social Work, Adelphi University, Garden City, NY |
| 1973 | Bachelor of Arts, English<br>State University of New York, Plattsburgh, NY |

## AWARDS

| | |
|---|---|
| 2003 | Arizona State University School of Social Work, Field Instructor of the Year Award |
| 1998 | Arizona Governor's Summit on Domestic Violence, recognized as contributing to solutions for domestic violence through a curriculum developed for group work with American Indian women survivors |
| 1997 | WASSAJA Summer Dissertation/Research Incentive Grant, Fort McDowell Mohave-Apache Indian Community, Fountain Hills, AZ |
| 1997 | Heideggerian Hermeneutic Scholarship, University of Wisconsin, Madison, WI |
| 1990-1991 | Outstanding Faculty of the Year, College of St. Joseph, Rutland, VT |
| 1989-1990 | Outstanding Faculty of the Year, College of St. Joseph, Rutland, VT |

## ACADEMIC POSITIONS

| | |
|---|---|
| 2004 | Assistant Professor, Social Work Department, University of New Hampshire |
| 1999-2003 | School of Social Work, Arizona State University<br>60% Faculty Position |
| 1994 –1998 | School of Social Work, Arizona State University<br>Adjunct Professor |

A000000192

| | |
|---|---|
| 1987 - 1993 | Assistant Professor Department of Human Services, College of St. Joseph, Rutland, VT |
| 1987 | Adjunct Professor<br>Department of Human Services, College of St. Joseph, Rutland, VT |

## COURSES TAUGHT
### UNIVERSITY OF NEW HAMPMSHIRE, DURHAM, NH
**MSW PROGRAM:**
Human Behavior and the Social Environment I
Field Internship I

### ARIZONA STATE UNIVERSITY, TEMPE, AZ

**MSW PROGRAM:**
Family Violence
Diversity and Oppression in the Social Work Context
Direct Practice I
Field Liaison for MSW students
Field Instructor for MSW students (contract between the School of
Social Work and various field agencies in the greater metropolitan
Phoenix area)

**BSW PROGRAM:**
Field Practicum I
Field Liaison for BSW students
Field Instructor for BSW students (contract between the School of
Social work and various agencies in the greater metroplotian
Phoenix area)

### COLLEGE OF ST. JOSEPH, RUTLAND, VT

**HUMAN SERVICES PROGRAM:**
Introduction to Sociology
Applications of Sociology
Group and Social Process
Counseling I & II
Family Dynamics
Family Violence
Substance Abuse
American Racial and Cultural Minorities

## ACADEMIC SERVICE

| | |
|---|---|
| 1989 | Established Women's Issues Club, College of St. Joseph, Rutland, VT |
| 1989 | Established Participation in Women's History Month, College of St. Joseph, Rutland, VT |

A000000193

1988        Established Non-Traditional Student Support Group, College of St.
            Joseph, Rutland, VT

## RESEARCH EXPERIENCE

2002 - 2003    Battered Mother's Testimony Project, Arizona Coalition Against
            Domestic Violence
Assisted in the questionnaire development, and training of interviewers

2002 - 2003    Arizona Attorney General's Task Force on Domestic Violence and Child
            Maltreatment
Facilitated Focus Groups for the Evaluation of Pilot Programs

2002 –2003    Consultant to Salt River Pima-Maricopa Indian Community
Designed and implemeneted an evaluation of the domestic violence programs and
            services.  Conducted focus groups and individual interviews of the community
            including 15 departments and Tribal Council.
            Wrote a report and submitted it to the Director of Health and Human Services.  A
            follow-up meeting with staff members revealed that many of the changes
            recommended in the report had been implemented satisfactorily.

2001        Consultant to Against Abuse, Inc through Project Safety Link
Member of training team providing domestic violence training to Pinal County Sherffi's
            Department.

2000 – present Research Methodologist, Arizona State University School of Social Work,
            Tempe, AZ
Member of research team using hermeneutics to uncover patterns of resilience among a
            sample of American Indian women students at Arizona State University.

2000        Consultant to House of Refuge East, Mesa, AZ
Assisted management in establishing a system for evaluation of their operations.  Created
            a database using Access for record keeping, retrieval and analysis.

2000        Consultant to Chrysallis Domestic Violence Shelter, Phoenix, AZ
Assisted management in reviewing program/staffing patterns.

2000        Program Evaluation Consultant:  Institute for Law and Justice,
            Washington, DC
Project title:  Impact Evaluation of the Eloy, Arizona Police Department's Domestic
            Violence Arrest Project
Assisted in the recruitment/planning of domestic violence victim interviews and focus
            groups, assisted in the facilitation of focus groups, and conducted victim
            interviews

A000000194

2000       Program Evaluation:  Governor's Office for Domestic Violence
           Prevention, Phoenix, AZ
Evaluated the 15 Arizona County Coordinated Community Response Teams to Domestic
           Violence incorporating both qualitative and quantitative components.  Purpose of
           the project was to determine the degree of impact each team has had on their
           respective communities, measure the strengths and challenges of forming the
           county teams, and to document services offered to and received by community
           members.

1998   Doctoral Research:  School of Social Work, Arizona State University, Tempe, AZ
           (Dissertation Chairperson:  Dr. Karen Gerdes)
Conducted a qualitative study entitled "Surviving Domestic Violence:  A Study of
           American Indian Women Claiming their Lives."  This study included in-depth
           interviewing of a sample of American Indian women survivors of domestic
           violence.  The study followed the Interpretive Theory of Research, specifically
           the Heideggerian Hermeneutic Phenomenological approach.  An analysis of
           common themes across stories was conducted using MARTIN, a qualitative data
           analysis program.

1997       Research Consultant to the Mesa, Arizona Police Department and the
           Center Against Family Violence, Mesa, AZ
Assisted a multidisciplinary team in designing a study to uncover variables that
           contribute to a higher than average number of domestic violence calls to police in
           a target neighborhood in the city of Mesa, Arizona.  Worked with the team to
           develop an innovative police response to domestic violence based on the findings
           of the study.

1995       Primary Investigator to Native American Connections, Inc., Phoenix, AZ
Conducted analysis of client records to determine predictor variables of domestic
           violence at an inpatient substance abuse treatment facility for American Indians.

1992       Co-Investigator (collaborative study with social work faculty member at
           Southern Vt College, Bennington, VT)
Co-author of a mentoring model to be implemented in social work curriculum and field
           practicum.  Pilot project was conducted with a sample of women in two rural
           communities in Vermont.  Developed and administered a survey instrument which
           was mailed to social workers across the state to study the role of mentoring by
           social workers with social work students in field placements.

1992       Lead Investigator College of St. Joseph, Rutland, VT
Research project with Counseling I students at the College of St. Joseph.  Students
           conducted a study of college counseling centers at large and small colleges
           throughout New England and New York State.  A questionnaire was developed
           and mailed by the students to one hundred (100) small and large college
           counseling centers.  Research analysis focused on correlations of size of student
           body with theoretical construct of counselor, types of cases seen, and use of long

term vs. short term treatment.  This research project was chosen by a review team of the New England Organization of Human Service Educators for presentation at a regional conference.

## RESEARCH INTERESTS

Feminist models of scholarship
Culturally relevant research methodologies, assessment & interventions
Practitioner-researcher issues
Domestic Violence program development, implementation, and evaluation
Battered women and custody issues
Social workers as expert witnesses/forensic social work

## SOCIAL WORK PRACTICE EXPERIENCE

1999-2003  Clinical Supervisor/Field Instructor for MSW student interns at Prehab of Arizona, a mental health placement
2000-2001  Clinical Supervisor for MSW clinician seeking licensure in Arizona
1994-1998 Private Practice, Tempe, AZ.
1994-2000  Domestic Violence Consultant to Native American Connections, Inc. (formerly known as Indian Rehabilitation, Inc.), Phoenix, AZ.  Designed a training manual for an eight week psycho-educational domestic violence survivor group. Facilitated a domestic violence survivor group, provided individual counseling, and staff training, and coordinated services with children's program regarding effects of domestic violence on children.. Designed and co-facilitated a batterer intervention program for American Indian men.
1996 Native American Connections, Inc., Phoenix, AZ  Provided clinical supervision to MSW intern from Arizona State University
1987-1993 College of St. Joseph, Rutland, VT  Provided ten (10) hours per week of Brief Therapy for College Student Population - emphasis on issues relating to family violence and sexual abuse
1983-1986 Crisis Team Specialist, Rutland Mental Health Services, Inc., Rutland, VT

## DOMESTIC VIOLENCE COURT EXPERIENCE

1997 – present  Conducted approximately twelve domestic violence assessments for attorneys representing battered women.  This experience includes all phases of court work from assisting in the development of a jury questionnaire, interviewing and assessing defendants for domestic violence, testifying at numerous hearings, trial or family court, testifying at sentencing, and at clemency hearings.  All cases involved  battered women  who were represented by the Maricopa County Public Defender, the Maricopa County Office of the Legal Defender, Graham County Attorney's Office or attorneys in private practice.

2004 (current) King v King
Attorney is Katherine Stearns for Carol King who is suing spouse for divorce. I am
   conducting a domestic violence assessment of Mrs King and will testify in
   Merrimack County District Court, Newport, New Hampshire, Sept. 2004.

2004 (current) Lusk v Crowe
Attorney is Judith Abrahmson of Phoenix, AZ. I was hired by the attorney to conduct a
   domestic violence assessment of K. Lusk to assist the court in establishing
   custody of the minor child.

2003 State v Paula Torrez
Assessment of Ms Torrez began November 5, 2003. A plea agreement was signed and I
   testified at sentencing July 2004. Attorney is Karen Kothe of Kothe and Helms,
   PC, Phoenix, AZ.

2003 (current) State v Rosemary Galindo
Assessment of Ms Galindo was conducted October 20, 2003 with a trial date of March,
   2004. Attorney is Dan Shepherd, Deputy Public Defender, Mesa, AZ. I testified
   at sentencing on April 6, 2004.

2003   Permenter v Morrison
Father sued mother for custody of their 3 year old daughter. I was hired to conduct a
   domestic violence assessment of mother and to testify as a domestic violence
   expert. Testimony included the results of a domestic violence assessment as well
   as the impact of domestic violence on children. I testified at trial December, 2003
   and mother won full physical and legal custody of their child.

2003 (current)  State v. Andriano
Wendi Andriano is charged with the 1st degree murder of her husband, Joseph Andriano.
   I was hired by Dan Patterson, Maricopa County Public Defender, and David
   DeLozier, JD, to conduct a domestic violence assessment of the defendant,
   prepare a report for court and testify as an expert on domestic violence. This case
   is scheduled for trial fall, 2004 in Phoenix, AZ.

2003   City of Scottsdale, AZ v Delwyn Gibbons  Scottsdale, AZ City Prosecutor's
   Office
Mr Gibbons was charged with a misdemeanor domestic violence offense against his
   former partner. I was hired by the prosecution to present testimony on the
   phenomenon of recantation. I did not conduct an assessment nor did I interview
   the victim. I testified on the phenomenon of recantation. The accused was
   acquitted of the charge.

2002   State v Michael Cruz  Graham County, AZ Attorney's Office
Mr Cruz was accused of aggravated assault on his wife, Amanda Cruz. I assisted the
   prosecutor in understanding the dynamics of domestic violence, in particular, why

a victim would recant. Mr Cruz pled guilty to a felony aggravated assault. I do not know the outcome of sentencing.

2002   State v Patricia Marie Rispoli and Richard H Lopez  Maricopa County, AZ Office of the Legal Defender
Ms Rispoli was accused of fraud, theft, and forgery. A plea bargain resulted in a possible sentence of 2-8 years for her and probation for her partner. I was asked to conduct a domestic violence assessment and issue a report to the Maricopa County Office of the Legal Defender (attorney Michelle Allen). At the sentencing the judge requested that both attorneys review the plea aggreement in light of my report stating that it was clear that Ms Rispoli was a victim of her partner's violence. Ms Rispoli was given the super-mitigated term of 2 years in prison.

2002   Family Court  Southwest Superior Court, Mesa, AZ
Petitioner: Laura Church, Respondent: Reginald Stewart Sr. I was hired by David DeLozier, Esq to conduct a domestic violence assessment, issue a report to the court, and testify at the hearing for the temporary custody of their 3 children. Children were awarded to the parents of Mr Stewart pending a custody evaluation.

2001   State v Melanie Neal and Brad Rakestraw  Maricopa County Office of the Legal Defender
Ms Neal and Mr Rakestraw were both indicted in the murder of Ms Neal's 3 year old son. I was hired by the Maricopa Country Office of the Legal Defender, attorney John Camby, to conduct a domestic violence assessment of Ms Neal and to submit a written report to the court. I submitted a written report to the court to be used in mitigation but was not asked to testify at sentencing.

2001   State v Myra L. Crum  Maricopa County Public Defender
I was hired by the Maricopa Country Public Defender's Office, the attorney was Marci Kratter to conduct a domestic violence assessment of Ms Crum and issue a report to the court. I did not testify.

1997   State v Kenton  Maricopa County Public Defender
Stella Kenton, an enrolled member of the San Carlos Indian Nation, was initially charged with the 1st degree murder of her partner, Richard Martinez in 1996. It was later changed to a charge of 2nd degree murder. I was hired by the Maricopa County Public Defender's Office (Phoenix, AZ), attorney was Tennie Martin, because of my expertise on domestic violence, particularly as it relates to American Indian women. I conducted a domestic violence assessment, wrote the report, assisted in writing the jury questionnaire, testified at multiple hearings, trial, sentencing, and at 2 clemency hearings. Ms Kenton was convicted of negligent homicide, received the minimum sentence of 4 years, and also received an expedited review for clemency per judge's request.

In addition to the previous cases, I have assisted numerous attorneys and battered women in the greater Phoenix metropolitan area with case planning and defense. Those cases have been conducted on a pro bono basis. Most of the cases involve divorce and custody issues although some have been dependency hearings. All of my work involves domestic violence cases. I have assisted 4 battered women in securing divorce and custody of their children. Several other women that I am assisting are currently involved in the process.

I moved from Phoenix, AZ to New London, NH 2003 and am currently on the social work faculty of the University of New Hampshire and establishing a consulting practice in New Hampshire.

## PUBLICATIONS

### Refereed Articles

Murphy, S., Gerdes, K., Risley-Curtiss, C. (2004). American Indian women and domestic violence: The lived experience. Human Behavior in the Social Environment, 7, (3/4).

Murphy, S., & Risley-Curtiss, C. (January, 2000). American Indian women's lived experience of domestic violence: Telling the stories of survival. E-Research Newsletter [On-line], Vol. 6, (1). Available: emailnewsletter@yahoo.com

Waller, M., Risley-Curtiss, C., Murphy, S., Medill, A. & Moore, G. (1998). Harnessing the Power of Language: American Indian Women, A Case Example. Journal of Poverty, 2, (4), 63 – 81.

### Book Chapters

Murphy, S., Gerdes, K., Risley-Curtiss, C. (in press). American Indian women and domestic violence: The lived experience. In N. J. Smyth (Ed.) (in press). Women and girls in the social environment: Behavioral perspectives. Binghamton, NY: Haworth Press. (Also published as a journal article)

Murphy, S. (2004). An unexpected journey. In E. Segal, K. Gerdes & S. Steiner, Social Work An Introducton to the Profession (p. 320). Belmont, CA: Brooks/Cole Publishing.

Waller, M., Risley-Curtiss, C., Murphy, S., Medill, A. & Moore, G. (1998). Harnessing the power of language: American Indian women: a case example. In Elizabeth A. Segal and Keith M. Kilty (Eds.) Pressing Issues of Inequality and American Indian Communities (pp 63-81). NY: Hayworth. (Also published as a journal article)

**Manuscript in Progress**

Risley-Curtiss, C., Holley, L., and Murphy, S., et al. (2004). Backyard dog: Women of color speak out. Manuscript in preparation.

Larson, N. & Murphy, S. (2000). Beyond Survival: Stories of Resilience Among First Nations Women. Manuscript in preparation.

**Cited in**

Williams, L. (2002). Family Violence and American Indian/Alaskan Natives: A Report to the Indian Health Service Office of Women's Health. Washington, DC: Indian Health Service Report

**Unpublished Work**

Murphy, S. (1998). Surviving Domestic Violence: A Study of American Indian Women Claiming their Lives. Unpublished dissertation.

Murphy, S. (1999). Group Manual for Domestic Violence Survivors. Native American Connections, Inc. Funded by Arizona Community Foundation.

Murphy, S. (1999). Group Manual for Child Witness to Domestic Violence. Native American Connections, Inc. Funded by Arizona Community Foundation.

**Conference Proceedings**

Alexander, G. and Murphy, S. (1992). A Mentoring Model for Women. Proceedings of the Fifth Annual Diversity in Mentoring Conference (pp. 1-11). Chicago: Western Michigan University Press.

## COMPETITIVE or INVITATIONAL PROFESSIONAL PAPER PRESENTATIONS and WORKSHOPS

**International:**

"Domestic Violence: Responding to Children's Needs" June, 2002 presented to the Borough of Croydon, London, England

**United States:**

Training for the town of New London, NH using "In Her Shoes" a domestic violence experiential training designed by the Washington Coalition Against Domestic Violence, Feb, 2004.

Training to Conciliation Services staff (Phoenix, AZ office) and Judge Mark Armstrong on domestic violence assessment and custody, August, 2003.

A000000200

Keynote Address at 3rd Annual Governor's Rural Summit on Domestic Violence, April 15, 2003, Safford, AZ

"Forging Partnerships Conference", April 1, 2003  Workshop Title:  "Risk Assessment and Safety Plannng for Battered Women", Scottsdale, AZ

"Sixth Annual Mental Health Providers Training " January 2003 to Family Court Department Mental Health Providers Training

"Effective Assessment of Domestic Violence" September 2002 presented to Southwestern School for Behavioral Health Studies, Tucson, AZ (co-presented with D. Nicholas)

"I Have One of Those DV Cases – Now What?" June 2001 presented to the State Bar of Arizona, Continuing Legal Education Department

"Cultural Competency" May 2001 presented to the AZ Bar Foundation

"The Co-Occurrence of Domestic Violence and Child Maltreatment" May, 2001 presented to members of the AZ Bar Association

"The Correlation of Domestic Violence and Substance Abuse", October 2001 sponsored by Ft McDowell Apache Indian Community

"Co-occurrence of Domestic Violence and Child Maltreatment", April, 2001 sponsored by Ft McDowell Apache Indian Community.

"Ethical and Cultural Considerations for Domestic Violence Shelter Staff", March 21, 2001 sponsored by Chrysallis Domestic Violence Shelter, Scottsdale, AZ

"Through Our Children's Eyes", Dec 1 – 3, 2000, co-facilitated a wellness conference retreat sponsored by the Yavapai-Prescott Indian Tribe for members of the Yavapai Nation.

"The Co-Occurrence of Child Maltreatment and Domestic Violence" October 17, 2000, sponsored by the Family Advocacy Center, Phoenix, AZ (co-presented this full-day training to 55 practitioners/graduate school students).

"Understanding the Effects of Domestic Volence on Women and Children" June 9, 2000. Presentation sponsored by Inter Tribal Council of Arizona.  Presented to tribal child welfare workers.

"Evaluation of the Coordinated Community Response Teams to Domestic Violence" June 9, 2000.  Presentation to the Governor's Office for Domestic Violence Prevention, and county representatives.

"Telling their stories:  American Indian Women Survivors of Domestic Violence" January 30, 2000.  In C. Risley-Curtiss (Chair),  Conducting culturally sensitive and respectful research with American Indians.  Symposium conducted at the meeting of the Society for Social Work and Research, Columbia, SC.

"Domestic Violence and Substance Abuse" September 29, 1999, for conference entitled, "Solutions II, Advanced Advocacy Conference" coordinated by the Governor's Office for Domestic Violence Prevention, Mesa, AZ

"The Effects of Domestic Violence on Children" October 28, 1998 for conference entitled, "Join our Journey Towards a Healthy Future" sponsored by the Navajo Nation in Albuquerque, NM.

"Leaving as a Process: Healing is a Journey" October 29, 1998 for conference entitled, "Join our Journey Towards a Healthy Future" sponsored by the Navajo Nation in Albuquerque, NM.

A000000201

"Domestic Violence Treatment Strategies" August, 1998 for conference entitled,
"Mending the Spirit" sponsored by Indian Health Service and Indian
Rehabilitation, Inc. Mesa, AZ
"Domestic Violence 101" December, 1997 for Indian Health Service, Nashville Area
Office, Fourth Annual Winter School, Naples, FL
"Domestic Violence - Past and Present" July, 1997 for Indian Health Service, Nashville
Area Office Domestic Violence Workshop, Bangor, Maine
"Domestic Violence - Assessment and Intervention" May, 1996 at Native American
Nurses Association, Phoenix Indian Medical Center, Phoenix, Arizona
"A Treatment Model for Native American Survivors of Domestic Violence" March,
1996, Presented to Social Services Department at Phoenix Indian Medical Center,
Phoenix, Arizona

## PROFESSIONAL and COMMUNITY SERVICE

2004-present:  Member of the NH Chapter of the National Association of Social Workers
2003-present:  Member of the NH Mental Health and Women's Addictions Task Force
2003-present:  Member of the Kearsarge (NH) Domestic Violence Task Force
2002 –2003:  Member of the Legal Committee of the Arizona Coalition Against
Domestic Violence
2000–2003:  Member of AZ Attorney General's Domestic and Family Violence Task
Force
2000 -2003:  Co-Chairperson to Women of Color Committee of the Arizona Coalition
Against Domestic Violence
1999 - 2003:  Board of Directors, Arizona Coalition Against Domestic Violence,
Secretary, 2002
1999 -2001: Chairperson, Program Guidelines and Technical Assistance Committee of
the Arizona Coalition Against Domestic Violence
1999 -2003: AZ Governor's Office of Domestic Violence Prevention, Steering
Committee member for the County Coordinated Community Response Team
1998-2003:  Women of Color Committee member, Arizona Coalition Against Domestic
Violence
1998-2003:  Legislative Committee member, Arizona Coalition Against Domestic
Violence
1996-1997 Member of the Arizona State-wide Planning Committee - Batterer
Intervention Program Guidelines, Arizona Coalition Against Domestic Violence
1994-1995 Conference planning committee member for "Curbing Violence,"
sponsored by the National Association of Social Workers - Arizona Chapter, Branch
I
1991-1993 Ethics Consultant for the Vermont Chapter of National Association of Social
Workers
1985-1987 Member of the National Association of Social Workers, Rutland County
Chapter, Rutland, VT, Chairperson, Fund Raising Committee
1985-1987 Member of the Board of Directors, National Association of Social Workers,
Vermont Chapter

A000000202

## CURRENT PROFESSIONAL MEMBERSHIPS and CERTIFICATIONS

Member of the New Hampshire Branch of the National Association of Social Workers
NH Governor's Task Force on Domestic and Sexual Violence, Subcommittee on Alcohol
and Mental Health
NH - Kearsarge Regional Task Force on Domestic and Sexual Violence
Domestic Violence Specialist Certification by Arizona Police Officers Standards and
Training
National Association of Social Workers – New Hampshire Chapter
American Professional Society on the Abuse of Children
Licensed Clinical Social Worker (#3428), Arizona State Board of Behavioral Health
Examiners  (am in the process of becoming licensed in NH)
Academy of Certified Social Workers (ACSW)
Alpha Delta Omega (National Human Service Honor Society)

## REFERENCES

Dr Karen Gerdes
ASU School of Social Work
PO Box 871802
Tempe, AZ  85287-1802
Phone:  (480) 965-0505

Dr Christina Risley-Curtiss
ASU School of Social Work
PO Box 871802
Tempe, AZ  85287-1802
Phone:  (480) 965-6076

Dr Nancy Larson
ASU School of Social Work
PO Box 871802
Tempe, AZ  85287-1802
Phone:  (480) 965-6600

Tennie Martin, JD
Court of Appeals
Phoenix, AZ
Email:  tenriffraff@aol.com

A000000203

June 2004

*Curriculum Vitae*

**Mindy B. Mechanic**

California State University, Fullerton
Department of Psychology
P.O. Box 6846
Fullerton, CA 92834-6846
Email: mmechanic@fullerton.edu

<u>Education</u>
**Ph.D.**          **University of Illinois at Urbana-Champaign**, 1996
<u>Major</u>: Clinical Psychology; <u>Minor</u>: Law
<u>Dissertation</u>: Battered Woman Syndrome: Juror Common Understanding and Expert Testimony

Clinical Internship, **University of Virginia** Health Sciences Center, 1990-1991
(APA-Accredited Pre-doctoral Internship)
Rotations:    Adult Psychiatric Clinic (major),
Western State Hospital, Acute Admissions Unit (major),
Forensic Psychiatry Clinic (extended minor)
Family Stress Clinic (minor)
Pain Management Center (minor)

**M.A.**          **University of Illinois at Urbana-Champaign**, 1987
<u>Major</u>: Clinical Psychology
<u>Thesis</u>: Assessment and Differentiation of Chronic Depression in a Non-Patient Sample

**B.A.**          **University of California, Los Angeles** (Psychology), 1981

<u>Professional Licenses</u>
May, 2004          Licensed Clinical Psychologist, California (19660)
June, 1998          Licensed Psychologist, State of Missouri (PY 01885)
July, 2000          Licensed Clinical Psychologist, State of Illinois (071-006086)

<u>Positions Held</u>
2002-          <u>Assistant Professor</u>
current          California State University, Fullerton
Department of Psychology

1998-          <u>Assistant Research Professor</u>
2002          Center for Trauma Recovery/Department of Psychology
University of Missouri-St. Louis

1

| | |
|---|---|
| 1996-1998 | <u>Post-doctoral Fellow</u><br>Center for Trauma Recovery/Department of Psychology<br>University of Missouri-St. Louis<br>Supervised Post-Doctoral Clinical Training Program. Includes individual and couples therapy, clinical and forensic assessment with trauma and non-trauma populations. Conducted clinical assessments for the determination of disability. |
| October, 1992-July,1996 | <u>Project Director</u>, NIMH Grant PTSD: Etiology and Treatment<br>Patricia A. Resick, Principal Investigator<br>Department of Psychology<br>University of Missouri-St. Louis<br>Trained and supervised graduate student interviewers conducting structured diagnostic interviews for DSM-IV disorder. Responsible for participant recruitment from community agencies and all aspects of data collection. |
| July, 1991-September, 1992, | <u>Research Assistant</u>: Coercion Project,<br>The John D. and Catherine T. MacArthur Foundation Research Network on Mental Health and the Law.<br>Supervisors: S. K Hoge, M.D. and John Monahan, Ph.D.<br>Responsibilities: Participated in the design and implementation of research protocols. Assisted in the collection and analysis of statistical data. Cultivated and maintained 0relationships among the primary and satellite research sites. |

## Grants

### Federal Grants
Principal Investigator, <u>Intimate Partner Abuse: Effects on Parenting</u>. Maternal and Child Health Bureau, HRSA (2003, submitted), $1,199,159.

Principal Investigator, <u>Intimate Partner Abuse: Effects on Parenting</u>. Maternal and Child Health Bureau, HRSA (2002, approved for funding – not funded),$750,000.

Co-Investigator. <u>Violence Against Women National Prevention Research Center</u>. Centers for Disease Control and Prevention (CDC,1998), $470,815.

Co-Principal Investigator, <u>Cognitive Processes in PTSD: Focus on Domestic Violence</u>. National Institute of Mental Health (NIMH, 1997), $ 1,374,843.

Co-Principal Investigator, <u>Marital Violence in the Wake of the Great Flood of 1993</u>. National Institute of Mental Health (NIMH, 1993). NIMH Grant # 1 R03MH52513-01, $71,266.

### Internal Grants
Principal Investigator, <u>The impact of intimate partner abuse on battered women's parenting</u> (2003). California State University, Intramural grant, State of California.

A000000205

Principal Investigator, <u>The impact of intimate partner abuse on battered women's parenting</u> (2002). California State University, Faculty Development Center Intramural Grants.

Principal Investigator, <u>The impact of intimate partner abuse on battered women's parenting</u> (2002). California State University, Department of Psychology, IRR release award.

### Grant Consultation

Consultant/Local Research Partner, <u>St. Louis County Domestic Violence and Child Maltreatment Demonstration Initiative</u> (HHS/DOJ)  (April, 2001, funded).

Consultant, <u>Community-based curriculum for training nursing students in the health care needs of incarcerated women</u>, Helene Fuld Health Trust (2000, funded).

## Publications

### Journal Articles

Griffin, M.G., Uhlmansiek, M.H., Resick, P.A., & Mechanic, M.B. (accepted for publication). Assessment of posttraumatic stress disorder in domestic violence survivors: Comparison of an interviewer-based versus a self-report measure, Journal of Traumatic Stress.

Mechanic, M.B. (in press). Beyond PTSD: Mental health consequences of violence against women, *Journal of Interpersonal Violence.*

Weaver, T.L., Chard, K.M., Mechanic, M.B., & Etzel, J.C. (2004, in press). Self-injurious behaviors, PTSD arousal, and general health Complaints within a treatment-seeking sample of sexually abused women. *Journal of Interpersonal Violence, 19* (5), 558-575.

Griffin, M.G., Resick, P.A., Waldrop, A., & Mechanic, M.B. (2003). Reactions to participation in trauma research: Is there evidence of harm? *Journal of Traumatic Stress 16*, 221-227.

Bennice, J.A., Resick, P.A., Mechanic, M.B., & Astin, M. (2003).  The relative effects of intimate partner physical and sexual violence on posttraumatic stress disorder symptomatology. *Violence and Victims, 18 (1),* 87-94.

Lee, R.K., Sanders-Thompson, V.L., & Mechanic, M.B. (2002).  Intimate partner violence and women of color: A call for innovation. *American Journal of Public Health, 92* (4), 530-534.

Rose, S., & Mechanic, M.  (2002).  Homophobic bias crimes: An examination of crime features, psychological distress and help-seeking behavior. *American Behavioral Scientist, 46* (1), 14-26.

Mechanic, M.B., Weaver, T.L., & Resick, P.A. (2000).  Intimate partner violence and stalking behavior: Exploration of patterns and correlates in a sample of acutely battered women. *Violence and Victims, 15* (1), 55-72.

A000000206

---Reprinted in: K.E. Davis, I.H. Frieze, & R.E. Maiuro (Eds.) *Stalking and obsessive behavior: Perspectives on victims and perpetrators*. Springer Publications (2002), pp. 62-88.

Mechanic, M.B., Uhlmansiek, M. H., Weaver, T.W., & Resick, P.A. (2000). The impact of severe stalking experienced by acutely battered women: An examination of violence, psychological symptoms, and strategic responding. *Violence and Victims, 15,* (4), 443-458.

---Reprinted in: K.E. Davis, I.H. Frieze, & R.E. Maiuro (Eds.) *Stalking and obsessive behavior: Perspectives on victims and perpetrators*. Springer Publications (2002), pp. 89-111.

Lurigio, A.J., & Mechanic, M.B. (2000,). The importance of being sensitive and responsive to crime victims. *Police, 24* (1), 22-28.

Nishith, P., Mechanic, M.B. & Resick, P.A. (2000). Prior interpersonal trauma: The contribution to current PTSD symptoms in female rape victims. *Journal of Abnormal Psychology, 109* (1), 20-25.

Mechanic, M.B., Resick, P.A. & Griffin, M.G. (1998). A Comparison of Normal Forgetting, Psychopathology, and Information Processing Models of Reported Amnesia for Recent Sexual Trauma. *Journal of Consulting and Clinical Psychology, 66 (6),* 948-957.

Mechanic, M.B. & Aber, M.S. (1997). O.J. Simpson: A threat to internal validity? *Journal of Social Issues, 53 (3),* 517-530.

Griffin, M.G. ,Resick, P.A., Mechanic, M.B, and Evans, T. (1997). Psychophysiological and nonverbal assessment of peritraumatic dissociation in rape victims . *American Journal of Psychiatry, 154,* 1081-1088.

Abramson, P.R., & Mechanic, M.B. (1983). Sex and the media: Three decades of best-selling novels and major motion pictures. *Archives of Sexual Behavior, 12,* 185-206.

### Chapters in Edited Volumes

Mechanic, M.B. (2004). Stalking victimization and intimate partner violence. In T. Jackson & L. VandeCreek (Eds). *Innovations in Clinical Practice: A sourcebook*. Sarasota, FL: Professional Resource Press, pp. 21-34.

Mechanic, M.B. (2003). Responding to the psychological impact of stalking. In M. Brewster (Ed). *Stalkers and their Victims: Psychology, law, risk factors and interventions*. Kingston, N.J.: Civic Research Institute, Chapter 11, pp. 11_1-11_22.

Mechanic, M.B. (2001). Stalking Victimization: Clinical implications for assessment and intervention. in K.E. Davis, I.H. Frieze & R.E. Maiuro (Eds.) *Stalking and obsessive behavior: Perspectives on victims and perpetrators*. Springer Publications. pp. 31-61.

A000000207

Mechanic, M.B. (1996).  Battered women, homicide and the legal system.  In A.R. Roberts (Ed.) *Helping battered women: New perspectives and remedies.*  New York: Oxford University Press, pp. 132-156.

Resick, P.A., &  Mechanic, M.B. (1995).  Brief cognitive therapies for rape victims.  In A.R. Roberts (Ed.) *Crisis Intervention and Time limited Treatment.*  Newbury Park, CA: Sage Publications. pp. 91-126.

### Other Publications

Mechanic, M.B., & Valdovinos, M. (February/March, 2004). Intimate partner abuse experienced by Latinas: Part I. *Domestic Violence Report,* 9 (3), 33, 42-45.

Mechanic, M.B., & Valdovinos, M. (June/July, 2004). Intimate partner abuse experienced by Latinas: Part II. *Domestic Violence Report, 9* (5), in press.

Tang-Martinez, Z., Mechanic, M. B. (2001).  A Natural History of Rape: Biological Bases of Sexual Coercion, *American Anthropologist,103, (4)* 1222-1223. (book review).

Mechanic, M.B, (2001). Autonomous Intimacy: Oxymoron or Necessary Precondition? *Psychology of Women Quarterly,* 25 (2), 169-170.  Review of *The Search for Autonomous Intimacy: Sexual Abuse and Young Women's Identity Development,* M. Sue Crowley.  NY: Peter Lang Publishing, 2000. 256 pp.  (book review)

Tang-Martinez, Z., & Mechanic, M.B. (May/June 2000). Response to Thornhill and Palmer on Rape. The Sciences: NY Academy of Sciences, page 3 (letter).

### Manuscripts Under Review

Mechanic, M.B., Griffin, M.G., & Resick, P.A. (2004, under review). The Effects of Intimate Partner Abuse on Women's Psychological Adjustment to a Major Disaster, *Journal of Traumatic Stress.*

Valdovinos, M., & Mechanic, M.B. (2003, under review). An exploration of marital sexual coercion and *machismo* among Latina women, *Violence Against Women.*

### Technical Reports

Mechanic, M.B., Sanders-Thompson, V., Shields, N., & Lee, R. (2003). *Violence against women prevention programming: A national survey of programs in use.*  St Louis, MO: National Violence Against Women Prevention Research Center, University of Missouri-St. Louis.

Mouradian, V.E., Mechanic, M.B., & Williams, L.M. (2001*). Recommendations for establishing and maintaining successful researcher-practitioner collaborations.*  Wellesley, MA: National Violence Against Women Prevention Research Center, Wellesley College.

National Violence Against Women Prevention Research Center (May, 2001). Fostering collaborations to prevent violence against women: Integrating findings from practitioner and researcher focus groups.  Charleston, SC. (Co-Author).

Resick, P. A., Mechanic, M. B., & Griffin, M. G. (1997).  *Marital violence in the wake of the great flood of 1993.*  Final report submitted to the National Institute of Mental Health, Grant #1 R03MH52513-01.

### Manuscripts In Preparation

Mechanic, M.B. (in preparation). The role of intimate partner abuse in battered women's parenting.

Mechanic, M.B. (in preparation). The pivotal role of emotional abuse in battered women's psychological and strategic responses to intimate partner violence.

Mechanic, M.B., Resick, P.A., & Griffin, M.G. (In preparation). The roles of partner abuse, cognitive schemas, and emotional disengagement as contributors to PTSD and depression among battered women.

### Unpublished Instruments

Mechanic, M.B. (unpublished measure) Cognitive Distortion Index.

Klein, D.N., Mechanic, M.B., & Miller, G.A.   (unpublished instrument)  A modified structured diagnostic interview.

### Professional Presentations (peer-reviewed)

Valdovinos, M., Harris, D., **Mechanic, M.B.**, Marelich, W., & Resick, P.A. (April,2004,). *Patterns of stalking in battered women.* Poster presented at Western Psychological Association, Phoenix, AZ.

Harris, D., Valdovinos, M., **Mechanic, M.B.**, Marelich, W.D., & Resick, P.A. (April, 2004). *Mental health effects of stalking and intimate partner violence* Poster presented at Western Psychological Association, Phoenix, AZ.

**Mechanic, M.B.**, Marelich, W., & Resick, P.A. (March, 2004). *The functional role of cognitive distortions among battered women.* In. T. Nichols (Chair), Exiting Abusive Intimate Relationships: Assessment of Challenges and Outcomes.  Symposium presented to American Psychology Law Society, Scottsdale, AZ.

Beck, C., Walsh, M., & **Mechanic, M.B.** (March, 2004). *Domestic Violence in Couples Court-Mandated to Attend Divorce Mediation.* In. T. Nichols (Chair), Exiting Abusive Intimate Relationships: Assessment of Challenges and Outcomes.  Symposium presented to American Psychology Law Society, Scottsdale, AZ.

A000000209

**Mechanic, M.B.**, Marelich, W., & Resick, P.A. (March, 2004). *Assessment of stalking as a risk factor for escalated violence among battered women.* In M. O'Connor (Chair), Research on risk factors associated with stalking: Victim and offender perspectives. Symposium presented to American Psychology Law Society, Scottsdale, AZ.

**Mechanic, M.B.**, Castillo, R., Marelich, W., & Resick, P.A. ( October, 2003). *Cognitive distortion index: A measure of survival-based alterations in cognitions among battered women.* Toward a national research agenda on violence against women: A national research conference. University of Kentucky Center for Research on Violence Against Women, Lexington, KY.

**Mechanic, M.B.** (October, 2003). *Mental health effects of victimization: Current Research Directions.* Toward a national research agenda on violence against women: A national research conference. University of Kentucky Center for Research on Violence Against Women, Lexington, KY.

Lee, R., Shields, N., Sanders, V., & Mechanic, M.B. (April, 2003). *Violence against women prevention programming: Who we are and what we use.* Paper presented at the Annual meeting of the Midwest Sociological Society, Chicago, IL.

Mechanic, M.B., & Resick, P.A. (2002). *Coping and chronic violence exposure: The relationship between spontaneous and effortful avoidant strategies.* In S. Lewis (Chair). Coping and service utilization for victims of chronic domestic assault. Symposium presented at the 18th Annual Meeting of the International Society for Traumatic Stress Studies, Baltimore, MD.

Waldrop, A., Resick, P., & Mechanic, M. B. (2002). *Coping with violence: Battered women's perspectives on helping sources.* In S. Lewis (Chair). Coping and service utilization for victims of chronic domestic assault. Symposium presented at the 18th Annual Meeting of the International Society for Traumatic Stress Studies, Baltimore, MD.

Griffin, M.G., Resick, P.A., & Mechanic, M.B. (2002). Psychophysiological reactivity in domestic violence victims. In J. Hopper (Chair). Biology research on PTSD: Addressing complexity and clinical issues. Symposium presented at the 18th Annual Meeting of the International Society for Traumatic Stress Studies, Baltimore, MD.

Mechanic, M.B., Kaysen, D.L., & Resick, P.A. (March, 2002). *Stalking, perceptions of lethality, and posttraumatic responding among recently battered women.* In M.B. Mechanic (Chair) "I'll be watching you:" Legal, clinical and social policy implications of recent stalking research. Symposium presented at the American Psychology Law Society (APLS) Association Biennial Meeting, Austin, TX.

Mechanic, M.B., & Resick, P.A. (December, 2001). *Mental health consequences of multiple forms of partner abuse.* In. M.B. Mechanic (Chair) Multiple dimensions of partner abuse: Physical and mental health outcomes.  Symposium presented at the 17th Annual Meeting of the International Society for Traumatic Stress Studies (New Orleans, LA).

Mechanic, M.B., & Rose, S. (December, 2001).  *Hate crime victimization: Help-seeking, disclosure, and symptom status.*  Poster presented at the 17th Annual Meeting of the International Society for Traumatic Stress Studies (New Orleans, LA).

Mechanic, M.B., & Resick, P.A. (December, 2001). *Violence against women researcher-practitioner collaboration: Findings from practitioner focus groups.*  In D.G. Kilpatrick (Chair) How the National Violence Against Women Prevention Research Center helps researcher-community collaboration.  Workshop to be presented at the 17th Annual Meeting of the International Society for Traumatic Stress Studies (New Orleans, LA).

Mechanic, M.B., & Resick, P.A. (August, 2001). *Fostering collaborations to prevent violence against women: Findings from practitioner focus groups* . In. D.G. Kilpatrick (Chair) Can violence against women researchers and practitioner—advocates just get along? Paper presented at the annual American Psychological Association Convention (San Francisco, CA).

Resick, P.A., & Mechanic, M. B. (2001, July).  *Types of abuse, cognitive schemas and dissociation among battered women.*  In C.R. Brewin (Chair) Dissociative processes in psychopathology: Clinical Applications.  Paper presented at the World Congress of Behavioral and Cognitive Therapies, Vancouver, British Columbia.

Mechanic, M.B., & Resick, P..A. (2000, November).  *Cognitive distortion index: Assessment of abuse-related cognitions among battered women.*  Poster presented at the 16th Annual Meeting of the International Society for Traumatic Stress Studies, San Antonio, TX.

O'Connor, M. & Mechanic, M.B. (2000, June).  *A Broader exploration of the role of gender in expert testimony.* In M. O'Connor (Chair) Sex of the expert: An empirical and experiential view.  Paper presented at the Society for the Psychological Study of Social Issues, Minneapolis.

Resick, P.A., Nishith, P., Griffin, M., Mechanic, M., & Weaver, T.L. (2000, March,). *PTSD and depression comorbidity: Prospective study and treatment outcome results.*  Paper presented at the 3rd World Congress for the International Society for Traumatic Stress Studies, Melbourne, Australia.

Mechanic, M.B., Weaver, T.L., & Resick, P.A. (1999, November).  *Intimate partner violence and stalking behavior: Exploration of patterns and correlates in a sample of acutely battered women.* Paper presented at the 15th Annual Meeting of the International Society for Traumatic Stress Studies, Miami.

A000000211

Griffin, M.G., Resick, P.A., & Mechanic, M.B. (1999, November). *Psychophysiological alterations related to peritraumatic dissociation in domestic violence victims.* Paper presented at the 15th Annual Meeting of the International Society for Traumatic Stress Studies, Miami.

Grubaugh, A., Waldrop. A., Mechanic, M.B., & Resick, P.A. (1999, November). *Alternative and investment as predictors of domestic violence victims self-schemas.* Poster presented at the 15th Annual Meeting of the International Society for Traumatic Stress Studies, Miami.

Rose, S., & Mechanic, M. (1999, October). *Homophobic bias crimes: An examination of crime features, psychological distress and helpseeking behavior.* Hate Crimes Conference sponsored by UCLA and the Society for the Psychological Study of Social Issues (SPISSI) , Los Angees, CA.

Williams, A.M., & Mechanic, M.B. (1998, November). *The disruption of meaning: An analysis of schema change in sexual assault survivors with PTSD.* Poster presented at the 32nd Annual Convention of the Advancement for Behavior Therapy, Washington, D.C.

Feuer, C., Mechanic, M.B. & Resick, P.A. (1998, November). *ASD and PTSD in sexual and physical assault survivors.* Paper presented at the Fourteenth Annual Meeting of the International Society for Traumatic Stress Studies, Washington, D.C.

Evans, T.W., Uhlmansiek, M.H., Resick, P.A., Griffin, M.G., & Mechanic, M.B. (1998, November). *The effects of disaster-related damage, social support, coping and PTSD on distressed and nondistressed dyads following the great flood of 1993.* Poster presented at the Fourteenth Annual Meeting of the International Society for Traumatic Stress Studies, Washington, D.C.

Mechanic, M.B., Resick, P.A., Griffin, M.G., & Astin, M.C. (1997, November). *Development of a measure to assess cognitive distortions in battered women.* Paper presented at the 31st. Annual Convention of the Advancement of Behavior Therapy, Miami, Fla.

Resick, P.A., Mechanic, M.B., & Griffin, MG. (1997, November). *Cognitions and recovery in rape and assault victims: A prospective study.* Paper presented at the 31st. Annual Convention of the Advancement of Behavior Therapy, Miami, Fla.

Nishith, P., Mechanic, M.B., & Resick, P.A. (1997,November). *Childhood sexual and physical abuse as predictors of adult sexual and physical revictimization in a sample of female crime victims.* In M. Cloitre (Chair) Sexual revictimization of women: risk factors and prevention strategies. Symposium presented at the 31st. Annual Convention of the Advancement of Behavior Therapy, Miami, Fla.

A000000212

Astin, M.C., Resick, P.A. & Mechanic, M.B. *Battered women: An information processing model of predicting PTSD and depression* (1997,November). Paper presented at the 13th Annual Meeting of International Society of Traumatic Stress Studies, Montreal, Canada.

Mechanic, M.B., Maguire, M., Resick, P.A., & Griffin, M.G. (1996,November). *Rape trauma narratives: Coherence and recovery from trauma.* In S. Orsillo (Chair). Narrative accounts of traumatic experience, Symposium presented at the 30th Annual Convention of the Association for the Advancement of Behavior Therapy, New York, New York.

Mechanic, M.B., Resick, P.A., & Griffin, M.G. (1996, November). *Traumatic memory in recent victims of sexual assault.* In. R.J. McNally (Chair). Memory in survivors of sexual violence. Symposium presented at the 30th Annual Convention of the Association for the Advancement of Behavior Therapy, New York, New York.

Mechanic, M.B., Griffin, M.G. & Resick, P.A. (1995, November). *Traumatic stress reactions following disaster: The mediating impact of marital conflict, marital satisfaction and coping.* In D.S. Riggs (Chair) The impact of relationship factors on post-traumatic stress responses. Symposium presented at the 29th Annual Convention of the Association for the Advancement of Behavior Therapy, Washington, D.C.

Mechanic, M.B., Griffin, M.G., & Resick, P.A. (1995, November). *Narrative accounts of rape: Assessing naturalistic changes as evidence of information processing.* Paper presented at the 29th Annual Convention of the Association for the Advancement of Behavior Therapy, Washington, D.C.

Mechanic, M.B., Resick, P.A., & Griffin, M.G. (1995, November). *Narrative accounts of rape: Is there evidence of information processing?* Paper presented at the 11th Annual Meeting of the International Society for Traumatic Stress Studies, Boston, MA.

Nishith, P., Mechanic, M.B., Griffin, M.G., & Resick, P.A. (November,1995). *Peritraumatic dissociation and chronic PTSD in rape victims.* Paper presented at the 11th Annual Meeting of the International Society for Traumatic Stress Studies, Boston, MA.

Resick, P.A., Griffin, M.G., Mechanic, M.B. & Trusty, M.L. (1995, November). *Marital abuse in the wake of disaster: Testing a model.* Paper presented at the 29th Annual Convention of the Association for the Advancement of Behavior Therapy, Washington, D.C.

Mechanic, M.B. (1995, June). *Battered Woman Syndrome: The impact of expert testimony on juror decision making.* Paper presented at the Annual Meeting of the Law and Society Association, Toronto, Canada.

Mechanic, M.B., Resick, P.A., & Griffin, M.G. (1994, November). *The role of cognitive schemata in persistent PTSD following sexual assault.* In M.B. Mechanic and D.S. Riggs (Co-Chairs) Cognitive schemata in female victims of sexual assault. Symposium

presented at the 28th Annual Convention of the Association for the          Advancement of Behavior Therapy, San Diego, CA.

Mechanic, M.B., Resick, P.A., & Griffin, M.G. (1994, November). *Post-rape reactions: Does knowing the rapist make a difference?* In M.B. Mechanic and D.S. Riggs (Co-Chairs) PTSD: a search for subtypes. Symposium presented at the 28th Annual Convention of the Association for the Advancement of Behavior Therapy, San Diego, CA.

Mechanic, M.B., Resick, P.A., & Griffin, M.G. (1994, November). *Acute stress disorder following sexual assault: A first glance.* In D.E. Hearst-Ikeda and M.B. Mechanic (Co-Chairs) Dissociation and trauma. Symposium presented at the 10th Annual Meeting of the International Society for Traumatic Stress Studies, Chicago, IL.

Mechanic, M.B., Resick, P.A., & Griffin, M.G. (1994, November). *Cognitive schemata and coping strategies in persistent PTSD following sexual assault.* In M.B. Mechanic and D.S. Riggs (Co Chairs) Cognitive schemata in post-traumatic stress disorder. Symposium  the 10th Annual Meeting of the International Society for Traumatic Stress Studies, Chicago, IL.

Griffin, M.G., Resick, P.A., &  Mechanic, M.B. (1994, November).  *Are there subtypes of PTSD?: Physiological and non-verbal evidence.*  In M.B. Mechanic and D.S. Riggs (Co-Chairs) PTSD: a search for subtypes.  Symposium presented at the 28th Annual Convention of the Association for the Advancement of Behavior Therapy, San Diego, CA.

Griffin, M.G., Resick, P.A., Mechanic, M.B  (1994, November). *Psychophysiological and nonverbal assessment of peritraumatic dissociation in rape victims.* In M.G. Griffin (Chair) Objective indicators of dissociation in Post-Traumatic Stress Disorder. Symposium presented at the 10th Annual Meeting of the International Society for Traumatic Stress Studies, Chicago, IL.

Resick, P.A., Mechanic, M.B., Griffin, M.G., & Spengel, L (1994, November).  Marital adjustment and violence in the wake of the great flood of 1993.  In P.A. Resick (Chair) *Coping with disaster: Symptoms and interpersonal effects.*  Symposium presented at the 10th Annual Meeting of the International Society for Traumatic Stress Studies, Chicago, IL.

Mechanic, M.B., & Resick, P.A. (1994, July).  *An approach to treating post-traumatic stress disorder and depression.*  In J.D. Maser (Chair), Research based treatments.  Symposium presented at the 20th Annual Meeting of the National Association for Rural Mental Health, Des Moines, IA.

Mechanic, M.B. & Resick, P.A. (1994, June). *Participation in the legal process following sexual*

*assault: Implications for recovery.* In K.A. Fischer (Chair), Gender, voice, and legal consciousness. Symposium presented at the Annual Meeting of the Law and Society Association, Phoenix, AZ.

Mechanic, M.B. & Resick, P.A. (1993, October). *The personal beliefs and reactions scale:*

*Assessing rape-related cognitive schemata.* In P.A. Resick (Chair), The role of cognition in PTSD. Symposium conducted at the 9th Annual Meeting of the International Society for Traumatic Stress Studies, San Antonio, TX.

Mechanic, M.B., Resick, P.A., Schnicke, M.K., & Griffin, M.G. (1993, November). *The impact of guilt and self-blame on recovery from PTSD in rape victims.* In E.S. Kubany (Chair), Assessment and treatment of trauma related guilt. Symposium conducted at the 27th Annual Convention of the Association for the Advancement of Behavior Therapy, Atlanta, GA.

Mechanic, M.B., Resick, P.A., & Griffin, M.G. (1993, November). *Rape-related PTSD: Comorbidity of DSMIII-R Axis I disorders and associated symptoms.* In D.E. Hearst (Chair), Collateral symptoms in women with PTSD: Depression, physical health, sexual, and interpersonal adjustment. Symposium conducted at the 27th Annual Convention of the Association for the Advancement of Behavior Therapy, Atlanta, GA.

Mechanic, M.B. & Aber, M. (1992, March) *Battered woman syndrome: Development of a measure to assess juror common knowledge.* Poster presented at the Biennial Meeting of the American Psychology Law Society (APLS), San Diego, California.

Hoge, S.K., Oberlander, L., Mechanic, M.B., & Monahan, J. (1992, August). *Coercion in the hospitalization process: Clinical variables and perceptions of coercion.* Paper presented at the 10th Annual Meeting of the American Psychological Association, Washington, D.C.

Mechanic, M.B., Miller, G.M., & Klein, D.N. (1986, August). *Assessment and differentiation of chronic depression in a non-patient sample.* Paper presented at the 94th Annual Meeting of the American Psychological Association, Washington, D.C.

Mechanic, M.B., & Abramson, P.R. (1981). *Sexuality and the media: Three decades of best selling novels and top rated films from 1959-1979.* Paper presented at the Western Psychology Conference for Undergraduate Research, Santa Clara, California.

## Invited Professional Presentations and Workshops

Mechanic, M.B. (April, 2004). *Researcher-Practitioner Collaboration to Improve Research on Violence Against Women.: Findings from the NVAWPRC focus groups.* University of Kentucky, Violence Against Women Research Center.

A000000215

Mechanic, M.B. (March 2004,). *Expert testimony on the effects of battering.* Invited presentation for the Missouri Coalition Against Domestic Violence Conference on Expert Testimony. St. Louis, Missouri.

Mechanic, M.B. (November, 2003). *Anxiety Disorders and Women.* Anxiety Disorders of Association of America. Chantilly, Virginia.

Mechanic, M.B. (October, 2003). *Mental Health Consequences of Violence Against Women.* Toward a national research agenda on violence against women: A national research conference. University of Kentucky Center for Research on Violence Against Women, Lexington, KY.

Mechanic, M.B. (2003, April). *Expert testimony on the effects of battering.* Invited presentation for the Missouri Coalition Against Domestic Violence Conference on Expert Testimony. St. Louis, Missouri.

Mechanic, M.B. (2002,March). *Nature and dynamics of domestic violence: Relevance for the practice of law.* Workshop presented for the Missouri Bar Association. Lake of the Ozarks, MO.

O'Brien , S., & Mechanic, M.B. (2002,March). *Defending battered women charged with crimes.* Workshop presented for the Missouri Bar Association. Lake of the Ozarks, MO.

Mechanic, M.B. (2002,March). *Child maltreatment and intimate partner violence.* Invited address presented for the Jefferson County, Missouri Family Court Conference.

Mechanic, M.B. (2001, December). Expert witness commentator in: *The relevance of domestic violence in the courtroom: Expert testimony in a duress case-Mock Trial.* Co-sponsored by the American Bar Association Commission on Domestic Violence and Criminal Justice Section and the International Society for Traumatic Stress Studies. New Orleans, LA.

Mechanic, M.B. (2001,May). *The intersection of stalking and intimate partner abuse.* The frst research conference on stalking. Rutgers University, New Brunswick, NJ.

Mechanic, M.B. (2001, January). *Expert witness testimony: Consideration of domestic violence in child custody determinations.* Legal services training sponsored by the Missouri Coalition Against Domestic Violence.

Mechanic, M.B. (2001, January). *Domestic violence and Child maltreatment: Legal and Psychological Intersection.* Presentation for the St. Louis Family Court Guardian Ad Litem Training.

Mechanic, M.B. (2000, October). *Preliminary findings from an NIMH study of 350 Battered Women.* Colloquium presented at the Center for Trauma Recovery, University of Missouri-St. Louis.

Mechanic, M.B. (2000,May). *The intersection between child maltreatment and domestic violence*. Presentation for the Annual Jefferson County Family Violence Council Training.

Mechanic, M.B. (2000,May). *Working effectively with expert witnesses in domestic violence cases*. Workshop presented at the Illinois Coalition Against Domestic Violence Annual Legal Conference.

Mechanic, M.B. (2000,April ). *Secondary trauma associated with representing battered women*. Workshop presented at Legal Services of Eastern Missouri.

Mechanic, M.B., & Weaver, T.W. (2000,January*). Domestic violence: The relationship to child abuse and neglect*. Presentation for the 22nd Judicial Circuit (City of St. Louis) Court Improvement Project.

Mechanic, M.B. (1999,January). *Vicarious traumatization: Impact of trauma work on trauma workers: Part 2.* Workshop presented for the staff at the Kathy J. Weinman Shelter for Battered Women, St.. Louis, MO.

Mechanic, M.B. (1998,December). *Vicarious traumatization: Impact of trauma work on trauma workers: Part I.* Workshop presented for the staff at the Kathy J. Weinman Shelter for Battered Women, St.. Louis, MO.

Mechanic, M.B. (1998,October). *Spousal abuse and workplace violence*. Invited presentation for the mid-year educational conference of the American College of Legal Medicine. St. Louis, MO.

Mechanic, M.B. (1997, November). *Acquaintance rape: Developing awareness and decreasing risk.* Invited presentation for COPS series sponsored by the University of Missouri Police Department.

Mechanic, M.B. (1997, November). *Criminal forensic assessment*. Colloquium presented for the University of Missouri-St. Louis Clerkship Seminar Series.

Mechanic, M.B. (1997, November). *Forensic psychological assessment: On being a psychological skeptic.* Colloquium presented at the University of Missouri-St. Louis, Department of Psychology Colloquium Series.

Mechanic, M.B. (1997, November). *Psychological sequelae of traumatic events: Part I. Overview and conceptual frameworks*. Invited workshop presented for Provident Counseling Center.

Mechanic, M.B. (1997 November). *Psychological sequelae of traumatic events: Part II. Using sructured diagnostic interviews to assess trauma history and posttraumatic symptoms.* Invited Workshop presented for Provident Counseling Center.

A000000217

Mechanic, M.B. (1997, November). *Sexual trauma: Conceptualization and intervention strategies.* Invited workshop at the University of Missouri-St. Louis Counseling Services Center.

Mechanic, M.B. (1997, May). *Sexual trauma and posttraumatic stress disorder.* Invited workshop presented for the Family Court of St. Louis County.

Mechanic, M.B., & Weaver, T.L. (1997, April). *Battered women: Sequelae of trauma.* Continuing Medical Education Workshop, St. Joseph's Medical Center.

Mechanic, M.B. (1997, February). *Violence, trauma and PTSD.* Invited workshop for the Mental Health Association of Greater St. Louis.

Mechanic, M.B. (1997, January). *Memory for sexual trauma.* Invited presentation for the ProWomen Therapists Group.

Mechanic, M.B. (1996, April). *Women and trauma:* Invited presentation for the ProWomen Therapists Group.

Mechanic, M.B. (1994, March). *Rape: Fact vs. Fiction.* Presentation for the University of Missouri Noon Cultural Series.

Mechanic, M.B. (1994, April). *Date Rape: Myths and Realties.* Presentation for the University of Missouri Women's Center.

Cornell, D., Hawk, G.L. & Mechanic, M.B. (1992, February). *Family homicide: Forensic assessment issues.* Paper presented at the Advanced Forensic Evaluation Training Program, Institute of Law, Psychiatry and Public Policy, University of Virginia.

Mechanic, M.B., Hawk, G., & Lombardo, P.A. (1991, May). *Battered woman syndrome.* Workshop presented at the 20th Semi-Annual Forensic Symposium, University of Virginia, Charlottesville.

Mechanic, M.B. (19 0, February). Battered women and the criminal law. Paper presented at the Advanced Forensic Training Program, Institute of Law, Psychiatry & Public Policy, University of Virginia.

**Teaching Experience**
Spring, 2004     California State University, Fullerton, Instructor
Psychology 331: **Psychology of Personality**
Psychology 561: **Psychological Assessment** (Graduate Level Course)

| | |
|---|---|
| Fall, 2003 | California State University, Fullerton, Instructor<br>Psychology 331: **Psychology of Personality**<br>Psychology 501: **Legal, Ethical and Professional Issues in Clinical Psychology** (Graduate Level Course) |
| Spring, 2003 | California State University, Fullerton, Instructor<br>Psychology 331: **Psychology of Personality**<br>Psychology 561: **Psychological Assessment** (Graduate Level Course) |
| Fall, 2002 | California State University, Fullerton, Instructor<br>Psychology 331: **Psychology of Personality**<br>Psychology 501: **Legal, Ethical and Professional Issues in Clinical Psychology** (Graduate Level Course) |
| Winter, 1999 | University of Missouri-St. Louis, Instructor<br>Course: Psychology 292: **Psychology of Victimization** |
| Fall, 1997 | University of Missouri-St. Louis, Instructor<br>Course: Psychology 410 **Women and Mental Health** (Graduate Level Course) |
| Spring, 1995 | Southwest Missouri State University, Instructor<br>Office of Continuing Education<br>Victimology Basic Certification Program<br>Course: **Sexual Assault and the Rapist** |
| Winter, 1995 | University Of Missouri-St. Louis, Instructor<br>Course: Psychology 292: **Psychology of Victimization** |
| Fall, 1993 | University of Missouri-St. Louis, Instructor.<br>Course: Psychology 392: Special topics in Psychology:<br>**Psychology and the Legal System.** |
| Spring, 1988 | University of Illinois, Instructor<br>(graduate and undergraduate course)<br>Course: Psychology 368: **Psychology and the law**: Exploring the application of psychological knowledge to the study of psycholegal issues. |
| Fall, 1987 | University of Illinois, Instructor |

A000000219

Course: Psychology 368: **Psychology and the law:** Exploring the application of psychological knowledge to the study of psycholegal issues.

Spring, 1986   University of Illinois, Co-Instructor
Course: Psychology 368: **Psychology and the law:** Exploring the application of psychological knowledge to the study of psycholegal issues.

## Clinical Experience and Supervision of Clinical Training

1998-2002   **Clinical Supervisor,** Community Psychological Services Center, University of Missouri-St. Louis
--Supervise psychology graduate students conducting psychological evaluations and individual therapy.

1992-2002   **Clinical Staff Member,** Center for Trauma Recovery, University of Missouri-St. Louis.
--Provided individual and group therapy for rape survivors using cognitive processing approach. Perform clinical assessments of physical and sexual assault survivors. Conduct crisis debriefing sessions in the community following traumatic, violent events, such as airline crashes and bank robberies. Supervise graduate students and post-doctoral fellows who provide individual and group therapy (since 1998).

1996-1997   **Post-Doctoral Fellow,** Center for Trauma Recovery and Community Psychological Services Center, University of Missouri-St. Louis.
--Supervised Post-Doctoral Clinical Training Program. Included individual and couples therapy, clinical and forensic assessment with trauma and non-trauma populations. Conducted assessments for the determination of disability.

1988-1990   **Correction Center Clinician,** Champaign County Correctional Center (on contract with the Mental Health Center of Champaign County, Illinois).
--Provided evaluation, assessment, crisis intervention and brief psychotherapy to male and female jail residents. Co-facilitated a bi-weekly support group for female residents. Participated in training jail staff in mental health issues.

1982-1988   **Clinical Psychology Intern,** Psychological Services Center, University of Illinois.
Practica:   Adult Individual Psychotherapy
Forensic Evaluation
Family and Marital Therapy
Advanced Adult Individual Psychotherapy

A000000220

1979-1980     **Rape Crisis Counselor**, Cedars-Sinai Medical Center, Los Angeles, California.

## Legal Consultation and Expert Testimony

2004     - - Provided expert evaluation in a battered woman's post-conviction case.
2003     - - Provided expert testimony at sentencing in two battered women's homicide cases.
2003     - - Provided expert testimony regarding the potential impact of omitted expert
testimony in an ineffective assistance of counsel hearing (homicide case).

2002     --Provided expert testimony regarding the lack of validity of RTS in a criminal sexual
assault trial.

2001-02   --Retained by defense counsel in two cases to perform clinical evaluations of female
criminal defendants charged with killing intimate partners who had abused them.
2001     --Consulted with district attorney regarding prosecution of a battered woman charged
with homicide and provided expert testimony.
--Consulted with defense counsel in a battered woman's self-defense case.
--Provided expert consultation in a sexual assault case (civil).
--Testified as an expert witness in a child custody case involving domestic violence.
1999     --Testified as an expert witness in a battered woman's self-defense case (civil).
--Provided expert consultation in the prosecution of a batterer (criminal).

--Provided expert consultation in a child custody case involving domestic violence.
--Performed a clinical evaluation of a battered woman charged with homicide.
1998     --Provided expert consultation for the civil prosecution of an acquaintance rape
case.
1997     --Provided expert consultation on the criminal prosecution of an acquaintance
rape case.
--Conducted a forensic evaluation of a rape victim pursuing a worker's
compensation claim.
--Provided consultation regarding jury selection in a sexual assault case.
--Conducted psychological evaluations for the purpose of determining disability.
1995     -- Provided consultation regarding memory for sexual trauma in a rape case.
1990/91   --Worked with team members at ILPPP at the University of Virginia in forensic
evaluation of criminal responsibility, fitness to stand trial, and capital sentencing.
1990     --With Dr. Gary Hawk (at ILPPP) conducted clinical forensic evaluation of a
battered woman charged with homicide of her abusive male partner.  Provided an
extensive written report.

## Professional Activities

2004-2006          **Public Education Committee,** International Society for Traumatic Stress
Studies

2003-2006          **Editorial Board,** Psychology of Women Quarterly.

2003-2006          **Editorial Board,** Journal of Aggression, Maltreatment and Trauma.

A000000221

| | |
|---|---|
| Fall, 2002 | Advisory Board, Women's Center: California State University, Fullerton |
| 2002-2005 | **Editorial Board**, Journal of Traumatic Stress. |
| 2001 | Served on Dissertation Committee for Ph.D. Student, UMSL |
| 2000-2003 | Board of Directors, Aid for Victims of Crime, St. Louis, Missouri |
| May-October 1999 | Member of Missouri Governor Carnahan's Task Force for the Development of a Model School Crisis Response Plan. |
| April, 1999 | Completed National Organization for Victim Assistance (NOVA) Advanced Training for Community Crisis Response |
| February 18-19, 1996 | Participated in SCID training for the DSM-IV with Lynn Gladdis, Ph.D., trainer. |
| 1995-1999 | Conducted victim advocate training three times per year for the St. Louis City Prosecutor's Victim Advocate Program |
| 1995-1997 | Volunteer, St. Louis Anti-Violence Project. Conducted volunteer and community education training, fundraising, and served as media spokesperson. |
| June, 1995 | Invited Chair/Discussant for a panel at Law and Society Association Meeting, Toronto. |
| September 9, 1994 | Completed the Sex Offender Evaluation Training Program, Institute of Law, Psychiatry and Public Policy, University of Virginia. |
| July, 1994 | Member of the Planning Committee for the Victimology Certification Program |
| | Basic Training Program Southwestern Missouri State University |
| June 14-15, 1994 | Participated in the Law and Society Association's Graduate Student Workshop on the theme of "Representation." [Participants are selected by application] |
| July 13-17, 1994 | Participated in the Law and Society Association's Summer Institute. Theme: "Every Day Practice and Trouble Cases." [Participants selected by application] |
| 1993-1998 | Coordinator, Center for Trauma Recovery Colloquium Series. |
| 1993-1995 | Member of Community-Based Jail Planning Task Force |

A000000222

| | |
|---|---|
| February 22-24, 1993 | Completed National Organization of Victim Assistance (NOVA) Community Crisis Response Team (CRT) Training Institute. Active Member of St. Louis CRT. |
| September-Oct, 1990 | Completed the 54-hour clinical hypnosis training course conducted by the Virginia Hypnosis Society. |
| August, 1990 | Completed the 48-hour Forensic Training Course at the Institute for Law, Psychiatry & Public Policy, University of Virginia. |
| 1983-1985 | Graduate Student Representative, Department of Psychology, University of Illinois |

**Memberships:**
Association for the Advancement of Behavior Therapy
International Society for Traumatic Stress Studies
American Psychology Law Society (Division 41 APA)
Western Psychological Association

**Ad Hoc Reviewer**

**Journals:**
Psychological Assessment
Violence & Victims
Journal of Abnormal Psychology
Journal of Consulting and Clinical Psychology
Violence Against Women: An Interdisciplinary Journal.

**Grants:**
United States Government, Department of Justice/OJP, Violence Against Women Office.
United Stated Government, Department of Veterans Affairs, Merit Review Grants.
The Ontario Mental Health Foundation
Research Board, University of Missouri-St. Louis.

**Conferences:**
Reviewer, Program Committee: Association for the Advancement of Behavior Therapy, 1997.
Reviewer, Program Committee: American Psychology Law Society (APLS-Division 41) 1995 , 2002 Biennial Conferences.
Reviewer, Program Committee: American Psychology Law Society (APLS-Division 41) Program for at the 2003  American Psychological Assn.
Reviewer, Program Committee: American Psychology Law Society (APLS-Division 41) 2004 Biennial Conference Program.

A000000223

**Professional
Standards:**  <u>National Victim Assistance Standards Consortium</u>, invited reviewer for
the development of professional standards of practice (2000).

**Media Interviews**

| | |
|---|---|
| February, 1996 | TV 30 (St. Louis) : Men who kill intimate female partners |
| March, 1996 | St. Louis Post-Dispatch: Acquaintance rape |
| May, 1996 | St. Louis Post-Dispatch: Domestic violence |
| July, 1996 | St. Louis Post-Dispatch: Floods/domestic abuse |
| July, 1996 | TV30 (St. Louis): 1993 Floods and domestic abuse |
| July, 1996 | Radio News Service: domestic abuse/1993 Floods |
| July, 1996 | TV 5 (St. Louis): Rohypnol and Date Rape |
| September, 1996 | KWMU radio (St. Louis): Violence against women |
| November, 1996 | TV 4 (St. Louis): Date rape drugs |
| December, 1996 | Alpha Phi Quarterly: Date Rape |
| March, 1997 | Riverfront Times (St. Louis): Domestic violence |
| September, 1997 | TV 4 (St. Louis): Acquaintance Rape |
| February, 1998 | Radio Interview-Metro News Wire Service: Domestic violence |
| February, 1998 | Radio Interview-KWMU St. Louis on the Air: Domestic violence |
| March, 1998 | Radio Interview-WILL: Domestic violence and child abuse |
| March, 1998 | Radio Interview- KMOX: Domestic violence |
| March, 1998 | Radio Interview-Newsbytes wire service: Domestic violence |
| April, 1998 | Radio Interview-Missouri Net news wire service. |
| June, 1998 | TV4 (St. Louis): Legislative Changes in Rape laws |
| July, 1998 | TV 11 (St. Louis): Recovery from rape |
| October,1998 | TV 5 (St. Louis): Intimate Partner violence |
| October 1998 | Newsbytes wire service (radio): Intimate partner violence. |
| October, 1998 TCI Cable TV: Intimate partner violence |
| October, 1998 | UMSL Current: Intimate partner violence |
| February, 1999 | TV 4: Stalking and domestic violence |
| February, 1999 | Radio Interview-WILL: Stalking and domestic violence |
| February, 1999 | Radio Interview-Missouri Net  news wire service: Stalking and domestic violence |
| February, 1999 | Radio Interview-Newsbytes wire service: Domestic violence and stalking |
| March, 1999 | Radio Interview- KMOX: Rape and recovery |
| March, 1999 | San Jose Star: Domestic violence |
| March, 1999 | Newsbytes wire service (radio): Domestic violence |
| April, 1999 | NYU-Date rape |
| April, 1999 | Newsbytes wire service (radio): Littleton, CO School shooting |
| April, 1999 | Radio Interview--KTRS : Littleton, CO School shooting |
| April, 1999 | TV 2: Media and School violence |
| April, 1999 | TV 30: Littleton, CO School shooting |
| April, 1999 | KMOX : Littleton, CO School shooting/crime victims |
| April, 1999 | TV 4 Eye on St. Louis: School violence/Crime Victim Rights |
| April, 1999 | TV 5: School violence October, 1999 |
| | Salon Magazine:  Familial homicide |

| January, 2000 I | KMOX Radio: Rape |
|---|---|
| January, 2000 | St. Louis Post-Dispatch: Relationship harmony & blood pressure |
| February, 2000 | GHB: Date rape drug |
| February, 2000 | AP Wire Service-Why men rape. |
| July, 2000 | Mademoiselle Magazine: Dating violence |
| January, 2001 | WILL Radio: Missouri Domestic Violence Legislation |
| April, 2001 | Court TV: Stalking |
| July, 2001 | St. Louis Post-Dispatch: Domestic homicide |
| July, 2001 | St. Louis Post-Dispatch: Domestic violence and family murders. |
| September, 2001 | NBC, North Carolina Affiliate: Domestic violence, stalking, and homicide. |
| September, 2001 | KWMU Radio: Same-sex partner abuse. |
| September 2001 | FOX 2 news: Impact of WTC tragedy. |
| September 2002 | Chronicle of Higher Education: Human Research Participants and IRB's. |
| November, 2002 | Independent Journalist: Ethical Issues in the Provision of Mandated Treatment of Offenders |

## Academic Honors and Awards

American Association of Trial Consultants Paper Competition Award (2000)
American Psychology Law Society Dissertation Award (1996)
American Psychology Law Society (APLS-Division 41)
(Grant-In-Aid to support dissertation)
Society for the Psychological Study of Social Issues (SPSSI)
(Grant-In-Aid to support dissertation)
Graduate College Dissertation Fellowship, University of Illinois
Department of Psychology Dissertation Grant, University of Illinois
Graduate College Thesis Grant, University of Illinois
Graduate College Travel Grant, University of Illinois
National Institute of Mental Health Clinical Traineeship
President's Undergraduate Fellowship
B.A., Magna Cum Laude
Psychology honor's program/award of honor's on undergraduate thesis
Pi Gamma Mu, social science honor society

A000000225



MICHAEL B. BAYLESS & ASSOCIATES
3620 NORTH THIRD STREET
PHOENIX, ARIZONA 85012
PHONE: 602-230-7373
FAX: 602-230-5105

MICHAEL B. BAYLESS, PH.D.
LETICIA AMICK, PH.D.
CRISTY LOPEZ, PH.D.

August 4, 2004

## PSYCHOLOGICAL REPORT
### RE: WENDY ANDRIANO

**Reason for Referral:**
Wendy Andriano entered a plea of not guilty to first-degree murder. She is currently charged with the murder of her husband, Joe Andriano. According to the police reports Joe Andriano's death occurred on or about October 8, 2000. The purpose of this evaluation is to exam Wendy Andriano's intellect, personality, and overall emotional stability.

**Observations:**
Wendy Andriano is a relatively short, thinly-built 33-year-old female of Caucasian descent. At the time of the interview, Ms. Andriano was wearing jail attire and her hygiene appeared to be good. She was in relatively good mood and was very open and cooperative with this examiner. Her affect was normal to content. She did not exhibit any abnormal motor activity or mannerisms. She denied having any tattoos or identifying physical marks. She was alert, exhibited good eye contact, and maintained satisfactory attention span. Her thoughts and communications were coherent and seemed to follow logical sequence. There were no obvious deficits in her short or long-term memory.

**Consent to Evaluation:**
Wendy Andriano signed Bayless and Associates 's Forensic Consent Form indicating she read and understood the purpose of the evaluation and limits of confidentiality. She was aware that information from this evaluation would be reported to the court and may be disseminated to interested parties. Ms. Andriano consented to the evaluation and voluntarily answered all questions.

**Documents Reviewed:**
1. Photographs of the crime scene
2. Phoenix Police Department departmental Reports
3. Autopsy Report
4. Sharon B. Murphy, Ph.D. Report and Domestic Violence Data

A000000226

Andriano
Page 2

**Procedures:**
1. The Shipley Institute of Living Scale.
2. The Williamson Sentence Completion Test.
3. The Minnesota Multiphasic Personality Inventory – II.
4. Clinical interview.

**Background:**
Wendy Andriano was born Groom, Texas and is an only child. Wendy did not know her biological father. Her mother remarried when she was approximately four years of age to Alejo Ochoa. Her stepfather raised her as his own daughter and was basically the only father she has ever known. Her father worked as an assistant pastor and managed a tortilla factory and restaurant. Her mother is a human resource person and both of her parents are described as being workaholics. However, she also states that they were very caring, outgoing, and very loving. Her father was the main disciplinarian in the family. She reports that she has always had a very loving and open relationship with her parents. She was raised as a Christian and states as a young girl she participated in a lot of church activities. When asked whether or not she had ever been physically or sexually abused, she reported that she was sexually abused by her biological father and her grandfather. She believes that she was less than two years of age and can barely remember what happened. She states that she remembers parts but not all of the things that happened. Noteworthy, her biological father is in prison for child molestation. Wendy has a vague memory of the molestation and states she can only remember it when she is dreaming.

Although she states that she was happy as a young girl, she did have a number of anxiety-related problems. During her childhood she was a sleepwalker, experienced night terrors, bed wet, and suffered from separation anxiety from her mother. Noteworthy, she continues to have night terrors to this day.

As a teenager, Wendy enjoyed music, playing the piano, and swimming. She went to a very small high school, such that there were only 15 kids in her high school class. She got along quite well with her peer group. The most significant event that happened to her during her teenage years was her participation in the church social group. She did not date during her high school years.

**Education:**
Wendy graduated from high school with honors and reports that she has always been a very good student and really enjoyed her education. She went to a small Christian school and reports that everyone was best friends. She has also completed approximately three years of college.

**Employment:**
Wendy's last job was working as a property manager for the San Riva apartments. She worked there from September 1999 through October 8, 2000. She earned approximately $32,000 a year. Before she was arrested, her goals were to work in real estate but now she simply wants to have her children back and go back to having a normal life. Noteworthy, after Wendy was arrested for the murder of her husband it was learned that there were some financial irregularities at the apartment complex. It was found that in apartment #229, a man had been allowed to live rent free without documentation in that apartment. There was also a full audit being done due to irregularities which had come to light. On a previous job, Wendy stole approximately $18,000 from her employer. She reported that she stole the money because her husband had created so much debt that she had to do something. She felt overwhelmed by the debt and felt responsible for the family's happiness. Consequently, she was forced to steal $18,000.

A000000227

Andriano
Page 3

**Relationships:**
Wendy has been married once and has two children. She was married from 1994 to 2000. Wendy's deceased husband had cancer and the last year of her marriage was very hard. She admitted to having an extra-marital affair during her last year of marriage. When asked about her affair, she reported that she had an affair with Rick Freeman. She met Rick at the apartment complex and they became friends. He was aware that her husband had cancer and he had told her that his fiancé had recently died. On one evening she went to Rockin' Rodeo, which is a local bar, with Rick and as they were coming home he kissed her. She stated that after they had kissed their relationship deepened and it became sexual. Noteworthy, Wendy reported to this examiner that she did not enjoy having sex and actually sex was quite painful for her. When asked about this, she stated "you can't just kiss on someone and not have sex with them, that's teasing". He was comforting me and as a trade I had sex with him". She reports she had sex with Rick Freeman five or six times. She claims he was quite gentle and although it wasn't painful for her, it was very uncomfortable. She stated "I don't know why my brain just clicks off. A lot of it is I was scared and thinking what do I do, how do I act. Joe was dying; life was going to be different".

**Psychological History:**
Wendy reports that she was treated by Candy Rhode in May once a week for three years. She denies receiving any other inpatient or outpatient treatment. This examiner did not receive copies of those records to review. Currently, while incarcerated, Wendy is taking Ativan, Zoloft and Seroquel. When asked if she had anyone in her family who had a history of mental illness or substance abuse, she reported her grandfather was an alcoholic and her aunt had a drug problem. She denies having a bad temper and states when she gets angry she would typically cry. She stated "I always see the best in people. Anger is a sin. I practice forgiveness and love".

Wendy denies having a frequent headaches, backaches, stomachaches, dizziness, heart palpitations, and fatigue. When she is under a great deal of stress she sometimes has difficulty sleeping and she used to have frequent nightmares. She reports her appetite is normal and she has not experienced any weight loss or weight gain.

Wendy denies experiencing hallucinations and/or delusions. She admitted that at times she does become depressed and has had suicidal ideations and one suicidal attempt. After being served papers about severing her parental rights she intentionally cut her arm. Further, she reported that she has a lot of fear and basic dislike of sexual intercourse due to it causing her pain.

Wendy is in relatively good physical condition and has not had any major operations or serious illnesses. She denies any neurological injuries.

**Alcohol/Drug Use:**
Wendy reported that she began drinking alcohol when she was 21 years of age. She typically drinks wine coolers and rarely if ever becomes intoxicated. She reports that she has been intoxicated maybe three or four times in her entire life. She denies using any illicit drugs. She does not drink coffee nor does she smoke cigarettes.

**Arrest Record:**
Wendy does not have a juvenile arrest record. She reports that this is the first time she has ever been arrested or charged with a crime. As noted earlier, Wendy is currently charged with first-degree murder. When asked how she is handling incarceration, she reported "I have adjusted. Either you sink or swim".

A000000228

Andriano
Page 4

**Defendant Statements:**

In 1994 Wendy married Joe Andriano. They were married in Casa Grande, Arizona. Initially, there was some conflict over their church and beliefs but that quickly resolved and their marriage was basically okay. After the marriage, Wendy reported that she and her husband Joe both felt as if they had changed and they did not have to any longer "put on any airs". Through their marriage they learned who they both were and everything was fine. Wendy initially hung out with Joe and his friends and eventually lost touch with her own friends. Joe was working as a welder but quit that and went into his own business, auto glass replacement. They got a loan and started Joe's Windshield Repair. In the process of obtaining a new business, Wendy and Joe moved to her parent's farm and basically renovated the old shack and lived there until March of 1998. She reported she had her first child in the old farmhouse. Approximately seven months into the marriage it was discovered that Joe had a tumor, which supposedly the doctor removed successfully. However, in 1996 it came back, which started to wreck havoc in their lives. They both were upset and under a lot of stress. Joe was not a very good businessman and spent most of his money on pleasurable activities. As a result, Wendy felt as though she had to put money back into the business from her job and eventually became overwhelmed by debt. She stated, "I felt responsible for my family's happiness". As a result, Wendy over a period of four year's, stole approximately $18,000 from her employer. She was fired from her job.

When Wendy first met Joe, he was dating this very wealthy girl and would say to her quite often that if he had stayed with his rich girlfriend his life would not be as miserable as it is today. Wendy reported this really hurt and here she was working full-time, stealing money from her company, attempting to go to school, making dinner, cooking, doing the clothes, and everything else around the house but that was not good enough. She stated, "What could I do, how could I make him happy".

At this point during the marriage, she was only around members of Joe's family. She felt isolated, alone and decided to go back to church. She tried to teach Joe how to love and forgive but was not very successful. Wendy was pregnant with her first child and Joe was not working. At this point, she was taking care of the baby, working and her parents were also helping do almost everything. Then she found out that she was pregnant again and that was just totally overwhelming. In October 1997 she decided that she was going to leave Joe because she did not want her son to grow up like this. She went to Jerry, the man who had loaned them the money for the business, and he gave her $2,000 and told her that if she wanted to leave, for her to leave. Noteworthy, Wendy did not leave Joe and instead reported that she actually gave the $2,000 to Joe. She reported that she wrote Joe a letter telling him that she was going to leave and later that evening he came in, in the middle of the night, and had apparently found the letter. He was angry and was screaming at her "what does this mean". She stated by the time it was all done he was begging her to stay and for some reason he was able to talk her into not leaving. Joe had a way with words and also she was very much afraid of his temper. She stated she remembers the first time she asked Joe about living on the farm, just that she thought they were living there so that they could save money to buy a house. She stated Joe became extremely angry, grabbed her and shook her, which made her very much afraid. Previously Joe told her about catching his ex-girlfriend sleeping with another man and he became so upset that he had to move to California to keep him from hurting the guy with whom his girlfriend was having an affair. She believes one of the reasons Joe told this story was so that she would be afraid of him.

Wendy reported that she really was not angry with Joe and actually always felt bad for him. Joe, in her mind, was angry at the world because of his cancer. Wendy stated, "It was the worse thing you could go through. You expect it when you are old, not when you are young". Wendy also reported that Joe would feel very bad when he had his episodes of anger. The cancer was overwhelming and basically consumed him. She told this examiner it was Joe who asked her to order the poisons because he wanted to take it and end it all.

A000000229

Andriano
Page 5

**Police Interviews:**
In witness interviews conducted by the Phoenix Police Department, Chris Hashisaki reported that Wendy had asked both Eric Vallante and James Yost to pose as Joe so she could a life insurance policy on Joe. She believed that they both were offered $50,000 to do this. Chris is also aware of an incident in which Wendy made an inquiry into a poison website. Apparently this occurred on Jerry Sentell's computer. Noteworthy, on the night of the incident in which the murder occurred, Chris described Wendy at the time as having no observable injuries.

Shannon Sweeney was also interviewed by the police and is one of Wendy's friends. Shannon and Wendy would often go to bars and hang out. Wendy apparently told Shannon that she had been having problems with Joe for a long time and would have left him if he had not become ill. Shannon believed that Joe was very possessive of Wendy. On one night, Shannon reported they took Wendy out for her birthday and they arrived home late. As they arrived home, Joe was very angry and threw Wendy's cellular phone and a glass bottle across the parking lot.

Shannon was also aware that Wendy had an affair with Rick Freeman. Apparently Wendy did not tell Rick that she was married and when Rick found out and wanted to end the relationship, Wendy did not want to end and became very persistent. Rick described this to Shannon as Wendy refusing to leave him alone. As an indicator of Wendy's persistence, there was a situation in which they ran into Rick and Eric at a club and after Rick initially said hello to them, he attempted to avoid Wendy. Wendy attempted to follow Rick around the bar and after which Rick left. Wendy later attempted to call Rick on the phone. When he would not answer, she began banging on his door and when he would not answer she threatened to get a passkey to his apartment. Shannon and Eric talked Wendy out of doing this. Later, Wendy also had a one night affair with a young man by the name of Travis whom she met at Rockin' Rodeo Bar.

Noteworthy, Wendy told Shannon about Joe screaming and would often break things. Wendy never told her about any incident in which Joe touched her. Shannon had never observed any injuries on Wendy. Apparently, Joe had a pending malpractice suit. Shannon was told that Wendy had told both James Yost and Eric that the lawsuit would be worth more if Joe were to die prior to settlement. Eric told Shannon that Wendy had asked him to pose as Joe to get a life insurance policy. Wendy told Eric there was no way the insurance company would find out about him posing as Joe. She also told Eric that Joe would most likely die of a heart attack due to his condition and treatment and that this would not be investigated. He also told Shannon that Wendy offered him $50,000 to pose at Joe. As to the poison ordered over the Internet, Wendy used a fictitious business license in order to order the poison. Noteworthy, Wendy gave an address to a company that she had no connection to. The poison Wendy ordered has the effect of mimicking a heart attack in its victim. Noteworthy, Wendy ordered poison from the website under the name of Anne Newton.

Ray Ortega, who was part of the management team that managed San Riva Apartments, found out that a man was living apartment 229 rent-free. Additionally, on October 10, 2000 Ray found in Wendy's office while he was cleaning the office, an envelope under Wendy's desk. Ray observed a pieced-together certificate from the City of Phoenix and a receipt for a chemical as well as several pages of information on cyanide. Two to three months prior to Joe's death, Ray was contacted by William Sentinel. William told him that while working on the office computer, he discovered where somebody had looked up a website containing information on cyanide as well as a point of reference site. Ray contacted Janice Lord and advised her of what William found. Ray, along with Janice, confronted Wendy about this. Wendy did not deny looking up this information but stated that she was helping a friend with a college report.

Eric Vaillent is a friend of Rick Freeman who was dating Wendy. He reported that Wendy would often pursue Eric and be at Rick's door at 2 or 3 o'clock in the morning. He would observe Wendy yelling and kicking his door asking Rick to let her in. He said this occurred several times over the summer. He also

A000000230

Andriano
Page 6

observed Wendy at nightclubs drinking excessively and would flirt and kiss on guys she knew at the bar. He observed Joe yelling at Wendy for coming home late but never saw him lay a hand on her. Wendy never told Eric about any of the domestic violence or any situation in which she was physically hurt. Noteworthy, in August, Wendy had called Eric and asked him to find Voigt on the Internet. Noteworthy, Voigt is a place on the Internet where you can buy poisons. Wendy told this examiner that it was Joe's idea to buy poison.

Wendy told Eric about the malpractice lawsuit and told him that when Joe died they were going to be awarded $20,000,000. She told Eric that she had researched things and that most people do not live past their third chemo treatment. Eric stated he got upset with Wendy and called her a money hungry bitch. Eric described Joe as being a nice guy who basically was fighting for his life. He believed Wendy did not really care for Joe any longer and she told him that she no longer had sex with Joe. This is quite interesting considering the fact that Wendy told this examiner that Joe demanded sex with her on a daily basis.

Rick Freeman admitted that he used to date Wendy and when he found out she was married he tried to break off the relationship. Wendy pursued him and often would come to his door in the middle of the night and bang on his door and call him incessantly. Wendy had told Rick that she often argued with Joe but she never told him anything about Joe being physically abusive.

Ted Bennett, who is a neighbor at the San Riva Apartments, reported that he last spoke to Joe approximately one week prior to his death. He described Joe as looking very sick. Wendy told Ted about their malpractice lawsuit but never told him how much money they expected to be awarded. Ted reported that Joe did not appear to have given up or want to die and in fact, Joe appeared to be very positive. He was unaware of any domestic problems. He never observed any injuries to Wendy. Noteworthy, while living at San Riva Apartments Ted had never been aware of any rodent problems that would require poison.

Debra Lewis was employed as a housekeeper for the San Riva Apartment complex. She is aware that Wendy and Joe were having some problems and was aware that Joe was questioning Wendy about where she was all the time and was checking up on her. Wendy was somewhat upset about Joe's continued checking up on her and Wendy also complained to Debra in the past about Joe not working. She also complained about having to take care of the kids and doing everything for Joe. Debra was unaware of any alligations of domestic violence between Wendy and Joe. She describes Joe as being a real pussy cat. Debra often observed Wendy talking to young male tenants and there were rumors about Wendy flirting with the men at the complex pool. Debra stated that Wendy acted as if she had already written off Joe and she believed Wendy acted as though Joe did not matter anymore. She described Wendy as acting as if she was not married.

Travis Black is a young man that Wendy met at a night club called the Rockin' Rodeo. She met Travis on September 27, 2000 and asked him to dance. They danced at the bar and were together. After dancing they went to breakfast and then went to Wendy's apartment and had sex. Wendy talked to Travis over the phone the following week and during these conversations Wendy told Travis that her husband had died of cancer.

On August 28, 2000 Wendy contacted Amica Life Insurance Company in reference to purchasing a life insurance policy on her husband Joe. Wendy talked to Carolyn Statalano and told her that Joe was staying out of town at his sister's house and had not set a date to return to Phoenix. In Carolyn's notes she stated this was a strange conversation. Noteworthy, no actual policy was ever taken out by Wendy. Also, on the application for a life insurance policy, the policy asks if Joe had cancer to which Wendy entered "no" on the application.

A000000231

Andriano
Page 7

Based on the above-mentioned interviews, it appears clear that Wendy in more than one situation had a tendency to be less than truthful. She has the ability to be manipulative and attempted to encourage others to get involved in fraudulent schemes to collect money from an insurance company. Additionally, for a woman who did not enjoy sex, she clearly was sexually aggressive with one of her male boyfriends and on one occasion met a man at a bar one night and took him home and had sex with him. She seemed to become somewhat obsessed with Rick and seemed to have extreme difficulty accepting the fact that he no longer wanted to date her. Additionally, Wendy told this examiner that Joe asked her to buy the poison. Yet in her overall quest to buy the poison, she attempted to hide her identity, have the poison mailed to a business address, and seemed to want to hide her connection to the poison.

**Intellectual Functioning:**
Wendy Andriano's performance on the Shipley Institute of Living Scale yielded a total IQ score of 110 which places her in the above-average range of intellectual functioning. Ms. Andriano was oriented to reality and had a capacity to appreciate the difference between right and wrong. At the time of the testing her memory, judgment, and decision making ability were intact. Although she was mildly anxious during the testing her test scores appear to be an accurate representation of her abilities. She did not report nor did the test data indicate the presence of neurological impairment.

Wendy Andriano's performance on the Minnesota Multiphasic Personality Inventory yielded a valid and interpretable profile. Her scores on the Validity Scales indicate that she tends to be defensive, lack insight, and be slightly more conforming and moralistic than usual. Typically, these individuals have a tendency to repress or deny problems and unfavorable traits. She is prone to minimize and disregard problems with herself. Self-insight and self-understanding are usually lacking. She is very concerned about how she is perceived by others and typically views emotional problems as weaknesses.

Ms. Andriano's performance on the Clinical Scales reveals an individual who has a very mild level of emotional distress that is characterized by a general dissatisfaction with life rather than by any specific mood. She is so unaware of this dissatisfaction that she can say that she is happy most of the time and very seldom has "spells" of the "blues". Yet she frequently worries about something. She will use indirect means of expressing her anger.

Ms. Andriano sees herself as quite capable and able to make decisions easily. Her memory and concentration skills are good. She does not analyze her or others feelings and behavior. She daydreams very little. She believes that it is safe to trust others and that they are willing to help. She is very direct and comfortable in stating her opinions to others.

Although she is concerned about her health, she does not report any specific symptoms other than dizzy spells. Individuals with similar scores report that they do not wake up fresh and rested most mornings. They typically have behavioral problems in school and are likely to have been in trouble with the law. Although she may abuse substances, she is unlikely to have suicidal ideation. Typically individuals with similar profiles have a very poor prognosis. This is due to their problems being more characterological and not readily amenable to change. She is experiencing minimal emotional distress and has little concern about her behavior, limiting her motivation for treatment.

Noteworthy, clients with this profile tend to be defensive, and unwilling to acknowledge psychological problems even when they are readily apparent to others. They report little psychological emotional distress and describe themselves as less depressed and anxious than do most psychiatric patients. Behavioral problems are more likely to occur in this code type than in any other code type that includes Scale 3. Further, clients of this profile are characterized by poorly controlled anger and hostility that it is expressed in cyclic fashion. Often these clients are eventually incarcerated for their violent acts.

A000000232

Andriano
Page 8

Typically, these clients are quiet, withdrawn individuals, and their sudden outbursts come as a surprise to others. They display poor judgment under stress, but their emotional or violent outbursts may be only minimally related to external stress or provocation. The cyclic pattern of violent outbursts with intermittent periods of appropriate behavior represents a chronic and stable personality disorder that is extremely difficult to change.

Ms. Andriano's performance on the Williamson Sentence Completion Test substantiates the findings noted above. Again we see an individual who has very little anxiety and who tends to be very superficial in her overall responses. This examiner finds this to be somewhat surprising considering what Ms. Andriano is being charged with and the fact that she is in jail. She tends to have very strict rules in which she expects herself and others to live up to. Further, she has a strong need to be needed and desperately wants to be seen in the eyes of others as being worthy. She has a rather naïve viewpoint of life such as she wants/desires a perfect existence. When she cannot get all her needs met she tends to feel guilty and has a tendency to externalize blame onto others for her own shortcomings. Her primary defense mechanism is denial.

**Summary:**
Wendy Andriano was raised in a very religious home environment in which there were very strict rules and regulations. She was well protected and was sent to private Christian schools from elementary to high school. After meeting her husband and working out their religious differences, they were married in 1994. Initially, Wendy hung out with her husband's friends and basically lost touch with her own. She claims that her husband was a very sexual person and although it was quite painful for her, she would always comply with his requests. In 1994, after several months of marriage, Joe Andriano found out that he had cancer and after an operation believed that it was all removed. However, the cancer came back in 1996. During this time period, Ms. Andriano reported that they had significant financial problems due to her husband not working. She stated "I felt responsible for our happiness. I was overwhelmed by debt". Consequently, to relieve some of that pressure she stole, over a period of four years, approximate $18,000 from her employer. She was fired from her job as a result of this.

According to witness statements, Ms. Andriano apparently became angry about her responsibility, believing that she did everything and that her husband was doing nothing. She took care of the kids, earned the money, took care of the house, cooked, cleaned, basically did everything. After a failed business attempt (windshield repair), Ms. Andriano seemed to become increasingly resentful and claims she decided to divorce her husband. Apparently her husband was able to talk her out of this. As her disappointment grew and as her husband became increasingly ill, Ms. Andriano seemed to look to other sources for enjoyment and support. She began going out with her friends, acting as if she were not married, and had an affair with Rick Freeman. Noteworthy, when Mr. Freeman found out that Ms. Andriano was married, he wanted to end the relationship. According to witness statements, Ms. Andriano became somewhat obsessed with Mr. Freeman and would call him incessantly, go to his door and go into his apartment at all hours of the night and bang on his door and at one point threatened to get a passkey and go into his apartment without permission. It is unclear from the documents but it seems as though Mr. Freeman was living free at the apartment complex, which Ms. Andriano was managing.

As her discontent and resentment increased, Ms. Andriano began to scheme such that she asked a couple of her friends to pose as her husband so as to take out a life insurance policy. It was noted that on the life insurance policy she indicated that her husband did not have cancer. Additionally, she began to research the poison and how to obtain it without her name being attached to it. She ordered the poison from the Internet through a fictitious name and had it sent to a separate business. Noteworthy, according to Ms. Andriano, her husband wanted her to get the poison because he wanted to commit suicide.

A000000233

Andriano
Page 9

Although Ms. Andriano claims that she was physically and psychologically abused by her husband, none of her friends ever witnessed any marks or evidence of the abuse. Her husband apparently was suspicious and somewhat upset about her staying out late and not coming home when she was supposed to. It was reported that he would throw things, yell and sort of go on a tirade about her inappropriate behavior but at no time did he become physically violent. The examiner notes that this is understandable considering Ms. Andriano's behavior and general response toward her husband. During this time period in which Ms. Andriano's husband was very suspicious of her behavior, she was, in fact, having an affair. As a matter of fact, she admits to having actually two affairs. This examiner finds this is quite interesting in light of the fact that Ms. Andriano reports that she did not enjoy sex and that it was quite painful.

In an interview with the police, Ms. Andriano reported that on the night of the offense she and her husband were engaged in a physical fight. She alleged that he had attempted to choke her with a telephone cord and had earlier pushed her into the dresser and onto her bed. He also pushed her into their wedding display case, shattering it, grabbed her in a bear hug and they both were wrestling around in the house. As her husband began to reach for a belt to hit her, she was able to wiggle away from him, grab the barstool and hit him on the back of his head. Apparently Joe was knocked unconscious and was severely injured. She gave him a pillow and blanket. She called Chris and told her Joe was having a heart attack. While she was waiting for Chris to come, she covered the blood on the carpet with a towel. Chris came over and told Wendy to call 911. Wendy told the 911 operator Joe was having a heart attack. The Fire Department came and Wendy sent them away. She also told Chris to go home. When she returned to the apartment and Joe was standing up. At this time he wrapped the charging cord from his cell phone around her neck and as they struggled and moved toward the kitchen she grabbed a knife and cut the cord from around her neck. She reported that the next thing she remembers was struggling with her husband in the living room. She still had the knife in her hand and the next thing she knew she had blood all over her. Noteworthy, after her husband was cut severely on the neck and appeared to be unconscious on the floor, she waited until he stopped making noises to call her father.

Previously, she calmly talked to the firemen that were there because of her 911 call and calmly told them that she did not need their help. During this time her husband was on the floor bleeding from his injuries. It was also noted that based on Chris's report, it appeared that Wendy had taken a shower and changed when she went out to meet the firemen. Based on the amount of blood noted and the physical condition of her husband, it is unreasonable to believe that Ms. Andriano did not know that her husband was severely injured and in need of help. It is also noteworthy that the firemen and her friend Chris did not report that Wendy appeared to have been attacked or injured in any way.

Further this examiner could not find any evidence to support Wendy Andriano's claim the she was a victim of domestic violence.

Diagnosis:
Axis I:      Depressive disorder NOS.
Axis II:     Personality disorder NOS with antisocial and borderline traits.
Axis III:    None.
Axis IV:     Marital conflict, financial problems.
Axis V:      GAF = 65.


---
Michael B. Bayless, Ph.D.
Clinical and Forensic Psychologist

A000000234



FILED
11/17/04   4:05 PM
MICHAEL K. JEANES, Clerk
By  M. LESUEUR
         Deputy

# IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

## IN AND FOR THE COUNTY OF MARICOPA

| | |
|---|---|
| STATE OF ARIZONA, | ) |
| | ) |
| Plaintiff, | ) |
| | )    CR 2000-096032 |
| | ) |
| vs. | ) |
| | )    FINAL INSTRUCTIONS |
| WENDI ELIZABETH ANDRIANO, | ) |
| | )    PHASE I |
| Defendant. | ) |
| | ) |
| | ) |
| | ) |
| | ) |

0364
A000000235

## INDEX FOR FINAL INSTRUCTIONS

PAGE

DUTY OF JURY ............................................................... 3

LAWYERS' COMMENTS ARE NOT EVIDENCE............................ 4

OBJECTIONS AND STRICKEN TESTIMONY................................4

PRESUMPTION OF INNOCENCE/BURDEN OF PROOF ...................5

VOLUNTARINESS OF DEFENDANT'S STATEMENTS ...................6

JURY NOT TO CONSIDER PENALTY ......................................6

A CHARGE IS NOT EVIDENCE...............................................7

DIRECT AND CIRCUMSTANTIAL EVIDENCE ............................7

INTENT INFERENCE...........................................................7

CREDIBILITY OF WITNESSES ...............................................8

THE DEFENDANT'S TESTIMONY ...........................................8

EXPERT TESTIMONY .........................................................8

TESTIMONY OF LAW ENFORCEMENT OFFICERS .......................9

CHARACTER AND REPUTATION OF DEFENDANT.......................9

FIRST DEGREE MURDER ...................................................10

JUSTIFICATION FOR SELF-DEFENSE.....................................11

DANGEROUS OFFENSE......................................................16

DELIBERATION SCHEDULE AND BREAKS ...............................17

REVIEW OF INSTRUCTIONS ................................................17

QUESTIONS AND MESSAGES ...............................................18

VERDICT .......................................................................19

2

A000000236

## DUTY OF JURY

It is your duty as a juror to decide this case by applying these jury instructions to the facts as you determine them. You must follow these jury instructions. They are the rules you should use to decide this case.

It is your duty to determine what the facts are in the case by determining what actually happened. Determine the facts only from the evidence produced in court. When I say "evidence," I mean the testimony of witnesses, any exhibits received in evidence, and any facts to which the parties stipulated or that I instructed you to accept. You must not speculate or guess about any fact. You must not consult outside sources for information, such as a dictionary, a newspaper, or the Internet. You must not be influenced by sympathy or prejudice. You must not be concerned with any opinion you feel I may have about the facts. You, as jurors, are the sole judges of what happened.

You must consider all these instructions. Do not pick out one instruction or part of one and ignore the others. As you determine the facts, however, you may find some instructions no longer apply. You must then consider the instructions that do apply, together with the facts as you have determined them.

A000000237

## LAWYERS' COMMENTS ARE NOT EVIDENCE

In their opening statements and closing arguments, the lawyers have talked to you about the law and the evidence. What the lawyers said is not evidence, but it may help you to understand the law and the evidence.

## OBJECTIONS AND STRICKEN TESTIMONY

If the Court sustained an objection to a lawyer's question, you must disregard it and any answer given. Any testimony stricken from the court record must not be considered by you for any purpose.

4

A000000238

## PRESUMPTION OF INNOCENCE/BURDEN OF PROOF

The charge against the defendant is not evidence against her. You must not think the defendant is guilty just because she has been accused of a crime. The defendant has pled "not guilty."

The law does not require a defendant to prove innocence. Every defendant is presumed by law to be innocent. You must start with the presumption that the defendant is innocent. The State has the burden of proving the defendant guilty beyond a reasonable doubt. This means the State must prove each element of the charge beyond a reasonable doubt.

In civil cases, it is only necessary to prove that a fact is more likely true than not or that its truth is highly probable. In criminal cases such as this, the state's proof must be more powerful than that. It must be beyond a reasonable doubt.

Proof beyond a reasonable doubt is proof that leaves you firmly convinced of the defendant's guilt. There are very few things in this world that we know with absolute certainty, and in criminal cases the law does not require proof that overcomes every doubt. If, based on your consideration of the evidence, you are firmly convinced that the defendant is guilty of the crime charged, you must find the defendant guilty. If, on the other hand, you think there is a real possibility that the defendant is not guilty, you must give the defendant the benefit of the doubt and find the defendant not guilty.

5

A000000239

## VOLUNTARINESS OF DEFENDANT'S STATEMENTS

You must not consider any statements made by the defendant to a law enforcement officer unless you determine beyond a reasonable doubt that the defendant made the statements voluntarily.

A defendant's statement was not voluntary if it resulted from the defendant's will being overcome by a law enforcement officer's use of any sort of violence, coercion, or threats or by any direct or implied promise, however slight.

You must give such weight to the defendant's statement as you feel it deserves under all the circumstances.

## JURY NOT TO CONSIDER PENALTY

You must decide whether the defendant is guilty or not guilty by determining what the facts in the case are and applying these jury instructions. You are not to consider the possible punishment.

A000000240

## A CHARGE IS NOT EVIDENCE

The State has charged the defendant with a crime. A charge is not evidence against the defendant. You must not think the defendant is guilty just because of a charge. The defendant has pled "not guilty." This plea of "not guilty" means that the State must prove each element of the charge beyond a reasonable doubt.

## DIRECT AND CIRCUMSTANTIAL EVIDENCE

Evidence may be direct or circumstantial. Direct evidence is the testimony of a witness who saw, heard, or otherwise observed an event. Circumstantial evidence is the proof of a fact or facts from which you may find another fact. The law makes no distinction between direct and circumstantial evidence. It is for you to determine the importance to be given to the evidence, regardless of whether it is direct or circumstantial.

## INTENT INFERENCE

Intent may be inferred from all the facts and circumstances disclosed by the evidence. It need not be established exclusively by direct sensory proof. The existence of intent is one of the questions of fact for your determination.

7

A000000241

## CREDIBILITY OF WITNESSES

In determining the evidence, you must decide whether or not to believe the witnesses and their testimony. As you do this, you should consider the testimony in light of all the other evidence in the case. This means you may consider such things as the witnesses' ability and opportunity to observe, their manner and memory while testifying, any motive or prejudice they might have, and any inconsistent statements they may have made.

## THE DEFENDANT'S TESTIMONY

You must evaluate the defendant's testimony the same as any witness testimony.

## EXPERT TESTIMONY

A witness may give an opinion on a subject upon which the witness has become an expert because of education, study, or experience. You should consider the opinion of an expert and the reasons, if any, given for it. However, you are not bound by any expert opinion. Give the expert opinion the importance that you believe it deserves.

8

A000000242

## TESTIMONY OF LAW ENFORCEMENT OFFICERS

The testimony of a law enforcement officer is not entitled to any greater or lesser importance or believability merely because of the fact that the witness is a law enforcement officer.  You are to consider the testimony of a police officer just as you would the testimony of any other witness.

## CHARACTER AND REPUTATION OF THE DEFENDANT

You have heard evidence of the defendant's character for peacefulness.  In deciding this case, you should consider that evidence together with, and in the same manner as, all the other evidence in the case.

9

A000000243

## FIRST DEGREE MURDER

The crime of First Degree Murder requires proof of the following three things:

1.    The defendant caused the death of another person; and

2.    The defendant intended or knew that she would cause the death of another person; and

3.    The defendant acted with premeditation.

"Person" means a human being.

"Intended" means that a defendant's objective is to cause that result or to engage in that conduct.

"Knew" means that a defendant acted with awareness of or belief in the existence of conduct or circumstances constituting an offense. It does not mean that a defendant must have known the conduct is forbidden by law.

"Premeditation" means that a defendant intended to kill another human being or knew she would kill another human being, and that after forming that intent or knowledge, reflected on the decision before killing. It is this reflection, regardless of the length of time in which it occurs, that distinguishes first degree murder from second degree murder. An act is not done with premeditation if it is the instant effect of a sudden quarrel or heat of passion.

A000000244

## JUSTIFICATION FOR SELF-DEFENSE

A defendant is justified in using or threatening physical force in self-defense if the following two conditions existed:

1.    A reasonable person in the defendant's situation would have believed that physical force was immediately necessary to protect against another's use or attempted use of unlawful physical force; and

2.    The defendant used or threatened no more physical force than would have appeared necessary to a reasonable person in the defendant's position.

The threat or use of physical force against another is not justified in response to verbal provocation alone.

A defendant may use deadly physical force in self-defense only to protect against another's use or apparent attempted or threatened use of deadly physical force.

A person is justified in threatening or using deadly physical force against another:

1.    If such person would be justified in threatening or using physical force against the other as described above; and

11

A000000245

2.    When, and to the degree, a reasonable person would believe that deadly physical force is immediately necessary to protect against the other's use or attempted use of unlawful deadly physical force.

Self-defense justifies the use or threat of physical force or deadly physical force only while the apparent danger continues, and ends when the apparent danger ends. The force used may not be greater than reasonably necessary to defend against the apparent danger.

The use of physical force or deadly physical force is justified if a reasonable person in the situation would have reasonably believed that immediate physical danger appeared to be present. Actual danger is not necessary to justify the use of physical force or deadly physical force in self-defense.

You must decide whether a reasonable person in a similar situation would believe that physical force or deadly physical force was immediately necessary to protect against another's use of unlawful physical force. That the defendant's belief was honest is immaterial. You must measure the defendant's belief against what a reasonable person in the situation would have believed.

12

A000000246

If you find that there have been past acts of domestic violence, as defined below, against the defendant by the other person, the state of mind of a reasonable person, for the purposes of the above instruction on self-defense/justification,  shall be determined from the perspective of a reasonable person who has been a victim of those past acts of domestic violence.

The defendant has the burden of proving any self-defense/justification defense by a preponderance of the evidence, which is a lesser burden than proof beyond a reasonable doubt.  As stated earlier, the State always has the burden of proving the crime charged beyond a reasonable doubt, and this burden never shifts during the trial.

Proof by "a preponderance of the evidence" means that a fact is more probably true than not.

If you find the defendant has proved a self-defense/justification defense by a preponderance of the evidence, then you must find the defendant not guilty of the crime charged.

"Physical force" means force used upon or directed toward the body of another person and includes confinement, but does not include deadly physical force.

"Deadly physical force" means force which is used with the purpose of causing death or serious physical injury or in the manner of its use or intended use is capable of creating a substantial risk of causing death or serious physical injury.

13

A000000247

"Serious physical injury" includes physical injury which creates a reasonable risk of death, or which causes serious and permanent disfigurement, serious impairment of health or loss or protracted impairment of the function of any bodily organ or limb.

"Domestic violence" includes the acts of endangerment, threatening or intimidating, assault, aggravated assault, and disorderly conduct between husband and wife.

"Endangerment" is defined as: A person commits endangerment by recklessly endangering another person with a substantial risk of imminent death or physical injury.  To be endangerment, a person must disregard a substantial risk that his conduct would cause imminent death or physical injury to the victim and his conduct must, in fact, create such a substantial risk of either imminent death or physical injury to the victim.

"Threatening or intimidating" is defined as:  A person commits threatening or intimidating if such person threatens or intimidates by word or conduct to cause physical injury to another person or serious damage to the property of another.

"Assault" is defined as intentionally, knowingly, or recklessly causing any physical injury to another person; or intentionally placing another person in reasonable apprehension of imminent physical injury; or knowingly touching another person with the intent to injure, insult or provoke such person.

14

A000000248

"Aggravated assault" is defined as:  A person commits aggravated assault if the person commits assault under any of the following circumstances:  The person causes serious physical injury to another, or the person uses a deadly weapon or dangerous instrument, or the person commits assault by any means of force which causes temporary but substantial disfigurement, temporary but substantial loss or impairment of any body organ or part, or a fracture of any body part.

"Disorderly conduct" is defined as:  A person commits disorderly conduct if, with the intent to disturb the peace or quiet of a neighborhood, family or person, or with knowledge of doing so, such person engages in fighting, violent or seriously disruptive behavior; or makes unreasonable noise; or uses abusive or offensive language or gestures in a manner likely to provoke immediate physical retaliation by such person; or recklessly handles, displays or discharges a deadly weapon or dangerous instrument.

000003665

A000000249

## DANGEROUS OFFENSE

If you find the defendant guilty of First Degree Murder, you must determine whether or not the offense was a dangerous offense.

An offense is a dangerous offense if it involves the discharge, use, or threatening exhibition of a deadly weapon or dangerous instrument, and/or the intentional, or knowing infliction of serious physical injury.

"Deadly weapon" means anything designed for lethal use.

"Dangerous instrument" means anything that under the circumstances in which it is used, attempted to be used or threatened to be used is readily capable of causing death or serious physical injury.

"Serious physical injury" includes physical injury which creates a reasonable risk of death, or which causes serious and permanent disfigurement, serious impairment of health or loss or protracted impairment of the function of any bodily organ or limb.

"Physical injury" means the impairment of physical condition.

16

A000000250

## DELIBERATION SCHEDULE AND BREAKS

After you have selected a foreperson, you should next discuss and then set your deliberation schedule. You may agree to deliberate Monday through Friday, in the morning and afternoon, or only half days. You are in charge of your schedule, and may set and vary it by agreement and with the approval of the Court.

After you have decided on a schedule, please send it to me by a note through the bailiff for my review and approval.

You are to discuss the case and deliberate only when all jurors are together in the jury room. You are not to discuss the case with each other or anyone else during breaks or recesses.

The admonition I have given you during the trial remains in effect when you are not deliberating.

## REVIEW OF INSTRUCTIONS

After setting your schedule, I suggest that you next review the written jury instructions and verdict form. It may be helpful for you to discuss the instructions and form to make sure that you understand them. Again, during your deliberations you must follow the instructions and refer to them to answer any questions about applicable law, procedure and definitions.

17

A000000251

## QUESTIONS AND MESSAGES

Should any of you, or the jury as a whole, have a question for the Court during your deliberations or wish to communicate with me on any other matter, please utilize the jury question form that we will provide you.  Your question or message must be communicated to the Court in writing and must be signed by you or the foreperson.

The Court will consider your question or note and, if necessary, consult with counsel before answering it in writing.  The Court will answer it as quickly as possible.

No member of the jury should ever attempt to communicate with me except by a signed writing, and I will communicate with you on anything concerning the case only in writing, or orally on the record.

Remember that you are not to tell anyone, including me, how you stand, numerically or otherwise, until after you have reached a verdict or have been discharged.

A000000252

## VERDICT

The case is now submitted to you for decision.  When you go to the jury room you will choose a foreperson.  He or she will preside over your deliberations and sign any verdict.

To return a verdict of guilty or not guilty, your verdict must be unanimous.

You will be given 1 form of verdict.  It will read as follows:

A000000253



FILED
11/18/04   3:48 PM
MICHAEL K. JEANES, Clerk
By   M. LESGEUR
Deputy

## IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

## IN AND FOR THE COUNTY OF MARICOPA

STATE OF ARIZONA

No.  CR2000-096032

v.

VERDICT

WENDI ELIZABETH ANDRIANO

We, the Jury, duly empanelled and sworn in the above-entitled action, upon our oaths, do find the Defendant, Wendi Elizabeth Andriano, as to FIRST DEGREE MURDER:

_____ NOT GUILTY

___✓___ GUILTY

If Guilty, we the Jury, do further find that the Defendant, Wendi Elizabeth Andriano:

_____ DID NOT COMMIT A DANGEROUS OFFENSE

___✓___ DID COMMIT A DANGEROUS OFFENSE

Foreperson:

_Barbara Bauer_
(Signature)

BARBARA BAUER
(Printed Name)

0368

DANIEL B. PATTERSON
Deputy Public Defender
11 West Jefferson, Suite 5
Phoenix, AZ  85003
(602) 506-6463
FAX:  (602) 506-5001
Bar No. 005743
Attorney for Defendant

MICHAEL K. JEANES, CLERK
BY
FILED

2004 NOV 19  PM 3: 57

IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

IN AND FOR THE COUNTY OF MARICOPA

|  |  |  |
|---|---|---|
| STATE OF ARIZONA, | ) | No. CR 2000-096032 |
| Plaintiff, | ) ) ) | |
| vs. | ) ) | **MOTION FOR COURT ORDER TO ASSIST MITIGATION INVESTIGATION AND PROPOSED ORDER** |
| WENDI ELIZABETH ANDRIANO, | ) ) | |
| Defendant. | ) ) ) ) | (Assigned to the Honorable Brian K. Ishikawa) |

Defendant Wendi Elizabeth Andriano, by and through undersigned counsel, moves the

court for an order directing state and local agencies and entities to provide records regarding

Ms. Andriano and her family to the defense.  If any state or local agency or entity possesses

any records relating to Ms. Andriano or her family, the defense needs to obtain them to

conduct an independent and thorough mitigation investigation in this capital case.

1

A000000285
0770

This motion is supported by the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution and Article 2, §§ 4, 15 and 24 of the Arizona Constitution. This motion is further supported by the attached Memorandum of Points and Authorities.

RESPECTFULLY SUBMITTED this _19th_ day of November, 2004.

Maricopa County Public Defender

By _____

DANIEL B. PATTERSON
Deputy Public Defender

2

A000000256

## MEMORANDUM OF POINTS AND AUTHORITIES

Pursuant to her rights under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution and Article 2, §§ 4, 15, and 24 of the Arizona Constitution, Ms. Andriano is entitled to have her defense attorneys conduct an independent and thorough investigation of potential mitigating information to be used at the sentencing proceeding. In order to conduct an independent and thorough investigation, the defense must obtain all records documenting Ms. Andriano's life. This motion seeks the assistance of the court in obtaining such records in the possession of any state or local public agency in the State of Arizona.

A capital defendant has an unqualified right to present any facet of her character, background, or record that might call for a sentence less than death. *See Eddings v. Oklahoma*, 455 U.S. 104, 116 (1982); *Lockett v. Ohio*, 438 U.S. 586, 602-03 (1978) (plurality opinion). The investigation into the existence of any mitigating circumstances must be conducted in accordance with the recently revised guidelines for defense counsel in capital cases. *See* ABA GUIDELINES FOR THE APPOINTMENT AND PERFORMANCE OF DEFENSE COUNSEL IN DEATH PENALTY CASES (revised 2003) [hereinafter "ABA GUIDELINES"]. The Guidelines "are not aspirational, . . . [but rather] embody the current consensus about what is required to provide effective defense representation in capital cases." *History of* ABA GUIDELINE 1.1. The United States Supreme Court has affirmed that the Guidelines are the established standards for capital defense counsel. *Wiggins v. Smith*, _____ U.S. _____,

3

A000000257

123 S.Ct. 2527, 2537 (2003) (The ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases are "well-defined norms."). *See also* Ariz.R.Crim.P. 6.8(b)(1)(iii).

Defense counsel must conduct "thorough and independent" investigations relating to issues of both guilt and penalty. ABA GUIDELINE 10.7. Penalty phase preparation requires an extensive and unparalleled investigation into the personal and family history of the accused. *Commentary to* ABA GUIDELINE 10.7. Mitigation investigations must include "efforts to discover *all reasonably available* mitigating evidence and evidence to rebut aggravating evidence that may be introduced by the prosecutor. *Wiggins*, 123 S.Ct. at 2537 (emphasis in original). This is because the sentencer in a capital case may not refuse to consider or be precluded from considering any relevant mitigating evidence. *Hitchcock v. Dugger*, 481 U.S. 393, 394 (1987). *See also Eddings v. Oklahoma*, 455 U.S. 104, 113-14 (1982); *Lockett v. Ohio*, 438 U.S. 586, 604-05 (1978).

A significant step in the mitigation investigation is the creation of a social history, which is used to identify events and circumstances of a capital defendant's life. A social history is required "to construct a persuasive narrative, rather than to simply present a catalog of seemingly unrelated mitigating factors." Commentary to ABA GUIDELINE 10.11. Construction of the narrative "normally requires evidence that sets forth and explains the client's complete social history from before conception to the present." *Id.*

4

A000000258

Any records relating to Ms. Andriano or her family that may be in the possession of state or local agencies are necessary to build his social history.  The defense must obtain these records in order to conduct the required independent and thorough investigation into Ms. Andriano's background.  The proposed Order will assist the defense in obtaining these records without the need to subpoena each individual agency to produce the records.

The proposed Order will also help to keep Ms. Andriano's privileged records from the prosecution and law enforcement until and unless disclosure of the records is required by Rule 15.2 of the Arizona Rules of Criminal Procedure.  Just as the prosecution is entitled to conduct its investigation independently from the defense, so, too, Ms. Andriano's defense team is entitled to collect her records without fear that they will be disclosed to the prosecution regardless of their privileged nature.  If the records will be used at any phase of the trial, their disclosure to the prosecution should be the decision of defense counsel, rather than that of an employee of a public agency in possession of the records.

For the foregoing reasons, Ms. Andriano asks the court to sign the proposed Order.

RESPECTFULLY SUBMITTED this _____ day of November, 2004.

Maricopa County Public Defender

By _____
DANIEL B. PATTERSON
Deputy Public Defender

5

000003675

A000000259

Copy of the foregoing mailed/
delivered this _____ day of November, 2004, to:

THE HONORABLE BRIAN K. ISHIKAWA
Judge of the Superior Court
Southeast Court Building, 3rd Floor
222 East Javelina
Mesa, Arizona  85210

JUAN MARTINEZ
Deputy County Attorney
Maricopa County Attorney's Office
301 W. Jefferson, 8th Floor
Phoenix, AZ  85003

G. DAVID DELOZIER
Attorney At Law
4016 East Forest Pleasant Place
Cave Creek, AZ  85331

By: _____
     DANIEL B. PATTERSON
     Deputy Public Defender

6

000003676

A000000260

DANIEL B. PATTERSON
Deputy Public Defender
11 West Jefferson, Suite 5
Phoenix, AZ   85003
(602) 506-6463
FAX:  (602) 506-5001
Bar No. 005743
Attorney for Defendant

## IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

## IN AND FOR THE COUNTY OF MARICOPA

| | | |
|---|---|---|
| STATE OF ARIZONA, | ) | No. CR 2000-096032 |
| | ) | |
| Plaintiff, | ) | |
| | ) | **ORDER** |
| vs. | ) | |
| | ) | |
| WENDI ELIZABETH ANDRIANO, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

Upon request of the defendant, Wendi Elizabeth Andriano, and good cause having been shown that records relating to the defendant and/or her family members are needed to conduct a thorough mitigation investigation, as required by *Wiggins v. Smith*, 539 U.S. 510 (2003), in this capital case:

IT IS ORDERED that the agencies and entities listed below, upon request of the defendant, shall release, in totality and without any redactions, any and all records regarding the above-listed defendant and all members of her family named in the request to the defendant's attorneys or to any other authorized representative of the defendant:

A000000261

- Arizona State Department of Transportation, including, but not limited to, records of the Motor Vehicle Division;

- Arizona State Health Services Department, including, but not limited to, records of Vital Statistics, Behavioral Health Services, Arizona State Hospital, Public Health Services, and Community and Family Health Services;

- Arizona State Board of Executive Clemency;

- Arizona State Department of Public Safety;

- Arizona State Department of Economic Security, including, but not limited to, records of Adult Protective Services, Child Assistance, Child Support, Child Protective Services, Developmental Disabilities, Family Assistance, and Rehabilitation Services;

- Arizona State Department of Corrections, including, but not limited to, medical records, mental health records, visitation records, central office file, institutional file(s), parole records, treatment records, work records, disciplinary records, classification records, and housing records for all periods of incarceration;

- Arizona Health Care Cost Containment System;

- Arizona State Department of Juvenile Corrections, including, but not limited to, medical records, mental health records, central office file, visitation records, institutional file(s), parole records, treatment records, work records, disciplinary records, educational records, classification records, housing records;

- Arizona State Veterans' Service Commission;

A000000262

- All state and law enforcement agencies, including, but not limited to, any and all police reports generated on the defendant and members of her family, whether victim, witness, or suspect;

- All Arizona Adult Probation Departments, including, but not limited to, all pre-sentence reports, working notes, field files, program notes, evaluations, mental health reports, and sex offender notes;

- All state and local jails, including, but not limited to, all classification reports, disciplinary reports, housing assignments, visitation records, booking information and documents, mental health records, and medical records;

- All Arizona Juvenile Probation Departments, including, but not limited to, all pre-sentence reports, all working notes, all field notes, all program notes, all evaluations, all mental health records, all medical records, and all sex offender records;

- All Arizona Medical Examiner Offices, including, but not limited to, all records and files on deaths of all family members and the victim in this case;

- Maricopa County Medical Center, including, but not limited to, all medical and mental health records;

- Maricopa County Correctional Health Services;

- All state and local Housing Departments;

- All state and local school districts.

IT IS FURTHER ORDERED, pursuant to A.R.S. § 39-121.01(D)(2), that if any records in the possession of an entity served with this order are withheld and not provided to the defendant or her representative, that the entity shall provide an index of the records or categories of records withheld, and the reason(s) such records or categories are being withheld.

IT IS FURTHER ORDERED that any entity served with this order shall not inform the prosecution or any other law enforcement agency that the defendant has made a request for records or that the entity has or had records relating to the defendant or family members or that the entity has provided records relating to the defendant or family members to the defendant or her representative.

IT IS FURTHER ORDERED that if any records and/or an index of records or categories of records withheld are provided to the defendant or her representative pursuant to this order the entity providing such records shall not provide copies of the records or an index of records or categories of records withheld to the prosecution or any other law enforcement agency.

DONE IN OPEN COURT this _____ day of November, 2004.


_____
JUDGE OF THE SUPERIOR COURT

A000000264





2004 NOV 22  PM 4:50

RICHARD M. ROMLEY
MARICOPA COUNTY ATTORNEY

Juan M. Martinez & Patricia A. Nigro
Deputy County Attorneys
State Bar Nos. 009510 & 014576
State Bar Firm No. 0032000
301 West Jefferson Street, Suite 210
Phoenix, AZ 85003-2143
Telephone: (602) 506-7422
FAX: (602) 506-7530

Attorneys for Plaintiff

## IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

## IN AND FOR THE COUNTY OF MARICOPA

---

| | |
|---|---|
| STATE OF ARIZONA, | No. CR 2000-096032 |
| Plaintiff, | **RESPONSE TO DEFENDANT'S MOTION FOR COURT ORDER TO ASSIST MITIGATION INVESTIGATION AND PROPOSED ORDER** |
| v. | |
| WENDI ELIZABETH ANDRIANO, | (Assigned to the Honorable Brian K. Ishikawa) |
| Defendant. | |

The State of Arizona hereby responds to Defendant's Motion for Court Order to

Assist Mitigation Investigation and Proposed Order.

SUBMITTED this 22$^{nd}$ day of November, 2004.

RICHARD M. ROMLEY
MARICOPA COUNTY ATTORNEY

By _____
Patricia A. Nigro
Deputy County Attorney

0371
A000000265

## MEMORANDUM OF POINTS AND AUTHORITIES

The State agrees with Defendant that she is entitled to have her attorneys conduct an independent and thorough investigation of potentially mitigating evidence. And the State recognizes that in general, it has no standing to object to any Court order requiring various agencies or entities to provide records to Defendant.

The State has two concerns with Defendant's proposed order, however. First, Defendant requests unredacted records from the Department of Corrections. The State is aware that the Department of Corrections has objected to such requests in the past. The State asks this Court to allow the Department to assert its position with respect to its records.[1] The State also requests that any Court order regarding records from the Department of Corrections include language allowing for redaction of those records "in accordance with the law to protect the security of the institution and the safety of inmates and staff."

Second, Defendant requests orders prohibiting agencies from informing the State that the agency "has or had records relating to the defendant or family members," and prohibiting the agencies from providing records to the State. (Proposed Order at 4). The State is entitled to any records that are not protected by some valid privilege. This Court should not order agencies to withhold Defendant's records absent such a privilege, which may certainly be asserted by the agency when applicable. As Defendant recognizes, the State is entitled to conduct an independent investigation in

---

[1] This may be unnecessary if Defendant does not in fact require Department of Corrections' records.

2

A000000266

preparation for the penalty phase of trial. Defendant should not be permitted to interfere with that investigation by obtaining a Court order prohibiting agencies from responding to requests from the State for records that the State is entitled to gather.

Finally, the State reserves its right to object to the late disclosure of any records obtained, and to seek preclusion pursuant to Rule 15.7, Ariz.R.Crim.P., if appropriate. While Defendant is certainly entitled to obtain records to assist with her mitigation investigation, any such records which contain new information at this stage of the proceedings may be subject to preclusion due to late disclosure to the State.

## CONCLUSION

Defendant is entitled to conduct an independent mitigation investigation. She is not entitled to hamper the State's investigation absent some valid privilege, however. Thus, any order entered by this Court should not include language that would have the effect of preventing the State from conducting its own investigation.

SUBMITTED this 22nd day of November, 2004.

RICHARD M. ROMLEY
MARICOPA COUNTY ATTORNEY


By _____
Patricia A. Nigro
Deputy County Attorney

3

A000000267

Copy of the foregoing
mailed\delivered this
22nd day of November, 2004 to:

The Honorable Brian K. Ishikawa
Judge of the Superior Court

Daniel B. Patterson
Deputy Public Defender
11 West Jefferson, Suite 5
Phoenix, Arizona 85003

G. David Delozier
Attorney at Law
4016 East Forest Pleasant Place
Cave Creek, Arizona, 85331

Attorneys for Defendant

Michael Brodsky
Assistant Attorney General
1275 West Washington
Phoenix, Arizona  85007
Attorney for Department of Corrections

BY _____
Patricia A. Nigro
Deputy County Attorney

4

A000000268



FILED
11/30/04 1:14 Pm
MICHAEL K. JEANES, Clerk
By M. LESUEUR
Deputy

IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

IN AND FOR THE COUNTY OF MARICOPA

STATE OF ARIZONA, )
)
Plaintiff, )
) CR 2000-096032
)
vs. )
) PRELIMINARY INSTRUCTIONS
WENDI ELIZABETH ANDRIANO, ) PHASE 2
Defendant. )
)
)
)
)

A000000269

INDEX FOR PRELIMINARY INSTRUCTIONS

PAGE

A.   INTRODUCTION ................................................ 3

B.   ORDER OF THIS PHASE ...................................... 3

C.   EVIDENCE TO CONSIDER ................................... 4

D.   ALLEGED AGGRAVATING FACTORS ........................... 4

000003686                                      A000000270

A.    <u>INTRODUCTION</u>

If you remember during the jury selection in this case, both in the questionnaire and during the oral questioning by court and counsel, you were given a description of the procedure to be used if the jury finds the defendant guilty of First Degree Murder.  In light of your verdict of guilty of First Degree Murder, we are about to begin the next phase of the trial.

The State has alleged the existence of certain aggravating factors.  It is during this phase that the State will attempt to prove the alleged aggravating factors.

Those directions in the preliminary instructions for the first phase of the trial regarding the following topics remain in full force and effect:  "Preliminary Instructions Concerning Juror Conduct", "Bench Conferences", and "Preliminary Instructions Concerning the Law".

B.    <u>ORDER OF THIS PHASE</u>

This phase generally proceeds in the following order:

First, the prosecutor will make an opening statement.  The defense attorney may make an opening statement after the prosecutor, or it may be postponed until after the State's case.  What is said in opening statements is not evidence.

Second, the State may present additional evidence or the State may rest on the evidence already adduced at the Guilty/Not Guilty Phase.  After the State finishes, the defendant may present evidence.  The defendant is not required to present

3

A000000271

evidence. If the defendant does present evidence, the State may present rebuttal evidence.

Third, the attorneys will make closing arguments to tell you what they think the evidence shows and how they think you should decide this phase of the trial. Just as in any opening statement, what is said in closing argument is not evidence.

Fourth, I will read the final instructions regarding this phase and explain to you the form of verdict.

Fifth, you will deliberate and decide upon a verdict. Once you agree upon the verdict, it will be read in court with you and the parties present.

## C.    EVIDENCE TO CONSIDER

In making your decision regarding this phase of the trial, you are to consider the evidence presented in both the Guilty/Not Guilty Phase and this phase of the trial.

## D.    ALLEGED AGGRAVATING FACTORS

The State has alleged the following aggravating factors:

1.    The defendant committed the offense in consideration for the receipt, or in expectation of the receipt, of anything of pecuniary value.

2.    The defendant committed the offense in an especially heinous, cruel or depraved manner.

4

A000000272

The question to be presented to you at the end of this phase of the trial will be whether the State has proved the alleged aggravating factors. The State has the burden of proving the alleged aggravating factors beyond a reasonable doubt.

Any verdict you return in this phase of the trial must be unanimous. You may find that the State has proved all, some or none of the aggravating factors.

000003689

A000000273



SUPERIOR COURT OF ARIZO
FOR MARICOPA COUNTY

FILED

11/30/04  2:47 PM
MICHAEL K. JEANES
CLERK
BY  M. LESUEUR
DEPUTY

CASE NUMBER CR 2000-096032

STATE OF ARIZONA V. WENDI ELIZABETH ANDRIANO

*especially heinous*
*or cruel*

JURY QUESTION

Would you consider Joe's injuries to be
~~excessive~~ in light of your experiance
as medical examiner?

0381

A000000274



FILED
12/1/04   4:06 PM
MICHAEL K. JEANES, Clerk
Sr   M. LESUEUR
Deputy

IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

IN AND FOR THE COUNTY OF MARICOPA

| | |
|---|---|
| STATE OF ARIZONA, )<br><br>Plaintiff, )<br><br>vs. )<br><br>WENDI ELIZABETH ANDRIANO, )<br><br>Defendant. ) | CR 2000-096032<br><br>FINAL INSTRUCTIONS<br><br>PHASE 2 |

0383

A000000275

## INDEX FOR FINAL INSTRUCTIONS

PAGE

DUTY OF JURY ................................................................ 3

LAWYERS' COMMENTS ARE NOT EVIDENCE.............................. 4

OBJECTIONS AND STRICKEN TESTIMONY.................................4

PRESUMPTION OF INNOCENCE/BURDEN OF PROOF ....................5

JURY NOT TO CONSIDER PENALTY ..........................................6

DIRECT AND CIRCUMSTANTIAL EVIDENCE ...............................7

CREDIBILITY OF WITNESSES ................................................. 7

EXPERT TESTIMONY ..........................................................8

TESTIMONY OF LAW ENFORCEMENT OFFICERS..........................8

ALLEGATION OF AGGRAVATING FACTORS.................................8

PECUNIARY GAIN.............................................................9

ESPECIALLY HEINOUS, CRUEL OR DEPRAVED MANNER...............10

DELIBERATION SCHEDULE AND BREAKS .................................12

REVIEW OF INSTRUCTIONS .................................................13

QUESTIONS AND MESSAGES .................................................13

VERDICT .......................................................................14

000003692

A000000276

## DUTY OF JURY

As you have been previously instructed, in the guilt phase of this trial the defendant was found guilty of First Degree Murder. In this aggravation phase you are not to retry the issue of the defendant's guilt. Your sole duty is to determine whether the State has proved beyond a reasonable doubt that the First Degree Murder of which the defendant has been convicted was committed with the existence of one or more aggravating factors alleged.

It is your duty as a juror to decide this case by applying these jury instructions to the facts as you determine them. You must follow these jury instructions. They are the rules you should use to decide this case.

It is your duty to determine what the facts are in the case by determining what actually happened. Determine the facts only from the evidence produced in court. When I say "evidence," I mean the testimony of witnesses, any exhibits received in evidence, and any facts to which the parties stipulated or that I instructed you to accept. You must not speculate or guess about any fact. You must not consult outside sources for information, such as a dictionary, a newspaper, or the Internet. You must not be influenced by sympathy or prejudice. You must not be concerned with any opinion you feel I may have about the facts. You, as jurors, are the sole judges of what happened.

3

A000000277

You must consider all these instructions. Do not pick out one instruction or part of one and ignore the others. As you determine the facts, however, you may find some instructions no longer apply. You must then consider the instructions that do apply, together with the facts as you have determined them.

## LAWYERS' COMMENTS ARE NOT EVIDENCE

In their opening statements and closing arguments, the lawyers have talked to you about the law and the evidence. What the lawyers said is not evidence, but it may help you to understand the law and the evidence.

## OBJECTIONS AND STRICKEN TESTIMONY

If the Court sustained an objection to a lawyer's question, you must disregard it and any answer given. Any testimony stricken from the court record must not be considered by you for any purpose.

4

A000000278

## PRESUMPTION OF INNOCENCE/BURDEN OF PROOF

The mere allegation of aggravating factors against the defendant and the fact that the State is seeking the death penalty is not evidence against her.  You must not think the allegations are true just because they have been made.

The defendant  is presumed not to be eligible for a death sentence under the law.  The presumption remains with her throughout every stage of the aggravation phase and during your deliberations on the verdict;  it is not overcome and the defendant is not eligible for a death sentence unless from all the evidence you unanimously find beyond a reasonable doubt that one or more of the alleged aggravating factors has been proved.  The State has the burden of proving each aggravating factor beyond a reasonable doubt, and must prove it with its own evidence.  Proof of one factor is not evidence that any other aggravating factor exists.

The State has the burden of proving beyond a reasonable doubt that the defendant is eligible for a death sentence under the law, and this burden remains on the State throughout the aggravation phase.  The defendant is not required to present any evidence or prove that she is ineligible for a death sentence.

In civil cases, it is only necessary to prove that a fact is more likely true than not or that its truth is highly probable.  In criminal cases such as this, the state's proof must be more powerful than that.  It must be beyond a reasonable doubt.

5

A000000279

Proof beyond a reasonable doubt is proof that leaves you firmly convinced of the aggravating factors.  There are very few things in this world that we know with absolute certainty, and in criminal cases the law does not require proof that overcomes every doubt.  If, based on your consideration of the evidence, you are firmly convinced that an alleged aggravating factor has been proved, then you must so find.  If, on the other hand, you think there is a real possibility that the alleged aggravating factor has not been proved, then you must give the defendant the benefit of the doubt and find the factor not proven.

The State must prove one or more of the allegations beyond a reasonable doubt with its own evidence.  The defendant is not required to testify or produce evidence of any kind.  The decision on whether to testify or produce evidence is left to the defendant acting with the advice of an attorney.  The defendant's decision not to testify or produce evidence is not evidence against her.  You must not conclude that the defendant is eligible for a death sentence because the defendant does not testify or produce evidence.  You must not let this choice affect your deliberations in any way.

## JURY NOT TO CONSIDER PENALTY

You must decide whether the State has proved one or more of the alleged aggravating factors.  In reaching your verdict on the issue of aggravating factors, you are not to consider the possible punishment.

6

A000000280

## DIRECT AND CIRCUMSTANTIAL EVIDENCE

Evidence may be direct or circumstantial.  Direct evidence is the testimony of a witness who saw, heard, or otherwise observed an event.  Circumstantial evidence is the proof of a fact or facts from which you may find another fact.  The law makes no distinction between direct and circumstantial evidence.  It is for you to determine the importance to be given to the evidence, regardless of whether it is direct or circumstantial.

## CREDIBILITY OF WITNESSES

In determining the evidence, you must decide whether or not to believe the witnesses and their testimony.  As you do this, you should  consider the testimony in light of all the other evidence in the case.  This means you may consider such things as the witnesses' ability and opportunity to observe, their manner and memory while testifying, any motive or prejudice they might have, and any inconsistent statements they may have made.

7

A000000281

## EXPERT TESTIMONY

A witness may give an opinion on a subject upon which the witness has become an expert because of education, study, or experience. You should consider the opinion of an expert and the reasons, if any, given for it. However, you are not bound by any expert opinion. Give the expert opinion the importance that you believe it deserves.

## TESTIMONY OF LAW ENFORCEMENT OFFICERS

The testimony of a law enforcement officer is not entitled to any greater or lesser importance or believability merely because of the fact that the witness is a law enforcement officer. You are to consider the testimony of a police officer just as you would the testimony of any other witness.

## ALLEGATION OF AGGRAVATING FACTORS

Aggravating factors are those which increase the guilt or enormity of the offense. In determining whether the defendant is eligible for a death sentence you may consider only the statutory aggravating factors listed below. The defendant is

8

A000000282

eligible for a death sentence only if one or more of the following two aggravating factors are unanimously found to exist beyond a reasonable doubt:

1.  The defendant committed the First Degree Murder in expectation of the receipt of anything of pecuniary value.

2.  The defendant committed the First Degree Murder in an especially heinous, cruel or depraved manner.

The law requires that you reduce your findings on the aggravating circumstances to writing.  Please mark your findings by checking the box next to each aggravating factor on the verdict form provided.  The verdict form must then be signed by your foreperson.

## PECUNIARY GAIN

The State alleges that the defendant committed the First Degree Murder in expectation of the receipt of anything of pecuniary value.

To find that the defendant committed the offense as consideration for pecuniary gain, you must find that the defendant's expectation of pecuniary gain was a motive, cause, or impetus for the murder, and not merely a result of the murder. You need not find that pecuniary gain was the sole motivation or cause of the murder in order to find that this factor exists.  However, you may not find this factor if it is merely shown that the defendant took property or money after a murder occurred.

9

A000000283

## ESPECIALLY HEINOUS, CRUEL OR DEPRAVED MANNER

All first degree murders are to some extent heinous, cruel or depraved. However, this aggravating circumstance cannot be found to exist unless the murder is especially heinous, cruel or depraved, that is, where the circumstances of the murder raise it above the norm of other first degree murders.

The terms "cruel", "heinous" or "depraved" are to be considered separately, but proof of any one of these factors is sufficient to establish this aggravating circumstance.

"Cruelty" involves the infliction of physical pain and/or mental anguish on a victim before death. A crime is committed in an especially cruel manner when a defendant either knew or should have known that the manner in which the crime is committed would cause the victim to experience physical pain and/or mental anguish before death. The victim must be conscious for at least some portion of the time when the pain and/or anguish was inflicted.

The terms "heinous" or "depraved" focus upon a defendant's state of mind at the time of the offense, as reflected by her words and acts. A murder is especially heinous if it is hatefully or shockingly evil; grossly bad. A murder is especially depraved if it is marked by debasement, corruption, perversion or deterioration. In order to find heinousness or depravity, you must find that the defendant had such a mental state as exhibited by engaging in at least one of the following actions:

10

A000000284

1.    Infliction of gratuitous violence on the victim;

2.    Needless mutilation of the victim's body after death.

In this context, "gratuitous violence" refers to violence committed upon the victim beyond that necessary to kill.

In this context, "needless mutilation" means that the defendant, in an act separate from the killing itself, committed other acts with the intent to mutilate the victim's corpse.

To assist you in determining whether the murder is heinous or depraved, you may consider whether:

1.    The murder was senseless; or

2.    The victim was helpless.

All murders are "senseless" because of their brutality and finality. Yet not all are senseless as the term is used to distinguish those first degree murders that warrant a death sentence from those that do not.  Rather, a "senseless" murder is one that is unnecessary to achieve the defendant's criminal purpose.

"Helplessness" is proven when the victim is unable to resist.

Neither "senselessness" nor "helplessness", standing alone, are sufficient to prove that this murder was heinous or depraved.

As previously stated, the terms especially "cruel", "heinous" or "depraved" are considered separately; therefore, the presence of any one of these

11

A000000285

factors, or combination of factors, is sufficient to establish this aggravating circumstance.

## DELIBERATION SCHEDULE AND BREAKS

After you have selected a foreperson, you should next discuss and then set your deliberation schedule. You may agree to deliberate Monday through Friday, in the morning and afternoon, or only half days. You are in charge of your schedule, and may set and vary it by agreement and with the approval of the Court.

After you have decided on a schedule, please send it to me by a note through the bailiff for my review and approval.

You are to discuss the case and deliberate only when all jurors are together in the jury room. You are not to discuss the case with each other or anyone else during breaks or recesses.

The admonition I have given you during the trial remains in effect when you are not deliberating.

A000000286

## REVIEW OF INSTRUCTIONS

After setting your schedule, I suggest that you next review the written jury instructions and verdict form. It may be helpful for you to discuss the instructions and form to make sure that you understand them. Again, during your deliberations you must follow the instructions and refer to them to answer any questions about applicable law, procedure and definitions.

## QUESTIONS AND MESSAGES

Should any of you, or the jury as a whole, have a question for the Court during your deliberations or wish to communicate with me on any other matter, please utilize the jury question form that we will provide you. Your question or message must be communicated to the Court in writing and must be signed by you or the foreperson.

The Court will consider your question or note and, if necessary, consult with counsel before answering it in writing. The Court will answer it as quickly as possible.

13

A000000287

No member of the jury should ever attempt to communicate with me except by a signed writing, and I will communicate with you on anything concerning the case only in writing, or orally on the record.

Remember that you are not to tell anyone, including me, how you stand, numerically or otherwise, until after you have reached a verdict or have been discharged.

## VERDICT

The allegation of aggravating factors is now submitted to you for decision. When you go to the jury room you will choose a foreperson. He or she will preside over your deliberations and sign any verdict.

To return a verdict, your verdict must be unanimous. Please mark your decision as to each aggravating circumstance on the verdict form provided.

You will be given 1 form of verdict. It will read as follows:

14

A000000288



IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

IN AND FOR THE COUNTY OF MARICOPA

FILED
12/6/04  3:22 PM
MICHAEL K. JEANES, Clerk
By  M. LESUER
Deputy

STATE OF ARIZONA,

      PLAINTIFF,

vs.

WENDI ELIZABETH ANDRIANO

      DEFENDANT

No. CR 2000-096032

AGGRAVATING FACTORS
VERDICT

We, the jury, duly empanelled and sworn in the above-entitled cause, upon our oaths do find as to the alleged aggravating factors by the "X" marks below:

| UNANIMOUSLY PROVEN BEYOND A REASONABLE DOUBT | UNANIMOUSLY NOT PROVEN | UNABLE TO REACH A UNANIMOUS DECISION | AGGRAVATING FACTORS |
|---|---|---|---|
| | | X | The defendant committed the offense in expectation of the receipt of anything of pecuniary value. |
| X | | | The defendant committed the offense in an especially cruel manner. |
| | | X | The defendant committed the offense in an especially heinous manner. |
| | | X | The defendant committed the offense in an especially depraved manner. |

Foreperson:

Date: 12/6/04

Barbara Bauer
(Signature)

BARBARA BAUER
(Printed Name)

0393
A000000289

MICHAEL K. JEANES, CLERK
Y
*signature*
DEP
GIPSI

2004 DEC -7  PM 3: 56

DANIEL B. PATTERSON
Deputy Public Defender
11 West Jefferson, Suite 5
Phoenix, AZ  85003
(602) 506-6463
Bar No. 005743
Attorney for Defendant

DD
24

IN THE SUPERIOR COURT OF THE STATE OF ARIZONA
IN AND FOR THE COUNTY OF MARICOPA

STATE OF ARIZONA,

Plaintiff,

v.

WENDI ELIZABETH ANDRIANO,

Defendant.

No. CR2000-096032

LIST OF MITIGATING FACTORS

(Honorable Brian Ishikawa)

Defendant, Wendi Elizabeth Andriano, through counsel undersigned, requests that

this list of mitigating factors be included in the Preliminary Instructions for Phase 3:

1)     No prior felony convictions;

2)     No prior misdemeanor convictions;

3)     No prior criminal charges;

4)     Good candidate for rehabilitation;

5)     Good employment history;

6)     Good mother to two children;

7)     Married for eight years;

8)     Good student in school – awards;

9)     Good student in school – grades;

0396

A000000290

10) Missionary work for church in Mexico

11) Strong religious convictions;

12) Good inmate in jail;

13) Helpful to staff and other inmates in jail;

14) Cooperative with authorities after arrest;

15) Domestic violence victim;

16) Emotional abuse victim;

17) Sexual abuse victim;

18) Stress of husband's cancer;

19) Stress of misdiagnosis of husband's cancer;

20) Stress of terminal illness;

21) Stress of economic difficulties;

22) No future threat to community;

23) Remorse;

24) Mercy;

25) Residual doubt;

26) Impact on Wendi's family members and friends; and

27) Age.

RESPECTFULLY SUBMITTED this ___7th___ day of December, 2004.

MARICOPA COUNTY PUBLIC DEFENDER

By_____

DANIEL B. PATTERSON
Deputy Public Defender

Copy of the foregoing
e-mailed this ___7th___ day of
December, 2004, to:

HONORABLE BRIAN ISHIKAWA
Judge of the Superior Court
Southeast Court Building, 4th Floor
222 East Javelina
Mesa, Arizona  85210

JUAN MARTINEZ
Deputy County Attorney
301 West Jefferson, Suite 800
Phoenix, Arizona 85003

DAVID DELOZIER
Attorney At Law
4016 E Forest Pleasant
Cave Creek  AZ  85331-5439

By_____

DANIEL B. PATTERSON
Deputy Public Defender

DBPcb120704H

- 3 -

A000000292



FILED
12/8/04  1:00 PM
MICHAEL K. JEANES, Clerk
By   M. LESUEUR
Deputy

IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

IN AND FOR THE COUNTY OF MARICOPA

| | |
|---|---|
| STATE OF ARIZONA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) CR 2000-096032 |
| | ) |
| vs. | ) |
| | ) PRELIMINARY INSTRUCTIONS |
| WENDI ELIZABETH ANDRIANO, | ) FOR PHASE 3 |
| Defendant. | ) |
| | ) |
| | ) |
| | ) |
| | ) |

0399
A000000293

# INDEX FOR PHASE 3 PRELIMINARY INSTRUCTIONS

PAGE

INTRODUCTION TO PRELIMINARY INSTRUCTIONS .............. 3

ORDER OF PENALTY PHASE ................................................. 3

EVIDENCE TO CONSIDER ...................................................... 5

OVERVIEW OF PENALTY PHASE ........................................ 5

BURDEN OF PROOF IN PENALTY PHASE............................6

DEFENDANT NEED NOT TESTIFY.........................................8

CONCLUSION..............................................................................8

2

A000000294

## INTRODUCTION TO PRELIMINARY INSTRUCTIONS

We are about to begin the third phase of the trial. It is called the Penalty Phase.

The directions in the preliminary instructions for the first phase of the trial regarding the following topics remain in full force and effect unless changed by these instructions: "Preliminary Instructions Concerning Juror Contact", "Bench Conferences", "Preliminary Instructions Concerning the law".

You were allowed to discuss the case among yourselves during deliberations. Effective immediately, permission for you to discuss the case is suspended. Do not discuss the case among yourselves or with anyone else during the Penalty Phase. Follow all the admonitions I have given you previously.

## ORDER OF PENALTY PHASE

The Penalty Phase, unless otherwise directed by the Court, will proceed as follows:

1. The defense may make an opening statement. The State may then make an opening statement or may defer it until the close of the

3

A000000295

defense case.  Again, what the attorneys say in opening statements is not evidence.

2.   The victim's survivors may, if they wish, make a statement relating to the characteristics of the victim and the impact of his murder on the victim's family.  They are not allowed to offer any opinion or recommendation regarding an appropriate sentence.

3.   The defendant will offer evidence in support of mitigation.

4.   The State may then make an opening statement if it was deferred, and may then offer evidence in rebuttal to the defendant's mitigation evidence.

5.   The defendant may offer evidence in rebuttal, or other evidence if the Court allows such to be presented.

6.   The defendant may make a statement to you, but she is not required to do so.  You cannot hold this against her if she chooses not to make a statement.

7.   The parties will present final arguments, with the defense having the opportunity to make an opening and a closing argument.

8.   The Court will then give you the final instructions on the law.

9.   You will then deliberate to decide on a verdict.  Once you agree upon a verdict, it will be read in Court with the parties present.

4

A000000296

## EVIDENCE TO CONSIDER

In deciding issues in the Penalty Phase, you are to consider all evidence presented in this phase, as well as the evidence presented in both preceding phases.

## OVERVIEW OF PENALTY PHASE

In the Penalty Phase we will address the sentence to be imposed. During the Penalty Phase, the parties may present information relevant to any mitigating circumstance. A mitigating circumstance is any factor relevant in determining whether to impose a sentence less than death, including any aspect of the defendant's character, propensities or record and any of the circumstances of the offense, including but not limited to the following:

1. No prior felony convictions.

2. No prior misdemeanor convictions.

3. Good candidate for rehabilitation.

4. Good mother to two children.

5. Married for eight years.

6. Good student in school—awards.

7. Good student in school—grades.

8. Missionary work for church in Mexico.

5

A000000297

9.      Strong religious convictions.

10.     Good inmate in jail.

11.     Helpful to staff and other inmates in jail.

12.     Cooperative with authorities after arrest.

13.     Domestic violence victim.

14.     Emotional abuse victim.

15.     Sexual abuse victim.

16.     Stress of husband's cancer.

17.     Stress of misdiagnosis of husband's cancer.

18.     Stress of terminal illness.

19.     Stress of economic difficulties.

20.     No future threat to community.

21.     Remorse.

22.     Impact on the defendant's family members and friends.

23.     Age.

## BURDEN OF PROOF IN PENALTY PHASE

As to the existence of mitigating circumstances, the defendant bears the

burden of proof.  The defendant must prove the existence of the mitigating

6

A000000298

circumstances by a preponderance of the evidence.   Proof by a preponderance of the evidence means that a fact is more likely true than not.  This is a lesser burden than "proof by clear and convincing evidence" and "proof beyond a reasonable doubt."

In the Guilt Phase of the trial, the jury unanimously found beyond a reasonable doubt that the defendant committed First Degree Murder.  In the Aggravation Phase, the jury unanimously found beyond a reasonable doubt that one aggravating factor was proven.  These issues have been finally decided and you are not to reconsider these verdicts.

In addition, you cannot consider any victim statements or victim impact evidence as a new aggravating factor.  However, it is something you may consider in assessing the mitigation presented.

The jurors do not have to agree unanimously that a mitigating circumstance has been proven to exist.  Each juror may consider any mitigating circumstance found by that juror in determining the appropriate penalty.

The possible sentences on First Degree Murder are the death penalty or life imprisonment.  The question to ultimately be decided by the jury at the end of the Penalty Phase, Phase 3, is:

- Should the defendant be sentenced to death or life imprisonment for her conviction of the First Degree Murder of Joseph Andriano, Jr.?

In answering this question, you must individually decide whether there is mitigation and whether it is sufficiently substantial to call for the imposition of a life sentence rather than a sentence of death.

Any verdict imposing a sentence of life or death must be unanimous.

7

A000000299

## DEFENDANT NEED NOT TESTIFY

The defendant is not required to testify or make any statement and you are precluded from drawing any inferences against the defendant should she decide not to testify or make a statement.  The decision on whether or not to testify or make a statement is left to the defendant acting with the advice of her attorneys.  You must not let this choice affect your deliberation in any way.

## CONCLUSION

The rules of law I have just shared with you are preliminary only.  At the end of this phase I will give you final and more detailed instructions that must be applied.    In deciding the case you must be guided by the final instructions.

8

A000000300



FILED
12/16/04  2:05 PM
MICHAEL K. JEANES, Clerk
By____M. LESUEUR____
Deputy

IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

IN AND FOR THE COUNTY OF MARICOPA

STATE OF ARIZONA,                 )
                                  )
              Plaintiff,          )
                                  )       CR 2000-096032
                                  )
vs.                               )
                                  )  FINAL INSTRUCTIONS
WENDI ELIZABETH ANDRIANO,         )  PHASE 3
              Defendant.          )
                                  )
                                  )
                                  )
                                  )
_____)

000003717

0419
A000000301

## DUTY OF JURY

I am now going to give you the final instructions on the law that you must follow to decide the issues in this Penalty Phase of the trial.

As you are aware, in the Guilt Phase of the trial the Defendant was found guilty of First Degree Murder.

In the Aggravation Phase, the following aggravating factor was found to exist:

- The Defendant committed the First Degree Murder in an especially cruel manner.

It is now your duty to determine whether the Defendant should be sentenced to death or life imprisonment on her conviction of First Degree Murder.

In answering this question, it is your duty to follow these instructions on the law. You must consider all of these instructions. Do not pick out one instruction or part of one and ignore the others. As you determine the facts, however, you may find some instructions no longer apply. You must then consider the instructions that do apply, together with the facts as you have determined them.

It is also your duty to determine the facts. "Facts" means what actually happened. Determine the facts only from the evidence produced in court. When I say "evidence," I mean the testimony of witnesses, and exhibits received in evidence, and any facts to which the parties stipulated or that I instructed you to

2

A000000302

accept.  You should not speculate or guess about any fact.  You must not consult outside sources for information, such as a dictionary, a newspaper or the Internet. You must not be concerned with any opinion that you feel I have about the facts or issues in any phase of the trial.  You must not take anything I may have said or done during the trial as indicating any opinion I may have about the facts.   You, as jurors, are the sole judges of what happened and of the issues to be decided.

## LAWYERS' COMMENTS ARE NOT EVIDENCE

In their opening statements and closing arguments, the lawyers have talked to you about the law and the evidence.  What the lawyers said is not evidence, but it may help you to understand the law and the evidence.

## STIPULATIONS

The lawyers are permitted to stipulate that certain facts exist.  This means that both sides agree those facts do exist and are part of the evidence.

## OBJECTIONS AND STRICKEN TESTIMONY

If the Court sustained an objection to a lawyer's question, you must disregard it and any answer given.  Any testimony stricken from the court record must not be considered by you for any purpose.

3

A000000303