# TABLE OF CONTENTS (INTERACTIVE)

| | |
|---|---|
| NNNNNN Part 2 | Response to Petition |

# EXHIBIT NNNNNN PART 2

## DIRECT AND CIRCUMSTANTIAL EVIDENCE

Evidence may be direct or circumstantial.  Direct evidence is the testimony of a witness who saw, heard, or otherwise observed an event. Circumstantial evidence is the proof of a fact or facts from which you may find another fact.  The law makes no distinction between direct and circumstantial evidence.  It is for you to determine the importance to be given to the evidence, regardless of whether it is direct or circumstantial.

## CREDIBILITY OF WITNESSES

In determining the evidence, you must decide whether or not to believe the witnesses and their testimony.  As you do this, you should consider the testimony in light of all the other evidence in the case.   This means you may consider such things as witnesses' ability and opportunity to observe, their manner and memory while testifying, any motive or prejudice they might have, and any inconsistent statements they may have made.

## EXPERT TESTIMONY

A witness may give an opinion on a subject upon which the witness has become an expert because of education, study, or experience.  You should consider the opinion of an expert and the reasons, if any, given for it.  However,

4

A000000304

you are not bound by any expert opinion.  Give the expert opinion the importance that you believe it deserves.

## PRIOR VERDICTS AND FINDINGS

In the Guilt Phase of the trial, the jury unanimously found beyond a reasonable doubt that the Defendant committed First Degree Murder.  In the Aggravation Phase, the jury unanimously found beyond a reasonable doubt the aggravating factor that the Defendant committed the First Degree Murder in an especially cruel manner.  These issues have been finally decided and you are not to reconsider these verdicts.

## BURDEN OF PROOF IN PENALTY PHASE PROCEEDINGS

In the Penalty Phase, the Defendant has had the opportunity to prove the existence of mitigating circumstances by a preponderance of the evidence.  A mitigating factor is proved by a preponderance of the evidence if it is shown to be more likely true than not.  This is a lesser burden than "proof by clear and convincing evidence" and "proof beyond a reasonable doubt."

5

A000000305

## MITIGATING CIRCUMSTANCES

Mitigating circumstances are circumstances which do not justify or excuse the offense, but which, in fairness or mercy, may extenuate or reduce the degree of blame or moral culpability.  Such mitigating circumstances may be any evidence presented by either the Defendant or the State that would lead you to apply leniency in this case and find that death is not an appropriate sentence.

Although a final decision on a penalty of death or life imprisonment must be unanimous,  the determination of what circumstances are mitigation is for each one of you to resolve, individually, based upon all the evidence that has been presented to you during this phase and at any of the prior phases of the trial.  The evidence to be considered by you in determining  mitigation includes any aspect of the Defendant's background, character, propensity or record, and any of the circumstances of the offense that might justify a penalty less severe than death. The mitigating circumstances offered by the Defendant are as follows:

- No prior felony convictions.

- No prior misdemeanor convictions.

- Good candidate for rehabilitation.

- Good mother to two children.

- Married for six years.

- Good student in school—awards.

6

A000000306

- Good student in school—grades.

- Missionary work for church in Mexico.

- Strong religious convictions.

- Good inmate in jail.

- Helpful to staff and other inmates in jail.

- Cooperative with authorities after arrest.

- Domestic violence victim.

- Emotional abuse victim.

- Sexual abuse victim.

- Stress of husband's cancer.

- Stress of misdiagnosis of husband's cancer.

- Stress of terminal diagnosis of husband's cancer.

- Stress of economic difficulties.

- No future threat to community.

- Remorse.

- Impact on her family members and friends.

- Age (considering level of intelligence, maturity, participation in the crime and past experience).

7

A000000307

You are not limited to considering these circumstances.  You must also consider any other relevant mitigation evidence presented during any phase of the trial, even if it was not proposed by either of the parties.  As a juror and sentencer in a death penalty case, you must give consideration to all relevant mitigating evidence presented.

You may not consider any information presented during this phase of the trial as a new aggravating factor.

## MITIGATION REBUTTAL EVIDENCE

The State has presented evidence to rebut the Defendant's mitigation evidence.  This evidence is not a new aggravating circumstance.  It is presented solely to give you a more complete picture of the Defendant's character, propensities or record, and to aid you in determining whether the mitigation is sufficiently substantial to call for leniency and the imposition of a life sentence.

## WEIGHING THE AGGRAVATING AND MITIGATING CIRCUMSTANCES AND DELIBERATING ON THE PENALTY

You must make your decision about whether mitigation is sufficiently substantial to call for leniency based solely upon your weighing of any mitigation proven to you and the aggravating factor you have already found during the

8

A000000308

Aggravation Phase. To do this, you must individually determine the nature and extent of mitigating circumstances. Then, in light of the aggravating circumstance that has been proven to exist, you must individually determine if the totality of the mitigating circumstances is sufficiently substantial to call for leniency and a life sentence.

The weighing of aggravating and mitigating circumstances does not mean a mere mechanical counting of factors on each side of an imaginary scale, or the arbitrary assignment of weights to any of them. You are free to assign whatever value you deem appropriate to each and all of the various factors you are permitted to consider. In weighing the various circumstances, you determine, under the relevant evidence, which penalty is justified and appropriate by considering the totality of the aggravating circumstance with the totality of the mitigating circumstances. In reaching a reasoned, moral judgment about which penalty is justified and appropriate, you must decide how compelling or persuasive the totality of the mitigating factors are when compared against the totality of the aggravating factor. You cannot be governed or influenced by mere sentiment, passion or prejudice; however, you may consider grounds for leniency and decline to impose the death penalty after a thoughtful consideration of the evidence.

Neither the State nor the Defendant has a burden of proving that the weight of the mitigation is or is not sufficiently substantial to call for leniency.

9

A000000309

The law does not define what is "sufficiently substantial to call for leniency." Each juror must determine for himself or herself what is "sufficiently substantial to call for leniency."

Any verdict of death or life imprisonment must be unanimous. If you unanimously find that no mitigation exists, then you must return a verdict of death. If you unanimously find that mitigation exists, each one of you must individually weigh that mitigation in light of the aggravating circumstance already found to exist, and if you unanimously find that the mitigation is not sufficiently substantial to call for leniency, you must return a verdict of death. If you unanimously find that mitigation exists and it is sufficiently substantial to call for leniency, you must return a verdict of life. If, after considering all of the aggravating and mitigating evidence, you have a doubt whether a death sentence should be imposed, then you should resolve that doubt in favor of a life sentence.

## VICTIM IMPACT INFORMATION

The victim's mother and father have each made a statement relating to personal characteristics of the victim and the impact of his murder on the victim's family. This information is not a new aggravating circumstance and you cannot consider it as such. Just as the law allows you to see the Defendant as a unique person and to see the loss that will result from her execution, the law also allows

10

A000000310

you to see the murder victim as a unique person and to see the loss resulting from his murder.  You are to consider this information only for this limited purpose.

## QUESTION TO BE DECIDED

The question for you to decide is:

Should the Defendant be sentenced to death or life imprisonment for her conviction of First Degree Murder?

As previously stated, in deciding this question you must decide whether there is mitigation that is sufficiently substantial to call for leniency.

Your decision is not a recommendation.  Your decision will be binding.  If your verdict is that the Defendant should be sentenced to death, the Defendant will be sentenced to death.  If your verdict is that the Defendant should be sentenced to life, the Defendant will not be sentenced to death, and the Court will sentence the Defendant to either life without parole until 25 calendar years in prison are served; or "natural life," which means the Defendant would never be released from prison.

## DELIBERATION SCHEDULE AND BREAKS

After you have selected a foreperson, you should next discuss and then set your deliberation schedule.  You may agree to deliberate Monday through

11

000003727

A000000311

Friday, in the morning and afternoon, or only half days.  You are in charge of your schedule, and may set and vary it by agreement and the approval of the Court.

After you have decided on a schedule, please send it to me by a note through the bailiff for my review and approval.

You are to discuss the case and deliberate only when all jurors are together in the jury room.  You are not to discuss the case with each other or anyone else during breaks or recesses.

The admonition I have given you during the trial remains in effect when all twelve of you are not in the jury room deliberating.

## REVIEW OF INSTRUCTIONS

After setting your schedule, I suggest that you next review the written jury instructions and verdict form.  It may be helpful for you to discuss the instructions and form to make sure that you understand them. Again, during your deliberations you must follow the instructions and refer to them to answer any questions about applicable law, procedure and definitions.

## QUESTIONS AND MESSAGES

Should any of you, or the jury as a whole, have a question for the Court during your deliberations or wish to communicate with me on any other

<center>12</center>

A000000312

matter, please utilize the jury question form that we will provide you.  Your

question or message must be communicated to the Court in writing and must be

signed by you or the foreperson.

The Court will consider your question or note and, if necessary,

consult with counsel before answering it in writing.  The Court will answer it as

quickly as possible.

No member of the jury should ever attempt to communicate with me

except by a signed writing, and I will communicate with you on anything

concerning the case only in writing or orally on the record..

Remember that you are not to tell anyone, including me, how you

stand, numerically or otherwise, until after you have reached a verdict or have been

discharged.


## VERDICT

The penalty issue is now submitted to you for decision.  When you go

to the jury room you will choose a foreperson.  He or she will preside over your

deliberations and sign any verdict.

To return a verdict of death or life imprisonment, your verdict must be

unanimous.  Please mark your decision on the verdict form provided.

You will be given one form of verdict.  It will read as follows:

13

A000000313



FILED
12/22/04 · 2:20 PM
MICHAEL K. JEANES, Clerk
By M. LESUEUR
Deputy

## IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

## IN AND FOR THE COUNTY OF MARICOPA

STATE OF ARIZONA

                                        No. CR2000-096032

v.                                      PENALTY VERDICT

WENDI ELIZABETH ANDRIANO

We, the Jury, duly empanelled and sworn in this matter, upon our oaths, do unanimously find that the Defendant, Wendi Elizabeth Andriano, shall be sentenced to:

    __X__ DEATH


    _____ LIFE


Foreperson:

_Barbara Bauer_
(Signature)

_BARBARA BAUER_
(Printed Name)

0426
A000000314

000003730

FILED

# UPERIOR COURT OF
# MARICOPA COUNTY

12/28/04  8:30AM
Michael K. Jeanes, Clerk

*EXHIBIT WORKSHEET*

By: M. LESUEUR
Deputy Clerk

Hearing Officer: **Hon. Brian K. Ishikawa**

Case Number: **CR2000-096032**

Co-Defendant: **No**

Hearing Date: **08/23/2004**

Hearing Type: **TRIAL**

STATE OF ARIZONA

vs

WENDI ANDRIANO

Counsel:    JUAN MARTINEZ

Counsel:    DANIEL PATTERSON AND DAVID
DELOZIER

| Ex # | ID | Off'd | In Evidence | Exhibit Description | Released |
|------|-----|-------|-------------|--------------------|----------|
| 1 | PLF | PLF | 09/13/2004 | PHOTOGRAPH | |
| 2 | PLF | PLF | 09/13/2004 | PHOTOGRAPH | |
| 3 | PLF | PLF | 09/13/2004 | PHOTOGRAPH | |
| 4 | PLF | | | PHOTOGRAPH | Y |
| 5 | PLF | PLF | 09/13/2004 | PHOTOGRAPH | |
| 6 | PLF | PLF | 09/13/2004 | PHOTOGRAPH | |
| 7 | PLF | PLF | 09/13/2004 | PHOTOGRAPH | |
| 8 | PLF | PLF | 09/13/2004 | PHOTOGRAPH | |
| 9 | PLF | PLF | 09/13/2004 | PHOTOGRAPH | |
| 10 | PLF | PLF | 09/13/2004 | PHOTOGRAPH | |
| 11 | PLF | PLF | 09/13/2004 | PHOTOGRAPH | |
| 12 | PLF | PLF | 09/13/2004 | PHOTOGRAPH | |
| 13 | PLF | PLF | 09/13/2004 | PHOTOGRAPH | |
| 14 | PLF | PLF | 09/13/2004 | PHOTOGRAPH | |
| 15 | PLF | PLF | 09/13/2004 | PHOTOGRAPH | |
| 16 | PLF | PLF | 09/13/2004 | PHOTOGRAPH | |
| 17 | PLF | PLF | 09/13/2004 | PHOTOGRAPH | |
| 18 | PLF | PLF | 09/13/2004 | PHOTOGRAPH | |
| 19 | PLF | PLF | 09/13/2004 | PHOTOGRAPH | |
| 20 | PLF | PLF | 09/13/2004 | PHOTOGRAPH | |

CR2000-096032  (08/23/2004)

Page 1 of 26

A000000315

0951

Hearing Officer: Hon. Brian K. Ishikawa

Case Number: CR2000-096032
Co-Defendant: No
Hearing Date: 08/23/2004

Hearing Type: **TRIAL**

STATE OF ARIZONA

vs

WENDI ANDRIANO

Counsel:   JUAN MARTINEZ

Counsel:   DANIEL PATTERSON AND DAVID DELOZIER

| Ex # | ID | Off'd | In Evidence | Exhibit Description | Released |
|------|-----|-------|-------------|---------------------|----------|
| 21 | PLF | PLF | 09/13/2004 | PHOTOGRAPH | |
| 22 | PLF | PLF | 09/13/2004 | PHOTOGRAPH | |
| 23 | PLF | PLF | 09/13/2004 | PHOTOGRAPH | |
| 24 | PLF | PLF | 09/13/2004 | PHOTOGRAPH | |
| 25 | PLF | PLF | 09/13/2004 | PHOTOGRAPH | |
| 26 | PLF | PLF | 09/13/2004 | PHOTOGRAPH | |
| 27 | PLF | PLF | 09/13/2004 | PHOTOGRAPH | |
| 28 | PLF | PLF | 09/13/2004 | PHOTOGRAPH | |
| 29 | PLF | PLF | 09/13/2004 | PHOTOGRAPH | |
| 30 | PLF | PLF | 09/13/2004 | PHOTOGRAPH | |
| 31 | PLF | PLF | 09/13/2004 | PHOTOGRAPH | |
| 32 | PLF | PLF | 09/13/2004 | PHOTOGRAPH | |
| 33 | PLF | PLF | 09/13/2004 | PHOTOGRAPH | |
| 34 | PLF | PLF | 09/13/2004 | PHOTOGRAPH | |
| 35 | PLF | PLF | 09/13/2004 | PHOTOGRAPH | |
| 36 | PLF | PLF | 09/13/2004 | PHOTOGRAPH | |
| 37 | PLF | PLF | 09/13/2004 | PHOTOGRAPH | |
| 38 | PLF | PLF | 09/13/2004 | PHOTOGRAPH | |
| 39 | PLF | PLF | 09/13/2004 | PHOTOGRAPH | |
| 40 | PLF | PLF | 09/13/2004 | PHOTOGRAPH | |
| 41 | PLF | PLF | 09/13/2004 | PHOTOGRAPH | |
| 42 | PLF | PLF | 09/13/2004 | PHOTOGRAPH | |
| 43 | PLF | PLF | 09/13/2004 | PHOTOGRAPH | |
| 44 | PLF | PLF | 09/13/2004 | PHOTOGRAPH | |
| 45 | PLF | | | PHOTOGRAPH | Y |
| 46 | PLF | PLF | 09/13/2004 | PHOTOGRAPH | |

CR2000-096032  (08/23/2004)

000003732

A000000316

Hearing Officer: **Hon. Brian K. Ishikawa**

Hearing Type: **TRIAL**

Case Number: **CR2000-096032**
Co-Defendant: **No**
Hearing Date: **08/23/2004**

STATE OF ARIZONA

vs

WENDI ANDRIANO

Counsel: JUAN MARTINEZ

Counsel: DANIEL PATTERSON AND DAVID DELOZIER

| Ex # | ID | Off'd | In Evidence | Exhibit Description | Released |
|------|-----|-------|-------------|---------------------|----------|
| 47 | PLF | PLF | 09/13/2004 | PHOTOGRAPH | |
| 48 | PLF | | | PHOTOGRAPH | Y |
| 49 | PLF | PLF | 09/13/2004 | PHOTOGRAPH | |
| 50 | PLF | PLF | 09/13/2004 | PHOTOGRAPH | |
| 51 | PLF | PLF | 09/13/2004 | PHOTOGRAPH | |
| 52 | PLF | PLF | 09/13/2004 | PHOTOGRAPH | |
| 53 | PLF | PLF | 09/13/2004 | PHOTOGRAPH | |
| 54 | PLF | PLF | 09/13/2004 | PHOTOGRAPH | |
| 55 | PLF | PLF | 09/13/2004 | PHOTOGRAPH | |
| 56 | PLF | PLF | 09/13/2004 | PHOTOGRAPH | |
| 57 | PLF | PLF | 09/13/2004 | PHOTOGRAPH | |
| 58 | PLF | PLF | 09/13/2004 | PHOTOGRAPH | |
| 59 | PLF | PLF | 09/13/2004 | PHOTOGRAPH | |
| 60 | PLF | PLF | 09/13/2004 | PHOTOGRAPH | |
| 61 | PLF | PLF | 09/13/2004 | PHOTOGRAPH | |
| 62 | PLF | PLF | 09/13/2004 | PHOTOGRAPH | |
| 63 | PLF | PLF | 09/13/2004 | PHOTOGRAPH | |
| 64 | PLF | PLF | 09/13/2004 | PHOTOGRAPH | |
| 65 | PLF | PLF | 09/13/2004 | PHOTOGRAPH | |
| 66 | PLF | PLF | 09/13/2004 | PHOTOGRAPH | |
| 67 | PLF | | | PHOTOGRAPH | Y |
| 68 | PLF | PLF | 09/13/2004 | PHOTOGRAPH | |
| 69 | PLF | PLF | 09/13/2004 | PHOTOGRAPH | |
| 70 | PLF | PLF | 09/13/2004 | PHOTOGRAPH | |
| 71 | PLF | PLF | 09/13/2004 | PHOTOGRAPH | |
| 72 | PLF | PLF | 09/13/2004 | PHOTOGRAPH | |

CR2000-096032  (08/23/2004)

Page 3 of 28
A000000317

000003733

Co-Defendant: No

Hearing Type: **TRIAL**

Hearing Date: **08/23/2004**

STATE OF ARIZONA          Counsel:   JUAN MARTINEZ

    vs

WENDI ANDRIANO         Counsel:   DANIEL PATTERSON AND DAVID DELOZIER

| Ex # | ID | Off'd | In Evidence | Exhibit Description | Released |
|------|-----|-------|-------------|---------------------|----------|
| 73 | PLF | PLF | 09/13/2004 | PHOTOGRAPH | |
| 74 | PLF | PLF | 09/13/2004 | PHOTOGRAPH | |
| 75 | PLF | PLF | 09/13/2004 | PHOTOGRAPH | |
| 76 | PLF | PLF | 09/13/2004 | PHOTOGRAPH | |
| 77 | PLF | PLF | 09/13/2004 | PHOTOGRAPH | |
| 78 | PLF | PLF | 09/13/2004 | PHOTOGRAPH | |
| 79 | PLF | PLF | 09/13/2004 | PHOTOGRAPH | |
| 80 | PLF | PLF | 09/13/2004 | PHOTOGRAPH | |
| 81 | PLF | PLF | 09/13/2004 | PHOTOGRAPH | |
| 82 | PLF | PLF | 09/13/2004 | PHOTOGRAPH | |
| 83 | PLF | PLF | 09/13/2004 | PHOTOGRAPH | |
| 84 | PLF | PLF | 09/13/2004 | PHOTOGRAPH | |
| 85 | PLF | PLF | 09/13/2004 | PHOTOGRAPH | |
| 86 | PLF | PLF | 09/13/2004 | PHOTOGRAPH | |
| 87 | PLF | PLF | 09/13/2004 | PHOTOGRAPH | |
| 88 | PLF | PLF | 09/13/2004 | PHOTOGRAPH | |
| 89 | PLF | PLF | 09/13/2004 | PHOTOGRAPH | |
| 90 | PLF | PLF | 09/13/2004 | PHOTOGRAPH | |
| 91 | PLF | PLF | 09/13/2004 | PHOTOGRAPH | |
| 92 | PLF | PLF | 09/13/2004 | PHOTOGRAPH | |
| 93 | PLF | PLF | 09/13/2004 | PHOTOGRAPH | |
| 94 | PLF | PLF | 09/13/2004 | PHOTOGRAPH | |
| 95 | PLF | PLF | 09/13/2004 | PHOTOGRAPH | |
| 96 | PLF | PLF | 09/13/2004 | PHOTOGRAPH | |
| 97 | PLF | PLF | 09/13/2004 | PHOTOGRAPH | |
| 98 | PLF | PLF | 09/13/2004 | PHOTOGRAPH | |

Page 4 of 28

CR2000-096032  (08/23/2004)

A000000318

Hearing Officer: **Hon. Brian K.** ᴵhikawa

Case ⁻ᵘmber: **CR2000-096032**

Co-D⁻ ᵈant: **No**

Hearing Type: **TRIAL**

Hearing Date: **08/23/2004**

STATE OF ARIZONA                      Counsel:   JUAN MARTINEZ

      vs

WENDI ANDRIANO                        Counsel:   DANIEL PATTERSON AND DAVID
                                        DELOZIER

| Ex # | ID | Off'd | In Evidence | Exhibit Description | Released |
|------|-----|-------|-------------|---------------------|----------|
| 99 | PLF | PLF | 09/13/2004 | PHOTOGRAPH | |
| 100 | PLF | PLF | 09/13/2004 | PHOTOGRAPH | |
| 101 | PLF | PLF | 09/14/2004 | PHOTOGRAPH | |
| 102 | PLF | PLF | 09/14/2004 | PHOTOGRAPH | |
| 103 | PLF | PLF | 09/14/2004 | PHOTOGRAPH | |
| 104 | PLF | PLF | 09/14/2004 | PHOTOGRAPH | |
| 105 | PLF | PLF | 09/14/2004 | PHOTOGRAPH | |
| 106 | PLF | PLF | 09/14/2004 | PHOTOGRAPH | |
| 107 | PLF | PLF | 09/14/2004 | PHOTOGRAPH | |
| 108 | PLF | PLF | 09/14/2004 | PHOTOGRAPH | |
| 109 | PLF | | | PHOTOGRAPH | Y |
| 110 | PLF | PLF | 09/14/2004 | PHOTOGRAPH | |
| 111 | PLF | PLF | 09/14/2004 | PHOTOGRAPH | |
| 112 | PLF | PLF | 09/14/2004 | PHOTOGRAPH | |
| 113 | PLF | PLF | 09/14/2004 | PHOTOGRAPH | |
| 114 | PLF | PLF | 09/14/2004 | PHOTOGRAPH | |
| 115 | PLF | PLF | 09/14/2004 | PHOTOGRAPH | |
| 116 | PLF | PLF | 09/14/2004 | PHOTOGRAPH | |
| 117 | PLF | PLF | 09/14/2004 | PHOTOGRAPH | |
| 118 | PLF | PLF | 09/14/2004 | PHOTOGRAPH | |
| 119 | PLF | PLF | 09/14/2004 | PHOTOGRAPH | |
| 120 | PLF | PLF | 09/14/2004 | PHOTOGRAPH | |
| 121 | PLF | PLF | 09/14/2004 | PHOTOGRAPH | |
| 122 | PLF | PLF | 09/14/2004 | PHOTOGRAPH | |
| 123 | PLF | PLF | 09/14/2004 | PHOTOGRAPH | |
| 124 | PLF | PLF | 09/14/2004 | PHOTOGRAPH | |

CR2000-096032  (08/23/2004)

000003735

A000000319

Hearing Officer: Hon. Brian K.   hikawa

Case  mber: **CR2000-096032**

Co-D  dant: **No**

Hearing Type: **TRIAL**

Hearing Date: **08/23/2004**

STATE OF ARIZONA

Counsel:   JUAN MARTINEZ

vs

WENDI ANDRIANO

Counsel:   DANIEL PATTERSON AND DAVID DELOZIER

| Ex # | ID | Off'd | In Evidence | Exhibit Description | Released |
|------|-----|-------|-------------|---------------------|----------|
| 125 | PLF | PLF | 09/14/2004 | PHOTOGRAPH | |
| 126 | PLF | PLF | 09/14/2004 | PHOTOGRAPH | |
| 127 | PLF | PLF | 09/14/2004 | PHOTOGRAPH | |
| 128 | PLF | PLF | 09/14/2004 | PHOTOGRAPH | |
| 129 | PLF | PLF | 09/14/2004 | PHOTOGRAPH | |
| 130 | PLF | PLF | 09/14/2004 | PHOTOGRAPH | |
| 131 | PLF | PLF | 09/14/2004 | PHOTOGRAPH | |
| 132 | PLF | PLF | 09/14/2004 | PHOTOGRAPH | |
| 133 | PLF | PLF | 09/14/2004 | PHOTOGRAPH | |
| 134 | PLF | PLF | 09/14/2004 | PHOTOGRAPH | |
| 135 | PLF | PLF | 09/14/2004 | PHOTOGRAPH | |
| 136 | PLF | | | PHOTOGRAPH | Y |
| 137 | PLF | | | PHOTOGRAPH | Y |
| 138 | PLF | PLF | 09/20/2004 | PHOTOGRAPH | |
| 139 | PLF | | | PHOTOGRAPH | Y |
| 140 | PLF | PLF | 09/20/2004 | PHOTOGRAPH | |
| 141 | PLF | PLF | 09/08/2004 | PHOTOGRAPH | |
| 142 | PLF | PLF | 09/08/2004 | PHOTOGRAPH | |
| 143 | PLF | PLF | 09/08/2004 | PHOTOGRAPH | |
| 144 | PLF | PLF | 09/08/2004 | PHOTOGRAPH | |
| 145 | PLF | PLF | 09/08/2004 | PHOTOGRAPH | |
| 146 | PLF | PLF | 09/08/2004 | PHOTOGRAPH | |
| 147 | PLF | PLF | 09/08/2004 | PHOTOGRAPH | |
| 148 | PLF | PLF | 09/08/2004 | PHOTOGRAPH | |
| 149 | PLF | PLF | 09/08/2004 | PHOTOGRAPH | |
| 150 | PLF | PLF | 09/08/2004 | PHOTOGRAPH | |

Hearing Officer: Hon. Brian K.  hikawa

Case:  mber: **CR2000-096032**

Co-D  dant: **No**

Hearing Type: **TRIAL**

Hearing Date: **08/23/2004**

STATE OF ARIZONA

vs

WENDI ANDRIANO

Counsel:   JUAN MARTINEZ

Counsel:   DANIEL PATTERSON AND DAVID DELOZIER

| Ex # | ID | Off'd | In Evidence | Exhibit Description | Released |
|------|------|------|------|------|------|
| 151 | PLF | PLF | 09/08/2004 | PHOTOGRAPH | |
| 152 | PLF | PLF | 09/08/2004 | PHOTOGRAPH | |
| 153 | PLF | PLF | 09/09/2004 | PHOTOGRAPH | |
| 154 | PLF | PLF | 09/09/2004 | PHOTOGRAPH | |
| 155 | PLF | PLF | 09/09/2004 | PHOTOGRAPH | |
| 156 | PLF | PLF | 09/09/2004 | PHOTOGRAPH | |
| 157 | PLF | PLF | 09/09/2004 | PHOTOGRAPH | |
| 158 | PLF | PLF | 09/09/2004 | PHOTOGRAPH | |
| 159 | PLF | PLF | 09/21/2004 | PHOTOGRAPH | |
| 160 | PLF | PLF | 09/21/2004 | PHOTOGRAPH | |
| 161 | PLF | PLF | 09/22/2004 | PHOTOGRAPH | |
| 162 | PLF | PLF | 09/22/2004 | PHOTOGRAPH | |
| 163 | PLF | PLF | 09/22/2004 | PHOTOGRAPH | |
| 164 | PLF | PLF | 09/22/2004 | PHOTOGRAPH | |
| 165 | PLF | PLF | 09/22/2004 | PHOTOGRAPH | |
| 166 | PLF | PLF | 09/22/2004 | PHOTOGRAPH | |
| 167 | PLF | PLF | 09/22/2004 | PHOTOGRAPH | |
| 168 | PLF | | | PHOTOGRAPH | Y |
| 169 | PLF | PLF | 09/22/2004 | PHOTOGRAPH | |
| 170 | PLF | PLF | 09/20/2004 | PHOTOGRAPH | |
| 171 | PLF | PLF | 09/09/2004 | PHOTOGRAPH | |
| 172 | PLF | PLF | 09/09/2004 | PHOTOGRAPH | |
| 173 | PLF | PLF | 09/09/2004 | PHOTOGRAPH | |
| 174 | PLF | PLF | 09/09/2004 | PHOTOGRAPH | |
| 175 | PLF | PLF | 09/09/2004 | PHOTOGRAPH | |
| 176 | PLF | | | PHOTOGRAPH | Y |

Hearing Officer: Hon. Brian K. ⟩hikawa

Case ⟩mber: **CR2000-096032**

Co-D⟩ ⟩dant: **No**

Hearing Type: **TRIAL**

Hearing Date: **08/23/2004**

STATE OF ARIZONA

Counsel:   JUAN MARTINEZ

vs

WENDI ANDRIANO

Counsel:   DANIEL PATTERSON AND DAVID DELOZIER

| Ex # | ID | Off'd | In Evidence | Exhibit Description | Released |
|------|-----|-------|-------------|---------------------|----------|
| 177 | PLF | | | PHOTOGRAPH | Y |
| 178 | PLF | PLF | 09/22/2004 | PHOTOGRAPH | |
| 179 | PLF | PLF | 09/22/2004 | PHOTOGRAPH | |
| 180 | PLF | PLF | 09/22/2004 | PHOTOGRAPH | |
| 181 | PLF | PLF | 09/22/2004 | PHOTOGRAPH | |
| 182 | PLF | PLF | 09/22/2004 | PHOTOGRAPH | |
| 183 | PLF | PLF | 09/22/2004 | PHOTOGRAPH | |
| 184 | PLF | PLF | 09/22/2004 | PHOTOGRAPH | |
| 185 | PLF | PLF | 09/22/2004 | PHOTOGRAPH | |
| 186 | PLF | PLF | 09/22/2004 | PHOTOGRAPH | |
| 187 | PLF | PLF | 09/22/2004 | PHOTOGRAPH | |
| 188 | PLF | PLF | 09/22/2004 | PHOTOGRAPH | |
| 189 | PLF | PLF | 09/22/2004 | PHOTOGRAPH | |
| 190 | PLF | PLF | 09/22/2004 | PHOTOGRAPH | |
| 191 | PLF | PLF | 09/22/2004 | PHOTOGRAPH | |
| 192 | PLF | PLF | 09/22/2004 | PHOTOGRAPH | |
| 193 | PLF | PLF | 09/22/2004 | PHOTOGRAPH | |
| 194 | PLF | PLF | 09/22/2004 | PHOTOGRAPH | |
| 195 | PLF | PLF | 09/22/2004 | PHOTOGRAPH | |
| 196 | PLF | PLF | 09/16/2004 | PHOTOGRAPH | |
| 197 | PLF | PLF | 09/16/2004 | PHOTOGRAPH | |
| 198 | PLF | PLF | 09/16/2004 | PHOTOGRAPH | |
| 199 | PLF | PLF | 09/16/2004 | PHOTOGRAPH | |
| 200 | PLF | PLF | 09/16/2004 | PHOTOGRAPH | |
| 201 | PLF | PLF | 09/16/2004 | PHOTOGRAPH | |
| 202 | PLF | PLF | 09/16/2004 | PHOTOGRAPH | |

CR2000-096032  (08/23/2004)

000003738

A000000322

Hearing Officer: **Hon. Brian K.** hikawa

Case mber: CR2000-096032

Co-D, ndant: **No**

Hearing Type: **TRIAL**

Hearing Date: **08/23/2004**

STATE OF ARIZONA

Counsel:   JUAN MARTINEZ

vs

WENDI ANDRIANO

Counsel:   DANIEL PATTERSON AND DAVID DELOZIER

| Ex # | ID | Off'd | In Evidence | Exhibit Description | Released |
|------|-----|-------|-------------|---------------------|----------|
| 203 | PLF | PLF | 09/16/2004 | PHOTOGRAPH | |
| 204 | PLF | PLF | 09/16/2004 | PHOTOGRAPH | |
| 205 | PLF | PLF | 09/16/2004 | PHOTOGRAPH | |
| 206 | PLF | PLF | 09/16/2004 | PHOTOGRAPH | |
| 207 | PLF | PLF | 09/16/2004 | PHOTOGRAPH | |
| 208 | PLF | PLF | 09/16/2004 | PHOTOGRAPH | |
| 209 | PLF | PLF | 09/16/2004 | PHOTOGRAPH | |
| 210 | PLF | PLF | 09/28/2004 | CASSETTE TAPE (SEALED IN PLASTIC) | |
| 211 | PLF | PLF | 09/27/2004 | HANDWRITTEN NOTE (IN SEALED PLASTIC) | |
| 212 | PLF | PLF | 09/27/2004 | COPY OF MASS MUTUAL DEATH CLAIM INFORMATION (SEALED IN PLASTIC) | |
| 213 | PLF | PLF | 09/27/2004 | LIFE INSURANCE ILLUSTRATION DOCUMENTS (SEALED IN PLASTIC) | |
| 214 | PLF | | | HANDWRITTEN NOTES WRITTEN ON RENT.NET PAPER | Y |
| 214.001 | PLF | | | MISCELLANEOUS HAND WRITTEN NOTES (SEALED IN PLASTIC) | Y |
| 215 | PLF | | | CIGI COMPANIES DOCUMENTS (IN PLASTIC) | Y |
| 216 | PLF | | | ETERM.COM DOCUMENT AND ENVELOPE (IN PLASTIC) | Y |
| 217 | PLF | PLF | 09/20/2004 | AMICA LIFE FILE FOLDER WITH DOCUMENTS INSIDE (IN A SEALED PLASTIC) - UNSEALED AND RESEALED BY STATE ON 11/18/04 | |
| 218 | PLF | | | UPS NEXT DAY AIR PACKAGE (IN PLASTIC) | Y |
| 219 | PLF | PLF | 09/21/2004 | ENVELOPE CONTAINING PHOTOGRAPHS (IN A SEALED PLASTIC) (PREVIOUSLY CONTAINED TWO PHOTOGRAPHS NOW MARKED AS 219.001 AND 219.002) OPENED AND RESEALED BY STATE ON 11/18/04 | |
| 219.001 | PLF | PLF | 09/21/2004 | PHOTOGRAPH TAKEN FROM EXHIBIT 219 | |
| 219.002 | PLF | PLF | 11/01/2004 | PHOTOGRAPH TAKEN FROM EXHIBIT 219 | |

Hearing Officer: **Hon. Brian K. Ishikawa**

Case Number: **CR2000-096032**
Co-Defendant: **No**

Hearing Type: **TRIAL**

Hearing Date: **08/23/2004**

STATE OF ARIZONA

Counsel:   JUAN MARTINEZ

vs

WENDI ANDRIANO

Counsel:   DANIEL PATTERSON AND DAVID DELOZIER

| Ex # | ID | Off'd | In Evidence | Exhibit Description | Released |
|------|-----|-------|-------------|---------------------|----------|
| 220 | PLF | PLF | 09/20/2004 | WALLET (IN A SEALED PLASTIC) (PREVIOUSLY CONTAINED TWO RECEIPTS NOW MARKED AS EXHIBITS 220.001 AND 220.002) - OPENED AND SEALED BY STATE ON 11/18/04 | *Vault* |
| 220.001 | PLF | PLF | 11/01/2004 | RECEIPT DATED 10/07/00 TAKEN FROM EXHIBIT 220 | |
| 220.002 | PLF | PLF | 11/01/2004 | RECEIPT DATED 10/06/00 TAKEN FROM EXHIBIT 220 | |
| 221 | PLF | | | THREE BOTTLES PRESCRIPTION DRUGS (IN PLASTIC) | Y |
| 222 | PLF | | | A GUIDE TO PROPER NUTRITION (IN PLASTIC) | Y |
| 223 | PLF | PLF | 09/21/2004 | HANDWRITTEN NOTE ON BACK OF BUSINESS CARD (IN SEALED PLASTIC) OPENED AND RESEALED BY STATE 11/18/04 | |
| 224 | PLF | | | MOSBY MEDICAL ENCYCLOPEDIA (IN PLASTIC) | Y |
| 225 | PLF | | | SMALL BOX OF PRESCRIPTION DRUGS (IN PLASTIC) | Y |
| 226 | PLF | PLF | 09/20/2004 | YELLOW ENVELOPE WITH CARD INSIDE (IN SEALED PLASTIC) OPENED AND RESEALED BY STATE 11/18/04 | |
| 227 | PLF | | | RESUME FOR WENDI ANDRIANO (IN PLASTIC) | Y |
| 228 | PLF | PLF | 09/13/2004 | LETTERS (IN A SEALED PLASTIC) OPENED AND RESEALED BY STATE 11/18/04 | |
| 229 | PLF | PLF | 09/13/2004 | SEVERAL PHOTOGRAPHS AND WHITE ENVELOPE (IN A SEALED PLASTIC) OPENED AND RESEALED BY STATE 11/18/04 | |
| 229.001 | PLF | PLF | 09/13/2004 | PHOTOGRAPH TAKEN FROM EXHIBIT 229 | |
| 229.002 | PLF | PLF | 09/13/2004 | PHOTOGRAPH TAKEN FROM EXHIBIT 229 | |
| 230 | PLF | PLF | 09/08/2004 | SAN RIVA DOCUMENTS (IN A SEALED PLASTIC) OPENED AND RESEALED BY STATE 11/18/04 | |
| 231 | PLF | PLF | 09/21/2004 | HANDWRITTEN NOTE (IN A SEALED PLASTIC) AND RESEALED BY STATE 11/18/04 | |
| 231.001 | PLF | | | PURPLE ENVELOPE | Y |
| 232 | PLF | | | CARD AND GREEN ENVELOPE (IN PLASTIC) | Y |
| 233 | PLF | | | SUBSCRIBER RECORDS INFORMATION FROM USA.NET (IN PLASTIC) | Y |
| 233.001 | PLF | PLF | 09/21/2004 | DOCUMENT DATED 02/23/01 SUBSCRIBER RECORDS | |

Hearing Officer: **Hon. Brian K.    hika'wa**

Case    mber: **CR2000-096032**

Co-D    ndant: **No**

Hearing Type: **TRIAL**

Hearing Date: **08/23/2004**

STATE OF ARIZONA.

Counsel:   JUAN MARTINEZ

vs

WENDI ANDRIANO

Counsel:   DANIEL PATTERSON AND DAVID DELOZIER

| Ex # | ID | Off'd | In Evidence | Exhibit Description | Released |
|------|-----|-------|-------------|---------------------|----------|
| 234 | PLF | | | CHECK (#1161 – ACCT. #390260)  AND BANK STATEMENT (IN PLASTIC) | Y |
| 235 | PLF | | | BANK OF AMERICA DOCUMENTS AND ENVELOPE (IN PLASTIC) | Y |
| 236 | PLF | | | WHITE ENVELOPE CONTAINING DOCUMENTS FROM BANK OF AMERICA TO PHOENIX POLICE DEPARTMENT (IN PLASTIC) | Y |
| 237 | PLF | PLF | 09/14/2004 | BLOOD STAINED KNIFE IN BROWN WRAPPING IN SEALED PLASTIC BAG | *Vault* |
| 238 | PLF | PLF | 09/14/2004 | SMALL MANILLA ENVELOPE PURPORTED TO CONTAIN HAIR FROM VICTIM'S LEFT HAND (UNSEALED AND RESEALED BY AGENCY ON 05/26/04) | |
| 239 | PLF | PLF | 09/14/2004 | SMALL MANILLA ENVELOPE PURPORTED TO CONTAIN HAIR FROM VICTIM'S RIGHT HAND (UNSEALED AND RESEALED BY AGENCY ON 05/26/04) | |
| 240 | PLF | PLF | 09/14/2004 | BROKEN PIECE OF LAMP (IN A SEALED  PLASTIC) | |
| 241 | PLF | PLF | 09/14/2004 | BLOODSTAINED BROKEN PIECE OF LAMP (IN A SEALED PLASTIC INSIDE OF ZIPLOCK PLASTIC BAG) | |
| 242 | PLF | PLF | 09/14/2004 | BLOODSTAINED BROKEN PIECE OF LAMP (IN A SEALED PLASTIC) | |
| 243 | PLF | PLF | 09/14/2004 | BLOODSTAINED BROKEN PIECE OF LAMP (IN A SEALED PLASTIC) | |
| 244 | PLF | | | BLOODSTAINED MANILLA ENVELOPE (IN PLASTIC) | Y |
| 245 | PLF | PLF | 09/14/2004 | BLOODSTAINED WHITE NAPKIN (IN A SEALED PLASTIC) | |
| 246 | PLF | PLF | 09/14/2004 | BLOODSTAINED PAPER (IN A SEALED PLASTIC) | |
| 247 | PLF | | | BLOODSTAINED PIECE OF WOOD FROM STOOL (IN PLASTIC) | Y |
| 248 | PLF | PLF | 09/14/2004 | CUT CELL PHONE CORD (IN A SEALED PLASTIC) OPENED AND RESEALED BY STATE ON 11/18/04 | |
| 249 | PLF | PLF | 09/13/2004 | BLOODSTAINED SECTION OF BARSTOOL SEAT WITH ORIGINAL WHITE PACKAGING ENVELOPE (IN A SEALED PLASTIC ) UNSEALED AND RESEALED BY STATE ON 11/18/04 | |
| 250 | PLF | | | BLOODSTAINED GIRLS' PANTS (IN PLASTIC) | Y |

Hearing Officer: **Hon. Brian K. Ishikawa**

Case Number: **CR2000-096032**

Co-Defendant: No

Hearing Type: **TRIAL**

Hearing Date: **08/23/2004**

STATE OF ARIZONA

Counsel:   JUAN MARTINEZ

vs

WENDI ANDRIANO

Counsel:   DANIEL PATTERSON AND DAVID DELOZIER

| Ex # | ID | Off'd | In Evidence | Exhibit Description | Released |
|---|---|---|---|---|---|
| 251 | PLF | PLF | 09/14/2004 | BLOODSTAINED HAIR BARRETT AND PLASTIC BAGGIE (IN A SEALED PLASTIC)  OPENED AND RESEALED BY STATE 11/18/04 | |
| 252 | PLF | PLF | 09/14/2004 | VICTIM'S SHORT AT TIME OF DEATH (IN A CLEAR PLASTIC) OPENED AND RESEALED BY STATE 11/18/04 | |
| 253 | PLF | PLF | 09/20/2004 | WHITE COTTON T-SHIRT (IN A SEALED PLASTIC) OPENED AND RESEALED BY STATE 11/18/04 | |
| 254 | PLF | | | PAIR OF BLOODSTAINED SHOES (IN PLASTIC) | Y |
| 255 | PLF | PLF | 09/20/2004 | PAIR OF BLOODSTAINED SHORTS (IN A SEALED PLASTIC) OPENED AND RESEALED BY STATE 11/18/04 | |
| 256 | PLF | PLF | 09/14/2004 | BLOODSTAINED BLANKET (IN A SEALED PLASTIC) OPENED AND RESEALED BY STATE 11/18/04 | |
| 257 | PLF | PLF | 09/13/2004 | BLOODSTAINED SECTION OF BARSTOOL SEAT (IN SEALED PLASTIC) OPENED AND RESEALED BY STATE 11/18/04 | |
| 258 | PLF | PLF | 09/13/2004 | BLOODSTAINED BROKEN BARSTOOL (IN SEALED PLASTIC) | |
| 259 | PLF | PLF | 09/13/2004 | BARSTOOL | |
| 260 | PLF | PLF | 09/14/2004 | BLOODSTAINED PILLOW CASE (IN SEALED PLASTIC) OPENED AND RESEALED BY STATE 11/18/04 | |
| 261 | PLF | | | GARBAGE CAN (IN BAG) | Y |
| 262 | PLF | | | BLOODSTAINED FRAMED PICTURE (IN PLASTIC) | Y |
| 263 | PLF | PLF | 09/14/2004 | LAMP IN BOX | |
| 264 | PLF | PLF | 09/22/2004 | POISON PACKING MATERIALS (IN SEALED PLASTIC) | |
| 265 | PLF | PLF | 09/22/2004 | POISON SILVER PACKING MATERIALS (IN SEALED PLASTIC) | |
| 266 | PLF | PLF | 09/21/2004 | LARGE WHITE ENVELOPE CONTAINING POISONOUS MATERIALS(IN SEALED PLASTIC) OPENED AND RESEALED BY AGENCY 11/18/04 | |
| 266.001 | PLF | PLF | 09/21/2004 | MANILLA ENVELOPE, (IN SEALED PLASTIC) OPENED AND RESEALED BY AGENCY 11/18/04 | |
| 266.002 | PLF | PLF | 09/21/2004 | SAN RIVA HISTORY DOCUMENT (IN SEALED PLASTIC) OPENED AND RESEALED BY STATE 11/18/04 | |

Hearing Officer: Hon. Brian K.   hikawa

Case   mber: CR2000-096032

Co-D    idant: No

Hearing Type: **TRIAL**

Hearing Date: **08/23/2004**

STATE OF ARIZONA

vs

WENDI ANDRIANO

Counsel:   JUAN MARTINEZ

Counsel:   DANIEL PATTERSON AND DAVID DELOZIER

| Ex # | ID | Off'd | In Evidence | Exhibit Description | Released |
|------|-----|-------|-------------|---------------------|----------|
| 266.003 | PLF | PLF | 09/21/2004 | SHIPPING DOCUMENT (IN SEALED PLASTIC) OPENED AND RESEALED BY STATE 11/18/04 | |
| 266.004 | PLF | PLF | 09/21/2004 | PACKAGING LABEL (IN PLASTIC) | |
| 266.005 | PLF | PLF | 09/21/2004 | ALFA AESAR SAFETY DATA SHEET  DOCUMENT DATED 9/28/00 (IN SEALED PLASTIC) OPENED AND RESEALED BY STATE 11/18/04 | |
| 266.006 | PLF | PLF | 09/21/2004 | ALFA AESAR DOCUMENTS (IN SEALED PLASTIC) OPENED AND RESEALED BY STATE 11/18/04 | |
| 266.007 | PLF | PLF | 09/21/2004 | DOCUMENT DATED 3/31/02  (IN SEALED PLASTIC) OPENED AND RESEALED BY STATE 11/18/04 | |
| 266.008 | PLF | PLF | 09/21/2004 | LABORATORY REFERNCE MANUALS  (IN SEALED PLASTIC) OPENED AND RESEALED BY STATE 11/18/04 | |
| 266.009 | PLF | PLF | 09/21/2004 | EMAILED DATED 9/25/00 DOCUMENTS  (IN SEALED PLASTIC) OPENED AND RESEALED BY STATE 11/18/04 | |
| 266.010 | PLF | PLF | 09/21/2004 | EMAILED DOCUMENTS AND POST-ITS  (IN SEALED PLASTIC) OPENED AND RESEALED BY STATE 11/18/04 | |
| 266.011 | PLF | PLF | 09/21/2004 | VOIGT GLOBAL DOCUMENT (IN PLASTIC) (IN SEALED PLASTIC) OPENED AND RESEALED BY STATE 11/18/04 | |
| 266.012 | PLF | PLF | 09/21/2004 | CITY OF PHOENIX  LIC. #9002400 DOCUMENT (IN SEALED PLASTIC) OPENED AND RESEALED BY STATE 11/18/04 | |
| 266.013 | PLF | PLF | 09/21/2004 | CITY OF PHOENIX LIC #9002501  DOCUMENT  (IN SEALED PLASTIC) OPENED AND RESEALED BY STATE 11/18/04) | |
| 266.014 | PLF | PLF | 09/21/2004 | CITY OF PHOENIX DOCUMENT (IN SEALED PLASTIC) (COPY OF 266.013)  OPENED AND RESEALED BY STATE 11/18/04 | |
| 266.015 | PLF | PLF | 09/21/2004 | COPY OF CITY OF PHOENIX DOCUMENT  (TO ALLEN) (IN SEALED PLASTIC) OPENED AND RESEALED BY STATE 11/18/04 | |
| 266.016 | PLF | PLF | 09/21/2004 | AZ DEPT. OF REVENUE DOCUMENT  (IN SEALED PLASTIC) OPENED AND RESEALED BY STATE 11/18/04 | |
| 266.017 | PLF | PLF | 09/21/2004 | ALMOND EXTRACT DOCUMENT  (IN SEALED PLASTIC) OPENED AND RESEALED BY STATE 11/18/04 | |
| 266.018 | PLF | PLF | 09/21/2004 | EMAILED  DOCUMENT DATED 03/21/00 (IN PLASTIC) (IN SEALED PLASTIC) OPENED AND RESEALED BY STATE 11/18/04 | |

Hearing Officer: **Hon. Brian K.  hikawa**                          Case   mber: **CR2000-096032**

                                                                   Co-E   ndant: **No**

Hearing Type: **TRIAL**                                            Hearing Date: **08/23/2004**

---

STATE OF ARIZONA                          Counsel:    JUAN MARTINEZ

        vs

WENDI ANDRIANO                            Counsel:    DANIEL PATTERSON AND DAVID
                                                      DELOZIER

| Ex # | ID | Off'd | In Evidence | Exhibit Description | Released |
|------|-----|-------|-------------|---------------------|----------|
| 266.019 | PLF | PLF | 09/21/2004 | CYANIDE AND ALMONDS DOCUMENT  (IN SEALED PLASTIC) OPENED AND RESEALED BY STATE 11/18/04 | |
| 266.020 | PLF | PLF | 09/21/2004 | DOCUMENT DATED 7/31/00 (IN SEALED PLASTIC) OPENED AND RESEALED BY STATE 11/18/04 | |
| 266.021 | PLF | PLF | 09/21/2004 | REMIT TO DOCUMENT  (IN SEALED PLASTIC) OPENED AND RESEALED BY STATE 11/18/04 | |
| 266.022 | PLF | PLF | 09/21/2004 | DOCUMENT WITH PARTIAL SIGNATURE  (IN SEALED PLASTIC) OPENED AND RESEALED BY STATE 11/18/04 | |
| 267 | PLF | PLF | 09/21/2004 | FAX COVER SHEET/LETTER FROM VOIGT GLOBAL DISTRIBUTION  (IN SEALED PLASTIC) OPENED AND RESEALED BY STATE 11/18/04 | |
| 268 | PLF | | | TIN CAN | Y |
| 269 | PLF | PLF | 09/22/2004 | PLASTIC FORK AND BAGGIE CONTAINING SUBSTANCE PURPORTED TO BE SODIUM AZIDE (IN SEALED PLASTIC) | |
| 270 | PLF | PLF | 09/22/2004 | PLASTIC KNIFE CONTAINING SODIUM AZIDE RESIDUE (IN SEALED PLASTIC) | |
| 271 | PLF | PLF | 09/22/2004 | PLASTIC TUPPERWARE IN BAGGIE CONTAINING SODIUM AZIDE RESIDUE (IN SEALED PLASTIC) | |
| 272 | PLF | PLF | 09/22/2004 | SMALL ROUND TUPPERWARE CONTINING SODIUM AZIDE RESIDUE (IN  SEALED PLASTIC) | |
| 273 | PLF | PLF | 09/22/2004 | WHITE PAPERTOWELL CONTAINING SODIUM AZIDE RESIDUE (IN SEALED PLASTIC) | |
| 274 | PLF | PLF | 09/22/2004 | ONE PAIR OF LATEX GLOVES (IN  SEALED  PLASTIC) | |
| 275 | PLF | PLF | 09/22/2004 | LATEX GLOVE (IN SEALED PLASTIC) | |
| 276 | PLF | PLF | 09/22/2004 | TWO PIECES OF ALUMINUM PACKING FOIL (IN SEALED PLASTIC) | |
| 277 | PLF | PLF | 09/22/2004 | BUBBLE WRAP (IN SEALED PLASTIC) | |
| 278 | PLF | PLF | 09/22/2004 | CLEAR PLASTIC BAG WITH BLACK RESIDUE (IN SEALED PLASTIC) | |
| 279 | PLF | PLF | 09/27/2004 | ELDERBERRY HERBAL SUPLEMENTS (IN SEALED PLASTIC).  Opened in Court on 10/20/2004 by Defense Counsel, David Delozier.  Resealed by the clerk on 10/20/2004 per Court Order. | |

Hearing Officer: **Hon. Brian K.** hikawa

Case umber: **CR2000-096032**

Co-D ndant: **No**

Hearing Type: **TRIAL**

Hearing Date: **08/23/2004**

STATE OF ARIZONA

    vs

WENDI ANDRIANO

Counsel:   JUAN MARTINEZ

Counsel:   DANIEL PATTERSON AND DAVID DELOZIER

| Ex # | ID | Off'd | In Evidence | Exhibit Description | Released |
|------|-----|-------|-------------|---------------------|----------|
| 280 | PLF | PLF | 09/29/2004 | ONE HANDWRITING EXEMPLAR DATED 6/12/02 (IN SEALED PLASTIC) OPENED AND RESEALED BY STATE 11/18/04 | |
| 280.001 | PLF | PLF | 09/29/2004 | ONE HANDWRITING EXEMPLAR DATED 2/6/01 (IN PLASTIC) (IN SEALED PLASTIC) OPENED AND RESEALED BY STATE 11/18/04 | |
| 281 | PLF | | | SUBSCRIBER INFORMATION FROM USA.NET (IN PLASTIC) | Y |
| 281.001 | PLF | PLF | 09/21/2004 | AZCREAT @ USA.NET  SUBSCRIBER RECORDS DOCUMENT | |
| 282 | PLF | PLF | 09/22/2004 | HANDWRITTEN NOTE (IN SEALED PLASTIC) | |
| 283 | PLF | | | PINK POST-IT NOTE (IN PLASTIC) | Y |
| 284 | PLF | | | PHOTOCOPIES OF SEVERAL DOCUMENTS EACH IN PLASTIC BAGS (IN PLASTIC) | Y |
| 285 | PLF | | | 42 LATENT PHOTOGRAPHS - NEGATIVES (IN PLASTIC) | Y |
| 285.001 | PLF | PLF | 09/23/2004 | LATENT PHOTOGRAPHS | |
| 285.002 | PLF | PLF | 09/23/2004 | LATENT PHOTOGRAPHS | |
| 285.003 | PLF | PLF | 09/23/2004 | LATENT PHOTOGRAPHS | |
| 285.004 | PLF | PLF | 09/23/2004 | LATENT PHOTOGRAPHS | |
| 285.005 | PLF | PLF | 09/23/2004 | LATENT PHOTOGRAPHS | |
| 285.006 | PLF | PLF | 09/23/2004 | LATENT PHOTOGRAPHS | |
| 285.007 | PLF | PLF | 09/23/2004 | LATENT PHOTOGRAPHS | |
| 285.008 | PLF | PLF | 09/23/2004 | LATENT PHOTOGRAPHS | |
| 285.009 | PLF | PLF | 09/23/2004 | LATENT PHOTOGRAPHS | |
| 285.010 | PLF | PLF | 09/23/2004 | LATENT PHOTOGRAPHS | |
| 285.011 | PLF | PLF | 09/23/2004 | LATENT PHOTOGRAPHS | |
| 285.012 | PLF | PLF | 09/23/2004 | LATENT PHOTOGRAPHS | |
| 285.013 | PLF | PLF | 09/23/2004 | LATENT PHOTOGRAPHS | |
| 285.014 | PLF | PLF | 09/23/2004 | LATENT PHOTOGRAPHS | |

Hearing Officer: **Hon. Brian K.** hikawa

Hearing Type: **TRIAL**

Case mber: **CR2000-096032**

Co-D ndant: **No**

Hearing Date: **08/23/2004**

STATE OF ARIZONA

vs

WENDI ANDRIANO

Counsel:   JUAN MARTINEZ

Counsel:   DANIEL PATTERSON AND DAVID DELOZIER

| Ex # | ID | Off'd | In Evidence | Exhibit Description | Released |
|------|-----|-------|-------------|---------------------|----------|
| 285.015 | PLF | PLF | 09/23/2004 | LATENT PHOTOGRAPHS | |
| 285.016 | PLF | PLF | 09/23/2004 | LATENT PHOTOGRAPHS | |
| 285.017 | PLF | PLF | 09/23/2004 | LATENT PHOTOGRAPHS | |
| 285.018 | PLF | PLF | 09/23/2004 | LATENT PHOTOGRAPHS | |
| 285.019 | PLF | PLF | 09/23/2004 | LATENT PHOTOGRAPHS | |
| 285.020 | PLF | PLF | 09/23/2004 | LATENT PHOTOGRAPHS | |
| 285.021 | PLF | PLF | 09/23/2004 | LATENT PHOTOGRAPHS | |
| 285.022 | PLF | PLF | 09/23/2004 | LATENT PHOTOGRAPHS | |
| 285.023 | PLF | PLF | 09/23/2004 | LATENT PHOTOGRAPH | |
| 285.024 | PLF | PLF | 09/23/2004 | LATENT PHOTOGRAPHS | |
| 285.025 | PLF | PLF | 09/23/2004 | LATENT PHOTOGRAPHS | |
| 285.026 | PLF | PLF | 09/23/2004 | LATENT PHOTOGRAPHS | |
| 285.027 | PLF | PLF | 09/23/2004 | LATENT PHOTOGRAPHS | |
| 285.028 | PLF | PLF | 09/23/2004 | LATENT PHOTOGRAPHS | |
| 285.029 | PLF | PLF | 09/23/2004 | LATENT PHOTOGRAPHS | |
| 285.030 | PLF | | | LATENT PHOTOGRAPH | Y |
| 285.031 | PLF | | | LATENT PHOTOGRAPH | Y |
| 285.032 | PLF | | | LATENT PHOTOGRAPH | Y |
| 285.033 | PLF | | | LATENT PHOTOGRAPH | Y |
| 285.034 | PLF | | | LATENT PHOTOGRAPH | Y |
| 285.035 | PLF | | | LATENT PHOTOGRAPH | Y |
| 285.036 | PLF | | | LATENT PHOTOGRAPH | Y |
| 285.037 | PLF | | | LATENT PHOTOGRAPH | Y |
| 285.038 | PLF | | | LATENT PHOTOGRAPH | Y |
| 285.039 | PLF | | | LATENT PHOTOGRAPH | Y |
| 285.040 | PLF | | | LATENT PHOTOGRAPH | Y |

Hearing Officer: **Hon. Brian K.   hikawa**

Hearing Type: **TRIAL**

Case    mber: **CR2000-096032**
Co-D    ..dant: **No**
Hearing Date: **08/23/2004**

STATE OF ARIZONA

vs

WENDI ANDRIANO

Counsel:   JUAN MARTINEZ

Counsel:   DANIEL PATTERSON AND DAVID DELOZIER

| Ex # | ID | Off'd | In Evidence | Exhibit Description | Released |
|------|----|----|----|----|----|
| 285.041 | PLF | | | LATENT PHOTOGRAPH | Y |
| 285.042 | PLF | | | LATENT PHOTOGRAPH | Y |
| 286 | PLF | | | ENVELOPE AND LETTER FROM VOIGT GLOBAL DISTRIBUTION (IN PLASTIC) | Y |
| 286.001 | PLF | PLF | 09/21/2004 | PHOTO COPY OF CHECK AND MONEY ORDER | |
| 287 | PLF | PLF | 09/21/2004 | ABCO FOODS MONEY ORDER (IN SEALED PLASTIC) - UNSEALED AND RESEALED BY STATE ON 11/18/04 | |
| 288 | PLF | PLF | 09/20/2004 | BLACK PLASTIC FILM CONTAINER AND TWO LATENT PHOTOGRAPHS - NEGATIVES (IN SEALED PLASTIC) - UNSEALED AND RESEALED BY THE STATE ON 11/18/04 | |
| 289 | PLF | | | LATENT PHOTOGRAPHS AND NEGATIVES (IN PLASTIC) | Y |
| 289.001 | PLF | PLF | 09/27/2004 | LATENT CARD | |
| 289.002 | PLF | PLF | 09/27/2004 | LATENT PHOTOGRAPHS (3) | |
| 289.003 | PLF | PLF | 09/27/2004 | LATENT PHOTOGRAPHS (2) | |
| 289.004 | PLF | PLF | 09/27/2004 | LATENT PHOTOGRAPH | |
| 289.005 | PLF | PLF | 09/27/2004 | LATENT PHOTOGRAPH | |
| 289.006 | PLF | PLF | 09/27/2004 | LATENT PHOTOGRAPH | |
| 289.007 | PLF | PLF | 09/27/2004 | LATENT PHOTOGRAPH | |
| 289.008 | PLF | PLF | 09/27/2004 | LATENT CARD | |
| 290 | PLF | | | FILM NEGATIVES (IN PLASTIC) | Y |
| 291 | PLF | PLF | 09/20/2004 | 18 LIFTS FROM THE FRONT DOOR (IN SEALED PLASTIC) (PREVIOUSLY CONTAINING FINGERPRINT CARD NOW MARKED AS EXHIBIT 291.001) - UNSEALED AND SEALED BY AGENCY ON 11/18/04 | |
| 291.001 | PLF | PLF | 09/20/2004 | FINGERPRINT CARD (TAKEN FROM EXHIBIT 291) | |
| 291.002 | PLF | | | NOT USED | Y |
| 292 | PLF | | | PINK PLASTIC BOWL AND BROWN PAPER BAG CONTAINING SODIUM AZIDE RESIDUE (IN PLASTIC) | Y |
| 293 | PLF | PLF | 09/20/2004 | BOX OF LATEX GLOVES AND BROWN PAPER BAG (IN PLASTIC) | |

000003747

A000000331

Hearing Officer: **Hon. Brian K.**  hikawa

Case  mber: **CR2000-096032**

Co-D  dant: **No**

Hearing Type: **TRIAL**

Hearing Date: **08/23/2004**

STATE OF ARIZONA

Counsel:   JUAN MARTINEZ

vs

WENDI ANDRIANO

Counsel:   DANIEL PATTERSON AND DAVID DELOZIER

| Ex # | ID | Off'd | In Evidence | Exhibit Description | Released |
|------|-----|-------|-------------|---------------------|----------|
| 294 | PLF | PLF | 09/13/2004 | LARGE DIAGRAM | Chart |
| 295 | PLF | | | LARGE DIAGRAM | Y |
| 296 | PLF | PLF | 09/21/2004 | LARGE DIAGRAM | Chart |
| 297 | PLF | PLF | 09/08/2004 | LARGE DIAGRAM | Chart |
| 298 | PLF | | | BLOODSTAINED FLORAL PILLOW (IN PLASTIC) | Y |
| 299 | PLF | | | BLOODSTAINED FLORAL PILLOW (IN PLASTIC) | Y |
| 300 | PLF | | | BROKEN FLOWER POT IN BROWN PAPER BAG (IN PLASTIC) | Y |
| 301 | PLF | | | BLOODSTAINED SEAT CUSHION (IN PLASTIC) | Y |
| 302 | PLF | | | BLOODSTAINED CARPET (IN PLASTIC) | Y |
| 303 | PLF | | | BLOODSTAINED CARPET (IN PLASTIC) | Y |
| 304 | PLF | | | BLOODSTAINED DOOR HANDLE (IN PLASTIC) | Y |
| 305 | PLF | | | BLOODSTAINED ARM COVER (IN PLASTIC) | Y |
| 306 | PLF | | | BLOODSTAINED DUST COVER (IN PLASTIC) | Y |
| 307 | PLF | | | BLOODSTAINED DUST COVER (IN PLASTIC) | Y |
| 308 | PLF | | | BLOODSTAINED FLORAL PILLOW (IN PLASTIC) | Y |
| 309 | PLF | | | BLOODSTAINED CUSION COVER (IN PLASTIC) | Y |
| 310 | PLF | | | BLOODSTAINED CUSHION COVER (IN PLASTIC) | Y |
| 311 | PLF | | | BLOODSTAINED CARPET (IN PLASTIC) | Y |
| 312 | PLF | | | BLOODSTAINED WHITE PILLOW IN BOX | Y |
| 313 | PLF | PLF | 09/08/2004 | PHOTOGRAPH | |
| 314 | PLF | PLF | 09/21/2004 | DELIVERY MANIFEST FROM AIRBORNE EXPRESS (IN SEALED PLASTIC) OPENED AND RESEALED BY STATE ON 11/18/04 | |
| 315 | PLF | | | PHOTOGRAPH | Y |
| 316 | PLF | | | PHOTOGRAPH | Y |
| 317 | PLF | PLF | 09/13/2004 | PHOTOGRAPH | |

Hearing Officer: **Hon. Brian K.** hikawa

Hearing Type: **TRIAL**

Case  mber: **CR2000-096032**
Co-D  ndant: **No**
Hearing Date: **08/23/2004**

STATE OF ARIZONA                    Counsel:    JUAN MARTINEZ

          vs

WENDI ANDRIANO                    Counsel:    DANIEL PATTERSON AND DAVID
                                             DELOZIER

| Ex # | ID | Off'd | In Evidence | Exhibit Description | Released |
|------|------|-------|-------------|---------------------|----------|
| 318 | PLF | | | PHOTOGRAPH | Y |
| 319 | PLF | PLF | 09/13/2004 | PHOTOGRAPH | |
| 320 | PLF | PLF | 09/13/2004 | PHOTOGRAPH | |
| 321 | PLF | PLF | 09/14/2004 | SM MAP WITH MEASUREMENTS | |
| 322 | PLF | PLF | 09/14/2004 | SM MAP APT. COMPLEX | |
| 323 | PLF | PLF | 09/14/2004 | BLOODSTAINED SILVERWARE TRAY (IN SEA;ED PLASTIC) UNSEALED AND RESEALED BY AGENCY ON 11/18/04 | |
| 324 | PLF | PLF | 09/13/2004 | BELT (IN PLASTIC) (IN SEALED PLASTIC) OPENED AND RESEALED BY STATE ON 9/13/04 | |
| 325 | DEF | | | PHOENIX FIRE DEPT. EMS INCIDENT REPORT | Y |
| 326 | DEF | | | PACKET OF DOCTOR'S REPORTS AND INFORMATION | Y |
| 327 | DEF | | | PACKET OF MEDICAL FILMS | Y |
| 328 | PLF | PLF | 09/20/2004 | PHOTOGRAPH | |
| 329 | PLF | PLF | 09/20/2004 | PHOTOGRAPH | |
| 330 | PLF | PLF | 09/20/2004 | PHOTOGRAPH | |
| 331 | PLF | PLF | 09/20/2004 | PHOTOGRAPH | |
| 332 | PLF | PLF | 09/20/2004 | PHOTOGRAPH | |
| 333 | PLF | PLF | 09/20/2004 | PHOTOGRAPH | |
| 334 | PLF | PLF | 09/20/2004 | PHOTOGRAPH | |
| 335 | PLF | PLF | 09/20/2004 | PHOTOGRAPH | |
| 336 | PLF | PLF | 09/20/2004 | PHOTOGRAPH | |
| 337 | PLF | PLF | 09/20/2004 | PHOTOGRAPH | |
| 338 | PLF | PLF | 09/20/2004 | PHOTOGRAPH | |
| 339 | PLF | PLF | 09/20/2004 | PHOTOGRAPH | |
| 340 | PLF | PLF | 09/20/2004 | PHOTOGRAPH | |
| 341 | PLF | PLF | 09/20/2004 | PHOTOGRAPH | |

000003749                                   A000000333

Hearing Officer: Hon. Brian K.  hikawa

Case   mber: **CR2000-096032**

Co-D   ndant: **No**

Hearing Type: **TRIAL**

Hearing Date: **08/23/2004**

STATE OF ARIZONA

Counsel:   JUAN MARTINEZ

vs

WENDI ANDRIANO

Counsel:   DANIEL PATTERSON AND DAVID DELOZIER

| Ex # | ID | Off'd | In Evidence | Exhibit Description | Released |
|------|-----|-------|-------------|---------------------|----------|
| 342 | PLF | PLF | 09/20/2004 | PHOTOGRAPH | |
| 343 | PLF | | | PHOTOGRAPH | Y |
| 344 | PLF | PLF | 11/09/2004 | PHOTOGRAPH | |
| 345 | PLF | PLF | 11/09/2004 | PHOTOGRAPH | |
| 346 | PLF | | | PHOTOGRAPH | Y |
| 347 | PLF | PLF | 11/09/2004 | PHOTOGRAPH | |
| 348 | PLF | | | PHOTOGRAPH | Y |
| 349 | PLF | | | PHOTOGRAPH | Y |
| 350 | PLF | | | PHOTOGRAPH | Y |
| 351 | PLF | PLF | 09/20/2004 | COPIES OF FINGERPRINTS | |
| 352 | PLF | PLF | 09/20/2004 | SMALL BOTTLE OF UNKNOWN FOOD ITEM (IN SEALED PLASTIC) | |
| 353 | PLF | PLF | 09/20/2004 | BOTTLE OF UNKNOWN FOOD ITEM (IN SEALED PLASTIC) | |
| 354 | PLF | PLF | 09/20/2004 | BOTTLE OF UNKNOWN FOOD ITEM (IN SEALED PLASTIC) OPENED AND RESEALED BY STATE ON 11/18/04 | |
| 355 | PLF | PLF | 09/20/2004 | BOTTLE OF UNKNOWN FOOD ITEM (IN SEALED PLASTIC) | |
| 356 | PLF | PLF | 09/20/2004 | JAR OF UNKOWN FOOD ITEM (IN SEALED PLASTIC) OPENED AND RESEALED BY COURT ON 11/18/04 | |
| 357 | PLF | PLF | 09/20/2004 | PHOTOGRAPH | |
| 358 | PLF | PLF | 09/20/2004 | PHOTOGRAPH | |
| 359 | PLF | PLF | 09/20/2004 | PHOTOGRAPH | |
| 360 | PLF | PLF | 09/20/2004 | PHOTOGRAPH | |
| 361 | PLF | PLF | 09/20/2004 | PHOTOGRAPH | |
| 362 | DEF | | | PHOENIX POLICE DEPARTMENT REPORT | Y |
| 363 | PLF | PLF | 09/20/2004 | PHOTOGRAPH | |
| 364 | PLF | PLF | 09/20/2004 | PHOTOGRAPH | |

Hearing Officer: **Hon. Brian K.  hikawa**          Case   mber: **CR2000-096032**

Co-D    dant: **No**

Hearing Type: **TRIAL**                               Hearing Date: **08/23/2004**

STATE OF ARIZONA                    Counsel:   JUAN MARTINEZ

vs

WENDI ANDRIANO                      Counsel:   DANIEL PATTERSON AND DAVID
                                               DELOZIER

| Ex # | ID | Off'd | In Evidence | Exhibit Description | Released |
|------|-----|-------|-------------|---------------------|----------|
| 365 | PLF | PLF | 09/20/2004 | PHOTOGRAPH | |
| 366 | PLF | PLF | 09/21/2004 | DIAGRAM | |
| 367 | PLF | PLF | 09/21/2004 | LATEX GLOVE (IN PLASTIC) | |
| 368 | PLF | | | PAPERS (IN PLASTIC) | Y |
| 368.001 | PLF | PLF | 09/21/2004 | NOTE | |
| 369 | PLF | PLF | 09/21/2004 | VERIZON BILL  (IN SEALED PLASTIC) OPENED AND RESEALED BY STATE ON 11/18/04 | |
| 370 | PLF | | | MANILLA ENVELOPE | Y |
| 371 | PLF | PLF | 09/23/2004 | FLOPPY DISK  (IN SEALED PLASTIC) OPENED AND RESEALED BY STATE ON 11/18/04 | |
| 372 | PLF | PLF | 09/22/2004 | CORRESPONDENCE DOCUMENT FROM ANNE NEWTON 8/21/00 | |
| 373 | PLF | PLF | 09/22/2004 | CORRESPONDENCE "SALES" DOCUMENT | |
| 374 | PLF | PLF | 09/22/2004 | CORRESPONDENCE DOCUMENT FROM ANNE NEWTON DATED 8/23/00 | |
| 375 | PLF | PLF | 09/22/2004 | CORRESPONDENCE  DOCUMENT- FID # REQUEST | |
| 376 | PLF | PLF | 09/22/2004 | CORRESPONDENCE DOCUMENT FID# PROVIDED | |
| 377 | PLF | PLF | 09/22/2004 | CORRESPONDENCE DOCUMENT REQUESTING PROOF OF BUSINESS | |
| 378 | PLF | PLF | 09/22/2004 | CORRESPONDENCE DOCUMENT FROM ANNE NEWTON DATED 9/19/00 | |
| 379 | PLF | PLF | 09/22/2004 | CORRESPONDENCE DOCUMENT "WARNING" CHEMICAL WILL EXPLODE WHEN HEATED | |
| 380 | PLF | PLF | 09/22/2004 | CORRESPONDENCE DOCUMENT DATED 9/22/00 | |
| 381 | PLF | PLF | 09/22/2004 | CORRESPONDENCE DOCUMENT "CHEMICAL DESCRIPTION CLARIFICATION" | |
| 382 | PLF | PLF | 09/22/2004 | ADDRESS "AZTEC CREATIONS" DOCUMENT | |
| 383 | PLF | PLF | 09/22/2004 | VOIGT AGREEMENT DOCUMENT UNSIGNED | |
| 384 | PLF | PLF | 09/22/2004 | DOCUMENTS FROM INTERNET "SODIUM AZIDE" | |
| 385 | PLF | PLF | 09/22/2004 | EMAIL DOCUMENTS "LEWIS DOT OF SODIUM AZIDE" | |

000003751

A000000335

Hearing Officer: Hon. Brian K.   hikawa

Case    mber: CR2000-096032

Co-D    ndant: No

Hearing Type: **TRIAL**

Hearing Date: 08/23/2004

STATE OF ARIZONA

vs

WENDI ANDRIANO

Counsel:   JUAN MARTINEZ

Counsel:   DANIEL PATTERSON AND DAVID DELOZIER

| Ex # | ID | Off'd | In Evidence | Exhibit Description | Released |
|------|-----|-------|-------------|---------------------|----------|
| 386 | PLF | PLF | 09/23/2004 | BUCKET CONTAINING SODIUM AZIDE | |
| 387 | PLF | PLF | 09/23/2004 | BROWN BOTTLE CONTAININT SODIUM AZIDE (IN SEALED PLASTIC) OPENED AND RESEALED BY STATE ON 11/18/04 | |
| 388 | PLF | PLF | 09/23/2004 | Q-TIPS (IN SEALED PLASTIC) | |
| 389 | PLF | | | DOCUMENT | Y |
| 390 | PLF | | | DOCUMENT | Y |
| 391 | PLF | | | DOCUMENT | Y |
| 392 | DEF | DEF | | WCAS DOCUMENT | |
| 393 | DEF | DEF | | WEST COAST ANALYTICAL DOCUMENTS | |
| 394 | PLF | PLF | | CONTENTS DOCUMENTS | |
| 394.001 | PLF | PLF | 09/28/2004 | MISC. DOCUMENTS | |
| 395 | PLF | | | CD-R DISC | Y |
| 396 | DEF | | | PHOTOGRAPH | Y |
| 397 | DEF | | | PHOTOGRAPH | Y |
| 398 | DEF | | | PHOTOGRAPH | Y |
| 399 | DEF | | | PHOTOGRAPH | Y |
| 400 | DEF | | | PHOTOGRAPH | Y |
| 401 | DEF | | | PHOTOGRAPH | Y |
| 402 | DEF | | | PHOTOGRAPH | Y |
| 403 | DEF | | | PHOTOGRAPH | Y |
| 404 | DEF | | | PHOTOGRAPH | Y |
| 405 | DEF | | | PHOTOGRAPH | Y |
| 406 | DEF | DEF | 10/04/2004 | PHOTOGRAPH | |
| 407 | DEF | DEF | 10/04/2004 | PHOTOGRAPH | |
| 408 | DEF | DEF | 10/04/2004 | PHOTOGRAPH | |
| 409 | DEF | | | PHOTOGRAPH | Y |

A000000336

000003752

Hearing Officer: **Hon. Brian K.   hikawa**

Case   mber: **CR2000-096032**

Co-D   )dant: **No**

Hearing Type: **TRIAL**

Hearing Date: **08/23/2004**

STATE OF ARIZONA

Counsel:   JUAN MARTINEZ

vs

WENDI ANDRIANO

Counsel:   DANIEL PATTERSON AND DAVID DELOZIER

| Ex # | ID | Off'd | In Evidence | Exhibit Description | Released |
|------|-----|-------|-------------|---------------------|----------|
| 410 | DEF | PLF | 10/05/2004 | PHOTOGRAPH | |
| 411 | DEF | | | PHOTOGRAPH | Y |
| 412 | DEF | DEF | 10/05/2004 | PHOTOGRAPH IN BROWN PAPER FRAME | |
| 413 | DEF | | | PHOTOGRAPH | Y |
| 414 | DEF | | | PHOTOGRAPH | Y |
| 415 | DEF | | | PHOTOGRAPH | Y |
| 416 | DEF | | | PHOTOGRAPH | Y |
| 417 | DEF | | | PHOTOGRAPH | Y |
| 418 | DEF | | | PHOTOGRAPH | Y |
| 419 | DEF | | | PHOTOGRAPH | Y |
| 420 | DEF | DEF | 10/04/2004 | PHOTOGRAPH | |
| 421 | DEF | DEF | 10/04/2004 | PHOTOGRAPH | |
| 422 | DEF | DEF | 10/04/2004 | PHOTOGRAPH | |
| 423 | DEF | DEF | 10/04/2004 | PHOTOGRAPH | |
| 424 | DEF | DEF | 10/06/2004 | PHOTOGRAPH | |
| 425 | DEF | DEF | 10/06/2004 | PHOTOGRAPH | |
| 426 | DEF | | | PHOTOGRAPH | Y |
| 427 | DEF | DEF | 10/06/2004 | PHOTOGRAPH | |
| 428 | DEF | DEF | 10/06/2004 | PHOTOGRAPH | |
| 429 | DEF | | | PHOTOGRAPH | Y |
| 430 | DEF | DEF | 10/04/2004 | PHOTOGRAPH | |
| 431 | DEF | DEF | 10/04/2004 | PHOTOGRAPH | |
| 432 | DEF | | | PHOTOGRAPH | Y |
| 433 | DEF | DEF | 10/05/2004 | PHOTOGRAPH | |
| 434 | DEF | | | PHOTOGRAPH | Y |
| 435 | DEF | | | PHOTOGRAPH | Y |

Page 21 of 28

000003753

A000000337

Hearing Officer: **Hon. Brian K.** hikawa

Hearing Type: **TRIAL**

Case mber: CR2000-096032
Co-D ndant: **No**
Hearing Date: **08/23/2004**

STATE OF ARIZONA

vs

WENDI ANDRIANO

Counsel:   JUAN MARTINEZ

Counsel:   DANIEL PATTERSON AND DAVID DELOZIER

| Ex # | ID | Off'd | In Evidence | Exhibit Description | Released |
|------|------|------|------------|----------------------------------------------|---------|
| 436 | DEF | DEF | 10/06/2004 | PHOTOGRAPH | |
| 437 | DEF | DEF | 10/06/2004 | PHOTOGRAPH | |
| 438 | DEF | DEF | 10/06/2004 | PHOTOGRAPH | |
| 439 | DEF | DEF | 10/06/2004 | PHOTOGRAPH | |
| 440 | DEF | DEF | 10/06/2004 | PHOTOGRAPH | |
| 441 | DEF | DEF | 10/06/2004 | PHOTOGRAPH | |
| 442 | DEF | DEF | 10/06/2004 | PHOTOGRAPH | |
| 443 | DEF | DEF | 10/06/2004 | PHOTOGRAPH | |
| 444 | DEF | DEF | 10/06/2004 | PHOTOGRAPH | |
| 445 | PLF | PLF | 10/05/2004 | PHOTO COPY OF PHOTOGRAPH | |
| 446 | PLF | | | VHS TAPE | Y |
| 447 | PLF | | | VHS TAPE | Y |
| 448 | DEF | | | POWER AND CONTROL WHEEL DOCUMENT | Y |
| 449 | DEF | | | COMMON CHARACTERISTICS DOCUMENT | Y |
| 450 | DEF | | | ABUSER CHARACTERISTICS DOCUMENT | Y |
| 451 | DEF | | | DOMESTIC VIOLENCE DEFINITION DOCUMENT | Y |
| 452 | PLF | | | COPY OF CASA GRANDE POLICE DEPT. REPORT | Y |
| 453 | PLF | | | POWER AND CONTROL WHEEL DOCUMENT | Y |
| 454 | PLF | | | PACKET OF DOCUMENTS REGARDING DOMESTIC VIOLENCE | Y |
| 455 | PLF | | | PARTNER ABUSE SCALE | Y |
| 456 | PLF | | | COPY OF TRASCRIPT DATED 6/17/03 | Y |
| 457 | PLF | | | CALCULATIONS | Y |
| 458 | PLF | | | COPY OF TRANSCRIPT DATED 6/12/03 | Y |
| 459 | PLF | | | HANDDRAWN NOTES | Y |
| 460 | PLF | | | COPY OF HYDROBENZOIN INFORMATION | Y |

Hearing Officer: **Hon. Brian K.** ͡hikawa

Case ͡mber: **CR2000-096032**

Co-D ͡ndant: **No**

Hearing Type: **TRIAL**

Hearing Date: **08/23/2004**

STATE OF ARIZONA

Counsel:  JUAN MARTINEZ

vs

WENDI ANDRIANO

Counsel:  DANIEL PATTERSON AND DAVID DELOZIER

| Ex # | ID | Off'd | In Evidence | Exhibit Description | Released |
|------|-----|-------|-------------|---------------------|----------|
| 461 | PLF | PLF | 10/21/2004 | COPY OF HYDROBENZOIN INFORMATION PAGE 755 | |
| 462 | DEF | DEF | 10/21/2004 | COPY OF SODIUM BISULFATE INFORMATION | |
| 463 | DEF | | | PHOTOCOPY OF GREETING CARD | Y |
| 464 | DEF | | | COPY OF PHONE NUMBERS | Y |
| 465 | DEF | | | COPY OF EMAIL | Y |
| 466 | DEF | | | DOCUMENT | Y |
| 467 | DEF | | | DOCUMENT | Y |
| 468 | DEF | | | DOCUMENTS | Y |
| 469 | DEF | DEF | 10/27/2004 | COPIES OF MISC. DOCUMENTS | |
| 470 | DEF | | | COPY OF LETTER | Y |
| 471 | PLF | PLF | 11/10/2004 | CERTIFICATE FROM BEST PRODUCTS | |
| 472 | PLF | PLF | 11/10/2004 | STATEMENT OF FINANCIAL STATUS | |
| 473 | PLF | PLF | 11/10/2004 | SCHOMAC PROPERTY MANAGEMENT DOCUMENT | |
| 474 | PLF | | | COURTYARD APTS. DOCUMENTS | Y |
| 475 | PLF | PLF | 10/28/2004 | GREETING CARD WITH FLOWER | |
| 476 | PLF | PLF | 10/28/2004 | GREETING CARD | |
| 477 | PLF | PLF | 10/28/2004 | PHOTOGRAPH | |
| 478 | PLF | PLF | 10/28/2004 | PHOTOGRAPH | |
| 479 | PLF | | | PHOTOGRAPH | Y |
| 480 | PLF | | | PHOTOGRAPH | Y |
| 481 | PLF | PLF | 11/01/2004 | VIDEO TAPE | |
| 482 | PLF | PLF | 11/01/2004 | VIDEO TAPE | |
| 483 | PLF | PLF | 11/01/2004 | PHOTOGRAPH | |
| 484 | PLF | PLF | 11/01/2004 | VIDEO TAPE | |
| 485 | PLF | PLF | 11/01/2004 | COPY OF EMPLOYEE TERMINATION NOTICE | |
| 486 | PLF | PLF | 11/01/2004 | VIDEO TAPE | |

000003755

Hearing Officer: **Hon. Brian K  hikawa**

Hearing Type: **TRIAL**

Case    mber: CR2000-096032

Co-D    ndant: No

Hearing Date: 08/23/2004

STATE OF ARIZONA                    Counsel:   JUAN MARTINEZ

vs

WENDI ANDRIANO                      Counsel:   DANIEL PATTERSON AND DAVID
                                               DELOZIER

| Ex # | ID | Off'd | In Evidence | Exhibit Description | Released |
|------|-----|-------|-------------|---------------------|----------|
| 487 | PLF | PLF | | APPLICATION DOCUMENT | |
| 488 | PLF | | | APPLICATION DOCUMENT | Y |
| 489 | PLF | | | DOCUMENT | Y |
| 490 | PLF | PLF | 11/02/2004 | VIDEO TAPE | |
| 491 | PLF | PLF | 11/02/2004 | VIDEO TAPE | |
| 492 | PLF | PLF | 11/02/2004 | VIDEO TAPE | |
| 493 | PLF | PLF | 11/02/2004 | VIDEO TAPE | |
| 494 | PLF | PLF | 11/02/2004 | VIDEO TAPE | |
| 495 | PLF | PLF | 11/02/2004 | MAP - SAN RIVA | |
| 496 | PLF | PLF | 11/09/2004 | PHOTOGRAPH | |
| 497 | PLF | PLF | 11/02/2004 | VIDEO TAPE | |
| 498 | DEF | PLF | 11/03/2004 | VIDEO TAPE | |
| 499 | PLF | PLF | 11/03/2004 | VIDEO TAPE | |
| 500 | PLF | PLF | 11/03/2004 | VIDEO TAPE | |
| 501 | PLF | PLF | 11/03/2004 | VIDEO TAPE | |
| 502 | PLF | PLF | 11/03/2004 | VIDEO TAPE | |
| 503 | PLF | PLF | 11/03/2004 | VIDEO TAPE | |
| 504 | PLF | | | COPY OF PHONE MESSAGE | Y |
| 505 | PLF | | | DOCUMENT | Y |
| 506 | PLF | | | DOCUMENT | Y |
| 507 | PLF | | | DOCUMENT | Y |
| 508 | PLF | | | DOCUMENT | Y |
| 509 | PLF | | | DOCUMENT | Y |
| 510 | PLF | PLF | 11/03/2004 | VIDEO TAPE | |
| 511 | PLF | PLF | 11/03/2004 | VIDEO TAPE | |
| 512 | PLF | PLF | 11/03/2004 | VIDEO TAPE | |

CR2000-096032  (08/23/2004)

Hearing Officer: Hon. Brian K   hikawa

Case   mber: **CR2000-096032**

Co-D.  ndant: No

Hearing Type: **TRIAL**

Hearing Date: **08/23/2004**

STATE OF ARIZONA

Counsel:   JUAN MARTINEZ

vs

WENDI ANDRIANO

Counsel:   DANIEL PATTERSON AND DAVID DELOZIER

| Ex # | ID | Off'd | In Evidence | Exhibit Description | Released |
|------|-----|-------|-------------|---------------------|----------|
| 513 | PLF | PLF | 11/03/2004 | VIDEO TAPE | |
| 514 | PLF | PLF | 11/03/2004 | VIDEO TAPE | |
| 515 | PLF | PLF | 11/03/2004 | PHOTOGRAPH | |
| 516 | PLF | PLF | 11/03/2004 | PHOTOGRAPH | |
| 517 | PLF | PLF | 11/03/2004 | PHOTOGRAPH | |
| 518 | DEF | | | PHOTOGRAPH | Y |
| 519 | DEF | DEF | 11/04/2004 | PHOTOGRAPH | |
| 520 | DEF | DEF | 11/08/2004 | PHOTOGRAPH | |
| 521 | DEF | DEF | 11/08/2004 | PHOTOGRAPH | |
| 522 | DEF | DEF | 11/08/2004 | PHOTOGRAPH | |
| 523 | DEF | DEF | 11/08/2004 | PHOTOGRAPH | |
| 524 | PLF | PLF | 11/08/2004 | VIDEO TAPE | |
| 525 | DEF | | | PHOTOGRAPH | Y |
| 526 | DEF | | | PHOTOGRAPH | Y |
| 527 | DEF | | | PHOTOGRAPH | Y |
| 528 | DEF | | | PHOTOGRAPH | Y |
| 529 | PLF | PLF | 11/09/2004 | PHOTOGRAPH | |
| 530 | PLF | PLF | 11/09/2004 | PHOTOGRAPH | |
| 531 | PLF | PLF | 11/09/2004 | PHOTOGRAPH | |
| 532 | PLF | PLF | 11/09/2004 | PHOTOGRAPH | |
| 533 | PLF | PLF | 11/09/2004 | PHOTOGRAPH | |
| 534 | PLF | PLF | 11/09/2004 | PHOTOGRAPH | |
| 535 | PLF | | | ASSESSING DANGEROUS QUESTIONS DOCUMENT | Y |
| 536 | PLF | | | RESPONSE TO VIOLENCE INVENTORY DOCUMENT | Y |
| 537 | PLF | | | POWER AND CONTROL WHEEL DOCUMENT | Y |
| 538 | PLF | | | PARTNER ABUSE SCALE DOCUMENT | Y |

Hearing Officer: **Hon. Brian K** hikawa

Case  mber: **CR2000-096032**

Co-D  ndant: **No**

Hearing Type: **TRIAL**

Hearing Date: **08/23/2004**

STATE OF ARIZONA

Counsel:   JUAN MARTINEZ

vs

WENDI ANDRIANO

Counsel:   DANIEL PATTERSON AND DAVID DELOZIER

| Ex # | ID | Off'd | In Evidence | Exhibit Description | Released |
|------|-----|-------|-------------|---------------------|----------|
| 539 | PLF | | | PARTNER ABUSE SCALE DOCUMENT | Y |
| 540 | PLF | | | QUESTIONNAIRES PACKET | Y |
| 541 | PLF | | | PHOTOGRAPH | Y |
| 542 | PLF | PLF | 12/08/2004 | PHOTOGRAPH | |
| 543 | PLF | PLF | 12/09/2004 | IMMUNIZATON DOCUMENT | |
| 544 | DEF | DEF | 12/13/2004 | CASA GRANDE COUNSELING DOCUMENTS | |
| 545 | DEF | DEF | 12/13/2004 | CENTRAL ARIZONA COLLEGE DOCUMENTS | |
| 546 | PLF | | | DOCUMENT | Y |
| 547 | PLF | | | DOCUMENT | Y |
| 548 | PLF | PLF | 12/14/2004 | COPY OF DISCIPLINARY ACTION REPORT | |
| 549 | PLF | PLF | 12/14/2004 | PENCIL | |
| 550 | DEF | DEF | 12/15/2004 | PHOTO COPIES OF PHOTOGRAPHS | |

Received By: _JBray \ Elva Martin_   Date _12-30-04_

Processed By: _O Rivera_   Date _12-30-04_

220 and 237 Vault.
BS- Death Penalty

CR2000-096032  (08/23/2004)

Page 28 of 28

A000000342

000003758

IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

IN AND FOR THE COUNTY OF MARICOPA

EXHIBIT / RECORD RELEASE FORM

STATE OF ARIZONA

v                                        No.  CR2000-096032

WENDI ELIZABETH ANDRIANO

Items released:  EX. 4, 45, 48, 67, 109, 136, 137, 139, 168, 176, 177, 214, 214.001, 215, 216, 218, 221, 222, 224, 225, 227, 231.001, 232, 233, 234, 235, 236, 244, 247, 250, 254, 261, 262, 268, 281, 283, 284, 285, 285.030, 285.031, 285.032, 285.033, 285.034, 285.035, 285.036, 285.037, 285.038, 285.039, 285.040, 285.041, 285.042, 286, 289, 290, 292, 295, 298, 299, 300, 301, 302, 303, 304, 305, 306, 307, 308, 309, 310, 311, 312, 315, 316, 318, 343, 346, 348, 349, 350, 368, 370, 389, 390, 391, 395, 446, 447, 452, 453, 454, 455, 456, 457, 458, 459, 460, 474, 479, 480, 488, 489, 504, 505, 506, 507, 508, 509, 535, 536, 537, 538, 539, 540, 541, 546, and 547

___X___ Permanent Release

_____ Temporary Release, to be returned on _____

Released to:____JUAN MARTINEZ_____    Date: _____

Returned by: _____    Date: _____

_____
Signature of Recipient

_____M. LESUEUR_____
Signature of Deputy Clerk (upon release)

_____
Signature of Deputy Clerk (upon return)

FORM: EXH                    000003759            LRD 09/21/20   A000000343

*IN THE SUPERIOR COURT OF THE STATE OF ARIZONA*

*IN AND FOR THE COUNTY OF MARICOPA*

*EXHIBIT / RECORD RELEASE FORM*

STATE OF ARIZONA

v                                                      No.  CR2000-096032

WENDI ELIZABETH ANDRIANO


Items released:   EX. 325, 326, 327, 362, 396, 397, 398, 398, 399, 400, 401, 402, 403, 404, 405, 409, 411, 413, 414, 415, 416, 417, 418, 419, 426, 429, 432, 434, 435, 448, 449, 450, 451, 463, 464, 465, 466, 467, 468, 470, 518, 525, 526, 527, and 528


____✗____ Permanent Release

_____ Temporary Release, to be returned on _____

Released to:   _DANIEL PATTERSON_____   Date: _____

Returned by: _____  Date: _____



_____
Signature of Recipient


_M·LESUEUR_____
Signature of Deputy Clerk (upon release)


_____
Signature of Deputy Clerk (upon return)


FORM: EXH                                                          A000000344
000003760




ED
13

DANIEL B. PATTERSON
Deputy Public Defender
1750 S. Mesa Drive, Suite 150
Mesa, Arizona 85210-6201
(602) 506-2205
Bar No. 005743
Attorney for Defendant

2004 DEC 29 PM 3: 42

HJ

## IN THE SUPERIOR COURT OF THE STATE OF ARIZONA
## IN AND FOR THE COUNTY OF MARICOPA

| | |
|---|---|
| STATE OF ARIZONA, | No. CR2000-096032 |
| Plaintiff, | **MOTION FOR NEW TRIAL: PHASE III** |
| v. | (Honorable Brian Ishikawa) |
| WENDI ELIZABETH ANDRIANO, | (Oral Argument Requested) |
| Defendant. | |

Defendant Wendi Elizabeth Andriano, through counsel undersigned, pursuant to

the Rule 24.1 of the Arizona Rules of Criminal Procedure, and the 5th, 6th, 8th and 14th

Articles of the Arizona Constitution, moves the Court to grant defendant a new trial for

reasons described more particularly in the attached Memorandum.

DATED this _____ day of December, 2004.

MARICOPA COUNTY PUBLIC DEFENDER

By_____
DANIEL B. PATTERSON
Deputy Public Defender

A000000345

000003761

## MEMORANDUM OF POINTS AND AUTHORITIES

Defendant was denied due process of law when this Court instructed the jury over objection of defense counsel to continue deliberating in the penalty phase of the trial despite being told that the jurors were deadlocked. Arizona has adopted the "totality of circumstances rule" for analyzing coerciveness surrounding guilty verdicts. State v. Roberts, 131 Ariz 513, 642 P2d 858 (1982). "Under the totality of circumstances rule, convictions will be reversed if the cumulative effect of the trial court's actions had a coercive influence on the jury". Roberts, supra, at 515. In other words, "the test of coerciveness is whether the trial court's actions or remarks, viewed in the totality of the circumstances, displaced the independent judgment of the jurors". State v. McCutcheon, 150 Ariz 317, 723 P2d 666 (1986).

While the concept of giving a supplemental instruction to the jury during the penalty phase of a capital case has been approved by the U.S. Supreme Court in its decision in Lowenfield v. Phelps, 484 U.S. 231, 108 S.Ct. 546 (1988), the Court recognized that such a charge must be considered "in its context and under all the circumstances." Id. at 237, 108 S.Ct, at 550. Moreover, the Court explicitly limited its holding to the facts of the case before it, stating "we do not mean to be understood as saying other combinations of supplemental changes and polling might not require a different conclusion "Id., at 241, 108 S.Ct. at 552.

Defendant submits that the supplemental instruction given in this case was not tailored to the unique circumstances of a capital case and therefore failed to insure the

A000000346

greater reliability required when a death sentence is imposed.  Lockett v. Ohio, 438 U.S.
586, 98 S.Ct. 2954 (1978).

The supplemental instruction should have included provisions that the jury was
not required to deliberate further, that a hung jury was permissible under the law, and that
a sentencing decision in a capital case is a personal, individual moral decision.   Further,
the supplemental charge should have reminded the jury of the burden of proof relevant to
the penalty phase.  U.S. v. Flannery, 451 f.2d 880 (1971).

For reasons described herein, Defendant Wendi E. Andriano, requests that the
verdict of the jury in the penalty phase be vacated and a mistrial be declared.

RESPECTFULLY SUBMITTED this ___29th___ day of December, 2004.

Maricopa County Public Defender

By_____
     DANIEL B. PATTERSON
     Deputy Public Defender

- 3 -

A000000347

Copy of the foregoing
delivered this ___29th___ day of
December, 2004, to:

HONORABLE BRIAN ISHIKAWA
Judge of the Superior Court
Southeast Court Building, 4th Floor
222 East Javelina
Mesa, Arizona  85210

JUAN MARTINEZ
Deputy County Attorney
301 West Jefferson, Suite 800
Phoenix, Arizona 85003

DAVID DELOZIER
Attorney At Law
4016 E Forest Pleasant
Cave Creek   AZ   85331-5439

By _____
   DANIEL B. PATTERSON
   Deputy Public Defender
   11 West Jefferson, Suite 5
   Phoenix, AZ   85003


DBPcb122904H

- 4 -

A000000348

ANDREW P. THOMAS
MARICOPA COUNTY ATTORNEY

Juan M. Martinez
Deputy County Attorney
Bar Id #: 009510
301 West Jefferson, 4th Floor
Phoenix, AZ  85003
Telephone: (602) 506-5780
MCAO Firm #:  00032000
Attorney for Plaintiff

2005 JAN 14  PM 5:18

IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

IN AND FOR THE COUNTY OF MARICOPA

THE STATE OF ARIZONA,          )
                               )
              Plaintiff,       )
                               )
        vs.                    )
                               )     CR 2000-096032
WENDI ELIZABETH ANDRIANO (A),  )
                               )     RESPONSE TO MOTION FOR NEW
              Defendant.       )     TRIAL (PHASE III)
                               )
                               )     (Assigned to the Honorable
                               )     Brian K Ishikawa, Div. Crj05)
                               )

        The State of Arizona, by and through the undersigned Deputy

County Attorney, requests that the court deny defendant's Motion

for a New Trial (Phase III). This response is supported by the

attached Memorandum of Points and Authorities.

        Submitted January __14__ , 2005.

                              ANDREW P. THOMAS
                              MARICOPA COUNTY ATTORNEY

                              BY _____
                                 Juan M. Martinez
                                 Deputy County Attorney

0439
A000000349

## MEMORANDUM OF POINTS AND AUTHORITIES

**FACTS**

On December 20, 2004, the jury submitted a question indicating that they were unable to reach a unanimous verdict. See Exhibit A. The court responded that same day as set forth in Exhibit B.

**LAW AND ARGUMENT**

Defendant has set forth no grounds under Rule 24.1, Ariz.R.Crim.P., nor any constitutional grounds to support her motion for a new penalty hearing. Presumably defendant is arguing that the supplemental instruction to continue deliberating was coercive. However, that is not the case. After the jury indicated that it appeared they were unable to reach a unanimous verdict, the court instructed the jury, in relevant part, as follows:

> It appears from your note that you are at a deadlock in your deliberations. I have some suggestions to help your deliberations, not to force you to reach a verdict. I am merely trying to be responsible to your apparent need for help. I do not wish or intend to force a verdict. Each juror has a duty to consult with one another, to deliberate with a view to reaching an agreement if it can be done without violence to individual judgment. No juror should surrender his or her honest conviction as to the weight or effect of the evidence solely because of the opinion of other jurors or for the purpose of reaching a verdict.

"A trial judge must be careful not to appear to influence a jury into making a particular decision or coerce a jury into a verdict that the jury would not otherwise reach without compromising the beliefs of one or more jurors...The test of coerciveness is whether the trial court's actions or remarks, viewed in the totality of circumstances, displaced the

2

A000000350

independent judgment of the jurors." *State v. McCutcheon,* 150 Ariz. 317, 319-320, 723 P.2d 666, 668-669 (1986). "What conduct amounts to coercion is particularly dependent upon the facts of each case." *State v. Roberts,* 131 Ariz. 513, 515, 642 P.2d 585, 860 (1982).

Under the facts of this case, the court's instruction did not influence or coerce the jury. To the contrary, they were specifically instructed that the court did not intend to force a verdict. Further, the jury was advised that no juror should surrender his or her honest conviction as to the weight or effect of the evidence solely because of the opinion of other jurors or for the purpose of reaching a verdict.

Supplemental instructions have been found non-coercive in a variety of circumstances. *Roberts,* supra, (court commented that "[t]here is a lot of evidence, so give it a while longer and see if you can't reach a verdict"); *State v. Sabala,* 189 Ariz.416, 943 P.2d 776 (App. 1997)(court knew numerical split of jury); *State v. Dunlap,* 187 Ariz. 441, 930 P.2d 518 (App.1996)(court told jurors they had not deliberated long enough).

In *State v. Webb,* 164 Ariz. 348, 793 P.2d 105 (App. 1990), the jury submitted a note to the judge on the second day of deliberations stating that they could not reach unanimous agreement after a two-week trial. The judge had the jurors recess for the weekend and resume deliberations the next Tuesday. On the third day the jury again relayed to the judge that they could not reach a verdict, but then resumed deliberations on their own initiative and reached a verdict. "Merely advising a deadlocked jury to continue deliberations does not, standing alone,

3

A000000351

constitute coercion or improper conduct on the part of the trial court...The trial court did not instruct the jurors that they had to reach a verdict, or indicate to the jurors that they abandon their conscientious convictions in order to reach agreement...Under the totality of the circumstances, the trial court did not coerce the jurors into reaching a unanimous verdict." *Id.* 164 Ariz. at 358, 793 P.2d at 115.

In *Lowenfield v. Phelps*, 484 U.S. 231 (1988), the trial judge instructed the jury to continue deliberations during the penalty phase of a capital trial. The court found that the supplemental instruction was not coercive and that the use of a supplemental charge has long been sanctioned (*e.g, Allen v. United States*, 164 U.S. 492 (1896)). The court noted the state's interest in having the jury reach a verdict in a capital case:

> The State has in a capital sentencing proceeding a strong interest in having the jury "express the conscience of the community on the ultimate question of life of death." *Witherspoon v. Illinois*, 391 U.S. 510, 519, 88 S.Ct. 1770, 1775, 20 L.Ed.2d 776 (1968). Surely if the jury had returned from its deliberations after only one hour and informed the court that it had failed to achieve unanimity on the first ballot, the court would incontestably have had the authority to insist that they deliberate further. This is true even in capital cases such as this one and *Allen*, even though we are naturally mindful in such cases that the "qualitative difference between death and other penalties calls for a greater degree of reliability when the death sentence is imposed." *Lockett v. Ohio*, 438 U.S. 586, 604, 98 S.Ct. 2954, 2964, 57 L.Ed.2d 973 (1978).

*Lowenfield*, 484 U.S. at 238-239.

The court in this capital case was careful to craft an instruction that each juror had a duty to consult with one another and to deliberate with a view to reaching an agreement if

4

A000000352

it could be done without violence to individual judgment. Clearly, the court did not coerce the jurors into reaching a unanimous verdict.

Defendant also argues without citing authority that the supplemental instruction should have included provisions that the jury was not required to deliberate further and that a hung jury was permissible. However, such provisions would have inappropriate since they could have encouraged the jury to abandon its efforts to reach a verdict.

In *Gilbert v. State*, 951 P.2d 98 (Ok.Cr.App. 1997), the court instructed the jury during the penalty phase to go back and try a little longer to reach a verdict. Defendant argued on appeal that "giving the *Allen* instruction fails to recognize the jury's right to fulfill its obligations by returning a final, non-unanimous decision." *Id.* at 116. Relying on *Lowenfield*, the court stated:

> Here, giving the Allen instruction combined with omitting any reference to the consequences of the jury's failure to reach a verdict did not coerce the jury into reaching a verdict. We reiterate our position that informing the jury as to the consequences of their failure to reach a unanimous verdict could improperly distract the jury from performing its duty of assessing the sentence. Appellant has failed to show how directing the jury to deliberate further and make an "earnest and diligent effort" to arrive at a verdict denied him the constitutional right to be sentenced by a jury that was not misled as to its sentencing duties or coerced by judicial instructions.

*Gilbert, Id.* at 116; *see also Darks v. Mullin*, 327 F.3d 1001, 1014 (10th Cir.2003) (neutrally phrased supplemental instruction encouraging jurors to continue deliberations did not coerce a death sentence).

5

A000000353

CONCLUSION

The court's supplemental instruction in this case merely encouraged the jury to continue deliberating and did not coerce jurors into making a particular decision. Defendant has failed to show that the trial court's supplemental instruction was coercive or that defendant was otherwise denied a fair and impartial penalty hearing. Therefore, the State asks this Court to deny defendant's Motion for New Trial (Phase III).

Submitted January _14_, 2005.

ANDREW P. THOMAS
MARICOPA COUNTY ATTORNEY

BY _Juan Martz_
Juan M. Martinez
Deputy County Attorney

Copy mailed\delivered
January _14_, 2005,
to:

The Honorable Brian K Ishikawa,
Judge of the Superior Court

Daniel Patterson
Deputy Public Defender
11 W. Jefferson, Ste. 5
Phoenix, AZ 85003

BY _Juan Martz_
Juan M. Martinez
Deputy County Attorney

6

000003770

A000000354

# EXHIBIT A

A000000355

FROM :                          FAX NO. :                    Jan. 13 2005 11:19AM  P2

SUPERIOR COURT OF ARIZONA
FOR MARICOPA COUNTY



FILED

12/20/04    4:00 PM
MICHAEL K. JEANES
CLERK
BY  M. Lesueur
DEPUTY

CASE NUMBER  2000-096032

STATE OF ARIZONA v. WENDI ELIZABETH ANDRIANO

JURY QUESTION

IF WE ARE UNABLE TO REACH AN UNANIMOUS VERDICT,
WHAT IS THE PROCEDURE THAT WILL BE FOLLOWED?

THANK YOU

Barbara Bauer
BARBARA BAUER
JURY FOREPERSON

A000000356

# EXHIBIT B

A000000357

FROM :                              FAX NO. :                    Jan. 13 2005 11:20AM P3

CR 2000-096032          STATE v. WENDI ELIZABETH ANDRIANO

Monday, December 20, 2004

It appears from your note that you are at a deadlock in your deliberations. I have some suggestions to help your deliberations, not to force you to reach a verdict. I am merely trying to be responsible to your apparent need for help. I do not wish or intend to force a verdict. Each juror has a duty to consult with one another, to deliberate with a view to reaching an agreement if it can be done without violence to individual judgment. No juror should surrender his or her honest conviction as to the weight or effect of the evidence solely because of the opinion of other jurors or for the purpose of reaching a verdict.

However, you may want to identify areas of agreement and disagreement and discuss the law and the evidence as they relate to the areas of disagreement.

If you still disagree, you may wish to tell the attorneys and me which issues, questions, law, or facts you would like us to assist you with. If you decide to follow this suggestion, please write down the issues, questions, law or facts on which we can possibly help. Please give your note to the bailiff. We will then discuss your note and try to help.

Judge Brian K. Ishikawa

A000000358

DANIEL B. PATTERSON
*Deputy Public Defender*
1750 S. Mesa Drive, Suite 150
Mesa, Arizona 85210-6201
(602) 506-2205
Bar No. 005743
Attorney for Defendant

MICHAEL K. JEANES, CLERK
BY _____ DEP
FILED

2005 JAN 27  PM 4: 01

IN THE SUPERIOR COURT OF THE STATE OF ARIZONA
IN AND FOR THE COUNTY OF MARICOPA

| | |
|---|---|
| STATE OF ARIZONA,<br><br>             Plaintiff,<br><br>v.<br><br>WENDI ELIZABETH ANDRIANO,<br><br>             Defendant. | No. CR2000-096032<br><br>**MOTION FOR NEW TRIAL: PHASE III**<br><br>(Honorable Brian Ishikawa)<br><br>(Oral Argument Requested) |

Defendant Wendi Elizabeth Andriano, through counsel undersigned, pursuant to

the Rule 24.1 of the Arizona Rules of Criminal Procedure, and the 5th, 6th, 8th and 14th

Amendments to the U.S. Constitution, moves the Court to grant defendant a new trial for

reasons described more particularly in the attached Memorandum.

DATED this _____25 th_____ day of January, 2005.

                                        MARICOPA COUNTY PUBLIC DEFENDER

                                        By _____
                                             DANIEL B. PATTERSON
                                             Deputy Public Defender

A000000859

## MEMORANDUM OF POINTS AND AUTHORITIES

Defendant was denied due process of law when this Court instructed the jury over objection of defense counsel to continue deliberating in the penalty phase of the trial despite being told that the jurors were deadlocked. Arizona has adopted the "totality of circumstances rule" for analyzing coerciveness surrounding guilty verdicts. State v. Roberts, 131 Ariz 513, 642 P2d 858 (1982). "Under the totality of circumstances rule, convictions will be reversed if the cumulative effect of the trial court's actions had a coercive influence on the jury". Roberts, supra, at 515. In other words, "the test of coerciveness is whether the trial court's actions or remarks, viewed in the totality of the circumstances, displaced the independent judgment of the jurors". State v. McCutcheon, 150 Ariz 317, 723 P2d 666 (1986).

While the concept of giving a supplemental instruction to the jury during the penalty phase of a capital case has been approved by the U.S. Supreme Court in its decision in Lowenfield v. Phelps, 484 U.S. 231, 108 S.Ct. 546 (1988), the Court recognized that such a charge must be considered "in its context and under all the circumstances." Id. at 237, 108 S.Ct, at 550. Moreover, the Court explicitly limited its holding to the facts of the case before it, stating "we do not mean to be understood as saying other combinations of supplemental changes and polling might not require a different conclusion "Id., at 241, 108 S.Ct. at 552.

Defendant submits that the supplemental instruction given in this case was not tailored to the unique circumstances of a capital case and therefore failed to insure the

000003776

A000000360

greater reliability required when a death sentence is imposed.  <u>Lockett</u> v. <u>Ohio</u>, <u>438 U.S.</u> <u>586</u>, <u>98 S.Ct.</u> <u>2954</u> (1978).

The supplemental instruction should have included provisions that the jury was not required to deliberate further, that a hung jury was permissible under the law, and that a sentencing decision in a capital case is a personal, individual moral decision.  Further, the supplemental charge should have reminded the jury of the burden of proof relevant to the penalty phase.  <u>U.S.</u> v. <u>Flannery</u>, 451 F.2d 880 (1971).

For reasons described herein, Defendant Wendi E. Andriano, requests that the verdict of the jury in the penalty phase be vacated and a mistrial be declared.

RESPECTFULLY SUBMITTED this __25th__ day of January, 2005.

Maricopa County Public Defender

By _____
DANIEL B. PATTERSON
Deputy Public Defender

A000000361

Copy of the foregoing
delivered this ___25th___ day of
January, 2005, to:

HONORABLE BRIAN ISHIKAWA
Judge of the Superior Court
Southeast Court Building, 4th Floor
222 East Javelina
Mesa, Arizona  85210

JUAN MARTINEZ
Deputy County Attorney
301 West Jefferson, Suite 800
Phoenix, Arizona 85003

DAVID DELOZIER
Attorney At Law
4016 E Forest Pleasant
Cave Creek   AZ   85331-5439

By _____
   DANIEL B. PATTERSON
   Deputy Public Defender
   11 West Jefferson, Suite 5
   Phoenix, AZ  85003


DBPcb122904H

- 4 -

A000000362

DANIEL B. PATTERSON
Deputy Public Defender
11 West Jefferson, Suite 5
Phoenix, AZ  85003
(602) 506-6463
Bar No. 005743
Attorney for Defendant

MICHAEL K. JEANES, CLERK
BY _____ DEP
FILED

2005 FEB -2  PM 3: 35

IN THE SUPERIOR COURT OF THE STATE OF ARIZONA
IN AND FOR THE COUNTY OF MARICOPA

STATE OF ARIZONA,

              Plaintiff,

v.

WENDI ELIZABETH ANDRIANO,

              Defendant.

No. CR2000-096032

**FACTUAL SUPPLEMENT TO
MOTION FOR NEW TRIAL:
PHASE III**

(Honorable Brian Ishikawa)

(Oral Argument Requested)

       Defendant Wendi Elizabeth Andriano, through counsel undersigned, pursuant to
the Rule 24.1 of the Arizona Rules of Criminal Procedure, and the 5th, 6th, 8th and 14th
Amendments to the U.S. Constitution, files the attached article from the Arizona
Republic as a factual supplement to the Motion for New Trial: Phase III, filed on January
25, 2005.

       DATED this ___2 nd___ day of February, 2005.

            MARICOPA COUNTY PUBLIC DEFENDER

            By_____
              DANIEL B. PATTERSON
              Deputy Public Defender

A000000363
0999A

Copy of the foregoing
delivered this __2nd__ day of
February, 2005, to:

HONORABLE BRIAN ISHIKAWA
Judge of the Superior Court
Southeast Court Building, 4th Floor
222 East Javelina
Mesa, Arizona  85210
FAX:  (602) 506-5980

JUAN MARTINEZ
Deputy County Attorney
301 West Jefferson, Suite 800
Phoenix, Arizona 85003

DAVID DELOZIER
Attorney At Law
4016 E Forest Pleasant
Cave Creek   AZ  85331-5439
(480) 575-6661

By _____
     DANIEL B. PATTERSON
     Deputy Public Defender
     11 West Jefferson, Suite 5
     Phoenix, AZ  85003

DBPcb020205H

A000000364



**Email this article**                              Click to send
**Print this article**                              Click to print
**Most popular pages**                          Today | This Week

# Deciding life, death takes toll on jurors

**Jim Walsh**
The Arizona Republic
Jan. 24, 2005 12:00 AM

One juror felt his knees shaking as he sat down to decide if an Ahwatukee Foothills woman should live or die.

Another says she spent the evening before the death penalty deliberations eating saltines and vomiting.

A third says she flashes back to the case, which featured a murder inside an apartment, every time she drives past an apartment complex.

Such is the emotional cost of Arizona's 2 1/2-year-old death penalty law under which ordinary people - jurors, not judges - make the toughest decision in the law, life or death, a choice no one would voluntarily make.

Since Arizona revamped its law because of a landmark U.S. Supreme Court ruling that juries must determine mitigating factors in death penalty cases, Maricopa County juries are voting for death far more often than their peers in four other states affected by the ruling. They are also dishing out death sentences more often than judges did in the past.

Including the jury in the Ahwatukee case, the trial of Wendi Andriano, Valley juries have voted the death penalty for 14 of 18 defendants since Aug. 1, 2002.

That 78 percent rate contrasts sharply with the sentences of Maricopa County Superior Court judges, who imposed death in 15 percent of cases from 1995 to 1999, according to 2002 report by the state Capital Case Commission.

While Arizona legal experts say it still may be premature to determine how the change is working, jurors in the Andriano case told *The Arizona Republic* that they believe juries should make the choice, even though they felt enormous pressure and anguished over their death penalty verdict.

## 'This is your duty'

In all, 15 jurors in Maricopa County Superior Court in Mesa spent four months hearing the case against Andriano, 34, who was charged with killing her terminally ill husband, Joe, 33. He was poisoned, bludgeoned and stabbed in their apartment Oct. 8, 2000, while their children, then 2 and 3, slept in a bedroom.

Six of the 12 jurors who voted last month to execute Andriano were interviewed, along with two of the three alternates.

"The first couple of weeks, it was kind of interesting," said juror Tanner Catalano, 27, of Gilbert.

"After it started to set in that you had to make a decision like this, it became overwhelmingly stressful."

Catalano and some of his peers on the jury argued that it is fairer for 12 everyday people to decide a death sentence than one judge. "A lot of things in life are hard.

A000000365
000003781

Deciding life, death takes toll ___jurors

This is your duty," he said.

Catalano played ice hockey to relieve the tension but said a rule that bars jurors from discussing a case with others forced him to keep his emotions private.

"I'd walk around in a daze and people would say, 'What's wrong with you?' You can't tell them why," he said.

The jury found Andriano guilty Nov. 18, about 15 minutes after they went into the jury room, said juror Jay Erke, 48, an airline mechanic foreman from Mesa.

Juror Linda Percy, 63, a Realtor from Mesa, said jurors didn't believe Andriano's testimony, given over nine days on the stand, that she poisoned her husband as part of a suicide pact, and that she hit him 23 times in the head with a bar stool in self-defense to stop him from reaching for a knife.

"The defense didn't have a lot of evidence, period," Percy said. "I don't think the defense had a lot to work with."

But the decision to execute Andriano was far more difficult, she and the five other jurors all said.

## Reaching guilty verdict

After they reached the guilty verdict, jurors heard a week of testimony on why Andriano should be executed, the aggravating factors that go into a death penalty decision.

They deliberated for four hours before finding the slaying was especially cruel, qualifying her for the death sentence.

They then heard six days of testimony on mitigating factors, reasons her life should be spared.

They gathered in the jury room Dec. 16 to consider whether there were reasons for sparing Andriano's life.

It took four days.

The sometimes-heated deliberations dramatically changed the case's outcome, with a split jury gradually shifting toward the death verdict.

When the deliberations began, the nine women and three men took a vote. Only three supported a death sentence, with four favoring a life sentence and the others undecided, said juror Mary Fobes, 74, of Mesa.

Catalano said he wasn't sure.

"I still hadn't made up my mind. I was giving her the benefit of the doubt," he said.

After one day, the jury went home for a three-day weekend that some called full of soul searching.

When they reconvened, Catalano gave a pivotal speech outlining his reasons for supporting a death sentence, and the vote swung to 11-1 in favor of execution, Fobes said.

"It was very passionate on why he thought she deserved the death penalty," Fobes said. "The more I thought about it, how could she be so brutal? She must have totally flipped her wig. I don't know how anyone could do that."

But the jury was on the verge of a deadlock, with one holdout, a senior citizen from Gilbert, saying he was adamantly against the death penalty.

On the third day of deliberations, jurors took turns discussing each of 23 reasons listed by the defense for sparing Andriano's life, the mitigating factors, weighing whether they were sufficient cause for leniency.

A000000366
000003782

Deciding life, death takes toll ... jurors                                    Page 3 of 4

They included that Andriano was a good mother to her children and had signed up at age 19 for missionary work when in Mexicali, Mexico, for the 91st Psalm Church, now the Harvest Family Church in Casa Grande.

Catalano said he gave all the mitigating factors some weight, but in the end, they were not enough.

"Does a good mother brutally murder her husband?" he said.

Percy said she also considered the arguments against execution, but on balance, "we could not find mitigating factors that overwhelmed the cruelty. To me, to everybody there, the knife wound was the crowning blow. She had three chances to back off."

While jurors were discussing whether to execute Andriano, they considered that they would have no control over whether the trial judge, Brian Ishikawa, would give her life in prison with or without parole, she said.

Jurors did not want to see a 25 years to life sentence.

"We also knew with the death penalty that she has an automatic appeal," Percy said.

Different parts of the case resonated with jurors. Some said they were moved by Andriano's plea for life during the mitigation phase on Dec. 16, just before the final deliberations, while others considered it an Academy Award acting job.

"I just thought, 'What an act you're putting on, honey,' " Fobes said. "She was such a liar. How could you believe anything she told you?"

The emotional impact of Andriano's 45-minute plea, in which she admitting making "a horrible choice that night" but insisted her cancer-stricken husband wanted to commit suicide, may have waned as days passed and jurors focused on the details of the case, Fobes said.

Erke was moved.

"Her speech was heartfelt. It teared me up," he said. But "I thought she was more sorry for the consequences of what she did than for the actions."

Others cited a videotape recording of the police interview with Andriano, only a few hours after the murder, as among the most incriminating evidence. The tape showed a relaxed Andriano talking to a Phoenix police detective, casually holding her knees against her chest.

"I can't imagine being so calm and collected and having no emotions," Percy said. "She never cried, she never asked about her kids, she seemed flirtatious."

## Manipulation

As the third day of deliberations ended, Fobes said she told the holdout juror, a Gilbert senior citizen, "Wendi has manipulated you. He said, 'Yes, I know.' "

The next day, the holdout gave a short speech saying he changed his mind. He declined two requests for an interview.

The jury delivered the death penalty verdict Dec. 22.

"Walking in there with that verdict, I was shaking like a leaf," Erke said, the daunting power of deciding if someone lives or dies overwhelming him. "It's 'Oh, my God, it's really happened.' "

Most are still mulling over their decision, but only one juror, a young nurse, expressed doubts.

"Sometimes, I think I'm too hard-hearted," Fobes said. "But she didn't feel any sympathy for him (the husband)."

A000000367

000003783

Percy said a telling look from Andriano was reassuring after a clerk read the verdict.

"She gave us a look like, 'How dare you?' " Percy said. "I thought, 'I made the right decision.' "

Reach the reporter at jim.walsh@arizonarepublic.com.

**Email this article**                          **Click to send**
**Print this article**                           **Click to print**
**Most popular pages**                    **Today | This Week**

A000000368

000003784

EXHIBIT B

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

03/09/2001                                    CLERK OF THE COURT
                                                  FORM R121

HONORABLE DANIEL A. BARKER                      G. Kuder
                                                 Deputy

CR 2000-096032

                                       FILED:   3·16-0/

STATE OF ARIZONA                       JUAN M MARTINEZ

v.

WENDI ELIZABETH ANDRIANO               G DAVID DELOZIER JR

                                       CORRECTIONAL HEALTH SERVICES
                                       COURT FORENSIC SERVICES UNIT
                                       MCSO-DIS
                                       VICTIM WITNESS DIV-CA-SE

---

ORDER FOR COMPETENCY SCREENING EVALUATION REPORT

    9:50 a.m.   State is represented by Deputy County Attorney
Juan Martinez.   Defendant is present and represented by counsel
G. David DeLozier, Jr.

    Court Reporter, Michele Gormley, is present.

    Upon    Defendant's    written    Motion    for    Competency
Determination,

    IT IS ORDERED that a competency screening evaluation report
be prepared and submitted to this Court by the Superior Court
Forensic Services Unit unless the following applies:

The Superior Court Forensic Services Unit will do a full Rule 11
criminal competency evaluation if the following criteria are
met:
                                                        0038

Docket Code 121                                        Page 1

B000000001

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

03/09/2001                                      CLERK OF THE COURT
                                                    FORM R121

HONORABLE DANIEL A. BARKER                       G. Kuder
                                                 Deputy

CR 2000-096032


        1.    The Defendant is in custody; and

        2.    The charges consist of Class 4, 5 and/or 6 felonies,
and/or misdemeanors; and

        3.    The Superior Court Forensic Services Unit believes
that "no reasonable expert" would disagree as to a finding of
incompetency and restorability.

        Counsel further agree to the Criminal Commissioners' Court
making a determination of competency based upon the receipt of
one report, pursuant to A.R.S. Section 13-4505(A), from the
Superior Court Forensic Services Unit.

        If either counsel objects to the above procedure, the Court
and the Superior Court Forensic Services Unit shall be notified
in writing within seven (7) judicial days of this date.

        In the event of objection by counsel or in the event that
the above criteria are not met,

        IT IS FURTHER ORDERED setting a Pretrial Conference and
hearing on Motion for Competency Determination on April 6, 2001
at 8:30 a.m. in this division.

        IT IS FURTHER ORDERED counsel shall provide the Superior
Court Forensic Services Unit with copies of the police reports
and all other medical and criminal history records for the
competency evaluation within three (3) judicial days of this
date.

        The Court having been advised that the Defendant is
presently in custody,

        If the Defendant is released prior to the examination
taking place,

Docket Code 121                                          Page 2

B000000002

000003787

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

03/09/2001                                      CLERK OF THE COURT
                                                    FORM R121

HONORABLE DANIEL A. BARKER                         G. Kuder
                                                   Deputy

CR 2000-096032

     IT IS FURTHER ORDERED directing defense counsel to
immediately upon Defendant's release contact the Superior Court
Forensic Services Unit to schedule a time for Defendant's
examination.   Defense counsel is to accompany the Defendant to
the examination or otherwise insure the Defendant's attendance
at the examination.

     IT IS FURTHER ORDERED vacating the Trial date of March 26,
2001.

     IT IS FURTHER ORDERED that Correctional Health Services
permit the mental health expert to view the Defendant's medical
file retained in the Maricopa County Jail.

     IT IS FURTHER ORDERED affirming prior custody orders.

     9:55 a.m.  Matter concludes.

Docket Code 121                                    Page 3

B000000003

000003788

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

03/23/2001

CLERK OF THE COURT
FORM R000A

HONORABLE DANIEL A. BARKER

L. Gonzales
Deputy

CR 2000-096032

FILED: 4/4/01

STATE OF ARIZONA

JUAN M MARTINEZ

v.

WENDI ELIZABETH ANDRIANO

G DAVID DELOZIER JR
LEON A THIKOLL

DOCKET-SE
VICTIM WITNESS DIV-CA-SE
ALEJO AND DONNA OCHOA
1104 NO. PARK
CASA GRANDE AZ  85222
WENDI ADRIANO-#A631830
ESTRELLA JAIL--ROOM B-312
2939 W. DURANGO
PHOENIX AZ  85009

MINUTE ENTRY

    Pursuant to Petition for Withdrawal of Counsel: Leon
Thikoll as "Knapp" Counsel with Consent of Defendant, Consent of
Parents of Defendant to Withdrawal of Leon Thikoll as "Knapp"
Counsel and Consent of G. David DeLozier to Withdrawal of Leon
Thikoll as "Knapp" Counsel filed with the Clerk of the Court
March 23, 2001,

    IT IS HEREBY ORDERED that Leon Thikoll is hereby withdrawn
as attorney of record for Wendi Andriano in the above case, in
accordance with the formal written Order signed by the Court
March 23, 2001 and filed with the Clerk of the Court March 23,
2001.

Docket Code 099

Page 1

0045

B000000004

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

03/27/2001                              CLERK OF THE COURT
                                            FORM R000A

HONORABLE DANIEL A. BARKER                   G. Kuder
                                             Deputy

CR 2000-096032

                               FILED: _____4-2-01_____

STATE OF ARIZONA               DAVID J PALMER

v.

WENDI ELIZABETH ANDRIANO       G DAVID DELOZIER JR

                               MCSO-DIS
                               VICTIM WITNESS DIV-CA-SE


                          MINUTE ENTRY

    **IT IS ORDERED** vacating the Pretrial Conference set on April
6, 2001 and resetting the same on April 13, 2001 at 8:30 a.m. in
this division.

Docket Code 172                                      Page **1**

0046
B000000005

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

04/13/2001                                      CLERK OF THE COURT
                                                     FORM R027

HONORABLE DANIEL A. BARKER                         G. Kuder
                                                    Deputy

CR 2000-096032

                                     FILED: _4-18-01_____

STATE OF ARIZONA                      JUAN M MARTINEZ

v.

WENDI ELIZABETH ANDRIANO              G DAVID DELOZIER JR
                                      DEAN M WOLCOTT
                                      WESLEY E PETERSON

                                      EXHIBITS-SE
                                      MCSO-DIS
                                      OFFICE OF COURT APPOINTED
                                      COUNSEL
                                      VICTIM WITNESS DIV-CA-SE


PRETRIAL CONFERENCE



      8:37 a.m.  This is the time set for hearing re: results of
Rule 11 Prescreen Exam.  State is represented by Deputy County
Attorney Juan Martinez.  Defendant is present and represented by
counsel G. David DeLozier, Jr.  Counsel Dean Wolcott is present
on behalf of Office of Court Appointed Counsel.  Deputy Public
Defender Wesley Peterson is present.

      Court Reporter, Jessica Casto, is present.

      Status of counsel and resources is discussed.

      IT IS ORDERED vacating the order of February 5, 2001 as to
Michael J. Sweedo.

Docket Code 027                                        Page 1

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

04/13/2001                                    CLERK OF THE COURT
                                                    FORM R027


HONORABLE DANIEL A. BARKER                   G. Kuder
                                                Deputy


CR 2000-096032


     The Court has reviewed the Rule 11 Prescreen Report and
finds the defendant competent to proceed.  No further Rule 11
proceedings will take place.

     IT IS ORDERED sealing the Rule 11 Prescreen Report, not to
be opened without further Order of the Court.

     Court and counsel discuss issue of representation.

     Defendant is questioned whether she wants the Public
Defender to represent her.  Defendant requests additional time
to decide this issue.

     IT IS ORDERED setting a status conference on April 16, 2001
at 8:30 a.m.

     IT IS FURTHER ORDERED excluding all time and establishing a
LAST DAY of 06-13-2001.

     IT IS FURTHER ORDERED affirming prior custody orders.

     9:35 a.m.  Matter concludes.


Docket Code 027                                      Page 2

SUPERIOR COURT OF ARIZON —
MARICOPA COUNTY

CR 2000-096032                                              03/12/2004

                                              CLERK OF THE COURT
HONORABLE BRIAN K. ISHIKAWA                        M. LeSueur
                                                     Deputy

                                              FILED: 03/15/2004

STATE OF ARIZONA                              JUAN M MARTINEZ

v.

WENDI ELIZABETH ANDRIANO                      DANIEL B PATTERSON
                                              G DAVID DELOZIER JR.

                                              VICTIM SERVICES DIV-CA-SE

MINUTE ENTRY

    The Court has had under advisement various motions.   The Court has considered said
motions, any responses and replies, and the oral arguments of counsel.

IT IS ORDERED:

- Denying the defendant's Motion to Remand for a New Finding of Probable
  Cause.

- Denying the defendant's Motion to Dismiss State's Notice of Intent to Seek
  Death Penalty.

- Denying Defendant's Supplemental/Renewed Motion to Strike State's Notice
  of Intent to Seek Death Penalty.

- Holding the defendant's Motion to Dismiss Section 13-703(G)(6) Aggravating
  Factor in abeyance pending trial.

- Holding the defendant's Motion to Dismiss A.R.S. Section 13-703(F)(5)
  Aggravating Factor (Pecuniary Gain) in abeyance pending trial.

- The defendant shall submit to an examination by the State's mental health
  expert without defense counsel being present and without audio and/or video

Docket Code 019                    Form R000A                           Page 1

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CR 2000-096032                                              03/12/2004

recording of the examination.  The State's mental health expert shall restrict her inquiry/examination to facts and circumstances other than the specific facts and circumstances of the October 8, 2000 alleged offense.  The defendant is not required to discuss the specific facts and circumstances of the October 8, 2000 alleged offense with the State's mental health expert.

- Granting the State's Motion in Limine dated March 27, 2003, relating to the defendant's hearsay statements in her interview by the Phoenix Police Department on October 8, 2000.

- Setting an Evidentiary Hearing on the defendant's Motion in Limine dated March 25, 2003 and the defendant's Motion in Limine dated January 20, 2004, on **April 15, 2004, at 1:30 p.m.** in this division.

- Setting oral argument on the defendant's Motion for Production of Victim Impact Statement on **April 15, 2004, at 1:30 p.m.** in this division.

B000000009

000003794

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CR 2000-096032                                    05/12/2004


                                        CLERK OF THE COURT
HONORABLE BRIAN K. ISHIKAWA                  M. LeSueur
                                              Deputy

                                        FILED: 05/14/2004

STATE OF ARIZONA                        JUAN M MARTINEZ

v.

WENDI ELIZABETH ANDRIANO                DANIEL B PATTERSON

                                        VICTIM SERVICES DIV-CA-SE



                              RULING


        The Court has had under advisement the defendant's Motion to Limit Evaluation of
Defendant by State's Expert Dr. Bayless. The Court has considered the motion and any response
and reply, the evidence presented at the Evidentiary Hearing, and the arguments of counsel.

        IT IS ORDERED:

        •   Denying the defendant's Motion to Limit Evaluation of Defendant by State's Expert
            Dr. Bayless.

        •   Allowing Dr. Bayless to administer the following tests on the defendant:

                    -MMPI-2.
                    -Shipley IQ.
                    -Williamson Sentence Completion.
                    -Thematic Apperception.
                    -Personality Assessment Inventory (PAI).

0153
B000000010

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CR 2000-096032                                    07/30/2004

                                        CLERK OF THE COURT
HONORABLE BRIAN K. ISHIKAWA                  M. LeSueur
                                               Deputy

                                        FILED: 08/06/2004

STATE OF ARIZONA                        JUAN M MARTINEZ

v.

WENDI ELIZABETH ANDRIANO                DANIEL B PATTERSON
                                        G DAVID DELOZIER JR.

                                        VICTIM SERVICES DIV-CA-SE


TRIAL MANAGEMENT CONFERENCE

State's Attorney:        Juan Martinez
Defendant's Attorney:    Daniel Patterson and David Delozier
Defendant:               Present
Court Reporter:          Traci Wheeler


1:54 p.m. This is the time set for Trial Management Conference.

Court and counsel discuss pretrial matters.

On Defendant's Motion to Continue and the State having no objection,

IT IS ORDERED vacating the current trial setting of August 9, 2004 and resetting same to **August 23, 2004 at 10:30 a.m.** in this division.

IT IS FURTHER ORDERED continuing the Trial Management Conference set on this date to August 13, 2004 at 1:30 p.m. in this division.

The Court finds that extraordinary circumstances exist and that a delay will be indispensable to the interests of justice.

Docket Code 064              Form R027                    Page 1

BOODO70011

·UPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CR 2000-096032                                              07/30/2004

The Defendant having waived the applicable time limits,

IT IS ORDERED excluding all time from 8/09/2004 through 8/23/2004 (14 days).  NEW
LAST DAY: 9/30/2004.

Counsel shall file Legal Memorandum re: Jury Selection no later than August 6, 2004.

The Court has had under advisement various motions. · The Court has considered said
motions, any responses and replies, and any oral arguments of counsel.

IT IS ORDERED:

- Granting the State's Motion to Preclude Counsel From Questioning Prospective
  Jurors Regarding Their Views on Specific Mitigation or Aggravation.  Counsel is
  precluded from asking prospective jurors their views on specific types of mitigation
  or aggravation, or posing hypotheticals of the same.

- Denying the State's Motion to Present Evidence in Rebuttal to Mitigation Evidence
  to the extent that the State's rebuttal shall be limited to directly negating the
  mitigation admitted.

- Granting the State's Motion to Preclude Evidence Regarding Future Prison
  Conditions.

- Granting the State's Motion to Instruct Jury Regarding Sympathy only to the extent
  of the guilt and aggravation phase.

- Granting the State's Motion to Allow State to Comment on Defendant's Allocation.

- Granting the State's Motion to Preclude Evidence Regarding Residue Doubt.  The
  defendant is precluded from presenting evidence or arguing residual doubt in the
  penalty phase of the sentencing.

- Granting the State's Motion to Instruct Jury Regarding Weighing of Factors.

- Granting the State's Motion to Preclude Argument Regarding Proportionality
  Review.

- Granting the State's Motion to Preclude Testimony Concerning Availability of
  Parole.



Docket Code 064                          Form R027                          Page 2

B000000012

UPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CR 2000-096032                                        07/30/2004

- Granting the State's Motion to Instruct Jury Regarding Defendant's Burden of Proof.

- Denying     the     defendant's     Motion     for     Production     of     Victim     Impact
  Statement.

- Denying the State's oral motion for Ms. Murphy's hand-written notes since defense
  counsel previously stated that Ms. Murphy has assured him that she incorporated all
  of her notes accurately and completely in her report.

2:03 p.m. Hearing concludes.

B000000013

000003798

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CR 2000-096032                                              09/01/2004


                                        CLERK OF THE COURT
HONORABLE BRIAN K. ISHIKAWA                    M. LeSueur
                                                 Deputy

                                        FILED: 09/08/2004

STATE OF ARIZONA                        JUAN M MARTINEZ

v.

WENDI ELIZABETH ANDRIANO                DANIEL B PATTERSON
                                        G DAVID DELOZIER JR.

                                        VICTIM SERVICES DIV-CA-SE



                        TRIAL MINUTE ENTRY
                             DAY 6


        State's Attorney:        Juan Martinez
        Defendant's Attorney:    Daniel Patterson and David Delozier
        Defendant:               Present
        Court Reporter:          Traci Wheeler


    1:33 p.m. Trial to Jury continues from August 23, 2004.

    Jury selection continues.

    The Jury Panel is not present.

    The Court having considered the request for video/photographic coverage from the
Ahwatukee Foothill News and previously Fox Channel 10, any response to the request from the
State and the defense, and also the factors set forth in Rule 122 (b) of the Rules of the Supreme
Court,

    IT IS ORDERED granting the Ahwatukee Foothill News' request for still camera
coverage and FOX Channel 10's request for video coverage only in the courtroom in which this
proceeding is being held.  Ahwatukee Foothill News may provide pool coverage for a still

Docket Code 012                    Form R012                           Page 1

01 9B00000014

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CR 2000-096032                                    09/01/2004

camera and FOX Channel 10 may provide pool coverage for video coverage.  All persons with cameras shall comply with all provisions of Rule 122, Rules of the Supreme Court of Arizona, whether or not Court is in session.  There shall be no still camera or video images taken of any juror.  There shall be no audio recordings of bench conferences.  There shall be no use of flashbulbs, strobe lights or other artificial lights anywhere in the courthouse.  There shall be no use of cameras in any hallway, stairwell, elevator, cafeteria, or other public or private area inside the courthouse.

The Court has considered the State's Motion for Disclosure, the defendant's Response to Motion for Disclosure, and the arguments of counsel.

IT IS ORDERED:

- Denying the State's Motion for Disclosure as it relates to the psychiatric evaluation of the defendant by Dr. Richard Rosengard.

- Denying the State's Motion for Disclosure as it relates to the mental health case notes from H. Kandy Rohde.

- Denying the State's Motion for Disclosure as it relates to reconsideration of the denial of State's oral motion for Sharon Murphy's hand-written notes.

Discussion is held regarding preliminary jury instructions.

1:47 p.m. Court stands at recess.

2:33 p.m. Court reconvenes.  Court, Counsel, and Defendant are present.

Court Reporter, Traci Wheeler, is present.

The Jury Panel is not present.

Discussion is held regarding trial procedures.

2:34 p.m. Court stands at recess.

2:35 p.m. Court reconvenes.  Court, Counsel, and Defendant are present.

Court Reporter, Traci Wheeler, is present.

The Jury Panel is not present.

Docket Code 012                    Form R012                    Page 2

B000000015

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CR 2000-096032                                        09/01/2004

The Court finds that the Jury Panel is passed for cause by each Party.

2:36 p.m. Court stands at recess.

2:44 p.m. Court reconvenes.  Court, Counsel, and Defendant are present.

Court Reporter, Traci Wheeler, is present.

The Jury Panel is present.

Jurors 3, 21, 28, 35, 39, 41, 42, 43, 60, 67, 69, 72, 81, 87, 90, and 95 are selected to serve
as trial jurors.

FILED:  Jury List

The Jury is sworn by the clerk.

The Indictment is read by the clerk to the jury and the plea of "not guilty" is made known
to them.

The Court instructs the jurors of the Preliminary Instructions in this matter.

The Court instructs the jurors of the admonition.

FILED:  Preliminary Instructions

3:14 p.m. Court stands at recess until 1:00 p.m., September 7, 2004.

Docket Code 012                    Form R012                    Page 3

B000000016

000003801

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CR 2000-096032                                    12/08/2004


                                            CLERK OF THE COURT
HONORABLE BRIAN K. ISHIKAWA                        M. LeSueur
                                                    Deputy

                                        FILED: 12/30/2004

STATE OF ARIZONA                        JUAN M MARTINEZ

v.

WENDI ELIZABETH ANDRIANO                DANIEL B PATTERSON
                                        G DAVID DELOZIER JR.

                                        VICTIM SERVICES DIV-CA-SE



                        TRIAL MINUTE ENTRY
                              DAY 50


        State's Attorney:      Juan Martinez
        Defendant's Attorney:  Daniel Patterson and David Delozier
        Defendant:             Present
        Court Reporter:        Sharon Flores


    12:55 p.m. Trial to Jury continues from December 7, 2004.

    The jury is not present.

    Court and Counsel discuss trial issues.

    THE COURT FINDS pursuant to A.R.S. Section 13-4420, the victim has the right to be
present at all court proceedings in which the Defendant is present.

    THE COURT FURTHER FINDS pursuant to A.R.S. Section 13-4401(19), the definition
of victim includes the murder victim's immediate family. Pursuant to A.R.S. Section 13-
4401(11), "immediate family" includes the victim's sibling.

Docket Code 012                 Form R012                          Page 1

                                                            0401
                                                            B000000017

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CR 2000-096032                                           12/08/2004

IT IS THEREFORE ORDERED denying the Defendant's Motion to Preclude Testimony of Jana Clayton and Jeanea Lambeth because of the rule of exclusion of witnesses.

With regard to Defendant's Motion for Reconsideration of Issue of Residual Doubt,

IT IS ORDERED denying the Defendant's Motion for Reconsideration of the Court's Ruling on the Issue of Residual Doubt.

IT IS FURTHER ORDERED affirming the Court's previous ruling of 7/31/2004 granting the State's Motion to Preclude Evidence Regarding Residual Doubt. The Defendant is precluded from presenting evidence or arguing the issue of residual doubt in the penalty phase.

With regard to the issue of "mercy" and defense witnesses' statements/testimony relating to the appropriate sentence to be imposed,

IT IS ORDERED that no witness, whether called by the Defense or by the State, shall be asked about nor are they to offer any opinion regarding the appropriate sentence to be imposed in this case, or make any request for a specific sentence in this case. Defense witnesses, however, may testify as to the loss/impact that will result from the Defendant's execution.

With regard to the issue relating to the Pinal County matter involving Donna Ochoa and Alejo Ochoa,

THE COURT FINDS that the issue involving Donna Ochoa and Alejo Ochoa involving Pinal County Cause No. AD200100058 is NOT relevant to any of the mitigating circumstances relating to this proceeding.

IT IS ORDERED granting the Defendant's Motion to Preclude the State from arguing and/or presenting evidence relating to Donna Ochoa and Alejo Ochoa and Pinal County Cause No. AD200100058 and the minute entry dated 10/15/2002 by the Honorable William J. O'Neil in Pinal County Superior Court and the related Maricopa County cause.

With regard to the issue relating to Defendant's activities in jail and Cynthia Edwards,

THE COURT FINDS that the disclosure of allegations against the Defendant relating to her activities with Cynthia Edwards is untimely under the Disclosure Requests under Rule 15.1 of the Arizona Rule of Criminal Procedure.

IT IS THEREFORE ORDERED granting the Defendant's Motion to Preclude the State from arguing or presenting evidence relating to the Defendant's activities with Cynthia Edwards as referenced by the State in oral argument yesterday.

Docket Code 012                   Form R012                        Page 2

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CR 2000-096032                                                    12/08/2004


With regard to the State's allegations that the Defendant committed thefts while employed at Casa Grande Medical Center, Courtyard Apartments, and San Riva Apartments,

IT IS ORDERED allowing the State to present rebuttal evidence relating to these alleged thefts if the Defendant asserts or presents evidence of its listed mitigating factors of no criminal charges, good employment history, or of the unlisted mitigating factor of the Defendant's honesty.

In light of the Court's ruling, Counsel for Defendant presents oral Motion to Delete Mitigating Factors from the Preliminary Jury Instructions.

IT IS ORDERED granting Defendant's oral Motion to Delete Mitigating Factors from the Preliminary Jury Instructions.

Counsel for the State presents Motion to Delete Mitigating Circumstances.

Counsel present arguments to the Court.

IT IS ORDERED denying the State's Motion to Delete the Mitigating Circumstances relating to no prior felony convictions, no prior misdemeanor convictions, good candidate for rehabilitation, strong religious convictions, and no further threat to the community.

IT IS FURTHER ORDERED denying the State's Motion to Preclude Testimony of Witnesses Mike Rochon and Jack Smith.

Juror #1 is brought into the courtroom and questioned by Court and Counsel regarding the Jury Note submitted by Juror #1 on 12/06/2004.

FILED:  Jury Note

The Jury is now present.

The trial schedule is discussed with the Jury.

The Court instructs the jurors of the Preliminary Jury Instructions in this matter.

Counsel for the Defendant presents opening statements to the Jury.

Counsel for the State presents opening statements to the Jury.

State's Exhibit 542 is marked for identification and received in evidence.

Docket Code 012                      Form R012                              Page 3

B000000019

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CR 2000-096032                                          12/08/2004

Jeanette Andriano addresses the Jury.

Joseph Andriano addresses the Jury.

Defendant's Case:

Laura King is sworn and testifies.

3:12 p.m. Court stands at recess.

3:32 p.m. Court reconvenes.  Court, Counsel, and Defendant are present.

Court Reporter, Sharon Flores, is present.

The Jury is present.

Laura King resumes the stand and testifies further.

The witness is excused, subject to recall.

Gerald Perry is sworn and testifies.

The witness is excused.

Joyce Van Every is sworn and testifies.

The witness is excused, subject to recall.

4:52 p.m. Court stands at recess until 1:00 p.m., December 9, 2004.

Docket Code 012                    Form R012                         Page 4

B000000020

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CR 2000-096032                                    12/14/2004


                                          CLERK OF THE COURT
HONORABLE BRIAN K. ISHIKAWA                    M. LeSueur
                                                Deputy

                                          FILED: 12/23/2004

STATE OF ARIZONA                          JUAN M MARTINEZ

v.

WENDI ELIZABETH ANDRIANO                  DANIEL B PATTERSON
                                          G DAVID DELOZIER JR.

                                          VICTIM SERVICES DIV-CA-SE



                        TRIAL MINUTE ENTRY
                              DAY 53


        State's Attorney:        Juan Martinez
        Defendant's Attorney:    Daniel Patterson and David Delozier
        Defendant:               Present
        Court Reporter:          Sharon Flores


        1:26 p.m. Trial to Jury continues from December 13, 2004.

        The jury is not present.

        Counsel present oral arguments to Court regarding Defendant's Motion to Preclude
Testimony of Dr. Bayless.

        IT IS ORDERED taking the above matter under advisement.

        The Jury is now present.

        Jana Clayton, having previously been sworn, resumes the stand and testifies further.


Docket Code 012                    Form R012                        Page 1

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CR 2000-096032                                              12/14/2004

Let the record reflect that the Court has received written questions from the jury. Same are discussed with counsel at a bench conference and asked of the witness.

FILED: Jury questions (2)

The witness is excused.

Timothy Lee is sworn and testifies.

The witness is excused.

1:58 p.m. Court stands at recess.

2:21 p.m. Court reconvenes.  Court, Counsel, and Defendant are present.

Court Reporter, Sharon Flores, is present.

The Jury is not present.

The Court has considered the Defendant's oral Motion to Preclude / or in the Alternative, Motion in Limine relating to Dr. Bayless.

The Court will note for the record that it allowed the MMPI II testing of the Defendant on the issue of whether or not the Defendant's characteristics were consistent with those of domestic violence victims.

IT IS ORDERED precluding the State from eliciting testimony from Dr. Bayless:

- About his opinions relating to the Defendant's honesty, truthfulness and credibility.

- Opinions based upon the MMPI II testing.

Discussion is held regarding testimony of Dr. Bayless.

2:50 p.m. Court stands at recess.

State's Exhibits 546 and 547 are marked for identification.

3:18 p.m. Court reconvenes.  Court, Counsel, and Defendant are present.

Court Reporter, Sharon Flores, is present.

Docket Code 012                      Form R012                          Page 2

B000000022

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CR 2000-096032                                      12/14/2004


Dawna Harris is sworn and testifies.

Let the record reflect the witness has made an in-court identification of the Defendant.

State's Exhibit 548 is marked for identification and received in evidence.

State's Exhibit 549 is marked for identification and received in evidence.

Let the record reflect that the Court has received written questions from the jury. Same are discussed with counsel at a bench conference and asked of the witness.

FILED: Jury questions (3)

The witness is excused.

Bonnie Lose is sworn and testifies.

The witness is excused.

4:37 p.m. Court stands at recess until 1:00 p.m., December 15, 2004.


Docket Code 012                    Form R012                       Page 3

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CR 2000-096032                                    02/07/2005

                                          CLERK OF THE COURT
HONORABLE BRIAN K. ISHIKAWA                  A. Pagel-Spaulding
                                                  Deputy

                                          FILED: 02/14/2005

STATE OF ARIZONA                          JUAN M MARTINEZ

v.

WENDI ELIZABETH ANDRIANO                  DANIEL B PATTERSON
                                          G DAVID DELOZIER JR.

                                          VICTIM SERVICES DIV-CA-SE


                         MINUTE ENTRY


         The Court has considered the defendant's Motion for New Trial: Phase III, the
State's Response to Motion for New Trial (Phase III), the defendant's Factual Supplement to
Motion for New Trial: Phase III, and the arguments of counsel.

         THE COURT FINDS that no grounds exist under Rule 24.1, Ariz.R.Crim.P., nor
any constitutional grounds to support the defendant's Motion for New Trial: Phase III.

         IT IS ORDERED denying the defendant's Motion for New Trial:
Phase III.


Docket Code 019                    Form R000A                        Page 1

EXHIBIT C

# IN THE SUPREME COURT
# STATE OF ARIZONA

STATE OF ARIZONA,

                    Appellee,

        v.

WENDI ELIZABETH ANDRIANO,

                    Appellant.

No. CR-05-0005-AP

Maricopa County Superior
Court No. CR-2000-096032

## APPELLANT'S OPENING BRIEF

MARICOPA COUNTY PUBLIC DEFENDER

BRENT E. GRAHAM
State Bar Membership No. 011868

PEG GREEN
State Bar Membership No. 011222

Deputy Public Defenders
Attorneys for APPELLANT
11 West Jefferson, Suite 5
Phoenix, Arizona 85003
Telephone (602) 506-0924

## TABLE OF CONTENTS

Page

STATEMENT OF THE CASE ................................................................ 1

STATEMENT OF FACTS .................................................................... 7

ISSUES PRESENTED FOR REVIEW ................................................ 30

ARGUMENT I ...................................................................................... 32

THE TRIAL COURT VIOLATED ANDRIANO'S RIGHT TO A FAIR TRIAL AND DUE PROCESS UNDER THE FIFTH, SIXTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND ARTICLE 2, §§ 4 AND 24 OF THE ARIZONA CONSTITUTION WHEN IT PERMITTED EVIDENCE OF ANDRIANO'S ATTEMPTS TO OBTAIN LIFE INSURANCE POLICIES AND EVIDENCE OF ANDRIANO'S EXTRAMARITAL ACTIVITIES AS INTRINSIC TO THE CHARGE OF PREMEDITATED MURDER.

ARGUMENT II ...................................................................................... 49

THE TRIAL COURT COMMITTED FUNDAMENTAL ERROR BY FAILING TO INSTRUCT THE JURY ON THE LESSER-INCLUDED OFFENSES OF SECOND DEGREE MURDER AND MANSLAUGHTER WHERE EVIDENCE AT TRIAL SUBSTANTIATED THOSE LESSER-INCLUDED OFFENSES DENYING ANDRIANO A FAIR TRIAL AND DUE PROCESS UNDER THE SIXTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES

i

000003812

CONSTITUTION AS WELL AS ARTICLE 2, §§ 4
AND 24 OF THE ARIZONA CONSTITUTION.

ARGUMENT III..................................................................54

THE CRUEL, HEINOUS, OR DEPRAVED
AGGRAVATOR UNDER A.R.S. § 13-703(F)(6) IS
FACIALLY VAGUE AND VAGUE AS APPLIED
DENYING ANDRIANO A FAIR TRIAL, A FAIR
SENTENCING, AND DUE PROCESS OF LAW
UNDER THE SIXTH, EIGHTH, AND
FOURTEENTH AMENDMENTS TO THE UNITED
STATES CONSTITUTION AS WELL AS ARTICLE
2, §§ 4, 15, AND 24 OF THE ARIZONA
CONSTITUTION.

ARGUMENT IV..................................................................67

THE TRIAL COURT'S INSTRUCTION DEFINING
CRUELTY UNDER A.R.S. § 13-703(F)(6) WAS
INSUFFICIENT TO GUIDE THE JURY AND
APPROPRIATELY CHANNEL THEIR
DISCRETION IN VIOLATION OF THE SIXTH,
EIGHTH, AND FOURTEENTH AMENDMENTS
TO THE UNITED STATES CONSTITUTION AS
WELL AS ARTICLE 2, §§ 4, 15, AND 24 OF THE
ARIZONA CONSTITUTION.

ARGUMENT V..................................................................75

APPLICATION OF THE PROPER, NARROW
CONSTRUCTION OF "ESPECIALLY CRUEL"
DEMONSTRATES THAT THE EVIDENCE IS
INSUFFICIENT TO SUPPORT THIS
AGGRAVATING CIRCUMSTANCE.

ii

ARGUMENT VI ................................................................ 89

THE TRIAL COURT'S REFUSAL TO PERMIT
ANDRIANO TO PRESENT EVIDENCE OF
RESIDUAL DOUBT DEPRIVED HER OF HER
RIGHT TO DUE PROCESS, A FAIR TRIAL, AND
A FAIR SENTENCING PROCEEDING UNDER
THE SIXTH, EIGHTH, AND FOURTEENTH
AMENDMENTS TO THE UNITED STATES
CONSTITUTION AS WELL AS ARTICLE 2, §§ 4,
15 AND 24 OF THE ARIZONA CONSTITUTION.

ARGUMENT VII ................................................................ 95

THE TRIAL COURT'S REFUSAL TO PERMIT
ANDRIANO TO PRESENT EVIDENCE OF
MERCY DEPRIVED HER OF HER RIGHT TO
DUE PROCESS, A FAIR TRIAL, AND A FAIR
SENTENCING PROCEEDING UNDER THE
SIXTH, EIGHTH, AND FOURTEENTH
AMENDMENTS TO THE UNITED STATES
CONSTITUTION AS WELL AS ARTICLE 2, §§ 4,
15 AND 24 OF THE ARIZONA CONSTITUTION.

ARGUMENT VIII ................................................................ 98

THE TRIAL COURT IMPROPERLY
INSTRUCTED THE JURY IN THE PENALTY
PHASE INSTRUCTIONS TO REQUIRE JURY
UNANIMITY REGARDING THE EXISTENCE OF
MITIGATING CIRCUMSTANCES. THE ERROR
VIOLATED ANDRIANO'S RIGHT TO DUE
PROCESS, A FAIR TRIAL, AND A FAIR
SENTENCING PROCEEDING IN VIOLATION OF
THE SIXTH, EIGHTH, AND FOURTEENTH
AMENDMENTS TO THE UNITED STATES

iii

CONSTITUTION AS WELL AS ARTICLE 2, §§ 8, 15 AND 24 OF THE ARIZONA CONSTITUTION.

ARGUMENT IX...................................................................105

THE TRIAL COURT IMPERMISSIBLY COERCED THE JURY WHEN IT GAVE AN IMPASSE INSTRUCTION DURING THE PENALTY PHASE WITHOUT KNOWING WHETHER THE JURY WAS DEADLOCKED.

ARGUMENT X ....................................................................115

THE TRIAL COURT INCORRECTLY INSTRUCTED THE JURY ABOUT ITS DUTY TO DELIBERATE DURING THE PENALTY PHASE. THE INSTRUCTION VIOLATED ANDRIANO'S DUE PROCESS, FAIR TRIAL AND EIGHTH AMENDMENT RIGHTS.

ARGUMENT XI ...................................................................120

ARIZONA'S STATUTE PROVIDING FOR EXECUTION BY LETHAL INJECTION IS VAGUE BECAUSE IT FAILS TO SUFFICIENTLY SPECIFY THE MEANS TO BE USED TO ENSURE AN EXECUTION BY LETHAL INJECTION THAT IS NOT CRUEL AND UNUSUAL, THUS VIOLATING ANDRIANO'S DUE PROCESS AND EIGHTH AMENDMENT RIGHTS.

ARGUMENT XII ..................................................................129

ARIZONA'S DEATH PENALTY IS UNCONSTITUTIONAL

CONCLUSION.....................................................................134

iv

**CERTIFICATE OF RULE 31.13(b) COMPLIANCE**.....................................136

**CERTIFICATE OF SERVICE**....................................................................137

**APPENDIX A**

**APPENDIX B**

v

## TABLE OF CITATIONS

Page

**UNITED STATES SUPREME COURT CASES**

*Beck v. Alabama,*
        447 U.S. 625, 100 S.Ct. 2382 (1980)................................................. 49

*Boyde v. California,*
        494 U.S. 370, 110 S.Ct. 1190 (1990)................................................. 91

*Buchanan v. Angelone,*
        522 U.S. 269, 118 S.Ct. 757 (1998)................................................. 93

*Caldwell v. Mississippi,*
        472 U.S. 320, 105 S.Ct. 2633 (1985)................................................. 113

*California v. Brown,*
        479 U.S. 538, 107 S.Ct. 837 (1987)................................................. 56

*Clemmons v. Mississippi,*
        497 U.S. 738, 110 S.Ct. 1441 (1990)................................................. 75

*Eddings v. Oklahoma,*
        455 U.S. 104, 102 S.Ct. 869 (1982)................................................. 89

*Estelle v. Gamble,*
        429 U.S. 97, 97 S.Ct. 285 (1976)................................................. 125

*Franklin v. Lynaugh,*
        487 U.S. 164, 108 S.Ct. 2320 (1988)................................................. 90, 91

*Godfrey v. Georgia,*
        446 U.S. 420, 100 S.Ct. 1759 (1980)................................................. 55, 59, 61

000003817

*Gregg v. Georgia*,
    428 U.S. 153, 96 S.Ct. 2909 (1976)......................................................... 55

*Kansas v. Marsh*,
    548 U.S. ___, 126 S.Ct. 2516 (2006)...................................................95-96

*Kotteakos v. U.S.*,
    328 U.S. 750, 66 S.Ct. 1239 (1946)........................................................ 47

*Lewis v. Jeffers*,
    497 U.S. 764, 110 S.Ct. 3092 (1990)................................................. 57, 60

*Lockett v. Ohio*,
    438 U.S. 586, 98 S.Ct. 2954 (1978)..............................89, 99-100, 106, 117

*Lowenfield v. Phelps*,
    484 U.S. 231, 108 S.Ct. 546 (1988)...............................................105-107

*Maynard v. Cartwright*,
    486 U.S. 356, 108 S.Ct. 1853 (1988)............................................55, 59, 61

*McCleskey v. Kemp*,
    481 U.S. 279, 107 S.Ct. 1756 (1987)................................................. 56, 89

*Mills v. Maryland*,
    486 U.S. 367, 108 S.Ct. 1860 (1988).............................................. 101, 103

*Oregon v. Guzek*,
    ___ U.S. ___, 126 S.Ct. 1226 (2006)..............................................90-91

*Ring v. Arizona, (Ring II)*,
    536 U.S. 584, 122 S.Ct. 2428 (2002)................ 1, 55, 58, 60, 91-92, 130-131

*Spaziano v. Florida*,
    468 U.S. 447, 104 S.Ct. 3154 (1984).............................................. 50, 56

vii

*Tuilaepa v. California,*
    512 U.S. 967, 114 S.Ct. 2630 (1994)............................................................. 93

*United States v. Batchelder,*
    442 U.S. 114, 99 S.Ct. 2198 (1979)............................................................. 121

*Walton v. Arizona,*
    497 U.S. 639, 110 S.Ct. 3047 (1990)........................ 54-55, 57-60, 62, 75-76

*Witherspoon v. Illinois,*
    391 U.S. 510, 88 S.Ct. 1770 (1968)........................................................... 106

*Woodson v. North Carolina,*
    428 U.S. 280, 96 S.Ct. 2978 (1976)................................................... 113, 117

*Zant v. Stephens,*
    462 U.S. 862, 103 S.Ct. 2733 (1983)........................................................... 93

## OTHER FEDERAL CASES

*Adamson v. Ricketts,*
    865 F.2d 1011 (9th Cir. 1988)..........................................................60, 64-65

*Beardslee v. Woodford,*
    395 F.3d 1064 (9th Cir. 2005).....................................................125-126, 128

*Cooper v. Rimmer,*
    379 F.3d 1029 (9th Cir. 2004)................................................................. 124

*Jammal v. Van de Kamp,*
    926 F.2d 918 (9th Cir. 1991)..................................................................... 47

*LaGrand v. Lewis,*
    883 F.Supp. 469 (D.Ariz., 1995)........................................................121-122

*McKinney v. Rees,*
    993 F.2d 1378 (9th Cir. 1993)................................................................... 47

*Morales v. Hickman,*
    438 F.3d 926 (9th Cir. 2006)..................................................................123-124

*United States v. Coleman,*
    78 F.3d 154 (5th Cir. 1996)..................................................................... 39

*United States v. DeGeorge,*
    380 F.3d 1203 (9th Cir. 2004)................................................................ 32, 44

*United States v. Woodley,*
    9 F.3d 774 (9th Cir. 1993)..................................................................... 120

*Woratzeck v. Lewis,*
    863 F.Supp 1079 (D.Ariz., 1994)............................................................59-61

## ARIZONA SUPREME COURT CASES

*Kauffman v. Schroeder,*
    116 Ariz. 104, 568 P.2d 411 (1977)........................................................98

*McKaney v. Foreman,*
    209 Ariz. 268, 100 P.3d 18 (2004)........................................................ 130

*State v. Adamson,*
    136 Ariz. 250, 665 P.2d 972 (1983).............................................56-57, 77

*State v. Anderson,*
    210 Ariz. 327, 111 P.3d 369 (2005)................................54, 68, 70, 75-76, 98

*State v. Apelt (Michael),*
    176 Ariz. 349, 861 P.2d 634 (1993)....................................................... 73

*State v. Atwood,*
    171 Ariz. 576, 832 P.2d 593 (1992)....................................................... 92

*State v. Beaty,*
    158 Ariz. 232, 762 P.2d 519 (1988)....................................................... 129

000003820

*State v. Bishop,*
    127 Ariz. 531, 622 P.2d 478 (1981)..........................................................86

*State v. Bolton,*
    182 Ariz. 290, 896 P.2d 830 (1995)..........................................................78

*State v. Brewer,*
    170 Ariz. 486, 826 P.2d 783 (1992)..........................................................73

*State v. Brookover,*
    124 Ariz. 38, 601 P.2d 1322 (1979)..........................................................63

*State v. Carlson,*
    202 Ariz. 570, 48 P.3d 1180 (2002)......................................................62, 83

*State v. Clark,*
    126 Ariz. 428, 616 P.2d 888 (1980)..........................................................87

*State v. Cromwell,*
    211 Ariz. 181, 119 P.3d 448 (2005)......................................................69-71

*State v. Dann,*
    206 Ariz. 371, 79 P.3d 58 (2003)..............................................................91

*State v. Dickens,*
    187 Ariz. 1, 926 P.2d 468 (1996)......................................................32, 39, 49

*State v. Djerf,*
    191 Ariz. 583, 959 P.2d 1274 (1998)....................................................72-73

*State v. Dugan,*
    125 Ariz. 194, 608 P.2d 771 (1980).........................................................50

*State ex rel. Thomas v. Granville,*
    211 Ariz. 468, 123 P.3d 662 (2005)................92, 98, 100-101, 115, 118-119

x

*State v. Gillies*,
   142 Ariz. 564, 691 P.2d 655 (1984)................................................................ 87

*State v. Glassel*,
   211 Ariz. 33, 116 P.3d 1193 (2005)............................................................... 98

*State v. Gretzler*,
   135 Ariz. 42, 659 P.2d 1 (1983)...............................57, 60-61, 64-65, 76-77

*State v. Harrod*,
   200 Ariz. 309, 26 P.3d 492 (2001)................................................91, 129-130

*State v. Hinchey*,
   181 Ariz. 307, 890 P.2d 602 (1994)............................................................. 132

*State v. Huerstel*,
   206 Ariz. 93, 75 P.3d 698 (2003)................................................105, 110-111

*State v. Johnson*,
   212 Ariz. 425, 133 P.3d 735 (2006)...................................................54, 57, 93

*State v. Jones*,
   205 Ariz. 445, 72 P.3d 1264 (2003)......................................................... 77, 91

*State v. Kiles*,
   175 Ariz. 358, 857 P.2d 1212 (1993)......................................................78-79

*State v. Knapp*,
   114 Ariz. 531, 562 P.2d 704 (1977).............................................................. 56

*State v. Krone*,
   182 Ariz. 319, 897 P.2d 621 (1995).............................................................. 50

*State v. Lavers*,
   168 Ariz. 376, 814 P.2d 333 (1991)............................................................. 77

xi

*State v. Lujan,*
    124 Ariz. 365, 604 P.2d 629 (1979)..................................................56

*State v. Mata,*
    185 Ariz. 319, 916 P.2d 1035 (1996)..............................................61

*State v. McCann,*
    200 Ariz. 27, 21 P.3d 845 (2001)............................................89, 95

*State v. Medrano,*
    173 Ariz. 393, 844 P.2d 560 (1992)..............................................84

*State v. Miles,*
    186 Ariz. 10, 918 P.2d 1028 (1996)..............................................132

*State v. Moody,*
    208 Ariz. 424, 94 P.3d 1119 (2004)..........................................73, 78

*State v. Newell,*
    212 Ariz. 389, 132 P.3d 833 (2006)..............................................76

*State v. Nordstrom,*
    200 Ariz. 229, 25 P.3d 717 (2001)..............................................50

*State v. Nordstrom,*
    206 Ariz. 242, 77 P.3d 40 (2003)..............................................91

*State v. Orendain,*
    188 Ariz. 54, 932 P.2d 1325 (1997)......................................67, 89, 95

*State v. Pandeli,*
    200 Ariz. 365, 26 P.3d 1136 (2001)........................................92, 131-132

*State v. Poyson,*
    198 Ariz. 70, 7 P.3d 79 (2000)........................................71-72, 131

xii

000003823

*State v. Ring*, (*Ring I*),
    200 Ariz. 267, 25 P.3d 1139 (2001)............................................................131

*State v. Ring*, (*Ring III*),
    204 Ariz. 534, 65 P.3d 915 (2003)............................................................130

*State v. Roscoe*,
    184 Ariz. 484, 910 P.2d 635 (1996)............................................................77

*State v. Salazar*,
    173 Ariz. 399, 844 P.2d 566 (1992)..............................................62, 64-65

*State v. Sansing*,
    200 Ariz. 347, 26 P.3d 1118 (2001)............................................................130

*State v. Sansing*,
    206 Ariz. 232, 77 P.3d 30 (2003)..............................................................62

*State v. Schackart*,
    190 Ariz. 238, 947 P.2d 315 (1997)............................................................91

*State v. Smith*,
    146 Ariz. 491, 707 P.2d 289 (1985)............................................................83

*State v. Soto-Fong*,
    187 Ariz. 186, 928 P.2d 610 (1996)............................................................86

*State v. Spears*,
    184 Ariz. 277, 908 P.2d 1062 (1996)......................................................91-92

*State v. Stokley*,
    182 Ariz. 505, 898 P.2d 454 (1995)............................................................70

*State v. Terrazas*,
    189 Ariz. 580, 944 P.2d 1194 (1997)............................................................44

000003824

*State v. Wagner,*
    194 Ariz. 310, 982 P.2d 270 (1999).................................................121

*State v. Wall,*
    212 Ariz. 1, 126 P.3d 148 (2006)....................................................50

*State v. Wallace,*
    151 Ariz. 362, 728 P.2d 232 (1986)............................................79-80

**ARIZONA COURT OF APPEALS CASES**

*State v. Alvarez,*
    205 Ariz. 110, 67 P.3d 706 (App. 2003).......................................120

*State v. Grijalva,*
    137 Ariz. 10, 667 P.2d 1336 (App. 1983)...................................45-46

*State v. McMahon,*
    201 Ariz. 548, 38 P.3d 1213 (App. 2002).......................................54

**OTHER STATE CASES**

*Commonwealth v. DeMarco,*
    444 Mass. 678, 830 N.E.2d 1068 (2005).......................................43

*People v. Houston,*
    130 Cal.App. 4th 279, 29 Cal.Rptr.3d 818 (Cal.App. 2005)..........43

*State v. Camm,*
    812 N.E.2d 1127 (Ind. App. 2004)................................................42

*State v. Kim,*
    897 A.2d 968 (NH 2006)...............................................................41

*State v. McKnight,*
    107 Ohio St.3d 101, 837 N.E.2d 315 (2005).................................43

xiv

000003825

*State v. Rhodes,*
      627 N.W.2d 74 (Minn. 2001)............................................................ 43

**CONSTITUTIONAL PROVISIONS**
**United States Constitution**

Article 1, § 10............................................................................................. 130

Fifth Amendment...............................................32, 38, 106, 115, 130-131

Sixth Amendment............................32, 38, 49, 54, 66-67, 74, 89, 94-96, 98-99, 104,
      ...............................................................106, 115, 130

Eighth Amendment..........................31, 54, 61, 66-67, 74, 89-90, 94-96, 98-99, 104,
      ...............................................................106, 112-115, 117, 120-122, 125-126, 128-132

Fourteenth Amendment.................32, 38, 49, 54, 66-67, 74, 89-90, 94-96, 98-99,
      ...............................................................104, 106, 115, 129-132

**Arizona Constitution**

Article 2, § 1.............................................................................................129-130

Article 2, § 4.............................32, 38, 49, 54, 66-68, 74, 89, 94-95, 97, 106,
      ...............................................................115, 129-131

Article 2, § 8.............................................................................98-99, 104

Article 2, § 15.........................54, 66-67, 89, 94-95, 97-99, 104, 106, 115, 129-132

Article 2, § 24.........................32, 38, 49, 54, 66-68, 74, 89, 94-95, 97-99,
      ...............................................................104, 106, 115, 130

Article 2, § 25.............................................................................................130

Article 6, § 5(3).............................................................................................6

xv

**STATUTES**
**Arizona Revised Statutes**

§ 13-703................................................................100, 131-132

§ 13-703(C)...........................................................100, 103, 115

§ 13-703(D)...........................................................................58

§ 13-703(E)...........................................................................92

§ 13-703(F)......................................................................1, 130

§ 13-703(F)(5)........................................................................5

§ 13-703(F)(6)...........................3, 5, 30, 54, 56-58, 60-62, 64-69, 76

§ 13-703(H)..........................................................................93

§ 13-703.01(K).....................................................................113

§ 13-704.............................................................................128

§ 13-704(A).....................................................................121, 128

§ 13-1104(A)(1).....................................................................51

§ 13-1104(A)(2).....................................................................51

§ 13-4031.............................................................................6

**RULES**
**Arizona Rules of Criminal Procedure**

Rule 22.4......................................................................106, 110

Rule 31.2(b)...........................................................................6

000003827

**Arizona Rules of Evidence**

Rule 105..................................................................................................... 44

Rule 402..................................................................................................... 44

Rule 403..................................................................................................... 32

Rule 404(b)..................................................................................... 3-4, 32-33, 41, 44

## OTHER AUTHORITIES

*Judge Stays Killer's Execution over Lethal-injection
    Concerns*, Arkansas Democrat Gazette, June 27, 2006.............................. 124

*When Legislatures Delegate Death:  The Troubling
    Paradox Between the State's Uses of Electrocution
    and Lethal Injection and What it Says About Us*,
    Ohio State Law Journal, Vol. 63:63 (2002)......................................... 126-128

000003828

## STATEMENT OF THE CASE

The appellant, Wendi Elizabeth Andriano, was indicted for the first-degree premeditated murder of her husband, Joseph Andriano. (Record on Appeal, p. 1, hereinafter ROA.)  On December 22, 2000, the state noticed its intention to seek the death penalty proposing, "To prove one or more of the enumerated factors in A.R.S. § 13-703(F)." (ROA, p. 23.)

On July 2, 2002, Andriano moved to dismiss the state's notice to seek the death penalty contending that pursuant to the United States Supreme Court's decision in *Ring v. Arizona*, 536 U.S. 584, 122 S.Ct. 2428 (2002), Arizona's maximum penalty for first degree murder was life in prison. (ROA, p. 70.)  On July 16, 2002, the state acknowledged that *Ring* posed questions concerning Arizona's death penalty and the legislature would have to act in order to determine the effect on pending cases and the future of the death penalty in Arizona. (ROA, p. 73.)  Thereafter, on July 19, 2002, the state moved for a stay of proceedings pending legislative action. (ROA, p. 75.)  Andriano objected to the state's request. (ROA, p. 78.)  The case continued.

On August 13, 2002, the state filed a notice of aggravating factors alleging that the offense was committed in consideration for the receipt of anything of pecuniary value, and the offense was committed in an especially heinous, cruel or

1

depraved manner. (ROA, p. 82.) Andriano filed a motion to remand to the grand jury for a specific finding of probable cause on the aggravating factors alleged, or alternatively, to dismiss the allegation of aggravating circumstances. (ROA, p. 83.) Andriano contended that Arizona's aggravating factors were like elements of the offense, thus they must be screened for probable cause by a grand jury. (Id.) The state responded that aggravating factors were not elements of the offense, but were standards to guide the making of the choice between death or life imprisonment. (ROA, p. 85.) On March 12, 2004, the trial court denied Andriano's motion to dismiss the state's intent to seek the death penalty. (ROA, p. 135.)

On September 10, 2002, Andriano filed a supplemental motion to strike the state's notice of intent to seek the death penalty contending that application of the renewed death penalty by the Arizona legislature violated the prohibition against *ex post facto* laws. (ROA, p. 86.) Andriano also argued that retroactive application of the new death penalty statute to her would violate her right to due process. (Id.) On March 12, 2004, the trial court denied Andriano's supplemental motion to strike the state's intent to seek the death penalty based on violation of the *ex post facto* laws. (ROA, p. 135.)

2

On March 18, 2003, Andriano moved to dismiss the aggravating factor of cruel, heinous or depraved under A.R.S. § 13-703(F)(6), as being unconstitutionally vague on its face and not able to be constitutionally narrowed for application by a sentencing jury. (ROA, p. 96.) On March 12, 2004, the trial court denied Andriano's motion. (ROA, p. 135.)

On January 29, 2004, Andriano moved to preclude the state's reference to, among other things, her misconduct in efforts to obtain additional life insurance policies on her husband. (ROA, p. 125.) Andriano urged that the information was not relevant, and was unfairly prejudicial in violation of Arizona Rules of Evidence, Rule 404(b). (Id.) The state responded that Andriano's attempts to obtain life insurance were relevant as part of her ongoing scheme to make her husband's death as lucrative as possible. (ROA, p. 130.) On September 7, 2004, the trial court denied Andriano's motion. (ROA, p. 193; Reporter's Transcript of Proceedings, 9/7/04, p. 13, hereinafter RT.)

Andriano also sought to exclude evidence of her extramarital affairs as inadmissible "bad acts" under Rule 404(b), thus not relevant, and, if relevant, unduly prejudicial. (ROA, p. 100; RT, 9/7/04, p. 9.) The state maintained that Andriano told her friends that she wanted her husband dead so she could enjoy the company of other men. (ROA, p. 106.) This was Andriano's motive according to

3

the state.  (Id.)  The state said that per her conversations with friends, Andriano said that once her husband was dead, a paramour, Rick Freeland, would be willing to resume the relationship with her.  (Id.)  The trial court denied Andriano's motion to preclude evidence of the relationships with both Rick Freeland and another man, Travis Black.  (RT, 9/7/04, p. 13.)  The court found that the evidence was intrinsic to the case, thus not 404(b) evidence at all.  (Id., p. 14.)

On May 10, 2004, the state moved to preclude evidence regarding residual doubt.  (ROA, p. 144.)  Initially, Andriano did not object.  (ROA, p. 165.)  The trial court granted the state's motion.  (ROA, p. 174; RT, 7/30/04, p. 5.)  Later, however, Andriano included residual doubt on her list of mitigating factors. (ROA, p. 396.)  The parties readdressed the issue.  Andriano urged that residual doubt be included as a specific mitigator.  (RT, 12/7/04, p. 5.)  The prosecutor objected.  (Id., pp. 5-6.)  The trial court denied Andriano's motion for reconsideration on the issue of residual doubt, and affirmed its original ruling precluding evidence of residual doubt.  (RT, 12/8/04, pp. 5-6.)  Residual doubt was not included as a mitigating factor for the jury to consider.

Andriano also requested the court list "mercy" as a specific aggravating factor.  (ROA, p. 396.)  At hearing, the prosecutor also objected to this mitigator. (RT, 12/7/04, pp. 5-6.)  Andriano asserted that mercy was synonymous with

4

leniency and, whereas mercy alone would perhaps not be sufficient to support a life sentence, mercy coupled with another mitigating factor would be sufficient. (Id., p. 6.) Andriano asked that mercy be included. (Id.) The trial court ordered that no witness statements pertaining to the appropriate sentence be elicited with regard to mercy. (RT, 12/8/04, p. 6.) The court also did not permit mercy to be proffered as mitigation for the jury to consider. (ROA, p. 419.)

The prosecutor moved to instruct the jury regarding the weighing of aggravating and mitigating factors. (ROA, p. 149.) Over Andriano's objection, (ROA, p. 169), the trial court granted the state's motion. (RT, 7/30/04, p. 5.)

Andriano's trial began August 23, 2004, with jury selection. (RT, 8/23/04, *passim.*) It concluded November 18, 2004, when the jury found Andriano guilty of first-degree murder as charged in the indictment. (RT, 11/18/04, p. 8.)

The aggravation phase began November 30, 2004. (RT, 11/30/04, *passim.*) The state sought to prove two aggravators, 1) the murder was committed in expectation of anything of pecuniary value pursuant to A.R.S. § 13-703(F)(5), and 2) the killing was done in an especially cruel, heinous or depraved fashion under A.R.S. § 13-703(F)(6). (Id., p. 9.) At the conclusion of the aggravation phase, the jury found that Andriano had committed the offense in an especially cruel manner. (ROA, p. 393; RT, 12/6/04, p. 3.)

5

The penalty phase began December 8, 2004.  (RT, 12/8/04, *passim*.)  The trial court instructed the jury as to twenty-three specific mitigating factors.  (ROA, pp. 399, 419.)  It concluded on December 22, 2004, when the jury found that Andriano should be sentenced to death.  (ROA, p. 426; RT, 12/22/04, p. 5.)  Based on the jury's finding, the trial court sentenced Andriano to be executed by lethal injection.  (RT, 12/22/04, p. 7.)

On December 29, 2004, Andriano filed a motion for a new trial for the penalty phase.  (ROA, p. 434A.)  On February 7, 2005, the trial court denied Andriano's motion for a new Phase III trial.  (Minute Entry, 2/7/05.)

On December 22, 2004, the clerk of the superior court timely filed a notice of appeal from Superior Court.  (ROA, p. 428.)  This Court has jurisdiction pursuant to Article 6, § 5(3) of the Arizona Constitution as well as A.R.S. § 13-4031 and Arizona Rules of Criminal Procedure, Rule 31.2(b).

6

## STATEMENT OF FACTS

Wendi Andriano's husband, Joe Andriano, had terminal cancer.  Only three months after their wedding, Joe found a painful lump in his neck.  (RT, 10/26/04, pp. 98-99.)  He had it removed and was told it was benign.  (Id., pp. 99-100.) Lumps grew back two more times and each time they were removed.  (Id., pp. 101-107.)  The fourth time a tumor grew, Joe went to a specialist.  (Id., pp. 110-111.) Eventually, he was diagnosed with a rare type of cancer.  (Id., p. 114.)  The doctors removed the tumor, but the cancer had spread to his brain and vital organs.  (Id., pp. 117, 121.)

His doctor, Christopher Kellogg, said Joe had a metastatic adenoid cystic carcinoma.  (RT, 9/28/04, p. 10.)  Dr. Kellogg opined that Joe could have lived any where from many months to a few years.  (Id., pp. 11-12.)  Dr. Kellogg treated Joe with chemotherapy.  He received four chemotherapy treatments all together.  (Id., p. 15.)  Dr. Kellogg thought that the chemotherapy might not have significantly impacted Joe's long-term survival.  (Id., p. 53.)  The autopsy confirmed that Joe's cancer was spreading.  (Id., pp. 40-41, 46-47.)

At the time of Joe's death, he and Andriano lived at the San Riva Apartments where Andriano worked as the manager.  (RT, 9/8/04, pp. 7-8.)  There, she worked with others in the office such as Chris Hashisaki, a bookkeeper and activities

7

director at the San Riva Apartments.  (Id.)  Hashisaki said that she and Andriano were professional working friends.  (Id., p. 8.)

On October 8, 2000, at about 2:30 a.m., Andriano called Hashisaki.  (Id., p. 10.)  Hashisaki went to the Andriano's apartment where she found Andriano outside on the sidewalk holding a telephone, looking confused.  (Id., p. 11.) Andriano told Hashisaki that her husband was inside on the floor dying and she had not yet called 911.  (Id., p. 12.)  As the two walked towards the apartment, Hashisaki told Andriano to call 911, but she could not get reception outside.  (Id., p. 13.)

Andriano was dressed in a white t-shirt and dark shorts.  (Id., p. 11.) Hashisaki did not see any stains or other color on the shirt.  (Id.)

Inside the apartment, Hashisaki saw Joe lying on the living room floor on his left side in a fetal position.  (Id., p. 14.)  As Hashisaki knelt by him, she saw that he was weak and had vomited on the floor.  (Id., pp. 14-15.)  Joe recognized Hashisaki and was able to communicate with her.  (Id.)  He wondered what was taking Emergency so long to respond.  (Id., pp. 15-16.)  Joe continued to lay on the floor, unable to sit up.  (Id., p. 16.)  Hashisaki did not see any bruising or blood on him.  (Id., p. 17.)

8

In a back bedroom, Hashisaki found Andriano on the phone.  (Id., p. 18.)
The two came out to the living room and Andriano knelt down beside Joe while on
the phone.  (Id.)  Andriano appeared calm as she spoke to the Emergency dispatch
operator.  (Id., p. 19.)  Andriano asked Hashisaki what Joe's color was like.  (Id., p.
20.)  Hashisaki said his color was fine, his lips were not blue, but he was having
trouble breathing.  (Id.)

Andriano hung up and said that they needed to get Joe to the car to get him
to the hospital faster.  (Id., p. 21.)  Andriano was anxious.  (Id.)  As the two tried to
lift Joe up, Andriano became irritated, telling him to get his ass up when he said he
could not make it to the car.  (Id., p. 22.)  Hashisaki advised Andriano to call
Emergency again and find out how far away they were.  (Id., p. 24.)  Upon hearing
that Emergency was about a mile away, Hashisaki said that they would wait.  (Id.)
Hashisaki went outside to direct the responders.  (Id.)  As she took a cigarette and
left, Hashisaki saw that Joe had begun to vomit again.  (Id., p. 25.)

When rescue personnel approached Andriano's apartment, she told them to
go away and would not let them in.  (Id., p. 27.)  Hashisaki told them that
Andriano's husband had cancer and was inside dying on the floor.  (Id., p. 28.)
The firemen knocked for five to ten minutes with no response.  (Id., p. 29.)
Hashisaki heard nothing from inside.  (Id.)  Finally, a fireman got a call back from

<div align="center">9</div>

dispatch telling them that Andriano said she was coming out. (Id., p. 30.)  The firemen and Hashisaki were waiting by the front door of Andriano's apartment. (Id.)  Instead, Andriano came around through the corridor of the front of the building on the north side. (Id.)  Andriano could not have come through on the north side other than by going out the backdoor of her apartment. (Id., p. 35.)

As Andriano approached, Hashisaki noticed that Andriano was now wearing dark shorts and a striped t-shirt, and her hair was wet whereas it had been dry when Hashisaki first got there. (Id., pp. 37, 13.)  Andriano walked past the firemen, stood by her front door and explained that her husband was dying, and this was not the way he wanted to go. (Id.)  When asked whether Joe had requested to not be resuscitated in an emergency, Andriano told them that Joe's doctor had such an order on file. (Id., pp. 37-38.)  Andriano told them that her father was on the way and she wanted them to leave. (Id., p. 38.)  The firemen left. (Id.)  Hashisaki said Andriano was calm as she spoke with them. (Id., p. 39.)

Hashisaki said as she stood outside the apartment waiting, she did not hear sounds of any kind of physical confrontation, or somebody being struck, or the sound of furniture breaking. (RT, 9/9/04, pp. 28-29.)  She didn't hear any screaming, crying, or words said in anger. (Id., p. 29.)

10

Fireman Benjamin McKinnon also noticed that Andriano's hair was wet and that she looked like she had showered. (RT, 9/14/04, pp. 162-163.) He recounted that Andriano had a ten-minute conversation with them at the front door of her apartment. (Id., p. 164.) The firemen were not permitted to enter. (Id.)

About an hour later, the same fire truck and crew again responded to Andriano's apartment. (Id., p. 166.) This time they were permitted inside the apartment. (Id.) There, they found a man on his back, deceased. (Id., p. 167.) Fire personnel removed Andriano's two children from the apartment and gave them over to Andriano's step-father. (Id., p. 170.) McKinnon said while outside the apartment attempting to gain entry the first time, he heard no noises consistent with a struggle or a fight. (Id., p. 171.)

Around 3:30 a.m., Phoenix police officer Bryan Richards responded to a call at 2155 East Liberty Lane, #132, in Phoenix. (Id., p. 107.) When Richards arrived, other fire trucks and police cars were already there. (Id.) As Richards entered the apartment, he saw an individual on the floor, face up. (Id., p. 108.) He noticed there was a pool of blood off to the side of the individual's head that looked like it was already starting to dry. (Id., p. 109.)

11

McKinnon said Andriano, who was now wearing different clothes, had blood spattering on the front side of her shirt. (Id., p. 177.) In the first response, Andriano had no visible blood staining on her outfit. (Id.)

Fireman Richard Perrott was also present at both responses to the Andriano home. (RT, 9/15/04, p. 7.) The first time, Perrott estimated that the crew tried to gain entry to Andriano's apartment by knocking from five to seven minutes. (Id., p. 11.) Perrott said he could hear the phone ringing inside the apartment as they were standing out front. (Id., p. 12.) Perrott said that when Andriano came out and spoke to them, she was very sincere and calm. (Id., pp. 13-14.) She did not seem anxious or hysterical. (Id., p. 14.)

Perrott said the second time they were called to the apartment and permitted to enter, he saw that the victim was semi-face down, turned to his right side. (Id., p. 18.) He was facing toward the door. (Id., p. 19.)

Perrott also said he heard no sounds of a fight or physical confrontation to cause him concern as they stood in front of Andriano's apartment door on the first trip. (Id., p. 21.) Because he was able to hear the phone ring, he opined that had a confrontation been occurring, he would have been able to hear it. (Id., pp. 21-22.) Perrott also noticed the second outfit Andriano was wearing at the second response had blood on it. (Id., p. 24.)

12

The medical examiner, Dr. Philip Keen, said the face of the decedent showed a combination of abrasions and contusions and scrapes at the time of the autopsy. (RT, 9/16/04, p. 13.) There were abrasions across the decedent's cheek and hemorrhaging and bruising on the lips. (Id., p. 16.) He said the face bruises, the lip bruising, and cuts inside the mouth could have been caused by falling to the floor face forward. (Id., pp. 55, 57.)

Dr. Keen saw pattern contusions across the top of the head and some linear areas of redness that were contusions. (Id., p. 17.) Dr. Keen opined that the injuries were blunt force injuries. (Id.) He felt the injury patterns on the forehead were unlikely to be produced by a single impact. (Id., pp. 18-19.) They appeared to be repetitive injuries, with similar running-like pattern. (Id., p. 19.) Dr. Keen saw contusions and abrasions on the parietal, occipital, and mastoid areas of the head. (Id., p. 21.) Dr. Keen noted the back of the head showed multiple primary lacerations, which showed more lacerated than incised wounds, although some may have been true incised wounds. (Id., pp. 21-22.)

The injuries to the back of the head were almost all produced by blunt force injury. (Id., p. 22.) According to Dr. Keen, the decedent received no less than twenty-three strikes. (Id., pp. 22-23.) However, his skull was not fractured. (Id., p. 51.)

13

Dr. Keen found all of the injuries to have occurred before death.  (Id., pp. 30-31.)  He also found that it was not an instantaneous death.  (Id., p. 31.) Dr. Keen said that between eight and ten of the injuries to the head would have rendered the decedent immediately unconscious.  (Id., p. 32.)

Dr. Keen also observed a large gaping wound to the side of the decedent's neck.  (Id., p. 25.)  The wound measured 3 ¾ inches by 2 inches.  (Id., p. 36.)  It severed a portion of the carotid artery.  (Id.)  Dr. Keen said that the previous surgeries to the decedent's neck may have caused some weakness that contributed to the final dimensions of the neck wound.  (Id., pp. 86-87.)  Dr. Keen said that if the neck wound was not the first injury, then the severity of the injuries to the head were sufficient to render the decedent unconscious.  (Id., p. 26.)

According to Dr. Keen, most of the blunt force injuries were concentrated in the occipital and parietal areas in an approximately 6 by 5 inch dimension.  (Id., p. 50.)  The focal point of the blunt trauma injuries were the back of the head.  (Id.) Dr. Keen noted that bleeding along the surface of the left side of the brain suggested there was cardiac function after he received the blunt force trauma.  (Id., p. 51.)  Dr. Keen also saw some subarachnoid hemorrhage particularly over the left temporal lobe, which was secondary to the external head trauma.  (Id., p. 34.)

14

Dr. Keen said in this particular case, once the decedent had been rendered unconscious, he probably would not have regained consciousness. (Id., p. 68.)

Dr. Keen opined that the decedent was killed by blunt force injuries and the stabbing wounds, but primarily the blunt force injuries. (Id., p. 43.) Dr. Keen later acknowledged that the decedent was still alive after the blunt force trauma. (Id., p. 51.) Thus, the blunt force trauma preceded the neck wound. (Id., pp. 51-52.) Dr. Keen said that the incised wound to the neck was the ultimate blow. (Id., p. 74.)

Dr. Keen could not tell if a knife caused a small laceration to the back of one of the decedent's ears. (Id., pp. 26-27.) Dr. Keen noted that there were cuts over the right knuckle and an incised wound on the dorsum of the right hand. (Id., p. 27.) Dr. Keen said the wounds were consistent with being defensive wounds. (Id., p. 28.) However, he described the incised wound as "superficial." (Id., p. 57.)

Similarly, Dr. Keen saw contusions and abrasions in the decedent's wrist area. (Id.) He also found those wounds to be consistent with defensive wounds. (Id.) Dr. Keen found two small superficial cuts on the decedent's left hand that could have been defensive wounds. (Id., pp. 28-29.) He noted that a bruise at the base of the decedent's left thumb could have been a defensive wound or could have been received from a fall. (Id., p. 29.)

15

Dr. Keen said the decedent had linear wounds on the left shoulder at the back, incised wounds between the upper back and medial to the scalp, but the doctor had difficulty distinguishing some of the small lacerations from incised wounds because there was some overlap. (Id., p. 30.) Dr. Keen acknowledged that the wood screws contained with the stool seized by police were sharp enough to have caused some of the incised wounds in the decedent's shoulder. (Id., p. 64.) Upon viewing the stool, Dr. Keen said, in the range of distances, it was possible to get two injuries from a single impact. (Id., p. 77.)

Dr. Keen observed no injuries from the upper torso down to the feet of the decedent. (Id., p. 33.) On both hands, Dr. Keen found fine caliber hairs stuck to the dried blood on the palmar and intertriginous surfaces of both hands and from the surface of the body. (Id., p. 58.)

In testing the decedent's stomach contents, Dr. Keen found 3.8 milligrams per liter of sodium azide. (Id., pp. 42-43.) Dr. Keen found that there was no sodium azide in the decedent's bloodstream. (Id., p. 60.) That suggested that he had ingested the sodium azide but it had not been in his system long enough to be absorbed into his bloodstream. (Id.)

Dr. Keen found the 3.8 milligrams of sodium azide a "small amount". (Id., p. 61.) Dr. Keen said a person who consumes sodium azide could have changes in

16

blood pressure, either higher or lower.  (Id., p. 62.)   A person could become agitated and emotionally hyper.  (Id., p. 63.)

Dr. Edward French, a professor of pharmacology, said that sodium azide is a very simple organic chemical made up of sodium and nitrogen.  (RT, 9/23/04, p. 10.)  It is used as a preservative, fungicide, insecticide and in explosives.  (Id.)  The first symptoms of azide ingestion include a headache and increased heart rate.  (Id., p. 13.)  A person's blood pressure would drop and they would become faint.  (Id.)  They would have difficulty breathing.  (Id.)  Ingestion is associated with vomiting and diarrhea.  (Id., p. 14.)  If a person ingested enough sodium azide, they would have respiratory failure, go into a coma, have convulsions, and die.  (Id.)  Sodium azide works just like cyanide in that it poisons the energy generated by the body's cells.  (Id., p. 16.)  It usually renders a person unconscious because they have too little oxygen getting to the brain.  (Id.)  A person who had been on the floor for forty-five minutes vomiting would probably not have the strength to get up.  (Id., pp. 19-20.)

Dr. French opined that the medical examiner's finding that there was no sodium azide in Andriano's blood was in error because West Coast Analytical found that the blood contained two parts per million of sodium azide.  (Id., pp. 22-23.)  That led Dr. French to believe that the victim had either ingested a large

17

amount of sodium azide further back in time or had ingested a very small amount

more recently. (Id., p. 26.) Dr. French said that sodium azide would supposedly

not have a taste. (Id., p. 32.) If anything, it would taste salty. (Id., p. 47.)

Joseph Richmond was a senior chemist for West Coast Analytical Service.
(RT, 9/27/04, p. 29.) He analyzed a blood sample labeled "Joe Andriano." (Id., p.
31.) Richmond found azide in the sample just at the limit of detection. (Id., p. 34.)
Three gelatin capsules that Richmond received from the Maricopa County Public
Defender's Office tested positive for azide. (Id., p. 45.)

Phoenix detective Dennis Olson processed the scene for evidence.  (RT,
9/9/04, p. 115.) Detective Olson seized two barstools, one broken.  (RT, 9/13/04,
p. 86; Exs. 257, 258.) There were bloodstains at the bottom on each of the stools.
(Id.)

Exhibit 29 shows blood drops on the top of the victim's feet described as
"impact spatter." (Id., p. 93.) From Exhibit 29, Detective Olson opined that the
victim was not standing up when the round blood drops hit because there is no
directionality to them. (Id., pp. 98-99.) The victim was lying down; his feet were
sticking straight out. (Id.) When he was being struck on the head with an object,
the blood was spattering going in a north direction and some of the spatter caught
on the top of the victim's foot. (Id., p. 99; Ex. 31.)

<center>18</center>

Olson explained that impact spatter occurs when an object sits in a blood source and the blood from that source travels and impacts another surface. (Id., p. 128, Ex. 54.)   Here, the stool hit the victim's head and the blood from that impacted against another surface. (Id., p. 129.)   Detective Olson opined that the point of convergence between stool and head was at floor level or just a little above it.   (Id.)   Several photographs depicted blood spatter, both impact and cast-off. (Exs. 50-52, 54, 60, 61-66, 76, 77, 98 (walls and floor), 58, 59, (trashcan), 69, 70, 71, 72 (chair and ottoman), 86, 87, 88 (ceiling fan), 92, 93, 94 (mirror), 99, 100 (child's chair).)

Detective Olson said the victim was laying on the ground or close to the ground when he was struck by the barstool or the lamp.  (RT, 9/14/04, p. 44.) Olson opined that the victim never got up after the blood began to flow.  (Id.) When the victim was stabbed, he was laying on his right side with his right arm extended away from his body; his face was lying on top of his right bicep.  (Id.)

This left void areas where there was not blood.  Olson explained that if the victim was lying on his right side and his left arm was across his chest and there was blood on top of the left arm, when the arm was moved it left a void area across the chest.  (RT, 9/13/04, p. 100; Exs. 36, 41.)

19

Exhibit 49 shows the laceration to the victim's left side of his neck.  (Id., p. 122.)  Exhibit 39 shows the arterial blood spurt from the wound traveling in a northeast direction.  (Id., p. 107.)  That indicated that the victim was on his right side when the wound occurred.  (Id., p. 108.)  Olson opined that the victim was moved after the first blood pool had been caused.  (RT, 9/14/04, p. 124.)

Detective Olson said a belt was placed in its position after the victim had bled.  (Id., p. 45; Ex. 324.)  Olson also opined that the victim did not cause any of the blood smears in the kitchen.  (Id., p. 47; Exs. 101-108.)  The victim did not walk around in the kitchen area or anywhere else after he was struck because he didn't have any blood on the bottom of his feet.  (Id., p. 48.)

Olson said that while it was possible that the victim may have been moving at the same time as the assailant, that scenario was not probable.  (Id., pp. 57, 59.)  Detective Olson opined that the victim was in one position laying on the ground and the person swinging the object was the one moving around.  (Id., p. 116.)  His opinion was supported by the low height of the blood spatter which ranged from 18 to 31 inches from ground level.  (Id., pp. 60-63.)

Andriano defended on the basis that she was an abused spouse defending herself from her husband's attack.  She had a strict religious upbringing that taught that a woman acquiesced to her husband.  (RT, 10/25/04, pp. 9-10, 21.)  That's the

20

way it was with her mother and step-father. (Id., pp. 33-34.) Her step-father was a volatile man whose fits of anger frightened Andriano. (Id., pp. 35-42.) She and her mother would hide in the bedroom or bathroom until he calmed down. (Id., p. 37.)

When Andriano was twenty-one years old, she started socializing outside of the church with her cousin. (Id., p. 45.) She started drinking alcohol, dancing and dating. (Id., p. 46.) She met Joe in 1992 at a pizza place. (Id., p. 108.) Andriano and Joe eventually decided to get married.

Joe pressured Andriano to have frequent sex. (Id., p. 118.) In fact, Joe was so adamant about frequent intercourse that he pressured Andriano into having sex with him shortly after the birth of their first child before her stitches were healed. (RT, 10/26/04, pp. 13-16.)

Andriano recounted incidents of violence. Once, she made dinner and the corn tasted bad. (RT, 10/25/04, pp. 127-129.) Andriano discovered that the bowl used to microwave the corn had been washed with bleach and left a bleach aftertaste on the corn. (Id.) Angry, Joe slapped her. (Id.)

Another time, at a bar, Andriano saw Joe put his arm around another woman. (RT, 10/26/04, p. 38.) Upset, Andriano turned to leave the bar but Joe followed her. (Id., p. 39.) He grabbed her in a bear hug and squeezed her until she

21

could not breathe, and told her she wasn't going anywhere. (Id.) Everyone told him to let her go, so he did. (Id.)

The couple often had arguments and Andriano would hide in the bathroom as she did as a child when her step-father was angry. (Id., p. 11.) Joe would pound on doors, breaking them, or break furniture. (Id., pp. 11-12.) One time, he pinned her up against a wall and smashed a stone pot into the wall right next to her head. (Id., p. 12.) After these incidents, Andriano learned not to question Joe. (Id., p. 13.)

Abusive incidents were witnessed by Andriano's cousin, Brandon, who related the bleach incident along with other acts of violence by Joe. (RT, 10/21/04, pp. 52-82.) Andriano's mother and step-father also recounted such incidents. (RT, 10/4/04, vol. 2, pp. 46-47, 69, 78-79; RT, 10/6/04, pp. 28-29, 31, 34-36.) Andriano's cousin, Barbara, told of an incident involving a Las Vegas trip where Joe verbally and mentally abused Andriano. (RT, 10/21/04, pp. 166-173.)

Dr. Sharon Murphy received her PhD in 1999 from Arizona State University in the specialty area of Domestic Violence. (RT, 10/7/04, pp. 28-29.) As an expert in counseling and domestic violence, she examined Andriano and concluded that she was a victim of domestic violence. (RT, 10/13/04, p. 44.) On cross-examination, Dr. Murphy admitted she was missing some information. (RT,

22

10/13/04, pp. 49-51, 57-66, 68-72, 85-86, 96, 100-101, 104, 118, 161; RT, 10/14/04, pp. 4-6, 12.)  Notwithstanding the additional information, Dr. Murphy did not change her opinion.  (RT, 10/14/04, p. 121.)  In rebuttal, the state called Dr. Brad Bayless.  Dr. Bayless opined that Andriano was not suffering from domestic violence.  (RT, 11/10/04, p. 41.)

Andriano recounted an incident on her thirtieth birthday.  (RT, 10/26/04, p. 66.)  She and her work friends went out in a limousine, to celebrate in nightclubs, but she was to be home by midnight.  (Id., p. 69.)  On the way home, they stopped to pick up one of the women's boyfriend, and his friend.  (Id., p. 71.)  Andriano described herself as very drunk.  (Id., p. 75.)  She sat between the friend's legs as they drove back to the apartment complex and flirted with him.  (Id., p. 73.)

Joe was there when they arrived at the complex.  (Id., p. 74.)  Andriano said Joe grabbed a wine cooler out of her hand and threw it because he was angry that she turned her phone off.  (Id., p. 75.)  He threw the phone too.  (Id.)  She followed him back to the apartment.  (Id.)  But Joe's sister was in the apartment, so he forced Andriano to sit in their vehicle while he yelled at her.  (Id., p. 77.)

The incident was also described by Andriano's workmate, Shannon Sweeney.  (RT, 9/15/04, pp. 34-37.)  However, Sweeney said it was Andriano's suggestion that they go pick up the woman's boyfriend and his friend.  (Id., p. 35.)

23

During this time period, the couple decided to investigate a malpractice claim against the doctors who misdiagnosed Joe. (RT, 10/27/04, p. 4.) According to Andriano, Joe also asked her to investigate the possibility of getting additional life insurance policies. (Id., pp. 32-34.) With Joe's knowledge, Andriano lied on the forms about Joe's health. (Id., p. 38.) Andriano admitted asking friends to stand in for Joe at the health exam. (Id., pp. 41-42.) Finally, her step-father told her to stop trying to get a policy; that she was engaging in fraud. (Id., p. 46.) She stopped. (Id.) Two life insurance agents described Andriano's efforts to obtain life insurance. (RT, 9/27/04, pp. 70-80, 119-127.)

During the summer of 2000, Andriano engaged in extramarital relationships. She met Rick Freeland who was a tenant at her apartment complex. (RT, 10/27/04, p. 47.) Andriano also had a brief sexual relationship with Travis Black, who she met at a bar. (Id., p. 74.) Andriano said she was drinking heavily at the time so she did not have to think. (Id., p. 76.) Freeland and Black both testified in detail concerning the affairs. (RT, 9/13/04, pp. 19-62; RT, 9/16/04, pp. 89-107.) Additionally, Chris Hashisaki, Shannon Sweeney, Stephanie Koeppen-Moser, and Erik Vaillant all recounted aspects of the liaisons. (RT, 9/8/04, pp. 47-49, 51-52, 69-71; RT, 9/15/04, pp. 38-42, 91; RT, 9/16/04, pp. 126-130.)

24

Eventually, Joe told Andriano he wanted to commit suicide so he could die the way he wanted to die. (RT, 10/27/04, p. 84.) She tried to change his mind. (Id.) They originally searched for cyanide on the internet. (Id., p. 85.) Andriano told Joe she could not find anything on cyanide. (Id., p. 86.) She then turned to her old friend Shawn King for help. (Id., p. 87.) He suggested the sodium azide. (Id., p. 90.) Joe did not want anyone to know about the suicide because of his Catholic upbringing and because his grandfather committed suicide. (Id., pp. 92-93.)

Andriano obtained the sodium azide by creating fictitious business papers. (Id., pp. 94-95.) She and Joe picked up the package and she brought it to her office. (Id., pp. 99-100.) She took the box to her office for safekeeping from their two children. (Id., p. 101.) The sodium azide arrived the Thursday before the Saturday night that Joe died. (Id., p. 101.)

Together she and Joe put the sodium azide powder into capsules that once held Elderberry powder. (Id., pp. 105-106.) The capsules would make it easier for Joe to take the sodium azide. (Id., p. 105.) Andriano said they filled fifteen capsules with the sodium azide. (Id., p. 108.)

On Saturday, the couple went to a swap meet with Joe's mom. (RT, 10/28/04, p. 16.) Then, they went to Sam's Club where they bought a lamp. (Id.,

25

p. 18.)  They went home and she and the kids napped while Joe tried to put the lamp together. (Id., pp. 20-21.)  Joe was upset because the lamp was broken. (Id., p. 21.)

They went to dinner at Joe's parents that night.  (Id., p. 22.)  Andriano thought Joe acted normal but quiet.  (Id.)  He lay on the couch during the visit. (Id., p. 24.)  On the way home, he told her he would commit suicide that night. (Id., p. 25.)

Joe took the sodium azide. (Id., p. 29.)  Andriano expected the poison to act quickly and painlessly. (Id., p. 30.)  But after fifteen minutes Joe became ill. (Id.) Although testing indicated that there was also sodium azide in the food sitting on the counter in the kitchen, Andriano testified she had no idea how the sodium azide got into that food. (RT, 11/2/04, p. 68.)

She offered to take Joe to the emergency room.  (RT, 10/28/04, p. 31.)  He fell to the floor in the living room and vomited. (Id.)  Joe wanted to go, so the suicide plan was called off. (Id., p. 32.)  Andriano called Chris Hashisaki to stay with the children. (Id., pp. 33-34.)  When Hashisaki arrived, she told Andriano to call 911. (Id., p. 35.)  After several tries, Andriano got through to 911 and told them Joe was having a heart attack. (Id., pp. 35-37.)  Hashisaki went out front to wait for the paramedics. (Id., p. 38.)  When the ambulance finally arrived, Joe said

26

he did not want their help.  (Id., p. 39.)  Joe told her to go out the back way and tell the paramedics to leave.  (Id., p. 41.)  She told them her husband was dying of cancer and did not want resuscitation.  (Id., p. 42.)

She went back inside and waited for Joe to die.  (Id., p. 44.)  Hashisaki knocked on the door asking for her purse, so Andriano tossed it to Hashisaki.  (Id., p. 43.)  She held Joe's head in her lap but he was not acting sick anymore.  (Id., p. 44.)  He asked her to tell him the truth about a condom missing from his drawer. (Id., p. 45.)  Andriano told him she used it with someone she met at Rockin' Rodeo because she wanted to be honest.  (Id., p. 46.)  She felt she owed it to him.  (Id.)

Joe became angry, sat up and called her a whore.  (Id., p. 47.)  He was enraged.  (Id.)  He rammed himself into a glass wedding box, shattering it.  (Id., p. 48.)  He grabbed her by the hair and drove her head into the wall.  (Id., p. 49.)  He swore and smashed their family portrait on the kitchen floor.  (Id.)  When she dropped to her knees to save the picture, he came up behind her and put a phone cord around her neck.  (Id., pp. 52-53.)

Andriano believed Joe would commit a murder-suicide.  (Id., p. 54.)  She was able to grab a knife from the kitchen drawer and use it to cut the cord from around her neck.  (Id.)  She turned around and pointed the knife at Joe.  (Id.)  She dropped the knife because she wanted Joe to calm down and she was disgusted at

27

their behavior.  (Id., p. 57.)  He picked up the knife so she grabbed a barstool and hit him while he was bending over.  (Id., p. 60.)  She hit him every time he moved.  (Id.)  Then, she dropped the broken barstool and ran into the bathroom.  (Id., p. 61.)  When it was quiet, she went back out to the living room where Joe lay.  (Id., pp. 61-62.)

When she approached him, he rolled over, still with the knife in his hand, and told her he would kill himself.  (Id., p. 62.)  She grabbed his hand to stop him.  (Id.)  They struggled, but her hand slipped in the blood, and the next thing she knew there was blood all over her glasses.  (Id.)  Andriano said she did not cut Joe.  (Id., pp. 62-63.)

She cried, went to the kitchen and called her step-father.  (Id., p. 63.)  Her step-father told her to call 911 so she did.  (Id., p. 64.)  They told her to roll Joe over and give him CPR.  (Id.)  She grabbed him around the ankles in order to roll him over.  (Id., p. 65.)  Then, she unlocked the door, and sat and waited for the paramedics.  (Id.)

Andriano said she never hit Joe with a lamp.  (Id., p. 66.)  She hit Joe with the barstool because she thought he would kill her.  (Id.)  Andriano did not tell police about the sodium azide because Joe had instructed her not to let anyone know about the suicide plan.  (Id., p. 67.)  She admitted that during a break in the

28

police interrogation, she called a co-worker and asked her to hide from the police documents in her office having to do with obtaining the sodium azide.  (RT, 11/2/04, pp. 56-57.)

29

## ISSUES PRESENTED FOR REVIEW

1.      Did the trial court err by permitting introduction of other "bad acts" evidence at trial?

2.      Did the trial court err by failing to *sua sponte* instruct on all lesser-included offenses supported by the evidence?

3.      Is A.R.S. § 13-703(F)(6) facially vague and vague as applied?

4.      Was the jury instruction defining "especially cruel" insufficient to guide the jury and channel their discretion?

5.      Is the evidence of the "especially cruel" aggravator insufficient to support the finding?

6.      Did the trial court improperly refuse to permit the mitigator of "residual doubt?"

7.      Did the trial court improperly refuse to permit the mitigator of "mercy?"

8.      In the penalty phase, did the trial court improperly instruct the jury so as to require the jury to unanimously find mitigators before individual weighing?

9.      In the penalty phase, did the trial court improperly give the jury an impasse instruction without knowing if the jury was deadlocked?

10.      Is an impasse instruction during the penalty phase regarding the jury's duty to deliberate improper?

30

11.    Is Arizona's lethal injection statute vague by not specifying proper execution protocol to ensure compliance with due process and the Eighth Amendment?

12.    Is Arizona's death penalty constitutional?

000003859

**Guilt/Innocence Phase Issues.**

## ARGUMENT I

**THE TRIAL COURT VIOLATED ANDRIANO'S RIGHT TO A FAIR TRIAL AND DUE PROCESS UNDER THE FIFTH, SIXTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND ARTICLE 2, §§ 4 AND 24 OF THE ARIZONA CONSTITUTION WHEN IT PERMITTED EVIDENCE OF ANDRIANO'S ATTEMPTS TO OBTAIN LIFE INSURANCE POLICIES AND EVIDENCE OF ANDRIANO'S EXTRAMARITAL ACTIVITIES AS INTRINSIC TO THE CHARGE OF PREMEDITATED MURDER.**

*Standard of Review*

The Court first determines *de novo* whether the evidence falls within the scope of Rule 404(b).  *United States v. DeGeorge*, 380 F.3d 1203, 1219 (9th Cir. 2004).  If so, the Court applies a four-part balancing test under Rule 404(b).  *Id.*  If not, the trial court's decision to admit the evidence is reviewed for abuse of discretion under Rule 403.  *Id.  See also, State v. Dickens*, 187 Ariz. 1, 18, 926 P.2d 468, 485 (1996).

*Facts*

Defense counsel filed a motion *in limine* to preclude the state from introducing evidence of Andriano's attempts to obtain life insurance on the life of

32

her husband and evidence of her extramarital affairs.  (ROA, p. 100.)  Andriano

argued that Rule 404(b) precluded this evidence as improper character evidence

not admissible for any other purpose.  (Id.)  The state maintained that part of the

motivation for the murder was greed evidenced by Andriano's attempt to

fraudulently obtain insurance on Joe's life.  (ROA, p. 106.)  The state asserted that

"per conversations with friends, once her husband was dead, Rick Freeland would

be willing to resume the relationship with her."  (Id.)  The court denied the motion,

ruling that the evidence of attempts to obtain life insurance and the evidence of

extramarital relationships was intrinsic to the charge of premeditated murder.  (RT,

9/7/04, p. 14.)

     According to Andriano, Joe asked her to check out the possibility of getting

additional life insurance policies.  With Joe's support, Andriano lied on the forms

about Joe's health.  Andriano asked their friends to stand in for Joe at the health

exam.   Finally, she stopped because her step-father told her that she was

committing fraud.

     During the summer of 2000, Andriano engaged in extramarital relationships.

She met Rick Freeland, a tenant at her apartment complex.  (RT, 10/27/04, p. 47.)

Andriano said during this time period, Joe was always very angry and took it out

on her.  (Id., p. 55.)  She considered Freeland a friend who listened to her and

33

shared her burden.   (Id., p. 61.)   Their relationship became sexual because
Andriano "couldn't imagine saying no.  It just wouldn't have been right."  (Id., p.
66.)   Freeland broke off the relationship after meeting Joe.   (Id., pp. 67-68.)
Andriano was hurt, felt like she lost her best friend, and did not understand. (Id., p.
69.)   When Freeland ignored her at a bar one night, she followed him home and
pounded on his apartment door even though he told her to go away.  (Id.)

Andriano also had a brief sexual relationship with Travis Black, who she
met at a bar.  (Id., p. 74.)  Andriano said she was drinking heavily at the time so
she did not have to think.  (Id., p. 76.)  Andriano invited Black to her apartment the
night she met him.  (Id., p. 81.)  Joe was at the lake.  (Id., p. 74.)  Andriano took
one of Joe's condoms from their dresser and gave it to Black to use.  (Id., p. 83.)
She had sex with him because she felt "I'd led him on to this point, then how could
you turn around and just say no?"  (Id., p. 82.)  Joe noticed the missing condom
right away and kept asking her about it for the next week.  (RT, 10/28/04, pp. 11-
12.)  She denied knowing what happened to it.  (Id., p. 12.)  Both Freeland and
Black testified for the state.  (RT, 9/13/04, pp. 15-71; RT, 9/16/04, pp. 88-111.)

The prosecutor made constant references to the affairs at trial.  During cross
examination of defense expert Sharon Murphy:

34

Q: Now, did you know that the reason that she had to use this lubricant was because…she thought Mr. Andriano was gross and skinny. Did you know that?

A: No.

(RT, 10/13/04, p. 68.)

Shortly thereafter:

Q: Do you know whether or not she had to use any lubricant with regard to Rick Freeland?

A: I don't know.

Q: Don't you think it would have been important to this inquiry to see whether or not she actually needed lubricant with Rick Freeland to determine whether or not it was just sex that she indicated or it was just sex with an icky, gross guy?

A: As I recall, the purpose of my questioning her and interviewing her was to get a picture, and I didn't ask specifics about the nature of the sex acts with Rick Freeland.

(Id., pp. 68-69.)

During his guilt phase closing:

Well, what about Dido Gomez. I mean, he might be a little upset he's not considered the first because the defendant says he was. I'm sure and Sharon Murphy was quick to point out every time that the defendant has sex with Mr. Andriano, she had to use a lubricant. I wonder if she had to use a lubricant with Dido Gomez. I wonder if she had to use a lubricant with Vernon Barnes. These

35

> are issues they brought up because they wanted to paint her holier than thou....

(RT, 11/16/04, p. 75.)

> He argued further:

>> It's just amazing, given the fact that she has blamed him for everything that has ever gone wrong in her life. Blamed him for the affairs. Blamed him for having to go out. Blamed him for wanting to go out and kiss guys. Blamed him for sitting between guys' legs. Blamed him for kissing this guy.

(Id., p. 61.)

> He also said: "You've seen what she looked like back then, all sassed up in her pink little outfit." (Id., p. 63.)

> On Andriano's relationship with Rick Freeland, the prosecutor contrasted Freeland and Black's good health to Joe being "skinny" and "gross." (Id., p. 76.) He compared Joe's fighting for his life and wanting to be with his family to Andriano's running around at bars, getting drunk; a debauched adulteress. (Id., pp. 87-89.)

> The prosecutor referred to yet another extramarital incident telling the jury:

>> And what's happening is that perhaps the defendant is heading to Shannon Sweeney's, to her apartment, that direction to her apartment rather than going home. Perhaps she's going to experience another one of these dalliances that is not an affair. We don't know. But she

36

was certainly headed with another man to another apartment at 1:30 or 2:00 in the morning, when, by her own account she was blasted, she was drunk. This is the woman who kisses men on the way home.

(Id., pp. 92-93.)

The prosecutor argued further:

...the last couple two or three months of his life that for two or three months, two times a week, minimum, the defendant was going out; Tuesdays and Saturdays or Fridays. Remember that? Rockin' Rodeo on the weekends and Tijuana Country Club in the middle of the week. What kind of marriage is that? Let's go out and look for the young bucks we have out here on the dance floor. Maybe we can take one home.

(Id., p. 101.)

The prosecutor continued:

And then to have this woman come over in the same living room, in the same sofa where on September 27th she enjoyed the spoils, if you will, with Travis Black in the same place.

(Id., p. 139.)

During closing argument of the aggravation phase, the county attorney admitted to the jury:

Even though she wanted to go out with other men, it wasn't like they were the love of her life in the sense she was with one individual now and later she hooked up

37

with another individual.  So that really wasn't the main
motivation.

(RT, 11/30/04, p. 20.)

## Discussion

The trial court admitted evidence of Andriano's attempts to obtain life
insurance and her extramarital activities as intrinsic to the charge of premeditated
murder.  The prosecutor made Andriano's promiscuous behavior the cornerstone of
his case when it had nothing to do with the premeditated murder of her husband.
This strategy permeated the trial with marginally relevant, unfairly prejudicial
evidence.

The trial court improperly characterized this evidence as intrinsic and
violated Andriano's due process and fair trial rights under the Fifth, Sixth, and
Fourteenth Amendments to the United States Constitution as well as Article 2, §§ 4
and 24 of the Arizona Constitution.  The evidence did not fall under the definition
of intrinsic evidence and was unfairly prejudicial, pervading every phase of this
trial.  By the time Andriano took the stand, the jury knew more about her
extramarital experiences than they knew about the events leading to Joe's death.
The prosecutor took every opportunity to infuse the trial with marginally relevant
information about Andriano's partying and man-chasing.

38

Other act evidence is intrinsic if 1) evidence of the other acts and evidence of the crime charged are inextricably intertwined or 2) both acts are part of a single criminal episode or 3) the other acts were necessary preliminaries to the crime charged. *State v. Dickens*, 187 Ariz. at 19, 926 P.2d at 486, *quoting United States v. Coleman*, 78 F.3d 154, 156 (5th Cir. 1996).

**Life Insurance.**

Evidence of Andriano's attempts to obtain life insurance on her husband after learning of his cancer diagnosis was not inextricably intertwined with the charge of premeditated murder.  Her unsophisticated attempts to get insurance relied on her hope that the insurance company would not do a thorough investigation before issuing a policy, as well as her hope that she could find someone to stand in for her husband during the physical exam.  She abandoned her plan to try to secure her family's future when Andriano's step-father told her what she was doing was wrong and fraudulent and to stop it.  She never did receive a policy on her husband's life and never went beyond initial exploratory stages.  She would never have gained from a policy even if she received one.  Her efforts to obtain insurance were distinct from any motive to kill her husband.

The attempts to obtain life insurance were not part of a single criminal episode or a necessary preliminary to the murder.  Her efforts were not close in

39

time to the murder, nor were they necessary to commit the murder. They were completely separate from the murder. They were not relevant to the aggravating factor alleged by the state, pecuniary gain, because she did not gain monetarily from her husband's death. She had no reason to believe she would receive any monetary gain from his murder.

## Extramarital Activity.

The evidence of extramarital affairs was not part of a single criminal episode or a necessary preliminary to the murder. The state used this evidence constantly throughout the trial to portray Andriano as a despicable person. At no time could the state connect any of her extramarital activities to the murder. Although at the outset of trial the state claimed otherwise, there was no evidence that Andriano engaged in an ongoing affair at the time of the incident.

There was no evidence that Andriano committed murder at the behest of a boyfriend. There was no evidence that a paramour assisted her in the planning or carrying out of the murder of her husband. There was no evidence that Andriano wanted to "get rid of" her husband to make way for a new person in her life. There was no connection at all between her promiscuous behavior and her husband's death.

40

Neither was the extramarital activity inextricably intertwined with the poisoning, beating or stabbing of her husband nor was it part of the chain of events leading up to her husband's death. In fact, the court had little information upon which to base its holding that this evidence was intrinsic. There was no evidentiary hearing, only motions and argument.

The state used this character evidence to convince the jury that Andriano was an uncaring, cold woman who went out to the bars two nights a week, kicking up her heels while her husband stayed home with the children as he died of cancer. Evidence of immorality does not tend to prove a propensity or predisposition to commit murder.

Courts in other states have addressed this issue, usually in the context of a 404(b) analysis, with varying results. Evidence of a defendant's lengthy extramarital affair was held to be admissible where the defendant's mistress testified in a robbery and murder case that shortly after the murder, the defendant met her in another state, gave her $35,000 in cash, slept at her apartment and left a suitcase of clothing there. *State v. Kim*, 897 A.2d 968 (NH 2006). These facts show a closer connection between the extramarital activities and the actual crime than the facts in the present case. There was no evidence that Andriano had a

41

paramour that assisted, collaborated or even knew of any plan to poison or otherwise kill her husband.

In a case where the state accused the defendant of murdering his wife and children, the appellate court held that the trial court abused its discretion when it allowed the state to introduce evidence of defendant's adulterous conduct in its case in chief. *State v. Camm*, 812 N.E.2d 1127 (Ind. App. 2004). The court found that the tie between such evidence and motive, or anything other than simply portraying the defendant as bad was too strained and remote to be reasonable. *Id.*, at 1131.

The *Camm* court held that to be admissible, evidence of a defendant's extramarital affairs should be accompanied by evidence that such activities had precipitated violence or threats between the defendant and the victim in the past or that the defendant was involved in an extramarital relationship at the time of the homicide. *Id.*, at 1133. The *Camm* rationale fits the facts of the present case. Here, any connection between the evidence of promiscuity and Andriano's motive to murder her husband is "too strained and remote as to be reasonable."

Although the state told the court before trial that Rick Freeland would be willing to resume his relationship with Andriano once her husband was dead, there was no evidence produced at trial to support that assertion. There was no evidence

42

indicating that Andriano was having an affair at the time of the incident.  Andriano told the jury that her husband was suspicious that she might be having an affair, only in response to the state's inordinate focus on her extramarital affairs during its case in chief.

The Ohio Supreme Court held that evidence of extramarital affairs should have been excluded because there was little to no probative value of the evidence while the prejudicial effect was significant because of the scorn a jury was likely to feel toward the adulterer. *State v. McKnight*, 107 Ohio St.3d 101, 152, 837 N.E.2d 315, 366 (2005).  By the time Andriano took the stand, the jury heard copious amounts of testimony painting her as a heartless, philandering woman who did not care about her dying husband.  The state spent significant time and energy introducing witnesses and testimony in its effort to persuade the jury that Andriano deserved their scorn.

Other courts have upheld the admission of evidence of extramarital affairs because it was relevant to the pattern of defendant's disrespect and hostility toward the victim. *Commonwealth v. DeMarco*, 444 Mass. 678, 830 N.E.2d 1068 (2005); *People v. Houston*, 130 Cal.App. 4th 279, 29 Cal.Rptr.3d 818 (Cal.App. 2005); *State v. Rhodes*, 627 N.W.2d 74 (Minn. 2001).

43

Because Andriano never did obtain life insurance before her husband's death, this evidence was not intrinsic to premeditated murder. Even if she had obtained a policy, she surely would not collect on it if she murdered her husband. Therefore, it does not follow that her attempts to get life insurance showed a motivation to murder her husband. Likewise, evidence of Andriano's extramarital behavior was not intrinsic to premeditated murder because the tie between the evidence and the motive was too strained and remote to be reasonable.

**404(b) Analysis.**

The evidence was not intrinsic, so was subject to a Rule 404(b) analysis. *United States v. DeGeorge*, 380 F.3d 1203 (9th Cir. 2004). This requires an analysis of the following: 1) Rule 404(b) requires that the evidence be admitted for a proper purpose; 2) Rule 402 requires that the evidence be relevant; 3) the probative value of the evidence must substantially outweigh any unfair prejudice; and 4) Rule 105 allows for an appropriate limiting instruction, if the party requests one. *State v. Terrazas*, 189 Ariz. 580, 583, 944 P.2d 1194, 1197 (1997).

For the reasons previously argued, the attempt to get life insurance and the extramarital affairs both fail to support the state's argument that they proved Andriano's motive to kill her husband. Neither subject matter was relevant to any material issue related to the charge of premeditated murder. Any marginal

44

relevance that may have existed was substantially outweighed by the unfair prejudice suffered by admitting these topics into evidence, especially the extramarital relationships.  Counsel did not request a limiting instruction and none was given.

Admitting the other act testimony into evidence when it was not intrinsic to the charge of premeditated murder, and so unfairly prejudicial, violated Andriano's right to due process and a fair trial.  It tainted the entire trial.  From the outset, the prosecutor introduced evidence of Andriano's promiscuous behavior calling eight witnesses who testified to her illicit behavior.

Extramarital activities continued as a theme throughout the state's closing arguments even though the prosecutor acknowledged there was no evidence that being free to see other men was the main motivation for the murder.  Instead of weighing the facts and evidence material to the charge of premeditated murder, the jury was fed a barrage of irrelevant evidence intended to make the jury detest Andriano.  The prosecutor constantly reminded them of reasons to loathe her, not for the crime of premeditated murder, but for being an unfaithful wife.

Prejudice resulting from the improper admission of other act evidence, to be reversible error, must make it reasonably probable that the verdict would have been different if the testimony had not been admitted.  *State v. Grijalva*, 137 Ariz. 10,

45

14, 667 P.2d 1336, 1340 (App. 1983).  The trial would have been a different trial in the absence of evidence of the loose behavior.  Freeland and Black would not have been called as witnesses for the state.  The testimony of many others would have been shorter and less scandalous.

The prosecutor's emphasis on whether or not Andriano used lubricant with her husband but not her paramours would not have been admitted for the jurors' consideration of whether she committed premeditated murder.  Nor would the jury consider the prosecutor's various arguments referring to Andriano having affairs and kissing other men.  The prosecutor would have been precluded from arguing that Andriano was "all sassed up" back then.  Nor could he argue how Joe's appearance was unappealing to Andriano, so she sought out healthy, good looking men.  The prosecutor would not have been able to refer to Andriano as a "demure little lotus blossom" who was out at the bar grabbing onto Travis Black.  He would not have been able to argue, "I guess the woman has needs and she's going to do something about it…." so she invited Black into her home to have sex.

The prosecutor took every opportunity to inject Andriano's extramarital sex life into the trial but never once was able to tie it into what happened in that apartment that night that resulted in Joe's death.  The prosecutor gratuitously used this ugly evidence against Andriano to make the jury despise her.

46

The testimony engendered a scornful attitude toward Andriano, yet it had only minimal, if any, connection to premeditated murder. Had the court precluded the evidence, the jury would not have focused on Andriano's extramarital sex life. The prosecutor's argument would have been limited to the salient facts surrounding the murder instead of exhibiting an inordinate focus on Andriano's sex life.

In *McKinney v. Rees*, 993 F.2d 1378, 1386 (9th Cir. 1993), the court said:

> His was not the trial by peers promised by the Constitution of the United States, conducted in accordance with centuries-old fundamental conceptions of justice. It is part of our community's sense of fair play that people are convicted because of what they have done, not who they are.

Here, as in *McKinney*, it is "highly probable that the error had substantial and injurious effect or influence in determining the jury's verdict." *Kotteakos v. U.S.*, 328 U.S. 750, 776, 66 S.Ct. 1239, 1253 (1946). Because there were no permissible inferences for the jury to draw from the evidence its admission violated due process. *Jammal v. Van de Kamp*, 926 F.2d 918, 920 (9th Cir. 1991).

The court improperly admitted the evidence of the attempts to get life insurance and the promiscuous behavior. The evidence was not inextricably intertwined with the charge of premeditated murder. It had minimal relevance to

47

premeditated murder.  It was unfairly prejudicial.  The result was a violation of Andriano's due process rights and her right to a fair trial.

000003876

## ARGUMENT II

**THE TRIAL COURT COMMITTED FUNDAMENTAL ERROR BY FAILING TO INSTRUCT THE JURY ON THE LESSER-INCLUDED OFFENSES OF SECOND DEGREE MURDER AND MANSLAUGHTER WHERE EVIDENCE AT TRIAL SUBSTANTIATED THOSE LESSER-INCLUDED OFFENSES DENYING ANDRIANO A FAIR TRIAL AND DUE PROCESS UNDER THE SIXTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AS WELL AS ARTICLE 2, §§ 4 AND 24 OF THE ARIZONA CONSTITUTION.**

*Standard of Review*

The appellate court reviews for fundamental error when the defendant does not request a lesser-included offense. *State v. Dickens*, 187 Ariz. 1, 22-23, 926 P.2d 468, 489-490 (1996).

*Discussion*

The trial court failed to instruct the jurors on lesser-included offenses supported by the evidence. The jury did not have the opportunity to consider non-death eligible offenses that the evidence supported. A sentence of death may not be imposed if the jury was not permitted to consider a lesser-included, non-capital offense and the evidence would have supported such a verdict. *Beck v. Alabama*, 447 U.S. 625, 627, 100 S.Ct. 2382 (1980).

49

The purpose of this rule is to ensure that the jury does not choose to convict the defendant of a death-eligible offense because it faces an all or nothing choice between that verdict and innocence. *Spaziano v. Florida*, 468 U.S. 447, 455 (1984). The failure of the court to instruct the jury on all lesser-included offenses supported by the evidence constitutes fundamental error. *State v. Krone*, 182 Ariz. 319, 323, 897 P.2d 621, 625 (1995); *State v. Nordstrom*, 200 Ariz. 229, 254, 25 P.3d 717, 742 (2001). Not only is it fundamental error, but it is a violation of due process. An offense is a "lesser-included" offense when the "greater offense cannot be committed without necessarily committing the lesser offense." *State v. Wall*, 212 Ariz. 1, 126 P.3d 148, 150 (2006), *quoting, State v. Dugan*, 125 Ariz. 194, 195, 608 P.2d 771, 772 (1980). The evidence supported instructions for second-degree murder and manslaughter.

In discussing final instructions, defense counsel told the court that he would not request any lesser-included offenses but noted that the court had a duty to instruct on all offenses supported by the evidence. (RT, 11/16/04, p. 4.) The court did not acknowledge this duty, nor did it instruct the jury on any lesser-included offenses. (Id., pp. 4-7; RT, 11/17/04, pp. 98-112.)

50

**Second-Degree Murder.**

A person commits second degree murder if without premeditation such person intentionally causes the death of another person or knowing that his conduct will cause death or serious physical injury, such person causes the death of another person. A.R.S. § 13-1104(A)(1) and (2). A reasonable jury could find Andriano abandoned her plan to kill her husband when she called her neighbor into her apartment and then called 911 to aid her husband. She would not call someone to her apartment to witness her crime and then call 911 if she planned to kill her husband.

Intentional second-degree murder is supported by evidence that between the time she called the neighbor and 911, and the time that the paramedics arrived, the Andrianos argued over Wendi's extramarital activities. A rational jury could have found Andriano guilty of second degree murder, that is, intentional but not premeditated. Although Andriano might have begun her actions with a premeditated plan to cause her husband's death with the poison, the poison was not the cause of death. She abandoned any plan to poison her husband when she called the neighbor to the apartment and dialed 911 for assistance. The argument that occurred while waiting for the paramedics began a new chain of events that while not premeditated, led to an intentional killing.

51

A rational jury could also have found a knowing second-degree murder.  It could have found that Andriano knew that her conduct of hitting her husband on the head with the bar stool twenty-three times, along with the knife thrust to the neck would cause her husband's death.  A knowing second-degree murder could be established if the jury believed that when the physical altercation began, Andriano did not start out to kill her husband.  The jury could find that she knew that beating him in the head with a bar stool twenty-three times and stabbing him in the neck would cause his death.

**Manslaughter.**

The evidence also supported manslaughter premised upon a sudden quarrel or heat of passion resulting from adequate provocation of the victim.  Joe provoked Andriano when, after her admission to having sex with another man, he approached her aggressively and reached for a fallen knife.   In response, she grabbed the stool and struck him on the head with it several times. Then, they struggled some more with the end result of Joe being stabbed in the neck.

A rational jury could find the adequate provocation required for manslaughter when Andriano observed Joe pick up the knife.  Little time passed between Hashisaki, speaking to a coherent Joe before going to wait for the paramedics and the paramedics speaking to a freshly showered Andriano.  Enough

52

time existed for the altercation to have occurred in this manner supporting a manslaughter conviction.

The failure to give instructions on lesser-included offenses supported by the evidence forced the jury into an all or nothing choice where, if completely instructed on all options, the jury might have found Andriano guilty of second-degree murder or manslaughter. Because the judge failed to give these lesser-included offense instructions supported by the evidence, the jury did not have that option. As a result, their choice was to either find Andriano guilty of a capital offense, or not guilty.

The primary purpose of giving lesser-included offense instructions is to ensure that the jury does not choose to convict the defendant of a death-eligible offense because it faces an all or nothing choice between that verdict and innocence. This case is an example where lesser-included instructions were appropriate but not given. The jury had only two choices—either find Andriano guilty of a death-eligible offense or find her not guilty. This violation of Andriano's due process rights was fundamental error mandating reversal.

53

**<u>Aggravation Phase Issues.</u>**

<u>**ARGUMENT III**</u>

**THE CRUEL, HEINOUS, OR DEPRAVED AGGRAVATOR UNDER A.R.S. § 13-703(F)(6) IS FACIALLY VAGUE AND VAGUE AS APPLIED DENYING ANDRIANO A FAIR TRIAL, A FAIR SENTENCING, AND DUE PROCESS OF LAW UNDER THE SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AS WELL AS ARTICLE 2, §§ 4, 15, AND 24 OF THE ARIZONA CONSTITUTION.**

*Standard of Review*

The court reviews *de novo* the constitutionality of a statute. *State v. McMahon*, 201 Ariz. 548, 38 P.3d 1213 (App. 2002).

*Discussion*

The sole aggravator found by the jury against Andriano was that the murder was especially cruel under A.R.S. § 13-703(F)(6). (ROA, p. 393.) Recently, in *State v. Johnson*, 212 Ariz. 425, 133 P.3d 735 (2006), this Court rejected Andriano's argument here, finding that the F.6 aggravator was not unconstitutionally vague. *Johnson*, 212 Ariz. at ___, 133 P.3d at 742. *See also*, *State v. Anderson*, 210 Ariz. 327, 352-53, 111 P.3d 369, 394-95 (2005). The Court has continued to adhere to the holding in *Walton v. Arizona*, that although facially

54

vague, the Arizona courts have given substance to the facially vague aggravator by providing a definitional narrowing construction which the sentencing judge was presumed to apply because judges "know the law and...apply it in making their decisions." *Walton v. Arizona*, 497 U.S. 639, 652-54, 110 S.Ct. 3047 (1990), *overruled in part on other grounds by Ring v. Arizona*, 536 U.S. 584, 122 S.Ct. 2428 (2002). However, the Court has now extended that holding from well-informed judge sentencing to poorly-informed jury sentencing. This change merits reexamination of the issue.

**Facial Vagueness.**

Where discretion is afforded a sentencing body on a matter so grave as the determination of whether a human life should be taken or spared, that discretion must be suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action. *Gregg v. Georgia*, 428 U.S. 153, 189, 96 S.Ct. 2909 (1976). Channeling and limiting the sentencer's discretion in imposing the death penalty is a fundamental constitutional requirement. *Maynard v. Cartwright*, 486 U.S. 356, 362, 108 S.Ct. 1853 (1988). The states must furnish the sentencer with "clear and objective standards" that provide "specific and detailed guidance," and that "make rationally reviewable the process for imposing a sentence of death." *Godfrey v. Georgia*, 446 U.S. 420, 428, 100 S.Ct. 1759 (1980). The state must establish

55

rational criteria that narrows the decision maker's judgment. *McCleskey v. Kemp*, 481 U.S. 279, 305, 107 S.Ct. 1756 (1987). The death penalty statutes must be structured so as to prevent the penalty from being administered in an arbitrary and unpredictable fashion. *California v. Brown*, 479 U.S. 538, 541, 107 S.Ct. 837 (1987). A state must administer the death penalty in a way that can rationally distinguish between those individuals for whom death is an appropriate sanction and those for whom it is not. *Spaziano v. Florida*, 468 U.S. 447, 460, 104 S.Ct. 3154 (1984).

The first published definition of the F.6 terms appeared in *State v. Knapp*, 114 Ariz. 531, 543, 562 P.2d 704, 716 (1977). "Cruel" was defined as "disposed to inflict pain esp. in a wanton, insensate or vindictive manner: sadistic." *Id.* In *State v. Lujan*, 124 Ariz. 365, 604 P.2d 629 (1979), the Court differentiated between the terms stating that "cruelty" went to whether the "victim suffered pain," while "heinous" and "depraved" focused on the "killer's state of mind at the time of the offense." *Id.*, at 372, 604 P.2d at 636.

In *State v. Adamson*, 136 Ariz. 250, 665 P.2d 972 (1983), the Court, without explanation, expanded the cruelty concept to include a component inquiring into the mental state of the defendant. *Id.*, at 266, 665 P.2d at 988. From *Adamson* on, a cruelty finding also required that the defendant must intend that the victim suffer

56

or reasonably foresee that there was a substantial likelihood that the victim would suffer as a consequence of the defendant's acts. *Id.* It is this definition of the facially vague term "cruel" that the Court has held provides the narrowing construction to save it from vagueness. However, both *Walton* and, most recently, *State v. Johnson*, suffer the same malady.

Neither the United States Supreme Court cases, nor the Arizona cases on this issue have engaged in an examination or analysis of the Arizona cases to see whether the construction itself is constitutionally sufficient and whether the construction has been consistently applied to narrow those eligible for the death penalty. On behalf of three other justices, and with far greater analysis than employed by the *Lewis* majority, Justice Blackmun, dissenting, wrote:

> The Arizona Supreme Court's opinion in *Gretzler* obviously did *not* announce a "narrowing construction" of the F6 circumstance...instead, the Arizona Supreme Court cited [dictionary] definitions with approval and then gave *examples* of their application...I do not see how the Arizona Supreme Court's *description* of the manner in which a vague aggravating factor has been applied can be regarded as the establishment of a constitutionally sufficient narrowing instruction.

*Lewis v. Jeffers*, 497 U.S. 764, 789, 110 S.Ct. 3092, 3107 (1990).  (Emphasis in original).

57

Instead, the current approach has been to affirm the F.6 aggravator through its narrowed construction by simply proclaiming that the construction is narrow, thus constitutionally sufficient. Because the terms do not constitutionally narrow the F.6 aggravator, it remains facially vague.

**Vagueness as applied.**

Even if the Court finds that the F.6 aggravator has been narrowed by case law, two important changes in the sentencing process render the F.6 factor vague in its application—the increased role of the jury in the sentencing process and the abandonment of proportionality review.

**The Jury As Capital Sentencer.**

Following the invalidation of Arizona's death penalty in *Ring v. Arizona*, 536 U.S. 584, 122 S.Ct. 2428 (2002) (*Ring II*), the Arizona legislature passed a new capital statute. Although not required by *Ring II*, the legislature assigned the determination of whether the death penalty should be imposed to the jury. A.R.S. § 13-703(D). Prior to *Ring*, Arizona engaged in judge sentencing in capital cases. *See Walton v. Arizona*, 497 U.S. 639, 110 S.Ct. 3047 (1990), *overruled in part by Ring II*. The *Walton* Court observed that there was no serious argument that Arizona's "especially heinous, cruel or depraved" aggravating factor was not facially vague. *Walton*, 497 U.S. at 654, 110 S.Ct. 3047. However, the definition

58

given to the "especially cruel" provision by the Arizona Supreme Court was constitutionally sufficient because it gave meaningful guidance to the sentencer. *Id.*, at 655, 110 S.Ct. 3047.  The *Walton* Court presumed that Arizona trial judges were applying the narrower definition.  The Court observed that under the logic of *Maynard* and *Godfrey* the concept that it is not enough to instruct a jury in the bare terms of an aggravating circumstance that is unconstitutionally vague on its face had no place in the context of sentencing by a trial judge.  *Id.*, at 653, 110 S.Ct. 3047.  However, when a jury is the final sentencer, it is essential that the jurors be properly instructed regarding all facets of the sentencing process.  *Id.*

In *Woratzeck v. Lewis,* 863 F.Supp 1079, 1087 (D.Ariz., 1994), the court found it of "critical significance" that a trial judge performed the sentencing calculus for "it would seem the necessity that a limiting construction specify what constitutes a heinous, cruel or depraved murder is directly proportional to the limited experience and resources upon which the sentencer may draw to evaluate the facts presented and make the required individualized determination as to the appropriateness of the death penalty."  Consequently, in states where a jury determines the existence of aggravating factors, the narrowing construction must be specific in order to channel their discretion.  *Id.*

59

The *Woratzeck* court observed that a review of *State v. Gretzler*, 135 Ariz.
42, 659 P.2d 1 (1983), disclosed that the Arizona Supreme Court did little more
than review and summarize its previous F.6 death penalty decisions. *Id.*, at 1086.
The *Woratzeck* court also noted that the Ninth Circuit acknowledged *Gretzler's*
limited significance in *Adamson v. Ricketts*, 865 F.2d 1011, 1032 (9th Cir. 1988),
*overruled by Walton v. Arizona, in turn, overruled by Ring II.* The *Adamson* court
said, "*Gretzler* reviewed a large number of cases, it did not…state [ ] what specific
factors are *necessary* for an (F)(6) finding. Moreover, the court did not include
any instructions to limit future review to the enumerated factors." *Adamson*, at
1032. (Emphasis in the original). The *Woratzeck* court also noted the similar
interpretation of *Gretzler* found in Justice Blackmun's dissent in *Lewis v. Jeffers*.
*Woratzeck*, at 1086.

The *Woratzeck* court found that the mere number of cases listed in *Gretzler*
could not itself effectively establish a narrowing construction, even if they were
utilized to provide some additional understanding. *Id.*, at 1087. The court
concluded that first, *Gretzler* was merely a comprehensive summation of existing
case law and provided no new or required definition or interpretation of the F.6
factor. Second, because sentencing judges are presumed to know the law and
apply it correctly, the narrowing constructions need not be as specific in states

60

where a judge is the final sentencer for Eighth Amendment purposes as long as "some guidance" is available. *Id.*

In *State v. Mata*, 185 Ariz. 319, 329, 916 P.2d 1035, 1045 (1996), the Arizona Supreme Court agreed with *Woratzeck v. Lewis* that the decisions prior to *Gretzler* provided adequate narrowing because in Arizona, the finding of aggravation is made by the trial judge, who requires less guidance than a jury.

Although juries need more specific channeling and guidance than do judges in construing facially vague aggravating factors, in Arizona they receive none. Here, the Arizona jury receives the same construction of the F.6 aggravator provided in *Gretzler* that the trial judges do. Yet, whereas a trial judge is presumed to know and apply the law, the same may not be said for a sentencing jury. Arizona juries are left with only the barest guidance in making their determinations. As a result, use of the *Gretzler* factors do not provide the clear and objective standards that give specific and detailed guidance to channel the jury's discretion as required by *Maynard* and *Godfrey*. Consequently, the jury cannot rationally distinguish between those individuals for whom death is an appropriate sanction and those for whom it is not. Therefore, instructing juries by reference to the *Gretzler* definitions alone does not provide the channeling required by the Eighth Amendment in a capital case.

61

## Abandonment of proportionality review.

Even though juries need more specific guidance than judges when they act as the sentencer in capital cases, in Arizona, trial judges have an added advantage that juries do not—the ability to compare any case before them to other capital murders and other non-capital murders to determine if the case before them is one in which the death penalty is warranted. While trial judges may have been able to sufficiently narrow the F.6 aggravator by reference to other capital cases, a jury does not have the same benefit. Thus, application of the F.6 aggravator is also unconstitutionally vague as applied by the Court's decision to abandon proportionality review.

In *Walton v. Arizona*, the United States Supreme Court decided that proportionality review was not constitutionally required. 497 U.S. at 655-56, 110 S.Ct. 3047. In 1992, the Arizona Supreme Court abandoned proportionality review in *State v. Salazar*, 173 Ariz. 399, 416-17, 844 P.2d 566, 583-84 (1992). Nevertheless, Arizona law requires that the circumstances of the crime set the murder apart from other first degree murders. That is, the circumstances of the murder must raise it "above the norm" of other first degree murders. *See, State v. Sansing*, 206 Ariz. 232, 241, 77 P.3d 30, 39 (2003); *State v. Carlson*, 202 Ariz. 570, 582, 48 P.3d 1180, 1192 (2002) (The death penalty should not be imposed in

62

every capital murder case but, rather, it should be reserved for cases in which either the manner of the commission of the offense or the background of the defendant places the crime "above the norm of first degree murders."); *State v. Brookover*, 124 Ariz. 38, 40, 601 P.2d 1322, 1324 (1979) (What is intended to be included are those capital crimes where the actual commission of the capital felony was accompanied by such additional acts as to set the crime apart from the norm of capital felonies, the conscienceless or pitiless crime which is necessarily torturous to the victim.)

Here, the jury was instructed:

> All first degree murders are to some extent heinous, cruel or depraved. However, this aggravating circumstance cannot be found to exist unless the murder is especially heinous, cruel or depraved. *That is where the circumstances of the murder raise it above the norm of other first degree murders.*

(RT, 12/1/04, p. 91.) (Emphasis added).

While trial judges have a fund of knowledge and experience in seeing both capital and non-capital murders during their tenure, it is safe to say that, in general, and here specifically, this was this jury's first homicide. The trial court in its specific instruction, and this Court in its application, thus, requires the jury to determine whether the circumstances of the murder before them raise it above the

63

norm of other first degree murders without providing the jury anything to compare the murder to in making its determination. The jury is left only with the cold comfort of the *Gretzler* definitions.

Dissenting to this Court's decision to abandon proportionality review, then Chief Justice Feldman argued that one of the reasons that proportionality review was valuable was because the "especially cruel" aggravator is unclear. *Salazar*, 173 Ariz. at 418-419, 844 P.2d at 585-586 (Feldman, C.J., dissenting.) Justice Feldman's argument focused on the fact that there was no "real science" in determining which crimes are "especially cruel." *Id.* Feldman illustrated this argument with examples observing:

> One becomes death eligible if, hand trembling because of fear, mental illness, or drug use, one fails to aim accurately or kill with the first blow and the victim fortuitously suffers and dies slowly.

*Id.*, at 419, 844 P.2d at 586.

In *Adamson v. Ricketts*, the Ninth Circuit Court of Appeals observed that the "especially cruel" aggravator may be, and has been applied in contradicting manners:

> As one commentator concluded, the Arizona Supreme Court's exposition of the "especially cruel" component would make the F(6) criterion applicable to almost any first degree murder case unless it involved a single

64

> unsuspecting victim.   Moreover, since suffering may
> occur either before or after attack by the defendant, that
> single unsuspecting victim must die, or be rendered
> unconscious, instantaneously for this criterion to apply.

865 F.2d at 1033.

The illustrations of the *Adamson* court and Justice Feldman in *Salazar* become more important to the consideration when a jury, rather than a judge, determines if a death sentence should be imposed.  In such a setting, almost every murder is capital murder.

Even if it were to be determined that the F.6 aggravator had been constitutionally narrowed by the *Gretzler* definitions, the change to jury sentencing and the abandonment of proportionality review have rendered it unconstitutionally vague as applied.  Juries require more specific guidance to channel their discretion than trial judges who know the law require.  More importantly, if Arizona juries are mandated to decide if the murder is "above the norm" of other first degree murders, they must be provided some standard by which to measure and compare the case before them to other such cases in order to comply with the mandate.

As a result, the F.6 aggravating factor is unconstitutionally vague on its face and vague as applied.  In particular, here, the jury was not provided specific, objective guidance to channel its discretion, nor was it given any way to determine

65

if this murder was above the norm of other first degree murders, although commanded to do so by the trial judge.   Its discretion was not guided in a constitutionally sufficient manner.   Consequently, it was left to determine the sentencing on an *ad hoc* basis.   This is an unconstitutional application of the F.6 aggravating factor in violation of Andriano's right to a fair trial, fair sentencing process and due process under the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution as well as Article 2, §§ 4, 15, and 24 of the Arizona Constitution.   This Court should vacate the finding of the especial cruelty.

000003894

## ARGUMENT IV

**THE TRIAL COURT'S INSTRUCTION DEFINING CRUELTY UNDER A.R.S. § 13-703(F)(6) WAS INSUFFICIENT TO GUIDE THE JURY AND APPROPRIATELY CHANNEL THEIR DISCRETION IN VIOLATION OF THE SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AS WELL AS ARTICLE 2, §§ 4, 15, AND 24 OF THE ARIZONA CONSTITUTION.**

*Standard of Review*

The court reviews *de novo* whether instructions to the jury properly state the law. *State v. Orendain*, 188 Ariz. 54, 56, 932 P.2d 1325, 1327 (1997).

*Discussion*

If the Court determines that the facially vague F.6 aggravating factor can be narrowly construed and applied by juries to channel and limit their discretion to rationally distinguish between those individuals who deserve the death penalty and those who do not, nonetheless the trial court's instructions here were unconstitutionally vague and did not channel the jury's discretion by clear and objective standards that provided specific and detailed guidance and that made rationally reviewable the process of imposing a sentence of death in violation of Andriano's rights under the Sixth, Eighth, and Fourteenth Amendments to the

67

United States Constitution as well as Article 2, §§ 4 and 24 of the Arizona Constitution.

In *State v. Anderson*, 210 Ariz. 327, 111 P.3d 369 (2005), the Court rejected the defendant's challenge that the jury was not given a "limiting definition" of the F.6 aggravator. For the definition of "especially cruel," the trial court in *Anderson* instructed the jury:

> The term "cruel" focuses on the victim's state of mind. Cruelty refers to the pain and suffering the victim experiences before death. A murder is especially cruel when there has been the infliction of pain and suffering in an especially wanton and insensitive or vindictive manner. The defendant must know or should have known that the victim would suffer.
>
> A finding of cruelty requires conclusive evidence that the victim was conscious during the infliction of the violence and experienced significant uncertainty as to his or her ultimate fate. The passage of time is not determinative.

*Id.*, n. 19.

In upholding the court's jury instruction, this Court observed that the jury was instructed in detail as to what would support a finding that the murders were "especially heinous, cruel or depraved." *Anderson*, at 352, 111 P.3d at 394.

68

Likewise, in *State v. Cromwell*, 211 Ariz. 181, 119 P.3d 448 (2005), the

Court also found that the jury instruction on cruelty did not suffer from vagueness.

211 Ariz. at 190, 119 P.3d at 457.  The jury in *Cromwell* was instructed:

> Cruelty goes to mental and physical anguish suffered by
> the victim.   Mental anguish occurs when the victim
> experiences significant uncertainty about her fate.   In
> order to constitute cruelty, conduct must occur before
> death and while a victim is conscious.   Conduct
> occurring after death or while a victim is unconscious
> does not constitute cruelty.  Before conduct can be found
> to be cruel, the state must prove that the defendant knew
> or should have known that the conduct would cause
> suffering to the victim.

*Id.*, at 189, 119 P.3d at 459.

Here, Andriano objected to and moved to dismiss the F.6 aggravating factor.

(ROA, p. 96; mistakenly denominated (G)(6); RT, 11/30/04, pp. 77-86.)   Over

Andriano's objection, the trial court instructed the jury:

> "Cruelty" involves the infliction of physical pain and/or
> mental anguish on a victim before death.   A crime is
> committed in an especially cruel manner when a
> defendant either knew or should have known that the
> manner in which the crime is committed would cause the
> victim to experience physical pain and/or mental anguish
> before death.   The victim must be conscious for at least
> some portion of the time when the pain and/or anguish
> was inflicted.

(RT, 12/1/04, pp. 91-92.)

69

Accordingly, unlike *Anderson* and *Cromwell*, the trial court here did not instruct on the significant uncertainty a victim must have about their fate or the physical and mental anguish that a victim must experience in order to satisfy the definition of "especially cruel." The mental anguish that results when a victim experiences significant uncertainty as to their ultimate fate is a critical circumstance in determining whether a murder is especially cruel.

For instance, in *State v. Stokley*, 182 Ariz. 505, 517, 898 P.2d 454, 466 (1995), a cruelty finding was upheld where the trial court observed that the victims were alive for some minutes from the start of the fatal assaults. They experienced great physical pain and mental anguish as they fought to free themselves. There was frequent repositioning of the hands of the killers on the throats of the victims, and the reasserting of the pressure until they were unconscious. The Court noted the extent of physical injuries on the victim's bodies, much of which they must have experienced while conscious. The victims' deaths were due to asphyxia by manual strangulation; the pathologist testified that death usually takes 12 to 15 minutes to occur. Both victims suffered injuries, including bruises, abrasions, and stab wounds, one near or in the right eye that occurred while still alive or shortly after death. Stomp marks on one victim's body, face, and neck were caused while she was alive or shortly after death. She suffered a complete fracture of the

70

cranium and laceration of the skull.   Both victims had injuries indicative of a struggle.

In *State v. Cromwell*, the Court upheld a cruelty finding where the 11 year old victim suffered unspeakable mental anguish, given the medical examiner's finding that she was still alive at the time she was stabbed and sexually assaulted. Given her age of 11 years, she was made to suffer pre-death anguish by conduct indescribable except in the most repulsive terms.   211 Ariz. at ___, ¶ 55, 119 P.3d at 458.

In *State v. Poyson,* 198 Ariz. 70, 78, 7 P.3d 79, 87 (2000), the Court upheld a cruelty finding where after a victim's throat was slashed, he struggled with Poyson and his co-defendant, Frank Anderson, for some forty-five minutes before dying.   He had two defensive wounds on his left hand confirming he was conscious throughout the ordeal.   The victim repeatedly asked the co-defendants why they were trying to kill him.   After being shot in the mouth, another victim fought with the co-defendants for several minutes before he died.   During the attack, the victim begged the defendant not to hurt him.

These examples all demonstrate the mental anguish caused to the victims by the significant uncertainty of their ultimate fates.   In contrast, here, the trial court's instruction to the jury that cruelty involves the infliction of physical pain and/or

71

mental anguish on a victim before death, did not sufficiently distinguish acts that would separate the cruelty inherent in all first degree murders from the especial cruelty that raises this murder above the norm of other first degree murders. In this respect, the trial court's instruction failed to channel the jury's discretion and provide it guidance in making its determination.

Likewise, the cases illustrating the physical pain of the especially cruel aggravator describe significant physical abuse occurring while the victim was conscious that raised the murder above the norm of first degree murders. For instance, in *Poyson*, one victim's throat was slashed, and then his head slammed against the floor and pounded with a rock. 198 Ariz. 70, 79, 7 P.3d 79, 88. Later, the defendant drove a knife into the victim's ear while he was still conscious and struggling. *Id.* A second victim suffered a gunshot wound to the mouth that shattered several of his teeth. He was then struck in the head numerous times with a rifle, and was conscious during much of the attack. *Id.*

In *State v. Djerf*, 191 Ariz. 583, 596, 959 P.2d 1274, 1287 (1998), the victim was conscious during part or all of the initial beating with a baseball bat. He later regained consciousness and although suffering great pain from his wounds, struggled with the defendant. The defendant stabbed the victim so fiercely with a knife that the blade pierced his right forearm and penetrated his torso where it was

72

later found embedded. The trial court's finding of cruelty was upheld. *Id. See also, State v. Moody*, 208 Ariz. 424, 472, 94 P.3d 1119, 1167 (2004) (Victim's prolonged ordeal caused her physical anguish due to the restraints and immobility and mental anguish due to the uncertainty of her fate.); *State v. Apelt (Michael)*, 176 Ariz. 349, 367, 861 P.2d 634, 652 (1993) (Victim was conscious when struck repeatedly with great force and stabbed in the back and chest, and her throat was slashed.); *State v. Brewer*, 170 Ariz. 486, 501, 826 P.2d 783, 799 (1992) (Victim was conscious during 45 minute attack.)

Like mental anguish, the physical pain that warrants a finding of especially cruel is physical pain beyond that inherent in the physical pain of almost all first degree murders. It is significant physical anguish experienced by the victim that raises the murder above the norm of first degree murders.

Here, because the trial court did not define physical pain in such a manner as to separate it from the norm of first degree murders, the jury was without guidance, and had no clear and objective standards by which to measure and apply this aggravating factor. As a result, the jury's discretion was not channeled in a specific, objective manner. They did not have detailed guidance from which they could rationally distinguish whether death was warranted in this case based upon an appropriate consideration of the aggravating factor of cruelty. Thus, the trial

73

court's jury instructions defining "especially cruel" were unconstitutionally vague as applied to Andriano in violation of the Sixth, Eighth, and Fourteenth Amendments of the United States Constitution as well as Article 2, §§ 4 and 24 of the Arizona Constitution.

74

## ARGUMENT V

## APPLICATION OF THE PROPER, NARROW CONSTRUCTION OF "ESPECIALLY CRUEL" DEMONSTRATES THAT THE EVIDENCE IS INSUFFICIENT TO SUPPORT THIS AGGRAVATING CIRCUMSTANCE.

*Standard of Review*

The Arizona Supreme Court independently reviews all death sentences to determine if the aggravating factors are supported by the evidence. Review is *de novo. Anderson*, at 352, 111 P.3d at 394.

*Discussion*

Assuming *arguendo* that the cruelty aggravator is capable of being constitutionally narrowed and constitutionally applied by the jury, application of the correct standard here demonstrates that the evidence does not support the existence of this aggravator.

If a trial judge fails to apply or instruct the jury on the constitutional construction of the aggravating factor or applies an improper construction, the constitution does not necessarily require that a state appellate court vacate a death sentence based on that factor. *Walton v. Arizona*, 497 U.S. at 653-54, 110 S.Ct. 3047. Rather, as the Court held in *Clemmons v. Mississippi*, 497 U.S. 738, 110 S.Ct. 1441 (1990), a state appellate court may itself determine whether the

75

evidence supports the existence of the aggravating circumstance as properly defined. *Id.*, 497 U.S. at 654, 110 S.Ct 3047; *State v. Anderson*, 210 Ariz. at 352, 111 P.3d at 394.   Here, proper application of the narrower construction of the "especially cruel" aggravator demonstrates that the evidence is insufficient to support this aggravating circumstance.

The jury unanimously found the single aggravating factor of cruelty.  (ROA, p. 393.)  A determination that the F.6 aggravator has been proven can be based on prongs that the murder was committed in an especially cruel, heinous, or depraved manner because they are in the disjunctive.  *State v. Newell*, 212 Ariz. 389, ___, 132 P.3d 833, 849-50 (2006); *State v. Gretzler*, 135 Ariz. 42, 51, 659 P.2d 1, 10 (1983).

The *Gretzler* Court observed:

> Our initial interpretations of this statutory phrase recognized that the words "especially heinous, cruel, or depraved" were not intended to apply to all first degree murders.   Rather they apply to "a killing wherein additional circumstances of the nature enumerated * * * set the crime apart from the usual or the norm."

*Gretzler*, at 50-51, 659 P.2d at 9-10.

The Court reiterated that it would not allow the F.6 provision to be used as a catch-all for those first degree murders where no other aggravating circumstance

76

applies. *Id.*, at 51, 659 P.2d at 10.  The Court defined cruel as, "disposed to inflict pain esp. in a wanton, insensate or vindictive manner:  sadistic." *Id.*  Cruelty involves the pain and distress visited upon the victim. *Id.*

A murder is especially cruel if the victim consciously suffers physical pain or mental anguish. *State v. Roscoe*, 184 Ariz. 484, 500, 910 P.2d 635, 651 (1996). The physical or mental pain suffered must be reasonably foreseeable by the defendant. *State v. Adamson*, 136 Ariz. 250, 266, 665 P.2d 972, 988 (1983).  The victim must have been conscious during at least some portion of the crime and the defendant either knew or should have known that the victim would suffer.  *State v. Jones*, 205 Ariz. 445, 449, 72 P.3d 1264, 1268 (2003).

For instance, in *State v. Lavers*, 168 Ariz. 376, 382-383, 814 P.2d 333, 339-340 (1991), the Court upheld a cruelty finding where the defendant had stabbed his wife in the back causing paralysis below the level of the injury.  The defendant's wife was unable to stand, walk, or use her legs to crawl.  Despite the paralysis, she would have experienced pain after being stabbed and any movement would have exacerbated the pain.  The stab wound was not immediately fatal, and did not leave her unconscious.  She could have remained conscious for several hours or longer, and was still alive at the time she was shot.

000003905

In *State v. Moody*, 208 Ariz. 424, 94 P.3d 1119 (2004), the Court upheld a cruelty finding where the trial court found that the defendant tied the victim up with neckties and cords tightly enough to leave marks on her arms and wrists. Because the defendant went to the bank twice and communicated with the victim both times after returning, the trial court concluded that she must have been conscious and suffering for some period of time. *Id.*, at 472, 94 P.3d at 1167. The Court found that the prolonged ordeal caused her physical anguish due to the restraints and her immobility and mental anguish due to the uncertainty of her fate and the knowledge that the defendant was aware she could identify him as her attacker if she survived. *Id.*

In *State v. Bolton*, 182 Ariz. 290, 311, 896 P.2d 830, 851 (1995), the Court found that the murder was especially cruel where the physical evidence showed that the victim was conscious for a considerable period of time between the beginning of the crime and her death.

In *State v. Kiles*, 175 Ariz. 358, 370, 857 P.2d 1212, 1224 (1993), the Court found the murder of the defendant's girlfriend was especially cruel as demonstrated by the prolonged, vicious beating of the victim with a jack stem over a period of time during a portion of which the victim was clearly conscious. Although the defendant initially knocked his girlfriend unconscious with the jack

78

stem, she regained consciousness and asked why he did that. *Id.*, at 371, 857 P.2d at 1225.   A struggle then ensued that resulted in the girlfriend's receiving numerous wounds including extensive blunt trauma to the face, head, neck, upper extremities, and trunk, extensive multiple lacerations, multiple skull fractures, puncture wounds to the left elbow, a fractured right forearm, and shattered teeth. *Id.*   The doctor who performed the autopsy said that her broken arm and elbow punctures were indicative of defensive wounds. *Id.*

Conversely, the Court found no cruelty in *State v. Wallace*, 151 Ariz. 362, 728 P.2d 232 (1986).   The day before the murder, the defendant and his girlfriend had argued about his continued use of alcohol and drugs.   *Wallace*, 151 Ariz. at 364, 728 P.2d at 234.   The next day, the defendant remained at his girlfriend's mobile home waiting for her and her children to return.   Her daughter arrived first. As she entered, the defendant attacked her from behind with a baseball bat; he struck her numerous times about the head, eventually breaking the bat.   Because she was moaning and still appeared to be alive, the defendant forced a portion of the broken bat through her throat until it hit the floor. *Id.*

The defendant obtained a pipe wrench and waited for his girlfriend's son to return home from school.   When the boy came home, the defendant followed him into his bedroom, surprised him, and repeatedly struck him over the head with the

79

pipe wrench.  The defendant used such force that the skull was fractured in several places and brain matter was clearly visible on the floor.  *Id.*

When the defendant's girlfriend entered the mobile home, they had a brief discussion and then she went to the kitchen to put away groceries.  As she turned to face the defendant, he struck her on the side of her head with the same wrench he used on her son.  The defendant repeatedly struck her, even after she had collapsed to the floor.  *Id.*

In rejecting cruelty, the Court found that defendant attacked each of his victims quickly and by surprise.  The state offered no evidence to establish pain or suffering by the victims and the record was inconclusive as to whether any of the victims were even conscious following the initial blow to the head.  *Id.*, at 367, 728 P.2d at 237.

Here, the murder was not especially cruel as construed by the narrowed definition and typified by the Arizona interpretations.  According to her testimony, fifteen minutes or so after her husband ingested the capsules he started feeling dizzy and nauseous.  He broke out in a sweat.  (RT, 10/28/04, p. 30.)  He lay down on the floor of the bedroom.  (Id., p. 31.)  He then put on his shorts and they walked out into the living room where another wave of nausea struck and he vomited on the living room floor.  (Id.)

80

When Chris Hashisaki walked inside the apartment at around 2:30 a.m., she saw Joe lying on the living room floor on his left side in a fetal position. (RT, 9/8/04, p. 14.) Hashisaki said Joe was able to communicate with her. (Id., pp. 14-15.) Joe continued to lay on the floor, unable to sit up. (Id., p. 16.) When asked to describe his condition for Emergency dispatch, Hashisaki said that Joe's color was fine, his lips were not blue, but he was having trouble breathing. (Id., p. 20.) As Hashisaki left to wait for Emergency responders, she saw that Joe had vomited again. (Id., p. 25.)

Andriano said that Joe started feeling a little bit better. (RT, 10/28/04, p. 38.) He wasn't sweating anymore, and had thrown up a second time. (Id.) Joe told Andriano that he was starting to feel a little better. (Id., p. 39.) Andriano said that Joe's symptoms began to decrease. (Id., p. 44.) He was no longer sweating nor had heart palpitations. (Id., p. 45.)

Dr. Keen, who performed the autopsy, said that he found no sodium azide in Joe's blood. (RT, 9/16/04, p. 60.) He discovered 3.8 milligrams per liter in Joe's gastric contents. (Id., pp. 60-61.) Dr. Keen said consumption of sodium azide would cause changes in blood pressure and pulse rate. (Id., p. 62.) Dr. Keen said there is a possibility a person would become agitated and emotionally excited. (Id., p. 63.) He said once a person vomited, then their symptoms should become

81

better unless they ingested so large a quantity that vomiting wouldn't get rid of it.
(Id., pp. 63-64.)

Dr. Edward French, University of Arizona, Pharmacology professor,
confirmed that the ingestion of sodium azide would cause headache, increased
heart rate, and blood pressure drop. (RT, 9/23/04, p. 13.) He said a person would
have shortness of breath. (Id.) If a person took a sufficient amount of sodium
azide, it would work like cyanide because too little oxygen would get to the brain.
(Id., p. 16.) Dr. French confirmed that once the azide had been purged from the
stomach, the symptoms would cease. (RT, 9/23/04, p. 34.) He acknowledged that
two parts per million was a small amount of azide. (Id., p. 36.)

Joseph Richmond, senior chemist for West Coast Analytical Service,
detected sodium azide in a sample of Joe's blood at two parts per million, which
was right at the detection limit. (Id., pp. 34-35.) Joe's oncologist, Dr. Kellogg,
observed that a person undergoing chemotherapy would experience nausea,
fatigue, shortness of breath and diarrhea. (RT, 9/28/04, pp. 26-27.)

It is clear that Joe had not taken a lethal amount of sodium azide. A 170
pound person would need to consume 2086 milligrams of sodium azide to die and
even then would only have a fifty percent chance. (RT, 9/21/04, pp. 27-28; Ex.
366.)

82

Although he was in obvious distress caused by the ingestion, it did not constitute the physical anguish as set forth in the Arizona cases defining especial cruelty. Joe didn't even know that he had been poisoned. Thus, he did not suffer the mental anguish contemplated by the cruelty cases over the uncertainty of his fate. It appears that his distress was actually very similar to the distress a person undergoing chemotherapy would normally feel. Under these circumstances, the poisoning evidence is insufficient to support an especially cruel finding.

Even if the Court finds that the poisoning was especially cruel, Joe's distress was not foreseeable by Andriano. The physical pain or mental anguish suffered by a victim before death must only be reasonably foreseeable, and foreseeability in connection with cruelty is based on an objective rather than subjective standard. *State v. Carlson*, 202 Ariz. 570, 582, 48 P.3d 1180, 1192 (2002); *State v. Smith*, 146 Ariz. 491, 504, 707 P.2d 289, 302 (1985).

According to Andriano, Joe directed her to call Shawn King to find out why Joe was sick and throwing up rather than his heart just stopping like was expected. (RT, 10/28/04, p. 68.) Andriano's expectation was that Joe's heart would just stop and it would be over, painlessly. (Id., p. 30.) Thus, her objective understanding was that the sodium azide would not cause pain or illness. As a result, Joe's physical distress was not reasonably foreseeable by Andriano.

83

Likewise, the injuries from the bludgeoning do not support the especially cruel aggravator.  Dr. Keen found that all of these injuries occurred before Joe's death. (RT, 9/16/04, pp. 30-31.) He said it was not an instantaneous death. (Id., p. 31.)  However, of the twenty-three or so strikes primarily to the back of the victim's head, eight or ten of the blows would have rendered him immediately unconscious. (Id., p. 32.)

Dr. Keen noted cuts over the victim's right knuckle, and an incised wound on the dorsum of the right hand.  (Id., p. 27.)  He also saw contusions and abrasions in the wrist area. (Id.) Dr. Keen found two small superficial cuts on the decedent's left hand. (Id., pp. 28-29.) Dr. Keen said the wounds on the right hand were consistent with defensive wounds and said the cuts on the left hand could have been defensive wounds.  (Id.)  He noted that a bruise at the base of the decedent's left thumb could be a defensive wound or could have been inflicted from a fall. (Id., p. 29.)

Defensive wounds can support a cruelty finding because they demonstrate that the victim was conscious when the wounds were inflicted, and often point to a physical struggle for survival that supports mental anguish. *See State v. Medrano*, 173 Ariz. 393, 397, 844 P.2d 560, 564 (1992).  However, review of the exhibits demonstrates that the defensive wounds here were minor and are not indicative of a

84

great or prolonged struggle of any sort.  (Exs. 206-209.)  During the aggravation phase, Dr. Keen described the knuckle laceration as "superficial."  (RT, 11/30/04, p. 54.)  Dr. Keen also said that the injury could be consistent with a wood screw scraping or incising the hand.  (Id.)

Dr. Keen said the victim was not conscious throughout the sequence of injuries that he sustained and Keen did not know at what point the victim became unconscious.  (Id., pp. 56-57.)  Dr. Keen said the blows to the back of Joe's head could have caused him to die.  (Id., p. 59.)  Dr. Keen said there were a number of possible scenarios.  (Id., p. 65.)  Joe's hands could have been struck with the first blow and been rendered unconscious.  (Id., p. 64.)  He could have been struck once, and then the second blow struck his hands and also rendered him unconscious.  (Id., p. 65.)  Dr. Keen said Joe had not sustained a mortal blow up to the point where his neck was cut.  (Id.)  Dr. Keen said Joe would have died within minutes from when the attack started until the point he died.  (Id., p. 69.)  Dr. Keen said given the magnitude of his injuries, if Joe were conscious he would have experienced some pain.  (Id., pp. 69-70.)

Dr. Keen said that because of the swelling inside Joe's brain, his loss of consciousness could be almost instantaneous, or could be minutes.  (Id., p. 72.)

85

Even given the uncertainty of the evidence, it appears that the attack was very quick and Joe succumbed just as quickly.

The state's theory, supported by the evidence, was that Andriano killed Joe in the five to ten minutes from when Hashisaki left the apartment to when Andriano came around from the back wearing different clothes with her hair wet. (RT, 11/16/04, pp. 49-54.) Thus, under the state's own theory, Andriano had to have killed her husband, showered, changed clothes, spoke on the phone to the dispatcher who called into the apartment trying to gain entrance for the Emergency personnel, and exited the apartment coming around from the back to speak with Emergency response, all within a maximum of ten minutes. By the state's own theory, Andriano's attack on her husband must have occurred very quickly.

In *State v. Soto-Fong*, 187 Ariz. 186, 203, 928 P.2d 610, 627 (1996), this Court rejected the assumption that an especially cruel finding was appropriate whenever the victim remains conscious for some moments [after being shot.] The Court observed that where the evidence was inconclusive that the victim was conscious or unconscious of pain immediately after the blows to the head, a cruelty finding is not supported. *Id.* (Citing cases.)

In *State v. Bishop*, 127 Ariz. 531, 534, 622 P.2d 478, 481 (1981), the Court held that cruelty had not been established where the victim was killed with

86

multiple blows from a claw hammer and the medical expert testified that the victim was unconscious of pain "immediately after the blows to the head." In *State v. Clark*, 126 Ariz. 428, 436, 616 P.2d 888, 896 (1980), the Court found cruelty to be inappropriate because "the fatal wounds appeared to have been delivered at vital parts of the bodies of the victims, and death ensued swiftly."

So it is here. All the evidence indicates that the attack on Joe was swift, and he was rendered unconscious very quickly. The defensive wounds indicate a brief struggle that ended quickly. Under these circumstances, an especially cruel finding is not warranted.

Finally, it is clear that at the time Joe was stabbed in the throat, he was unconscious from the wounds suffered to the back of his head. Thus, the stabbing cannot support a finding of cruelty.

Viewing the totality of circumstances surrounding the murder, the evidence is insufficient to support a finding of the especially cruel aggravating factor. *See State v. Gillies*, 142 Ariz. 564, 570, 691 P.2d 655, 661 (1984). Andriano requests this Court vacate the jury's finding of especial cruelty.

If the Court concludes that especial cruelty was properly found by the jury, the mitigation is nevertheless sufficiently substantial to call for leniency. Andriano

87

requests this Court to independently review the aggravation and mitigation, vacate her death sentence, and remand for imposition of a life sentence.

88

**Penalty Phase Issues.**

## ARGUMENT VI

**THE TRIAL COURT'S REFUSAL TO PERMIT ANDRIANO TO PRESENT EVIDENCE OF RESIDUAL DOUBT DEPRIVED HER OF HER RIGHT TO DUE PROCESS, A FAIR TRIAL, AND A FAIR SENTENCING PROCEEDING UNDER THE SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AS WELL AS ARTICLE 2, §§ 4, 15 AND 24 OF THE ARIZONA CONSTITUTION.**

### *Standard of Review*

Constitutional issues are reviewed *de novo*. *State v. McCann*, 200 Ariz. 27, 28, 21 P.3d 845, 846 (2001). The Court reviews *de novo* whether instructions to the jury properly state the law. *State v. Orendain*, 188 Ariz. 54, 56, 932 P.2d 1325, 1327 (1997).

### *Discussion*

The Eighth and Fourteenth Amendments require that the sentencer…not be precluded from considering, as a mitigating factor, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death. *Lockett v. Ohio*, 438 U.S. 586, 604, 98 S.Ct. 2954 (1978); *Eddings v. Oklahoma*, 455 U.S. 104, 102 S.Ct. 869 (1982); *McCleskey v. Kemp*, 481 U.S. 279, 306, 107 S.Ct. 1756 (1987).

89

In *Franklin v. Lynaugh*, 487 U.S. 164, 108 S.Ct. 2320 (1988), the United States Supreme Court found that its previous cases had not interpreted the Eighth Amendment to give a capital defendant the right to introduce evidence of "residual doubt" and found it "quite doubtful" that any such right existed. 487 U.S. at 173, n. 6, 108 S.Ct. 2320. Most recently, in *Oregon v. Guzek*, ___ U.S. ___, 126 S.Ct. 1226 (2006), the defendant sought to reintroduce at his sentencing proceeding his alibi defense for the jury to consider as a "residual doubt." The Supreme Court again observed that it could find nothing in the Eighth or Fourteenth Amendments that provided a capital defendant a right to introduce new evidence of this kind at sentencing. *Id.*, at ___, 126 S.Ct. at 1231.

However, the Court did not go so far as to preclude consideration of "residual doubt" evidence. The Court said, "We once again face a situation where we need not resolve whether such a right exists, for, even if it does, it could not extend so far as to provide the defendant with a right to introduce the evidence at issue." *Id.*, at ___, 126 S.Ct. at 1232. The Court noted that the Eighth Amendment does not deprive the state of its authority to set reasonable limits upon the evidence a defendant can submit, and to control the manner in which it is submitted. *Id.* "States are free to structure and shape consideration of mitigating evidence 'in an effort to achieve a more rational and equitable administration of the death

90

penalty.'" *Id.*, *quoting Boyde v. California*, 494 U.S. 370, 377, 110 S.Ct. 1190 (1990), *quoting Franklin*, at 181, 108 S.Ct. 2320.

Arizona has struggled with the issue of "residual doubt." In *State v. Harrod*, 200 Ariz. 309, 317 n. 7, 26 P.3d 492, 500 n. 7 (2001), *reversed on other grounds by Ring II*, the Court expressed doubt about "residual doubt" as a mitigating circumstance, but found in particular it wasn't warranted in Harrod's case. Likewise, in *State v. Schackart*, 190 Ariz. 238, 253, 947 P.2d 315, 330 (1997), the Court found that unsupported claims of innocence after a person is found guilty beyond a reasonable doubt did not constitute mitigation for sentencing purposes.

Yet, in other cases, defendants have presented residual doubt as a mitigator at trial. *See, e.g., State v. Dann*, 206 Ariz. 371, 374, 79 P.3d 58, 61 (2003); *State v. Nordstrom*, 206 Ariz. 242, 247, 77 P.3d 40, 45 (2003); *State v. Jones*, 205 Ariz. 445, 451, 72 P.3d 1264, 1270 (2003). And, this Court has considered residual doubt in its independent review of mitigation. As Justice Feldman (Ret.) observed in *Harrod*, the majority opinion's discomfiture with "residual doubt" appeared odd in light of the fact that other Arizona cases intimated, if not held, that residual doubt was a mitigating circumstance. *Harrod*, 200 Ariz. at 323-324, 26 P.3d 492, 506-207 (Feldman, J., specially concurring), *referring to State v. Spears*, 184 Ariz.

91

277, 908 P.2d 1062 (1996), and *State v. Atwood*, 171 Ariz. 576, 832 P.2d 593 (1992).

In *State v. Pandeli*, 200 Ariz. 365, 379, 26 P.3d 1136, 1150 (2001), *reversed on other grounds by Ring II*, the Court considered residual doubt, but found that when a jury verdict finding a defendant guilty beyond a reasonable doubt was supported by very strong evidence, the trial court properly refused to find the non-statutory mitigator of "residual doubt."

In *State ex rel. Thomas v. Granville*, 211 Ariz. 468, 123 P.3d 662 (2005), the Court discussed the defendant's burden to prove mitigating evidence. In *Granville*, the state conceded that A.R.S. § 13-703(E) did not create a "presumption of death" and acknowledged that a jury may return a verdict of life in prison even if the defendant decides to present no mitigation evidence at all. 211 Ariz. at 471, 123 P.3d at 665. The Court observed that even if a juror believed that the aggravating and mitigating factors were equally balanced, § 13-703(E) did not require the juror to impose the death penalty. Rather, each juror is permitted to vote for a sentence of life or death as each juror sees fit in light of the aggravating factors found by the jury and the mitigating evidence found by each juror. *Id.*, at 472, n. 3, 123 P.3d at 663, n. 3.

92

Recently, in *State v. Johnson*, 212 Ariz. 425, ___, 133 P.3d 735, 746-747 (2006), this Court upheld a trial court's refusal to instruct jurors on specifically requested mitigation not wishing to confine jurors' consideration of mitigation. The Court cited The United States Supreme Court's emphasis of the need for a broad inquiry into all relevant mitigating evidence to allow an individualized determination. *Citing, Buchanan v. Angelone*, 522 U.S. 269, 276, 118 S.Ct. 757 (1998).

"[The Supreme Court's] decisions suggest that complete jury discretion is constitutionally permissible." *Id.*, citing *Tuilaepa v. California*, 512 U.S. 967, 978-79, 114 S.Ct. 2630 (1994) ("at the [penalty] phase, the state is not confined to submitting specific propositional questions to the jury and may indeed allow the jury unbridled discretion."); *see also*, *Zant v. Stephens*, 462 U.S. 862, 875, 103 S.Ct. 2733 (1983) (finding that a scheme permitting jurors unbridled discretion in determining whether to impose the death penalty after eligibility for the death penalty is determined is not unconstitutional.) *Id.*

Thus the mitigating evidence to be found by each individual juror is broad and may include any relevant factor that serves as a basis for a juror to vote for a life verdict. Our mitigation statute recognizes this fact. Under A.R.S. § 13-703(H), the trier of fact shall consider as a mitigating circumstance any factors

93

proffered by the defendant or the state which are relevant in determining whether to impose a sentence less than death, including any aspect of the defendant's character, propensities or record and any of the circumstances of the offense.

As a result, "residual doubt" is a valid mitigating factor that may be considered by the trier of fact in considering the appropriate sentence to impose. Here, and with the consideration of "mercy" in Argument VII below, the trial court refused to permit Andriano to proffer important, relevant mitigation.

Andriano specifically requested the court to permit her to introduce evidence regarding "residual doubt." (RT, 12/7/04, p. 5.)  Counsel phrased "residual doubt" as "that space between beyond a reasonable doubt and beyond all doubt" and urged that it was an area to be explored in terms of mitigation.  (Id.)  The trial court refused to permit Andriano to introduce evidence of residual doubt.

In this regard, the trial court erred and denied Andriano her right to present relevant mitigation, to have a fair sentencing proceeding, and to due process under the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution as well as Article 2, §§ 4, 15 and 24 of the Arizona Constitution.  This Court should remand for a new penalty phase trial.

94

## ARGUMENT VII

**THE TRIAL COURT'S REFUSAL TO PERMIT ANDRIANO TO PRESENT EVIDENCE OF MERCY DEPRIVED HER OF HER RIGHT TO DUE PROCESS, A FAIR TRIAL, AND A FAIR SENTENCING PROCEEDING UNDER THE SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AS WELL AS ARTICLE 2, §§ 4, 15 AND 24 OF THE ARIZONA CONSTITUTION.**

*Standard of Review*

Constitutional issues are reviewed *de novo*. *State v. McCann*, 200 Ariz. 27, 28, 21 P.3d 845, 846 (2001). The Court reviews *de novo* whether instructions to the jury properly state the law. *State v. Orendain*, 188 Ariz. 54, 56, 932 P.2d 1325, 1327 (1997).

*Discussion*

As set forth in Argument VI above, Supreme Court precedents confer upon defendants the right to present sentencers with information relevant to the sentencing decision and oblige sentencers to consider that information in determining the appropriate sentence.

In *Kansas v. Marsh*, 548 U.S. ___, 126 S.Ct. 2516, ¶ 8 (2006), the Court observed that Kansas juries are permitted to consider any evidence relating to any mitigating circumstance in determining the appropriate sentence for a capital

95

defendant, so long as that evidence is relevant.  In reviewing the Kansas mitigation statute, the Court took note of one of the jury instructions:

> The appropriateness of the exercise of mercy can itself be a mitigating factor you may consider in determining whether the state has proved beyond a reasonable doubt that the death penalty is warranted.

*Id.*  The Court commented that the "mercy" jury instruction alone foreclosed the possibility of a *Furman*-type error as it eliminated the risk that a death sentence would be imposed in spite of facts calling for a lesser penalty. *Id.*, n. 3.

Thus, the *Marsh* Court expressed approval of mercy as a mitigating factor in and of itself that may call for a sentence less than death.  The Arizona statute, like the Kansas statute, permits broad consideration of mitigating circumstances in determining the appropriate sentence for a capital defendant.  Mercy is such a circumstance.

The trial court refused to include mercy as a mitigating factor for the jury to consider.  (ROA, p. 419.)  This refusal failed to permit the jury to consider mercy as a mitigator and give full effect to Andriano's proffered mitigation.  As a result, the trial court denied Andriano's right to due process and a fair penalty phase trial in violation of the Sixth, Eighth, and Fourteenth Amendments to the United States

96

Constitution as well as Article 2, §§ 4, 15 and 24 of the Arizona Constitution.  This Court should remand for a new penalty phase trial.

97

## ARGUMENT VIII

**THE TRIAL COURT IMPROPERLY INSTRUCTED THE JURY IN THE PENALTY PHASE INSTRUCTIONS TO REQUIRE JURY UNANIMITY REGARDING THE EXISTENCE OF MITIGATING CIRCUMSTANCES. THE ERROR VIOLATED ANDRIANO'S RIGHT TO DUE PROCESS, A FAIR TRIAL, AND A FAIR SENTENCING PROCEEDING IN VIOLATION OF THE SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AS WELL AS ARTICLE 2, §§ 8, 15 AND 24 OF THE ARIZONA CONSTITUTION.**

*Standard of Review*

Whether an instruction to a jury following the penalty phase of a capital trial correctly states the law is reviewed *de novo*. *State ex rel. Thomas v. Granville*, 211 Ariz. 468, 471, 123 P.3d 662, 665 (2005), citing *State v. Glassel*, 211 Ariz. 33, 53, 116 P.3d 1193, 1213 (2005). Whether a trial court erred in giving or refusing to give a requested jury instruction is reviewed for abuse of discretion. *Id.*, citing *State v. Anderson*, 210 Ariz. 327, 343, 111 P.3d 369, 385 (2005). The jury instructions are read as a whole to ensure that the jury receives the information it needs to arrive at a legally correct instruction. *Id.*, citing *Kauffman v. Schroeder*, 116 Ariz. 104, 106, 568 P.2d 411, 413 (1977).

98

*Discussion*

In the penalty phase instructions, the trial court instructed the jury:

> Any verdict of death or life imprisonment must be unanimous.  If you unanimously find that no mitigation exists, then you must return a verdict of death.  If you unanimously find that mitigation exists, each one of you must individually weigh that mitigation in light of the aggravating circumstances already found to exist and if you unanimously find that the mitigation is not sufficiently substantial to call for leniency, you must return a verdict of death.

> If you unanimously find that mitigation exists and it is sufficiently substantial to call for leniency, you must return a verdict of life.

(RT, 12/16/04, p. 49.)

Andriano objected to the instruction.  (RT, 12/15/04, p. 9.)  Andriano said that the court's instruction was not an accurate recitation of death penalty law and the jury need not go through that process.  (Id.)  The trial court's instruction improperly required unanimity as to the existence of mitigation in violation of Andriano's right to due process, a fair trial, and a fair sentencing proceeding under the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution as well as Article 2, §§ 8, 15 and 24 of the Arizona Constitution.

A jury may not be precluded from considering any appropriate circumstances offered in mitigation.  *Lockett v. Ohio*, 438 U.S. 586, 98 S.Ct. 2954

99

000003927

(1978).  In Arizona, the consideration of mitigating evidence is codified by A.R.S.

§ 13-703(C).  In relevant part:

> If the trier of fact is a jury, the jurors do not have to agree unanimously that a mitigating circumstance has been proven to exist.  Each juror may consider any mitigating circumstance found by that juror in determining the appropriate penalty.

Recently, in discussing the relative burdens of proof in a capital case, this

Court observed:

> The plan is carefully laid out in the statutes:  Once a defendant is "death eligible" – that is, once a jury has found beyond a reasonable doubt that the defendant is guilty of a capital offense and that at least one statutory aggravating factor exists – *the jurors must assess whether to impose the death penalty based upon each juror's individual, qualitative evaluation of the facts of the case, the severity of the aggravating facts, and the quality of any mitigating evidence.*

*State ex rel. Thomas v. Granville,* 211 Ariz. at 472, 123 P.3d at 666, citing to

A.R.S. § 13-703.  (Emphasis added).

The Court concluded:

> We therefore now clarify that the determination whether mitigation is sufficiently substantial to warrant leniency is not a fact question to be decided based on the weight of the evidence, but rather is a sentencing decision to be made by each juror based upon the juror's assessment of the quality and significance of the mitigating evidence that the juror has found to exist.

100

*Id.*, at 473, 123 P.3d at 667. The Court concluded, "[E]ach juror must determine whether in that juror's individual assessment, the mitigation is of such quality or value that it warrants leniency." *Id.*

In *Mills v. Maryland*, 486 U.S. 367, 384, 108 S.Ct. 1860, 1870 (1988), the Supreme Court held that if there was a substantial probability that reasonable jurors, upon receiving the judge's instructions in the case, well may have thought they were precluded from considering any mitigating evidence unless all twelve jurors agreed on the existence of a particular such circumstance, the death sentence must be vacated and the case remanded. The Court found that the possibility that a single juror could block consideration of all mitigating evidence and consequently require the jury to impose the death penalty is a possibility the Court would not risk. *Id.*

Here, viewing the jury instructions as a whole, the jury was told that the determination of what circumstances are mitigation was one for each of the jurors to resolve individually based on all the evidence presented during all phases of the trial. (RT, 12/16/04, p. 45.) The jury was instructed that they could consider any relevant mitigation presented during any phase of the trial, even if it wasn't proposed by either of the parties. (Id., p. 46.) In weighing the aggravating and

101

mitigating circumstances, the jury was instructed to individually determine the nature and extent of mitigating circumstances. (Id., p. 47.)

Utilizing the pronoun "you," the jurors were told that each of them were free to assign whatever value they deemed appropriate to each and all of the various factors they were permitted to consider. (Id., p. 48.) The jurors were instructed that neither the state nor the defendant had the burden of proving that the weight of the mitigation was or was not sufficiently substantial to call for leniency, and was advised that the law did not define "sufficiently substantial to call for leniency." (Id.)

The jury was next instructed, again using the pronoun "you," that if they found unanimously that no mitigation existed, they must return a verdict of death. (Id., p. 49.) Then:

> *If you unanimously find that mitigation exists*, each one of you must individually weigh that mitigation in light of the aggravating circumstances already found to exist and if you unanimously find that the mitigation is not sufficiently substantial to call for leniency, you must return a verdict of death.

(Id.) (Emphasis added).

A fair reading of this instruction, in light of the instructions as a whole, told the jury that before each of them could individually weigh particular mitigation in

102

light of aggravating circumstances, the jury had to unanimously find that the mitigation existed. This instruction directly contradicted the law as set forth in *Mills v. Maryland*, and A.R.S. § 13-703(C). Although other instructions advised the jury that what was mitigation was for each of them to resolve individually, they were still instructed that they must find unanimously that mitigation existed before each individual weighed the mitigation in light of the aggravation.

In *Mills v. Maryland*, the Court observed that in reviewing death sentences, the Court has demanded even greater certainty that the jury's conclusions rested on proper grounds. *Mills*, 486 U.S. at 376, 108 S.Ct. at 1866. The Court found that unless it could rule out the substantial possibility that the jury may have rested its verdict on the "improper" ground, it must remand for resentencing. *Id.*, at 377, 108 S.Ct. at 1867.

Here, there is a substantial probability that reasonable jurors in attempting to evaluate and analyze the mitigation in light of the judge's instructions, thought they were precluded from individually considering any mitigating evidence unless all twelve first unanimously agreed upon the existence of such mitigation. That may have prevented individual jurors from considering all mitigation evidence because of the risk that the jurors may have misunderstood how to arrive at mitigation to be considered before individually weighing it, the trial court abused

103

its discretion in giving the offending instruction over Andriano's objection.   The error violated Andriano's right to due process, a fair trial, and a fair sentencing proceeding under the Sixth, Eighth and Fourteenth Amendments to the United States Constitution as well as Article 2, §§ 8, 15 and 24 of the Arizona Constitution.   The death sentence must be vacated and the matter remanded for further proceedings.

104

## ARGUMENT IX

**THE TRIAL COURT IMPERMISSIBLY COERCED THE JURY WHEN IT GAVE AN IMPASSE INSTRUCTION DURING THE PENALTY PHASE WITHOUT KNOWING WHETHER THE JURY WAS DEADLOCKED.**

*Standard of Review*

Whether the jury was improperly coerced requires review of the supplemental charge in its context and under all the circumstances. *Lowenfield v. Phelps*, 484 U.S. 231, 237, 108 S.Ct. 546 (1988). We consider the premature giving of the impasse instruction in the analysis of whether, under the totality of the circumstances, the trial court coerced the jury verdict. *State v. Huerstel*, 206 Ariz. 93, 100, 75 P.3d 698, 705 (2003).

*Discussion*

The trial court gave an impasse instruction before the jury even indicated it was at an impasse. The instruction was coercive, signaling to the jury that it must come to a unanimous decision. Instead of answering the question that the jury asked, the court improperly used that opportunity to pressure the jurors to come to a unanimous decision.

A criminal defendant has a right to a fair jury trial, due process and the right to a reliable sentence of death under the federal and state constitutions. U.S.

105

Const., Amend. 5, 6, 8 and 14; Ariz. Const. Art. 2, §§ 4, 15 and 24.  If the jury advises the court that it has reached an impasse in its deliberations, the court may, in the presence of counsel, inquire of the jurors to determine whether and how the court and counsel can assist them in their deliberative process. 17 A.R.S. Rules of Crim. Proc., Rule 22.4.  After receiving the jurors' response, if any, the judge may direct that further proceedings occur as appropriate. *Id.*

It is generally true that the very object of the system is to secure unanimity by a comparison of views, and by arguments among the jurors. *Lowenfield v. Phelps*, 484 U.S. at 237.  The state has a strong interest in a capital sentencing proceeding in having the jury "express the conscience of the community on the ultimate question of life or death." *Id.*, at 238, *quoting Witherspoon v. Illinois*, 391 U.S. 510, 519, 88 S.Ct. 1770 (1968).  However, it is important not to lose sight of the fact that the difference between death and other penalties calls for a greater degree of reliability when the death sentence is imposed. *Id.*, at 239, *quoting Lockett v. Ohio*, 438 U.S. 586, 604 (1978).  Any criminal defendant and especially any capital defendant being tried by a jury is entitled to an un-coerced verdict. *Lowenfield v. Phelps*, 484 U.S. at 241.

The *Lowenfield* Court found that the instruction used in did not coerce the jury. *Id.*  However, the facts in *Lowenfield* differ from the facts here in that in

106

*Lowenfield*, the court told the jury before deliberations began that if they were unable to reach a unanimous decision that the court would impose life without probation, parole, or suspension of sentence. *Id.*, at 234. Additionally, in *Lowenfield*, the jury informed the court that it was actually deadlocked and asked to again be instructed about its responsibilities. *Id.* The Supreme Court found that the trial court's polling of the jury as well as its further instructions were not coercive. *Id.*, at 241.

In contrast, here, after five hours of deliberations over two days, the jury sent the judge a note. (ROA, pp. 421, 424.) It read: "If we are unable to reach an unanimous verdict, what is the procedure that will be followed?" (RT, 12/20/04, p. 4.)

The court met with counsel and proposed answering the question by sending in a written response. (Id., pp. 4-5.) That response read:

> Monday, December 20, 2004. It appears from your note that you are in deadlock in your deliberations. I have some suggestions to help your deliberations, not to force you to reach a verdict. I'm merely trying to be responsive to your apparent need for help. I do not wish or intend to force a verdict. Each juror has a duty to consult with one another, to deliberate with a view to reaching an agreement if it can be done without violence to individual judgment.

107

No juror should surrender his or her honest conviction as to the weight or effect of the evidence solely because of the opinion of other jurors or for the purpose of reaching a verdict.

However, you may want to identify areas of agreement and disagreement and discuss the law and the evidence as it relates to the areas of disagreement. If you still disagree, you may wish to tell the attorneys and me which issues, questions, law and facts you would like us to assist you with.

If you decide to follow this suggestion, please write down the issues, questions, law or fact of which we can possibly help. Please give your note to the bailiff. We will then discuss your note and try to help.

(Id., pp. 4-5).

Defense counsel objected, saying, "Yes, I object to it in totality. There's no duty for these folks to deliberate jointly at this stage of the process. It's a moral decision held by each individualized juror. That's in the nature of allan (sic) charge. I think it's wholly inappropriate." (Id., p. 5.) The court gave the instruction. (Id.)

The jury then deliberated another four hours on December 21, 2004. (ROA, p. 425.) They returned a death verdict on December 22, 2004, at approximately 2:25 p.m. (ROA, p. 427.) The jury asked no further questions after being given the impasse instruction. (ROA, pp. 424, 425, 427.)

108

Andriano renewed her objection in a motion for new trial. (ROA, p. 434A.)
Defense counsel argued to the court that its impasse instruction improperly coerced
the jury. (Id.) Counsel referred to a newspaper article written after trial where
jurors described their deliberations. (ROA, p. 444A; RT, 2/4/05, pp. 6-9.) He
argued that the article showed the instruction coerced the jury. (RT, 2/4/05, pp. 7-
9.) The six jurors who spoke to the journalist told him that at one point, the jury
was on the verge of a deadlock with one elderly hold out. (Id., p. 7.) The hold out
was adamantly against the death penalty. (Id.) Counsel argued that the impasse
instruction obviously coerced the hold out into voting for death. (Id.)

Counsel also contended that the instruction coerced the jurors into using
improper reasons or bases for their decisions. (Id.) The jurors improperly
considered that Andriano might one day be paroled if they did not give her death,
and improperly considered Andriano's right to an automatic appeal as a basis for
their verdict. (Id.) Counsel reiterated that the hold out had no duty to continue to
deliberate once he came to the conclusion that the death penalty was inappropriate.
(Id., p. 8.) He was under no obligation to subject himself to the rationales of the
other jurors. (Id.)

Finally, defense counsel asserted that the penalty phase of a capital trial is
distinct from the guilt phase of a non-capital trial because there is no duty for each

109

juror to deliberate towards a consensus. (Id., p. 15.) He argued that the life or death decision is an individual, moral decision that is made by each individual juror. (Id.) The trial court denied the motion. (Minute Entry, 2/7/05.)

The court violated Rule 22.4 when it gave the jury the impasse instruction without any clear evidence that the jury needed help. Standing alone, the court's premature giving of the impasse instruction does not rise to the level of reversible error. *State v. Huerstel*, 206 Ariz. at 100, 75 P.3d at 705. But the court must consider the premature giving of the instruction in its analysis of whether, under the totality of the circumstances, the trial court coerced the jury verdict. *Id.* Instead of allowing a rash response to the juror's note, the rule requires an affirmative indication from the jury it is in need of help before assistance may be offered. *State v. Huerstel*, 206 Ariz. at 99, 75 P.3d at 704.

The jury's note did not declare an impasse. The court reacted hastily by treating the jury's note as if it declared an impasse. The jurors merely asked what would happen if they were deadlocked and the court responded by instructing them to deliberate with a view to coming to a unanimous decision. The clear message to the jurors was to reach a unanimous decision. The note from the jury to the judge merely asked what procedure would be followed if they could not reach a

110

unanimous decision.  There was no affirmative indication from the jury that it was in need of help because it was at an impasse.

Giving the impasse instruction before the jury even indicated that it was at an impasse signaled to the jury that it was taking too long to reach a verdict.  *State v. Huerstel*, 206 Ariz. at 101, 75 P.3d at 706.  It was also coercive because it improperly instructed the jury regarding its duty to deliberate.   In direct contradiction to its own instructions given before deliberation, the impasse instruction told the jurors that they had a duty to consult with one another and to deliberate with a view to reaching an agreement.  *See*, Argument X.

Additionally, the instruction was coercive because it did not actually answer the jurors' question.  To answer the jurors' question, the court should have told them not to concern themselves with legal procedures in place in the event of a deadlock.  Instead, the court immediately jumped to the conclusion that the jury was deadlocked and instructed them not to make an individualized, moral judgment but to deliberate with a view to reaching an agreement.

Finally, the way the instruction coerced the jury became evident after the trial in comments made by the jury to a local journalist.  According to six jurors, at one point the jury was on the verge of a deadlock with one elderly hold out.  The

111

hold out was adamantly against the death penalty.   The trial court's premature impasse instruction pressured this hold out into voting for death.

From their statements, it appears that the instruction forced the jurors into using improper reasons or bases for their decisions.   The jurors improperly considered the alternate sentence of twenty-five years to life in reaching their verdict.   They did not want Andriano to be eligible for parole.   Moreover, the jury improperly considered the automatic appeal as a basis for their verdict. Presumably, the automatic appeal had the effect of a safety net for the jurors, thus their attempt to relieve the pressure of the court's instruction that they must deliberate with a view to reaching a unanimous verdict.   The hold out had no duty to continue to deliberate once he came to the conclusion that the death penalty was inappropriate.   Contrary to the court's instruction, he was under no obligation to subject himself to the rationales of the other jurors.

The court's premature impasse instruction violated Andriano's rights to due process, a fair trial and a reliable sentence under the Eighth Amendment by compelling the jury to reach a unanimous decision during the penalty phase of a capital trial.   This phase is the most sensitive and stressful phase of the process, where the jurors are asked to decide whether another human being shall live or die. Belief in the truth of the assumption that sentencers treat their power to determine

112

the appropriateness of death as an "awesome responsibility" has allowed this Court

to view sentencer discretion as consistent with—and indeed as indispensable to—

the Eighth Amendment's "need for reliability in the determination that death is the

appropriate punishment in a specific case." *Caldwell v. Mississippi*, 472 U.S. 320,

105 S.Ct. 2633 (1985), *quoting Woodson v. North Carolina*, 428 U.S. 280, 305, 96

S.Ct. 2978 (1976) (plurality opinion).

Because this phase of a capital trial is so crucial, it is imperative that the

court take great care when dealing with concerns expressed by jurors and the

court's response to those concerns. Arizona law specifically describes the court's

duties if the jury announces that it is deadlocked. Not only that, but in a capital

case, Arizona law provides for the selection of a second jury if the original jury is

deadlocked. *See*, A.R.S. § 13-703.01(K).

Andriano's right to due process and a fair trial required the trial court to

patiently let the jury's deliberations unfold without interference. The court

violated Andriano's right to a reliable sentence to death under the Eighth

Amendment when it jumped to the conclusion that the jury was at an impasse, and

then compounded the problem by giving an instruction not specifically tailored to

the penalty phase of a capital case. *See*, Argument X, below. By not waiting for

the jury's deliberations to run their course, and advise it was at an impasse before

113

giving an improper instruction, the court pressured and coerced the jury. Andriano's rights to a fair trial, due process and a reliable sentence of death under the Eighth Amendment were violated and reversal is required.

000003942

## ARGUMENT X

**THE TRIAL COURT INCORRECTLY INSTRUCTED THE JURY ABOUT ITS DUTY TO DELIBERATE DURING THE PENALTY PHASE. THE INSTRUCTION VIOLATED ANDRIANO'S DUE PROCESS, FAIR TRIAL AND EIGHTH AMENDMENT RIGHTS.**

*Standard of Review*

The appellate court reviews *de novo* whether the jury instructions properly state the law.  *State ex rel. Thomas v. Granville*, 211 Ariz. 468, 471, 123 P.3d 662, 665.

*Discussion*

The trial court's impasse instruction to the jury regarding their duty to deliberate during the penalty phase misstated the law.  It contradicted the instructions given by the court before the jury began to deliberate during the penalty phase.  This resulted in a violation of Andriano's due process rights, right to a jury trial and her Eighth Amendment right to a reliable verdict under the federal and state constitutions.  U.S. Const., Amend. 5, 6, 8 and 14; Ariz. Const. Art. 2, §§ 4, 15 and 24.

Pursuant to A.R.S. § 13-703(C), jurors do not have to agree unanimously that a mitigating circumstance has been proven to exist.  Each juror may consider

115

any mitigating circumstance found by that juror in determining the appropriate penalty.

As set forth in Argument VIII above, although the court instructed the jury somewhat consistently with the statute, nevertheless, the court also instructed them that they must unanimously find mitigation existed before each juror individually weighed it. After fifteen hours of deliberation, the jury sent out a note. The court's impasse instruction, given after fifteen hours of deliberation, and before the jury indicated that it was at an impasse, incorrectly instructed the jury regarding its duty to deliberate. Instead of emphasizing the instructions that were already given, the court incorrectly instructed the jury that "[e]ach juror has a duty to consult with one another, to deliberate with a view to reaching an agreement if it can be done without violence to individual judgment." Defense counsel appropriately objected by informing the court that "There is no duty for these folks to deliberate jointly *at this stage of the process*. It's a moral decision held by each individualized juror." (RT, 12/20/04, p. 5.) (Emphasis added).

The penalty phase of a capital case is different from deliberations in a non-capital felony case. The standard impasse instruction in the judge's bench book does not apply in the penalty phase of a capital case. Because the law and the previous instructions given to the jury instructed them to make individualized

116

decisions, the language of the impasse instruction used in this case is incorrect. At the outset of deliberations, the court correctly instructed them to make a reasoned, moral judgment based on individual determinations. The trial court should have repeated or referred the jury back to the instructions given before deliberations began.

The impasse instruction was incorrect because during the penalty phase, the jurors do not have a duty to consult with one another or to deliberate with a view to reaching an agreement. This is the essence of the penalty phase. The sentencing process must permit consideration of the "character and record of the individual offender and the circumstances of the particular offense as a constitutionally indispensable part of the process of inflicting the penalty of death," *Woodson v. North Carolina*, 428 U.S. 280, 304, 96 S.Ct. 2978 (1976), in order to ensure the reliability, under Eighth Amendment standards, of the determination that "death is the appropriate punishment in a specific case." *Id.*, at 305; *Lockett v. Ohio*, 438 U.S. 586, 601 (1978).

The court's incorrect instruction to the jurors that they must deliberate with a view to reaching a unanimous decision pressured the jurors to abandon their individualized moral decisions in an effort to reach a unanimous verdict. It therefore jeopardized the reliability, under Eighth Amendment standards, of the

117

determination that Andriano's sentence to death was appropriate.   The jurors'

individualized and diligent consideration of every mitigating factor without

interference from the court is essential to a reliable death sentence.

The Arizona Supreme Court recently discussed the jurors' individual duty to

evaluate mitigating evidence in *State ex rel. Thomas v. Granville*, 211 Ariz. 468,

123 P.3d 662 (2005):

> ...the mitigation must be of such quality or value that it is
> adequate, in the opinion of an individual juror, to
> persuade that juror to vote for a sentence of life in prison.
> A mitigating factor that motivates one juror to vote for a
> sentence of life in prison may be evaluated by another
> juror as not having been proved or, if proved, as not
> significant to the assessment of the appropriate penalty.
> Each juror must determine whether, in that juror's
> individual assessment, the mitigation is of such quality of
> value that it warrants leniency in a particular case.

*Id.*, at 667.

The Court clarified that the determination of whether mitigation is

sufficiently substantial to warrant leniency is not a fact question to be decided

based on the weight of the evidence, but a sentencing decision to be made by *each*

*juror* based upon the juror's assessment of the quality and significance of the

mitigating evidence that the juror has found to exist.   *Id.*   The Court stated,

"...each juror must determine whether, in that juror's *individual assessment*, the

118

mitigation is of such quality or value that it warrants leniency." *Id.* (Emphasis added).

This requirement of individual assessment during the deliberation process of the penalty phase is different and distinct from the deliberation process during a non-capital criminal trial. The impasse instruction that is appropriate for the guilt finding process of a non-capital trial is not appropriate for the unique task the jurors face during the penalty phase of a capital trial. Defense counsel properly objected to the court's instruction because it incorrectly instructed the jurors to deliberate with a view to reaching an agreement. Reversal and remand for a new penalty phase trial is warranted.

000003947

## ARGUMENT XI

**ARIZONA'S STATUTE PROVIDING FOR EXECUTION BY LETHAL INJECTION IS VAGUE BECAUSE IT FAILS TO SUFFICIENTLY SPECIFY THE MEANS TO BE USED TO ENSURE AN EXECUTION BY LETHAL INJECTION THAT IS NOT CRUEL AND UNUSUAL, THUS VIOLATING ANDRIANO'S DUE PROCESS AND EIGHTH AMENDMENT RIGHTS.**

*Standard of Review*

Imposition of an illegal sentence constitutes fundamental error. *State v. Alvarez*, 205 Ariz. 110, 116, 67 P.3d 706, 712 (App. 2003). Whether a statute is void for vagueness is reviewed *de novo*. *United States v. Woodley*, 9 F.3d 774, 778 (9th Cir. 1993).

*Discussion*

Arizona's lethal injection statute is vague. It does not detail with sufficient clarity the proper procedure for executing a person by lethal injection. It improperly leaves the procedure to the Department of Corrections. The proper procedure for lethal injection requires the appropriate type and amount of chemicals as well as qualified executioners. These requirements are beyond the expertise of the Department of Corrections. Without proper guidance and more

120

specificity regarding chemicals and procedures, Arizona's lethal injection law falls short of due process and Eighth Amendment requirements.

Vague sentencing provisions may pose constitutional questions if they do not state with sufficient clarity the consequences of violating a given criminal statute. *United States v. Batchelder*, 442 U.S. 114, 123, 99 S.Ct. 2198 (1979); *State v. Wagner*, 194 Ariz. 310, 312, 982 P.2d 270, 272 (1999). Arizona's statute reads: "The penalty of death shall be inflicted by an intravenous injection of a substance or substances in a lethal quantity sufficient to cause death, under the supervision of the state Department of Corrections." A.R.S. § 13-704(A). The statute does not specify the quantity or type of "substance" to be used in lethal injection. Nor does it specify the qualifications of the persons performing the execution. It does not meet the sufficient clarity standard set out in *Batchelder* because it designates the execution in a fashion that leaves too many variables unaddressed. Thus, problems arise during executions calling into question the constitutionality of lethal injection in Arizona.

Arizona appears to have no published administrative regulations or guidelines for proper execution by lethal injection. There is reason to believe that the Arizona Department of Corrections (ADOC) established "internal management procedures" regarding lethal injections. *LaGrand v. Lewis*, 883 F.Supp. 469, 470

121

(D.Ariz., 1995) (IMPs do not describe the exact protocol used in Arizona prisons, but do require the participation of "knowledgeable personnel" and the presence of a physician to monitor the inmate's vital signs, record the time of execution, the time of cardiac arrest and issue an unofficial time of death.)[1]  However, ADOC has published a general protocol for lethal injection:

> Inmates executed by lethal injection are brought into the injection room a few minutes prior to the appointed time of execution.  He/she is then strapped to a Gurney-type bed and two (2) sets of intravenous tubes are inserted-one (1) in each arm.  The three (3) drugs utilized include: Sodium Pentothal (a sedative intended to put the inmate to sleep), Pavulon (stops breathing and paralyzes the muscular system) and Potassium Chloride (causes the heart to stop).  Death by lethal injection is not painful and the inmate goes to sleep prior to the fatal effects of the Pavulon and Potassium Chloride.

www.azcorrections.gov/prisons/florenceHist.htm.

The protocol designates the drugs but not the quantities to be used during the lethal injection.  It does not specify who shall insert the IV tubes or administer the drugs.  It does not specify the qualifications of the persons involved in injecting the

---

[1]  The United States District Court held in *LaGrand v. Lewis* that the Internal Management Procedures promulgated by ADOC were not constitutionally infirm simply because they failed to specify in explicit detail the execution protocol. *LaGrand v. Lewis*, 883 F.Supp. 469, 470 (D.Ariz., 1995).  The 1995 opinion addressed an Eighth Amendment challenge to lethal injection and found that lethal injection comported with societal norms. *LaGrand v. Lewis*, 883 F.Supp. at 471.

122

substances into the inmate.   For these reasons, the statute does not state with sufficient clarity how a person shall be executed.

**Problems with the chemicals used to execute a person by lethal injection.**

A recent California case, *Morales v. Hickman*, 438 F.3d 926, 928 (9th Cir. 2006), describes the sequence of injections of the chemicals.   The California protocol for lethal injection which appears similar to, but more specific than, Arizona's published protocol:

> First, the condemned receives five grams of sodium thiopental (also known as sodium pentothal), which if administered properly, will render him unconscious and therefore insensible to pain.   Next, the injection team administers 100 milligrams of pancuronium bromide (also known as Pavulon), paralyzing the inmate's voluntary muscles.   Finally, 100 milligrams of potassium chloride are injected, resulting in cardiac arrest and death.

*Morales v. Hickman*, 438 F.3d at 928.

California's protocol is similar to Arizona's because the same drugs are used in the same sequence.   One problem with this protocol is that if the anesthetic is not administered properly, the inmate would experience the sensation of being suffocated as a result of the pancuronium bromide and excruciating pain from the potassium chloride activating nerve endings in the inmate's veins. *Id.*   However, if

123

the sodium pentothal is administered correctly, most persons would be unconscious within 60 seconds and would experience no pain. *Id.*, at 929.

In *Morales*, the district court had "substantial questions" about the protocol. *Id.* California's execution logs suggested there was some doubt as to whether the protocol actually functioned as intended. *Id.* The district court found that evidence tended to show that many inmates continued to breathe long after they should have ceased to do so. *Id.* The court also expressed concerns that the state's administration of its protocol could result in a situation where the inmate who was rendered unconscious by sodium thiopental might regain consciousness during the administration of pancuronium bromide or potassium chloride. *Id.*, at 927. *See also*, Satter, *Judge Stays Killer's Execution over Lethal-injection Concerns*, Arkansas Democrat Gazette, June 27, 2006.

Again addressing California's protocol, the use of pancuronium bromide only masks the intense suffering that could be experienced in combination with the other chemicals that are used and that the combination of chemicals can fail to work properly. *Cooper v. Rimmer*, 379 F.3d 1029, 1031-32 (9th Cir. 2004). The concern that substantial pain and suffering can occur when the inmate receives an inadequate dose of sodium pentothal and therefore regains consciousness and sensation during the administration of the remaining two drugs arises again in

124

*Beardslee v. Woodford*, 395 F.3d 1064, 1074 (9th Cir. 2005).   *Beardslee* also

described problems that occur while establishing an intravenous connection.   *Id.*

Some prisoners have collapsed or inaccessible veins due to drug abuse or because

the veins are too deep, too flat or below layers of fat.   *Id.*   Sometimes a "cut-down"

procedure is needed to expose the vein.    *Id.*   Further, individuals have varying

sensitivity and resistance to sodium pentothal.   *Id.*

These conditions make it essential for a state statute mandating lethal

injection as the form of execution of its death penalty to specifically state what

drugs will be used, in what order and in what proportions.   The type and amount of

chemicals as well as the administration of this lethal cocktail by trained personnel

are important factors because the execution of the death penalty must be done

within the requirements of the Eighth Amendment.    The Eighth Amendment

proscribes torture and other barbarous methods of punishment.   *Estelle v. Gamble*,

429 U.S. 97, 102, 97 S.Ct. 285 (1976).   The Eighth Amendment embodies broad

and idealistic concepts of dignity, civilized standards, humanity and decency.   *Id.*

Punishments that are incompatible with "the evolving standards of decency that

mark the progress of a maturing society" violate the Eighth Amendment.    *Id.*

When a state statute does not take the necessary steps to outline a lethal injection

125

procedure that complies with the Eighth Amendment, there is great risk that the implementation of the death penalty will violate the Eighth Amendment.

The statute must address the inherent difficulties with individual issues in performing lethal injections such as vein accessibility and chemical resistances. Arizona's statute does not have the sufficient clarity needed to impose the death penalty by lethal injection within the requirements of due process and the Eighth Amendment.

## Problems that can arise due to the use of untrained personnel.

Arizona's statute is deficient because it fails to prescribe the qualifications of the personnel who perform the lethal injection.  This is important because lethal injection requires insertion of IV tubes into the veins of the condemned.  Insertion of IV tubes is a medical procedure requiring medical expertise.  Lethal injection procedures are hampered by ethical restrictions on physicians who are prohibited from participating in executions.  *Beardslee v. Woodford*, 395 F.3d at 1074. Prisons may therefore rely on inexperienced and untrained personnel. *Id.* Reliance on unqualified personnel increases the chance of botched executions.

Inmates can experience substantial pain and suffering if they are given an inadequate dosage of sodium thiopental.  They could regain consciousness and sensation while being injected with the second and third chemicals. Denno, *When*

126

*Legislatures Delegate Death: The Troubling Paradox Between the State's Uses of Electrocution and Lethal Injection and What it Says About Us*, Ohio State Law Journal, Vol. 63:63 (2002), p. 17. Executioners can ignore each prisoner's physical characteristics like age, body weight, and health even when these factors strongly affect a person's reaction to the chemicals. *Id.* Doctors have difficulty finding suitable veins among people with diabetes, heavily pigmented skin, obesity or extreme muscularity. *Id.* For untrained executioners, the problems are even greater. *Id.* Untrained executioners may resort to inserting the catheter into a sensitive area such as the hand or groin, or in the wrong direction, so that the chemicals flow away from the heart and hinder absorption, or intramuscularly instead of intravenously. *Id.*

These problems are worth noting, since they result in botched executions. *Id.*

> In 1985, Stephen Peter Morin waited forty minutes while executioners probed both of his arms and legs to find a vein suitable for the injection; in 1988, Raymond Landry also endured forty minutes of needle probing, shortly after which the catheter popped out of his vein and spurted the chemicals toward witnesses two feet across the room; and in 1989 Stephen McCoy's violent physical reaction to the lethal injection drugs was so great that one witness fainted while others gasped.

*Id.*

Without proper statutory guidance, there is no assurance that executioners will inject sufficient quantities of the chemicals or that the chemicals are injected in the proper order. *Id.*, p. 19. There is no assurance that the executioners will give the full amount of chemicals necessary for a proper execution. *Id.*, p. 20.

Finally, Arizona's statute does not provide for public disclosure of detailed protocols of the lethal injection process or of records taken during executions. A.R.S. § 13-704 does not even require that records be maintained. It appears states can be loath to disclose this information to the inmate or to the public. *See, Beardslee v. Woodford*, 395 F.3d at 1076. Detailed information about lethal injection procedures may be considered confidential or may not even exist. Denno, *When Legislatures Delegate Death: The Troubling Paradox Between the State's Uses of Electrocution and Lethal Injection and What it Says About Us*, Ohio State Law Journal, Vol. 63:63 (2002), p. 19.

Arizona's general statute providing for lethal injection as the means for execution violates due process because it lacks sufficient clarity. It does not establish a detailed protocol of chemicals to be used in lethal injections. It does not establish standards for the training and expertise of persons involved in conducting the executions. A.R.S. § 13-704(A) is void for vagueness, violating Andriano's due process and Eighth Amendment rights, necessitating reversal.

128

# ARGUMENT XII

## ARIZONA'S DEATH PENALTY IS UNCONSTITUTIONAL.

1.      The death penalty is cruel and unusual under any circumstances and violates the Eighth and Fourteenth Amendments to the United States Constitution and Article 2, § 15 of the Arizona Constitution. *State v. Harrod*, 200 Ariz. 309, 320, 26 P.3d 492, 503 (2001).

2.      The death penalty is imposed arbitrarily and irrationally in Arizona in violation of the Eighth and Fourteenth Amendments to the United States Constitution and Article 2, § 15 of the Arizona Constitution, as well as Andriano's right to due process under the Fourteenth Amendment to the United States Constitution and Article 2, § 4 of the Arizona Constitution. *State v. Beaty*, 158 Ariz. 232, 762 P.2d 519 (1988).

3.      Application of the death penalty on the facts of this case would constitute cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments to the United States Constitution and Article 2, §§ 1, 4, and 15 of the Arizona Constitution.

4.      The prosecutor's discretion to seek the death penalty has no standards and therefore violates the Eighth and Fourteenth Amendments to the United States

000003957

Constitution and Article 2, §§ 1, 4, and 15 of the Arizona Constitution.  *State v. Sansing*, 200 Ariz. 347, 361, 26 P.3d 1118, 1132 (2001).

5.     Aggravating factors under A.R.S. § 13-703(F) are elements of capital murder and must be alleged in an indictment and screened for probable cause. Arizona's failure to require this violates a defendant's right to due process and a fair trial under the Sixth and Fourteenth Amendments to the United States Constitution and Art. 2, §§ 4 and 24 of the Arizona Constitution.  *McKaney v. Foreman*, 209 Ariz. 268, 100 P.3d 18 (2004).

6.     Application of the death penalty statutes promulgated after *Ring v. Arizona*, 536 U.S. 584 (2002) (*Ring II*), violates the prohibition against *ex post facto* laws. The changes altered the rules of evidence to permit different testimony than that required at the time of Andriano's offense.  U.S. Const. Art. 1, § 10, Clause 1, Ariz. Const. Art. 2, § 25.  *State v. Ring*, 204 Ariz. 534, 65 P.3d 915 (2003) (*Ring III*).

7.     The absence of proportionality review of death sentences by Arizona courts denies capital defendants due process of law and equal protection and amounts to cruel and unusual punishment in violation of the Fifth, Eighth, and Fourteenth Amendments to the United States Constitution and Article 2, § 15 of the Arizona Constitution.  *Harrod*, 200 Ariz. at 320, 26 P.3d at 503.  Proportionality review

130

serves to identify which cases are "above the norm" of first-degree murder thus narrowing the class of defendants who are eligible for the death penalty.

8.   Arizona's capital sentencing scheme is unconstitutional because it does not require that the State prove that the death penalty is appropriate. Failure to require this proof violates the Fifth, Eighth, and Fourteenth Amendments to the United States Constitution and Article 2, § 15 of the Arizona Constitution. *State v. Ring*, 200 Ariz. 267, 284, 25 P.3d 1139, 1156 (2001) (*Ring I*), *rev'd on other grounds by Ring II*.

9.   A.R.S. § 13-703 provides no objective standards to guide the sentencer in weighing the aggravating and mitigating circumstances and therefore violates the Eighth and Fourteenth Amendments of the United States Constitution and Article 2, § 15 of the Arizona Constitution. *State v. Pandeli*, 200 Ariz. 365, 382, 26 P.3d 1136, 1153 (2001).

10.   Arizona's death penalty scheme is unconstitutional because it does not require the sentencer to find beyond a reasonable doubt that the aggravating circumstances outweigh the accumulated mitigating circumstances, in violation of the Fifth, Eighth, and Fourteenth Amendments to the United States Constitution and Article 2, §§ 4 and 15 of the Arizona Constitution. *State v. Poyson*, 198 Ariz. 70, 83, 7 P.3d 79, 92 (2000).

000003959

11.    A.R.S. § 13-703 does not sufficiently channel the sentencer's.  Aggravating circumstances should narrow the class of persons eligible for the death penalty and reasonably justify the imposition of a harsher penalty.   The broad scope of Arizona's aggravating factors encompasses nearly anyone involved in a murder, in violation of the Eighth and Fourteenth Amendments to the United States Constitution and Article 2, § 15 of the Arizona Constitution. *Pandeli*, 200 Ariz. at 382, 26 P.3d at 1153.

12.    Execution by lethal injection is cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments to the United States Constitution and Article 2, § 15 of the Arizona Constitution. *State v. Hinchey*, 181 Ariz. 307, 315, 890 P.2d 602, 610 (1994).

13.    Arizona's death penalty unconstitutionally requires imposition of the death penalty whenever at least one aggravating circumstance and no mitigating circumstances exist, in violation of the Eighth and Fourteenth Amendments to the United States Constitution and Article 2, § 15 of the Arizona Constitution. *State v. Miles*, 186 Ariz. 10, 19, 918 P.2d 1028, 1037 (1996).

    Andriano recognizes that this Court has previously found these claims to be constitutional as evidenced by her citation to the cases previously rejecting these

132

claims.    However, Andriano requests this court re-examine these issues in determining the constitutionality of the death penalty in Arizona.

133

000003961

## CONCLUSION

The trial court denied Andriano a fair trial by erroneously permitting irrelevant "bad acts" evidence. This evidence had little if any probative value, but was highly prejudicial. The court also failed to *sua sponte* instruct the jury on all lesser-included offenses supported by the evidence.

The aggravator of "especially cruel" is vague on its face and as applied. The trial court failed to narrow the definition sufficiently to channel the jury's discretion. A proper examination of this aggravator reveals the evidence fails to support it.

The trial court improperly refused to allow Andriano to proffer the mitigating circumstances of "residual doubt" and "mercy." The court also erred by instructing the jury that it must unanimously find mitigation before each juror individually weighed the mitigation.

The court improperly gave an impasse instruction before the jury declared it was at an impasse. An impasse instruction at the penalty phase of a capital trial is improper in any event. Because penalty phase consideration is individual, an impasse instruction was unwarranted.

134

Arizona's lethal injection statute is unconstitutionally vague. It does not specify the execution protocol nor set forth the necessary qualifications of execution personnel.

Based on the foregoing, Andriano requests this court reverse her conviction and remand for a new trial.

Respectfully submitted,

MARICOPA COUNTY PUBLIC DEFENDER

By _____
BRENT E. GRAHAM
Deputy Public Defender

By _____
PEG GREEN
Deputy Public Defender
Attorneys for APPELLANT

135

## CERTIFICATE OF RULE 31.13(b) COMPLIANCE

The brief is double-spaced, uses a 14-point Times New Roman proportionately spaced typeface, and contains 28000 words, according to the processing system used to prepare this brief.

MARICOPA COUNTY PUBLIC DEFENDER

By _____
BRENT E. GRAHAM
Deputy Public Defender

By _____
PEG GREEN
Deputy Public Defender
Attorneys for APPELLANT

136

## CERTIFICATE OF SERVICE

**TWO COPIES** of Appellant's Opening Brief mailed this 17th day of July, 2006, to KENT E. CATTANI, Capital Litigation Section, Attorney General's Office, 1275 West Washington Street, Phoenix, Arizona 85007.

**ONE COPY** of Appellant's Opening Brief mailed this 17th day of July, 2006, to WENDI ELIZABETH ANDRIANO, #191593, Arizona State Prison Complex, Perryville - Lumley Unit, P.O. Box 3300, Goodyear, Arizona 85338.

MARICOPA COUNTY PUBLIC DEFENDER

By _____
    BRENT E. GRAHAM
    Deputy Public Defender
    Attorney for APPELLANT
    11 West Jefferson, Suite 5
    Phoenix, Arizona 85003
    Telephone (602) 506-0924
    State Bar Attorney No. 011868

KLBGPG071706P

137

# APPENDIX A

NWAnews.com :: Northwest Arkansas' News Source

 **Arkansas Democrat 🦅 Gazette**
NORTHWEST ARKANSAS EDITION

## Judge stays killer's execution over lethal-injection concerns

BY LINDA SATTER
Posted on Tuesday, June 27, 2006
URL: http://www.nwanews.com/adg/News/158912/

Nine days before Don Williams Davis' scheduled execution for the 1990 killing of a Rogers woman, a federal judge granted a stay on Monday, citing concerns that Arkansas' lethal injection process is cruel.

"The Court finds that Davis has shown that he is personally under a threat of irreparable harm," U. S. District Judge Susan Webber Wright said in a written order. "If Davis remains or becomes conscious during the execution, he will suffer intense pain that will never be rectified.... If a stay is granted and Davis's allegations prove true, he and others will be spared subjection to an unconstitutional execution procedure.... If, on the other hand, a stay is granted and Davis's allegations are without merit, the State can carry out Davis's execution without the specter that the [Arkansas Department of Correction's] protocol carries an unreasonable risk of inflicting unnecessary pain."

On May 4, seven days before Gov. Mike Huckabee scheduled Davis's execution date, Davis intervened in a federal lawsuit filed May 1 by another deathrow inmate, Terrick Terrell Nooner.

The lawsuit, filed by attorney Julie Brain of the federal public defender's office, contends that inmates who are put to death in Arkansas under the state's lethal injection protocol may be subjected to cruel and unusual punishment, in violation of the Eighth Amendment.

In 1992, Davis, now 43, was sentenced to death after being convicted of capital murder for shooting and killing Jane Martha Daniel, 62, while burglarizing her home Oct. 12, 1990. Her husband found her body in the basement of their home when he returned from a business trip.

Brain says that according to a board-certified anesthesiologist, Arkansas' three-pronged injection process fails to ensure that the first injection actually renders the inmate unconscious to the point that he will not experience intense pain and agony after the administration of the second and third drugs, which cause paralysis and stop the heart, respectively.

The lawsuit says that the statements of witnesses to various Arkansas executions indicate that perhaps the paralysiscausing drug merely prevents the condemned inmate from outwardly indicating the painful effects of the drugs.

NWAnews.com :: Northwest Arkansas' News Source

The second drug causes difficulty breathing, while the third drug, potassium chloride, burns intensely as it travels through the veins to the heart, according to the suit.

The plaintiffs' expert, anesthesiologist Dr. Mark J. S. Heath of New York City, contends that the state's protocol fails to comply with medical standards for inducing and maintaining anesthesia, and "creates an unacceptable risk that condemned inmates will be conscious for the duration of the execution procedure," Wright's order notes.

While the state has defended its execution procedures, noting that Arkansas uses the same chemicals as other states that have withstood constitutional challenges, Wright said she plans to hold an evidentiary hearing on the lawsuit's claims.

"Crime victims and the general public have an important interest in the timely enforcement of criminal sentences," her order said.

"However, failure to consider Davis's allegations would ignore the equally important public interest in the humane and constitutional application of the State's lethal injection statute."

She said she will try to schedule a hearing quickly, and that the execution is stayed "until further notice."

Nooner's execution date has not been scheduled.

Copyright © 2001-2006 Arkansas Democrat-Gazette, Inc. All rights reserved.
Contact: webmaster@nwanews.com

# APPENDIX B

OHIO STATE LAW JOURNAL
[Vol. 63: 63 (2002)]

# When Legislatures Delegate Death: The Troubling Paradox Behind State Uses of Electrocution and Lethal Injection and What it Says About Us

## DEBORAH W. DENNO[*]

*This article discusses the paradoxical motivations and problems behind legislative changes from one method of execution to the next, and particularly moves from electrocution to lethal injection. Legislatures and courts insist that the primary reason states switch execution methods is to ensure greater humaneness for death row inmates. History shows, however, that such moves were prompted primarily because the death penalty itself became constitutionally jeopardized due to a state's particular method. The result has been a warped legal "philosophy" of punishment, at times peculiarly aligning both friends and foes of the death penalty alike and wrongly enabling legislatures to delegate death to unknowledgeable prison personnel. This article first examines the constitutionality of electrocution, contending that a modern Eighth Amendment analysis of a range of factors, such as legislative trends toward lethal injection, indicates that electrocution is cruel and unusual. It then provides an Eighth Amendment review of lethal injection, demonstrating that injection also involves unnecessary pain, the risk of such pain, and a loss of dignity. These failures seem to be attributed to vague lethal injection statutes, uninformed prison personnel, and skeletal or inaccurate lethal injection protocols.*

*The article next presents the author's study of the most current protocols for lethal injection in all thirty-six states where anesthesia is used for a state execution. The study focuses on a number of criteria contained in many protocols that are key to applying an injection, including: the types and amounts of chemicals that are injected; the selection, training, preparation, and qualifications of the lethal injection team; the involvement of medical personnel; the presence of general witnesses and media witnesses; as well as details on how the procedure is conducted and how much of it witnesses can see. The study emphasizes that the criteria in many protocols are far too vague to assess adequately. When the protocols do offer details, such as the amount and type of chemicals that executioners inject, they oftentimes reveal striking errors and ignorance about the procedure. Such inaccurate or missing information heightens the likelihood that a lethal injection will be botched and suggests that states are not capable of executing an inmate constitutionally. Even though executions have become increasingly hidden from the public, and therefore more politically palatable, they have not become more humane, only more difficult to monitor.*

## I. INTRODUCTION

The history of executions in this country is fraught with paradox about why legislatures change from one execution method to another.[1] This article focuses on the most recent versions of this quixotic dilemma—legislative moves from electrocution to lethal injection. Evidence suggests that state patterns of rejecting and retaining execution methods are diagnostic of the status of the death penalty process because they have gauged for more than a century how this country views executions, both literally and symbolically. Michel Foucault had long observed how methods of punishment and death were vibrant, social and political symbols.[2] The symbols have remained, but they have a disturbing modern twist. The death penalty in the United States "has thus been retained more as the symbol of a particular politics than as an instrumental aspect of penal policy."[3]

Generally, pro and con debates concerning the death penalty are divisively clear. Such predictability is not the hallmark of reactions to changes in execution methods, however. Oftentimes, friends and foes of the death penalty align both sides of the execution methods debate, despite their different goals. The result is a dangerous and distorted legal "philosophy" of punishment that erodes human rights and constitutional safeguards, most particularly the Eighth Amendment's Cruel and Unusual Punishments Clause.[4]

The core of this execution methods paradox lies, not surprisingly, on whether legal actors want to reject or retain the death penalty and which stance will ensure their success. On the one hand, legislatures and courts have consistently claimed that the change from one method of execution to another provides the condemned the most humane and decent means of death possible given our knowledge of human science.[5] At the same time, however, statutory and judicial behavior contradicts this purported rationale. For example, legislatures typically change an execution method only to stay one step ahead of a looming constitutional challenge to that method because the acceptability of the death penalty process itself therefore becomes jeopardized.[6] Moreover, legislative changes to new execution methods oftentimes have not been retroactive; inmates already on death row when the change occurs must be executed by the older, more problematic method or they are still allowed to "choose" that method.[7]

In more recent years, death penalty proponents and opponents have united against lethal injection specifically. For example, some proponents feel that the older, more questionable method, typically electrocution, better represents their

[Vol. 63: 63 (2002)]

OHIO STATE LAW JOURNAL

retributive sentiments than lethal injection;[8] some opponents believe that lethal injection will increase the number and acceptability of executions because the death penalty will be more palatable.[9] Paradoxically, the two sides also have united by promoting lethal injection because it appears more humane. For this reason, some proponents feel that injection can save the death penalty from abolition[10] while some opponents believe injection can save inmates from torture.[11] Public opinion polls occupy both camps: the public says it wants the death penalty,[12] but it also wants what it believes to be the most humane method of execution.[13] Occasionally, inmates fuel the frenzy by picking for their own death the older, more controversial, execution method if they are in a state that allows such a choice—just to make a point about the barbarity of the death penalty.[14] Of course, the media is allowed, if not required, to record whether the execution process is humane; yet, courts have routinely dismissed the media's accounts of botched executions in cases challenging the constitutionality of execution methods.[15]

Despite the overwhelming use of lethal injection in this country,[16] many of those individuals who are medically qualified to carry out a proper and humane injection—doctors and nurses—simply do not want to do it.[17] The nineteen percent who do[18] confront opposition by influential medical societies.[19] Legislatures delegate death to prison personnel and executioners who are not qualified to devise a lethal injection protocol, much less carry one out.[20] In an effort to present a medically sterile aura of peace, for example, executioners inject paralyzing drugs that serve no other purpose than to still a prisoner who, in reality, may be experiencing the hideous pains of dying but may not be able to express it.[21] The consequences suggest the most duplicitous irony of all: the very method that seems most appealing in the eyes of the public is also one of the most unjustifiably cruel. In their all-consuming haste to perpetuate the death penalty, legislatures and courts promote an uncontrolled brutality that should have no place in society or the law. The U.S. stance also starkly contrasts with the approach in the international community, where the number of abolitionist countries increases each year.[22]

Part II of this article describes the current distribution of execution methods in this country as a prelude to discussing the history and modern development of Eighth Amendment standards and an execution methods jurisprudence. The Part emphasizes the United States Supreme Court's complete constitutional disregard for how inmates are executed, irrespective of a century-long pattern of horrifying, and entirely preventable, mishaps linked to all execution methods. The Part contends that an Eighth Amendment analysis of execution methods requires a simultaneous examination of the behaviors of all three institutional decision makers—legislatures, courts, and prison officials. Even though a legislature may consider a particular method to be the most humane under ideal circumstances, prison officials may, in practice, continually misapply the method. If a pattern of inappropriate application exists, the court should find that method unconstitutional, and the legislature should abandon that punishment.

Part III examines the constitutionality of electrocution using four interrelated criteria derived from the Court's modern Eighth Amendment jurisprudence. These criteria emphasize the importance of pain, the risk of pain, human dignity, and legislative trends reflecting changing execution methods.[23] The Part notes that pain is only one of a range of factors for evaluating execution methods, although evidence suggests that even a routine or "properly performed" execution can cause intense pain and a lingering death. When an analysis of electrocution considers other Eighth Amendment factors, such as legislative trends toward lethal injection, there are strong arguments suggesting that electrocution is cruel and unusual. Lastly, the Part examines case studies in three states (Georgia, Nebraska, and Ohio) that illustrate paradoxical legislative problems with electrocution.

Part IV overviews the origins of lethal injection, the types of lethal injection statutes, the lethal injection procedure, and judicial challenges to injection. Given the problems in all of these areas, the Part is a prelude to questioning legislatures' and courts' presumptions that injection meets the Eighth Amendment's standards.

Part V provides a modern Eighth Amendment analysis of lethal injection relying on the same standards and criteria used to assess electrocution, in addition to a focus on media coverage. Although legislative trends are moving exclusively in the direction of lethal injection, there still are important issues that bear on "evolving standards of decency," most particularly the American Medical Association's prohibition of physicians' participation in lethal injections. The Part concludes that there is substantial evidence that lethal injection involves an "unnecessary and wanton infliction of pain," the risk of such pain, and a loss of dignity. These problems seem to be attributed to vague lethal injection statutes, uninformed prison personnel, and missing, skeletal, or inaccurate lethal injection protocols.

Part VI discusses the author's study of the most current protocols for lethal injection in all thirty-six states where anesthesia is used for state executions. The Part first emphasizes the author's difficulty in acquiring protocols or information on incomplete protocols. Of those states with prison officials who agreed to submit a protocol to the author or who had a

OHIO STATE LAW JOURNAL                                    [Vol. 63: 63 (2002)]

protocol publicly available (such as through a web site), only a limited number of protocols offered any details on the application of the lethal injection method itself in terms of key criteria, which include the following: (1) the amount of chemicals that are injected into the inmates, since the great majority of states used the standard three-injection chemicals (sodium thiopental, pancuronium bromide, and potassium chloride); (2) the preparation by the execution team for the lethal injection process; (3) the selection, training, and qualifications of the lethal injection team; (4) the involvement of medical personnel; (5) the extent to which guidelines are explicitly enumerated, written down, and made publicly available; (6) the availability of advice if there is a problem or a mistake during the execution procedure (for example, a tube becomes clogged), or instructions on how to revive an inmate if there is a stay in the execution; (7) the allowed or required presence of general witnesses or media witnesses; as well as (8) details on how the procedure is conducted and how much of it witnesses can see. When the protocols do provide details, such as the amount of chemicals that are injected, they oftentimes reveal ignorance and errors that heighten the likelihood that an execution will be botched. Such inaccurate or missing information suggests that states are not capable of executing an inmate humanely.

Part VII analyzes the paradoxical motivations behind legislative changes in execution methods. The Part notes that the conflicting goals of death penalty proponents and opponents alike ironically can merge when the topic is a switch in execution methods, particularly the move from electrocution to lethal injection. The Part illustrates these tensions and converges in the context of the 2001 federal execution of Timothy McVeigh. McVeigh's execution, which involved the traditional three-chemical lethal injection, was either too painless, humane enough, or too torturous, depending on the political eye and medical education of the observer.

As McVeigh's death indicates, execution procedures often have served as an underlying barometer of social attitudes toward the death penalty in general. Paradoxically, the seemingly serene and medically pristine application of lethal injection satisfies both friends and foes of the death penalty because it fuels the death penalty process for those who want it to continue, but also makes the process seem more humane for those who would like it to end. Perhaps Foucault would have agreed, however, that even though executions have become increasingly hidden from the public and therefore more politically acceptable, they have not become more humane, only more difficult to monitor.

This article contends that lethal injection appears to be unconstitutional given the science and faulty application of injections. However, the protocols are so sketchy, and the procedure so covert, that legislatures and courts are able to turn a blind eye toward the consequences. Moreover, prison officials are wrongly delegated a degree of discretion for which they have no training and knowledge.

This article does not recommend that prison officials acquire an expertise for killing people. Rather, the goal is three-fold—to expose yet one more line of evidence showing the failures of the death penalty process, to provide a possible explanation for why such failures exist, and to detail the difficulties and paradoxes surrounding the attempts to resolve these problems. While death penalty proponents may believe that the increasing refinement of execution methods, irrespective of their humaneness, rightly perpetuates the death penalty, there are no legal or social standards that support this agenda. "The Court has *never* accepted the proposition that notions of deterrence or retribution might legitimately be served through the infliction of pain beyond that which is minimally necessary to terminate an individual's life."[24] Unfortunately, however, it seems that legislatures have accepted this proposition through irresponsible delegation.

## II. THE EIGHTH AMENDMENT EXECUTION JURISPRUDENCE

### A. *Current Methods of Execution and "Choice" States*

An analysis of the execution methods paradox requires some perspective on the current distribution of execution methods in this country. Table 1[25] lists the execution methods currently enacted in the thirty-eight death penalty states. Lethal injection now is the predominant method of execution; it is the sole method of execution in twenty-seven states and one of the two methods in each of the nine choice states.[26] Likewise, lethal injection executions far exceed the numbers of executions conducted by any other method.[27] In contrast, electrocution is the sole method of execution in only two states—Alabama and Nebraska—and legislatures in both states are now considering bills challenging its use.[28] Electrocution is an option in three of the choice states (Florida, South Carolina, and Virginia).[29] Hanging, the firing squad, and lethal gas are no longer the sole method of execution in any state.[30] Although each of these three methods is included as an option in two choice states, the methods are rarely used.[31]

However, this capsule of the current distribution of execution methods is not the end of the legislative story. The following sections of this article discuss the circuitous path that led up to it. The sections will focus first on electrocution because it was the most widely used execution method and challenges to it have had the strongest impact on legislative

OHIO STATE LAW JOURNAL                                [Vol. 63: 63 (2002)]

developments. Yet, this article examines most closely state uses of lethal injection in an effort to demonstrate how disturbingly errant legislative delegations of death continue to be.

## B. *The Impact of Eighth Amendment Standards*

A striking oddity of the American death penalty is the Court's complete constitutional disregard for how inmates are executed. While the Court continually recognizes the Eighth Amendment hazards associated with prison conditions,[32] it has never reviewed evidence on the constitutionality of execution conditions despite repeated, horrifying, and entirely preventable mishaps.[33] Indeed, the Court has recently agreed to hear challenges on the subject twice (involving California[34] and Florida[35]), only to drop the cases after state legislatures have changed their methods of execution.[36]

Explanations for these circumstances are baffling, yet one result seems clear: by refusing to acknowledge the problems with execution methods, the Court does not question the death penalty process itself. Moreover, states have aided this result through their systematic efforts to change to a new execution method whenever it seems likely that their current method is constitutionally vulnerable.[37] Increasing adoption of lethal injection by the great majority of death penalty states is the most visible evidence of this constitutional sidestepping.[38]

### 1. *An Historical Intertwining of Courts and Legislatures*

When the United States Constitution was being ratified, the Framers included in the Bill of Rights a prohibition of cruel and unusual punishments that was created expressly to proscribe the kinds of "torturous" and "barbarous" penalties associated with certain methods of execution.[39] To date, however, courts generally have provided only superficial and, at times, inaccurate Eighth Amendment review of the constitutionality of execution methods. Most commonly, courts dismiss the electrocution challenge entirely (often in one sentence) by relying on the century-old precedent of *In re Kemmler*.[40] In *Kemmler*, the Court held that the Eighth Amendment did not apply to the states and deferred to the New York legislature's conclusion that electrocution was not a cruel and unusual punishment under the state's Electrical Execution Act.[41] Courts have mostly relied on *Kemmler* to dismiss challenges to the constitutionality of electrocution, although the case also has been used to bolster challenges to the other four types of execution methods.[42]

*Kemmler*'s history, however, demonstrates how unique and problematic the case really is. The events surrounding *Kemmler* also suggest that political and financial forces outweighed the purported humanitarian concerns over how death row inmates were executed. For example, the New York Electrocution Act was a direct result of two major legislative events: (1) the Governor of New York's 1885 message to the legislature decrying the barbarity of hanging;[43] and (2) the Governor's appointment of a Commission to investigate "the most humane and practical method known to modern science" of carrying out executions.[44] Compelling evidence suggests that the Commission's ultimate recommendation of electrocution as the most humane method of effecting death was influenced heavily by a financial competition between Thomas Edison and George Westinghouse concerning whose current would dominate the electrical industry: Edison's DC current or Westinghouse's AC current.[45] Edison and his associates would have benefited by showing that George Westinghouse's AC current was so lethal it could kill someone. If AC current were applied in the electric chair, people would be afraid to use the current in their own homes.[46] Indeed, this Edison-Westinghouse rivalry existed within and throughout the New York Supreme Court's evidentiary hearings.[47] Yet, despite a cross-examination demonstrating Edison's ignorance of the effects of electrical currents on the human body as well as experimental results showing that electrocution did not quickly kill many of the animals tested, Edison's enormous reputation at the time outweighed revelation of his or any other expert's substantive flaws.[48] The New York legislature adopted electrocution and, with time, the medical community recommended AC current in particular.[49]

### 2. *A Lack of Proper Precedent*

For a range of reasons, *Kemmler*'s precedential value has diminished substantially over the last century. First, the *Kemmler* Court never specifically employed the Eighth Amendment's Cruel and Unusual Punishments Clause even though post-incorporation cases have continued mistakenly to cite *Kemmler* as an Eighth Amendment case.[50] Next, the *Kemmler* Court adopted an unusually stringent burden of proof standard[51] that has not been used since in death penalty cases.[52]

Moreover, a court reviewing electrocution under the Eighth Amendment would not defer to the state's legislature to the same extent as the *Kemmler* Court.[53] Most critically, because *Kemmler* was decided before anyone had been electrocuted, the Court had limited evidence in reaching its conclusion apart from the law, science, and politics of the time.[54]

Scientifically, William Kemmler's 1890 electrocution failed. The media reported in graphic detail the confusion and mistakes that surrounded the executioners' attempts to regulate the newly tried electric chair, as well as the physical violence and mutilation that Kemmler experienced.[55] Regardless, Kemmler's mishap was a blight on the memory of state legislatures. Electrocution quickly became a popular means of execution in other states, despite comparable reports of mishaps and botches.[56] It appeared that the desire to perpetuate the death penalty outweighed any humanitarian goal to switch to a new method or to stop executions entirely.[57] Consequently, the Court relied on *Kemmler* decades later in *Malloy v. South Carolina*[58] and in *Louisiana ex rel. Francis v. Resweber*[59] to fuel states' uses of electrocution in the face of new kinds of legal challenges.

## C. *The Modern Development of Eighth Amendment Standards*

Since 1962, when the Court held in *Robinson v. California*[60] that the Eighth Amendment applies to the states,[61] the Court's Eighth Amendment doctrine has emphasized an "evolving standard of decency" of cruel and unusual punishment.[62] This evolution occurs because "[t]ime . . . brings into existence new conditions and purposes. Therefore, a principle to be vital must be capable of wider application than the mischief which gave it birth."[63] For these reasons, the Court has viewed the Eighth Amendment "in a flexible and dynamic manner,"[64] recognizing that the Clause "draw[s] its meaning from the evolving standards of decency that mark the progress of a maturing society."[65] Current claims of cruel and unusual punishment must therefore be assessed "in light of contemporary human knowledge."[66]

Aspects of *Kemmler* coincide with the "evolving standards of decency" jurisprudence. Although scientific evidence does not support the *Kemmler* Court's factual assumptions regarding the acceptability of electrocution,[67] one of the *Kemmler* Court's legal conclusions remains viable: "Punishments are cruel when they involve torture or a lingering death . . . . something more than the mere extinguishment of life."[68]

In conjunction with the "evolving standards of decency" and "torture and lingering death" guideposts, some courts also have considered whether a particular state's execution methods statute is unconstitutionally vague.[69] This approach recognizes that all three levels of decision makers (legislatures, courts, and prison personnel) are simultaneously involved in execution procedures, but that legislatures could play a greater role in either guiding or curtailing prison personnel's discretion in implementing executions.

Currently, five states can still apply electrocution. Two states use electrocution as their sole method of execution[70] and three states allow the condemned a choice between electrocution and lethal injection.[71] Yet, not one of these five states provides information on the voltage or amperage of the electrical current that should be applied, nor the way that current should be administered. Three of the five states specify nothing more than "death or punishment by electrocution."[72]

Overall, the electrocution statutes alone provide insufficient information to assess whether electrocution meets Eighth Amendment standards.[73] For that reason, this article focuses more directly on the behavior of prison officials.

The Court's Eighth Amendment jurisprudence suggests four interrelated criteria for determining the constitutionality of an execution method: (1) "the unnecessary and wanton infliction of pain";[74] (2) "nothing less than"[75] human dignity (for example, "a minimization of physical violence during execution"[76]); (3) the risk of "unnecessary and wanton infliction of pain";[77] and (4) "evolving standards of decency" as measured by "objective factors to the maximum extent possible,"[78] such as legislation passed by elected representatives[79] or public attitudes.[80] However, no court has reviewed the constitutionality of electrocution or lethal injection under modern Eighth Amendment standards that consider, as a substantial part of an "evolving standards of decency" analysis, legislative trends and related information, such as public opinion polls and execution protocols. The next Part of this article briefly attempts such an analysis.

## III. A MODERN EIGHTH AMENDMENT ANALYSIS OF ELECTROCUTION

The Court's modern Eighth Amendment jurisprudence suggests that pain is only one of a range of factors used to evaluate whether an execution method constitutes cruel and unusual punishment. This Part discusses the pain and physical violence of electrocution but then focuses on other Eighth Amendment criteria, especially the strong showing of legislative trends away from electrocution. The legislative trend criterion has been the most strongly ignored by courts, but is perhaps the most critical now.

## A. *Electrocution Constitutes the "Unnecessary and Wanton Infliction of Pain"*

The Court set forth general principles gauging what can be considered proper measures of excessive pain; however, other courts have provided substantially more detail. For example, in an effort to determine if an inmate experienced "unnecessary and wanton infliction of pain" while conscious, the Ninth Circuit has supported consideration of a wide range of evidence, including scientific research and eyewitness accounts of actual executions.[81]

The most recent research and eyewitness observations suggest that many factors associated with electrocution, such as severe burning, boiling body fluids, asphyxiation, and cardiac arrest, can cause extreme pain when unconsciousness is not instantaneous.[82] Table 8[83] lists brief summaries of nineteen botched electrocutions following *Gregg v. Georgia*,[84] when the Court ended its moratorium on the death penalty.[85] These botches provide considerable evidence that prisoners can experience extensive pain and suffering even when the electrocution is routine or "properly performed."[86]

On July 8, 1999, perhaps the most notorious botched electrocution occurred when Allen Lee Davis's execution in Florida's electric chair went terribly awry—an event that garnered worldwide notice and condemnation.[87] The Florida Supreme Court's color photos of the executed Davis (posted on the Internet as part of a case appendix)[88] received so many "hits" from the several millions of interested viewers that the court's computer system crashed and was disabled for months afterwards.[89]

The photos and witnesses' testimony detailed the horror. Davis suffered deep burns on his head, face, and body, as well as a nosebleed that poured blood down his face and shirt. More troubling was evidence that Davis was partially asphyxiated before and during the electrocution from the five-inch-wide mouth strap that belted him to the chair's head-rest.[90] There also was testimony that, after guards placed the mouth strap on him, Davis's face became red and he tried to get the guards' attention by making sounds[91]—noises described by witnesses as "'screams,' 'yells,' 'moans,' 'high-pitched murmurs,' 'squeals,' or 'groans,' or like 'a scream with someone having something over their—their mouth.'"[92] Execution team members stated that they "ignored" Davis's noises, however, because those kinds of sounds "were not unusual during an electrocution."[93] In the post-execution photos taken by Department of Corrections personnel,

> a sponge placed under [Davis's] head-piece obscures the top portion of his head down to his eyebrows; because of the width of the mouth-strap, only a small portion of Davis' face is visible above the mouth-strap and below the sponge, and that portion is bright purple and scrunched tightly upwards; his eyes are clenched shut and his nose is pushed so severely upward that it is barely visible above the mouth-strap. . . .[94]

Thomas Provenzano, who was scheduled to be executed in Florida State Prison the next day, filed a petition with the Florida Supreme Court seeking a stay of execution and argued that the state's electric chair was cruel and unusual punishment. The Florida Supreme Court remanded Provenzano's case to the circuit court to conduct an evidentiary hearing on the constitutionality of Florida's electric chair. After the hearing, the circuit court held that electrocution in Florida's electric chair "is not unconstitutional."[95] In *Provenzano v. Moore*, a 4–3 *per curiam* opinion, a plurality of the Florida Supreme Court affirmed in three pages the circuit court's "finding that the electric chair is not unconstitutional."[96] Moreover, the plurality reiterated its previous holding in *Jones v. State*[97] that had rejected the claim that Florida's use of electrocution violated "evolving standards of decency."[98] The court implied there was no need to readdress the "evolving standards of decency" issue.

In *Provenzano*, the Florida Supreme Court's skeletal *per curiam* opinion virtually ignored the great bulk of the Court's Eighth Amendment jurisprudence. Therefore, the Florida Supreme Court effectively begged the question of electrocution's continued propriety under an "evolving standards of decency" test.

In granting certiorari to review the issue in *Bryan v. Moore*,[99] the Court defied history and expectations. For the first time ever, it seemed willing to consider arguments concerning whether execution by electrocution in any state—in this case

OHIO STATE LAW JOURNAL                              [Vol. 63: 63 (2002)]

Florida—violated the Eighth Amendment's Cruel and Unusual Punishments Clause.[100] The Court ultimately dismissed its certiorari grant in light of the Florida legislature's decision to switch to lethal injection.[101] Regardless, *Bryan* signifies the beginning of the final end to electrocution. *Bryan* also has fueled comparable constitutional challenges in the two remaining electrocution states, Alabama and Nebraska.[102]

Because the *Provenzano* court disregarded much of the existing Eighth Amendment jurisprudence, the *Bryan* Court's failure to provide guidance for evaluating execution methods leaves open the possibility that additional factors influenced the Court's decision to grant certiorari. As in *Provenzano*, other courts also have engaged in brief Eighth Amendment reviews that focus predominantly on the amount of pain inflicted while ignoring alternative Eighth Amendment standards.

B. *Electrocution Constitutes "Physical Violence" and Offends "Human Dignity"*

Much of the attention directed toward Allen Lee Davis's execution concerned not only the pain he might have experienced but, without question, the mutilation that occurred when he and others before him were electrocuted. Evidence of mutilation resulting from electrocution is derived from three sources: (1) post-execution autopsies, which are required in some states; (2) observations provided by experts; and (3) witnesses' descriptions of executions, some of which are detailed in Table 8.[103] The effects of electrocution on the human body include the following: charring of the skin and severe external burning, such as the possible burning away of the ear; exploding of the penis; defecation and micturition, which necessitate that the condemned person wear a diaper; drooling and vomiting; blood flowing from facial orifices; intense muscle spasms and contractions; odors resulting from the burning of the skin and the body; and extensive sweating and swelling of skin tissue.[104]

Similar to Allen Lee Davis's execution, for example, the execution of Wilbert Lee Evans in Virginia resulted in substantial bleeding; blood poured from Evans's eyes and nose, drenching his shirt. Moreover, the flames witnessed during the 1990 execution of Jesse Joseph Tafero and the 1997 execution of Pedro Medina made the public explicitly aware of how a human body could be burned and distorted during an electrocution.[105]

C. *Electrocution Constitutes the Risk of "Unnecessary and Wanton Infliction of Pain"*

When legislatures or courts validate the use of electrocution, it is implied that prison officials will perform executions properly and that equipment will not malfunction. A focus on electrocutions in all states and over time, however, reveals the potential for prison personnel to contribute to a risk of unnecessary pain.

In 1990, for example, Jesse Tafero's botched electrocution in Florida suggested there was a substantial likelihood the state's execution procedure could result in severe pain and prolonged agony. Subsequently, a pattern of consecutive malfunctions has been established with the botched Florida electrocutions of Pedro Medina and, now, Allen Lee Davis. Tafero's and Medina's executions shared similar problems (most particularly difficulties with the headset sponge), that created the flames, smoke, smell, and burning in both executions.[106] Notably, both of their executions closely resembled William Kemmler's over a century ago.[107] The new set of problems accompanying Davis's execution suggests that a continuing pattern of botches is highly foreseeable. Indeed, a pattern of consecutive botching also occurred in Virginia even after the state rewired the electric chair due to prior botching. These problems prompted Virginia to allow inmates a choice between electrocution and lethal injection.[108]

D. *Electrocution Contravenes "Evolving Standards of Decency"*

Legislative trends are an established way to measure "evolving standards of decency."[109] Yet, courts, such as *Provenzano*,[110] have ignored such trends when they have evaluated the constitutionality of electrocution. A thorough assessment of this aspect of the Court's Eighth Amendment jurisprudence should consider legislative changes in execution methods in all states over the course of the twentieth century, starting with the New York legislature's 1888 selection of electrocution.

1. *The Marked Legislative Trends Away from Electrocution*

Legislative trends from 1888–2001 show three general patterns in the use of the five available execution methods in the United States. First, most state legislatures presumably change from one method of execution to another or to a "choice" between a state's old method of execution and lethal injection for humanitarian reasons, most typically because there have

OHIO STATE LAW JOURNAL                                      [Vol. 63: 63 (2002)]

been problems with the method. However, other factors, such as cost, also are considered. Second, legislatures demonstrate a fairly consistent pattern of movement from one method of execution to another, suggesting that states take notice of the methods used, and the difficulties encountered, by other states. Third, since 1977, when lethal injection was first introduced, no state has changed to, or included as an additional "choice," any other method of execution but lethal injection. In general, states' changes in execution methods have occurred in the following order: from hanging to electrocution to lethal gas to lethal injection. The firing squad has been used sporadically in only a few states.[111]

In 1853, hanging, the "nearly universal form of execution," was used in forty-eight states and territories.[112] Nearly four decades later, however, concerns over the barbarity of hanging and the subsequent advent of electrocution prompted states to change their method of execution from hanging to electrocution.[113] Even though the first electrocutions were grotesquely botched,[114] by 1913, a total of thirteen states had changed to electrocution as a result of "a well-grounded belief that electrocution is less painful and more humane than hanging."[115] By 1949, twenty-six states had changed to electrocution, the largest number of states that had ever used electrocution at the same time.[116] Since 1949, however, no state legislature has selected electrocution as its method of execution.[117]

It appears that states stopped adopting electrocution initially because of the greater appeal of lethal gas. In 1921, Nevada was the first state to switch from its prior methods (hanging and shooting) to lethal gas in accordance with the state's new Humane Death Bill.[118] By 1955, eleven states were using lethal gas and twenty-two states were using electrocution. By 1973, twelve states were using lethal gas and twenty states were using electrocution. Since 1973, however, no state has selected lethal gas as a method of execution.[119]

With each new lethal gas statute came controversy and constitutional challenges, both before and after the Court's moratorium on capital punishment in *Furman v. Georgia*.[120] By 1994, there was a "national consensus" concluding that lethal gas was not an acceptable method of execution because of the cruelty involved.[121] Lethal gas continues to be available for use for executions in two states (California and Missouri),[122] and it continues to be controversial.

Recent research indicates that there is an even more striking national consensus rejecting electrocution. Since 1973, twelve states have abandoned lethal gas as their exclusive method of execution.[123] By contrast, since 1949, twenty-one states have abandoned electrocution as either an exclusive or choice method of execution.[124] Moreover, nine (or nearly one-half) of these states dropped electrocution in the last six years.[125]

Recent trends also suggest that state legislatures may have reached a "sufficient" degree of national consensus in rejecting both lethal gas and electrocution as execution methods. Although the Court has never specified how much of a consensus is considered "sufficient," it has rendered punishments unconstitutional with far less consensus than that shown for lethal gas or electrocution. In *Enmund v. Florida*,[126] for example, the Court held the death penalty unconstitutional for some kinds of felony murder, explaining that of the thirty-six death penalty jurisdictions, "only" eight, "a small minority," allowed capital punishment for such an offense.[127] Furthermore, even if the Court considered, along with these eight states, an additional nine jurisdictions that allowed the death penalty "for an unintended felony murder if . . . aggravating circumstances . . . outweigh[ed] mitigating circumstances," the Court emphasized that still "*only about a third* of American jurisdictions" would allow a defendant to be sentenced to death for such offenses.[128] The Court noted that even though this trend was not "'wholly unanimous among state legislatures' . . . it nevertheless weighs on the side of rejecting capital punishment for the crime at issue."[129] Lastly, in those cases where the Court has rejected Eighth Amendment challenges to a particular punishment, there have been far more states employing that particular punishment than the number of states employing electrocution.[130]

## 2. The Overwhelming Use of Lethal Injections for Executions

Over time, lethal injection has become the overwhelmingly dominant method of execution.[131] Of those inmates executed by either electrocution or lethal injection between 1978 and 2001, 80% were executed by lethal injection and 20% were executed by electrocution.[132] As the total number of executions from these two methods increased over time (from 1 execution in 1979 to nearly 100 executions in 1999), the percentage of electrocution executions declined, albeit unevenly.[133] The percentage of electrocution executions dropped fairly steadily from 1981 to 1986 (from 100% to 39%), then increased

OHIO STATE LAW JOURNAL                                    [Vol. 63: 63 (2002)]

briefly from 1987 to 1991 (up to 50%), then declined steadily thereafter.[134] From 1997 to 2000, electrocutions constituted less than 7% of all executions.[135] In 2001, there were no electrocutions—an unprecedented statistic.[136] Already a rarity, it is likely that electrocution will soon be extinct.

### 3. *Other Evolving Standards of Decency Factors*

There are other issues that bear on evolving standards of decency. For example, no country other than the United States uses electrocution.[137] Of the four electrocution states in this country that used electrocution with the most frequency from 1976–2000 (Alabama, Florida, Georgia, and Nebraska), Florida imposed the most electrocution executions. Since 1976, more than half of the electrocutions in this country—and thus in the world—have taken place in Florida.[138]

Electrocution also is not favored as a method of execution in recent public opinion polls. Polls show that lethal injection is preferred by most, if not the great majority, of respondents.[139] Floridians as a group demonstrated majority support for lethal injection after Davis's execution.[140]

The Florida Corrections Commission, the body responsible for overseeing Florida's electric chair, also had recommended that Florida change to lethal injection.[141] The Commission's state-wide survey of execution methods revealed that "numerous states had recently changed to lethal injection from electrocution because it was considered to be a 'more humane method of execution.'"[142] Lastly, the Humane Society of the United States and the American Veterinarian Medical Association consider electrocution a wholly unacceptable method of euthanasia for animals.[143]

In *Provenzano*,[144] the Florida Supreme Court failed to address these critical evolving standards of decency factors. Clearly, a modern Eighth Amendment analysis of electrocution reveals the court's unjustified conclusion that electrocution is constitutional. Most perplexing was the *Provenzano* court's failure to consider legislative trends away from electrocution towards lethal injection.

### E. *Ongoing Legislative Problems with Electrocution: Three Current Case Studies*

One of the most disturbing facets of electrocution is the extent to which it has remained a constitutional, legislative, and penal concern. Three cases in three different states illustrate the problems accompanying this persistence: (1) until 2001, the continuing application of electrocution for Georgia death row inmates sentenced before Georgia's enactment of lethal injection (in contrast to Louisiana, which has a similar statute, but declines to use electrocution); (2) the confusion in 2001 accompanying the extent to which the electrocution protocol in Nebraska corresponds with legislative intent; and (3) the difficulties that arise when an inmate unexpectedly decides to choose electrocution when lethal injection is the favored and more predictable choice—a problem Ohio confronted in 2001.

### 1. *Georgia (and Louisiana)*

In 2000, the Georgia legislature determined that all individuals sentenced to death for capital crimes committed on or after May 1, 2000, should be executed by lethal injection, while all condemned individuals sentenced to death before that date should be executed by electrocution. Previously, electrocution was the only execution method available in Georgia.[145] If this law had stayed in effect, 129 death row men and one woman in Georgia would have been electrocuted.[146]

The Georgia legislature's motivation for devising such a stringent, choice-less bifurcation between execution methods is not unique; other states have recommended this peculiar strategy, eventually switching to a lethal injection-only approach due to the onslaught of litigation over the controversial prior method.[147] The fact that Georgia appeared not to have incorporated the experiences of other states despite the decades-long attacks on electrocution suggests that old methods die hard, along with the punitive philosophies that accompany them. Until *Dawson v. State*[148] was decided in 2001, no appellate court had found electrocution unconstitutional,[149] although lower courts in Georgia[150] and Nebraska[151] had.

In *Dawson*, the Georgia Supreme Court ruled, 4–3, that the state could no longer use electrocution, explaining that the method's "specter of excruciating pain and its certainty of cooked brains" constitutes cruel and unusual punishment.[152] *Dawson* emphasized that the Georgia legislature had, since 2000, been moving in this direction.[153] Similarly, while the *Dawson* court focused on the "purposeless physical violence and needless mutilation" that characterize electrocution, the court

also stressed that "many states" had moved to lethal injection, "clearly" an "important factor" in determining the constitutionality of "an older method."[154]

Georgia's change spotlights the different kinds of relationships that exist between legislatures and prison personnel when the legislature has mandated a controversial execution method. For example, Louisiana's execution method statute is comparable to Georgia's.[155] Louisiana's inmates are to be executed by electrocution if they were sentenced to death before September 15, 1991, and they are to be executed by lethal injection if they were sentenced to death after that date.[156] However, in practice, Louisiana's prison officials have used only lethal injection since the change in statute because they dismantled the electric chair in 1991. Essentially, all judges issue death warrants specifying that lethal injection will be used.[157] No one has ever questioned the fact that Louisiana prison officials do not follow the law,[158] most likely because following it would create so many needless problems.

### 2. Nebraska

Two court rulings in 2000 and 2001, respectively, determined that Nebraska's four-jolt method of electrocution violates state law.[159] The first ruling found electrocution to be both illegal and unconstitutional, explaining that the gaps between jolts allow "the potential for the inmate to regain consciousness and experience substantial and unnecessary pain."[160] The second ruling upheld the constitutionality of electrocution and the 1980s protocol created for its use; however, the court concluded that the state statute requires that inmates be executed with one continuous jolt and not four separate jolts.[161] As the court explained, "[t]he state 'has the responsibility for following a protocol that will be consistent with the statute. . . . This is not the case at the present time.'"[162] On the other hand, the statute is read differently by lawyers with the Nebraska Attorney General's Office and the Director of Nebraska's Department of Correctional Services; they state that there is nothing in the statute's language suggesting one continuous current.[163]

While both sides continue to wrangle, one issue is clear: the Nebraska legislature's delegation of statutory interpretation to prison officials has caused a crisis over how executions should be carried out. Moreover, by revealing that prison officials may not be operating according to legislative intent, it seems likely that prisoners' Eighth Amendment rights might have been violated. In light of Nebraska's experience with electrocution, the prospect that the Nebraska legislature may ultimately adopt lethal injection[164] indicates that comparable kinds of problems may occur with that method.

### 3. Ohio

Ohio presents yet another variation on a theme in terms of the statutory problems associated with electrocution. Until November 2001, under the Ohio statute, condemned inmates were electrocuted unless they affirmatively chose lethal injection.[165] Unlike Georgia's statute, this bifurcation provided all death row inmates the same punishment, and all could choose lethal injection. Unpredictably, however, John Byrd, Jr. wanted to be executed by electrocution.[166] According to Ohio's prison director, who was concerned about the reliability of the state's 104-year-old electric chair, such a choice could have created great emotional stress and technical difficulty, and his staff was not prepared.[167] As a result, in July 2001, prison officials at Ohio's Department of Rehabilitation and Correction asked the Ohio Legislature to abolish the use of electrocution because they were concerned that the electric chair may malfunction.[168] With the support of the state governor, the Ohio legislature enacted an emergency bill eliminating electrocution.[169]

Such an ironic initiative contradicts the traditional sides that such parties take when the issue concerns the constitutionality of an execution method. The inmate, who does not want to be executed, is requesting the presumably harsher method to make a statement about the cruelty of electrocution and capital punishment. Prison officials clip that gesture entirely and the legislature reinforces them with a change in the statute. In the meantime, legislative change occurs because prison officials concede that they could not properly carry out the punishment that the inmate wanted and the legislature originally prescribed.

Ohio's situation, which is not unique,[170] highlights the paradoxical dilemma when friends and foes of the death penalty align on both sides of the execution method debate, albeit with different purposes in mind. Two state senators, both death penalty proponents, stood on either side of Ohio's debate: one senator argued to rid of electrocution in order to keep the death penalty, the other argued to keep the chair to show Ohio's law and order bent.[171] Others engaged in the debate—including a

[Vol. 63: 63 (2002)]

non-legislator and opponent of the death penalty—wanted to keep electrocution because lethal injection "sanitizes" and "sugarcoats" killings; "putting someone to death (in any way) is cruel and unusual punishment."[172]

The incongruity of this dilemma is all the more pronounced when lethal injection is investigated more thoroughly. The next Part contends that lethal injection has just as many, if not more, medical and constitutional problems as electrocution.

## IV. QUESTIONING LETHAL INJECTION AS A LEGITIMATE ALTERNATIVE FOR EXECUTIONS

This Part questions legislatures' and courts' presumptions that lethal injection is a constitutional method of execution. Evidence suggests that lethal injection is following a similar constitutional path taken by other execution methods that were initially viewed as humane, but later rendered problematic when there was insurmountable evidence that executions were being botched. The Court's continuing avoidance of the execution method debacle unfortunately ensures that legislatures and courts will confront the problems with lethal injection only after countless numbers of individuals have been executed inhumanely.

This Part first examines lethal injection in the context of the applicable Eighth Amendment standards. It then analyzes some of the problems associated with lethal injection as well as the dubious and limited rationales that courts have offered for finding the method constitutional.

### A. *The Beginning of Lethal Injection*

Lethal injection was considered a potential method of execution as early as 1888.[173] The procedure was briskly rejected, however, predominantly because of the medical profession's belief that the public would begin to link the practice of medicine with death.[174] In 1953, the renowned British Royal Commission on Capital Punishment questioned both the humaneness and practicality of lethal injection because of the problems that could result from the peculiar physical attributes of many inmates (for example, abnormal veins) or the medical ignorance of the executioners.[175] Regardless, the United States commenced a renewed interest in lethal injection in 1976 after *Gregg v. Georgia,*[176] when the country again confronted the dilemma of executing people.[177]

There is a range of opinion concerning the source of the country's interest in lethal injection. Some scholars insist that legislatures at the time seemed to show no preference for a particular execution method.[178] However, others claim that lethal injection became popular along with the conservative shift in the nation's politics.[179] In 1973, for example, then-Governor Ronald Reagan of California recommended the idea of lethal injection for executions when he compared it to animal euthanasia, specifically, the ease of putting a horse to sleep.[180] Still others contend that legislatures favored lethal injection because it appeared more humane and palatable relative to other methods,[181] and it was cheaper.[182]

Irrespective of the origins of lethal injection, legislatures embraced the method quickly. In May 1977, Oklahoma became the first state to adopt lethal injection and by 1981, five states had adopted it.[183] However, the procedure was not even used until 1982, in the botched lethal injection of Charles Brooks, Jr.[184] The substantial numbers of other botched lethal injections, particularly at the start,[185] did not deter other states from adopting the method with relative confidence and speed.[186]

### B. *Types of Lethal Injection Statutes*

There are six general and overlapping types of lethal injection statutes.[187] These types illustrate the complex and peculiar ways in which states have introduced lethal injection as a new method of execution, particularly within the choice states, and how perpetuation of the death penalty appears to be a primary goal. Most striking are the distinctions between states that authorize either retroactive or nonretroactive applications of a new method of execution, depending on whether the amending statute was enacted after the prisoners were sentenced or convicted ("pre-enactment prisoners") or before they were sentenced or convicted ("post-enactment prisoners").

Table 10 shows that twenty-seven states provide no alternative method of execution for prisoners sentenced or convicted after the date the lethal injection statute was enacted or became effective (Type 1).[188] Six states allow the prisoner to choose between lethal injection and another execution method (Type 2);[189] three states allow someone other than the prisoner (such as the commissioner of corrections) to choose the method of execution (Type 3).[190] Type 3 statutes appear to be partly a

OHIO STATE LAW JOURNAL                                    [Vol. 63: 63 (2002)]

function of practicality, in case one method is difficult or unavailable. In turn, five states allow choices between lethal injection and another execution method only to pre-enactment prisoners who were sentenced or convicted prior to the statute's enactment (Type 4).[191]

Table 10's choice statutes (Types 2, 3, and 4)[192] illustrate legislatures' simultaneous efforts to change and retain methods of execution. Yet, such cross purposes result in nonsensical provisions that have no apparent penological or social policy justification. For example, states can allow either the prior method or the new, and purportedly more humane, method be the default if an inmate refuses to make a choice between methods. Most inmates decline, for whatever reason, to choose a particular method.[193] Consequently, they die by the least humane method in those states that have the least humane method as the default. This least humane default dilemma prompted the California litigation that the Court was going to address before the California legislature changed the default to lethal injection.[194] South Carolina's choice statute is even more perplexing. Both pre-enactment and post-enactment prisoners can choose their method of execution, although the no choice default for the former is electrocution whereas the no choice default for the latter is lethal injection.[195] Predictably, electrocution is the constitutional substitute if lethal injection is rendered unconstitutional.[196]

The one Type 5 statute for Louisiana is unusual because it does not allow any choice. Rather, it mandates that a pre-enactment prisoner use the method of execution that existed when the prisoner was sentenced to death—electrocution—although post-enactment prisoners receive lethal injection.[197] In *Malloy v. South Carolina,*[198] the Court held that it was not a violation of the Ex Post Facto Clause when a new, purportedly more humane, method of execution was retroactive.[199] Yet, Louisiana has a statute where the new, purportedly more humane, method is not retroactive.[200] What is unique about Louisiana, however, is that the state's statutory "appearances" are deceiving about what happens in practice. Ever since September 15, 1991, when lethal injection was first made available, Louisiana officials have executed all inmates by injection, regardless of what the statute says.[201] Perhaps those officials could foresee that at some point, the use of electrocution would become a source of litigation, similar to what Georgia experienced. Until 2001, Georgia officials executed pre-enactment inmates by electrocution under a statute nearly identical in language to Louisiana's.[202]

The legislative concern for ensuring the continuation of the death penalty process through execution methods, however, is perhaps most clearly illustrated by the constitutional substitute provisions of the ten states listed in the last category of Table 10 (Type 6).[203] These states have one or more constitutional substitutes in case lethal injection is deemed unconstitutional or invalid. In Oklahoma, for example, if lethal injection is rendered unconstitutional, the death sentence will be carried out by electrocution instead; yet, if both lethal injection and electrocution are rendered unconstitutional, the death sentence "shall be carried out by firing squad."[204] Presumably, the three execution methods are ordered in terms of their relative humaneness; but currently, both constitutional substitutes (electrocution and firing squad) are considered more inhumane or problematic than lethal injection. It appears that the state's interest is not with seeking the method that avoids unnecessary pain, but rather the constancy of the death penalty process itself, with a substitute initially considered to be second or third in a rank ordering of humaneness. States seem to have such a replacement to avoid any possible hiatus that may arise in applying the death penalty should lethal injection prove to be constitutionally troublesome.

*C. The Lethal Injection Procedure*

The constitutional issues concerning lethal injection have as much to do with the substance of the chemicals, as with how they are administered. In line with the paradoxical tale of execution methods generally, the motivation behind the origins of the specific lethal injection procedure that most states follow in this country was linked with improving the humaneness and cost of executions, as well as the palatability of the death penalty. Moreover, it appears that a prominent doctor—Stanley Deutsch—may have had far more influence than he realized.

In 1977, the now-deceased Senator Bill Dawson of Oklahoma asked Dr. Deutsch, then head of Oklahoma Medical School's Anesthesiology Department, to recommend a method for executing prisoners through the administration of drugs intravenously.[205] Senator Dawson was concerned that it would cost the state $62,000 to fix its electric chair and $300,000 to build a gas chamber, and he had been informed that a lethal injection procedure would be substantially cheaper.[206] In his letter of reply to Dawson,[207] Deutsch advised that lethal injection was "[w]ithout question . . . extremely humane in comparison to" electrocution and lethal gas.[208] As Deutsch explained in a news article, "[f]rom what I had heard of electrocution, . . . it was pretty grotesque, with eyeballs popping out of their sockets and smoke coming out of the head helmet.

[Vol. 63: 63 (2002)]

OHIO STATE LAW JOURNAL

It seemed to me a lethal injection would be much more humane. I thought it was a pretty good idea, myself."[209]

The state adopted lethal injection based in part on Deutsch's recommendation that anesthetizing would be a "rapid[ly] pleasant way of producing unconsciousness" and ensuing death.[210] Indeed, Oklahoma's lethal injection statute, which is representative of other state statutes,[211] repeats nearly verbatim the terminology that Deutsch used in his letter to describe to Dawson the two main types of drugs that Deutsch recommended. According to Deutsch's letter, unconsciousness and then *"death"* would be produced by "[t]he *administration . . . intravenously . . . in* [specified] *quantities of . . . an ultra short acting barbiturate"* (for example, sodium thiopental) in *"combination"* with a "nueormuscular [sic] blocking drug[]" (for example, pancuronium bromide) to create a "long duration of *paralysis*."[212] According to Oklahoma's statute, "[t]he punishment of death must be inflicted by continuous, *intravenous administration* of a lethal *quantity of an ultrashort-acting barbiturate* in *combination* with a chemical *paralytic* agent until *death* is pronounced by a licensed physician according to accepted standards of medical practice."[213] Deutsch's recommendations of specific drugs also are incorporated in all of the latest lethal injection protocols in those states that identify the chemicals that executioners use.[214]

The typical lethal injection consists of three chemicals,[215] the first two of which were suggested by Deutsch;[216] the origins of the use of the third chemical are not clear.[217] The first chemical is a nonlethal dose of sodium thiopental, commonly known by its trademark name, Sodium Pentothal, a frequently used anesthetic for surgery.[218] This article uses the generic name sodium thiopental, unless it is referring to a particular state's protocol, in order to avoid partisanship toward companies that, theoretically, are competing in the same market.[219] Like the Oklahoma statute, other lethal injection statutes refer generally to an "ultrashort-acting barbiturate" or an "ultrafast-acting barbiturate,"[220] which appropriately characterize the brevity of sodium thiopental's effect.[221] Sodium thiopental is supposed to induce a deep sleep and the loss of consciousness, usually in about twenty seconds.[222]

The second chemical is pancuronium bromide, also known as Pavulon, a total muscle relaxant. Given in sufficient dosages, pancuronium bromide stops breathing by paralyzing the diaphragm and lungs.[223] Again, this article refers to the generic name, pancuronium bromide.

The third and last chemical, potassium chloride—which physicians most frequently use during heart bypass surgery—induces cardiac arrest and stops the inmate's heartbeat permanently.[224] Many states now use a saline solution[225] to flush the intravenous line before and after each chemical is administered so that the chemicals do not clog the tubing.[226]

It is not clear how or why this chemical combination has persisted, although increasingly, the chemical manufacturers have come under attack for their roles in lethal injections.[227] Sodium thiopental—an "ultra-short" acting drug as Deutsch and the statutes specify[228]—typically wears off very quickly; other similar drugs, such as pentobarbital, endure far longer.[229] The "fast acting" aspect of sodium thiopental can have horrifying effects if the inmate awakens while being administered the other two drugs.[230] Deutsch recommended a dosage that appears to some doctors sufficient to keep even a drug-resistant individual asleep for an adequately long time period.[231] However, most states do not specify the dosage that the executioners use,[232] so that it is unclear whether the amounts are proper. Most importantly, it is totally unnecessary for the barbiturate to be "fast acting" given the availability of longer acting chemicals.[233]

The third drug, potassium chloride, may have been recommended initially for use in lethal injections by two possible sources: (1) advising doctors, some of whom were involved in developing state execution protocols (such as New Jersey's), and/or (2) Fred Leuchter, the highly controversial and later-discredited creator of much, if not most, of the execution equipment in this country,[234] including lethal injection machines.[235] According to Leuchter, the New Jersey doctors agreed with his recommendation that potassium chloride be used as the third chemical in the machine Leuchter created for New Jersey's executions.[236] Because the medical literature did not have articles specifying what dosages of the drugs were adequate to be lethal, Leuchter relied on the information that was available for pigs and estimated accordingly.[237]

When Deutsch recommended to Dawson two chemicals rather than three,[238] the second chemical, pancuronium bromide (or a chemical similar to it),[239] was intended to cause death. However, when potassium chloride is used as an additional third chemical, pancuronium bromide serves no real purpose other than to keep the inmate still while potassium chloride kills.[240] Therefore, pancuronium bromide creates the serene appearance that witnesses often describe of a lethal injection execution,

OHIO STATE LAW JOURNAL                                    [Vol. 63: 63 (2002)]

because the inmate is totally paralyzed.[241] The calm scene that this paralysis ensures, despite the fact that the inmate may be conscious and suffering, is only one of the many controversial aspects of this drug combination.[242]

As the following sections discuss, from the start, lethal injection was fraught with constitutional challenges that courts regularly have dismissed, despite continuing evidence of egregious mishaps. Such challenges have focused on issues suggesting that lethal injection is cruel and unusual, including, the types of drugs used and their effects, the vagueness of the lethal injection statutes, and the substantial amount of discretion that prison officials have in administering injections.

## D. *Judicial Challenges to Lethal Injection*

Judicial dismissals of lethal injection challenges have resembled those cases dismissing electrocution challenges. However, the variations between the two types of execution methods have introduced some different legal issues as well. Of particular interest in this article are challenges concerning the extent to which a state can delegate to prison personnel the discretion and power to punish, a problem of greater relevance in lethal injection cases. In *Ex parte Granviel*,[243] for example, the Texas Court of Criminal Appeals rejected the first Eighth Amendment challenge to lethal injection by emphasizing that courts, such as *In re Kemmler*,[244] had upheld the constitutionality of other execution methods and that injection complied with "evolving standards of decency."[245] But, the *Granviel* court also countered a wide range of the appellant's additional claims, arguments that would be echoed by other courts over the next quarter century: (1) any possible pain associated with injection-related complications "could be characterized as a possible discomfort or suffering necessary to a method of extinguishing life humanely";[246] (2) the Texas statute's failure to specify the substances to be used in the injection was no less clear than those statutes pertaining to other execution methods, such as electrocution, which no court had declared unconstitutionally vague;[247] and (3) the fact that the Director of the Department of Corrections determined the lethal substance and procedure to be used did not constitute an improper delegation of the state's legislative power.[248]

Using *Granviel* as precedent, courts successfully thwarted two other lethal injection challenges[249] prior to the Court's consideration of a different line of argument in *Heckler v. Chaney*.[250] In *Heckler*, death row inmates claimed that the drugs used for lethal injection had been approved by the Food and Drug Administration (FDA) only for the medical purposes stated on their labels[251]—for example, animal euthanasia[252]—and not for the executions of humans.[253] Given this designation and the likelihood that the drugs would be applied by unknowledgeable prison personnel, "it was also likely that the drugs would not induce the quick and painless death intended."[254] Such practices constituted the "unapproved use of an approved drug" and therefore a violation of the prohibition against "misbranding" under the Federal Food, Drug, and Cosmetic Act.[255] Regardless, the Court steadfastly held that the FDA's discretionary authority in refusing to initiate proceedings according to the inmates' demands was not subject to judicial review.[256] One year later, the Fifth Circuit Court of Appeals relied on *Heckler* in *Woolls v. McCotter*[257] to deny Randy Woolls's claim that Congress failed to provide judicial review for the FDA's refusal to evaluate the use of sodium thiopental as a lethal drug; the court emphasized that the use of such a drug did not constitute cruel and unusual punishment.[258] Six days after his challenge, Woolls's execution was botched.[259]

After *Woolls*, courts have rejected a range of additional challenges to lethal injection,[260] including two group actions by inmates. In the first, a class action, Illinois death row inmates contended, among other things, that the State's use of Leuchter's lethal injection machine was unconstitutional because of Leuchter's lack of qualifications and because prison officials administered the wrong drugs.[261] Similar arguments condemning lethal injection were raised and dismissed prior to the execution of John W. Gacy.[262] Yet, Gacy's execution was notoriously botched.[263] In a second group suit, thirty-six Missouri death row inmates claimed that lethal injection is unconstitutional because of the nature and length of Emmitt Foster's 1995 execution.[264] Although a judge granted an order halting all executions in Missouri, the Eighth Circuit Court of Appeals overturned it.[265]

In *Sims v. State*[266] and a number of preceding cases,[267] the litigation focused again on many of the issues raised in *Ex parte Granviel*.[268] The Supreme Court of Florida discounted Sims's constitutional challenge to lethal injection based upon a range of arguments.

First, Sims was not denied a full and fair evidentiary hearing because of "the State's failure to disclose the execution procedures or the chemicals to be used in administering the lethal injection."[269] According to the court, Sims received a copy

OHIO STATE LAW JOURNAL                                    [Vol. 63: 63 (2002)]

of the Florida Department of Corrections' "Execution Day Procedures," which disclosed the chemicals to be used during the execution, and the State presented at the evidentiary hearing three Department of Corrections (DOC) witnesses who gave more specific information about the lethal injection chemicals.[270]

Second, the Florida DOC's execution protocol provided adequate details and procedures for administering lethal injection.[271] The trial court was correct in ruling that lethal injection was neither cruel nor unusual and that "the Department of Corrections is both capable and prepared to carry out executions in a manner consistent with evolving standards of decency."[272] According to the *Sims* court, a comparable kind of challenge to lethal injection was "raised and rejected" by the United States District Court in *LaGrand v. Lewis*,[273] in which the court held that "the written procedures are not constitutionally infirm simply because they fail to specify in explicit detail the execution protocol."[274] Moreover, in *Sims*, the expert testimony offered by a sociologist documenting lethal injection botches "came from newspaper accounts of the execution and did not come from first-hand, eyewitness accounts or formal findings following a hearing or investigation into the matter."[275] The *Sims* court also discounted the expert testimony from a neuropharmacologist who provided examples of how a lethal injection execution could be botched if the chemicals were not injected properly or if prison personnel were not fit to administer them.[276] According to the court, the expert "admitted that lethal injection is a simple procedure and that if the lethal substances to be used by DOC are administered in the proper dosages and in the proper sequence at the appropriate time, they will 'bring about the desired effect.'"[277] The expert also stated that "at high dosages of the lethal substances intended [sic] be used by the DOC, death would certainly result quickly and without sensation."[278] As the *Sims* court concluded, "[o]ther than demonstrating a failure to reduce every aspect of the procedure to writing, Sims has not shown that the DOC procedures will subject him to pain or degradation if carried out as planned."[279]

Third, Florida's lethal injection statute does not violate the Separation of Powers Clause in the Florida Constitution due to the improper delegation of legislative power to an administrative agency.[280] Relying on *Granviel*,[281] the *Sims* court explained that the lethal injection statute "clearly defines the punishment to be imposed (i.e., death)" and "makes clear that the legislative purpose is to impose death."[282] While the statute allows the DOC to determine the methodology and chemicals to be used, the court thought that delegation was more preferable than relying on state legislators because the DOC "has personnel better qualified to make such determinations."[283]

The following sections of this article point out the weaknesses of the *Sims* court's analyses. The discussion first shows that the precedent the *Sims* court cited is grossly insufficient. For example, *Sims* turns to *Ex parte Granviel*,[284] the first case to challenge lethal injection. However, *Granviel* was decided in 1978, a quarter century ago and four years before lethal injection was ever used in this country.[285] Like *Kemmler* is to electrocution, *Granviel* is to lethal injection—entirely inappropriate as precedent scientifically.[286] The *Sims* court also relied heavily on *LaGrand v. Lewis*.[287] Yet, *Lewis*—a two-page court order that never involved an evidentiary hearing on lethal injection—presents merely a short and diluted look at lethal injection and cites comparably limited reviews of the method.[288]

As this article makes clear, an Eighth Amendment analysis of lethal injection also requires that inmates have a public and detailed protocol of the lethal injection procedure far in advance of litigation. The kind of notice the *Sims* court and other courts have found acceptable is out of touch with modern science. The following sections offer a further glimpse of what these courts have lacked.

## V. A MODERN EIGHTH AMENDMENT ANALYSIS OF LETHAL INJECTION

A modern Eighth Amendment assessment of lethal injection relies on the same kinds of standards that guide evaluations of electrocution: the "unnecessary and wanton infliction of pain," the "risk" of such pain, "physical violence," the offense to "human dignity," and the contravention of "evolving standards of decency."[289] Granted, there is an ironical dearth of literature available on how to execute people. Much of this article's, and the case law's, analysis of the constitutionality of lethal injection relies on the expert opinions of experienced anesthesiologists[290] because their profession is so involved in this country's execution industry.[291]

A. *The Significance of Media Coverage of Executions*

This article's Eighth Amendment analysis of electrocution recognized judicial validation of a diversity of evidence to determine if an inmate experienced "unnecessary and wanton infliction of pain."[292] This evidence included scientific research and eyewitness accounts of actual executions.[293] More recent cases have, once again, emphasized the importance of eyewitness accounts of actual executions, this time in the context of lethal injection executions.[294] Courts have addressed in particular media witnesses[295] who "almost invariably now serve as the public's surrogate" to ensure that "no untoward conduct has occurred."[296] The majority of state protocols allow for media witnesses at lethal injection executions.[297]

In *California First Amendment Coalition v. Woodford*,[298] the United States District Court for the Northern District of California listed many of the reasons why it considered the media's viewing of executions to be significant: (1) the Eighth Amendment and the First Amendment both mandate the public's presence during the entire execution because the public's perception is needed to determine whether an execution protocol meets evolving standards of decency;[299] (2) courts assessing the constitutionality of execution methods partly rely on eyewitness testimony because it "is crucial to the review of execution protocols which the courts frequently undertake";[300] (3) the prevailing opinion that lethal injection is the most "humane and painless" available execution method may change with the evolution of technology and society's perceptions;[301] and (4) eyewitness media reports provide the documentation needed for society to make its judgments.[302] In a striking statement, the *Woodford* court made clear that "[e]xecution witnesses present by statute [were] entitled to view the entire execution, not just 'the dying.'"[303] Therefore, witnesses could observe "the condemned entering the chamber, his placement on the gurney and the installation of the intravenous device."[304]

Given such strong reliance on the presence of the media, the *Sims* court's dismissal of an expert sociologist's organization of newspaper accounts of botched lethal injection executions[305] makes no scientific or legal sense. Granted, the expert did not witness the executions; however, the reporters who wrote the newspaper articles did, oftentimes in accordance with statutes and state protocols either requiring or allowing media witnesses.[306] Moreover, the *Sims* court contradicts its own conclusions when it quotes for support a portion of *LaGrand v. Lewis*[307] which refers specifically to "eye-witness reports" of two lethal injections that confirm "the finding that the condemned lose consciousness within seconds, and death occurs with minimal pain within one to two minutes."[308] The *Sims* court's conclusions regarding newspaper accounts disregard two critical criteria: (1) accepted legal standards concerning the significance of media witnesses, and (2) the court's own evidence for finding lethal injection constitutional.[309]

## B. *An "Unnecessary and Wanton Infliction of Pain"*[310]

The most significant facet of the media case law on executions concerns the extent to which witnesses can see the earlier stages of the lethal injection process—specifically, the point at which the lethal chemicals begin to enter an inmate's body.[311] For example, California now allows witnesses to view the procedure from the point just prior to the inmate "being immobilized," i.e., strapped to the gurney, to the point just after the inmate dies.[312] However, acquiring this range in view was a legal struggle. Prison officials preferred that witnesses see the proceedings only after officials had strapped the inmate to the gurney and had inserted intravenous tubes.[313] Yet, the most serious problems with lethal injection executions oftentimes occur at the start of the procedure, especially when executioners try to find a suitable vein for the first injection.[314] Regardless, many execution protocols enforce strict limits on viewing witnesses.[315]

In general, executioners strap the inmate to a gurney in the execution chamber, insert a catheter into a vein, and inject a nonlethal solution. After the reading of a death warrant, a lethal mixture is injected by one or more executioners or, depending upon the state, by a machine.[316] This entire procedure involves potential Eighth Amendment concerns that have not been sufficiently addressed by courts or legislatures. Moreover, given the breadth and scope of the potential difficulties associated with lethal injection, witnesses for the public should be available to monitor the inmate's last twenty-four hours (with due privacy protections of course)—including the last meal, the walk to the gurney, the tie down, intravenous injections, the pronouncing of death, and the removal of the corpse.[317]

There are many practical reasons for suggesting a wide scope. First, prisoners differ in their physiological constitution as well as their drug tolerance and drug use histories; therefore, some prisoners may need a far higher dosage of sodium

OHIO STATE LAW JOURNAL                              [Vol. 63: 63 (2002)]

thiopental than others "before losing consciousness and sensation."[318] Inmates can experience substantial pain and suffering if they receive an inadequate dosage of sodium thiopental and therefore regain consciousness and sensation while being injected with the second and third chemicals.[319] For example, the procedure initially applied in Illinois required an amount of sodium thiopental that would be insufficient to produce unconsciousness in approximately twenty percent of the population.[320] If the three chemicals are administered out of sequence—for example, pancuronium bromide is administered first—there is a near certainty that the inmate will experience excruciating pain during a lethal injection even without the outside appearance of pain because the pancuronium bromide paralyzes him.[321]

Second, the discretion allowed prison officials in administering every procedure[322] enables executioners to ignore each prisoner's physical characteristics (for example, age, body weight, health), even though these factors strongly affect an individual's reaction to the chemicals as well as the condition of their veins.[323] For example, physicians have particular difficulty finding suitable veins among individuals with diabetes, heavily pigmented skin, obesity, or extreme muscularity, as well as the very nervous or drug users.[324] Nearly one quarter of prison inmates' veins may be inaccessible "because they are deep, flat, covered by fat or damaged by drug use."[325]

Third, medically trained people have enough difficulty finding a vein with certain individuals; for untrained executioners, the problems are compounded substantially.[326] Executioners experiencing trouble finding a vein can unnecessarily insert the catheter: (1) into a sensitive area of the body, such as the groin[327] or hand;[328] (2) in the wrong direction so that chemicals flow away from the inmate's heart and therefore hinder their absorption;[329] (3) intramuscularly instead of intravenously.[330] In some cases, executioners must perform a "cutdown," a surgical procedure that exposes the vein if there is difficulty finding one.[331] In addition, if the inmate eats or drinks six-to-eight hours before the execution, he may choke or gag after the injection of sodium thiopental.[332]

Finally, lethal injection is considered the most humane method for the euthanasia of animals.[333] However, the Humane Society firmly states that the chemicals must be injected by "well trained and caring personnel"[334]—a sharp contrast to the qualifications available for those executing death row inmates.

Over time, such difficulties have resulted in a high risk of lethal injection botches,[335] which some experts contend "is the most commonly 'botched' method of execution in the United States."[336] Botches are particularly prevalent in Texas because of the state's frequent and early use of the method.[337] Even Leuchter contends that "about eighty percent" of the lethal injections in Texas "have had one problem or another,"[338] although he does not document this estimate.

The execution errors in Texas are glaring and repetitive. For example, in 1985, Stephen Peter Morin waited forty minutes while executioners probed both of his arms and legs to find a vein suitable for the injection; in 1988, Raymond Landry also endured forty minutes of needle probing, shortly after which the catheter popped out of his vein and spurted the chemicals toward witnesses two feet across the room; and in 1989, Stephen McCoy's violent physical reaction to the lethal injection drugs was so great (chest heaving, gasping, and choking) that one witnesses fainted while others gasped.[339]

The high percentage of botches in Texas appeared to be partly attributable to the dearth of written procedures provided to the executioners concerning how to perform an execution. Originally, these "procedures" listed little more than the chemicals to be used (in incorrect order of application) and a vague account of the content of the syringes. Moreover, there was no information specifying the nature and extent of the qualifications that executioners should have in order to perform an execution.[340] After Stephen Morin's 1985 botched execution, a prison spokesperson stated that the difficulty caused from inserting the needles "would probably prompt the Texas Department of Corrections to review its procedures for administering the drugs when the condemned person has a history of drug abuse."[341] Notably, the Texas Department of Corrections has never changed its procedures to accommodate the special injection problems associated with damaged veins.[342] Indeed, a botched execution attributable to an inmate's unsuitable veins occurred each year following Morin's execution until Landry's botched execution.[343] Texas continues to have difficulties starting intravenous injections in former drug users.[344] These problems also occur in other states.[345] Georgia is now the most pronounced example of the problems that can result when executioners are ignorant and inexperienced.[346]

C. *"Physical Violence" and Offends "Human Dignity"*

[Vol. 63: 63 (2002)]

Lethal injection does not entail mutilation in the same way as electrocution. Yet, lethal injection does offend an inmate's dignity in light of the accounts of botched lethal injections listed in Table 9[347] and those discussed in this Part.

### D. *Evolving Standards and Legislative Trends*

Legislative trends are moving exclusively in the direction of lethal injection.[348] Regardless, there are significant issues concerning lethal injection that bear on the standards of decency factor. Most predominant is the ongoing stance by the American Medical Association's (AMA) Council on Ethical and Judicial Affairs, which prohibits physicians' participation in executions.[349] Although the Council's position pertains to all methods of execution, it is particularly applicable to lethal injection, which requires relatively more medical skill[350] and has long been affiliated with the medical profession.[351]

The question of what does and should constitute physician involvement in executions is controversial.[352] The AMA and state medical associations have publicly condemned physician participation in lethal injection executions, stating that a physician's role should be limited to the pronouncement of death.[353] In the past, some states had attempted to solve this dilemma by employing Leuchter's lethal injection machines in which syringes are activated by a mechanical plunger.[354] Yet, Leuchter's reputation has since been destroyed[355] and no state lethal injection protocol that this author studied mentions the use of a machine.[356] In turn, a number of state statutes are extremely vague on the subject of the procedure to be used and the involvement of medical personnel.[357]

This situation is unlikely to change, which raises a number of contentious issues. For example, is it unethical for the medical profession to loan its instruments to the state for the purposes of execution?[358] Is it wrong for physicians to be present at a lethal injection execution even if they could prevent a mishap that could prolong the pain and death of an inmate?[359] While some commentators raise concerns that medical involvement may inappropriately "sanitize or humanize executions,"[360] others warn that if physicians relinquish involvement in executions to less trained individuals, there could be far greater inhumanity.[361] A fringe of commentators compare the condemned inmate's situation to that of the terminally ill because neither has a recourse for living. Physicians are responsible for ensuring that the terminally ill die as smoothly and as painlessly as possible. Should inmates have comparable treatment?[362] Would it be cruel and unusual to afford anything less?

Regardless of these kinds of debates and the stance of the medical societies, physicians do participate in lethal injection executions in different ways.[363] Since 1977, for example, physicians have been part of every stage of an execution, "whether preparing for, participating in, or monitoring executions or attempting to harvest prisoners' organs for transplantation."[364] While physicians find some stages more acceptable than others, a substantial minority are involved in every possible stage. In 2001, a cross-sectional survey of 413 practicing physicians showed that forty-one percent of the respondents were willing to perform at least one action involving capital punishment by lethal injection that was disallowed by the American Medical Association.[365] The proportion agreeing to perform a disallowed action ranged from the 19% who were willing to administer the lethal chemicals to the 36% who were willing to determine death.[366]

The next Part of this article discusses in greater depth the medical problems with state delegation of death in the context of lethal injection by examining all lethal injection protocols in use in this country in the first half of 2001. The Part focuses on the problems that prison officials face in having to enforce a punishment deemed acceptable in theory by legislatures but extremely difficult to apply in practice.[367]

## VI. STATE DELEGATION OF LETHAL INJECTION

This Part reports the author's study of lethal injection protocols in the thirty-six states that used lethal injection as an execution method in 2001. Lethal injection protocols or information about them were gathered in at least one of three major ways, summarized in Tables 19 and 20:[368] (1) by mail, which was forwarded by a prison official; (2) by website, in those states that had them; and (3) by e-mail or phone communication, in those states that had no available protocol or when the protocol that was available had missing information that could not be obtained in any other way except by telephone or e-mail. This Part concludes that because of the extremely vague nature of lethal injection statutes, prison officials have far too much discretion in administering injections.

OHIO STATE LAW JOURNAL                                    [Vol. 63: 63 (2002)]

### A. *Missing Protocols and Missing Information*

One of the most striking aspects of studying lethal injection protocols concerns the sheer difficulty involved in acquiring them. As Table 11 shows, in four states, prison officials explained by phone or by e-mail that information concerning the types of chemicals used in their lethal injection executions was confidential.[369] Yet, two of these four states—Virginia and South Carolina—ranked high, second and eighth respectively, among those states with the most number of executions since 1976; indeed, Virginia was second only to Texas.[370] In three other states—Kansas, Kentucky, and New Hampshire—officials explained that the information on lethal injection chemicals does not exist; for Kansas and New Hampshire, there is no protocol because there is no prospect of having an execution any time soon.[371] While on the surface such a rationale seems understandable since neither state has executed anyone for decades,[372] it makes it impossible to conduct a complete evolving standards of decency analysis of execution methods. If a state is going to have a death penalty with a certain method of execution, the details of that execution method should be provided. Moreover, Kentucky does engage in executions with some regularity;[373] there is no reason why the state does not have a protocol.

As Tables 11 and 12 show, not surprisingly, the great majority (twenty-seven) of the states use the standard three lethal injection chemicals: sodium thiopental, pancuronium bromide, and potassium chloride. Nineteen, or 70% of these states and 53% of all states, also specifically mention the use of a saline solution in their protocol.[374] This is important because, if the lethal injection lines are not properly flushed through with a solution such as saline, "flocculation" (clogging) can occur, as some of the protocols warn.[375] Notably, North Carolina's and New Jersey's decision to use only two—rather than all three—chemicals, can have a bearing on how the execution proceeds.[376] Of particular interest is the fact that although both states use sodium pentothal as their first chemical, they do not use the same second chemical. In North Carolina, where the second chemical is pancuronium bromide, a prisoner would take far longer to die (as much as twenty minutes) because potassium chloride kills so much more quickly. In New Jersey, where the second chemical is potassium chloride, the prisoner may die far more quickly, but the death may not be as still or "serene" as in other states because the prisoner will not be paralyzed. At the same time, there is not the prospect that a prisoner will be paralyzed in pain and unable to scream out—a potential reality in every other state.[377]

A closer look at New Jersey's lethal injection practice suggests, however, that statutes may not reflect the reality of an execution when power is delegated to prison officials. For example, the New Jersey Department of Corrections has stated consistently over the years that it plans to use three drugs when administering a lethal injection, including one to stop breathing.[378] This approach indicates that, contrary to statute, pancuronium bromide or a chemical similar to it will in fact be administered.

### B. *Problems with the Quantities of Lethal Injection Chemicals*

Tables 13–15 show the additional kinds of details that states provide in their protocols beyond simply listing chemicals. According to Tables 13 and 14, only nine states—or one-quarter of all death penalty states—specify the quantity of the lethal injection chemicals that they use.[379] In other words, those states that merely list their chemicals give no indication of whether executioners are injecting sufficient quantities of those chemicals, much less whether they are injecting the chemicals in the correct order. Nor is there any indication that executioners are avoiding flocctuation and additional potential problems that witnesses may not be able to detect.

Table 15 lists the nine states that do specify the quantities of chemicals that executioners are supposed to use in lethal injection executions.[380] However, a close examination of Table 15 shows that simply because a state lists the quantities of chemicals that it uses does not mean that it provides such information properly. In order to determine the proper concentration of lethal injection chemicals, chemical quantities should be designated two ways: (1) by weight, which is indicated by grams (gm) or milligrams (mg), and (2) by volume, which is indicated by cubic centimeters (cc) or milliliters (ml). One needs to know both the weight of a chemical and the volume of diluent to determine the chemical's effectiveness. The volume of diluent for chemicals should be (1) at least large enough so that all the chemicals will be dissolved, and (2) sufficiently dilute so that it will not irritate the inmate's vein and cause that inmate pain. For example, 2.5 gm of thiopental sodium is lethal; however, that amount will merely end up as precipitated sludge if there is an attempt to dissolve it in 5 ml. If there is an attempt to dissolve the 2.5 gm of thiopental sodium in 50 ml, the resulting solution will be very irritating to the inmate's veins and therefore painful. However, dissolving 2.5 gm in 100 ml would create an effective concentration.

An examination of California's chemical quantities in Table 15 provides a good illustration of the limited amount of information that state lethal injection protocols offer. The California protocol indicates that the executioner first injects five grams of sodium pentothal (weight) in 20–25 cc of diluent (the diluent is a normal saline solution). This amount of sodium thiopental is more than enough to kill any human being. Thus, the concentration of the injection is "sufficient" at the very least; a twenty percent concentration of sodium thiopental can burn when it goes into the vein. Like most states, California has two additional chemicals to ensure death: pancuronium bromide and potassium chloride. As Table 15 shows, however, there is no designation of weight for either chemical, only volume (cc's). Therefore, it is impossible to know how much California executioners inject.

Similarly, all the chemical designations for Tennessee mention only volume (cc's) and not weight. There is not enough information to determine the adequacy of Tennessee's protocol.

Florida's chemical specifications are accurate, but incomplete, demonstrating a problem that is the converse to California and Tennessee. According to many anesthesiologists, "no less than" two grams of sodium pentothal is enough to put even a very resistant person into a long, deep, sleep;[381] however, Florida's protocol does not mention the volume of fluid used to dissolve the sodium pentothal. Nor does it mention the amount of fluid used to dissolve the pancuronium bromide and potassium chloride. Therefore, in Florida, the concentrations of all three chemicals are unknown.

In contrast to California, Florida, and Tennessee, the weights and volumes for all three lethal injection chemicals in the protocols for Connecticut, Mississippi, New Mexico, and Washington are predictably lethal. Of all the states included in Table 15, however, Connecticut has the most technically sophisticated protocol. The amounts provided are described in a scientific way and the protocol refers both to volume (ml) and to weight (mg), as well as to "mEq" (milliequivalent), a sound technical description. The doses administered in Connecticut are certainly enough to kill even a very resistant person.

For Mississippi, the amounts and descriptions of all three chemicals also seem lethal per syringe. However, the Mississippi protocol's reference to two syringes for pavulon and three syringes for potassium chloride creates considerable confusion regarding how officials actually administer the injection. The Mississippi Department of Corrections representative was unable to elaborate further,[382] making the protocol difficult to evaluate.

The North Carolina protocol specifies the weight for sodium pentothal (typically far more than sufficient). However, the rest of the protocol's description is very confusing. For example, the same protocol provides the unit of liquid for pavulon, but not the weight. The concentration is unknown.

In Montana, the amount of sodium pentothal is not a lethal dose; it is one-fourth or less than that used in other states. Therefore, if the pancuronium bromide is effective while the sodium pentothal is wearing off, the inmate would be paralyzed but awake. In turn, the Montana protocol refers only to ampules for the pavulon and the potassium chloride, so that the concentration of either chemical is unknown.

Overall, there is inordinate variation and incompleteness across the nine states that provide quantities of lethal injection chemicals in Table 15. Note that Table 15 does not list those states where most lethal injection executions have been performed (those among the top five) and lists only two states that have had at least five lethal injection executions between 1977–1999 (North Carolina and California).[383] Whereas Montana and Washington have had two and one lethal injection executions, respectively, between 1977–1999, the remaining states listed in Table 15 did not have any (Connecticut, Florida, Mississippi, New Mexico, and Tennessee).[384] Paradoxically, then, those states with the most number of lethal injection executions are the least informative about how they perform executions. In contrast, those states that have among the fewest lethal injection executions, or who had not lethally injected anyone at all during this time period, are the most informative.

Simply because some states specify the amounts of their chemicals, however, does not mean that their efforts are valid and reliable. Those states that do provide quantities of injection chemicals vary so widely in terms of their doses and instructions, it is not surprising that botched executions result. Furthermore, with rare exceptions, there is no information available on who measures the chemicals or even whether the executioner gives the full amount of chemical quantities that are indicated. For example, even if an execution takes place in a state that appears to have some sophistication in listing its chemicals (for example, Connecticut), there is no assurance that the executioner actually injects what the Connecticut protocol lists. The practice in New Jersey suggests that prison officials may not even follow what the state legislature dictates, much less what the lethal injection protocol may describe.[385] As the following section discusses, protocols mention little to nothing about the medical expertise of the executioners.

## C. Executioners and Execution Procedures

The thirty-six lethal injection states provide minimal information in their protocols on the quality or training of those individuals selected to execute an inmate (Table 17). Fourteen states—or approximately 39% of all the states[386]—for example, mention "training" or "competency" or "preparation" or "practice" for the executioners. Moreover, even among

OHIO STATE LAW JOURNAL                                                [Vol. 63: 63 (2002)]

those states that mention some training, there is little to no indication of what kind of preparation the department of corrections offers. Likewise, only eight states give any direction concerning how an executioner should proceed if there are serious, foreseeable, or unexpected problems with the execution procedure or with the inmate: (1) Florida (if death does not occur initially), (2) Georgia (if a suitable vein cannot be found), (3) Indiana (if an inmate has "extremely small veins"), (4) New Jersey (if a vein cannot be found, warns that medication "must not be rapidly or sporadically injected," and directs that executioners should provide life saving techniques if a stay is called), (5) New Mexico (warns that flocculation can occur if sodium pentothal is not flushed from the line and recommends using the other injection tube), (6) New York (warns that if sodium pentothal is not flushed from the line, flocculation may occur if it mixes with the pavulon), (7) Tennessee (if death does not occur initially), and (8) Washington (notes that the "condemned's file is examined to see if any special instructions may be required").[387]

Ironically, the mere fact that the protocols in eight states warn executioners of problems, suggests that prison officials are aware of the hazards involved if ill-trained individuals administer a lethal injection. An experienced anesthetist would not need such warnings, or surely not in the context of a written protocol to be learned at the time of the execution. Furthermore, the remaining states basically say nothing about preventing problems.

Criteria for selecting or training executioners in these states appear to be nonexistent. In eight states, the executioners are anonymous department of corrections staff members,[388] whereas in five states, the warden or commissioner selects executioners without specifying if they are staff members.[389] Five other states simply mention the number of people on an execution team or the mere fact that there is a team.[390] Only Arkansas relies on "unpaid volunteers."[391] In turn, eight states[392] do not provide any information whatsoever. Regardless of such silence about training, state protocols also are lax on giving directions concerning what executioners should do if there is a stay of execution. For example, seventeen states do not indicate whether they have phone lines in effect for the governor or other individuals to call to stop an execution.[393]

In some states, it is unclear who is to pronounce death when the execution goes through, or whether there is any involvement of medical personnel, particularly physicians. Because of the significance of physician contributions, Table 17 examines lethal injection protocols as well as all state statutes specifying the involvement of medical personnel in executions. For most (twenty-seven) states, the protocols overlapped substantively with the statutes. In nine states, however, the statutes offered some additional information.[394] Regardless of the source (protocol or statute), in eight states, there is no mention that medical personnel are to participate in any way, even in pronouncing death.[395] If only protocols are examined for this information and not statutes, this figure would rise to fifteen states.[396] Relying on both protocols and statutes, Table 17 shows that physicians are present to declare or "pronounce" death in thirteen states,[397] a coroner pronounces death in five states,[398] and the warden or deputy commissioner in one state.[399] In South Dakota, there is a required post-mortem exam and report.[400] Only Florida states specifically that a pharmacist prepares the lethal injection.[401] In general, states allow for substantial physician participation, although the roles are limited, at least officially.

There is strikingly little information on the time of the last meal and the time of the execution (Table 16).[402] The length of time between the meal and the execution is important because if the inmate ingests food or drink six-to-eight hours before the execution, the inmate may choke or gag when sodium thiopental is injected.[403] There are six states that provide some information on this time frame:[404] (1) Indiana, five-to-six hour span; (2) New Jersey, not less than eight hours; (3) Ohio, approximately six hours; (4) Oregon, approximately six hours; (5) Texas, approximately two-to-three hours; and (6) Virginia, not less than four hours.[405] Ironically, Texas and Virginia, the states with the highest numbers of lethal injection executions,[406] have the shortest time span between the meal and the execution (of those states that mention any time span), and neither time span even approximates the six-to-eight hour parameter.

The next section examines the extent to which protocols allow or encourage witnesses to view an execution. This issue is particularly significant given the litigation brought by journalists concerning how much of a lethal injection they can watch.[407]

## D. General Witnesses and Media Witnesses

Table 18 shows how many states have "general witnesses" for executions—individuals who include anyone from a family member to a physician to a corrections officer—as well as "media witnesses"—individuals who represent one or more of a broad range of media.[408] The great majority of states specify that there should be general witnesses present for the execution,

OHIO STATE LAW JOURNAL [Vol. 63: 63 (2002)]

although the types of witnesses vary substantially. Of the seven states that do not provide such specification, four have no protocol at all.[409] Only two states omit any mention of general witnesses from the protocols they do have and one state (Nevada) indicates that the information is confidential.[410] Most states also allow for media witnesses, although eight of the states that provide for general witnesses do not mention explicitly whether they allow for media witnesses as well.[411]

Altogether, fourteen state protocols specified what media witnesses could view during an execution. None of these protocols echoed the liberal scope upheld by the court in *California First Amendment Coalition v. Woodford*,[412] which allowed witnesses to see the entire lethal injection procedure, including the inmate being injected.[413] Rather, all fourteen protocols shield witnesses from the actual injection of the inmate and differ to the extent they cover other parts of the procedure. The protocols can be divided into four general categories (minor differences between them are presented in Table 18), ranging from the least restricted (1) to the most restricted (4) viewing:

(1) Witnesses arrive to view the execution before the execution team has inserted intravenous catheters into the inmate's arm. The curtain to the witness room is then closed only to be reopened after the intravenous catheters have been inserted into the inmate. The execution continues and, presumably, death is pronounced (Louisiana and Virginia).

(2) Witnesses arrive to view the execution after the execution team has inserted intravenous catheters into the inmate's arm and they stay to view until the inmate's death is pronounced (Colorado, Georgia, Mississippi, New Mexico, North Carolina, Oregon, South Dakota, and Texas).

(3) Witnesses arrive to view the execution after the execution team has inserted intravenous catheters into the inmate's arm and they stay to view until all the chemicals have been injected. The curtain is then closed and a physician is called in to pronounce death. After the physician pronounces death, the curtain is raised and there is an official pronouncement of death made to the witnesses (New York, Ohio, and Tennessee).

(4) Witnesses arrive to view the execution after the execution team has inserted intravenous catheters into the inmate's arm and they stay to view until all the chemicals have been injected. The curtain is then closed and the inmate's death is pronounced (Connecticut).

The four categories indicate that the primary distinction among them is whether witnesses are allowed to see the inmate die (categories one and two only). While this distinction may appear to be minor, the practical implications can be significant. Lethal injection botches can occur even if the injection procedure has been hidden from view or has seemingly gone smoothly (for example, the inmate may react to the chemicals). The following Part reviews the preceding sections of this article in the context of the Timothy McVeigh execution which, from most accounts, appeared quiet and serene except to some of those with a more trained eye.

## VII. DISCUSSION: LETHAL INJECTION AND TIMOTHY MCVEIGH

This article discusses the paradoxical motivations behind legislative changes from one method of execution to the next. Legislatures and courts have consistently stated that the primary reason states switch execution methods is to ensure greater humaneness and decency for death row inmates.[414] Throughout history, however, it appears that such moves were prompted primarily because the death penalty itself became jeopardized due to a state's particular method—be it hanging, electrocution, or lethal gas.[415] The result has been a warped legal "philosophy" of punishment, at times peculiarly aligning both friends and foes of the death penalty alike. This "death-penalty goal" also has wrongly enabled legislatures to delegate death to uninformed prison personnel.

What frames this paradox are the competing and contradictory efforts by legal actors to abolish or expand the death penalty. Such wrangling has become all the more acute as states increasingly drop electrocution in order to adopt lethal injection.[416] For example, some death penalty proponents feel that electrocution better represents the retributive goal of the death penalty and that lethal injection is far too soft on criminals. This perspective was stunningly represented by Bob Butterworth, the Attorney General of Florida, who stated that Pedro Medina's horrendously botched electrocution[417] would serve as both a means of retribution and as a deterrent.[418] "People who wish to commit murder, they better not do it in the state of Florida because we may have a problem with our electric chair."[419] Yet, Butterworth's pronouncements were consistent with this country's century-long tendency to use execution methods as a punishment device extending well beyond "death," both symbolically and politically.[420]

Other death penalty proponents claim that lethal injection is not cruel enough. As the mother of one crime victim stated in an interview preceding the execution of her daughter's killer, lethal injection "is too quick. . . . He would need to suffer a little bit more according to what he gave [my daughter], which was a lot of suffering."[421] Justice Scalia may have mirrored such

views when describing a gruesome case he considered particularly eligible for the death penalty—the rape and murder of an eleven-year-old girl.[422] "How enviable a quiet death by lethal injection compared to that!"[423] At the same time, legislatures and courts are appealing to such anecdotal accounts from a vengeful minority; the majority of Americans in public opinion polls[424] as well as some prison officials[425] prefer lethal injection because they consider it to be the most humane method. Others view injection as an effective way to perpetuate the death penalty because it makes the process seem less gruesome.[426]

The dialogue surrounding the federal execution of Timothy McVeigh illustrates these tensions. The protocol for federal execution by lethal injection, which is not released to the public without a Freedom of Information Act request, uses the same three chemicals applied in most states.[427] Because McVeigh's death was so rapid,[428] some witnesses complained that it was too painless as compared to that of his victims. "He didn't suffer at all," recounts one witness, but rather "just went to sleep."[429] In general, witnesses appeared to believe that McVeigh's transition from life to death was "subtle";[430] the relaxing of his eyes and lips was the only indication of his "remarkably uneventful" death.[431]

Other witnesses' observations suggested, however, that McVeigh's death was slightly more difficult. As the first injection occurred, McVeigh's chest moved up and down, his lips puffed air out, his jaw clenched, and his eyes glassed over but remained open.[432] As the next two chemicals were injected, his skin turned pale yellow.[433] The most dramatic account came from a media witness who recalled McVeigh's eyes glassing over to the point of being watery as the injections were administered,[434] a sign to some anesthesiologists that McVeigh may have been tearing due to pain.[435]

The point here is not to invoke sympathy for McVeigh, but rather to scrutinize the process by which he was executed and the inconsistencies surrounding it. On the one hand, the public outrage against McVeigh seemed limitless and death in the form of lethal injection too good for him.[436] On the other hand, the impending execution educated the public about the lethal injection procedure itself and some of the potential hazards associated with it.[437] For these reasons, some death penalty opponents consider lethal injection to be inhumane and not the "deep sleep" it appears to be.[438] Although far less publicized, the events also gave some visibility to those who actually perform the executions and the toll it takes on them emotionally.[439] Regardless of what side the public was on, lethal injection appeared to be a paradox revealing the complexities of the execution process as well as the death penalty itself.

## VIII. CONCLUSION

The execution methods debate is played out in terms of legislative decision-makers, who oftentimes turn a blind eye to the concerns of those who actually have to kill.[440] In turn, a considerable portion of doctors, nurses, and other medical personnel willingly participate in executions. Prison officials face the worst of both worlds: they have limited political clout by which to make their choices known, and minimal guidance provided by those who make the choices for them. The process is made all the more perplexing because those who report the problems with the system—media witnesses—have questionable credibility when experts attempt to use their accounts in court. "As a result," in Foucault's words, "justice no longer takes public responsibility for the violence that is bound up with its practice."[441] The system becomes literally and symbolically unobservable. In the context of applying execution methods, when justice becomes unobservable, it ceases to exist.

* Professor of Law, Fordham University School of Law. B.A., University of Virginia, 1974; M.A., University of Toronto, 1975; Ph.D., University of Pennsylvania, 1982; J.D., University of Pennsylvania, 1989. I am most grateful to the following individuals for their contributions to this article: Daniel Auld, Stephen Bright, Edward Brunner, Edward Chikofsky, Robert Cowey, Lawrence Egbert, Juan Fernandez, Bruce Green, Christopher Hale, Rick Halperin, John Hanusz, Roberta Harding, Mark Heath, Hunter Labovitz, Mathew Rubenstein, and Kevin Walsh. Any errors in this article are mine only. I give special thanks to Daniel Auld for creating most of this article's tables and for diligently collecting the information on lethal injection protocols. Numerous prison officials and administrators throughout the country graciously gave their time and resources to describe the execution procedures and protocols that this article discusses. The names and affiliations of these individuals are listed in Table 20 (Appendix I). I also appreciate the excellent research assistance provided by Janice Greer and Marianna Politzer, as well as the materials offered by the following organizations: the Fair Housing Center (New Jersey), the Georgia Resource Center, the Multicounty Public Defender (Georgia), and the Southern Center for Human Rights (Georgia). Lastly, I thank Fordham Law School for its characteristically generous research support, and the Institute for Advanced Legal Studies, University of London, for its helpful resources.

[1] Currently, five different types of execution methods are used in this country: hanging, firing squad, electrocution, lethal gas, and lethal injection. *See infra* app. 1, tbl.1. For a discussion of legislative changes in execution methods over time, see generally Deborah W. Denno, *Getting to Death: Are Executions Constitutional?*, 82 IOWA L. REV. 319 (1997) [hereinafter Denno, *Getting to Death*]; Deborah W. Denno, *Is Electrocution an Unconstitutional Method of Execution? The Engineering of Death over the Century*, 35 WM. & MARY L. REV. 551 (1994)

OHIO STATE LAW JOURNAL [Vol. 63: 63 (2002)]

[hereinafter Denno, *Electrocution*].

2 *See generally* MICHEL FOUCAULT, DISCIPLINE AND PUNISH: THE BIRTH OF THE PRISON (Alan Sheridan trans., 1977) [hereinafter FOUCAULT, DISCIPLINE AND PUNISH]. According to Foucault, the history of punishment is marked by increasing secrecy in which penalties "become the most hidden part of the penal process" and, as a result, "justice no longer takes public responsibility for the violence that is bound up with its practice." *Id.* at 9. As a more modern commentator notes, what is considered "violent" is accompanied by limitations, even today. "Humane treatment simply does not offend human sensibilities, and therefore cannot be graphic, spectacular, or terroristic." John W. Murphy, *Technology, Humanism and Death by Injection*, 11 PHIL. & SOC. ACTION 55, 56 (1985). The less passionate the method, the more humane it becomes because society appears to be guided by the exercise of reason, and its members characterized as rational actors. *See* MICHEL FOUCAULT, MADNESS AND CIVILIZATION: A HISTORY OF INSANITY IN THE AGE OF REASON 78 (Richard Howard trans., 1965). Electrocution was considered relatively less passionate than hanging because it appeared to be more a product of engineering. *See generally* Denno, *Electrocution, supra* note 1. Lethal injection appears to be a product of medicine and sanitized conditions. *See generally* Denno, *Getting to Death, supra* note 1.

3 DAVID GARLAND, PUNISHMENT AND MODERN SOCIETY 245 (1990).

4 The Eighth Amendment provides that "[e]xcessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." U.S. CONST. amend. VIII.

5 *See infra* notes 111–17, 141–44, 152–54, 165–69, 210, 414, 424–25 and accompanying text.

6 *See infra* notes 9, 32–38, 57, 171, 203–04, 415 and accompanying text.

7 *See, e.g., infra* notes 145–58, 193–202 and accompanying text.

8 *See infra* notes 171, 417–20 and accompanying text.

9 *See infra* notes 172, 180–81, 210, 360, 426 and accompanying text; *see also* David Firestone, *Court to Rule on Method's Constitutionality*, N.Y. TIMES, March 7, 2001, at A12 (noting that national opponents of the death penalty held "mixed feelings" about challenging the constitutionality of electrocution; although they oppose electrocution, several emphasized that lethal injection has been approved so overwhelmingly "precisely to make capital punishment more acceptable to the public").

10 *See infra* notes 37–38, 171, 426 and accompanying text.

11 *See infra* notes 171, 180–81 and accompanying text; *see also* David Crary, *Electric Chair's Days Are Numbered as Cruelty Is Cited Punishment*, L.A. TIMES, Aug. 19, 2001, at A18.

12 *See infra* notes 139–40, 424–26 and accompanying text.

13 *See infra* notes 139–40, 142, 424–26, 440 and accompanying text.

14 *See infra* notes 165–72 and accompanying text.

15 *See infra* notes 87, 275, 303–09 and accompanying text.

16 *See infra* notes 109–36 and accompanying text; app. 1, tbls.1–6.

17 Neil J. Farber et al., *Physicians' Willingness to Participate in the Process of Lethal Injection for Capital Punishment*, 135 ANNALS INTERNAL MED. 884, 886 (2001); *see also infra* notes 349–64 and accompanying text.

18 Farber et al., *supra* note 17, at 886; *see also infra* notes 352, 363–66 and accompanying text.

19 Linda L. Emanuel & Leigh B. Bienen, *Physician Participation in Executions: Time to Eliminate Anonymity Provisions and Protest the Practice*, 135 ANNALS INTERNAL MED. 922, 922–24 (2001); *see infra* notes 349–62 and accompanying text.

20 *See infra* notes 386–401 and accompanying text.

21 *See infra* notes 230, 241–42, 258, 261, 318–21, 377, 435 and accompanying text.

22 Deborah W. Denno, *Capital Punishment and the Human Rights Norm*, 9 CRIM. L. FORUM 171, 171 (1999) (reviewing WILLIAM A. SCHABAS, THE DEATH PENALTY AS CRUEL TREATMENT AND TORTURE: CAPITAL PUNISHMENT CHALLENGED IN THE WORLD'S COURTS (1996)); *see also* note 87 and accompanying text (emphasizing the worldwide notice and condemnation of Allen Lee Davis's botched electrocution).

23 *See infra* notes 74–80 and accompanying text.

24 Glass v. Louisiana, 471 U.S. 1080, 1084 (1985) (Brennan, J., dissenting from denial of certiorari); *see also* Furman v. Georgia, 408 U.S. 238, 392 (1972) (Burger, C.J., dissenting) ("The dominant theme of the Eighth Amendment debates was that the ends of the criminal laws cannot justify the use of measures of extreme cruelty to achieve them.").

25 *See infra* app. 1, tbl.1.

26 *See infra* app. 1, tbl.1.

27 *See infra* app. 1, tbls.4–7; *see also infra* notes 131–36 and accompanying text.

28 *See infra* app. 2 (Alabama and Nebraska).

29 *See infra* app. 1, tbl.1; app. 2 (Florida, South Carolina, and Virginia).

30 *See infra* app. 1, tbl.1; app. 2.

<u>31</u> *See infra* app. 1, tbl.5 n.*, tbl.6 n.*.

<u>32</u> *See* Denno, *Getting to Death*, *supra* note 1, at 321–27, 345–48.

<u>33</u> *See generally* Deborah W. Denno, *Adieu to Electrocution*, 26 OHIO N.U. L. REV. 665 (2000); Denno, *Getting to Death*, *supra* note 1; Denno, *Electrocution*, *supra* note 1.

<u>34</u> In *Fierro v. Gomez*, the Ninth Circuit unanimously held that California's statute authorizing execution by lethal gas was unconstitutionally cruel and unusual. 77 F.3d 301, 309 (9th Cir. 1996), *vacated on other grounds*, 519 U.S. 918 (1996) (remanding for reconsideration in light of the changed statute). *Fierro* marked the first time in this country's history that a federal appeals court had held any method of execution unconstitutional. *Id.* at 308 (stating that two circuit courts had found execution by lethal gas to be unconstitutional). Yet, the Court vacated the Ninth Circuit's holding that lethal gas was unconstitutional in light of the California legislature's subsequent amendment of the state's death penalty statute allowing lethal injection to be used unless the death row inmate specifically requested lethal gas. *See Gomez*, 519 U.S. at 918 (remanding for reconsideration in light of changed statute). In *Stewart v. LaGrand*, 526 U.S. 115 (1999), the Court held that the death row inmate waived his claim that execution by lethal gas violated the Eighth Amendment because the inmate chose to be executed by lethal gas rather than lethal injection. *Id.* at 118–19.

<u>35</u> *See infra* notes 99–102 and accompanying text (discussing *Bryan v. Moore*, 528 U.S. 960 (1999) and *Bryan v. Moore*, 528 U.S. 1133 (2000)).

<u>36</u> *See infra* app. 2 (California and Florida).

<u>37</u> *See* Denno, *Getting to Death*, *supra* note 1, at 388–90.

<u>38</u> *See id.* at 363–72, 385–86.

<u>39</u> *Furman v. Georgia*, 408 U.S. 238, 263 (1972) (Brennan, J., concurring). The origin of the Eighth Amendment's Cruel and Unusual Punishments Clause has been described in detail. *See* Harmelin v. Michigan, 501 U.S. 957, 973–79 (1991); *Furman*, 408 U.S. at 316–28 (1972) (Marshall, J., concurring); RAOUL BERGER, DEATH PENALTIES: THE SUPREME COURT'S OBSTACLE COURSE 29–58 (1982); Anthony F. Granucci, *"Nor Cruel and Unusual Punishments Inflicted": The Original Meaning*, 57 CAL. L. REV. 839, 839–65 (1969) (examining the history of the Clause and the case law).

<u>40</u> 136 U.S. 436 (1890); *see also* Denno, *Getting to Death*, *supra* note 1, at 329–54; Denno, *Electrocution*, *supra* note 1, at 616–23.

<u>41</u> *Kemmler*, 136 U.S. at 443.

<u>42</u> Examples of such dismissals are categorized by execution method as follows. *Lethal gas*: Hernandez v. State, 32 P.2d 18, 24–25 (Ariz. 1934); People v. Davis, 794 P.2d 159, 173 (Colo. 1990); State v. Kilpatrick, 439 P.2d 99, 110 (Kan. 1968); Calhoun v. State, 468 A.2d 45, 70 (Md. 1983). *Lethal injection*: People v. Stewart, 528 N.E.2d 631, 639 (Ill. 1988); *Ex parte* Granviel, 561 S.W.2d 503, 510 (Tex. Crim. App. 1978). *Firing squad*: People v. Anderson, 493 P.2d 880, 890–91 (Cal. 1972); *Kilpatrick*, 439 P.2d at 110. *Hanging*: Anderson, 493 P.2d at 890; DeShields v. State, 534 A.2d 630, 640 (Del. 1987); *Kilpatrick*, 439 P.2d at 110.

<u>43</u> In 1885, the Governor of New York announced in his annual message to the legislature that:

[t]he present mode of executing criminals by hanging has come down to us from the dark ages, and it may well be questioned whether the science of the present day cannot provide a means for taking the life of such as are condemned to die in a less barbarous manner.

*Kemmler*, 136 U.S. at 444.

<u>44</u> 1886 N.Y. Laws ch. 352, § 1.

<u>45</u> CRAIG BRANDON, THE ELECTRIC CHAIR: AN UNNATURAL AMERICAN HISTORY 67–88 (1999); Denno, *Electrocution*, *supra* note 1, at 568–73.

<u>46</u> Denno, *Electrocution*, *supra* note 1, at 571.

<u>47</u> *See* BRANDON, *supra* note 45, at 89–133; Denno, *Electrocution*, *supra* note 1, at 577–83. Edison testified that death by electrocution would be quick and painless and that electricity would not mutilate the victim's body. In contrast, Westinghouse reportedly financed William Kemmler's appeal at a cost exceeding $100,000. Both Edison and Westinghouse also relied on a series of experiments testing the effects of electrocution on animals, albeit emphasizing differing results. BRANDON, *supra* note 45, at 89–133; Denno, *Electrocution*, *supra* note 1, at 573–83.

<u>48</u> Denno, *Electrocution*, *supra* note 1, at 580–81.

<u>49</u> *Id.* at 574–77.

<u>50</u> *See* Denno, *Getting to Death*, *supra* note 1, at 334. For examples of cases that incorrectly state that *Kemmler* analyzed and applied the Eighth Amendment, see, for example, McCleskey v. Kemp, 481 U.S. 279, 299 (1987); Johnson v. Glick, 481 F.2d 1028, 1031 (2d Cir. 1973); Bailey v. Lally, 481 F. Supp. 203, 218 (D. Md. 1979); Thompson v. State, 542 So. 2d 1286, 1298 (Ala. Crim. App. 1988), *aff'd*, 542 So. 2d 1300 (Ala. 1988).

<u>51</u> The New York courts had required the prisoner to show "beyond doubt" that the execution method was cruel and unusual. *In re* Kemmler, 136 U.S. 436, 442 (1890).

<u>52</u> Courts, such as *Provenzano v. Moore*, typically fail to identify the burden of proof when reviewing the constitutionality of execution methods. 744 So. 2d 413, 416–19 (Fla. 1999) (per curiam). However, the burden of proof that courts cite most frequently—preponderance of the evidence—is far less stringent than the "beyond doubt" standard stated in *Kemmler*. *See* Denno, *Getting to Death*, *supra* note 1 at 335; *see also*

Walton v. Arizona, 497 U.S. 639, 649–51 (1990) (plurality opinion) (upholding Arizona's imposition on defendants the burden of establishing, "by a preponderance of the evidence, the existence of mitigating circumstances sufficiently substantial to call for leniency" in order to avoid the death penalty after the establishment of one or more aggravating factors); Blake v. Hall, 668 F.2d 52, 57 (1st Cir. 1981) (determining that plaintiffs had failed to establish by "a fair preponderance of the evidence" that cell conditions at a prison constituted cruel and unusual punishment); McGill v. Duckworth, 726 F. Supp. 1144, 1148–49 (N.D. Ind. 1989) (discussing the applicability of the preponderance of the evidence standard in suits against prison officials for failing to protect a prison inmate from attack by another inmate), *aff'd in part and rev'd in part*, 944 F.2d 344 (7th Cir. 1991); Martin v. Foti, 561 F. Supp. 252, 257 (E.D. La. 1983) (noting that plaintiffs had "failed to show by a preponderance of the evidence" that conditions were cruel and unusual).

[53] *See Kemmler*, 136 U.S. at 442–43 (quoting the New York Supreme Court's explanation of why it deferred to the legislature).

[54] *See generally* BRANDON, *supra* note 45; Denno, *Electrocution*, *supra* note 1, at 559–607.

[55] *See generally* BRANDON, *supra* note 45, at 160–204. A *New York Times* reporter's account of Kemmler's August 6, 1890, execution explains some of the problems that occurred:

> After the first convulsion there was not the slightest movement of Kemmler's body. . . . Then the eyes that had been momentarily turned from Kemmler's body returned to it and gazed with horror on what they saw. The men rose from their chairs impulsively and groaned at the agony they felt. "Great God! he is alive?" some one said; "Turn on the current," said another . . . .
> Again came that click as before, and again the body of the unconscious wretch in the chair became as rigid as one of bronze. It was awful, and the witnesses were so horrified by the ghastly sight that they could not take their eyes off it. The dynamo did not seem to run smoothly. The current could be heard sharply snapping. Blood began to appear on the face of the wretch in the chair. It stood on the face like sweat. . . . An awful odor began to permeate the death chamber, and then, as though to cap the climax of this fearful sight, it was seen that the hair under and around the electrode on the head and the flesh under and around the electrode at the base of the spine was singeing. The stench was unbearable.

*Far Worse Than Hanging*, N.Y. TIMES, Aug. 7, 1890, at 1. For a fascinating historical account of the press's attempts to cover executions in New York, see Michael Madow, *Forbidden Spectacle: Executions, the Public and the Press in Nineteenth Century New York*, 43 BUFF. L. REV. 461 (1995).

[56] *See* BRANDON, *supra* note 45, at 205–43; Denno, *Electrocution*, *supra* note 1, at 598–676.

[57] *See* Denno, *Getting to Death*, *supra* note 1, at 388–94.

[58] 237 U.S. 180, 185 (1915) (concluding that the State's implementation of death through electrocution, rather than hanging, did not increase the punishment of murder but only changed its mode).

[59] 329 U.S. 459 (1947) (plurality opinion). In *Francis*, the issue was not whether electrocution was per se unconstitutional, but whether the State of Louisiana could constitutionally execute the appellant after the electric chair had malfunctioned during the first attempt. *Id.* at 461. In examining the circumstances of *Francis* "under the assumption, but without so deciding" that the Eighth Amendment applied, a plurality of four Justices interpreted the Cruel and Unusual Punishments Clause as prohibiting only the "inflict[ion of] unnecessary pain," not the suffering created in an "unforeseeable accident." *Id.* at 462, 464. The Justices thus assumed that state officials performed "their duties . . . in a careful and humane manner." *Id.* at 462. Justice Frankfurter explained, however, that his deciding fifth vote did "not mean that a hypothetical situation, which assumes a series of abortive attempts at electrocution . . . would not raise different questions." *Id.* at 471 (Frankfurter, J., concurring).

[60] 370 U.S. 660 (1962).

[61] *Id.* at 666. In *Furman v. Georgia*, Justice Douglas relied on both *Robinson* and *Francis* to conclude that the Eighth Amendment's applicability to the states is "now settled." 408 U.S. 238, 241 (1972) (per curiam) (Douglas, J., concurring).

[62] Trop v. Dulles, 356 U.S. 86, 101 (1985) (plurality opinion); *see also* Stanford v. Kentucky, 492 U.S. 361, 369 (1989); Denno, *Getting to Death*, *supra* note 1, at 337–38.

[63] Weems v. United States, 217 U.S. 349, 373 (1910).

[64] *Stanford*, 492 U.S. at 369 (quoting Gregg v. Georgia, 428 U.S. 153, 171 (1976)).

[65] *Trop*, 356 U.S. at 101.

[66] Robinson v. California, 370 U.S. 660, 666 (1962).

[67] *See, e.g.*, Poyner v. Murray, 508 U.S. 931, 933 (1993) (Souter, J., joined by Blackmun & Stevens, JJ., concurring in denial of certiorari) (emphasizing that *Kemmler* was not "a dispositive response to litigation of the issue [of the constitutionality of electrocution] in light of modern knowledge").

[68] *In re* Kemmler, 136 U.S. 436, 447 (1890).

[69] For a discussion of how courts have assessed whether a state's particular execution method is unconstitutionally vague, see *infra* notes 73, 247, 273–74, 282–83, 357 and accompanying text. These unconstitutionally vague statute cases have focused primarily on lethal gas and lethal injection, discussed *infra* notes 247, 273–74, 282–83, 357 and accompanying text (lethal injection cases). The lethal gas cases are examined briefly in this footnote because challenges to the vagueness of lethal gas statutes have provided precedent for the challenges to the vagueness of lethal injection statutes. Regardless, no court has upheld a statutory vagueness challenge. For example, in *State v. Gee Jon*, 211 P. 676, 682 (Nev. 1923), the court emphasized two points: (1) the legislature "sought to provide a method of inflicting the death penalty in the most humane manner known to modern science," *id.*; *see also* Robert A. Maurer, *Death by Lethal Gas*, 9 GEO. L.J. 50, 51 (1921) (noting that "it would appear that the Nevada statute would be upheld as another attempt by a legislature to find a still more humane method of execution than by electrocution and the other methods now in use"); and (2) prison officials administering the gas would also "carefully avoid inflicting cruel punishment" when selecting the type of gas to use, because it was unspecified in the statute. *See Gee Jon*, 211 P. at 682; *see also* Hernandez v. State, 32 P.2d 18, 25 (Ariz. 1934)

("The fact that [lethal gas] is less painful and more humane than hanging is all that is required to refute completely the charge that it constitutes cruel and unusual punishment."); People v. Daugherty, 256 P.2d 911, 922 (Cal. 1953) (declining defendant's contention that lethal gas is cruel and unusual because executioners "could use a lethal gas which would cause long and cruel suffering"); Raymond Hartmann, *The Use of Lethal Gas in Nevada Executions*, 8 ST. LOUIS U. L.J. 167, 168 (1923) (expressing support for the Nevada statute despite concerns that the lack of specification for the type of gas might introduce error on the part of prison officials, who may inadvertently select a type of gas that would inflict pain and suffering).

70 The two states are Alabama and Nebraska. ALA. CODE § 15-18-82(a) (1975) ("[T]he sentence shall be executed . . . by causing to pass through the body of the convict a current of electricity of sufficient intensity to cause death, and the application and continuance of such current through the body of such convict shall continue until such convict is dead."); NEB. REV. STAT. § 29-2532 (1943) ("[Death] shall be by causing to pass through the body . . . a current of electricity of sufficient intensity to cause death."); *see also infra* app. 1, tbl.1; app. 2 (Alabama and Nebraska).

71 The three states—Florida, South Carolina, and Virginia—allow a choice between electrocution and lethal injection. *See infra* app. 1, tbl.1; app. 2 (Florida, South Carolina, and Virginia). Only the electrocution provisions in their respective statutes are cited here. *See* FLA. STAT. ANN. § 922.105(1) (West 2000) ("A death sentence shall be executed by lethal injection, unless the person sentenced to death affirmatively elects to be executed by electrocution."); S.C. CODE ANN. § 24-3-530 (A) (Law Co-op. 1993) (amended 1995) ("[The condemned] shall suffer the [death] penalty by electrocution . . . ."); VA. CODE ANN. § 53.1-233 (Michie 1994) ("The death chamber shall have all the necessary appliances for the proper execution of prisoners by electrocution."). Arkansas allows pre-enactment prisoners a choice between electrocution and lethal injection. *See infra* app. 1, tbl.10 (Type 4—Arkansas). However, only two inmates remain who can make that choice. *See infra* app. 2 (Arkansas). Because of the limited potential for the use of electrocution in Arkansas, this article does not consider Arkansas a choice state.

72 *See supra* note 71 (The three states are Florida, South Carolina, and Virginia.).

73 *See* Denno, *Getting to Death*, *supra* note 1, at 352–53 (reviewing the issue of statutory vagueness in the context of electrocution statutes).

74 Gregg v. Georgia, 428 U.S. 153, 173 (1976); Louisiana *ex rel.* Francis v. Resweber, 329 U.S. 459, 463 (1947) (plurality opinion).

75 Trop v. Dulles, 356 U.S. 86, 100 (1958) (plurality opinion).

76 Glass v. Louisiana, 471 U.S. 1080, 1085 (1985) (Brennan, J., dissenting).

77 Farmer v. Brennan, 511 U.S. 825, 842 (1994) (in terms of a standard of deliberate indifference, referring to a risk that is "longstanding, pervasive, well-documented, or expressly noted by prison officials in the past, and the circumstances suggest that the defendant-official . . . had been exposed to information concerning the risk and thus 'must have known about it.'"). Even though the *Farmer* Court's standard pertains to the risk of inmate attacks, the Court did not suggest that the standard should be limited only to this circumstance. Furthermore, the likelihood of a botched execution can be estimated far more accurately than the likelihood of an inmate attack, given that the former is based on more readily identifiable and objective criteria. *See also Glass*, 471 U.S. at 1093 (Brennan, J., dissenting) (noting that even if electrocution did not "invariably produce pain and indignities, the apparent century-long pattern of 'abortive attempts' and lingering deaths suggests that this method of execution carries an unconstitutionally high risk of causing such atrocities").

78 Stanford v. Kentucky, 492 U.S. 361, 369 (1989) (quoting Coker v. Georgia, 433 U.S. 584, 592 (1977) (plurality opinion)).

79 Fierro v. Gomez, 865 F. Supp. 1387, 1410 (N.D. Cal. 1994), *aff'd*, 77 F.3d 301 (9th Cir. 1996), *vacated on other grounds*, 519 U.S. 918 (1996) (remanding for reconsideration in light of the changed statute).

80 *Fierro*, 865 F. Supp. at 1400–01.

81 Fierro v. Gomez, 77 F.3d 301, 308 (9th Cir. 1996), *vacated on other grounds*, 519 U.S. 918 (1996) (remanding for reconsideration in light of the changed statute). Given the scientific uncertainty concerning measurements of pain and unconsciousness, the *Fierro* district court found to be probative, "to varying degrees," all the evidence of eyewitness observations of gas chamber executions. Fierro v. Gomez, 865 F. Supp. 1387, 1400 (N.D. Cal. 1994). The court particularly considered as "objective" and "reliable sources of clinical information," the San Quentin execution records produced contemporaneously with the actual executions by trained medical personnel closely observing the inmates. *Id.* at 1400–01. The execution records of two recently executed inmates were deemed "the most probative evidence of pain and consciousness" because the men were executed under the protocol being challenged. *Id.* at 1401.

82 *See* Denno, *Getting to Death*, *supra* note 1, at 354–58 (summarizing available medical publications, eyewitness reports, and affidavit testimony).

83 *See infra* app. 1, tbl.8.

84 428 U.S. 153 (1976).

85 *Id.* at 168–207.

86 Sherwin B. Nuland, M.D., *Cruel and Unusual*, N.Y. TIMES, Nov. 9, 1999, at A25 ("Even when it functions exactly as it should, the electric chair is a brutal killer."). *See generally* SHERWIN B. NULAND, HOW WE DIE: REFLECTIONS ON LIFE'S FINAL CHAPTER (1993) (discussing different methods of death and the pain associated with them).

87 *Amnesty Calls for Death Penalty Abolition, Following Grisly Execution*, AGENCE FRANCE-PRESSE (Paris, Fr.), July 9, 1999, at 1; Joe Carroll, *US Death Sentence Ruling Defies Ratified UN Treaty*, IRISH TIMES (Dublin, Ir.), Nov. 3, 1999, at 12; Roberta Harrington, *Death Penalty Debate Sparked*, SUNDAY HERALD (Glasgow, Scot.), Nov. 28, 1999, at 16; Julie Hauserman, *Lethal Injection is Signed into Law*, ST. PETERSBURG TIMES, Jan. 5, 2000, at 1A; *Madrid Demonstrators Protest Death Sentence*, PRESS JOURNAL (Vero Beach, Fla.), Nov. 3, 1999, at A11; *Millions Flock to US Execution Site*, THE SCOTSMAN (Edinburgh, Scot.), Nov. 1, 1999, at 22; Michael Peltier, *Death Pictures Pique Interest Worldwide*, PRESS JOURNAL (Vero Beach, Fla.), Oct. 25, 1999, at A8; David Usborne, *Is the End in View for Old Sparky?*, THE INDEPENDENT (London, Eng.), Jan. 9, 2000, at 20.

OHIO STATE LAW JOURNAL                                      [Vol. 63: 63 (2002)]

[88] Provenzano v. Moore, 744 So. 2d 413, 442–44 (Fla. 1999) (Shaw, J., dissenting).

[89] *Millions Flock to US Execution Site, supra* note 87; Peltier, *supra* note 87; Usborne, *supra* note 87.

[90] *Provenzano*, 744 So. 2d at 433–34 (Shaw, J., dissenting).

[91] *Id.*

[92] Brief for Petitioner at 3, Bryan v. Moore, 528 U.S. 960 (1999) (citations omitted).

[93] *Id.*

[94] *Provenzano*, 744 So. 2d at 434 (Shaw, J., dissenting).

[95] *Id.* at 416.

[96] *Id.*

[97] 701 So. 2d 76, 79 (Fla. 1997).

[98] *Provenzano*, 744 So. 2d at 415.

[99] 528 U.S. 960 (1999).

[100] *Id.* However, it was unclear why the Court made such a move after all these years. There were a range of views: (1) the Court wanted to declare electrocution constitutional once and for all, to end the seemingly ceaseless stream of appeals challenging the method's constitutionality over the years; (2) the Court in particular wanted to examine the constitutionality of Allen Lee Davis's execution in light of Florida's history of botched executions; or (3) the Court wanted to examine whether electrocution in general, as well as applied specifically in Florida, was constitutional. This broad scope necessitated a sufficiently wide focus for challenging the constitutionality of electrocution, beginning with the method's history.

[101] Bryan v. Moore, 528 U.S. 1133 (2000); *see infra* app. 2 (Florida).

[102] *See infra* app. 2 (Alabama and Nebraska).

[103] *See infra* app. 1, tbl.8.

[104] *See* Denno, *Getting to Death, supra* note 1, at 359.

[105] *See infra* app. 1, tbl.8.

[106] *See infra* app. 1, tbl.8.

[107] *See supra* note 55 and accompanying text.

[108] *See* Denno, *Getting to Death, supra* note 1, at 362 & n.262.

[109] *See supra* notes 78–79; *infra* notes 126–30, 154 and accompanying text.

[110] 744 So. 2d 413 (Fla. 1999) (per curiam).

[111] Denno, *Getting to Death, supra* note 1, at 363–408, 439–64; *see infra* app. 1, tbls.2–3; app. 2.

[112] Campbell v. Wood, 511 U.S. 1119, 1119 (1994) (Blackmun, J., dissenting from denial of certiorari) (citing State v. Frampton, 627 P.2d 922, 934 (Wash. 1981)).

[113] *See supra* notes 43, 56 and accompanying text.

[114] *See supra* notes 55–56 and accompanying text.

[115] Malloy v. South Carolina, 237 U.S. 180, 185 (1915) (noting the adoption of electrocution by eleven states following the decision of a New York commission that it was more humane, making the total number of states adopting electrocution thirteen, including the state at issue, South Carolina).

[116] *See infra* app. 1, tbl.2; app. 2.

[117] *See infra* app. 1, tbls.2–3; app. 2.

[118] In 1921, in an attempt to prove the state humane, the Nevada legislature passed a law providing that lethal gas was to be administered "without warning and while [the inmate was] asleep in his cell." WILLIAM J. BOWERS, LEGAL HOMICIDE: DEATH AS PUNISHMENT IN AMERICA, 1864–1982, at 12 (1984). This procedure was never followed, however, because it was impossible to release the gas in a regular cell. *Id.* Yet, in *State v. Gee Jon*, the Nevada Supreme Court emphasized that the legislature "sought to provide a method of inflicting the death penalty in the most humane manner known to modern science." 211 P. 676, 682 (Nev. 1923). The legislature evaluated, but rejected, hanging and shooting in favor of lethal gas. *Id.* The 1921 lethal gas law did not expressly indicate retroactive operation. *Id.* at 681–82.

[119] Denno, *Getting to Death, supra* note 1, at 366–67; *see infra* app. 2.

[120] 408 U.S. 238, 256–57 (1972) (holding that the discretionary statutes were unconstitutional as applied, violating the Equal Protection Clause). For an overview of these challenges, see Denno, *Getting to Death, supra* note 1, at 367–68.

[121] Denno, *Getting to Death, supra* note 1, at 368.

[122] *See* app. 1, tbl.1; app. 2 (California and Missouri).

[123] Denno, *Getting to Death, supra* note 1, at 368–70.

124 These states are, in order of abandonment: Oklahoma (1951), Mississippi (1954), New Mexico (1955), Texas (1977), Massachusetts (1982), Arizona (1983), Illinois (1983), New Jersey (1983), South Dakota (1984), Louisiana (1990), Pennsylvania (1990), Ohio (1993, 2001), Virginia (1994), Connecticut (1995), Indiana (1995), New York (1995), South Carolina (1995), Kentucky (1998), Tennessee (1998), Florida (2000), and Georgia (2000). *See infra* app. 1, tbls.1–3.

125 *See supra* note 124; *infra* app. 1, tbls.1–3; app. 2. There are historical differences between the uses of electrocution and lethal gas that point to states' initial, relative reluctance to reject electrocution. First, over the course of the century, states have relied on *Kemmler* to support the retention of electrocution, whereas no court case has addressed the constitutionality of lethal gas. Next, electrocution was introduced three decades earlier than lethal gas during a time when science was substantially less advanced; therefore, lethal gas, which was also a considerably more visible method than electrocution, had the advantage of greater immediate scrutiny. Nonetheless, electrocution and lethal gas have comparable "legislative lifelines" (sixty-one years and fifty-one years respectively) in terms of the point at which they were introduced and the point at which they were no longer adopted, thereby suggesting comparable periods of tolerance (electrocution was first introduced in 1888 and last adopted in 1949; lethal gas was first introduced in 1921 and last adopted in 1973). Lastly, lethal gas is more expensive than electrocution, a factor that states have acknowledged when they have changed execution methods. *See infra* app. 2.

126 458 U.S. 782 (1982).

127 *Id.* at 792.

128 *Id.* (emphasis added).

129 *Id.* at 793.

130 *See, e.g.,* Stanford v. Kentucky, 492 U.S. 361, 370–71 (1989) (rejecting a challenge to the constitutionality of the death penalty for 16-year-olds, noting that ten of the thirty-seven death penalty jurisdictions allowed capital punishment for such youths); Penry v. Lynaugh, 492 U.S. 302, 334–35 (1989) (rejecting a challenge to the constitutionality of the death penalty for mentally retarded persons, emphasizing that only two states had prohibited it).

131 *See infra* app. 1, tbls.1–6.

132 *See infra* app. 1, tbl.4.

133 *See infra* app. 1, tbl.4.

134 *See infra* app. 1, tbl.4.

135 *See infra* app. 1, tbl.4.

136 *See infra* app. 1, tbl.4.

137 Provenzano v. Moore, 744 So. 2d 413, 436 (Fla. 1999) (Shaw, J., dissenting); Jones v. State, 701 So. 2d 76, 87 (Fla. 1997) (Shaw, J., dissenting); AMNESTY INTERNATIONAL, WHEN THE STATE KILLS 265–68 (1989).

138 *See infra* app. 1, tbl.7.

139 *See* Carla McClain, *Arizona Gas Chamber Stays,* GANNET NEWS SERV., Apr. 7, 1992, *available in* LEXIS, Nexis Library, Wires File (84% favoring lethal injection); George Skelton, *Death Penalty Support Still Strong in State,* L.A. TIMES, Apr. 29, 1992, at A1 (63% favoring lethal injection).

140 Steve Bousquet, *Eye on 2000: A State Poll, The Chair Out of Favor,* MIAMI HERALD, Nov. 7, 1999, at 1A (reporting the results of an October 1999 statewide poll conducted by *The Miami Herald* and *The St. Petersburg Times* in which 58% of the 600 people questioned supported a state law to replace the electric chair with lethal injection); *Poll: Electric Chair Unpopular in Florida,* OMAHA WORLD-HERALD, Nov. 7, 1999, at 22A.

141 *Provenzano,* 744 So. 2d at 436–37 (Shaw, J., dissenting) (citations omitted).

142 *Id.* at 437.

143 *Id.* at 436.

144 *Id.* at 413 (per curiam).

145 *See infra* app. 1, tbl.2; app. 2 (Georgia).

146 Dick Pettys, *Electrocution Argued in Court,* CHI. TRIB., July 10, 2001, § 1, at 12.

147 Denno, *Getting to Death, supra* note 1, at 378–79 (discussing Mississippi); *see infra* app. 2 (Mississippi).

148 554 S.E.2d 137 (Ga. 2001).

149 *Id.* at 144; *see also id.* at 146–47 (Thompson, J., dissenting) ("The majority claims that state imposed electrocution has fallen into disfavor in this country, but it does not cite a single case where an appellate court in another state or the federal system has held electrocution to be cruel and unusual under a state constitution or the federal constitution. *That is because there are no cases.*"); Henry Weinstein, *Georgia High Court Relegates Electric Chair to History,* L.A. TIMES, Oct. 6, 2001, at A21 (noting that the *Dawson* court's decision "marks the first time an appellate court has issued such a ruling against use of the electric chair").

150 *Dawson,* 554 S.E.2d at 139–41.

151 *See infra* notes 159–60.

152 *Dawson,* 554 S.E.2d at 144.

[153] *Id.*

[154] *Id.* at 143.

[155] *See infra* app. 2 (Louisiana).

[156] *See infra* app. 2 (Louisiana).

[157] *See infra* app. 2 (Louisiana).

[158] *See infra* app. 2 (Louisiana).

[159] Todd von Kampen, *Sticking with 4 Jolts for Now, Two Officials Say a Second Judge's Ruling Against How the Electric Chair is Used Won't Prompt Quick Changes*, OMAHA WORLD-HERALD, Feb. 23, 2001, at 9.

[160] *Id.* (quoting the May 2000 ruling by District Judge Robert Hippe in the 1999 murder case involving death row inmate Raymond Mata, Jr.).

[161] *Id.* (referring to the February 22, 2001, ruling by District Judge Randall Rehmeier in the case of convicted murderer Kimberly Sue Faust). Nebraska's electrocution statute refers to a continuous current. NEB. REV. STAT. § 29-2532 (1943) ("The mode of inflicting the punishment of death, in all cases, shall be by causing to pass through the body of the convicted person a current of electricity of sufficient intensity to cause death; and the application of such current shall be continued until such convicted person is dead."); *see also supra* note 70.

[162] von Kampen, *supra* note 159, at 9.

[163] *Id.*

[164] In January 2001, bills were introduced by Sens. Jon Bruning and Kermit Brashear to replace electrocution with lethal injection. L.B. 62, 97th Leg., 1st Reg. Sess. (Neb. 2001); L.B. 356, 97th Leg., 1st Reg. Sess. (Neb. 2001).

[165] *See infra* app. 2 (Ohio).

[166] Randy Ludlow, *"Old Sparky" Finale? Byrd Electrocution Maybe Chair's Last*, CIN. POST, Aug. 10, 2001, at 1A.

[167] *Id.* ("Some pretty nasty stuff has happened around the country, and that's not something I want to put our staff through. . . . It's stressful on me [too]." (quoting Ohio Corrections Director Reggie Wilkinson)); *see also* Randy Ludlow, *Old Sparky is Out of Work*, CIN. POST, Nov. 16, 2001, at 19A (noting that Ohio Corrections Director Reginald Wilkinson had wanted to "dismantle the oak chair to spare his volunteer execution team from witnessing the horror of electrocution").

[168] *National Briefing (Midwest)*, N.Y. TIMES, July 19, 2001, at A18.

[169] Am. H.B. 362, 124th Gen. Assem., Reg. Sess. (Ohio 2001) (eliminating electrocution as a means of executing the death sentence), *available at* http://www.legislature.state.oh.us/ bills.cfm?ID=124_HB_362; *see also* app. 2 (Ohio).

[170] A comparably peculiar circumstance arose when John Albert Taylor made a highly publicized choice to be executed by firing squad under Utah's choice statute, which has lethal injection as the default. *See infra* app. 2 (Utah); James Brooke, *Utah Debates Firing Squads in Clash of Past and Present*, N.Y. TIMES, Jan. 14, 1996, § 1, at 16; *Condemned Criminal in Utah Seeks Death by Firing Squad*, N.Y. TIMES, Dec. 11, 1995, at A14 [hereinafter *Condemned Criminal*]; *Firing Squad Executes Killer*, N.Y. TIMES, Jan. 27, 1996, at A22. Apparently motivated by a desire to embarrass the State, Taylor's decision accentuated current problems in administering the firing squad. *See* Brooke, *supra*; *Condemned Criminal*, *supra*. Regardless, the diminished publicity following Taylor's death appears to have also dimmed the political concern with the firing squad.

[171] Bill Cohen, *Ohio Considers Junking Electric Chair*, STATELINE.ORG (July 30, 2001), *at* http://www1.stateline.org/story.do?/storyId=138945.

[172] *Id.*

[173] In 1888, lethal injection was considered along with other execution methods when New York's governor-appointed commission was seeking the most humane means of implementing the death penalty. Denno, *Electrocution*, *supra* note 1, at 571–72; *see also supra* notes 43–44 and accompanying text (discussing the appointment of the New York commission).

[174] Denno, *Electrocution*, *supra* note 1, at 572–73; Patrick Malone, *Death Row and the Medical Model*, 9 HASTINGS CTR. REP., Oct. 1979, at 5; *see also* James W. Garner, *Infliction of the Death Penalty by Electricity*, 1 J. AM. INST. CRIM. L. & CRIMINOLOGY 626, 626 (1910) (stating that in the opinion of one Philadelphia physician, utilizing "the practice of medicine . . . for the purpose of putting criminals to death would arouse the unanimous protest of the medical profession"). This concern among physicians still exists. Jerome D. Gorman, M.D. et al., *The Case Against Lethal Injection*, 115 VA. MED. 576, 576–77 (1988) ("This use of a well-known medical tool, general anesthesia, for execution blurs the distinctions between healing and killing, between illness and guilt.").

[175] ROYAL COMMISSION ON CAPITAL PUNISHMENT 1949–1953 REPORT 258–61 (1973) [hereinafter ROYAL COMM'N REP.] (stating that attempts to make an injection into a vein often result in practical difficulties, rendering the method unsuitable for execution). The Royal Commission discussed four major problems that are still relevant to lethal injections today: (1) lethal injection could not be administered to individuals with certain "physical abnormalities" that make veins impossible to locate and that even "normal" veins can be flattened by cold or nervousness, conditions frequently characteristic of an execution setting; (2) lethal injection is difficult unless the subject fully cooperates and remains "absolutely still"; (3) lethal injection requires medical skill, although the medical profession was opposed to participating in the process; and (4) because of such problems, it was likely that executioners would have to implement an intramuscular (rather than intravenous) injection even though the intramuscular method would be slower and more painful. *Id.* at 258–60. In 1965, executions were abandoned entirely in Great Britain; consequently, there was no reason for the British to re-evaluate whether lethal injection would be preferable to other methods of execution. FRANKLIN E. ZIMRING & GORDON HAWKINS, CAPITAL PUNISHMENT AND THE AMERICAN AGENDA 109 (1986).

[176] 428 U.S. 153 (1976) (plurality opinion).

177 ZIMRING & HAWKINS, *supra* note 175, at 109–10.

178 *Id.* at 109–11.

179 Ward Casscells, M.D. & William J. Curran, M.D., *Doctors, the Death Penalty, and Lethal Injection*, 307 NEW ENG. J. MED. 1532, 1532 (1982).

180 Then-Governor Reagan explained the procedure as follows:

> Being a former farmer and horse raiser, I know what it's like to try to eliminate an injured horse by shooting him . . . . Now you call the veterinarian and the vet gives it a shot and the horse goes to sleep—that's it. I myself have wondered if maybe this isn't part of our problem [with capital punishment], if maybe we should review and see if there aren't even more humane methods now—the simple shot or tranquilizer.

Henry Schwarzschild, *Homicide by Injection*, N.Y. TIMES, Dec. 23, 1982, at A15 (quoting Ronald Reagan); *see also* Scott Christianson, *Corrections Law Developments: Execution by Lethal Injection*, 15 CRIM. L. BULL. 69, 70 (1979). Zimring and Hawkins claim, however, that the subsequent lure of lethal injection cannot be traced to any charismatic figure or special constituency. ZIMRING & HAWKINS, *supra* note 175, at 110.

181 Daniel C. Hoover, *Injection Death Bill Endorsed by House*, NEWS & OBSERVER (Raleigh, N.C.), June 29, 1983, at 1A. The appearance of lethal injection also was important in light of an increasing public interest in the possibility of televised executions. *See, e.g.*, Garrett v. Estelle, 424 F. Supp. 468, 470–71 (N.D. Tex. 1977) (discussing an attempt by a Public Broadcasting Service television station to enjoin the Texas Department of Corrections from banning the broadcast of the first execution in Texas since 1964), *rev'd*, 556 F.2d 1274 (5th Cir. 1977); Jef I. Richards & R. Bruce Easter, *Televising Executions: The High-Tech Alternative to Public Hangings*, 40 UCLA L. REV. 381, 386–89 (1992) (discussing *Garrett* and related cases); *infra* note 206 and accompanying text (noting that the chemicals for a lethal injection execution are about $100 or less).

182 Christianson, *supra* note 180, at 72 (contending that Oklahoma passed the lethal injection statute in part because of its economic benefits). Advocates of lethal injection present four major arguments on its behalf: (1) economy; (2) humaneness; (3) political feasibility; and (4) constitutional soundness. Herb Haines, Primum Non Nocere: *Chemical Execution and the Limits of Medical Social Control*, 36 SOC. PROBS. 442, 445–46 (1989); *see also* Gorman et al., *supra* note 174, at 577 (noting that lethal injection appears to be more humane and cheaper than electrocution).

183 *See infra* app. 2 (The adopting states were: Oklahoma and Texas in 1977, Idaho in 1978, New Mexico in 1979, and Washington in 1981.).

184 *See infra* app. 1, tbl.9 (Charles Brooks, Jr.).

185 *See infra* app. 1, tbl.9.

186 *See infra* app. 1, tbl.3; app. 2. The start of electrocution also was accompanied by large numbers of botched executions. *See supra* notes 55–56 and accompanying text.

187 *See infra* app. 1, tbl.10. Additional types are possible; these six provide the most workable introduction to lethal injection statutes.

188 These twenty-seven states are: Arizona, Arkansas, Colorado, Connecticut, Delaware, Georgia, Illinois, Indiana, Kansas, Kentucky, Louisiana, Maryland, Mississippi, Montana, Nevada, New Mexico, New York, North Carolina, Ohio, Oklahoma, Oregon, Pennsylvania, South Dakota, Tennessee, Texas, and Wyoming. *See infra* app. 1, tbl.10 (Type 1 statutes); *see also infra* app. 1, tbl.1.

189 These six states are: California, Florida, South Carolina, Utah, Virginia, and Washington. *See infra* app. 1, tbl.10 (Type 2 statutes).

190 These three states are: Idaho, New Hampshire, and Missouri. *See infra* app. 1, tbl.10 (Type 3 statutes).

191 These five states are: Arizona, Arkansas, Delaware, Kentucky, and South Carolina. *See infra* app. 1, tbl.10 (Type 4 statutes).

192 *See infra* app.1, tbl.10 (statutes of Types 2, 3, and 4).

193 For example, one small survey showed that of the twenty-four California death row inmates who were provided a choice between lethal gas and lethal injection between January 1, 1993, and October 14, 1993, two-thirds (sixteen inmates) declined to make a choice. In turn, seven selected lethal injection and one chose lethal gas. *Fierro v. Gomez*, 865 F. Supp. 1387, 1391 (N.D. Cal. 1994), *aff'd*, 77 F.3d 301 (9th Cir. 1996), *vacated on other grounds*, 519 U.S. 918 (1996) (remanding for reconsideration in light of changed statute). The Royal Commission initially considered that giving a prisoner a choice between methods would provide a way of "introducing an untried system." However, the Commission ultimately decided otherwise because of the inmate's "tormenting vacillation" involved in making such a choice. ROYAL COMM'N REP., *supra* note 175, at 220.

194 *See supra* note 34 and accompanying text; *infra* app. 2 (California).

195 *See infra* app. 1, tbl.10; app. 2 (South Carolina).

196 *See infra* app. 1, tbl.10 (Type 6 statutes); app. 2 (South Carolina).

197 *See infra* app. 1, tbl.10 (Type 5 statutes).

198 237 U.S. 180 (1915).

199 *Id.* at 182–84 (holding that a retroactive method of execution does not violate Article I, Section 10 of the Constitution, which bars ex post facto laws); *see also supra* notes 58, 115 and accompanying text (discussing *Malloy v. South Carolina*, 287 U.S. 180 (1915)).

200 *See infra* app. 2 (Louisiana).

201 *See supra* notes 155–58 and accompanying text.

202 *See supra* notes 145–55 and accompanying text; *infra* app. 2 (Georgia).

OHIO STATE LAW JOURNAL                                                    [Vol. 63: 63 (2002)]

203 These ten states are: Arkansas, California, Delaware, Florida, Illinois, New Hampshire, Ohio, Oklahoma, South Carolina, and Wyoming. *See infra* app. 1, tbl.10 (Type 6 statutes).

204 OKLA. STAT. ANN. tit. 22, § 1014(B), (C) (West 1986); *see also infra* app. 1, tbl.10.

205 *See* Don Colburn, *Oklahoma Was the First*, WASH. POST, Dec. 11, 1990, (Health Section), at 14; Frank Murray, *McVeigh to Die from Mixture of 3-Drug Cocktail; Execution Foes Say It Is Inhumane*, WASH. TIMES, Apr. 25, 2001, at A4; Jeff Stryker, *The Role of Professions in the Execution Process*, THE RECORDER, Apr. 23, 1992, at 6.Telephone Interview with Dr. Stanley Deutsch, Professor of Anesthesiology, George Washington University School of Medicine and Health Sciences (July 25, 1995).

206 *See* Stryker, *supra* note 205, at 6; *see also supra* note 182 and accompanying text (commenting on the low cost appeal of lethal injection). Currently, the cost of lethal injection drugs averages about $100 or less, depending upon the state and other factors such as the supplier and the amount of chemicals used. *See, e.g.*, Lawrence D. Egbert, *Physicians and the Death Penalty*, AMERICA, Mar. 17, 1998, at 16 (stating that the cost of the "anesthesia equipment" in a Maryland execution in July 1997 "was about $75"); Frank Zoretich, *Clark Execution Cost More Than $40,000, Officials Say*, ALBUQUERQUE TRIBUNE, Feb. 16, 2002, at A3 (explaining that "the lethal injection cocktail of drugs cost taxpayers $91.49"); N.C. DEP'T OF CORR., EXECUTION METHODS, *at* http://www.doc.state.nc.us/DOP/deathpenalty/executio.htm (last updated Sept. 5, 2001) (noting that the cost of execution supplies in North Carolina averages about $105:63).

207 Letter from Stanley Deutsch, Ph.D., M.D., Professor of Anesthesiology, University of Oklahoma Health Sciences Center , to the Honorable Bill Dawson, Oklahoma state senator (Feb. 28, 1977) [hereinafter Deutsch Letter] (on file with the author). Deutsch's letter reads as follows:

Dear Senator Dawson:

This letter is written to review areas that we discussed regarding execution by administration of drugs intravenously. Without question this is, in my opinion, extremely humane in comparison to either electrocution or execution by the inhalation of poisonous gases.

The administration of an ultra short acting barbiturate such as Thiopental (Pentothal) or Methohexital (Brevital) in quantities of 2000 mg with 1000 mg of Succinylcholine intravenously would produce unconsciousness within 40 seconds and death of [sic] asphyxia. Other nueormuscular [sic] blocking drugs that could be employed include Pancuronium or Decamethonium in doses of 20 mg to produce long duration of paralysis and an effect similar to Succinylcholine. The effect of [sic] combination of ultra short acting barbiturate and neuromuscular blocking drugs would produce death in a predictable way and with certainty. These drugs have understandability of terminology in all medical and other biological circles and therefore there would be no probability of confusion with regard to which drugs would be used and the intent at the doses employed.

Administration of these drugs would necessitate the starting [of] an intravenous infusion of fluids through a plastic catheter as we commonly do in the operating room. In an uncooperative patient, this would require restraint of an arm, but this can be facilitated by oral sedation or intramuscularly prior to attempting to begin the intravenous solution. This is also commonly employed in patients who are apprehensive prior to arrival in the waiting room.

Having been anesthetized on several occasions with ultra short acting barbiturates and having administered these drugs for approximately 20 years, I can assure you that this is a rapid[ly] pleasant way of producing unconsciousness. If there is any further information that I can provide you, do not hesitate to call upon me.

Sincerely yours,

/s/

Stanley Deutsch, Ph.D., M.D.
Professor and Head
Department of Anesthesiology
[The University of Oklahoma Health Sciences Center]

*Id.*

208 *Id.*

209 Colburn, *supra* note 205, at 14.

210 Deutsch Letter, *supra* note 207 (providing specifics on how lethal injection could be carried out); *see also* Stryker, *supra* note 205, at 6 (summarizing Dr. Deutsch's opinion). Nancy Nunnally, a spokesperson for the Oklahoma Corrections Department, confirmed that the state changed to lethal injection for "humane" reasons. As she explained, "[p]eople don't realize it, but the electric chair can take 11 minutes to kill people. The first shock knocks you unconscious, but then it would just cook you. You would literally fry." Mary Thornton, *Death by Injection*, WASH. POST, Oct. 6, 1981, at A1.

211 *See infra* app. 1, tbl.10. *See generally* app. 2.

212 Deutsch Letter, *supra* note 207 (emphases added).

213 OKLA. STAT. ANN. tit. 22, § 1014 (A) (West 1996) (manner of inflicting punishment of death) (emphases added); *see also infra* app. 2 (Oklahoma).

214 *See infra* app. 1, tbls.11–12; app. 3.

215 *See infra* app. 1, tbls.11–12; app. 3. For an overview of the controversy concerning these chemicals, see Haines, *supra* note 182, at 445–46 (discussing whether lethal injection is a humane method of execution); Harold L. Hirsh, *Physicians as Executioners*, LEGAL ASPECTS OF MED. PRAC., Mar. 1984, at 1, 1–2 (describing the circumstances surrounding *Chaney v. Heckler*); Don Colburn, *Lethal Injection: Why Doctors Are Uneasy About the Newest Method of Capital Punishment*, WASH. POST, Dec. 11, 1990, (Health Section), at 12 (debating the role of physicians in

OHIO STATE LAW JOURNAL                                   [Vol. 63: 63 (2002)]

execution by lethal injection); *Death Dealing Syringes*, TIME, Dec. 20, 1982, at 29 (reporting the execution of Charles Brooks by lethal injection); Ian Fisher, *Merits of Lethal Injection Are Questioned by Its Foes*, N.Y. TIMES, Feb. 17, 1995, at B5 (analyzing the controversy surrounding lethal injection as a humane method to induce death); Jacob Weisberg, *This is Your Death: Capital Punishment: What Really Happens*, NEW REPUBLIC, July 1, 1991, at 23 (explaining the debate over televised executions).

216 Deutsch Letter, *supra* note 207.

217 *See infra* notes 234–37 and accompanying text.

218 PHYSICIAN'S DESK REFERENCE 835 (55th ed. 2001); Malone, *supra* note 174, at 6.

219 *See infra* notes 261, 320, 375–77, 381, 387 and accompanying text.

220 *See infra* app. 1, tbl.10 (Type 1 statutes).

221 *See infra* note 222 and accompanying text.

222 *See* Malone, *supra* note 174, at 6. Because prisoners differ in their physiological constitution as well as their drug tolerance and drug use histories, some prisoners may need a far higher dosage of sodium pentathol than others "before losing consciousness and sensation." *See* Affidavit of Edward A. Brunner, M.D., Ph.D., ¶ 8G [hereinafter Brunner Affidavit], Exhibit B of Verified Complaint in Chancery, Gacy v. Peters, No. 94 CH (Ill. Apr. 1994) [hereinafter Gacy Complaint].

223 THE AM. COLL. OF PHYSICIANS ET AL., BREACH OF TRUST: PHYSICIAN PARTICIPATION IN EXECUTIONS IN THE UNITED STATES 20 (1994) [hereinafter BREACH OF TRUST]; PHYSICIAN'S DESK REFERENCE, *supra* note 218, at 1193. Other chemical paralyzing agents include tubocurarine chloride and succinylcholine chloride, the last of which Deutsch also recommended. Deutsch Letter, *supra* note 207.

224 Malone, *supra* note 174, at 6. Potassium chloride stops the heart; potassium induces cardiac arrest. Letter to Deborah W. Denno, Professor, Fordham University School of Law, from Lawrence Egbert, M.D., M.P.H., former Professor of Anesthesiology, University of Texas Southwestern Medical School, and current President, Maryland chapter of Physicians for Social Responsibility 6 (Nov. 2001) [hereinafter Egbert Letter] (on file with the author).

225 STEDMAN'S MEDICAL DICTIONARY 1566 (26th ed. 1995) (defining "saline" as "[a] salt solution, usually sodium chloride").

226 *See infra* note 375 and accompanying text.

227 Justine Sharrock, *Undercutting Executions*, MOTHER JONES, Dec. 28, 2001, *at* http://www.motherjones.com/web_exclusives/features/news/executions.html (targeting Bergen Brunswig, Cardinal Health, and Abbott Laboratories); Martin Yant, *Lethal Injection, Cardinal Health on the Hot Seat*, COLUMBUS ALIVE (Columbus, Ohio), Jan. 17, 2002, at 7 (implicating Abbott Laboratories, Cardinal Health, Inc., Bergen Brunswig, and Ross Products).

228 *See supra* notes 207, 210, 212–13, 220–21 and accompanying text.

229 Telephone and e-mail interview with Lawrence Egbert, M.D., M.P.H., former Professor of Anesthesiology, University of Texas Southwestern Medical School, and current President, Maryland chapter of Physicians for Social Responsibility (Aug. 13, 2001).

230 *See supra* note 21 and accompanying text; *infra* notes 230, 241–42, 258, 261, 318–21, 377, 435 and accompanying text.

231 Deutsch Letter, *supra* note 207 (referring to "an ultra short acting barbiturate such as Thiopental (Pentothal) or Methohexital (Brevital) in quantities of 2000 mg"); *see* Sims v. State, 754 So. 2d 657, 666 n.17 (Fla. 2000) (referring to a "lethal dose" of 2000 milligrams of sodium pentothal, "certain to cause rapid loss of consciousness (i.e., within 30 seconds of injection)"). *But see* Egbert, *supra* note 206, at 16 (stating that 2000 mg. of thiopental may not be lethal for some people).

232 *See infra* app. 1, tbls.11–15; app. 3.

233 Egbert Letter, *supra* note 224, at 6.

234 Denno, *Getting to Death*, *supra* note 1, at 354–58, 385 n.400; Denno, *Electrocution*, *supra* note 1, at 624–62; *see also infra* notes 261, 345, 355 (noting Leuchter's controversy and questionable credibility).

235 Denno, *Getting to Death*, *supra* note 1, at 377, 384–85; *see also infra* notes 261, 345 (noting the problems with Leuchter's lethal injection machines).

236 STEPHEN TROMBLEY, THE EXECUTION PROTOCOL: INSIDE AMERICA'S CAPITAL PUNISHMENT INDUSTRY 76–77 (1992).

237 *Id.* at 77–78; *see also infra* note 345 (discussing Leuchter's dubious "technique" for creating the chemical combinations necessary for a lethal injection).

238 Deutsch Letter, *supra* note 207.

239 The two drugs similar to pancuronium bromide were succinylcholine and decamethonium. *Id.*

240 *See infra* note 321.

241 *See infra* notes 261, 321.

242 Emanuel & Bienen, *supra* note 19, at 923.

243 561 S.W.2d 503 (Tex. Crim. App. 1978) (en banc).

244 136 U.S. 436, 447 (1890). For a discussion of *Kemmler*, see *supra* notes 40–70 and accompanying text.

[Vol. 63: 63 (2002)]

245 *Ex parte Granviel*, 561 S.W.2d. at 509 (quoting *Trop v. Dulles*, 356 U.S. 86, 101 (1958)).

246 *Id.* at 510.

247 *Id.* at 511–13. The *Granviel* court set forth the standards for determining whether a statute is unconstitutionally vague:

It is, of course, true that a law must be sufficiently definite that its terms and provisions may be known, understood, and applied. An Act of the legislature which violates either of said Constitutions (Federal or Texas), or an Act that is so vague, indefinite, and uncertain as to be incapable of being understood, is void and unenforcible [sic].

*Id.* at 511 (internal quotation marks omitted).

248 *Id.* at 514 (noting that a legislative body "may delegate to the administrative tribunal or officer power to prescribe details"). *See generally* John H. Gordon, Jr., Note, *Criminal Procedure—Capital Punishment—Texas Statutes Amended to Provide for Execution by Intravenous Injection of a Lethal Substance*, 9 ST. MARY'S L.J. 359, 361–65 (1977) (providing arguments for why the Texas lethal injection statute is constitutional).

249 *See* Earvin v. State, 582 S.W.2d 794, 799 (Tex. Crim. App. 1979) (en banc) (rejecting a lethal injection challenge in one sentence by citing to *Granviel*); Felder v. State, 564 S.W.2d 776, 779 (Tex. Crim. App. 1978) (en banc) (same).

250 470 U.S. 821 (1985).

251 *Id.* at 823.

252 Chaney v. Heckler, 718 F.2d 1174, 1177 n.5 (D.C. Cir. 1983), *rev'd*, 470 U.S. 821 (1985).

253 *Heckler*, 470 U.S. at 823.

254 *Id.*; *see also* Michele Stolls, *Heckler v. Chaney: Judicial and Administrative Regulation of Capital Punishment by Lethal Injection*, 11 AM. J.L. & MED. 251, 251–69 (1985) (discussing the *Heckler* Court's decision to decline to review the FDA's nonenforcement decision and its impact on the judicial regulation of death penalty cases).

255 *Heckler*, 470 U.S. at 823–24.

256 *See id.* at 837–38.

257 798 F.2d 695 (5th Cir. 1986).

258 *See id.* at 697–98. In support of his claim, Woolls provided testimony from several physicians contending that: (1) "the injection of sodium thiopental may cause physical and mental pain due to possible technical difficulties in administering the drug"; (2) "even if administered by a professional . . . the individual would be aware of the onset of loss of consciousness and the paralytic drug would produce a sense of shortness of breath and suffocation over a two to three minute period"; and (3) "the individual may also experience a sensation of multiple electric shocks over the entire body with erratic muscle twitching followed by acute paralysis and suffocation." *Id.*

259 *See infra* app. 1, tbl.9 (Randy L. Woolls).

260 *See, e.g.*, Hill v. Lockhart, 791 F. Supp. 1388, 1394 (E.D. Ark. 1992) (rejecting a claim that lethal injection is unconstitutional because it is not performed by medical doctors and therefore results in difficulties, such as an inability to locate a vein); People v. Stewart, 520 N.E.2d 348, 358 (Ill. 1988) (rejecting a claim that lethal injection constitutes cruel and unusual punishment because "defendant has submitted no evidence which indicates that execution by lethal injection results in protracted death or unnecessary pain"); *see also infra* notes 261–62, 264–79 and accompanying text.

261 In 1990, Charles Silagy and Walter Stewart brought a class action for injunctive relief against the State of Illinois and the Illinois Department of Corrections (DOC) contending that the lethal injection procedure used by the DOC violated the Illinois death penalty statute. Plaintiffs' Complaint at 1–2, Silagy v. Thompson, No. 90-C-5028 (N.D. Ill. Feb. 7, 1991). Plaintiffs emphasized that they were not challenging the constitutionality of lethal injection per se, but rather the particular procedure the defendants intended to use to implement it. *Id.* at 2–3. Although the Illinois statute authorized the injection of only two chemicals (a barbiturate and a paralytic agent), the defendants authorized the injection of three chemicals—sodium pentothal, pancuronium bromide, and potassium chloride. *Id.* at 1–2. According to the plaintiffs, "defendants' procedures create the substantial risk that plaintiffs will strangle or suffer excruciating pain during the three-chemical injection, but will be prevented by the paralytic agent from communicating their distress." *Id.* at 2. In addition, the DOC planned to use a lethal injection machine manufactured by Leuchter, despite the fact that the DOC had fired Leuchter because of his questionable qualifications. *Id.* at 6. Subsequently, Leuchter announced that his machine in Illinois was faulty and likely to fail. *Id.* at 6–7. The District Court for the Northern District of Illinois ultimately dismissed the plaintiffs' complaint. Silagy v. Thompson, No. 90-C-5028 (N.D. Ill. Feb. 7, 1991) (memorandum opinion and order).

262 Verified Complaint in Chancery, Gacy v. Peters, No. 94 CH (Ill. Apr. 1994).

263 *See infra* app. 1, tbl.9 (John W. Gacy).

264 Tom Jackman, *Death Penalty Resumes; Missouri Injection Case is With Supreme Court After Appellate Ruling*, KAN. CITY STAR, June 21, 1995, at C1; *see infra* app. 1, tbl.9 (Emmitt Foster).

265 Jackman, *supra* note 264.

266 754 So. 2d 657 (Fla. 2000).

267 LaGrand v. Lewis, 883 F. Supp. 469, 471 (D. Ariz. 1995), *aff'd sub nom*, LaGrand v. Stewart, 133 F.3d 1253 (9th Cir. 1998) (listing prior cases involving a constitutional challenge to lethal injection).

268 561 S.W.2d 503 (Tex. Crim. App. 1978); *see supra* notes 243–49 and accompanying text (discussing *Granviel*).

OHIO STATE LAW JOURNAL                              [Vol. 63: 63 (2002)]

269 *Sims*, 754 So. 2d at 665.

270 *Id.* An edited version of this protocol can be found *infra* app. 3 (Florida).

271 *Sims*, 754 So. 2d at 665–66.

272 *Id.* at 668.

273 *Id.* at 666 (citing LaGrand v. Lewis, 883 F. Supp. 469 (D. Ariz. 1995), *aff'd sub nom*, LaGrand v. Stewart, 133 F.3d 1253 (9th Cir. 1998)).

274 *Id.* at 667 (quoting *LaGrand*, 883 F. Supp. at 470–71).

275 *Id.* at 667 n.19.

276 *Id.* at 667–68, 667 n.19.

277 *Id.* at 668 n.19.

278 *Id.* at 668.

279 *Id.*

280 *Id.*

281 *Id.* at 668–69 (citing *Ex parte Granviel*, 561 S.W.2d 503 (Tex. Crim. App. 1978)).

282 *Id.* at 670.

283 *Id.*

284 561 S.W.2d 503 (Tex. Crim. App. 1978).

285 In 1982, Charles Brooks was the first person to be executed by lethal injection. *See supra* note 184 and accompanying text; *infra* app. 1, tbl.9.

286 Notably, *Granviel* used *Kemmler* as precedent to find lethal injection constitutional. *Granviel*, 561 S.W.2d at 508–09; *see also supra* notes 243–48 and accompanying text (discussing *Granviel*'s reliance on *Kemmler*).

287 *Sims*, 754 So. 2d at 666–67 (citing LaGrand v. Lewis, 883 F. Supp. 469 (D. Ariz. 1995)).

288 *See generally* LaGrand v. Lewis, 883 F. Supp. 469 (D. Ariz. 1995).

289 *See supra* notes 74–80 and accompanying text (discussing Eighth Amendment standards in the context of evaluating electrocution).

290 In addition to the medical literature, this article relies on the expert opinions of two anesthesiologists, who also have provided expert testimony in court on challenges to the constitutionality of lethal injection: Edward A. Brunner, M.D., Ph.D., former Professor of Anesthesia at Northwestern University Medical School, and Lawrence Egbert, M.D., M.P.H., former Professor of Anesthesiology at the University of Texas Southwestern Medical School and current President of the Maryland chapter of Physicians for Social Responsibility.

291 Egbert, *supra* note 206, at 15. *See generally* TROMBLEY, *supra* note 236.

292 *See supra* notes 81–102 and accompanying text.

293 *See supra* notes 81–95 and accompanying text.

294 *See, e.g.*, California First Amendment Coalition v. Woodford, No. C-96-1291-VRW, 2000 WL 33173913 (N.D. Cal. July 26, 2000); California First Amendment Coalition v. Calderon, 88 F. Supp. 2d 1083 (N.D. Cal. 2000); California First Amendment Coalition v. Calderon, 956 F. Supp. 883 (N.D. Cal. 1997) ("Calderon I"), *rev'd* 150 F.3d 976 (9th Cir. 1998).

295 *Calderon I*, 956 F. Supp. at 890 (noting that the First Amendment protects public access to executions).

296 *Id.* at 889 ("Even though the historical basis for the media's witnessing of executions is somewhat less clear than that of the public generally, it is no stretch to suggest that the public's right of access includes a right of media access."); *see also* California First Amendment Coalition v. Calderon, 150 F.3d 976, 981 (9th Cir. 1998) (emphasizing that "the role of the media is important; acting as the 'eyes and ears' of the public, they can be a powerful and constructive force, contributing to remedial action in the conduct of public business" (quoting Houchins v. KQED, Inc., 438 U.S. 1, 8 (1978)).

297 *See infra* notes 408–11 and accompanying text.

298 No. C-96-1291-VRW, 2000 WL 33173913 (N.D. Cal. July 26, 2000).

299 *Id.* at *9.

300 *Id.*

301 *Id.*

302 *Id.*

303 *Id.*

304 *Id.*

305 *See supra* note 275 and accompanying text.

306 *See infra* notes 408–11 and accompanying text. The credibility of newspaper accounts of botched lethal injections also came up in

Connecticut's evidentiary hearing concerning the constitutionality of lethal injection. The 1997 Connecticut evidentiary hearing relied on this author's testimony as well as the testimony of Drs. Edward Brunner and Lawrence Egbert. State v. Breton, No. CR4-147941 (Conn. Super. Ct. Nov. 14, 1997); *see also supra* note 290 (describing the credentials of Drs. Brunner and Egbert). Yet, the *Breton* court focused on the evidence it wanted to hear. For example, the court merely mentioned both doctors' extended testimony concerning the risks inherent in the lethal injection process. In contrast, the court emphasized the fact that on cross examination "both doctors agreed . . . that the proper implementation of the state's procedures by lethal injection would result in a virtually painless death." *Breton,* No. CR4-147941, at 2. The court considered "reliable" the author's data and studies on botched lethal injection executions, and noted my opinion that there exists a substantial risk of the infliction of unnecessary pain in light of the number of botched executions (for example, at least one in nine of twenty-two states that have the lethal injection procedure). However, the court considered my "second and third hand reports [newspaper accounts of botched executions], substantially less reliable." *Id.* Remarkably, the court chose to credit instead the testimony of two State experts on this issue: (1) Dr. Jeffrey Gross, who testified about the "routine" and "ordinary" nature of the lethal injection process and the State's efforts to avoid mishaps; and (2) David Nunnelee, a witness who characterized the 121 Texas executions as "seemingly painless," and "with no outward signs of physical pain or torture." *Id.* at 3. Moreover, the court highlighted evidence that the Deputy Commissioner of Corrections had followed "appropriate steps" to ensure a safe and effective procedure that would avoid any possible mishaps experienced in other states. *Id.* at 5.

307 883 F. Supp. 469 (D. Ariz. 1995).

308 Sims v. State, 754 So. 2d 657, 667 (Fla. 2000) (quoting LaGrand v. Lewis, 883 F. Supp. 469, 470–71 (D. Ariz. 1995)).

309 The fact that other courts preceding *Sims* have reacted similarly to newspaper accounts of botched lethal injections presented by this author during evidentiary hearings provides only further evidence of how limited Eighth Amendment analyses of lethal injection have been. *See, e.g., supra* note 306 (discussing *State v. Breton* in Connecticut); *see also Ex parte* Richardson, No. 81-CR-1545 (175th Dist. Ct., Bexar County, Tex. Oct. 1, 1997) (concerning the evidentiary hearing on the constitutionality of lethal injection in Texas held on April 28–30, 1997; in that hearing, the prosecution also questioned the reliability of this author's testimony on botched lethal injection executions based on newspaper reports).

310 *See supra* note 74 and accompanying text.

311 *See* California First Amendment Coalition v. Woodford, No. C-96-1291-VRW, 2000 WL 33173913 (N.D. Cal. July 26, 2000); California First Amendment Coalition v. Calderon, 88 F. Supp. 2d 1083 (N.D. Cal. 2000); California First Amendment Coalition v. Calderon, 956 F. Supp. 883 (N.D. Cal. 1997) ("*Calderon I*"), *rev'd*, 150 F.3d 976 (9th Cir. 1998).

312 *California First Amendment Coalition,* 2000 WL 33173913, at *10; *California First Amendment Coalition,* 88 F. Supp. 2d at 1084; *Calderon I,* 956 F. Supp. at 889–90.

313 *California First Amendment Coalition,* No. C-96-1291-VRW, 2000 WL 33173913, at *10; *California First Amendment Coalition,* 88 F. Supp. 2d at 1084; *Calderon I,* 956 F. Supp. at 889–90.

314 *See infra* app. 1, tbl.9 (detailing executioners' problems with finding a vein or keeping a needle inserted in a vein).

315 *See infra* app. 1, tbl.18; notes 412–13 and accompanying text (analyzing statewide restrictions on witnesses viewing a lethal injection procedure).

316 *See generally* TROMBLEY, *supra* note 236, at 105–16.

317 Egbert Letter, *supra* note 224, at 7.

318 Brunner Affidavit, *supra* note 222, ¶ 8G.

319 Brunner Affidavit, *supra* note 222, ¶ 8G–H; Affidavit of Lawrence Deems Egbert, M.D., M.P.H., ¶ 13 [hereinafter Egbert Affidavit], Exhibit 3 of Petition for Post Conviction Writ of Habeas Corpus, *Ex parte* Sam Felder, Jr., No. 227815-B (Tex. Crim. App. May 12, 1994) [hereinafter Felder I Petition] (pet. denied); *see also* Chaney v. Heckler, 718 F.2d 1174, 1191 (D.C. Cir. 1983) ("Even a slight error in dosage or administration can leave a prisoner conscious but paralyzed while dying, a sentient witness of his or her own slow, lingering asphyxiation."), *rev'd,* 470 U.S. 821 (1985).

320 Brunner Affidavit, *supra* note 222, ¶ 8G (Illinois Department of Correction's procedures typically recommended that 40cc of sodium pentothal be injected.).

321 Brunner Affidavit, *supra* note 222, ¶ 8H. As Brunner explains:

Under such circumstances, the prisoner will suffer an extremely painful sensation of crushing and suffocation, as the pancuronium bromide takes effect and stops his ability to breathe. The pancuronium bromide will paralyze the prisoner, rendering him unable to move or communicate in any way, while he is experiencing excruciating pain. As the third chemical, potassium chloride is administered, the prisoner will experience an excruciating burning sensation in his vein. This burning sensation—equivalent to the sensation of a hot poker being inserted into the arm—will then travel with the chemical up the prisoner's arm and spread across his chest until it reaches his heart, where it will cause the heart to stop.

*Id.*

322 *Id.* ¶ 7 (noting that under the Illinois procedure, "unlimited discretion to determine the dosages—and even to alter the chemicals themselves—is given to unspecified 'qualified health care personnel'"); Egbert Affidavit, *supra* note 319, ¶ 7 (emphasizing the discretion under the Texas death penalty statute); *see infra* app. 3 (illustrating the amount of discretion in all state protocols).

323 Thomas O. Finks, *Lethal Injection: An Uneasy Alliance of Law and Medicine,* 4 J. LEGAL MED. 383, 397 (1983); Hirsh, *supra* note 215, at 1.

324 Finks, *supra* note 323, at 397 (explaining that "[l]ethal injections may not work effectively on diabetics, drug users, and people with heavily pigmented skins"); Hirsh, *supra* note 215, at 1 (noting that "if a person is nervous or fearful, his veins become constricted"); *On Lethal*

*Injections and the Death Penalty*, 12 HASTINGS CTR. REP., Oct. 1982, at 2 [hereinafter *On Lethal Injections*] (explaining that lethal injections are particularly difficult to administer "to people with heavily pigmented skins . . . and to diabetics and drug users"); *Another U.S. Execution Amid Criticism Abroad*, N.Y. TIMES, Apr. 24, 1992, at B7 [hereinafter *Another U.S. Execution*] (reporting that the difficulty in executing Billy Wayne White was due to his history as a heroin user); Weisberg, *supra* note 215, at 23 (describing the forty-five minutes required for technicians to find a serviceable vein in a former heroin addict).

325 Finks, *supra* note 323, at 397 (quoting Kotulak, *Execution by Injection: The Doctor's Dilemma*, CHI. TRIB., Dec. 21, 1982, § 2, at 4).

326 Egbert Affidavit, *supra* note 319, ¶ 11 ("Unskilled personnel may be unable to insert successfully the IV catheter in the prisoner. This may be because the prisoner was once an addict and used the veins carelessly so the veins clotted or because the prisoner is anxious and this causes the veins to constrict.").

327 *Capital Punishment: Cruel and Unusual*, ECONOMIST, Jan. 23, 1993, at 86 (reviewing TROMBLEY, *supra* note 236, and quoting a death row inmate, "[t]hey put a catheter in your penis"); *see infra* app. 1, tbl.9 (George "Tiny" Mercer); *infra* app. 3 (Kentucky).

328 *See infra* app. 1, tbl.9 (Rickey Ray Rector).

329 Affidavit of Stephen M. Trombley, ¶ 20 [hereinafter Trombley Affidavit], Exhibit A of Gacy Complaint, *supra* note 222.

330 Brunner Affidavit, *supra* note 222, ¶ 5; Egbert Affidavit, *supra* note 319, ¶ 9. If the catheter is improperly administered into the muscle, the prisoner will experience a severe burning sensation, and the drugs will take longer to absorb than if they had been directly inserted into the bloodstream. Brunner Affidavit, *supra* note 222, ¶ 8E; Egbert Affidavit, *supra* note 319, ¶ 9.

331 TROMBLEY, *supra* note 236, at 261; Finks, *supra* note 323, at 397; Haines, *supra* note 182, at 448. Cutdowns are typically unnecessary if a technician is experienced and uses modern equipment. Interview with Edward A. Brunner, M.D., Ph.D., Professor of Anesthesia, Northwestern University Medical School (Apr. 29, 1997).

332 Brunner Affidavit, *supra* note 222, ¶ 8E (noting that the risk of strangulation could be prevented by denying the prisoner food six-to-eight hours before execution).

333 Humane Soc'y of the U.S., *General Statement Regarding Euthanasia Method for Dogs and Cats*, SHELTER SENSE, Sept. 1994, at 11.

334 *Id.* at 11–12.

335 *See infra* app. 1, tbl.9.

336 Sims v. State, 754 So. 2d 657, 667 n.19 (Fla. 2000) (quoting the expert testimony of Professor Michael Radelet).

337 *See infra* app. 1, tbl.9 (describing the lethal injection botches of eleven Texas inmates: Charles Brooks, Jr., James D. Autry, Thomas Andy Barefoot, Stephen Peter Morin, Randy L. Woolls, Elliot Rod Johnson, Raymond Landry, Stephen McCoy, Billy Wayne White, Justin Lee May, and Ronald Allridge). Perhaps for this reason, in 1997, a Texas district court held an evidentiary hearing on the constitutionality of lethal injection. *Ex parte* Richardson, No. 81-CR-1545 (175th Dist. Ct., Bexar County, Tex. Oct. 1, 1997); *see also supra* note 309 (discussing the Texas hearing). This hearing was followed shortly by a hearing in Connecticut because the state had just adopted, but never used, the method. State v. Breton, No. CR4-147941 (Super. Ct. Conn. Nov. 14, 1997). Both the Connecticut and Texas courts upheld the constitutionality of lethal injection. *See supra* notes 306, 309 (discussing, respectively, the outcomes of the hearings in Connecticut and Texas).

338 TROMBLEY, *supra* note 236, at 73 (noting that, "[i]n the final analysis, it looks disgusting" because the inmates "routinely choke, cough, spasm, and writhe as they die").

339 *See infra* app. 1, tbl.9.

340 Richardson, No. 81-CR-1545 (testimony of Deborah W. Denno).

341 *Murderer of Three Women Is Executed in Texas*, N.Y. TIMES, Mar. 14, 1985, at A22 [hereinafter *Murderer of Three Women*].

342 *See infra* app. 3 (Texas).

343 *See infra* app. 1, tbl.9 (Randy Woolls (1986) and Elliot Rod Johnson (1987)).

344 *See infra* app. 1, tbl.9. The Texas executions of Billy Wayne White in 1992 and Ronald Allridge in 1995 also were botched because technicians experienced difficulties locating suitable veins. *See infra* app. 1, tbl.9.

345 *See infra* app. 1, tbl.9. Also, at the time lethal injection machines malfunctioned in the states that used them. By 1990, four states had purchased Leuchter-created lethal injection machines. Denno, *Electrocution*, *supra* note 1, at 627–28 (listing Delaware, Illinois, Missouri, and New Jersey). However, Leuchter had no technical or medical expertise for devising the different mixtures of chemicals he recommended. For example, when one of the first states that switched to lethal injection contacted Leuchter for advice on that method, he began to study pharmacology and chemistry. Based upon the results of studies conducted on pigs and rabbits, Leuchter calculated the dosages of sodium thiopental, pancuronium bromide, and potassium chloride required for the lethal injection of human beings. Thereafter, he created a computer-controlled machine for injecting prisoners without, he explained, rupturing their veins or inducing "undue discomfort." *Dr. Death and His Wonderful Machine*, N.Y. TIMES, Oct. 18, 1990, at A24.

346 *See infra* app. 1, tbl.9 (Jose Martinez High).

347 *See infra* app. 1, tbl.9 (Joseph High, Nov. 7, 2001).

348 *See supra* notes 1, 25–31, 131–36, 183–203 and accompanying text.

349 Council on Ethical and Jud. Affairs, AMA, Council Rep., *Physician Participation in Capital Punishment*, 270 JAMA 365, 365 (1993) [hereinafter Council on Ethical and Jud. Affairs] ("A physician, as a member of a profession dedicated to preserving life when there is hope of doing

[Vol. 63: 63 (2002)]

se; should not be a participant in a legally authorized execution." (quoting Council on Ethical and Jud. Affairs, AMA, Code of Med. Ethics, Current Op., Op. 2.06 (1994))); BREACH OF TRUST, *supra* note 223, at xi. The Hippocratic Oath that physicians take rests on an intention to "do no harm." *Id.* at 39. *See generally* W. Noel Keyes, *The Choice of Participation by Physicians in Capital Punishment*, 22 WHITTIER L. REV. 809, 812 (2001) (discussing the AMA's stance against physician participation and the long history of doctor involvement in executions). Capital punishment also contradicts nursing philosophy although the American Association of Nurse Anesthetists has not taken a formal stance concerning the participation of certified nurse anesthetists in capital punishment cases. Ann E. Aprile, *Ethical Issues Involving Medical Personnel and the Administration of Lethal Injection in Capital Punishment Cases*, CRNA: THE CLINICAL FORUM FOR NURSE ANESTHETISTS, Aug. 1996, at 116–17.

350 Christina Michalos, *Medical Ethics and the Executing Process in the United States of America*, 16 J. MED. & L. 125, 126 (1997) (noting that with a lethal injection execution, "[m]edical knowledge is required to order the drugs, insert the catheter and connect the monitoring equipment").

351 James K. Boehnlein et al., *Medical Ethics, Cultural Values, and Physician Participation in Lethal Injection*, 23 BULL. AM. ACAD. PSYCHIATRY LAW 129, 130 (1995) ("Lethal injection is an example of the medicalization of a complex social issue, yet it is unique because in this instance physicians' skills and procedures are being used to carry out government mandates that contradict established medical practice (i.e., the taking of a human life)."); David J. Rothman, *Physicians and The Death Penalty*, 4 J.L. & POL'Y 151 (1995) (discussing the historical role of physicians in executions); James Welsh, *Execution by Lethal Injection*, 348 LANCET 63 (1996) (emphasizing how the growing use of lethal injection internationally is drawing physicians into further involvement with capital punishment and therefore raising serious ethical and human rights issues); James Welsh, *The Medicine That Kills*, 351 LANCET 441 (1998) (discussing a 1998 Amnesty International report detailing the problems with lethal injection and medical involvement in it).

352 *See, e.g.*, Ronald Bayer, *Lethal Injections and Capital Punishment: Medicine in the Service of the State*, 4 J. PRISON & JAIL HEALTH 7, 7–14 (1984) (discussing the controversy surrounding physician participation in lethal injections); Casscells & Curran, *supra* note 179, at 1532–33 (same); *see also* Neil Farber et al., *Physicians' Attitudes About Involvement in Lethal Injection for Capital Punishment*, 160 ARCHIVES OF INTERNAL MED. 2912, 2912 (2000) (reporting the results of a survey of 482 physicians and concluding that, regardless of the statements of medical societies, "the majority of physicians surveyed approved of most disallowed actions involving capital punishment, indicating that they believed it is acceptable in some circumstances for physicians to kill individuals against their wishes"); *supra* note 18; *infra* notes 363–66 and accompanying text (discussing other survey results).

353 Council on Ethical and Jud. Affairs, *supra* note 349, at 366–67. "The AMA guidelines . . . specify that selecting injection sites, starting intravenous lines, prescribing, preparing or administering injection drugs, and consulting with lethal injection personnel constitute physician participation in executions and are unethical." BREACH OF TRUST, *supra* note 223, at 20. The presence of a physician at a lethal injection execution was required by some state statutes such as Oklahoma's. OKLA. STAT. ANN. tit. 22, § 1014 (1996). However, this arrangement has changed for two reasons: (1) the AMA's pronouncement and physicians' complaints that states were turning executions into medical procedures, see Gorman et al., *supra* note 174, at 576; and (2) claims that physicians were blurring the line between their role as a healer and as a killer, see Fisher, *supra* note 215 (reporting that, in several states, doctors are present at executions, but do not administer the injections). As a result, states with lethal injection no longer require the services of a physician, except to pronounce death. *See generally* BREACH OF TRUST, *supra* note 223.

354 Denno, *Electrocution*, *supra* note 1, at 627–28 (listing Delaware, Illinois, Missouri, and New Jersey); *see supra* note 345 and accompanying text (discussing those states that apply Leuchter's machines).

355 Denno, *Electrocution*, *supra* note 1, at 664–62; *see supra* notes 234, 261, 345 and accompanying text (discussing some of the problems Leuchter has encountered).

356 *See infra* app. 3.

357 BREACH OF TRUST, *supra* note 223, at 18–20; *see infra* app. 3; *infra* notes 386–407 and accompanying text.

358 Aprile, *supra* note 349, at 116 (noting that the equipment loaning issue is in controversy). Some doctors have likened such involvement to the physician participation in the torture and murder of Nazi prisoners and concentration camp victims. Gorman et al., *supra* note 174, at 577.

359 Fred Leuchter claims that in lethal injection executions, doctors will knowingly watch prison personnel mix or inject chemicals incorrectly but not say anything because they do not want to get involved. TROMBLEY, *supra* note 236, at 74–77.

360 Aprile, *supra* note 349, at 116. Three doctors recently explained the problem:

> Lethal injection looks more like therapy than punishment. It involves a traditional and familiar therapeutic modality, intravenous general anesthesia, typically with Pentothal and a muscle relaxant. One difference is that the "patient," once "put to sleep," is not recovered. By wrapping punishment in a therapeutic cloak, the whole process leading to that final moment feels less aversive to those who are required to participate and is therefore more bearable.

Gorman et al., *supra* note 174, at 576 (noting that lethal injection appears to be more humane and cheaper than electrocution).

361 According to one author, for example, physicians in such a situation could be viewed as reneging on their "contract with their patients." Aprile, *supra* note 349, at 117. Yet, others view the situation far differently.

> Even though lethal injection is 'medicalized' by society, there is no doctor-patient relationship and, consequently, no give and take between physician and patient. Yet even when there is no defined doctor-patient relationship, the doctor is using knowledge and skills attained during medical education and is thus recognized by society as possessing and using those specific skills that are normally used to sustain and enhance life.

Boehnlein et al., *supra* note 351, at 132.

362 Aprile, *supra* note 349, at 117 (questioning whether "dignity in death and dying [are] denied as a personal right for the death-row inmate?"). *But see supra* note 351 and accompanying text (offering counter arguments).

363 This participation was thoroughly documented in BREACH OF TRUST, a report on physician participation in executions throughout the United States. *See* BREACH OF TRUST, *supra* note 223; *see also* Boehnlein et al., *supra* note 351, at 130; Farber et al., *supra* note 17, at 886; Farber et al., *supra* note 352, at 2912.

> As of 1991, Oklahoma required physicians to order the drugs used in the lethal injection, pronounce the prisoner dead, and inspect the intravenous line started by a technician to ensure its proper function. Physicians have been required to perform cutdowns on prisoners when adequate veins could not be found. As recently as 1997, twenty-three states required physicians to determine or pronounce death, and Illinois has passed statutes specifically to allow physicians to give lethal drugs for the purposes of capital punishment. Moreover, physicians are participating via indirect means such as providing technical advice, ordering drugs, supervising drug administration, or pronouncing death. A total of twenty-seven states require or permit physicians to be involved in some way in the process of capital punishment.

Farber et al., *supra* note 352, at 2912–13.

364 Emanuel & Bienen, *supra* note 19, at 922 (citing Robert D. Trogg & Troyen A. Brennan, *Participation of Physicians in Capital Punishment*, 329 NEW ENG. J. MED. 1346, 1346–50 (1993)).

365 Farber et al., *supra* note 17, at 886.

366 *Id.*; *see also* Farber et al., *supra* note 352, at 2912 (noting that in a recent survey of physicians, more than half approved of most disallowed medical actions involving capital punishment).

367 *See generally* DONALD A. CABANA, DEATH AT MIDNIGHT: THE CONFESSION OF AN EXECUTIONER (1996) (detailing former prison warden Cabana's account of the prison system and his personal problems with the administration of the death penalty); ROBERT JOHNSON, DEATH WORK: A STUDY OF THE MODERN EXECUTION PROCESS (1990) (exploring the details of the execution process from the perspectives of the death row prisoners, their guards, and the executioners).

368 *See infra* app. 1, tbls.19–20.

369 *See infra* app. 3 (Nevada, Pennsylvania, South Carolina, and Virginia).

370 DEATH PENALTY INFO. CTR., STATE EXECUTIONS, *at* http://www.deathpenaltyinfo.org/ dpicreg.html (last updated on Feb. 19, 2002).

371 *See infra* app. 3 (Kansas, Kentucky, and New Hampshire).

372 DEATH PENALTY INFO. CTR., STATE BY STATE DEATH PENALTY INFO., *at* http:// www.deathpenaltyinfo.org/firstpage.html (indicating that Kansas and New Hampshire have had no executions since 1976) (last updated on Feb. 1, 2001).

373 DEATH PENALTY INFO. CTR., *supra* note 370, at http://www.deathpenaltyinfo.org/ dpicreg.html (last updated on Feb. 19, 2002); TRACY L. SNELL, BUREAU OF JUSTICE STATISTICS BULLETIN, CAPITAL PUNISHMENT 1999 at 10 tbl.10 (2000).

374 Virginia also mentions the use of saline, although prison officials will not specify the lethal injection chemicals. *See infra* app. 1, tbl.11.

375 *See infra* app. 1, tbl.17. The New York protocol, for example, states the following:

> 1. CAUTION: If all of the sodium pentothal has not been flushed from the line, mixture with the pavulon may create flocculation (solid particles) to block the flow of the liquid through the angiocath. If blockage occurs, the remaining injections must be made in the contingency line running to the alternate site.

*See infra* app. 3 (New York).

376 *See infra* notes 377–78 and accompanying text.

377 *See supra* notes 21, 230, 241–42, 258, 261, 318–21; *infra* note 435 and accompanying text.

378 Donald Janson, *Prisoners' Appeals Delay Jersey Executions*, N.Y. TIMES, March 9, 1986, at 42 ("The New Jersey law mandates death by successive injections of thiopental sodium, to render the person unconscious, pancuronium bromide to stop his breathing, and potassium chloride to end his heartbeat."); Michael Norman, *Site of Executions Ready in Trenton*, N.Y. TIMES, Aug. 21, 1983, at 43 (referring to syringes "filled with three drugs: thiopental sodium, a fast-acting barbiturate that causes unconsciousness; pancuronium bromide, a muscle relaxant that can induce respiratory failure, and potassium chloride, a salt compound that produces an abnormal heart rhythm and heart failure"); Meg Nugent, *Death Chamber Renovations Nearly Done—Corrections Chief Sorts Through Final Details for Execution of Martini*, STAR-LEDGER (Newark, N.J.), July 30, 1999, at 21 ("[Commissioner] Terhune said he wasn't prepared yesterday to release details on what drugs will be used, saying the decision had not yet been finalized. But he said one would serve as a relaxant while the other two would stop the heart and breathing."); Steve Strunsky, *N.J. Law; Death, After 36 Years, Is Back on Death Row*, N.Y. TIMES, Aug. 8, 1999, § 14, at 5 (describing a "cocktail of three drugs—a sedative and drugs to arrest Mr. Martini's heartbeat and breathing—that will kill Mr. Martini"); Joseph L. Zentner, *We Cannot Sanitize Execution*, THE RECORD (Bergen, N.J.), Oct. 27, 1985, at 1 ("Two technicians stand behind stainless-steel trays. One tray holds syringes filled with saline; the other holds the 'hot' syringes, which are filled with: thiopental sodium, a fast-acting barbiturate that produces unconsciousness; pancuronium bromide, a muscle relaxant that causes respiratory failure; and potassium chloride, a salt compound that induces heart failure.").

379 *See infra* app. 1, tbls.13–14.

380 *See infra* app. 1, tbl.15.

381 *But see* Egbert, *supra* note 206, at 16.

382 *See infra* app. 3 (Mississippi).

383 States with the highest number of lethal injection executions, from 1977–1999, rank as follows: Texas (199), Virginia (48), Missouri (41), Arkansas (20), Oklahoma (19), South Carolina (19), Arizona (17), North Carolina (13), Illinois (12), Delaware (9), Nevada (7), California (5), and Louisiana (5). SNELL, *supra* note 373, at 16 app. tbl.4.

384 SNELL, *supra* note 373, at 16 app. tbl.4.

385 *See supra* note 378 and accompanying text.

386 The fourteen states are: Arizona, Connecticut, Illinois, Louisiana, Montana, New Jersey, New Mexico, New York, Ohio, Oregon, Pennsylvania, Texas, Utah, and Washington. *See infra* app. 1, tbl.17.

387 *See infra* app. 1, tbl.17.

388 The eight states are: California, Colorado, Connecticut, Delaware, Georgia, Idaho, North Carolina, and Ohio. *See infra* app. 1, tbl.17.

389 The five states are: Florida, Maryland, Montana, New Jersey, and New Mexico. *See infra* app. 1, tbl.17.

390 The five states are: Arizona, Indiana, Mississippi, Oklahoma, and Utah. *See infra* app. 1, tbl.17.

391 *See* app. 1, tbl.17.

392 The eight states are: Kansas, Kentucky, Missouri, Nevada, New Hampshire, South Carolina, South Dakota, and Tennessee. *See infra* app. 1, tbl.17.

393 These seventeen states are: Delaware, Kansas, Kentucky, Louisiana, Maryland, Missouri, Nevada, New Hampshire, North Carolina, Oklahoma, South Carolina, South Dakota, Texas, Utah, Virginia, Washington, and Wyoming. *See infra* app. 1, tbl.17.

394 *See infra* app.1, tbl.17.

395 These eight states are: Arizona, Arkansas, Delaware, Illinois, Kansas, Maryland, Montana, and Utah. *See infra* app. 1, tbl.17.

396 The seven additional states are: Kentucky, Nevada, New Hampshire, Oklahoma, Pennsylvania, South Carolina, and Virginia. *See supra* note 395 for the other eight states.

397 These thirteen states are: California, Connecticut, Florida, Georgia, Indiana, Mississippi, New Hampshire, New Jersey, New Mexico, New York, Ohio, Oregon ("a medical professional"), and Washington. *See infra* app. 1, tbl.17.

398 These five states are: Colorado, Idaho, Louisiana, Montana, and Pennsylvania. *See infra* app. 1, tbl.17.

399 The single state is North Carolina. *See infra* app. 1, tbl.17.

400 *See infra* app. 1, tbl.17.

401 *See infra* app. 1, tbl.17.

402 *See infra* app. 1, tbl.16.

403 Brunner Affidavit, *supra* note 222, ¶ 8E (noting that the risk of strangulation could be prevented by denying the prisoner food six-to-eight hours before execution); *see supra* note 332 and accompanying text.

404 The six states are: Indiana, New Jersey, Ohio, Oregon, Texas, and Virginia. *See infra* app. 1, tbl.16.

405 *See infra* app. 1, tbl.16.

406 *See supra* note 383 and accompanying text.

407 *See supra* notes 294–313 and accompanying text.

408 *See infra* app. 1, tbl.18.

409 These four states are: Kansas, Kentucky, New Hampshire, and Pennsylvania. *See infra* app. 1, tbl.18; *see also infra* note 410 and accompanying text for the other three states.

410 The two states that omit any mention of general witnesses are Arizona and Nevada. *See infra* app. 1, tbl.18.

411 These eight states are: Arkansas, Florida, Idaho, Illinois, Indiana, Maryland, Missouri, and Wyoming. *See infra* app. 1, tbl.18.

412 *See supra* notes 294–313 and accompanying text (discussing all the stages of the litigation).

413 *See supra* notes 312–13 and accompanying text.

414 Denno, *Getting to Death*, *supra* note 1, at 439–64; *see also supra* notes 142, 152–54, 165–69, 210; *infra* notes 424–25 and accompanying text.

415 Denno, *Getting to Death*, *supra* note 1, at 388–98; *see also supra* notes 6, 9, 32–38, 57, 150–51, 171, 203–04 and accompanying text. Kentucky is a classic example of how a state legislature's decision to switch from electrocution to lethal injection sparked a debate about the acceptability of the death penalty itself. Michael Collins, *Bill Replaces Electrocution with Lethal Injection*, CIN. POST, Jan. 9, 1998, at 5K; Tom Loftus, *1998 Kentucky General Assembly; House Backs Execution by Injection*, COURIER-JOURNAL (Louisville, Ky.), Jan. 15, 1998, at 1B.

416 *See supra* notes 109–36 and accompanying text; *infra* app. 1, tbls.1–6.

417 *See infra* app. 1, tbl.8.

<sup>418</sup> *Condemned Man's Mask Bursts Into Flame During Execution*, N.Y. TIMES, Mar. 26, 1997, at B9 [hereinafter *Condemned Man's Mask*].

<sup>419</sup> *Id.*

<sup>420</sup> *See generally* Denno, *Getting to Death*, *supra* note 1, at 391–98; Denno, *Electrocution*, *supra* note 1; *supra* notes 2–3 and accompanying text.

<sup>421</sup> *Man Executed for 1986 Murder*, AUSTIN AMERICAN-STATESMAN, June 21, 1995, at B5.

<sup>422</sup> Callins v. Collins, 510 U.S. 1141, 1143 (1994) (Scalia, J., concurring).

<sup>423</sup> *Id.*

<sup>424</sup> *See supra* notes 139–40 and accompanying text.

<sup>425</sup> *See supra* note 141; *infra* note 440 and accompanying text.

<sup>426</sup> *See supra* notes 10, 37–38, 171, 180–81 and accompanying text.

<sup>427</sup> The protocol for a federal lethal injection consists of three ten-second injections into the saline running through the intravenous tube. The injections are one minute apart. The three drugs used in the lethal injection are sodium thiopental, pancuronium bromide, and potassium chloride. When all goes as planned, death takes less than two minutes after the final injection. The entire execution takes about four and a half minutes. Murray, *supra* note 205; Lois Romano, *McVeigh is Executed*, WASH. POST, June 12, 2001, at A13.

<sup>428</sup> At 7:10 a.m. EDT, the first chemical was injected into the intravenous line in McVeigh's right leg, which was not visible to the witnesses. Romano, *supra* note 427. The next drug was administered at 7:11, and at 7:14 McVeigh was dead. *Witnesses Describe McVeigh's Last Moments*, CNN.COM LAWCENTER, (June 11, 2001), *at* http://www.cnn.com/2001/LAW/06/11/ mcveigh.witnesses/ [hereinafter *Witnesses Describe McVeigh's Last Moments*]. In total, the execution was four minutes long. Romano, *supra* note 427.

<sup>429</sup> Pam Belluck, *The Scene: Calm at Execution Site and Silence by McVeigh Prove Unsettling for Some*, N.Y. TIMES, June 12, 2001, at A27.

<sup>430</sup> *Id.*

<sup>431</sup> *Witnesses Describe McVeigh's Last Moments*, *supra* note 428, *at* http://www.cnn.com/ 2001/LAW/06/11/mcveigh.witnesses; *see also* Romano, *supra* note 427. Most witnesses reported that McVeigh's eyes blinked a few times and then very slowly started to move back in his head. Rick Bragg, *McVeigh Dies for Oklahoma City Blast*, N.Y. TIMES, June 12, 2001, at A1; *see also* Paul Duggan, *Too Easy For Him: For Witnesses in Oklahoma, A Long Day Brought Little Relief*, WASH. POST, June 12, 2001, at A1; Alex Rodriguez, *U.S. Executes its Worst Terrorist*, CHI. TRIB., June 12, 2001, at A17; *Witnesses Describe McVeigh's Last Moments*, *supra* note 428, *at* http://www.cnn.com/ 2001/LAW/06/11/mcveigh.witnesses. Others observed McVeigh blow air out of his mouth twice before his eyes rolled back. Bragg, *supra*; *see also* Duggan, *supra*; Rodriguez, *supra*. These accounts agree that the death seemed peaceful.

<sup>432</sup> Caryn James, *The Coverage: The Oklahoma Bomber's Final Hours Are Hardly Television News's Finest*, N.Y. TIMES, June 12, 2001, at A26. Several witnesses observed McVeigh's eyes turning glassy. Bragg, *supra* note 431.

<sup>433</sup> James, *supra* note 432; *see also* Bragg, *supra* note 431; Romano, *supra* note 427. Another victim witness observed a momentary lapse in McVeigh's otherwise blank expression—as the sedative took hold, McVeigh apparently clenched his mouth as if "he was trying to fight the sleep." Bragg, *supra* note 431. Another witness account also recalls McVeigh's pursed lips and a tight jaw. Romano, *supra* note 427.

<sup>434</sup> Romano, *supra* note 427.

<sup>435</sup> Telephone Interview with Edward Brunner, M.D., Ph.D., Professor of Anesthesiology, Northwestern University Medical School (Aug. 6, 2001); *see also* Bruce Shapiro, *Dead Man Waking*, TALK MAG., Oct. 2001, at 86 (discussing the observations of Mark Heath, an anesthesiologist and neuroscientist at Columbia Presbyterian Medical Center, stating that McVeigh's tear was "a classic sign of an anesthetized patient being awake").

<sup>436</sup> *20/20 Friday: An Eye for an Eye, A Life for a Life; The Prosecutor; Joseph Hartzler Discusses Prosecuting Timothy McVeigh* (ABC television broadcast, May 4, 2001); *20/20 Friday: An Eye for an Eye, A Life for a Life; The Victims; Victims and Relatives Share Views on McVeigh's Execution* (ABC television broadcast, May 4, 2001).

<sup>437</sup> Murray, *supra* note 205; *20/20 Friday: An Eye for an Eye, A Life for a Life; The Death House; Warden Burl Cain Describes Death by Lethal Injection* (ABC television broadcast, May 4, 2001).

<sup>438</sup> Murray, *supra* note 205.

<sup>439</sup> *20/20 Friday: An Eye for an Eye, A Life for a Life; The Executioners; Executions Take High Toll on People Who Perform Them* (ABC television broadcast, May 4, 2001).

<sup>440</sup> *See supra* notes 165–69, 367 and accompanying text.

<sup>441</sup> FOUCAULT, DISCIPLINE AND PUNISH, *supra* note 2, at 9.

EXHIBIT D

000004011

Print Document

MICHAEL K. JEANES, CLERK
BY R. Bracing DEP
FILED
2001 JUN 18  AM 9: 01

1 | G. DAVID DELOZIER, P.C.
    4016 East Forest Pleasant Place
2 | Phoenix, Arizona 85032
    Phone: (480) 575-6660
3 | Facsimile: (480) 575-6661
    E-mail: gddelozier@aol.com
4 |
    G. David DeLozier
5 | State Bar of Arizona ID: #005237
    Attorney for Petitioner
6 |
        IN THE SUPERIOR COURT OF THE STATE OF ARIZONA
7 |           IN AND FOR THE COUNTY OF MARICOPA

8 | In the Matter of the                    No. PB 2000-004531
    Guardianship of
9 |                                         ORDER FOR SUBSTITUTION
    NICHOLAS ANDRIANO and                   OF COUNSEL FOR MATERNAL
10| ASHLEE ANDRIANO,                         GRANDPARENTS

11|            Minor Children.              (Assigned to the Honorable
                                           Jane Bayham-Lesselyong,
12|                                         Commissioner)

13|
14|         Pursuant to Stipulation, and good cause appearing therefor,

15|      IT IS HEREBY ORDERED that G. David DeLozier of the law firm of G. David
   DeLozier, P.C., be substituted as counsel of record for Donna Ochoa and Alejo Ochoa,
16| Maternal Grandparents of the Minor Children, in the place of Leon Thikoll of the Law
   Offices of Leon Thikoll, for all further proceedings in the above-captioned matter.
17|
      DONE IN OPEN COURT this 11th day of _____ June _____, 2001.
18|
19|
20|
21|                                    The Honorable Jane Bayham-Lesselyong,
                                      Commissioner, Maricopa County Superior Court
22|
23|
24|
25|
26|
27|
28|
                                          4

Print Document

MICHAEL K. JEANES, CLERK
BY *R. Northby* DEP
FILED

2002 FEB 25  AM 9: 04

1 | G. DAVID DELOZIER, P.C.
4016 East Forest Pleasant Place
2 | Phoenix, Arizona 85032
Phone: (480) 575-6660
3 | Facsimile: (480) 575-6661
E-mail: gddelozier@aol.com
4 |
G. David DeLozier
5 | State Bar of Arizona ID: #005237
Attorney for Maternal Grandparents
6 | And Wendi Andriano, Mother
7 |         IN THE SUPERIOR COURT OF THE STATE OF ARIZONA
IN AND FOR THE COUNTY OF MARICOPA
8 |
9 | In the Matter of the                    No. PB 2000-004531
Guardianship of
10 |                                          MATERNAL GRANDPARENT'S
NICHOLAS ANDRIANO and          REPLY TO GUARDIANS' RESPONSE
11 | ASHLEE ANDRIANO,              TO THE GRANDPARENT'S REQUEST
TO TERMINATE THE APPOINTMENT OF
12 |          Minor Children.            THE GUARDIANS OF THE MINOR
CHILDREN
13 |
14 |                                          (Status Conference set for
February 25, 2002 at 11:00 AM)
15 |
16 |                                          (Assigned to the Honorable
Jane Bayham-Lesselyong,
17 |                                          Commissioner)
18 |         The Maternal Grandparents of the Minor Children, Donna and Alejo Ochoa, by and
19 | through undersigned counsel, G. David DeLozier, hereby Reply to the Guardians'
20 | Response dated February 22, 2002.
21 | 1)      In the Response, Counsel for the Lambeths seeks to justify the virtual denial of
22 |         visitation by blaming (a) the Grandparents, (b) Linda Gray, and (c) the Court.
23 |         However, other than a cessation of overnight visits, there was no change in the
24 |         November 2000 agreement, which provided: ". . . reasonable visitation shall
25 |         include not less than two (2) weekends per month . . . ."  That is at least 4 days
26 |         per month, Saturday all day and Sunday all day.  The children have had only one
27 |         Sunday with the Ochoas since January 1, 2001, Mother's Day for 4 hours.  If the
28 |

Print Document

MICHAEL K. JEANES, CLERK
BY R. Brown  DEP
FILED
2002 JUL 31  PM 4: 32

1   *Daphne Budge*
     State Bar # 004823
2    45 West Jefferson, Suite 225
     Phoenix, AZ 85003
3    Tel. (602) 712-1227
     Fax. (602) 712-9447
4
     Attorney for Maternal Grandparents
5

6

7                IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

8                      IN AND FOR MARICOPA COUNTY

9

10

11                                              No. PB 2000-004531

12   In the Matter of the Guardianship of
                                           STIPULATION FOR SUBSTITUTION
13   NICHOLAS ANDRIANO and                 OF COUNSEL FOR MATERNAL
14   ASHLEE ANDRIANO,                            GRANDPARENTS

15              Minor Children.

16
                                              (Assigned to the Honorable
17                                                  Commissioner
                                            JANE BAYHAM-LESSELYONG)
18

19

20

21

22        Pursuant to Ariz.R.Civ.Pro. 5.1(2)(A), it is hereby stipulated that Daphne Budge,

23   Attorney at Law, be substituted for G. David DeLozier of the law firm of G. David

24   DeLozier, P.C., as counsel of record for the Maternal Grandparents, Donna and Alejo

25   Ochoa.  Mr. and Mrs. Ochoa have terminated the representation of Mr. DeLozier

26   because they lost confidence in his ability to represent their interests based on Mr.

27   DeLozier's handling of the adoption matter in Pinal County.

28        Ms. Budge has been advised of the next date for the continuing trial/evidentiary

                                        1

Print Document

| | |
|---|---|
| 1 | hearing in this matter.  Undersigned counsel received the Ochoas' voluminous file on |
| 2 | Friday, July 26th, 2002, and reached an agreement to represent them on Monday, July |
| 3 | 29th, 2002.  New counsel will need a reasonable time period within which to familiarize |
| 4 | herself with the history and issues in the case.  Accordingly she will seek a |
| 5 | postponement of the trial/evidentiary hearing set for August 1st, 2002, at 3:00 p.m.  The |
| 6 | Ochoas' termination of Mr. DeLozier's representation, and their reason therefor, |
| 7 | constitute "good cause" justifying the Court's order allowing Mr. DeLozier to withdraw |
| 8 | despite the late date.  See Ariz.R.Civ.Pro. 5.1(2)(C). |
| 9 | RESPECTFULLY SUBMITTED this _30_ day of July, 2002 |
| 10 | |
| 11 | |
| 12 | Daphne Budge, Attorney at Law |
| 13 | |
| 14 | |
| 15 | G. David DeLozier for<br>G. David DeLozier, P.C. |
| 16 | |
| 17 | |
| 18 | Donna Ochoa, maternal grandmother |
| 19 | |
| 20 | Alejo Ochoa, maternal grandfather |
| 21 | |
| 22 | |
| 23 | |
| 24 | |
| 25 | |
| 26 | |
| 27 | |
| 28 | |

2

D000000004
7/11/2012
...gov/AppNet/controlsupport/print.aspx?id=5c0f31e4-3a0f-40b8-80...

Print Document

1    hearing in this matter.  Undersigned counsel received the Ochoas' voluminous file on

2    Friday, July 26th, 2002, and reached an agreement to represent them on Monday, July

3    29th, 2002.  New counsel will need a reasonable time period within which to familiarize

4    herself with the history and issues in the case.  Accordingly she will seek a

5    postponement of the trial/evidentiary hearing set for August 1st, 2002, at 3:00 p.m.  The

6    Ochoas' termination of Mr. DeLozier's representation, and their reason therefor,

7    constitute "good cause" justifying the Court's order allowing Mr. DeLozier to withdraw

8    despite the late date. See Ariz.R.Civ.Pro. 5.1(2)(C).

9        RESPECTFULLY SUBMITTED this _____ day of July, 2002

10

11

12   Daphne Budge, Attorney at Law

13

14   G. David DeLozier for

15   G. David DeLozier, P.C.

16

17   Donna Ochoa, maternal grandmother

18

19

20   Alejo Ochoa, maternal grandfather

21

22

23

24

25

26

27

28

                            2

Print Document

FILED
4:00pm  8-1-02
MICHAEL K. JEANES, Clerk
By _L. Muhammad_
Deputy

IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

IN AND FOR MARICOPA COUNTY

In the Matter of the Guardianship of

NICHOLAS ANDRIANO and
ASHLEE ANDRIANO,

Minor Children.

No. PB 2000-004531

**ORDER**

On stipulation of the parties with the written consent of the Maternal

Grandparents of the Minor Children, and good cause appearing,

IT IS HEREBY ORDERED substituting Daphne Budge for G. David DeLozier as

counsel of record for the Maternal Grandparents for all further proceedings in the

above-captioned matter.

Dated this ___31___ day of ___July___, 2002.

HON. JANE BAYHAM-LESSELYONG
Maricopa County Superior Court Commissioner

...eans.gov/AppNet/controlsupport/print.aspx?id=5c0f31e4-3a0f-40b8-80...

Print Document

... -

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

08/02/2002

CLERK OF THE COURT
FORM P000

HONORABLE JANE BAYHAM-LESSELYONG

L. Muhammad
Deputy

PB 2000-004531

FILED:   AUG 0 5 2002

IN THE MATTER OF THE
GUARDIANSHIP OF:

NICHOLAS ANDRIANO
ASHLEE ANDRIANO

MINORS

JOHN J JAKUBCZYK
WENDI ANDRIANO #A631830
ESTRELLA FACILITY MCSO
2939 W DURANGO
PHOENIX AZ  85009
GARY ALAN WIESER
LINDA GRAY FEE
DAPHNE BUDGE
G DAVID DELOZIER JR

DOCKET - PB-MH-TX-CCC
BRIAN W YEE PHD
7220 N 16TH ST BLDG K
PHOENIX AZ  85020

HEARING RESET
COUNSEL SUBSTITUTED

    IT IS ORDERED continuing the hearing set for 3:00 p.m. on
August 1, 2002 and resetting it to September 13, 2002 at 1:45
p.m., all in accordance with the formal written Order signed by
the Court July 31, 2002 and filed by the Clerk of Court August 1,
2002.

    IT IS ORDERED substituting Daphne Budge for G. David
DeLozier as counsel of record for the maternal grandparents for
all further proceeding, all in accordance with the formal written
Order signed by the Court July 31, 2002 and filed (entered) by
the Clerk o Court August 1, 2002.

                                                    Page 1

Docket Code 004

MICHAEL K. JEANES, CLERK
BY _____ DEP
FILED

2004 NOV 15 PH 2: 11

1  Alejo and Donna Ochoa
   1104 N. Park
2  Casa Grande, AZ 85222
   520/836-6829
3  *Pro Se*

4

5        IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

6            IN AND FOR THE COUNTY OF MARICOPA

7

8  In the Matter of the          )   No. PB 2000-004531
   Guardianship of               )
9                                 )
                                  )   NOTICE RE:  REPRESENTATION
10 NICHOLAS ANDRIANO and          )
   ASHLEE ANDRIANO                )
11                                )
        Minor Children.           )
12                                )   (Hon. Jane Bayham-Lesselyong)
                                  )
13

14        ALEJO OCHOA and DONNA OCHOA (Ochoa), hereby give notice to this Court that they

15 are no longer being represented in this matter by Daphne Budge.  Alejo and Donna Ochoa will be

16 acting on their own behalf until further notice.  The Court and any other interested parties shall direct

17 any notice to their address, as follows:

18        Alejo and Donna Ochoa
          1104 N. Park
19        Casa Grande, AZ 85222
          520/836-6829
20

21        Ochoa hereby requests that this Court's records be updated to remove Daphne Budge as

22 counsel of record.

23        A copy of this notice has been mailed to counsel for the Guardians of the children.

24

25        DATED this 15 day of ~~July~~ Nov, 2004.

26

27                                   _____
                                     Alejo Ochoa
28

29                                   _____
                                     Donna Ochoa

1

**CERTIFICATE OF MAILING**

2

3        The undersigned states that the Original and Copies of the foregoing document were mailed

4   on the _____ day of July, 2004, to the following persons:

5

6   ORIGINAL of the foregoing mailed to:

7   Clerk of the Probate Court
    Maricopa County Superior Court
8   125 W. Washington
    Phoenix, Arizona  85003
9

10  COPIES of the foregoing mailed to:

11  Honorable Jane Bayham-Lesselyong
    Probate Commissioner
12  Maricopa County Old Courthouse, Courtroom 207
    125 W. Washington, Second Floor
13  Phoenix, Arizona  85003

14  Gary Alan Wieser, Esq.
    4506 N. 12th Street
15  Phoenix, Arizona  85014
    Guardian ad Litem for the Minor Children:
16     Nicholas and Ashlee Andriano

17  Ms. Daphne Budge
    Attorney at Law
18  234 N. Central, Suite 722
    Phoenix, Arizona  85004
19
    John J. Jakubczyk, Esq.
20  2711 N. 24th Street, Suite 200
    Phoenix, Arizona  85008
21  Attorney for Guardians

22  By _____
23      Aleja/Donna Ochoa

24

25

26

27

28

29

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

PB 2000-004531                                        12/09/2004

COMMISSIONER EDWARD W. BASSETT          CLERK OF THE COURT
                                                         P. Valenzuela
                                                            Deputy

IN THE MATTER OF THE GUARDIANSHIP        FILED: 12/10/2004
OF:

NICHOLAS ANDRIANO                          DAPHNE BUDGE
ASHLEE ANDRIANO                            GARY ALAN WIESER

MINORS                                     JOHN J JAKUBCZYK

                                           ALEJO OCHOA
                                           1104 NORTH PARK
                                           CASA GRANDE AZ  85222

                                           DONNA OCHOA
                                           1104 NORTH PARK
                                           CASA GRANDE AZ  85222

                                           DOCKET - PB-MH-TX-CCC


                            MINUTE ENTRY


      The court is in receipt of Alejo Ochoa and Donna Ochoa's Notice Re: Representation,
filed with the Court on November 15, 2004.

      No objections having been received,

      IT IS ORDERED allowing Daphne Budge to withdraw as attorney of record for Alejo
Ochoa and Donna Ochoa.

      All parties representing themselves must keep the Court updated with address changes.
A form may be downloaded at http://www.superiorcourt.maricopa.gov/ssc/sschome.html.

Docket Code 099                    Form P000                      Page 1

EXHIBIT E

1   IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

2   IN AND FOR THE COUNTY OF PINAL

3

4   In the Matter of the          )
    Adoption of:                  )
5                                 )
                                  )
6                                 )
    **NICHOLAS ANDRIANO** and     )    No. AD-200100058
7   **ASHLEE ANDRIANO,**          )
                                  )
8        (Minor children)         )    2 CA-JV 2002-0127
                                  )
9   _____      )

10

11   REPORTER'S TRANSCRIPT OF PROCEEDINGS

12

13

14                  EVIDENTIARY HEARING

15

16

17                    Florence, Arizona
                      September 27, 2002
18                    9:16 o'clock a.m.

19

20

21   BEFORE:  The Hon. **WILLIAM J. O'NEIL**, Judge

22

23

24   TAKEN BY:  LAURA MILLER, RPR
                Certified Court Reporter
25               Arizona No. 50505
                Official Court Reporter, Div. I



ORIGINAL
E000000001

2

```
 1   APPEARANCES:

 2   For the Petitioners:          Mr. G. David DeLozier
     Maternal Grandparents         Ms. Daphne Budge
 3   Alejo and Donna Ochoa         Attorneys at Law

 4

 5   For the Guardians:            Mr. John J. Jakubczyk
     Bradley and Jeanea Lambeth    Attorney at Law
 6

 7

 8
                                   Florence, Arizona
 9                                 September 27, 2002
                                   9:16 o'clock a.m.
10

11

12        (Whereupon, LAURA MILLER was duly sworn to act

13   as Official Court Reporter herein.)

14

15        THE COURT:  Good morning.  This is in the

16   Matter of the Adoption of the Andriano children,

17   AD-200100058.

18        Identification, please.

19        MR. DeLOZIER:  Good morning, Your Honor, David

20   DeLozier.

21        MS. BUDGE:  Your Honor, Daphne Budge, I'm

22   coming down from Phoenix.  I am the Ochoas' new counsel

23   in the Phoenix case, in the guardianship, and I haven't

24   filed a Notice of Appearance on their behalf.  I guess

25   it wouldn't be appropriate to because I don't represent
```

E000000002

3

```
 1    them in this -- well, I guess I do represent them in

 2    this proceeding for the purposes of this hearing today

 3    and I will file a Notice of Appearance if that is the

 4    Court's desire, I will cause it to be filed.

 5              THE COURT:  All right, that's what the rules

 6    call for so file one.

 7              MR. JAKUBCZYK:  Good morning, Your Honor, John

 8    Jakubczyk, J-A-K-U-B-C-Z-Y-K.  I am the attorney for

 9    Brad and Jeanea Lambeth, who are the guardians of

10    Nicholas and Ashlee.

11              THE COURT:  Thank you.

12              Are we ready to proceed?

13              MR. DeLOZIER:  Yes.

14              THE COURT:  This is the time set for an

15    evidentiary hearing and I think you have filed a motion

16    to dismiss and a motion for sanctions.

17              MR. JAKUBCZYK:  Your Honor, we did request

18    sanctions in this matter because of the failure of the

19    petitioners in this case to follow the Court order that

20    required that they provide notice to my clients of the

21    intent to adopt.

22              THE COURT:  All right, I think we scheduled

23    this for an evidentiary hearing.

24              MR. JAKUBCZYK:  That is correct, Your Honor.

25              THE COURT:  Are we ready?
```

E000000003

4

1    MR. JAKUBCZYK:  Yes, Your Honor.

2    THE COURT:  All right, I think the evidence

3  will be primarily to determine one, whether or not you

4  complied and two, if there was a lack of compliance,

5  was it at the direction of your clients or you.

6    MR. DeLOZIER:  Yes, Your Honor.  I don't know

7  that we need an evidentiary hearing as such if you

8  permit me to speak.

9    THE COURT:  You're an officer of the court,

10  anything you say will be deemed to be an avowal which

11  is the same as being under oath, so proceed.

12    MR. DeLOZIER:  Thank you, Your Honor, I was

13  going to say that as well; I'm a member of the State

14  Bar and officer of the court.

15    Your Honor, at the time that this order was

16  originally issued on December 18, 2001, by -- I think

17  it was Judge McCarville on your behalf, the Ochoas had

18  already finished a family study that was done by Home

19  Builders which I think you have a copy of.

20    THE COURT:  Yes.

21    MR. DeLOZIER:  In fact, in that very document

22  the court order I'm referring to now on December 18th,

23  unnumbered page which I think is one, two, three, four,

24  five, six, seven, eight, nine, ten, 11 -- page 11

25  unnumbered of that study, it specifically provides that

E000000004

5

```
1    the Ochoas' position regarding the paternal
2    grandparents is as follows:
3            "The paternal grandparents also live in Casa
4    Grande and will be allowed to visit with the children
5    if they're adopted by the Ochoas."
6            I wanted to address that it was never their
7    intention and they believe -- even today believe that
8    they would be permitted as part of the court order if
9    in fact there was an adoption, to permit and become
10   part of the adoption process, an order granting by
11   agreement the Andrianos' visitation rights with the
12   children, so it was not their intention to that order.
13   It's been mentioned in I think two minute entries that
14   that appeared to be part of what these folks were
15   attempting to do.  I just wanted to bring out that was
16   not and it's recorded in the Home Builders' study which
17   was, of course, October 12, 2001, is the date of that
18   which preceded by at least two months the Court's
19   minute entry.  That perhaps was not made clear earlier
20   and if it wasn't it was my fault.
21           Speaking of which, when we received minute
22   entries from the Court, I discussed the alternatives
23   with my clients and one, of course, alternative we
24   provided to them was, of course, a special action
25   appeal.  I told them I did not think that was the
```

6

```
1    prudent approach to follow and obviously since your
2    orders were to proceed by way of notification and have
3    Home Builders do a family study of the Lambeths as
4    well, their thoughts at that time which happened to be
5    January of 2002 at this time, that since they had
6    already paid several thousand dollars for a home study
7    to be done by Dr. Brian Yee in Phoenix, it would be a
8    duplication of those efforts.
9         My practice -- pardon me, Your Honor, I have a
10   scratchy throat today and I have a lozenge.
11        THE COURT:  You have a drink of water whenever
12   you want, that's fine with me.
13        MR. DeLOZIER:  My experience in the practice
14   that I have and I apologize, I don't have any in front
15   of you other than this one, is that when I have a case
16   that I have not served a defendant or an adversarial
17   party that the matter would abate for lack of service
18   under Rule 4.  And it was frankly my mistake in not
19   notifying this Court prior to July the 12th that that's
20   what we had thought had occurred, and then of course,
21   on July 12th I notified the Court pursuant to rule --
22   Arizona Rules of Civil Procedure, Rule 41, that we
23   wanted to voluntarily dismiss at that time.  That was
24   their intention.  In fact, that's what my clients had
25   thought had happened back several months ago.
```

1          So if anyone's at fault, it's me and I

2    apologize to everybody that's here today that had to be

3    here today because of that inadvertence on my part.

4    I've discussed with Mr. Jakubczyk a voluntary sanction

5    of $1,000 against me for the fact that those people and

6    he had to be here today, and obviously we've taken up

7    your time as well.   It was never our intent for this to

8    happen this way and I'm sorry that I didn't be more

9    forthright and tell the Court early on that that was

10   the decision of the parties, that after advice of

11   counsel we proceed with the action as it was pending in

12   Maricopa County because we believed it would be a

13   duplication, and frankly, both of these parties have

14   spent funds that have long since been exhausted over

15   the fight of these precious children.

16          I know that the Lambeths are having

17   difficulties with some of their financial affairs from

18   what I understand because of these fights and I know

19   the Ochoas have long since had that issue as well, so

20   the Ochoas would not be participating in my voluntary

21   offer to sanction of $1,000 to the Lambeths.   That's

22   something that I would undertake myself because I don't

23   believe anybody's at fault other than me.

24          THE COURT:   I want to make sure I'm clear on

25   this.   Are you saying that the directive that was

8

1   issued -- Judge McCarville signed the order on January

2   2nd, the minute entry, but it was actually drafted and

3   dictated by me, he signed it in my absence.

4          That the order to amend the social study, that

5   you were not directed to do that?

6          Not to abide by that order, that was one that

7   you yourself had determined not to follow under the

8   circumstances, with the anticipation that the matter

9   would dismiss?

10         MR. DeLOZIER:  Yes, or alternatively we would

11  under Rule 41 have a voluntary dismissal which is --

12  when we saw that had not happened, I wasn't monitoring

13  it from you to see if it had gone -- administratively

14  dismissed which is what we normally see in our county.

15         THE COURT:  Whose decision was it not to serve

16  the guardians in this case?

17         MR. DeLOZIER:  Your Honor, it was -- it was

18  not anything that we even contemplated prior to your

19  order.  The January 2, as I think you said it was

20  signed, December 18th is the date I have on it.  It had

21  not even been contemplated because the statute doesn't

22  provide or require for it as I think you've agreed to

23  in your minute entries.  So consequently it was never a

24  thought that was something we needed to do under the

25  state law until such time as your orders indicated to

E000000008

9

1  the contrary, and at that point in time we had

2  discussions about their alternatives and at that

3  particular time also, January, 2002, we had finally

4  gotten to the point where we believed that Dr. Yee was

5  going to complete his study because several -- I think

6  we paid him like $5,000 in January, was in fact going

7  to result in getting a full study performed by him and

8  completed.  I think he completed it in March if my

9  memory is correct.  So what we were doing is there was

10  at least some -- now some movement in Maricopa County

11  with that case there and it seemed to be to them at

12  least and to me, sort of a duplication to have -- spend

13  the money on Home Builders and go through the same

14  process that we were doing there.

15       We did end up in February, I think it was,

16  with some new orders from that court which granted

17  these folks some visitation that they had been -- felt

18  like they had been denied for quite sometime.  So

19  starting in February, some of the reasons for being in

20  this court frankly had begun to ameliorate as well.

21  But to answer your question, yes, that was how I saw it

22  and had seen it.  It would simply be administratively

23  dismissed under Rule 4 if I did not serve them.

24       THE COURT:  I have by separate order directed

25  a written response as to why the social study had not

E000000009

10

1   been amended.  I didn't see one that was timely

2   submitted.

3        Was that also at your directive or at your

4   clients'?

5        MR. DeLOZIER:  Sir, same reasons I've just

6   given you would be likewise.  Obviously in any case

7   it's the client's decision, but I believe that decision

8   to not proceed was based on my advise.

9        THE COURT:  All right, your turn.

10        MR. JAKUBCZYK:  Thank you, Your Honor.

11        As much as I appreciate counsel for the Ochoas

12   taking responsibility for the failure to provide notice

13   to my clients, the guardians, and for the failure to

14   have Home Builders do the social study as directed by

15   the Court, I think there's an underlying concern that

16   the Court needs to address with respect to the

17   continued efforts by the Ochoas, either through counsel

18   or the direction of counsel or upon the advice of

19   counsel, to attempt to avoid an action that was pending

20   in Maricopa County, Arizona, regarding a guardianship

21   by petition to adopt here.  You had an order that

22   directed that the guardians be notified, they were not

23   notified and instead a petition for the removal of the

24   guardians was filed thereafter in Maricopa County.

25        It is unknown as to why at the time of the

1   petition to adopt on August 31st of 2001, the Ochoas

2   chose or decided not to notify Maricopa County Superior

3   Court Commissioner Jane Bayham-Lesselyong, who was the

4   presiding judicial officer over the guardianship of

5   that petition.  Rules of law and rules of court and

6   rules of civil procedure require that when pending

7   matters are going on and a concurrent matter happens

8   that the courts all be notified.  It's also courtesy

9   and common sense.

10          From August until December, the efforts that

11   appear from the Pinal County Courthouse's docket,

12   pleadings filed, indicate an effort to obtain an

13   adoption order from this Court without providing

14   notice.  In October there was an effort to do that and

15   a minute entry regarding that issue was raised.  And

16   again in December, after apparently argument about

17   whether or not notice was required, this Court issued

18   an order directing that notice be given.  In December

19   and in January no notice or request to dismiss was

20   filed.  That leaves the Court and this attorney with

21   the question as to why everything was left hanging

22   during a time period which then a petition to remove

23   the guardians and have the Ochoas substituted as

24   guardians was filed.

25          One could speculate, and I suppose we could

E000000011

1   put the Ochoas on the stand and ask them if their

2   effort to obtain guardianship was in order so that they

3   could avoid providing notice or thereupon comply with

4   the Court's order to provide notice to guardians if

5   they became the guardians, and thus the effort and the

6   time and the expense, the thousands upon thousands of

7   dollars that my clients have had to spend to defend the

8   petition for removal which they filed in Maricopa

9   County, which we were not -- during which time we were

10  not aware of a pending action that was filed in

11  Pinal County.

12          Had we known that something had been filed in

13  December, it might have explained why the Ochoas called

14  Child Protective Services in an attempt to have a child

15  abuse report issued against my clients.  Had we known

16  that the Ochoas had filed a petition to adopt here in

17  Pinal County, we might have been able to approach the

18  Court and inquire as to motivation other than the so

19  called claim that they love the children.

20          Now, Your Honor, we regret having to be here.

21  I regret the last six months of having to go to Judge

22  Bayham-Lesselyong's court with my clients and defend a

23  guardianship that was initially agreed upon by all the

24  family members, because all the family members knew

25  that the Lambeths were the best and most appropriate

13

1  family to care for Nicholas and Ashlee, given the

2  horrible and tragic events that had just occurred.

3          And that consent that they later object to,

4  they later withdrew.  They later went to the courts and

5  said we withdraw the consent.  Wendy withdraws the

6  consent, therefore there's no guardianship and the

7  Court said "no," the guardianship remains because it's

8  in the best interest of the children.  The Court has

9  been monitoring this for two years, has heard countless

10  hours of hearing and testimony, attacks upon my

11  clients' integrity, their ability to care for children,

12  all these things that have been totally without merit

13  during which time a petition to adopt here was filed

14  and this Court ordered that we be notified and we were

15  not given notice.

16          It obviously impacted upon the way that I

17  prepared my clients for this case in Maricopa County

18  because all throughout this time period I had been

19  evoking an argument that we need to try and work things

20  out with these people, we need to try to work with

21  them, because in the best interest of the children

22  everyone needs to put aside the anger and the hostility

23  that comes from the tragedy that happened two years

24  ago.  Had I known that they were filing a petition

25  behind our back to try and adopt the children without

1    even notifying us, I perhaps would have been a little

2    more realistic in the assessment of my opponents.

3              Your Honor, I am very, very sorry to have to

4    be here and ask this Court to issue sanctions against

5    Mr. DeLozier and his clients, but I don't believe with

6    all due respect that Mr. DeLozier -- that he was the

7    sole person making this decision.  I think it was a

8    combination of an understanding that they did not want

9    notice to go to my clients because it would have

10   triggered the question of why shouldn't our clients

11   move to sever and begin a petition for adoption.

12   We had had an understanding way back in the beginning,

13   my clients and I, that because of the pending murder

14   trial we would wait until after the resolution of that

15   case to start a proceeding in any direction.  We had

16   told the Ochoas that in the event there was a

17   conviction that we would probably want to incorporate

18   Nicholas and Ashlee into the Lambeth family, but not at

19   their exclusion because they would be grandparents.

20   However, in understanding the emotions and human nature

21   as it is, the Ochoas have chosen not to become a part

22   of the family but to fight, to take the children away

23   from the family, and that is not right.

24              And now we are here this morning before this

25   Court because they filed a petition in August and

E000000014

15

1    didn't comply with the court order in December to tell

2    us what was going on.  Now had they gone ahead and

3    filed a dismissal in December, it is very unlikely we

4    would have ever learned of this.  But again, the fact

5    that we learned of it and we had to pursue it and we

6    had to follow up with it, the fact that now Mr.

7    DeLozier has had to step down up in Maricopa County and

8    now there's a new attorney involved in the matter and

9    this new attorney is now proceeding in the same line of

10   trying to figure out what is going on so she can make

11   her best assessments for her clients as she sees fit,

12   we're about to begin going through the same thing that

13   I have just been going through for the past six months

14   and my clients have been through a lot.  Not only do

15   they still have the unresolved issue of Jeanea's

16   brother's death, because the trial has not taken place

17   yet, but the whole question of what is going to happen.

18   I mean they have a family.  Nicholas and Ashlee have

19   been with them now two years come two weeks.

20          And so, Your Honor, you know, I'm forced to

21   ask you to consider a sanction that's much more serious

22   than the proposed offer, which I appreciate and respect

23   as being an offer, and I appreciate Mr. DeLozier's

24   candor, but I do believe that he is protecting his

25   clients and that he is acting in a way to avoid laying

E000000015

1    the responsibility where it falls and that is upon the

2    clients because there's not been an effort in good

3    faith to provide notice even to the Court.  In August

4    when they filed this petition, we had court proceedings

5    in Maricopa County.  Dr. Brian Yee was doing

6    evaluations of the families.  Dr. Yee didn't know of

7    this information.  This might have impacted upon his

8    report.  All of these things would have impacted upon

9    the actions and the information that the attorneys and

10   the people would have done, but because we were not

11   provided this notice, you know, we were working on it

12   in a different mind set.  So, Your Honor, it's with

13   great reluctance but I have to say that I would ask for

14   a much more serious sanction and I would say the

15   sanction should apply to both the attorney and the

16   client.

17              THE COURT:  And the sanction you propose is?

18              MR. JAKUBCZYK:  I would suggest a sanction of

19   $10,000.  It would represent a portion of the attorney

20   fees that have been expended by my clients between

21   August and this year.  It does not represent the entire

22   amount.  It's probably about half to a third, but it

23   would also be a very strong statement about the

24   importance of disclosing when a court orders something.

25   And I regret having to ask for this, but my clients

E000000016

1 have suffered a lot and they have been put through a

2 lot that they didn't have to if notice and proper

3 protocol had been followed.

4   Thank you, Your Honor.

5   THE COURT:  Who is going to speak?

6   MS. BUDGE:  I'm sorry?

7   THE COURT:  Which one of you is going to have

8 the final say?

9   MS. BUDGE:  Well, maybe -- I haven't spoken

10 yet so maybe I'm it, Judge.

11   THE COURT:  All right.

12   MS. BUDGE:  The situation with my clients and

13 these grandchildren -- Judge, I'm not exactly sure how

14 much of this background you have been provided in

15 writing so if I repeat things that you're already well

16 aware of, I apologize.

17   The children's father died on October the 8th

18 of 2000.  The mother called my clients who are her

19 parents, her grown parents, and said:  Come over and

20 get the children.  When they arrived, the mother Wendy

21 was being interviewed by the police.  She told the

22 police that she wanted her parents to take the children

23 and they allowed that.  The Ochoas took the children

24 home to their home in Casa Grande.  They received a

25 call from the Andriano grandparents the very next day

1   saying could you bring the children over.  They did.

2          The Ochoas were grief stricken because -- at

3   that time because they had been very close to the

4   children's father, their son-in-law, they were

5   extremely close to their daughter and the families --

6   the Ochoas and Wendy and Joe and the children spent a

7   tremendous amount of time together.  In fact, the

8   Ochoas were like a second set of parents to the

9   children.  The children would go and spend the night.

10  They would go over every Saturday for breakfast.  One

11  of the grandparents went to almost every single

12  doctor's appointment with them.  So the children were

13  completely bonded with their maternal grandparents and

14  the Ochoas had no reason to think that the Andriano

15  family had ulterior motives for wanting to have the

16  children.

17          The truth is, Judge, that the Ochoas took the

18  children to the Andriano grandparents on October the

19  9th.  One week later, seven days later the family had

20  already consulted with Mr. Jakubczyk and filed a

21  petition for guardianship.  That petition was filed on

22  October the 16th, seven days after the Ochoas took the

23  children over.  The Andrianos asked for the children to

24  stay a couple of days because family was going to come

25  in for a -- family was going to come in for the

E000000018

1    funeral.  So here is a family grief stricken because --

2    as were the Ochoas, but the Lambeths had had time

3    during this week of funeral and family in town and

4    grieving, they've had time to run down to talk to Mr.

5    Jakubczyk in time for him to file that following

6    Monday.

7         Meanwhile, let's back up to the week of the

8    funeral.  The Andrianos asked for the children for a

9    couple of days and the Ochoas say fine.  The Andrianos

10   say we want the children to meet their out-of-town

11   relatives who are coming in for the funeral.  So

12   they're supposed to come and get -- the Ochoas are

13   supposed to come and get the kids on Wednesday after a

14   two day visit.  They come on Wednesday and the

15   Andrianos say well just a couple more days.  Now

16   meanwhile the Lambeths are talking to Mr. Jakubczyk,

17   preparing -- they know they're not going to give the

18   children back and who knows when they knew that but

19   they certainly knew it during that week, that they were

20   going to essentially snatch the children away from the

21   Ochoas.

22         So, Judge, really the shoe is on the other

23   foot here.  The family, the Ochoas were the natural

24   choice undisputably except Mr. Jakubczyk will dispute

25   it I'm sure, but they had the intensely loving,

E000000019

1    wonderful, long term, at times almost everyday

2    relationship with these grandchildren.  These

3    grandchildren were the light of their lives.  So now

4    the Andrianos and the Lambeths have snatched the

5    children, have gone to court deceptively, you know.  My

6    clients are now in Mr. Jakubczyk's cross hairs because

7    they followed their lawyer's advice, but Mr. Jakubczyk

8    participated wittingly or unwittingly in a deception on

9    the Ochoas.  So the children were not returned and the

10   children from almost day one, Your Honor, were in

11   trauma.  Obviously they had lost their parents in one

12   day.  They had lost the familiarity of their parents'

13   home.

14          Now the first night after all this they went

15   to their maternal grandparents, the Ochoas, which was

16   like a second home to them.  The next night, I'm not

17   sure where they were, but ultimately and very shortly

18   they were at the Lambeths.  They knew the Lambeths from

19   periodic family gatherings.  Apparently Joe was not

20   very close to his family --

21          But may I ask the Court to caution the people

22   in the back of the courtroom not to make their

23   editorial remarks by scoffing at what I'm saying?

24          THE COURT:  I'm sorry, I didn't hear them

25   scoffing.

21

1        MS. BUDGE:  I can hear them.

2        THE COURT:  I will simply direct them to

3   please don't scoff.  I didn't hear them, but if you say

4   they did --

5        MS. BUDGE:  Thank you.

6        Where was I?

7        THE COURT:  You were saying --

8        MS. BUDGE:  Yes, they didn't know them very

9   well.  Wendy Andriano --

10        THE COURT:  Why did your client sign this

11   agreement then if these were strangers they were

12   putting their grandchildren with?

13        Did their arms get twisted, were they

14   threatened?

15        MS. BUDGE:  No, what happened was and I

16   could -- they had a lawyer by the name of Leon Thikoll.

17        THE COURT:  So they did it with legal advice?

18        MS. BUDGE:  Leon recommended to Wendy Andriano

19   because she was sitting in jail -- she went to jail on

20   October 8th and she's been there ever since, okay.

21   Leon talked to Wendy and he said:  You know, if you

22   consent -- because meanwhile, here the petition had

23   been filed, right, the petition for guardianship.  He

24   said to Wendy -- and I've been out to the jail to talk

25   to her about this.  He said:  Go ahead and sign this

E000000021

1  consent to the guardianship because it will placate the

2  Andriano family.  So Wendy, guess what, calls her

3  parents and talks to her parents and encourages them to

4  sign the guardianship, which Judge mind you, does

5  provide for visitation.  So part of their motivation

6  was that anything that was good for their daughter was

7  high on their list, but also they were going to get

8  visitation and they missed their grandchildren

9  tremendously.  So those were their two motivations.

10        Furthermore, Judge, both Wendy and the Ochoas

11  have told me that they believed that the guardianship

12  was going to be temporary.  Now nothing said temporary

13  unfortunately.  The papers did not, they were drafted

14  by Mr. Jakubczyk who conveniently, Judge, put in the

15  guardianship agreement, slipped it in, that the rights

16  of Wendy Ochoa -- or Wendy Andriano were suspended by

17  circumstance.  That -- his heading is on this order or

18  on this agreement, and it slipped by everybody and so

19  now suddenly everyone's agreed that Wendy's rights have

20  been suspended by circumstance.  Well, that's bologna.

21  She's entitled to a hearing before her rights are

22  suspended, but Mr. Jakubczyk who is claiming my clients

23  were deceptive -- you know, he has his means and

24  methods too, Your Honor.

25        THE COURT:  So your clients just thought they

1   would one up back the other way, only permanently

2   instead of temporarily?

3           MS. BUDGE:  I'm sorry, Judge.

4           THE COURT:  So your clients thought they would

5   one up back only permanently, not temporarily, correct?

6           MS. BUDGE:  No, no, because --

7           THE COURT:  What part am I missing?  Isn't

8   this a permanent --

9           MS. BUDGE:  I haven't gotten that far yet.

10          THE COURT:  Isn't this a permanent -- your

11  clients were going to permanently terminate the

12  Andrianos' rights to any contact, isn't that the result

13  of adoption?

14          It's not?

15          MS. BUDGE:  Well --

16          THE COURT:  I'm sorry, I guess I missed the

17  law.  Explain it.  You're shaking your head no, so

18  explain to me how a severance and an adoption is not a

19  permanent termination of the Andrianos' rights because

20  I thought that's what the law was, correct me, please.

21          MS. BUDGE:  Well, if the Court -- the terms of

22  the adoption would be whatever the court orders.

23          THE COURT:  I don't understand that.

24          MS. BUDGE:  Well, it may be that the law

25  provides for severance of everybody's rights, but if

```
1   the court orders that everybody's rights are not
2   severed then they're not.
3            THE COURT:  Do you think that's what the law
4   is in Arizona?
5            MS. BUDGE:  Well, I think that's what the
6   court's power is in Arizona.
7            THE COURT:  You think the court in an adoption
8   has the right to reinstate another family's rights
9   somehow?
10           Was that requested in this petition?
11           Your clients requested that somewhere --
12  because I didn't see it.
13           MS. BUDGE:  Well, it says in the Home
14  Builders' report and unfortunately it's not paginated,
15  Judge.
16           THE COURT:  Right, which I then issued an
17  order and said please, I would like something from the
18  Home Builders to make sure they are aware this will
19  permanently terminate the other side's rights because
20  that counsel in law is what an adoption does and always
21  has done.  And if you have something that says judges
22  can ignore that somehow, I'm not aware of it.
23           MS. BUDGE:  Well, I'm just saying, Judge, that
24  in the home study --
25           THE COURT:  I know what the home study says.
```

1    MS. BUDGE: Okay.

2    THE COURT: You're saying that your clients --

3  I'm taking your avowals. You're saying your clients'

4  intent here was that they were going to request of this

5  court an order that says the adoption does not

6  terminate the Andrianos' rights?

7    I didn't see it in the petition. I asked the

8  home study be amended so that those things were

9  reflected. I ordered the guardians be notified. None

10 of those things were done and what you're saying is:

11 But Judge, we didn't do it to permanently sever, we

12 didn't ask for it, it was not in the petition. When I

13 said you should give them notice, you responded back

14 two ways.

15    Number one, we don't have to. I said you're

16 correct, but the best interest of the children require

17 it and I received a notice of change of judge. That's

18 what your clients did. Now that's the status of the

19 case. If you don't know it you ought to because you're

20 arguing in my court today.

21    So what I'm trying to figure out is you've

22 laid this foundation; the Lambeths are evil, they're

23 bad, this was all surreptitious. And what I'm here

24 today for is to find out why did your clients then file

25 for a permanent termination of the paternal rights in

E000000025

1    this case without notice and then when I ordered give

2    them notice, they didn't.  That's what I'm trying to

3    find out and thus far the only reason I've heard is the

4    other side are bad people, they tricked us, they went

5    to a lawyer, we did too, their lawyer was better and

6    now we took it up and ratchetted it up a notch.

7            So help me through that.

8            MS. BUDGE:   Okay.  Your Honor, Mr. Jakubczyk

9    I felt had attempted to impugn my clients at every

10   stage of the game, if you will.  And so I was giving --

11   I intended my remarks to address the facts that he went

12   through in picking out things, cherry picking as

13   lawyers do, and I thought it's time for me to clarify

14   the picture so that was all I was doing, Judge.

15           Let me get to the --

16           THE COURT:   Were your clients given notice of

17   this guardianship?

18           MS. BUDGE:   Excuse me?

19           THE COURT:   Were your clients given notice of

20   the guardianship?

21           MS. BUDGE:   Yes, they were.  In fact the

22   guardianship --

23           THE COURT:   You think that was proper?

24           MS. BUDGE:   Yes.

25           THE COURT:   All right, so why wasn't notice

E000000026

```
 1   proper in this case?  That's all I want to know.
 2           MS. BUDGE:  Your Honor, I'm going to leave
 3   the -- all I know, Judge, is that clients hire lawyers
 4   because they don't understand the legal system and so
 5   I'm not sure what you think my clients -- I mean, I
 6   have been here in court when you said who made the
 7   decision.  Clients make their decisions based on advice
 8   of counsel so -- and Mr. DeLozier has told you how
 9   those decisions were made and indeed they did make
10   their decisions on the advice of counsel.
11           But the reason for the filing of the adoption
12   here, just on a factual level, Judge, is that after the
13   guardianship was agreed to and the court in Maricopa
14   County appointed the Lambeths guardians, after that --
15   and let me say that the guardianship agreement was
16   incorporated into the judge's appointment of the
17   Lambeths.  The Lambeths wouldn't give them visitation
18   and finally -- okay, that was signed -- they were
19   appointed by the court in Maricopa County in November
20   of 2000 -- of 2000.  They can't get visitation.  They
21   go to court in April -- I mean they get a little
22   visitation, but they go to court in April because they
23   can't get adequate visitation and the judge appoints a
24   guardian ad litem -- I think I have my chronology
25   correct here, but it's good enough.  Anyway, the
```

E000000027

28

1    guardian ad litem is supposed to arrange this and he

2    tells the parties to exchange their availability dates

3    and he then is supposed to arrange the visits.  He

4    doesn't arrange the visits and he doesn't respond to

5    e-mails from my client, telephone calls from my client,

6    letters from my client, he doesn't do anything, and she

7    is calling -- like my client Donna Ochoa is calling to

8    Jeanea Lambeth and Jeanea Lambeth is saying talk to the

9    guardian ad litem; now this would be the guardian ad

10   litem for the kids.

11          Mr. DeLozier gets involved --

12          THE COURT:  DeLozier.  Isn't it DeLozier?

13          MR. DeLOZIER:  I answer to either one, Your

14   Honor.

15          THE COURT:  All right.

16          MS. BUDGE:  Okay, he gets involved and makes

17   phone calls to Gary Wieser as well, who is the guardian

18   ad litem, and Gary Wieser won't answer his telephone

19   conversations, so it was against the backdrop of not

20   having cooperation.  They signed the agreement too,

21   this guardianship agreement agreeing to two weekends

22   per month, that the Ochoas should have two weekends per

23   month.

24          There was an intervening recommendation

25   actually in December of 2000 from the counselor that

E000000028

1    the Lambeths were taking the children to, a woman named

2    Linda Gray.  Not court appointed, selected by them and

3    paid for by them.  Linda Gray told the Ochoas in

4    December of 2000 that overnight visits were upsetting

5    to the children.  Well, Linda Gray did not know that

6    the children were bedwetting starting back on day one

7    when the children first went to the Lambeths' house.

8    Now the little one was I think still in diapers so she

9    started her bedwetting as soon as she was otherwise

10   toilet trained, but the older boy who was three,

11   who had only occasional accidents, started bedwetting

12   at the Lambeths' almost every single night -- every

13   night -- okay, every night -- and they didn't, of

14   course, tell Linda Gray so they were withholding

15   important information from her.

16        The children had trouble when they would go

17   back to the Lambeths' after seeing their grandparents

18   the Ochoas because guess what, Judge, the Ochoas were

19   like second parents to them and they were being sent

20   back after the visits that the Ochoas did have with the

21   children to the Lambeths and apparently the kids were

22   having a problem adjusting -- readjusting to the

23   Lambeths.  Okay, so Linda Gray in my view, Judge, and

24   this is my personal opinion and maybe it's not relevant

25   to these proceedings, that Linda Gray became -- kind of

E000000029

1   got caught up in the Lambeths desire for permanent --

2   that this arrangement be permanent and her decisions

3   were then driven by that agenda which was the agenda of

4   the Lambeths, that they be ultimately able to adopt.

5   So she recommended in December -- this is Gray

6   recommended -- told them -- in fact, told my clients no

7   more overnight visits.  So it was in the context of the

8   visits that they did get that weren't overnight, but

9   they didn't even get those which prompted them to go to

10  court -- to court in superior court in the guardianship

11  seeking relief from the lack of visitation.  It didn't

12  do any good because Wieser, who was supposed to

13  organize the proper visitation and enforce the proper

14  visitation, didn't do his job and Mr. DeLozier couldn't

15  get him on the phone and my clients tried again and

16  again and again.  Judge, in the year of 2001, based on

17  what the visitation that should have been, the hours

18  would have been 624, we've done the computation, my

19  clients got 20 percent of the visitation that they

20  should have had.  Now this isn't counting the two

21  weekends a month, Judge, this is counting the

22  visitation that they should have had after the weekend

23  visits went out the window.

24          THE COURT:  So they filed this petition?

25          MS. BUDGE:  They -- as I understand it, there

E000000030

31

1    was no movement in the Maricopa -- I know there was no

2    movement in Maricopa County Superior Court.

3              THE COURT:  So they filed this action?

4              MS. BUDGE:  And that's my understanding, yes,

5    Your Honor.

6              THE COURT:  So what was their purpose besides

7    adopting these children?

8              I mean, I'm trying to  --

9              MS. BUDGE:  Well, their lawyer suggested the

10   adoption and they're following their lawyer's advice.

11   They are frantic, Your Honor.  They are frantic --

12             THE COURT:  You know the social study in this

13   case had no interview with the custodial guardians,

14   you're aware of that?

15             MS. BUDGE:  I am, Judge, but I'm also aware --

16             THE COURT:  And you're aware that I ordered

17   that they be interviewed and they never were and they

18   still haven't been today by the home study?

19             MS. BUDGE:  Right, now that's before --

20             THE COURT:  Now just as an attorney, you don't

21   find that troubling at all that in an adoption that the

22   other side, the paternal side, would have no service,

23   that you'd have an order that says do serve them, they

24   don't get served, that the home study -- and I have

25   only been doing -- I have been Presiding Juvenile Judge

32

```
1   which is the court that has jurisdiction over these
2   things, I have only been doing this 12 years.  I have
3   never and I mean never had a home study that did not
4   interview the people who had custody, never.  But in
5   this case that's what I got, no interview.  And when I
6   said that's troubling, interview didn't happen, you
7   don't find that troubling at all?
8        MS. BUDGE:  Your Honor, do I personally find
9   it troubling or did my clients?
10       Were they in the driver's seat with the
11  decision and did they realize what the legal
12  consequences might be or what their legal obligations
13  were?
14       I think that it's -- with all due respect,
15  Your Honor, my opinion, would I have done it?  Do you
16  want to know whether I would have done it?
17       THE COURT:  No, I'm just trying -- I'm here
18  for one reason.  You have one side and you want to be
19  part of that side and I've allowed your comments.
20       MS. BUDGE:  Right.
21       THE COURT:  And I'm trying to determine what
22  sanctions to issue because frankly orders that I issued
23  were not followed.
24       MS. BUDGE:  That's true, Your Honor, but when
25  a client --
```

E000000032

33

1    THE COURT:  And thus far what I have heard is

2    these people on the other side of the room, Judge, are

3    bad people and they were tricking us and they were bad

4    and so we filed a petition to adopt, which under state

5    law permanently severs all rights that the bad people

6    would have to these children; am I missing something?

7        MS. BUDGE:  Am I not allowed with all due

8    respect, Your Honor, to address the facts from my

9    clients' prospective after Mr. Jakubczyk has argued

10   what bad people my clients are?

11       THE COURT:  Absolutely and I'm allowing that.

12       MS. BUDGE:  That's what I'm doing, okay.

13       THE COURT:  I'm allowing that.  I'm just

14   saying that --

15       MS. BUDGE:  I'm just rebutting what he's

16   saying.

17       THE COURT:  I'm just saying, there's not going

18   to be bifurcated counsel here.  Mr. DeLozier's spoken,

19   now you have.  There's only one side of this room.

20   He's not going to be following you.

21       MS. BUDGE:  Great, okay.

22       THE COURT:  I'm just saying -- so what I'm

23   trying to get at is what I have heard, this is what I'm

24   hearing is bad people tricked us, hired a lawyer fast,

25   they went to Wendy, got Wendy to sign a consent, Wendy

1   called and said parents sign the consent too; is that

2   right?

3         MS. BUDGE:   Correct.

4         THE COURT:   That's the order of things.   And

5   consent went in, guardianship happened, visitation was

6   supposed to occur, it didn't happen.   In fact, only 20

7   percent of what everybody agreed to with visitation.

8   The GAL didn't side with us, didn't side with the other

9   side and that was wrong.   Didn't have a good attorney

10  at the start on your side, I'm sure they do now, and

11  the end result was a petition to adopt.

12        MS. BUDGE:   On advice of counsel and when it

13  came to -- what it came to, Judge, with this Court's

14  order or someone -- the other judge that entered the

15  order on your behalf, they behaved and took their

16  lawyer's advice.   By then, of course, too Judge, there

17  was -- you know, they were getting some visitation so

18  it seemed like things were perhaps going to move along

19  at that point.   So things were ameliorating in the

20  Maricopa County case, but yes, indeed they did then

21  file to become the permanent guardians in Maricopa

22  County in lieu of pursuing this case, so they did put

23  all their eggs in one basket at that point, but Your

24  Honor, on advice of counsel.   And so I would submit to

25  the Court that the Ochoas hired a lawyer to give them

E000000034

1   advice, to navigate them through a system that they are

2   completely unfamiliar with and when he gives his

3   advice, like good clients they take his advice.  So I

4   think that to hold them personally responsible for

5   their lawyer's decisions and their lawyer's advice and

6   the fact that they took their lawyer's advice, I think

7   is really an extreme position to take.

8          So unless the Court has questions -- wait just

9   a moment.

10          THE COURT:  I received a correspondence dated

11   September 23 given to either my court reporter or JA,

12   is that -- I don't read letters before proceedings so

13   who is this from and what is it?

14          MS. BUDGE:  This is from the Ochoas and I

15   submitted it to your court staff.

16          THE COURT:  All right, did you receive a copy

17   of this?

18          MR. JAKUBCZYK:  It was sitting on the table

19   this morning when I arrived.

20          THE COURT:  All right, no problem with my

21   reading it or is there?

22          MR. JAKUBCZYK:  Well, Your Honor, I think --

23          THE COURT:  It's an ex-parte communication so

24   I don't read these without --

25          MR. JAKUBCZYK:  Your Honor, it probably would

1   be inappropriate for you to read it.  I think Ms. Budge

2   has summarized in her oratory the contents of the

3   document, but you know, I will leave it to the Court.

4   If the Court feels it would find it helpful in the

5   matter, I would not have any trouble.

6           **THE COURT:**  There are a host of cases that

7   provide that the voice the party uses -- so we're all

8   on the same page, there are a host of cases, more on

9   the criminal side because we tend to get these more in

10  that, that provide when you have an attorney that is

11  your voice in court, that is your voice to the judge.

12  That for a party to represent themselves, which is

13  essentially what a correspondence such as this is,

14  becomes essentially the voice of the client in addition

15  to the voice of the attorney.  It's not proper, you're

16  not entitled to have dual counsel that way.  You can't

17  represent yourself and have an attorney represent you,

18  it's improper.  There's a host of cases that way so I'm

19  really -- I don't want to ignore that correspondence.

20  I will make it a part of the file, but I really don't

21  want to open an avenue where I get a letter then from

22  the other side saying they wrote and Judge we want to

23  write and then Judge we want to write back, I'm not

24  here for that.  I think it would fuel what

25  unfortunately are increasingly ancient fires of

E000000036

37

```
 1   disharmony between the parties.  My hope for both sides

 2   is that that will resolve.

 3           I will take it under advisement and hopefully

 4   have you a ruling within two weeks.

 5           Thank you.

 6

 7           (Whereupon, the proceedings concluded at 10:06

 8   o'clock a.m.)

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

E000000037

38

1

2

3

4

5

6          I, LAURA MILLER, having been first duly sworn

7  and appointed as Official Court Reporter herein, do

8  hereby certify that the foregoing pages, numbered from

9  1 to 37, constitute a full, true and correct

10  transcript of all proceedings had in the above matter,

11  all done to the best of my skill and ability.

12

13          DATED this 10th day of April, 2003.

14

15  _____
    LAURA MILLER, RPR
16  Certified Court Reporter
    Arizona No. 50505
17  Official Court Reporter
    Division I

18

19

20

21

22

23

24

25

E000000038

# ORIGINAL

FILED
ARIZONA COURT OF
APPEALS DIV TWO

03 MAY 27   AM 9:18

JEFFREY P. HANDLER
CLERK

## IN THE

## COURT OF APPEALS

### STATE OF ARIZONA

### DIVISION TWO

|  |  |  |
|---|---|---|
| IN THE MATTER OF THE ADOPTION OF | ) | No. 2-CA-JV 2002-0127 |
| NICHOLAS ANDRIANO and | ) | |
| ASHLEE ANDRIANO, | ) | Pinal County Superior |
| | ) | Court No. AD2001-0058 |
| Minor Children | ) | |
| | ) | |
| G. DAVID DELOZIER and | ) | |
| G DAVID DELOZIER, P.C., | ) | |
| | ) | |
| Real Parties In Interest/Appellants. | ) | |
| | ) | |

## APPELLANT'S OPENING BRIEF

**G. DAVID DELOZIER, P.C.**
4016 Forest Pleasant Place
Cave Creek, Arizona 85331
Phone   480-575-6660
Facsimile   480-575-6661
e-mail.  gddelozier@aol com

G. David DeLozier
State Bar No  005237
In pro per

E000000039

# TABLE OF CONTENTS

Table of Authorities ............................................................................ iv

Introduction ......................................................................................... 1

Statement of the Case ......................................................................... 3

    A.   Nature of the Case ................................................................. 3

    B.   Course of Proceedings in the Trial Court ............................. 4

    C    This Court's Jurisdiction ...................................................... 7

Statement of Facts ............................................................................... 8

Issue Presented For Review ............................................................... 14

Argument ............................................................................................ 14

I    Standard of Review ............................................................. 14

II.   Discussion ........................................................................... 15

    A   The Trial Court Lacked Subject Matter Jurisdiction
        To Consider The Guardians' Motion To Dismiss Or
        For Sanctions After The Ochoas Filed Their Notice Of
        Dismissal Under Rule 41(a)(1) On July 12, 2002 ............... 15

    B.   Sanctions Are Not Warranted Against Either The
        Ochoas Or Undersigned Counsel For Their Adoption
        Petition And Related Pleadings, Which Complied
        With Applicable Law In All Respects. ................................. 17

    C.   Under The Facts Of This Case, Neither Undersigned
        Nor The Ochoas Can Be Sanctioned For Failing
        To Abide By The Court's Orders ......................................... 22

ii

E000000040

Conclusion 24

CERTIFICATE OF COMPLIANCE 25

CERTIFICATE OF SERVICE 26

iii

E000000041

## <u>TABLE OF AUTHORITIES</u>

<u>Cases</u>

*Anderson v Pima County Dept of Public Welfare*, 77 Ariz 339,      20
271 P 2d 834 (1954)

*Brown v Pierce Mfg , Inc* , 169 F R.D 118 (E D Wisc. 1996)      17

*Crawford v Crawford*, 20 Ariz App 599, 514 P 2d 1050      15, 17
(App. 1973)

*Goodman v Gordon*, 103 Ariz 538, 447 P 2d 230 (1968)      6, 15

*Harvey Honore' Constr Co , Inc v Louisiana Associated*      17
*General Contractors, Inc* , 1996 WL 627993, (E.D.La. 1996)

*Hedlund v Ford Marketing Corp* , 129 Ariz 176,      16
629 P 2d 1012 (App 1981)

*Hill v Chubb Life American Ins Co* , 178 Ariz 37,      14, 18
870 P.2d 1133 (App. 1993)

*In re Anonymous*, 4 Ariz App, 588, 422 P 2d 419 (1967)      20-21

*In re Infant Child Skinner*, 982 P 2d 670 (Wash App 1999)      10-11

*In the Matter of Guardianship of Mikrut*, 175 Ariz. 544,      21-23
858 P.2d 689 (App. 1993)

*James, Cooke & Hobson, Inc v Lake Havasu Plumbing & Fire*      14
*Protection*, 177 Ariz. 316, 868 P.2d 329 (App 1993)

*Matter of West Texas Marketing Corp* , 12 F.3d 497 (5th Cir.1994)      16

*Mayer v State*, 908 P.2d 56, 184 Ariz. 242 (App.1995)      16

E000000042

*Meinecki v  H & R Block of Houston,* 66 F 3d 77 (5th Cir.1995)          16

*Spring v  Spring,* 3 Ariz.App  381, 414 P.2d 769 (1966)          15

*Thomas v  Thomas,* 198 Ariz  298, 49 P.3d 306 (App  2002)          14

*Williams v  Ezell,* 531 F 2d 1261 (5th Cir.1976)          16

**Statutes**

Arizona Revised Statute § 8-104          4

Arizona Revised Statute § 8-106          1, 5, 11-12, 19-21

Arizona Revised Statute § 12-2101(B)          8

Arizona Rule of Civil Procedure 4(i)          23

Arizona Rule of Civil Procedure 41(a)(1)          6, 15-17, 23

Federal Rule of Civil Procedure 41(a)          16-17

v

E000000043

## INTRODUCTION

In this matter, Alejo and Donna Ochoa, the maternal grandparents of the Nicholas and Ashlee Andriano (the "Children"), sought to adopt their grandchildren   The Children's father had passed away and their mother was incarcerated, accused of killing the father   At the time of the proceedings at issue, the Children were living with a paternal aunt and uncle in the Phoenix area, who had been appointed temporary guardians of the Children

From the outset of the adoption matter, the Ochoas alerted the trial court to the guardianship, and that guardianship proceedings were underway in the Maricopa County Superior Court.  However, the Ochoas informed the trial court of their belief that the guardians did not need to be served because the terms of the guardianship did not include the right to consent to an adoption. Arizona Revised Statute section 8-106(B) provides that consent of a guardian is **not** required unless the guardians were expressly provided authority to consent to an adoption. *See id.*

The trial court, "acknowledg[ing] that A.R.S  § 8-106 does not require notice to the guardians," found that "the best interests of the children do " 12/18/01 Minute Entry, **IR 9**, at p  1.[1]  Accordingly, the trial court ordered

---

[1]     References to the index of record shall be referred to as "IR," followed by the applicable reference number  References to transcripts shall

1

E000000044

the Ochoas to serve the guardians, and to cause the social study to be amended to include the guardians  *Id.*

However, by the time of the trial court's order, the Ochoas were both emotionally and financially tapped from the extended guardianship proceedings in Maricopa County.  They lacked the resources to effect the adoption.  Accordingly, believing that the "sanction" for a failure to serve a matter was dismissal, the Ochoas abandoned their adoption proceeding in Pinal County.  They did not serve the petition to adopt on the guardians, nor did they take any other step to advance the adoption proceeding  The matter, the Ochoas reasonably believed, would be dismissed due to failure to effect service and failure to prosecute.   Indeed, on July 12, 2002, the Ochoas formally submitted their Notice of Dismissal

However, the trial court, apparently believing that an adoption proceeding once begun cannot be abandoned, sanctioned both the Ochoas and undersigned counsel.  In a logical nonsequitur, the Court reasoned that "counsel G. David DeLozier intentionally and surreptitiously avoided this Court's orders with the intentions of permanently severing the paternal interest of the children and that he intentionally disregarded this Court's

---

be referred to by the date of the hearing, "RT," and the applicable page number, *i e* , 9/27/02 RT 8.

2

E000000045

orders."  **IR 27.**[2]  In fact, by not complying with the trial court's orders, there was no possible way that they matter could proceed.  Since the trial court had made it clear that it would **not** grant the adoption **without** the intervention of the guardians, **there was no possible way that "avoid[ing] th[e] Court's orders" could have achieved the alleged result of "permanently severing the paternal interest of the children."**  The trial court apparently believed that the adoption petition, once filed, could **only** be terminated by a ruling on the merits.  This is obviously incorrect  Thus, for the reasons set forth herein, undersigned counsel respectfully requests that this Court reverse the award of sanctions against both him and his clients

## STATEMENT OF THE CASE

A.   <u>Nature of the Case</u>

This is an appeal from an adoption matter  The issue, however, concerns not the merits of the adoption, but the trial court's October 16,

---

[2]    Ironically, this Court may take judicial notice that the Lambeths have subsequently filed their own petition to adopt the Children in Maricopa County Superior Court.   *See* Maricopa County Superior Court No  JS 505461.  Their request to adopt the Children is without the consent of the Children's mother, and would have the effect on the maternal side of the family – a permanent severance – that the trial court found distasteful in the present matter

3

E000000046

2001, award of sanctions and entry of judgment against the petitioners, Alejo and Donna Ochoa, and undersigned counsel  *See* **IR 27.**

**B.     Course of Proceedings in the Trial Court**

On August 31, 2001, Alejo and Donna Ochoa, the maternal grandparents of Nicholas and Ashlee Andriano, filed a petition to adopt Nicholas and Ashlee in Pinal County Superior Court.  **IR 1.**  Since the Ochoas resided in Casa Grande, Pinal County, they filed their petition in Pinal County, as permitted by Arizona law  *See* A.R.S  § 8-104 (venue for an adoption proceeding can include county where prospective adoptive parents reside)

In the petition, the Ochoas informed the trial court that they were the maternal grandmother and stepgrandfather of the Children. **IR 1,** at p  2  In addition, the Ochoas informed the trial court the Children were residing with their paternal aunt and uncle, Bradley James and Jeanea Lambeth, pursuant to a guardianship proceeding in Maricopa County.  *Id.* (referencing *In the Matter of the Guardianship of Nicholas Andriano and Ashlee Andriano,* Maricopa County Superior Court No  PB2000-004531).  The Children's natural mother, Wendi Andriano, consented to the Ochoas' adoption of the Children.  **IR 2.**

4

E000000047

On October 5, 2001, the trial court entered a minute entry indicating that "no consent to the guardianship has been filed by the guardian as required by law." IR 6  Thereafter, the Ochoas, through counsel, submitted a notice of compliance with A.R.S. § 8-106, noting that "[n]o guardian approval is required since the guardians were not given authority by the court to consent their adoptions." IR 7, at p 1  The Agreement regarding the Lambeths' guardianship and the Maricopa County Superior Court's order appointing the Lambeths as guardians was attached to the Notice as exhibits. *Id*

The Ochoas submitted their home study to the trial court on October 17, 2001  In this home study, the Ochoas indicated that the paternal grandparents also reside in Casa Grande, and that the paternal grandparents "will be able to visit with the children, if they are adopted by the Ochoas." IR 8, at pp 13-14.

On December 18, 2001[3], the trial court issued a minute entry indicating that "[w]hile the Court acknowledges that A R.S § 8-106 does not require notice to guardians, the best interest of the children do." IR 9, at

---

[3]    Although the trial court's minute entry was dated December 18, 2001, it was not signed until January 2, 2002, and then signed by Judge McCarville on behalf of Judge O'Neill.  Undersigned counsel did not receive the order until well past the first of the year 2002

E000000048

p. 1.  Accordingly, the trial court ordered the Ochoas to serve the guardians and to amend the home study to include the guardians, Bradley and Jeanea Lambeth  *Id* at p 2.

Thereafter, nothing happened in the matter for over six months[4]   On January 10, 2002, the counsel for the guardians filed a request for leave to inspect the file   Two days later, the Ochoas, exercising their "absolute, self-executing" right to dismiss their action pursuant to Arizona Rule of Civil Procedure 41(a)(1), *see Goodman v  Gordon*, 103 Ariz. 538, 540, 447 P 2d 230, 232 (1968), filed a notice of dismissal  **IR 15**   Over six days later, the guardians filed a belated motion to dismiss and motion for sanctions  **IR 16.** The trial court did not recognize the Ochoas' dismissal of the adoption proceeding but, rather, set an evidentiary hearing requiring undersigned to explain

> his failure to abide by this Court's direct orders and whether his failure to abide by these orders was a s a result of directives from his clients or his own initiative and why Home Builders for Children, Inc  failed to amend its report as previously ordered.

---

[4]      On Jaunary 2, 2002, undersigned, upon hearing a report that Judge O'Neill was ill, sent a notice of change of judge to Pinal County Superior Court.  **IR 12.**  This notice was filed the next day, on January 3, 2002. Notably, undersigned sent this notice in **prior** to receipt of the December 18, 2001, minute entry that was signed by Judge McCarville on January 2, 2002 Nonetheless, the trial court denied this request for change of judge.  **IR 13.**

6

E000000049

**IR 18.**  As undersigned counsel explained, both in writing and orally, *see, e g,* **IR 21, 23,** the "orders" were not complied with because the Ochoas no longer desired to "to proceed with the adoption herein." *See* **IR 15** (Notice of Dismissal).   Nonetheless, the trial court, apparently believing that the Ochoas did **not** have the right to withdraw their petition to adopt, sanctioned both the Ochoas and undersigned counsel   Specifically, the court found·

> The Court finds it impossible to accept that they [the Ochoas] did not contemplate that the methodology by which these pleadings were submitted and the timing of them would result in paternal interest being severed permanently.  The Court finds counsel G. David DeLozier intentionally and surreptitiously avoided this Court's orders with the intentions of permanently severing the paternal interest of the children and that he intentionally disregarded this Court's orders.

**IR 27.**  The trial court awarded the guardians and their counsel, non-parties to this action, six thousand dollars in attorney's fees   The trial court also "dismissed" the adoption proceeding "with prejudice  *Id*

>  This appeal followed

**C.**    **This Court's Jurisdiction**

The trial court's signed minute entry of October 18, 2002, expressly provides that its ruling is "reduced to judgment."  **IR 27.**  The minute entry further purports to dismiss the adoption matter "with prejudice."  *Id.*

7

E000000050

Accordingly, this Court has jurisdiction over this matter pursuant to **A.R.S. § 12-2101(B).**

## STATEMENT OF FACTS

The Ochoas married on June 6, 1975, and have been together, without any period of separation since *See* **IR 8.** Mrs. Ochoa had one child, Wendi, from a previous marriage Wendi is the mother of the two minor Children at issue in the present proceeding. Mrs. Ochoa's husband, Reverend Alejo Ochoa, adopted Wendi on January 31, 1977 In addition, on February 25, 1991, the Ochoas adopted Brandon Henry Ochoa, the natural son of Mrs. Ochoa's sister. The Ochoas obtained custody of Brandon when he was 2 ½ years old, and adopted him approximately two years later *Id*

The Ochoas have always had a close relationship with the Children, Nicholas and Ashlee Prior to the guardianship appointment, the Ochoas spent literally hundreds of hours annually visiting with and/or, babysitting the Children. The Ochoas had developed a very close grandparent/grandchild relationship with both of the Children. *Id*

On or about October 8, 2000, the father of the Nicholas and Ashlee Andriano – the minor Children in this matter – died. Their mother, Wendi Andriano, was arrested and charged with the murder of Mr Andriano. *Id*

8

E000000051

The Ochoas initially cared for the Children. However, within a few days of Mr. Andriano's death, the Children's paternal grandparents requested a visit with the Children. The Ochoas acquiesced. *Id.; see also* **IR 21** (the Ochoas' Memorandum Regarding Guardians' Motion To Dismiss)

When the time came for the scheduled return of the Children, the paternal grandparents requested a few more days. When that deadline came and went, with yet another request for additional time, it became clear that the paternal grandparents had no intention of returning the Children. The Ochoas soon discovered that the Children were staying with the Lambeths, their paternal aunt and uncle **IR 21.**

At the time, however, the Ochoas were still in shock from the recent death of their son-in-law and incarceration of their daughter. Moreover, their financial resources, already tapped due to financial assistance for Joseph Andriano's medical bills, were further strained by the present situation. Thus, when the Lambeths sought to become the temporary guardians of the Children, the Ochoas reluctantly agreed, particularly when Wendi Andriano's attorney suggested that she consent to the guardianship to "assist" her in the criminal matter.

There is no question that the Ochoas are loving and concerned grandparents. The expert retained by the **Lambeths** conceded as much

9

E000000052

Specifically, in his report in the Maricopa County action, Dr. Brian Yee wrote

> Despite parties' [the Lambeths' and the Ochoas'] distrust, hostility, and negative opinions of each other, neither household is viewed as unfit for the children. Each of the adults is accomplished in their own right, appears to love the children, evidences no diagnosable psychiatric disorder, appears comfortable and skilled in relating to these young children, has a good fund of knowledge regarding children, evidences a seemingly functional approach to discipline and parenting of children, appears a productive member of the community and society, and evidences no issues of substance abuse, adjustment disorder, or antisocial/illegal behavior

*See* IR 23, Exhibit A, at p. 4

Following the death of the Children's father and the incarceration of their mother, the Ochoas have always desired to adopt the Children. **This desire was completely independent and separate from any perceived deficiencies with the Lambeths' guardianship** The Ochoas' beliefs regarding adoption as a preferable option to a guardianship have been accurately captured by the Washington Court of Appeals in *In re Infant Child Skinner*, 982 P.2d 670 (Wash. App. 1999):

> [W]ith regard to guardianships as an alternative to termination, our courts have consistently held that such placements are only a temporary solution and do not achieve permanence for a child. Such placements make sense in the dependency context, where the child may need to be temporarily removed from the home. But a guardianship does not adequately substitute for a permanent placement and, in fact, postpones the child's early

E000000053

integration into a stable and permanent home   We conclude that a guardianship would not be an appropriate placement when the purpose of the proceeding is to ensure that the child is placed in a permanent home

*Id.* at 676.

The purpose of the adoption proceeding was simply to obtain a permanent placement for the Children, not to create a referendum on the Lambeths' guardianship   The petition was filed in Pinal County Superior Court, and undersigned counsel expressly informed the Pinal County Superior Court of the pendency of the guardianship.   In undersigned counsel's October 9, 2001 Notice Of Compliance With A R.S. § 8-106 and Request For Hearing, undersigned counsel attached the following:  (1) the Agreement Regarding the Guardianship of Nicholas Andriano and Ashlee Andriano, (2) the Order Appointing Guardian of Minor Children, filed on November 15, 2000; and (3) this Court's minute entry date November 15, 2000 regarding the hearing on the Petition for Appointment of Co-Guardians for Minors  **IR 7.** Undersigned counsel's disclosure to the trial court in the adoption proceedings was thorough

In this same notice, undersigned counsel explained why the consent of the Guardians was not required.   *Id.*   Specifically, A R.S. § 8-106(B) provides that consent of a guardian is **not** required unless the guardians were

11

E000000054

expressly provided authority to consent to an adoption   *See* A.R.S. §§ 8-106(A) & (B).

The trial court agreed with undersigned counsel's reading of the law but, relying on the disclosures made by undersigned counsel, concluded that the best interests of the Children required more.  The court wrote  "While the Court acknowledges that A.R.S. § 8-106 does not require notice to the guardians, the best interest of the children do."  **IR 9.**   In order to proceed with the adoption,[5] this Court required service of the Guardians  *Id*

In short, the adoption proceedings would have become what was already transpiring in Maricopa County, a referendum on the Lambeths' guardianship   In addition, it would have very costly for the Ochoas to maintain these two proceedings   Thus, rather than create duplicitous proceedings regarding the same subject matter, the Ochoas abandoned their adoption proceeding   As the Lambeths themselves have acknowledged, nothing has transpired in the adoption proceedings since January; the Lambeths wrote  "There is nothing further in the Court file after January 23, 2002, except a filing by undersigned counsel [for the Lambeths] requesting an opportunity to review the records."  **IR 16,** at p  3.

---

5    Undersigned counsel reasonably construed the Court's order as a "conditional" order, *i e ,* in order to proceed with the action, the Guardians must be served

E000000055

The Lambeths and the trial court apparently reason that, having filed a petition to adopt, the Ochoas thereafter had no choice but to proceed with the matter to the bitter end, regardless of any perceived duplication with the present proceedings, regardless of the costs involved, and regardless of any continued desire on their part to continue with the proceedings.

On July 12, 2002, the Ochoas filed a notice of dismissal of the adoption proceeding  IR 15. Notwithstanding this notice, six days later, the Lambeths (who were not parties to the action at the time) filed a motion to dismiss the petition and a motion for sanctions.  IR 16.   The trial court conducted an evidentiary hearing on the motion for sanctions on September 27, 2002 and, on October 18, 2002, issued a signed minute entry granting sanctions and dismissing the matter with prejudice  IR 27.  As noted above, the trial court expressly provided that its ruling was to be "reduced to judgment"  Id.  Undersigned filed a notice of appeal from this final judgment on October 27, 2002. IR 29.

Ironically, it is now the Lambeths who have filed a petition to adopt the Children.  On December 31, 2002, the Lambeths filed a petition to adopt in Maricopa County Superior Court, case number JS 505461.  The Ochoas, having only recently learned of the petition, have moved to intervene

E000000056

## ISSUE PRESENTED FOR REVIEW

**A.**   Following the Ochoas' "absolute, self-executing" notice of dismissal pursuant to Arizona Rule of Civil Procedure 41(a)(1) on July 12, 2002, was the trial court divested of jurisdiction to consider the Guardians' motion to dismiss and for sanctions?

**B.**   Did the trial court abuse its discretion in sanctioning undersigned counsel and the Ochoas were every action taken by counsel was objectively reasonable in light of well-established law?

## ARGUMENT

**I.   Standard Of Review**

This Court reviews *de novo* whether a trial court had subject matter jurisdiction over the matter at issue *Thomas v Thomas*, 198 Ariz 298, 299-300, 49 P 3d 306, 307 -308 (App 2002) A trial court's decision to award sanctions is reviewed for an abuse of discretion *James, Cooke & Hobson, Inc v Lake Havasu Plumbing & Fire Protection*, 177 Ariz. 316, 320, 868 P.2d 329, 333 (App. 1993). "The test to determine whether Rule 11, Arizona Rules of Civil Procedure, has been violated is **not one of subjective good faith but an objective one of reasonableness**" *Hill v Chubb Life American Ins Co*, 178 Ariz 37, 40, 870 P.2d 1133, 1136 (App 1993).

14

E000000057

## II.   Discussion

### A.   The Trial Court Lacked Subject Matter Jurisdiction To Consider The Guardians' Motion To Dismiss Or For Sanctions After The Ochoas Filed Their Notice Of Dismissal Under Rule 41(a)(1) On July 12, 2002.

Arizona Rule of Civil Procedure 41(a)(1) provides in pertinent part that "an action may be dismissed (A) by the plaintiff without order of court by filing a notice of dismissal at any time before service by the adverse party of an answer or of a motion for summary judgment, whichever first occurs ." Ariz.R.Civ.P. 41(a)(1)   This rule, the Arizona Supreme Court has held, is "absolute, self-executing, and accomplished automatically by plaintiff's filing a notice of dismissal." *Goodman v Gordon*, 103 Ariz. 538, 540, 447 P.2d 230, 232 (1968)   "There need be no notice to defendant, no hearing on the matter, and no order of the court." *Id*

Arizona courts also recognize the "general rule" that "once having dismissed an action, the trial court has no jurisdiction to grant affirmative relief to the parties based on their subsequent petitions for affirmative relief." *Crawford v Crawford*, 20 Ariz App. 599, 600, 514 P.2d 1050, 1051 (App. 1973); *see also Spring v Spring*, 3 Ariz.App 381, 414 P.2d 769 (1966) (holding that the plaintiff-wife's voluntary dismissal, prior to any answer or motion for summary judgment had the same effect as a formal

E000000058

dismissal and, therefore, the trial court had no jurisdiction concerning the substitution of attorneys or the awarding of fees) Federal courts follow the same rule with respect to the federal counterpart of Rule 41(a)(1).[6] For example, the United States Court of Appeals for the Fifth Circuit has reiterated the rule that after dismissal is entered pursuant to Rule 41(a)(1), any further actions by the court are "superfluous." *See, e g, Meinecki v H & R Block of Houston*, 66 F.3d 77, 82 (5th Cir 1995); *Matter of West Texas Marketing Corp*, 12 F.3d 497, 501 (5th Cir 1994). In *Williams v Ezell*, 531 F.2d 1261 (5th Cir 1976), the Fifth Circuit held that after filing of a notice of voluntary dismissal, a district court not only may not address the merits of an action, it may not entertain applications for attorneys' fees The court explained:

> The [district] court had no power or discretion to deny plaintiffs' right to dismiss or attach any condition or burden to that right That was the end of the case and the attempt to deny relief on the merits and dismiss with prejudice was void. Likewise, except for determining appealability, the subsequent orders granting attorneys fees were a nullity

*Id* at 1264

---

[6]    Federal decisions construing analogous rules of civil procedure are highly persuasive in interpreting Arizona counterparts. *See, e g, Mayer v State*, 908 P.2d 56, 184 Ariz. 242 (App.1995); *Hedlund v Ford Marketing Corp*, 129 Ariz. 176, 178, 629 P.2d 1012, 1074 (App. 1981) (nothing that Arizona courts give "great weight" to federal interpretation of analogous rules of procedure).

E000000059

000004081

Here, the Ochoas had the right to dismiss their adoption matter. They could not be, nor should not have been, compelled to proceed with an adoption proceeding that they no longer wished to pursue. Moreover, Arizona Rule of Civil Procedure 41(a)(1) expressly grants to the Ochoas the absolute right to dismiss their adoption proceeding  Accordingly, having exercised this right on July 12, 2002, the trial court thereafter lacked subject matter jurisdiction to enter any further orders in the matter, or to entertain the guardians' untimely motion to dismiss and for sanctions. *Crawford, supra*; *see also Brown v Pierce Mfg , Inc* , 169 F.R.D. 118, 120 (E.D  Wisc 1996) (refusing to award sanctions where plaintiff had voluntarily dismissed complaint under Fed.R Civ P. 41(a)), *Harvey Honore' Constr  Co , Inc  v Louisiana Associated General Contractors. Inc* , 1996  WL  627993,  *3 (E.D.La  1996) (holding that "(1) a court cannot condition the exercise of the plaintiff's absolute right of dismissal on the payment of attorneys' fees and costs; and (2) an order granting an award of attorneys' fees against the plaintiff on the heels of a valid Rule 41(a)(1)(i) dismissal is a nullity").

**B.    Sanctions Are Not Warranted Against Either The Ochoas Or Undersigned Counsel For Their Adoption Petition And Related Pleadings, Which Complied With Applicable Law In All Respects.**

E000000060

As noted above, "[t]he test to determine whether Rule 11, Arizona Rules of Civil Procedure, has been violated is **not one of subjective good faith but an objective one of reasonableness**" *Hill v Chubb Life American Ins Co* , 178 Ariz 37, 40, 870 P 2d 1133, 1136 (App 1993). In the present matter, the trial court apparently believed that the Ochoas and/or undersigned counsel were engaged in an effort to "blindside" the paternal grandparents, noting that "the methodology by which these pleadings were submitted and the timing of them would result in paternal interest being severed permanently" **IR 27** Undersigned disagrees with the trial court's assessment in this matter, however, it is not necessary to resolve this issue, because neither the trial court nor this court can be concerned with the subjective intent or beliefs of the parties, but whether the legal steps taken were objectively reasonable. *Hill, supra.* In this matter, **every action** taken by the Ochoas and undersigned counsel was supported by well established statutory and case law authority Accordingly, as a matter of law, the trial court abused its discretion in sanctioning either the Ochoas or undersigned counsel.

1. **Arizona law unquestionably permitted the adoption proceeding to be filed in Pinal County.** Arizona Revised Statute section 8-104 provides that venue for an adoption proceeding can include county

000004083

E000000061

where prospective adoptive parents reside   The Ochoas reside in Casa Grande, within Pinal County   Accordingly, their petition was properly filed in the Pinal County Superior Court.

2    **The Ochoas Disclosed The Guardianship And Related Proceedings To The Trial Court From The Outset Of The Adoption Proceeding.**   The trial court's conclusion that undersigned counsel was attempting an impermissible "short circuit" of the paternal grandparents is belied by the fact that undersigned and the Ochoas, from the outset, disclosed the existence of the Children's guardianship to the trial court   The guardianship and related proceedings – including the specific case number – was included in the Ochoas' Petition To Adopt.  **IR 1.**  In the Ochoas' Notice Of Compliance With A.R S  § 8-106, the Ochoas attached to their notice the (1) guardianship agreement, (2) the Maricopa County Superior Court order appointing the Lambeths as guardians, and (3) the November 15, 2000 Maricopa County Superior Court minute entry regarding the hearing on the petition for appointment of the guardians  *See* **IR 9** (Exhibits 1 through 3).

3.    **Undersigned counsel reasonably believed that service upon the Guardians was not required by law.**  In the Ochoas' October 9, 2001 notice regarding compliance with A.R S. § 8-106, undersigned indicated that

19

000004084

E000000062

it was his belief that service upon the guardians was not required by Arizona law, relying upon the expressly language of section 8-106. Section 8-106(A) specifically provides that

> A The court shall not grant an adoption of a child unless consent to adopt has been obtained and filed with the court from the following .
>
> > 4 Any guardian of the person of the child appointed by a court **and given authority by it to consent to the child's adoption**

*Id* (emphasis added)   Section 8-106(B) of the Arizona Revised Statutes further provides that **"[i]t not necessary for a person to obtain consent to adopt from . . . [a] person whose consent is not required under subsection A of this section "** *Id*. (emphasis added)   In the present matter, there is no dispute that the guardians had no authority to consent to an adoption

The limited case law in this matter reinforces undersigned's legal conclusion  In *In re Anonymous*, 4 Ariz App, 588, 422 P 2d 419 (1967), the Arizona Court of Appeals reiterated that these statutory provisions mean what they say.  The court wrote·

> It is apparent that the court is invested with power to decree the adoption of a child without anyone's consent where, upon a hearing, it appears that the child's welfare will thereby be promoted. *Anderson v Pima County Dept of Public Welfare*, 77 Ariz. 339, 344, 271 P.2d 834 (1954). It is equally apparent from a reading of A R.S § 8-103 [now A.R.S. § 8-106(A)] that

20

E000000063

the consent requirement therein provided comes into play only when applicable.

*Id* at 590, 422 P 2d at 421   Indeed, even the trial court agreed, acknowledging that "A.R.S § 8-106 does not require notice to the guardians " IR 9.[7]

4.   **Undersigned counsel had the express consent of the Children's mother to the adoption, as well as Ms. Andriano's withdrawal of her consent to the guardianship.** Contemporaneously with the adoption petition, the Ochoas submitted the notarized consent of the Children's natural mother to the adoption which counsel reasonably believed, under existing Arizona case law, to be dispositive of the Ochoas' right to adopt. Specifically, in *In the Matter of Guardianship of Mikrut*, 175 Ariz 544, 858 P 2d 689 (App. 1993), a parent had consented to the appointment of a guardian for the parent's child, then subsequently withdrew the consent. The trial court, however, refused to terminate the guardianship

The court of appeals determined that this was error.  "Parents," the court observed, "have a fundamental liberty interest in the care, custody, and management of their children." *Id* at 547, 858 P 2d at 689  "[A] state may

---

[7]   Undersigned counsel was also aware of the Iowa Court of Appeals' decision in *In the Matter of Adoption of K T*, 497 N.W 2d 163 (Iowa App. 1992), in which the Iowa appellate court held that the paternal grandparents

E000000064

not presume the unfitness of a parent, but instead must provide individualized procedural safeguards (notice, hearing, and proof of unfitness) before the state can terminate parental rights." *Id* (quotation omitted). In the present matter, the Children's mother, Wendi Andriano, had filed a notice of withdrawal of her consent to the guardianship in the Maricopa County Superior Court. She had consented to the Ochoas' adoption of the Children. Accordingly, both the Ochoas and undersigned reasonably believed that they had fulfilled all of the requirements of Arizona law for the adoption of the minor Children.

**C.    Under The Facts Of This Case, Neither Undersigned Nor The Ochoas Can Be Sanctioned For Failing To Abide By The Court's Orders.**

The trial court was also apparently troubled by the fact that its orders were not complied with, *i e*, the petition was not served upon the guardians and the home study not updated. However, undersigned counsel reasonably construed the Court's order as a "conditional" order, *i e*, in order to proceed with the action, the guardians must be served. Adoption is a voluntary action by a party or couple, and a couple cannot be compelled to proceed with an adoption. Hence, undersigned counsel reasonably believed that if

---

were not "custodians" entitled to notice of an adoption petition and did not have standing to petition to vacate the adoption decree. *Id* at 164-66.

22

E000000065

the Ochoas did not desire to prosecute the adoption petition while simultaneously contesting the Lambeths' guardianship in Maricopa County Superior Court, they could not be compelled to do so. Obviously, by serving the guardians, the Ochoas would have been proceeding with an adoption proceeding that they did **not** desire to prosecute.[8]

In addition, the Ochoas and undersigned reasonably believed the matter would abate. Arizona Rule of Civil Procedure 4(i) provides that a matter is to be served within 120 days and, if not, the matter is subject to dismissal. Simply put, the "sanction" for failing to serve a party is dismissal of the matter. *Id.*

The Ochoas did not believe that they needed to serve the guardians, expand the home study, only to inform the court that they had no desire to proceed with the adoption. (Indeed, if any conduct would have been sanctionable, that would have been it.) Accordingly, both undersigned and the Ochoas believed that compliance with the trial court's orders were preconditions to proceeding with the adoption, not orders to be complied with even if they no longer desired to proceed.

---

[8]     Obviously, compelling a party to proceed with an action commenced by that party is contrary to both the spirit and letter of Rule 41(a).

23

E000000066

## CONCLUSION

For the foregoing reasons, undersigned respectfully requests that this Court reverse the trial court's award of sanctions against him and the Ochoas.

**RESPECTFULLY SUBMITTED** this 27th day of May, 2003

**G. DAVID DeLOZIER, P.C.**

By _____
     G  David DeLozier

24

E000000067

## CERTIFICATE OF SERVICE

I certify that two copies of the foregoing Brief for Appellant were

served upon Appellees by mailing same this 27th day of May, 2003 to:

> John J. Jakubcyzyk, Esq
> 2711 North 24th Street, Suite 200
> Phoenix, Arizona 85008
> Attorney for Guardians
>
> Daphne Budge, Esq
> 45 West Jefferson, Suite 225
> Phoenix, Arizona 85003

By _____
G  David DeLozier

25

E000000068

## CERTIFICATE OF COMPLIANCE

Pursuant to Arizona Rule of Civil Appellate Procedure 14, I certify that the attached brief uses proportionately spaced type of 14 points or more, is doubled-spaced using a roman font, and contains 5,233 words, according to the "Word Count" feature of Microsoft Word

DATED this 27th day of May, 2003

By _____
G David DeLozier

26

E000000069

ORIGINAL

IN THE

COURT OF APPEALS

STATE OF ARIZONA

DIVISION TWO

FILED
ARIZONA COURT OF
APPEALS DIV TWO

03 MAY 27 AM 9: 19

JEFFREY P. HANDLER
CLERK

| | |
|---|---|
| IN THE MATTER OF THE ADOPTION OF ) | No. 2-CA-JV 2002-0127 |
| ) | |
| NICHOLAS ANDRIANO and ) | Pinal County Superior |
| ASHLEE ANDRIANO, ) | Court No. AD2001-0058 |
| ) | |
| Minor Children ) | |
| ) | |
| G. DAVID DELOZIER and ) | |
| G. DAVID DELOZIER, P C , ) | |
| ) | |
| Real Parties In Interest/Appellants. ) | |

---

**APPELLANT'S APPENDIX**

**G. DAVID DELOZIER, P.C.**
4016 Forest Pleasant Place
Cave Creek, Arizona 85331
Phone: 480-575-6660
Facsimile: 480-575-6661
e-mail· gddelozier@aol com

G David DeLozier
State Bar No. 005237
In pro per

E000000070

## <u>LIST OF EXHIBITS</u>

**Exhibit A:**    August 31, 2001 Petition To Adopt  **(IR 1)**

**Exhibit B:**    August 31, 2001 Consent To Adoption Of The Minor Children **(IR 2)**

**Exhibit C:**    October 5, 2001 Ruling On Request For Final Hearing  **(IR 6)**

**Exhibit D:**    Notice Of Compliance With A R.S. § 8-106 and Request For Hearing **(IR 7)**

**Exhibit E:**    December 18, 2001 Ruling On Notice Of Compliance With A.R S  § 8-106 and Request For Hearing **(IR 9)**

**Exhibit F:**    October 15, 2002 Ruling On Motion(s)/Issue(s) **(IR 27)**

**Exhibit G:**    Notice of Appeal **(IR 29)**

ii

E000000071

# EXHIBIT A

E000000072

G. DAVID DELOZIER, P.C.
4016 East Forest Pleasant
Cave Creek, AZ 85331-5439
Phone (480) 575-6660
Facsimile (480) 575-6661
E-mail  gddelozier@aol.com

G  David DeLozier
State Bar of Arizona NO  005237
Attorney for Petitioners

IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

IN AND FOR THE COUNTY OF PINAL, JUVENILE DIVISION

FILED PINAL COUNTY
SUPERIOR COURT
ALMA JENNINGS HAUGHT CLERK

AUG 3 1 2001

| IN THE MATTER OF THE ADOPTION OF | ) | No. 2001 00100053 |
| | ) | |
| | ) | |
| NICHOLAS ANDRIANO and, | ) | PETITION TO ADOPT |
| ASHLEE ANDRIANO | ) | |
| | ) | |
| Minor Children | ) | |
| | ) | |

Come  now  the  Petitioners  DONNA  OCHOA  (d o b  ▓▓▓▓▓▓) (Soc  Sec

▓▓▓▓▓▓ and  ALEJO  OCHOA  (d o b  ▓▓▓▓▓) (Soc  Sec  ▓▓▓▓▓▓  the

maternal grandmother and step-maternal grandfather of the minor children, and for their petition for

the adoption of minor children, NICHOLAS ANDRIANO and ASHLEE ANDRIANO,  and

allege as follows

                                    I

Petitioners are residents of this county and state and live at 1104 North Park Avenue, Casa

Grande, Arizona 85222

/ / /

/ / /

000004095

E000000073

II

Petitioners are the maternal grandmother and step-maternal grandfather of the minor children

III

The minor children, pursuant to which this petition is filed are residents of Maricopa County and State of Arizona and are presently residing with the Bradley James Lambeth and Jeanea Lambeth at ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ and have resided with them since October 9, 2000, pursuant to In the Matter of the Guardianship of NICHOLAS ANDRIANO and ASHLEE ANDRIANO, Minor Children, Case No PB 2000-004531, Maricopa County Superior Court, Phoenix, Arizona

IV

The minor children, pursuant to which this petition is filed, are **NICHOLAS ANDRIANO**, a male born June 20, 1997 and **ASHLEE ANDRIANO**, a female born September 16, 1998, the natural mother of said minor children is **WENDI E. ANDRIANO**, the daughter of the Petitioners, whose address is Estrella Facility MCSO, 2939 West Durango, Phoenix, Arizona 85009, the natural father of the said minor children is deceased as of October 8, 2000

V

It is the desire of the natural mother of the minor child, **WENDI E. ANDRIANO**, that Petitioners, **DONNA OCHOA** and **ALEJO OCHOA** adopt the minor children as evidenced by her Consent to Adoption

VI

E000000074

That the natural father, **JOSEPH D. ANDRIANO**, was deceased on October 8, 2000, as evidenced by the death certificate attached hereto and incorporated herein by this reference

VII

That the name of the minor children should not be changed

**WHEREFORE,** Petitioners pray that this court enter its order setting a hearing upon this petition, for an order allowing the Petitioners to adopt the aforesaid minor children, and that Petitioners have such other and further relief as may be just and proper in the premises

DATED this 21st day of ____August____, 2001

G DAVID DELOZIER, P C

By _____
G David Delozier
Attorney for Petitioners

E000000075

# VERIFICATION

STATE OF ARIZONA        )
                        )ss
County of PINAL         )

**DONNA OCHOA**, being first duly sworn, upon her oath, deposes and states

That she is the Petitioner in the foregoing entitled and numbered cause, that she has read the

foregoing Petition, and knows the contents thereof and the matters and things stated there n are true

to her own knowledge, except as to those matters stated therein upon information and belief, and as

to those matters she believes them to be true

_____
DONNA OCHOA

Signed and sworn to before me this 31st day of _August_

_____
NOTARY PUBLIC

MY COMMISSION EXPIRES

_Sept 19, 2002_


Official Seal
NOTARY PUBLIC
STATE OF ARIZONA
County of Pinal
DELIA J SCHROEDER
My Commission Expires September 19, 2002

E000000076

VERIFICATION

STATE OF ARIZONA        )
                            ) ss
County of PINAL            )

    **ALEJO OCHOA**, being first duly sworn, upon his oath, deposes and states

    That he is the Petitioner in the foregoing entitled and numbered cause, that he has rea  the

foregoing Petition, and knows the contents thereof and the matters and things stated the e n ar

to his own knowledge, except as to those matters stated therein upon information and belie  an

to those matters he believe them to be true

                                          *Alejo L Ochoa*
                                    ALEJO OCHOA

    Signed and sworn to before me this 31st day of     August           2000

                                          *Lola Archuleta*
                                    NOTARY PUBLIC

MY COMMISSION EXPIRES     February 2, 2005

LOLA ARCHULFTA
Notary Public  Arizona
Pinal County
My Commission Expires
Feb uary 2 2005

E000000077

000004099

CERTIFICATION OF VITAL RECORD

# STATE OF ARIZONA

STATE OF ARIZONA
DEPARTMENT OF HEALTH SERVICES - OFFICE OF VITAL RECORDS
CERTIFICATE OF DEATH

DEATH NO 00-031303
D 102-

IN THE VERIFICATION BOX (TO RIGHT OF ARROW, HOLD BETWEEN THUMB AND FOREFINGER, OR BREATHE ON IT, COLOR WILL DISAPPEAR, THEN REAPPEAR)

ORIGINAL STATE COPY

| Field | Value |
|---|---|
| NAME OF DECEASED A FIRST | JOSEPH |
| B MIDDLE | DEWAYNE |
| C LAST | ANDRIANO |
| SEX | Male |
| DATE OF DEATH | OCTOBER 08, 2000 |

RACE IN WHICH MALE, BLACK, AMERICAN INDIAN (SPECIFY BELOW ETC): White
WAS DECEDENT OF HISPANIC ORIGIN (SPECIFY YES OR NO): No    IF YES INDICATE MEXICAN, SPANISH, PUERTO RICAN, CUBAN ETC
WAS DECEASED EVER IN U S ARMED FORCES (SPECIFY YES OR NO): No

PLACE OF DEATH    A COUNTY: MARICOPA    B TOWN OR CITY: PHOENIX
C HOSPITAL OR INSTITUTION: 2155 E LIBERTY LANE #132
IF RESIDENCE GIVE STREET ADDRESS: DOA / OP EMER / IN PATIENT

DATE OF BIRTH: August 18, 1967    AGE (LAST BIRTHDAY): 33    IF UNDER 1 YEAR MOS DAYS    IF UNDER 1 DAY HRS MIN
MARRIED NEVER MARRIED WIDOWED DIVORCED (SPECIFY): Married
SURVIVING SPOUSE (IF WIFE GIVE MAIDEN NAME): Wendi Ochoa

STATE AND/OR (IF NOT IN USA, NAME COUNTRY): AZ - Casa Grande
CITIZEN OF WHAT COUNTRY: USA    SPECIFY
SOCIAL SECURITY NO
USUAL OCCUPATION (KIND OF WORK DONE MOST OF WORKING LIFE EVEN IF RETIRED): Evans Builder
KIND OF BUSINESS OR INDUSTRY: Boat Company

USUAL RESIDENCE    A STATE: Arizona    B COUNTY: Maricopa    C TOWN OR CITY: Phoenix    D ZIP CODE: 85048    E PREVIOUS STATE OF RESIDENCE: Life
HOW LONG IN ARIZONA
EDUCATION HIGHEST GRADE COMPLETED: ELEMENTARY/SECONDARY (0-12) 12    COLLEGE (1-4 or 5+)

STREET ADDRESS OR R F D: 2155 E. Liberty Lane #132    INSIDE CITY LIMITS (SPECIFY Yes or No): Yes    ON RESERVATION (SPECIFY Yes or No): No    PREVIOUS STATE OF RESIDENCE: None

FATHER'S NAME    A FIRST: Joseph    B MIDDLE: C.    C LAST: Andriano
MOTHER'S MAIDEN NAME    A FIRST: Jeanette    B LAST: Mitchell

INFORMANT'S SIGNATURE: Jeanette Andriano    RELATIONSHIP TO DECEASED: Mother    ADDRESS    STREET NO    CITY AND STATE

EMBALMER'S SIGNATURE    CERT NO: £1141
BURIAL, CREMATION, REMOVAL, OTHER (SPECIFY): Burial    DATE: 10/13/00    CEMETERY OR CREMATORY NAME/LOCATION: Wakita Cemetery Wakita, Oklahoma    FUNERAL DIRECTOR OR PERSON ACTING AS SUCH SIGNATURE    CER NO: F0962
FUNERAL HOME: Cole & Maud Mortuary    215 South Washington Street    Casa Grande, Arizona 85222-4841

TO THE BEST OF MY KNOWLEDGE DEATH OCCURRED AT THE TIME, DATE AND PLACE AND DUE TO THE CAUSE(S) STATED
SIGNATURE AND TITLE
DATE SIGNED (Mo Day Year)
HOUR OF DEATH
NAME OF ATTENDING PHYSICIAN IF OTHER THAN CERTIFIER (Type or Print)

ON THE BASIS OF EXAMINATION AND/OR INVESTIGATION, IN MY OPINION DEATH OCCURRED AT THE TIME, DATE AND PLACE AND DUE TO THE CAUSE(S) STATED
SIGNATURE AND TITLE
DATE SIGNED (Mo Day Year): October 11, 2000    HOUR OF DEATH: UNK
PRONOUNCED DEAD (Mo Day Year): October 08 2000    PRONOUNCED DEAD (Hour): 0345

NAME AND ADDRESS OF CERTIFIER PHYSICAL AND MEDICAL EXAMINER OR CORONER, LAW ENFORCEMENT AUTHORITY (Type or Print): PHILIP E KEEN MD 120 S SIXTH AVE PHOENIX, AZ
REGISTRAR'S SIGNATURE    REG DISTRICT: 0705    24 R RECD BY STATE OFFICE: JAN 04 2001

DATE REGISTERED: OCT 16 2000    REG FILE NO: 19341

CAUSE OF DEATH    ENTER THE DISEASES INJURIES OR COMPLICATIONS THAT CAUSED THE DEATH (ENTER ONLY ONE CAUSE ON EACH LINE)
PART I
A IMMEDIATE CAUSE (FINAL DISEASE OR CONDITION RESULTING IN DEATH): MULTIPLE BLUNT FORCE AND INCISED INJURIES
B DUE TO (OR AS A CONSEQUENCE OF):
C DUE TO (OR AS A CONSEQUENCE OF):
APPROXIMATE INTERVAL BETWEEN ONSET AND DEATH

PART II Other significant conditions contributing to death but not resulting in the underlying cause given in Part I
AUTOPSY (Specify Yes or No): YES
WAS CASE/INE REFERRED TO MEDICAL EXAMINER (Specify Yes or No): YES

MANNER OF DEATH: HOMICIDE    DATE OF INJURY: 10/08/2000    DAY: SUN    HOUR: UNK    HOUR AT WORK (Specify Yes or No): NO    DESCRIBE HOW INJURY OCCURRED: ASSAULTED BY ANOTHER
PLACE OF INJURY (at home farm street factory office building etc) SPECIFY: RESIDENCE
WHERE LOCATED STREET ADDRESS CITY OR TOWN STATE: 2155 E LIBERTY LANE #132, PHOENIX, AZ

SUPPLEMENTARY ENTRIES

AUG 3 1 2001

Julie Frasco
JULIE FRASCO
ASSISTANT
STATE REGISTRAR

This is a true certification of the facts on file in the OFFICE OF VITAL RECORDS, DEPARTMENT OF HEALTH SERVICES, PHOENIX, ARIZONA issued under the authority of A R S 36 341 and by direction of
This copy not valid unless prepared on engraved form displaying state seal and imprinted with raised seal of issuing agency

ANY ALTERATION OR ERASURE VOIDS THIS CERTIFICATE

F 2560866

Arizona Department of Health Services

E000000078

# EXHIBIT B

E000000079

**G. DAVID DELOZIER, P.C.**
4016 East Forest Pleasant
Cave Creek, AZ 85331-5439
Phone (480) 575-6660
Facsimile (480) 575-6661
E-mail  gddelozier@aol.com

G  David DeLozier
State Bar of Arizona NO  005237
Attorney for Petitioners

```
                                        FILED
                                   SUPERIOR COURT
                              ALAN JENNINGS HAUGHT CLERK

                                   AUG 3 1 2001
```

IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

IN AND FOR THE COUNTY OF PINAL, JUVENILE DIVISION

| | | |
|---|---|---|
| IN THE MATTER OF THE ADOPTION OF | ) | No.    0 0 1 0 0 0 5 3 |
| | ) | |
| NICHOLAS ANDRIANO and | ) | **CONSENT TO ADOPTION OF THE** |
| ASHLEE ANDRIANO, | ) | **MINOR CHILDREN** |
| | ) | |
| Minor Children | ) | |
| | ) | |

COMES NOW the natural mother, **WENDI E. ANDRIANO** (d o b  August 26  1970) of

the minor child herein  **NICHOLAS ANDRIANO and ASHLEE ANDRIANO**, being of sound

mind and body  and does hereby knowingly and willingly consent to the adoption of the minor

children, **NICHOLAS ANDRIANO** and **ASHLEE ANDRIANO** by the Petitioners  **DONNA**

**OCHOA and ALEJO OCHOA**

    The undersigned fully understands that the adoption of the minor children is final and

irrevocable

    The undersigned acknowledges that the adoption is in the best interest of the minor

children

    The undersigned has not received any direct or indirect compensation for this consent

E000000080

DATED this _31st_ day of _August_, 2001

_Wendi E Andriano_
WENDI E ANDRIANO

Signed and sworn to before me this _31st_ day of _August_, 2001

_G David DeLozier_
NOTARY PUBLIC

MY COMMISSION EXPIRES

Notary Public State of Arizona
Maricopa County
G David DeLozier
Expires August 2, 2003

000004103

E000000081

# EXHIBIT C

E000000082

FROM : G. David DeLozier,P.C.         PHONE NO. : 602 867 5894         Oct  05 2001 01:33PM P1

OFFICE DISTRIBUTION
[X]    DIVISION 3

# IN THE SUPERIOR COURT
## OF
### PINAL COUNTY, STATE OF ARIZONA

Filed in Court Record
Date: October 5, 2001
Time: 4:00 p.m.

### Date 10/5/2001

JUDGE HONORABLE WILLIAM J. O'NEIL          ALMA JENNINGS HAUGHT, CLERK
DIVISION 3
COURT REPORTER NONE                        By FLORA FLORES, Deputy
ADDRESS

| | | |
|---|---|---|
| In the Matter of the Adoption of | ) | Case No. AD200100058 |
| | ) | |
| | ) | MINUTE ENTRY ACTION: |
| NICHOLAS ANDRIANO and | ) | |
| ASHLEE ANDRIANO, | ) | |
| | ) | |
| | ) | RULING ON REQUEST FOR FINAL |
| Minor children | ) | HEARING |
| | ) | |

PRESENT:

This Court through its Administrative Assistant received a request to schedule this matter for a final adoptive hearing by a Sam O'Brien who purported to be an attorney at law with the firm of G David Delozier, P C   However, in reviewing the State Bar of Arizona membership directory, while a Mr. Samuel E. O'Brien is listed with the phone number given, he does not show as a member of the firm.  Further, the Court notes no notice of appearance was submitted by separate counsel nor substitution of counsel by Mr. O'Brien.  IT IS HEREBY ORDERED the request to schedule this matter for final hearing is, as a result, denied.

Further, the Court notes that in any event, no consent to the guardianship has been filed by the guardian as required by law (see A.R.S §8-106).

Mailed/distributed copy(s):10/5/2001

cc:  G DAVID DELOZIER
     ATTORNEY AT LAW
     4016 EAST FOREST PLEASANT
     CAVE CREEK AZ  85331-5439

E000000083

FROM : G  David DeLozier,P C          PHONE NO  602 867 5E94      —  Oct  04 200_ 04 03PM P1

1

**8-106. Consent to adoption; who shall consent; waiver; consent to the release of information; notification to potential fathers.**

A. The court shall not grant an adoption of a child unless consent to adopt has been obtained and filed with the court from the following:

1. The child's birth or adoptive mother, if living

2. The child's father if any of the following is true.

(a) The father was married to the child's mother at the time of conception or at any time between conception and the child's birth unless his paternity is excluded or another man's paternity is established pursuant to title 25, chapter 6, article 1

(b) The father has adopted the child

(c) The father's paternity is established under title 25, chapter 6, article 1 or section 36-322.

3. A child who is twelve years of age or older and who gives consent in open court.

4. Any guardian of the person of the child appointed by a court and given authority by it to consent to the child's adoption

© 1991 Matthew Bender & Company  Inc  a member of the Lexis Nexis™ Group  All rights reserved

E000000084

# EXHIBIT D

E000000085

G. DAVID DELOZIER, P.C.
4016 East Forest Pleasant
Cave Creek, AZ 85331-5439
Phone (480) 575-6660
Facsimile (480) 575-6661
E-mail  gddelozier@aol.com

FILED
SUPER E
AL... EARNING HAUGH...
OCT - 9 2001

G. David DeLozier
State Bar of Arizona NO  005237
Attorney for Petitioners

IN THE SUPERIOR COURT OF THE STATE OF ARIZONA
IN AND FOR THE COUNTY OF PINAL, JUVENILE DIVISION

IN THE MATTER OF THE ADOPTION OF          )      No. AD200100058
                                          )
                                          )
NICHOLAS ANDRIANO and,                    )      NOTICE OF COMPLIANCE
ASHLEE ANDRIANO,                          )      WITH A.R.S. 8-106, and
                                          )      REQUEST FOR HEARING
          Minor Children                  )
                                          )      (Assigned to the Honorable
                                          )      William J  O'Neil, Judge)

COMES NOW the Petitioners, **DONNA OCHOA** and **ALEJO OCHOA**,  by and

through undersigned counsel, and files this Notice of Compliance with A.R.S. 8-106 and

to Request a Hearing

I       The provisions of **A.R.S. 8-106 A.** have been complied with, as follows

        1       The minor children's birth mother, Wendi E  Andriano, has consented to

                their adoption

        2       The minor children's father is deceased

        3       Neither of the minor children are twelve years of age or older

        4       No guardian approval is required since the guardians were not given

                authority by the court to consent their adoptions    See **Exhibit "1"**,

                Agreement Regarding the Guardianship of Nicholas Andriano and Ashlee

E000000086

000004108

Andriano, **Exhibit "2"**, Order Appointing Guardian of Minor Children filed on November 15, 2000, and **Exhibit "3"**, Court's Minute Entry dated 11/15/00 re the hearing on Petition for Appointment of Co-Guardians for Minors. None of these require or permit the guardians' consent to the minor childrens' adoption

5    No agency consent is required

6    There is no consent required since there is no adult parent with a guardian appointed

Furthermore, **A.R.S. 8-106.B.** provides that "it is not necessary for a person to obtain consent to adopt from the following

"**4.**    A person whose consent is not required under subsection A of this section "

Thus, the consent of the minor childrens' guardian, who were **not** "given authority by it [the court] to consent to the child's adoption", is not required by statute

Additionally, on March 19, 2001, the minor childrens' mother, Wendi E. Andriano, signed Withdrawal of Consent to Guardianship. See **Exhibit "4"**.

**WHEREFORE**, based on the foregoing, Petitioners respectfully request that the Court set a hearing as soon as time is available on the Court's calendar for the adoption of the minor children, Nicholas Andriano and Ashlee Andriano, by the Petitioners

DATED this 9th day of _October_, 2001

                              G. DAVID DELOZIER, P.C.

                              By _____

                              G. David Delozier
                              Attorney for Petitioners

E000000087

ORIGINAL of the foregoing filed this
9TH day of October, 2001, with

Clerk of the Superior Court, Pinal County
100 North Florence
Florence, AZ 85232-2730

COPIES of the foregoing delivered*/mailed**
this 9TH day of October, 2001, to:

The Honorable William J. O'Neil
Judge, Pinal County Superior Court
100 North Florence
Florence, AZ 85232-2730

Donna & Alejo Ochoa
1104 North Park Avenue
Casa Grande, AZ 85222
Petitioners

Wendi E. Andriano
Booking #A631830
Estrella Facility MCSO
2939 West Durango
Phoenix, Arizona 85009
Mother

By X _____

E000000088

EXHIBIT "1"

E000000089

## AGREEMENT REGARDING THE GUARDIANSHIP OF
## NICHOLAS ANDRIANO and ASHLEE ANDRIANO

THIS AGREEMENT entered into by and between BRADLEY JAMES LAMBETH and JEANEA LAMBETH and ALEJO OCHOA and DONNA OCHOA.

### RECITALS

The parties wish to provide for a stable environment for NICHOLAS ANDRIANO and ASHLEE ANDRIANO, while allegations against there mother are being resolved by the courts.

The parties all recognize the interests of the grandparents and the relatives regarding the care and custody of NICHOLAS ANDRIANO and ASHLEE ANDRIANO.

The parties have agreed to a care and custody arrangement which all believe is in the best interests of NICHOLAS ANDRIANO and ASHLEE ANDRIANO at this time.

The parties, therefore, agree as follows:

1.   BRADLEY JAMES LAMBETH and JEANEA LAMBETH shall petition the Court to become Guardians of NICHOLAS ANDRIANO and ASHLEE ANDRIANO.

2.   The undersigned parties agree to this appointment.

3.   NICHOLAS ANDRIANO and ASHLEE ANDRIANO shall reside with BRADLEY JAMES LAMBETH and JEANE LAMBETH at ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ ▓▓▓▓▓.

4    BRADLEY JAMES LAMBETH and JEANE LAMBETH shall recognize the grandparents' right to customary and reasonable visitation of the children. The parties agree that such customary and reasonable visitation shall include not less than two (2) weekends per month with ALEJO OCHOA and DONNA OCHOA unless more visits otherwise arranged

E000000090

ro and agreed by the partie    Such arrangements shall reflect the parties' intentions to maintain the close relationship of the children with their grandparents and relatives

5    The parties shall cooperate in making the children available to the grandparents of both sides of the family and do everything to insure that the best interests of the children are considered.

6    The parties agree to a one year review of this guardianship unless there is an earlier even of major significance which would affect the children

7    WENDI E ANDRIANO shall be provided with a copy of this Agreement

8    ALEJO OCHOA and DONNA OCHOA waive their presence at the hearing on November 15, 2000 and submit this Agreement to the Court as a reflection of their position.

IN WITNESS WHEREOF, the parties sign their names this ___ day of November,

2000

_____    _____  11-6-00
BRADLEY JAMES LAMBETH        ALEJO OCHOA

_____    _____  11-6-00
JEANEA LAMBETH               DONNA OCHOA

_____  11-7-00
WENDI ANDRIANO

E000000091

**EXHIBIT "2"**

COPY

1  John J. Jakubczyk, Bar No. 003884
   2711 N. 24th Street, Suite 2
2  Phoenix, AZ 85008
   (602) 453-9388
3  Attorney for Petitioners

NOV 1 5 2000

4       IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

5           IN AND FOR THE COUNTY OF MARICOPA

6  In the Matter of the            )   No. PB 2000-004531
   Guardianship of                 )
7                                  )   ORDER APPOINTING GUARDIAN
   NICHOLAS ANDRIANO and           )   OF MINOR CHILDREN
8  ASHLEE ANDRIANO                 )
                                   )
9       Minor Children.            )

10

11       The Petition for Appointment of Guardian of Minor Children having come before this

12  Court, the Court finds as follows:

13       1.   Petitioners are entitled to file said Petition under A.R.S. §14-5303(A).

14       2.   Notice has been given as required by law and waived by all interested parties.

15       3.   NICHOLAS ANDRIANO is an unmarried minor born on June 20, 1997.

16       4.   ASHLEE ANDRIANO is an unmarried minor born on September 16, 1998.

17       5.   Venue in this county is proper.

18       6.   The natural father of the minor children is deceased.  The natural mother is

19  presently incarcerated.  Her rights to custody have been suspended by circumstance.

20       7.   The natural mother, WENDI E. ANDRIANO, has signed an Agreement

21  consenting to the guardianship.

22       8.   The maternal grandparents have signed an Agreement consenting to the

23  guardianship.

24       9.   The terms of the Agreement are approved by the Court and incorporated herein

25  by reference.

26       10.  No Guardian for the minor has been appointed by Will or by Court order of any

27  Court, and no other proceedings for the appointment of a Guardian are pending in any other

28  Court.

E000000093

11.     The welfare and best interests of the minor children require the appointment of a Guardian.

12.     BRADLEY JAMES LAMBETH and JEANEA LAMBETH are qualified to serve as Guardians of the minor children.

IT IS THEREFORE ORDERED that:

(A)     BRADLEY JAMES LAMBETH and JEANEA LAMBETH are hereby appointed Guardians of NICHOLAS ANDRIANO and ASHLEE ANDRIANO, Minor Children, and that, upon acceptance, Letters of Guardian of a Minor shall be issued to said appointee, without restriction.

(B)     The Guardians shall immediately notify the Court of any change in address and shall be responsible for all costs resulting from failure to do so

(C)     The Court shall set a review date for one year from the date of this Order. This matter is set for hearing Nov 15 2001 @ 10 am annual report due 20 days prior to hearing.

DATED this ___ day of ___ NOV 1 5 2000 ___, 2000.

Honorable Jane Bayham-Lesselyong

Commissioner Jane Bayham-Lesselyong

2

E000000094

**EXHIBIT "3"**

E000000095

11/15/2000

CLERK OF THE COURT
F--- POOO

R. Honan
Deputy

HONORABLE JANE BAYHAM-LESSELYONG

PB2000004531

IN THE MATTER OF THE GUARDIANSHIP        FILED: November 21, 2000
OF:

NICHOLAS ANDRIANO                        JOHN J JAKUBCZYK
ASHLEE ANDRIANO


MINORS



                        MINUTE ENTRY

        9:07 a.m. This is the time set for hearing on a Petition
for Appointment of Co-Guardians for Minors.  Petitioners Bradley
and Jeanea Lambeth, the paternal aunt and uncle of the minors,
are present with counsel John J. Jakubczyk.

        No court reporter is present.

        Brad and Jeanea Lambeth are sworn and testify.

        The mother of the minors, Wendy Andriano, is incarcerated.
The father is deceased.

        Counsel presents the Court with an agreement between the
petitioners and the mother signed November 7, 2000. The amended
notice shows she was sent a notice of this hearing on November 1,
1000. She was sent a copy on October 31, 2000 at the Madison
Street Jail but was moved from that location.

        The Court finds as follows, pursuant to A.R.S. §14-5204
through -5208:

        1.   The Court has jurisdiction over this matter;

        2.   Proper notice of this proceeding has been given;

        3.   The minors were born on ▓▓▓▓▓▓ (Nicholas)
and ▓▓▓▓▓▓▓▓ (Ashlee);

RECEIVED
NOV 27 2000

                                                        Page 1
Docket Code 421

E000000096

11/15/2000

MARICOPA COUNTY

CLERK   THE COURT
FORM P000

R. Honan
Deputy

HONORABLE JANE BAYHAM-LESSELYONG

PB2000004531

    4.   The appointment of guardians is necessary;

    5.   The parental rights of the parents of the minor have been terminated or suspended by circumstances or prior court order;

    6.   The welfare and best interests of the minors will be served by the appointment; and,

    7.   Bradley J. Lambeth and Jeanea M. Lambeth are capable and competent to serve as guardians of the minors.

    IT IS ORDERED appointing Bradley J. Lambeth and Jeanea M. Lambeth as Co-Guardians of Nicholas Andriano and Ashlee Andriano, all as set forth in the formal written Order signed by the Court this date, and released to counsel for the issuance of letters, certification and filing.

    IT IS FURTHER ORDERED approving the Order to Guardians signed by the Court this date.

    IT IS FURTHER ORDERED setting hearing for continuance of the guardianship November 15, 2001 at 10:00 a.m.

    IT IS FURTHER ORDERED that on or before October 26, 2001 the Guardian shall file with the Probate Registrar the required Report of Guardian for the period from November 15, 2000 through October 25, 2001. A copy of the report shall also be provided to Probate Court Administration at the time of filing.

    IT IS FURTHER ORDERED setting an internal review by Probate Court Administration on November 10, 2001 to confirm compliance.

    9:25 a.m. Matter concludes.

Docket Code 421

Page 2

E000000097

000004119

**EXHIBIT "4"**

E000000098

**LEON THIKOLL**
ATTORNEY AT LAW

239 N MEYER
TUCSON, AZ 85701
TELEPHONE (520) 884-7997

State Bar No 01467
Pima County Computer No 57060

Attorney for

    Alejo and Donna Ochoa
    and Wendi Andriano

IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

IN AND FOR THE COUNTY OF MARICOPA

| In the Matter of the Guardianship of | ) | Case No PB 2000-004531 |
|---|---|---|
| | ) | |
| NICHOLAS ANDRIANO and | ) | WITHDRAWAL OF CONSENT |
| ASHLEE ANDRIANO | ) | TO GUARDIANSHIP |
| | ) | |
| Minor Children | ) | |

COMES NOW Wendi Andriano, natural mother of Nicholas and Ashlee Andriano and does hereby state to the Court that she withdraws her previously granted consent to guardianship

Wendi Andriano now seeks an Order of Appointment of her parents, DONNA OCHOA and ALEJO OCHOA, husband and wife, to be the guardians of her children

DATED this _19_ day of March, 2001

                                                Wendi Andriano

E000000099



Copy of the foregoing mailed this
19 day of March, 2001, to.

John Jakubczyk, Esq
2711 N 24th Street, Suite 200
Phoenix, AZ 85008
Attorney for Bradley and Jeanea Lambeth

LEON THIKOLL
ATTORNEY AT LAW
239 N MEYER
TUCSON AZ 85701

E000000100

# EXHIBIT E

E000000101

D 041-2009

OFFICE DISTRIBUTION
[X]    DIVISION 1/

**IN THE SUPERIOR COURT**
OF
PINAL COUNTY, STATE OF ARIZONA

Date 12-18-2001

Filed in Court Record
Date December 27, 2001
Time. 12 00 p.m

JUDGE HONORABLE WILLIAM J. O'NEIL

DIVISION 1
COURT REPORTER None
ADDRESS

ALMA JENNINGS HAUGHT, CLERK

By Jackie K Greathouse, Deputy

---

In the Matter of the Adoption of.

NICHOLAS ANDRIANO and
ASHLEE ANDRIANO

A person(s) under the age of 18 years

)
)
)
)
)
)
)
)
)

Case No AD200100058

MINUTE ENTRY ACTION:

RULING   ON   NOTICE   OF
COMPLIANCE WITH A.R.S. 8-106 and
REQUEST FOR HEARING

---

PRESENT

A Notice of Compliance with A R S §8-106 and Request for Hearing having been submitted herein on October 9, 2001, and the Court having reviewed the same,

IT IS HEREBY ORDERED the Request for Hearing is DENIED

While the Court acknowledges that A R S §8-106 does not require notice to the guardians, the best interest of the children do   The Social Study submitted in support of the adoption states that the Petitioners intend, if the natural mother's trial results in a not guilty verdict, that the children would be returned to the natural mother   No information with any great specificity is given regarding what charges the mother has been charged with, nor does this Judge know what charges she is facing   However, the report indicates the potentiality of a prison term.   The adoption would necessarily sever the mother's relationship to the children

Further, the Social Study states the children live with the guardians and that the paternal grandparents who live in Casa Grande "will be able to visit with the children if they are adopted by the Ochoas " " The adoption by law would terminate any such rights to visit by either the paternal grandparents or the paternal aunt and uncle who presently serve as guardians   The additional filings by the Petitioners underscore this Court's concern by the refusal of the Petitioners to give notice

E000000102

000004124

Case No. AD200100058                                                    Page 2

of their intention to terminate any rights of the paternal side of the
family, including the guardians of these children   On November 14 an
agreement was made between the Petitioners and the guardians which
included a Consent to Guardianship   The recitals are telling, "the
parties all recognize the interest of the grandparents and the relatives
regarding the care and custody of Nicholas Andriano and Ashlee
Andriano." The guardians by stipulation of the Petitioners took custody
of these children and they have lived in that home at least since that
time.   The Social Study makes findings based on interviews of the
Petitioners and not of the guardians or of their present living
arrangements   This Court under A R S. §8-116 must find "that the
adoption is in the best interest of the child.   " The best interest
of the children are served by formal notice being given to those
individuals, who the Petitioners themselves have previously both
stipulated to be guardian of the children, and who have further
stipulated such children's best interest is served by those guardians
having the care and custody of them

IT IS THEREFORE ORDERED directing the Petitioners to serve the guardians
with the Petition for Adoption

IT IS FURTHER ORDERED directing the Petitioners to cause the Social
Study to be amended to include interviews of the guardians and the
present living arrangements of the children and further to make
recommendations regarding the children's best interests, in light of a
complete severance of all rights which the guardians and paternal
grandparents presently enjoy pursuant to A R S  §8-117


[X]   SIGNED this *2nd* day of *January*, 20*02*.

                              [X]   STEPHEN F. McCARVILLE
                              [X]   JUDGE OF THE SUPERIOR COURT

                                    *For Hon. William*
                                    *J. O'Neil*

Mailed/distributed copy(s):12-27-2001

cc   G DAVID DELOZIER, P C
     ATTORNEY AT LAW
     4016 E FOREST PLEASANT
     CAVE CREEK AZ  85331


E000000103

000004125

# EXHIBIT F

E000000104

# IN THE SUPERIOR COURT

### PINAL COUNTY, STATE OF ARIZONA

**Filed** in Court Record

Date Filed  10/16/2002
Time Filed  01 27 PM

### Date: 10/15/2002

THE HON WILLIAM J O'NEIL
Division 1
Court Reporter  NONE

ALMA JENNINGS HAUGHT, CLERK

By GINA M LAUGHLIN Deputy Clerk

IN THE MATTER OF THE
ADOPTION OF:

NICHOLAS ANDRIANO and
ASHLEE ANDRIANO,
                                    Minor Child(ren)

)
)
)
)
)
)
)
)

AD200100058

MINUTE ENTRY ACTION:

RULING ON MOTION(S) /
ISSUE(S)

PRESENT

## RULING UNDER ADVISEMENT

This matter was set for Evidentiary Hearing by the Court at the request of Petitioners/Maternal Grandparents  The Court permitted both counsel of record, G  David DeLozier, and their counsel in a Maricopa County cause, Daphne Budge, to submit statements, avowals and to make argument  Thereafter, a Substitution of Counsel was submitted and a "Motion for Order Denying Monetary Sanctions" was submitted  This Court previously rejected the ex parte communications submitted by Ms  Budge and the Court having already conducted the evidentiary hearing and having the matter under advisement does summarily deny the Motion for Order Denying Monetary Sanctions

The Court's orders in this action were clear and unequivocal  Likewise, the avowal of Ms Budge in her closing statements makes clear that the grandparents believe the Court in Maricopa County acted improperly, that counsel appointed for the children in that action acted improperly and that as they were not getting the result they wanted, they chose to file the adoption  The Court finds it impossible to accept that they did not contemplate that the methodology by which these pleadings were submitted and the timing of them would result in paternal interest being severed permanently  The Court finds counsel G  David DeLozier intentionally and surreptitiously avoided this Court's orders with the intentions of permanently severing the paternal interest of the children and that he intentionally disregarded this Court's orders

2599                                   AD200100058                          Page 1 of 2

E000000105

IT IS ORDERED that a copy of the transcript of the hearing be prepared

IT IS FURTHER ORDERED as a sanction that G DAVID DELOZIER pay for such transcript, a copy of which will be forwarded to the State Bar of Arizona for review to determine if unethical behavior was conducted by him  As a further sanction, he is ORDERED to pay attorney fees of the paternal aunt and uncle/guardians in the amount of $6,000 00, which sum is reduced to judgment

Further, the Court finds the Petitioners/Maternal Grandparents, Donna and Alejo Ochoa, knew the orders were not being abided by, that the actions were done to thwart the orders of the Maricopa Superior Court  A copy of this minute entry shall be forwarded to this Court's sister court in Maricopa County, cause PB20000-004531, with a copy to the assigned Judge  As a sanction, the Petition to Adopt by Donna Ochoa and/or Alejo Ochoa is dismissed with prejudice

Signed this 18ᵀᴴ day of October, 2002.

WILLIAM J. O'NEIL

JUDGE OF THE SUPERIOR COURT

Mailed/distributed copy: 10/15/2002

cc:
G DAVID DELOZIER JR – PETITIONERS/
MATERNAL GRANDPARENTS

JOHN J JAKUBCZYK – CSL FOR
GUARDIANS IN MARICOPA COUNTY CASE

DAPHNE BUDGE – CSL FOR MATERNAL
GRANDPARENTS IN MARICOPA COUNTY
CAUSE PB20000-004531

2599                    AD200100058                    Page 2 of 2

E000000106

000004128

# EXHIBIT G

E000000107

FILED SUPERIOR COURT
SUPERIOR COURT
PINAL COUNTY, ARIZONA

NOV 1 - 2002

G. DAVID DELOZIER, P.C.
4016 Forest Pleasant Place
Cave Creek, Arizona 85331
Tel  480-575-6660
Fax  480-575-6661
e-mail  gddelozier@aol.com

G. David DeLozier
State Bar No. 005237
*In Pro Per*

## IN THE SUPERIOR COURT OF THE STATE OF ARIZONA
## IN AND FOR THE COUNTY OF PINAL

| | |
|---|---|
| In the Matter of the Adoption of | No. AD 2001-00058 |
| NICHOLAS ANDRIANO and ASHLEE ANDRIANO, | **NOTICE OF APPEAL** |
| Minor Children | |
| G. DAVID DELOZIER and G. DAVID DELOZER, P.C., | |
| Real Parties In Interest | |

G. David DeLozier, and the law firm of G. David DeLozier, P.C., hereby give notice that they are appealing to the Arizona Court of Appeals, Division Two, the minute entry, order, and judgment dated October 18, 2002, awarding sanctions as against the foregoing Real Parties in Interest.

RESPECTFULLY SUBMITTED this ____ day of November, 2002

G. DAVID DELOZIER, P.C.

By _____
G. David DeLozier, Esq.
*In Pro Per*

-1-

E000000108

## CERTIFICATE OF SERVICE

THE ORIGINAL of the foregoing
filed this ⎧st⎭ day of November, 2002 with

Clerk of the Court
Pinal County Superior Court
31 North Pinal Street, Bldg E
Florence, Arizona 85232

And a copy mailed to

Honorable William J O'Neill
Pinal County Superior Court
31 North Pinal Street, Bldg E
Florence, Arizona 85232

Honorable Jane Bayham-Lesselyong
Commissioner, Maricopa County Superior Court
125 West Washington
Phoenix, Arizona 85003

Daphne Budge, Esquire
45 West Jefferson, Suite 225
Phoenix, Arizona 85003

John J Jakubcyzyk, Esquire
2711 North 24th Street, Suite 200
Phoenix, Arizona 85008
Attorney for Guardians

By _____

-2-

E000000109

# ORIGINAL

IN THE

## COURT OF APPEALS

### STATE OF ARIZONA

### DIVISION TWO



RECEIVED
JUL 10 2003
COURT OF APPEALS
DIVISION TWO

FILED BY CLERK
JUL 10 2003
COURT OF APPEALS
DIVISION TWO

IN THE MATTER OF THE ADOPTION OF )
)
NICHOLAS A and )
ASHLEE A , )
)
Minor Children, )
)
G DAVID DELOZIER and )
G. DAVID DELOZIER, P.C., )
)
Real Parties In Interest/Appellants )
)

No 2-CA-JV 2002-0127

Pinal County Superior
Court No AD2001-0058

## APPELLEES' ANSWERING BRIEF

**JOHN J. JAKUBCZYK**
2711 N 24th Street, Suite 200
Phoenix, Arizona 85008
Phone 602/468-0030
Facsimile 602/468-0053
e-mail jakeslaw@ionet net

John J Jakubczyk
State Bar No. 005894
Attorney for Appellees



RECEIVED
JUL 11 2003
COURT OF APPEALS
DIVISION TWO

000000110

# TABLE OF CONTENTS

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  iv

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  1

STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . . . . . . . .  1

    1.   History of this Matter . . . . . . . . . . . . . . . . . . . . . . . .  1

    2.   Nature of the Case . . . . . . . . . . . . . . . . . . . . . . . . . . .  8

    3.   Court's Jurisdiction . . . . . . . . . . . . . . . . . . . . . . . . .  8

STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . .  8

RESPONSE TO APPELLANT'S STATEMENT OF FACTS . . . . . . . . . . 11

ISSUES FOR REVIEW . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

    1.   Standard of Review . . . . . . . . . . . . . . . . . . . . . . . . 13

    2.   Discussion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

        A.   Appellant failed to follow the Court's order
            issued in the 12/18/01 Minute Entry . . . . . . . . . . . . 13

        B.   Appellant's actions are all subject to *Cooter &*
            *Gell v. Hartmarx Corp.* . . . . . . . . . . . . . . . . . 14

        C.   The trial court retained jurisdiction to consider
            sanctions against Appellant . . . . . . . . . . . . . . . . . 18

ii

E000000111

## TABLE OF CONTENTS – Page 2

D.   The trial court did not abuse its discretion in
     awarding sanctions . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

     1)   Sanctions were warranted for Appellant's
          conduct . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

     2)   The Ochoas have not appealed the sanction . . . . . . . . 21

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

CERTIFICATE OF SERVICE . . . . . . . . . . . . . . . . . . . . . . . . . 23

CERTIFICATE OF COMPLIANCE . . . . . . . . . . . . . . . . . . . . . . 24

iii

E000000112

## TABLE OF AUTHORITIES

<u>Cases:</u>

*Brown v. Local 58, Int'l Brotherhood of Electrical Workers*
*AFL-CIO*, 76 F.3d 762 (6th Cir. 1996) . . . . . . . . . . . . . . . . . . . 17

*Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384 (1990) . . . . 14, 16, 17, 18, 19

*Crawford v. Crawford*, 20 Ariz.App. 599, 514 P.2d 1050 (App.1973) . . . . . 14

*Floyd v. Ortiz*, ____ F.3d ____ No  01-1295, 2002 WL 1980462
(10th Cir., August 28, 2002) . . . .  . . . . . . . . . . . . . . . . . . . . . 20

*Goodman v. Gordon*, 103 Ariz. 538, 447 P.2d 230 (1968) . . . . . . . . . . . . 15

*Greenberg v. Sala*, 822 F.2d 882 (CA9 1987) . . . . . . . . . . . . . . . . 17

*James, Cooke, & Hobson, Inc., v. Lake Havasu Plumbing & Fire*
*Protection*, 177 Ariz. 316, 868 P.2d 329 (App.1993) . . . . .  . .  . . . 13

*Linder v. Brown & Herrick*, 189 Ariz. 398, 943 P.2d 758
(App.Div.1, 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Mark Indus Ltd. v. Sea Captain's Choice, Inc.*, 50 F.3d 730
(9th Cir  1995)  . . . . . . . . . . . .  .  . . . . .  . . . . . .  .    19

*Matter of Ireland*, 146 Ariz. 340, 706 P.2d 352 (1985) . . . . . . . . . . . . 16

*Meinecke v. H&R Block*, 66 F.3d 77 (5th Cir. 1995)  . . . . . . . . . . . . . . 15

*Muthig v. Brant Point Nantucket, Inc.*, 838 F.2d 600 (CA1 1988) . . . . . 18

*Othen v. Ann Arbor School Board*, 699 F.2d 309 (6th Cir. 1983)  . . . . . 17

*Santiago v. Victim Servs. Agency of the Metro. Assistance Corp.*,
753 F.2d 219 (2d Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . 16

E000000113

## TABLE OF AUTHORITIES – Page 2

*Spring v. Spring*, 3 Ariz.App. 381, 414 P 2d 769 (1966) . . . . . . . . . . . .   14

*Szabo Food Service, Inc. v. Canteen Corp.*, 823 F.2d 1073
  (CA7 1987), cert. dism'd, 485 U.S. 901 (1988) . . . . . . . . . . . . . .   17, 18

*Taylor v. Great Lakes Seamen's Union, Local 5000*,
  657 F Supp. 550 (N.D. Ohio 1984) . . .        . . . . . . . . . . . . . . . .   17

*Williams v. Ezell*, 531 F.2d 1261 (5th Cir. 1976) . . . . . . . . . . . . . . .   15, 16

**Statutes:**

A.R.S. § 12-122 . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   15, 16

A.R.S. § 12-2101(B) . . . . . . . . . . . . . . . . . . . . . . . . . . . .   8

A.R.S. § 12-349 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   16

A.R.S. § 12-861 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   16

A.R.S. § 8-117. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   9

**Rules:**

Rule 11, *Ariz.R.Civ.P.* . . . . . . . . . . . . . . . . . . . . . .   13, 16, 18, 19

Rule 41(a), *Ariz.R.Civ.P.* . . . . . . . . . . . . . . . . . . . . .   16, 17

Rule 41(a)(1), *Ariz.R.Civ.P.* . . . . . . . . . . . . . . . . . . . .   14, 16, 18, 19

Rule 41(a)(1)(i), *Ariz.R.Civ.P.* . . . . . . . . . . . . . . . . . .   18, 19

Rule 41(a)(1)(ii), *Ariz.R.Civ.P.* . . . . . . . . . . . . . . . . . .   15

Rule 41(a)(2), *Ariz.R.Civ.P.* . . . . . . . . . . . . .       . . . . . . . . . . . . .   17

E000000114

## INTRODUCTION

Appellant, David DeLozier, was sanctioned by Pinal County Judge William J. O'Neil for failing to comply with a Court Order that he provide notice of a Petition to Adopt to the children's guardians, and further for failing to have the social study completed to investigate the children's living arrangements and relationship with the Guardians, and to make recommendations to the Court.

Appellant was ordered to pay $6,000.00 in attorney's fees to the Guardians. He appealed the decision. The Ochoas have not appeared, nor appealed the decision. Appellees are the Guardians and believe the decision should be affirmed.

## STATEMENT OF THE CASE

1   **History of this Matter**

Nicholas and Ashlee Andriano are the natural children of Joseph and Wendi Andriano. Nicholas was born on June 20, 1997. Ashlee was born on September 16, 1998. While Nicholas and Ashlee were three and two years old, their father was murdered. On October 8, 2000, Wendi Andriano was arrested for the murder of her husband. The next day, October 9, 2000, paternal aunt and uncle Jeanea and Bradley Lambeth took custody of the two children, brought them into their home, and have had continuous care, custody and control of their nephew and niece since that time. Following a meeting of the paternal grandparents, the maternal grandparents and Bradley and Jeanea Lambeth, Donna and Alejo Ochoa agreed in

1

E000000115

writing that Bradley and Jeanea Lambeth should be the guardians of the children. With this agreement the Lambeths filed a petition in Maricopa County Superior Court for their appointment as guardians. On November 15, 2000, the Probate Court reviewed the facts of the case, determined that Wendi Andriano's ability to parent her children had been suspended by circumstances, i.e. her incarceration, and found that Brad and Jeanea Lambeth were fit and proper persons to be guardians of the children. The Lambeths were appointed Guardians of the children

A short time after the guardianship had been approved, the children's therapist became concerned about the ability of the children to stabilize in the Lambeth home. The therapist determined that overnight visits to the maternal grandparents were not in the children's best interest, and therefore recommended they be stopped. In heeding the recommendations of the therapist and seeking the support of the Probate Court, the guardians incurred the wrath of Donna and Alejo Ochoa. During the first year, 2001, the Ochoas raised numerous unsubstantiated concerns and sought to have the court revoke the guardianship by the Lambeths. Wendi Andriano submitted her withdrawal of consent to the guardianship, and the Ochoas thought that based on that withdrawal of her consent they would get the children.

When the Probate Court, per Commissioner Jane Bayham-Lesselyong, determined that it was not in the children's best interest to terminate the guardianship or to remove the children from the Lambeth home, and that a court-

2

E000000116

appointed guardian ad litem should be appointed to represent the children, the Ochoas became even more incensed. Through numerous court filings, they persuaded the court to appoint a psychologist to do an evaluation and determine if overnight visits were appropriate. During the process of this evaluation, the Ochoas argued in court to change the evaluation from being about visitation and overnight visits, to a full-scale evaluation as to whom should have custody of the children. While this was happening, on August 31, 2001, the Ochoas decided, without providing notice to the Maricopa County Superior Court or the guardians or the guardian ad litem or anyone else involved, to file a petition for adoption in Pinal County, Arizona. As the Court can review from the record, the Ochoas had a home study prepared regarding Donna and Alejo Ochoa. The persons conducting the home study never communicated with the guardians or obtained any information from the guardians regarding the welfare of the children, even though the guardians' home was the primary residence of the children. When the adoption petition came before the court for initial hearing, the court expressed concern that there had been no notice provided to the guardians. The Ochoas went to great lengths to argue that notice was not required. They filed pleadings to that effect, and argued that the court could grant the adoption without notice being given to the guardians However, despite these arguments, the court held that notice to the guardians was in the best interest of the children.

<center>3</center>

In December 2001, when that order was further articulated by the court, the Ochoas took the unusual step of attempting to change the Judge, and filed a Notice of Change of Judge following the ruling of the court. It was during this time that the Ochoas made allegations to Child Protective Services that the Lambeths had been abusive toward the children. These allegations later became one of the grounds for their filing a petition to remove the Lambeths as guardians in Maricopa County Superior Court. As the record reflects, the Pinal County judge declined to grant the change of judge. The Court ordered the petitioners to serve the guardians and advise the social agency doing the home study that they should interview the guardians.

The Ochoas and their attorney chose not to comply with the court order. Instead, they aggressively pursued removal of the guardians in Maricopa County Superior Court. It was only after numerous hearings that, in July 2002, the guardians' attorney became aware that there may be a pending action in Pinal County. On July 10, 2002, he traveled to Florence, the Pinal County seat, from Phoenix to investigate and review the file. After review of the file, he made contact with the Ochoas' counsel, the guardian ad litem and the Court on July 11, 2002 The guardians then filed a Motion to Dismiss the Petition and a Motion for Sanctions, based upon the Ochoas' failure to comply with the court order. The Ochoas also filed a Notice of Dismissal on July 12, 2002. On September 27, 2002,

4

E000000118

the court held an evidentiary hearing, which primarily consisted of the attorneys making avowals as to what the facts were, given the circumstances. This court has a copy of the transcript of the argument.

After taking the matter under advisement, Judge O'Neil sanctioned the attorney, Mr. DeLozier, $6,000.00, reduced the amount to a judgment and ordered that the judgment be paid to the Lambeths. The court also dismissed the Petition to Adopt with prejudice. It was the guardians' position that such a sanction was mild, given the egregious disregard of the court order and the two years of frustration and expense that the Ochoas caused the Lambeths. As further explained in this brief, the Lambeths had been subjected to incredible pressure by the Ochoas. Their family life had been interrupted on almost a weekly basis by the Ochoas during a period of over two years. They had been required to expend enormous sums of money merely to defend the attacks made by the Ochoas and their attorneys. The $6,000.00 Judgment represented a very modest amount as a sanction. As articulated below, the judgment was appropriate, as was the sanction against the Ochoas. From the testimony it appeared that Mr. DeLozier chose to "fall on his sword" rather than implicate his clients in their decisions. However, counsel believes the court saw through much of the charade, and therefore made its determinations based upon facts, the law and a certain appreciation for justice.

In the introduction submitted by Mr. DeLozier, there were numerous

5

inaccuracies, misrepresentations and incorrect facts. One inaccuracy claimed that the Guardianship was temporary. The Guardians were not temporary Guardians. The Court on March 23, 2001 declined to characterize the guardians as temporary. In addition, the Ochoas were not both emotionally and financially tapped at the time of the court order in January 2002. They filed a petition to revoke the guardianship in February 2002 and aggressively pursued the action through many hearings, until the court ruled in the Fall of 2002 that their petition failed. They are incorrect in stating that they lacked the resources to "effect an adoption." They had already paid for the home study, and considering the amount of money that they had paid for attorney's fees between February 2002 and November 2002, it was improbable that they lacked the resources to effect the adoption. Therefore it did not follow that they believed that the "sanction" for failure to serve the matter would be "dismissal." Had the Ochoas truly decided that they did not want to pursue the adoption because they did not want to serve the guardians with notice of the petition, all they had to do was file a motion to dismiss the adoption in January 2002.

Their failure to dismiss supports the argument that their efforts to have the guardianship revoked was in order to have the Ochoas substituted as guardians so that they could have proceeded with the adoption. The only reason that the Ochoas filed the Motion to Dismiss on July 12, 2002, was that counsel for the guardians addressed the issue with Mr. DeLozier, the guardian ad litem and the Court at the

6

E000000120

000004142

evidentiary hearing on July 11, 2002.

Appellants cannot speculate as to what the trial court believed in sanctioning both the Ochoas and their counsel, and therefore his comments in the introduction, attempting to set up the straw man, fail.

Why should the court not believe that the failure by DeLozier and his clients to provide notice to Maricopa County Superior Court, the guardians and the guardian ad litem was to prevent the Guardians' participation in the adoption proceeding? Their action was an intentional disregard of a specific court order. Appellant's introduction is somewhat incredulous, because the reason he was sanctioned is that he failed to obey the court order to provide notice. In fact, after the hearing he filed a Notice of Change of Judge.

Six months went by, and only after being discovered by opposing counsel did the Ochoas file a notice to dismiss. Appellant speculates further when he states that the trial court apparently "believed" that the adoption petition, once filed, could only be terminated by a ruling on the merits. The trial court never made that statement. The trial court focused on the failure of the attorney to follow through and obey a court order. It is further interesting that Appellant did not notify the Maricopa County Superior Court initially when the Ochoas filed the petition to adopt in Pinal County, since it concerned the children who were the subject of the guardianship in Maricopa County. Thus, in analyzing both the initial facts of the case and looking

7

E000000121

at the issues of this Appeal, one may conclude that Appellant is attempting to avoid the simple question of whether or not he obeyed the court order   Given the evidentiary hearing and Appellant's explanation, the court was not moved to believe that he was doing so for a legitimate purpose.

2.   **Nature of the Case**

This is an appeal by the attorney for the petitioners, who was sanctioned for failure to obey a court order following a motion by the guardians of the children to dismiss the petition for adoption and to award sanctions against Mr. DeLozier and/or his clients for failure to abide by a specific court order issued by Pinal County Superior Court Judge William J. O'Neil.

Appellant has appealed the sanction of $6,000.00, the amount of the Judgment to be paid to the guardians for attorney's fees.

3.   **Court's Jurisdiction**

This Court has jurisdiction per A.R.S. § 12-2101(B).   The lower court reduced the ruling to a Judgment and dismissed the Ochoas' claim with prejudice.

## STATEMENT OF FACTS

A.   Brad and Jeanea Lambeth have been the Guardians of Nicholas and Ashlee Andriano since November 14, 2000, and have had physical care, custody and control since October 9, 2000.  (IR-16)

B.   The Ochoas filed a Petition to Adopt on August 31, 2001.  (IR-1)

8

E000000122

C.    The Ochoas did not provide notice to the Guardians.  (IR-16, 21)

D.    The Ochoas filed a request to schedule a final adoptive hearing through an attorney who had not filed a proper Notice of Appearance.  (IR-6)

E.    On October 5, 2003, the court denied the request to schedule this for final adoptive hearing, and further noted that no consent had been filed by the Guardians as required by law.  (IR-6)

F.    The Ochoas filed a Notice of Compliance and again requested a hearing on October 9, 2001   (IR-7)

G.    On December 18, 2001, the court again denied the Request for Hearing. (IR-9)

H.    In a Minute Entry dated December 18, 2001, the court stated, "It is therefore ordered directing the Petitioners to serve the guardians with the Petition for Adoption." (IR-9)

I.    The court also issued the following order:  "It is further ordered directing the Petitioners to cause the Social Study to be amended to include interviews of the guardians and the present living arrangements of the children and further to make recommendations regarding the children's best interests, in light of a complete severance of all rights which the guardians and paternal grandparents presently enjoy pursuant to A.R.S. §8-117." (IR-9)

J.    The attorney for the Ochoas then filed a Notice of Change of Judge.

9

E000000123

The court ordered the Notice stricken, stated that on two occasions it had denied the request for final hearing and directed that the Guardians were to be served. (IR-12, 13)

     K.    The attorney for the Ochoas never served the Petition on the Guardians or the Guardian ad litem, nor notified the Maricopa County Superior Court of the action in Pinal County. (IR-16, 21, 22)

     L.    The Ochoas filed a Petition to Revoke Guardianship in Maricopa County, Arizona. (IR-16, 21, 22)

     M.    After numerous hearings and thousands of dollars spent, the Superior Court in Maricopa County reaffirmed the Guardianship and denied the Ochoas' Petition. (IR-16)

     N    In July 2002, the Guardians' lawyer learned of the Petition to Adopt that was still pending in Pinal County. (IR-16)

     O    The Guardians' lawyer advised the Court, the guardian ad litem and counsel for the Ochoas of his awareness of the pendency of the Petition.  On July 12, 2002, counsel for the Ochoas filed Notice of Dismissal. (IR-15)

     P.    The Guardians filed a Motion to Dismiss the Petition and Motion for Sanctions for Failure to Comply with the Court Order. (IR-16)

     Q.    The Lambeths have been taking continuous care of Nicholas and Ashlee Andriano since October 9, 2000. (IR-22)

E000000124

000004146

R.     All evaluations by court-appointed psychologists have recommended the Lambeths remain as Guardians.  (IR-22)

S.     The Pinal County Superior Court, per Judge O'Neil, held an evidentiary hearing on September 27, 2002, after allowing the parties, including the Ochoas' new lawyer, to submit briefs and memoranda.  (IR-20, 24)

T.     During the hearing, both DeLozier and Budge were permitted to argue to the court.  Neither attorney chose to put on any evidence or testimony.  (IR-27)

U.     The court issued the sanction awarding Guardians the sum of $6,000.00 for attorney's fees.  The court also dismissed the adoption proceeding as it applied to the Ochoas.

V.     DeLozier filed a Notice of Appeal on the issue of the $6,000.00 sanction on November 1, 2002.  (IR-29)

## RESPONSE TO APPELLANT'S STATEMENT OF FACTS

Appellant attempts to argue the entire guardianship in his brief.  His Statement of the Case and Statement of Facts detail the Ochoas' version of what has happened over the last three years.  While an effort to evoke sympathy, it is not germane to the limited issue before the Court.  Appellees therefore will not further burden the Court with the ancillary proceedings, except to say as follows.

A.     The Ochoas did not care for the children after their father's death.  The Lambeths have had exclusive care, custody and control of the children since October

11

E000000125

9, 2000.  (IR-16, 20)

B.    The Ochoas agreed that the Lambeths would be best suited to be the guardians of Nicholas and Ashlee.  (IR-16, 22)

C    The Ochoas changed their position, and since that change have attempted to undermine the children's placement and their relationship with the Lambeths.  (IR-16, 22)

D.    Brian Yee was appointed by the court  not retained by the Lambeths. The court requested Dr. Brian Yee accept the appointment as stated in its April 5, 2001 minute entry.  (IR-16, 22)

E.    The Ochoas never gave notice of any other intentions to the court-appointed guardian ad litem.

F.    Wendi Andriano's trial is set now set for September 24, 2003.  It was set for July 14, 2003.  Prior to that date it was set for April 2, 2003

### ISSUES FOR REVIEW

A.    Did Appellant fail to follow the trial court Order as directed in the Minute Entry dated December 18, 2001?  (IR-9)

B.    Did the court have jurisdiction to award sanctions against the attorney for his failure to comply with said court order?

C.    Did the court abuse its discretion in awarding the sanction against Appellant?

12

E000000126

000004148

## ARGUMENT

**1.   Standard of Review**

The appropriate standard of review of the trial court's imposition of sanctions is abuse of discretion. *James, Cooke, & Hobson, Inc., v. Lake Havasu Plumbing & Fire Protection*, 177 Ariz. 316, 320, 868 P.2d 329, 333 (App.1993). The good faith component of Rule 11 does not turn on whether the attorney subjectively pursues claims in good faith. Instead, that Rule embodies an objective standard about what a professional competent attorney would do in similar circumstances *Linder v. Brown & Herrick*, 189 Ariz. 398, 943 P.2d 758 (App.Div.1, 1997), *reconsideration denied, review denied.*

**2.   Discussion**

**A.   Appellant failed to follow the Court's order issued in the 12/18/01 Minute Entry.**

This statement is uncontroverted. Instead, Appellant justifies his failure to follow the Court Order with a series of excuses as to why failure to comply is not the basis for sanctions. Appellant also argues that the "Notice of Dismissal," filed on July 12, 2002, removed jurisdiction from the trial court. However, the cases cited do not support his argument that the trial court lacked the appropriate authority to sanction him for willful failure to follow a Court Order.

13

**B.**     **Appellant's actions are all subject to** *Cooter & Gell v. Hartmarx Corp.*

Appellant does not refer to the U.S. Supreme Court decision of *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384 (1990), concerning the ability of a court to sanction the conduct of attorneys. Instead, Appellant cites *Crawford v. Crawford*, 20 Ariz.App. 599, 600, 514 P.2d 1050, 1051 (App.1973). In *Crawford*, the wife's Complaint was dismissed by a "formal written judgment on 20 January 1971." *Id.* at 1051. After the wife filed a petition for an order to show cause to recover attorney's fees, the Court ruled that it had no jurisdiction to enter such an award following an order dismissing the action, granting the husband's motion to quash However, the general rule cited by Appellant does not apply to the imposition of sanctions. See *Cooter & Gell v. Hartmarx Corp.*

Appellant then cites *Spring v. Spring*, 3 Ariz.App. 381, 414 P.2d 769 (1966). However, the court limited its decision in *Spring* to the specific facts. The court also said, "We do not hold that a dismissal under Rule 41(a)(1), Rules of Civil Procedure 16, A.R.S., would necessarily terminate a case in all situations in which no answer or motion for summary judgment has been filed by the adverse party." *Id.* at 772. In *Spring*, former attorneys for Mrs. Spring were seeking payment of attorney's fees in a divorce action. Prior to any answer, Mrs. Spring, through new counsel, filed a Notice of Dismissal of the divorce action. The Court of Appeals

14

E000000128

reversed the trial court's award of attorney's fees to her former attorneys.

The facts in *Goodman v. Gordon*, 103 Ariz. 538, 447 P.2d 230 (1968), are also different from our facts. In *Goodman*, plaintiff filed an action first in Mohave County Superior Court. After defendants answered, plaintiff then moved to voluntarily dismiss. Defendants did not respond and the court granted the motion to dismiss. When Plaintiff filed in federal court, defendants filed motions to vacate the dismissal order and reinstate the action in state court. The trial judge granted the motion and reinstated the case. The Supreme Court reversed and granted the dismissal. However, the Court's ruling involved a Motion to Dismiss. It recognized the dismissal requested was discretionary with the court <u>and</u> that the court retained jurisdiction, citing A.R.S. § 12-122. *Id.* at 231.

Appellant does not fully explain the federal cases cited. Each case, when reviewed, reveals a serious difference from our set of facts. In *Meinecke v. H&R Block*, 66 F.3d 77 (5th Cir. 1995), the parties <u>stipulated</u> to a dismissal per Rule 41(a)(1)(ii), even as the trial court was ruling on a motion for summary judgment. The Court held that "when the parties file a stipulation of voluntary dismissal pursuant to Rule 41(a)(1)(ii), 'any further actions by the court are superfluous,' " citing *Williams v. Ezell*, 531 F.2d 1261. Therefore, the district court's order granting summary judgment was void.

None of these rulings, however, insulate a lawyer from complying with a

15

E000000129

specific court order or prevent a court from sanctioning a lawyer's conduct.

The superior court has the authority and power to sanction a lawyer's conduct. A.R.S. § 12-122, A.R.S. § 12-349. A.R.S. § 12-861, Rule 11, *Ariz. R.Civ.P.* An attorney is under an obligation not to mislead the court through its intentional omissions. Further, an attorney is not to engage in a pattern of deception and misrepresentation to the superior court. See *Matter of Ireland*, 146 Ariz. 340, 706 P.2d 352 (1985).

Appellant relies upon decisions holding that a voluntary dismissal wrests jurisdiction from the district court and renders a subsequent request for attorney's fees "a nullity." *Santiago v. Victim Servs. Agency of the Metro. Assistance Corp.*, 753 F.2d 219, 221 (2d Cir. 1985); *Williams v. Ezell*, 531 F.2d 1261, 1264 (5th Cir. 1976). The United States Supreme Court, however, recently made clear that it disapproved of the approach taken in *Santiago*. In *Cooter & Gell v. Hartmarx Corp.*, the Court considered whether a plaintiff's voluntary dismissal under Rule 41(a)(1) divested the district court of jurisdiction to assess Rule 11 sanctions. The Court rejected the Second Circuit's reasoning, holding that a district court retains jurisdiction to impose sanctions even after a plaintiff voluntarily dismisses its action under Rule 41 (a). *Id.* at 394, 398. The Court explained,

> "Like the imposition of costs, attorney's fees, and contempt sanctions, the imposition of a Rule 11 sanction is not a judgment on the merits of an action. Rather, it requires the determination of a collateral issue.

16

E000000130

whether the attorney has abused the judicial process and if so what sanction would be appropriate  Such a determination may be made after the principal suit has been terminated." *Id.* at 396.

Though dicta, this passage supports the position that a district court retains jurisdiction to consider the question of attorney's fees after a plaintiff has dismissed its suit under Rule 41(a).

Other appellate courts have also reached this conclusion.  In *Othen v. Ann Arbor School Board*, 699 F.2d 309 (6th Cir. 1983), plaintiff brought a civil rights action against defendant but subsequently dismissed the suit pursuant to Rule 41(a)(2).  Plaintiff filed an application for attorneys' fees and costs, arguing that the suit served as a catalyst for defendant's compliance with the civil rights laws.  The court did not address the jurisdictional issue but proceeded directly to consideration of the merits of plaintiff's request for fees and costs.  *Id.* at 313   Despite the voluntary dismissal, the court and the parties assumed that the district court retained jurisdiction to address the request for attorneys' fees.  *See also Taylor v  Great Lakes Seamen's Union, Local 5000*, 657 F. Supp. 550, 563 n.1, 567 (N D. Ohio 1984) (following *Othen* where plaintiff voluntarily dismissed LMRDA claims and subsequently sought attorneys' fees on a common benefit theory).  See also *Brown v. Local 58, Int'l Brotherhood of Electrical Workers AFL-CIO*, 76 F.3d 762 (6th Cir 1996); *Szabo Food Service, Inc. v. Canteen Corp.*, 823 F.2d 1073, 1076-1079 (CA7 1987), cert. dism'd, 485 U.S. 901 (1988); *Greenberg v. Sala*, 822 F.2d 882,

17

E000000131

885 (CA9 1987); *Muthig v. Brant Point Nantucket, Inc.*, 838 F.2d 600, 603-604 (CA1 1988).

### C.   The trial court retained jurisdiction to consider sanctions against Appellant.

The U. S. Supreme Court in *Cooter & Gell v. Hartmarx Corp.* ruled that a voluntary Rule 41(a)(1)(i), *Ariz.R.Civ.P.*, dismissal does not deprive a district court of jurisdiction to impose a Rule 11 sanction. This view is consistent with Rule 11's purposes of deterring baseless filings and streamlining federal court procedure and is not contradicted by anything in that Rule or Rule 41(a)(1)(i). *Id.* at 393-398.

The Court stated that lower courts may enforce sanctions against the parties or their attorneys even after a plaintiff has filed a notice of dismissal under Rule 41(a)(1). The Court ruled that the district court's jurisdiction, invoked by the filing of the underlying complaint, supports consideration of both the merits of the action and the motion for Rule 11 sanctions arising from that filing, and held that a voluntary dismissal does not expunge the Rule 11 violation. *Szabo Food Service* at 1077. The Supreme Court held that in order to comply with Rule 11's requirement that a court "shall" impose sanctions "[i]f a pleading, motion, or other paper is signed in violation of this rule," a court must have the authority to consider whether there has been a violation of the signing requirement regardless of the dismissal of the underlying action. The Court determined that nothing in the language of Rule

18

41(a)(1)(i), Rule 11, or other statute or Federal Rule terminates a lower court's authority to impose sanctions after such a dismissal

The Court explained that since a Rule 11 sanction does not signify a district court's assessment of the legal merits of the complaint, the imposition of such a sanction after a voluntary dismissal does not deprive the plaintiff of his right under Rule 41(a)(1) to dismiss an action without prejudice. The Court also reminded the parties that it has long been established that a federal court may consider collateral issues after an action is no longer pending. See *Cooter & Gell* at 395-397

Finally, the Court of Appeals should apply an "abuse of discretion" standard in reviewing all aspects of the lower court decision. *Id.* at 399.

**D.    The trial court did not abuse its discretion in awarding sanctions.**

1.    Sanctions were warranted for Appellant's conduct

The trial court listened to the arguments of Appellant at the evidentiary hearing. The trial court allowed Appellant to make his argument as to why he did not comply with the Court's Order. The court allowed the Ochoas to have their substitute attorney, Daphne Budge, address the court. The trial court took the matter under advisement and then ruled accordingly.

A court abuses its discretion in imposing sanctions when it bases its decision on an erroneous view of the law or on a clearly erroneous assessment of the evidence. *Mark Indus Ltd. v. Sea Captain's Choice, Inc.*, 50 F.3d 730, 732 (9th

19

Cir. 1995). The standard of review is to sustain the lower court's determination if there is a reasonable basis to support the court's decision. *Floyd v. Ortiz*, ___ F 3d ___ No. 01-1295, 2002 WL 1980462 (10th Cir., August 28, 2002).

Judge O'Neil based his decision on a complete review of the record and the evidence. The trial court made certain findings of fact to support its decision to sanction Appellant in its October 18, 2002, Minute Entry and order:

        a.     The Court's order to notify the guardians was clear and unequivocal.

        b.     Ms. Budge avowed that the Ochoas believed i) the Court in Maricopa County had acted improperly; ii) the counsel appointed for the children had acted improperly; and iii) they were not getting the result they wanted

        c.     The Ochoas chose to file the Petition to adopt through DeLozier.

        d.     DeLozier disregarded the Court Order.

        e.     DeLozier intentionally and surreptitiously avoided the Court's Orders.

The Court heard argument from DeLozier and Budge. It reviewed the pleadings prior to issuing the sanction. The sanction recognized that the Ochoas had instigated legal proceedings which required the Guardians to expend thousands of dollars in attorney's fees to defend same.

20

The Court also concluded from the evidence that Appellant and his clients intended to permanently sever the paternal interest of the children. Had Appellant complied with the Court's December 18, 2001, Order, such action would have notified the Superior Court in Maricopa County of these proceedings. That notice would have affected the nature of the legal proceedings and the costs to the guardians. As any financial impact upon the guardians would of necessity affect the children, the Court acted within its discretion in awarding attorney's fees as a sanction for Appellant's total disregard for the Court.

          2.      <u>The Ochoas have not appealed the sanction.</u>

In Appellant's Brief, sections B and C, Appellant asks this Court to reverse not only the sanction against himself but also the sanction against the Ochoas However, this appeal was filed by DeLozier solely on behalf of himself. The Ochoas have not appealed the sanction. Therefore the Court should disregard any reference or request to reverse the Ochoas' sanction.

<div align="center">CONCLUSION</div>

Appellant and his clients were caught attempting to secure an adoption of Nicholas and Ashlee Andriano without providing notice to the guardians appointed by the Maricopa County Superior Court. When Pinal County Juvenile Court Judge William J. O'Neil ordered Appellant to provide notice and to have the social study include the guardians, he filed a pleading attempting to avoid it. When the court

<div align="center">21</div>

again ordered him to provide notice, he filed a Notice of Change of Judge. (IR-12). When that Notice was stricken, Appellant and his clients attempted a different strategy (IR-13). Clearly, Appellant and his clients <u>did</u> <u>not</u> want the guardians, their lawyer, the guardian ad litem, or the Maricopa County court to know that the Ochoas had filed a Petition to Adopt.

When Appellant could not convince the court that the guardians did not have to be notified, he decided to change the guardians. So the Ochoas filed a petition in Maricopa County Superior Court to remove the guardians. During the extended evidentiary hearing, the guardians' attorney learned of the Pinal County proceeding. Only after being discovered did Appellant file a Notice of Dismissal.

This Court should sustain the lower court decision to award attorney's fees to the guardians. The Court should also order an award of attorney's fees to the guardians for filing a Response to this appeal.

RESPECTFULLY SUBMITTED this 10th day of July, 2003.

John J. Jakubczyk, Esq.
Attorney for Appellees

22

E000000136

000004158

## CERTIFICATE OF SERVICE

I certify that two copies of the foregoing Appellees' Answering Brief were served upon the following by mailing same this 10th day of July, 2003, to:

G. David DeLozier, Esq.
G. David DeLozier, P C.
4016 Forest Pleasant Place
Cave Creek, Arizona 85331
Appellants

Ms. Daphne Budge
Attorney at Law
45 W. Jefferson, Suite 225
Phoenix, Arizona 85003-2325
Attorney for Donna and Alejo Ochoa

By _____
John J. Jakubczyk, Esq.

23

E000000137

## CERTIFICATE OF COMPLIANCE

Pursuant to Arizona Rule of Civil Appellate Procedure 14, I certify that the attached brief uses proportionately spaced type of 14 points or more, is double-spaced using a roman font, and contains 5270 words, according to the word count feature of *WordPerfect 9*.

DATED this 10th day of July, 2003.

By _____
John J. Jakubczyk, Esq.

24