# TABLE OF CONTENTS (INTERACTIVE)

| | |
|---|---|
| NNNNNN Part 4 | Response to Petition |

# EXHIBIT NNNNNN PART 4

EXHIBIT I

000004220

 **CASA GRANDE REGIONAL MEDICAL CENTER**

1800 EAST FLORENCE BOULEVARD • CASA GRANDE, ARIZONA 85222
(520) 426-6300 FAX (520) 426-6435

June 25, 1996

CONFIDENTIAL



Mr. Robert Grennan
Hartford Fire Insurance Company
Bond Claim Department
Tower Building, 4th Floor Hartford Plaza
Hartford, CT 06115

Dear Mr. Grennam:

Per Mr. Jeff Hodges' request, I am forwarding the following information regarding Ms. Wendi Andriano to you, as I understand that Mr. Hodges has forwarded her file to you.

Attached please find a copy of Ms. Andriano's W-2 form. Ms Andriano's date of hire was 5/10/93 and date of termination was 03/06/96. The most current address we have on file is P.O. Box 12102, Casa Grande, AZ 85230.

The process of signatures on checks has been corrected and improvements have been made.

If I can be of any further assistance, please feel free to give me a call, if appropriate, at (520) 426-6581 or page me at (520) 426-5391.

Sincerely,

Jill A. Bates
Director of Human Resources

JAB/dt

c: Mr. John McEvoy, Agent

enclosure

**Employer's State, City, Local or File Copy**

| a Control number | | OMB No. 1545-0008 |
|---|---|---|

| 1 Wages, tips, other compensation | 2 Federal income tax withheld |
|---|---|
| 24234.28 | 322.45 |

| 3 Social security wages | 4 Social security tax withheld |
|---|---|
| 24234.28 | 1502.52 |

| 5 Medicare wages and tips | 6 Medicare tax withheld |
|---|---|
| 24234.28 | 351.38 |

| 7 Social security tips | 8 Allocated tips |
|---|---|
| .00 | .00 |

| 9 Advance EIC payment | 10 Dependent care benefits |
|---|---|
| .00 | |

| 11 Nonqualified plans | 12 Benefits included in box 1 |
|---|---|
| .00 | |

| 13 | 14 Other |
|---|---|
| | DEN1     351.00 |
| | MEDI     676.00 |
| | VISI     656.00 |

b Employer's identification number

c Employer's name, address, and ZIP code
REGIONAL HEALTHCARE SERV
DBA/CGRMC
1800 E. FLORENCE BLVD
CASA GRANDE    AZ  85222

d Employer's social security number
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

e Employee's name, address, and ZIP code
MENDI E ANDRIANO
P.O. BOX 12102
CASA GRANDE                    AZ
85222

| 15 Statutory employee | Deceased | Pension plan | Legal rep. | Hshld. emp. | Subtotal | Deferred compensation |
|---|---|---|---|---|---|---|
| | | X | | | | |

| 16 State | Employer's state I.D. No. | 17 State wages, tips, etc. | 18 State income tax | 19 Locality name | 20 Local wages, tips, etc. | 21 Local income tax |
|---|---|---|---|---|---|---|
| AZ | 11-2249698C | 24234.28 | 70.94 | | | |

Form **W-2 Wage and Tax Statement**  1995

Department of the Treasury—Internal Revenue Service

# NOTICE OF CONCERN

Name _Wendi Andriano_   Job Title _Staff Accountant_   Facility _Chelsea_
e of Notice _3-1-96_   Date(s) of Occurance _____

**Action Taken:**
☐ Documented Verbal Notice    ☐ Performance Improvement    ☐ Written Notice    ☐ Termination
☑ Suspension for _Pending Investigation_ days, to start on _3/1/96_ and return on _____
_w/o pay_                                                    (date)                          (date)

Nature of Concern: _Based on our Conversation 3/1/96. (See attached Statement),_
_the hospital has identified some forms of misconduct as being so_
_detrimental to the best interest of the hospital to warrant immediate_
_discharge. (See Policy D-2-01)_
_At this time, my intent is to terminate Wendi's employment_
_w/ Casa Grande Regional Medical Center based on her actions;_
_however, at this time Wendi is suspended pending investigation._
_Wendi is to contact me, Sue Baker, on Monday March 4, 1996_
_@ pager (520) 426-6581 & she will notify Wendi of the status of_
_the investigation. I will be Wendi's point of contact & this_
_matter should not be discussed w/ any employees of the organization_
_& Wendi during the investigation._
_Wendi is encouraged to continue her contact w/the Employee Assistance_
_Program ~ 1-800-634-6433._                    _Sue A Baker_
                                              _Director of Human Resources_

Employee Comments: _Joe and I would like to pay back the money to_
_DVCC. At this time, we are not able (to pay the full amount._
_We would be able to pay a monthly payment until the full_
_amount is paid._

Action to be taken if same problem occurs:    ☐ Written Notice    ☐ Suspension    ☑ Termination
Important Note: If another type of problem occurs, the action may be different than shown above. All the
relevant facts would be taken into consideration, including this prior notice.

T notice was given on _3-1-96_          _Wendi Andriano_   _3-1-96_
                        (date)          Employee's Signature          Date
                                        ☐ Employee Refused to sign — requires witness signature
Supervisor's Signature          Date
_____   _3-1-96_       _Sue A Baker_        _3/1/96_
Dept. Manager/Administrator   Date      Witness Signature            Date

White: Administrative/Personnel    Yellow: Dept. Mgr.    Pink: Employee

I 000000003

000004223

# NOTICE OF CONCERN

Name Wendi Andariano   Job Title Staff Accountant   Facility CHRMC

Date of Notice 3-6-96   Date(s) of Occurance _____

**Action Taken:**
☐ Documented Verbal Notice   ☐ Performance Improvement   ☐ Written Notice   ☒ Termination
☐ Suspension for _____ days, to start on _____ and return on _____
                                          (date)                (date)

Nature of Concern: Misconduct detrimental to the best interest of the organization to warrant immediate discharge. (See Policy D-4-01) Investigation has been concluded & in conjunction w/ Wendi's statement on 3/1/96 we have concluded that termination is appropriate & in the best interest of the organization.
RHSC has decided not to press charges at this time as long as Wendi makes restitution in an agreed & timely manner & as long as no further monies are noted missing.

Employee Comments: _____

Action to be taken if same problem occurs:   ☐ Written Notice   ☐ Suspension   ☐ Termination
   Important Note: If another type of problem occurs, the action may be different than shown above. All the
   relevant facts would be taken into consideration, including this prior notice.

The notice was given on  3-6-96
                          (date)

Supervisor's Signature                    Date  3-6-96
Dept. Manager/Administrator               Date

Employee's Signature  Wendi Andariano   3-6-96   Date
☐ Employee Refused to sign — requires witness signature

Witness Signature                        3/6/96   Date

White: Administrative/Personnel     Yellow: Dept. Mgr.     Pink: Employee

36-1787-0

000004224                                          I000000004



FEB-29-1996  14:24                                                      P.02

Joe's Windsheild Repair, Inc
2S2 N Otter Rd.
1-5-95

FEB-29-1996  14:24                                    P.03



MAR-14-1996  15:34                                                           P.02



Angela

MAR-14-1996  15:35                                    P.03



TOTAL P.03

000004228

I000000008

CASA GRANDE
REGIONAL MEDICAL CENTER
1800 EAST FLORENCE BOULEVARD
CASA GRANDE, ARIZONA 85222

Wendi Andrews
1104 N. Park Ave
Casa Grande, AZ 85222

MAR-14-1996  15:16                                                          P.02



Angela



MAR-14-1996  15:16

P.03

TOTAL P.03

DESERT VALLEY
CARE CENTER
1150 N. Arizola Road
Casa Grande, Arizona 85222

THE BANK OF CASA GRANDE VALLEY
Casa Grande, Arizona 85222

No. 0015472

01-525/1221

| DATE | CHECK NUMBER |
|------|--------------|
| 5/24/95 | 0015472 |

CHECK AMOUNT

*****1,672.13

PAY    *****1,672   DOLLARS   AND   13 CENTS

DESERT VALLEY CARE CENTER

TO
THE
ORDER
OF

JOE'S WINSHIELD REPAIR
PO BOX 12102
CG                    AZ 85230

1589

⑆154721⑆ ⑆122105252⑆ ⑆6010501047⑆        ⑈0000167213⑈

000004232

I000000012



I000000013

P.02

MAR-19-1996  12:05



THE BANK OF CASA GRANDE VALLEY
Casa Grande, Arizona 85222

DESERT VALLEY
CARE CENTER
650 N. Arizola Road
Casa Grande, Arizona 85222

No.  0015472

01-525/1221

| DATE | CHECK NUMBER |
|------|--------------|
| 5/24/95 | 0015472 |

CHECK AMOUNT
******1,672.13

PAY  *****1,672  DOLLARS  AND  13 CENTS

DESERT VALLEY CARE CENTER

TO
THE
ORDER
OF

JOE'S WINDSHIELD REPAIR
PO BOX 12102

CG                    AZ 85230

⑆65472⑆  ⑆122105252⑆  ⑆6010501067⑆         ⑈0000167213⑈









1000000017





I000000018

000004238



| CASA GRANDE REGIONAL MEDICAL CENTER | | | | Policy and Procedure Manual | | |
|---|---|---|---|---|---|---|
| HUMAN RESOURCES | | | | | | |
| Chapter | Section | Subject | CONFIDENTIALITY OF INFORMATION | Date Issued | Date Revised | Page |
| D | 4 | 02 | | 11/20/87 | 1/94 | 1 of 2 |

I.   **OBJECTIVE:**
　　To provide a right to privacy and confidential environment for patients, employees and physicians.

II.   **POLICY:**
　　Casa Grande Regional Medical Center employees obtain and maintain confidential information regarding patients, employees and physicians in the normal course of their duties. Preserving this confidentiality is an integral part of the responsibilities of every employee.

III.   **DEFINITIONS:**
　　Examples of confidential information include:

　　Patient diagnosis/care
　　Employee health information
　　Employee pay and performance levels
　　Insurance contract rates
　　Strategic business information
　　Patients' financial information, etc.
　　Proprietary Business information

IV.   **PROCEDURES:**

1. During new employee hospital orientation, a Human Resources representative will explain the importance of confidentiality to all new employees.  New employees will be given a copy of the "Confidentiality of Information" policy, and required to sign the attached Code of Ethics form.  The signed form will be placed in the employee's personnel file.

2. Each department manager and/or supervisor is responsible for identifying to all current and future employees information which is sensitive and confidential to their respective area. They should also identify to whom and under what circumstances confidential information may be released appropriately.

　　Under no circumstances should confidential information be disclosed inappropriately or to unauthorized individuals. A breech of confidentiality will result in a written warning or termination for the first offense (depending on the circumstances), and termination will result for the second offense.

| Signature | Title   ADMINISTRATOR/CEO |
|---|---|

| CASA GRANDE REGIONAL MEDICAL CENTER | | | | Policy and Procedure Manual | | |
|---|---|---|---|---|---|---|
| HUMAN RESOURCES | | | | | | |
| Chapter | Section | Subject | CONFIDENTIALITY OF INFORMATION | Date Issued | Date Revised | Page |
| D | 4 | 02 | | 11/20/87 | 1/94 | 2 of 2 |

The confidentiality of our patients and employees, and the trust they place in us to maintain that confidentiality requires our maximum respect.

V.   ATTACHMENTS:
     Code of Ethics Form

VI.   REFERENCES:  JM.2.1

**CASA GRANDE REGIONAL MEDICAL CENTER**
Casa Grande, Arizona 85222

## CODE OF ETHICS

I fully understand that the following is a provision of employment at Casa Grande Regional Medical Center.

I do solemnly pledge that I will hold in strictest confidence all personal matters committed to my keeping, or any information regarding any patient with whom I may have contact. I will not divulge to anyone within or without the Hospital any action of any patient, fellow employee or member of the medical staff unless I am instructed to do so by my superior or if giving such information falls within my normal scope of duties.

I am aware that if I violate any part of the above provision of employment, I may be dismissed from my position and lose all benefits from the Casa Grande Regional Medical Center.

_____
(Signed)

_____
(Witnessed)

_____
(Date)

FIDELITY CLAIM DEPARTMENT

*Casa Grande Community Hospital, Inc.*
(Name of Principal)
*d.b.a. Casa Grande Regional Medical Center*
(Name of Insured)
*59CBBBE817*
( Bond No.)

State of *Arizona*
County of *Pinal*

I _____
_____ (If corporation, title of party making this affidavit must appear after name )
of _____ hereby certify that on or about _____ _895
*to January 1996, Casa Grande Regional Medical Center* suffered loss through _____ ___nt dishonesty of
*Wendi Andriano* employed as *Staff Accountant* and that the amount of money, s___ ___tes or other covered
property dishonestly misappropriated, or covered loss dishonestly caused by said *employee* amounts to
*eighteen thousand three hundred thirty six and 05/100* dollars (*$18,336.05*); herein is a detailed statement
of said loss, and of all sums due or owing said employee, and all other credits, and the balance stated is the
true net loss from *March of 1995 to January of 1996*. I further certify that knowledge of this loss first came
to me on or about *February 29, 1996* as follows: *Routine bank reconciliation discovered missing check.*
*Employee subsequently contacted director of Human Resources for an appointment. See letter dated*
*March 01, 1996*; that the manner in which this loss occurred is as follow: *See attached*; And that nothing has
been suppressed, withheld or misrepresented by me material to a knowledge of the facts of said loss, and that
this statement is a complete and truthful recital of the facts.

There is no other suretyship, indemnity or insurance under which the above claim, or any portion thereof, is
claimable, except the following:

| Name of Insurer (Indemnitor) | Kind of Insurance (Indemnity) | Amount |
|---|---|---|
| *St. Paul Fire and Marine | Blanket Bond | $250,000.00/100,00.00 |

_____
Jennifer Andrew, Controller

Sworn to and subscribed before me this _____ day of _____ 19____.

_____
Notary Public - My Commission Expires:

## INSTRUCTIONS FOR MAKING CLAIMS (See Reverse Side)

(1) In the loss portion of this form, the gross amounts of money or property stolen or embezzled should
be listed with their dates of loss, and these items should be described in the column marked
"Description of Item."

(2) In the credit portion of this form should be listed in detail any salary, commission, cash, and other
credits, including securities, notes, offsets, etc., not paid the delinquent to which the delinquent is
entitled, the exact dates to be shown hereon. Recoveries from third parties should be shown where
indicated.

(3) Documentary or other evidence in support and in explanation of items claimed must be hereto
attached.

(4) Where the loss covers collections made and not accounted for, if possible, use original receipts, or
verified copies thereof, given by delinquent for such payments, should accom____ ___ .his claim blank.
In the event such receipts or copies cannot be furnished, affidavits of the part__ ___ing to have
paid the delinquent must be obtained and furnished the Surety.

## ATTENTION

(1) Delivery of claim blanks, assistance rendered by representatives of this company c___ ___estigation
of loss is not a waiver of this company's rights or defenses, nor an admission of liab__ ___ and is
entirely without prejudice.

(2) Please be advised and take notice that a copy of this Instrument and supporting documentation will
be presented to alleged principal and his/her attorney.

*Contact: Mr. John W. McEvoy*
*The Mahoney Group - Casa Grande*
*(520) 836-7483 for information*

Form FC-34-2/Rev. 8/94

000004243

I000000023

## DOCUMENTATION OF MISSING CHECK SEARCH

◆    A search for missing checks was completed by matching cancelled checks returned by the bank to the corresponding bank statement for Central Arizona Medical Center (CAMC), Central Arizona Care Center (CACC), Desert Valley Care Center (DVCC) and Casa Grande Regional Medical Center (CGRMC).

◆    The time period of October 1994 through February 1996 was researched for CAMC.  The search resulted in two (2) missing checks.  Attached is a detail listing of these checks.

◆    The time periods of August 1994 and October 1994 through February 1996 were searched for DVCC.  The search resulted in seven (7) missing checks.  Of the checks missing one check was paid to a legitimate vendor.  See attached listing for missing checks.

◆    For CACC the time period of July 1995 through February 1996 was searched.  There was one check missing; but was subsequently found to be made payable to a legitimate vendor.

◆    For CGRMC the time periods of March 1995 through April 1995 and mid-May 1995 through February 1996 were searched.  For the time period of May 1 - 15, 1995 cancelled checks were not found within the Accounting department or in storage. At this point, Caliber Bank was purchased by Norwest Bank and bank statements were cut mid-month.  There is a question if cancelled checks were returned by Caliber Bank.  There is also a question if Caliber Bank was returning cancelled checks to CGRMC for periods prior to March 1995.  Norwest Bank has been unable to verify if checks were or were not returned.

◆    During the search of CGRMC three checks were determined to be missing; but did not appear suspicious.  Check copies were returned by Norwest and were found to be paid to legitimate vendors.

Prepared by:  Karen Edmunds                                    March 21, 1996

I 000000024

## DETAIL LISTING OF MISSING CHECKS

| BANK ACCT # | ENTITY | A/P SYSTEM/PAYEE | DATE CLEARED | CHECK NUMBER | AMOUNT |
|---|---|---|---|---|---|
| 60138-0102-3 | CAMC | KRAFT | 12/18/95 | 18862 | 3,865.96 |
| 60138-0102-3 | CAMC | KRAFT | 1/30/96 | 16420 | 2,289.12 |
| | | | | | 6,155.08 |
| | | | | | |
| 60105-0101-7 | DVCC | KRAFT | 3/6/95 | 15052 | 2,185.95 |
| 60105-0101-7 | DVCC | KRAFT | 3/23/95 | 15105 | 2,314.56 |
| 60105-0101-7 | DVCC | KRAFT | 5/26/95 | 15472 | 1,672.13 |
| 60105-0101-7 | DVCC | KRAFT | 9/5/95 | 15774 | 1,519.95 |
| 60105-0101-7 | DVCC | KRAFT | 12/19/95 | 16340 | 2,251.29 |
| 60105-0101-7 | DVCC | KRAFT | 1/5/96 | 14013 | 2,237.09 |
| | | | | | 12,180.97 |

GRAND TOTAL   18,336.05

```
ACCOUNTING          Casa Grande Regional Medical Ce.           3/15/9
ACCT6461        * Use ATTN key to work with Printer and Job Ques *   7:58:2
JBRANTS
========================================================================

   1. ******* MENUS *******        13. ******* MISC *******
    . General Ledger System        14. Set GL Library List
   2. Accounts Payable System      15. Set AP Library List - CGRMC
   4. View Roboted Reports         16. Set AP Library List - CAMC
   5. Fixed Assets System          17. Set FA Library List
   6. Payroll System               18. Set PR Library List
   7. EFI System                   19. Set EFI Library List
   8. MedSeries4 Report Writer Menu 20. Display Your Library List
   9. GL - Work with Object Locks  21. Query
  10. AP - Work with Object Locks  22. Start Print Writer - PA - ACCT
  11. FA - Work with Object Locks  23. Start Print Writer - PD - RAHP
  12. PP - Work with Object Locks  24. Sign Off

-----------------------------------------------------------------------
                                          Invocation level 0:
Enter Menu Option

F3=Signoff.  F5=Reclaim Resources.F12=Previous menu. F15=Initial menu.

(c) Copyright GTE Health systems, Inc.  1982 - 1999.
```

1. 15 "Enter"

2. 3 "Enter"

I000000026

```
APMASTER                  Casa Grande Regional Medical Ctr        3/15/9
ACCT6461                 A C C O U N T S   P A Y A B L E          7:59:3
JBRANTS                          MASTER MENU
========================================================================

   1. Invoice Functions Menu          13. Reports Menu - Day End
                                       14. Reports Menu - On Demand
   3. Inquiry/Maintenance Menu         15.
   4.                                  16. Operations Menu
   5. Check Functions Menu             17.
   6.                                  18. Managers Menu
   7. Vendor Master Inquiry/Maint      19. Payables Report
   8. Vendor Delete/Combine            20. Purge Menu
   9.                                  21. Menu
  10. 1099 Processing Menu             22.
  11. AR Master                        23.
  12.                                  24. Sign Off
   ---------------------------------------------------------------
  -----------------------------                  Invocation level 0:
Enter Menu Option

F3=Signoff.   F5=Reclaim Resources.F12=Previous menu. F15=Initial menu.
```

3.  1 "Enter"

```
APMENU4                  Casa Grande Regional Medical Ctr              3/15/9
ACCT6461                 A C C O U N T S   P A Y A B L E               7:59:3
JBRANTS                        INVOICE FUNCTIONS
==================================================================================
```

```
   1. Invoice Entry/Update              13. Match Prepaids/Receipts
                                        14.
   3. Linematch Invoices                15. Hold/Release Invoices by Vendr
   4.                                   16.
   5. Recurring Invoices                17. tst pt refunds--select
   6.                                   18. approve pt rfnds
   7. Invoice Approval                  19.
   8.                                   20. INQUIRY/UPDATE MENU
   9. Invoice Maintenance Log           21. CHECK FUNCTIONS MENU
  10.                                   22. A/P MASTER MENU
  11. Change Invoice User Name          23.
  12. Create Unpaid Sales Tax Invoic    24. Sign Off
```

```
-------------------------------------------------------------------
                                              Invocation level 03
Enter Menu Option

F3=Signoff.   F5=Reclaim Resources.F12=Previous menu. F15=Initial menu.
```

4o 1 "Enter"

I000000028

```
                    A C C O U N T S   P A Y A B L E          3/15/96
APDI091C     H O S P I T A L   S E L E C T I O N   S C R E E N    8:02:25
==============================================================================

       Ln        User ID      Hospital ID   Hospital Name
-----------------------------------------------------------------------------
      01        JBRANTS         100         CGRMC
      02        JBRANTS         200         CAMC
      03        JBRANTS         250         CACC
      04        JBRANTS         300         DVCC
      05        JBRANTS         400         CGRRC
      06        JBRANTS         500         MAB
      07        JBRANTS         600         CFW
      08        JBRANTS         700         RAHP
      09        JBRANTS         710         REBA
      10        JBRANTS         720         VAN
-----------------------------------------------------------------------------

              Enter Line Number........  1


F3=Exit
```

5. 1 "Enter"

A/P INVOICE INPUT/UPDATE SCREEN (HEADER)          8:02:34

```
APDU100I
Hospital    100 CGRMC
Voucher.....                              Status....... NEW    Type...
Alternate Payable Master...               P.O.....
Vendor ID...
Invoice ....                              Expense
Total Inv $.                              Period Year
Dates: Invoice Discount  Pay   Check
(MMDDYY)

Enter Batch number:

Vendor   Name........
         Check Name..
         Addr1.......
         Addr2.......
         City/St/Zip.
         Fed ID/SSN..           Phone:
```

Inquiry : F19=Logs   F16=Vendor   F17=Invoice   F18=Checks

6o  F17 — Take you to invoice inquiry screen

I000000030

```
APDI010C              A C C O U N T S   P A Y A B L E        3/15/-6
Hosp    100 CGRMC          I N V O I C E   S E A R C H        8:29:10
=====================================================================
Ln  Inv Num      SN Chk Dt Vend ID Vend Name   PO Num Voucher Stat  Amour
---------------------------------------------------------------------
01 TRIAL         01 031496 20781   TEST OF A/         40052 PAID    10.0
02 REIMB FOR DINNE 01 031396 20782 APODACA, B         40054 PAID    38.8
03 KEFLEX PRESCIP. 01 010896 2079  WAL-MART P         34076 PAID    11.5
04 LUCAS NELSON-PR 01 090294 2079  WAL-MART P          3103 PAID    34.4
05 MEDICINE FOR 2  01 022396 2079  WAL-MART P         38427 PAID    30.8
06 MR 288500       01 082595 2079  WAL-MART P         25865 PAID    15.7
07 PT:KAISER,STEVE 01 020596 2079  WAL-MART P         36676 APRV    16.1
08 PT:RINDFLESCH,S 01 010896 2079  WAL-MART P         34196 PAID    18.7
09 RX JOYCE MONTIJ 01 102894 2079  WAL-MART P          6703 PAID    41.7
10 6702581        01 090894 2079   WAL-MART P          3933 PAID    48.2
---------------------------------------------------------------------

      Enter line No, or Voucher No......
      or Vendor ID and/or Invoice No....
             and     Status (O/C)..
      or PO Number.....................
      Enter Vendor Name for Search....  TEST

F3=Exit    F12=Previous
   Line number and F8: Return to previous screen with selection
```

9. - Tab down to Vender Name Search
   - Type in Vendor/ or part of Vendor name

   - In this case
         Type : Test "Enter"

I000000031

```
                      A C C O U T S   P A Y A B L E   S Y S T E M        3/15/96
                      V E N D O R   M A S T E R   F I L E   S E A R C H    8:29:25
  APDI020C
  =================================================================================
                                                       Federal ID    Tmp  Ref
   ___n   Vendor Id    Vendor Name                      --------------
   ---------------------------------------------------------------------   Y
   01    20781          TEST OF A/P CONTROLS #2
   02    2012           THACKRAY RECONSTRUCTIVE SYSTEM               Y
   03    20615          THARRINGTON, ROY
   04    4831           THE ARIZONA LABOR LETTER
   05    4048           THE AZ PHARMACY ASSOC
   06    4140           THE BUSINESS WORD INC.
   07    4157           THE BUTTES
   08    4550           THE CARING COMPANY                          Y
   09    20164          THE EXECUTIVE GALLERY INC
   10    4435           THE HEALTHCARE FORUM
   ---------------------------------------------------------------------
          Enter Line No, Vendor Name or *ADD.
               or Vendor ID...................


  F3=Exit    F12=Previous
       Line Number and F8: Return to previous screen with selection
```

8o Type °.1 "Enter"

```
                A C C O U N T S   P A Y A B L E   S Y S T E M          3/15/9
APDU020A              VENDOR MASTER FILE MAINTENANCE                     8:31:0
========================================================================
Category
Vendor ID 20781        Vendor Name                          Temp Vnd Flag
                       Check Name                            Refund Vendor

            ACCOUNTING ADDRESS              MATERIALS ADDRESS
Address 1   KDKDK                           KDKDK
Address 2
City/State
Zipcode
Contact
Phone No.
Federal ID or SSNO              Service#
                                800 No.

Ship Term
Pay Term:  Payment  Day      Type         Creation Date      3/14/96
Disc Term: Discount Day      Type         Maintenance Date   3/15/96
           Discount %                      User ID           JBRANTS

Display Vendor Statistical detail N       Rec Sts.. A
```

This screen would show name of vendor
before check run which would be printed
on check ←
  ※ "Enter" to get out of screen

```
              A C C O U N T S   P A Y A B L E   S Y S T E M         8:31:4
APDU020A          VENDOR MASTER FILE MAINTENANCE
============================================================================
Category
Vendor ID 20781        Vendor Name                              Temp Vnd Flag
                       Check Name                               Refund Vendor

            ACCOUNTING ADDRESS              MATERIALS ADDRESS
Address 1   KDKDK                           KDKDK
Address 2
City/State
Zipcode
Contact
Phone No.                          Service#
Federal ID or SSNO                 800 No.

Ship Term
Pay Term:  Payment  Day      Type          Creation Date     3/14/96
Disc Term: Discount Day      Type          Maintenance Date  3/15/96
           Discount %                       User ID          JBRANTS

Display Vendor Statistical detail N     Rec Sts.. A
```



9. After check run you would return to this screen by repeating steps 7 & 8. Then would change name back to original vendor in which you wanted system to show

```
APDI010C                A C C O U N T S    P A Y A B L E      3/-3/9C
Hosp   100 CGRMC .                I N V O I C E   S E A R C H       8:25:38
==============================================================================
Ln  Inv Num          SN Chk Dt Vend ID  Vend Name   PO Num Voucher Stat   Amoun
==============================================================================
                     01 031496 20781   INSTAC                 40052 PAID    10.0
 .  REIMB FOR DINNE   01 031396 20782   APODACA, B            40054 PAID    38.8
03  KEFLEX PRESCIP.   01 010896 2079    WAL-MART P            34076 PAID    11.5
04  LUCAS NELSON-PR   01 090294 2079    WAL-MART P             3103 PAID    34.4
05  MEDICINE FOR 2    01 022396 2079    WAL-MART P            38427 PAID    30.8
06  MR 288500         01 082595 2079    WAL-MART P            25865 PAID    15.7
07  PT:KAISER,STEVE   01 020596 2079    WAL-MART P            36676 APRV    16.1
08  PT:RINDFLESCH,S   01 010896 2079    WAL-MART P            34196 PAID    18.7
09  RX JOYCE MONTIJ   01 102894 2079    WAL-MART P             6703 PAID    41.7
10  6702581           01 090894 2079    WAL-MART P             3933 PAID    48.2
    ---------------------------------------------------------------------
      Enter line No, or Voucher No......
      or Vendor ID and/or Invoice No....
              and     Status (O/C)..
      or PO Number....................
      Enter Vendor Name for Search......

F3=Exit   F12=Previous
    Line number and F8: Return to previous screen with selection
```

*X Shows invoice again*

*Type 1 "F8"*

I000000035

A/P INVOICE INPUT/UPDATE SCREEN (DETAIL)                        3/13/96
                                                                8:26:25

APDU100C                              Status....... PAID  Type... NOPO
Hospital    100 CGRMC                 Packing List. TRIAL
Voucher.    40052                     Vendor Information:
Alternate Payable Master... OP
Vend ID. 20781        Warn: Duplicate Inv     KDKDK
  Invoice. TRIAL                  1
P.O....
Dates: Invoice    Discount    Pay    Check
        3/14/96   3/14/96   3/14/96  3/14/96    Po.    /              Net
Terms:Vend.        /              Net           Prd   Co   Check     Date Prd T
  Ln Type Code   Amount   Tax   Account    %     9   100.            31496      9
   1 DOLL          1000         834004200         9   100             31496
   2                                              9   100             31496
   3                                              9   100             31496
   4                                              9   100             31496
   5                                              9   100             31496
   6                                              9   100             31496
   7                                              9   100             31496
   8

Invoice total:        10.00    Display 1099/Delete Screen.  N or F4
                               Display Distribution Process. N or F11

Inquiry: F10=G/L Acct   F16=Vendor   F17=Invoice   F18=Check

* Vendor before being change, but after check was issued

```
APDU010C     A / P   I N V O I C E   D E T A I L   S C R E E N              8:32:06
                                                                              
Invoice... TRIAL                    01     Status...... PAID   Type... NOPO
Voucher...   40052                          Packing List. TRIAL
P.O.......                           Vend ID 20781
1099...... N                         Vendor   TEST OF A/P INTERNAL CONTROLS NUMBER
                                              KDKDK
  Date  Invoice  Discount   Pay    Check
 3/14/96 3/14/96 3/14/96  3/14/96 3/14/96
Comments.. TEST OF A/P INTERNAL CONTROLS
Terms...      /                   Net
  Ln  Type     Amount    Tax  Account  Fund Sub  Co   Check     Type Prt Date A
   1 DOLL       10.00         834004200 OP   00  100             10  N  3/14/96
```

                          Enter a Line Number for more Detail......       1 Lines

                                        Total Invoice Amount...            10.0

         F8: Return with selection     F10: Previous Inv   Enter: Next Invoice

* Shows vendor was changed after check was
  issued

I000000037

```
                   A C C O U T S   P A Y A B L E   S Y S T E M        3/15/96
                   V E N D O R   M A S T E R   F I L E   S E A R C H   8:31:50
APDI020C
==========================================================================
                                                    Federal ID    Tmp  Ref
LF   Vendor Id    Vendor Name                                  ---------
                                                                 Y
                                                                 Y
02   2012         THACKRAY RECONSTRUCTIVE SYSTEM
03   20615        THARRINGTON, ROY
04   4831         THE ARIZONA LABOR LETTER
05   4048         THE AZ PHARMACY ASSOC
06   4140         THE BUSINESS WORD INC.
07   4157         THE BUTTES
08   4550         THE CARING COMPANY                                 Y
09   20164        THE EXECUTIVE GALLERY INC
10   4435         THE HEALTHCARE FORUM
--------------------------------------------------------------------------
        Enter Line No, Vendor Name or *ADD....
            or Vendor ID.....................


F3=Exit    F12=Previous
    Line Number and F8: Return to previous screen with selection
```

*Shows vendor name was change — done
after check was cut to "Test of A/P Control"*

I000000038

```
                  A C C O U T S   P A Y A B L E   S Y S T E M        3/15/96
                  V E N D O R   M A S T E R   F I L E   S E A R C H    8:29:25
APDI020C
=======================================================================
                                               Federal ID    Tmp  Ref
Ln.  Vendor Id    Vendor Name
-----------------------------------------------------------------------
01   20753        [redacted]                                    Y
02   2012         THACKRAY RECONSTRUCTIVE SYSTEM                 Y
03   20615        THARRINGTON, ROY
04   4831         THE ARIZONA LABOR LETTER
05   4048         THE AZ PHARMACY ASSOC
06   4140         THE BUSINESS WORD INC.
07   4157         THE BUTTES
08   4550         THE CARING COMPANY                             Y
09   20164        THE EXECUTIVE GALLERY INC
10   4435         THE HEALTHCARE FORUM
-----------------------------------------------------------------------
         Enter Line No, Vendor Name or *ADD....
            or Vendor ID.....................


F3=Exit   F12=Previous
   Line Number and F8: Return to previous screen with selection
```

Shows vendor before check issued and
Vendor changed

I000000039

# NOTICE OF CONCERN

Name _Wendi Andriano_   Job Title _Staff Accountant_   Facility _Chelioc_
~~e~~ of Notice _3-1-96_   Date(s) of Occurance _____

**Action Taken:**

☐ Documented Verbal Notice   ☐ Performance Improvement   ☐ Written Notice   ☐ Termination
☑ Suspension for _Pending Investigation_ days, to start on _3/1/96_ and return on _____
   W/o Pay                                              (date)                                   (date)

**Nature of Concern:** _Based on our conversation 3/1/96, (See Attached Statement), the hospital has identified some forms of misconduct as being so detrimental to the best interest of the hospital to warrant immediate discharge. (See Policy D-4-01)_

_At this time, my intent is to terminate Wendi's employment w/ Casa Grande Regional Medical Center based on her actions; however, at this time Wendi is suspended pending investigation. Wendi is to contact me, Jij Bates, on Monday March 4, 1996 by pager (520) 426-6051 & she will notify Wendi of the status of the investigation. I will be Wendi's point of contact & this matter shouldn't be discussed w/ any employee of the organization except Wendi during the investigation._
_Wendi is encouraged to continue her contact w/the Employee Assistance Program ~ 1-800-634-6433._

_Jij Bates_
_Director of Human Resources_

**Employee Comments:** _Joe and I would like to pay back the money to DVCC. At this time, we are not able to pay the full amount. We would be able to pay a monthly payment until the full amount is paid._

_____

_____

_____

**Action to be taken if same problem occurs:** ☐ Written Notice   ☐ Suspension   ☑ Termination
   **Important Note:** If another type of problem occurs, the action may be different than shown above. All the relevant facts would be taken into consideration, including this prior notice.

T~~h~~ notice was given on _3-1-96_          _Wendi Andriano_          _3-1-96_
                    (date)                          Employee's Signature                Date
                                                    ☐ Employee Refused to sign — requires witness signature
Supervisor's Signature        Date
_Jij Bates_       _3-1-96_          _Jij Bates_          _3/1/96_
Dept. Manager/Administrator   Date    Witness Signature                 Date

White: Administrative/Personnel      Yellow: Dept. Mgr.      Pink: Employee

36-1747-9                                                              I000000040

March 1, 1996

I Wendi Andriano have willfully and knowingly transferred funds from the Desert Valley Care Center account to my own personal account. I transferred these funds approximately one month ago.

I created a manual check and entered the check number into the system under the name of Kraft, deposited the money into my personal account, and destroyed the yellow duplicate copy of the check.

The check was for approximately $2200.00.

I requested this meeting on March 1, 1996 with Jennifer Andrew, Controller and Jill Bates, Director of Human Resources to explain what I had done.

_____          3-1-96
Wendi Andriano                              Date


Witnessed by:

_____          3-1-96
Jennifer Andrew, Controller               Date

_____          3-1-96
Jill A. Bates, Director of Human Resources   Date

| CASA GRANDE REGIONAL MEDICAL CENTER | | | | Policy and Procedure Manual | | |
|---|---|---|---|---|---|---|
| HUMAN RESOURCES | | | | | | |
| Chapter | Section | Subject | EMPLOYER EXPECTATIONS | Date Issued | Date Revised | Page |
| D | 4 | 01 | | 8/84 | 1/94 | 1 of 3 |

I.   **OBJECTIVE:**
To provide employees with examples of the types of misconduct which could result in corrective discipline.

II.   **POLICY:**
Employees engaging in the following acts of misconduct while on duty or while on CGRMC grounds, could be subjected to corrective discipline.

III.   **DEFINITIONS:**

<u>Misconduct:</u>   Any act intentional, or unintentional that results in the disruption of hospital operations, affects patient care, or is unsafe to the employee or others.

<u>Corrective discipline:</u>   As described in the Progressive Discipline Policy.

IV.   **PROCEDURES:**
Examples of minor offenses would include, but not be limited to, the following:

<u>Unexcused absences</u> (not notifying supervisor in an appropriate timely manner of an absence), repeated tardiness, excessive absenteeism (5 recorded absences within a sliding 12-month period), loafing, misuse of time, substandard work performance, excessive break time, or failure to follow safety rules.

More serious acts of misconduct even for the first offence, depending on the circumstances in each case, would call for more severe steps of corrective discipline. Examples of these more serious offenses would include but not be limited to the following:

1.   Inefficient or careless performance of duties.
2.   Deliberate waste of materials of supplies.
3.   Posting or removal of notices, signs or writing in any form on any bulletin board on hospital property without authorization.
4.   Violation of safety rules or hospital safety practices.
5.   Vulgar or abusive language or behavior.
6.   Failure to submit a physician's statement on request.
7.   Leaving one's own department during working hours for reasons not job-related without permission of one's department head.
8.   Excessive absenteeism (6 recorded absences within a sliding 12-month period).
9.   Allowing non-employees to enter hospital departments or work areas without

Signature   _(signature)_          Title   ADMINISTRATOR/CEO

| CASA GRANDE REGIONAL MEDICAL CENTER | | | | | Policy and Procedure Manual | | |
|---|---|---|---|---|---|---|---|
| HUMAN RESOURCES | | | | | | | |
| Chapter | Section | Subject | EMPLOYER EXPECTATIONS | | Date Issued | Date Revised | Page |
| D | 4 | 01 | | | 8/84 | 1/94 | 2 of 3 |

   authorization of department head.

10. Smoking in a "no smoking" area.
11. Discriminating against and patient, visitor, employee or doctor because of race, color, age, religion, handicap, sex or national origin.
12. Engaging in personal activities on hospital time without permission.
13. Reasonable suspicion of unauthorized personal use of hospital supplies and/or equipment.
14. Refusal to accept overtime assignments without justifiable reason when necessary and requested by department manager.
15. Reasonable suspicion of sexual harassment of any employee, patient, visitor or contract staff of C.G.R.M.C.

The hospital has identified some examples of misconduct as being so detrimental to the best interests of the hospital, it patients and employees, as to warrant possible **immediate discharge**. The following situations are examples of types of conduct for which the disciplinary procedure may be bypassed, but the list is not considered all inclusive:

1. Gross insubordination: outright refusal to follow directions or obey legitimate orders for supervision.
2. Willful negligence in performance on the job.
3. Willful or negligent misuse or abuse of hospital property, equipment or buildings.
4. Reasonable suspicion of releasing confidential employee and/or employer, and/or patient information to anyone without prior authority.
5. Altering time cards, willful falsification of time spent at work, and other records without supervisory approval.
6. Knowingly completing another employee's time card or allowing someone else to complete your time card.
7. Physical violence or threats toward any employee, patient or guest of the hospital.
8. Reasonable suspicion of stealing or conviction by a court of law for stealing from fellow employees, patients, the hospital or others on hospital premises.
9. Reasonable suspicion of taking hospital property, records, or hospital information without permission.
10. Conviction of a felony.
11. Sleeping, or giving the appearance of sleeping while on duty.
12. Gross negligence jeopardizing the welfare of a patient.
13. Falsification of application for employment, work reports, or other data required by the hospital.
14. Reasonable suspicion of bringing intoxicants, unauthorized drugs or narcotics onto hospital property, or consuming intoxicants, unauthorized drugs or narcotics on hospital property, or reporting for duty under the influence of intoxicants, drugs or narcotics.
15. Reasonable suspicion of buying and/or selling of any intoxicants, unauthorized drugs or narcotics or arranging to do same on hospital property.

I000000043

| CASA GRANDE REGIONAL MEDICAL CENTER | | | | Policy and Procedure Manual | | |
|---|---|---|---|---|---|---|
| HUMAN RESOURCES | | | | | | |
| Chapter | Section | Subject | EMPLOYER EXPECTATIONS | Date Issued | Date Revised | Page |
| D | 4 | 01 | | 8/84 | 1/94 | 3 of 3 |

16.   Immoral conduct or indecency on hospital property.
17.   Reasonable suspicion of unauthorized possession of weapons on hospital property.


V.    ATTACHMENTS:  None

VI.   REFERENCES:  None

I000000044

| CASA GRANDE REGIONAL MEDICAL CENTER | | | Policy and Procedure Manual | | | |
|---|---|---|---|---|---|---|
| HUMAN RESOURCES | | | | | | |
| Chapter | Section | Subject | EMPLOYER EXPECTATIONS | Date Issued | Date Revised | Page |
| D | 4 | 01 | | 8/84 | 1/94 | 1 of 3 |

I.   **OBJECTIVE:**
To provide employees with examples of the types of misconduct which could result in corrective discipline.

II.   **POLICY:**
Employees engaging in the following acts of misconduct while on duty or while on CGRMC grounds, could be subjected to corrective discipline.

III.   **DEFINITIONS:**
Misconduct:   Any act intentional, or unintentional that results in the disruption of hospital operations, affects patient care, or is unsafe to the employee or others.

Corrective discipline:   As described in the Progressive Discipline Policy.

IV.   **PROCEDURES:**
Examples of minor offenses would include, but not be limited to, the following:

Unexcused absences (not notifying supervisor in an appropriate timely manner of an absence), repeated tardiness, excessive absenteeism (5 recorded absences within a sliding 12-month period), loafing, misuse of time, substandard work performance, excessive break time, or failure to follow safety rules.

More serious acts of misconduct even for the first offence, depending on the circumstances in each case, would call for more severe steps of corrective discipline. Examples of these more serious offenses would include but not be limited to the following:

1.   Inefficient or careless performance of duties.
2.   Deliberate waste of materials of supplies.
3.   Posting or removal of notices, signs or writing in any form on any bulletin board on hospital property without authorization.
4.   Violation of safety rules or hospital safety practices.
5.   Vulgar or abusive language or behavior.
6.   Failure to submit a physician's statement on request.
7.   Leaving one's own department during working hours for reasons not job-related without permission of one's department head.
8.   Excessive absenteeism (6 recorded absences within a sliding 12-month period).
9.   Allowing non-employees to enter hospital departments or work areas without

| Signature | | Title | ADMINISTRATOR/CEO |
|---|---|---|---|

000004265

I000000045

| CASA GRANDE REGIONAL MEDICAL CENTER | | | | Policy and Procedure Manual | | |
|---|---|---|---|---|---|---|
| HUMAN RESOURCES | | | | | | |
| Chapter | Section | Subject | EMPLOYER EXPECTATIONS | Date Issued | Date Revised | Page |
| D | 4 | 01 | | 8/84 | 1/94 | 2 of 3 |

10.   authorization of department head.
10.   Smoking in a "no smoking" area.
11.   Discriminating against and patient, visitor, employee or doctor because of race, color, age, religion, handicap, sex or national origin.
12.   Engaging in personal activities on hospital time without permission.
13.   Reasonable suspicion of unauthorized personal use of hospital supplies and/or equipment.
14.   Refusal to accept overtime assignments without justifiable reason when necessary and requested by department manager.
15.   Reasonable suspicion of sexual harassment of any employee, patient, visitor or contract staff of C.G.R.M.C.

The hospital has identified some examples of misconduct as being so detrimental to the best interests of the hospital, it patients and employees, as to warrant possible immediate discharge. The following situations are examples of types of conduct for which the disciplinary procedure may be bypassed, but the list is not considered all inclusive:

1.   Gross insubordination: outright refusal to follow directions or obey legitimate orders for supervision.
2.   Willful negligence in performance on the job.
3.   Willful or negligent misuse or abuse of hospital property, equipment or buildings.
4.   Reasonable suspicion of releasing confidential employee and/or employer, and/or patient information to anyone without prior authority.
5.   Altering time cards, willful falsification of time spent at work, and other records without supervisory approval.
6.   Knowingly completing another employee's time card or allowing someone else to complete your time card.
7.   Physical violence or threats toward any employee, patient or guest of the hospital.
8.   Reasonable suspicion of stealing or conviction by a court of law for stealing from fellow employees, patients, the hospital or others on hospital premises.
9.   Reasonable suspicion of taking hospital property, records, or hospital information without permission.
10.   Conviction of a felony.
11.   Sleeping, or giving the appearance of sleeping while on duty.
12.   Gross negligence jeopardizing the welfare of a patient.
13.   Falsification of application for employment, work reports, or other data required by the hospital.
14.   Reasonable suspicion of bringing intoxicants, unauthorized drugs or narcotics onto hospital property, or consuming intoxicants, unauthorized drugs or narcotics on hospital property, or reporting for duty under the influence of intoxicants, drugs or narcotics.
15.   Reasonable suspicion of buying and/or selling of any intoxicants, unauthorized drugs or narcotics or arranging to do same on hospital property.

I 000000046

| CASA GRANDE REGIONAL MEDICAL CENTER | | | | Policy and Procedure Manual | | |
|---|---|---|---|---|---|---|
| HUMAN RESOURCES | | | | | | |
| Chapter | Section | Subject | EMPLOYER EXPECTATIONS | Date Issued | Date Revised | Page |
| D | 4 | 01 | | 8/84 | 1/94 | 3 of 3 |

16.   Immoral conduct or indecency on hospital property.
17.   Reasonable suspicion of unauthorized possession of weapons on hospital property.

V.   ATTACHMENTS:  None

VI.   REFERENCES:  None

I000000047

| CASA GRANDE REGIONAL MEDICAL CENTER | | | | Policy and Procedure Manual | | |
|---|---|---|---|---|---|---|
| HUMAN RESOURCES | | | | | | |
| Chapter | Section | Subject | PROGRESSIVE DISCIPLINE PROCESS | Date Issued | Date Revised | Page |
| D | 4 | 21 | | 8/84 | 1/94 | 1 of 2 |

I.  **OBJECTIVE:**
To provide employees with a description of corrective disciplinary action to be used in a given case of misconduct. While each case of misconduct must be judged individually, first time, or lesser offenses would normally require beginning steps of corrective discipline. Repeated offenses, or failure to correct deficiencies, may require successive steps of corrective discipline or possible discharge.

II.  **POLICY:**
The hospital may use a four-step disciplinary procedure to resolve employee problems and/or deficiencies.

III.  **DEFINITIONS:** None

IV.  **PROCEDURES:**

Step One - Verbal:  Discussion of the problem with the employee's supervisor in private, pointing out why correction of the problem is necessary and suggesting ways to improve. A brief write-up of what was discussed, with whom and when will serve as a reminder to your supervisor of the verbal warning. A Notice of Concern form should be used and a copy is to be placed in the employee's personnel file.

Step Two - Written:  A Performance Improvement Recommendation will be written which will specify the problem and required improvement. The Notice of Concern form will be used and a copy will be placed in the employee's personnel file.

Step Three
Formal Reprimand:  A statement of Formal Reprimand will be written on a Notice of concern form and a copy will be placed in the employee's personnel file. Once again the employee will be made aware of the problem and the relevant facts in a private conference. At this time the employee may be given a suspension without pay or be informed the continuation of the problem will lead to suspension or discharge.

Step Four
Written Notice
of Discharge:  If the same problem continues, or serious misconduct for the first offense is taking place, an employee will be discharged by their supervisor.

| Signature | _(signature)_ | Title | ADMINISTRATOR/CEO |
|---|---|---|---|

I000000048

| CASA GRANDE REGIONAL MEDICAL CENTER | | | Policy and Procedure Manual | | | |
|---|---|---|---|---|---|---|
| HUMAN RESOURCES | | | | | | |
| Chapter | Section | Subject | PROGRESSIVE DISCIPLINE PROCESS | Date Issued | Date Revised | Page |
| D | 4 | 21 | | 8/84 | 1/94 | 2 of 2 |

The hospital reserves the right to apply progressive discipline steps, or immediate discharge as it determines appropriate on a case by case basis.

All steps will be documented on a "Notice of Concern" form and a copy will be placed in the employee's personnel file.

The Director of Human Resources will be present during any step at the request of either the department manager/supervisor or the employee.

If applicable, an employee may be suspended without pay under the Formal Reprimand step. Suspension may be used to permit time to conduct an investigation of alleged serious employee misconduct. Upon notification of a suspension, an employee will be required to leave the premises immediately. An employee may not be suspended for more than 5 working days as a result of disciplinary actions.

The corrective discipline and discharge policy may apply to employees during their 90-day orientation period.

V.   ATTACHMENTS:  Notice of Concern form

VI.   REFERENCES:  None

03/01/1996  18:13    4147962525          NEAS                    PAGE  01

# FACSIMILE TRANSMISSION



## NATIONAL EMPLOYEE ASSISTANCE SERVICES, INC.

Date: 3/1/96                          Time: 10:05 AM

To: Joel Bates                        From: Linda R-G

Location: Casa Grande                 Fax Number: (414) 798-3923

Fax Number: 520-426-6615              Phone Number: (414) 798-3900

The documents accompanying this telecopy transmission contain confidential information belonging to the sender which is legally privileged. The information is intended only for the use of the individual or entity named above. If you are not the intended recipient, you are hereby notified that any disclosure, copying, distribution or taking of any action in reliance on the contents of this telecopied information is strictly prohibited. If you have received this telecopy in error, please immediately notify us.

Message: _____

_____

_____

_____

Total Number of Pages (including cover): _____ 2

*Please call (414) 798-3900 if you do not receive all pages.*

NATIONAL EMPLOYEE ASSISTANCE SERVICES, INC.
20700 Swenson Drive Suite 200
Waukesha, WI 53186

I000000050

March 1, 1996

I Wendi Andriano have willfully and knowingly transferred funds from the Desert Valley Care Center account to my own personal account. I transferred these funds approximately one month a go.

I created a manual check and entered the check number into the system under the name of Kraft, deposited the money into my personal account, and destroyed the yellow duplicate copy of the check.

The check was for approximately $2200.00.

I requested this meeting on March 1, 1996 with Jennifer Andrew, Controller and Jill Bates, Director of Human Resources to explain what I had done.

_____        _____3-1-96_____
Wendi Andriano                           Date


Witnessed by:

_____        _____3-1-96_____
Jennifer Andrew, Controller              Date

_____        _____3-1-96_____
Jill A. Bates, Director of Human Resources    Date

February 29, 1996
Karen Edmunds
Senior Accountant II

During the normal monthly bank reconciliation process for the January 1996 Desert Valley Care Center bank account an item appeared on the bank statement that was questionable. I was in the process of training Jerry Brantz, Senior Accountant for DVCC, on the reconciliation process. The item appeared on the January bank statement clearing the account as an 'INSF force check paid' item. This is not an unusual occurrence on a bank reconciliation. What causes this is that although the account is overdrawn, checks are forced to clear. The unusual part about this forced check item was that there was no check number associated with it; normally the bank will indicate what check number was forced paid. Since there was not a check number, Jerry and I searched the returned cancelled checks for any check that may have cleared for that amount; thus, giving us a check number to cancel on the AP system.

Once Jerry and I determined that the cancelled check had not been returned by the bank we completed the bank reconciliation and left the amount in question as a reconciling item. I then indicated to Jerry that I would contact the Bank of Casa Grande Valley and see if I could obtain a check copy. On the 22nd I called Laura at the Bank of Casa Grande Valley (836-4666) and informed her that I had an item on the bank statement that I could not identify. At that point she asked me to fax her a copy of the bank statement and indicate what item was in question. Within an hour she called me back and gave me a check number "14013". She thought that it was odd that I was missing that one cancelled check. In order to determine that I was missing the check Laura asked me to count the number of cancelled checks I received with the bank statement and to compare it to a number on the bank statement that indicates the number of enclosures. I counted the number of checks and was one item short of the number indicated. Laura said that it would be possible to get a copy of the missing document but it would take approximately one week to receive it.

Since Laura was able to provide me with a check number I looked the check number up on the A/P system. When I inquired by check number the system showed me that check number as being issued as payment for a Kraft invoice. I started questioning the check number at that point since the invoice to Kraft in the A/P system was for a different amount than the item that cleared the bank by approximately $30.00. My next step was to ask Marcie Mahon, A/P clerk, to see if she could find the invoice and the check copy that should be on file. On Friday the 23rd Marcie indicated that she could not find the check copy or the Kraft invoice. She asked me that since Wendi was on vacation, could I wait until Wendi returned to find the check since Wendi might have an idea where it might be. I told her I had no problem with that.

Then on the 29th during the early afternoon Jerry Brantz and Angela Gutzmer came to ask me if I had received the copy of the cancelled check yet. I said no, but that I would contact Laura at the Bank of Casa Grande Valley and find out the status getting the check copy. I contacted Laura and she orginally indicated that it could take another couple of days to receive the check copy. During the first part of our conversation Laura said that she had just spoke with Wendi that morning in regards to that check and that Wendi had indicated that when the copy was received to call her at 426-

I 000000052

6582 (which is her work number). I told Laura, 'that's strange that you spoke with Wendi about that check, because Wendi is out of the office on personal leave.' I asked her if she was sure that she spoke with Wendi and she said yes. Laura said that it sounded as though Wendi was on a cell phone. I then told Laura that since Wendi was out of the office to please contact me instead when the check copy arrived. I indicated that we were anxious to get a copy of the check so that we could wrap up the bank reconciliation for the month. About a half hour after our initial conversation Laura called me back and said that she was able to get a faxed copy of the cancelled check.

I then asked Laura to verify the check number to be '14013' and she said yes. I then asked if the check was made out to Kraft since that is the payee per the A/P system. She said no-- the check was made out to Joe's Windshield Repair and the check was dated 1/5/95. She then commented on the date but then said that could have been an easy mistake since the year had just changed and many people make that mistake of entering the wrong year. Laura said a copy would be available on Friday for the runner to pick up when they made their daily run to the bank.

At that point, knowing the connection between Wendi and Joe's Windshield Repair, I went to Angela Gutzmer and told her that I had received a call from Laura at the bank. I reiterated my call with Laura to Angela and said that Laura had a fax copy available. Angela called Jerry over to her desk and informed him of what I found out. At that point Angela said that we should get the fax copy from Laura as soon as possible. I picked up the copy from Laura and gave the copy to Angela Gutzmer when I returned.

CGRMCC                    ID:                          MAR 01'96   11:25

TRANSMIT CONFIRMATION REPORT

NO.              :  003
RECEIVER         :              4147962525
TRANSMITTER      :  CGRMCC
DATE             :      MAR 01'96   11:25
DURATION         :  01'34
MODE             :      STD
PAGES            :  02
 RESULT          :  OK

*WEAS*
((414) 798-3928)

000004274                                    I000000054



# CASA GRANDE
# REGIONAL MEDICAL CENTER

## HUMAN RESOURCES DEPARTMENT

This fax is from:

[ ✓ ]  Jill Bates
       Director

[ ] Melinda Zambrano
    Compensation/Information
    Coordinator

[ ] Pam DeWitt
    Employee Development
    Coordinator

[ ]  Tanya Haney
     Assistant Director

[ ]  Melissa Brewster
     HR Coordinator

[ ]  Debby Turner
     HR Assistant

PLEASE DELIVER THIS FAX TO: ___Linda Robinson Coy___
___NEAS___

This fax is ___1___ pages long
(Not including cover sheet)

Please note the following: ___(See Attached)___
___Jill___

If any part of this fax is missing, please call the Human Resources
department at 502-426-6510.

Thanks!                                                    tsh142

000004275                                  I000000055

03/01/1996  10:13   4147962525                    NEAS                          PAGE  02

National Employee Assistance Services, Inc.
Consent for Release of Confidential Information
MUST BE SIGNED BY EVERY CLIENT

CROSS OUT ALL SECTIONS WHICH DO NOT APPLY

| Section 1: | Release by the EAP to providers/payors | Section 2: | Release by providers to EAP | Section 3: | Release to employer |

I, X Wendi Andriano                    , voluntarily consent to and authorize the following releases of
   (Name of Client)                                      information:

**SECTION ONE:** I authorize National Employee Assistance Services, Inc. ["the EAP"] to disclose and
release to the following individuals, agencies or organizations:

_____   (Name of affiliate, other providers,
_____   insurers, third party administra-
_____   tors, or others to whom informa-
                                          tion will need to be released)

All information needed to (a) have services authorized, (b) obtain benefit coverage or payment for services,
(c) help in planning, providing or monitoring services. Information released under this Section One may
include all information that the EAP has produced or obtained about services provided to me or on my
behalf, including the details of those services.
If I previously gave the EAP permission over the telephone to release information, my signature confirms
that this written consent also apply to any release of information which I authorized verbally and which has
already occurred.

**SECTION TWO:** I authorize any service provider to whom I am referred by the EAP or by any of its
affiliated providers, including, without limitation, _____
                                          [Name of Affiliate or other Provider]
to disclose and release to the EAP all information needed to help manage or coordinate my case.
Information released under this Section Two may include all information which any provider has produced
or obtained about services provided to me or on my behalf, including the details of those services.

**SECTION THREE:** (RELEASE TO EMPLOYER ONLY) I authorize the EAP to disclose and release to
representatives of my employer, _Gil Betts, Human Resources or design_
                              (Name of supervisor or other employer representative)
The following information (cross out any that do not apply):
  (1) That I have accepted referral to and contacted the EAP.
  (2) The EAP's assessment of my situation.
  (3) The EAP's recommendations regarding services.
  (4) My compliance with, progress toward fulfillment of, and/or completion of the EAP's recommendations,
     including test results and reports of other providers relating to my compliance or progress.
  (5) Other: _____
                    (Other information authorized to be released)
The purpose of release under this Section Three is to assist in compliance with a company referral to the EAP.

**APPLICABLE TO ALL CONSENTS:** I understand that information to be released or disclosed under any
Section of this Consent may be confidential in nature, and may include written notes and records as well as
impressions and conclusions of providers.
• This Consent becomes effective on the date I sign it, and will continue in effect for twelve (12) months from
that date unless I revoke it before that time.  I understand I can revoke this Consent at any time, but
information released before revocation cannot be retrieved.
• I acknowledge that a copy of this Consent has been offered to me, and a copy will be kept in EAP records.
I understand that I have a right, upon written request, to inspect and receive a copy of any written
information disclosed under this Consent.
• I agree that a photocopy or facsimile copy of this Consent is as valid as the original.
• I release the EAP and other service providers referred to above from any liability for disclosure of
confidential information while this Consent is effective.

Signed: X _Wendi Andriano_                   Date: X _3-1-96_
       OR
Signature of Legally
Authorized Person: _Gil A Betts_    Date: _3-1-96_   (520) 426-6581 — work #
                                                      (520) 426-5591 — Pager

Relationship to Client: _____

Witness: _Gil A Betts_                    Date: _3-1-96_

SEE INSTRUCTIONS ON REVERSE SIDE.                                          5

000004276                                    I000000056

**NOTES**

*Meeting w/ West Indiana 3/1/96 8:*

- Typed CK — Made out to their
- Deposited

Manual CK — Entered into Computer Until

Thrown away Yellow CK Copy

About a month ago              (Approx – $2200)

Didn't

Spoke to Re Last Night —
— WMX Bank / Goes toward Business
— She buys Stuff
— Take Credit Card Statement — Maxed Out!
— Joe went to use & Couldn't
— Asked Why

who knows
(Joe, Kellie & Us!)

//

⊛ Spoke w/ Linda Robinson bay :
(8/1/96 — 11:15 Am)
RE: Already Knowing
• Vm message
Ann Employee

# interoffice
## M E M O R A N D U M

**to:**   Jill Bates, Director of Human Resources

**cc:**

**from:**   Angela Gutzmer

**re:**   Wendi Andriano

**date:**   March 1, 1996

<u>This letter will detail the events that occurred on Thursday, February 29, 1996:</u>

At approximately 1:30 p.m. Jerry Brantz and myself had a conversation regarding a very upsetting situation that had occurred between Marcy McMahon (Accounting Clerk) and Wendi Andriano (Staff Accountant) earlier this same day.  Apparently, Wendi had made phone contact with Marcy during the morning hours asking her assistance in creating back-up for a manual check that had been entered into the computer system.  This manual check had been cut in early January and cleared the bank on January 9, 1996.  The check was actually tied to a Kraft Food Service invoice but was made out to Joe's Autoglass Shop.  This is her husbands business.  The check was for approximately $2,237.00.

from the desk of....

Angela Gutzmer
Financial Analyst
Central Arizona Medical Center
P.O. Box 2080
Florence, AZ

(520) 426-6572
Fax: (520) 426-6435

Jerry and myself began the process of searching for the actual cancelled check.  We spoke with Karen Edmunds who had completed the January 1996 bank reconciliation for Desert Valley Care Center.  This particular check was missing from the bank statement and it appeared as if someone had taken that check out of the cancelled checks.  The bank statement showed their should have been 61 enclosures and their was only 60.  At this point, Karen called The Bank of Casa Grande Valley to speak with Laurie, the women she had spoken with last week when

000004278

I 000000058

she ordered a copy of the check.  Laurie made the comment that Wendi Andriano had called her that morning (2/29/96) and requested that they call her when that check copy was ready.  Through the banks efforts, we were able to obtain a copy of the cancelled check which indicated that it was cashed to Joe's Autoglass Shop and was clearly not made to Kraft Food Service.  We then confronted Jennifer Andrew and Jill Bates.

I also learned that Wendi stopped by Marci McMahon's apartment the morning of March 1, 1996 sometime before 8:00 a.m.

March 1, 1996

Jill Bates
Human Resources Director
Casa Grande Regional Medical Center
1800 E. Florence Blvd.
Casa Grande, AZ  85222

Dear Jill:

This letter is documentation in reference to the call I received from Wendi Andriano
Wednesday Feb 28, 1996.  She wanted Bessie Hamilton's telephone number for a
member at her church.  Wendi did not sound well at all.  I told her to call me  if
there was anything I can do for her or If she needed to talk someone.  Wendi
mentioned that she was embarrassed.  I wasn't sure why she should be  embarrassed.
I told her some people go through emotional feelings and that was nothing to be
embarrassed about.  The conversation ended at that point.  I have had no
communication with Wendi since that evening.

Sincerely,

*Delia Schroeder*

Delia Schroeder

< Can we return Msg — >

· Consumer Credit Counseling

Register
∘ 1/15
∘ 2 IDS
∘ 1½ Hours (App / Interview / Testing
∘ Résumé

· Call w/ Kathy Opachl
↳ (Setup Testing)

```
PPDU030B
```
                          F I L E   M A I N T E N A N C E
                          D E D U C T I O N   F I L E                3/06/96 11:35:37

                    100   ████████   ANDRIANO, WENDI E

    Deduction Code ....... 0891   EMP SPECIAL PURCHASE
                              Employee          Employer        Processing Code..
    Deduction Amount .....    216.50                 .00        Rollup Type ....... 0
    Deduction Percent ....                                      Flex Ded?/Option  N
    Computation Method ... A              A                     Transaction Type..
    Billing/Option Code...
    Deduction Limit ......    1,082.50              .00         Limit Use .......... 2
    One Time Amount ......          .00             .00         Frequency .......... E
    Table Amounts ........     .0000        .0000
    Bank Account Number...
    Bank Routing Number...
    Deposit Type ......... N                        EE/Spouse/Dep Sequence#..........
    Chk/Sav Type .........                          EE/Spouse/Dep Birth Date... 8/26/70
                                                       Employee         Employer
    Take Deduction? ...... Y                Current ..    216.50            .00
                                            QTD .....      216.50            .00
    Effective Date ....... 0/00/00          YTD .....      216.50            .00
    Effective End Date ... 99/99/99         Last Change: Yr 96   Pay Prd   5

        (+) Amount Taken — $

                          Amount already Pd—
                          to be directed towards
                          monies owed if company
                          reimburses he for the
                          ring.

I, Wendi Andriano, will pay $100 as a downpayment on the debt I owe. On March 22, I will make arrangements to make regular payments.

Wendi Andriano 3-6-96

(Witness: Jill A. Bates (3/6/96))

• Wendi is to contact Jill A. Bates at (426-6581.) or Page me (426-5391). or or before March 22, 1996. At this time, 3/22/96, Wendi will return the ring she purchased from the Jewlery sale to go against the monies owed.

(WITNESS: Jerry J. Ahn 3/6/96)

```
ACCOUNTING              Casa Grande Regional Medical Ctr            Friday
ACCT6461                                                           3/15/96
JBRANTS           * Use ATTN key to work with Printer and Job Ques *   7:58:24
=================================================================================

    ******* MENUS *******        13. ******* MISC *******
 1. General Ledger System        14. Set GL Library List
 2. Accounts Payable System      15. Set AP Library List - CGRMC
 3.                              16. Set AP Library List - CAMC
 4. View Roboted Reports         17. Set FA Library List
 5. Fixed Assets System          18. Set PR Library List
 6. Payroll System               19. Set EFI Library List
 7. EFI System                   20. Display Your Library List
 8. MedSeries4 Report Writer Menu 21. Query
 9. GL - Work with Object Locks  22. Start Print Writer - PA - ACCT
10. AP - Work with Object Locks  23. Start Print Writer - PD - RAHP
11. FA - Work with Object Locks  24. Sign Off
12. PP - Work with Object Locks
---------------------------------------------------------------------------
                                                       Invocation level 01
Enter Menu Option

F3=Signoff.  F5=Reclaim Resources.F12=Previous menu. F15=Initial menu.

(c) Copyright GTE Health systems, Inc.  1982 - 1999.
```

1. 15 "Enter"

2. 3 "Enter"

Following pages are showing procedures after check has be selected to pay

PAGE 1
000004284                                    I000000064

```
APMASTER               Casa Grande Regional Medical Ctr            Friday
ACCT6461               . A C C O U N T S   P A Y A B L E          3/15/96
JBRANTS                       MASTER MENU                         7:59:30
==============================================================================
```

```
 1. Invoice Functions Menu                13. Reports Menu - Day End
 2.                                        14. Reports Menu - On Demand
 3. Inquiry/Maintenance Menu               15.
 4.                                        16. Operations Menu
 5. Check Functions Menu                   17.
 6.                                        18. Managers Menu
 7. Vendor Master Inquiry/Maint            19. Payables Report
 8. Vendor Delete/Combine                  20. Purge Menu
 9.                                        21. Menu
10. 1099 Processing Menu                   22.
11. AR Master                              23.
12.                                        24. Sign Off
```

```
--------------------------------------------------------------------------
                                                   Invocation level 02
Enter Menu Option

F3=Signoff.  F5=Reclaim Resources.F12=Previous menu. F15=Initial menu.
```

3. 1 "Enter"

```
APMENU4                    Casa Grande Regional Medical Ctr              Friday
ACCT6461                    A C C O U N T S   P A Y A B L E             3/15/96
JBRANTS                         INVOICE FUNCTIONS                       7:59:39
===============================================================================
```

   Invoice Entry/Update                13. Match Prepaids/Receipts
                                       14.
 3. Linematch Invoices                 15. Hold/Release Invoices by Vendr
 4.                                     16.
 5. Recurring Invoices                 17. tst pt refunds--select
 6.                                     18. approve pt rfnds
 7. Invoice Approval                    19.
 8.                                     20. INQUIRY/UPDATE MENU
 9. Invoice Maintenance Log             21. CHECK FUNCTIONS MENU
10.                                     22. A/P MASTER MENU
11. Change Invoice User Name            23.
12. Create Unpaid Sales Tax Invoic      24. Sign Off
                                       ----------------------------------------
------------------------------------                      Invocation level 03
Enter Menu Option

F3=Signoff.   F5=Reclaim Resources.F12=Previous menu. F15=Initial menu.


4o 1 "Enter"

```
                     A C C O U N T S   P A Y A B L E           3/15/96
APDI091C       H O S P I T A L   S E L E C T I O N   S C R E E N    8:02:25
===================================================================================

        Ln        User ID      Hospital ID   Hospital Name
-----------------------------------------------------------------------------------
        01        JBRANTS          100         CGRMC
        02        JBRANTS          200         CAMC
        03        JBRANTS          250         CACC
        04        JBRANTS          300         DVCC
        05        JBRANTS          400         CGRRC
        06        JBRANTS          500         MAB
        07        JBRANTS          600         CFW
        08        JBRANTS          700         RAHP
        09        JBRANTS          710         REBA
        10        JBRANTS          720         VAN
-----------------------------------------------------------------------------------

              Enter Line Number........  1


F3=Exit
```

5. 1 "Enter"

```
                    A/P INVOICE INPUT/UPDATE SCREEN (HEADER)        3/15/96
                                                                    8:02:34
APDU100I
Hospital    100 CGRMC
Voucher.....
Alternate Payable Master...              Status....... NEW    Type...
Vendor ID...                             P.O.....
Invoice ....
Total Inv $.                             Expense
Dates: Invoice Discount  Pay   Check     Period Year
(MMDDYY)

Enter Batch number:

Vendor  Name........
        Check Name..
        Addr1.......
        Addr2.......
        City/St/Zip.
        Fed ID/SSN..                Phone:


Inquiry : F19=Logs  F16=Vendor  F17=Invoice   F18=Checks
```

6. F17 — Take you to Invoice inquiry screen

```
APDI010C              A C C O U N T S   P A Y A B L E          3/15/96
Hosp   100 CGRMC         I N V O I C E   S E A R C H           8:29:10
======================================================================
Ln  Inv Num        SN Chk Dt Vend ID Vend Name   PO Num Voucher Stat  Amount
----------------------------------------------------------------------
 1  TRIAL          01 031496 20781   TEST OF A/           40052 PAID    10.00
 2  REIMB FOR DINNE 01 031396 20782  APODACA, B           40054 PAID    38.82
03  KEFLEX PRESCIP. 01 010896 2079   WAL-MART P           34076 PAID    11.54
04  LUCAS NELSON-PR 01 090294 2079   WAL-MART P            3103 PAID    34.43
05  MEDICINE FOR 2  01 022396 2079   WAL-MART P           38427 PAID    30.86
06  MR 288500       01 082595 2079   WAL-MART P           25865 PAID    15.75
07  PT:KAISER,STEVE 01 020596 2079   WAL-MART P           36676 APRV    16.15
08  PT:RINDFLESCH,S 01 010896 2079   WAL-MART P           34196 PAID    18.74
09  RX JOYCE MONTIJ 01 102894 2079   WAL-MART P            6703 PAID    41.71
10  6702581         01 090894 2079   WAL-MART P            3933 PAID    48.23
----------------------------------------------------------------------
    Enter line No, or Voucher No......
    or Vendor ID and/or Invoice No....
            and     Status (O/C)..
    or PO Number....................
    Enter Vendor Name for Search....:   TEST

F3=Exit   F12=Previous
    Line number and F8: Return to previous screen with selection
```

%  - Tab down to Vendor Name Search

   - Type in Vendor/ or part of vendor name

   - In this case
         Type : Test "Enter"

Page 6

```
                   A C C O U T S   P A Y A B L E   S Y S T E M      3/15/96
                V E N D O R   M A S T E R   F I L E   S E A R C H    8:29:25
APDI020C
=================================================================================
         Vendor Id     Vendor Name                    Federal ID    Tmp  Ref
        -------------------------------------------------------------------------
01      20781          TEST OF A/P CONTROLS #2                        Y
02      2012           THACKRAY RECONSTRUCTIVE SYSTEM                 Y
03      20615          THARRINGTON, ROY
04      4831           THE ARIZONA LABOR LETTER
05      4048           THE AZ PHARMACY ASSOC
06      4140           THE BUSINESS WORD INC.
07      4157           THE BUTTES
08      4550           THE CARING COMPANY                             Y
09      20164          THE EXECUTIVE GALLERY INC
10      4435           THE HEALTHCARE FORUM
---------------------------------------------------------------------------------
        Enter Line No, Vendor Name or *ADD..  1
             or Vendor ID...................


F3=Exit   F12=Previous
    Line Number and F8: Return to previous screen with selection
```

So Type "o.1" "Enter"

```
                A C C O U N T S   P A Y A B L E   S Y S T E M          3/15/96
                      VENDOR MASTER FILE MAINTENANCE                    8:31:07
APDU020A
================================================================================
Category                                                         Temp Vnd Flag Y
Vendor ID 20781        Vendor Name TEST OF A/P CONTROLS #2        Refund Vendor
                       Check Name  TEST VENDOR #2

              ACCOUNTING ADDRESS              MATERIALS ADDRESS
              KDKDK                           KDKDK
Address 1     KDKDK
Address 2
City/State
Zipcode
Contact
Phone No.                         Service#
Federal ID or SSNO                800 No.

Ship Term                                Creation Date      3/14/96
Pay Term:  Payment  Day    Type          Maintenance Date   3/15/96
Disc Term: Discount Day    Type          User ID            JBRANTS
           Discount %

Display Vendor Statistical detail N      Rec Sts.. A
```

*This screen would show name of vendor before check run which would be printed on check —*

*✳ "Enter" to get out of screen*

```
                  A C C O U N T S   P A Y A B L E   S Y S T E M         3/15/96
                        VENDOR MASTER FILE MAINTENANCE                   8:31:46
APDU020A
=================================================================================
Category
Vendor ID 20781        Vendor Name TEST OF A/P CONTROLS NUMBER 2   Temp Vnd Flag Y
                       Check Name  TEST VENDOR NUMBER 2            Refund Vendor

                  ACCOUNTING ADDRESS            MATERIALS ADDRESS
                  KDKDK                         KDKDK
Address 1   KDKDK
Address 2
City/State
Zipcode
Contact
Phone No.                             Service#
Federal ID or SSNO                    800 No.

Ship Term                             Creation Date    3/14/96
Pay Term:  Payment  Day     Type      Maintenance Date 3/15/96
Disc Term: Discount Day     Type      User ID          JBRANTS
           Discount %

Display Vendor Statistical detail N       Rec Sts.. A
```

9. After check run you would return to this screen by repeating steps 7&8. Then would change name back to original vendor in which you wanted system to show

```
APDI010C                    A C C O U N T S   P A Y A B L E          3/15/96
Hosp   100 CGRMC                I N V O I C E   S E A R C H           8:25:38
================================================================================
Ln Inv Num        SN Chk Dt Vend ID Vend Name   PO Num Voucher Stat   Amount
--------------------------------------------------------------------------------
   TRIAL          01 031496 20781    TEST OF A/        40052 PAID       10.00
   REIMB FOR DINNE 01 031396 20782   APODACA, B        40054 PAID       38.82
03 KEFLEX PRESCIP. 01 010896 2079    WAL-MART P        34076 PAID       11.54
04 LUCAS NELSON-PR 01 090294 2079    WAL-MART P         3103 PAID       34.43
05 MEDICINE FOR 2  01 022396 2079    WAL-MART P        38427 PAID       30.86
06 MR 288500       01 082595 2079    WAL-MART P        25865 PAID       15.75
07 PT:KAISER,STEVE 01 020596 2079    WAL-MART P        36676 APRV       16.15
08 PT:RINDFLESCH,S 01 010896 2079    WAL-MART P        34196 PAID       18.74
09 RX JOYCE MONTIJ 01 102894 2079    WAL-MART P         6703 PAID       41.71
10 6702581         01 090894 2079    WAL-MART P         3933 PAID       48.23
--------------------------------------------------------------------------------

   Enter line No, or Voucher No......
   or Vendor ID and/or Invoice No....
            and    Status (O/C)..
   or PO Number......................
   Enter Vendor Name for Search......

F3=Exit   F12=Previous
   Line number and F8: Return to previous screen with selection
```

\# Shows invoice again

or Type 1 "F8"

```
                    A/P INVOICE INPUT/UPDATE SCREEN (DETAIL)          3/15/96
                                                                       8:26:25
APDU100C                                    Status....... PAID  Type... NOPO
Hospital    100 CGRMC                        Packing List. TRIAL
Voucher.     40052                           Vendor Information:
Alternate Payable Master... OP                TEST VENDOR #2
  nd ID. 20781       Warn: Duplicate Inv       KDKDK
Invoice. TRIAL                          1
P.O....
Dates: Invoice   Discount    Pay    Check
       3/14/96   3/14/96   3/14/96  3/14/96   Po.    /            Net
Terms:Vend.          /            Net         Prd   Co   Check   Date Prd Typ
  Ln Type Code   Amount   Tax  Account    %    9    100   T       1  31496  9 10
   1 DOLL          1000         834004200        9    100           31496
   2                                             9    100           31496
   3                                             9    100           31496
   4                                             9    100           31496
   5                                             9    100           31496
   6                                             9    100           31496
   7                                             9    100           31496
   8

Invoice total:       10.00     Display 1099/Delete Screen.   N or F4
                               Display Distribution Process.  N or F11

  Inquiry: F10=G/L Acct   F16=Vendor   F17=Invoice   F18=Check
```

* Vendor before being change, but after
  check was issued

```
APDU010C     A / P   I N V O I C E   D E T A I L   S C R E E N          3/15/96
                                                                        8:32:06
   Invoice... TRIAL                   01    Status....... PAID  Type... NOPO
   Voucher...   40052                       Packing List. TRIAL
   P.O......                          Vend ID 20781
   99...... N                         Vendor  TEST OF A/P CONTROLS NUMBER 2
   C.ate    Invoice  Discount   Pay   Check   KDKDK
   3/14/96  3/14/96  3/14/96  3/14/96  3/14/96
   Comments.. TEST OF A/P INTERNAL CONTROLS
   Terms...    /              Net
    Ln  Type     Amount    Tax  Account  Fund Sub  Co   Check      Type Prt Date App
     1 DOLL        10.00         834004200 OP   00   100  T         1 10 N  3/14/96 Y


          Enter a Line Number for more Detail......          1 Lines

                                    Total Invoice Amount...          10.00
      F8: Return with selection   F10: Previous Inv   Enter: Next Invoice
```

✗ Shows vendor was changed after check was issued

```
                    A C C O U T S   P A Y A B L E   S Y S T E M         3/15/96
                    V E N D O R   M A S T E R   F I L E   S E A R C H   8:31:50
APDI020C
===============================================================================
       Vendor Id     Vendor Name                    Federal ID   Tmp  Ref
-------------------------------------------------------------------------------
01   20781           TEST OF A/P CONTROLS NUMBER: 2                Y
02   2012            THACKRAY RECONSTRUCTIVE SYSTEM                Y
03   20615           THARRINGTON, ROY
04   4831            THE ARIZONA LABOR LETTER
05   4048            THE AZ PHARMACY ASSOC
06   4140            THE BUSINESS WORD INC.
07   4157            THE BUTTES
08   4550            THE CARING COMPANY                            Y
09   20164           THE EXECUTIVE GALLERY INC
10   4435            THE HEALTHCARE FORUM
-------------------------------------------------------------------------------

        Enter Line No, Vendor Name or *ADD....
             or Vendor ID..................


F3=Exit   F12=Previous
    Line Number and F8: Return to previous screen with selection
```

*Shows Vendor name was change – done after check was cut to "Test OF A/P Control #2"*

Dcase  11 (b)

000004296

I000000076

```
                    A C C O U T S   P A Y A B L E   S Y S T E M      3/15/96
APDI020C            V E N D O R   M A S T E R   F I L E   S E A R C H    8:29:25

========================================================================
      Vendor Id    Vendor Name                    Federal ID   Tmp  Ref
----------------------------------------------------------------------
01   20781        TEST OF A/P CONTROLS #2                        Y
02   2012         THACKRAY RECONSTRUCTIVE SYSTEM                 Y
03   20615        THARRINGTON, ROY
04   4831         THE ARIZONA LABOR LETTER
05   4048         THE AZ PHARMACY ASSOC
06   4140         THE BUSINESS WORD INC.
07   4157         THE BUTTES
08   4550         THE CARING COMPANY                             Y
09   20164        THE EXECUTIVE GALLERY INC
10   4435         THE HEALTHCARE FORUM
----------------------------------------------------------------------
      Enter Line No, Vendor Name or *ADD....
         or Vendor ID...................


F3=Exit   F12=Previous
     Line Number and F8: Return to previous screen with selection
```

*Shows Vendor before check issued and Vendor changed*

Page 11 (c)

000004297

I000000077

Feb 29, 1996

The following statement is a summary
of events which occured on Feb 29, 1996.
About 1:00pm Mary asked if I had
some time. She needed to talk to me.
We went to a room outside of accounting
since she wanted our conversation to be
private. - Mary then informed me that
Wendi had contacted her and asked for
her assistance, Mary was not really
clear on what she was asking, but
knew it involved a check from CSROHC
which Wendi had wrote to Joes Auto Glass.
The check was put in the system to
Kraft and actually referenced an invoice
for Kraft Foods. The check however was not
wrote to Kraft. Upon recieving a copy of
the check we found it was to Joes Auto
Glass, Wendis husbands business. Mary was
very upset, and said she just didn't
want to have any part of this and
had to tell someone about. She was not
really sure what needed to be done at
this point. After our conversation I
talked to Angelia and explained to her
the events which had taken place. It
was at this point we called the

bank to get a copy of the check and
called Kraft foods to inquire about
the invoice the check was to have
paid. The check and invoice had different
amounts and Kraft explained they had
faxed copies for this invoice a number
of times and never received a check. Upon
calling the bank they informed us that
Wendi had also called them asking
about the check. She asked them to
call her if the copy came in. Upon
collecting this information we contacted
Jill Bates & Jennifer Andrew about the
issue.

The evening of February 29th I
received a phone call from Wendi.
She was very upset and told me she
didn't know what to do. She said she
had stolen some money from DYC.
I told her to call Jill or Jennifer
immediately and set up a time for
the morning to meet with them. I told
her she needed to address the issue
with them as soon as possible. I then
called Jill and explained the conversation.
I told her it would be good if she

I000000079

might even contact Wendi that evening.
I believe this was done.

2) <u>Incident Report</u> : (<u>RE</u>: Wendi Andriano)                    2/29/96

At approximately 4:00 p.m I was contacted by Angela
Butzner + Jerry Brantz that they would like to speak
with me + Jennifer regarding a serious matter. They
(Angela) said she'd locate Jennifer + we'd meet. I called
Jennifer's office approximately 15 minutes later + Jennifer
asked me to go up to the Accounting Dept. When I
arrived in Accting, Jennifer was meeting w/ Angela
Butzner + Jerry Brantz in Jennifer Andrus's office.
They explained that they had evidence that Wendi
Andriano transferred money from the Org. into her
personal Acct.

3) <u>After a lengthy discussion the following things happened:</u>
1.) I paged Steve Weber + Bob Reade to have Payroll +
    Accting locks chg'd immediately. (Mark Severson CAP-EX)
                                              chg'd the locks

2.) Angela called Bank One + notified them that Wendi
    was on Personal Leave + had no authorization.

3.) Met w/ entire Dept + notified of Situation + asked them
    to document what they knew that had happened,
    any helpful hints + turn into me Fri 3/1 - Am.

< Jennifer's Car~No Start >

7.) Jennifer & I went to Mr. T's office arrived 5:30pm.
& explain ~~discuss~~ Situation.

2/29/96

I call ERP~ Kellie 8:00ish

Larry called Me ~

I called Jennifer

I call ERP

I called Wendi ~ 9:00 ish

( To meet w/ Wendi ~ 8:01 Am - 3/, _ my office )

Called Wendi Andriano at Home

○ Call Wendi ~ Get Supervisory Referral

○ Call MEAS w/ Game Plan < (Ask for Conners)

(Spoke w/ Kellie →
2/29/96
8:27 Am

New Supervisor
Record 2/29/96
Ref 2/29/96

W:100 —

Pain & Distress
Attorney Fee
Other
Diminished

**NOTES**



4) Workman's Comp : (Per Discussion w/ Bob + Jennifer)

o LARS Disk — Gonna have Finance Person
(Fund Deficit)                    Look at + Evaluate
                    "Ideas"

o March 14th —                         Jennifer
  o Involve John McVay
  + Finance Person
  Mtg w/ Hartford

o Negotiate Paying
  over a year                         Wendy
                                      too today
                                      Commodore

o Starting March 16
  Pay ad'l $40,000
  $ annual Payroll                    Felicia

  1/18 19%          *Anne
                    Call Howard
                    Turn off Reend
                    Remove

                    Vic - not alive
                    all people 20        Ask
                    Retire off            Randall
                    Sub off



000004306                                    I000000086

## DETAIL LISTING OF MISSING CHECKS

| BANK ACCT # | ENTITY | A/P SYSTEM PAYEE | DATE CLEARED | CHECK NUMBER | AMOUNT |
|---|---|---|---|---|---|
| 60138-0102-3 | CAMC | KRAFT | 12/18/95 | 18852 | 3,865.96 |
| 60138-0102-3 | CAMC | KRAFT | 1/30/96 | 16420 | 2,289.12 |
| | | | | | 6,155.08 |
| 60105-0101-7 | DVCC | KRAFT | 3/6/95 | 15052 | 2,185.95 |
| 60105-0101-7 | DVCC | KRAFT | 3/23/95 | 15105 | 2,314.56 |
| 60105-0101-7 | DVCC | KRAFT | 5/26/95 | 15472 | 1,672.13 |
| 60105-0101-7 | DVCC | KRAFT | 9/5/95 | 15774 | 1,519.95 |
| 60105-0101-7 | DVCC | KRAFT | 12/19/95 | 16340 | 2,251.29 |
| 60105-0101-7 | DVCC | KRAFT | 1/5/96 | 14013 | 2,237.09 |
| | | | | | 12,180.97 |
| | | | GRAND TOTAL | | 18,336.05 |

CHECKS MISSING - FOUND PAYABLE TO LEGIMATE VENDORS:

| | | | | | |
|---|---|---|---|---|---|
| 61556-0101-9 | CACC | BANK OF CASA GRANDE VALLEY | 12/11/95 | 9123 | 7,781.07 |
| 60105-0101-7 | DVCC | CGRMC | 11/30/95 | 16274 | 2,339.64 |

CHECKS MISSING - UNDER RESEARCH BY NORWEST BANK:

| | | | | | |
|---|---|---|---|---|---|
| 3000174362 | CGRMC | MOORE BUSINESS PRODUCTS | 5/26/95 | 5881 | 140.61 |
| 3000174362 | CGRMC | SONORA LABS SCIENCES | 5/26/95 | 5910 | 16,329.53 |
| 3000174362 | CGRMC | AIR LIQUIDE AMERICA CORP | 5/26/95 | 5832 | 1,283.32 |

298

I000000087

AR27

ACCOUNT STATUS
THRU 03/14/96   CASA GRANDE REG MED CNTR

03/14/96
16:34:34

PAGE:   1

A/R ACCOUNT: 33334947
DISTRICT: 4146
ACCT BAL:   84,924.32   TERMS: NET 30 DAYS

| REF/CK# | TRN | CUSTOMER | DATE | AGE | AMOUNT | NET DUE | CUMUL AMT |
|---|---|---|---|---|---|---|---|
| 6865 | IAT | 33334947 | 07/21/95 | 237 | 291.44 | 291.44 | 291.44 |
| 5956845 | CRE | 33334947 | 09/24/95 | 203 | 14.92- | 14.92- | 276.52 |
| 5994770 | CRE | 33334947 | 09/26/95 | 175 | 24.31- | 24.31- | 252.21 |
| 5901590 | CRE | 33334943 | 09/26/95 | 170 | 5.98- | 5.98- | 246.23 |
| 5802060 | CRE | 33334947 | 09/27/95 | 169 | 15.27- | 15.27- | 230.96 |
| 5803904 | CRE | 33334947 | 09/29/95 | 167 | 4.26- | 4.26- | 226.70 |
| 5991560 | CRE | 33334947 | 12/01/95 | 104 | 36.40- | 36.40- | 190.30 |
| 5606058 | CRE | 33334947 | 12/13/95 | 92 | 103.60- | 103.60- | 115.18 |
| 10293 | PMT | 33334947 | 01/25/06 | 77 | 28.49 | 75.12- | 115.18 |
| 3720543 | CRE | 33334947 | 01/03/96 | 71 | 6,412.79 | 6,412.79 | 6,527.97 |
| 5936139 | CRE | 33334947 | 01/04/96 | 70 | 59.34- | 59.34- | 6,461.83 |
| 3752730 | INV | 33334947 | 01/09/96 | 65 | 97.18- | 97.18 | 6,565.01 |
| 3752730 | CRE | 33334947 | 01/09/96 | 65 | 4,781.59 | 4,781.59 | 11,947.40 |
| 5943373 | INV | 33334947 | 01/10/96 | 64 | 383.82- | 383.82 | 10,960.58 |
| 5733336 | INV | 33334947 | 01/10/96 | 64 | 4,461.55 | 4,461.55 | 16,420.13 |
| 5945068 | INV | 33334947 | 01/11/96 | 63 | 97.54- | 97.54 | 15,322.59 |
| 3785B60 | CRE | 33334947 | 01/11/96 | 63 | 286.60 | 286.60 | 15,609.19 |
| 5946792 | INV | 33334947 | 01/12/96 | 62 | 20.03- | 20.03 | 15,589.16 |
| 3801149 | INV | 33334947 | 01/18/96 | 56 | 293.26 | 293.26 | 15,882.42 |
| 3824699 | INV | 33334947 | 01/23/96 | 51 | 226.20 | 226.20 | 16,078.62 |
| 3824700 | INV | 33334947 | 01/23/96 | 51 | 3,962.31 | 3,962.31 | 20,040.93 |
| 3824701 | INV | 33334947 | 01/23/96 | 51 | 4,819.66 | 4,819.66 | 20,332.43 |
| 3824729 | INV | 33334947 | 01/24/96 | 50 | 162.96- | 4,456.02 | 24,788.45 |
| 5983600 | CRE | 33334947 | 01/25/96 | 49 | 7.48- | 7.48 | 23,628.03 |
| 5963470 | CRE | 33334947 | 01/31/96 | 49 | 46.73- | 46.73 | 23,305.16 |
| 5963354 | CRE | 33334947 | 01/28/96 | 46 | 304.02- | 304.02 | 23,306.15 |
| 3860914 | INV | 33334947 | 01/30/96 | 44 | 4,819.66 | 4,819.66 | 28,636.01 |
| 3860916 | INV | 33334947 | 01/30/96 | 43 | 791.80- | 477.14- | 28,468.87 |
| 5970538 | CRE | 33334947 | 01/31/96 | 43 | 177.14- | 177.14- | 28,442.22 |
| 5970537 | CRE | 33334947 | 01/31/96 | 43 | 16.65- | 16.65- | 32,720.42 |
| 3862264 | INV | 33334947 | 01/31/96 | 43 | 4,278.20 | 4,278.20 | 32,800.43 |
| 3867443 | INV | 33334947 | 02/01/96 | 42 | 80.01 | 80.01 | 32,768.31 |
| 5972071 | CRE | 33334947 | 02/06/96 | 42 | 42.12- | 42.12- | 38,850.47 |
| 3896679 | INV | 33334947 | 02/06/96 | 39 | 4,092.16 | 4,092.16 | 38,835.97 |
| 5979693 | INV | 33334947 | 02/07/96 | 38 | 14.50- | 14.50- | 37,027.79 |
| 3900026 | INV | 33334947 | 02/07/96 | 38 | 191.82 | 191.82 | 41,209.25 |
| 5981018 | CRE | 33334947 | 02/08/96 | 36 | 4,283.13 | 4,283.13 | 45,344.18 |
| 3933737 | INV | 33334947 | 02/13/96 | 30 | 81.67- | 81.67- | 41,260.92 |
| 3999934 | INV | 33334947 | 02/14/96 | 29 | 4,194.93 | 4,194.93 | 49,446.83 |
| 5990024 | CRE | 33334947 | 02/15/96 | 28 | 4,102.65 | 4,102.65 | 49,429.83 |
| 3940811 | INV | 33334947 | 02/16/96 | 28 | 42.97 | 42.97 | 49,472.80 |

I000000088

-AR27

ACCOUNT STATUS
THRU 03/14/96

03/14/96
16:34:34

PAGE: 2

A/R ACCOUNT: 33334947  CASA GRANDE REG MED CNTR
DISTRICT: 4146
ACCT BAL: 84,924.32   TERMS: NET 30 DAYS

| REF/CK# | TRN | CUSTOMER | DATE | AGE | AMOUNT | NET DUE | CUMUL AMT |
|---|---|---|---|---|---|---|---|
| 3972276 | INV | 33334947 | 02/20/96 | 23 | 3,843.68 | 3,843.68 | 83,316.48 |
| 5997731 | CRE | 33334947 | 02/21/96 | 22 | 61.64- | 61.64- | 83,284.84 |
| 3978201 | INV | 33334947 | 02/21/96 | 22 | 4,861.67 | 4,861.67 | 88,136.51 |
| 5999577 | CRE | 33334947 | 02/22/96 | 21 | 114.24- | 114.24- | 88,022.27 |
| 4010689 | INV | 33334947 | 02/27/96 | 16 | 4,335.81 | 4,335.81 | 82,358.08 |
| 5907116 | CRE | 33334947 | 02/28/96 | 15 | 24.00- | 24.00- | 82,334.08 |
| 4016737 | INV | 33334947 | 02/28/96 | 15 | 3,945.56 | 3,945.56 | 86,279.64 |
| 4024516 | INV | 33334947 | 02/29/96 | 14 | 175.02 | 175.02 | 86,454.66 |
| 5910448 | CRE | 33334947 | 03/01/96 | 13 | 140.72- | 140.72- | 86,305.94 |
| 4046609 | INV | 33334947 | 03/05/96 | 9 | 5,074.06 | 5,074.06 | 71,380.00 |
| 5916199 | CRE | 33334947 | 03/06/96 | 8 | 39.88- | 39.88- | 71,340.12 |
| 4055197 | INV | 33334947 | 03/06/96 | 8 | 4,672.16 | 4,672.16 | 76,012.28 |
| 5917925 | CRE | 33334947 | 03/07/96 | 7 | 45.37- | 45.37- | 75,966.91 |
| 4063072 | INV | 33334947 | 03/07/96 | 7 | 172.72 | 172.72 | 76,139.63 |
| 4086884 | INV | 33334947 | 03/12/96 | 2 | 4,093.17 | 4,093.17 | 80,232.80 |
| 5926466 | CRE | 33334947 | 03/13/96 | 1 | 22.58- | 22.58- | 80,210.22 |
| 4092366 | INV | 33334947 | 03/13/96 | 1 | 4,464.70 | 4,464.70 | 84,674.92 |
| 4101256 | INV | 33334947 | 03/14/96 | 0 | 249.40 | 249.40 | 84,924.32 |

```
AR27                              ACCOUNT STATUS                                    03/14/96
                                  THRU 03/14/96                                     16:35:22

A/R ACCOUNT: 73346025  DESERT VALLEY CARE CENTER                          PAGE:   1
    DISTRICT: 4148     TERMS: NET 30 DAYS
    ACCT BAL:   18,536.99
```

| REF/CK/# | TRN | CUSTOMER | DATE | AGE | AMOUNT | NET DUE | CUMUL AMT |
|---|---|---|---|---|---|---|---|
| 5903020 | CRE | 73346025 | 09/13/95 | 183 | 73.25- | 73.25- | 73.25- |
| 5410122 | INV | 73346025 | 11/03/95 | 132 | 2,251.29 | 2,251.29 | 2,178.04 |
| 5888184 | CRE | 73346025 | 11/29/95 | 106 | 92.97- | 92.97- | 2,085.07 |
| 5004458 | CRE | 73346025 | 12/11/95 | 94 | 13.46- | 13.46- | 2,071.61 |
| 5903202 | CRE | 73346025 | 12/13/95 | 92 | 18.79- | 18.79- | 2,052.82 |
| G910055 | CRE | 73346025 | 12/15/95 | 87 | 45.96- | 45.96- | 2,006.86 |
| 5923302 | CRE | 73346025 | 12/26/95 | 79 | 36.42- | 36.42- | 1,970.44 |
| 5931405 | CRE | 73346025 | 01/02/96 | 72 | 57.36- | 57.36- | 1,913.08 |
| 5939990 | CRE | 73346025 | 01/05/96 | 69 | 56.02- | 56.02- | 1,857.06 |
| 5939941 | CRE | 73346025 | 01/08/96 | 66 | 18.61- | 18.61- | 1,838.45 |
| 5939924 | CRE | 73346025 | 01/10/96 | 64 | 5.75- | 5.75- | 1,832.70 |
| 5952081 | CRE | 73346025 | 01/17/96 | 57 | 51.62- | 51.62- | 1,780.88 |
| 5795500 | INV | 73346025 | 01/17/96 | 57 | 357.09 | 357.09 | 2,137.97 |
| 5044926 | INV | 73346025 | 01/26/96 | 48 | 58.57 | 58.57 | 2,196.54 |
| 5875184 | INV | 73346025 | 01/29/96 | 42 | 81.00 | 81.00 | 2,277.54 |
| 3870771 | INV | 73346025 | 02/01/96 | 41 | 33.44 | 33.44 | 2,310.98 |
| 3879772 | INV | 73346025 | 02/02/96 | 41 | 1,705.86 | 1,705.86 | 4,016.84 |
| 3879773 | INV | 73346025 | 02/02/96 | 41 | 16.60 | 16.60 | 4,033.44 |
| 3896476 | INV | 73346025 | 02/05/96 | 37 | 4.10 | 4.10 | 4,037.54 |
| 3996478 | INV | 73346025 | 02/05/96 | 37 | 1,136.46 | 1,136.46 | 5,174.00 |
| 3917101 | INV | 73346025 | 02/09/96 | 34 | 1,329.79 | 1,329.79 | 6,503.79 |
| 3983738 | INV | 73346025 | 02/13/96 | 30 | 1,048.14 | 1,048.14 | 7,551.93 |
| 3956705 | INV | 73346025 | 02/16/96 | 27 | 1,059.39 | 1,059.39 | 8,611.32 |
| 3972277 | INV | 73346025 | 02/19/96 | 23 | 1,552.98 | 1,552.98 | 10,164.43 |
| 3978755 | INV | 73346025 | 02/20/96 | 23 | 42.23 | 42.23 | 10,206.53 |
| 3993000 | INV | 73346025 | 02/20/96 | 23 | 377.90 | 377.90 | 10,584.43 |
| 3993901 | INV | 73346025 | 02/23/96 | 20 | 1,272.68 | 1,272.68 | 11,857.11 |
| 5903865 | CRE | 73346025 | 02/23/96 | 20 | 48.86 | 48.86 | 11,905.97 |
| 4010690 | CRE | 73346025 | 02/26/96 | 17 | 21.00 | 21.00 | 11,884.97 |
| 5907364 | CRE | 73346025 | 02/27/96 | 16 | 771.15 | 771.15 | 12,656.12 |
| 4031823 | CRE | 73346025 | 02/28/96 | 15 | 12.23- | 12.23- | 12,643.89 |
| 4031829 | INV | 73346025 | 03/01/96 | 13 | 1,598.56 | 1,598.56 | 14,242.45 |
| 4034811 | INV | 73346025 | 03/01/96 | 13 | 237.22 | 237.22 | 14,479.67 |
| 4048607 | INV | 73346025 | 03/02/96 | 12 | 64.86 | 64.86 | 14,544.53 |
| 4048608 | INV | 73346025 | 03/05/96 | 9 | 1,215.41 | 1,215.41 | 15,759.94 |
| 4068990 | INV | 73346025 | 03/05/96 | 9 | 120.83 | 120.83 | 15,880.77 |
| 4073003 | INV | 73346025 | 03/06/96 | 8 | 1,365.30 | 1,365.30 | 17,246.07 |
| 4073003 | INV | 73346025 | 03/06/96 | 6 | 103.54 | 103.54 | 17,349.61 |
| 5822073 | CRE | 73346025 | 03/14/96 | 2 | 3.00- | 3.00- | 17,346.61 |
| 4068883 | INV | 73346025 | 03/12/96 | 2 | 1,190.38 | 1,190.38 | 18,536.99 |

```
CUSTOMER 73346025 DESERT VALLEY CARE CENTER TOTAL:

ACCOUNT 73346025 DESERT VALLEY CARE CENTER TOTAL:    18,536.99    18,536.99
```

000004310

I000000090

AR2T

```
ACCOUNT STATUS                                    09/14/96
THRU 09/14/96                                     16:05:10

A/R ACCOUNT: 234G2054  CENTRAL AZ MEDICAL CENTER
DISTRICT: 4146         TERMS: ** Multiple **      PAGE:  1
ACCT BAL:  37,680.73
```

*Handwritten annotations:*
Attn: Gary Brantz
520-426-6435
4 pages
from: Bob
Alliant Foodservice
602-352-3556

| REF/CK# | CUSTOMER | TRN | DATE | AGE | AMOUNT | NET DUE | CUMUL. AMT |
|---|---|---|---|---|---|---|---|
| 3244890 | 3345931 | INV | 10/04/95 | 162 | 3,865.96 | 3,865.96 | 3,865.96 |
| 5925508 | 3345931 | CRE | 10/13/95 | 153 | 27.56- | 27.56- | 3,838.40 |
| 5933799 | 3345931 | CRE | 10/19/95 | 147 | 44.06- | 44.06- | 3,794.34 |
| 5942830 | 3345931 | CRE | 10/26/95 | 140 | 2.35- | 2.35- | 3,791.99 |
| 5942831 | 3345931 | CRE | 10/26/95 | 140 | 7.54- | 7.54- | 3,784.45 |
| 5973239 | 3345931 | CRE | 11/17/95 | 118 | 127.65- | 127.65- | 3,656.80 |
| 5999761 | 3345931 | CRE | 12/07/95 | 98 | 73.69- | 73.69- | 3,583.11 |
| 5919084 | 3345931 | CRE | 12/21/95 | 84 | 21.50- | 21.50- | 3,561.61 |
| 5934628 | 3345931 | CRE | 01/04/96 | 70 | 474.05- | 474.05- | 3,087.55 |
| 5944751 | 3345931 | CRE | 01/11/96 | 63 | 7.78- | 7.78- | 3,079.77 |
| 5953997 | 3345931 | CRE | 01/11/96 | 56 | 26.10- | 26.10- | 3,053.67 |
| 1B8 199 | 3345931 | IAT | 01/15/96 | 49 | 382.95- | 382.95- | 2,670.72 |
| 5901984 | 3345931 | INV | 01/25/96 | 49 | 10.90- | 10.90- | 2,669.82 |
| 5901990 | 3345931 | CRE | 02/07/96 | 36 | 4,034.02 | 4,034.02 | 6,693.84 |
| 5902256 | 3345931 | CRE | 02/09/96 | 34 | 6.14- | 6.14- | 6,690.70 |
| 5902269 | 3345931 | CRE | 02/09/96 | 34 | 4.46- | 4.46- | 6,683.26 |
| 5930300 | 3345931 | INV | 02/14/96 | 29 | 3,297.88 | 3,297.88 | 9,980.84 |
| 5997951 | 3345931 | CRE | 02/21/96 | 22 | 2.12- | 2.12- | 9,978.72 |
| 5976873 | 3345931 | CRE | 02/21/96 | 22 | 50.20 | 50.20 | 10,028.92 |
| 5976874 | 3345931 | INV | 02/21/96 | 22 | 124.16 | 124.16 | 10,153.08 |
| 5976476 | 3345931 | CRE | 02/21/96 | 21 | 3,200.53 | 3,200.53 | 13,353.61 |
| 5908668 | 3345931 | INV | 02/22/96 | 21 | 73.19- | 73.19- | 13,280.42 |
| 5996327 | 3345931 | CRE | 02/22/96 | 21 | 75.24 | 75.24 | 13,365.46 |
| 4004454 | 3345931 | CRE | 02/26/96 | 20 | 164.12 | 164.12 | 13,130.78 |
| 4016832 | 3345931 | CRE | 02/28/96 | 17 | 1,189.09 | 1,189.09 | 13,573.81 |
| 5913860 | 3345931 | INV | 02/28/96 | 15 | 395.05 | 395.05 | 18,073.86 |
| 4055992 | 3345931 | CRE | 03/05/96 | 9 | 60.41- | 60.41- | 18,013.45 |
| 4092369 | 3345931 | INV | 03/06/96 | 8 | 3,357.89 | 3,357.89 | 21,371.34 |
|  |  | INV | 03/13/96 | 3 | 3,229.75 | 3,229.75 | 24,601.09 |
| CUSTOMER | 3345931 | CENTRAL AZ MEDICAL CENTER TOTAL: |  |  |  |  | 24,601.09 |
| 3866169 | 3462041 | INV | 01/31/96 | 43 | 3,859.42 | 3,859.42 | 3,859.42 |
| 3901996 | 3462041 | INV | 02/07/96 | 36 | 1,807.06 | 1,807.06 | 5,666.48 |
| 5982615 | 3462041 | INV | 02/14/96 | 29 | 4.92- | 4.92- | 5,661.56 |
| 3933305 | 3462041 | INV | 02/21/96 | 29 | 1,693.41 | 1,693.41 | 7,354.97 |
| 3978875 | 3462041 | INV | 02/22/96 | 22 | 1,660.91 | 1,660.91 | 9,015.88 |
| 5999522 | 3462041 | INV | 02/22/96 | 21 | 29.27 | 29.27 | 8,986.61 |
| 5986669 | 3462041 | INV | 02/28/96 | 21 | 29.27 | 29.27 | 9,015.88 |
| 4016831 | 3462041 | INV | 02/29/96 | 15 | 1,525.15 | 1,525.15 | 10,541.09 |
| 5908731 | 3462041 | CRE | 03/05/96 | 14 | 18.46- | 18.46- | 10,522.57 |
| 4059991 | 3462041 | INV | 03/06/96 | 8 | 1,144.42 | 1,144.42 | 11,666.99 |
| 4092352 | 3462041 | INV | 03/13/96 | 1 | 1,412.65 | 1,412.65 | 13,079.64 |
| CUSTOMER | 3462041 | CENTRAL ARIZONA CARE CTN TOTAL: |  |  |  |  | 13,079.64 |
| ACCOUNT | 234G2054 | CENTRAL AZ MEDICAL CENTER TOTAL: |  |  |  |  | 37,680.73 |

DETAIL LISTING OF MISSING CHECKS

| BANK ACCT # | ENTITY | A/P SYSTEM PAYEE | DATE CLEARED | CHECK NUMBER | AMOUNT |
|---|---|---|---|---|---|
| 60138-0102-3 | CAMC | KRAFT | 12/18/95 | 18852 | 3,865.96 |
| 60138-0102-3 | CAMC | KRAFT | 1/30/96 | 16420 | 2,289.12 |
| | | | | | 6,155.08 |
| 60105-0101-7 | DVCC | KRAFT | 3/6/95 | 15052 | 2,185.95 |
| 60105-0101-7 | DVCC | KRAFT | 3/23/95 | 15105 | 2,314.56 |
| 60105-0101-7 | DVCC | KRAFT | 5/26/95 | 15472 | 1,672.13 |
| 60105-0101-7 | DVCC | KRAFT | 9/5/96 | 15774 | 1,519.95 |
| 60105-0101-7 | DVCC | KRAFT | 12/19/95 | 16340 | 2,251.29 |
| 60105-0101-7 | DVCC | KRAFT | 1/5/96 | 14013 | 2,237.09 |
| | | | | | 12,180.97 |
| | | | | GRAND TOTAL | 18,336.05 |

CHECKS MISSING - FOUND PAYABLE TO LEGIMA'E VENDORS:

| 61556-0101-9 | CACC | BANK OF CASA GRANDE VALLEY | 12/11/95 | 9123 | 7,781.07 |
| 60105-0101-7 | DVCC | CGRMC | 11/30/95 | 16274 | 2,339.64 |

CHECKS MISSING - UNDER RESEARCH BY NORWEST BANK:

| 3000174362 | CGRMC | MOORE BUSINESS PRODUCTS | 5/26/95 | 5881 | 140.61 |
| 3000174362 | CGRMC | SONORA LABS SCIENCES | 5/26/95 | 5910 | 16,329.53 |
| 3000174362 | CGRMC | AIR LIQUIDE AMERICA CORP | 5/25/95 | 5832 | 1,283.32 |

29B

```
ACCOUNTING        Casa Grande Regional Medical Ctr          Friday
ACCT6461                                                    3/15/96
JBRANTS         * Use ATTN key to work with Printer and Job Ques *   7:58:24
=================================================================
                                    13. ******** MISC ********
    ******** MENUS ********        14. Set GL Library List
 2. General Ledger System          15. Set AP Library List - CGRMG
 3. Accounts Payable System        16. Set AP Library List - CAMC
 4. View Roboted Reports           17. Set FA Library List
 5. Fixed Assets System            18. Set PR Library List
 6. Payroll System                 19. Set EFI Library List
 7. EFI System                     20. Display Your Library List
 8. MedSeries4 Report Writer Menu  21. Query
 9. GL - Work with Object Locks    22. Start Print Writer - PA - ACCT
10. AP - Work with Object Locks    23. Start Print Writer - PD - RAHP
11. FA - Work with Object Locks    24. Sign Off
12. PP - Work with Object Locks
                                      ---------------------------------
                                          Invocation level 01
-----------------------------------------------------------------
Enter Menu Option

F3=Signoff.  F5=Reclaim Resources.F12=Previous menu. F15=Initial menu.

(c) Copyright GTE Health systems, Inc.  1982 - 1999.
```

16. 15 "Enter"

6. 3 "Enter"

```
                                                                 Friday
APMASTER            Casa Grande Regional Medical Ctr            3/15/96
ACCT6461              A C C O U N T S   P A Y A B L E           7:59:30
JBRANTS                        MASTER MENU
================================================================
=================================================================
  _Invoice Functions Menu_         13.  Reports Menu - Day End
 2.                                 14.  Reports Menu - On Demand
 3.  Inquiry/Maintenance Menu       15.
 4.                                 16.  Operations Menu
 5.  Check Functions Menu           17.
 6.                                 18.  Managers Menu
 7.  Vendor Master Inquiry/Maint    19.  Payables Report
 8.  Vendor Delete/Combine          20.  Purge Menu
 9.                                 21.  Menu
10.  1099 Processing Menu           22.
11.  AR Master                      23.
12.                                 24.  Sign Off
                                   -----------------------------------
                                         Invocation level 02
---------------------------------------------------------------
Enter Menu Option

F3=Signoff.  F5=Reclaim Resources.F12=Previous menu. F15=Initial menu.
```

3.   1 "Enter"

```
APMENU4                Casa Grande Regional Medical Ctr         Friday
ACCT6461               A C C O U N T S   P A Y A B L E          3/15/96
JBRANTS                      INVOICE FUNCTIONS                  7:59:39
========================================================================

   1. Invoice Entry/Update      13. Match Prepaids/Receipts
   2.                           14.
   3. Linematch Invoices        15. Hold/Release Invoices by Vendr
   4.                           16.
   5. Recurring Invoices        17. tst pt refunds--select
   6.                           18. approve pt rfnds
   7. Invoice Approval          19.
   8.                           20. INQUIRY/UPDATE MENU
   9. Invoice Maintenance Log   21. CHECK FUNCTIONS MENU
  10.                           22. A/P MASTER MENU
  11. Change Invoice User Name  23.
  12. Create Unpaid Sales Tax Invoic  24. Sign Off
------------------------------------------------------------------------
                                             Invocation level 03
------------------------------------------------------------------------
Enter Menu Option

F3=Signoff.  F5=Reclaim Resources.F12=Previous menu. F15=Initial menu.
```

4. 1 "Enter"

```
                    A C C O U N T S   P A Y A B L E            3/15/96
          H O S P I T A L   S E L E C T I O N   S C R E E N     8:02:25
APDI091C
===========================================================================

         Ln        User ID      Hospital ID   Hospital Name
------------------------------------------------------------------------
         01        JBRANTS         100          CGRMC
         02        JBRANTS         200          CAMC
         03        JBRANTS         250          CACC
         04        JBRANTS         300          DVCC
         05        JBRANTS         400          CGRRC
         06        JBRANTS         500          MAB
         07        JBRANTS         600          CFW
         08        JBRANTS         700          RAHP
         09        JBRANTS         710          REBA
         10        JBRANTS         720          VAN
------------------------------------------------------------------------

              Enter Line Number....... 1


F3=Exit
```

5. 1 "Enter"

```
                    A/P INVOICE INPUT/UPDATE SCREEN (HEADER)        3/15/96
                                                                    8:02:34

APDU100I
Hospital    100 CGRMC
Voucher.....                            Status....... NEW   Type...
Alternate Payable Master...             P.O.....
   ndor ID...
Invoice ....                               Expense
Total Inv $.                            Period Year
Dates: Invoice Discount  Pay   Check
(MMDDYY)

Enter Batch number:

Vendor   Name........
         Check Name..
         Addr1........
         Addr2........
         City/St/Zip.
         Fed ID/SSN..              Phone:



    Inquiry : F19=Logs  F16=Vendor  ▓▓▓▓▓▓▓  F18=Checks
```

6. F17 - Take you to Invoice inquiry screen

```
APDI010C                    A C C O U N T S   P A Y A B L E        3/15/
Hosp   100 CGRMC              I N V O I C E . S E A R C H           8:29:10
=================================================================================
Ln  Inv Num          SN Chk Dt Vend ID Vend Name  PO Num Voucher Stat  Amount
---------------------------------------------------------------------------------
   TRIAL             01 031496 20781    TEST OF A/        40052 PAID     10.00
02 REIMB FOR DINNE   01 031396 20782    APODACA, B        40054 PAID     38.82
03 KEFLEX PRESCIP.   01 010896 2079     WAL-MART P        34076 PAID     11.54
04 LUCAS NELSON-PR   01 090294 2079     WAL-MART P         3103 PAID     34.43
05 MEDICINE FOR 2    01 022396 2079     WAL-MART P        38427 PAID     30.86
06 MR 288500         01 082595 2079     WAL-MART P        25865 PAID     15.75
07 PT:KAISER,STEVE   01 020596 2079     WAL-MART P        36676 APRV     16.15
08 PT:RINDFLESCH,S   01 010896 2079     WAL-MART P        34196 PAID     18.74
09 RX JOYCE MONTIJ   01 102894 2079     WAL-MART P         6703 PAID     41.71
10 6702581           01 090894 2079     WAL-MART P         3933 PAID     48.23
---------------------------------------------------------------------------------
   Enter line No, or Voucher No......
   or Vendor ID and/or Invoice No....
            and      Status (O/C)..
   or PO Number......................
   Enter Vendor Name for Search....

F3=Exit   F12=Previous
   Line number and F8: Return to previous screen with selection
```

%. -Tab down to Vender Name Search
   - Type in Vendor/ or part of vendor name
   - In this case
       Type : Test "Enter"

000004318                                    I000000098

```
                    A C C O U T S   P A Y A B L E   S Y S T E M        3/15/96
                    V E N D O R   M A S T E R   F I L E   S E A R C H    8:29:25
APDI020C
===============================================================================
                                                   Federal ID   Tmp  Ref
       Vendor Id     Vendor Name
                                                                  Y
-------------------------------------------------------------------------------
  01   20781         TEST OF A/P CONTROLS #2
  02   2012          THACKRAY RECONSTRUCTIVE SYSTEM               Y
  03   20615         THARRINGTON, ROY
  04   4831          THE ARIZONA LABOR LETTER
  05   4048          THE AZ PHARMACY ASSOC
  06   4140          THE BUSINESS WORD INC.
  07   4157          THE BUTTES
  08   4550          THE CARING COMPANY                           Y
  09   20164         THE EXECUTIVE GALLERY INC
  10   4435          THE HEALTHCARE FORUM
-------------------------------------------------------------------------------
         Enter Line No, Vendor Name or *ADD.
             or Vendor ID.....................


F3=Exit   F12=Previous
    Line Number and F8: Return to previous screen with selection
```

8₀ Type ⁸₀¹ "Enter"

```
                A C C O U N T S   P A Y A B L E   S Y S T E M          3/15/96
                     VENDOR MASTER FILE MAINTENANCE                    8:31:07
APDU020A
=================================================================================
Category                    Vendor Name                     Temp Vnd Flag Y
Vendor ID 20781             Check Name                       Refund Vendor
```



```
               ACCOUNTING ADDRESS               MATERIALS ADDRESS
               KDKDK                             KDKDK
Address 1
Address 2
City/State
Zipcode
Contact
Phone No.                        Service#
Federal ID or SSNO               800 No.

Ship Term                                  Creation Date        3/14/96
Pay Term:  Payment  Day      Type          Maintenance Date     3/15/96
Disc Term: Discount Day      Type          User ID              JBRANTS
           Discount %

Display Vendor Statistical detail N        Rec Sts.. A
```

This screen would show name of vendor
before check run which would be printed
on check →
   * "Enter" to get out of screen

```
        .  .                 A C C O U N T S   P A Y A B L E   S Y S T E M          3/15/96
          .  .                   VENDOR MASTER FILE MAINTENANCE                      8:31:46
APDU020A
=================================================================================
Category
Vendor ID 20781          Vendor Name                                   Temp Vnd Flag
                         Check Name                                    Refund Vendor
```



```
              ACCOUNTING ADDRESS                MATERIALS ADDRESS
Address 1     KDKDK                             KDKDK
Address 2
City/State
Zipcode
Contact
Phone No.                       Service#
Federal ID or SSNO              800 No.

Ship Term
Pay Term:  Payment  Day    Type        Creation Date      3/14/96
Disc Term: Discount Day    Type        Maintenance Date   3/15/96
           Discount %                  User ID            JBRANTS

Display Vendor Statistical detail N     Rec Sts.. A
```

9. After check run you would return to
this screen by repeating steps 7&8.
Then would change name back to
original vendor in which you wanted
system to show

I000000101

```
APDI010C                    A C C O U N T S   P A Y A B L E          3/15/96
                            I N V O I C E   S E A R C H              8:25:38
Hosp   100 CGRMC
=============================================================================
                    SN Chk Dt Vend ID Vend Name   PO Num Voucher Stat   Amount
Ln Inv Num
                    01 03149  20781  APODACA,  B            4052 PAID    10.10
                    01 031396 20782  APODACA,  B            40054 PAID   38.82
02 REIMB FOR DINNE  01 031396 2079   WAL-MART P             34076 PAID   11.54
03 KEFLEX PRESCIP.  01 010896 2079   WAL-MART P              3103 PAID   34.43
04 LUCAS NELSON-PR  01 090294 2079   WAL-MART P             38427 PAID   30.86
05 MEDICINE FOR 2   01 022396 2079   WAL-MART P             25865 PAID   15.75
06 MR 288500        01 082595 2079   WAL-MART P             36676 APRV   16.15
07 PT:KAISER,STEVE  01 020596 2079   WAL-MART P             34196 PAID   18.74
08 PT:RINDFLESCH,S  01 010896 2079   WAL-MART P              6703 PAID   41.71
09 RX JOYCE MONTIJ  01 102894 2079   WAL-MART P              3933 PAID   48.23
10 6702581          01 090894 2079   WAL-MART P

    --------------------------------------------------------------------
        Enter line No, or Voucher No......
        or Vendor ID and/or Invoice No....
              and      Status (O/C)..
      or PO Number.......................
      Enter Vendor Name for Search......


F3=Exit    F12=Previous
    Line number and F8: Return to previous screen with selection
```

# Shows invoice again

or Type 1 "F8"

000004322

I000000102

```
                    A/P INVOICE INPUT/UPDATE SCREEN (DETAIL)        3/15/96
                                                                    8:26:25
APDU100C
Hospital    100 CGRMC                    Status....... PAID   Type... NOPO
Voucher.    40052                        Packing List. TRIAL
Alternate Payable Master... OP           Vendor Information:
( nd ID. 20781        Warn: Duplicate Inv   ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
invoice. TRIAL                        1     KDKDK
P.O....
Dates: Invoice   Discount      Pay     Check
        3/14/96   3/14/96   3/14/96   3/14/96                        Net
                                               Po.   /              Date Prd Typ
Terms:Vend.              /          Net        Prd  Co   Check      31496  9 10
   Ln Type Code  Amount  Tax    Account   %     9   100  ▓▓▓▓
    1 DOLL          1000         834004200      9   100             31496
    2                                           9   100             31496
    3                                           9   100             31496
    4                                           9   100             31496
    5                                           9   100             31496
    6                                           9   100             31496
    7                                           9   100             31496
    8

Invoice total:         10.00     Display 1099/Delete Screen.  N or F4
                                 Display Distribution Process. N or F11

 Inquiry: F10=G/L Acct   F16=Vendor   F17=Invoice   F18=Check
```

\* Vendor before being change, but after
check was issued

I000000103

```
APDU010C     A / P   I N V O I C E   D E T A I L   S C R E E N          3/15/96
                                                                        8:32:06
Invoice... TRIAL                   01      Status....... PAID  Type... NOPO
Voucher...   40052                        Packing List. TRIAL
P.O.......                          Vend ID 20781
  99...... N                        Vendor  TEST OF A/P CONTROLS NUMBER
Create   Invoice   Discount   Pay   Check   KDKDK
3/14/96  3/14/96   3/14/96  3/14/96 3/14/96
Comments.. TEST OF A/P INTERNAL CONTROLS
Terms...     /            Net                               Check        Type Prt Date App
  Ln  Type    Amount    Tax  Account  Fund  Sub   Co              Type Prt Date App
   1 DOLL       10.00         834004200 OP   00   100            10 N  3/14/96
```

                Enter a Line Number for more Detail......          1 Lines

                                        Total Invoice Amount...        10.00
        F8: Return with selection    F10: Previous Inv   Enter: Next Invoice

*Shows vendor was changed after check was
   issued*

```
                    A C C O U T S   P A Y A B L E   S Y S T E M          3/15/96
                    V E N D O R   M A S T E R   F I L E   S E A R C H     8:31:50
APDI020C
=================================================================================
                                                      Federal ID     Tmp  Ref
L-     Vendor Id    Vendor Name      -----------------------------------------
~~01~~  ~~10216~~   ~~TEST OF A/P CONTROL NUMBER~~                       Y
02     2012         THACKRAY RECONSTRUCTIVE SYSTEM                       Y
03     20615        THARRINGTON, ROY
04     4831         THE ARIZONA LABOR LETTER
05     4048         THE AZ PHARMACY ASSOC
06     4140         THE BUSINESS WORD INC.
07     4157         THE BUTTES
08     4550         THE CARING COMPANY                                   Y
09     20164        THE EXECUTIVE GALLERY INC
10     4435         THE HEALTHCARE FORUM
------------------------------------------------------------------------------
       Enter Line No, Vendor Name or *ADD....
          or Vendor ID...................


F3=Exit   F12=Previous
    Line Number and F8: Return to previous screen with selection
```

*Shows Vendor name was change — done after check was cut to "Test OF A/P Control #.*

```
             A C C O U T S   P A Y A B L E   S Y S T E M        3/15/96
APDI020C     V E N D O R   M A S T E R   F I L E   S E A R C H   8:29:25

=====================================================================================
     Vendor Id      Vendor Name                    Federal ID      Tmp  Ref
-------------------------------------------------------------------------------------
01   20491          WEST DEPT. ACCONTROLS                            Y
02   2012           THACKRAY RECONSTRUCTIVE SYSTEM                   Y
03   20615          THARRINGTON, ROY
04   4831           THE ARIZONA LABOR LETTER
05   4048           THE AZ PHARMACY ASSOC
06   4140           THE BUSINESS WORD INC.
07   4157           THE BUTTES
08   4550           THE CARING COMPANY                               Y
09   20164          THE EXECUTIVE GALLERY INC
10   4435           THE HEALTHCARE FORUM
-------------------------------------------------------------------------------------

        Enter Line No, Vendor Name or *ADD....
            or Vendor ID....................


F3=Exit   F12=Previous
     Line Number and F8: Return to previous screen with selection
```

Shows Vendor befor check issued and
Vendor changed

I000000106

000004326

MAR-14-1996  15:34

P.02



Angela



I000000108

P. 02

MAR-14-1996  15:16



Angela

I000000109

000004329

Desert Valley Care Center

ID 14013 → Coded to Kraft
          → Check made to Joe Auto Glass
          → Amount   2237⁰⁹
          → Cleared Bank Acct 60105-0101-7   1/9/96

16340     → Coded to Kraft
          → Joes Auto Glass
          → $2261.29
          → Cleared Acct 60105-0101-7   12/19/96
     * Both one same invoice

Central Arizona Care Center
          → Coded to Kraft
          → Joes Auto Glass
          → $3865⁹⁶
          → Cleared Acct 60138-0102-3   12/18/96

T000000111



Desert Valley Care Center
General Account
950 N. Arizola Road
Casa Grande, Arizona 85222

14013

1-05-95          $2237.09

Jos. Windshield Repair, Inc.
2005 N. Otter Road
Casa Grande, AZ 85222

THE BANK OF CASA GRANDE VALLEY
CASA GRANDE, ARIZONA

Desert Valley Care Center

⑆014013⑆ ⑆122105252⑆ ⑆601050101 7⑆ ⑈0000223709⑈

THE BANK OF CASA GRANDE VALLEY
Casa Grande, Arizona

034996

KC MANAGEMENT INC.
dba CINDY'S WORK FORCE

I000000112



14013

**Desert Valley Care Center**
General Account
960 N. Arizola Road
Casa Grande, Arizona 85222

1-05-95                    $2237.09

Joe's Windshield Repair Inc
20052 N Otter Road
Casa Grande, AZ  85222

Desert Valley Care Center

THE BANK OF CASA GRANDE VALLEY
CASA GRANDE, ARIZONA

⑆014013⑆ ⑆122105252⑆ ⑆6010501017⑆          ⑈0000223709⑈

KC MANAGEMENT INC.
dba CINDY'S WORK FORCE

THE BANK OF CASA GRANDE VALLEY
Casa Grande, Arizona

034996

I000000113

FIRST INTERSTATE BANK NA
ARIZONA 01/05/96 009
1221-0001-1
4171625

DVCC ᴊLawaᴺ

#16430        $2,251.29        12/19/95
16340          3237
        #40361600


Angela -

An copy request - ASAP


                                    Thanx !

Ck# 18852      $3,865.96

Paid to: Kraft

Cleared   12/18/95

Acct # 60138-0102-3

SeQ # 30140970

Need copy ASAP!

        Thanx!

AR27

```
                                          ACCOUNT STATUS          03/14/96
                                          THRU 03/14/96           16:34:34

A/R ACCOUNT: 33334947  CASA GRANDE REG MED CNTR
DISTRICT: 4146  TERMS: NET 90 DAYS                                PAGE:  1
ACCT BAL:  84,924.32
```

| REF/CK# | TRN | CUSTOMER | DATE | AGE | AMOUNT | NET DUE | CUMUL AMT |
|---|---|---|---|---|---|---|---|
| 6965 | IAT | 33334947 | 07/21/95 | 237 | 291.44 | 291.44 | 291.44 |
| 09BEB045 | CRE | 33334947 | 08/22/95 | 203 | 14.92- | 14.92- | 276.52 |
| 5947778 | CRE | 33334947 | 09/21/96 | 175 | 24.31- | 24.31- | 252.21 |
| 5901599 | CRE | 33334947 | 09/26/95 | 170 | 5.95- | 5.95- | 246.26 |
| 5900066 | CRE | 33334947 | 09/27/95 | 169 | 15.27- | 15.27- | 230.99 |
| 5905924 | CRE | 33334947 | 09/28/95 | 167 | 4.26- | 4.26- | 226.70 |
| 5905958 | CRE | 33334947 | 10/01/95 | 164 | 36.40- | 36.40- | 190.30 |
| 10293 | PMT | 33334947 | 12/18/95 | 104 | 103.00- | 103.00- | 115.18 |
| 10293 | PMT | 33334947 | 01/25/96 | 92 | 28.40- | 28.40- | 115.18 |
| 0720643 | INV | 33334947 | 01/03/96 | 92 | 6,412.79 | 6,412.79 | 6,527.97 |
| 5936139 | CRE | 33334947 | 01/04/96 | 71 | 65.84- | 65.84- | 6,462.63 |
| 3752786 | CRE | 33334947 | 01/09/96 | 70 | 92.18- | 92.18- | 6,366.01 |
| 3752738 | INV | 33334947 | 01/09/96 | 65 | 4,781.59 | 4,781.59 | 11,147.60 |
| 3752739 | INV | 33334947 | 01/09/96 | 64 | 381.82 | 381.82 | 10,959.58 |
| 5949373 | CRE | 33334947 | 01/10/96 | 64 | 1,461.55- | 381.82 | 11,420.13 |
| 3788698 | INV | 33334947 | 01/11/96 | 63 | 1,461.55 | 97.64- | 15,322.59 |
| 5976588 | INV | 33334947 | 01/11/96 | 61 | 97.64- | 286.80 | 15,609.39 |
| 3768698 | INV | 33334947 | 01/12/96 | 62 | 286.80 | 20.03- | 15,589.18 |
| 5946732 | CRE | 33334947 | 01/17/96 | 59 | 20.03- | 263.26 | 15,878.72 |
| 3801149 | INV | 33334947 | 01/18/96 | 51 | 263.26 | 223.20 | 16,078.62 |
| 3826099 | INV | 33334947 | 01/19/96 | 51 | 226.30 | 291.50 | 16,040.93 |
| 3824700 | INV | 33334947 | 01/23/96 | 51 | 291.50 | 3,982.31 | 20,322.43 |
| 5947701 | INV | 33334947 | 01/24/96 | 50 | 3,982.31 | 4,465.02 | 24,788.49 |
| 5807729 | INV | 33334947 | 01/25/96 | 50 | 4,465.02 | 7.43- | 20,635.49 |
| 5965354 | CRE | 33334947 | 01/25/96 | 49 | 7.43- | 46.73- | 23,638.06 |
| 5963254 | CRE | 33334947 | 01/25/96 | 49 | 46.73- | 304.82 | 23,591.33 |
| 3860914 | INV | 33334947 | 01/30/96 | 44 | 304.82 | 4,819.19 | 28,410.52 |
| 3860916 | INV | 33334947 | 01/30/96 | 44 | 4,819.19 | 69.80- | 28,705.81 |
| 5970595 | CRE | 33334947 | 01/31/96 | 43 | 69.80- | 177.14- | 28,636.01 |
| 5970596 | CRE | 33334947 | 01/31/96 | 43 | 177.14- | 16.66- | 28,458.87 |
| 3867443 | INV | 33334947 | 01/31/96 | 43 | 16.66- | 4,278.20 | 28,442.22 |
| 3866264 | INV | 33334947 | 02/01/96 | 42 | 4,278.20 | 80.01 | 32,720.42 |
| 5972071 | INV | 33334947 | 02/08/96 | 37 | 80.01 | 42.12- | 32,800.43 |
| 3896479 | CRE | 33334947 | 02/06/96 | 36 | 42.12- | 4,092.16 | 32,758.31 |
| 5975683 | CRE | 33334947 | 02/07/96 | 36 | 4,092.16 | 14.50- | 36,850.47 |
| 3900027 | INV | 33334947 | 02/07/96 | 36 | 14.50- | 191.82 | 36,835.97 |
| 3900018 | INV | 33334947 | 02/08/96 | 35 | 191.82 | 4,263.13 | 37,027.79 |
| 5902018 | CRE | 33334947 | 02/08/96 | 35 | 4,263.13 | 81.67- | 41,290.92 |
| 3933737 | CRE | 33334947 | 02/10/96 | 36 | 81.67- | 194.99 | 41,209.25 |
| 3933737 | INV | 33334947 | 02/13/96 | 29 | 194.99 | 14.80- | 41,344.18 |
| 5999804 | CRE | 33334947 | 02/14/96 | 29 | 14.80- | 4,102.65 | 49,446.83 |
| 5990241 | CRE | 33334947 | 02/15/96 | 28 | 4,102.65 | 17.00- | 49,429.83 |
| 3940811 | INV | 33334947 | 02/15/96 | 28 | 17.00- | 42.97 | 49,472.80 |

I000000116

AR27

A/R ACCOUNT: 33934947   CASA GRANDE REG MED CNTR
DISTRICT: 4146
ACCT BAL: 84,924.32

ACCOUNT STATUS
THRU: 03/14/96
TERMS: NET 30 DAYS

PAGE: 2

03/14/96
16:04:04

| REF/CK# | TRN | CUSTOMER | DATE | AGE | AMOUNT | NET DUE | CUMUL AMT |
|---|---|---|---|---|---|---|---|
| 3972276 | INV | 33934947 | 02/20/96 | 23 | 3,843.68 | 3,843.68 | 93,316.48 |
| 5902779 | CRE | 33934947 | 02/21/96 | 22 | 61.64- | 61.64- | 93,254.84 |
| 3978281 | INV | 33934947 | 02/21/96 | 22 | 4,881.67 | 4,881.67 | 98,136.51 |
| 5999677 | CRE | 33934947 | 02/22/96 | 21 | 114.24- | 114.24- | 98,022.27 |
| 4010689 | INV | 33934947 | 02/27/96 | 16 | 4,335.81 | 4,335.81 | 62,358.08 |
| 5907116 | CRE | 33934947 | 02/28/96 | 15 | 24.00- | 24.00- | 62,394.08 |
| 4016787 | INV | 33934947 | 02/28/96 | 15 | 3,945.56 | 3,945.56 | 66,279.64 |
| 4024516 | INV | 33934947 | 02/29/96 | 14 | 175.02 | 175.02 | 66,454.66 |
| 5910448 | INV | 33934947 | 03/01/96 | 13 | 148.72- | 148.72- | 66,305.94 |
| 4040608 | INV | 33934947 | 03/05/96 | 9 | 5,074.06 | 5,074.06 | 71,380.00 |
| 5916199 | CRE | 33934947 | 03/05/96 | 9 | 39.88- | 39.88- | 71,340.12 |
| 4055197 | INV | 33934947 | 03/06/96 | 8 | 4,672.16 | 4,672.16 | 76,012.28 |
| 5917935 | CRE | 33934947 | 03/07/96 | 7 | 45.97- | 45.97- | 75,966.91 |
| 4063072 | INV | 33934947 | 03/07/96 | 7 | 172.72 | 172.72 | 76,139.63 |
| 4068884 | INV | 33934947 | 03/12/96 | 2 | 4,093.17 | 4,093.17 | 80,232.80 |
| 5920666 | INV | 33934947 | 03/13/96 | 1 | 22.58- | 22.58- | 80,210.22 |
| 4092666 | INV | 33934947 | 03/13/96 | 1 | 4,464.70 | 4,464.70 | 84,674.92 |
| 4101256 | INV | 33934947 | 03/14/96 | 0 | 249.40 | 249.40 | 84,924.32 |

I000000117

ACCOUNT STATUS
THRU 03/14/96

PAGE: 1

03/14/96
16:35:22

A/R ACCOUNT: 73946025   DESERT VALLEY CARE CENTER
DISTRICT: 4148
ACCT BAL: 18,596.99   TERMS: NET 90 DAYS

| REF/CK# | TRN | CUSTOMER | DATE | AGE | AMOUNT | NET DUE | CUMUL. AMT |
|---|---|---|---|---|---|---|---|
| E983007 | CRE | 73946025 | 09/13/95 | 183 | 73.25- | 73.25- | 2,178.34 |
| 34101922 | INV | 73946025 | 11/03/95 | 133 | 1,125.25 | 1,052.00 | 2,178.34 |
| B988104 | CRE | 73946025 | 11/29/95 | 106 | 18.79- | 18.79- | 2,071.61 |
| 5D04456 | CRE | 73946025 | 12/11/95 | 94 | 18.79- | 18.79- | 2,052.82 |
| 5D08202 | CRE | 73946025 | 12/13/95 | 92 | 18.79- | 18.79- | 2,006.88 |
| 5914065 | CRE | 73946025 | 12/18/95 | 87 | 45.98- | 45.98- | 1,970.44 |
| 5920302 | CRE | 73946025 | 12/26/95 | 79 | 57.36- | 57.36- | 1,913.08 |
| 5931455 | CRE | 73946025 | 01/02/96 | 72 | 56.02- | 56.02- | 1,867.06 |
| 5939641 | CRE | 73946025 | 01/08/96 | 66 | 18.01- | 16.01- | 1,830.78 |
| E943824 | CRE | 73946025 | 01/10/96 | 64 | 8.75- | 8.75- | 1,780.68 |
| E952681 | CRE | 73946025 | 01/17/96 | 57 | 51.82- | 51.82- | 357.09 |
| 37958000 | INV | 73946025 | 01/17/96 | 57 | 357.09 | 357.09 | 2,187.97 |
| B449926 | INV | 73946025 | 01/26/96 | 48 | 58.57 | 58.57 | 2,196.54 |
| 3975184 | INV | 73946025 | 02/01/96 | 42 | 81.00 | 81.00 | 2,277.54 |
| 3877977 | INV | 73946025 | 02/02/96 | 41 | 33.44 | 33.44 | 2,310.98 |
| 3879773 | INV | 73946025 | 02/02/96 | 41 | 1,705.86 | 1,705.86 | 4,016.84 |
| 3896476 | INV | 73946025 | 02/06/96 | 37 | 4.10 | 4.10 | 4,020.94 |
| 3896470 | INV | 73946025 | 02/06/96 | 37 | 1,186.46 | 1,186.46 | 5,174.00 |
| 3917101 | INV | 73946025 | 02/09/96 | 34 | 1,329.79 | 1,329.79 | 6,503.79 |
| 3933738 | INV | 73946025 | 02/13/96 | 30 | 1,048.14 | 1,048.14 | 7,551.93 |
| 3956708 | INV | 73946025 | 02/18/96 | 27 | 1,059.39 | 1,059.39 | 8,611.32 |
| 3956670 | INV | 73946025 | 02/18/96 | 27 | 42.23 | 42.23 | 8,653.55 |
| 3972765 | INV | 73946025 | 02/20/96 | 23 | 582.98 | 582.98 | 10,204.53 |
| 3973755 | INV | 73946025 | 02/22/96 | 23 | 972.98 | 972.98 | 10,887.41 |
| 3989900 | INV | 73946025 | 02/23/96 | 20 | 1,272.68 | 1,272.68 | 11,884.97 |
| 3989901 | INV | 73946025 | 02/26/96 | 20 | 40.86 | 40.86 | 11,905.97 |
| E903886 | INV | 73946025 | 02/26/96 | 17 | 21.00- | 21.00- | 12,656.12 |
| E907384 | CRE | 73946025 | 02/28/96 | 15 | 12.23- | 12.23- | 12,643.89 |
| 4031828 | INV | 73946025 | 03/01/96 | 13 | 1,598.56 | 1,598.56 | 14,242.45 |
| 4031828 | INV | 73946025 | 03/01/96 | 13 | 227.22 | 227.22 | 14,469.67 |
| 4044811 | INV | 73946025 | 03/02/96 | 12 | 64.86 | 64.86 | 14,534.48 |
| 4048007 | INV | 73946025 | 03/05/96 | 9 | 1,216.41 | 1,215.41 | 15,750.89 |
| 4048008 | INV | 73946025 | 03/05/96 | 9 | 120.83 | 120.83 | 15,880.07 |
| 4069990 | INV | 73946025 | 03/08/96 | 6 | 1,365.30 | 1,365.30 | 17,246.07 |
| 4073003 | CRE | 73946025 | 03/09/96 | 5 | 103.54- | 103.54- | 17,349.61 |
| E920073 | CRE | 73946025 | 03/12/96 | 2 | 3.00- | 3.00- | 17,346.61 |
| 4098813 | INV | 73946025 | 03/11/96 | 3 | 1,190.38 | 1,190.38 | 18,596.99 |

ACCOUNT 73946025 DESERT VALLEY CARE CENTER TOTAL:   18,596.99

CUSTOMER 73946025 DESERT VALLEY CARE CENTER TOTAL:   18,596.99

I000000118

AR27

ACCOUNT STATUS
THRU 03/14/96                                              PAGE:  1

A/R ACCOUNT: 23462054   CENTRAL AZ MEDICAL CENTER
DISTRICT:  4146
ACCT BAL:  97,680.73   TERMS: ** Multiple **

| REF/CK# | TRN | CUSTOMER | DATE | AGE | AMOUNT | NET DUE | CUMUL AMT |
|---|---|---|---|---|---|---|---|
| 3344480 | INV | 33462041 | 10/04/95 | 162 | 3,065.96 | 3,065.96 | 3,065.96 |
| 59246500 | CRE | 33462041 | 10/13/95 | 153 | 27.56- | 27.56- | 3,838.40 |
| 59337991 | CRE | 33462041 | 10/13/95 | 153 | 27.56- | 27.56- | 3,838.40 |
| 5933799 | CRE | 33462041 | 10/19/95 | 147 | 44.06- | 44.06- | 3,794.34 |
| 5942830 | CRE | 33462041 | 10/26/95 | 140 | 2.95- | 2.95- | 3,791.39 |
| 5942831 | CRE | 33462041 | 10/26/95 | 140 | 7.54- | 7.54- | 3,784.45 |
| 5973829 | CRE | 33462041 | 11/17/95 | 118 | 127.65- | 127.65- | 3,656.80 |
| 5999781 | CRE | 33462041 | 12/07/95 | 98 | 73.69- | 73.69- | 3,583.11 |
| 5913944 | CRE | 33462041 | 12/29/95 | 84 | 21.00- | 21.00- | 3,562.11 |
| 5942042 | CRE | 33462041 | 01/04/96 | 70 | 474.06- | 474.06- | 3,087.35 |
| 5944751 | CRE | 33462041 | 01/11/96 | 63 | 7.78- | 7.78- | 3,079.77 |
| 5953997 | CRE | 33462041 | 01/18/96 | 56 | 26.10- | 26.10- | 3,053.67 |
| 108 | 1AT | 33462041 | 01/25/96 | 49 | 382.95- | 382.95- | 2,670.72 |
| 108 | 1AT | 33462041 | 01/25/96 | 49 | 10.90- | 10.90- | 2,659.82 |
| 5963199 | CRE | 33462041 | 01/25/96 | 49 | 4,034.02 | 4,034.02 | 2,659.82 |
| 3901094 | INV | 33462041 | 02/01/96 | 42 | 4.14- | 4.14- | 2,693.84 |
| 5982265 | CRE | 33462041 | 02/07/96 | 36 | 14.16- | 14.16- | 6,687.86 |
| 5982265 | CRE | 33462041 | 02/09/96 | 34 | 4.44- | 4.44- | 6,683.26 |
| 3693906 | INV | 33462041 | 02/14/96 | 28 | 3,297.58 | 3,297.58 | 9,980.84 |
| 5997991 | INV | 33462041 | 02/21/96 | 22 | 2.12- | 2.12- | 9,978.72 |
| 3978073 | INV | 33462041 | 02/21/96 | 22 | 50.20 | 50.20 | 10,028.92 |
| 3978074 | INV | 33462041 | 02/21/96 | 22 | 124.16 | 124.16 | 10,153.08 |
| 3978076 | INV | 33462041 | 02/21/00 | 22 | 3,200.53 | 3,200.53 | 13,353.61 |
| 3978076 | INV | 33462041 | 02/22/96 | 21 | 73.19- | 73.19- | 13,280.42 |
| 3986669 | INV | 33462041 | 02/22/96 | 21 | 75.24 | 75.24 | 13,355.66 |
| 3906327 | INV | 33462041 | 02/23/96 | 20 | 164.12 | 164.12 | 13,519.78 |
| 40i6031 | INV | 33462041 | 02/26/96 | 17 | 159.03 | 159.03 | 14,676.81 |
| 40i6032 | INV | 33462041 | 02/28/96 | 15 | 3,395.05 | 3,395.05 | 18,073.86 |
| 40i6033 | INV | 33462041 | 02/28/96 | 15 | 60.41- | 60.41- | 18,013.45 |
| 5918BED | CRE | 33462041 | 03/05/96 | 9 | 3,357.89 | 3,357.89 | 21,371.34 |
| 4053992 | INV | 33462041 | 03/06/96 | 8 | 3,229.75 | 3,229.75 | 24,601.09 |
| 4092063 | INV | 33462041 | 03/13/96 | 1 | | | |

ACCOUNT   23462054 CENTRAL AZ MEDICAL CENTER CTN TOTAL:                              97,680.73

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 3846165 | INV | 34620d1 | 01/31/96 | 43 | 3,869.42 | 3,869.42 | 3,869.42 |
| 3901094 | INV | 34620d1 | 02/07/96 | 36 | 1,807.06 | 1,807.06 | 5,666.48 |
| 5982615 | CRE | 34620d1 | 02/09/96 | 34 | 4.92- | 4.92- | 5,661.56 |
| 3998805 | INV | 34620d1 | 02/14/96 | 29 | 1,693.41 | 1,693.41 | 7,354.97 |
| 3976976 | INV | 34620d1 | 02/21/96 | 22 | 1,660.91 | 1,660.91 | 9,015.88 |
| 5989022 | CRE | 34620d1 | 02/22/96 | 21 | 29.27- | 29.27- | 8,986.61 |
| 3916940 | INV | 34620d1 | 02/23/96 | 20 | 29.27 | 29.27 | 8,986.61 |
| 40i6031 | INV | 34620d1 | 02/28/96 | 15 | 1,525.15 | 1,525.15 | 10,541.03 |
| 5908731 | CRE | 34620d1 | 02/28/96 | 14 | 18.46- | 18.46- | 10,522.57 |
| 4053991 | INV | 34620d1 | 03/06/96 | 8 | 1,144.42 | 1,144.42 | 11,666.99 |
| 4092062 | INV | 34620d1 | 03/13/96 | 1 | 1,412.65 | 1,412.65 | 13,079.64 |

ACCOUNT   34620d1 CENTRAL ARIZONA CARE CTN TOTAL:                                    13,079.64

CUSTOMER  33459d1 CENTRAL AZ MEDICAL CENTER TOTAL:

*(handwritten notes in margin):*
*attn: Jerry Banks*
*520-426-6435*
*4 pages*
*from: Ruby*
*Allied Commerce*
*602-350-3556*

I000000119

EXHIBIT J

000004340

OCT-17-00 10:31 AM
P.01

October 17, 2000

Mountain States Credit Corporation
Attn..: Donna
1307 N. Pinal Avenue
Casa Grande, AZ 85222

re:   Theft by Conversion by Former Employee(s)
Courtyard Apartments - Casa Grande, AZ
█████Andriano  SSN ████████  DOB ██████
████████  SSN ████████  DOB██████



SPMC
Property Management

17 West Wetmore
Suite 301
Tucson, Arizona
85705-1043

Tel: 520-577-9700
Fax: 520-577-0924

A Subsidiary of
Schwencke Group, Inc.

Pursuant to our conversation in September, 2000 please find enclosed materials related to the above referenced matter. We have included copies of materials to establish our claims which were gathered during our internal audits.

Although we can attribute more than $30,000.00 in theft by conversion by Ms. Andriano, we are only able to support or track on paper $8,338.17 of the total misappropriated. Andriano refused certified mail service, and was recently booked into the Maricopa County Jail on suspicion of 2nd degree murder. We have provided information gathered from news sources of her last known address and employer as of 10/09/00. We wish to proceed with our claim against Ms. Andriano.

We have been more successful in our audit of ██████'s activities. With the cooperation of residents, we have established and included substantial back up for our claim of $15,185.58 against ████████ We have also included a record of her current employment and address as of 10/13/00. We wish to aggressively pursue our claim against ████████

Thank you for any assistance that you render in this matter. If you are in need of any additional information, please call. We look forward to hearing from you soon.

Very truly yours,

Timothy Lee

Agent/Owner
(602) 243-4250

000004341

J000000001

OCT-17-00 10:31 AM                                    P.02

**Theft by Conversion by Former Employee**
**Courtyard Apartments - Casa Grande, AZ**

Wendi Andriano  SSN         DOB 

Last Known Address:

Murder 2, Maricopa County Jail
100 W. Washington, 19th Floor
Phoenix, AZ 85003
(602) 256-1032

San Riva at the Foothills Apartments
Manager
2155 E. Liberty Lane
Phoenix, AZ 85048
(480) 283-8488

Employer:
Fairfield Residential, Inc.
8260 E. Raintree Drive, Suite 204
Scottsdale, AZ 85260

J000000002

DEC-17-99 04:50 PM   WWW.1AZPROPERTY.COM        602 242 1518          P.01

*Wendi Andriano*

# FAX TRANSMISSION

## SCHOMAC PROPERTY MANAGEMENT, INC.
### Timothy Lee, Regional Director – Phoenix
PHOENIX, AZ 85040
(602) 243-4250
FAX:(602) 268-5208

| | | | |
|---|---|---|---|
| **To:** | Ms. Christy Dotson | **Date:** | December 17, 1999 |
| **Fax #:** | (520) 888-8221 | **Pages:** | 17 including this cover sheet |
| **Subject:** | Courtyard Apartments | | |
| | Supplemental Information | | |
| | Assessment of Property Audit | | |
| | Wendi Ochoa/Andriano | | |

**COMMENTS:**

Christy:

In **addition** to the materials sent by Sophia this week, the following is a recollection of activity uncovered during the Audit of the above referenced matter.

We have tracked a pattern of numerous Accounting and Data Entry irregularities which resulted in delinquencies being covered up and occupancies being elevated.

The methods used appear to have been accelerated in Spring, 1999. That was the time of year when most Home in Arizona Residents paid an entire year of rent in advance. The rents were taken in and redistributed through Rent Roll into other tenant delinquencies and vacant apartments. We are also aware that Wendi had knowledge of pass codes to the Rent Roll program which were only known to Kris Reed. She evidently watched over Kris Reed's shoulder and memorized the data entry necessary to bypass the Rent Roll audit systems we have in place for all of our Properties.

All Home in Arizona Residents purchased the existing furniture in their units at $1.00, upon signing a Lease Renewal in the Spring of 1999. The furniture was new. The actions were verbal. The results are of consequence. There is no additional future revenue gain against this action, therefore the result of this action is very costly.

J000000003

DEC-17-99 04:51 PM   WWW.1AZPROPERTY.COM          602 242 1518          P.02

The Home in Arizona Residents were also given free carport parking and free storage space, for paying in advance, during the Spring of 1999. We believe this action was taken to accelerate the funds coming into the office, to cover for the Accounting actions outlined in Sophia's Memo.

Wendi covered for Move-In mistakes for a new resident out of a Checking Account at Norwest Bank, Casa Grande Branch. Please note one example attached which we have audited. It denotes Check #1222 Norwest Bank and Account ████████████ and Wendi Andriano and Joe D. Andriano as the Account holder. The check for $800.30 was made payable to Moving Services in Tucson, AZ. The resident stated that she was reimbursed "... by the Property..." for several mistakes made during her Move-In period at Courtyard, including an unfinished market ready apartment. The resident was told that "... there is no problem with the Property covering her additional hassles and moving expenses..." We obtained a copy of the check from the moving company. See attached.

Courtyard's Clubhouse Furniture was 'sold' and delivered to Wendi's Father - See attached Invoice of missing furniture.

The Accounting and judgement errors are calculated, deceitful, and numerous. However, there are still many unknowns from the results of the Accounting irregularities. The judgement errors are not simple oversights, but deliberate actions which can be very costly to future value with regard to income and related occupancies/delinquencies. Our total write-offs and liabilities, at this point, are still not fully known.

Memo

To: Christy Dotson-Human resource SPM, Inc.

From: Sophia Wieneke-Assistant Area Manager, Phx Casa Grande

Below is an assessment of audit findings for Courtyard Apartments, Casa Grande.

---

Apt # 408-Schlaphoff                                    $  54.35
Tenant was over charged on monthly
auto bill for yearly prepay as Winter
Visitor.

Apt # 702-Scott                                         $ 150.30
Tenant was given discount per CD due
to condition of apt at move in and tardiness
in having apt non market ready for day of move in.

Apt # 112                                               $ 359.82
Tenant was not credited payment for the month of
August 99.  Payment was divided and credited to
other tenants apartments.

Apt # 201-Daquisto                                      $  14.40
Tenant was overcharged in monthly auto bill due
to yearly prepay as winter visitor.

Apt # 1115-Johnson                                      $ 105.09
Tenant was overcharged in monthly auto bill
resulting in delinquent balance and additional
late fee.

Apt # 111-Burley                                        $   8.15
Tenant was overcharged in monthly auto bill
resulting in delinquent balance.

Apt # 320 -Schoenenberger, Paul                         $ 336.90
Tenant was charged for 15 days of occupancy
which was false resulting in balance due and
late fee.

Apt# 1111-Schoenenberger, Richard                       $ 489.00

J000000005

DEC-17-99 04:52 PM   WWW.1AZPROPERTY.COM        602 242 1518        P.04

Tenant was overcharged on application
fee and monthly auto bill, resulting in
balance due and late fees.

Apt# 208-Sward                                   $   485.00
Tenant was overcharged in monthly
auto bill for parking and discounted
yearly prepay for selling chair and
sleeper sofa to CD.

Apt# 708-Rowen                                   $ 3,485.11
Tenant was overcharged monthly auto bill
for Corp suite apartment, but apartment
was not a suite.

Apt#1108-Jessen                                  $ 1,800.05
Tenant prepaid $4,487.75or discount as Winter
visitor was only credited a partial payment of
$2,687.70.  Additional part of tenants payment
was distributed between 3 other apartments which
were delinquent at the time.

Reservations                                     $   900.00 (1 dep)
Six tenants prepaid  $175.00 for security deposits    150.00 (app fee)
and application fees for priority hold list.  Tenants
did not rent requesting refunds.   Checks did clear
the bank, but we cannot find record of the deposits.

*Estimated Total                                 $8,338.17

*Please note that the above audit does not include the number of late fees written off due to
checks not being posted to correct accounts.  Nor does it reflect the estimated yearly loss of
revenue due to tenants who were given free covered parking and storage due to renewing for
a year and paying up front. That could estimate anywhere $750.00-$1500.00 depending on
apartment.

The above amounts have been written off toward vacancy loss as well as late fee charge backs
and application fee charge backs.  All information was verified by tenant as well as canceled
checks where necessary.

cc: Timothy Lee

DEC-17-99 04:52 PM    WWW.1AZPROPERTY.COM          602 242 1518          P.05

Suzie,
The home of
the moving company
that Wendy paid
storage to in Tucson
is:

Moving Services
(520) 622-7676

ASK FOR CHERYL.

I CALLED AND LET HER
KNOW YOU WOULD BE CALLING
SOME TIME IN THE FUTURE.
Veronica

1222

WENDI ANDRIANO
JOE D. ANDRIANO
2060 N TREKELL RD., APT B48
CASA GRANDE, AZ 85222

91-327/1271
A4P0003                    Date 5-16-99

Pay to the
order of   Moving Service              $ 800.30

Eight hundred                    30/100              DOLLARS

NORTHWEST BANK
Highway 84 & Hwy 87 N.J.
Casa Grande Office 30048
1060 E Florence Blvd
Casa Grande, AZ 85222

Memo

⑆ 2 2 4 0 5 2 7 8⑆ ⑆ 2 2 2⑈4 9 4 4 9 5 0 4 8 8⑈

DEC-18-99 06:13 AM

000004347                                    J000000007

DEC-17-99 04:53 PM  WWW.IAZPROPERTY.COM      602 242 1518      P.06

DEC-18-99 06:48 AM                                              P.03

HEILIG-MEYERS FURNITURE
1346 E. FLORENCE BLVD.
CASA GRANDE, AZ 85222

COURTYARD APT, C. LAWSON

STREET 2060 N. TREKELL RD.

CITY CASA GRANDE, AZ

PHONE 520-426-9451   BUSINESS PHONE 520-836-4012

| QTY | SKU # | MFGR | DPT | MFGR # | DESCRIPTION | SP | UNITPRICE | AMOUNT |
|-----|-------|------|-----|--------|-------------|-----|-----------|--------|
| 1 | 565020 | BENCHCR | 001 | 544-00W | UTICA LOVESEAT | 1 | 399.00 | 399.00 |
| 1 | 283415 | GUARDIA | 023 | 50FA | MIRACLE GUARD NO. 1 | 1 | 64.99 | 64.99 |
| 1 | 283440 | GUARDIA | 023 | LOVESEAT | MIRACLE GUARD | 1 | 49.99 | 49.99 |
| 1 | 565037 | BENCHCR | 001 | 544-10-W | UTICA LOVESEAT | 1 | 379.00 | 379.00 |

Clubhouse furniture

The undersigned Buyer (whether one or more) purchases
the goods ('Goods') and services described above from
Seller, subject to the terms and conditions hereof. Buyer
agrees to pay Seller the Total of Payments by installments
in the number and amounts, and by the due dates,
inscribed herein.

ITEMIZATION OF THE AMOUNT FINANCED
1. TOTAL AMOUNT FOR GOODS        892.98
2. SALES TAX    7.0000 %          69.65
3. CASH PRICE (1+2)              962.63
4. DOWN PAYMENT                     .00
5. CASH PRICE LESS DOWN PAY(3-4) 962.63
6. OLD BALANCE                      .00
7. REFUNDS   FINANCE CHARGE         .00
             LIFE INS                .00
             DISAB INS               .00
             PROP INS                .00
             UNEMP INS               .00

8. BALANCE BEFORE FINANCING(5+6-7)  962.63
9. INS:  AMOUNT PAID TO LIFE INS CO    .00
         AMOUNT PAID TO DISAB INS CO   .00
         AMOUNT PAID TO PROP INS CO    .00
         AMOUNT PAID TO UNEMP INS CO   .00
0. NON-FILING CHARGES                  .00

1. AMOUNT FINANCED (8+9+10)      962.63

A PORTION OF ANY AMOUNTS SHOWN ON
LINE 9 MAY BE RETAINED BY THE CREDITOR

FOR STORE USE ONLY    1004.40

IF THE AMOUNT FINANCED SHOWN BELOW IS
PAID WITHIN 90 DAYS OF THE DATE HEREOF,
NO FINANCE CHARGE WILL BE IMPOSED

PAGE 1 OF

| ANNUAL PERCENTAGE RATE | FINANCE CHARGE | Amount Financed | Total of Payments | Total Sale Price |
|---|---|---|---|---|
| The cost of your credit as a yearly rate. | The amount the credit will cost you. | The amount of credit provided to you or on your behalf. | The amount you will have paid after you have made all payments as scheduled. | The total cost of your purchase on credit including your downpayment of $ .00 |
| 24.00 % | $ 41.77 | $ 962.63 | $ 1004.40 | $ 1004.40 |

Your Payment Schedule will be:
1 PMTS OF 1004.40 DUE ON 10TH DAY OF THE MONTH STARTING  7/10/1998

SECURITY: Certain household items are the security for this transaction.

LATE CHARGE: If a payment is more than 10 days late you may be charged a late charge equal to $5.00.

PREPAYMENT: If you pay off early, you may be entitled to a refund of part of the finance charge.

See your contract for any additional information about nonpayment, default, any required repayment in full before the scheduled date and prepayment refunds and penalties.

**Important Warranty Information: SELLER MAKES NO EXPRESS WARRANTY, AND UNLESS BUYER PURCHASES A SERVICE CONTRACT FROM SELLER AT THE TIME OF THE SALE OF THE GOODS OR WITHIN 60 DAYS THEREAFTER, SELLER MAKES NO IMPLIED WARRANTY, INCLUDING ANY WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE IN CONNECTION WITH THE SALE OF ANY GOODS.**

Notice to the Buyer: (1) Do not sign this agreement before you read it or if it contains any blank spaces to be filled in. (2) You are entitled to a completely filled-in copy of this agreement. (3) You can repay the full amount due under this agreement at any time and obtain a partial refund of the finance charge. (4) If you desire to pay off in advance the full amount due, the amount of the refund you are entitled to, if any, will be furnished upon request.

TERMS AND CONDITIONS PRINTED ON REVERSE SIDE HEREOF ARE INCORPORATED IN AND CONSTITUTE A PART OF THIS AGREEMENT

000004348

J000000008

DEC-17-99 04:53 PM   WWW.1AZPROPERTY.COM        602 242 1518              P.07
   DEC-18-99 06:39 AM                                                    P.01

Timothy,
        This is a list of Winter Visitors
that pd. in deposits. That we are
refunding back to them. These monies
were not posted in Computer that
we can find.

Kline        175.00
Ashby        175.00
Barnaby      175.00
Rubenstien   175.00
Siddoway     175.00
Czepa        175.00
            _____
            1,050.00

Susie
12-17-99

DEC-17-99 04:54 PM   WWW.1AZPROPERTY.COM        602 242 1518            P.88
DEC-18-99 06:39 AM                                                      P.02

1139

7-5 19 99

Pay to the order of  Courtyard Apt. Homes              $ 175.00

One Hundred Seventy-Five 00/100 ___ Dollars

U.S. BANK OF IDAHO
NATIONAL ASSOCIATION

Appl. Fee - 25
sec. Dep .150

000004350                                           J000000010

DEC-17-99 04:54 PM   WWW.1AZPROPERTY.COM          602 242 1518          P.09





DEC-17-99 04:55 PM  WWW.1AZPROPERTY.COM          602 242 1518          P.10

SCHOMAC PROPERTY MANAGEMENT

Courtyard Apartments
Account Ledger

Unit #415

| Date | Slog Unit | Description | User/Source/Jrnl Document | Code | Period | Charge | Credit | Balance |
|---|---|---|---|---|---|---|---|---|
| 04/30/1999 | | TENANT Application Fee | JO G RESI | CN APPF 199905 | | 25.00 | | 25.00 |
| 05/08/1999 | | COMMON Payment, Payne | WA N RESI 461 | PZ PMT 19990507 | | | 25.00 | 0.00 |

*** Designates Items Contributing To Delinquent Or Prepaid Balances.

P.03                                    DEC-18-99 06:14 AM

000004352                                J000000012

DEC-17-99 04:55 PM   WWW.1AZPROPERTY.COM          602 242 1518          P.11







21181-13DEC99/P-CL/GXL003/19-AUG-99/359.02/USD/6104622196//332/0
14-DEC-99/ 000000005971004883/REFR: 199912130960/A6/

Enclosed is the photocopied item you requested.  For further assistance,
please call 1-800-869-3557. (1-800-TO-WELLS)  A separate fee for this
service, as described in your account disclosure agreement, has been
subtracted from your account.
Thank you for banking with Wells Fargo — your Anytime Anywhere Bank.

        – – – INTEROFFICE MAIL – – – –
        MAC: S3914011
        TO:  MARGARET AVALOS  AU:

DEC-17-99 04:56 PM   WWW.1AZPROPERTY.COM          602 242 1518          P.12

11/22/99 09:34:39               ->6166378152          9482768        Page 002

3850

April 2, 1999

$ 4,487.78

*#1101*

CUSTOMER:ORB-SOUTHWEST SOUTH HAVEN
ITEM NUMBER:V4AR 001-01-9722100160 ¢      1

000004354                                J000000014

DEC-17-99 04:56 PM  WWW.IAZPROPERTY.COM          602 242 1518          P.13



SCHOMAC PROPERTY MANAGEMENT                                    Page   1
Courtyard Apartments                                          1.7.4
Cash Basis Accounting For April '1999
Deposit Batch  06

| Unit ID | Name | Description | User/Source | Document | JRNL Period | Date | Code | Debit | Credit |
|---|---|---|---|---|---|---|---|---|---|
| | | Payment | WA | M 7406235 | RESI 19990406 04/10/99 PZ PMT | | | 401.75 | |
| | | Payment | WA | M 2641 | RESI 19990406 04/10/99 PZ PMT | | | 447.75 | |
| | | Payment | WA | M 11215 | RESI 19990406 04/10/99 PZ PMT | | | 457.88 | |
| | | Payment | WA | M 7406246 | RESI 19990406 04/10/99 PZ PMT | | | 175.00 | |
| | | Security Deposit Paid In | WA | M 644 | RESI 19990406 04/10/99 I  DEP | | | 150.00 | |
| | | Payment | WA | M 644 | RESI 19990406 04/10/99 PZ PMT | | | 372.18 | |
| | | Payment | WA | M 739224 | RESI 19990406 04/10/99 PZ PMT | | | 291.41 | |
| | | Payment | WA | M 735239 | RESI 19990406 04/10/99 PZ PMT | | | 339.36 | |
| | | Payment | WA | M 5996 | RESI 19990406 04/10/99 PZ PMT | | | 4,852.41 | |
| | | Payment | WA | M 6145 | RESI 19990406 04/10/99 PZ PMT | | | 595.05 | |
| | | Payment | WA | M 7255 | RESI 19990406 04/10/99 PZ PMT | | | 563.60 | |
| | | Payment | WA | M 5267 | RESI 19990406 04/10/99 PZ PMT | | | 594.24 | |
| | | Payment | WA | M 1164 | RESI 19990406 04/10/99 PZ PMT | | | 441.23 | |
| | | Payment | WA | M | RESI 19990406 04/10/99 PZ PMT | | | 2,687.70 | |

Checking Account Number Main Checking Net For Deposit       13,984.96

| Code | Description | General Ledger Account Name | G/L Account # | Debit | Credit |
|---|---|---|---|---|---|
| PMT | Payment | Cash In Bank | 1120.0010 | 11,836.86 | |
| PMT | Payment | Accounts Receivable Rent | 1130.0000 | | 2,838.58 |
| RENT | Rent | Rental Revenue | 5120.0000 | | 8,764.31 |
| TAX | Sales Tax | City Sales Tax | 2250.0001 | | 188.05 |
| LATE | Late Charge | Late Charges | 5920.0010 | | 395.00 |
| CAB | Cable Television | Cable Tv | 6090.0010 | | 81.90 |
| DEP | Security Deposit Paid In | Cash In Bank | 1120.0010 | 150.00 | |
| DEP | Security Deposit Paid In | Deposit Security | 219..0010 | | 150.00 |
| NRF | Non Refundable Redec Fee | Non Redecorating Fee | 5920.0020 | | 254.80 |
| APPF | Application Fee | Application Fee | 5990.0020 | | 25.00 |
| PARK | Parking | Parking Revenue | 5170.0030 | | 105.00 |
| STOR | Storage Space | Storage Revenue | 5190.0010 | | 105.00 |

Totals:  11,986.86   13,986.86

*1800.05*

90°d                                        DEC-18-99 06:16 AM

P.06

000004355                                    J000000015

DEC-17-99 04:57 PM  WWW.1AZPROPERTY.COM        602 242 1518        P.14

11/36/1999                          SCHOMAC PROPERTY MANAGEMENT                    Page   1
2:36 pm                                Courtyard Apartments                         TEAM
                                          Account Ledger
                                     Utilities (PROPERTY01)
                                         Unit HCOMMON

        Applied. ....: May 1998     Autobill Rent ...    0.00    Sched Rent .:    0.00
        Moved In .....: May 1998    Other Charges...     0.00    Telephone #.:
        Lease Start .: May 1998     Other Credits.       0.00    Alt Phone #.:
        Lease End...: 31 Dec 2099   Account Balance .    0.00    Alt Phone #.:
        Notice Given.:                                            Last NSF  ..:
        Notice For...:              Deposit Required     0.00    Times NSF Checks...   0
        Moved Out ...:              Deposit Paid In..    0.00    Times Late Charges.   0

Date    Bldg Unit   Description      User/Source/Jrnl Document  Code  Period   Charge   Credit   Balance

*handwritten notes:*
Rent Applied (deposit)
4/7 3850   4,487.75 Rent
3/18 3842  -335.94 guest
4/7 3851   525.00 furn

000004356                                                    J000000016

DEC-17-99 04:57 PM  WWW.1AZPROPERTY.COM          602 242 1518          P.15

```
11/15/1999                    SCHOMAC PROPERTY MANAGEMENT                    Page  1
2:35 pm                          Courtyard Apartments                        TRAN
                                    Account Ledger
                              Guest Suite (R33300607)
                                    Unit SCHOCM

        Applied......: 1 May 1998    Autobill Rent...:    0.00    Sched Rent .:    0.00
        Moved In.....: 1 May 1998    Other Charges ..:    0.00    Telephone #.:
        Lease Start..: 1 May 1998    Other Credits ..:    0.00    Alt Phone #.:
        Lease End....: 31 Dec 2099   Account Balance..:  -91.62   Alt Phone #.:
             Notice Given.:                                       Last NSF....: 24 Sep 1998
             Notice For...:          Deposit Required.:    0.00   Times NSF Checks ...   7
             Moved Out...:           Deposit Paid In..:    0.00   Times Late Charges.:   0
```

| Date | Bldg Unit | Description | User/Source/Jrnl | Document | Code | Period | Charge | Credit | Balance |
|---|---|---|---|---|---|---|---|---|---|
| 04/15/1998 | COMMON | Guest Housing | WA M RESI | | CK BSI | 199806 | 30.54 | | 30.54 |
| 04/25/1998 | COMMON | Payment, Guest Suite | WA M RESI 0619 | | PZ PMT | 19926618 | | 30.54 | 0.00 |
| 04/24/1998 | COMMON | Brutinel Plumbing-1114 | C68 M RESI | | CK BSI | 199806 | 213.78 | | 213.78 |
| 04/24/1998 | COMMON | Brutinel Plumbing -1114 | WA M RESI 13485 | | PZ PMT | 19980622 | | 213.78 | 0.00 |
| 07/15/1998 | COMMON | Guest Housing | WA M RESI 3876 | | CK BSI | 199807 | 122.16 | | 122.16 |
| 07/16/1998 | COMMON | Payment, Guest Suite | WA M RESI 3876 | | PZ PMT | 19980713 | | 122 16 | 0.00 |
| 08/07/1998 | COMMON | Guest Housing | WA M RESI 267 | | CK BSI | 199808 | 30.03 | | 30.08 |
| 08/07/1998 | COMMON | Payment, Guest Suite | WA M RESI 267 | | PZ PMT | 19980806 | | 30 00 | 0 00 |
| 09/08/1998 | COMMON | Guest Housing - Haecker | WA M RESI | | CK BSI | 199809 | 850.12 | | 850.22 |
| 09/09/1998 | COMMON | haecker | WA M RESI | | PZ PMT | 19980908 | | 850 12 | 0.00 |
| 09/28/1998 | COMMON | Payment, Guest Suite J. Ravi | WA M RESI 111 | | PZ PMT | 19980912 | | 175 00 | -175.00 |
| 09/24/1998 | COMMON | Guest Housing | WA M RESI 4126 | | CK BSI | 199809 | 105.00 | | -70.00 |
| 09/24/1998 | COMMON | Guest Housing | WA M RESI | | CK BSI | 199809 | | 1010.12 | -1,025.12 |
| 09/24/1998 | COMMON | Guest Housing | WA M RESI | | CK BSI | 199809 | 89.77 | | -935.35 |
| 09/24/1998 | COMMON | Payment, Guest Suite | PZ M RESI 4126 | | PZ PMT | 19980913 | 110.00 | | -1,315.35 |
| 09/24/1998 | COMMON | NSF, Payment, Guest Suite | WA M RESI 4126 | | PZ PMT | 19980908 | 180.00 | | -935.35 |
| 09/24/1998 | COMMON | NSF, haecker | WA M RESI 4126 | | PZ PMT | 19980909 | 850 12 | | -85.23 |
| 09/24/1998 | COMMON | Payment, Guest Suite | WA M RESI 2487 | | PZ PMT | 19980913 | | 89.77 | -175.00 |
| 09/28/1998 | COMMON | Payment, Guest Suite--Ravi | WA M RESI 1053 | | PZ PMT | 19981002 | | 1138.00 | -1,313.00 |
| 11/01/1998 | COMMON | Guest Housing | WA M RESI | | CK BSI | 199811 | 1113.00 | | 0.00 |
| 11/07/1998 | COMMON | Guest Housing | WA M RESI 0677 | | CK BSI | 199812 | 120 00 | | 120.00 |
| 12/07/1998 | COMMON | Payment, Guest Suite | WA M RESI 0677 | | PZ PMT | 19981207 | | 120.00 | 0.00 |
| 01/23/1999 | COMMON | Guest Housing | WA M RESI | | CK BSI | 199901 | 213.76 | | 213.76 |
| 01/23/1999 | COMMON | Payment, Guest Suite | WA M RESI 3598 | | PZ PMT | 19990112 | | 213.78 | 0.00 |
| 01/23/1999 | COMMON | Guest Housing | WA M RESI 1021 | | CK BSI | 199902 | 213.78 | | 213 78 |
| 01/23/1999 | COMMON | Payment, Guest Suite | WA M RESI 1021 | | PZ PMT | 19990201 | | 213.76 | 0.00 |
| 02/12/1999 | COMMON | Guest Housing | WA M RESI | | CK BSI | 199902 | 61.00 | | 61.00 |
| 03/12/1999 | COMMON | Payment, Guest Suite | WA M RESI 3002 | | PZ PMT | 19990210 | | 61.00 | 0.00 |
| 02/16/1999 | COMMON | Payment, Guest Suite | WA M RESI | | PZ PMT | 19990211 | | 50.00 | -50.00 |
| 02/16/1999 | COMMON | Payment, Guest Suite | WA M RESI 9502 | | PZ PMT | 19990211 | | 30.54 | -80.54 |
| 02/27/1999 | COMMON | Guest Housing | WA M RESI | | CK BSI | 199902 | 83 54 | | 0.00 |
| 02/28/1999 | COMMON | Sales Tax | WA M RESI | | CF TAX | 199903 | 8.29 | | 8.29 |
| 02/28/1999 | COMMON | Payment, Guest Suite | WA M RESI | | PZ PMT | 19990302 | | 8.29 | 0.00 |
| 03/05/1999 | COMMON | Guest Housing | WA M RESI | | CK BSI | 199903 | 397 02 | | 397.02 |
| 03/05/1999 | COMMON | Payment, Guest Suite | WA M RESI 0669 | | PZ PMT | 19990306 | | 30.54 | 366.48 |
| 03/06/1999 | COMMON | Payment, Guest Suite | WA M RESI 3346 | | PZ PMT | 19990306 | | 366.48 | 0.00 |
| 03/05/1999 | COMMON | Payment, Guest Suite | WA M RESI 479 | | PZ PMT | 19993000 | 235.00 | | -235.00 |
| 03/05/1999 | COMMON | Payment, Guest Suite | WA M RESI | | PS PMT | 19990308 | | 7.33 | -242.33 |
| 03/21/1999 | COMMON | Sales Tax | WA M RESI | | CF TAX | 199903 | 9.67 | | -232.56 |
| 03/21/1999 | COMMON | Guest Housing | WA M RESI | | CK BSI | 199903 | 242.33 | | 9.67 |

J000000017

DEC-17-99 04:58 PM   WWW.1AZPROPERTY.COM        602 242 1518          P.16



J000000018

## SCHOMAC GROUP OF COMPANIES

1-ENTERED/COMPUTER

### EMPLOYEE TERMINATION NOTICE

Andriano                Wendi
Last Name              First          M.I.

Job Title/Location: CYD          O1

Hire Date: 5/27/98     Termination Date: 9/6/99

Supervisor: T. LEE

Resigned/ Discharged/ Laid Off   (Circle One)        Eligible for Rehire    Y____   N (X)

Reason for Separation (In Detail): Failure to follow Company Policy & Procedures in Personnel Time Management And in Paper work Management. Failure to Appropriately direct subordinate

Employee Comments:

520 426 0403
520 705 4219

Forwarding Address: _____
                    Street Address          City          State     Zip Code

SALES LICENSE   (Y X)   N____   N/A____

HOME OFFICE NOTIFIED TO SEVER LICENSE  (Y X)   N____

Items Turned In (If Applicable):

1. ✓ Keys
2. ✓✓ Price Club Card
3. ✓ Postage Paid
4. ○ Long Distance Paid
5. ○ Chips Turned In
6. ○ Petty Cash (closed out)
7. ○ Uniforms
8. ○ Pager
9. ○ Operations Manual
10. N/A Back Belt
11. N/A Badge
12. ○ Cobra Forms
13. Laundry Keys
14. ✓ Final Time Sheets
15. ✓ Employee Guide
16. ○ cell phone

Employee Signature _____        Date _____

(Signature acknowledges employment termination under the above terms.)

Supervisor Signature _____        Date 9/6/99

Revised 8/95

000004359                                          J000000019

file:///Untitled

Timothy:

I spoke with Wendi today regarding the status of vacating her apartment. She stated that she has a U-haul coming on Friday night and will be packing up over the weekend. She assured me that she would be completely out by the end of the weekend.

She further stated that she told both Sophia and Kris of her plans this morning. I asked her if she had contacted you regarding her plans, and she said that she had not. I suggested that she leave a message on your voice mail.

A copy of this E-mail will be placed in her personnel file.

SEP-03-99 08:32 AM   WWW.1AZPROPERTY.COM        602 242 1518        P.01

Wendy Andriano

# FAX TRANSMISSION

### SCHOMAC PROPERTY MANAGEMENT, INC.
### Timothy Lee, Regional Director - Phoenix
PHOENIX, AZ 85040
(602) 243-4250
FAX:(602) 268-5208

| | | | |
|---|---|---|---|
| **To:** | Ms. Christy Dotson | **Date:** | September 3, 1999 |
| **Fax #:** | (520) 887-4594 | **Pages:** | -4-,  including this cover sheet |
| **Subject:** | Courtyard Apartments | | |

**COMMENTS:**

Christy:

Attached please find a Summary of the events that unfolded on Thursday, September 2, 1999 at Courtyard Apartments. The situation is almost unbelievable.

J000000021

SEP-03-99 08:32 AM   WWW.1AZPROPERTY.COM        602 242 1518          P.02
Courtyard Apartments

Subject: Courtyard Apartments
   Date: Fri, 03 Sep 1999 08:22:23 -0700
   From: traduce@excite.com
      To: Kimberly Fitch <kfitch@spminc.com>, kreed@spminc.com

Review of 9/2/99 - Courtyard Apartments

Termination of 

Property Review, Company Policies, with Staff
including Neal Breault, Wil Mariano, Ana Velazquez
with Jese Mora present as Interpreter for Ana.

The QC Staff has routinely been working 10-12 hour days,
Saturday, Sunday and Holidays with "Comp Time" being
doled out in the week after the actual time worked occurred.

If QC Staff works more than 40 hours in week one,
they routinely take the following Wednesday or
Friday off in week two and Wendi has been marking
the Time Sheet with 8 hours actually worked when
in reality, the QC person is not physically present
and working on the Property.

Wil told me that Wendi "caught him up" on his last
paycheck by putting in 25 hours of Overtime in
exchange for the "Comp Time" he has accumulated.
In addition, we still owe him 25 Hours of "Comp Time."

Neal told me that he has "been caught up" on his
"Comp Time" through the use of "PTO" coupled
with his recent vacation, and that the system outlined
above is standard at Courtyard.

I noticed that Neal was not at work on Wednesday
August 11 when I was there for the Mortgage Company
Review, and on Thursday, August 12, when we toured
the Property with Moise. His Time Sheet did not
indicate PTO and I telephoned Wendi about this.
She told me that she "turned it into Payroll, directly."
I noted that Neal did not have sufficient PTO time
accumulated and that he would need to sign a
PTO Pay back Agreement Form. Wendi told me that
this Form was also sent to Payroll.

I noted the discussion on Neal's Time Sheet, and recently
discussed the matter with Christy Dotson, who followed
up with Wendi in order to find the missing paperwork.

1 of 3                                                          9/3/99 8:23 AM

SEP-03-99 08:33 AM   WWW.1AZPROPERTY.COM      602 242 1518          P.03
Courtyard Apartments

Ana told me through the Interpreter that she cleans
Wendi's apartment during working hours and then
sometimes baby sits until 10:00 p.m.  Her "Comp
Time" is also arranged by taking days off after
working the overtime and marked by Wendi on her
time sheet as 8 hours worked - when she is not
physically on the Property.  We owe Ana approximately
20 Hours of "Comp Time."  She is desperately afraid of
retribution regarding this issue, as she is the 'Personal
Assistant' of Wendi's family.  She was very reluctant
to discuss much of the details involved in her
"Comp Time" duties.  I informed Ana that she was
hired to clean the Property, only.  Personal work for
the Manager was personal and not to be mixed with
the Time Sheet.

I think that Christy Dotson needs to get personally
involved in this matter, immediately.

Both Neal and Wil told me that the "Property is
out of control."  This was verified by ▓▓▓▓▓who told
me that "You are so stupid, you're firing the wrong
person."  "This stuff has been going on from day one."
"I only do what I am directed to do by my Manager."
"If you don't fire her, too, I filing a law suit."

▓▓▓▓▓proceeded to tell me how Wendi manipulates
the computer to make the paper work look like the
the Property is always 100% leased.  Indeed, she
showed me one example - the one I have been chasing
for the past 60 days - that there are apartments involved in
the "transaction" with no Move-In or Move-Out paper work
completed - so that all three appear leased or pre-leased.

The scary part is that there really is physical occupancy
in all three apartments - without paperwork.

I sat with and spoke to the three Residents involved in this
"transaction" Apt #'s 1113, 526 and 703.  It is a carnival
of transaction errors and 'switch-a-roo.'  The Residents -
DPS Officers - are exasperated with the situation.

Apartment #904 was locked out of his apartment
without Due Process.  Neal told me that this has
happened about six or seven times in the last year
at the direction of the Manager.

The Residents Ledger shows he owes $90.00.  He was

000004363

J000000023

SEP-03-99 08:34 AM   WWW.1AZPROPERTY.COM        602 242 1518           P.04
Courtyard Apartments

locked out for Non-Payment of over $900.00. ▓▓▓▓▓
told me that Wendi knows how to manipulate the computer
so that there are no delinquencies showing and uses
the lock out system to force the issue, if they don't pay.
There is no "Hot Rack" or "Legal Book" to verify who
is in Court or pending legal action.  The "Hot Rack"
that was there has been moved to a file drawer which
in no manner resembles a "Hot Rack."

There are checks everywhere.  There are files everywhere.
There is stacks of paper work everywhere.

We do not know at this point what the status of
vacancies is.  We do know that there are people
living in Guest Suites - for months - awaiting a
move into a market ready apartment. The Guest Suites
are showing up a vacant on the computer.

Respectfully ...

3 of 3

9/3/99 8:23 AM

J000000024

EXHIBIT K

## MESA POLICE DEPARTMENT CONTINUATION REPORT | DR# 20011210670

On 050101 at 1719 hours I responded to 4450 E. Main reference a Fraud. Upon arrival I spoke with Roxanne Altamirano, who advised the following:

Roxanne told me that a fraud had been committed at the Compass Bank. She advised me that it occurred at approximately 1250 hours while she was at lunch. She advised me that one of the bank tellers, Jennifer Muir, actually dealt with the incident. I spoke with Jennifer and she advised me that a black female dressed in navy blue hospital scrubs came to her window and presented two checks from Arizona Retirement Center, both in the amount of four thousand five hundred dollars. Jennifer said the female ( who identified herself to Jennifer as Cynthia Edwards) requested to purchase two cashiers checks made payable to the name Geraline. Jennifer told rae she could not sign the cashiers check so she took them to the senior teller, Chad Oloughlin. Chad advised Jennifer that the cashier's checks could only be made out to the name purchasing them. Jennifer returned to her window and explained this to Cynthia. Cynthia told Jennifer she would go ahead and cash them. Jennifer took the checks to Chad and he advised her to cash them. He told Jennifer to set the checks aside so Roxanne could sign them when she returned. Jennifer then went to the vault to get the money. She returned to her window and counted out the money for Cynthia. Cynthia took the money and left the building.

Roxanne advised me she was notified of the incident when she returned from lunch. She said she looked at the checks and thought there was something wrong with them. Roxanne called the Arizona Retirement Center and was advised that they knew nothing about the checks and had no one on their staff named Cynthia Edwards. Roxanne then called her security department and reported the incident.

I was unable to speak with Chad because he was already gone when I arrived.

Roxanne turned over the security tape to me and I placed it into Mesa P.D. Property as evidence. Roxanne also gave me copies of the two checks.

Cynthia is described as a black female, 5'6, 150-160 lbs, black hair and brown eyes. Jennifer advised me that Cynthia wore large eyeglasses.

A Pims check was completed and I could not find a Cynthia Edwards matching the description.

No Further Information. Request CID follow up

OFFICER NAME & SERIAL #
FRASIER #13845

MPD 004   Rev 3/91

K000000001

| MESA POLICE DEPARTMENT CONTINUATION REPORT | DR# 20011240460 |
| --- | --- |

**NARRATIVE:**

On 050401 at 1330 hrs I went to Compass Bank located at 4450 E. Main St. in Mesa to investigate a suspect attempting to pass a forged check. I arrived and spoke with Officer G. Adams #7679 who had S/Cynthia Edwards in an office in the bank.

Officer Adams #7679 gave me Cynthia's Arizona driver's license and the check she was attempting to cash.

I asked Cynthia to explain to me what was going on and she told me she is a clergy for the prison system. She told me an inmate, I/ Beverly Audande, asked her if she would take checks from her daughter and cash them for her. Cynthia said Beverly told her that her daughter, P/Amber Troub who is 16 years old, did not have any form of identification and could not cash the checks. Cynthia said she agreed to help Beverly and Amber by cashing the checks and giving Amber the cash. Cynthia said she met with Amber on US-60 at Alma School and got two checks on 050101 at approximately 1230 hrs. Cynthia stated she got the checks from Amber and cashed them at the Compass Bank on 050201.

Cynthia told me she received the check she was attempting to cash today from Amber at the Boys and Girls Club loacated at Gilbert and Elliot. She told me Amber met her there on 050201 because the person that was driving Amber would not take Amber to Cynthia's house. Cynthia wrote a statment which is attached

I spoke with W/Sahba Omair who is the bank teller Cynthia presented the check to and she told me, she ran the check through the bank's system and it indicated the account was "frozen". She said she told Cynthia about the freeze on the account and Cynthia acted surprised. Sahba said she asked her manager, Roxanne Altamirano to assist her in explaining the situation to Cynthia. Sahba wrote a written statement which is attached.

Roxanne told me she recognized Cynthia as the same person who was in the bank cashing high dollar checks on 050201. Roxanne told me both the checks cashed on 050201 by Cynthia are fraudulent. She told me they verified with the account holder, Arizona Retirement Centers, Inc., that the checks were not written by them and they did not know Cynthia Edwards. Roxanne told me the other teller working today, P/Jennifer Muir, is the teller who waited on Cynthia on 050201. A police report was made on 050201 regarding these two checks (DR# 20011210670).

| OFFICER NAME & SERIAL # |
| --- |
| G. Daniels #14130 |

MPD 004   Rev 3/91

K000000002

**MESA POLICE DEPARTMENT CONTINUATION REPORT** | DR# 20011240460

I spoke with Jennifer who told me she recognized Cynthia as the person who cashed the two checks on 050201. She told me the checks totaled $9000.00. Jennifer wrote a statement which is attached.

Detective K. Carroll #4692 responded to the Bank and took over the investigation. He interviewed Cynthia and during the interview he asked me to contact Amber with a phone number provided by Cynthia. I called the number and spoke with a female who identified herself as Amber Troub. Amber told me she knew Cynthia as someone who knows her mother, Beverly, who is in prison. Amber denied any knowledge of checks or any type of activity involving the checks. Amber told me her mother has not mentioned anything about passing checks to Cynthia to get them cashed. Amber told me she has a Arizona picture driver's license and would not need help cashing checks. Amber told me her mother was in Estrella Jail for forgery and fraud charges (her booking number is A650360).

I gave the information I received from Amber to Detective Carroll #4692 who was still interviewing Cynthia.

I was then asked to contact Northwest Bank and Trust and ask them about two checks Cynthia told Detective Carroll #4692 she cashed at that bank. I called the bank and spoke with P/Deborah Kaya who immediately recognized the name. She told me Cynthia was in the bank on 050101 and cashed a check for the amount of $4500.00 and was in the bank again on 050201 and cashed a check in the amount of $5000.00. Deborah told me the checks were created with a computer and were not printed on the same paper as the checks issued by the bank. She told me the police did respond and gave her a case number (DR# 20011220550).

Detective K. Carroll #4692 ended his interview with Cynthia and I placed Cynthia into custody charging her with three counts of presenting a forged instrument. I transported Cynthia to the Mesa holding facility where she was booked into jail.

Cynthia's husband, James Edwards, came to the central station and all Cynthia's personal items were released to him per Cynthia's request. Cynthia's car was left parked at the bank and keys were given to James Edwards per her request.

Detective K. Carroll #4692 seized all evidence in this case at the holding facility.

CLEARED ARREST.

OFFICER NAME & SERIAL #
G. Daniels #14130

MPD 004  Rev 3/91

K000000003

# MESA POLICE DEPARTMENT SUPPLEMENTAL REPORT

DR# 20011240460

| | | | |
|---|---|---|---|
| TYPE OF ADDITIONAL INFORMATION: | CONTINUATION ☐ | INFORMATION ONLY ☐ | CLEARANCE ☒ |

| CRIME/INCIDENT CODE# 13-2002.A3 Forgery | | | CONNECTING DR# 20011210670 | |
|---|---|---|---|---|
| LOCATION 4450 E. Main, Mesa, Az | DATE & TIME OF REPORT 050401 1340 hrs. | GRID AA22 | BOOKING # 265661 | BOOKING FOI # |

PERSON INVOLVED

| TYPE | NAME TYPE | NAME: LAST, FIRST, MIDDLE | | | | | CITE(S)# | CODE(S)# |
|---|---|---|---|---|---|---|---|---|
| S | P | Edwards, Cynthia, La Vern | | | | | | |
| **SEX** | **RACE** | **ETHNIC H N U** | **DOB** | **HT** | **WT** | **HAIR** | **EYES** | **SCARS/MARKS/TATTOOS** |
| F | B | | [redacted] | 502 | 135 | Blk | Brn | |

ADDRESS, CITY, STATE, ZIP CODE: 323 E. Park Ave., Gilbert, Az 85234

| PHONE/HOME | PHONE/WORK | SSN | DRIVER'S LICENSE # | ST | CL |
|---|---|---|---|---|---|
| 480-633-8313 | 480-396-9222 | [redacted] | [redacted] | AZ | D |

| HAND USE | MASK | HAT | BUILD | GLASSES | FACIAL HAIR | HAIR STYLE/LENGTH |
|---|---|---|---|---|---|---|
| — | — | — | 02 | — | — | — |
| **PHYSICAL CONDITION** | **CLOTHING** | **TEETH** | **COMPLEXION** | **SPEECH** | **TYPE OF INJURY** | **PHOTO/POLAROID** |
| — | 01 | 09 | — | 08 | 08 | ☒ YES ☐ NO |

CLOTHING DESCRIPTION OF SUSPECT/RUNAWAY/MISSING ADULT: pink sweatpants and pink t-shirt

NARRATIVE:

On 050401 I was assigned this case for follow-up investigation and possible submission to the Maricopa County Attorney's Office for review. On 050401 at approximately 1400 hrs. I received a call from Officer Clark #4373 advising that he and Officer Daniels #14130 were on a forgery call at the Compass Bank located at 4450 E. Main in Mesa. They had s/Cynthia La Vern Edwards detained for presenting counterfeit Compass Bank check #153646, written on the account of Arizona Retirement Centers, Inc. and made payable to Cynthia Edwards for the amount of $5000.00.

From a call I had received on 050101 from Compass Bank Fraud Investigator, Karen Garrison, I knew that two Compass Bank checks #153644 and #153645, written on the account of Arizona Retirement Centers, Inc. and made payable to Cynthia Edwards for the amount of $4500.00 each, were presented and cashed at the Compass Bank Branch located at 4450 E. Main in Mesa on 050101. The suspect had presented the checks along with Az picture driver's license OLN/[redacted] which returned to a Cynthia La Vern Edwards. See DR# 20011210670 for further details on that incident.

I responded to the Compass Bank located at 4450 E. Main to assist with the investigation. Upon arrival, I located Officer Daniels and Officer Clark, sitting in a glass enclosed office with a black female I learned had been identified as s/Cynthia Edwards.

I spoke with bank teller, w/Jennifer Muir, who advised me she had been the teller who dealt with s/Edwards on 050101. According to w/Muir, she had been working as a teller on 050101 at approximately 1245 hrs. The bank wasn't busy at that time. A black female, who identified herself by Az picture driver's license as s/Cynthia Edwards OLN[redacted] came to w/Muir's window. S/Edwards presented two Compass Bank checks #153644 and #153645, written on the account of Arizona Retirement Centers, Inc. and made payable to Cynthia Edwards for the amount of $4500.00 each. S/Edwards requested using the checks to purchase two cashier's checks for $4500.00 each, made payable to Affordable Bail Bonds from the remitter of the name, Carolina. Because the cashier's checks were for an amount over w/Muir's signing limit, she

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| UNFOUNDED REPORT | | EXCEPTIONALLY CLEARED | | INVEST. CONT. | CONN RPTS | PROPERTY | ARREST |
| JUVENILE CLEARED | X | CLEARED ARREST | | FIELD CLOSURE | | JUVENILE | OTHER |

SUPERVISOR: [signature] 7851 5/17/01 — OFFICER NAME & SERIAL #: Detective K. Carroll 11692 — JUL 10 2001 — CID FOLLOW-UP REQUESTED? ☐ YES X NO

KBC

MPD 005 Rev 3/91

K000000004

PAGE 2 OF 7

**MESA POLICE DEPARTMENT CONTINUATION REPORT**     DR # Z0011Z40460

presented them to the senior teller, Chad. Chad advised that the cashier's checks could not be made payable to a business, when the other checks are made payable to s/Edwards. S/Edwards chose to cash the presented checks instead. W/Muir counted out $9000.00 to s/Edwards. W/Muir later learned the presented checks were counterfeit and a report was filed with the Mesa Police Department (DR#20011210670).

This afternoon, w/Muir saw s/Edwards at w/Sahba's teller window. When s/Edwards said hi to w/Muir, she recognized s/Edwards as the same person who had presented the counterfeit checks on 050101. W/Muir found bank manager, w/Altamirano, and learned w/Altamirano was already aware of the situation with s/Edwards and that the police were being called.

I showed w/Muir copies of the two counterfeit checks #153644 and #153645, which she identified as copies of the checks she had been presented with on 050101 by S/Edwards. W/Muir told me she had copied s/Edwards OLN at the top of each check. W/Muir advised me that the female, sitting in the glass enclosed office with Mesa PD Officers, was the presenter of the two counterfeit checks. See w/Muir's written statement for further details.

I then spoke with bank teller, w/Sahba Omair, who advised me she had been presented with a Compass Bank check for $5000.00 at approximately 1315 hrs. by s/Edwards. According to w/Omair, a black female, who identified herself as s/Cynthia Edwards, came to her teller window and presented Compass Bank check #153646, written on the account of Arizona Retirement Centers, Inc. and made payable to Cynthia Edwards for the amount of $5000.00. S/Edwards asked w/Omair to verify that funds were available in the account to cash the check. When w/Omair looked up the account, the status was listed as "Frozen – No Activity". S/Edwards was surprised when w/Omair explained that she would be unable to cash the check, saying that it was not possible because they just asked her to do business for them. W/Omair asked s/Edwards if she was an employee of the company. S/Edwards said she was not, but that they'd recently hired her to do some work for them. S/Edwards wanted to know when the account was frozen. W/Omair contacted the bank manager, w/Altamirano, and explained the situation. W/Altamirano looked at the screen and then asked s/Edwards for identification. S/Edwards provided an Az picture driver license. W/Altamirano asked s/Edwards if she has an account with Compass Bank. S/Edwards said she did not, but that she plans to open one in the future. In an attempt to stall, w/Altamirano advised s/Edwards that the account was frozen, but that the company has another account with Compass Bank and they could get the money from that account. W/Altamirano told s/Edwards that they would have to get the money from the vault. On the way to the vault, w/Altamirano advised w/Omair that they needed to call 911 and look normal. W/Altamirano also told w/Omair to count the money slowly, because they cannot give it to s/Edwards and she needed to be stalled until the police arrive. W/Omair and w/Altamirano were able to stall s/Edwards until a Mesa PD Officer approached them at the counter. S/Edwards was identified to the Officer as the presenter of the counterfeit check.

W/Omair told me that twice during the incident, s/Edwards asked if they still had her Identification. S/Edwards also asked w/Omair to be discreet about going to get the money from the vault. W/Omair advised me that the female, sitting with Mesa PD Officers in the glass enclosed office, was the person who presented the counterfeit check for $5000.00 and identified herself as s/Cynthia Edwards. See w/Omair's written statement for further details.

Next I spoke with bank manager, w/Roxanna Altamirano, who advised me she had been contacted by bank teller, w/Omair, reference a lady trying to cash a check on a frozed account. According to w/Altamirano,

| OFFICER NAME & SERIAL #<br>Detective K. Carroll  11692 | MPD 004 Rev 3/91 |
|---|---|

000004370

K000000005

**MESA POLICE DEPARTMENT CONTINUATION REPORT**    DR #  20011240460

when she went to the teller window and saw s/Edwards, she recognized her from a security tape of the incident on 050101. W/Altamirano also recognized the account holder and name, Cynthia Edwards, as being the same as on the two previous counterfeit checks from 050101. W/Altamirano asked s/Edwards for identification. S/Edwards presented an Az picture driver license and a Capital One Visa. W/Altamirano had s/Edwards place a thumbprint on the presented check. S/Edwards told w/Altamirano that she was starting a new business and she would like to speak to someone about business accounts. According to s/Edwards, she was waiting for her EIN to be mailed to her from back east. W/Altamirano asked s/Edwards if she has lived here long. S/Edwards said she had not. W/Altamirano observed that s/Edwards Az driver license looked worn. W/Altamirano told s/Edwards that they had to go to the vault to get some money. During this time, the police department was contacted. W/Altamirano stalled for time by slowly counting the money. She then had w/Omair count the money slowly. A Mesa Police Officer came in while w/Altamirano was talking with s/Edwards at the counter. W/Altamirano motioned the Officer over and explained the situation. When w/Altamirano told the Officer that s/Edwards had cashed two counterfeit checks on 050201 (I confirmed that the two counterfeit checks had actually been cashed on 050101), s/Edwards started talking really fast, denying to the Officer that she had been the one who cashed the fraudulent checks. When w/Altamirano told the Officer that the OLN's matched, s/Edwards admitted she had cashed the checks, but that she did not know they were bad checks. S/Edwards claimed someone from jail sent the checks to her to put money on their books. At this point, the Officer took s/Edwards to the office. See w/Altamirano's written statement for further details.

Officer Daniels provided me with s/Edwards' written statement prior to my interview with her. According to s/Edwards' statement, she received a call from Beverly Arundel, saying she has a business and asking if s/Edwards would cash checks for her 16 year old daughter, who has no ID. Arundel also asked that s/Edwards cash some checks and put money on the accounts of some prisoners. S/Edwards says she gave the rest of the money from the checks she cashed back to Amber, who provided the checks. S/Edwards says she did not ask questions originally because she believed Arundel must have a business, since the checks were so large. The first check she received in the mail was for $1000.00. S/Edwards deposited it into her own account and withdrew that amount. That check came back as no good. S/Edwards told Arundel and Arundel apologized, saying she would clear it. Arundel did clear it. On Monday s/Edwards received two checks from Amber. She came to Compass bank to cash them. S/Edwards told the teller, Jennifer, that she would open an account later. S/Edwards says she received another check on 050201 and was asked to cash it. She asked Amber when her mother would be finished taking care of her business. Amber told s/Edwards that she thought her mother was finished now with the business account. S/Edwards came to Compass Bank on 050401 to cash another check, thinking this was it. She was told the account was frozen. S/Edwards asked the teller for the date that it had been frozen. The teller got her manager, who stalled her until the police showed up. S/Edwards also states that she had been reported to Check Systems some years back and that she needed to wait for some information fraud forms from back east before she can open up an account here.

After speaking with the witnesses, I contacted s/Edwards. S/Edwards was sitting in the branch office with Officer Clark. I read s/Edwards her Miranda warnings from the Mesa PD Miranda card at 1512 hrs. S/Edwards said, "Yes I do," to understanding her rights and, "Yes I will," to voluntarily answering my questions. S/Edwards told me she belongs to New Life Ministries church, which has five members, including she and her husband. S/Edwards also goes into the prisons and meets with some of the inmates as clergy. One of the inmates, Beverly Arundel, learned of s/Edwards through inmate, Wendi Andriano. According to s/Edwards, Arundel called saying she has a business and since s/Edwards is clergy, Arundel

| OFFICER NAME & SERIAL # |
|---|
| Detective K. Carroll  11692 |

MPD 004 Rev 3/91

**MESA POLICE DEPARTMENT CONTINUATION REPORT**   | DR #   20011240460 |

was hoping she could help her daughter, Amber (who is 16 years old and does not have ID), by cashing checks so bills could be paid.  S/Edwards told me she got the first two checks for $4500.00 each, which she cashed at this branch of Compass Bank earlier this week, from Amber.  She met Amber and another female, who was driving the car Amber was in, on the side of US60 near Alma School this past Monday.  Amber was unable to explain why they met on the side of US60.  S/Edwards said she was to cash the checks and, after depositing some of the money in several inmate's accounts, give the rest to Amber.  S/Edwards claimed this is what she did.  S/Edwards told me that she deposited $1200.00 of the money into Beverly's account at Estrella.  I asked s/Edwards why she had first requested two cashiers checks for $4500.00 each, made out to Affordable Bails Bond for Carolina.  S/Edwards told me she forgot that she had requested that first, but was unable to explain who Carolina was or why the request for cashiers checks made payable to affordable bails bond.

S/Edwards told me she got the third Compass Bank check, which she was attempting to cash today, from Amber on 050201 at the Boys and Girls Club located on the corner of Gilbert and Elliot in Gilbert. S/Edwards admitted to cashing all three checks, but denied knowing that they were counterfeit or part of fraudulent activity.

S/Edwards told me about additional checks she had cashed for Arundel:

The first two were for her church, New Life Ministries.  One was for $4000.00 and the other for $4500.00. They were deposited into New Life Ministries account at Desert Schools Federal Credit Union.  According to s/Edwards, these checks were a contribution to the church by Arundel and Amber.  I asked if Arundel or Amber were members of her church or ever attended her church.  S/Edwards claimed they were not and had not.  I asked her why they would be willing to make such a large donation.  S/Edwards claimed it was for tax purposes.  S/Edwards was then to return the money to them, which s/Edwards says she did.  This occurred last month.

The next two checks went into Cynthia Edwards' account at Desert Schools Federal Credit Union.  This included a check for $1000.00 (which s/Edwards claims came back NSF) and another for $4000.00.

The fifth and sixth checks were made payable to Cynthia Edwards and cashed at a Northern Trust branch located at Greenfield and the freeway for $4000.00 and $4500.00, with the money going to Amber. Cynthia told me that Amber did give her $1000.00 from the two checks.

The seventh and eighth checks were made payable to Cynthia Edwards and cashed at a Bank One branch for the amounts of $6500.00 and $2000.00.  One of them had been on a business account and the other on a personal account.

The last three checks, according to s/Edwards, were the two that were cashed at Compass Bank for $4500.00 each and the third check she had been trying to cash today for $5000.00.

When asked if she thought it was strange that Amber had access to so many large dollar amount checks over a short period of time, s/Edwards told me it did seem weird, but she wasn't keeping the money.  S/Edwards claimed she only kept $1000.00 of the money, which she had been given by Amber.  See s/Edwards' written statement for further details.

| OFFICER NAME & SERIAL #
Detective K. Carroll  11692 |

MPD 004 Rev 3/91

**MESA POLICE DEPARTMENT CONTINUATION REPORT**   DR #   20011240460

S/Edwards denied telling the bank cashiers that she had done work for Arizona Retirement Centers, Inc.

From her bag, s/Edwards provided a telephone number for Amber.  Officer Daniels contacted Amber Troub at that number.  Amber told Officer Daniels that she does know s/Edwards.  Amber said s/Edwards knows her mother, Beverly Arundel, who is in jail at Estrella on forgery and fraud charges. According to Amber, the last time she saw s/Edwards was a couple of weeks ago, when Amber and a friend had a blow-out on US60 near Alma School.  S/Edwards had come by to help them.  Amber denied knowing anything about or having any involvement with the counterfeit checks.

S/Edwards was arrested and transported to the Mesa PD Holding Facility, where she was booked on three counts of forgery.  At the Holding Facility, Officer Clark provided me with evidence found in s/Edwards bags, incident to arrest.  These items included:

1.  Bank One check #7170, written on the account of Datacheck and made payable to Cynthia Edwards for the amount of $6500.00.  S/Edwards' OLN▮▮▮▮▮▮▮▮ is written at the top of the check.  The check appears to have been endorsed by s/Edwards as well.  The stamp on the back of the check seems to indicate the check was presented on 042701 at 1517 hrs., but had not been cashed.

2.  Community Bank of Arizona check #121273, written on the account of Freedom Plaza-Arizona and made payable to Cynthia Edwards for the amount of $4500.00.

3.  A piece of paper with the name, DOB, and booking number of Terri Livingstone.  The paper also contains an additional booking number without further information.

4.  A Desert Schools Federal Credit Union printout for Cynthia Edwards dated 042401 at 0814 hrs; documenting the deposit of a $4500.00 and a $1000.00 check and advising of the release dates.  The printout is signed by s/Edwards.

5.  A note card with the name of Wendi Andriano and her cell block number.  It has a date of 043001 and a time of 1630 hrs.  The card is noted, "Last visit one month ago".  There is also a note about (3,500 keep) and Balance on (2) books.

6.  A piece of paper with the name, Carolina, and the phone number of 602-410-3781.

7.  A carbon for a Desert Schools Federal Credit Union check #125, written on the account of New Life Ministries and dated 041001 for the amount of $3000.00.  There is a note in the memo line saying, "Prison Fund".

8.  An envelop with numerous figures listed and added.  There is a circle around a thousand and the word, "mine" next to it.  Amber's name and a phone number are written below the figures.

9.  A piece of paper with Amber's name and phone number, Carolina's name in parenthesis, a figure scribbled out, a note saying, "4 or 5 more" followed by, "4500 each".  Underneath that is a note saying, "money order for 10,000.00 Back".  An arrow points from "10,000.00" to the note, "verify with Amber". There is another note saying, "(Afordable BailsBond) followed by "9 leave alone".

| OFFICER NAME & SERIAL # |
| --- |
| Detective K. Carroll  11692 |

MPD 004 Rev 3/91

PAGE 6 OF 7

**MESA POLICE DEPARTMENT CONTINUATION REPORT**    DR #   20011240460

10. An envelop from Andriano to s/Edwards stamped from Estrella Jail

11. A carbon for Desert Schools Federal Credit Union check #453, written on the account of Cynthia Edwards, dated 050201 and made payable to Caroline Pena for the amount of $155.00.

12. A carbon for Desert Schools Federal Credit Union check #451, written on the account of Cynthia Edwards, dated 050101 and made payable to Compass Bank for the amount of $5.00.  The memo line reads, "Cashiers Ck (Carolina)".

13. An envelop with the name of Trivia Thompson and the address of Perryvale Prison in Goodyear handwritten on it.  Below that information was a figure of 500.

14. A Maricopa County Sheriff's Office visitor form with inmate, Andriano's, name and info and the visitor name of Cynthia Edwards.

15. A Maricopa County Sheriff's Office visitor form with inmate, Andriano's, name and info and the visitor name of Cynthia Edwards.  Written in the amount line is 500.00.

16. A piece of paper, containing numerous figures and computations.  A note saying, "church name" is next to a 4000 and 5000.  A note saying, "Cynthia's name" is next to the figures 4500, 1000, 2000, 6500.  There is also a note to call Amber and Amber's phone number.  After some of the figures there are notes saying, "came back"  "used it to clear the one for 4,000"  "Good"  "No good Bank"  "good check NSF Funds".

17. A handwritten letter from Wendi to s/Edwards explaining how Wendi lied to her dad about why s/Edwards gave her $250.00.  Wendi also tells s/Edwards she hopes s/Edwards got her more money.  Wendi outlines $9000.00, which she says s/Edwards had, and lists the amounts out of that which s/Edwards has already given to Wendi, Paula, Bev, and Pat.  Wendi then says she wants s/Edwards to place additional amounts of money on Wendi, Bev, and Pat's accounts.  After completing this, Wendi advises s/Edwards that she should be left with $5600.00 out of the $9000.00.  Wendi then says, "That's only half of what I told you but the rest will be in to you by Sat. or so.  Thank you for doing all this for me.  I really appreciate it."

When I questioned s/Edwards concerning the letter in her property from Wendi, s/Edwards admitted that she had received $5600.00 and not $1000.00 as she had previously told me.  I asked s/Edwards about the different account holders on the checks she had in her purse.  S/Edwards told me she had not looked at the checks closely and was unaware of different account holders.

I seized this property, along with counterfeit Compass Bank check #153646, Az Driver license OLN# ▓▓▓▓▓▓▓ and Capital One Visa card belonging to s/Edwards.  The items were later placed into Mesa PD Property as evidence.

On 050901 I called the phone number listed on one of Cynthia's papers for Carolina.  A female answered the phone and identified herself as Carolina Pena.  Pena told me she knows s/Edwards through her friend Amber.  Pena told me that she had a blow-out while driving her car on US60 on 042401.  Amber was with her at the time.  They needed someone to assist them and Amber knew s/Edwards was clergy to her mother, Beverly, who is currently in jail.  Amber called s/Edwards, who came by their location.  S/Edwards talked

| OFFICER NAME & SERIAL #            |
|------------------------------------|
| Detective K. Carroll  11692        |

MPD 004 Rev 3/91

                    K000000009

**MESA POLICE DEPARTMENT CONTINUATION REPORT**    | DR #   20011240460 |

with them a short time and left.  Pena did not see Amber give s/Edwards any checks.  Pena said she is unaware of s/Edwards cashing any checks for Amber or giving her any money.  I asked Pena if she had been incarcerated recently.  Pena said she had not.  In fact, Pena told me she went into the hospital to have her baby on 042601 and got out of the hospital on 050101.  Pena said she was not trying to bond anyone out of jail and did not know anyone who needed bonded out.

I received Mesa PD DR# 20011210670 after I conducted my interviews and investigations on 050401 reference this case.  Since my investigation covered the incident reported in DR# 20011210670 and all charges reference that case are included under this current report, DR# 20011210670 was cleared exceptional to DR# 20011240460.  A copy of DR#20011210670 is attached to this report.

Based on the following information, I believe probable cause exists to charge suspect/Edwards with three counts of forgery 13-2002.A3:

> On 050401 at 1320 hrs. Compass Bank check #153646, written on the account of Arizona Retirement Centers, Inc. and made payable to Cynthia Edwards for the amount of $5000.00, was presented to bank teller, w/Omair, at the Compass Bank branch located at 4450 E. Main in Mesa.  Along with the check, Az picture driver license and Capital One Visa card belonging to Cynthia Edwards were also presented.

> On 050101 at approximately 1245 hrs. two Compass Bank checks #153644 and #153645, written on the account of Arizona Retirement Centers, Inc. and made payable to Cynthia Edwards for the amount of $4500.00 each, were presented to bank teller, w/Muir, at the Compass Bank Branch located at 4450 E. Main in Mesa.  Along with the checks, an Az picture driver license belonging to Cynthia Edwards was also presented.

> The checks were confirmed with the account holder to be counterfeit/forged.

> Mesa PD Officers, who responded to 4450 E. Main on 050401 reference a forgery in progress, contacted s/Cynthia Edwards inside the bank.  S/Edwards was positively identified to the officers as the presenter of the counterfeit/forged check.

> Bank teller, w/Muir, positively identified s/Edwards as the presenter of the two counterfeit/forged checks on 050101.

> Under Miranda, s/Edwards admitted to presenting the two counterfeit/forged checks on 050101 and the counterfeit check on 050401.

> Although s/Edwards denied knowing the checks she presented were counterfeit, the inconsistencies in her statements to the bank tellers, when compared to the statements she gave me, the number of checks and the amount of money involved, the number of different banks the checks were written on, and numerous other inconsistencies in her story clearly demonstrate s/Edwards' intent to defraud.

All witnesses and victims are willing to assist with prosecution.  I have included a completed complaint/warrant and release questionaire with this case for submission to the Maricopa County Attorney's Office for review and possible filing of the listed charges.

| OFFICER NAME & SERIAL #
| Detective K. Carroll  11692 |

MPD 004 Rev 3/91

MESA POLICE DEPARTMENT CONTINUATION SHEET

SUPP [X]                                                          DR#: 20011240460
TYPE: Continuation [ ]          Information Only [X]              Clearance [ ]

CRIME TYPE: Forgery

VICTIM: Compass Bank

SUSPECT: Cynthia Edwards


Peoria. Troub identified herself by Az picture driver license. According to Troub, her friend, Carolina

Pena, needed $10,000.00 to save her mother, Yolanda Gomez', house. The house had been been

put up as collateral for the bond of a guy named Roman Borquez. Borquez failed to show for his

court appearance and Gomez was going to lose her house.


Troub told me that her mother, Beverly Arundel, who was currently being held in the Estrella Jail, had

a friend, Cynthia Edwards, who could loan the money to Gomez. Gomez could then make payments

to Edwards to pay off the loan. Troub believed Beverly knew Edwards through another friend,

Wendi, who was also in jail. Troub said Beverly gave her a phone number for Edwards.


Troub said she and Pena called Edwards and set up a meeting with her in Scottsdale about one

month ago. They got lost and did not end up meeting Edwards that day. The two set up another

meeting with Edwards, off of Power Road in Mesa on Friday, April 27th. She remembered the date

because Pena went to the hospital that night and had her baby. On the way to meet Edwards, their

car had a flat tire at Alma School and US60. They called Edwards, who came and helped them.


STATUS:                                                          PAGE 1
CLEARED ARREST [X]    CLEARED EXCEPT. [ ]    INVES. CONT. [ ]   CLOSED INACTIVE [ ]
SUPERVISOR:           DATE: 031202           DETECTIVE: K. Carroll 11692
    FILED 7840 (ACT.)                            KBC
    COPY TO CA 13-13-02 KH                                    MAR 1 3 2002

MESA POLICE DEPARTMENT CONTINUATION SHEET

SUPP [X]                                                                    DR#:  20011240460
TYPE:  Continuation [ ]                    Information Only [X]              Clearance [ ]

Edwards asked how much money was needed.  They told her the exact amount was $10,454.00.

Troub told me that no money or checks exchanged hands at that time.


Troub told me that Edwards gave Pena the entire amount some time after she got out of the hospital.

She believes Pena met Edwards at her job (possibly a hospital).  Edwards gave her cashier's checks

totaling $10,000.00, $350.00 in cash, and a personal check for $150.00.  Troub said Pena told her

she cashed the personal check and then paid Affordable Bail Bonds with the cashier's checks and

$454.00 in cash.  Troub was not present at that time.  Troub went with Pena to Affordable Bail Bonds

on 050501 to pick up the deed.  Troub said Carolina signed some papers and they left.


When asked how Edwards came up with $10,500.00, Troub said Edwards explained that she would

get the money from her husband's church donations.


NFI


STATUS:                                                                     PAGE 2
CLEARED ARREST [X]      CLEARED EXCEPT. [ ]     INVES. CONT. [ ]    CLOSED INACTIVE [ ]
SUPERVISOR:             DATE: 031202            DETECTIVE:  K. Carroll  11692

K000000012

K000000013

K00000014

11/23/2004   14:44   CLERK OF COURT → 67950                                                NO.499   P10

JUN 0 4 2002

IN THE SUPERIOR COURT OF THE STATE OF ARIZONA
IN AND FOR THE COUNTY OF MARICOPA

THE STATE OF ARIZONA,                    )    NO. CR 2002-000712
                                         )
                    Plaintiff,           )    PLEA AGREEMENT
                                         )
        vs.                              )
                                         )
CYNTHIA LA VERN EDWARDS (C),             )
                                         )
                    Defendant.           )
                                         )

The State of Arizona and the Defendant hereby agree to the following disposition of this case:

**Plea:**  The Defendant agrees to plead GUILTY to:

Count 11: FORGERY, A CLASS 4 FELONY in violation of A.R.S. §§ 13-2002, 13-2001, 13-701, 13-702, 13-702.01, and 13-801 committed on 5/1/01.
Count 15: FORGERY, A CLASS 4 FELONY in violation of A.R.S. §§ 13-2002, 13-2001, 13-701, 13-702, 13-702.01, and 13-801 committed on 5/5/01.
Count 41: FRAUDULENT SCHEMES AND ARTIFICES, A CLASS 2 FELONY in violation of A.R.S. §§ 13-2310, 13-701, 13-702, 13-702.01, and 13-801 committed between 4/30/01 – 11/9/01.

These are non-dangerous, non-repetitive offenses under the criminal code.

THIS OFFER EXPIRES AND IS REVOKED IF NOT ENTERED IN COURT BY June 28, 2002.

**Terms:**  On the following understandings, terms and conditions:

1.  The crimes carry presumptive sentence of 2.5/5 years; minimum sentences of 1.6/4 years (1/3 years if trial court makes exceptional circumstances finding); and maximum sentences of 3/10 years (3.75/12.5 years if trial court makes exceptional circumstances finding). Probation is available. Restitution of economic loss to the victim and waiver of extradition for probation revocation procedures are required. The maximum fine that can be imposed is $150,000.00 plus a 77% surcharge. If the Defendant is sentenced to prison, the Defendant shall also be sentenced to serve a term of community supervision equal to one-seventh of the prison term to be served consecutively to the actual period of imprisonment. If the Defendant fails to abide by the conditions of community supervision, the Defendant can be required to serve the remaining term of community supervision in prison. Special conditions regarding the sentence imposed by statute (if any) are None.

2.  The parties stipulate to the following additional terms, subject to court approval at the time of sentencing as set forth in paragraph 7;  ~~Defendant shall be sentenced to the Department of Corrections, term to be determined by the Court.~~ Defendant shall pay restitution to all victims, including dismissed counts, in an amount not to exceed $250,000. **No Agreements.**

3.  The following charges are dismissed, or if not yet filed, shall not be brought against the Defendant:  2, 2A, 5-8, 10, & 12-14. The State agrees to dismiss the allegation of A.R.S. § 13-702.02.

4.  This agreement serves to amend the complaint or information, to charge the offense to which the Defendant pleads, without the filing of any additional pleading. However, if the plea is rejected by the court or withdrawn by either party, or if the conviction is subsequently reversed, the original charges and any charges that are dismissed by reason of this plea agreement are automatically reinstated.

5.  If the Defendant is charged with a felony, she hereby waives and gives up her rights to a preliminary hearing or other probable cause determination on the charges to which she pleads. The Defendant agrees that this agreement shall not be binding on the State should the Defendant be charged with or commit a crime between the time of this agreement and the time for sentencing in this cause; nor shall this agreement be binding on the State until the State confirms all representations made by the Defendant and her attorney, to-wit:  Defendant avows no prior felony convictions.  If the Defendant fails to appear for sentencing, the court may disregard the stipulated sentence and impose any lawful sentence which is the same as or exceeds the stipulated sentence in the plea agreement. In the event the court rejects the plea, or either the State or the Defendant withdraws the plea, the Defendant hereby waives and gives up her right to a preliminary hearing or other probable cause determination on the original charges.

K000000015

11/23/2004     14:44     CLERK OF COURT → 67950                                      NO.499    P11

THE STATE OF ARIZONA,                    )     NO. CR 2002-000712
                                         )
                    Plaintiff,           )
                                         )     PLEA AGREEMENT
          vs.                            )
                                         )
CYNTHIA LA VERN EDWARDS (C),             )
                                         )
                    Defendant.           )
                                         )

Unless this plea is rejected by the court or withdrawn by either party, the Defendant hereby waives and gives up any and all motions, defenses, objections, or requests which she has made or raised, or could assert hereafter, to the court's entry of judgment against her and imposition of a sentence upon her consistent with this agreement. By entering this agreement, the Defendant further waives and gives up the right to appeal.

The parties hereto fully and completely understand and agree that it is the court's duty to impose sentence upon the Defendant, and that any sentence either stipulated to or recommended herein in paragraph two is not binding on the court. If after accepting this plea the court concludes that any of the plea agreement's provisions regarding the sentence or the term and conditions of probation are inappropriate, it can reject the plea. If the court decides to reject the plea agreement provisions regarding sentencing, it must give both the state and the Defendant an opportunity to withdraw from the plea agreement. In case this plea agreement is withdrawn, all original charges will automatically be reinstated. The Defendant in such case waives and gives up her right to a probable cause determination on the original charges.

If the court decides to reject the plea agreement provisions regarding sentencing and neither the State nor the Defendant elects to withdraw the plea agreement, then any sentence either stipulated to or recommended herein in paragraph 2 is not binding upon the court, and the court is bound only by the sentencing limits set forth in paragraph 1 and the applicable statutes.

This plea agreement in no way affects any forfeiture proceedings pursuant to A.R.S. § 13-4301 et seq., § 13-2314, or § 32-1993, if applicable, nor does the plea agreement in any way compromise or abrogate any civil actions, including actions pursuant to A.R.S. § 13-2301 et seq. or § 13-4301 et seq., or the provisions of A.R.S. § 13-2314 or A.R.S. § 13-4310.

I have read and understand the provisions of pages one and two of this agreement. I have discussed the case and my constitutional rights with my lawyer. I understand that by pleading GUILTY I will be waiving and giving up my right to a determination of probable cause, to a trial by jury, to confront, cross-examine, compel the attendance of witnesses, to present evidence in my behalf, my right to remain silent, my privilege against self-incrimination, presumption of innocence and right to appeal. I agree to enter my plea as indicated above on the terms and conditions set forth herein. I fully understand that if, as part of this plea agreement, I am granted probation by the court, the terms and conditions thereof are subject to modification at any time during the period of probation. I understand that if I violate any of the written conditions of my probation, my probation may be terminated and I can be sentenced to any term or terms stated above in paragraph one, without limitation.

I have personally and voluntarily placed my initials in each of the above boxes and signed the signature line below to indicate I read and approved all of the previous paragraphs in this agreement, both individually and as a total binding agreement.

Date ___5/31/02___        Defendant _____
                                    CYNTHIA LA VERN EDWARDS

I have discussed this case with my client in detail and advised her of her constitutional rights and all possible defenses. I believe that the plea and disposition set forth herein are appropriate under the facts of this case. I concur in the entry of the plea as indicated above and on the terms and conditions set forth herein.

Date ___5/31/02___        Defense Counsel _____
                                           Maria L. Schaffer

I have reviewed this matter and concur that the plea and disposition set forth herein are appropriate and are in the interests of justice.

Date ___4/23/02___        Prosecutor _____
                                      Elizabeth A. Gilbert

                                    2

                    000004381                        K000000016



June 20, 2002


Dear Judge Galati.

My name is Cynthia Edwards. My sentencing date is June 28, 2002 at 8:30am. I am praying that this letter gets to you prior to the sentencing date and that you will be able to read and maybe better understand what took place prior to my arrest, pre-trial conference, and plea-agreement hearing.

The only person I knew concerning this entire ordeal is a lady by the name of Wendi Andriano. Years ago as a high school student I knew Wendi. We are both from Casa Grande. We were both raised hard-core Christians. I also knew Wendi's husband Joe. He and I went to school together. In the time that Wendi and I were apart, I had obtained my ministry license, and I had been in good standing with the church. Wendi had continued to provide for her family (her husband was diagnosed with cancer and found it hard to work). Wendi made over $60,000.00 a year and never had any financial problems.

One morning about 2 years later (since we had contact) Wendi's face came across the TV saying she had killed her husband. Being the friend as well as minister that I am, I went to see her. She explained to me that her husbands death was self-defense, which I know now was not true. I had no reason to doubt her because of the close relationship we had for so long, and the relationship I thought she had (I know she had at one time) with the Lord. While visiting her at estrella jail, we would have bible studies, I also conducted a bible study under the chaplain there at the jail during inmate chapel time. I also provided communion (the guards would allow other inmates to join in the communion), I never once met or knew the person by the name of Beverly Ardando.

One day after numerous and consistent visits to see Wendi, she asked me if I would do a favor for her. She said a lady in there with her has a business on the outside (sub-contracting). She wanted to know if I would cash a couple of checks for her and give the money to her daughter (the daughter had no ID) so that the business would not suffer. Wendi led me to believe that the lady would be getting out soon. Since the lady was a sub-contractor I told Wendi I would do it only if the company's she's contracted with would make the check payable to me (I worked in the bank for 8 years and I know that third party checks are hard to cash and I did not want to have to go through a lot of red tape). I agreed. The young lady I thought was Beverly's daughter Amber (whom I received the check from as well as gave the money to), I later found out she was no relation to Beverly. All charges were dropped against this female because she knew all the players (my co-defendants) and helped the prosecution indicted all of them. So I became apart of something that I had no clue or idea I was apart of because of Wendi and some girl, that I don't know. Neither of them are in this picture or have been or will be charged. I have never met or talked to any of my co-defendants. Two of the tapes in evidence, that I have in my custody (from my attorney) have Beverly, her daughters and her sister

K000000017

11/23/2004    14:44    CLERK OF COURT → 67950                          NO.499      P09

                        ID:                              JUN 21'02      8:56 No.003 P.03

talking about how they checked me out on the internet and how I was clean and that they could use me to cash the checks for them.

As I am typing this letter to you, my mere words sound foolish to me now because I can see red flags jumping all over the place. Please note, at the time this took place I did not. I've always known Wendi to have big money as well as associate herself with white collar people, so the large amount of the checks did not phase me at the time. You might even wonder why I didn't get the fact that these women, Wendi and Beverly were in jail and that should have been a red flag. Well I have never in my life seen the inside of a jail (other than on TV), not even to visit before I went on Wendi's behalf. I thought she was innocent (of her charges) and our visits were strictly clerical. Before now I would have almost sworn to you that Wendi would never betray the trust and friendship we had in each other.

Humbly yours,

Cynthia L. Edwards

000004383                                                    K000000018

11/23/2004    14:44    CLERK OF COURT → 67950                                        NO.499    P01



The Superior Court of Arizona in Maricopa County – Adult Probation Department **F I L E D**
Chief Probation Officer Barbara A. Broderick                    07-31-02   3:30 pm
                                                                MICHAEL K. JEANES, Clerk
**PRESENTENCE INVESTIGATION**                         By   _____
                                                                Deputy

State of Arizona v. Cynthia Lavern Edwards, CR2002-000712C          

Superior Court Criminal Division SAJ 04

Sentencing Date: **June 28, 2002**

Sentencing Judge: **Frank T. Galati**          Prosecutor:        **Elizabeth Gilbert, DCA**
PSI Officer:        **Shani Martinez**          Defense Counsel: **Maria Schaffer, DPD**

**PRESENT OFFENSE:**

The following information is summarized from Maricopa County Sheriff's Office Departmental Report #01-21628; Mesa Police Departmental Reports #2001-1240460 and 2001-1210670; Arizona Department of Public Safety Report #2001-078637:

On May 1, 2001, the defendant passed two counterfeit checks at Compass Bank, resulting in a loss to the bank of $9,000.00. On May 4, 2001, she attempted to pass another counterfeit check of $5,000.00 at the same branch. She was detained an arrested. She denied knowing the checks were bad, and she had been given them by codefendant A so she could put money on jail inmate accounts. She met codefendant A while working as volunteer ministry in the jail and was introduced by another inmate.

The defendant told police she received a telephone call from codefendant A, who told her she had a business. She asked the defendant to cash checks for her sixteen-year-old daughter who had no identification and put some of the money on accounts for other jail inmates. The defendant believed codefendant A had a business, so the size of the checks did not surprise her. The first check she cashed went through her own bank for $1,000.00. It was no good, she told codefendant A, and codefendant A cleared the check with other money. In April 2001 she cashed two checks at Desert Schools Federal Credit Union totaling $8,800.00. She cashed two more the same month, same bank totaling $5,000.00. She cashed two at Northern Trust Bank totaling $8,500.00. She cashed two at Bank One totaling $8,500.00.

Found in her bag incident to arrest were various other large dollar counterfeit checks and correspondence from various codefendants revealing her involvement was far more than she was reporting to police. She claimed she only received at total of $1,000.00. However, one of the documents in her possession showed she received $5,600.00, and when asked by police why she lied, she gave a contradicting answer. She denied being involved with multiple fraudulent check cashing. She told police inconsistent stories and told the tellers other stories.

Police determined the defendant was actually involved with at least eleven counterfeit checks totaling more than $40,000.00. The checks had been provided by codefendant D, codefendant A's older daughter. The checks were made by codefendant B, who is the sister to codefendant A and aunt to codefendants D and E.

PAGE 1

K000000019

11/23/2004    14:44    CLERK OF COURT → 67950                                    NO.499   P02

The Superior Court of Arizona in Maricopa County – Adult Probation Department
*Chief Probation Officer Barbara A. Broderick*

State of Arizona v. Cynthia Lavern Edwards, CR2002-000712C

Between April 30, 2001 and November 9, 2001, Beverly Jo Arundel (codefendant A) had her daughter, Amber Troub (codefendant D), Carolina Pena, and her other daughter, Ashley Troub (codefendant E), all three minors, engage in criminal activity involving check forgery, counterfeiting, sales and cashing, to benefit codefendant A who was in custody. Codefendant A was the person who instructed her daughters to deposit money into her jail account following their check cashing schemes. The defendant also deposited monies into codefendant A's account. Bobbie Valles (codefendant B), codefendant A's sister, made the counterfeit checks and delivered checks. She obtained the check information through her mother's business. Gabriel Garcia (codefendant F) accompanied Ashley Troub to deliver counterfeit checks to various persons. Some of the financial institutions and businesses victimized were: Northern Trust Bank, Sun Valley Group, Inc., Compass Bank, Arizona Retirement Centers, Norwest Bank, Century 21, Chase Manhattan Bank, United Healthcare, Bank of America, Salomon Smith Barney, Bank One, Pinnacle West, LaSalle National Bank, Lifecare Centers of America Inc., Nations Bank, Lou Grubb, Mellon Bank, Contact—a division of Banner Health Systems, Catholic Healthcare West, Wells Fargo Bank, and Freedom Plaza.

DEFENDANT'S STATEMENT:

An old friend was in jail, and she went to see her, as the defendant is clergy. This friend asked her to cash a couple of checks. She trusted the friend, as she had known her for years. The defendant cashed the checks and gave them to the daughter of her friend's friend. As she was about to cash the second check, the bank noticed the first check was no good. The police were called and she was arrested. She had not idea the checks were not good.

She would like the Court to take no further action as restitution of approximately $2,000.00 should satisfy the situation. She signed the plea agreement and feels she should not be punished for this, as she did not know the checks were fake. She thought she was helping out a friend. She accepts her involvement in the offenses, but she reiterated she did not know they were fake and she was helping a friend.

The defendant does not know any of the other codefendants in this case, she told police everything she knew, even though the police officer called her a liar and arrested her. She knew nothing of the system and this world, now she knows. She did not receive any money for cashing the checks. She was helping her friend through her ministry.

The range of sanctions were discussed. The defendant stated she is a single parent with two children, and the police "have no proof." However, her hands are tied because the options she was given, she cannot afford, so she had to plead guilty. She "prays" the lord will speak. If she had money and no children, she would have taken this to trial as she stated, "I am innocent." She was used.

She provided a letter for the Court elaborating on her statement.

PAGE 2

K000000020

**The Superior Court of Arizona in Maricopa County – Adult Probation Department**
*Chief Probation Officer Barbara A. Broderick*

State of Arizona v. Cynthia Lavern Edwards, CR2002-000712C

The defendant also stated she had already made arrangements on the date of sentencing to go to California and Disneyland. Also, she was finalizing arrangements to go to Africa in August 2002. She wanted to know if probation would interfere with her travel plans. The range of sanctions were again discussed to include probation, prison, jail, and travel sanctions on probation. She indicated she would put off her plans to go to Africa until the outcome of sentencing.

CODEFENDANT ACTION:

Codefendant A, Beverly Jo Arundel, entered a plea agreement to count I, participation in a criminal syndicate, a class 2 felony with one prior felony conviction; count IV, money laundering, first degree, a class 2 felony, with one prior felony conviction; count VI, conspiracy to commit fraudulent schemes and artifices, a class 2 felony, with one prior felony conviction; and count XLI, fraudulent schemes and artifices, a class 2 felony, with one prior felony conviction. She committed the present offenses while pending charges of fraudulent schemes and was sentenced to prison on the other case during which time she continued to conduct the scheme in the present offenses. She was scheduled to be sentenced June 21, 2002. No further information was found.

Codefendant B, Bobbie Valles, entered a plea agreement to count VII, conspiracy to commit assisting a criminal syndicate, a class 2 felony; count IX, computer tampering, a class 3 felony; and count XLI, fraudulent schemes and artifices, a class 2 felony. She is scheduled to be sentenced July 25, 2002 before Judge Ballinger.

Codefendant D, Amber Troub, entered a plea agreement to count III, assisting a criminal syndicate, a class 4 felony; count V, money laundering, a class 3 felony, count XXII, forgery, a class 4 felony, and count XLI, fraudulent schemes and artifices, a class 2 felony. She is scheduled to be sentenced July 1, 2002 before Judge Schwartz.

Codefendant E, Ashley Troub, has not entered into a plea agreement. A status conference is scheduled July 26, 2002 before Judge Schwartz. When her sister Amber was interviewed by this officer, she stated Ashley is still a juvenile and is pregnant.

Codefendant F, Gabriel Lopez Garcia, has not entered into a plea agreement. A status conference is scheduled July 26, 2002 before Judge Schwartz.

Codefendant G, Mario Carbajal, entered a plea agreement to count XXXVIII, solicitation to sell dangerous drugs, a class 4 felony. He was sentenced to three years probation, three months delayed jail, and a fine on May 16, 2002 before Judge Schwartz.

STATEMENT OF VICTIMS:

Victim contact information was not provided by the County Attorneys Office, and this officer requested information from victims where information could be determined through the

The Superior Court of Arizona in Maricopa County – Adult Probation Department
*Chief Probation Officer Barbara A. Broderick*

State of Arizona v. Cynthia Lavern Edwards, CR2002-000712C

police report while working on a codefendant report. However, no information has been received. The loss to the victims is substantial monetarily.

Some of the losses directly attributed to the defendant were clear in the police report. However, due to the nature of this scheme, this officer is unsure if all losses are joint and severally for all of the defendants. Therefore, the ledger reflects only codefendant's A, B, and D as joint and severally liable with the defendant, as A, B, and D were the main participants of the scheme.

STATEMENT OF INTERESTED PARTIES:

The defendant was screened for Furlough Programs by Adult Probation screener Amona Roberts and found to be appropriate.

SOCIAL HISTORY CONSIDERATIONS:

Unless otherwise noted, the following information was provided by the defendant:

She reported no mental or physical health issues. She has been divorced for six months and lives with her two children ages five and seven. She does not receive child support at this time as her ex-husband recently lost his job. When his employment resumes, so should child support. She is close to her five siblings and her immediate family, and she stated thy are all well off.

She is a high school graduate (unverified) and completed an associates in science from Central Arizona College (unverified.) She is a certified Phlebotomist and is going through the certification with her current employer as a dialysis technician. She has to renew her Phlebotomist certification one a year. A Word Recognition Aptitude Test administered to the defendant indicates a reading ability above the sixth grade level.

SUBSTANCE USE:

She initially denied any use of illegal substances. Later, she admitted experimenting with marijuana several times as a high school senior. She denies any other use or experimentation with illicit substances or the need for treatment.

She tried alcohol in the past, but did not provide the age at which she first tried alcohol. She does not like the taste and her religion asks for her to abstain. She stated she would ask anyone who drinks to abstain. She denied the need for treatment.

FINANCIAL STATUS AND EVALUATION:

She believes if her employer becomes aware of her offenses, she might be terminated. (Licensing board notification attached.) She has been with her current employer, Renal Care

PAGE 4

The Superior Court of Arizona in Maricopa County – Adult Probation Department
*Chief Probation Officer Barbara A. Broderick*

State of Arizona v. **Cynthia Lavern Edwards**, CR2002-000712C

Group since May 2002.  She was making a lot of money prior to her arrest as a Phlebotomist coordinator.

She cited assets $2,000.00 which includes her vehicle and bank account.  Later she reported she had bought a home and cited the asset as $78,000.00.  She has bad credit so the home is in her mother's name.  She is paying the owner for seven years, then she will finance the home in her own name when her credit is good.

She cited liabilities of $500.00 in credit card debt and $300.00 in medical debt.  She earns bi-weekly $740.00 per paycheck, and she receives $470.00 per month in child support.  She and her children are covered medically by the Arizona Health Care Cost Containment System (AHCCCS).  Her pay rate is $9.00 per hour, and she has over-time opportunities but they are discouraged.  She reported there were a number of documents she could not obtain to verify her expenses, as some are in her parents' name and mailed to their home, or her ex-husband has them and they are unavailable.  She reported monthly expenses as follows: $478.00 mortgage, $200.00 utilities including cable television, telephone, and cellular telephone service, $110.00 insurance, $450.00 groceries, $50.00 for orthodontist, and $200.00 for gasoline.

Her adjusted gross income for 2001 according to an IRS statement was $25,438.00.  Her credit report reflects a number of accounts in collections, several recently past due, and several in good standing.

She believes she can afford to pay $50.00 per month toward Court fees and assessments.  She stated she only cashed two checks totaling $9,000.00 but in a form she completed she stated restitution should be about $2,000.00.

The defendant successfully cashed more than just two checks.  The police report showed she was responsible for the successful cashing of eleven checks and was arrested on a twelfth attempt.  She also had in her possession at the time of her arrest a number of large value checks.  The total value of the checks she cashed is $40,800.00.  The defendant should be held responsible for this amount in its entirety, and as previously stated, the ledger reflects her joint and severally liable with the family of defendants who were conducting the scheme.  The defendant noted she could only pay $50.00 per month toward assessments, and she did not disclose to this officer how she was financing her travel plans to Disneyland and Africa.

## DISCUSSION AND EVALUATION:

The defendant is before the Court having used her volunteer clergy position to join a check-cashing scheme and make money for herself.  She claims all of her involvement was for the purpose of helping a friend, she denies knowing any of the codefendants, contrary to the police report, and she claims she never received any money for her involvement and she only cashed two checks.  However, she appears to have been more forthcoming with police.  She told this officer she is innocent of the charges.  She provided a lengthy statement with a number of contradictions, she minimizes her involvement, and she portrays herself as the victim.  She has

PAGE 5

**The Superior Court of Arizona in Maricopa County – Adult Probation Department**
*Chief Probation Officer Barbara A. Broderick*

State of Arizona v. **Cynthia Lavern Edwards,** CR2002-000712C

not voiced any concern for the damage caused by her large dollar successful check cashing, and she was concerned community supervision would interfere with her travel plans.  She denies issues with alcohol or drugs, she is skilled vocationally, and she is currently employed.

Her known criminal history is comprised only of the present offenses.

The plea agreement and available sanctions were considered.  Of great concern to this officer is the defendant's inability to give consistent information.  She portrays herself as the victim although she exploited a volunteer clergy position to further her crimes, deflects blame, and on again and off again admits only a small portion of her criminal activity.  Although incarceration is certainly necessary, this officer has had difficulty deciding whether it should be in prison or in jail.  However, she has not previously been afforded community supervision, she is employable, and her activity had not yet reached the magnitude of her codefendants, although the potential certainly existed.  Therefore, this officer believes a jail sentence and community supervision is appropriate.  The White Collar terms of probation are necessary in order to facilitate supervision and payment of restitution.

These factors were considered in making a sentencing recommendation:

1. The nature of the present offenses, in that her actions resulted in losses to financial institutions exceeding $40,000.00.
2. The defendant denies her involvement, claims she is innocent, portrays herself as a victim, and changed her story multiple times as to her involvement.
3. The presence of accomplices.
4. The plea agreement and available sanctions.
5. The need to impress upon the defendant the seriousness of her actions and need to take responsibility.

RECOMMENDATION:

Count XI AND XV:

It is respectfully recommended the defendant be granted four years standard probation and abide by the following terms and conditions:

Term #8   Do not drink alcoholic beverages.
Term #10  Submit to drug or alcohol testing as directed by probation officer.
Term #11  Successfully complete all programs of assistance, counseling, or therapy as directed by the Probation Department.  In addition, the Court emphasizes the following services.
          Budgeting classes

PAGE 6

K000000024

**The Superior Court of Arizona in Maricopa County – Adult Probation Department**
*Chief Probation Officer Barbara A. Broderick*

State of Arizona v. **Cynthia Lavern Edwards, CR2002-000712C**

| | |
|---|---|
| Term #12 | Pay through the Clerk of the Maricopa County Superior Court: |
| | See count XLI |
| Term #16 | Have no contact with victim(s) unless approved by probation officer. |
| Term #17 | Abide by the following Addendum to Terms of Probation: |
| | White Collar |

Count XLI:

It is respectfully recommended the defendant be granted seven years standard probation and abide by the following terms and conditions:

| | |
|---|---|
| Term #8 | Do not drink alcoholic beverages. |
| Term #10 | Submit to drug or alcohol testing as directed by probation officer. |
| Term #11 | Successfully complete all programs of assistance, counseling, or therapy as directed by the Probation Department. In addition, the Court emphasizes the following services, |
| | Budgeting classes |
| Term #12 | Pay through the Clerk of the Maricopa County Superior Court: |
| | Restitution per the attached ledger sheet. |
| | Probation fees at a monthly payment of $50.00 beginning on November 1, 2002. |
| | A $20.00 time payment fee. |
| Term #13 | Be incarcerated in the Maricopa County Jail, with furlough consideration, for four months beginning on June 28, 2002. |
| | Not to be released until October 27, 2002. |
| Term #16 | Have no contact with victim(s) unless approved by probation officer. |
| Term #17 | Abide by the following Addendum to Terms of Probation: |
| | White Collar |

The defendant has served three days of presentence incarceration.

Reviewed by:

Judge:

Date: 6/27/02

Respectfully submitted by:

Shani Martinez, Senior Adult Probation Officer
(602) 506-3829/June 23, 2002
mailto:smartine@apd.maricopa.gov

PAGE 7

000004390

K000000025

EXHIBIT L

Exhibit No.: 548

Case No.: **CR2000-096032**

For Identification: PLF

12/14/04

In Evidence: PLF

12/14/04

**Clerk of Superior Court**

CR-05-0005-AP

By: _____M. LeSueur_____

(Deputy Clerk)

1000544275

MARICOPA COUNTY SHERIFF'S OFFICE — Joseph M. Arpaio, Sheriff

2 C41

Segregation Days: _____

## DISCIPLINARY ACTION REPORT

DAR #: 18146

**ANDRIANO, WENDY** A631830   DURA/DZ/UNIT II C41   12-3-3/1320

| Inmate Name | Booking # | Facility | Cell/Room | Date/Time |

Specific Offense(s): 105 POSS. OF UNAUTH. ITEMS   121 VIOLATION OF ANY RULES

Formal Statement of Charge(s). (Include who, what, when, where, how, and witnesses): ON 12-2-3 at approx. 1330, while conducting a headcount I briefly searched I/m Andriano's cell (C41) while she had a visit. I found under her mattress a compact & a glass mirror. This had to come into the jail from outside as glass cannot be purchased thru commes. Andriano has made a serious attempt @ suicide by cutting. Today @ approx. 1330 hrs while I was doing clothing xchange, C41 inmates who came in D-pod while off. Lose A1166 conducted cell searches in C-pod and found more contraband in Andriano's cell w/ in her possession. The items include: 2 black pens, a new lipstick in a metal case, lipgloss & eyeliner. None of which can be obtained thru jail commissary.

Officer's Action and Recommendation: These items can be very dangerous to her or any other psych inmate that could get ahold of them.

Written Warning _____ You are being issued a warning for the listed offense(s). An accumulation of minor offenses, for any infractions, can be used as documented evidence in future disciplinary action against you.

_____ Days Disciplinary Segregation   Harris A3345   12-3-3/1330

30 Days Full Restriction   Officer's Signature & A#   Date/Time

I have been informed of the offense(s) listed hereon. I acknowledge receipt of this report and plead: guilty __X__ not guilty _____

Inmate's Signature _____   12-3-3   Date/Time

Supervisor Review/Comments: 15 Days FR   Sgt R. Martin A1449   12/4/03 1800

Supervisor's Signature & A#   Date/Time

**Bureau Hearing Officer Action or Sanctions:**

Findings: 105 - Guilty   121 - Repetitive

THIRD OFFENSE

0 Days Disciplinary Segregation   20 Days Full Restriction

To Commence 0001 _____ to End 2400 _____   To Commence 0001 12/6/03 to End 2400 12/25/03

Time/Date   Time/Date   Time/Date   Time/Date

Hearing Officer: Cole A5500   Forward to Classification: _____

Reclassified: _____

I have been informed of the right to appeal this decision and know I must submit my appeal with my yellow copy attached within 24 hours of the below date/time.

**GUILTY PLEA MAY APPEAL**

Inmate's Signature _____   12/5/03 0645   Date/Time

5000-247  R 7/97   WHITE - Division File Copy   YELLOW - Inmate After Disposition   PINK - Inmate Copy

000004393

# EXHIBIT M

000004394

Exhibit No.: 472

Case No.: CR2000-096032

For Identification: ~~with~~ PLF

10/28/04

In Evidence: PLF

11/10/04

**Clerk of Superior Court**

CR-05-0005-AP

By: _____ M. LeSueur _____
(Deputy Clerk)

1000515700

JUN-01-1999  10:48        DCS                                    2098583939    P.02/05

# STATEMENT OF FINANCIAL STATUS

[INFORMATION PROVIDED ON THIS FORM WILL BE HELD CONFIDENTIAL]

The information you provide in the following statement will be used to determine your ability to repay your defaulted loan. It is to your advantage to be as accurate and clear as possible, and explain any unusual expenses. You must enclose a copy of two recent pay stubs (leave and earnings statement) from you and your spouse, as well as, any other contributing member of your household. You must provide documentation (copies of bills, receipts, etc.) of expenses you list. You may attach additional pages if needed to document additional expenses or provide explanations.

Do not include monthly payments on credit cards. If, for example, you are making payments on a department store card that you use to purchase clothing, list that payment under "clothing" expenses. If you are paying some of your expenses quarterly or annually, such as automobile insurance or property taxes, calculate what the amount would be on a monthly basis and put that amount in the space provided. Do not leave any item blank. If the answer is zero, write zero.

Andriano, Wendi E.
Your Name (Last, First, Middle, Previous) ▓▓▓▓▓▓ Date of Birth   ▓▓▓▓▓▓ Social Security Number

2060 N. Trekell          Casa Grande, AZ 85222  520 426-0403
Current Residence Address        City  State  Zip        Res. Telephone Number

Courtyard Apts.                                  6-98
Your Present Employer(s)                         Date Employed

2060 N. Trekell CG AZ 85222              520 836-4012
Employer(s)' Address(es)      City  State  Zip       Employer(s)' Telephone Number

Community Director Gross Income $2198.46 per MO. Net Income $1921.36 per MO.
Present Position

Number of dependents including self (as defined by IRS) ✓ (Married) _____ Single _____ Divorced _____ w 3 dependents

Andriano, Joe D.
Spouse's Name (Last, First, Middle)                           Social Security Number

Gross Income $  Ø   per _____ Net Income $  Ø   per _____

Other Contributing Resident(s)                               Social Security Number(s)

Gross Income $  Ø   per _____ Net Income $ _____ per _____

OTHER INCOME (Child Support, Alimony, Interest, public assistance, etc.) describe:
Ø
_____
_____

### See Back Page For Privacy Act Notice

CREATED JUNE 98                    Page 1        G:\CORPADMN\PRODUCTN\DEFAULT\AWG\STMTFINSTAT.DOC & H1J-3

000004396

JUN-01-1999  10:49          DCS                          2098583939    P.03/05

**Monthly Expenses**   Please provide documentation for all bills pertaining to shelter, utilities, medical expenses, car payments, car insurance, child expenses and any other insurance you may have.

Shelter:        Rent/Mortgage (To Whom  _Courtyard Apts_  )  $585.35
                    If Buying – Name & Address of Lender)

                Second Home Mortgage  (To Whom  _N/A_  )  $ Ø

                Home Insurance                                     $ Ø

                Property Taxes                                     $ Ø

                Other ( Describe _____ )  $ Ø

Food:                                                              $400.00

Utilities:      Electric                                           $ 80.—

                Gas                                                $ Ø

                Water Sewer                                        $ Ø

                Garbage Pickup                                     $ Ø

                Basic Telephone                                    $ 30.—

                Other (Describe _____ )  $ _____

Clothing:                                                          $ 30.—

Medical Expenses:  Medical Insurance Payments Not Deducted From Paycheck  $ _____

                Medical Bill Payments Not Covered By Insurance  _Mayo, clinic_  $ See bill

                Other (Describe  _Therapy_  )  $240.—

Transportation:  Car Payments (To Whom _____ )  $ _____

                Gas & Oil                                         $ 100.00

                Public Transportation                             $ Ø

                Car Insurance                                     $ Ø

                Other (Describe _____ )  $ _____

Child Expenses   Child Care (Number of Children  _2_  )  $ 700.00

                Child Support (Number of Children _____ )  $ Ø

                Other (Describe _____ )  $ Ø

Other Insurance (Describe _____ )  $ Ø

CREATED JUNE 98                   Page 2          E:\CORPADMIN\PRODUCTN\DEFAULT\AWB\STMTFINSTAT.DOC & H13-3

000004397

JUN-01-1999  16:58        DCS                        2098583939    P.04/05

## Assets

| | | |
|---|---|---|
| All Checking Account Balances | (Where Held Norwest ) | $ 200 + - |
| | (Where Held N/A ) | $ 0 |
| All Savings Account Balances | (Where Held N/A ) | $ 0 |
| | (Where Held N/A ) | $ 0 |

Home --Current Market Value: $_____, Balance of Note: $_____, Equity:   $ 0

Other Property Owned:  Type_____ (If Real Estate, Location _____ )   $ 0

     Current Market Value: $_____, Balance of Note $_____, Equity:   $ 0

Auto #1--Current Market Value: $_____, Balance of Note $_____, Equity:   $ 0
     Make _____ Year_____

Auto #1--Current Market Value: $_____, Balance of Note $_____, Equity:   $ 0
     Make _____ Year_____

Stocks, Bonds and Certificates of Deposit—Current Value:   $ 0

Current Cash (Loan) Value of Life Insurance   $ 0

Other Accounts Receivable or Asset (Describe_____ )  $ 0

## Please sign the declaration below:

I cannot pay my debt in full at this time.   Please schedule monthly payments in the amount of $ 50⁰⁰ based on my financial statement above.

I declare under the penalties provided by Title 18, Sec. 1001 U.S. Code, that the answers and statements contained herein are the best of knowledge and belief true, correct and complete.

_Wendi Andriano_ _____       6-11-99
Signature                                    Date

**WARNING:**  Title 18, Sec. 1001 U.S. Code: "whoever . . .knowingly and willfully falsifies, conceals or covers up by any trick, scheme, or devise a material fact, or makes any false, fictitious or fraudulent statements or representations. ., shall be fined not more that $10,000.00, or imprisoned not more than five years, or both".

000004398

# EXHIBIT N

000004399

Exhibit No.: 487

Case No.: **CR2000-096032**

For Identification: PLF

— OFFERED.

In Ev   BUT NOT

CR-   RCVD -

**Clerk of Superior Court**

By:   M. LeSueur
(Deputy Clerk)

1000518835

8-20-98

# FIRST WEST
## PROPERTIES CORPORATION

# APPLICATION FOR EMPLOYMENT

PRE-EMPLOYMENT QUESTIONNAIRE  AN EQUAL OPPORTUNITY EMPLOYER

## PERSONAL INFORMATION

DATE 5-21-98

NAME Andriano, Wendi E.
       LAST    FIRST    MIDDLE      SOCIAL SECURITY NUMBER ▓▓▓▓▓

PRESENT ADDRESS 20652 W. Otter Rd  Casa Grande, AZ 85222
          STREET         CITY      STATE    ZIP

PREVIOUS ADDRESS 1650 N. Kadota  CG, AZ 85222
          STREET         CITY      STATE    ZIP

PHONE NUMBER (520) 426-0403  ARE YOU 18 YEARS OR OLDER  YES ☑  NO ☐

### SPECIAL QUESTIONS

DO NOT ANSWER ANY OF THE QUESTIONS IN THIS FRAMED AREA UNLESS THE EMPLOYER HAS CHECKED A BOX PRECEDING A QUESTION, THEREBY INDICATING THAT THE INFORMATION IS REQUIRED FOR A BONA FIDE OCCUPATIONAL QUALIFICATION., OR DICTATED BY NATIONAL SECURITY LAWS, OR IS NEEDED FOR OTHER LEGALLY PERMISSIBLE REASONS.

☐ Height ____ Feet ____ Inches ☐ Are you prevented from lawfull employment in the U.S.? ____Yes ____No

☐ Weight ____lbs. ☐ Date of Birth * _____

☐ What foreign languages do you speak fluently? _____ Read ____ Write ____

☐ Have you ever been convicted of any crime other than a traffic violation? ** ____Yes ____No . Describe: ____

☐ Do you use or are you involved in the sale or distribution of illegal drugs or substances? ____ Yes ____ No

☐ Have you ever had a judgement filed against you? ____ Yes ____ No

☐ Have you ever been evicted? ____ Yes ____ No

## EMPLOYMENT DESIRED

POSITION Manager / Courtyard
DATE YOU CAN START 5-26-98  SALARY DESIRED ____

ARE YOU EMPLOYED NOW? no
IF SO MAY WE INQUIRE OF YOUR PRESENT EMPLOYER? ____

EVER APPLIED TO THIS COMPANY BEFORE? yes  WHERE? Quail  WHEN? '92

## EDUCATION

| SCHOOL | NAME AND LOCATION | *NO OF YEARS ATTENDED | * DID YOU GRADUATE | SUBJECTS STUDIED |
|---|---|---|---|---|
| HIGH SCHOOL | Harvest Christian Academy | | yes | |
| COLLEGE | Univ. of Phoenix | | yes | Acctg / Bs. Mgmt. |
| TRADE, BUSINESS OR CORRESPONDENCE SCHOOL | | | | |

* The Age Discrimination in Employment Act of 1967 prohibits discrimination on the basis of age with respect to individuals who are at least 40 but less than 70 years of age.

000004401

** You will not be denied employment solely because of a conviction record, unless the offense is related to the job for which you have applied.

## FORMER EMPLOYERS (LIST BELOW FOUR EMPLOYERS, STARTING WITH LAST ONE FIRST).

| DATE MONTH AND YEAR | NAME AND ADDRESS OF EMPLOYER | SALARY | POSITION | REASON FOR LEAVING |
|---|---|---|---|---|
| From present | Joe's Windshield Repair | | owner | |
| To | | | | |
| From 8-93 | CG Regional Medical Center | 32,000. - | Staff Accountant | Work w/ husband |
| From 5-96 | | | | benefits + |
| From | Quail Gardens | 1200/mo w/Apt. | Asst. Mgr. | higher pay |
| From 8-93 | | | | |
| From | | | | |
| To | | | | |

## REFERENCES: GIVE THE NAMES OF THREE PERSONS NOT RELATED TO YOU, WHOM YOU HAVE KNOWN AT LEAST ONE

| NAME | ADDRESS AND PHONE NUMBER | BUSINESS | YRS. ACQUAINTED |
|---|---|---|---|
| 1. Tom King | CG    836-0045 | Pastor | 17 |
| 2. Dr. Yang | CG, 836-9785 | Dentist | 17 |
| 3. Nita Johnson | | Apt. Mgr. | 7 |

DESCRIBE SPECIALIZED TRAINING, APPRENTICESHIP, SKILLS, AND DESCRIPTION OF PAST WORK PERFORMED

Management experience with own business, computer experience with Win 95, Excel, spreadsheets, etc. Can prepare financials, budgets, etc.

## PHYSICAL RECORD:
DO YOU HAVE ANY PHYSICAL LIMITATIONS THAT PREDLUDE YOU FROM PERFORMING ANY WORK FOR WHICH YOU ARE BEING CONSIDERED? ___ Yes _X_ No   IF YES, WHAT CAN BE DONE TO ACCOMODATE YOUR LIMITATION? _____

PLEASE DESCRIBE:

INCASE OF
EMERGENCY NOTIFY  Donna Ochoa        1104 N. Park   CG      836-6829
                      NAME                    ADDRESS                      PHONE NO.

"I CERTIFY THAT THE FACTS CONTAINED IN THIS APPLICATION ARE TRUE AND COMPLETE TO THE BEST OF MY KNOWLEDGE AND UNDERSTAND THAT, IF EMPLOYED, FALSIFIED STATEMENTS ON THIS APPLICATION SHALL BE GROUNDS FOR DISMISSAL. I AUTHORIZE INVESTIGATION OF ALL STATEMENTS CONTAINED HEREIN INCLUDING OBTAINING A CREDIT REPORT. I AUTHORIZE THE REFERENCES LISTED ABOVE TO GIVE YOU ANY AND ALL INFORMATION CONCERNING MY PREVIOUS EMPLOYMENT AND ANY PERTINENT INFORMATION THEY MAY HAVE PERSONAL OR OTHERWISE, AND RELEASE ALL PARTIES FROM ALL LIABILITY FOR ANY DAMAGE THAT MAY RESULT FROM FURNISHING SAME TO YOU.

I UNDERSTAND AND AGREE THAT, IF HIRED, MY EMPLOYMENT IS FOR NO DEFINITE PERIOD AND MAY, REGARDLESS OF THE DATE OF PAYMENT OF MY WAGES AND SALARY, BE TERMINATED AT ANY TIME WITHOUT ANY PRIOR NOTICE."

DATE: 5-21-98        SIGNATURE: Wendi Andriano

INTERVIEWED BY: _____        DATE: _____

HIRED:    Yes__ No__    POSITION: _____        SALARY/WAGE: _____

This form has been designed to strictly comply with State and federal fair employment practice laws prohibiting employment discrimination.

First West Properties Corporation • EMPLOYMENT APPLICATION • Form EMPLOYAP. p.2 FRM © 1991

000002402

# EXHIBIT O

DP

05-0002  1
Braccio



1            IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

2               IN AND FOR THE COUNTY OF MARICOPA

3

4    STATE OF ARIZONA,              )
                                    )
5            Plaintiff,             )
                                    )
6    v.                             )        No. CR 05-0005 AP
                                    )        MARICOPA COUNTY
7    WENDI ELIZABETH ANDRIANO,      )        No. CR 2000-096032
                                    )
8            Defendant.             )
     _____)

9

10

11

12                           Mesa, Arizona 4
                          September 29, 2008

13

14

15

16              BEFORE:   The Honorable BRIAN K. ISHIKAWA

17

18              REPORTER'S TRANSCRIPT OF PROCEEDINGS

19                         TRIAL DAY 20

20

21

22

23

24   ORIGINAL Prepared for APPEAL by:
     TRACI L. WHEELER, CSR, RPR
25   Certified Court Reporter No. 50313


        TRACI L. WHEELER, OFFICIAL COURT REPORTER, CSR, RPR, CCR

1                          A P P E A R A N C E S

2    FOR THE STATE:          JUAN M. MARTINEZ,
                             Deputy County Attorney
3
     FOR THE DEFENDANT:      DANIEL B. PATTERSON,
4                            Deputy Public Defender
                             and
5                            G. DAVID DELOZIER,
                             Attorney at Law
6

7            I N D E X   O F   E X A M I N A T I O N

8    WITNESS                                              PAGE

9    HSEUH, JOHN, Called on behalf of the State
               Direct Examination by Mr. Martinez           4
10
     MILLER, JEFFREY, Called on behalf of the State
11             Direct Examination by Mr. Martinez          53
               Cross-examination by Mr. Patterson          70
12             Redirect Examination by Mr. Martinez        95

13

14       E X H I B I T S   A D M I T T E D   I N   E V I D E N C E

15   NO.     DESCRIPTION                                  PAGE

16   280     Handwriting exemplar (dated 06-12-02)          46
     280.001 Handwriting exemplar (dated 02-06-01)          22
17

18

19

20

21

22

23

24

25


        TRACI L. WHEELER, OFFICIAL COURT REPORTER, CSR, RPR, CCR

```
 1              MESA, ARIZONA, WEDNESDAY, SEPTEMBER 29, 2004
 2
 3         THE COURT:  Good afternoon.  This is trial in CR
 4    2000-096032, State of Arizona versus Wendi Elizabeth
 5    Andriano.  The record will reflect the presence of Defendant,
 6    Counsel and the Jury.
 7              Mr. Martinez, the State may call its next
 8    witness.
 9         MR. MARTINEZ:  State calls John Hseuh.
10         THE COURT:  Sir, if you could step forward right up
11    here.  Give your name to the clerk and she'll swear you in.
12
13                   JOHN HSEUH,
14         CALLED TO TESTIFY ON BEHALF OF THE STATE,
15      HAVING FIRST BEEN DULY SWORN, TESTIFIES AS FOLLOWS:
16
17         THE COURT:  Sir, please have a seat on the witness
18    stand.  Please make yourself comfortable there.  Please pull
19    the microphone close to you.  Please remember to speak loudly
20    and clearly in the microphone so everybody can hear you.
21    Also please wait until the question is completed before you
22    answer the question, and please make sure you give a verbal
23    response.  Is that agreeable, sir?
24         THE WITNESS:  Yes, Your Honor.
25         THE COURT:  Mr. Martinez, you may proceed.
```

TRACI L. WHEELER, OFFICIAL COURT REPORTER, CSR, RPR, CCR

1      DIRECT EXAMINATION BY MR. MARTINEZ:

2              Q.      Your name, sir?

3              A.      My name is John Hseuh.

4              Q.      Who are you employed by?

5              A.      I'm employed by the City of Phoenix Police

6      Department in the crime lab.

7              Q.      What do you do there in the crime lab?

8              A.      I'm a forensic document examiner with the City

9      of Phoenix Police Department.

10             Q.      And specifically what are your day-to-day

11     duties?

12             A.      My day-to-day duties as a document examiner are

13     able to determine authenticity, is this a genuine driver's

14     license, cashier's check, passport, or I'm asked to determine

15     authorship, who wrote it or did this copier or typewriter or

16     printer produce this document.

17             Q.      What is your educational background?

18             A.      My educational background consists of attending

19     the University of Missouri, St. Louis, and St. Louis

20     University.   I received two bachelor degrees; one in Biology,

21     one in Chemistry, both from St. Louis University.

22             Q.      Sir, what is the process of photocopying?   I

23     know you mentioned you work with that, but what is the

24     process of photocopying and where did you obtain your

25     experience and experience with regard to that area?

TRACI L. WHEELER, OFFICIAL COURT REPORTER, CSR, RPR, CCR

000004407

1          A.     Okay.   There's several different questions.

2          Q.     Right.

3          A.     Let me just -- if I could just explain the

4     process of photocopy first.

5          Q.     Sure.

6          A.     In the process of photocopy, the document is

7     placed on the glass, which is also called the platen.   A

8     source of light scans the document and gives that information

9     to a corona wire and a drum.   The corona wire is -- excuse

10    me, the drum is moving and the corona wire is charging the

11    document, making an image of the document.   The drum is now

12    charged and then continues to rotate.   As it rotates, it's

13    also spraying on toner.   That toner is attributed to the

14    charged area of the drum.   The drum continues to rotate and

15    then the paper feed comes in on the bottom side and now in

16    contact with the drum.   The drum becomes deactivated or

17    decharged and the paper is now charged, and the toner will

18    now attract to the paper.   The paper continues beyond the

19    drum, and through a process of fusion, either hot or cold,

20    the toner, that is now from the drum onto the paper, is fused

21    to the paper.   Once that fusion is completed, that paper will

22    be ejected from the machine into the tray.

23         Q.     Where did you get your experience in this field?

24         A.     I -- my background in question documents

25    consists of being trained as senior document examiner for

TRACI L. WHEELER, OFFICIAL COURT REPORTER, CSR, RPR, CCR

000004408

1    four years.  I've also been trained by the FBI, Secret

2    Service, Rochester institute of technology.  It's just a

3    matter of all the other tests and all the other experience.

4         Q.    Going to show you what I've marked for

5    examination -- identification as Exhibit 395.  Do you

6    recognize it?

7         A.    Yes, I do.

8         Q.    If I may have it back.  Is this CD a copy of

9    what you are about to present to us today?

10        A.    This CD is a copy of a Power Point

11   presentation.

12        Q.    And the Power Point presentation is what you

13   are going to present to us today, correct?

14        A.    That's correct.

15        Q.    Now, before you begin your Power Point

16   presentation, did you have occasion to be presented with

17   documents that are marked as Exhibits number 266.04 -- sorry,

18   .014, 266.016, 266.012, 266.013, and 266.015.

19              (Pause in proceedings.)

20              THE WITNESS:  266.015, I have seen.

21   BY MR. MARTINEZ:

22        Q.    Okay.

23        A.    Exhibit 266.013, I have seen.  Exhibit 266.012,

24   I have seen.  Exhibit 266.015, I have seen.  And Exhibit

25   266.014, I have seen.


              TRACI L. WHEELER, OFFICIAL COURT REPORTER, CSR, RPR, CCR

1          Q.     And are these items that are used as part of

2     the -- your Power Point presentation today?

3          A.     Yes.

4          Q.     Why don't you go ahead and show us the first

5     slide that you want to discuss as it relates to these

6     documents that we just discussed.

7          A.     May I step down, please?

8          Q.     Sure.

9          MR. PATTERSON:   Judge, could we just approach for a

10    minute?

11         THE COURT:   Yes.

12

13                    (The following proceedings were held at the

14    bench:)

15

16         MR. PATTERSON:   I've been trying cases for 25 years,

17    Judge.  I got to admit I've never seen a witness give a Power

18    Point presentation, so I really don't know what the rules

19    are.  My sense is he should not be allowed to give a

20    narrative testimony, but I don't know what Mr. Martinez's

21    intent is in that regard, if he's going to ask questions

22    or --

23         MR. MARTINEZ:   What's going to happen is he's going

24    to show an image and I'm going to show him -- I'll ask him

25    about this exhibit,  And now, with regard, just as an

TRACI L. WHEELER, OFFICIAL COURT REPORTER, CSR, RPR, CCR

000004410

```
 1    example, 266.015, what is it that you did with it, and then
 2    he'll show on the screen what he did with it.
 3              THE COURT:  Make sure you use question and answer
 4              MR. MARTINEZ:  And we're going one at a time also.
 5              MR. PATTERSON:  Okay.  Thanks, Judge.
 6
 7              (The following proceedings were held in open
 8    court:)
 9
10              THE COURT:  Sir, you could step down.  Please
11    remember when you're away from the microphone speak up as
12    loudly as you can so everyone can hear you.
13              THE WITNESS:  Yes, Your Honor.
14    BY MR. MARTINEZ:
15         Q.    Up there you have something that looked to be
16    like a privilege license.  I want you to take a look at
17    Exhibit 266.015.  Is that what you have up there?
18         A.    Yes, it is.
19         Q.    Okay.  With regard to this particular document,
20    what is it that you can tell us about it?
21         A.    I marked this as Q6 when I first received it
22    and it's part of my analysis of this set.
23         Q.    And is this the one that has the "To Allen" on
24    the margin?
25         A.    Yes.  It was handprinted.
```

TRACI L. WHEELER, OFFICIAL COURT REPORTER, CSR, RPR, CCR

9

```
 1          Q.    All right.  What is the next item that you
 2   dealt with?
 3          A.    This is marked as Q7.
 4          Q.    Is your Q7 actually Exhibit 266.013?
 5          A.    Yes, it is.
 6          Q.    Okay.  And do you want to tell us what this
 7   shows or are you going to wait until we --
 8          A.    The format of this presentation was simply to
 9   place all of the cues in context first and then to present
10   what was requested and what the analysis was.
11          Q.    Okay.  Let's go --
12          A.    If you want, I could --
13          Q.    No.  Let's go ahead with the next slide.  And
14   is this Exhibit 266.012?
15          A.    Yes, it is.
16          Q.    Go ahead to the next slide.  Is this 266.016?
17          A.    Yes, it is.
18          Q.    And the next slide.  Is that 266.014?
19          A.    Yes, it is.
20          Q.    Okay.  Let's go on to the next slide.  What
21   were you asked to do with regard to these documents?
22          A.    I was asked to examine the city of Phoenix
23   business license to see and look for alterations.
24          Q.    And what is the first thing that you did?
25          A.    I looked at these exhibits and worked with them
```

TRACI L. WHEELER, OFFICIAL COURT REPORTER, CSR, RPR, CCR

000004412

1    and came up with the following.  This is the initial --

2          Q.    With regard to the one that you have there as

3    Q9, I know we've looked at it before.  Just for the sake of

4    the record, it's 266.016, right?

5          A.    Yes, it is.  This is the initial document. What

6    I wanted to show essentially was -- if I could use a pointer,

7    please -- this is a faxed information.  This is page number

8    2.  This document is the Arizona State Department of Revenue

9    document for a bond exemption in the name of Cardinal

10   Industry, also known as Copperstate Glass and Mirror.  This

11   document is smaller than the full scan of the photocopier.

12         Q.    How did you know that?

13         A.    Because there are other indicia of information

14   on there.

15         Q.    Go ahead and tell me what that is?

16         A.    As I mentioned the process of a photocopy, in

17   this case, as I said, this document is smaller than the full

18   scan so other information was included.  Essentially this is

19   the belt mark.  This would be the cover of your photocopier.

20   What it says if there's a belt mark and there was an autofeed

21   involved where you could put a set of documents and it will

22   mechanically feed the documents into the printer -- or,

23   excuse me, into the copier.  Because this one was smaller,

24   the belt or the cover was reflected into the scan.

25               In addition to that, we also have trash marks.


TRACI L. WHEELER, OFFICIAL COURT REPORTER, CSR, RPR, CCR

1          Q.     Can you explain the difference between a trash

2     mark and a belt mark?

3          A.     Yes.  The belt mark, again, is from the cover.

4     This is the roller that's on there and shows some of the

5     features.  The trash mark would be trash marks or blemishes

6     on your glass, or what's called a platen, whether somebody,

7     let's say, used some white out and it didn't dry right away

8     and they put it on the photocopier face down and some of the

9     copier -- excuse me, some of the white out got onto the

10    glass, or some other blemishes had occurred on the glass, and

11    they will come up and show up as trash marks.

12         Q.     You also have something there and you mentioned

13    the corona wire?

14         A.     Yes.  The corona wire, as I mentioned before,

15    is giving a charge to the drum.  As the drum rotates, the

16    corona wire will charge and discharge certain areas in order

17    to reflect the document that's being copied.

18                In this case, as the drum is rotating, the

19    corona wire is not correctly working, and so we have a

20    scanned line where it just literally activated the entire

21    strip for that run of that drum.  That's reflected and the

22    toner gets on there, then gets on the paper so that you have

23    a corona wire defect.

24         Q.     When you say you have a corona wire defect, is

25    there two places there can be a defect or just -- or it could

```
1    be both, either one.  How does that work?  I'm not sure I

2    understood what you said about that.

3              A.     The corona wire is a full wire going across.

4    Parts of it are not acting properly, and so parts of it, as

5    in this case, two sections of it, are activated and does not

6    turn itself off, and therefore the toner is attracted and the

7    toner reflects that onto the paper.

8              Q.     Let's go on to the next slide, please?

9              A.     This is the --

10             Q.     Before we get started, this document as you

11   indicated is Q8, correct?

12             A.     May I see --

13             Q.     Q8?

14             A.     Yes, it is.

15             Q.     And that would be our Exhibit Number 266.012,

16   right?

17             A.     Yes.

18             Q.     And on this one it appears that's the same or

19   it appears there's also belt marks.  Are those significant to

20   you?

21             A.     Yes.

22             Q.     Why is that?

23             A.     They are the same belt marks, the same corona

24   wire, and same trash marks that were on the previous --

25             Q.     Exhibit?
```

TRACI L. WHEELER, OFFICIAL COURT REPORTER, CSR, RPR, CCR

1        A.      -- exhibit.

2        Q.      So what does that tell you?

3        A.      Well, in addition to the past exhibit being

4    page 2, this is now page 3 according to the faxed

5    information, and my conclusion here -- if I may go to the

6    next --

7        Q.      Sure.

8        A.      My conclusion here is that Q9 and Q8 were

9    produced by the same copy machine.

10       Q.      When you're saying they were produced by the

11   same copy machine, just so I'm clear, does that mean they're

12   run in the same copier?

13       A.      That is correct.

14       Q.      Let's go on to the next line.  This is your Q7,

15   which I believe is Exhibit Number 266.013?

16       A.      Yes, it is.

17       Q.      Okay.  What does this show us?

18       A.      This shows us that there are paper strips that

19   have directional text that have been inserted or taped onto

20   the document.  In addition, this document is a copy of the

21   previous document, Q8.

22       Q.      How do you know it's a previous copy of Q8?

23       A.      Essentially because it still has the faxed

24   information on there, page 3.

25       Q.      Okay.


TRACI L. WHEELER, OFFICIAL COURT REPORTER, CSR, RPR, CCR

```
 1          A.      -- in addition -- well, let me --
 2          Q.      You can go back for a minute.
 3          A.      All right.  In addition, I will show that there
 4    is the same information as far as the same defects from the
 5    first photocopier there.
 6          Q.      Let me ask you -- I was going to ask you about
 7    that.  The line we have at the bottom, is that the defect
 8    we're talking about?
 9          A.      These are the corona wire defects from the
10    first copier.
11          Q.      How many paste ons do we have up there?
12          A.      One, two, three, four -- it appears five.
13          Q.      Okay.  Let's go on to the next one?
14          A.      What I did next is I lifted the paste off in
15    order to show that it was Copper State, which, again, is a
16    copy of the original Q8.
17          Q.      Okay.
18          A.      Which was, again, page 3.
19          Q.      Now, you have another slide up there, and you
20    marked that as Q7?
21          A.      That's the same one we're still on.
22          Q.      Okay.
23          A.      As I mentioned, this is a copy of Q8, so these
24    are the defects from the first copier.  In addition, to that
25    we now have a second copier with more trash marks.
```

TRACI L. WHEELER, OFFICIAL COURT REPORTER, CSR, RPR, CCR

```
 1              Q.      Before you go any further, we've been talking

 2      about the first one having -- the first couple being copied

 3      and the first one copied.  Are you now telling us that with

 4      regard to your Q7 that was run through another copier

 5      different from the first two.

 6              A.      That is correct?

 7              Q.      How could you tell that?

 8              A.      Because we now have trash marks that were on

 9      this copy that weren't on the original.

10              Q.      Okay.  Go ahead.

11              A.      We still have the faxed information on the

12      side.  The next item is Q10?

13              Q.      I'm going to show you Exhibit 266.014.  Is that

14      your Q10?

15              A.      Yes, it is.

16              Q.      And you have some arrows there to the left of

17      this document.  Why is that significant?

18              A.      In addition to now being a copy of the previous

19      document, which now the original had the Copperstate Glass,

20      and then the -- the paper that was on top of it said Aztec

21      Creation, this photocopy shows the Aztec Creation, however,

22      it still has some of the faxed information.

23              Q.      But before we go any further, just so I'm

24      clear, one of the previous exhibits, and that would be

25      Exhibit 266.03 (sic), had some paste ons -- pasted on items.
```

TRACI L. WHEELER, OFFICIAL COURT REPORTER, CSR, RPR, CCR

```
 1    Is this a copy of that exhibit that previously had the paste

 2    ons?

 3         A.    Yes.  May I show --

 4         Q.    No, that's okay.

 5         A.    Okay.  So this is a copy of the previous

 6    information or the previous document, and, as I said, there

 7    is the correction tape that you have for your typewriters.

 8    They are inserted over here.  What I did was I put it onto a

 9    light box.  A light box is a sort of light, put the document

10    on top of it so instead of peeling off the white correction

11    tape I could read through it.  Unfortunately, we can't read

12    it.

13         Q.    Well, with this lighting --

14         A.    Let me show you this date.  This is time 437

15    that reflects this 437 on a previous document.

16         Q.    And so after putting it under a light, were you

17    able to determine that this white out that was on -- on your

18    Q10 was actually the same as the one that we've been

19    previously talking about?  For example, with regard to

20    266.012 that's on the margin there and 266.013, that's also

21    on the side?

22         A.    Yes.

23         Q.    Okay.  So in your opinion did somebody put that

24    on there to obstruct that number?

25         A.    Yes.
```

TRACI L. WHEELER, OFFICIAL COURT REPORTER, CSR, RPR, CCR

```
1          Q.      Okay.  Go ahead.

2          A.      In addition as I mentioned before, this is now

3    a second copy.  And so we still have the trash marks from the

4    first generation copy on the second copy, but this copy is a

5    copy -- this is a copy of the original -- of the previous

6    document, Q7.

7          Q.      But was it made on a second copier?

8          A.      Yes, it was.

9          Q.      Okay.

10         A.      In addition to that we now have a second

11   generation on this second copy.  And, again, there are trash

12   marks, the same trash marks as was on the first -- on the

13   previous document, however, the orientation is different.  If

14   I could --

15         Q.      What does that mean when you tell us that the

16   orientation is different?

17         A.      It means that the defect was on the glass.

18   Let's say if the glass was -- the defect was on the north --

19   on the north-south on the glass, the first copy was placed

20   with the header, let's say, on the north side.  The second

21   copy was rotated and placed there so the defect is still on

22   the north side but the heading and everything, the

23   orientation, is completely 180 degrees changed.

24         Q.      Let me ask you, at this point the very top now,

25   the orientation is changed.  The marked two lines across it
```

1      are now not part of the business license, correct?

2              A.    Yes.  Do you see what I'm saying?  The business

3      license no longer has those marks going through it, right?

4      You see what I'm saying?  They're not going through the

5      heading or any part like it did here on Exhibit 266.016

6              Q.    These lines are not touching the actual

7      document that's being copied, correct?

8              A.    That's correct.

9              Q.    Go ahead.

10             A.    This is a close up of that with the trash marks

11     on the -- from the second copy of that second copier.

12             Q.    And that tells us what?

13             A.    That tells us that a second copy was used with

14     a second generation document.

15             Q.    Okay.  Next?

16             A.    From this point on, I came to the conclusion.

17             Q.    And what is that?

18             A.    The conclusion is that the final copy of the

19     citizens -- the City of Phoenix privileged license for Aztec

20     Creation, referred to as Q6, which is this document, which

21     has no faxed information anymore, which has the Aztec

22     Creation and has trash marks from the first, the second, and

23     the third generation of that copy are present.

24             Q.    So -- okay.  What does that tell you?

25             A.    That tells me it was altered from the faxed

TRACI L. WHEELER, OFFICIAL COURT REPORTER, CSR, RPR, CCR

```
1     Phoenix license of Copperstate Glass Mirror, referred to as
2     Q8.
3          Q.    In other words, just so that -- see if I
4     understand it, there was a fax from Copperstate Glass and
5     Mirror that eventually turned into, if you could go back to
6     the previous slide, turned into what we have here as Aztec
7     Creations, Wyndstar Enterprises.
8          A.    Yes.
9          Q.    If you take a look at this, which is our
10    Exhibit 266.015, and you look to the right margin, what does
11    it say there?
12         A.    This is a handwriting or handprinting document
13    that says "To Allen."
14         Q.    That -- that is handwritten, correct?
15         A.    That is handwritten.
16         Q.    Now, do you have any experience in attempting
17    to match up or identify handprinting to unknown handprinting
18    to that of a known individual?
19         A.    Yes.
20         Q.    And can -- does it have to be cursive writing
21    or can you also make the comparison involving, like I said,
22    handprinting or printing like we have here.
23         A.    Comparison can be apples to apples, so if the
24    questioned document is printed, then the knowns have to be
25    printed.  If the questioned document is cursive writing then
```

```
 1    the knowns have to be cursive writing too in order to compare

 2    one to the other.

 3         Q.    Were you asked to attempt to ascertain who in

 4    fact had printed that on the one that says "To Allen"?

 5         A.    Among other documents, yes.

 6         Q.    And in an attempt to do that, did you attempt

 7    or did you obtain some writing samples back on February 6 of

 8    the year 2001?

 9         A.    Yes.

10         Q.    And are these the writing samples that you

11    obtained back on that date, they're marked as 280.001?

12         A.    May I check my --

13         Q.    Sure.

14              (Pause in proceedings.)

15         THE WITNESS:  Can you repeat the question for me,

16    please?

17    BY MR. MARTINEZ:

18         Q.    Did you obtain those writing samples?

19         A.    They appear to be the same in my opinion.

20         Q.    When you say they appear to be the same, do you

21    have any doubt about it?

22         A.    Yes, I do.

23         Q.    How so?

24         A.    I cut -- when I received it, it was marked and

25    sealed.
```

TRACI L. WHEELER, OFFICIAL COURT REPORTER, CSR, RPR, CCR

```
1              Q.     Okay.

2              A.     I did my incision.  I pulled the documents

3        out.  I identified them, then I placed it back into the bag.

4              Q.     Okay.

5              A.     There is a second incision here that I have no

6        knowledge of.

7              Q.     But aside from that, I want to you take a look

8        at the documents themselves.  Let me open -- perhaps Mr.

9        Martinez may have opened them before.  Just take a look at

10       them and see if these are the ones you actually seized.

11                    (Pause in proceedings.)

12             THE WITNESS:  Yes.

13       BY MR. MARTINEZ:

14             Q.     These are the documents you seized back on

15       February 6, 2001?

16             A.     I did not seize them.

17             Q.     In other words, you had someone provide them to

18       you?

19             A.     Yes.

20             Q.     And the individual that provided them to you,

21       is that individual in court today?

22             A.     Yes.

23             Q.     Can you tell me where they are seated and what

24       they are wearing?

25             A.     Wendi Andriano is seated over to my right.
```

```
 1    She's wearing a pink sweater with a black -- excuse me, a

 2    pink blouse with a black sweater.

 3            MR. MARTINEZ:  Your Honor, may the record reflect the

 4    identification of the defendant?

 5            THE COURT:  The record may reflect identification of

 6    the defendant by the witness.

 7            MR. MARTINEZ:  I move for admission of Exhibit

 8    280.001.

 9            MR. PATTERSON:  No objection, Judge.

10            THE COURT:  Exhibit 280.00 -- sorry for that.

11    Exhibit 280.001 for identification is admitted into

12    evidence.

13    BY MR. MARTINEZ:

14            Q.    What did you do next with regard to this

15    investigation?

16            A.    I was asked to do a handwriting comparison.

17            Q.    Of what?

18            A.    Of the known samples to the questioned

19    documents.

20            Q.    And what questioned documents are we talking

21    about that you were asked to compare?  Do you have those up

22    there?

23            A.    Yes, I do.

24            Q.    Okay.  Let's go to the first document that you

25    were asked to take a look at.  And that's your Q1, right?
```

```
1           A.    Yes, it is.

2           Q.    Is that our Exhibit 266.011?

3           A.    This is 266.011, yes.

4           Q.    And what other document were you asked to take

5     a look at?  You have a Q2 and Q2A.  Can you explain to me

6     what you're referring to when you put Q2 and Q2-A?

7           A.    Apparently this document also had a pay stub or

8     a post it with it, and so one document was Q2 and then the

9     second document, the post it, that was also attached to this

10    document was -- was classified as 2-A.

11          Q.    And if I show you Exhibit 266.010, is that the

12    document that you have displayed?

13          A.    Yes, it is.

14          Q.    Let's go on to the next document.  You have Q3

15    and Q3-A.  Specifically what is that?

16          A.    If I can -- Q3 was a whole set of notes or,

17    excuse me, whole set of items and the first item was marked

18    as A, item A, 3-A.  Let me show you what has been marked for

19    identification as Exhibit Number 266.020.  Take a look at it

20    and then I'll ask you some questions about it.

21                (Pause in proceedings.)

22    BY MR. MARTINEZ:

23          Q.    What you have displayed up there, take a look

24    at the back.  Is that this right here?  It says 10 grams

25    sodium cyanide, Voigt Global sales.  Is that what you have up
```

TRACI L. WHEELER, OFFICIAL COURT REPORTER, CSR, RPR, CCR

000004426

```
 1    there?

 2            A.    Yes, it is.

 3            Q.    Okay.  Let's go onto the next slide.  Q3-A R,

 4    I'm now going to show you that same exhibit, but it's the

 5    front of it.  Is that the front of it?

 6            A.    It's the reverse, that's why it's initialed

 7    "R."  This is, again, 3-A, but this is my reverse side.  This

 8    was the original side.

 9            Q.    So you were looking at the backside as your

10    original side?

11            A.    Well, I --

12            Q.    Or the front side.  I understand.

13            A.    Okay.

14            Q.    There's a line on the middle of this exhibit

15    here that we have up there.  Can you explain how that

16    happened?  See what I'm talking about?

17            A.    No, I do not.

18            Q.    Let me have your pointer, please.  See that

19    right there?

20            A.    Okay.

21            Q.    Do you know how that happened?

22            A.    It -- it appears to be either from the copy

23    machine or from a laser printer.

24            Q.    Okay.  What do you have next?

25            A.    This is C3-B as the reverse side of Q3-B.
```

1          Q.     I'm showing you Exhibit 266.021.  Is that it?

2          A.     Yes.

3          Q.     Does that seem to have the same line as the

4     previous exhibit that we discussed right down the middle?

5          A.     Yes, it does.

6          Q.     Next?

7          A.     This is from the Q3 -- this is the third

8     document referred to as C, and it's the reverse side.  That's

9     why it's "R."

10         Q.     And is that Exhibit 266.022?

11         A.     Yes, it is.

12         Q.     Next, what is this, first of all?  What was the

13    area of interest that caught your eye?

14         A.     The area of interest has always been the

15    handprinting or the handwriting.  That's what I was asked to

16    do a comparison on.  This appears to be a San Riva history

17    printout.

18         Q.     And was your area of interest what's toward the

19    bottom, written out?

20         A.     Yes.  The area I wanted was the writing.

21         Q.     What did you number that as?

22         A.     I numbered that as Q4.

23         Q.     Showing you Exhibit 266.002, that one?

24         A.     Yes, it is.

25         Q.     Next, what did you work with?

TRACI L. WHEELER, OFFICIAL COURT REPORTER, CSR, RPR, CCR

000004428

```
 1          A.    Q --

 2          Q.    What are those, first of all.  What is it?

 3          A.    Q5 is two post its that were attached to a

 4    piece of paper.

 5          Q.    And I show you Exhibit 266.019.  Are these the

 6    two post its and the piece of paper?

 7          A.    Yes, they are.  They are the post its.

 8          Q.    So now you have the known samples, you have the

 9    unknowns, and go to work.  And first of all, just generally

10    speaking, how is it that you go about effecting or attempting

11    to effect a match and/or a comparison?

12          A.    Well, first of all, on handwriting, I did a

13    side by side comparison between the question and the known in

14    order to determine -- with measurement, magnification and

15    lighting in order to determine there are more consistencies

16    and inconsistencies between the questioned and known.

17          Q.    Okay.  Go ahead.

18          A.    There are additional documents --

19          Q.    Why don't you go ahead and put them up?

20          A.    This was from the previous set.  This was Q6.

21    Again, there was the original handprinting on this document.

22          Q.    And that is our Exhibit 266.015?

23          A.    Yes, it is.

24          Q.    Okay.  Go ahead.

25          A.    The next document that had handprinting on it
```

TRACI L. WHEELER, OFFICIAL COURT REPORTER, CSR, RPR, CCR

```
 1    was Q11.  This was a money order, a Western Union money order

 2    with some handprinting and some handwriting.

 3              Q.    And what number did you give it again?

 4              A.    I identified it as Question Document Number 11.

 5              Q.    Show you Exhibit 287.  Is that what you have up

 6    there?

 7              A.    Yes, it is.

 8              Q.    Okay.  Next?

 9              A.    This is an Airborne manifest, and this was

10    listed as Questioned Document Number 12.

11              Q.    And what were you most interested in on this

12    one?

13              A.    I was interested in the signature line and the

14    printed line here.

15              Q.    Would that be our Exhibit 315?

16              A.    Yes.

17              Q.    What did you do next?

18              A.    I now looked at the known samples.

19              Q.    Okay.  And then did you make your comparison?

20              A.    Yes, I did.

21              Q.    And what conclusion did you draw?

22              A.    The handprinting on the documents listed as

23    Q1 --

24              Q.    Why don't you show us what Q1 is as you go

25    along.
```

TRACI L. WHEELER, OFFICIAL COURT REPORTER, CSR, RPR, CCR

```
 1        A.      Okay.

 2        Q.      Hand printing on Q1, which handprinting are you

 3   talking about?

 4        A.      I'm referring to all the handprinting.

 5        Q.      Okay?

 6        A.      This is handwriting.   All the handprinting is

 7   over here.

 8        Q.      Okay.   You were saying all the handprinting on

 9   Q1 -- we've seen Q1.   Go ahead?

10        A.      All the handprinting on Q 2 --

11        Q.      All right.

12        A.      Q3-A.

13        Q.      All the handprinting there, okay.   Go back a

14   step.   How about -- okay.   How about there, Q3, Q3-A?

15        A.      Yes.   The reverse side of Q3-A all the

16   handprinting.

17        Q.      All right.   Go ahead.   How about the numbers?

18   Are you able to -- that's Q3-B R.   Are you able to effect a

19   comparison to numbers?

20        A.      Yes, I did.

21        Q.      So you looked at those?

22        A.      Yes.

23        Q.      Okay.   What else?

24        A.      Let's skip this one.

25        Q.      You're looking at Q3-R.   That doesn't have any
```

1    printing on it, correct?

2            A.    That's correct.  It had handwriting, hand

3    cursive.  Q3, 4, all the handprinting on there.

4            Q.    All right.

5            A.    Q5, all the handprinting, Q6 all the

6    handprinting.

7            Q.    Which is the "To Allen" on that one?

8            A.    Yes.  Q11, the handprinting.

9            Q.    That appears to be "Voigt" on it, right?

10           A.    Yes.

11           Q.    Go ahead.

12           A.    Those are all written by one writer.  All of

13   these documents were written by one writer.

14           Q.    Did you have occasion to compare these to the

15   known exemplars provided by the defendant --

16           A.    Yes.

17           Q.    -- to see whether or not there was the one

18   writer?

19           A.    Yes.

20           Q.    And what were your findings?

21           A.    That the writer of the known examplars wrote

22   the handprinting.

23           Q.    All of these documents we talked about?

24           A.    Yes.

25           Q.    Okay.  Go ahead.  You have up there something

1    about known exemplars.  Do you want to tell me a little bit

2    about that?

3           A.    Basically in this section here, if I could just

4    show the knowns that were given?

5           Q.    Sure.

6           A.    These were the knowns that were received that

7    were written by the -- by this writing.

8           Q.    And what you're showing us up there actually is

9    exhibit -- what's in Exhibit 280.001, correct?

10          A.    Yes.

11          Q.    Okay.  Go ahead.  And just --

12          A.    There were 13 of these exhibits, or, excuse me,

13    13 of these, I apologize.  There are 12 of these documents.

14          Q.    Okay.  Before we get to that, while you were

15    taking down these samples from the defendant back on what

16    appears to be February 9 of the year 2001, did she ever voice

17    any complaints or ever indicate that she didn't want to

18    continue with the examination?

19          A.    Towards the end she complained of fatigue,

20    hand -- her hand hurt.

21          Q.    That her hand hurt?

22          A.    Yes.

23          Q.    Would that affect the samples that are provided

24    to you?

25          A.    They might, yes.

```
 1          Q.     How long total time were you with her on
 2     February 9 of the year 2001 -- February 6, 2001, sorry?
 3          A.     Approximately an hour.
 4          Q.     And during that hour that you were there, were
 5     you asking her to write different things throughout that
 6     whole hour?
 7          A.     As you saw from the forms, some of them I asked
 8     her just to answer the questions.  Others were dictated words
 9     that I asked her to either print or write.
10          Q.     And as I understood it there was a total of 12
11     documents generated during that hour visit with her, correct?
12          A.     Yes.
13          Q.     Okay.  And you have up there there's a request
14     to compare the known exemplars to the questioned documents.
15     Can you explain to me what that is?
16          A.     As I mentioned before, we do a side by side
17     comparison to the questions and knowns.  We look for the same
18     words or the same group of words or the same letter grouping
19     between the question and the known.  If I can --
20          Q.     Sure.  Go ahead.
21          A.     In this case what I've done is --
22          Q.     With regard to this one, before we go any
23     further, just give us the number to the left, and then you
24     could tell us whatever you want to tell us.
25          A.     The number to the left is -- this is Q3,
```

TRACI L. WHEELER, OFFICIAL COURT REPORTER, CSR, RPR, CCR

1   Q3-A.  What I've highlighted is the "Anne Newton" in the

2   questioned document.

3          Q.    Okay.

4          A.    I've placed that "Anne Newton" now in what we

5   call a pay stub, which is literally a cut and paste.  I

6   photocopied the documents, then cut out the handprinting and

7   placed it on a -- on another piece of paper and compared

8   "Anne Newton" to other forms of either "Anne" or "Newton."

9          Q.    This is the one you previously indicated to us

10  was written by the defendant?

11         A.    The Q1, Q4, Q3-A, and Q3-A R were all written

12  by the writer of the known.

13         Q.    Okay.  In addition this is a document -- the

14  known document number 9.  The word "Anne" has been isolated.

15  And this is something that you received from her back on

16  February 6, 2001?

17         A.    This is from the exemplars that were given, the

18  handwriting.

19         Q.    Right.

20         A.    That was photocopied and then I cut out --

21         Q.    Okay.

22         A.    -- and pasted, and then the designation at the

23  bottom, Q9.

24         Q.    All right?

25         A.    Again, another known sample Q12.  The word

1    "new" has been isolated and has been placed in this pay stub

2    to compare the handprinting of "Anne Newton" to the "Anne" or

3    "Newton" parts of it in the knowns.  All of these are known

4    writings from Wendi, all of these are from the question that

5    has the designation of where it is by the "Q."

6            Q.    Okay.  All right.  Go ahead.

7            A.    The "Anne Newton" on the questioned document,

8    only isolated.  This one here is from the Q12.  This is from

9    the Airborne manifest.  What I've done is I go through a

10   series of steps, series of tests.  I look for the size, the

11   proportion, the slant.  In this case is an example of the

12   slant both in the question to see if they were first written

13   by one writer and then to see if it compares to the known.

14           Q.    Okay.

15           A.    My conclusion --

16           Q.    Go ahead.

17           A.    The handprinted "Anne Newton" in the documents

18   referred to as Q1, Q3, Q4 were authored by the writer of the

19   knowns K1 through K12.

20           Q.    And the writer of the knowns was the defendant?

21           A.    Yes.

22           Q.    Go ahead.

23           A.    I isolated this one here, Q12, this is the

24   Airborne manifest.  This is the handprinting, the

25   handprinting of "Anne Newton" on Q12 was probably authored

```
 1    by the knowns K1 through K12.

 2         Q.    Do you see -- probably on with this one and on

 3    the previous three items, you indicated they were written by

 4    the defendant?

 5         A.    In this case here the handprinting runs on

 6    beyond the line that was allotted for "of the."  Also, it's

 7    very mechanical and not naturally written.

 8         Q.    Go ahead.

 9         A.    In addition, as I said before, I also compared

10    the rest of the handprinting.  Again, the designations are

11    the Qs with the questioned documents and the Ks for the

12    knowns.

13         Q.    The one on the right looks like it's just a cut

14    out piece of something.  What is that?

15         A.    This one here on the right is Q11.  This is in

16    the money order.  This is the Abco Western Union money order.

17         Q.    Okay.

18         A.    And just very briefly, some of the

19    characteristics, you've got a "V" with the terminal stroke

20    going higher than the initial stroke, the "G" is very good.

21    It comes down and goes up.  We'll see a lot of "G"s coming

22    down and going up having, exaggerated terminal strokes.  The

23    "I" dot is very good, the "I"s.  Above the stem and to the

24    left of the stem.  Again, this is another one from the

25    questioned document.  Here we're showing the "PH" combination
```

TRACI L. WHEELER, OFFICIAL COURT REPORTER, CSR, RPR, CCR

000004437

1    that were touching each other.  Here we're showing the "OE"

2    combination that's touching each other.  "PH" combination

3    that's touching each other.  Here the "X" is very good.  This

4    stroke is taller than this other one.

5                    QRA questioned document R 3A on the other

6    side.  The "S" is very good.  The A combination is also

7    taller in the question and also in the known.  The "Arizona"

8    again in the question Q3A reverse side to the knowns.  I

9    noticed that all the lower case is very, very even, both in

10   the question and the known.  Again, on the questioned

11   document "East First Avenue."

12            Q.    This address came from -- the exhibit number

13   that you're looking at right there, came in Exhibit 266.0113

14            A.    Yes.

15            Q.    Okay.  Go ahead.

16            A.    This is the questioned document.  These are the

17   knowns.  Again, what I'm trying to do is get the same word,

18   same combination of words in order to do a comparison.  The

19   "E" is very good.  The "ST" combination is very good.  The

20   "V" has a curvature on the terminal stroke.  The "V" has a

21   very good curvature on the terminal stroke.

22                    This is the Scottsdale --

23            Q.    That's the same exhibit we were previously

24   referring to?

25            A.    Yes.  That is still Q1.  The initial stroke

TRACI L. WHEELER, OFFICIAL COURT REPORTER, CSR, RPR, CCR

```
 1    "S," a flat "S" going down both in the question and known.
 2    The "O" -- the "CO" where the terminal stroke of the "C" goes
 3    into the "O" is very good, both in the question and known.
 4    The "T"s have a crossing, what we call a T-bar crossing which
 5    is the individual typically will do one cross through both
 6    "T"s.  They are separate for both the question and known.
 7    The "D" initial stroke is round and then coming down both in
 8    the question and the known.  Two part "D," sorry.  "Aztec
 9    Creation," the "AZ" we've already seen the "AZ" in the Aztec
10    Creation.
11            Q.    You have up there Q3-A, right?
12            A.    Q3-A, Q3-A -- yes.  All from Q3-A.
13            Q.    All right.
14            A.    Again, getting some of the combination with
15    "AZ" in the "Arizona," we also have the "Creation."  The
16    "C" -- terminal stroke of the "C" going into the "R".  The
17    "TI" combination, which is very good.  The T bar crossing
18    goes into the next letter, both in the question and known.
19    The "AE" combination in "create," both in the question and
20    known.
21            Q.    All right.
22            A.    Next, the react "ACT" included is in Q3, 2-W.
23    The "chem" or "chemical inquiry" in Q2-A 5 compared to the
24    known samples.  The "R" is very good initial stroke, comes
25    down, goes back up on the retrace, comes down and over both
```

TRACI L. WHEELER, OFFICIAL COURT REPORTER, CSR, RPR, CCR

1    in the question and known.  In "chemical," the "AL"

2    combination both in the question and known.  The question is

3    very good with the terminal stroke of the "Q" exaggerated

4    both in the question and known.  The "G," again, as we've

5    seen before, long extension then terminal stroke upward both

6    in the question and known.  The "Y," we'll be able to see in

7    a future slide also, a long loop and large oval.

8            Q.    Okay.

9            A.    Global.com, QA -- Q2-A, K5.  The "AL"

10   combination both in the question and known.  The ".com,"

11   notice that the initial hump is smaller than the second hump,

12   again, both in the question and known.

13           Q.    All right.

14           A.    This is the upper case "Global."

15           Q.    Q2, right?

16           A.    This is Q2, and these are the known standards,

17   the "G" is very good.  The terminal stroke on the "G" that

18   we've seen in the past on some of the questions is here now

19   in the known.  The "AL" combination, again, both in the

20   question and in the known.  In "distribution," the "T" with

21   the T-bar crossing goes into the "R" both in the question and

22   known.

23           Q.    Okay.

24           A.    Again, the word "right."

25           Q.    Is that in Q4?

TRACI L. WHEELER, OFFICIAL COURT REPORTER, CSR, RPR, CCR

1          A.    QU.

2          Q.    Is that QU?

3          A.    Yes.

4          Q.    Okay.

5          A.    The initial stroke "7" downward stroke and

6    coming back up both in the question known.  The "I" over --

7    again, over here to "the."  This is above the stem, this is

8    above the stem, this is slash, this is also a slash.  The "G"

9    comes out and extends to the right both in the question and

10   known.  "Buckeye" initial stroke --

11         Q.    Is that from Q4 also?

12         A.    Sorry, yes.  It is from Q4.

13         Q.    All right.

14         A.    The "Buckeye" initial stroke is downward.  The

15   stroke on the "B" comes back up and around both in the

16   question and in the known.  The "Y" as we've seen previous,

17   in the question is a long loop, both also in the question and

18   the known.

19         Q.    All right.

20         A.    Also here the "BU" the combination which

21   connects and touches each other.  This is very good.  This is

22   from --

23         Q.    Again, this is from Q2?

24         A.    This is Q2.  Initial stroke on "P" is down

25   toward initial stroke is down and over in the known.  The "O"

TRACI L. WHEELER, OFFICIAL COURT REPORTER, CSR, RPR, CCR

000004441

1   initially starts at the top, comes down, and the terminal

2   stroke over here on the right.  Same with over here on the

3   known.  The box -- again the box, in the box there's a stroke

4   down, comes down around over both in the question and the

5   known.

6           Q.    Next.

7           A.    The "Topeka" the T bar crossing --

8           Q.    Is that Q2?

9           A.    That is from Q2.  The "Topeka" the T-bar

10  crossing over off-centered to the right, both in the question

11  and the known.  The "KS" combination, the "S" that's flat

12  both in the question and known.

13          Q.    Next.

14          A.    This is some of the numbers that were generated

15  on question 2.  The "4," the downward stroke on that stem is

16  taller both in the question and known.  The "5" has a wave on

17  the top, again, both in the question and known.  The "6" has

18  a long elliptical both, again, in the question and in the

19  known.

20          Q.    All right.  Next.

21          A.    This, again, is a phone number from Q3-B on the

22  reverse side.  Initial stroke on the "7," there is downward,

23  goes up both in the question and known.  The "8" is very

24  good.  It has a flattop initial stroke, comes from right to

25  left, comes down makes an oval and back up, terminal stroke

1    on the right.  Again, both in the question and in the known.

2              Q.    And this is from Q3-A?

3              A.    This is Q3-A.  Initial stroke is down to the

4    "10" and the "0."  The stroke is from the left side, goes

5    around, and then terminal stroke is here.  Again, the same

6    thing, initial stroke is from the left side and goes around

7    and terminal stroke is down.  The "G" is, again, exaggerated

8    and hooked both in the question and known.

9              Q.    All right.

10             A.    Sales.

11             Q.    And that's Q2-A, right?

12             A.    That is Q2-A.  "Sales" you could see also the

13   combinations touching each other both in the question and

14   known.

15             Q.    Go ahead.

16             A.    This is Q3-A.  The "Zebra," "Z" is very good.

17   The "E" from the left to right then comes around.  The "B"

18   initial stroke is down and comes back up, down, comes back up

19   and then goes around.  Down, comes back up and goes around

20   both in the question and known.

21             Q.    And from Q4, you have something there?

22             A.    Q4 is "Wyndstar."  Again, we've seen that the

23   elliptical curve is on the "Y." The "D" is a two stroke.  "Y"

24   initial stroke is left to right counter clockwise, and then

25   downward stroke, again, both the question and known.  The "S"


TRACI L. WHEELER, OFFICIAL COURT REPORTER, CSR, RPR, CCR

```
 1     is -- got a flat "S" both in the question and known.  This
 2     is "LLC" --
 3             Q.    Is that Q2?
 4             A.    That is Q2.  This is from the known K10.
 5             Q.    All right?
 6             A.    These are some of the dates.  This is one is
 7     8/21.
 8             Q.    That's from Q1, right?
 9             A.    That is from Q1.  And, again, the same
10     formatting both in the question and known.  The "8," that's
11     flat.  The "2," very good.
12                   We get into the next one -- this is from Q3-A
13     R.  This is the 731.  And, again, this "3" is very good.
14     Initial 3 goes down, around, terminal stroke is up both in
15     the question and known.
16             Q.    Next.
17             A.    "16th," either "16th" or "16th Street" --
18             Q.    That's the "Q4," correct?
19             A.    Q3, Q4 and K4.
20             Q.    Okay.
21             A.    Again, that compares with the question -- or
22     with the known documents.  These are samples from Q3 and Q4.
23     This is the zip code "85004."  Again, the flat "8."  The
24     curvature on the top of the "5" both in the question and the
25     known.  The downward stroke of the "4" again in both the
```

TRACI L. WHEELER, OFFICIAL COURT REPORTER, CSR, RPR, CCR

1    question and known being the tallest, the initial stroke on

2    the "7" being upward, both, again, in the question and known.

3           Q.    All right.

4           A.    This is the from Q3-A and Q5, "sodium," that's

5    very good with the "S" and "O" connected, the upper case "S"

6    flat top, the "D," the "U" -- "IUM," the "cyanide." It's a

7    two part "Y" on the "cyanide," again, both in the question

8    and knowns.  We've seen the "G" before with the long stroke

9    hidden from the question to the known.

10          Q.    This one is from the license.  This is Q6,

11   correct?

12          A.    That is correct.  This is from Q6, this is "To

13   Allen," and in comparison I took the first part Topeka, "TO"

14   combination, you can see the downstroke of the stem, there's

15   a space between that and the -- the T-bar crossing on the

16   top, off centered to the right both in the question and

17   known.  Initial stroke of the "A" is downward stroke, comes

18   back up, has a tent at the top and comes back down, both on

19   the question and known.

20          Q.    On the K9, did -- you got "Allen."  Did you ask

21   her to just printout "Allen"?  Is that how that worked?

22          A.    I believe so.

23          Q.    Go ahead.

24          A.    We're also showing the stroke across on the "A"

25   that goes beyond the downward stroke, both on the question

```
1    and known.  Also the headline, the "A" is tallest, two "L"s

2    and then the "EN," both in the question and known.

3             Q.    Okay.

4             A.    This is from Q4.  This is the "Johnson."

5    Again, the T-bar crossing on the top overhangs, several of

6    the letters to the right of it both in the question and

7    known.

8             Q.    All right.  Next?

9             A.    Some more of the index.

10            Q.    That's Q5, right?

11            A.    Q5, Q5.  Again, same printing style both

12   question and known.  This is the --

13            Q.    Q3-A?

14            A.    Q3-A and Q5, I believe, with a "www," "W"s and

15   the curvature to the left on the terminal stroke both in the

16   question and the known.

17            Q.    Next.  We have a conclusion there, right?

18            A.    Yes, sir.  I do.

19            Q.    What are they?  What is that?

20            A.    The conclusion is that the handprinting you've

21   just seen was all authored by the writer of the known --

22   writer of the known being the writer of the known numbers K1

23   through K12.

24            Q.    Let me see if I could repeat that.  The writer

25   of the documents is the writer we've referred to today, is
```

1     that the defendant?

2              A.    Yes, it is.

3              Q.    Next were you asked to do something else?

4              A.    Yes.

5              Q.    Go ahead.  And did that refer to the signature

6     portion or the cursive writing of the name "Anne Newton"?

7              A.    Yes.

8              Q.    You went earlier and you received some

9     documents from the defendant and some writing samples.  Why

10    is it that you weren't -- you didn't do it the first time?

11    In other words, what necessitated you to visit with her a

12    second time?

13             A.    I'm still on the first.

14             Q.    Okay.  Go ahead.

15             A.    In this case what I'm doing is comparing the

16    "Anne Newton" signature to what I received the first time for

17    the "Anne Newton."  I was not able to get an upper case "A"

18    in cursive, but I was able to get a lower case "A" in

19    cursive.  If I could go to the next slide --

20             Q.    Sure.

21             A.    The next slide showing the known exemplars,

22    again, with the lower case "A" but in cursive, the rest of

23    the handprinting or handwriting that was in comparison,

24    again, with the known samples versus the questioned

25    document.  There wasn't enough there for a full comparison of

TRACI L. WHEELER, OFFICIAL COURT REPORTER, CSR, RPR, CCR

000004447

1    the question to the known.

2         Q.    Okay.  So then did that require that you go

3    back and get a second set of exemplars?

4         A.    Later on, yes.

5         Q.    Okay.  I'm going to show you what has been

6    marked for identification as Exhibit 280.  Do you recognize

7    what's in this exhibit?

8         A.    Yes.

9         Q.    And what was the date you obtained these?

10        A.    These were obtained on June 12, 2002.

11        Q.    Who were they obtained from?

12        A.    These were obtained, again, from Wendi

13   Andriano.

14        Q.    Is that the same person that you previously

15   identified in court?

16        A.    Yes.

17        MR. MARTINEZ:  Your Honor, I ask for the

18   identification -- that the record reflect the identification

19   of the defendant.

20        THE COURT:  The record will reflect identification

21   of the defendant by the witness.

22        MR. MARTINEZ:  And I move for admission of

23   Exhibits -- Exhibit Number 280.

24        MR. PATTERSON:  No objection, Judge.

25        THE COURT:  Exhibit 280 for identification is


TRACI L. WHEELER, OFFICIAL COURT REPORTER, CSR, RPR, CCR

000004448

1      admitted into evidence.

2      BY MR. MARTINEZ:

3              Q.      Go ahead.  You were telling us about the

4      signature?

5              A.      In my first handwriting comparison there was

6      not enough to do a full comparison of the questions and the

7      known, so what I did was I compared all the questioned

8      documents to see if they were all written by the same

9      writer.  Again, doing the slants as well as the rest of the

10     initials -- initial strokes, terminal strokes, I was able

11     come to a conclusion.

12             Q.      And what was that conclusion?

13             A.      The signatures, "Anne Newton" on Q1, Q3-A R,

14     Q3-C R, and Q11 and Q12 were all written by one writer.

15             Q.      So all of the signatures which you have up

16     there were authored by the same writer?

17             A.      Yes.

18             Q.      Okay.  Go ahead.

19             A.      As I said, I tried to compare it to what I had

20     as far as knowns but I was limited because I didn't have the

21     upper case "A," I didn't have a full "A-N-N-E," and so the

22     best I could do was make a determination that it was probably

23     written by the writer, but there was not enough consistency

24     to go any further than that.

25             Q.      So what you're telling us right now, the

TRACI L. WHEELER, OFFICIAL COURT REPORTER, CSR, RPR, CCR

000004449

1    signatures "Anne Newton" you told us about before were

2    written by the same person and they're probably written by

3    the defendant?

4            A.    That is correct.

5            Q.    Okay.  Go ahead.  And we've already talked

6    about you having to go out and speak with the defendant to

7    get some other samples, correct?

8            A.    Yes.

9            Q.    Go -- and when you went this second time, how

10   long did your visit -- yeah.  How long did your visit last?

11           A.    Approximately an hour.

12           Q.    And during that time did you go through the

13   same process that we just discussed before where you asked

14   her to write certain things?

15           A.    Yes, I did.

16           Q.    And how many pages were generated that day?

17           A.    There were only seven pages generated that

18   time.

19           Q.    Was she able to -- did she complain at any

20   time?

21           A.    Again, she complained about fatigue of her

22   hand.

23           Q.    And was she able to provide you with an upper

24   case "A" or were there some samples that you were unable to

25   obtain?

TRACI L. WHEELER, OFFICIAL COURT REPORTER, CSR, RPR, CCR

000004450

1          A.     I was still unable to get a cursive upper case

2     "A."

3          Q.     In other words, the large "A" you weren't able

4     to get?

5          A.     That is correct.

6          Q.     Go ahead.  And the first thing you have up

7     there is Q11, correct?

8          A.     Yes.  This is the money order.

9          Q.     All right.  And the "Anne Newton" we're looking

10    at is the one on the right, right?

11         A.     Yes.

12         Q.     Okay.  Go ahead.

13         A.     In this case, additional exemplars were

14    obtained.  These are in order K13, 14, 15 all the way through

15    19.

16         Q.     Okay.  And then you were asked to make a

17    comparison to the money order.  And what did you do?

18         A.     I was asked to make a more definitive if

19    possible opinion of this, so what I did was I took, again,

20    the "Anne Newton."  I cropped it out, cut and paste.  I

21    received more "Anne Newtons" and did a comparison.  Again,

22    the "Newton" from the K9 was there.

23         Q.     And what was your conclusion?

24         A.     Conclusion was that the "Anne Newton" on the

25    money order referred to as Q11 was, again, probably written


TRACI L. WHEELER, OFFICIAL COURT REPORTER, CSR, RPR, CCR

000004451

1    by the writer of the exemplars.  Q11, the signature "Anne

2    Newton" was unnaturally written.  No other opinion could be

3    rendered.

4            Q.    When you say that the Q11 money order, the

5    signature was unnaturally written, what are you saying by

6    that?

7            A.    Okay.  What I'm saying is in this case, the

8    "Anne Newton," each letter was created.  There was a pen lift

9    and then the next letter was put in, so it was not naturally

10   written.  No one would write the first letter and lift the

11   pen, put their pen down, up, down, up, down; simply, if it

12   was a signature, it would be a complete cursive continuance

13   signature.  In this case there were a lot of pen lifts, first

14   in the "Anne" and parts of the "Newton."

15           Q.    Go ahead.  I think that's all the slides we

16   have, correct?

17           A.    Yes, it is.

18           Q.    Go ahead and take a seat and I have some

19   questions for you.

20                 I want you to take a look at Exhibit 266.011,

21   266.021, and 266.022.  Are they same document?

22           A.    As --

23           Q.    As each other.  In other words, do they have

24   the same words on there except for maybe the line going down

25   the middle?

TRACI L. WHEELER, OFFICIAL COURT REPORTER, CSR, RPR, CCR

1          A.     Yes.

2               MR. MARTINEZ:  I don't have any other questions.

3               THE COURT:  Mr. Patterson?

4               MR. PATTERSON:   I have no questions for this

5     gentleman.  Thank you, Judge.

6               THE COURT:  Any further questions of this witness by

7     the jury?  If so, please raise your hand.

8

9                    (The following proceedings were held at the

10    bench:)

11

12              THE COURT:  Question, "Would you be able to make a

13    comparison today by viewing a document?  If so, could you

14    compare Exhibit Number 368.001 to known writer Wendi

15    Andriano?"

16                   Exhibit 368.001 is -- it's listed on the

17    exhibit list as some kind of note.

18              MR. PATTERSON:  Well, there's a Rule 15 issue,

19    Judge.  This opinion he would be asked to render was never

20    disclosed, so it's -- they can't do what the county attorney

21    can't do.

22              MR. MARTINEZ:  Is that the deleting cookies note?  Is

23    that what --

24              THE COURT:  I don't know which.

25              MR. MARTINEZ:  Okay.


TRACI L. WHEELER, OFFICIAL COURT REPORTER, CSR, RPR, CCR

1          THE COURT:  I'm not going to ask that.  Did either

2     one of you want to put anything on the record on that last

3     question?

4          MR. MARTINEZ:  No.

5          THE COURT:  Okay.  Next question, "Did Wendi appear

6     to try to change her handwriting or printing for your known

7     exemplars?"

8          MR. MARTINEZ:  No objection to that.

9          MR. PATTERSON:  Well, again, I don't know how he can

10    do that.  I think it's -- he had never seen other printing

11    from this defendant.  He wouldn't know what she was doing was

12    different in any fashion.  I think it's beyond the scope of

13    this gentleman's opinion.

14         MR. MARTINEZ:  The thing is that his expertise is

15    also in watching people write, the way their hand goes up and

16    down, whether or not they slant it to the right or left.  I

17    know he has an opinion about that.

18         THE COURT:  I'm not going to ask that because there

19    hasn't been foundation laid to answer the question.

20

21              (The following proceedings were held in open

22    court:)

23

24         THE COURT:  Are there any further questions of this

25    witness by the jury?  If so, please raise your hand.


          TRACI L. WHEELER, OFFICIAL COURT REPORTER, CSR, RPR, CCR

```
 1                    (No response.)
 2          THE COURT:  No one has raised their hand.
 3                    May the witness be excused?
 4          MR. MARTINEZ:  Yes, sir.
 5          MR. PATTERSON:  Yes, Your Honor.
 6          THE COURT:  Thank you very much.  You're excused.
 7          THE WITNESS:  Thank you, Your Honor.
 8          THE COURT:  Thank you.
 9                    Mr. Martinez, the State may call its next
10   witness.
11          MR. MARTINEZ:  State calls Jeffrey Miller.
12                    (Pause in proceedings.)
13          THE COURT:  Sir, if you could please step forward
14   right up here.  If you could give your name to the clerk and
15   she'll swear you in.
16
17                    JEFFREY MILLER,
18          CALLED TO TESTIFY ON BEHALF OF THE STATE,
19     HAVING FIRST BEEN DULY SWORN, TESTIFIES AS FOLLOWS:
20
21          THE COURT:  Please have a seat on the witness
22   stand.  Please make yourself comfortable there on the witness
23   stand.  Please pull the microphone close to you.  Please
24   remember to speak loudly and clearly into the microphone so
25   everybody can hear you.  Also please wait until the question
```

```
 1    is completed before you answer the question, and please make

 2    sure you give a verbal response.  Is that agreeable to you,

 3    sir?

 4               THE WITNESS:  Yes, sir.

 5               THE COURT:  Mr. Martinez, you may proceed.

 6

 7    DIRECT EXAMINATION BY MR. MARTINEZ:

 8         Q.    Your name, sir?

 9         A.    Jeff B. Miller.

10         Q.    What do you do for a living, sir?

11         A.    I'm an attorney.

12         Q.    Who do you work for?

13         A.    My law firm is Rousch, McKracken, Guerrero,

14    Miller and Ortega.

15         Q.    What is your primary area or what are your

16    primary areas of practice?

17         A.    Professional negligence, medical malpractice,

18    legal malpractice, and catastrophic personal injury cases.

19         Q.    Generally speaking with regard to that -- those

20    areas that you've talked about, how is it that you attain

21    your fee?  In other words, how is it that there's any

22    recovery?  If you could just explain to us generally how that

23    system works.

24         A.    Typically as opposed to a contract attorney who

25    might charge on an hourly basis, most attorneys charge on
```

TRACI L. WHEELER, OFFICIAL COURT REPORTER, CSR, RPR, CCR

1    contingency fee basis which means there is no payment made

2    for the work that was done unless the case is successful.

3        Q.    And what is it that you are seeking to get in

4    these type of cases for the client?  What is it that you were

5    attempting to get?  In other words, are you attempting to get

6    money or how does that work?

7        A.    About the only thing that a personal injury

8    attorney can do for a client is to obtain some type of

9    financial compensation either through a settlement or through

10    a judgment after a trial.

11        Q.    And you mentioned something about a

12    settlement.  Again, generally speaking, how does the general

13    practice of personal injury work?  Do you go through the

14    settlement phase first or -- and then go to the filing or

15    does it vary, but just generally speaking?

16        A.    It varies and it varies particularly depending

17    on the type of case that's involved.  Just to give an

18    example, the typical auto accident case might sit there with

19    no litigation involved especially if the injuries are

20    relatively minor.  We don't typically do those kind of cases

21    in my office.  Most of the cases that we handle, because of

22    the nature of the injuries and the complexity of the type of

23    claim require filing litigation, the case might settle during

24    the course of that litigation either through discussion by

25    the attorneys or through mediation.  The case could settle

TRACI L. WHEELER, OFFICIAL COURT REPORTER, CSR, RPR, CCR

1    while the jury is out considering the case after a trial has

2    already taken place.  So there are no rules, but it tends to

3    happen in my type of cases later rather than sooner.

4          Q.    And, again, just generally speaking about this

5    area, we've heard terms and one of them that was used by

6    medical malpractice cases and then we've also perhaps heard

7    terms like "wrongful death."  Are they the same thing?  If

8    so, let me know that.  If not, how are they different?

9          A.    They're not exactly the same thing.  A medical

10   malpractice claim is a type of personal injury claim where

11   the plaintiff is claiming that some act of negligence was

12   done by a doctor or healthcare professional that then led to

13   some type of damages.

14                A wrongful death claim only arises when a

15   person passes away, and that claim is the claim of the -- of

16   a certain specific survivor of the person who is deceased,

17   and in this state it's statutorily a surviving parent,

18   surviving spouse and surviving children of the deceased if

19   any of these persons exist.

20                A wrongful death claim could arise out of

21   medical malpractice.  In other words, you could allege the

22   death of the result of malpractice, but there is -- there's

23   at least a conceptual difference between the two types of

24   claims and a definite difference in the two and how they can

25   resolve, hypothetically speaking, when we have a medical

TRACI L. WHEELER, OFFICIAL COURT REPORTER, CSR, RPR, CCR

1    malpractice claim where the patient has died.

2           Q.    There was an allegation there was some

3    negligence out there by some healthcare provider.  And let's

4    assume this individual is married for the purposes of this

5    question that I'm going to ask.  This recovery that this

6    person is going to get for the damages done to him as a

7    result of the negligence, do they go to him or do they go to

8    him and the wife, if he's married?

9           A.    The proceeds of any settlement?

10          Q.    Right.  Uh-huh.

11          A.    It depends on how the claim was -- is pled.

12   The personal injury claim, the malpractice claim of the

13   person who has sustained the damages is his claim.  There may

14   also be a claim for the spouse in such a situation for what's

15   called loss of consortium, which is loss of spousal services,

16   the things a spouse might do for another spouse.

17          Q.    But this claim that we have for this

18   individual, the one that's been injured, generally speaking,

19   and it's hypothetical, is that usually larger than the loss

20   of consortium we're talking about or is it the same or is it

21   less?

22          A.    I can't conceive of a circumstance where it

23   would be -- where the spouse's claim would be greater than.

24   The spouse's claim can be significant, for example, where one

25   spouse becomes a quadriplegic and the other spouse then has a

1    whole lot of caring obligations in addition to the loss of

2    services.  So the spousal claim can be significant, but

3    typically the -- the injured party, the person who sustained

4    the actual physical injuries claim is going to be larger.

5         Q.    Let's assume for purposes of our hypothetical

6    That the parties are living together for a certain period of

7    time during which -- and they're married during which the

8    punitive or the alleged negligence by the doctor arises.

9    They live together, let's say, maybe four, five, six, seven

10   years.  And before the case is settled and before it goes to

11   trial, before anything is done or any money is offered, the

12   couple gets divorced.  In that case, let's say that there's

13   an award and it's an award for the damages done to the

14   patient.  Who gets to keep that money?

15        A.    I'm not a divorce attorney and I stay as far

16   away from that area of the law as possible.  As far as trying

17   to decide whether that's joint property or sole and separate

18   property, my information on that would be somewhat

19   secondhand.  Typically, because we have had to deal with the

20   issue on some occasions, a personal injury settlement is sole

21   and separate property, which would make the injury property

22   sole and separate.  And the loss of consortium also to the

23   extent was awarded is sole and separate property.

24        Q.    In other words you're saying the spouse who has

25   the loss of consortium, so to speak, is the other party that

TRACI L. WHEELER, OFFICIAL COURT REPORTER, CSR, RPR, CCR

000004460

1    would get what was due to them for whatever damages had been

2    caused?

3         A.    I'm only hesitant because it's a little murkier

4    than that.  For example, one of the claims of the injured

5    person might be a lost wage claim and those last wages were

6    lost to the client.

7         Q.    Right.

8         A.    So that claim might be split right down the

9    middle.

10        Q.    Right.

11        A.    I'm giving you a generality.

12        Q.    Right.

13        A.    But there are exceptions to all those things.

14        Q.    How about for pain and suffering, the injury

15   itself?  Let's say that they're living together as husband

16   and wife, they get a divorce and there is an award for the

17   suffering -- the pain and suffering, disfigurement, whatever

18   it may have been, awarded to one of the spouses.  Does the

19   other spouse get any of that?

20        A.    Again, without putting it into the divorce

21   context and how things might be divided up for divorce

22   purposes, that is typically the claim of the injured party.

23        Q.    In this case did you have occasion to come in

24   contact by the -- with somebody by the name of Wendi

25   Elizabeth Andriano?


TRACI L. WHEELER, OFFICIAL COURT REPORTER, CSR, RPR, CCR

000004461

```
 1            A.    Yes.

 2            Q.    Is she in court today?

 3            A.    I -- I only know that because I know why I'm

 4    here and I know she's sitting at the defense table.  It's

 5    been a long time since I've seen her.

 6            Q.    When was the last time you saw her?

 7            A.    It's been at least four years, and it may be

 8    closer to four and a half years ago.

 9            Q.    And --

10            A.    We've both aged since then.

11            Q.    And the Wendi Elizabeth Andriano that you dealt

12    with, was she married?

13            A.    Yes.

14            Q.    Did she have a husband?

15            A.    Yes.

16            Q.    What was his name?

17            A.    Joe.

18            Q.    Could it have been Joseph Dwayne Andriano?

19            A.    It was, but he was "Joe" in our office.

20            Q.    And were they married, the two of them?

21            A.    As far as I knew.

22            Q.    I mean, that's how they presented themselves to

23    you?

24            A.    Absolutely.

25            Q.    And when was it that you first had contact with
```

```
 1     either them, whether they called you, mailed you something,
 2     or you spoke with them?
 3          A.     When was the first time they contacted the
 4     office?
 5          q.     Yeah, uh-huh.
 6          A.     Late summer of 1998.  It was either the last
 7     week of August, first week of September 1998.
 8          Q.     And who was it that initiated that contact?
 9     Was -- was it him or was it her?
10          A.     There had been a call to our office and I can't
11     tell you by which one it was.  It was actually for my partner
12     Chuck Rousch and Mr. Rousch was out of the country at the
13     time.  I responded to that call and on that occasion I
14     reached Wendi Andriano.
15          Q.     And what date was that?  Is that the date that
16     you just gave us where --
17          A.     It would have been -- the conversation would
18     have been a week or two prior to that.  I remember I went to
19     their apartment or their apartment complex last week of
20     August, first couple days of September.  I know that because
21     I sent them a letter that was dated September 3, 1998, and it
22     references "It was nice to see you all on Saturday."
23          Q.     Right.
24          A.     So whenever the Tuesday was is when I saw them.
25          Q.     You mentioned letters.  Do you have as part of
```

1    your file a correspondence backer?

2         A.    I do.

3         Q.    If there had been a letter written by either of

4    them, would it be, in the general course of business, usually

5    included in that correspondence backer?

6         A.    Yes.

7         Q.    Would you mind taking a look to see what the

8    first correspondence from them is to you there?

9         A.    I looked through this before I came in, Mr.

10   Martinez, and the truth is I don't have a recollection of

11   anything substantive from them by way of correspondence.

12   They returned things to me that I sent to them.  There may

13   have been some correspondence at some time, but I don't

14   remember it being of any substance.

15        Q.    But in any event, the first contact with either

16   of them was a telephone call in which you spoke to Wendi

17   Andriano, the wife?

18        A.    That's true.

19        Q.    What was the substance of that conversation if

20   you can remember?

21        A.    What I recall was that there was a failure to

22   diagnose cancer.  There was not a lot of specific

23   information.  They were interested in whether or not that

24   failure was medical malpractice and were in the process of

25   talking to lawyers and were interested in whether or not we

1    were interested in representing them.  My partner had been in
2    I think it was Phoenix Magazine's best lawyers in the state
3    or something and that was how they found our particular name.
4            Q.    Again, just so I'm clear, you said "they were
5    interested."  You only spoke with her at that time, though,
6    right?  He wasn't on the extension or anything?
7            A.    I don't believe so.
8            Q.    Okay.  In response to that, what happened?
9            A.    I drove to Casa Grande within a couple days of
10   the conversation and -- and met with them.
11           Q.    Okay.  Do you remember the time of day it might
12   have been that you met with them?
13           A.    It was daytime.  My recollection was it was
14   early afternoon, early to this time of the day, afternoon,
15   but I'm not absolutely certain.
16           Q.    And who did you speak with first or did you
17   speak with both of them at the same time?
18           A.    At that first meeting there were several people
19   present.  Wendi was there.  My recollection is that there
20   were a member or two of his family, and my recollection is
21   that Joe came in at some point during the course of the
22   conversation.
23           Q.    But just so that I understand it, my perception
24   of it may be wrong, but my perception of it is that you came
25   over, the defendant -- Mrs. Andriano was there, members of

```
 1    his family were there, but he wasn't present initially when
 2    you came over?
 3         A.    That's my recollection is that he came in at
 4    some point.
 5         Q.    And how much time elapsed before he came in?
 6         A.    Couldn't tell you.
 7         Q.    Had you already began to speak with the family
 8    about the representation or was it just sort of a salutation
 9    kind of thing?
10         A.    There was a lot of general discussion.  Some of
11    it was questions of me regarding our firm, regarding me in
12    particular, what we did, how much of this we did, how it
13    worked, what we would do.  As I recall the meeting lasted for
14    some time, an hour, an hour and a half, something like that.
15         Q.    And he came in at some point?
16         A.    Yes.
17         Q.    And what was his demeanor if you could
18    remember?
19         A.    He was attentive and polite.
20         Q.    And did he stay for the whole meeting?
21         A.    My recollection is from the time he came in, he
22    stayed.
23         Q.    And after that was there an agreement, a
24    meeting of the minds, or did anything come of that meeting?
25         A.    I left there with no particular commitment,
```

```
 1   only that they would get back to me, and at some point within
 2   a week or two of that meeting they did indeed get back to us.
 3            Q.     When you say they got back to you, do you know
 4   who actually called you?  Was it just a message or --
 5            A.     I believe it was Wendi.
 6            Q.     And what -- what was the context or what was it
 7   that she indicated?
 8            A.     Only that they had decided to go with our law
 9   firm and to -- I mentioned that we would need medical
10   releases and I would provide them a copy of our fee agreement
11   if they agreed to retain us, and I did those things.
12            Q.     You sent those out to her?
13            A.     Yes.
14            Q.     And were they returned?
15            A.     They were returned in two phases.  I think I
16   got the medical releases back first.  There was a correction
17   they wanted to make because I didn't have Joseph's full name,
18   and there was a request that I correct that and I did so, and
19   then ultimately that came back.
20            Q.     All right.
21            A.     More like October, somewhere in there.
22            Q.     Did you -- when was the next time you spoke to
23   either Mr. Andriano or Mrs. Andriano?
24            A.     I wouldn't be able to give you specific days
25   and times.  There were several conversations and I spoke to
```

TRACI L. WHEELER, OFFICIAL COURT REPORTER, CSR, RPR, CCR

1    both Joe and Wendi during the first month or two while we

2    were doing our investigation.  Primarily calls from us to

3    them seeking information, names of doctors, how he was doing,

4    what treatment he was undergoing, and my recollection was

5    that they were expecting a baby and also just to check on how

6    they were doing.

7         Q.     At that point it appears that you then engaged

8    in some sort of discovery or checking the claim out, right?

9         A.     The process of -- of investigating a medical

10   malpractice claim takes a while.  We explained that to them

11   and went about the process of doing our investigation.

12        Q.     During the time that you were investigating

13   this claim, did you ever receive any call from the defendant

14   or Wendi Andriano?

15        A.     Periodically.

16        Q.     Do you remember whether or not you received any

17   calls from Joseph Andriano?

18        A.     There were a call or two from Joseph over the

19   course of the first six or eight months.

20        Q.     And thereafter did you decide this is a case

21   that had some merit and you would go forward with it?

22        A.     We ultimately made that decision, yes.

23        Q.     When was that made?

24        A.     With earnesty, it was made in the early part of

25   2000, but because we were able to retain a good pathology

```
1     review by a fairly prominent pathologist over at Scripps in
2     California, I was able to go visit him, he have gave us the
3     analysis that we needed, and at that time I communicated to
4     them we were in a position to go forward.  We were still
5     looking for an expert to talk about the issue of staging,
6     where Joe would have been in the progress of his cancer had
7     it been detected with the first pathologist who missed the
8     diagnosis versus the second pathologist versus the third.
9     That was one of the trickiest issues of the case.
10          Q.     And was the kind of case -- I know  that you
11    handle -- had handled complex cases, but did this case
12    ultimately result in a filing?
13          A.     It did.
14          Q.     And where did you file that?
15          A.     We filed that in Superior Court, Maricopa
16    County.
17          Q.     And what date?
18          A.     Actually, I may have just misstated that.
19          Q.     May have been Pinal -- or Pima?
20          A.     Yeah, it was Pima County, I'm sorry.  Because
21    most -- the misdiagnosis had taken place at medical
22    facilities in Pima County.
23          Q.     And what was the date that you filed?
24          A.     I'm -- looks like it was filed middle of July.
25          Q.     Do you have the date that the document -- I
```

```
 1    know they have dates on them.
 2           A.    I have a summons date July 2000.  Usually
 3    that's same day date --
 4           Q.    Okay.
 5           A.    -- as the complaint.  Let me find the
 6    complaint, if you'd like.
 7                 (Pause in proceedings.)
 8           THE WITNESS:  Maybe I can't.  July 12.
 9    BY MR. MARTINEZ:
10           Q.    Okay.  Was it actually Pima or Pinal County
11    where you filed it?
12           A.    Pima County.
13           Q.    Okay.  And once you filed it, did you let the
14    Andrianos know that's what had happened?
15           A.    Yes.
16           Q.    And did you continue to have conversations both
17    with Wendi Andriano and Joseph Andriano?
18           A.    The -- the complaint was not served immediately
19    but served over the course of the next couple of months.
20    They were advised as we accomplished service and as lawyers
21    began filing answers to the complaint on behalf of the
22    defendants, so there was some communication there, and there
23    were a couple phone calls around that time period, but not
24    much after the answers came in.
25           Q.    Did you ever have a conversation with Wendi
```

TRACI L. WHEELER, OFFICIAL COURT REPORTER, CSR, RPR, CCR

000004470

1  Andriano about this lawsuit and indicating any value to it?

2      A.    I never put a specific value on any case

3  until -- until I have to officially either through the

4  settlement process or in asking a jury to award damages.

5      Q.    Did you ever indicate that this could be

6  something that's worth millions of dollars or words to that

7  effect?

8      A.    I suppose it's all in how you hear it.  I would

9  use words like "significant," "substantial," that it's

10 certainly a case that has a significant value.  In my

11 business you try not to put specific numbers on things

12 because clients look to specific numbers and things happen in

13 cases that change their value for the better or worse during

14 the course of litigation and you want to maintain

15 flexibility.

16     Q.    As you sit here today, what is your --

17 obviously, you're not representing her anymore.  What is your

18 view of what significant may have been as it applied to that

19 particular case?

20     A.    It was -- it was a case where if it had -- if

21 nothing had changed, and just to be specific this is not in

22 any fashion in a way I would have communicated it to the

23 clients.

24     Q.    Right.

25     A.    But in terms of internal evaluation of the

1    case, we saw it as a case that was a seven figure case.  But

2    what that meant specifically, even internally we don't lock

3    ourselves into thinking it is a 1.2 million dollar versus 2.6

4    million dollar versus 3 million dollar case until we're much

5    further along in the process.

6          Q.    In this particular case if the matter had

7    proceeded to trial, assuming it had and prior to it actually

8    being presented to a jury or to a judge, depending, and Mr.

9    Andriano had died, what -- would that have changed the value,

10   either make it lower or more in the case or not at all?

11         A.    It would have depended on a couple of things,

12   would have depended on what he died from.

13         Q.    Let's assume he had a horrible, painful

14   asphyxiation, and prior to this we have been told he would

15   die from that, and dying from the cancer.

16         A.    From the dancer.  It would have to go through

17   changes in the pleadings to make a wrongful death, there

18   would be additional parties added, such as his parents,

19   assuming they were still alive and --  well, any additional

20   children that had come along in the process, so the parties

21   would change, the character of the claim would change, and

22   you'd have to evaluate it at that time through addition of

23   additional parties, and the fact that you can say then with

24   certainty what was going to happen to him whereas in a

25   failure to diagnose cancer case, there's always at least

EXHIBIT O

```
 1      potentially a good possibility somebody doesn't die from the
 2      the cancer.
 3              Q.      Right.
 4              A.      And the jury may find that, you have to go
 5      through and evaluate where you are at that time.  But the
 6      potential is there for the case to be more valuable only
 7      because the damages are going to be more certain, there may
 8      be additional parties who would have claims, the results will
 9      certainly be permanent and --
10              Q.      Is --
11              A.      -- there is significant sympathy that's
12      involved.
13              MR. MARTINEZ:  Thank you very much.  I have nothing
14      else.
15              THE COURT:  Mr. Patterson.
16              MR. PATTERSON:  Thank you, Judge.
17
18      CROSS-EXAMINATION BY MR. PATTERSON:
19              Q.      How you doing, Mr. Miller?
20              A.      Fine, thank you.
21              Q.      We've spoken on several occasions about this
22      case, haven't we?
23              A.      Yes, sir.
24              Q.      You are a civil lawyer?
25              A.      Yes, sir.
```

TRACI L. WHEELER, OFFICIAL COURT REPORTER, CSR, RPR, CCR

 1          Q.    Okay.  And what you do is governed by the Rules

 2    of Civil Procedure, right?

 3          A.    Yes.

 4          Q.    Okay.  There are certain statute of limitations

 5    with regard to causes of action, right?

 6          A.    Yes.

 7          Q.    And you need to file pleadings in a -- a court

 8    in order to avoid the impact of a statute of limitations

 9    violation, which would be a dismissal of the case or

10    inability to proceed with the cause of action, right?

11          A.    Yes.

12          Q.    Okay.  So there's deadlines by which you need

13    to file things, right?

14          A.    Yes.

15          Q.    Okay.  In this case what was the deadline by

16    which you needed to file some civil pleading to get the ball

17    rolling?

18          A.    It wasn't far after the time period when we

19    filed it.  And I don't have the specific date in front of me,

20    but it was based on when the Andrianos learned that Joe had

21    had cancer and had had cancer from the time of the first

22    pathology report that was erroneous.

23          Q.    All right.  So that deadline's out there kind

24    of in the -- in the nether region, if you will, and mindful

25    of that, you're trying to evaluate, investigate, and look

1    into this case, right?

2         A.    Yes.

3         Q.    Okay.  So what kind of time frame did you have

4    in order to give an initial assessment to the cause of action

5    to the Andrianos?

6         A.    This was one of the few cases where we had

7    quite a bit of time to do that.  Often that's not true, but

8    they had only recently before talking to me learned what I

9    just told you, so I had almost two years to do an

10   investigation.

11        Q.    All right.  And at the two year period then did

12   you contact experts of your own in an effort to try to

13   determine whether there was medical malpractice here?

14        A.    Yes.

15        Q.    What was that gentleman's name

16        A.    The gentleman that ended up providing us with

17   the opinions was Dr. Bernard Chang (phonetic).

18        Q.    Okay.  And in that period of time when were you

19   working up your initial evaluation of the case, did you

20   mention any figures in terms of settlement amount to either

21   Joe Andriano or Wendi Andriano?

22        A.    No.

23        Q.    Okay.  Did you actually have a feel for what

24   this case was worth until after you had done the workup?

25        A.    Only in the broadest sense, only in the sense

1    of is this a significant case, is this a case that is worth

2    doing and doing all of the work and spending all of the money

3    that would be required to investigate it?  And if the facts

4    turn out to be as the clients related to us, which doesn't

5    always turn out to be true, if all of that worked out, is

6    this a significant enough case to be involved in, and we did

7    believe that to be true.

8              Q.    Okay.  Did you ever mention the figure of 20

9    million dollars to Wendi Andriano, that's what you thought

10   this case was worth?

11             A.    No.

12             Q.    Did you ever mention that figure to Joseph

13   Andriano?

14             A.    No.

15             Q.    Okay.  As you told us, that's not the custom of

16   your industry to make that kind of statement to your clients

17   because it could be construed as a guarantee?

18             A.    That would be one of ways to look at it.

19             Q.    Okay.  You just don't do that?

20             A.    You don't do that.

21             Q.    Okay.  At some point in time then having spoken

22   with an expert you believed you had a viable cause of action

23   and you filed the lawsuit, right?

24             A.    Yes.

25             Q.    That was in advance of the statute of

TRACI L. WHEELER, OFFICIAL COURT REPORTER, CSR, RPR, CCR

000004477

1     limitations?

2            A.     Yes.

3            Q.     Okay.  In that pleading did you ask for a

4     specific amount of money?

5            A.     No.

6            Q.     Okay.  Prior to filing the pleading did you

7     make any overtures to the potential defendants in this case

8     in an effort to settle it?

9            A.     No.

10           Q.     Okay.  So you certainly didn't throw out any

11    figures to the other side prior to filing the pleading in an

12    effort to settle the case, right?

13           A.     There were no discussions of that at all.

14           Q.     Okay.  Were they aware, if you know, of the

15    potential for the filing of the lawsuit in this case?  I

16    guess did you get a call from any lawyers purporting to

17    represent these doctors saying, you know, You're nosing

18    around here, you want to settle this thing?

19           A.     I don't remember getting any phone calls.  It's

20    typical for doctors to have some concern if they get a

21    request from a lawyer for medical records information.

22           Q.     Okay.  That would, I would understand,

23    noticeably frighten them a little bit.  Did you get any

24    overtures from persons representing the doctors saying, What

25    are you nosing around for?


        TRACI L. WHEELER, OFFICIAL COURT REPORTER, CSR, RPR, CCR

                            000004478

```
1          A.    No.

2          Q.    So you didn't get any settlement proposal from

3    the other side?

4          A.    No.

5          Q.    Okay.  So no figures offered by you nor figures

6    offered by them?

7          A.    True.

8          Q.    Okay.  Having not offered anything, you

9    certainly didn't communicate that information to Wendi or Joe

10   Andriano, right?

11         A.    That's right.

12         Q.    Okay.  All right.  You file a complaint and

13   that kind of starts the case rolling, right?

14         A.    Yes.

15         Q.    And in that complaint you make certain

16   allegations of medical malpractice, right?

17         A.    Yes.

18         Q.    Okay.  Who were the clients that you were

19   representing at that time?

20         A.    Joseph and Wendi Andriano.

21         Q.    Okay.  So you -- you advanced a claim for both

22   of those individuals seeking money or monetary damages on

23   their behalf for the misconduct or malpractice of the doctors

24   involved in the cancer?

25         A.    Yes.
```

TRACI L. WHEELER, OFFICIAL COURT REPORTER, CSR, RPR, CCR

1        Q.    Okay.  You filed that in July of 2000, July 12?

2        A.    Yes.

3        Q.    Okay.  What's the first thing you have to do

4   after you file a civil lawsuit?

5        A.    Wait.  You wait until the answers come in from

6   the defendants, you find out who all of the attorneys are,

7   you have some informal conversations, just exchanging

8   information.

9        Q.    Let me back you up just a little bit.  After

10   you file it, you have to give them a copy of it, right?

11        A.    True.  You have to serve the doctor.

12        Q.    Okay.  That sometimes takes time, right?

13        A.    Yes.

14        Q.    Okay.  So there's a delay or lag time between

15   the filing of the lawsuit and service of process upon the

16   defendants, correct?

17        A.    Yes.

18        Q.    Okay.  How many potential defendants were there

19   in this case?

20        A.    Well, there were three major doctors and then

21   the facilities at which they practiced when they performed

22   the malpractice.

23        Q.    All right.  And in general, what was the theory

24   of your claim?

25        A.    Was that each of the doctors had failed to

TRACI L. WHEELER, OFFICIAL COURT REPORTER, CSR, RPR, CCR

1    pursue -- perceive that the pathology sample that they

2    examined was adenoid cystic carcinoma as opposed to some type

3    of benign tumor.

4            Q.    Because that's what those potential defendants

5    had done.  They'd excised a portion of Joe Andriano's tumor,

6    they looked at it, said in their professional opinion this

7    was a benign noncancerous tumor, and he needn't to worry

8    about it in so many words?

9            A.    Essentially, that's so.

10           Q.    This diagnosis was made not once, not twice,

11   but by three separate pathologists, right?

12           A.    Yes.

13           Q.    So you essentially sued all three of these

14   doctors for failing to recognize the jeopardy Mr. Andriano

15   was in as a result of the cancer in his neck?

16           A.    Yes.

17           Q.    Okay.  Now, once these folks are served they

18   have a period of time within which to get back to you, right?

19           A.    Filing the answer, yes.

20           Q.    They could do one of two things.  They could

21   roll over and say "We did it," right?  Or they could file a

22   response and say "Huh-uh, you're off base, your claim's not

23   meritorious, we're fighting this," right?

24           A.    Yes.

25           Q.    Okay.  In this case what happened in terms of

1    responses that you received from the defense?

2         A.    You know, my recollection is that they -- they

3    answered.  There may have been a motion to dismiss filed.

4    There were a couple motions that were filed very early on

5    instead of answers, but in flipping through I'm seeing

6    answers rather than initial motions to dismiss.

7         Q.    Okay.  So they expressed to you by virtue of

8    their pleadings they were actively fighting you on those

9    issues, right?

10        A.    No one rolled over.

11        Q.    All right. And some of them took the added step

12   of saying throw this out of court at this point because it's

13   not a colorable claim for -- for whatever reason.  They said

14   let's dismiss this thing, not only fighting it but we're

15   asking the court to dismiss it, right?

16        A.    That was the position that was taken, yes.

17        Q.    All right.  And none of these doctors made a

18   settlement proposal accompanying their pleadings.  They were

19   fighting the issues that you had raised in your complaint,

20   correct?

21        A.    True.

22        Q.    All right.  And when did you receive these

23   answers in general?

24        A.    They came in over the course of September -- I

25   see some dated, for example, 12th of September, and that was

TRACI L. WHEELER, OFFICIAL COURT REPORTER, CSR, RPR, CCR

000004482

```
 1    the general -- general time period, 12th of September, 7th of

 2    September.  They would have all been due on approximately the

 3    same date.  Sometimes you get a request for a couple days

 4    extension which is typically granted --

 5            Q.    Okay.

 6            A.    -- just as a courtesy.

 7            Q.    So fair to say it's very early on in the fight

 8    here, right?

 9            A.    Yes.

10            Q.    Okay.

11            A.    The earliest answer was September 1.

12            Q.    All right.  They're not rolling over, they're

13    contesting the allegation that you make?

14            A.    Yes.

15            Q.    All right.  There's no settlement proposal on

16    the table at this point?

17            A.    True.

18            Q.    All right.  Not being able to predict the

19    future, you could lose your lawsuit, correct, ultimately?

20            A.    Always a possibility.

21            Q.    All right.  No guarantees in your business?

22            A.    Not at all.

23            Q.    Okay.  And I believe you told me one of the

24    curiosities of the case was that they could use the fact that

25    three doctors failed to diagnose the problem as kind of an
```

TRACI L. WHEELER, OFFICIAL COURT REPORTER, CSR, RPR, CCR

1    affirmative defense, right?

2         A.    I perceived that to be the defense as a

3    practical matter for the defendants in this case.

4         Q.    In so many words, you anticipated their defense

5    would be, look, three guys in this industry all certified to

6    diagnose this kind of thing didn't catch it?

7         A.    Right.

8         Q.    And if that was somehow evidence, it was

9    reasonable for each of them not to have caught it.

10        A.    Exactly.

11        Q.    Because that's the standard you're dealing

12   with.  Physicians are allowed to make mistakes, right?

13        A.    Right.

14        Q.    But the mistakes have to be reasonable mistakes

15   in those circumstances.

16        A.    That's a fair general statement.

17        Q.    Okay.  So we don't hold physicians to a strict

18   standard of care, they've got to cure all cancer, they have

19   to diagnose all cancer, they could never make a mistake,

20   right?

21        A.    That's true.

22        Q.    Okay.  You had one physician or pathologist in

23   San Diego willing to say it was unreasonable as to their

24   failure to diagnose this problem?

25        A.    As to each one of them.


TRACI L. WHEELER, OFFICIAL COURT REPORTER, CSR, RPR, CCR

000004484

1          Q.     Okay.  All right.  When you're getting the

2    answers in at this point in time, you're able to come to some

3    kind of settlement value?

4          A.     We were a long way from that in my mind at that

5    point, and that's typical.  There's nothing usual about that.

6          Q.     So certainly you didn't communicate to Wendi

7    Andriano at this stage of the process this is a 50 million

8    dollar lawsuit, let's try and settle it?

9          A.     No.  I never communicated that.

10         Q.     Nor did you communicate that fact to Joe

11   Andriano?

12         A.     That's true.

13         Q.     Okay.  All right.  Now there are two kinds of

14   lawsuits potentially at issue here.  You started this out

15   with a -- a medical malpractice lawsuit?

16         A.     Yes.

17         Q.     All right.  And in that context Wendi has --

18   has a claim?

19         A.     Yes.

20         Q.     As does Joe Andriano?

21         A.     Yes.

22         Q.     And what are the elements, if you will, of that

23   claim?  How do we figure out monetarily how much a person

24   should be awarded for a medical malpractice claim?

25         A.     It's not scientific.  Ultimately, it's either a

TRACI L. WHEELER, OFFICIAL COURT REPORTER, CSR, RPR, CCR

000004485

1   process of negotiation between the parties where the parties

2   simply agree upon a value, or it's subject to a jury

3   determination; the jury hears all the evidence and comes to a

4   decision as to what the value of the case is.

5        Q.   Okay.  In that settlement process, suppose the

6   defendants said we'll give you a million bucks and you had

7   accepted that settlement.  Would it necessarily be broken

8   down into what amount of money constituted what award for

9   what particular kind of damage?

10        A.   No.

11        Q.   Okay.  It would just be 1 million bucks?

12        A.   In your scenario, yes.

13        Q.   He'd cut a check to you initially, I assume?

14        A.   If there isn't -- is nothing to cause the check

15   to be broken up, the check would come to Joseph and Wendi

16   Andriano, husband and wife, and Jeff Miller, their attorney.

17        Q.   Okay?

18        A.   All on one check.

19        Q.   You would then take the check, deposit in your

20   account, take your fee out of it --

21        A.   Yes.

22        Q.   -- because you've earned it, then you'd remit

23   the proceeds, the balance of the proceeds to Joseph and Wendi

24   Andriano?

25        A.   As however they direct them to.

```
 1          Q.    Okay.  They would have some input in that

 2    process?

 3          A.    Sure.

 4          Q.    They could put it in a joint checking account?

 5          A.    They could.

 6          Q.    Okay.  But the money that comes in to you from

 7    the defendants doesn't say this is so much for Joe, this is

 8    so much for Wendi, this is so much for Jeffrey Miller,

 9    typically?

10          A.    Typically only if it was directed to be that

11    way by the clients for some reason.

12          Q.    All right.  Now, at this point in time in your

13    discussions with Joe and Wendi Andriano had you gotten any

14    input from them compelling you or directing you to segregate

15    it or break it down into Joe's money or Wendi's money?

16          A.    No.

17          Q.    Okay.  Had you ever heard any discussion up to

18    this time about the prospect of divorce?

19          A.    No.

20          Q.    These persons appeared to be happily married?

21          A.    As far as I knew.

22          Q.    From what you observed?

23          A.    Absolutely.

24          Q.    Okay.  And had there been the prospect or hint

25    of divorce, would you have considered bringing another lawyer
```

```
 1    into the process?

 2            A.     Potentially.

 3            Q.     Because of ethical problems for you?

 4            A.     There's potentially a conflict of interest

 5    between the position of husband and position of wife with

 6    respect to some fund of monies.

 7            Q.     Okay.  You didn't do that?

 8            A.     No.

 9            Q.     So you didn't perceive that there was

10    antagonism or opposite interest between Wendi and Joe

11    Andriano?

12            A.     That's true.

13            Q.     Okay.  All right.  At some point the

14    possibility exists for converting this med mal case, medical

15    malpractice case, into a wrongful death case because of the

16    severity of the disease that's involved here, right?

17            A.     It was recognized that Joe's condition, and I

18    don't mean to be informal by saying "Joe," that's just how I

19    always thought of him -- but Mr. Andriano's condition was

20    known to be terminal and we recognized that as a possibility.

21            Q.     Okay.  If you had a broken leg, you wouldn't

22    have been unduly concerned about the possibility of a

23    wrongful death action?

24            A.     True.

25            Q.     But you knew this was terminal cancer so you
```

TRACI L. WHEELER, OFFICIAL COURT REPORTER, CSR, RPR, CCR

1    were mindful of that eventuality right?

2         A.    Yes.

3         Q.    And to that end did you explain the difference

4    between a medical malpractice lawsuit and wrongful death

5    lawsuit to Joseph Andriano?

6         A.    Yes.

7         Q.    Did you explain it to Wendi Andriano?

8         A.    Yes.

9         Q.    Okay.  And was this done jointly or separately?

10        A.    It was done at the initial meeting.

11        Q.    Okay.  Did you explain to both parties, Joseph

12   and Wendi, that in order to preserve the -- the viability of

13   the wrongful death claim that the death ultimately -- that

14   transpired, that he expired from, had to bear some reasonable

15   relationship to the original misdiagnosis of the doctors?

16        A.    It came up in the context of the initial

17   discussion about whether or not this was a case where the

18   family wanted me to expedite the case.

19        Q.    Okay.  Talk to us about that.

20        A.    Sometimes, and this was one of those

21   circumstances, there may be reasons that the family has for

22   wanting a case to move faster than most situations.  What

23   you're trying to do is maximize the value of the case.  And

24   those circumstances often exist in, for example, a case like

25   this where the only therapies that might be available to the

TRACI L. WHEELER, OFFICIAL COURT REPORTER, CSR, RPR, CCR

000004489

1   person with the disease are experimental and might not be

2   covered by insurance and they have a need of funds.

3              Q.    Okay.

4              A.    So the discussions is that under what

5   circumstance do you need me to fire sale this case.

6              Q.    Discount?

7              A.    Discount it, settle it for below what it might

8   actually be worth because you need the money right now.   And

9   we had that discussion early because it was a concern of mine

10  based on where Joseph was in his treatment, and as part of

11  that discussion it also came up how it works and I -- my

12  recollection is being asked this specific question, what if

13  Joe were to pass away during the course of a medical

14  malpractice case?  And I explained what a wrongful death case

15  was and explained drawing the distinction that his passing

16  away has to be from the medical malpractice.  And I typically

17  use a car accident as my example, by delaying, one of the

18  risks is that you have a car accident and if Mr. Andriano

19  passes away from the car accident, the medical malpractice

20  case goes away and there is not a wrongful death case at

21  least from the cancer.  There might be one from the car

22  accident but not from the cancer.

23             Q.    And both parties, Wendi and Joe, appeared to

24  appreciate the substance of what you explained to them?

25             A.    I believe so.

1          Q.    Okay.  What did Mr. Andriano say about

2    discounting or fire sale-ing the case, settling it at the

3    earliest possible --

4               MR. MARTINEZ:  Objection.  Hearsay as to his --

5               MR. PATTERSON:  Judge, I need to complete -- can we

6    approach?

7

8                    (The following proceedings were held at the

9    bench:)

10

11              MR. PATTERSON:  We are limiting our inquiry to

12    conversations that this gentleman had with this gentleman.

13    He inquired in that regard.  I'm allowed to bring in other

14    facts and other statements that this person made to this

15    gentleman within that same context.

16              THE COURT:  Mr. Martinez?

17              MR. MARTINEZ:  I never asked him to tell me anything

18    Joseph said.

19              THE COURT:  I sustained the objection.

20              MR. PATTERSON:  Okay.

21

22                    (The following proceedings were held in open

23    court:)

24

25              THE COURT:  Mr. Patterson.


TRACI L. WHEELER, OFFICIAL COURT REPORTER, CSR, RPR, CCR

BY MR. PATTERSON:

     Q.    After your discussion with Mr. Andriano, did you make any effort to discount or fire sale or settle the case on an expeditious basis?

     A.    No there's correspondence from me regarding having spoken with him and --

     MR. MARTINEZ:  Objection.  Hearsay if he's going to go into what he wrote or said.

     THE COURT:  Just answer the question "yes" or "no."

BY MR. PATTERSON:

     Q.    You didn't make any --

     A.    I did not.

     Q.    Did Wendi encourage you to fire sale the case?

     A.    No.

     Q.    Okay.  Now, just so -- conceptually you used the auto accident case.  If you cross against the red light and get hit by a bus, that kind of thing would eliminate the med mal case, right?

     A.    Yes.

     Q.    Any way or manner of dying that's not basically cancer related would be problematic to the lawsuit that you were pursuing on behalf of these people?

     A.    Yes.

     Q.    Okay.  Now, if a person would -- were to have a heart attack which were -- which you could arguably attribute

TRACI L. WHEELER, OFFICIAL COURT REPORTER, CSR, RPR, CCR

```
 1    the cancer which was misdiagnosed, would the lawsuit

 2    theoretically be in a posture to avoid dismissal?

 3              A.    If you could relate those items, as long as

 4    they were in a causal chain going back to the malpractice.

 5              Q.    Okay.  At some point in time did you make a

 6    phone call to Joe and express some concern about some

 7    suicidal ideations he might be having?

 8              MR. MARTINEZ:  Objection.  Hearsay.

 9              THE COURT:  Sustained.

10              MR. PATTERSON:  I'm going --

11              THE COURT:  Just ask -- did you make a phone call?

12              THE WITNESS:  Yes.

13              THE COURT:  Ask your next question.

14    BY MR. PATTERSON:

15              Q.    Did you discuss with Joe any suicide --

16              MR. MARTINEZ:  Objection.  Hearsay.

17              THE COURT:  Overruled.  Go ahead and answer the

18    question "yes" or "no."

19                    Let me see Counsel here at the bench.

20

21                    (The following proceedings were held at the

22    bench:)

23

24              THE COURT:  Tell me where you're going on this and

25    whatever was said.
```

TRACI L. WHEELER, OFFICIAL COURT REPORTER, CSR, RPR, CCR

```
1              MR. PATTERSON:  I'm sorry?
2              THE COURT:  Tell me where you're going with this.
3              MR. PATTERSON:  He called having -- Wendi expressed a
4     concern to him that Joe was expressing suicidal ideations.
5     He called him, he talked to him about suicide and offered him
6     a counselor if he needed one to combat or fight any
7     depression he may be having.
8              THE COURT:  Mr. Martinez?
9              MR. MARTINEZ:  What we have is the defendant making a
10    call, which I believe was the kind of situation where --
11    where it's something that she may want or believe in, and as
12    a response to that, he made a call.  But it's in response to
13    hearsay that he did this.  He has absolutely no knowledge
14    that the victim was suicidal.
15             MR. PATTERSON:  He could cross-examine on that.
16             THE COURT:  Hold on a second.
17                  What did she tell Mr. Miller?
18             MR. PATTERSON:  She told Mr. Miller that Joe
19    expressed to her the thoughts of suicide, that he wanted to
20    commit suicide, okay?  And in that regard she said "Joe,
21    we're going to lose the lawsuit if you do that.  Talk to the
22    lawyer."
23                  She called the lawyer, the lawyer called Joe.
24    They talked about suicide and he offered him a counselor.
25             THE COURT:  Okay.  I'm going to sustain the objection.
```

```
 1
 2                (The following proceedings were held in open
 3     court:)
 4
 5                THE COURT:  The objection is sustained.  Ask your
 6     next question.
 7     BY MR. PATTERSON:
 8           Q.    All right.  You had discussions during the
 9     course of this lawsuit, the pendency of this lawsuit with
10     both Joseph and Wendi, correct?
11           A.    True.
12           Q.    All right.  And would you call them typically
13     or would they call you or how would the conversations or
14     dialogues be initiated?
15           A.    They occurred both ways.  More frequently we
16     called them than they called us.
17           Q.    Okay.  Were there --
18           A.    And there were personal visits as well.
19           Q.    Were there occasions when you called and Wendi
20     would speak with you and then hand the phone to Joe and then
21     he would finish the conversation with you?
22           A.    My recollection is it was usually the other way
23     around.
24           Q.    That you would call, speak with Joe, and he
25     would hand the phone to Wendi?
```

TRACI L. WHEELER, OFFICIAL COURT REPORTER, CSR, RPR, CCR

1          A.     Yes.

2          Q.     Okay.  When you got into the specifics of the

3    lawsuit, Joe would hand the phone to Wendi and let her deal

4    with it?

5          A.     No.  It was more the sense of I was calling for

6    a specific piece of information, I'd talk to Joe, ask

7    questions about how he was doing and tell him why I was

8    calling, and he'd say -- he'd hand the phone to Wendi.

9          Q.     All right.

10         A.     It was not a frequent thing.

11         Q.     Okay.  The contract that you had with the

12   parties, was that endorsed by Joseph Andriano?

13         A.     Yes.

14         Q.     Okay.  The medical releases which allowed you

15   to access information about his medical treatment and

16   condition, were those releases endorsed by Joseph Andriano?

17         A.     Yes.

18         Q.     Okay.  In response to Mr. Martinez's

19   questioning, this first meeting you met initially with Wendi

20   and Joseph's parents?

21         A.     And Joseph during the course of the meeting.

22         Q.     Okay.  Did you go over anything kind of

23   clandestinely with Wendi and Joseph's parents before Joe

24   Junior's arrival?

25         A.     No.


TRACI L. WHEELER, OFFICIAL COURT REPORTER, CSR, RPR, CCR

1      Q.    Okay.  There's nothing secretive going on here?

2      A.    No.

3      Q.    Okay.  He just arrived late to the meeting?

4      A.    I have some recollection being told he might do

5  that.

6      Q.    Okay.  When he did finally arrive, you had a

7  full and fair and open discussion with him as well as with

8  the other members of the family?

9      A.    I believe I regurgitated in a more brief form

10  what we already covered just so he heard it.

11      Q.    There was no effort on your part to leave him

12  out of the loop at that point?

13      A.    Not at all.

14      Q.    Okay.  And as a general proposition you can't

15  say whether one kind of lawsuit is more valuable than

16  another, right?

17      A.    That is -- that's a fair statement.  They all

18  depend on where they are at any particular point of time,

19  what the politics in the world are at that particular time

20  and what's happening.

21      Q.    And factored specifics with regard to each

22  case?

23      A.    As a general matter, that's true.

24      Q.    As a general rule, you can't tell us a med mal

25  case is less valuable than a wrongful death case?

```
 1              A.    Not without a lot more information.

 2              MR. PATTERSON:  Thank you, Judge.  That's all I have.

 3              THE COURT:  Redirect?

 4              MR. PATTERSON:  Sorry, Judge, may I have one moment?

 5    BY MR. PATTERSON:

 6              Q.    I think out of an abundance of clarification,

 7    we need to know what happened to that lawsuit?

 8              A.    The lawsuit was ultimately dismissed, trading

 9    the cost incurred by the defense for the dismissal of the

10    lawsuit.  I can explain that if you'd like.

11              Q.    Please.  It was dismissed after the death of

12    Joe?

13              A.    After the death of Mr. Andriano and simply

14    based on the description of what had transpired, the

15    communication was do we dismiss this, do we let them file

16    motions and force it to be dismissed, or do we attempt to

17    make the best of the situation and trade any claim for costs

18    that the doctors would have by virtue having had to file

19    answers and being served in a lawsuit for an agreement to

20    dismiss the case with prejudice, which means it can't be

21    refiled.  That was authorized and that was done.

22              Q.    Okay.  And I assume the logic from your

23    perspective was that the cause of death for Mr. Andriano was

24    not caused by the cancer, right?

25              A.    That was the -- the only thing we knew, yes.
```

TRACI L. WHEELER, OFFICIAL COURT REPORTER, CSR, RPR, CCR

1          Q.    Okay.  So that brings me to my last question.
2    Would death by being struck by a stool vanquish or eliminate
3    an ability to recover for the wrongful death of Joe Andriano?
4          A.    Unless one could find some causal connection
5    between the cancer and that incident, you know, yes, it would
6    vanquish the case.
7          Q.    Okay.  Similarly, a cut throat which caused the
8    death of Joe Andriano, that too would eliminate any recovery
9    for the original medical malpractice failing to diagnose the
10   cancer?
11         A.    Yes.
12         MR. PATTERSON:  Okay.  That's all I have, Judge.
13   Thank you.
14         THE COURT:  Mr. Martinez?
15
16   REDIRECT EXAMINATION BY MR. MARTINEZ:
17         Q.    Along that same vein, how about if somebody
18   poisoned him?  Would that also do away the lawsuit?
19         A.    Yes.  Knowing no more than that, yes.
20         Q.    Well, you knew no more than that when Mr.
21   Patterson was asking you, right?
22         A.    And the same answer.
23         Q.    How about if he was suffocated with a pillow?
24   Would that be the same answer?
25         A.    Yes.


         TRACI L. WHEELER, OFFICIAL COURT REPORTER, CSR, RPR, CCR

                          000004499

```
1              Q.    Now, one of the things that you indicated to us
2    was that you never discussed with the -- your clients the
3    amount.  You don't give them a figure, right?
4              A.    That's true.
5              Q.    And -- but would you agree or disagree that
6    good communication is something that is key to a practice
7    such as a law practice?
8              A.    True.
9              Q.    So are you saying that you never communicated
10   to them that it was a good case?
11             A.    No.  In fact as I told you before, I would have
12   used words like "significant" or "substantial" and did use
13   words like that.
14             Q.    So just so that we're clear, you didn't
15   leave -- did you leave them with an impression that it was a
16   "dog case," that you were just doing charity work?
17             A.    Absolutely not.
18             Q.    You indicated that it was a substantial case,
19   right?
20             A.    True.
21             Q.    And you may have also discussed with them at
22   the first meeting something about what would happen if he
23   died during the pendency of the lawsuit.
24                   MR. PATTERSON:  Judge, he's leading on redirect.
25                   THE COURT:  Sustained.
```

TRACI L. WHEELER, OFFICIAL COURT REPORTER, CSR, RPR, CCR

000004500

```
 1          Q.     Now, one of the things that you indicated to us
 2    was that you never discussed with the -- your clients the
 3    amount.  You don't give them a figure, right?
 4          A.     That's true.
 5          Q.     And -- but would you agree or disagree that
 6    good communication is something that is key to a practice
 7    such as a law practice?
 8          A.     True.
 9          Q.     So are you saying that you never communicated
10    to them that it was a good case?
11          A.     No.  In fact as I told you before, I would have
12    used words like "significant" or "substantial" and did use
13    words like that.
14          Q.     So just so that we're clear, you didn't
15    leave -- did you leave them with an impression that it was a
16    "dog case," that you were just doing charity work?
17          A.     Absolutely not.
18          Q.     You indicated that it was a substantial case,
19    right?
20          A.     True.
21          Q.     And you may have also discussed with them at
22    the first meeting something about what would happen if he
23    died during the pendency of the lawsuit.
24                 MR. PATTERSON:  Judge, he's leading on redirect.
25                 THE COURT:  Sustained.
```

TRACI L. WHEELER, OFFICIAL COURT REPORTER, CSR, RPR, CCR

000004500

```
 1    BY MR. MARTINEZ:

 2         Q.    Did you discuss with them at the first meeting

 3    what would happen if he died during the pendency of the

 4    claim?

 5         A.    Yes.

 6         Q.    And did you give them the same explanation that

 7    you gave us as to the value?

 8         A.    With respect to "significant" or "substantial,"

 9    words such as that?

10         Q.    Yes, uh-huh.

11         A.    I don't recall having that discussion at that

12    time.  It's possible that I did.  I don't have a recollection

13    of it.

14         Q.    Now, you also talked about the claims and you

15    talked about the amount that may be offered during the

16    settlement.  Do you remember that colloquy between you and

17    defense counsel?

18         A.    Yes.

19         Q.    And you indicated, well, the check just comes

20    in and then I just give it over to the clients minus the fee?

21         A.    Very, very general terms.

22         Q.    But if you are settling something -- let's just

23    talk about settling first.  Generally speaking, if you have a

24    loss of consortium claim and you have a medical malpractice

25    case such as this, are the people going to settle with you?
```

1    Say they'll give you $500,000 for the loss of consortium in

2    this case and $500 for the medical malpractice.  Is that what

3    you would expect in this case?

4         A.    Most often it's settled for a number.

5         Q.    And you never discussed the amount of pain and

6    suffering one suffered versus the other?

7         A.    Not never, but in most circumstances, it's

8    settled for a number.

9         Q.    And in your experience as a lawyer then, what

10   you're telling us, I think, is that the amount that the

11   person that is aggrieved receives the same or even less than

12   the person who loses the consortium.

13              MR. PATTERSON:  Judge, he's leading.

14              THE COURT:  Sustained.  Rephrase the question.

15   BY MR. MARTINEZ:

16        Q.    Well, in your experience is the loss that is

17   suffered by a person who in this case has been misdiagnosed

18   with cancer more or less substantial than the loss of

19   consortium that was pleaded in this case?

20        A.    In doing an internal evaluation, you would

21   evaluate the personal injury side of it as being more

22   substantial.  If -- your question related to settlement as I

23   understood it.

24        Q.    Well, the value of -- let me put it this way.

25   Was the value of the case being significant, was that related

TRACI L. WHEELER, OFFICIAL COURT REPORTER, CSR, RPR, CCR

000004502

1    to the loss of consortium or was that related to the medical

2    malpractice that Mr. Andriano suffered?

3         A.    The significance was in the injury that Mr.

4    Andriano suffered as a primary matter.

5         Q.    With regard to the pleadings that were filed in

6    this case, you did indicate that some filed answers.  You

7    also indicated perhaps there were motions there to dismiss.

8    Were there any motions to dismiss?

9              (Pause in proceedings.)

10         THE WITNESS:  My recollection is that there was at

11    least one motion to dismiss filed.  I'm not seeing it on the

12    pleading backer.  I don't have my entire file any longer, so

13    I can't tell you with certainty.

14    BY MR. MARTINEZ:

15         Q.    Okay.  As you sit here today, if you're

16    pleading backer -- does it have a motion to dismiss in it?

17         A.    It does not, at least not that I'm seeing, and

18    I'm flipping through quickly.

19         Q.    So that leads you to my next point.  You -- you

20    were asked, Well, Did these answers actively indicate that

21    they were going to fight lawsuit?  Do you remember that line

22    of questioning?

23         A.    Yes.

24         Q.    Now, with regard to that line of questioning,

25    does that mean that you thought that it was a bad lawsuit

TRACI L. WHEELER, OFFICIAL COURT REPORTER, CSR, RPR, CCR

000004503

```
 1    just because they were actively or aggressively fighting it?

 2              A.   No.   That's typicals.

 3              MR. MARTINEZ:  I don't have any other questions.

 4              THE COURT:  Are there any further questions of this

 5    witness by the jury?  If so, please raise your hand.

 6                   (No response.)

 7              THE COURT:  No one has raised their hand.  May the

 8    witness be excused?

 9              MR. MARTINEZ:  Yes, sir.

10              MR. PATTERSON:  Yes, Your Honor.

11              THE WITNESS:  No objection.

12              THE COURT:  Thank you very much.  You're excused.

13              Okay.  We'll go ahead and take our afternoon

14    break at this point in time.

15                   Ladies and gentlemen, during this break

16    remember the entire admonition I gave you including the fact

17    you're not to discuss this case with anyone, do not let

18    anyone discuss the case with you, keep an open mind about the

19    case.  Have a nice break.  We'll see you in 20 minutes.  And

20    I'll stay here with Counsel.

21                   (Whereupon, the jury exits the courtroom.)

22

23              THE COURT:  Please be seated.  This is cause number

24    CR 2000-096032, State of Arizona versus Wendi Elizabeth

25    Andriano.  The record will reflect the presence of the
```

1    Defendant and Counsel.

2                Where are we at in terms of scheduling?

3         MR. MARTINEZ:  As I previously indicated to the

4    Court, I will rest at this point.

5         THE COURT:  Okay.  What I'll do is go ahead and allow

6    you to formally rest in front of the jury, but we could argue

7    the motion that Mr. Patterson would like to make at this

8    point in time.

9         MR. PATTERSON:  Yes, Judge.  Pursuant to Rule 20, I

10   would ask that this cause be dismissed, the State's having

11   failed to produce any substantial evidence establishing the

12   defendant as having caused the death of Mr. Joseph Andriano.

13   There's no substantial evidence establishing any connection

14   between the object that may have caused the death of Mr.

15   Andriano with my client in terms of fingerprints or blood

16   analysis, anything of that nature.  There's no substantial

17   evidence adduced of any premeditation with regard to that

18   case, so my request is it be dismissed outright or at a bare

19   minimum be reduced to second degree murder.

20        THE COURT:  Mr. Martinez?

21        MR. MARTINEZ:  With regard to his last point last --

22   first, there is ample evidence of premeditation.  We have the

23   indications that she was attempting or thinking about killing

24   him early on in July when she opened the account in the name

25   of Anne Newton, an account that she opened for the sole

TRACI L. WHEELER, OFFICIAL COURT REPORTER, CSR, RPR, CCR

1    purpose of obtaining poison which she gave to him and which

2    was found in his system.

3              Additionally, we have had other testimony from

4    others who indicated that she was sick of him and that she

5    was sick of the cancer and she hoped he would just die so

6    that she could move on.

7              On that particular night, I don't need to

8    regale the Court with all the details, you were here, but her

9    conduct that night during the death is suspect to say the

10   least, so I do believe that we have demonstrated that there

11   is substantial evidence that she is the person that caused

12   the death.  There was nobody else there.  This theory that

13   they perhaps espoused during their opening statement that

14   he -- he took this knife and stuck it in the side of his neck

15   and twirled the knife around there just does not stand up to

16   the light of day, if you will, when the witnesses testified,

17   so it's my view there is premeditation.  There is one that

18   did it.  There's no requirement there be fingerprints on

19   anything for there to be a conviction for this sort of thing,

20   so I think this issue is best left -- better left for the

21   jury.

22             THE COURT:  Anything further from Mr. Patterson?

23             MR. PATTERSON:  No, Judge.  That's all I have.

24             THE COURT:  The Court -- having considered the

25   Defendant's Rule 20 motion, the Court does find there is

TRACI L. WHEELER, OFFICIAL COURT REPORTER, CSR, RPR, CCR

000004506

```
 1    substantial evidence to warrant a conviction as charged and
 2    it is ordered denying the Defendant's Rule 20 motion.
 3              We'll go ahead and take a break.  When we
 4    return with the jury, I'll allow Mr. Martinez to rest
 5    formally before the jury, and then we'll begin with you, Mr.
 6    Patterson.
 7              MR. PATTERSON:  Well, we had an understanding,
 8    Judge --
 9              THE COURT:  What is that?
10              MR. PATTERSON:  I told you yesterday at side bar our
11    first witness is scheduled for tomorrow.
12              THE COURT:  Okay.  I forgot about that.  We won't
13    have additional witnesses until tomorrow?
14              MR. PATTERSON:  No, sir.
15              THE COURT:  Okay.  Let's do this.  In 20 minutes when
16    we reconvene with the jury, we'll have Mr. Martinez go ahead
17    and rest formally before the jury and we'll recess.  I forgot
18    about that.
19              MR. PATTERSON:  Thank you, Judge.
20              THE COURT:  We'll be in recess.
21                 (Recess.)
22
23              THE COURT:  This is cause CR 2000-096032, State of
24    Arizona versus Wendi Elizabeth Andriano.  The record will
25    reflect the presence of the Defendant, Counsel and the jury.
```

TRACI L. WHEELER, OFFICIAL COURT REPORTER, CSR, RPR, CCR

000004507

1              Mr. Martinez?

2          MR. MARTINEZ:  The State rests, Your Honor.

3          THE COURT:  Ladies and gentlemen, we're going to go

4   ahead and take our evening recess.  I'll have everyone return

5   tomorrow at 1:00 p.m.

6              During this evening recess remember the entire

7   admonition I have given you, including the fact you're not to

8   discuss this case with anyone.  Do not let anyone discuss the

9   case with you.  Do not do any research, investigation,

10  experimentation or investigation on your own.  Avoid any

11  media coverage in the case.  Keep an open mind.

12             We'll see you tomorrow at 1:00 p.m.  Have a

13  nice evening.  I'll stay here with Counsel.

14

15             (Whereupon, the jury exits the courtroom.)

16

17          THE COURT:  Please be seated.  The record will

18  reflect the presence of Defendant and Counsel.  We're outside

19  the presence of the jury.

20             Anything further we can discuss at this point?

21          MR. MARTINEZ:  No, sir.

22          MR. PATTERSON:  No, Your Honor.

23          THE COURT:  We'll see everyone tomorrow at 1:00.

24  Have a nice evening.  We'll be in recess.

25

TRACI L. WHEELER, OFFICIAL COURT REPORTER, CSR, RPR, CCR

1                    (Evening recess.)

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

TRACI L. WHEELER, OFFICIAL COURT REPORTER, CSR, RPR, CCR

```
 1

 2

 3                    CERTIFICATE OF REPORTER

 4

 5    STATE OF ARIZONA      )
                            )
 6    COUNTY OF MARICOPA    )

 7

 8              I, Traci L. Wheeler, CSR, RPR, an official

 9    and certified reporter in the Superior Court of the State

10    of Arizona, in and for the County of Maricopa, hereby

11    certify that I made a shorthand record of the proceedings

12    had in the within case, and that the foregoing transcript

13    is a full, true, and correct transcription of the

14    proceedings in this case.

15              Dated this 28th day of March, 2005.

16

17

18
                         Traci L. Wheeler, CSR, RPR
19                       Certified Court Reporter No. 50313
                         Official Court Reporter
20

21

22

23

24

25
```

TRACI L. WHEELER, OFFICIAL COURT REPORTER, CSR, RPR, CCR

000004510

EXHIBIT P



*DP*

*05-0002*
*Braccio*

1         IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

2              IN AND FOR THE COUNTY OF MARICOPA

3

4    STATE OF ARIZONA,            )
                                  )
5              Plaintiff,         )
                                  )
6    v.                           )    No. CR-05-0005 AP
                                  )    MARICOPA COUNTY
7    WENDI ELIZABETH ANDRIANO,    )    CR 2000-096032
                                  )
8              Defendant.         )
     _____)
9

10

11

12           REPORTER'S TRANSCRIPT OF PROCEEDINGS

13    BEFORE:   The Honorable BRIAN K. ISHIKAWA

14

15

16

17                    Mesa, Arizona
                     February 4, 2005
18

19

20

21

22

23

24    ORIGINAL Prepared for APPEAL by:
      TRACI L. WHEELER, CSR, RPR
25    Certified Reporter No. 50313


        TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR
                         000004512

2

1                    A P P E A R A N C E S

2     FOR THE STATE:        JUAN MARTINEZ,
                            Deputy County Attorney
3
      FOR THE DEFENDANT:    DANIEL B. PATTERSON,
4                           Deputy Public Defender
                                    and
5                           G. DAVID DELOZIER,
                            Deputy Public Defender
6
      THE DEFENDANT:        WENDI ELIZABETH ANDRIANO
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

3

1                  MESA, ARIZONA, FRIDAY, FEBRUARY 4, 2005

2

3           THE COURT:  This is cause number CR 2000-096032,

4     State of Arizona versus Wendi Elizabeth Andriano.

5                  Is the State ready?

6           MR. MARTINEZ:  Yes, sir.  Juan Martinez for the

7     State.

8           THE COURT:  And on behalf of defendant?

9           MR. PATTERSON:  We are, Your Honor.  Dan Patterson

10    and David DeLozier appearing with Ms. Andriano, seated at

11    counsel table.

12          THE COURT:  This is time set for Defendant's Motion

13    for New Trial, Phase 3.  For the record, I have received

14    Defendant's Motion for New Trial Phase 3, State's response

15    to Motion for New Trial, and Defendant's Factual Supplement

16    to the Motion for New Trial Phase 3.

17                  I'll hear from Mr. Patterson.

18                  Mr. Patterson?

19          MR. PATTERSON:  Thank you, Judge.  Firstly, I want

20    to clarify some clerical issues.  I got a call after I filed

21    my motion from the appellate clerk in Superior Court who

22    said that they had lost the original, okay?  So to that end,

23    she said the remedy she thought was appropriate to refashion

24    an original, okay?  Pursuant to her instruction I did

25    refashion an original, but in the process of doing that

4

1   noted that there was an error on the cover sheet, if you

2   will, where it said my -- something, something, something,

3   something articles.  And so I have changed that and I don't

4   know if you have the new one or the "original" original.

5          THE COURT:  I did have a copy that is dated December

6   29, 2004.  And on the first page there it makes reference to

7   Rule 24.1 of the Arizona Rules of Criminal Procedure and

8   5th, 6th, 8th, and 14th Articles of the Arizona

9   Constitution --

10         MR. PATTERSON:  Right.  And in the process of

11   preparing a new original, I've changed the verbiage of that

12   cover sheet.  And the new original now with the Court says

13   pursuant, basically, to the 5th, 6th, 8th and 14th

14   Amendments to the U.S. Constitution.

15         THE COURT:  Okay.

16         MR. PATTERSON:  So that is the original now on file.

17   And I didn't change any of the substance, if you will, in

18   the memorandum, nor have I changed any of the basis for

19   seeking relief.

20         THE COURT:  Okay.  Thank you.

21         MR. PATTERSON:  All right.  Our position is pretty

22   succinctly stated, Judge.  There was a time during the

23   course of the deliberative process where the jury sent out a

24   note indicating they were deadlocked.  You then gave them

25   what I believe is just a garden variety Allen charge, which

1    is used in all felony cases in the Superior Court.   It

2    wasn't particularly tailored to a capital case.   I objected

3    to it at that time.   They returned and deliberated and came

4    back with a death verdict.

5              Our information is that a hung jury in a

6    capital case in Phase 3 is an acceptable constitutional

7    situation.   Lowenfield is the U.S. Supreme Court case that

8    bears upon that issue.   But my reading of Lowenfield is that

9    the holding is very equivocal in that case.   I cited what I

10   appear -- believe is the equivocation in that holding where

11   it says the Court explicitly limited its holding to the

12   facts of the case before it stating, quote, We do not mean

13   to be understood as saying other combinations of

14   supplemental changes -- and that should be charges -- and

15   polling might not require a different conclusion.

16              I advised the Court that's a 1988 decision.

17   There are no post-Ring decisions from the U.S. Supreme Court

18   which bear upon propriety of giving the so-called Allen

19   charge to a jury deliberating in the course of Phase 3 or

20   penalty phase in a capital case.   I believe that the errors

21   that were committed in that particular charge are found in

22   the Government's response, but they actually appended a copy

23   of the charge that was given to the jury at the time of

24   deadlock.

25              And what I think is particularly problematic

6

```
1    when you tell them each juror has a duty to consult with one
2    another.  I don't think that's the law in capital cases.
3                 Reading further, to deliberate with a view to
4    reaching an agreement.  Again, I don't think that's a
5    requirement in a capital case.
6                 And the verbiage thereafter is just surplusage
7    because it says if it can be done without violence to
8    individual judgment -- that really doesn't alleviate the
9    problem that you've created by telling them they need to
10   come to some kind of conclusion, which I don't think is the
11   law in capital cases.
12                I have added in my motion what I thought a
13   proper, if given, supplemental instruction should have
14   included.  I think they should have been expressly told
15   there was no requirement for them to continue deliberating,
16   that a hung jury was permissible under the law, and that a
17   sentencing decision in a capital case is a personal,
18   individual, moral decision, thus clarifying what you
19   attempted to impart to them when you told them that if it
20   can be done without violence to individual judgment.  I
21   think a better way of phrasing that is just -- just telling
22   them once they reach their own individual moral decision,
23   their duties in this case are done and complete.
24                I've supplied the Court with a news article
25   that was generated by Mr. Jim Walsh of the Arizona Republic.
```

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR
000004517

1    He describes in that article what he did in this case.   He
2    spoke with, I believe, six of the jurors.   What seems to
3    have happened as a result of this Allen charge is that
4    Mr. Walsh states, "But the jury was on the verge of a
5    deadlock with one hold out, a senior citizen from Gilbert,
6    saying he was adamantly against the death penalty."   That
7    Allen charge obviously affected this gentleman's position in
8    this case and coerced his decision, his verdict.
9              I believe the Allen charge caused these folks
10   to find reasons or bases for their decision that were wrong,
11   and that, too, is reflected in the article by Mr. Walsh.   He
12   states, "While jurors were discussing whether to prosecute
13   Andriano, they considered that they would have no control
14   over whether the trial judge Brian Ishikawa would give her
15   life in prison with or without parole.   Jurors did not want
16   to see a 25 years to life sentence."   Clearly, that's an
17   inappropriate basis for them to come to any conclusions in
18   this case, and I believe the reason they did that or thought
19   it was appropriate to find the basis is because you
20   instructed them to get back in there and deliberate.
21             Another false or improper reason for their
22   decision is the next line.   It says, "We also knew that
23   with the death penalty she has an automatic appeal Percy
24   said."   Again, that's an inappropriate reason to come to any
25   conclusions in the trial level case that somehow she has the

```
 1      safety net of an automatic appeal in the event they find
 2      that death verdict is appropriate.  And, again, I think it's
 3      a direct result, proximate result of the improper
 4      instruction when they were at an impasse in their
 5      deliberative process.  Again, on the improper reason for
 6      them to come to their conclusions is seen in the line that
 7      says, quote, "I can't imagine being so calm and collected
 8      and having no emotions, Percy said.  She never cried, she
 9      never asked about her kids.  She seemed flirtatious."
10      Again, voting for the death penalty because of a flirtatious
11      attitude with the principle state examiner, Detective Lucero
12      in this case, is just an inappropriate reason to come to the
13      conclusions they came to, and I believe it's the proximate
14      result of the instruction given at the time they declared
15      they were at an impasse.  And, again, it shows that the
16      person who purportedly was -- was comfortable or convince
17      that a life verdict was appropriate.
18                  There's some reflection in this article that
19      as the third day of deliberations ended, Fobes said she told
20      the holdout juror, a Gilbert senior citizen, "Wendi has
21      manipulated you.  He said, 'Yes, I know.'"  Again, if, once
22      he had come to the conclusion the death penalty was
23      inappropriate, he was under no obligation to continue
24      deliberating.  He was under no obligation to subject himself
25      to the rationality of the other jurors when they claimed to
```

1    him that my client was manipulative and he thereafter folded

2    and abandoned his firmly-held belief that a life verdict was

3    appropriate in this case.

4              For all those reasons, Judge, that I've

5    described both in writing and in oral argument today, I ask

6    that you declare a mistrial, a hung jury with regard to

7    Phase 3, and give us a new trial on the issues that are

8    tended to Phase 3.

9              THE COURT:   Thank you.

10             Mr. Martinez?

11             MR. MARTINEZ:   The State, of course, objects to

12   their request to the that the Court grant a motion for a new

13   trial as to Phase 3.   One of the things that Counsel uses

14   sort of to buttress his argument that perhaps the Court may

15   have misinstructed the jury is to take a look at a newspaper

16   article.   What the newspaper reports isn't exactly the

17   truth, not that they would somehow give us something that

18   isn't true, but -- but the bottomline is that we all know

19   that when the news media is there and cameras are there,

20   people sometimes have a tendency to -- perhaps they may not

21   have said others or exaggerate things that perhaps don't

22   accurately reflect what happened, so I don't see that as the

23   bible as to what happened in the jury room.   It's -- it's

24   just a number of jurors who expressed an opinion as to what

25   may have happened.

```
 1              One of the issues that the defense raises is
 2    that, well, one of the jurors mentioned that they looked at
 3    whether or not it was appropriate for the Court to impose a
 4    25 year sentence with a life sentence with a 25 years --
 5    possibility of release after 25 years.  Well, one of the
 6    things we have to keep in mind is that when they were
 7    instructed, they were instructed to consider not only the
 8    instructions at Phase 3, but also the instructions at Phase
 9    2 and also the instruction at Phase 1.  What happened during
10    Phase 2 is that defense counsel I believe improperly invited
11    the jury, and this was during the determination of whether
12    or not there were any aggravating factors, he invited them
13    to stop the proceedings now.  And I remember him clearly
14    saying, You should stop the proceedings now, allow Judge
15    Ishikawa to go ahead and impose a life sentence.  He's
16    putting things out there for them to consider.  And when
17    they do take him seriously and they do listen to what he has
18    to says, he says, Well, no, they shouldn't have listened to
19    anything I had to say.  He can't have it both ways.  I
20    believe the jury listened very carefully to what the lawyers
21    were saying, what the Court was saying, and when they were
22    back in the jury room, they were free to consider it and
23    give it whatever weight they want.
24              That applies to the report that one of the
25    jurors indicated, well, she may have manipulated you or she
```

1   was flirtatious.  That's an observation she made and an

2   observation she was entitled to have.  She viewed the

3   videotape.  She was here in the courtroom and saw what the

4   defendant's demeanor was.  All of those things are proper

5   subjects of deliberations.  I do think that.

6            I do not think, however, that at this stage

7   the subjective processes that the jury went through are --

8   is something that the Court can consider.  In other words,

9   what they may have thought, what they may have gone back and

10  forth and considered, is not -- is not a reason to be

11  considered at this particular point.  The law's pretty

12  clear.  The subjective process is off limits when we are

13  considering whether or not to grant or allow a phase -- or a

14  new trial.

15           I will note that the instruction that you gave

16  is the standard instruction.  I don't believe that we needed

17  to tailor it to a death case.  There's nothing that says we

18  need to somehow change the law.  I do know that what you

19  indicated to the jury was that -- and it's set out in my

20  Exhibit B -- what you indicated to them was that you told

21  them that you did not intend to force a verdict.  You

22  specifically told them that.  You also then followed that up

23  by saying, "No juror should surrender his or her honest

24  convictions as to weight or effect of the evidence solely

25  because of the opinion of other jurors or for the sole

1   purpose of reaching a verdict." That clearly indicates to

2   them, look, you go in there, you deliberate, you need to do

3   whatever you need to do, but don't surrender your honest

4   beliefs. Don't surrender your honest opinion just because

5   other jurors are telling you so. It's your belief that

6   we're looking at here, and don't do it just for the purpose

7   of reaching a verdict. In other words, if you want to

8   remain with that belief and it results in a hung jury, well,

9   then that's what you ought to do. And you specifically told

10  them that they could do that.

11          Other things that you told them that indicate

12  that they were free to do whatever it is they wanted to do

13  is that you -- you indicated that you were merely responding

14  to what was an apparent need for help. You didn't say to

15  them, you know, you haven't asked for it. It's unclear.

16  You indicated to them, you sent me the note first and I'm

17  just responding to your note.

18          And then you followed that up with a

19  indication that you did not intend to force a verdict. You

20  did indicate that they may want to identify areas of

21  agreement and disagreement and discuss the law and the

22  evidence as they relate to the areas of disagreement. In

23  other words, you told them to go back there and talk about

24  the case. That's all you told them to do. You didn't

25  indicate to them that it was their duty to reach a verdict

1    even though that would somehow have violated their moral

2    beliefs, and you didn't do any of that, so I believe that

3    the instruction that you gave them, even though it is in a

4    capital case, is appropriate.  I think the case law that I

5    cited for you indicates that that was the appropriate thing

6    to do.

7                    And if we are going to use some of the -- or

8    if you are going to consider that article that the defense

9    counsel gave to you, in it somewhere it indicates that they

10   went back and -- I probably should find it, but -- in it, it

11   indicates that -- it's on Page 3 of 4, that according to the

12   jurors, they gave all the mitigating factors to weigh, but

13   in the end they were not enough.  They did what the jury

14   instructions told them to do; take a look at the mitigating

15   factors to see whether or not they outweigh the aggravating

16   factors.  Even though if the items that they indicated that

17   they provided to you in that newspaper specifically

18   indicates they followed the law and followed your

19   instructions.

20                   I think that the jury instruction that you

21   gave them is appropriate.  I think the law backs -- backs

22   you up on that, and -- and then, additionally, the newspaper

23   article just indicates that they followed your instruction.

24   And so I ask that you deny their request for a Phase 3

25   Motion for New Trial.

```
 1            I would note there was a hung jury with regard
 2    to the other three aggravating factors that were alleged by
 3    the State, and although I -- by no means am I requesting or
 4    implying that a new trial as to Phase 3 is appropriate, but
 5    should you grant that, I think it would only be appropriate
 6    to allow the State then, as to that hung jury, attempt to
 7    prove whether or not the defendant's conduct was such that
 8    she committed the murder in expectation of pecuniary gain,
 9    whether or not it was a heinous or depraved, since that was
10    a hung jury, but, again, I'm -- at no point am I indicating
11    that I believe that a motion for a new trial as to Phase 3
12    is appropriate.  So I would ask that you deny their request.
13    Thank you.
14            THE COURT:  Mr. Patterson, I'll give you the final
15    word.
16            MR. PATTERSON:  Just want to make two points with
17    regard to his request, perhaps to open the issues in Phase
18    2.  I think he's procedurally estopped from raising that at
19    this point, so I would ask the Court pay no attention to,
20    quitely frankly, any suggestion that if you grant the Phase
21    3 motion for new trial that somehow it's a right for him to
22    reopen the issues of Phase 2.
23            Last thought, Judge.  You know, we're all kind
24    of learning this new post-Ring capital jury sentencing
25    process.  What I think the judiciary is failing to
```

1    understand is -- that's relevant in this case, is that there

2    are differences in the process with regard to each phase

3    concerning the jury's duty to deliberate.  Phase 1, guilt or

4    innocence.  That's kind of the old system where we used to

5    do with burglaries, all kinds of felonies.  There is a duty

6    of the jury to attempt to reach a consensus, guilty or not

7    guilty, and that's still evident and still the law in my

8    estimation in post-Ring landscape in a capital case.

9              I also believe in Phase 2 there is a duty on

10   the part of the jury to try and achieve consensus, to try

11   and achieve a finding as to whether or not a -- an

12   aggravator exists or doesn't exist.

13             What we're failing to understand as

14   collectively as a group here, and what the judiciary is

15   failing to understand, is that when you get to Phase 3, that

16   format is thrown out the window.  There is no duty for each

17   of the 12 citizens to deliberate towards a consensus.  That

18   life or death decision is an individual, moral decision that

19   is made by each individual juror.  And once that person -- a

20   person reaches a conclusion in their own minds based upon

21   their own moral beliefs and their own moral teachings, there

22   is no duty to further deliberate.  And that's the error when

23   you give those folks the standard Allen charge that you use

24   in all other felony cases here in Superior Court.  Because

25   you're giving that in the context of guilt, innocence

1    because the jury doesn't sentence any other felony in

2    Arizona.  So this type of Allen charge is appropriate when

3    you have determination of guilt in a burglary case.  It's

4    inappropriate in Phase 3 because, using this gentleman from

5    Gilbert, he was opposed to the death penalty.  And once he

6    made that declaration, it was incumbent upon all the other

7    11 people to back off.  But you told them to get back in

8    there and basically deliberate, try to achieve consensus,

9    and that's an improper instruction in the context of

10   basically in a capital case.  That's our position in a

11   nutshell.

12          THE COURT:  Okay.  What I'm going to do, I'm going

13   to take the matter under advisement.  I'll issue a decision

14   probably early next week.

15               In the meantime, I'll go ahead and order that

16   the defendant be returned to the Department of Corrections

17   immediately.

18          THE DEFENDANT:  Thank you.

19          THE COURT:  Anything further from either Counsel?

20          MR. MARTINEZ:  No, sir.  Thank you.

21          MR. PATTERSON:  No, Your Honor.  Thank you.

22          THE COURT:  Thank you very much.  We'll be in

23   recess.

24               Oh, just for the record, so there's a clear

25   record, the Lowenfield case that Mr. Patterson cited, let me

1    give you the cite just so it's clear in the record.   It's

2    Lowenfield versus Phelps, 484 U.S. 231, 108, Supreme Court

3    546, 1988.

4                        We'll be in recess.   Thank you.

5

6                        (Whereupon, the proceedings were concluded.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

18

```
 1

 2

 3                    CERTIFICATE OF REPORTER

 4

 5    STATE OF ARIZONA      )
                            )
 6    COUNTY OF MARICOPA    )

 7

 8

 9              I, Traci L. Wheeler, CSR, RPR, an official and

10    certified reporter in the Superior Court of the State of

11    Arizona, in and for the County of Maricopa, hereby certify

12    that I made a shorthand record of the proceedings had in the

13    within case, and that the foregoing transcript is a full,

14    true, and correct transcription of the proceedings in this

15    case.

16              Dated this 31st day of October, 2005.

17

18

19

20                                 _____
                                   Traci L. Wheeler, CSR, RPR
21                                 Certified Reporter No. 50313
                                   Official Court Reporter
22

23

24

25
```

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000004529

EXHIBIT Q



05-0002₁
Braccio

1          IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

2               IN AND FOR THE COUNTY OF MARICOPA

3

4    STATE OF ARIZONA,                )
                                      )
5              Plaintiff,             )
                                      )
6                                     )
                                      )    CR2000-096032
7    Vs                               )
                                      )
8    WENDI ELIZABETH ANDRIANO,        )
                                      )
9              Defendant.             )
     _____    )

10

11

12                    **STATUS CONFERENCE**

13

14   BEFORE:        THE HONORABLE DANIEL BARKER

15
     APPEARANCES:   MR. JUAN MARTINEZ
16                  Deputy County Attorney
                    Representing the State
17

18                  MR. DAVID DELOZIER
                    Attorney at Law
19                  Representing the Defendant

20                  MR. DEAN M. WOLCOTT
                    SACKS TIERNEY P.A.
21                  Representing OCAC

22
                                         Mesa, Arizona
23                                       February 5, 2001

24

25   Prepared for:               Patricia J Moore, RPR
     COPY               Certified Court Reporter (AZ 50093)

1                          PROCEEDINGS

2                  THE COURT:  We're in session on

3    CR2000-096032, State v. Andriano.  This is a status

4    conference with regard to a request for consideration of

5    funds to represent the defendant.

6                  MR. MARTINEZ:  Juan Martinez on behalf of

7    the State.

8                  MR. DELOZIER:  Dave Delozier for

9    Ms. Andriano, the defendant.

10                 MR. WOLCOTT:  Dean Wolcott with Sacks

11   Tierney.  I represent the Office of Court Appointed

12   Counsel.

13                 THE COURT:  Mr. Delozier, do you waive your

14   client's presence?

15                 MR. DELOZIER:  I do, yes.

16                 THE COURT:  Thank you.  I have the

17   application for funds.  And I'm assuming on behalf of the

18   State, Mr. Martinez, you don't have any particular

19   position?

20                 MR. MARTINEZ:  I do not.

21                 THE COURT:  Mr. Wolcott, what is your

22   position?

23                 MR. WOLCOTT:  Yes, Your Honor, I do have a

24   position.  I'm sorry I didn't get an opportunity to file a

25   written response.  I just heard about this matter on

1    Friday.

2                    THE COURT:  For the record, I think we

3    probably had something faxed to you.  Maybe not even that.

4    I know I had my staff call Mark Kennedy and that word got

5    to you and you're here.  So we appreciate it.  Thank you.

6                    MR. WOLCOTT:  No problem.  I did have an

7    opportunity a few minutes ago to look at the Court's file

8    and, as I understand it, this Court has made a

9    determination that the defendant is indigent.

10                    It also appears that the Court has appointed

11   the Public Defender.  We certainly would agree that if the

12   Public Defender is appointed, those costs should be borne

13   by the Public Defender.  I found nothing in the Court file

14   to suggest that the Public Defender has been relieved of

15   his duty to represent the defendant.

16                    THE COURT:  And I thought -- I will tell you

17   that it occurred to me to get the Public Defender here,

18   but I had assumed there was a substitution of counsel.

19                    MR. DELOZIER:  Yes, sir.  There was.

20                    MR. WOLCOTT:  I didn't see it in the file

21   but I assume that there has been.

22                    THE COURT:  I think there is.

23                    MR. WOLCOTT:  I guess my position would be

24   that if the defendant is indigent, the defendant is

25   entitled, and the Public Defender should be appointed

1    under Rule 6.5, small b, that if the defendant is

2    indigent, the Public Defender is appointed.  That doesn't

3    preclude the representation by Mr. Delozier, nor does it

4    preclude the representation by Mr. Thikoll.

5                 THE COURT:  And he has now withdrawn, hasn't

6    he?

7                 MR. DELOZIER:  As far as I know he is an ad

8    counsel.  We communicate fairly frequently, he assumes

9    that he is.

10                THE COURT:  All right.  The reference was to

11   Rule?

12                MR. MARTINEZ:  Rules of Criminal Procedure,

13   Your Honor, Rule 6.5(b).

14                THE COURT:  Mr. Delozier, what is your

15   thought?

16                MR. DELOZIER:  Your Honor, I have relatively

17   little experience with this issue, quite frankly.  And

18   I've attached to my original motion the only other

19   experience I have, in front of Judge Galati.  In that case

20   we had specific individuals that he allocated specific

21   dollar amounts to.  I don't think that we're at a position

22   in this case that we can do that, that precisely.  That

23   case had been going on -- at the time that was done --

24   probably about 15 months.  There was a host of pretrial

25   motions and other things that preceded all of this.  But

1    that is the only experience that I have with this system.

2              THE COURT:  Well, here was the issue that I

3    saw, and this is why it occurred to me a little bit ago

4    that we should have had the Public Defender here.  It

5    seems clear to me that the defendant is entitled to

6    resources, in some form, to have the appropriate

7    investigator and other experts.  The only issue was whose

8    budget was it going to come out of.  And what I didn't

9    want to see happen is what I see, everybody here is paid

10   -- OCAC, the Public Defender, the Legal Defender, the

11   Legal Advocate -- all paid by Maricopa County.  But all

12   have separate budgets and everyone has a vested interest

13   of having their own budget not take the hit.

14             MR. WOLCOTT:  They also have separate

15   investigators and separate experts in the Office of the

16   Court Appointed Counsel.  The investigators that we

17   provide for the defense and the experts are under contract

18   and are paid pursuant to those contracts.  In the case of

19   the Public Defender, they have investigators and experts

20   on their staff.  In either case, we would suggest that

21   counsel has to avail himself of these resources before

22   this Court would appoint someone that we don't know and at

23   some cost that we have no handle on.

24             THE COURT:  What I would like to do so that

25   we resolve the issue, is get somebody from the Public

1   Defender's Office here.  Suggestions?  I mean, there is

2   Wes Peterson, he is the supervisor out here.  I don't know

3   if somebody downtown might be better.  So we can get them

4   on the phone and get the issue resolved.

5            MR. WOLCOTT:  Since this is considered a

6   southeast case, the person to get out here would be Wes

7   Peterson.  And also in terms of a procedural thing, on my

8   notes it indicates on December 18th there was some

9   discussion about substitute counsel, so just to serve as a

10  benchmark.

11           THE COURT:  Well, let's take a brief recess

12  and see if we can get Mr. Peterson on the phone, or now

13  his office is across the street, and go from there.

14                 (Brief recess was taken)

15           THE COURT:  We're back in session on State

16  v. Andriano, CR2000-096032.  Same counsel are here, the

17  defendant is not.  And also Mr. Wes Peterson is on the

18  phone.  In fairness to Mr. Peterson, he doesn't know

19  anything about what we're doing right here, but I wanted

20  to get him here.  Let me bring you up to speed on this

21  case, Mr. Peterson.

22              What we got is a capital case, and

23  Mr. Delozier has substituted in and represents the

24  defendant -- substituted in for the Public Defender.  The

25  defendant is indigent, and the defendant also has ad

000004536

1    counsel as well.   Mr. Delozier made a request for funds to

2    have an investigator appointed and also an expert, and I

3    don't have all the details on that, but Mr. Delozier does.

4    I then had my staff contact the Office of Court Appointed

5    Counsel and Mr. Wolcott, Dean Wolcott, is here on their

6    behalf.   And Mr. Martinez, Juan Martinez, is also here for

7    the State.   I think everyone agrees there is no

8    disagreement that the defendant is indigent and entitled

9    to the reasonable and appropriate needs for this case.

10                    In terms of investigatory and expert

11    services, OCAC's position is that the Public Defender

12    should be responsible for that and not OCAC, and has

13    referred to Rule 6.5(b), which says the Public Defender

14    shall represent all persons entitled to appointed counsel

15    whenever he or she is authorized by law to do so.

16                    So the issue really -- and I laid it out to

17    counsel before -- it seems clear that reasonable and

18    appropriate investigatory and expert services are going to

19    need to be paid for by the County because the defendant is

20    indigent.   It's really which entity is going to do it.

21    Whether it's OCAC -- I don't have the Legal Defender here

22    or the Legal Advocate, but I got two of the four entities.

23    What is your thought, Mr. Peterson?

24                    MR. PETERSON:   We don't have our

25    investigators assigned to pro per cases.   And we represent

1   indigent people, but we're not representing the defendant;

2   there has been a substitution of counsel filed.  So I

3   don't see how it would come out of our budget.  If we're

4   representing her, fine.  Obviously, we would pay our

5   investigators to do the investigation.  But we have a long

6   standing practice in pro per cases where we don't have our

7   investigators because we don't want our investigators to

8   be supervised by anybody other than our attorneys.

9               THE COURT:  So on pro per cases where the

10  defendant is indigent, OCAC, in fact, pays for the

11  investigatory services?

12              MR. PETERSON:  Yes, Your Honor.

13              THE COURT:  Mr. Wolcott, if you follow that

14  theory, that seems to bounce the ball back to you, which

15  is why I wanted everybody here.

16              MR. WOLCOTT:  Your Honor, again, in my

17  review of the Court's file, the minute entry reflects a

18  document signed by the defendant indicating that the

19  Public Defender is her attorney.  And that she was

20  requesting that Mr. Thikoll appear as Knapp counsel.  As

21  far as I could tell, the Public Defender is not off of

22  this case.

23              THE COURT:  Well, I think if they're not --

24  and the document may not be there -- it's imminent, and

25  the document will be signed.  It's my understanding that

1   you've been privately retained, Mr. Delozier.

2                MR. DELOZIER:  Yes, sir.  By her parents.

3                THE COURT:  And to substitute in and replace

4   the Public Defender?

5                MR. DELOZIER:  Yes, that's correct.  And

6   that document has been prepared, signed, and I don't know

7   why it's not in your file.

8                THE COURT:  So if that, in fact, is not the

9   case, I'll revisit the issue.  But let's work off the

10  assumption that the document has been signed, it's just

11  not in the file.  And we'll have to -- not today -- but

12  Mr. Delozier, perhaps you can file another copy of that

13  when you get back to your office.

14               MR. DELOZIER:  Do you have the clerk's file

15  as well?

16               THE COURT:  I do.

17               MR. DELOZIER:  We'll bring another one.

18  That argument is done.

19               MR. WOLCOTT:  Let's assume, and I don't want

20  to make this assumption, but let's assume that you have

21  relieved the Public Defender of his duty to represent the

22  defendant --

23               THE COURT:  Okay, and let me make it clear,

24  based on the avowal of Mr. Delozier that such a document

25  that shows the substitution of counsel and is signed by

1   his client, has, in fact, been filed.

2                MR. PETERSON:  If I could interrupt, I'm

3   looking at the screen right now, and that was done on

4   December 11th, the Court signed a court order for taking

5   physical evidence and new counsel was substituted in.

6                THE COURT:  It should have been in the file

7   by now.  Mr. Wolcott looked through it, I haven't.  But so

8   it's clear, it's ordered that Mr. Delozier is substituted

9   in and has replaced the Public Defender's Office.

10               So now let's go forward.

11       -       MR. WOLCOTT:  All right, Your Honor, again

12   assuming that the Public Defender has been properly

13   substituted out of this case --

14               THE COURT:  And if you wish to contest it,

15   you can file something.

16               MR. WOLCOTT:  I won't for purposes of this

17   hearing, but let's move on then.  It's the position of the

18   Office of Court Appointed Counsel then that Mr. Delozier,

19   or Mr. Thikoll, or whoever is representing the defendant

20   in the case, would be obligated to use -- or the Court

21   would be obligated to appoint -- under the Rules of

22   Procedure, the experts and investigators from OCAC that

23   would be necessary to adequately provide resources to

24   defense counsel.

25               MR. PETERSON:  All right, and if that is the

1   case, we can provide the Court with those lists of those

2   investigators and experts.

3            THE COURT:  Okay let's do this for right

4   now.  Mr. Peterson, I think we're probably through with

5   needing you now.  We'll go back to Mr. Wolcott.  Thank

6   you.

7            MR. PETERSON:  Thank you.

8            THE COURT:  Mr. Delozier, how is that with

9   you?

10           MR. DELOZIER:  I don't have an immediate

11  issue with it, except that we've already gone a little

12  further down the line than starting at the stage with new

13  people and, you know, our schedule that we talked about.

14  The reason that I have these two folks that we already

15  selected, plus Ms. O'Quinn on our staff, is they're

16  already familiar with what we're trying to do.  I think

17  that we'll have to have more time, as my client really

18  didn't want me to -- you know, I don't mind looking at who

19  they have and trying to use who they have, I would rather

20  not do it with some of the ones that I feel that I already

21  identified.

22           THE COURT:  Here is what I would like to do.

23  I don't know if there is something that can be worked out

24  with the people that Mr. Delozier has, in terms of having

25  a similar fee structure, that sort of thing.  I don't

1    know.  It seems reasonable to me.  And this isn't a

2    ruling, but it seems reasonable to me that OCAC's position

3    that if we're going to have to be paying for it, we ought

4    to be able to do it with the people that we entered into

5    contracts with and are familiar with, that that would be a

6    sensible way to do it.  But it also makes sense that

7    Mr. Delozier and you, Mr. Wolcott, would be able to talk

8    and see what the resources are.  If there is some major

9    difficulty, then I would revisit it and come back to the

10   issue in terms of the time for the trial.  I don't know.

11            And I'll be happy to hear from your client

12   and you, Mr. Delozier, on this, but it's not clear to me

13   that where a defendant would get new counsel, that that

14   would then create a situation, and the defendant does not

15   always waive time, that the defendant would be able to

16   bootstrap into getting experts and investigatory staff

17   that was significantly more expensive than what OCAC would

18   typically provide for.

19            MR. DELOZIER:  One of the reasons that we

20   had moved in the direction that we have, as you might

21   recall, is Mr. Ditsworth, former counsel for the State,

22   indicated it might be six to eight months before Phoenix

23   PD would have the results of some of their work.  So that

24   put us into "what do we do" problems.  I don't believe she

25   would mind waiving time, but my involvement, I don't

1    think, really had anything to do with that delay.

2              It may be that we wouldn't need some of

3    these experts at all if, in fact, Mr. Martinez could get

4    the Phoenix PD to move more quickly.  And I'm open to

5    having that -- and he and I have not had a chance to talk

6    about that -- and I know that he was looking for an order

7    from you, for example.  But the rest of our items he has

8    moved very quickly on, in satisfying some of the things

9    that I needed.

10             MR. MARTINEZ:  My understanding is that

11   there is some blood evidence that is out there that will

12   be done by the time the trial is here, other than DNA

13   analysis, I'm make sure that gets done.  I'll ask the

14   Court for a copy of apparently there is an order out there

15   to obtain handwriting exemplars.  I'll get that today, and

16   that will be done within two weeks.  The blood splatter

17   expert is finished.  The only thing that is sort of left

18   is this sodium avise that was found inside the stomach of

19   the victim.  And my understanding is that that went to

20   California for analysis.  I'll see what the status of that

21   is, but I can't foresee that taking six months to do.

22             Other than that, I don't see anything that

23   takes six months.

24             MR. DELOZIER:  So we might be further along

25   than we think.  And that is always very nice, if it is.

000004543

1   One of the other points I would like to raise on this is I

2   have no hesitancy in going over with Mr. Wolcott, or

3   whoever he designates, the people that we have to see, if

4   we can fit their fee schedules.  And they may be

5   appropriate, I don't know.  But there are some folks that

6   it probably wouldn't be compatible with their program,

7   that are almost irreplaceable.  One of them is this lady,

8   but hopefully we can work that out too, if that is what

9   you're suggesting.

10              THE COURT:  Let me do this, and I'll make it

11  more direct, I'm going to grant the motion for funds.  And

12  I'm granting it to this extent:  That the Office of Court

13  Appointed Counsel is to provide the necessary

14  investigators and experts as they would, as they believe

15  to be appropriate, given this case.  Now, if there is a

16  dispute about that, then we can come back here, but I'm

17  assuming that, Mr. Wolcott, that you and Mr. Delozier will

18  be able to work things out.  If you can't, then you can

19  come back.  But right now what I'm granting is the need --

20  is the ability to have -- if it's necessary still -- an

21  investigator and an expert.  But OCAC will handle it in

22  the way it typically would if there was an Office of Court

23  Appointed Counsel lawyer dealing with that request.  And

24  if there is a dispute over how that is to be handled, come

25  back to me and I'll sort it out.  That makes some sense.

1              MR. WOLCOTT:  Certainly Mr. Delozier can

2    contact Mr. Kennedy directly.  Perhaps they can work out a

3    fee schedule.  Let me understand, is the Court also

4    granting this order, as far as the paralegal is concerned?

5              THE COURT:  Here is what I'm intending to

6    do, is to give Mr. Delozier the kind of assistance that a

7    lawyer who was on an OCAC contract would get, given that

8    kind of assistance.  So whatever that would be.  And then

9    Mr. Delozier, if you don't think that is enough, that they

10   should be giving you more, this order is without prejudice

11   to that request.  And hopefully, you'll all be able to

12   work things out.  But if you're not, I'll be here.  Is

13   that clarified?

14             MR. WOLCOTT:  We'll see.

15             THE COURT:  Do you typically assign a

16   paralegal and an investigator to a capital case?

17             MR. WOLCOTT:  I don't know.

18             THE COURT:  I don't know either.  And Mark

19   Kennedy probably does, and he is probably the person to

20   call.  And then if there is a dispute, Mr. Kennedy can

21   call Mr. Wolcott and we'll tell him that.  Does that make

22   sense?

23             MR. DELOZIER:  That's fine.

24             THE COURT:  Anything else?

25             MR. MARTINEZ:  I do have something, and it

1   has to do with the handwriting exemplar.  I spoke with

2   Mr. Delozier and he indicated that that motion had been

3   granted, and for whatever reason, it probably got lost in

4   our file or somewhere else.  What I intend to do is have

5   my secretary prepare another form of order and submit it

6   to this Court for signature today so I can deliver it to

7   my officer today, if that is agreeable to Mr. Delozier.

8            MR. DELOZIER:  That is fine with me.  It was

9   what the young man read on the phone December 11th.  We

10  all agreed to it that day.

11           THE COURT:  I suppose we could get -- if

12  Mark Kennedy is available -- we could get him on the phone

13  right now.  That would be fine if he is.  Let's see if he

14  is.  Let's get him on the phone and you can talk with him

15  right now, Mr. Delozier.  And he may need more

16  information.  It might not be productive for me to get

17  involved now, but we have Mr. Wolcott here, and if you

18  folks need me, I'll come back into the courtroom.

19                    (Recess was taken)

20           THE COURT:  Back in session on the Andriano

21  matter.  Same counsel are present with the exception of

22  Mr. Peterson.  All right, Mr. Kennedy is not on the phone,

23  or wasn't available.  But tell me where we are.

24           MR. DELOZIER:  He wasn't available, and I

25  think that counsel talked to the office and got some rates

1    and that is what we felt like we ought to talk to you

2    about.

3              MR. WOLCOTT:  Your Honor, I was able to get

4    a hold of Sherry, who is from the Office of Court

5    Appointed Counsel and that knows what she is doing.

6    Mr. Kennedy was recently appointed to this job and I do

7    not feel confident that he would have in hand the exact

8    numbers that the Office of Court Appointed Counsel

9    provides as compensation to investigators and expert

10   witnesses.  I do want to bring to the Court's attention

11   A.R.S. 13-4013, and it says that the court appoint, upon

12   application of the defendant, shall appoint such

13   investigators and expert witnesses as may be needed and as

14   are reasonable.  The statute doesn't talk in terms of

15   paralegals or legal assistance.

16              The Office of Court Appointed Counsel does

17   tell me that they have, on occasion, and upon request of

18   defense counsel, appointed or assigned legal assistance

19   and paralegals to assist lawyers in the routine office

20   type matters.  However, it is rare.  And when the Office

21   of the Court Appointed Counsel does assign such persons to

22   assist counsel, they are compensated at the rate of $12 an

23   hour.

24              As far as investigators are concerned, our

25   accounts with investigators pay $20 per hour.  And as far

000004547

1   as the forensic experts are concerned, we pay them,

2   depending on the matter to be investigated, anywhere

3   between $65 and $175 per hour.

4              I will also remind the Court how this system

5   works.  The County Attorney has contracts with these

6   individuals to provide these kinds of services upon

7   request of defense attorney.  The defense attorney on the

8   other hand is obligated to obtain from this Court an order

9   showing what charges are reasonable.  And/or defense

10  attorney may then make a written request to the Office of

11  Court Appointed Counsel for the kinds of expenses that he

12  or she feels will be incurred in the defense of this

13  action.  So that is, in a nutshell, how the system works.

14             We certainly have no problem if Mr. Delozier

15  wants to make application to OCAC for an investigator for

16  a certain number of hours or for a forensic expert for a

17  certain number of hours, assuming that it is reasonable

18  and OCAC has the ability to evaluate the request of the

19  defense attorney.  I may have a problem if defense counsel

20  is insisting or demanding that the Court issue some sort

21  of order to compensate a paralegal in the amount of $50 an

22  hour.  That is what he has indicated that he is asking

23  for.  Your Honor, this defendant is now represented by two

24  attorneys, and I think that the Court would be well

25  advised as to inquire whether it is reasonable to pay a

1   paralegal those kinds of fees.

2                   THE COURT:  Thank you.  Mr. Delozier?

3                   MR. DELOZIER:  Thank you, Your Honor.

4                   THE COURT:  Is it DE-LO-ZER or DE-LOW-ZER?

5                   MR. DELOZIER:  Depends on what part of the

6   country.  DE-LOZ-YEAH is how I pronounce it.

7                   Okay, again, my experience is limited to our

8   experience with Judge Galati.  And as Your Honor is aware,

9   the judge there, knowing that Ms. O'Quinn is a lawyer,

10  chose not to pay her as lawyer, but chose to pay her as a

11  paralegal to assist in trial preparation.  And the rate

12  that he agreed to in that case was the same rate that she

13  worked with me on all of the other matters.  I pay her $50

14  an hour for whatever it is that she does.  I don't know, I

15  don't think -- well, I do have -- I had a brand new

16  paralegal once that charged me $12 that was worth maybe

17  five.  No disrespect.  But I can't find anybody to work

18  for that kind of rate anymore.  They may be out there, and

19  I guess I'm shopping in the wrong market if they are.

20                  But as you know, the portion right above

21  Ms. O'Quinn's paragraph on page four, paragraph C, is

22  authorizing $300 an hour for a particular person we had in

23  that case.  And as I said earlier, we'd gone a bit further

24  than we have in this one and had spoken to these people

25  and had quotes from them.  I do have one quote from one

1  person and he has reduced his rate to 130, Mr. Sweedo.

2  Mr. Jones, I have not negotiated with him.  One of the

3  reasons I wanted someone like Mr. Jones is because he had

4  17 years in the Homicide Division of the Mesa Police

5  Department.  It would seem to me that someone like him

6  would be ideal to be able to talk to Detective Lacero and

7  help both, plaintiff and defense, come to some kind of

8  recognition of what the areas of dispute are.

9              I recognize that they probably have these

10 folks on some sort of contract, I really don't have a

11 contract of such with Ms. O'Quinn.  But she has been

12 working with me now for three years on a contractor basis.

13 She has other things that she does as well.

14             So I would strongly urge the Court to adopt

15 something similar to what Judge Galati did.  He was --

16 this person that I was defending at that time -- was

17 indigent.  I represented him pro per and the Court decided

18 not to give me any funds at all because I had been

19 operating on the pro per status up to that point.  He

20 didn't choose to change that, as you can see in paragraph

21 D.

22             But, in this case we have received some

23 funds.  We have not received anywhere near what the family

24 has promised.  And I don't know that they will be able to

25 any time between now and the trial that is presently set

1   be able to meet that obligation.  But again, it's one of

2   these things that have several folks involved that wanted

3   us to assist, and we chose to do that.  As I said earlier

4   too, if there is any way for all of the forensic work and

5   other work to be completed it may well be that we won't

6   need anywhere near the funds that we identified.  But at

7   the time that we were doing this, we felt it best to err

8   on the high side rather than the low side.  I'm somewhat

9   optimistic that the two folks we selected, we may not need

10  any other but one.  There is the possibility of a limited

11  use for a pathologist.  But other than that, I don't know

12  that we can identify anyone beyond those three; Ms. O'Quinn

13  and the two that I've identified already.

14          THE COURT:  I see the information on

15  Ms. O'Quinn and I see the reference to a potential

16  pathologist.  The other individual?

17          MR. DELOZIER:  The detective.  Attached to

18  the filing that we did on February one, Your Honor.  It

19  may be easier to show you our copy.

20          THE COURT:  What is the rate for Jones?

21          MR. DELOZIER:  His quote is 60.  I've not

22  interviewed him.  I suspect I might be able to get him to

23  drop it some, but I don't think that I would get him to

24  drop it to $20.

25          Mr. Sweedo, one of the reasons that we chose

```
 1   him is he fits into three or four of the disciplines that

 2   we would expect to need to use.  And his fee quote is

 3   within the range that counsel mentioned, less than 175.

 4               THE COURT:  And I'm not -- let me make sure

 5   I got that reference --

 6               MR. DELOZIER:  Mr. Sweedo's?

 7               THE COURT:  Yeah, I do.  And in terms of

 8   Sweedo, he is within the range that is within OCAC's

 9   range; is that right, Mr. Wolcott?

10               MR. WOLCOTT:  I don't know who Mr. Sweedo

11   is.  Is that the forensic person?

12               THE COURT:  That is the -- right -- the one

13   that would deal with crime scene blood splatter.

14               MR. WOLCOTT:  That would fall within $60.

15               MR. DELOZIER:  No, sir, he is 130.

16               THE COURT:  The 60 was the investigator,

17   which isn't the same as your range.

18               MR. WOLCOTT:  It would fit within the range

19   that we currently compensate for forensic experts.

20               THE COURT:  I'll deal with it one step at a

21   time.  Do you know on Sweedo if you need him yet?

22               MR. DELOZIER:  I believe he is critical,

23   regardless of what we get from the State.

24               THE COURT:  How many hours do you think that

25   you'll need him for?
```

1           MR. DELOZIER:  Well, Your Honor, the way

2  that this is set out, it's 130 an hour for review,

3  consultation and report.  And 180 an hour for depositions

4  and trial testimony.  And they have a retainer agreement

5  that they want us to sign for 3850.  And I have not done

6  the math to see what that works out to.  I think it's

7  attached to the copy that I just gave you of the retainer

8  agreement.

9           THE COURT:  Okay.

10          MR. WOLCOTT:  Sounds like we've gone outside

11  of the parameters that we currently pay our forensic

12  experts.

13          THE COURT:  Tell me how that fits in with

14  your parameters.

15          MR. WOLCOTT:  Sixty-five to $175.

16          THE COURT:  You're talking about the 180?

17          MR. WOLCOTT:  Yes.

18          MR. DELOZIER:  Well, $5 an hour, I'll be

19  glad to pay that myself, if that makes up the difference,

20  Your Honor.

21          THE COURT:  Well, as to Sweedo, it's ordered

22  approving him for the rate of 130, except for deposition

23  time.  And what is the rate where you capped it, at 160?

24          MR. WOLCOTT:  175.

25          THE COURT:  And 175 for deposition time.

1             MR. DELOZIER:  That is also trial time, Your

2    Honor.

3             THE COURT:  And trial time.  Now, I noted

4    Judge Galati limited you to 15 hours with the expert on

5    the other case.  Makes some sense to me to put a cap on

6    it.  Any reason for anything different?

7             MR. DELOZIER:  This particular person was

8    limited to reviewing investments in offshore environments.

9    Whereas this fellow is analyzing the entire scene.  We

10   worked to get to this budget on just that thing; how long

11   is it going to take to do this portion and that portion

12   and so forth.  I don't know that we will expend all the

13   amounts that they requested.  It is refundable.  And quite

14   frankly, I have to pay it in advance to get him to

15   participate.  It's the way they work.

16            THE COURT:  3850.  Is there somebody who is

17   quick with their math?  If it's 130 an hour for the

18   average fee, how many hours is that in there?

19            MR. DELOZIER:  Approximately 30.

20            THE COURT:  Around 30.  I'm going to cap

21   things at either 25 hours or 3850, because some of the

22   hourly rate goes up.  So that is the cap there.  It's not

23   to exceed 3850.  Now, next, as to the investigator.

24            MR. DELOZIER:  Excuse me, Your Honor.

25   Before we go beyond Mr. Sweedo.  In this case for me to be

1  able to retain him, I need to advance those funds.  And

2  normally what we do is we submit it to the Office of the

3  Court Appointed Counsel on a monthly basis.  So I don't

4  know how logistically to do that in this case, and I don't

5  know if Mr. Wolcott has any suggestions or not.

6         MR. WOLCOTT:  Your Honor, it's a requisition

7  form, a request for payment that goes in at any time.  It

8  doesn't have to be monthly.

9         THE COURT:  So I'll order OCAC to pay 3850

10  to Mr. Delozier for the services of Michael J. Sweedo, and

11  to be paid at the hourly rates that we've gone over on the

12  record.

13         MR. WOLCOTT:  Let me try to understand the

14  Court's order.  Is the Court ordering us to pay 3850 in

15  advance to Mr. Delozier?

16         THE COURT:  I was.

17         MR. WOLCOTT:  Your Honor, the County is on a

18  pay as you go system.  We don't advance money.  If

19  Mr. Delozier wants to put in a requisition for expenses to

20  be paid to Mr. Sweedo, we'll do that.

21         THE COURT:  I think that we can -- I'm going

22  to -- and this may satisfy your person -- I'm going to

23  order OCAC to pay 3850, but not in advance.  And that is

24  if the services are earned.  So you can tell the expert

25  that there is an order OCAC will pay it, but I'm going to

1    have them be paid as they're incurred on a monthly basis.

2              MR. WOLCOTT:  Right.  As they submit his

3    invoices.

4              THE COURT:  So you can tell him there is a

5    court order that the agency pay that, but that it be paid

6    on a monthly basis.  And if OCAC is delayed in making

7    their payments, then come back here and we'll do attorney

8    fees for having you collect them.  I don't want you to

9    think he is getting a six-month delay until he gets paid.

10             MR. DELOZIER:  In view of my relationship

11   with people like this, I'm going to go ahead and pay the

12   3850.  And I don't know how OCAC is going to handle that

13   because they want an application from Mr. Sweedo and he

14   would have already been paid.

15             THE COURT:  All you have to do is Mr. Sweedo

16   has to give you a bill each month and then you pass that

17   bill on to OCAC.  And if he is signing the payment over to

18   you, that is fine.  But then OCAC will pay the money to

19   you.  But if he ends up not using the whole 3850, then

20   you'd have to work that arrangement out with him.

21             MR. DELOZIER:  That will work.  Thank you.

22             THE COURT:  Next, on the investigator issue.

23   Any reason to think that the investigators that OCAC uses

24   couldn't adequately do this?

25             MR. DELOZIER:  I don't know enough about

1   them at this point.

2           THE COURT:   I'll order that an investigator

3   be made available through OCAC.   Pay it at the contract

4   rate.   And I'm just assuming -- I don't know this -- does

5   OCAC need a specific number of hours to give the

6   investigator or does he just go and do what the lawyer

7   asks?

8           MR. WOLCOTT:   We don't need that kind of

9   estimate from the Court.   Mr. Delozier will send us a

10  requisition outlining the number of hours he expects the

11  investigator to work on the matter.   And then we evaluate

12  it.   If it's reasonable, in light of the kind of case that

13  we've got here, OCAC will approve it.

14          THE COURT:   And let's see if we got --

15          MR. WOLCOTT:   If we don't, Mr. Delozier, I'm

16  sure, will be right back in here.

17          THE COURT:   Do you know about how many hours

18  right now, Mr. Delozier?

19          MR. DELOZIER:   Well, we got 42 tapes and

20  about 500 pages of material that person needs to digest.

21  There is going to be interviews of probably 50, minimum of

22  50 people.   I don't know how to estimate that.   How much

23  time do you have to spend Juan?

24          MR. MARTINEZ:   It just depends on the

25  questions.   I just sit there and listen.

1               MR. DELOZIER:  I mean, you don't know how

2   much time your folks have spent on this?

3               MR. MARTINEZ:  No, I don't.  I just took the

4   case over.

5               THE COURT:  Why don't you just -- if you

6   don't have a good feel for it now -- just make the request

7   from OCAC.  And if it needs to go up -- it's obviously

8   necessary to get this person going immediately.  So I'm

9   going to order that OCAC provide the services of an

10  investigator immediately.  If there were 30 hours we were

11  talking about for an expert, it seems like that would

12  certainly need to be substantially more than that for the

13  investigator.

14              MR. DELOZIER:  I would guess probably 100.

15              THE COURT:  No more than 100 at this point.

16  Again, that is without prejudice to being either raised or

17  lowered, if after each side has had more of an opportunity

18  to become familiar with it.  That sounds reasonable right

19  now.

20              Now, as to a paralegal.  Tell me what the

21  paralegal would be doing.

22              MR. DELOZIER:  Well, Ms. O'Quinn is a former

23  prosecutor from the State of Louisiana with about ten

24  years experience as a prosecutor.  She has moved here and

25  has been raising her young family and working part time.

1    I use her to organize the cases for court appearances,

2    help prepare court documents, and otherwise see that I'm

3    staying on top of all the things that we need to do in

4    trial preparation.  She attends most of the hearings with

5    me, if she is available.

6             And we used that term "paralegal" for her in

7    Judge Galati's case because of the unwillingness to call

8    her anything else.  But I don't intend to have anybody

9    else on my staff -- if you want to call that staff --

10   working on the case.

11            THE COURT:  Here is my thoughts, and just

12   looking at Judge Galati's order maybe I'm missing it, it

13   looks like she was getting used similarly to how an

14   investigator would be used.  I appointed an investigator

15   here.

16            MR. DELOZIER:  We didn't need an

17   investigator in that case.  The only really investigators

18   we had basically were the paragraph A person, Strickman,

19   who was an accounting expert, and the offshore investment

20   person.

21            THE COURT:  So basically to assist you in

22   the courtroom and getting prepared for court.  And tell me

23   how it differs from what the investigator would do.

24            MR. DELOZIER:  Well, my understanding of the

25   investigator in this context would be the person that goes

000004559

1  out in the field and finds some of the people that we need

2  to have ferreted out.   There are folks all the way from

3  Apache Junction to Casa Grande to Tucson that have

4  involvement in the case.   I don't see sending someone like

5  Ms. O'Quinn to do those things.   It's -- pardon the

6  expression -- gumshoe work.   They were involved in the

7  boat business.   They were involved in the window business.

8  We need to look into those things.   Whereas she is more

9  office and getting the paperwork ready and monitoring the

10  work being done by the various folks.   And I think Juan

11  has a paralegal in his office.   We got research issues

12  that I wouldn't have the investigator doing, for example.

13          THE COURT:   And OCAC pays when you've done

14  that?   You have people that you hired for $12 an hour?

15          MR. WOLCOTT:   We have, Your Honor.   And I

16  might also add that counsel has a second chair on this

17  case, and perhaps he didn't in the offshore laundering

18  case.   I don't know.

19          THE COURT:   Mr. Thikoll?

20          MR. WOLCOTT:   Correct.

21          MR. DELOZIER:   Mr. Thikoll has been

22  primarily a friend of the family and been involved with

23  issues related to the two minor children.   He periodically

24  sent me information that he thought might be useful for me

25  to know.   And I think that he interviewed the defendant on

1   one occasion.  I don't know how active he intends to be.

2             THE COURT:  Well, this is my order, and if

3   counsel have other authorities they would like to present,

4   I'll be happy to consider them.  But it seems to me

5   looking at the statute 13-4013(B) pertains to experts, and

6   it also pertains to investigators.  It seems clear to me

7   that if the defendant chose to have the Public Defender,

8   and this would be right now, the Public Defender's Office

9   is available.  But the defendant has not chosen to avail

10  herself of those services.  Mr. Delozier would essentially

11  have a second chair.  And it doesn't seem appropriate to

12  me, under the circumstances of the case, to pay at County

13  expense for a paralegal when Mr. Delozier could have one

14  through the Public Defender's Office if he wished to do

15  so.  And that is also in view of this Court's ruling with

16  regard to an investigator, to make sure that that is

17  provided.

18             So, the way I'm viewing this is when the

19  defendant chose to have private counsel, if that counsel

20  believes that it would be helpful to have a paralegal to

21  assist him with trial, that is much like -- not a

22  technical second chair -- but I know that is how

23  paralegal's get used.  Twelve dollars an hour does not

24  seem like a reasonable rate for the type of services that

25  Ms. O'Quinn would be providing.  They seem much more

```
 1   similar -- she is a former prosecutor or lawyer from
 2   another jurisdiction -- to what you would get by having a
 3   Public Defender's Office co-counsel on the case.  So I'm
 4   not going to approve the payment of Ms. O'Quinn.
 5               MR. DELOZIER:  Could I ask for
 6   clarification.  Are you suggesting that I can ask the
 7   Public Defender to appoint someone to be second chair?
 8               THE COURT:  Well, I can be educated on this,
 9   but I think, and I gave this offer last time, was that
10   there was no reason I had to take the Public Defender off
11   the case.  Mr. Wolcott, that is why even though the order
12   wasn't there, I was pretty sure they were taken off,
13   because I went over that and that is not what defense
14   counsel wanted.
15               MR. DELOZIER:  Well, I thought we already
16   had the Knapp problem and that would have made me second
17   chair and the Public Defender in charge, which is not what
18   she wanted.  So I'm asking you a different question:  Is
19   it possible in this case to have the Public Defender
20   assign someone to be, basically, my assistant?
21               THE COURT:  Well, and let me make sure I'm
22   understanding how it would work with Knapp counsel, it's
23   your understanding, and this may be the law, that if the
24   Public Defender is involved then the Public Defender would
25   be lead counsel?
```

1           MR. DELOZIER:  That was my understanding.

2           THE COURT:  Everybody in agreement on that?

3           MR. MARTINEZ:  I don't know.

4           MR. WOLCOTT:  Not necessarily in agreement.

5   I've heard it work both ways, Your Honor.

6           THE COURT:  Well, and that is the issue, of

7   where it seems to me -- and if we need to get Mr. Peterson

8   back on the phone, I guess we can do it.  He'll be

9   surprised that we're still here.  But that was what I had

10  contemplated; that if you wanted a second chair, then it

11  made more sense to me to just appoint the Public Defender.

12          MR. DELOZIER:  I just didn't think that was

13  possible.  I thought I was the Knapp counsel and I know

14  that is not what the family wanted.  However, in view of

15  the ruling today, I need to have somebody -- no disrespect

16  to your ruling.  I frankly don't believe I will get much

17  help out of Mr. Thikoll, but that is the family's choice

18  as well of having him involved, whatever he is going to

19  do.

20          THE COURT:  And part of the basis for my

21  ruling is that there is a public agency, it's the Public

22  Defender's Office, set up to provide these services and

23  the defendant opted out of them.  And they are available

24  to the defendant, but the defendant is choosing not to

25  take them and now asking me to appoint somebody to do the

1    similar services at $50 an hour, whereas if I appointed

2    the Public Defender there would be no extra cost to the

3    County.  That is what I see happening.  I don't see

4    Ms. O'Quinn being a $12 an hour paralegal.  And I think

5    that you stated as much.  I don't think she is a person

6    that you hired to organize this file or that file in a

7    file clerk type manner.  You're looking for someone who

8    can assist you in legal research and other aspects, like a

9    paralegal would.  So I indicated at the start of this

10   ruling that I'm happy to consider further with other

11   authorities, particularly to go to Knapp.  If it's not

12   possible to do what I'm envisioning, then perhaps I would

13   reconsider that ruling.

14              MR. DELOZIER:  Why don't we go ahead and

15   make this phone call back to the fellow and see what his

16   opinion is, since we're here.  I'm already late to another

17   meeting anyway.

18              THE COURT:  All right.  Let's take a brief

19   recess.  And do you have the order, Mr. Martinez?

20              MR. MARTINEZ:  Yes, I do.

21              THE COURT:  I'll just sign that.

22              (Brief recess was taken)

23              THE COURT:  Back in session, same counsel

24   are here in the courtroom.  Mr. Peterson is now back on

25   the phone.  Mr. Peterson, the issue that has come up is

1  this:  I have now granted the defense request for an

2  expert and also for an investigator, and ordered OCAC to

3  pay for those along the lines that I previously ordered.

4  The defense is also requesting a paralegal.  And I ruled

5  -- and I told him that I would consider further

6  information if it was available, and that is why we're

7  doing this -- I ruled that the request for a paralegal in

8  this case is really almost like a second chair.  I have

9  appointed an investigator and an expert, and the paralegal

10  is seeking to be compensated at the rate of $50 an hour.

11  She is an attorney from another jurisdiction that works

12  here as a paralegal.  The paralegals that OCAC utilizes

13  are $12 an hour.  And the defense and Mr. Delozier request

14  -- you're not requesting a paralegal of that sort?

15              MR. DELOZIER:  No.

16              THE COURT:  They're not making that request

17  for that type of individual.  So the issue that arose is

18  whether the Public Defender, whether Mr. Delozier's client

19  would want to have the Public Defender appointed.  He

20  would still want to be lead counsel and get his second

21  chair through the Public Defender's Office.  The question

22  is whether Knapp allowed that or whether the Public

23  Defender has to be lead counsel?

24              MR. PETERSON:  We never had counsel switch.

25  There is already ad counsel on this case.  There is an

1  attorney from Tucson that is Knapp counsel.  When we had

2  the case it was a Knapp counsel from Tucson.

3              THE COURT:  Right.  And part of this, it may

4  be premature, Mr. Delozier would have to make some

5  decisions.  I don't know how many Knapp counsel you can

6  have.  The issue is really whether the Public Defender is

7  appointed, if they would have to be lead counsel.  I don't

8  have any authority in front of me to give me guidance.

9  I've got State v. Knapp, at least the verse of 114 Arizona

10  531, but that deals with just expenditure of money for

11  experts and investigators, at least as I briefly skimmed

12  it.  And so other than just knowing what the practice has

13  been on the tip of your finger, that is about the

14  information that you have, Mr. Peterson.

15              MR. PETERSON:  Yes, it's never been done,

16  Judge.  As far as I've known, the office people associate

17  with us, we don't associate with them.  So once we're

18  appointed we don't want to take a second chair.  We have

19  our own capital guidelines.  We always have second chair

20  capital cases, but we've never been assigned, to my

21  knowledge.  I can check with Mr. Gusek and see if it's

22  been done downtown, if we've ever been Knapped on to

23  second chair in a murder case.

24              THE COURT:  All right.  Why don't,

25  Mr. Delozier, why don't you explore the options, both in

1    what the case law provides and Mr. Peterson, perhaps you

2    can call him and he can check with Mr. Gusek.  We've done

3    a lot of proceedings today.  I think that I got you off

4    and running with the experts and investigator.  I will

5    consider again the paralegal issue because it is based on

6    the theory that I could appoint the Public Defender as

7    Knapp counsel.  It's not now clear to me that I do or

8    don't have that authority.  So, if you want to pursue it

9    with the paralegal, it's probably appropriate to just file

10   something and get it to Mr. Wolcott so he can have a look

11   at it.  And I'll look at the issue again.

12             But it would also be helpful to me just to

13   know what you're wanting to use.  I'm envisioning the

14   paralegal as a second chair.  And the other issue is if

15   you hire private counsel, does the County pay for a second

16   chair?  I mean, that to me seems to be the issue.  But if

17   there is some other paralegal services that are

18   appropriate, that aren't certainly the second chair, then

19   I would revisit whether I should appoint a paralegal.  But

20   then I would start thinking about the $12 rate, although

21   that does sound very low even for a paralegal doing

22   ministerial type matters.

23             MR. DELOZIER:  Let me ask for clarification

24   from you what your position is on the definition of second

25   chair?  Maybe that might help clarify it a little bit.

1           THE COURT:  What I'm working off of, and

2   this is just to guide the parties right now and the basis

3   for my ruling, and this may be inaccurate, if a defendant

4   wanted to hire privately two lawyers, or a lawyer and a

5   second chair, the defendant should do that.  Or I could

6   appoint the Public Defender to act as the second chair, if

7   permissible.  The issue is whether that is really -- that

8   their services, such as investigators and expert witnesses

9   -- is not limiting, if it does say such, that the County

10  has an obligation to pay once the defendant has decided

11  not to use the services of Public Defender but decided to

12  hire private counsel.

13          MR. DELOZIER:  When I think of second chair

14  it's someone that would be participating in a trial, if

15  there was one, at various points.  Ms. O'Quinn would not

16  be doing that.  What she would be limited to is to do

17  research, do document preparation, motions, things like

18  that, that you have already seen.  It's largely her work

19  that you've seen.

20          THE COURT:  Research and motions are

21  typically lawyer functions.  Like I said, perhaps there is

22  some authority elsewhere, and I could be persuaded, but it

23  didn't seem to fall within.

24          MR. DELOZIER:  I was just trying to

25  understand because I don't see Mr. Thikoll doing any

1   motions.   I don't foresee him being here participating in

2   the trial and taking portions of it.   So maybe what we

3   need to do is ask him to decide what he is going to do and

4   let us know.

5             THE COURT:   Ask him what he is going to do

6   and be very specific about what the paralegal would do and

7   define what the permissible roles of the Public Defender

8   are.   And if you want to submit that, I would be happy to

9   reconsider the issue.

10            MR. DELOZIER:   Thank you, Your Honor.   I

11   appreciate your time.

12                              *  *  *

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1
 2
 3
 4
 5
 6                    C E R T I F I C A T E
 7
 8
 9            I, PATRICIA J. MOORE, Court Reporter, do
10   hereby certify that the foregoing pages numbered 1 through
11   6, inclusive, constitute a full and accurate printed
12   record of my stenographic notes taken at said time and
13   place, all done to the best of my ability.
14
15
16
17            DATED this  16  day of  Feb  ,
18   2005.
19
20
21
22
     _____
23            PATRICIA J. MOORE, RPR
        Certified Court Reporter (AZ 50093)
24
25
```