# TABLE OF CONTENTS (INTERACTIVE)

| | |
|---|---|
| NNNNNN Part 5 | Response to Petition |

# EXHIBIT NNNNNN PART 5

# EXHIBIT R

000004571

*DP*

*05-0002*
*Braccio*

IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

IN AND FOR THE COUNTY OF MARICOPA

STATE OF ARIZONA,       )
                        )   *CR- 05- 0005- AP*
            Plaintiff,  )
                        )
    vs.                 )  No. CR2000-096032
                        )
WENDI ELIZABETH ANDRIANO,   )
                        )
            Defendant.  )
_____)


REPORTER'S TRANSCRIPT OF PROCEEDINGS
PRETRIAL CONFERENCE


BEFORE:        THE HONORABLE DANIEL A. BARKER
               Judge, Presiding


APPEARANCES:   Mr. Juan M. Martinez
               Ms. Suzanne Wilson
               Deputy County Attorneys
               Representing the State

               Mr. G. David DeLozier, Jr.
               Attorney at Law
               Mr. Dean M. Wolcott
               Office of Court Appointed Counsel
               Mr. Wesley E. Peterson
               Deputy Public Defender
               Attorneys representing the Defendant


                         April 13, 2001
                         Mesa, Arizona
                         8:37 a.m.

               *Appeal*
COPY

               JESSICA CASTO MOROZ
               Certified Court Reporter, # 50254

2

1                    P R O C E E D I N G S

2

3              THE COURT:  Apparently we have a blower.  I

4    don't know if people can hear all right.  But there is

5    something wrong with a blower in the courtroom.  We

6    don't usually have that, that background noise.  We are

7    trying to get it fixed.

8              This is number four on the calendar,

9    CR2000-96032, State versus Andriano.  This is a pretrial

10   conference.

11             MR. MARTINEZ:  Juan Martinez for the State.

12             MR. WOLCOTT:  Your Honor, Dean Wolcott, law

13   firm of Sacks Tierney.  I'm Office of Court Appointed

14   Counsel.

15             MR. DELOZIER:  And Dean DeLozier, appearing

16   for the defendant, Ms. Andriano, who is present, in

17   custody.  Good morning, Your Honor.

18             THE COURT:  And I asked Mr. Peterson to come

19   from the Public Defender's Office.  Because after I

20   reviewed the pleading, that became apparent that I may

21   want to hear from the Public Defender's Office.

22             Mr. Wolcott, I apologize.  You apparently

23   hadn't received notice of the last scheduling change.

24   Apparently there is a glitch.  I'm sorry for that.

25             MR. WOLCOTT:   No problem.  What's the --

3

1    well, the other thing that concerns me is for some

2    reason the Court file is not complete with regard to the

3    paperwork as to the paper trail on counsel.  And it

4    concerns me.

5             I have signed -- I have signed a couple of

6    orders.  One I've recently signed is the Order

7    Substituting al -- or Allowing Mr. Thikoll to Withdraw.

8    He's out, but I can't find it in the Court file, which

9    concerns me.

10            The original paperwork all pointed to

11   Mr. DeLozier.  It's not really appointing him.  That

12   isn't the right word.  It's private counsel.  But allow

13   Mr. DeLozier to substitute in.  I don't know that

14   there's any dispute concerning it.  But it does

15   become -- it concerns me that the paperwork is not

16   there.

17            Do you have a copy of that, Mr. DeLozier?

18            MR. DELOZIER:  That's what I was just

19   checking, Your Honor.  I think we've -- the docket

20   reflects that having -- it having been done, but I don't

21   know that I have one -- a copy of it with me.

22            THE COURT:  Let me just do this.  I've read

23   these materials.  And rather then hearing argument, let

24   me just tell you what I understand the status to be then

25   hear from people if they disagree with that.

4

1        And that's why I invited Mr. Peterson here.

2   Because as I understand the status -- and this is why I

3   wish I had the paperwork -- Mr. DeLozier effectively

4   substituted in for the Public Defender's Office.   Public

5   Defender went out.   There was no conflict, but the

6   Public Defender was out.

7        And now there was also an unusual

8   circumstance that Mr. Thikoll was "Knapp" Counsel at

9   that time, but -- or sometime.   But in any event,

10  Mr. Thikoll is now out.   So counsel for the defendant is

11  only Mr. DeLozier.   I entered some orders earlier that

12  allowed for the Public Defender for certain items based

13  on Mr. DeLozier being counsel.

14       But now, Mr. DeLozier, as I understand it,

15  you're being retained by family members and you would

16  like to have the Court appoint counsel for Ms. Andriano

17  based on the finding of indigency that had taken place

18  earlier?   Is that pretty much the status?

19       MR. DELOZIER:   Yes.   The complication in

20  addition -- if I might assist in just a moment?

21       THE COURT:   Go ahead.

22       MR. DELOZIER:    -- is the nature of the way

23  we have moved into this.   And I appreciate your summary

24  of it.   I agree with it as you've stated.   We find it

25  necessary to come back basically and have you

1  micromanage how I'm going to defend her.  And I find

2  that uncomfortable both for me, and I'm sure for you.

3  So I'm at a bit of a quandary on this one.  That is why

4  I worded my reply the way I did.

5          I'm open to most of the suggestions as to

6  how to move away from that.  Also give her the defense

7  she is entitled to under our laws.  And if that means

8  that I'm "Knapp" Counsel, then maybe that is what we

9  ought to do if that simplifies things.  I don't have any

10  preconceived notions on how we ought to proceed.

11          THE COURT:  That is what I thought that is

12  the conclusion you were coming to.

13          All right.  OCAC filed the claim that Rule

14  6.2 requires that the Public Defender's Office be

15  appointed if there is to be counsel appointed initially;

16  correct?

17          MR. WOLCOTT:  Well, Your Honor, I think we

18  have to go back to the beginning here.  There was a

19  substitution of counsel.  Mr. DeLozier for Mr. Thikoll

20  entered a "Knapp" Counsel appearance.  They did not

21  associate with the Public Defender because the Public

22  Defender wasn't there anymore.  They undertook the

23  defense of the defendant.

24          THE COURT:  And I think that is clear as to

25  Mr. DeLozier.  As to Mr. Thikoll, he originally --

6

```
 1   there's a "Knapp" Counsel notice.

 2              MR. WOLCOTT:  Your Honor, with all due

 3   respect, he may call himself "Knapp" Counsel.  But there

 4   is no Public Defender, there's no court appointed

 5   attorney assigned to represent the defendant.

 6              THE COURT:  Well, there was initially.

 7              MR. WOLCOTT:  There was initially.  But

 8   Mr. DeLozier, as well as Mr. Thikoll, entered an

 9   appearance to represent the defendant.

10              THE COURT:  Let me just stop you for a

11   minute because here is my tentative conclusion, not a

12   ruling.  It would appear as though I appoint the Public

13   Defender, because that is why Mr. Peterson is here.

14   Because she wants counsel.

15              And then in terms of what role Mr. DeLozier

16   plays, I'm appointing the Public Defender.  I assume the

17   Public Defender's Office and Mr. DeLozier can work that

18   out.

19              MR. PETERSON:  It depends if we are

20   appointed, we are representing, we are the counsel.  We

21   have to make the decisions concerning the case.  If we

22   are appointed, I mean, it's our duty to represent her

23   how we see fit.  The problem we have with some "Knapp"

24   Counsel is they call them self "Knapp" Counsel and they

25   want to take over the representation.
```

1          There was a Notice of Appearance, as

2  Mr. Wolcott correctly stated, entered.  We are no longer

3  on the case.  And we are -- we appoint -- we want it to

4  be made clear on the record that it is our case and that

5  the decisions are going to be made by our attorneys

6  based -- we'll consult with "Knapp" Counsel obviously.

7  And I'm not trying to say in no way we just ignore what

8  they have to say.  But when it comes down to it, the

9  decisions will have to be ours if we are going to be

10  appointed.

11          If "Knapp" Counsel wants to take over as

12  counsel, they have to do that, Your Honor.  They can't

13  have it both ways.

14          THE COURT:  Now, I read Knapp and I didn't

15  get a whole lot of guidance either way from Knapp.  It

16  didn't seem like there was an issue there.

17          MR. PETERSON:  The problem we have -- there

18  have been two problems to term where "Knapp" Counsel

19  have basically tried to take over the case.  They

20  basically just use the Public Defender's Office for

21  expert funds and things like that, and basically shoved

22  us out of interviews and other things that make it clear

23  that we're counsel for funding purposes only.  And that

24  just doesn't provide a framework that we can work under,

25  Your Honor.

8

1          THE COURT:  Mr. DeLozier?  What is your

2  position?

3          MR. DELOZIER:  I appreciate that.  And that

4  sort of brings us back to the micromanage issue.  From

5  my point of view, one of the things we've got is I've

6  found unfortunately we've lost some time because of

7  change of personnel.  Not only my shop, but the people

8  we originally were employed at through OCAC had to

9  withdraw and we had to bring in other investigators.  I

10  would hate to have to start again, if you will, or with

11  those people.  And then obviously we've already spent a

12  fair amount of money for Mr. Sweedo.  And so there is

13  sort of a dilemma.

14          I don't have a problem with working with the

15  Public Defender's Office.  One of the things that I was

16  going to use the investigators for was to do the

17  interviews rather than do them myself.  I don't normally

18  do that, except I often sit in.  But I don't handle

19  them.  For a variety of reasons.  So I certainly am not

20  going to exclude Public Defender's Counsel if they

21  choose to handle it.

22          There is a number of issues with this case

23  that I believe probably weren't present when we started.

24  I assume you've heard Dr. Potts' report and it raises a

25  whole other problem of providing adequate defense for

9

1   Ms. Andriano well.

2           So, while I appreciated Dean Wolcott's

3   comments about may this and may that, but at the time

4   that is the best I can do, was to alert the Court that

5   it looks like these are some of the categories of people

6   we might be required.

7           I got a notice yesterday, for example, from

8   the State.  And I have ten items that we had inquired

9   about.  Seven of them are ones that they don't plan to

10  do any research on.  We will be required to do those.

11  If we intend to present those.  And I obviously raised

12  them with the State.  And one of the things -- you may

13  recall back from January, we were told then that it

14  might take quite a while for some of those things to get

15  done.

16           THE COURT:  Let me set some parameters here.

17  And you may want to consult with your client right now.

18  You are her privately retained counsel.  And there is

19  not another court appointed counsel.  I will absolutely

20  appoint the Public Defender's Office if requested.

21           Now, I'm not going to resolve what may or

22  may not be a dispute right now between the Public

23  Defender's Office and Mr. DeLozier.  But I will resolve

24  that dispute if it turns out to be one.  And it may be.

25           Just so the Defendant understands, it may

10

1  come down, as Mr. Peterson suggests, maybe it won't.  I

2  haven't seen the case law.  But that could certainly be

3  a conceivable result.  So if the Defendant wants court

4  appointed counsel, she will get it.  It will be the

5  Public Defender's Office.

6          Next, if I do that, I don't understand why I

7  would leave OCAC in the case paying for any type of

8  private investigators.  And I would then rescind and

9  vacate the prior order that dealt with paying for

10  investigators.

11          So if Ms. Andriano wants to go down the

12  court appointed route, she is not going to be reaching

13  into both sides -- well, two different coffers, if you

14  will.  Public Defender's coffer and OCAC's coffers.  And

15  these, for the record, are separate budget streams.

16          So I will vacate that order.

17          It's really up to the Defendant however she

18  would like to proceed.

19          MR. PETERSON:  Your Honor, there is one

20  thing I would like to add.  Our Capital Representation

21  Unit right now is strapped.  Mr. Gavin's really the only

22  person out here in Mesa who is doing it.  We are adding

23  a second person.  We are in the process of doing an

24  improvement.  We are going to meet with Judge Hotham

25  probably next week to work out Mr. Gavin's schedule.

11

1          He has got a couple of trials getting

2  bunched up.  He is also getting married and going on a

3  honeymoon in the next couple of weeks.  It's going to be

4  only a week or two that he is going to be off for that.

5  But he does have trials that he is going to be starting

6  as soon as he returns.  I think this case is still early

7  enough on.  I just want to make the Court aware of that.

8          THE COURT:  And again, I view that as an

9  issue that I may have to address.  And I appreciate

10  having it highlighted.  But if there is going to be

11  court appointed counsel, there is no conflicts with the

12  Public Defender's Office, and I will appoint the Public

13  Defender.  And certainly the resource issues deal

14  with -- is appropriate in any way.

15          MR. PETERSON:  That's fine, Your Honor.

16          THE COURT:  Did you want to --

17          Now, Mr. DeLozier, I don't know if you have

18  a different view, are objecting having OCAC resources if

19  your client has the Public Defender's Office.  Did you

20  agree with that or did you disagree?

21          MR. DELOZIER:  Well, not entirely.  I think

22  I'm sort of straddling the fence a little bit.  The

23  concern is I've -- we've already spent a fair amount of

24  money and time with the folks that you've appointed

25  previously.  And while there is still a fair amount of

12

1  work to do, I'm just sort of a conservative type that

2  doesn't like to waste the resources once they've been

3  spent.   It will be more spent.

4            THE COURT:  Let me stop you.  From OCAC's

5  point of view you specified to stop the funding.  It's

6  not so much that this would keep --

7            MR. DELOZIER:  That's correct, Your Honor.

8            THE COURT:  This would conserve that

9  resource.   They are your resources.

10           MR. WOLCOTT:  We would respectfully request

11 that that order be rescinded.

12           THE COURT:  Okay.

13           MR. WOLCOTT:  I would think that

14 Mr. DeLozier owns the reports that have been generated

15 so far.  So I don't think there is any great loss here.

16           THE COURT:  Okay.

17           MR. DELOZIER:  Well actually, there's been

18 no reports.  It's educating those people with the case

19 is what we've done so far.  It's education.  We'll lose

20 all of that as well as the time.  But I appreciate

21 your --

22           THE COURT:  That is why I raised the issue.

23 The defendant wanted to have a private counsel and now

24 has apparently changed her mind.  And that does have an

25 impact on how the case would proceed.

13

1          Did you wish to consult with her?  Have you

2   already done that on these issues?  Are you ready for me

3   to rule?

4          MR. DELOZIER:  We should probably discuss

5   one more facet.

6          THE COURT:  Okay.

7          MR. DELOZIER:  Let's assume that she says:

8   I don't like that structure.

9          THE COURT:  Okay.

10          MR. DELOZIER:  What are the alternatives, I

11   guess, is what I usual like to give my client.

12          THE COURT:  I'll be happy to hear from each

13   side.  But again, I've read the materials.  And if the

14   other issue is:  Will I appoint second counsel, the

15   answer is no.  You're privately retained.  And as I

16   understand the law, the requirement for two counsel only

17   comes through court appointed counsel.  So I will not be

18   ordering OCAC to provide a second counsel.

19          MR. DELOZIER:  Regarding the other folks,

20   what -- I'm sorry, I didn't -- how do we micromanage the

21   rest of it if she chooses to not have the Public

22   Defender involved?

23          THE COURT:  Candidly let me tell you what I

24   did.

25          MR. DELOZIER:  Okay.

14

1          THE COURT:  I came to a conclusion on this

2   first issue.  And then if your client did not want, I

3   didn't think through it.

4          MR. DELOZIER:  I understand.

5          THE COURT:  If you would like me to, I would

6   like to if that's important to her decision.  But it

7   became clear to me that if I appointed counsel, it would

8   be the Public Defender's Office.  If I did that, OCAC's

9   resources would no longer be involved.

10          MR. DELOZIER:  I understand.

11          THE COURT:  And then what I would do perhaps

12  is -- this is the best guidance I can give right now.  I

13  would just apply the pertinent case law, hear from

14  whoever's standing to give me input that there were

15  issues on whether there should be, hear the expenditures

16  for other experts if your client continued to wish to be

17  privately retained but yet seeks funding for additional

18  personnel.  By that I mean experts and from OCAC.

19          And I would also be open to -- if there's a

20  different way of doing it than I've done it, I would be

21  open to considering it.

22          MR. WOLCOTT:  Your Honor, rest assured we

23  too strenuously object to any order supplying services

24  for additional staff to Mr. DeLozier unless there is an

25  appointed attorney on the case.

15

1          THE COURT:  I think I understand -- I think
2   I understand your position.   You objected.
3          Before I order services, so everybody
4   understands that, I will hear each side, make a ruling.
5   I don't know what that will be.   I would just hear from
6   each side.  "Each side" in this case being the Office of
7   Court Appointed Counsel and Privately Retained Counsel.
8          And I would also consider if the Defense
9   wanted this, because they did want to present those
10  issues to me, as the trial judge I would consider having
11  a different judge do that to avoid any concern about
12  having the same judge be the trial judge.   That's
13  deciding who gets resources, the extent of the
14  resources.
15          MR. DELOZIER:  Okay.  I suppose with the
16  status we are at, maybe the best thing for us to do is
17  take a recess and let me cover it with both the family
18  and my client.
19          THE COURT:  Okay.  That sounds fine.
20          MR. DELOZIER:  Thank you.  And let me see if
21  there is --
22          MR. MARTINEZ:  Judge, I may have to leave
23  within five, ten minutes.  So somebody will handle it
24  for me.  Ms. Wilson did stand in.
25          THE COURT:  Fine.  That is the issue the

16

1  State doesn't have any standing in, so I appreciate you

2  being here.

3          MR. MARTINEZ:  We do have that Rule 11

4  prescreen.

5          THE COURT:  We do.  We are still on the

6  record with the same counsel and defendant here.

7          A couple of things that I would like to

8  resolve this morning and hoped too was setting some sort

9  of schedule for trial discovery schedule, and also in

10  advance of that obviously resolving the Rule 11 issue.

11          MR. DELOZIER:  Sounds like to me we've got

12  at least 60 days before we know about the Public

13  Defender.

14          MR. PETERSON:  Judge, I can stand in.  I can

15  stand in.  We also had a second counsel appointed when

16  we were on the case.  Mr. Gavin would be the lead

17  counsel, but Bethanne Klopp-Bryant was also working on

18  the case when we had it.

19          THE COURT:  What I was concerned with there

20  was having somebody from the State here because we are

21  going to get back to issues as soon as we resolve the

22  counsel issue, where I'll need either Mr. Martinez or

23  somebody who can speak for him.  On the Rule 11 issue,

24  and then depending upon how that goes, the trial on

25  discovery issue.

17

1          MR. MARTINEZ:  I haven't seen the documents

2    from Dr. Potts.  What has he recommended?

3          THE COURT:  Why don't I do this:  Let's let

4    you take a look at that, let Mr. DeLozier talk with you,

5    counsel, and then we'll reconvene.

6          Are counsel here on the Carreon matter?

7          MR. PETERSON:  Can I look at the Rule 11?  I

8    don't know if counsel is aware we have a right to redact

9    certain portions of the prescreen report?

10         Not that impression, Mr. Martinez.

11         But I would like to see the Rule 11

12   prescreen before we give it to Mr. Martinez.

13         THE COURT:  That's fine.  Then what I'll do

14   is just let you coordinate that.

15         MR. PETERSON:  I will, Judge.

16         THE COURT:  You've got a copy there.

17         MR. MARTINEZ:  I would -- also, if we can't

18   somehow reach a resolution right now, I would ask that

19   we do it this afternoon.  I'll come back.  And I have no

20   problem with that.

21         THE COURT:  This afternoon is not a pretty

22   picture in my courtroom as far as squeezing anything in.

23   So we'll -- if we can't resolve it, we'll resolve it

24   another time.

25         MR. MARTINEZ:  Okay.

18

1          THE COURT:  Thank you.

2          We'll take a brief recess and you can confer

3  with your client.

4          MR. DELOZIER:  Thank you, Your Honor.

5          (Whereupon, the Court took a recess.)

6          THE COURT:  Okay.  Let's proceed on the

7  Andriano matter.  This is CR2000-96032.  Continuation

8  proceedings from this morning.

9          Counsel can give their appearances, please.

10          MS. WILSON:  Suzanne Wilson for Juan

11  Martinez for the State.

12          MR. WOLCOTT:  Dean Wolcott, Sacks Tierney,

13  Office of Court Appointed Counsel.

14          MR. DELOZIER:  David DeLozier on behalf of

15  the defendant, who is present, in custody.

16          THE COURT:  And Mr. Peterson is still here

17  too.

18          Mr. DeLozier?

19          MR. DELOZIER:  Your Honor, I've attempted to

20  explain the alternative to my client.  And frankly; I

21  don't think she is following me on the matter adequately

22  so that I feel comfortable with being able to give you

23  her decision.

24          One of the suggestions Mr. Wolcott's made

25  was perhaps if we could in some way let you know if it

19

1   was the Public Defenders she decided on later, that we

2   would make it sort of retroactive to this.  It's not

3   exactly what she said, but something to that effect.  I

4   just don't believe she is capable of making that

5   decision.

6           THE COURT:  Well, here is what I'm going to

7   do then:  We'll go forward.  You are her counsel.  I've

8   got a Rule 11 proceeding that is pending.  I would still

9   like Mr. Peterson to stay.  And we may come back to this

10  issue this morning.

11          Anything further on the Rule 11,

12  Mr. DeLozier?

13          MR. DELOZIER:  No.  It's fairly clear in my

14  opinion.

15          THE COURT:  Ms. Wilson, anything from the

16  State?

17          MS. WILSON:  It's clear a full Rule 11

18  should not be granted.

19          THE COURT:  The Court has considered the

20  report from Dr. Potts.  The Court finds that the

21  Defendant is competent to proceed.  No further Rule 11

22  proceedings will take place.

23          We are now back on the issue of counsel.

24          And Mr. DeLozier, I think I'll just address

25  your client.

20

1              MR. DELOZIER:  Okay.

2              THE COURT:  On this issue.  Is that

3    acceptable to you?

4              MR. DELOZIER:  Yes.

5              THE COURT:  Ms. Andriano, you are entitled

6    to have a Public Defender.  Actually, in your case it

7    would be two who would be appointed with regard to this

8    case.  You are still entitled in that event to have

9    Mr. DeLozier represent you.

10             Now, if there are conflicts how the Public

11   Defender would handle this case as opposed to how

12   Mr. DeLozier would handle the case, then either I would

13   resolve it or -- so the record is clear, or another

14   judge.  And I may do that just to make sure there's no

15   concerns about the trial judge resolving this issue.  If

16   that is an issue for counsel, we'll resolve those

17   conflicts.

18             The other issue is -- and I've advised --

19   you've been in the courtroom while I've advised your

20   lawyer of this.  In the event that the Public Defender

21   is appointed, then the earlier order that I gave, and

22   that's an order dated February 5, 2001, where I approved

23   Michael J. Sweedo, ordered OCAC to pay for him and

24   ordered OCAC to pay for an investigator, those would be

25   vacated.

21

```
 1            I'm not precluding the Public Defender from
 2   utilizing Mr. Sweedo, but I'm not saying that that will
 3   happen.  The Public Defender may choose it to be
 4   somebody else.  If there is a dispute between
 5   Mr. DeLozier and the Public Defender, then I or another
 6   judge will resolve it.
 7            So what would happen if you chose to have
 8   court appointed counsel is I would not be providing
 9   these services through OCAC.  Now, whether that means
10   you have different people doing them, I don't know.  I
11   don't know what the Public Defender and Mr. DeLozier
12   would do.  But OCAC would not be paying for it.  That is
13   the only thing that would be different right now.
14            Now, your lawyer's expressed some concern
15   whether or not you understand and can make a decision on
16   whether you would like court appointed counsel or not.
17   Do you think you understand the issues that I just
18   described?
19            THE DEFENDANT:  I understand, Your Honor.  I
20   just don't feel like I can make a decision right at this
21   moment.
22            THE COURT:  Okay.
23            THE DEFENDANT:  I will -- I'd like to think
24   about it.
25            THE COURT:  All right.
```

22

1          THE DEFENDANT:  And speak with my family and

2  my attorney.

3          THE COURT:  All right.  That's fine.  Why

4  don't we --

5          How much time do you think you need, ma'am?

6          THE DEFENDANT:  A couple of days.

7          THE COURT:  That's fine.

8          Why don't we schedule something for --

9          MR. DELOZIER:  Your Honor, if I could try to

10  clarify my suggestion?

11          THE COURT:  Sure.

12          MR. DELOZIER:  With Mr. Wolcott's

13  suggestion, if she decides on the Public Defender route,

14  then perhaps we could not require everybody to reappear.

15  If she decides to not go that way, perhaps we need to

16  come back.  That is all.  I'm trying to save resources.

17          THE COURT:  And the only issue -- well, I

18  can go ahead and set a trial date.  It may depend on who

19  the lawyer is.

20          MR. PETERSON:  We ask you not to do that.

21  It's either going to be us -- you found that she is

22  indigent.  I know Mr. Wolcott's position.  If she is

23  indigent, it's got to be us.  So I don't --

24          THE COURT:  It's you.  But you may not be

25  involved and Mr. Wolcott may still be involved if it's

23

1  Mr. DeLozier.  And I need to -- and I don't know how to

2  avoid that, as much as I'd like, to be able to have her

3  send in something "I choose the Public Defender."

4            MR. PETERSON:  Not their only monkey

5  wrenches.  I don't see why if she is indigent she is

6  asking for resources.  It's our duty to provide them.  I

7  don't see why we are coming back.  I mean, if she is

8  indigent, she is either going to have us or she is going

9  to waive counsel.  In my opinion, if she waives counsel,

10  it's going to have to be done in writing, waiving

11  indigent representation entirely.

12            THE COURT:  I don't think you need to go

13  through -- if you need to go through a formal procedure

14  to waive the Public Defender, I don't think it was ever

15  conducted.  But right now she has waived.  She has got

16  Mr. DeLozier.  What I'm concerned about is just the next

17  stage.

18            Why don't we do this:  Let's set it for a

19  week from today.

20            MS. WILSON:  Your Honor, excuse me.

21  Mr. Martinez's availability next week is pretty limited

22  to Monday or Tuesday.

23            THE COURT:  Can you meet with her over the

24  weekend?

25            MR. DELOZIER:  Sure.

24

```
 1              THE COURT:  Ma'am, can you sort this out
 2   over the weekend?
 3              THE DEFENDANT:  Yes, Your Honor.
 4              THE COURT:  Monday would be a much better
 5   day.
 6              And then what I'd like to do on Monday, if
 7   it's going to be the Public Defender, and I understand
 8   that everybody has got a busy calendar here, it does
 9   need to be Mr. Gavin or you.  But I need somebody.
10              MR. PETERSON:  I'll be here, Judge.
11              THE COURT:  And what I need is to be able --
12   if it's a Public Defender, just talk about scheduling.
13              MR. PETERSON:  That's fine.  I can do that.
14              THE COURT:  All right.  And --
15              MS. WILSON:  8:30, Your Honor?
16              MR. DELOZIER:  I have a matter downtown at
17   8:40, Judge McVey.  Criminal calendar.
18              THE COURT:  What kind of case is it?
19              MR. DELOZIER:  The --
20              THE COURT:  Is it a capital case?
21              MR. DELOZIER:  No.
22              THE COURT:  Is it something where I can call
23   him and say we'd really like to let me do that?
24              MR. DELOZIER:  Yes.
25              THE COURT:  Mr. Wolcott, if you want to
```

25

1   appear telephonically for this Monday --

2           MR. WOLCOTT:  Terrific, Your Honor.  I

3   appreciate that.

4           THE COURT:   --  you'd be welcome to.

5   Because I think the only thing that is going to happen

6   from your involvement -- well, we might need to take up

7   the expert testimony.  But we could argue that

8   telephonically too.

9           MS. WILSON:  Just for the record, Your

10  Honor, the victims are present and they are okay with

11  Monday.

12          THE COURT:  Okay.  Fine.  And then that

13  takes it up -- well, I have found that I need to do

14  this:  I'm going to set the last day of -- just set a

15  last day of -- last day was suspended until today.  I'm

16  going to set a last day 60 days away.

17          MR. DELOZIER:  That's fine.

18          THE COURT:  In which that would be -- we'll

19  just make it June 13, with the understanding that the

20  next setting is when we'll talk about a specific trial

21  date.

22          Thank you.  That concludes this matter.

23          MS. WILSON:  I believe, Your Honor, that

24  concludes the morning calendar?

25          THE COURT:  I think you are right.  We'll be

26

1  in recess.

2          (Whereupon, the proceedings were concluded.)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

EXHIBIT S

State v. Andriano
IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

IN AND FOR THE COUNTY OF MARICOPA

STATE OF ARIZONA,                    )
                                     )
              Plaintiff,             )        Supreme Court No.
                                     )        CR-05-0005-AP
       vs.                           )
                                     )        Superior Court No.
WENDI ELIZABETH ANDRIANO,            )        CR 2000-096032
                                     )
              Defendant.             )
_____)

REPORTER'S TRANSCRIPT OF PROCEEDINGS

STATUS CONFERENCE


BEFORE:          The Honorable Daniel A. Barker
                 Superior Court Judge, Presiding

APPEARANCES:     Mr. Juan M. Martinez
                 Mr. Harold Brenneman
                 Deputies County Attorney
                 Representing the State

                 Mr. G. David DeLozier, Jr.
                 Mr. Wesley E. Peterson
                 Mr. Dean M. Wolcott
                 Attorneys at Law
                 Representing the Defendant


                                          April 16, 2001
                                          Mesa, Arizona
                                          8:40 a.m.


COPY

          Kristin A. Woodall, RPR
          Certificate No. 50196


                              2

1                    P R O C E E D I N G S

2

3            (Mr. Wolcott is appearing telephonically.)

4

5            THE COURT:  This is CR 2000-096032, State versus
                              Page 1

State v. Andriano

6   Andriano.  This is the time set for status conference.

7         MR. MARTINEZ:  Juan Martinez for the State.

8         MR. DeLOZIER:  David DeLozier on behalf of the

9   defendant who is present in custody.

10        THE COURT:  Okay.  And, Mr. Wolcott, are you

11  still here?

12        MR. WOLCOTT:  I'm here.

13        THE COURT:  Mr. DeLozier, tell me what your

14  thought process is.

15        MR. DeLOZIER:  Your Honor, we've had lots of

16  conversations this weekend and a visit to the facility not only

17  by myself, but also by the counselor who has been assisting the

18  defendant, and her decision as of late last night when I got a

19  phone call is she would not elect to be served by the Public

20  Defender's Office.

21        THE COURT:  It's her choice.

22        You understand, ma'am, that you are entitled to a

23  public defender and can have a public defender, if you choose?

24        THE DEFENDANT:  Yes, Your Honor.

25        THE COURT:  And you understand that's without

CLARK CERTIFIED COURT REPORTERS

3

1  cost to you?

2        THE DEFENDANT:  Yes, Your Honor.

3        THE COURT:  And you would prefer to not be

4  represented by the public defender, but to have Mr. DeLozier

5  represent you?

6        THE DEFENDANT:  That's correct.

7        THE COURT:  Fine.  You've talked with

8  Mr. DeLozier about that?

9        THE DEFENDANT:  Yes, Your Honor.

10       THE COURT:  All right.  That's fine.  Takes us to
Page 2

State v. Andriano

11  the next issue, additional experts and expenses.

12          MR. DeLOZIER:  Your Honor, I might address that

13  to some extent.  Mr. Martinez and I have been communicating in

14  the last 30 days about the kinds of things that the State was

15  planning to do and what it probably wasn't going to do.  It's

16  my understanding they have completed the work that they plan to

17  do.  You might want to address that, add some clarification on

18  that.

19          MR. MARTINEZ:  That's correct.  All of the

20  fingerprint work that we need have been completed.  All of the

21  analysis in terms of fluids and that sort of thing, blood,

22  gastric, that sort of thing has also been completed.

23  Everything that the State intends to present at trial has been

24  completed.  Of course, if they come up with something, there

25  will be something in rebuttal, but as it stands now, we're

CLARK CERTIFIED COURT REPORTERS
4

1  ready to go.

2          THE COURT:  All right.

3          MR. DeLOZIER:  We had a number of items that we

4  wanted clarification on there.  We thought especially after

5  going through the evidence at the facility over on Elwood,

6  there were a number of things that came clear that needed to be

7  identified, and some of these we requested clarification

8  whether they were going to use or not.  And I have ten items I

9  had specifically on the list, seven of those were not

10  included.  And once they had planned to do so, we do want a

11  little bit more clarity than what they did.  When I wrote the

12  original memo, frankly I expected there would be some other

13  areas that I haven't identified just for Your Honor's benefit.

14          THE COURT:  Just things that in good faith you

15  don't know about right now, but may come up.

Page 3

State v. Andriano

16        MR. DeLOZIER:  Exactly.

17        THE COURT:  Understood.

18        MR. DeLOZIER:  I can give you sort of a

19   categorization of ones that I think are clear at this point, if

20   that would be okay.

21        THE COURT:  That would be fine.

22        MR. DeLOZIER:  We're going to need a chemist to

23   do at least two things.  One is obviously an analysis of this

24   sodium azide.  It appears from the reports I have from the

25   State they found it in two food substances apparently that were

CLARK CERTIFIED COURT REPORTERS
5

1    unidentifiable that were in the refrigerator.  We'd like to

2    have those analyzed and any prints that might have been

3    involved in that.  Of course, I'm now mixing apples and

4    oranges, but a fingerprint person is going to be necessary as

5    well.

6        MR. MARTINEZ:  Judge, sort of to help him along

7    so we're clear, it was also found in the gastric contents of

8    the victim.

9        MR. DeLOZIER:  Right, right.  Thank you.  I

10   didn't mean to look like I was excluding it, but it was also in

11   two food substances, which was somewhat puzzling to us, and I

12   think we need to take a closer look at that.

13        There were also some capsules that were seized in

14   the home.  Identified several of those capsules and the

15   examination of the evidence that I thought needed to be

16   examined, and they don't intend to do those either.

17        There is some issue of whether the same knife was

18   involved in both the severing of a telephone cord and

19   apparently used on Mr. Andriano.  So, a forensic metallurgist

20   would be the right category.  Although, I'm not certain about

Page 4

000004602

State v. Andriano

21   that.  A pathologist obviously.  I've already finished a

22   fingerprint analysis.

23                There are different versions of his health status

24   at the time, and we probably need an oncologist to review all

25   the medical records, and I have quite a few of those.  I think

CLARK CERTIFIED COURT REPORTERS
6

1   I've passed most of them on to Juan.  Although, I have just

2   recently received from the lawyer who was handling the

3   malpractice suit, Mr. Miller, probably another 3,000 pages of

4   stuff.

5                A handwriting person I think will be necessary

6   based on Dr. Potts and Connie Rehdea (phonetic), a psychiatrist

7   we have on staff currently through OCAC, the two investigators,

8   and we have Mr. Swedo (phonetic) that we would continue to

9   use.  It would be helpful from my point of view to have a

10   paralegal if one's available through OCAC because there's some

11   research that I would like to have someone like that do, and we

12   have an issue that was brought out by some of the interviews of

13   whether there was abuse to the --

14                THE COURT:  Just one minute, please.

15                For the record, Mr. Peterson is here from the

16   Public Defender's Office.  I would like him to stay.

17                Just to bring him up to speed, Ms. Andriano at

18   this point has indicated she would not choose to utilize the

19   services of the Public Defender's Office, but we're going to

20   wait to visit the issue here of experts and other issues.  So,

21   I'd like the Public Defender to still be here.  Go ahead.

22                MR. DeLOZIER:  Not a problem, Your Honor.

23                As I said, if OCAC has someone on staff or on

24   contract, a paralegal would be very helpful to me.

25                The last person is, based on the interviews that
Page 5

000004603

State v. Andriano

CLARK CERTIFIED COURT REPORTERS
7

1    I have listened to that were performed by the detectives for

2    the police department, there appears to be some issue of

3    whether there was any kind of history of abuse.

4         The defense, of course, is self-defense, at least

5    one of them, and we need an expert that can help us identify

6    those people and potentially even testify.  And I've looked

7    into that and have someone local that has been recommended by

8    two or three different organizations, Kathleen Fararro at ASU

9    Women's Studies.

10        THE COURT:  Tell me what this person does again,

11   Kathleen Fararro?

12        MR. DeLOZIER:  She's head of the Women's Studies

13   department at ASU.  The abuse issue has been raised in two

14   different methods, one through the detectives' interviewing of

15   the various potential witnesses that have been listed by the

16   State, and secondly, the statements made to several of us by

17   the defendant that she was defending herself when the cord was

18   wrapped around her neck.  She claims there has been a history

19   of him choking her and other forms of abuse.

20        I believe based on the research that I've had and

21   experience that it's better to have one of those kind of people

22   involved in the defense early on rather than later on because

23   it would likely be a key element in the defense of whether

24   there, in fact, was any kind of abuse or not and how much and

25   those kinds of things.  And those people tend to be ones that

CLARK CERTIFIED COURT REPORTERS
8

1    are relied on to clarify, for example, one of the questions

2    typically most of us raise is if there was abuse, why didn't

3    you leave?  Well, I don't know that I can answer that

Page 6

000004604

State v. Andriano

4   affirmatively, but apparently there is some psychological

5   reasons as well according to Connie Rehdea that have been

6   addressed, issues from her childhood even in discussing it with

7   her mother and with the counselors.

8            So, the last person I would like is that

9   individual mainly because she's I think testified both for the

10  State and for defense.  It's my understanding PDs have used her

11  I've been told.  I tried to clarify that after Friday's

12  meeting, and I was told she had testified both for the Public

13  Defender's Office and also from the County Attorney's Office.

14  So, it appears she has met the requisite expert requirements in

15  that field.

16           MR. WOLCOTT:  Your Honor, I could not hear the

17  last few remarks Mr. DeLozier made there.

18           THE COURT:  Go ahead.  State it again.

19           MR. DeLOZIER:  I'll try again.  It's my

20  understanding that this lady, Kathleen Fararro, who's head of

21  Women's Studies at ASU, has testified both for the defense and

22  for the prosecution.  So, apparently she meets the standard of

23  being an expert witness in this area.

24           MR. WOLCOTT:  I thought you were connecting back

25  the Public Defender's Office.  Go ahead, never mind.

CLARK CERTIFIED COURT REPORTERS
9

1            MR. DeLOZIER:  Okay.  That's the best I can do

2   today to identify what it appears we need to properly defend

3   this case.

4            THE COURT:  So, if I've got it right, you would

5   like a chemist, a fingerprint analyst, perhaps a forensic

6   metallurgist to look at the knife, a pathologist, an

7   oncologist, a psychiatrist, a paralegal if there's one

8   available, and then this Kathleen Fararro.  That's what you're

Page 7

State v. Andriano

9    thinking of?

10              MR. DeLOZIER:  Yes, Your Honor.  And, of course,

11   continuing with Mr. Swedo and with the two investigators that

12   we have working through OCAC now.

13              THE COURT:  Mr. Martinez, I don't want your input

14   on this request, but what I would like is just an outline of

15   what the allegations are by the State so I can understand the

16   factual setting.

17              MR. MARTINEZ:  It appears that the victim was

18   suffering from incurable cancer, and one of the things that was

19   up in the air is how long he was going to live.  There are

20   allegations that the defendant attempted to hire other men to

21   stand in for him for purposes of a physical examination so that

22   she could obtain a life insurance policy.

23              Shortly before his death, about a month before

24   his death, we picked up the trail on e-mail that she was

25   attempting to get some information on poisons.  And after a

CLARK CERTIFIED COURT REPORTERS
10

1    while, she settled on something called a sodium azide, and that

2    sodium azide was delivered under the name of Ann Newton.

3    That's already been -- it's been determined that she's the Ann

4    Newton that actually requested that poison.

5              Additionally, the poison was found in her storage

6    she had at the apartment complex where they were living, and

7    her fingerprints have been found on the packaging to the sodium

8    azide.

9              After she obtained this sodium azide, within

10   about two to three days after obtaining it, the killing

11   occurred.  And at the time of the killing, it was sometime at

12   night, she contacted a friend of hers to come on over.  The

13   victim was near the door, and this goes to what the defense

Page 8

000004606

State v. Andriano

14  wants, but the victim was near to the door on the ground.  And

15  the defendant indicated that he was ill, and the victim kept

16  saying call the ambulance or words to that effect, but instead

17  of calling the ambulance, she grabbed him by the hand and said,

18  "Get up, you asshole."  That goes to their self-defense.

19          When this neighbor -- upon seeing that the

20  ambulance was not being called, this neighbor kept pressing her

21  to do so.  Finally, the ambulance was called.  When the sirens

22  were approaching, the defendant physically threw out the

23  neighbor, and then also realizing that the neighbor had left a

24  purse behind, threw the purse out.

25          When the paramedics arrived at her apartment,

CLARK CERTIFIED COURT REPORTERS
11

1  there was a knock on the door.  And after about 15 minutes, the

2  defendant appeared, but she didn't appear at the front door

3  because, if we remember, the victim was laying there near the

4  door.  She came out through the back and said, "He has a do not

5  resuscitate order.  Just go away, and he'll be okay."

6          Sometime later, 30, 40, 50 minutes, I don't have

7  an exact time, she called them again.  And when they came out,

8  what they did this time -- and when they came the first time,

9  she had already washed herself.  She had already taken a

10  shower.  So, when they came the second time, they did open the

11  front door, the front door of the place where the neighbor said

12  that she had last seen him and cursed at him to get up and what

13  obviously was someone emaciated.

14          They were able to determine that she took one of

15  the bar stools, and the part where you sit on top, she broke it

16  on his head.  She then took one of the legs, if you will, and

17  just beat him over the head with that.  It was clear that he

18  was not dead at that point.

Page 9

State v. Andriano

19      So, what she did, she took the knife that
20  Mr. DeLozier is talking about and put a gash approximately four
21  inches in his neck.  The reason that we know he was still
22  alive, there was an arterial spurt from the location where he
23  was laying.
24          Additionally, where he was laying, there was some
25  vomit that was tested also.  We took the gastric content and

CLARK CERTIFIED COURT REPORTERS
12

1   found there was sodium azide.  My understanding was that there
2   was a pot of, I believe it was beef stew that was on the stove,
3   and that also tested positive for the sodium azide.  And
4   additionally, his bowel tested positive for this sodium azide.
5           In terms of their defense of self-defense, there
6   was a telephone, one of those cell phone cords there in the
7   general area.  Additionally, there was a belt that was on top
8   of his body.  There was some blood on the refrigerator, some
9   smudges.  There was blood on the front door, a smudge on the
10  front door.
11          Our blood spatter expert is going to testify that
12  it's impossible for those items to have been there unless
13  somebody put them there.  In other words, it was a contrived
14  scene.  There's where this issue of self-defense comes in.
15  There was a telephone cord that may or may not have been cut,
16  and there was smudges that you saw on the front door.  I assume
17  they're going to say she was trying to get out.  They're also
18  on the refrigerator door.
19          THE COURT:  Okay.  Thank you.  Now, I'm sorry, if
20  you would, the paramedics, what happened?  Tell me what
21  happened.
22          MR. MARTINEZ:  The first time they came in, she
23  appeared from the back door to the right and was showered and

Page 10

000004608

State v. Andriano

24  all this, and the second time they came out, they found the

25  body the way it was.

CLARK CERTIFIED COURT REPORTERS

13

1           THE COURT:  So, the first time in the State's

2   allegation is she sends them away with a nonresuscitation

3   order, and why did they come back again?

4           MR. MARTINEZ:  She called them again after 30 or

5   45 minutes.

6           THE COURT:  She being the neighbor?

7           MR. MARTINEZ:  No, the defendant.

8           THE COURT:  Okay.  And this time she said come

9   out?

10          MR. MARTINEZ:  Right, uh-huh.

11          THE COURT:  And at least that's the State's

12  view.  All right.

13          Here's the issue I'm interested in, and we've

14  had -- we've been through a number of these issues, and we need

15  to get them resolved.  I still want input on this issue, and

16  that is, can a defendant waive the right to appointed counsel

17  because he or she is indigent, retain private counsel, and then

18  seek public moneys for experts and other individuals as

19  contracted to?  If you want the availability of public

20  services, do you take the whole package, the lawyer, and still

21  have the right to have counsel and have access, but the lawyers

22  and public service through that avenue?

23          Now, I think I know -- obviously I don't want any

24  position from the State.  They're not involved in this.  I can

25  guess what OCAC's position might be on it, but is there any

CLARK CERTIFIED COURT REPORTERS

14

1   authority on it?  Does anybody know?

2           MR. WOLCOTT:  Your Honor, if I could address

Page 11

State v. Andriano

3   that, I'd be happy to.

4           THE COURT:  Go ahead, please.

5           MR. WOLCOTT:  I think the Knapp case showcases

6   the issue and provides the following instruction.  I believe

7   Knapp says that there are, in terms of indigency, there is

8   indigency as a matter of fact.  I believe there is indigency as

9   a matter of law.  If you look at the definition of indigency in

10  the rules, it says a person is indigent if they are unable to

11  obtain their own counsel.

12          Now, I think a person can be indigent as a matter

13  of fact, that is stone-cold broke, and still be able to retain

14  counsel or to obtain counsel.  Obtain is better.  The rules and

15  the law say we cannot look to the family and friends of the

16  defendant to establish the defendant's resources to obtain

17  counsel.

18          But having said that, if the defendant does

19  obtain or somehow retain counsel, then that person is no longer

20  indigent under the eyes of the law.  And the next step is, of

21  course, if that person is not indigent, they are not entitled

22  as a matter of law to public resources to provide defense

23  services.  I think that encapsulizes by position.

24          In other words, if Ms. Andriano has now declined

25  the services of the public defender, she has therefore said and

CLARK CERTIFIED COURT REPORTERS
15

1   Mr. DeLozier must have accepted as a matter of law the duty to

2   represent the defendant.

3           If that's the case, and if I heard the Court

4   correctly address the defendant on that issue, that is

5   precisely what has happened.  Mr. DeLozier is now counsel of

6   record.  He is retained, and the defendant is no longer, quote,

7   indigent under the eyes of the law, and I think that makes it

Page 12

000004610

State v. Andriano

8   perfectly clear, if there was a Knapp case.

9            Let's come at it from a different perspective in

10   the Knapp case.  Knapp counsel is clearly one who is associated

11   with a, quote, appointed attorney.  An appointed attorney is

12   one provided by the State.  Under Gideon versus Wainwright, we

13   don't have that here.  And, Your Honor, it is incorrect to

14   suggest that you may have a privately retained counsel, yet

15   being afforded all of the services and resources of the

16   Government to assist in the defense.  It simply is a round peg

17   in a square hole.

18            THE COURT:  Thank you.  Mr. Peterson, do you have

19   any input on the issue?  Just happy to do whatever I ask you to

20   do?

21            MR. PETERSON:  Whatever you order, Judge.

22            THE COURT:  Okay.  Finally, Mr. DeLozier?

23            MR. DeLOZIER:  Thank you, Your Honor.  I didn't

24   bring some of the pleadings that we had done previously because

25   I thought we sort of already addressed this, but I am prepared

CLARK CERTIFIED COURT REPORTERS
16

1   based on someone loaning me their manual to address it, in

2   part, at least.

3            A.R.S. 13-4013(B), as I'm sure Your Honor knows,

4   says, "When a person is charged with a capital offense, the

5   Court may on its own initiative and shall upon application of

6   the defendant and a showing that the defendant is financially

7   unable to pay for such services, appoint such investigators and

8   expert witnesses as are reasonably necessary adequately to

9   present his defense."

10            I guess even if I hadn't made a mess, you could

11   do it on your own.  I think you've already found she's

12   financially unable to pay for the services.

Page 13

000004611

State v. Andriano

13          THE COURT:  Let's go --

14          MR. DeLOZIER:  I don't know the parents providing

15     funds to retain me is the determining issue.

16          THE COURT:  But let me just ask.  Subsection A, I

17     think it deals with counsel being appointed by the Court.  B,

18     it doesn't seem to reference that --

19          MR. DeLOZIER:  Right.

20          THE COURT:  -- in fairness to your position, but

21     what about the issue -- here's the issue that concerns me.

22     What's to stop anybody from hiring private counsel who's

23     indigent and then rejecting the public defender and then

24     saying:  My client is indigent, but I want to represent my

25     client, but my client can't afford any of these experts and so

CLARK CERTIFIED COURT REPORTERS
17

1      I want the county now to pay for them.

2           And we have three offices.  We have a public

3      defender, a legal defender, and a legal advocate that are all

4      set up so that they can not only provide representation, but

5      make arrangements with experts, other persons.  And I assume

6      it's some benefit to the county in terms of the expense, and

7      now I'm completely outside that system.  Now I have privately

8      appointed counsel, but who's coming in here wanting to get all

9      the other services that a person who has a public counsel,

10     publicly appointed counsel have.

11          How do I deal with that issue, Mr. DeLozier?  It

12     seems like it would just break down our system.

13          MR. DeLOZIER:  I think you have a couple of

14     issues.  One is that the ability for this circumstance to arise

15     is probably limited, number one.  You start off with a person

16     who is over 18, and that's what we get into.  How do we

17     determine that person's financial status, and that's the

Page 14

000004612

State v. Andriano

18 determining factor, if a person is of majority, and if they are
19 of majority and themselves are indigent, that's the status of
20 whether they qualify.

21      I think the unique feature in a sense is that the
22 family has gone to their family members and asked us to assist
23 in the defense. At the time we did that, it was a little
24 convoluted because Mr. Thikoll was involved previously, and at
25 the time we substituted in for the public defender's, he was

CLARK CERTIFIED COURT REPORTERS
18

1 still involved. He's now, for I think a variety of reasons,
2 including health reasons, has withdrawn.

3      And so there's really no distinction between
4 where we were in February and where we are now other than
5 perhaps these now are my motions. And bringing this matter up,
6 we've now said maybe we shouldn't have done it that way to
7 start off, and I'm not being critical of what we decided in
8 February. We were faced with a situation I thought we had
9 resolved though.

10      Regarding A and B and 4013, I don't know if
11 there's supposed to read in conjunction or not or assumed they
12 are. I didn't do any research into the legislative history of
13 it. I know you gave us the options on Friday, and the option
14 that she selected is not one that would have lent itself to
15 that. I have not explored that with her nor was that option
16 available to me to see if one of those other two groups might
17 be acceptable. There were some --

18      THE COURT: I'm not suggesting those other two
19 groups. I just mentioned those. I have no intent and I'm not
20 going to get the other two groups involved. We got the public
21 defender here. I only mentioned those other two for the reason
22 that the county has obviously taken steps to provide these

Page 15

000004613

State v. Andriano

23   types of services through public offices, plus OCAC if you run

24   out of the public offices and you get private counsel, but

25   that's for folks who have not -- I mean, Mr. Wolcott, you're

CLARK CERTIFIED COURT REPORTERS
19

1   here.  Typically that's to cover conflict between those three

2   offices and to provide the equivalent of a publicly appointed

3   attorney, correct?

4              MR. WOLCOTT:  That's correct, Your Honor.

5              THE COURT:  Okay.

6              MR. DeLOZIER:  I would mention also, Your

7   Honor --

8              MR. WOLCOTT:  If I could address this issue one

9   more time?

10             THE COURT:  Go ahead.

11             MR. WOLCOTT:  The Court with all due respect, and

12   counsel, have suggested that the defendant had some sort of

13   option on Friday to take private counsel or retain counsel.

14             Your Honor, I just don't think that's the case.

15   If the defendant is indigent, the defendant must be as a matter

16   of law appointed the public defender.  I think we have to start

17   there.  And if there is some rejection of it, it must be

18   because the defendant is no longer indigent, and we can't --

19   there's no need to be discussing any of these other services --

20             THE COURT:  Okay.

21             MR. WOLCOTT:  -- and expert witnesses.

22             THE COURT:  Let me just stop you, Mr. Wolcott.  I

23   cut Mr. DeLozier off, too, but here's -- let me tell you what

24   I'm considering at this point, and I am going to reconsider my

25   earlier order.  I'm not going to rule on it right now just in

CLARK CERTIFIED COURT REPORTERS
20

Page 16

000004614

State v. Andriano

1   fairness to all the sides.

2          Mr. DeLozier, as he mentioned, doesn't have

3   pleadings with the paperwork, but I am going to reconsider my

4   earlier order that I will use public moneys in a situation such

5   as the one Mr. Wolcott has described and as we have here where

6   I have an indigent defendant.  I have a public defender who's

7   ready, willing, and able to provide appropriate counsel, and

8   I'm sure they'll also provide the appropriate services.  That's

9   their duty, to responsibly and vigorously represent their

10  clients.

11         So, I am going to reconsider whether I will in a

12  situation such as this where the defendant has opted for

13  private counsel whether I will consider making public moneys

14  available in any form other than through the public defender's

15  office where the public defender would represent the defendant

16  and Mr. DeLozier can be Knapp counsel, and those two lawyers

17  can sort out how they're going to handle the representation.

18         MR. DeLOZIER:  Your Honor, if I can make two

19  comments?

20         THE COURT:  Sure.

21         MR. DeLOZIER:  One, I think I previously

22  mentioned in my earlier motion back in January, early February

23  that Judge Galati had permitted the same kind of treatment in

24  another matter that I had.  That's the only other experience I

25  had.

CLARK CERTIFIED COURT REPORTERS
21

1          THE COURT:  Right.

2          MR. DeLOZIER:  Number one.  Number two, there's

3   specific reasons why, and I'm not putting them on the record,

4   but I feel compelled to tell why the family, and particularly

5   the defendant, does not want a public defender involved.  Would

Page 17

State v. Andriano

6    you like for me to do that?

7              THE COURT:  If you think -- yes, if you think

8    there's a reason why the public defender can't provide the

9    services.

10             MR. DeLOZIER:  Okay.  Number one, the mother of

11   the defendant was told by the public defender who was

12   representing the defendant at the time that she was dead meat,

13   that there's absolutely no way to defend her in the case

14   whatsoever, had no idea on how to do that.

15             MR. WOLCOTT:  Your Honor, I think I have to

16   object.  Is Mr. DeLozier raising a conflict of interest in the

17   public defender's office?

18             THE COURT:  I'm not exactly sure.

19             MR. DeLOZIER:  I don't know that I would

20   necessarily call it a conflict.  The issue that we were faced

21   with on Friday and Saturday and Sunday though was choose public

22   defender, okay, or not, and I'm telling you that the family had

23   substantive reasons why they chose not to elect the public

24   defender.  That was, in their opinion, prejudicial to their

25   position.  Now --

CLARK CERTIFIED COURT REPORTERS
22

1              MR. WOLCOTT:  Your Honor, Mr. DeLozier, the law

2    is crystal clear that an indigent defendant is not entitled to

3    select his own counsel.  The State has the burden of providing

4    appointed counsel to an indigent defendant, but not any

5    specific attorney.  And unless Mr. Peterson indicates that the

6    public defender's office has a conflict of interest,

7    Mr. DeLozier has no standing to indicate that a public defender

8    cannot represent his client.

9              MR. PETERSON:  Judge, we have no conflict of

10   interest.  And if he wants to raise these issues, I want a

Page 18

State v. Andriano

11  hearing where I get to defend my people from what I consider to

12  be accusations.  If there's a problem with a specific public

13  defender, I can work with that, but I don't want the public

14  defender's office's reputation impugned by this gentleman.

15          THE COURT:  I agree with that.

16          MR. DeLOZIER:  I was not going to raise it at all

17  until we got to the point where we are at.

18          THE COURT:  I agree.  The way to do it is like

19  Mr. Peterson suggested.  Rather than have hearsay accounts come

20  in, as I said, I'm going to reconsider the issue as to whether

21  I will provide or order public moneys in this particular

22  circumstance where the public defender is available and the

23  defendant has chosen to reject the public defender's office and

24  seek private counsel.

25          So, I know I've already considered that issue.

CLARK CERTIFIED COURT REPORTERS

23

1  That's why I'm saying I'm going to reconsider the order, and I

2  think it's only fair to give the involved parties the

3  opportunity to present other aspects on that issue, which

4  Mr. DeLozier now wishes to do, and reemphasize the pertinent

5  legal authorities.

6          Did you want to present some witnesses on that,

7  Mr. DeLozier?

8          MR. DeLOZIER:  They're both here that raised the

9  these points with me.  I don't -- I had no intention of raising

10  them quite frankly at all.

11          THE COURT:  Why don't we do this then.  I've got

12  other matters I need to take up this morning, but we'll come

13  back to this, let's say, at 10:30.  I don't know what counsel's

14  schedule looks like.

15          MR. MARTINEZ:  That's fine.

Page 19

State v. Andriano

16          THE COURT:  Mr. Peterson?

17          MR. PETERSON:  Fine, Judge.

18          THE COURT:  Okay.  Mr. Wolcott?

19          MR. WOLCOTT:  10:30, I'm wondering if we're going

20  to have an evidentiary hearing.  I think I might want to be

21  there.

22          THE COURT:  You should have plenty of time to be

23  out here by then, if you would like to just come on out.

24          MR. WOLCOTT:  Yes, I'll be there.

25          THE COURT:  10:30.  Thank you very much.  10:30

CLARK CERTIFIED COURT REPORTERS
24

1  here.  We'll continue the proceedings until that time, and I

2  will consider that.

3          Mr. DeLozier, does that give you enough time to

4  pull together your other motions or do you want this done at a

5  time a little further off?

6          MR. DeLOZIER:  My office is about an hour away

7  from here.  So, if I had to go back to the office --

8          THE COURT:  Do you want to make it 1:30 this

9  afternoon?  My schedule today would permit that.  I don't have

10  a matter that's in trial.

11          MR. DeLOZIER:  Let me try to understand what you

12  want.  I'm a little confused.

13          THE COURT:  I'd be happy to -- here's how I'm

14  viewing the choices now, and we've gone through choices.  It

15  hasn't always proved to be the most effective way to do things,

16  but as a practical matter, it's difficult to foresee everything

17  in advance.  And choices is perhaps the wrong word.  Issue's a

18  better word.

19          The issue I see is this, and it's the issue that

20  I raised earlier, where someone rejects the public defender's

Page 20

000004618

State v. Andriano

21  office.  Can they then -- and chooses private counsel.  Can

22  they then come in and say:  Judge, please give me all the

23  experts and all the other things which otherwise the public

24  defender would be under a duty to provide and use -- have the

25  court order public moneys for that purpose when I already have

CLARK CERTIFIED COURT REPORTERS
25

1  an office set up that would allow the defendant to be

2  represented by counsel.  Also, allow private counsel to

3  associate with that counsel, and the public moneys would be

4  provided through that office.

5           The other option being if you choose to have the

6  private representation and the lawyer agrees to that, has that

7  lawyer then made the decision and that client then made that

8  decision that they are going to be also bearing the cost of the

9  experts, those sorts of services.  So, that's the issue.  Does

10  that --

11           MR. DeLOZIER:  Thank you, it does.  I don't see

12  us being prepared today myself to deal with all of that.  I

13  think we've dealt with it, in part, in some of our earlier

14  pleadings, but not to the specificity you're looking for.

15           THE COURT:  Let me suggest this.  I would like to

16  have Mr. DeLozier -- it's obvious that what you've mentioned

17  about the public defender's office is not information that the

18  public defender has had.  It makes some sense to me that you,

19  and Mr. Peterson's here who's the supervisor bureau chief,

20  whatever the proper name is out here.  Wrong term?  What is --

21           MR. PETERSON:  Chief trial deputy, Judge.

22           THE COURT:  Chief trial deputy.  Why don't you

23  communicate with him about those concerns.  If it's a major

24  factor for your client, I would think those concerns could be

25  resolved.  I don't know exactly what they are, but I could tell

Page 21

000004619

State v. Andriano
CLARK CERTIFIED COURT REPORTERS
26

1   you that the public defender has a duty to zealously represent

2   their clients.  I have a duty as a judge.  If I got somebody in

3   there, whether public defender or privately retained counsel,

4   if they aren't competently, zealously representing their

5   client, they're not going to be able to be here.  They'd be out

6   of the courtroom.  I don't care if it's a public defender or

7   not.  The public defender's office has their own independent

8   duties as well.

9            So, my suggestion would be why don't you talk

10  through those issues with the public defender's office and your

11  client, and then why don't we still have some sort of status

12  conference at 1:30.  We could call it that, if you would like,

13  a status conference to give you -- if you still wanted --

14  Mr. DeLozier wanted to fully address the issue, to give you

15  some more time because this is a significant issue before I

16  would take up a hearing on reconsidering that issue.

17            MR. DeLOZIER:  In other words, have a status

18  conference at 1:30, not a hearing?

19            THE COURT:  Or maybe it's even later this

20  morning.  Just if you can all talk this morning and identify

21  your concerns to the public defender, let the public defender's

22  office see if they can address those for you.

23            You've now heard me express that I don't care if

24  it's public defender, legal defender, privately retained

25  counsel.  There's not going to be a lawyer in here that is not

CLARK CERTIFIED COURT REPORTERS
27

1   zealously representing their client.

2            MR. DeLOZIER:  That's all of our obligations.  I

3   agree with you.  Under our rules, the issue I think isn't

4   necessarily that from what I'm understanding, but he -- and if

Page 22

State v. Andriano

5  he's available, we'll talk and the family is here.  So, we can

6  explain their positions on it as well, if you would like.

7           The issue I've got though is much more involved.

8  I think what you asked for a moment ago requires some

9  research.  I don't know that I know I can do that between now

10  and 1:30.

11          THE COURT:  I agree with that, but what I'm

12  suggesting, you may work out an arrangement where you feel

13  comfortable with being Knapp counsel, which does away with the

14  resource issue.

15          MR. DeLOZIER:  Second issue we have in that area,

16  Your Honor, that I didn't raise before is that we've spent a

17  lot of time already with the people that we have that you've

18  already given us, and I have a fundamental problem with losing

19  those people.

20          THE COURT:  Why don't you talk with Mr. Peterson

21  about it.

22          MR. DeLOZIER:  I will.

23          THE COURT:  Just I have no idea how the public

24  defender deals with those particular issues, and capital cases

25  where it has already started, I just don't know.  But it makes

CLARK CERTIFIED COURT REPORTERS
28

1  some sense to me to have a detailed discussion about those

2  issues and then see if this is something I need to resolve or

3  something you can work out.

4          MR. DeLOZIER:  Sounds to me then what you're

5  suggesting is a bifurcation, and pardon the word, talk to

6  Mr. Peterson, maybe come back at 1:30 for a status, and then

7  decide if we need to do the additional --

8          THE COURT:  Right, right, between --

9          MR. PETERSON:  Judge, 10:30 or 1:30?
                            Page 23

State v. Andriano

10            MR. MARTINEZ:  Can I suggest something at 1:30?

11            MR. DeLOZIER:  We could excuse you.

12            MR. MARTINEZ:  Well --

13            MR. PETERSON:  I have no problem excusing

14  Mr. Martinez.

15            THE COURT:  Let's just make it 1:30.

16            And, Mr. Wolcott, why don't -- there's not going

17  to be a hearing as I understand it, which is fine.  So, if you

18  want to just be available telephonically still or if you wanted

19  to be out here, either way is fine.

20            MR. WOLCOTT:  Okay.

21            THE COURT:  So, we'll still bifurcate it.  And if

22  you want more time, Mr. DeLozier, you're entitled to it, and

23  I'll give it to you, but at 1:30, between now and then, I'll

24  have you talk with the public defender.

25            MR. DeLOZIER:  I couldn't even get back to my

1  office and back over here by 1:30.  Part of the problem I'm

2  having with the schedule you're proposing, it's just too far.

3  I'm in Cave Creek.

4            THE COURT:  Well, I'll tell you, part of the -- I

5  would like you to talk with Mr. Peterson while you're here.

6            MR. DeLOZIER:  I intend to do that, if he's

7  available.  The issue I've got is whether I should go home, get

8  my files, and come back or stay here, and it's a huge loss of

9  time either way.  I hate to be --

10            THE COURT:  To me, I don't know that perhaps you

11  need the legal authorities to work it out, to see if you can

12  work out an arrangement with the public defender.  I don't know

13  that you do.  It's clear to me you need them for the second

14  part.

Page 24

State v. Andriano

15          What I was suggesting is having that factual

16   discussion like who the lawyer would be, if you have some

17   concerns about a particular lawyer.  The public defender has

18   already indicated they can address those concerns.  If there's

19   a personality issue or whatever, they may not believe under the

20   law they're required to do it, but they will try and

21   accommodate people.  Also, how the public defender's office

22   would deal with people -- with using people who have already

23   put in work.  Those are factual matters.  I'd like you to

24   discuss those factual issues today, and then I believe --

25          MR. DeLOZIER:  Sorry, didn't mean to imply we

CLARK CERTIFIED COURT REPORTERS
30

1   wouldn't.  If he's available, we'll do it as soon as we're

2   finished with this portion of this matter.

3          MR. PETERSON:  I'm available.

4          MR. DeLOZIER:  We'll go out in the hall or down

5   the hall and get into a room to deal with that.  Obviously, I

6   don't know how we would have him talk to my client.  I guess it

7   would make things more difficult because you don't have a room

8   here to do it unless I -- we go into the jury room.

9          THE COURT:  We'll make some accommodations.  I'll

10   have her brought up.  If you would like me to, I can have her

11   brought up here separately after I'm done with everybody else.

12          MR. PETERSON:  Why don't we do this.  Why don't

13   Mr. DeLozier and I go downstairs, and we can talk with the

14   family.  And then if we need to speak with the defendant, we

15   can.

16          THE COURT:  Let's do that.  I will be happy to

17   make arrangements for her to be brought up later this morning

18   just as though this were a separate proceeding that involved

19   just her, make arrangements for you and Mr. Peterson to talk

Page 25

000004623

State v. Andriano

20   with her in the jury room.

21          MR. DeLOZIER:  I don't see, involving this issue,

22   without her participation.

23          THE COURT:  I agree completely, and I'll be happy

24   to do that.  If you want to come back at 10:30, we can do that.

25          MR. DeLOZIER:  Second part then for this

CLARK CERTIFIED COURT REPORTERS

31

1   afternoon is I will tell you what we have worked out and if we

2   need to have another hearing.

3          THE COURT:  Yeah.

4          MR. DeLOZIER:  Can I do that by phone?

5          THE COURT:  Sure.  I don't have a problem with

6   that.  Let's make it 2 o'clock since it's telephonic.  That

7   will fit better.

8          MR. DeLOZIER:  And the defendant wants to waive

9   her presence for that afternoon session, if that's okay.

10         THE COURT:  Here's what I'd like to do.  I

11   would -- before everybody goes this morning, Mr. Martinez, you

12   got --

13         MR. MARTINEZ:  I got a 10 o'clock.

14         THE COURT:  Okay.  How long is your 10 o'clock?

15         MR. MARTINEZ:  No more than 30 minutes.  I could

16   be back by 11:30.

17         THE COURT:  I don't think you need to be here

18   either, but before I lose Mr. Peterson, Mr. DeLozier, and the

19   defendant, I'd like to be able to know there's been some

20   resolution of these factual issues understanding that the legal

21   issue isn't complete.

22         And, you know, Mr. Wolcott, are you available to

23   get on the phone sometime this morning?

24         MR. WOLCOTT:  Yes.

Page 26

000004624

State v. Andriano

25          THE COURT:  Okay.  And, Mr. Martinez, can

CLARK CERTIFIED COURT REPORTERS
32

1   somebody stand in for you on this issue?

2          MR. MARTINEZ:  Sure.

3          THE COURT:  Mr. Brenneman, can you do that?

4          MR. BRENNEMAN:  This morning or this afternoon?

5          THE COURT:  This morning.

6          MR. BRENNEMAN:  This morning, yes.

7          THE COURT:  If it's between 10:30 and 11:00,

8   Mr. Brenneman will cover you.  If it's another time, just call

9   us so we know where we can reach you, Mr. Martinez.

10         MR. MARTINEZ:  Okay.

11         THE COURT:  All right.  Thank you.

12         MR. WOLCOTT:  They're going to need my phone

13  number, 602-631-3971.

14         THE COURT:  Okay, thank you.  That concludes this

15  matter.

16         (Recess taken.)

17         (Mr. Juan Martinez is not present.)

18         THE COURT:  We're back in session on the Andriano

19  matter, CR 2000-96032.  Mr. Brenneman is here standing in for

20  Mr. Martinez.  Mr. DeLozier and Mr. Peterson are in the

21  courtroom.

22         Mr. Wolcott, are you on the phone?

23         MR. WOLCOTT:  I am, thank you.

24         THE COURT:  Thank you.  Mr. DeLozier, why don't

25  you go ahead.

CLARK CERTIFIED COURT REPORTERS
33

1          MR. DeLOZIER:  Thank you, Your Honor.  Your

2   suggestion was a wise one.  We had a good meeting with

Page 27

State v. Andriano

3  Mr. Peterson and the family and Mr. Peterson and the defendant,

4  and then the defendant, with your assisting with the deputy,

5  talking over the banister.  It was very helpful and clarified a

6  number of issues, and she has decided that it would be in her

7  best interest to elect assistance from the public defender's

8  office.

9              THE COURT:  Okay.  Based on that, it's ordered

10 appointing the public defender.  So the record is clear,

11 Mr. DeLozier still remains counsel as well.

12             And as I mentioned before, if there's some

13 disagreement as to how the matter is to proceed, then counsel

14 knows how to find their way back here.  As I said before, if

15 you think it's better to have me resolve some of these issues,

16 because I'll be the trial judge, that's fine, too.  I'm not

17 suggesting there will be any difficulties like that.

18             MR. DeLOZIER:  Nor are we.  Nor are we

19 anticipating, I should say.  Both of us would like to have the

20 ability to have the people who have been assisting spend some

21 time with his staff so we can sort of download.  If he chooses

22 not to use them, I don't know what the issues might be if you,

23 quote, rescind the earlier order.  That's the only reason I'm

24 bringing it up.

25             MR. PETERSON:  The main thing is we'll be

CLARK CERTIFIED COURT REPORTERS
34

1  responsible for payment of experts starting today.

2              MR. WOLCOTT:  I did not hear the request.

3              THE COURT:  Why don't you come up here.  The

4  issue now, Mr. Wolcott, and and let me just again try and be

5  clear here, now the public defender's involved.  And so based

6  on what I talked about earlier, I will vacate the prior order

7  that OCAC pay for the individuals it is paying, but as part of

Page 28

State v. Andriano

8    that, the issue is, can there be some order in terms of

9    conveying information.  Is that it?

10          MR. DeLOZIER:  Judge, here's why.  Our office is

11   willing to pay for it from today forward for their time because

12   I know we have to pay for their time.

13          MR. WOLCOTT:  Are we talking about the

14   investigator currently on the case?  I think it's Mary Margaret

15   Meyers.  Is that what you're talking about?

16          MR. PETERSON:  I think there's a criminalist

17   assigned to the case as well.

18          MR. DeLOZIER:  We're not going to pay any of the

19   past due bills.  Anything started from today's date, we'll

20   obviously pay, but they will --

21          MR. WOLCOTT:  Judge, there's a good idea.  Were

22   there any new bills?  I'm aware of the bill that has been

23   submitted by the criminalist.  I think it was 2700 bucks.  And,

24   you know, I guess since you already ordered me to pay that,

25   we'll pay that.  What I do want to know is if there are any

CLARK CERTIFIED COURT REPORTERS

35

1    other pending bills.

2           THE COURT:  I appreciate that willingness to

3    comply.  And, Mr. Wolcott, I'm speaking in jest here.

4           MR. WOLCOTT:  My question is, are there any other

5    bills since Mr. DeLozier's pleading?

6           THE COURT:  Do you know, Mr. DeLozier?

7           MR. DeLOZIER:  There probably are some, and I

8    think Mr. Peterson is suggesting as of today we will pick up

9    those and whatever else.  All I was wanting to make sure is

10   that we all have discussed this so it isn't a surprise.

11          THE COURT:  Here would be my thought, just makes

12   sense.  Any bills, any work that has been done and performed up

Page 29

State v. Andriano

13    to today at 10:45 would be paid for by OCAC.

14          Now, if there's an objection to the amount,

15    obviously I'd take that up in an appropriate way, but the

16    public defender wouldn't be at issue for that, for any bills

17    after today.  You know, this time then, it would be the public

18    defender's office even though there were people that were

19    initially engaged by OCAC.

20          MR. WOLCOTT:  Judge, that's fine.  That's very

21    good.

22          MR. PETERSON:  I don't think I need anything,

23    Mr. Wolcott.

24          MR. BRENNEMAN:  Judge, if I could point out, I've

25    been told by the victim/witness advocate on this that

CLARK CERTIFIED COURT REPORTERS
36

1    Mr. Martinez was paged and he's on his way, and he'll be here

2    within 10 minutes if we're going to set some other definite

3    dates.

4          THE COURT:  And that was the next item.  I

5    understood that, too.  It probably makes some sense to if he's

6    going to be here in 10 minutes, I would like to then have you

7    all talk, Mr. Martinez and you, and see if you can --

8          MR. DeLOZIER:  If it would be useful, I'm not

9    willing to speak for Mr. Martinez, but he and I did cover some

10   of that this morning, and we sort of agreed that a trial

11   schedule in the fall would probably be appropriate for whatever

12   that's worth.

13          MR. PETERSON:  I think that's realistic, Judge.

14          THE COURT:  That's fine in terms of -- and I'm

15   assuming he's talked with the victims?

16          THE VICTIM/WITNESS ADVOCATE:  It was early

17   November.

Page 30

000004628

State v. Andriano

18      MR. PETERSON:  Perhaps set a status conference in

19  30 days or wait for Mr. Martinez if he's on his way out.

20      THE COURT:  Let's give him 10 minutes.

21      Mr. Wolcott, I think -- I'm sure you're

22  disappointed, but I don't think we'll be needing you any

23  longer.

24      MR. WOLCOTT:  Thank you very much, Judge.

25      THE COURT:  Okay, thank you.  We'll be in recess

CLARK CERTIFIED COURT REPORTERS
37

1  and reconvene when Mr. Martinez is here.

2      MR. DeLOZIER:  Thank you, Your Honor.

3      (Recess taken.)

4      (Mr. Dean Wolcott is not present.)

5      (Mr. Harold Brenneman is not present.)

6      (Mr. Juan Martinez is present.)

7      THE COURT:  We're back in session on the Andriano

8  matter.  The same counsel with the addition Mr. Martinez and

9  the exception of Mr. Wolcott, who's no longer involved, are

10  present as well as the defendant are present, CR 2000-96032.

11      Counsel, let me tell you my schedule in

12  November.  There's another capital case that I presently have

13  set for November 14th, and you were talking about November.

14  What about November 1st?

15      MR. MARTINEZ:  November 1st is fine with me.

16      THE COURT:  That's a Thursday, which is a good

17  day to pick a jury on this kind of a case.

18      MR. DeLOZIER:  Right now, that's fine, Your

19  Honor.

20      THE COURT:  Then as I understand it,

21  Mr. Martinez, the victims are all right with that?

22      MR. MARTINEZ:  Yes.  In fact, that was part of

Page 31

000004629

State v. Andriano

23 the reason why we picked November.  They will be in Oklahoma.

24 They're farmers apparently, and October is the month they'll be

25 gone.

CLARK CERTIFIED COURT REPORTERS
38

1         THE COURT:  Let's do a new last day of three

2 weeks after that, November 22.

3         Now, I don't know how many interviews you need to

4 do, that sort of thing.  I know obviously something now about

5 the case just because of the issues we've been through.

6         Do you want -- I'm open to doing this any way you

7 like to.  It obviously makes sense to have this date be a good

8 one and to kind of keep on some sort of a schedule.  It does

9 make some sense to have some things that are scheduled to be

10 done in the next couple of months or whatever.

11         So, what's -- just give me a schedule that you

12 think is a good one and plug those dates in, and I'll inject

13 myself a status conference at some point, and we'll go from

14 there.

15         Let me just ask you, Mr. DeLozier.  Like between

16 now and let's just say two months from now, what would you like

17 to see done?

18         MR. DeLOZIER:  From where we are at the moment, I

19 believe that it's fairly critical to get some of the expert

20 analysis work.  We had not planned on really doing some of the

21 interviews until some of that was concluded because it may be

22 that some of those interviews are going to be unnecessary.

23         There are one or two interviews that might be a

24 higher priority than perhaps some of the others, but from my

25 point of view, it seems like we need to get the rest of this

CLARK CERTIFIED COURT REPORTERS
39

1 forensic work done.

Page 32

State v. Andriano

23

24

25

CLARK CERTIFIED COURT REPORTERS

000004631

EXHIBIT T



DP

05-0005

1          IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

2             IN AND FOR THE COUNTY OF MARICOPA

3

4   STATE OF ARIZONA,            )
                                 )
5          Plaintiff,            )
                                 )
6          vs.                   )   CR 2000-096032
                                 )   CR 05-0005 AP
7   WENDI ELIZABETH ANDRIANO,    )
                                 )
8          Defendant.            )
    _____)

9

10

11                        Phoenix, Arizona
                          July 27, 2001

12

13      BEFORE:   THE HONORABLE LINDA A. AKERS
                  Judge of the Superior Court

14

15

16            REPORTER'S TRANSCRIPT OF PROCEEDINGS

17

18

19

20                  DONALD EDWARD MOLL, RMR, CRR
                      Certified Court Reporter
21                      Cert. No. 50347

22

23

24

25

2

```
 1                  A P P E A R A N C E S

 2    FOR THE STATE:

 3           JUAN MARTINEZ
              Deputy County Attorney
 4
      FOR THE DEFENDANT:
 5
              WESLEY PETERSON
 6            Deputy Public Defender

 7           G. DAVID DeLOZIER, JR.
              Attorney at Law
 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

DONALD E. MOLL, RMR, CRR

3

1                                          Phoenix, Arizona
                                           July 27, 2001

2

3                      P R O C E E D I N G S

4    IN OPEN COURT:

5           THE COURT:  This is CR 2000-096032, State of

6    Arizona versus Wendi Elizabeth Andriano.

7                Counsel, would you indicate your presence,

8    for the record.

9           MR. MARTINEZ:  Juan Martinez for the State.

10          MR. PETERSON:  Your Honor, Wesley Peterson from

11   the Public Defender's Office.

12          MR. DeLOZIER:  And Dave DeLozier.  Ms. Andriano

13   is present.

14          THE COURT:  Thank you.

15                I set this status conference.  There is an

16   issue regarding payment of court appointed experts.

17                Mr. Peterson, you may need some additional

18   time on this.  We do need to, however, address the issue

19   at some point, because Ms. Andriano needs to have

20   experts appointed in this case.

21                Are you up to date on the issue,

22   Mr. Peterson?

23          MR. PETERSON:  I believe I'm up to date, Judge.

24          THE COURT:  All right.  What is the Public

25   Defender's position with respect to these issues?

4

1          MR. PETERSON:  Your Honor, it's our position that

2    when we were here last, when I was here last, I think

3    you had a hearing last week when I was downtown on other

4    matters ——

5          THE COURT:  Yes, sir.

6          MR. PETERSON:  —— it was decided that we were

7    going to be representing Ms. Andriano, and Mr. DeLozier

8    was going to be Knapp counsel.

9                Any expenditure of funds —— I can't approve

10   expenditures of funds for Mr. DeLozier.  He's a nice guy

11   and everything that he is, but I have to approve it for

12   one of my attorneys, and Mr. Gavin was assigned to the

13   case until approximately three weeks ago.  I spoke to

14   Mr. Gavin, and he said he never heard anything from

15   Mr. DeLozier about expert funds.

16               And what we decided with Judge Barker, at

17   least this is my understanding, Mr. DeLozier and

18   Mr. Martinez can say if they're having a meeting of the

19   minds on what experts were needed, and I have not

20   approved that many expert request funds since I've been

21   doing this for four or five years as a supervisor, but

22   they have to come through our attorneys.

23               There has been a slight snag.  Three weeks

24   ago Mr. Gavin left my office, and his cases were sort of

25   in limbo.  Mr. DeLozier couldn't have contacted anybody

1   for the past three weeks.

2                Mr. Dan Patterson has joined our office.

3   He's capital certified.  He's been assigned to this

4   case.  He and Mr. DeLozier will have to work together.

5                One of problems was within a week or two

6   after we were in front of Judge Barker, it was agreed

7   that any billings up to that date would be paid by OCAC,

8   and I think Dean Wolcott agreed with that.

9                I think the minute entry stated that.  We

10  had a bill for $3,000 from Michael Sweedo, who we did

11  not have any prior approval of funds for.

12               The Public Defender's Office, and I think

13  how most public agencies work, you approve the money

14  beforehand.  You don't let people perform services,

15  because it's taxpayer money, so you have to make sure it

16  is not being wasted, so you do an approval of funds in

17  advance of any services that are rendered.

18               And there's a letter that goes out to the

19  expert very specific as far as, "This is the amount of

20  money that's been allocated.  If you think it is going

21  to go over that, don't do any work on it until you hear

22  from us, and you get that approval."

23               So Mr. DeLozier and Mr. Patterson can work

24  it out, and there's also got to be something as far as

25  the duties of the attorneys, Judge.

1          Mr. DeLozier seems to be taking more of an

2   active role than most Knapp counsel, and that's fine,

3   but with taxpayer money, and with money from our office,

4   it has to be one of our attorneys who makes the request.

5          THE COURT:  Mr. Peterson, I have a minute entry

6   order from Judge Barker, and it says that the Office of

7   Court Appointed Counsel was to pay for appropriate

8   expenses incurred up to April the 16th, 2001, at 10:45

9   a.m., and the Office of Public Defender shall pay from

10  this date forward from 10:45 a.m., and the Office of the

11  Public Defender will not pay any past due bills.

12          Any other appropriate work done and

13  performed up to this date at 10:45 a.m. shall be paid by

14  the Office of Court Appointed Counsel, and any

15  appropriate bills after today will be paid by the Office

16  of the Public Defender.

17          So I guess what you're telling me now is

18  that there is a protocol in your office as to how those

19  bills are paid.

20      MR. PETERSON:  Yes.

21      THE COURT:  And that protocol has to be observed.

22      MR. PETERSON:  Yes.  It has to be approved in

23  advance.  It has to be from one of our attorneys.  Let

24  me make this clear on the record.

25          I don't know if Mr. Martinez remembers or

1   Mr. DeLozier how the expenditures work in our office,

2   and it would be our attorneys who decide whether or not

3   the services would be rendered, because I don't think

4   the Court has the authority to order us to pay for a

5   private attorney's expert.

6           Like I said, I don't think they'll be a

7   problem if -- I'll leave it at that, Judge.

8           THE COURT:  All right.  Counsel.

9           MR. DeLOZIER:  Thank you.

10          I didn't know anything about this up until

11  last Friday.  The people that submitted the bill,

12  Mr. Sweedo, we were given specific approval by Judge

13  Barker to hire that person, and that person was hired

14  through OCAC.

15          The person for this language that you just

16  recited, Your Honor, was to say as of that moment, any

17  billings Mr. Sweedo has, or for that matter, Mary

18  Margaret has, would be subject to the Public Defender.

19          What Mr. Peterson and I discussed was that

20  he would decide some time, or his office would decide

21  whether they were gonna retain those two criminologists

22  and the private investigator, okay, from that point

23  forward, whether they would, in fact, use them.  Okay.

24          THE COURT:  And --

25          MR. DeLOZIER:  So it may be that Mr. Sweedo

1  simply sent the bill to the wrong office. But like I

2  said, I'm not aware of the issue until last Friday.

3      THE COURT: All right.

4      MR. DeLOZIER: So I think Mary Margaret hasn't

5  even submitted one at all. We've been laboring under

6  the other problem, and I thought that was the one we

7  were really addressing, and that is why we haven't done

8  anything.

9          We were told we would be assigned a number

10 two chair. I would be the number three chair. Frankly,

11 I haven't done anything other than wait to hear from

12 people since April 16th.

13         We were all led to believe, including the

14 Judge, that things would be moving forward. We set

15 schedules, and frankly, Your Honor, nothing's been done.

16     THE COURT: All right. Mr. Peterson, did I

17 understand you to say that there's a new attorney in

18 your office, and he's going to be assigned to this case,

19 or has been assigned? Can you clarify that for me?

20     MR. PETERSON: He has been assigned, Your Honor.

21 He started in the office on Monday. It is Dan

22 Patterson.

23     THE COURT: Dan Patterson. Thank you.

24     MR. DeLOZIER: He's death certified.

25     THE COURT: All right. So should we indicate him

DONALD E. MOLL, RMR, CRR

1   on our minute entry order?

2          MR. PETERSON:  Yes, ma'am.

3          THE COURT:  All right.

4          MR. PETERSON:  The other thing, Your Honor,

5   there's no way our office will approve any private

6   investigator.  We have seven private investigators on

7   our payroll who do very good investigations, so that, I

8   don't think, is really an issue, at least as far as I'm

9   concerned.

10              I would never approve expenditures for an

11  investigator when we have seven people on staff.

12          THE COURT:  Well, Mr. Peterson and -- excuse

13  me -- Mr. Patterson and Mr. DeLozier need to get

14  together and talk about these issues.

15          MR. PETERSON:  And I think we can do that very

16  quickly, Judge.

17          THE COURT:  All right.

18          MR. PETERSON:  I do apologize.  There has been,

19  in this three and a half, or maybe even close to four

20  weeks that Mr. Gavin left the office, leaving us with

21  really no death certified attorney in the office, and we

22  can't have non death certified attorneys working on

23  death penalty cases.  The ABA standards wouldn't allow

24  that.

25          THE COURT:  I absolutely understand what you're

1    saying, Mr. Peterson.

2            MR. DeLOZIER:  Your Honor, I'm sorry.  The issue

3    is that we've been over three months, and there's been

4    absolutely no contact by that office with anyone, and

5    that was one of the reasons I came in to start with.

6    Okay.

7            THE COURT:  All right.

8            MR. DeLOZIER:  I don't know that the family ——

9    now, Mr. Peterson, you sat here and talked to all of the

10   family, and you talked to me, at significant length.  I

11   appreciate it that you don't like me saying these

12   things.

13           MR. PETERSON:  If you state the truth, I have no

14   problem with whatever you say.

15           MR. DeLOZIER:  Oh, you're assuming I'm not

16   stating the truth?

17           THE COURT:  Counsel, let's direct your comments

18   to the Court, and ——

19           MR. PETERSON:  I'm sorry, Your Honor.

20           THE COURT:  —— and we'll move through this.

21           MR. PETERSON:  Yes, ma'am.  I'm sorry, Your

22   Honor.

23           THE COURT:  And that admonishment was meant for

24   everyone.

25           MR. PETERSON:  That's fine, Judge.  I apologize.

DONALD E. MOLL, RMR, CRR
000004642

1        THE COURT:  Not just for you.  All right.  We

2    need to move forward.  We have a firm trial date of

3    November the 1st, 2001, that may need to be adjusted

4    based on events that are --

5        MR. DeLOZIER:  There's absolutely no way it can

6    be done, absolutely no way, Your Honor.

7        THE COURT:  All right.  If you will put that

8    request in writing after you've talked to Mr. Patterson,

9    then I will entertain the defense request for additional

10    time.

11        MR. PETERSON:  I will make sure Mr. Patterson

12    contacts Mr. DeLozier, if not today, on Monday.  I don't

13    know what his schedule is today, but I can guarantee

14    Mr. Patterson will be in contact with Mr. DeLozier by

15    Monday, Your Honor, by 5:00 o'clock.

16        MR. DeLOZIER:  That's what you said last time,

17    very shortly.

18        THE COURT:  Excuse me.  Mr. DeLozier, please

19    direct your comments to the Court.

20        MR. DeLOZIER:  Your Honor, the family was led to

21    believe the same thing would happen last time.  Here we

22    are three and a half months later, and I haven't had any

23    contact with anybody.

24        THE COURT:  All right.

25        MR. PETERSON:  There's been numerous messages

DONALD E. MOLL, RMR, CRR

1  left.

2       THE COURT:  All right.  I'm going to get involved

3  in this case, and we're gonna set this, and we'll have

4  Mr. Patterson, who is now on board, is that correct?

5       MR. PETERSON:  Yes.  Judge, I'm not sure

6  Mr. DeLozier has a telephone, but he could have called

7  us as well.

8            I'm not gonna -- I don't want to get into

9  this contest with Mr. DeLozier just because -- I'm

10 leaving the office in a week anyway.  It is not going to

11 be my problem.

12      MR. DeLOZIER:  I'd be glad to put on evidence of

13 all the people who have contacted that office, and had

14 no contact back.

15      MR. PETERSON:  I'll put on my witnesses, Judge.

16      THE COURT:  Counsel, let's stop this right now,

17 because I don't think that this is -- I don't think this

18 is beneficial, and it certainly isn't beneficial for

19 Ms. Andriano, who is sitting over here probably

20 wondering how it could have gotten to this point.  So

21 let's start in right now fresh and new.

22      MR. PETERSON:  It will be new, Judge, because I

23 will be out of the office, so Mr. DeLozier -- you know,

24 and I hope the case can move forward.  That's fine,

25 Judge.

1          THE COURT:  All right.  And Mr. Patterson is our

2   contact person from this point forward with respect to

3   to the case.

4          MR. PETERSON:  Yes.

5          THE COURT:  And so I'm sorry to have to do this

6   again.  Mr. DeLozier, would you do this for me.  Would

7   you write down whatever expenditures there are, and

8   whoever may have outstanding bills.

9          MR. DeLOZIER:  There's only two.

10         THE COURT:  Two.  All right.

11         MR. DeLOZIER:  Okay.  Mr. Sweedo, whatever his

12   bill is.

13         MR. PETERSON:  I don't know.  He was told to

14   submit it to OCAC.  Apparently he submitted it to the

15   Public Defender.  I didn't know anything about that

16   until last week, like I said.

17         THE COURT:  Well, then, if he's supposed to

18   submit it to OCAC, and he submitted it to the Public

19   Defender, then that's going to be a snafu for him, so he

20   needs to get it to the right source.

21         MR. DeLOZIER:  I'll contact him.  The other one

22   is Ms. Mary Margaret.

23         MR. PETERSON:  I'm sorry, Judge.  I'm addressing

24   the Court.  Can I just ask the Court to inquire what she

25   does on the case?

DONALD E. MOLL, RMR, CRR

**000004645**

1          THE COURT:  My understanding is she was an

2    investigator.

3          THE COURT:  She's nodding her head yes.

4      MR. PETERSON:  That's fine.  I have no idea what

5    her involvement in the case was.

6          THE COURT:  How many hours does she have to this

7    point?

8        MS. MEYERS:  Your Honor, I haven't totaled them

9    up.

10         THE COURT:  Some of those hours, I assume, are

11   going to go to OCAC based on the previous order of Judge

12   Barker.

13         MR. DeLOZIER:  Your Honor, frankly, neither of

14   those people, as far as I know, have done anything since

15   April 16th, because we've all been waiting to hear.

16         THE COURT:  All right.  Well, then maybe this

17   would be an easier situation than I think.  Here's what

18   I'm going to direct.

19             Mr. Patterson, Mr. DeLozier, get together

20   this week.  I'm going to set another status conference.

21   I hate to have to over status conference this.  Let's

22   just get through this point.  Then we can move forward

23   with the case.

24             I'm assuming, Mr. Martinez, you've been

25   silent because you have nothing to add to the

1   discussion, is that correct?

2         MR. MARTINEZ:  Correct.

3         THE COURT:  All right.  Ms. Andriano, this is an

4   important case to you, and we're going to see what we

5   can do to get this issue ironed out so your case can

6   move forward.  I don't want to see this delayed, but you

7   are entitled to effective representation.  These are

8   serious charges.

9              Mr. DeLozier --

10        MR. DeLOZIER:  Yes, Your Honor.

11        THE COURT:  -- will you get in touch with

12  Mr. Patterson, please, and Mr. Peterson, would you tell

13  Mr. Patterson to be in touch with Mr. DeLozier.

14        MR. PETERSON:  Mr. Patterson, I can guarantee

15  you, will talk to Mr. DeLozier by 5:00 o'clock on

16  Monday.  I'll try to get it done today.  I don't know

17  what his schedule is today.  I can guarantee it by

18  Monday at 5:00, Judge.

19        THE COURT:  That's sufficient.  That's

20  sufficient, counsel.

21             What I'm going to do is this.  I'm going to

22  set another status conference in this case with

23  Mr. Patterson present.  Not that you haven't been useful

24  and helpful, Mr. Peterson, but we'll get Mr. Patterson

25  on board, and move forward.

1          MR. PETERSON:  I think that's a good idea, Judge.

2          THE COURT:  And we'll set this for 9:00 a.m. on

3   August the 3rd.

4          MR. MARTINEZ:  Judge, I will be unavailable on

5   that date.  I would be asking for Thursday in the

6   morning, or perhaps Friday after that.

7               I will be starting a trial on July 30th in

8   front of Judge McClennen, so Fridays are good for me,

9   but not this coming Friday.

10         THE COURT:  Mr. Martinez, are you going to the

11  APAC conference?

12         MR. MARTINEZ:  I am.

13         THE COURT:  All right.  And that's the following

14  Friday?

15         MR. MARTINEZ:  Right.  I could do it the 3rd in

16  the late afternoon.

17         THE COURT:  The problem with that is Judge Barker

18  has some matters that he's keeping, and I've set aside

19  the afternoon, a couple of afternoons for Judge Barker,

20  and I was trying not to have us play musical chairs up

21  here, and he come on and I come on, and then back and

22  forth, and I'm just trying to set those afternoons aside

23  for him, and that includes those next two afternoons.

24         MR. MARTINEZ:  Okay.

25         MR. PETERSON:  Judge, not to tell Mr. Martinez

1  what to do.  I think it is really more of a question

2  between Mr. Patterson and Mr. DeLozier.

3         I think that's the only question that's

4  really going to be resolved on the 3rd.  I don't know if

5  you could have coverage cover that or not.

6     MR. MARTINEZ:  I can do that.  I was just letting

7  the Court know that I will not be available in the

8  morning.

9     THE COURT:  Why don't we do that.  That way we'll

10  have the defense side in place.  Mr. Martinez, I won't

11  entertain any requests for additional time, although I'm

12  anticipating that it may come up as a result of the

13  events that I've heard described here.  We won't reset

14  any trial.

15         We'll set that aside until a day when you

16  can be present, so I know that your --

17     MR. MARTINEZ:  I know that we have a deadline of

18  August 17th to do interviews, and that sort of thing.  I

19  would ask that things not be changed unless I'm heard

20  from.

21     MR. DeLOZIER:  Your Honor, that's part of the

22  issue we've had that we've already missed one deadline,

23  okay, and we've got another one coming up in less than

24  30 days.

25     THE COURT:  Mr. Martinez, you're objecting to any

1   deadline being set aside?

2          MR. MARTINEZ:  No, no, I'm not objecting.  I just

3   want to be —— you know, if they set it five days after

4   the original deadline, of course, I won't be able to

5   provide the interviews.

6          MR. PETERSON:  Might I suggest that we perhaps

7   move the deadline today since Mr. Martinez is here?

8          THE COURT:  That's a reasonable request.  Can you

9   give me an estimate of how much more time?  Part of this

10  depends on Mr. Patterson's schedule.  We'll assume that

11  he's available.

12         MR. PETERSON:  His trial schedule is not very

13  bad.  He picked up five capital cases when he joined the

14  office.

15         THE COURT:  Thank you.

16         MR. DeLOZIER:  For whatever guidance this is

17  worth, my recollection is that on April 16, when we were

18  here before, what we did was plan two months for one set

19  of things to be done, and another two months for another

20  set of things to be done.

21             That gave us June 17, as I recall, and

22  August 17th.  What we might want to do is use that same

23  formula.  I don't recall all the rationale for that

24  particular day, but that's what happened.

25         THE COURT:  All right.  Let's do this, then.

DONALD E. MOLL, RMR, CRR

1    Let's move the deadline out.

2              Have any interviews been conducted?

3         MR. DeLOZIER:  Very few.  I think it was the

4    forensics part that we thought we needed to move quickly

5    on.

6              That's one of the reasons that I was led to

7    believe that Mr. Peterson might want to continue with

8    Mr. Sweedo and the private investigator that we had on

9    board, because there were a number of forensic problems

10   that we were experiencing.

11             That was part of the reason that we

12   addressed a number of those specialists in that memo

13   that I filed back in March, I think it was.

14        THE COURT:  I'm sure Mr. Peterson/Patterson will

15   take into account whatever your recommendations are in

16   determining how best to proceed on behalf of the client,

17   and I'll hear from you or Mr. Patterson at the

18   appropriate time.

19        MR. PETERSON:  And, Judge, I believe what we

20   stated at the last hearing was that we had no problem

21   paying investigators to at least get our investigators

22   up to speed, not just cold turkey taking one

23   investigator off, and putting another one on.

24             There is going to be some expenditures

25   we're gonna have to pay the investigator who has done

1    the investigation in the past to meet with our

2    investigators and bring them up to speed.  There's no

3    question about that.

4         THE COURT:  All right.

5         MR. DeLOZIER:  We were postponing the interview

6    deadline until after the forensics portion because some

7    of the interviews may well need to have that information

8    to do a proper interview.

9         THE COURT:  And there has not been a forensics

10   portion completed?

11        MR. DeLOZIER:  No.  That was the June 17th

12   deadline that we missed.

13        THE COURT:  All right.  Has anything been done so

14   that we can account for any time?

15        MR. DeLOZIER:  The only thing that's been done so

16   far is by Mr. Sweedo, and he, I think, his title is a

17   criminalist.  He's been up.  He's reviewed the evidence

18   in the evidence room.  He's talked to me.

19             I don't know that he's done much more than

20   analyze the police reports and the other documents.  I

21   think the figure he has spent up to this point is like

22   $3,000 in time.

23        THE COURT:  My question was designed to try to

24   determine whether or not we could shorten that period of

25   time a few months, or do we need to leave it at the same

1  length?

2       MR. PETERSON:  Judge, given forensics, I think

3  two months is -- I mean, it takes a while with experts

4  and everything else.

5            I've done a lot of these types of cases,

6  and I don't want to set a deadline that's unattainable.

7  I think the courts are aware that if you have realistic

8  deadlines, then both sides can work toward them, and

9  that's the best way to handle it.

10      THE COURT:  All right.

11      MR. MARTINEZ:  My suggestion, then, would be to

12  set the deadline to have the interviews completed by

13  late December, and then to have a trial date within 30

14  to 60 days after that.

15      THE COURT:  All right.  So we're looking at

16  October the 17th, 2001, to complete the forensics

17  portion.  That consistent with your previous

18  determination?

19      MR. MARTINEZ:  Quite frankly, I don't really

20  think that they need a deadline in which to complete

21  their forensics things.

22            I think the only thing that we need is the

23  deadline when the interviews need to be completed, and

24  so they were factoring that in, but I don't think the

25  Court indicated to them that they couldn't do any test,

1   so, if we could just have the interviews to be completed

2   by, let's say, the end of December, first part of

3   January, and then the trial date 30 to 60 days after

4   that.

5        THE COURT:  Any objection from you, Mr. Peterson,

6   to that suggestion?

7        MR. PETERSON:  Your Honor, in my experience with

8   these types of cases, I think that would be realistic.

9   I'll defer to Mr. DeLozier, but I think Mr. Patterson's

10   schedule is such that he could do the interviews.  This

11   is a somewhat a more complicated case, because of

12   toxicology and everything else, than a lot of homicides.

13        THE COURT:  All right.  Mr. DeLozier?

14        MR. DeLOZIER:  That's fine.

15        THE COURT:  Does that sound like a good idea to

16   you?

17        MR. DeLOZIER:  That's fine.  My client approves.

18        THE COURT:  All right.  Then let's complete the

19   interviews by December 31st, and let's talk about a

20   trial date now in early 2002.

21            This will necessitate the Court excluding a

22   significant amount of time.  Is your client aware of

23   that, Mr. DeLozier and Mr. Peterson?

24        MR. DeLOZIER:  Yes.

25        THE COURT:  Ms. Andriano, you understand that?

DONALD E. MOLL, RMR, CRR

000004654

1    Is that a yes?

2              THE DEFENDANT:  Yes.

3              THE COURT:  All right.  Counsel, how many days to

4    a jury are you anticipating now?  And I know that's a

5    difficult determination right now.  If you would just

6    give me some ballpark.  A week, two weeks.

7              MR. MARTINEZ:  Eight to ten trial days, including

8    jury selection.

9              MR. PETERSON:  I would say about three weeks,

10   Your Honor, to four weeks.  I think it is better to

11   be -- to err on the side of being too long when you're

12   talking to jurors about how long things might last.  I

13   would say three weeks would be sufficient.

14             THE COURT:  I'll just estimate three weeks at

15   this time, and then you can give me a better

16   determination later as the case progresses, and when you

17   find out how many witnesses you're going to have.

18             We'll make it three weeks, and we'll set

19   the trial for -- my calendar doesn't go that far out.

20   How about mid February?

21             MR. MARTINEZ:  That's fine.

22             THE COURT:  Does that seem reasonable?

23             MR. PETERSON:  Mr. Patterson I think could be

24   ready by then, Judge.  I don't know what DeLozier's

25   trial schedule is.  I know Mr. Patterson's trial

1   schedule.

2        MR. DeLOZIER:  That works for me.

3        THE COURT:  All right, then.  I don't have

4   anything up here that has a 2002 calendar.  All I've got

5   is January.  Wait a minute.  There is something here.

6             How about February 11th?  Is that a

7   holiday?  Does anyone know?

8        MR. PETERSON:  The second Monday, I think, Judge,

9   is a holiday.

10       THE COURT:  Yeah, that is the second Monday.

11  Perhaps the 12th.

12       MR. PETERSON:  Perhaps the 12th?

13       THE COURT:  Let's go with February 12th.

14       MR. MARTINEZ:  And then we have a status

15  conference of August 3rd at 9:00 o'clock.

16       THE COURT:  Yes, sir.  And that's just to make

17  sure that we keep everything rolling forward.  I

18  wouldn't anticipate that needs to be long at all.

19             In fact, counsel may come in and say it's

20  all resolved, there's not an issue that really the Court

21  needs to address.

22       MR. DeLOZIER:  The 3rd.  At 9:00 o'clock was it?

23       THE COURT:  9:00 o'clock, August the 3rd, 2001.

24             You may, in fact, tell me that, and that's

25  fine.

DONALD E. MOLL, RMR, CRR

000004656                    --

1    MR. PETERSON:  Your Honor, if Mr. Patterson and

2  Mr. DeLozier reach some understanding, could we perhaps

3  vacate that upon the request of both of them?

4    MR. DeLOZIER:  Certainly I'll entertain that

5  request, and I assume Mr. Martinez won't have any

6  objections since he's not available anyway.

7         I'm going to vacate the trial date of

8  November the 1st, 2001.

9         I'm going to exclude time from today's date

10  to -- well, what I'll do is I'll just set a new last day

11  based on the exclusion of time, finding that

12  extraordinary circumstances exist, and a delay is

13  indispensable to the interests of justice, based on the

14  issues that have been presented so far in the case, and

15  the need to do the forensics investigations, as well as

16  the interviews in the case.

17         I have read the file, and as Mr. Peterson

18  rightly pointed out, this is not the usual first degree

19  murder case.  There are some complications here, and

20  some issues involving forensics that will need to be

21  addressed by the lawyers in their preparation.

22         I will set a new last day, therefore, for

23  March 15th, 2001 -- 2002.  Wait minute.  March 15th,

24  2002.

25         Anything further for the Court to address

26

1    at this time?

2            MR. DeLOZIER:   No, Your Honor.   Thank you very

3    much.

4            THE COURT:   Thank you.

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

27

1

2

3

4

5

6

7

8

9

10          I, DONALD EDWARD MOLL, Certified Court

11  Reporter, do hereby certify that the foregoing pages

12  constitute a full, accurate typewritten record of my

13  stenographic notes taken at said time and place, all

14  done to the best of my skill and ability.

15          DATED this 31st day of January, 2005.

16

17

                                DONALD EDWARD MOLL
18                                Cert. No. 50347

19

20

21

22

23

24

25

DONALD E. MOLL, RMR, CRR

000004659

EXHIBIT U

000004660

DP

05-0005
Braces
COPY


1          IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

2              IN AND FOR THE COUNTY OF MARICOPA

3

4

5   STATE OF ARIZONA,                )
                                     )
6               Plaintiff,           )
                                     )
7        vs.                         )   No. CR 05-0005 AP
                                     )   MARICOPA COUNTY
8   WENDI ELIZABETH ANDRIANO,        )   No. CR 2000-096032
                                     )
9               Defendant.           )
    _____    )

10

11

12

13          REPORTER'S TRANSCRIPT OF PROCEEDINGS

14       BEFORE:   The Honorable BRIAN K. ISHIKAWA

15

16

17                      Mesa, Arizona
                        May 21, 2004
18

19

20

21

22

23

24   Prepared FOR APPEAL by:
     TRACI L. WHEELER, CSR, RPR, CCR
25   Certified Court Reporter #50313



     TRACI L. WHEELER, OFFICIAL COURT REPORTER, CSR, RPR, CCR

```
1                    A P P E A R A N C E S

2    For the STATE:       JUAN M. MARTINEZ,
                          Deputy County Attorney
3
     For the DEFENDANT:   DANIEL B. PATTERSON,
4                         Deputy Public Defender
                                and
5                         G. DAVID DELOZIER,
                          Attorney at Law
6
     The DEFENDANT:       WENDI ELIZABETH ANDRIANO
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

TRACI L. WHEELER, OFFICIAL COURT REPORTER, CSR, RPR, CCR

```
 1                 MESA, ARIZONA, FRIDAY, MAY 21, 2004

 2

 3           THE COURT:  This is CR 2000-096032 State of Arizona

 4     versus Wendi Elizabeth Andriano.  This is the time set for

 5     status conference.

 6                Is the State ready?

 7           MR. MARTINEZ:  Yes, sir.  Juan Martinez for the

 8     State.

 9           THE COURT:  And the defense?

10           MR. PATTERSON:  Dan Patterson appearing with David

11     DeLozier.  Wendi Andriano is standing in your jury box.

12                The first item I guess, Judge, June 1 does not

13     appear to be a viable trial date at this time.  We've had

14     some unexpected things develop.

15                First problem is that you allowed the

16     Government to give certain forensic tests to my client.

17     Dr. Bayless met with Ms. Andriano yesterday and gave her

18     about three hours worth of tests.  Those have not been

19     scored.  He has not rendered a report.  Certainly, I have the

20     need to read his report, run the report by my current expert,

21     and probably hire an MMPI expert as well to look at the

22     data.  That's the first problem.

23                Second problem is that Mr. Martinez and I have

24     to travel to California to speak with the persons from West

25     Coast Analytical Systems who have done testing in this case
```

1    both for the Government and for the defense.  That interview

2    is scheduled, as I said, next Friday.

3              Further and separate problem, Patty Rubio is my

4    paralegal.  She has been on this case since the time that my

5    office acquired it, approximately two years in July.  She is

6    very conversant with the case and she's an essential team

7    member in the defense team.  She gave birth recently, came

8    back to work.  Unfortunately, her child developed meningitis

9    and was admitted to the hospital in the intensive care unit

10   for 10 days.  My understanding is the child has been

11   released, but understandably she needs to be home with the

12   child for the next couple weeks.  She's not expected for full

13   time employment until June 24.

14             Last and separate basis for continuance, my

15   paralegal -- my mitigation specialist, Scott McCloud,

16   inherited this case approximately a month and a half ago in

17   March when Pat Lindeman, who had been the litigation

18   specialist, resigned the office and moved to Indiana.  This

19   is his first capital case and he advised me that while he

20   could be ready June 1, it would -- it would not be the best

21   way to approach this thing, that he could use additional time

22   to coordinate his thoughts and prepare for my benefit a

23   cogent theme and theory for mitigation, and he's working on

24   that at this time.

25             So for all those reasons, Judge, I don't find


TRACI L. WHEELER, OFFICIAL COURT REPORTER, CSR, RPR, CCR

1    June 1 to be a realistic trial date.  I've explained these

2    circumstances to my client.  She's agreed to allow the case

3    to be continued and allow the intervening time period to be

4    excluded.

5         THE COURT:  Thank you.

6              Mr. Martinez?

7    MR. MARTINEZ:  I've spoken with the next of kin about

8    that particular issue and the need to continue the trial, and

9    specifically I spoke to both Joseph and Jeanette Andriano,

10   the parents of the decedent in this case.  Although they are

11   unhappy, and very much so, about the need for a continuance,

12   they understand that this matter needs a little bit more

13   work, and they also understand that the consequences of not

14   doing that extra work down the road in the future.

15              So although, as I said, they are unhappy about

16   it, they have no objection to the requested continuance and

17   neither do I.

18         THE COURT:  Okay.

19              Ms. Andriano, did you hear what Counsel said?

20         THE DEFENDANT:  Yes, sir.

21         THE COURT:  Are you agreeable to a continuance with a

22   waiver of time?

23         THE DEFENDANT:  Yes, sir.

24         THE COURT:  Okay.  The Court finds the defendant

25   waives time.  Time will be excluded.  Court finds


TRACI L. WHEELER, OFFICIAL COURT REPORTER, CSR, RPR, CCR

1   extraordinary circumstances exist and that a delay would be

2   indispensable to the interest of justice.  I've considered

3   everyone's input as stated on the record.

4        MR. PATTERSON:  Judge, I don't know if it's necessary

5   to embellish, but there's about twelve motions I need to

6   respond to.

7        THE COURT:  Right.  I was going to bring that up.

8        MR. PATTERSON:  Okay.

9        THE COURT:  And for the reasons stated on the record

10   by Mr. Patterson, the Court finds extraordinary circumstances

11   exist and that a delay would be indispensable to the interest

12   of justice, and time will be excluded.

13        Also, as Mr. Patterson just brought up,

14   Mr. Martinez filed on behalf of the State several motions

15   which I'm going to allow Mr. Patterson the opportunity to

16   respond to.  And so what I'm going to do is this, and I

17   anticipate -- Mr. Martinez, I think were you going to be

18   filing a motion with regard to notes of the defendant's

19   interview with Sharon Murphy?

20        MR. MARTINEZ:  Actually, I was going to ask the Court

21   to consider it orally, and the reason I will probably not

22   file -- or unless the Court asked me to, I will -- is I will

23   incorporate the previous memo with regard to mental health

24   experts that have previously been filed in this case.  I

25   don't think that I need to anything -- add anything to that,

TRACI L. WHEELER, OFFICIAL COURT REPORTER, CSR, RPR, CCR

1    specifically the case law is already set out there as to what

2    the State is entitled to and specifically what that seems

3    to -- what that does indicate is that if they're going to use

4    an expert, the State is entitled to have an expert of their

5    own.  If their expert is going to use the notes as part of

6    their opinion, which she did in this particular case,

7    basically, in my interview she -- "she" being Sharon

8    Murphy -- indicated that she spoke to the defendant and she

9    spoke to the defendant many, many times over 20 hours.  And

10   during that time she conducted an assessment.  And this was

11   based on conversations that she had with the defendant and

12   that she took notes of her conversations with the defendant,

13   and that's what formed the -- part of what formed the basis

14   of her opinion.  I think we're entitled to those notes.  If

15   the Court wants it, I will put something in writing.

16              I also note there is a restriction, and we're

17   not going to talk about the events of October 8th, year 2000,

18   but other than that, I think we are entitled to those notes

19   so that our expert could then use them in evaluating the

20   tests that have been administered to the defendant.

21              THE COURT:  Mr. Patterson?

22              MR. PATTERSON:  Our position, Judge, I spoke with Ms.

23   Murphy.  She has generated notes during the course of her

24   about 20 hours of interview with my client.  She assured me

25   she incorporated all of those notes accurately and completely

TRACI L. WHEELER, OFFICIAL COURT REPORTER, CSR, RPR, CCR

1    in her report, and that report has been disclosed to the

2    State.  I told Mr. Martinez that I would not disclose the

3    personal notes that were taken by her during the course of

4    those interviews without an order of the Court.  If you

5    compel us to disclose those notes, I reserve the right to

6    redact from those notes anything that touches upon the dates

7    of the events, the dates that were the dates of the

8    allegation, the crime in this case, which is October 8, 2000.

9          THE COURT:  Anything further, Mr. Martinez?

10         MR. MARTINEZ:  The only thing I would add is if they

11   have been incorporated in her report, there shouldn't be any

12   reason we shouldn't have them.

13         THE COURT:  Let me think about it.  Let me take the

14   matter under advisement and let me issue a decision.

15         MR. PATTERSON:  As authority, the Fifth Amendment

16   privilege not to talk about things with the Government expert

17   is why I elected not to disclose those voluntarily without

18   order of the Court.

19         THE COURT:  Let me -- I'll issue a decision on Monday

20   and I'll fax your office my decision.

21              Okay.  With regard to the State's motions that

22   have recently been filed, what I'm going to do is.  I'm going

23   to give Mr. Patterson the opportunity to file a response on

24   behalf of the defendant to those motions, and I'll set a

25   deadline of June 11, 2004.  And then we'll set the matter for


TRACI L. WHEELER, OFFICIAL COURT REPORTER, CSR, RPR, CCR


000004668

1    oral argument on the motions and also a status conference re

2    jury questionnaire, we'll set that for June 18, 2004, at 2:30

3    p.m. in this division.

4              And for the record, just recently I received

5    from Mr. Patterson and from Mr. Martinez some additional

6    requests relating to the jury questionnaire, and also I

7    received -- one of the motions that I received was the

8    State's motion to preclude Counsel from questioning

9    prospective jurors regarding their views on specific

10   mitigation or aggravation, so be ready to argue those matters

11   on June 18, okay?

12             And then I'll go ahead and reset the trial

13   management conference from June 1 -- sorry.  It was set

14   for --

15        MR. PATTERSON:  Next week.

16        THE COURT:  -- May 28, 2004.  We'll reset it for July

17   13, 2004, 8:30 a.m. in this division, and the trial will be

18   rescheduled from June 1, 2004, to July 14, 2004 at 10:30 a.m.

19   in this division.

20             Let me just make sure we've covered

21   everything.

22             (Pause in proceedings.)

23        THE COURT:  Counsel, have we covered everything?

24        MR. MARTINEZ:  I believe we have, actually.

25        THE COURT:  Mr. Patterson?


TRACI L. WHEELER, OFFICIAL COURT REPORTER, CSR, RPR, CCR

1           MR. PATTERSON:  I believe so, Judge.

2           THE COURT:  Okay.  Thank you very much.

3           MR. MARTINEZ:  Actually, the only other thing --

4           MR. PATTERSON:  Thank you.

5           MR. MARTINEZ:  -- that we discussed was that I was to

6    provide the Court with information regarding two other

7    cases --

8           THE COURT:  Right.

9           MR. MARTINEZ:  -- I know I have pending, and that

10   once I do that, the Court would consider calling the other

11   judges and explaining to them what happened here today.

12          THE COURT:  Right.  For the record, I had an informal

13   conference with Counsel with regard to scheduling, and Mr.

14   Martinez indicated that he has other trials scheduled before

15   Judge Schneider and Judge Reinstein, and I indicated to

16   Counsel under the circumstances I'll contact those judges and

17   indicate that we've continued these matters and what happened

18   here today in open court as far as the reason why we had to

19   continue this case, okay?

20          MR. MARTINEZ:  Thank you.

21          THE COURT:  Anything further?

22          MR. PATTERSON:  Nothing further, Judge.

23          MR. MARTINEZ:  No, sir.

24          THE COURT:  Thank you.

25               (Whereupon, the proceedings were concluded.)


TRACI L. WHEELER, OFFICIAL COURT REPORTER, CSR, RPR, CCR

```
 1

 2

 3                    CERTIFICATE OF REPORTER

 4

 5    STATE OF ARIZONA      )
                            )
 6    COUNTY OF MARICOPA    )

 7

 8              I, Traci L. Wheeler, CSR, RPR, CCR, an official

 9    and certified court reporter in the Superior Court of the

10    State of Arizona, in and for the County of Maricopa, hereby

11    certify that I made a shorthand record of the proceedings had

12    in the within case, and that the foregoing transcript is a

13    full, true, and correct transcription of the proceedings in

14    this case.

15              Dated this 8th day of February, 2005.

16

17

18

19                              Traci L. Wheeler, CSR, RPR
                                CCR No. 50313
20                              Certified Court Reporter
                                Official Court Reporter

21

22

23

24

25
```

TRACI L. WHEELER, OFFICIAL COURT REPORTER, CSR, RPR, CCR

000004671

EXHIBIT V

05-0002
Braccio

COPY

1

DP

1           IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

2              IN AND FOR THE COUNTY OF MARICOPA

3

4   STATE OF ARIZONA,          )
                       )

5         Plaintiff,    )
                       )

6   v.                  )   No. 1 CA-CR 04-0731
                       )   MARICOPA COUNTY

7   WENDI ELIZABETH ANDRIANO,  )   No. CR 2000-096032
                       )

8        Defendant.    )
       _____)

9

10

11

12                   Mesa, Arizona
                 October 25, 2004

13

14

15

16      BEFORE:  The Honorable BRIAN K. ISHIKAWA

17

18        REPORTER'S TRANSCRIPT OF PROCEEDINGS

19              TRIAL DAY 31

20

21

22

23

24   ORIGINAL Prepared for APPEAL by:
     TRACI L. WHEELER, CSR, RPR
25   Certified Court Reporter No. 50313

2

<pre>
 1                    A P P E A R A N C E S

 2    FOR THE STATE:       JUAN M. MARTINEZ,
                           Deputy County Attorney
 3
      FOR THE DEFENDANT:   DANIEL B. PATTERSON,
 4                         Deputy Public Defender
                                    and
 5                         G. DAVID DELOZIER,
                           Attorney at Law
 6

 7            I N D E X   O F   E X A M I N A T I O N

 8    WITNESS                                          PAGE

 9    ANDRIANO, WENDI ELIZABETH, Called on her own behalf
              Direct Examination by Mr. Patterson        4
10            Continued Direct Examination by Mr. Patterson  86

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
</pre>

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000004674

1          MESA, ARIZONA, MONDAY, OCTOBER 25, 2004

2

3          THE COURT:  Good afternoon.  This is trial in cause

4   number CR 2000-096032, State of Arizona versus Wendi

5   Elizabeth Andriano.  The record will reflect the presence of

6   the Defendant, Counsel and the jury.

7                    Mr. Patterson?

8          MR. PATTERSON:  Thank you, Judge Ishikawa.  At this

9   time, with the Court's permission, Wendi Andriano would like

10  to testify.

11         THE COURT:  Please step forward to the clerk.  Please

12  give your name to the clerk and she'll swear you in.

13

14              WENDI ELIZABETH ANDRIANO,

15          CALLED TO TESTIFY ON HER OWN BEHALF,

16     HAVING FIRST BEEN DULY SWORN, TESTIFIES AS FOLLOWS:

17

18         THE COURT:  Please have a seat on the witness stand.

19  Please make yourself comfortable there on the witness stand.

20  Please pull the microphone close to you.  Please remember to

21  speak loudly and clearly into the microphone so everyone can

22  hear you.  Also please wait until the question is completed

23  before you answer the question, and please make sure you give

24  a verbal response.  Is that all agreeable to you?

25         THE WITNESS:  Yes, sir.


     TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

                    000004675

1          THE COURT:  Mr. Patterson, you may proceed.

2          MR. PATTERSON:  Thank you, Judge.

3

4    DIRECT EXAMINATION BY MR. PATTERSON:

5          Q.    Would you give us your name, please?

6          A.    Wendi Elizabeth Andriano.

7          Q.    Let's start out, Wendi, with some dates and

8    establish kind of a time frame in which we're going to be

9    discussing things.  What is your date of birth?

10         A.    8/26/70.

11         Q.    So do the math for me.  Currently you are what

12   age?

13         A.    34.

14         Q.    And how old were you then in October of 2000?

15         A.    30 years old.

16         Q.    On what day did you and Joe Andriano marry?

17         A.    January 22nd, 1994.

18         Q.    Okay.  And how old were you on the date of the

19   marriage?

20         A.    23.

21         Q.    And how old was Joe at that time?

22         A.    26.

23         Q.    And you are the mother of two small -- well,

24   they're older children now, but two children.  Nicolas is the

25   first child?

1        A.    Yes, sir.

2        Q.    What is his date of birth?

3        A.    6/20/1997.

4        Q.    And that was followed with the daughter by the

5   name of Ashley.

6        A.    Uh-huh.

7        Q.    What is Ashley's birthday?

8        A.    Ashley is September 16th, '98.

9        Q.    Okay.  So currently how old is Nicolas?

10       A.    He's 7.

11       Q.    Okay.  And Ashley is?

12       A.    6.

13       Q.    Okay.  And what day did you graduate from high

14   school?  What year?

15       A.    May of '89.

16       Q.    All right.  And lastly in terms of dates and

17   other items, how tall are you?

18       A.    5'4".

19       Q.    Okay.  Has that changed in the last four years?

20   Have you gotten shorter or taller?

21       A.    No, sir.

22       Q.    Okay.  So you were 5 foot 4 inches tall back in

23   October of 2000?

24       A.    Yes, sir.

25       Q.    What is your current weight?

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1          A.     Around 120.

2          Q.     Okay.  And in October of 2000 how much did you

3    weigh?

4          A.     103.

5          Q.     So the Wendi that presents herself today is

6    about 17 pounds heavier?

7          A.     Yes, sir.

8          Q.     Okay.  All right.  Let's go back in time,

9    Wendi, to that period of time, the growing up period of

10   time.  Were you born here in Arizona?

11         A.     No, sir.

12         Q.     Okay.  Where were you born?

13         A.     I was born in Texas.

14         Q.     Okay.  Near  a big city in Texas?

15         A.     That's -- it's 40 miles outside of Amarillo.

16         Q.     Okay.  So in the panhandle area of Texas?

17         A.     Yes.

18         Q.     Okay.  And what is your mother's name?

19         A.     Donna Ochoa.

20         Q.     Was that the woman that spoke earlier in these

21   proceedings?

22         A.     Yes.

23         Q.     Okay.  And your biological father, what was his

24   name?

25         A.     Skip Robertson.

1      Q.    Okay.  Did you have much contact with your

2   biological father growing up?

3      A.    Not that I recall, no.

4      Q.    Okay.  When did he leave Donna or when did that

5   unit kind of break up?

6      A.    My understanding is when I was small --

7         MR. MARTINEZ:  Objection.  Hearsay.

8         THE COURT:  Overruled.  Go ahead, answer the

9   question.

10         THE WITNESS:  When I was 3-ish, 3 or so.

11   BY MR. PATTERSON:

12      Q.    All right.  At some point in time did Donna

13   marry another gentleman?

14      A.    Yes.

15      Q.    Okay.  What was that gentleman's name?

16      A.    Alejo.

17      Q.    He too was the gentleman that came in here and

18   testified a week or so ago?

19      A.    Yes.

20      Q.    Okay.  Now, even though you weren't the

21   biological offspring of Alejo, did he commence legal

22   proceedings to become at some point your adoptive father?

23      A.    Yes.

24      Q.    Okay.  When did that happen?

25      A.    When I was around 5 or 6, I believe.  I'm not

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000004679

1    sure of the date.

2           Q.    Okay.  So if you were born in August of 1970,

3    '75, '76, thereabouts?

4           A.    Yes.

5           Q.    Okay.  Did you have any blood or siblings that

6    were both offspring of Alejo and Donna?

7           A.    No.

8           Q.    Okay.  Did you at some point acquire an

9    adoptive brother?

10          A.    Yes.  My cousin Brandon when he was around two

11   years old, my parents adopted him.

12          Q.    Okay.  And, again, was he the gentleman that

13   testified last week in this case?

14          A.    Yes, sir.

15          Q.    Okay.  So as I understand, he is the son of

16   your mom's sister?

17          A.    Yes.

18          Q.    Okay.  And did Brandon live with you and the

19   family for a period of time?

20          A.    Yes.

21          Q.    Okay.  Do you have any other siblings?

22          A.    From my biological father.

23          Q.    Okay.

24          A.    There's siblings there, but I don't know them

25   at all.

1          Q.     You didn't grow up with them, haven't maintain

2     contact with them?

3          A.     No.

4          Q.     Okay.  In the early years, where did you live?

5     3, 4, 5, in that area?

6          A.     In Phoenix, Arizona with my grandmother and my

7     mom.

8          Q.     Okay.  In Phoenix proper or do you recall

9     exactly where?

10         A.     No, I don't recall.

11         Q.     Okay.  At some point in time did the family go

12     out of state?

13         A.     After my mother married Alejo Ochoa, yes, we

14     did.  We went to California.

15         Q.     Okay.  And do you have memories of that

16     experience?

17         A.     Yes, I do.

18         Q.     Okay.  What was the purpose of the travel

19     adventure out to California with Alejo and Donna?

20         A.     My father was a street minister and they would

21     go around to different churches and do ministry work and

22     that's what they did.  I don't --

23         Q.     Okay.  Do you have memories of that period of

24     time?

25         A.     I do, actually.  I do.


          TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1          Q.     Do you recall living arrangements, the

2    environment that you grew up in?

3          A.     I recall a fifth wheel trailer.  I recall a

4    small blue Volkswagen van that was also blue and had a white

5    top with flower curtains in it, and a bus that had been --

6    the inside had been redone into living arrangements.  There

7    was a bedroom, bathroom and small kitchen area type thing.

8          Q.     Okay.  So a bus converted into --

9          A.     Living quarters.

10         Q.     -- a mobile home?

11         A.     Yeah.

12         Q.     Living quarters?

13                Okay.  Do you recall at all was there a pastor

14   or a director of this troupe so to speak?

15         A.     Yes.  His name was Rick.

16         Q.     Okay.  And do you remember Rick?

17         A.     Yes, I do.

18         Q.     His influence on the group?

19         A.     The whole time that we were traveling around,

20   it always seemed to me that like he was one who was in charge

21   who told us what to do, how to do it and everything.  Even

22   more so than my father.  I actually probably took more orders

23   from Rick than I did my dad.

24         Q.     What age are we talking about here?

25         A.     Probably 6 to 9.


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1      Q.    Okay.  At some point in time was the decision

2  made to come back to Arizona?

3      A.    Yes, sir.

4      Q.    Okay.  Do you recall the basis for that

5  determination?  Were you involved in that procession?

6      A.    I wasn't involved in that process.  But the

7  only thing I remembered about it is that it was a secret and

8  I remember coming back to Arizona under -- like, it was a

9  secret type thing.  Being that small I didn't understand what

10  was happening, but --

11      Q.    Okay.  All right.  Where did the family unit --

12  I assume we're talking about Alejo, Donna and yourself at

13  this point.  Where did you guys wind up here in Arizona?

14      A.    At my dad's mom's house --

15      Q.    Okay.

16      A.    -- in Casa Grande.

17      Q.    All right.  So was Alejo originally, his

18  family, from the Casa Grande area?

19      A.    Yes.

20      Q.    Okay.  Did Donna have any connection with Casa

21  Grande?

22      A.    I believe so.  Before we traveled, my mom

23  worked down here, down in Casa Grande.

24      Q.    All right.  So this was a logical place to

25  return there, he had roots there, kinships in Casa Grande?

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    A.    Yes.

2    Q.    Okay.  Where did you move into?  I mean, what

3  was the setup when you got back to Casa Grande?

4    A.    Well, it was my -- my nana's house.  She had --

5  1, 2 -- 3 bedrooms, and one bathroom.  And my nana, my

6  cousin, my aunt lived there, and then I remember my mom, dad

7  and I moved in too.

8    Q.    Okay.

9    A.    I don't know the length of time we lived there,

10  but it was for a little while so we could get our own house.

11    Q.    All right.  At some point in time did Alejo,

12  Donna and you find a place of your own?

13    A.    I remember moving to a little house.  It was on

14  12th Street and it was a little bitty tiny house, and I

15  remember it having a tin roof because every time it rained

16  you could -- it was very loud.

17    Q.    Okay.

18    A.    But, yeah.

19    Q.    All right.  What business or -- or things did

20  Alejo do at that point in order to provide for the family?

21    A.    I remember my dad being in construction with

22  Gallo Construction.  I also remember him working at Foxworth,

23  which is a very small version of like a Home Depot or

24  something.  It's carpentry-type stuff.  I remember him doing

25  things like that, and also working still with a church that

1    was in town called 91st Psalm.

2          Q.    Okay.  So was that the church that he was

3    affiliated with before you folks went over to California, is

4    that something he found on his return?

5          A.    I believe that before we went to California we

6    actually went to church at like in people's homes or at -- in

7    a business that had been closed for the day.  I don't think

8    there was an actual church building we went to.  I don't

9    recall that.

10         Q.    Okay.  Would your father, under those

11   circumstances would he be the pastor or the preacher or the

12   person leading the services?

13         A.    One of them.  They would take turns.

14         Q.    All right.  Come back to Casa Grande.  He now

15   allies himself with the 91st Psalm Church.  Is your mother

16   a -- a congregant, I guess the word is, at 91st Psalm as

17   well?

18         A.    Yes.  And she actually participated in the

19   church in several different ways.

20         Q.    In what capacity?

21         A.    I believe she did some secretarial work.  At

22   first that's mainly what she did.  Later on I know she helped

23   with the school we have there too.

24         Q.    All right.  How old are you now at this point?

25         A.    Around 9.

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1     Q.     Okay.  Are there traditional Sunday services at

2  this church?

3     A.     Yes.  We had service every Sunday morning.

4  Well, we had Sunday School first and then Sunday service, and

5  then we had Sunday night service, and we also had a Wednesday

6  night service.

7     Q.     All right. And your father Alejo, is he a -- a

8  lay minister or participant in the preaching --

9     A.     Yes.

10     Q.     -- of this church?

11     A.     He wasn't the main pastor.  He was -- I don't

12  know if his official title was youth pastor, but I believe

13  that's what it was and he would fill in if the main pastor

14  wasn't available to run the service.  But my father's main

15  job there was actually doing children's church, and on

16  Wednesday night he would also do teen group.

17     Q.     Okay.  And those concepts, they're pretty much

18  self explanatory services for that age group?

19     A.     Yeah.  Children's church -- I remember he

20  actually drove around the neighborhoods in a bus and picked

21  up children whose parents didn't come to church, but they

22  wanted their kids to go, and so he had quite the, you know,

23  puppet shows and, you know, quite the thing going on to

24  entertain the children in a way they would also be educated

25  about the Bible.

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1       Q.    Okay.  Is there a certain sect or denomination

2    we're dealing with here in terms of this particular church?

3       A.    My understanding of it is that it is

4    nondenominational, just a faith-filled Bible-believing

5    church.

6       Q.    Okay.  I guess we could differentiate -- let me

7    go back -- tell me what it isn't.  Is it Catholic?

8       A.    It is not.

9       Q.    Is it Muslim?

10      A.    No.

11      Q.    Is it Buddhist?

12      A.    No.

13      Q.    Okay.  What's the main thrust of the teachings

14   of this particular --

15      A.    We believe in the Holy Bible and we believe in

16   the Trinity -- God, the Father, and Jesus, his Son, and the

17   Holy Spirit.  They're three in one.  And that Jesus came

18   and --

19          MR. MARTINEZ:  Objection.  Relevance.

20          THE COURT:  Overruled.  Go ahead, finish the

21   question.

22          THE WITNESS:  Around, oh, 2000 years ago, he died on

23   the cross for our sin, rose from the dead, and as long as you

24   accept him as your Savior in your heart, then you'll go to be

25   with the son.

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    BY MR. PATTERSON:

2         Q.    Okay.

3         A.    That's --

4         Q.    More or less traditional Christian fundamental

5    belief --

6         A.    Yes.

7         Q.    -- system?

8         A.    Yes.

9         Q.    Okay.  And in terms of, if you can understand

10   conceptually that continuum, where would the teachings of

11   that church lie on the kind of continuum of Christianity?

12        A.    I'm not -- I can't answer that.

13        Q.    Okay.  That's a lawyer question.  I apologize.

14   I'm trying to just find out how fundamental is this

15   fundamental church?

16        A.    The church was very -- very strict.  We --

17        Q.    Okay.

18        A.    Whatever the Bible says, that's what you

19   follow.  You obey your parents, you don't sin.  If you do

20   sin, I mean, it's a pretty major thing to the point where if

21   somebody's doing something wrong in the church, the -- the

22   pastor, whoever, will confront you and, you know, hope that

23   you straighten out.  And if you don't, you are asked the

24   leave the church.

25        Q.    Okay.  How big was this congregation when you

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

```
 1    folks first arrived?

 2            A.    I don't recall when I first arrived.

 3            Q.    Okay.

 4            A.    Maybe like 100, 150 people.

 5            Q.    All right.  Who was the pastor initially?

 6            A.    Calvin Lords was the pastor.

 7            Q.    Okay.  Was he the founder of the church too?

 8            A.    I believe so, yes.

 9            Q.    Okay.  At some point did the mantle of lineup

10    transfer to some other pastor?

11            A.    It did.  It went to Pastor Tom King.

12            Q.    All right.  And how old were you when he

13    assumed the lineup role there at 91st Psalm?

14            A.    I'm not real sure.  11, 12, maybe.

15            Q.    All right.  Was there a school associated or

16    affiliated with that particular church?

17            A.    Yes, there was.

18            Q.    Okay.  And what was the grade level?  And we'll

19    get into grades or -- not in a public school sense, but what

20    was the range of -- of student ages, if you will, in that

21    particular school?

22            A.    The school went from prekindergarten all the

23    way through high school.  You could graduate from there and

24    it was called Accelerated Christian Education.  That was

25    based out of Texas and it's a Southern Baptist curriculum.
```

1       Q.     Okay.  And tell me how particularly it worked.

2    Did you have kind of conventional teachers and student grade

3    groupings and promoted, you know, one year to the next, that

4    kind of thing?

5       A.     No.  It's more old-fashioned.  At -- what we

6    did was say all of the children from what you would consider

7    first grade through junior high would sit in one large

8    learning center.  It's just one large room and we had desks

9    that faced the wall and dividers between each of us, and we

10   would sit there and do our school work.  And if we needed

11   help, we would raise a flag and a supervisor or a monitor

12   would come over and assist you with your learning.

13      Q.     Okay.  And was the learning skills, were they

14   broken up into certain little increments so to speak?

15      A.     Yes.

16      Q.     What were they called?

17      A.     Basically one traditional grade was made out of

18   twelve paces, which are little booklets.  So take math for

19   instance.  If you were doing your second grade math, you

20   would have twelve math books and each one of those were

21   called "paces."  And whenever you finished those twelve, you

22   have basically finished second grade and you could move on to

23   the next grade.

24      Q.     Okay.  So it wasn't contingent upon a calendar

25   year?

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1        A.    No.

2        Q.    As soon as you were at that point where you

3   could be promoted, you were promoted to the next level?

4        A.    Right.  We didn't even call it a promotion

5   because you just worked at your own pace and children who

6   wouldn't complete their work as quickly were not compared

7   with ones who went quicker, so there was no embarrassment if

8   you couldn't work as fast.  Or if you could work quickly,

9   there wasn't really a reward for that either.

10       Q.    Okay.  Were religious themes kind of involved

11   in this educational process at all stages and all levels?

12       A.    Most definitely.  The paces, as I said, for the

13   curriculum was Southern Baptist, which is very traditional,

14   very strict, very -- like girls wear dresses below their

15   knees and no more than two fingers blow your collar bone, no

16   make up, buns in the hair, that type of thing, and so those

17   were the people who actually put together this curriculum.

18   Well, in the curriculum they used a boy and a girl to talk to

19   each other at -- in order to relay instructions to you.

20       Q.    Okay?

21       A.    And those were always biblical based.

22       Q.    Give me a for instance.

23       A.    Just off the top of my head, I could think of

24   most popular, everybody knows Noah's Ark, how the animals

25   came in two-by-two.  That would be something used to help

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1     with your multiplication tables or teach the concept of

2     adding two plus two.

3          Q.     And those themes are woven into all of the

4     subject matters?

5          A.     Yes, they are.

6          Q.     Okay.  And how did you begin your day?

7          A.     We began our day saying actually a prayer.  We

8     did the Pledge of Allegiance, and just had a basic -- we

9     read -- oh, we also read a chapter out of the Bible that

10    was -- we had a certain one assigned each month that we had

11    to memorize, so we had to read that over in the morning if

12    somebody was ready to recite it from memory at that time.

13    Everybody would listen to them stand up and say their

14    scripture.

15         Q.     Okay.  And each day was there a one subject or

16    one period set aside for the study of scripture and study of

17    the Bible?

18         A.     Yes.  On Tuesdays and Thursdays we had a class

19    called Devotions where we could leave the ordinary learning

20    center and go to another room, and my father taught that and

21    what that is is Bible study.  You take certain parts of the

22    Bible and he explains it to you in a way you could understand

23    and learn how to apply it to our own lives.  On Wednesday

24    morning we went to an actual church service where there was

25    music first, preaching afterwards, and then we'd return to

1    school.

2         Q.    Okay.  And what kind of ideals did they

3    instruct you about?

4         A.    Basically everything that is in the Bible is

5    how we're supposed to live our life.  We're supposed to

6    follow in Jesus' footsteps and so that's the main thrust of

7    everything.  It's -- it's basically love your neighbor as

8    yourself, love the Lord your God with all your heart, honor

9    your mom and dad, you know, the 10 Commandments, don't lie,

10    all that sort of stuff.

11         Q.    Particular ideals or scriptures given

12    concerning the role between husband and wife?

13         A.    Most definitely.

14         Q.    What were those?

15         A.    I grew up where my father was the head of the

16    household, decisions were made by him, and the mom is there

17    to support him in what he does and to help him assist him do

18    his job and his duties.  And you always -- you always obey

19    your father.  You -- so in -- I learned as being raised, in

20    addition in a husband and wife situation, the wife submits to

21    her husband and you do what he says.

22         Q.    Okay.  Were there certain subjects that were

23    not taught in your school?  For instance, Darwin's Theory of

24    Evolution?

25         A.    Right.  We were actually introduced to the

1    concept of evolution, but in such a manner it was false

2    because we believe in Creation and so we were -- you know, it

3    was like it was presented to you so you were aware of it, but

4    we were taught not to believe it.

5         Q.    Okay.   It was discredited as a theory?

6         A.    Yes.

7         Q.    Okay.   And you said it was explained or

8    contrasted with creationism.   What was that?

9         A.    Uh-huh, creation.

10        Q.    What was that?

11        A.    Creation as it is taught in the Bible in

12   Genesis Chapter 1, how God created the Earth in six days and

13   rested on the seventh.

14        Q.    Okay.   Were there home services during your

15   period of upbringing?

16        A.    Yes, there were.

17        Q.    Okay.   What were those all about?

18        A.    We would have Bible study groups at home or

19   like my father would do devotions with his family a lot.

20   Sometimes -- I remember sometimes going over to, when Calvin

21   was the pastor, going over to his house and having home

22   meetings also.   And if somebody was wanting to teach like a

23   certain subject or whatever, you would go to their house and

24   there might be a book or something that people were going

25   through and everybody would get together in these little like

1    cell groups and do more in-depth Bible study.

2          Q.    Okay.  But the topic of discussion always was

3    the scriptural teachings of the Bible?

4          A.    Yes.

5          Q.    Okay.  Did your family socialize back at that

6    time frame?

7          A.    With other church members, yes.

8          Q.    Okay.  And the subject matter of your

9    socialization was what?

10         A.    Occasionally I recall us playing some board

11   games.  I recall one time they were showing movies on a

12   Friday night and we got to watch Sound of Music or Old

13   Yeller, and in particular I remember the Rocky movies.  And

14   the reason why we got to watch the Rocky movies is because we

15   never gave up.  He had a goal and did everything he had to do

16   to reach that goal.  And our school is very goal-oriented.

17   We state our own goals so it's drilled in us that you --

18   you -- you set goals and you work until you meet them.

19         Q.    Okay.

20         A.    So not meeting your goals, that's not accepted.

21         Q.    All right.  In the social context were there

22   certain activities not allowed or prohibited?

23         A.    Yes.  We were not allowed to dance or drink or

24   smoke or listen to secular music.  Pretty restricted on

25   wearing makeup and the types of clothes that you wore.  They

1    had to get approval by your parents.  You couldn't go

2    cruising around, hang out in the parking lots, couldn't go to

3    R-rated movies.  Even some of them that were PG-13 I wasn't

4    allowed to watch.  No dating.  No prom, no -- just --

5        Q.    Okay.  The activities that you were allowed to

6    participate in, were your folks always around, were there?

7        A.    Yes.  Because my father was the youth pastor,

8    my home was the one where we would invite a lot of teenagers

9    or younger kids over and we'd have like a fun night at my

10   house and that would be like playing games and doing

11   scavenger hunts, things like that.

12       Q.    But it was group activity --

13       A.    Uh-huh, group activities.

14       Q.    -- under the watchful eye of your father, the

15   associate --

16       A.    And my mom, yeah.

17       Q.    -- pastor?

18       A.    Yes.  He also took us camping, which was fun.

19   He would -- him and other couples would take all the kids

20   camping and a couple of summers I did -- was able to go to

21   camping, but it was -- it was the Assembly of God camps, so

22   it's another kind of Christian --.

23       Q.    Okay.  And was the focus of that camp the

24   teaching

25       A.    Uh-huh.


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1          Q.      -- of scripture and --

2          A.      Yeah.

3          Q.      -- analysis, if you will, of the Bible?

4          A.      Yes.

5          Q.      Okay.  At some point in time did you change

6    headmasters or directors, if you will, to the high school

7    there at 91st Psalm?

8          A.      Yes.  At one point the principal and his wife's

9    name was Mr. And Mrs. Keeting (phonetic), Mark and Nancy, and

10   I know when they came in, they brought in some programs to

11   the school such as sports that we had not had before.  They

12   started a track team and --

13         Q.      All right.  Was there a reason for kind of

14   opening up the curriculum somewhat in terms of was there a

15   decline in the enrollment?

16         A.      Yes, there was.

17         Q.      Okay.  Tell me about that.

18         A.      Well, the school really -- the school was kind

19   of a reflection of the church and so the church membership

20   declined you wouldn't see as many kids in school, and so I

21   believe that they were brought in to try to make the school

22   more well rounded.

23         Q.      Okay.  A little more mainstream, if you will?

24         A.      I believe so.

25         Q.      Okay.  To that end what did they do?  Did they

1    implement some new programs?

2              A.    Mm-hmm.

3              Q.    Loosen it up a little bit?

4              A.    Well, they brought in sports is what they did.

5              Q.    Okay.  Tell me about that?

6              A.    Mr. Keeting started a swim -- swim team, swim

7    club, and his wife started a track team.  And that was pretty

8    fun.  Most everybody participated in that.

9              Q.    All right.  Were you a member of one or the

10   other team?

11             A.    Just the swim team, I was.

12             Q.    All right.  Tell me about your participation in

13   that program.  Was it a daily event?

14             A.    Yeah.  It was pretty grueling.  Mark had been a

15   swim coach before and had competed in swimming back east

16   wherever he was from, and we would -- at times we would have

17   swim practice in the morning before school, then go to

18   school, and then after school we'd have swim practice again,

19   then three times a week we also lifted weights.

20             Q.    Okay.  And I assume the 91st Psalm or Harvest

21   Christian Academy didn't have a swimming pool?

22             A.    No.

23             Q.    Where did you --

24             A.    We actually used the pool out at Central

25   Arizona College, which was about a 20-minute drive from us.

1          Q.      And did the fact that you had to go to a

2    different site for swim team have an influence on your

3    development?

4          A.      Well, at one point Mark Keeting started helping

5    coach the Casa Grande Union High School swim team and that

6    brought -- that was my first introduction to kids outside of

7    my church realm.

8          Q.      Okay.

9          A.      So that -- that was interesting.  It was

10   really -- we were very shy, didn't know how to talk to them

11   or how to socialize with them or anything.  It was -- we kind

12   of kept to ourselves, but we'd watch them, my friends and I

13   on the swim team, watched their behavior to see how they were

14   because we just weren't sure.

15         Q.      Okay.  And how old were you at this point in

16   your life?

17         A.      14, 15.

18         Q.      All right.  So just to kind of understand

19   what's going on here, up to age 14 or 15, you had associated

20   with -- with who primarily?

21         A.      Well, my friends were usually when Calvin was 3

22   he had three daughters and I hung around -- they were --

23   that's who my friends were.  And then when Pastor Tom was

24   there, he had Shawn and Brad and Amy, and I hung around them

25   all the time too.  They were my best friends.

1      Q.     And as a result of this swim team opportunity

2   where you went to different locations, this was the first

3   time you met people that didn't share your same scriptural

4   beliefs?

5           A.     Yes.

6      Q.     Is that a fair statement?

7           A.     That's correct.

8      Q.     Okay.   To that end, what did began to develop

9   here in terms of your perceptions and attitudes?

10          A.     Well, it was always communicated to us that

11   those people who went to the high school -- to the, you know,

12   public high school were rowdy and always sinning and were

13   just -- not bad people, but just people that would be a bad

14   influence on us, that you're not supposed to hang around them

15   because you're only supposed to hang around Christian people,

16   and that was my first time that I saw that I didn't think

17   that they were bad.   I didn't think that they were -- in fact

18   they seemed very fun.   And, you know, they would talk about

19   different things they would do and even some of those kids

20   went to different churches in town and were still allowed to

21   do all those things like go to the movies, something just as

22   simple as after swim practice, they would go to McDonalds and

23   I would want to go but I couldn't go.   I wasn't allowed to.

24      Q.     Okay.   What was your hair color back then at 14

25   or 15?

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000004700

1          A.     Well, I was born blonde and it stayed blonde,

2     and while I was swimming it definitely stayed that way

3     because of the chlorine and the sun.

4          Q.     Okay.  Chlorine accentuated the --

5          A.     Most definitely.

6          Q.     All right.  Were there times back when you were

7     attending the school that you ran away from home?

8          A.     Yes, I did.

9          Q.     Okay.  In terms of numbers?

10         A.     When Calvin was the pastor of the church, and

11    as I said before, Kyrie (phonetic), his daughter, was my best

12    friend, and we had corporal punishment in school.

13         Q.     What do you mean by that?

14         A.     We would get spanked with what they called the

15    rod, and it was a wooden paddle.  And you could get spanked

16    for a variety of reasons, and some of them in our little

17    minds, we didn't feel it was exactly fair.  We didn't want a

18    spanking.  So one day right after school, we decided to

19    just -- we were going -- we were going to go -- this is

20    embarrassing, sorry.  We were going to go live in one of

21    those KOA campgrounds, and I don't know what we were going to

22    do, but we were just -- it was to escape some type of, you

23    know, punishment that we knew was coming.  And so as soon as

24    school was over, we started walking through the desert and

25    down some dirt roads.  Then we got hot and tired and just sat

```
1    there on the side of the road until somebody drove by and

2    picked us up.

3            Q.   Okay.  What age were you at that first --

4            A.   Had to be like 9.

5            Q.   Okay.  Were there other times?

6            A.   Well, Kyrie and I did that a couple more times,

7    just --

8            Q.   Kyrie is the daughter of the original pastor?

9            A.   Uh-huh.

10           THE COURT:  Is that a "yes"?

11           THE WITNESS:  Yes.

12           THE COURT:  Make sure you give a verbal response.

13   Thank you.

14           THE WITNESS:  Yes, sir.

15   BY MR. PATTERSON:

16           Q.   All right.  So that happened a couple of

17   occasions, two or three occasions?

18           A.   Two or three times.

19           Q.   There was another time --

20           A.   Yes.

21           Q.   -- where you had enough and you tried to --

22           A.   Well --

23           Q.   -- make a change in your lifestyle?

24           A.   When I was 15 years old, my mom worked out at a

25   place called Ak-Chin Farms, and her boss was Mr. Don England.
```

1        Q.    Is that a tribe out in the Casa Grande area,

2  Maricopa County area?

3        A.    Uh-huh, Maricopa County area.

4        Q.    Okay.

5        A.    And his two children went to our school. The

6  son was about my age and the daughter was a couple years

7  older. And she used to drive to school everyday and she had

8  quite a lot of freedom. They weren't raised the same way we

9  were raised. They attended church, but they weren't really

10  involved with church, if that -- if you could understand the

11  difference.

12        Q.    Uh-huh, sure.

13        A.    They were Sunday-goers instead of actually

14  living that as your lifestyle. Well, Susie would come to

15  school sometimes with pink hair, or, you know, she was just

16  kind of a little bit more outgoing than what we had ever

17  seen, and I felt that some of the things that I wanted to do,

18  like if I wanted to go to the State fair or if I wanted to go

19  to the movies or something like that, I didn't feel like it

20  was unreasonable and I didn't understand why my mom and dad

21  wouldn't let me. So one day after school I told Susie, I

22  said, you know, can I go home with you because, you know, I

23  wanted to talk to her mom. I really liked her mom, Martha.

24  And so Susie said, well, do your mom and dad know? And

25  well, no, they don't, but I said that they would let me go.

1    Anyways, I got in the truck and went home with her.  And I

2    remember crying on Martha because I thought it was so unfair.

3    I'm growing up around these kids from the swim team, around

4    even your own mom's bosses kids who could watch things --

5    like I wanted to watch the movie "Grease" and I wasn't

6    allowed to, so I kind of cried on Martha's shoulder.  I

7    wasn't running away, but I needed somebody to speak to my

8    parents for me because they weren't listening.

9            Q.    Okay.  How long did this venture last?

10           A.    I only stayed there overnight.  The next day I

11   went back to school and went home, and actually it was a good

12   thing because my parents sat down with me, talked with me and

13   really listened to me.

14           Q.    Okay.  Does that cover your --

15           A.    Yeah, that's it.

16           Q.    -- rebellious youth?

17           A.    That's all I did.

18           Q.    All right.  Tell me a little bit about the

19   relationship, the family relationship, between your father

20   Alejo, your mother, Donna, and yourself, the family dynamics.

21   Who was in charge of the home, so to speak?

22           A.    My father.

23           Q.    Okay.

24           A.    My father was definitely in charge.

25           Q.    All right.  Was it in the nature, I guess,

1    where he would share decision-making responsibilities with

2    mom or did he make the decisions?

3            A.    No.   In fact because my father was part of the

4    church, there was a lot of things that went on in the church

5    that he was not able to share with my mother, and so I really

6    feel like a lot of things were just done by my dad and we

7    didn't even know what was going on, you know, if there was

8    problems going on in the church or whatever, and that just

9    carried over into our family life.   My dad would decide

10   everything.

11           Q.    For instance, give me an example of his -- his

12   decision making.

13           A.    Well, at the -- okay.   The only thing I recall

14   my mom making decisions would be sometimes if she would go

15   out to eat, she would decide because my dad didn't want to

16   decide.

17           Q.    She picked the restaurant?

18           A.    Picked the restaurant.

19           Q.    With that exception, all other major decisions

20   were made by your father?

21           A.    Oh, yes.

22           Q.    Okay.

23           A.    And the reason why is because he's the one

24   that, you know, he prays and asks God what God wants him to

25   do, so my mom trusts in that and trusts that my father's

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000004705

1  hearing from God and then follows those decisions.

2         Q.    Okay.  And did you share in that belief that

3  your father had kind of a right to make the decisions in the

4  family?

5         A.    Sure.

6         Q.    Okay.

7         A.    Yes.

8         Q.    Did your father also have a temper?

9         A.    Yeah.

10         Q.    Okay.  Describe it for me.  How extreme was his

11  temper?

12         A.    (No response.)

13         Q.    Take your time.  Have a sip of water.

14         A.    There was a lot of yelling between my --

15  actually more my father yelling at my mother or my father

16  yelling at me because there was a lot of frustration with

17  being a minister in a church and so we would get the brunt

18  end of it.

19         Q.    Okay.

20         A.    One of the things -- it's just hard because I

21  love my dad, you know.

22         Q.    I understand.

23         A.    He would yell about all kinds of stuff.

24         Q.    For instance?  Give me an example.

25         A.    After school --

1          MR. MARTINEZ:  Judge, could we have some foundation

2    of when he did this yelling?

3          THE COURT:  I'll sustain the objection.

4    BY MR. PATTERSON:

5          Q.    Okay.  Growing up you were in Casa Grande,

6    right?

7          A.    Yeah.

8          Q.    Okay.  How old are you when you first begin to

9    perceive your father has this significant temper?

10         A.    I had seen it when we were traveling in

11   California.

12         Q.    Okay.

13         A.    I had not seen it before then.  When we moved

14   back to Casa Grande is when it actually got a little worse.

15   When we lived at my nana's house, my mom and dad would go

16   outside and have their arguments, but of course you could

17   still hear them.  And it probably happened I wouldn't say on

18   a daily basis, but, I don't know, three, four times a week or

19   so that there would be an eruption.

20         Q.    Is this continuing throughout your --

21         A.    Yeah.  This is just --

22         Q.    -- teenage years while you were living at home?

23         A.    Yes.

24         Q.    All right.

25         A.    Until the day I moved out, that was my life.


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    That was part of my life at home.

2         Q.    All right.  What kind of things would upset

3    your father?

4         A.    Well, some things I wasn't aware of.  I don't

5    know what was going on in the church, the people or whatever.

6         Q.    Okay.

7         A.    He would be upset about that.

8         Q.    What would the manifestations of that upset be?

9    When he would come home, what would you observe he and

10   mother do?

11        A.    Well, my mom and I seemed to get yelled at for

12   any little thing that wasn't done right, if the house wasn't

13   clean or if my mom would come home from work and hadn't made

14   dinner yet, so I had learned at an early age to make dinner

15   and make sure that was ready so my dad wouldn't be upset.

16        Q.    Okay.  And in terms of yelling --

17        A.    Yeah.

18        Q.    -- what kind of yelling are you talking about?

19        A.    He didn't curse at us.  It was just yelling.

20   He was -- he has one of those really bad tempers where, you

21   know, you start to break out in a sweat and yelling to where

22   you're halfway down the street you could hear it.  It was

23   embarrassing.

24        Q.    Would he throw things periodically?

25        A.    Yes, he would.

1      Q.    Okay.  What would he throw?

2      A.    Well, I remember specifically one day he --

3      MR. MARTINEZ:  Foundation for this day?

4      THE COURT:  Lay some foundation.

5  BY MR. PATTERSON:

6      Q.    How old are you when this happened?

7      A.    I'm about 14 years old.

8      Q.    Okay.  At the home there in Casa Grande?

9      A.    Uh-huh.  We're at the house and he was in the

10  living room, and I don't recall what he was mad about because

11  it was between my mom and him and I was standing in the

12  hallway just kind of waiting to see what was going to happen.

13  And it was silly, but he took his -- all the change that he

14  had in his pocket and threw it up against the wall.  And

15  later on he looked, and we actually laughed about it later,

16  but, I mean, there were imprints of the coins on the wall.

17  He didn't throw things a whole lot, I mean, but just

18  occasionally.

19      Q.    How would you react to your father's outbursts?

20      A.    It would scare me.  He's scary when he's mad.

21      Q.    Okay.  What would you do?

22      A.    If it was at me and my mother, then we would

23  either usually go to the bathroom or to her bedroom and shut

24  the door and hope he wouldn't come back there and keep on,

25  because usually if it's out of sight he would calm down or he

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000004709

1    would leave and drive away.  He'd come home a couple hours

2    later whenever he was cooled down.

3            Q.    Okay.  Did you witness your mother making any

4    efforts to try and placate him or calm him down?

5            A.    My mom and I both did that.

6            Q.    What would you do?

7            A.    When he'd leave, you know, we -- when -- we

8    knew that he'd come back in an hour, maybe an hour and a half

9    or two, and when he got back we'd want to have dinner ready

10   for him.  Or, you know, his favorite thing was he liked to

11   lay on the couch and I'd always play with his hair and that

12   would calm him down.  And just things like that.  Just --

13   just talking softly to him and, you know, just trying to

14   please him.

15           Q.    Did you ever encourage your mother to leave

16   him?

17           A.    When I was older I had a conversation with her

18   about that.  But my mother had been divorced once and she

19   said when you do something twice you make it a habit.

20           MR. MARTINEZ:  Objection.  Hearsay.  And if we could

21   have the foundation.

22           THE COURT:  I'll sustain the objection.  Ask your

23   next question.

24   BY MR. PATTERSON:

25           Q.    When did you have this conversation with your

1    mom?

2          A.    When I was about 17 years old.  Can I tell you

3    the whole incident or the --

4          Q.    Yeah what lead to this particular conversation

5    with your mother?

6          A.    I had asked to go to a family reunion with

7    somebody.  It wasn't a date.  It was a family thing.  It was

8    a group thing, but, yes, it was with a guy I had met through

9    Christian school.  And my dad didn't want me to go because he

10   thought it was a date.  My mom said, no it's not a date and

11   yes, you can go, so I went ahead and went.  And when I got

12   back, my dad was outside in the backyard watering the trees.

13   And I went out there because I knew that he'd been upset and

14   I just would rather face it and get it over with.  And as

15   soon as he saw me, he started yelling at me and couldn't

16   believe that I disobeyed him and just was yelling and

17   yelling, just -- I can't tell you all the words, but just he

18   ended up backing me up against the wall in the back of the

19   house and he -- he put his hands on me, put his hands on my

20   shoulders, and he was starting to shake me.  And then

21   something inside of him, it was like -- like somebody snapped

22   in front of his face or I don't know what it was, but he

23   said, You know what --

24              MR. MARTINEZ:   Objection.  Hearsay.

25              THE WITNESS:   -- get out of my sight.


                 TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

 1          THE COURT:  Sustained.

 2          MR. PATTERSON:  Well, no, impact --

 3

 4               (The following proceedings were held at the

 5     bench:)

 6

 7          MR. PATTERSON:  Judge, our entire defense is based

 8     upon this woman's -- how she was molded during the course of

 9     her life from the male patriarchal figures in the family.

10     We're not offering what this gentleman said to her on that

11     date for the truth of matter asserted, but how she reacted

12     and how it formed -- formed her personality.  So it's not

13     offered as a hearsay truth.

14          THE COURT:  Mr. Martinez?

15          MR. MARTINEZ:  What's -- I understand what he's

16     trying to do, and I can understand --

17          MR. DELOZIER:  Excuse me.

18          MR. MARTINEZ:  -- why he wants to elicit that from

19     her, but I'm not telling him how to do it, how to do this,

20     but the better course would be did he raise his voice, what

21     was his demeanor, all of that.  The fact is, if it isn't

22     important, we can't hear it.

23          THE COURT:  What's she going to say he said?

24          MR. PATTERSON:  That she basically -- I don't know

25     exactly what she's going to say but, what he said to her is

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1  basically, you know, we're in charge here and learn to live

2  with it.

3          THE COURT:  Okay.  I'll allow the question about her

4  state of mind going towards 13-414, so go ahead and repeat

5  the question.

6

7          (The following proceedings were held in open

8  court:)

9

10         THE COURT:  Mr. Patterson, restate the question,

11  please.

12         MR. PATTERSON:  Yes, Your Honor.

13  BY MR. PATTERSON:

14         Q.    You had a confrontation with your father at

15  this time and you're about, what, 17?

16         A.    Yes.

17         Q.    Okay.

18         A.    And the background was I disobeyed basically a

19  direct order.

20         Q.    Okay.  Did you father say something to you at

21  that point in your life that affected you?

22         A.    He directed me to get out of his face before he

23  hurt me.

24         Q.    Okay.

25         A.    And I took off running to my bedroom and shut

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    the door.

2           Q.    Okay.  So his anger had gotten to such a point

3    where he was capable, you believe, of him hurting you?

4           A.    That's what I thought, yes.

5           MR. MARTINEZ:  I'm going to object.  She's being

6    nonresponsive.

7           THE COURT:  Sustained.  That last portion will be

8    stricken.

9    BY MR. PATTERSON:

10          Q.    Why was that?

11          A.    That was because he had his hands on me and he

12   never put his hands on me before.

13          Q.    Okay.

14          A.    Besides spanking me.

15          Q.    Did that affect you in some fashion?

16          A.    That scared me.

17          Q.    Okay.  Were there any other incidents where

18   your father touched you improperly or harmed you physically?

19          A.    No.

20          Q.    How about your mom?  Mom do anything that

21   harmed you physically during the course of your growing up

22   there in Casa Grande?

23          A.    Because of the way we say the father is the

24   head of the household, there's not quite the level of awe and

25   respect with your mother as there is with your father, at

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000004714

1    least in my family.  And so sometimes when I was smaller, I

2    would reveal -- you know, when you say something smart to

3    your parents or smart off, or you're not listening or

4    whatever the deal is, I would do that with my mom more than I

5    would my dad, and she would always grab my hair and pull me

6    by my hair.

7          Q.    Okay.  Anything else that --

8          A.    No.  She just -- that was her thing.

9          Q.    All right.  Let's talk about your dating

10    history back there in Casa Grande.  Who was your first

11    boyfriend?

12          A.    Shawn King.

13          Q.    Okay.  Who was Shawn?

14          A.    Shawn was Pastor Tom's son.

15          Q.    Okay.  And how old were you when you first

16    started going with Shawn King?

17          A.    Well --

18          Q.    And probably the term "going with" is a little

19    extreme.

20          A.    Yeah, that's not --

21          Q.    Okay.  Let me --

22          A.    That's not --

23          Q.    -- back off on that.

24          A.    Wesley, Shawn and I were very good friends from

25    the time we were 11 years old, 12 years old.  It was never a

1    boyfriend, girlfriend type of thing, although as children,

2    you know, you pull each other's hair and chase each other

3    around the playground, things like that.  But when we got

4    older is when it became more of a --, boyfriend girlfriend

5    relationship as far as just like holding hands, but we -- our

6    first date was after I was 18 and that was chaperoned by my

7    mom and dad.

8          Q.    Okay.  Were there certain pressures on you

9    because of who he was and who you were in the school there?

10         A.    Once this began, it was pretty much expected in

11   the church that we would get married.

12         Q.    Did you do any socializing with him alone with

13   him at any time up to age 18?

14         A.    Alone?

15         Q.    Yeah.  Did you go out to the movie --

16         A.    Oh, no.

17         Q.    -- together, anything of that nature?

18         A.    No.

19         Q.    Okay.  Again, does that go back to what you

20   told me those kinds of activities were not preferred?

21         A.    Right.  We -- right.  We did group things, but

22   nothing by ourselves.

23         Q.    Okay.  At some point in time, age 18, you did

24   have the opportunity to go out with him?

25         A.    Uh-huh.

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1       Q.      And it was chaperoned by your father?

2       A.      Right.  Our first date was chaperoned and we

3   actually went to -- I don't recall the restaurant, but it was

4   a nicer restaurant and Shawn and I sat at our own table and

5   my mom and dad sat at their table nearby, and that was our

6   first date.

7       Q.      Okay.  Did you ever have any intimate relations

8   with Shawn King?

9       A.      We -- to a degree, yes.

10      Q.      Okay.  To what extent?  How far?

11      A.      We --

12      Q.      I know it's somewhat private, but --

13      A.      We never had sexual intercourse.

14      Q.      Okay.

15      A.      But we did experiment a little bit, you know.

16      Q.      Okay.  At what age did this begin?

17      A.      Well, around that time I had gone to Mexico so

18   it would have been, I don't know, 19?  I guess 19 years old.

19      Q.      All right.  Did you have some experiences with

20   some other boys there in Casa Grande?  And if so, tell me

21   about them?

22      A.      Yes, I did.  After I was 21, I wasn't dating

23   Shawn any longer and Barbara, my cousin, actually introduced

24   me to Casa Grande society and we started going out to

25   different places, and that was the first time I had ever

1    taken a sip of alcohol, it was the first time I'd ever been

2    to a dance, and yes, I did have -- I dated a few guys.

3            Q.    Okay.  And did you have a sexual relationship

4    with either of those two gentleman or both?

5            A.    I did with two people.

6            Q.    Okay.  And what were their names?

7            A.    One was Didos Gamez and the other was Vernon

8    Barnes.

9            Q.    Okay.  Let's talk about the Didos Gamez

10   circumstance.  How did that come about?

11           A.    I had seen him around, you know, at different

12   bars or whatever, and I actually think that we met at a

13   desert party in Casa Grande.  Lots of the kids go out in the

14   desert and light a big bonfire and everybody kind of hangs

15   around out there.  And my friends that I hung around, like

16   Barbara and Margaret, continually were teasing me that I

17   hadn't slept with somebody.

18           Q.    Okay.  That you were still a virgin?

19           A.    Yeah.

20           Q.    Okay.

21           A.    And so I -- I guess one night I decided that I

22   wanted to see what this was all about, and that's the person

23   that -- oh, my God.

24           Q.    I understand it's difficult.  How old were you

25   at this time?

1        A.    I was 21.

2        Q.    All right.  And frequency?  Did it happen once,

3   twice, was that it?

4        A.    Yeah, it was not what I expected and so it

5   didn't -- no, that was --

6        Q.    Okay.  So it was an effort on your part to lose

7   your virginity --

8        A.    Uh-huh.

9        Q.    -- basically?

10       THE COURT:  You need to say "yes" or "no."

11       THE WITNESS:  Yes, sir.

12       Q.    Okay.  There was another Casa Grande boy that

13   you had a brief relationship with?

14       A.    Yes, there was.

15       Q.    What was his name?

16       A.    His name was Vernon Barnes and he was always

17   out at the bars and stuff and he was a lot of fun to be

18   around and he -- they're a farming family and so he had a

19   brother named Chris and I'd go out to the -- out there to the

20   farm fielding with them and out to Gila Bend and different

21   places and stuff.  And then what happened was I found out

22   that he had a girlfriend and I didn't know about that, and it

23   was -- that was my first introduction to drama in a small

24   town city that -- it was -- I had no idea.

25       Q.    Okay.  Did you sleep with Mr. Barnes?

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1        A.      Yes, I did.

2        Q.      And how many times did that occur?

3        A.      Not a lot.  It was only over a period of maybe

4    two months that -- that we -- oh, gosh, I don't know, seven

5    or eight times.

6        Q.      Okay.  Was that -- were there any other males

7    in your life prior to your meeting Joe Andriano?

8        A.      I had gone out with a couple of others but I

9    hadn't slept with them.

10       Q.      Okay.  In terms of your sexual experiences, it

11   was with Didos --

12       A.      Uh-huh.

13       Q.      -- and Mr. Barnes?

14       A.      Yes, sir.

15       Q.      Okay.  All right.  Let's -- would you tell me,

16   before we leave your growing up period, about the different

17   kinds of groups of kids that were in the Casa Grande area?

18       A.      Well, my cousin is Mexican as is my father.

19   Her crowd of people were more middle class, didn't always

20   have a car to drive.  You know, sometimes you have to file

21   in -- in with a friend that does have a car.  And then there

22   was another group that -- of kids that seemed to always have

23   brand new vehicles.  They hung around in a couple of

24   different -- Cotton Hill or like Dell's Pizza, and they all

25   stuck together pretty much.


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1          Q.     Okay.  And what group did you run with

2      primarily?

3          A.     Well, see, what happened was, I -- I was with

4      Barbara and all her friends, but when we'd be in the bar, the

5      guys from this other group were the ones who always wanted to

6      know who I was and were trying to buy me drinks, things like

7      that.

8          Q.     Okay.  Could you categorize the other group

9      from what kinds of families did they come from?

10         A.     They're -- well, I -- we just called them the

11     "farm kids" because --

12         Q.     Okay.

13         A.     most of their familiar -- most of their

14     parents, their families, were into farming or into the

15     chemical sales or into something that had to do with farming

16     cotton or things like that.

17         Q.     Okay.  And was it your perception that group

18     was more affluent than the group you were running?

19         A.     Uh-huh.

20         THE COURT:  Is that --

21         THE WITNESS:  Yes.

22         THE COURT:  -- a "yes"?

23         THE WITNESS:  Yes.

24     BY MR. PATTERSON:

25         Q.     All right.  Each group kind of hung to

1      themselves or stuck with themselves?

2          A.    Yes, they did.  Joe was part of that group, and

3      when I met Joe, he kept me very much away from that group of

4      people until he had -- we had solidified a relationship

5      between us.

6          Q.    All right.  We'll come back to that.

7          A.    Okay.

8          Q.    Let's go now to your job history.  At what age

9      did you first go out and become gainfully employed?

10         A.    It was the summer of -- I was 15, and the

11     summer that I was 16 my mom worked, as I said before, at

12     Ak-Chin Farms.  She was a bookkeeper and Don England let me

13     come out there and he put me on the payroll to help do, you

14     know, little office things.

15         Q.    All right.  And was the opportunity that was

16     presented to you for jobs kind of coordinated through your

17     church?

18         A.    Yes.  My first few jobs were for people in the

19     church.

20         Q.    Okay.

21         A.    Unofficial jobs I'd like to talk about.

22         Q.    Sure, Uh-huh.

23         A.    One of the things with our school is that the

24     end of the year we always had a competition that we wanted to

25     go to.  It was a state competition, and then it went to a

1    national level or international, actually.  And one of the

2    things is that we had to pay for our trips.  And so several

3    families from the church were really -- they're wonderful to

4    work for.  They would hire you for the day and you would

5    clean windows, get weeds out of the yard, you would babysit,

6    I mean, anything that needed to be done, and they're very

7    good about helping us do that so we could earn the money to

8    go on our trip.

9         Q.    Okay.

10        A.    So I've always done that.

11        Q.    Okay.  There was some kind of expectation that

12   you should work at an early age --

13        A.    Yes.

14        Q.    -- in terms of the teachings of your --

15        A.    Well, even during school from 3:00 to 3:30 we

16   had chores we all had to do.  That was just part of -- and

17   then I know we'd have workdays on Saturdays or we'd come and

18   clean up the church grounds.

19        Q.    Okay.

20        A.    So working was -- and I always helped my dad

21   clean the church too.

22        Q.    All right.  While we're on the school topic,

23   did you ultimately graduate from this Harvest Christian

24   Academy?

25        A.    Yes, I did.

1          Q.      How old were you?

2          A.      Was in '89, so I was 18.

3          Q.      Okay.  Did you achieve or acquire any honors or

4    awards during the course of your high school experience?

5          A.      Yes, I did.

6          Q.      Can you go over them in general for me?

7          A.      I don't know all the terminology.  I just know

8    that I completed more than what was required, and so it was

9    something that you graduated with honors was always my

10   understanding --

11         Q.      Okay.

12         A.      -- of it.

13         Q.      How about in music?  Any awards in the --

14         A.      Yeah.  Every year I went to these competitions

15   now, so that was in between several ACE schools, I would win

16   awards a lot in music, piano, poetry recitation, short story

17   writing, sewing, things like that.

18         Q.      Okay.  Was there an award for memorizing

19   scripture?

20         A.      Oh, that's right.  My -- the one that -- it was

21   a new one that had come out and several of us in school did

22   it, but it was to memorize the Book of Proverbs within a

23   certain amount of time.  And -- and I did that and received

24   a, I think it was, like a bronze apple that sat on --

25         Q.      Okay.


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1       A.    -- a plaque.  It was really nice.

2       Q.    Okay.  Let's go back to your jobs here.  First

3  true job, if you will, with working at Ak-Chin, kind of your

4  mom's gopher?

5       A.    Right.

6       Q.    Okay.  What was your next position --

7       A.    My next --

8       Q.    -- of employment?

9       A.    Given to me by "John Casey," we called him.

10  That was Pat King's father.  Pat King is Pastor Tom's wife.

11       Q.    Again, was this acquired through the good

12  graces of your church membership?

13       A.    Yes.

14       Q.    Okay.

15       A.    Yes.  And he was the manager of a place called

16  the Federal Compass, and that was in Picacho and that was in

17  a place where cotton was like ginned or whatever and then it

18  was put into bales and then we'd weigh the bales with cotton

19  and they would sit there until it was sold.  It was kind of a

20  big warehouse type of thing.

21       Q.    Okay.  And what was your task or assignment at

22  that particular location?

23       A.    I rode on top of what looks like a fork-lift,

24  but actually it has pinchers on the front of it and it would

25  pickup a bale of cotton.  And each bale is tagged and then

1    this machine would weigh it and I would have to write down

2    the weight next to the tag.

3         Q.    All right.

4         A.    And the two guys that drove the machine were

5    members of our church also.

6         Q.    Okay.  All right.  Who was the owner again of

7    this particular enterprise?

8         A.    Not the owner, he was the manager, but we

9    called him John Casey.

10        Q.    Okay.  What was your next job?  Did you work

11   for a man named Charlie Peterson?

12        A.    Oh, I did, yeah.

13        Q.    What did he do?  What was the name of his

14        A.    The Peterson's also went to our church and the

15   pastor's sister was his secretary and I believe that she was

16   going to be leaving, and so somehow or the other I was hired

17   for the job and so I was -- it was Peterson Machinery and

18   what they had was big like drills and lathes and just all

19   this big machinery.  I don't know really know what it was.

20        Q.    A machine shop?

21        A.    A machine shop, yeah.  And Charlie Peterson was

22   the owner.  And my first week working there, this man -- the

23   man would always be upset about something.  I could hear him

24   on the phone yelling.  It was a pretty high stress business.

25   So -- I'm used to the yelling, you know, so that was okay.


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    But one day he brought it up -- he brought it out of his

2    office and came by me and -- and the little thermostat that

3    you have on the wall --

4              Q.    To adjust the temperature?

5              A.    Right, to adjust the temperature, as he's

6    yelling he strikes it with his fist and it just comes off --

7    flying off the wall.  And then he went storming out in the

8    machine shop, and that was the first time I had seen him do

9    something physically and I didn't know what to do.  I didn't

10   want to be around that, so I called my dad because I just

11   bought a car and I didn't know what to do.

12             Q.    Okay.  And --

13             A.    And my dad said that I could go ahead and just

14   leave and come home.

15             Q.    And did you resign your position there?

16             A.    I just walked out, yes.

17             Q.    Okay.  Were there efforts made to try to bring

18   you back?

19             A.    Yes.  He had a partner in Florida, his name was

20   Dan, and Dan called me at home and tried to smooth things

21   over and apologize and say this wouldn't happen again and --

22   and it was really hard for me to say no.  I wanted to go

23   ahead and go back to work for him, but I talked about it with

24   my dad and he said, you know, it will happen again.  So he

25   went ahead and got on the phone with Dan and told him I

1    wouldn't be coming back to work.

2           Q.    Again, what was the reason for your decision to

3    leave that particular position of employment?

4           A.    Him striking out in anger at an object on the

5    wall that was so close to me, it -- I already lived in a home

6    where my parents yelled.  I didn't want to be in a work place

7    where I had to hear yelling too because I just --

8           Q.    Okay.  So your decision at that point was to

9    remove yourself from that environment?

10          A.    Yes, sir.

11          Q.    Okay.  All right.  After the Peterson machine

12   shop, what did you do or what job did you have?

13          A.    Well, now I had a car payment that I'm

14   responsible for and so my aunt had suggested I go down to

15   DES.

16          Q.    Okay.

17          A.    So --

18          Q.    Before we get there, let's back up a little

19   bit?

20          A.    Okay.

21          Q.    There was a period of time when you weren't

22   paid for a job but you were a missionary in Mexico?

23          A.    Yes.  I -- I went to Mexico and I was -- it was

24   there was a church in Yuma who is considered --

25          Q.    Let's set the time frame?

1      A.    Okay.

2      Q.    When did this missionary trip occur in your

3  life?

4      A.    When I was 18.

5      Q.    Okay.  And it was after your graduation?

6      A.    After I graduated.

7      Q.    But before what job?

8      A.    But before Peterson Machinery.

9      Q.    Okay.  And what did that entail?  What was that

10  all about?

11      A.    Well, first of all, the church that I went

12  to -- actually, Pastor Tom may have paid for it out of his

13  pocket, but they sent me to the Berlitz School of Language.

14      Q.    Okay.  For what purpose?

15      A.    To -- I knew Spanish from my dad's family, but

16  I was not fluent in it at all and so it was to become more

17  fluent in Spanish.

18      Q.    Okay.  And --

19      A.    So I went to that and I completed it, and then

20  I went to Mexico with a sister church of ours.  The church is

21  located in Yuma and --

22      Q.    What's the name of that church?

23      A.    I don't know the name of it.

24      Q.    Okay.  Who was the pastor?

25      A.    Ray.  Pastor Ray.

1        Q.    Okay.  And was that church affiliated in some

2   fashion with the Harvest Christian --

3        A.    It was.  Pastor Tom always referred to Pastor

4   Ray as his pastor because he always said there was somebody

5   you needed to check and balance with.  So Pastor Ray did a

6   lot of missionary work down in Mexico, so he would be the

7   natural person to go to if you wanted to go to Mexico.

8        Q.    Okay.

9        A.    So he placed me with a church down there.

10       Q.    What city?

11       A.    In Mexicali.

12       Q.    All right.  And what part of Mexico is Mexicali

13   in?

14       A.    It's -- well, Calexico is on the other side, so

15   it's -- it's right south of the California border.

16       Q.    Okay.  Just across --

17       A.    Uh-huh, because --

18       Q.    -- the border between the two countries?

19       A.    -- the city I'm told had about a million people

20   in it, but I could take the bus and go ahead and walk across

21   the border into the United States.

22       Q.    Okay.  So it was along the border there between

23   the United States and Mexico?

24       A.    Yes.

25       Q.    Okay.  And was there a church in that city that

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    you were assigned?

2          A.    Yes.  There was a little church there, and

3    they -- one of the things I did was help with their music

4    because they had a keyboard, so I helped somebody learn how

5    to play that and so they could have music in their church.

6                And my main focus though was the kids.  I liked

7    to take the children and I would do Sunday school with them

8    while their parents were in the regular service so they

9    wouldn't be disturbed.  And we'd also go around to different

10   places and drop off clothes and toys to children and things

11   like that.

12         Q.    How long was your service as a missionary?

13         A.    It was 6 months to a year and I don't recall

14   exactly how long I stayed.

15         Q.    Okay.  How did you get down there in the first

16   place?  Did you drive a car, was there a car waiting for you?

17         A.    No.  I believe -- I believe my dad drove me

18   down there because I had a car during high school, but I

19   went -- I gave it away to the -- to the church in Mexico.

20         Q.    You donated the car --

21         A.    I donated it to --

22         Q.    -- the church?

23         A.    Yeah, I donated it, yes.

24         Q.    Okay.  There was an orphanage associated with

25   the church?

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1          A.    It wasn't associated with, but there were

2     several orphanages around that our church and their church

3     collected pounds and pounds of toys and clothes for.  And

4     even the -- we'd take -- I don't know if we took food or not,

5     but and we would -- it's just so adorable because like a doll

6     that an American child wouldn't want to play with anymore --

7          MR. MARTINEZ:  Objection.  Relevance.

8          THE COURT:  Sustained.  Let's move on.

9          MR. PATTERSON:  This -- well --

10    BY MR. PATTERSON:

11         Q.    Did you do any charitable work with the

12    children?

13         A.    Uh-huh.  We would give the little kids toys and

14    they would be so happy.

15         Q.    Did this period of time away from your family

16    in Mexico influence you to a certain degree?

17         A.    Sure.  I had -- I had a taste of independence.

18    I could make my own decisions kind of.  Living out from

19    underneath your father is a whole new experience.

20         Q.    Okay.  To that end when you came back to the

21    states, did you make any changes in relationships that you

22    had previously?

23         A.    I did.  What happened is when I came back I had

24    the job at Peterson Machinery, and then after that I got a

25    job at Quail Garden Apartments, and with that job was an

1    apartment of my own.  So I -- 20 years old, I just moved out

2    into my own place, and it was really exciting.  And all

3    these, you know, during high school, all the kids that I had

4    seen that didn't necessarily follow the way -- the way our

5    church did, they didn't seem bad to me.  It didn't seem that,

6    you know, they were going to go to hell because they're

7    watching a movie or because they're eating at Burger King or,

8    you know, doing all those sorts of stuff.  But we know to the

9    degree of going out and having a drink of alcohol wasn't -- I

10   just wasn't seeing anything wrong with it.

11          So I think being on my own in Mexico, it was

12   the first step of me being able to make some decisions and

13   say I want to experience a little bit more of what is out

14   there before I decide where I want to live and how -- what my

15   relationship with God is going to be.

16          Q.    Okay.  In that regard did you have a discussion

17   with Shawn King about any possible relationship that you and

18   he might have?

19          A.    I did.  In fact we had several discussions

20   about it because at this time I'm wanting to go out with

21   Barbara and with the girls and I wanted to go dancing and

22   I -- I had been in a dance class in -- in Central Arizona

23   College and I loved it.  It was just -- it was fun for me.

24   And so going to a dance place where you could dance was fun

25   for me.  And Shawn at that time was still living at home I

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1      believe and wasn't inclined to do those sorts of things, and

2      so I told him that I -- I needed to do this for myself.   I

3      needed to go out and experience life and see how I wanted to

4      be.

5              Q.      Okay.

6              A.      And so that meant that him and I -- I still

7      wanted to be friends, you know, like we had been friends

8      before, but I didn't want -- I didn't want to date anymore.

9              Q.      Okay.

10             A.      We had several conversations about that.

11             Q.      All right.

12             A.      But it was really -- that was very difficult.

13             Q.      Did it come to a head at some point?

14             A.      It did.  In my mind I thought it was clear that

15     we weren't dating anymore, that this was over, and one day he

16     came over to my apartment and was very furious because he had

17     found out that I had slept with somebody.  And I guess he

18     felt that I betrayed him.  And I --

19             Q.      Did you feel that you betrayed him?

20             A.      I didn't because I made it clear so many times

21     it's just that -- it just wasn't -- we just couldn't resolve

22     it, you know?  It just -- it's really hard when you grow up

23     with somebody like that and try to go -- let go of all that

24     kind of stuff.

25             Q.      All right.


                TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1       A.      So he had given me an emerald ring.  It wasn't
2  an engagement ring, but it was, you know --
3       Q.      Friendship?
4       A.      A friendship, more than -- you know, special
5  friendship ring.  And I remember him, he had grabbed my hand
6  and bit it.
7       Q.      Bit your hand or the ring?
8       A.      No, he bit the ring while it was on my hand and
9  jerked it off my hand.  And I believe he took the band with
10  him, but even this day I still have the emerald that came out
11  of it.
12       Q.      Okay.  Did he do anything else --
13       A.      Well
14       Q.      -- at that time?
15       A.      It was brought to my attention by the security
16  guard at the apartments that I lived at that he had gone and
17  broken some windows on the car.
18       Q.      All right.  Let's back up.  You didn't see him
19  do that?
20       A.      No.
21       Q.      Okay.  Did you make a police report as a result
22  of his conduct in terms of biting the ring?  Did you call the
23  police?
24       A.      No, I did not.
25       Q.      Okay.  At some point in time did the police

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    arrive?

2          A.    Yes, they did.

3          Q.    Okay.  But you hadn't called them?

4          A.    No.

5          Q.    Okay.  Because you hadn't seen --

6          A.    I didn't see that, no.

7          Q.    Okay.  At some point in time did they take you

8    to your vehicle?

9          A.    The apartments had an off-duty police officer

10   who also went to our church and received a discount off his

11   apartment in order to patrol or keep an eye on the grounds.

12   And he was the one who had seen that happen.  So I got a

13   knock on my door and said that he had called it in because

14   he's required --

15         MR. MARTINEZ:  Objection.  Hearsay.

16         THE COURT:  Sustained.

17         THE WITNESS:  Oh.

18         THE COURT:  Let's move on.

19         THE WITNESS:  I didn't --

20   BY MR. PATTERSON:

21         Q.    You didn't report it.  It was reported in some

22   fashion?

23         A.    Uh-huh.

24         THE COURT:  Is that a yes?

25         THE WITNESS:  Yes.


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1          THE COURT:  Make sure you give a verbal response.

2    BY MR. PATTERSON:

3          Q.    At some point did the police arrive at your

4    door step?

5          A.    Arrived at my doorstep and I was --

6          Q.    Were you escorted to where your car was parked?

7          A.    That's where I first saw it.

8          Q.    Where?

9          A.    I saw some windows broken and I don't remember

10   her name, she's on the police report, but she's the one who

11   had actually saw -- another tenant resident of the place had

12   seen what had happened.

13         Q.    How did that impact you, the first time you

14   kind of break up with a male, this kind of thing happened?

15         A.    I hurt for Shawn.  I felt bad for him because I

16   didn't mean -- you know, I didn't want him driven to that.

17         Q.    Did you make an effort to maintain a friendship

18   with him thereafter?

19         A.    We talked on the phone a few more times.

20         Q.    Okay.  Did you maintain a talking

21   conversational relationship with him thereafter?

22         A.    No.  There was a period of time that we didn't

23   talk.

24         Q.    Okay.  At some point in time was that

25   relationship, the friendship, rekindled?

1       A.   Yes.

2       Q.   Okay.  And was that after you had married Joe

3  Andriano?

4       A.   After I had married Joe and then he was dating

5  a girl named Nicky, we all became friends at church.

6       Q.   Okay.  Quail Garden Apartments, that was in

7  Casa Grande?

8       A.   Yes.

9       Q.   Okay.  And did you have a job with Quail

10  Garden?

11       A.   Yes, I did.  I was originally hired as a

12  leasing agent and my job was to show prospective residents a

13  tour of the property and of the apartments and basically

14  persuade them to rent at our place instead of somewhere else.

15       Q.   Okay.  And how -- how was it that you got into

16  the rental apartment business?

17       A.   When I had left Peterson Machinery, I had to

18  have a job right away, so I went down to DES and they had a

19  listing of jobs on the board, and this lady interviewed me

20  and she said she thought this job would be good for me, so

21  she sent me over to Quail Gardens, I had an interview that

22  day, and she hired me that day.

23       Q.   Okay.  So this was your first venture into the

24  rental apartment business, right?

25       A.   Yes, it was.

1          Q.     Would that be the principle area of employment

2    that you would keep thereafter?

3          A.     Yes.

4          Q.     Okay.   What were the benefits that you received

5    at Quail Garden?   Salary?

6          A.     I received a salary and a place to stay,

7    free apartment and free utilities.

8          Q.     Okay.   And describe the first unit that you

9    received at Quail Garden?

10         A.     It was a one-bedroom upstairs and had vaulted

11   sealings, had a patio.   It was, you know, maybe 6-, 700

12   square feet.

13         Q.     Okay.   Leasing agent, essentially is that kind

14   of the low person on the --

15         A.     That is.

16         Q.     -- corporate ladder?

17         A.     As far as office personnel, that is the lowest

18   you could go.

19         Q.     Okay.   Did you receive any promotions while at

20   Quail Garden?

21         A.     Yes, I did.

22         Q.     What was that?

23         A.     They promoted me to assistant manager.

24         Q.     Contrast for me the difference between job

25   requirements with the leasing assistant versus the assistant

1    manager?

2           A.    Assistant manager just has a little bit more

3    responsibility as far as reporting to the main office.

4           Q.    Okay.  And what would an assistant manager do

5    on site?

6           A.    Well, our manager -- my manager didn't live on

7    site.  I did.  And so it would be up to me to be -- if there

8    were any resident problems, I would have to address them.

9    And we had procedures that we followed and so I would -- like

10   if somebody had slipped and fallen on the property, I'd have

11   to take pictures and report it for insurance reasons, things

12   like that.  So a leasing agent wouldn't do that, but an

13   assistant manager would.

14          Q.    Okay.

15          A.    I also planned activities.  We had a lot of

16   winter visitors that actually resided there, so I did a

17   lot -- we planned a lot for Thanksgiving and Christmas, New

18   Years, coffee and doughnuts in the morning for them and

19   things like that.

20          Q.    Okay.  Up to this point in time had you met Joe

21   Andriano?

22          A.    No.

23          Q.    Okay.  Is it your first home away from mom and

24   dad, correct?

25          A.    Yes, it was.


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1          Q.    Okay.  And how is that influencing your

2    development?

3          A.    Well, obviously, I could go wherever I wanted

4    to go and I didn't have to report to anybody, and that was

5    kind of interesting.  It was -- I liked it but my mom was

6    over all the time anyway.  And she was so cute, my dad would

7    come over, and so it wasn't like I totally separated myself

8    from my parents.

9          Q.    Okay.

10         A.    They -- they thought my apartment was cute too

11   and she would come over and have dinner and watch television

12   and stuff, so -- but besides that, actually Barbara's the

13   one -- she kind of moved in with me.

14         Q.    Okay?

15         A.    It wasn't official.

16         Q.    Was this Barbara Mitchell that testified

17   earlier?

18         A.    Yes, my cousin.

19         Q.    Okay.

20         A.    So her and I used to go out and do everything

21   together.

22         Q.    All right.  Let's go over that for a moment

23   here.  Talk to me about your relationship with Barbara

24   Mitchell?

25         A.    Well, she became my best friend instead of just


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1     my cousin.

2              Q.     Okay.

3              A.     She -- because she had gone to Casa Grande High

4     School, she knew everybody.  I didn't.  I didn't really even

5     know my dad's family because he has quite an extended family

6     in Casa Grande.  And so through Barbara is how I met all

7     my -- my whole family.

8              Q.     Was she at Harvest Christian Academy for a

9     period of time?

10             A.     She went there a while, yes, but then her mom

11    allowed her to go to public school.

12             Q.     Okay.  Did you maintain a relationship with

13    Barbara Mitchell?

14             A.      I would see her at church, yes, and things like

15    that, but it wasn't -- it didn't become like a best friend

16    type of thing until she -- until I moved out into my own

17    apartment.  Then it -- that's when we did lunch together

18    everyday and dinner, and we were just always together.

19             Q.     Okay.  Inseparable?

20             A.     Yes.  Very much so.

21             Q.     Okay.  Have we exhausted your job history, if

22    you will, at Quail Garden?  Anything else of note?

23             Okay.  Where did you move from there?

24             MR. MARTINEZ:  Objection.  Lack of foundation.

25             THE COURT:  Overruled.  Go ahead, answer the question

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    if you can.

2            THE WITNESS:  After Quail Gardens I took a job at

3    Casa Grande Regional.

4    BY MR. PATTERSON:

5            Q.    Okay.  For what?

6            A.    And --

7            Q.    Why did you get out of the rental business and

8    into Casa Grande Regional Hospital?

9            A.    The whole reason I did that was because there

10   was no a way I could ever be promoted to a manager until I

11   had more financial experience.

12           Q.    Okay.

13           A.    And so I hired on as a clerk in the accounting

14   department at the hospital.  And that's when -- and they have

15   a program there where they'll pay your schooling, so I

16   started attending University of Phoenix at night with that

17   goal in mind to learn more about financial so I could go back

18   and be a manager.

19           Q.    Okay.  So you still kept the prospect of

20   working in the rental --

21           A.    Yeah.

22           Q.    -- apartment business?

23           A.    I loved it.

24           Q.    But you needed to fill out your resume?

25           A.    I did.  My education.


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1        Q.     Okay.  You went to University of Phoenix, what
2    kind of courses did you take there?
3        A.     They were in Business.
4        Q.     Okay.
5        A.     I never completed those, so I -- I got a lot of
6    them in accounting, finance, that type of stuff.
7        Q.     Okay.  And kind of got in practical experience
8    at Casa Grande Regional Hospital?
9        A.     I did.  I got a lot of experience there.
10       Q.     What things did you do for Casa Grande?
11       A.     I learned how to do accounts payable.  I
12   learned how to do the accounts receivable.  I learned how to
13   work the general ledger, how to prepare a set of financials,
14   how to audit books.  Just everything about accounting.
15       Q.     Okay.  And how long were you at Casa Grande
16   Regional Hospital?
17       A.     Maybe three years.
18       Q.     Okay.  Was Barbara also employed there during
19   that period of time?
20       A.     No.
21       Q.     Okay.  How about your mom?
22       A.     No.
23       Q.     Those folks got jobs there afterwards?
24       A.     Yes, sir.
25       Q.     Okay.  All right.  After you left Casa Grande

1    Regional Hospital, what was your next job?

2          A.    Was at AccuGlass.

3          Q.    Okay.  By this time you had met Joe Andriano?

4          A.    Yes, sir.

5          Q.    Okay.  And tell me a little bit about

6    AccuGlass.  What was it?

7          A.    It was a windshield replacement and repair

8    business that was located in Mesa.  And it had been in

9    existence for a while and Joe and I purchased it with a

10   partner.

11         Q.    Okay.  How is it that he became interested or

12   you became interested in AccuGlass, that particular --

13         A.    Through Joe.

14         Q.    -- firm?  Okay.

15         A.    Oh, through Joe.  My husband used to purchase

16   glass from them while he was doing his own business.

17         Q.    All right.  Let's backup a little bit then.  He

18   had his own venture.  What was the name of that?

19         A.    Joe's Windshield Repair.

20         Q.    Okay.  What would he do in that context in that

21   business?

22         A.    He was mobile.  He didn't have an office.  He

23   kept everything on his truck and he would go on site and

24   replace somebody's windshield or he could also repair cracks

25   in the window.

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1          Q.     Okay.  Did that business survive or --

2          A.     No.  It was based solely in Casa Grande, and

3    another glass business came to town that was backed by Empire

4    Glass, which was huge, and Joe didn't feel like he could

5    compete with them.

6          Q.     All right.  So that one went by the by, and in

7    its place you folks got involved with a place called

8    AccuGlass?

9          A.     Right, because it was already established.  And

10   so the idea was, well, if we could get into an established

11   one, then we could keep it going and make it better.

12         Q.     Okay.  And did you work side by side with Joe

13   at this enterprise?

14         A.     Yes.

15         Q.     What did you do?

16         A.     I stayed in the office and like would take

17   calls for jobs, call in to insurance companies to get

18   approval for jobs, things like that.

19         Q.     Okay.

20         A.     Printout work orders, which would tell the

21   installers where to go to replace the glass.

22         Q.     This business was located in Mesa, Arizona?

23         A.     Uh -- yes.

24         Q.     Did -- okay.  Did you actually work on site

25   or --

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1       A.    Yes.

2       Q.    Was Joe there working on site as well?

3       A.    Some of his stuff was on site, but a lot of it

4  was out.  A lot of it was mobile.  He would have to go to

5  someone's place of business or like to Earnhardts, wherever

6  it was, that the jobs needed to be done.

7       Q.    Okay.  What years are we talking about that you

8  and Joe ran this enterprise known as AccuGlass?

9       A.    It would have been, I believe, around July or

10  August of '96, but by February of 9 -- February of '97, he

11  had surgery and, yeah, by then it was the partner had taken

12  it over.

13       Q.    Okay.  So we're talking five, six months?

14       A.    Right.

15       Q.    Okay.  What was the next job that you had after

16  AccuGlass?  Did we forgot Courtyard?  How's Courtyard --

17       A.    No, that's -- that's my next job.

18       Q.    Okay.  Talk to me then about Courtyard

19  Apartments?

20       A.    Courtyard Apartments, I began in '90 --

21  oh, '98, Spring of '98.

22       Q.    Where was Courtyard Apartments located?

23       A.    2060 North Trekell Road in Casa Grande.

24       Q.    How did you become involved there?

25       A.    From my job at Quail Gardens.  My manager there

1    got me the job as the manager there.

2         Q.    Is this the first time you were the manager of

3    an apartment complex?

4         A.    Yes.

5         Q.    Are you an on-site manager there?

6         A.    Yes.

7         Q.    What does that mean?

8         A.    I'm required to live on site and they, along

9    with my salary, provided me a 2-bedroom, 2-bath apartment

10   with utilities included.

11        Q.    Okay.  This is in '98, so obviously you were

12   married in '94, right?

13        A.    Yes.

14        Q.    So you're about four years along in your

15   marriage with Joe?

16        A.    Yes.

17        Q.    Okay.  And when -- what were your requirements

18   or tasks with Courtyard?  What do you do for them?

19        A.    As a manager you are responsible for the

20   maintenance, the housekeeping, the leasing, and resident

21   retention -- those are the four main areas.  You're also

22   responsible for month end closings.  You have to do the

23   financials and submit them to the corporate office.  I was

24   also responsible for all the social activities.

25               What happens is when somebody moves out of an

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    apartment, they usually leave it a mess and so we have to

2    schedule maintenance to go in and repaint and shampoo the

3    carpet, do all that sort of stuff, so everyday we'd have a

4    staff meeting and schedule out the apartments that needed to

5    be done and what needed to be done.  Excuse me.  I did have a

6    maintenance supervisor who reported to me and then also a

7    housekeeper because she would go in after maintenance was

8    done and at the same time that this is happening, the leasing

9    people would be renting these apartments.  So it's a circular

10    effect, you know, somebody moves out, you rent a new one, you

11    got to clean it up, get it ready, and I had to make sure that

12    wheel turned.

13         Q.   Okay.  Did you enjoy your stay at Courtyard?

14         A.   Yes, I did.

15         Q.   Okay.  Who was your supervisor?

16         A.   Timothy Lee.

17         Q.   Okay.  And was he a regional supervisor?

18         A.   Yes, he was.

19         Q.   Okay.  So he covered what?

20         A.   He covered a couple properties in Phoenix and

21    the three that we had in Casa Grande.

22         Q.   Is Joe working at this time when you were --

23    you're at Courtyard?

24         A.   No, he's not.

25         Q.   And do we have any children at this point?

1          A.     Two.

2          Q.     Okay.  So who's providing day care at this

3    particular set up for you?

4          A.     Jessie and Nina were a couple that lived right

5    above us, and during the day she would watch Nicolas and

6    Ashley for me.  And then when Brandon would get home from

7    school, he would get them and take them down to my apartment

8    until I could get home from work.

9          Q.     Okay.  He would watch them until what time

10   would you generally --

11         A.     Around 6:00.

12         Q.     Okay.  So he would have primary care of your

13   children from what time period?

14         A.     Maybe about two hours.  However, when Ashley

15   was just newborn, Nina would go ahead and keep Ashley because

16   Brandon couldn't.

17         Q.     Okay.

18         A.     So Brandon would basically take Nicolas and

19   play with him and entertain him.

20         Q.     All right.  Was there a time before when he

21   would come over and pick up your children that he actually

22   lived with you guys?

23         A.     When he lived with us it was right after I had

24   Nicolas in '97.

25         Q.     Okay.

1       A.      I wasn't working.  We were living out at the

2  shop on the farm.

3       Q.      Okay.

4       A.      And that's when he lived with us.

5       Q.      Okay?

6       A.      And he helped me a lot with Nicolas when he was

7  a newborn.

8       Q.      All right.  I think it's a good point to go

9  over to the shop there.  You mentioned the shop?

10      A.      Uh-huh.

11      Q.      What was the shop?

12      A.      Joe's father had a 10 acre parcel of land, and

13  in '94 when Joe wanted to start Joe's Windshield Repair, I'm

14  working at the hospital, and we had just leased, or rented I

15  should say, a condo and it was a 6-month lease.  When the six

16  months were over, Joe asked me if I would mind moving out to

17  where his brother had lived in this place they called the

18  shop -- excuse me -- in order to save on expenses so we could

19  get Joe's Windshield Repair off the ground.  That was not a

20  problem, so in July of '94, we moved to this attachment.

21              I'm trying to figure out how to explain it, but

22  there was a huge concrete pad like you could pull a tractor

23  up into, okay, and attached to that was a low-slung building

24  that had three rooms that ran in a row.  You'd walk in one

25  door and it was a kitchen, dining room type of thing, and it

1    had some really old tile with paint all over the floor and

2    whatever, and there was a little bathroom in there.

3              And then when you walked through the next

4    entryway or whatever you want to call it, it was more like a

5    living room and that became our living room and our bedroom

6    and there was carpet laid in there.  As I said, Joe's brother

7    lived in it before us so, he kind of made it like a little

8    bachelor pad.  They'd done some upgrades, put in kitchen

9    cabinets in there, a refrigerator later that I believe was

10   his mom and dad's old one or something, and so it was, you

11   know, you could live there.

12          Q.    Okay.  And for what period of time did you

13   reside at this small house?

14          A.    From July of '94 until we moved into Courtyard,

15   which would have been the Spring of '98.

16          Q.    Okay.  And it was an effort to save money so

17   you could actually buy something?

18          A.    Well, yes.  The deal was that we would live

19   there and we thought it would only be about a year and then

20   Joe wanted to buy a house.

21          Q.    Okay.

22          A.    And so did I.  We wanted to live in a house, so

23   that was the goal, but it never --

24          Q.    Okay.  We'll get to that later.

25              All right.  So you're that -- at that

1   particular unit for a period of time.  You thereafter move to

2   the Courtyard?

3          A.    Yes.

4          Q.    You're now manager at that complex?

5          A.    Yes.

6          Q.    Okay.  At some point in time did you change

7   jobs from the Courtyard to another location?

8          A.    Yes.  Then I went to the Meridian at the

9   Biltmore and I was manager there but I was not resident

10  manager.

11         Q.    Okay.  Let's talk about that.  Meridian?  You

12  said the Biltmore.  That's in the city of Phoenix?

13         A.    Yes, on 32nd Street and Camelback.

14         Q.    What kind of benefits were afforded to you in

15  terms of conditions for employment for the Meridian?

16         A.    The Meridian is a very luxurious apartment

17  complex.  They don't let their staff live on site, but they

18  compensate you very well with salary, so my salary was a lot

19  higher and at the time we were living at Joe's parent's

20  house.

21         Q.    Okay.  So you moved out of the --

22         A.    Courtyard into the --

23         Q.    Courtyard?  Okay.

24         A.    His mom and dad's.  His mom and dad let us

25  stay with them and we were probably there two and a half

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000004753

1  months or so, and I was driving back and forth from Casa

2  Grande to Phoenix so I wasn't getting home until probably

3  8:00 at night, 7:00, 8:00.

4       Q.    All right.  Did that commute and the fact you

5  didn't have an on site apartment create some -- some problems

6  with the relationship?

7       A.    Yes.  It caused a lot of friction because Joe

8  wanted me around more and I was gone all day.  So in the

9  beginning he looked around for rental places and we talked

10  about renting a house, but everything was too expensive, I

11  believe.

12       Q.    Okay.  Did you actually enjoy your employment

13  with Meridian?

14       A.    Yes.  That was -- that is if you're going to be

15  a manager of anything, that's one of the ones you would want

16  to be a manager of, because it's -- it's top of the line.

17       Q.    All right.  How long did you work at Meridian?

18       A.    Just for a few months.

19       Q.    Okay.  And why ultimately did you decide to

20  leave Meridian?

21       A.    Because they did not provide housing and the

22  friction it was causing in my relationship with Joe, I needed

23  to find a place that had housing.

24       Q.    Okay.  To that end did you find another

25  position of employment?

1      A.    Yes, I did.

2      Q.    Where did you wind up?

3      A.    I wound up at San Riva Apartments.

4      Q.    Okay.  When did -- how did you acquire the

5  position at San Riva?

6      A.    Actually, it was in construction and Joe's

7  cousin would drive by it all the time and she knew I was --

8  you know, this was an issue that we were looking for

9  somewhere that we could live on site, and she's the one that

10  actually provided us with the phone number.  And Joe drove me

11  by quite often.  We kept an eye it and I called the number

12  and set up an interview with Janice Lind.

13      Q.    Okay.  Janice Lind, the lady --

14      A.    Yes.

15      Q.    -- that testified earlier in the trial?

16      A.    Yes.

17      Q.    What part of town was the San Riva apartment

18  complex?

19      A.    Ahwatukee.

20      Q.    All right.  And was it on the far south end of

21  the Ahwatukee?

22      A.    Oh, yeah.  It backed right up to Pecos Road,

23  which is the -- on the other side is the Indian reservation.

24      Q.    Okay.  Was that a good thing because of its

25  close proximity to Casa Grande?

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000004755

1          A.     It was very good for Joe, yes.

2          Q.     Okay.  And why was that?

3          A.     That's where he was comfortable at and we

4    wanted to stay close to that -- that area.

5          Q.     Okay.  Can you describe for me the San Riva

6    complex?

7          A.     It was a 280 unit luxury apartment complex.  We

8    had one bedrooms that started at 700 a month up to 3 bedrooms

9    which could go up to 17-, 1800 a month.

10         Q.     Okay.  And what were the benefits that you

11   acquired in addition to your salary?

12         A.     I received a three-bedroom apartment this time

13   and it's brand new.  It was a very nice apartment.

14         Q.     Okay.  So this was a good thing?

15         A.     Wonderful, yes.

16         Q.     Okay.  And you obviously had two children at

17   this point?

18         A.     Yes.

19         Q.     Okay.  And what are your tasks as resident

20   manager there at the San Riva?

21         A.     A little bit different than Courtyard because

22   this is a lease-up property.

23         Q.     Okay.  Explain that to me?

24         A.     What it is, it's brand new, nobody lives there.

25   So my job as a manager is to get it occupied as quickly as

1  possible so we could sell the asset and build more and do the

2  same thing.

3        Q.      Okay.  Who was the owner of the property?

4        A.      The owner was Sumatoma Corporation.

5        Q.      And was there a property management group?

6        A.      Property management was Fairfield Properties.

7        Q.      Okay.  What, again, was their general course of

8  business in terms of developing these kinds of complexes?

9        A.      They had two -- two corporations.  One was

10  Fairfield Development, which was basically a construction

11  company.  They went out and they built these apartments, and

12  then Fairfield management would come in and lease them up.

13  We'd fill up all these occupancies that we have, and when we

14  got the a certain occupancy, it would go on the market and

15  then I would have the job of escorting investors through the

16  property so they could see it.  So we had to keep it in tip

17  top shape all the time.

18        MR. PATTERSON:  Judge, might be a good time to break

19  for the afternoon.

20        THE COURT:  Okay.  We'll go ahead and take our

21  afternoon break at this point in time.  During this break

22  remember the entire admonition I have given you including the

23  fact you're not to discuss this case with anyone, do not let

24  anyone discuss the case with you, keep an open mind.

25                    Have a nice break.  We'll see you in 20

1     minutes.

2

3                      (Recess.)

4

5           THE COURT:  This is cause number CR 2000-096032,

6     State of Arizona versus Wendi Elizabeth Andriano.  The record

7     will reflect the presence of the Defendant is on the witness

8     stand, the Counsel and the jury.  We'll continue with the

9     direct examination by Mr. Patterson.

10                      Mr. Patterson?

11          MR. PATTERSON:  Thank you, Judge Ishikawa.

12

13    CONTINUED DIRECT EXAMINATION BY MR. PATTERSON:

14          Q.     You are Wendi Andriano?

15          A.     Yes, I am.

16          Q.     You are the same Wendi Andriano that was

17    testifying before the break?

18          A.     Yes, sir.

19          Q.     And you realize you're still under oath?

20          A.     Yes, sir.

21          Q.     Okay.  We left off you just acquired the job as

22    resident manager at the San Riva apartment complex.  You were

23    describing for me in general what that complex, the physical

24    layout is.  Again, could we start there?

25          A.     Like I said before, it was 280 units.  There

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    were, I believe, nine separate buildings.  It was a

2    three-story building.  Each, you know, each building had

3    three floors on it.

4          Q.    Were the layouts of each of the nine

5    residential buildings essentially the same?

6          A.    No.  One building, like the building I lived

7    in --

8          Q.    Okay.  Let's start there.  Which unit did you

9    receive initially?

10          A.    A three-bedroom, two bath.

11          Q.    Okay.

12          A.    So it had the only three bedroom and then on

13    the inside were two-bedroom two-baths.

14          Q.    Okay.  What was the unit number of the

15    apartment that you received?

16          A.    132.

17          Q.    Okay.  And did you remain at 132 throughout

18    your residency there at San Riva?

19          A.    Yes, I did.

20          Q.    Okay.  Of the eight other buildings, they're

21    all three stories, were they four apartments per floor,

22    generally speaking, as yours was?

23          A.    Eight.

24          Q.    Okay.  Eight units per floor?

25          A.    I'm thinking -- eight, yes.


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1      Q.    Okay.  And that's eight in the entire building

2   or --

3      A.    Eight on the floor.

4      Q.    Okay.  So each building had approximately 24

5   units?

6      A.    Right.

7      Q.    Okay.  So there was an on-site office, correct?

8      A.    Yes, there was.

9      Q.    Okay.  How far distant was that to from your

10   place of resident 132?

11      A.    I was in the very back of the property.  That's

12   what we called the back of the property.

13      Q.    Okay.  Was it -- geographically it was the far

14   south what -- what southern corner of the property, south?

15      A.    I'm not very good with directions.

16      Q.    Okay.  What was the street --

17      A.    Um --

18      Q.    -- immediately to the --

19      A.    Pecos was what we backed up to.

20      Q.    Okay.

21      A.    And then it was 24th Street, I believe.

22      Q.    Was the north-south street?

23      A.    Uh-huh.

24      Q.    Okay.  What was the street on the north end of

25   the complex?

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1          A.     Liberty Lane.

2          Q.     Okay.  So the complex was officially within

3     Pecos, Liberty, 24th Street -- what was the far west

4     boundary, 32nd Street?

5          A.     There wasn't a street there, so it just ran

6     into desert.

7          Q.     Okay.  The office -- where was the office

8     situated in relationship to where your apartment was?

9          A.     You would have to turn down Liberty Lane to get

10    into the front entrance of San Riva.

11         Q.     Okay.  And that's --

12         A.     That's right where the front office was.

13         Q.     What effectively was the layout at the front

14    office?

15         A.     You would walk into somewhat of a courtyard.

16    It was a cement pad that had a couple of trees that had

17    little benches around them, and then to your right is the

18    front doors into the main leasing office.  But also there was

19    a gate into the pool area and the door into the fitness

20    room.  And behind the fitness room -- I mean, attached in

21    this one building was a business office for the residents to

22    use.  It had a computer fax machine, that type of thing.  But

23    as you walk into the leasing office, you walk into a

24    main -- a big room that had one, two -- two desks in it, a

25    sitting area, which were some upholstered chairs with a round

1    table with books on it.  Then also like a buffet-type thing

2    that we kept refreshments there for people who would come in,

3    such as we had our own bottled water so we would keep it on

4    ice and set out cookies and things like that.  And then

5    directly behind that would have been the assistant manager's

6    office.

7            Q.    Okay.

8            A.    And where the two leasing desks were behind

9    that, there was also an overflow office for more leasing.  If

10   there happened to be more than two sets of prospective

11   residents in there, we could use that room also.

12           Q.    Was there another entrance way into the office

13   proper?

14           A.    When you walked into the front door, it -- the

15   hallway went all the way back to another door, which is

16   called the resident's door, and that's where once you became

17   a resident of San Riva you would enter through that back door

18   to pay your rent, place work orders, pick up packages,

19   whatever reason.

20           Q.    Okay.  If a resident were to come in that

21   entrance way, what office would they discover on their

22   immediate left as they walked in?

23           A.    The resident's entrance, when you walked into

24   your left is -- was the maintenance kind of like a storage

25   office area and then to your right was the bookkeeper's

1    office, and she had a desk or a -- like a counter there that

2    you could walk up to and collect rent or talk to people or

3    would do whatever.

4          Q.    Okay.

5          A.    There was no window there.  It was just open.

6          Q.    All right.  The next office, if you will, as a

7    residence is walking through the entry way --

8          A.    Uh-huh.

9          Q.    -- the second one on the left, what would that

10   be?

11         A.    The left would be the kitchen.

12         Q.    Okay.

13         A.    And we would have residents that also came into

14   the kitchen to get cold water.  They liked our bottled water.

15   They'd come in there and help themselves to the fridge. We

16   also had soda pop in there, things like that.

17         Q.    Okay.  Was there a key system or passcard

18   system back then?

19         A.    The maintenance room there was a locked box

20   that actually contained a set of keys for every apartment.

21   They were not -- the old system was you would have a pass key

22   that could go into everything.  We didn't have that.  We had

23   individualized keys for each residence.

24         Q.    Okay.  And they were kept in a central

25   receptacle?

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1       A.      Yes, they were.

2       Q.      Who had access to that central receptacle?

3       A.      Every office person and everybody -- everybody

4   had the key to that box.

5       Q.      Okay.  Again, how would the resident then gain

6   access into this office complex coming in through the

7   residence entry way?  Was the door always open or do you use

8   your pass?

9       A.      Oh, it was open.  They could only come in

10   during business hours.

11      Q.      All right.  But any resident would have free

12   access into that door through the business area?

13      A.      Sure.

14      Q.      Okay.  As a resident is walking down this

15   corridor, what would be the second office on the right?

16      A.      My office.

17      Q.      Okay.  And describe what was on site there in

18   your office?

19      A.      In my office when you -- when you walked up to

20   it, I had a glass door and I had a window that went -- that

21   went directly -- it was a window instead of a wall that

22   separated my office from the bookkeeper's office.  And you

23   could walk into my office and I had a desk with two chairs

24   and behind me a built-in type of file drawers.  There was

25   it was -- it was built with the office, so it wasn't a

1    separate piece of furniture, and there were file folder

2    drawers type of things behind me.

3         Q.    Okay.  And the walls to your office, you said

4    there were windows?

5         A.    Uh-huh?

6    THE COURT:  Is that a "yes"?

7    THE WITNESS:  Yes.

8    BY MR. PATTERSON:

9         Q.    Persons could see in as well as see out?

10        A.    Yes.

11        Q.    You could also see into the bookkeeper's office

12   as could the bookkeeper's office see inside to your office?

13        A.    Most definitely.

14        Q.    Okay.  How many computers were on site in the

15   business office?

16        A.    We had a computer in the bookkeeper's office,

17   which was that first office in the back.  That was probably

18   the most used.  And there was also a computer in the

19   assistant manager's office.

20        Q.    Did you have a computer in your office?

21        A.    No, I did not.

22        Q.    Okay.  Was one of the two computers that were

23   in the office connected to the internet system?

24        A.    The bookkeeper's office.

25        Q.    Okay.  And accessibility with regard to these

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    computers, how would an employee of Fairfield access the

2    computer?

3              A.    When you first would -- you know, you're first

4    screen would ask for some kind of password, and it was a

5    general password.  It was "San Riva" and then it was by

6    user.  We each had our own password, and instructions per

7    policy was to keep that to yourself --

8              Q.    Okay.  So --

9              A.    -- because each password had different levels

10   of -- like I could enter different areas than say the

11   maintenance person could, you know, so we can -- we each had

12   our password allowed different access to the program.

13             Q.    Okay.  Even though policy was such, did you

14   become aware of other employee's passwords and they become

15   aware of yours, or was that policy?

16             A.    Not frequently.  I mean, that could happen but

17   then you could just change your password.

18             Q.    Okay.  All right.  Did you have a computer in

19   your unit 132, the residence?

20             A.    I had a laptop.

21             Q.    Okay.  Was that connected to the internet

22   system?

23             A.    No.  I never used it.

24             Q.    Okay.  So you didn't have internet access on

25   your home computer?

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1      A.    No, sir.

2      Q.    Okay.  All right.  When you first came on as

3  resident manager, who was working -- I assume you were the

4  top dog that --

5      A.    Uh-huh, yes.

6      Q.    Okay.  Who were your subordinates or who was

7  working under your supervision?

8      A.    I had a different assistant manager.  I cannot

9  recall her name.  I had to terminate her.

10      Q.    Okay.

11      A.    And I just -- I don't recall her name right

12  now.

13      Q.    All right.

14      A.    Stephanie Koeppen was there.  Jimmy Yost, I

15  believe, was there.  The housekeeper was there.

16      Q.    What was her name?

17      A.    Debbie Hines I believe was her last name.  And

18  I believe I ended up with different maintenance people later

19  on.

20      Q.    Okay.  During the period of time that you did

21  work there then, talk to me about all of the persons that

22  worked with you or whom you supervised?

23      A.    Okay.

24      Q.    You mentioned Stephanie?

25      A.    And, you know, I may be -- I may be wrong.  The

1    lady that I terminated was the bookkeeper, not the assistant

2    manager.

3         Q.    Okay.

4         A.    I believe that Jimmy Yost was the assistant

5    manager from the time I started.

6         Q.    Okay.

7         A.    I could be mistaken, but from what I recall.

8    So it would have been myself and Jimmy, as the assistant

9    manager, and then later on Chris Hashisaki -- Hashisaki

10    became the bookkeeper.  She had worked at a different

11    Fairfield property in Ahwatukee and I was asked by my manager

12    to bring her over to San Riva.  And then Stephanie was also a

13    leasing person, and we had different ones come through there.

14         Q.    Okay.

15         A.    I had --

16         Q.    So personal leasing agents-wise turned over?

17         A.    Yes.  And I just --

18         Q.    Okay.

19         A.    -- could not tell you all their names.

20         Q.    Okay.

21         A.    I don't recall.

22         Q.    How about --

23         A.    And then Jerry Sentelle was the maintenance

24    manager and Tim Mosna was his assistant.  And we also had a

25    porter and his name escapes me right now.

1        Q.      What did the porter do?

2        A.      The porter -- we had ashtrays out on the

3   property.  His main job was to make sure there was not trash

4   on the grounds, that the ashtrays were kept clean, windows,

5   that type -- things were just presentable because we didn't

6   ever know when an investigator was going to drive through to

7   look at our property.

8        Q.      Okay.  What were your job descriptions?  What

9   did you do as a resident manager at San Riva?

10       A.      I oversaw the people that worked there.  We

11  would have meetings, and we had actually a board that we

12  called.  It was like a make ready status and that kept track

13  of all the apartments, because even though they were brand

14  new, there's still minor maintenance things that need to be

15  done on them.  There was housekeeping that needed to be done

16  before a resident could move into it, so we had to oversee

17  that.

18              I also was in charge of bringing traffic -- we

19  called it traffic -- to our property.  Because of where we're

20  located, we don't have people that just drive by, see this

21  new place and want to, you know, check it out.  We're set

22  back out of the way and so we had to come up with creative

23  ideas as far as bringing traffic to us.

24       Q.      Okay.  What kind of programs did you --

25       A.      Lots of --


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000004769

1          Q.      -- initiate?

2          A.      A lot of different advertising.  We did a thing

3   of -- we allowed large pets into our community so we did some

4   stuff with the humane society.  We did wine and cheese

5   parties for apartment locators.  A Locator is somebody who

6   advertises a lot and says they could help find you an

7   apartment, so we tried to develop a good relationship with

8   those people.  They would bring their traffic to us instead

9   of to our competition.

10         Q.      Okay.  What else?

11         A.      We also had activities for residents that Chris

12  actually, the bookkeeper, would put them together, but I

13  would have to oversee them and, you know, I approve all the

14  different things going on plus participate in them, make sure

15  everybody was, you know, happy, whatever.

16         Q.      What kinds of activities would you organize for

17  the residents there at San Riva?

18         A.      We had -- what all did we have?  We had --

19  well, a lot -- well, three or four pool parties because it

20  was summertime and we had a younger crowd of people that

21  lived there.

22         Q.      What was the typical pool party?

23         A.      Typical pool party started about 5:00 or so,

24  and we would barbecue.  We had barbecues around the pool.  We

25  would have hamburgers, hot dogs, things like that, or

1   actually buy those six-foot long sandwiches.  You know,

2   things like that.  I mean, it was just typical summer food

3   and people would come bring their kids and play in the pool.

4   And one time we had like hula dancers and a fireeater type of

5   entertainment, you know.  Just things like that at a couple

6   of the parties.  We also allowed drinking.  You could bring

7   your own, but because we were had such a younger crowd at San

8   Riva, we were trying to keep them there, I went ahead and

9   purchased a keg, so we had that there available also.

10          Q.    Okay.  How long would these pool parties last?

11   Start at 5:00, when would they typically end?

12          A.    Until people wanted to leave.  There was no --

13   when we sent the fliers out, we wouldn't put an ending date

14   or ending time, so just until everybody had their fill.

15          Q.    Okay.  Did San Riva sponsor any athletic teams?

16          A.    Yes, we did.

17          Q.    Okay.

18          A.    We sponsored a men's softball team and I was

19   asked by one -- couple of the residents actually who

20   participated on that team, we would sponsor them because they

21   didn't have a sponsor.

22          Q.    Okay.  And what did sponsorship entail?

23          A.    We had to give them a check so they could buy

24   their shirts, put San Riva on it, and we gave them support as

25   far as going to the ball game, things like that.


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1        Q.    Okay.  How many of those ball games do you

2    recall that you may have attended?

3        A.    In the beginning I didn't attend a lot of them.

4    I attended them more towards the end, whenever they were

5    winning, so they were in -- I don't know the terminology, but

6    where they would --

7        Q.    Play offs, that kind of thing?

8        A.    Yes, I guess so.  I'm not too much of a sport

9    person.  And that's -- our team was doing really well.   In

10   fact, they won the whole part of their division type of

11   thing.

12       Q.    Okay.  I know we talked about the folks working

13   with you at San Riva.  Who were your supervisors in the

14   Fairfield system?

15       A.    I had -- with brand new managers they had a

16   buddy system and, oh, my buddy was the manager of Red Rock

17   and -- Gail.  Her name was Gail.  And my direct supervisor

18   was Janice Lind.

19       Q.    Okay.  All right.  Let's talk about unit 132.

20   You said it was a three-bedroom --

21       A.    Two-bath.

22       Q.    -- two-bath layout and it was on the far corner

23   of that building?

24       A.    Of building 5.

25       Q.    Okay.

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1        A.      Yes.

2        Q.      You told us there were two accesses into the

3    complex, one off of Liberty.  Was there also one off of 24th

4    Street?

5        A.      Yes.

6        Q.      Okay.  Which of the two did you generally use?

7        A.      One off 24th Street because it drove right to

8    my building.

9        Q.      Okay.  And typically where would you park when

10   you were living there?

11       A.      Well, the entry way or off of 24th Street drove

12   right to building 5 and so my bedroom window, the master

13   bedroom where Joe and I were when we drove in our headlights

14   would hit that window and we would park right there.

15       Q.      Okay.  So if you're going grocery shopping.

16   Would you park at that location?

17       A.      Uh-huh, yes.

18       Q.      And how would you get your groceries or

19   parcels, if you will, into your apartment?

20       A.      Well, because we were so close to our patio, I

21   mean our car was just, you know, a little bit away, we would

22   just take all our bags and put them right over the patio, put

23   Nicolas and Ashley over there, and I would go over and start

24   putting the groceries inside.

25       Q.      Okay.  Would you use that patio entrance as one

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    of the principle entrances to your apartment?

2          A.    Yes, we did.

3          Q.    Okay.  All right.  Talk to me about your tasks

4    on a daily basis at San Riva as a resident manager.  Were you

5    involved in the collection of rent?

6          A.    Not hands-on, really.  I -- what would happen

7    is people would basically give their rent to the bookkeeper,

8    and because we were trying to keep this -- we, you know, I

9    had a lot of pressure on me to fill this place up.  We needed

10    to reach a certain occupancy, and a lot of times when people

11    are renting apartments, they have -- they receive their

12    paychecks on a certain Friday and then come pay their rent.

13    Well, the first of the month may fall at a different time

14    than their paycheck, so a lot of the times we would have

15    residents who would call in and say, you know, we're going to

16    be a little bit late.

17          Q.    Okay.

18          A.    Now, that was my decision to make.  That was

19    not the bookkeeper's, so her -- she, you know, went by the

20    book.  You have to collect rent on the 1st and charge them a

21    $50 late fee.  If that was to be waived or any other -- any

22    other things were to be -- any other arrangements were to be

23    made, then it would have to be approved by me.

24          Q.    Okay.  Was there a formal legal process that

25    was initiated against tenants who were behind in their rent?

1        A.    Yes.

2        Q.    How did that work?

3        A.    There's a landlord tenant law out there and

4   what it allows us to do is it -- they have signed a lease at

5   the time that they receive keys to their residence, and they

6   agree to pay their rent on the 1st, and if not then they

7   assess a $50 late fee.  And on the 2nd of the month, we could

8   print out something out of the computer that showed us

9   everybody who had not paid rent.  And at that point we could

10  fill out what we called a 5-day notice.

11        What that does that's the first step in

12  evicting a resident, so you filled out a 5-day notice and we

13  had a company who would serve them for us for a fee or we

14  could serve them ourselves.  As long as they were served and

15  signed, you know, whatever, then it was considered legal.

16  Certain months we used that company because I didn't have

17  time to serve the 5 days or I didn't have, you know, or the

18  assistant manager didn't have time.  Other months I would

19  take Nicolas and Ashley and I would go around and serve five

20  days, but a lot of the times I would take that list and we'd

21  call people and remind them --   Because a call is much more

22  likely to get rent out of somebody than a legal action,

23  saying we're going to evict you out of your apartment.

24        So in San Riva's circumstances, we wanted

25  residents to stay, not leave, and so we were -- I was much

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000004775

1    more inclined to call somebody and ask them, and then they'd

2    tell me, you know, I get paid in four days, I'll bring the

3    rent in and that was fine.  I would waive the rent fee.

4            Q.    Okay.  And you had the discretion to make that

5    waiver of penalty and fee?

6            A.    Yes, I did.

7            Q.    Okay.  All right.  Were there times when

8    tenants would leave and they would leave personal property

9    behind?

10           A.    Yes.

11           Q.    Okay.  In those circumstances did you have some

12   discretion as a residential manager to do with the personal

13   property that was left behind?

14           A.    Yes.  We actually had garages at San Riva that

15   had remotes to them and we had several, I should say, garages

16   full of items that residents had left.  And I never know why

17   people leave whatever they leave, but we would collect it and

18   we would hold it for 30 days.  After 30 days, it becomes our

19   property.  And so if somebody needed a bed, we felt like

20   giving them a bed, we could do so.  If you wanted to hold a

21   big garage sale and try a yard sale of all this stuff, you

22   could do that also.  It just, you know, it just depended

23   on -- I could do whatever I wanted with it.

24           Q.    Okay.  So you had some latitude in that regard?

25           A.    Yes, I did.


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1      Q.    Okay.  Also with your residential unit at 132

2  did you also receive some garage space, storage space?

3      A.    Yes.  I had two garages.

4      Q.    Okay.

5      A.    I started out with one and ended up with two.

6      Q.    Okay.  And where were they located relative to

7  your apartment?

8      A.    Well, because I was not paying for mine, I

9  actually had to switch garages a couple of times because if a

10  resident was going to rent an apartment and we wanted to

11  throw in a free garage, which normally cost $95 a month, and

12  say it happened to be the one I was occupying but the closest

13  one to their apartment, I would give it up and move all the

14  stuff out and move to a different location so they could have

15  that one.

16          So in October of 2000 I had one that was --

17  Building 5 sat here and there was some parking, and then in

18  garages right here, and there was one right there, and then

19  building 5 also had another building in front of it with some

20  garages there, and I had one there also.

21      Q.    Okay.

22      A.    So they were the two closest ones to me.

23      Q.    During the period of time that you and Joe were

24  living at the San Riva, did it develop that one garage was

25  used for one thing and the other garage was used for

1   something else?

2          A.    The garage that was over here was really hard

3   to pull a boat up to because it deadended, whereas the garage

4   over here was right next to the that back entry way we used

5   all the time, and you could pull in and the boat would be

6   right there by the garage.  And that's where he could -- he

7   changed the oil, worked on the, engine and did whatever it is

8   that, you know.

9          Q.    Okay.

10         A.    So that one had a big red toolbox and I don't

11  know whatever.  And the other one held more of our overflow

12  stuff.

13         Q.    Okay.  Is the other one for storage, the one

14  closer to the boat was used as --

15         A.    Yeah.  If like Joe was working on his boat,

16  Nicolas and Ashley and I would be out there with him in the

17  garage.  I would be with him and Nicolas would be in the boat

18  Ashley would be in the stroller, and, you know, we'd all be

19  out there.

20         Q.    Persons that worked with you back in October of

21  2000, Ms. Hashisaki, did she live on site too?

22         A.    Yes, she did.

23         Q.    Okay.  Where was her apartment relative to your

24  apartment?

25         A.    It was just -- I wish I had a map.

1       Q.    We have the layout.  I guess my point is --

2       A.    If --

3       Q.    -- could you see your apartment from?

4       A.    If I was on Chris' balcony, I could see the

5   front entrance of my apartment --

6       Q.    Okay.

7       A.    -- of the entry way into my apartment, not my

8   front door.

9       Q.    Okay.  Because the interior door or front door

10  of your apartment opened --

11      A.    Into, yeah --

12      Q.    -- to the breezeway?

13      A.    -- the hallway, right.  Right.

14      Q.    Okay. All right.  But Ms. Hashisaki's

15  balcony --

16      A.    Uh-huh, yes.

17      Q.    -- was it first story, second story?

18      A.    It was the third story.

19      Q.    From her balcony you could see the north or

20  southern breezeway entrance?

21      A.    The north.

22      Q.    The one closest to Liberty away from Pecos?

23      A.    Yes.

24      Q.    Did Ms. Sweeney also live on site?

25      A.    Yes, she did.


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1       Q.      Where did she lived?

2       A.      She lived in the same building as Chris.  She

3   was on the third floor, but she actually faced north instead

4   of south.

5       Q.      Okay.  So from her balcony you could not see

6   the north entrance way or the north exit from the breezeway

7   to building 5?

8       A.      No.

9       Q.      Okay.  All right.  Let's change categories

10  now.  Let's talk about your life with Joe.  When did you

11  first meet Joe Andriano?

12      A.      On March 17th of '92.

13      Q.      St. Patrick's Day?

14      A.      St. Patrick's Day.

15      Q.      What were the circumstances?  Where did you

16  meet?

17      A.      We met at Dell's Pizza.  And Dell's Pizza is

18  somewhat of a sports bar pizza place, and I was out with a

19  lady named Maureen Murphy and she was Irish and wanted to go

20  out for St. Patrick's Day.  And I'm -- she was probably in

21  her 40s or so.  So we went around to a couple places and

22  ended up at Dell's Pizza and everybody was, you know,

23  drinking green beer, all that sort of stuff, so --

24      Q.      This is in Casa Grande?

25      A.      Yes.

1        Q.      All right.  What was your initial reaction to

2    this gentleman?

3        A.      I thought he was so cute.  He had -- when we

4    walked into Dell's Pizza, it only took a few minutes to see

5    him and the crowd of people around him because he was very

6    animated and very much the life of the party and very cute

7    about it.  Just had a boyish quality about him.

8        Q.      Okay.  Do you remember that day to this day?

9        A.      Uh-huh, yes, I do.

10       Q.      Okay.  Was he with any group -- certain kind of

11   group of people at Dell's Pizza?

12       A.      Yes, he was.

13       Q.      Which group was he with?

14       A.      He was with what I called the farm kids, and he

15   was actually sitting, or standing I should say, at a table

16   with a bunch of girls, and those were some of the same girls

17   who had given me grief about the guy Vernon Barnes.

18       Q.      Okay.  Was Vernon Barnes from that group of

19   kids that you called the farmer's kids?

20       A.      Yes.

21       Q.      Okay.  Was he there with any of his other

22   friends there at Dell's Pizza?

23       A.      The place was packed.

24       Q.      Okay.

25       A.      It was full of everybody.

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000004781

1    Q.    All right.  Was everybody drinking basically?

2  Drinking beer, having a --

3    A.    By the time we had gotten to Dell's Pizza, it

4  was later in the evening so everybody was pretty happy.

5    Q.    All right.  Do you recall meeting with him,

6  talking with him?

7    A.    I do.  I was kind of shy and I didn't, you

8  know -- I didn't know -- I had never seen him in Casa Grande

9  before.  I didn't know who he was.  But I said to Maureen

10  that I thought he was cute.  And Maureen is funny because

11  she's very loud and boisterous so she is the one who actually

12  initiated the meeting between Joe and I.

13    Q.    Okay.

14    A.    And Joe came over and offered to buy me a drink

15  and stood at the bar with me for a long time, and we just

16  chit-chatted and just -- I don't know.  It was kind of like

17  an instant connection there.

18    Q.    Okay.  How long do you think you stood there at

19  Dell's Pizza with Joe Andriano chit-chatting?

20    A.    Until it closed.

21    Q.    How many hours is that?

22    A.    Probably about an hour or so.

23    Q.    Okay.  It was a pleasant experience?

24    A.    Yes, it was.

25    Q.    Did it affect you from the beginning?

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000004782

1      A.    Yeah, I really liked him. I thought he was a

2    lot of fun and he was easy to talk to and he wasn't stuck up

3    and snobbish, and I just -- I liked him.

4      Q.    Okay. I assume you went your separate ways

5    that night. Was there a plan to meet later to continue the

6    relationship?

7      A.    Yes. I actually gave him one of my business

8    cards from Quail Garden's because that's where I was employed

9    because he said he wanted to call me and maybe we could hang

10    out. And what -- we had discussed that there was no

11    boyfriend-girlfriend thing here, we just wanted to be

12    friends, and -- but he wanted to call me. And we went our

13    separate ways and I didn't hear from him for, I don't know, a

14    couple weeks, and then he had given me his number also and he

15    told me to call him.

16      Q.    Okay. And did you do you that?

17      A.    And I did that and they had an answering

18    service that answered the phone, so I left my name and number

19    a couple of times. And one day I did get -- no, actually, I

20    was at work and Joe came into work.

21      Q.    At Quail Gardens?

22      A.    At Quail Gardens and surprised me. I was like

23    oh, hi, stranger. He had been in Oklahoma, that's why he

24    hadn't returned my of my calls or anything.

25      Q.    Barbara described your recollection to him as

1    being smitten.  Is that an apt description?

2         A.    Yeah.  I think she would use that word because

3    I -- yeah, everything was about Joe.  I just -- the

4    conversations that we had were -- were -- I had this

5    compassion for him and I -- I don't know.  He was just a

6    really neat guy.  He had some issues on things that I felt

7    sorry for him and I just wanted -- I wanted to help make his

8    life better.

9         Q.    That was from the inception from the first time

10    you met him?

11         A.    Probably those feelings started happening third

12    or fourth time that we --

13         Q.    Okay.  All right.  What would you do typically?

14    After the first meeting, where did you guys go?

15         A.    The second time we went out we actually went to

16    Tucson and ate at an Italian restaurant down there, and then

17    went to Dillards and he had me buy him some clothes because

18    he said that he wasn't very -- he was color blind or whatever

19    and couldn't pick out clothes very much, so we went shopping.

20         Q.    Okay.  So you picked out his wardrobe on the

21    second date?

22         A.    Second date, yes.

23         Q.    Yes?

24         A.    Yeah.

25         Q.    Okay.  What did you guys do after the second,

1    third, fourth?

2            A.      Like third and fourth, those started becoming

3    lake trips.  We -- we had some really good friends, Raul and

4    Tonya, and we would be at their house barbecuing or something

5    and the next thing I knew, we'd be packing up going to the

6    lake.

7            Q.      Okay.

8            A.      So it would be Friday night at, I don't know,

9    midnight, and everybody would decide they wanted to go to the

10   lake, so we'd take off to the lake.

11           Q.      All right.  Is that the principle recreation

12   for that group of folks that Joe was --

13           A.      Besides hanging out in the bar, yes, it was.

14           Q.      Okay.  So hanging out at the bar and going to

15   the lake?

16           A.      Uh-huh, yes.

17           Q.      Okay.  Did Joe have a boat at that time?

18           A.      Yes, he did.

19           Q.      Okay.  And what kind of boat was it?

20           A.      It was a Kachina jet boat.

21           Q.      Okay.  And that was one of the boats he had

22   throughout the period of your relationship?

23           A.      Yes.

24           Q.      Okay.

25           A.      It's like about eighteen feet long and had a,

1    you know, some kind of engine on the back of it with these

2    big pipes that come out and it went pretty fast.

3         Q.    Okay.  And did other folks in his group also

4    have boats?

5         A.    Yes, they did.

6         Q.    Okay.  Were they similar kinds of boats?

7         A.    Yes.

8         Q.    Okay.  Was boat racing some of the things --

9    one of the things that was done when you folks would go up to

10   the lake?

11        A.    Most definitely.

12        Q.    Okay.

13        A.    Yeah.  They're very competitive about whose

14   boat has what on it, what could go how fast, things like

15   that.

16        Q.    These are quite loud, noisy boats?

17        A.    Very loud.

18        Q.    Okay.  Would Joe spend time when he wasn't with

19   you working on --

20              (Cell phone rings in the courtroom.)

21        THE COURT:  Hold on a second.

22   BY MR. PATTERSON:

23        Q.    -- his boat --

24        THE COURT:  Hold on a second.

25              Ma'am.  Ma'am.  Ma'am, please leave the


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    courtroom with that cell phone.

2                 WOMAN IN COURTROOM:  I'm turning it off, sir.

3                 THE COURT:  Please leave the courtroom with that cell

4    phone.

5                      If anyone has a cell phone in here, I want it

6    turned off.

7                      Mr. Patterson, you may continue.

8            MR. PATTERSON:  Thank you, Judge.

9            THE WITNESS:  I don't know what you were saying.

10   BY MR. PATTERSON:

11          Q.    Yeah.  Let me repeat the question.  You folks

12   would go up to the lake.  I guess we could talk about what

13   lake you guys would go to.

14          A.    Most frequently we would go to Apache Lake and

15   spend the weekend.  If it was going to be a day trip, we

16   might go to Saguaro or Canyon.

17          Q.    Okay.  The times he wasn't actually going to

18   the lake with the boat, was he spending time fixing the boat

19   or souping up the boat or working on the boat?

20          A.    Yes.

21          Q.    Okay.  Did you do any other kind of

22   recreational things with Joe in the early phase of your

23   relationship?

24          A.    We went snow skiing a couple times.  We did

25   we liked to go to the movies, and we liked to go out and eat.


                  TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1        Q.     Okay.  Weren't forced to watch Rocky movies

2   with Joe, were you?

3        A.     No.  No.  We went and saw whatever was playing

4   at Casa Grande, you know, the little theater there.

5        Q.     Okay.  This relationship, is it -- do you still

6   categorize it as a couple of friends or is it developing into

7   something more serious?

8        A.     Yeah.  In the beginning Joe had a welding

9   business, so what would happen is he liked to do a lot of his

10  building towards the late evening because it's cooler, and so

11  he'd be finished sometime in the middle of the night and he'd

12  knock on the door at my apartment.  So I would get up and

13  we'd visit and he'd be hungry or something and I'd give him

14  something to eat and we'd watch TV for a little bit and he'd

15  fall asleep on my couch.

16             That went on for a while and then a few items

17  of clothing would get left at my house, and he told me that

18  he was having to pay rent at his parents and I didn't -- I

19  didn't like that, and so I eventually just said why don't you

20  move in here, you know, because it just would be a lot

21  easier.  We'd see each other more often and you live over

22  here all the time anyway.

23             And when he'd want to hide from people it would

24  be in my apartment, and he'd shut off his cell phone and

25  nobody knew me or my telephone number so he could get away

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000004788

1    from everybody and just hang out for the day.

2         Q.    All right.  So if you met on March 17 of '92,

3    what time are we talking about now when there's some

4    discussion about him actually moving into your apartment at

5    Quail Garden?

6         A.    Around August.

7         Q.    Okay.  So that's about five months?

8         A.    I believe so.

9         Q.    Okay.  Up to this point in time, is it a

10   friendship relationship or is there an intimate component to

11   it?

12        A.    The first couple of months it was just a

13   friendship thing, and later on, yeah, it became more -- more

14   of a sexual thing.  And I'm not going to say an intimate

15   thing, but it became -- it became sexual.

16        Q.    Okay.  But in a sexual intercourse sense or

17   like second or third base we used to call it?

18        A.    Yes -- lord, I don't know.

19        Q.    I don't know how else to describe it.

20        A.    I'm sorry.

21        Q.    That's okay.

22        A.    Yes.  It -- sexual intercourse and -- and Joe

23   and I always had an issue of being emotionally intimate.

24        Q.    Okay.  And

25        A.    And for me that means the hugging, kissing and

1    things like that.

2              Q.    Was that present in the relationship?

3              A.    We had fun together in the relationship.

4              Q.    Okay.  So just so I understand, the time he

5    moved in, it had developed into a sexual intercourse

6    relationship?

7              A.    Right about that time, yes.

8              Q.    Okay.  All right.  And was there a frequency of

9    that particular act in terms of number of times per week?

10             A.    It was everyday.

11             Q.    Okay.  And how was that for you at least

12   initially?

13             A.    Well, the first time it happened, I cried and I

14   don't know why.  And I -- it really freaked him out.  He

15   didn't know what to do.  He didn't know to hold me, walk

16   away, or what to do, you know.  It was just a really awkward

17   moment.  But after that, the friends he was hanging around

18   with then were like Justin and a couple others, and they

19   would really compare about sex and things like that.  And so

20   it was really important that for their egos or whatever you

21   want to call it to have sex every day, so I -- I realized

22   that through conversations and behaviors at the bars, things

23   like that and that Joe -- that was part of his -- what he

24   expected, and so -- so that's what we did.  We engaged in

25   sexual intercourse every day.

1      Q.    Prior to his moving in with you, had you heard

2   from his friends that he may have some anger control issues?

3          MR. MARTINEZ:  Objection.  Leading.

4          THE COURT:  Overruled.  Go ahead, answer the question

5   if you can.

6          THE WITNESS:  Yes, I had. I heard several --

7          MR. MARTINEZ:  Objection.  Lack of foundation as to

8   who she heard it from, dates, times.

9          THE COURT:  Ask your next question.

10          MR. PATTERSON:  Thank you, Judge.

11   BY MR. PATTERSON:

12          Q.    What point -- assuming you met him 3/17/92 --

13   obviously that's the first time you saw him, so then did you

14   start to hear reports from associates or friends of Joe there

15   may in fact be some anger control issues?

16          A.    The first people I heard it from was Raul and

17   Tonya, and that would have been the first year that we dated.

18   And --

19          Q.    Raul and Tonya were the two you went up to the

20   lake with?

21          A.    Right.

22          Q.    Okay.

23          A.    And they had their own place and it wasn't an

24   apartment so you didn't have to worry about being noisy to

25   the neighbor, things like that.  So we would always be over

1    at their place and a lot of it was made in a joking manner.

2    Oh, yeah, Joe blew up over this or Joe did that, Joe did

3    that, and you know, so you kind of laughed about it and

4    didn't -- I didn't take it too seriously.

5        Q.    Okay.  Did it continue and did you at some

6    point early on take it seriously?

7        A.    Well, after -- Joe seemed to switch groups of

8    friends, so we stopped hanging around Raul and Tonya and hung

9    around a different group of people.  And one night -- this

10    was -- had to be the summer of '93 -- we were at one of the

11    little bars in Casa Grande and I was sitting with Dale

12    Hartman, actually, because the girls there, I just wasn't

13    comfortable sitting with because they just hadn't accepted me

14    as part of their little group or whatever.  So I was sitting

15    there and Dale was a good friend of Joe's, very good friend.

16    They grew up together.  And Justin was there too.  And when

17    we were at a bar together, Joe didn't really hang around me

18    or pay attention to me.  He -- he did his thing with his

19    friends and I tried to make friends and, you know, whatever.

20    It was kind of awkward, but -- I just have to tell you this

21    story because Joe and --

22        MR. MARTINEZ:  I'm going to object if it's going to

23    be a narrative.

24        THE COURT:  Just answer the question.  Go ahead.

25        THE WITNESS:  Well, that's --

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1          MR. PATTERSON:  Is this --

2          THE COURT:  Hold on a second.  Ask your next

3     question.

4     BY MR. PATTERSON:

5          Q.    The report and topics, reports you got from

6     associates of Joe pertaining to anger control issues?

7          A.    While I was sitting there with Dale Hartman,

8     Joe and Justin were up at the bar and they were starting to

9     have a confrontation with -- we were in a bar that actually

10    Indians from the reservation would hang out in it.  It wasn't

11    one of your typical hang outs and they didn't appreciate us

12    being there, so they started to get into a confrontation and

13    I was kind of getting nervous and didn't know how to handle

14    it.  And Dale told me, he said that this -- they have guns

15    out in their trucks and this is -- if they want to be in the

16    bar, they'll be in the bar, Joe will handle it, don't worry

17    about it.

18               And then as the evening progressed, he had also

19    said to me that --

20          MR. MARTINEZ:  I'm going to object.  Who is it, Joe

21    or --

22          THE WITNESS:  Dale Hartman had said to me --

23          THE COURT:  Go ahead.

24          THE WITNESS:  He started relating to me some of Joe's

25    earlier violent experiences that Dale had been witness to.

1    And I listened to Dale, but I had never seen evidence really

2    of that in Joe, so I didn't really know what to think.

3              The yelling and stuff like that was okay with

4    me because that's how I grew up, but physical violence I

5    didn't really approve of, but I hadn't seen any of that.

6    BY MR. PATTERSON:

7         Q.    Okay.  So you had heard --

8         A.    So I had heard stories, but --

9         Q.    All right.  Is there also something at work

10   here, were you happy that Joe had shown you some attention?

11        A.    Oh, yes, I was.

12        Q.    Talk to me about that.  Coming from one group

13   and he was in the other group, how did that impact you?

14        A.    Well, yeah.  It's very flattering.  Here you

15   have this -- he was very popular with the girls and a very

16   handsome man and lots of fun and all this sort of stuff, and

17   here he's interested in me.  And I come from, you know, a

18   very nonsocial group and I'm not used to all that sort of

19   stuff, so it was very flattering that he even wanted to spend

20   time with me.

21        Q.    Okay.  All right.  Now you mentioned that there

22   was some yelling.  Even early on in the relationship, he

23   began to yell?

24        A.    Yeah.  I would hear him yell.  It wasn't

25   necessarily directed at me so I didn't even -- that didn't

1    bother me.

2         Q.   All right.  Directed at other instances,

3    incidents, or persons?

4         A.   Yes, other people or even just while doing

5    something out of frustration.

6         Q.   All right.  So you moved in together at Quail

7    Gardens?

8         A.   Yes.

9         Q.   You were the resident manager?

10        A.   Assistant manager.

11        Q.   Assistant manager, sorry.

12        A.   It was a one-bedroom apartment when we first

13   moved in.

14        Q.   Okay.  And did that change?

15        A.   Yes, it did.

16        Q.   How did that change?

17        A.   We were living in the one bedroom and it was

18   too small.  And Joe asked if we could have a two bedroom

19   since I worked there.  Well, normally an assistant manager

20   would not be given a two bedroom, only the manager would.

21   But we had that discussion several times and it seemed very

22   important in the relationship to keep things happy and keep

23   everybody, you know, whatever.  So I did go to my boss and I

24   told her and at first she said no.  I mean, she couldn't even

25   believe I had asked, but, you know, I -- I was persistent in

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    asking her.  And a month or so later she went ahead and

2    okayed it with our district manager and let me have a two

3    bedroom.

4          Q.    Okay.  Is Joe employed at this time?

5          A.    He has his welding business.

6          Q.    Okay.  Whatever happened to the welding

7    business?

8          A.    He told me he didn't want to do it anymore

9    because of the danger to his eyesight.

10          Q.    Okay.

11          A.    He said at one time he gotten a piece of metal

12    in his eye and he didn't want to lose his eyesight.

13          Q.    Okay.  After the welding business, were you

14    guys still at Quail Garden?

15          A.    No.

16          Q.    Okay.  Where did you?

17          A.    No.  We actually rented a townhouse on Pepper,

18    and the reason why we rented the townhouse on Pepper was

19    because I went to go work at the hospital, and so obviously a

20    free apartment was no longer part of my salary, so we moved

21    to Pepper and Joe still had his welding business then and

22    that's when I was working at the hospital.

23          Q.    Okay.  And what year are we talking about?

24          A.    This is Fall of '93.

25          Q.    Okay.  Is the fact that Joe and you are sharing

1    an apartment or townhouse creating difficulties for your mom

2    and dad?

3              A.    For my dad more than my mom.

4              Q.    Okay.  And --

5              A.    Um --

6              Q.    What was the impact upon you in that regard?

7              A.    When Joe moved in, when I was still in the one

8    bedroom, he moved in -- I think it was about August or so of

9    '92 -- and my dad did not talk to me until '93.

10             Q.    And that was the result of that living with Mr.

11   Andriano?

12             A.    He didn't approve of it.

13             Q.    Okay.  You're at the townhouse on Pepper you

14   said?

15             A.    Uh-huh.

16             Q.    This is in Casa Grande.  You're now working at

17   Casa Grande Regional Hospital?

18             A.    That's correct.

19             Q.    All right.  And how is the relationship with

20   Joe in terms of -- well, let's start is there verbal

21   altercations at this time?

22             A.    Yes, there is.  I had used my car to trade

23   in --

24             MR. MARTINEZ:  I'm going to object.  There's no

25   question before her.  She was asked if there were

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000004797

1   altercations.

2         THE COURT:  I'll sustain the question.  Go ahead and

3   ask your next question.

4   BY MR. PATTERSON:

5         Q.   Is there an instance of verbal disagreements or

6   what you mentioned?

7         A.   Yes.  This is what happened.

8         MR. MARTINEZ:  If we could have more foundation

9   when.

10  BY MR. PATTERSON:

11        Q.   Where are you living at the time?

12        A.   In the townhouse at Pepper.

13        Q.   Okay.

14        A.   This is the Fall of '93.

15        Q.   Okay.  And you're at Casa Grande Regional --

16        A.   Casa Grade Regional Hospital.

17        Q.   And Joe's not employed?

18        A.   He has his welding business.

19        Q.   Welding business?  Okay.  Tell me about an

20  incident that --

21        A.   I traded in my car so he could have a full-size

22  truck.  We only had one vehicle between the two of us and

23  living at the townhouse, and he is taking me to work and I'm

24  finding rides home from work because usually by that time

25  he's outside doing welding stuff or at the bar with his

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000004798

1      friends.  And I would be home by myself and I'd want him to

2      come get me so I could, you know, be with him or do whatever,

3      not just sit at home.  And I would call on the cell phone and

4      that's what started all of the arguments is because he didn't

5      want to have to leave the bar come get me, things like that.

6      So when he would get home, I would get yelled at for

7      bothering him.

8              Q.    Okay.  And the inception of this verbal

9      altercation is while you're at the townhome?  Or had it

10     started before when you were at the Quail Garden Apartments?

11             A.    No.  I will -- would say it wasn't until I

12     really had -- probably the first time he ever yelled at me

13     was over me asking him to come pick me up.

14             Q.    Okay.  Were there times at the townhome --

15     we're talking Fall of '93 now, right?

16             A.    Yes.

17             Q.    -- where the verbal argument would escalate in

18     a touching episode?

19             A.    There's only one time that I recall.  I had

20     made dinner and I had, I believe, I made pot roast and made

21     corn to go with it.  And I don't mean to laugh, but when Joe

22     went to take a bite of the corn, something was wrong with it.

23     And he was like, What's in this corn?  And, you know, so I'm

24     tasting it and we're trying to figure out what in the world?

25     And we're kind of laughing about it or trying to figure out

1    what's going on.

2                And what had happened was earlier that day I

3    was washing dishes, and one of the plastic containers I had

4    stored red like tomato sauce or spaghetti sauce in and it

5    stained the thing, so I used bleach to clean it out.  And I

6    did not know you can't put bleach in Tupperware products.  I

7    was just trying to get it clean.  That same bowl is what I

8    cooked the corn in and the bleach obviously went into the

9    Tupperware and the heat from the microwave made --

10         Q.    So it had a foul taste?

11         A.    Yeah, it had a foul taste.  It was funny.  We

12   joked around about it at first and I -- you know, I -- I

13   didn't know -- I didn't know what was -- so, anyways, we

14   ended up throwing it away.

15                Later on in the evening I'm cleaning off the

16   table for, you know, after eating our dinner, whatever, and

17   he comes into the kitchen and he starts opening up all the

18   cupboards and just starts throwing away all the Tupperware.

19   And I'm like, "What are you doing?"  He just keeping throwing

20   this stuff away and starts cussing at me, saying I'm not --

21   won't have the chance to do that to him again, all this sort

22   of stuff.  And he starts getting mad about it and I didn't

23   know why he was mad, but he wanted to fill up the garbage can

24   with all this stuff.  And I didn't know what was going on and

25   I said something to him that I guess he might have been

1    considered smart or whatever, and I got backhanded across the

2    side of my face.

3          Q.    Okay.  Was your adopted -- Brandon there that

4    day?

5          A.    Yes, he was.

6          Q.    How'd you deal with that issue that evening?

7          A.    I didn't know what to do.  I -- after he hit

8    me, I stood there stunned.  I just started crying.  I didn't

9    know.  I couldn't understand why he hit me.  He was still

10   upset and he ended up going outside.  I took Brandon and went

11   up to the bedroom and stayed up there.  And later on in the

12   evening Brandon went to bed in the guest bedroom and Joe came

13   in and went to bed and we never said anything about it.

14         Q.    Okay.  So you didn't deal with it directly at

15   all?

16         A.    No.  I didn't know what to say.

17         Q.    Okay.  Did he mention it?

18         A.    No.

19         Q.    Was it mentioned the following day or the day

20   thereafter?

21         A.    No.  We never talked about it.

22         Q.    After the townhouse, where did you folks move?

23         A.    For a brief amount of time I moved back in with

24   my parents and I think Joe moved in either with his sister or

25   with his mom and dad, and that was just right before our

1    wedding.

2              Q.     Okay.   There was a reason for the --

3              A.     The townhouse that we were renting, the people

4    were selling it, and so we had to move out of it and we

5    hadn't had time to find another place to live, and I also was

6    trying to make amends with my father, so I moved home a

7    little bit before I got married and moved into a house

8    together after we were married type thing.   I was just trying

9    to keep the peace.

10             Q.     Okay.   Had there been discussions between you

11   and Joe concerning marriage?

12             A.     Yes, there had been discussion.

13             Q.     Okay.   I mean --

14             A.     Um --

15             Q.     -- how did it happen?

16             A.     -- well --

17             Q.     How was the decision made that you folks

18   decided to become man and wife?

19             A.     Most of our time was spent when there was

20   drinking involved, and when Joe would drink that's when he

21   would talk to me more.   And so when we were in the

22   two-bedroom apartment at Quail Gardens was the first time it

23   came up because I asked him -- he told me he loved me and I

24   asked him why he loved me because I didn't really believe he

25   loved me.   And he told me that because I wasn't like all the

1    other girls that he had dated and that he -- that I really --
2    that he felt that I really cared about him and he liked the
3    way I took care of him and the way I offered to pay for
4    lunch, dinner, going to the movies, things like that.  And I
5    was just a different kind of person than he had ever gone out
6    with, so -- and I remember both of us crying that night.  It
7    was just -- and then just a little bit after that he started
8    talking about wanting to marry me.  So it was just kind of
9    decided we would get married.
10            Q.    Okay.  Was -- were there plans made for a
11   formal wedding ceremony, honeymoon, those kinds of things?
12            A.    There were.  I don't know how to even explain
13   all this, but I was working at the hospital and at that time
14   we decided -- his sister had gotten married the year before.
15            Q.    Which sister?
16            A.    Jan.
17            Q.    Jan?
18            A.    Either the year before or two years before.
19   I'm not real clear on that.  And so his parents didn't have a
20   whole lot of money to be putting into a wedding, my parents
21   aren't rich, they didn't have that either, so between the
22   three of us we were going to finance this wedding, you know,
23   Joe and I, his mom and dad, and my mom and dad.  And so we
24   picked January of 94 because of the cotton season, that
25   would be a good time.  And I believe there was some

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

 1    discussion that there would be more funds available for us to

 2    have a wedding at that time.

 3                My mom actually ended up doing a lot of the

 4    planning for me, and I know that just because I was so busy

 5    at work and I also -- I don't know, it just -- I just

 6    couldn't seem to take a huge interest in planning this

 7    wedding.  And I don't know why, so my mom stepped in and

 8    she -- she did that for me.

 9          Q.    Did you have some reservations in your heart,

10    in your mind?

11          A.    I'm sorry.  My big reservation was that I had

12    been raised that you only marry a Christian man and I wasn't

13    doing that.  And I couldn't even go to my own pastor of my

14    church to ask him to marry us.

15          Q.    Did you have any reservations about his conduct

16    up to this point?

17          A.    No.  It hadn't seemed any different from my

18    father what I had been raised with, so no, I wasn't -- I

19    wasn't really concerned about it.

20          Q.    All right.  So the plans were made.  Which

21    facility did you folks use to --

22          A.    Well --

23          Q.    -- establish the marriage?

24          A.    There was some discrepancy because he had been

25    raised catholic and so we picked a neutral church and I

                    TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1      couldn't even tell you the name of the church right now --

2              Q.    Okay.

3              A.    -- but some -- some other church.  And where we

4      got married, I know it's across the street from the Catholic

5      church.  I just don't remember the name of it.

6              Q.    In Casa Grande?

7              A.    Casa Grande.

8              Q.    Tell me about your relationship prior to the

9      wedding with your best friend Barbara Mitchell?

10             A.    Well, it went from her and I doing everything

11     together to it just being Joe and I, and he didn't like her.

12     He thought she was too wild or too this or too that or

13     whatever the reasons were.  I don't even -- can't even

14     recall, but there was always something.  And she did come to

15     the lake with us once and he never even acknowledged that she

16     was there.  And it just made her feel very uncomfortable, so

17     she just, you know, it just kind of dissipated our whole

18     friendship.

19             Q.    Okay.  Did you maintain any friendship

20     relationships with other girlfriends or other male friends

21     after you and Joe moved into together?

22             A.    Not with any of mine that had been my friends,

23     no.

24             Q.    Okay.  The friends that you were now

25     associating with were whom?

1        A.      They were Joe's friends.

2        Q.      Okay.

3        A.      Yeah.

4        Q.      Okay.   There was a decision made with regard to

5    who should be the maid or matron of honor in your wedding?

6        A.      Yes.   I had -- I knew if I asked Barbara it

7    just wouldn't, because of the previous history, go over well,

8    and so there was a person, Nola Barnes, that was also kind of

9    like me that came into this group through her boyfriend and

10   her and I got along pretty well, and she was somebody I felt

11   comfortable around, I could be myself around, she could be

12   herself, and, you know, if we were at the bars together it

13   was her and I sitting there at the table and kept -- kept

14   each other company.   And so I had asked her to be my maid of

15   honor.

16              And shortly before the wedding, Joe had a

17   falling out with her boyfriend, who was Steve Barnes, and

18   wouldn't -- they were no longer speaking to each other, and

19   so Joe instructed me to call Nola and tell her she was no

20   longer welcome to the wedding.   And I didn't want to do that

21   just, you know, because she's my friend.

22       Q.      Did you do that?

23       A.      I couldn't call.

24       Q.      Okay.

25       A.      So I ended up writing her a letter.   And the

1    next time that we saw her, she was -- it was horrible.

2         Q.    Okay.  Who served as your maid or matron of

3    honor in your wedding?

4         A.    I have to say that Joe's sister Janay was my

5    maid of honor, and her and her husband were so helpful to us

6    during the wedding.

7         MR. MARTINEZ:  Objection.  Beyond the scope.

8         THE COURT:  Sustained.  Go ahead, ask your next

9    question.

10   BY MR. PATTERSON:

11        Q.    Who served as maid of honor?

12        A.    Janay.

13        MR. MARTINEZ:  Objection.  Asked and answered.

14        THE COURT:  Ask your next question.

15        THE WITNESS:  Janay served as my maid of honor.

16   And --

17   BY MR. PATTERSON:

18        Q.    And who made that decision?

19        A.    Who made that decision?

20        MR. MARTINEZ:  Objection.

21        THE COURT:  Sustained.  Ask your next question.

22        MR. PATTERSON:  Wait, Judge.

23        THE COURT:  Re-ask the question.

24   BY MR. PATTERSON:

25        Q.    Who made the decision -- was it Janay?

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1          A.     Janay.

2          Q.     -- of asking her?

3          A.     Janay asked me that, and I didn't have a

4     problem with that because I really liked Janay.

5          Q.     Okay.  But who brought her up as a potential

6     maid of honor?

7          A.     Joe did.  He asked me.

8          Q.     Okay.  Okay.  Got married in January of '94?

9     Okay.  Were you able to have a honeymoon?

10         A.     In January at the hospital in the accounting

11    department --

12         MR. MARTINEZ:  I'm going to object as being

13    nonresponsive.  Calls for a "yes" or "no."

14         THE COURT:  Sustained.  Just answer the question

15    that's asked.

16         THE WITNESS:  Okay.

17    BY MR. PATTERSON:

18         Q.     Did you take a honeymoon after --

19         A.     A brief one.

20         Q.     Okay.  How were you able to pay for that?

21         A.     Joe's sister Janay and Brad gave that to us as

22    our wedding present.

23         Q.     Okay.  Where did you guys go?

24         A.     We spent three days in Las Vegas.

25         Q.     All right.  Do you recall which particular

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000004808

1    hotel?

2              A.    We stayed at the Flamingo Hotel and --

3              MR. MARTINEZ:  Objection.  She's now going to

4    narrate.

5              THE COURT:  Ask your next question.

6    BY MR. PATTERSON:

7              Q.    Okay.  Why was it a three-day duration?

8              MR. MARTINEZ:  Objection.  Relevance.

9              THE COURT:  Overruled.  Go ahead and answer the

10   question.

11             THE WITNESS:  That's all the time I could get off of

12   my job.

13   BY MR. PATTERSON:

14             Q.    Okay.  You returned back to Phoenix.  Did you

15   then go back -- you're at Casa Grande Regional?

16             A.    Still, yes.

17             Q.    Okay.  Is Joe still involved with his welding

18   practice?

19             A.    No.

20             Q.    Has he moved on to some other enterprise? What

21   is he doing now?

22             A.    At the time of our wedding and all this, he

23   decided that he wanted to do a windshield repair and

24   replacement business.

25             Q.    Okay.  And that's when he started Joe's --

```
1         A.     That's when he started Joe's Windshield Repair.

2         Q.     Okay.  And that was in Casa Grande?

3         A.     Yes.

4         Q.     Okay.  And how long did that last?

5         A.     Well, he kept it when we had AccuGlass.  He

6    always had Joe's Windshield Repair, but as far as being an

7    active, viable business, I don't -- we never -- he never

8    really even got it off the ground.

9         Q.     Okay.  Did you folks make any money at that

10   enterprise?

11        A.     We made money, but did not make profit.

12        Q.     Okay.

13               MR. PATTERSON:  Judge, it might be a good time stop.

14               THE COURT:  Okay.  We'll go ahead take our evening

15   recess at this point in time.

16               Ladies and gentlemen, during this recess

17   remember the entire admonition I've given you including the

18   fact you're not to discuss this case with anyone, do not let

19   anyone discuss the case with you, keep an open mind about the

20   case, do not do any research, investigation, experimentation

21   or testing on your own, avoid any media coverage of the case.

22               Again, keep an open mind.  I want you to have a

23   nice evening.  We'll see you tomorrow at 1:00 p.m.  Have a

24   nice evening.  We'll see you tomorrow.  Have a nice recess.

25               (Evening recess.)
```

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

```
 1

 2

 3                        CERTIFICATE OF REPORTER

 4

 5    STATE OF ARIZONA      )
                            )
 6    COUNTY OF MARICOPA    )

 7

 8                  I, Traci L. Wheeler, CSR, RPR, an official

 9    and certified reporter in the Superior Court of the State

10    of Arizona, in and for the County of Maricopa, hereby

11    certify that I made a shorthand record of the proceedings

12    had in the within case, and that the foregoing transcript

13    is a full, true, and correct transcription of the

14    proceedings in this case.

15                  Dated this 5th day of June, 2005.

16

17

18                                   _____
                                     Traci L. Wheeler, CSR, RPR
19                                   Certified Court Reporter No. 50313
                                     Official Court Reporter
20

21

22

23

24

25
```

          TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

EXHIBIT W

000004812



05-0002   1
Braccio



1   IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

2   IN AND FOR THE COUNTY OF MARICOPA

3

4   STATE OF ARIZONA,                )
                                     )
5           Plaintiff,               )
                                     )
6   v.                               )       No. 1 CA-CR 04-0731
                                     )       MARICOPA COUNTY
7   WENDI ELIZABETH ANDRIANO,        )       No. CR 2000-096032
                                     )
8           Defendant.               )
                                     )
9   _____)

10

11

12                      Mesa, Arizona
                        October 26, 2004

13

14

15

16      BEFORE:   The Honorable BRIAN K. ISHIKAWA

17

18          REPORTER'S TRANSCRIPT OF PROCEEDINGS

19                      TRIAL DAY 32

20

21

22

23

24   ORIGINAL Prepared for APPEAL by:
     TRACI L. WHEELER, CSR, RPR
25   Certified Court Reporter No. 50313


     TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

<pre>
1                    A P P E A R A N C E S

2   FOR THE STATE:        JUAN M. MARTINEZ,
                          Deputy County Attorney
3
    FOR THE DEFENDANT:    DANIEL B. PATTERSON,
4                         Deputy Public Defender
                                  and
5                         G. DAVID DELOZIER,
                          Attorney at Law
6

7          I N D E X   O F   E X A M I N A T I O N

8   WITNESS                                         PAGE

9   ANDRIANO, WENDI ELIZABETH, Called on her own behalf
            Continued Direct Examination              3
10          Continued Direct Examination             76

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
</pre>

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

```
1                MESA, ARIZONA, TUESDAY, OCTOBER 26, 2004

2

3           THE COURT:  Good afternoon.  This is trial in cause

4    number CR 2000-096032, State of Arizona versus Wendi

5    Elizabeth Andriano.  The record will reflect the presence of

6    the Defendant, who's on the witness stand, Counsel and the

7    jury.  Defendant Wendi Andriano is on the witness stand.

8    We'll continue with direct examination by Mr. Patterson.

9                Mr. Patterson?

10          MR. PATTERSON:  Thank you, Judge Ishikawa.

11

12                WENDI ELIZABETH ANDRIANO,

13           CALLED TO TESTIFY ON HER OWN BEHALF,

14    HAVING PREVIOUSLY BEEN SWORN, TESTIFIES FURTHER AS FOLLOWS:

15

16   CONTINUED DIRECT EXAMINATION BY MR. PATTERSON:

17          Q.   You are Wendi Andriano?

18          A.   Yes, I am.

19          Q.   You are the same Wendi Andriano that was

20   testifying yesterday in this case?

21          A.   Yes, sir.

22          Q.   You realize you're still under oath?

23          A.   Yes.

24          Q.   We left off with discussions about Joe's

25   Windshield Repair, and you told us that it never really made
```

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000004815

1   a profit.  What was the next business that you and Joe

2   involved yourself in in sequence here?

3           A.    In '96 we purchased with a partner a business

4   called AccuGlass --

5           Q.    Okay.

6           A.    -- that was located in Mesa.

7           Q.    All right.  Did you move from one location to

8   another in order to save some money to either put into Joe's

9   Windshield Repair or into AccuGlass?

10          A.    Yes, we did.  When we were first married in

11  January of '94 we had rented a -- a two-bedroom house little,

12  like, patio home, and in July of '94 we moved to the shop

13  house or farm house on -- in order to save money to put it

14  into Joe's Windshield Repair to try to get it going.

15          Q.    All right.  From whom did you purchase

16  AccuGlass?

17          A.    Gary and Judy Wyatt.

18          Q.    And this was an ongoing business in the city of

19  Mesa?

20          A.    Yes, it was.

21          Q.    Okay.  Was it a sole installation or was it a

22  franchise or --

23          A.    No.  It was the only one.  It was incorporated,

24  I believe, but Gary and Judy ran it.  Gary was the manager

25  and owner and Judy worked in the office along with her

1    daughter.  And they had a couple of installers I believe that

2    worked for them.

3         Q.    Okay.

4         A.    Joe had done this work for them previously.

5         Q.    Did it have an existing client base?

6         A.    Yes it did.

7         Q.    All right.  What was the purchase price for

8    AccuGlass?

9         MR. MARTINEZ:  Objection.  Relevance.

10        THE COURT:  Overruled.  Go ahead, answer the

11   question.

12        THE WITNESS:  $185,000.

13   BY MR. PATTERSON:

14        Q.    All right.  How did you fund the purchase price?

15        A.    We put down 85,000 cash and signed a note with

16   Gary and Judy for 100,000 to be paid over the next five

17   years.

18        Q.    From what source did you acquire the down

19   payment?

20        A.    Part of it was from us and a large portion was

21   from our partner.  That's -- we had to have a partner.

22        Q.    All right.  And who was the partner again?

23        A.    Jerry Robles.

24        Q.    How much did he invest into the proposition?

25        A.    $65,000.

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1        Q.    Okay.  Was he an active hands on day-to-day

2    kind of partner?

3        A.    No.  He was going to be a silent partner.   He

4    was into it for the money.

5        Q.    The investment?

6        A.    The investment, yes.

7        Q.    Okay.  And who actually did the hands-on

8    running of the day to day business at AccuGlass?

9        A.    Joe was considered the operating owner slash

10   manager, but he also did do some installation --

11       Q.    Okay.

12       A.    -- work also.

13       Q.    And what was your job at that particular --

14       A.    I sat in the office and answered the phones and

15   did paperwork, things like that.

16       Q.    Okay.  Did you have the assistance of an

17   attorney, somebody looking over the books before you

18   purchased it?

19       A.    Yes, we did.  Jerry Robles had an attorney who

20   did the paperwork for us.

21       Q.    Okay.  And when did you first take over that

22   business or begin -- open the doors for the first time as Joe

23   and Wendi doing business as AccuGlass?

24       A.    Around July or August of '96.

25       Q.    Okay.  When did you finally close up the doors

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    at AccuGlass?

2         A.    We never closed the doors, but we did hand over

3    to keys to our partner in December, January, of that same --

4    it was either December '96 or January of '97.

5         Q.    Okay.  So you were there for five months, six

6    months tops?

7         A.    Yes.

8         Q.    Okay.  Why did the business run into some

9    problems?

10        A.    When we originally presented the problems to

11   our partner, there was a certain amount of profit that was

12   shown on the books.  And while we were running it, that

13   profit was no longer there.  In fact Jerry had to put in

14   additional cash just to keep things going, and so that's why

15   he came in and took it over.  He was -- he owned 51 percent,

16   so he had the authority to do that.

17        Q.    Okay.  Why did AccuGlass go out of business or

18   why was it necessary for this silent partner to take over the

19   operation of the enterprise?

20        A.    What would happen is as many jobs as possible

21   would be invoiced on Joe's Windshield Repair instead of

22   AccuGlass such as cash jobs, so the income was no longer

23   showing up on AccuGlass books.  It was going into Joe's

24   Windshield Repair.

25        Q.    Okay.  Was that being used to sustain the

8

1    family or what was it being used for?

2         A.    Basically used for trips to Laughlin, boat

3    trips, lake trips, things like that.

4         Q.    At some point in time you become aware Mr.

5    Robles was going to take over the operation?

6         A.    Yes.

7         Q.    Did Joe become aware of that intent as well?

8         A.    Yes, he did.

9         Q.    Did that precipitate an act of violence in your

10   life?

11        A.    Yes, it did.

12        Q.    Tell me about that.

13        A.    Joe felt that AccuGlass was his and he's the

14   one that knew everything about doing the installation of

15   glass and he's the one that brought the opportunity to Jerry,

16   so he didn't feel that Jerry had the right to take it away

17   from him.  He was highly upset about it.  And him and a

18   person in Casa Grande met at my house and decided to -- well,

19   they put a hit out on Jerry.  And Joe purchased a gun that --

20   I guess you could call it it couldn't be identified, the

21   serial numbers had been taken off of it, and he carried that

22   around with him a lot and in the hopes of finding Jerry

23   around town.

24        Q.    Okay.  This is the town of Casa Grande?

25        A.    Yes.

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1          Q.    Is this at a time when you're living on the

2     farm?

3          A.    Yes.

4          Q.    The shop at the farm?

5          A.    Yes.

6          Q.    Okay.   What did you do when you became aware of

7     Joe's intentions in that regard?

8          A.     I told my dad because Jerry Robles has been a

9     friend of my -- an acquaintance, I should say, of my father,

10    and that was just very disrespectful.   And I knew that if

11    this was to happen, the fingers would be pointed at us and

12    Joe would immediately be in trouble.   I mean, it just --

13    nobody else would have had a motive, so I'd asked Joe to not

14    do that and he didn't want to talk about it with me, said it

15    wasn't my business, so I went to my father and told my dad.

16         Q.    Okay.

17         A.    And --

18         Q.    What did you do in terms of confronting Joe

19    thereafter?

20         A.    Actually, Joe and I and my father were standing

21    outside of my dad's house one day and we were instructed

22    quite strongly to stop doing that.

23         Q.    By whom?

24         A.    By my father.

25         Q.    Okay.

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1      A.     And not to, you know, to knock it off, quit

2  planning the stuff, don't even be talking about it, because

3  not only would the law come down, there would also be a lot

4  of other consequences.

5      Q.     Okay.  Is this your plan or Joe's plan?

6      A.     No.  I had nothing to do with it.

7      Q.     Okay.  At some point in time did Joe gather

8  that you may have made efforts to contact Mr. Robles?

9      A.     Well, I told Joe one night after my father had

10  told us this and he was still continuing to meet with this

11  other person and they were still planning this stuff and

12  doing it right in my living room, and I told Joe, I said "If

13  you continue to do this, I'm going to go tell Jerry, I'm

14  going to let him know what you're doing because you're --

15  you're not thinking straight."

16      Q.     And what was Joe's response?

17      A.     Well, Joe had that gun, he carried it with him,

18  and he pointed it at me.  He, you know, put the gun up on me

19  like this and told me "You go tell Jerry any of this and I'll

20  kill you first."

21      Q.     Okay.

22      A.     So --

23      Q.     This happened at a time when you were in the

24  shop house on the farm?

25      A.     Yes, we were.


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000004822

1      Q.    And what -- what year and month are we talking

2   about?

3      A.    We're talking in '97.

4      Q.    Okay.  Were there other times when you were

5   living in that location that there were acts of violence

6   committed upon you by Joe Andriano?

7      A.    Where he actually put his hands on me or

8   just --

9      Q.    Well, an incident involving perhaps the

10   bathroom door?

11      A.    Yeah.  Whenever we'd have arguments, I don't

12   like confrontation, and so he'd usually be cursing and

13   yelling and I would want to get away from him, so I would

14   always go either to another room or somewhere.  But the

15   bathroom, it was a particularly nasty argument or whatever,

16   I'd go to the bathroom and lock the door until he was calmed

17   down.  And quite frequently he tried to open up the door and

18   sometimes if he couldn't, he would pound his fists on it and

19   it would break through like the first layer, so we'd replaced

20   that door quite a few times.

21      Q.    Okay.  Was there a time when he broke the -- or

22   punched the wall separate from the bathroom door?

23      A.    He actually didn't punch the wall.  What

24   happened was he had come home late one night and had been

25   drinking all night, and it was about 2:00 in the morning, and


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1   I was concerned about where he had been and so I asked him.

2   I said "Where have you been?  I've been, you know, sitting

3   here waiting for you.  I was worried about you.  You weren't

4   answering your cell phone," and he got upset that I

5   questioned where he was.

6              And so he starts raging around the house and he

7   busted up -- we had an oak and glass coffee table and he

8   broke that all to pieces.  I had run into the bedroom and he

9   threw himself through the bedroom door.  This is not a solid

10  door.  These are, you know, two pieces of wood that

11  there's -- it's hollow in between, and he actually put his

12  body through the door and scraped up his shoulders.  And I

13  mean, he had scratches everywhere, there was blood dripping

14  and stuff, but -- and he had pulled me up out of the bedroom

15  and was yelling in my face and had pinned me up against the

16  living room wall.

17             And right next to us was a desk with a -- a

18  stone pot, it's called a cachet pot, and it's a pretty heavy

19  stone pot.  He picked that up and I thought was going to

20  smash it into my head.  And instead of an inch from my head,

21  he just smashed the thing right into the wall and it made a

22  big old hole.  And I just -- I just started crying.  I just

23  thought he was -- I didn't know what he was going to do.

24        Q.   How did you feel after that episode?

25        A.   I was scared of him when he would be drinking

1    like that so I just knew not to question him.  You know,

2    don't -- you know, leave him alone when he's -- when he's

3    like that because when the whole thing was over, he just went

4    to the room -- as I said, the living room was our bedroom and

5    everything, and he went to the bed passed out on the bed

6    bloody and all, so I just knew not to -- don't -- don't

7    confront him with anything, don't ask him anything that will

8    upset him.

9          Q.    The day after did you folks have a discussion

10   about that particular episode or incident?        :

11         A.    No.  We never communicated about arguments or

12   disagreements or things broken in the house.  Joe was pretty

13   good about the next day.  He'd go down to the local, you

14   know, Foxworth -- it's like a Home Depot -- purchase a door,

15   replace the door.  We got another coffee table, and nothing

16   was ever said about it.  We'd even go eat lunch together the

17   next day and life moved on.

18         Q.    Okay.  All right.  Were there any other

19   episodes of physical violence while you were a resident there

20   at the shop house on the farm?

21         A.    Yes.  After I had Nicolas, it was about three

22   weeks after I'd had him.  Joe felt that it was long enough

23   that he had to wait long enough before we resumed our marital

24   duties -- I don't know what else to call it, but -- and I had

25   had stitches and I wasn't healed yet and I told him I

1   couldn't.  And he was very --

2            Q.    Let me understand.  Did you have an episiotomy?

3            A.    Yes, I did.

4            Q.    And it had been sewn up.

5            A.    Uh-huh.

6       THE COURT:  Is that a "yes"?

7       THE WITNESS:  Yes.

8   BY MR. PATTERSON:

9            Q.    Three weeks post partum or after birth?

10           A.    Yes.

11           Q.    That's when the discussion began?

12           A.    Yes.

13           Q.    Okay.

14           A.    Yes.

15           Q.    And what did he say?

16           A.    He was very cajolling about it at first.  It

17  wasn't an angry thing, he was just trying to talk me into

18  doing this and I don't think he understood how serious it

19  was.  I said I really can't do this, it will hurt, it will

20  open the stitches, and he just -- he wouldn't listen.  That's

21  what he -- that was his focus, that was his goal, and that's

22  what he wanted.  And it -- it escalated into anger because I

23  kept saying no.

24           And at that time I had a dog named Max, and Max

25  was more my dog than Joe's, and when Joe would raise his

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1   voice at me, Max would growl.  He didn't like it.  And so

2   that particular day, Max started growling at Joe and Joe

3   turned to the dog and had him pinned down on the floor and

4   had his hand around his -- his, you know, his --

5           Q.    Snout?

6           A.    -- mouth, snout, whatever.  And he looked at me

7   and told me, you know, "I'm going to kill your F-ing dog if

8   you don't get in the bedroom right now."

9           Q.    We know what "F-ing" means, but --

10          A.    Yeah.  He said he was going to kill my fucking

11  dog.

12          Q.    Okay.  And what was his demeanor at the time he

13  made that statement?

14          A.    He was upset.  He wanted me to do what he said

15  to do.

16          Q.    Okay.  And so the threat was that if you didn't

17  perform sexual intercourse with him, he would kill your dog?

18          A.    Yes, sir.

19          Q.    Okay.  And he was serious about that?

20          A.    Yes, he was.

21          Q.    What did you do?

22          A.    Well, Nicolas started crying because I was

23  crying, and there was so much noise going on and it was just

24  getting chaotic in the house.  And I told Joe "Please stop.

25  Let my dog go.  Please stop."  And I said "Just let me take

1    care of Nicolas first and then I'll go in there."  So I

2    breastfed Nicolas and calmed him down and got him back to

3    sleep, and then I went in the bedroom and Joe came in there

4    and we had intercourse and --

5           Q.    Was it painful?

6           A.    Yes, it was.

7           Q.    Did you rip the stitches as a result of the

8    intercourse?

9           A.    I was bleeding.  I don't know if the stitches

10   ripped or anything because I never went back to the doctor.

11   I was too embarrassed.

12          Q.    Okay.

13                (Pause in proceedings.)

14   BY MR. PATTERSON:

15          Q.    Were there any other significant acts of

16   violence visited upon you by Joe Andriano when you were at

17   the small house on the farm?

18          A.    Um -- um, I could think of one other major one

19   that we had.  Small incidences that aren't clear in my head,

20   you know.  Just it was part of your normal married life.  But

21   one other one that was scary to me was it was while Brandon

22   was living with us and -- sorry.  And I don't even recall

23   what the argument was about, but something had happened I had

24   asked him about something.  I believe it was he wanted to buy

25   another boat, and I just, you know, we didn't have the money

1    to be doing all this sort of stuff and he really wanted it.

2    So I was trying to talk to him reasonably into seeing that we

3    can't afford another boat, but he wanted it and it escalated

4    into an argument.  And we were in the bedroom because I

5    didn't want Brandon to see us arguing because he had enough

6    of that with my mom and dad.  But I just remember Joe being

7    right in my face and I know he smacked me around a couple of

8    times, and it just -- that was just -- that's just what

9    happened when I'd get him upset.

10            Q.    Okay.  There were times when you would take the

11   argument back into the back room and close the doors so that

12   Brandon wouldn't hear?

13            A.    Yeah.  I didn't want Brandon to see this stuff.

14            Q.    Is it at or near this time while you're at the

15   small house on the farm that you begin to contemplate leaving

16   Joe?

17            A.    Actually, it was after I had Nicolas.

18            Q.    Okay.  And why was that an important point in

19   your life where you came to some conclusions about what

20   you -- whether you wanted to stay there or not?

21            A.    I didn't want my baby boy to grow up like

22   that.  I didn't want him to -- because I know we grow up just

23   like our parents and I wanted to go away so I could protect

24   Nicolas.  He loved Nicolas.  There wasn't any threat to

25   Nicolas except for behavior-wise, and I didn't want him to

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1   grow up and be that way.

2           Q.     All right.  Just to clarify that, you're not

3   saying Joe at any time physically harmed Nicolas?

4           A.     No.  He loved Nicolas.

5           Q.     All right.  But your fear was that he would

6   what?

7           A.     That Nicolas would grow up just like him and,

8   you know --

9           Q.     Become an abusive --

10          A.     Yes.

11          Q.     -- husband?

12                 Okay.  So what did you do to that end to try

13   and get away from that environment?

14          A.     In '97 after I had Nicolas, my mom and dad said

15   that I wouldn't have to work.  They would -- they will

16   support us and let me stay home with Nicolas for a year.  So

17   what I had done was in order to help, I had researched some

18   at home businesses that I could do to supplement our income,

19   and I had become pretty involved in one called Global

20   Enterprises, and it was a marketing type of thing over the

21   phone, and my sponsor's name was Judy and she lived up in

22   Washington state.

23          Q.     What exactly did Global deal in in terms of

24   marketing?

25          A.     Usually --

1      Q.    What was the product?

2      A.    -- investments.  You invested in overseas

3  things, so it was -- it was a pretty complicated financial

4  type thing.

5      Q.    And how did you become aware of this marketing

6  opportunity?

7      A.    I found it in the paper and I called the number

8  and -- and was very interested in it.  It sounded like

9  something that I could sell over the phone, although I had

10  never done marketing over the phone like that, so I gave it a

11  try.

12     Q.    Okay.  And contacted a person in the northwest?

13     A.    Uh-huh.  Her name was Judy.

14     Q.    Judy?

15     A.    She was called my sponsor.

16     Q.    Okay.  Do you recall her last name?

17     A.    I don't.

18     Q.    All right.  How long -- well, let me start over

19  again.

20     A.    Excuse me.

21     MR. PATTERSON:  Judge, could I just have 30 seconds?

22     THE COURT:  Yes.

23          (Pause in proceedings.)

24  BY MR. PATTERSON.

25     Q.    Okay.  When did you initiate contact with this

1    Judy in the northwest?

2           A.    The summer of -- you know, it might have even

3    been April or May of '97.

4           Q.    Okay.  In any event, you're at that small shop

5    on the farm?

6           A.    Uh-huh.  Yes, sir.

7           Q.    Okay.  You make phone calls to this lady.  What

8    develops as a result of the phone calls?

9           A.    Well, we have a business relationship, but I

10   also began sharing with her a little bit about my personal

11   life and home life because really at that time she was the

12   only one that I could talk to and I felt that she was far

13   enough away that she wouldn't poke her nose into it too much.

14          Q.    Okay.  So you developed a business slash kind

15   of personal relationship with this person?

16          A.    Yes.

17          Q.    Okay.  And what time frame are we talking

18   about?  How many weeks are elapsing while you're trying to

19   set up this potential business out of your home?

20          A.    Well, I believe that May of '97 until after

21   Nicolas was born, probably up until October, November --

22          Q.    Okay.

23          A.    -- of '97.

24          Q.    What happened?

25          A.    Well, she had volunteered her home as a place

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000004832

1    that I could come to.

2         Q.    Okay.

3         A.    And she said that I could bring Nicolas with

4    me.  And so one weekend Joe was going to Firebird Lake --

5         Q.    I'm sorry.  I didn't catch the last --

6         A.    One weekend Joe was planning on staying the

7    whole weekend at Firebird Lake --

8         Q.    Okay.

9         A.    -- because there was a big race up there.

10        Q.    What did you do?

11        A.    I wrote a note to Joe saying I was leaving and

12   taking Nicolas and I left it on his desk.

13        Q.    Okay.  When was he expected back?

14        A.    Not for three or four days.

15        Q.    Okay.  And --

16        A.    And I did this the first night that he had

17   left.  He went with Frank and Brenda from Tucson.

18        Q.    Okay.

19        A.    And so I wrote out the note and I left it on

20   the desk.

21        Q.    Did you have some funds?

22        A.    Yes, I did.

23        Q.    How did you acquire funds for this -- this

24   departure?

25        A.    I went to our old business partner, Jerry.


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    Q.    Okay.  And how much money did he give you?

2    A.    He gave me $2000.

3    Q.    And the purpose --

4    A.    He cashed --

5    Q.    -- of this money?

6    A.    I told him I was going to leave Joe but I

7    didn't have any money to leave Joe.  So that's what he had on

8    him at that point, so he gave me that and he said to call him

9    once I got up there if I needed anymore help.

10   Q.    Okay.  How are we going to get up -- again,

11   this is Seattle you said?

12   A.    Yes, up around Seattle.

13   Q.    Okay.

14   A.    It wasn't directly in Seattle.

15   Q.    Okay.  How were you going to get from Casa

16   Grande to Washington?

17   A.    I was going to drive.  So I had the cash and I

18   had packed up some stuff, left the note, and went ahead and

19   went to sleep and I was going to get up in the morning start

20   driving then.  I figured it would be easier to drive during

21   the day -- excuse me -- and I was woken up that morning by my

22   husband.  He had come home at about 6:00 in the morning to

23   pick up some things they needed for the lake, and when he

24   came inside, obviously, he had seen my letter on the -- on

25   the desk.

1    Q. What was his reaction?

2    A. He was crying.  He came and woke me up and I

3 just remember him, you know, holding me and crying, asking me

4 why I would want to leave him and please not to leave him.

5 And I had really determined that I was going to, but the way

6 Joe was, he was just -- I loved him so much, you know?  And

7 then when he would be nice like that and he was -- you know,

8 it was just adorable and I was like -- so I changed my mind

9 and I said, you know, if we can try to work this out better

10 and, you know, and help me out a little bit here.

11    Q. And did he assure you that he would try to

12 help?

13    A. Yes.  He made me all kinds of promises.

14    Q. Okay.  Did he ever fulfill those promises?

15    A. For some time he did.

16    Q. What period of time are we talking about where

17 his behavior modified somewhat?

18    A. Probably up until the first couple of months

19 that we lived at Courtyard -- excuse me.

20    Q. All right.  Anything else significance in terms

21 of violence, either verbal or physical, that occurred during

22 your stay in the small house on the farm?

23    A. No, not -- not that sticks out in my head.

24    Q. Okay.  From that location where did you guys

25 move?

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1          A.    It was the springtime of '98 and I got a job at

2    Courtyard as the manager, and so along with my job they

3    provided a two-bedroom apartment for us to live, so we got to

4    move out of the shop and moved into an apartment.

5          Q.    Okay.   There was some mention earlier about a

6    housekeeper by the name of Anna?

7          A.    Yes.

8          Q.    Okay.   What did Anna do for you in terms of

9    housekeeping?

10         A.    Anna -- when Joe had his fourth surgery and I

11   had Ashley two weeks later, I needed some assistance because

12   I had just had a baby and Joe just had major surgery.   And so

13   she would -- for the next two months she'd help me clean the

14   house.

15         Q.    Okay.   Did she provide any other kind of

16   daycare, babysitting?

17         A.    No.   At that time Jessie and Nina were watching

18   my baby.

19         Q.    Okay.   And how many times do you think Anna

20   helped clean your house while you were --

21         A.    Well, for two months, about once a week.

22         Q.    Okay.   Nicolas has been born, Ashley has just

23   been born.   Tell me about Joe's bonding with the two

24   children.

25         A.    Joe adored Nicolas.   He just thought the world

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1   of him.  And when Nicolas was a tiny baby, he'd be -- we

2   would wrap him up, you know, papoose style in a little

3   blanket, and Joe had a lazy boy that he watched TV on, and

4   he'd always have Nicolas laying on his chest and that's how

5   they hung out in the evenings.  And it was really cute.  And

6   he -- he kept pictures in his wallet, showed them to

7   everybody.  He just -- he loved that little -- they looked

8   just like each other.

9          Q.    That was my next question.  Did Nicolas

10  physically favor either you or Joe?

11         A.    He favored Joe.  I mean, definitely, you could

12  look at Joe's baby picture and he looked pretty much the

13  same --

14         Q.    Okay.

15         A.    -- except for eye color but --

16         Q.    All right.  Compare that with his bonding with

17  Ashley?

18         A.    With Ashley it was a little bit more difficult

19  because, as I said, he had just had a major surgery --

20         Q.    All right.

21         A.    -- so -- and I had Ashley two weeks later, and

22  so he didn't -- he didn't seem to take to Ashley as he did

23  Nicolas.

24         Q.    Did he say hurtful things about

25         A.    Yeah.

1        Q.    -- Ashley?

2        A.    At first he was like, "That can't be my child"

3  because she didn't come out with blond hair.  Nicolas had --

4  he was, you know, pretty towheaded and had -- it was very

5  obvious that was Joe's child.  And so he'd make fun of Ashley

6  and just --

7        Q.    Did he compare her features to your features?

8        A.    Yes.

9        Q.    What did he say in that regard?

10       A.    Well, he'd always made fun of my brown eyes,

11  and Ashley has brown hair and brown eyes and taking after me

12  more and he just -- I don't know.  He just wasn't nice about

13  it.

14       Q.    Okay.  Did he use hurtful terms to describe the

15  brown color?

16       A.    Yes, he did.

17       Q.    What hurtful terms?

18       A.    Well, he also -- he always called us doo-doo

19  eyes and, you know, after a while it just makes you feel

20  pretty insecure, you know?  I wanted to go out and buy

21  colored contacts and start wearing colored contacts just to

22  make him stop doing that.

23       Q.    Did he use the term doo-doo or some other term

24  for excrement?

25       A.    He used both.  He would call us shit brown eyes

1    and doo-doo eyes, things like that, and laugh about it.

2         Q.    All right.  We're at the Courtyard Apartments

3    now.  Are there episodes of violence that are visited upon

4    you by Joe while at the courtyard apartments?  Let's take

5    it -- how about verbal?  Did verbal arguments continue?

6         A.    Well, actually I have to say that I believe it

7    was August of '98 when he had his first surgery, and after

8    that he was so trying to recover from that surgery that --

9    that like in the hospital he was not a pleasant patient to

10   the nurses, so I stayed there with him and helped buffer all

11   of that.  He wasn't mean to me.  He'd just become -- well, he

12   was upset.  He was mad he had a trach he didn't think he was

13   going to have and had a muscle removed that he didn't realize

14   he had a lot -- it was a much more invasive surgery than --

15        Q.    Okay.  Did he have problems with the nurses

16   that you observed?

17        A.    Yeah.  Well, just one in particular.  She

18   wanted to come in and shave his face, help him out because he

19   had been there for a little while and Joe wasn't able to talk

20   and that was very frustrating for him.  He had to write

21   things down on a note -- on a clip board.  And when she came

22   in to shave him, she was pretty persistent about it and he

23   ended up -- because he was shaking his head no, because he

24   didn't want her to do it, and he ended up throwing a clip

25   board and pen at her and she just left the room.  And so

1    actually the next day Joe made an effort to try to shave his

2    own face.

3           Q.    Okay.  All right.  Let's go back in time to

4    some events that had been testified to.  There was reference

5    made to an incident at Christmas.  Do you recall '93?

6           A.    It was Christmas time and I was actually living

7    at my mom and dad's, and I believe Joe was at his parents.

8    I'm not clear on that one.  And it was right before we were

9    going to get married and '90 -- in January.  And my parents

10   have a -- had a large dog and his name was Jethro and we

11   liked to play around.  And Jethro -- he's a big old, you

12   know, kind of sloppy dog, whatever.

13                  And we were playing and -- and Joe used to

14   think it was funny if he'd lick his hands and put it on my

15   glasses.  It was pretty frustrating, but it was a joke and so

16   we'd laugh about it.  So that particular day he decided to

17   hold me down and let Jethro lick all over my face and my

18   glasses.  And at first it was funny, you know.  I was

19   laughing, but he wouldn't let me up, so I started getting

20   frustrated because I had enough of Jethro in my face.

21          Q.    Now, was Joe a physically strong person back in

22   '93?

23          A.    Yes.

24          Q.    Okay.  And Joe was holding you down on the

25   floor?

1      A.    Yes.

2      Q.    Okay.  And Jethro was licking your face?

3      A.    At the time we got married, Joe weighed 220

4  pounds, so he was, you know, he was very strong.

5      Q.    Okay.  All right.

6      A.    So he was holding me down, I couldn't get up,

7  and the dog was just, you know, he's in a frenzy or whatever,

8  you know, because Joe kept telling him "Get her, Get her,"

9  all this sort of stuff, and I started crying.  I wanted up, I

10  couldn't breathe, I had this slobber all over me and

11  everything, and it just became -- it became an ugly thing

12  because he wouldn't let me up because I'm crying, he was

13  laughing, and I was crying -- it just wasn't funny and --

14      Q.    So it started out as --

15      A.    It started out playing but it turned out where

16  it was actually mean because he should have let me up.  I

17  couldn't -- I'm in tears asking him to let me up you, you

18  know.

19      Q.    Was this witnessed by any other member of your

20  family?

21      A.    My dad saw it and my dad's the one that told

22  Joe to let me up.

23      Q.    Okay.  Did you and Joe talk about your dislike

24  of that conduct the following day?

25      A.    No.


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1       Q.      Did you ever discuss it with him?

2       A.      Well, I was crying.  He knew I didn't like it.

3    I mean --

4       Q.      My point is after this episode, is this another

5    episode that you didn't talk about?

6       A.      No.  We never talked about it.

7       Q.      Okay.  We've heard testimony about an injury

8    that Nicolas sustained to his calf, his leg.

9       A.      Right.

10      Q.      Tell us about that?

11      A.      It was actually the front part of his leg, the

12   shin.

13      Q.      Shin, okay.

14      A.      Shin area.  I was working at Courtyard and this

15   would have been the Summer of '99, I believe.  And I -- I was

16   at the office by myself and actually was in a meeting with my

17   district manager, Timothy Lee, and nobody else was in the

18   office.  And one of the rules is you never lock up the office

19   and leave unless somebody else -- you have to -- one person

20   has to be there because you could lose a resident that way.

21   And so I'm having my meeting with Timothy and the phone rings

22   and I answer.  And I'm directed to go to the hospital

23   immediately because Nicolas has been hurt.

24      Q.      Okay.  Did you have a conversation with your

25   supervisor at that point?

1          A.     Yes.

2          Q.     Okay.

3          A.     So I'm kind of panicked, he's like, "Go take

4     care of your son," and so that was the first time that, you

5     know, he had went ahead and let me lock up the office and

6     leave.

7          Q.     Okay.  So any hesitancy that you had --

8          A.     I just wasn't sure --

9          Q.     -- was it job related or kid --

10         A.     No, job related.  I wanted to go but I didn't

11    know how to leave the office unattended.

12         Q.     He didn't seem concerned and so you took off?

13         A.     No.  He -- he was definitely telling me, "Go to

14    the hospital and take care of what you need to take care

15    of --"

16         Q.     Okay.

17         A.     -- so --

18         Q.     And what did you do?

19         A.     So I immediately got into the car and went to

20    the Casa Grande ER and --

21         Q.     Who was there when you arrived?

22         A.     My father, my mother, and Joseph and Nicolas

23    and they were already back in the emergency room.  So they

24    let me through and I went into the room and Nicolas was

25    crying and his leg was bloody everywhere and my dad was

1    holding him.  And it just made me nauseous, you know, looking

2    at him and my -- it looks like his -- you know, just from

3    looking at it, it looked like his leg had been cutoff or

4    something.  It just looked terrible.

5              But the doctor was in there and explained that

6    he was going to have to numb all the area around there so he

7    could stitch him up because.  What it did was his leg had

8    been almost filleted.  The meat by the bone had just been

9    filleted, so it was a pretty deep cut. And I was about ready

10   to pass out because I couldn't handle looking at my son like

11   that.  So I went out to the waiting room and the doctor, you

12   know, obviously sewed him up.  And when they were done, they

13   came out to the waiting room and then I took Nicolas and held

14   him.  And somebody drove us home, I don't know, but I was

15   holding Nicolas.

16        Q.    Home to the Courtyard Apartments?

17        A.    Yes.  Then Joe and Nicolas were in the

18   apartment and I left to go pick up Brandon from school

19   because I knew that Brandon and Nicolas loved each other and

20   they were kind of like playmates.  I figured if Brandon was

21   around, he could help distract him from the pain of his leg.

22   So I picked up Brandon and brought him home to the apartment

23   and asked him to stay there with Joe and Nicolas and help him

24   out.

25        Q.    Okay.  Did an argument ensue thereafter between

1    you and Joe?

2          A.    It did.  That was the first time that after

3    everything had calmed down that I could stop and ask Joe what

4    had happened.

5          Q.    Okay.

6          A.    So I asked him.  I wanted to know what had

7    happened and how in the world, you know -- how did he cut his

8    leg this badly?

9          Q.    Okay.  And what did you discover at that point?

10         A.    I discovered that Nicolas had been trying to

11   balance himself on one of the propellers from the boat that

12   was off of the boat and laying down, and those are sharp and

13   almost like knives.  And as he's trying -- my two-year old is

14   trying to balance himself on this propeller, he slipped and

15   that's what filleted his leg.

16         Q.    Okay.

17         A.    And I was upset that Joe wasn't watching him

18   better and why this had happened and why would he even let

19   him play on a propeller.  I didn't understand that, and Joe

20   took it as I -- as if I was criticizing him and he became

21   very defensive about it.

22         Q.    What did he do?

23         A.    He started being defensive and yelling back at

24   me, you know, saying he was a good father, he was trying to

25   watch Nicolas, he didn't know he was going to get hurt, this,

1      you and Joe?

2              A.      It did.   That was the first time that after

3      everything had calmed down that I could stop and ask Joe what

4      had happened.

5              Q.      Okay.

6              A.      So I asked him.   I wanted to know what had

7      happened and how in the world, you know -- how did he cut his

8      leg this badly?

9              Q.      Okay.   And what did you discover at that point?

10             A.      I discovered that Nicolas had been trying to

11     balance himself on one of the propellers from the boat that

12     was off of the boat and laying down, and those are sharp and

13     almost like knives.  And as he's trying -- my two-year-old is

14     trying to balance himself on this propeller, he slipped and

15     that's what filleted his leg.

16             Q.      Okay.

17             A.      And I was upset that Joe wasn't watching him

18     better and why this had happened and why would he even let

19     him play on a propeller.   I didn't understand that, and Joe

20     took it as I -- as if I was criticizing him and he became

21     very defensive about it.

22             Q.      What did he do?

23             A.      He started being defensive and yelling back at

24     me, you know, saying he was a good father, he was trying to

25     watch Nicolas, he didn't know he was going to get hurt, this,

1    that and the other, and I was like, "You don't let a two year

2    old play on a sharp propeller."  So I was upset, you know,

3    about this terribly and the doctor said he could have cut his

4    nerves and not be able to walk properly and all this other

5    stuff.  And so Joe just started yelling at me and, you know,

6    of course, I had words back with him, and then it just

7    escalated into a big -- big to do.  It was -- it was awful.

8         Q.    Was it all verbal or was there any touching,

9    pushing?

10        A.    He was grabbing my arms and shaking me, like

11   yelling in my face, things like that.  And I know it ended up

12   in the bedroom because I didn't want -- thinking I -- you

13   know, I don't want Brandon and Nicolas, either, to see all

14   this stuff going on.

15        Q.    Okay.  Describe for me what proximity was Joe

16   to you when he was yelling in your face?

17        A.    Two inches from my face.

18        Q.    Okay.  And what kind of words was he using when

19   he was yelling at you?

20        A.    Well, he cusses a lot and so he was full of

21   obscenities.  I don't want to sit here and --

22        Q.    Okay.

23        A.    But that was his language.  Joe swore all the

24   time.

25        Q.    Does that pretty much cover the injury incident

1  with Nicolas?

2      A.   Yes, sir.

3      Q.   Okay.  We've heard about an incident involving

4  a blue shirt.  Could you tell us about that?

5      A.   Um --

6      Q.   First off, where were you when this incident

7  happened?

8      A.   We would have still been living at the shop and

9  I would have just had Nicolas.  So I had Nicolas in June of

10  '97, so it would have been shortly thereafter.

11      Q.   Okay.  Was anybody else present other than you

12  and Joe?

13      A.   My cousin Barbara had come over to see the

14  baby, so I was showing her Nicolas and we were talking and

15  trying to catch up on things.  And Joe had come home and --

16      Q.   Let me stop you there for a minute.  Was there

17  a -- an understanding between you and Barbara that Barbara

18  wouldn't come over if Joe was present?

19      A.   I hardly ever saw Barbara because --

20      MR. MARTINEZ:  Objection.  Nonresponsive.

21      THE COURT:  Sustained.  Repeat the question.

22  BY MR. PATTERSON:

23      Q.   Well, did you -- did you cease seeing Barbara

24  at about this time or earlier?

25      A.   Yes, I had ceased seeing her.

1      Q.    Okay.  And why was that?

2      A.    It was too uncomfortable with my husband.

3      Q.    Okay.  And why?  Why was that uncomfortable?

4      A.    He didn't -- he didn't like her and wouldn't

5   speak to her or acknowledge her.

6      Q.    Okay.  And so as a result of that, was it --

7   did I understand from you and Barbara she would come over

8   only under the circumstances when Joe wasn't home?

9      A.    Actually, we really didn't even have that

10  understanding.  It just happened that way and I only saw her

11  maybe two or three times without Joe being there.

12     Q.    Okay.  On this particular occasion, where was

13  Joe?

14     A.    He would have been in town or something, maybe

15  at a bar.

16     Q.    Did Barbara come over?

17     A.    Yes.

18     Q.    She arrived?

19     A.    Uh-huh, yes.

20     Q.    How long after she arrived did Joe show?

21     A.    She had been there for about an hour and Joe

22  had come home.  He appeared to me as though he'd been working

23  because his clothes were dirty and he went into the back

24  room, I guess, to change and then came back out and wanted to

25  know he had a favorite blue denim shirt that he liked to wear

1    and he wanted to know, first of all, where it was, so I got

2    up.

3           Q.    Well, what language did he use?

4           A.    It was just real abrupt and short because he

5    was upset that Barbara was at the house and I could see it.

6    I knew that -- I knew he was mad and so he came out of the

7    bedroom, wanted to know where the hell his shirt was, so I

8    got up and went to find his shirt.  And when I did, I handed

9    it to him and I walked back out to the living room with

10   Barbara.  I didn't want to leave her sitting out there by

11   herself.  He came back in the living room and starts yelling

12   at me because it wasn't ironed.  So I got up and I went and

13   ironed his shirt while Barbara sat there.  And when it was

14   done being ironed, I went back out to the living room.  He

15   got dressed and then just left the house.

16          Q.    Okay.  Now, you described this rather

17   unemotionally.  Was it as unemotional as you just described?

18          A.    No.  It's because I'm so -- it's embarrassing.

19   He acted just like a child, throwing a fit and wanting to

20   know where the shirt was as if he couldn't find it himself.

21   And I believe it was just he was mad because Barbara was

22   there, so I -- he carries on about this shirt which had

23   nothing to do with anything, but he had to -- he had to make

24   a big deal of it and have a temper tantrum and --

25          Q.    How did you feel after this?

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1      A.    It's embarrassing.

2      Q.    Okay.

3      A.    It makes you not want to invite anybody over

4  because it's embarrassing.   It's --.

5      Q.    All right.  These -- these episodes that you

6  had up to this point with your husband, verbal altercations,

7  physical violence, where have they been conducted primarily?

8      A.    In our house.

9      Q.    Okay.  Up to this point with the exception of

10  perhaps of the dog licking incident, were there any major

11  blowups in public?

12      A.    There was one that I recall.  We had been at --

13  this was during the first six months of our marriage and we

14  had been at Mr. K's, which was a dance place bar-type thing

15  in Casa Grande at the Holiday Inn and we had obviously been

16  drinking and some people had been buying Joe shots, and had

17  to -- the restroom facilities were not inside the bar.  You

18  had to walk outside to the pool area to use the restroom.

19          Well, I'm looking around for Joe and I don't

20  see him.  He had been gone for quite sometime, so I went out

21  to the restroom area to see where he was and he was standing

22  there with his arm around a girl.  And I looked at him like

23  what was going on because it surprised me, and he came after

24  he -- he hurriedly dropped his arm as if it was -- I mean,

25  it just looked suspicious to me, and I -- I didn't say

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1 anything to him.  I just turned around and walked away and I

2 was heading out the front doors because I was going to call

3 my dad and ask him to pick me up and take me home because you

4 didn't want to -- I didn't -- I didn't want to ask him what

5 was going on, but I didn't want to be there if he was doing

6 something else.

7 So I'm walking out the front doors and I'm

8 actually on the sidewalk in the parking lot's right there,

9 and he comes busting out of the front doors and I start

10 walking faster because I want to get away from him because

11 he's yelling at me, and he -- some of the people that were

12 with us at the bar had followed us out.  Marcy McMann was the

13 only other person I know because that's who I was there that

14 was my girlfriend that was there.  And he grabbed me just in

15 a bear hug and started squeezing tighter and tighter and said

16 that I wasn't going to leave, that nothing was going on, and

17 was yelling in my face.  And, you know, you're not going to

18 leave me here and this, that and the other, and I said I just

19 want to go home.

20 Anyway, it got to be so tight where I couldn't

21 breathe and I was like "Please let me go" and everyone was

22 going "You need to let her go" because you could tell I

23 couldn't breathe.  And finally he did let go and some of his

24 friends took Joe off and I went over and went to the phone

25 and called my father and he picked me up and took me home.

1       Q.      With that exception or the two other

2   exceptions, the arguments, the violence, were they behind

3   closed doors?

4       A.      Yes, they were.

5       Q.      Okay.  Did you ever call your mom or dad and

6   tell them that Joe was -- was a problem in that regard?

7       A.      No.  I didn't want them to not like Joe.

8       Q.      Okay.  Did you ever complain to Joe's parents?

9       A.      No, I did not.

10      Q.      Was there a reason why you didn't bring it to

11   the attention of law enforcement.

12      A.      I always felt like Joe's behavior wasn't his

13   fault.  Always felt that it was -- it was because either I

14   upset him or life wasn't fully expected because he was really

15   unhappy with life and he'd get frustrated and mad about it.

16   And at that time I just was trying to make him better, you

17   know.  I just -- we're taught that if you love somebody

18   enough you could fix everything.  And Joe always did that to

19   my heart.  I just -- I just felt if I loved him enough, we

20   could -- we could do this.  We could make this work out.

21      Q.      There was some testimony about a Mother's Day

22   trip to Las Vegas, okay.  When did this happen?

23      A.      May of 2000.

24      Q.      And how did that come about?

25      A.      Well, I had two children now, so mom decided to

1   save up some money and do something special for us for

2   Mother's Day.  So she planned a trip to Vegas as a three-day

3   trip for us.

4          Q.   Okay.  Had you and Joe some years earlier

5   purchased a vacation time share?

6          A.   Yes, we had.

7          Q.   Tell me about that?

8          A.   On our three-day, four-day honeymoon his sister

9   and husband had purchased for us on our wedding date, we had

10   gone to the Flamingo Hotel and at that time behind the

11   Flamingo they were in construction of what's called a Hilton

12   Grand Vacations Club.  And what it was was like a timeshare

13   but it had a different spin on it.  They actually sold you a

14   piece of property instead of a piece of time.

15          And Joe's family had -- I never knew anything

16   about timeshares, but his parents I believe had had one at

17   one time and his sister has one and it's -- it sounds like a

18   great way to have a vacation.  You can use your time in Vegas

19   or trade it around for other places.  And it's -- so we went

20   through this couple hour tour of this place.

21          Q.   This was a Hilton property?

22          A.   Hilton, yes.

23          Q.   Okay.

24          A.   And at the end of the tour, Joe wanted it.  It

25   was pretty impressive.  I even agreed with him it sounded

1    like a good deal, and so we ended up buying one of those.

2           Q.    Okay.  Do you recall how much was invested in

3    the timeshare?

4           A.    The down payment I believe was only 1800 and

5    then we had to make monthly payments on it.

6           Q.    Okay.

7           A.    Around a couple hundred dollars a month.

8           Q.    In retrospect was that a mistake in terms of

9    economics of your relationship?

10          A.    Yes.

11          Q.    Okay.

12          A.    It was.

13          Q.    Why was that?

14          A.    It was something that was not needed.  It was

15   something that was just an additional pressure.  We were not

16   financially stable.  We did not need to be purchasing that.

17          Q.    Okay.  Was this the timeshare that you used

18   when you went on your mom's day out into Las Vegas?

19          A.    Yes, it is.

20          Q.    Okay.  And who did you go with initially over

21   to Las Vegas?

22          A.    My mother.

23          Q.    Okay.  You guys flew over?

24          A.    Yes.

25          Q.    Okay.  Who made the reservations?  Who set up

1    the trip?

2             A.    My mom did all that.

3             Q.    Okay.  And what -- were the reservations set up

4    for a certain departure and certain return?

5             A.    Yes, they were.

6             Q.    Okay.  And what was the expected date of

7    return?

8             A.    Sunday afternoon.

9             Q.    Okay.  Did somebody arrive after you and mom

10   had been there?

11            A.    Yes.  After work Barbara came, my cousin.

12            Q.    And this was the Barbara Mitchell that

13   testified earlier?

14            A.    Yes, sir.

15            Q.    Okay.  And where did you guys stay?

16            A.    At that timeshare, the Hilton behind the

17   Flamingo Hilton, at the Hilton Grand Vacations building.

18            Q.    And how many rooms were involved?

19            A.    It was a two-bedroom, two-bath suite that had

20   locking doors, so it could actually be a one bedroom here and

21   one bedroom there, but, you know, if you unlocked the doors

22   and opened everything up, it became a two bedroom.

23            Q.    Okay.  And what did do you while you were

24   there?

25            A.    Laid out by the pool.

44

1    Q.    Okay.

2    A.    We went to one show.

3    MR. MARTINEZ:  Objection.  Relevance.

4    THE COURT:  Overruled.  Go ahead, answer the

5    question.

6    THE WITNESS:  And basically just relaxed.

7    BY MR. PATTERSON:

8    Q.    Okay.

9    A.    It was just a time to take a break.

10   Q.    Were there times when you and Barbara were

11   separate and apart?

12   A.    Yes.

13   Q.    Okay.  Tell us --

14   A.    Actually, I would -- I liked to take naps

15   because I was exhausted, I was tired, and so Barbara and my

16   mother would take a taxi and go sightseeing and I had been to

17   Vegas several times so I didn't really care about seeing all

18   that stuff again.

19   Q.    Okay.  Did you begin to receive phone calls

20   from Joe after you got there?

21   A.    I did.

22   Q.    Okay.  When did the first phone call -- when

23   was it received?

24   A.    Actually, I called him first when I got there

25   to let him know that we arrived safely and that, you know,

1    the condition of the place, that it was still nice and all

2    that sort of stuff.  We chit chatted for a little bit.

3          Q.   Okay.  And that was upon your arrival?

4          A.   Yes.

5          Q.   Thereafter did he begin to call?

6          A.   That night, no.  The next day he did.  He began

7    calling.  He would leave messages on the -- on the room phone

8    and I was instructed to carry my cell phone with me just in

9    case there was an emergency, which I didn't have a problem

10   doing, but I was also receiving phone calls on my cell phone

11   and most of the messages were for me to hurry up and come

12   home.

13         Q.   Okay.  Were there times when you actually had

14   voice contact with him?

15         A.   Yes.

16         Q.   What did he say?

17         A.   He was highly upset.  He was tired of watching

18   the kids.  He wanted me home right now.  He just -- he didn't

19   want to -- he didn't -- he didn't -- I don't think he -- it

20   would have been okay if he was there, but he didn't want me

21   out there by myself.

22         Q.   Okay.  Did he say that?

23         A.   Yes, he did.  He, you know, that's -- we should

24   be taking trips together and you shouldn't be out there by

25   yourself, you shouldn't leave me here with the kids, all this

1    sort of stuff.  And, you know, I told him there's Gina, the

2    babysitter, my father, your parents, your sisters -- there's

3    plenty of people around if the childcare was really

4    overwhelming.

5            Q.    Okay.  Up to this point had you taken any of

6    these ventures alone?

7            A.    No, I had not.

8            Q.    Okay.  There was the --

9            A.    This was the first one.

10           Q.    Okay.  And what did you tell him when he kept

11   saying you needed to come home?

12           A.    At first I kept laughing at him because I

13   didn't think he was serious because he knew I had plane

14   tickets with a certain time and date to come home and then he

15   started yelling at me because I laughed at him and he said,

16   "It's not funny, I'm serious.  I want you home now."  And I'm

17   like, "How do you expect me to get home?"  I mean, I was

18   just -- this is ridiculous.  And he -- he instructed me to go

19   sit down in the -- the terminal and wait for one of those

20   that you can -- you don't have to buy a ticket for, I guess

21   you could just --

22           Q.    Stand by?

23           A.    Yes, thank you, a stand by.  I -- and I -- you

24   know, so, yeah, I got upset at him.  I was like, you know,

25   this is the first time I've ever had a break.  I just -- I

1    needed a break.  We had gone through so much stuff and it was

2    just three days.

3              Q.    Okay.  You didn't leave that day, right?

4              A.    No, I didn't.

5              Q.    This is the Saturday when you're getting all

6    these phone calls?

7              A.    Right.

8              Q.    Sunday, the next day, are you still getting

9    phone calls?

10             A.    Sunday, yes.

11             Q.    Okay.  Can you aggregate the number of phone

12   calls that you think you got?

13             A.    No, I can't because at one point I shut off my

14   cell phone and I didn't answer the room phone because I knew

15   that it was him just trying to get me to come home again, and

16   I was tired of getting yelled at on the phone.

17             Q.    Okay.  What time did you folks leave on Sunday?

18             A.    In the afternoon sometime.  I don't recall

19   specifically what time.

20             Q.    Was it the regularly scheduled return flight?

21             A.    Yes.

22             Q.    Okay.  Was there some problem with that

23   particular flight?

24             A.    It was delayed for some reason and I don't

25   recall why.

1      Q.      Was it America West?

2      A.      You know what?  I don't even know that, but,

3   yes, our arrival was delayed.

4      Q.      Okay.  Were you able to communicate the fact

5   that it was delayed to Joe?

6      A.      Not before I left, no.  As soon as we hit the

7   ground and my cell phone got a signal I called him to let him

8   know.

9      Q.      Okay.  Was he on the premises at that point at

10   the airport?

11      A.      I didn't even ask him.

12      Q.      Okay.

13      A.      Because he was yelling in the phone.  He was --

14   I really couldn't get a word in edgewise just beyond the fact

15   that we're here, we got here.

16      Q.      You got your luggage, I assume?

17      A.      We picked up our luggage --

18      Q.      Where did you go?

19      A.      -- and went to one of the curbs.  I don't even

20   know which one, but it was the one that Joe had told me to go

21   to.

22      Q.      What did you next see?

23      A.      Next thing I see is the Yukon comes squealing

24   up into the -- just -- it wasn't even in front of where we

25   were standing.  It was way over across the traffic, and he

49

1    gets out of the car, leaves the doors open, opens up the

2    back.

3         Q.    Which lane of traffic did he stop in?

4         A.    The -- the one where traffic is trying to drive

5    through.

6         Q.    Okay.

7         A.    Not where you pull up and pick up people --

8         Q.    All right.

9         A.    -- because that was all full so he just stopped

10   right there.

11        Q.    Okay.  What happened next?

12        A.    And he came up to where we were standing and

13   he was just -- he was yelling at me.

14        Q.    What did he say?

15        A.    Wanted to know why we were so late.

16        Q.    Did he swear?

17        A.    Yes.  He was cussing and, you know, this 30

18   minutes was just, you know, the end of the world that we were

19   late.  I mean, it just ruined his whole world basically and

20   he was just cussing and carrying on about it and just -- he

21   jerked the bags up off the ground, threw them into -- you

22   know, stopped the traffic across, and I mean moving traffic,

23   not even looking or honking.  And he threw the stuff in the

24   back of the Tahoe and Brandon -- or not Brandon, but mom and

25   Barbara and I looked at each other and were like, oh, here we

1   go, and get in the Yukon and nobody says a word and he just

2   squeals off and drove crazy all the way home, just weaving in

3   and out of traffic trying to get home quickly.  And it was

4   hold on to your seat or you're going to get flown around.

5          Q.    Was it frightening?

6          A.    Oh, gosh, I felt like I was in his boat.  It

7   was -- it was crazy.

8          Q.    Were you embarrassed at all because it happened

9   in the presence of your mom and friend?

10          A.    Very much so.  Very much so.

11          Q.    This is when you're at San Riva?

12          A.    Yes, sir.

13          Q.    Okay.  What happened when you get to San Riva?

14          A.    Well, he just squealed into the parking lot,

15   gets out, and goes inside the apartment.  So I get my

16   suitcase and my mom and Barbara said they're not coming

17   inside, they were just going to leave, so they left and I

18   went inside.  And I believe that I recall Joe's father being

19   there with the children.  I don't remember who else was

20   there.  Nothing more was said.

21          Q.    Again --

22          A.    He sat in his lazy boy as if -- I mean, it was

23   like put one mask on and take another off.  It was

24   very -- I mean, he had just been fuming mad and now I walk

25   inside with the suitcase and he's sitting in the chair as if

1   nothing had ever happened.

2          Q.    How did you feel after that episode?

3          A.    Well, it's confusing because you just never

4   know what -- what to expect.  And why act the fool in front

5   of my mom and then come in here and -- and pretend that

6   everything's okay.

7          Q.    Did you discuss --

8          A.    No.

9          Q.    -- this episode the following day?

10         A.    I would never discuss it because if he didn't

11   bring it up, I'm sure not going to bring it up because I

12   don't want a repeat of what had just happened.

13         Q.    There was some testimony with regard to a Kool

14   Aid incident.  When did this happen?

15         A.    This would have happened in September of 2000.

16         Q.    Okay.  While you're at what location?

17         A.    Riva, at San Riva apartment 132.  As I had

18   stated earlier, San Riva sponsored a softball team and I had

19   ridden with Chris Hashisaki in her vehicle along with Shannon

20   and Stephanie to attend the final championship game.

21         Q.    Okay.  Was Joe aware that you were going to

22   this softball playoff game?

23         A.    Yes, he was.

24         Q.    Okay.  Did he express any concern or

25         A.    He was okay with it as long as that night I had

1    to be home by 11:00.

2          Q.    Was he in the custom of establishing curfews

3    for you?

4          A.    Yes.  I -- for a while there, I would go out on

5    Tuesday nights and as long as I was home by 12:00, he was

6    okay with that.

7          Q.    All right.  So you're going to the softball

8    game.  Do you recall exactly what park it was played at?

9    Was it the south side of Phoenix, north side?

10         A.    No.  Actually we took the freeway up north

11   quite a bit.  That was only the second time I had been there.

12   I don't recall -- really recall.  I want to say something off

13   of McDowell maybe.  I don't --

14         Q.    Okay.  So in any event, travelling from San

15   Riva you had to get on Interstate 10 and go, what, north into

16   town?

17         A.    Yes.

18         Q.    Okay. And you're in the company of whom now?

19         A.    Chris.

20         Q.    Okay.

21         A.    And Stephanie and Shannon.

22         Q.    Okay.  And these are colleagues at work?

23         A.    Yes.

24         Q.    And the reason you're attending this particular

25   softball play off is again?

1           A.     It's the final game.  It's the championship

2     game.

3           Q.     And you sponsored this --

4           A.     Yes.

5           Q.     -- or San Riva sponsored --

6           A.     San Riva sponsored it so we were going ever

7     there to lend support.

8           Q.     Okay.  So on the way over did you get a

9     telephone call from Joe?

10          A.     Yes, I did.

11          Q.     What's the substance of the telephone call?

12    What does he say?

13          A.     He wanted me to go to the grocery store, buy

14    tortillas and cheese and come home and make a him a cheese

15    crisp.

16          Q.     Do you know whether or not he was aware you

17    were with Chris Hashisaki and two other girls and Chris was

18    driving?

19          A.     Yes.  He was very aware of that.  I always

20    explained to him where I was going and who I was going with

21    and things like that.

22          Q.     So what did you say to him when he asked you to

23    stop and pick up the makings of a cheese crisp?

24          A.     I said to him I asked him why he wouldn't go to

25    the grocery store because my mom was there watching the

1    children and both vehicles were there.  The keys to both

2    vehicles were there.  I said to him I didn't understand why

3    he wouldn't go get it.  And he didn't want to.  He wanted me

4    to go do that.

5         Q.   Did he give you any expectations of when this

6    would happen?

7         A.   Right now.  He wanted me to go do this right

8    now.

9         Q.   Okay.  Did you explain to him that you were en

10   route to the baseball game?

11        A.   I said -- yeah, I can't have Chris turn around,

12   the game's getting ready to start, and I didn't -- I didn't

13   know why he wanted me to go do this because before I left I

14   always tried to make sure that, you know, whatever he -- he

15   needed, whatever he wanted, he had, that way he wouldn't be

16   left, you know, left in the lurch -- or I don't know what to

17   call it, and he had never said something about wanting a

18   cheese crisp.

19        Q.   Was this an odd conversation?  I mean --

20        A.   Yeah, it was very odd.  The only thing I could

21   say that would make it not odd is that he was taking

22   chemotherapy at this time and so, yes, his tastes would

23   change frequently and I was in the habit if he felt like

24   having broccoli cheese soup from TGI Fridays, I would go pick

25   him up some soup and bring it home just so he could eat.  You

1 know, if that's what he felt like his taste buds could handle

2 at that time.

3   Q. Okay.  So he had made odd requests for certain

4 kinds of cuisine earlier?

5   A. Well, sure.  Well, yes, I always asked him, you

6 know, what do you -- because that first week of chemotherapy

7 your taste buds are really messed up, and so I would ask him,

8 you know, what -- what sounds like you could eat this -- this

9 time.

10   Q. Okay.  Were you angry with him?

11   A. No, I wasn't.

12   Q. Were you a smart aleck with him, anything like

13 that?

14   A. You could have taken it smart aleck and I said

15 there's two cars at home and the keys are there and you're

16 asking me to, you know, go do this?  I --

17   Q. Okay.  So you refused to do that?

18   A. I guess you can say I refused to because I

19 didn't do it.

20   Q. Okay.  What did you leave him with when you

21 hung up?

22   A. Well, when I hung up I was like, you know, I

23 had said about the cars and why can't you do this, and so it

24 was about, I don't know, 10 minutes later he calls again and

25 he didn't feel like going out, he doesn't want to drive the

1    car, he didn't want to go to the grocery store and blah,

2    blah, blah, blah, blah, come home and do this.  And so each

3    call just got progressively more demanding and more -- and I

4    said I cannot ask Chris to turn around and do this.  I can't

5    do that.  I can't.  You know, I'm sorry, I just -- I can't.

6    If I was in my own car, I would turn around and go, it would

7    be no problem, but I'm in somebody else's vehicle and I have

8    no control over that.

9            Q.    Okay.  Was that the last phone call that you

10   had on that issue?

11           A.    Yes, because then I turned off my cell phone.

12           Q.    Okay.  Went to the ball game?

13           A.    Uh-huh.

14       THE COURT:  Is that a "yes"?

15       THE WITNESS:  Yes, sorry.

16   BY MR. PATTERSON:

17           Q.    What time do you think the ball game concluded?

18           A.    Around 10:00.

19           Q.    Okay.  Did you -- did Chris drive you

20   immediately back to San Riva?

21           A.    No.  Afterwards our team won and everybody was

22   very excited, and the team had a certain hang out that they

23   went to and they wanted to go celebrate and they insisted all

24   of us go with them.

25           Q.    Okay.  Did you have any discussions with Chris

1    about whether you needed to get home?

2        A.    No, because I called Joe and I let him know

3    that our team had won and so, you know, all that.  We had a

4    civil conversation and I said that they wanted to go to this

5    sports bar, you know, and celebrate and have a couple

6    pitchers of beer, whatever.  And he said that would be fine,

7    and at that point we decided -- I can't say we decided, but

8    he told me to be home by midnight, and that was my

9    instructions and then I could go.

10       Q.    Okay.  And did you explain the rules, if you

11   will, to Chris when you needed to be home?

12       A.    Yeah.  Everybody was quite aware of my midnight

13   curfew.

14       Q.    Okay.  And did Chris deliver you home in

15   advance of that midnight curfew?

16       A.    No.

17       Q.    Okay.  What happened?

18       A.    As we were there, people were drinking, I was

19   drinking, I was not watching the clock.  I guess time just

20   slipped away from me.  And I had gone to the restroom, and

21   when I came out of the restroom, the bartender came up to me

22   and said there was a phone call for you.  And I said, you

23   know, that was really odd because I've never been to this

24   place before and said someone was looking for you, and I was

25   like oh, it was probably my husband.  So I go to my purse and

1  picked up my cell phone and there had been a few missed

2  calls.  It says missed calls on the thing because on -- in a

3  bar, it's loud and my purse was sitting on the table and I

4  just didn't hear my phone ring.  I stepped outside and called

5  him and Joe was livid.  He -- oh, my gosh.  When he found out

6  I hadn't left and I wasn't on my way home, he just started

7  chewing me -- he started in on me.

8       Q.   Okay.  Did you make plans at that point to get

9  home?

10       A.   Yeah.  I went inside and I said I got to go, I

11  have to go right now, you guys.  And some of the people

12  wanted to leave, some of them didn't.  I went back outside to

13  still -- still have Joe on the phone, stepped outside and a

14  couple of people followed me outside.  And one in particular,

15  it was Erik, and he could hear Joe yelling on the phone and

16  so he took the phone from me and he tried to calm Joe down

17  and Joe -- Joe started swearing at Erik.  I could hear him --

18       Q.   Erik Vaillant?

19       A.   Vaillant, yes.  He told him to give the fucking

20  phone back to his wife and Erik said "I'm taking her home

21  right now, I'm bringing her home."  And we were trying to

22  calm him down and he never would stop cursing on the phone,

23  so Erik took the phone from me and just turned it off and we

24  all got in the car and drove pretty fast back to --

25       Q.   Who took you home?

1    A.    -- San Riva.  Erik's the one who drove.

2    Q.    Okay.  What time did you think you got home to

3    the San Riva apartments?

4    A.    Probably 12:30, 12:45, something like that.

5    Q.    30, 45 minutes late?

6    A.    Yes.

7    Q.    What did you see when you came in the front

8    door?

9    A.    Joe was standing there waiting for me and was

10   yelling.  He was very angry.

11   Q.    Now, you say he had a chemo treatment.  At

12   point -- what point in time prior to this date had he had his

13   chemo treatment?

14   A.    I can't say specifically because I don't recall

15   the actual dates of things.

16   Q.    Okay.  We had some --

17   A.    I know we had some testimony on the days of

18   his --

19   Q.    Okay.  One was 9/26?

20   A.    It was before that.

21   Q.    Okay.  What was the one before 9/26?

22   A.    It was before he had gone to visit his sister.

23   I had gone briefly so it was before that.  I guess it had to

24   be very early September.

25   Q.    Okay.  And what stage of the process -- when

1    did he -- when did he have the actual chemo?

2         A.    He probably had two stages of chemo.  I'm --

3         Q.    Okay.  How many days had elapsed from the

4    taking of the chemo to this confrontation in 132?

5         A.    I can't tell you.

6         Q.    Was he sick that day?

7         A.    No.

8         Q.    When you talk about the taste bud issue --

9         A.    I see what you're saying.  I -- I know before I

10   left for the game -- I don't recall when he had the chemo

11   before this, that or when.  You know, I can't tell you that.

12        Q.    Okay.

13        A.    But I do know specifically that I had made sure

14   that was there anything I could get you, was there anything I

15   could do for you.

16        MR. MARTINEZ:  Objection.  Nonresponsive.

17        THE COURT:  Sustained.  Ask your next question.

18   BY MR. PATTERSON:

19        Q.    Yeah.  Trying to figure out, if you can, how

20   much time elapsed from this chemo though to this

21   confrontation.  If you don't know, then --

22        A.    I really don't know.

23        Q.    Okay.  In any event, was he under any kind of

24   physical incapacitation when you got home that evening?

25        A.    No, he was not.

1   Q.   Okay.  And in terms of taking the chemo and

2   physically incapacitated, was there kind of a rhythm or

3   cycle?  Tell me about that.

4   A.   Yes, there was.  His chemo treatment lasted all

5   day.  And when he got home from that -- I would bring him

6   home.  I know once his father had brought him home because I

7   couldn't leave work, but I tried to be there for every time

8   that I could get away from work.  And when we would get back,

9   he could walk himself into the apartment and we usually

10  stopped and rented four or five movies from Blockbuster, and

11  so he would walk into the movie place with me, pick out

12  movies, we'd get back in the car, I would drive, and we'd get

13  to the apartment and he would walk into the apartment and go

14  back to our bedroom because we had a VCR and had the TV in

15  there and he would lay in bed and I'd put a movie in and he

16  could drink liquids and things, but usually that night he

17  wouldn't eat anything too solid.  It -- it didn't sit well

18  with his stomach.

19  Q.   Okay.  And that basically covered the following

20  day where he just languished --

21  A.   I think --

22  Q.   -- in bed and watched some movies?

23  A.   I would say, to be generous, three days of

24  that.

25  Q.   Okay.  After the third day then he would be

1    walking about, able to --

2            A.    Sure.  And he would be up and driving and --

3            Q.    Okay.

4            A.    -- visiting his friends and doing what he does.

5            Q.    All right.  Back to 132, you come home from the

6    softball game and the post game celebration, it's about

7    12:45, he's there, what happened?

8            A.    Well, as soon as I opened the front door, he

9    was right there yelling at me why was I so late and I told

10   you to get home and I've been waiting for my cheese crisp.

11   And --

12           Q.    Did you have the cheese crisp?

13           A.    No.

14           Q.    Okay.

15           A.    No, I sure didn't.

16           Q.    You didn't stop?

17           A.    No.

18           Q.    Okay?

19           A.    I probably should have.  That would have

20   avoided that.

21           MR. MARTINEZ:  Objection.  Nonresponsive.

22           THE COURT:  Sustained.  Go ahead, ask your next

23   question.

24           THE WITNESS:  I didn't do that.  So, anyway, he was

25   yelling at me at why I was late.  And I had some wine coolers

1   and I knew I had to get up the next day, and quite often when

2   he's yelling, as long as I don't respond and I try get away,

3   he works his anger out.

4                And so I went back to the bedroom and I said I

5   have to go to work tomorrow, let's go to bed, you know. It

6   was -- stop yelling, let's go to sleep. And he's puttering

7   around and yelling and carrying on, whatever, and I -- I put

8   my pajamas on and I went to bed.

9                And Joe had been out in the kitchen, and next

10  thing I'm aware of is ice cold red Kool Aid being thrown all

11  over me. I was drenched. And it woke me right up and I sat

12  right up in bed going, oh, my God, what just happened? I

13  didn't know what happened. And Joe was standing right there

14  beside the bed and holding a pitcher. It was a light blue

15  pitcher that he had and started yelling. He goes, I didn't

16  want you to go to sleep, you need to wake up, we need to

17  finish, you know, having this conversation, and blah, blah,

18  blah. And, you know, I -- I didn't know what to say,

19  didn't -- he was just in a rampage. And he turned around and

20  punches twice into the highboy, that -- the dresser that's

21  right there beside the bed. I couldn't believe it. I'm just

22  watching him. I was like what in the world? I didn't know

23  what had gotten into him because he was just like going

24  crazy.

25                And then he turned around to me and he's

1    holding me down on the bed and yelling in my face.  And now

2    I'm -- I"m starting to get scared because his hands are on my

3    throat and he's pushing down harder onto the mattress.  And

4    I was -- this just seemed more serious than -- than before.

5    I mean, this was a -- you could tell by the looks in his

6    eyes.  His eyes are very -- when he's happy, they're

7    slashingly when he's mad, you could tell.

8           Q.    Okay.

9           A.    It's just very scary.

10          Q.    Did this appear to be an escalation in terms of

11   violence --

12          A.    Yes.

13          Q.    -- that he visited upon you?

14          A.    Most definitely.  This was weird.  This was

15   like okay, um, you know, what's going on here?  Um -- um --

16   he finally let go of me and I remember telling me him that he

17   wanted to call his sister because I kept thinking maybe Janay

18   could calm him down.  I didn't know -- I didn't know what to

19   do.  He ended up throwing his body onto -- we had a four

20   poster bed that sat up off the ground, I don't know, three,

21   four feet, something like that, and he threw his body onto

22   the poster -- the end post of the bed, and it split the

23   footboard in half.  And the bed -- the bottom end of the bed

24   just collapsed in half.  And, you know, he's just pacing like

25   a -- he was just full of anger, just pacing around and -- and

1    it seemed that after he broke those few things, that kind of

2    helped replace some of this stuff that he was feeling.  And I

3    just continued to sit there in the Kool Aid watching him

4    because I didn't really know what to do.  And I know at one

5    point I did pick up the phone and call Janay and I don't know

6    what specifically I said to her, but Joe, I remember, grabbed

7    the phone out of my hand and had a conversation with her as

8    if nothing happened.

9         Q.    The next day did you talk about what had just

10   happened that evening before?

11        A.    Well, the rest of that evening Joe actually

12   repaired to the best of his ability the footboard on the bed.

13        Q.    What did he do in that regard?

14        A.    He had hammered some nails in there and, I

15   mean, there was several -- there was a whole line following

16   the crack.  I don't know.  I didn't watch him do it, but he

17   fixed it and then I know he put the hammer underneath it to

18   hold it up.

19        Q.    Okay.

20        A.    And then I changed all the bedding and we went

21   to bed.

22        Q.    Did you talk about it the next day?

23        A.    No, we didn't.  The next day about 7:00 in the

24   morning I had still been sleeping.  I didn't have to be to

25   work.  I didn't have to go to work until 9:00.  And he shows

1    up with some flowers and some balloons saying he was sorry.

2        Q.    Was that the first time in your relationship

3    that he'd ever made an effort to apologize for his

4    misconduct?

5        A.    Besides the time when I was going to leave him,

6    that's the second time he's ever said he was sorry to me.

7        Q.    There was an incident on your birthday that

8    same year I believe?

9        A.    Yes, there was.

10       Q.    Can you tell me about that?

11       A.    On August 26 I was going to turn 30 years old

12   and I'd never done really anything major for a birthday party

13   or anything like that, but because I was turning 30, it was

14   something special to me, and my mom and dad were making a big

15   deal with it.  The girls at work were making a big deal about

16   it, and traditionally Joe and I would go to dinner or we'd

17   even go to Laughlin together for our birthdays because his

18   was just a few days before mine.  And this year he didn't

19   want to do anything for my birthday.

20       Q.    Again, do you think that maybe the chemotherapy

21   had some play here?

22       MR. MARTINEZ:  Objection.  Speculation.

23       THE COURT:  Sustained.

24   BY MR. PATTERSON:

25       Q.    Well, was he -- as a result of the

1   chemotherapy, was he not desiring to go out places, that kind

2   of thing?

3        A.   No, because we had actually gone to the lake.

4        Q.   Okay.

5        A.   But this particular weekend and I believe his

6   sister Janna was in town and --

7        Q.   This is Janna from Memphis?

8        A.   Yes.

9        Q.   Okay.

10       A.   Yes.  And he --

11       MR. MARTINEZ:  Objection.  There's no question before

12   her.

13       THE COURT:  Sustained.  Go ahead, ask your next

14   question.

15   BY MR. PATTERSON:

16       Q.   Well, I interrupted her with the other

17   question.  How did that --

18       A.   Mother's Day?

19       Q.   Sorry.  Start all over.  Back on the birthday,

20   30th birthday, how did it -- something that somebody set up

21   was on that date?

22       A.   Well, the girls at work wanted to take me out

23   and I let Joe know that and I said, you know, we don't know

24   which night to do this thing, Friday or Saturday, and I said,

25   you know, could you pick a night that I could go do this with

1   the girls.  We -- my father rented a limousine for us and we

2   were just going to go out and have a girls night out.

3                   And -- and what actually cemented me to go

4   ahead and go do that was because Joe wasn't wanting to do

5   anything for my birthday.  And so we finally picked a night

6   and made arrangements.  The limo showed up at the office at

7   San Riva and --

8           Q.   What was the plan?

9           A.   The plan was for everybody to show up at the

10  office and get inside the limo and then just go wherever we

11  felt like going.  There was no set -- set schedule.  There

12  wasn't a set plan.  It was just, you know, wherever we could

13  think of, just kind of spend a little bit at each place, just

14  kind of bar hop, I guess, if you want to call it.

15          Q.   Okay.

16          A.   So everybody gets there.  We get --

17          MR. MARTINEZ:  Objection.

18  BY MR. PATTERSON:

19          Q.   Everybody who?  Give me names.  Who's there?

20          A.   Okay.  Chris Hashisaki, Stephanie Koeppen,

21  Shannon.  Then there was another lady named Wendy who was a

22  resident.  There was a couple other residents that went with

23  us.  The reason why they went with us, they attended pool

24  parties with us and they had become -- they would come into

25  the office and visit a lot and we thought that would be a

1    nice group of people to have.

2         Q.    Okay.  These newcomers, had you ever gone out

3    any place with the newcomers?

4         A.    No, I hadn't.

5         Q.    Okay.

6         A.    Besides the property sponsor outings that we

7    had.

8         Q.    I'm talking about going out to bars.

9         A.    No.

10        Q.    Ladies night out, anything like that?

11        A.    No, not besides with my co-workers.

12        Q.    Okay.  So how many women were there do you

13    figure at this point?

14        A.    Probably about ten of us.

15        Q.    Okay.  You get in the limosuine?

16        A.    Yes.

17        Q.    Where do you guys go?

18        A.    I believe our first stop was Axis Radius.

19        Q.    Okay.  And what time do you think you departed

20    the San Riva complex?

21        A.    It was a little bit light outside, so maybe

22    6:00, 7:00.

23        Q.    Okay.  Did you have a curfew when this would

24    end?

25        A.    Yes.  I had to be home by midnight.

EXHIBIT W

000004883

1       Q.      All right.  And who imposed that curfew?

2       A.      That was Joe's doing.

3       Q.      Okay.  So you guys took off about 6:00, 6:30?

4       A.      Uh-huh.

5       Q.      Went to Axis Radius?

6       A.      Axis first.

7       Q.      First?  Okay.  That evening how many different

8  places do you think you stopped at?

9       A.      Six that I could recall.

10      Q.      Okay.  And was it -- did anybody else arrive at

11  these various other places to join the party?

12      A.      No.

13      Q.      Okay.  So it was just the original core group

14  that went from location to location?

15      A.      Uh-huh.  Yes, sir.

16      Q.      Okay.  Drinking and dancing, I guess?

17      A.      There was a little bit of drinking, but a lot

18  of it was just all of us would go on the dance floor and

19  dance.  It was totally -- we were goofing around, being

20  girls, and a lot of drinking going on, a lot of buying shots,

21  things like that.

22      Q.      Okay.  What were you wearing?

23      A.      I had a red summer dress on.

24      Q.      Okay.  Did anything unusual happen during the

25  course of time that you were at these various bar locations?

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000004884

1     A.    No.

2     Q.    Okay.  Did you receive any phone calls during

3  that evening from Joe?

4     A.    I didn't take my cell phone with me.  I left it

5  inside the limousine.

6     Q.    Okay.  Was that by design or by accident?

7     A.    No.  I just left it -- I had a pager so if

8  there was an emergency he could page me, but I -- this was

9  girls night out.

10     Q.    Okay.  At some point in time coming back from

11  the last location, was the decision made to pick up other

12  people?

13     A.    Yes.

14     Q.    Who made that?  How did that come about?

15     A.    Shannon was on her cell phone and she turned

16  and asked me if we could pick up her boyfriend, and I don't

17  recall his name.

18     Q.    Okay.  Where did he live?

19     A.    He lived somewhere in Tempe.  I said sure.  I

20  was very happy at that point and I didn't care.

21     Q.    Okay.  Had you been drinking?

22     A.    Yes, a lot.

23     Q.    Okay.  And in terms of your enebriation, would

24  you categorize it for me at that time?

25     A.    There was no way I could have driven or tried

1    to walk in a straight line at that time.

2            Q.    Okay.  Does the limousine stop and pick up some

3    new occupants?

4            A.    Yes.

5            Q.    Who do they pick up?

6            A.    Picked up Ryan and his roommate, Chris.

7            Q.    Okay.  Now, had you met this Chris or known

8    about this Chris person?

9            A.    Yes.

10           Q.    Describe Chris for us.

11           A.    Chris is a little bit shorter than I am and

12   he's kind of your -- your guy friend that can go out on girls

13   night out and -- and fit in and have fun, and he always had

14   us laughing on the dance floor because he would go do a

15   routine of the Backstreet Boys, and he was just fun to hang

16   around.

17           Q.    Okay.  So you had socialized with this guy

18   previously?

19           A.    A little bit, yes.

20           Q.    Okay.  But not in a dating or one on one --

21           A.    No.

22           Q.    -- situation?

23           A.    No.

24           Q.    Okay.  He -- he gets into the limo.  Where does

25   he sit?

1      A.     Chris and Ryan sat in the back seat with

2  Stephanie -- no, not Stephanie, with Shannon and myself and

3  Chris Hashisaki.

4      Q.     Okay.  What happens during the ride back to San

5  Riva?

6      A.     Shannon is sitting on Ryan's lap and I'm

7  sitting in between Chris' legs, but I'm not thinking anything

8  of it because he's just one of the girls too.

9      Q.     Is there any kind of contact between you and

10 Chris in the back of the limousine then?

11     A.     We could have been flirting around a little

12 bit, but nothing -- I mean, harmless stuff.

13     Q.     Okay.

14     A.     You know, I don't -- I didn't see it as

15 anything disrespectful or --

16     Q.     Okay.  And you were enebriated at the time?

17     A.     Oh, yeah.

18     Q.     Okay.  At some point in time the limo arrives

19 at San Riva?

20     A.     Yes.

21     Q.     Okay.  What happened then?

22     A.     We drive up into the same place that we left

23 from and the road was just right in front of the office and

24 we all started getting out of the limousine.  And Ryan and

25 Shannon get out on the side and then Chris and then myself

1   and we were laughing and I have a wine cooler and I have my

2   phone in my hand.  And I was laughing because I had tripped

3   when I was trying to get out of the limousine.

4              Anyway, I heard Joe and I looked over and he

5   was standing right in front of the limousine.

6        Q.   How far away was he?

7        A.   At the -- 8 feet, 9 feet away from me.

8        Q.   Okay.

9        A.   And it surprised me.

10       Q.   In the sidewalk or in the parking lot?

11       A.   You know, I described before that there's a

12   sidewalk.  There's also a courtyard before you go into there,

13   so he was standing in that area.

14       Q.   Okay.  What did his demeanor -- what is his

15   look at that time?

16       A.   He was pissed off.

17       Q.   Okay.  You had seen that look before?

18       A.   Oh, yeah.

19       Q.   Okay.  What happened next?

20       A.   Well, the limousine had gotten us back late

21   because of that little stop and I guess I wasn't really

22   thinking about it.  It hasn't -- it hadn't, occurred to me

23   that I was late.  So when Joe was standing there it really

24   shocked me and he was pissed off and wanted to know why I was

25   late and where I had been and this, that and the other, and I

1    wasn't really responding too well because I didn't know what

2    to say.  And I remember him -- he noticed that I was quite

3    inebriated and so he grabbed the wine cooler out of my hand

4    and threw it.  And -- and then he started in about me not

5    answering the cell phone and looks at the cell phone and saw

6    that it was off, and he just cursed me up one side, down the

7    other that the phone was off, and that's why I hadn't been

8    answering it, I had done it on purpose, this, that and the

9    other.  And, oh, gosh, it was just -- and then he threw it

10   and smashed my cell phone in the parking lot.

11              Q.    Where did he throw it?

12              A.    Right there in the parking lot.

13              Q.    What did he do after that?

14              A.    Um -- um, he grabbed my arm to go home and then

15   he let go of my arm, and I started running after him because

16   I just knew when we got home it was not going to be fun.  And

17   I was trying to tell him I was sorry for being late, I didn't

18   realize and, you know, I -- I'm not the one driving, but he

19   wasn't accepting any of that.

20              Q.    Okay.  What happened after you folks actually

21   got inside 132?

22              A.    Um --

23                    (Pause in proceedings.)

24                    THE WITNESS:  Can we take a break?

25              MR. PATTERSON:  Judge, could we take a break, please?

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1       THE COURT:   We'll go ahead take our afternoon break

2    at this point.   Ladies and gentlemen, during this time

3    remember the admonition I've given you including the fact

4    you're not to discuss the case with anyone, do not let anyone

5    discuss the case with you, keep an open mind.   Have a nice

6    break.

7

8               (Recess.)

9

10       THE COURT:   This is trial in cause number CR

11   2000-096032, State of Arizona versus Wendi Elizabeth

12   Andriano.   The record will reflect the Defendant is present

13   on the witness stand.   Defendant Wendi Elizabeth Andriano is

14   on the witness stand.   We'll continue with the direct

15   examination at this time.

16       MR. PATTERSON:   Thank you, Judge Ishikawa.

17

18   CONTINUED DIRECT EXAMINATION BY MR. PATTERSON:

19       Q.   You are Wendi Andriano?

20       A.   Yes, I am.

21       Q.   And you're the same Wendi Andriano that was

22   testifying prior to the break?

23       A.   Yes.

24       Q.   And you realize you're still under oath?

25       A.   Yes.


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000004890

1      Q.    We've gotten to that point in your testimony

2  concerning returning home that evening after having been out

3  for a birthday celebration?

4      A.    Right.

5      Q.    You had been going back towards 132.   What

6  happened next?

7      A.    At that time there was somebody in our

8  apartment and --

9      Q.    Who was in the apartment?

10     A.    Joe's sister.

11     Q.    Name?

12     A.    Janna.

13     Q.    Okay.

14     A.    And so Joe had the keys to our Yukon and

15  actually put me inside the Yukon.

16     Q.    Physically put?

17     A.    Physically put me inside the Yukon, got inside,

18  locked the doors, and finished saying everything that he had

19  to say about me being late, me being gone, and -- and just

20  cussing and swearing at me.   When he was done, I mean, I

21  remember him just holding onto the steering wheel just --

22  never hit me, he didn't do anything to me, but he just -- he

23  let me know how pissed off he was.

24     Q.    Okay.

25     A.    And then when he was done, we got out of the

1   Yukon and we went over the patio wall into the master

2   bedroom.

3       Q.   Okay.  So coming in the back slider area --

4       A.   Yeah.

5       Q.   -- of the patio?

6       A.   Yes.

7       Q.   Okay.

8       A.   Went into the master bedroom and just went to

9   bed.

10       Q.   Let's talk about the things that he would make

11   decisions for you, okay?  Hair color.  Tell me about how you

12   had to have a certain hair color during the period of your

13   marriage to Joe Andriano?

14       A.   When I met Joe, I had auburn color hair, and as

15   we -- as time went along and he would go to my parent's house

16   and things like that, he saw pictures of when I was younger

17   and had blond hair and he preferred that, and so he asked me

18   if I would go back to blond.  And I also had a little bit

19   longer hair and he didn't like that.  He liked short hair.

20       Q.   Okay.  So --

21       A.   So I cut my hair and started dying it.

22       Q.   Okay.  To that end were there certain

23   promotional packets that would come through San Riva

24   periodically, business promotions, tie-ins with various

25   vendors in the -- in the Ahwatukee area?  Talking about

1    specifically Pink Salon.

2        A.    Oh, okay.  I wasn't understanding what you

3    meant.

4        Q.    I'm sorry.  I'm trying not to lead.

5        A.    Right.

6        Q.    But I need to bring topics up for your

7    consideration.  So the Pink Salon?

8        A.    Right.  Part of your move-in at San Riva was a

9    welcome home packet, and inside that packet were coupons like

10   for dry-cleaning, for haircutting, for the different

11   businesses that were in the Ahwatukee area.  They actually

12   would come to us and ask can we advertise with your

13   residents?  So the way we allowed them to do so was to put a

14   flyer for an advertisement or a coupon something like that in

15   our welcome home brochure folder-type thing.

16       Q.    Okay.  Was one of the vendors or small

17   businesses in the area the Salon, Pink Salon?

18       A.    It was Adam Pink Salon.

19       Q.    Adam Pink?

20       A.    Yes.

21       Q.    There we go.

22       A.    Yes.

23       Q.    Had you ever gone to the Adam Pink Salon prior

24   to receiving this kind of tie-in?

25       A.    No.  I didn't even know about them.

1    Q.    Okay.  At some point in time did you need to

2  have your hair colored?

3    A.    Yes, I did.

4    Q.    To that end did you go to the Adam Pink Salon?

5    A.    I did.  And I used one of their coupons.

6    Q.    Is that how you happened to use that particular

7  location?

8    A.    Yes.

9    Q.    Did you know any of the salon personnel?

10    A.    No.  I knew nobody there.  That was the first

11  time I had been there.

12    Q.    Okay.  There was a lady named Donna DeAngelis

13  came in which testified she colored your hair.

14    A.    Yes.

15    Q.    Was she in fact your colorist?

16    A.    She did color my hair a coup -- coup -- couple

17  of times.

18    Q.    Okay.  Do you recall having any kind of long

19  dialogs with this woman about your marital circumstance?

20    A.    I had the same conversation with her that I do

21  with anybody who inquires about are you married, what does

22  your husband do, things like that.  I let her know that my

23  husband was sick with cancer, that, you know, just things

24  like that.  Nothing evil, nothing hateful toward my husband.

25  I would never speak ill of my husband to anybody.

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000004894

1       Q.    Okay.  Do you have any explanation for what she

2  was talking about?

3       A.   I really don't because I actually thought -- I

4  mean, when I went to get my hair cut, she always treated me

5  fine.  She never --

6      MR. MARTINEZ:  Objection.  Nonresponsive.

7      THE COURT:  Overruled.  Go ahead and continue.

8      THE WITNESS:  -- treated me as if she had a problem

9  with anything, and I would never -- and she did cut my hair

10  enough for me to even -- I mean, I had conversations with her

11  that I would with anybody that I had just met.  I --

12  BY MR. PATTERSON:

13       Q.   Okay.

14       A.   You know.

15       Q.   I guess what I'm -- what I'm trying to figure

16  out, was she your friend?

17       A.   No.

18       Q.   Any information -- she wasn't a confidante of

19  yours in any --

20       A.   Not at all.

21       Q.   Okay.  Let's talk about other incidents of

22  decision making that Joe would make the decisions.  How about

23  your apparel?

24       A.   Yes.  If I purchased something that he didn't

25  like, he would not let me wear it.  I would have to take it

1    back.  Specifically, he did not like me wearing black.  I had

2    black in my wardrobe when I met him and slowly got rid of all

3    of that.  And the only other time that I purchased black

4    clothing was for work purposes because at times as a manager

5    I was required to wear black suits and things like that.

6         Q.    Did he have any particularized objection

7    towards the people that were --

8         A.    Yes.

9         Q.    -- asking you to wear the black clothing?

10        A.    Yes, he did.

11        Q.    What was --

12        A.    He would always have a fit about it in the

13   morning, cuss them out, and, you know, then his anger was

14   directed at them because, you know, I -- I have to wear

15   this.  And so he -- I don't know what his deal was with

16   black, but he didn't like it.

17        Q.    Okay.  Did you have to take a certain item of

18   apparel off the hanger and show it to him before you would be

19   able to wear it to work?

20        A.    I'd usually put it on.

21        Q.    Okay.

22        A.    Like if it was too short or too low or too this

23   or too that then I wouldn't wear it.

24        Q.    Okay.  So he would veto that particular choice?

25        A.    Yes.

1    Q.    Okay.  There was a time when he bartered with

2    you to allow to you go out for a period of time if you would

3    do certain things in return?

4    A.    Yes.

5    Q.    Okay.  What point in time are we talking about?

6    A.    It was the summer of 2000.  It was after he

7    started his chemo.  I remember he didn't have any hair.

8    And --

9    MR. MARTINEZ:  I'm going to object.  There's no

10   question before her.  She's answered.

11   THE COURT:  Sustained.  Ask your next question.

12   BY MR. PATTERSON:

13   Q.    What happened?

14   A.    I wanted to go to Rockin' Rodeo and I asked Joe

15   to go with me.

16   Q.    All right.  Let's segue over to the Rockin'

17   Rodeo issue first and then we'll move back.  Did there come a

18   time when you started to go out with the colleagues at work

19   to various local establishments in the Ahwatukee area?

20   A.    Yes.

21   Q.    Okay.  When did that start?

22   A.    Started around the time just a little --

23   well, probably June or July of 2000.

24   Q.    Okay.  And how long had you been employed as

25   the resident manager at San Riva as of that date?

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    A.    Eight months or so.

2    Q.    Okay.

3    A.    I'm not sure.

4    Q.    And what local establishments in the Ahwatukee

5    area did you folks go to?

6    A.    Well, we only went to two places.  We went to

7    Tijuana Country Club and we went to Rockin' Rodeo.

8    Q.    All right.  Where was Tijuana Country Club

9    located?

10   A.    It was on Ray Road.

11   Q.    Next to the Frys there?

12   A.    Yes.

13   Q.    Okay.  All right.  And where was the Rockin'

14   Rodeo?

15   A.    Elliot and I-10.

16   Q.    Okay.  What kind of a bar was Tijuana Country

17   Club?

18   A.    It had a little bitty dance floor on it.  It

19   was just kind of a local hang out.  You would see a lot of --

20   golfing is very popular over there, so you would have a lot

21   of people after golf or whatever hang out there, have happy

22   hour, just a pretty laid back place.

23   Q.    Okay.  And Rockin' Rodeo, describe what that

24   was about.

25   A.    It was a west -- a western dance place.  The

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000004898

1   main focus of it is a huge dance floor and all the tables and

2   everything circle around the huge dance floor.

3          Q.    Okay.

4          A.    So.

5          Q.    Is there a generally accepted or usual standard

6   of -- of apparel that --

7          A.    Yes.

8          Q.    -- is worn at the Rockin' Rodeo?

9          A.    Yes, there is.

10         Q.    What kind of --

11         A.    You wear boots with, you know, pants and some

12   kind of top.

13         Q.    Okay.  And any particular kind of pants?

14         A.    I wore Rocky's.

15         Q.    Is that customary for that kind of

16   establishment?

17         A.    They're western, yes.  They're western pants.

18         Q.    Okay.

19         A.    I had worn those throughout my marriage.

20   That's something that I wore a pair of those to my wedding

21   rehearsal dinner.

22         Q.    Okay.  It's country and there's line dancing,

23   that kind of stuff?

24         A.    Yes, there is.

25         Q.    All right.  Those are the two places that you

1     and your colleagues went to?

2         A.   Yes.

3         Q.   Okay.  There was a certain day of the week that

4     you would go to one or the other of these two establishments?

5         A.   Occasionally on Tuesdays, we would go to

6     Tijuana Country Club because of the happy hour and it was

7     ladies night and so drinks were just $1.

8         Q.   Okay.  And this started in the summer of 2000?

9         A.   Yeah, I'm thinking so.

10        Q.   Okay.

11        A.   I can't recall exactly.

12        Q.   But in -- in total from that point in time when

13    you first started going to, say, the 1st of October --

14        A.   Okay.

15        Q.   -- of 2000, how many times do you think you

16    went out with the girls to those kinds of places?

17        A.   The Tijuana Country Club I didn't go every

18    Tuesday.  I would have to say, if you want to put a number on

19    it, you could pick every other Tuesday and that would be more

20    accurate.

21        Q.   All right.  And were these ventures out with

22    the colleagues at work known to Joe?

23        A.   Yes.

24        Q.   Okay.  Did he approve of your going

25        A.   Yes.

1      Q.      -- to these places?

2      A.      As long as I was home by midnight, he had no

3  problem with it.

4      Q.      All right.  And when you would come home by

5  midnight, was there a benefit to him?

6      A.      Yes, there was.

7      Q.      Okay.  What was the benefit?

8      MR. MARTINEZ:  Objection.  Lack of foundation.  Is

9  this every time or just once or --

10     THE COURT:  Overruled.  Go ahead, answer the question

11 if you can.

12     THE WITNESS:  As I said before, Joe liked to have sex

13 everyday, and so when I would come home from Tijuana Country

14 Club, of course, I'd been drinking and that was one of the

15 requirements, that I wouldn't complain, that I would

16 participate and -- and he -- that was -- that was his -- I

17 don't know.  I don't know how to say it.

18 BY MR. PATTERSON:

19     Q.      Okay.

20     A.      Sorry.

21     Q.      Just so I understand, if you came home by

22 curfew and would have sexual relations with him, he wouldn't

23 complain about you going out?

24     MR. MARTINEZ:  Objection.  Leading.

25     THE WITNESS:  Yes, sir.

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000004901

1      MR. MARTINEZ:  Asked and answered.

2      THE COURT:  Sustained.  Rephrase the question.

3  BY MR. PATTERSON:

4      Q.   Okay.  Can you tell me what his expectations

5  were when you would come home by curfew after being out with

6  the girls?

7      THE WITNESS:  Yes.

8      MR. MARTINEZ:  Objection.  Asked and answered.  She's

9  already answered.

10     THE COURT:  Overruled.  Answer the question.

11     THE WITNESS:  If I was home by midnight, I would come

12  home and I would take a shower and then go to the bedroom and

13  participate in whatever he had planned.

14  BY MR. MARTINEZ:

15     Q.   Okay.  Now, these nights out with the girls,

16  did you ever bring any other girl friends to these

17  circumstances other than the girls that you work with at San

18  Riva?

19     A.   No, sir.

20     Q.   Okay.  All right.  There was one circumstance

21  where he made a trade off with you?

22     A.   Yes.

23     Q.   Okay.  Tell me about that.

24     A.   I wanted to go to Rockin' Rodeo and I wanted

25  Joe to go with me and he didn't want to go because of his

1    bald head.  He was very embarrassed about that.  And some of

2    my co-workers were going to be there and I just wanted to go

3    dancing.  It was sort of a break from the stressful life we

4    were having and I could just relax for a little bit.

5              And so he made a deal with me.  He said he'd

6    have a surprise for me when I got done.  I could be there for

7    three hours.  He dropped me off and I had no idea what, you

8    know -- I didn't know what -- what he had in mind, but it

9    sounded fine to me, you know.  So I spent three hours at

10   Rockin' Rodeo.

11             Q.    Did he give you the particulars before you

12   left?  You had no idea what was in store?

13             A.    No.  He just said he was going to have a

14   surprise for me.

15             Q.    Okay.

16             A.    And it didn't sound bad or anything so, you

17   know I mean?  He said it in a nice way.

18             Q.    Okay.

19             A.    And he dropped me off and he actually came

20   inside Rockin' Rodeo, and when the three hours were up, he

21   picked me up and we got in the vehicle and sitting on my seat

22   was a couple of packages.  And I picked them up and started

23   looking at them, and it was all sorts of -- I don't even know

24   what some of it was -- but they were sexual toys.

25             Q.    Okay.  Were you excited about the fact that

1    he'd bought you some presents when you first got into the

2    vehicle?

3         A.    At first, yes.  I thought that was very unusual

4    and I was curious.  I was -- I was like, "What'd you get me?"

5         Q.    All right.  When you discovered what they are,

6    actually were, what was your reaction?

7         A.    I don't like things like that and it was

8    disguesting to me.  I didn't even know what some of the stuff

9    was.

10        Q.    Had you ever participated in sexual activities

11   using those kinds of items previously?

12        A.    No.

13        Q.    Okay.  So this was -- was it a shock to you?

14        A.    It was because I've never seen that side of Joe

15   and I couldn't believe he wanted to use that stuff.

16        Q.    All right.  Did you express your disinterest to

17   him at that point?

18        A.    Oh, yeah.

19        Q.    And what did he say?

20        A.    I couldn't figure out what some of the stuff

21   was.

22        Q.    Okay.

23        A.    I -- so, you know, I --

24             MR. MARTINEZ:  Objection.  Nonresponsive.

25             THE COURT:  Sustained.  Ask your next question.

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000004904

1    BY MR. PATTERSON:

2           Q.    Did you express -- did you query him, ask him

3    what are those things?

4           A.    I did.  I was like "what?"  You know, because I

5    would pull something out of the package, and "What in the

6    world is this" and "I can't believe you expect me to use this

7    stuff," and he was just like, well, that was the deal, you

8    know, and "You'll like it, don't worry about it."  It was --

9    it was weird.

10          Q.    Okay.

11          A.    I don't know.

12          Q.    Were you successful in dissuading him from that

13    course of conduct on the ride home?

14          A.    No.  We got home --

15    MR. MARTINEZ:  Objection.  Nonresponsive.

16    THE COURT:  Sustained.  Repeat the question.

17    MR. PATTERSON:  Judge, I'm trying to elicit testimony

18    here and -- okay.

19    THE COURT:  Go ahead and repeat the question.

20    BY MR. PATTERSON:

21          Q.    Were you successful in discouraging him from

22    that course of conduct while in the vehicle?

23          A.    No, I was not.

24          Q.    Okay.  When you got to 132, what happened?

25          A.    Carried the items inside, Joseph carried them

1    inside and went back and made me take a shower because I

2    smelled like cigarette smoke from being in the bar, and when

3    I got out of the shower he had everything laid out on the

4    bed.

5            Q.    How were you feeling at this point?

6            A.    Oh, my gosh, I was just -- I didn't know what

7    to do because I knew if I -- if I tried to leave or if I

8    tried to, you know, tell him no, I was not going to do this,

9    that -- that just wasn't going to fly.  He was going to make

10   me do this stuff and I had agreed to it and he was holding me

11   to it.  You know, I didn't -- I didn't want repeats of

12   earlier behavior.  I --

13           Q.    So what happened?

14           A.    Do I have to go into details or --

15           Q.    To the extent that you feel comfortable.

16           A.    Well, the things that were purchased, he used

17   them on me.

18           MR. MARTINEZ:  I'm going to object as to lack of

19   foundation.  If she wants to describe what they are, we don't

20   really know what's going on.

21           THE COURT:  Overruled.

22           THE WITNESS:  There was these things called, like,

23   anal beads or something and he used that on me and that was

24   just humiliating.  That was one of the things.

25   BY MR. PATTERSON:

1          Q.     Okay.  Were there other things done that

2    evening?

3          A.     (No audible response.)

4          Q.     Okay.  How long did the whole process take?

5          A.     A couple of hours.

6          Q.     What did you do afterwards?

7          A.     I had some Tylenol P.M. and I just took some

8    pills and went to sleep.

9          Q.     Did you ever have a discussion with him the

10   next day about your feelings in that regard?

11         A.     No, I didn't.

12         Q.     Okay.  What form of birth control did you use

13   back during your time with Joe?

14         A.     We used different kinds.

15         Q.     Okay.

16         A.     In the beginning before I had, Nicolas the

17   whole time that we had been together, I took a Depo-Provera

18   shot --

19         Q.     Okay.

20         A.     -- once every three months.

21         Q.     Thereafter?

22         A.     And then obviously we didn't use any while I

23   was trying to get pregnant.  And after Nicolas, Joe used

24   condoms.  But then we wanted Ashley, so then we didn't use

25   anything, and after Ashley, Joe used condoms.

1    Q.    Okay.  And where did he keep his condoms?

2    A.    In the top dresser of the tall dresser that we

3    had.  In the top drawer, excuse me.

4    Q.    Were they boxed up or loosely arrayed in the

5    top drawer there?

6    A.    I just know he bought boxes of them and I'm too

7    short to see in there.

8    Q.    Okay.  We were talking about the things he

9    bought for you that night that he picked you up at Rockin'

10   Rodeo.  Did he ever buy you any birthday presents during the

11   course of your relationship?

12   A.    Bought me a wedding present.

13   Q.    Okay.  What was that?

14   A.    The pearl necklace I have on.

15   Q.    Okay.

16   A.    My 30th birthday he bought me three books.

17   Q.    Okay.  Tell me about the -- how those books

18   were purchased?

19   A.    He had been out with his mom and sister --

20   MR. MARTINEZ:  Objection.  Lack of foundation,

21   hearsay.

22   THE COURT:  Sustained.

23   BY MR. PATTERSON:

24   Q.    Okay.  At some point in time did he arrive back

25   at the apartment?

1      A.      Yes, and he handed me these books and he said

2   "I hope you like these.  My mom picked them out."

3      Q.      Okay.  Do you have something else with him at

4   that point?

5      A.      Yes.  He had a birthday card.

6      Q.      Show you what's been marked as an exhibit into

7   evidence, Exhibit Number 226.  Do you recognize that

8   particular exhibit?

9      A.      Yes, I do.

10      Q.      When did you receive that card?

11      A.      With the books.

12      Q.      Okay.  And what did he say about the origin of

13   that card?

14      MR. MARTINEZ:  Objection.  Hearsay.

15      THE COURT:  Sustained.

16   BY MR. PATTERSON:

17      Q.      What date in time, 30th birthday we're talking

18   about, so it's what, January?

19      A.      It's August.

20      Q.      I'm sorry.  August of --

21      A.      2000.

22      Q.      -- 2000?

23      Had he ever gotten you a birthday card prior to

24   that date during the course of your relationship?

25      A.      He had never, no.

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000004909

1      Q.    Okay.  Thereafter did he get you any cards

2   after August?

3      A.    No.

4      Q.    Is this the only card you've ever gotten from

5   this person?

6      A.    From Joe himself, yes.

7      Q.    Okay.  Is that why you kept it?

8      A.    (No audible answer.)

9      Q.    How about Christmas?  Any Christmas presents?

10     A.    We would always try to do --

11          MR. MARTINEZ:  I'm going to object as nonresponsive.

12          THE COURT:  Overruled.  Go ahead just answer the

13   question that's asked.

14          THE WITNESS:  Oh, okay.  No Christmas presents.

15   BY MR. PATTERSON:

16     Q.    How about presents for Mother's Day?

17     A.    No.

18     Q.    During the course of your relationship with

19   Joe, what kind of things would you do for him?

20     A.    With regards to what?  I mean, I --

21     Q.    Personal grooming.

22          MR. MARTINEZ:  Objection.  Lack of foundation.  When?

23   At the end of his life, beginning?

24          THE COURT:  Overruled.  Go ahead, answer question.

25          THE WITNESS:  While we were dating and up until we

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1  had Nicolas, I loved to take care of Joe.  In other words, I

2  would file his fingernails and cut them and buff them because

3  he was always working with grease, so I always cleaned up his

4  hands for him.  And I'd pluck his eyebrows.  I would always

5  give him massages.  And just I always babied him.

6  BY MR. PATTERSON:

7      Q.   How about in terms of who would purchase the

8  pantry stores, things needed for the kitchen, food stuffs,

9  that kind of thing?

10     A.   I would.

11     Q.   The shopping, I guess you would call it.

12     A.   I would and he would go with me sometimes.

13     Q.   Okay.  So he'd help you in that regard?

14     A.   Yes.

15     Q.   Okay.  How about clothing purchases for him?

16     A.   I made those.

17     Q.   Okay.  What else?

18     A.   I -- I usually was the one that took care of

19  everything.  I -- one thing he would do is the dry-cleaning

20  and that's because he was friends with the people who owned

21  the dry-cleaner.

22     Q.   Okay.

23     A.   But beyond that I would do the shopping and the

24  cooking and the cleaning and the

25          MR. MARTINEZ:  Objection.  Asked and answered.  She's

1    giving us the same thing we've already heard.

2         THE COURT:  Ask your next question.

3    BY MR. PATTERSON:

4         Q.   Who would do the banking?

5         A.   Joe would.

6         Q.   Okay.  And who would pay the bills?

7         A.   A lot of the times I would sit down and write

8    them out and he would tell me how much to send to this place

9    and how much to send to that place.  Occasionally he would

10   write them out himself.

11        Q.   Okay.  Let's talk about Joe's cancer, okay?

12   Tell me about the first time that you become aware that he

13   had some pain in the left throat area, left neck area?

14        A.   About three months into our marriage.

15        Q.   Okay.  So married in January, we're talking,

16   what, April?

17        A.   March or --

18        Q.   Of 94?

19        A.   Yes.

20        Q.   Okay.  What did he complain of officially?

21        A.   That he was having some pain and he put my hand

22   up to his throat so I could feel there was a little lump in

23   there, and said he had had it for a while but it hadn't hurt

24   before.  But it was starting to hurt him now so he was

25   getting concerned.

1    Q.    Okay.  And where'd you guys go to try and
2  determine whether this was in fact a problem?
3        A.    At the time I was working at Casa Grande
4  Regional Hospital and so we went to -- my insurance was with
5  them, and we went to one of his primary care physicians who
6  referred us to a surgeon.  I don't recall his name though
7  specifically.
8        Q.    Okay.
9        A.    The surgeon was Dr. Stu -- something -- Stu --
10  I don't know.  I can't remember.
11        Q.    Okay.  Did you sit at the doctor's office while
12  they tried to figure out what was wrong with Joe?
13        A.    Oh, yes.  I went to every doctor's appointment
14  with Joe.  We went in and talked to him and he said that he
15  wanted to do almost -- kind of like where you have day
16  surgery.  You don't have to spend the night.
17        Q.    Okay.
18        A.    And he would remove the lump and then do a
19  biopsy of it, see what it was --
20        Q.    Okay.
21        A.    -- see what was going on.  He didn't think it
22  was anything serious.
23        Q.    All right.  So was that done?
24        A.    That was done.
25        Q.    Was a biopsy done of the material that was

1    removed from his neck area?

2         A.    Yes, sir.

3         Q.    Okay.  And what did -- what were you informed

4    at that time?

5         A.    They told us it was a benign mixed tumor.

6         Q.    Okay.  And --

7         A.    And it had originated in his salivary gland and

8    the doctor went ahead and removed the salivary gland along

9    with the tumor.

10        Q.    Okay.  How long to do that?

11        A.    It was a day thing.

12        Q.    Okay.  And did Joe have a scar, surgical scar

13   as a result of that intervention?

14        A.    It was fairly small, but yes, he did.

15        Q.    Okay.  Did you hear from them at some point

16   with regard to the biopsy?  What did --

17        A.    Sure.  When the -- well, when the biopsy --

18        Q.    Okay.

19        A.    -- came back, they told us, well, we had a copy

20   of the report and it said a benign mixed tumor.

21        Q.    Benign led you to believe what?

22        A.    That it's not cancerous.

23        Q.    Okay.  So I suspect you were relieved, happy?

24        A.    Sure.  We thought it was done and over with.

25        Q.    Okay.  All right.

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000004914

1      A.    That we really didn't -- it wasn't a big deal

2    then.

3      Q.    All right.  What date is this first surgery?

4      A.    You're asking me dates, I'm sorry.

5      Q.    Okay.  Peg it to something your life.  Is it --

6    how long after your marriage?

7      A.    I believe it happened September of that year.

8      Q.    Okay.  So approximately eight months after the

9    marriage, correct?

10      A.    Yes, sir.

11      Q.    Okay.  Did there come a time when he complained

12    again of symptoms in this particular region of his throat?

13      A.    Yes.  It seemed like it was just a few months

14    after that he started noticing a lump again.  When he shaved

15    or just -- he was real watchful of that area, started

16    noticing a lump again, and it got to the point where I could

17    see it.  And it started causing him pain again right in the

18    same -- same area.

19      Q.    Okay.  What did you do at that point?

20      A.    We went back to the surgeon and he said that it

21    could be scar tissue wrapping around the nerves in there.

22      Q.    Okay.  Did he make any recommendations with

23    regard to treatment at that point?

24      A.    Yes.  He started giving Joe cortisone shots.

25      Q.    Okay.

1      A.   In this right here, in this area (indicating).

2      Q.   Okay.  Were Joe's parents involved in this

3  kind of medical situation at that time?

4      A.   Yes.

5      Q.   Okay.

6      A.   Yeah.

7      Q.   Did they also go to see the doctor?

8      A.   I don't know if they ever met him or not.

9      Q.   Okay.  How about your parents?  Were they

10  involved in this medical issue --

11      A.   Yes.

12      Q.   -- early on?

13      A.   Yes.

14      Q.   Okay.  What treatment was recommended after

15  discovery of the second problem --

16      A.   Um --

17      Q.   -- or the current problem?

18      A.   Well, the cortisone shots weren't working and

19  the lump was continuing to grow and it was causing us a lot

20  of concern.  He was in a lot of pain.  It was -- it was

21  terrible.  And so we decided to go to a specialist.

22      Q.   Okay.  And where was the specialist located?

23      A.   In Tucson.

24      Q.   All right.  Do you recall his name?

25      A.   Dr. Rubianis (phonetic).

1      Q.      Okay.  And who went down to visit Dr.

2  Rubianis?

3      A.      First visit was my mother and Joe and I.  And

4  he was a head -- head and neck specialist, so he checked Joe

5  out, did an examination on him and scheduled x-rays, I

6  believe, or CT scan, something like that.

7      Q.      Okay.  And that's for a subsequent visit?

8      A.      Yes.

9      Q.      Okay.  Did you return thereafter and go through

10  those other processes?

11      A.      Yes, we did.

12      Q.      Okay.  And who was with you the next time you

13  went down there?

14      A.      Well, some of those were just made by Joe and

15  I.

16      Q.      Okay.  All right.

17      A.      I can't tell you each and every time who went

18  with us.

19      Q.      Okay.  But in general was your mother and

20  father involved --

21      A.      Oh, yes.

22      Q.      -- in this medical situation as were Joe's

23  parents?

24      A.      Yes, but my parents probably more to a greater

25  degree.

1      Q.    Okay.  Second time, second doctor, tell me what

2  happens?

3      A.    After reviewing the -- the tests he had run on

4  Joe, he said that it was definitely another tumor there and

5  he needed to operate on it.  And we asked why, if this was

6  benign, would it grow back in the same spot, and he told us

7  that because the first surgeon was only a general surgeon, he

8  might have left some of it in there.

9      Q.    Okay.

10     A.    So that kind of relieved our -- our thinking on

11  the whole deal.

12     Q.    All right.

13     A.    So we scheduled the surgery and that was --

14     Q.    So you were a little relieved perhaps it was

15  the benign tumor, they hadn't gotten it, all of it the first

16  time through?

17     A.    Oh, yes.  When he said all of that, it gave us

18  tremendous relief.

19     Q.    Okay.

20     A.    Because that gave us an explanation of why that

21  he had this again.

22     Q.    Okay.  Was that second excised tumor biopsied?

23     A.    Yes, it was.

24     Q.    What was the result of the biopsy?

25     A.    The same result, that it was a benign mixed

1    tumor.

2           Q.    How did it make you feel?

3           A.    Well, it first rang through to what he said

4    about the first surgeon leaving some in there.

5           Q.    What was Joe's reaction?

6           A.    He was relieved because he was in pain and now

7    it's gone and we could move on.

8           Q.    What date thereabouts are we talking about, the

9    second surgery?

10          A.    Second surgery I believe was in '95, late '95.

11          Q.    Okay.  So here is --

12          A.    August of '95 I believe a year has passed.

13          Q.    Okay.  Does there come a time that it appears

14   there is a recurrent problem again in this location?

15          A.    Yes.

16          Q.    Okay.  And what brings this to your attention?

17          A.    Actually, that was at the time that we were

18   working at AccuGlass, and at times Joe would have to sit in

19   the office holding the side of his head because he was in so

20   much pain.

21          Q.    All right.

22          A.    He let it go a lot longer this time instead of

23   a year.

24          Q.    Okay.  And when you say holding his head, was

25   it --

1          A.    Holding the side of his neck.

2          Q.    Side of his neck?

3          A.    Because it hurt so bad, yeah.

4          Q.    Okay.  About a year has elapsed at this point

5    from the second surgery?

6          A.    Yes.

7          Q.    Okay.  All right.  What did you do at this

8    point?

9          A.    We make an appointment to go back to the

10   specialist in Tucson.

11         Q.    Okay.  Dr. Rubianis, the same guy that removed

12   a portion of the tumor the second time?

13         A.    Yes, or we thought removed all of it.

14         Q.    Gotcha.  What does he tell you when you go

15   visit again?

16         A.    He has no explanation as to why it's back, so

17   he wanted to go in and do another surgery and have it

18   biopsied again.  It was -- he didn't -- under the

19   circumstances, he sent us to another --

20         Q.    Okay.

21         A.    -- doctor who just said the same thing that he

22   had said.  I don't recall his name, but -- but this is a

23   particularly aggressive tumor and that if you don't get every

24   single cell of it out, it will continue to grow in your body

25   and that it was benign.


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1      Q.    Was there a third surgery?

2      A.    Yes, there was.

3      Q.    You said the first one was a little tiny scar

4  basically?

5      A.    Yes.

6      Q.    The second one, how pronounced was the scar?

7      A.    It was larger but right over the first one, but

8  it was longer this time.

9      Q.    Okay.

10     A.    And --

11     Q.    How about as a result of the third surgery,

12  how --

13     A.    It was much --

14     Q.    -- dramatic was the incision?

15     A.    It was much, much bigger.  It went from the

16  back of his jaw line almost to the middle of his chin.

17     Q.    Okay.

18     A.    It was a lot -- a lot more invasive.

19     Q.    Okay.  And was there a feeding tube or a trach

20  tube as a result of that third operation?

21     A.    No, sir.

22     Q.    Okay.  And was -- tell me about the dressings

23  that were involved at this time for the third surgery?

24     A.    This one required a lot longer hospital stay,

25  and the third surgery, I believe, was in February of '97.

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000004921

1      Q.    Okay.

2      A.    And so the nurses of course dressed -- took

3    care of the dressing there.  There was a -- it's like a clear

4    tube that's inside the incision and out -- and hanging off

5    of -- it is a round --

6      Q.    Collection --

7      A.    Yeah, it holds liquid.

8      Q.    Okay.

9      A.    And it would drain -- his wound would drain in

10    there and they would measure how much was draining out and

11    stuff because it had to heal from the inside out.

12      Q.    Okay.  Did you have any difficulty nursing him

13    at this point?

14      A.    Yeah, it -- it made me really -- I could do --

15    I could arrange his pillow, change his sheets, you know, wipe

16    his forehead, feed him, all that sort of stuff, but I just --

17    my stomach couldn't handle dressing the wound.  I -- I

18    couldn't do that.

19      Q.    Is this similar to the response you experienced

20    when you saw Nicolas' leg?

21      A.    Yes.  It makes me very ill.  I can't do it.

22      Q.    Okay.  So who assisted with the changing of the

23    dressing?

24      A.    My parents did.

25      Q.    Did they come up from Casa Grande to you or --

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000004922

1      A.    Well --

2      Q.    -- did you --

3      A.    -- after Joe was released from the hospital, we

4   went back to the shop.

5      Q.    Okay.

6      A.    My mom and dad would come over.  At this point

7   I believe it was mostly my mother was changing his dressing

8   then.

9      Q.    All right.  Did they biopsy the material that

10  was removed as a result of the third surgery?

11     A.    They did.

12     Q.    Okay.  What did they tell you at this point?

13     A.    The very same thing.

14     Q.    Okay.  So now you've had three surgeries?

15     A.    Three surgeries with the same diagnosis each

16  time, this is a benign mixed tumor, and this third one was

17  just -- we don't know why it's back.

18     Q.    Okay.

19     A.    It was very frustrating.

20     Q.    Are you beginning to question?

21     A.    Yes.

22     Q.    -- the information you're getting here?

23     A.    Yes.

24     Q.    Is Joe beginning to question the information?

25     A.    Yes.  It was very confusing to us why does this

1    thing keep growing in the same spot.

2          Q.    Okay.  At some point did you make an effort to

3    bring in some other experts into the process here?

4          A.    Not until he started feeling it again.

5          Q.    Okay.  How much time elapsed then from the

6    third surgery to the point in time where you started to feel

7    symptoms again and that moved you to do something?

8          A.    Not too -- by the end of '97, we know there's

9    definitely another growth there.  And, let me think, I

10   believe it was the beginning of '98 that I had changed jobs

11   and so I had different insurance, so now Joe has a different

12   primary care physician.  We made an appointment with him for

13   the first time and went to Tucson.  He was also in Tucson.

14         Q.    Okay.

15         A.    And he received all of Joe's medical records

16   and he sent Joe into one of the hospitals, Tucson Medical or

17   something like that -- TMC I think it was -- for x-rays.

18         Q.    X-rays were taken and what happened to those

19   x-rays?

20         A.    The x-rays were done and I couldn't get off

21   work that particular day that Joe went back for the results

22   of the x-rays, so he went by himself to Tucson.  And I

23   expected him home -- I got off work and I expected him back

24   real, you know, quick, and I couldn't reach him on the cell

25   phone.  I was getting worried and he got home at 9:00 at

1    night and he was really quiet.

2          Q.    What did he say?

3          A.    And I still hadn't --

4          MR. MARTINEZ:  Objection.  Hearsay?

5          THE WITNESS:  I still --

6          THE COURT:  Hold on a second.  Overruled.

7          THE WITNESS:  I still had Nicolas up.  He told me to

8    put him to bed, so I did, and we sat down in the living room

9    and he said I have something to tell you, and he was really

10   upset and he said that the just -- the general chest x-ray

11   they had done of him showed spots all over his lungs, he

12   said.  Then the doctor proceeded to ask him if he had Valley

13   Fever, and of course he hadn't because that would be an

14   explanation for that.  And, you know, he asked him lots and

15   lots of questions because he didn't know what was all over

16   his lungs.  And Joe was really upset about that.

17   BY MR. PATTERSON:

18         Q.    Okay.

19         A.    And so I -- I called Dr. Rubianis and I had him

20   paged.

21         Q.    And what happened next?

22         A.    His answering service kept trying to get a hold

23   of him, so I was kind of -- I didn't know what was going on.

24   And Joe was just kind of sitting there in a stunned didn't

25   know what to -- you don't know what to say.  And Dr. Rubianis

1   was on call at University -- at UMC and he called me back at

2   home and I told him, I said Joe just found out from this

3   doctor that he had spots all over his lungs and this, you

4   know, he has another growth in his neck and it started

5   growing, and I'm like, you know, what is going on?  And he

6   tried to calm me down on the phone and he said come into the

7   office tomorrow and we'll talk, you know, and he goes And

8   I'll get the x-rays and look at them because I can't tell you

9   anything over the phone, I haven't seen this stuff.

10          So the next day I took off work and we went

11  down there and Dr. Rubianis had gotten all the x-rays and

12  things.  And he's looking at them and he says I don't -- he

13  says I don't know what this is so we're going to send you in

14  for a lung biopsy.  So he scheduled one of those and Joe had

15  the lung biopsy done, and that was terrible, but they put a

16  long needle in through his back --

17          MR. MARTINEZ:  Objection.  Relevance.

18          THE COURT:  Sustained.  Ask your next question.

19  BY MR. PATTERSON:

20          Q.    What did you do next?

21          A.    They sent the lung biopsy off to the -- I

22  forgot what they call whoever it is that -- anyway, they told

23  us that it was the same material that had been in his neck,

24  it's the same substance.  They still were calling it a benign

25  mixed tumor.  They had no idea why it had gone to the lungs,

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000004926

1   but they knew from the -- the pathologist, thank you, I

2   looked at the slides and said it's the very same thing that

3   it's been here, and for some reason now it's all in your

4   lungs.  And at that point was when Rubianis said we need to

5   find somebody more specialized in this and he sent us to the

6   Arizona Cancer Center in Tucson.

7           Q.    Okay.  When did you go visit those folks?

8           A.    As soon as we could get an appointment.

9           Q.    And what did they tell you once you got over

10  there?

11          A.    We went down there and Joe did -- Joe -- the

12  doctor did a preliminary, you know, touching and feeling and

13  asking Joe questions and stuff like that.  And he looked over

14  Joe's files and without even ordering anymore tests or

15  anything he said this has to be cancer, and that was just

16  the -- what we weren't --

17          Q.    Is that the first time you heard the word

18  "cancer" from a doctor?

19          A.    Yeah.

20          Q.    What did you do when you heard that?

21          A.    We were devastated.  We --

22          MR. MARTINEZ:  Objection.  There's no question before

23  her.

24          THE COURT:  Wait until the question is asked.

25          / / / / /

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000004927

1    BY MR. PATTERSON:

2         Q.    What did you do next?

3         A.    The doctor there recommended that we find a

4    better pathologist and take all of the slides from all of the

5    surgeries and from any of the biopsies and have somebody else

6    look at them.

7         Q.    Okay.  Did you have a -- a relative or friend

8    who had a recommendation?

9         A.    The whole -- the whole family became very

10   involved in finding I -- I believe that he -- the doctor had

11   recommended somewhere and I don't recall the name.  And then

12   Joe's uncle is in the service and had a connection with the

13   Walter Read Institute in Washington DC, and that is very well

14   known, and could make an accurate diagnosis of Joe.

15        Q.    Did you send the medical records to Walter

16   Read?

17        A.    We collected them all and then packaged them up

18   and overnighted them to Walter Read and they did whatever

19   they did.  They ran their tests on it and looked at it.

20        Q.    And what did you discover after Walter Read

21   examined the medical records?

22        A.    I was at work and I got a fax over the fax

23   machine.  And what it was was the diagnosis and it said it

24   was adenoid cystic carcinoma, stage four, high-grade cancer.

25   It had originated in the salivary gland and metastisized to

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000004928

1   both lungs.

2        Q.    How did that impact you?

3        A.    It was devastating.

4        Q.    Did you communicate this information to Joe?

5        A.    Yes.

6        Q.    What was his reaction?

7        A.    We both cried.

8        Q.    And what point in time are we talking about

9   this?

10       A.    This is in '98, like summertime of '98.

11       Q.    Okay.  Did you communicate this new

12   development, new information to your parents?

13       A.    To everybody, yes.

14       Q.    Okay.  That -- including Joseph's parents?

15       A.    Yes.

16       Q.    Okay.  When you got this information, how did

17   you respond, what did you do, what was the plan at this

18   point?

19       A.    Well, we knew we had to get the tumor taken

20   out.  We obviously didn't trust the guy that had done it two

21   times before.  And so everybody kind of went on a search of

22   who knew about adenoid cystic carcinoma and who would be the

23   best qualified to remove this from his -- from his jaw.  And

24   I know there was lots of phone calls and just everybody was

25   trying to find who could do this.  And it was decided that

1    the Mayo Clinic in Scottsdale would be the best one to handle

2    that.

3           Q.    Okay.  Were appointments made to take Joe to

4    the Mayo?

5           A.    Yes.  We actually made an appointment with a

6    Dr. Mark Green.

7           Q.    Okay.

8           A.    He's an oncologist there.

9           Q.    All right.  And who was present at that first

10   meeting with Dr. Green?

11          A.    It seemed like a lot of family members, and I

12   can't specifically tell you who, but I believe that many

13   parts of Joe's family was there, part of my family was there,

14   we were there.

15          Q.    Okay.  So there were a lot of people

16   involved --

17          A.    A lot of people.

18          Q.    -- in this process at this time?

19          A.    Yes.

20          Q.    Okay.  And what essentially did Dr. Green tell

21   you?

22          A.    He explained to us what adenoid cystic

23   carcinoma was, the little they did know about it, the rate of

24   growth, treatment plans, things of that nature.

25          Q.    Okay.  And was a -- an initial course of

1    treatment decided at that point?

2         A.    Yes.  The first and foremost thing, most

3    important thing was to have surgery on this area again and

4    remove that primary tumor.

5         Q.    Okay.  And was that done?

6         A.    That was done by a different doctor, Dr. Joseph

7    Small I believe did that.

8         Q.    Okay.  At the Mayo?

9         A.    He was -- no.  He was a Mayo doctor who did the

10   surgery at Scottsdale North Hospital -- or it's on 92nd

11   Street and Shea.  I can't recall the name of it.

12        Q.    Okay.  All right.  And --

13        A.    And so that surgery was done August of '98.

14        Q.    Okay.  And how invasive was that particular

15   surgery?

16        A.    Oh, this one was 100 times worse than any of

17   the other ones.  They removed -- they called it a radical

18   neck surgery and he had to have a tracheotomy with it.  And

19   what they did was remove --

20        MR. MARTINEZ:  Objection.  Relevance.

21        THE COURT:  Overruled.

22        THE WITNESS:  They removed his jugular vein, they

23   removed lymph nodes, salivary glands, the muscle that lifts

24   your arm up and down, so half of his neck was missing along

25   with having a trach.

1    BY MR. PATTERSON:

2          Q.    In terms of dressings and bandages, what was

3    there?

4          A.    Well, when they first took him out of surgery,

5    they had to put him in ICU.  And when I saw him, it was all

6    wrapped around -- everything was bandaged up so I couldn't

7    really see it.  They also had another one of those things

8    that drained.

9                When he was released from the hospital, we had

10   to meet with the doctor as far as wound care at home, and my

11   father is the one who volunteered to do that for me.  And so

12   Dr. Small taught my father how to dress Joe's wound.

13         Q.    Again, why didn't you agree to be his nurse?

14         A.    I just couldn't do it.  It made me really

15   nauseous and I -- I would cry the whole time so I couldn't --

16   I just couldn't do it.

17         Q.    Okay.  So your father became the nurse, the

18   bandage-changer person?

19         A.    Yes.

20         Q.    Okay.  And this was in August of '98?

21         A.    Yes.

22         Q.    Okay.  He was released from ICU, was he

23   released to the home?

24         A.    After ICU they put him in a regular room.

25         Q.    Okay.

1      A.     So he was in there for a while.

2      Q.     Okay.

3      A.     And then he was released from the hospital to

4  go home.

5      Q.     Okay.  Approximately how many days after the

6  surgery did he come back home?

7      A.     I'm not sure.

8      Q.     Okay.  And where were you living at the time?

9      A.     San Riva.

10     Q.     Would your father then come over there and deal

11  with the dressings and change the bandages?

12     A.     Yes, he did.

13     Q.     Okay.  And how long was the recuperative

14  period for Joe as a result of this fourth surgery?

15     A.     Well, when we came home he had a feeding tube

16  also and so it took a couple of months at least to get

17  better.

18     Q.     All right.  Did he have any kind of physical

19  therapy to deal with the shoulder issues, recuperation

20  process?

21     A.     No, he didn't.  No.

22     Q.     Okay.  How long thereafter did Joe resume a

23  somewhat normal life?

24     A.     Well, about two and a half weeks after that is

25  when I went into labor with Ashley and he drove us up to the

1   hospital and so he could drive, but he can't work because he

2   had to keep this stuff clean.  And plus his arm, you know, it

3   was -- it was terrible.  But for about I would say three

4   months he was pretty much back to normal and at home he would

5   practice lifting his arm and it really -- he could still even

6   do a windshield after and that was a relief to him.

7        Q.   Okay.  Is it within this period of time that

8   the dog episode, the postpartum sex?

9        A.   No.  That was after Nicolas.

10        Q.   Okay.  After Nicolas?  Okay.  During the period

11   of his recuperative processes, did you have any physical

12   fights with him, arguments with him?

13        A.   No.  This was so devastating to us that, I

14   mean, it was -- it felt like every day was his last week.

15        MR. MARTINEZ:  I'm going to object as nonresponsive.

16        THE WITNESS:  I'm sorry.

17        THE COURT:  I'm going to sustain the objection.

18   BY MR. PATTERSON:

19        Q.   Did you fight at the time?

20        A.   No, I did not.

21        Q.   All right.  As a result of the fourth surgery

22   you're now aware that there is cancer in Joe, right?

23        A.   Yes.

24        Q.   And it has metastasized to the lung area?

25        A.   Yes.

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000004934

1        Q.    Okay.  Are you made aware of any other

2   metastises at that time?

3        A.    No.  We were just explained to that the nature

4   of the cancer was that it had metastisized to his brain and

5   to other vital organs in his body.

6        Q.    Okay.  Did Dr. Green give you any kind of

7   insight into the -- the prognosis for cure, those kinds of

8   things?

9        A.    Yes.  He told us that -- well, he recommended

10  radiation and chemotherapy for Joe and we really questioned

11  the chemotherapy a lot and so he went into great detail with

12  us and did some studies and everything.  They found out that

13  there was only a 30 percent chance that the chemotherapy

14  would even affect the tumors in the lungs.

15       Q.    Okay.

16       A.    However, it would affect this area along here,

17  the neck area.

18       Q.    Okay.

19       A.    So he recommended that Joe start radiation

20  treatments for the neck area and then chemotherapy to just

21  try and see if it would help in the lungs.

22       Q.    Okay.  What decisions were made with regard to

23  the radiation treatment?

24       A.    We went and talked to the person who would do

25  the radiation, and I don't recall his name, but he was at the

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000004935

1     Mayo clinic.  And there was just some terrible side effects

2     to the radiation.

3           Q.     For instance?

4           A.     It would burn your skin, you could lose all

5     your teeth, it would burn up your salivary glands, so you

6     would always have to carry water with you.  You no longer are

7     able to salivate.

8                 And that was -- that was bad enough.  And he

9     recommended that he get fitted -- have his teeth fitted so he

10    could get dentures afterwards.

11          Q.     Okay.  How about the side effects of the

12    chemotherapy?

13          A.     Gen -- just the general ones.  You get sick,

14    lose your hair, things like that.  But the main one that we

15    focused on was that it was only a 30 percent chance that it

16    would affect the tumors in the lungs.  And we also asked him

17    about lung replacement or surgery on the lungs, and they said

18    he couldn't do that because it was just the top of it and

19    they also wouldn't let him have a lung replacement because

20    since the original place was somewhere besides the lungs, if

21    you put a new set of lungs in there, it would just effect the

22    new lung.

23          Q.     Okay.  So what was your attitude, if you will,

24    as you walked out of this conversation with Dr. Green

25    concerning the prognosis for recovery for your husband?

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000004936

1        A.    There wasn't.

2        Q.    Okay.  Was Joe aware of that too?

3        A.    Yes.

4        Q.    Okay.  All right.  So was radiation treatment

5    done for Joe?

6        A.    No.

7        Q.    Why not?

8        A.    He didn't want all the side effects of it.

9        Q.    Okay.

10        A.    And if it wouldn't be taken care of in his

11    lungs, then why go through all that?

12        Q.    Initially was the decision made with regard to

13    the chemotherapy treatments?

14        A.    Joe decided he didn't want to do either one of

15    them.

16        Q.    Okay.  And this is at what point in time after

17    the major 4th surgery?

18        A.    Very soon after.  I mean, because they wanted

19    to start as soon as the wound healed up.  They wanted to hit

20    it --

21        Q.    Okay.

22        A.    -- since it had grown so much.

23        Q.    Okay.  Were other treatment modes or treatment

24    processes investigated by you and Joe?

25        A.    Yes.

1        Q.      What did you investigate?

2        A.      Once he decided not to do the conventional

3    treatment, we did some research into holistic therapies.

4        Q.      Okay.  And what did you find out?

5        A.      Well, there was an abundance of them on it

6    there and a lot of them claim to either slow down the growth

7    of cancer or cure it, and there was one program in particular

8    that we actually believed and decided to do.

9        Q.      Okay.  Which program is this?

10       A.      This was a program where he would go up to

11   Colorado for 10 days and go through a detox.  And what that

12   is they clean out your whole system of anything that's

13   toxic.  Basically he went on a juice fast and had enemas

14   three times a day, coffee enemas because coffee is really

15   good to pull out all the toxins out of your body.  And by the

16   time he came back, he was feeling -- really had a lot more

17   energy.  He was feeling good and --

18       Q.      When did he depart to Colorado?

19       A.      I believe it was October or November.

20       Q.      Of '98?

21       A.      Maybe -- yeah.  Some -- maybe, yeah, around

22   that time.

23       Q.      Okay.

24       A.      I can't tell you a specific date.

25       Q.      All right.  And how was that funded?

1    A.    The -- I believe it was Janna's idea to do a

2  fundraiser in town, and so everybody got involved with that

3  and they held a dinner and dance for Joe at the Elks club and

4  raised money to be spent for his healthcare.

5    Q.    Okay.  Came back, he was feeling better?

6    A.    Yes, much better.

7    Q.    Okay.  Did it improve his spirits, his --

8    A.    Sure did.

9    Q.    Okay.

10    A.    Sure did.

11    Q.    Where are you guys now living at that point?

12    A.    We're still at Courtyard.

13    Q.    Okay.  And you're employed at Courtyard --

14    A.    Courtyard.

15    Q.    -- as the resident manager?

16    A.    Yes.

17    Q.    Okay.  Why other -- well, did there come a time

18  after his return from Colorado that it appeared that the

19  holistic intervention had not maybe done what it was expected

20  to do?

21    A.    When he returned home from that, it was a

22  program that you follow in order to maintain this and for the

23  cancer to go away.  And so for the next several months, we --

24  we followed this program.  And -- and what it is is 80

25  percent raw fruits and vegetables and 20 percent grains and

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000004939

1    absolutely no meat.   And -- and so I bought lots of cookbooks

2    and things and we went to Trader Joes and places like that

3    and bought organic foods.

4              And for the next several months, that's the

5    program that we followed.   And we bought this commercial

6    juicer machine that made this juice that he needed to drink.

7    And we were pretty excited about it because we thought that

8    we had found the way to stop his cancer, at least stop it

9    from growing.

10        Q.    Okay?

11        A.    And so that continued on for a while.   Then

12   Joe's front teeth started hurting.

13        Q.    Okay.   And what did you do or he do in response

14   to the pain in the teeth?

15        A.    Well, he let it go for quite a while.   He

16   thought maybe he had bumped his mouth or done something like

17   that or he wasn't sure what was going on.

18              So we had a family dentist, Dr. Yang, that we

19   had always gone to and so I made an appointment for him to go

20   to the dentist.   And he went to the dentist and they did

21   x-rays on him and he had a tumor pushing down on his front

22   teeth and that's what was causing him pain.

23        Q.    Okay.   And what month are we talking about now?

24        A.    It was the summertime of '99.

25        Q.    Okay.   What was Joe's reaction to this new

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    found tumor?

2            A.    One of disbelief because we really thought that

3    what we were doing was working.  And we had also started

4    attending church more regularly.  And a lot of our church

5    members would come over and encourage Joe and talk to him,

6    and so one of them suggested that he come to a healing

7    service at the church.

8            Q.    Okay.  And this is the Harvest Christian?

9            A.    Harvest Family Church.

10           Q.    Harvest Family?  Okay.

11           A.    There were some guest speakers there and they

12   are known for believing in healing, and so does our church,

13   laying on hands and praying for you and you're healed of

14   whatever it is that's bothering you.

15           Q.    Okay.  Did you decide to try some of this?

16           A.    We did.  Both of us did.  We were excited about

17   it.  So we went and these ladies the name of the group was

18   Shikana Glory (phonetic) and they had called Joe.  Joe had

19   told him that he had this going on and they called him up

20   front and laid hands on him and prayed and it was -- it

21   seemed like a miraculous thing for us.  And we went home and,

22   you know, we just continued to believe that God would take

23   care of this.  And -- and within a week Joe no longer had any

24   pain in his mouth or anywhere and it was gone.  It was

25           Q.    What was his reaction to --

1        A.    We were ecstatic.  We were like thank you,

2  Lord.  You know, thank God for your healing and taking care

3  of us.

4        Q.    Okay.  Did it thereafter develop that maybe

5  that was a false hope?

6        A.    Yes.

7        Q.    Okay.  What were the circumstances of that?

8  Did you discover a new tumor or new disease or new pain?

9        A.    New pain.

10       A.    This would have been towards the end of '99.

11  I'm not real sure of the date.  And Joe had gone back to the

12  doctor because he was having some problems.  And I scheduled

13  a CAT scan for him.

14       Q.    Which doctor is this?

15       A.    I don't even recall which doctor now this is.

16       Q.    Is it with Mayo still or --

17       A.    No.  It's no longer the Mayo.  It was --

18       Q.    Okay.

19       A.    -- whoever my insurance covered and.

20       Q.    And what was discovered.

21       A.    They sent him in for a CAT scan and we really

22  thought that all the tumors in his lungs would be gone

23  because of what had happened with his mouth and they were

24  still there.  In fact there was more.

25       Q.    Was Joe disappointed with the failure of the

1    faith healing in your church?

2         A.    To a degree.  He quit going to church.   And

3    then --

4         Q.    What did he say to you about that?

5         A.    He cursed at me about me and my F-ing God and

6    why would I lie to him that it could heal him and put him

7    through all this false hope and thinking that things would be

8    better.

9         Q.    What was done after the discovery, the results

10    of the CAT scan came through?

11         A.    Um -- excuse me.  I believe it was about four

12    months later he had to have another CAT scan done, so they

13    could measure how fast it was growing or something.  And,

14    um -- um, we were told that it had doubled in size in four

15    months so it was actually growing rapidly now.

16         Q.    Okay.  Had you been referred to a new doctor at

17    this point?

18         A.    Yes.  And I don't recall his name.

19         Q.    Is this the doctor that came and --

20         A.    Patel, I think it was Patel P-a-t-e-l.

21         Q.    Okay.

22         A.    And then referred us to Dr. Kellogg.

23         Q.    Okay.  And Dr. Kellogg was the gentleman who

24    came and testified?

25         A.    Yes.

1          Q.     During the course of this trial, before we get

2    to Dr. Kellogg, had -- from the point in time that Joe

3    returns from the Colorado holistic intervention to the

4    meeting with Dr. Kellogg, had Joe returned to normal

5    activities?

6          A.     Most definitely.

7          Q.     What did he do in that regard?

8          A.     I worked.

9          Q.     For instance, did he go up to the lake?

10         A.     Oh, yes.

11         Q.     Okay.

12         A.     Yes.

13         Q.     Would he run his boat?

14         A.     Yes, he would.

15         Q.     How exactly could he do that from the return of

16   Colorado to his meeting with Dr. Kellogg?

17         A.     Just like I also had.  If he couldn't be there

18   every weekend, he would be there as soon as he could get

19   there.  But if -- that was his pleasure in life.  And since

20   all this was going on with him, it was just to let him go up

21   there and -- and enjoy what he had left of life.

22         Q.     Okay.  Let's talk about your meeting with Dr.

23   Kellogg, the initial meeting.  What was discussed?

24         A.     Well, we went there to discuss chemotherapy.

25         Q.     Okay.

1       A.      We wanted to know more about it, what drugs

2  would be used, what would really happen to him, what he

3  thought, because we only had the Mayo doctor's opinion as to

4  how the chemo would affect him.  We wanted to know his

5  experience with adenoid cystic carcinoma.  We just had loads

6  of questions for him.

7       Q.      Okay.  And it was you and Joe at that meeting?

8       A.      Yes, it was.

9       Q.      Any other in-laws or parents?

10      A.      Not at this one, no.

11      Q.      Okay.  And so he derived a host of chemotherapy

12  at that time?

13      A.      That's right.  He gave us paperwork on it, let

14  us read up about it, and really get to know what was going to

15  happen.

16      Q.      Okay.  Were any decisions made in the office or

17  did you have a time to discuss it between and you Joe?

18      A.      No.  Actually, we went home and read over

19  everything that we -- well, I read to him.  I read all the

20  warnings, all the side effects, everything that was going to

21  happen, and we really talked about it because this -- this

22  was a big step, a serious step, and he hadn't wanted to do it

23  before, and now this seemed to be like a last ditch effort as

24  far as we had tried everything else.

25      Q.      Okay.

1          A.     There was nothing left to try.

2          Q.     Had Dr. Kellogg given you any kind of prognosis

3    for recovery as a result of the chemotherapy?

4          A.     He said at best he could try to stop the growth

5    of it.  He really didn't feel like it would shrink it.  He

6    said that the dosage of chemo for the kind -- he called it a

7    "cocktail" of chemo that he wanted to give Joe could only be

8    administered nine times in a lifetime, and that he would want

9    to do CAT scans after, you know, two or three, and measure it

10   and see.  And he said if -- if that doesn't work, then we

11   could try other chemicals.

12         Q.     Okay.  How long did it take for you and Joe to

13   come to the decision as to whether chemotherapy was

14   appropriate?

15         A.     Not too long.  It was only a week or two

16   because I remember sitting in bed just --

17         MR. MARTINEZ:  Objection.  Nonresponsive.

18         THE COURT:  I'll sustain the objection.  Go ahead and

19   ask your next question.

20   BY MR. PATTERSON:

21         Q.     Tell me about your conversations with him on

22   this topic?

23         A.     We talked about everything we had done in the

24   past and how it hadn't worked and, you know, maybe this could

25   work and, you know, maybe we were being silly before by not

1    trying conventional methods, and maybe -- that this would --

2    you know, we -- we just didn't know, and it seemed like maybe

3    the chemo was the answer and we'd give it -- give it a try.

4         Q.    Okay.  So you went back to Dr. Kellogg with

5    that, with a decision?

6         A.    You know, I don't think we actually made

7    another office visit.  I believe we just called and said go

8    ahead and schedule the chemotherapy.

9         Q.    Okay.

10        MR. PATTERSON:  Judge, you want to stop now or keep

11   going?

12        THE COURT:  We'll go ahead and take our evening

13   recess at this point in time.

14             Ladies and gentlemen, we'll go ahead and take

15   our evening recess at this point in time.  During this recess

16   remember the entire admonition I've given you including the

17   fact you're not to discuss this case with anyone, do not let

18   anyone discuss the case with you.  Do not do any research,

19   investigation, experimentation or testing on your own.  Avoid

20   any media coverage of this case.  Keep an open mind.

21             I want you to have a nice evening.  We'll see

22   everyone tomorrow at 1:00 p.m.  We'll be in recess until that

23   time.  Have a good evening.

24

25             (Evening recess.)


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000004947

134

```
 1
 2
 3                      CERTIFICATE OF REPORTER
 4
 5    STATE OF ARIZONA     )
                           )
 6    COUNTY OF MARICOPA   )
 7
 8              I, Traci L. Wheeler, CSR, RPR, an official
 9    and certified reporter in the Superior Court of the State
10    of Arizona, in and for the County of Maricopa, hereby
11    certify that I made a shorthand record of the proceedings
12    had in the within case, and that the foregoing transcript
13    is a full, true, and correct transcription of the
14    proceedings in this case.
15              Dated this 5th day of June, 2005.
16
17
18
19              Traci L. Wheeler, CSR, RPR
                Certified Court Reporter No. 50313
20              Official Court Reporter
21
22
23
24
25
```

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

EXHIBIT X

000004949

DP

05-0002
Braccio

1      IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

2          IN AND FOR THE COUNTY OF MARICOPA

3

4   STATE OF ARIZONA,              )
                                   )
5          Plaintiff,             )
                                   )
6   v.                             )      No. 1 CR 05-0005 AP
                                   )      MARICOPA COUNTY
7   WENDI ELIZABETH ANDRIANO,      )      No. CR 2000-096032
                                   )
8          Defendant.             )
    _____)

9

10

11

12                         Mesa, Arizona
                        November 1, 2004
13

14

15

            BEFORE:   The Honorable BRIAN K. ISHIKAWA
16

17

18          REPORTER'S TRANSCRIPT OF PROCEEDINGS

19                     TRIAL DAY 35

20

21

22

23

24   ORIGINAL Prepared for APPEAL by:
     TRACI L. WHEELER, CSR, RPR
25   Certified Court Reporter No. 50313

        TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

2

```
 1                    A P P E A R A N C E S

 2    FOR THE STATE:        JUAN M. MARTINEZ,
                            Deputy County Attorney
 3
      FOR THE DEFENDANT:    DANIEL B. PATTERSON,
 4                          Deputy Public Defender
                                    and
 5                          G. DAVID DELOZIER,
                            Attorney at Law
 6

 7         I N D E X   O F   E X A M I N A T I O N

 8    WITNESS                                          PAGE

 9    ANDRIANO, WENDI ELIZABETH, Called on her own behalf
              Continued Cross-examination by Mr. Martinez     3
10            Continued Cross-examination by Mr. Martinez   111

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1          MESA, ARIZONA, MONDAY, NOVEMBER 1, 2004

2

3          THE COURT:  Good afternoon.  This is trial in cause

4    number CR 2000-096032, State of Arizona versus Wendi

5    Elizabeth Andriano.  The record will reflect the presence of

6    the Defendant, Counsel and the jury.  The defendant, Wendi

7    Elizabeth Andriano, is on the witness stand, and we'll

8    continue with the cross-examination by Mr. Martinez.

9               Mr. Martinez?

10

11          WENDI ELIZABETH ANDRIANO,

12          CALLED TO TESTIFY ON HER OWN BEHALF,

13    HAVING PREVIOUSLY BEEN DULY SWORN, TESTIFIES FURTHER:

14

15   CONTINUED CROSS-EXAMINATION BY MR. MARTINEZ:

16          Q.    Ma'am, you're the same individual who was

17   testifying here on Thursday, right?

18          A.    Yes, sir.

19          Q.    You're Wendi Andriano, Anne Newman, or Mrs.

20   Montgomery who testified previously last Thursday, right?

21          A.    I am Wendi Andriano.

22          Q.    Now, one of the things that you told us when

23   you were testifying on direct examination was that there was

24   this lamp that you and Mr. Andriano purchased on October 7 of

25   the year 2000, correct?


          TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

4

1           A.     On Saturday, yes.

2           Q.     And the person that was with you was Joseph's

3    mother, Mrs. Andriano, correct?

4           A.     Yes.

5           Q.     There are two kids, right?

6           A.     Yes.

7           Q.     And then you purchased this lamp and you then

8    took it back home, right?

9           A.     Yes.

10          Q.     And at some time during that afternoon, Mr.

11   Andriano started or you heard noises like he was putting it

12   together somewhere in the house, right?

13          A.     I heard noise that he was upset because it

14   wasn't all there.  It was broken.

15          Q.     And you heard that back again on that Saturday

16   which was October 7 of the year 2000, right?

17          A.     Yes.

18          Q.     And one of the things we know from looking at

19   the photographs is that there's a lamp shade that goes on the

20   bed.  You've seen those photographs, haven't you?

21          A.     Yes, sir.

22          Q.     Well, then let me show you those photographs so

23   we know exactly what we're talking about, okay?  This is

24   Exhibit Number 135.  Can you see that from where you are?

25          A.     Yes, sir.


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

5

1      Q.   And that's the lamp shade that went on this

2  lamp that the two of you purchased that Saturday, right?

3      A.   I believe so, yes.

4      Q.   And Exhibit 134 is just another perspective of

5  the same lamp shade, right?

6      A.   Yes, sir.

7      Q.   And if we take a look at Exhibit Number 132,

8  that's the box that lamp came in, right?

9      A.   I believe so.

10     Q.   Okay.  And Exhibit Number 133, just a closer

11  look at that box that that lamp came in, right?

12     A.   I believe so.  I didn't see it with my own

13  eyes.

14     Q.   Well, you were there at the Sam's Club, weren't

15  you?

16     A.   Yes, sir.

17     Q.   And you testified last week about it, didn't

18  you?

19     A.   Yes, sir.

20     Q.   And you were in that house on that Saturday,

21  weren't you?

22     A.   I was.

23     Q.   And you heard him complaining about the lamp,

24  didn't you?

25     A.   Yes, sir.

1    Q.    There wasn't anybody else that went into that
2  house with another lamp box that you're aware of, is there?
3    A.    No, sir.
4    Q.    So that is the box to that lamp, isn't it?
5    A.    I believe so.
6    Q.    Now, if you purchased this lamp as you tell us
7  on that Saturday, then it would be impossible if we take a
8  look at Exhibit 440 for that photograph to be taken in early
9  September, wouldn't you agree?
10    A.    No, sir.
11    Q.    Why would you disagree?
12    A.    Because we had purchased a lamp before, so I
13  don't understand what you're trying to say.
14    Q.    So you purchased another lamp before and so
15  what you're telling me is that this box goes to the other
16  lamp that was on the other side, right?
17    A.    I don't know.
18    Q.    Well, you're saying that you purchased another
19  lamp.  This could be the other box to the other lamp is what
20  you're telling me, right?
21    A.    I actually don't know.  I wasn't the one who
22  made the photographs, so I couldn't tell you.
23    Q.    Well, no, you were here when we had testimony
24  that this was taken in the first part of September, weren't
25  you?

1          A.      Yes, I was here.

2          Q.      Nobody else -- your parents were on vacation,

3   weren't they, in September?

4          A.      In September, yes.

5          Q.      They returned back that Saturday, didn't they?

6          A.      Yes.

7          Q.      So the point is are you telling me that this

8   could be the box to the other lamp?  Is that what you're

9   telling me?

10         A.      I don't know.

11         MR. PATTERSON:  Judge, that's asking her to

12   speculate.  She said she doesn't know what box that is.

13         THE COURT:  Sustained.

14   BY MR. MARTINEZ:

15         Q.      Actually, ma'am, you purchased the other lamp

16   on Friday October 6, 2000, didn't you?

17         A.      I did not, no.

18         Q.      Let me show you some receipts that have already

19   been admitted into evidence to show you whether or not you

20   were right or wrong about that.

21              (Pause in proceedings.)

22         MR. MARTINEZ:  Judge, these exhibits are a part of

23   220, which is in evidence, along with the contents of that.

24   Just for the sake of clarification, I'm going to go ahead and

25   move them into evidence.  They're 220.001 and 220.002.

8

1          MR. PATTERSON:  Judge, could we just make a record?

2          THE COURT:  Yes.

3

4          (The following proceedings were held at the

5     bench:)

6

7          MR. PATTERSON:  These two receipts were found in Mr.

8     Andriano's --

9          THE COURT:  Wallet?

10         MR. PATTERSON:  -- wallet.  I don't know the history

11    of these particular receipts, okay?  These are not some

12    receipts that my client had in her possession, okay?  So I

13    don't believe that there's sufficient foundation to have

14    these admitted at this time.

15         THE COURT:  Let me make sure I understood Mr.

16    Martinez.  Exhibit 220 was admitted into evidence back on

17    September 20th.  Those are items already --

18         MR. MARTINEZ:  Right.

19         THE COURT:  -- in the wallet.  It was admitted, right?

20         MR. MARTINEZ:  Right.

21         THE COURT:  I think you looked through it, right?

22         MR. PATTERSON:  Right.  Well, at this point I'm

23    objecting to bringing this in.  I'm asking they be withdrawn

24    as an exhibit, that the balance of the other contents be

25    admitted, but not these two items because it does create an

1    issue.

2            THE COURT:  Mr. Martinez, go ahead, make your

3    record.

4            MR. MARTINEZ:  I will just say I heard Mr. -- the two

5    lawyers talking about it, and I overheard Mr. DeLozier when

6    this wallet came in say to Mr. Patterson "There's the

7    receipt," and so for them to say that, claim surprise, is not

8    fair.

9            Additionally, when that wallet that Exhibit 228

10   came in, they sat down they looked through each and every

11   document.  They had an opportunity to object.  Now, when it

12   looks like their client is lying and we're presenting it,

13   they have an objection to it.  All of those were found in his

14   wallet.  I don't need to add any other foundation other than

15   that they were in his wallet.

16           THE COURT:  Mr. Patterson?

17           MR. PATTERSON:  The client is not lying.  She

18   doesn't -- she doesn't know when this other lamp was

19   purchased.

20           THE COURT:  Okay.  You've made your record this has

21   already been admitted into evidence, so just as a formality,

22   I'll go ahead and reestablish the fact that 220.001 and

23   220.002 have been previously admitted into evidence.

24

25           (The following proceedings were held in open

1    court:)

2

3           THE COURT:  Okay.  Exhibit 220.001 and 220.002 have

4    previously been admitted into evidence as part of 220.

5           MR. MARTINEZ:  All right.

6    BY MR. MARTINEZ:

7           Q.    Ma'am, let's go ahead and take a look at these

8    exhibits first.  I'm going to show you 220.001, and if we

9    look at the very bottom of it, from where you sit -- can you

10   see the date there?

11          A.    Yes.

12          Q.    It's October 7 of the year 2000 at 1:18:03

13   p.m., correct?

14          A.    Yes, it is.

15          Q.    It is from Sam's Club, right?

16          A.    Yes.

17          Q.    You did indicate to us on direct examination

18   that you did go to Sam's Club, right?

19          A.    Yes.

20          Q.    And in fact at the very top it shows a start

21   time of the time that you went to the register, and that's

22   October 7 of the year 2000 at 1:17 p.m. right?

23          A.    Yes, sir.

24          Q.    And then right there in the middle we have a

25   lamp, Stock Number 3456000, right?

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1          A.    600.

2          Q.    600, I'm sorry.  Correct?

3          A.    Yes.

4          Q.    And the price is $24.91, correct?

5          A.    Yes.

6          Q.    You do not see any other lamp on this receipt,

7     do you?

8          A.    I do not.

9          Q.    And you did tell us previously that you did

10    purchase a lamp that afternoon that Saturday, right?

11         A.    Yes.

12         Q.    Well, then let's take a look at another item.

13    It's Exhibit Number 220.002, and the date on that is October

14    6 of the year 2000 at 10:46:39 a.m. right?

15         A.    Yes.

16         Q.    And then if we look at the top, it says you got

17    to the cash register on October 6 at 10:44 in the morning,

18    right?

19         A.    Yes.

20         Q.    And then if we look down, we see another lamp

21    don't we?

22         MR. PATTERSON:  Judge, objection to form of the

23    question.  He keeps saying she went to the register.

24         THE WITNESS:  Yeah, I

25         THE COURT:  I'll sustain the objection.  Rephrase

1     your question, please.

2     BY MR. MARTINEZ:

3          Q.     We do see a 345600, don't we?

4          A.     Yes, we do.

5          Q.     That is the same stock number in Exhibit

6     220.001, right?

7          A.     Yes, it is.

8          Q.     And then with regard to this 220.001, which is

9     October 7, that's the time that you did go to Sam's Club,

10    right?

11         A.     No, I don't recall going to Sam's Club that

12    day.

13         Q.     You don't remember telling us that on Saturday

14    you went to Sam's Club?

15         A.     Oh, Saturday, yes.

16         Q.     That's October 7, ma'am.

17         A.     Excuse me, sorry.

18         Q.     So on October 7 you remember that you told us

19    you go to Sam's Club?

20         A.     Yes.

21         Q.     And on that day you told us you bought Koolaid,

22    something like --

23         A.     I wasn't sure.  I know we purchased other

24    items, yes.

25         Q.     That was in anticipation of going over to the

1    Andriano's in Casa Grande, right?

2          A.    Yes.

3          Q.    And you could see that the day before another

4    lamp with the same stock number and same price was purchased,

5    right?

6          A.    I can see that, yes.

7          Q.    And there was one other lamp in your house,

8    wasn't there, that was to -- if you look at it, to the left

9    of the bed if you stand at the foot of the bed, right?

10         A.    Yes.  I had a lamp on my side of the bed.

11         Q.    So now that we know that there are two lamps

12   out there, we know that there was one at least ostensibly on

13   a receipt for October 6.  We know that, right?

14         A.    Yes.

15         Q.    Which is Friday, right?

16         A.    Yes.

17         Q.    We know there is another one on the receipt

18   that's there for Saturday, and you were there, right?

19         A.    Yes.

20         Q.    Knowing that and knowing there are only two

21   lamps, wouldn't you agree with me that this photograph, when

22   that box was purchased on October 7 or that lamp was

23   purchased on October 6, could not have been taken in early

24   part of September?

25               MR. PATTERSON:  Judge, objection to the form of the

1    question.  He's making another assumption in the question.

2    We know there's only two lamps.  There's no testimony as to

3    the number of lamps in this particular apartment.

4              THE COURT:  I'll overrule the objection.

5              THE WITNESS:  That's what I was going to say.  I

6    don't know if there was another lamp purchased or not.

7    BY MR. MARTINEZ:

8         Q.    Let me put it to you this way.  You did live in

9    apartment 132, didn't you?

10        A.    Of course.

11        Q.    You lived with Joseph Andriano, right?

12        A.    Yes, I did.

13        Q.    Two children, right?

14        A.    Yes.

15        Q.    Nicolas and Ashley, right?

16        A.    Yes.

17        Q.    They didn't go out and buy a lamp, Nicolas and

18   Ashley, did they?

19        A.    They're not able to, no.

20        Q.    Right.  So the answer is no, right?  They did

21   not buy another lamp, right?

22        A.    No.

23        Q.    Your parents were out on vacation during the

24   latter part of September, early part of October, right?

25        A.    Yes.


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1  Q.   So they wouldn't have purchased the lamp and

2  brought it over then, right, because they could not have

3  during that time, right?

4  A.   Not during the time they were on vacation, no.

5  Q.   And with the -- that only leaves you and Mr.

6  Andriano, right?

7  A.   Yes.

8  Q.   You go out and purchase another lamp, did you?

9  A.   No, I did not.

10  Q.   And so that only leaves Mr. Andriano, right?

11  A.   Yes.

12  Q.   And that only leaves his wallet, which is

13  Exhibit 220, doesn't it?

14  A.   No, not necessarily.

15  Q.   Okay.  So we know that there are four people

16  that are living in apartment 132, don't we?

17  A.   Yes.

18  Q.   We know that you have the run of the house,

19  don't you?

20  A.   No.

21  Q.   You're not allowed to go into the master

22  bathroom?

23  A.   Yes, I am.

24  Q.   You are also allowed to go into the other

25  bathroom that's in that house, right?

```
 1          A.    Yes.

 2          Q.    You're also allowed to go into Ashley's room,

 3  right?

 4          A.    Yes.

 5          Q.    You're allowed to go into every single part of

 6  that apartment, aren't you?

 7          A.    Yes.

 8          Q.    And on October 7 of the year 2000 you were

 9  allowed to go into any part of that apartment, right?

10          A.    Sure.

11          Q.    There wasn't -- Mr. Andriano wouldn't tell you

12  "Don't go into the kitchen," would he?

13          A.    No.

14          Q.    Mr. Andriano wouldn't say don't go, for

15  example, in the bedroom, would he?

16          MR. PATTERSON:  Your Honor, objection to the form of

17  the question as to what Mr. Andriano would tell my client.

18          THE COURT:  Overruled.  Go ahead, answer question if

19  you can.

20          THE WITNESS:  No.

21  BY MR. MARTINEZ:

22          Q.    It was unrestricted, right?

23          A.    Yes.

24          Q.    And it wasn't such a big place that it was

25  something that would take days to go through, right?
```

1       A.      No.

2       Q.      So it -- if a person wanted to walk through

3   there, it would take what 5, 10 minutes at the most?

4       A.      Sure.

5       Q.      It would even take less than that, right?

6       A.      I've never timed it.  I don't know.

7       Q.      So you never saw any other lamps other than

8   those two we're talking about, right?

9       A.      Actually, I only saw the one lamp.

10      Q.      And you saw the box then for the other lamp

11  then, right?

12      A.      On the picture, yes.

13      Q.      Just so that I understand, you saw one lamp to

14  the left, which is on the nightstand, right?

15      A.      Yes.

16      Q.      And then you saw the box, right?

17      A.      Yes.

18      Q.      You didn't see any other lamps, right?

19      A.      No.

20      Q.      Assuming that we only have what you saw, which

21  is the box and the lamp, then it would be impossible for this

22  picture in Exhibit 440 to be taken since those two lamps were

23  purchased on October 6 and October 7, right?

24      A.      That's an assumption I can't make.

25      Q.      So you're unwilling to -- what you're telling

1    me is that even though you don't know of any other lamp, you

2    can't -- well, let me put it this way.  You do have keys to

3    your apartment, right?

4         A.    Yes, I do.

5         Q.    Although you tell me you keep the side door

6    open all the time, you could climb in and out over that face?

7         A.    Yes.

8         Q.    Nobody climbs in or out of there.  Have you

9    ever found a burglar in there?

10        A.    No.

11        Q.    Are you telling me somebody somehow brought in

12   another lamp?

13        A.    I don't know.

14        Q.    So you think that a burglar brought it in?

15        A.    I did not say that.

16        Q.    You looked through the house, didn't you?

17        A.    When?

18        Q.    Whenever you went in, didn't you?

19        A.    Sure.

20        Q.    Didn't see any other lamps, right?

21        A.    The lamp beside my bed.

22        Q.    And then the other box, right?

23        A.    Yes.

24        Q.    You were you there when this photograph was

25   taken in the early part of September, Exhibit 440?

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1       A.    No, I wasn't.

2       Q.    How did you know that this is even -- I guess

3   the point is this.  Your father has the run of your house?

4       A.    He has keys to my house, yes.

5       Q.    So he would just come over on a whim and come

6   over and take pictures of stuff in your house then, right?

7       A.    Not -- I don't know.  I couldn't answer that.

8       Q.    How many times -- other times has he done that

9   that you know of that he's come over and taken pictures of

10  things in your house?  How many times has that happened?

11      MR. PATTERSON:  Judge, object to the form of the

12  question.  The testimony was he was invited in to take

13  photographs --

14      THE COURT:  Sustained.

15      MR. PATTERSON:  -- to help prepare --

16      THE COURT:  Sustained.  Ask your next question.

17  BY MR. MARTINEZ:

18      Q.    Did you invite him over to take that

19  photograph?

20      A.    I did not, no.

21      Q.    Isn't it true, ma'am, that what actually

22  happened with regard to that photograph is that that was

23  taken on October 8th after you had killed your husband when

24  you and your father were trying to create a defense for you?

25  Isn't that when it was taken?

1        A.    First of all, I did not kill my husband.   And

2   second of all, October 8 I was not in the house so I wouldn't

3   know what was done or not done.

4        Q.    You weren't in the house on October 8 at 2:30

5   in the morning, ma'am?

6        A.    I was thinking during the day.   I was at the

7   police department.

8        Q.    Ma'am, at 2:30 in the morning of October 8,

9   Saturday, you were in that house, weren't you?

10       A.    Yes, I was.

11       Q.    And the police weren't called the second time

12  until 3:41 in the morning, were they?

13       A.    I believe that's what the record shows.

14       Q.    And during that whole time, there was nobody

15  else in there except you and Mr. Andriano, according to you,

16  right?

17       A.    That's correct.

18       Q.    Isn't it true that this photograph here was

19  taken on October 8th, which is Sunday morning between 2:45

20  and 3:40 in the morning?

21       A.    That is absolutely not true.

22       Q.    Okay.   And these hits that you have here, you

23  previously indicated to Sharon Murphy that these occurred

24  after you failed to provide Mr. Andriano with a cheese crisp.

25  Do you remember telling us that?

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1      A.    Yes.

2      Q.    They weren't there or weren't put there on the

3  night involving the birthday limo, were they?

4      A.    No, they were not.

5      Q.    Okay.  Ma'am, one of the other things you told

6  us that week was that, well, I think it was Tuesday of last

7  week you told us you weighed 103 pounds back in the Summer of

8  the year 2000.  Do you remember telling us that?

9      A.    I said in October I weighed, when I got booked

10  in, they weighed me at 103.

11      Q.    Okay. And you also indicated that you weighed,

12  on Thursday, you told us you weighed 100 pounds, right?

13      A.    No.

14      Q.    You don't?

15      A.    I weigh close to 120.

16      Q.    I don't remember -- you don't remember telling

17  us Thursday when you were asked about your weight in the

18  Summer of the year 2000 that you weighed 100 pounds.  Do you

19  remember telling us that?

20      A.    Yes.

21      Q.    So it's either 100 pounds or 103 pounds, right?

22      A.    Around that.

23      Q.    When the police talked to you back then, you

24  told them you weighed 110 pounds, right?

25      A.    That's what I thought, yes.

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    Q.    Okay.  So regardless of what you weigh, let's

2    go ahead and take a picture of what you really looked like

3    back then, okay?  Let me show it to you.

4          While she's doing that, ma'am, one of the

5    things, just to get back to the thing about the lamp shade,

6    one of the things you told us, just so I could get the time

7    sequence of that, you left the Sam's Club and then you went

8    straight home, right, after making your purchases that

9    Saturday, right?

10    A.    I believe so, yes.

11    Q.    And then when you got there, that's when Mrs.

12    Andriano left, right?

13    A.    Yes.

14    Q.    And your mother may have dropped by for a short

15    while, right?

16    A.    Yes.

17    Q.    And then that's when this nap took place, right?

18    A.    Yes.

19    Q.    And that was about 3:00 in the afternoon,

20    wasn't it?

21    A.    I couldn't really say, but I know it was

22    afternoon.

23    Q.    Okay.  Was it 5:00?

24    A.    As I said, I can't really say.  I don't recall

25    the exact time we took the nap.

| | | |
|---|---|---|
| 1 | Q. | Could it have been dark when you took that nap? |
| 2 | A. | No. |
| 3 | Q. | It was light, right? |
| 4 | A. | Yes. |
| 5 | Q. | It was after you came back from Sam's Club, |

6 right?

| | | |
|---|---|---|
| 7 | A. | It was afternoon, yes. |
| 8 | Q. | You don't know if it was 5:00, you don't know |

9 if it was 3:00, and you don't know if it was 4:00, right?

| | | |
|---|---|---|
| 10 | A. | That's correct. |
| 11 | Q. | But you do know you ended up at the Andrianos |

12 about 7:00 at night, right?

| | | |
|---|---|---|
| 13 | A. | I believe so. |
| 14 | Q. | And the drive was around 30, 40 minutes? |
| 15 | A. | I said about 40 minutes, yes. |
| 16 | Q. | So when you got over to Andrianos, that means |

17 you left your house at about 6:20 in the evening, right?

| | | |
|---|---|---|
| 18 | A. | Correct. |
| 19 | Q. | How long did you nap for? |
| 20 | A. | I don't know. |
| 21 | Q. | How long did Mr. Andriano nap? |
| 22 | A. | I don't know.  I was in Nicolas's room. |
| 23 | Q. | So both of you could have napped two hours, |

24 three hours?

| | | |
|---|---|---|
| 25 | A. | Yes, we could have. |

1          Q.     So if you're napping two or three hours and you

2    get there at 3:00, that leaves you at about 6:00 in the

3    afternoon, doesn't it?

4          A.     According to your calculation, yes.

5          Q.     So when does Mr. Andriano have time to put this

6    lamp together?

7          A.     He did it when we first arrived home.

8          Q.     Oh, before you took the nap, right?

9          A.     Yes.

10         Q.     Where were you when he was putting the lamp

11   together?

12         A.     I was in Ashley's.

13         Q.     I thought you didn't see him?

14         A.     See him?

15         Q.     Putting the lamp together?

16         A.     No.  I never did.  I heard him.

17         Q.     You heard him somewhere else in the house,

18   correct?

19         A.     That's correct.

20         Q.     You don't know what he was putting together

21   because you didn't see him, right?

22         A.     I know what he was putting together from his

23   words.

24         Q.     Ma'am, you didn't see it?

25         A.     No, I did not see it.

1        Q.    And whatever he was doing, you heard something,

2   but you were in another room, right?

3        A.    That is correct.

4        Q.    And you don't know what he was messing with,

5   right?

6        A.    Yes, I do know.

7        Q.    That's based on words, but you didn't see it?

8        A.    That's correct.

9        Q.    Everybody tells the truth 100 percent of the

10  time, right?

11       MR. PATTERSON:  Judge, that's clearly argumentative.

12       THE COURT:  Sustained.

13  BY MR. MARTINEZ:

14       Q.    You believe everything you hear?

15       MR. PATTERSON:  Objection.  Same question differently

16  stated.

17       THE COURT:  Sustained.  Let's move on.

18  BY MR. MARTINEZ:

19       Q.    So with regard to that, you were with Ashley,

20  correct?

21       A.    That's correct.

22       Q.    And you don't know which room he was in,

23  whatever it was that he was doing, do you?

24       A.    I know from his words that he was trying to put

25  a lamp together.


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1          Q.     I'm not asking you what he was trying to do.

2     I'm asking you what room he was in.  Did you not understand

3     my question?

4          A.     Obviously not.

5          Q.     What room was he in?

6          A.     I don't know.

7          Q.     Could have been the bedroom, right?

8          A.     It could have been.

9          Q.     Because all of the indications are, if we take

10    a look at the exhibits here, that he did this -- if we take a

11    look at Exhibit 134, it shows a lamp shade.  Exhibit 135 also

12    shows a lamp shade.  That one's on the bed, right?

13         A.     Yes.

14         Q.     Was that yes?

15         A.     Yes.

16         Q.     And Exhibit 132 is the box and it's at the foot

17    of the bed, right?

18         A.     Yes.

19         Q.     All of the indications are that the action is

20    going on in the bedroom, right?

21         MR. PATTERSON:  Judge, that makes --

22         MR. MARTINEZ:  Is that correct?

23         THE COURT:  Hold on a second.

24         THE WITNESS:  I

25         THE COURT:  Sustained.

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000004975

1          THE WITNESS:  I don't know.

2     BY MR. MARTINEZ:

3          Q.    You don't know?  He wasn't doing it in the

4     bedroom, right?

5          MR. PATTERSON:  Objection.  Asked and answered.

6          THE COURT:  Sustained.  Move on.

7     BY MR. MARTINEZ:

8          Q.    Well, ma'am, you told us before you thought he

9     was in the living room, didn't you?

10         A.    Yes.

11         Q.    But he could have been working on it in the

12    bedroom, right?

13         A.    Yes.

14         Q.    That's an assumption you could make, right?

15         A.    You're the one that made the assumption.

16         Q.    You assumed he was working on it in the living

17    room, didn't you?

18         A.    Yes, because when I went to get Nicolas he was

19    in the living room.

20         Q.    Okay.  And then you saw him with the lamp then,

21    right?

22         A.    No, I did not see him with a lamb.

23         Q.    Well, wait a minute.  If you're going to where

24    he's working and you see him there and you've just heard him

25    say something to the effect of the lamp, don't you --


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    wouldn't you expect you would see him there with a lamp?

2         A.    No.  My attention was on Nicolas, getting him

3    to his bedroom.

4         Q.    So the lamp was so small that even though

5    you're in the same room with him, you couldn't see the lamp.

6    Is that you're saying?

7         MR. PATTERSON:  That's not what she's saying, Judge.

8         THE COURT:  Sustained.

9         MR. PATTERSON:  Her attention was diverted elsewhere.

10        THE COURT:  Sustained.  Ask your next question.

11   BY MR. MARTINEZ:

12        Q.    You saw Joseph, right --

13        A.    Yes.

14        Q.    -- in the living room?

15        A.    Yes.

16        Q.    You didn't see that he was doing anything?

17        A.    No.  I wasn't paying attention.

18        Q.    It wasn't dark or anything.  It was light

19   enough for you to see?

20        A.    Yes.  That's what I said.

21        Q.    So it was light, yes or no?

22        A.    Yes.

23        Q.    So then you start doing something with Nicolas,

24   right?

25        A.    Yes.

1          Q.    Now, ma'am, you did indicate that he said

2    something about taking it back, right?

3          A.    Yes.

4          Q.    But you did not see any little pieces of lamp

5    anywhere though, did you?

6          A.    I didn't notice anything, no.

7          Q.    Right, because you weren't -- you just told us

8    you weren't pay attention?

9          A.    That's right.

10          Q.    So you didn't see whether or not it was in

11    pieces, right?

12          A.    Did not see anything.

13          Q.    Right.  Where was he when you walked into the

14    living room?  And I'm asking about Mr. Andriano.   Where was

15    he?

16          A.    At what time?  When are you --

17          Q.    When you walked in with Nicolas and right

18    after, he said something about taking the lamp back?

19          A.    He was by his chair.

20          Q.    Which chair is that?  There's a sofa and

21    there's a chair.

22          A.    His La-Z-Boy chair.

23          Q.    Is that the one that's to the south?

24          A.    It's the green one.

25          Q.    They're both green.  Oh, you're talking about

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    the one that leans back?

2         A.    The La-Z-Boy, yes.

3         Q.    Okay.  Then that's when you guys go ahead, take

4    your nap, right?

5         A.    Yes.

6         Q.    And then you tell us that you came back from

7    Casa Grande and you came back, what, 11:00 in the evening?

8         A.    I think it was closer to midnight by the time I

9    got home.

10        Q.    Okay.  So let's go and say that you came home

11   around midnight, right, and you have your two kids with you,

12   right?

13        A.    Yes.

14        Q.    And then what happens is that you park your

15   Yukon, right?

16        A.    Yes.

17        Q.    And after you park your Yukon, the whole lot of

18   you, the four of you, go through the back and you sort of

19   place the kids over the fence, right?  That's how you do it,

20   right?

21        A.    That's not what I said about that particular

22   evening.

23        Q.    Well, haven't you told us that it is usually

24   your custom to put -- to go in and jump over that fence to

25   get into that apartment.  You told us that, right?

1      A.    I did.

2      Q.    And you've also told us before on direct

3  examination that you've done it with the kids, right?

4      A.    Yes.

5      Q.    And on this particular time, wouldn't it have

6  been just as easy to go ahead and sort of dump them over the

7  patio wall?

8      A.    I don't dump my kids over the patio wall, but

9  they were sound asleep and we walked in through the front

10 door this time.

11     Q.    So this time you didn't walk through the back,

12 right?

13     A.    No.  All the parking spots were taken.

14     Q.    What does that have to do with how you enter

15 the door, ma'am?

16     A.    Well, depending on where we park is how we walk

17 inside the apartment.

18     Q.    Every time you walked on that side, you walked

19 in.

20     MR. PATTERSON:  Judge, that's not what she said.

21     THE COURT:  Overruled.  Go ahead answer the question

22 if you can.

23     THE WITNESS:  Yes.  I would say that.

24 BY MR. MARTINEZ:

25     Q.    Okay.  Let's go ahead and take a look at what

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    that looks like then.  This is Exhibit 147.  Do you recognize

2    that?

3              A.    I sure do.

4              Q.    And right over here is that patio, right?

5              A.    Yes.

6              Q.    And that's the one that you customarily walk

7    over whenever you park your car over there on the side,

8    right?

9              A.    Yeah, right about where that white little car

10   is.

11             Q.    Right.  That's where -- and you would just walk

12   on over.  Would you agree with me there's some rocks there,

13   right?

14             A.    Yes.

15             Q.    And now if we take a look at Exhibit 148, that

16   shows us a photograph straight on of that particular area,

17   right?

18             A.    Yes.

19             Q.    So isn't it true that's about a 4 foot wall?

20             A.    I don't know.

21             Q.    Well, you -- if you customarily go over it,

22   wouldn't you be able to tell me --

23             A.    No.  I never measured it, but I know that it

24   was very easy to just -- I -- I could get over that very

25   easily.

1    Q.    And you could even do it with a dress, right?

2    A.    Yes, I could.

3    Q.    I mean, it didn't take very much of you hiking

4    the dress up just to get over --

5    A.    You didn't have to hike the dress up at all.

6    All you have to do is put your back to the wall, put your

7    hands up on there, pull yourself up and slide over.

8    Q.    You never tore the fabric or anything like that

9    even though that's pretty high on the top of the wall there?

10   A.    No.

11   Q.    Okay.  Now, ma'am, before we got onto this

12   topic we were talking about what you may have looked like

13   back when this occurred in the Summer of the year 2000.  I

14   want you to take a look at Exhibit 483.

15   A    Okay.

16   Q.    That's you, isn't it?

17   A.    In the pink, yes.

18   Q.    And that's you back in the summer of 2000,

19   isn't it?

20   A.    Yes.

21   Q.    And that's during one of the pool parties that

22   you put on for the San Riva apartment complex, right?

23   A.    That's correct.

24   Q.    And this shows how you looked back in the

25   Summer of the year 2000, doesn't it?

1      A.    I believe I said, yes.

2      Q.    That's what you looked like, yes?

3      A.    Yes.

4          MR. MARTINEZ:  I move for admission of Exhibit 483.

5          MR. PATTERSON:  Judge, this is cumulative.  We have a

6      number of photographs that show my client at or near the time

7      of the pool parties.

8          THE COURT:  Overruled.  Exhibit 443 for

9      identification is admitted into evidence.

10         MR. MARTINEZ:  Actually, it's 483.

11         THE COURT:  483?  I'm sorry.  Exhibit 483 is admitted

12     into evidence.

13         MR. PATTERSON:  Judge, I just want to make an

14     additional record on this issue, please.

15

16             (The following proceedings were held at the

17     bench:)

18

19         MR. PATTERSON:  It's not only cumulative, but it's

20     being offered because it establishes the nature of her

21     conduct which the Government thinks is the background behind

22     all of this misconduct.  I think it's cumulative and shows

23     nothing more than her in a bikini and that's the only reason

24     it's being proffered at this point.

25         MR. MARTINEZ:  Judge, they were the ones -- I've got

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000004983

1   it right here, Your Honor.  They were the ones that brought

2   up the fact that she weighed 100 pounds, then they said 107.

3   Now they're telling us 117 pounds.  The issue is they're

4   trying to tell you she didn't have the power to go ahead and

5   swing that.  That shows what she wasn't this little person

6   who couldn't pick up a stool and hit.  There are no other

7   photographs in a bikini.  There are no other photographs that

8   show that.

9           THE COURT:  Okay.  I've allowed 483 to be admitted

10  into evidence.  And in doing this, I'm looking at it right

11  now, and even looking at it and taking into consideration

12  with 403, I'll allow it in, okay?

13          (The following proceedings were held in open

14

15  court:)

16

17  BY MR. MARTINEZ:

18          Q.    Let's go ahead and take a look at it.  That's

19  what you looked like back in the summer of the year 2000,

20  right?

21          A.    Yes.

22          Q.    You were not under a medical doctor's care for

23  any chronic condition back in summer of 2000, were you?

24          A.    No, I was not.

25          Q.    You were not under the effects of any

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000004984

1      debilitating disease or anything like that, were you?

2            A.    No, I wasn't.

3            Q.    You went through a normal six-month, yearly

4      sort of doctor visits, but other than that you didn't have

5      anything other thank normal run-of-the-mill doctor's visits,

6      did you?

7            A.    No.

8            Q.    Ma'am, you also told us that in the summer, I

9      think it was in September of the year 2000, there was a trip

10     that you took to Memphis or the suburbs, right?

11           A.    In September, yes.

12           Q.    And other people went with you, right?

13           A.    Yes.

14           Q.    And the other individuals that went were your

15     husband, right?

16           A.    Yes.

17           Q.    And Nicolas and Ashley also went, correct?

18           A.    Yes.

19           Q.    And what you told us with regard to that trip,

20     and in fact shown part of the ticket, that is Exhibit 469 in

21     evidence, that -- that he Joseph and Nicolas returned from

22     Memphis.  Do you remember that exhibit?

23           A.    Yes.

24           Q.    But one of the things that you told us was that

25     even though you were scheduled to return with them, you

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    didn't, right?

2         A.    That's not what I said.

3         Q.    You -- you were scheduled to return with them,

4    weren't you?

5         A.    No.  I had to come back early to go to work.

6         Q.    Ma'am, when this -- the reservations were made

7    by the sister, weren't they?

8         A.    Yes, they were.

9         Q.    And everybody was scheduled to leave at the

10   same time, weren't they?

11        A.    Yes.

12        Q.    And everybody was scheduled by Janna, the

13   sister, to return at the same time, right?

14        A.    Right.

15        Q.    But you instead, for whatever reason, had to

16   come back early, right?

17        A.    Yes.  My boss said I --

18        Q.    The answer is yes, right?  You did come back

19   early, didn't you?

20        A.    I did come back early.

21        Q.    The point being, ma'am, that you changed your

22   reservations.  You were able to do that, weren't you?

23        A.    I don't know if I did it or Janna did it.

24        Q.    Actually, you had -- she refused to pay the

25   difference.  Do you remember that?


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    A.    No, I don't recall.

2    Q.    But there is a fee that you had to pay, right?

3    A.    I don't recall.

4    Q.    So you did come back early though, right?

5    A.    Yes.

6    Q.    Unlike in Las Vegas, there was no -- you told

7    us when you went to Las Vegas in May of 2000, it was

8    impossible for you to come back early, right?

9    A.    Yes.

10   Q.    However this airline, Northwest, did allow you

11   to come back early, right?

12   A.    Yes.

13   Q.    Is there something about Las Vegas or the

14   airline that does not allow to you come back early like this

15   airline did from Memphis?

16   A.    This was a different set of circumstances.   I

17   had to return to work.

18   Q.    And you did not have to return to see Mr.

19   Andriano back in May of 2000, did you?

20   A.    No, it was not necessary.

21   Q.    And you made that call, right?

22   A.    I did.

23   Q.    And that's because you were the one that was in

24   charge of that relationship, right?

25   A.    No.

1         Q.    Well, you made that call, didn't you?  It was

2    not necessary is what you just told me, right?

3         A.    That's correct.

4         Q.    And you made that call?

5         A.    I made that call, yes.

6         Q.    And now, when you did go to Memphis, Tennessee,

7    one of the things that happened was there was a birthday

8    celebration, right?

9         A.    Yes.

10        Q.    And at that birthday celebration, there were

11   photographs that were taken, weren't there?

12        A.    Yes.

13        Q.    The person in the middle there is your husband,

14   right?

15        A.    Yes, it is.

16        Q.    That's Joseph Andriano, right, ma'am?

17        A.    Yes, that's my husband.

18        Q.    And to the left is Ashley, right?

19        A.    Yes.

20        Q.    And to the right is Nicolas, right?

21        A.    Yes.

22        Q.    They're all wearing party hats, right?

23        A.    Yes.

24        Q.    And this is the person that you said "I wish he

25   was dead so I could move on with my life," right?  That

1   person in the middle, right?

2         A.    I did not say that.

3         Q.    You didn't say that to Donna DeAngelis while

4   she was taking care of your haircut?

5         A.    I did not.

6         Q.    And he's the same person that you told James

7   Yost, you know, "Joe's worth more dead than alive to me."

8   You said that, didn't you?

9         A.    No.

10        Q.    That's the person that we're talking about

11  right there, right?

12        A.    That's not what I said.

13        Q.    And when you found yourself with Travis Black,

14  that's the person whose existence you denied, isn't it?

15        A.    Yes.

16        Q.    You told Travis he was dead, right?

17        A.    Yes.

18        Q.    Because that was wishful thinking on your part,

19  wasn't it?

20        A.    No.

21        Q.    That's what you wanted, didn't you?

22        A.    No, not at all.

23        Q.    This is the same person that you told Erik

24  Vaillant once he died he was going to be worth $20 million to

25  you, right?


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000004989

1          A.    No.   I never said that.

2          Q.    This is the same person that you went into

3    business in the glass -- in AccuGlass, right?   Right?

4          A.    Yes.

5          Q.    This is the same person that you accused of

6    attempting or wanting to kill Jerry Robles, right?

7          A.    I didn't accuse him of it.   I just stated the

8    facts.

9          Q.    You said it in court then.   How about that?

10         A.    Yes.

11         Q.    And you also told that to Sharon Murphy, right?

12         A.    Yes.

13         Q.    Do you remember when the issue of finances came

14   up that you wrote a letter to Mr. Robles about this

15   individual?

16         A.    No.   I don't recall that.

17         Q.    When was the business about to dissolve, ma'am?

18   When was that?

19         A.    From what I remember, it was the end of '96,

20   beginning of '97.

21         Q.    Okay.

22         A.    Something like that.

23         Q.    And so wasn't it at the end of '96, the

24   beginning of '97 that you wrote to Jerry Robles, quote, "In

25   order to prevent any disequalness in the future, we have made

1    some changes.  Joe is now installing full time.  This has

2    taken a huge burden off me.  I couldn't stand being in the

3    office with him all day."

4              You wrote that to Jerry Robles, didn't you,

5    back in late '96, early '97?

6         A.   Yes.  That was the time I was going to leave

7    Joe.  I had been -- it was just too much.

8         Q.   So that was during that time even in '97, early

9    '97, you couldn't stand being around him, could you?

10        A.   No, that's not true.

11        Q.   Let's contrast this individual here and what

12   you said about him with somebody else, okay?  Let's talk a

13   little bit about -- well, before we leave him, I'm going to

14   show you another photograph.  It's going to be 219.002.

15                   (Pause in proceedings.)

16   BY MR. MARTINEZ:

17        Q.   I want you to take a look at Exhibit 219.002.

18   This photograph was also taken in Memphis, wasn't it?

19        A.   Yes, sir.

20        Q.   And it was taken during that same trip where

21   you left early to come home, right?

22        A.   Yes.

23        Q.   And in it it shows Mr. Andriano, doesn't it?

24        A.   Yes.

25        Q.   And Mr. Andriano is wearing the same pair of

1    shorts that it -- that are pictured in Exhibit Number 34.

2    Let me show that one to you.  See those shorts, Exhibit 34?

3           A.    Yes.

4           Q.    Those are the same shorts that he's wearing in

5    Exhibit 219.002, aren't they?

6           A.    It appears to be, yes.

7           Q.    And they also show him standing, don't they?

8           A.    Actually --

9           Q.    Mr. Andriano is standing there, right?

10          A.    Yes.

11          Q.    It shows what his body looked like back then,

12   maybe two to three weeks before his death, right?

13          A.    I believe so, yes.

14          Q.    That's what he looked like two to three weeks

15   before his death, right?

16          A.    Yes.

17          Q.    He's wearing those same shorts he was found

18   dead in, right?

19          A.    Yes.

20          Q.    Right?

21          A.    Yes.  I believe you asked me that.

22          MR. MARTINEZ:  I move for admission of Exhibit

23   219.002.

24          MR. PATTERSON:  Again, Judge, this is cumulative.  We

25   have a number of photographs of Mr. Andriano.

1          THE COURT:  Let me see the photograph.

2          MR. PATTERSON:  This lends nothing new in terms of

3     the quantum of proof the Government needs to prove.

4

5               (The following proceedings were held at the

6     bench:)

7

8          MR. MARTINEZ:  One of the things they've indicated is

9     that this individual had super human strength, that he --

10    I'm not finished yet -- that he let out hellacious or

11    animalistic growl, and even though he was hit on the head 23

12    times, he still had the fortitude or strength to stand up.

13    Additionally, not only was he suffering from

14    cancer, not only was he poisoned, he still had to have the

15    strength to come after her.  They need to see what he looks

16    like before.

17         MR. PATTERSON:  We have the photograph from the

18    birthday party, other photographs of Joe here.  This is

19    cumulative and lends nothing to the evidence that the jury

20    needs to consider in this case.

21         THE COURT:  Okay.  I'm looking at this photograph and

22    I've weighed the considerations set forth under Rule 403.

23    I'm going to allow the photograph admitted into evidence.

24

25              (The following proceedings were held in open

1    court:)

2

3          THE COURT:   Exhibit 219.002 for identification is

4    admitted into evidence.

5    BY MR. MARTINEZ:

6          Q.   Let's take a look at it.  That's what he looked

7    like about two or three weeks before his death, right?

8          A.   Yes, sir.

9          Q.   Got the bald head, right?

10         A.   Yes.

11         Q.   And those are his two kids that he's pulling

12   along, right?

13         A.   Yes.

14         Q.   One of the things that you told us was that you

15   helped him shave his head when his hair was falling out,

16   right?

17         A.   I did.

18         Q.   And that one of the comments or statements that

19   you attributed to him was that, well, after he did that,

20   Nicolas came up to him and asked him what happened to your

21   head or words to that effect, right?

22         A.   To his hair.

23         Q.   And he said "Your mommy did this to me"?

24         A.   Exactly.

25         Q.   He didn't say that mean, did he?

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000004994

1    A.    Yes, he did.

2    Q.    He said it really mean?

3    A.    He did.

4    Q.    Was his voice sort of a low growl that you

5    described to us on the night that you and he were having this

6    fight?

7    A.    No.  I had never heard that before.

8    Q.    But that was just at the very end.  In other

9    words, this growl that you heard was only once, right, on the

10   night that you and he were involved in this fisticuffs

11   according to you?

12   A.    Yes.

13   Q.    It wasn't more than once that you heard the

14   growl, right?

15   A.    No, not like that.

16   Q.    Just once, right?

17   A.    Yes.

18   Q.    Now, we've seen what -- what Joseph looked

19   like.  Let's take a quick look at what Mr. Freeland looked

20   like, Exhibit 229.001.  That's you and Mr. Freeland, right?

21   A.    Yes.

22   Q.    And he was healthy, wasn't he?

23   A.    Yeah.

24   Q.    He wasn't suffering any illness or anything

25   like that, was he?

1       A.    No.

2       Q.    And he was the one that was sensitive, right?

3       A.    Yes.

4       Q.    He was the one that was a good listener, right?

5       A.    Yes.

6       Q.    He was -- he was a really good listener, but he

7   wouldn't let you into his apartment for at least an hour

8   though, right?

9       A.    You're combining circumstances.  You'll have to

10  rephrase it.  I can't answer that.

11      Q.    You're saying this person in this photograph

12  was sensitive and a good listener, right?

13      A.    Yes.

14      Q.    You went over to his apartment the night of the

15  Sanctuary soiree and stood outside of his door for an hour,

16  right?

17      A.    No.

18      Q.    He wouldn't let you in, would he?

19      A.    No, not at first.

20      Q.    You stood out there for a long time, right?

21      A.    Yes.

22      Q.    Threatened to get the pass key, didn't you?

23      A.    No.

24      Q.    Did

25      A.    We didn't use pass keys.

1   Q. Well, ma'am, you do have duplicate keys to

2 these apartments, don't you?

3   A. No.  He had all of them.

4   Q. Ma'am, San Riva had duplicate keys for the

5 apartments, right?

6   A. Not for his apartment, no.

7   Q. Ma'am, I'm not asking about his apartment, am

8 I?  Am I?

9   A. Yes, apartments --

10   Q. I'm asking you every other apartment but his.

11 San Riva has duplicates for everybody else's apartment,

12 right?

13   A. Except for the employees, yes.

14   Q. And if there was an emergency, you would need

15 everybody -- you would need keys to get in.  That's part of

16 the reason why you had them, right?

17   A. Yes.

18   Q. The way you described it, they were in a safe

19 or something like that?

20   A. A lock box, yes.

21   Q. You had a key to that lock box, right?

22   A. Yes.

23   Q. The only key that was not in that lock box was

24 the one to Mr. Freeland, right?

25   A. No, that's not true.

1      Q.    Well, you just said that --

2      A.    No, I did not.

3      Q.    So there were other residents who didn't have

4  their keys in that lock box, right?

5      A.    Yes, there were.

6      Q.    Who are they?

7      A.    Myself, Chris, Stephanie, Shannon.

8      Q.    Those were the only ones?

9      A.    Jerry Sentelle.

10     Q.    Those are all employees?  Mr. Freeland wasn't

11  an employee of San Riva, was he?

12     A.    No.

13     Q.    The ones that you mentioned were employees,

14  right?

15     A.    Yes.

16     Q.    So he was the only nonemployee to not have his

17  key in that lock box, right?

18     A.    Yes.

19     Q.    And the reason that his key wasn't in that lock

20  box was that he took it because he was afraid you were going

21  to get into his apartment.  Isn't that true?

22     A.    No, that's not true.

23     Q.    Let's take another look at you and he,

24  229:002.  That's you and him, right?

25     A.    Yes.

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1      Q.     And by "him," I mean Mr. Freeland, right?

2      A.     Yes.

3      Q.     This is the same individual who on July 23rd,

4   you and he had a heart to heart, or at least you had a heart

5   to heart talk, didn't you?

6      A.     I don't know the dates so I'm not sure what

7   you're talking about.

8      Q.     Do you remember sending him a fax?

9      A.     Yes.

10     Q.     And in Exhibit Number 228, let's take a look at

11   the date on top.  See that?

12     A.     Yes.

13     Q.     It's July 23, 2000, 5:33 p.m., San Riva

14     A.     Yes.

15     Q.     You sent it, right?

16     A.     Yes, I did.

17     Q.     And the person that you sent it to was Rick,

18   right?

19     A.     Uh-huh.

20     THE COURT:  Is that a "yes"?

21     THE WITNESS:  Yes, I'm sorry.

22   BY MR. MARTINEZ:

23     Q.     That would be Rick Freeland, right?

24     A.     Yes.

25     Q.     You told him, "Here I go again with the letters

1    but this time I just need to clear the air.  After your

2    rejection and plain speaking Friday night, I totally

3    understand that you want nothing to do with me."  That's what

4    you wrote, right?

5            A.    Yes.

6            Q.    Because he didn't want anything to do with you

7    because you were married, right?

8            A.    That's not the full reason, but yes.

9            Q.    You -- so you are saying that he did want to do

10   something with you even though you were married?

11           MR. PATTERSON:  That's not her answer, Judge.

12           THE COURT:  Overruled.

13           MR. PATTERSON:  Misstates her response.

14           THE COURT:  Overruled.  Go ahead, answer the question

15   if you can.

16           THE WITNESS:  I'll have to rephrase.  I can't answer

17   it like that.

18   BY MR. MARTINEZ:

19           Q.    You're saying he still wanted to be with you

20   even though you were married?

21           MR. PATTERSON:  That's not what she testified.

22           THE WITNESS:  That's not --

23           THE COURT:  Overruled.  Go ahead, answer the question

24   if you can.

25           THE WITNESS:  That's not a true statement.


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000005000

1    BY MR. MARTINEZ:

2        Q.    Bottomline is the fact you were married was a

3    big factor here in him not wanting to see you, right?

4        A.    See me in a --

5        Q.    In a having-a-sex way, ma'am, yes.

6        A.    Yes, thank you.

7        Q.    And then you said "I am so sorry that I had to

8    keep pushing everything," right?

9        A.    Right.

10       Q.    In other words, what you're telling us there is

11   that even though he rejected you, you still kept pushing it,

12   didn't you?

13       A.    I didn't understand why we couldn't be friends.

14       Q.    I'm not asking you if you -- if you understood

15   why you couldn't be friends.  I'm asking you whether or not

16   you kept pushing him?

17       A.    Pushing the friendship, yes.

18       Q.    No.  Does it say friendship anywhere there,

19   ma'am?

20       A.    No, it does not.

21       Q.    And in fact you and he had a sexual

22   relationship, didn't you?

23       A.    But it was a friendship first.

24       Q.    Ma'am, you and he did have a sexual

25   relationship, didn't you?

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000005001

1       A.   Yes.

2       Q.   In fact you had sexual intercourse under a

3   bridge.  Do you remember that?

4       A.   No.

5       Q.   You never had sexual intercourse with him under

6   a bridge near a golf course?

7       A.   No.

8       Q.   Oh, so all of the times that you had sexual

9   relations with him, it was in his apartment, right?

10      A.   No.  There was one time outside.

11      Q.   And so one time outside and the rest were

12  inside of his apartment then, right?

13      A.   4 or 5 times.

14      Q.   Some of them were really late, right?

15      A.   Yes.

16      Q.   When your kids were being either taken care of

17  by Joe or somebody else, right?

18      A.   Not by Joe, no.

19      Q.   Well, the third time, where was it that you had

20  sexual intercourse?

21      A.   In his apartment.

22      Q.   What time of the night was it?

23      A.   Around 2:00.

24      Q.   In the morning then, right?

25      A.   Yes.

1     Q.    And you are not watching your kids at 2:00 in

2   the morning, at that time that you're having intercourse with

3   him, right?

4     A.    I am not.

5     Q.    Somebody else is taking care of your kids,

6   right?

7     A.    Yes.

8     Q.    These kids that you cried for on the witness

9   stand these last couple days, that brought you to tears,

10   right?

11     A.    Yes.

12     Q.    Those are the same ones, right?

13     A.    Yes.

14     Q.    And it was the same -- you had the same

15   reaction about your husband.  That brought you to tears when

16   you were telling us how cute he was, right?

17     A.    Yes.

18     Q.    And yet you were still out there with this

19   other individual, right?

20     A.    Yes.

21     Q.    Because you didn't love him anymore, right?

22     A.    I loved Joe very much.

23     Q.    That's how you showed your love for Joe by

24   going and having sex with another person?

25          MR. PATTERSON:  Objection.

1                THE WITNESS:  No, sir.

2                MR. PATTERSON:  Argumentative, Judge.

3                THE COURT:  Sustained.  Let's move on.

4    BY MR. MARTINEZ:

5         Q.    Well, you kept pushing it, so what exactly do

6    you mean by pushing it?

7                MR. PATTERSON:  Judge --

8    BY MR. MARTINEZ:

9         Q.    You haven't told us what that means.

10               MR. PATTERSON:  Objection.  Asked and answered.

11               THE COURT:  Sustained.  Let's move on.

12   BY MR. MARTINEZ:

13        Q.    Ma'am, how many times did you push it?  Where

14   did you push it?  We don't know --

15               MR. PATTERSON:  Objection.  Same question,

16   differently stated.

17               THE COURT:  Sustained.  Let's move on.

18   BY MR. MARTINEZ:

19        Q.    Ma'am, there is another here in Exhibit Number

20   228.  And the date on it is September 20th.  You see that?

21        A.    Yes.

22        Q.    That's an email that you initiated, isn't it?

23        A.    It says "From Rick, To Wendi."

24        Q.    Okay.  And then underneath it it says

25   wendiandrianobbw@usa.net wrote "Congratulations," and then

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    there's a salutation there at the end, isn't there?

2           A.    Yes.

3           Q.    You're asking him to go out with you, right?

4           A.    No, not at all.

5           Q.    Well, you -- do you think you're going to have

6    a drink with him in his apartment?

7           A.    It's just a friend thing.

8           Q.    I'm not asking you if it's a friend thing.  I'm

9    not asking you the emotional involvement here, ma'am.  I'm

10   asking you whether or not you're asking him to go out and

11   have a drink with him?

12          A.    Yes.  I said, "How about a drink sometime?"

13          Q.    That would be at a bar or his apartment,

14   wouldn't it?

15          A.    Not his apartment, no.

16          Q.    Doesn't say either way, right?

17          A.    Could be lunch time, it could be dinner time,

18   it could be -- it doesn't --

19          Q.    And that was at a time, September 20th, when

20   you had just come back from that Memphis trip, wasn't it?

21          A.    Well, actually, it was after their -- their

22   game that they did so well at that I had -- was able to watch

23   and attend.

24          Q.    But this was after the Memphis trip, wasn't it?

25          A.    I don't recall.  I don't remember which date I

1    went to Memphis.

2         Q.    Ma'am, we have Exhibit Number 469 which tells

3    us that Mr. Andriano and his son returned back on September

4    22nd.

5         A.    Right.

6         Q.    And you told us that you came back before them,

7    right?

8         A.    I did, yes.

9         Q.    And so you are taking the opportunity when your

10   husband's out of town to ask another man to have a drink with

11   you, right?

12        A.    Not like you said, no.

13        Q.    You're not asking him, "How about a drink

14   sometime?"

15             MR. PATTERSON:   Judge, objection.   Asked and answered.

16             THE COURT:   Sustained.   Let's move on.

17   BY MR. MARTINEZ:

18        Q.    You were still interested in him at that time,

19   weren't you?

20        A.    No, I was not.

21        Q.    And it was just seven days after that that you

22   and Travis Black became friends, right?

23        A.    We were not necessarily friends.

24        Q.    You were just lovers then?

25        A.    It was a one-night stand.

58

1          Q.     Well, it was more than a one-night stand,

2   wasn't it?

3          A.     Not really, no.

4          Q.     Well, you exchanged numbers, didn't you?

5          A.     Yes.

6          Q.     He called you, didn't he?

7          A.     Yes.

8          Q.     You called him, right?

9          A.     Once or twice.

10          Q.     So the answer is yes, you did call him?

11          A.     Yes, I did call him.

12          Q.     You met with him one other time after that,

13   right?

14          A.     He did come with us one time.

15          Q.     Right.  So the answer is "yes," right?

16          A.     He did come with us one time, yes.

17          Q.     It was at a bar, right?

18          A.     Tijuana Country Club, yes.

19          Q.     And so it isn't like you weren't continuing to

20   be on a social basis with Travis Black, was it?

21          A.     Not really.

22          Q.     And in fact you would talk to him for hours on

23   the telephone while you were at work, right?

24          A.     No, I wouldn't agree.

25          Q.     In fact the only reason you didn't continue on

1    with this was because of what happened on October 8 of the

2    year 2000, wasn't it?

3          A.    No, that's not true.

4          Q.    Let's just take a look at the games that you

5    play at your office.  This is Exhibit 231.  You told us that

6    there was some sort of game that you played at the office.

7    Do you remember that?

8          A.    It was at a manager's meeting.

9          Q.    Okay.  And at this manager's meeting, for

10   whatever reason, Rick's name appears, right?

11         A.    Yes.

12         Q.    Rick is not a manager or in any way associated

13   as an employee with San Riva, was he?

14         A.    No.

15         Q.    You see Eric's name on there, right?

16         A.    Yes.

17         Q.    He is not anyway associated as an employee with

18   San Riva, correct?

19         A.    Correct.

20         Q.    We also see there Chris.  She's associated,

21   isn't she?

22         A.    She is, yes.

23         Q.    Unless we're talking about the Chris that we

24   see you with in the photograph when you had the drink in your

25   hand and you were wearing the red dress, right?

1          A.    I had a purple top on.

2          Q.    Okay.  The purple top.  His name was also

3     Chris, right?

4          A.    Yes.

5          Q.    And Shawn.  He didn't work for San Riva either,

6     did he?

7          A.    No.

8          Q.    In fact what you told us was that his legs were

9     cutoff and they were being put back on him or something about

10    that time?

11         A.    No, I didn't say about that time.  I said

12    earlier this had happened to him.

13         Q.    So all these people at least three -- one, two,

14    three -- potentially four of these people really didn't work

15    for the San Riva apartment complex, right?

16         A.    That wasn't the --

17         Q.    Is that "yes" or "no," ma'am?

18         A.    No, they did not.

19         Q.    And yet you somehow are playing some sort of

20    manager's game with them as evidenced by Exhibit 231?

21         A.    Ice breaker at a manager's meeting.

22         Q.    And the ice breaker was Rick, Shawn and Eric,

23    right?

24         A.    That was in response to whatever question they

25    were asking.


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    Q.    One of the things we talked about yesterday was

2  that you -- when I was talking to you about Sharon Murphy,

3  one of the things that you told me was, well, you know, I

4  think it was her mistake when she put down that there was a

5  new management company at the Courtyards Apartments and that

6  was the reason why you no longer continued your association

7  with the Courtyard Apartments.  Do you remember telling me

8  that?

9    A.    No.  I don't know if I said that or not.

10   Q.    Do you remember telling us, and we talked about

11  the term Courtyard -- sorry, management company.  Do you

12  remember that we talked about that?

13   A.    Yes, I do.

14   Q.    Okay.  And you -- we talked and I talked to you

15  about that report.  Do you remember we talked about it over

16  and over, right?

17   A.    Oh, yes.

18   Q.    And one of the things that we talked about in

19  that report was that you indicated to her that a new

20  management company came in at the Courtyards and that's why

21  you didn't -- that's why you didn't continue in their employ

22  in August or September of 1999.  Do you remember that?

23   A.    Something to do with new management, yes.

24   Q.    Right.  You said that it was a mistake.  You

25  never said it was a new management company.  That's what you

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000005010

1    told us, right?

2            A.    It's not a new management company?

3            Q.    Right.

4            A.    I don't know what happened there.  I -- I can't

5    tell you.

6            Q.    Well, ma'am, do you remember that on October 8

7    of the year 2000 you did have a conversation with the

8    detective, right?

9            A.    Yes.

10           Q.    And prior to having that conversation he read

11   you your Miranda warnings.  Do you remember that?

12           A.    He did.

13           Q.    And Friday -- sorry, on Thursday we took a look

14   at Exhibit 481.  Do you remember that?

15           A.    Yes.

16           Q.    That's him reciting the Miranda warnings to

17   you, right?  Isn't it?

18           A.    Yes.

19           MR. MARTINEZ:  Move for admission of 481.

20           MR. PATTERSON:  No objection.

21           THE COURT:  Exhibit 481 for identification is

22   admitted into evidence.

23           MR. MARTINEZ:  Judge, if I may play this, please?

24           THE COURT:  Yes.

25                      (Whereupon, the tape was played.)


         TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1  BY MR. MARTINEZ:

2        Q.    And then you proceeded to have a rather long

3  conversation with him that morning, right?

4        A.    A long conversation, yes.

5        Q.    The answer is yes though, right?

6        A.    Yes.

7        Q.    And, ma'am, you and he discussed the issue of

8  the Courtyard Apartments, didn't you?

9        A.    I don't remember.

10        MR. MARTINEZ:  Judge, she may have to review this so

11  I could then move it into evidence.

12        THE COURT:  How long is that going to take?

13        MR. MARTINEZ:  It's about a 20 second snippet.

14        THE COURT:  Let's do this.  I'll have the jury return

15  to the jury room for just a few moments here.  During this

16  time remember the entire admonition I gave you.

17

18              (Whereupon, the jury exits the courtroom.)

19

20        THE COURT:  Please be seated.  The record will

21  reflect the presence of the Defendant and Counsel.  We're

22  outside the presence of the jury.

23        MR. MARTINEZ:  Mr. Patterson, do you want her to come

24  down or could she see from there?

25              (Whereupon, the tape is played.)


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000005012

1          THE COURT:  Ready for the jury?

2          MR. MARTINEZ:  Yes.

3

4              (Whereupon, the jury enters the courtroom.)

5

6          THE COURT:  Please be seated.  This is cause number

7   CR 2000-096032, State of Arizona versus Wendi Elizabeth

8   Andriano.  The record will reflect the presence of the

9   Defendant, who's on the witness stand, Counsel and the jury.

10             We'll continue with the cross-examination by

11  Mr. Martinez.

12  BY MR. MARTINEZ:

13         Q.    During the brief break we had occasion to take

14  a look at Exhibit 484, didn't we?

15         A.    Yes, we did.

16         Q.    It does deal with your statement involving why

17  you left the courtyard apartments, doesn't it?

18         A.    Yes.

19         MR. MARTINEZ:  Your Honor, move for admission of

20  Exhibit 484.

21         MR. PATTERSON:  No objection, Judge.

22         THE COURT:  Exhibit 484 for identification is

23  admitted into evidence.

24             (Whereupon, the tape is played.)

25  / / / / /

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    BY MR. MARTINEZ:

2          Q.   Ma'am, you did indicate that the reason that --

3    you did indicate that there was a change in management

4    companies at the Courtyard, didn't you?

5          A.   Yes, sir.

6          Q.   And that was the reason why you were let go,

7    right?

8          A.   I thought that was the reason, yes.

9          Q.   And then you also indicated that, something to

10   the effect, that it was because of the medical bills or

11   something like that, right?

12         A.   Medical problem, yes.

13         Q.   Well, actually, what you said is "I think it

14   was because a lot of our medical problems, um, so that's when

15   I found employment up here at San Riva."  That's what you

16   said, right?

17         A.   That is what I said.

18         Q.   And that's not true at all, is it?

19         A.   No, it's not.

20         Q.   That's a lie.

21         A.   Partially.

22         Q.   Well, there's no thing as partial lies.  They

23   either are or they're not.  That's not true, is it?

24         A.   That's not true about the new management

25   company.

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1      Q.    It's also not true about the medical problem,

2  is it?

3      A.    Yes, it is.

4      Q.    There were other reasons, ma'am, why you were

5  disassociated with Courtyard Apartments.  Isn't that true?

6      A.    Yes.

7      Q.    And those are the reasons, not the medical

8  problems, why you were not -- why you were disassociated or

9  not employed by Courtyard.  Isn't that true?

10     A.    I'm actually not sure of all the reasons.

11     Q.    Would you like to take a look at a piece of

12  paper that will tell you why?  Let me go ahead and mark it,

13  okay?  Right before you left, didn't you have an interview

14  with Timothy Lee?

15     A.    We had a brief interview.  I know he had me

16  sign a paper but --

17     Q.    Is that "yes" or "no"?

18     A.    Yes.

19     Q.    You did, and he's the person that was your

20  boss, right?

21     A.    Yes, he was.

22     Q.    And as a result of that meeting, you were no

23  longer employed by Courtyard, right?

24     A.    That's correct.

25     Q.    Okay.  I want to take a look at Exhibit 485.


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1              (Pause in proceedings.)

2          THE WITNESS:  Okay.

3    BY MR. MARTINEZ:

4          Q.    May I have it back?

5          A.    Yes.

6          Q.    This details why you are no longer associated

7    with the Courtyard Apartments.  Isn't that true?

8          A.    Yes, it does.

9          Q.    Doesn't say anything about Joe's medical

10   problems or anything like that, does it?

11         A.    Not directly, no.

12         Q.    No, it doesn't say that indirectly either, does

13   it?

14         A.    Yes.

15         Q.    Yes, it doesn't say that, does it?

16         A.    Yes, it does say that.

17         Q.    It does say that?  Okay.  Then let's take a

18   look at it.

19         MR. MARTINEZ:  I move for admission of Exhibit 485.

20         MR. PATTERSON:  No objection.

21         THE COURT:  Exhibit 485 for identification is

22   admitted into evidence.

23   BY MR. MARTINEZ:

24         Q.    It's called a termination notice, isn't it?

25         A.    Yes, it is.

1    Q.    You were terminated, weren't you?

2    A.    Yes, I was.

3    Q.    You didn't leave voluntarily, right?

4    A.    No.

5    Q.    You told Sharon Murphy you had, didn't you?

6    A.    No.  I believe I told her I was let go.

7    Q.    All right.  Let's take a look at her report.

8    A.    I don't remember.

9    Q.    It's page 12 of her report, ma'am.  And I would

10   direct you to the third paragraph from the top.  I want you

11   to read it and then we'll go over it.

12   A.    Okay.

13                   (Pause in proceedings.)

14         THE WITNESS:  Okay.

15   BY MR. MARTINEZ:

16   Q.    You lied to Sharon, didn't you?

17   A.    About the new management company, yes.

18   Q.    You lied to Sharon about the fact that you were

19   terminated, didn't you?

20   A.    No.

21   Q.    Well, let's see what you told her.  Didn't you

22   tell her that by August of 1999 things began to get crazy

23   again.  You told her that, right?

24   A.    Yes.

25   Q.    They went on vacation with Wendi's parents, and

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000005017

1  when they returned, Wendi discovered that a new property

2  management company had taken over and she no longer had a job

3  and no place to live, right?

4        A.    Yes.

5        Q.    She found another job managing but not given an

6  apartment as part of job.  And you never indicated to Sharon

7  Murphy that you were terminated, did you?

8        MR. PATTERSON:  Judge, that -- previous question was

9  she lied to Sharon Murphy.  Now he's suggesting that she

10 didn't tell her that.

11       THE COURT:  Overruled.

12       MR. PATTERSON:  That's not impeaching what he just

13 read.

14       THE COURT:  Overruled.  Answer the question.

15       THE WITNESS:  I didn't use the word terminate.  I

16 did say I no longer had a job.

17 BY MR. MARTINEZ:

18       Q.    So you never told her that you were fired?

19       A.    That -- that is no longer having a job.

20       Q.    But there are reasons -- other reasons, you

21 would agree with me, why people no longer have a job.  They

22 could be laid off, right?

23       A.    They could be, yes.

24       Q.    The only reason you don't have a job isn't that

25 you were discharged.  Wouldn't you agree?

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000005018

1          A.    Yes, I was discharged.

2          Q.    Okay.  And Exhibit Number 485 tells us that you

3    were terminated September 6, 1999, weren't you?

4          A.    Yes.

5          Q.    It also tells us that you were discharged and

6    that you were not eligible for rehire, right?

7          A.    Yes.

8          Q.    And then gives us the reason, right?

9          A.    Yes.

10         Q.    Says failure to follow company policy and

11   procedures in personal or personal time management.  Says

12   that essentially, doesn't it?

13         A.    Yes, it does.

14         Q.    This refers to the fact that you would have or

15   would take time off during work to go tan.  Isn't that true?

16         A.    That is not true.

17         Q.    This --

18         A.    It isn't true.

19         MR. PATTERSON:   Judge, we need to make a record on

20   this.

21

22              (The following proceedings were held at the

23   bench:)

24

25         MR. PATTERSON:   I think he's allowed to impeach her.


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    She made a misstatement to Ms. Murphy -- Dr. Murphy or that

2    she has made misstatements in the past, but he couldn't go in

3    collateral or extrinsic proof.  He can't go into the

4    collateral background.

5           THE COURT:  Mr. Martinez?

6           MR. MARTINEZ:  She's not a lawyer and it's not

7    collateral at all.

8           THE COURT:  I'll sustain the objection.  Let's move

9    on.

10

11              (The following proceedings were held in open

12   court:)

13

14           THE COURT:  Mr. Martinez, let's move on.  Ask your

15   next question.

16   BY MR. MARTINEZ:

17       Q.    One of the things that your mother told us was

18   that during the time you were at the Courtyard you didn't

19   have time to do anything.  Do you remember her telling us

20   that?

21       A.    That I didn't have time to do anything?

22       Q.    Of a social nature.  Do you remember that?

23       A.    I don't remember that.

24       Q.    And that you were always busy taking care of

25   the house?

1      A.    Yes.

2      Q.    Taking care of the kid -- the child, sorry.

3      A.    Yes.

4      Q.    Do you remember her telling us that?

5      A.    Yes.

6      Q.    Take caring of Joseph, right?

7      A.    Yes.

8      Q.    But you found time during work to go get

9  tanned, didn't you?

10     A.    My lunch hour, yes.

11     Q.    Well, didn't you also go get your nails done,

12  ma'am, during lunch?

13     A.    I don't remember if I was getting my nails done

14  at that time.

15     Q.    Didn't you have the acrylic nails on?

16     A.    I don't recall.

17     Q.    And then it also says and in paperwork, failure

18  to appropriately direct subordinates.  That's what it says,

19  right?

20     A.    Yes.

21     Q.    And that refers to Anna, doesn't it?

22     A.    No, it doesn't.

23     Q.    Well, ma'am, there was a memo that I -- that

24  was put together.  You've already taken a look at it.

25     A.    Uh-huh.


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000005021

1      Q.    And it indicates that you were using Anna as

2    your personal servant, didn't it?

3      A.    No, it did not.

4      Q.    It did not?  Okay.  We'll find the memo at the

5    break and then we'll show it to you, okay?   We'll find it at

6    the break and come back to it.

7           Now, ma'am, with regard to that issue of the

8    limo, where we left off last time, that is not the time that

9    the dresser was damaged in any way, right?

10     A.    No, it is not.

11     Q.    But you did have an interview with the police,

12   didn't you?

13     A.    I did.

14     Q.    And we've already reviewed it.  It's this tape

15   right here, Exhibit 482?

16     A.    Yes.

17     Q.    Is that ties with that night, doesn't it?

18     A.    Yes.

19   MR. MARTINEZ:  Move for admission of Exhibit 482.

20   MR. PATTERSON:  Is that the one I looked at Thursday?

21   MR. MARTINEZ:  Yes.

22   MR. PATTERSON:  Okay.  No objection.

23   THE COURT:  Exhibit 482 for identification is

24   admitted into evidence.

25   / / / / /

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    BY MR. MARTINEZ:

2          Q.    Let's go ahead and take a look at it.

3                (Whereupon, the tape is played.)

4    BY MR. MARTINEZ:

5          Q.    Ma'am, that references the birthday limo date,

6    doesn't it?

7          A.    What's that?

8          Q.    It does reference the birthday limo date?

9          A.    Yes.

10         Q.    Doesn't it?

11         A.    Yes.

12         Q.    And that's because you turned 30 in August,

13   right?

14         A.    Yes.

15         Q.    And then you indicate to the detective who's

16   interviewing you that you got home at about 1:30, right?

17         A.    That's what I said, yes.

18         Q.    And that your husband accused you of all kinds

19   of stuff.  And then you said he just went berserk, broke the

20   bed, broke the dressers.  That's what you said, right?

21         A.    Yes.

22         Q.    That's not true, right?

23               MR. PATTERSON:  Wait, wait, wait.  He's laid a number

24   of predicate facts and then he said it's not true.

25               THE COURT:  Sustained.


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1          MR. PATTERSON:  Which predicate fact is he talking

2     about?

3          THE COURT:  Rephrase the question.

4     BY MR. MARTINEZ:

5          Q.    It's not true that when you returned after your

6     date in the limo that Mr. Andriano went berserk, broke the

7     bed -- sorry, broke the bed, and broke the dresser.  That's

8     not true.

9          MR. PATTERSON:  Object to the form the question.

10          THE COURT:  Sustained.  Rephrase the question.

11     You're asking multiple things in that question.

12          MR. MARTINEZ:  Right.

13     BY MR. MARTINEZ:

14          Q.    Isn't it true that that evening you indicated

15     to the detective that Mr. Andriano broke the bed?

16          A.    The night of my birthday?

17          Q.    Yeah.

18          A.    Yes.

19          Q.    And you also indicated that he broke the

20     dresser, right?

21          A.    Yes.

22          Q.    And you used the term he just went berserk,

23     right?

24          A.    Yes.

25          Q.    But you told Sharon Murphy something different,

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000005024

1   didn't you?

2           A.    Yes.

3           Q.    You told her that the dresser was broken on the

4   night that you went out to the softball game, right?

5           A.    Yes.  That is true.

6           Q.    When did you go out for your birthday, ma'am?

7   What was the date?

8           A.    I don't recall the exact date.

9           Q.    Could it have been in April of the year 2000?

10          A.    No.  It was in August.

11          Q.    Was it late August?

12          A.    Late August.

13          Q.    So then with the report that Ms. Murphy has,

14  that's inaccurate because you provided her inaccurate

15  information, right?

16          A.    No, that's not true.

17          Q.    Well, did he break the bed on -- or not the

18  bed, sorry.  Did he break the dressers on the night that you

19  went to the softball game?

20          A.    Yes.

21          Q.    I thought we just heard on the tape that he

22  broke the dresser -- sorry, broke the bed on the night that

23  you went out for your birthday?

24          MR. PATTERSON:  Asked and answered.  He's arguing.

25          THE COURT:  Sustained.

1    BY MR. MARTINEZ:

2         Q.    Ma'am, which of the two did he -- which one?

3         A.    It was the softball night.  I was mistaken on

4    the tape.

5         Q.    Wouldn't you agree that your memory back on

6    October 8 of the year 2000 was a whole heck of a lot better

7    than it would be in September of 2003?

8         A.    I don't agree at all.

9         Q.    So your memory, again, has gotten better as

10   time goes on?

11        A.    That's not the issue, no.

12        Q.    Ma'am, that is the issue we're talking about.

13   You just told me that your memory gets better?

14        A.    No, I did not say that.

15        Q.    Well, I asked you previously whether or not

16   your memory was better on October 8 of the year 2000 when you

17   spoke to the detective and you told me no.  Do you remember

18   that?

19        A.    I do remember that.

20        Q.    And now you're telling me that as time went on

21   in whenever it was in 2003 when you spoke to Sharon Murphy

22   that you remember the incidents better?

23        A.    I did.

24              MR. PATTERSON:  She didn't say that, Judge.  She said

25   she remembers it different.


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1          THE COURT:  Overruled.  Go ahead, answer the question

2    if you can.

3          THE WITNESS:  Yes.  That night I was under tremendous

4    stress and had a very hard time to remember details and

5    things.  I was just trying to help as best as I could.

6    BY MR. MARTINEZ:

7          Q.    So you were making things up as you went along

8    that night.  Is that your testimony?

9          MR. PATTERSON:  Objection.

10          THE COURT:  Sustained.

11    BY MR. MARTINEZ:

12          Q.    Were you just saying things to the detective

13    then?

14          MR. PATTERSON:  Same question, argumentative.

15          THE COURT:  Sustained.  Let's move on.

16    BY MR. MARTINEZ:

17          Q.    You're saying the things you told the

18    detective were not true?

19          MR. PATTERSON:  Judge, objection.  Same question

20    three times now.

21          THE COURT:  Sustained.  Move on.

22    BY MR. MARTINEZ:

23          Q.    Let's take a look at the photographs of the

24    dresser.  If you want -- well, you've already seen those

25    photographs, haven't you, today?


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1        A.    Yes, I have.

2        Q.    And those photographs of the damage to the

3   dresser when was that caused, whenever that was, caused on

4   the night you went out to the soft ballgame or were they

5   caused on the day that you went out in the limo?

6        A.    The softball game.

7        Q.    What was the date of the softball game?

8        A.    I don't know.

9        Q.    Well, could it have been in April of the year

10   2000?

11        A.    No.  It was early September.

12        Q.    Okay.  And how much after the limo thing was

13   it?

14        A.    I couldn't tell you.  I don't know the exact

15   date.

16        Q.    Could it have been two weeks, three weeks?

17        A.    I don't know.

18        Q.    Immediately after these dressers were damaged,

19   did you call your father to let him know that it happened?

20        A.    No, I did not.

21        Q.    You didn't call your mother either, did you?

22        A.    No.

23        Q.    They had no way of knowing that happened,

24   right, unless you told them, right?

25        A.    No, that's not true.

1        Q.    Well, if you see a dent on the dresser, it

2    immediately tells you that Joseph Andriano did it.  Is that

3    what that means?

4        A.    I was there when he did it.

5        Q.    So, ma'am, what I'm talking about is your

6    parents, just by looking at the dresser, they would know

7    immediately that Mr. Andriano had done that, right?

8        A.    If he told them, yes.

9        Q.    I'm not -- I'm saying without anybody telling

10   anybody, looking at the dresser by itself without anybody

11   telling you anything, you wouldn't be able to tell that

12   anything had happened or that somebody had struck it, right?

13       A.    You could tell something happened.  You

14   wouldn't know who do it.

15       Q.    And you don't know how they would do it, right?

16       A.    Of course not.

17       Q.    According to you, it was done with his fist,

18   right?

19       A.    That's right.

20       Q.    And all of the damage that we saw was done with

21   his fist, right, to the dresser?

22       A.    To the drawers, yes.

23       Q.    Ma'am, one of the things that you told us that

24   happened that night was that Joe took you to the Yukon and he

25   sat there and he was very upset with you.  Do you remember

1    that?

2          A.    Yes.

3          Q.    And that then you guys went inside the

4    apartment after he was done venting, right?

5          A.    Yes.

6          Q.    You didn't tell Sharon Murphy about that, did

7    you?

8          A.    No.

9          Q.    I thought that you told me that your memory got

10   better as time progressed.  Did you forget about that?

11         MR. PATTERSON:  Judge, those questions are

12   argumentative and improper.

13         THE COURT:  Overruled.  Go ahead, answer the question

14   if you can.

15         THE WITNESS:  What was your question?

16   BY MR. MARTINEZ:

17         Q.    Why didn't you tell her?

18         A.    I didn't remember about it.

19         Q.    And so you remembered it last week?

20         A.    I did.

21         Q.    And there was something about this trial that

22   triggered it for you?

23         A.    It was the fact that I remembered that Janna

24   had her at her house, yes.

25         Q.    So there was nothing in the trial that

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000005030

1    triggered it then.   Right?

2              MR. PATTERSON:  Judge, that's not what she said.

3              THE WITNESS:  That's not what I'm saying.

4              THE COURT:  Overruled.  Answer the question if you

5    can.

6              THE WITNESS:  No.

7    BY MR. MARTINEZ:

8         Q.    So what was it that triggered it again?

9         A.    I don't know.  It just -- I just remembered I

10   was -- Janna spent the night on my birthday night so then I

11   started -- it's hard to remember all those things.

12        Q.    But you're someone who's the victim of domestic

13   violence, and that was fairly recently before the death.

14   Don't you think that's something that you would remember?

15        A.    Actually not, no.

16        Q.    Not you?  Okay.  One of the -- you indicated

17   that you didn't tell that to Ms. Murphy.  You also told us

18   about a slap in the face while you were at the townhouse.  Do

19   you remember that?

20        A.    Yes.

21        Q.    That's another thing that you forgot, right,

22   that you didn't tell Sharon Murphy about?

23        A.    That's correct.

24        Q.    When did that happen?

25        A.    We were living in the townhouse, the end of

1    '93.

2            Q.    So that was before you were married, right?

3            A.    Yes.

4            Q.    And, again, that was something that was

5    triggered as a result of something that happened in this

6    trial?

7            A.    Yes.

8            Q.    Then you came in here and you talked about the

9    issue of him having sex with you three weeks post partum I

10   think you said, right?

11           A.    From Nicolas, yes.

12           Q.    Okay.  And one of the things that you told us

13   about was that, well, there were -- there were these

14   stitches, right?

15           A.    Yes.

16           Q.    But didn't the doctor tell you that the

17   stitches get absorbed after five days, ma'am?

18           A.    No, that's not what he said.

19           Q.    And in fact didn't he say you were welcome to

20   have intercourse after four weeks?

21           A.    No.

22           Q.    So if there's a document that indicates that,

23   that would be an error, right?

24           A.    Yes, because I don't recall there being one

25   like that.


                TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1          Q.    But if there was one, you would be in error

2    then, right?

3          A.    No.  My body is my body and, you know --

4          Q.    Nobody's saying that.  We're talking about what

5    the doctor told you, not whether your body is your body.  So

6    are you telling me that he possibly could have told you it

7    was four weeks?

8          A.    No.  I don't recall that at all.

9          Q.    Okay.  You also told us about a situation at

10   Mr. Kay's.  Do you remember that?

11         A.    Yes.

12         Q.    And when did that happen?

13         A.    That would have happened when we had first

14   moved into the shop, so sometime -- the end of '94.

15         Q.    And that's another one that escaped you're

16   telling Sharon Murphy, right?

17         A.    Yes.

18         Q.    But that's the one, according to you, he got

19   you in a bear hug, right?

20         A.    Yes.

21         Q.    This was after you saw him talking to another

22   woman, right?

23         A.    Yes.

24         Q.    And according to you, you called your father,

25   right?

1          A.     I did.

2          Q.     And he came and picked you up, right?

3          A.     Yes, he did.

4          Q.     And then you went home, right?

5          A.     Yes.

6          Q.     And that's, again, something that, for whatever

7     reason, something in the trial brought it out --

8          A.     No.

9          Q.     Well, then how did you remember it then?  How

10    did this revelation come to you?

11         A.     Just by, you know, this is my daily life and

12    I -- I don't have --

13         Q.     Ma'am, I'm asking --

14         MR. PATTERSON:  Judge, he asked an open-ended how did

15    she recall --

16         THE COURT:  Hold on a second.  Let me see Counsel at

17    the bench.

18

19              (The following proceedings were held at the

20    bench:)

21

22         THE COURT:  Mr. Patterson, you don't have to get so

23    emotional.

24         MR. PATTERSON:  I'm sorry.  My apologies.

25         THE COURT:  I'm sustaining the objection, but you

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    don't need to get so emotional.  Just state the objection and
2    I'll rule on the objection.
3         MR. PATTERSON:  I apologize.
4         THE COURT:  I'll sustain the objection.  Let's move
5    on.  The objection is sustained.
6         MR. MARTINEZ:  Judge --
7         MR. PATTERSON:  That means she's allowed to continue
8    her testimony.
9         MR. MARTINEZ:  I'm going to object.  She's being
10   unresponsive.
11        THE COURT:  I thought you were objecting to --
12        MR. PATTERSON:  She's been asked an open-ended
13   question, sorry.  He asked her an open-ended question.  She
14   proceeded to explain in direct response to the open-ended
15   question and he doesn't like what she was saying.  That's
16   inappropriate.  If he's asking open-ended questions, she's
17   allowed to respond.
18        THE COURT:  You're objecting to the fact he was
19   interrupting her?
20        MR. PATTERSON:  And not allowing her to complete her
21   answer.
22        THE COURT:  What was the question?
23        MR. MARTINEZ:  As I remember, it went into the
24   revelation or something to that effect, when did this come to
25   you?

1          THE COURT:  Okay.  Repeat that question and I'll

2     allow her to answer.

3

4               (The following proceedings were held in open

5     court:)

6

7          THE COURT:  Go ahead and answer the question.

8          THE WITNESS:  Okay.  A lot of my life with Joe had

9     been repressed because it was -- when you -- it's just a self

10    defense mechanism.  And when I have to start talking about

11    all this stuff and it brings up all these memories, all these

12    things that -- you know, I didn't sit there and hold a grudge

13    and remember every day, and so, yes, as we -- as I'm sitting

14    in trial, as I'm hearing all this sort of stuff, it's -- I'm

15    getting overwhelmed with a lot of memories.

16    BY MR. MARTINEZ:

17         Q.    Are you done --

18         A.    Yes.

19         Q.    -- with your answer?  You had 20 hours to speak

20    with Sharon Murphy, didn't you?

21         A.    Yes, I did.

22         Q.    It was an unfettered conversation, wasn't it?

23         A.    Yes.

24         Q.    You could have told her anything that came to

25    your mind, couldn't you?

1        A.    That's true.

2        Q.    But you didn't tell her about the bear hug

3    incident, did you?

4        A.    No.  I hadn't remembered it at that time.

5        Q.    We talked about Exhibit 440 previously, and

6    this is the one where the drawers are and the damages are to

7    the dresser.

8        A.    Yes.

9        Q.    These are the damages that occurred as a result

10   of the fists, correct?

11       A.    Yes.

12       Q.    And you indicated that I think you went out for

13   your birthday, when, late August?

14       A.    Yes.

15       Q.    And that it was sometime after that, like two

16   weeks later, that you went out to the ball game?

17       A.    I indicated that I didn't know the date.

18       Q.    Well, I'm not asking for the date.  I'm asking

19   for a time sequence.

20       A.    I can't even tell you that.  I just know it was

21   at my birthday.

22       Q.    After the limo?

23       A.    Yes.

24       Q.    So it was the next night that you also went

25   out?

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1          MR. PATTERSON:  Judge, she has said she doesn't

2     recall the time frame.

3          THE COURT:  I'll sustain the objection.  Let's move

4     on.

5     BY MR. MARTINEZ:

6          Q.    Ma'am, isn't it true that during the time

7     that -- that this softball game incident happened, your

8     parents were in California, weren't they?

9          A.    I don't know that either.

10          Q.    You don't know whether they went to California

11     either?

12          A.    No, I don't.

13          Q.    Do you even know when they returned?

14          A.    Saturday.

15          Q.    That's the only thing you know, right?

16          A.    Yes.

17          Q.    But if they left -- if these were done in the

18     middle of September, your parents were already in California,

19     weren't they?

20          A.    Actually, they returned on the 7th, and as they

21     testified they had been gone for 10 days, so whatever that

22     would be.

23          Q.    Okay.  One of the other things that you told or

24     that you talked to Sharon Murphy about was -- was your

25     extramarital affairs, right?  Do you remember talking to her

1   about that?

2           A.    An affair, yes.

3           Q.    And according to you, having intercourse then

4   calling the individual sometime after that and receiving

5   calls from that individual, and then meeting them at a bar

6   after that, that does not, in your mind, constitute an

7   affair, right?

8           A.    No.

9           Q.    Because in your mind the only thing that

10  constitutes an affair is the emotional involvement, right?

11          A.    For me, yes.

12          Q.    So you could go out and have sex with a bunch

13  of guys on one-night stands and those would not be affairs,

14  right, by your definition?

15          A.    Yes, sir.

16          Q.    Now, did you have an emotional bond to somebody

17  named Chris Barnes back in July of 1996?

18          A.    An emotional bond?

19          Q.    Well, you were friends, weren't you?

20          A.    He was Joe's friend.  I -- I would call him a

21  friend, an acquaintance.

22          Q.    Right now I'm just asking specifically about

23  you.  You did know Chris Barnes back in July of 1996, right?

24          A.    Yes.

25          Q.    And you and he were friends, right?

1          A.    Yes.

2          Q.    And when Joe would go to the lake, you and he

3    got together, didn't you?

4          A.    No.

5          Q.    You weren't in a parking lot in a truck at 4:00

6    the morning on July of 1996?

7          A.    No, I was not.

8          Q.    I'm going to show you Exhibit Number 454.   I

9    want you to take a look at what is there, Number 161.   Do you

10   see the listing there involving extramarital affairs?

11         A.    On 161?

12         Q.    Let me show you.

13         A.    Yes.

14         Q.    Okay.  And you did list that you had one

15   extramarital affair, right?

16         A.    Yes.

17         Q.    And the reason that you didn't list Travis

18   Black is because you didn't have an emotional attachment to

19   him, right?

20         A.    As I said before, it was a one-night stand.   It

21   was not an affair.

22         Q.    And you're not denying that you had sexual

23   intercourse with him, are you?

24         A.    I am not denying that.

25         Q.    You're denying that he then called you after

1    that, right?

2              MR. PATTERSON:  Judge, asked and answered.

3              THE COURT:  Sustained.  Let's move on.

4    BY MR. MARTINEZ:

5         Q.    And it's your definition that we're talking

6    about as to why there is only one mentioned rather than two

7    or three, right?

8         A.    There was never three.

9         Q.    Well, according to you, there was never two,

10   right?

11        A.    There was one affair and one one-night stand.

12        Q.    You never mentioned Travis Black to Sharon

13   Murphy, did you?

14        A.    Yes, I did.

15        Q.    Do you remember that she had 20 hours of

16   interviews with you?  Do you remember that?

17        A.    Yes, sir.

18        Q.    And that as a result of that do you remember

19   that she compiled the report that we heard as dated September

20   22nd, 2003.  You're familiar with that report, right?

21        A.    Yes.

22        Q.    And she never mentions that about Travis Black

23   in her report.  Did you know that?

24        A.    I believe she did do a report on him.

25        Q.    Ma'am, in this report here, if you want, have

1   you -- you read this report, haven't you?

2        A.    Yes, I have.

3        Q.    It doesn't mention Travis Black anywhere, does

4   it?

5        A.    Not in that original one, no.

6        Q.    So is the answer "no"?

7        A.    No.

8        Q.    And that was after 20 hours of talking to you,

9   isn't it?

10       A.    Yes.

11       Q.    And somehow you're now telling us that, for

12  whatever reason, something happened afterwards and you

13  decided to come clean.  That what's happening here?

14       A.    No.

15       MR. PATTERSON:  Form of the question, very

16  argumentative.

17       THE COURT:  Sustained.

18  BY MR. MARTINEZ:

19       Q.    You told her during those 20 hours that you had

20  a relationship with 20 -- with Travis Black?

21       MR. PATTERSON:  Asked and answered.

22       THE COURT:  Sustained.  Let's move on.

23  BY MR. MARTINEZ:

24       Q.    Did you?

25       MR. PATTERSON:  Objection.


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1          THE COURT:  Sustained.

2          MR. PATTERSON:  Same question.

3          THE COURT:  Sustained.  Let's move on.

4     BY MR. MARTINEZ:

5          Q.   Ma'am, you indicated that you did tell her

6     about this affair, right, or this relationship or this

7     one-night stand with Travis Black, right?

8          A.   Yes.

9          Q.   When did you tell her?  Was it for the first 20

10    hours or the second or after that?

11         MR. PATTERSON:  Wait, wait --

12         THE WITNESS:  I don't recall when.

13         MR. PATTERSON:  -- wait.  Assumes facts not in

14    evidence.

15         THE COURT:  Sustained.  Let's move on.

16    BY MR. MARTINEZ:

17         Q.   We'll put that up here because it's not in the

18    report.  And then I'm just putting other instances of

19    physical violence.

20         MR. PATTERSON:  Judge, I need to make a record,

21    please.

22

23              (The following proceedings were held at the

24    bench:)

25


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000005043

1          MR. PATTERSON:  I object to the process that Mr.

2   Martinez is employing by paraphrasing the testimony and then

3   including it in some easel presentation.

4          THE COURT:  Mr. Martinez?

5          MR. PATTERSON:  It's inappropriate.

6          MR. MARTINEZ:  It is appropriate.  If he wants, I

7   could write down every single instance we talk about, but

8   that's burdensome.  We did talk about Travis Black, we did

9   talk about other instances of physical violence.  If he

10  wants, I could just write them down.

11         THE COURT:  I'll sustain the objection.  There's no

12  reason for you to write it down.  Just ask the question, let

13  her answer the question.  Let's move on.

14         MR. PATTERSON:  Can we remove this?

15         MR. MARTINEZ:  Well, we could turn the page, but --

16         THE COURT:  Right.

17

18              (The following proceedings were held in open

19  court:)

20

21         THE COURT:  Mr. Martinez, ask your next question.

22  BY MR. MARTINEZ:

23      Q.    You also indicated to us that you had a

24  relationship with somebody by the name of Shawn King, didn't

25  you?

1       A.    Yes, I did.

2       Q.    And this was right after you graduated from

3   high school in 1989, correct?

4       A.    Actually, we had a relationship before then.

5       Q.    You were not allowed to date until you turned

6   18, right?

7       A.    We were not allowed to go out on a date by

8   ourselves.

9       Q.    Until after you turned 18?

10      A.    Yes.

11      Q.    You turned 18 while you were still in high

12  school, right?

13      A.    Yes, I did.

14      Q.    And you were almost 19 when you graduated from

15  high school?

16      A.    Yes.

17      Q.    And then you went for six months over to

18  Calexi -- I'm sorry, Mexicali, correct?

19      A.    Yes.

20      Q.    And then you returned and at some point you

21  found yourself at the Quail Garden Apartments, right?

22      A.    Yes.

23      Q.    That was when?  I know it's '91, but when did

24  you move in there?

25      A.    I know it was a little bit before I turned 21,

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1   so it would have been -- I don't know what my hire date was,

2   but I would say -- the middle of '91?  I don't know.  I just

3   can't tell you.

4          Q.   Okay.  And while you were there, that's when at

5   some point you decided to tell Mr. King that whatever you

6   guys had, it was over, right?

7          A.   Yes.

8          Q.   And then after that apparently he'd given you a

9   ring, right?

10         A.   Not after that, no.

11         Q.   He had a ring he'd given you, right?

12         A.   Yes.

13         Q.   And he came over to your house one time, right,

14   apartment, right?

15         A.   Several times, yes.

16         Q.   And one of the times, there were some windows

17   that were broken, right?

18         A.   Yes.

19         Q.   And you told us that no, what happened was that

20   you didn't even know that the police were there, right?

21         A.   That's right.  They came to my apartment.

22         Q.   And in fact they at this point come to your

23   apartment.  A security guard came to your apartment, right?

24         A.   Who was a police officer, yes.

25         Q.   So you're saying that the security guard is one

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1   in the same as the police officer?

2        A.   Chris Vasquez was a police officer who attended

3   our church and who was a courtesy patrol for Quail Gardens.

4        Q.   And -- and then he came to your apartment and

5   took the report, right?

6        A.   No.  I don't recall who took the report, but --

7        Q.   Actually, ma'am, the report reflects that you

8   were already outside when the police arrived.  Isn't that

9   true?

10       A.   I was with Chris.

11       Q.   The answer is "yes" or "no"?

12       A.   Yes.

13       Q.   The report makes no mention of this Chris

14   Vasquez, does it?  Let's take a look at Exhibit 452.  That's

15   the report.  Show us where it talks to any security guard

16   named Chris Vasquez or any security guard, period.

17            (Pause in proceedings.)

18       THE WITNESS:  Okay.

19   BY MR. MARTINEZ:

20       Q.   It isn't in there, is it?

21       A.   It doesn't have Chris Vasquez's name in here,

22   no.

23       Q.   It doesn't have security guard there, does it?

24       A.   No, the --

25       Q.   The answer is "no," right?

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000005047

1          A.     Right.

2              MR. PATTERSON:  May I have the number of that

3      exhibit, Judge?

4              THE COURT:  That was Exhibit 452 for identification.

5      Is that correct?

6              MR. PATTERSON:  Thanks, Judge.

7      BY MR. MARTINEZ:

8          Q.     It does indicate however that you were already

9      outside when the police officer arrived.  Isn't that true?

10         A.     Well, I was confused reading the report because

11     it says that I saw Shawn leave twice and that's impossible.

12         Q.     Ma'am --

13         A.     So I don't really know.

14         Q.     Ma'am, it does indicate at the time the police

15     officer arrived, doesn't it?

16         A.     Yes.

17         Q.     And it does indicate that "I was met by Wendi

18     Ochoa who told me the following information."  It does say

19     that?

20         A.     It does say that, yes.

21         Q.     And you had a chance to read the whole thing?

22         A.     Yes.

23         Q.     And it even includes a citation in the back,

24     doesn't it?

25         A.     Yes.

1          Q.     Nowhere is there a mention of this security

2     guard, is there?

3          A.     Not in that report, no.

4          Q.     This is the Phoenix -- I'm sorry, the Casa

5     Grande police report, isn't it?

6          A.     I believe so, yes.

7          Q.     Well, let's take a look at it and make sure

8     that it is the Casa Grande police report.

9                 (Pause in proceedings.)

10                THE WITNESS:  Yet, it is.

11    BY MR. MARTINEZ:

12         Q.     Do you have any reason to doubt that it's not

13    the Casa Grande police report?

14         A.     No.

15         Q.     The other thing you told us on direct

16    examination was that Shawn King bit your -- bit your finger,

17    right?

18         A.     Bit the ring.

19         Q.     No, when we were here in court you indicated

20    Shawn King bit your finger while the ring was on.  Do you

21    remember that?

22         A.     He bit the ring off my finger.

23         Q.     So he didn't bite your finger then, right?

24         A.     No.

25         Q.     The police report doesn't indicate anything of

1   that sort, does it?  It doesn't, does it?

2          A.    It says something about the ring.  I don't

3   recall exactly.

4          Q.    It doesn't say anything about biting your

5   finger, biting the ring anything like that?

6          MR. PATTERSON:  Judge, that's compound and she

7   said --

8          THE COURT:  Sustained.

9          MR. PATTERSON:  -- he never bit her finger.

10          THE COURT:  Sustained.

11   BY MR. MARTINEZ:

12          Q.    You did say he bit the ring, right?

13          A.    Yes, he did.

14          Q.    This report doesn't say anything about biting

15   the ring, does it?

16          A.    Not that I just recall from reading it.

17          Q.    Go ahead and take a look at it again.  See if

18   it does say that.

19          A.    It just says he crushed the ring.

20          Q.    Ma'am, the question is does it say anything

21   about biting the ring?

22          A.    The word he used was crushed.

23          Q.    Ma'am, does it say anywhere in there that he

24   bit the ring?

25          A.    No, it does not.


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1  Q.   And the way that it happened is that he came

2  over and just wanted his ring back, right?

3  A.   No, that's not exactly what happened.

4  Q.   Well, it does say that you said that "he wanted

5  the ring back that he had given to her."  That's what you

6  say, right?

7  A.   Yes.

8  Q.   And then she said "took the ring off and gave

9  it to him," right?

10  A.   That's what it says.

11  Q.   It doesn't say anything about the biting,

12  grabbing the hand, things like that?

13  MR. PATTERSON:  Judge, could we approach again?

14

15  (The following proceedings were held at the

16  bench:)

17

18  MR. PATTERSON:  This is collateral.  I didn't object

19  to it initially because there was an issue whether she

20  reported the incident to the police having told Sharon Murphy

21  something different.  So that's how that initially became

22  relevant.  But now going into the particular details about

23  the facts and circumstances of an event that happened years

24  ago is collateral and extrinsic and is not relevant.

25  THE COURT:  Mr. Martinez?

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000005051

1           MR. MARTINEZ:  Counsel forgets about Rule 106 which

2      indicates that if you bring an issue, and he brought about

3      biting the ring and reporting it, the State can then fill-in

4      the gaps with anything she told the police at that time,

5      comes in under Rule 106.

6           THE COURT:  I'm going to sustain the objection.

7      Let's move on.

8           MR. MARTINEZ:  Your Honor, does --

9           THE COURT:  Mr. Martinez?

10          MR. MARTINEZ:  Are you saying I can't ask her

11     anything she told the police?

12          THE COURT:  No.  I'm just saying you've basically

13     beat a dead horse.  She's already answered and it's getting

14     into the point where it's collateral.

15          MR. MARTINEZ:  Okay.

16

17               (The following proceedings were held in open

18     court:)

19

20     BY MR. MARTINEZ:

21          Q.   Ma'am, after he left your apartment, that's

22     when you heard some crashing or a banging noise, right?

23          A.   Yes, I did hear that.

24          Q.   And then you told the police officer that you

25     saw Shawn leave, right?

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1          MR. PATTERSON:   Judge, I think we just addressed this

2     issue.

3          THE COURT:   Let me see Counsel here at the bench.

4

5               (The following proceedings were held at the

6     bench:)

7

8          THE COURT:   Look, I've allowed you to bring up the

9     fact there was an inconsistency in what she said and what

10    might have happened, but I don't want you to get into every

11    little minute detail.

12         MR. MARTINEZ:   But, Judge, that's --

13         THE COURT:   Let's move on.

14

15              (The following proceedings were held in open

16    court:)

17

18         THE COURT:   Mr. Martinez?

19    BY MR. MARTINEZ:

20         Q.   Back then you were going also to the -- were

21    you attending the Harvest Family Church?

22         A.   Yes, I was.

23         Q.   Let's talk about some of the things you may or

24    may not have told Sharon Murphy about your previous

25    experiences.

1      A.    You were here when Sharon Murphy opined or gave

2  the opinion that she thought that when you were first with

3  Mr. Andriano that was your first experience.  Do you remember

4  that?

5           MR. PATTERSON:  Judge, I don't recall that testimony.

6           THE COURT:  Overruled.  She could answer question.

7           THE WITNESS:  No, I don't remember that.

8  BY MR. MARTINEZ:

9      Q.    Ma'am, she indicated that when you were with

10  Mr. Andriano you cried.  Do you remember that?

11      A.    Yes.

12      Q.    And she was also asked on cross-examination

13  about the issue about crying and -- actually, she was asked

14  on direct examination by Mr. Patterson.  She was asked was

15  that her first sexual experience, and do you remember Sharon

16  Murphy saying yes?

17      A.    No, I don't remember that.

18      Q.    So if everybody else's recollection -- let's do

19  it this way.  Why did you cry with Mr. Andriano?

20      A.    As I indicated to her, I didn't know why

21  either.  It was -- it was really strange.

22      Q.    Did you cry with Didos Gamez?

23      A.    No.

24      Q.    Did you cry with Didos Gamez all the times you

25  made love to him or had sex with him?

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1       A.    I didn't have sex with him.  I only had sex

2   with him once.

3       Q.    Ma'am, didn't you have sex with him over four

4   times, between four and five times?

5       A.    I don't recall.  I -- I'm just not -- I don't

6   recall.

7       Q.    Do you remember that in the -- when it was very

8   late at night you would go over to his apartment.  You went

9   over to his apartment on at least two occasions and had sex

10  with him?

11      A.    No, I don't recall.

12      Q.    Do you recall that on at least two occasions he

13  came over to your apartment at night and had sex with you?

14      A.    No.  I recall one time that he did.

15      Q.    So you only remember having sex with him one

16  time total?

17      A.    Yes.

18      Q.    And you indicated that he's the individual that

19  you were with first, correct?

20      A.    Yes.

21      Q.    But he was before Mr. Andriano, correct?

22      A.    Yes.

23      Q.    And somebody else that you indicated that you

24  may have been intimate with was Vernon Barnes, right?

25      A.    Yes.


                 TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1          Q.    And he was also before Mr. Andriano, right?

2          A.    Yes.

3          Q.    You didn't cry with him either, right?

4          A.    No.

5          Q.    And with regard to Mr. Gamez, he never took you

6     out to the movies, did he?

7          A.    No.  Our -- it was a bar thing.

8          Q.    Well, he -- he never took you out to dinner,

9     right?

10         A.    No.  I think we would just eat fast food

11    together.

12         Q.    Actually, you indicate -- you just indicated

13    that there was a bar thing between you and him, right?

14         A.    Uh-huh, yes.

15         Q.    What that means is he met you at a bar one

16    night and the two of you went home, right?

17         A.    That's not what that means.

18         Q.    And with regard to Vernon Barnes, he never took

19    you out to dinner either, did he?

20         A.    No, we didn't go out to dinner.

21         Q.    Never went out to the movie or anything like

22    that, right?

23         A.    No.

24         Q.    And you indicated that with him it was the

25    girls or whatever girls may have been that caused you two to

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    break up, right?

2         A.    Me finding out he had a girlfriend, yes.

3         Q.    So it wasn't that they found out about you, but

4    you found out he had a girlfriend, right?

5         A.    Yes.  And then they approached me and told me

6    because I didn't know.

7         Q.    So some girls came up to you and told you he

8    had a girlfriend, right?

9         A.    Yes.

10        Q.    You broke up with him?

11        A.    We weren't necessarily going together.  It

12   was -- I don't how to explain it.

13        Q.    Was it more like the Travis Black situation?

14        A.    No.  No.

15        Q.    Was it more than that?

16        A.    No.  We just were always at the bars together

17   and sometimes I'd go out on a farm with him and things like

18   that, go to Gila Bend.

19        Q.    With regard to him, you met him at Mel's Bar,

20   didn't you, out in Casa Grande?

21        A.    No.  I believe I met him at Spirits.

22        Q.    And after meeting him at Mel's Bar, didn't you

23   go home with him?  Or whatever bar it was, didn't you go home

24   with him that night?

25        A.    No.

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000005057

1      Q.    And didn't you have sex with him that night?

2      A.    No, I did not.

3      Q.    And the reason that you broke up actually was

4 because he found you or caught you, whatever term you want to

5 use, having relations or in bed with Jonathan Householder,

6 didn't he?

7      A.    No, not at all.  I've never had a relationship

8 with Jonathan Householder.

9      Q.    You do know Jonathan Householder, don't you?

10     A.    I do.

11     Q.    He was Vernon Barnes's roommate?

12     A.    For a time, yes.

13     Q.    And you even left your card at Jonathan

14 Householder's room, didn't you, from the Quail Garden

15 Apartments?

16     A.    No, I didn't.

17     Q.    How about Pete Munoz?  Do you know him?

18     A.    I do.

19     Q.    And he also lived at the Quail Garden

20 Apartments, didn't he?

21     A.    Yes.

22     Q.    And you also had relations with him, didn't you?

23     A.    No, I did not.

24     Q.    Isn't it true that you never went to the movies

25 with him either, right?

1       A.      That's correct.

2       Q.      You never went out to dinner with him?

3       A.      That's correct.

4       Q.      But you did enjoy a drink with him, right?

5       A.      No.

6       Q.      And for two or three months you and he did not

7  enjoy having -- you and he did not have sexual relations?

8       A.      No, we did not.

9       Q.      Let's go back to the Abusive Observation

10  Checklist, which is Exhibit Number 454.  It does indicate

11  that there were some three to ten times that you had minor

12  bruising.  Do you remember writing that down?

13      A.      Yes, sir.

14      Q.      And if you do then, do you remember then

15  speaking to the detective about that issue?

16      A.      No, I don't.

17      Q.      Well, let me go ahead and play the tape for you

18  and see if that refreshes your recollection, and then we'll

19  play it.

20      THE COURT:  Let's do this.  We'll go ahead, take our

21  afternoon break at this point in time.  During this break

22  remember the entire admonition I've given you and do not

23  discuss this case with anyone, do not let anyone discuss the

24  case with you.  Keep an open mind.  Have a nice break.  We'll

25  see you in about 20 minutes.


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1          (Recess.)

2

3          THE COURT:  There is CR 2000-096032, State of

4   Arizona versus Wendi Elizabeth Andriano.  The record will

5   reflect the presence of the defendant, who's on the witness

6   stand.

7                    Ladies and gentlemen of the jury, I know it's

8   pretty warm in here.  I'm trying to get it cooled down, but

9   somehow I don't -- when I wave that magic wand, it doesn't

10  work all the time.  We're working on it.  I just want you to

11  know they're working on it.  We're trying to do the best we

12  can.  But the defendant is on the witness stand, and we'll

13  continue with the cross-examination by Mr. Martinez.

14

15  CONTINUED CROSS-EXAMINATION BY MR. MARTINEZ:

16          Q.    Ma'am, you're the same individual who was

17  previously testifying before the break?

18          A.    Yes, sir.

19          Q.    At the break you took a look at Exhibit 486,

20  correct?

21          A.    Yes.

22          Q.    That's a statement by you involving whether or

23  not you've ever had any bruises during the marriage, right?

24          A.    That's not what I recall it being.

25          Q.    The question was did he ever leave any marks

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000005060

1   and your answer was no, I don't.  I don't mark -- I don't

2   bruise.  Do you remember saying that?

3          A.    Yes.

4          MR. MARTINEZ:  Move for admission of Exhibit 486.

5          MR. PATTERSON:  No objection, Judge.

6          THE COURT:  Exhibit 486 for identification is

7   admitted into evidence.

8   BY MR. MARTINEZ:

9          Q.    However, ma'am, in Exhibit 454, which is the

10  Abusive Observation Checklist, you did indicate, for example,

11  that in terms of minor bruises that Mr. Andriano had bruised

12  you at least 10 times, right?

13         A.    I believe it said three to ten times.

14         Q.    So it would be a maximum of ten, right?

15         A.    According to that chart, yes.

16         Q.    You filled that chart out, right?

17         A.    Yes, I did.

18         Q.    So according to this, he bruised you at least

19  three to ten times, right?

20         A.    Three to ten times.

21         Q.    Which one's right?  Did he bruise you or --

22         A.    Yes, he did bruise me.

23         Q.    So what you did was lie, right?

24         MR. PATTERSON:  Judge, objection.

25         THE WITNESS:  I think it was taken --

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1        MR. PATTERSON:  Her answer on the tape is "I don't

2    bruise easily."

3        THE COURT:  Sustained.

4    BY MR. MARTINEZ:

5        Q.    Ma'am, do you remember the question was "Did he

6    ever leave any marks?"  Do you remember that?

7        A.    Yes.

8        MR. PATTERSON:  Okay.  What page?

9        MR. MARTINEZ:  By the detective --

10       MR. PATTERSON:  What is the counter number?  I'm

11   sorry.  If I could have the counter number of this tape?

12       MR. MARTINEZ:  It's Exhibit Number --

13       THE COURT:  Exhibit 486.

14       MR. MARTINEZ:  486.

15       THE COURT:  The one just admitted?

16       MR. PATTERSON:  Right.  I have the exhibit number,

17   but I have previous -- can I just fill you in on something

18   here?

19       THE COURT:  Yes.

20

21            (The following proceedings were held at the

22   bench:)

23

24       MR. PATTERSON:  We had the Rule 15 issue on Thursday,

25   and Mr. Martinez and I worked it out in that he gave me the

1    counter numbers of when certain portions of her statement

2    commenced and ended so that he didn't have to reproduce the

3    snippets that he's using.  But I need the counter number of

4    where this particular statement is so I could follow along in

5    the transcript.  That's why I asked for the counter number.

6         MR. MARTINEZ:  First of all, there is no Rule 15

7    issue so I disclosed that over four years ago.  I chose to

8    take snippets out of something is just the style.

9         THE COURT:  Okay.

10        MR. MARTINEZ:  But it's a capital case and I just

11   want to make sure there is no Rule 15 issue.

12        MR. PATTERSON:  I'm not suggesting there is.  We've

13   made it happen.

14        THE COURT:  Just as a professional courtesy.

15        MR. MARTINEZ:  I'll announce it.

16        THE COURT:  Okay.

17

18             (The following proceedings were held in open

19   court:)

20

21   BY MR. MARTINEZ:

22        Q.   Ma'am, at 8:50:50 were you asked the following

23   question by the detective, "Did he ever leave any marks?"  Do

24   you remember seeing it on the tape?

25        A.   Yes, sir.


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000005063

1        Q.     And that you answered "No."  That's what you
2    said, right?
3        A.     Yes, that is what I said.
4        Q.     And meaning if he didn't leave any marks, that
5    means there was no bruise, right?
6        A.     No.
7        Q.     So you're saying that leaving -- a person can
8    bruise but not have any marks on them?
9        A.     I don't think "bruise" and "mark" is the same
10   word, no.
11       Q.     I didn't ask you if "bruise" and "mark" are the
12   same word, ma'am.  I asked you whether or not they meant the
13   same thing.  In other words, if he slaps you and he leaves
14   something there, you're going to say that's a bruise, that's
15   not a mark?
16       A.     A slap mark is different from a bruise, yes.
17       Q.     I'm not asking about a slap mark.  I'm asking
18   about any mark, because he could have hit you with something
19   else other than his hand, right?
20       A.     Yes.
21       Q.     So you're saying then, just so I'm clear, did
22   he ever leave any marks, you answered "no"?
23       A.     That is what I said.
24       Q.     Okay.  Yet in your inventory here you indicated
25   that he bruised you up to 10 times, right?

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1       A.      Yes, sir.

2       Q.      Additionally, you indicated that he punched you

3    10 to 49 times.  He punched you as much as 49 times, right?

4       A.      The key figure there is 10 to 49, and so I did

5    not --

6       Q.      Ma'am, would you agree that you wrote down 10

7    to 49 times?

8       A.      I checked the box 10 to 49 times, yes.

9       Q.      Okay.  And which could mean as high as 49,

10    right?

11       A.      It could, yes.

12       Q.      And it could be as low as 10, right?

13       A.      Yes, sir.

14       Q.      Okay.  And all of these times when there were

15    bruises, all of these times where he punched you, there is

16    not one single time that you called the police, right?

17       A.      No, there is not.

18       Q.      There's not one single time that you sought

19    medical care that you went to the doctor for, right?

20       A.      No, sir.

21       Q.      There's no medical report that would indicate

22    any bruising whatsoever, right?

23       A.      No, sir.

24       Q.      There is no indication in writing anywhere that

25    this ever happened, right?

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1          A.    By a police agency, no.

2          Q.    Or by anybody.  You didn't write that down

3    either, did you?

4          A.    Well, no.

5          Q.    Nobody wrote it down, right?

6          A.    Not that I'm aware of.

7          Q.    All we have is your word on these, right?

8          A.    That and I believe there was other testimony to

9    that effect.

10         Q.    Well, with regard to this particular document

11   454, you filled it out, right?

12         A.    I did.

13         Q.    And you're the one that provided all the

14   information on here, right?

15         A.    Yes, sir.

16         Q.    And you were not helped by Sharon Murphy in any

17   way to fill this out, right?

18         A.    No, sir.

19         Q.    But she did help you fill out some of the other

20   documentation, right?

21         A.    I believe there was one that she filled out

22   because I wasn't allowed to.

23         Q.    Oh, so in your view, the reason you weren't

24   allowed to fill it out is because you were not allowed to?

25         A.    I was sitting behind glass.  I couldn't --

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1          Q.     Okay.  So while you could fill out Exhibit 454,
2     you couldn't fill out the others, the other one?
3          A.     There was one in particular that I couldn't
4     fill out, yes.
5          Q.     Now, one of the things that Ms. Murphy talked
6     to us about was this power and control wheel.  Do you
7     remember that?
8          A.     Yes, sir.
9          Q.     Exhibit 453?
10         A.     Yes, sir.
11         Q.     And one of the other things she talked about
12    was in terms of domestic violence there really doesn't have
13    to be no violence at all.  Do you remember that?
14         A.     I do believe she said there doesn't have to be
15    physical violence.
16         Q.     And in fact one of the things she talked about
17    was that you indicated that there was this look that he would
18    give you, right?
19         A.     Yes, sir.
20         Q.     And that's what sometimes would make you
21    afraid, right, the look?
22         A.     Oh, yes, sir.
23         Q.     And that's because it's a power and control
24    issue, not a hitting issue, right?  That's what she said,
25    right?

```
 1              MR. PATTERSON:  Judge, I'm confused whether he's

 2    citing Dr. Murphy's testimony or wants testimony from the --

 3              THE COURT:  Sustained.

 4              MR. PATTERSON:  -- witness.

 5              THE COURT:  Rephrase the question.

 6    BY MR. MARTINEZ:

 7         Q.    Do you understand -- you were here when Sharon

 8    Murphy testified, right?

 9         A.    Yes, sir.

10         Q.    She indicated that there really wasn't that

11    many instances of physical abuse on you.  Do you remember

12    that?

13              MR. PATTERSON:  Judge, again, comparing witness

14    testimony is improper.

15              THE COURT:  Sustained.

16    BY MR. MARTINEZ:

17         Q.    Ma'am, how many instances of abuse did Sharon

18    Murphy put in her report?  How many did you tell her about?

19         A.    I don't know the number.

20         Q.    Well, you told her about the limo, right?

21    That's one.

22         A.    Okay.

23         Q.    But you didn't tell her about what happened in

24    the car, right, and in the Yukon?

25         A.    No, I didn't tell her that.
```

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    Q.    So far we have one.  You also told her about
2    the one that happened after the -- the softball game, right?
3    A.    Yes.
4    Q    And that's it.  You didn't tell her anything
5    else?
6    A.    No.  I believe I told her other things.
7    Q.    Which other ones did you tell her?
8    A.    I don't have the report in front of me.  I had
9    quite a lengthy conversation with her.
10    Q.    In this particular case she also indicated that
11    you didn't like the word "fucking."  Do you remember her
12    saying that it's not something that you used?
13    A.    Yes, sir.
14    Q.    And "fuck" is a word that Mr. Andriano used,
15    and that was a way for him to control or exercise power over
16    you?
17    A.    That was part of his vocabulary, yes.
18    Q.    And even though it's part of his vocabulary,
19    when he used that word, that made you scared or under his
20    control, right?
21    A.    No, that's not a correct statement.
22    Q.    So he could use that word and you wouldn't be
23    scared then, right?
24    A.    He could.
25    Q.    And it was only if he gave you the look plus

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000005069

1   the word?

2          A.   It depended on the circumstance, yes.

3          Q.   So not all the time that is he used that word

4   were you scared then?

5          A.   No, sir.

6          Q.   Were you offended every time he used that word?

7          A.   If it was in the presence of the children, yes.

8          Q.   Other than that were you offended all the

9   time --

10         A.   No.

11         Q.   -- when he used that word?

12         A.   No.

13         Q.   In fact you've used that word, haven't you?

14         A.   I have, yes.

15         Q.   In fact when Mr. Andriano was dying on the

16  ground after being poisoned, you used that word, didn't you?

17         A.   I did not.

18         Q.   You told him to get his ass up, didn't you?

19         A.   I did not.

20         Q.   And then as you tried to lift him, you told him

21  to get your fucking ass up, didn't you?

22         A.   I did not.

23         Q.   When you were attempting to take Mr. Andriano

24  to the hospital, Chris Hashisaki was present, wasn't she?

25         A.   Yes, she was for part of the time.


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1     Q.     Right.  And she also spoke to Mr. Andriano,

2     right?

3     A.     Yes, she did.

4     Q.     So that interaction between and you Mr.

5     Andriano was not private, was it?

6     A.     Not while Chris was there, no.

7     Q.     No.  That was public.  In other words if we use

8     Mrs. -- we use Sharon Murphy's vocabulary, if there's any

9     power and controlling that is going on or any domestic

10    violence, that's public.  In other words, somebody else is

11    seeing it, right?

12           MR. PATTERSON:  Judge, objection.

13           THE WITNESS:  I don't understand what you're asking.

14           THE COURT:  Sustained.

15    BY MR. MARTINEZ:

16    Q.     Somebody else was present, right?

17    A.     Chris was there, yes.

18    Q.     Just like when on the limo situation there were

19    other people present.  Chris was present at that time too,

20    right?

21    A.     Yes, she was.

22    Q.     And during this particular time she also spoke

23    to Mr. Andriano, correct?

24    A.     Which particular time?

25    Q.     When she was at your apartment?

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000005071

1      A.    Yes.

2      Q.    And that was during the time that perhaps you

3   were in the back, right, talking to the --

4      A.    I was on the phone, yes.

5      Q.    And according to you, the paramedics told you

6   that they were busy and they couldn't come out there, didn't

7   they?

8      A.    No, I don't believe so.

9      Q.    So you didn't tell anybody that you had called

10   the paramedics and they had told you they weren't coming

11   because they were busy?

12      A.    No, I wouldn't say that.

13      Q.    In terms of again who ruled the roost in your

14   house, you were going out twice a week there toward the end,

15   weren't you?

16      A.    Not every week, no.

17      Q.    You weren't going out to Tijuana Country Club

18   on Tuesdays?

19      A.    Occasionally, yes.

20      MR. PATTERSON:  Objection.  Time frame?

21      THE COURT:  Sustained.

22      MR. MARTINEZ:  I've already indicated right before he

23   died, the two or three months before.

24      THE COURT:  Why don't you restate the question with

25   that in there.


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    BY MR. MARTINEZ:

2         Q.    In the two or three months before he died, you

3    were going out two or -- two times a week, weren't you?

4         A.    Not every week.

5         Q.    You did go on Tuesdays to Tijuana Country Club,

6    didn't you?

7         A.    Not every Tuesday, no.

8         Q.    But you did, didn't you?

9         A.    Yes, I did.

10        Q.    And it was on Tuesdays, right?

11        A.    Yes.

12        Q.    And that was ladies night, right?

13        A.    Yes.

14        Q.    And then in addition you would go out Rockin'

15    Rodeo?

16        A.    Yes, when Joe went to the lake.

17        Q.    Ma'am, is that "yes" or "no"?

18        A.    I can't answer it "yes" or "no."

19        Q.    So you didn't go to Rockin' Rodeo?

20        A.    Not every weekend.

21        Q.    I didn't ask you if it was every weekend. I

22    asked if you went to --

23        MR. PATTERSON:   Objection.   Which weekend?

24        THE WITNESS:   Yeah.

25        MR. MARTINEZ:   In the last two or three months before

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    he died.

2              THE WITNESS:  Is there --

3              MR. PATTERSON:  Judge, please.  That contemplates 12

4    or 14.

5              THE COURT:  Sustained.  Rephrase the question.

6    BY MR. MARTINEZ:

7         Q.    In the last two or three months before he died,

8    did you ever go to Rockin' Rodeo on the weekend?

9         A.    Yes, I did.

10        Q.    How many times?

11        A.    However many times he went to the lake.  That's

12   the only times I went.

13        Q.    And one of the things that you told us was that

14   he went to the lake on September, I think it was, 27 when you

15   met Travis Black.  Do you remember telling us that?

16        A.    The night I met Travis Black, yes, Joe was at

17   the weekend -- at the lake for the weekend.

18        Q.    And you're sure that that was a weekend.

19        A.    The night I met Travis Black.

20        Q.    Yes, uh-huh.

21        A.    It was a Friday night.

22        Q.    With regard to -- okay.  With regard to going

23   out to Rockin' Rodeo or whether it was Tijuana Country Club,

24   Mr. Andriano didn't want to you go out all of those times,

25   did he?

1        A.    No, that's not true.  I had his permission to

2   go out.

3        Q.    Each and every time?

4        A.    Yes.  As long as I was home by midnight.

5        Q.    So then why were you hiding a dress and panties

6   in your office then?

7        MR. PATTERSON:  Objection, judge.  Form of the

8   question.

9   BY MR. MARTINEZ:

10        Q.    In October of 2000.

11        MR. PATTERSON:  No testimony she was hiding anything,

12   Judge.

13        THE COURT:  Sustained.

14   BY MR. MARTINEZ:

15        Q.    Why did you have a dress and black panties in

16   your office in October of 2000 then?

17        A.    I don't recall why.

18        Q.    Let me show you Exhibit Number 170.  That

19   night -- actually, that's in evidence.

20        THE COURT:  What number exhibit again is this?

21        THE WITNESS:  170.

22   BY MR. MARTINEZ:

23        Q.    That's your dress, right?

24        A.    Yes, sir.

25        Q.    Those are your panties, right?

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000005075

1           A.    Yes, sir.

2           Q.    They were in your office, weren't they?

3           A.    Yes.

4           Q.    There's no reason to have a dress and panties

5     in your office, is there?

6           A.    Yes, there is.

7           Q.    Well, ma'am, wasn't your apartment within

8     walking distance of that leasing office?

9           A.    Yes, it was.

10          Q.    It was -- it would take you 5 minutes to get

11    there, right?

12          A.    A few minutes, yes.

13          Q.    So there really is no reason to store a dress

14    and panties in the office, is there?

15          A.    Yes.

16          MR. PATTERSON:  Objection.  Argumentative.  She said

17    there is a reason.

18          THE COURT:  Overruled.  Go ahead and answer the

19    question if you can.

20          THE WITNESS:  I did.  Yes, sir.

21    BY MR. MARTINEZ:

22          Q.    You also indicated that you don't like

23    confrontation, right?

24          A.    No, I don't.

25          Q.    You're not one who likes arguments, so you just


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000005076

1   let things go, right?

2          A.    Yes, sir.

3          Q.    But you -- you are somewhat assertive, aren't

4   you?

5          A.    I can be in a professional way.

6          Q.    Well, you could also be aggressive and

7   assertive in a social sense, can't you?

8          MR. PATTERSON:  Judge, again, that -- that's an

9   imprecise question.  It contemplates a whole host of

10  scenarios.

11         THE COURT:  Overruled.  Go ahead, answer the question

12  if you can.

13         THE WITNESS:  Assertive?  I don't -- I don't know.

14  You'll have to -- I can't answer that.

15  BY MR. MARTINEZ:

16         Q.    Do you remember you met Joseph Andriano at a

17  bar, right?

18         A.    Yes, I did.

19         Q.    And that it was, according to you, it was St.

20  Patrick's Day, right?

21         A.    Yes.

22         Q.    And you exchanged numbers, right?

23         A.    Yes.

24         Q.    And he didn't call you, did he?

25         A.    He told me to call him.

1          Q.     Ma'am, you gave him your number and he didn't

2     call you, right?

3          A.     Yes, he did.

4          Q.     Ma'am, initially he called you first?

5          A.     No.

6          Q.     Do you remember that you also indicated that he

7     didn't call you but you called him.  Do you remember that?

8          A.     Yes.  Yes, sir.

9          Q.     And you indicated that he didn't return your

10    calls initially and so you made calls to him.  Do you

11    remember that?

12         A.     Yes, sir.

13         Q.     That's plural?

14         A.     Yes, sir.

15         Q.     That's assertive, don't you think?

16         A.     He requested me to call him.  I didn't --

17         Q.     Ma'am, that's not the question.  Whether he

18    asked you to call him or not isn't the question.  The

19    question is whether or not that's assertive.  You took

20    initiative to call him, didn't you?

21         A.     I can't answer it using those words, no.

22         Q.     Okay.  Did you not -- were you not the one who

23    picked up the phone to call him before he called you?

24         A.     Yes, because he asked me to.

25         Q.     Is the answer "yes" or "no"?  I'm not asking

1    you if he asked you to call him.  Did you pick up the phone

2    to call him before he called you?

3          A.    Yes.

4          Q.    And did you do it on more than one occasion

5    before he called you?

6          A.    Yes, I did.

7          Q.    With regard to Mr. Rick Freeland, didn't you go

8    over to his apartment to make sure you got an explanation for

9    what was happening with your relationship?

10         A.    Yes, I did.

11         Q.    You stood outside of his door, right?

12         A.    Yes.

13         Q.    At the Sanctuary you followed him around such

14   that he felt uncomfortable and left, right?

15         A.    I don't recall.

16         Q.    That's what you said on direct examination last

17   week.  You don't remember it now?

18         A.    I tried to talk to him there and he wouldn't

19   talk to me.

20         Q.    That's right.  And you went up to talk to him.

21   He didn't come up to talk to you, right?

22         A.    That's correct.

23         Q.    And he walked away, right?

24         A.    Yes, sir.

25         Q.    And then that same night when you got home, you

1    saw that his light was on, right?

2            A.    I don't -- I don't remember what -- why.

3            Q.    You didn't know he was home and so you just

4    took a chance and went over to his house.  Is that right?

5            A.    No, I knew he was home, I just don't recall the

6    reason.

7            Q.    So you knew he was home and it was late, wasn't

8    it?

9            A.    Yes, it was.

10           Q.    It was after 1:00 in the morning?

11           A.    No.  It may have been midnight.

12           Q.    It was late, around midnight then?

13           A.    Yes.

14           Q.    And you decided that was the best opportunity

15   to go over there and get an explanation from him as to why

16   you were no longer friends?

17           A.    No.  I don't think I consciously made that

18   decision, no.

19           Q.    It was a voluntary act on your part to go to

20   his apartment, wasn't it?

21           A.    Yes.

22           Q.    Nobody told you to go?

23           A.    No, sir.

24           Q.    You weren't so drunk that you don't remember

25   it, right?

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1          A.    I remember it.

2          Q.    And that's when you threatened him if he didn't

3   open the door that you were going to get a key, right?

4          A.    No, sir.

5          Q.    Now, again, to see whether or not you're

6   assertive, one of the things you were telling us was that you

7   lived at the Quail Garden Apartments and that initially you

8   were only given a one-bedroom apartment.  Do you remember

9   that?

10         A.    Yes, sir.

11         Q.    And that when Joseph moved in that one of the

12  things that the two of you talked about was getting a

13  two-bedroom apartment.  Do you remember that?

14         A.    That's what he talked to me about, yes.

15         Q.    Ma'am, the issue is did the two of you -- the

16  question is did the two of you talk about getting a

17  two-bedroom apartment, "yes" or "no"?

18         MR. PATTERSON:  Well, Judge, it doesn't call for a

19  "yes" or "no."  She could answer as she deems appropriate.

20         THE COURT:  Overruled.  Go ahead, answer the

21  question.

22         THE WITNESS:  Actually, Joe asked me --

23  BY MR. MARTINEZ:

24         Q.    So is that "yes"?

25         A.    No, that's not "yes."

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1        Q.    So he didn't -- so the two of you didn't talk

2   about getting a two-bedroom apartment?

3        A.    That's not how I'd phrase it, no.

4        Q.    He verbalized it to you then?

5        A.    No.

6        Q.    There was communication between the two of you

7   about increasing the number of rooms in the apartment

8   that -- in the apartment, right?

9        A.    Yes, sir.

10       Q.    The two of you verbalized together?

11       A.    Right.  Verbalized, but not -- we didn't decide

12  on it together, no.

13       Q.    You verbalized it together, didn't you?

14       A.    I think you're taking it out of context.

15       Q.    Ma'am, did you or did you not talk, verbalize

16  it, you and Mr. Andriano, about getting a bigger apartment,

17  getting a two-bedroom apartment?

18       A.    He did, yes.

19       Q.    So you just sat there and didn't say a word?

20       A.    I said some words, yes.

21       Q.    Okay.  That's called a conversation, isn't it,

22  when he says something and you say something.  That's a

23  conversation, right?

24       A.    Yes.

25       Q.    So you had a conversation about getting --

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000005082

1   going from a one to two-bedroom apartment, right?

2        A.   Yes, sir.

3        Q.   And you said, well, you know, one of the things

4   you told us on direct examination was, you know, "she didn't

5   want to give me a two-bedroom apartment."  Do you remember

6   saying that?

7        A.   Oh, yes, sir.

8        Q.   It was unprecedented or in your mind that it

9   wasn't a real good shot at you getting this two-bedroom

10  apartment, right?

11       A.   That's correct.

12       Q.   But one of the other things that you told us

13  about that was that you persisted and you kept sort of going

14  after the manager until she relented and gave you a

15  two-bedroom apartment, right?

16       A.   That is correct.

17       Q.   That's the assertiveness, isn't it?

18       A.   Not on my part.

19       Q.   Ma'am, do you remember telling us that you

20  watched this movie, Rocky movie, growing up in high school,

21  junior high, whatever it was.  Do you remember that?

22       A.   Yes, sir.

23       Q.   And that what you took from that, or one of the

24  mottos or things of that particular movie was if there's a

25  goal, you should go out and try to achieve it?

```
 1          A.    If I set a goal, yes, I should do everything I
 2     can do to achieve it.
 3          Q.    And somebody else can have goals too, right?
 4          A.    Most definitely.
 5          Q.    They could go out and try to achieve them too,
 6     right?
 7          A.    They could, yes.
 8          Q.    It's not just the things directed to you, is
 9     it?
10          A.    I would hope not.
11          Q.    With regard to that movie there was a goal here
12     in mind and that was to get a two-bedroom apartment?
13          A.    That was Joe's goal, yes.
14          Q.    Well, you and he had a conversation about it,
15     right?
16          A.    Yes, we did.
17          Q.    As a result of that conversation you went into
18     action, didn't you?
19          A.    I did.
20          Q.    You started to talk to somebody about it?
21          A.    My manager, yes.
22          Q.    Even though it looked like it wasn't going
23     to -- it wasn't something that she was going to do, right?
24          A.    Exactly.
25          Q.    You kept at her until she finally said yes?
```

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1        A.      Yes.

2        Q.      So you achieved a goal, whether it was yours or

3    somebody elses, you achieved the goal, right?

4        A.      Correct.

5        Q.      The other thing you were telling us about,

6    well, Joe then moved in to the apartment that you had at the

7    Quail Gardens, right?

8        A.      Yes.

9        Q.      And when he moved in, that created quite a

10   problem at your house, right?

11       A.      At my house?

12       Q.      Yes.

13       A.      No.

14       Q.      Didn't your father get upset with you?

15       A.      Yes.

16       Q.      Didn't you tell me that he didn't speak to you

17   for a very long time?

18       A.      Yes.

19       MR. PATTERSON:  Judge, objection to the form of the

20   question, use of the term "house" talking about the parent's

21   house.

22       THE COURT:  Sustained.

23   BY MR. MARTINEZ:

24       Q.      Let's go over this.  When he moved into your

25   apartment, your father was upset, right?

1     A.    Very.

2     Q.    And he wouldn't speak to you, right?

3     A.    That's correct.

4     Q.    But having Joe move in there, you -- the idea

5  of having Joe in your apartment came from you, right?

6     A.    Yes, it did.

7     Q.    And you knew going in that your father would be

8  none too happy about it, right?

9     A.    Yes, I did.

10     Q.    Because of your upbringing, right?

11     A.    Yes, sir.

12     Q.    And he, I'm sure, discussed it with you on

13  other occasions, right?

14     A.    Yes.

15     Q.    But you then had a goal.  You wanted Joe to

16  move in with you, Joseph to move in with you, right?

17     A.    Yes.  We -- he wanted to also.

18     Q.    I'm not asking about him.  You just told me

19  that you wanted him to move in with you, right?

20     A.    Yes.

21     Q.    That's the goal.  It can be seen as a modest

22  goal, but it's a goal, right?

23     A.    I don't perceive it as a goal, but --

24     Q.    Well, it's something that you want, right?

25     A.    Yes.  I didn't want to be woke up at 3:00 in

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    the morning.

2         Q.    Ma'am, am I asking you whether you wanted to be

3    woken up at 3:00 in the morning?

4         A.    No, but --

5         Q.    We're talking about goals, aren't we?

6         A.    You are, yes.

7         Q.    No, I'm -- are you not understanding what I'm

8    saying?

9         A.    Some of it, yes.  Not all of it.

10        Q.    Well, you will stop me when you don't

11   understand, right?

12             THE WITNESS:  I'm trying to.

13             MR. PATTERSON:  Judge, he's arguing with the witness.

14             THE COURT:  Mr. Martinez, don't get argumentative.

15             THE WITNESS:  I'm trying --

16   BY MR. MARTINEZ:

17        Q.    Ma'am, you indicated that's what you wanted,

18   right?

19        A.    Yes.

20        Q.    And if it's something that you want, that's

21   sort of a goal, isn't it?  It's an aspiration, if you don't

22   want, like, the word "goal," wants, aspirations, right?

23        A.    Wants and goals are different in my mind,

24   but --

25        Q.    Okay.  There's an end that you want to achieve

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000005087

1   in both -- both senses, isn't there?

2       A.   Yes.

3       Q.   And so in that sense both the goal and a desire

4   or wanting are the same thing, right?

5       A.   No, sir.

6       Q.   So to you a goal and wanting are not -- even in

7   the way I've defined it, are not the same things?

8       A.   Not in my mind, no.

9       Q.   Okay.  But you did have a want, right?

10      A.   Yes.

11      Q.   And in order to achieve that want, you didn't

12  care that this authority figure who had this power and

13  control over you while you were growing up, you didn't care

14  whether he got upset, did you?

15      A.   I was no longer under his roof, no.

16      Q.   I'm not asking you if you were under his roof,

17  did I?

18      A.   Well, you said if he had power and control

19  over --

20      Q.   No, had power and control over here?

21      A.   He had had, yes.

22      Q.   You didn't care about this authority in your

23  past.  You thought about it, you did it anyway, right?

24      A.   I very much cared about it.

25      Q.   But in spite of what you thought and in spite

1    of what was going on, you still did it anyway, right?

2          A.    That's correct.

3          Q.    And, again, that shows you -- that shows us

4    that if you want to do something even if the consequences are

5    a little bit unpleasant, you'll go ahead and do them, right?

6          A.    Not always, no.

7          Q.    I'm not asking always, but in that circumstance

8    you did, right?

9          A.    In that circumstance I did, yes.

10         Q.    And also in the previous circumstances that

11   we've been discussing, right?

12         A.    No.  I don't -- I can't answer that question.

13         Q.    Well, no matter the circumstances, with regard

14   to Rick Freeland you wanted to confront him anyway, right?

15         A.    Yes, I confronted Rick Freeland.

16         Q.    There were consequences to that, weren't there?

17         A.    I don't believe so.

18         Q.    People that you worked with saw you, didn't

19   they?

20         A.    Yes, they did.

21         Q.    Wasn't even it a little bit embarrassing to you

22   to have them see you knocking on the door, begging to be let

23   in?

24              MR. PATTERSON:  Judge, use of the term "begging" to

25   come in.

1          THE COURT:  Sustained.

2          MR. PATTERSON:  That's not the evidence in this case.

3   BY MR. MARTINEZ:

4          Q.    Asking to come in at whatever time?

5          A.    At that moment, no, I was not concerned about

6   them.

7          Q.    I didn't say at that moment.  I'm asking isn't

8   there a consequence, whether at that point or later on, to

9   you being seen by people that you care about, people that you

10  socialize with, seeing you standing outside a door?

11         A.    No.  They knew what was going on.

12         Q.    So you weren't embarrassed by what they saw,

13  right?

14         A.    No, sir.

15         Q.    So by the same token, when you saw the issue of

16  the limousine, what they saw, that didn't embarrass you

17  either, right?

18         A.    Yes, it did.

19         Q.    I see.  It's just different kinds of --

20  different circumstances for you, give you different

21  reactions.  Is that what you're saying?

22         MR. PATTERSON:  Judge, he's arguing with the witness.

23         THE COURT:  Overruled.  Go ahead, answer the question

24  if you can.

25         THE WITNESS:  You're comparing two different

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1   circumstances that have nothing to do with each other.

2   BY MR. MARTINEZ:

3        Q.    On the night that you came back from the --

4   your 30th birthday, was Chris Hashisaki there?

5        A.    Yes, she was.

6        Q.    On the night you stood outside of the door, was

7   Chris Hashisaki there?

8        A.    No.

9        Q.    Ma'am, she -- she was there, wasn't she?

10       A.    He lived next door, but no she was not there.

11       Q.    Okay.   Shannon Sweeney was there too on the

12  night with the limousine, wasn't she?

13       A.    Yes.

14       Q.    And Shannon Sweeney was there that night also

15  at Rick Freeland's door, wasn't she?

16       A.    No, she was not.

17       Q.    Erik Vaillant, was he there on the limo thing?

18       A.    No.

19       Q.    But he was there when you were standing outside

20  Rick Freeland's apartment?

21       A.    Actually, Shannon and Eric were in Eric's

22  apartment.

23       Q.    They were -- they could see what was going on,

24  couldn't they?

25       A.    That's what they testified to, yes.


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000005091

1        Q.     Well, you are the manager or were the manager

2    of that apartment complex, right?

3        A.     Yes, sir.

4        Q.     You knew what apartments they were in, right?

5        A.     Yes.

6        Q.     You know that from Eric's apartment he could

7    see what was going on in Rick's apartment, couldn't he?

8        A.     Yes.

9        Q.     One of the other things that you told us was

10   that you really took good care of your kids.  And, again,

11   this is with regard to this goal oriented thing.

12              And you did tell us a little bit about an

13   injury that Nicolas suffered back in May and June of 1999,

14   right?

15       A.     Yes, sir.

16       Q.     And you really liked your job over there at the

17   Courtyard Apartments, right?

18       A.     Yes, sir.

19       Q.     And Timothy Lee was your boss, right?

20       A.     Yes, sir.

21       Q.     And while you were there, you received a call

22   from Joseph, didn't you?

23       A.     Yes, sir.

24       Q.     And it was about an injury to Nicolas, right?

25       A.     Yes, sir.

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000005092

1     Q.    You were so driven in that job that you refused

2   to go with him to the hospital, didn't you?

3     A.    No, sir.

4     Q.    It was actually Joseph who took him to the

5   hospital?

6     A.    Yes.  Nicolas was in his care.

7     Q.    Well, but you didn't go.  Isn't it -- you

8   didn't go to the hospital, did you?

9     A.    Yes, I did.

10     Q.    Isn't it true that you had -- Timothy Lee was

11   present when you received that call, wasn't he?

12     A.    Yes.  We were in a meeting together.

13     Q.    Isn't it true that he urged you to go and you

14   said "No, I'm not leaving"?

15     A.    No, that's not true.

16     Q.    Isn't it true you did not leave to go to the

17   hospital that afternoon?

18     A.    Oh, yes, sir, I did.

19     Q.    Okay.  And your attitude was cavalier.  In

20   other words, you would rather have stayed there at work than

21   go to the hospital, right?

22     A.    That is absolutely not true.

23     Q.    And when you were there, you were rude to Mr.

24   Andriano on the phone, weren't you?

25     A.    No.

1          MR. PATTERSON:  Which Mr. Andriano?  There are

2     several.

3          THE COURT:  Clarify that if you can, Mr. Martinez.

4     BY MR. MARTINEZ:

5          Q.    Ma'am, Joseph -- and I know there's two

6     Josephs, so let's talk about the decedent, okay?  With regard

7     to the decedent, he called you, right?

8          A.    Yes, he did.

9          Q.    He was the one that notified you about this,

10    right?

11         A.    Yes.  He told me to hurry up and get to the

12    hospital.

13         Q.    So he notified you about this, right?

14         A.    Yes.

15         Q.    And Mr. Lee was also present, right?

16         A.    Yes.

17         Q.    Your brother was not there, was he?

18         A.    He was at school.

19         Q.    And you actually picked him up that day, didn't

20    you?

21         A.    Yes, I did.

22         Q.    What time did you pick him up?

23         A.    Once we got home from the hospital.

24         Q.    So what time did you pick him up?

25         A.    I don't recall the time.

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1       Q.     Didn't you tell us previously that it was 3:30

2    that you picked him up?

3       A.     No, I don't believe I told you that.

4       Q.     You also told us there was this injury to

5    Nicolas's leg, right?

6       A.     Yes, sir.

7       Q.     You described it as being filetted, right?

8       A.     Yes, sir.

9       Q.     There is a picture of that injury, isn't there?

10      A.     There's probably several, yes.

11      Q.     No, no, no.  Did you take those pictures?

12      A.     No.

13      Q.     Well, the pictures that you're referring to,

14   who took them?

15      A.     My mom and dad were taking some.

16      Q.     Anybody else take those pictures?

17      A.     I don't know.

18      Q.     And the reason you don't know that somebody

19   else may have taken those pictures is because you weren't at

20   the hospital, were you?

21      A.     Yes, I was at the hospital.

22      Q.     Then why?

23      A.     I don't know.

24      Q.     That one, under the Rocky scheme of things,

25   that was a goal for you, right?

1          MR. PATTERSON:  Wait, wait, wait, wait, wait.  Form

2     of the question.

3          THE COURT:  Sustained.

4          MR. PATTERSON:  What is the Rocky scheme of things?

5          THE COURT:  Sustained.

6     BY MR. MARTINEZ:

7          Q.    Well, ma'am, you told us there was a theme in

8     that Rocky movie.  Do you remember telling us?

9          A.    Yes, sir.

10         Q.    If you have a goal, you try to do almost

11    anything to achieve it?

12         A.    I didn't say -- not almost anything.

13         Q.    Okay.  Well, what was the theme in the Rocky

14    movie then?

15         A.    He wanted to win a fight.

16         Q.    No, ma'am.  We talked about it just now.  Do

17    you remember --

18         A.    Yes.

19         Q.    Do you remember telling me about how if there's

20    a goal you should try as hard as you possibly can to achieve

21    it.  You remember that, right?

22         A.    I don't know if those were my exact words.

23         Q.    But those are -- that's the gist of what you

24    said, right?

25         A.    More or less, yes.


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000005096

1      Q.    Well, it's more -- actually, that's -- that's

2  almost exactly what you said, isn't it?

3           MR. PATTERSON:  Judge, he's arguing with the witness.

4           THE COURT:  Sustained.  Let's move on.  Move on, Mr.

5  Martinez.

6  BY MR. MARTINEZ:

7      Q.    Now, you describe having sex with Didos Gamez

8  being your goal?

9      A.    I did not describe that as a goal.

10     Q.    Ma'am, you just said it right here in this

11  court no more than a minute or so ago, didn't you?

12     A.    No, I did not.

13     Q.    Okay.  Now, you did have several employers

14  prior to working for San Riva, right?

15     A.    Yes.

16     Q.    And one of them we've already talked about was

17  the Courtyard Apartments, right?

18     A.    Yes.

19     Q.    And with regard to the Courtyard Apartments,

20  before you were hired, you filled out an application, right?

21     A.    I believe so, yes.

22     Q.    Let me show you that application.

23           (Pause in proceedings.)

24  BY MR. MARTINEZ:

25     Q.    With regard to your application, which is

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    Exhibit 487, you lied on that application, didn't you?

2           A.    I don't know.

3           Q.    Well, take a look at it.  It's Exhibit 487.

4                 (Pause in proceedings.)

5           THE WITNESS:  Okay.

6    BY MR. MARTINEZ:

7           Q.    That is your application, correct?

8           A.    Yes, it is.

9           Q.    And it's a copy of it, right?

10          A.    Yes, sir.

11          MR. MARTINEZ:  Move for admission of Exhibit 487.

12          MR. PATTERSON:  Premature at this point, Judge. I

13    don't know what the purpose this is being offered for.

14          MR. MARTINEZ:  It's a statement by her, Judge, as

15    long as it's relevant.  She's already --

16          MR. PATTERSON:  Well --

17          MR. MARTINEZ:  -- talked about her employment.

18          THE COURT:  Let me see Counsel here at the bench.

19

20                 (The following proceedings were held at the

21    bench:)

22

23          MR. PATTERSON:  As Mr. Martinez says, if it's

24    relevant.  Not every statement a client makes in her history

25    is relevant in this tribunal.  We need to tie it up and find

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000005098

1    out if it's relevant.  It may be collateral, that's

2    extrinsic, and he couldn't prove it with extrinsic evidence.

3         THE COURT:  Mr. Martinez?

4         MR. MARTINEZ:  One of the things they indicated to

5    Sharon Murphy was that she had received her BS.  In this case

6    she indicated she had her BS, and that's a lie.  Sharon

7    Murphy was there.

8         THE COURT:  Ask some additional questions and I may

9    or may not allow it in.

10        MR. MARTINEZ:  Okay.

11

12             (The following proceedings were held in open

13    court.)

14

15   BY MR. MARTINEZ:

16        Q.    Ma'am, it does ask you whether or not you have

17   any college education, doesn't it?

18        A.    Yes, sir.

19        Q.    You indicated that you went to the University

20   of Phoenix, didn't you?

21        A.    Yes, sir.

22        Q.    It also asked did you graduate, doesn't it?

23        A.    Yes, sir.

24        Q.    You put yes?

25        A.    Yes, sir.


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000005099

1          Q.     That's not true?

2          A.     That's not true.

3          Q.     That's a lie?

4          A.     Yes, sir.

5          MR. MARTINEZ:  I move for admission of Exhibit 487.

6          MR. PATTERSON:  Judge --

7

8                    (The following proceedings were held at the

9     bench:)

10

11          THE COURT:  Go ahead and whisper.

12          MR. PATTERSON:  This is a lot of information.  She's

13     acknowledged this.  It has no independent significance.

14          THE COURT:  I'll sustain the objection.

15

16                    (The following proceedings were held in open

17     court:)

18

19          THE COURT:  I'll sustain the objection to admission

20     of Exhibit 487.

21     BY MR. MARTINEZ:

22          Q.     There are also other lies in this document,

23     aren't there?

24          A.     I don't know.

25          Q.     Well, it indicates that you worked for the Casa

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1      Grande Regional Medical Center on here, doesn't it?

2              A.      Yes.

3              Q.      That you worked there from August of '93 to May

4      of '96, right?

5              A.      I don't remember the dates but --

6              Q.      Let's take a look at it.  That's what it says,

7      right?

8              A.      Yes, that's what it says.

9              Q.      And it does say Casa Grande Regional Medical

10     Center, right?

11             A.      Yes, sir.

12             Q.      You did work for them, right?

13             A.      Yes, sir.

14             Q.      It does indicate that your salary there was

15     $32,000, right?

16             A.      That's what it says, yes.

17             Q.      Was that your salary there?

18             A.      I don't recall.

19             Q.      It wasn't, was it?

20             A.      I don't recall.

21             Q.      And it does indicate that your position was a

22     staff accountant, right?

23             A.      Yes, sir.

24             Q.      And it asked you for a reason for living --

25     leaving, doesn't it?

1          A.     Yes, sir.

2          Q.     You indicated there work with husband, right?

3          A.     Yes.

4          Q.     That's not why you were asked -- that's not why

5     you left Casa Grande Regional Health Center, right?

6          A.     Yes, I did go to work for my -- with my

7     husband.

8          Q.     Ma'am, I'm not asking you if --

9          MR. PATTERSON:  Judge --

10    BY MR. MARTINEZ:

11         Q.     -- after you left you went to work with him.

12         MR. PATTERSON:  Objection.

13

14                (The following proceedings were held at the

15    bench:)

16

17         MR. PATTERSON:  There's a 403 issue on the reason for

18    the termination.  I avoided it to comport with the ruling of

19    the Court.  Earlier you wouldn't allow this kind of stuff to

20    come in, so we just moved on.  He's now going to go into 403

21    (B) issues involving reasons for termination which I objected

22    to earlier and you sustained, and I will ask he not be

23    allowed to go there.

24         THE COURT:  Mr. Martinez?

25         MR. MARTINEZ:  I'm not asking her for reasons she was

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1   terminated.  I'm asking her whether or not it was true or not

2   the fact she may have been terminated or other things that --

3        THE COURT:  I don't have Sharon Murphy's testimony

4   in front of me, but at the time she said something different

5   to Sharon Murphy.  Is that correct?

6        MR. MARTINEZ:  The point is this woman will lie to

7   everybody, to her employer, to Sharon Murphy, to the police,

8   lie to the Casa Grand Police Department.

9        THE COURT:  You can compare it with Sharon Murphy?

10        MR. MARTINEZ:  Not this part.  This has nothing to do

11   with the other application.

12        THE COURT:  Okay.  We're treading on the area that I

13   ordered for you to avoid.

14        MR. MARTINEZ:  I'm not --

15        THE COURT:  Just go ahead.

16        MR. MARTINEZ:  I'm not going to ask her the reason.

17   She -- what she says today is the reason was because she went

18   to work for her husband.  That's partly true, but the reason

19   she was -- reason she wanted to work for her husband was

20   because they fired her.

21        THE COURT:  Anything further, Mr. Patterson?

22        MR. PATTERSON:  No, that's not true.

23        THE COURT:  Let's move on.

24

25             (The following proceedings were held in open

1    court:)

2

3           THE COURT:  I've sustained the objection.  Let's move

4    on.

5    BY MR. MARTINEZ:

6           Q.    Let's talk now about the San Riva apartments.

7    You were hired by them on November 9 of 1999, right?

8           A.    I don't know the exact hire date, but --

9           Q.    It was in November, right?

10          A.    Yes, sir.

11          Q.    And the person you talked to to be hired was

12   someone by the name of Janice Lind, right?

13          A.    Yes, sir.

14          Q.    In fact, you indicated to us that somebody or

15   you -- or somebody was driving by and that you actually saw

16   the complex and then you made the application, right?

17          A.    Made the phone call, yes.

18          Q.    Okay.  And as part of that application process,

19   you submitted a resume, right?

20          A.    Yes, sir.

21          Q.    And we've already had Janice Lind come in and

22   tell us that the writing -- the writing on it is hers, but

23   the typewritten part on this resume is yours, isn't it? And

24   this is Exhibit 390.

25          A.    Yes, sir.

1     Q.     You lied on that resume too, didn't you?

2     A.     What are you referring to?

3     Q.     Well, if you look at your education --

4     A.     Yes, sir.

5     Q.     Additionally, you also lied to her about how

6 much money you were making at the Courtyard Apartments,

7 didn't you?

8     A.     I don't believe so.

9     Q.     Let me show you your application for employment

10 at Fairfield, okay?  While she's doing that, on your resume

11 it does indicate your cell phone number, doesn't it?

12     A.     What's that?

13     Q.     On your resume it does indicate your cell

14 number, doesn't it?

15     A.     The handwritten?  Is that what you're --

16     Q.     Yes, uh-huh.

17     A.     Yes, sir.

18     Q.     Your cell number back then was 602-826-1150,

19 right?

20     A.     I believe so.

21     Q.     That's the number that you used when you held

22 yourself out as Anne Newton when you were trying to obtain

23 sodium azide, isn't it?

24     A.     I don't recall.

25     Q.     Okay.  We'll get to that.  Exhibit 488, take a

1    look at it.   Take a look under number 2, asking about

2    salary.

3            A.    Okay.

4            Q.    And the amounts there are, what, $42,500 to

5    $50,000?

6            A.    Uh-huh.   Yes, sir.

7            Q.    And this has the same lie about having

8    graduated from college, right?

9            A.    Yes, it does.

10           MR. PATTERSON:   Judge --

11   BY MR. MARTINEZ:

12           Q.    Now, when you indicated here that you were

13   making $42,500 to $50,400 at Courtyard, that was a lie too?

14           A.    No, I don't believe so.

15           Q.    Let me show you exhibit -- another exhibit.

16   There is Exhibit Number 391.   Take a look at it.

17                 (Pause in proceedings.)

18           THE WITNESS:   Okay.

19   BY MR. MARTINEZ:

20           Q.    It does say the figure of 4 -- what is it,

21   $42,500 to -- let me take a look at it, please.   With the

22   number of $42,500 to $50,400 is incorrect, isn't it?

23           A.    No, I don't see that.

24           Q.    Okay.  Let me show it to you then.

25           A.    Yeah, I don't --

1        Q.     Sorry.  I gave you the wrong one.  Let me give
2    you the other one.  Sorry.  Let's go ahead, have this one
3    marked.  Take a look at Exhibit Number 489.
4                    (Pause in proceedings.)
5            THE WITNESS:  Okay.
6    BY MR. MARTINEZ:
7        Q.     That's the response to Janice Lind's inquiry,
8    isn't it?
9        A.     Yes, it is.
10       Q.     It's about you, right?
11       A.     Yes, sir.
12       Q.     And it does indicate there that the rate of pay
13   that you listed was $42,500 to $52,000, right?
14       A.     Yes.  That's correct?
15       Q.     Which is the amount you listed here in Exhibit
16   Number 488 which is your employment application, right?
17       A.     Yes, sir.
18       Q.     And it does indicate that that is incorrect,
19   right?
20       A.     She says that it's 36 a year plus the
21   apartment.  I included the apartment in the figure I wrote.
22       Q.     Does it say correct or incorrect?
23       A.     It says incorrect, and that --
24       Q.     That's all I wanted to ask you.  It says it's
25   incorrect, doesn't it?

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1       A.    With an explanation.

2       Q.    That's your explanation though, right?

3       A.    No.  That's her handwriting, not mine.

4       Q.    Well, then let's -- it says here rate of pay

5   $42,500 to $50,400 per year, right?  That's what it says?

6       A.    Yes, sir.

7       Q.    Then it has a box for correct and incorrect?

8       A.    That's correct.

9       Q.    It says incorrect, right?

10      A.    Yes.

11      Q.    And nowhere on there does it say anything about

12   an apartment attached to this, does it?

13      A.    Yes, it does.

14      Q.    Show me.

15      A.    Right there.  It $36,000 a year plus the

16   apartment.

17      Q.    But that's not money that you're getting, is

18   it?

19      A.    Yes, it is.  That is part of my compensation

20   package for working.

21      Q.    Ma'am, when you go to the IRS to file your

22   income tax return, do you put down $42,500 to $50,400 in

23   those years or did you put $36,000 a year?

24              MR. PATTERSON:  Objection, relevancy.

25              THE COURT:  Sustained.


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1         MR. PATTERSON:  Collateral.

2         THE COURT:  Sustained.  Let's move on.

3    BY MR. MARTINEZ:

4         Q.   Ma'am, with regard to the cell phone number

5    that we talked about in Exhibit 390, 602-806-1150, take a

6    look at the monitor.  This is Exhibit 374.  Can you see the

7    number listed there?

8         MR. PATTERSON:  Judge, it doesn't show on the --

9         MR. MARTINEZ:  Yes, it does.

10        MR. PATTERSON:  It only shows --

11        MR. MARTINEZ:  I see 602-806 --

12        MR. PATTERSON:  Okay.

13   BY MR. MARTINEZ:

14        Q.   That's what it says, 602-806 what?

15        A.   1150.

16        Q.   Is that the same as the cell number that's

17   listed in your resume?

18        A.   Yes, sir.

19        Q.   So that does indicate that's your business

20   phone, doesn't it?

21        A.   Yes, sir.

22        Q.   That's a lie?

23        A.   I did conduct business on that phone, yes.

24        Q.   I thought you were working for San Riva back

25   then?

1          A.     I -- well, I was.

2          Q.     And back then, didn't they have a phone?

3          A.     Yes.

4          Q.     They didn't pay you for use of your cell phone,

5    did they?

6          A.     I could submit an expense report for it, yes.

7          Q.     You could submit expense reports, but you went

8    out and applied for this phone, didn't you?

9          A.     I think it was part of a package that Joe had,

10   yes.

11         Q.     And you used it as an ongoing social basis,

12   didn't you?

13         A.     Yes, sir.

14         Q.     And also does indicate here there's a social

15   security number of 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, doesn't it?

16         A.     Yes, sir.  Yes.

17         Q.     That's -- there's a couple of numbers there

18   that are off of your social security number.  Isn't that

19   true?

20         A.     Yes.

21         Q.     Your social starts out 527, right?

22         A.     Yes.

23         Q.     What are the next two numbers?

24         A.     65-9703.

25         Q.     Okay.  The next two numbers are 65?

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    A.    Yes, sir.

2    Q.    The one on Exhibit 374 is actually 66, right?

3    A.    Yes, sir.

4    Q.    And then it's 9704.  And what is yours?

5    A.    9703.

6    Q.    You put that on there because you didn't want

7    that to be tracked back to you, didn't you?

8    A.    Yes, sir.

9    Q.    And if we take a look again at Exhibit 374, it

10   says it was sent Wednesday, August 23rd, 2000, at 10:46.  And

11   it talks about use, disposal of rodents.  It says that,

12   right?

13   A.    Yes, sir.

14   Q.    This had nothing to do with rodents, did it?

15   A.    No, it didn't.

16   Q.    That's a lie, right?

17   A.    Yes, sir.

18   Q.    And you wrote that, right?

19   A.    Yes.

20   Q.    You're Anne Newton, right?

21   A.    No, I'm not.

22   Q.    Well, you used that name, didn't you?

23   A.    Yes, sir.

24   Q.    It wasn't Joe that wrote this, right?

25   A.    No, not specifically.

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000005111

1       Q.   Ma'am, he wasn't -- his hands weren't on the

2  keyboard when this message went out, were they?

3       A.   No.

4       Q.   And the message was sent from a computer at the

5  San Riva apartment complex, right?

6       A.   Yes, sir.

7       Q.   The -- the bookkeeper's computer, right?

8       A.   Yes, sir.

9       Q.   And there's no authorized use for you to be

10  seeking these kinds of things on the San Riva apartment

11  computer, right?  You see what I'm asking?

12       A.   No, I don't.

13       Q.   It's against policy to be misusing the computer

14  this way, right?

15       A.   I don't know if there's a policy about that.

16       Q.   So it's okay for all -- for the rest of the

17  employees to use it for this sort of thing?

18       A.   They would do personal things on the computer,

19  yes.

20       Q.   It's okay then?  If the answer is yes, it's

21  yes.

22       A.   Yes.

23       Q.   Okay.  It also lists business Wyndstar

24  Enterprises doing DBA as Aztec Creations.  DBA means "Doing

25  Business As," right?

1     A.   Yes.

2     Q.   There's no such thing as Aztec Creations?

3     A.   No, there's not.

4     Q.   That's something you made up?

5     A.   Yes, sir.

6     Q.   You also indicate this is a partnership, right?

7     A.   Yes.

8     Q.   We are not -- That's not true, is it?

9     A.   Wyndstar Enterprises is a partnership, right.

10    Q.   How about Aztec Creations?

11    A.   No.

12    Q.   So that's not true that Aztec Creations is a

13    partnership, right?

14    A.   That's not what it says.

15    Q.   It says Aztec Wyndstar Enterprises doing

16    business as Aztec Creations.  You just told me that Aztec

17    Creations is something you came up with, right?

18    A.   Yes.  Yes, sir.

19    Q.   Aztec Creations is not a partnership, right?

20    A.   Wyndstar is.

21    Q.   The answer is no then, right?  I'm asking you

22    about Aztec Creations.  I'm not asking --

23    A.   Okay.  Aztec Creations is not a partnership.

24    Q.   Okay.  And then you indicate, "We're not

25    incorporated in the State of Arizona.  I'm not sure what the

1    federal ID number is, but here's my social."  We've already

2    talked about what the business number is.  And then it says,

3    "We farm several acres in Arizona and Oklahoma."  You didn't

4    farm anything in Arizona or Oklahoma, did you?

5            A.    No, I did not.

6            Q.    "We are having severe problems with rodents."

7    That's not true?

8            A.    No, sir.

9            Q.    You were having problems with --

10           A.    No.  I said no, sir.

11           Q.    An acquaintance suggested cyanide.  We're

12   hoping that would work out.  Do you have any suggestions?"

13   It does say that, right?

14           A.    Yes.

15           MR. PATTERSON:  What was that exhibit again, Mr.

16   Martinez?

17           MR. MARTINEZ:  374.

18           MR. PATTERSON:  Thank you.

19   BY MR. MARTINEZ:

20           Q.    Now, you also were in contact with some

21   insurance companies, right?

22           A.    Yes, sir.

23           Q.    You were in contact with the insurance

24   companies, weren't you?

25           A.    Actually, both of us were.


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1       Q.    Ma'am, you were the one that sent -- for

2 example, you were the one that sent out the email to

3 eterm.com, right?

4       A.    Yes, sir.

5       Q.    We know that you indicated your computer at

6 home did not have internet access, right?

7       A.    Correct.

8       Q.    And Joseph Andriano was not allowed to use the

9 computer at work?

10      A.    He could have, yes.

11      Q.    But he didn't though, did he?

12      A.    No.  He didn't know how to.

13      Q.    Right.  The person that actually did all of

14 this contacting of the insurance companies was you, right?

15      A.    I initiated the process.

16      Q.    Right.  So the answer is yes, it was you who

17 initiated the process then, right?

18      A.    Yes.

19      Q.    And one of the first people or one of the

20 people that you contacted was a guy by the name of -- or

21 eterm.com, right?

22      A.    Yes.

23      Q.    And that was on August 29th of the year 2000,

24 right?

25      A.    I don't know the date.

1      Q.    Let's take a look at an exhibit.  Maybe that

2   will refresh your recollection.  This is Exhibit Number

3   394.001.  Take a look at this.

4              (Pause in proceedings.)

5   BY MR. MARTINEZ:

6      Q.    See the date there?

7      A.    I do.

8      Q.    And --

9      A.    It says something about a call date.  I don't

10  know what this stuff is.

11     Q.    It does say August 29, right?

12     A.    That does, yes.

13     Q.    Okay; if I may have it back.  And as a result

14  of you making this application over the internet, somebody

15  started to call you, right?

16     A.    That's correct.

17     Q.    You made the application over the internet,

18  right?

19     A.    I physically -- I put the information, yes.

20     Q.    Sure.  And one of the things that you

21  physically inputted into this computer was that Joseph

22  Andriano did not have cancer, right?

23     A.    That's correct.

24     Q.    That was not true.  That was a lie?

25     A.    Yes.

1    Q.   And one of the other things that you did was

2    that you had this long conversation with the individual who

3    called you, right?

4        A.   I believe I did, yes.

5        Q.   A guy by the name of Gary Foster, right?

6        A.   Yes.

7        Q.   And during that conversation he asked you if

8    you had any moving violations or tickets.  Do you remember

9    him asking you that?

10       A.   Yes, I do.

11       Q.   And at some point you said, "Yeah, I may have

12   one, I may have two," something like that.  Do you remember

13   that?

14       A.   I think I told him I had several if I recall

15   correctly.

16       Q.   Okay.  Well, then, let's play it so that it

17   refreshes your recollection.  This is Exhibit Number 210.

18       THE COURT:  Okay.  The court reporter will not take

19   this down.

20       MR. MARTINEZ:  Okay.

21       THE COURT:  It's being played.  This is exhibit --

22       MR. MARTINEZ:  210, I think.

23           (Whereupon, the tape is played.)

24   BY MR. MARTINEZ:

25       Q.   He asked you about moving violations, didn't

1    he?

2              A.     Yes, sir.

3              Q.     You didn't ever tell him that your license was

4    suspended when you were speaking to him, did you?

5              MR. PATTERSON:  Wait, wait, wait.  Judge, that's

6    clearly improper impeachment.  The predicate question was

7    moving violations, no issue about suspended license.

8              THE COURT:  Sustained.

9    BY MR. MARTINEZ:

10             Q.     You withheld information from him, didn't you?

11             MR. PATTERSON:  Objection.  Same question,

12   differently stated.

13             THE COURT:  Sustained.

14   BY MR. MARTINEZ:

15             Q.     Were you honest with him?

16             A.     With who?

17             Q.     The person that you were talking to?

18             A.     Regarding Joe's cancer?

19             Q.     Regarding the application and what you told

20   him?

21             A.     Not regarding the health status of my husband,

22   no.

23             Q.     But with regard to everything else you were?

24             A.     Yes.

25             Q.     Okay.  In fact you also indicated that you were

1    doing this because Mr. Andriano -- or in other words you were

2    doing this on his life, right?  Mr. Andriano's life, right?

3         A.    Yes.

4         Q.    And in fact Mr. Andriano didn't even know

5    anything about it?

6         A.    Yes, he did.

7         Q.    Well, were you present when we heard the tape

8    recording of Mr. Foster call Mr. Andriano?

9         A.    Yes, I was.

10        Q.    And Mr. Andriano indicated he didn't know --

11        A.    Actually, he told him to call back.

12        Q.    Told him to call back, but he indicated he

13    didn't know anything about it.  Do your remember that?

14        A.    No.

15        Q.    I'll cue it and then we'll play it for you.

16        A.    Okay.

17        Q.    And then there was contact with Mr. Andriano on

18    September 6 and he told Mr. Foster that he wasn't interested,

19    right?

20        A.    I don't know.

21        Q.    Let's take a look, if you could see, at

22    394.001.  Show you the date first.  It's right there

23    September 6.  Can you see it?  You may step down if you wish.

24        A.    Yes.

25        Q.    It does say "Andriano," doesn't it?

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1          A.     Yes.

2          Q.     And then it does say GWR, which we know is Gary

3    Foster.  It says Joe for Joe Andriano.  Message, the primary

4    insured, which is your husband, he indicated not interested.

5          A.     Yes.  That's what it says.

6          Q.     However, you persisted, didn't you, because you

7    then sent an e-mail saying to reinstate the request for the

8    insurance, didn't you?

9          A.     I don't know if I did or not.

10         Q.     All right.  Let's take a look at Exhibit

11   394.001.

12         THE COURT:  I thought that last one was 394.001.

13         MR. MARTINEZ:  It's the same one, Your Honor.

14         THE COURT:  Okay.

15         MR. MARTINEZ:  It's business records.

16   BY MR. MARTINEZ:

17         Q.     It says original message there, doesn't it?

18         A.     Yes, sir.

19         Q.     From Wendi Andriano @ wendi.bbw@usa.net?

20         A.     Yes.

21         Q.     That's you, right?

22         A.     Yes, sir.

23         Q.     You've already indicated to us that you

24   physically sent these messages, right?

25         A.     Yes.

1        Q.    And that Joe wouldn't have done it because he

2   wasn't very good at the computer is what you told us before,

3   right?

4        A.    Right.

5        Q.    And the day it was sent was Saturday, September

6   9, 2000, at 11:45 a.m., right?

7        A.    Yes.

8        Q.    And this was sent from the computer down at

9   the -- at the San Riva complex, right?

10       A.    Yes.

11       Q.    And it's done at 11:45 in the morning, right?

12       A.    Yes.

13       Q.    That's a workday, right?

14       A.    Yes, sir.

15       Q.    And then it's -- it's regarding confirmation of

16  cancelled life insurance enrollment request, right?

17       A.    Yes.

18       Q.    And it says "Please reinstate my request for

19  insurance."

20       A.    Yes.

21       Q.    My wife can be reached at 480-283-8488?

22       A.    Yes.

23       Q.    You wrote that, right?

24       A.    Yes, sir.

25       Q.    And the number there, 480-283-8488, that's the

1    number to the San Riva apartment complex, right?

2         A.    Yes, sir.

3         Q.    And then you also wrote "Thank you," right?

4         A.    Yes.

5         Q.    So even though your husband calls and says he's

6    not interested, you had a goal in mind, didn't you?

7         A.    What's that?

8         Q.    You had a goal in mind, didn't you?

9         A.    I didn't, no.

10        Q.    You had a goal in mind to have money after he

11   died, didn't you?

12        A.    No, sir.

13        Q.    This was one way, wasn't it, of getting money

14   once Joe died, wasn't it?

15        MR. PATTERSON:  Judge, asked and answered.

16        THE COURT:  Overruled.  Go ahead, answer the

17   question.

18        THE WITNESS:  Not the way you're saying it, no.

19   BY MR. MARTINEZ:

20        Q.    Well, ma'am, you're asking for life insurance

21   on this one weren't you?

22        A.    Yes.

23        Q.    And the amount was $100,000, right?

24        A.    Yes, sir.

25        Q.    If it had gone through and weren't ever

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    discovered, the fraud, you would be entitled to some of the

2    $100,000, wouldn't you?

3              MR. PATTERSON:  Judge, that calls for a great deal of

4    speculation.

5              THE COURT:  Sustained.

6    BY MR. MARTINEZ:

7         Q.    Ma'am, you weren't doing this just so you

8    wouldn't get any money, were you?

9         A.    That doesn't make sense.

10        Q.    Of course it doesn't make sense.  You were

11   doing this to get money, right?

12        A.    No.

13        Q.    But that didn't stop there.  There were other

14   insurance companies that you contacted, right?

15        A.    Per my instructions, yes.

16        Q.    You contacted them, "yes" or "no"?

17        A.    Yes, sir.

18        Q.    And one of -- another one was Amica, and that

19   involved somebody named Carolyn Catalano?

20        A.    Yes, sir.

21        Q.    And in fact we even have the application that

22   was found in your -- in your office, right?

23        A.    Yes, sir.

24        Q.    And in that one you also indicated that your

25   husband did not have cancer, right?

1      A.    That's correct.

2      Q.    And you were requesting $100,000, right?

3      A.    That's correct.

4      Q.    And in this one there was a conversation that

5  indicated to the individual there something to the effect

6  that your husband was not with you or something like that,

7  that you would sit down and have lunch with him.  Do you

8  remember that?

9      A.    No, I don't.  I don't --

10     Q.    In other words, do you remember that Ms.

11 Catalano asked you when would be a good time to talk to Mr.

12 Andriano.  Do you remember that?

13     A.    Yes, sir.

14     Q.    And do you remember that you told her, well,

15 he's staying with his sister.  And as soon as he comes back,

16 I'm going to talk to him?

17     A.    Yes, sir.

18     Q.    And he really wasn't staying with his sister,

19 was he?

20     A.    Yeah.  I believe that's when he was in Memphis.

21     Q.    Oh, so he was on vacation then, right?

22     A.    Staying with, on vacation, whatever you want to

23 call it.

24     Q.    What do you want to call it?

25     A.    He was staying at his sister's house, yes.

1    Q.    Okay.  How long was he staying at his sister's
2  house?
3    A.    I don't recall.  A week or so, maybe longer.
4    Q.    Okay.  Now, while this is going on you are
5  continuing to request or you make the request for some sodium
6  azide, don't you?
7         MR. PATTERSON:  Judge, predicate while what was
8  going on?
9         THE COURT:  Sustained.
10        MR. PATTERSON:  Compound.
11  BY MR. MARTINEZ:
12    Q.    While you were asking to get money on your life
13  insurance and your husband's life, you were also at the same
14  time requesting information on sodium azide, weren't you?
15    A.    No, sir.
16    Q.    Well, let's take a look at Exhibit 372.  Who's
17  it from?
18    A.    It says from Anne Newton.
19    Q.    That's you, right?
20    A.    That's the name I used, yes.
21    Q.    You are Anne -- that's you though, right?
22    A.    It's the name I used.
23    Q.    And it does have the Aztec Creations on there,
24  right?
25    A.    Yes.

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1      Q.     This is to Sales at Voit Global, right?

2      A.     Yes.

3      Q.     And it was sent Monday, August 21, 2000 at

4  10:36 in the morning, right?

5      A.     Yes.

6      Q.     And then this is where you took -- this is the

7  first message actually that you sent out, isn't it?

8      A.     I don't recall.

9      Q.     It says please forward pricing and availability

10  for sodium cyanide, right?

11      A.     Yes.

12      Q.     And you're asking about 10 grams at your

13  earliest convenience, right?

14      A.     That's what it says, yes.

15      Q.     And saying -- thank you.  It says "The required

16  contract has been signed and faxed, Anne Newton, Aztec

17  Creations," right?

18      A.     Yes, sir.

19      Q.     Now, something about Mr. Andriano that you knew

20  about, he actually had a vast experience in the use of

21  chemicals, didn't he?  And I'm talking about Joe Andriano,

22  Junior?

23      A.     Actually, Senior did.

24      Q.     Well, didn't Joe Andriano, Junior, work with

25  his father when he was younger?

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000005126

1    A.    I don't know.

2    Q.    Isn't it -- well, then, let's go to Joe,

3  Senior.  He actually had a business that specializes in

4  chemicals, didn't he?

5    A.    Yes, sir.

6    Q.    He could get sodium azide or he could get

7  whatever he wanted, right?

8    A.    I don't know that.

9    Q.    And in fact wasn't one of the things that was

10  considered by the doctors when they talked to you about the

11  cancer involving Joseph Junior was that it was his work

12  around these chemicals that may have caused the cancer. Do

13  you remember anything like that?

14    A.    No.  I remember me asking them, but they could

15  not say.

16    Q.    But it -- but they indicated it could have

17  been, they just couldn't confirm it for you, right?

18    A.    It was actually from them playing in the

19  irrigation channels.  It wasn't from them working.

20    Q.    Now, you also contacted a third insurance

21  agency, didn't you?

22    A.    The one day that I sat down I contacted

23  whatever came up on the screen.  I didn't do this at

24  different times and it's --

25    Q.    Well, yes, you did do it at separate times

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    because didn't you contact Mass Mutual at -- on August 10th.

2         MR. PATTERSON:  Judge, that's -- that's deceptive.

3    She called the agent in Casa Grande.

4         THE COURT:  Hold on a second.  Hold on.  What's the

5    objection?

6         MR. PATTERSON:  It's deceptive, the question.  She

7    never contacted Mass Mutual.

8         THE COURT:  I'll overrule the objection.  Go ahead,

9    answer the question.

10        THE WITNESS:  No, I did not contact them.

11   BY MR. MARTINEZ:

12        Q.   Let's take a look at Exhibit 211.  Do you see

13   the date there, ma'am?

14        A.   Yes, I do.

15        Q.   August 10th, 2000, right?

16        A.   Yes.

17        Q.   It says Wendi Andriano, right?

18        A.   Yes.

19        Q.   Joe's wife, right?

20        A.   Yes.

21        Q.   In Ahwatukee, right?

22        A.   Yes.

23        Q.   And then it says mobile and then it says

24   telephone, please call.  And it lists Joe's number, right?

25        A.   Yes.  It says to please call Joe.

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000005128

1       Q.   Right.  But you called them, didn't you?

2       A.   Yes.

3       MR. PATTERSON:  Called whom, Judge?

4       THE COURT:  Sustained.  Rephrase the question.

5   Restate the question.

6   BY MR. MARTINEZ:

7       Q.   Did you call Ed Sandidge?

8       A.   No, I actually spoke to his secretary.

9       Q.   Right.  So you do remember calling the

10  insurance agency, don't you?

11      A.   Yes.  Joe handed me the paperwork and asked me

12  to call them for him.

13      Q.   Ma'am, did you pick up the receiver and speak

14  into the receiver?

15      A.   I did.

16      Q.   And did you get the secretary for Ed Sandidge?

17      A.   I believe that for whoever it was, I don't know

18  the man's name, but it was a lady that I spoke to.

19      Q.   Right.  And you left your name, right?

20      A.   I did.

21      Q.   Wendi Andriano, right?

22      A.   Yes.

23      Q.   You indicated that you were Joe's wife, right?

24      A.   Yes.

25      Q.   You indicated that you were in Ahwatukee,

1    right?

2         A.    I believe so.

3         Q.    And you left Joe a number there, Joe's number,

4    right?

5         A.    Yes.

6         Q.    And then you indicated that you wanted them to

7    call back, right?

8         A.    To call Joe back, yes.

9         Q.    Ma'am, it says please call -- it says to please

10   call Joe and then it says "want to increase coverage as a

11   5000 MM policy number," and it lists the number, and it says

12   "willing to take exam."  Doesn't -- isn't that what it says?

13        A.    Yes.

14        Q.    Then it says TC on the bottom of it, right?

15        A.    Yes.

16        Q.    Now, Mr. Sandidge spoke with you about this

17   telephone message, didn't he?

18        A.    No.  I've never spoken to Mr. Sandidge.

19        Q.    You never had a conversation with a gentleman

20   named Ed Sandidge?

21        A.    No, I did not.

22        Q.    You never had a conversation in which you

23   told -- in which Mr. Sandidge wanted to speak or set up an

24   appointment to speak with Mr. Andriano?

25        A.    No, sir.

1     Q.     You never had a conversation in which you were

2  obstreperous and made sure that meeting didn't take place?

3     A.     Absolutely not.

4     Q.     While we're talking about insurance, you know

5  James or Jimmy Yost, right?

6     A.     Yes.

7     Q.     And with -- it's somebody that worked with you

8  at the San Riva apartment complex, right?

9     A.     Yes, sir.

10    Q.     It's somebody you liked, right?

11    A.     Sure.  He was --

12    Q.     Somebody that was a friend, right?

13    A.     Was a co-worker.

14    Q.     He was more than that.  Wasn't he also a

15  friend, somebody that you hung out with occasionally?

16    A.     No, I don't believe so.

17    Q.     And he's somebody that you sat down in your

18  office and talked to about your situation with Mr. Andriano,

19  right?

20    A.     Yes, everybody in the office knew.

21    Q.     I'm not asking about everything.  I'm talking

22  about Mr. Yost right now, okay?  Did you have a conversation

23  with him in your office about Mr. Andriano?

24    A.     Yes, I did.

25    Q.     And during that conversation isn't it true that

1    you took out Mr. Andriano's wallet?

2         A.    No, sir.

3         Q.    Isn't it true that you then pushed the wallet

4    to him?

5         A.    No, sir.

6         Q.    And isn't it true that you then attempted to

7    pay him some or offer him some money so he would pose or

8    stand in for a physical?

9         A.    Absolutely not.

10        Q.    You didn't offer him, to start with, $10,000?

11        A.    No, sir.

12        Q.    You then didn't raise it all the way up to

13    $50,000?

14        A.    No, sir.

15        Q.    And didn't you also tell him Joe was worth more

16    dead than alive?

17        A.    No.  That's a lie.

18        Q.    And you indicated to him that you were looking

19    for a million dollars, didn't you?

20        A.    No, sir.

21        Q.    How about Erik Vaillant?  Did you talk to him?

22        A.    Yes, I did.

23        Q.    And he's -- he called you money hungry during

24    that conversation when you spoke about life insurance, didn't

25    he?

1    A.    He said that to you.  He's never said that to
2    me.
3        Q.    No, he indicated, ma'am, he said it to you when
4    you were having this conversation.  Do you remember that?
5        A.    No, that's not what happened.
6        Q.    Well, needless to say, again, you had a
7    conversation with him?
8        A.    Yes.
9        Q.    Why is it, ma'am, that you have this situation
10   at home and you have this husband who's very ill and you're
11   walking around talking to everybody about life insurance.
12   Isn't that --
13            MR. PATTERSON:  Judge, wait, wait, wait, wait, wait.
14            THE COURT:  Sustained.
15            MR. PATTERSON:  There's no evidence --
16            MR. PATTERSON:  Sustained.
17   BY MR. MARTINEZ:
18       Q.    You didn't talk to Erik Vaillant about life
19   insurance?
20       A.    I did.
21       Q.    You didn't talk to Jimmy Yost about life
22   insurance?
23       A.    I did.
24       Q.    So you are talking to people about life
25   insurance?

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1      A.    Two people, yes.

2      Q.    You didn't talk to Chris Hashisaki about it?

3      A.    No.

4      Q.    Now, isn't it true that you indicated to Erik

5   Vaillant that if Mr. Andriano died before the suit went to

6   court or that he could be worth as much as $20 million?

7      A.    No, I did not.

8      Q.    Isn't it true that you also asked him to pose

9   as Mr. Andriano for the purposes of a life insurance exam?

10     A.    I did talk to Eric about that, yes.

11     Q.    And that wasn't Joe Andriano speaking to Erik

12   Vaillant, was it?

13     A.    Speaking through me, yes.

14     Q.    Ma'am, that was you, wasn't it?

15     A.    Yes, it was.

16     Q.    And you're the one that asked him, right?

17     A.    Yes.

18     Q.    Okay.  And additionally isn't it true that you

19   also talked to him about chemotherapy?

20     A.    I don't know.

21     Q.    Isn't it true that you told him that people

22   with adenoid cystic carcinoma who undergo chemotherapy

23   treatment, only 80 percent of them survive the round of chemo

24   they were

25     A.    No.  I don't even know that figure.

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1          Q.    You did say though that you went to all of the

2    appointments with Mr. Andriano, right?

3          A.    No.  I -- I have missed some of them, but I've

4    been to most of them.

5          Q.    You went to most of the appointments with Dr.

6    Kellogg, right?

7          A.    Yes.

8          Q.    You went to the appointments where they

9    discussed the chemotherapy treatments?

10         A.    Yes.

11         Q.    And he described the -- the problems that may

12   be associated with chemotherapy treatment?

13         A.    Yes, he gave us paperwork on it.

14         Q.    But he also discussed it with you, didn't he?

15         A.    Yes, he did.

16         Q.    Additionally, he indicated to you how long a --

17   Mr. Andriano was expected to survive, didn't he?

18         A.    He didn't know for sure.

19         Q.    Right.  He didn't know for certain, but he gave

20   you a ballpark figure, didn't he?

21         A.    Yes.

22         Q.    He indicated it was one to two years, didn't

23   he?

24         A.    No.  I believe it was under a year.

25         Q.    You were here when he testified though, right?

1    A.    Yes.

2         MR. PATTERSON:  Objection.  Comparing testimony is

3    inappropriate.

4         THE COURT:  Overruled.  What was the answer to that

5    last question?

6         THE WITNESS:  I said yes.

7         THE COURT:  Okay.  We'll go ahead and take our

8    evening recess at this point in time.  Ladies and gentlemen,

9    we'll go for our evening recess at this point in time.

10   During this recess remember the entire admonition I've given

11   you including the fact you're not to discuss this case with

12   anyone, do not let anyone discuss the case with you.  Do not

13   do any research, experimentation, investigation on your own.

14   Avoid any media coverage on this case.  Keep an open mind.

15        Have a nice evening.  We'll see everyone

16   tomorrow at 1:00 p.m.  Have a nice evening.

17

18        (Evening recess.)

19

20

21

22

23

24

25

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1

2

3                          CERTIFICATE OF REPORTER

4

5    STATE OF ARIZONA      )
                           )
6    COUNTY OF MARICOPA    )

7

8                   I, Traci L. Wheeler, CSR, RPR, an official

9    and certified reporter in the Superior Court of the State

10   of Arizona, in and for the County of Maricopa, hereby

11   certify that I made a shorthand record of the proceedings

12   had in the within case, and that the foregoing transcript

13   is a full, true, and correct transcription of the

14   proceedings in this case.

15              Dated this 5th day of July, 2005.

16

17

18   _____
     Traci L. Wheeler, CSR, RPR
19   Certified Court Reporter No. 50313
     Official Court Reporter

20

21

22

23

24

25


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

# EXHIBIT Y

DP

05-00021
Braccio



1        IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

2            IN AND FOR THE COUNTY OF MARICOPA

3

4    STATE OF ARIZONA,              )
                                    )
5            Plaintiff,             )
                                    )
6    v.                             )    No. 1 CR 05-0005 AP
                                    )    MARICOPA COUNTY
7    WENDI ELIZABETH ANDRIANO,      )    No. CR 2000-096032
                                    )
8            Defendant.             )
     _____  )

9

10

11

12                        Mesa, Arizona
                         November 2, 2004
13

14

15

                BEFORE:  The Honorable BRIAN K. ISHIKAWA
16

17

18            REPORTER'S TRANSCRIPT OF PROCEEDINGS

19                       TRIAL DAY 36

20

21

22

23

24    ORIGINAL Prepared for APPEAL by:
      TRACI L. WHEELER, CSR, RPR
25    Certified Court Reporter No. 50313


         TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

```
 1                    A P P E A R A N C E S

 2    FOR THE STATE:        JUAN M. MARTINEZ,
                            Deputy County Attorney
 3
      FOR THE DEFENDANT:    DANIEL B. PATTERSON,
 4                          Deputy Public Defender
                                     and
 5                          G. DAVID DELOZIER,
                            Attorney at Law
 6

 7           I N D E X   O F   E X A M I N A T I O N

 8    WITNESS                                        PAGE

 9    ANDRIANO, WENDI ELIZABETH, Called on her own behalf
             Continued Cross-examination by Mr. Martinez    5
10           Continued Cross-examination by Mr. Martinez  116

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1          MESA, ARIZONA, NOVEMBER 2, 2004

2

3          THE COURT:  The record will reflect that we're

4     outside the presence of the jury.  The record will reflect

5     Mr. Martinez is here on behalf of the State and Mr. Patterson

6     and Mr. DeLozier are here on behalf of the defendant who's in

7     custody but not present.

8               Mr. Patterson, do you waive your client's right

9     to be present for the purpose of this discussion?

10          MR. PATTERSON:  Yes, Your Honor.

11          THE COURT:  Mr. Martinez wanted to put something on

12     the record.

13          MR. MARTINEZ:  Actually, it was a request on my part

14     to use a part of some data that came to my attention.

15     Specifically, as the Court knows and the record will reflect,

16     there are indications that the defendant may be -- may have

17     been having a surreptitious relationship or affair, whatever

18     you want to call it, with an individual by the name of Chris

19     Barnes in July of 1996 and also for the months thereafter.

20               I am in possession of a receipt, and I can't

21     think of doctor's names, but they indicate or the document

22     indicates that on October 16th of 1996 the defendant

23     submitted herself for a chlamydia test.  My reason for

24     wanting to use that is that we have the other documentation

25     prepared by Sharon Murphy who indicates that the defendant

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000005141

1   said that her husband had never been unfaithful.

2   Additionally, she only indicated one tryst, and so that being

3   the case it would go to credibility.  Additionally, it would

4   go to how well or how bad the relationship was going.

5           THE COURT:  Mr. Patterson?

6           MR. PATTERSON:  I oppose it's use at this late hour,

7   Judge.  This is the first I've become aware of it and it's a

8   collateral issue, seems to me.

9           THE COURT:  Okay.

10          MR. PATTERSON:  So I ask it not be used.

11          THE COURT:  Okay.  I'm going to order precluding the

12  State from introducing or trying to introduce into evidence

13  any such receipt or mention of the fact that this was found.

14              Anything further?

15          MR. MARTINEZ:  That's all.

16          MR. PATTERSON:  That's it, Judge.

17          THE COURT:  Okay.

18

19              (Recess.)

20

21          THE COURT:  Good afternoon.  This is trial in cause

22  number CR 2000-096032, State of Arizona versus Wendi

23  Elizabeth Andriano.  The record will reflect the presence of

24  the Defendant, Counsel and the jury.  The Defendant is on the

25  witness stand, Wendi Elizabeth Andriano is on the witness

1    stand, and we'll continue with the cross-examination by Mr.

2    Martinez.

3                    Mr. Martinez?

4

5                    WENDI ELIZABETH ANDRIANO,

6             CALLED TO TESTIFY ON HER OWN BEHALF,

7         HAVING PREVIOUSLY BEEN DULY SWORN, TESTIFIES FURTHER:

8

9    CONTINUED CROSS-EXAMINATION BY MR. MARTINEZ:

10             Q.    Ma'am, you're the same individual that was

11   testifying yesterday?

12             A.    Yes, sir.

13             Q.    And one of the things we talked about yesterday

14   was a conversation that was had between an individual by the

15   name of Gary Foster of eterm.com and an individual known as

16   Joseph Andriano.  And that conversation we were told took

17   place on August 29 of the year 2000.  And I'm going to play

18   that for you.

19                    (Whereupon, the tape is played.)

20   BY MR. MARTINEZ:

21             Q.    That was Joseph Andriano, correct?

22             A.    Yes, sir.

23             Q.    And he didn't know anything about this

24   application that you had made to eterm.com, did he?

25             MR. PATTERSON:  Judge, this --


                TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1          THE WITNESS:  Yes, he did.

2   BY MR. MARTINEZ:

3          Q.    In spite of what the tape says, you maintain

4   that he did know?

5          A.    Yes, he did.

6          Q.    Ma'am, the other thing we talked about

7   yesterday was this liason that you had with Travis Black.   Do

8   you remember we talked a little bit about this yesterday?

9          A.    Yes, we did.

10          Q.    And one of the things you told me was that --

11   or that you told us was that this occurred on a weekend when

12   Mr. Andriano was at the lake, right?

13          A.    Yes, sir.

14          Q.    I want you to take a look at the television

15   monitor, and I'm going to show you Exhibit 223.   Do you see

16   that date there, ma'am, Tuesday, 9/26?

17          A.    Yes, I do.

18          Q.    That's the date that Mr. Andriano had his

19   chemotherapy treatment, ma'am?

20          A.    Yes, sir.

21          Q.    And that was a Tuesday?

22          A.    Yes, sir.

23          Q.    The date that you had sexual intercourse with

24   Travis Black was the 27th, ma'am, which would make it a

25   Wednesday, not a weekend?

1        A.    No, sir.

2        Q.    Are you saying that Wednesday doesn't follow

3    Tuesday?

4        A.    Yes, it does.

5        Q.    Well, if he had his chemotherapy treatment on

6    the 26th and you had intercourse with him on the 27th, that

7    would mean it wasn't the weekend, right?

8        A.    I didn't have intercourse with Travis Black on

9    the 27th in my living room with my husband home.  It was on

10   the weekend when he was at the lake.

11       Q.    Well, actually your husband was over at Janna's

12   house, wasn't he, because she was the one that took him over

13   to get his chemotherapy and then she took him over to her

14   house that Tuesday, didn't she?

15       A.    No.

16       Q.    And just so that we're clear about this, the

17   other side of it is -- of this Exhibit 223, it shows that it

18   is the card for Mr. Andriano.

19             The other thing that you told us during direct

20   examination was that the individual in Exhibit Number 230,

21   somebody by the name of Deborah or Debbie Hines, this is from

22   Exhibit 230, you told us that Ms. Hines was actually the

23   housekeeper there, right?

24       A.    I believe so, yes.

25       Q.    But you're not sure, are you?

1      A.    No.  I know her name was Debbie and I think her
2  last name was Hines.
3      Q.    Right.  It's actually Deborah Lewis, isn't it?
4      A.    I don't recall.
5      Q.    Now, ma'am, one of the things we know that you
6  did is that you went to usa.net and opened an account under
7  the name of Anne Newton, right?
8      A.    Yes, sir.
9      Q.    And Exhibit 281.001 shows us that, right? It's
10 in the name of Aztec Creations at usa.net, right?
11     A.    Yes, sir.
12     Q.    And you were the individual that opened this
13 account, right?
14     A.    Yes, sir.
15     Q.    You gave a fictitious name, right?
16     A.    Yes.
17     Q.    That's the same as a lie, right?
18     A.    You could classify it as that, yes.
19     Q.    I'm asking whether you would classify it as a
20 lie?
21     A.    Um, yes, because I -- I was misrepresenting
22 myself.  I am not Anne Newton.
23     Q.    Right.  Not only that, but you give an address
24 of 17 -- sorry, 1722 East 10th Street, right?
25     A.    Yes.

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    Q.    This's also not true, right?

2    A.    No.  That is not my address.

3    Q.    Right.  So that's a lie also, right?

4    A.    You could say that, yes.

5    Q.    I'm asking what you would say, ma'am?

6    A.    Yes, it is a lie.

7    Q.    And to contrast that, we have Exhibit 223.001,

8    and this is another account that you opened.  It's

9    wendi.bbw@usa.net, right?

10    A.    Yes.

11    Q.    And it shows the date that you opened it as 6,

12    27, 2000, right?  And it does ask for your address there also

13    and you indicated that, right?

14    A.    Yes.

15    Q.    And just so that we're clear on the other

16    exhibit, 281.001, the date that you opened that account was

17    July 26, 2000, correct?

18    A.    Yes.

19    Q.    And the one with your real name on it, you

20    opened on June 27th, 2000, right?

21    A.    Yes.

22    Q.    Approximately a month apart, right?

23    A.    Yes.

24    Q.    And you opened this account with usa.net under

25    the name of Wendi Andriano for the express purpose of

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    obtaining poison, didn't you?

2         A.    Oh, no.

3         Q.    Well, ma'am, there are no other emails that

4    went out under that name for any other purpose other than

5    perhaps to Shawn King, but he -- he was also related.  So who

6    else did you email under Anne Newton?

7         A.    I emailed my parents, I emailed Rick.

8         Q.    So under "Anne Newton," your parents knew it

9    was you?

10        A.    No, not under -- I misunderstood you.  Under

11   "Wendi."

12        Q.    No, no, no.  I'm asking under "Anne Newton"?

13        A.    Oh.

14        Q.    Did you use that for any other purpose other

15   than to obtain poison?

16        A.    No.

17        Q.    Now, one of the things that you did use that

18   site for was to -- and this is Exhibit 378 -- was to attempt

19   to get poison, right?

20        MR. PATTERSON:  Asked and answered, Judge?

21        THE COURT:  Overruled.  Go ahead and answer the

22   question.

23        THE WITNESS:  It was to get sodium azide, yes.

24   BY MR. MARTINEZ:

25        Q.    Well, that's not what you were to get

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    originally.  You wanted to get cyanide, didn't you?

2         A.    Yes.

3         Q.    So it was to get a substance, that is a poison,

4    to change from cyanide to sodium azide, right?

5         A.    Yes.

6         Q.    And this is the email that indicates that you

7    were in Ireland.  Do you see that there?

8         A.    Yes.

9         Q.    You were never in Ireland, were you?

10        A.    No, sir.

11        Q.    That's a lie, right?

12        A.    Yes, sir.

13        Q.    But one of the things that this email does say

14   is that, quote, "I sent over a fax yesterday."  Do you see

15   that?

16        A.    Yes.

17        Q.    And the fax that you were referring to there is

18   what we have as our Exhibit 266.001, right?  If you need to

19   see it up close, let me know.

20        A.    I'm familiar with that.

21        Q.    That's what you faxed over, right?

22        A.    Yes, sir.

23        Q.    And you faxed it over under the name of "Anne

24   Newton," right?

25        A.    Yes.

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1     Q.   You signed it.  Joseph didn't sign it, right?

2     A.   Right.

3     Q.   You printed "Anne Newton" on there, right?

4     A.   Yes.

5     Q.   Joseph didn't print that, right?

6     A.   No.

7     Q.   The date on there of 8/21/00, you printed that

8 there, right?

9     A.   Yes.

10     Q.   The address of 6962 East First Avenue, Number

11 102 in Scottsdale, Arizona, 85251, USA, that's all your

12 writing, right?

13     A.   Yes, sir.

14     Q.   That's all a lie, right?

15     A.   Yes.  It is fictitious.

16     Q.   And in fact with regard to that particular

17 address, the police found Exhibit Number 368.001 in your

18 home.  It's the address to somebody named "Rob Walker." Do

19 you see that?

20     A.   Yes.

21     Q.   And the address is 6962 East First Avenue,

22 number 102, Scottsdale, Arizona, 85251.  Do you see that?

23     A.   Yes, I see that.

24     Q.   That's the same address that you listed on the

25 Exhibit Number 266.011, right?

1      A.    Yes, sir.

2      Q.    And this is the address that you asked Erik

3   Vaillant to go check out to see what type of building it was,

4   isn't it?

5      A.    No, not to check out.  Rob Walker is Eric's

6   friend.

7      Q.    Well, isn't -- this is the address -- you asked

8   Mr. Vaillant to go check out an address where this item may

9   be delivered to, didn't you?

10      A.    I asked him if he could pick it up, yes.

11      Q.    You wanted him to pick it up from Rob Walker's

12   house, right?

13      A.    Yes.

14      Q.    Because your intent was for them to --

15      A.    That was the shipping address, right.

16      Q.    That was your intent to have the sodium azide

17   shipped over to that address, right?

18      A.    That is the shipping address, yes.

19      Q.    So that was your intent.  That's what you

20   wanted, right?

21      A.    I have answered, yes.

22      Q.    Okay.  Now, you didn't just send out Exhibit

23   266.001.  You actually practiced on it a little bit, didn't

24   you?

25      A.    Yes, I did.

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1        Q.    And in fact you also -- we have 266.021.  You

2    have a phone number written on that, don't you, at the very

3    bottom, 785-554-0757, right?

4        A.    Yes.

5        Q.    You wrote that, right?

6        A.    That looks like my handwriting, right.

7        Q.    Joseph didn't write that, did he?

8        A.    No.

9        Q.    And that is the number to Voit Global, isn't

10    it?

11        A.    I don't know.

12        Q.    Well, let's take a look at an exhibit.  We just

13    looked at Exhibit Number 378, and -- sorry.  Let's look at

14    Exhibit 379, very bottom.  It does have a number on there,

15    doesn't it, 785-554-0757, right?

16        A.    Yes.

17        Q.    That's the same number that's written down here

18    on the bottom of Exhibit 266.021, right?

19        A.    Yes.

20        Q.    And on this one, 266.002, the "AN" that's at

21    the bottom there, that's you practicing your "Anne Newton,"

22    right?

23        A.    No, I don't believe so.

24        Q.    You didn't put that on there?

25        A.    Yes.  That is mine.

1        Q.    You didn't fill that out all the way, did you?

2        A.    No, I didn't.

3        Q.    So why only stop there?  Is it because you were

4    practicing?

5        A.    No.  It was because of the quality of the

6    paper.

7        Q.    Okay.  Well, if it was the quality of the

8    paper, then let's look at 266.022.  The quality is the same.

9    There's a line in the middle as there is on .022.  You see

10   the line in the middle.  Same line here on 266.020, yet you

11   filled the one out?

12       A.    Yes, because I couldn't get a better copy.

13       Q.    You finally were able to do that though, right,

14   get a better copy?

15       A.    No, obviously not.

16       Q.    Well, if we take a look at Exhibit Number

17   266.011, that's a better copy, isn't it?  There's no line

18   down the middle, is there?

19       A.    Not on that one, no.

20       Q.    Well, this is the one you faxed.  You told me

21   that just now?

22       A.    I don't know.

23       Q.    Well, you filled everything out on here you

24   told me before, right?

25       A.    Yes.

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1          Q.    You told me you faxed one over to Voit Global,

2     didn't you?

3          A.    Yes.  I faxed one over.

4          Q.    Right.  This is it, right?

5          A.    I don't know if that's the exact one.

6          Q.    Well, you wouldn't have sent this one over

7     here, 266.020, because it doesn't even have an address, does

8     it?

9          A.    Right.  If it's not complete, that's the one I

10    faxed.

11         Q.    Right.  And this is just you practicing your

12    "Anne Newton" and writing it out, isn't it?

13              MR. PATTERSON:  Judge, asked and answered.  She said

14    that's not the case.

15              THE COURT:  Sustained.

16    BY MR. MARTINEZ:

17         Q.    Did you say it was not the case?  Maybe I

18    didn't hear you.

19         A.    No, that is not the case.

20         Q.    You were not practicing on this one?

21         A.    No, sir.

22         Q.    Why did you not fill it out all the way?

23         A.    I didn't have an address.

24         Q.    So you were waiting to get an address to put in

25    there, right?


          TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1      A.    Yes.

2            Q.    And that's when you happened upon the address

3      in 368.001, Mr. Walker's address, right?

4            A.    It -- I didn't happen upon it, no.

5            Q.    But that's when you -- that's when you decided

6      to use Mr. Walker's address, right?

7            A.    Yes, sir.

8            Q.    You indicated to us that Mr. Andriano was the

9      one to purchase the money order.  Do you remember telling us

10     that?

11           A.    Yes, sir.

12           Q.    But if we take a look at Exhibit Number 287,

13     let's look at the signature.

14           A.    Yes.

15           Q.    He didn't write that, did he?

16           A.    No.  I did.

17           Q.    And, again, you're not "Anne Newton," are you?

18           A.    No, sir.

19           Q.    That's a lie on that?

20           A.    Are you asking me a question?

21           Q.    I am.

22           A.    What is the question?

23           Q.    Isn't that a lie?

24           A.    That's the name I was using, yes.  It's "Anne

25     Newton."

1        Q.    So that's the truth then.   The truth is you're

2   "Anne Newton" then?

3        A.    No, sir.

4        Q.    You want me to address you as "Anne Newton"

5   from now on?

6        MR. PATTERSON:   Objection judge argumentative.

7        THE COURT:   Sustained.

8   BY MR. MARTINEZ:

9        Q.    Well, isn't it a lie when you put a name that

10  isn't yours down on a document?

11       MR. PATTERSON:   She answered the question.   She said

12  it was a fictitious name she used.

13       THE COURT:   Sustained.   Let's move on.

14  BY MR. MARTINEZ:

15       Q.    But you're the one who filled this out here

16  too, didn't you?

17       A.    Did I fill it out?   No.

18       Q.    Joseph didn't do it?

19       A.    No.   He brought it to me.

20       Q.    Ma'am, did I ask you whether or not he brought

21  it to you to do it?

22       A.    Not yet, no.

23       Q.    Did I ask you that, ma'am?

24       A.    No, sir.

25       Q.    Now, what happened after that is you decided to

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    then send an email over to Voit Global, didn't you, to

2    continue this purchase, right?

3         A.    I don't recall the next step, but that probably

4    was what happened.

5         Q.    Well, in Exhibit 267 we have a document that

6    says "Sales Voit Global to Anne Newton," and then it says

7    "Your international retailer of scientific instruments," and

8    it has all of that.  And then if we go over to the right, it

9    says "Please send via overnight.  Thanks."  That's what it

10   say, right?

11        A.    Yes, sir.

12        Q.    And in fact you were the one that actually sent

13   this with the money order, circling the part down at the

14   bottom, right?

15        A.    Yes, sir.

16        Q.    Joseph Andriano didn't do that, right?

17        A.    No, he did not.

18        Q.    Then in Exhibit Number 380, right before you

19   sent that out, this is dated -- it's an email dated September

20   22nd, 2000, Exhibit 380, it does talk about "Allen, I realize

21   it may not seem like a great bang for the buck, but an

22   acquaintance swears they have used sodium cyanide or

23   potassium cyanide mixed with similarly prepared greens for

24   the rodents placed near the concentrated area of the plant

25   life they intend to muck up."  Do you see that it says that?

1      A.   Yes, sir.

2      Q.   And it does talk about cyanide, doesn't it?

3      A.   Yes, it does.

4      Q.   It does not talk about sodium azide, does it?

5      A.   Sodium azide is --

6      Q.   Ma'am, it doesn't talk about sodium azide, does

7 it?

8      A.   No, sir.

9      Q.   Okay.  You told us previously you had a

10 conversation with Shawn King about this subject, didn't you?

11      A.   Yes.

12      Q.   You indicated that took place in early summer.

13 Do you remember telling us that?

14      A.   No.  I believe the first conversation was about

15 March or so, and then we didn't talk about it again until

16 summertime.

17      Q.   And in the summertime you indicated that he's

18 the one that gave the name of "sodium azide" as the substance

19 to get, right?

20      A.   Yes, sir.

21      Q.   And he is -- and before that you had only been

22 looking for cyanide, right?

23      A.   That's correct.

24      Q.   Ma'am, if that's true, then why is it that

25 still in September 22nd, and we know this was mailed out to

1    you on September 28, you're still talking about cyanide if

2    you had all of these conversations with Shawn King?

3         A.    Because it took us that long to figure out that

4    cyanide could not be purchased.

5         Q.    Well, but the thing is you told us that you had

6    this conversation with him and that in this conversation that

7    the two of you had -- you said I don't want to use cyanide, I

8    want to use something different.  Do you remember telling us

9    that?

10        A.    No.  I did not say that.

11        Q.    He didn't say that to you either then?

12        A.    No.

13        Q.    You didn't talk about -- so you don't remember

14   what you told us on direct examination?

15        A.    Yes, I do.

16        Q.    And that's exactly what you said, that you and

17   he talked about it but you wanted something other than

18   cyanide, right?

19        A.    Cyanide could not be purchased.  It was not

20   available.

21        Q.    Ma'am, but you agreed on something else, right?

22        A.    Yes.

23        Q.    You and he.

24               This conversation took place in early summer,

25   didn't it?

1      A.   No, sir.

2      Q.   It took place when then?

3      A.   Well, it took a couple months to figure out

4 that cyanide could not be purchased, so it would have been, I

5 don't know, August, September, something like that.

6      Q.   You're saying that the conversation whether or

7 not to make it sodium azide was Mr. King's, right?

8      A.   Yes.  He said it would be a substitute for it.

9      Q.   And he gave you the name of Voit Global, right?

10     A.   That's correct.

11     Q.   But you're corresponding with Voit Global on

12 August 21 of the year 2000, aren't you?

13     A.   Yes.  Yes, sir.

14     Q.   The information that it's sodium azide that you

15 want to purchase, right, isn't it?

16     A.   Looks like it said cyanide to me.

17     Q.   My point is you indicated to us that as a

18 result of speaking with Mr. King you were able to get Voit

19 Global as a source, right?

20     A.   Yes, sir.

21     Q.   And after that you started to email Voit

22 Global, right?

23     A.   No, not after that.

24     Q.   Well, it was on July 26 that you started to

25 that's when you set up your account, right?

1       A.      I don't know the date.

2       Q.      Well, we just looked at it.  Do you want to

3   take a look at it again?    Exhibit 281.001 says July 26,

4   right?

5       A.      Yes, sir.

6       Q.      And you set it up specifically for the purpose

7   of buying a substance, right?

8       A.      Yes, sir.

9       Q.      And you said that Shawn King was the person

10  that gave you the name of Voit Global, right?

11      A.      Yes, sir.

12      Q.      And the first email went out on August 21 of

13  the year 2000, right?  Or, sorry, August 10th of the year

14  2000?

15      A.      I believe so.

16      Q.      But in your direct examination what you told us

17  was that as a result of the conversation with Shawn King

18  that's when the decision was made to make it sodium azide,

19  didn't you?

20      A.      Yes.

21      Q.      And so if you have that conversation and he's

22  already told you about sodium azide, then why are you asking

23  about cyanide in Exhibit Number 380?

24      A.      I think you're confused.  We had several

25  conversations trying to find cyanide and could not find it.


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1          Q.      Where did you try to get cyanide other than

2   from Voit Global, ma'am?

3          A.      There were different places.  I don't even

4   know.  Shawn --

5          Q.      I didn't ask about Shawn.  I asked about you.

6   What other places did you attempt to get cyanide from?

7          A.      I couldn't recall the company.  It's --

8          Q.      It was more than one?

9          A.      What's that?

10          Q.      Was it more than one company that you attempted

11   to obtain cyanide from?

12          A.      Yes.

13          Q.      Was it over the internet?

14          A.      Actually, the research was being done by Shawn.

15          Q.      Well, you told me that you attempted?

16          A.      I did.

17          Q.      Okay.  Did you attempt to do it over the

18   internet or did you do it by phone or in person?

19          A.      I made a couple of phone calls.

20          Q.      And when did you make these phone calls?

21          A.      In July sometime.

22          Q.      And they told you no, we can't get any cyanide,

23   right?  It's --

24          A.      It's not for sale.

25          Q.      It's not for sale because it's regulated by the

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    government, right?

2           A.    Yes, sir.  Something like that.

3           Q.    Right.  This is in August I think you said?

4           A.    I just said July.

5           Q.    July, sorry.  In July you made these calls and

6    you then know cyanide is regulated by the government and you

7    can't buy it.  That's what you just --

8           A.    At least from the people I had called, yes.

9           Q.    Right.  That's the only information you had,

10   according to you, other than what Mr. King is telling you,

11   right?

12          A.    Regarding what?  I'm --

13          Q.    Cyanide.

14          A.    You're confusing me.

15          Q.    I want to know about cyanide and you indicated

16   that in July you made a couple calls attempting to purchase

17   cyanide, right?

18          A.    Yes, sir.

19          Q.    And these individuals from whom you attempted

20   to purchase the cyanide told you, no, we can't sell it to you

21   because it's regulated by the government.  That's what you

22   just told us, right?

23          A.    Not in those exact words, but, yes, I was not

24   able to purchase it.

25          Q.    And the reason you weren't able to purchase it,

1    ma'am, is because the federal government regulates it, right?

2         MR. PATTERSON:  Judge --

3         MR. MARTINEZ:  That's what you told --

4         MR. PATTERSON:  -- this is not what she's saying.

5         THE COURT:  Overruled.  Go ahead, answer the question

6    if you can.

7         THE WITNESS:  I don't know the specific reason.  I

8    know as an individual I could not purchase cyanide.

9    BY MR. MARTINEZ:

10        Q.   Okay.  So but then through your Wyndstar

11   Enterprises doing business as Aztec Creations, right --

12        A.   Yes, sir.

13        Q.   -- you've already asked for cyanide and you

14   know you can't purchase it again because Mr. Voit tells you

15   that, right?

16        A.   Yes, he does.

17        Q.   Well, then why on September 22nd, if he's

18   already told you that, you're still asking for it?

19        A.   Because I don't recall the date that he told me

20   I couldn't purchase it.

21        Q.   Okay.  Now, in an effort to have this thing go

22   forward, you decided to get a business license, didn't you?

23        A.   No, I did not.

24        Q.   Well, no.  Yes, you did because you contacted

25   Copperstate Glass and Mirror to get a copy of their business

1    license, didn't you?

2            MR. PATTERSON:  Judge, misstates prior testimony.

3            THE COURT:  Overruled.  She could answer the

4    question.

5            THE WITNESS:  I did not get a business license.  I

6    made a business license.

7    BY MR. MARTINEZ:

8        Q.    Well, no, you had to make it from something

9    that you obtained, didn't you?  You didn't type the whole

10   thing up, did you?

11       A.    No, sir.

12       Q.    So you obtained it from Copperstate Glass and

13   Mirror, didn't you?

14       A.    Yes, sir.

15       Q.    And this was on September 12th of the year

16   2000, right?

17       A.    I don't know.

18       Q.    Well, let's take a look at the top here of

19   Exhibit Number 266.012.  See the date up there?

20       A.    Yes, sir.

21       Q.    September 12th at 4:37 in the evening, right?

22       A.    Yes.

23       Q.    That's when they faxed you over a license that

24   you would then alter to submit to Voit Global, right?

25       A.    That's correct.


            TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1          Q.     And you were going to submit it even though as

2     we have seen from Exhibit Number 380, which is dated

3     September 22nd, 2000, you hadn't agreed or hadn't been able

4     to obtain the cyanide that you were looking for, right?

5          A.     Doing the business license had nothing to do

6     with cyanide.

7          Q.     Well, yes, it did, because on September 22nd,

8     that's what you're looking to buy, isn't it?

9          A.     That is what the request was.

10          Q.     That's what you requested, right?

11          A.     That's what we requested.

12          Q.     No, ma'am.   Let's take a look at Exhibit 380.

13     There's no "we" on there.   It says from "Anne Newton."   You

14     requested it, right?

15          A.     I'm doing the actual -- the actual typing and

16     the request, but it was a joint effort.

17          Q.     I know you keep telling me that, but from this

18     document, we see one name only, don't we?

19          A.     Yes.

20          Q.     And that's you, your name, as Anne Newton,

21     right?

22          A.     Yes.   It does say from "Anne Newton."

23          Q.     I know it says from "Anne Newton," but it was

24     from you though, right?

25          A.     I typed the email, yes.


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1        Q.   So again in this email, you're asking for

2   sodium cyanide or potassium cyanide, right?

3        A.   Yes, sir.

4        Q.   Even though you're already in the process of

5   getting a business license of -- on September 22nd of the

6   year 2000, even though you haven't agreed on a product yet,

7   right?

8        A.   What was the date of the other one?

9        Q.   The other one was September 22nd.  This

10  preceeded it by 10 days, ma'am.

11       A.   Okay.

12       Q.   All right.  And this is what you received,

13  right?  Copperstate Glass sends it to you, correct?

14       A.   Correct.

15       Q.   One of the things you told us on direct

16  examination was that San Riva had vendors.  Do you remember

17  telling us that?

18       A.   Yes.

19       Q.   And you had a bunch of these vendors, right?

20       A.   Yes.

21       Q.   You indicated you had these business licenses

22  in the back --

23       A.   And insurance and --

24       Q.   Sure.

25       A.   Yes.

1    Q.    If you had it in the back, why is it on
2    September 12th you're requesting it?
3    A.    We had to request them from all the vendors.
4    Q.    I know you had to request them, but it was
5    already an existing vendor where you did have --
6    A.    Because we can't put our book together yet.
7    That was one of the things that was an ongoing process.
8    Q.    So the book wasn't put together then?
9    A.    No.
10    Q.    And you decided to go ahead and call
11    Copperstate Glass and Mirror and say, hey, send over a
12    privilege license?
13    A.    Along with the insurance and along with
14    whatever else was required.
15    Q.    This is the one that you took and decided
16    to do something with, right?
17    A.    Yes, sir.
18    Q.    That's 266.012, right?
19    A.    Yes.
20    Q.    And Joseph Andriano did not request this, did
21    he?
22    A.    No.  I made the phone call.
23    Q.    Joseph Andriano did not even see this license,
24    did he?
25    A.    Yes, he did.

1          Q.     Then on 266.013, there are some changes to it.

2     And if we hold it up, we could see there's sort of like some

3     White Out, like we did with regard to your previous apartment

4     under the name "Montgomery," we see the same sorts of White

5     Out under 266.013, and there's one at the top there.   There's

6     90002501.  Do you see that?

7          A.     Yes.

8          Q.     You put that on there, didn't you?

9          A.     Yes.  I recreated the whole business license.

10          Q.     Specifically you put that on there, right?

11     That item that I just referenced, you put that on there,

12     right?

13          A.     Yes, sir.

14          Q.     It wasn't Joseph Andriano, was it?

15          A.     No.

16          Q.     Now, 22.02 (sic), you did that, right?

17          A.     Yes.

18          Q.     And then also it's covered up, but you did put

19     another piece right there that had Wyndstar doing business as

20     Aztec Creations, right?

21          A.     Yes, sir.

22          Q.     Joseph Andriano did not do any of that, did he?

23          A.     No.  He wouldn't do any of that.

24          Q.     Is the answer no, he didn't do that?

25          A.     The answer is no, he wouldn't do any of that.


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1          Q.    Ma'am, he didn't do it, did he?

2          MR. PATTERSON:  Judge, she's testified that he

3     wouldn't do that.

4          THE COURT:  Sustained.  Let's move on.

5     BY MR. MARTINEZ:

6          Q.    You're implying, by "wouldn't do it," is that

7     you couldn't force him to do it.  That's what you're saying,

8     right?

9          A.    That is not what I'm saying.

10         Q.    You didn't ask him to do it, did you?

11         A.    I wouldn't ask my husband to do that.

12         Q.    Well, why wouldn't you ask him to do it?  You

13    said he asked you to do all those other things.  Why don't

14    you ask him to help you?

15         A.    The point was he asked me to do it and so I did

16    it.

17         Q.    And you do everything he tells you, right?

18         A.    I try.

19         Q.    Including remaining faithful, right?

20         MR. PATTERSON:  Judge --

21         THE COURT:  Sustained.  Let's move on.

22    BY MR. MARTINEZ:

23         Q.    He did ask you to remain faithful?

24         A.    Yes, he did.

25         MR. PATTERSON:  Argumentative.  It's asked and

1    answered.

2           THE COURT:  Sustained.  Let's move on.

3    BY MR. MARTINEZ:

4           Q.    266.014 is the next step, isn't it?  We have an

5    Aztec Creations Wyndstar Enterprises and we have an address

6    there?

7           A.    Yes.

8           Q.    It's 2442 South 24th Street, right?

9           A.    Yes.

10          Q.    Actually the address is 2424 South 24th Street

11   for Copperstate, isn't it?

12          A.    I don't know.

13          Q.    But this didn't turn out to be perfect because,

14   again, you had to use white out on the margin, didn't you?

15          A.    Yes.  There was stuff there that I told you.  I

16   recreated the whole thing.

17          Q.    So you wanted to make it so it couldn't be

18   traced back to Copperstate, right?

19          A.    Well, of course.

20          Q.    Because you wanted to engage in a fraudulent

21   transaction, right?

22          A.    I did.

23          Q.    And Joseph didn't do any of the whiting out on

24   266.014, did he?

25          A.    No, he wouldn't.

1      Q.    The answer is no, right?

2      A.    The answer is no, he wouldn't.

3      Q.    Exhibit 266.015, we have at the very top of

4   that "To Allen." You wrote that, right?

5      A.    I did.

6      Q.    Joseph didn't do that, did he?

7      A.    No.

8      Q.    And this is the one that you actually faxed

9   over to Voit Global, right?

10     A.    It appears to be so, yes.

11     Q.    Joseph didn't do the faxing, did he?

12     A.    Of course not.

13     Q.    You did it?

14     A.    I did it.

15     Q.    One thing that you said, with regard to Mr.

16  Black, I just want to clear that up, you indicated that you

17  met him at the Rockin' Rodeo, right?

18     A.    Yes.

19     Q.    And that you were there and somehow the two of

20  you met, right?

21     A.    Chris introduced us, yes.

22     Q.    It wasn't the case that he was out there

23  dancing and that you approached him, was it?

24     A.    No.

25     Q.    It wasn't the case that it was next or close to

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    the last song of the evening, was it, when you approached him

2    on the dance floor, was it?

3         A.   No, it wasn't.

4         Q.   And it wasn't while you were out there dancing

5    on the dance floor and before the song was over you kissed

6    him.  It wasn't like that, right?

7         A.   Yes, sir.

8         Q.   It wasn't that you groped him at all?

9         A.   No, sir.

10        Q.   And it wasn't that when he went to drop you off

11   at your house, it wasn't that you asked him to come up to

12   your apartment?

13        A.   Yes, I did ask him in.

14        Q.   Is that when you became the tease or when did

15   you become the tease as you told us?

16        A.   As the evening progressed.

17        Q.   So it's just flirtation that's going on at the

18   Rockin' Rodeo?

19        A.   Yes.

20        Q.   There's a flirtation continuing on at Denny's

21   when you're having breakfast?

22        A.   Actually, we had more conversation there than

23   flirting.

24        Q.   But even -- if you were intoxicated by the time

25   you got to Denny's and you had breakfast, the effects of the

1    alcohol were wearing off, weren't they?

2            A.    Starting to.

3            Q.    And so then you asked him or he took you to

4    your apartment, right?

5            A.    Yes.

6            Q.    You asked him in, didn't you?

7            A.    Yes, I did.

8            Q.    And once he was inside, he sat down and he had

9    a beer, right?

10           A.    Yes.

11           Q.    And at some point during the evening the

12   occasion arose for a prophylactic, right?

13           A.    That's correct.

14           Q.    Isn't it true that he actually supplied the

15   prophylactic that night?

16           A.    No, sir.

17           Q.    You supplied it then?

18           A.    I did.

19           Q.    And you got it from, according to you, the

20   dresser drawer, right?

21           A.    That is correct.

22           Q.    The dresser drawer you indicated that is too

23   high for you to look into, right?

24           A.    Yes, it is.

25           Q.    So you're not even able to see what's in there,

1    right?

2              A.    Not unless I stand on a chair or something.

3              Q.    If you're standing on the ground, it's too high

4    for you to see, right?

5              A.    Yes.

6              Q.    So that in fact you probably have never even

7    looked in there, have you, prior to that night?

8              A.    Yes, I have.

9              Q.    Well, did you stand on a chair to look at it in

10   the previous times that you do look in there?

11             A.    Yes.

12             Q.    How many times had you looked inside there?

13             A.    I couldn't tell you that.

14             Q.    When was the last time prior to September 27th

15   of the year 2000 did you look into that drawer?

16             A.    September 27th?  I don't even know what that

17   date is.

18             Q.    That's the date that you had intercourse,

19   according to Mr. Black, with him?

20             A.    The Friday evening that he spent over at my

21   house was the last time that I got into that drawer.

22             Q.    He needed to go to work the next morning,

23   didn't he?

24             A.    Yes, he did.

25             Q.    And you had looked into that drawer to see what

1    was in there, right?

2              A.    I had on occasion, yes.

3              Q.    Okay.  And on this particular time you weren't

4    even able to look.  You just reached around and were lucky

5    enough to find the prophylactics, correct?

6              A.    No, that's not true.

7              Q.    You found them though, didn't you, according to

8    you?

9              A.    I did because Joe keeps them right there all

10   the time and I have the opportunity everyday to see him get

11   one.

12             Q.    You're saying that you had sex with him every

13   day, right?

14             A.    Almost, yes.

15             Q.    Including the time he was having chemotherapy,

16   right?

17             A.    I said almost.

18             Q.    You had sex with him almost all the time?

19             A.    Yes.

20             Q.    Including during the period that he had

21   chemotherapy, right?

22             A.    Not the day he had --

23             Q.    The --

24             A.    --but during the period, yes.

25             Q.    During the period he had chemotherapy you had

1    occasion to have sex with him almost every day?

2            A.    Yes.

3            Q.    Now, one of the things that, to follow this

4    package, is that you -- it was actually delivered by Airborne

5    Express, right?

6            A.    Yes, sir.

7            Q.    And you ended up going down there to pick it

8    up, right?

9            A.    Actually, Joe drove me down there.

10           Q.    And Exhibit 266.002, this says what?  On the

11   upper left, ma'am.

12           A.    San Riva history.

13           Q.    Joe didn't work for San Riva, did he?

14           A.    No.

15           Q.    And at the very bottom we have an address,

16   right?  Says South 16th Street, right, on 26th, and then 1415

17   East Buckeye.  Do you see that?

18           A.    Yes, I do.

19           Q.    You wrote that?

20           A.    Yes, I did.

21           Q.    That's the place where the Airborne Express is

22   at your work, right?

23           A.    That's correct.

24           Q.    You wrote that.  Joseph didn't write that,

25   right?

1      A.   Yes, I wrote that.

2      Q.   Which means you picked up the telephone call --

3 you had to make a call to see what their address was, right?

4      A.   Yes.

5      Q.   Because they contacted you by that cell phone

6 number that you left, right?

7      A.   I believe so.

8      Q.   They didn't contact Joseph through Joe's cell

9 phone, did they?  They contacted you?

10      A.   They contacted me, yes.

11      Q.   And right down here, the lower right, it says

12 Barry and a phone number.  We had Barry Singelais here and he

13 indicated earlier that's his direct line.  Why are you

14 calling Barry Singelais of Alpha Aesar?

15      A.   I don't recall.

16      Q.   You don't recall calling him?

17      A.   No.  I don't recall the reason when or why I

18 would have called him.

19      Q.   But you did call him though?

20      A.   I don't know.

21      Q.   That is your writing, right?

22      A.   Yes, it is.

23      Q.   That's the number that you wrote, right?

24      A.   Yes.

25      Q.   But you don't know why you put it there?

1          A.     No, I don't.

2          Q.     Let's take a look at the Airborne Express

3    delivery manifest.  It's Exhibit 314.  It's got there -- it's

4    got a name Anne Newton at about -- at 2:34 in the afternoon

5    on October 5, you signed for that package, didn't you?

6          A.     Yes, I did.

7          Q.     And that's the package that had the sodium

8    azide in it, right?

9          A.     Yes, sir.

10         Q.     That was a lie in terms of you being -- in

11   terms of that being your name, isn't it?

12         A.     Yes.  I've already said that.

13         Q.     Well, no.  This is a different exhibit, ma'am.

14   Different person, Airborne Express.  You held yourself out to

15   be Anne Newton to Airborne Express, didn't you?

16         A.     I did.

17         Q.     And it doesn't say "Joseph Andriano" on there,

18   does it --

19         A.     No, it does not.

20         Q.     -- with the number that he has had.  He could

21   have just as easily signed for it as you, right?

22         A.     No.  He was holding the box and I signed the

23   paper.

24         Q.     I know that may have been what you're telling

25   us, but he could have put the box down, and since you guys

1    had the shipping number, he could have signed Joseph Andriano

2    on this, right, and they would have given you the box?

3         A.   He could have.

4         Q.   But he didn't, did he?

5         A.   No, he did not.

6         Q.   And one of the things we know about -- have

7    about that particular day, are you familiar with the term

8    forcible detainer?

9         A.   Yes.

10        Q.   And forcible detainer is a court action, isn't

11   it?

12        A.   It is.

13        Q.   It's a court action whereby people in your

14   business seek to remove tenants for whatever reason from

15   their apartment, right?

16        A.   Yes.

17        Q.   And one of the things that happened, you told

18   Shannon Sweeney that you were going to court for a court

19   action at 2:30 in the afternoon, right?

20        A.   That's what she says, yes.

21        Q.   You didn't tell her that you were going to the

22   court that afternoon?

23        A.   I don't recall telling her that, no.

24        Q.   If you don't recall, then it's possible that's

25   what you told her?

1      A.    It is possible.

2      Q.    And she also indicates that she was a little

3  miffed at you.  Do you remember that?

4      A.    No, I don't.

5      Q.    Because you arrived back late to the office,

6  right?

7      A.    I don't remember what time I got back.

8      Q.    Well, you arrived at 5:30.  Do you remember

9  that?

10     A.    Yes, sir.

11     Q.    And if you arrived at about 5:30 -- well, let

12  me do it this way.  How long does it take to drive from San

13  Riva over to the address where you picked up this package?

14     A.    I don't know.

15     Q.    20, 30 minutes?

16     A.    I just -- I don't know.

17     Q.    2 hours?

18     MR. PATTERSON:  Your Honor, she says she doesn't know.

19     THE COURT:  Sustained.

20  BY MR. MARTINEZ:

21     Q.    You have no idea?  None whatsoever?

22     A.    No, sir.

23     MR. PATTERSON:  Asked and answered.

24  BY MR. MARTINEZ:

25     Q.    You did make the trip though?

1      A.   As a passenger, yes.

2      Q.   You did make the trip?

3      A.   As a passenger, yes.

4      Q.   Is that as a yes, you made the trip, ma'am?

5      A.   I said yes.

6      Q.   And as a passenger you were able to see -- you

7   took a road to get there, right?

8      A.   Well, yes.  We didn't fly.

9      Q.   You could see that there were other cars on the

10   road, right?

11      A.   Yes, sir.

12      Q.   You could see buildings that went by, right?

13      A.   Yes, sir.

14      Q.   You could tell whether it was day or night,

15   couldn't you?

16      A.   Yes, sir.

17      Q.   Was it day when you left?

18      A.   Yes, sir.

19      Q.   Was it day when you returned?

20      A.   Yes, sir.

21      Q.   And when you returned, ma'am, one of the things

22   that you did was that you went over to the San Riva leasing

23   office, didn't you?

24      A.   Yes.  That's where --

25      Q.   And --

1        A.     -- we arrived at.

2        Q.     -- you had a very personal package with you

3   when you went in there, right?

4        A.     What do you mean "very personal package"?

5        Q.     Well, you didn't want anybody to know what was

6   in there, did you?

7        A.     Not necessarily, no.

8        Q.     Well, you had gone through all these lengths,

9   using the name "Anne Newton," opening an account, you know,

10  getting a fraudulent license, you didn't want anybody linking

11  you up with that package, did you?

12       A.     It wasn't -- actually, it was Joe not wanting

13  that linked with --

14       Q.     No.  You know what?  I don't want to know what

15  Joe knew.  I want to know what you knew, okay?  That was a

16  package that you didn't want somebody linking up to you,

17  right?

18       A.     Actually, I didn't -- I mean, I walked into the

19  office with it and had people see me.  I wasn't really

20  thinking about that.

21       Q.     Ma'am, you're not answering my question.

22       MR. PATTERSON:  Wait, Judge.  She is answering the

23  question.

24       THE COURT:  Repeat the question.

25  / / / / /

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000005183

1   BY MR. MARTINEZ:

2          Q.    You didn't want anybody to link you up with

3   that package, did you?

4          A.    No.  That's not true.

5          Q.    Well, if they had linked you up with the

6   package, wouldn't that have made it impossible for you to

7   keep your promise to Joseph that nobody would ever find out

8   about this suicide?

9          A.    No.  Actually, the people in the office seeing

10  me carrying a box is no -- what the -- I don't understand

11  what you're trying to say.

12         Q.    What if they open it and say, hey, give it to

13  me, show us what's inside this package you have.  Wouldn't

14  that sort of put a little bit of a wrench into the plans?

15         MR. PATTERSON:  Judge, that's sheer speculation.

16  There's no evidence to support that.

17         THE COURT:  Sustained.  Let's move on.

18  BY MR. MARTINEZ:

19         Q.    You did something else to that package, didn't

20  you?

21         A.    I don't know what are you talking about.

22         Q.    You didn't take it home, did you?

23         A.    No.

24         Q.    What you did is you dropped it off at the

25  leasing office, right?


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1     A.    Yes.

2     Q.    Joe wasn't with you when you dropped that off,

3  was he?

4     A.    Yes, he was.

5     Q.    He was in the leasing office?

6     A.    Yes.

7     Q.    And -- and Shannon Sweeney saw him, right?

8     A.    I don't know.

9     Q.    Well, she was there when you got there, wasn't

10  she?

11     A.    I believe -- I believe she was, yes.

12     Q.    Yeah, because she was upset because you had

13  come back late, right?

14     A.    I don't recall that.

15     Q.    So what you do is decide to leave that package

16  behind, right?

17     A.    We set it in an office.

18     Q.    Ma'am, you set it in the office, right?

19     A.    No.   Joseph set it in the office.

20     Q.    Okay.  And he wasn't wearing gloves, was he?

21     A.    No.

22     Q.    You weren't wearing gloves, right?

23     A.    No.

24     Q.    And he was -- he wasn't handling it with those

25  kinds of gloves that we've seen before here in this court.


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    In other words, he didn't have those plastic gloves on,

2    right?

3          A.    No, sir.

4          Q.    Neither did you, right?

5          A.    No, sir.

6          Q.    So what happens is that package is left behind

7    there, right?

8          A.    Yes, sir.

9          Q.    Ma'am, if you weren't afraid that Joseph was

10   going to find that package and know what was in it, why

11   didn't you just take it home?

12         A.    We decided not to take it home.

13         Q.    Ma'am, no, no, no.  I'm not asking you what

14   "we" did.  I'm asking you why you did not take it home.

15         MR. PATTERSON:  Judge, she's trying to answer the

16   question.

17         MR. MARTINEZ:  She's being nonresponsive.

18         MR. PATTERSON:  He's telling her how to answer the

19   question.

20         THE COURT:  Overruled.  Answer the question if you

21   can.

22         THE WITNESS:  We decided not to take it home because

23   of Nicolas and Ashley.

24   BY MR. MARTINEZ:

25         Q.    Ma'am, why did you -- you.  I'm not asking

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000005186

1    about Mr. Andriano.  Obviously he's not here.  I'm asking you

2    about you.  Why did you decide to do it?

3            A.    Because my husband didn't want to take it home.

4            Q.    Okay.  So you were following his mandate,

5    right?

6            A.    Yes, sir.

7            Q.    And the reason that you say that you didn't

8    want to take it to the apartment was because Nicolas and

9    Ashley would get into it, right?

10           A.    They could.

11           Q.    That's what you just said, right?

12           A.    They could.

13           Q.    Right.  You have drawers that are high up in

14   the kitchen.  Don't you -- you have counter space, right?

15           A.    Yes but not that would fit at the box.

16           Q.    Ma'am, you have counter space, right?

17           A.    Yes.

18           Q.    You have counter space right there where the

19   telephone was, right?

20           A.    Yes.

21           Q.    And Ashley and Nicolas would not have reached

22   that, could they?

23           A.    Yes.  They frequently are on the counter.

24           Q.    Ma'am, they're two and three years old at the

25   time, aren't they?

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1       A.      Yes.

2       Q.      One of them just started walking about a year

3  before, right?

4       A.      Yes, sir.

5       Q.      Ashley, you're telling me, can get up on this

6  kitchen counter and get things off of that?

7       A.      Nicolas can, yes.

8       Q.      I'm asking you about Ashley.  You're not --

9  you're not hearing me.  Ashley can get up on this counter?

10      A.      No, Ashley could not.

11      Q.      There are other areas, and there's one area in

12  particular that we know they couldn't get on, and that is the

13  dresser, right?  They can't get on top of the dresser, can

14  they?

15      A.      No, sir.

16      Q.      Because you can't even reach that, right?

17      A.      That's correct.

18      Q.      You could have put that box on top of that

19  dresser, right?

20      A.      Yes, we could have.

21      Q.      But instead he decided to leave it where

22  others -- and by "others" I'm talking about Shannon Sweeney,

23  Chris Hashisaki, Stephanie Koeppen, Janice Lind, Ray Ortega,

24  Jerry Sentelle -- all of those people had access to that

25  room, didn't they?

1      A.    Yes.

2      Q.    And that's where you left the package, right?

3      A.    That is correct.

4      Q.    But you left the package -- you didn't leave

5 everything that came on that package there, did you?

6      A.    Yes, I believe so.

7      Q.    No, ma'am.  You actually took off what's

8 contained in Exhibit 266.004, didn't you?  That was found in

9 the same area or in the same part as we did all the licenses.

10 Do you remember that?

11     A.    Okay.

12     Q.    You took -- what you did is you took this off,

13 which says "Aztec Creations, Anne Newton," and then it says

14 the address.  You took that off, didn't you?

15     A.    No.  I don't recall pulling that off.

16     Q.    It was found in the same area as the business

17 license, right?

18     A.    Yes, sir.

19     Q.    It wasn't found with the box was it?

20     A.    Obviously not.

21     Q.    And, ma'am, one of the other things, instead of

22 leaving it there at that place where you can get boxes, is

23 you could have put it in number 315, couldn't you, storage

24 shed number 315, couldn't you?

25     A.    We could have put it a number of places.

1      Q.    I'm not asking that.  I'm asking you whether or

2   not you could have either driven or walked yourself or taken

3   one of those little carts that you have over to storage shed

4   number 315, taking your key that locks that storage shed, and

5   place it in there.  You could have down that, right?

6      A.    Yes, sir.

7      Q.    You chose not to do that, right?

8      A.    No, sir.

9      Q.    And the reason you didn't do that was because

10  you were afraid that Joseph may find it, right?

11     A.    That is incorrect.

12     Q.    You wanted to put it in a place, that area that

13  we talked about, that Joseph didn't have access to, right?

14     A.    Yes, he did.

15     Q.    You're meaning to tell me that he could have

16  walked in there any time he wanted, and even though he's not

17  an employee, and start going into a locked office?

18     A.    Yes, sir.

19     Q.    Okay.  Some of the other things you left behind

20  was Exhibit 266.006, which is from Alpha Aesar, which

21  indicates what basically you received -- the printing's not

22  that good -- but it says "sodium azide," right?  You left

23  that actually in the office, right?

24     A.    I believe so.

25     Q.    Why would you, for example, take the thing that


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    says "Anne Newton" and "Aztec Creations?"  Why would you take

2    that off the box unless it was to make sure that if Joseph

3    saw the package he wouldn't ask you about it?

4         A.   As I said before, I don't recall removing that

5    from the box.

6         Q.   You don't remember how it got into your

7    belongings containing, for example, the business license,

8    some of your emails, the indemnity agreement -- you don't

9    know how this return ticket got on there, this address

10   ticket.  You don't know --

11        A.   No, sir.

12        Q.   Ma'am, the police did talk to you about this

13   situation, didn't they?

14        A.   Yes, sir.

15        Q.   It's fair to say that they did not specifically

16   ask you if your name was "Anne Newton," right?

17        A.   I don't recall if they did or not.

18        Q.   So you think that they asked you, Ma'am,

19   please give us your name, is your name "Anne Newton"?

20        MR. PATTERSON:  Judge, she says she doesn't recall.

21        THE COURT:  Sustained.

22   BY MR. MARTINEZ:

23        Q.   Let me try to refresh your recollection, okay?

24   Did the detective who was talking to you say to you, Are you

25   "Anne Newton?"


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1       A.   He addressed me as Wendi.

2       Q.   Right.  And you never told him that you went

3  under the alias or name of "Anne Newton," did you?

4       A.   Of course not.

5       Q.   And the reason that it's of course not is that

6  you didn't want him to catch you buying poison or sodium

7  azide over the internet, right?

8       A.   No, that's not the reason.

9       Q.   You wanted him to find that out?

10      A.   No, sir.

11      Q.   And there were a number of other things that

12  you didn't tell him, right?

13      A.   Yes, sir.

14      Q.   And you could have told him, right?

15      A.   I could have, yes.

16      Q.   And you made the conscious voluntary decision

17  not to do that, right?

18      A.   Yes, sir.

19      Q.   That's a lie by omission, isn't it?

20      A.   I was keeping a promise.

21      Q.   Which required you to make a lie by omission,

22  right?

23      A.   Yes, sir.

24      Q.   Now, one of the other things that happened was

25  that you were interviewed from about 7:30 in the morning till

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    about 11:30 in the afternoon, right?

2            A.    I don't know.

3            Q.    It was a long interview, right?

4            A.    It was.

5            Q.    After the interview was done, you were left

6    alone in that room, right?

7            A.    No.  Actually they took me to a different room.

8            Q.    All right.  And you were left alone in that

9    room, right?

10           A.    Yes, sir.

11           Q.    And that room was about 5 by 6, a very small

12    room, right?

13           A.    I don't remember.

14           Q.    Has a chair in it, right?

15           A.    Yes.  I was sitting on the chair.

16           Q.    Has a desk in there, right?

17           A.    Yes.

18           Q.    Also has a telephone, right?

19           A.    Yes, sir.

20           Q.    And one of the things that you did while you

21    were in there is you decided to avail yourself of the

22    telephone, didn't you?

23           A.    Yes.  They told me I could.

24           Q.    Right.  We're not saying you somehow violated

25    some sort of policy.  You used the telephone, didn't you?

1    A.    Yes, sir.

2    Q.    You didn't call your mother, right?

3    A.    No.

4    Q.    You didn't call your father, right?

5    A.    No.  I had already talken (sic) to them.

6    Q.    You didn't call Joseph or Jeanette Andriano,

7  right?

8    A.    No, sir.

9    Q.    You knew all of their numbers, right?

10   A.    Yes, sir.

11   Q.    The person that you decided to call was Shannon

12  Sweeney, wasn't it?

13   A.    Yes.

14   Q.    And the reason you chose to speak with Shannon

15  Sweeney is because you wanted her to go in and get some of

16  your documentation from the credenza so that she could hide

17  it for you so the police couldn't find it, right?

18   A.    That is not correct.

19   Q.    You were talking to Shannon about your work.

20  Is that what it was?

21   A.    I asked her to do some specific things and they

22  weren't what you just said.

23   Q.    Were they things that you wanted the police to

24  find out about?

25   A.    No.

1        Q.    They were things you didn't want the police to

2  find out, right?

3        A.    You are correct.

4        Q.    And that is something that you did not share,

5  these things that you didn't want the police to find out,

6  that is not something you shared with the detective during

7  the interview, right?

8        A.    That's correct.

9        Q.    So even though you're in this traumatic

10  situation where you've seen all this blood, you've now been

11  taken down there, you've been asked all these questions, you

12  were still plotting, aren't you, on how to best get through

13  this, right?

14        A.    No, sir.

15        Q.    And then that's when you make the call to make

16  sure certain things aren't found, right?

17        A.    Yes, sir.

18        Q.    And these things that you were upset and

19  worried about were all in the credenza, weren't they?

20        A.    No, I don't believe so.

21        Q.    Well, where were they then?

22        A.    They were on the floor in my office.

23        Q.    And are we talking about the things having to

24  do with the sodium azide?

25        A.    Yes, sir.

1          Q.    You didn't also ask her to hide the pictures of

2    Rick Freeland?

3          A.    No.

4          Q.    They weren't in a basket behind your desk on

5    the credenza?

6          A.    In a basket?  They may have been, I don't know.

7          Q.    But you did have pictures of Rick Freeland in

8    your office, didn't you?

9          A.    I had pictures of pool parties from San Riva,

10   not just specifically of Rick Freeland.

11         Q.    But those included pictures of Rick Freeland,

12   didn't they?

13         A.    As a resident of San Riva, yes.

14         Q.    And as a lover of Anne Newton?

15         A.    No.

16         Q.    Well, he was somebody that you had had an

17   affair with, right?

18         A.    That's correct.

19         Q.    And there were pictures of him there, right?

20         A.    Not in the way you're suggesting.

21         Q.    Were there pictures of him there, ma'am?

22         A.    Yes.

23         Q.    Now, one of the things that you told us

24   yesterday was that on Saturday everything is normal,

25   everything is okay between you and Joseph Andriano, right?

1      A.    Which Saturday?

2      Q.    October 7 of the year 2000?

3      A.    Yes, sir.

4      Q.    And during that day, one of the -- one of the

5 activities you told me that the two of you engage in is that

6 you go over the Sam's Club, right?

7      A.    Yes, sir.

8      Q.    After Sam's Club, you come home, see your

9 mother and father, right?

10     A.    Yes, sir.

11     Q.    They're really not in too much of a mood to

12 stay because they've just gotten back from a trip and they

13 drive off, right?

14     A.    Yes.

15     Q.    And your mother does have a Mazda automobile,

16 doesn't she?

17     A.    Yes.

18     Q.    The other individual that you spent part of the

19 day with was Jeanette Andriano, right?

20     A.    That's correct.

21     Q.    She's Joseph Andriano's mother, right?

22     A.    Yes.

23     Q.    And there was this get-together that was going

24 to take place at their home in Casa Grande, Arizona, right?

25     A.    Yes.

1        Q.     And the reason for the party -- well, you

2    didn't give us a reason, but isn't it true the reason they

3    had the party was because James Andriano was there from

4    Oklahoma?

5        A.     I don't recall.

6        Q.     And that was the reason why they were all

7    getting together that Saturday night.  You don't remember

8    that?

9        A.     I just remember it was a family get-together.

10       Q.     Do you even remember that James Andriano was

11    there?

12       A.     No, I don't.

13       Q.     James Andriano is a brother to Joseph Andriano,

14    isn't he?

15       A.     Yes, he is.

16       Q.     And you indicated that you went over and

17    whatever happened, happened.  Time passed.  And according to

18    you, you arrived back at the San Riva apartment complex at

19    about 1:00 -- sorry, at about midnight is what you told me

20    yesterday?

21       A.     I believe so.

22       Q.     So if we get a little bit past midnight, now

23    we're on October 8 of the year 2000, right?

24       A.     Yes, sir.

25       Q.     And so from now on I'm going to start talking

1    to you about October 8, 2000.

2              One of the things that you told us was that on

3    that particular night what happened is that on the way home

4    Joseph Andriano indicated to you that he was going to go

5    ahead with this suicide thing, right?

6              A.    Yes, sir.

7              Q.    But prior to that earlier in the day on Friday,

8    just so we could get a perspective, on Friday you and he had

9    done some preparations, right?

10             A.    Yes, sir.

11             Q.    And the preparations, according to you, was to

12   take some Elderberry capsules, right?

13             A.    Yes, sir.

14             Q.    Take the laborious task of opening them up,

15   right?

16             MR. PATTERSON:   Judge, "laborious task," that

17   overstates her testimony.

18             THE COURT:   Overruled.   You could answer the question

19   if you can.

20             THE WITNESS:   What was the question?

21   BY MR. MARTINEZ:

22             Q.    You had the laborious task of taking the

23   capsules apart?

24             A.    No, it wasn't difficult.

25             Q.    Well, it was difficult if we consider what's

1    coming up, wasn't it?

2              A.    Yes.

3              Q.    Then what you do is you have to open the bottle

4    of sodium azide, right?

5              A.    Yes.

6              Q.    You have to open the box, right?

7              A.    Yes.

8              Q.    You have to go through all of the stuff that

9    they piled in there, right, all of the packaging material,

10   right?

11             A.    Yes, sir.

12             Q.    You have to then go into the kitchen to get a

13   couple of Tupperware containers, right?

14             A.    Yes, sir.

15             Q.    And you got those Tupperware containers, right?

16             A.    Yes, I did.

17             Q.    You got the knife, didn't you?

18             A.    Yes, I did.

19             Q.    And then what happens is that the sodium azide

20   is dumped into one of those Tupperware containers, right?

21             A.    Yes, sir.

22             Q.    While you're doing that, you're running the

23   risk of exposure, right?

24             A.    Yes.

25             Q.    To the sodium azide?

1       A.   That's why we went outside.

2       Q.   So is the answer yes, you were running the risk

3  of exposure?

4       A.   We didn't believe so while we were outside, no.

5       Q.   Ma'am, you wore plastic gloves, didn't you?

6       A.   Yes.

7       Q.   That's because you are worried about the risk

8  of exposure, weren't you?

9       A.   Not with the gloves on, no.

10       Q.   But that's why you put the gloves on, right?

11       A.   Yes.  Yes.

12       Q.   So you are aware that there's a risk, right?

13       A.   Yes.  We read the --

14       Q.   I'm not asking about "we."  I'm asking about

15  you.  On October -- on October 6th, Friday, okay?  You.  You

16  were aware of the risk, right?

17       A.   Yes, I was.

18       Q.   That's why you used the gloves?

19       A.   Yes, sir.

20       Q.   And then you went and got two Tupperware

21  containers, right?

22       A.   No, that's not the sequence of the event.

23       Q.   At some point while this is happening you got

24  two Tupperware containers, right?

25       A.   Yes, sir.

1      Q.    And the ostensible reason for the Tupperware

2  containers was so that you could dump out part of the sodium

3  azide, right?

4      A.    Yes, sir.

5      Q.    So that you could then take the capsule you've

6  just opened and fill it up with the sodium azide, right?

7      A.    Yes, sir.

8      Q.    And you did that, according to you, to about 16

9  of those, right?

10     A.    Around that.  I don't know.

11     Q.    So 16 times you had to open, 16 times you had

12  to scoop, and 16 times you had to put it together, right?

13     A.    Yes, sir.

14     Q.    And 16 times you had to empty out what was

15  inside the Elderberry capsules?

16     A.    Yes, sir.

17     Q.    And you did this on the patio, right?

18     A.    Yes, sir.

19     Q.    This is the patio you use cutomarily as an in

20  and out, right?

21     A.    Yes, sir.

22     Q.    This is the patio that's now going to be

23  exposed in the air to sodium azide, right?

24     A.    No.  It's outside.

25     Q.    No, you just said you did it on the patio?

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000005202

1    A.   Yes, but it's outside air.

2    Q.   Right.  And the sodium azide could have fallen

3  on the patio, right?

4    A.   No.  We were very careful.

5    Q.   It could have, can't it?

6    A.   No, sir.

7    Q.   It -- there's no chance in the world that it

8  could have?

9    A.   No.  We were being careful.

10    Q.   Ma'am, it is possible that it could have fallen

11  there?

12         MR. PATTERSON:  Judge, she's answered the question.

13         THE COURT:  Sustained.  Let's move on.

14  BY MR. MARTINEZ:

15    Q.   This is the area where your kids can go in and

16  out, right?

17    A.   Yes, sir.

18    Q.   And this is the area where you keep the door

19  unlocked, right?

20    A.   Yes, sir.

21    Q.   Where Nicolas is a tall enough person, a kid,

22  that can get on the counter, he could open that door, right?

23    A.   Yes, sir, he can.

24    Q.   You also leave that door open.  He could have

25  gone out there?

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1          A.     He wasn't there.

2          Q.     He could have gone out there after you were

3     done, right?

4          A.     No, he was not there.

5          Q.     But he was there afterwards, wasn't he?

6          A.     Yes.

7          Q.     And you could have inadvertently dropped some

8     sodium azide there?

9          A.     No, sir.

10         Q.     You could have though?

11         A.     No, sir.

12         Q.     And he could have gotten in it, couldn't he?

13         A.     No, sir.

14         Q.     So then what ends up happening, according to

15    you, is after you fill all of those up, you decide to put

16    the -- the cap back on the bottle that contains the sodium

17    azide, right?

18         A.     No.  I don't believe I did that.

19         Q.     Okay.  The cap is put back on the sodium azide

20    bottle, right?

21         A.     Yes, sir.

22         Q.     Then it's put back inside the box, right, with

23    some of the packing material, right?

24         A.     Yes, sir.

25         Q.     And then it's taken over to the storage unit

1    315, right?

2         A.    I don't know the number, but the -- the

3    furthest one.

4         Q.    It's taken to your storage unit, right?

5         A.    To our storage unit.

6         Q.    Ma'am, you were the person -- you are the

7    reason why San Riva allows Joseph Andriano to live there,

8    right?

9         A.    Yes.

10        Q.    And so if we're looking at it that way, it is

11   your storage unit, isn't it?

12        A.    It is our storage unit.

13        Q.    And he takes it, according to you, over to the

14   storage unit, right?

15        A.    Yes, sir.

16        Q.    Why all of a sudden now are we putting this box

17   into storage unit 315?  Why not put it back in the office if

18   that's --

19        A.    It's --

20        Q.    -- hold on -- if that's such a good place to

21   store things?

22        A.    Because it's been opened.

23        Q.    You could have sealed it with tape couldn't

24   you?

25        A.    Could have.


                TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    Q.    And then walked it back, right?

2    A.    Could have, yes.

3    Q.    But now instead it's all right to put it in

4    number 315, right?

5    A.    Yes, it is.

6    Q.    Ma'am, the reason that all of those events took

7    place is because you were the one, and only you, were the one

8    that filled those Elderberry capsules with sodium azide,

9    right?

10    A.    No, sir.

11    Q.    Joseph Andriano had absolutely no knowledge of

12    that, did he?

13    A.    Yes, he did.

14    Q.    And, ma'am, the other thing that you didn't

15    talk to us about is the sodium azide that was found in the

16    soup or whatever on the kettle that was found on the stove.

17    You didn't talk to us about that on direct examination, did

18    you?

19    A.    No, sir.

20    Q.    You put that in that food, didn't you?

21    A.    No, sir.

22    Q.    Well, it was in the food, wasn't it?

23    A.    That's what the tests say, yes.

24    Q.    You put it in there, didn't you?

25    A.    No, sir.

1                MR. PATTERSON:  Asked and answered.

2    BY MR. MARTINEZ:

3            Q.    Did you --

4            THE COURT:  Overruled.

5    BY MR. MARTINEZ:

6            Q.    Did you -- did you make that soup, ma'am?

7            A.    I had made the soup a week before.

8            Q.    And so you're saying it was in the -- it was in

9    the refrigerator and then you just took it out, right,

10   because you say that you clean every Friday, right?

11           A.    That's correct.

12           Q.    And so you're telling us that you cleaned out

13   the refrigerator on Friday, which would be October 6, 2000,

14   right?

15           A.    I started to.

16           Q.    And that was one of the things that you took

17   out, right?

18           A.    Along with others, right.

19           Q.    But that was one of the things you took out?

20           A.    Yes.

21           Q.    And you put it on the stove, right?

22           A.    Yes.

23           Q.    Right on the burner, right?

24           A.    Yes, because the counter was full.

25           Q.    Right on the burner, yes or no?


            TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

                          000005207

1      A.    I don't recall if it was right on the burner.

2      Q.    The pictures show where it is, right?

3      A.    Yes, sir.

4      Q.    You didn't move it once you put it on the

5 burner, did you?

6      A.    No, sir.

7      Q.    And there it sat all Friday day, right?

8      A.    Yes, sir.

9      Q.    There it stayed all Friday night?

10      A.    Yes, sir.

11      Q.    And there it stayed all Saturday morning?

12      A.    Yes, sir.

13      Q.    There it stayed while Jeanette Andriano came

14 over, right?

15      A.    Yes, sir.

16      Q.    There it stayed while your parents came over?

17      A.    They didn't come over.

18      Q.    They stopped --

19      A.    They stopped by.

20      Q.    So that's --

21      A.    But they --

22      Q.    -- coming over, isn't --

23      A.    No.  Coming over and coming inside the house

24 are different.  They didn't come inside.

25      Q.    They were physically in your presence, in your

1    presence while you were at the San Riva apartment complex on

2    October 7?

3             A.    In the parking lot.

4             Q.    The question was were they physically in your

5    presence at San Riva?

6             MR. PATTERSON:  Judge, the answer --

7             THE WITNESS:  Yes.

8             MR. PATTERSON:  -- is in the parking lot.

9             THE COURT:  Overruled.  Go ahead, answer the question.

10            THE WITNESS:  I did, yes, sir.

11   BY MR. MARTINEZ:

12            Q.    Is the answer yes, they were there?

13            A.    In the parking lot.

14            Q.    So they stayed -- the pots stayed while they

15   were out there, right?

16            A.    Yes, sir.

17            Q.    Then you indicated -- oh, I forgot.  You went

18   to the movies on Friday, and while you were at the movies

19   that pot stays there, right?

20            A.    Yes, sir.

21            Q.    And then there is some water in the -- in the

22   sink, isn't there?

23            A.    I don't know.

24            Q.    Well, didn't you testify on direct examination

25   that on the night that this happened, which was October 7,

1    late night, October 8 in the morning, that what you did is

2    run inside the kitchen and washed your hands -- cleaned your

3    hands out in the sink?

4          A.    No, sir.

5          Q.    You didn't do that in the kitchen sink after

6    all this happened?

7          A.    That is not what I said I did, no.

8          Q.    You didn't -- you didn't -- you didn't -- after

9    whatever happened between you and Mr. Andriano, you didn't go

10   in the kitchen?

11         A.    Yes, I did.

12         Q.    You didn't go over to where the sink was?

13         A.    Yes, sir.

14         Q.    You didn't wash your hands there?

15         A.    Yes, I did.

16         Q.    You didn't clean up there?

17         A.    Yes, sir.

18         Q.    Isn't that what I just asked you?

19         A.    No.  You just asked me if I ran into the

20   kitchen and I didn't.

21         Q.    I see.  You didn't run, you walked?

22         A.    I had to feel my way into the kitchen.

23         Q.    You walked?

24         A.    Yes, sir.

25         Q.    So to get back to this pot, and then what

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000005210

1    happens is that Saturday afternoon the whole family decides

2    to take a nap, right?

3         A.    Yes, sir.

4         Q.    And the pot stays there and on the same burner,

5    same position, while you guys take a nap, right?

6         A.    I suppose so, yes.

7         Q.    Well, no one's going to get into your

8    apartment, are they, ma'am?  You didn't report a burglary

9    that day, did you?

10        A.    No, I did not.

11        Q.    From what you told us, Joseph Andriano wasn't

12   into doing dishes.  He didn't do the dishes, did he?

13        A.    No, sir.

14        Q.    He's not the kind of person who did the dishes

15   or did he?

16        A.    That's correct.

17        Q.    He didn't clean out the fridge; you would?

18        A.    That's correct.

19        Q.    You would be the person that would take care of

20   the pans or whatever came out of refrigerator, right?

21        A.    Yes, sir.

22        Q.    Before you get ready to go to Casa Grande,

23   right?

24        A.    On Saturday?

25        Q.    Yes.

1    A.    Yes.

2    Q.    Yes?

3    A.    Yes.

4    Q.    And the pot stays in the same place, right?

5    A.    I believe so.

6    Q.    And there are two bowls that also are sitting

7    right there on the counter next to the pot, aren't there?

8    A.    Yes, sir.

9    Q.    And were those also taken out of refrigerator?

10    A.    I don't know.

11    Q.    Well, you were the one that cleaned out the

12    refrigerator?

13    A.    Right.

14    Q.    You're the one that would know, right?

15    A.    That was four years ago.  I don't recall what

16    specifically I took out of the refrigerator.

17    Q.    Those items also had sodium azide in them.  You

18    put that in there, didn't you?

19    A.    No, sir.  I did not.

20    Q.    And you don't know how it got in there, right?

21    A.    I really don't.

22    Q.    And then what happens is you decide to go over

23    to Casa Grande that night because there had been a scheduled

24    get-together, right?

25    A.    Yes.  That's what we decided.

1     Q.   And you decided to go, right?

2     A.   Yes, sir.

3     Q.   And you take the two kids with you, the two and

4     three year old, right?

5     A.   Yes, sir.

6     Q.   Does the three year old speak, ma'am?

7     A.   Yes.

8     Q.   Did the two year old speak at that time?

9     A.   A little bit.

10    Q.   And so they decide to -- you decide to go and

11    end up in Casa Grande that night, right?

12    A.   Yes, sir.

13    Q.   And you're there for a number of hours, and the

14    pot still is staying over two days, or close to two days now,

15    in the same position that you left it, right?

16    A.   Yes.

17    Q.   And we know that you then return at about

18    midnight, right?

19    A.   Yes.

20    Q.   Isn't it true that you're the one that spiked

21    that, both the bowls and that pot --

22    MR. PATTERSON:  Judge --

23    THE WITNESS:  No.

24    MR. MARTINEZ:  -- with sodium azide?

25    MR. PATTERSON:  Judge, asked and answered several

1    times.

2            THE COURT:  Sustained.

3    BY MR. MARTINEZ:

4            Q.    Did you do it on Friday?

5            MR. PATTERSON:  Judge --

6            THE WITNESS:  Do it?

7            MR. PATTERSON:  -- same question, differently stated.

8            THE COURT:  Sustained.

9    BY MR. MARTINEZ:

10           Q.    One of the things that you told us was that

11   when you got back, and there are -- you gave two stories with

12   regard to what happened that night, didn't you, ma'am?

13           MR. PATTERSON:  Well, context, Judge.

14           MR. MARTINEZ:  October 8, 2000.

15           MR. PATTERSON:  Stories to whom?

16           THE COURT:  Sustained.  Rephrase the question.

17   BY MR. MARTINEZ:

18           Q.    You gave a story to the police on October 8,

19   2000, didn't you --

20           A.    Yes, I did.

21           Q.    -- about what happened between you and Joseph

22   Andriano, didn't you?

23           A.    Yes, sir.

24           Q.    And then last week you gave us a story here

25   too, right?  You testified --

1        A.    I told you what happened, yes.

2        Q.    You testified, right?

3        A.    I testified, yes.

4        Q.    And one of the things that you told us was

5   that, you know, on the way back from Casa Grande was when he

6   was going to do it, right?

7        A.    Yes, sir.

8        Q.    And when he came back from Casa Grande, one of

9   the things that happened was that you and he -- make sure I

10  get this right.  That you and he just kind of had a little

11  bit of a last discussion about what was getting ready to

12  happen, right?  That's what you told us, right?

13       A.    Yes, sir.

14       Q.    Well, ma'am, you do remember speaking to the

15  police, don't you?

16       A.    Yes, I remember speaking to them.

17       Q.    You told them a totally different story about

18  what happened when you got home, didn't you?

19       MR. PATTERSON:  Judge, objection.  Categorizing,

20  entirely different story.

21       THE COURT:  Sustained.  Rephrase the question.

22  BY MR. MARTINEZ:

23       Q.    You told them a different story when you got

24  home -- about what happened when you got home, didn't you?

25       MR. PATTERSON:  With regard to what particulars,

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    Judge?

2            THE COURT:  Overruled.  Go ahead and answer the

3    question if you can.

4            THE WITNESS:  I told them part of it.  I didn't tell

5    them the whole thing.

6    BY MR. MARTINEZ:

7        Q.   Well, ma'am, you didn't tell them about this

8    last discussion, did you?

9        A.   I don't recall.

10       Q.   And in fact what you told the officers was that

11   there was an argument, didn't you?

12       A.   Which there was, yes.

13       Q.   Okay.  Let's go ahead and show you exhibit

14   number -- let's have it marked so we could see what you did

15   tell the police.

16            (Pause in proceedings.)

17   BY MR. MARTINEZ:

18       Q.   While she's doing that, you never told us there

19   was an argument as soon as you got back from Casa Grande, did

20   you?

21       A.   No, because there wasn't one as soon as we got

22   there.

23       Q.   You didn't tell us there was an argument before

24   you took a bath?

25       A.   No, sir.

1      Q.    You did tell that to the police though?

2      A.    Yes, I probably did.

3      MR. MARTINEZ:  Judge, this will require for her to

4  take a look at -- it's a 30-second snippet.  She'll have to

5  take a look at it.

6      THE COURT:  Okay.  We'll have this done outside the

7  presence of the jury.  I'll have the jury step into the jury

8  room for just a few minutes.

9           During this time, remember the entire

10  admonition I've given you including the fact you're not to

11  discuss this case with anyone, do not let anyone discuss the

12  case with you, keep an open mind.  This should just take a

13  few minutes.

14

15           (Whereupon, the jury exits the courtroom.)

16

17      THE COURT:  Please be seated.  This is cause number

18  CR 2000-096032, State of Arizona versus Wendi Elizabeth

19  Andriano.  The record will reflect we're outside the presence

20  of the jury.  Record will reflect the presence of Defendant

21  and Counsel.

22

23           (Whereupon, the tape is played.)

24

25      THE COURT:  We ready for the jury?


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000005217

1

2              (Whereupon, the jury enters the courtroom.)

3

4           THE COURT:  Please be seated.  This is cause number

5    CR 2000-096032, State of Arizona versus Wendi Elizabeth

6    Andriano.  The record will reflect the presence of the

7    Defendant, who's on the witness stand, Counsel and the jury.

8    We'll continue with the cross-examination by Mr. Martinez.

9           Mr. Martinez?

10   BY MR. MARTINEZ:

11        Q.    Ma'am, we played Exhibit 490 while the jury was

12   out, right?

13        A.    Yes, sir.

14        Q.    And that was you in this videotape, right?

15        A.    Yes, sir.

16        Q.    And there was a detective with you, right?

17        A.    Yes, sir.

18        Q.    And you and he had a conversation, right?

19        A.    Yes, sir.

20   MR. MARTINEZ:  I move for admission of Exhibit 490.

21   MR. PATTERSON:  No objection.

22   THE COURT:  Exhibit 490 for identification is

23  admitted into evidence.

24

25           (Whereupon, the tape is played.)

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1

2    BY MR. MARTINEZ:

3         Q.    Actually, that night before you took a bath

4    there was an argument with Joseph Andriano, wasn't it?

5         A.    No, sir.

6         Q.    And it was about how -- was it about the fact

7    that he wanted to have sex with you, right?

8         A.    No, sir.  I just said we didn't have an

9    argument before the bath.

10        Q.    Ma'am, you're saying that this particular

11   snippet as it was taken there, the argument is after you have

12   the -- after you take the bath is that what you're saying?

13        A.    Yes, sir.

14        Q.    Either way, you didn't tell us about it, right?

15        A.    About what?

16        Q.    About this argument that you had about sex?

17        A.    No.  I told you about an argument we had, yes.

18        Q.    Ma'am, so if we play the whole tape for you,

19   you would then -- that would indicate that what you're

20   talking about, this argument about sex, that that argument

21   occurred after the bath?

22        A.    Yes.

23        Q.    Not before?

24        A.    Yes.

25        Q.    But in any event, you do decide to take a bath,

1    don't you?

2         A.    Yes, we do.

3         Q.    And you told us that you took this bath.  What

4    time did this bath start, ma'am?

5         A.    I wasn't watching the clock.  I don't know.

6         Q.    Do you remember that you told the police

7    officer that it started at 1:00?

8         A.    No, sir.  I don't remember.

9         MR. MARTINEZ:  Okay.  Let me show you another exhibit.

10        THE COURT:  Let me see Counsel here at the bench.

11

12              (The following proceedings were held at the

13        bench:)

14

15        THE COURT:  Let me ask you something.  Don't you have

16   a transcript of this interview where you could show her and

17   just say isn't that what you said?

18        MR. MARTINEZ:  I could ask her that, but then the

19   reason I can't do that is I don't want to be precluded from

20   introducing her statement.

21        THE COURT:  Well, that's fine, but are you -- what

22   are you going to do right now?

23        MR. MARTINEZ:  I'm going to do the same, didn't you

24   say that.  But then the problem is isn't this what this video

25   tape says and she's going to say no, that's not what it says.

1          THE COURT:  Are you going to object to showing this?

2          MR. PATTERSON:  I'm going to move to have the entire

3     video tape played at some point to offset this piecemeal

4     approach the Government's using.

5          THE COURT:  I understand that, but if he moves to

6     have this admitted, are you going to object?

7          MR. PATTERSON:  I think under 801 (D), whatever it

8     is, statements of a party are admissible --

9          THE COURT:  Okay.

10          MR. PATTERSON:  -- independent of whether it's

11     impeachment or not.

12          THE COURT:  That's fine.

13          MR. PATTERSON:  So I think this comes in.

14          THE COURT:  That's fine.  Because I know --

15          MR. MARTINEZ:  I know what you're asking.

16          THE COURT:  -- what --

17          MR. MARTINEZ:  The jury could be removed like the

18     last time it was played.

19          MR. PATTERSON:  That's the problem, it seems to me,

20     because he's mixing impeachment statements with statements

21     that are admissible because they're not hearsay, they're

22     admission of a party opponent.  He only needs to show the

23     statement if it's true impeachment, but the process -- he

24     tends to vague or blur that distinction between those two

25     uses.  Unfortunately, I anticipated this.  I can't say what

1   he's doing is objectionable.  It's cumbersome, but not

2   objectionable.

3           THE COURT:  Okay.

4           MR. MARTINEZ:  I guess he's going to say -- if he's

5   going to object, if he is and these are coming in --

6           MR. PATTERSON:  That's not what I said.

7           THE COURT:  No.  He said he's not going to object.

8           MR. MARTINEZ:  Okay.  I'll just move it into evidence.

9           THE COURT:  I don't have any problem with that.

10          MR. PATTERSON:  Every statement my client makes is

11  made independent of whether it's impeachment or not.

12          THE COURT:  Okay.

13          MR. MARTINEZ:  Okay.  I'll have it marked then.

14

15              (The following proceedings were held in open

16  court:)

17

18  BY MR. MARTINEZ:

19          Q.   You did have a conversation with the detective

20  about the time that the bath started, didn't you?

21          A.   I don't recall.

22          Q.   And didn't it go something like this.  He asked

23  you -- let me backup.  And he said okay -- sorry.  And he

24  said --

25          MR. PATTERSON:  Do we have a page, Your Honor?

1       MR. MARTINEZ:  No, we don't.  This is just a snippet?

2       THE COURT:  Okay.  Why don't you go ahead and show

3   Mr. Patterson.

4   BY MR. MARTINEZ:

5       Q.    And then he said, About what time did you think

6   it is that you got into the bath tub.  Your answer, 1:00

7   o'clock.  He said 1:00 a.m. and you said, Yeah.

8            Do you remember saying that?

9       A.    Not particularly, but --

10      MR. MARTINEZ:  Your Honor, Exhibit 491 has the

11  conversation and I move it into evidence.

12      THE COURT:  Any objection?

13      MR. PATTERSON:  No objection.

14      THE COURT:  Exhibit 491 for identification is

15  admitted into evidence.

16      MR. PATTERSON:  And just so we understand, Judge, all

17  those excerpts are from that interview that was conducted on

18  October 8, 2000, correct?

19      THE COURT:  Is that correct, Mr. Martinez?

20      MR. MARTINEZ:  He and I have already discussed it.

21  There's no other tape I'm aware of.

22      THE COURT:  Just for the record --

23      MR. PATTERSON:  Just for the record, right.

24      MR. MARTINEZ:  Right.

25      THE COURT:  Okay.


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000005223

1
2                    (The following proceedings were had in open
3        court:)
4
5                    (Whereupon, the tape is played.)
6
7        BY MR. MARTINEZ:
8             Q.    Ma'am, does that refresh your recollection as
9        to what time you got into the bathtub?
10            A.    Not really.  It just shows that that's what I
11       said to the detective.
12            Q.    So it could be true, it could not be true?
13            A.    Yes, sir.
14            Q.    Again, since you've been untruthful to him
15       before, it wouldn't surprise you if you were untruthful about
16       that?
17            A.    I don't know what time I got into the bathtub.
18            Q.    I'm going to create a time line for you so we
19       know what happened that night, and we'll start at 1:00 in the
20       morning.
21            A.    How can you if I don't know --
22            Q.    Ma'am, does that tape -- is that you speaking
23       on that tape?
24            A.    Yes, sir.
25            Q.    Was that you saying 1:00?  Is that you saying

1    that?

2              A.    But I wasn't sure --

3              MR. PATTERSON:  Judge, under the rules if we go to

4    the next part of that statement --

5              MR. MARTINEZ:  Judge, that's for redirect, not for

6    right here.

7              MR. PATTERSON:  No.  The issue is whether we could --

8              THE COURT:  Hold on a second.

9              MR. PATTERSON:  -- establish a time line.  That's

10   what his testimony is, not what her testimony is.

11             THE COURT:  Hold on a second.  Let me see Counsel

12   here at the bench.

13

14                  (The following proceedings were held at the

15   bench:)

16

17             THE COURT:  Go ahead.

18             MR. PATTERSON:  He persists in the same conduct that

19   he did which was objectionable earlier, creating a time line

20   or creating assumptions based upon what he believes the

21   testimony to be rather than what the witness testimony is and

22   it's objectionable.

23             THE COURT:  Mr. Martinez?

24             MR. MARTINEZ:  She said 1:00, Judge.

25             THE COURT:  You don't need to write down everything

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    she said.

2         MR. MARTINEZ:  No, not everything.  It's just a time

3    line, what time was it.

4         THE COURT:  Just ask her that.  You could argue that

5    in closing argument.  Let's move on.

6         MR. MARTINEZ:  Okay.

7

8         (The following proceedings were held in open

9    court:)

10

11   BY MR. MARTINEZ:

12        Q.   Ma'am, how long were you in the tub?

13        A.   I don't know.  There wasn't a clock in there.

14        Q.   Do you remember that same question, and even

15   though there wasn't clock in there, at that time you had an

16   answer?

17        A.   Yes.

18        Q.   And you did indicate that -- the question was

19   asked, "How long were you and Joe in the bathtub together

20   bathing and making love," and you said, "I wasn't watching

21   the clock."  And then you -- he asked "Was it of some

22   duration?"  "Yes."

23        So it was of some duration, wasn't it?

24        A.   Yes, sir.

25        Q.   But you told the police something different,

1    didn't you?

2              A.    I don't know.

3              Q.    You told the police that it wasn't too long,

4    didn't you?

5              A.    I don't know what the words were I used.

6              Q.    Didn't you tell the police it was maybe 10

7    minutes?

8              A.    I don't know.

9              Q.    Okay.  Let's take a look at what you did tell

10   them.

11             MR. MARTINEZ:  I move for admission of -- well, I

12   haven't marked it.

13             ───────────(Pause in proceedings.)─────────────

14             MR. MARTINEZ:  Move for admission of Exhibit 492.

15             MR. PATTERSON:  No objection.

16             THE COURT:  Exhibit 492 for identification is

17   admitted into evidence.

18                   (Whereupon, the tape is played.)

19   BY MR. MARTINEZ:

20             Q.    That was on that video tape, wasn't it?

21             A.    Yes, sir.

22             Q.    That was you saying "not too long," wasn't it?

23             A.    Yes, sir.

24             Q.    And that was you saying 10 minutes, right?

25             A.    Yes, sir.

1          Q.    And if we take your word of about 1:00 in the

2     morning, that would put you at about 1:10 when you got out of

3     that bath, right?

4          A.    I can't say that.

5          Q.    Can you not add ten minutes to 1:00?

6          MR. PATTERSON:  Judge, it's not a question of

7     mathematic disability here.  She didn't testify she believed

8     1:00 was the start time.

9          THE COURT:  Sustained.  Let's move on.

10    BY MR. MARTINEZ:

11         Q.    Didn't you just previously tell me you said,

12    quote, about what time do you think it is that you got into

13    the bathtub, and you told the detective 1:00.  And then the

14    detective said 1:00 a.m.?  And you said "Yeah."  Do you

15    remember the video tape showed you saying that?

16         A.    Yes, sir.

17         Q.    So if it's 1:00 and 10 minutes later, it's 1:10

18    a.m., isn't it, by the time you get out of the bathtub,

19    right?

20         A.    No.  I cannot agree to that.

21         Q.    And during those 10 minutes you're in the

22    bathtub, according to you, what you did was put up some

23    candles, right?

24         A.    Yes, sir.

25         Q.    You scrubbed his back, right?

1       A.    Yes, sir.

2       Q.    And then you also made love to him, right, all

3  in those 10 minutes?

4       A.    Those weren't the words I said.

5       Q.    Those aren't the words you said in court,

6  ma'am?

7       A.    10 minutes in court?  No, I did not say that.

8       Q.    No, no, no.  Ma'am, I'm asking you whether or

9  not you previously indicated to us the following, okay?

10  "Were there candles set up around the perimeter of the

11  bathtub?"  And your answer was, "Around the bathroom."  The

12  question was "Bathtub?"  And your answer, "Not necessarily

13  the on the bathtub."  Question, "Okay.  And did you scrub his

14  back with the -- with the things you described?"  Your answer

15  was, "I did."  Question was, "Okay.  How long did this --

16  well, there was also another activity that occurred in the

17  bathroom?"  "Yes," your answer.  Question, "What was the

18  activity?"  "We made love," right?

19       A.    That's correct.

20       Q.    But you told the police officer that you were

21  only in there 10 minutes, right?

22       A.    That's what it says, yes.

23       Q.    No, that's what you said, right?

24       A.    Yes.  Yes, at that time.

25       Q.    Has your memory gotten better now?

1          MR. PATTERSON:  Judge, this is --

2          THE COURT:  Overruled.

3          MR. PATTERSON:  -- not a fair line of questions.

4          THE COURT:  Overruled.  Continue on.

5              Mr. Patterson?

6          MR. PATTERSON:  May we have a conference?

7

8              (The following proceedings were held at the

9     bench:)

10

11         MR. PATTERSON:  She never testified in trial that

12    the duration of those activities was 10 minutes.  I asked

13    her, she said she doesn't recall.  I said was it of some

14    duration?  She said it was of some duration.  Now he's using

15    a statement to law enforcement four years ago to suggest that

16    she's lying, and that's not proper.

17         THE COURT:  He can ask her the question, she could

18    answer it.

19         MR. PATTERSON:  But there's -- it's a

20    when-did-you-stop-beating-your-wife kind of question.

21    There's no way you could answer "yes" or "no" to these

22    questions.

23         THE COURT:  Mr. Patterson, you have the right to

24    redirect to clear it up.

25         MR. PATTERSON:  Okay.


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1

2           (The following proceedings were held in open

3     court:)

4

5           MR. MARTINEZ:  Can you read the question back to me,

6     please?

7                    (Whereupon, the pending question was read as

8           follows:

9                         Q.     Has your memory gotten better now?)

10

11          THE WITNESS:  Yes, it actually has.

12    BY MR. MARTINEZ:

13          Q.    Now, one of the things you also told us was

14    that before getting out you washed your hair, right?

15          A.    Yes, I did.

16          Q.    And if we can fast forward a little bit so we

17    could talk about that, the paramedic arrived at your house

18    per all the of the documentation at 2:30 in the morning.  If

19    you get out of the bath at 1:10 in the morning -- your hair

20    was short back then, wasn't it?

21          A.    Yes.

22          Q.    If you get out of the bath at, let's say, 1:10,

23    1:15 in the morning, that means that your hair would have --

24    well, was your hair still wet from the bath when the

25    paramedics arrived?

1          A.    I don't recall.

2          Q.    When you got out of the bath, you did get

3    dressed, didn't you?

4          A.    I believe I put a t-shirt and shorts on, yes.

5          Q.    And those were the items you'd been wearing all

6    day, right?

7          A.    No, sir.

8          Q.    Well, they were dirty, right?

9          A.    When I put them on?  No.

10         Q.    They weren't dirty when you put them on?

11         A.    No, sir.

12         Q.    Do you remember having a conversation with the

13   police that went as follows:  After getting out of the bath,

14   you got dressed --

15         MR. PATTERSON:  Again, Judge, if I could just have

16   the --

17         MR. MARTINEZ:  It's 9:10:17 to 9:10:56.

18         MR. PATTERSON:  Just a moment, Judge, just to find

19   that page.

20              (Pause in proceedings.)

21         MR. PATTERSON:  Okay.  Thank you, Judge.

22   BY MR. MARTINEZ:

23         Q.    "You got dressed?"  Your answer, "I put my

24   clothes on, yeah."  "Is that the clothes you're wearing

25   you're wearing now or did you go back in your pajamas?"  Your

1    answer, "No, actually, I put -- yeah.  I put shorts on and

2    I -- I didn't put my jammies back on.  I'm like, huh?  When

3    did I do --" And the detective says, "You put shorts on?"

4    "Yeah."  And then the detective says, "The shirt and --" And

5    you say, "I grabbed them off the floor, I remember that.  I

6    throw all my dirty clothes on the floor off the -- of the

7    closet, and I grab clothes and I just stuck them on."  And he

8    asked you, "Shoes and everything?"  And your answer, "No, I

9    didn't have -- I didn't have shoes on.  I wish I had shoes

10   on."  "So you put on shorts and a t-shirt?"  And you said,

11   "Uh-huh.  Uh-huh."

12              Do you remember that?

13        A.    Yes.

14              MR. MARTINEZ:  I move for admission of Exhibit 493

15   that references the conversation I just talked about on

16   October 8, 2000.

17              MR. PATTERSON:  No objection.

18              THE COURT:  Exhibit 493 is admitted into evidence.

19

20              (Whereupon, the tape is played.)

21

22   BY MR. MARTINEZ:

23        Q.    Ma'am, you've had those -- you previously told

24   us that you did not put on dirty clothes, so which one is it?

25   Did you put dirty clothes on or not?

1       A.      When I put clothes on the floor, just because I
2  wear them once doesn't mean they're dirty.  I could rewear
3  them.
4       Q.      Did you say, "I remember I throw all my dirty
5  clothes on the floor of the closet, and I grabbed clothes and
6  I just stuck them on"?
7       A.      Yes.
8       Q.      You did say that?
9       A.      Yes, sir.
10      Q.      So you did reference dirty clothes, didn't you?
11      A.      I did reference that, yes.
12      Q.      Although you referenced dirty clothes, they
13  were not dirty?
14      A.      The ones I put on?
15      Q.      Right.
16      A.      I don't believe so.
17      Q.      Okay.  If you know they weren't dirty, what
18  kind of top did you put on?
19      A.      I believe I had a white t-shirt on.
20      Q.      And what kind of bottoms did you put on?
21      A.      Jean shorts, something like that.
22      Q.      What color were they?
23      A.      They were dark.
24      Q.      I'm going to show you something here.  Take a
25  look at Exhibit Number 255.  If you want, you could take it

```
 1      out.  Are these your shorts?

 2            A.    Yes.

 3            Q.    Is that the shorts that you put on that were on

 4      the floor of the closet?

 5            A.    Yes, sir.

 6            Q.    I want you to take a look at Exhibit Number

 7      253.  Take a look at it.  If you need to open it, let me

 8      know.  Is that the t-shirt that you put on from the floor?

 9            A.    Yes, sir.

10            Q.    This t-shirt is not striped, is it?

11            A.    No, sir.

12            Q.    It's just a plain old white t-shirt, isn't it?

13            A.    Yes, sir.

14            Q.    Then, according to you, it was after the bath

15      that Mr. Andriano decides to take the Elderberry capsules,

16      right?

17            A.    Yes, sir.

18            Q.    And it was at that time that you indicated that

19      he took how many?

20            A.    I don't know.  He took a handful.

21            Q.    Didn't tell the police about it, right?

22            A.    No, sir.

23            Q.    And this clothing that I just showed you, was

24      that dirty clothing or was that clean clothing back then when

25      you put it on?
```

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

```
 1            A.    It was clothing off the floor, and I don't
 2    think I would have put dirty clothing on.
 3            Q.    And that's when he wants to die, right?
 4            A.    Yes, sir.
 5            Q.    And he takes them with Gatorade, right?
 6            A.    I believe so, yes.
 7            Q.    And then he starts feeling dizzy, right?
 8            A.    Yes, sir.
 9            Q.    And nauseous, right?  Right?
10            A.    Yes, sir.
11            Q.    And then you say he puts on his shorts, right?
12            A.    Yes, sir.
13            Q.    He puts on the green shorts, right?
14            A.    Yes.
15            Q.    And then you say we walked out to the living
16    room, right?  Right?
17            A.    I believe so, yes.
18            Q.    That's not what you told the police, is it?
19            A.    I don't know.
20            Q.    You told the police "So then we go -- so then
21    we go out to the living room."
22            MR. PATTERSON:  Judge, may I have a counter number
23    please?
24            THE COURT:  Yes.
25            MR. MARTINEZ:  9:12:09 to 9:12:26.
```

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1          MR. PATTERSON:   Thank you.

2   BY MR. MARTINEZ:

3          Q.    So then we go out to the living room because

4   I'm like, you know what?  You're going to start arguing, I

5   don't want the kids to hear it, so go to the living room,

6   don't want the upstairs neighbors to hear it.  When you're

7   in the bedroom they hear everything.  It's, you know, it's

8   part of apartments.  It's something we know."

9          MR. PATTERSON:   Judge, objection.

10

11          (The following proceedings were held at the

12   bench:)

13

14          MR. PATTERSON:   See, here's the dilemma I find myself

15   in.  That statement she made is admissible under admission of

16   a party interest.  It is not an admissible impeaching

17   statement.  For him to suggest it's contradictory to the

18   testimony she had in open court is improper because it's not

19   impeaching.  She doesn't talk about the attempted suicide

20   plot at all in her statement to law enforcement, so anything

21   that bears upon that is something she did not tell law

22   enforcement and therefore not impeaching of her statement

23   here in trial.  And he's mixing apples and oranges here, but

24   he's allowed to bring in these statements independent under

25   the admission against party interest exception.

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1          MR. MARTINEZ:  The only individual mixing apples and

2     oranges is him.  If you don't make a statement in court and

3     you do make it to somebody else, that's clearly impeaching

4     because you're lying to somebody else.  I can make a

5     statement that it's a lie.

6          MR. PATTERSON:  People might keep --

7          MR. MARTINEZ:  It comes in.

8          THE COURT:  Hold on a second.  Both of you can

9     whisper like I'm whispering.

10          MR. MARTINEZ:  Okay.  It basically comes in as a

11     statement against interest.  Either way it comes in.

12          THE COURT:  Either way it comes in --

13          MR. PATTERSON:  Yes, but --

14          THE COURT:  -- right?

15          MR. PATTERSON:  Correct.

16          THE COURT:  If you want to clarify, you could do that

17     on redirect.

18          MR. PATTERSON:  I just think it's improper for the

19     context for him to establish a potentially impeachable

20     statement.  That is what you do under classic

21     cross-examination, but then to use a statement that would not

22     be admissible for impeachment purposes in and of itself

23     because it doesn't bear upon the topic that the predicate

24     question did --

25          THE COURT:  I know, but you just said it could come

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1      in as a statement against interest, correct?

2              MR. PATTERSON:  Correct, but the process is

3      objectionable.  That's what I'm saying.

4              THE COURT:  Okay.  Let's continue on.

5

6              (The following proceedings were held in open

7      court:)

8

9              THE COURT:  Mr. Martinez?

10     BY MR. MARTINEZ:

11         Q.    You did make that statement, didn't you?

12         A.    Which statement?

13         Q.    The one I just read to you before we took the

14     side bar.

15         A.    Yes, sir.

16             MR. MARTINEZ:  I move for admission of Exhibit 494.

17             MR. PATTERSON:  No objection, Your Honor.

18             THE COURT:  Exhibit Number 494 for identification is

19     admitted into evidence.

20             (Whereupon, the tape is played.)

21     BY MR. MARTINEZ:

22         Q.    He was starting to argue with you, wasn't he,

23     ma'am?

24         A.    No, sir.

25         Q.    And you ordered him to go into the living room,

```
 1     didn't you?

 2            A.     No, sir.

 3            Q.     Because you didn't want the upstairs neighbors

 4     to hear, right?

 5            A.     No, sir.

 6            Q.     Because it had been your experience that if you

 7     were in the living room, people upstairs don't hear as well,

 8     right?

 9            A.     That is true, they don't hear in the living

10     room as well as the bedroom.

11            Q.     That's why you told him to go to the living

12     room, right, if he was going to argue?

13            A.     No, sir.

14            Q.     You did wear the pants in that family, didn't

15     you?

16            A.     No, sir.

17            Q.     You could order him to go from room to room,

18     didn't you?

19            A.     No, sir.

20            Q.     He did follow your mandate and go into the

21     living room, didn't he?

22            A.     No, sir.

23            Q.     Now, you then told us here in court that --

24     well, that you had a discussion about the emergency room,

25     right?
```

```
1      A.    Yes, sir.

2      Q.    And that you told them, "I said we need to go

3   because something's wrong, you know," right?

4      A.    Yes.

5      Q.    Ma'am, you know that you have just purchased

6   within the last week or so sodium azide, don't you?

7      A.    Yes, sir.

8      Q.    You know that sodium azide is a poison, right?

9      A.    Yes, sir.

10     Q.    Shawn King told you that, right?

11     A.    Yes, sir.

12     Q.    That's part of the reason why you got it

13   because it -- that is the reason why you got it is because it

14   is a poison, right?

15     A.    Part of the reason, yes.

16     Q.    Is there any other -- are you going to kill

17   rodents with it?  Is that what you're going to do with it?

18     A.    No, sir.  My husband's going to use it.

19     Q.    Right.  You got it for a specific reason,

20   right?

21     A.    Yes, sir.

22     Q.    And that was to kill another human being,

23   right?

24     A.    No, sir.

25     Q.    You -- you didn't get it so that Joseph
```

1     Andriano could take it?

2          A.    Yes, sir.

3          Q.    So that's -- he's a human being, isn't he?

4          A.    Yes, he is.

5          Q.    Even though he has a scar, he's still a human

6     being?

7               MR. PATTERSON:  Judge --

8               THE COURT:  Sustained.

9               MR. PATTERSON:  Argumentative.

10              THE COURT:  Sustained.

11              MR. PATTERSON:  Judge, could we hold on a second?

12              THE COURT:  Let's continue on.  We'll go on a few

13    more minutes.

14    BY MR. MARTINEZ:

15         Q.    And with regard to the poison, you know that

16    it's going to do something to his body that is going to cause

17    his death, right?

18         A.    Yes, we know that.

19         Q.    No.  I'm asking what you know, not what "we"

20    know.  What you know.  You did know that, right?

21         A.    Yes, sir.

22         Q.    So why is it when it starts doing something to

23    his body, like vomiting, like sweating, all of a sudden you

24    say you know what, and you're upset that it's doing something

25    to his body.  Why are you upset if you knew it was going to

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000005242

```
 1    kill him?

 2              A.    That wasn't what we expected to happen.

 3              Q.    You didn't expect him to die?

 4              A.    Yes, sir.

 5              Q.    Well, so he's in the process of dying.  Why do

 6    you now tell us that you're scared?

 7              A.    Because that wasn't what was supposed to

 8    happen.

 9              Q.    He wasn't supposed to die?

10              A.    That's not what I'm saying.

11              Q.    That's what you're telling us.

12              A.    No, sir.

13              MR. PATTERSON:  No, Judge.  That's not what she's

14    telling us.

15              THE COURT:  Hold on a second.  Go ahead, answer the

16    question if you can.

17    BY MR. MARTINEZ:

18              Q.    That's what you're telling us, isn't it?

19              A.    No, sir.

20              Q.    Anyway, so he starts to die and then you,

21    according to your statement, get scared, right?

22              A.    No.  Actually, Joe got very scared and then I

23    did because we didn't know what was going on.

24              Q.    Ma'am, you did get scared that night according

25    to your testimony?
```

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1          A.     Yes, I did.

2          Q.     And it's because this poison is doing something

3   to him, right?

4          A.     It was doing things we weren't expecting, yes.

5          Q.     Ma'am, you keep saying "we." I want to know

6   what you were expecting, okay?  Doing things to his body,

7   right?

8          A.     Yes, sir.

9          Q.     And so because it's doing something, because

10  it's working, it's doing what it's supposed to do, you then

11  say to us that you and he had a discussion about the

12  emergency room, right?

13         A.     We did, yes.

14         Q.     And he is having sweating, right?  You told us

15  that, right?

16         A.     Yes, sir.

17         Q.     He was vomiting, right?

18         A.     He did vomit once, yes.

19         Q.     He was nauseous, right?

20         A.     Yes, sir.

21         Q.     I think you also said he had -- his heart was

22  racing.  You told us that?

23         A.     Yes.

24         Q.     In between of all of that, you and he are

25  having a discussion about going to the hospital?

1        A.    No, it's not a discussion, but it is, yes,

2   let's go to urgent care.

3        Q.    Ma'am, the question was did you actually have a

4   discussion about the emergency room.  Was this something that

5   you just told him needed to be done and you said "I told

6   him -- I said we needed to go because something's wrong, you

7   know."  That's what you said, right?

8        A.    That is correct.

9        Q.    If the poison was to kill him and he is dying,

10   what is going wrong?

11        A.    I got scared?

12        Q.    No.  What's going wrong in your mind?  What

13   do you think is going wrong?

14        A.    I don't know what's going on.

15        Q.    No, no, no.  What's going wrong, because that's

16   what you said --

17        A.    I didn't know.  That's what I'm telling you.

18   Thing's were happening that we weren't expecting and so --

19        Q.    No, no, no.  I want to know --

20        MR. PATTERSON:  Judge, she is --

21        THE COURT:  Hold on a second.

22        MR. PATTERSON:  He's being badgering.

23        THE COURT:  Ask your next question.  Ask your next

24   question.

25   / / / / /

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    BY MR. MARTINEZ:

2         Q.    So if you take him to the hospital, wouldn't

3    that spoil his desire to die?

4         A.    Yes, it would.

5         Q.    But that's -- but according to you, you and he

6    have that discussion?

7         A.    What discussion?

8         Q.    About going to the emergency room?

9         A.    Yes, we did.

10        Q.    And this is all because of the symptoms that he

11   is exhibiting.  Is it in the bedroom or the living room that

12   you have this discussion?

13        A.    In the living room.

14        Q.    Because according to you in the bedroom he has

15   already fallen once, right?

16        A.    Yes.  He was dizzy.

17        Q.    And that's when he went ahead and put his

18   shorts on, right?

19        A.    Yes, sir.

20        Q.    And the shorts that we're talking about are the

21   same shorts that we saw in that photograph when he was in

22   Memphis, correct?

23        A.    Yes, sir.

24        Q.    And it's these shorts that I have here marked

25   as Exhibit Number 252, right?


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1          A.     Yes, sir.

2          Q.     Ma'am, one of the things you told us that when

3     he was healthy he weighed about 220 pounds, right?

4          A.     Yes, sir.

5          Q.     That's when you got married.  I think you said

6     he was that much, right?

7          A.     Yes, he did.

8          Q.     When he died, he was about 165 or 170, right?

9          A.     Yes.

10         Q.     He lost a substantial amount of weight, right?

11         A.     Yes, he did.

12         Q.     He was weak, right?

13                MR. PATTERSON:  Point in time, Judge, when he was

14    weak.

15                THE COURT:  Sustained.

16                MR. MARTINEZ:  The week before he died.

17                THE WITNESS:  Not necessarily.

18    BY MR. MARTINEZ:

19         Q.     So the chemotherapy hadn't done him in?

20         A.     Done him in?  No.

21         Q.     In other words, the chemotherapy hadn't made

22    him weak?

23         A.     Made him weaker, but not weak.

24         Q.     So we now know he had his chemotherapy on

25    September 20th of 2000.  You were here when Dr. Kellogg

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    testified about the effects, right?

2         A.    Yes, sir.

3         Q.    Now, you're telling us that even though he is

4    undergoing chemotherapy treatment, even though he's lost

5    80-some pounds, he's --

6         MR. PATTERSON:  Wait, wait, wait, wait, wait.

7    There's a mathematical problem here, Judge.

8         THE COURT:  Are you referring to 220 minus 165, 170?

9         MR. MARTINEZ:  Yeah, whatever that --

10         THE COURT:  Well, using mathematics a little bit

11    is --

12         MR. MARTINEZ:  Okay.  It's about 60 pounds.

13         THE COURT:  50 pounds, I think.

14         MR. MARTINEZ:  Well, if we do 220 minus 1 --

15         THE COURT:  220 minus 170?

16         MR. MARTINEZ:  No, 165.

17         THE COURT:  55 pounds.

18    BY MR. MARTINEZ:

19         Q.    All right.  Let's go with 50 pounds.  So he's

20    lost 50 pounds, right?

21         A.    Yes.

22         Q.    So you're saying this individual who's lost

23    this much weight has just undergone his fourth round of

24    chemotherapy and by your own account it got worse every time

25    that he went.  Isn't that what you told us before?


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1          A.    Yes, sir.

2          Q.    He's undergone his fourth round of chemotherapy

3    treatment, he's vomiting and doing all those things, he's

4    still really strong?

5          A.    I didn't stay he's really strong.  I said he

6    wasn't that weak.

7          Q.    Okay.  And right at that time when you're

8    talking about going to the emergency room and having him

9    taken a look at, you start to worry about your kids, right?

10         A.    Well, yeah.  Why leave them in the apartment by

11   themselves?

12         Q.    Right.  You have a -- a telephone service out

13   there in San Piva, don't you?

14         A.    Yes, I do.

15         Q.    You have a landline there, right?

16         A.    Yes.

17         Q.    You also have a cell phone, right?

18         A.    Yes.

19         Q.    He also has a cell phone, right?

20         A.    Yes.

21         Q.    It never occurred to you to call 911 then take

22   him to the hospital?

23         A.    No, it didn't.

24         Q.    I mean, that would have taken care of your

25   concern about the kids, right?

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1        A.    It would have, yes.

2        Q.    It could have taken care of your concern about

3   getting immediate help to him, right?

4        A.    Yes, it would have.

5        Q.    According to them, they arrived within three

6   minutes of the call, right?

7        A.    Yes.

8        Q.    The reason you didn't call, ma'am, was because

9   you didn't want them out there, did you?

10       A.    That's not correct.

11       Q.    You didn't want them out there because they

12   would have done something that perhaps would have saved him?

13       A.    No, that's not true.

14       Q.    If he lived then your lawsuit is worthless?

15       A.    No, that's not a true statement.

16       Q.    So you then decide to start looking for a

17   babysitter while your husband was dying on the floor, right?

18       A.    Yes.  I was trying to find somebody to come

19   over.

20       Q.    So you called Shannon Sweeney, right?

21       A.    Right.

22       Q.    You don't get a hold of her, right?

23       A.    Right.

24       Q.    You then do get a hold of Chris Hashisaki,

25   right?

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000005250

```
 1        A.    Yes.
 2        Q.    And so she comes, and one of the things that
 3   happens is that you walked out to meet her, right?
 4        A.    I did.
 5        Q.    And when you walk out to meet her, you leave
 6   your kids alone in the apartment, right?
 7        A.    Joe's in there.
 8        Q.    Ma'am -- all right.  You leave them in the
 9   apartment with Joe, right?  Yes or no.
10        A.    Yes, but I'm just --
11        Q.    Yes or no?
12        THE COURT:  Go ahead, answer question that's asked.
13        THE WITNESS:  Yes.
14   BY MR. MARTINEZ:
15        Q.    And you leave them alone in the apartment with
16   Joseph who is throwing -- has vomited at least once, right?
17        A.    Yes.
18        Q.    Who has taken poison?
19        A.    Yes.
20        Q.    Who has fallen down?
21        A.    Yes.
22        Q.    Who is nauseous?
23        A.    Yes.
24        Q.    Who is in the living room, right?
25        A.    Yes.
```

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1          Q.     So then you go out and you go out to wait for

2     Chris Hashisaki, right?

3          A.     Right.  Just right outside my door.

4          Q.     So you were actually in the north breezeway,

5     are you not?

6          A.     Yes, but it's just right there.  It's not --

7          Q.     Is the answer "yes"?

8          A.     It's not like I'm leaving my children alone in

9     the house.

10         Q.     You were waiting at the north end of the

11    breezeway, right?

12         A.     Yes.

13              THE COURT:  Okay.  This would be a good time to take

14    our afternoon break.  We'll go ahead and take our afternoon

15    break at this time.

16              During the break remember you're not to discuss

17    this case with anyone, do not let anyone discuss the case

18    with you.  Keep an open mind.  Have a nice break.

19

20              (Recess.)

21

22         THE COURT:  Please be seated this is cause number CR

23    2000-096032, State of Arizona versus Wendi Elizabeth

24    Andriano.  The record will reflect the presence of Defendant

25    and Counsel.  We're outside the presence of the jury.


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000005252

1          I just wanted to bring up a matter with

2     Counsel.  This lady in the front row with the blonde hair,

3     second from the aisle, I have noticed and my staff has

4     brought up to me that she's making facial expressions during

5     the testimony that are quite obvious and I'm not sure whether

6     she is aware of that or not.

7          But you're not to do that.

8          WOMAN IN COURTROOM:  Okay.

9          THE COURT:  Okay.  And I'm not accusing you of doing

10    it consciously, but the fact is you're doing it, okay?  So I

11    don't want any facial expressions or anything like that or

12    any sounds or sighs or that type of thing.

13         Also, I believe you're eating something here in

14    court and that's not permitted.  I think my bailiff addressed

15    that with you earlier.

16         And that applies to everyone here, okay?  I'm

17    not trying to embarrass you, but I want to make sure everyone

18    up understands that, okay?

19         We ready for the jury?

20         MR. MARTINEZ:  Yes, sir.

21         MR. PATTERSON:  Yes, Your Honor.

22

23         (Whereupon, the jury enters the courtroom.)

24

25         THE COURT:  Please be seated.  This is CR

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    2000-096032, State of Arizona versus Wendi Elizabeth

2    Andriano.  The record will reflect the presence of the

3    Defendant, who is on the witness stand, Counsel and the jury.

4    The defendant is on the witness stand.

5              We'll continue with the cross-examination by

6    Mr. Martinez.

7

8    CONTINUED CROSS-EXAMINATION BY MR. MARTINEZ:

9              Q.    Ma'am, you're the same individual that was

10   testifying previously before the break?

11             A.    Yes, sir.

12             Q.    One of the things that -- that you told us when

13   we left off is you had walked out to the breezeway to wait

14   for Chris Hashisaki, right?  Correct?

15             A.    Yes.

16             Q.    You indicated that the reason you went out

17   there is because you could see from the breezeway to your

18   apartment, right?

19             A.    Yes, sir.

20             Q.    In fact you indicated you saw her walking or

21   running down the stairs, right?

22             A.    Yes.

23             Q.    And in fact, ma'am, that's not true, is it?

24             A.    Yes, it is.

25             Q.    I'm going to show you a site map for San Riva.

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000005254

1     It's Exhibit Number 495.  Please take a look at it.

2                    (Pause in proceedings.)

3          THE WITNESS:  Okay.

4     BY MR. MARTINEZ:

5          Q.    That's a true and accurate depiction of the San

6     Riva complex as it existed back on October 8 of year 2000,

7     isn't it?

8          A.    Yes, it is.

9          MR. MARTINEZ:  Move for admission of Exhibit 495.

10         MR. PATTERSON:  This is duplicative, I think, of the

11    larger one.  Is there a need for two of those?

12         MR. MARTINEZ:  The one that's larger has a chunk cut

13    off of it.

14         THE COURT:  Any objection?

15         MR. PATTERSON:  No.

16         THE COURT:  Exhibit Number 2 -- sorry.  Exhibit 495

17    for identification is admitted into evidence.

18    BY MR. MARTINEZ:

19         Q.    Ma'am, let's go ahead and take a look at this.

20    Can you see that?

21         A.    Yes.

22         Q.    And that shows us right here is Apartment 132,

23    right?

24         A.    Yes.

25         Q.    And this is the area that you told us that you

1    would park, and then you'd come around this corner like this

2    and jump over onto your patio, right?

3          A.    I can't see.

4          Q.    Why don't you go ahead and step down for me,

5    please.

6          THE WITNESS:  Okay.  What did you say?

7    BY MR. MARTINEZ:

8          Q.    You indicated that this was the area here where

9    you would park and you would walk down this way like this?

10         A.    No, sir.

11         Q.    And this -- this is your patio in the back,

12   isn't it?

13         A.    Yes, sir.  But we would also park right here.

14         Q.    All right.  You would always park right there

15   and come right here and go into the patio there, right?

16         A.    Yes.

17         Q.    This is 132, right?

18         A.    Yes, sir.

19         Q.    And you indicated that on that night you

20   actually were out here at the head of the breezeway, which

21   would allow you to look to the left, right?

22         A.    Yes, sir.

23         Q.    If we just continue that way, ma'am, and we go

24   all the way to the other side of the complex, what apartment

25   was Chris Hashisaki in?


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1      A.    Keep going.

2      Q.    What's the number?

3      A.    I don't know the number, but if you --

4      Q.    How about 385.  Does that sound about right?

5      A.    Yes, it is.

6      Q.    It's right here, right?

7      A.    Yes, sir.

8      Q.    And if she is at that apartment, aren't you

9    forgetting about -- and then we'll show it up closer.  Aren't

10   you forgetting about Building 317 in the -- or not Building

11   317, Building 4 that's in the way?

12     A.    No.  You could see through the breezeway.

13     MR. MARTINEZ:  Judge, may I walk this in front of the

14   jury so they could see it?

15     THE COURT:  Yes.

16     MR. MARTINEZ:  It's real cumbersome.

17     THE COURT:  And we're referring to Exhibit 495?

18     MR. MARTINEZ:  Yes, sir.  While I'm walking, I'll

19   also have my finger on 385 and 132.  My right hand will be on

20   385 and my left will be on 132 -- maybe it will.

21              (Pause in proceedings.)

22   BY MR. MARTINEZ:

23     Q.    Ma'am, Building Number 4 would be right in the

24   way, wouldn't it?

25     A.    Actually, it's not.  You could see right

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    through the breezeway.

2         Q.   Let's take a look at some photographs.   144.

3    This is the eastern part of Building Number 5, right?

4         A.   I don't know.

5         Q.   That's what has been testified to before,

6    ma'am.

7         A.   Okay.

8         Q.   And you were here right through this whole

9    thing, right?

10             Let me orient you then.   We have been told that

11   this is the eastern part of Building 5.   You lived in

12   Building 5, didn't you?

13        A.   Yes, sir.

14        Q.   And we have also been told that it faces to the

15   north.   This would be the north in this direction

16   (indicating).

17        A.   Okay.

18        Q.   There's this tree here and the breezeway ends

19   right behind this tree.   We've been told that.   And you

20   indicated that you were standing right outside the breezeway,

21   right?

22        A.   Yes, sir.

23        Q.   Okay.   So according to you, you see Chris

24   Hashisaki coming down from Building Number 12, right?

25        A.   From her building, yes.


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000005258

1          Q.     And if we take a look at Exhibit Number 495,

2    that is Building 12, right?

3          A.     Yes.

4          Q.     And you sit there and you go out there with a

5    telephone, right?

6          A.     I sit there and I go out there with a -- no, I

7    don't sit anywhere.

8          Q.     You went outside with a telephone, right?

9          A.     Yes.

10         Q.     You went outside to wait for her, right?

11         A.     Yes, to see if she was coming.  He needed her

12   to hurry.

13         Q.     Ma'am, she had already told you she was on the

14   way?

15         A.     Yes, but I had to call her back a second time.

16         Q.     After the second time she told you she was on

17   the way, didn't she?

18         A.     Yes, she did.

19         Q.     Even though she told you she was on the way,

20   you decided to walk out and go to the breezeway, right?

21         A.     Yes.

22         Q.     And then you went and then you took the

23   telephone with you, right?

24         A.     I had the telephone in my hand, yes.

25         Q.     And you had not called 911 at that time or --

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000005259

1           A.    No.

2           Q.    In fact you hadn't called 911 even though

3    Joseph Andriano, to your knowledge, had already taken poison

4    from about 1:10 in the morning.   It was now 2:30 in the

5    morning time and you hadn't --

6                 THE WITNESS:  I can't --

7                 MR. PATTERSON:  Wait, wait.

8                 THE WITNESS:  No.

9                 THE COURT:  Sustained.

10                MR. PATTERSON:  Compound question.

11                THE COURT:  Sustained.

12   BY MR. MARTINEZ:

13          Q.    It was 2:30 in the morning then when Chris

14   Hashisaki finally showed up?

15          A.    I believe you told me earlier 911 was there at

16   2:30.

17          Q.    Ma'am, then she showed up shortly before they

18   arrived, didn't she?

19          A.    Yes.

20          Q.    And actually the 911 showed up after that at

21   about 2:38 in the morning.

22          A.    Okay.

23                MR. PATTERSON:  I think he misspoke.  911 showed up?

24   I think he meant to say EMT.

25                THE COURT:  You mean EMT, correct?

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1          MR. MARTINEZ:  Yes.

2     BY MR. MARTINEZ:

3          Q.    So EMT showed up about 2:38 in the morning,

4     right?

5          A.    Yes, sir.

6          Q.    She showed up shortly before that, right?

7          A.    Yes.

8          Q.    And when she showed up it was, give or take,

9     around 2:30 in the morning then, right?  That's what she

10    testified to?

11         A.    Okay.  I can't say.

12         Q.    Previously in your statement to the police you

13    told them it was about 1:10 in the morning when you got out

14    of the bath, right?

15         A.    No, sir.

16         Q.    You told them you took a bath at about --

17         A.    I said I wasn't sure.  I was just guestimating.

18         Q.    You guestimated about 1:00 in the morning,

19    right?

20         A.    To the police, yes.

21         Q.    You guestimated you were in the tub for about

22    10 minutes, right?

23         A.    Yes.

24         Q.    And then when you got out, you put on dirty

25    clothes, right?

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1      A.    No, sir.

2      Q.    Well, you said --

3      MR. PATTERSON:  Judge, this has all been asked and

4    answered.

5      THE COURT:  Sustained.  Let's move on.

6    BY MR. MARTINEZ:

7      Q.    How much time did it take you to put those

8    clothes on?

9      A.    I can't say.

10      Q.    Did it take you 30 minutes?

11      MR. PATTERSON:  Judge, she said she can't say.

12      THE COURT:  Sustained.

13    BY MR. MARTINEZ:

14      Q.    Ma'am, you're -- at 1:10, 1:15 in the morning,

15    by that time you're dressed.  Isn't that true?

16      A.    No, sir.

17      Q.    Then what happens is you said that that's when

18    he takes the poison after getting out of the shower -- out of

19    the bath, right?

20      A.    You're misquoting the time.  I can't tell you

21    that.

22      Q.    Am I asking you about time now?  I'm saying

23    after you get out of the bathtub, that's when he took the

24    poison, right?

25      A.    After the bathtub stuff, yes.


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000005262

1          Q.     Right.  And then we now know it's about 2:30 in

2     the morning when Chris Hashisaki shows up, right?

3          A.     No, I don't know that.

4          Q.     So if it were 2:30 in the morning then, we've

5     got an hour and 15 minutes between the time he took it and

6     the time that Chris Hashisaki showed up, right?

7          MR. PATTERSON:  Judge, that's --

8          THE WITNESS:  No, sir.

9          MR. PATTERSON:  -- clearly a misstatement of her

10    testimony.

11         THE COURT:  Sustained.

12    BY MR. MARTINEZ:

13         Q.     Others have indicated that she showed up around

14    2:30, Chris Hashisaki.

15         MR. PATTERSON:  Judge, what other people testified to

16    is for argument, not for this witness.

17         THE COURT:  Sustained.

18    BY MR. MARTINEZ:

19         Q.     It was approximately an hour and 15 minutes

20    between the time that he took the poison and the time that

21    Chris Hashisaki showed up, yes or no?

22         MR. PATTERSON:  Judge, that's the same question

23    differently stated.

24         THE COURT:  Overruled.  Go ahead, answer the

25    question.

1          THE WITNESS:  No, sir.

2     BY MR. MARTINEZ:

3          Q.    And the poison had had an hour and 15 minutes

4     to work on him, didn't it?

5          A.    I just said no, sir, it did not.

6          Q.    So you're out there waiting for Chris Hashisaki

7     and she does show up, right?

8          A.    Yes, she does.

9          Q.    You have a brief conversation with her, right?

10         A.    Yes, I do.

11         Q.    The phone is still with you, right?

12         A.    Yes, sir.

13         Q.    And you tell her, "You know what?  I've told

14    Joe that I've called 911 or the paramedics, but I haven't

15    done it.  I lied to him."  Did you tell her that?

16         A.    No, sir.

17         Q.    And then she tells you, "Well, Wendi you're

18    going to hate yourself if you don't call 911."

19         A.    No, sir.  We did not have this conversation.

20         Q.    And then as a result of that, you then go back

21    into Apartment 132, right?

22         A.    No, sir.

23         Q.    You walk down the breezeway, don't you?

24         A.    We do walk down the breezeway.

25         Q.    You still have the telephone in your hand,

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    right?

2              A.    Yes, I do.

3              Q.    And then when you get to the door, you walk in,

4    right?

5              A.    Well, actually you skipped a part.

6              Q.    You do get to the door, right?

7              A.    Yes, we did.

8              Q.    And then you go inside, right?

9              A.    Yes, sir.

10             Q.    You had not tried to call 911 yet when Chris

11   arrived over at Apartment 132, had you?

12             A.    While Chris and I were in the breezeway I tried

13   to call 911.

14             Q.    Before Chris Hashisaki arrived you had not

15   tried to call 911, had you?

16             A.    No.  That was not our plan.

17             Q.    Ma'am, isn't it true that before Chris

18   Hashisaki arrived you had not called 911?

19             A.    No.  We didn't decide to call 911.  He wanted

20   to go to urgent care.

21             Q.    Ma'am, I'm not asking you what you decided.

22   I'm not asking you what "we" did or anything like that. I'm

23   asking you what you did and what you thought.

24             Now had -- by the time that Chris Hashisaki

25   had arrived, had you called 911?

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1          MR. PATTERSON:   Judge, she's answered that question

2     three times.

3          THE COURT:   Overruled.   Just answer the question

4     that's asked.

5          THE WITNESS:  No, we did not call 911.

6     BY MR. MARTINEZ:

7          Q.    Ma'am, he's down on the ground vomiting.

8     During all that, you're saying he didn't call 911, we didn't

9     call 911.   Did you expect him to make the call?   Is that what

10    you're telling me?

11         A.    That's not what I'm talking --

12         Q.    You said just now we did not call 911, didn't

13    you?

14         A.    That is correct.

15         Q.    That implies you want him to get up from his

16    vomiting, get up from being poisoned --

17         THE WITNESS:   It does not.

18         MR. PATTERSON:   Wait, wait.

19         THE COURT:   Sustained.   Let's move on.

20    BY MR. MARTINEZ:

21         Q.    But a call is made to 911, right?

22         A.    Yes, sir.

23         Q.    And you had no problems getting through to 911

24    once you were inside the house, did you?

25         A.    That is correct.


                TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1        Q.    And you placed the call, right?

2        A.    Yes, sir.

3        Q.    And you tell them that he's having a heart

4    attack by your own admission earlier?

5        A.    Yes.

6        Q.    That's not true, is it?

7        A.    I didn't know what was happening to him.

8        Q.    Yes, you did know what was happening to him,

9    didn't you?

10        A.    No.  We -- that's why we were going to urgent

11    care.  We weren't sure what was happening.

12        Q.    I'm asking about you -- again, I don't want to

13    know about what Mr. Andriano did or didn't know.

14        A.    Well, he was involved in all this, so it has to

15    be all --

16        Q.    Ma'am, I'm asking what you knew and we're

17    talking right now about what you knew.  All right?

18        A.    Uh-huh.

19        THE COURT:  Is that a "yes"?

20        MR. MARTINEZ:  Yes?

21        THE WITNESS:  Yes.

22    BY MR. MARTINEZ:

23        Q.    Okay.  You said you were talking about the

24    heart attack that you indicated to the 911 operator, whoever

25    it was.  You told him he was having a heart attack, right?

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000005267

1          A.    Yes, sir.

2          Q.    And that was not true, was it?

3          A.    I don't know if it was true.

4          Q.    Well, ma'am, you knew that he was suffering

5     from sodium azide ingestion, didn't you?

6          A.    Yes, sir.

7          Q.    You didn't tell that to 911, did you?

8          A.    I did not.

9          Q.    That's a lie by omission, isn't it.

10         A.    No, it's not.

11              MR. PATTERSON:  Wait, wait, wait.  This lie by

12     omission stuff, what is this?

13              THE COURT:  Overruled.  Go ahead, answer the question

14     if you can.

15              THE WITNESS:  No, sir.

16     BY MR. MARTINEZ:

17         Q.    That was the full truth that you told them,

18     that he was having a heart attack?

19              MR. PATTERSON:  Judge, that's argumentative.

20              THE COURT:  Overruled.  Go ahead, answer the question

21     if you can.

22              THE WITNESS:  What was your question?

23     BY MR. MARTINEZ:

24         Q.    That was the full truth when you spoke to 911

25     that he was having a heart attack?


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1        A.    No, it was not the full truth.

2        Q.    Then as a result of that call, you -- or after

3   that call, you then go into the living room, right?

4        A.    Yes, I did.

5        Q.    When you go into the living room, it's clear

6   that Mr. Andriano cannot stand up, isn't it?

7        A.    He was still laying on the floor, yes.

8        Q.    Well, he's down on the floor, you called 911,

9   right?

10       A.    Yes.

11       Q.    Chris Hashisaki is present, correct?

12       A.    Yes.

13       Q.    And even though you called 911, you now want to

14   do something different than to wait for 911, right?

15       A.    That is not correct.

16       Q.    Didn't you want to take him to the hospital?

17       A.    He wanted to go to the hospital, yes.

18       Q.    Didn't you -- I'm asking about you.  Didn't you

19   want to take him to the hospital?

20       A.    I can't answer that question yes or no.

21       Q.    Ma'am, when you took the stand, one of the

22   things that happened is you stood in front of this

23   blonde-haired woman named Mary, didn't you?

24            MR. PATTERSON:  Judge --

25            THE WITNESS:  I did.


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1          MR. PATTERSON:  -- objection.

2          THE COURT:  Hold on a second.

3          MR. MARTINEZ:  I'll ask the next --

4          MR. PATTERSON:  He's trying to --

5          THE COURT:  Just ask the next question.

6     BY MR. MARTINEZ:

7          Q.    Did you swear to tell the truth, the whole

8     truth, and nothing but the truth?

9          A.    I did.

10         Q.    So why are you telling us you can't answer this

11    question?

12         A.    Because you're asking me the wrong words.

13    You're trying to put words in my mouth.

14         Q.    Ma'am, I'm asking you whether or not your

15    husband could get up at that point, and he couldn't, could

16    he?

17         A.    I don't know that.

18         Q.    And at that point, even though you had called

19    911, you wanted to pick him up, knowing that services were on

20    the way, and take him out of the apartment, didn't you?

21         A.    He wanted to get in the car to go to urgent

22    care.  That's what I was trying to do.

23         Q.    If you were doing everything that he wanted you

24    to do, then why in the world did you call 911 in the first

25    place?  Because that's against what he just told you, right?

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000005270

1        A.    That's because Chris was like "We'd better call

2    911."

3        Q.    So you're abiding by Chris now as opposed to

4    your husband?

5        A.    There was a lot of stress going on that night.

6    I was just trying to get -- you know, you're  --

7        Q.    I --

8        A.    You're making assumptions that aren't true.

9        Q.    I don't know.  That's what I'm trying to find

10   out.

11       A.    Uh-huh.

12       Q.    So Chris tells you what to do now?

13       A.    In that particular instance, yes, she did.

14       Q.    She was the boss in that particular instance.

15       MR. PATTERSON:  Judge, she's --

16       THE COURT:  Sustained.

17       MR. PATTERSON:  These are argumentative questions.

18       THE COURT:  Sustained.

19   BY MR. MARTINEZ:

20       Q.    You indicated there was this request by Mr.

21   Andriano to go to the hospital, right?

22       A.    Yes.

23       Q.    And we now know that Chris Hashisaki is there.

24   She's speaking to him, right?

25       A.    She did, yes.

1      Q.    While you were in the room while you were in

2  making the call, right?

3      A.    That's what she said, yes.

4      Q.    Then you come back, don't you?

5      A.    Yes, I do.

6      Q.    Immediately upon coming back and then you tried

7  to lift him up, right?

8      A.    That is not true.

9      Q.    Well, you don't have a long conversation with

10  him, do you?

11      A.    No, I do not.

12      Q.    You don't say to him, "Honey, do you really

13  want to go with our plan to go to the hospital or do you want

14  to wait for 911?"  You don't do that?

15      A.    Yes, I do.

16      Q.    So you actually say that to him in front of

17  Chris Hashisaki?

18      A.    Yes.  I'm asking him how he's feeling.

19      Q.    No, no, no.  How he's feeling is different than

20  having a conversation about the location and plan --

21      A.    If you let me continue --

22      Q.    No, I --

23      MR. PATTERSON:    Judge, this --

24      THE COURT:    Hold a second.  Hold on.  Hold on a

25  second.  Mr. Martinez will ask the question and you will

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    answer the question.

2            THE WITNESS:  I'm trying.

3            THE COURT:  I don't want any arguing back and forth.

4    You will ask the question, pause, listen to the question,

5    then you will answer the question.

6            THE WITNESS:  I'm trying.

7            THE COURT:  Mr. Martinez, you wait until she answers

8    the question.  Continue on.

9    BY MR. MARTINEZ:

10           Q.    With regard to Mr. Andriano being down on the

11   ground, after you made the call to 911, is it your testimony

12   today that you and he had a conversation about the manner and

13   location of his medical treatment?

14           A.    Yes, sir.

15           Q.    While he's down on the ground, after having

16   vomited, he can sit there and talk to you back and forth and

17   tell you what he wants to do?

18           A.    Actually, he was laying there and, yes, he

19   could.

20           Q.    And that's when, according to you in front of

21   Chris Hashisaki, he told you I still want to go to urgent

22   care or -- or the hospital?

23           A.    No.  I asked him if he wanted to and then he

24   said "No," since 911 was on the way, that's what he would do.

25           Q.    All right.  But you still persisted and tried

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000005273

1      to lift him up, didn't you?

2              A.    No, I did not.

3              Q.    In fact according to you, didn't you try to get

4      him up to get him out of the apartment?

5              A.    No, sir.

6              Q.    Chris Hashisaki was present during this, wasn't

7      she?

8              A.    Yes, she was.

9              Q.    And isn't it true that at that point you had

10     become exasperated or frustrated with him, hadn't you?

11             A.    No, sir.

12             Q.    In fact you had no patience for him and so you

13     went and started to lift him from underneath the armpits?

14             A.    That's a complete lie.

15             Q.    Okay.  And didn't you then, when you tried to

16     get him from underneath the armpits, say "Get your ass up"?

17             A.    Absolutely not.

18             Q.    Then when he couldn't get up, you then put your

19     arms underneath his armpits and said "Get your fucking ass

20     up"?

21             A.    Absolutely not.

22             Q.    Isn't the reason that you wanted him out of

23     that apartment is because you didn't want emergency medical

24     care to be rendered to him?

25             A.    No, sir.


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000005274

1          Q.    You wanted him to die, didn't you?

2          A.    No, sir, I didn't.  That was his choice.

3          Q.    Because if he died and it was a heart attack

4    then the lawsuit would be worth more, right?

5          A.    No, sir.

6          Q.    Because Joe would be worth more dead than

7    alive, right?

8          A.    That's not a true fact.

9          Q.    When we were in court you told us -- well, I --

10    "well, because I couldn't get a hold of 911, I know that Joe

11    doesn't like a change of plans, and he, you know -- our

12    decision was to go to urgent care, so I told him can you get

13    up now?  Are you able to get up?"  That statement that you

14    gave us last week, was that a statement that you made while

15    Chris Hashisaki was present?

16          A.    Yes, sir.

17          Q.    He wasn't strong enough to get up, was he?

18          MR. PATTERSON:  Judge, she's answered that question

19    three times.

20          THE COURT:  Sustained.

21    BY MR. MARTINEZ:

22          Q.    When you heard the sirens -- you heard the

23    sirens that night, didn't you?

24          A.    Yes, I did.

25          Q.    When you heard the sirens, Mr. Andriano wasn't

1   strong enough to get up, was he?

2            MR. PATTERSON:  Judge, that's the same question.

3            THE COURT:  Sustained.

4   BY MR. MARTINEZ:

5            Q.   When he was down on the ground and the

6   paramedics were about to arrive, is that -- and where he was

7   laying, is that the place that you saw him working on the

8   lamp, ma'am?

9            A.   No, sir.

10           Q.   He was working -- the lamp that we talked about

11  that you guys purchased back on -- the day before?

12           A.   Yes.

13           Q.   You said he was working on it in the living

14  room, right?

15           A.   That afternoon, he had --

16           MR. PATTERSON:  Judge -- wait, wait, wait.

17           THE WITNESS:  He was doing something.

18           MR. PATTERSON:  Please --

19           THE COURT:  Hold on.  Let me see Counsel at the bench.

20

21               (The following proceedings were held at the

22  bench:)

23

24           THE COURT:  Mr. Patterson make your objection, but no

25  speeches.  Just say "objection, asked and answered,"

1   "objection, hearsay," whatever it is.  No speeches.

2   MR. PATTERSON:  Okay.  At this point though he

3   continues to ask improper questions compelling me to stand up

4   and object and object and object and appear to be obstructing

5   things.  And when you sustain my objection, all he does is

6   change the verbiage or add some words to the question and he

7   persists.  And you've never admonished him for that, so it

8   looks like I'm the bad guy here, and it's been the process he

9   has been employing here.

10  THE COURT:  Look -- Mr. Martinez, come over here.

11  Okay.  I'm going to tell both of you this and

12  I'm only going to tell you one time.  If you have an

13  objection, either one of you, state the objection -- hearsay,

14  asked and answered, whatever it may be.  No speeches.  If I

15  sustain an objection, don't just ask the question in another

16  way.  Do you understand that?

17  MR. MARTINEZ:  I will do --

18  THE COURT:  You have a habit of doing that and Mr.

19  Patterson is correct.

20  MR. MARTINEZ:  Well --

21  THE COURT:  You have a habit of asking the same

22  question a different way even though when the objection is

23  sustained.  Let's move on.  When I say move on, you move on.

24  MR. MARTINEZ:  All right.  Before we go, I would --

25  THE COURT:  Go ahead.


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1          MR. MARTINEZ:  I would like, since you admonished me,

2     if you would admonish him.  He doesn't need to say "Wait,

3     wait, wait."

4          THE COURT:  Okay.  Look.  I'm going to say this one

5     time.

6          MR. MARTINEZ:  No, I just want to --

7          THE COURT:  Hold on a second.  I'm going to say this

8     one time and I'm not going to say it anymore.  When we're

9     here at the bench, I've asked both of you to just whisper.

10         MR. MARTINEZ:  Okay.

11         THE COURT:  Okay?  Like I'm whispering now.

12         MR. MARTINEZ:  Okay.

13         THE COURT:  I don't want you speaking in a normal

14     tone.  I mean, you're not, but you're not exactly whispering.

15     So just whisper.  This microphone up here is very sensitive,

16     and the court reporter, if she has trouble hearing us, she'll

17     let us know she's having trouble.

18         MR. MARTINEZ:  Okay.

19         THE COURT:  So both of you whisper.

20         MR. PATTERSON:  Okay.

21         MR. MARTINEZ:  Okay.

22         MR. MARTINEZ:  I want the record to reflect I don't

23     think he's made an objection that is legal or providing a

24     legal basis at any time when he gets up and says "Wait, wait,

25     wait, wait, wait, wait."  I know he talks about

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1   professionalism, so I'm asking and moving in limine that if

2   he has an objection, he make it.  And he doesn't need to

3   stand there while I'm asking my questions.

4           THE COURT:  Okay.  And that's what I'm telling you

5   both to do.

6           MR. PATTERSON:  The "wait, wait, wait" was directed

7   at the witness who continued to answer when I was trying to

8   get an opportunity to interpose an objection.  And I wouldn't

9   have to be standing up every other question objecting --

10          THE COURT:  Okay.  Listen to me, both of you.  I'm

11  only going to say it one more time.  If there's an objection,

12  just say hearsay, asked and answered, whatever it might be.

13  No speeches, okay?  That's Rule Number 1.

14               Rule Number 2, if I say sustained, you move on.

15          MR. MARTINEZ:  All right.

16          THE COURT:  Period.  Don't try to ask the question

17  another way.

18          MR. MARTINEZ:  All right.

19          THE COURT:  Let's go.

20

21               (The following proceedings were held in open

22  court:)

23

24          THE COURT:  Ask your next question.

25          MR. MARTINEZ:  Quite frankly, Judge, after the


                TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1   conversation we had, I would --

2           THE COURT:   Just ask your question.

3   BY MR. MARTINEZ:

4           Q.    With regard to the sirens, you remember hearing

5   the sirens, don't you?

6           A.    Yes, sir.

7           Q.    And you were inside the apartment when you

8   heard the sirens, right?

9           A.    Yes, I was.

10          Q.    This was when you were still trying to get him

11  up, wasn't it?

12          A.    No, sir.

13          Q.    Chris Hashisaki was present when the sirens

14  sounded, right?

15          A.    No, sir.

16          Q.    She was not inside the apartment?

17          A.    No.  She went outside to smoke a cigarette.

18          Q.    And then when you heard the sirens, isn't it

19  true that Ms. Hashisaki then walked out and said "I'm going

20  to show them the way to the apartment"?

21          A.    No.  She walked out before we heard the sirens.

22          Q.    And the only reason she went out was to smoke a

23  cigarette?

24          A.    No.  It was also to direct the EMTs to our

25  apartment.

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000005280

1      Q.     And before -- there was knocking on the door,

2   and before the EMTs came to the door, isn't it true that you

3   threw out Chris Hashisaki's purse onto the breezeway?

4      A.     No, sir.

5      Q.     This happened after the paramedics left --

6      A.     Yes.

7      Q.     -- according to you?

8      A.     Yes.  I don't know if they were still there or

9   not, but it was after I went inside from speaking to the

10  EMTs.

11     Q.     And you're inside now, and then what happens is

12  that Ms. Hashisaki is now inside, right?

13     A.     Yes, she is.

14     Q.     You're inside with Mr. Andriano, right?

15     A.     Yes, sir.

16     Q.     You lock the door, right?

17     A.     I shut the door.

18     Q.     You don't lock the door?

19     A.     I don't recall at that point if I did or not.

20     Q.     Do you remember on direct examination telling

21  us that you did lock the door?

22     A.     Then I probably did, yes.  I don't --

23     Q.     Then what happens is you're in there for some

24  time, weren't you, before anything happens, before you come

25  out?

1          MR. PATTERSON:  Judge, form of the question, "some

2     time."

3          THE COURT:  Sustained.

4     BY MR. MARTINEZ:

5          Q.    Ma'am, tell us how long you were in there

6     before you came out and greeted the fire department?

7          A.    I can't tell you that.

8          Q.    So it was some time, wasn't it?

9          A.    Wasn't a great amount of time, no.

10         Q.    I didn't ask you if it was great amount of

11    time.  I said it was some time, wasn't it?

12         A.    I don't know what you mean by "some time," so I

13    can't answer that.

14         Q.    Some time means 5 minutes, 10 minutes, 15 -- it

15    could mean an hour.  It's just some time?

16         A.    I can't answer that question.

17         Q.    And you were alone in there for that period of

18    time, whatever it may be, with Mr. Andriano, right?

19         A.    That is correct.

20         Q.    And then at some point there was a knock on the

21    door, wasn't there?

22         A.    That's correct.

23         Q.    You didn't answer the door, did you?

24         A.    No, I did not.

25         Q.    They knocked and knocked and you did not answer

1    the door, did you?

2              A.    I did not.

3              Q.    And then you did come out though, didn't you?

4              A.    Actually, I received a phone call asking me to

5    come out.

6              Q.    Ma'am, did you eventually come out, "yes" or

7    "no"?

8              A.    Yes.

9              Q.    So you came out of the apartment, right?

10             A.    Yes.

11             Q.    You didn't come out of the front door, did you?

12             A.    No.  I wasn't allowed to.

13             Q.    Ma'am, the question is did you come out of the

14   front door?

15             A.    No, sir.

16             Q.    Instead, ma'am, what you did is you went out

17   the side door, right?

18             A.    That's correct.

19             Q.    Went through the patio, right?

20             A.    Yes, sir.

21             Q.    Went behind the building, right?

22             A.    I went to the sidewalk, yes.

23             Q.    The east side of the building, right?

24             A.    I believe so.

25             Q.    Weren't wearing any shoes?

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1          A.    Excuse me?

2          Q.    You weren't wearing any shoes?

3          A.    I don't recall.

4          Q.    Then you continued to a northbound direction on

5     the sidewalk, right?

6          A.    I went to where the fire trucks were, yes.

7          Q.    And then you turned around and you took a left,

8     which would be westbound, right?

9          A.    I went into the breezeway, yes.

10         Q.    No, ma'am.  I'm still in front.  Let me show

11    you a diagram.  Go ahead and take a look at Exhibit 321.

12               Ma'am, this is your apartment, 132?

13         A.    Yes, sir.

14         Q.    What happened is you came out into this patio,

15    right?

16         A.    Yes, sir.

17         Q.    Jumped over the wall, right?

18         A.    Yes.

19         Q.    Into the gravel or rocks?

20         A.    Well, yeah, that's what's there.

21         Q.    Okay.  And then you walked in this direction,

22    which is eastbound, right?

23         A.    Yes, sir.

24         Q.    And then you walked 95 feet northbound?

25         A.    Yes, sir.


                TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

```
1         Q.     And when you got to this corner, then you took
2    a left which is westbound, right?
3         A.     Yes, sir.
4         Q.     And then you got to the head of the breezeway,
5    correct?
6         A.     Yes, sir.
7         Q.     And then you walked southbound, didn't you?
8         A.     Yes, because I saw the paramedics by my door,
9    yeah.
10        Q.     Because you saw the paramedics by your door.
11   Didn't you know the paramedics were at your door already
12   because they were knocking too?
13        A.     Actually, I didn't know if they would have gone
14   back to the truck after my telephone conversation with them
15   or where they would be.
16        Q.     And then you walked southbound, right?
17        A.     Yes, sir.
18        Q.     You walked to your door at apartment 132,
19   right?
20        A.     Yes, sir.
21        Q.     Ma'am, wouldn't you agree that going this route
22   as we've described it is a lot more circuitous than going
23   over the patio, going to your right, which would be
24   westbound, and then just going to the door.  Wouldn't you
25   agree that's a lot -- lot shorter?
```

1      A.      That is shorter, yes.

2      Q.      But you didn't take that route, did you?

3      A.      I did not.

4      Q.      And then wouldn't you also agree that if you

5  went from the living room here to the front door, that would

6  also be shorter?

7      A.      I agree with that, yes.

8      Q.      But you didn't do that either, right?

9      A.      I wasn't allowed to, no.

10      Q.      You didn't do that either, did you?

11      A.      I was not allowed to.

12      Q.      Is that a "yes" or "no"?

13      A.      No.

14      Q.      And the reason that you didn't do that was

15  because you had already beaten your husband, hadn't you?

16      A.      Absolutely not.

17      Q.      In the space that it took whatever time it took

18  for them -- for Chris Hashisaki to leave to wait for the fire

19  department until you came out, that some time, whatever that

20  is, you'd already beaten him, hadn't you?

21      A.      No, sir.

22      Q.      Not only had you beaten him, you'd already

23  stuffed that pillow in his mouth so that nobody could hear

24  him, whatever moans and sounds he was making, right?

25      A.      You're grossly mistaken.  That is so wrong.

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    Q.    And he was in the living room also where the

2  neighbors really couldn't hear what was going on according to

3  you, right?

4    A.    You're  -- I can't agree with anything you're

5  saying.

6    Q.    You can't agree in the living room, per your

7  previous testimony, the neighbors don't hear as well?

8    A.    That is true.

9    Q.    And that's where this all happened, isn't it?

10   A.    Yes, this is where it happened.

11   Q.    That's when you hit him over the head, isn't it?

12   MR. PATTERSON:  Judge, she's already answered that.

13   THE COURT:  Sustained.

14   MR. PATTERSON:  Judge, may we approach?

15   THE COURT:  Sustained.  Let's move on.

16  BY MR. MARTINEZ:

17   Q.    Isn't this where you took the lamp and hit him

18  over the head?

19   A.    No, sir.

20   Q.    Isn't this when there was all this blood on the

21  ground?

22   A.    In the living room, yes.

23   Q.    Right?

24   A.    Yes.

25   Q.    During this period of time, isn't that --

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1      A.   No.

2      Q.   And isn't this when you took that knife and you

3  stabbed him?

4      A.   Absolutely not.

5      Q.   Well, ma'am, you did come out and greet the

6  fire department in a different outfit, didn't you?

7      A.   No, sir.

8      Q.   You came out in a striped shirt, didn't you?

9      A.   No, sir.

10      Q.   You also came out with wet hair, didn't you?

11      A.   I don't know if my hair was wet or not.

12      Q.   Isn't it true that you had just taken a shower?

13      A.   No, sir.

14      Q.   And the reason that you had taken a shower was

15  because you had just finished attacking him, right?

16      A.   Absolutely not.

17      Q.   Ma'am, do you have a shirt that has stripes on

18  it?

19      A.   Yes, I do.

20      Q.   Did you have one handy that day?

21      A.   I wouldn't recall that.

22      Q.   Let me show you another exhibit.   Take a look

23  at Exhibit Number 496.   You'll recognize that?

24      A.   Yes, I do.

25      Q.   That's the entry to your master bedroom, isn't

1    it?

2         A.    Yes, it is.

3         Q.    That's how it existed back on October 8 of the

4    year 2000, isn't it?

5         A.    On October 8?  No.

6         Q.    It didn't exist --

7         A.    I mean, I couldn't tell you all the items that

8    were laying just like this on October 8, no.

9         Q.    Was --

10        A.    I don't know when this picture was taken.

11        Q.    Was the door any different to your master

12   bedroom?

13        A.    No, sir.

14        Q.    Was this TV any different in your master

15   bedroom?

16        A.    No, sir.

17        Q.    That item of clothing that's there --

18        A.    Uh-huh.

19        Q.    -- is that something that's yours?

20        A.    No.  That's Joe's polo shirt.

21        Q.    Okay.  It is striped though?

22        A.    Yes, it is.

23        Q.    And then you did talk to the paramedics, didn't

24   you?

25        A.    At --

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000005289

1          Q.    When you were at the door?

2          A.    When I -- when I came out of the apartment,

3     yes, I went to talk to the paramedics.

4          Q.    So you did talk to the paramedics, right?

5          A.    Yes, I did.

6          Q.    You didn't tell them about the sodium azide

7     poisoning, did you?

8          A.    No, sir.

9          Q.    Ma'am, if you were so scared, which is what you

10    told us before, that he needed medical care, why -- and you

11    wanted to take him to the hospital, why didn't you allow

12    treatment to be taken there when the people that are going to

13    provide treatment can do it?

14         A.    Because I was instructed otherwise.

15         Q.    You're telling us now that he'd now had another

16    change of heart, right?

17         A.    Yes, he did.

18         Q.    And so what you're telling us now is that he

19    first wants to die from coming back -- when you're coming

20    back from Casa Grande, right?

21         A.    Yes, sir.

22         Q.    And to that end, he -- he does what he does,

23    takes the sodium azide, right?

24         A.    Yes, sir.

25         Q.    Then after that you're getting a little scared

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    and there is a decision to render medical care, right?

2          MR. PATTERSON:  Judge, this is reiterating testimony.

3    It's improper.

4          THE COURT:  Overruled.  Go ahead, answer question.

5          THE WITNESS:  Yes, sir.

6    BY MR. MARTINEZ:

7          Q.    That means that now he does not want to die,

8    right?

9          A.    No.  The symptoms that started happening scared

10    him.

11          Q.    And he wanted medical care?

12          A.    Yes, at that point.

13          Q.    So that means he doesn't want to die anymore,

14    right, if he's going to want medical care, right?

15          A.    I don't know.

16          Q.    If you want medical care, wouldn't you agree

17    that it's inconsistent to say "I want medical care but I also

18    want to die"?

19          MR. PATTERSON:  Judge, objection.  Arguing with the

20    witness.

21          THE COURT:  Sustained.

22    BY MR. MARTINEZ:

23          Q.    But now he wants to die again, right?

24          A.    Yes.  He told me to send the EMTs away.

25          Q.    When you were standing there, didn't you also

1    have a conversation with Chris Hashisaki about whether or not

2    you had spoken to your father?

3         A.    No, sir.

4         Q.    Didn't you tell Chris Hashisaki, "That's all

5    right.  Don't stay with me.  Don't worry about me.  I've

6    already called my dad"?

7         A.    No, sir.

8         Q.    Why would you take a shower, ma'am, before you

9    got out there to talk to the EMTs?

10         MR. PATTERSON:  Objection.  Assumes facts not in

11    evidence.

12         THE COURT:  Sustained.

13    BY MR. MARTINEZ:

14         Q.    You did call your dad though that night, didn't

15    you?

16         A.    That evening, yes.

17         Q.    And you called him about 2:00 in the morning,

18    didn't you?

19         A.    No, sir.

20         Q.    Ma'am, you were present when your father

21    testified right?

22         A.    Yes, I was.

23         Q.    You weren't successful in getting ahold of him

24    on your initial call at about 2:00 in the morning, did you?

25         A.    I did not try to call him around 2:00 in the

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000005292

1    morning.

2              Q.    When did you try to call him then?

3              A.    After the second time the EMTs came.

4              Q.    No calls --

5              A.    Or around that time.

6              Q.    No calls before Chris Hashisaki arrived?

7              A.    No, sir.

8              Q.    No calls while Mr. Andriano was down on the

9    ground and the EMTs were outside the door?

10             A.    No, sir.

11             Q.    And no calls shortly thereafter?

12             A.    No, sir.

13             Q.    One of the things that you didn't tell us about

14   on direct examination, ma'am, was that you were choked with a

15   belt?

16             A.    That's correct.

17             Q.    You didn't tell us about that during direct

18   examination?

19             A.    That's correct.

20             Q.    But you did address that issue with the police,

21   didn't you?

22             A.    I don't recall.

23             Q.    You did talk to the police about it or you're

24   not saying no, you're just saying you don't recall?

25             A.    I just -- I don't know.

1          Q.    I want to take a look at Exhibit 40.  This is

2     the belt that I'm talking about.

3          A.    Okay.

4          Q.    Do you recognize that belt?

5          A.    Yes.

6          Q.    And that's the belt that was at the scene,

7     right?

8          A.    Yes, sir.

9          Q.    And that's a belt that you did not tell us

10    anything about during your direct examination, right?

11         A.    That's correct.

12         Q.    But you did talk to the police about that,

13    didn't you?

14         A.    I don't remember.

15         MR. PATTERSON: Judge, she said she didn't recall that.

16         THE COURT:  Sustained.

17    BY MR. MARTINEZ:

18         Q.    Ma'am, at 9:43:54, didn't the following

19    conversation take place?

20         MR. PATTERSON:  Counter please?

21         MR. MARTINEZ:  9:43:54.

22         MR. PATTERSON:  Thank you.

23         MR. MARTINEZ:  That's what I said.

24         MR. PATTERSON:  Sorry, I didn't realize 95 -- thank

25    you.

1    BY MR. MARTINEZ:

2         Q.    Didn't you tell the police -- you and the

3    police had this conversation.  The detective, "You didn't

4    tell me that he choked you with a belt.  When did that

5    happen?"  And you answered, "Oh, yeah.  That happened before

6    the kitchen thing, before I even -- that was when I ran as

7    soon as I got away to get something to stop him, stop him

8    with --"  His answer, "You're losing me there."  "Oh, I'm

9    sorry.  As he's choking me with a belt, I get out of there,

10   start running to the kitchen, and that's when he grabbed me

11   again and must have grabbed the cell phone thing, I don't

12   know, and that's when I grabbed the knife."  "Where's his

13   cell phone at?"  "I have no idea.  I didn't see."  "Where

14   does he plug it in at?"  "I don't know, just where he has a

15   car plug -- car plug-in.  He has a house -- his house

16   plug-in.  I don't know.  Couldn't tell you."

17        Does that refresh your recollection at all?

18        A.    Yes.

19        MR. MARTINEZ:  I move for admission of Exhibit 497.

20        MR. PATTERSON:  No objection.

21        THE COURT:  Exhibit 497 for identification is

22   admitted into evidence.

23   BY MR. MARTINEZ:

24        Q.    Let's go ahead and take a look at it.

25             (Whereupon, the tape is played.)

1    BY MR. MARTINEZ:

2         Q.    So according to you, one of the things that he

3    did is that he went after with you a belt, right?

4         A.    I don't recall.

5         Q.    You don't recall him ever going after you with

6    a belt?

7         A.    No, I don't recall.

8         Q.    Was it because your memory was better then when

9    you spoke to the police than it is now?

10        A.    I don't know.  It's just something that I

11   don't -- it's part of the evening that I don't remember.

12        Q.    I'm going to ask you a little bit more about

13   that particular photograph.  How did that belt get there?

14        A.    I don't know.

15        Q.    How did that knife get there?

16        A.    The knife got there from the -- the scuffle

17   that Joe and I had when I was talking to him, and I was

18   walking towards him in the living room.  I had dropped it on

19   the ground.

20        Q.    Was this after he was dead that the knife got

21   there?

22        A.    Absolutely not.

23        Q.    So the knife, as it appears there -- this is

24   his arm right there -- does that give you a different

25   perspective as to when that knife got there?

1          A.    No, it doesn't.

2          Q.    I really didn't get it the first time.   Why

3    don't you tell me how that knife got there?

4          A.    I brought it into the living room as I was

5    talking to Joe and then --

6          Q.    No, no, no.   I'm talking about how it ended up

7    in that position on the carpet.   I'm sorry, my question

8    wasn't clear.

9          A.    I don't know.   While I was on the phone with

10   911 the second time, she had me move Joe around, and so -- I

11   don't know.   I wasn't looking at things around Joe.   My focus

12   was on him.

13         Q.    So the bottom line is you don't know how the

14   knife got there.   That's what you're telling me, right?

15         A.    In that exact position?

16         Q.    Yes.

17         A.    No, I do not.

18         Q.    But you would agree with me that the knife

19   is -- sorry.   That the belt is on top of the knife, right?

20         A.    It appears to be so, yes.

21         Q.    And if that is the case, then that belt was

22   placed there after the knife was already down?

23         A.    I don't agree with that.

24         Q.    So you're saying that somehow the belt was

25   already down, somehow somebody -- you or -- well, you --

1    lifted the belt up and then stuck the knife underneath it?

2         A.    No, sir.

3         Q.    Are you saying that Joseph Andriano, after

4    having been stabbed to the side of his neck, somehow stuck

5    the knife underneath the belt?

6         A.    No, sir.

7         Q.    But the knife is definitely underneath the

8    belt, isn't it?

9         A.    Yes, sir, it is.

10        MR. MARTINEZ:  May I have some scissors and some

11   gloves, please?  Do you have a baggy I could put this in

12   after I'm done?

13                   (Pause in proceedings.)

14   BY MR. MARTINEZ:

15        Q.    Ma'am, I'm showing you Exhibit 324.  Do you

16   recognize it?

17        A.    Yes, I do.

18        Q.    Whose belt is it?

19        A.    That's mine.

20        Q.    And where do you usually keep your belts?

21        A.    Well, belts and shoes are usually all over the

22   house.

23        Q.    Do you have a normal place where you put your

24   belts and shoes?

25        A.    Yes, I do.  Have a shoe rack, but with my kids,

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    they play with them, so they could end up anywhere.

2          Q.    So are you saying that your kids put this on

3    top of the knife?

4          A.    No, that's not what I'm --

5          MR. PATTERSON:  Objection, Judge.  That's not what

6    she's saying.

7          THE COURT:  Sustained.

8    BY MR. MARTINEZ:

9          Q.    Nicolas does walk, right?

10         A.    Yes, he does.

11         Q.    He does get into things, right?

12         A.    Yes, he does.

13         Q.    Ashley does also walk, doesn't she?

14         A.    Yes, she does.

15         Q.    With regard to this particular belt, how long

16   had you owned it?

17         A.    I couldn't tell you.  I don't know.

18         Q.    Does it go to a specific outfit?

19         A.    No.

20         Q.    It's just a belt you bought independent of any

21   clothing?

22         A.    No.  It could have come with a pair of jeans.

23   I don't recall.

24         Q.    Ma'am, did you take this belt and try to choke

25   him with it?

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

```
 1        A.    No, sir.

 2        Q.    Did you grab this belt by the tips like this

 3   (indicating), in any fashion like this?

 4        A.    No, sir.

 5        Q.    You were bloody that night, weren't you?

 6        A.    I was, yes, sir.

 7        Q.    When you spoke to the police, you didn't

 8   mention anything to them about kneeling on the carpet and him

 9   coming up behind you, did you?

10        A.    I don't recall that.

11        Q.    And is that because your memory was better then

12   than it is now?

13        A.    No.  It's just -- I don't know what you're

14   talking about.  I don't know.

15        Q.    Remember when you were telling us about him

16   coming after you?  Do you remember that?

17        A.    Yes, I do.

18        Q.    And do you remember that you told us that there

19   was a photograph that went down to the kitchen floor.  Do you

20   remember telling us about that?

21        A.    That he threw on the kitchen floor, yes.

22        Q.    So the answer is "yes"?

23        A.    Yes.

24        Q.    And then also telling us that while you were

25   down there, he came up behind you and put the telephone cord
```

1    around your neck?

2           A.    Yes, he did.

3           Q.    And with regard to that telephone cord, you

4    then said that there was some sort of struggle.  But did --

5    isn't it true that you never told the police that you were

6    kneeling down in the kitchen when he came up behind you to

7    put that cell phone cord around --

8           A.    I don't know.

9           Q.    In terms of that, let's take a look at some

10   exhibits, Exhibit 104 and 20.  Do you recognize that?

11                (Pause in proceedings.)

12          THE WITNESS:  Yes, sir.

13   BY MR. MARTINEZ:

14          Q.    What is that?

15          A.    That's a telephone cord.

16          Q.    And Exhibit 20, do you recognize that?

17          A.    Yes, sir.

18          Q.    And if we look a little bit to the left in that

19   photograph, what's that?  Is that the pot with the -- is that

20   the photograph with the pot on it?  You may step down if

21   you'd like.  Right here (indicating).

22          A.    Yes, sir.

23          Q.    You do remember this part, right, about what

24   happened involving the telephone cord and the photograph.

25   You remember that part, right?

1        A.    Yes, sir.

2        Q.    Showing you Exhibit Number 248, do you

3   recognize it?

4        A.    Yes, sir.

5        Q.    That's the cell phone cord that's in that

6   photograph, right?

7        A.    Yes, sir.

8        Q.    One of the things that you told us about that

9   was that -- that the next thing you know, you're down on your

10   knees, and that the next thing that you feel is something

11   going around your neck.  Do you remember telling us that?

12        A.    Yes, sir.

13        Q.    And this is while you were on the ground,

14   right?

15        A.    I was kneeling on the ground, yes.

16        Q.    And this is from where this thing around your

17   neck came, right, and from where this is -- okay.

18              You indicated to us that it came from behind

19   you, right?

20        A.    Yes, sir.

21        Q.    And the only other individual in the room with

22   you was Joseph, so it was Joseph, right?

23        A.    Yes, sir.

24        Q.    And so then you describe the struggle for us,

25   right?

1    A.    I believe so, yes.

2    Q.    You told us that this man, who wasn't weak, he

3  was strong enough to get up, that he started pulling at it to

4  go around your neck, right?

5    A.    Yes, I did.

6    Q.    He wasn't doing it gently, was he?

7    A.    No, sir.

8    Q.    And in fact he was doing it very hard so that

9  you were afraid for your life, right?

10    A.    Yes, sir.

11    Q.    And you were so afraid for your life, that's

12  when you reached over to the -- that area there and started

13  to go for the knife, right?

14    A.    Yes, sir.

15    Q.    And -- but he is pulling it tight around your

16  neck, isn't he?

17    A.    With my hands on it, yes.

18    Q.    Ma'am, you didn't know that he was behind you,

19  right, when you were down on the ground, right?

20    A.    That's right.

21    Q.    He startled you or surprised you when he put

22  that thing around your neck, right?

23    A.    Yes, sir.

24    Q.    So the element of surprise was with him, wasn't

25  it?

1          A.     Yes, sir.

2          Q.     And he comes around, he puts it around your

3    neck, right?

4          A.     Yes, sir.

5          Q.     And you're in trouble now, right?

6          A.     Yes, sir.

7          Q.     That's when you feel like -- you think that you

8    could perhaps lose your life, right?

9          A.     Yes, sir.

10         Q.     And then that's when you start to grab at this

11   cord, right?

12         A.     Immediately, I did.

13         Q.     Right.  And when you start grabbing for this

14   cord, you also start grabbing for the knife, right?

15         A.     Not instantaneously, but yes.

16         Q.     Almost immediately, right?

17         A.     Yes.  I knew I had to get something.

18         Q.     Right.  You're able to stand up, weren't you?

19         A.     Yes.  The elasticity in the cord allowed me to

20   stand up.

21         Q.     The answer is --

22         A.     Because he was pulling up on it so hard.

23         Q.     The answer is yes, he was pulling on it so

24   hard, you got up, right?

25         A.     Yes, sir.

1   Q.   And then you went over to get the knife, right?

2   A.   I just had to lean over, yes.

3   Q.   It's not like he's letting you lean over, is

4   he?

5   A.   He's trying not to let me, exactly.

6   Q.   According to you, he's physically stronger than

7   you, right?

8   A.   Yes, he is.

9   Q.   And according to you he's taller than you,

10  right?

11  A.   Yes, sir.

12  Q.   According to you, you only weighed 100 pounds

13  back then, right?

14  A.   Yes, sir.

15  Q.   So he very strongly has this around your neck,

16  right?

17  A.   With my hands in it, yes.

18  Q.   So then -- well, it isn't your hands because

19  you're reaching for the knife?

20  A.   Initially it was, and then I got a hand out.

21  Q.   And when you got a hand out, that's when you

22  went for the knife, right?

23  A.   Yes, sir.

24  Q.   How is it that you happened to have your hands

25  like that if he surprises you when you're down here with the

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    picture?

2           A.    The elasticity of the cord allowed that.

3           Q.    But even though the cord is elastic, ma'am,

4    even though the cord is elastic, it's very easy to pull

5    and -- see (indicating)?

6           A.    Yes.

7           Q.    And if it's strong like this and he puts it

8    around your neck, where are you fingers going to be?

9           A.    They were -- I had them right there.

10          Q.    He surprised you with this though, right, this

11   elastic cord here?

12          A.    Yes, they're --

13               MR. PATTERSON:  Judge --

14               THE WITNESS:  -- falling off of it.

15               MR. PATTERSON:  He's gone over this event --

16               THE COURT:  Sustained.

17               MR. PATTERSON:  -- two or three times.

18               THE COURT:  Sustained.

19   BY MR. MARTINEZ:

20          Q.    I want to talk to you about the knife then.

21   You got this cord around you and he's pulling hard on it,

22   right?

23          A.    Yes, sir.

24          Q.    Yet you're still able to move over to where the

25   knife is, right?

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

```
 1          A.    Yes, sir.

 2          Q.    And then you're able to reach into the drawer,

 3     right --

 4          A.    Yes, sir.

 5          Q.    -- while you still have the -- which hand do

 6     you have in the cord?

 7          A.    I believe it was my left hand.

 8          Q.    Okay.  And then you're going for -- for the

 9     knife with your right hand, right?

10          A.    Yes, sir.

11          Q.    And he's got it around your neck, right?

12          A.    Not like this, no.

13          Q.    Well, you said he had it tight?

14          A.    Yes, he did.

15          Q.    That it was really bad and you thought you were

16     going to die, right?

17          A.    Yes, sir.

18          Q.    And that he's strong at this point, isn't he?

19          A.    Yes.  Yes, he is.

20          Q.    And he's mad at you, right?

21          A.    Yes, sir.

22          Q.    And for whatever --

23          MR. PATTERSON:  Judge, objection.  He's going over

24     the same sequence of events and eliciting answers.

25          THE COURT:  Overruled.  Go ahead.
```

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1          THE WITNESS:  What did you ask me?

2    BY MR. MARTINEZ:

3          Q.     He's mad at you?

4          A.     Yes.

5          Q.     He has the strength and he's making this noise,

6    right?  Screaming?

7          A.     Yes.

8          Q.     And then you're able to get a hold of a knife,

9    right?

10         A.     Yes, sir.

11         Q.     And you have it in your right hand, right?

12         A.     Yes, sir.

13         Q.     You don't stab at him or anything like that, do

14   you?

15         A.     No.

16         Q.     Your main concern is to go after this, right?

17         A.     Yes.  I have to get it off my neck.

18         Q.     But if you were to reach around like this or

19   like this you'd be able to stab him with a knife, wouldn't

20   you?

21         MR. PATTERSON:  Objection.  Calls for speculation as

22   to what she didn't do.

23         THE COURT:  Overruled.  Go ahead, answer the question

24   if you can.

25         THE WITNESS:  That never occurred to me.



        TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

```
1      BY MR. MARTINEZ:

2              Q.    But you could have done it?

3              A.    No, sir.

4              Q.    You then, according to you, are able to cut

5      this cord right there, right?

6              A.    It appears so, yes.

7              Q.    Well, this was found there, wouldn't you agree?

8              A.    Yes, sir.

9              Q.    You were there?

10             A.    Yes, sir.

11             Q.    You had the knife?

12             A.    Yes, sir.

13             Q.    Joseph didn't cut it; right?

14             A.    I cut it.

15             Q.    Okay.  So you did cut this cord, right?

16             A.    Yes, I did.

17             Q.    How is it possible that -- you know, let me do

18     it this way real quick.  How is it possible, ma'am, that you

19     cut this cord around your neck like this, okay?  How is it

20     possible that you are able to get the tip of the knife in

21     here like this without -- and remember, he's moving you

22     around and everything.  How is it --

23             A.    You're not portraying it correctly.

24             Q.    How is it that you don't have any injuries

25     here?  How is it that you don't have any knife prints or any
```

1    knife marks on you?

2          MR. PATTERSON:  Judge, objection to this

3    demonstration.  It doesn't follow her testimony.

4          THE COURT:  She could explain.  You could go ahead

5    and answer the question.

6          THE WITNESS:  Okay.  My hand was in the cord between

7    my neck and the cord.  You only have a small portion of the

8    cord.  He had the whole thing -- it was a lot more stretchy

9    to it.

10          And as I'm holding it, I was able to cut the

11    cord because of my hand pulling it away.

12          Q.    Okay.  So even though there isn't more cord,

13    ma'am --

14          A.    Yes.

15          Q.    -- that doesn't mean it gets any less tight,

16    does it?

17          A.    Yes, it does.

18          Q.    You -- because you were just telling me it was

19    so tight you were afraid you were going to die.

20          A.    Yes.  I had my hand in it and he kept pulling

21    it tighter and tighter.

22          Q.    If you move your hand from underneath there,

23    okay -- you have both hands underneath there initially,

24    right?

25          A.    I did.

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1          Q.    And then you had your left hand underneath it,

2    right?

3          A.    Yes, sir.

4          Q.    Then you had the right hand that now has the

5    knife, right?

6          A.    Yes, sir.

7          Q.    You then are telling me that you are somehow

8    able to get the knife between this cord and your neck?

9          A.    No, sir.  I said with my hand I pulled away

10   from my neck and cut the cord.

11         Q.    So you were strong enough to overcome his very

12   strong tightening of this cord around your neck?

13         A.    Well, I was able to pull it away and cut it,

14   yes.

15         Q.    You were stronger than he was if you were able

16   to then pull it out?

17         A.    That's not a true statement.

18         Q.    Or was -- he wasn't holding it very tight?

19         A.    No.  Just there's a lot of elasticity in there.

20   It was -- that's my only explanation for it.

21         Q.    Then you hold the knife in your hand, right?

22   Right?

23         A.    Yes, sir.

24         Q.    And this is same individual that previously had

25   been vomiting --

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000005311

```
 1          A.    He vomited twice, yes.

 2          Q.    -- he's the same individual that has just taken

 3   an uncounted, approximately 16 sodium azide Elderberry pills?

 4          A.    Sometime before, yes.

 5          Q.    How much time before?

 6          A.    I don't know, but it was sometime before.

 7          Q.    It was hours, wasn't it?

 8          A.    No, sir.

 9          Q.    And he's the same individual that you had tried

10   to get up and put into the car and he couldn't stand up,

11   right?

12          MR. PATTERSON:  Judge, objection.  He's asked these

13   questions.

14          THE COURT:  Sustained.

15          MR. PATTERSON:  He's restating testimony.

16          THE COURT:  Sustained.

17   BY MR. MARTINEZ:

18          Q.    Where is he getting all this super human

19   strength?

20          MR. PATTERSON:  Objection.  Form of the question,

21   super human strength.

22          THE COURT:  Sustained.

23   BY MR. MARTINEZ:

24          Q.    Where is he getting all the strength, ma'am,

25   based on what you told us before?
```

1       A.    I think he expelled what it was that was making

2    him sick and so the anger was motivating him.   I don't know.

3    I -- I -- I don't know where he got it from.   He was just

4    angry.

5       Q.    But then the two of you get involved in this

6    other fight right after that?

7       A.    No.

8       MR. PATTERSON:   Judge, sequence?   After what?

9       THE COURT:   Sustained.   Rephrase the question.

10   BY MR. MARTINEZ:

11      Q.    After the cord, you are left holding the knife,

12   right?

13      A.    That is correct.

14      Q.    And then you become involved in another

15   altercation, don't you?

16      A.    Not at first, no.

17      Q.    Not at first but after that, right?

18      A.    After what?

19      Q.    You are in the kitchen, knife in hand, right?

20      A.    Yes, sir.

21      Q.    He is standing there in front of you now with

22   two ends of cord in each hand, right?

23      A.    Yes, sir.

24      Q.    He isn't behind you, is he?

25      A.    Not now, no.

1      Q.    Well, no, he was behind you initially, right?

2      A.    Yes, sir.

3      Q.    You spun around and now you have the knife in

4  hand, right?

5      A.    Yes, sir.

6      Q.    He was very close to you when he had the -- the

7  cord around your neck, wasn't he?

8      A.    Yes, sir.

9      Q.    I mean, he was touching you, wasn't he?

10     A.    I don't recall -- I don't know.  All I -- all

11  my attention was on my neck.

12     Q.    So that when you turned around the knife was

13  inches away from him, wasn't it?

14     A.    No, it wasn't.

15     Q.    How far away was --

16     A.    He was standing a couple feet from me.

17     Q.    So he was standing a couple feet backwards

18  towards where the kitchen is, towards where the dining room

19  is?

20     A.    Yes.  He was right next to the counter.

21     Q.    He was right next to the counter, right?

22     A.    Yes, sir.

23     Q.    How is it then, ma'am, we have a photograph of

24  the cord right there, if he's standing there, right there

25  next to the counter?

```
 1          A.    Because he dropped it.

 2          Q.    Dropped it immediately, right?

 3          A.    I guess so, yes.

 4          Q.    Then now he's at the counter and you start

 5   advancing towards him and you're telling him something,

 6   right?

 7          A.    Yes.

 8          Q.    You have a conversation with him?

 9          A.    I start talking to him, yes.

10          Q.    Then you get into the living room, don't you?

11          A.    Yes.

12          Q.    When you get into the living room, something

13   happens, right?  Right?

14          A.    I -- you have to describe what you mean by

15   "something."  I don't know.

16          Q.    You hit him over -- at some point you hit him

17   over the head with a bar stool, don't you?

18          A.    Something happened before that.

19          Q.    At some point --

20          A.    At some point, yes, I did.

21          Q.    This is when he was down on the ground?

22          A.    Yes, sir.

23          Q.    He was standing when you hit him?

24          A.    He was bending over.

25          Q.    Was he on all fours?
```

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1          A.     No, sir.

2          Q.     So he was standing and he was bending over like

3     this and you hit him?

4          A.     Yes, sir.

5          Q.     Was he facing you when you hit him?

6          A.     Um, no.  He wasn't facing me.

7          Q.     So he was -- had his back to you?

8          A.     No.  He was bending down facing the ground,

9     trying to pick up the knife.

10         Q.     So you dropped the knife and he was facing down

11    like this.

12         A.     Yes, sir.

13         Q.     Right?

14         A.     Yes.

15         Q.     And you were in front of him?

16         A.     Yes, sir.

17         Q.     And so what happened was you picked up the bar

18    stool, right?

19         A.     I grabbed it, yes.

20         Q.     Where was the bar stool?

21         A.     It was the closest thing next to me.

22         Q.     Where was the bar stool?

23         A.     Next to me.

24         Q.     Where were you?

25         A.     Standing somewhere in between --, well just in

1    the middle of the dining/living room area.

2         Q.    So the bar stool was right next to the counter.

3    Is that what we're telling me?

4         A.    Yes.

5         Q.    And you picked it up?

6         A.    Yes, sir.

7         Q.    Where was he when you picked up that bar stool?

8         A.    He was by the knife trying to pick it up.

9         Q.    Where was the knife?

10        A.    On the floor.

11        Q.    In relationship to the stool, where was the

12   knife?

13        A.    I couldn't tell you exactly.

14        Q.    Was it towards the door that leads to the

15   patio, was it towards the front door, was it toward the --

16             (Pause in proceedings.)

17        THE WITNESS:   I remember it being in the living

18   room, somewhat by the couch.  Seemed that he was standing

19   right in the middle of the living room.  I don't -- I don't

20   know.

21   BY MR. MARTINEZ:

22        Q.    And he -- did you throw the knife at him?

23   Since you're standing over there by the counter and he's in

24   the living room, did you --

25        A.    No.  I tossed it to the floor because I

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    couldn't believe I had a knife in my hand.

2         Q.    How is it that's in the middle of the room and

3    the knife is over there unless you threw it at him?

4         A.    I didn't throw it at him.

5         Q.    Well, then how did he get close to the knife

6    and be in the middle of the living room?

7         A.    As I said, I tossed it away because we were

8    having this conversation.

9         Q.    So you tossed the knife towards the middle of

10   the living room.  That's what you're telling me?

11        A.    Not like this.

12        Q.    Underhanded?

13        A.    Just getting it out of my hand, yes.

14        Q.    You tossed it in some fashion towards the

15   middle of the living room?

16        A.    Yes, sir.

17        Q.    And then he went for it, right?

18        A.    Yes, sir.

19        Q.    And you saw him go for it, right?

20        A.    Yes, sir.

21        Q.    And he went over, right?

22        A.    Yes, sir.

23        Q.    If he is bent over to get the -- wouldn't you

24   agree if he's going to lift it up like this, if -- you toss

25   the knife and I go get it, wouldn't it be fair to say that I

 1     would have my back to you?

 2          MR. PATTERSON:  Judge, that is inaccurate as to what

 3     she just testified to.

 4          THE COURT:  Overruled.  Go ahead and answer the

 5     question if you can.

 6          THE WITNESS:  Yeah.  No, his back is not to me.

 7     BY MR. MARTINEZ:

 8          Q.    But then you kept hitting him and hitting him

 9     and hitting him, right?  Right?

10          A.    I hit him every time I thought he was getting

11     up, yes.

12          Q.    So you kept hitting him, hitting him, and

13     hitting him?

14          A.    I thought he was getting up.

15          Q.    And you kept hitting him, hitting him and

16     hitting him in the back of the head, right?

17          MR. PATTERSON:  Judge, asked three consecutive times.

18          THE COURT:  Sustained.

19     BY MR. MARTINEZ:

20          Q.    Did you keep hitting him in the head, ma'am?

21          MR. PATTERSON:  Fourth time, Judge.

22          THE COURT:  Sustained.

23     BY MR. MARTINEZ:

24          Q.    Then, ma'am, how did he get the injury to his

25     mouth?  He got hit in the mouth too, didn't he?


                 TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

```
 1          A.    No, sir.

 2          Q.    Any idea how that injury appeared?

 3          A.    We had testimony on it.

 4          Q.    Ma'am, you were there.  How did the injury get

 5    to his mouth?

 6          A.    I don't know.

 7          Q.    Did you hit him?

 8          A.    No, sir.

 9          Q.    How about his nose?  Who hit him in the nose?

10          A.    I -- I didn't.

11          Q.    You told us on direct examination that as soon

12    as the stool broke, that's you -- you stopped hitting him

13    with the stool, right?  You told us that, right?

14          A.    No.  That's not -- those were not my words.

15          Q.    So after the stool broke, you continued to hit

16    him?

17          A.    When he stopped moving is when I stopped

18    hitting him.

19          Q.    My question is with regard to the stool.  Did

20    you continue hitting him after the stool was broken?

21          A.    I believe so, yes.

22          Q.    And that's why he's got those things on the top

23    of his head, because you hit him with the wood screws that

24    are attached to the wooden stool, right?

25          A.    I believe so.
```

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

```
 1            THE COURT:  Okay.  We'll go ahead and take our
 2    evening recess at this point in time.  During this evening
 3    recess remember the entire admonition I have given you,
 4    including the fact you're not to discuss this case with
 5    anyone, do not let anyone discuss the case with you.  Do not
 6    do any research, investigation, experimentation or testing on
 7    your own.  Avoid any and all media coverage of this case.
 8    Keep an open mind.  I want you to have a nice evening we'll
 9    see everyone at 1:00 p.m. tomorrow.
10            Have a nice evening.  We'll be in recess.
11
12        (Evening recess.)
13
14
15
16
17
18
19
20
21
22
23
24
25
```

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000005321

1

2

3                        CERTIFICATE OF REPORTER

4

5    STATE OF ARIZONA      )
                           )
6    COUNTY OF MARICOPA    )

7

8              I, Traci L. Wheeler, CSR, RPR, an official

9    and certified reporter in the Superior Court of the State

10   of Arizona, in and for the County of Maricopa, hereby

11   certify that I made a shorthand record of the proceedings

12   had in the within case, and that the foregoing transcript

13   is a full, true, and correct transcription of the

14   proceedings in this case.

15              Dated this 5th day of July, 2005.

16

17

18   _____
     Traci L. Wheeler, CSR, RPR
19   Certified Court Reporter No. 50313
     Official Court Reporter
20

21

22

23

24

25


          TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

# EXHIBIT Z

DP

05-0002
Braccio

1    IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

2     IN AND FOR THE COUNTY OF MARICOPA

3

4  STATE OF ARIZONA,     )
              )
5    Plaintiff,   )
              )
6  v.           )  No. 1 CR 05-0005 AP
              )  MARICOPA COUNTY
7  WENDI ELIZABETH ANDRIANO, )  No. CR 2000-096032
              )
8    Defendant.   )
   _____)

9

10

11

12        Mesa, Arizona
        October 27, 2004
13

14

15

16   BEFORE: The Honorable BRIAN K. ISHIKAWA

17

18   REPORTER'S TRANSCRIPT OF PROCEEDINGS

19       TRIAL DAY 33

20

21

22

23

24 ORIGINAL Prepared for APPEAL by:
  TRACI L. WHEELER, CSR, RPR
25 Certified Court Reporter No. 50313


  TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

2

1                    A P P E A R A N C E S

2    FOR THE STATE:         JUAN M. MARTINEZ,
                            Deputy County Attorney
3
     FOR THE DEFENDANT:     DANIEL B. PATTERSON,
4                           Deputy Public Defender
                                    and
5                           G. DAVID DELOZIER,
                            Attorney at Law
6

7           I N D E X   O F   E X A M I N A T I O N

8    WITNESS                                        PAGE

9    ANDRIANO, WENDI ELIZABETH, Called on her own behalf
          Continued Direct Examination by Mr. Patterson    3
10        Continued Direct Examination by Mr. Patterson   88

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25


               TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

                          000005325

```
 1              MESA, ARIZONA, WEDNESDAY, OCTOBER 27, 2004

 2

 3              THE COURT:  Good afternoon.  This is trial in cause

 4    number CR 2000-096032, State of Arizona versus Wendi

 5    Elizabeth Andriano.  The record will reflect the presence of

 6    the Defendant on the witness stand, Counsel and the jury.

 7    The Defendant, Wendi Elizabeth Andriano, is on the witness

 8    stand, and we'll continue with the direct examination by Mr.

 9    Patterson.

10              Mr. Patterson?

11         MR. PATTERSON:  Thank you, Judge Ishikawa.

12

13              WENDI ELIZABETH ANDRIANO,

14         CALLED TO TESTIFY ON HER OWN BEHALF,

15    HAVING PREVIOUSLY BEEN DULY SWORN, TESTIFIES FURTHER:

16

17    CONTINUED DIRECT EXAMINATION BY MR. PATTERSON:

18         Q.    You are Wendi Andriano?

19         A.    Yes, I am.

20         Q.    You are the same Wendi Andriano that was

21    testifying yesterday in this proceeding?

22         A.    Yes, sir.

23         Q.    You realize you're still under oath?

24         A.    Yes.

25         Q.    All right.  I want to move to a related topic
```

4

1   of the cancer.  You told us at some point in time you

2   discovered that the previous diagnosis of benign tumors were

3   in fact erroneous.

4        A.   Yes.

5        Q.   Correct?

6        A.   Yes.

7        Q.   Okay.  And once again when did you come to that

8   realization?

9        A.   That was after Walter Read had looked at all

10  the slides and told us their opinion of what it was, and this

11  was probably June of '98.

12       Q.   Okay.  Was there some discussion amongst family

13  members that perhaps a lawsuit was necessary to kind of

14  pursue the persons who may have misdiagnosed this cancer?

15       A.   Yes, there was.

16       Q.   Okay.  How did that come about?  Give me the

17  first couple times that it was a topic of discussion?

18       A.   Um, I believe it came mainly from his family

19  and they were more familiar with lawsuits and things and

20  because it was a misdiagnosis and had caused irreparable

21  damage to Joe, it was kind of a group thing that everybody

22  said, well, you should look into getting an attorney and

23  filing a suit.

24       Q.   Okay.  How did you go about finding an attorney

25  in that regard?

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1          A.     Well, Joe has a cousin Andrea who is an

2    attorney and she had attended a seminar where an attorney by

3    the last name of Roush was the presenter.   And she said that

4    he was very well known for his ability to handle medical

5    malpractice suits, so she recommended him to us.

6          Q.     Okay.  And was that recommendation made to you

7    jointly, both you and Joe?

8          A.     Yes, it was.

9          Q.     Okay.  Based upon that recommendation, what did

10   you do?

11         A.     I actually called up to the firm and tried to

12   speak with Mr. Roush, but he was unavailable for some reason,

13   and a Mr. Jeffrey Miller is the one who returned our call.

14         Q.     Okay.  And was Joe aware that this was the law

15   firm you were going to contact?

16         A.     Oh, yes.

17         Q.     Okay.  And who made the decision to have you

18   make the phone call?

19         A.     I -- that's what I did.  Joe didn't like to

20   speak on the phone.  He had slurred speech from the

21   surgeries, and so --

22         Q.     Okay.  So you made the phone calls?

23         A.     I did.

24         Q.     All right.  Can't get hold of Mr. Roush, but

25   you did contact Mr. Miller?

1          A.     Yes, I did.

2          Q.     All right.  Did you speak initially with Mr.

3     Miller?

4          A.     I gave him a brief overview and he said he'd

5     been very interested in the case.

6          Q.     Okay.  Did you run the notion of Mr. Miller as

7     lawyer by the cousin Andrea?

8          A.     Yes.  She said that anybody in that firm would

9     probably be good.

10          Q.     Okay.  So you got kind of a vote of approval

11     from the attorney who recommended that law firm in the first

12     place?

13          A.     Correct.

14          Q.     Okay.  What was the next step in that process?

15          A.     The next step was Mr. Miller set up an

16     appointment with us and he drove to Casa Grande and that was

17     at my work place.

18          Q.     Okay.  And was that in the conference room at

19     the --

20          A.     We actually had a clubhouse and that's where he

21     met with us.

22          Q.     All right.  What time of day do you recall did

23     Mr. Miller show up?

24          A.     It was during my workday so it was probably

25     midafternoon or so.

1       Q.    Okay.  Who was present in the clubhouse or club

2   room when Mr. Miller made his presentation?

3       A.    I can't tell you exactly who was there.

4       Q.    Okay.

5       A.    I know there was a group of us.

6       Q.    All right.

7       A.    And it was family members and --

8       Q.    Were --

9       A.    -- myself and Joe.

10      Q.    Okay.  Were Joe's family members represented at

11   this meeting as well?

12      A.    Yes.

13      Q.    Okay.  How about Donna and Alejo, your mom and

14   dad?

15      A.    I believe that my mother was there.  I don't

16   think my father was there.

17      Q.    Okay.  And how long did this initial meeting

18   with Mr. Miller last?

19      A.    A couple of hours.

20      Q.    Okay.  And did he answer all of your questions?

21   What was the process?  Did he lecture?

22      A.    We didn't know anything about it, so basically,

23   once again, as you know, we had to ask an abundance of

24   questions to find out what is this medical malpractice all

25   about, what are all the details about it, what do we do.  And

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000005330

1    so he basically just filled us in on what the procedures are

2    and how you retain him, you don't -- yes, you retain him,

3    you don't have to hire him, because we were concerned about

4    having to put money down because, you know, we were putting

5    all this money in his treatments.

6           Also the fact that he had been misdiagnosed by

7    three different pathologists was a big deal.  He just

8    explained to us that, you know, that we had a very good case.

9    And also that if he decided to do this there was a time limit

10   on it.  It had to be filed within, I believe, 18 months of

11   discovery and that it also could take a very long time to --

12   because it was such a complex case, that this was nothing

13   that can be settled within a year, this would take many years

14   to do.

15          Q.    Okay.  And did you retain him at that point or

16   did you allow him to go back to Phoenix and mull it over?

17          A.    I believe that we did not retain him that day.

18   We had talked about interviewing other attorneys, but after

19   the meeting with Mr. Miller, we really liked him.  He was

20   very personable, he answered all of our questions, we were

21   very comfortable with him, and so at a later date we called

22   and I believe he faxed to my office forms that we had to sign

23   that retained him.

24          Q.    Okay.  Was this decision made jointly between

25   you and Joe?

1        A.    Yes, because Joe had to sign all these papers

2    along with myself.

3        Q.    All right.  And did Joe sign the retainer

4    agreement with Mr. Miller?

5        A.    Yes, he did.

6        Q.    Okay.  Do you recall Joe showing up late at

7    that meeting?

8        A.    I don't recall that, but it wouldn't surprise

9    me.  Joe had a nickname of being called "No-show Joe."

10       MR. MARTINEZ:  Objection.

11       THE COURT:  I'll sustain the objection.

12   BY MR. PATTERSON:

13       Q.    Okay.  You have no specific recollection that

14   he --

15       A.    I don't, but I don't think he would have been

16   too terribly late.

17       Q.    Is it your recollection he participated in the

18   meeting sufficiently to come to a decision?

19       A.    I believe so.

20       Q.    You signed the paperwork, shipped it off to Mr.

21   Miller's office.  What was the next step in the lawsuit

22   process?

23       A.    Next --

24       Q.    How about the medical records?

25       A.    Right.  Next step was to collect medical

1    records, and so Mr. Miller had faxed -- well, we had to

2    provide them with all the names of all the doctors and all

3    the pathologists, all the hospitals, you know, everything.

4    And once we did that, he sent us --

5         Q.    Okay.  Who supplied Mr. Miller with that

6    information?

7         A.    I did.

8         Q.    Okay.

9         A.    And after I did that, he sent a package to our

10   house with forms that Joe had to sign that were releases of

11   information.

12        Q.    Okay.

13        A.    And so Joe signed all of those and then we sent

14   them back to Mr. Miller.

15        Q.    All right.  Physically accessing the medical

16   records, how was that done?

17        A.    Well, we waited a couple of months, and Joe

18   called Mr. Miller trying to find out, you know, how things

19   were progressing, and people were not responding as far as

20   sending the records.  So my husband offered to go pick them

21   up physically and bring them to his office, so that's what

22   Joe occupied himself with for the next -- it took a while

23   because there was quite a few people we had to get records

24   from.

25        Q.    Okay.  So you got all those records and got

1   those to Mr. Miller's office.  What was the next step in the

2   lawsuit process?

3          A.    Actually, just waiting.  We really didn't -- we

4   didn't have to do anything else.  It was all up to Mr.

5   Miller.  I guess he was doing research and -- I don't know

6   exactly what he was doing.

7          Q.    Okay.  Were there times during the -- well,

8   let's see.  Did you have a meeting at some point in time with

9   Mr. Miller in his office where he discussed the difference

10  between a med mal lawsuit and a wrongful death lawsuit?

11         A.    Yes.

12         Q.    Okay.  Tell me about that discussion.  What was

13  explained to you in that regard?

14         A.    Joe and I went to Mr. Miller's office and we

15  were in the conference room, and on a white board he -- Joe

16  was interested in the amount of money that Mr. Miller was

17  kind of counting on or whatever.

18         Q.    Okay.

19         A.    What his expectations were.

20         Q.    Did Mr. Miller ever give you a -- a figure?

21         A.    No, he did not.  He said that he -- that in

22  cases like this, there's not a figure that you can, you know,

23  like, you're trying to achieve or that -- any of that stuff.

24  He said there's -- there's no way that you could tell.  And

25  one of the reasons why he said that is because sometimes you

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    settle and sometimes you go to court.  Sometimes you settle

2    in court.  There's just a lot of variables there.

3         Q.    Okay.  You mentioned settlement.  At this

4    particular meeting was there a discussion about whether or

5    not Joe and you wished to settle this case?

6         A.    No.  Joe wanted it to proceed all the way.

7         Q.    Okay.  So at this point does he explain the

8    distinction or difference between med mal -- a medical

9    malpractice lawsuit and wrongful death lawsuit?

10        A.    Our conversation about that, because Joe --

11   if -- because Joe was driving the boats, if he was to have an

12   accident and die, basically the medical malpractice suit

13   would be void and he made that very clear.  A wrongful death

14   suit, I don't really think we discussed it in great detail.

15   It was just something that's not really an option because

16   that's not what you want to do.  You want to take care of

17   yourself and do the medical malpractice suit and that's what

18   you want to do.

19        Q.    All right.  Did he explain to you conceptually

20   the cancer had to create the death for Joe in order to

21   sustain the lawsuit?

22        A.    Yes.

23        Q.    Okay.

24        A.    He did.

25        Q.    All right.  Were there papers generated by Mr.

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000005335

1   Miller's office and sent to you for your signature, that kind

2   of thing, in addition to what you've already described for

3   us?

4        A.   I believe the only one was retaining him and

5   the medical authorizations.  No.  I don't -- I don't think

6   so.

7        Q.   Okay.  Was there some point in time when you

8   become concerned about Joe's emotional well being and you

9   called Mr. Miller and told him that there may be a problem?

10       A.   I sure did.

11       Q.   What did you do?

12       A.   I had been having discussions with Joe in our

13  house and things that he was saying to me that was concerning

14  me, worrying me, and I thought, well, if anybody can get Joe

15  to change his mind and to encourage him or whatever, it would

16  be Mr. Miller.

17       Q.   Okay.

18       A.   So I called Mr. Miller and I let him know what

19  was going on.

20       Q.   Okay.  And what did you tell him Joe had been

21  talking about?

22       MR. MARTINEZ:  Objection.  Hearsay.

23       THE COURT:  Overruled.  You can answer the question.

24       THE WITNESS:  I told Mr. Miller that Joe had been

25  talking about killing himself.

1      BY MR. PATTERSON:

2              Q.    Okay.  And to that end, what did you do?

3              A.    I told him and he said, um --

4              Q.    You called --

5              A.    I called Mr. Miller.

6              Q.    Okay.

7              A.    And I'm having this conversation with Mr.

8      Miller.

9              Q.    Okay.

10             A.    And I explained why because things were -- Joe

11     was feeling terribly, things were getting worse, he was

12     getting very depressed and I said I don't know what to do.  I

13     can't seem to pump him up out of that and so would you talk

14     to him.  And -- and so Jeffrey Miller did talk to Joe.

15             Q.    Okay.  Did you hand the phone to Joe at that

16     point?

17             A.    Yes.

18             Q.    Okay.  Were you standing by when there was a

19     conversation between Mr. Miller and Joe?

20             A.    Yes.  When they had the conversation, Joe let

21     me know that --

22             MR. MARTINEZ:  Objection.  Hearsay.

23             THE COURT:  Overruled.

24             THE WITNESS:  That it was -- that if he were to

25     proceed with these plans that he had the lawsuit would become

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    void.

2    BY MR. PATTERSON:

3        Q.    Okay.

4        A.    And he stopped and thought about that for a

5    while.

6        Q.    All right.  Do you recall when this telephone

7    conversation occurred with Mr. Miller and Joe?

8        A.    Probably around May.

9        Q.    All right.  We've gotten to the point yesterday

10   that you had just made the joint decision to begin the

11   chemotherapy treatments.  Let's talk about what the

12   chemotherapy process entailed for both Joe and for you,

13   okay?

14       A.    Okay.

15       Q.    When to your recollection was the first

16   chemotherapy treatment?

17       A.    In July of 2000.

18       Q.    Okay.  And was it at Dr. Kellogg's office?

19       A.    Yes, it was.

20       Q.    Okay.

21       A.    And in Chandler --

22       Q.    Did you have a meeting with Dr. Kellogg at that

23   first therapy session?

24       A.    No.  I don't recall seeing Dr. Kellogg at the

25   first session.  Actually, when we checked in, a nurse took us

1   back to this room where there was a bunch of Lazy-Boys that

2   people sit in to receive their chemo.

3          Q.    Okay.  Was that at the Chandler Regional

4   Hospital?

5          A.    It's a part of it.

6          Q.    Okay.

7          A.    It's actually off -- off to the side.

8          Q.    Medical offices on the --

9          A.    Yes.

10          Q.    -- campus of Chandler --

11          A.    Yes.

12          Q.    -- Regional?

13          A.    Yes.

14          Q.    All right.  Take you in a room with

15   barcoloungers basically?

16          A.    Yeah.

17          Q.    Nurses were involved with the process?

18          A.    Right.

19          Q.    Okay.

20          A.    I know they checked -- they did stuff on him

21   first before hooking him up to the IV.

22          Q.    Blood pressure?

23          A.    All that, yeah.

24          Q.    Okay.  Obviously he's in the barcolounger.  Do

25   they bring something to the barcolounger to administer the

1   chemical?

2           A.    They do.   They bring an IV stand over and bags

3   of stuff.   I recall one of them being bright red.   And they,

4   you know, hooked up the IV to his arm and explained that this

5   would be, I believe, it was almost a six to eight hour

6   process.   And there was books and a TV and things that if he

7   wanted to occupy himself with that while this stuff was going

8   into his body, he could.

9           Q.    Okay.   At this first session, did he have a

10   full head of hair?

11          A.    Yes, he did.

12          Q.    Okay.   Do you recall what time of the day you

13   would arrive and then what time you would leave at the

14   conclusion of the session?

15          A.    Probably around 9:00, 9:30.   It was morning,

16   midmorning, not early morning, but like midmorning.   And we

17   wouldn't be done until 5:00 or 6:00.   And then I'd drive him

18   home.

19          Q.    Okay.   And would you sit with him throughout

20   the process?

21          A.    Yes, I did.

22          Q.    Okay.   Is there any -- could you observe any

23   pain associated with the process, burning, anything of that

24   nature?

25          A.    No.   The -- the stuff actually going -- chemo

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1   going into his body, he didn't -- you know, it was cold.

2   That's the only -- there's a sensation of cold.  And probably

3   halfway through the day it would start upsetting his stomach.

4        Q.    Make him nauseous?

5        A.    Yes, it would.

6        Q.    And did he vomit?

7        A.    He never threw up.  He would just turn a little

8   bit pale.  You could tell he wasn't feeling too good, and I

9   believe they gave him something for the nausea.

10       Q.    Okay.  Put something in the bag?

11       A.    Right.

12       Q.    Okay.  Was he able to walk out of the session

13  room to the car?

14       A.    Yes.

15            MR. MARTINEZ:  Objection.  Lack of foundation.  It's

16  my understanding she never was there long enough.

17            MR. PATTERSON:  That's not --

18            THE COURT:  Overruled.

19            MR. PATTERSON:  -- what she said, Judge.  She took

20  him home.

21            THE COURT:  Answer the question.

22            THE WITNESS:  Yes.  He walked to the vehicle, but I

23  drove him.

24       BY MR. PATTERSON:

25       Q.    He got in the passenger side and you --

1       A.      Yes.

2       Q.      -- drove him home?

3               Okay.  Did he indicate to you whether or not

4    the process was painful, the process was distasteful,

5    anything like that?

6       A.      It was -- it was very distasteful.  He didn't

7    like it.  He didn't want to be doing it.  He was very upset

8    about it.  And he does not like any type of not feeling well.

9       Q.      Okay.

10      A.      And that nausea just -- it made him pretty

11   upset.

12      Q.      Okay.  When you got home, did you stop on the

13   way home to a Blockbuster and get the movies or was that some

14   other time?

15      A.      No, we did that.

16      Q.      Okay.

17      A.      Because the -- the doctor told us after chemo

18   probably you're not going to be up and around very much.  So

19   Joe loved to watch movies so we stopped at Blockbuster and

20   represented several movies.

21      Q.      Okay.  Did he go to bed when he got home?

22      A.      Yes.  He went to the master bedroom and --

23              MR. MARTINEZ:  Objection.  Asked and answered

24   yesterday.

25              THE COURT:  Overruled.


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1          THE WITNESS:  I brought liquids.  He liked Gatorade,

2     things like that, so he was able to drink things, but he

3     wasn't ready to eat anything.

4     BY MR. PATTERSON:

5          Q.    Okay.  The next day when he awoke, what was the

6     circumstance?

7          A.    He slept in and I went to work.  I -- we had

8     several telephone conversations.  He was okay.  He was

9     watching a movie and --

10         Q.    Who was taking care of the kids?

11         A.    Gia.  We had a babysitter.

12         Q.    Okay.

13         A.    And so he was -- he wasn't 100 percent at all,

14    but he -- he wasn't sick and throwing up in bed either.

15         Q.    Okay.  The day after is he getting

16    progressively better in terms of the nausea --

17         A.    Yeah.  He --

18         Q.    -- lethargy, that kind of thing?

19         A.    Probably about the third day he was up and

20    about driving around, doing his stuff, whatever he did.

21         Q.    Okay.  How much time elapsed then before the

22    second -- is it cycle?  Is that what we're talking about

23    here?

24         A.    Right.  I know we had to wait three weeks in

25    between treatments, so I don't know the date of the second

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    one, but it would have been in August sometime.

2         Q.    Okay.  Is it essentially the same process the

3    second time though?

4         A.    Yes.

5         Q.    Okay.  And describe it.  We're talking --

6         A.    The effects of it are stronger now because the

7    first one obviously weakened your body.  And so the second

8    one he was feeling a little bit more symptoms --

9         Q.    Describe --

10        A.    -- as far as --

11        Q.    Describe the symptoms he demonstrated?

12        A.    A lot more.  A lot more nausea to the point we

13   were -- they prescribed him some pills to take that would

14   help once he got home.  And I believe on the second one, it

15   was either second or the third one, I was not able to stay

16   all day and so his father drove up.  I took him there and

17   stayed for a little bit until his dad got there.

18        Q.    Okay.

19        A.    And then his dad stayed with him and brought

20   him back.

21        Q.    All right.  His dad brought him back to

22   apartment 132 at San Riva?

23        A.    Actually, brought him back into the office.

24        Q.    Okay.

25        A.    Came into -- Joe came into the office, sat in

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    the kitchen and that's where we talked.  I asked him how

2    things went.

3              Q.    Is his hair at this point still intact or is he

4    starting to lose his hair?

5              A.    It's thinning.

6              Q.    Is it noticeable?

7              A.    When you see him everyday, it's -- it's hard to

8    really tell, but when I look back at pictures, you can.  You

9    can tell that it was thinning.

10             Q.    Okay.  Did the fact that he was losing his hair

11   upset him?

12             A.    Highly upset him.

13             Q.    Okay.

14             A.    He did not want to lose his hair.

15             Q.    All right.  When you're in the office, you're

16   talking about the second session.  Is he describing to you an

17   increase in terms of the -- the distastefulness of the

18   process?

19             A.    I believe that after that he and his father had

20   actually stopped and got something to eat.

21             Q.    Okay.

22             A.    And I was surprised at that.  I was like, oh,

23   okay, so, you know, I -- I believe the pills that he was

24   taking helped --

25             Q.    Okay.

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1        A.    -- that part of it.

2        Q.    All right.  You went back to 132 after he came

3   home, right?

4        A.    Yes.

5        Q.    All right.  And what was that evening like?

6        A.    That evening's okay.  He basically would stay

7   in bed and I would, um -- um, just, you know, sit with him on

8   the bed, the kids would come in there, we would hang out with

9   him or whatever, and then -- or, um, if my mom or dad could

10  be there, they would keep the kids.  It just depended on what

11  circumstances were going on.

12       Q.    Okay.  And how much time now has elapsed

13  between the decision to have chemotherapy through this second

14  cycle?

15       A.    Well, maybe a month, little over a month.

16       Q.    Okay.

17       A.    Probably a month.

18       Q.    Has Dr. Kellogg indicated to you how many total

19  cycles can be had in terms of the chemotherapy regimen?

20       A.    Of that chemo cocktail he was receiving he

21  could only receive 9 sessions of that.

22       Q.    Okay.  And did Dr. Kellogg ever tell you that

23  persons are more likely to pass away after a certain cycle?

24       A.    Well, he told us that the effect of the chemo

25  drugs are very toxic on the body and as far as your heart,

1    your liver, your kidneys, things like that, but you -- his --

2    the way he presented it was you have to weigh out whether or

3    not it's doing anything for your cancer and how much damage

4    it is creating in your body.  It's -- it's -- you're  really

5    kind of backed into a corner.

6            Q.   Did he ever tell you at a precise point in time

7    people are going to die from this stuff?

8            A.   No.

9            Q.   Okay.  You've completed the second -- and is

10   cycle term of arte here or --

11           A.   I don't know.  Second session.

12           Q.   Okay.  We'll call a session.

13           A.   Okay.

14           Q.   Is it at this point where you go back to Dr.

15   Kellogg and he begins to determine whether there's been any

16   improvement in the condition?

17           A.   Um, I know after the third session is -- I

18   don't recall specifically, if it was after the third or the

19   fourth session.

20           Q.   Okay.  Let's go on then.  It certainly wasn't

21   after the second session?

22           A.   No, it wasn't.

23           Q.   Okay.  After the second?

24           A.   It was either after the third or fourth.

25           Q.   Let's get on to the third then.  When is that

1    scheduled in relation to the second session?

2         A.    Well, three weeks after.  You know, it's -- I

3    can't tell you a specific date.

4         Q.    Okay.  Three weeks?

5         A.    Three weeks or so.

6         Q.    Did you escort Joe to the --

7         A.    The third one, yes.

8         Q.    Okay.  And did you remain with him throughout?

9         A.    I was able to, yes.

10        Q.    And did you drive him home?

11        A.    I brought him home.

12        Q.    Again, what is the condition of his hair by the

13   third session?

14        A.    By the third one, it's -- it's thinning and we

15   came home that week after the session, we had clippers in the

16   house that you buzz men's hair with, and he asked me to go

17   ahead and just buzz all his hair off.

18        Q.    Okay.  It had become thin and patchy?

19        A.    No, it wasn't patchy.  It was just thinning.

20        Q.    Okay.  And so it was decided to go ahead and

21   just --

22        A.    Yeah.  We were in the master bedroom, or

23   bathroom, excuse me, and that's where I remember, you know,

24   he went over and I shaved off all his hair.  And it was quite

25   shocking.

1        Q.        Okay.  How did it affect him?

2        A.        Oh, it was awful.  He -- he started wearing

3    caps and things because he didn't want anybody to see that.

4    He was -- he was very self-conscious of it.

5        Q.        Okay.  Did he make a comment to your daughter

6    about his new condition?

7        A.        Not to my daughter.

8        Q.        Your son?

9        A.        Yes.

10       Q.        What did he say?

11       A.        Well, Nicolas wanted to know what had happened

12   to daddy's hair, and Joe turned around and he said, "This is

13   what your mom did to me."

14       Q.        Okay.  This is after the third session?

15       A.        Yes.

16       Q.        Okay.  Describe for me the third session.  Same

17   set up, barcolounger, drip system so to speak?

18       A.        Same thing, yes.

19       Q.        Okay.  Your observation of the symptoms at that

20   time, nausea?

21       A.        Still feeling very nauseous, more depressed,

22   more angry, nose -- difficulty in breathing, pain.  He would

23   get pain in his back and we didn't understand that.  And, um,

24   it was scary.  We didn't know what was going on.  And we

25   didn't realize that your lungs do -- can create pain in your

1    back.

2              Q.    Does it appear that the chemotherapy is

3    improving his physical condition at all?

4              A.    No.

5              Q.    Okay.

6              A.    No.

7              Q.    Is it in fact aggravating?

8              A.    It is aggravating everything.  It's making it

9    worse, making him more temperamental.  The quality of his

10   life was just terrible at that point.  He was pretty mad at

11   the world.  He was mad at -- he was mad he had to take the

12   chemo, he was mad he had the cancer, he was mad he wasn't

13   healed, he was mad he couldn't eat food he wanted to eat.  He

14   was just very upset, just --

15             Q.    You thought it was perhaps after the third

16   session that Dr. Kellogg sat down with you again and

17   discussed with you the results of the chemotherapy?

18             A.    Yes.  I know at one time that Joe was scheduled

19   for another CAT scan.

20             Q.    Okay.

21             A.    And that's when we talked to Kellogg because

22   another CAT scan was done.

23             Q.    Okay.  It may have been after the fourth or --

24             A.    Third or fourth, yes.

25             Q.    Okay.  What were you presented by Dr. Kellogg

1     as a result of the CAT scan?

2          A.     That there was no shrinkage of the tumors at

3     all, and that was very disappointing for us.

4          Q.     Why were -- why was it disappointing?

5          A.     Because we really -- you know, you keep

6     grabbing on to something and hoping that it will work, and so

7     we hoped that the chemo would shrink his tumors because

8     there's no other options now.

9          Q.     This was the last --

10         A.     This is it.

11         Q.     -- chance?

12                Okay.   There was a fourth session that you

13    recall?

14         A.     I believe so, yes.

15         Q.     Okay.   Was it the same initial process that you

16    described for the first, second and third sessions?

17         A.     Yes, it is.

18         Q.     Okay.

19         A.     It's more -- more chemical being pumped into

20    your body.

21         Q.     Okay.   Was that the one that was in September?

22         A.     Yes.

23         Q.     Okay.

24         A.     And there was a bigger lapse between the third

25    and fourth because Joe was out of town.

1        Q.    Okay.  Where -- where had he gone?

2        A.    I went with him to visit his sister in Memphis.

3        Q.    Okay.

4        A.    Actually, it wasn't -- it's a suburb of that,

5    but I can't recall the name.

6        Q.    All right.  So the fourth session is, what, in

7    the latter part of September?

8        A.    Yes, it is.

9        Q.    Okay.  Do you escort him over for that session?

10       A.    Yes, I did.

11       Q.    Do you bring him back?

12       A.    Yes.

13       Q.    What is his demeanor as a result of the fourth

14   session of chemotherapy?

15       A.    In the car on the way home, to use his

16   terminology, he said this is bull shit.  He felt horrible,

17   he's lost his hair, it's not working.  "Why do I have to keep

18   doing this?"

19       Q.    Okay.  All right.  Is he having difficulty

20   breathing at this time?

21       A.    He does.  He has more shortness of breath.  You

22   know, you could take that a deep breath and exhale, and he

23   wasn't able to do that.

24       Q.    Okay.  Did Dr. Kellogg describe for you what

25   the mechanism of death would be or how he would pass away?

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    What did Dr. Kellogg tell you in that regard?

2              A.    Yes, he did.  He said that Joe would slowly

3    suffocate to death.  In essence, it's like drowning in air is

4    how he described it.

5              Q.    Okay.  How did Joe react to that?

6              A.    He said there was no way he wanted to die like

7    that.

8              Q.    Does your mom have some background in

9    respiratory therapy?

10             A.    Yes.  She is a licensed respiratory therapist.

11             Q.    Were there times she would come over and

12   massage Joe?

13             A.    A lot of times she'd bring her equipment over,

14   listen to his lungs and try to see if they were filling up or

15   how much of the lung was being taken up by the tumor.  You

16   know, things like that.

17             Q.    All right.  Let's talk about another category

18   in this case.  Let's talk about life insurance.

19             A.    Okay.

20             Q.    When you folks were first married, did you

21   folks have life insurance?

22             A.    Yes.

23             Q.    Okay.  Was it reciprocal on both parties or

24   just on one person's life initially?

25             A.    I had one policy that I had before I met Joe,

1    and Joe had -- had a couple of policies before he met me.

2         Q.    Okay.  Was one of the policies that was in on

3    Joe's life a policy that had been purchased by his parents?

4         A.    Yes.

5         Q.    Okay.  And do you recall the face amount of

6    that policy?

7         A.    Actually, there was two that had been paid for

8    by his parents, but one in particular was a $5000 policy.

9         Q.    All right.  And who were the beneficiaries of

10   that policy?

11        A.    His parents.

12        Q.    Okay.  You had no interest whatsoever in that

13   policy?

14        A.    None whatsoever.

15        Q.    Okay.  After you guys got together, did you go

16   out and buy additional policies of life insurance?

17        A.    Yes, we did.

18        Q.    Okay.  How many?

19        A.    I believe there was three or four additional

20   ones on Joe.

21        Q.    Okay.  And obviously they came with premiums?

22        A.    They did.

23        Q.    Okay.  And were the -- were the premiums paid

24   on those policies initially?

25        A.    Yes.

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1     Q.     Okay.  Did there come a time when the economics

2  of your relationship caused to you cut corners on certain

3  things?

4     A.     Yes.

5     Q.     Okay.

6     A.     When we lost AccuGlass, we had to let go of a

7  lot of stuff.

8     Q.     Okay.

9     A.     And the insurance was one of them.

10    Q.     All right.  So the policies of life insurance

11  that you had at some point lapsed because you didn't pay the

12  premiums?

13    A.     Yes.

14    Q.     Okay.  But that one policy lived on, right?

15    A.     It did.

16    Q.     Okay.  At some point in time when you become

17  aware that Joe is in serious medical difficulty, did you and

18  Joe decide to try and get additional life insurance policies?

19    A.     Yes, we did.

20    Q.     Okay.  What kind of discussions did you have in

21  that regard?

22         MR. MARTINEZ:  Objection.  Lack of foundation when

23  this happened.

24         THE COURT:  Sustained.

25  / / / / /

1    BY MR. PATTERSON:

2           Q.    When did these discussions first begin?

3           A.    They first began around -- probably around May,

4    June of 2000.

5           Q.    Okay.  And it was at a time when he was in --

6    in significant medical difficulty?

7           A.    Yes.  That was when he was making the decision

8    to do the chemotherapy and not knowing what was going to

9    happen and knowing that even if he didn't do anything he

10   really didn't have that much time left to live, but we were

11   still going to try chemo so he really wanted to have a life

12   insurance policy to leave behind.

13          Q.    Okay.  And for whose benefit?

14          A.    For Nicolas and Ashley.

15          Q.    Okay.  You were mindful though of the fact with

16   his medical condition there might be some problems?

17          A.    Yes.  I was very mindful of that.

18          Q.    Okay.  Nevertheless did Joe encourage you to

19   try to access some life insurance?

20          MR. MARTINEZ:  Leading.

21          THE COURT:  Sustained.  Don't lead.

22   BY MR. PATTERSON:

23          Q.    Well, what did Joe instruct or advise you to do

24   in that regard?

25          MR. MARTINEZ:  Objection.  Leading.  Never -- we

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    don't know he did.

2             THE COURT:  Objection is leading?

3             MR. MARTINEZ:  Yes.  We don't know if he did instruct

4    her.

5             THE COURT:  Sustained.  Rephrase the question.

6    BY MR. PATTERSON:

7             Q.    Did you and Joe have a discussion about

8    accessing life insurance policy?

9             A.    Yes.  Joe asked me, as in everything else we

10   had done, to do some research and find out if there's a

11   company out there that we could get an insurance policy for

12   him.

13            Q.    Okay.  And what was the first step you took in

14   that process?

15            A.    The first step I took would have been -- I

16   didn't really know to call agents or what to do, so I just

17   went on the internet and typed in "insurance."

18            Q.    Okay.

19            A.    And it brought up a page of a bunch of

20   insurance companies.

21            Q.    All right.  At some point in the process did

22   you call the life insurance agent that had sold the policy

23   that was still in existence on Joe's life?

24            A.    Actually, the premium for that policy had

25   been -- the bill had been mailed to our house, and it was

1   like for $60 or something, and Joe said why don't we see if

2   this one can be raised from $5000 to whatever they would

3   allow?

4          Q.   Okay.

5          A.   And he was trying to get close to $100,000.

6          Q.   All right.  Let me show you what's been marked

7   as Exhibit 211, as an exhibit in this case.  Did you make a

8   phone call to the insurance agency that was the broker for

9   that policy?

10         A.   Yes, I did.

11         Q.   Okay.  How did you get the number for that

12  office?

13         A.   I believe it was in the paperwork.  Joe and I

14  were in the living room and he -- he handed me the number to

15  call.

16         Q.   Okay.  You made the phone call -- that claims

17  it was in August.  Does that square --

18         A.   It says --

19         Q.   -- with your recollection?

20         A.   Yeah.  It says August 10.

21         Q.   Okay.  Did you speak with anybody?

22         A.   I did.

23         Q.   Okay.

24         A.   And I introduced myself and just gave her

25  briefly what we wanted to do.  And she would not discuss

1    anything with me because I was not on the insurance, I was

2    not a beneficiary, I had no interest in the policy at all,

3    and she said that only Joe could speak to them.

4           Q.    Okay.

5           A.    So I handed the phone to Joe.

6           Q.    All right.  Did Joe have a conversation with

7    that person?

8           A.    Just a brief one, leaving a message for the

9    agent to call him.

10          Q.    Okay.  And what phone number is described on

11   that message?

12          A.    It says "mobile" and it says "Joe."

13          Q.    Okay.  And what's the number?

14          A.    And the number is 602-618-9177.

15          Q.    And whose mobile phone number is that?

16          A.    That is Joe's mobile phone number.

17          Q.    Okay.  Do you have a mobile phone as well or

18   did you have a mobile phone back at that time?

19          A.    Yes, I did.

20          Q.    Was your mobile phone number different from

21   that mobile phone number?

22          A.    Yes, it was.

23          Q.    Did you thereafter have any conversations with

24   any persons at this insurance brokerage?

25          A.    I did not.

1      Q.    Okay.  Okay.  Back to the internet accessing,

2  do you recall what month the internet stuff was commenced?

3  Was it at or near the same time as the --

4      A.    It could have been before that.  I believe it

5  was before that.

6      Q.    Okay.  In any event, did you have some

7  conversations with certain life insurance sellers?

8      A.    Yes.

9      Q.    Okay.  You recall that tape we heard the

10  other --

11      A.    Yes.

12      Q.    -- several weeks past?

13          Okay.  Was that you on the tape?

14      A.    Yes, it was.  That was me.

15      Q.    Okay.  How did that conversation come about?

16      A.    On the internet they have applications that you

17  fill out, so I filled them out or filled out whatever, you

18  know, information they were requesting, and that's when I

19  started receiving phone calls.  And that was one of the phone

20  calls that had happened.  And I received from several

21  different companies.

22      Q.    All right.  Did you give them your home phone

23  number?

24      A.    Yes.

25      Q.    Okay.  Did you receive phone calls at home

1    concerning the life insurance application?

2         A.    Yes.

3         Q.    Okay.  Was Joe aware that those phone calls

4    were coming in from life insurance companies?

5         A.    Yes, because he was home more than I was and

6    answered the phone more than I did, so --.

7         Q.    Okay.  There are certain questions in that

8    application that you provided false answers to, correct?

9         A.    Yes, sir.

10        Q.    And what area specifically?

11        A.    Regarding his physical well being.

12        Q.    Okay.  And why did you do that?

13        A.    We knew that -- we knew already that if --

14        MR. MARTINEZ:  I'm going to object.  She keeps saying

15   "we."  She's being asked why did "you" do it.

16        THE COURT:  Sustained.  Repeat the question.

17   BY MR. PATTERSON:

18        Q.    Did you and Joe have a discussion concerning

19   what information to provide on these applications?

20        A.    Yes, we did.

21        Q.    All right.  And what was decided?

22        A.    We decided to just put as if he was a healthy

23   male and see what happened.

24        Q.    Okay.  Did Joe have a friend named Erik

25   Vaillant?

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1        A.     Yes, he did.

2        Q.     Okay.  And is this the Erik Vaillant that was

3   in the photograph that we saw here at the pool party?

4        A.     Yes.

5        Q.     Okay.

6        MR. MARTINEZ:  Objection.  What exhibit are we

7   talking about?

8        MR. PATTERSON:  Well, I could go through all the

9   photographs.

10       THE COURT:  Overruled.

11       MR. PATTERSON:  The photograph was displayed.

12       THE COURT:  Overruled.

13   BY MR. PATTERSON:

14       Q.     Was there a photograph we saw in the course of

15   this trial that showed Erik and Joe at a pool party?

16       A.     Yes.

17       Q.     Okay.  Was there a photograph during the course

18   of this trial that displayed Erik in the company of Joe and

19   you at the lake?

20       A.     Yes.

21       Q.     Okay.  Would Joe go -- would Joe and Erik go to

22   the lake --

23       A.     Yes.

24       Q.     -- for recreation?

25       A.     Yes.

1          Q.     Okay.  And this is the same Erik Vaillant that

2    testified in court?

3          A.     Yes.

4                 (Pause in proceedings.)

5          MR. PATTERSON:  Judge, if I could approach the

6    witness with Exhibit 464?

7          THE COURT:  Yes.

8    BY MR. PATTERSON:

9          Q.     Okay.  Does this appear to be a photocopy of a

10   document that you're familiar with?

11         A.     Yes, it is.

12         Q.     Okay.  What is it a photocopy of?

13         A.     This is a photocopy of the phone numbers that

14   were in his daytimer book.

15         Q.     Okay.  Whose daytimer book?

16         A.     My husband's.

17         Q.     Okay.  And was this a document that was in your

18   apartment as of October 2000?

19         A.     Yes, sir.

20         Q.     Okay.  Do you recognize his handwriting?

21         A.     Yes, I do.

22         Q.     Okay.  Is there an entry there for Erik

23   Vaillant?

24         A.     Yes, there is.

25         Q.     Okay.  And spell the entry for us?

1          A.    It's spelled E-r-i-k, and the last name is

2   V-a-i-l-l-a-n-t.

3          Q.    Does it have a phone number?

4          A.    Yes, it does.

5          Q.    What is that phone number?

6          A.    659-5866.

7          Q.    Okay.  So Joe and Erik were friends?

8          A.    Yes.

9          Q.    Okay.  Did there come a time when there was a

10  decision made between you and Joe to try and enlist the

11  assistance of Erik in -- in acquiring some life insurance?

12          MR. MARTINEZ:  Objection.  Leading.

13          THE COURT:  Overruled.  Go ahead, answer the

14  question.

15          THE WITNESS:  Yes, there was.

16  BY MR. PATTERSON:

17          Q.    Okay.  What was the substance of that

18  discussion?

19          A.    The insurance companies were requiring a type

20  of physical or something, and so every time I'd get a phone

21  call, I would let Joe know, well, you have to go to do a

22  physical so this isn't going to work out.  And that's when

23  Joe said to me, well, let's see if there's a possibility that

24  somebody could stand in for him.

25          Q.    Okay.  And did he mention any specific persons?


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1          A.     Yes.   He mentioned Erik.  I didn't think it

2   would really --

3          MR. MARTINEZ:  Objection.  Beyond the scope of the

4   question.

5          THE COURT:  Sustained.  Ask your next question.

6   BY MR. PATTERSON:

7          Q.     What did you think about that?

8          A.     I didn't think it would work.

9          Q.     Okay.  Did you approach Erik nevertheless?

10         A.     I did.

11         Q.     Okay.  Tell me about that.

12         A.     I let Erik know what was going on and he

13  laughed and was like there's no way.  And I -- I agreed with

14  him but, you know, I said I had to ask anyway because --

15  try -- trying -- tried to keep Joe happy.

16         Q.     Okay.  Was there also a time that -- well, who

17  was Jimmy Yost?

18         A.     Jim Yost had been my assistant manager at San

19  Riva.

20         Q.     Okay.  In terms of physical appearance, did

21  Jimmy Yost resemble your husband at the time you were looking

22  for life insurance?

23         A.     No.

24         Q.     Okay.  What were the differences?

25         A.     Jimmy was a much bigger man than Joe, blue eyes

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1   instead of green, and much lighter color hair.  Just a lot

2   different.

3          Q.    Okay.  Did you have a conversation with Mr.

4   Yost about the topic of life insurance?

5          A.    Yes, I did.

6          Q.    Okay.  When did this happen?

7          A.    I can't tell you what month.  I mean, probably

8   July or August.

9          Q.    Was it at or near the same time you're

10  involving yourself --

11         A.    Yes.

12         Q.    -- in other -- options on the internet?

13         A.    Yes.  It's all --

14         Q.    Okay.

15         A.    -- the same.

16         Q.    All right.

17         A.    Because these were at -- were a result of me

18  putting the stuff on the internet.

19         Q.    Okay.  What was your purpose in talking with

20  Jimmy Yost?

21         A.    I was talking to Jimmy Yost about what was

22  going on with Joe and about the insurance and all that sort

23  of stuff.  And he let me know that he had a relative in the

24  insurance business, and if there was a company out there that

25  would insure Joe without requiring a physical that she would

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    know about it.

2              Q.     Okay.  So he had a relative in the industry?

3              A.     Yes.

4              Q.     Okay.  Did he ever give you her name?

5              A.     No.

6              Q.     Okay.  Did he indicate whether or not he would

7    scope it out or check it out for you?

8              A.     He did, and he made a call from my office.

9              Q.     Okay.  What was the result of that

10   conversation?  What did you do?

11             A.     He let me know there was not a company out

12   there, that there's no way this could be done.

13             Q.     All right.  Did you ever ask Jimmy Yost to pose

14   as your husband for the purposes of acquiring life insurance?

15             A.     I did not.  I only asked Erik.

16             Q.     All right.  At some point in time did it come

17   to your -- well, did -- all right.  Did you ever acquire any

18   life insurance policies on Joe's life?

19             A.     No, I did not.

20             Q.     Okay.  To this date have you ever collected any

21   life insurance benefits as a result of the death of Joe

22   Andriano?

23             A.     No, I have not.

24             Q.     Okay.  The policy that was on Joe's life for

25   benefit of his parents, do you know whether or not that was

1    paid out?

2         A.    I saw a piece of paper that said it was, yes.

3         Q.    Okay.  But the proceeds were not paid out to

4    you?

5         A.    No.

6         Q.    Okay.  At some point in time did you have a

7    conversation where Joe was present and your father concerning

8    your efforts to acquire life insurance on Joe's life?

9         A.    Yes.

10        Q.    Where did this conversation take place?

11        A.    In Casa Grande.

12        Q.    At?

13        A.    At my parent's house.

14        Q.    Okay.  Who was present at this conversation?

15        A.    My father, Joe, and I.

16        Q.    Okay.  And how did it come up that you began

17   discussing life insurance with your father?

18        A.    I was telling my dad what was going on.

19        Q.    Okay.  And did you -- did you supply us with

20   the details of what you were trying to do?

21        A.    Yes, I did.

22        Q.    Was Joe present during the course of this

23   discussion?

24        A.    Yes.  He was involved in the conversation too.

25        Q.    Okay.  What did your father tell you about your

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000005368

1   efforts in this regard?

2           MR. MARTINEZ:  Objection.  Hearsay.

3           THE COURT:  Overruled.

4           THE WITNESS:  He told us to stop.  He said you need

5   to quit doing that because that is highly illegal and you'll

6   get arrested for it.

7   BY MR. PATTERSON:

8           Q.    Okay.

9           A.    It's fraudulent.

10          Q.    Did you cease your efforts in that regard?

11          A.    Yes.  I made no further contacts with the

12  insurance companies.

13          Q.    Okay.  Did they continue to contact you

14  however?

15          A.    Very much so.

16          Q.    Okay.  Did you send information --

17          A.    They would send stuff in the mail and they

18  would call, and it was very -- very irritating.

19          Q.    Okay.  One of the proposals that was sent from

20  Amica I believe was -- did not have an apartment number,

21  okay?

22          A.    Okay.

23          Q.    Do you have any information in that regard, how

24  did you still receive that, and if so --

25          A.    Sure.

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1       Q.    Okay.  How did you receive that?

2       A.    Within each mailbox is listed your last name.

3  And the mailman, even if mail does not have an apartment

4  number on it, will put it in your mailbox.

5       Q.    Okay.  He knows the tenants?

6       A.    As long as the last name matches, that's where

7  it goes.

8       Q.    Okay.  Did you do anything to try and keep Joe

9  from knowing about these life insurance applications?

10      A.    That would have --

11      Q.    Policies?

12      A.    -- been impossible since he's the one that

13  requested I do this.

14      Q.    All right.

15          Let's talk about another area here, Rick

16  Freeland.  Okay?  Who is Rick Freeland?

17      A.    He was a resident at San Riva apartments and he

18  was also a person that I had an affair with.

19      Q.    Okay.  Was he your friend?

20      A.    Very much so.

21      Q.    Okay.  When did you first come to know Rick

22  Freeland?

23      A.    One of the apartment locators had brought him

24  over on a Sunday to rent an apartment, and the leasing agent

25  was busy with another couple, so I -- I came out and

1    proceeded to give them a tour of San Riva.

2         Q.    Okay.  After the tour did you go back to the

3    office?

4         A.    Yes.

5         Q.    Okay.  And did he agree to become a tenant at

6    that point?

7         A.    Yes.  He sat down with a locator and filled out

8    all the paperwork and rented an apartment.

9         Q.    Okay.  Was this in your office?

10        A.    No.  We were sitting out in the leasing area.

11        Q.    Okay.  Went through paperwork, he became a

12   tenant?

13        A.    That's right.

14        Q.    Okay.  Was it purely a resident manager-tenant

15   relationship at that point?

16        A.    Yes.

17        Q.    Okay.  He moves in -- when does he move in, do

18   you recall?

19        A.    Might have been February or March of 2000.

20        Q.    Okay.  Where is his apartment in relationship

21   to your office?

22        A.    When you drive into the north entrance and the

23   office is there, the first building that faces Liberty Lane.

24   He was in that building.

25        Q.    Okay.

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1          A.    He faced north, the street.

2          Q.    And where is that building in relationship to

3     your building that housed unit 132?

4          A.    Well, mine is in the back, so it's several --

5     it's a ways away.

6          Q.    Okay.  He moves in.  At some point in time did

7     you have occasion to meet him socially on the premises?

8          A.    Actually, I met him in a business fashion for

9     quite some time.

10          Q.    All right.  Explain to me that concept?

11          A.    He needed to move in quickly, and so the

12     apartment -- the only apartment that we had available was not

13     market ready yet.  In other words, maintenance still needed

14     to go in there and do some things, housekeeping still needed

15     to go in and clean.

16          Q.    Clean the carpets, paint the walls?

17          A.    Exactly.  Um, so he moved in with the

18     understanding this would be done after he moved in.  So

19     several times during the next month or so, he would come into

20     the office to let me know he found something else that needed

21     to be fixed or whatever the deal was.

22          Q.    Okay.

23          A.    And he would always come in and tell me instead

24     of anybody else.

25          Q.    Okay.

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1      A.    Probably because I'm the one that rented to

2    him.

3      Q.    Okay.  Would he go into your office at times?

4      A.    Yes.  That's where he would -- he would walk in

5    the front door and come into my office.

6      Q.    Okay.  This is the office as you earlier

7    described as you come in from the front door, it's on the

8    left?

9      A.    Yes.

10      Q.    Okay.  Did you have family pictures in your

11    office?

12      A.    Yes, I did.

13      Q.    Okay.  Those family pictures, who did they

14    include?

15      A.    My husband and my two children and myself.

16      Q.    Okay.  All right.  So, again, we're still

17    talking purely rental resident manager-tenant relationship at

18    this point?

19      A.    Yes, we are.

20      Q.    Okay.  After the initial circumstances, you

21    know, correcting the problems with the apartment, did you see

22    him thereafter at other occasions on the premises?

23      A.    In the office.  He kept coming into the office

24    and -- yes, he kept coming into the office

25      Q.    Okay.  Did he make an effort, did it appear, to

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1   talk to you?

2       A.    Yes.  That's how we began a friendship.

3       Q.    Okay.  Was it flattering initially?

4       A.    No.  He was just easy to talk to.  He was a

5   nice guy and, you know, as you're talking about things about

6   your apartment, you find out why he moved out of his old

7   apartment, and just -- we just started finding out things

8   about each other and it was a fun thing.

9       Q.    Okay.  At some point in time did it come to

10  your attention he had lost some loved ones too?

11      A.    Yes.

12      Q.    Was that in the early part of this?

13      A.    No.  That was after our first social outing.

14      Q.    Okay.  We'll get to that then.

15            So he's coming in, you're talking, he's a nice

16  guy, friendly guy.  He's a good looking guy?

17      A.    Yes, he is.

18      Q.    Okay.  Were there circumstances then on site

19  where you'd have pool parties, that kind of thing?

20      A.    We had pool parties and I saw him on a daily

21  basis because we had a fitness center right there next to the

22  office and he always went in there to workout.  And when he'd

23  go in there to workout, when he was done, he'd come into the

24  office to get some water and chit chat.

25      Q.    Okay.  So how much time has elapsed here and

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    how many times have you chit chatted with Mr. Freeland?

2        A.    I would say a good month and a half, two

3    months.

4        Q.    Okay.  Nothing social at this point?

5        A.    No.

6        Q.    Okay.  Tell me about the first time then when

7    something social developed?

8        A.    It was a Sunday and Stephanie and I were

9    working in the office.  I had to work five hours on Sunday.

10    And at about 4:00 in the afternoon, he pops in in his swim

11    trunks.  He doesn't come all the way into the office, he just

12    kind of opened the door because he was wet from the pool.

13        Q.    Okay.  The office proper for your --

14        A.    The front -- no, not my office --

15        Q.    Okay.

16        A.    -- office but the building.

17        Q.    Okay.

18        A.    Popped his head in and said hi.  And I went out

19    front because we're the only two working.  So he and his

20    friend -- we have windows that face the whole pool so we

21    could see, but he had a lot of buddies over there and stuff

22    and he asked us if we would like to come and eat barbecue

23    with them.

24        Q.    Okay.  Did he mention the location where

25    everybody was doing --

1          A.      Right there at the pool.

2          Q.      So he was cooking?

3          A.      They were cooking, yes.

4          Q.      Okay.  Where was Joe at this point?

5          A.      Joe was in Casa Grande.

6          Q.      Okay.  What did you say?

7          A.      I said no.  I said I have to go home after work

8     and make dinner, things like that.

9          Q.      Okay.  For the kids?

10         A.      Uh-huh.

11         Q.      Okay.

12         THE COURT:  Is that a "yes"?

13         THE WITNESS:  Yes, sorry.

14   BY MR. PATTERSON:

15         Q.      Okay.  Did he persist?

16         A.      He sent somebody else in to ask and we laughed

17    about it.  It was, you know, one of those things where you'd

18    like to go, but you -- probably not.  You know, we probably

19    shouldn't do that, but Stephanie and I sat there for the next

20    hour watching them having fun in the pool, this, that and the

21    other, and decided we would go ahead and go out.  And I made

22    a phone call down to Casa Grande and just let Joe know that I

23    would be at the pool --

24         Q.      Okay.

25         A.      -- at a barbecue.

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1      Q.      Did you actually have telephonic contact with

2   Joe?

3      A.      I did.

4      Q.      Okay.  Where did you go?

5      A.      I went home first, changed out of my work

6   clothes, and so did Stephanie.  Then she met me at my

7   apartment and --

8      Q.      What about the children?

9      A.      Joe had the children down in Casa Grande.

10     Q.      Okay.

11     A.      And we then we walked up to the pool and went

12  inside and ate dinner with them, and they were playing

13  football a little bit and stuff like that, so we just

14  socialized.

15     Q.      Okay.  How long did this particular barbecue

16  last?

17     A.      We were probably there two hours.  And during

18  those two hours I spent most of my time sitting on a lawn

19  chair talking with Rick.

20     Q.      Okay.  What did you guys talk about?

21     A.      Everything, and just any kind of conversation.

22  Just what do you like to do, what are your hobbies, just

23  things like that.  Just personal information.

24     Q.      Was he easy to talk to?

25     A.      Very easy.


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1      Q.    And was that by way of contrast with the

2  situation you had with Joe?

3      A.    Yes.

4      Q.    Okay.  Distinguish that for me?

5      A.    By this time my relationship with Joe has

6  changed because and I -- I really feel like it's because of

7  the sickness, because of the cancer.  He was very, very angry

8  and chose to take that anger out on me.  And I never knew one

9  moment from the next whether or not, you know, I was going to

10  get yelled at or if he was going to be okay.  Walking in the

11  door at home was just -- I didn't know what to expect with

12  him, so it was kind of like walking on eggshells with him.

13      Q.    Okay.  And contrasting that with the

14  conversation you had with Mr. Freeland?

15      A.    With Mr. Freeland I could just, you know, I

16  didn't have to worry about him yelling at me or wanting

17  something or demanding something or any of that stuff.  We

18  were just two people sitting there talking.

19      Q.    Okay.  Did the barbecue wrap up at some point?

20      A.    It did.

21      Q.    Okay.  And what happened then?

22      A.    They were all going to go to Rockin' Rodeo.  I

23  guess on Sunday nights it had a -- some special something

24  there, I don't really know, but they asked us to go with

25  them.

1    Q.    Okay.  Did you go?

2    A.    Yes.

3    Q.    And you say "we."  Who left?

4    A.    Stephanie and I got into -- I can't recall his

5    name, one of Rick's friend's vehicles.  He had a larger

6    vehicle and everybody piled into there and I left a note at

7    home telling Joe that I was going out, so --.

8    Q.    Okay.  Were you able to make telephonic contact

9    with Joe?

10   A.    I couldn't reach him on his cell phone, so

11   that's why I left a note at the house.

12   Q.    And where did you guys go?

13   A.    We went to Rockin' Rodeo.

14   Q.    Do you recall what time you got there?

15   A.    Around 9:00.

16   Q.    Okay.

17   A.    8:30, 9:00.

18   Q.    What did you do when you got there?

19   A.    Actually, all the guys wanted to play pool, so

20   we all went to the pool table area and watched the guys play

21   pool and this, that and the other, and had a couple of

22   drinks.  And while they're playing pool, Rick and I are

23   continuing our conversation.  And I would say that's when it

24   became -- started becoming a little bit more flattering,

25   where you could tell there was some flirtation there --

1  Q. Okay.  Was it --

2  A. -- on both parts.

3  Q. -- mutual?

4  A. Yes.

5  Q. Okay.  What did you talk about there at the

6 Rockin' Rodeo, again?

7  A. Just -- I don't know.  We just made

8 conversation.  I can't tell you specifically, but that's when

9 I found out he liked to dance, and I love to dance, and so we

10 left the pool table area and spent the rest of the evening

11 dancing.

12  Q. Okay.  Contrast that behavior with the behavior

13 with your husband.  Was Joe a dancer?

14  A. He would dance with me once at a wedding, but

15 otherwise, when we'd go out, he would let me dance with his

16 friends, but he didn't like to get out on the dance floor.

17  Q. Okay.  What time do you think it wrapped up at

18 Rockin' Rodeo?

19  A. Maybe around 11:00.

20  Q. Okay.  Had Joe called at all while you were at

21 Rockin' Rodeo?

22  A. No, he hadn't.

23  Q. What time did you get home?  Obviously you got

24 home at some point, but where did you go after Rockin' Rodeo?

25  A. Back to San Riva.

1    Q.    Okay.  Did you call it a night at that point?

2    A.    Everybody was going back up into Rick's

3    apartment and I didn't want to -- being the manager, I didn't

4    want to go up into his apartment.  And I told him, I said,

5    you know, after tonight and what's been going on, I need to

6    have a conversation with you.  And so he said, Where do you

7    want to go?  And we decided to go -- right across the street

8    is a big church and a parking lot, and there's a -- I call it

9    a ditch.  I don't really know.  It's full of river rock.

10    Q.    Like a culvert?

11    A.    I guess.

12    Q.    Okay.

13    A.    And it has a concrete wall.  And we went and

14    sat on the concrete wall and started talking.

15    Q.    Okay.  What was the topic of discussion at that

16    point?

17    A.    That's when I let him know about my personal

18    life as far as my husband having cancer, all the things we

19    had gone through, how -- and I was crying because, you know,

20    I told him that we -- how we had found out that it had become

21    cancerous now instead of benign and we didn't really know how

22    much time Joe had left to live and it was just a horrible

23    situation.  And I was --

24    Q.    Did he appear to have some empathy for your

25    circumstances?

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000005381

1    A.    He had a lot of empathy.

2    Q.    What was that based on?

3    A.    He had lost his fiancee in a car accident and

4 so he absolutely understood what I was going through.

5    Q.    Okay.  Did he -- was he supportive in helping

6 you?

7    A.    Yes.  He was so sympathetic and -- and it was a

8 relief for me to be able to tell somebody all this stuff that

9 was going on.

10    Q.    Okay.  Was this the main topic of discussion

11 there sitting on the concrete --

12    A.    Yes, it was.

13    Q.    -- fence there?

14          Okay.  How long was this conversation?

15    A.    It took a couple of hours.

16    Q.    Was there any intimacy, any touching, any --

17    A.    He gave me a hug, yes.

18    Q.    Okay.  And how about that hug?

19    A.    That was probably the first time I'd been

20 hugged in a long time and it just was wonderful.

21    Q.    Okay.  All right.  At the conclusion of that

22 conversation, where'd you go?

23    A.    Rick went back to  his apartment and I went

24 home.

25    Q.    Okay.  Joe was not home?

1      A.    Joe was home.

2      Q.    Oh.  He'd come in from Casa Grande?

3      A.    Yes.

4      Q.    Okay.  So do you recall what time you may have

5    gotten in that evening?

6      A.    About 1:00, 1:30.

7      Q.    Okay.  Were there repercussions as a result of

8    being late?

9      A.    Yes, there were.

10      Q.    What happened?

11      A.    Actually, when I got home I couldn't get in the

12    door because we had two locks on the door, one that locked

13    from the inside and one that locked on the outside.  And I

14    put my key in the door and I -- the inside lock was locked.

15    And so I knocked on the door for quite some time and nobody

16    answered.  And then I went around to the patio and climbed

17    over the patio.  And then we had the french door into the

18    master bedroom and Joe flung it open and wanted to know where

19    the "F" I had been, and this, that and the other.

20      Q.    Was there an argument?

21      A.    Yeah.

22      Q.    Was --

23      A.    Yeah.  There was -- um, a lot of yelling and

24    cussing at me and wondering where I was and calling me all

25    kinds of things, and I -- I felt -- you know, I felt a little

1    bad because yes, I had been out talking with somebody else,

2    but it wasn't -- I wasn't trying to hurt Joe.  I was just

3    trying to make it.

4            Q.    All right.  Next day or next couple of days,

5    other occasions when you see Mr. Freeland again?

6            A.    Yes.

7            Q.    Okay.

8            A.    I see him everyday.

9            Q.    All right.

10           A.    And he starts calling me from work, just

11   seeing how I was, how are you today, you know.

12           Q.    Okay.  Were you pleased that he would call?

13           A.    Yes.  It was really nice to share this burden

14   with somebody else.

15           Q.    Okay.  Was it at this time that he was involved

16   with the softball team or is that afterwards?

17           A.    He had always been involved with softball, but

18   I don't believe it was that particular team that we

19   sponsored.

20           Q.    Okay.  That develops later?

21           A.    Yes.

22           Q.    Okay.  Is there a second time when you go out

23   with Mr. Freeland?

24           A.    Yes.  Again to Rockin' Rodeo and we danced all

25   night.  It was -- it was -- I had a lot of fun with him.

1    Q.    Okay.  How many days have elapsed since this

2  first conversation and this conversation out on the culvert

3  there and --

4    A.    Probably two weeks.

5    Q.    Okay.  Where is Joe on this occasion?

6    A.    Joe had gone to Oklahoma to visit his, I

7  believe, his mom and his brother were at their farm in

8  Oklahoma.

9    Q.    Okay.  And what time of the year is this? Do

10  you recall?

11    A.    I don't know. It's Spring.  April, May?

12  Somewhere around there.  I'm not real sure.

13    Q.    All right.  How is it that you go out on the

14  second occasion with Mr. Freeland?

15    A.    Well, he was always just around.  He was always

16  coming in the office and we were talking and stuff, and so

17  then he was like, "Do you want to go out dancing again?"

18  Because he knew how much I liked it and it was just such a

19  stress reliever for me, and it was just something I could

20  enjoy doing, and so I was sure, I want to go, and we went.

21    Q.    You went and --

22    A.    We went with a group of people.  It wasn't by

23  ourselves.

24    Q.    Who else accompanied you to the Rockin' Rodeo

25  with Rick?

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000005385

1          A.     Stephanie would have gone, Chris could have

2     gone.  I'm not real sure about that on the second time, but

3     probably Chris and Stephanie and a lot of his friends.

4          Q.     A lot of Mr. Freeland's friends?

5          A.     Yes.

6          Q.     Okay.  Up to this point in time had he been in

7     your apartment?

8          A.     I don't believe Rick has ever been in my

9     apartment.

10          Q.     Okay.  So the contacts you're having with him

11     are in public?

12          A.     Uh-huh, yes.

13          Q.     Okay.  And you're going to public places --

14          A.     Yes, we are.

15          Q.     -- with colleagues from --

16          A.     Yes.

17          Q.     -- your office and also residents, other

18     residents?

19          A.     Yes.

20          Q.     Okay.  Again, you go to the Rockin' Rodeo and

21     you dance all night?

22          A.     Yes, sir.

23          Q.     Okay.  Are you doing this on the dance floor in

24     public?

25          A.     Yes.

1       Q.    Do you come home that night?

2       A.    Yes.

3       Q.    And how do you get home?

4       A.    In whatever vehicle we were in.

5       Q.    Did you come home as a group?

6       A.    Yes.

7       Q.    Okay.  What happened after you got home?

8       A.    Rick and I stayed on the sidewalk talking after

9 everybody had gone to their apartments and stuff, and um --

10 um, he asked me if I would -- if I wanted to come up and have

11 another drink or something, and I did.  I went up.

12       Q.    Went to his apartment?

13       A.    Yes.

14       Q.    Okay.  What happened then?

15       A.    We talked for a while and I know I had another

16 drink and so did he.  And as I was getting ready to leave I

17 was standing by the front door and he was walking me to the

18 front door.  And it was just -- it was one of those moments

19 where I didn't want to leave, he didn't want me to leave, you

20 could just -- and he gave me a hug.  And it was the first

21 time he kissed me.

22       Q.    What happened next?

23       A.    I just felt so much love and affection.  It

24 was -- I had never been kissed like that before.  It was very

25 comforting and romantic.  It was -- I don't know.

1       Q.     What happened next?

2       A.     I went home after that.

3       Q.     Okay.  Okay.  Was there a third time that you

4  went out with Mr. Freeland?

5       A.     Yes, sir.

6       Q.     Okay.  And in terms of time elapsing from the

7  second, how much time later?

8       A.     Actually, during the time that Joe had been

9  gone to Oklahoma, he -- I would go with Rick to some of his

10 softball games, I would go with him to eat dinner with his

11 buddies.  I just -- I just hung around him all the time.

12      Q.     Okay.  And were the children in Joe's company?

13      A.     Nicolas went with Joe and I kept Ashley.

14      Q.     Okay.  On those occasions when you would go out

15 socializing with Mr. Freeland, who was taking care of Ashley?

16      A.     Well, as long as it was just like eating dinner

17 and things like that, I kept Ashley with me.

18      Q.     Okay.

19      A.     And if it was going to be a nighttime thing or

20 whatever, then I would either have my mom come up and stay

21 with Ashley or I'd take Ashley to Casa Grande or Gia would

22 watch her.

23      Q.     Okay.  These times you're spending with Mr.

24 Freeland while Joe is in Oklahoma, again, were these in

25 public places?

1          A.     They were, but then there were a few evenings

2     that I went back to his apartment.

3          Q.     Okay.  Is it at those times that the intimacy

4     increases?

5          A.     Yes, sir.

6          Q.     Okay.  Tell me about the first time that you

7     and Rick Freeland had sex?

8          A.     It was a lot of kissing and hugging and things

9     like that, a lot of affection.  And I -- I was really happy

10    with that.  It -- like I said, I never experienced that

11    before.  It was just -- he made me feel so wonderful.  And --

12    and then we had intercourse, which, for me, I didn't really

13    care about that.

14         Q.     Why did you do it?

15         A.     I didn't want to be a tease.  I didn't want to,

16    you know, here -- I truly cared for Rick and he had been so

17    good for me.  And so I couldn't imagine saying no.  It just

18    wouldn't have been right.

19         Q.     How much time had elapsed from the first day

20    that he signed the lease agreement, you know, agreed to move

21    in, to that point in time?

22         A.     It would have been three months later or so.

23         Q.     Okay.  So you had 90 days or so of a friendship

24    with this person that didn't involve any kind of sexual --

25         A.     Right.

1      Q.      -- intimacy?

2      A.      Right.

3      Q.      Okay.  In total, how many times did you have

4   sexual intercourse with Mr. Freeland?

5      A.      Just maybe five or six times.

6      Q.      Okay.  And in terms of that first time through

7   the last time, how much time elapses?

8      A.      Well, when Joe got home from Oklahoma we had

9   gone to a pool party and that was the first time Rick had

10  ever seen Joe in person and saw -- you know, it was just like

11  in-your-face type of thing.

12     Q.      Okay.  Let me understand that conceptually.

13  You testified that you had told him that you were married,

14  that you had a husband with cancer, and that you had

15  photographs of your family in your office?

16     A.      Yes.

17     Q.      Okay.  The period of intimacy with Mr. Freeland

18  occurred during the time that Joe was out of town?

19     A.      Yes.

20     Q.      Okay.  And how long was Joe in Oklahoma?

21     A.      Two or three weeks.

22     Q.      Okay.  At some point in time, Mr. Andriano,

23  Joe, comes back to the complex, and this is the first time

24  that to your knowledge Mr. Freeland has contact with your

25  husband?

1       A.    In person, yes.

2       Q.    Okay.  And where -- where does this happen?

3       A.    At the pool party.

4       Q.    Okay.  Did that impact Mr. Freeland?

5       A.    Very much so.

6       Q.    Okay.  What happened?

7       A.    We later had a conversation.  He was like "I

8    can't do this."

9       Q.    He says "I can't do this"?

10       A.    (No response.)

11       Q.    Okay.  What did you take that to mean?

12       A.    I took that to mean that this intimacy that we

13    were engaging in was too much.

14       Q.    Okay.  What did he do?

15       A.    Well, so that was my understanding.  I

16    didn't -- I thought we could still be friends.  And after

17    that, he just absolutely ignored me.  He quit working out in

18    the fitness room, he never came in the office, just

19    disappeared.

20       Q.    Okay.  He quit -- it appeared to quit having

21    contact with you at all?

22       A.    At all, yeah.

23       Q.    Okay.  All right.  How did that affect you?

24       A.    It hurt.

25       Q.    Okay.

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1      A.    I had shared so much of my life with him, told

2   him all sorts of things, and then he just quit being my

3   friend.  I didn't understand.

4      Q.    Okay.  Did you feel like you'd lost a friend

5   there?

6      A.    I did.  I lost my best friend.

7      Q.    So what did you do then?

8      A.    When Shannon and I had gone out to a place

9   called the Sanctuary and Rick and Erik was there.  And I saw

10  Rick and I tried to talk to him, and he just walked away as

11  if he didn't even know me.  And I didn't understand, you

12  know?  I'm like trying to -- just tell me what's going on

13  because I don't understand.

14         And so when we got home that night, I went up

15  to his apartment and knocked on the door and tried to get him

16  to answer the door and he wouldn't.  He wouldn't.  He kept

17  telling me to go away.  I wanted an answer.  I wanted to

18  know, why.  Why did he do this?

19     Q.    Why did he do what?

20     A.    Why did he quit being my friend?  I didn't

21  understand.

22     Q.    So what did you do?

23     A.    Well, I stayed there for quite a -- you know,

24  30 minutes or so, pounding on his door.  I'm like, "You need

25  to come out and talk to me because I cannot handle this.

1    This is too much.  You already know how stressful my life is,

2    now you're being this way.  Explain to me.  Please, why can't

3    you be my friend?"

4              Q.    Did you ever threaten to get the pass key?

5              A.    There were no pass keys.

6              Q.    Okay.  You told us earlier about a receptacle

7    where tenant keys are.  Did you threaten to go get his key

8    and come in?

9              A.    I did not because he had those.

10             Q.    Okay.

11             A.    He didn't want his keys hanging in the box.

12             Q.    Where was Joe that day?  Or that evening?

13             A.    Joe was at the lake.

14             Q.    And how about the children?  Who was taking

15    care of the children?

16             A.    My mom.

17             Q.    Okay.  Did there come a time when you gave some

18    furniture to Mr. Freeland?

19             A.    Yes, I did.

20             Q.    Okay.  Tell me about that?

21             A.    When Rick moved in, he didn't have any

22    furniture.  All he had was his bedroom stuff.  He didn't have

23    any living room or anything else.  And -- and there was a

24    group of people that had moved out of our apartments and left

25    quite a bit of stuff.  And so when they moved out, I -- I

1    believe Rick and Erik both, they went down and carried up

2    some furniture into Rick's apartment and I let them have it.

3          Q.    Okay.  Was that discretion allowed to you as

4    the resident manager at San Riva?

5          A.    Yes.

6          Q.    Okay.  Had you given other tenants abandoned

7    property?

8          A.    Yes.

9          Q.    Or allowed them to use abandoned property?

10         A.    Yes.  We wouldn't let them use it.  We would

11    give it to them.

12         Q.    Okay.  What exactly do you think you allowed

13    Mr. Freeland to have?

14         A.    I know I let him have some living room

15    furniture and a dining room table.

16         Q.    Okay.  Did you go into your pocket at all to

17    purchase those items?

18         A.    Not into my pocket.

19         Q.    All right.  At some point in time San Riva did

20    sponsor the softball team that Mr. Freeland played for?

21         A.    Yes.

22         Q.    Tell me about that softball team?

23         A.    After some time had passed, Rick came in and we

24    talked and became friends again, so he'd keep me updated like

25    on his softball activities and work and things like that, and

1   he said that he was starting a softball team, that he was

2   going to be a captain of it, this, that and the other, but he

3   was looking for sponsors and wanted to know if we would be

4   interested in sponsoring since several of the residents from

5   San Riva were going to be participating on the team.

6         Q.    Okay.  Who might we know was also on that team?

7         A.    Well, Erik was on that team and there were a

8   couple other guys.

9         Q.    Okay.  So it appears after that evening

10   episode, knocking on the door, he changed his attitude at

11   some point?

12         A.    He did.

13         Q.    Tell me about that?

14         A.    Well, I don't know what transpired in his mind,

15   but some time had passed and he finally came into the office

16   and we made amends.

17         Q.    Okay.  You didn't rekindle the intimate

18   relationship?

19         A.    No, not at all.

20         Q.    Okay.

21         A.    Not at all.

22         Q.    All right.  So now you're sponsoring the

23   softball team.  What is entailed in sponsoring a softball

24   team?

25         A.    They needed a certain amount of money to

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    purchase shirts that would be screen printed with "San Riva"

2    on them.  And that was -- that was the main focus of

3    sponsoring is them needing money.

4         Q.    Okay.  Is that a decision you make or is it

5    made at the corporate level or --

6         A.    No.  I could make it.  It would be a marketing

7    tool.

8         Q.    Okay.  And how much do you think San Riva or

9    Fairfield invested in the venture?

10        A.    Well, we gave them 300.

11        Q.    Okay.  Would you go to these games thereafter?

12        A.    I went to a couple of them, but not very many.

13        Q.    Okay.  Was one of those games the game you

14   described involving the cheese crisp incident?

15        A.    That was the final game was they had -- they

16   had, let's see, I'm not familiar with all this terminology,

17   but they had won all their whatevers and it had come down to

18   a final game which would make them a champion or not.

19        Q.    Okay.  We've seen during the course of this

20   trial some email correspondence thereafter.  What was that

21   all about?

22        A.    It was just friendly email.

23        Q.    Okay.  Was it -- did it indicate any kind of

24   rekindling of any kind of relationship here?

25        A.    Friendship, yes.


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

# EXHIBIT Z

1      Q.   Okay.  And you mentioned going out and having a
2   drink.  Did you ever go out and have that drink with him?
3      A.   No, we never did.  The only time I ever went
4   out and had a drink was after that game we had -- we went to
5   the sports bar to celebrate, but that was as a group.
6   Everybody did.
7      Q.   Okay.  There was some mention in the emails
8   that you need -- if you need somebody to talk to.  What was
9   that all about?
10      A.   Well, that's the way our relationship had
11   been.  I had gone to him for advice on things or just -- just
12   to unload off of me and, you know, he would always give me
13   really good advice, you know, as far as how to handle things
14   at home and whatever.  So he was -- he was referring to that
15   again, that if I wanted to come to him for advice, I could.
16      Q.   Okay.  There was another gentleman that was
17   discussed during the course of this trial.  His name's Travis
18   Black?
19      A.   Yes.
20      Q.   Tell me about Travis?
21      A.   Travis Black was just one of those -- Joe had
22   gone to the lake that weekend and I went out with the girls,
23   went to Rockin' Rodeo and -- and we -- we met each other, we
24   danced on the floor, and just -- you want me to describe the
25   whole evening?  Is that --

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1      Q.    Well, let's talk about that.  What day of the

2   week, the weekend did you go with the girls to Rockin' Rodeo?

3      A.    Friday night.

4      Q.    Okay.  And who was with you that evening?

5      A.    Chris and Stephanie.

6      Q.    Okay.  Chris Hashisaki?

7      A.    Yes.

8      Q.    And Stephanie Koeppen?

9      A.    Yes.

10     Q.    And those are co-workers --

11     A.    Yes.

12     Q.    -- at San Riva?

13          Okay.  You went out to the Rockin' Rodeo.  What

14   time do you think you got there?

15     A.    We'd usually get there around 9:00 or 10:00.

16     Q.    Okay.  Who was taking care of the children at

17   this point?

18     A.    My mother.

19     Q.    Okay.  Were you drinking at Rockin' Rodeo?

20     A.    Uh-huh.  Yes, I was.

21     Q.    Were you drinking a lot at Rockin' Rodeo that

22   night?

23     A.    I was.

24     Q.    Okay.  Any particular reason you were drinking

25   heavily?

1       A.    Yes, I was.  Um, because it was a way of escape

2    from what was going on.

3       Q.    Had your drinking -- well, let's talk about

4    your drinking.  Categorize for me your drinking habits in the

5    early part of your marriage to Joe?

6       A.    I would usually drink five or so wine coolers

7    and I would be the one to drive home from bars and things

8    because Joe was a lot more drunk than I was.

9       Q.    Okay.

10      A.    I wouldn't even classify myself as being

11   drunk.  And probably after -- I think I started drinking a

12   lot more when the first time that Joe had blamed me for God

13   not healing him.

14      Q.    Okay.  Did you drink at home?

15      A.    Occasionally.

16      Q.    Okay.  So the drinking was primarily out in the

17   context of going out with the girls?

18      A.    Yes.

19      Q.    Okay.  Did your drinking become progressively

20   greater or more excessive?

21      A.    It did because if I drank more I didn't have to

22   think.

23            MR. MARTINEZ:  I'm going to object.  The question was

24   did she drink a lot.

25            THE COURT:  Sustained.  Repeat the question.


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000005400

1    BY MR. PATTERSON:

2         Q.    Okay.  And why did you drink more?

3         A.    So I could forget about all the stress that was

4    going on.

5         Q.    Rockin' Rodeo that night, when you encountered

6    Mr. Black, how much had you had to drink?

7         A.    I wasn't in any shape to drive home.

8         Q.    Okay.  Do you recall a number -- what were you

9    drinking?

10        A.    Well, at that time I drank wine -- mainly wine,

11   and then this other stuff, that Jagermeister with an energy

12   drink in it.

13        Q.    Okay.  How many of those collectively or in

14   aggregate do you think you had that night?

15        A.    I don't even know.  A lot.

16        Q.    Okay.  How much did you weigh?

17        A.    Like 100 pounds.

18        Q.    All right.  At some point in time was your

19   attention drawn to Mr. Black?

20        A.    Yes.

21        Q.    Okay.  And what were the circumstances?

22        A.    As I said before, that Rockin' Rodeo has a

23   dance floor and everybody circles around it.  And what people

24   do, they walk around in circles and there's bars at different

25   locations and the normal whatever is walking around, seeing

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000005401

1    who's there, that type of thing.  We were sitting at a table

2    and I had seen him walk by several times.

3            Q.    Okay.  And you were seated with Chris Hashisaki

4    and Stephanie Koeppen?

5            A.    Yes.

6            Q.    Okay.  At some point in time did you approach

7    Mr. Black?

8            A.    Actually, he came to our -- well, you know,

9    Chris Hashisaki was the one who called him over to our table.

10           Q.    Okay.  And did he come over?

11           A.    Yes, he did.

12           Q.    And what happened next?

13           A.    And he was very funny.  He was -- just

14   introduced himself and you could tell he was tipsy and

15   laughing, and I asked if he wanted to dance.

16           Q.    Okay.  Did he tell you what he did for a living?

17           A.    No.  I didn't --

18           Q.    Okay.  Did you dance with him?

19           A.    Yeah, I did.

20           Q.    Okay.  Did you kiss him, did you hug him, those

21   kinds of things on the dance floor?

22           A.    No.  I heard him say that, but, no, we did not

23   kiss on the dance floor, but we were dancing very

24   provocatively.

25           Q.    Okay.  Were you aware that his either soon to

1    be or ex-wife was also present?

2           A.    No.

3           Q.    Okay.  Did you dance with him and him alone

4    throughout the evening?

5           A.    Yes.

6           Q.    Okay.  Did he dance with other persons there?

7           A.    Did he?

8           Q.    Uh-huh.

9           A.    No.

10           Q.    Okay.  So how many hours or dances do you think

11    you spent with Mr. Black?

12           A.    Probably from, I don't know, 11:00 to 1:00.

13           Q.    Okay.  And this is country swing stuff like

14    Rockin' Rodeo?

15           A.    Mixed in with, like, just regular dance music.

16           Q.    Okay.  What time was closing time?

17           A.    1:00.

18           Q.    Okay.  What happened to Ms. Hashisaki and Ms.

19    Koeppen?

20           A.    They left.

21           Q.    All right.

22           A.    They left and I was having fun and I didn't go

23    with them.

24           Q.    Okay.  Did you depart that evening then with

25    Mr. Black?

1          A.    Yes, I did.

2          Q.    Okay.  Was there a plan as to what was -- what

3   you were going to do before you left with Mr. Black?

4          A.    He was going to take me home.  And him and his

5   friend and I got into his truck, and then they were talking

6   about eating, so we decided to go to Denny's.

7          Q.    Okay.  Was there any kind of intimacy in the

8   front seat of his pickup truck?

9          A.    I sat next to him.  I may have had my hand on

10  his leg, but not -- I mean, I was not groping him or any of

11  that kind of stuff.

12         Q.    Okay.  Where did you guys go initially?

13         A.    We went to Denny's to eat breakfast.

14         Q.    Okay.  Is he somewhat inebriated as well?

15         A.    Oh, yeah.  Yes.

16         Q.    How about you at that time?

17         A.    We both are, yes.

18         Q.    Okay.  And the other gentleman, did you ever

19  figure out what his name was?

20         A.    No.  I don't remember his name.

21         Q.    Okay.  You guys went to Denny's?

22         A.    Yes.

23         Q.    And what did you do there?

24         A.    Had breakfast.

25         Q.    Okay.  Anything of an intimate sexual nature

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    happen at the Denny's?

2         A.    Not really, no.

3         Q.    Okay.

4         A.    We were just flirting.  I was --

5         Q.    Okay.  What happened next?

6         A.    When we were done eating, he needed -- he was

7    going to go take his friend home.

8         Q.    Okay.

9         A.    And we did that.  I remember he was at some

10   apartment place right there at I-10 and Chandler, maybe

11   Adante or something.

12        Q.    Okay.

13        A.    I don't remember.

14        Q.    Dropped him off.  Where did you guys go next?

15        A.    Then he went to take me home --

16        Q.    Okay.

17        A.    -- at San Riva.

18        Q.    Back to San Riva?

19        A.    Right.

20        Q.    Tell me what happened after you got back to the

21   San Riva apartment complex?

22        A.    I invited him inside.  I knew there was some

23   beer in the refrigerator and stuff.  And it was actually --

24   by the time we finished having breakfast, it's close to 2:30,

25   3:00 in the morning and he told me that he had to get up and

 1    go to work early.

 2            Q.    Okay.

 3            A.    So he came inside.  We sat on the couch.  I

 4    gave him a drink and turned on the TV.  And we're kind of

 5    just -- I don't -- you know, I don't even know.  I --

 6            Q.    Okay.

 7            A.    Well -- um --

 8            Q.    What developed?  What happened?

 9            A.    We started kissing and hugging and stuff like

10    that.  And the next thing I know, it's at a point where it's

11    either we're going to go all the way or not going to.

12            Q.    So what happened?

13            A.    Well, once again I'm in the situation that I

14    feel like --

15            MR. MARTINEZ:  I'm going to object.  She's being

16    non-responsive.  The question is did she go all the way.

17            THE COURT:  Sustained.

18    BY MR. PATTERSON:

19            Q.    Did you make a decision at this point?

20            A.    Yes, I did.

21            Q.    Why did you make this decision?

22            A.    I felt that saying no was something that -- I

23    mean, if I -- I'd led him on to this point, then how could

24    you turn around and just say no?

25            Q.    Okay.


         TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1          A.    And I know that's what guys like and, you know,

2    it was -- I got myself in another situation.

3          Q.    Okay.  What happened next?

4          A.    I went into the back bedroom, and I obviously

5    knew where Joe kept his condoms, and reached up into the top

6    drawer.  I couldn't see.  I just felt around and grabbed one

7    out of there and went back out to the living room.  And then

8    we had sex.

9          Q.    Okay.  One occasion?

10         A.    Yes.

11         Q.    Okay.  Afterwards what happened?

12         A.    We both fell asleep on the couch.

13         Q.    Okay.  At some point in time did he awake and

14   depart?

15         A.    About 5:00 in the morning.

16         Q.    Okay.  Did you have any significant contact

17   with that person, Mr. Black, thereafter?

18         A.    Not really.  Just a couple of phone

19   conversations, but nothing -- it was -- it was just my one

20   and only one night stand, that type of thing.  I don't know

21   how else to categorize it.

22         Q.    Okay.  Dr. Murphy asked to you fill out certain

23   written instruments concerning your sexual history?

24         A.    Yes.

25         Q.    And in that information you reflected one

1    affair?

2         A.    Yes.

3         Q.    Tell me why you didn't include Mr. Black in

4    this?

5         A.    She asked me about affairs and I had an affair

6    with Rick.  I didn't have an affair with Travis.  Travis was

7    just something that happened one night.

8         Q.    All right.

9         A.    It wasn't --

10        Q.    Okay.  Let's go to another topic or

11   discussion.  Sodium azide.

12        A.    Okay.

13        Q.    How is it that you began to search for

14   chemicals that could be used that would cause people to die?

15        A.    There was a point in time that Joe and I had a

16   very serious conversation.  And he told me that he didn't

17   want to die the way they told him he was going to die.  He

18   wasn't going to do that.  He said, "There's no way I'm going

19   to go into a hospital and be hooked up to machines.  I'm not

20   going to do that."  And he said, "I want you to help me."  He

21   said, "I -- I'm going to commit suicide.  I'm going to die

22   the way I want to die."  And for about a month, I tried to

23   change his mind, tried to find some other -- something to

24   help us, but I was all out of answers.  I didn't have

25   anymore.  I couldn't cure his cancer.  I couldn't fix this

1   one.  And that's what began the search for a chemical that

2   would help end his life.

3           Q.    How did you go about trying to access this

4   chemical?

5           A.    It was a chemical we didn't know about.

6           MR. MARTINEZ:  I'm going to object as Nonresponsive.

7   She keeps saying "we."

8           THE COURT:  I'll sustain the objection.  Restate the

9   question.

10  BY MR. PATTERSON:

11          Q.    What did you do?

12          A.    Joe suggested to me cyanide, so I typed in

13  "cyanide" to the internet and different things had come up.

14  And it was very confusing.  I didn't -- I wasn't getting

15  anywhere because I'm not very internet savvy.

16          Q.    Okay.  Let's talk about the internet process

17  here.  Did you have a home internet setup?

18          A.    No, I did not.

19          Q.    Okay.  So Joe gave you the cyanide suggestion

20  at home.  And then what you do with it?  Where did you go?

21          A.    Well, at work is where I had to do all that

22  sort of stuff because we didn't have anything at home.

23          Q.    Okay.  And typed in "cyanide" into the

24  computer.  I mean, do you know -- do you know what a search

25  engine is?

1    A.    I didn't know what a search engine was.  I knew

2  of one and that's where I typed in the word "cyanide."

3    Q.    Okay.  And what did you get?

4    A.    I don't even recall everything, but it was

5  just -- I remember one big black screen and, you know, it

6  said "dangerous" and had like cross things on it and just --

7  but nothing -- nothing really with any information.  It was

8  just there were -- they were just kinds of scary looking

9  sites.

10    Q.    Okay.  At some point in time did you ask

11  somebody to help you with the process?

12    A.    I went back to Joe and I told him I'm not --

13    MR. MARTINEZ:  Objection.  Nonresponsive.  Did she

14  ask somebody.

15    THE COURT:  Sustained.

16    THE WITNESS:  I'm sorry.

17    THE COURT:  Just answer the question.

18    MR. PATTERSON:  That's a bad question, Judge.

19  BY MR. PATTERSON:

20    Q.    When you got the result of the cyanide, what

21  did you do with it?

22    A.    I let Joe know what happened.

23    Q.    Okay.  And what did you talk about?

24    A.    I told him I'm having no luck finding anything

25  on cyanide.  I don't know.  I -- it was not successful.

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1      Q.    Okay.  What did you do then?

2      A.    We -- Joe and I had another conversation.

3      Q.    About?

4      A.    About Mr. Shawn King.

5      Q.    Okay.  Is this the same Shawn King who was the

6  pastor's son --

7      A.    Yes.

8      Q.    -- that you went to high school with?

9      A.    Yes.

10     Q.    Why was Shawn King's name brought up?

11     A.    Shawn had become an architect in computer

12  programming and he was -- had just gone through a terrible

13  accident that had severed his legs and his legs had been sewn

14  back on and he had gone through -- he had been unconscious

15  for a long time, he had -- he had gone through a very

16  terrible experience.

17     Q.    Okay.

18     A.    And Joe felt comfortable asking Shawn to help

19  us because Shawn knew everything about computers and also was

20  sympathetic to Joe's condition because at one time Shawn had

21  also thought about suicide.

22     Q.    Okay.  So what did you do?

23     A.    So I asked Shawn to help find something on the

24  Internet.

25          MR. PATTERSON:  Judge, it might be a good point in


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    time to break before moving to a new topic.

2         THE COURT:  We'll take the afternoon break at this

3    point.  During this break remember the entire admonition I

4    gave you including the fact do not discuss the case with

5    anyone.  Do not let anyone discuss the case with you.  Keep

6    an open mind.  Have a nice break.

7

8              (Recess.)

9

10        THE COURT:  This is CR 2000-096032, State of Arizona

11   versus Wendi Elizabeth Andriano.  The record will reflect the

12   presence of the Defendant, Counsel and the jury.  Defendant

13   Wendi Elizabeth Andriano is on the witness stand, and we'll

14   continue with the direct examination by Mr. Patterson.

15             Mr. Patterson?

16       MR. PATTERSON:  Thank you, Judge Ishikawa.

17

18   CONTINUED DIRECT EXAMINATION BY MR. PATTERSON:

19        Q.   You are Wendi Andriano?

20        A.   Yes, I am.

21        Q.   You are the same Wendi Andriano that was

22   testifying before our break here?

23        A.   Yes, sir.

24        Q.   And you recognize that you're still under oath?

25        A.   Yes.

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000005412

1       Q.    We had gotten to the point where you and Joe

2   jointly agreed to enlist the assistance of a Shawn King --

3       A.    Yes.

4       Q.    -- in the search for toxic chemicals.

5       A.    Yes.

6       Q.    Okay.  And, again, what time of the year do you

7   think this happened?

8       A.    Spring time is when Joe had originally

9   approached me with it, but there was a time, as I said

10  before, that I was trying to talk him out of it.

11      Q.    Okay.  So in the early part of the year,

12  Spring?

13      A.    Right.

14      Q.    Okay.  What did you do in that regard?  Did you

15  get a hold of Shawn King?

16      A.    I had made a brief contact with him, but also I

17  had -- Joe and I had both --

18      MR. MARTINEZ:  I'm going to object as nonresponsive.

19      THE COURT:  Sustained.  Just go ahead and repeat the

20  question.

21  BY MR. PATTERSON:

22      Q.    You contacted Shawn King.  Do you and Joe do

23  anything with regard to contacting Joe King?  Or Shawn King?

24      A.    We had been in contact with him because of his

25  illness and what he had been going through, so it wasn't out

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1  of the blue that we contacted him.

2        Q.    Okay.  Did you contact Shawn for the purpose of

3  assisting you in finding a toxic chemical?

4        A.    I did.  Sometime after that first, you know,

5  computer contact, I did -- I believe I emailed him and asked

6  him for assistance in doing research because I was having --

7  I couldn't do it.

8        Q.    Okay.  And did he help you?

9        A.    Yes, he did.

10       Q.    Okay.  And mechanically, how did he help you?

11  Did he come into your office or was there some other means by

12  which he assisted you?

13       A.    No.  It was through the computer, through email

14  and telephone.

15       Q.    Okay.

16       A.    And he would actually -- he's the one who

17  actually located the web sites for me and told me how to get

18  there --

19       Q.    Okay.

20       A.    -- and all that stuff.

21       Q.    All right.  And what websites did he instruct

22  you how to access?

23       A.    Well, he ended up finding a chemical called

24  sodium azide instead of the cyanide I originally asked him to

25  find.

1  Q.  Okay.  And follow-up on that.  What --

2  A.  So.

3  Q.  -- did you discover about sodium azide?

4  A.  That it was similar to cyanide and I believe

5  that cyanide can -- was not available to be purchased, but

6  you could purchase this stuff and -- and it should be about

7  the same --

8  Q.  Okay.

9  A.  -- was what I was told.

10  Q.  Did you advise Joe you had found an alternative

11  to cyanide?

12  A.  Yes, I did.

13  Q.  What did you tell him?

14  A.  I told him cyanide could not be found anywhere,

15  but that Shawn had said sodium azide was about the same thing

16  and should, you know, accomplish what he was trying to do.

17  Q.  Okay.  Did you then pursue the acquisition of

18  sodium azide?

19  A.  Yes, I did.

20  Q.  And how did you go about doing that?

21  A.  Shawn found one site in particular and so it

22  was called Voit Global or Voit -- I don't know.  And they

23  sold all different kinds of chemicals.  They also had sodium

24  azide, and so I made an initial contact with them through

25  email about purchasing -- how to purchase sodium azide.

1       Q.    Okay.

2       A.    I mean, what do you do?

3       Q.    All right.  And were you somewhat secretive in

4 this process?

5       A.    No.

6       Q.    Okay.  How did you go about then -- tell me

7 about the process of dealing with these people who were

8 vendors of sodium azide?

9       A.    Well, what happened was they said that as an

10 individual you could not purchase this.  It had to be

11 purchased through a business.  So I had -- was kind of in a

12 dilemma there.

13       Q.    Okay.  What did you do?

14       A.    And I let Joe know.  I said, you know, maybe we

15 could purchase it through Joe's Windshield Repair or

16 something, I mean, because we can't buy it just as Joe and

17 Wendi Andriano.

18       Q.    Okay.  Was there some discussion about keeping

19 the identity of the purchaser secret?

20       A.    Yes, there was.

21       Q.    Okay.  Why was that?

22       A.    The whole point of disguising that, or whatever

23 you want to call it, was to -- well, there was two purposes.

24 First one is Joe didn't want anybody to know about his

25 decision to end his own life.

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    Q.    And why not?

2    A.    He had been raised Catholic and I -- and in

3    their belief system, if you take your own life, I -- I guess

4    you don't make it to heaven and he didn't want to leave that

5    burden with his family.  And his family had already had

6    experience with that as far as with his grandfather.

7    Q.    Okay.

8    A.    And so he didn't want -- he didn't want to do

9    that again to them.  And the second reason was to try to

10   preserve, as I said before, the lawsuit.

11   Q.    So is that why Joe's Windshield Repair or some

12   valid business license was not used?

13   A.    Yes.  That is why.

14   Q.    Okay.  So confronted with the situation that

15   only a business could buy this stuff, did Joe indicate "we

16   should back off" or what was the decision at that point?

17   A.    Well, I kind of left it up to him because I

18   didn't know what to do then.  You know, what do you want to

19   do?  His father had had a chemical business before and that's

20   when I guess it occurred to him.  He said that we could,

21   um -- um, purchase it under the guise of a -- you know,

22   needing the chemical for a farm purpose, things like that.

23   Q.    And did he mention specific use for it on the

24   farm?

25   A.    Sure.  As a -- as a pesticide.


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1        Q.    Okay.  So armed with that knowledge, what do

2    you do?

3        A.    Well, then I went back to the computer.  I

4    recontacted this Voit place, and under the name of Anne

5    Newton as a business and asked them how to purchase sodium

6    azide.

7        Q.    And what did they tell you?

8        A.    Well, then they needed proof of it --

9        Q.    Okay.

10       A.    -- so --

11       Q.    So is this becoming more difficult --

12       A.    Oh, my Lord.

13       Q.    -- than originally anticipated?

14       A.    Yes.  I had no idea it was going to be this

15   difficult.

16       Q.    Okay.  So now you need a business license, what

17   did you do?

18       A.    Well, I didn't obviously have a business loan

19   for that because it's fictitious, and when we had been at

20   AccuGlass, there had been fictitious documents created for

21   our partner and Joe suggested I do that again for this.

22       Q.    Okay.  How did you go about doing it?

23       A.    We had a vendor book at San Riva that -- we're

24   required to have copies of people's business licenses and

25   insurance and things like that, and so I used one of our

1    vendors.

2         Q.    Copperstate?

3         A.    Copperstate, yes.

4         Q.    Okay.

5         A.    Used a copy of their business license, and I

6    just went over it and put some made up information on it.

7         Q.    Okay.  Was this -- where was this done?

8         A.    In the business -- in Chris' office, the

9    business -- bookkeeper's office --

10        Q.    Okay.  Were --

11        A.    -- at San Riva.

12        Q.    Were there witnesses to what you were doing and

13   creating?

14        A.    Yes.  I did this during business hours.  I'm --

15        Q.    Who saw you do this?

16        A.    I believe Stephanie saw me once, and I don't

17   know if Chris saw me or not but --

18        Q.    But it was done?

19        A.    -- I was just doing it right there in -- on the

20   countertops where we do normal business.

21        Q.    Okay.  Did you have any reservation about

22   creating this fictitious business license in the presence of

23   witnesses?

24        A.    In the presence of witnesses?

25        Q.    Uh-huh.

1       A.      No.

2       Q.      Why not?

3       A.      Just never occurred to me that -- that -- I

4    don't know.  It just --

5       Q.      Well, what was the purpose?

6       A.      We were just using it to -- to buy some

7    chemical.  It wasn't -- I don't know.

8       Q.      Okay.  All right.  After you generated these --

9    this fictitious business license, what did you do with it?

10      A.      I faxed it to, I don't remember his name, but

11   whoever the guy was at Voit, and I believe at that point he

12   accepted that as legit.  And -- oh, you know, I remember.  I

13   had just provided him with a federal tax number first to try

14   to see if that would work.

15      Q.      Okay.

16      A.      But he wanted like paperwork, so that's why I

17   generated that license.

18      Q.      All right.  Shipped that off to him.  Was there

19   some discussion via the internet concerning the price and

20   that kind of thing?

21      A.      Yes, there was.

22      Q.      All right.  And did you give them an address

23   where it should be delivered?

24      A.      Yes, I did.

25      Q.      Okay.  How was the product purchased?


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

```
 1          A.    It was prepaid and we paid for it with a money
 2    order.
 3          Q.    Okay.  Who purchased the money order?
 4          A.    Joe did.
 5          Q.    Okay.  And where did he acquire the money
 6    order?
 7          A.    Just down the street at Abco.
 8          Q.    Okay.  Did you give him the cash?
 9          A.    No.  He always had cash.
10          Q.    Okay.  He came back at some point with a money
11    order?
12          A.    Yes, he did.
13          Q.    Okay.  And what did you do with that money
14    order?
15          A.    We put it in an Airborne thing with --
16          MR. MARTINEZ:  Nonresponsive.  He asked her what she
17    did the money order.
18          THE COURT:  Sustained.  Repeat the question.
19    BY MR. PATTERSON:
20          Q.    What you do the with the money order?  You put
21    it --
22          A.    Put it in the Airborne package and shipped it
23    off to the seller.
24          Q.    To the seller of the sodium azide?
25          A.    Yes.
```

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1        Q.     And what location did you give them as the

2    location to be delivered?

3        A.     I believe that they delivered to the location

4    that was on the business license, which was --

5        Q.     Okay.

6        A.     -- just a made up number, so it was not a

7    legitimate address.

8        Q.     Okay.  How then were you expecting to be able

9    to pickup the parcel?

10       A.     Good question.  I -- I just figured that

11   Airborne would hold it.

12       Q.     Okay.

13       A.     Yeah, because I had experience with UPS before

14   and you could just go to the UPS office and pick it up.

15       Q.     Okay.  So you're familiar with the carrier that

16   was going to be involved --

17       A.     Yes.

18       Q.     -- with the delivery there?

19       A.     Yes.

20       Q.     Okay.  At some point in time were you notified

21   that the parcel had in fact arrived?

22       A.     Yes.

23       Q.     Okay.  And how is it that they were able to

24   contact you?

25       A.     They had my phone number.


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR