# TABLE OF CONTENTS (INTERACTIVE)

| | |
|---|---|
| NNNNNN Part 6 | Response to Petition |

# EXHIBIT NNNNNN PART 6

1          Q.     Okay.   The phone number that you gave them, was

2     that legitimate?

3          A.     Yes.

4          Q.     Okay.   And was it your cell phone, house phone?

5          A.     It -- I believe I was contacted at the business

6     phone at San Riva.

7          Q.     Okay.   Notified the parcel had arrived.   What

8     did you do?

9          A.     I think it was on a Thursday afternoon.   Joe

10    and I drove down there to the Airborne sort of by the

11    airport.   I don't even remember the address.   And went inside

12    and gave them the tracking number and they retrieved the

13    package and gave it to us.

14         Q.     Where was Joe?

15         A.     With me.

16         Q.     Okay.   Was he in the building or --

17         A.     Yeah.  We --

18         Q.     Okay.

19         A.     Yes.

20         Q.     What was the parcel?   Describe it for me?

21         A.     It was a cardboard box about like so --

22         Q.     Okay.  And what did you do with the parcel

23    after you picked it up?

24         A.     We put it in the car and I went back to work

25    and Joe went off wherever he went.

1  Q. Okay.  Where did the parcel go?

2  A. Into the office with me.

3  Q. Okay.  So you actually carried this package of

4 sodium azide in the cardboard container into the office?

5  A. Yes.

6  Q. Okay.  Did people see you with this parcel?

7  A. Yes.

8  Q. Okay.  Did you make any comments to any

9 observers about the nature of the parcel?

10  A. At that time, no.

11  Q. Okay.  Where did you put the parcel?

12  A. I just set it in my office.

13  Q. All right.  After you created the business

14 license that allowed you to purchase this product, what did

15 you do with that paperwork that you used to create the

16 business license?

17  A. Well, I didn't know if we'd need it again or

18 what to do with it, so I just put it all in a manilla

19 envelope and stuck it in my office.

20  Q. Okay.  Did you make any effort to destroy it

21 or discard it?

22  A. No.

23  Q. Okay.  All right.  And this parcel that came in

24 the cardboard box, where do you put that?  In your office?

25  A. I just set it beside the desk.

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1      Q.    Okay.  Went home that evening, did you take the

2  parcel with you?

3      A.    No, I did not.

4      Q.    Okay.  Left the parcel in the office?

5      A.    Yes, I did.

6      Q.    Okay.  And why did you do that?

7      A.    Because that night Nicolas and Ashley were

8  going to be around and I didn't -- I don't want -- I don't

9  want the box around them.

10      Q.    Okay.  That evening -- let me follow here.  So

11  nothing happened that evening.  And what evening are we

12  talking about, Thursday?

13      A.    Thursday.

14      Q.    Okay.  And this is the Thursday before the

15  Saturday?

16      A.    Yes.

17      Q.    Or Sunday morning that the incident happened,

18  right?

19      A.    Yes, sir.

20      Q.    Okay.  So that parcel never arrives at 132 on

21  Thursday?

22      A.    No.

23      Q.    Okay.  Friday morning, do you go back -- well,

24  are you working that Friday?

25      A.    No.  Fridays are my days off.

1       Q.      Okay.  At some point in time on that Friday, do

2   you go back to the office and retrieve the parcel?

3       A.      Yes.  Got up sometime Friday morning, took the

4   children to the sitters, and on my way back, stopped by the

5   office and picked up the box to take home.

6       Q.      Okay.  Again, do people observe you in

7   possession of this parcel while at the office?

8       A.      Yes.

9       Q.      Did you make any comments to any persons there

10  about the contents of the parcel?

11      A.      Yeah.  They were being really -- well,

12  actually, Shannon was being really persistent as to what was

13  in the box and it really wasn't any of her business, but I

14  didn't -- I'm not one to be smart like that.  So I just told

15  her it was a surprise for somebody and tried to leave it at

16  that and then left the office.

17      Q.      Okay.  What did you do with the parcel after

18  you retrieved it from the business office?

19      A.      I put it in the car and drove to my apartment.

20      Q.      Okay.  And who was present at the apartment

21  when you arrived?

22      A.      My husband.

23      Q.      Okay.  What did you do with the parcel when you

24  arrived at unit 132?

25      A.      I carried it inside to the apartment, set it on

1    the kitchen counter, and I believe Joe opened it, and I

2    actually took off the -- it's like a little plastic -- it's a

3    baggy, but it's attached to the box.  And inside of it were

4    some papers.

5               Q.    Okay.

6               A.    So I pulled those out and proceeded to read

7    those.

8               Q.    Okay.  Did Joe share -- did you share the

9    contents of the paperwork with Joe as well?

10              A.    Yes.  I read them out loud to him.

11              Q.    Okay.  And what essentially did it tell you

12   about this product?

13              A.    It said it was very toxic, that you shouldn't

14   open it in a closed space, that you -- it can be absorbed

15   through your skin, so at that point we decided to take it

16   outside on the patio.

17              Q.    Okay.  And is this the rear patio we're talking

18   about?

19              A.    Yes.

20              Q.    Okay.  So you went through the slider and out

21   to the patio?

22              A.    Okay.

23              Q.    Was there a table out there?

24              A.    No.

25              Q.    Okay.  What did you do when you got out to the

1    patio?

2          A.    Actually, Joe had gone into the bathroom to get

3    us some gloves, plastic gloves --

4          Q.    All right.

5          A.    -- so the product, the chemical, wouldn't get

6    into our skin.

7          Q.    Okay.  Did you each have a set of those plastic

8    gloves?

9          A.    Yes, we did.

10         Q.    Okay.  And they were acquired from the bathroom

11   area?

12         A.    Yes.

13         Q.    Okay.  What else did you guys get at that point?

14         A.    I carried out a couple plastic bowls from the

15   kitchen and I had to go back in once we opened it up and I

16   got a plastic fork to break up the stuff because it was very

17   chunky.

18         Q.    Okay.  What else was in the parcel or the

19   cardboard box other than the plastic that you described?  Was

20   the sodium azide in there?

21         A.    Oh, yes.  I'm sorry.

22         Q.    What kind of container was that in?

23         A.    There was an amber colored brownish glass

24   bottle, about like so and maybe this big around (indicating)

25   full of white powder, and a label on it said sodium azide.


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000005428

1         Q.    Okay.  So you got a fork.  You got how many

2    Tupperware bowls?

3         A.    I think I brought out two.

4         Q.    Okay.  Any other implements?

5         A.    Used a plastic knife to cut through the tape on

6    the box.

7         Q.    Okay.  Any other items that you brought out

8    onto the patio?

9         A.    Cotton swabs.  Joe had also purchased at the

10   same time as that money order a bottle of Elderberry, and we

11   used -- what that was is an herbal supplement, and it had

12   capsules that could pull apart --

13        Q.    Okay.

14        A.    -- so we took that outside.

15        Q.    Was there a plan before the parcel arrived as

16   to how this sodium azide would be ultimately used to assist

17   in the suicide?

18        A.    Yes.

19        Q.    What was that plan?

20        A.    To put it in capsules, that way he could

21   swallow them.

22        Q.    Okay.  Was an effort made to find, for lack of

23   better term, virgin capsules, capsules that hadn't been used?

24        A.    Not really.

25        Q.    Okay.  So you just --


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1          A.    I had never seen them around.  He didn't

2     either.

3          Q.    Okay.  So he purchased some herbal supplements?

4          A.    Just bought a bottle of the Elderberry and

5     brought it home.

6          Q.    Okay.  All right.  Was that too brought out to

7     the patio?

8          A.    Yes, it was.

9          Q.    Okay.  What's the process employed at this

10    point as in with you and Joe?

11         A.    Well, we have our gloves on and I open up the

12    Elderberry and start pulling apart one of the capsules.

13    Well, the Elderberry because it came out of the capsule,

14    quite -- it leaves a lot of stuff in there.

15         Q.    Some residue?

16         A.    Residue, thank you.

17         Q.    All right?

18         A.    And --

19         Q.    What's the color of the Elderberry?

20         A.    It's a greenish-purple.

21         Q.    Okay.  And what's the color of the sodium azide?

22         A.    White.

23         Q.    Okay.

24         A.    Like salt.

25         Q.    All right.  So you -- you take these gelcaps

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000005430

1    apart?

2              A.     Yes.

3              Q.     What happens next?

4              A.     And so I sent Joe back inside for some Q-tips

5    so we could clean out the capsule, so he brings those out to

6    me and we clean out the capsule.  And Joe had poured some or

7    scooped out some of -- of the sodium azide into the other

8    bowl and I reached in with the capsule and filled up the

9    thing with the sodium azide and put it back together.

10             Q.     Okay.  Now, are you seated on the patio floor

11   at this point?

12             A.     We're sitting on the floor yeah, yes.

13             Q.     Okay.  And can you mechanically show me how

14   you're doing this in terms of you take the Elderberry

15   capsules apart --

16             A.     Mm-hmm (indicating).

17             Q.     -- and use the Q-tip to --

18             A.     To clean out the rest of the Elderberry that

19   was in there.

20             Q.     Okay.  And is the sodium azide in the

21   Tupperware container?

22             A.     Yes.

23             Q.     Okay.  And did you pour a little bit or amount

24   into the paper?

25             A.     Joe had poured into some -- a bowl while I was

1     emptying out --

2            Q.    Okay.

3            A.    -- the capsules.

4            Q.    And is it -- is it the condition of the sodium

5     azide, does it require additional processing, if you will, by

6     you in order to make it -- allow it to go into these gelcaps?

7            A.    Yes, it was very difficult.

8            Q.    And so what did do you?

9            A.    So I used the plastic fork to break it up and

10    so --

11           Q.    Okay.  Breaking it up?

12           A.    Breaking it up.

13           Q.    And there's still a mound if you will in the

14    Tupperware.  How do you go about taking the gelcaps?

15           A.    You just -- you just chop it up and it goes

16    right into the capsules, and you close them, push them back

17    together.

18           Q.    Okay.  And how many capsules do you believe you

19    made in utilizing that process?

20           A.    Around 15.

21           Q.    Okay.  And what did you do with the balance of

22    the Elderberry capsules that I -- assume there were more in

23    the original container.  What did you do with those?

24           A.    I believe those just got thrown out.

25           Q.    Okay.  The 15 or so gelcaps that you created

1    with the sodium azide, what did do you with them?

2         A.    Stuck them inside the bottle.

3         Q.    Okay.  And what did you do?

4         A.    And sealed the bottle.

5         Q.    Put the cap back on?

6         A.    Right.

7         Q.    Okay.  And what did you do with that particular

8    herbal supplement that now contains the sodium azide?

9         A.    Well, because of the children, Joe took it and

10   put it up inside our master bedroom closet up on the top

11   shelf, and I was putting everything back in the box --

12        Q.    Okay.

13        A.    -- while he did that.

14        Q.    Put everything back into the cardboard box?

15        A.    Yes.

16        Q.    Okay.  Joe was wearing gloves at this point?

17        A.    Yes.

18        Q.    And, again, why was he wearing these gloves?

19        A.    Well, he didn't want the chemical to get into

20   his skin at that point because that was not the time that he

21   wanted that --

22        Q.    Okay.

23        A.    -- so --

24        Q.    Was there any plan established at that point as

25   to when these capsules would ultimately be used by Joe in the

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000005433

1   assisted suicide?

2          A.    All Joe indicated to me was that he wanted --

3   wanted the --

4          MR. MARTINEZ:  Judge, nonresponsive.

5          THE COURT:  Sustained.  Rephrase the question.

6          THE WITNESS:  Well --

7          THE COURT:  Restate the question.  Just answer the

8   question that's asked.

9   BY MR. PATTERSON:

10         Q.    Did Joe give you some information in that

11  regard as to when this plan would be fulfilled?

12         A.    Yes, he did.

13         Q.    What did he say?

14         A.    He wanted it to happen before his father's

15  birthday at the end of October so it wouldn't get into the

16  holidays.

17         Q.    Okay.  Now, to that end, did Joe take some

18  trips in the months preceding what we just described in terms

19  of making the gelcaps?

20         A.    Yes, he did.

21         Q.    Okay.  When did he go and -- well, when did he

22  go?

23         A.    He went to Oklahoma.

24         Q.    Okay.  Why did he go to Oklahoma?

25         A.    To see his brother.

1          Q.   All right.  Had he seen his brother recently

2     prior to that departure?

3          A.   Not really, not to spend some time with him.

4          Q.   Okay.  Let's talk in general.   How many

5     siblings does Joe have?

6          A.    He has a younger brother, James, and two older

7     sisters Janna and Janay is the oldest.

8          Q.   Okay.  Let's talk about where they live.   James

9     lived in --

10         A.   In Oklahoma.

11         Q.   Okay.  Where did Janna lived?

12         A.   Janna lived in Tennessee.

13         Q.   And Janay -- is it Janay?

14         A.   Janay.

15         Q.   Where did Janay live?

16         A.   In Gilbert.

17         Q.   Okay.  Where did -- does that cover them all?

18         A.   Yes.

19         Q.   Okay.  What month does Joe go to Oklahoma to

20    see James?

21         A.   I think it was May.

22         Q.   Okay.

23         A.   May, around then.

24         Q.   And this had been the first time he had gone to

25    see James in a while?

1          MR. MARTINEZ:  Objection.  Leading.

2          MR. PATTERSON:  I'm sorry.

3   BY MR. PATTERSON:

4          Q.    When had he gone to see James prior to that

5   time?

6          A.    Well, James had always lived in Oklahoma.  The

7   only other time we had gone to Oklahoma was several years

8   before.

9          Q.    Okay.

10         A.    Joe and I went together.

11         Q.    All right.  But in May Joe decided to go to

12  Oklahoma to see James?

13         A.    Yes.

14         Q.    And how long did he spend with James?

15         A.    Two or three weeks.

16         Q.    Okay.  And did he take Nicolas with him?

17         A.    Yes, he did.

18         Q.    Okay.  Were there other friends or kin folk

19  that Joe visited in Oklahoma?

20         MR. MARTINEZ:  Objection.  Lack of foundation.

21         THE WITNESS:  I wasn't there.

22         THE COURT:  Hold on a second.

23         THE WITNESS:  All right.

24         THE COURT:  Sustained.

25  / / / / /

1    BY MR. PATTERSON:

2         Q.    Do you know of other relatives that live in the

3    Oklahoma area with James?

4         A.    I know his mom was there, but I don't -- I

5    don't know.

6         Q.    Okay.  And another sister lives in Memphis,

7    Tennessee, right?

8         A.    Yes.

9         Q.    Or about the vicinity --

10        A.    Yes.

11        Q.    -- of Memphis?

12              Okay.  When did he go to see that sister?

13        A.    In September.

14        Q.    September following the May that he went to see

15    James?

16        A.    Yes.

17        Q.    Okay.  On October 7 where did you guys go?

18        A.    We went to a family dinner in Casa Grande at

19    his parent's house.

20        Q.    Okay.  And who was at the family dinner that

21    day?

22        A.    His aunt and uncle, his sister, and --

23        Q.    The sister from Gilbert?

24        A.    Uh-huh.

25        Q.    Janay.

1        THE COURT:  Is that a "yes"?

2        THE WITNESS:  Yes.

3   BY MR. PATTERSON:

4        Q.    And the brother-in-law?

5        A.    The brother-in-law, the children.  I do believe

6   his cousin Andrea stopped by.  There was quite a few family

7   members.

8        Q.    Okay.  So in the -- let's see.  May through

9   October, that five-month period, had he visited with all of

10   his immediate family?

11        A.    Yes, he had.

12        Q.    Okay.  And why did he do that?

13        A.    It was his -- his way of saying goodbye to

14   everybody without saying goodbye.  He wanted to see them.

15   And just like with Janna, we never made it out there, and he

16   made a point this time to go and visit her and see her and

17   spend some time with her.

18        Q.    Okay.  Were these visits made with the

19   anticipation that at some point he was going to commit

20   suicide?

21        MR. MARTINEZ:  Objection.  Asked and answered.

22        THE WITNESS:  Yes.

23        THE COURT:  Sustained.

24   BY MR. PATTERSON:

25        Q.    Let me show you item 469 for identification.

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000005438

1    Let me show it to Mr. Martinez first.

2              THE COURT:  What number is this again?

3              MR. PATTERSON:  It's 469, Your Honor.

4              THE COURT:  Thank you.

5    BY MR. PATTERSON:

6         Q.    Let me show you this one, two, three-page

7    exhibit.  Were those -- are -- are those photo copies of

8    items that were in your house in October of 2000?

9         A.    Yes.

10        Q.    Okay.  What are they?

11        A.    I believe this would be the return ticket from

12   Memphis into Phoenix for Joe and Nicolas --

13        Q.    Okay.

14        A.    -- from Janna's house.

15        Q.    Okay.  Did you go with them initially to

16   Janna's house?

17        A.    I did.  I went for the weekend.

18        Q.    All right.

19        A.    Then I had to go back to work.

20        Q.    Okay.  Did you depart Memphis earlier than your

21   son and Joe?

22        A.    Yes, I did.

23        Q.    Those are the ticket stubs, if you will, for

24   the boarding passes for those flights?

25        A.    Yes, sir.


                TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1      Q.    Okay.  And what date are those boarding pass

2    stubs for?

3      A.    September 22nd of 2000.

4      Q.    And is that the point in time when Joe went

5    back to Memphis with you and Nicolas to visit his sister --

6      A.    Yes.

7      Q.    -- Janna?

8      A.    Yes.

9         MR. PATTERSON:  Okay.  All right.  Judge, I move for

10    admission of Exhibit 469.

11        THE COURT:  Any objection?

12        MR. MARTINEZ:  No, sir.

13        THE COURT:  Exhibit 469 for identification is

14    admitted into evidence.

15            (Pause in proceedings.)

16    BY MR. PATTERSON:

17      Q.    Let me show you Exhibit 470 for

18    identification.  I want you to read through that.  Let's

19    discuss what that is.

20            (Pause in proceedings.)

21        THE WITNESS:  Okay.

22    BY MR. PATTERSON:

23      Q.    Does that appear to be a photocopy of a letter

24    that was in your apartment as of October 2000?

25      A.    Yes, sir.


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1        Q.    Okay.  And is it from a notebook of some sort?

2        A.    Yes.

3        Q.    Okay.  It's addressed to a lady by the name of

4   Pat.  Who is Pat?

5        A.    Pat was a -- um, a supervisor in the global

6   marketing that I had been involved with.

7        Q.    Okay.  And is this the story -- the lady

8   that --

9        A.    Yes.  She was actually Judy's direct

10  supervisor.

11       Q.    All right.  Did you ever see this letter?

12       A.    Yes, I did.

13       Q.    How is it the copy was --

14       A.    I faxed it.

15       Q.    Okay.  The substance of that letter is such

16  that it describes what about your economic circumstance at

17  that time?

18       MR. MARTINEZ:  Objection.  Hearsay, cumulative, asked

19  and answered, immaterial.

20       MR. PATTERSON:  It's recorded recollection, Judge.

21       THE COURT:  Overruled.  Answer the question.

22       THE WITNESS:  I wrote to her letting her know we

23  were in a very difficult situation.  I described it as we

24  were robbing Peter to pay Paul just because we were borrowing

25  money and --

1          MR. MARTINEZ:  Objection.  Hearsay, asked and

2   answered.

3          THE COURT:  Overruled.

4          THE WITNESS:  And so this -- this was done right

5   after the time that --

6          MR. MARTINEZ:  Objection.  Beyond the scope of the

7   question.

8          THE COURT:  Sustained.

9   BY MR. PATTERSON:

10         Q.   When was this generated?

11         THE COURT:  Just answer the question that's asked.

12         THE WITNESS:  This was written after the episode

13   where I was going to leave Joe.

14   BY MR. PATTERSON:

15         Q.   Okay.

16         A.   And he actually had made -- made some promises

17   to me that things would get better.

18         MR. MARTINEZ:  Objection.  Beyond the question.

19         THE COURT:  Sustained.

20   BY MR. PATTERSON:

21         Q.   Okay.  Were part of his promises his agreement

22   to sell certain things to get you guys back on an economic

23   level?

24         A.   Yes.

25         Q.   And are they recited in that letter?

1   A. Yes, they are.

2   Q. Okay.  Tell me what you told Pat in an effort

3 to try to sell certain items and what items did you seek to

4 sell?

5   A. I just told her how -- how things were, that we

6 were, you know, at the point where things were hard, life

7 insurance was -- was being dropped, utilities were going to

8 get turned off, how are we going to pay the phone bill,

9 things like that.

10   Q. And is there a list of items that you ask for

11 assistance in selling?

12   A. Yes.

13   Q. Tell us what those are?

14   A. Joe's two --

15   Q. Go right to --

16   A. Oh.  Can I read from this?

17 MR. PATTERSON:  Yeah, uh-huh.

18 MR. MARTINEZ:  Objection.  Hearsay.

19 THE COURT:  Let me see Counsel here at the bench.

20

21   (The following proceedings were held at the

22 bench:)

23

24 THE COURT:  This document has not been submitted into

25 evidence, so she should not be reading from it.  Depending on

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    how you ask the question, I may allow you to get into it.

2         MR. PATTERSON:  All right.

3

4              (The following proceedings were held in open

5    court:)

6

7    BY MR. PATTERSON:

8         Q.   Wendi, use the document to refresh your

9    recollection and then talk to me about what you asked, what

10   you told Pat that you needed to sell, and how much you wanted

11   for it.

12             (Pause in proceedings.)

13             THE WITNESS:  Okay.

14             THE COURT:  Wait until Mr. Patterson asks the

15   question.

16             Mr. Patterson, ask a question.

17   BY MR. PATTERSON:

18        Q.   What did you sell?  What did you seek to sell?

19        A.   I listed on there --

20             MR. MARTINEZ:  I'm going to object.  She just wants

21   to tell us what she wants to do.

22             THE COURT:  Has your recollection been refreshed by

23   looking at the document?

24             THE WITNESS:  That's what I was --

25             THE COURT:  Ask your next question.

1    BY MR. PATTERSON:

2        Q.    Tell us what you ask her for assistance in

3    selling.

4        A.    Two boats.

5        Q.    How much did you ask to sell them for?

6        A.    I believe one was 11,500 and the other was

7    9500.

8        Q.    Okay.  And those are the two boats that Joe

9    used primarily at the lakes --

10       A.    Yes.

11       Q.    -- that we talked about?

12       A.    Yes.

13       Q.    Okay.  What kind of boats were they again?

14       A.    They were jet boats, racing.

15       Q.    Okay.  What else did you ask for in terms of

16   assistance of selling and how much did you ask for each item?

17       A.    There was a hot dog cart, brand new purchased

18   by my parents.  And we were trying to sell that for 3000.

19   There was an enclosed trailer.  I believe it was 2500, I

20   don't recall specifically.  And I do believe there might have

21   been a couple of engines listed on there.

22       Q.    Okay.

23       A.    Racing engines.

24       Q.    Boat engines?

25       A.    Yes, like a 454 -- whatever.

1        Q.    Okay.  And was there a price on --

2        A.    I believe one was for 5000 and I don't recall

3    how much the other one was.

4        Q.    Okay.  And these were Joe's toys primarily,

5    right?

6        A.    These were all of our assets, yes.

7        Q.    Okay.  And he was willing to sell these things?

8        A.    At that time, yes.

9        Q.    Okay.  Did it come later on that he changed his

10   position?

11       A.    Yes.

12       Q.    Okay.  All right.  Approaching you with 466.

13   Why don't you look at 466.

14              (Pause in proceedings.)

15       THE WITNESS:  Okay.

16   BY MR. PATTERSON:

17       Q.    Okay.  Have you had a chance to review that?

18       A.    Yes.

19       Q.    Okay.  And is that a photocopy of a document

20   that was in your apartment in October of 2000?

21       A.    Yes, sir.

22       Q.    Okay.  And from whom did you receive that

23   document?

24       A.    From Janna.

25       Q.    Okay.  That's the sister of Joe?

1          A.     Yes.

2          Q.     Okay.  And what is the sum and substance, if

3     you will, of that particular document?  Well, first, when do

4     you think you received it?

5          A.     I believe that Joe had brought that back with

6     him from the visit.

7          Q.     To Oklahoma or to Memphis?

8          A.     To his sister's, yes.

9          Q.     Okay.  Was that sister helpful in trying to

10    locate treatment modes, if you will, for Joe's cancer?

11         A.     Very helpful, yes.

12         Q.     Okay.  To that -- in that regard what did she

13    do?

14         A.     She would look up things on the internet all

15    the time and inform Joe of -- of new treatments that were out

16    there or things that they were testing, other holistic

17    therapies, things like that.

18         Q.     Okay.  So if he brought that back with them,

19    what time or date do you think that comes home to 132 if the

20    return trip was 22 September, 2000, about that time.

21         A.     Around, yes.

22         Q.     Okay.  What is that information?  What does it

23    describe?

24         A.     It describes a place down in Mexico that treats

25    cancer and is known to cure cancer and there's handwritten

1    information on it --

2         Q.    Okay.

3         A.    -- with more details.

4         Q.    Some of the handwritten information related to

5    the price or cost of the treatment?

6         A.    Yes.

7         Q.    What is that?

8         A.    Anywhere from 22 to  25,000.

9         Q.    Okay.  So it was quite pricey?

10        A.    Very, for us.

11        Q.    Okay.  Did that create frustrations for Joe?

12        A.    Yes.

13        Q.    Okay.  Tell me about that?

14        A.    The family knew we didn't have money --

15        MR. MARTINEZ:  Objection.  Nonresponsive.

16        MR. PATTERSON:  No, it is responsive.

17        THE COURT:  Overruled.

18        THE WITNESS:  And he would get really upset when they

19   kept -- because they were trying to be helpful as far as

20   providing the information, but how in the world are we going

21   to come up with 25,000 to go to Mexico to try something that

22   we don't know is going to work?

23   BY MR. PATTERSON:

24        Q.    Okay.  So here a cure -- a potential cure was

25   presented.

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000005448

1     A.    Like dangling right in front of you, but you

2  have no way of attaining it.

3     Q.    Okay.  And certainly Janna was well

4  intentioned?

5     A.    Very much so.

6     Q.    Okay.  But it was frustrating to Joe?

7     A.    It was very frustrating.

8     Q.    I'll show you Exhibit 468.  Why don't you look

9  through that.

10                (Pause in proceedings.)

11          THE WITNESS:  Okay.

12  BY MR. PATTERSON:

13     Q.    Okay.  Does that appear to be a photocopy of

14  documents that were in your apartment in October of the year

15  2000?

16     A.    Yes, sir.

17     Q.    Okay.  What do those documents represent?

18     A.    Actually, there are a couple of documents in

19  here that are not part of the whole the rest of the package.

20     Q.    Okay.  Why don't you show me those and I'll ask

21  the clerk to --

22          THE WITNESS:  This is a calendar from and -- that's

23  a -- this page goes with these.

24          MR. PATTERSON:  These go --

25          THE COURT:  Why don't you show them to Mr. Martinez

1    first and --

2            MR. PATTERSON:  I'm sorry, Judge.

3                    (Pause in proceedings.)

4    BY MR. PATTERSON:

5            Q.    Judge, I'm going to ask your clerk -- I

6    erroneously included three pages in the exhibit.

7            THE WITNESS:  Why don't you show the clerk that?

8            MR. PATTERSON:  Can we redact those?

9                    (Pause in proceedings.)

10   BY MR. PATTERSON:

11           Q.    Okay.  You've had a chance to look at those.

12   We've taken out three of the pages that aren't on the same

13   subject matter.  What essentially do these papers stand for?

14           A.    They are emails that contain information

15   regarding support group for cancer people --

16           Q.    Okay.  Did you --

17           A.    -- with the specific cancer adenoid cystic

18   carcinoma.

19           Q.    Okay.  Did you make an effort to try and find

20   resources for parents, patients who had adenoid cystic

21   carcinoma?

22           A.    Actually, Janna did.

23           Q.    Okay.  And did she turn you on to a support

24   group?

25           A.    Yes.


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1          Q.    Okay.  And did you make contact with those

2     people?

3          A.    No.

4          Q.    Okay.  And why not?

5          A.    That would have been Joe's decision and he

6     didn't want to.

7          Q.    Okay.  All right.  Exhibit 467, again, is this

8     a photocopy of a document that was in your home in October of

9     2000?

10         A.    Yes.

11         Q.    Okay.  Again, what is that indicative of?

12         A.    It is more emails regarding looking in the --

13    actually, because in that other package also was research

14    into new pharmaceuticals that could affect this, and this was

15    all known through the sport group.

16         Q.    Okay.  Did Joe have any desire of pursuing this

17    link any further?

18         A.    No, sir.

19         Q.    Okay.  You mentioned the -- you mentioned in

20    468 that there were certain experimental treatments?

21         A.    Yes.

22         Q.    Could you find those for me?

23               (Pause in proceedings.)

24               THE WITNESS:  One in particular is R-e-s-a-n-i.

25    Don't know how to pronounce it.

1    MR. PATTERSON:

2         Q.    Okay.  Is that a medication, experimental

3    medication?

4         A.    Yes, it is.

5         Q.    Okay.  And who gave you that information?

6         A.    Janna gave it to Joe.

7         Q.    Okay.  Did Joe have any desire to try

8    experimental medication?

9         A.    No, he did not.

10        Q.    Okay.  And was this at a time after he'd

11   commenced his chemotherapy?

12        A.    Yes, sir.

13        Q.    Okay.  And the fact he had chemotherapy, did

14   that play into that decision making there?

15        A.    No.  Actually --

16        MR. MARTINEZ:  Objection.  What she's going to say is

17   beyond the scope.

18        THE COURT:  Just answer the question.

19   BY MR. PATTERSON:

20        Q.    The answer is no.  Then what did motivate him

21   not to explore this experimental treatment?

22        A.    He did not want experimental treatment because

23   he was not a guinea pig and did not want to participate in

24   that manner.

25        Q.    Let me show you Exhibit 465 for

1   identification.  What does this appear to be?

2                    (Pause in proceedings.)

3        THE WITNESS:  It appears to be copies of emails

4   between Shawn and myself.

5   BY MR. PATTERSON:

6        Q.    Okay.

7        A.    Shawn King.

8        Q.    And what was the reason for emailing Shawn?

9        A.    To elicit his help in -- in research.

10       Q.    Okay.  Is there a date on this email that

11   indicates when the original email was sent?

12       MR. MARTINEZ:  I'm going to object.  He's assuming

13   that's the original email.  We don't know that.

14       THE COURT:  Sustained.

15       MR. PATTERSON:  Well --

16       THE COURT:  Hold on a second.  Repeat the question

17   again.

18       MR. PATTERSON:  I'll just rephrase it.

19   BY MR. PATTERSON:

20       Q.    Is there a date in that email that is referred

21   to as original email on that document?

22       A.    Yes, there is.

23       Q.    Okay.  What is the date?

24       A.    May I look?

25       Q.    Yes.

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1          A.     It says March 21st of 2000.

2          Q.     Okay.  And is that, to your recollection, the

3    time that you started inquiring or seeking Shawn's help?

4          A.     It was the first time I approached him about

5    it, but I -- I did not actively -- I talked to him more about

6    it from his perspective of the suicidal thing rather than

7    finding something.

8          Q.     Okay.

9          MR. PATTERSON:  Judge, may we approach?

10         THE COURT:  Yes.

11

12               (The following proceedings were held at the

13    bench:)

14

15         MR. PATTERSON:  I'm about 10 minutes off, but I've

16    exhausted my questions for today.  I don't want to just ask

17    questions for the sake of asking questions, so --

18         THE COURT:  Okay.

19

20               (The following proceedings were held in open

21    court:)

22

23         THE COURT:  Okay.  Ladies and gentlemen, we're taking

24    our evening recess at this point in time.  During this

25    recess, remember the entire admonition I've given you

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000005454

```
 1    including the fact you're not to discuss this case with
 2    anyone, do not let anyone discuss the case with you.  Do not
 3    do any research, investigation, experimentation or testing on
 4    your own.  Avoid any media coverage of this case.  Keep an
 5    open mind.
 6              I want you to have a nice evening.  We'll see
 7    you tomorrow at 1:00 p.m.  Have a nice evening.
 8
 9              (Evening recess.)
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

132

```
 1

 2

 3.                        CERTIFICATE OF REPORTER

 4

 5     STATE OF ARIZONA      )
                             )
 6     COUNTY OF MARICOPA    )

 7

 8                   I, Traci L. Wheeler, CSR, RPR, an official

 9     and certified reporter in the Superior Court of the State

10     of Arizona, in and for the County of Maricopa, hereby

11     certify that I made a shorthand record of the proceedings

12     had in the within case, and that the foregoing transcript

13     is a full, true, and correct transcription of the

14     proceedings in this case.

15                   Dated this 5th day of July, 2005.

16

17

18                                   _____
                                     Traci L. Wheeler, CSR, RPR
19                                   Certified Court Reporter No. 50313
                                     Official Court Reporter
20

21

22

23

24

25
```

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

# EXHIBIT AA

DP

05-0002.1
Braccio


1              IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

2                  IN AND FOR THE COUNTY OF MARICOPA

3

4    STATE OF ARIZONA,                )
                                      )
5              Plaintiff,             )
                                      )
6    v.                               )      No. 1 CR 05-0005 AP
                                      )      MARICOPA COUNTY
7    WENDI ELIZABETH ANDRIANO,        )      No. CR 2000-096032
                                      )
8              Defendant.             )
     _____)
9

10

11

12                        Mesa, Arizona
                       October 28, 2004
13

14

15            BEFORE:  The Honorable BRIAN K. ISHIKAWA

16

17

18            REPORTER'S TRANSCRIPT OF PROCEEDINGS

19                         TRIAL DAY 34

20

21

22

23

24   ORIGINAL Prepared for APPEAL by:
     TRACI L. WHEELER, CSR, RPR
25   Certified Court Reporter No. 50313



        TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

2

1                    A P P E A R A N C E S

2    FOR THE STATE:        JUAN M. MARTINEZ,
                           Deputy County Attorney
3
     FOR THE DEFENDANT:   DANIEL B. PATTERSON,
4                          Deputy Public Defender
                                    and
5                          G. DAVID DELOZIER,
                           Attorney at Law
6

7            I N D E X   O F   E X A M I N A T I O N

8    WITNESS                                              PAGE

9    ANDRIANO, WENDI ELIZABETH, Called on her own behalf
             Continued Direct Examination by Mr. Patterson    3
10           Continued Direct Examination by Mr. Patterson   50
             Cross-examination by Mr. Martinez               69
11           Continued Cross-examination by Mr. Martinez    102

12

13

14

15

16

17

18

19

20

21

22

23

24

25


            TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

```
1              MESA, ARIZONA, THURSDAY, OCTOBER 28, 2004

2

3              THE COURT:  Good afternoon.  This is trial in

4    cause number CR 2000-096032, State of Arizona versus Wendi

5    Elizabeth Andriano.  The record will reflect the presence of

6    the Defendant, Counsel and the jury.  The defendant, Wendi

7    Elizabeth Andriano is on the witness stand.  We'll continue

8    with the direct examination by Mr. Patterson.

9                   Mr. Patterson?

10             MR. PATTERSON:  Thank you, Judge Ishikawa.

11

12             WENDI ELIZABETH ANDRIANO,

13             CALLED TO TESTIFY ON HER OWN BEHALF,

14   HAVING PREVIOUSLY BEEN DULY SWORN, TESTIFIES FURTHER:

15

16   CONTINUED DIRECT EXAMINATION BY MR. PATTERSON:

17             Q.   You are Wendi Andriano?

18             A.   Yes, I am.

19             Q.   You are the same Wendi Andriano that was

20   testifying earlier in this trial?

21             A.   Yes.

22             Q.   And you recognize that you're still under oath?

23             A.   Yes, sir.

24             Q.   Okay.  Checking over my notes last night,

25   Wendi, I neglected to ask you certain questions in certain
```

4

1     areas, and so I'm going to jump around for a few minutes

2     here.

3              Let's start with Exhibit 231.  Would you have a

4     look at that and see if you recognize that particular

5     document?

6         A.    Yes, I do.

7         Q.    Okay.  What is that?

8         A.    This was an ice breaker game that we had at one

9     of our manager's meetings.  Fairfield managers got together

10    and -- that's what it was.

11        Q.    Mechanically, how does this ice breaker game

12    work?

13        A.    If I recall correctly, they had you number the

14    paper 1 through whatever, and they would ask you certain

15    questions and you'd write a name by each of those numbers.

16    And then afterwards they'd put like the key or whatever to

17    it, and it was just a funny thing because your answers end

18    up, you know, saying that maybe you're going to get married

19    to your mother, you know, or just --

20        Q.    Okay.  So certain person's names are randomly

21    assigned certain numbers and then thereafter there are

22    certain descriptive terms --

23        A.    Yes.

24        Q.    -- randomly attached to those names and

25    numbers?

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000005461

1          A.     Yes.  I believe in the beginning of the game

2     whoever's giving the, you know, the instructions, the number

3     and the description go together.  What's random is the names

4     that you come up with.

5          Q.     Okay.  All right.  So that entry that says

6     "Rick Love," was that just a random assignment of descriptive

7     terms?

8          A.     Yes, it is.

9          Q.     Okay.  And "Erik," was that Erik Vaillant?

10          A.     That was Erik Vaillant.

11          Q.     And what's beside his name?

12          A.     "Knows you best."

13          Q.     Okay.  And, again, was that just a random

14     assignment of a characteristic?

15          A.     Yes, that is.

16          Q.     Okay.  And this was done to break the ice at a

17     manager's --

18          A.     Yes.

19          Q.     -- meeting?  Why was it in your house?

20          A.     Frequently when I get home from a manager's

21     meeting, I would go home first and eat some lunch or

22     whatever, and so it would have just been paperwork left -- I

23     had several papers from my -- that were work related in my

24     home.

25          Q.     Okay.  All right.  There was some testimony

```
 1   about having to go home as a result of Joe calling to take

 2   care or diaper the babies.  Do you recall that discussion

 3   that was had earlier in this trial?

 4           A.    Yes, I did.

 5           Q.    Okay.  Did you work at San Riva on Sundays?

 6           A.    Yes, I did.

 7           Q.    Okay.  And who generally speaking was home with

 8   the children on Sundays?

 9           A.    On occasion Joe would have to watch them by

10   himself.

11           Q.    Okay.  And would this be occasions when he

12   wasn't out at the lake?

13           A.    Yes.

14           Q.    Okay.  Would you receive phone calls from Joe

15   demanding that you do certain things on those days?

16           A.    Yes, I would.

17           Q.    What would he ask you or demand or tell you to

18   do?

19           MR. MARTINEZ:  Objection.  Lack of foundation.  Which

20   days?

21           THE COURT:  Objection --

22           MR. PATTERSON:  On these --

23           THE COURT:  -- is --

24           MR. PATTERSON:  Sorry.

25           THE COURT:  -- sustained.  Lay a little more
```

1    foundation.

2    BY MR. PATTERSON:

3         Q.    On these Sundays you were working, what are we

4    talking about?

5         A.    I worked for 5 hours on Sundays.

6         Q.    Okay.  This was from the point in time you

7    first took the job at San Riva through October of 2000?

8         A.    Yes, sir.

9         Q.    Okay.  On these occasions would you receive

10   phone calls from Joe demanding you come home and do

11   something?

12        A.    Yes, I would.

13        Q.    What was he demanding you do?

14        MR. MARTINEZ:  Again, lack of foundation.  Was it

15   every time, which, when?

16        THE COURT:  I'll sustain the objection.

17   BY MR. PATTERSON:

18        Q.    There was a theme or consistent substance to

19   the nature of the calls he would make to you?

20        A.    Yes, there was.

21        Q.    Okay.  Tell us about those?

22        A.    He would call me to come home when the babies

23   needed their diapers changed or when they were hungry to feed

24   them.

25        Q.    Okay.  And would you do that?


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000005464

1       A.      Yes, I would.

2       Q.      And how would you get from the manager's office

3   down to unit 132?

4       A.      Occasionally I would -- we had golf carts that

5   we used to escort people around the property, and I would

6   take that and drive it back to the apartment.  Or I would --

7   if one of those weren't available, I would take my vehicle

8   that I was driving and drive home.

9       Q.      Okay.  And why would you use a vehicle to get

10  from the manager's office to unit 132?

11      A.      Because of my dress attire.  I'm usually in --

12  in pumps or whatever and it takes a while to walk home. And

13  in the summertime it's quite hot.

14      Q.      Okay.  When you would get home, would you take

15  care of the things that needed to be taken care of?

16      A.      Yes, I would.

17      Q.      Okay.  Did it create some difficulty for you

18  with the children?

19      A.      Yes, it did.

20      Q.      What did -- why was it difficult?

21      A.      Every time I would leave, the children would

22  cry.  Ashley would hold onto my leg and Nicolas wouldn't want

23  me to go, and they'd be crying and it was very frustrating

24  for me and it hurt.  And so I would always sneak out of the

25  house so they wouldn't know I was leaving.  So having to come

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000005465

9

1   home in the middle of the day and having to leave again was

2   just terrible because they'd be crying again.

3           Q.    All right.  At some point in time did Joe

4   explain to you his position with regard to infidelity?

5           A.    Yes, he did.

6           Q.    Okay.  At what point in your relationship did

7   this discussion occur?

8           A.    Maybe the first six months of our dating.

9           Q.    Okay.

10          A.    Sometime in there.  I can't tell you a specific

11  day.

12          Q.    Okay.  What did he tell you was his position

13  with regard to your -- any future infidelity that you might

14  engage in?

15          A.    He would not tolerate it.  It had happened to

16  him once before and it would not happen again.  He would --

17  basically he said to me that if it -- if I ever did that to

18  him, that he would F-ing kill me.

19          Q.    Okay.  Did he give you an example of a problem

20  he had with a fiancee?

21          A.    Yes, he did.

22          Q.    Okay.  What was her name?

23          A.    Shelly.

24          Q.    Okay.  And what did he say that he did when he

25  found out -- well, did he tell you that he discovered that

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1          she in fact had been unfaithful to him?

2                  A.     Yes.  That's what he told me.

3                  Q.     Did he describe the circumstances to you?

4                  A.     He said he found out that she was cheating on

5          him.  He discovered her in bed with somebody.

6                  Q.     Okay.  And did he tell you what he had to do to

7          deal with that?

8                  A.     I guess he became so angry at the situation

9          that he ended up leaving the state and going to California

10         until he could calm down and -- and return to Arizona.

11                 Q.     All right.  With regard to the -- let's talk

12         about the Travis Black incident, okay?  You wanted to clear

13         one thing up with regard to who was babysitting your children

14         at the time you had your relationship with Travis Black?

15                 A.     Yes, I did.

16                 Q.     Okay.  What did you tell us earlier?

17                 A.     Yesterday I said that my mother was watching

18         them and in fact Nicolas and Ashley stayed the night at our

19         sitter, Gia's.  My mom and dad weren't in town then.

20                 Q.     Okay.  Now, you testified yesterday that you

21         secured the condom that was used during the intercourse with

22         Mr. Black from the top of the highboy in the bedroom where

23         Joe kept his collection of condoms, correct?

24                 A.     Yes, sir.

25                 Q.     Okay.  Where was Joe that weekend?

1          A.     He was at the lake.

2          Q.     Okay.  At some point in time obviously he came

3    home from the lake?

4          A.     Sunday evening.

5          Q.     Okay.  Was there any discussion reference

6    condoms, infidelity, anything of that nature Sunday evening?

7          A.     No, there was not.

8          Q.     Okay.  Where did you go Monday morning, the

9    next Monday?

10         A.     That Monday morning I went to work.

11         Q.     Okay.  And did you receive a phone call from

12   Joe that Monday?

13         A.     Yes, I did.

14         Q.     Okay.  What was the substance of that phone

15   call?

16         A.     He wanted to know where in the world his

17   missing condom was.

18         Q.     Okay.  So he apparently had counted his condoms

19   and found that one was missing?

20         MR. MARTINEZ:  Objection.  Leading.

21         THE COURT:  Sustained.

22   BY MR. PATTERSON:

23         Q.     How did he come to know this information if you

24   know?

25         A.     He just told me that one of his condoms were

1    missing and he wanted to know where it was and he swore at me

2    quite a lot over the phone.

3         Q.    What did you do?

4         A.    I was shocked.  I didn't even know how to

5    answer him, and I just kept telling him I didn't know where

6    it was.

7         Q.    Okay.  Did he persist in his interrogation of

8    you?

9         A.    That was the central theme of our conversations

10   for the next week.

11        Q.    He would bring it up thereafter?

12        A.    Oh, yes.

13        Q.    And what was your response to this question?

14        A.    I just kept telling him I didn't know, I don't

15   know, I don't know, I don't know.

16        Q.    Let's talk about that Friday when you put the

17   sodium azide in the gelcaps.  After you were done, where did

18   the box go?

19        A.    Joe took it out to our storage -- not the one

20   that -- he took it to the one that was -- that we stored

21   things in, not the one that he would use for working on his

22   vehicles.

23        Q.    Okay.  And why was that decision made?

24        A.    Because the children would more likely be

25   around that one rather than the other.


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1         Q.    Which one?  The one where he was working on the

2    boats or where he stored things?

3         A.    The children would be around where he worked on

4    his boats, not the one we stored things.

5         Q.    Okay.  All right.  After he took the cardboard

6    box away from 132 to the storage unit, what did you guys do

7    that afternoon, that evening?

8         A.    That afternoon we went to the movies right

9    there on Ray Road.

10        Q.    Okay.  Do you recall which film you attended?

11        A.    Yes.  We watched Coyote Ugly.

12        Q.    Okay.  Is -- is Friday a certain kind of day

13   for you generally speaking back in October of 2000 or back in

14   2000?

15        A.    Yes, it is.

16        Q.    Okay.  What was your work schedule with San

17   Riva?  What days did you work?

18        A.    I worked Sunday through Thursday.

19        Q.    Okay.  So Thursday was your day off?

20        A.    Friday, yes.

21        Q.    Okay.  Typically on Fridays what did you do?

22        A.    I would get up and start -- that was my day to

23   clean house.

24        Q.    Okay.  On this particular Friday, did you do

25   some house cleaning?

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

14

1          A.     I started to.

2          Q.     Okay.  What did you start to do?

3          A.     One of the first things that I do is clean the

4     kitchen, so I will open up the refrigerator and take out all

5     the leftovers from the week that -- that we hadn't eaten.

6          Q.     Okay.

7          A.     And take them out and just clean, you know,

8     start cleaning dishes.

9          Q.     And generally speaking, are there a lot of

10     leftovers in the refrigerator in the Andriano household?

11          A.     Always.

12          Q.     Okay.  And why is that?

13          A.     Joe didn't eat leftovers.

14          Q.     Okay.  So you would make a dinner.  Whatever

15     was left over, you'd put in Tupperware.  And what would

16     happen to it?

17          A.     Occasionally I would eat it for hunch.  If I

18     didn't have time to eat it for lunch by Friday, of course, I

19     needed to get rid of it.

20          Q.     Okay.  Had you started to do that this

21     particular Friday, October 6, 2000?

22          A.     Yes, I had.

23          Q.     Okay.  And where were some of the leftovers in

24     the kitchen?

25          A.     Well, the kitchen counter space isn't large and

1    so I fill up to the left of the kitchen sink the counter

2    space there which overflowed onto the stove.

3         Q.    Okay.   Were you in the process of cleaning

4    the -- the containers?

5         A.    Yes, I was.

6         Q.    Okay.   And to that end where were the

7    containers in terms of the sink?

8         A.    To the left and some overflow onto the stove.

9         Q.    Okay.   Did you make dinner that evening,

10   October 6, 2000?

11        A.    No, I did not.

12        Q.    Where did you folks eat?

13        A.    We had take out from Carrabas.

14        Q.    Okay.   And what is Carrabas for those who --

15        A.    It's an Italian restaurant and it's just right

16   across the I-10 from the movies.

17        Q.    Okay.   So you went to Coyote Ugly, and on the

18   way home you picked up Carrabas?

19        A.    Yes, we did.

20        Q.    Okay.   Okay.   Anything eventful happen 10/6,

21   the evening of 10/6/2000?

22        A.    No.

23        Q.    Okay.   All right.   Were there plans that

24   evening to go to another location for dinner with somebody

25   else on Saturday?

```
 1          A.    Yes.

 2          Q.    Okay.  What were those plans?

 3          A.    On Saturday evening we were invited down to his

 4   parents house in Casa Grande for a cookout.

 5          Q.    What time did you wake up on October 7, 2000?

 6          A.    7:00 or 8:00.

 7          Q.    Okay.  You obviously got the kids up, got

 8   them --

 9          A.    Actually, Nicolas would get me up, but, yes.

10          Q.    All right.  Where was the first place that you

11   and Joe and kids went Saturday morning, October 7, 2000?

12          A.    Actually, his mother met us at the apartment

13   and we ended up going to the swap meet in downtown Phoenix.

14          Q.    Okay.  And the mom is Jeanette Andriano?

15          A.    Yes.

16          Q.    Okay.  Who drove from San Riva to the swap

17   meet?

18          A.    Joe did.

19          Q.    Okay.  This is the swap meet at Washington,

20   downtown Phoenix?

21          A.    Yes.

22          Q.    Was there any particular reason for going to

23   the swap meet or --

24          A.    Yes, there was.  We had been there before and

25   had purchased a little bike for Nicolas that had on the back
```

```
 1     of it a carrier that Ashley could sit.  It was a -- somebody

 2     was making them.  They were -- I don't know.  It's kind of

 3     like a tricycle with a little thing on the back, and the kids

 4     loved it.

 5             Well, we had taken it to the babysitter and

 6     some of the older children had ruined it, so we were

 7     purchasing another one.

 8          Q.    Okay.  So a replacement?

 9          A.    Yes.

10          Q.    Okay.  And was this mom-in-law's gift?  Is that

11     why she came along, or is there a reason why Mrs. Andriano

12     was there?

13          A.    No.  She was just spending the day with us.

14          Q.    Okay.  Playing with the grandkids?

15          A.    Yes.

16          Q.    Okay.  At the swap meet how long did you speak?

17     How much time did you spend there?

18          A.    A few hours.  I can't -- I don't have a

19     specific time, but we were there for quite some time.

20          Q.    Okay.  Did you eat there?  Did you buy anything

21     other than the little tricycle apparatus?

22          A.    Might have purchased a couple other things.  I

23     remember we bought kettle corn there because that's the only

24     place you can buy that, but I remember buying that.

25          Q.    Okay.  Any problems at the swap meet?
```

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000005474

1          A.      No.

2          Q.      Okay.  Where'd you go after the swap meet?

3          A.      After the swap meet we went to Sam's Club.

4          Q.      Okay.  And where is the Sam's Club located?

5          A.      It's on Chandler -- is it Chandler Boulevard?

6     I believe Chandler Boulevard and I-10.  I think it's

7     Chandler.

8          Q.      Between Ray and Chandler? You could see it from

9     the freeway --

10         A.      Right.

11         Q.      -- on the 10 there?

12         A.      Right.

13         Q.      Do you recall what time of day you got to Sam's

14    Club?

15         A.      Afternoon.

16         Q.      Okay.  And do you remember how much time you

17    spent at Sam's Club?

18         A.      Maybe an hour.

19         Q.      Okay.  Do you recall what you may have

20    purchased there?

21         A.      Um, we all -- well, whatever.  I mean, we

22    always picked up a few things.  Maybe some snacks for the

23    kids and juices, things like that.  And we also purchased a

24    lamp.

25         Q.      Okay.  Now, can you describe this lamp that was

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    purchased -- well, did you ever see this lamp?

2            A.    I saw the box.

3            Q.    Okay.  Describe what was depicted on the box?

4            A.    It was somewhat a glass-type shade with a --

5    kind of like a pewter base.

6            Q.    Okay.  Did you ever open that box and look

7    inside that box and see what was in that box?

8            A.    I did not.

9            Q.    Okay.  And from where in Sam's club?  How was

10   it acquired?  Was it on the shelf and --

11           A.    There was a whole load of them, yeah.  They

12   were stacked pretty high.

13           Q.    Okay.  And did you or Joe pick it off the shelf

14   and do something with it?

15           A.    Joseph would have, yes.

16           Q.    Okay.  And what did he do with it?

17           A.    Put it in the basket.

18           Q.    Okay.  All right.  Did you go to any place

19   after your trip to Sam's Club?

20           A.    We went home.

21           Q.    Okay.  Do you recall about what time you got

22   home?

23           A.    Maybe around 3:00.

24           Q.    Okay.  What did you do when you got home?

25           A.    I started getting the babies ready for a nap.

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1        Q.     And where would -- where would you have done

2    that kind of activity?

3        A.     Actually, I would put Ashley in her room and

4    rock her.  There was a rocker in her room and I would rock

5    her a little while and then I could lay her in the crib and

6    she'd take a nap.

7        Q.     Okay.  How old is Ashley at this point?

8        A.     She has just turned two.

9        Q.     Okay.  And Nicolas?  What did you do with

10   Nicolas at this time?

11       A.     Nicolas would have been running around doing

12   whatever, I don't know.  And then as soon as I put Ashley

13   down, I got him and put him in his room to take a nap.  And

14   he didn't want to, he was -- I guess too much excitement

15   during the day, so I ended up staying in the room with

16   Nicolas and we took a nap together.

17       Q.     Okay.  And in which room is this nap occurring?

18       A.     In Nicolas's room.

19       Q.     Okay.  Prior -- did you actually doze off or

20   just lay with him?

21       A.     Oh, I actually went to sleep too.

22       Q.     Okay.  Before you dozed off, where was Joe?

23       A.     Well, while I was chasing Nicolas around and

24   trying to get him to take a nap, Joe had been in the living

25   room.  And I could hear him --

1           MR. MARTINEZ:  Object as nonresponsive.  She's --

2           THE COURT:  Sustained.  Ask your next question.

3           MR. PATTERSON:  Thanks, Judge.

4    BY MR. PATTERSON:

5           Q.    Where was Joe when you were tracking down

6    Nicolas?

7           A.    In the living room.

8           Q.    Okay.  What was he doing in the living room?

9           A.    I could hear him opening and messing with this

10   lamp box.  He was going to put it together.

11          Q.    Okay.  Did you hear him at some point cussing,

12   swearing or complaining?

13          A.    Yes, I did.

14          Q.    What was he complaining about?

15          A.    That the lamp was broken.

16          MR. MARTINEZ:  Objection.  Hearsay.

17          THE COURT:  Overruled.  Go ahead, answer the

18   question.

19          THE WITNESS:  He was very upset the lamp was broken.

20   He was going to have to take the thing back, and he was

21   cussing and carrying on with that.

22   BY MR. PATTERSON:

23          Q.    And this was the lamp you had only viewed the

24   exterior of the box?

25          A.    Yes, sir.


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1          Q.     Okay.  You're taking a nap.  How long did this
2    nap with Nicolas last?

3          A.     Probably for a couple of hours, somebody called
4    the house and woke us up.

5          Q.     Okay.  After you awoke, what did you do?

6          A.     Got everybody ready and got in the car to drive
7    to Casa Grande.

8          Q.     Okay.  Got in the car, did you make any stops
9    before you actually got on the road to Casa Grande?

10         A.     Yes, we did.

11         Q.     Where did you go?

12         A.     We went to Marie Calendar's.

13         Q.     Okay.  For what purpose?

14         A.     We purchased a couple of pies to take down to
15   the dinner.

16         Q.     Okay.  Was that your contribution to the
17   barbecue down at in Casa Grande?

18         A.     Yes.

19         Q.     Okay.  All right.  Tell me about Joe's demeanor
20   up to this point on this day.  How was he acting?

21         A.     He was acting normal.  He just was a little
22   more quiet than usual, but he was still going through the
23   motions of daily life.

24         Q.     Okay.  Get down to Casa Grande.  Who's down
25   there?  Well, I guess -- what time do you think you arrived


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1      in Casa Grande?

2              A.     Maybe close to 7:00.

3              Q.     Okay.  And who's there that you recognize when

4      you arrive?

5              A.     Well, that I can recall, I know Janay and Brad

6      and their children.

7              Q.     Now, Janay just had a child or she have a

8      toddler?

9              A.     She had a little one, yes.

10             Q.     Okay.

11             A.     Um, his mom and dad.  I believe, um, his aunt

12     and uncle, and Andrea, his cousin.  That's all that I can

13     remember off the top of my head.

14             Q.     Okay.  Was it an outdoor sitdown, indoor

15     buffet?  How did you guys --

16             A.     It was all -- the food was being cooked outside

17     and brought into the dining room table to sit at and eat.

18             Q.     Okay.  Did you assist in creating the dinner or

19     did you just sit and enjoy?

20             A.     No.  There was more just socializing and then

21     we ate, Joe and I ate.

22             Q.     Okay.  Tell me about what you and Joe did.

23     Well, let's take it step by step.  What did you do while the

24     meal was being created?

25             A.     Just socialized.


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1          Q.     Okay.  And sitting in the rooms or --

2          A.     Living room.

3          Q.     Okay.  Where was Joe at this time?

4          A.     For most of the evening, Joe was laying on the

5     couch and I was sitting next to him.  And there were other

6     people in the living room, and so we were all talking.

7          Q.     Okay.  Do you recall what Brad was doing, your

8     brother-in-law?

9          A.     Yes.  He was on the floor with the two little

10    ones and kind of playing with them a little bit.  And -- and

11    we were -- it was all kind of close.  We were all sitting

12    together watching them.

13         Q.     Okay.  Was Joe playing with the children on the

14    carpet?

15         A.     No, he wasn't.

16         Q.     Okay.  Was that something he would generally do

17    when he would go down to visit the kin folk?

18         A.     Yes.  Joe normally would be out playing with

19    the kids.

20         Q.     Okay.  On this occasion he didn't and just

21    remained on the couch?

22         A.     Yes, sir.

23         Q.     Okay.  Can you describe his demeanor for me

24    during the period of time he was at his father and mother's

25    place in Casa Grande?


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1          A.    He seemed very pensive and very -- a little bit

2     depressed, a little bit sad.

3          Q.    At some point in time, did you leave Casa

4     Grande?

5          A.    Yes, we did.

6          Q.    Okay.  Had there been any discussion that you

7     observed or overheard concerning Joe's suicide and his

8     parents, anything of that nature?

9          A.    Not that I heard, no.

10          Q.    Okay.  Did you and he discuss the suicide plan

11     at the Casa Grande house of his mother and father?

12          A.    No, we did not.

13          Q.    All right.  The drive back from Casa Grande

14     takes, what, how many minutes?

15          A.    40 minutes or so.

16          Q.    Okay.  During that period of time back was

17     there any discussion about the suicide plan involving the

18     sodium azide?

19          A.    Yes, there was.

20          Q.    Okay.  What was the discussion?

21          A.    He said he was going to do it tonight.  It

22     was -- it's time.

23          Q.    Okay.  And tell me a bit about your husband's

24     decision-making process?

25          A.    Very spontaneous, very and -- once he makes a

1    decision, he doesn't change his mind.  I -- we just -- he's

2    just very strongminded, and when he decides something, that's

3    what he does.

4            Q.    Okay.  Did you discuss it?  I mean, was it a

5    discussion in the sense that you had input in the process or

6    is he basically doing the talking?

7            A.    No.  It's him telling me what he's going to do.

8            Q.    When you got home, what did you do with the

9    children?

10           A.    They fell asleep in the car and so I picked up

11   Nicolas and put him in his bed, and Joe took Ashley and put

12   her in her bed.

13           Q.    Okay.  After the children were set for bed,

14   what happened next?

15           A.    Um, Joe wanted some popcorn so I made him some

16   popcorn, microwave popcorn.  And we just kind of had a little

17   bit of last discussion about what was getting ready to

18   happen.

19           Q.    What was the dialogue if you can recall it?

20           A.    Well, he wanted us to take a bath together

21   first.  Just as a last goodbye.

22           Q.    Had that been a ritual that you and he had

23   engaged in throughout the period of your marriage?

24           MR. MARTINEZ:   I'm going to object.  He only died

25   once.

27

```
1              THE COURT:  Overruled.  Go ahead and answer the
2    question.
3              MR. PATTERSON:  Judge, I'm talking about the bath.
4              THE COURT:  Right.
5              THE WITNESS:  Yes.
6              THE COURT:  Do you understand the question?
7              MR. PATTERSON:  Go ahead and answer.
8              THE WITNESS:  Can you ask me again?
9    BY MR. PATTERSON:
10             Q.    Was the bathing together a ritual that you and
11   he had done during the period of your marriage?
12             A.    Yes, we had.
13             Q.    Okay.  And was this the location frequently
14   where the sexual activity occurred?
15             A.    Once a month.
16             Q.    All right.  And was there a kind of certain
17   things that were done to create an environment in the
18   bathroom on each occasion?
19             A.    Yes.
20             Q.    Tell me about that.
21             A.    I loved candles, and so I would always light
22   candles around and stuff, and I also had, like, scrubby
23   things, and I would wash his back and stuff like that.
24             Q.    Okay.  Did that occur October 7, 2000?
25             A.    Yes.
```

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000005484

1          Q.     Okay.  Were there candles set up around the

2    perimeter of the bathtub?

3          A.     Around in the bathroom.

4          Q.     Bathroom?

5          A.     Not necessarily on the bathtub.

6          Q.     Okay.  And did you scrub his back with the --

7    with the things that you described?

8          A.     I did.

9          Q.     Okay.  How long did this -- well, was there

10   also another activity that occurred in the bathtub?

11         A.     Yes.

12         Q.     What was that activity?

13         A.     We made love.

14         Q.     How long were you and Joe in the bathtub

15   together bathing and making love?

16         A.     I don't know.  I wasn't watching the clock.

17         Q.     Okay.  What was -- was it of some duration?

18         A.     Yes.

19         Q.     Okay.  What happened after the bathing and the

20   making love?

21         A.     Joe was the first one to get out of the

22   bathtub, and I went ahead and took a shower, rinsed off,

23   and --

24         Q.     Did you wash your hair?

25         A.     Yes.  I always wash my hair when I take a

1    shower.  And we both went to the bedroom.

2              Q.     Did Joe at that time take something from the

3    closet?

4              A.     Yes, he did.

5              Q.     What did he take?

6              A.     The bottle of Elderberry.

7              Q.     It didn't contain Elderberry though, did it?

8              A.     No, sir.

9              Q.     Okay.  Did he ask you to get something for him?

10             A.     He wanted a -- a glass of Gatorade.

11             Q.     Okay.  Did you get that for him?

12             A.     Yes, I did.

13             Q.     Okay.  And I assume that was from the kitchen?

14             A.     Yes.

15             Q.     Okay.  When you came back into the bedroom with

16   the Gatorade, what did you see?

17             A.     Well, he's standing there with the bottle and I

18   hand him the glass of Gatorade and I -- he said, Well, here

19   it goes, and so he opened the bottle and poured out -- and I

20   don't even know how many pills were in his hand.  He popped

21   them in his mouth and swallowed them with the Gatorade.

22             Q.     This occurred in the bedroom?

23             A.     Yes, sir.

24             Q.     Okay.  What kind of clothing does Joe have on

25   at that time?


           TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1        A.    He just had his boxers on.

2        Q.    Okay.  What were you doing while he was

3   consuming the pills?

4        A.    It was very unreal for me, and I'm just

5   standing there watching him because I don't know what's going

6   to happen.

7        Q.    Do you have any idea how this would accomplish

8   the objective as Joe saw it?

9        A.    We both thought it would be just like --

10       MR. MARTINEZ:  Objection.  Speculation as to what he

11   thought.

12       THE COURT:  Sustained.

13   BY MR. PATTERSON:

14       Q.    What did you think?

15       A.    That it would work like the cyanide and within

16   a few minutes you -- your heart would stop and it would be

17   over.

18       Q.    Okay.  Do you have any kind of belief as to

19   whether it would be painless, painful that kind of thing?

20       A.    Painless.

21       Q.    Okay.  After he ingested the capsules what

22   happened?

23       A.    Some minutes passed, I don't know how long,

24   but -- maybe 15 or so, and Joe started feeling dizzy and

25   nauseous.  I saw him breaking out in a sweat.  And he

1    actually went to the floor in the bedroom and then some of

2    that -- he got up and that's when I was scared.  And I said,

3    "Can I take to you the emergency room?"  Because it was

4    freaking both of us out because he was just -- things were

5    happening that we didn't have any idea.  And so he put on his

6    shorts and we walked out to the living room, and then it's

7    like another wave of whatever hit him again.

8            Q.    What happened?

9            A.    And then he vomited on the living room floor.

10   And he's laying on the living room floor.

11           Q.    Okay.  Were you frightened at this time?

12           A.    Yes, sir.

13           Q.    What was Joe's reaction?

14           A.    He was scared.

15           Q.    Did you actually have a discussion about the

16   emergency room?  Was this something that you just told him

17   needed to be done?

18           A.    I told him -- I said we need to go because

19   something's wrong, you know?  I didn't know what was

20   happening, but he wanted to go too.  He was scared.

21           Q.    All right.  What was the plan then at that

22   point with regard to a trip to the emergency room?

23           A.    Well, we were going to go to the car as soon as

24   I could get somebody to the apartment to watch the children,

25   and I was going to drive him to the urgent care on Chandler

32

1    Boulevard.

2            Q.    Okay.  Was that in close proximity to the San

3    Riva apartments?

4            A.    It was just right down the street.

5            Q.    Okay.  Was Joe in agreement with that plan?

6            A.    Yes, he was.

7            Q.    Okay.  So as of this point in time, the suicide

8    plan was off?

9            A.    Yes, because we were scared.

10           Q.    Okay.  Had he vomited by this time?

11           A.    Yes, he had vomited.

12           Q.    Okay.  And where was he at the time after the

13   vomiting?

14           A.    Laying on the living room floor.

15           Q.    Okay.  Did you make a phone call at that time?

16           A.    Yes, I did.

17           Q.    Who did you call?

18           A.    I called Shannon.

19           Q.    Shannon Sweeney?

20           A.    Yes.

21           Q.    Okay.  Did she live on site?

22           A.    Yes.

23           Q.    And what was your reason for calling Shannon?

24           A.    I wanted her to come over and stay in the

25   apartment while I drove Joe to the Urgent Care.

1      Q.    Okay.  Did you get an answer at Shannon

2   Sweeney's house?

3      A.    No, I didn't.

4      Q.    Okay.  What did you do at that point?

5      A.    Then I called Chris.

6      Q.    Chris --

7      A.    Hashisaki.

8      Q.    Okay.  Was she home?

9      A.    Yes, she answered the phone.

10      Q.    And what did you express to her at that time?

11      A.    I said that Joe was sick and I asked her -- I

12   told her I was going to take him to Urgent Care and if she

13   could come over and watch the kids for me.

14      Q.    Okay.  Did she agree to come up?

15      A.    Yes, she did.

16      Q.    Did she come over immediately?

17      A.    No.

18      Q.    All right.  What did you do at that point?  Had

19   some time elapsed from the phone call to Chris Hashisaki when

20   you did something else?

21      A.    I'm sitting there holding Joe's head, and we're

22   kind of just waiting for her to show -- hurry up and get

23   there.

24      Q.    Okay.  How much time elapsed do you think

25   before you were forced to do something else?

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1       A.      I don't know.  5, 10 minutes.

2       Q.      Okay.  Did you make a second phone call to

3    Chris?

4       A.      Yes, I did.

5       Q.      What did you tell her the second time?

6       A.      I said "Please hurry up."

7       Q.      Okay.  What did you do after the second phone

8    call?

9       A.      I went outside to the sidewalk because I could

10    see her apartment from my -- from outside, and I was -- I was

11    waiting to see her come down the stairs, and then she started

12    hurrying down there to where I was at.

13       Q.      Okay.  Had you brought anything from the

14    bedroom to where Joe was laying on the carpet?

15       A.      Yes.  I had brought him a pillow.

16       Q.      Okay.  What did you do with that pillow?

17       A.      I put it under his head.

18       Q.      All right.  Chris arrived at some point?

19       A.      Yes, I met her out on the sidewalk.

20       Q.      Did you have a discussion with her out there?

21       A.      Yes, I did.

22       Q.      Did you have anything in your possession?

23       A.      I had the phone in my hand.

24       Q.      Okay.  Now, was it a landline phone or cell

25    phone?

```
 1        A.     Landline phone.

 2        Q.     Okay.  But it was a portable?

 3        A.     Portable phone.

 4        Q.     Okay.  And why had you brought that phone out

 5   with you?

 6        A.     Because I had just called her and I just was --

 7   I don't know.

 8        Q.     Okay.  Did you and she have a discussion

 9   outside apartment 132?

10        A.     Yes.

11        Q.     Okay.  What is the nature of that discussion?

12        A.     Told her that Joe was sick and I needed to get

13   him to Urgent Care.

14        Q.     Okay.  What did Ms. Hashisaki say in response

15   to that?

16        A.     She recommended calling 911.  If it was that

17   serious, call 911 and get them here.

18        Q.     Okay.  Did you do that?

19        A.     I tried to.

20        Q.     Okay.  Were you successful at the outside

21   location getting hold of 911?

22        A.     No.

23        Q.     Okay.

24        A.     My phone wouldn't work out there.

25        Q.     Okay.  So what did you and Ms. Hashisaki do at
```

1      that point?

2              A.    We went into the apartment.

3              Q.    Okay.  And where was Joe when you walked in?

4              A.    The same place.  He was still laying there.

5              Q.    Okay.

6              A.    Um --

7              Q.    Did Ms. Hashisaki go over to where Joe was

8      laying?

9              A.    Yes, she did.

10             Q.    Okay.  And did they appear to have a

11     conversation?

12             A.    Yes.

13             Q.    Okay.  What did you do at that point?

14             A.    I -- well, because I couldn't get a hold of 911

15     and I knew that Joe doesn't like a change of plans and he --

16     you know, our decision was to go to Urgent Care so I told

17     him, "Can you get up now, are you able on get up?"  Because

18     earlier he had been able to get up to put his shorts on, and

19     so if he could get up and get to the car, Chris is there and

20     we can go.  And -- and that's I believe when Chris was saying

21     call 911.  And then so I -- I tried to call them again.

22             Q.    Were you successful in getting hold of them the

23     second time?

24             A.    Yes, I was.

25             Q.    Okay.  And from what advantage point did you

1    make that particular phone call?  Was that next to where Joe

2    was or in another room?

3            A.    No.  I actually went to the other phone that

4    was not a portable phone.

5            Q.    Okay.

6            A.    Because I was -- just wasn't sure, so I grabbed

7    that phone to use.

8            Q.    And this phone is a landline phone that's

9    located in the bedroom?

10           A.    Yes, sir.

11           Q.    Okay.  What did you tell 911?

12           A.    I believe I told them that my husband was

13    having a heart attack.

14           Q.    Okay. And what did they tell you to do or did

15    they indicate that they were coming?

16           A.    Yeah.

17           Q.    Okay.

18           A.    They said they're on their way right away.

19           Q.    Did -- what did you do after receiving that

20    information from 911?

21           A.    I went out to the living room.

22           Q.    And who was out there?

23           A.    It was Chris and Joe.

24           Q.    Okay.

25           A.    And I let Chris know that the 911 was on their

1    way.

2             Q.    All right.  What did Chris Hashisaki do at that

3    time?

4             A.    She said that she would go out front and wait

5    for them.

6             Q.    Okay.  And did she take anything with her when

7    she went out the front door?

8             A.    Yes.  She grabbed her cigarettes.

9             Q.    Okay.  From where?

10            A.    Her purse.

11            Q.    Okay.  And I guess the last you saw her at that

12   point was disappearing out the front door?

13            A.    Yes.

14            Q.    Okay.  What did you do at that point?

15            A.    I knelt back down with Joe because I'm

16   concerned about him.  I don't know what's going on and I want

17   to know how he's feeling and what's happening.

18            Q.    Okay.  And what -- what are you discussing?

19   What was your dialogue at that point?

20            A.    Well, I sat down and we're just talking about

21   how he's feeling, just -- that's it.  It was -- it was -- and

22   he was starting to feel a little bit better.  He wasn't

23   sweating anymore and I had seen that he had thrown up another

24   time.

25            Q.    Okay.

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1          A.     So he said he was starting to feel a little bit

2     better and maybe, you know, it was just a -- an initial

3     reaction.  We weren't sure.

4          Q.     Okay.  Is there a decision or discussion about

5     this plan that involved now the 911 people coming over, the

6     EMT people coming to your apartment?

7          A.     Yes.

8          Q.     Okay.  What were you talking about at this

9     time?

10         A.     Well, we hear them and so I told Joe, I said

11    they're here so they can, you know, take care of you, and he

12    says no, I don't want them here.

13         Q.     Did he say why?

14         A.     He wanted to finish doing what this was going

15    to do to him.  He wasn't -- he wasn't scared anymore.  It was

16    more of a determined type of conversation.  He told me no,

17    don't let them in the house.

18         Q.     Okay.  Did you close the door at that point?

19         A.     I did get up and close the door.

20         Q.     Okay.  And what did you do after you closed the

21    door and had been told by Joe that he didn't want the EMT's

22    assistance?

23         A.     We just sat there quietly and we -- they

24    started knocking on the door and things like that, and we

25    just sat there.  And I said are you sure you don't want to go

```
 1   with them?  And he's like no, I don't.  I'm not going.
 2         Q.    Okay.  Did he direct you to do anything in that
 3   regard?
 4         A.    Not at first, no.
 5         Q.    Okay.  What are you thinking?  What are you --
 6   there were people at your door.  What's going on there?
 7         A.    I don't know what to do.  I'm just trying to
 8   do -- follow what Joe wants done here, so this was -- this
 9   was his thing not mine.
10         Q.    Okay.  So some time elapsed.  At some point did
11   you do something?
12         A.    The phone rang.
13         Q.    Okay.  And who was on the other end of the line?
14         A.    Somebody from 911.
15         Q.    Okay.  Did you have a discussion with them at
16   that point?
17         A.    Yes.  They said they're outside our door, we
18   needed to let them in, and I told them that my husband was
19   refusing service.
20         Q.    Okay.
21         A.    And they -- they actually said that I would
22   need to come out or somebody would -- I don't remember the
23   exact language, but somebody would need to come out and let
24   them know face-to-face that -- to go away.
25         Q.    Okay.  Did you relate the substance of the
```

1    phone call from 911 to Joe?

2          A.    I did.  I hung up.  I said we have to open the

3    door because they want to see and we have to tell them to go

4    away.

5          Q.    Okay.  What --

6          A.    He said you're not opening the door because if

7    you open the door then they could just come in.  And I'm like

8    what do you want me to do?  I have to go -- I have to do

9    something.  They're just going to stand there.  What do I do?

10         Q.    So what -- what was decided?

11         A.    So he just said go on out the back.  He said

12   that way they won't come in the front door.  Go out the back

13   and tell them to go away.

14         Q.    Okay.  And did you do that?

15         A.    I did.

16         Q.    Okay.  And where did you go?

17         A.    Over the patio, just --

18         Q.    Okay.  And what route did you take thereafter?

19         A.    I walked up the sidewalk and went to where I

20   thought the, you know, the paramedic trucks and all that were

21   in front.  And when I looked down the hall, they were still

22   at the front door, so I went ahead and walked down to the

23   front door.

24         Q.    Okay.  Who was there when you arrived outside

25   your front door?

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1          A.    Chris was still there and there was

2     paramedics.  I don't know how to tell you -- how many, I

3     don't know.

4          Q.    Had Chris at some point asked to have her purse

5     given to her?

6          A.    Yes, she did.

7          Q.    Okay.  When did that occur in the sequence of

8     events here?

9          A.    That happened after I went back inside.

10         Q.    After the EMT's had departed?

11         A.    Yes, sir.

12         Q.    Okay.  So she hadn't gotten there yet.

13     All right.  Do you recall how many EMTs were

14     outside your door with Chris?

15         A.    No, I don't.

16         Q.    All right.  What did you tell them?

17         A.    I just told them my husband doesn't want any

18     help, and they said why?  And I said because he has -- I do

19     believe I told them he had cancer and he didn't want -- he

20     just wanted to die.  He didn't want any resuscitation or any

21     of that kind of stuff.

22         Q.    Okay.  Was there a discussion about a "do not

23     resuscitate" order?

24         A.    They asked me if there was one and I said yes,

25     that he had signed one.


                 TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1          Q.     Okay.  And at what location had there been one

2     signed?

3          A.     Well, he signed one every time he had to

4     take -- had to have surgery.

5          Q.     Okay.  Was Chris present when you were having

6     this discussion with the EMTs?

7          A.     Yes, she was.

8          Q.     Okay.  Did she express any concern to the EMTs

9     or request they not depart?

10         A.     I didn't hear her say anything like that.

11         Q.     Okay.  The EMTs did leave at some point, right?

12         A.     Yes, sir.

13         Q.     Okay.  And what did you do after they departed?

14         A.     Well, I -- I don't know.  I went inside before

15     they departed, so --.

16         Q.     Okay.  At some point then did Chris request --

17         A.     Then --

18         Q.     -- she be given her purse?

19         A.     Yes.  It seemed as soon as I got back inside of

20     the living room somebody else was knocking on the door.  And

21     it was Chris and she said "I need my purse, I left my purse

22     in there."  I turned around and looked and, yes, it was on

23     the floor.  I picked it up, opened the door, and I gently --

24     and I did not throw it at her, but I tossed it at her, and

25     then I shut the door.

1       Q.    Okay.  Was there a reason why you didn't want

2  to talk to Chris any further at that point?

3       A.    Because Joe didn't want anybody else around.

4  That was -- because he knew that Chris would insist on this

5  911 thing again and he just wasn't going through that again.

6       Q.    Okay.  So the purse is out, you are back inside

7  with Joe, and what happens next?

8       A.    Well, I sit back down on the floor with him.  I

9  put his head in my lap and we were just going to sit there

10  until whatever happens happens.  I don't know -- you know, we

11  thought another 15 or 20 minutes, we don't know.  We don't

12  know what's -- I guess it just had to work its course or

13  whatever.

14       Q.    Okay.  So you're still operating under the

15  assumption this stuff is in his system and it's going to

16  accomplish the objective?

17       A.    Right.

18       Q.    Okay.

19       A.    I just figured it must have been a different --

20  a slower process than what -- what was related to us.

21       Q.    Okay.  Is he at this time showing or

22  manifesting any of the symptoms that you first observed

23  shortly after he initially took the stuff?

24       A.    At this time, no.

25       Q.    Okay.

1         A.      No.

2         Q.      Any profuse sweating, heart palpitations,

3   anything?

4         A.      No.

5         Q.      Okay.  How is he in general at this point while

6   he's on the carpet with his head on the pillow?

7         A.      It's pretty quiet.  And then, you know, I'm --

8   I'm just kind of patting his head and, you know, just -- I

9   don't know what to do, you know?  This is really hard to sit

10  there and watch somebody die.

11        Q.      All right.  How much time elapses while you're

12  sitting there comforting him?

13        A.      A few minutes.

14        Q.      Okay.  Is there at this point a discussion

15  about something else?

16        A.      Yes, there is.

17        Q.      Okay.  What does the conversation turn to at

18  this point?

19        A.      Joe asked me to please tell him the truth about

20  that condom.

21        Q.      Had this been a topic of concern for him for

22  the preceding week, preceding days?

23        A.      Yes.

24        Q.      Okay.  What did you do?

25        A.      I didn't answer him at first, but he just

1    was -- he said before I die, please tell me what's -- you

2    know, clear the air, let me know what happened.  Please tell

3    me.  And I felt so bad and I didn't want him to die like

4    that.  At least, you know, we could be honest with each

5    other, so I told him what happened.

6               Q.   Okay.  What did you tell him?

7               A.   I told him the weekend he'd been at the lake I

8    had met somebody at Rockin' Rodeo and that it ended up being

9    a sexual thing and that -- that's why one of his condoms were

10   missing.

11              Q.   Did you supply any other detail at that point?

12              A.   Excuse me?

13              Q.   Did you supply any other detail at that point?

14              A.   No.

15              Q.   Okay.  Why did you tell him?

16              A.   Because I felt like I owed it to him, you know?

17   We'd been through 8 years of --

18              MR. MARTINEZ:  I'm going to object.  She's already

19   told us why.

20              MR. PATTERSON:  Well, no --

21              THE COURT:  Overruled.  Go ahead.

22              THE WITNESS:  We'd been through 8 years together and

23   I should tell him.

24   BY MR. PATTERSON:

25              Q.   Okay.  What was his response?


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000005503

1          A.     He just stared at me and it was just like

2     complete silence.  And then I saw his eyes get -- he started

3     getting mad, just -- he sits up and he turned around and

4     looks at me, started calling me all kinds of -- I was a whore

5     and F-ing this, and he just went on and on calling me all

6     sorts of --

7          Q.     He called you a fucking whore?

8          A.     Yes, he did.

9          Q.     Okay.  What the else did he call you at that

10    time?

11         A.     He was just calling me all sorts of things.  I

12    mean he called me a whore, he called me a fucking slut, and I

13    was just like all the rest of them and now -- it was just --

14    I felt so bad.

15         Q.     Did he accuse you of cheating on him?

16         A.     Of course.  That I had betrayed him.  He said I

17    told you never to do this.  Look at what you fucking did,

18    you're a fucking whore.

19         Q.     You told us that previously you had seen him in

20    a rage about various issues in the relationship.  Can you

21    compare what you're seeing at this point with the Joe that

22    you had dealt with earlier?

23         A.     I can't because I had never seen him like this

24    before.  This was -- this was just rage beyond anything I've

25    ever seen.

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

48

1          Q.     What did he do after -- well, did he ever stop

2 yelling?

3          A.     No.

4          Q.     Okay.   What did he do then at the time he was

5 yelling?   Did he get up off the floor?

6          A.     Yes.   He was standing up yelling at me.   We

7 were standing in the living room.

8          Q.     Okay.   What did he do next?

9          A.     Well, he caught sight of my wedding box, the

10 glass box that held all of our wedding stuff in it, like a

11 display case, and he rammed himself into it, just shattered

12 it into pieces, saying it was all a joke.   I mean --

13          Q.     What kind of curios were displayed in that

14 display case?

15          A.     My bouquet was in there, my wedding veil and

16 Joe's flower that he wore.

17          Q.     Boutonniere?

18          A.     Yes.   Our cake knife and server piece, just all

19 the things that were momentos from our wedding.

20          Q.     What happened next?   Or, excuse me, what was

21 the display case made of?

22          A.     Glass.

23          Q.     Okay.   After he broke the wedding display case,

24 what happened next?

25          A.     He was just raging around the living room, just

49

1    going berserk.  He ended up grabbing me by the hair and

2    hitting my head up against the wall.

3              Q.    Do you recall which wall and what location?

4              A.    Over by the dining room.

5              Q.    All right.  What did he next do?

6              A.    And right there where we were standing, right

7    behind him was our family photo that we had just had done.

8              Q.    Who was in that family portrait?

9              A.    My two babies and Joe and I.  He took the

10   picture up off the wall and he starts looking at it and

11   shaking it and calling me all kinds of names again, and that

12   I ruined the family.  This is what -- how you're going to

13   teach Ashley to be?  Is this what -- you know, is this the

14   kind of mother you are?  And he's like fucking bitch, all

15   this --

16             Q.    What does he do with the family portrait?

17             A.    He takes it over to the kitchen and smashes it

18   on the floor.

19                   (Pause in proceedings.)

20             MR. PATTERSON:  Judge, could we take a break or is it

21   too early?

22             THE COURT:  We'll take a 10 minute break at this

23   point in time.

24             MR. PATTERSON:  Thank you, Your Honor.

25             THE COURT:  During this break, remember the entire

50

1     admonition I've given you including the fact you're not to

2     discuss this case with anyone, do not let anyone discuss the

3     case with you, keep an open mind.  This will be a 10 minute

4     break.

5

6                    (Recess.)

7

8              THE COURT:  This is cause number CR 2000-096032,

9     State of Arizona versus Wendi Elizabeth Andriano.  The record

10    will reflect the presence of Defendant, Counsel and the jury.

11    The Defendant, Wendi Elizabeth Andriano, is on the witness

12    stand.  We'll continue with the direct examination by Mr.

13    Patterson.

14             MR. PATTERSON:  Thank you, Judge Ishikawa.

15

16    CONTINUED DIRECT EXAMINATION BY MR. PATTERSON:

17         Q.    You are Wendi Andriano?

18         A.    Yes.

19         Q.    You are the same Wendi Andriano that was

20    testifying before the break?

21         A.    Yes.

22         Q.    And you recognize that you're still under oath?

23         A.    Yes.

24         Q.    Okay.  We'd gotten to the point that Joe had

25    smashed the family portrait on the floor of the kitchen.

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000005507

1        A.     Yes.

2        Q.     Is he continuing to yell at you at this point?

3        A.     Yes, he is.

4        Q.     And what is he saying?

5        A.     He's saying stuff.  He's calling me a fucking

6   bitch and a whore and everything imaginable that goes with

7   it.  I mean --.

8        Q.     Okay.  Up to this point in time in your

9   relationship had he ever damaged your personal items, momento

10  kind of keepsake items?

11       A.     No.

12       Q.     What kind of things had he destroyed in the

13  past?

14       MR. MARTINEZ:  Objection.  Asked and answered.

15       THE COURT:  Overruled.

16       MR. PATTERSON:  Answer the question.

17       THE WITNESS:  You know, the coffee table, bedroom

18  furniture, things like that, but it wasn't --

19  BY MR. PATTERSON:

20       Q.     On this particular evening his behavior was a

21  little different?

22       MR. MARTINEZ:  Objection.  Leading.

23       MR. PATTERSON:  With regard to --

24       THE COURT:  Sustained.

25  / / / / /


            TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1      BY MR. PATTERSON:

2             Q.    Was his behavior different this evening with

3      regard to the kind of things he was destroying?

4             A.    Yes.

5             Q.    Okay.  Did he do anything on top of the

6      portrait while it was on the kitchen floor?

7             A.    He grabbed the pot of flowers that I had on the

8      counter and just threw it, to smash it even more.

9             Q.    Okay.  And where did he throw the flower pot?

10            A.    Right on top of the picture.

11            Q.    What did you do at that point?  What were

12     you -- well, what were you saying to him at this point?

13            A.    I'm not saying too much right now because I'm

14     freaking out.  I can't believe that he's doing this.  I

15     dropped to my knees because --

16            MR. MARTINEZ:  Objection.  Nonresponsive as to what

17     she's saying.

18            THE COURT:  Ask your next question.

19     BY MR. PATTERSON:

20            Q.    What do you do at this point?

21            A.    I went to my knees and I'm trying to see if I

22     can at least save the pictures.

23            Q.    Is he continuing to yell at you at this point?

24            A.    Yes, he is.

25            Q.    Okay.  What's the next thing that happens?

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

53

1          A.    I feel something going around my neck.

2          Q.    While you're on the ground?

3          A.    Yes.

4          Q.    Okay.  And from where is this thing around your

5     neck apparently coming?

6          A.    From behind me.

7          Q.    Okay.  And who is standing behind you at this

8     point?

9          A.    Joseph was.

10          Q.    Okay.  What is it -- do you discover what it is

11     at that point?

12          A.    I reached my hands up because that was just --

13     it felt like, you know, the phone cord.

14          Q.    Okay.  Did it have any -- any characteristics

15     that led you to believe that?

16          A.    Yes, because of the spirals and it being

17     stretchy.  I was able to pull it up off my neck.

18          Q.    What was Joe doing at this point?

19          A.    He was yelling.

20          Q.    What was he yelling?

21          A.    He was pulling and yelling at me to get up, get

22     up, get up on your fucking feet right now.

23          Q.    And where are you at this point in time when

24     he's pulling you up by this telephone cord?

25          A.    Standing in the kitchen, not far from the

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000005510

1    kitchen.

2         Q.    What did he do?

3         A.    At this time all I can think of is that this is

4    going to be one of those murder-suicides.  He was going to

5    kill me, you know?  He told me he was and he really is going

6    to do it.

7         Q.    So what do you do?

8         A.    I knew I had to get that cord off my neck, and

9    right in front of me was the drawer with the knives, and so I

10   was able to grab a knife.

11        Q.    What did you do with that?

12        A.    I'm holding onto the cord with one hand and I

13   took the knife and I cut with cutting motions and it finally

14   came off.

15        Q.    What happened with the telephone cord?

16        A.    I don't know.

17        Q.    Okay.  Where was Joe when you were doing this

18   to the telephone cord?

19        A.    He was behind me --

20        Q.    Okay.

21        A.    -- trying to pull it tighter.

22        Q.    After you cut it, what did you do?

23        A.    I turned around and I pointed the knife at him

24   and I told him not to put his hands on me.

25        Q.    What --

1        A.    Please don't put your hands on me.

2        Q.    How did you display the knife?

3        A.    Had it in my hand and I was pointing it at him.

4        Q.    And what room is this taking place at

5    initially?

6        A.    Right there in the kitchen.

7        Q.    Okay.  What does he do after you point the

8    knife at him?

9        A.    He stops.  He's just looking at me like he

10   can't believe I'm doing this, and I'm just -- I just don't

11   want him to touch me again, just get away from me.  He starts

12   backing up.

13       Q.    What's going through your mind at this point?

14       A.    I know that if I can calm him down and get him

15   to listen to me, then this will be okay and it will stop.

16       Q.    What does he do after backing towards the, I

17   guess, the dining area?

18       A.    Well, as he's backing into the dining area, he

19   just knocked everything off the kitchen counter and --

20       Q.    Show me what he does?

21       A.    Just takes his arm and backhands it and flings

22   it off the -- I'm standing there holding the knife, watching

23   him because I'm not sure what he's going to do.

24       Q.    Okay.  Were there items on the counter that he

25   backhanded?

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

```
 1          A.    Yes.

 2          Q.    What did he knock off the counter?

 3          A.    I don't even know what was on the counter.

 4          Q.    Okay.  Where did those items go?

 5          A.    All over the floor.

 6          Q.    Of what particular room?

 7          A.    The dining area.

 8          Q.    Is he continuing to back into the dining area

 9   at this point?

10          A.    Well, no, because the table is there, so he

11   goes -- and, you know, the living room and dining room,

12   kitchen are all one area, and he goes into the living room.

13          Q.    Okay.  And you still have the knife in your

14   possession?

15          A.    I do.

16          Q.    Okay.  Do you come after him or follow him

17   in --

18          A.    I don't go after him, but, yes, I do start

19   walking towards him.

20          Q.    Okay.  What is your intention at this point?

21          A.    I'm talking to him and I'm telling him it's not

22   his fault, that I am so sorry.

23          Q.    Okay.  And what did you mean when you told him

24   it's not his fault?

25          A.    It's not his fault.  It's not his fault that I
```

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    had an affair, that I cheated on him.  It's not his fault any

2    of this, you know?  It's -- it's just really too bad that's

3    what life handed us.

4           Q.    Okay.  And what is your purpose in talking to

5    him at this point?

6           A.    Because I want to calm him down and I don't

7    want him to feel like it's his fault, I don't want him to be

8    upset.

9           Q.    Okay.  Is this conduct that you've used

10   previously in your relationship with Joe at times that he has

11   been angry with you or yelling at you or enraged with you?

12          A.    I could usually calm him down.

13          Q.    What did you do with the knife at this point?

14          A.    That's when I realized I still had the knife in

15   my hand and I could see Joe calming down.

16          Q.    Okay.

17          A.    He's listening to me.  And I told him, I mean,

18   look at what this has brought us to?  I'm holding a knife at

19   you.  And I was just so disgusted and I just dropped the

20   knife down.  I was -- like --

21          Q.    You were disgusted because you were actually in

22   a position --

23          A.    Because I'm holding a knife at my husband and

24   I'd never done this before.

25          Q.    What did you do next?

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

58

```
 1           A.    I want to touch him.  I wanted to touch him

 2   because I knew if I could touch him, if I could give him a

 3   hug or something, it would make him feel better.  And I start

 4   to take a step towards him, and he bends down to pick up the

 5   knife.

 6           Q.    What did you do when he went down to pick up

 7   the knife?

 8           A.    I grabbed the closest thing to me.

 9           Q.    Which was?

10           A.    It was a bar stool that was sitting there.

11           Q.    And what did you do with it.  Well, how did you

12   grab it?

13           A.    I just grabbed it with both my hands, just

14   picked it up.

15           Q.    On what part of the bar stool?

16           A.    The legs.

17           Q.    Okay.  Did you have one leg in each hand?

18           A.    Yes.

19           Q.    Okay.  And what did you do with the bar stool

20   at that point?

21           A.    Well, all I could think of is I can't let him

22   get that knife, and if I hit him over the head, he'll pass

23   out.

24           Q.    Okay.  And where did you get that notion from?

25           A.    That's just what -- I don't know.  I guess from
```

1    movies and things like that.  You just think if you hit

2    somebody on the back of the head that they, you know --

3         Q.    What position was Joe in at the time you first

4    struck him with the bar stool?

5         A.    Bending over.

6         Q.    Okay.  And he was bending over in an effort to

7    do what?

8         A.    To get the knife.

9         Q.    Okay.  Did you strike him with the bar stool?

10        A.    I did.

11        Q.    Okay.  And what part of his body did you strike

12   with the bar stool?

13        A.    The back of his head.

14        Q.    Okay.  What happened?

15        A.    He fell to his knees.  It was just like a

16   moment in time that was just still.  And I was like -- I

17   didn't know what to expect, I didn't know what's happening.

18   And all of a sudden I hear this like animalish growl come out

19   of Joe that he just -- just a rage, like, erupting out of

20   him.  I don't know how to explain it.

21        Q.    Had you ever heard that kind of sound come out

22   of his mouth before?

23        A.    No.  It was incredible.

24        Q.    Okay.  How did that make you feel?

25        A.    It scared me.  Gosh, I don't know.  It sounded


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

60

```
 1    like a mad man.

 2              Q.    What did you do at that point?

 3              A.    So I hit him again.

 4              Q.    Did he have the knife in his hands at this

 5    point?

 6              A.    He had the knife in his hands and all I could

 7    think of is I could not let him get up.  He's too big.  And

 8    every time he moved, I'd hit him again.

 9              Q.    Did you say anything to him?

10              A.    I said "Please stop, please stop, don't move,

11    please quit moving."  I just wanted him to stop moving.  I

12    didn't want him to be able to get up and get me.

13              Q.    Did he continue to try and get up?

14              A.    It seemed like for a long time.

15              Q.    And what did you say to him?

16              A.    That's all that was going through my head, and

17    that's all I kept saying, "please stop."

18              Q.    Do you know how many times you struck him with

19    the bar stool?

20              A.    No, I don't.

21              Q.    Okay.  Do you recall him moving each time

22    before you struck him with the bar stool?

23              A.    Yes, I do.

24              Q.    At some point he stopped?

25              A.    Yes, he did.
```

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1          Q.     Okay.  What did you do?

2          A.     The bar stool had broken and I just dropped it

3     and I ran into the bathroom and locked the door.

4          Q.     What did you do inside the bathroom?

5          A.     Sat up against the door and I could hear sounds

6     and whatever coming from the living room.

7          Q.     Sounds that Joe was making?

8          A.     I guess so.

9          Q.     Okay.  At some point in time did the sounds

10    stop?

11         A.     It did get quiet.

12         Q.     And what did you do after it became quiet?

13         A.     I waited.  I didn't know if he was going to

14    come to the bathroom or I didn't know what was going to

15    happen.

16         Q.     After he quieted down out there, what did you

17    do?

18         A.     I finally decided I'd waited long enough, and I

19    opened the door and looked around and he wasn't there.  And I

20    started walking down the hallway and I stayed up against the

21    left side of the hallway, because if he was waiting for me in

22    the living room, I didn't want him to see me coming out of

23    the hallway.

24         And I got to the end of the hallway and I saw

25    his legs laying out, so I had hurried up and came around the

1    corner, and he's laying face down on the carpet right in

2    front of our lazy boy chair.  There was blood everywhere.

3    And I fell to Joe and I put my hands on him and I was like

4    oh, my God, baby, what happened, what did I do?

5          Q.   So you touched him at that point?

6          A.   I did.

7          Q.   And there was blood everywhere?

8          A.   Yes.

9          Q.   What happened next?

10         A.   Then he starts to roll over and sit up, and all

11   I saw was the knife in his hand, but he didn't have it

12   pointing at me.  He said he was going to fucking kill himself

13   now he said because I messed everything up.  He said I just

14   have to do it since you couldn't do it right.  And I grabbed

15   his hands because he was trying to move the knife towards his

16   neck, and I was telling him no, don't do it, please don't do

17   this.  I don't know if we struggled over the knife, but

18   everything was so bloody my hand slipped off.  The next thing

19   I know, I had blood all over me.  I just got --

20         Q.   Were you wearing your glasses that day?

21         A.   Yes, I was.

22         Q.   Okay.  Was there blood all over your glasses

23   as -- immediately thereafter?

24         A.   Yes.

25         Q.   Okay.  Did you cut Joe with that knife?


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000005519

1          A.    No, I did not.

2          Q.    What did you do after the blood spurted all

3    over your face and your shirt?

4          A.    I sat and cried and I couldn't see.  I

5    couldn't -- all I could see was blood all over me.  I had to

6    get it off.

7          Q.    So what did you do?

8          A.    I got up and I made my way into the kitchen to

9    try to rinse the blood off of me so I could see what was

10   happening.  I didn't know -- I couldn't -- I don't know.  I

11   didn't know what I was thinking.

12         Q.    What did do you after that?

13         A.    I went back over to the living room and he was

14   laying face town in a pool of blood and I saw he wasn't

15   breathing.  I was so --

16         Q.    What's that?

17         A.    I didn't know what to do.

18         Q.    Did you make a phone call at some point?

19         A.    I remember sitting there for a while because I

20   didn't know -- I didn't know what to do, and then I did.  I

21   called my dad.  I needed -- I didn't know what -- I just

22   needed my dad.

23         Q.    Did you have some difficulty in getting through

24   to your dad?

25         A.    He wouldn't answer the phone.  He -- I just

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    wanted to talk to my dad.

2         Q.    Did you finally get through to your father?

3         A.    I -- I remember I had to call my cousin to go

4    tell him to wake up, and I think he called me back or I

5    called -- I don't recall, but, yes, I talked to him.

6         Q.    Did you speak with -- did your father suggest

7    any -- what you should do at that point?  Call somebody else

8    perhaps?

9         A.    I said Joe was dead on my living room floor and

10   I don't know what to do, and my dad just said you need to

11   hang up the phone and call 911 right now.  And I just sat

12   there, and he goes -- he repeated it, hang up the phone, call

13   911.

14        Q.    Did you do that?

15        A.    Yes, I did.

16        Q.    Did you have a discussion with the 911 operator

17   at that point?

18        A.    Yeah.

19        Q.    Okay.  Were you given some instructions or

20   directions from the 911 operator?

21        A.    She told me that I had to do CPR on him, and I

22   was -- you don't understand.  I can't.  And she was like, you

23   know, asked me what position he was in.  I don't remember the

24   entire conversation, but I said I had to roll him over and

25   try to give him CPR.

65

1      Q.    What did you do?

2      A.    I tried to roll him over.

3      Q.    How did you go about trying to roll him over?

4      A.    I tried to roll him from his upper body and I

5  couldn't.  He was too heavy.  And so I -- I finally got him

6  over by -- through his legs and his upper body, so then I

7  grabbed him around his ankles to help with the momentum.

8      Q.    Did the 911 operator indicate to you that

9  somebody was on the way?

10     A.    I believe so.

11     Q.    Did you do anything at that point based upon

12 that information?

13     A.    Yeah.

14     Q.    What did you do?

15     A.    I went, unlocked the door so they could come

16 in.

17     Q.    Then where did you go after they unlocked the

18 door?

19     A.    I sat down there beside him and waited.

20     Q.    At some point in time did the police arrive?

21     A.    Yeah.

22     Q.    Where were you seated when the police walked in

23 the apartment?

24     A.    I just remember sitting on the floor.  I don't

25 know.

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

```
1          Q.   What was your emotional state at that point
2     when they walked in?
3          A.   Very numb.  I couldn't feel anything.  I
4     couldn't think anything.  I -- I don't know.  Nothing was --.
5          Q.   At any time that evening did you strike Joe
6     with a -- a lamp?
7          A.   No.
8          Q.   At any time that evening did you give any items
9     to your father to take away from the apartment?
10         A.   No.
11         Q.   Why did you strike Joe with the bar stool?
12         A.   Because I knew if he got that knife he would
13     kill me.
14         Q.   Was this night different than other nights
15     where you and he had gotten into serious arguments or serious
16     fights?
17              MR. MARTINEZ:  Objection.  Asked and answered.
18              THE COURT:  Overruled.  Go ahead and answer the
19     question.
20              THE WITNESS:  Very much so.
21     BY MR. PATTERSON:
22         Q.   Okay.  Did -- had you ever seen Joe behave the
23     way he did that night at any time in your relationship to
24     that degree?
25         A.   Not to that degree, no.
```

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1          Q.     Were you arrested that night?

2          A.     I don't know if I was or not.

3          Q.     Okay.

4          A.     I know that --

5          Q.     Were you taken from that location in a police

6     car to some other location?

7          A.     Yes, I was.

8          Q.     Okay.  Where were you taken?

9          A.     To some police place.  I don't know.

10          Q.     Okay.  And did you have a discussion with the

11     police detective?

12          A.     Yes, I did.

13          Q.     Did you tell this police detective about the

14     poison?

15          A.     I did not.

16          Q.     Okay.  Why not?

17          A.     Because I'd promised.

18          Q.     Who'd you promise?

19          A.     I promised Joe I wouldn't tell.

20          Q.     And why did you promise Joe that you wouldn't

21     talk about the poison?

22          A.     Because he didn't -- he didn't want to leave

23     that burden, like I said before, about committing suicide.

24          Q.     I need to walk you back because I neglected to

25     ask you one issue at one point in time on that date.  When

1    Joe's on the carpet after the EMTs have left did you make

2    another phone call?

3           A.    I did.

4           Q.    Okay.  And to whom was that phone call made?

5           A.    I called Shawn.

6           Q.    Shawn?

7           A.    King.

8           Q.    Okay.  And at whose direction was that?

9           A.    Joe's.

10          Q.    Okay.  And what did Joe say to you as a reason

11   for calling Shawn King?

12          A.    To find out what the hell happened.

13          Q.    Okay.  In -- in what context?

14          A.    Why was he feeling this way, throwing up,

15   instead of just his heart stopping like we thought.

16          Q.    Okay.  And why is it that he directed you to

17   call Shawn?

18          A.    Because Shawn had done a lot of the research

19   and said that azide was like cyanide.

20          Q.    We spent a great deal of time talking about

21   your religious background and upbringing.  It appears in --

22   from the period of your marriage with Joe you did some

23   unreligious things.  For instance, you created false

24   documents in order to access this sodium azide?

25          A.    I did.


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1          Q.     You had lied on forms in an effort to secure

2     life insurance?

3          A.     I did.

4          Q.     Why did you do these things?

5          A.     It's really a struggle because when you're

6     married and your husband's the head of the household and

7     you're trying to do things for him, you know?  Sometimes

8     you -- it takes more than -- it takes more than, you know,

9     what's allowed by law.  And so -- and I knew that God would

10    forgive me because I was obeying my husband.

11         Q.     There was one area though of misconduct that

12    wasn't directed by your husband and that's the relationship

13    you had with Rick Freeland and the one time you had

14    relationships with Travis Black.  Do you have an explanation

15    for that conduct?

16         A.     I know.  I've -- I could give you a thousand

17    excuses but it was wrong.  It was wrong.

18         MR. PATTERSON:  Judge, that's all I have at this

19    time.

20         THE COURT:  Mr. Martinez?

21

22    CROSS-EXAMINATION BY MR. MARTINEZ:

23         Q.     Ma'am, how would you prefer that I address you?

24    Do you want me to call you Wendi Andriano or Anne Newton.

25    What is your preference?

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000005526

1          A.     Wendi.

2          Q.     Because the other name, Anne Newton, is not

3    your name, right?

4          A.     It is not.

5          Q.     You were using it for a fraudulent purpose,

6    right?

7          A.     That is correct.

8          Q.     You were using it to lie, right?

9          A.     Yes.

10         Q.     And one of the things that we have seen

11   throughout your three days or four days of testimony,

12   whatever it's been, is that you've cried a lot.  Wouldn't you

13   agree that's true?

14         A.     Yes, I would.

15         Q.     Today we even took a break to allow you to

16   compose yourself, right?

17         A.     Yes.

18         Q.     And do you remember that one of the times that

19   you were having trouble keeping your composure was when you

20   were shown the birthday card that your husband gave you for

21   your birthday, right?

22         A.     Yes.

23         Q.     And the reason that you gave us for it having

24   such an effect on you was that you said, you know, he never

25   gave me anything during our marriage, right?


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

| | | |
|---|---|---|
| 1 | A. | That's right. |
| 2 | Q. | And he never gave you any jewelry, right? |
| 3 | A. | That's right.  Well, my necklace. |
| 4 | Q. | Just the necklace at your wedding, right? |
| 5 | A. | Yes. |
| 6 | Q. | He never gave you any other birthday cards or |

7  anything like that, right?

| 8 | A. | Not that he bought, no. |
| 9 | Q. | No.  The point is he never gave you any other |

10  birthday cards, right?

| 11 | A. | Not from him, no. |
| 12 | Q. | So that's why Exhibit Number 226 is really |

13  special for you, right?

| 14 | A. | Yes. |
| 15 | Q. | It's the only thing he ever bought that he gave |

16  you, right?

| 17 | A. | That he bought, yes, sir. |
| 18 | Q. | Actually, that's an absolute and fraudulent |

19  misstatement.  Don't you agree?

| 20 | A. | No, I don't. |
| 21 | Q. | Don't you remember him buying you jewelry, |

22  ma'am?

| 23 | A. | No I do not. |
| 24 | Q. | You don't remember him buying you an emerald |

25  ring for your birthday?

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

```
 1          A.    No.  I bought that.

 2          Q.    Oh, you bought that?  I see.

 3                And so because -- is your signature anywhere

 4     on the documents, ma'am?

 5          A.    Excuse me.

 6          Q.    Is your signature anywhere on the documents to

 7     purchase that?

 8          A.    I don't know.

 9          Q.    How about did he ever buy you a pendant for

10     your birthday?

11          A.    No.

12          Q.    Let me show you what I'm going to mark as an

13     exhibit.

14                (Pause in proceedings.)

15     BY MR. MARTINEZ:

16          Q.    Why don't you take a look at it.  It's Exhibit

17     471.  There's a receipt in there and there's also another

18     sheet of paper.  Go ahead take a look at those.  Take your

19     time.

20                (Pause in proceedings.)

21          THE WITNESS:  Yes.

22     BY MR. MARTINEZ:

23          Q.    May I have it back, please.

24                The date of purchase is August 30th, 1996,

25     isn't it?
```

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000005529

```
 1          A.    That is the date.

 2          Q.    Your birthday -- you were born August 30th,

 3    1970, weren't you?

 4          A.    No, I was not.

 5          Q.    You weren't born August 30th?

 6          A.    No.

 7          Q.    What was your date of birth, ma'am?

 8          A.    August 26th.

 9          Q.    This was about four days after your birthday,

10    wasn't it?

11          A.    Yes.

12          Q.    So you're still saying that he never got you

13    anything, are you?

14          A.    Yes, I am saying that.

15          Q.    With regard to this, doesn't it say "To Wendi

16    Andriano"?

17          A.    Yes.  I was there with him and I'm -- I bought

18    the ring.

19          Q.    Oh, you bought the ring?

20          A.    Yes.  I asked for it.

21          Q.    Did you sign for this?

22          A.    No.  Joe did.  That was his credit card.

23          Q.    And it was from Best Products, right?

24          A.    Yes, sir.

25          Q.    So he did buy you something, didn't he?
```

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

74

1          A.     No, he did not.

2          Q.     So you're saying that even though it was his

3    credit card and it's his signature, you bought it, right?

4          A.     Yes, sir.

5          Q.     And in your definition, in your world, your

6    definition of it is that even though somebody uses their

7    credit card and even though they sign for it, you're still

8    buying it, right?

9          A.     If I'm paying for it, yes.

10          Q.     But it's his credit card, isn't it?

11          A.     It's our credit card.

12          Q.     No, ma'am.  It's his credit card because his

13    name's on the credit card, isn't it?

14          A.     We both had one.

15          Q.     He used his credit card, didn't he?

16          A.     Yes.  He -- he did, but I paid the bills.

17          Q.     I know you may want to tell us that, but it was

18    his credit card, wasn't it?

19          A.     Yes, sir.

20          Q.     He signed for it, right?

21          A.     Yes, he did.

22          Q.     You would agree that he doesn't wear any rings

23    of that sort, wouldn't you?

24          A.     I agree.

25          Q.     And he wouldn't wear a pendant, right?


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000005531

```
 1          A.     I agree.

 2          Q.     And with regard to that, it was about $100,

 3     right?

 4          A.     Yes, it was.

 5          Q.     So he did get you something, didn't he?  This

 6     person that you said he never bought you anything --

 7          MR. PATTERSON:  Judge, asked and answered three

 8     times.

 9          THE COURT:  Sustained.

10     BY MR. MARTINEZ:

11          Q.     So did he or did he not buy you anything?

12          A.     He did not.

13          Q.     Now, the other thing you told us previously was

14     that the reason that you decided to have sexual intercourse

15     with Dido Gamez was because, well, you indicated that Barbara

16     Mitchell was chiding you about it.  In other words, sort of

17     teasing you about it.  Do you remember that?

18          A.     Yes.

19          Q.     And that you decided that you would go ahead

20     and have sexual intercourse with Dido Gamez, right?

21          A.     Yes, sir.

22          Q.     And you also -- and this came up in the context

23     of not having revealed that information to Sharon Murphy.  Do

24     you remember that?

25          A.     Yes, sir.
```

1          Q.     In other words, you didn't tell Sharon Murphy

2    about Dido Gamez or anything like that, right?

3          A.     I wasn't asked about that.

4          Q.     I know you weren't asked, but did you tell

5    her --

6          A.     No, I did not.

7          Q.     Okay.  So anyway, with regard to that, you

8    indicated he was the individual with whom you first had

9    sexual relations?

10         A.     Yes.

11         Q.     Actually, do you know someone by the name of

12   Pete Munoz?

13         A.     Yes, I do.

14         Q.     In fact he was one of the residents at the

15   Quail Garden Apartments when you were the manager?

16         A.     He lived with my cousin, yes.

17         Q.     Pardon?

18         A.     He lived with my cousin.

19         Q.     As a matter of fact, you and he developed a

20   friendship, didn't you?

21         A.     Not really.

22         Q.     Well, isn't it true that you may not have

23   developed a friendship in the traditional sense, but he was

24   actually the first person that you had intercourse with.

25   Isn't that true?


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000005533

```
 1          A.     That is not.

 2          Q.     Isn't it true you and he talked because you

 3     indicated that you were tired of being that way and you

 4     wanted to know what actually was going on?

 5          A.     Absolutely not.

 6          Q.     So that's not true then, right?

 7          A.     That is not.

 8          Q.     But you do agree that you did have intercourse

 9     with Vernon Barnes, right?

10          A.     Yes, sir.

11          Q.     How about Jonathon Householder?  Did you tell

12     us about him?

13          A.     Never had sex with him.

14          Q     Jonathon was Vernon Barnes's roommate, right?

15          A.     Yes, sir.

16          Q.     Did you also forget to tell us about Chris

17     Barnes?  Did you tell us about him?

18          A.     No.  There was no need to.

19          Q.     Actually, after you were married, didn't you

20     have occasion to be with him in July of 1996, ma'am?

21          A.     With him in what manner?

22          Q.     Intimate?

23          A.     No.

24          Q.     The other thing that you told us was that when

25     you worked at the Courtyard Apartments that you indicated
```

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    that you had your bedroom -- or sorry, your apartment free,

2    right?

3            A.    Yes.

4            Q.    I think it was 2 bedrooms, 2 baths?

5            A.    Yes, it was.

6            Q.    Ma'am, isn't it true that at some other time

7    you've indicated that you actually paid over $500 for that?

8            A.    That was probably the market rent on it, yes.

9            Q.    No, no, no.  Didn't you use it, when it was to

10   your advantage to say --

11           A.    No.  I actually paid a total of $585.35 for

12   that apartment.

13           Q.    Didn't you hold yourself out as renting an

14   apartment for that amount at the Courtyard?

15           A.    I don't know.

16           Q.    You don't know whether or not you ever did

17   that?

18           A.    No, I don't.

19           Q.    Well, let me show you something to see if this

20   refreshes your recollection, okay?

21                 (Pause in proceedings.)

22   BY MR. MARTINEZ:

23           Q.    Let's take a look at it.  It's Exhibit 472.

24   It's three pages.

25                 (Pause in proceedings.)


                TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

                               000005535

```
 1              THE WITNESS:  Okay.
 2     BY MR. MARTINEZ:
 3          Q.    May I have it back, please?
 4          A.    Sure.
 5          Q.    That is your signature on it, is it?
 6          A.    That is.
 7          Q.    And it's dated June 11, 1999, right?
 8          A.    I didn't look at the date, but --
 9          Q.    Let me go ahead and show it to you.
10                (Pause in proceedings.)
11              THE WITNESS:  Okay.
12     BY MR. MARTINEZ:
13          Q.    It is June 11, 1999, right?
14          A.    Yes.
15          Q.    That's when you were one of the managers over
16     at the Courtyard Apartments, right?
17          A.    Yes.
18          Q.    And that's the place that you told us that you
19     didn't have to pay for an apartment, right?
20          A.    Exactly.
21          Q.    But in a document where you were seeking a
22     benefit, you indicate that your rent is actually $585.35,
23     don't you?
24          A.    That is my -- yes, because instead of receiving
25     that as monies on the salary end, you have to show it as an
```

1    expense.

2              Q.    Right.  But you even went further than that.

3    You actually fabricated another document to show that you

4    were actually paying $585.35 for that, didn't you?

5              A.    I don't know.

6              Q.    Well, let's take a look at another exhibit.

7                    (Pause in proceedings.)

8    BY MR. MARTINEZ:

9              Q.    Exhibit Number 473.  Take a look at it.  Please

10   note the date.

11                   (Pause in proceedings.)

12             THE WITNESS:  Okay.

13   BY MR. MARTINEZ:

14             Q.    The date is June 11, isn't it?

15             A.    Yes, it is.

16             Q.    That corresponds with the date that we have on

17   the other documents which -- that I showed you previously,

18   doesn't it?

19             A.    Yes, sir.  It does.

20             Q.    And that is Exhibit Number 472.  Actually has

21   some white out on it, doesn't it, on the name of the tenant

22   that actually made the payments there, doesn't it?

23             A.    Yes.

24             Q.    And of course on the top of it it gives you as

25   the residence as the person who lives there, doesn't it?

1          A.     Yes.

2          Q.     That was not true, was it?

3          A.     No.

4          Q.     You lied on this, right?

5          A.     It's not a yes or no question, but --

6          Q.     Is it true that you were residing in apartment

7     number 706?

8          A.     No, it is not.

9          Q.     Is it true that your last name is Montgomery?

10         A.     No.

11         Q.     So this is not a listing of the amounts that

12    you paid on that apartment, is it?

13         A.     No.

14         Q.     And you submitted these when it was to your

15    benefit to submit that, right?

16         A.     Not to my benefit.

17         Q.     Well, it didn't hurt you, did it, for you to

18    have this expense, did it?

19         A.     No.

20         Q.     So it was to your benefit, right?  You were

21    asking somebody to do something for you, weren't you?

22         A.     I was trying to portray the correct picture of

23    what was going on with my salary, yes.

24         Q.     No, ma'am.  What you were trying to do is you

25    were trying to get a reduction in the amount of money you had

82

1    to pay for a bill.  Isn't that true?

2         A.    Yes, but if I say I make 20,000 and receive a

3    free apartment, they don't understand that.

4         Q.    You didn't write that down in this statement of

5    financial status.  You didn't tell them that, did you?

6         A.    There was is no place to.

7         Q.    You mean you couldn't have affixed anything to

8    this and say, you know what?  I want to let you know I'm

9    actually getting the apartment for me free as a benefit of

10   working there.  You didn't do that, did you?

11        A.    No, I did not.

12        Q.    You filled it out and you put an amount and

13   then you fabricated a list of payments that you did not make,

14   right?

15        A.    No.

16        Q.    You did not -- you made payments to apartment

17   706 from your pocket?

18        A.    No.  I did not make payments, no.

19        Q.    You're not Mrs. Montgomery or Mr. Montgomery,

20   are you?

21        A.    No, sir.

22        Q.    So it's -- Joe didn't make you do this, did he?

23        A.    No, he did not.

24        Q.    That was not his loan, was it?

25        A.    No.  That -- that was mine.

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1          Q.     You did it all on your own, right?

2          A.     I did.

3          Q.     Ma'am, one of the other things that, just while

4    we're still on Courtyard and then we'll get on the other

5    thing, one of the things you indicated to us was that Anna

6    was somebody that worked or helped you out during the time

7    that Joe had his surgeries.  Do you remember that?

8          A.     That's correct.

9          Q.     And you indicated that Joe had surgery, that

10   big surgery, in 1998, right?

11         A.     Yes.

12         Q.     Around August of '98, right?

13         A.     Yes.

14         Q.     And that Ashley was born shortly thereafter,

15   right?

16         A.     That's right.

17         Q.     When was she born, ma'am?

18         A.     September 16th.

19         Q.     Of 1998?

20         A.     Yes.

21         Q.     And so you indicated that what happened was

22   that actually Anna was only there to help you during that

23   time, right?

24         A.     Yes.

25         Q.     In 1998, right?


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1          A.    Yes.

2          Q.    And that it wasn't at any other time other than

3     those four -- two months, right?

4          A.    She may have helped me other times but that was

5     the main time she helped me out, yes.

6          Q.    That's not true either, is it?

7          A.    Yes, it is.

8          Q.    Ma'am, do you remember when you left the

9     Courtyard Apartments that that was approximately August or

10    September -- actually, it was September of 1999.  Do you

11    remember leaving them?

12         A.    Yes.

13         Q.    And we've already established through Sharon

14    Murphy that perhaps you weren't truthful with her as to your

15    reason for leaving there, right?

16         A.    I don't know.

17         Q.    In other words, you told Sharon Murphy that the

18    reason you left the -- the apartments was because there was a

19    change in management, right?

20         A.    Yes.

21         Q.    That's -- that's not true at all, is it?  Is it

22    true or not, ma'am?

23         A.    Um, no.

24         Q.    Okay.  And in fact it was in 1999, not 1998 as

25    you previously told us, that Anna was working in your


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    apartment, wasn't she?

2          A.    No.

3          Q.    Well, let's take a look at a document to see if

4    that refreshes your recollection as to the date that this

5    actually was taking place.  I'm going to go ahead and mark it

6    as an exhibit.

7                (Pause in proceedings.)

8          THE COURT:  Just for everyone's information, we'll

9    take a break at about 3:30 since we took a previous break.

10   We'll take our break at about 3:30, okay?

11   BY MR. MARTINEZ:

12         Q.    Take a look at the first page so you could

13   familiarize yourself with the date and take a look at the

14   second page which has the highlighted portion, please.

15               (Pause in proceedings.)

16         THE WITNESS:  I believe they have a name here

17   written --

18   BY MR. MARTINEZ:

19         Q.    Ma'am, have you read it?  Please.

20         A.    Yes, I have.

21         Q.    Okay.  May I have it back?

22         A.    Sure.

23         Q.    And the date on this is -- it's an email

24   Friday, September 3rd, 1999?

25         A.    Yes.


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1                    (Attorney-attorney discussion.)

2                    (Pause in proceedings.)

3    BY MR. MARTINEZ:

4         Q.    Do we agree on the date, that it was September

5    of 1999?

6         A.    Yes.

7         Q.    And you've already told us that you weren't

8    truthful with Ms. Murphy as to why you were no longer

9    associated with Courtyard.  Isn't it true that -- that what

10   actually was happening in August about that time, or perhaps

11   a month or so before that, that Anna was actually working

12   even, though she was employed by Courtyard, you were actually

13   using her for your personal interests, weren't you?

14        A.    No, that's not true.

15        Q.    So you've read this report, haven't you?

16        A.    Yes, I have.

17        Q.    Well, ma'am, isn't that part of the reason why

18   you were no longer associated with Courtyard?

19        A.    No, not because of Anna.

20        Q.    It was other things?

21        A.    It was Mina.

22        Q.    Well, this is -- you're saying that it was Mina

23   you were using instead of Anna?

24        A.    Mina was the one who babysat for me and she

25   also cleaned laundry rooms and -- she was fired by me.


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1        Q.      So this is incorrect when you're -- do you know

2     Timothy --

3        A.      Yes, I do.

4        Q.      You know who Timothy Lee is?

5        A.      Yes.

6        Q.      He was your boss back then?

7        A.      That's correct.

8        Q.      He's the one who had the talk with you after

9     you -- before you stopped being associated with Courtyard

10    Apartments, right?

11       A.      Yes.

12       Q.      He's the one that talked to you about these

13    issues, right?

14       A.      Yes.

15       Q.      And you're familiar with those issues right?

16       A.      Yes.

17       Q.      And you were familiar with those issues when

18    you spoke with to Sharon Murphy, right?

19       A.      Sure, yes.

20       Q.      And you didn't tell her anything about it,

21    right?

22       A.      No.   Why?

23       Q.      You lied to her about her about them, didn't

24    you?

25       A.      No, I didn't lie to her.

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

```
 1          Q.    Didn't you tell her the reason that -- the

 2    reason you were no longer associated with Courtyard was

 3    because they had gone on vacation and they changed management

 4    companies?  Didn't you tell her that?

 5          A.    Yes, with other things.

 6          Q.    Right.  But that isn't true either because

 7    another management company was the company that was managing

 8    the Courtyard Apartments, right?

 9          A.    Yes.

10          Q.    And they came on in May of 1998, didn't they?

11          A.    I don't recall.

12          Q.    Well, they didn't come in in September of 1999,

13    did they?

14          A.    No.

15          Q.    They had been on for at least a year, hadn't

16    they?

17          A.    Yes, they had.

18          Q.    So when you told Sharon Murphy that was part of

19    the reason -- that was the reason, you weren't being truthful

20    with her, were you?

21          A.    Um, when I discussed with Timothy Lee, yes,

22    there were changes in the management, there was things going

23    on, and that's why.  That was one of the reasons, so that --

24    that's what I chose to tell her.

25          Q.    You didn't tell her -- you told her that there
```

```
 1     was a change in the management, didn't you?  "Management
 2     company," didn't you use that word?
 3              A.   No.  I said management.
 4              Q.   You didn't say "management company"?
 5              A.   No.
 6              Q.   If we take a look at the report, will that
 7     refresh your recollection from Sharon Murphy?
 8                   Didn't you tell Sharon Murphy following -- at
 9     this point in 1999, Joe was eating healthy and participating
10     in church.  Did you tell her that?
11              A.   In '99, yes.
12              Q.   But by August of 1999 things began getting
13     crazy again.  Did you tell her that?
14              A.   If that's what you're reading, yes.
15              Q.   So I'm asking you whether or not you told her
16     that.  Don't rely on what I'm reading.
17              A.   Yes, sir.
18              Q.   Okay.  And then it goes on, they went on
19     vacation with Wendi's parents and when they returned Wendi
20     discovered that a new property management company had taken
21     over and she no longer had a job and no place to live.  You
22     did use the term "company," didn't you?
23              A.   I did not but she did, yes.
24              Q.   So now you're saying to me that Sharon Murphy
25     probably did not get everything that you told her as
```

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    accurately as she could have?

2          MR. PATTERSON:  That's a gross generalization.  He

3    needs to particularize his question to the issues he's

4    depositing for this witness.

5          THE COURT:  Overruled.  Go ahead, answer the question

6    if you can.

7          THE WITNESS:  You know, I don't -- could you rephrase

8    your question?

9    BY MR. MARTINEZ:

10         Q.    Sharon Murphy got it wrong, didn't she?

11         A.    Got what wrong?

12         MR. PATTERSON:  Your Honor --

13         MR. MARTINEZ:  What we're talking about.

14         THE COURT:  Why don't you specify what you're

15   talking about.

16   BY MR. MARTINEZ:

17         Q.    I'll read the statement to you again, ma'am.

18   They went on vacation with Wendi's parents and when they

19   returned Wendi discovered that a new property management

20   company had taken over and she no longer had a job and no

21   place to live.

22         Sharon Murphy got it wrong when she put down

23   "management company," right?

24         A.    When she said "company," yes.

25         Q.    So she got it wrong, right?


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1          MR. PATTERSON:  She just answered that question.

2          THE COURT:  Let's move on.  Ask your next question.

3     BY MR. MARTINEZ:

4          Q.    So it's not your fault, right?

5          A.    What's not my fault?

6          Q.    It's Sharon Murphy's fault if that word

7     "company" is in there?

8          A.    It's just a mistake.  I don't know.

9          Q.    No, no, no.  I'm asking is it your fault or

10    hers.  I want to know.

11         MR. PATTERSON:  She's answered the question.  It's

12    not a question of fault.

13         THE COURT:  Sustained.  Let's move on.  Move on.

14    BY MR. MARTINEZ:

15         Q.    Let's talk some more about Sharon Murphy and

16    some of the things you may have told her.  I want to talk to

17    you specifically about your birthday in the limo, okay?

18         A.    Okay.

19         Q.    First of all, who paid for the limo, ma'am?

20         A.    My dad did.

21         Q.    Actually, it's his view, ma'am, that the girls

22    at the San Riva apartment complex paid for it.  So would it

23    be --

24         MR. PATTERSON:  Judge, objection.  We need to

25    approach.

```
 1
 2                    (The following proceedings were held at the
 3       bench:)
 4
 5            MR. PATTERSON:  It is improper for him to compare
 6       testimonies amongst all the witnesses in this case as
 7       predicates for his questions.  He can argue it afterwards if
 8       there's a discrepancy, but you can't formulate the question
 9       comparing testimonies.  It's inappropriate.
10            THE COURT:  I'll sustain the objection.
11
12                    (The following proceedings were held in open
13       court:)
14
15            THE COURT:  Mr. Martinez, ask your next question.
16       BY MR. MARTINEZ:
17            Q.    Was the limo paid for by your father or paid by
18       the women at the San Riva apartment complex?
19            A.    My father.
20            Q.    Okay.  And one of the things that we know is
21       that you guys went out that night, right?
22            A.    Yes.
23            Q.    And that you went to a number of bars and it
24       was because it was your birthday, right?
25            A.    Yes.
```

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1        Q.      And you guys stayed out until whatever hours of

2   the night, right?

3        A.      Yes.

4        Q.      And then throughout the evening you indicated

5   that you were drinking, right?

6        A.      Yes.

7        Q.      And that part of the reason is that you were

8   drinking just to forget things, right?

9        A.      It helped, yes.

10       Q.      It helped numb whatever feelings you were

11   having, right?

12       A.      The stress, yes.

13       Q.      The stress, whatever you were under, it helped

14   to numb it?

15       A.      Yes.

16       Q.      Was that the stress to help Rick Freeland not

17   answering the door or what exact -- what kind of stress are

18   we talking about?

19       A.      I'm talking about our daily living.  It had

20   nothing to do with Rick Freeland.

21       Q.      Well, you testified yesterday, and do you

22   remember that you were asked about Rick Freeland and when he

23   didn't want to see you anymore?

24       A.      Yes.

25       Q.      Do you remember that you cried on the stand

94

1     about that?

2              A.     Yes, it hurt.

3              Q.     And that you told us that you couldn't

4     understand why he didn't want to see you anymore, right?

5              A.     Why he didn't want to be my friend.

6              Q.     Well, he didn't want to talk to you anymore,

7     right?

8              A.     That's correct.

9              Q.     He didn't want to be around you anymore,

10    correct?

11             A.     Correct.

12             Q.     He didn't go weightlifting anymore.  Is that

13    what you told us?

14             A.     Correct.

15             Q.     You're still having contact with him on July

16    23rd of 2000.  You're sending him emails, aren't you?

17             A.     I don't recall the specific date, but yes.

18             Q.     And --

19             A.     We did make friends again.

20             Q.     And in fact that's about the time that your

21    birthday hit about a month later, right?

22             A.     Of what?  I don't understand.

23             Q.     July 23rd is approximately one month before

24    your birthday --

25             A.     Yes.

1          Q.      -- of August 26?

2          A.      It is.

3          Q.      And by that time you'd made friends.  So it

4   wasn't the stress with Rick Freeland that was driving you to

5   perhaps want to numb things?

6          A.      Exactly.

7          Q.      But one of the things we do know is that on the

8   way back you made the decision or made the request that you

9   stop to pick up some fellas, right?

10         A.      That is not true.

11         Q.      Were you here when Shannon Sweeney testified?

12         A.      Yes, I was.

13         Q.      Were you here when Chris Hashisaki testified?

14         A.      Yes.

15         Q.      Were you here when Stephanie Koeppen testified?

16         A.      Yes.

17         Q.      Okay.  And so there is however a -- an

18   unplanned stop in Tempe the way over to San Riva, right?

19         A.      That is correct.

20         Q.      And one of the people that came in is an

21   individual by the name of, I think, Shawn, right?

22         A.      No.  I don't believe that was his name.

23         Q.      Well, what was Shannon's boyfriend's name?

24   What was his name?

25         A.      It wasn't Shawn.  I think it was Ryan.


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1          Q.    So Ryan gets into the limo?

2          A.    Ryan and Chris, yes.

3          Q.    And then another male gets into the car also,

4     right?

5          A.    Yes.

6          Q.    His name is Chris, right?

7          A.    Yes.

8          Q.    And as the fates would have it, Chris ends up

9     in the area where you're seated or near the area that you're

10    sitting, right?

11         A.    Yes.

12         Q.    And so what as fates would have it then, you

13    end up between his legs, right?

14         A.    That's how we all piled in, yes.

15         Q.    I'm not asking about anybody else.  I'm asking

16    about you, ma'am.  I don't care about the "we" part.  I care

17    about you.  Were you between his legs on the way back to the

18    San Riva apartments?

19         A.    Yes, I was sitting between his legs.

20         Q.    That's not something you told Sharon Murphy

21    about, is it?

22         A.    I don't recall.

23         Q.    Well, let me show you the report and I'll have

24    you read it and see if it's there.  Bottom of page 15, over

25    to the top of page 16.


             TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

```
 1                   (Pause in proceedings.)
 2          THE WITNESS:  Okay.
 3   BY MR. MARTINEZ:
 4          Q.    If I may have it back.
 5                That part is not included in the report, right?
 6          A.    No, it is not.
 7          Q.    And when you spoke to Sharon Murphy you talked
 8   to her for approximately 50 hours, right?
 9          A.    Yes, I did.
10          Q.    There wasn't a prosecutor there to interject
11   himself when you were talking to her, was there?
12          A.    No, there was not.
13          Q.    There wasn't anybody else, for example a
14   defense attorney or anybody stopping you from talking to her,
15   was there?
16          A.    No.
17          Q.    You were free to tell her anything that you
18   wanted to, right?
19          A.    Based on Joe and I, yes.
20          Q.    No.  You were free to tell her anything you
21   wanted, whether it was --
22          A.    Sure.  Yes, I could.
23          Q.    And she at no time while you were having this
24   interview ever said to you, "No, don't tell me that," right?
25   She just sat there and talked to you, right?
```

1      A.      That's correct.

2      Q.      And she took notes, right?

3      A.      That's correct.

4      Q.      And she took notes during all the times that
5   you guys were sitting there talking, right?

6      A.      Yes.

7      Q.      And at no time did you tell her about Chris,
8   did you?

9      A.      It wasn't an issue.

10     Q.      At no time did you tell her about Chris, did
11   you?

12     A.      It wasn't an issue, no.

13     Q.      So the answer is "no" then, right?

14     A.      No.  No, I did not.

15     Q.      So it isn't Joe's fault then you didn't tell
16   her about Chris?

17     A.      No, it's not.

18     Q.      And so one of the other things that we know is
19   that you were kissing Chris on the way in, right?

20     A.      No.

21     Q.      Well, you did tell us that you were pretty much
22   toasted that night, didn't you?

23     A.      Yes, I was.

24     Q.      And you did indicate to us further on down the
25   line that you were in a similar circumstance involving Travis

99

1     Black.  Do you remember that?

2              A.     Similar?  No, it is not similar.

3              Q.     You weren't drunk when you were with Travis

4     Black?

5              A.     Yes, I was drunk.

6              Q.     He is a male, right?

7              A.     Yes.

8              Q.     And so is -- so is Chris, isn't he?

9              A.     Yes, he is.

10             Q.     And so could it be that you just don't remember

11    since you, according to your description, your own

12    description, you were really pretty drunk and that maybe you

13    were kissing Chris?

14             A.     No.  I said there might have been some

15    flirtatious stuff, but no, I did not kiss Chris.

16             Q.     You were here again when Chris Hashisaki

17    testified, right?

18             A.     Yes, I was.

19             Q.     You were here when Shannon Sweeney testified?

20             A.     Yes, I was.

21             Q.     And -- but you did say something else yesterday

22    about sitting between his legs and sort of flirting with him

23    was no -- was not meant as a sign of disrespect at all, was

24    it?

25             A.     No.

1        Q.      It was nothing to you, right?  I mean, it was

2   just good old fun, right?

3        A.      It wasn't -- no, it was not -- it wasn't

4   anything.

5        Q.      Right.  It wasn't anything.  It was just you

6   being a girl, right?

7        A.      I don't know if I'd phrase it like that, but --

8        Q.      It was no big deal to you.

9        A.      No, it was not.

10       Q.      And the reason it wasn't any big deal to you is

11  because when you would go out -- you would go out and start

12  kissing on guys.  It's something you did all the time, right?

13       A.      That is incorrect.

14       Q.      You were here when Chris Hashisaki testified,

15  right?

16              MR. PATTERSON:  Judge, same objection.

17              THE COURT:  Sustained.

18              Let's take our afternoon recess at this time.

19  During the recess remember the entire admonition I've given

20  you including the fact you're not to discuss this case with

21  anyone, do not let anyone discuss the case with you.  Keep an

22  open mind.  We'll have a 20-minute recess.  Have a nice

23  break.

24

25              (Recess.)


                TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

                          000005557

1

2          THE COURT:  This is cause number CR 2000-096032,

3    State of Arizona versus Wendi Elizabeth Andriano.   The record

4    will reflect the presence of the Defendant and Counsel.

5    We're outside the presence of the jury.

6                Yes, Mr. Patterson?

7          MR. PATTERSON:  Your Honor, it was discovered during

8    the portion of my direct examination by Ms. Andriano, and

9    obviously it was inadvertently placed in Exhibit 231 which

10   has been admitted into evidence.  I showed it to Mr. Martinez

11   and he has no objection to adjusting the exhibit to remove

12   the blue envelope and leave only the white piece of paper

13   with numbers on the left and names and descriptive things

14         THE COURT:  Mr. Martinez?

15         MR. MARTINEZ:  That's correct.

16         THE COURT:  Okay.  That will be done by the clerk

17   then by stipulation of the parties.

18         MR. PATTERSON:  Thank you, Judge.

19         THE COURT:  We ready for the jury?

20         MR. PATTERSON:  Yes.

21         MR. MARTINEZ:  Yes, sir.

22         THE COURT:  Let's have the jury.

23

24              (Whereupon, the jury enters the courtroom.)

25

1        THE COURT:  Please be seated.  This is cause number

2   CR 2000-096032, state of Arizona versus Wendi Elizabeth

3   Andriano.  The record will reflect the presence of the

4   Defendant, Counsel and the jury.  The defendant, Wendi

5   Elizabeth Andriano, is on the witness stand.  We will

6   continue with the cross-examination by Mr. Martinez.

7        Mr. Martinez?

8

9   CONTINUED CROSS-EXAMINATION BY MR. MARTINEZ:

10       Q.    We started our talk earlier today by talking

11   about the fact that Mr. Andriano never gave you any cards or

12   anything like that.  Do you remember that's what we started

13   talking about?

14       A.    I recall that, yes.

15       Q.    I'm going to show you exhibit 476 and see if

16   you recognize it.

17             (Pause in proceedings.)

18       THE WITNESS:  Yes, I do.

19   BY MR. MARTINEZ:

20       Q.    It's a Mother's Day card, isn't it?

21       A.    Yes, it is.

22       Q.    It is to you, isn't it?

23       A.    Yes.

24       Q.    It was given to you by Mr. Andriano, wasn't it?

25       A.    I can't answer that question yes or no.

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000005559

1          Q.     Well, ma'am, it does have your daughter's name

2     on there, Ashley, doesn't it?

3          A.     Yes, it does.

4          Q.     And Ashley at that time back in the year 2000

5     could not go down to the store and get this herself?

6          A.     No, but my mother did.

7          Q.     But the writing on there -- I'm not asking you

8     who bought it.  The writing on it is Mr. Andriano's, isn't

9     it?

10         A.     Some of it is, yes.

11         Q.     Some of it is and the rest of it is Ashley's,

12    right?

13         A.     And Nicolas

14         Q.     Right.  But the writing that you can decipher

15    is from your late husband, Mr. Andriano, correct?

16         A.     Yes, it is.

17         Q.     And you received this card, didn't you?

18         A.     I received it, yes.

19         Q.     What year?

20         A.     I couldn't tell you what year.

21         Q.     But it was, anyway, after Ashley was born?

22         A.     Yes, sir.

23         Q.     And what year was Ashley born?

24         A.     She was born in '98.

25              MR. MARTINEZ:  I move for admission of Exhibit 476.

1          MR. PATTERSON:  I have no objection, Judge.

2          THE COURT:  Exhibit 476 for identification is

3    admitted into evidence.

4    BY MR. MARTINEZ:

5          Q.    Ma'am, on the inside it does say, "Happy

6    Mother's Day from the kid who made it all possible.  Love,

7    Ashley."  Doesn't it say that?

8          A.    Yes, it does.

9          Q.    And the writing that we have here just to --

10   and you previously testified about some entries in Mr.

11   Andriano's log book.  Do you remember that with regard to

12   some --

13         A.    Yes.

14         Q.    And you're familiar with his writing, right?

15         A.    Yes, I am.

16         Q.    And the writing in this card, the one that says

17   "Love, Ashley" is Mr. Andriano's, isn't it?

18         A.    Yes, that is.

19         Q.    Now I'm going to show you Exhibit Number 475.

20   Take a look at it.  Do you recognize it?

21               (Pause in proceedings.)

22         THE WITNESS:  Yeah, I do.

23   BY MR. MARTINEZ:

24         Q.    It's a mother -- a birthday card, isn't it?

25         A.    Yes, it is.


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1      Q.    It is from your two kids, isn't it?

2      A.    Yes.

3      Q.    And it's in Mr. Andriano's handwriting, isn't

4   it?

5      A.    Yes, it is.

6      Q.    What year did you receive it?

7      A.    I don't know.  '99 or 2000.

8      MR. MARTINEZ:  Okay.  I move for admission of Exhibit

9   475.

10      MR. PATTERSON:  I have no objection, Judge.

11      THE COURT:  Exhibit Number 475 for identification is

12   admitted into evidence.

13   BY MR. MARTINEZ:

14      Q.    And it does say in the front "For my mommy,"

15   doesn't it?

16      A.    Yes, it does.

17      Q.    Then it has a message inside and it deals with

18   your birthday, doesn't it?

19      A.    Yes.

20      Q.    And in Joseph Andriano's handwriting it says

21   "Love you, Nicolas, Ashley," right?

22      A.    Yes, it does.

23      Q.    When we left off we were talking about your

24   going out on your birthday, which was around August 26 of

25   of 1999, right?  Or sorry August 26, 2000.  Do you remember

1   going out?

2          A.   Yes, sir.

3          Q.   I'm going to show you some Exhibits 477, 478.

4   Take a look at them.

5          A.   Okay.

6          Q.   Those are pictures of you and others on that

7   night, aren't they?

8          A.   This one is.   This is not.

9          Q.   Okay.   The one on the right, what date -- what

10  number is it, please?

11         A.   Number 477.

12         Q.   And the one on your right, Number 477, when was

13  that taken?

14         A.   I don't know when it was taken, but it would

15  have had to have been the summer of 2000.

16         Q.   What's the bar?

17         A.   Looks like Tijuana Country Club.

18         Q.   And that's you in that with a couple of

19  gentlemen, correct?

20         A.   Yes.

21         Q.   And the other one in your left-hand, what

22  exhibit number is it?

23         A.   478.

24         Q.   And that one was the one that was taken on the

25  limo night, right?

1      A.    Yes.

2      Q.    If I may have those back.

3      MR. MARTINEZ:  Move for admission of Exhibit 477 and

4   478.

5      MR. PATTERSON:  Well, if we could have some more

6   foundation, Judge, who the other persons are in this

7   photograph 477.  I have no objection to 478.

8      THE COURT:  Exhibit 478 is admitted into evidence.

9      Go ahead lay some more foundation with regard

10   to 477 for identification.

11   BY MR. MARTINEZ:

12      Q.    These gentlemen that are in the photograph,

13   they were men that were standing next to you?

14      A.    Yes, they were.

15      Q.    They were men on that particular night with

16   your friends, right?

17      A.    I can't answer that question just yes or no.

18   Not just on that particular night.

19      Q.    Well, it's a couple of men and you -- you may

20   not know their names.  Do you?

21      A.    I do know their names.

22      Q.    What are their names?

23      A.    The one on the top is Justin or -- excuse me,

24   Ryan, who is Shannon's boyfriend, and his roommate Chris.

25      Q.    And so that would be the individual on the

1    bottom -- on the lower, right?

2         A.    Yes.

3         MR. MARTINEZ:  I reurge 477.

4         MR. PATTERSON:  Can we establish, Judge -- I don't

5    think we established when it was taken.

6         MR. MARTINEZ:  Summer 2000 she said at the Tijuana

7    Country club.

8         MR. PATTERSON:  Is her testimony, Judge --

9         THE WITNESS:  Yes.

10        MR. PATTERSON:  -- the same?  Or I didn't --

11        THE COURT:  Yes.

12        MR. PATTERSON:  With that understanding, I have no

13   objection.

14        THE COURT:  Exhibit 477 for identification is

15   admitted into evidence.

16        MR. MARTINEZ:  Judge, we've already dealt with 478, I

17   believe.

18        THE COURT:  I'm sorry?

19        MR. MARTINEZ:  We've already dealt with 478 and

20   whether it's in evidence, I believe.

21        THE COURT:  Right.  So just so it's clear, 477 for

22   identification and 478 for identification are admitted into

23   evidence.

24   BY MR. MARTINEZ:

25        Q.    Let's just go ahead and take a quick look at

1    them, ma'am.

2                (Pause in proceedings.)

3    BY MR. MARTINEZ:

4        Q.    Exhibit 477, this is the one that you told us

5    was taken in the summer at the Tijuana Country Club, right?

6        A.    I believe so, yes.

7        Q.    And this is Chris, the individual between whose

8    legs you were sitting on that limo date, correct?

9        A.    Yes, it is.

10        Q.    And if we take a look at Exhibit 478, that's

11    you on the night that you were out celebrating your birthday

12    in the year 2000, correct?

13        A.    Yes.

14        Q.    And that's you on the right, correct?

15        A.    The right?  No, I'm on the left.

16        Q.    No.  If you look at it from my perspective,

17    it's the right, isn't it?

18        A.    Oh, yes.

19        Q.    And in the middle is Chris Hashisaki, right?

20        A.    Yes.

21        Q.    And then to Chris Hashisaki's right is Shannon

22    Sweeney?

23        A.    Yes.

24              MR. PATTERSON:  Judge, could we just approach for a

25    minute?

1
2                    (The following proceedings were held at the

3        bench:)

4

5              MR. PATTERSON:  I just want to make Mr. Martinez

6        aware that they were notified by the deputy she's not to get

7        up from the witness stand so to not encourage her to get up

8        and look at --

9              MR. MARTINEZ:  Is it a health thing or just he

10       doesn't -- he doesn't want her to?

11             MR. PATTERSON:  Yeah, that's what -- she shall not

12       get up because as soon as she gets up, she'll zap her with

13       the thing.

14             MR. MARTINEZ:  I want --

15             MR. PATTERSON:  If he gets to a point where he needs

16       to have her see something she can't really see on the ELMO,

17       we need to call a time out and bring in the deputy or --

18             THE COURT:  Wait.  Are you going to be getting to

19       things on the whole that she's going to have to stand up?

20             MR. MARTINEZ:  Well, that depends.  Maybe what we

21       should do is take a quick break, show it to her, and put her

22       back on --

23             MR. PATTERSON:  I mean, she could probably see the

24       items from there.  Just if she has difficulty seeing over

25       there, we might have to take a break.  But I don't want to

1    take a break unless it's absolutely necessary.

2                 MR. MARTINEZ:  I understand.

3                 THE COURT:  Okay.

4

5                 (The following proceedings were held in open

6    court:)

7

8    BY MR. MARTINEZ:

9         Q.    Getting back that night, one of the things that

10   we know, according to you, was that when you arrived at the

11   San Riva apartment complex that Joseph Andriano was waiting,

12   right?

13        A.    Yes, he was.

14        Q.    And one of the reasons that you were upset that

15   he was waiting for you is because he'd left the kids alone in

16   the apartment, right?

17        A.    I wasn't upset.

18        Q.    You weren't worried about your kids being alone

19   in the apartment asleep?

20        A.    No.  Janna was there.

21        Q.    Well, ma'am, do you remember talking to Sharon

22   Murphy?

23        A.    I do.

24        Q.    And do you remember telling her, quote, "He had

25   left the children alone asleep in the apartment so that he

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000005568

1    could wait for her in the office."  Do you remember telling

2    Sharon Murphy that?

3        A.    I did.  And what I told her --

4        Q.    So the answer is "yes"?

5        A.    No, sir.

6        Q.    That's not true?

7        A.    It happened on a different occasion.

8        Q.    Ma'am, I'll let you read it.  Bottom of page

9    15, top of page 16.  Those two paragraphs that we read

10    before.  Read them, please, if you need to.

11        A.    No need to read them.  Thank you.

12        Q.    They do refer to the day that you were coming

13    home for your birthday, right?

14        A.    Yes, they do.

15        Q.    And you would agree that Ms. Murphy was under

16    the understanding that the children were alone and asleep in

17    the apartment and that Mr. Andriano was down there?

18        A.    Yes.

19        Q.    So from your perspective you didn't tell her

20    that at all?

21        A.    Yes, I did tell her that.

22        Q.    If you did tell her that, then that was a lie?

23        A.    No, it was not.

24        Q.    Well, it wasn't the truth, was it?

25        A.    At the time, that is what I had recalled.

1      Q.      You -- you would agree with me though that as

2  time goes on, memories get dimmer rather than better, don't

3  they?

4      A.      Not necessarily.

5      Q.      So for you it's just the opposite.   Your memory

6  gets better as time goes on rather than dimmer?

7      MR. PATTERSON:  That's not what she said, Judge.

8  Objection to the form of the question.

9      THE COURT:  Sustained.

10  BY MR. MARTINEZ:

11      Q.      Does your memory then get better as time goes

12  on rather than dimmer?

13      A.      It depends.   I can't answer that "yes" or "no."

14      Q.      So with regard to that particular issue, it has

15  now gotten better, right?

16      A.      Yes.   I recall exactly what happened.

17      Q.      Okay.   And what you now recall of what happened

18  was that there was really no problem with Joseph standing out

19  there waiting for you in terms of the kid -- in terms of the

20  kids, right?

21      A.      That's correct.

22      Q.      Because they were back in -- in the apartment,

23  right?

24      A.      Yes.

25      Q.      And Janna was watching them, right?

1      A.    Yes, she was.

2      Q.    Wouldn't you agree that -- well, actually, you

3  said that, didn't you, so that Ms. Murphy would feel sorry

4  for you about how bad Mr. Andriano was to you and how

5  uncaring he was?

6      A.    That is not correct.

7      Q.    Well, but then you continue on with your

8  narration, or we know that what happened according to you is

9  that you get out of the limousine, right?

10      A.    Yes.

11      Q.    You weren't walking to 132, were you, when you

12  got out of that limousine, right?

13      A.    Yes.  I was going home.

14      Q.    You weren't walking with Chris then?

15      A.    No.

16      Q.    The young man we just saw?

17      A.    No.

18      Q.    You weren't walking with Shannon?

19      A.    We were walking with everybody.  Everybody got

20  out of the limousine.

21      Q.    You weren't walking in the same direction and

22  same group as Shannon?

23      A.    Yes.  My apartment lies in the same direction

24  I would have to go to my --

25      Q.    Actually --

1      A.    -- house.

2      Q.    Actually, your apartment lies in a different

3 direction, doesn't it?

4      A.    No, it doesn't.

5      Q.    What apartment number are they?

6      A.    I don't remember the number, but when we're

7 parked right here, you have to walk on this sidewalk and down

8 this driveway and then turn and go to my house.

9      Q.    But the problem was is that as you told us

10 wasn't Mr. Andriano by the clubhouse inside?  He wasn't out

11 near the sidewalk where the car was, was he?

12      A.    Yes, he was.  I didn't say he was inside the

13 clubhouse.

14      Q.    By the clubhouse.  Wasn't it by the clubhouse?

15      A.    He was standing right in front of the limousine

16 which is -- there's a courtyard area with a sidewalk and he

17 was standing right there.

18      Q.    And according to you that's when he smashed the

19 bottle, right, when he saw you?

20      A.    No after -- well, after I walked up to him.

21      Q.    So you walked up to him then?

22      A.    Definitely.

23      Q.    And he didn't say to you "Wendi, what are you

24 doing?"  Didn't say that at all?

25      A.    No.  He cussed at me.

1      Q.      Right.  He cussed at you in front of everybody,

2  right?

3      A.      He did.

4      Q.      And then you went up to him to try to calm him

5  down, right?

6      A.      I was already standing there.

7      Q.      Okay.  So he cussed at you as you got close to

8  him, right?

9      A.      Yes.

10      Q.      And that's when he grabbed the bottle, right?

11      A.      Yes, he did.

12      Q.      And that's when he was screaming, according to

13  use your phrase, screaming in your face, right?

14      A.      Yes.

15      Q.      And then that's when, according to you, he

16  grabbed you by the arm, right?

17      A.      No.

18      Q.      Well, at some point he grabbed you by the arm,

19  didn't he?

20      A.      Yes, he did.

21      Q.      And so he grabbed you by the arm and -- but

22  that's different than saying he dragged you away from there,

23  isn't it?  Do you see what I'm saying?

24      A.      No, I don't see what you're saying.

25      Q.      Didn't you tell Sharon Murphy that, quote, "He

1   then dragged me home."  Didn't you tell her that?

2        A.    Yes.

3        Q.    And so what you're telling us today is that he

4   didn't drag you physically home.  He only touched you a

5   little bit on the arm when you walked up and you followed

6   him, didn't you?

7        A.    That is not what I said.

8        Q.    You said that yesterday when we talked about

9   it, didn't you?

10       A.    No, I did not.

11       Q.    Didn't you say he sort of grabbed you by the

12  arm, you turned around and you started to try to explain

13  things to him as he tried to walk away.  Didn't you say that?

14       A.    Those are not my words no.

15       Q.    I understand that.  I'm not a tape recorder.

16  Isn't that thought the gist of what you said?

17       A.    He grabbed my arm, started to drag me home and

18  finally let go, and that's when I did follow him home trying

19  to explain, trying to calm them down.

20       Q.    Well, this says -- you've indicated to us this

21  is someone you're scared of, right?

22       A.    Occasionally, yes.

23       Q.    Well, no.  You told us from early on in the

24  relationship you were scared of him, right?

25       A.    No, I didn't.


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000005574

1          MR. PATTERSON:  Judge, that's not what she testified

2     to.

3          THE COURT:  Overruled.  She can explain.

4     BY MR. MARTINEZ:

5          Q.    When in the relationship did you become --

6     start becoming scared of him?  When was that?

7          A.    There was just different incidences.  There was

8     not a particular time.

9          Q.    When was the first incident that caused you to

10    be afraid of him?

11         A.    The first incident would have been probably

12    when we were still dating.

13         Q.    Okay.  So that is well before the year 2000,

14    isn't it?

15         A.    Yes, it is.

16         Q.    And so even though you had an incident before

17    you were dating, you weren't afraid of him on that particular

18    night, were you?

19         A.    Not on a daily basis I was not afraid of him.

20         Q.    I'm not talking about a daily basis.  I'm

21    talking about the night of the limousine when you said that

22    he sort of grabbed you by the arm and started to walk away

23    and you went after him.  You weren't afraid of him at that

24    point?

25         A.    I was trying to calm him down.  I didn't want

1    an eruption once we got home.

2         Q.    That's not any question.  My question was isn't

3    it true you weren't afraid of him?

4         A.    That's not true.

5         Q.    So you were afraid of him?

6         A.    Yes.

7         Q.    And you followed him anyway?

8         A.    Of course.  He's my husband.

9         Q.    Just because he's your husband, there have been

10   other occasions where you didn't do what he tells you.  We

11   know that, right?

12        A.    You'll have to rephrase your question.  I --

13        Q.    Well, when you were in Las Vegas, you refused

14   to do what he told you, right?

15        A.    It was impossible to --

16        Q.    Ma'am, you could have gotten on an airplane and

17   come back, couldn't you?

18        A.    I could have, yes.

19        Q.    Right.  So it wasn't impossible, was it?

20        A.    At that time, yes, it was.

21        Q.    And what you're saying is it's impossible to go

22   standby.  That's what you're telling me, right?

23        A.    For me at that time yes, it was.

24        Q.    Okay.  There were other instances where he

25   would ask you for sex and you'd tell him no.  You stood up to

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000005576

1    him, didn't you?

2            A.    No.

3            Q.    You never told him no?

4            A.    Yes, I told him no.

5            Q.    Okay.  And so then what happens is you follow

6    him and, instead of going back to the apartment, he takes you

7    to the Yukon, right?

8            A.    That's correct.

9            Q.    For whatever reason he happens to be prepared

10   with the keys to the Yukon?

11           A.    Oh, yes.  He had them in his pocket.

12           Q.    Right.  So he was prepared, right?

13           A.    Because he was going to come out looking for

14   me, yes.

15           Q.    Well, he had -- he was prepared, for whatever

16   reason, he had the keys to the Yukon, right?

17           A.    Yes, sir.

18           Q.    And then he took you into that Yukon, grabbed

19   the steering wheel and cursed at you, right?

20           A.    Oh, we had a very, very long conversation, yes.

21           Q.    Well, no.  No, you --

22           A.    Yes, of him cursing at me.

23           Q.    Right.  You didn't ever, according to your

24   previous testimony, you didn't have anything to say really.

25   You were just trying to calm him down?

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000005577

1        A.    Exactly.

2        Q.    He was the one that was upset?

3        A.    He was upset.  I was trying to calm him down.

4        Q.    You weren't upset, right?

5        A.    No.  I was crying.

6        Q.    Okay.  So then what happened is after he's done

7    being mean to you is when you guys go to the apartment,

8    right?

9        A.    That's correct.

10       Q.    And instead of going to the front door, you go

11   in through the side door, right?

12       A.    Through the patio, yes.

13       Q.    All right.  Ma'am, let's take a look at Exhibit

14   313.  Do you see yourself in there?

15       A.    Yes, I do.

16       Q.    You're the woman in the red dress, right?

17       A.    Yes.

18       Q.    The dress is below the knees, isn't it?

19       A.    Yes, it is.

20       Q.    So what you're telling us is that you hiked

21   that dress up, stuck your leg over that 4-foot fence, and

22   went in through the back, right?

23       A.    No.  That's not how I got in.

24       Q.    Ma'am, that wall is 4 feet, isn't it?

25       A.    I don't know.

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000005578

1        Q.    It comes to right -- on your chest, it comes to

2  right about here (indicating), doesn't it?

3        A.    Maybe a little bit lower.

4        Q.    Okay.  So if it's right to about there on your

5  chest, wouldn't you agree that's about 4 feet?

6        A.    I don't know.

7        Q.    And on the other side of it, it's filled with

8  rocks, isn't it, on the outside?

9        A.    It's landscaping rocks, yes.

10       Q.    It's got a bunch of rocks, right?

11       A.    Sure.

12       Q.    And in fact it's lower than the actual cement

13  that's part of the apartment, part of the patio?

14       A.    No.

15       Q.    So if the picture shows something different,

16  you would disagree with that?

17       A.    No.  I don't recall it being lower.

18       Q.    And so what ends up happening is you, instead

19  of going through the front door where you may not damage your

20  dress or whatever, you still go over that wall, right?

21       A.    Yes.

22       Q.    And he goes with you?

23       A.    Yes.

24       Q.    And he has the keys to get in, right?

25       A.    It's -- the door's not locked.

1        Q.    So are you guys in the habit of leaving that

2  door unlocked?

3        A.    Yes.

4        Q.    So it doesn't -- so but the point is this,

5  ma'am.  That door does not lock from the outside, does it?

6        A.    That's correct.

7        Q.    In other words, what happens with that door is

8  in order for it to be locked, it has to be locked from the

9  inside?

10       A.    That's correct.

11       Q.    So what that's telling us is that, number one,

12  Mr. Andriano had to have left it open before he left, right?

13       A.    We always left it open.

14       Q.    So then the answer to that is "yes," right?

15       A.    Yes.

16       Q.    And rather than taking you through the front,

17  you decided to go through the back, right?

18       A.    I did not decide, no.

19       Q.    He forced to you go through the back?

20       A.    That's where we went in, yes.

21       Q.    Did he force to you go in through the back?

22       A.    That's was just a pattern he -- of habit.

23  That's where we went in.

24       Q.    I know that may be a pattern and I know that's

25  a habit.  On that particular night, did he force you to go

1    that way, "yes" or "no"?

2          A.    You'll have to rephrase the question.   I can't

3    agree with the word "force."

4          Q.    Well, did you feel free to go through the front

5    door?

6          A.    Sure.

7          Q.    So you could have gone through the front door

8    if you wanted to?

9          A.    If I wanted to, sure.

10         Q.    And you chose not to?

11         A.    No.

12         Q.    Where was this Yukon parked?

13         A.    Right by our master bedroom.

14         Q.    Okay.   Now, as part of this investigation, and

15   Mr. Patterson alluded to it, you were taken down to the

16   police station.   Do you remember telling us that?

17         A.    Yes.

18         Q.    And there was a detective who spoke to you

19   about this case, right?

20         A.    Yes.

21         Q.    And in fact the conversation that you had with

22   him started around -- somewhere around 7:30 in the morning,

23   right?

24         A.    I have no idea.

25         Q.    It was in the morning, wasn't it?

1       A.    I really couldn't tell you.  I don't know.

2       Q.    It was October 8th, wasn't it?

3       A.    It was that Sunday, yes.

4       Q.    Okay.  You don't even remember the date?

5       A.    No -- yes, I do.  I mean at that time no, I

6   didn't know what date it was, but I do now.

7       Q.    Well, no.  I'm asking you what you know now.

8   It was October 8, wasn't it?

9       A.    Yes.

10      Q.    And the time?  Do you know it now?

11      A.    No, I don't.

12      Q.    Is it because your memory's gotten dimmer as

13   time has passed?

14      A.    No.  It's because I didn't have a watch on.  I

15   wasn't aware of the time.

16      Q.    You know that your conversation was videotaped?

17      A.    I do.

18      Q.    And you've had a chance to review that video

19   tape?

20      A.    I have.

21      Q.    It has the time on it, doesn't it?

22      A.    It may have.  I don't know.

23      Q.    You didn't pay attention to it, right?

24      A.    No, I wasn't watching that.

25      Q.    And when the detective spoke to you, he didn't

1   make you any promises in exchange for you speaking to him,

2   did he?

3          A.    No.

4          Q.    He didn't put a gun to your head, right?

5          A.    No.

6          Q.    He didn't coerce you in any way to talk to him,

7   did he?

8          A.    I can't answer that question.

9          Q.    Well, you -- he was talking to you and you were

10  answering the questions voluntarily, weren't you?

11         A.    I felt that I had to, yes.

12         Q.    Well, ma'am, isn't it true that you told him

13  that you even wanted to set the things -- set things

14  straight?

15         A.    I was trying to help.

16         Q.    Right.  You told him you were trying to help,

17  right?  So when you told us that you felt that you had to,

18  that came from within, not anything that he was doing, right?

19         A.    Yes, it did.

20         Q.    Okay.  And he promised you no benefit, right?

21  In other words, he didn't promise to go easy on you if you

22  talked to him?

23         A.    I remember him telling me something about you

24  need to just tell me that way we could help and all this kind

25  of stuff.

1     Q.   Ma'am --

2     A.   I don't know.

3     Q.   -- do you need to refer to your statement to

4  see that is not in fact what happened?

5     A.   No.  I've seen it already.

6     Q.   Right.  Nowhere in that statement does it say

7  it's going to be to your benefit to talk to him, does it?

8     A.   He does not say that, no.

9     Q.   And there was another detective that came in,

10  right, Sally Dillian?  Do you remember that?

11     A.   Yes, I do.

12     Q.   And she, again, didn't promise you anything,

13  right?

14     A.   No.

15     Q.   She didn't threaten you in way anyway, right?

16     A.   No.

17     Q.   In fact she helped you change clothing, didn't

18  she?  Right?

19     A.   Yes.

20     Q.   And should if you needed to go to the bathroom,

21  she took you to the bathroom?

22     A.   Yes.  She was very friendly to me.

23     Q.   And she provided with you Advil because you

24  indicated you had a headache, right?

25     A.   I don't recall that.

1      Q.    They provided you with water, right?

2      A.    I believe so, yes.

3      Q.    And when you were cold, they provided you with

4  some booties for your feet, didn't they?

5      A.    I don't recall.

6      Q.    You did review the video tape though, didn't

7  you?

8      A.    I did, yes.

9      Q.    If it's in the video tape, would you have

10  reason to dispute it?

11      A.    No, I would not.

12      Q.    As part of that, you were admonished or given

13  your Miranda warnings, weren't you?

14      A.    Yes, I was.

15      Q.    And that was at about 7:30 in the morning

16  7:38:43 a.m., weren't you?

17      A.    I was given my rights, yes.  I don't know what

18  time it was.

19      Q.    Well, ma'am, I have a copy of that tape so that

20  we can take a look at it.

21      MR. MARTINEZ:  And, Judge, may we approach?

22      THE COURT:  Yes.

23

24      (The following proceedings were held at the

25  bench:)

1

2          MR. MARTINEZ:  I'd like to have this marked and then

3     I'd like to have her view it and then I'd like to move it

4     into evidence, so that will require her to take a look at it.

5          THE COURT:  How long is the tape?

6          MR. MARTINEZ:  I think it's 45 seconds.

7          THE COURT:  That's all?

8          MR. MARTINEZ:  Yeah.  I only have the snippets of

9     what I want ready to go.

10          THE COURT:  Okay.  Go ahead, have it marked.  And

11     I'll have the jury step out for just a moment, okay?

12

13                        (The following proceedings were held in open

14     court:)

15

16          THE COURT:  Ladies and gentlemen, I just need to

17     speak with Counsel about something outside your presence.

18     This should only take 5 minutes.  Remember the admonition I

19     gave you.  This should only take 5 minutes.

20

21                   (Whereupon, the jury exits the courtroom.)

22

23          THE COURT:  You can be seated.  This is cause number

24     CR 2000-096032, State of Arizona versus Wendi Elizabeth

25     Andriano.  The record will reflect the presence of the

1    Defendant and Counsel.  We're outside the presence of the

2    jury.

3              MR. MARTINEZ:  Judge, if I may play Exhibit 481 for

4    her?

5              THE COURT:  Yes.  This will not be taken down by the

6    court reporter.

7              MR. MARTINEZ:  Right.

8              MR. PATTERSON:  Judge --

9                   (Attorney-deputy discussion.)

10             MR. PATTERSON:  Okay.  He says she has permission to

11   come down if need be.

12             THE COURT:  Okay.

13

14                  (Whereupon, the tape is played.)

15

16             MR. MARTINEZ:  Judge, I'm also going to follow-up by

17   having her take a look at Exhibit 482.  That's to save some

18   time.

19

20                  (Whereupon, the tape is played.)

21

22             MR. MARTINEZ:  All right.  Those are the two.

23             MR. PATTERSON:  I don't quite understand the process

24   here.

25             THE COURT:  Just for the record, the record will

1    reflect we're outside the presence of the jury.  Counsel and

2    the Defendant are present.

3         MR. PATTERSON:  She was asked whether or not she was

4    administered her Miranda rights.  She said she had been given

5    her Miranda rights.  That's not inconsistent with the tape

6    certainly.

7              I don't know what the predicate question is

8    with regard to the second tape, and I don't know if that then

9    is impeaching of her answer here at trial, so I don't know

10   where this is going, Judge.

11        MR. MARTINEZ:  It is impeachment and I'll -- I'll

12   just lay it out.  One of the things that she states in the

13   second tape is they went out on this particular day in the

14   limo and she indicates that's the day that Mr. Andriano broke

15   the dressers and did all of that, whereas she told Sharon

16   Murphy it was on a different occasion.  So that's for

17   impeachment purposes.

18        THE COURT:  Okay.  Well, what I'll do is I'll allow

19   you to ask the question as far as whether that's what she

20   indicated to the detective.

21        MR. MARTINEZ:  Judge, that's why I gave you the memo.

22   It isn't for impeachment purposes.  I don't have to move it

23   in for impeachment purposes.  I could move it in as long as

24   it's relevant since it talks about this incident.  All I need

25   to do is ask her, did you have a conversation with the

1    detective on this incident involving the limo and your

2    birthday and what happened when you got home.  And she's seen

3    the tape and she could say yes, and then I could move it into

4    evidence.

5              THE COURT:  Okay.  Mr. Patterson?

6              MR. PATTERSON:  Well, this snippet presentation, you

7    know, I'm at a severe disadvantage as to what the predicate

8    question was beforehand, what was the follow-up question is

9    thereafter, and we're relying in large part upon the editing

10   capabilities of the county attorney's office.  So I oppose

11   this particular process.

12             THE COURT:  Mr. Martinez?

13             MR. MARTINEZ:  He has been provided a copy of this

14   tape.  There's nothing that I've done other than take a

15   portion of it.  We don't want to play the whole tape.  We

16   don't want to have to.  If he wants to on redirect, he could

17   play the whole tape.  If he wants, over the weekend, he could

18   look and there is the time stamp on there, so I don't believe

19   there's an objection that carries any weight.

20             THE COURT:  Let me -- you received a copy?

21             MR. PATTERSON:  I don't have a quarrel with his

22   position that her statements are not hearsay.  It's admission

23   of party opponent.  I understand that.

24             What I object to is the device.  I've been

25   afforded no copies of these edited snippets.  These just

1    arrived today and he's taking an edited snippet and

2    presenting it to the defendant and asking her whether that

3    snippet is accurate.  It is accurate, but it's wholly out of

4    any kind of context, so it -- it suffers from the capability

5    of leaving wrong impressions on this jury.

6               And so I think it's -- it's improper for him to

7    do it in this fashion and it's a Rule 15 violation for him

8    not to have given me the edited copies of these video tapes.

9          THE COURT:  How many of these video tapes do you plan

10   on --

11         MR. MARTINEZ:  About 25.

12         THE COURT:  Video tapes?

13         MR. MARTINEZ:  Right, uh-huh.  I will say this, it is

14   not a violation of Rule 15.  I have given him a copy of it.

15   The way the State presents that -- for example, I have been

16   quoting out of Sharon Murphy's report for however long.

17   There's been no objections to that.

18              So my point is this.  He has had this for a

19   long time.  I'm entitled to introduce it any way that I see

20   fit.  It is not a Rule 15 violation?

21         THE COURT:  Okay.  But you're saying you plan on

22   using or asking the Court to have admitted into evidence

23   several different video tapes --

24         MR. MARTINEZ:  Right.

25         THE COURT:  -- of different lengths --

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000005590

1          MR. MARTINEZ:  Right.

2          THE COURT:   -- of different portions and those are

3     the tapes?

4          MR. MARTINEZ:  Right.  And that's why Rule 106 is

5     there.  If he thinks I've somehow misquoted it, then he

6     can -- the times are on -- on the video tapes and then he

7     could turn around and say no, Mr. Martinez, that's not right,

8     and then he could play the other part that -- that would be

9     accurate if, that's what he -- if that's what he's saying.

10         THE COURT:  Anything further from Mr. Patterson?

11         MR. PATTERSON:  Yeah, Judge.  Ninth week of trial and

12    this is the first day I've been presented with the notion

13    that he had edited, if you will, that video tape that was

14    given to me in toto, what, four years ago?  Now, I have to

15    scramble over the weekend to make sure -- I don't know how

16    I'm going to do it, quite frankly, over the weekend because

17    I'm not going to have copies of his edited snippets.

18         THE COURT:  Okay.  Hold on.  You agree Mr. Martinez

19    did provide you a copy of the video tape of the entire

20    interview with the detective?

21         MR. PATTERSON:  Absolutely true.

22         THE COURT:  Let's do this.  It's close to the close

23    of day anyway.  Let's take our evening recess.  We don't have

24    trial tomorrow, and you and Mr. Martinez can look at whatever

25    videotapes that the two of you can.  We're close to the time

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    to recess anyway.

2              MR. MARTINEZ:  Okay.

3              MR. PATTERSON:  Okay.  Thank you.

4              THE COURT:  We ready for the jury?

5                   Go ahead, have a seat back on the witness

6    stand.

7                   We ready for the jury?

8              MR. MARTINEZ:  Yes, sir.

9              THE COURT:  We'll bring the jury in.

10

11              (Whereupon, the jury enters the courtroom.)

12

13              THE COURT:  Please be seated.  This is cause number

14   CR 2000-096032, State of Arizona versus Wendi Elizabeth

15   Andriano.  The record will reflect the presence of the

16   Defendant, Counsel and the jury.

17                   Ladies and gentlemen, we're going to go ahead

18   and take our evening and weekend recess at this point in

19   time.  Remember that we don't have trial tomorrow, but we'll

20   recess a little bit early here this evening.

21                   During this evening and weekend recess,

22   remember the entire admonition I've given you including the

23   fact you're not to discuss this case with anyone, do not let

24   anyone discuss the case with you.  Do not do any research,

25   investigation, experimentation or testing on your own.  Avoid

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000005592

1    any media coverage of this case.  Keep an open mind.

2    Remember we don't have trial tomorrow.  Have a nice weekend.

3    We'll see everyone at 1:00 p.m. on Monday.

4              Have a nice weekend.  Try to stay dry.  It

5    might still be wet outside.  Have a nice weekend.

6

7              (Whereupon, the jury exits the courtroom.)

8

9              THE COURT:  Okay.  This is cause number CR

10   2000-096032, State of Arizona versus Wendi Elizabeth

11   Andriano.  The record will reflect the presence of the

12   Defendant and Counsel.  We're outside the presence of the

13   jury.

14             Anything further we need to discuss at this

15   point in time?

16             MR. MARTINEZ:  I don't think so.

17             MR. PATTERSON:  No, Your Honor.  Thank you.

18             THE COURT:  I trust the two of you will make

19   arrangements?

20             MR. PATTERSON:  We work good together.

21             THE COURT:  Okay.  Thank you very much.  We'll be in

22   recess until Monday at 1:00 p.m.

23             (Evening recess.)

24

25


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1                          CERTIFICATE OF REPORTER

2

3      STATE OF ARIZONA        )
                               )
4      COUNTY OF MARICOPA      )

5

6                  I, Traci L. Wheeler, CSR, RPR, an official

7      and certified reporter in the Superior Court of the State

8      of Arizona, in and for the County of Maricopa, hereby

9      certify that I made a shorthand record of the proceedings

10     had in the within case, and that the foregoing transcript

11     is a full, true, and correct transcription of the

12     proceedings in this case.

13                      Dated this 5th day of July, 2005

14

15

16                      _____
                        Traci L. Wheeler, CSR, RPR
17                      Certified Court Reporter No. 50313
                        Official Court Reporter

18

19

20

21

22

23

24

25



              TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

EXHIBIT BB



05-0002
Braccio


1

IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

IN AND FOR THE COUNTY OF MARICOPA

STATE OF ARIZONA,               )
                                )
          Plaintiff,            )
                                )
     v.                         )    No. 1 CR 05-0005 AP
                                )    MARICOPA COUNTY
WENDI ELIZABETH ANDRIANO,       )    No. CR 2000-096032
                                )
          Defendant.            )
_____ )

Mesa, Arizona
November 3, 2004

BEFORE:   The Honorable BRIAN K. ISHIKAWA

REPORTER'S TRANSCRIPT OF PROCEEDINGS

TRIAL DAY 37

ORIGINAL Prepared for APPEAL by:
TRACI L. WHEELER, CSR, RPR
Certified Court Reporter No. 50313

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

2

1                      A P P E A R A N C E S

2   FOR THE STATE:       JUAN M. MARTINEZ,
                       Deputy County Attorney

3   FOR THE DEFENDANT:   DANIEL B. PATTERSON,
                       Deputy Public Defender
4                             and
5                     G. DAVID DELOZIER,
                       Attorney at Law

6

7           I N D E X    O F    E X A M I N A T I O N

8   WITNESS                                        PAGE

9   ANDRIANO, WENDI ELIZABETH, Called on her own behalf
        Continued Cross-examination by Mr. Martinez     3
10        Further Cross-examination by Mr. Martinez     62
        Redirect Examination by Mr. Patterson     69

11

12

13     E X H I B I T S   A D M I T T E D   I N   E V I D E N C E

14    NO.      DESCRIPTION                             PAGE

       498      Videotape                             68
15     499      Videotape                              7
       500      Videotape                              9
16     501      Videotape                            14
       502      Videotape                            16
17     503      Videotape                            27
       510      Videotape                            47
18     511      Videotape                            50
       512      Videotape                            62
19     513      Videotape                            63
       514      Videotape                            64
20     515      Photograph                         64
       516      Photograph                         64
21     517      Photograph                         64

22

23

24

25

TRACI L. WHEELER,  CERTIFIED COURT REPORTER,  CSR,  RPR

```
 1              MESA, ARIZONA, WEDNESDAY, NOVEMBER 3, 2004

 2

 3         THE COURT:  Good afternoon.  This is trial in cause

 4    number CR 2000-096032, state of Arizona versus Wendi

 5    Elizabeth Andriano.  The record will reflect the presence of

 6    Defendant, Counsel and the jury.  The defendant, Wendi

 7    Elizabeth Andriano, is on the witness stand.  We'll continue

 8    with the cross-examination by Mr. Martinez.

 9              Mr. Martinez?

10         MR. MARTINEZ:  Thank you.

11

12              WENDI ELIZABETH ANDRIANO,

13         CALLED TO TESTIFY ON HER OWN BEHALF,

14    HAVING PREVIOUSLY BEEN DULY SWORN, TESTIFIES FURTHER:

15

16    CONTINUED CROSS-EXAMINATION BY MR. MARTINEZ:

17         Q.    Ma'am, you're the same individual who testified

18    yesterday?

19         A.    Yes, sir.

20         Q.    You also testified back on October 28th of 2004

21    that, quote, I told him that the weekend that he'd been at

22    the lake I had met somebody at Rockin' Rodeo and that it

23    ended up being a sexual thing, and that -- that's why one of

24    his condoms were missing?

25         A.    Yes, sir.
```

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000005598

4

1       Q.    And you were referring to Travis Black, right?

2       A.    Yes, sir.

3       Q.    Later on that same day, you testified that you

4   went -- you had a knife in your hand and that you were

5   walking towards Mr. Andriano and that you were talking to

6   him, correct?

7       A.    I don't know if it was that same day, but yes,

8   that is what I said.

9       Q.    And you indicate -- the question was "Okay.

10  What did you mean when you told him it was not his fault?"

11  And your answer was, "It's not his fault.  It's not his fault

12  that I had an affair."  Do you remember testifying to that?

13      A.    Yes, sir.

14      Q.    So you did have an affair with Travis Black

15  then?

16      A.    I had an affair with Rick.

17      Q.    Well, you didn't tell Mr. Andriano about Rick,

18  did you?

19      A.    No, sir.

20      Q.    And when you talked to Mr. Andriano that night,

21  and the person involving the condom, that was Travis Black,

22  right?

23      A.    Yes, sir.

24      Q.    So when you're telling Mr. Andriano "It's not

25  his fault.  It's not his fault that I had an affair," you're

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

5

1     talking about Travis Black, aren't you?

2         A.    I'm talking about a lot of things that weren't

3     his fault.

4         Q.    Well, the answer was "It's not his fault, it's

5     not his fault that I had an affair."  That's what you told

6     him, right?

7         A.    That's correct.

8         Q.    Now, ma'am, one of the other things that we

9     talked about yesterday was the telephone cord.  Do you

10    remember that?

11        A.    Yes, sir.

12        Q.    And at one point I asked you, well, how did the

13    telephone cord get there?  And you told me, well, Mr.

14    Andriano threw it down.  Do you remember that?

15        A.    No.  I believe I said he dropped it.

16        Q.    That he dropped it?  Okay.

17        Do you remember also testifying back on October

18    28th and indicating the following:  "I'm holding onto the

19    cord with one hand.  I took the knife and I cut with cutting

20    motions, and it finally came off."  The question was "What

21    happened with the telephone cord?"

22        A.    I don't know.  It's on the floor.  He dropped

23    it.

24        Q.    But you did tell us that again when you were

25    asked that question previously, correct?

1          A.     If that's what I said, yes.

2          Q.     The other thing that you told us was that you

3     were able to pull it out it appeared with your left hand, and

4     in order to avoid any injury to yourself, that you were able

5     to get the knife and then start cutting in that fashion,

6     correct?

7          A.     I was able to do that, yes.

8          Q.     You could have also just as easily, since it

9     was as loose as you picture it, thrown it over your head

10    without having to cut it, right?

11         A.     No, sir.

12         Q.     Now, you also talked to the police department

13    back on October 8th of the year 2000, didn't you?

14         A.     Yes, sir.

15         Q.     And at 9:28 and 54 seconds you indicated the

16    following, didn't you.  You, "So then he grabs the cell phone

17    like he was going to call somebody and it had the charger

18    hooked up to it and that's when he wrapped that thing around

19    my neck."  And the detective asked you, "What's that?"  And

20    your answer was, "The cord to the cell phone.  He wrapped it

21    around my neck.  Oh, my God.  We had been standing by the,

22    um, where he keeps his thing charged or whatever.  I don't

23    even know.  I hadn't noticed it.  If -- if I would have seen

24    it, I would have thought something first."

25               You spoke to the detective about that, didn't

1    you?

2            A.    Yes, sir.

3            MR. MARTINEZ:  I move for admission for Exhibit 499.

4            MR. PATTERSON:  No objection.

5            THE COURT:  Exhibit 499 for identification is

6    admitted into evidence.

7                    (Whereupon, the tape is played.)

8    BY MR. MARTINEZ:

9            Q.    When you testified about this series of events,

10   you told us actually that you were kneeling down in the

11   kitchen when he came up behind you and he startled you,

12   right?

13           A.    Yes, sir.

14           Q.    That's different than what you told the police,

15   isn't it?

16           A.    Yes, it is.

17           Q.    In fact what you told the police was that you

18   weren't even in the kitchen when he put that cord around your

19   neck, right?

20           A.    I don't believe I said that.

21           Q.    Well, you said, "And then he grabs the cell

22   phone like he was going to call somebody and has the charger

23   hooked up for it, and that's when he wrapped that thing

24   around my neck."  "What's that?"  The cord to the cell phone.

25   He wrapped it around my neck.  Oh, my God.  We had been

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    standing by the, um, where he keeps his thing charged or

2    whatever."

3              In other words, you're telling the detective

4    that you're standing in an area where he keeps that telephone

5    charger, right?

6         A.    That is what I said.

7         Q.    And he didn't keep his telephone charger in the

8    kitchen, did he?

9         A.    Yes, he did, on the kitchen counter.

10        Q.    And so you're saying that you were in the

11   kitchen then when this happened?

12        A.    Yes, sir.

13        Q.    And were you kneeling in the kitchen when this

14   happened?

15        A.    Yes, I was.

16        Q.    Okay.  Let's take a look at something else at

17   9:29:39 and what you told the police.  "So he's -- he's

18   like -- has that around my neck.  But I -- that was kind of

19   stretchy, so I could pull it.  And he kept trying to squeeze

20   it tighter and tighter.  And, um, I start moving our way into

21   the kitchen and, um, that's when I thought I needed a knife.

22   I just got to cut this.  I've got to cut -- you've got to cut

23   it.  Um -- um, oh, my God.  I remember reaching into the

24   drawer and trying, grabbing a knife.  And he's trying to pull

25   me away from the knife and I think -- I try to grab on the

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000005603

 1     refrigerator, anything I can do, you know.  I'm like,

 2     don't -- don't pull me away.  Let me hold onto -- onto

 3     something and, um, oh, my God."

 4                   That's something you said, didn't you?

 5          A.    Yes, sir.

 6          MR. MARTINEZ:  I move for admission of Exhibit 500.

 7          MR. PATTERSON:  No objection.

 8          THE COURT:  Exhibit Number 500 for identification is

 9     admitted into evidence.

10                   (Whereupon, the tape is played.)

11     BY MR. MARTINEZ:

12          Q.    So you weren't in the kitchen -- you were not

13     inside the kitchen when he put this thing around your neck,

14     were you?

15          A.    No.  I was in the kitchen.

16          Q.    So then what you told the police officer back

17     then was an error?

18          A.    Yes, sir.

19          Q.    Was your memory better then than it is now?

20          A.    No, sir.

21          Q.    Was your memory better -- has the passage of

22     time caused your memory to be better now than it was on

23     October 8?

24          A.    No.  I can't agree with that.

25          Q.    So your memory was better back on October 8?

1          A.     No, sir.

2          Q.     When is your memory better?  Back on October 8

3     or when you testified about those events?

4          A.     When I testified about those events I testified

5     to the truth of those events and how they happened.

6          Q.     Ma'am, am I asking whether or not you testified

7     to the truth?  I'm asking you something entirely different.

8     Please listen to my question.  I'm asking you about your

9     memory.  I'm asking whether your memory was better back on

10    October 8, 2000, or back on in October -- or I'm sorry --

11    yeah.  It was October of the year 2000 when -- 2004 when you

12    testified here in court.

13              MR. PATTERSON:  Objection.  Asked and answered.

14              THE COURT:  Overrruled.  Go ahead, answer the

15    question if you can.

16              THE WITNESS:  When I testified here in court about

17    those events, the memory that I have of those events are

18    exactly as I told them.

19    BY MR. MARTINEZ:

20         Q.     But that doesn't answer my question, ma'am.  My

21    question doesn't go to whether or not that is your memory to

22    the best of your recollection.  My question is whether in

23    your mind your memory as to what happened that night was

24    better on October 8, 2000 or better when you testified here

25    in court?

1          MR. PATTERSON:  Objection.  Asked and answered.

2          THE COURT:  Overruled.  Go ahead, answer just the

3    question that's asked.

4          THE WITNESS:  I'm trying.  The night that I was -- or

5    the day, whatever time it was, that I was questioned back in

6    2000, I was under tremendous stress and I can't even -- no,

7    my memory was not very good then.

8    BY MR. MARTINEZ:

9          Q.    So it's better here in court then?

10         A.    It sure is, yes, sir.

11         Q.    One of the things we know about you and you

12   told us during your direct examination was that you used to

13   win the silver apple award when you were in high school?

14         A.    Actually, it was a gold apple.

15         Q.    All right, the gold apple when you were in high

16   school, correct?

17         A.    Yes, sir.

18         Q.    And the reason was because of your prowess in

19   having a very good memory.  Isn't that true?

20         A.    I memorized the Book of Proverbs.  That's why.

21         Q.    And you used to win it almost every year is

22   what we were told?

23         A.    No.  I won it one -- one year.

24         Q.    And, again, the year you did win it was because

25   you had a good memory?

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1          A.    Because I memorized the Book of Proverbs.

2          Q.    Memorizing took some time, didn't it?

3          A.    Yes, it did.

4          Q.    And it required how -- and how long is the Book

5    of Proverbs?  How big is it?

6          A.    It's 31 chapters.

7          Q.    You memorized each and every one of them,

8    right?

9          A.    Yes, I did.

10         Q.    So your memory was pretty good then, right?

11         A.    Yes, sir.

12         Q.    And the other thing you told us, and I'm trying

13   to get to your memory, is that you did get married back on

14   January what 22nd of 1994?

15         A.    Yes, sir.

16         Q.    And you got married at a chapel that was across

17   the street from the Desert Family Church or something like

18   that?

19         A.    No, sir.

20         Q.    Was this in Casa Grande that you got married?

21         A.    Yes, sir.

22         Q.    But you couldn't tell us the name of the

23   church, right?

24         A.    Yes, sir.  No, sir.

25         Q.    And in fact you told us that, well, we went to

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000005607

1    Las Vegas for your --

2            A.    Yes, sir.

3            Q.    Actually, you went to Orlando for your

4    honeymoon?

5            A.    No, sir.

6            Q.    Didn't you stay at Janay's condo there and do

7    all the things that people do in Florida?

8            A.    No, sir.

9            Q.    You also indicated that you did get married at

10   the Desert Family Church for a reason, right?

11           A.    No, I did not say that.

12           Q.    Well, it's fair to say that the reason there is

13   no reason for any -- it wasn't Joseph's fault that you didn't

14   get married at the Desert Harvest or Desert Family Church,

15   right?  It's not his fault, is it?

16           A.    I can't answer that question --

17           Q.    Well --

18           A.    -- with a "yes" or "no."

19           Q.    Well, we've been talking about Pastor Tom King.

20   You know who he is, right?

21           A.    Yes, I do.

22           Q.    He cannot marry people, just like he can't

23   preside over a burial, right?

24           A.    Yes, he can.

25           Q.    He's not an ordained minister.  Did you know


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000005608

1    that?

2             A.     Paster Tom King has the authority to marry

3    people.

4             Q.     And your father's not ordained, is he?

5             A.     He has the authority to marry people also.

6             Q.     Okay.  Now, you also told the police the

7    following, didn't you, at 9:42:54.  "I -- I know I did not

8    stab him with a knife, if that's what you are asking me."

9    And then you were asked, "You did not stab him?"  And your

10   answer, "I did not stab him with a knife, no."  The question

11   was, "How did he get cut?"  And you answered, "No, I don't

12   know.  That's why I'm like I don't know.  I don't know what

13   happened.  All I know is all of a sudden there's blood every

14   where, and I'm like what just happened?  I don't know." And

15   then you're asked, "But you got the knife in your hand at

16   that time -- but you got the knife in your hand at the time

17   And your answer was, "I had the knife in my hand and he

18   falls.  Oh, God.  I don't know.  I don't know how --"  "Were

19   you in the living room or kitchen?"  Answer, "The living

20   room."  Do you remember that?

21            A.     From you reading it to me, but no, I don't have

22   my own memory of that.

23            MR. MARTINEZ:  I move for admission of Exhibit 501.

24            MR. PATTERSON:  No objection.

25            THE COURT:  Exhibit 501 is admitted into evidence.


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1                    (Whereupon, the tape is played.)

2     BY MR. MARTINEZ:

3          Q.     You indicated back then on October 8th that you

4     did not know how he got cut?

5          A.     That is correct.

6          Q.     Yet you came into court approximately four

7     years later and tell us that you do know how he was cut,

8     right?

9          A.     Yes, sir.

10         Q.     And is that because your memory has gotten

11    better?

12         A.     It's because my memory had returned after the

13    stress and shock had worn off.

14         Q.     And additionally it does say that you did have

15    a memory back then of who had the knife when Mr. Andriano

16    fell, doesn't it?

17         A.     Yes, it did say -- I did say I had it in my

18    hands.

19         Q.     And so back then you did remember that at the

20    time that Mr. Andriano was stabbed you had the knife in your

21    hands, right?

22         A.     We both did, yes.

23         Q.     No, ma'am.  That's not what it says.  The

24    question was "But you got the knife in your hand at that

25    time?"  And your answer is, "I had the knife in my hand and

1    he falls."  That's what you said, right?

2              A.    That is what I said.

3              Q.    And you weren't lying to the officer, were you?

4              A.    No.  I was telling him what I remembered.

5              Q.    Now, he also asked you, "How did you get back

6    from being in the kitchen getting the knife out of the drawer

7    and back into the living room?"  And do you remember telling

8    him, "I have no idea."  Do you remember that?  And that's at

9    9:33:09.  Do you remember that?

10             A.    No, but you just read it to me.  I don't -- I

11   don't remember much of that.

12             MR. MARTINEZ:  Move for admission of Exhibit 502.

13             MR. PATTERSON:  No objection.

14                   What is the counter on that one?

15             MR. MARTINEZ:  9:33:09.

16             MR. PATTERSON:  Thank you.

17             THE COURT:  Exhibit 502 for identification is

18   admitted into evidence.

19                   (Whereupon, the tape is played.)

20   BY MR. MARTINEZ:

21             Q.    Ma'am, you did not tell that detective that you

22   actually had the knife in your hand and that you began to

23   approach or walk towards Mr. Andriano that night, did you?

24             A.    No, sir.  I did not.

25             Q.    You did not tell that detective that Mr.

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000005611

1       Andriano then began to back away from you, correct?

2              A.    No, sir.  I did not.

3              Q.    And that he backed away all the way to the

4       living room.  You didn't tell him that, did you?

5              A.    No, sir.

6              Q.    And then when he got to the living room, that

7       at that point you tossed the knife, whether underhanded or

8       overhanded in his direction.  You didn't tell him that, did

9       you?

10             A.    No, sir.

11             Q.    And you also did not tell him that Mr. Andriano

12      at some point began to lean over to pick up that knife.  You

13      didn't tell him that, did you?

14             A.    No, sir.

15             Q.    And you didn't tell him that at that point you

16      started to go towards Mr. Andriano, did you?

17             A.    I don't know if I did or not.

18             Q.    You didn't tell him that it was at that time

19      that you began to fear for your life because he had a knife

20      in his hand.  You didn't tell him that?

21             A.    No, because that's not the truth.

22             Q.    Well, that's what you told us before that he

23      went to get the knife and that's when you hit him in the

24      head.  Do you remember telling us that?

25             A.    Yes, sir.


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    Q.    You didn't tell that to the detective, did you?

2    A.    I don't know, sir.

3    Q.    Well, it says here, "How did you get from being

4    in the kitchen getting the knife out of the drawer back into

5    the living room?"  And your answer was, "I have no idea."

6    That means you didn't tell him, right?

7    A.    It means I had no idea at that point.

8    Q.    And if you had no idea at that time, it means

9    you didn't tell him, right?

10   A.    I wouldn't have been able to, no.

11   Q.    So the answer is no, you didn't tell him?

12   A.    I couldn't tell him, no, sir.

13   Q.    And then at that point you indicated that you

14   struck Mr. Andriano repeatedly, right?  Well, you told us

15   that in court, didn't you?

16   A.    That's not how I said it, no.

17   Q.    Well, you indicated that you picked up the

18   stool while he was going for the knife and you hit him in the

19   head, right?

20   A.    Yes, sir.

21   Q.    You didn't tell that to the detective, did you?

22   A.    I don't know, sir.

23   Q.    Again, question was, "How did you get from

24   being in the kitchen getting the knife out of the drawer back

25   into the living room?"  And your answer was, "I have no

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

```
 1    idea."  So you didn't tell him, did you?
 2          A.    You're reading one question and you're asking
 3    me several other ones, so I can't answer those.
 4          Q.    Ma'am, there was a question to you and there
 5    was a response there to you.  We've agreed and seen that's
 6    what you said, right?
 7          A.    Regarding how we got from the kitchen to the
 8    living room?
 9          Q.    Right.  And in fact that is when, according to
10    you earlier, that's when you tossed the knife at Mr. Andriano
11    in Mr. Andriano's direction, right?  That's when that
12    happened, right?
13          A.    Yes, sir.
14          Q.    And here when the detective is asking you that,
15    what happened, you say "I don't know."  Isn't that true?
16          A.    No, sir.
17          Q.    And then what ends up happening is that you
18    tell us, "Well, he starts going for the knife and because I'm
19    afraid for my life I pick up the stool," right?
20          A.    Yes, sir.
21          Q.    You don't tell that to the detective?
22          A.    I don't know, sir.
23          MR. PATTERSON:  Judge, this is -- objection.  This is
24    improper impeaching.  If he will continue to read on, it
25    explains the balance of the statement.
```

```
 1              THE COURT:  Overruled.  Continue on.
 2   BY MR. MARTINEZ:
 3         Q.    So now, ma'am, you are now striking Mr.
 4   Andriano in the head.  Do you remember telling us that?
 5         A.    Not in those words, but yes, sir.
 6         Q.    You do remember that you told us that you
 7   struck him in the head with a stool, right?
 8         A.    Yes, sir.
 9         Q.    But never -- did you tell us when you were
10   telling us that, that you never hit him in the facial area,
11   did you?
12         A.    Because I did not.
13         Q.    Never did you tell us that you hit him in the
14   nose area, right?
15         A.    Because I did not.
16         Q.    And the reason that you didn't hit him in those
17   areas is because he was already down on the ground and his
18   face was down in the carpet, but you kept hitting him anyway,
19   right?
20         A.    I don't know, sir.
21         Q.    At some point you stopped hitting him, didn't
22   you?
23         A.    Yes, sir.
24         Q.    And then you told us that, in court, that at
25   that point you went into the bedroom and waited, or maybe
```

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

21

```
 1    even the bathroom?
 2            A.    The bathroom, yes, sir.
 3            Q.    But -- the bathroom?  To get to the bathroom
 4    you had to go through the bedroom, don't you?
 5            A.    No, sir.
 6            Q.    Which bathroom did you go to?
 7            A.    The master bedroom.
 8            Q.    Don't you have to take a right and go into it
 9    into the master bedroom before going into the bathroom?
10            A.    No.  No, sir.
11            Q.    You went to the bathroom?
12            A.    Yes, sir.
13            Q.    And there you waited for some time, right?
14            A.    Yes, sir.
15            Q.    And then you came back out, right?
16            A.    Yes, sir.
17            Q.    And that's when you say that you approached him
18    and at some point he had the knife in his hand, right?
19            A.    Yes, sir.
20            Q.    That is not what you told the police, right?
21            A.    I don't believe I remembered.  I don't think I
22    told them any -- I don't know what I told them.
23            Q.    Well, you've had -- you've seen yourself on
24    some of these -- some of those conversations that you had
25    with them, right?
```

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1      A.     Yes, sir.

2      Q.     That was you, wasn't it?

3      A.     Yes, sir.

4      Q.     And that was you talking, right?

5      A.     Yes, sir.

6      Q.     Then when you say that you come back from the

7  bathroom, you indicated that that's when he has the knife in

8  his hand and that's when he now wants to commit -- commit

9  suicide via the knife, right?

10     A.     Yes, sir.

11     Q.     And you indicated that you struggled with the

12 knife -- for the knife with him, correct?

13     A.     Yes, sir.

14     Q.     You didn't tell any of that to the police, did

15 you?

16     A.     I don't believe so.

17     Q.     And then you indicated that -- that you and he

18 were grappling for the knife, and, according to you, that's

19 when the knife went into his neck, right?

20     A.     No, sir.  That's not the words I used.

21     Q.     I didn't ask you if those were the words you

22 used.

23     A.     Yes.  You asked me if I said that.  No, sir.

24     Q.     You didn't tell us that?

25     A.     Not with those words, sir.


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000005617

```
 1          Q.     I'm not -- ma'am, I can't tape record

 2   everything and play it back for you, but is that essentially

 3   what you told us?

 4          A.     I do believe that I said that we were

 5   struggling, I was trying to hold it back from him.

 6          Q.     You and he were grappling, struggling for the

 7   knife, right?

 8          A.     Not for the knife, no.

 9          Q.     Well, you were struggling with him, weren't

10   you?

11          A.     Yes, sir.

12          Q.     And according to you he had the knife in his

13   hand, right?

14          A.     We both had it in our hands, yes.

15          Q.     Well, no, that's not what you told us on direct

16   examination.

17          A.     Yes, sir.

18          Q.     You told us that he had the knife, didn't you?

19          A.     No.   We both -- it's in his hands.   My hands

20   are over his.   The knife is in between us.   I'm trying to

21   hold him back.

22          Q.     No.   Let me read to you what you said back on

23   October 28th, 2004.   "Then he starts to roll-over and sit

24   up.

25          MR. PATTERSON:   Page?
```

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000005618

1        MR. MARTINEZ:  37.  This is -- this is what she told

2   us in court.

3        MR. PATTERSON:  My mistake, sorry, Judge.

4   BY MR. MARTINEZ:

5        Q.    "Then he starts to roll over and sit up, and

6   all I saw was the knife in his hand."  You did tell us he had

7   the knife in his hand, right?

8        A.    Yes, sir, but --

9        Q.    But he didn't have that pointed at -- "he said

10  he was going to fucking kill himself now, he said, because I

11  messed everything up"?

12        A.    Yes, sir.

13        Q.    He said "I just have to do it because you

14  couldn't do it right"?

15        A.    Yes, sir.

16        Q.    "And I grabbed his hands because he was trying

17  to move the knife towards his neck, and I was telling him no,

18  don't do it.  Please don't do this."  You said that, right?

19        A.    Yes, sir.

20        Q.    So that means the knife is in his hands and at

21  that point you grabbed his hands, right?

22        A.    Yes, sir.

23        Q.    Then you say -- well, my question to you is you

24  must have just grabbed his hands not the knife, right?

25        A.    I can't say that for certain, no.


                TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

                            000005619

```
 1          Q.    Well, you didn't have any cuts on your hands,

 2   did you?

 3          A.    You didn't -- I wouldn't have grabbed the blade

 4   of the knife.

 5          Q.    Well, that's because you were thinking that's

 6   not a good thing to grab, right?

 7          A.    No, sir.  I just -- that's just not something

 8   you grab.  You grab the handle.

 9          Q.    Well, you couldn't grab the handle because that

10   was in his hand, right?

11          A.    All I remember is wrapping both of my hands

12   around him and trying to pull it away.

13          Q.    The question remains, ma'am, you couldn't grab

14   the handle of the knife because, as you told us, he already

15   had the knife in his hand, right?

16          A.    Yes, sir.

17          Q.    And then, according to you, your hand slipped

18   off of his hand and that's how the stabbing occurred,

19   correct?

20          A.    Yes, sir.

21          Q.    Didn't tell any of that to the detective back

22   on October 8, 2000, did you?

23          A.    No, sir.

24          Q.    You then told us that, well, what you tried to

25   do was after that was that you had a lot of blood on you,
```

1    right?

2              A.    Yes, sir.

3              Q.    And after you had that blood on you, what you

4    did was "I got up and I made my way into the kitchen to try

5    to rinse the blood off of me so I could see what was

6    happening," right?  That's what you told us you did, right?

7              A.    Yes, sir.

8              Q.    And I'm showing you Exhibit Number 27.  This is

9    the sink in your apartment back on October 8th of the year

10   2000.  That's the sink, right?

11             A.    That looks like one half of it, yes.

12             Q.    And to the left of it -- if you need to step

13   down, please do so.  On the left of it, right here, is we

14   have some cereal with milk in it and a spoon, right?

15             A.    I can't tell what it is, but something.

16             Q.    That's what it looks like right?

17             A.    Yes, sir.

18             Q.    Right up there we have some Dawn, which is a

19   detergent used for washing dishes, right?

20             A.    Yes, sir.

21             Q.    And then if we move down, this is what is on

22   one side of the sink, right?

23             A.    Yes, sir.

24             Q.    And you could tell that it's filled with blue

25   water, right?

1       A.      Yes, sir.

2       Q.      Not red water, blue water?

3       A.      That's correct.

4       Q.      And then right over here we have a glass, right?

5       A.      Yes, sir.

6       Q.      And there is no water in that glass, is there?

7       A.      No, sir.

8       Q.      But the spigot is right above it, isn't it?

9       A.      Yes, sir.

10      Q.      There is no red anywhere there that you could

11   see, is there?

12      A.      No, sir.

13      Q.      The police -- you did talk to the police about

14   this, and at 9:34:13 seconds, you told them, "I had to take

15   my glasses off and I don't see well without my glasses.  I

16   went to the bathroom.  I'm going Oh, my God.  I rinsed my

17   glasses off so I could see what's going on.  I rinse my

18   hands, I go back out there, and he's just -- I even -- I even

19   stood in the bathtub, okay?  I'm sure I stood in the bathtub

20   and rinsed off my legs.  You have no -- I had blood

21   everywhere.  You have no idea.  I was just disgusting."  You

22   told that to the police, right?

23      A.      Yes, sir.

24          MR. MARTINEZ:  I move for admission of Exhibit 503.

25          MR. PATTERSON:  No objection, Your Honor.


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1           THE COURT:  Exhibit 503 for identification is

2    admitted into evidence.

3                (Whereupon, the tape is played.)

4    BY MR. MARTINEZ:

5           Q.    You never made mention to the detective that

6    you went to the kitchen, did you?

7           A.    Not at that time, no, sir.

8           Q.    Not ever, ma'am.  Immediately after you didn't?

9           A.    No, sir.

10          Q.    Instead you told them that you went into the

11   bathroom, right?

12          A.    That is what I said.

13          Q.    And that's when you washed your hair, didn't

14   you?

15          A.    No, sir.

16          Q.    You had -- you indicated that you had it all

17   over your hair and everything, didn't you?

18          A.    I don't believe that's what I said.

19          Q.    Well, ma'am, you say that you had it all over

20   your face, you have it all over your glasses that you were

21   just disgusting.  The only place that you didn't have it was

22   your hair?

23          A.    No.

24          Q.    Because you didn't say I had it all over my

25   body, so you didn't have it in your hair then?

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1          A.     I don't know.

2          Q.     Well, you were there, weren't you?

3          A.     Yes, sir.

4          Q.     And you know enough to tell us even here that

5    you had it all over yourself and you went down to the kitchen

6    sink to clean up, didn't you?

7          A.     Yes, sir.

8          Q.     And did you -- were you here when there was

9    this barrette that was introduced that was found at the

10   scene.  Do you remember that?

11         A.     Yes.  I do remember that.

12         Q.     That was your barrette, right?

13         A.     Yes, sir.

14         Q.     It was coated in blood or it had a reddish

15   substance to it.  Wasn't that blood from your hair?

16         A.     No, sir.

17         Q.     You never had any blood on your hair?

18         A.     If I did, I would have rinsed on -- in the

19   kitchen sink because I remember using some towels and things,

20   but --

21         Q.     Did you have blood on your hair, "yes" or "no"?

22         A.     I don't know, sir.

23         Q.     But you think you did or think you didn't?

24              MR. PATTERSON:  Judge, she answered "I don't know."

25              THE COURT:  Sustained.


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000005624

30

```
 1    BY MR. MARTINEZ:

 2         Q.    Ma'am, one of the things that you told us was

 3    that when you were hitting him with the stool that was the

 4    only place you hit him was the head, right?

 5         A.    I believe so, yes, sir.

 6         Q.    Let's take a look at Exhibit 206.  This is a

 7    photograph of Mr. Andriano's right hand.  Do you see the

 8    injuries there?

 9         A.    Yes, sir.  I do.

10         Q.    He actually was putting his arm up to shield

11    himself from the blows, wasn't he?

12         A.    I don't know, sir.

13         Q.    One of the things that we do know is that you

14    did clean yourself up, right?  In other words, after you had

15    the blood on you, regardless of how it happened, you did

16    clean up, didn't you?

17         A.    I can't say regardless.  I went to the kitchen

18    and cleaned up, yes, sir.

19         Q.    When you went to the kitchen or the bathroom

20    after you got the blood on you, you cleaned up, right?

21         A.    I did clean up in the kitchen, yes.

22         Q.    Washed your hands, right?

23         A.    Yes, sir.

24         Q.    Wiped -- wiped your face?

25         A.    Yes, sir.
```

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1      Q.      And did your legs, right?

2      A.      My glasses.

3      Q.      Your glasses, right?  When the paramedics

4   arrived the first time, there was no -- you didn't have any

5   blood on you, did you?

6      A.      No, sir.

7      Q.      And when you opened the door to throw out Chris

8   Hashisaki's purse, you had no blood on you, right?

9      A.      Absolutely not.

10      Q.      And immediately -- then immediately after the

11   stabbing however, that came about, it is your position that

12   you went to the kitchen to wash up, right?

13      A.      Yes, sir.

14      Q.      Well, then, ma'am, how is it that -- if we take

15   a look at Exhibit 57, there's blood on the door.  How did it

16   get on there if you're all cleaned up -- you just told me you

17   washed your hands?

18      A.      Yes, sir.  On the 911 call I had to -- I was

19   instructed to roll Joe over and my hands became bloody again.

20      Q.      How did you roll him over?

21      A.      When they were trying to roll him over by his

22   chest and I couldn't get it -- get him rolled and, um, I had

23   to roll his legs too and I -- I don't remember.

24      Q.      That explains that, but, ma'am, we also have

25   Exhibit Number 357 right outside your door, and I'll give you

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000005626

1      a close up of it, with blood.

2               MR. PATTERSON:  Well, wait, wait, wait.  There's been

3      no testimony as to what this substance is, Judge.

4               THE COURT:  Sustained.

5      BY MR. MARTINEZ:

6               Q.    This substance that has the appearance of

7      blood.  If you didn't go outside, how did that get there?

8               A.    I could not tell you.

9               Q.    Isn't it true what happened in this particular

10     case, ma'am, is that after this attack happened, your father

11     was already there?

12              A.    No, sir.

13              Q.    Isn't it true that you then opened the door for

14     him?

15              A.    No, sir.

16              Q.    And then after you opened the door for him, you

17     went outside for a bit and you actually touched that wall

18     while you still had blood on your hands?

19              A.    No, sir.

20              Q.    And then you let him in, didn't you?

21              A.    No, sir.

22              Q.    And then when he came in, the two of you got

23     together and decided to do certain things.  Isn't that true?

24              A.    I've just been saying no, my father was not

25     there.


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000005627

1        Q.    And then you and your father decided to put the

2  belt there to make that part of a self defense claim.  Isn't

3  that true?

4        A.    My father was never inside the apartment.

5        Q.    So all of these things you did by yourself

6  then?

7        A.    Yes, sir.

8        Q.    You decided to put the belt there?

9        A.    No, sir.

10        Q.    You decided to put the belt there, didn't you?

11        A.    No, sir.

12        Q.    But you can't explain how the belt got there,

13  can you?

14        A.    I can not.

15        Q.    You can't explain how it is that there's blood

16  in the kitchen when you tell us you actually went to the

17  bathroom, can you?

18        A.    I said I went to the kitchen.

19        Q.    But you told the police you went to the

20  bathroom?

21        A.    That's what I said back then, yes, sir.

22        Q.    You can't explain to us how it is that when you

23  go to the front of the door via the long route the first time

24  the paramedics are there, you can't tell us why your hair is

25  wet, can you?

1          A.     You didn't say my hair was wet.

2          Q.     Was your hair totally wet when you went out to

3    meet the paramedics?

4          A.     I don't know.

5          MR. PATTERSON:   Judge, that question has been asked

6    and answered.   Now he's circling back.   It's inappropriate.

7          THE COURT:   Sustained.

8    BY MR. MARTINEZ:

9          Q.     You can't explain to us how the blood got into

10   the kitchen, can you?

11         A.     Yes, sir.

12         Q.     Well, you can -- but you didn't explain it to

13   the police officer, did you?

14         A.     Not at that time, no, sir.

15         Q.     There was another call to 9 -- 911 that night,

16   wasn't there?

17         A.     Yes, sir.

18         Q.     You placed it, right?

19         A.     Yes, sir.

20         Q.     So it shows us that you know how to call 911,

21   right?

22         A.     I do.

23         Q.     So that you had that same knowledge, if you

24   will, earlier.   At about 2:30 in the morning you knew you

25   could call 911, right?

1          A.     Um, I am physically able to, but that is not

2     what was going on at that time.

3          Q.     No, I'm not asking you if you're physically

4     able to.  I'm asking you whether or not you had the

5     capacity --

6          A.     Yes, sir.

7          Q.     -- to be able to do that?

8          A.     Yes, sir, I do.

9          Q.     Yet you chose not to do that earlier, right?

10          A.     That's not correct.

11          Q.     And one of the things that you told us, "Well,

12     you know, part of the reason I didn't call was because I was

13     stressed out and I didn't think about it."  Do you remember

14     telling us that yesterday?

15          A.     No, sir.

16          Q.     You did tell us that, ma'am.  Were you stressed

17     out and that's why you didn't call 911 the first time?

18          A.     No, sir.

19          MR. PATTERSON:  Judge, that misstates her prior

20     testimony.

21          THE COURT:  Overruled.  Go ahead, answer if you can.

22          THE WITNESS:  No, sir.  Joe did not want me to call

23     911.  Our plans were to get in the vehicle and go to urgent

24     care.

25     / / / / /

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

BY MR. MARTINEZ:

Q.    Actually, your plans were for him -- the plans for that night were both for him to die, wasn't it?

A.    His plans were for him to die, yes.

Q.    But you were going to help, right?

A.    I just provided how to buy the stuff.

Q.    That's help, isn't it?

MR. PATTERSON:  Judge, objection.  We've gone over this many, many times.

THE COURT:  Overruled.  Go ahead, answer the question if you can.

THE WITNESS:  I helped buy the stuff, yes, sir.

BY MR. MARTINEZ:

Q.    You also helped by putting them in the capsules?

A.    Yes, sir.

Q.    You also helped by bringing the Gatorade?

A.    Yes, I brought him Gatorade.

Q.    So that he could take them, right?

A.    Yes, sir.

Q.    You did call the paramedics a second time, right?

A.    Yes, sir.

Q.    And at that time you were wearing the white t-shirt that we've just looked at, right?

A.    Yes, sir.

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1          Q.    That was different than the t-shirt that you

2    wore when you first met the paramedics, isn't it?

3          A.    No, sir.

4          Q.    You were aware that at the time of his death

5    Mr. Andriano had a medical malpractice case pending, didn't

6    you?

7          A.    Yes, sir.

8          Q.    And the lawyer that was involved is somebody by

9    the name of Jeffrey Miller, right?

10         A.    Yes, sir.

11         Q.    And in fact, in your words, because of this

12   lawsuit, Mr. Andriano was worth more dead than alive, right?

13         A.    I never said that.

14         MR. PATTERSON:   Judge --

15   BY MR. MARTINEZ:

16         Q.    And according to you Mr. Andriano only had

17   approximately one year left to live from the time that he

18   contacted Dr. Kellogg, correct?

19         A.    Not according to me.   According to the doctor.

20         Q.    Right.   According to Dr. Kellogg, right?

21         A.    Yes, sir.

22         Q.    It was in your -- it was your understanding

23   that he only had about a year left to live, right?

24         A.    After our meeting with Dr. Kellogg, that's what

25   he had suggested under the circumstances, yes.


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000005632

1          Q.     In terms of the lawsuit, you were the one that

2   placed the call, weren't you, ma'am, to Jeffrey Miller's?

3          A.     Yes, sir, I did.

4          Q.     That was back on August 25 of 1998?

5          A.     I don't know.

6          Q.     It wasn't Joe that made that call, right?

7          A.     Of course not.

8          Q.     And then you also called again on September 1st

9   of the year 2000, didn't -- I'm sorry, of 1998, didn't you?

10          A.     I don't recall the dates.

11                 (Pause in proceedings.)

12   BY MR. MARTINEZ:

13          Q.     Let me show you Exhibit 504 and see if that

14   refreshes your recollection as to whether or not you called

15   on September 1st of 1998.

16          A.     Okay.

17          Q.     You did call on September 1st, didn't you?

18          A.     It appears so, yes, sir.

19          Q.     And then on or about September 2nd, September

20   3rd, the early part of September of 1998, you had a

21   conversation -- a somewhat extensive conversation with

22   Jeffrey Miller, the attorney, didn't you?

23          A.     I don't know.

24          Q.     And this conversation did not include Mr.

25   Andriano, did it?


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000005633

 1            A.    You would have to give me more details.  I
 2    don't know.
 3            MR. MARTINEZ:  I will.  Let me go ahead and mark this
 4    exhibit.
 5                  (Pause in proceedings.)
 6    BY MR. MARTINEZ:
 7            Q.    Ma'am, I'm going to show you Exhibit Number
 8    505.  You may wish to go to the highlighted portions or you
 9    just may read the whole thing, whatever is your preference.
10                  (Pause in proceedings.)
11            THE WITNESS:  Okay.
12            MR. PATTERSON:  Judge, before he questions, may I see
13    this?
14            THE COURT:  Yes.
15                  (Pause in proceedings.)
16            MR. PATTERSON:  Thank you, Judge.
17    BY MR. MARTINEZ:
18            Q.    You did have a -- this references the meeting
19    that you had out in Casa Grande, doesn't it?
20            A.    It references the first meeting that Jeffrey
21    Miller met with all of us, yes, sir.
22            Q.    And in it it indicates that you and he spoke
23    about the contingency fee agreement issues when Mr. Andriano
24    was not present, right?
25            A.    You're taking that out of context.

1         Q.    Ma'am, doesn't it say that?  "I realize that I

2    had not gone through a sample contingency fee agreement with

3    you and talked about the general issue of fees and costs.  I

4    believe Wendi and I talked about those issues a little bit on

5    the phone, but wanted to make sure that all of your questions

6    were answered."  Doesn't that say that?

7         A.    That is what it says.

8         Q.    It does indicate that you and he had, prior to

9    Mr. Miller coming out there, had a conversation on the phone,

10   right?

11        A.    No, sir.  I took that to say after our meeting

12   he was clearing up the issue of the contingency fee for us.

13        Q.    And it says, "I believe Wendi and I talked

14   about those issues, the contingency fee issues, a little bit

15   on the phone"?

16        A.    Yes, sir.

17        Q.    "I wanted to make sure that all of your

18   questions were answered"?

19        A.    That is correct.

20        Q.    You and he, without Mr. Andriano being present,

21   talked about the fee that Mr. Miller was going to charge,

22   right?

23        A.    Yes, sir.

24        Q.    Additionally, you were still talking to other

25   lawyers, weren't you?

```
 1            A.    I don't believe so.

 2            Q.    You didn't talk to Leon Thikoll about that?

 3            A.    Oh, we did, yes.

 4            Q.    No, no, no.  Ma'am, let me show you this and

 5   see if that refreshes your recollection.  Take a look at

 6   Exhibit 506.

 7                  (Pause in proceedings.)

 8            THE WITNESS:  Yes, sir.

 9   BY MR. MARTINEZ:

10            Q.    And the date of that?

11            A.    Was September 18th, 1998, right.

12            MR. PATTERSON:  Judge, may I see this before he --

13            THE COURT:  Yes.

14            THE WITNESS:  Yes, sir.

15   BY MR. MARTINEZ:

16            Q.    And, ma'am, it's a letter addressed to you,

17   isn't it?

18            A.    Yes, sir.

19            Q.    And it's a letter regarding the possible

20   representation of Mr. Andriano in his personal injury case,

21   isn't it?

22            A.    His medical malpractice case, yes.

23            Q.    Right.  And it's directed to you, not to Mr.

24   Andriano, is it?

25            A.    It's inviting Joe and I down for a meeting,
```

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000005636

1     yes, sir.

2            Q.     No.   It says Mrs. Joe Andriano.   Isn't that the

3     salutation on it?

4            A.     Yes, that is.

5            Q.     And then after that you continued to have

6     conversations with Mr. Miller, didn't you?

7            A.     Occasionally I did, yes.

8            Q.     In fact you had one on or about December 18th,

9     1998, didn't you?

10           A.     I couldn't tell you the date.

11                  (Pause in proceedings.)

12     BY MR. MARTINEZ:

13           Q.     Take a look at Exhibit 507.   Again, you may

14     wish to read the highlighted portions or the whole letter.

15                  (Pause in proceedings.)

16           THE WITNESS:   Okay.

17                  (Pause in proceedings.)

18     BY MR. MARTINEZ:

19           Q.     So you did have a conversation with him on or

20     about December 18th, 1998, right?

21           A.     Yes, sir.

22           Q.     And in -- and then he confirmed that in writing

23     to you, right?

24           A.     To Joe and I, yes.

25           Q.     And -- well, the letter is to you and Joe, but


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    it -- it does indicate that it was a pleasure speaking with

2    Wendi on Monday, doesn't it?

3           A.    Yes, sir.

4           Q.    So he didn't speak to Joe.  He spoke to you,

5    right?

6           A.    That's correct.

7           Q.    And one of the things that you and he

8    discussed -- not you, he and Joe -- but one of the things you

9    and he discussed, was a possible settlement of that case,

10   didn't he?

11          A.    No.

12          Q.    "The issue I addressed with Wendi to discuss

13   with Joe is whether the two of you wished me to go ahead on

14   an urgent basis"?

15          A.    Urgent basis, yes, sir.

16          Q.    And he was discussing a settlement wasn't he?

17          A.    I don't know.

18          Q.    Well, why don't you read the rest of the

19   paragraph and see if that refreshes your recollection, okay?

20                (Pause in proceedings.)

21          THE WITNESS:  Okay.

22   BY MR. MARTINEZ:

23          Q.    That is what he is referring to, isn't it?

24          A.    That's one of the options, yes, sir.

25          Q.    And he in fact -- not with Joe but with you --


          TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1   he discussed whether or not the case should be settled on an

2   urgent basis, right?

3          A.    No.  It was just brought up that we needed to

4   decide that.

5          Q.    Right, but he discussed it with you?

6          A.    Yes, sir.

7          Q.    He also indicated that he spoke to you about

8   whether or not it would be advisable to do a home visit,

9   right?

10          A.    I don't remember that part.

11                (Pause in proceedings.)

12          THE WITNESS:  Yes, sir.

13   BY MR. MARTINEZ:

14          Q.    He did mention that, didn't he?

15          A.    Yes, sir.

16          Q.    And you continued your contact with Jeffrey

17   Miller, didn't you?

18          A.    Yes, sir.

19          Q.    And in fact on January 20th of 1999 you

20   emailed -- or sorry, you faxed him some document, didn't you?

21          A.    I don't know the date.

22                (Pause in proceedings.)

23   BY MR. MARTINEZ:

24          Q.    Let me show you Exhibit 508.

25                (Pause in proceedings.)


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000005639

1           THE WITNESS:  This is a cover sheet, but there --
2    BY MR. MARTINEZ:
3           Q.    Take a look at it.  Go ahead.
4           A.    I am.
5           Q.    You're through with it?
6           A.    Yes.
7           Q.    Okay.  You did fax him some document, didn't
8    you?
9           A.    It appears so, yes, sir.
10          Q.    Well, no.  It has "To Jeff Miller."  That's
11   your handwriting, right?
12          A.    Yes, sir.
13          Q.    It does indicate the date of January 20th,
14   1999, correct?
15          A.    Yes, sir.
16          Q.    It is from the Courtyard Apartments right?
17          A.    Yes, sir.
18          Q.    And at the very bottom it does say Shomac
19   Management Company, doesn't it?
20          A.    Yes, sir.
21          Q.    So you did send him some documents, didn't you?
22          MR. PATTERSON:  Judge, all that the county attorney
23   is referring to is a fax cover sheet prepared.  She said --
24          THE WITNESS:  Yeah, I don't recall them.
25          THE COURT:  Continue on.


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000005640

1    BY MR. MARTINEZ:

2         Q.    It does indicate January 21, 1999, 5:01 p.m. as

3    the time it was actually faxed.   Do you see that?

4         THE COURT:   Does that refresh your recollection as to

5    whether you did or didn't --

6         THE WITNESS:   I'm sure I did because I did fax things

7    to him.   I'm just uncomfortable that the rest of it is not

8    with it.

9         THE COURT:   Continue on.

10    BY MR. MARTINEZ:

11         Q.    And you even tried to help Mr. Miller locate

12    some of the addresses of some of the doctors that had

13    provided care for Mr. Andriano, didn't you?

14         A.    Of course.   That's part of the procedure.

15         Q.    And do you remember that you sent him a fax

16    June 26th of the year 2000?

17         A.    No, sir.

18              (Pause in proceedings.)

19    BY MR. MARTINEZ:

20         Q.    Take a look at Exhibit 509.

21              (Pause in proceedings.)

22         THE WITNESS:   Okay.

23    BY MR. MARTINEZ:

24         Q.    In June -- on June 26, 2000, you faxed him

25    something, didn't you?

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000005641

1        A.    Yes, I did.

2        Q.    And it was the address of one of the doctors

3    who may have provided medical care for Mr. Andriano, correct?

4        A.    It was Dr. Rendon, the pathologist, yes, sir.

5        Q.    And it was actually on the San Riva fax

6    machine, right?

7        A.    Yes, sir.

8        Q.    It's clear that with regard to the proceeding

9    or the advancement of the lawsuit, that you did almost

10   everything, didn't you?

11       A.    No, that is not clear and that is not true.

12       Q.    Ma'am, one of the other things that you told us

13   was that you loved your husband, right?

14       A.    Very much so.

15       Q.    And you did tell the detective, for example,

16   that no matter -- sorry 9:20:44.  "No matter what happened

17   between us, we've always never said that we would get a

18   divorce.  I mean, it was just, you know, we'll get through

19   all of this.  These hard times, we'll make it."  You said

20   that, right?

21       A.    Yes, sir.

22       MR. MARTINEZ:  Move for admission of Exhibit 510.

23       MR. PATTERSON:  No objection.

24       THE COURT:  Exhibit 510 for identification is

25   admitted into evidence.


                TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1       BY MR. MARTINEZ:

2               Q.      Let's go ahead and take a look at it.  You do

3       remember telling that to the detective, right?

4               A.      Yes, sir.  You read it to me.

5               Q.      Independent of me reading it to you, do you

6       remember telling that to the detective?

7               A.      Um -- I -- I -- that night, I can't tell you

8       that I have a memory of anything I told the detectives, so --

9               Q.      So you don't remember a single thing that you

10      told the detective?

11              A.      Well, you've been showing me tapes, yes, I do.

12              Q.      No, before I showed you the tapes.

13              A.      When you read it to me, yes.

14              Q.      Even before I read it, did you have a single

15      memory of what you told the detective that night?

16              A.      Not really.

17                      (Whereupon, the tape is played.)

18      BY MR. MARTINEZ:

19              Q.      You did say that, right?

20              A.      Yes, sir.

21              Q.      That was in spite of the fact that you had at

22      least on one occasion picked up a man in a bar, right, and

23      brought him home, right?

24              A.      On one occasion, I did so.

25              Q.      That was in spite of that, right?


                TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

```
 1              MR. PATTERSON:  Judge, can we approach please?

 2              THE COURT:  Sustained.  Let's move on.  Let's move

 3    on.

 4    BY MR. MARTINEZ:

 5          Q.    You also talked to the detective and he said to

 6    you, Did you tell me earlier that, um, that -- that he was

 7    talking about divorce?"  Meaning Joe.  You answered, "No.

 8    That was one thing we would never discuss.  I mean, we -- we

 9    made an agreement that we would always figure out a way to

10    work it out.  You know, we -- well, it's probably because of

11    our church background and stuff.  I mean, that's just --

12    that's just -- that's not -- that's too much of an easy out

13    or whatever you want to call it."  Do you remember that?

14              MR. PATTERSON:  Counter?

15              MR. MARTINEZ:  It's 10:29:58.  Do you remember that?

16              THE WITNESS:  Not necessarily, but --

17                  (Pause in proceedings.)

18                  (Whereupon, the tape is played.)

19    BY MR. MARTINEZ:

20          Q.    You didn't want to get a divorce, did you?

21          A.    No.  We agreed never to talk about divorce.

22          Q.    Ma'am, I didn't ask you about what you and he

23    agreed to.  I asked you whether or not you wanted to get a

24    divorce?

25          A.    No, sir.
```

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000005644

1          Q.    The reason you didn't want to get a divorce

2    from this man who was dying was because you would lose out on

3    the money that he would get from the medical malpractice

4    suit.  Isn't that true?

5          A.    That is not true.

6          MR. MARTINEZ:  I don't have anything else.

7          THE COURT:  Mr. Martinez, were you offering --

8          MR. MARTINEZ:  I think I already did.

9          THE COURT:  I don't think you moved that.

10         MR. MARTINEZ:  I move it into evidence then.

11         THE COURT:  Mr. Patterson, any objection?

12         MR. PATTERSON:  No.

13         THE COURT:  Exhibit Number 511 for identification is

14    admitted into evidence.

15         MR. MARTINEZ:  I don't have any other questions.

16         MR. PATTERSON:  Judge, can we take a break at this

17    time so I can get prepared for redirect?

18         THE COURT:  Okay.  We'll take a -- we'll take a 10

19    minute break at this point in time.  During this break

20    remember the entire admonition I've given you including the

21    fact you're not to discuss this case with anyone, do not let

22    anyone discuss the case with you.  It will be a short 10

23    minute break.

24         MR. PATTERSON:  Judge, would you hold the bench?

25

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

```
1                  (Whereupon, the jury exits the courtroom.)

2

3          THE COURT:  Please be seated.  This is CR

4    2000-096032, State of Arizona versus Wendi Elizabeth

5    Andriano.  The record will reflect the presence of Defendant

6    and Counsel.  We're outside the presence of the jury.

7                  Mr. Patterson?

8          MR. PATTERSON:  May I talk with Mr. Martinez just

9    briefly?

10         THE COURT:  Yes.

11                 (Attorney-attorney discussion.)

12         MR. PATTERSON:  Okay, Judge.

13

14                 (The following proceedings were held at the

15    bench:)

16

17         MR. PATTERSON:  Because Mr. Martinez used snippets of

18   my client's video, I think under Rule 106 I have the right to

19   play those portions of the tape that need to be, I think the

20   rule is, played for fairness or whatever the -- I can't

21   remember, any other part of any writing or statement which

22   out of fairness should be considered, I think because he's

23   culled snippets from various portions of the tape, that in

24   order to complete the story, I need to play the entire tape.

25   Tape one he didn't go into any snippets.  From tape 2 there's
```

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000005646

1    quite a lot of things that happened that were videotaped.

2    And Lucero gets on tape one.   Then there's Sally Dillian

3    comes in, Homer Shalice, who is the technician -- they do

4    some things.   Lucero comes back in and then kind of grills

5    her basically found some things in the interim that, suffice

6    it to say, is not a question and answer.   It's more of an

7    interrogation or grilling.

8                 I don't propose to go into day 2 because he

9    didn't go into day 2, but I do have the right under 106 to

10    play as much of that tape as I deem it necessary under the

11    circumstances.   I don't know if you've had occasion to look

12    at the tape.

13                 THE COURT:   I've not seen the tape.   How long is the

14    tape?

15                 MR. MARTINEZ:   3 hours, 39 minutes.

16                 THE COURT:   How --

17                 MR. MARTINEZ:   3 hours, 39 minutes.

18                 MR. PATTERSON:   Yeah.   Starts at 7:36 and goes

19    through 10 -- at least with the regard to the portions he

20    extended, it's like three hours.

21                 THE COURT:   Mr. Martinez?

22                 MR. MARTINEZ:   The rule is it does indicate whatever

23    portions I played he has a right to, if you will, fill-in the

24    blanks, so I agree with that concept.   However, there is a

25    limitation to that rule, and the better way for me to explain

1    it is by way of example.  If we're talking about an

2    individual who stole a car, we don't then don't bring in the

3    fact that he has been raising goats in Malaysia.  It is only

4    things relevant to that portion, and so to that extent I ask

5    that it be limited to the issues that I raised.

6         MR. PATTERSON:  And I'm avowing to the Court

7    everything she tells to the officer that night is substance

8    that bears upon what he has cross-examined her on.  And it

9    shows the context -- I cannot excerpt portions of the tape as

10   he's done and fairly combat what he's raised without showing

11   the context.

12        THE COURT:  Why don't we look at the rule together.

13   Rule 106 says when a writing or recorded statement or part

14   thereof is introduced by a party, an adverse may require the

15   introduction at that time of any other part or any other

16   writing or recorded statement which ought to be -- ought in

17   fairness to be considered contemporaneously with it.  It

18   actually says "at that time," okay, meaning that it should be

19   brought up at the time that it's read or played, I guess.

20   But I understand the fact that, you know, it's a little bit

21   confusing or whatnot in the way that it was presented in the

22   sense that there were snippets.

23        What is your argument as far as what Mr.

24   Patterson said.  Is it the whole tape goes to what was

25   presented in the way of snippets?  I'm at a disadvantage

1    because I haven't seen the tape.

2            MR. PATTERSON:  I Understand.

3            MR. MARTINEZ:  Um --

4            MR. PATTERSON:  I'd just avow to the Court all of

5    discussions they had were about the incident of October 7, 8.

6            MR. MARTINEZ:  Um, he, of course, does ask her about

7    other incidents, not the night of October 7 or 8.  I'm at a

8    disadvantage because I don't know exactly which -- well he's

9    going to play the whole thing up to what time, 10:36?

10           MR. PATTERSON:  You go through 10:36, 10:37:02. You

11   said there were two other tapes, but that was in the other

12   tape?

13           MR. MARTINEZ:  Right.  I didn't

14           MR. PATTERSON:  You didn't go into those.

15           MR. MARTINEZ:  Right.  I addressed the matters

16   specifically at the time of the killing.  In other words,

17   what happened that night is what I brought in.  I did not

18   bring in any of the other matters that may have happened, so

19   anything that relates to that in fairness should be played,

20   and so I'll leave it at that.

21           THE COURT:  Say that one more time.

22           MR. MARTINEZ:  The only snippets that I played that

23   had to do with what she did when the killing happened like

24   what she did before immediately before -- the cord around the

25   neck, the belt, the grabbing -- well, there wasn't a


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000005649

1    grabbing, but the knife thing, and where she went to clean

2    up, that sort of stuff.  Anything having to do with what

3    happened in that apartment between them I think is fair game.

4          MR. PATTERSON:  It's a technological problem though,

5    Judge, because excerpting the snippets takes it out of the

6    context, and you need to hear the whole thing.  When she

7    delivered -- I mean, he suggests some of these things are

8    impeaching of her testimony.  They weren't when they're used

9    in the total context of what she told this gentleman, so

10   fundamental fairness requires I be allowed to play the whole

11   thing.

12         THE COURT:  You're playing the -- all 3 hours 39

13   minutes, whatever it is?

14         MR. PATTERSON:  Only with regard to the snippets that

15   he discussed.  I mean --

16         MR. MARTINEZ:  But fundamental fairness, if we go

17   through the whole time, to use his argument, it's the

18   whole -- the entire tail end of it has to be played if we go

19   with his argument.  My view is if he plays it as it's

20   proposed, the whole thing comes in, not just up to 10:36

21   because the same argument applies.  Let's just -- if he's

22   going to play the whole thing, let's play the whole thing,

23   not just parts.

24         MR. PATTERSON:  I agree.  It's essentially the same

25   process.  The entire process applied throughout the entire

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    interview. The interview initially starts off, he asks her

2    non-leading specific questions, okay?  There's a lapse of

3    time when he apparently does other things, he's spoken with

4    Chris Hashisaki or officers who have spoken with Chris

5    Hashisaki, he then comes back in and says "I don't believe

6    you."  So he is giving his opinion with regard to her

7    credibility in the second tape which renders that tape. The

8    second tape is admissible because it's replete with his

9    opinion that everything she has told him is not true.

10          MR. MARTINEZ:  Right.

11          MR. PATTERSON:  And that's inappropriate.

12          MR. MARTINEZ:  Dan, let me stop you.  I'm not saying

13    we should play the second tape.

14          MR. PATTERSON:  Okay.

15          MR. MARTINEZ:  I agree with what he's saying.  I

16    agree with you that's vouching.

17          THE COURT:  Second tape is not an issue?

18          MR. MARTINEZ:  No.  I'm just saying, first of all, we

19    should restrict ourselves to what happened, but if the Court

20    is not amenable to that, then the whole first tape should be

21    played.

22          MR. PATTERSON:  I don't disagree with that.

23          MR. MARTINEZ:  But I do think only the portions

24    dealing with the --

25          THE COURT:  Well, what I remember of the snippets


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000005651

1    that you played, they just deal with basically that day.

2            MR. MARTINEZ:  Right.

3            THE COURT:  Was there -- refresh my recollection.

4    Was there a portion about going to Sam's Club?

5            MR. MARTINEZ:  No, I didn't play that.  I don't

6    believe that I played that.

7            MR. PATTERSON:  But he talks about force, this kind

8    of thing, to get the whole context, Judge.

9            THE COURT:  How long is the portion that you're

10   talking about?  Not the entire three hours --

11           MR. PATTERSON:  Think it has to, Judge, because the

12   first hour or so is independently admissible, okay, because

13   it is essentially a documenting of the injuries.  She sits

14   down, she complains about her pain, present sense

15   impressions.  Lucero --

16           MR. MARTINEZ:  The --

17           MR. PATTERSON:  Let me finish.  Lucero says we better

18   bring in a technician.  A technician comes in and 30 minutes

19   of the tape is taking these injuries --

20           THE COURT:  Okay.

21           MR. PATTERSON:  -- which is independently significant.

22           MR. MARTINEZ:  But you didn't ask her about any of

23   her injuries.

24           MR. PATTERSON:  Well, I have would move to reopen.  I

25   mean, I need to talk about those issues.

1          THE COURT:  Well, you'll be able to that on redirect.

2          MR. PATTERSON:  Correct.

3          THE COURT:  Okay.  There was reference to the

4    injuries in the interview?

5          MR. PATTERSON:  Yes, sir.  Absolutely.

6          THE COURT:  What was said in the interview about the

7    injuries?

8          MR. PATTERSON:  She sits down, she immediately fixes

9    her glasses, okay?  She then is provided a bottle of water.

10   She goes to open the bottle of water.  She says "I can't open

11   it,"  She then indicates injured hands, hands it to the

12   detective.  He opens it for her.  She then complains of --

13   she's holding her left hand oddly.  She's pointing to the

14   redness, she says there's a knot on my head, my ribs hurt,

15   every muscle hurts, thanks for the Advil.  They bring her in

16   two Advil, okay, and she takes them.  My mind is wandering.

17   Yeah.  It's -- it's -- he would just shake, yell.  Talking

18   about his anger, his rage -- I mean she just describes in

19   detail albeit somewhat different than what she testified in

20   trial.

21         MR. MARTINEZ:  If you allow that then I have some

22   more questions to ask about the injuries.

23         THE COURT:  Okay.  That's the thing.  If it's

24   agreeable to both of you, I'll allow the entire tape to be

25   played, but I'm going to give him an opportunity to ask

1    additional questions.

2           MR. PATTERSON:  That's fine.  That's fair.

3           THE COURT:  And I'll do that, but it's 3:39.

4           MR. PATTERSON:  Well, there's -- there's some

5    deadtime that I can fast forward through.

6           MR. MARTINEZ:  No, I don't want it forwarded through

7    the deadtime, and there's a reason I don't want it forwarded

8    through the deadtime.

9           MR. PATTERSON:  Okay.  I'm making suggestions.

10          THE COURT:  Has the tape been marked for

11   identification?

12          MR. PATTERSON:  It's been admitted sometime ago.

13          THE COURT:  Everyone knows what's on that tape, right?

14          MR. PATTERSON:  It's the tape --

15          MR. MARTINEZ:  If that's the tape I gave him, I know

16   what's on there.

17          THE COURT:  Just -- why don't you check it first.

18              (Pause in proceedings.)

19          MR. PATTERSON:  That's the tape, Judge.  That's the

20   one, right?

21          MR. MARTINEZ:  Yeah.

22          MR. PATTERSON:  We never introduced the master --

23   that's a copy -- did you?

24          MR. MARTINEZ:  No.

25          MR. PATTERSON:  You didn't?

1            MR. MARTINEZ:  I don't have a copy.

2            THE COURT:  Is that a copy of the copy?

3            MR. PATTERSON:  This was from --

4            MR. MARTINEZ:  I have a copy I provided him.

5            THE COURT:  I'm inclined to allow Mr. Patterson to

6     get into some of these things.

7            MR. MARTINEZ:  Okay.

8            THE COURT:  Are you both agreeable -- well, I guess

9     the parties agree this exhibit can be admitted and we'll play

10    it right here this afternoon.

11           MR. MARTINEZ:  Well, I won't stipulate to it, but he

12    could offer it and, obviously, I won't object.

13           THE COURT:  Okay.

14           MR. MARTINEZ:  With the understanding that I'm going

15    to be allowed to ask additional questions.

16           MR. PATTERSON:  That's fine.  When do you want me to

17    do that?

18           MR. MARTINEZ:  You want me to ask questions now or

19    after the tape is played?

20           THE COURT:  Okay.  Why don't you go ahead and -- why

21    don't you go ahead and wait until the tape is played.

22           MR. PATTERSON:  Well, I --

23           THE COURT:  Or go ahead and ask it right now.

24           MR. PATTERSON:  Do you have the questions now?  If

25    that's the case, I'll need a couple minutes because I have


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000005655

1    other tapes I want to play then.

2         THE COURT:   Okay.   And then we'll get into that other

3    tape.

4         MR. MARTINEZ:   Okay.

5         THE COURT:   You need some time then, right?

6         MR. PATTERSON:   Yes, I do.   Maybe 10 minutes, Judge.

7         THE COURT:   I'll have the bailiff tell the jurors

8    we're taking our afternoon break at this point in time, okay?

9

10         (The following proceedings were held in open

11    court:)

12

13         THE COURT:   We'll be in recess.

14

15         (Recess.)

16

17         THE COURT:   Please be seated.   This is cause number

18    CR 2000-096032, State of Arizona versus Wendi Elizabeth

19    Andriano.   The record will reflect the presence of the

20    Defendant, Counsel and the jury.   The defendant, Wendi

21    Elizabeth Andriano, is on the witness stand.

22         And, Mr. Martinez, I'll allow you to reopen

23    your cross.

24

25    / / / / /

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000005656

```
 1    FURTHER CROSS-EXAMINATION BY MR. MARTINEZ:
 2            Q.    Ma'am, you had occasion to look at Exhibit 512?
 3            A.    Yes, sir.
 4            Q.    That shows you alone in this room prior to the
 5    detective speaking with you, correct?
 6            A.    Yes, sir.
 7            MR. MARTINEZ:  Move for admission of Exhibit 512.
 8            MR. PATTERSON:  No objection.
 9            THE COURT:  Exhibit 512 for identification is
10    admitted into evidence.
11                 (Whereupon, the tape is played.)
12    BY MR. MARTINEZ:
13            Q.    Ma'am, in this particular clip you are seen
14    extending your left arm down to pull down your shorts, aren't
15    you?
16            A.    Yes, sir.
17            Q.    However, when the detective speaks to you or
18    the photographs are taken, you hold your left elbow up like
19    this, don't you?
20            A.    I don't know, sir.
21            Q.    You also had occasion to take a look at Exhibit
22    513, didn't you?
23            A.    Yes, sir.
24            Q.    And then -- again, this is on October 8 --
25            A.    Yes, sir.  Yes.
```

1          Q.      -- of 2000?

2          A.      Yes.

3          MR. MARTINEZ:  I move for admission of 513 into

4   evidence.

5          MR. PATTERSON:  No objection.

6          THE COURT:  Exhibit 513 for identification is

7   admitted into evidence.

8                 (Whereupon, the tape is played.)

9   BY MR. MARTINEZ:

10         Q.      And in that clip, ma'am, you're seen adjusting

11  your glasses, correct?

12         A.      I was trying to straighten them, yes.

13         Q.      And you have no problem with your dexterity

14  doing that, do you?

15         A.      Yes.  My left-hand -- I didn't -- wasn't --

16  didn't have full use of it.

17         Q.      And, ma'am, you had no problem with the elbow

18  moving in that, did you?

19         A.      The elbow?

20         Q.      Right.

21         A.      No, sir.

22         Q.      Exhibit 514 also shows you, doesn't it?

23         A.      Yes, sir.

24         Q.      Again, that's on October 8, year 2000?

25         A.      Yes, sir.

1           MR. MARTINEZ:  Move for admission of Exhibit 514 into

2    evidence.

3           MR. PATTERSON:  No objection.

4           THE COURT:  Exhibit 514 for identification is

5    admitted into evidence.

6                 (Whereupon, the tape is played.)

7    BY MR. MARTINEZ:

8           Q.    And that was, again, you, wasn't it?

9           A.    Yes, sir.

10          Q.    Ma'am, now I want to you show you some

11   photographs.  They're exhibits 515 through 517.  Are those

12   photographs of you while in the custody of the Phoenix Police

13   Department on October 8th?

14          A.    Yes, sir.

15          MR. MARTINEZ:  I move for admission of Exhibits 515,

16   516, and 517.

17          MR. PATTERSON:  No objection.

18          THE COURT:  Exhibit numbers 515, 516, and 517 for

19   identification are admitted into evidence.

20   BY MR. MARTINEZ:

21          Q.    That's a picture of you, correct?

22          A.    Yes, sir.

23          Q.    And that shows your left arm extended, doesn't

24   it?

25          A.    Yes, sir.


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1      Q.    516, once again, picture of you, right?

2      A.    Yes, sir.

3      Q.    And 517.  That's also a picture of you, correct?

4      A.    Yes, sir.

5      Q.    And that shows your left arm extended, doesn't

6   it?

7      A.    Yes, sir.

8      Q.    What injury did you suffer to your left hand,

9   ma'am?

10     A.    I had several injuries to my hand, but I

11  remember my little finger and my index finger, the nurse who

12  examined them, thought they were broken.

13     Q.    Ma'am, I'm asking you what injuries you had.

14  I'm not asking you --

15     MR. PATTERSON:  Judge, she's trying to respond to

16  that question.

17     THE COURT:  Just answer the question that's asked.

18  Go ahead, repeat the question.

19     THE WITNESS:  Um --

20  BY MR. MARTINEZ:

21     Q.    What injuries did you have, not what somebody

22  told you?

23     A.    Yes.  They were quite swollen and a -- a couple

24  of my nails had been popped all the way off.  I mean, not

25  not just the tips.  I had acrylic nails on.  I had a couple

1    cuts to my hand, things like that.

2         Q.    Was one nail from each of the hands, right,

3    that was gone, right?

4         A.    I think there's more than that.

5         Q.    But we do have photographs of that, right?

6         A.    Yes, we do.

7         MR. MARTINEZ:  And, Your Honor, at this time I move

8    for admission of Exhibit 498 which is the entire taped

9    statement.

10        THE COURT:  Mr. Patterson?

11        MR. PATTERSON:  Judge, can we just make a record on

12   this?

13

14             (The following proceedings were held at the

15   bench:)

16

17        MR. PATTERSON:  I just want the Court to know and

18   record reflect that was a slick move, okay?  That I was going

19   to introduce the entire tape in order to show the fairness of

20   the proposition and he has beaten me to the punch.  I just

21   want the record to reflect that.

22        THE COURT:  You could say by stipulation I agree.  Do

23   you want to say that?  I'll allow you to.

24             (Attorney-attorney discussion.)

25        MR. PATTERSON:  Yeah, I need -- I object to the form


         TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    of the question or form of the request that he called a

2    confession which it was a statement that my client made.

3    That needs to be corrected too, but I -- I just want the

4    record to reflect that's what happened here, okay?  That we

5    had a series of discussions in chambers where I was moving

6    for the entire -- well, that was on tape two before, so we're

7    okay.

8              THE COURT:  Okay.

9              MR. PATTERSON:  I don't have a legal objection. What

10   he did was fine.

11             THE COURT:  Okay.  Let's just make sure the record's

12   clear.  For the record we had in chambers an informal

13   discussion about setting up the videotape and whatnot, and at

14   that time I asked Mr. Martinez whether he would be able to

15   stipulate to this tape being admitted into evidence.  He said

16   he wouldn't be able to stipulate, but he won't object and

17   there was a discussion leaning towards the fact that you were

18   going to be introducing it.

19             MR. PATTERSON:  Correct.  I proffered to move it and

20   he would object -- not object at that time, but he has beaten

21   me to the punch by offering it, and I think it's just a slick

22   move and I don't know of a legal objection to it.

23             THE COURT:  Okay.  I'll turn to you and ask if you

24   have any legal objection.

25             MR. PATTERSON:  Correct.


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000005662

1          MR. MARTINEZ:  Judge, before he goes, I will note

2     what happened was I stipulated -- I offered to stipulate to

3     it after thinking about the Court's request.  We went back

4     into chambers, Mr. Patterson said no, I'm going to move it

5     into evidence.  That's the reason why I went ahead and

6     offered it, but when we were in chambers I offered and he

7     declined.

8          MR. PATTERSON:  To stipulate.

9          THE COURT:  Did I ask you whether you would be --

10         MR. MARTINEZ:  Of course, the record shows initially

11    you did and I didn't, but then I decided -- I had a change of

12    heart.  I offered and I know this is proper under the rules.

13         MR. PATTERSON:  I can't find a legal objection for

14    it, Judge.

15

16              (The following proceedings were held in open

17    court:)

18

19         THE COURT:  Okay.  With regard to Exhibit Numbers 498

20    for identification, any objection?

21         MR. PATTERSON:  Absolutely not, Your Honor.

22         THE COURT:  Okay.  Exhibit 498 for identification is

23    admitted into evidence.

24         MR. MARTINEZ:  And, Judge, I don't have any further

25    questions.


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1          THE COURT:  Are the parties agreeable that Exhibit

2    498 can be played to the jury at this time?

3          MR. PATTERSON:  That was my intention, Judge.

4          MR. MARTINEZ:  I am.

5          THE COURT:  Okay.  We're going --

6          MR. PATTERSON:  But I need to preface it.

7          MR. MARTINEZ:  Judge, if he's making a --

8          MR. PATTERSON:  I just need to preface it.  Just

9    give me redirect --

10         THE COURT:  Okay.

11         MR. PATTERSON:  -- and I'll start it up.

12         THE COURT:  Okay.  That's fine.  Redirect then, Mr.

13    Patterson?

14         MR. PATTERSON:  Thank you, Judge.

15

16    REDIRECT EXAMINATION BY MR. PATTERSON:

17         Q.    Wendi, on October 8, 2000, did you have a

18    discussion with Detective Lucero of the Phoenix Police

19    Department?

20         A.    Yes, sir.

21         Q.    Okay.  And where was that discussion conducted?

22         A.    The police station.  I don't know which one.

23         Q.    Okay.  And was it in a -- in a room?

24         A.    Yes, it was.

25         Q.    And was there furniture in the room?

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000005664

1         A.     There was a desk and chairs, yes.

2         Q.     Okay.  Do you recall about what time that

3    discussion with Detective Lucero started?

4         A.     Not really.  It's -- I know it was morning

5    time.

6         Q.     Okay.  And how many hours had elapsed from the

7    time that you were transported from the San Riva apartments

8    to that destination where you had your discussion with

9    Detective Lucero?

10        A.     A lot of time.  It had been three or four hours.

11        MR. PATTERSON:  All right.  Judge, with the Court's

12   permission, I would request I be allowed to play the entire

13   tape of the interview.

14        THE COURT:  Okay.

15        MR. PATTERSON:  That's on tape one of the interview.

16        THE COURT:  Okay.  And this is Exhibit 498 which has

17   just been admitted into evidence.

18             I'll have the bailiff move the television set

19   over in front of the jury, more in the middle so everyone can

20   see.

21        MR. MARTINEZ:  Judge, I don't have any problem with

22   that, but may we approach about another issue?

23        THE COURT:  Yes.  While he's doing that then, I'll

24   have the bailiff check the volume and whatnot.

25

```
 1              (The following proceedings were held at the
 2    bench:)
 3
 4              MR. MARTINEZ:  Judge, he indicated that was the
 5    entire interview.  That was not the entire interview.  As you
 6    know, there is a second tape.
 7              MR. PATTERSON:  I said as recorded on Tape 1.
 8              MR. MARTINEZ:  No.  He said and the record will
 9    reflect he said the entire interview.
10              MR. PATTERSON:  It was -- maybe that's what I said,
11    but then I added as recorded in Tape 1.
12              THE COURT:  I -- I don't believe that you were even
13    paying attention to that -- whether it was Tape 1 or -- and
14    you'll -- it's noted for the record, but I'm not going to
15    draw attention to it.
16
17              (The following proceedings were held in open
18    court:)
19
20              THE COURT:  Okay.
21              MR. PATTERSON:  Judge, may we allow your bailiff to
22    test run it to make sure everyone can hear?
23              THE COURT:  At any time you can't see or can't hear,
24    please raise your hand.
25              MR. PATTERSON:  Judge, we also have permission that
```

1  my client could sit at counsel table?

2      THE COURT:  Yes.  And then for the record, Counsel,

3  the court reporter will not take down the audio portion of

4  Exhibit 498.  The exhibit will speak for itself.

5      MR. PATTERSON:  Well -- okay.  Thank you, Judge.

6      THE COURT:  Okay.  If anyone cannot hear or see,

7  raise your hand and let me know.

8

9          (Whereupon, the tape is played.)

10

11      THE COURT:  Turn up the volume.  Let's turn up the

12  volume.

13      MR. PATTERSON:  It's maxed out, Judge.

14      THE COURT:  Why don't you stop it and let's try

15  putting the microphone right there.  Move the podium right

16  there and put the microphone right in front of it.  That

17  might help.  And go ahead and get the microphone from Mr.

18  Martinez's table since it's the closest microphone there.

19

20          (Whereupon, the tape continues to be played.)

21

22      THE COURT:  Can you hear it a little bit better?

23  Could we do it a little bit better?

24

25          (Whereupon, the remainder of the tape is

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000005667

```
 1    played.)

 2

 3         THE COURT:  Okay.  We'll go ahead and stop the tape

 4    at this point in time.  We'll go ahead and take our evening

 5    recess.  During the evening recess remember the entire

 6    admonition I've given you.  Do not discuss this case with

 7    anyone, do not let anyone discuss the case with you.  Do not

 8    do any research, experimentation, testing on your own.  Avoid

 9    any media coverage of this case.  Have a nice evening.  We'll

10    see everyone tomorrow at 1:00 p.m.  Have a nice evening.

11

12              (Evening recess.)

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1

 2

 3                    CERTIFICATE OF REPORTER

 4

 5   STATE OF ARIZONA      )
                          )
 6   COUNTY OF MARICOPA    )

 7

 8              I, Traci L. Wheeler, CSR, RPR, an official

 9   and certified reporter in the Superior Court of the State

10   of Arizona, in and for the County of Maricopa, hereby

11   certify that I made a shorthand record of the proceedings

12   had in the within case, and that the foregoing transcript

13   is a full, true, and correct transcription of the

14   proceedings in this case.

15              Dated this 5th day of August, 2005.

16

17

18                                                    ON
                                                    10.04.05
19            Traci L. Wheeler, CSR, RPR
              Certified Court Reporter No. 50313
              Official Court Reporter

20

21

22

23

24

25
```

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

EXHIBIT CC

000005670

DP

05-0002
Braitio

1

1      IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

2        IN AND FOR THE COUNTY OF MARICOPA

3
STATE OF ARIZONA,              )
4                              )
            Plaintiff,         )
5                              )
      vs.                      )      CR 2000-096032
6                              )
WENDI ELIZABETH ARDRIANO,      )      CR05-0005-AP
7                              )
            Defendant.         )
8      _____)

9

10

11            TRANSCRIPT OF PROCEEDINGS

12

13

14   BEFORE:        THE HONORABLE BRIAN K. ISHIKAWA

15

16
                        November 4, 2004
17                      Mesa, Arizona

18

19

20                      Blanche Paulsen
21              Offical Court Reporter #50526

22

23

24

25

A-P-P-E-A-R-A-N-C-E-S

For the Plaintiff:          Mr. Juan M. Martinez
                              Deputy County Attorney

For the Defendant:         Mr. Daniel B. Patterson
                              Deputy Public Defender

3

November 4, 2004

Mesa, Arizona


P-R-O-C-E-E-D-I-N-G-S


THE COURT:  Good afternoon, this is CR number 2000-096032, State of Arizona versus Wendi Andriano.

The record should reflect the presence of the counsel.

Mr. Martinez, you wanted to address an issue?

MR. MARTINEZ:  Yesterday at the break, I was informed by the Court that the individual in the front row, your extreme right, was a Hispanic male with the dark sunglasses, he was relating something to Don Ayala (phonetic) part of what the proceedings were.  That's a violation of law, and after I made the Court aware of that, this individual disappeared.  I have not seen him today.

I guess that takes care of that issue.

THE COURT:  Who is that individual?

MR. MARTINEZ:  I was introduced to him, I think a relative of Mr. Ayala (phonetic).

THE COURT:  Do you have a name?

MR. MARTINEZ:  Gilbert.  He's apparently a long time friend of Ayala.

THE COURT:  What is Gilbert's last name?

4

15   1          MR. MARTINEZ:  We don't know, Your Honor.

2          THE COURT:  If he appears here, alert me to that

3   fact.

4          I just want to remind everyone in here that's a

5   spectator, there is also a rule in effect that's called the Rule

6   of Exclusion of Witnesses.  That means the witnesses are not

7   allowed in the courtroom while other witnesses are testifying so

8   they don't know what is going on in court.

9          I just want to remind everyone of that fact.  If

10   this individual appears in court, I want someone to alert me to

11   the fact and we'll address it at that time.

12          Anything else we need to address before we bring

13   the jury in?

14          MR. PATTERSON:  There is an issue regarding

15   rebuttal.  We can do it at the close of the hearing today.

16   16          THE COURT:  Do you have tape number 498 ready to

17   roll?

18          MR. PATTERSON:  It appears it's ready to go.

19          I have not tested the audio.

20          THE COURT:  Why don't we roll it back a little bit

21   and test that audio.  I don't want any mechanical problems to

22   start off the day.

23          Just remember, I am not having the court reporter

24   taking down what is being said on the audio tape.

25          MR. PATTERSON:  The audio appears to be working,

5

16

1    Your Honor.

2                    THE COURT:  We are ready for the jury?

3                    MR. MARTINEZ:  Yes.

4                    THE COURT:  Let's have the jury.

5                    (Whereupon, the following proceedings took place in

6    the presence of the jury panel.)

7                    THE COURT:  This is CR2000-096032, State of Arizona

8    versus Wendi Andriano.

9                    Let the record reflect the presence of the

10   defendant and counsel and the jury is present.

11                   Ladies and gentlemen of the jury, at this time we

12   will continue the playing of the video tape which had been

13   admitted into evidence as Exhibit Number 489, which we started

14   yesterday.

15                   MR. PATTERSON:  I will started the video tape at

16   this time, Your Honor.

17                   THE COURT:  Yes.

18                   MR. PATTERSON:  Your Honor, some suggestion, maybe

19   it's too loud.

20                   THE COURT:  It is too loud.

21                   A JUROR:  Just a bit loud.

22                   THE COURT:  Why don't you turn it down.

23                   There you go.

24                   (Whereupon, the video tape was played.)

25                   THE COURT:  We're going to take the break.

000005676

6

16

1        Remember the admonition.  Do not discuss the case

2   and keep an open mind and we will see you after the break.

3        (Recess.)

4        THE COURT:  Please be seated.

5        (Whereupon, the following proceedings took place

6   out of the presence of the jury panel.)

7        THE COURT:  This is CR 2000-096033, State of

8   Arizona versus Wendi Andriano.

9        The record notes the presence of defense counsel

10  and the absence of the jury.

11        Mr. Patterson, you wanted to bring up a matter

12  regarding rebuttal witnesses?

13        MR. PATTERSON:  Yes.  Mr. Martinez provided me with

14  a listed he wants to call for rebuttal.  In the first place,

15  pursuant to 15.1 F, he is not required to list as rebuttal

16  witnesses those he reasonably anticipated to call, and that's in

17  the case authority in the pocket part.  Obviously, he's already

18  listed the witnesses and I have interviewed them.  I have no

19  quarrel with that, no problem.

20        Let me just read the whole list, and I can tell you

21  that the other people I don't have a quarrel with because I have

22  interviewed them.

23        He anticipates to call these people, and I've also

24  talked to some of those people.  I object to them at this point.

25        The complete list is, Kulesa, K-U-L-E-S-A, it's

7

16

1    Tom.  Tina, Ayala, A-Y-A-L-A.  She is a regional supervisor of

2    my client when she worked for Shoemack, S-H-O-E-M-A-C-K,

3    Management Company.  Timothy Lee, a Vernon Barns and Paul Didos,

4    D-I-D-O-S, Gamez, G-A-M-E-Z, Pete Nonoz, N-O-N-O-Z, and Chris

5    Barnes, Jonathan Householder, it's spelled as it sounds, and

6    Tracy Crisman from Dr. Brad Bayless' office.

7              Apparently, there was a Alejo Ochoa was the person

8    I interviewed, and, therefore, I object to them, but Detective

9    Tom Cruley, Detective Alyea, and Detective Lowley (phonetic) we

10   don't.  Tomorrow at 11:00 o'clock we want to meet with Dr. Brad

11   Bayless.  We reviewed a report and he provided a copy to the

12   Court, so I don't have any quarrel with Brad Bayless.  I spoke

13   with the secretary, I don't object to her

14             Mr. Lee has information concerning the social

15   capacity of my client.  That's previously been disclosed to me.

16   I don't have had a quarrel with Mr. Lee.  I anticipate he will

17   be called as rebuttal.  That leaves us with Vernon Barnes and

18   Pete Munoz, Paul Gamez and Christian Barn and Jonathan

19   Householder.

20             Mr. Martinez is kind enough to let me know what all

21   those witnesses are going to talk about.  One essential topic is

22   the fact they had a sexual relationship with my client at one

23   point in her life.  She acknowledged in court having have a

24   sexual relationship with Didos Gamez and Vernon Barns, and

25   Mr. Martinez says those are going to rebutted in terms of degree

17

8

17

1  rather from facts.

2       If it happens he has true knowledge that did

3  happen, I would object to all five of those people being allowed

4  to testify as rebuttal witnesses because I believe Mr. Martinez

5  could have reasonably foreseen these persons being called in

6  rebuttal.

7       The reason he was allowed to inquire about their

8  experience is the report rendered by Dr. Karen Murray where she

9  talks about my client's sexual history and affair arrangements,

10  could be maybe she took into account her sexual history in her

11  report, it came out concerning her sexual history, and they were

12  in the discovery.  After Dr. Murray's evaluation of my client,

13  he had ample time to disclose to us the existence of persons who

14  would controvert her statement to Dr. Murray regarding her

15  sexual history.

16       The first I heard of these names was during his

17  cross examination, and I've never been inform he noticed these

18  persons will be called as rebuttal witnesses, and the issue of

19  my client's sexual relations I know is a violation of Rule 15

20  disclosure requirements.

21       Obviously, there are a number of sanctions that

22  could be imposed.  I think because of the lateness of the

23  violation, the only sanction that is appropriate is to preclude

24  them.  Give us the opportunity to talk to these people over the

25  weekend.  Even at this point the availability of calling them

9

1  doesn't give me time concerning the factual allegations they are

2  going to make regarding the sexual relationship of my client,

3  for example, whether I can determined on a set date whether my

4  client was in this community on the date, doing what they do

5  said with her, concerning what she's done and the facts.

6          That's the only appropriate real sanction regarding

7  these witnesses is preclusions.  This is our position, Judge.

8          THE COURT:  Mr. Martinez.

9          MR. MARTINEZ:  I think we need to take a step back

10  and determine what these people are going to testify to before

11  we decide what remedy is appropriate for the Court to impose.

12          When we're talking about a sexual act, that's one

13  of the most intimate things, that's probably the most intimate

14  of things that can happen between a man and woman.  This is not

15  the type of thing most people in the community want to talk

16  about, especially since these acts occurred back in the 1990s.

17          These individuals, these men have moved on.  Some

18  of them had gotten married and some of them have gotten

19  divorced.  Some of them are in a relationship right now.  They

20  are all very reluctant to come, or what is key in this case is

21  what the State was aware of is knowledge, and how was the State

22  aware of that knowledge.

23          It would be it impossible for me to go to Casa

24  Grande and post somewhere, I guess, maybe a bowling alley or

25  maybe in the newspaper, some sort of notice asking anyone

10

1    whoever had ever been with Windy avow to come forward.

2           There is no way for me to actively pursue that

3    angle.  There was nothing I could do.  Should I go and call all

4    the males in Casa Grande and should I go nationwide to do that.

5    It's a situation where because of the nature of the evidence and

6    because it was remote and because of the number of people that

7    are involved in Casa Grande, it would be impossible for me to go

8    out and actively look for them.

9           With that as a background, I would then indicated

10   to the Court the knowledge involving this sort of conduct came

11   to me on, not because of anything I did, but it was actually

12   related to me by somebody who then said you may want to talk to

13   these individuals.

14          This was after the trial started and before Karen

15   Murray was interviewed, and so what I did, I began to call those

16   individuals.  There were more names that were given to me and I

17   also attempted to contact them.  I don't know the dates.  It was

18   in the middle of trial and it was usually after work that I was

19   attempting to contact these individuals.  Like I said, there

20   were other names of other individuals that were provided.

21          I don't remember who they were because I wasn't

22   able to get in touch with them.  When I was not able to get in

23   touch with them, I discarded that information.  The first

24   individual's name available to speak to was somebody by the name

25   of Danny Ochoa.  Again, that was in the middle of trial.  He

18

1   came to me, he had in fact had a relationship with the defendant

2   and that nature of the relationship was such it was purely

3   sexual.  They never went to dinner, didn't go to any movie,

4   anything like that.

5          What happened is he come over late at night for, on

6   two occasions which he believed that was on two occasions, he

7   went over to her house in the middle of the night.  That was the

8   extent of their relationship.  It was through him I was paged

9   two, got the names of the people mostly have been attempting to

10  contact, Mr. Marona (phonetic) but I wasn't able to get his

11  phone number.  I did get a phone number, but every time I

12  called, a person would hang up on me.

13         Finally, what I did, I don't remember the time, as

14  I said because I was in trial, I asked our investigative

15  department to try to contact them.  What he did, they contacted

16  the Casa Grande Police Department.  My understanding is, this is

17  secondhand, and then they went and spoke to him and they

18  eventually confirmed that he had a sexual relationship with the

19  defendant right about at this point or a little bit before.

20         Again, I just don't know when it happened.  I just

21  know it happened during the middle of the trial.  It was the

22  same information provided to me.  During the trial, Vernon

23  Barns' name came up and I spoke with him.  I had trouble getting

24  a hold of him, apparently he works at the Cotton Exchange.  He

25  went to California, apparently is what he does, and I believe is

12

1   where he is now.  In fact, I'm pretty sure that's where he's

2   now.  I contacted him on a cell phone, and I spoke to him about

3   it and he indicated he did in fact have a sexual relationship.

4          The other names were provided by the individual.

5   All I can say is that this is a situation I have been

6   diligentory.  As soon as or as close as I could, I let them know

7   about those individuals and did question Dr. Murray about it and

8   that's how it fell.  I don't have, I don't believe I need an

9   excuse to say to the Court:  Well, Judge, please overlook this

10  particular conduct.  There was nothing I did either that was

11  unfair to the defense.

12         What I did, I came by some information.  I didn't

13  know about the information.  There is no police report, and

14  again, there is no police report because these individuals did

15  not come forward.  These individuals, I assume, did not want to

16  talk to the police, or even prior to that, the State would not

17  have known of their existence.  It's not something we can go out

18  and find out about them.

19         So for those reasons, I would ask I'd be allowed to

20  call these individuals.  I know some are reluctant to come in.

21  For example, Jonathan Householder indicated he does not want to

22  come in.  He's going through to a divorce and that may hurt his

23  situation.  But Raul Didos Gamez indicated in July of 1996, he

24  described he was coming home from a party and saw the defendant

25  and Chris Barns in a truck at 4:00 o'clock in the morning in a

13

1    compromising situation.

2            So for those reasons, I'd ask the Court to do what

3    I think is right.  Obviously, that is to impose a remedy and

4    that remedy is that we have the weekend, we have tomorrow, we

5    can conduct these interviews by telephonic and or in person.  We

6    can then go ahead and be prepared to cross examine them.

7            This is not the kind of situation where, again,

8    we're talking about very private acts where there isn't

9    anything, there isn't anything out there that's going to

10   corroborate it.  These were sexual contacts between two

11   individuals.  What is there to corroborate other than it

12   happened or did not happen.

13           For those reasons, Your Honor, I'd ask I'd be

14   allowed to call those very four individuals.

15           THE COURT:  Mr. Patterson.

16           MR. PATTERSON:  I'd like to say the last word.

17   Mr. Martinez described to you how he came upon these witnesses.

18   You may have observed some of the bad faith.  It certainly does

19   not allow the late disclosure of those witnesses, and he

20   apparently had readily access to others.  They have other things

21   they never disclosed.  He's getting information from their

22   sources in Casa Grande.  It's my position it's the relatives,

23   the next of kin of the decedent knowing the sexual history of my

24   client was potentially an issue.  I didn't get this kind of

25   information.  He apparently indicates there had been some

14

19

1    investigation done or interviews of those people done.  I've

2    never been afforded the courtesy of any interview.

3                I am shooting behind here, Judge.  It seems to me

4    the Court should allow me, to give me the opportunity to speak

5    to those people.  Having no means to prepare properly for their

6    interviews which is a situation that can have consequences in a

7    capital case.  I'd ask for the sanctions to be imposed here.

8                THE COURT:  I'm going to think about it.  I'll make

9    a decision.  I'll have my judicial assistant phone you or E-mail

10   you with my decision.

11               One thing I did want to bring up, Mr. Patterson, I

12   think there is some intent on your part to perhaps present some

13   additional witnesses after the State's rebuttal witnesses have

14   been presented.  It would be the Court's inclination at this

15   point in time if you were to present witnesses, it would be

16   during the defense's case rather than after the State's

17   rebuttal.

18               MR. PATTERSON:  I have not been given the

19   opportunity to speak with Ms. Murray.  I have not spoken with

20   Dr. Murray.  Mr. Martinez invested the time and money to go talk

21   to her.  I believe her testimony is germane and relevant if his

22   choice is to put Dr. Bayless on.  Remember, we had this pretrial

23   discussion, I objected to a psychologist evaluating my client.

24               Regarding the pretrial issue, you ruled in favor of

25   Dr. Murray's evaluation and using those, and my information

15

1   based upon the report she is going to testify not as a

2   psychiatrist as a psychologist, and she will basically say she

3   seen some psychological interviews.  Unless she takes the stand

4   as a psychiatrist and she says there are some psychological

5   concerns, again, there is no basis for that declaration.

6          Once she makes the declaration, I'm going to call

7   Dr. Mechanic, who is a Tucson expert in domestic relations and

8   family testify there are some limited applications.  He's a

9   psychologist who feels it has to be dealt with very

10  introspectively using the MMPI tests.  It shows these kinds of

11  things which he had viewed in the domestic violence victims and

12  a result of victims taking those tests.

13         It is my position it's not relevant and admissible

14  unless he attempts to rebut Dr. Murray with Dr. Bayless.  It's

15  been my thinking throughout here, I think this a circumstance

16  where I have the burden such as in the justification.  I get an

17  opening statement so the State gets a rebuttal and I get a

18  sur-rebuttal limit, what their position is as rebuttal evidence,

19  and in the 703 Statute in death penalty, the way the rules are

20  for regulation of death penalty cases allows me both opening

21  argument and closing argument, if we get to the sentencing

22  phase.

23         It's the same language, it's the one they find

24  aggravating factors.  It's incumbent on me to show the

25  mitigation outweighs the need for imposing the death penalty.

16

1   I'm saying he's wrong because the methodology he applied is

2   inappropriate.  They are going to put forth to the jury they

3   have to go with that qualification by Dr. Bayless, specifically

4   a psychologist without being a specialist.  This is something

5   that can be done in the case-in-chief.  It doesn't need to be

6   done in rebuttal, specifically, they are not going to rebut what

7   he says.  He's going to come in with this theory, see, this is

8   why you don't use a run-of-the-mill psychologists.  This is

9   something they can do in their case-in-chief.

10              THE COURT:  Let take a break at this time.

11              We will discuss that at the end of day.

12              We'll be in recess.

13              (Recess.)

14              THE COURT:  This is number CR CR2000-096032, State

15  of Arizona versus Wendi Andriano.

16              Let the record reflect the presence of defendant's

17  counsel and the jury.

18              We will continue with the tape that had been

19  admitted into evidence as Exhibit Number 498.

20              MR. PATTERSON:  May I start it, Judge?

21              THE COURT:  Yes.  Thank you.

22              (Whereupon, the video tape was played.)

23              THE COURT:  We will have the defendant retake the

24  witness stand.

25              The record well reflected the defendant,

17

1    Mrs. Andriano, is back to the witness stand.

2

3                     WENDI ANDRIANO,

4    having been previously sworn by the Court, testified upon her

5    oath as follows:

6

7                CONTINUED DIRECT EXAMINATION

8    BY MR. PATTERSON:

9         Q.    All right.  You are Wendi Andriano?

10        A.    Yes, I am.

11        Q.    Is this the same Wendi Andriano who testified

12   earlier in the case?

13        A.    Yes.

14        Q.    And you recognize you're still under oath?

15        A.    Yes, sir.

16        Q.    Let's talk about some discussion Mr. Martinez made

17   in his cross examination.  We watched this video and first part

18   of that video Detective Darry (phonetic) appeared to be

19   recording injuries to your person.

20              Is that what we observed in the video?

21        A.    Yes.

22        Q.    What you injuries did you obtain to your person as

23   a result of Joe Andriano?

24        A.    I had bruising on my hand.  I had cuts on my hands.

25   I had acrylic nails ripped out that left bruising on my nail

18

20

1   bed.  I had soreness all in my ribs.  I had injuries to the the

2   back of my head.  I had marks around my neck, and I just recall

3   almost every muscle in my body being very sore and felt almost

4   like flu like symptoms

5           Q.    At some point do you remember during the course of

6   the video tape you told Dr. Ackly (phonetic) you did not want to

7   go to the doctor or medical facility?

8           A.    Yes, I did.

9           Q.    Was that decision changed at some point?

10          A.    Yes.

11          Q.    Tell me about that.

12          A.    I believe he's a nurse, came in and they took

13  samples of my hair and my blood.  By that time my two fingers on

14  my left hand were pulsing with pain, so they almost felt like

15  pressure was building as it was just hurting worse and worse as

16  time went on and I showed them to him and he said --

17                  MR. MARTINEZ:  Objection.

18                  THE COURT:  Sustained.

19          Q.    BY MR. PATTERSON:  What did you do based upon his

20  evaluation of what happened?

21          A.    Then I requested medical care because it was

22  getting worse.

23          Q.    Did you in fact go to a medical facility?

24          A.    Yes, I did.

25          Q.    Where did you go?

19

20

1      A.     I think it was Maricopa County Hospital.

2      Q.     What did they do for you at the location?

3      A.     I remember having X-rays done and a doctor looked

4   at me, and he had to drill holes in my nail to relieve the

5   pressure from, I guess, the blood that was putting the pressure

6   on my finger when that happened, and they clamped up some of the

7   scratches that I had on me, things like that.

8      Q.     You observed, during the course of video tape, at

9   some point do you remember given a couple of Advil?

10      A.     Yes.

11      Q.     What was the Advil for?

12      A.     My head hurt pretty bad.  As I said before my whole

13   body was feeling like I've been run over like a truck.  It is

14   just --

15      Q.     Were you aware that you were in fact being video

16   taped?

17      A.     No, sir.

18      Q.     Was any visible cameras in the room to lead you to

19   the conclusion you are in fact being video taped?

20      A.     No, I had no idea.

21      Q.     And at that time did Detective Darry and Detective

22   Kilten tell you you were in fact being video tape?

23      A.     No, they didn't.

24      Q.     You said you had some acrylic nails.  For those of

25   us who don't wear acrylic nails, what are acrylic nails?

20

A.     Acrylic nails is a substance that's put on top of your natural nails and it is your nail actually grows out with it and every two weeks you go in for what we call a fill, where they apply more of the product, and I kept mine at an active length when in the office if I were to pull out a file drawer --

MR. MARTINEZ:  Objection.

THE COURT:  Overruled.

THE WITNESS:  When I pull out a file drawer it would not bend over.  So they are very durable.

Q.     BY MR. PATTERSON:  Is there a reason why you began to wear acrylic nails?

A.     Yes.

Q.     What is the reason --

MR. MARTINEZ:  Objection.

THE COURT:  Overruled.

THE WITNESS:  I wear acrylic nails because they're not sharp.  The acrylic nails have a soft end to them.  When I change Ashley's diaper and I pick them up and I won't scratch them, and they don't catch, they don't scratch.  They are pretty smooth.

Q.     BY MR. PATTERSON:  Let me show you this was in a -- let's start with this one.  This appears to be --

MR. PATTERSON:  Judge, I cannot remember, number 360.

THE COURT:  Well, I think it's the same problem.

21

Q.   BY MR. PATTERSON:   Is that one of your nails, 364, does this show your right hand?

A.   Yes, it does.

Q.   How many acrylic nails are on that hand at the time the photograph was taken?

A.   I have three on.

Q.   Are some missing?

A.   Yes, sir.

Q.   Prior to your fight with Joe Andriano, how many acrylic nails did you have on that hand?

A.   I believe I had four.

Q.   Which one was missing before?

A.   The thumb nail.

Q.   So was one lost apparently in the altercation you had with Mr. Andriano?

A.   Yes, it was.

Q.   We have 519 for identification.   What does that show?

A.   This is my left hand.

Q.   And how many acrylic nails do -- we have one with a thumb.   Did you have any acrylic nails on the thumb?

A.   It doesn't show here.   I believe I did.

Q.   Okay.   Again how many acrylic nails do we show, not counting the thumb?

A.   Three.

22

1    Q.    There is one missing?

2    A.    Yes.

3    Q.    What finger?

4    A.    Is my index finger.

5    Q.    Did you have an acrylic nail on your index finger

6    of the left hand prior to your altercation with Joe Andriano?

7    A.    Yes, I did.

8    Q.    Apparently that was lost in the fight?

9    A.    Yes.

10       MR. PATTERSON:  Judge, I move for admission of 319.

11       THE COURT:  Any objection?

12       MR. MARTINEZ:  I don't know.  I'd like to look at

13   it first.

14       THE COURT:  Exhibit number 519 is admitted into

15   evidence.

16       Were you able to see it?

17       MR. MARTINEZ:  Yes.  I looked at it.

18   Q.    BY MR. PATTERSON:  I'm going show you what has been

19   marked as identification as 523, apparently there is a

20   photograph of two hands.

21       Are those your hands?

22   A.    Those are.

23   Q.    Does that show your left thumb?

24   A.    Yes, it does.

25   Q.    Is there an acrylic nail on the left thumb?

23

A.    Yes.

Q.    In total how many acrylic nails do you think you lost in your fight with Joe Andriano?

A.    Two.

MR. PATTERSON:  Move for the admission of 523, Judge.

MR. MARTINEZ:  No objection.

THE COURT:  Exhibit number 523 for identification is admitted into evidence.

Q.    BY MR. PATTERSON:  Now, it appears in the video tape there is a second episode of photographing your injuries.

Did that happen?

A.    Yes, it does.

Q.    And who was in charge of the first photograph session where they document injuries?

A.    I believe it is, Sally was.

Q.    Who was in charge of the session, and Sally came in and that was the brown haired lady?

A.    Yes.

Q.    Three detectives with the city of Phoenix?

A.    Yes.

Q.    There was an area Mr. Martinez discussed with you concerning your efforts to have a student loan forgiven.

Can you tell me about that, please?

A.    Yes, I had student loans that I was trying to make

24

1    payments on and I hadn't for some months been able to make

2    payments and they were going to garnish my wages.

3         Q.    Why weren't you able to make payments on the those

4    student loans?

5              MR. MARTINEZ:  Objection, relevant.

6              THE COURT:  Overruled.

7              THE WITNESS:  I was the only one working.  My

8    paycheck wasn't many enough to pay all those bills.

9         Q.    BY MR. PATTERSON:  Was it a time when you were with

10   Joe Andriano?

11        A.    Yes.

12        Q.    Was he generating any income at that time?

13        A.    No.  Well, he would be in Tucson at Larry Malane,

14   and I know he worked down there.  It wasn't anything that he

15   brought into the household.

16        Q.    What would he use that money for that he generated

17   at Larry Malane?

18             MR. MARTINEZ:  Objection.

19             THE COURT:  Sustained.

20        Q.    BY MR. PATTERSON:  What would he use that money

21   for?

22             MR. MARTINEZ:  Objection.

23             THE COURT:  Sustained.

24        Q.    BY MR. PATTERSON:  Was that used in the family pool

25   to pay bills, things like that?

25

MR. MARTINEZ:  Objection, asked and answered.

THE COURT:  Overruled.  Ask your next question.

Q.    BY MR. PATTERSON:  To that end did you make a effort to try to have that student loan forgiven?

A.    I believe what it was, was to bring down the payments and I think I agreed pay $50 a month or something like that.

Q.    So it was kind of a refinance, if you will, of the obligation?

A.    Yes.  They lower my payment instead of garnishing my wages.  That would have been terrible.

Q.    Did they agree to refinance the obligation?

A.    Yes.

Q.    Did you continue to make payments at a reduced monthly rate?

A.    Yes.

Q.    To that end do you include in the sheet your rent that was paid for the apartment you and Joe lived in?

A.    I included a sheet that would have shown if he hadn't pay, but the apartment we lived in was prepaid.  That was a benefit of me working there, so it was part of my salary.

Q.    And did you include that in the paperwork?

A.    Yes, I did.

Q.    All right.  Mr. Martinez talked about your supervisor at Shoemack?

26

A.     Shoemack, I'm sorry.

Q.     His name is Timmy Lee?

A.     Yes.   Timmy Lee.

Q.     Let's talk about the issue of your tending to Nicholas.  Okay.  Again, explain to me how you became aware Nicholas was injured and how Mr. Lee interacted in that process of you going to take care of your son.

A.     Okay.  Timmy Lee, I'm sorry.  We were having a management meeting which he did once a week and I was the only one in the office besides him, and I received a phone call from my husband directing me to go to the emergency room right away because Nicholas had been hurt.  I hung up the phone.  I let Mr. Lee know what happened, and I didn't know what to do because under no circumstances were we allowed to lock the office and leave.

Q.     Okay.  You were the only employee of that particular complex on the site at that time in the office except maintenance?

A.     Yes.  I was the only office person there.

Q.     And Mr. Lee being a supervisor he is, is he the kind of guy that would have tended to daily operations of that particular complex?

A.     Not at all.

Q.     So could you leave Mr. Lee in charge of the situation, I mean, was that your concern?

27

A.    If he wanted to, but I would just have to ask him.
I did.  I let him know Nicholas had been hurt and what do I do,
and I didn't know what do.  I didn't know what happened at that
point.

When I explained Nicholas had been hurt he was on
the way the emergency room, he would, like, most definitely you
need to go take care of your son.  So with his permission, I
went ahead and locked up the office and went.

Q.    So if there was any reluctance on your part to go,
what was the reluctance based upon?

A.    My responsibility for the office.

Q.    Right.  There was also some discussion about your,
there maybe two women involved, their names maybe confused.
Tell me about Mina and Anna.  Who is is Mina?

A.    Mina is the lady to watched my children while I
worked at Court Yard.

Q.    All right.  Was she an employee of Court Yard.

A.    Sometime later after she began watching my children
we had a part time job opening on the Court Yard to clean the
laundry rooms, so Mina, needing extra funds applied for the
position and we hired her to clean the laundry rooms.

Q.    Was Mina married?

A.    Yes, to Jessie.

Q.    Did Mina and Jesse provide day care for your
children?

28

A.    Yes, he did.

Q.    How did they do that?

A.    They lived right above us at Court Yard Apartments. In the morning I'd just take the children up there.  Certain days Joe would have Nicholas with him, other times he would just leave them with Mina.

Q.    And then Jessie gets home from work around 3:00?

A.    Yes.  He played with the children, too, sometime take them to the play yard and stuff.

Q.    Are those the folks who would go over to school and pick up the kids and take them to your apartment?

A.    Yes.

Q.    Who is Anna?

A.    Anna is the lady who watched Nicholas for me on occasion during the year of, probably the last six months of '97 and maybe a couple of months into maybe January, February of '98.

Q.    Where did you reside at that time?

A.    Tory Shop House.

Q.    Now, describe Anna for me.

A.    Anna is a Mexican lady.  She is not an American citizen and I meet her through the Tory Shop (phonetic) and the Mexican lady there they introduced me there, and she said she knew she, they would be happy to watch Nicholas while I was at my job.

29

Q.    Did Anna have anything to do with Court Yard
Apartments?

A.    Sometimes later in '99 I was out walking Nicholas
and Ashley in their stroller, and I saw Anna and stopped to talk
to her and I discovered then he's living with a gentleman at
Court Yard but she was not on the lease.  I had no idea she
lived there.  When I found that out I told her she would need to
come and in put her name on the lease and things like that.

Q.    Did she do that?

A.    Yes.

Q.    Did she have any day care responsibilities during
the time you lived at Court Yard?

A.    No, sir.

Q.    That was Mini?

A.    That was Mini.

Q.    All right.  Mr. Martinez talks to you about that a
ring that was purchased at Best Company, I believe in the
context you told us on direct that the only present your husband
ever bought you was the pearl necklace?

A.    Yes.

Q.    And then Mr. Martinez approached the topic of the
emerald ring.  Okay.

A.    Correct.

Q.    And he shows you to a particular document?

A.    That's correct?

30

Q.    Let's discuss that issue.  When is your birthday?

A.    My birthday is August 26th.

Q.    And what is the date of that particular document?

A.    August 30th, 1996.

Q.    So it's four days after your birthday?

A.    Yes, it is.

Q.    Did you and he go to Best Company for the purpose of him buying you a birthday present?

A.    No, sir.

Q.    Had he gotten you anything for your birthday, 8-26?

A.    No, sir, we'd just gone to eat dinner.

Q.    No presents purchased for you?

A.    No, sir.

Q.    How it is that you went to Best Company four days later?

A.    We were going to go buy a set of silverware that was on sale for $100.

Q.    And this Best Company I gather is no longer in business.  Do you recall where it was back then?

A.    By Fiesta Mall.

Q.    So you're walking through this store looking for this silverware set?

A.    Yes.

Q.    At some point in time did you go to the jewelry section?

31

A.     I did, yes.

Q.     Why do you do that?

A.     It's the female thing.  I like to look at jewelry.

Q.     On August 30, '96, were you at the jewelry department at Best Company?

A.     Yes, I was.

Q.     What were you looking at?

A.     I looked at their emerald rings and bracelets, things like that.

Q.     Did you ultimately purchase two items from the jewelry section at Best Company?

A.     Yes.

Q.     Are they described on the document?

A.     Yes.

Q.     Describe the first one for us.

A.     One was a ring for $800 and the other was an emerald pendent which slides into a necklace for $200.

Q.     Whose decision was it to buy those particular items of jewelry?

A.     Mine.  I wanted them.

Q.     Did you buy those as a result of Joe offering to buy those for you?

A.     No.

Q.     Was Joe present?

A.     Yes, he was.

32

Q.   How were those purchases paid for?

A.   With his credit card.

Q.   Did he sign for the purchase?

A.   Yes, he did.

Q.   Thereafter how were the payments made on those two items?

A.   I make the payments.

Q.   Do you consider those items as a gift from Joe?

A.   No, sir.

Q.   Again, I ask you how long were you and Joe together from dating to October 8th, 2000?

A.   March 17th, of '92 until October of 2000.

Q.   A little over eight years?

A.   Yes.  Eight-and-a-half years, probably.

Q.   How many presents did he give you for your birthday?

A.   For my birthday, none.

Q.   For Mother's Day?

A.   None.

Q.   All right.  There was some discussion about birthday cards.  I am sorry, Mother's Day cards from your daughter and son?

A.   Yes.

Q.   Who prepared those Mother's Day cards for you?

MR. MARTINEZ:   Objection, lack of foundation.  If

33

1   you know.

2           THE COURT:  Lay some foundation.

3       Q.    BY MR. PATTERSON:  The handwriting on the card

4   whose handwriting was it?

5       A.    It was my children's along with my husband.

6       Q.    Did he give you any information as to how those

7   cards were prepared?

8       A.    No.

9       Q.    Okay.  Did he give you information as to how he

10  acquired those cards?

11      A.    Yes.

12      Q.    What was that information?

13          MR. MARTINEZ:  Objection, hearsay.

14          THE COURT:  Sustained.

15      Q.    BY MR. PATTERSON:  Were there any presents that

16  accompanied these two cards?

17      A.    No.

18      Q.    And when again was Ashley born?

19      A.    September 17th, of '98.

20      Q.    So you would have had two Mother's Days being the

21  mother of Ashley?

22      A.    Yes.

23      Q.    And when was Nicholas born?

24      A.    June 20th, 1997.

25      Q.    Again, it looks like two Mother's Days with

34

Nicholas as your child?

    A.    Yes.

    Q.    Are those the only two cards you received in the context of Mother's Day from Joe?

    A.    Yes.

    Q.    And that birthday card that we showed you earlier, how many birthdays cards have you had from March of '92 through October of 2000?

    A.    Nine.

    Q.    How many birthday cards did you receive from Joe Andriano?

    A.    That was the only one from Joe Andriano that I received.

    Q.    Was there a reason why you received that particular card?

    A.    Yes.

    Q.    Why was that?

    A.    That was the only one I had ever gotten.

    Q.    All right.  There was some discussion with Mr. Martinez about change of flight plans from, with your return trip from Memphis.  Let's talk about going over to set up the plane flights.  You, Nicholas and Joe go to Memphis, Tennessee?

    A.    To his sister, Janice.

    Q.    Was it three airline tickets?

    A.    I don't recall if we had to purchase one for Ashley

35

or not or she had to purchase one.

Q.    So all four of you went and you went on three tickets?

A.    Yes.

Q.    They are purchased by your sister-in-law?

A.    Yes.

Q.    The departure and return back, what was it originally scheduled for, actually the same time, or over at the same time and back at the same time?

A.    Yes.

Q.    Did it differ during the period of time while you were over there, was there a need to return to the city of Phoenix?

A.    Yes.

Q.    What was the need?

A.    I had to come back to work.

Q.    How do you present work, was it presented as a problem.

A.    I stayed in contact with work and I don't recall the details as to why, but I needed to go back to work being I'm the manager.

Q.    What do you do in regards, what did you to alter any travel plans?

A.    Scheduled the flight back early.

Q.    Did you in fact return earlier?

36

A.    Yes, I did.

Q.    Did you go to work upon your return?

A.    Yes, I did.

Q.    Did Joe impose any objection to you returning early?

A.    No, sir.

Q.    All right.  While in Memphis, there was a photograph taken of Joe strolling with the kids?

A.    Yes.

Q.    What was the photograph of, obviously, it's him and the kids, but the circumstance, where was that taken?

A.    We were on our way back to Janice's house and she lived at the top of a hill, and we'd been down walking around the pool area or something.  We just went out for a walk and so Joe was pulling the children back in the wagon.

Q.    This is what month and year?

A.    This would have been September, middle of September, 2000.

Q.    Did he have any difficulty walking up the hill or walking the kids around the park while at his sister's house in Memphis?

A.    No.

Q.    In that period of time after he's -- well, had he been undergoing chemo therapy prior to departing to Memphis?

A.    He had three sessions of chemo.

37

Q.    When he returned from Memphis, did he continue with the physical activity?

A.    Yes.

Q.    What physical things did he do, not withstanding the fact he had three extensive doses of therapy?

A.    Everything he did even before chemotherapy.

Q.    Give me an example.

A.    Such as, I know he was still working on his engines and that required lifting of stuff, and if I needed help carrying the groceries inside the house, he would do that.  Just everything.

Q.    Okay.

A.    There wasn't any changes.

Q.    Mr. Martinez mentioned the term weak.  Did you see any weakness in Joe on a continuing basis in the period of two three weeks in November, October, 2000?

A.    I could not say it is a weakness.  Actually the length of his endurance, that would shorten.  As far as length, no.

Q.    What in terms of his actual duration, what did you observe the chemo therapy effected?

A.    He would have to take more frequent breaks if he was, you know, we are going to walk to the park.  When we got to the park, usually he may be, you know, we are pushing the kids on the swing or something, he might have to sit down for a few

38

seconds before he started doing that.

Q.    Okay.  So it effected his endurance, is that a fair statement?

A.    Yes.

Q.    All right.  Mr. Martinez had some discussion with you about an incident that where you claimed that Joe forced you into an active intercourse post-partum?

A.    Yes.

Q.    Tell me again what you told Joe when he requested to have intercourse with him after the delivery of Nicholas, I believe it was.

MR. MARTINEZ:  Objection, beyond the scope.  I didn't ask her anything.

THE COURT:  Sustained.

Q.    BY MR. PATTERSON:  You had a discuss with Mr. Martinez about sex after having delivered Nicholas.  Why didn't you want to have sex with Joe Andriano after having delivered Nicholas some three weeks earlier?

A.    I had an apostomoy and my body just wasn't ready for sexual intercourse.

Q.    So had you been told by a physician at some point in time you were free to have sexual intercourse?

A.    No, sir.

Q.    What did you base that decision at that time upon in refusing to have intercourse with Joe?

39

A.    After having a child, excuse me, but, you know, if you're healed or not, and I wasn't healed yet.

Q.    Was it, did you in fact have intercourse with him at that time?

A.    Yes.

Q.    Was it painful?

A.    Very.

Q.    Were those your instincts before you had intercourse in this regard?

A.    Yes.

Q.    Mr. Martinez discussed with you the incident at, I believe it was Twelve Gardens with Shawn King.

A.    Yes.

Q.    Tell me again.  Did you report that assault on your vehicle to law enforcement?

A.    I did not make the initial report, no.

Q.    How it is a report was generated?

MR. MARTINEZ:  Objection, lack of foundation.  If she knows, sir.

THE COURT:  Lay some foundation.

Q.    MR. PATTERSON:  Did you actually observe the damage, the damage being occasioned to your vehicle by Mr. King?

A.    No.

Q.    At some point in time did you go out and see the vehicle had in fact been damaged?

40

A.     Yes.

Q.     How was it brought to your attention that there was some damage to your vehicle?

A.     Chris knocked on my door and had me come out to look.

Q.     He is Chris Vasques?

A.     He is the security patrol for Twelve Gardens.

Q.     Did he also have another job?

A.     He was Casa Grand policeman.

Q.     He's sixty-nine and moonlighting at a Twelve Gardens?

A.     Yes.

Q.     Did he take a statement from you?

A.     Did Chris?

Q.     Chris Vasques.

A.     No.

Q.     Did you then examine that vehicle for damage?

A.     Yes.

Q.     Did you discuss with him why Shawn had been there in the first place and an incident involving a ring?

A.     Yes, I did.

Q.     What did you tell him?

MR. MARTINEZ:  Objection, hearsay.

THE COURT:  Sustained.

MR. PATTERSON:  Judge, he opened this door and

41

talked about crushing the ring or pointing a finger.

        THE COURT:  Hold on a second.

        MR. MARTINEZ:  My fault.

        THE COURT:  Let's hear what you have to say.

        MR. PATTERSON:  He opened the door.  He talked about crushing the ring, biting fingers, all those things, that's the picture he described in the police report.  He opened it and I needed to followup on it.

        THE COURT:  Those are the rules.

        MR. PATTERSON:  What I discussed with her was laid out in the police report.  I did ask her whether or not this was Chris Vasques and whether or not this was mentioned in the police report.  I never asked her what Mr. Vasques said or what she told Mr. Vasques.

        MR. MARTINEZ:  Objection.

        THE COURT:  Sustained.

        MR. PATTERSON:  He talked about not biting his finger and I thought this was in the context of this police report.

        THE COURT:  It's almost 5:00 o'clock.  We will take our break, and you can think about it over the weekend.

        MR. MARTINEZ:  Judge, before you take off, I have one item, based on what she answered involving whether or not she received medical care, and it's my belief and it's been denied, it's my belief that she did not receive any medical care

42

1    at the hospital.  Also, she is basically making that up to

2    exonerate the severity of her injury.

3              I am either going to call Detective Lou Vera or

4    Officer Marner, and also I may have occasion to call the

5    custodian of records of Maricopa County Medical Center.  I do

6    have the records.  I think that's what he shows.

7              That's final.  I made a record.

8              THE COURT:  We're going to take the evening recess.

9              Ladies and gentlemen, just a remainder of it.  Next

10   week we're going to have a short week.  We will not have trial

11   on Thursday, Thursday of next week, November 11th, is Veteran's

12   Day.  The court facility will be closed.  There will be trial on

13   ~~Monday to Wednesday and Thursday but not Thursday.~~

14             During the weekend remember the admonition

15   including the fact you are not to discuss the case with anyone.

16   Don't let anyone discuss the case with you.  Do not do any

17   research and experimentation or testing on your own, avoid any

18   media coverage and we will see everyone on Monday.

19             We will be in recess.

20             (Whereupon, the jury panel left the courtroom.)

21             THE COURT:   CR 2003-096032, State of Arizona

22   versus Wendi Andranio.

23             The record should reflect the presence of the

24   defendant and counsel.  We're outside the presence of jury.

25             Anything further we need to discuss?

43

1          MR. PATTERSON:  I'll go upstairs and make a copy of

2   the report for you to review, additionally I'll get those

3   videos.  I forgot about that.

4          THE COURT: Thank you.  We will be in recess.

5

6

7                        *********

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

44

1

2

3

4

5                    C E R T I F I C A T E

6

7

8

9              I, BLANCHE F. PAULSEN, do hereby certify that the

10   proceedings had upon the hearing of the foregoing cause are

11   contained fully and accurately in the shorthand record made by

12   me thereof, and that such shorthand was reduced to writing under

13   my direction and the foregoing 43 pages of said transcript

14   contain a full, true and correct transcript of my shorthand

15   notes taken by me as aforesaid, all to the best of my skill and

16   ability.

17              DATED this the 8th day of March 2005, at Mesa,

18   Arizona.

19

20

21

22              _Blanche Paulsen_

23              BLANCHE PAULSEN #50526

24              Certified Court Reporter

25

EXHIBIT DD

05-0002
Braccio



IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

IN AND FOR THE COUNTY OF MARICOPA

| | | |
|---|---|---|
| STATE OF ARIZONA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | No. CR2000-096032 |
| | ) | CR05 0005-AP |
| WENDI ELIZABETH ANDRIANO, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

BEFORE:  THE HONORABLE BRIAN K. ISHIKAWA

Mesa, Arizona
November 8, 2004

REPORTER'S TRANSCRIPT OF PROCEEDINGS
(Trial)

COPY

SHARON FLORES
CERTIFIED COURT REPORTER
50374

1

2

A P P E A R A N C E S

3

4

5

6

7    For the State:

Mr. Juan M. Martinez

8                Deputy County Attorney

9

10

11

12

13

14    For the Defense:

Mr. Daniel B. Patterson

15               Mr. G. David Delozier, Jr.

16               Office of the Public Defender

17

18

19

20

21

22

23

24

25

1

2

I N D E X

3                                                                 PAGE

4  WITNESSES:

5

6     WENDI ELIZABETH ANDRIANO                                      9

7        Redirect Examination by Mr. Patterson                     22

8        Voir Dire Examination by Mr. Martinez                     24

9        Redirect Examination by Mr. Patterson (Cont)             26

10       Voir Examination by Mr. Martinez                          27

11       Redirect Examination by Mr. Patterson (Cont)             42

12       Examination by the Court                                  46

13       Further Redirect Examination by Mr. Patterson            47

14       Recross-Examination by Mr. Martinez

15

16    ALEJO ACHOA                                                  49

17       Direct Examination by Mr. Delozier                        51

18       Cross-Examination by Mr. Martinez                         61

19       Redirect Examination by Mr. Delozier

20

21

22

23

24

25

1

2

### E X H I B I T S

3

4

(Exhibits were marked prior to trial unless

5

6  indicated.)

7

| NUMBER: | DESCRIPTION | MARKED | ADMITTED |
|---------|-------------|--------|----------|
| 521 | Photograph | | 23 |
| 520 | Photograph | | 24 |
| 522 | Photograph | | 26 |
| 523 | Photograph | | 24 |
| 524 | Videotape | | 56 |

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

P R O C E E D I N G S

1

2

3          THE COURT:  Good afternoon.  This is the trial in

4    Cause Number CR2000-096032, State of Arizona versus Wendi

5    Elizabeth Andriano.

6          The record will reflect the presence of the

7    defendant and counsel.  We're outside the presence of the

8    jury.

9          Just a couple of housekeeping measures here.

10         Sir, in the front row here, the gentleman seated

11   in the front row here.  There's been some discussion last

12   week that perhaps you had a conversation with Mr. Ochoa

13   about what you observed here in court.

14         Let me just explain to you and just a reminder to

15   everyone else in the courtroom, there's a ruled called Rule

16   of Exclusion of Witnesses.  They're not to be here during

17   the trial to see what other witnesses say or what occurred

18   here in trial.  That includes hearing from other people

19   what occurred in trial.  I don't know what type of

20   conversation you may have had with Mr. Andriano, if

21   anything at all.  But you're not to speak with the

22   witnesses about what occurred here in trial.

23         Do you understand that, sir?

24         Is that yes?

25         SPECTATOR:  Yes, sir.

6

1    THE COURT:  What is your name for the record?

2    SPECTATOR:  Gilbert Perez.

3    THE COURT:  Do you understand what the rule

4  means?

5    MR. PEREZ:  Yes, sir.

6    THE COURT:  Do you have any questions about it at

7  all?

8    MR. PEREZ:  No.

9    THE COURT:  Anything further from either

10  Mr. Martinez or Mr. Patterson in that regard?

11    MR. MARTINEZ:  No, sir.

12    MR. PATTERSON:  No, Your Honor.

13    THE COURT:  Also, I informed counsel informally

14  here just a few moments ago about the fact my uncle passed

15  away last week.  We had visitation last Friday evening

16  which would have been -- I'm not sure of the date -- would

17  have been the 5th, I guess.  It would have been the 5th.

18  We had visitation at the funeral home on Friday evening.

19  And low and behold, Juror Number 1 -- who was formerly

20  Juror Number 3 -- Juror Number 1 appeared at the

21  visitation.  And she was there with the other ladies and

22  there were many other people around.  She apparently bowls

23  with my aunt in a bowling league on, I believe, Tuesday

24  morning.  And as soon as I saw Juror Number 1, when she

25  didn't say anything to me, by way of wanting to prevent

1   anything from occurring as far as the case is concerned so

2   right way I said remember we can't talk about the case and

3   she just nodded her agreement.  I believe she offered her

4   condolences to both me and other family members, including

5   my aunt.  And that was it.  We said good-bye.  I said I'll

6   see you on Monday.  Other ladies were there.  Two other

7   ladies were with her and they discussed with my aunt

8   bowling and my uncle and offered their condolences and all

9   that happened so I wanted to place that on the record.

        Anything further from Mr. Martinez in that

10

11  regard?

            MR. MARTINEZ:  No, sir.

12

            MR. PATTERSON:  No, Your Honor.  I have no motion

13

14  as a result of this disclosure.

            THE COURT:  Okay.  And then, I heard argument

15

16  last week with regard to the defendant's motion to preclude

17  certain witnesses.

        I am going to grant the defendant's motion to

18

19  preclude Raul Dido Gamez, Vernon Barnes, Christopher

20  Barnes, Jonathan Householder and Pete Munoz from being

21  called as rebuttal witnesses by the State.

        And is there anything else we need to discuss at

22

23  this time?

            MR. MARTINEZ:  Not that I'm aware of.

24

            MR. PATTERSON:  No, Your Honor.

25

1      THE COURT:  Ready for the jury?

2      MR. PATTERSON:  Please.

3      THE COURT:  Okay.  Let's have the jury.

4      The other thing I wanted to place on the record

5  was my uncle's funeral was on Saturday.  I do not know

6  whether Juror Number 1 was at the funeral or not.  For the

7  memorial service I did give the eulogy.  I don't know

8  whether she was there or not.

9      (Jurors entered the courtroom.)

10     THE COURT:  Please be seated.  This is Cause

11  Number CR2000-096032, State of Arizona versus Wendi

12  Elizabeth Andriano.

13     The record will reflect the presence of the

14  defendant, counsel and the jury.

15     The defendant is on the witness stand.  We'll

16  continued with redirect examination by Mr. Patterson.

17     Mr. Patterson.

18     MR. PATTERSON:  Thank you, Judge.

19     (Next page, please.)

20

21

22

23

24

25

WENDI ELIZABETH ANDRIANO,

1

2   called as a witness herein, having been previously duly

3   sworn, was examined and testified as follows:

4

                    REDIRECT EXAMINATION

5

6   BY MR. PATTERSON:

7       Q.   You are Wendi Andriano?

8       A.   Yes, I am.

9       Q.   The same Wendi Andriano who was testifying last

10  week in this trial?

11      A.   Yes, I am.

12      Q.   And you recognize you are still under oath?

13      A.   Yes, sir.

14      Q.   Mr. Martinez broached the topic of the

15  acquisition of the sodium azide.  He discussed with you a

16  series of e-mails that were sent to Voigt Global.  They're

17  Exhibits 380, 375, 378, 379, 376, 381, and 373.

18          Let's start with 380.  What was your discussion

19  by e-mail with Voigt Global?  What did it concern?

20          MR. MARTINEZ:  Objection.  Lack of foundation.

21  What was the beginning, middle and the end.

22          THE COURT:  Sustained.  Lay some foundation.

23      Q.   BY MR. PATTERSON:  In general, when you first

24  made contact with Voigt Global, what was the purpose of

25  accessing that particular supplier of chemicals?  What were

1   you looking for?

2        A.    Sodium azide.

3        Q.    Is there one -- 380, I believe it is.  Read that

4   e-mail for us.  And is that pertaining to anything other

5   than sodium azide?

6        A.    Now, the subject is sodium azide.  However we do

7   reference sodium cyanide or potassium cyanide that an

8   acquaintance had used.

9        Q.    Even though it's referenced in that e-mail, the

10  topic of that e-mail is still sodium azide?

11       A.    Yes, sir, it is.

12       Q.    Is it consistent with all the e-mails there for

13  your consideration?

14       A.    Yes, sir it is.

15       Q.    Did you ever access Voigt Global with the intent

16  to acquire sodium cyanide?

17       A.    No, sir.

18       Q.    Was Joe aware of your efforts to acquire sodium

19  azide?

20       A.    Yes, he was.

21       Q.    Did he approve of your efforts?

22       A.    Yes, he directed me to do so.

23       Q.    Was he aware you made certain misstatements in

24  order to acquire the sodium azide?

25       A.    Yes, sir.

1     Q.   And why did you make those misstatements to Voigt

2 Global in an effort to acquire sodium azide?

3     A.   The main reason why was to help disguise, or

4 whatever, the fact of him wanting to commit suicide.  We

5 didn't want anything leading back to that.

6     Q.   What was your reasoning there?

7     A.   Well, it's -- I believe it's a mortal sin if you

8 commit suicide in the Catholic faith which is what Joe grew

9 up as.  And he didn't want to leave that burden with his

10 family even though that wasn't a particular belief of his.

11 And, also, wanted to preserve, if he could, any of the

12 medical malpractice suit for Nicholas and Ashley.

13     Q.   One of those e-mails is a reference to farm

14 rodents?

15     A.   Yes.

16     Q.   Where did you acquire that information?

17     A.   From Joe.

18     Q.   Did he have a background or experience working on

19 a farm, dealing with --

20     A.   Yes.

21     Q.   -- varmints on the farm?

22     A.   Yes, he does.

23     Q.   And tell me the degree of literacy that Joe had

24 with regard to the e-mail process, the Internet, that kind

25 of thing?

1      A.   To my --

2           MR. MARTINEZ:  Objection.  How she knows that.

3           THE COURT:  Sustained.  Lay some foundation.

4      Q.  BY MR. PATTERSON:  Did you and he have

5  discussions concerning whether or not he was capable of

6  transmitting these e-mails?

7      A.   No.  That's why he asked me to do it because he

8  had no experience whatsoever on the computer.

9      Q.   Did you have a computer hooked up to the Internet

10  in your apartment?

11      A.   No, sir.

12      Q.   All right.  On what day of the week was the

13  sodium azide picked up from the Buckeye UPS station?

14      A.   I believe it was Airborne Express.

15      Q.   Airborne Express.  I'm sorry.

16      A.   Thursday afternoon.

17      Q.   Where did it go from the Airborne Express

18  station?

19      A.   We drove back to my office --

20           MR. MARTINEZ:  Objection.  Nonresponsive.  He

21  asked where did it go, not what she did.

22           THE COURT:  Sustained.

23      Q.   BY MR. PATTERSON:  Did you transport the package

24  from Airborne Express to another location?

25      A.   Yes, sir.

1    Q.   Who was with you when it was transported?

2    A.   My husband.

3    Q.   And you went from the Airborne Express to what

4  location?

5    A.   San Riva office.

6    Q.   What did you do with the parcel at that point?

7    A.   Carried it inside to my office.

8    Q.   And where did you place it in the office?

9    A.   Just on the floor, probably next to the desk or

10  something.

11    Q.   Could you have placed it elsewhere?

12    A.   I could have, yes.

13    Q.   Could you have placed it in the storage shed

14  where it ultimately wound up after it was parceled out to

15  the elderberry capsules?

16    A.   I could have but it just was inconvenient.

17    Q.   Was it inside your apartment Thursday evening?

18    A.   No, sir.

19    Q.   The following Friday, did you go back to the

20  office and access that parcel?

21    A.   Yes, sir, I did.

22    Q.   Where did you take it?

23    A.   To my apartment.

24    Q.   And was this the first day that the parcel

25  containing the sodium azide was inside your apartment,

1   Apartment 132?

2       A.   Yes, sir.

3       Q.   Did you make dinner for the family that Friday

4   night?

5       A.   No, I did not.

6       Q.   Did you make dinner -- I said dinner -- did you

7   make a bowl of stew or kettle of soup or anything of that

8   nature on Friday?

9       A.   No, I did not.

10      Q.   Did you make a kettle of soup or stew that

11  Saturday?

12      A.   No, I did not.

13      Q.   Did you put sodium azide into the two soup bowls

14  that were found on the counter in your kitchen?

15      A.   No, I did not.

16      Q.   Do you have any idea how that chemical got inside

17  those two soup bowls?

18      A.   No, I do not.

19      Q.   Did you place any of the chemical inside the

20  kettle that was on the stove?

21      A.   No, sir, I did not.

22      Q.   Did you, on Friday, make an effort to clean out

23  stuff that was stuck in the refrigerator, leftovers?

24      A.   Yes, sir, I did.

25      Q.   Had you accomplished, to a certain extent, the

1  clean up of those containers or things that had the

2  leftovers in the refrigerator?

3      A.   I was part-way through my task.

4      Q.   And have you seen photographs that indicate that

5  being somewhat accomplished?

6      A.   Yes, I have.

7      Q.   What do those photographs disclose?

8      A.   A sink full of soapy water with dirty dishes in

9  them.  And a counter full of dirty dishes that I still

10  needed to clean.

11      Q.   Let me show you Exhibit 27.  Is that the

12  photograph you just described?

13      A.   Yes, it is.

14      Q.   What's it show as you're looking at the

15  photograph on the left of the sink?

16      A.   It shows a sink full of the water with utensils,

17  a bowl, a sponge and miscellaneous items in it.

18      Q.   Now, in the other sink, there is a drinking

19  glass, correct?

20      A.   Yes, there is.

21      Q.   How did the drinking glass get onto that side of

22  the sink, if you recall?

23      A.   I took a drink of water and set it down there.

24      Q.   At what point in time, was it before or after

25  your fight with Joe?

1       A.   After.

2       Q.   Was that at or near the time when you were doing

3   something else in the kitchen?

4       A.   Yes, sir.

5       Q.   What were you doing at that time?

6       A.   I was cleaning off my glasses and face.

7       Q.   After they had been squirted with a substance?

8       A.   Yes.

9       Q.   All right.  You took this chemical and you told

10  us that you placed it in the capsules, the elderberry

11  capsules?

12      A.   Yes, sir.

13      Q.   What -- Did you observe Joe initially do

14  something with that bottle of elderberry capsules that now

15  contained the sodium azide initially after they were

16  created?

17      A.   Oh, after the sodium azide was put into it?

18      Q.   Yeah, initially, when you were on the patio

19  replacing the elderberry contents with the sodium azide.

20  Did you see what Joe did with the container initially?

21      A.   Yes.  He took it inside the master bedroom.

22      Q.   And where did he place it?

23      A.   On top of the closet.

24           MR. MARTINEZ:  Objection.  Lack of foundation.

25  How did she know that he did that.

1      THE COURT:  Did you see him do this?

2      THE WITNESS:  I saw it afterwards.

3      THE COURT:  Overruled.

4    Q.  BY MR. PATTERSON:  Where did you see it

5 afterwards?

6    A.  On the top self of the master bedroom closet.

7    Q.  At some point in time, you testified that he took

8 a handful of these capsules.  Where did the container of

9 the capsules go after he immediately took a handful?

10    A.  I believe it was just sitting next to us on the

11 bed.

12    Q.  Okay.  At some point in time, he developed some

13 symptoms, some nausea and you folks proceeded to the living

14 room?

15    A.  Yes.

16    Q.  What happened to the container of elderberry

17 capsules now containing the sodium azide?

18    A.  I wrapped it to take it with us to urgent care.

19    Q.  What was your purpose in bringing it along to

20 urgent care?

21    A.  So they could see what was making him ill.

22    Q.  So now that container is in the living room at

23 the time when Joe has vomited and he's on the floor?

24    A.  Yes.

25    Q.  What did you do with that container when the plan

1   changed and you're no longer going to urgent care?

2       A.   The door was opened to let Chris inside the

3   apartment and nine-one-one was on their way.  I stuck it

4   right inside that little closet right there by the front

5   door.

6       Q.   Why did you do that?

7       A.   Because Joe had changed his mind and didn't want

8   anyone to know what was going on.  We didn't know if they

9   were going to come in the door or not.

10          MR. MARTINEZ:  Objection.  Nonresponsive.

11          THE COURT:  Overruled.

12          THE WITNESS:  We didn't know if nine-one-one

13  would just make their way inside the house or not.  And so

14  that's why it was hidden, basically.

15      Q.   BY MR. PATTERSON:  All right.  In response to a

16  question from Mr. Martinez, you said that you have, in

17  fact, recollected additional episodes of abusive behavior

18  attributable to your husband within the past months or so,

19  the past year or so?

20      A.   Yes.

21      Q.   Why is that?

22      A.   My experience when I was married was that if

23  there was anything unpleasant such as violence or yelling

24  or anything like that, in order to survive -- it's a means

25  of survival -- in order to survive you just put that away,

1   tuck it away somewhere in your head and you don't put a lot

2   of attention on it because if you did, it would make you

3   crazy.  You couldn't, you know, you couldn't live with it.

4   And I would rationalize it and you know a lot it wasn't his

5   fault.  Things like that.

6              MR. MARTINEZ:  Objection.  She's going afield.

7              THE COURT:  Sustained.

8        Q.   BY MR. PATTERSON:  But were these episodes in

9   your mind noteworthy or were they normal?

10       A.   They were normal.

11       Q.   Have you heard, for instance, your brother, half

12  brother, whatever relationship he is.

13       A.   He's my brother.

14       Q.   Have you heard him testify about a specific

15  event?  Did that rekindle a recollection for you?

16       A.   It did.

17       Q.   Did you include on your resume a college degree

18  that you did not, in fact, have?

19       A.   Yes, I did.

20       Q.   Why did you do that?

21       A.   I was trying to get the best jobs available and

22  the highest salary possible to support my family.

23       Q.   When you were arrested, what shirt did you have

24  on?

25       A.   A white T-shirt that had blood all over it.

1      Q.    Is that the T-shirt with the blood depicted in

2  these two photographs?

3            MR. PATTERSON:  I didn't read the numbers out

4  Judge, I'm sorry.  328 and 330.

5            THE WITNESS:  Yes, that's the shirt.

6      Q.   BY MR. PATTERSON:  And how did that blood get on

7  your T-shirt?

8      A.    Through --

9      Q.    Let me ask it another way.  Did it arrive on your

10  T-shirt at or near the same time when the substance got on

11  your glasses and your face?

12     A.    Yes, sir.

13     Q.    Did you make any effort to change that T-shirt

14  before law enforcement arrived?

15     A.    No.

16     Q.    Was that the T-shirt you had on when law

17  enforcement came to the front door at 132?

18     A.    Yes.

19     Q.    Photograph 329 shows that same T-shirt but also

20  shows something else on it.  Do you see what I'm talking

21  about?

22     A.    Yes.

23     Q.    What -- Describe for us, in addition to the

24  spattering there appears to be what in addition on this

25  T-shirt?

1  A.  There's two large blood stains.

2  Q.  Do you recall how those got on your T-shirt?

3  A.  Yes.

4  Q.  Can you tell us how?

5  A.  That was when I was kneeling by Joe when we were

6  struggling over the knife and I got what they described as

7  arterial spurting.  But, that's what happened.

8  Q.  Were you in contact at some point also with Joe?

9  A.  Yes, I was.

10  Q.  Let me show you another photograph here.  This is

11  521 for identification.  This is an additional photograph

12  that was taken of the highboy.  Does that also depict any

13  damage to that highboy or dresser?

14  A.  Yes, sir, it does.

15  Q.  Counting from the top down, how many dressers

16  (sic) down is the actual damage?

17  A.  The third and fourth drawers down are damaged.

18  Q.  And on what occasion was that damage done to the

19  particular dresser?

20  A.  When I returned from a softball tournament.

21  MR. PATTERSON:  Judge, I move for the admission

22  of 521.

23  MR. MARTINEZ:  Judge, may I voir dire the

24  witness?

25  THE COURT:  Yes.

VOIR DIRE EXAMINATION

1

2 BY MR. MARTINEZ:

3    Q.   Ma'am, with regard to Exhibit 521, you tell us

4 that it was the third and fourth drawers that has the

5 damage on it.  That's what you told us, right?

6    A.   Yes.

7    Q.   And with regard to the fourth, I'm sorry, the

8 third drawer, can you tell me where the damage is?

9    A.   Right there and right there.

10    Q.   Is this the same dresser that is depicted in

11 Exhibit 444?

12    A.   Yes.

13    Q.   And that damage that you indicated to us on the

14 third drawer, if we take a look at Exhibit 444, can you

15 show it to us?

16    A.   It's this and this.

17       MR. MARTINEZ:  Judge, may I just put it on the

18 ELMO real quick?

19       THE COURT:  Hold on.  Which photograph are you

20 talking about?

21       MR. MARTINEZ:  444 to show what she pointed out.

22       THE COURT:  I'll allow you to show Exhibit 444

23 which also already has been admitted into evidence to show

24 what the witness just pointed out.

25    Q.   BY MR. MARTINEZ:  The damage that you're talking

1  to -- speaking to 521 to the third drawer -- is that what

2  you're talking about?  That is the third drawer?

3       A.   Yes, sir.

4       Q.   And this right here is the fourth drawer?

5       A.   I believe so.  It's hard to tell from that

6  picture.

7       Q.   Were you present when these were taken?

8       A.   When the pictures were taken?

9       Q.   When Number 444 was taken?

10      A.   No.

11      Q.   You weren't present when that was taken, when the

12  picture was taken?

13      A.   When the pictures were taken?

14      Q.   When picture 444 was taken.

15           MR. PATTERSON:  Judge, this is well beyond the

16  scope of voir dire.  He's now cross-examining on the

17  picture.

18           THE COURT:  Sustained.

19           Is there any objection to Exhibit 521 coming into

20  evidence?

21           MR. MARTINEZ:  I don't have any objection.

22           THE COURT:  Exhibit Number 521 marked for

23  identification is admitted into evidence.

24

25

REDIRECT EXAMINATION (Continued)

1

2   BY MR. PATTERSON:

3       Q.   Wendi, Exhibit 520, does that also depict the

4   highboy?

5       A.   Yes, it does.

6       Q.   Does it show more accurately, succinctly or

7   better, if you will, the damage to the third drawer?

8       A.   Yes.  It's the bottom of the third drawer but

9   it's there.

10      Q.   Was this the condition of your highboy in the

11  early morning hours of October 8, 2000?

12      A.   Yes, it was.

13          MR. PATTERSON:  Move the admission of 520.

            MR. MARTINEZ:  I have no objection.

14          THE COURT:  Exhibit Number 520 marked for

15

16  identification is admitted into evidence.

17          MR. PATTERSON:  Judge, I neglected to move 523

18  the other day.  So I move 523 at this point.

19          THE COURT:  What number?

20          MR. PATTERSON:  523.

            MR. MARTINEZ:  I don't have any objection to

21

22  that.

            THE COURT:  Exhibit Number 523 marked for

23

24  identification is admitted into evidence.

25      Q.   BY MR. PATTERSON:  Showing you what's been marked

1   for identification as Exhibit 522.  What does that depict?

2       A.   The top drawer of this highboy.

3       Q.   Okay.  And whose drawer was that?

4       A.   It's Joe's drawer.

5       Q.   And from what you can observe inside that drawer,

6   what kind of things apparently were in that drawer at the

7   time this photograph was taken on October 8, 2000?

8       A.   Well, in the very top a Playboy magazine.

9   There's a videotape, a book, his condoms.  I can't tell

10  what the other stuff is.

11      Q.   How do you know the condom packet?

12      A.   How do I know it?

13      Q.   Recognize?

14      A.   I saw it every day.

15      Q.   Was it a certain color?

16      A.   They were blue and white.

17      Q.   And is this the top drawer that you said that he

18  would put his condoms in?

19      A.   Yes.

20           MR. PATTERSON:  Move the admission of 522.

21           MR. MARTINEZ:  May I voir dire the witness?

22           THE COURT:  You may.

23

24

25

VOIR DIRE EXAMINATION

1

2   BY MR. MARTINEZ:

3       Q.   Is this the same drawer you said you couldn't see

4   in?

5       A.   I would have to stand on a chair to see in.

6       Q.   But is this the same drawer that when Travis

7   Black came over you said you couldn't see in?

8       A.   That's correct.

9       Q.   If you couldn't see in it, how do you know what

10  was in it on October 8th of the year 2000?

11      A.   Because Joe always keep his condoms in it.

12      Q.   You didn't look in it on October 8th 2000, did

13  you?

14      A.   Put my hand in.

15      Q.   But you didn't look in it, right?

16          MR. PATTERSON:  This is cross-examination, not

17  voir dire.

18          THE COURT:  Overruled.

19      Q.   BY MR. MARTINEZ:  But you didn't look in it, did

20  you?

21      A.   No, I just had to reach my hand in there.

22          MR. MARTINEZ:  I would object.  She doesn't know.

23          THE COURT:  Over the objection, Exhibit 522

24  marked for identification is admitted into evidence.

25

REDIRECT EXAMINATION (Continued)

1

2   BY MR. PATTERSON:

3       Q.   All right.   Mr. Martinez was asking you some

4   questions about a belt.   Do you have any specific recall

5   about the belt being used on October 8, 2000?

6       A.   I don't.

7       Q.   There was some discussion by Mr. Martinez about

8   Joe's weight loss.   Can you describe that for me?   Over

9   what period of time and what events precipitated the weight

10  loss in Mr. Andriano?

11      A.   As I said before, he was about 220 when we got

12  married.   And in the fall of 1998 when he went to Colorado

13  to detox his body he lost a significant amount of weight

14  then.

15      Q.   Is that a homeopathic approach?

16      A.   Yes, that was.   He brought his weight down to

17  about 175, 180 is where he was from that point on.   And

18  then when he started chemotherapy, I know he lost maybe

19  another ten pounds.

20      Q.   So, on October 8th, 2000 there abouts, how much

21  did he weigh?

22      A.   I think just from hearing I thought it was like

23  165 or 170.

24      Q.   What was your weight approximately at that time

25  frame?

1    A.   When they booked me I was 103.

2    Q.   Mr. Martinez talked to you about Exhibit 506, a

3  letter you received from Leon Thikoll.  Who was Leon

4  Thikoll?

5    A.   Leon Thikoll was a family attorney.

6    Q.   And had you and Joe used him for other

7  attorney-related matters?

8    A.   Yes.

9    Q.   Prior to 2000?

10   A.   Yes  in '96 we used him for some stuff with

11  accuglass.

12   Q.   Had he worked with Joe before?

13   A.   During the accuglass things, yes.

14   Q.   Let me show you Exhibit Number 220, it's is your

15  husband's billfold.  There was a card that was in his

16  billfold at the time of his death.  Whose business card is

17  that?

18   A.   Leon Thikoll.

19   Q.   And is it the same Leon Thikoll that is reflected

20  in the letter?

21   A.   Yes, it is.

22   Q.   The address the same?

23   A.   Yes, it is.

24   Q.   And did you make an effort to have Leon Thikoll

25  assist you in the prosecution, if you will, of the

1  malpractice claim?

2      A.   Yes.  We approached him first since he was doing

3  other business for us.

4      Q.   And you say "we," it was both you and Joe?

5      A.   Yes.  He wanted us to meet with him and some

6  other attorney that was going to help him with it.

7      Q.   Okay.  And is that reflected in Exhibit Number

8  506?

9      A.   Yes, it is.

10      Q.   What does it say?

11           MR. MARTINEZ:  Objection.  Hearsay.

12           THE COURT:  Has 506 being admitted into evidence

13  yet?

14           MR. PATTERSON:  No, Your Honor.

15           THE COURT:  I'll sustain the objection.

16      Q.   BY MR. PATTERSON:  What efforts were made to

17  secure a lawyer after Mr. Thikoll declined to assist you?

18           MR. MARTINEZ:  Objection.  Assuming Mr. Thikoll

19  declined.

20      Q.   BY MR. PATTERSON:  Was unable to assist you or

21  didn't assist you?

22      A.   What's the question?  I'm sorry.

23      Q.   You and Joe did not retain Leon Thikoll to assist

24  you in prosecution of the malpractice claim, correct?

25      A.   No, we did not.

1      Q.   At some time did you acquire the services of

2  another lawyer?

3      A.   Yes.

4      Q.   What was that lawyer's name?

5      A.   Jeffrey Miller.

6      Q.   Looking again at Exhibit Number 520, your late

7  husband's billfold taken at the time of his death, is there

8  a card in his billfold for that lawyer?

9      A.   Yes, there is.

10     Q.   And which law firm is that gentleman associated

11 with?

12     A.   Rouch, McCracken, Guerrero and Miller.

13     Q.   Is that the lawyer who showed up in the trial and

14 testified in this case?

15     A.   Yes, it is.

16     Q.   Let's talk about the letters that Mr. Martinez

17 had marked for identification in the case coming from

18 Mr. Miller.  There appears to be two.  To whom are those

19 letter addressed?

20     A.   Joe and Wendi.

21     Q.   To your knowledge, were there ever any letters,

22 signed agreement or anything of that nature sent to you

23 that Joe was not aware of?

24     A.   No, sir.

25     Q.   After you received a letter from Mr. Miller, what

would you do in response to that particular letter?

1

    MR. MARTINEZ:  Objection.  Assumes facts not in

2

evidence, i.e. only she received letters.  She just said

3

they both received.

4

    THE COURT:  Overruled.

5

    Go a head and answer the question.

6

    THE WITNESS:  Follow whatever instructions were

7

on there because usually it was a request for something or

8

he needed to meet with us or whatever it was.

9

    Q.   BY MR. PATTERSON:  Did you communicate with your

10

husband about the substance of those letters?

11

    A.   Yes.  He was usually the one that got the mail so

12

he would have it first.

13

    Q.   If there was a follow-up phone call to be made

14

who would generally make the phone call?

15

    A.   I would.

16

    Q.   Why is that?

17

    A.   That is normal.  I just -- I made phone calls and

18

did e-mails and I did all that stuff.

19

    Q.   At some point, were you asked to find the address

20

of one of the physicians who may have mistreated your

21

husband?

22

    A.   Yes, I was.

23

    Q.   And did you send that off to Mr. Miller?

24

    A.   I did.

25

1   Q.   Is that reflected in that particular fax?

2   A.   Yes, it is.

3   Q.   Which doctor was that?

4   A.   It was Dr. Rendone.

5   Q.   And how did you go about accessing Dr. Rendone's

6   address?

7   A.   I worked with him at the hospital and so through

8   hospital contact I was able to locate him on the Internet.

9   Q.   Did you subsequently transmit that information to

10   Mr. Miller?

11   A.   Yes, I did.

12   Q.   Mr. Martinez discussed with you acquisition of

13   life insurance or attempted acquisition of life insurance

14   in this case?

15   A.   Yes.

16   Q.   Just so we're clear, did you ever acquire a

17   policy of life insurance on the life of Joseph Andriano for

18   your benefit?

19   A.   No, sir.

20   Q.   The one life insurance policy that he did have

21   upon his death, to whom were the benefits paid?

22   A.   I believe to his parents.

23   Q.   Did you acquire any money as a result of the

24   death of Joseph Andriano?

25   A.   None.   None.

1      Q.   All right.  Did you make misstatements of fact in

2   your effort to acquire the information about a policy of

3   life insurance?

4      A.   Yes, I did.

5      Q.   Did you ever go so for as to fill out an actual

6   application for life insurance?

7      A.   I believe they were pre-apps.  I don't believe it

8   was an actual application.

9      Q.   Was Joe aware of your efforts in this regard?

10     A.   Yes, sir.

11     Q.   Did you discuss your efforts in this regard with

12  him?

13     A.   Very much so.

14     Q.   What did you do in response to your discussing

15  this with him?

16     A.   What he directed me to do.

17     Q.   There was some discussion with Mr. Martinez about

18  the nine-one-one call.  Did they direct you to do something

19  specifically with regards to Joe at some point in time?

20              MR. MARTINEZ:  Objection.  Lack of foundation.

21  There were two calls that were made.

22              THE COURT:  Sustained.

23              Rephrase question.

24     Q.   BY MR. PATTERSON:  One of the calls that you had

25  with nine-one-one, did the operator direct you to do

1    something with Joe?

2              MR. MARTINEZ:  Same objection.  Which one.

3              THE COURT:  Overruled.

4              Go a head and answer the question yes or no.

5              THE WITNESS:  Yes.

6         Q.   BY MR. PATTERSON:  What did the operator direct

7    you to do?

8         A.   To --

9              MR. MARTINEZ:  Objection.  Hearsay.

10             THE COURT:  Overruled.

11             THE WITNESS:  To roll him over and to put

12   something to stop the bleeding in his neck.  That's all I

13   remember.

14        Q.   BY MR. PATTERSON:  And in that process, did you

15   have contact with Joe?

16        A.   Yes, I did.

17        Q.   And the part of his body that you contacted was

18   it bloody or not bloody?

19        A.   Bloody.

20             MR. PATTERSON:  Let me just check my notes,

21   Judge.  I think I'm done at this point.  Oh, one area then

22   we're done.

23        Q.   BY MR. PATTERSON:  You watched the entire

24   videotape.  One of your discussions with Detective Lucero

25   and Detective Dillian?

1    A.   Yes.

2    Q.   Was there one topic that you avoided in your

3 discussions with Detective Lucero and Detective Dillion?

4    A.   Yes, there was.

5    Q.   What topic was that?

6    A.   The suicide.

7    Q.   Why did you avoid discussing that topic with

8 Detective Lucero or Detective Dillion?

9    A.   Because I promised I wouldn't talk about it.

10    Q.   The balance of the things that you told

11 Detectives Lucero and Dillion, were they accurate to the

12 best of your ability?

13    A.   At that point in time, yes, I was trying to but I

14 was very disoriented.  And watching it now I -- I could

15 tell that I didn't -- sequence of events and things like

16 that just were not making sense.

17            MR. PATTERSON:  Judge, I have nothing

18 additional.

19            THE COURT:  Are there any questions of the

20 witness by the jury?  If so, please raise your hand.

21            (Bench conference was held outside the hearing of

22 the jury.)

23            THE COURT:  First question:  Did Rick Freeland

24 know you were married before the affair.

25            Mr. Patterson.

1          MR. PATTERSON:  No objection.

2          MR. MARTINEZ:  No objection.

3          THE COURT:  Next question:  Why didn't you talk

4   your husband out of contemplating suicide.  Was it okay

5   that the children were in the apartment.

6          Mr. Patterson.

7          MR. PATTERSON:  No objection.

8          MR. MARTINEZ:  No objection.

9          THE COURT:  Next question:  Do you wear contact

10  lenses?

11         Mr. Patterson.

12         MR. PATTERSON:  No objection.

13         MR. MARTINEZ:  No objection.

14         THE COURT:  Next question:  Do you know where

15  Shawn King is.  How many years have you been friends with

16  Shawn King?

17         Mr. Patterson.

18         MR. PATTERSON:  No objection.

19         MR. MARTINEZ:  The first part she didn't know

20  where Shawn King is.  So there's lack of foundation

21  question.  But I have no objection to the second part how

22  long she's known him.

23         THE COURT:  I'll ask the first question:  Do you

24  know where Shawn King is.

25         MR. PATTERSON:  That's fine.  No objection.

1        THE COURT:  Next question:  Was Joe standing with

2    when the knife was in your hands just before the blood hit

3    you in your face.

4        MR. PATTERSON:  No objection.

5        Mr. MARTINEZ:  No objection.

6        THE COURT:  Next question.  What did Joe do with

7    the broken lamp from Sam's Club?

8        MR. PATTERSON:  No objection.

9        MR. MARTINEZ:  No objection.

10       THE COURT:  Next question:  Who initiated the

11   sexual intercourse during the relationship with Rick

12   Freeland?

13       MR. PATTERSON:  No objection.

14       MR. MARTINEZ:  No objection.

15       THE COURT:  Next question:  What hand did Joe

16   have the knife in during the struggle?

17       MR. PATTERSON:  No objection.

18       MR. MARTINEZ:  No objection.

19       THE COURT:  Next question:  When did your father

20   arrive at the apartment on October 8, 2000?

21       MR. PATTERSON:  No objection.

22       MR. MARTINEZ:  No objection.

23       THE COURT:  Next question: What  time of day and

24   where in the home did he usually take his medications and

25   vitamins.

1          MR. PATTERSON:  Meaning who?

2          THE COURT:  Sounds like meaning Mr. Andriano.

3          MR. MARTINEZ:  No objection.  There's no one else

4  taking medication.

5          MR. PATTERSON:  It's general.  I don't know what

6  the time frame is.  So that's problematic.

7          THE COURT:  Tell me what you want me to do.

8          MR. PATTERSON:  The time frame is some what

9  problematic.  WE objection because I don't think it's

10  formulated to a certain date, time or circumstance.

11  Therefore, it's subject to misinterpretation.

12          THE COURT:  Mr. Martinez.

13          MR. MARTINEZ:  There is only one person here that

14  was taking medication.  That's Mr. Andriano.  So my

15  recollection of the case would be what time of day and

16  where in the home Joe usually takes his medications and/or

17  vitamins.

18          MR. PATTERSON:  I still object as it doesn't

19  restrict it to time.  These people knew each other for

20  eight years.

21          THE COURT:  I'll not ask that question.

22          Question: The sodium azide is ordered by Anne

23  Newton using the San Riva phone number.  When Airborne

24  Express calls San Riva, do they ask for Anne Newton?  Was

25  any ID required to pick it up.

1   MR. PATTERSON:  I don't have any problem with the

2   second part of the question.  The first part of the

3   question, I don't think there's any testimony that the

4   Airborne Express lady called up.  I don't recall the

5   testimony.

6   THE COURT:  I don't recall testimony as to who

7   got notification.

8   MR. PATTERSON:  Right.  I don't recall the

9   Airborne Express lady saying she spoke with anyone in

10  particular.

11  MR. MARTINEZ:  The testimony was that she put the

12  phone number down and that the phone number was in the

13  e-mail and that I asked her on cross-examination if that

14  was the number that you called and she said yes.  She said

15  that it was the number that you used for work.  That's all

16  I remember.

17  MR. PATTERSON:  Which, work or cell phone?

18  MR. MARTINEZ:  She said her cell number was her

19  work number.

20  MR. PATTERSON:  Okay.  The call was to the cell

21  phone.  So I don't have any problem with it then.

22  THE COURT:  So, you don't have any problem with

23  any of the questions?

24  MR. PATTERSON:  See, that misstates the

25  testimony.  It is her cell phone she used for business

1  purposes so the question is not accurately tracking the

2  trial testimony.

3           THE COURT:  So tell me what you want me to do.

4           MR. PATTERSON:  Ask that it not be asked because

5  it's error.

6           THE COURT:  Mr. Martinez.

7           MR. MARTINEZ:  I don't see anything

8  objectionable to asking that.  You asked that of the

9  witness.

10          THE COURT:  You have a problem with me asking

11 whether she received the call or what telephone number?

12          MR. PATTERSON:  No.

13          THE COURT:  I'll ask:  Did you receive a phone

14 call from Airborne Express?  If so, what phone did you

15 receive that on.

16          MR. PATTERSON:  That's fine.

17          THE COURT:  Next question:  Where are your

18 children.  Have you been able to have any contact with

19 them?

20          Mr. Patterson.

21          MR. PATTERSON:  I have no objection to the

22 questions.

23          MR. MARTINEZ:  Rule 403 relevance, unduly

24 prejudicial.  We can say the children are with Joseph's

25 mother.  I don't think it's really relevant.

1   THE COURT: I'm not going ask it.

2   Next question: Explain the consistency of sodium

3   azide that you described as lumpy yet you could break it up

4   with plastic forks.  Compare it with say, brown sugar.

5   MR. PATTERSON:  No objection.

6   MR. MARTINEZ:  No objection.

7   THE COURT:  Next question:  Did Shawn King know

8   why you wanted information on sodium azide?

9   MR. PATTERSON:  It's state of mind.  I don't

10  think we can inquire on it.

11  MR. MARTINEZ:  I agree.

12  THE COURT:  Next question:  If shown King did

13  actual research to find the poison, who gave him the

14  requirements for how the poison was to act .i.e. simulate a

15  heart attack.

16  MR. PATTERSON:  No objection.

17  THE COURT:  Let e read that again:  If Shawn King

18  did actual research to find the poison, who gave him the

19  requirements for how the poison was to act, i.e,, simulate

20  a heart attack.

21  MR. PATTERSON:  I have no objection.

22  MR. MARTINEZ:  Lack of foundation.  He didn't

23  know how she came about that knowledge.  Maybe she may have

24  got it through the Internet.  She may have got it from a

25  book.

1          MR. PATTERSON:  If you know.

2          THE COURT:  I'm not going to ask that question.

3          Next question:  When you returned from the

4    bathroom after the first altercation, was Joe standing,

5    leaning or lying down?

6          MR. PATTERSON:  No objection.

7          MR. MARTINEZ:  No objection.

8          THE COURT:  Next question:  Whose signature was

9    on the money order that was purchased to pay Voigt Global

10   for the sodium azide.

11         MR. PATTERSON:  No objection.

12         MR. MARTINEZ:  No objection.

13         THE COURT:  Next question:  Was Joe right or

14   left-handed?

15         MR. PATTERSON:  No objection.

16         MR. MARTINEZ:  It's already been asked twice.

17         MR. PATTERSON:  He's right handed.

18         MR. MARTINEZ:  Okay.  That's fine.

19         (Bench conference concluded.)

20

21                    EXAMINATION

22   BY THE COURT:

23         Q.  I have some additional questions for you.  The

24   first one reads as follows:  If you know, did Rick Freeland

25   know you were married before the affair?

1    A.   Yes, he did.

2    Q.   Why didn't you talk your husband out of

3  contemplating suicide?  Was it okay that the children were

4  in the apartment?

5    A.   I tried for a few months but once he has

6  something set in his head it's hard to change his mind.

7    Q.   Let me reread that second portion.  Was it okay

8  that the children were in the apartment?

9    A.   Originally it was because it was supposed to be a

10  quiet thing then it turned into a fight.

11    Q.   The next question reads as follows:  Do you wear

12  contact lenses?

13    A.   I do occasionally, yes.

14    Q.   The next question reads as follows:  Do you know

15  where Shawn King is?

16    A.   No.

17    Q.   "How many years have you been friends with Shawn

18  King?"

19    A.   I grew up with him but then once in '92 is when

20  our friendship kind of dissipated for quite a few years.

21    Q.   Next question reads as follows:  Was Joe standing

22  when the knife was in your hand just before the blood hit

23  you in the face?

24    A.   No, he was not.

25    Q.   "What did Joe do with the broken lamp from Sam's

1  Club?"

2        A.   I have no idea.

3        Q.   Next question reads as follows:  Who initiated

4  sexual intercourse with Rick Freeland?"

5        A.   Rick did.

6        Q.   Next question:  What hand did Joe have the knife

7  in during the struggle?

8        A.   His right hand.

9        Q.   "When did your father arrive at the apartment on

10  October 8, 2000?"

11        A.   The first time I saw my father was when I was

12  sitting out on the sidewalk with a policeman watching me,

13  or whatever you want to call it, and my dad walked up to me

14  there and starting talking to me.  So this was after the

15  second nine-one-one call and after whoever, I mean police

16  and EMTs, whoever all those people were, had arrived.

17        Q.   Next question reads as follows:  Sodium azide is

18  ordered by Ann Newton.  Did you receive the phone call from

19  Airborne Express?

20        A.   I actually think that I had to call and find out

21  where the package went.

22        Q.   "And which phone or what phone did you have

23  contact with Airborne Express with?

24        A.   My office phone, I believe.  I can't say for

25  certain.

1      Q.   "Was any ID required to pick it up?"

2      A.   No.

3      Q.   "Explain the consistency of sodium azide that you

4   describe as lumpy yet you could break it up with a plastic

5   fork?  Compare it with, say, quote, brown sugar, end of

6   quote?

7      A.   I know some -- okay.  There's different

8   consistencies of brown sugar.  But when it first starts

9   getting lumpy you can break it up with just your fingers if

10  you're putting it in a bowl.  I imagine with the sodium

11  azide you could have done that, also.  But just to be on

12  the safe side, I used a plastic fork.  It wasn't as hard as

13  brown sugar can be.  If it's left in a cupboard for, you

14  know, six months or something it can become really

15  crystallized.  It was not crystallized, it was just lumped

16  together.

17     Q.   The next question reads as follows:  When you

18  returned from the bathroom after the first altercation, was

19  Joe standing, kneeling or lying down?

20     A.   He was lying down.

21     Q.   Next question:  Whose signature was on the money

22  order that was purchased to pay Voigt Global for the sodium

23  azide?

24     A.   I filled out the money order so it would have

25  been mine.

1      Q.   "Was Joe right or left-handed?

2      A.   Right-handed.

3           THE COURT:  Are there any further questions of

4  this witness by the jury?  If so, please raise your hand.

5  No one has raised their hand.

6           Any follow-up questions for those specific jury

7  questions that were ask, Mr. Patterson?

8           MR. PATTERSON:  Yes, Your Honor.

9

                    FURTHER REDIRECT EXAMINATION

10

11  BY MR. PATTERSON:

12      Q.   You told us that you filled out the money order.

13  Who actually purchased the money order at ABCO?

14      A.   Joe went and purchased that along with the

15  elderberry and brought it back to the office.

16      Q.   And you say when you came out after the first

17  half, if you will, of the altercation, you said Joe was

18  lying on the ground?

19      A.   Right.

20      Q.   At some point in time, did you get closer to him

21  and did his posture change at some point?

22      A.   That's when I knelt down beside him because I was

23  highly upset.  I didn't know what was going on.  And that's

24  when he went to sit up and had the knife in his hand.

25           MR. PATTERSON:  I have nothing additional.

THE COURT:  Mr. Martinez.

RECROSS-EXAMINATION

BY MR. MARTINEZ:

Q.   In terms of the Rick Freeland question, you indicated that he initiated the sexual intercourse, correct?

A.   Yes, sir.

Q.   But, you consented to it, didn't you?

A.   I did.

Q.   The other thing with regard to Joe, you indicated that he was right-handed, correct?

A.   Yes.

Q.   You're also right-handed, correct?

A.   Yes, I am.

Q.   You indicated that with regard to the consistency of sodium azide, it's at a point where if you took it between your fingers that you could sort of break it down. That's what you told us, right?

A.   Yes.

Q.   Is that what you did when you put it in his food on the stove?

A.   I didn't --

MR. PATTERSON:  Your Honor, objection.  It's well beyond the scope of the jury question.

1    THE COURT:  Sustained.

2    Any further questions?

3    MR. MARTINEZ:  No.

4    THE COURT:  You may step down.

5    Mr. Patterson.

6    MR. PATTERSON:  Your Honor, I believe we have

7    another witness in the hallway, Judge.

8    We recall Alejo Ochoa on a very narrow issue.

9    THE COURT:  Sir, please step forward.  You were

10    not excused and so you are still under oath.  So please

11    retake the witness stand.  You're still under oath.

12    Remember what we discussed the last time you were

13    here to testify.  Go ahead and pull the microphone close to

14    you.  Please remember to speak up loud and clear to make

15    told to everyone can hear your.  Please wait until the

16    question is completed before you answer the question.  And

17    please make sure that you give a verbal response.

18    Is that agreeable, sir?

19    THE WITNESS:  Yes.

20    THE COURT:  Mr. Delozier, you may proceed.

21    MR. DELOZIER:  Thank you, Your Honor

22    (Next page, please.)

23

24

25

ALEJO OCHOA,

1

2  called as a witness herein, having been previously duly

3  sworn, was examined and testified as follows:

4

DIRECT EXAMINATION

5

6  BY MR. DELOZIER:

7      Q.   Please state your name?

8      A.   Alejo Ochoa.

9      Q.   And you testified here previously?

10     A.   Yes.

11     Q.   We had one area that we were talking about when

12  you were here last time and that was life insurance?

13     A.   Yes.

14     Q.   And my recollection is that you testified that

15  you did talk to Wendi and Joe about life insurance at

16  various times?

17     A.   Yes.

18     Q.   When was the last time you spoke to them about

19  it?

20     A.   You need to know the exact date?

21     Q.   Approximately was it 2000, for example?

22     A.   Yeah, it was 2000, September, late September

23  somewhere around there.

24     Q.   Sometime in September of 2000?

25     A.   Yes.

1     Q.    And you had a discussion with both of them

2  present?

3     A.    Yes.

4     Q.    And what was the discussion about?

5     A.    Joe wanted to, well -- they wanted to up a life

6  insurance policy.  From what I understand they already had

7  a life insurance policy that they wanted to up it, make it

8  more valuable for when Joe passed away.

9     Q.    Yes.  So he wanted to increase the

10  policy --

11     A.    Wanted to increase it.

12     Q.    -- or get a larger policy, which are you talking

13  about?

14     A.    Well, all I know is they wanted a larger policy.

15  I thought it was one that they already had but it could

16  have been one for, you know, they wanted a new one.  They

17  basically wanted to get somebody to stand in for Joe and

18  try to get a bigger insurance policy.

19     Q.    What did you tell them?

20     A.    I told them no.  First of all, it's fraud and

21  they'll get caught.

22          MR. DELOZIER:  I have nothing further, Your

23  Honor.  Thank you.

24          THE COURT:  Mr. Martinez.

25

CROSS-EXAMINATION

1

2   BY MR. MARTINEZ:

3       Q.    Going back on October 8th of the year 2000, you

4   had a conversation with your daughter, didn't you?

5       A.    October 8?

6       Q.    Right.

7       A.    Could you be more clear on what the conversation

8   was about?

9       Q.    Well, you did have a conversation with your

10  daughter on October 8, 2000.  You remember that, don't you?

11      A.    Not specifically.  What conversation?

12      Q.    Let me refresh your recollect if you don't

13  remember.  That was the date that you received a call at

14  about two o'clock in the morning.  Do you remember that

15  morning?

16      A.    Okay.  I remember that morning.

17      Q.    And do you remember that you talked to your

18  daughter on the telephone, right?

19      A.    Not at two o'clock, no.

20      Q.    Shortly thereafter, at two o'clock, right?

21      A.    Sometime after that.

22      Q.    And one of the things that she told you on the

23  telephone was she had stabbed Joe, didn't she?

24      A.    I don't remember her telling me that, no.

25      Q.    Do you remember that you had on October 8 at

1   about eleven o'clock in the morning a conversation with a

2   detective from the Phoenix Police Department?

3       A.   I know that we had a conversation, yes.

4       Q.   And --

5       A.   Interview.

6       Q.   Yes.  At that time, isn't it true that you told

7   the detective, "She told me she had stabbed -- I thought it

8   was -- I thought it was when we were here, when I was

9   already here.  Maybe it was when I was on the cell.  I

10  remember her telling me she had stabbed him."

11          Do you remember having that conversation with the

12  detective?

13      A.   It's possible but I don't remember it.

14      Q.   Let me go a head and mark the video.

15          MR. MARTINEZ:  This is the segment that is

16  required that we play it outside the presence of the jury.

17          THE COURT:  At this time, this should just take a

18  few minutes.  I'll ask the jury to step back into the jury

19  room for just a few minutes.

20          Remember the admonition that I've given.  Do not

21  discuss the case with anyone.  Do not let anyone discuss

22  the case with you.  Keep an open mind.  This should just

23  take a few minutes.

24          (Jurors exited the courtroom.)

25          THE COURT:  This is Cause Number CR2000-096032

53

1  State of Arizona versus Wendi Elizabeth Andriano.

2          The record will reflect the presence of the

3  defendant and counsel.  We are outside the presence of the

4  jury.

5          MR. PATTERSON:  Judge, may we discuss this issue

6  before we start the tape?

7          THE COURT:  Yes.

8          MR. PATTERSON:  Just to keep the record clean,

9  Mr. Martinez is not going to go into the narrow area for

10  which we recalled Mr. Ochoa.  I would ask that you allow us

11  to rest.  Just keep the record clean because, I mean,

12  seeing we're going into an area that we didn't re-raise on

13  the narrow issue -- I understand he is going to call him on

14  rebuttal.  But it now appears that -- I don't know.

15          THE COURT:  Are you just doing this rather than

16  calling Mr. Ochoa on rebuttal, Mr. Martinez?

17          MR. MARTINEZ:  The rules of evidence do not

18  restrict me to the scope of direct examination.  That being

19  the case, I can then go into this.

20          MR. PATTERSON:  Wait, wait, wait.  You -- the

21  Court allowed us to recall this guy.  You granted their

22  motion on hearsay earlier to preclude us from going into

23  this specific area.

24          I guess it doesn't really matter, all things

25  considered.  I just wanted to know whether or not the Court

1  thought that we should do that practice.

2          THE COURT:  I'm assuming you're not going to be

3  calling Mr. Ochoa, then, in rebuttal?

4          MR. MARTINEZ:  I will not.

5          MR. PATTERSON:  With that understanding, we

6  can --

7          THE COURT:  We need to make sure when

8  Mr. Delozier is handling the witness, he should be the one

9  making the appropriate objections.

10          MR. PATTERSON:  I understand.  But I was here for

11  the purposes of resting our defense case -- or not resting

12  our defense case.

13          THE COURT:  I'm going to allow Mr. Martinez to go

14  into this area based on what Mr. Martinez said about that

15  he's not going to be calling Mr. Ochoa now in rebuttal.

16          MR. MARTINEZ:  I'm going to play Exhibit 524.

17          THE COURT:  For the record, I'm not going to have

18  the court reporter take it down.  The tape will speak for

19  itself.

20          (Tape played.)

21          THE COURT:  Are we ready for the jury?

22          MR. MARTINEZ:  Yes.

23          THE COURT:  Let's go ahead and bring the jury in

24  at this time.

25          (Jurors entered the courtroom.)

1    THE COURT:  Please be seated.  This is Cause

2 Number CR2000-096032, State of Arizona versus Wendi

3 Elizabeth Andriano.

4          The record will reflect the presence of the

5 defendant, counsel and the jury.

6          Alejo Ochoa is on the witness stand and we'll

7 continue with the cross-examination.

8          JUROR:  May I remain standing?  I hurt my back.

9          THE COURT:  That's fine.

10         Mr. Martinez.

11    Q.   BY MR. MARTINEZ:  You had occasion to review

12 Exhibit Number 524, didn't you?

13    A.   Yes.

14    Q.   In it you were heard -- that was you on the

15 videotape, wasn't it?

16    A.   Yes.

17    Q.   That was you at the police station, right?

18    A.   Yes.

19    Q.   And in it isn't it true that you were heard

20 saying, "maybe it was on the cell.  I remember her telling

21 me that she stabbed him."

22    A.   I don't remember that.  I believe that's what I

23 said on the tape.

24         MR. MARTINEZ:  Judge, I move for the admission of

25 Exhibit 524 since he has denied it.

56

1       THE WITNESS:  I'm not denying it.  I'm just

2  saying it's on the tape but I don't remember.

3       MR. MARTINEZ:  It's clear he's denying what's on

4  the tape.  I move for the admission of Exhibit 524.

5       THE COURT:  Mr. Delozier?

6       MR. DELOZIER:  No objection.

7       THE COURT:  Exhibit 524 marked for identification

8  is admitted into evidence.

9       MR. MARTINEZ:  May I play it, Your Honor?

10      THE COURT:  Yes.

11       (Videotape is played in open court.)

12       Q.  BY MR. MARTINEZ:  With regard to the particular

13  phone call that you received, when you spoke to your

14  daughter -- you did speak to your daughter from your house

15  that night, didn't you?

16       A.  I did speak to her yes.  Yes.

17       Q.  And when you spoke to your daughter, it wasn't a

18  situation where your wife handed the telephone to you,

19  right?

20       A.  I believe I -- I called over there at the

21  apartment.

22       Q.  In other words, it wasn't the situation --

23       A.  I don't remember.

24       Q.  -- it wasn't the situation that she called your

25  house, spoke to your wife and then your wife gave the phone

1  over to you.  That's not the way it happened, right?

2      A.  I really don't remember.  I think I called her.

3      Q.  And then  --

4      A.  I don't remember.

5      Q.  Even though you had the information that she

6  stabbed him, why didn't you call the police?

7      A.  Why didn't I call the police?

8      Q.  Right.

9      A.  I told her that I was on the way.  I was going to

10  go over there.  And I told her to call the police, call

11  nine-one-one.  I felt that she was still in danger of Joe,

12  that he was coming after her again.

13      Q.  Sir  --

14      A.  I was on the way over there.  And I

15  called  --

16          THE COURT:  Answer the question that was asked.

17          THE WITNESS:  Am I.

18          THE COURT:  Mr. Martinez.

19      Q.  BY MR. MARTINEZ:  Sir, you indicated previously

20  when you testified that you could not understand most of

21  what she was telling you, right?

22      A.  Right.

23      Q.  And  --

24      A.  On the phone call from the house.

25      Q.  All right.  Are you now telling us that you then

1   had a conversation with her on the cell phone and you could

2   understand her?

3       A.   I kept calling on the cell phone and telling her

4   to call the police.

5       Q.   Is that, yes, you could then understand her when

6   you spoke to her on the cell phone?

7       A.   No.

8       Q.   You still couldn't understand her?

9       A.   No, she is still --

10      Q.   I'm going to show you a photograph, Exhibit 444.

11  You told us before that you took this picture?

12      A.   Yes, I took that.  Yes.  I took that picture.

13      Q.   And you told us initially that you took this

14  picture the early part of September, 2000, right?

15      A.   I --

16      Q.   Is that yes or no, sir?

17      A.   Yes, initially I did.

18      Q.   And then additionally one of the other pictures

19  that you took was Exhibit Number 440.  Do you remember

20  telling us that you took that picture?

21      A.   Yes.  That's the one with the box, correct?

22      Q.   Right.  And remember that we discussed this issue

23  of the box previously?

24      A.   Yes.

25      Q.   And that this box was the same box that I showed

1   you in the other photograph, do you remember that?

2        A.   Yes.

3        Q.   That's Exhibit 132.   Right?   We talked about

4   that, right?

5        A.   Yes.

6        Q.   How tall is this dresser?

7        A.   I don't know.

8        Q.   Well, you were there.   You took a picture of it,

9   weren't you?

10       A.   I don't know how tall it was.   I mean, it's

11   about -- I never measured it.

12       Q.   What I would like for you to do, sir, is stand

13   down from where you are and then show us with your hand how

14   tall that dresser is.

15       A.   About to here (witness demonstrating).

16       Q.   And that would --

17       A.   I'm guessing.

18       Q.   That would be to about your mouth, right?

19       A.   Around through there.

20       Q.   Could be lower than your mouth, could be a little

21   higher than your mouth, what you're doing with your hand,

22   right?

23       A.   I guess.   I don't know.   I don't know how tall.

24   I never stopped to look to see how tall it was.

25       Q.   But you did take these pictures of the dresser,

1   right?

2        A.   Yes.

3        Q.   And the defendant was present when you took those

4   photographs, right?

5        A.   I believe he was.

6        Q.   Now, your daughter was present when you took

7   those photographs, right?

8        A.   Oh, yes, I believe she was.

9        Q.   Now, sir, one of the things that we now know is

10  that this box was taken into that apartment, at the

11  earliest, October 6th of the year 2000?

12       A.   Okay.

13       Q.   You were on vacation on that time, weren't you.

14            MR. DELOZIER:  Objection.  Assuming facts not in

15  evidence.

16            THE COURT:  Overruled.

17            Answer the question if you can.

18            THE WITNESS:  What's the date?

19            MR. PATTERSON:  We need to approach.

20            THE COURT:  Let me see counsel at the bench.

21            (Bench conference was held outside the hearing of

22  the jury.)

23            THE COURT:  You know what, I'm going to sustain

24  the objection.

25            (Bench conference concluded.)

THE COURT:  The objection is sustained.

Mr. Martinez.

Q.   BY MR. MARTINEZ:  As you stand here today, is it still your testimony that you took this photograph, Exhibit 440, the early part of September?

A.   I thought I had, yes.

Q.   You didn't take at it the night or the morning of October 8, 2000, did you?

A.   No.

MR. MARTINEZ:  I don't have anything else.

THE COURT:  Mr. Delozier, you may proceed.

MR. DELOZIER:  Thank you, Your Honor.


REDIRECT EXAMINATION

BY MR. DELOZIER:

Q.   Your testimony with Mr. Martinez was to the effect that you did not talk to Wendi at around two o'clock, right?

A.   No, I didn't talk to her about two o'clock.

Q.   Do you remember approximately when the first time you did talk to her was?

A.   I really don't know the time.

Q.   Okay.  Did I understand you correctly that you made one telephone call from your home?

A.   No.  I know I called from the house but I don't

1  know if that's when we actually connected or if she called

2  me and I answered.  I don't remember what the situation

3  was.  If I got through to her or if she called while I was

4  woken up.

5      Q.   Do you recall whether you were still at home or

6  if you were already in the car the first time you spoke to

7  her?

8      A.   I was at home.

9      Q.   So there was a call, whether you made it or she

10  made it to you?

11      A.   When I was at home?

12      Q.   When you're at home.

13      A.   Yes.

14      Q.   You said you had trouble understanding her?

15      A.   Yes.

16      Q.   What was your condition at that time?

17      A.   Still half asleep.  I didn't get to bed until

18  about midnight.  I was tired.  We'd just come back from

19  California that Saturday before in the afternoon.  Didn't

20  sleep much the night before.  I was just real tired and

21  worn out.

22      Q.   So your instructions to her were what?

23      A.   Call the police.  From what I understood, what I

24  was trying to gather from her that Joe was coming after her

25  again.

1    MR. MARTINEZ:  Objection.  Nonresponsive.

2    THE COURT:  Sustained.

3   Q. BY MR. DELOZIER:  Why would you suggest she call

4 the police?

5   A. I feared that there was problems with Joe.

6   Q. What kind of problems?

7   A. Coming after her.

8   Q. Okay.  Was that based on her being incoherent or

9 what?

10   A. This happened before.  The situations where he's

11 come after her, she'd locked herself in the bathrooms in

12 different apartments where they lived at.  And I thought

13 she was in danger.

14    MR. MARTINEZ:  Objection.  Nonresponsive.

15    THE COURT:  Sustained.

16    Ask your next question.

17   Q. BY MR. DELOZIER:  Now, you got in the car or

18 truck, right?

19   A. Right.

20   Q. And that's a Chevy truck?

21   A. Right.

22   Q. Okay.  And you proceeded where?

23    MR. MARTINEZ:  Objection.  Beyond the scope.

24    THE COURT:  Sustained.

25   Q. BY MR. DELOZIER:  Did you have any further

1  discussions with your daughter?

2      A.   After I left the house, I kept trying to get a

3  hold of her with my cell phone to tell her to call -- make

4  sure she did call the police.  If she didn't, I was going

5  to call the police.  Couldn't get an answer.  I finally

6  got -- I don't remember if I talked to her on the cell or

7  not.  I kept getting her message machine once or twice or

8  three times, maybe.  I don't remember.  She finally

9  answered the phone.  She said she did call the police.

10     Q.   You didn't have any further conversations with

11 her at that time?

12     A.   No.

13     Q.   Was she still hysterical?

14     A.   She was more calmed down.

15     Q.   Okay.  Approximately how long was that between

16 that call and the first call?

17     A.   When I actually talked to her?

18     Q.   Yes.

19     A.   I'm guessing anywhere from 15 to 30 minutes.  I

20 don't know.  I really couldn't tell you.  I really don't

21 know.

22     Q.   Okay.

23          MR. DELOZIER:  Just one second, Your Honor.

24     Q.   BY MR. DELOZIER:  When you arrived at San Riva,

25 did you go to the apartment?

1    A.   No.

2    Q.   Who was there?

3    A.   The paramedics were there.  The police were

4 there.  I couldn't go to the apartment.  She was sitting on

5 the sidewalk and I asked the police officer if I could sit

6 down next to her.  She said I could so I went and sat down

7 next to her while the police officers were there.  But I

8 didn't go into the apartment.

9         MR. DELOZIER:  Nothing further, Your Honor.

10 Thank you.

11        THE COURT:  Are there any further questions of

12 this witness by the jury?  If so, please raise your hand.

13        No one has raised their hand.

14        May this witness be excused?

15        MR. MARTINEZ:  Yes, sir.

16        MR. DELOZIER:  Yes, Your Honor.

17        THE COURT:  Thank you very much.  You're

18 excused.

19        MR. PATTERSON:  May we approach?

20        (Bench conference was held outside the hearing of

21 the jury.)

22        MR. PATTERSON:  I still have a witness

23 subpoenaed.  He's supposed to be in three other courts

24 today.  I'll try to get him here tomorrow at one o'clock.

25        THE COURT:  Do you want me to tell them there is

1    some witness scheduling problem?

2              MR. PATTERSON:  Yeah.  We have a witness problem

3    because he couldn't make it to this Court.  He's testifying

4    -- he's subpoenaed today in three other courts.

5              (Bench conference concluded.)

6              THE COURT:  Ladies and gentlemen, we're going to

7    go a head and take our evening recess at this time and I'll

8    tell you why.  There's been a witness that's been

9    subpoenaed.  The witness is actually testifying in another

10   court at the present time because that witness is

11   subpoenaed in another case.  And so, that witness can't be

12   two places at one time.  So, we're going to take our

13   evening recess at this time.

14              During the evening recess remember the entire

15   admonition I have given you including the fact that you're

16   not to discuss the case with anyone.  Do not let anyone

17   discuss the case with you.  Do not do any research,

18   investigation, experimentation or testing on your own.

19   Avoid any media coverage of the case.  Keep an open mind

20   and we'll see you tomorrow at 1 p.m.  Have a nice evening.

21              I'm going to stay here with counsel.

22              (Juror exited.)

23              THE COURT:  This is Cause Number CR2000-096032,

24   State of Arizona versus Wendi Elizabeth Andriano.

25              The record will reflect the presence of defendant

1   and counsel.  We are outside the presence of the jury.

2              Yes, Counsel?

3            MR. PATTERSON:  I don't have anything additional

4   at this time for the record.

5            THE COURT:  Mr. Martinez?

6            MR. MARTINEZ:  Nothing, thank you.

7            THE COURT:  I just received this afternoon the

8   defendant's motion to preclude testimony of Dr. Michael

9   Bayless.  I have not had the opportunity to fully review

10  this motion.  I'm going to give Mr. Martinez the

11  opportunity to file a response to that.  And what I'll

12  anticipate doing is at the end of testimony tomorrow I'll

13  hear oral argument on this motion.

14             Is that agreeable to both sides?

15           MR. PATTERSON:  Yes, Your Honor.

16           MR. MARTINEZ:  Yes, sir.

17           THE COURT:  Anything further from either counsel

18  at this time?

19           MR. MARTINEZ:  No, Your Honor.

20           MR. PATTERSON:  No, Your Honor.  Thank you.

21           THE COURT:  We'll be in recess.  Have nice

22  evening.

23             (Proceedings Adjourned.)

24

25

EXHIBIT EE

COPY

1        IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

2              IN AND FOR THE COUNTY OF MARICOPA

3

4    STATE OF ARIZONA,                )
                                      )
5              Plaintiff,             )
                                      )
6    v.                               )   No. CR 05-0005 AP
                                      )   MARICOPA COUNTY
7    WENDI ELIZABETH ANDRIANO,        )   No. CR 2000-096032
                                      )
8              Defendant.             )
     _____     )

9

10

11

12                         Mesa, Arizona
                        September 8, 2004

13

14

15          BEFORE:  The Honorable BRIAN K. ISHIKAWA

16

17

18          REPORTER'S TRANSCRIPT OF PROCEEDINGS

19                TRIAL DAY 8 -- TESTIMONY

20

21

22

23

24   ORIGINAL Prepared for APPEAL by:
     TRACI L. WHEELER, CSR, RPR
25   Certified Court Reporter No. 50313
     Official Court Reporter


       TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

A P P E A R A N C E S

1

2   FOR THE STATE:         JUAN M. MARTINEZ,
                          Deputy County Attorney

3
    FOR THE DEFENDANT:    DANIEL B. PATTERSON,
                          Deputy Public Defender
4                                 and
                          G. DAVID DELOZIER,
5                         Attorney at Law

6

7       I N D E X   O F   E X A M I N A T I O N

                                                      PAGE

8   WITNESS

9   HASHISAKI, CHRIS, Called to testify by the State
          Direct Examination by Mr. Martinez
10          Voir Dire Examination by Mr. Patterson

11

12    E X H I B I T S   A D M I T T E D   I N   E V I D E N C E

                                                      PAGE

13    NO.   DESCRIPTION

                                                       31
14    141   Photograph                                 31
      142   Photograph                                 31
15    143   Photograph                                 31
      144   Photograph                                 31
16    145   Photograph                                 31
      146   Photograph                                 31
17    147   Photograph                                 31
      148   Photograph                                 31
18    149   Photograph                                 31
      150   Photograph                                 31
19    151   Photograph                                 31
      152   Photograph                                 73
20    230   San Riva Documents                         60
      297   Large Diagram                              43
21    313   Photograph

22

23

24

25

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000005786

1          MESA, ARIZONA, WEDNESDAY, SEPTEMBER 8, 2004

2

3          THE COURT:  Please be seated.  This is cause number

4     CR 2000-096032, State of Arizona versus Wendi Elizabeth

5     Andriano.  The record will reflect the presence of the

6     defendant and counsel.  We're outside the presence of the

7     jury.

8               Yes?

9          MR. DELOZIER:  Yes, Your Honor.  I wanted to make a

10    motion for mistrial based on your making evidentiary rulings

11    during opening remarks.  We were attempting to make a good

12    faith attempt to what we believe would come in as evidence.

13    Of course, our position is later if it's determined not to be

14    admissible, all you would have to do is remind the jury that

15    the opening statements were not evidence and we believe the

16    rulings that were made during opening excluding things we

17    wanted to mention this morning would fit into that category.

18         THE COURT:  Mr. Martinez?

19         MR. MARTINEZ:  Every first year law student learns

20    you cannot unring a bell once it's been rung although we have

21    a lot of guarantees sometimes, trying to admonish the jury

22    they should not consider it is difficult to do.  Rather than

23    wade in troubled waters, the safer and more temperate course

24    was the one the Court took and specifically that is to make a

25    ruling not to allow that sort of evidence in.


          TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1          Additionally, it appears that the defendant is

2    asking for a mistrial based on the Court's conduct, however

3    he has not cited any legal basis other than that he doesn't

4    like the Court's ruling.

5          So for those reasons I don't think his request

6    is we will taken and his request should be denied.

7          MR. DELOZIER:  Well, Your Honor, we certainly could

8    brief it if you wish.

9          THE COURT:  Sorry?

10         MR. DELOZIER:  We could certainly brief it for you if

11   you wish, but making evidentiary rulings during opening

12   remarks we believe are improper.

13         THE COURT:  The Defendant's oral motion for mistrial

14   is denied.

15         We ready for the jury?

16         MR. MARTINEZ:  Yes, sir.

17

18         (Whereupon, the jury enters the courtroom.)

19

20         MR. DELOZIER:  Your Honor, could we approach?

21

22         (The following proceedings were held at the

23   bench:)

24

25         MR. DELOZIER:  I don't want to be super sensitive,


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1   but we've been criticized for Mr. Alejo Ochoa holding open

2   the door open for the jurors, and his staffing person sitting

3   with him is now sitting the door open for the jurors.   I

4   believe it could be appropriate for court staff to do that,

5   not one of the people from our staff and his staff.

6           THE COURT:  What are you saying?

7           MR. DELOZIER:  The gentleman sitting at his desk --

8           MR. PATTERSON:  Detective Olson.

9           MR. DELOZIER:  Detective Olson is opening the door

10   for the jurors.  He raised that as criticism at Alejo Ochoa

11   doing that very same thing earlier.

12           THE COURT:  When was he doing that?

13           MR. DELOZIER:  He's doing it right now.  He's done it

14   before.

15           THE COURT:  Oh, you mean the juror box?

16           MR. DELOZIER:  Yes.

17           THE COURT:  Instruct him to not do that.  That should

18   just be common sense.

19           MR. DELOZIER:  Thank you, Your Honor.

20

21           (The following proceedings were held in open

22   court:)

23

24           THE COURT:  Please be seated.  This is cause number

25   CR 2000-096032, State of Arizona versus Wendi Elizabeth


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    Andriano.  The record will reflect the presence of the

2    Defendant, Counsel and the jury.  The State may call its

3    first witness.

4         MR. MARTINEZ:  State calls Chris Hashisaki.

5         THE COURT:  Please step forward right up here to be

6    sworn by the clerk.

7

8                        CHRIS HASHISAKI,

9         CALLED TO TESTIFY ON BEHALF OF THE STATE,

10   HAVING FIRST BEEN DULY SWORN, TESTIFIES AS FOLLOWS:

11

12        THE COURT:  Please have a seat on the witness stand.

13   Please make yourself comfortable there on the witness stand.

14   Please pull the microphone close to you.  Please remember to

15   speak loudly and clearly into the microphone so that everyone

16   can hear you.  Also please wait until the question is

17   completed before you answer the question, and please make

18   sure you give a verbal response.  A lot of times people shake

19   their head, say "uh-huh," "huh-uh."  You need to give a

20   verbal response.  Is that agreeable to you?

21        THE WITNESS:  Yes.

22        THE COURT:  Mr. Martinez, you may proceed.

23

24   DIRECT EXAMINATION BY MR. MARTINEZ:

25        Q.    May I have your name, please?


           TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR


                         000005790

1       A.      Chris Hashisaki.

2       Q.      And drawing your attention back to January of

3    the year 2000, where were you employed?

4       A.      San Riva Apartments.

5       Q.      And what were your duties with the San Riva

6    Apartments?

7       A.      I was the bookkeeper and activities director.

8       Q.      And as the bookkeeper, what is it that -- I

9    know what term "bookkeeper" means, but what were you required

10   to do there at San Riva?

11      A.      As a book keeper I was required to temporarily

12   lease apartments, show them to potential residents.  Also

13   bookkeeping functions were to enter data into the computer

14   system as far as new leases, move-outs, move-ins, move-outs.

15   I also completed reports that were transferred to the

16   corporate office on a weekly and monthly basis, and prepared

17   accounts payable for approval by the manager to send off to

18   the corporate office.

19      Q.      You also indicated that you were an activities

20   director?

21      A.      Correct.

22      Q.      What did that require you to do?

23      A.      We planned -- or I planned different functions

24   for the community, the apartment community, and residents.

25      Q.      And who was your boss?


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    A.    Wendi Andriano.

2    Q.    And is that individual in court today?

3    A.    Yes, she is.

4    Q.    Tell me where she is seated and what she's

5    wearing?

6    A.    The table over there, purple sweater.

7    MR. MARTINEZ:  Your Honor, may the record reflect the

8    identification of the defendant?

9    THE COURT:  The record may reflect the identification

10   of the defendant by the witness.

11   BY MR. MARTINEZ:

12   Q.    And did you interact with the defendant on a

13   day-to-day basis back then?

14   A.    Yes.

15   Q.    Would you say you were very good friends, just

16   friends?  Describe the relationship that you had, the two of

17   you had back then.

18   A.    We were friends.  We were all professional

19   working friends.

20   Q.    And as part of that relationship, did the group

21   of you also go out?

22   A.    Yes.

23   Q.    And how often, if you can remember?  Let's say

24   around August or July of 2000.  How often would you and she

25   go out?


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    A.    Over a period of time?

2    Q.    Or on a weekly basis.  Did you go out once a

3  week or twice a week?

4    A.    Once a week.

5    Q.    And when you and she went out, did the both of

6  you go alone or was it a situation where you went with others?

7    A.    We went with others.

8    Q.    And normally where was it that you would go?

9    A.    Tijuana Country Club or Rockin' Rodeo.

10    Q.    When you went to these places, were you able to

11  see the defendant's actions while she was out there that

12  June -- sorry, that July or August of the year 2000 when she

13  was out there interacting on that social basis?

14    A.    Yes.

15    Q.    And how was she with the other men that were

16  there?

17    A.    Flirtatious.

18    Q.    Would she ever have any physical contact with

19  them, for example kissing them?

20    A.    Yes, she would.

21    Q.    Would she have other physical contact, for

22  example touching them, that sort of thing?

23    A.    Yes.

24    Q.    Would they touch her back?

25    A.    Yes.


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    Q.    And during this time that you were working with
2    her, you indicated that not only were you professionals but
3    you also socialized on an ongoing basis.  Did you have
4    occasion to talk to her about, you know, almost anything that
5    came up?
6         A.    Yes.
7         Q.    And during that time that you would talk to
8    her, did there ever come a time where she would complain
9    bitterly about her husband and/or may have made comments like
10   that and that you ever advised her that she should just go
11   ahead and leave him?
12        A.    She complained about it being too much, about
13   things getting to be too much.
14        Q.    But did she ever -- did you then say to her,
15   "Well, then leave him."  Did you ever counsel her that that
16   was the appropriate course?
17        A.    A few of us told her to move him out or get a
18   divorce.
19        Q.    Now, with regard to October 8th of the year
20   2000, in the morning, sometime around 2:30 in the morning,
21   did you receive a telephone call?
22        A.    Yes, I did.
23        Q.    And did you receive a telephone call from the
24   defendant?
25        A.    Yes, I did.


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1       Q.      And as a result of that telephone call, did you

2   then go over to the defendant's apartment?

3       A.      Yes.

4       Q.      And when you arrived there, what is it that you

5   saw?

6       A.      When I arrived, Wendi was outside of the

7   apartment building on the sidewalk.

8       Q.      And were you able to see what she was wearing?

9       A.      Yes.

10      Q.      And what was she wearing?

11      A.      White t-shirt and dark shorts.

12      Q.      And did -- did they have any stains, whether

13  it's red, brown any other color, did that shirt have any

14  stains on it?

15      A.      No.

16      Q.      It appeared -- did it appear to be clean?

17      A.      Yes.

18      Q.      When you walked up to her was she crying?

19      A.      No.

20      Q.      Was she despondent or hysterical in any way?

21      A.      Not hysterical, no.

22      Q.      How would you describe her demeanor?

23      A.      Confused.

24      Q.      And did she have a telephone in her hand?

25      A.      She did.


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1      Q.      And did you and she have a conversation?

2      A.      Yes.

3      Q.      What was that conversation?

4      A.      I walked up to her and I said, "How are you

5   doing," and she said, "I have a problem.  Don't ask any

6   questions.  My husband's in on the floor dying and I haven't

7   called 911 yet."

8      Q.      And did she indicate whether or not he knew if

9   she had called 911?

10      A.      Yes.  As we walked inside, she indicated that.

11      Q.      That -- that he knew that she hadn't called 911

12   or that she hadn't told him that -- that she had told him

13   that she called 911 but hadn't done that?

14      A.      She told me Joe did not know she hadn't called.

15      Q.      Was it your indication she had already told him

16   she called 911 but she hadn't done it?

17      A.      She told me she had not called and she told me

18   that she thought she had but she had not.

19      Q.      In other words, she told you, "He thinks I've

20   called 911, but I haven't done it"?

21      A.      Correct.

22      Q.      And he's in there dying, correct?

23      A.      Correct.

24      Q.      Did she tell you why he was dying or anything?

25      A.      No.

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000005796

1        Q.    Did she say, "It's the cancer" or anything like

2  that?

3        A.    No.

4        Q.    Did you then advise her, admonish her to do

5  anything with to the 911 call?

6        A.    I said she needed to call 911.

7        Q.    And did there come a point when the two of you

8  then began to walk towards her apartment?

9        A.    Yes.  She couldn't get reception outside. She

10  said she couldn't get reception outside, so we -- I told her,

11  "Let's go inside.  You need to call."

12        Q.    And then what happened?

13        A.    We walked in toward the apartment and she

14  attempted to dial and could not get reception there either,

15  so she --

16        Q.    When she attempted to dial, was that in the

17  breezeway leading up to the apartment or inside the

18  apartment?

19        A.    In the breezeway in the corridor at the first

20  apartment.

21        Q.    And when you and she were standing out there,

22  were you able to see whether or not her hair was wet?

23        A.    No, her hair was not wet.

24        Q.    In other words, did it look like she'd just

25  been in a tub or anything like that?  In other words, wet of

1   any -- any fashion to you?

2       A.   No.

3       Q.   So you're now walking down the breezeway and

4   towards her apartment.  What number is it, do you remember?

5       A.   132.

6       Q.   And as you get there, what happened?

7       A.   The doorway was open and she walked back to the

8   back bedroom to utilize the telephone and call.  And I walked

9   over to Joe on the floor.

10      Q.   Well, when you walked in, where was Joe?

11      A.   He was lying on the living room floor.

12      Q.   And describe his position for me.

13      A.   He was lying on his left side in a fetal

14  position by the couch.

15      Q.   Was he facing the front door or facing away

16  from the front door?

17      A.   Facing the front door.

18      Q.   When you saw him, what did you do?

19      A.   I walked over to him and knelt down beside him.

20      Q.   Did you say anything?

21      A.   I asked him if he recognized me and he said

22  "Yes."  And I said "Do you recognize me with my glasses on?"

23  And he said "Yes."

24      Q.   Did he appear to be angry in any way at that

25  point?

1   A. No.

2   Q. What was his demeanor like when he was down

3 like that?

4   A. It was weak, worn out and he vomited on the

5 floor.

6   Q. Then what happened?  Did you and he continue

7 speaking?

8   A. Yes.  I asked him how he was doing and he said

9 "I need help."  And I said "I know.  She's on the phone right

10 now. " And I said that "They're on their way."  And I said --

11 he said "I've needed help for a long time."

12   Q. At any time while he was telling you he needs

13 help, did he indicate to you "Don't call the ambulance, don't

14 do anything, go away"?  Did he ever --

15   MR. PATTERSON:  Your Honor, form of the question

16 suggests the answer to the question.

17   THE COURT:  Sustained.  Restate the question.

18 BY MR. MARTINEZ:

19   Q. At any time point did he indicate to you

20 whether or not he wanted people to leave him alone?

21   A. No.  He wondered where they were at and why it

22 was taking 45 f-ing minutes.

23   Q. 45 what minutes?

24   A. 45 fucking minutes.

25   Q. So he was upset and it appears -- and if I'm,

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    incorrect tell me -- it appears he was upset because it had

2    been a while?

3            MR. PATTERSON:  Objection.  Leading question

4    suggesting the question (sic).

5            THE COURT:  Sustained.  Restate the question.

6    BY MR. MARTINEZ:

7        Q.   He appeared to be upset is what you told us,

8    right?

9        A.   He was wondering, yes, and he stated why it was

10   taking them so long to get there.

11       Q.   And who is "them" we're talking about?

12       A.   The paramedics.

13       Q.   So the term about 45 minutes was suggested or

14   indicated, correct?

15       A.   Correct.

16       Q.   Where was the defendant while you're having

17   this conversation with Mr. Andriano?

18       A.   Back in the master bedroom on the phone.

19       Q.   While you're sitting there talking to him, was

20   he able to sit up?  Did he get up and sit up or did he do

21   anything like that?

22       A.   No.

23       Q.   Did he just remain laying there?

24       A.   He -- he remained on the floor.

25       Q.   Do you remember what he was wearing?

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1          A.     Pair of dark shorts, no shirt.

2          Q.     And did you get a chance to take a look at, for

3     example, his face up close?

4          A.     Yes.

5          Q.     Did you see any bruising?  For example, like

6     right here in the mouth or the nose or the eye, anything?

7          A.     No.

8          Q.     How about any bruising in the back of the head?

9          A.     No.

10         Q.     Blood anywhere?

11         A.     No.

12         Q.     But I think you did tell us that you did see

13    vomit, correct?

14         A.     There was a cloth, like a dishcloth in the --

15    sort of where he was laying, and he had thrown up and it was

16    covering that, yes.

17         Q.     And how far away was his mouth from the vomit?

18    In other words, place the vomit in the location to his body.

19         A.     I would say chest and stomach area in front of

20    him, lying down.

21         Q.     And that would have been closer to the door

22    than he was, right?

23         A.     Correct.

24         Q.     And, again, you indicated he was in a fetal

25    position, but if you could describe it a little bit more,


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR


000005802

1   what do you mean that he was in a fetal position?

2          A.    He was lying on his left side with his knees

3   bent.

4          Q.    Okay.  So now you've had this conversation.

5   And how long are you talking to him before anything else

6   happens?

7          A.    Maybe three minutes.

8          Q.    And then what happens?

9          A.    I told him I was going to go back and check on

10  Wendi and ask him if he would be okay.

11         Q.    What did he say?

12         A.    He said "Yeah."

13         Q.    And then?

14         A.    Went back to the back bedroom and found Wendi

15  on the phone.

16         Q.    And at any time after she was on the phone did

17  the two of you then walk back out?

18         A.    Yes.  She -- she was apparently asked what his

19  condition was and --

20         Q.    Well, don't tell us what she was asked.  What

21  did she tell you while you were back there?

22         A.    Nothing.  She was on the phone.

23         Q.    So she -- right.  And then you came out?

24         A.    Then we came out to the living room, she knelt

25  down beside him while she was still on the phone.


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1       Q.      While she knelt down beside him, where did she

2   kneel?  Next to him?

3       A.      In front of him.

4       Q.      So in other words she would be closer to the

5   door then?

6       A.      Correct.

7       Q.      Where were you when she was kneeling close to

8   him?

9       A.      Right next to her.

10      Q.      And were you behind her or to her left or

11  right?

12      A.      I was to her left.

13      Q.      And at this point was the defendant crying at

14  all?

15      A.      No.

16      Q.      Was she hysterical, screaming, upset, that kind

17  of thing?

18      A.      No.

19      Q.      How would you describe her demeanor?

20      A.      Calm as she was talking to 911.

21      Q.      And what did you hear her say?

22      A.      She -- while we were in the back bedroom, she

23  was explaining his condition.

24      Q.      But --

25      A.      And that's --

1  Q. -- when --

2  A. -- when we walked to the front.  She had asked

3 what his color was like and --

4  Q. She asked you that?

5  A. Yes.

6  Q. And what did you say?

7  A. I said "His color is fine.  He's having trouble

8 breathing.  They need to get here."

9  Q. Then was there, at any point, any suggestion or

10 any talk about the color of his lips?

11  A. Yes.

12  Q. When was that?

13  A. At the same time.

14  Q. And --

15  A. "What's his color like?  Are his lips blue?"

16  Q. And when she asked you this, about the lips

17 being blue, what did you say?

18  A. I said "No, his lips are not blue.  He's having

19 trouble breathing.  They need to get here."

20  Q. When you say he had trouble breathing, how was

21 it you learned or found out that he had trouble breathing?

22  A. It was visible to me he was having trouble

23 intaking air.

24  Q. So was there sort of -- sort of a shortness of

25 breath, that kind of thing?

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    A.    Heavy breathing, yes.

2    Q.    And -- but at this point you haven't seen him

3 vomit.  You had seen vomit in front, correct?

4    A.    That's correct.

5    Q.    Where we left off I think she was kneeling in

6 front of him and you were kneeling on her left.  Then what

7 happened?

8    A.    She hung up the phone and she went around

9 behind him and said she needed to get him in the car.

10    Q.    When you say she went behind him, would that be

11 towards his head or would that be toward the bedroom area

12 or --

13    A.    Towards his head, shoulders.

14    Q.    And when she said something about needing to

15 get him to the car, what was her demeanor like then?  Was it

16 still -- how was it?

17    A.    She was anxious.  She needed to get him to the

18 car.

19    Q.    Then what happened?

20    A.    She said she needed to get him to the car

21 because they were on another call and it would be faster to

22 get him to the hospital, and he said, "I can't get up.  I

23 can't make it to the car."  And she attempted to -- she said,

24 "I'm going to help you up," and attempted to help him up.

25    Q.    How did she attempt to help him up?

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000005806

1    A.  She reached underneath his arms, was attempting

2  to help him up.

3    Q.  Was he able to get up with her help?

4    A.  No.  He said "I can't make it to the car.  I

5  can't get up."

6    Q.  What was your impression about his strength at

7  that point?  Was it somebody really strong, was he faking,

8  was -- what was your impression about the strength?

9    A.  No.  He was weak.  He couldn't make it to the

10  car.

11    Q.  And could he even get up?

12    A.  No.

13    Q.  Could he even sit up?

14    A.  He was having a lot of trouble sitting up or

15  getting up, yes.

16    Q.  So then you indicated that she went behind him

17  and tried to lift him up or something.  Then what happened?

18    A.  Then she got irritated.  She said, "Get your

19  ass up," and he said, "I can't make it to the car."

20    Q.  When she said "Get your ass up," did she use

21  any expletive or is that the whole statement?

22    A.  After he said that she said, "Get your fucking

23  ass up."

24    Q.  At first she said "Get your ass up"?

25    A.  Uh-huh.


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1          THE COURT:  Is that a "yes?"  You need to give a

2    verbal response.

3          THE WITNESS:  Yes.

4    BY MR. MARTINEZ:

5          Q.    When she said "Get your ass up," was she trying

6    to lift him at that point?

7          A.    Yes, she was.

8          Q.    Was she able to lift him when she said "Get

9    your ass up"?

10         A.    No.

11         Q.    Was it -- he was still on the ground then?

12         A.    Correct.

13         Q.    And then she made another statement, correct,

14    that you just told us about?

15         A.    Right.

16         Q.    What was his position when she made that second

17    statement, which I believe was what?  What was that second

18    statement?

19         A.    "Get your fucking ass up."

20         Q.    Was she still with her hands behind him trying

21    to get him up?

22         A.    Trying to lift him, yes.

23         Q.    Was he able to get up?

24         A.    No.

25         Q.    Was it said -- when she made that statement,

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    was it said in a caring sort of jovial sort of kidding sort

2    of way?

3          A.    No.

4          Q.    Was it in anger?

5          A.    Anxious anger, yes.  She was wanting him in the

6    car.

7          Q.    And what was his reaction to that?

8          A.    He couldn't get up.  He said, "I can't make it

9    to the car."

10         Q.    Then what happened?

11         A.    Then I told her to wait a minute.  I said, "Get

12   back on the phone and see where they're at."

13         Q.    Okay.

14         A.    So she came back around to the front of him and

15   called again.

16         Q.    And after she called, what did she tell you?

17         A.    She said they were about a mile away or so, and

18   I said, "That's three minutes.  We're waiting."

19         Q.    Then what happened?

20         A.    Then -- decided to wait and I heard the fire

21   truck or ambulance or whatnot outside, and I said "I'm going

22   to go flag down the fire department" because in an apartment

23   community they have trouble finding apartments, so I'm going

24   out to flag them down, "Would that be okay," and she said

25   "Yeah."


          TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1      Q.      Were you going out to just sit around and smoke

2   a cigarette out there?

3      A.      No.

4      Q.      But you are a smoker?

5      A.      I am a smoker and I did begin to leave the

6   apartment and turned around and I said, "I'm going to grab a

7   cigarette, go flag them down."

8      Q.      Was your main purpose for leaving to grab a

9   cigarette and smoke it or was it to go flag them down?

10     A.      It was to flag down the fire department.

11     Q.      So did you grab that cigarette?

12     A.      Yes, I did.

13     Q.      And then what happened?

14     A.      I walked out to the front of the building and

15   out onto the street and waited for the fire department.

16     Q.      Did you notice anything unusual about the door

17   after you walked out?  In other words, while you were -- let

18   me back you up.

19              As you begin to walk out, did you ever look

20   back to see whether or not Mr. Andriano had gotten up?

21     A.      As I was walking up the first time, I turned

22   around to get my cigarette and he had begun to vomit again.

23     Q.      And he was still in that same fetal position?

24     A.      Correct.  He had propped himself up on his

25   elbow somewhat and began to vomit.


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    Q.    Where was she -- and by "she" I mean the

2  defendant -- when he was vomiting?

3    A.    Dining room area between the kitchen and the

4  hallway.

5    Q.    And at this point you're leaving.  Are there

6  any bruises, is there -- are there any cuts, are there any

7  bloods -- any blood on Mr. Andriano?

8    A.    No.

9    Q.    So you walk out, correct, with a cigarette?

10    A.    Correct.

11    Q.    And you're going to show these people --

12    A.    Uh-huh.

13    Q.    -- in?

14      Is that a "yes?"

15  THE COURT:  "Yes?"

16  THE WITNESS:  Yes.

17  THE COURT:  Make sure you give a verbal response.  A

18  lot of times people say "uh-huh," "huh-uh."  You need to make

19  sure you give a verbal response.

20  THE WITNESS:  Sorry.

21  BY MR. MARTINEZ:

22    Q.    As you were walking out, do you know whether

23  she left the door open behind you?

24    A.    The door was

25    Q.    Initially.

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000005811

1    A.    The door was propped open the entire time, yes.

2    Q.    Then you left, right?

3    A.    Then I left.

4    Q.    So where did you go?

5    A.    I walked up to the front of the building,

6    waited for the fire department to come, and as they came

7    around the corner, Wendi screamed from the hallway.

8    Q.    What did she say?

9    A.    She screamed, "Go away, go away.  Chris, tell

10   them to go away."

11   Q.    Did you hear whether or not Joseph Andriano

12   said anything or did you hear him scream or anything?

13   A.    No.

14   Q.    So the only person that you heard, so we're

15   clear, was the defendant?

16   A.    Correct.

17   Q.    Did the door stay open or anything or what?

18   A.    No.  At that time I said "Wendi, they're here.

19   They're coming in."  I said "My purse is inside.  We're

20   coming in."  And at that time my purse flew out the door and

21   the door slammed.

22   Q.    Do you know whether or not the door was locked?

23   A.    I do not know that.

24   Q.    But the door did slam?

25   A.    Correct.


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1          Q.    Were you already with the paramedics at that

2    time or were you on your way to speak with the paramedics?

3          A.    They had just parked and were getting out of

4    the vehicle.

5          Q.    So you were walking towards them?

6          A.    Correct.

7          Q.    You then took your purse with you, correct?

8          A.    No.  I hadn't gone back to get my purse yet.

9          Q.    Okay.  So she screamed after you and then the

10   purse came flying out?

11         A.    Correct.

12         Q.    Then what happened?

13         A.    The fire department got out of their vehicle

14   and started walking towards me, and I said, "I'm not too sure

15   what's going on here," I said, "But this is -- she called me

16   over to watch the kid, you know.  Her husband's got cancer.

17   He's in there dying on the floor, and she just slammed the

18   door and threw my purse outside, told us to go away, told me

19   to tell you to leave."

20         Q.    At any time while you're having this

21   conversation -- previously when you had a conversation with

22   her, did she ever tell you anything about any poison or

23   anything like that?

24         A.    No.

25         Q.    What happened after that?  You've now talked to

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000005813

1    the paramedics, and what happened?

2          A.    They said, "We cannot administer treatment if

3    they're refusing it, but we will go knock on the door."

4          Q.    Okay.  And then what happened?

5          A.    We walked up to the apartment door and I

6    knocked and knocked and there was no answer.  And the fireman

7    knocked and knocked and there was no answer.  And one of the

8    firemen called back to dispatch to have someone call.

9          Q.    Let me ask you this.  This knocking and no

10   answer, how long were you and the fire department personnel

11   standing there, you know, knocking?

12         A.    5, 10 minutes.

13         Q.    And at any time did you hear any noises from

14   inside the apartment?

15         A.    No.

16         Q.    Did you ever hear Joseph Andriano's voice from

17   inside?

18         A.    No.

19         Q.    Did you ever hear Wendi Andriano's voice --

20         A.    No.

21         Q.    -- from -- from inside?

22         A.    No.

23         Q.    Any crying from the kids or anything like that?

24         A.    No.

25         Q.    So you guys are standing out there and

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000005814

1    knocking, and finally about 5 or 10 minutes later, what

2    happens?

3         A.    He got a call back from dispatch and she said

4    that she was coming out.

5         Q.    Were you guys standing by the front door?

6         A.    Standing right by the front door.

7         Q.    That would be of apartment 132?

8         A.    That's correct.

9         Q.    Did the front door open?

10        A.    No, sir.  She came around through the corridor

11   of the front of the building.

12        Q.    Would that be the north or south side?

13        A.    That would be the north side.

14        Q.    I'm going to show you some photographs and I

15   want you to take a look at them.  I want you to see if this

16   is representative of the way the San Riva Apartment complex

17   was and Building Number 5 which houses Apartment 132 and how

18   it looked from the front and the back.  Go ahead and take a

19   look at it.  These are Exhibits 141 to 152.

20                 (Pause in proceedings.)

21   BY MR. MARTINEZ:

22        Q.    Are those true and accurate depictions of

23   Building Number 5 as it existed back when you went there on

24   October 8, 2000?  Is that what it looked like?

25        A.    Yes.


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR


000005815

1          MR. MARTINEZ:  Move for the admission of Exhibits 141

2     to 151 -- sorry, 152.

3               (Pause in proceedings.)

4          MR. PATTERSON:  No objection.

5          THE COURT:  Exhibit Numbers 141 through 152 for

6     identification are admitted into evidence.

7          MR. MARTINEZ:  Judge, while she's marking them, I

8     would make the request to be allowed to use the easel now to

9     publish them to the jury and also ask this witness questions.

10         MR. PATTERSON:  No objection.

11         THE COURT:  You may proceed.

12              (Pause in proceedings.)

13    BY MR. MARTINEZ:

14         Q.   Let's take a look, first of all, at Exhibit

15    141.  Do you recognize what's depicted there?  Can you see it

16    from where you are?

17         A.   Yes.  That's going towards Building 5.

18         Q.   And if we take a look at it -- I'm going to

19    point something out here -- this is at the very corner here.

20    What number of building is that?  This one at the very back

21    here (indicating).

22         A.   I believe that's 5.

23         Q.   Right here?

24         A.   (No audible answer.)

25         Q.   And where did you live back then?  Did you live

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    in this area here or did you live somewhere else?

2              A.    I lived at the front of the community.

3              Q.    How long would it take you to get to Building 5

4    from your apartment?

5              A.    3, 4 minutes.

6              Q.    And would this be the back of the community

7    (indicating)?

8              A.    Yes.

9              Q.    Exhibit 142, what does that show us?

10             A.    The front of Building 5.

11             Q.    Is this the breezeway we've been talking about

12   (indicating)?

13             A.    Yes.

14             Q.    Is this north or south?

15             A.    It's looking south.  It's the north entrance.

16             Q.    North entrance.  And this breezeway we're

17   talking about, is it a through and through kind of thing that

18   allows you to go from north to south?

19             A.    Correct.

20             Q.    If you wanted to come from the south for

21   whatever reason, there was a way to get in then?

22             A.    Yes.

23             Q.    What does 143 show?

24             A.    Corner view of the building.

25             Q.    And, again, you indicated previously that this

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    was the north entrance.  Are we now moving in a sort of

2    eastern way?

3              A.    Yes.

4              Q.    And if we take a look at 144, what does that

5    show?

6              A.    The back of the building.

7              Q.    And are we facing west now?

8              A.    Yes.

9              Q.    And the north entrance would be right about

10   here then (indicating), right?

11             A.    Correct.

12             Q.    145, what does that show?

13             A.    I can't see.

14             THE COURT:  You can step down.

15             MR. MARTINEZ:  Why don't you step down as it appears

16   to us and stand to the left of it.

17             THE COURT:  When you're away from the microphone,

18   just remember to speak up so everyone can hear you.

19                   (Pause in proceedings.)

20             THE WITNESS:  Back of the building.

21   BY MR. MARTINEZ:

22             Q.    I think you indicated that's the back of the

23   building, correct?

24             A.    Yes.

25             Q.    And 146, what is that?


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1      A.     It's going around -- it's the side of the

2  building going around to the back.

3      Q.     This right here (indicating) would be the east

4  then?

5      A.     That's correct.

6      Q.     And down here would be to the south?

7      A.     Yes.

8      Q.     147, what does that show us?

9      A.     It's the back of the building patios.

10     Q.     This patio, do you know which apartment that

11 belongs to?

12     A.     That would be Wendi's apartment.

13     Q.     That would be Apartment 132?

14     A.     Yes.

15     Q.     So when you indicated to us previously that she

16 came in through the north side.  And you're familiar with

17 these apartments; is there any other way out of this

18 apartment other than through this back area here

19 (indicating)?  In other words, is there another door other

20 than the front and this one (indicating)?

21     A.     No.  There's a door off onto the patio, but

22 you'd have to climb over the patio.

23     Q.     So in other words there's only two doors, one

24 in the front and this one back here, correct?

25     A.     Correct.


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1          Q.    And you indicated that she came from the north

2    side, correct?

3          A.    Yes.

4          Q.    So that would mean that she climbed over this

5    patio, walked all the way around, and then came down?

6          MR. PATTERSON:   Your Honor, objection.  Calls for

7    speculation unless she observed this.

8          THE COURT:  Sustained.

9              Rephrase the question.

10   BY MR. MARTINEZ:

11         Q.    Is there any other way she could have got to

12   that position on the north side other than going out that

13   back door?

14         A.    No, sir.

15         Q.    Okay.  Let's take a look now at Exhibit 148.

16   What is that?

17         A.    The back patio.

18         Q.    And this is the back patio to 132, right?

19         A.    Yes.

20         Q.    149, what does that show?

21         A.    That would be the south entrance to the

22   breezeway.

23         Q.    And what apartment would this be right here?

24         A.    132.

25         Q.    And this is the area that we've been talking

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000005820

1   about, correct?

2          A.   Yes.

3          Q.   Patio?

4               It appears that there are, like, rocks down

5   here.  Is that what that is down there?

6          A.   Yes, landscaping rocks.

7          Q.   So as we look at Exhibit 150, that also appears

8   to be rocks, right?

9          A.   Uh-huh.

10          MR. MARTINEZ:  Is that "yes?"

11          THE COURT:  "Yes?"

12          THE WITNESS:  Yes.

13   BY MR. MARTINEZ:

14          Q.   So that would tell us that we're looking in

15   what direction?

16          A.   You're looking north.

17          Q.   Is this the area that she came through where

18   there are rocks or was it the other direction?

19          A.   No.  It was the other direction.

20          Q.   And if we look at 152, that's a look at the

21   breezeway from the other direction down the other way,

22   correct?

23          A.   That's correct.

24          Q.   Why don't you go ahead and resume the stand.

25               So she came through -- you saw her come in

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    through the north down to where the group of you were

2    standing, correct?

3           A.    Yes.

4           Q.    When she came towards you, did you notice

5    whether or not she was wearing the same clothing as she had

6    been wearing previously when you were inside?

7           A.    She had changed clothing.

8           Q.    What was she wearing now?

9           A.    Dark shorts and a striped t-shirt.

10          Q.    And before she had been wearing what?

11          A.    Dark shorts and a white t-shirt.

12          Q.    And was there anything different about her hair

13   that you noticed?

14          A.    It was wet.

15          Q.    And then what happened?

16          A.    She walked past the fire department and myself

17   and stood by the front door and explained that she did not

18   want any service, that her husband was dying and this was not

19   the way that he wanted to go, and that she would like us to

20   leave.

21          Q.    And what did the fire department people do?

22          A.    The fire department said that if you're

23   refusing treatment that was something they understood.  They

24   asked her if he had a "DNR."  She asked them what a "DNR" was

25   and they said "DNR" was a "do not resuscitate."


          TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1      Q.     And then?

2      A.     She said yes, she had one with Joe's doctor and

3  that she would let the doctor take care of that.  She had

4  called her father and he was on his way and she wanted us to

5  leave.

6      Q.     So she indicated that she already called her

7  father, right?

8      A.     Correct.

9      Q.     When you first went to speak with her and met

10  her out there and she had the telephone, did she tell you at

11  that point she had already called her father or is this the

12  first mention of her father?

13      A.     That's the first time she mentioned she had

14  done that.

15      Q.     Did she tell you or indicate where her father

16  was?

17      A.     No, she didn't tell me.  I knew where her

18  father was.

19      Q.     And --

20      A.     Her father lived in Casa Grande.

21      Q.     Okay.  And then what happened?

22      A.     At that particular point the firemen picked up

23  their things and began to walk away.

24      Q.     And what did the defendant do?

25      A.     I asked her what was going on, if she was going

1   to be okay.  She said, "Yeah, we'll be fine.  Just go home

2   I'll call you tomorrow."

3           Q.   What was her demeanor like when she was talking

4   to the fire department?  Was she crying?

5           A.   No.

6           Q.   So what was her demeanor?

7           A.   She was just calm and very certain that she

8   wanted -- didn't want any help, wanted them to go home.

9           Q.   Did the fire department at any time or did the

10  paramedics at any time speak with Joseph Andriano that you

11  saw?

12          A.   No.

13          Q.   Then what happened?  Did you leave or did you

14  stay?

15          A.   No.  We walked up to the front of the building

16  and the fire department loaded up and I asked her again if

17  she wanted me to sit with her and stay with her until her dad

18  got there, and she said, "No, just go home.  I'll call you

19  tomorrow."

20          Q.   And, again, was she crying when she said that?

21          A.   No.

22          Q.   Now, you knew that the defendant's birthday was

23  in August, did you not?

24          A.   Yes.

25          Q.   And that August of 2000, did a group of you go

1    out?

2         A.    Yes.

3         Q.    And describe a little bit for me what the group

4    you went out in?

5         A.    For Wendi's birthday, she had arranged a

6    limousine and also arranged with one of the apartment

7    locaters some champagne and whatnot for eight of us to go out

8    on her birthday.

9         Q.    Do you know whether or not her husband, Joseph,

10   even knew that's what was happening?

11        A.    He did not know.

12        MR. PATTERSON:  Objection.  Basis of knowledge?

13        THE COURT:  I'll sustain the objection.  That last

14   answer is stricken.

15   BY MR. MARTINEZ:

16        Q.    With regard to whether or not he knew, did you

17   and Wendi speak about whether or not her husband knew?

18        A.    He didn't know she got the limo.

19        Q.    And -- but what I'm asking is this.  Did you

20   and Wendi talk about it?  Is that how you gained your

21   knowledge?

22        A.    Yes.

23        Q.    When did you and Wendi talk about whether or

24   not Joe knew that or did not know that she was going to go

25   out for her birthday?

000005825

1        A.    During the planning of her birthday.   It was

2   days before that.

3        Q.    And this conversation that you had with the

4   defendant, what did she say specifically about Joe's

5   knowledge about whether or not he knew?

6        A.    She said that he was unaware of her having the

7   limo and going out with the girls.

8        Q.    I'm going to show you Exhibit 313.   Please take

9   a look at it.   Do you recognize what's in that photograph?

10       A.    Yes.

11       Q.    What is it?

12       A.    All of the girls getting ready to go out in the

13   limo.

14       Q.    And this was in August of 2000?

15       A.    Yes.

16       Q.    At any time when you had the conversation and

17   the preparation with her about this going out thing, did she

18   ever indicate, well, you know, Joe doesn't take me out and

19   that's why I'm doing this, or was it just he doesn't even

20   know.

21            MR. PATTERSON:  Objection.  Leading.  Suggests the

22   answer in the form of the question.

23            THE COURT:  Overruled.  Go ahead and answer the

24   question if you can.

25            THE WITNESS:  I'm sorry.  Can you repeat it?


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    BY MR. MARTINEZ:

2         Q.    Sure.  With regard to when she was planning

3    this, did she ever say to you, "Well, he won't take me out,

4    that's why I'm doing this"?

5         A.    No.

6         Q.    But she did tell you -- I think that you told

7    us previously that he did not know?

8         A.    He didn't know.

9         MR. MARTINEZ:  I move for the admission of Exhibit

10   313.

11                   (Pause in proceedings.)

12        MR. PATTERSON:  Your Honor, is there another current

13   exhibit list than the one you --

14        THE COURT:  I'm sorry?

15        MR. PATTERSON:  May I --

16        THE COURT:  Step up.

17        MR. PATTERSON:  I have an exhibit list that doesn't

18   have 313 on it.

19        THE CLERK:  He just gave it to me.

20        MR. PATTERSON:  Just got it today?

21             Okay, Judge.  Thank you.

22             May I have a moment, Judge?

23        THE COURT:  Yes.

24                   (Pause in proceedings.)

25        MR. PATTERSON:  No objection, Judge.


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1          THE COURT:  Exhibit Number 313 for identification is

2    admitted into evidence.

3    BY MR. MARTINEZ:

4          Q.    Let's go ahead and take a look at Exhibit 313.

5    Who is this individual here, right here?

6          A.    That would be Wendi.

7          Q.    And who's this person in the black dress?

8          A.    That would be myself.

9          Q.    And these other people that are here, are they

10   also people that worked at the San Riva apartment complex or

11   other people too?

12         A.    Two of the other persons in the picture worked

13   with us.  The others are residents.

14         Q.    Who is this individual I'm pointing to second

15   from the left?

16         A.    Shannon Sweeney.

17         Q.    Did she work for the apartment complex?

18         A.    Yes, she did.

19         Q.    And this individual that's to the right of the

20   defendant?

21         A.    Stephanie.

22         Q.    What was her last name?

23         A.    Koeppen.

24         Q.    Did she also work for the San Riva apartment

25   complex?

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    A.    She did.

2    Q.    And what was Stephanie Koeppen's or Koeppen's

3  position?  What did she do?

4    A.    She was a leasing agent.

5    Q.    What did that require her to do?

6    A.    She basically showed prospective residents and

7  leased apartments.

8    Q.    And how about this individual, Shannon Sweeney?

9    A.    She was the assistant manager.

10    Q.    Where did you guys go that night?

11    A.    Downtown to a number of different places.

12    Q.    And when you went out, was there some dancing

13  that took place?

14    A.    Yes.

15    Q.    Did you see the defendant's demeanor?

16    A.    Yes.

17    Q.    And you indicated previously that when you'd

18  gone out with her she would kiss men and perhaps touch them.

19  Did that happen that night?

20    A.    Yes.

21    Q.    About what time did this party break up with

22  you guys coming home?

23    A.    It was after 12:00.  I don't know for certain.

24    Q.    And where did the car pull up?

25    A.    The car pulled up in front of San Riva.


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1   Q. And when it pulled up in front of San Riva, was

2 there anybody there?

3   A. Yes.

4   Q. Who was there?

5   A. Joe was out front.

6   Q. But you just told us that he didn't even know

7 what she was doing and where she was going.  Do you know how

8 he acquired the knowledge, why he was waiting there?

9   A. I did not know that.

10   Q. But was he unhappy or upset or what was he --

11   A. He was angry.

12   Q. And what happened?

13   A. He threw something.  I believe it was a

14 telephone.

15   Q. And where did he throw it?

16   A. Into the street.

17   Q. And who was he angry at?

18   A. He was angry with Wendi.

19   Q. And did you hear what he said?

20   A. No.

21   Q. Did they then walk away together or anything or

22 what happened?

23   A. She said, "Joseph, just a minute," and they

24 started walking back towards their apartment.

25   Q. Did she begin crying or anything like that as

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    she said "Joseph, wait a minute"?

2        A.    No.

3        Q.    What was her demeanor when she said "Joseph,

4    wait a minute"?

5        A.    She was attempting to explain.

6        Q.    And what -- was she upset?

7        A.    No.

8        Q.    Was she calm?

9        A.    Yes.

10       Q.    Did she appear to you to be frightened?

11       A.    No.

12       Q.    And when they walked away, were they walking

13   together or was she walking in front, was she walking behind

14   him?  How were they walking away?

15       A.    He started walking in front of her as she was

16   following him.

17       Q.    She was actually following him rather than him

18   saying things to her?

19       A.    Yes.

20       Q.    And is that when she said, "Let me explain

21   things to you"?

22       A.    She didn't say that.  She said "Joseph" as

23   she -- like she wanted to.

24       Q.    Like she wanted to?

25             Okay.  And did you watch them as they walked

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    away?

2        A.    No.

3        Q.    Now, you indicated that you guys had gone out

4    to several bars.  Did there ever come a time in the early

5    morning hours that -- well, let me ask you, what apartment

6    number did you live in?

7        A.    385.

8        Q.    Did an individual by the name of Rick Freeland

9    live at the San Riva apartments?

10       A.    Yes.

11       Q.    And where did he live in relationship to your

12   apartment?

13       A.    Next door.

14       Q.    And what was his apartment number?  Do you

15   remember?

16       A.    384.

17       Q.    And did there ever come a time when there was a

18   situation where the defendant was knocking on Rick Freeland's

19   apartment?

20       A.    Yes.

21       Q.    Was this before or after the birthday bash that

22   you guys had?

23       A.    I can't answer that.

24       Q.    Was it in the summer?

25       A.    Yes, it was in the summer.


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR


000005832

1      Q.    And during the summer, did this -- about what

2  time was it?

3      A.    That what?

4      Q.    That she was over at Rick Freeland's knocking

5  on the door?

6      A.    At what time during the day?

7      Q.    Yes.  Or night.

8      A.    Evening.

9      Q.    About what time was it?

10     A.    8:00?  I don't know.

11     Q.    And was she knocking lightly or loudly?

12     A.    No.  She was pounding on the door.

13     Q.    And what was she saying, if anything?

14     A.    She wanted in.  She wanted him to let her in.

15     Q.    How long did she pound on the door before

16  anything happened?

17     A.    Five minutes.

18     Q.    And then what happened?

19     A.    I came outside and she came inside and used my

20  telephone to call him.

21     Q.    Did you say anything to her while she was out

22  there pounding to let her come in or what happened?

23     A.    Asked "What are you doing?"

24     Q.    And what did she say?

25     A.    She was trying to get him to come to the door.

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1      Q.    And then what did you say?  How was it --

2      A.    Told her to come on in.

3      Q.    And did she?

4      A.    Uh-huh.

5          THE COURT:  Is that a "yes"?

6          THE WITNESS:  Yes.

7   BY MR. MARTINEZ:

8      Q.    When she came in, you saw her use the phone I

9   take it?

10     A.    Correct.

11     Q.    You saw -- did you see her dial?

12     A.    Yes.

13     Q.    And did you then see her start talking on the

14  telephone?

15     A.    Yes.

16     Q.    What was she saying?

17     A.    I don't know.  I didn't stay for the

18  conversation.

19     Q.    What was her demeanor when she was pounding on

20  the door?

21     A.    She was anxious.

22     Q.    Was she angry?

23     A.    She was -- yes, pissed off that he wouldn't let

24  her in.

25     Q.    If you compare the demeanor at the door where

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    she's pounding "Let me in, let me in," to the demeanor that

2    she exhibited when she began to follow Joseph from the

3    limousine, I want you to make a comparison with the two of

4    them.  Was she angry at the time that she followed Mr.

5    Andriano like she was when she was pounding on the door?

6              MR. PATTERSON:  Objection.  Relevance.

7              THE COURT:  Overruled.  Go ahead and answer the

8    question if you can.

9              THE WITNESS:  No.

10   BY MR. MARTINEZ:

11         Q.    Was she angrier when she was pounding on the

12   door or when she was following Joseph?

13         A.    Yes.

14         Q.    Was she angry when she was following Joseph?

15         A.    No.

16         Q.    You indicated she was calm.  Was she calm when

17   she was pounding on the door?

18         A.    No.

19         Q.    How long did she stay on the telephone?

20         A.    Not very long.  Five minutes maybe.

21         Q.    Then what happened?

22         A.    Sat down and visited.

23         Q.    How long did she visit you with -- visit with

24   you?

25         A.    I don't recall.  20 minutes, 30 minutes.


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1          Q.     Do you know where her husband was while she was

2     out there pounding on that door?

3          A.     He was at home.

4          Q.     Where were the kids?  Were they with her when

5     she was pounding on that door?

6          A.     No.  They were with him.

7          MR. PATTERSON:  Objection.  Based on what knowledge?

8     How does she know?

9          THE COURT:  Sustained.  Those last two answers will

10    be stricken.

11    BY MR. MARTINEZ:

12         Q.     Did you see the kids with her?

13         A.     I did not see the children with her.

14         Q.     Did you see Joseph Andriano with her?

15         A.     No.

16         Q.     Did there come a time that you and she

17    discussed a relationship with this Rick Freeland individual?

18         A.     Yes.

19         Q.     And during the -- how many times would you say

20    you discussed it?

21         A.     I don't know to put a number on it.

22    Frequently.

23         Q.     And when you say "frequently," during those

24    frequent conversations, did she ever tell you whether or not

25    she had ever been intimate or had sexual intercourse with Mr.


                TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

```
 1    Freeland?
 2            A.    Yes.
 3            Q.    What did she say about that?
 4            A.    She was sexually active with Rick Freeland.
 5            Q.    Did she, during those conversations, ever
 6    express any remorse and say "Well, you know, I'm sorry for
 7    Joe," or anything like that while you guys were talking about
 8    it?
 9            A.    No.
10            Q.    Was she happy in her relationship with Mr.
11    Freeland?
12            A.    Yes.
13            Q.    Were there -- were you aware whether or not
14    that relationship continued or was it ever -- did it end?
15            A.    Mr. Freeland ended that relationship.
16            Q.    So it wasn't that she ended it?  You believe --
17    and let me ask you what -- the basis of your belief is that
18    he ended it?
19            A.    Yes.
20            Q.    And did you gain that -- where did you gain
21    that knowledge or how did you know that Mr. Freeland ended
22    the relationship?
23            A.    From Mr. Freeland.
24            Q.    Did you also talk to the defendant about who
25    ended the relationship?
```

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1        A.     No.

2        Q.     Did she ever tell you "I ended the

3  relationship?"  In other words that she, the defendant, ended

4  the relationship?

5        MR. PATTERSON:  Objection.  Asked and answered. She

6  already said she never acquired any knowledge from my client.

7        THE COURT:  Sustained.  Ask your next question.

8  BY MR. MARTINEZ:

9        Q.     What was said about the time that the

10  relationship ended with Mr. Freeland?  What was the

11  defendant's demeanor after that happened, if you remember?

12        MR. PATTERSON:  Again, date, time, circumstance and

13  what proximity to --

14        THE COURT:  Sustained.  Rephrase the question.

15  BY MR. MARTINEZ:

16        Q.     When did you have this conversation, if you

17  could remember, with Mr. Freeland about him ending the

18  relationship?

19        A.     Maybe a week after the end of the relationship.

20        Q.     And would that have been in the summer?

21        A.     Would have been in the summer, yes.

22        Q.     Would that have been -- do you know what month

23  it would have been?

24        A.     Definitely?  No.  Maybe July.

25        Q.     Okay.  And after this July ending of the


                TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    relationship, did you see a change or did the defendant's
2    demeanor remain the same?
3            A.    She was upset that they weren't seeing one
4    another any longer.
5            Q.    How do you know that?
6            A.    Because of the persistency in coming over to
7    see him and pounding on his door and talking about it in the
8    office.
9            Q.    When you say she persisted in coming over to
10   see him, how many times would you say that she went over to
11   see him at his apartment after the breakup?
12           A.    I don't know.
13           Q.    Was it -- but she persisted in doing that?
14           MR. PATTERSON:  She just said she doesn't know, Judge.
15           THE COURT:  Sustained.  Ask your next question.
16   BY MR. MARTINEZ:
17           Q.    You indicated that she persisted in coming
18   over.  What did you mean when you said she persisted?
19           A.    She would drop by his apartment and drop by my
20   apartment.
21           Q.    Okay.  And you just don't know the number.  Is
22   that what you're saying?
23           A.    That's correct.
24           Q.    With regard to Joseph Andriano in the summer of
25   2000, would you see him often?


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1        A.     Yeah.

2        Q.     And how often would you see him?

3        A.     He would come by the office maybe a couple

4    times a week.

5        Q.     And when he would come by the office, was there

6    a normal time that he came by or was it just randomly?

7        A.     He would come by in the afternoon.

8        Q.     About --

9        A.     Before Wendi was to get off.

10       Q.     Would -- and would he come alone or come

11   accompanied?

12       A.     He would bring the children.

13       Q.     And what was his demeanor -- well, let me put

14   it this way.  Was there ever a situation where you saw him

15   angry when he came to pick up Wendi in the afternoon, those

16   twice-a-week times that you saw him?

17       A.     No.

18       Q.     What was their demeanor when they would walk

19   away?

20       A.     Fine.

21       MR. PATTERSON:  Well, again, date, time,

22   circumstances when this happened.

23       THE COURT:  Sustained.  Ask your next question.

24   BY MR. MARTINEZ:

25       Q.     At any time during this whole time that you saw


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    Joseph with the kids walking away, did you ever see him angry

2    at the defendant?

3         A.    No.

4         Q.    Did San Riva have -- you indicated you were the

5    activities director.   Did San Riva have pool parties?

6         A.    Yes, we did.

7         Q.    Were you in charge of those or somebody else in

8    charge of those?

9         A.    I was in charge of those.

10        Q.    And what was the defendant's role or function

11   with regard to those parties?

12        A.    Well, naturally, as a manager she authorized

13   everything and assisted.

14        Q.    Would she attend those parties?

15        A.    Yes.

16        Q.    How often would you have those parties?

17        A.    That summer I believe we had three.

18        Q.    And at any of those parties did Joseph Andriano

19   attend?

20        A.    Yes.

21        Q.    And when he attended those parties, did he go

22   by himself?

23        A.    No.

24        Q.    Who did he go with?

25        A.    Wendi.


             TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1      Q.    And do you know whether or not he ever came

2  with the children to those parties?

3      A.    The children came to the party, yes.

4      Q.    Did they come to the three parties he came to

5  or just one, two, or --

6      A.    I believe they came to two.

7      Q.    At any of those parties that summer, did you

8  ever see Joseph Andriano drinking?

9                (Pause in proceedings.)

10     THE WITNESS:  One of the parties we had a keg at,

11  and I believe he had a beer.

12  BY MR. MARTINEZ:

13     Q.    So at one of the parties he had a beer?

14     A.    Yes.

15     Q.    Anything else to drink at all of those parties

16  that you saw?

17     MR. PATTERSON:  Judge, objection.  The opportunity to

18  observe.  Was she watching this guy?

19     THE COURT:  I'll sustain the objection.  Lay some

20  foundation.

21  BY MR. MARTINEZ:

22     Q.    Well, you noticed he was at each of those three

23  parties, right?

24     A.    Correct.

25     Q.    At each of those three parties, the first

1    party.  Let's just call it the first party.  You saw him

2    there, correct?

3         A.    Yes.

4         Q.    At this party you saw him at, was this the one

5    you saw him take a drink?

6         A.    I don't recall.

7         Q.    It was just one of them, right?

8         A.    Right.

9         Q.    But you did see him at a party and it was only

10   one of them you saw him with the drink?

11        A.    I saw him at the party, yeah, and I did see him

12   have a beer from the keg.

13        Q.    With regard to these parties, you indicated I

14   think that the children attended two of them I think you

15   said?

16        A.    Yes.

17        Q.    Who was taking care of the kids at those

18   parties?

19        A.    I don't know.

20        Q.    And did Mr. Andriano stay there the whole party

21   or was he there --

22        A.    I know there was one party that he had left

23   early and one party that Wendi had left early, but which one,

24   I don't recall.

25        Q.    Okay.  Did San Riva have a softball -- a

1    softball team?

2            A.    San Riva sponsored a softball team, yes.

3            Q.    Was -- you indicated you know Rick Freeland,

4    right?

5            A.    I do.

6            Q.    Was Rick Freeland on that softball team?

7            A.    Yes, he was.

8            Q.    Do you know what his function was?  In other

9    words, was he a captain or --

10           A.    He was the captain of the softball team, yes.

11           Q.    I want to talk to you a little bit about the

12   layout of the San Riva and where your offices may have been.

13   I'm going to show you what's been marked for identification

14   as Exhibit 297.  Why don't you go ahead and take a look at

15   it.  It's not to scale, but take a look at it.

16                (Pause in proceedings.)

17           THE WITNESS:  Okay.

18   BY MR. MARTINEZ:

19           Q.    Is that a true and accurate depiction of the

20   San Riva offices as they existed back when you were working

21   there in October -- or October 8 of 2000?

22           A.    Yes.

23           MR. MARTINEZ:  Move for admission of Exhibit 297.

24           MR. PATTERSON:  If I could have a moment, Judge?

25           THE COURT:  Yes.


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1          (Pause in proceedings.)

2          MR. PATTERSON:  No objection, Judge.

3          THE COURT:  Exhibit 297 for identification is

4    admitted into evidence.

5    BY MR. MARTINEZ:

6          Q.    Can you see it from there?

7          A.    Yes.

8          Q.    What area is this (indicating)?  What does that

9    show?

10          A.    It's the front entry.

11          Q.    And is that where the people that have any

12    business or may want to go into the office walk in?

13          A.    Correct.

14          Q.    And to the lower right on this diagram

15    (indicating), what would that be?

16          A.    That -- I'm sorry.  The entry that you just

17    showed me --

18          Q.    I have this backwards?

19          A.    Yeah, it's backwards.

20          Q.    This one right here.  What is that?

21          A.    That's the front entry.

22          Q.    Okay.  And this entry we're talking about is --

23          A.    That's the back entry, by the office.

24          Q.    Is this the entry (indicating) that people who

25    do not work for San Riva use?  And I'm talking about the one

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    to the right of the diagram.

2         MR. PATTERSON:  Judge, may I ask you to direct the

3    county attorney to use a pointer or something?  Every time

4    he steps in front, I can't see what he's pointing at.

5         THE COURT:  That's fine.  Is there a pointer there?

6         MR. MARTINEZ:  Yeah.  Here's one.

7    BY MR. MARTINEZ:

8         Q.    And I'll describe it for you.  I'm talking

9    about the opening that is to the right of this diagram.  Do

10   you see what I'm talking about?

11        A.    Yes.

12        Q.    Is that an opening that is commonly used by the

13   public or is that for employees only?

14        A.    Staff members and existing residents. Sometimes

15   existing residents utilize that entry.

16        Q.    And is this also an entrance (indicating)? And

17   I'm over here to the extreme left of the diagram.

18        A.    That would be the main entrance to the office

19   or for prospective residents, vendors, the public.

20        Q.    And immediately to the right of that, what is

21   that?

22        A.    To the --

23        Q.    Right here (indicating).

24        A.    Lounge areas for prospective residents.

25        Q.    To the top of that, what would that be

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    (indicating)?

2              A.    Two leasing desks there.

3              Q.    On the -- as we look at it and we're traveling

4    along, we see what appears to be an office on the lower

5    right-hand side (indicating).  Do you see that?

6              A.    The first office in there is the assistant

7    manager's office.

8              Q.    And who would that be?

9              A.    Shannon Sweeney.

10             Q.    And we saw a photograph of her, correct?

11             A.    Yes.

12             Q.    And in terms of hierarchy, if the defendant is

13   the manager, what is Shannon Sweeney with regard to that

14   hierarchy?

15             A.    Second in line.

16             Q.    And what -- are you in any part of that line?

17             A.    No.

18             Q.    Okay.  And if we continue on back to the very

19   end of this diagram, to the very end near the entrance that

20   is reserved for employees and not the public, there seems to

21   be a room to the right (indicating).  Do you see that?

22             A.    Across from Shannon's office?

23             Q.    No, right over here in the back (indicating).

24             A.    That's a maintenance office.

25             Q.    When somebody -- did the San Riva apartment

1    complex, would they sign for packages and that sort of thing?

2         A.    Yes, we would.

3         Q.    And if you would sign for those packages, would

4    you take them up to the apartment that it was for or would

5    you hold them?

6         A.    They would be held in the maintenance office.

7         Q.    Is that what we just pointed to there?

8         A.    That's correct.

9         Q.    Right immediately above that is also an office.

10   Do you see that?

11        A.    Yes, I do.

12        Q.    Whose office is that?

13        A.    That was my office.

14        Q.    And did you have a computer in your office?

15        A.    I did.

16        Q.    And with regard to having the absolute

17   authority over that computer, was that you or did the

18   defendant have more authority?

19        A.    There were two computers in the office and we

20   had a security level clearance for the rent roll or

21   information on the computer.  The manager, Wendi, had

22   complete access to the computer system.

23        Q.    And that would be this one back here, right?

24        A.    To both of them.

25        Q.    Right.  The other computer, would that be in

1      this -- in Shannon's office that we're talking about?

2           A.     Correct.

3           Q.     Now, how is it that somebody would log on to

4      your computer?  Would they have to have a password or how did

5      it work?

6           A.     Yes.  Everyone who logged on had a password to

7      log on with.

8           Q.     Did the defendant have access to your computer

9      via the use of the pass -- use of her password?

10          A.     She has access to the computer and to all the

11     passwords.

12          Q.     That would mean she also had access to this one

13     right here (indicating)?

14          A.     Yes.  That would be Shannon's.

15          Q.     In the scheme of things, we've talked about the

16     bottom here.  What about the top?  The room -- this office

17     (indicating).  Whose office is this?

18          A.     That wasn't an office.  That was sitting room

19     for prospective rentals.

20          Q.     How about the office right there (indicating)?

21          A.     That was Wendi's office.

22          Q.     And what is that?

23          A.     That's a glass window?

24          Q.     Okay.  So she could --

25          A.     She could see out the front and into my office,

1      and then the door, obviously, and down the hallway.

2              Q.    Did you ever open an account with USA.net

3      using the name Wendi -- not Wendi, but Anne Newton?

4              A.    No.

5              Q.    Did you ever open an account with USA.net under

6      the name of Aztec Creations?

7              A.    No.

8              Q.    Did you ever, using this computer here that's

9      to the back in your office, ever go online and hold yourself

10     out to be Anne Newton?

11             A.    No.

12             Q.    Did you ever, while you were employed with San

13     Riva, did you ever email a company by the name of Voigt

14     Global?

15             A.    No.

16             Q.    Did you ever request any poison over the

17     internet ever?

18             A.    No.

19             Q.    With regard to issue of -- that issue that

20     we're talking about, did there ever come a time when you saw

21     the defendant looking at some privileged license or business

22     license or doing something with them?

23             A.    She was creating a business license in my

24     office.

25             Q.    She actually did it in your office?

1        A.      Yes.

2        Q.      Are you familiar with Copperstate Glass and

3   Mirror?

4        A.      I am.   They're a vendor of San Riva's.

5        Q.      And when you saw the defendant doing something

6   with this business license, what is it you saw her doing?

7        A.      She was typing it up on the typewriter located

8   in that office and removing a seal or something from

9   Copperstate.

10       Q.      And what else did you see her do?

11       A.      Said she was putting it together.   I asked her

12   what she was doing.

13       Q.      And did she tell you why she was putting it

14   together?

15       A.      She said that she was starting another business

16   and to just nevermind.

17       Q.      And did you nevermind?

18       A.      Yes, I did.

19       Q.      Now, drawing your attention to maybe that

20   Friday before that Sunday when Joseph Andriano was on the

21   ground and you saw him in the fetal position -- it was a

22   Friday.   Did you work on Fridays?

23       MR. PATTERSON:   Judge, I think there's -- it was

24   past midnight when she may have seen him.

25       MR. MARTINEZ:   I'm talking about whether or not she

1    worked on Friday.

2           MR. PATTERSON:  Okay.  The preforatory question

3    seemed to suggest -- well, would you ask him to rephrase? I'm

4    sorry.

5           THE COURT:  Why don't we rephrase the question so

6    there's no misunderstanding.

7    BY MR. MARTINEZ:

8           Q.   Did you work the Friday before Joseph Andriano

9    was killed?

10          A.   Yes, I did.

11          Q.   Did defendant work that Friday?

12          A.   No.

13          Q.   Did she come into the office?

14          A.   She was in the office, yes.

15          Q.   Do you remember what time?

16          A.   I believe it was late morning.

17          Q.   And when she came over, was she with somebody

18   or was she alone?

19          A.   She was by herself.

20          Q.   And did you see what she did?

21          A.   She had brought in a box.

22          Q.   And what was she doing with the box?  What did

23   you see her do?

24          A.   I was in Shannon's office and Shannon asked me

25   to ask her what was in the box.

1       Q.    And did you?

2       A.    I asked her what was in the box and she was on

3  the telephone at that time.

4       Q.    Do you know who -- do you know what she was

5  saying when she was on the telephone?

6       A.    I do not know what she was saying.  She was on

7  the telephone with Travis.

8       Q.    How do you know she was on the telephone with

9  Travis?

10       A.    Shannon told me she was on the telephone with

11  Travis.

12       MR. PATTERSON:  Objection.  Move to strike.  Hearsay.

13       THE COURT:  Sustained.  That last answer is stricken.

14  BY MR. MARTINEZ:

15       Q.    She was on the telephone with somebody, right?

16       A.    Correct.

17       Q.    Then what happened?

18       A.    Shannon said to ask her what's in the box, so I

19  asked her, "What's in the box?"  And she said "It's a

20  present."  And I said, "Who's the present for?"  And she

21  said, "It's a present for a friend."

22       Q.    And did she seem upset when she said that or

23  what?

24       A.    No.

25       Q.    Now, you were familiar with Rick Freeland's

1    apartment, weren't you?

2         A.    Yeah.  I know where it's at, yes.

3         Q.    Were you familiar with how some of the

4    furnishings got into that apartment?

5         A.    Yes.

6         Q.    And first of all, how is it that you are

7    familiar with how the furnishings got into that apartment?

8         A.    Wendi purchased the furnishings for that

9    apartment and she told me that she did it.

10        Q.    And what furnishings did she tell you that she

11   purchased for Mr. Freeland?

12        A.    She purchased a couch, bed, dining room table,

13   coffee table, television.

14        Q.    To your knowledge did she purchase any of these

15   items for anybody else?

16        A.    No.

17        Q.    Do you know when she purchased them?  Did she

18   tell you when she purchased them?

19        A.    I do not recall the date that she purchased the

20   items.

21        Q.    Do you know when she told you?  Was it in the

22   summer, was it in the spring?

23        A.    It was during the purchase.  A previous

24   resident was moving out.  They were relocating and selling

25   all of their items, so she went and purchased them for him.

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    Q.    And then did you -- okay.

2           Now, as your job as a bookkeeper there, was it

3    your job to send out late notices?

4    A.    Yes.

5    Q.    I'm going to show you what has been marked for

6    identification as 230.

7           (Pause in proceedings.)

8    MR. PATTERSON:   Judge, may I have permission to move

9    the easel?  We can't see the witness.

10   THE COURT:   Yes.

11           (Pause in proceedings.)

12   BY MR. MARTINEZ:

13   Q.    Take a look at these documents, and

14   particularly the first three pages from Exhibit Number 230 to

15   see if you recognize those along with everything else that's

16   there.

17           (Pause in proceedings.)

18   THE WITNESS:   Yes.  I recognize these.

19   BY MR. MARTINEZ:

20   Q.    What is that paperwork?

21   A.    These are 5-day notices that we deliver to

22   persons who could not pay their rent.

23   Q.    And what is the first document on top?  What is

24   it first of all?

25   A.    It' a fax cover sheet that I --

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1        Q.    Who is it to?

2        A.    To Brita.

3        Q.    And who sent it?

4        A.    Initially I sent it, but there's additional

5 writing on here.

6        Q.    And whose name is on there?

7        A.    My name is on there, Wendi -- well, it's been

8 crossed out, signed "Wendi," and "Please cancel all five

9 days, do not deliver."

10       Q.    Okay.  With regard to the notice that's

11 immediately after that 5-day notice, who is that to?

12       A.    Erik Vaillant.

13       Q.    How about the notice after that?

14       A.    Rick Freeland.

15       Q.    And then there are other notices of other

16 tenants, correct?

17       A.    Yes.

18       Q.    If I may have that back.

19       MR. MARTINEZ:  I move for the admission of Exhibit

20   230.

21       THE COURT:  Any objection?

22          (Pause in proceedings.)

23       MR. PATTERSON:  Judge, can I voir dire the witness?

24       THE COURT:  Yes.

25       MR. PATTERSON:  Admissibility issue.

1

2      VOIR DIRE EXAMINATION BY MR. PATTERSON:

3            Q.      Sorry.  I may have been talking with my client

4      at the time, are you the person that prepares those notices?

5            A.      Correct.

6            Q.      Okay.  And after they're prepared, where do

7      they wind up before they're delivered to the tenant?

8            A.      Manager's desk.

9            Q.      Okay.  And -- all right.  So the last that you

10     would have seen of these notices is when they were in the --

11     or left on the desk of the manager, correct?

12           A.      Correct.

13           Q.      That's when your contact with these things

14     stops?

15           A.      They have to be approved by her.

16           Q.      Okay.

17           A.      At that particular point, then they are

18     delivered.

19           Q.      Okay.  But you don't deliver them?

20           A.      Yes.  We deliver 5-day notices.

21           Q.      I'm sorry, you personally?

22           A.      Yes.

23           Q.      You personally deliver them?

24           A.      Uh-huh.

25                   THE COURT:  Is that a "yes"?


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1          THE WITNESS:  Yes.

2          MR. PATTERSON:  Okay.

3               I have no objection, Judge.

4          THE COURT:  Exhibit 230 for identification is

5     admitted into evidence.

6               Is this a good time to take our evening break?

7          MR. MARTINEZ:  It is if you'd like.

8          MR. PATTERSON:  Yes, Judge.

9          THE COURT:  Why don't we go ahead and take our

10    evening recess at this point in time.  We'll always try to

11    finish the day about 4:50.

12               Now, during this evening recess remember the

13    entire admonition I gave you including the fact you're not to

14    discuss this case with anyone, do not let anyone discuss the

15    case with you, keep an open mind about the case, and avoid

16    any media coverage if there is any media coverage.

17               Have a nice evening.  We'll see you tomorrow.

18    Do not do any investigation or research on your own.

19    Remember the entire admonition.

20               Have a nice evening.  We'll see you tomorrow at

21    1:00 p.m.  We'll be in recess.

22

23               (Evening recess.)

24

25

1

2

3                        CERTIFICATE OF REPORTER

4

5    STATE OF ARIZONA      )
                           )
6    COUNTY OF MARICOPA    )

7

8              I, Traci L. Wheeler, CSR, RPR, an official

9    and certified reporter in the Superior Court of the State

10   of Arizona, in and for the County of Maricopa, hereby

11   certify that I made a shorthand record of the proceedings

12   had in the within case, and that the foregoing transcript

13   is a full, true, and correct transcription of the

14   proceedings in this case.

15              Dated this 5th day of March, 2005.

16

17

18   _____
     Traci L. Wheeler, CSR, RPR
19   Certified Court Reporter No. 50313
     Official Court Reporter
20

21

22

23

24

25


         TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

# EXHIBIT FF

000005860

05-0002     1

COPY

DP

1                    IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

2                         IN AND FOR THE COUNTY OF MARICOPA

3

4    STATE OF ARIZONA,              )
                                    )
5              Plaintiff,           )
                                    )
6    v.                             )          No. CR 05-0005 AP
                                    )          MARICOPA COUNTY
7    WENDI ELIZABETH ANDRIANO,      )          No. CR 2000-096032
                                    )
8              Defendant.           )
     _____)

9

10

11

12                              Mesa, Arizona
                             September 14, 2004
13

14

15                    BEFORE:  The Honorable BRIAN K. ISHIKAWA

16

17

18                    REPORTER'S TRANSCRIPT OF PROCEEDINGS

19                              TRIAL DAY 11

20

21

22

23

24    ORIGINAL Prepared for APPEAL by:
      TRACI L. WHEELER, CSR, RPR
25    Certified Court Reporter No. 50313
      Official Court Reporter

         TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

                              000005861

<pre>
 1                    A P P E A R A N C E S

 2    FOR THE STATE:       JUAN M. MARTINEZ,
                           Deputy County Attorney
 3
      FOR THE DEFENDANT:   DANIEL B. PATTERSON,
 4                         Deputy Public Defender
                                    and
 5                         G. DAVID DELOZIER,
                           Attorney at Law
 6

 7         I N D E X   O F   E X A M I N A T I O N

 8    WITNESS                                        PAGE

 9    MCKINNON, BENJAMIN, Called on behalf of the State
           Direct Examination by Mr. Martinez        154
10         Cross-examination by Mr. Patterson        171
           Redirect Examination by Mr. Martinez      178
11         Follow-up Questions by Mr. Martinez       184

12    OLSON, DENNIS, Called on behalf of the State
           Continued Direct Examination by Mr. Martinez   4
13         Cross-examination by Mr. Patterson        50
           Redirect Examination by Mr. Martinez      104
14

15      E X H I B I T S   A D M I T T E D   I N   E V I D E N C E

16    NO.    DESCRIPTION                             PAGE

17    101    Photograph                               10
      102    Photograph                               10
18    103    Photograph                               10
      104    Photograph                               10
19    105    Photograph                               10
      106    Photograph                               10
20    107    Photograph                               10
      108    Photograph                               10
21    110    Photograph                               15
      111    Photograph                               15
22    112    Photograph                               15
      113    Photograph                               15
23    114    Photograph                               15
      115    Photograph                               18
24    116    Photograph                               18
      117    Photograph                               18
25    118    Photograph                               18
</pre>

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

3

1          E X H I B I T S   A D M I T T E D   C O N T I N U E D

2.    NO.      DESCRIPTION                                          PAGE

3    119      Photograph                                            18
     120      Photograph                                            18
4    121      Photograph                                            18
     122      Photograph                                            18
5    123      Photograph                                            18
     124      Photograph                                            18
6    125      Photograph                                            25
     126      Photograph                                            25
7    127      Photograph                                            25
     128      Photograph                                            25
8    129      Photograph                                            25
     130      Photograph                                            25
9    131      Photograph                                            25
     132      Photograph                                            25
10   133      Photograph                                            25
     134      Photograph                                            25
11   135      Photograph                                            25
     237      Bloodstained Knife                                    43
12   238      Small envelope containing hair                        42
     239      Small envelope containing hair                        41
13   240      Broken piece of lamp                                  24
     241      Bloodstained broken piece of lamp                     19
14   242      Bloodstained broken piece of lamp                     21
     243      Bloodstained broken piece of lamp                     23
15   245      Bloodstained napkin                                   35
     246      Bloodstained paper                                    36
16   248      Cut cell phone cord                                   37
     251      Bloodstained hair barrette and plastic baggie         42
17   252      Victim's shorts at the time of death                  32
     256      Bloodstained blanket                                  35
18   260      Barstool in red plastic                               33
     263      Lamp in box                                           28
19   321      Map with measurements                                 38
     322      Map of apartment complex                              38
20   323      Bloodstained silverware tray                          34

21

22

23

24

25

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000005863

4

1           MESA, ARIZONA, TUESDAY, SEPTEMBER 14, 2004

2

3           THE COURT:  Good afternoon.  This is cause number

4   CR 2000-096032, State of Arizona versus Wendi Elizabeth

5   Andriano.  The record will reflect the presence of the

6   Defendant, Counsel and the jury.  Dennis Olson is on the

7   witness stand and when we recessed yesterday evening, and

8   he's on the witness stand at this time.  We'll continue with

9   the direct examination by Mr. Martinez.

10           Mr. Martinez?

11

12               DENNIS OLSON,

13           CALLED TO TESTIFY BY THE STATE,

14   HAVING FIRST BEEN DULY SWORN, FURTHER TESTIFIES AS FOLLOWS:

15

16   CONTINUED DIRECT EXAMINATION BY MR. MARTINEZ:

17       Q.    Good afternoon.  Your name, please?

18       A.    Dennis Olson.

19       Q.    And are you the same individual that was

20   testifying yesterday?

21       A.    Yes, sir.

22       Q.    And we were about to go over some photographs,

23   and we'll start with Exhibit Number 89 and I'll ask you to

24   step down.  And we also have 294 up, which is a diagram.

25           What does that show us?

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000005864

1          A.     This is the hallway that leads east from the
2    dining room and the living room area back to the back bedroom
3    and master bathroom.

4          Q.     If you could come down to Exhibit 294 and sort
5    of stand there and show us where that is leading to?

6          A.     Photograph leads down the hallway to the
7    northeast bedroom and to the master bedroom and bathroom.

8          Q.     Previously, again, and if you don't mind
9    referring to Exhibit 294, we talked about a door leading up
10   to -- out from the master bedroom that leads out to the patio
11   and then outside.  Could you show us where that is?

12         A.     Yes.  This is a door that leads from the master
13   bedroom to the rear porch.

14         Q.     We talked about a door from the living room led
15   to this -- to the same patio.  On Exhibit 294, if you could
16   show me where that door is?

17         A.     The west side of the patio leads from the
18   living room to the patio.

19         Q.     Let's take a look now at Exhibit Number 90.
20   And what does that show us?

21         A.     That's a photograph of the dining room table
22   and the dining room which is located in the north section of
23   the apartment just east of the kitchen.

24         Q.     And this item right here (indicating), what is
25   that?

1  A. That's a bar stool.

2  Q. And is that the bar stool we have here today?

3  A. Yes, same one as this Exhibit, 259.

4  Q. And on the table there appears or there is some

5 paper.  You see where I'm pointing to?

6  A. Yes.

7  Q. On that paper, were you able to determine

8 whether or not there were any drops of blood?

9  A. Yes.

10  Q. And in terms of, again, of that paper, were you

11 able to make a determination as to -- and we have three terms

12 that you were using yesterday -- as to what type that was?

13  A. Yes.  That would be cast-off blood spatter.

14  Q. Exhibit 91 is a photograph of what?

15  A. This is the north wall of the dining room which

16 is this area at the top of the diagram.

17  Q. And what is this right here?

18  A. That's a large mirror that's on the north wall.

19  Q. If we go back to Exhibit 90, where would the

20 mirror be on this photograph?

21  A. It's at the top portion of the photograph, just

22 above the chair.

23  Q. Exhibit 92, what is that?

24  A. That's a photograph of a mirror on the north

25 wall of the dining room and I have on the mirror marked

1    bloodstains.

2         Q.    And that would be right here?

3         A.    Yes.

4         Q.    This photograph that's right here in the

5    mirror, is that just a reflection or is that -- do you see

6    this right here (indicating)?

7         A.    Yes.

8         Q.    This picture right here?

9         A.    That's a reflection of the photograph that's on

10   the -- the east wall of the dining room.

11        Q.    And 93?

12        A.    Just a close up of one of the bloodstains

13   that's on the mirror --

14        Q.    And --

15        A.    -- with the scale in it.

16        Q.    -- when you said you were scaling it, what does

17   that mean?

18        A.    We have little one inch strips that measures in

19   millimeters the measurement and we put it next to the

20   bloodstain to show how big it is in the photograph.

21        Q.    94?

22        A.    This is a picture of another bloodstain on the

23   mirror with the scale.

24        Q.    And, again, was this -- what kind of blood was

25   this in terms of the three types we talked about?

1         A.    Cast off.

2         Q.    And cast-off is where somebody is swinging an

3    object that may have blood on it?

4         A.    Yes.

5         Q.    How far away was this mirror from the body?

6         A.    Say approximately 12, 15 feet.

7         Q.    Exhibit Number 95, what does that show us?

8         A.    These are bloodstains that's located on the

9    wall above the mirror on the north wall of the dining room.

10        Q.    And this brown item that starts here and goes

11   up right here and then -- what is that right there

12   (indicating)?

13        A.    That's the west side of the dining room chair.

14        Q.    And the mirror that we were just looking at,

15   where would it be in relationship to this particular

16   photograph?

17        A.    It would be above it.

18        Q.    And there seems to be three spots that are

19   marked there.  Is that correct?

20        A.    Yes.

21        Q.    Is that the only drops that you found there or

22   were there more?

23        A.    I think there's more on the other side.

24        Q.    And 96?

25        A.    That's just a close up of one of the

1    bloodstains that is on the north wall.

2        Q.     97?

3        A.     Another close up of a bloodstain on a north

4    wall.

5        Q.     And, again, those are cast-off?

6        A.     Cast off, yes.

7        Q.     And Number 98, what is that?

8        A.     A Cast-off bloodstain on the north wall.

9        Q.     Exhibit 99, first of all, what is that?

10       A.     That is a children's plastic chair.

11       Q.     And where is it located on 294?

12       A.     I believe it's located right here (indicating).

13   It's just west of the table and against the north wall.

14       Q.     And of interest to us, is there any blood on

15   this one?

16       A.     Yes.

17       Q.     Show me where?

18       A.     There's bloodstain at the bottom of the chair,

19   and I believe this is a bloodstain also.

20       Q.     In relationship to the bloodstains on the wall,

21   where would the wall be, the one that had the bloodstains,

22   the ones we just talked about, Exhibit 97, 98, and 96 and 95?

23       A.     It would be the wall in this area right here

24   just above it.

25       Q.     And the mirror that also had the bloodstains,

1   where would it be if we use this photograph as a reference?

2          A.     It would be above this chair on the wall.

3          Q.     And finally, if we look at Exhibit 100, what is

4   that?

5          A.     That's a close up of the bloodstain that's on

6   the bottom of the chair.

7          Q.     I'm going to show you some more photographs,

8   Exhibits 101 through 108.  Go ahead and take a look at them.

9                 (Pause in proceedings.)

10  BY MR. MARTINEZ:

11         Q.     Do you recognize what's in those photographs?

12         A.     Yes, I do.

13         Q.     What's in them?

14         A.     They're pictures of bloodstains that's located

15  in the kitchen area on the refrigerator, countertop.

16         Q.     And, again, are these photographs accurate

17  representations of the kitchen area and the cabinets as it

18  existed back on October 8 of year 2000?

19         A.     Yes.

20         MR. MARTINEZ:  Move for admission of exhibits 101

21  through 108.

22                (Pause in proceedings.)

23         MR. PATTERSON:  I have the same position, Judge.

24         THE COURT:  Exhibit Numbers 101, 102, 103, 104, 105,

25  106, 107, and 108 for identification are admitted into

1    evidence.

2                        (Pause in proceedings.)

3    BY MR. MARTINEZ:

4         Q.    Let's talk about Exhibit 101.  What does that

5    show us?

6         A.    This is a photograph of the refrigerator and

7    the kitchen area and showing the bloodstains on the east

8    corner of the refrigerator.

9         Q.    And Exhibit 102?

10        A.    Is a close up of the bloodstain that's on the

11   corner of the refrigerator.

12        Q.    And how would you characterize it?  What term

13   would you use to describe that?

14        A.    Transfer, smear.

15        Q.    And specifically what does that mean, a

16   transfer or smear?

17        A.    Object that's bloody is touching another object

18   that's not bloody and transferring the blood to that

19   non-bloody surface.

20        Q.    Okay.  103, what does that show us?

21        A.    This is the north end of the countertop that

22   leads into the kitchen that shows the bloodstains on the

23   countertop.

24        Q.    In relationship to Exhibit 102, next to the

25   stove here that we talked about, where would this bloodstain

12

1    be?

2          A.    The -- the refrigerator is located on the right

3    side of the photograph here and the bloodstain is up here in

4    the corner.

5          Q.    And, again, what type of bloodstain is that?

6          A.    That appears to be finger swipes, transfer.

7          Q.    Same as the one in Exhibit 102?

8          A.    Yes.

9          Q.    So it's a transfer or smear as you call it?

10         A.    Yes.

11         Q.    Exhibit 104?

12         A.    This is a photograph of the bloodstain that's

13   on the kitchen floor and also the cellular cord which goes to

14   a cell phone.

15         Q.    And this blood that's down here, we've talked

16   about a number of them -- transfers, cast-offs, smears --

17   what is this right here on the floor?

18         A.    Looks like there's blood drops and also there's

19   a smear in the blood on the floor.

20         Q.    With regard to the drops as you call them, how

21   would they -- how could that have been placed there?   In

22   other words, we've talked about other drops that are cast-off

23   and we've talked about other drops that are spattered on

24   there.  How -- are these the same or are these blood drops

25   the same or different from those?

1       A.      These would be different.  This is more like a

2    passive blood drop where blood is on an object or hand where

3    it's dropping off the hand or object onto the floor.

4       Q.      You used another term, passive blood drop.  If

5    you could just describe that?

6       A.      Passive is just the normal flow of blood. If

7    you have a bloody object or hand or whatever, when there's so

8    much blood on it that blood is dropping off that object and

9    onto the floor, that's what we call a passive blood drop.

10      Q.      Okay.  105, what does that show?

11      A.      This is the left side of the refrigerator and

12   it shows the finger smears on the freezer part and also on

13   the refrigerator part of the door.

14      Q.      We previously talked about what may have been

15   other smears on the right hand side of the photograph,

16   correct, on the refrigerator?

17      A.      That's correct.

18      Q.      And 106, what does that show us?

19      A.      This is a close up photograph of the finger

20   smears.  You can see four different marks of the blood

21   smears.

22      Q.      Exhibit 107, first of all, tell us where it is

23   in relationship to the refrigerator and counter and tell us

24   what it is?

25      A.      This is the, I guess what you call, the

1   silverware drawer.  This is the refrigerator, this is

2   directly west.  This is the top of the countertop, and this

3   would be the top drawer of that countertop, and this is a

4   silverware drawer that had some bloodstains on it.

5            Q.    And is this the position that this silverware

6   drawer was found in?

7            A.    When we arrived, yes.

8            Q.    And 108?

9            A.    Just a close up of the blood smears on the

10   drawer and also on the measuring spoon.

11           Q.    And just so I understand, you indicated these

12   were smears all around this particular drawer?

13           A.    That's what I would call them, yes.

14           Q.    Are any of these the passive blood drops that

15   you described previously?

16           A.    No.  They're blood smears.

17           Q.    Let's continue looking at some photographs.

18   Let's go to Exhibit 110 through 114.  Please take a look at

19   those.

20                 (Pause in proceedings.)

21   BY MR. MARTINEZ:

22           Q.    Do you recognize what's in those photographs?

23           A.    Yes, I do.

24           Q.    What is it?

25           A.    They're photographs of the green chair that

1    contains the bloodstained pillow in the living room.

2            Q.    Are these true and accurate depictions of the

3    pillow and chair as it existed back on October 8, 2000?

4            A.    Yes, sir.

5            MR. MARTINEZ:  I move for admission of Exhibits 110

6    through 114.

7                  (Pause in proceedings.)

8            MR. PATTERSON:  I have the same position, Judge.

9    Thank you.

10           THE COURT:  Exhibit Numbers 110, 111, 112, 113 and

11   114 are admitted into evidence.

12                 (Pause in proceedings.)

13   BY MR. MARTINEZ:

14           Q.    Let's take a look at Exhibit 110.   What does

15   that show us?

16           A.    This is the green chair that's against the east

17   wall of the living room, the bloodstained pillow.   This is a

18   hallway that leads to the east portion of the apartment.

19           Q.    And these things that are sticking up here,

20   what are those?

21           A.    That's the broken bar stool that's laying on

22   the floor.

23           Q.    And Exhibit 111?

24           A.    This is when we picked up the pillow to

25   photograph both sides.   I believe this is the bottom side of

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000005875

1    the pillow laying on the seat of the chair.

2         Q.    And these -- we've talked about smears, passive

3    blood drops, cast-off and spatter.  These particular blood

4    patterns, what are they called?

5         A.    They would be called transfer smear patterns.

6         Q.    And are these -- is there anything unusual or

7    different about these particular transfers?

8         A.    Not on this side of the pillow, no.

9         Q.    Okay.  How about on Exhibit 112?  What does

10   that show us?

11        A.    This is the other side of the pillow, this is

12   the transfer that you see on the other photograph on this

13   side of the pillow.  And this has what we call expirated

14   blood pattern on top of the pillow.

15        Q.    What -- if you could explain, what does

16   expirated blood pattern mean or what is that?

17        A.    Expirated blood is blood in your nose or your

18   mouth and you expirate it.  As you're trying to breathe,

19   you're blowing out blood out of your mouth and nose.

20        Q.    And Exhibit 113?

21        A.    Just a close up of the expirated blood pattern

22   on the pillow.

23        Q.    114, what does that show us?

24        A.    Item Number 18 is a broken piece of metal lamp

25   that we found on the seat of the couch.  This is the

1    bloodstained pillow that was next on it -- sorry, this was on

2    the green chair, not on the couch.

3         Q.    With regard to this particular pillow, was it

4    on top of the piece of lamp or is this how you found the lamp

5    and the -- what we believe to be a piece -- and the pillow?

6         A.    No.  This is how we found it.

7         Q.    And if you take a look at Exhibit 110 from a

8    different perspective, the number 18 that you guys numbered

9    would have been where?

10        A.    It would have been in this corner of the chair

11   below the pillow.

12        Q.    And was the pillow covering that or to the side

13   of that particular item?

14        A.    I believe it was just like we found it.  It was

15   just in that little open area of the seat and the pillow was

16   laying like crossways.

17        Q.    Let me show you some photographs and let's

18   continue talking about these items that were found, and I

19   want you to -- to that end, I want you to take a look at

20   Exhibits 115 through 124.

21             (Pause in proceedings.)

22   BY MR. MARTINEZ:

23        Q.    What do they show?

24        A.    They're specific photographs of the broken lamp

25   pieces, some of the bloodstains that we have in the living

1    room.

2            Q.    And is this a true and accurate depiction of

3    these pieces as they were when you found them back on October

4    8 of the year 2000?

5            A.    Yes, sir.

6            MR. MARTINEZ:  Move for admission of Exhibits 115

7    through 124.

8                    (Pause in proceedings.)

9            MR. PATTERSON:  Same position, Judge.  Thank you.

10           THE COURT:  Exhibit Numbers 115, 116, 117, 118, 119,

11   120, 121, 122, 123, and 124 for identification are admitted

12   into evidence.

13                   (Pause in proceedings.)

14   BY MR. MARTINEZ:

15           Q.    Let's start by taking a close up look at

16   exhibit -- of where your Number 18 is, which is Exhibit 115.

17   What does that show us?

18           A.    This is a piece of broken lamp found on the

19   corner of that green chair.

20           Q.    And is that the bottom or the top -- the design

21   side or outer part of the piece?

22           A.    It -- it's the inner part.

23           Q.    And if you take a look at 116, that shows us

24   what?

25           A.    It's the same piece of lamp that's placed on a

1    blue piece of paper and this shows the outer part of the

2    lamp.

3            Q.    Did this appear to be what you believe to be

4    blood on that particular item?

5            A.    Yes.

6            Q.    Now, I'm going to show you what has been marked

7    for identification as Exhibit 241 and, it's actually opened a

8    little bit, but take a look at it.  Do you recognize that?

9            A.    Yes.

10           Q.    What is it?

11           A.    It's Item Number 18, that broken piece of lamp.

12           MR. MARTINEZ:  I move for admission of Exhibit 241.

13           MR. PATTERSON:  No objection.

14           THE COURT:  Exhibit 241 for identification is

15    admitted into evidence.

16                 (Pause in proceedings.)

17    BY MR. MARTINEZ:

18           Q.    Let's take a look at it on the ELMO and see

19    what it actually looks like.  What is this right here

20    (indicating)?  What is that?

21           A.    Some kind of design that's on the piece of

22    lamp.

23           Q.    Does it also appear to be a design right here

24    (indicating) going up and down?

25           A.    Yes.

1       Q.     Let's take a look at Exhibit 117.   First of
2   all, let's start with what is this item right here on the
3   left.
4       A.     That is the I would call the left side of that
5   green chair that's against the east wall of the living room,
6   and then this is the north portion of the couch that's
7   against the east wall.   There's a small table in between
8   them.
9       Q.     What about the -- is this the table where your
10  Number 18 was found, which is our Exhibit Number 241?   Is
11  that where it was found?
12      A.     It was found on top of this green chair.
13      Q.     All right.   And what is this right down here at
14  the bottom?
15      A.     This is the broken piece of stool.
16      Q.     And there seems to be something yellow right
17  there.   Do you know what that is?
18      A.     Yes.   These are number placards we use to
19  identify evidence so we could photograph it and collect it.
20      Q.     Take a look at Number 118.   What is it we're
21  looking at there?
22      A.     Item Number 16 is another piece of broken lamp
23  that was found on the floor, and 15 is the paper napkin that
24  we found that has bloodstains on it.
25      Q.     That would be this right here, the paper

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000005880

1    napkin, right?

2              A.    Yes, sir.

3              Q.    And Exhibit Number 119, what does that show?

4              A.    That is a piece of broken lamp.  The shadow is

5    covering up the majority of it.

6              Q.    But if we take a look at Exhibit 120, what does

7    that show us?

8              A.    This is the same piece of broken lamp on the

9    floor.

10             Q.    I want you to take a look at Exhibit Number

11   242.  Do you recognize that?

12             A.    Yes.

13             Q.    What is it?

14             A.    It's Item Number 16, the broken piece of lamp.

15             Q.    And that's the one we're taking a look at

16   that's pictured in Exhibit 120?

17             A.    Yes.

18             Q.    Does that also have what you believe to be the

19   presence of blood on it?

20             A.    Yes, sir.

21        MR. MARTINEZ:  Move for admission of Exhibit 242.

22        MR. PATTERSON:  No objection, Judge.

23        THE COURT:  Exhibit 242 for identification is

24   admitted into evidence.

25                   (Pause in proceedings.)

1    BY MR. MARTINEZ:

2           Q.    And with regard to this one, if you could just

3    sort of --

4           MR. MARTINEZ:  If the Court will permit, may he walk

5    this in front of the jury, Your Honor?

6           THE COURT:  Yes.

7           MR. MARTINEZ:  Sort of walk it starting at that end.

8                  (Pause in proceedings.)

9    BY MR. MARTINEZ:

10          Q.    Sir, if we take a look at Exhibit 241, when we

11   take a look at Exhibit 242 side by side, they appear to have

12   the same sort of -- or do they appear to have the same sort

13   of design to them?

14          A.    Yes, they do.

15          Q.    Let's take a look at Exhibit 121.  Do you

16   recognize what's there?

17          A.    Yes.  Item Number 20 is another piece of broken

18   lamp found on the floor in front of the green chair.  This is

19   the bloodstained pillow that was on top of the green chair

20   that we've already talked about.

21          Q.    In fact, if we take a look at 112, that's the

22   one we're talking about?

23          A.    Yes, sir.

24          Q.    And 122?

25          A.    That's the close up photograph of Item Number

1  20, which is another piece of broken lamp.

2        Q.    Going to show you Exhibit Number 243.  Please

3  take a look at it.  Do you recognize it?

4        A.    Yes.

5        Q.    What is it?

6        A.    Item Number 20, broken piece of lamp.

7        Q.    Did it appear to you to have a substance on it

8  that you believed to be blood?

9        A.    Yes.

10       MR. MARTINEZ:  Move for admission of Exhibit 243.

11       MR. PATTERSON:  No objection.

12       THE COURT:  Exhibit Number 243 for identification is

13  admitted into evidence.

14              (Pause in proceedings.)

15  BY MR. MARTINEZ:

16       Q.    And if we could just take a look at it, does it

17  appear to have the same designs as the other parts of the

18  what you've described as lamps, maybe, for example, Number

19  242 -- 241?

20       A.    Yes.

21       Q.    Let's now look at Exhibit 123.  And if you

22  could orient us first where that is and tell us what we're

23  looking at?

24       A.    This is the entryway in the front door into the

25  living room.  This is the closet.  This is the carpet to the

1    living room, and this is the west wall where the trash can

2    was located.

3           Q.    And what is this item that's right here near

4    the entryway?

5           A.    That's a broken piece of lamp.

6           Q.    I'm now going to show you Exhibit Number 124.

7    What is that?

8           A.    This is a broken piece of lamp.

9           Q.    That's a close up of it, correct?

10          A.    Yes.

11          Q.    I'm now going to show you Exhibit 240.    Please

12   take a look at it.

13          A.    Okay.

14          Q.    What is it?

15          A.    It's this piece of broken lamp found at the

16   entryway to the living room.

17          MR. MARTINEZ:  I move for admission of Exhibit 240.

18          MR. PATTERSON:  No objection, Judge.

19          THE COURT:  Exhibit Number 240 for identification is

20   admitted into evidence.

21   BY MR. MARTINEZ:

22          Q.    And, again, did this also appear to have the

23   presence of blood on it?

24          A.    Yes.

25          Q.    Let me show you some other photographs,

1    Exhibits 125 through 135.

2                (Pause in proceedings.)

3    BY MR. MARTINEZ:

4         Q.    Do you recognize what's there?

5         A.    Yes.

6         Q.    What is it?

7         A.    These are photographs of the master bedroom.

8         Q.    Are these true and accurate photographs of the

9    master bedroom as it existed back on October 8th, 2000?

10        A.    Yes.

11        MR. MARTINEZ:  Move for admission of exhibits 125

12   through 135.

13               (Pause in proceedings.)

14        MR. PATTERSON:  May I have a moment with the county

15   attorney, Your Honor?

16        THE COURT:  Yes.

17               (Attorney-attorney discussion.)

18        MR. PATTERSON:  I have the same position with regard

19   to the photographs, Judge.

20        THE COURT:  Exhibit Numbers 125 through 135 for

21   identification are admitted into evidence.

22               (Pause in proceedings.)

23   BY MR. MARTINEZ:

24        Q.    Let's take a look at Exhibit 125.  What does

25   that show us?

1       A.    This is a photograph of the master bedroom, the

2   east wall along the north wall of the bedroom.

3       Q.    And if you could come down to the diagram,

4   which is 294, and show us where that --

5       A.    It would be standing on the west side shooting

6   a photograph in this direction (indicating) showing the lamp

7   and the north side of the bed.

8       Q.    Now, what is this object that's right here?

9       A.    It's a lamp.

10       Q.    Take a look at Exhibit 126.  What does that

11   show us?

12       A.    That's a close up of the lamp on the nightstand

13   next to the bed.

14       Q.    And Exhibit 127?

15       A.    It's a close up of the design of the lamp.

16       Q.    128?

17       A.    It's a close up of the design of the lamp.

18       Q.    129, what does that show us?

19       A.    We're standing in the -- it would be the

20   northeast corner of the bedroom looking southwest.  It's a

21   photograph of the foot of the bed and the west wall showing a

22   dresser and then the door that leads out onto the patio.

23       Q.    This is the door that would go to the patio.

24   Is that correct?

25       A.    Yes, sir.

1          Q.    What is this right here in the middle?

2          A.    That's an open box that used to contain one of

3    these lamps.

4          Q.    If you could show us on 294 where the box would

5    be?

6          A.    The box would be on -- I don't know what you

7    call it -- the little table at the foot of the bed.

8          Q.    Exhibit 130, what does that show us?

9          A.    We're now standing in the southwest corner

10   looking northeast.  It shows the open box for the lamp and

11   the dresser against the north wall and the lamp in the

12   northeast corner.

13         Q.    The lamp -- this is a box?

14         A.    Yes.

15         Q.    Exhibit 131?

16         A.    We're standing at the northwest corner of the

17   bedroom looking south and it shows the box at the foot of the

18   bed and the table that it's on.  And also, at the top

19   left-hand corner, there's the glass lamp shade that goes on

20   top of the lamp.

21         Q.    If we go back to Exhibit 126, does this have a

22   glass lamp shade already on it?

23         A.    Yes, it does.

24         Q.    Exhibit 132?

25         A.    It's a photograph of a box that contains one of

1      those lamps.

2          Q.    And up here, what is that (indicating)?

3          A.    That's a lamp in the northeast corner of the

4      bedroom that appear to be the same design that's on the box.

5          Q.    Exhibit 133?

6          A.    It's a close up of the box.

7          Q.    Exhibit 134?

8          A.    We're standing on the north side of the bed,

9      looking south, and it shows the glass lamp shade on top of

10     the bed, and that's the window that oversees the south side

11     of the property.

12         Q.    And Exhibit 135?

13         A.    That's a picture of the lamp shade that's on

14     the bed with the light bulb, and also the washer that helps

15     tighten down the light shade on top of the lamp.

16         Q.    Why don't you go ahead and take a seat.

17               Go ahead and take a look at exhibit 263.   What

18     is it?

19         A.    It's the lamp that's located in the northeast

20     corner of the bedroom.

21         Q.    And if we take a look at Exhibit 126, is that

22     the lamp you're talking about?

23         A.    Yes.

24         Q.    If I may have it back.

25               MR. MARTINEZ:  Move for the admission of Exhibit

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1   263.

2                    (Pause in proceedings.)

3          MR. PATTERSON:  I have no objection, Judge, although

4   can I just inquire of the witness?  There's a broken light

5   bulb in here.  Was it broken at the time you put it in the

6   box?

7          THE WITNESS:  I don't think so no.

8          MR. PATTERSON:  It may have been broken being

9   transported either from this apartment to your police station

10  or from the police station to the courtroom?

11         THE WITNESS:  That's correct.

12         MR. PATTERSON:  No objection, Judge.

13         THE COURT:  Exhibit 263 for identification is

14  admitted into evidence.

15  BY MR. MARTINEZ:

16         Q.   Why don't you go ahead and hold it up so people

17  can see it.  And the designs on that match the designs, for

18  example, on Exhibit Number 241?

19         A.   Yes, it does.

20         Q.   And how about the design of that?  Does it

21  match the design on Exhibit Number 242?

22         A.   Yes.

23         Q.   And does it match the design on Exhibit Number

24  243?

25         A.   Yes it does.

1    Q.    And does it match the exhibit on -- the design

2    on Exhibit Number 240?

3    A.    Yes, it does.

4    Q.    If you could take a look at Exhibit 294 from up

5    there and if you could step down and show us where these

6    pieces were found of the lamp?

7    A.    I don't know which exhibit numbers, but there's

8    one found at the entry way from front door to the living

9    room, one on top of this green couch, one on the south side

10   of the couch, and one on the west side --   I'm sorry, the

11   green chair, and one in front of the green chair.

12   Q.    And the lamp itself, the one that we have right

13   behind you, where was that found?

14   A.    It's located in the northeast corner of the

15   master bedroom.

16   Q.    And was the box that was found for this lamp or

17   another lamp the same as this one?   Where was this found?

18   A.    Found on the little table at the foot of the

19   bed.

20   Q.    All right.   What is this?

21   A.    This is the glass lamp shade.   That's what I

22   call it.

23   Q.    Okay.   And there was two of those, correct,

24   back at the apartment?

25   A.    Yes, one laying on the bed and one actually on

1    the lamp.

2         Q.    Go ahead and have a seat.

3              Were you -- did you or any other members of the

4    Phoenix Police Department, were they ever able to find the

5    other lamp?

6         A.    No.

7         Q.    Did the Phoenix Police Department look

8    throughout the living room where the body was found?

9         A.    Yes.

10        Q.    Did they look through the kitchen?

11        A.    Yes, sir.

12        Q.    How about the living room area?  Not the living

13   room, but the dining room area.  Did they look there?

14        A.    Yes.

15        Q.    How about the children's bedrooms?  Did you

16   look there?

17        A.    Yes.

18        Q.    How about the master bedroom?

19        A.    Yes.

20        Q.    Did they look through every part of that

21   apartment?

22        A.    Yes.

23        Q.    Were they successful in finding the base, if

24   you will, with these designs on it anywhere in that

25   apartment?

1       A.    No.

2       Q.    Let me talk to you a little bit more about some

3   of the items that have been found there.  Take a look at

4   Exhibit 252.  What is that?

5       A.    This is a pair of green shorts that the victim

6   was wearing.

7       Q.    And these were the ones that the police seized?

8       A.    Yes.

9       Q.    If I may have them back.

10      MR. MARTINEZ:  Move for the admission of Exhibit 252.

11      MR. PATTERSON:  I have no objection, Judge.  Thank

12   you.

13      THE COURT:  Exhibit 252 for identification is

14   admitted into evidence.

15              (Pause in proceedings.)

16   BY MR. MARTINEZ:

17      Q.    Officer, if you could just take Exhibit 252

18   out.  You may not need the scissors, but hold it up so we

19   could see it.

20              (Pause in proceedings.)

21   BY MR. MARTINEZ:

22      Q.    And that -- that would be the front that you're

23   showing us?

24      A.    Yes.

25      Q.    And if you could show us the back.  With regard

1    to the belt, is it the kind that stays on there all the time

2    or is it the kind that you actually have to get an

3    independent belt that goes around?

4              A.    No, it's an independent belt.

5              Q.    If you could put that away, please.

6                    Let's take a look at Exhibit Number 260, can

7    you tell me what that is?

8              A.    This is the bloodstained pillowcase.

9              Q.    And where was it found?

10             A.    It was found on the pillow on the green chair

11   in the living room.

12             Q.    If I may have it back.

13             MR. MARTINEZ:  Move for the admission of Exhibit 260.

14             MR. PATTERSON:  I have no objection, Judge.

15             THE COURT:  Exhibit 260 for identification is

16   admitted into evidence.

17   BY MR. MARTINEZ:

18             Q.    Why don't you go ahead and open it for us and

19   hold it up so we could take a look at it.

20                   (Pause in proceedings.)

21             THE WITNESS:  You want me to take it out of the bag

22   or just --

23             MR. MARTINEZ:  Yes, please.  And if you could just

24   hold it up so we could look at it.

25                   (Pause in proceedings.)

1              MR. MARTINEZ:  Go ahead and put it back.

2                    (Pause in proceedings.)

3     BY MR. MARTINEZ:

4              Q.    I want you to take a look at Exhibit 323.   What

5     is it?

6              A.    This is the silverware drawer that's located in

7     the top drawer in the kitchen by the refrigerator.

8              MR. MARTINEZ:  Move for admission of Exhibit 323.

9              MR. PATTERSON:  No objection, Judge.

10             THE COURT:  Exhibit 323 for identification is

11    admitted into evidence.

12    BY MR. MARTINEZ:

13             Q.    If you could just hold it up so we could take a

14    look at it.

15                   (Pause in proceedings.)

16    BY MR. MARTINEZ:

17             Q.    Let's take a look at Exhibit Number 256.   What

18    is it?

19             A.    This is the red and white blanket that was

20    laying on the floor next to the victim's neck.

21             Q.    Did it have the appearance of blood on it when

22    you seized it?

23             A.    Yes.

24             MR. MARTINEZ:  I move for the admission of Exhibit

25    256.

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1          MR. PATTERSON:  No objection.

2          THE COURT:  Exhibit 256 for identification is

3   admitted into evidence.

4                    (Pause in proceedings.)

5   BY MR. MARTINEZ:

6          Q.    Exhibit Number 245, please tell me what it is?

7          A.    There is a napkin that we found laying on the

8   floor by the green chair and the couch.

9          Q.    If I show you Exhibit Number 121, which is the

10  green chair, where would the napkin have been found?

11         A.    Found on the south side between the couch and

12  the chair.

13         Q.    Does it have the appearance of a red substance

14  that you believe to be blood?

15         A.    Yes.

16         MR. MARTINEZ:  Move for the admission of Exhibit 245.

17         MR. PATTERSON:  No objection, Judge.

18         THE COURT:  Exhibit Number 245 for identification is

19  admitted into evidence.

20  BY MR. MARTINEZ:

21         Q.    Now, I want to show you Exhibit 246.  If you

22  could take a look at it.  What is it?

23         A.    This is the document that was laying on top of

24  the kitchen table, dining room table in the dining room.

25         Q.    Was this the one that was right in front of the

1    mirror?

2           A.    Yes.

3           Q.    And is this the one you believe that also has

4    the appearance of blood on it?

5           A.    Yes.

6           MR. MARTINEZ:  I move for the admission of Exhibit

7    246.

8           MR. PATTERSON:  No objection, Judge.

9           THE COURT:  Exhibit Number 246 for identification is

10   admitted into evidence.

11   BY MR. MARTINEZ:

12          Q.    And if we take a look at Exhibit Number 90, can

13   you tell us where 246 was picked up from?

14          A.    Yes.  It was picked up from the east side of

15   the dining room table.

16          Q.    Okay.  Take a look at Exhibit 248.  What is it?

17          A.    That's the two cell phone cords located in the

18   middle of the kitchen floor.

19          Q.    And one appears to be cut from the other,

20   correct?

21          A.    Yes.

22          MR. MARTINEZ:  I move for the admission of Exhibit

23   248.

24          MR. PATTERSON:  No objection.

25          THE COURT:  Exhibit Number 248 for identification is

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    admitted into evidence.

2    BY MR. MARTINEZ:

3         Q.    And was this next to a smear of blood?  Do you

4    remember the configuration of where it was?

5         A.    Yes.

6         Q.    Why don't you -- did you happen to also get a

7    diagram, if you will, of apartment 132 and the other

8    apartments that may have been in that same building?

9         A.    Yes.

10        Q.    I want you to take a look at exhibits 321 and

11   322.  What do they show?

12        A.    This is a diagram of a breezeway that goes

13   through the apartments by the defendant's apartment, 132.

14        Q.    And one of them, 321, has some measurements on

15   it and 322 does not, correct?

16        A.    That's correct.

17        MR. MARTINEZ:  I move for admission of Exhibits 321

18   and 322.

19        MR. PATTERSON:  May I ask a question or two, Your

20   Honor, on these exhibits?

21        THE COURT:  Yes.

22        MR. PATTERSON:  When were these created?

23        THE WITNESS:  Saturday.

24        MR. PATTERSON:  Last Saturday?

25        THE WITNESS:  Yes, sir.

1          MR. PATTERSON:  And did you go out and do the actual

2     measuring at the scene?

3          THE WITNESS:  Yes, I did.

4          MR. PATTERSON:  I have no objection, Judge.

5          THE COURT:  Exhibit Numbers 321 and 322 for

6     identification are admitted into evidence.

7     BY MR. MARTINEZ:

8          Q.    Let's take a look at 342 first.  What is that

9     area at the top of the diagram?

10          A.    This is the parking lot and the sidewalk and

11     this is stairwell that goes up to the second and third floor.

12          Q.    And the area at the top, is that north, west,

13     east or south?

14          A.    Oh, sorry.  Yes, top is facing north, this is

15     east, west, and the bottom, south.

16          Q.    So this would -- would it be fair to

17     characterize this as the north entrance?

18          A.    Yes.

19          Q.    And the apartment immediately to the right

20     would be what?

21          A.    It would be 125.

22          Q.    And the one to the left?

23          A.    126.

24          Q.    And then the one at the bottom right?

25          A.    Apartment 132.

1          Q.    And then to the left?

2          A.    131.

3          Q.    Is there a way to get from the north side all

4    the way down to the south side of the building that is

5    unimpeded?

6          A.    Through the breezeway?

7          Q.    Yes.

8          A.    Yes.  There's a door at the south side that can

9    be opened and exit onto the south side of the building.

10         Q.    And what is the area that's down here

11   (indicating)?  What is it composed of down here?

12         A.    I believe -- well, it stops right here.  This

13   is all gravel landscaping and this is the stairwell that goes

14   up to the second and third floor, and there's a little cement

15   walkway right there (indicating).

16         Q.    What is this right here?

17         A.    This is the patio to apartment 132.

18         Q.    You previously indicated that there's two ways

19   to get to that patio.  If you could point out on that diagram

20   how it is that you can get to the patio from inside apartment

21   132?

22         A.    There's a doorway to the living room that comes

23   to the patio, and a doorway from the bedroom, this comes into

24   the patio.  This is a storage room.

25         Q.    Is there a way to get to the north part of the


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000005899

1  entry to the breezeway if one goes through patio and without

2  going through the breezeway here?  Is there another way to

3  get to the north side?

4          A.    Well, this is all enclosed.  You could climb

5  over the wall, walk over to the parking lot and walk up to

6  the north side and back west to the front.

7          Q.    And then you could come down this way?

8          A.    And then you come back south into the

9  breezeway.

10         Q.    And just so that we complete the picture,

11 Exhibit 321 does have some measurements on it, doesn't it?

12         A.    Yes, sir.

13         Q.    And what's the distance between this wall here

14 to the parking lot -- or why don't you just tell me what that

15 55 means?

16         A.    This is -- yeah.  This is the sidewalk, west

17 side of the sidewalk to the parking lot is 55 feet.  And

18 then --

19         Q.    Okay.

20         A.    From this sidewalk down to the edge of the

21 building is 95 feet.

22         Q.    And from this wall to the --

23         A.    From this -- from the south side of the

24 building, this is the 5 foot brick wall, that's 45 feet.

25         Q.    I want to take you back to the scene for a

1    minute and ask you about Exhibit Number 239?

2         A.    Can I take these off?

3         Q.    Yes.  Actually, no.  Go ahead and keep them.

4    What is Exhibit 239?

5         A.    These are hairs that were taken from the

6    victim's right hand and placed in an envelope.

7         MR. MARTINEZ:  Move for admission of Exhibit 239.

8         MR. PATTERSON:  No objection.

9         THE COURT:  Exhibit 239 for identification is

10   admitted into evidence.

11   BY MR. MARTINEZ:

12        Q.    Take a look at Exhibit 238.  What is this?

13        A.    These are hairs from the victim's left hand

14   taken from him at the scene.

15        Q.    Is this the left or right hand?

16        A.    This is the left hand.

17        Q.    Which one is it?

18        A.    Left hand.

19        MR. MARTINEZ:  Move for admission of Exhibit 238.

20        MR. PATTERSON:  I assume it's in the envelope?

21        MR. MARTINEZ:  Yeah.  The hairs are inside the

22   envelope.

23        MR. PATTERSON:  No objection, Judge.

24        THE COURT:  Exhibit 238 for identification is

25   admitted into evidence.

1    BY MR. MARTINEZ:

2         Q.    I want you to take a look at Exhibit 251.   What

3    is it?

4         A.    This is a plastic bag and a hair barrette

5    that's bloodstained, found on the floor next to the green

6    chair.

7         Q.    I'm going to show you Exhibit Number 121.

8    Where would the hair barrette be found?

9         A.    It would be located on the south side of the

10   chair on the floor.

11        Q.    Does the hair barrette appear to have what you

12   believe to be blood?

13        A.    Yes.

14        MR. MARTINEZ:  Move for admission of 251.

15        MR. PATTERSON:  No objection.

16        THE COURT:  Exhibit 251 for identification is

17   admitted into evidence.

18             (Pause in proceedings.)

19   BY MR. MARTINEZ:

20        Q.    If you could just show it to the jury, please.

21   And now showing you what has been marked for identification

22   as Exhibit 237.   What is it?

23        A.    This was the knife found next to the victim's

24   body.

25        Q.    Is this the one found underneath the belt?

1          A.    Yes.

2          MR. MARTINEZ:  I move for the admission of Exhibit

3    237.

4          MR. PATTERSON:  No objection.

5          THE COURT:  Exhibit Number 237 for identification is

6    admitted into evidence.

7                    (Pause in proceedings.)

8    BY MR. MARTINEZ:

9          Q.    Why don't you go ahead and open it for me,

10   please, and then show it to the jury.

11                   (Pause in proceedings.)

12         MR. MARTINEZ:  Walk in front.

13                   (Pause in proceedings.)

14   BY MR. MARTINEZ:

15         Q.    Do you mind putting it away?

16                   (Pause in proceedings.)

17   BY MR. MARTINEZ:

18         Q.    Go ahead and have a seat.

19               You could take those off.

20               I'm now going to ask you about some of your

21   observations as an expert and the opinions you may have

22   reached based upon your review of the scene.  With regard to

23   the person that was down on the ground, do you have an

24   opinion as to whether or not he was standing or down or what

25   position he may have been when he was hit above the head

1    causing this bleeding?

2          A.    It would be my opinion he was laying on the

3    ground or close to the ground when he was struck by the bar

4    stool or the lamp.

5          Q.    With regard to, again, this laying position, he

6    may or may have -- may have been in, is it your position,

7    and, again, based on your experience and your training,

8    whether or not he ever got up after the blood began the flow?

9          A.    No, he never got up.

10         Q.    Why is that?

11         A.    There's no blood drainage from his head that

12   runs vertical down his body.  Everything is concentrated

13   around his shoulders and his head area.  There's no blood on

14   his chest, his pants, his legs.  Everything is on the arms

15   which would be consistent from laying on the floor when he

16   was injured.

17         Q.    With regard to the stab wound to the left side

18   of the neck, what is your opinion as to his position when

19   that particular stab wound was inflicted?

20         A.    He was laying on his right side with his right

21   arm extended away from his body.  His face was laying on top

22   of his right bicep.

23         Q.    If you could demonstrate that for me, please.

24         A.    If I'm lying on the ground right here, his

25   right arm is extended away from his body.  His head is laying

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000005904

1   on his bicep and this left arm is over his chest of his body.

2   As you see in the voided area from the bloodstain, he was

3   sort of in a position like this (indicating) when his throat

4   is cut which causes that trail to spurt which would cross his

5   hand, cross the bar stool, and onto the floor.

6        Q.    With regard to the belt that was found on top

7   of the knife, do you have an opinion as to whether or not if

8   that belt was put there while he was bleeding?

9        A.    That belt was placed there in that position

10  after he had bled.

11       Q.    Why do you give that opinion?

12       A.    Because the belt was in the line of the

13  arterial spurt and there was no blood on the belt.  There's a

14  little bit on the tips of the belt, but nothing on the center

15  of the belt that would indicate it was there during the

16  arterial spurt.

17       Q.    In terms of the knife that was there, do you

18  have any opinion as to whether that was placed there before,

19  during or after?  Any opinon with regard to the knife?

20       A.    The knife was also the same position.  It was

21  placed there after the arterial spurt stopped.

22       Q.    How do you know that the knife was placed there

23  after the spurt had stopped?

24       A.    Because there's no arterial spurt on top of the

25  knife that was laying on top of the arterial spurt pattern?

1     Q.     With regard to the part of the seat bottom

2  that was to the right of him, do you have any opinion as to

3  when that was placed?  In other words, was it placed before

4  or after the arterial spurt?

5     A.     I would say it would be afterwards because --

6  sorry.  That was item number 5?

7     Q.     It's the larger one of the two, not the one

8  near his head.  It's not here, it's still back there.

9     A.     I would say that would be on the floor prior to

10  the blood striking that area.

11     Q.     How about this exhibit here, which is Exhibit

12  number 258?  Any opinion as to whether it was there before or

13  after the stab wound to the neck?

14     A.     That was before because on top of the broken

15  bar stool there's arterial spurt.

16     Q.     I'm going to show you Exhibit Number 257 just

17  so we're clear.  This particular item, 257, was this there

18  before or after the arterial spurt?

19     A.     Before.

20     Q.     And, again, why?

21     A.     Because the arterial spurt is on top of it and

22  there's a void area.  If you pick up that seat, there's a

23  void area underneath the seat which indicates that the blood

24  came after the item was placed there.

25     Q.     Today we talked about some of what you'd

1      characterize as smears or transfers on the -- on the

2      refrigerator and the stove.  With regard to that, is it -- do

3      you have an opinion as to whether or not, based on what you

4      just told us, whether or not the individual that was down on

5      the ground ever got up and placed that blood, for example, on

6      the corner of the refrigerator?

7              A.     I would say he didn't.

8              Q.     Why not?

9              A.     Due to the injuries he sustained, the amount of

10     blood loss that he had, and plus, there would be -- the blood

11     patterns itself on the body does not indicate he ever got up

12     after being struck.

13             Q.     How about with regard to the blood smears that

14     were on the counter as you walk into the kitchen?  Do you

15     have an opinion as to whether or not the individual that was

16     injured put those there?

17             A.     Same opinion.  I don't think he did that.

18             Q.     How about with regard to the kitchen where we

19     have the knives and utility holder, which is Exhibit Number

20     323.  The blood smears that were there, do you have an

21     opinion as to whether or not the person that was down on the

22     ground ever put these smears on there?

23             A.     It would be my opinion he did not.

24             Q.     And why not?

25             A.     Because of the blood patterns on the victim's

1    body and his injuries.

2          Q.    How about the smears in the middle of the

3    kitchen?  Do you know what I'm talking about?

4          A.    Yes.

5          Q.    The ones next to the telephone cord, cell phone

6    cord that appears to be cut.

7          A.    Yes.

8          Q.    Again, given your experience and what you saw

9    about the scene, is it your opinion that the person that was

10   down and that was bleeding, did he put those blood smears or

11   what you call passive drops in that area?

12         A.    No.  The smears appear to be maybe someone

13   walking through the blood and smearing them.  If it were the

14   victim, it would be on the bottom of the victim's feet.  He

15   didn't have any blood on the bottom of his feet.

16         MR. MARTINEZ:  I don't have any further questions.

17         MR. PATTERSON:  Judge, may we approach?

18         THE COURT:  Yes.

19

20              (The following proceedings were held at the

21   bench:)

22

23         MR. PATTERSON:  Judge, I suggest a 10 minute or a 15

24   minute recess to I could get organized so I'm not stumbling

25   and fumbling around.

1       MR. MARTINEZ:  One other thing, I may have too many

2   people.  What I mean by that, Trip McKinnon is one of the

3   paramedics that responded both times.  He had surgery to his

4   shoulder and can't drive.  I think either his mother or his

5   wife, one of the two, drove him here today, and I told him

6   that I would ask your permission to allow me to stop this

7   maybe like around -- I thought at the break, at 3:15, and put

8   him on, but, you know, whenever you want.

9       MR. PATTERSON:  Okay.

10       MR. MARTINEZ:  We could do it.  I just don't want him

11   to come back because he doesn't have a ride back.

12       THE COURT:  Do you want to do it right now?

13       MR. PATTERSON:  I would prefer to take a few shots at

14   this guy and then take a break.

15       THE COURT:  Okay.

16

17       (The following proceedings were held in open

18   court:)

19

20       THE COURT:  Ladies and gentlemen, what I'll do is

21   we'll take two 10 minute breaks today.  We'll take a 10

22   minute break at this point in time.

23       So we'll take a 10 minute break at this point

24   in time.  During this break, remember the entire admonition I

25   gave you including the fact you're not to discuss this case

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    with anyone, do not let anyone discuss the case with you.

2    Keep an open mind about the case.

3              We'll take a 10 minute break.

4

5              (Recess.)

6

7              THE COURT:  This is cause number CR 2000-096032,

8    State of Arizona versus Wendi Elizabeth Andriano.  The record

9    will reflect the presence of Defendant, Counsel and the jury.

10   Dennis Olson is on the witness stand, and we'll begin

11   cross-examination by Mr. Patterson.

12             MR. PATTERSON:  Thank you, Judge.

13

14   CROSS-EXAMINATION BY MR. PATTERSON:

15        Q.   Good afternoon, Detective Olson.

16        A.   Good afternoon.

17        Q.   We have spoken before, haven't we?

18        A.   Yes, sir.

19        Q.   Happened back on October 8, 2002?

20        A.   I believe that's the correct date, yes.

21        Q.   And I had a tape recorder at the time and I

22   tape recorded our discussion at that time?

23        A.   Yes, sir.

24        Q.   Okay.  And I had occasion thereafter to

25   transcribe that taped discussion that we had, correct?

51

1          A.     Yes, sir.

2          Q.     And I've afforded you a copy of that?

3          A.     Yes, sir.

4          Q.     Okay.  This bloodstain pattern analysis we're

5    talking about, that's essentially a method by which you can

6    reconstruct a scene, correct --

7          A.     Correct.

8          Q.     -- in trying to establish a scenario as to what

9    may have transpired at that scene at an earlier time,

10   correct?

11         A.     That's correct.

12         Q.     All right.  You've described one scenario.

13   You're not suggesting that there are no other scenarios that

14   may also account for the evidence that was discovered in that

15   apartment, correct?

16         A.     There could be possible other scenarios, that's

17   correct.

18         Q.     Okay.  And as I look at it, it's essentially a

19   common sense approach thing, right?

20         A.     I would say for the most part it is, yes.

21         Q.     So these folks here, we encourage them to

22   exercise their common sense too in that practice as well,

23   right?

24         A.     Yes, sir.

25         MR. MARTINEZ:  Objection.  Calls for speculation.


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1          THE COURT:  Sustained.

2     BY MR. PATTERSON:

3          Q.    All right.  Let's talk about some concepts of

4     the discipline here.  Arterial spurt happens when kind of a

5     major artery is either cut or dissected in some fashion,

6     correct?

7          A.    That's correct.

8          Q.    Okay.  And it is a function, basically, of the

9     heart pumping and driving the blood out the opening that's

10    created by whatever mechanism, right?

11         A.    That's correct.

12         Q.    Okay.  And it would continue to spurt, if you

13    will, until the heart basically stops, right?

14         A.    Correct.

15         Q.    So you may have more than one arterial spurt.

16    Is that a fair statement?

17         A.    Yes.

18         Q.    Okay.  And bloodstain pattern analysis, the

19    term "pattern" is in the title, okay?  And I believe that's

20    there because you derive more information if there's a series

21    of bloodstains rather than just, say, one or two droplets.

22    Is that a fair statement?

23         A.    Yes, that's a fair statement.

24         Q.    Okay.

25         A.    You can't tell a pattern by one or two drops.

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    You have to have some type of a pattern.

2           Q.    Okay.  So you look at the totality of the stain

3    and each independent component of it to try to deduce how

4    that may have been created at some point?

5           A.    Yes, sir.

6           Q.    You could do that if there is a pattern or

7    sequence of bloodstains rather than just say one or two

8    droplets?

9           A.    That's correct.

10          Q.    Okay.  All right.  Let's talk about, first, the

11   cast-off bloodstain patterns.  You told us that those are

12   created when an object that has blood or some other liquid on

13   it, in the process of wielding that object, the stuff is

14   broadcast or cast-off from it, correct?

15          A.    That's correct.

16          Q.    Okay.  And it can be cast-off in the back swing

17   so to speak?

18          A.    Yes, sir.

19          Q.    It can be cast-off in the forward thrust of the

20   object?

21          A.    Yes.

22          Q.    All right.  And that tends to leave distinctive

23   patterns.  You could see them on the wall, ceilings and

24   floors?

25          A.    Yes.

1      Q.    Okay.  Now, let's talk about that cast-off

2  stuff.  It's fair to state that all of the cast-off was found

3  in the living room and the dining room, correct?

4      A.    Correct.

5      Q.    Okay.  There's no cast-off discovered in the

6  kitchen?

7      A.    No, sir.

8      Q.    Okay.  And in the living room, the cast-off was

9  discovered in -- well, let me back up just a little bit.

10  This living room is essentially a 15-by-15 room?

11      A.    15' 3" by 17' 3".

12      Q.    Okay.  17' 3" runs north south?

13      A.    Yes, sir.

14      Q.    And 15' 3" running east west?

15      A.    Yes, sir.

16      MR. MARTINEZ:  Judge, may I ask Counsel to use the

17  pointer so I could perhaps see?

18      MR. PATTERSON:  Okay.  I will, Judge.

19  BY MR. PATTERSON:

20      Q.    I can't get too far away from it because then I

21  can't see it.

22      So that's what we essentially have here, 17

23  going this way and 15 this way, right?

24      A.    Yes, sir.

25      Q.    And the dimension of the dining room is 9 by

1    10 -- 9 by 9?

2        A.    Yeah, basically.

3        Q.    Ball park?

4        A.    Yeah, 9 feet east-west, 8' 10" north-south.

5        Q.    And that dimension perhaps from this boundary

6    to a temporary line across here?

7        A.    That's correct.

8        Q.    Okay.  So we've got the cast-off in against

9    this wall essentially, right?

10       A.    Yes, sir.

11      Q.    It's against this sofa, if you will, and wall,

12    in this area?

13       A.    Well, the sofa I believe is impact spatter.

14       Q.    Okay.  Sorry.

15       A.    The walls would be the cast-off.

16       Q.    But there is cast-off on the wall here?

17       A.    I believe, yes.

18       Q.    So there's cast-off on the southern wall?

19       A.    Yes, sir.

20       Q.    Cast off on the closet area and against this

21    western wall, right?

22       A.    Yes, sir.

23       Q.    Okay.  And there's cast-off on what would be

24    the northern wall of the living room?

25       A.    Yes, sir.

1      Q.    Okay.  That suggests, doesn't it, that the

2  person wielding the object that was providing the cast-off

3  may be moving relative to the target that's supplying the

4  cast-off, correct?

5      A.    The subject that's swinging the object is

6  moving?

7      Q.    Correct.

8      A.    Yes, I would agree with that.

9      Q.    Okay.  We don't have a situation where the

10  object that's providing the cast-off material is being struck

11  over and over repeatedly from one location?

12      A.    Yes.

13      Q.    That is not true?

14      A.    Oh, I'm sorry.  Well, I believe that the source

15  is in one spot --

16      Q.    Okay.

17      A.    -- but the person swinging the object could be

18  moving around that source in different directions.

19      Q.    Okay.  Or, by the same token, the source could

20  be moving?

21      A.    Are you talking about a hypothetical situation

22  or this particular case?

23      Q.    I'm talking about a circumstance based upon the

24  evidence you discovered, the fact there's cast-off in the

25  entire perimeter of this living room, okay?  Clearly, the

1   person with the object providing the cast-off appears to be

2   moving.  That's a fair statement?

3           A.   Yes.

4           Q.   Right?

5           A.   Yes.

6           Q.   Okay.  At the same time that person is moving,

7   the other person could be moving too?

8           A.   He could be, but in this particular case I

9   don't think he was moving.

10          Q.   Okay.  That's your opinion, right?

11          A.   It's just -- that's what I was asking about.

12  If you're talking about a hypothetical, yeah, but the source

13  could be moving around also.

14          Q.   Exactly.  But you're talking about an opinion

15  you have.  I'm talking about the evidence is not inconsistent

16  with the proposition that the source was also moving at the

17  same time that the person with the object was moving?

18          A.   Okay.  I would say that's possible.

19          Q.   Okay.  Let's talk about the next kind of

20  bloodstain pattern that has a place in this case, and that's

21  medium velocity spatter?

22          A.   Medium velocity impact spatter, yes.

23          Q.   Impact spatter?  Okay.  That was discovered,

24  again, in the living room?

25          A.   Yes, sir.

1          Q.     And it was discovered in various places within

2     the living room, correct?

3          A.     Yes, sir.

4          Q.     Principally upon this sofa, large sofa,

5     correct?

6          A.     The large sofa, the chair on the south wall,

7     and also against the north wall of the living room.

8          Q.     Okay.  This -- where the filing area is here?

9          A.     Yes, sir.

10         Q.     Okay.  And, again, the distances, we're talking

11    about a 17-by-15 foot room?

12         A.     That's correct.

13         Q.     Okay.  Medium velocity spatter travels at what

14    pace?

15         A.     About 25 feet per second.

16         Q.     Okay.  So within this dimension, if the source

17    remained relatively constant, that medium spatter could

18    impact on various portions of this living room?

19         A.     That's correct.

20         Q.     Okay.  The distances are not too great?

21         A.     That's correct.

22         Q.     Okay.  But, again, we have spatter on the north

23    side of the room?

24         A.     Yes, sir.

25         Q.     We have spatter on the west side of the room?

1      A.     I don't believe so.

2      Q.     Sorry, south side of the room?

3      A.     Yes, sir.

4      Q.     And spatter on the east side of the room?

5      A.     Yes, sir.

6      Q.     Again, that suggests the source may be moving,

7  correct?

8      A.     I'm going to say it's possible, but not

9  probable.  That's just my opinion.  I don't think the source

10  was moving.

11      Q.     Okay.  I understand that you don't believe

12  that, but I'm saying based upon the spatter evidence that you

13  discovered, the source could have relocated within a general

14  area in the center of this living room based upon your

15  observations of the spatter patterns?

16      A.     Are you asking me if it's possible?  I would

17  probably have to say I probably have to agree with that,

18  possible.

19      Q.     Okay.  Let's talk about height, all right?  Do

20  you have something before you that you could give me precise

21  heights where the spatter pattern was discovered?  And, let

22  me see.  I have my notes here.  Your item 32 and 33 -- Items

23  32, 33, if there's a dimension?

24      A.     There's no dimension, I guess.

25      Q.     It's called a cushion cover, seat of couch,

1    north side cushion.

2         A.    Yes, sir.  I found it.

3         Q.    Okay.  And that is -- let me see.  I got some

4    photographs here.  That's -- well, I think I had those of the

5    sofa.

6               Let's talk about that.  What is that, the

7    cushion cover, seat of couch, south side -- sorry, cushion

8    cover, seat of couch, north side cushion.  What exactly is

9    that?

10        A.    I think there's a misprint on that.  I'm not

11   sure what that is.

12        Q.    Okay.  Is it one of these two?

13        A.    It's north side cushion of the couch against

14   the east wall.

15        Q.    This thing here (indicating)?

16        A.    Yes.

17        Q.    Okay.  And you actually measured the height

18   where the medium velocity impact spatter pattern was

19   observed, correct?

20        A.    Correct.

21        Q.    Okay.  And how high up this particular piece of

22   furniture was that spatter pattern?

23        A.    1 foot 6 inches high.

24        Q.    Okay.  Or let's use inches completely because

25   we're going through a number of things here.

1          A.    Eighteen inches.

2          Q.    Eighteen inches?

3          A.    Floor to 18 inches, yes.

4          Q.    Eighteen inches on that one?

5          A.    Yes.

6          Q.    Okay.  There was 33, cushion cover of seat of

7   couch, south side cushion.  You also have a height dimension

8   on that spatter pattern, correct?

9          A.    Yes, sir.

10         Q.    That's right here, right?

11         A.    Yes, sir.

12         Q.    Okay.  And what's the height of that spatter

13   pattern?

14         A.    18 inches.

15         Q.    Okay.  So the spatter patterns here you

16   observed and measured are the same?

17         A.    From the floor up to 18 inches.

18         Q.    That's a complete pattern, right, with

19   something like that?

20         A.    Yes, sir.

21         Q.    Okay.

22         THE COURT:  Go ahead and show that again.  I'm not

23   sure whether they saw that.

24         MR. PATTERSON:  If this (indicating) is about 18

25   inches?

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000005921

1          THE WITNESS:  That's close.

2          MR. PATTERSON:  Something like that?

3          THE WITNESS:  Yes, sir.

4  BY MR. PATTERSON:

5          Q.    Okay.  Okay.  On 36 you have a height

6  dimension?

7          A.    Yes.

8          Q.    Okay.  And that's described as the arm cover of

9  couch, north arm?

10         A.    Yes.

11         Q.    Okay.  And that's basically this thing right

12  here (indicating)?

13         A.    Yes.

14         Q.    Okay.  What's the height dimension of that

15  spatter pattern?

16         A.    It's about 31 inches high.

17         Q.    Okay.  2 feet 7 inches or 31 inches high?

18         A.    Yes.

19         Q.    Okay.  And, again, I don't know if this is 36

20  inches or not, but we're up around here (indicating) where

21  this pattern is observed, correct?

22         A.    Yes.

23         Q.    Okay.  Then you've got item number 42, a seat

24  cushion cover?

25         A.    Yes.


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000005922

1          Q.     Okay.  Again, impact spatter pattern observed,
2     correct?
3          A.     Yes.
4          Q.     And what's the height of that spatter pattern?
5          A.     20 inches high.
6          Q.     Okay.  Again, now we're coming down a little
7     bit, but up a little bit from the one we observed first on
8     the couch, right?
9          A.     Yes.
10         Q.     So now it's about 20 inches, right?
11         A.     Yes, sir.
12         Q.     Okay.  And then let's see, 43 is described as
13    the flowered pillow chair against south living room -- sorry,
14    let's go back to 42.  Where did we find that one seat cushion
15    cover of chair?
16         A.     That would be against the south wall right --
17    yeah.
18         Q.     Right where you're pointing at?
19         A.     Yes, sir.
20         Q.     Okay.  And the last one is 43, and that's  a
21    flowered pillow chair against south living room wall impact
22    spatter, correct?
23         A.     Yes, sir.
24         Q.     Okay.  And what's the height dimension where
25    you observed that spatter pattern on that particular item?


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1      A.    Two foot high or 24 inches.

2      Q.    24 inches.  So now we're up here, right?

3      A.    Yes, sir.

4      Q.    Okay.  All right.  And that is over in which

5  direction?

6      A.    It's the chair against the south wall.

7      Q.    This thing here or this one?

8      A.    No, sir.

9      Q.    That's the ottoman?

10     A.    That's the chair.

11     Q.    Chair?

12     A.    Yes.

13     Q.    Okay.  So you observed within this living room

14  varying heights of spatter patterns, correct?

15     A.    Yes.

16     Q.    Doesn't that suggest that the source of the

17  spatter that was providing the liquid is moving up and down

18  or changing his relative height relative to the person who

19  may be wielding the item?

20     A.    Well, that's one possibility.  The other

21  possibility is the way the person is swinging the chair, or

22  whatever it is that is hitting the source, the position she's

23  in when she's swinging it, the bloodstain I said was going

24  horizontally, but it could be going slightly upward or

25  slightly downward also.

1    Q.    But you took care to measure those dimensions

2    so it's a significant dimension, correct?

3    A.    Correct.

4    Q.    Okay.  And one of the explanations for the

5    difference in height that you observed on the living room

6    furniture is that the source of the spatter is changing his

7    or her position relative to the person who's wielding the

8    thing that's creating the problem, creating the injury?

9    A.    Well, like I said, that's one possibility.  But

10   in this particular case, I think it's the position she's in

11   swinging the chair or whatever it is, the bar stool.  She

12   could also determine how high that spatter goes too by the

13   way she swings.

14   Q.    That's a possibility?

15   A.    That's what I'm saying, two possibilities.

16   Q.    The original object, when we first started

17   talking about this, there are a number of scenarios that may

18   account for the blood pattern evidence you observed in this

19   apartment, correct?

20   A.    That's correct.

21   Q.    Okay.  Okay.  There's another concept that

22   we -- that you introduced us to during the course of your

23   direct, and I guess we call them "voids"?

24   A.    Yes, sir.

25   Q.    Okay.  It's a spot where you see no bleeding

1    where you would expect bleeding?

2          A.    Yes.   That would be a simple way of putting it,

3    yes.

4          Q.    The laws of gravity suggest there should be

5    blood and in fact there isn't, there's a void?

6          A.    Correct.

7          Q.    Okay.   Now, voids only tell us something about

8    the position of the body after the bleeding starts, right?

9          A.    Well, before or after, yes.

10         Q.    Well --

11         A.    I mean, because of the position you're in just

12   before it starts because the blood hasn't impacted that area.

13         Q.    I understand, but blood being what it is, blood

14   may not get to a position immediately, correct?

15         A.    That's correct.

16         Q.    So voids only tell us about the position of the

17   body after the bleeding starts?

18         A.    I see what are you're saying.   Yes, that's

19   correct.

20         Q.    Without bleeding, voids are of no impact,

21   correct?

22         A.    Correct.

23         Q.    There's a void on his right bicep, correct?

24         A.    Yes, sir.

25         Q.    All right.   So that says in your opinion his

1    head was on the right bicep at the time of the arterial

2    spurting, correct?

3            A.    Yes.

4            Q.    Okay.  Now, you also tell us that arterial

5    spurting is a dynamic process.  It keeps going until the

6    heart stops, correct?

7            A.    Correct.

8            Q.    All right.  So we don't know what his position

9    was prior to the point in time when he got cut on the throat,

10   do we, based upon that void?

11           A.    Well, I think that's a medical question, but I

12   would think arterial spurt would start immediately after you

13   cut it.

14           Q.    Okay.

15           A.    I would say he was in that position when his

16   neck was cut.

17           Q.    But let's go back just a little bit here.  The

18   spurting is going off in a direct position from where his arm

19   is, correct?

20           A.    It's going across his body as he's facing to

21   the right.

22           Q.    Well, if I'm here and the neck's cut here,

23   where is the spurting going to go?  That way (indicating)?

24           A.    Well, if your neck -- if you're turned more,

25   your head is going to go like it is on the --

1        Q.    I got my head on the bicep, right, like you

2    suggest Mr. Andriano had?

3        A.    Turn your face into your arm.

4        Q.    Okay.  Head, knee, arm.  Where is that -- the

5    cut's right here, right?

6        A.    Right.

7        Q.    Isn't the spurt going to go over there?

8        A.    Yes.

9        Q.    It's not going to hit the arm initially, right?

10        A.    I'm not sure you have the arm in the right

11    position.

12        Q.    Well, put my arm where you think I should put

13    it.

14        A.    The arm is more up like this.

15        Q.    Okay.  I'm here -- is this good?

16        A.    Turn your face.  It's easiest just to show the

17    photograph.

18        Q.    Well, but --

19        A.    Yeah.

20        Q.    Is this the position he was in, officer, or

21    Detective Olson, at the time he was cut?  Do we know that for

22    certain?

23        A.    In that position?

24        Q.    Yeah.

25        A.    No.  He was on his back.

1       Q.      He's been moved.   Somebody moved him, right?

2       A.      Right.

3       Q.      At least we know that's pretty consistent with

4   our observations here?

5       A.      Right.

6       Q.      But his body's been rolled over at times,

7   right?

8       A.      Right.

9       Q.      So when you walked in, you didn't see him in

10   the position that he was at the time the cutting occurred,

11   correct?

12       A.      That's correct.

13       Q.      Okay.   So you're trying, in your own mind, to

14   kind of recreate a scenario where he could have his head on

15   his bicep, and, in your opinion, the spurt would have hit his

16   hand, correct?

17       A.      Correct.

18       Q.      Okay.

19       A.      Well, not his hand.   His arm.   If I said the

20   hand, I didn't mean that.   It's over the upper part of his

21   arm.

22       Q.      Okay.   And there's a void here meaning the

23   spurt didn't hit this part of the arm?

24       A.      Correct.

25       Q.      It was impeded by or blocked out or obscured by

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000005929

1    something, correct?

2        A.    Correct.

3        Q.    Okay.  But that spurting is a constant concept

4    until the heart stops, right?

5        A.    Correct.

6        Q.    Can you put a scenario where the first spurt

7    would have missed the arm and that arterial --

8        A.    I guess I would have to agree with you.  I

9    guess I really don't know for sure.

10        Q.    First spurt misses the arm, continues with one

11    spurt or second or third.  That's what we're seeing on this

12    man's arm after he's collapsed on his bicep and created the

13    void.  That's a scenario you can't discount, correct,

14    Detective?

15        A.    I can't discount it.  That's correct.

16        Q.    Okay.  And one of the problems with this blood

17    pattern analysis is we really can't tell the times with some

18    scientific precision as to when these patterns were created.

19    We can get kind of a feel of things but not precisely, right?

20        A.    That's correct.

21        Q.    Okay.  Now, the last -- sorry, not the last,

22    Another kind of blood pattern that you introduced us to in

23    this session was transfers, okay?  And that's when something

24    with blood on it touches something that doesn't have blood on

25    it?

1        A.    Correct.

2        Q.    Okay.  And in the process it's transferred from

3   one surface to the other?

4        A.    That's true, yes.

5        Q.    Okay.  And a lot of the transfers you described

6   for us -- well, let's talk about transfers on the interior

7   door near the dead bolts.

8        A.    Yes, sir.

9        Q.    Okay.  Those transfer patterns could have been

10  made if somebody was unlocking the door to allow somebody

11  access into the apartment?

12       A.    I don't know if I could say that.  All I know

13  is there are finger smears on the side of the door.

14       Q.    In close proximity to the dead bolts?

15       A.    Yes, sir.

16       Q.    Okay.  There's a couple of smears also on the

17  refrigerator.  Let's see, in your schematic, is this the

18  refrigerator?

19       A.    Yes, sir.

20       Q.    The counter is not directly across.  It's kind

21  of kitty corner?

22       A.    Yes, sir.

23       Q.    There's another transfer?

24       A.    Yes.

25       Q.    Okay.  Consistent with somebody having grabbed

1    the refrigerator for support?

2         A.    It's a possibility, yes.

3         Q.    Okay or grabbed the counter for support?

4         A.    You're saying for support? I don't know.

5         Q.    Sorry, in the process of going in, touching it.

6         A.    They could have touched it, yes.

7         Q.    That's not inconsistent with what you

8    observed --

9         A.    Correct.

10        Q.    -- on the counter?

11        A.    Correct.

12        Q.    Same thing, going into the kitchen, grabbing

13   the refrigerator, in the process created that transfer on the

14   refrigerator?

15        A.    Yes, sir.

16        Q.    Okay. And I figure, excuse me, two transfers,

17   there's one like a -- almost like fingers coming down that's

18   right on the front of the refrigerator, right?

19        A.    That's correct.

20        Q.    And then there's more of -- a more localized,

21   if you will, transfer on the corner of the refrigerator?

22        A.    Yes, sir.

23        Q.    Okay. All right. Now, did you make any

24   effort, excuse me, to try and discern fingerprints out of

25   these transfer -- I mean, you described them as perhaps

1    finger transfer patterns.

2        A.    Well --

3        Q.    Did you make any effort to determine whether a

4    latent print could be extracted from that transfer?

5        A.    On the inside of the front door it appears

6    there may have been some type of prints in the blood so we

7    did have the evidence techs try to process that for finger

8    prints by using chemicals.  The one on the refrigerator and

9    counter, they looked at it and there's -- it was just a smear

10    and, there was lifting, but couldn't make a clean lift.

11        Q.    Okay.  So you guys -- how about the one on the

12    floor of the kitchen?

13        A.    No.

14        Q.    You made an effort on the front door jamb or

15    door proper, but your chemical process wasn't effective in

16    lifting a latent from that transfer smear?

17        A.    That was my understanding from the evidence

18    techs at the scene.  They couldn't lift a fingerprint.

19        Q.    Okay.  So we don't know who created this

20    transfer smear at the door?

21        A.    I have an opinion.

22        Q.    You have an opinion, I understand, but we have

23    no fingerprint certainty?

24        A.    That's correct.

25        Q.    Okay.  And we have no fingerprint certainty

1    with regard to the refrigerator?

2         A.    That's correct.

3         Q.    Nor with the counter?

4         A.    That's correct.

5         Q.    Nor with the kitchen floor here?

6         A.    That's correct.

7         Q.    Okay.  Let's talk about the blood pools that

8    you observed in close proximity to Mr. Andriano in kind of

9    the center of the living room here.   There are two distinct

10   pools, right?

11        A.    Yes, sir.

12        Q.    And one pool you also had described as an

13   arterial spurt?

14        A.    Yes, sir.

15        Q.    Okay.  In your opinion it does appear to be two

16   separate episodes in a sequence of events that may have

17   happened within this apartment, right?

18        A.    Yes.

19        Q.    Okay.  Appears to be a period of time where he

20   was struck about the head, lay in a position on the carpet

21   for a period of time, and that created the first pool of

22   blood on the carpet?

23        A.    Yes, sir.

24        Q.    That's a reasonable scenario, right?

25        A.    Yes, sir.

1        Q.    Okay.  Sometime later.  We don't know how long

2   later, right?

3        A.    That's correct.

4        Q.    There was another incident, the -- it was

5   probably the cutting of the carotid artery, which created a

6   separate and distinct pool in a position farther north of the

7   original pool, correct?

8        A.    Correct.

9        Q.    And that is over -- well, we don't know if it's

10  overlaid or underlaid with arterial spurt, right?

11       A.    Correct.

12       Q.    We can't tell scientifically that the spurt

13  happened first and then the pooling out second?

14       A.    That would be my opinion, yes.

15       Q.    Okay.  All right.  Now, within these two

16  generalized areas between the two pools, you didn't observe

17  any drag marks, did you?

18       A.    No.

19       Q.    Okay.  You didn't observe any drag marks on the

20  carpet, correct?

21       A.    Not that I remember, no.

22       Q.    Nor did you observe any drag marks on his back,

23  correct?

24       A.    I'm not sure if I would have seen any on his

25  back.

1     Q.    Well, I assume if you're dragging something

2     through a bloody circumstance, it may create distinctive drag

3     marks on the carpet and in the process create kind of

4     replicate drag marks on the back if a bloody body is dragged

5     in that position?

6         A.    His back wasn't bloody at that time.

7         Q.    Well --

8         A.    I didn't see any indications of that.  I

9     don't -- I don't know if that means it didn't happen.  I just

10    didn't see indications of it.

11        Q.    Let me show you Items 8, 11, and 38 that have

12    been admitted.  With regard to 8 and 11, there are no

13    discernible drag marks on the carpet there, right?

14        A.    I don't know if I -- not that I could see, no.

15        Q.    Okay.  And that's something you would have

16    looked for right when you were out there?

17        A.    I'm not sure if there was an issue at that

18    time.  If I would have seen it, I would have documented it.

19        Q.    Okay.  But it's something you've seen before

20    this?

21        A.    Yes, sir.

22        Q.    You know what it looks like?

23        A.    Yes, sir.

24        Q.    And had you seen that on the scene, you would

25    have made a note in your report and we'd probably have a

1 photograph of it, right?

2   A. Correct.

3   Q. Okay.  And with regard to Item 38, that's the

4 backside of Mr. Andriano, again, no discernible drag marks on

5 his back, correct?

6   A. That's correct.

7   Q. Okay.  Lost my pen here.

8   Okay.  You also observed in this living room in

9 the center, close proximity to Mr. Andriano, what you

10 described as vomit pools, correct?

11   A. Yes, sir.

12   Q. In your supplement you only talked about one

13 vomit pool, didn't you?

14   A. I believe you're correct.

15   Q. When was it you realized there was maybe a

16 second vomit pool?

17   A. I think when the blanket was moved.

18   Q. Okay.

19   A. I mean, it's not -- you know, at the time, the

20 vomit, to me, wasn't an issue until it was found out later.

21   Q. Okay.  Kind of the benefit of hindsight, right?

22   A. Yes.

23   Q. I got you.  One of the two things as you're

24 describing the vomit pools is one is decidedly larger than

25 the other, correct?

| | | |
|---|---|---|
| 1 | A. | Yes, sir. |
| 2 | Q. | Okay.  Were samples of that vomit taken at the |

3      scene?

| | | |
|---|---|---|
| 4 | A. | Yes, there was. |
| 5 | Q. | Were they ever analyzed to your knowledge? |
| 6 | A. | I don't know if it was analyzed, but I know we |

7      seized it.

| | | |
|---|---|---|
| 8 | Q. | Okay.  You did your job and you took it? |
| 9 | A. | Yes. |
| 10 | Q. | Okay.  But you don't know whether somebody |

11      followed up and had it analyzed?

| | | |
|---|---|---|
| 12 | A. | That's correct. |
| 13 | Q. | Were samples taken from what we describe as |

14      both pools or just one pool?

| | | |
|---|---|---|
| 15 | A. | I think it was just the one pool. |
| 16 | Q. | Okay. |
| 17 | A. | I think it's item 14, if I remember right. |
| 18 | Q. | All right.  Let's check that.  Item 14 you say? |
| 19 | A. | Yes.  14, vomit.  The one above the victim's |

20      head.

| | | |
|---|---|---|
| 21 | Q. | Vomit.  There you go. |
| 22 | A. | Item 14 is a pool of vomit. |
| 23 | Q. | Okay.  All right.  Sample of that pool taken, |

24      no sample taken of the other one?

| | | |
|---|---|---|
| 25 | A. | That's correct. |

1       Q.    Okay.  So obviously the second one could never

2  be tested?

3       A.    Well, I cut out the carpet.  That might be

4  enough to sample.

5       Q.    Okay.

6       A.    It could be, I guess.

7       Q.    You don't specifically recall if that was

8  included in the carpet sample that you retrieved?

9       A.    I'd have to look at it.  I'm not sure.

10      Q.    In any event, are you aware of any testing done

11  on the second vomit sample?

12      A.    No.

13      Q.    In your survey of the apartment did you notice

14  any towels that were in close proximity to Mr. Andriano?

15      A.    There was.

16      Q.    There was a big red one, right?

17      A.    That's a blanket.

18      Q.    That's more of a blanket?

19      A.    There were damp towels in the kitchen.

20      Q.    Okay.  Did you seize those damp towels?

21      A.    Yes, I did.

22      Q.    Okay.  Did you have those tested?

23      A.    I don't know if they were tested or not.  I did

24  seize them.

25      Q.    Did you look inside of them?

1 A. Yeah.  I mean, if I remember, it just seemed

2 like they were just damp, they were wet.

3 Q. Didn't see any kind of gelatin capsules inside

4 the towel there?

5 A. No.

6 Q. Okay.  All right.  Let's talk about your theory

7 with regard to this blood spatter pattern.  This is Item 29.

8 This is Mr. Andriano's left foot, I believe.

9 A. Yes, sir.

10 Q. Okay.  Now, what's your theory with regard to

11 how those drops got on -- well, first we should start with

12 how many drops are there?

13 A. It appears there's at least one or two.

14 Q. Okay.  Two drops.  You told us earlier that two

15 drops ain't a great basis to make any kind of opinion with

16 regard to blood pattern spatter analysis, right?

17 A. That's correct.

18 Q. Okay.  So are you going out on a limb with this

19 one here?

20 A. No. This foot is in line with impact patterns

21 against the north wall.

22 Q. Okay.

23 A. So my opinion is the impact spatter hit the top

24 of the feet and also traveled past the feet, striking the

25 wall and the floor.

1        Q.    Okay.  For that to happen, you'd have to be

2   completely supine, right?

3        A.    Yes.

4        Q.    Laying on his back.

5        A.    I wouldn't say he's laying on his back, but

6   down on his side.  You'd have to be horizontal.

7        Q.    Completely on the -- on the floor, right?

8        A.    Yes, sir.

9        Q.    Okay.  Because it's that low over here, right?

10       A.    Yes.

11       Q.    Okay.  Did you look at the autopsy photographs?

12       A.    I may have.  I don't have a copy of them.

13       Q.    Do you know where -- where almost all of his

14  injuries were sustained in terms of head injuries?

15       A.    I believe it's on the top of his head.

16       Q.    Or the top of the back of his head?  It's this

17  part of the head, wasn't it?

18       A.    I believe so.

19       Q.    There's nothing up here, right?

20       A.    I'd have to -- I'd have to review them again.

21  I'm not sure.

22       Q.    All right.

23       A.    I'll take your word for it.

24       Q.    Okay.  But you would agree with me then if he's

25  completely supine lying on his back, there's no way he's

1   getting struck in a fashion that's sending medium velocity

2   spatter up against this wall, correct?

3       A.   Well, I'm not sure what position or when that

4   was occurring, but it's my opinion that's medium velocity

5   impact spatter against that wall.  His foot was in line with

6   that.

7       Q.   The foot's over here.  It's not against the

8   wall, right?

9       A.   Within a couple feet of the wall.

10      Q.   Okay.  In order for that to happen, he had to

11  have been sideways, kind of in a fetal position.  Is that

12  what you're saying?

13      A.   No.  He could be lying on his left side, right

14  side, on his back.  If he's hit on the back of the head, he's

15  obviously laying on his right side.

16      Q.   If he's laying on his back, he wouldn't be able

17  to get hit in the back of the head.

18      A.   Correct.

19      Q.   And as I understand the mechanism of spatter,

20  it didn't go through the head, right, not continuing to go

21  out the eyes, right?

22      A.   No.  What happens is it goes on the object, the

23  lamp, stool, whatever it is.  It hits the head, the blood

24  flies off the lamp and hits the wall.

25      Q.   That's cast-off?

1        A.    Not exactly.  Not when you're hitting an

2   object.  It's impact spatter.

3        Q.    Well, you called this --

4        A.    Cast off is when you fling an object and get

5   cast-off on the wall.  Obviously, if you have an object in

6   your hand and it hits, this will have blood on this object

7   and this object, both being in this direction.

8        Q.    Not through the hand though?

9        A.    No, but you're not going to hit directly on the

10  source either.

11       Q.    But in terms of a line, it's going this way,

12  right?  It's not going forward, right?

13       A.    No.  It's going -- it's going to go like in 180

14  degrees.  That's why you have it all over the living room.

15       Q.    Assuming -- okay.  You have drops on your hand

16  like this.  Are you telling me the blood on my palm is going

17  to go through my palm, come out and hit the jury?

18       A.    Blood on this palm right here, if you don't hit

19  it squarely, you will have it up here.  That will be --

20       Q.    Assuming it's up here on the fingers?

21       A.    Right.

22       Q.    Say this is an object and there will be blood

23  all over it --

24       A.    If you hit it squarely all the time, I would

25  agree with you.  But if you miss a little bit --

1      Q.    Okay.  All right.  Let's talk about another

2   possibility for those two drops or so on the foot.  Could it

3   have been expired blood?

4      A.    No.

5      Q.    Why not?

6      A.    There's nothing on the legs or his pants.

7      Q.    Well, I mean, he could miss his legs and pants

8   and just hit the toe, right?

9      A.    He's not standing up though.  He's laying down.

10     Q.    Well, you're assuming he's lying down

11   throughout this process.  I'm saying maybe at some point in

12   time he was actually on his feet.

13     A.    No.  He would have blood down the front of him.

14     Q.    Assuming he was on his feet for a period of

15   time to allow gravity to do its work --

16     A.    I disagree with that theory.

17     Q.    Okay.  How about if he has blood on his hands,

18   which we know he does, and at some point that drops on his

19   big toe or little toe?

20     A.    If the drops fall on the toe and are dropping

21   off his hands, it's going to be a larger spot.

22     Q.    So it's not possible at all that it could have

23   dropped off?

24     A.    I'm not saying it's not.  I'm saying it's not

25   probable.

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1          Q.    Okay.  It is a possibility?

2          A.    It is.

3          Q.    It is an explanation for the two blood droplets

4    we find on his toes?

5          A.    You're  -- my opinion is that's not the way it

6    happened.  If you're asking me if that's one of many

7    possibilities, that's very possible, yes.

8          Q.    Okay.  It's an alternative scenario?

9          A.    Yes.  I would say that.

10         Q.    Okay.  All right.  Beyond the blood spatter

11   pattern stuff that you did, you also kind of made some

12   observations with the generalized condition of this

13   apartment, right?

14         A.    Yes, sir.

15         Q.    Okay.  And you observed damage to items

16   consistent with what in your experience appear to have been a

17   physical altercation between at least two people, correct?

18         A.    That was my first observation, yes.

19         Q.    Okay.  I mean, you may have come to a different

20   conclusion, but you observed damage to this apartment, right?

21         A.    Yes.

22         Q.    Damage that you'd seen in other circumstances

23   involving domestic violence, correct?

24         A.    Yes.

25              MR. MARTINEZ:  Objection.  Calls for legal conclusion

1    of domestic violence.

2          THE COURT:  Sustained.

3    BY MR. PATTERSON:

4          Q.    In other domestic relations cases?

5          MR. MARTINEZ:  Objection.  Calls for a legal

6    conclusion.  It could be an intruder.

7          THE COURT:  I'll sustain the objection.

8    BY MR. PATTERSON:

9          Q.    In terms of where there appeared to have been a

10   fight between two persons?

11         A.    My first observation was that, yes.

12         Q.    Okay.  You observed a broken family portrait in

13   the kitchen, correct?

14         A.    Yes.

15         Q.    That was the on the ground?

16         A.    Yes.

17         Q.    Okay.  Face up?

18         A.    Yes.

19         Q.    And the glass covering or retainer, if you

20   will, was broken, shattered, right?

21         A.    Correct.

22         Q.    Okay.  On top of that was a broken flower pot,

23   correct?

24         A.    Correct.

25         Q.    Okay.  And that broken flower pot was laying on

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    top of the broken family portrait, correct?

2          A.    Correct.

3          Q.    You observed no blood evidence whatsoever on

4    either the broken family portrait or the broken flower pot,

5    correct?

6          A.    That's correct.

7          Q.    No transfer, correct?

8          A.    That's correct.

9          Q.    Okay.  Nothing that would resemble somebody

10   with bloody hands having touched that flower pot, correct?

11         A.    Yes.  That's correct.

12         Q.    And nothing to state that the person with

13   bloody hands touched the family portrait prior to having been

14   broken?

15         A.    That's correct.

16         Q.    Okay.  You observed a broken wedding display

17   case?

18         A.    Yes.

19         Q.    And that's item -- is it 66 or 99?  66, I

20   believe.

21         A.    Yes.

22         Q.    And that was broken in -- help me out here.

23         A.    Southwest corner.

24         Q.    The southwest corner right here?

25         A.    There's a speaker right there.  I think it was

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000005947

1    on top of the speaker.

2            Q.    Over here?

3            A.    Yes.

4            Q.    Okay.  Couple blood droplets in that vicinity?

5            A.    Yes.

6            Q.    Again, you told us a couple of blood droplets.

7    You really can't tell us what significance those blood

8    droplets have?

9            A.    True.

10            Q.    Okay.  You observed items apparently scattered

11    off either the table or the kitchen counter, correct?

12            A.    That's correct.

13            Q.    Okay.  As if somebody had taken them and swept

14    them off and knocked them on the floor, correct?

15            A.    That's a possibility, yes.

16            Q.    And it's the kind of items on the floor that

17    similar items were observed on the kitchen counter?

18            A.    Kitchen counter and on the dining room table.

19            Q.    Okay.  Medicines?

20            A.    Yes.

21            Q.    Papers?

22            A.    Yes.

23            Q.    We got a photograph of that, right?

24            A.    Yes, sir.

25            Q.    Okay.  You observed a cut cellular phone cord

1    in the kitchen, correct?

2           A.    Yes, sir.

3           Q.    And that's Exhibit 248, correct?

4           A.    Yes.

5           Q.    Again, it appears as if it's been cut into two

6    pieces, correct?

7           A.    Yes, sir.

8           Q.    And there's absolutely no blood evidence on

9    that item, is there?

10          A.    Doesn't appear to be, no.

11          Q.    No transfer blood evidence?

12          A.    No.

13          Q.    As if somebody with bloody hands had cut that

14   cord, correct?

15          A.    Correct.

16          Q.    You observed hairs in both hands of Mr.

17   Andriano, correct?

18          A.    Correct.

19          Q.    And not just in the hands.  They were kind of

20   wrapped around the fingers, correct?

21          A.    Yes, sir.

22          Q.    As if he grabbed somebody by the hair at some

23   point that evening?

24          A.    Yes, sir.

25          Q.    And similar observation with regard to the

```
1    other hand left-hand?

2         A.    Yes, sir.

3         Q.    Again, numerous hairs around the fingers?

4         A.    Yes.

5         Q.    And maybe even up underneath the fingers, the

6    nails?

7         A.    I'm not sure about that, but I know they were

8    attached to the fingers.

9         Q.    Again, as if somebody grabbed the head of hair

10   and pulled, thereby leaving hairs in the left-hand?

11        A.    It's a possibility, yes.

12        Q.    And he apparently had no hair?

13        A.    That's correct.

14        Q.    So it couldn't have been his hair?

15        A.    That's correct.

16        Q.    Unless something extraordinary happened that

17   evening, correct?

18        A.    Correct.

19        Q.    Okay.  You observed in close proximity to Mr.

20   Andriano, a hair barrette, correct?

21        A.    Yes, sir.

22        Q.    And how distant was this from Mr. Andriano?

23        A.    I'd say probably about two feet maybe.

24        Q.    Okay.  This does have blood evidence on it,

25   doesn't it?
```

1        A.    Yes, sir.  It does.

2        Q.    And the blood evidence that you observed is

3   what you described as transfer evidence, correct?

4        A.    Transfer smears, yes.

5        Q.    Okay.  Not cast-off or high velocity or medium

6   velocity impact spatter, correct?

7        A.    That's correct.

8        Q.    Okay.  As if somebody with blood on his or her

9   hands had grabbed this barrette and touched it at some point

10  that evening?

11       A.    That's a possibility, yes.

12       Q.    Okay.  You observed a broken stool in the

13  apartment?

14       A.    Yes, sir.

15       Q.    And that's this broken stool here?

16       A.    Yes, sir.

17       Q.    That's Exhibit 258.  Correct?

18       A.    Yes.

19       Q.    And this is in essentially the same condition

20  as you observed it that evening?

21       A.    Yes, except for one of the legs was crossed --

22       Q.    Okay.  And that's more accurately displayed in

23  the photograph that we see?

24       A.    Yes, sir.

25       Q.    And in the process of packaging this, you put

1    it back together?

2           A.    Yes, sir.

3           Q.    Okay.  But the screws sticking out of the top,

4    they were there on the evening or early morning of October 8,

5    2000?

6           A.    Yes.

7           Q.    Just as we see them here today?

8           A.    Yes, sir.

9           MR. PATTERSON:  Judge, if I could just bring this

10   closer to the jury so they could observe the screws?

11          THE COURT:  Yes.

12                (Pause in proceedings.)

13   BY MR. PATTERSON:

14          Q.    They're pretty pointy, right?  Pretty sharp --

15          A.    Yes.

16          Q.    -- around this way?

17                These are what they call, I think, wood screws,

18   right?

19          A.    Yes.

20          Q.    It's a sharp point on each of the four ends

21   here?

22          A.    Yes, sir.

23          Q.    Okay.  You observed pieces of a broken lamp,

24   correct?

25          A.    Yes, sir.

1        Q.    All right.  And these pieces were discovered in

2   plain view in the living room at least two of the four,

3   correct?

4        A.    Yes, sir.

5        Q.    One piece near the entry way?

6        A.    Yes, sir.

7        Q.    One piece directly in front of the green swivel

8   chair?

9        A.    Yes, sir.

10       Q.    Okay.  One piece was to the left of the green

11  swivel chair or south of the green swivel chair?

12       A.    Yes, sir.

13       Q.    And one piece was discovered on the green seat

14  cushion of the swivel chair?

15       A.    Yes, sir.

16       Q.    When you first observed it, there was a pillow

17  partially obscuring it?

18       A.    Yes.

19       Q.    In any event, two clearly within plain view of

20  this living room?

21       A.    Yes.

22       Q.    And they were there when you walked in, right?

23       A.    Yes, sir.

24       Q.    Did you ever find the rest of that lamp?

25       A.    No, sir.

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    Q.    Okay.  We have kind of what appears to be the

2    companion of that lamp.  I think it's in here.  The pieces

3    that you retrieved appear to be pieces from the middle of the

4    lamp, correct?

5    A.    That's correct.

6    Q.    One of the flanges for lack of better term?

7    A.    Yes, sir.

8    Q.    In terms of the percentage of the lamp that you

9    recovered, what are we talking about, maybe one complete

10   flange if you added them all together?

11   A.    Yeah.

12   Q.    Okay.  So there's a lot of this that you didn't

13   recover, right, this kind of lamp?

14   A.    That's correct.

15   Q.    All right.  You looked throughout the

16   apartment?

17   A.    Yes, sir.

18   Q.    You looked within the garage of the apartment?

19   A.    Yes, sir.

20   Q.    Did you send somebody out to the dumpsters out

21   back?

22   A.    Yes, I did.

23   Q.    Can you find it out in the dumpster?

24   A.    No, sir.

25   Q.    How many dumpsters did you check?

1        A.     Well, Detective Dillian is who checked the

2    dumpster.

3        Q.     You instructed and that person apparently did

4    some checking and reported back?

5        A.     Right.

6        Q.     That was Sally Dillian?

7        A.     Yes, sir.

8        Q.     She came back, without going into elaborate

9    hearsay, she didn't have anything for you, right?

10       A.     That's correct.

11       Q.     So you don't know how many dumpsters they may

12   have --

13       A.     I know she checked all in the central vicinity

14   on the other side of the brick wall to the south.

15       Q.     Okay.  So let's see the diagram we just had

16   made here.

17              (Pause in proceedings.)

18       MR. PATTERSON:  Give me a moment here, Judge.

19       THE COURT:  Yes.

20       MR. PATTERSON:  I need to find the diagram.  If your

21   clerk could help me.

22              Do you know where the last --

23       THE COURT:  Was that 38?

24       MR. PATTERSON:  Yes, the --

25       THE COURT:  I mean 238?

1    MR. PATTERSON:  On Saturday.  Do you have that?

2    MR. MARTINEZ:  No, I don't.

3         (Pause in proceedings.)

4    MR. PATTERSON:  I think we found it, Judge.

5    THE COURT:  321 or 322.

6    MR. PATTERSON:  Got it, Judge.  Thank you.  321.

7    THE COURT:  Okay.

8    BY MR. PATTERSON:

9    Q.    Let me show you 321 here, Detective.  This is

10   the kind of bird's eye view of the complex that you prepared

11   last Saturday?

12   A.    Yes, sir.

13   Q.    Okay.  To your knowledge, where did Ms. Dillian

14   look for the balance of this lamp?

15   A.    There are several locations in the parking lot

16   of community dumpsters.  She looked in those dumpsters and

17   also a third area, a field that's south of that five-foot

18   brick wall.  She checked that field also plus the landscape

19   around the building.

20   Q.    Okay.  So the area to the immediate south of

21   this rear covered porch, that was completely scoured looking

22   for this thing?

23   A.    Yes, sir.

24   Q.    The area north of the parking lot was

25   completely scoured looking for this thing?

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1   A.   Yes, sir.

2   Q.   How about west side, east side?

3   A.   My understanding is she checked them all.

4   Q.   Okay.  Didn't find anything?

5   A.   No, sir.

6   Q.   Okay.  And you knew what you were looking for

7   because you had the companion for comparison purposes?

8   A.   That's correct.

9   Q.   It's not like she could have stumbled upon it

10  and said that ain't it?

11  A.   That's correct.

12  Q.   Okay.  You discovered a belt in close proximity

13  to Mr. Andriano, correct?

14  A.   Correct.

15  Q.   And there was in fact blood transfer on the

16  belt, correct?

17  A.   Yes.

18  Q.   Okay.  No arterial spurt, correct?

19  A.   That's correct.

20  Q.   But blood transfer as if somebody with bloody

21  hands had touched the belt, correct?

22  A.   Yes.

23  Q.   Okay.  And the blood -- here it is.  The blood

24  is observable on the belt buckle, correct?

25  A.   I believe so, yes.

1    Q.    And on the tip end of the belt, correct?

2    A.    Yes.

3    Q.    Correct?

4    A.    Yes.

5    Q.    As if somebody with bloody hands grabbed it on

6  one end and the other and used it in some fashion?

7         MR. MARTINEZ:  Objection.  Calls for speculation.

8         THE COURT:  Overruled.  Go ahead and answer if you

9  can.

10         THE WITNESS:  I can say he touched both ends of it,

11  yes.

12  BY MR. PATTERSON:

13    Q.    That's not inconsistent having held it with one

14  bloodied hand and another bloodied hand and held it in that

15  fashion?  That's not inconsistent with what you observed,

16  correct?

17    A.    No, it's not.

18    Q.    You discovered a phone knocked over from the

19  table, correct, behind the green couch or green swivel

20  barcolounger, whatever you call it?

21    A.    Yes, sir.

22    Q.    Okay.  That was clearly knocked over.  The

23  phone was upside down on the floor, correct?

24    A.    The base, yes.

25    Q.    The base, the cradle?

1          A.      Correct.

2          Q.      Okay.  And next to that was an overturned lamp,

3    correct?

4          A.      Yes.

5          Q.      Okay.  You observed an overturned chair within

6    this apartment, didn't you?

7          A.      Yes, I did.

8          Q.      I think this is it right here, right?

9          A.      Yes, sir.

10         Q.      It appears to be one of the set of chairs that

11   went to this dining room suite, right?

12         A.      Yes, sir.

13         Q.      That clearly was knocked over, right?

14         A.      Yes.

15         Q.      Okay.  And you observed on the counter here a

16   broken cell phone, correct?

17         A.      Yes.

18         Q.      Okay.  Let's talk about the kitchen, here.  Let

19   me go back to 84.  You described for us the knocked over

20   cradle of the telephone and the knocked over lamp.  Is that

21   what's depicted in 84?

22         A.      Yes, sir.

23         Q.      Okay.  Let's talk about the kitchen.  All

24   right.  Let me show you 21 and 27.  21 shows us a number of

25   things.  It shows the flower pot and the family portrait on

1    the floor, correct?

2            A.    Correct.

3            Q.    It also shows us a stew pot on the stove?

4            A.    Yes, sir.

5            Q     Did you have occasion when you were out there

6    to lift the lid of that stew pot and examine the contents of

7    the stew pot?

8            A.    Yes.

9            Q.    Do you recall what you saw?

10           A.    I believe it was either stew or a soup-type

11   mixture.

12           Q.    Day old, two days old, fresh?

13           A.    I couldn't tell you that.

14           Q.    Okay.  It was of no consequence to you

15   basically at that point in time?

16           A.    At that point, no, it wasn't.

17           Q.    Okay.  So you don't have an accurate

18   recollection of the condition of the substance within that

19   stew pot, correct?

20           A.    No.

21           Q.    Okay.  Let me show you 27.  That's a photograph

22   of the sink in the kitchen there?

23           A.    Yes, sir.

24           Q.    It appears there are food utensils in the

25   left-hand side of the sink, correct?

1          A.     Correct.

2          Q.     Consistent with soaking them in advance or

3     anticipation of washing them?

4          A.     Yes.

5          Q.     Okay.  Have you had occasion to listen to the

6     911 tape in this case?

7          A.     No, I have not.

8          Q.     Did you observe in close proximity to Mr.

9     Andriano what appears to be a towel or blanket or something

10     that may have been used to staunch some bleeding?

11          A.     Just that red towel.  Or not a towel, but the

12     blanket.

13          Q.     Blanket?

14          A.     Yes.

15          Q.     Okay.  This is Item 256?

16          A.     Yes.

17          Q.     Okay.  And this was in such connection, if you

18     will, with Mr. Andriano as it appears it was attempting to

19     staunch the flow from the cut in the neck?

20          A.     It was laying over the top of his cut, yes.

21          Q.     Okay.  Okay.  Let's talk about -- do you have a

22     set of gloves?  I need some gloves here.  Do you have some

23     gloves over there, Detective?

24          A.     No, I don't.  You want me to pick it up?

25          Q.     Okay.  Good.  That will save me from having to

1    do it.  If you'll just adopt a position over there.  Hold

2    that up for us.

3                    Okay.  This is the -- why don't you turn it the

4    other way first.  There we go.

5                    This is the pillow case that was on the pillow

6    on the green chair, right?

7         A.    Correct.

8         Q.    When you talk about expirated or blown out,

9    this is the stuff you're talking about, right?

10        A.    Yes, sir.

11        Q.    Okay.  As if a sneeze or a blow or generated

12   air caused some blood spotting, correct?

13        A.    Correct.

14        Q.    Right?  That's kind of the totality of this

15   area, right?

16        A.    Yes, sir.

17        Q.    Okay.  You don't see any smearing in that area,

18   right?

19        A.    No, sir.

20        Q.    Okay.  Not as -- as if it were used after the

21   aspiration to, you know, press on the face or anything of

22   that nature.  That would have left a distinctive transfer

23   smearing pattern, right?

24        A.    Yes.

25        Q.    We don't see that here.

1          A.     No, sir.

2          Q.     Backside is more just contact transfer as if it

3     was sitting while the blood was pooling.  That's not a

4     smearing pattern, is it?

5          A.     It's a transfer pattern, yes.

6          Q.     Right?

7          A.     It's not -- I mean, it was placed over a source

8     of blood.  Whether it was the nose or mouth, I'm not sure.

9          Q.     You don't know -- well, the mouth site appears

10    to be over there, that area.

11         A.     Yes.

12         Q.     Over here could have been in contact with any

13    part of his anatomy?

14         A.     Correct.

15         Q.     Or the pool collecting on the carpet?

16         A.     It's possible.  Not my opinion, but it's

17    possible.

18         Q.     Well, what about this transfer pattern?  This

19    eliminates all -- this tells us it was in contact with some

20    liquid flowing, some kind of fluid, right?

21         A.     That's correct.

22         Q.     Whether it was on the carpet or on his head at

23    the time, we don't know that, right?  There's nothing

24    allowing us to differentiate that pattern at all?

25         A.     I'll agree with you.


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000005963

1          Q.    Okay.

2          THE COURT:  For reference, was that Exhibit 260 on

3    the green tag?

4          THE WITNESS:  260.

5          THE COURT:  Okay.

6          MR. PATTERSON:  If I could have a moment, Judge.

7          THE COURT:  Yes.

8              (Pause in proceedings.)

9          MR. PATTERSON:  If I could just have a moment, Judge.

10         THE COURT:  Yes.

11             (Pause in proceedings.)

12         MR. PATTERSON:  Judge, I have nothing additional at

13   this time.

14         THE COURT:  Mr. Martinez, redirect examination.

15

16   REDIRECT EXAMINATION BY MR. MARTINEZ:

17         Q.    Sir, one of the things I want to talk to you

18   about first is the areas that may or may not have been

19   searched by Detective Dillian, okay?

20         A.    Yes, sir.

21         Q.    You told us some of the areas she did search,

22   right?

23         A.    Yes, sir.

24         Q.    You know the areas she searched because that's

25   what she told you, right?

1          A.     Correct.

2          Q.     Do you know whether or not she searched the

3     defendant's father's car?

4          A.     I don't believe she did, no.

5          Q.     Do you know whether or not she searched the

6     defendant's mother's car?

7          A.     No.

8          Q.     Were they?

9          A.     Were you asking me if I know?  I do know she

10    didn't.

11         Q.     Were those cars there?

12         A.     No.   They were gone already.  By the time I got

13    there, they were gone.

14         Q.     No.   At the time this happened were the cars

15    there?

16         MR. PATTERSON:  Well, if he knows, Judge.

17         MR. MARTINEZ:  Right, if you know.

18         THE WITNESS:  I don't know.

19    BY MR. MARTINEZ:

20         Q.     But with regard to the search, she did search

21    trash cans, that sort of thing, right?

22         A.     Correct.

23         Q.     And when she searched those trash cans, did she

24    happen to find a second or a set of bloody clothing anywhere?

25         A.     I don't believe so.

1       Q.   Did she, for example, find a -- a striped sort

2  of shirt anywhere with blood on it?

3       A.   I don't believe so, no.

4       Q.   Well, you would know since you received the

5  report, wouldn't you?

6       A.   Yes.

7       Q.   And does the report indicate that anybody

8  found, for lack of better term, a second set of bloody clothing?

9       MR. PATTERSON:  Judge, that's calling for hearsay.

10      THE COURT:  I'll sustain the objection.

11  BY MR. MARTINEZ:

12       Q.   Do you know, "yes" or "no"?

13       MR. PATTERSON:  Well, the Judge ruled --

14      THE COURT:  I'll sustain the objection.

15  BY MR. MARTINEZ:

16       Q.   You were asked many questions about

17  possibilities, probables, that sort of thing.  Is it -- and

18  just because you were asked that, with regard to

19  possibilities, would it be possible, in the realm of

20  everything that is possible, that Mr. Andriano was down and

21  he was saying, "Beat me on the head harder, baby.  It feels

22  good."  Is that a possibility?

23       MR. PATTERSON:  Judge, could we approach, please?

24      THE COURT:  Yes.

25

1           (The following proceedings were held at the

2     bench:)

3

4           MR. PATTERSON:  It is Mr. Martinez's custom to follow

5     through inquiry with narration during direct, then on

6     redirect he begins to lead and suggest to the expert his

7     opinion when in fact the opinion should be coming from the

8     stand.  It's a pattern he's engaged in on several occasions

9     in this case and I ask that he be told not to lead and not to

10    suggest opinions to his expert.

11          MR. MARTINEZ:  The only thing that question suggests

12    is that the area that he opened up which is possibility, and

13    when he tried to answer the question, that wasn't his

14    opinion.  He would say "Well, is this possible, this is

15    possible."  He brought up the question.  He brought up the

16    issue.  I'm entitled to then bring up a possibility and ask

17    him if that's a possibility based on the way that Counsel was

18    asking the questions.  I think it's a proper question.

19          MR. PATTERSON:  He's not entitled to do it.  It's his

20    expert.  His expert is to give his opinion, not Mr.

21    Martinez's opinion.

22          MR. MARTINEZ:  It's not my opinion.

23          THE COURT:  Okay.  I'm just telling you, you didn't

24    lead, but the way you asked that question, I don't think it's

25    a proper question the way you asked it.  Don't get into

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    dramatics about whether he said this or that.  He doesn't

2    know that.

3        MR. MARTINEZ:  That's the point.  I was asking him

4    and he objected.  I was asking him is it possible, for

5    example, that somebody grabbed a hold of the gadget, and, you

6    know, that came in.

7        THE COURT:  I understand that, but the way you asked

8    that question, you got into some things that may have been

9    said or whatnot.  That's just sheer speculation.  I'll

10   allow --

11       MR. MARTINEZ:  That's -- sorry, Judge.

12       THE COURT:  I'll allow you to get into some of the

13   possibilities because of the fact that's what he asked.  But,

14   number 1, don't lead, and number 2, not in the dramatics you

15   were asking.

16           You were saying something?

17       MR. MARTINEZ:  Okay.  Thank you.

18       THE COURT:  Okay.

19

20           (The following proceedings were held in open

21   court:)

22

23       THE COURT:  Mr. Martinez, rephrase your question.

24   BY MR. MARTINEZ:

25       Q.    With regard to this issue of possibilities and

1     the realm in this world, is anything possible?

2          A.    Yes.

3          Q.    As it applies to this case, is that the

4     situation in your opinion even though it is possible?

5          A.    Yes.

6          Q.    Well, no.  In other words, your opinion as to

7     what you gave in this case, is it affected by the fact that

8     there's all these other possibilities out there?

9          A.    Oh, no.

10         Q.    Do you change your opinion just because it's

11    been suggested to you that all these other things were

12    possible?

13         A.    No.

14         Q.    You were asked whether or not you have reviewed

15    the back of the -- or the photographs involving the back of

16    Mr. Andriano's head and you indicated that you had, correct?

17         A.    Yes.

18         Q.    Because we have been talking about the bleeding

19    and where it came from, correct?

20         A.    Correct.

21         Q.    And you reviewed these photographs, correct?

22         A.    Yes, sir.

23         Q.    Let me show you one of those photographs.

24    Let's take a look at Exhibit 201 and 202.  Please just keep

25    them to yourself and take a look at them.  It's 201 and 202.

1    Are those part of the photographs that you received in

2    anticipation of this?

3             A.    Yes.

4             Q.    And those are true and accurate depictions in

5    your mind of the back of Mr. Andriano's head, correct?

6             A.    Yes.

7             Q.    And they were useful to you in forming your

8    opinion as to what actually happened out there that night?

9             MR. PATTERSON:   Judge, he's leading again.

10            THE COURT:   Rephrase the question.   Don't lead.

11   BY MR. MARTINEZ:

12            Q.    Are they helpful in reaching your opinion as to

13   what happened that night on October 8, 2000?

14            A.    Yes.

15            Q.    Did you use them to form your opinion?

16            A.    Yes.

17            MR. MARTINEZ:   I move for admission of Exhibit 201

18   and 202.

19            MR. PATTERSON:   Can we approach?

20            THE COURT:   Yes.

21

22            (The following proceedings were held at the

23   bench:)

24

25            MR. PATTERSON:   These are highly inflammatory and

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    unnecessary to -- he's doing it again.  He's bringing in

2    stuff for the sole purpose of inflaming the jury.

3          THE COURT:  Mr. Martinez?

4          MR. MARTINEZ:  The fact that he keeps coming up here

5    and saying "He's doing it again," I just want the record to

6    reflect that it is nothing more than a ploy on his part.

7          THE COURT:  Okay.  Look, both sides, let's just stick

8    to the case.

9          MR. MARTINEZ:  One the things they talked about was

10   how the body was laying and how the blood could have possibly

11   ended up where it did, and he talked about the eyes and

12   anything -- the only part he was bleeding from and being

13   struck, is that possible?  The jury has the right to see for

14   themselves where it was he was struck.  He claims they are

15   unduly inflammatory.  These are not spots with blood on them.

16   They're cuts that occurred to the back of Mr. Andriano's

17   head.  They've been cleaned up.  It's not a situation where

18   we're showing them ones that are, if you will, unsecured.

19   These have been sanitized by the medical examiner's office.

20   There's no way to adequately convey to the jury what he

21   suffered and where the cuts were and the minutia of that

22   other than to show that by a photograph so that he could then

23   explain how it is that he came to an opinion as to how the

24   blood spatter happened, how the smears happened, and how

25   the -- the other blood evidence, how he was able to reach the

1    conclusions that he has.

2             THE COURT:  Anything further from Mr. Patterson?

3             MR. PATTERSON:  There's a foundational problem, too.

4    These were taken out of the presence of Mr. Olson.  We don't

5    know where these came from at this point.

6             MR. MARTINEZ:  But with regard to the foundation

7    problem, that's not an issue because he said he relied on

8    these.  The fact that he relied on them, it doesn't -- I

9    don't have to lay the extra foundation.  He relied on them.

10             THE COURT:  Okay.  I believe that you do have to lay

11    some more foundation to have these into evidence as to when

12    these were taken.  Even though he said --

13             MR. MARTINEZ:  Judge, I will avow the person who took

14    them is from the medical examiner's -- that's not the issue

15    now.

16             THE COURT:  Mr. Patterson?

17             MR. PATTERSON:  I've made my statement, Judge.

18             THE COURT:  Okay.  I'm not going to allow you to

19    admit them right now until you've laid more foundation as to

20    when these photographs were taken, okay?

21             MR. MARTINEZ:  If I will -- if I avow to the Court

22    they were taken at the autopsy and that I will have the

23    technician who was there who took the photographs come in

24    because she's on the witness list.  Additionally, I'll --

25    Detective Louis was there and she's on the list.  There is no

113

1   other foundation I think I would need.

2          THE COURT:  Okay.  I've made my ruling.  Let's move

3   on.

4

5               (The following proceedings were held in open

6   court:)

7

8   BY MR. MARTINEZ:

9          Q.    Officer, with regard to these photographs, how

10  many cuts would you say there was to the back of the head?

11  And, again, don't show them to us.

12         MR. PATTERSON:  Judge, if he has independent

13  knowledge of that issue, that's one thing.  Looking at the

14  photograph and counting them on a photograph, that's not

15  proper.

16         THE COURT:  Mr. Martinez?

17         MR. MARTINEZ:  He did rely on them, Your Honor.

18         THE COURT:  Okay.  Overruled.  Go ahead and answer

19  the question if you can.

20         THE WITNESS:  Okay.

21         THE COURT:  Before you answer the question, are you

22  able to recollect independently of the photographs?

23         THE WITNESS:  Yes.

24         THE COURT:  Okay.  Then don't look at the photographs

25  and answer the question independently of the photographs

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    then.

2    BY MR. MARTINEZ:

3         Q.    How many cuts are there in the back of the

4    head?

5         A.    Approximately 20.

6         Q.    And is that in addition to the one on the neck

7    or just on the back of the head?

8         A.    Back and top of the head.

9         Q.    Now, I want to talk to you again about this

10    issue of possibilities and probabilities and what your

11    opinion and conclusion is in this case.  You were asked about

12    different scenarios.  Do you remember that?

13        A.    Yes.

14        Q.    Now, with regard to scenarios in this

15    particular case, anything could have happened, right?

16        A.    That's true.

17        Q.    In this case you were asked about whether or

18    not the person that was down on the ground, if he could have

19    gotten up.  Do you remember being asked that question?

20        A.    Yes.

21        Q.    In your opinion is there any doubt in your mind

22    with regard to your opinion whether or not as to whether this

23    person got up or not?

24        A.    No.  I don't believe he -- I don't believe he

25    got up, no.

1       Q.     Any doubt in your mind as to that?

2       A.     No.

3       Q.     Why not tell us why he didn't get up although

4    there are millions of possibilities out there?

5       A.     Based on blood patterns on the victim's body

6    and on all the walls and on the floor.  He was in a down

7    position when he was being struck by the object.

8       Q.     With regard to the pattern on the victim's body

9    that you just talked about, what are those patterns that you

10   talk about that lead you to believe he didn't get up on the

11   body.  Tell us that.

12      A.     There's medium velocity impact spatter on top

13   of his shoulder, there's impact spatter on top of his toes,

14   and plus the bloody arms and the arterial spurt from his

15   neck.

16      Q.     What about -- you told us also about the walls.

17   What about the walls?  I mean, we went through this whole

18   thing measuring up and down.  My question to you is when

19   somebody hits somebody on the head and blood goes from that,

20   the spatter -- is there a certain absolute distance that it

21   absolutely has to hit in order to say that a person hasn't

22   gotten up?

23      A.     No.

24      Q.     Is there an absolute position that it has to

25   hit before a person gets up?  In other words, my question is

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    you were asked about 24 inches, you were asked about 18

2    inches.  Anything about those measurements detract from your

3    opinion?

4          A.    No.

5          Q.    You indicated that the possibility that -- or

6    not the possibility, but about the fact these were up and

7    down may have been caused by a different thing other than the

8    victim moving.  Do you remember that?

9          A.    Yes.

10         Q.    And what in your opinion caused that?

11         A.    My opinion is that the victim was in one spot,

12   which was laying on the ground, and the person swinging the

13   object was the one moving around.

14         Q.    Okay.  So moving -- the object that's striking

15   the head, if I understand it correctly, can cause it to go up

16   and cause it to go down then, right?

17         A.    Yes, sir.

18         Q.    Okay.  So the measurement itself, is it

19   important?

20         A.    Yes, it is.

21         Q.    Is that the whole story as to the possibilities

22   that have happened?

23         A.    No.

24         Q.    Do you have to look -- what else do you have to

25   look at?  Do you look at the whole circumstance or do you

1    just look at one single item and then you say well, with

2    regard to this single item, that's the opinion that I have?

3            A.    No.   I have to look at the totality of the

4    entire scene investigation, which includes the objects that

5    have been used to cause the injuries to the victim, the blood

6    pattern on the walls, blood patterns on the floor, blood

7    patterns on the victim.   You have to take the whole thing in

8    context.   You can't just take one pattern and say this is

9    what happened.

10           Q.    You took a look at the stool, didn't you?

11           A.    Yes.

12           Q.    And if this stool would have been used to do

13   all of those hits that are in that photograph, would the

14   blood patterns on the stool, which is Exhibit Number 258,

15   would they be -- as they are on here, would they be

16   different?

17           A.    They would be as they are on the stool.

18           Q.    But, in other words, to hit somebody in the

19   back of the head I think you said 20-something times --

20           MR. PATTERSON:   Wait, wait, wait.   That's not what he

21   testified to.

22           THE COURT:   Sustained.   Rephrase the question.

23   BY MR. MARTINEZ:

24           Q.    How many times did -- you indicate that you saw

25   how many cuts that you saw on the back of the head?

1          A.      I'd say approximately 20 times.

2          Q.      With regard to those 20 cuts that you may have

3     seen in the back of the head, the blood patterns that you see

4     on this particular stool in connection with the circumstances

5     as to how you found it, would this be the only object that

6     caused the injury to the back of the head in your opinion?

7          MR. PATTERSON:  Judge, if he has the foundation for

8     that opinion, and I don't think he rendered that opinion on

9     direct.  This is something that's totally new.

10         THE COURT:  If you could give that opinion.

11         THE WITNESS:  You're asking if all 20 hits were

12    caused by that stool?

13    BY MR. MARTINEZ:

14         Q.      In light of all the hits you saw there, yes.

15         THE COURT:  Hold on a second.

16         MR. PATTERSON:  Judge, we have no evidence of 20

17    hits.

18         MR. MARTINEZ:  Judge, he's making a speaking

19    objection.

20         THE COURT:  Hold on.  Let me see Counsel at the

21    bench.

22              (The following proceedings were held at the

23    bench:)

24

25         THE COURT:  Okay.

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1        MR. PATTERSON:   He said approximately 20 cuts.

2        THE COURT:   Let's move on from here.   Rephrase the

3   question.

4        MR. PATTERSON:   Thank you.

5

6        (The following proceedings were held in open

7   court:)

8

9   BY MR. MARTINEZ:

10       Q.   Could the 20 cuts, in light of all of the

11  circumstances that -- you know, you just told me you just

12  don't  look at one thing.   In light of everything that you

13  know, was the stool the one that caused those 20 cuts?

14       A.   It's just -- it's a good possibility, yes.

15       Q.   Is that your opinion?

16       A.   Yes.

17       Q.   That this is the one that did it?

18       A.   Oh, that one?

19       Q.   Yes, this particular one.

20       A.   That one's the bloodiest.

21       Q.   Okay.   How about this issue of the lamp that

22  you talked about?   Doesn't that fit into it?

23       A.   Yes.

24       Q.   Well, if the lamp fits into it and you can't

25  find the lamp, how does that fit into your opinion?

1          A.    The broken pieces of the lamp where it had to

2    hit something to break it, but the majority of the lamp is

3    missing from the scene.

4          Q.    But the pieces that you --

5          A.    I can't -- I can't discount the lamp wasn't

6    used to strike because there's bloodstains on the broken

7    pieces of the lamp.

8          Q.    What you're telling us is there's all these

9    possibilities out there, but you're not here to talk about

10   possibilities, right?

11         A.    That's correct.

12         Q.    You're here to tell us with certainty what you

13   believe is --

14         MR. PATTERSON:   Judge, this is a leading question.

15         THE COURT:   Sustained.   Don't lead.   Ask your next

16   question.

17   BY MR. MARTINEZ:

18         Q.    Okay.   With regard to your opinion that we've

19   been talking about, the voids that you were asked about and

20   the arm positioning -- do you recall that we went through all

21   of that?

22         A.    Yes, sir.

23         Q.    What is your opinion as to the victim's

24   position with regard to his position at the time that the

25   knife was stuck on the left side of his neck?

1          A.     He was lying on his right side, his head laying

2     on his right bicep, and the left side of his neck was cut.

3          Q.     And with regard to the knife that's there, was

4     that placed there, when was that placed in relationship to

5     the stick to the -- or stabbing to the side of the neck?

6          A.     That was placed on top of the bloodstain after

7     the blood stopped bleeding.

8          Q.     And how about the knife?  When was that placed

9     in relationship to this bleeding or arterial spurt from the

10    side of the neck?

11         A.     It's my opinion that the arterial spurt has

12    already stopped causing a bloodstain on the carpet and the

13    knife was on top of that bloodstain, then the knife was on

14    top and the belt was on top of the knife.

15         Q.     So if the knife -- just so I understand it, so

16    if the knife and belt are placed there afterwards, after the

17    arterial spurt, is the victim alive at that point?

18         A.     No.

19         Q.     You talked about transfers.  You were asked

20    about transfers.  Do you remember that?

21         A.     Yes, sir.

22         Q.     And you were asked about questions about

23    someone holding onto the counter and all that stuff.  That's

24    a possibility?

25         A.     Yes.

1      Q.    And you were asked about possibility, right?

2      A.    Yes, sir.

3      Q.    And you -- you know, in the whole realm of this

4  whole world, is it a possibility that somehow -- well, let me

5  put it this way.  Is it your opinion that it was the victim

6  that put those there or is it your opinion that somebody else

7  put those there?

8      A.    Someone else.

9      Q.    Why is that?

10     A.    Because I don't believe the victim got up from

11 where he was beaten on the floor.  There was no indication he

12 ever stood up vertical after he was hit.

13     Q.    How about on the refrigerator?  Is it your

14 opinion the victim put those transfers or smears on there?

15     A.    No.

16     Q,    How about on the knife drawer or the drawer

17 that contained forks, knives, that sort of thing?

18     A.    No.

19     Q.    In terms of this issue about the two pools of

20 blood, describe for me the first one, please.  Where was it

21 in relationship to the body?

22     A.    The first one which is above his head?

23     Q.    Yes.

24     A.    Probably 6 inches to a foot above his head.

25     Q.    And the other -- the other pool of blood?

1       A.      The other pool of blood is located on the east

2   side of the victim's head and is involved with the trail

3   spurting.

4       Q.      And if you put that together with your opinion

5   that the victim did not get up -- that was your opinion,

6   right?

7       A.      Correct.

8       Q.      If you put that together, the fact there's one

9   blood pool up here, one blood pool down there, in addition to

10  the smears you have on the ankles -- do you remember those?

11      A.      Yes, sir.

12      Q.      What is your opinion then as to what happened

13  to the victim?  Did he get up and move or was it done by

14  somebody else?

15      A.      Done by someone else.  Whoever had the bloody

16  hands had hold of his feet and pulled him six inches or so

17  from the blood pool.

18      Q.      In the realm of possibilities, you don't know

19  what they were thinking, right?

20      A.      That's correct.

21      Q.      You don't know why they did it, right?

22      A.      That's correct.

23      MR. PATTERSON:  Judge, he's doing it again.  He does

24  it constantly.

25      THE COURT:  Don't lead.

1    BY MR. MARTINEZ:

2         Q.    Do you know what they were thinking?

3         A.    No.

4         Q.    Do you know why they did it?

5         A.    No.

6         Q.    In your opinion though, do you -- you indicated

7    that whether -- what was your opinion as to whether or not he

8    was moved?

9         A.    I believe he was moved after the first blood

10   pool.

11        Q.    And with regard to when he was being dragged,

12   do you know or do you have any idea who did it?  I mean,

13   based on what you saw out there?

14        A.    Yes.

15        MR. PATTERSON:   Judge, that's beyond the scope of his

16   opinion.

17        THE COURT:   Sustained.

18   BY MR. MARTINEZ:

19        Q.    The bottom line is there's plenty of

20   possibilities out there, right?

21        MR. PATTERSON:   Leading.

22        THE COURT:   Don't lead.

23   BY MR. MARTINEZ:

24        Q.    Are there plenty of possibilities out there

25   based on what he asked you?

1        A.    Yes.

2        Q.    You were asked about the -- the vomit pools.

3  Do you remember that?

4        A.    Yes.

5        Q.    You indicated that there were how many vomit

6  pools?

7        A.    I believe there was two.

8        Q.    You were asked whether or not there was a

9  sample taken.  Do you remember that?

10        A.    Yes.

11        Q.    What was your response to that?

12        A.    Yes, there was a sample taken.

13        Q.    And you were asked whether or not you knew if

14  they were -- if that sample was ever tested.  Do you remember

15  that?

16        A.    Yes.

17        Q.    And with regard to the other pool sample,

18  you -- what did you indicate as to whether or not it had been

19  preserved?

20        A.    I believe it was cut out with the carpet.

21        Q.    So if somebody wants to examine it, is it

22  available for that?

23        A.    Yes.

24        Q.    Now, do you know whether or not those samples

25  were sent to another lab to be analyzed at all?  Would that

1    be your job to know that?

2         A.    I don't know that, no.

3         Q.    They could have been, you just don't know?

4         A.    That's correct.

5         Q.    And are you the case agent as they say?

6         A.    No, I'm not.

7         Q.    Who is that?

8         A.    Detective Lucero.

9         Q.    And he or somebody else is the person that

10    would have the answer to that question, right?

11        A.    Yes, sir.

12        Q.    You were asked again about how it was possible

13    that the victim's left foot had some spots on it of blood.

14    Do you remember that question?

15        A.    Yes, sir.

16        Q.    And you were asked about the possible position

17    of the victim at the time that those could have been placed

18    there?

19        A.    Yes.

20        Q.    Do you have an opinion as to how the victim was

21    laying when those spots were put there?

22        A.    Yes, sir.

23        Q.    Tell me about it.

24        A.    My opinion is that he was laying horizontally

25    on the floor and his feet were sticking straight out, and

1   with the impact spatter from being hit in the head, some of

2   that was hitting the top of his feet.

3          Q.    And do you have anything that corroborates what

4   you're telling us now?  In other words, anything else in the

5   apartment that corroborates that?

6          A.    Well, there's impact spatter on the wall just a

7   little bit farther north of his foot.  His foot is right in

8   line with the impact spatter on the north wall and on the

9   ground.

10         Q.    You were asked over and over about what

11   happened in the apartment and you were asked about the

12   possibilities, about the issue of the broken glass in the

13   corner.  Do you remember that?

14         A.    Yes.

15         Q.    Do you remember something about stuff being

16   moved from a table and the hand being moved like this?  Do

17   you remember that question?

18         A.    Yes.

19         Q.    And you kept indicating, well, at first

20   observation I thought that it was a fight between two

21   persons.  Do you remember saying that?

22         A.    Yes.

23         Q.    That sort of leads us to believe there may be a

24   second observation you now have.

25         A.    (No audible answer.)


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1          Q.     Is that a "yes" or "no"?

2          A.     Yes.

3          Q.     Okay.  What is -- if you have another

4     observation, what is that?  You were asked about the first

5     one --

6               MR. PATTERSON:  Whoa.  Let's approach.

7

8               (The following proceedings were held at the

9     bench:)

10

11               MR. PATTERSON:  This guy ain't competent, Judge, to

12     render an opinion in that regard.  He's a blood spatter

13     person.  He could tell you about blood.  He can't opine --

14               MR. MARTINEZ:  He asked about his observations.

15               MR. PATTERSON:  I did not ask him.  I did not,

16     Judge.  I asked him whether he made any observations.  That's

17.    the way I structured the question.  He volunteered, "Oh, I

18     made some observations initially, but now I have a different

19     opinion."  That's completely different than what I elicited

20     from him.  I never elicited his opinion as to this.

21               MR. MARTINEZ:  Judge, the way it happened, he began

22     asking the question "Are you familiar with domestic

23     violence."  I objected.  He then went on, something about

24     fighting between two people, two people that know each other.

25     I objected again, then he restricted it to a fight and he

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1   kept saying, "Well, yeah, I believe there was a fight the

2   first time," or that was based on his first observation.  He

3   should be allow to give his second observation.

4        MR. PATTERSON:  No, the second observation is based

5   on theory and opinion and hearsay.  He may have talked with

6   other people about their opinions and impressions of this

7   case.

8        THE COURT:  You know, I may allow the question. I

9   want to hear what the question is again because you did open

10  the door, but I just want to hear -- depends upon how the

11  question is asked.

12       MR. MARTINEZ:  Okay.

13       THE COURT:  Keep it very narrow and then I'll rule on

14  how you ask the question.

15       MR. MARTINEZ:  Okay.

16       THE COURT:  I want to hear the question again.

17

18           (The following proceedings were held in open

19  court:)

20

21       THE COURT:  Mr. Martinez, re-ask the question,

22  please.

23  BY MR. MARTINEZ:

24       Q.   We were talking about this observation issue,

25  and you did indicate, I believe, on your cross-examination

130

1    that you -- that was your first observation.  Do you remember

2    that line of questioning?

3              A.    Yes, sir.

4              Q.    And just so that we bring it to the floor, you

5    were asked about two people fighting.  Do you remember that?

6              A.    Yes.

7              Q.    And you said, "Well, that's what I thought

8    initially," right?

9              A.    Yes.

10             Q.    That there was a fight between two people.

11   That's what you said, right?

12             A.    Yes.

13             Q.    Now, as you sit here today, is that your

14   opinion?

15             A.    No.

16             Q.    And is your opinion that you now have, is that

17   based on further study than what you actually had in those

18   two hours or whatever it was that you were at the scene?

19             A.    It's based on interviews of other witnesses

20   plus the investigation.

21             Q.    And there were sights at the scene that were

22   found as part of the scene investigation that, if you will,

23   made you change your mind, right?

24             A.    Yes.

25             Q.    As you sit here today, do you believe that

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1     there was a fight between two individuals as described by

2     defense counsel?

3              MR. PATTERSON:  Objection.  Form of the question

4     beyond the scope of this expert opinion.

5              THE COURT:  Overruled.  Answer the question "yes" or

6     "no."

7              THE WITNESS:  Yes.

8     BY MR. MARTINEZ:

9         Q.    So you believe it happened like defense counsel

10    asked you?

11        A.    Oh, sorry.  No.

12        Q.    Let's get it straight, okay?  With regard to

13    this observation that you have, based on everything that you

14    know and everything that you now have, is your observation

15    that it happened and there was a fight between two

16    individuals?  Because that's what you were asked.  Is it now

17    your opinion, as defense counsel phrased it, that there was a

18    fight between two individuals that night?

19        A.    I misunderstood your question.  The answer is

20    no.

21        Q.    And your opinion then is something different

22    than that, right?

23        A.    Yes.

24        Q.    And what is that opinion?

25              THE COURT:  I'll sustain the objection.


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000005991

1              MR. PATTERSON:  Thank you.

2    BY MR. MARTINEZ:

3         Q.    You were asked about this family portrait that

4    was down there in the kitchen, correct?

5         A.    Yes.

6         Q.    Do you know how that got there?

7         A.    No.

8         Q.    Do you know who put it there?

9         A.    No.

10        Q.    Is it in your opinion that the person that was

11   down there on the ground that had all the blood on him, Mr.

12   Andriano, did he put it there?

13             MR. PATTERSON:  Objection, Judge.  Time, place,

14   circumstance.

15             THE COURT:  Sustained.

16   BY MR. MARTINEZ:

17        Q.    The point is, Officer, with regard to that

18   family portrait, do you know when it was put there?

19        A.    No.

20        Q.    Do you know if it even has anything to do with

21   what happened that night?

22        A.    No.

23        Q.    Could it have happened a week before and she

24   was just a messy housekeeper?

25        A.    Possibility.


        TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1 Q. With regard to that cut cord, do you know when

2 it was put there?

3 A. No.

4 Q. So it could have happened a week earlier?

5 A. Possibility.

6 Q. Now, with regard to the blood, you talked about

7 that.  Do you remember that?

8 A. Yes.

9 Q. The one that was next to the phone cord, do you

10 remember that?

11 A. Yes.

12 Q. And in your opinion could Mr. Andriano have put

13 that blood there?

14 A. No.

15 Q. Why not?

16 A. Because he'd have to be walking around to place

17 that blood there.  In my opinion, he never -- once he got

18 hit, he didn't move from that position.

19 Q. With regard to any of the hypotheticals that

20 the defense may have asked you, could it have happened this

21 way, could it have happened that way, could it have happened

22 the other way, or are we just talking possibilities or is

23 that the reality of what happened in your opinion?

24 MR. PATTERSON:  Judge, objection.  Asked and answered.

25 THE COURT:  Overruled.  Answer the question if you

1   can.

2            THE WITNESS:  Sorry.  What was the question?

3   BY MR. MARTINEZ:

4        Q.    With regard to this issue of possibilities and

5   different scenarios -- that was a word that was used with

6   regard to all of these scenarios given to you and you kept

7   saying that was a possibility -- my question to you is just

8   because a possibility is out there, is that your opinion and

9   is that the scenario that you believe as posed by defense

10  counsel?

11       A.    Oh, no.

12       Q.    Based on the line of questioning, what do you

13  believe?  Is anything possible based on the way the question

14  is phrased?

15           MR. PATTERSON:  Judge, objection.

16           THE COURT:  Sustained.  Let's move on.

17  BY MR. MARTINEZ:

18       Q.    The grabbing of the hair and the fingers and

19  that sort of thing, do you remember that?

20       A.    Yes, sir.

21       Q.    Do you remember how those -- do you have any

22  idea how they got there?  The hair in the fingers, do you

23  know?

24       A.    I don't know the scenario how it got there,

25  but, I mean, the hairs are on the fingers and they're not --

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000005994

1    they're not the victim's because he's bald.

2             Q.    Right.  And you indicated again that in your

3    opinion the victim never got up.  Do you remember telling us

4    that?

5             A.    That's correct.

6             Q.    So in your opinion the hairs get there because

7    they're bloody, right?

8             A.    Bloody hand, yes.

9             Q.    Did they get there while the victim was down?

10            A.    That's a possibility, yes.

11            Q.    If he can't get up, how could he get the hairs

12   in there then?

13            A.    Well, if the victim -- if the defendant is down

14   next to him, he could have reached up and grabbed her hair.

15            Q.    Okay.

16            A.    I don't know.

17            Q.    And put it there.  Is that what you're saying?

18            A.    And put it in his fingers?

19            Q.    Right.

20            A.    Right.

21            Q.    Now, the barrette -- and you were being asked

22   the transfer, blood transfers, that sort of thing on the

23   barrette.  Do you recall that?

24            A.    Yes.

25            Q.    And just so that I understand it, the blood

1   transfer on the barrette, how could the blood have gotten on

2   the barrette?  Explain to me how you see the transfer, what

3   had to happen for there to be a transfer of blood on the

4   barrette?

5          A.     I would think someone's bloody hands would have

6   to touch it.

7          Q.     If the barrette was in somebody's hair, would

8   you expect or not expect that the hair would also have blood

9   in it if the barrette had blood on it?

10         A.     I would expect the hair to have blood in it,

11  yes.

12         Q.     As in the circumstances here, you were shown a

13  picture of the hand, weren't you?

14         A.     Yes.

15         Q.     Let's find that.

16                (Pause in proceedings.)

17  BY MR. MARTINEZ:

18         Q.     Take a look at Exhibit 42.   Which hand is that?

19         A.     That will be the right hand.

20         Q.     If that were the hand that was used to take the

21  barrette off somebody's head, would you expect that there

22  would be blood also on the hair, a blood transfer?

23         A.     Yes.

24         Q.     With regard to the telephone that you were

25  being asked about and the items that may have been found

1   around it, do you know how that telephone got there?

2          A.    No, I do not.

3          Q.    And near that telephone I think you testified

4   on redirect that -- sorry, on cross-examination, that there

5   were how many of the pieces of the lamp?  Do you remember?

6          A.    I think there was at least one.  There was two

7   around the chair, the phone base was pushed upside down

8   behind the chair.

9          Q.    Just so I could refresh your memory, was there

10  one on the couch?

11         A.    Yes.

12         Q.    And one in front.  Do you remember that?

13         A.    Correct.

14         Q.    And one on the side?

15         A.    Correct.

16         Q.    And the other piece of the lamp, where was it?

17         A.    There was one in front of the entryway.

18         Q.    Right.  So there was a total of four pieces of

19  lamp, right?

20         A.    Yes.

21         Q.    And the barrette was found where in

22  relationship to those pieces of lamp?

23         A.    The barrette was on the floor on the south side

24  of the green swivel chair.

25         Q.    And you were talking about the percentages of

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    how much of the lamp you found or didn't find.  Do you

2    remember that?

3            A.    Yes.

4            Q.    Just because you didn't find the full lamp,

5    does that mean those pieces in your opinion don't come from a

6    lamp?

7            A.    Correct.

8            Q.    So you do agree that there was a lamp there,

9    right?

10           A.    Yes.

11           Q.    And so just with regard to this moving that you

12   were asked about, in your opinion did Mr. Andriano get up as

13   he was being beaten?

14           A.    No.

15           MR. PATTERSON:   Objection.  Asked and answered

16   several times.

17           THE COURT:  Sustained.

18   BY MR. MARTINEZ:

19           Q.    With regard to this issue of the barrettes and

20   how they may have ended up over there and the lamp and where

21   all of these items ended up, could he have moved his head

22   over to the front entryway to get hit over there or moved his

23   head down over to the chair?  Did he move to those places to

24   get hit?

25           A.    No.

1      Q.    Did he ever get up then?

2      A.    No.

3            MR. MARTINEZ:  I don't have anything else.

4            THE COURT:  Are there any further questions of this

5      witness by the jury?  If so, please raise your hand.

6                  Let me see Counsel at the bench.

7

8                  (The following proceedings were held at the

9      bench:)

10

11           THE COURT:  Question, "Is the lamp metal or plastic

12     or what?"

13                 Any objection from the State?

14           MR. MARTINEZ:  No.

15           THE COURT:  Any objection?

16           MR. PATTERSON:  He could feel it and give an opinion.

17     That's fine, yeah.

18           THE COURT:  Next question, "How many heart beats,

19     arterial spurts before heart stops?"

20           MR. MARTINEZ:  That's beyond the scope.

21           MR. PATTERSON:  I don't think he understands enough

22     to tell us that.

23           THE COURT:  I'm not asking that.

24                 Next question, "Judge, by admitting the photos

25     in evidence, are you the Judge overruling the defendant's

1    objection to those photos?  Should any inference be made?"

2         MR. PATTERSON:  Explain it.

3         MR. MARTINEZ:  Explain to them that they're in

4    evidence for their consideration.

5         MR. PATTERSON:  And that I'm doing my job and the

6    reason for doing my job they should not consider in any way,

7    shape or form in your ruling.

8         MR. MARTINEZ:  And --

9         MR. PATTERSON:  May I finish?  Thank you.

10        MR. MARTINEZ:  -- in --

11        MR. PATTERSON:  Your ruling in no way reflects upon

12   my competency or the county attorney's questioning.

13        THE COURT:  I'll just say I make a ruling based upon

14   the rules of evidence and rules of law.

15        MR. PATTERSON:  She's asking should she derive any

16   inference.

17        THE COURT:  And no inference shall be made one way or

18   the other.

19        MR. MARTINEZ:  I would object to what he's asking

20   because that's vouching.

21        MR. PATTERSON:  No, it's not.

22        THE COURT:  I'm just going to say, look, I admitted

23   into -- photos into evidence.  That means they've been

24   admitted into evidence for the jury's consideration at the

25   end of the case for the jury's consideration, that I base my

1    rulings on the rules of law and the evidence, and other than

2    that, the jury should not make any inference.

3         MR. MARTINEZ:  Okay.

4         MR. PATTERSON:  Well, again, you need to explain that

5    I am required to make objections and there should be no

6    adverse inference taken from that.

7         THE COURT:  I'm just going to say that Counsel, if

8    they feel that there's a legal objection, they have a right

9    to state that objection --

10         MR. PATTERSON:  An obligation to make that.

11         THE COURT:   -- and no inference should be made about

12    that.

13         MR. PATTERSON:  Okay.

14         MR. MARTINEZ:  I would object to that.  I mean, then

15    we could turn around and then say, you know, the State didn't

16    do anything wrong either and I know we could say it a little

17    bit better by saying this is something that's part of the

18    case and they did nothing wrong by bringing them just

19    because -- you know, I just believe that's vouching by saying

20    what defense counsel is doing is okay.  I mean, I just -- I

21    think that's vouching.  You're turning around and you're

22    sanctioning what they're doing and saying they're doing a

23    good job.

24         THE COURT:  You know, I'll state it one way and

25    you've already made a record of how you wanted it stated and

1   you've made your record.

2              Next question, "Was any fingerprints lifted

3   from floor" -- sorry.  "Was any fingerprints lifted from the

4   flower pot, family portrait, and cut cell phone" --

5              MR. PATTERSON:  Charger.

6              THE COURT:  -- "car charger?  If yes, who did they

7   trace this back to?"

8              MR. PATTERSON:  You could ask that.  He doesn't know.

9              MR. MARTINEZ:  He doesn't know.  We could wait for

10  that.

11             MR. PATTERSON:  If he knows.

12             MR. MARTINEZ:  It calls for hearsay.  He knows

13  because it's based on the reports.

14             THE COURT:  Okay.  I'll just say some questions may

15  be answered by other witnesses.  He really doesn't know

16  except for what he reads.

17             MR. PATTERSON:  Fact of the matter is there weren't

18  any, so we'll get to that sooner for later.

19             THE COURT:  Next question, "One, in what position was

20  Mr. Andriano when you arrived?  Was he on his side or back,

21  was he moved prior to your arrival?"

22             Any objection from the State?

23             MR. MARTINEZ:  No.

24             MR. PATTERSON:  Well, he could state what position he

25  observed the guy in.  He doesn't know what position he was in

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000006002

1    prior to his arrival.

2         THE COURT:  Okay.  I'm just going to ask what

3    position was Mr. Andriano when you arrived, okay?

4              It's high tech.

5              Okay.  Next question, "At any time were the

6    small children subjected to their father's crime scene?"

7         MR. PATTERSON:  The next witnesses are going to say

8    the kids were passed out through the back --

9         MR. MARTINEZ:  He doesn't know.

10        MR. PATTERSON:  -- slider, so --.

11        THE COURT:  Next question, "Would you give an

12   explanation again on cast-off bloodstains?"

13        MR. PATTERSON:  Asked and answered many numbers of

14   times.  It's cumulative.  Just because they ask it doesn't

15   make it righteous.

16        MR. MARTINEZ:  They obviously have an issue about

17   it.  They're asking pretty much all of these questions that

18   have been covered.

19        THE COURT:  Your objection is noted for the record.

20   I'll ask it anyway.

21             Next question, "Whose hair found in victim's

22   hand?"

23        MR. MARTINEZ:  We know whose it is but he doesn't

24   know.  I would object to that.

25        THE COURT:  Mr. Patterson?

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000006003

1       MR. PATTERSON:  Yeah.  It's beyond the scope of this

2    witness.

3       THE COURT:  Okay.  Next question, "Was the victim

4    found on his back when the police originally arrived on

5    scene?"

6       MR. PATTERSON:  Already been asked.

7       THE COURT:  "If not, when was he moved to the supine

8    position, if you know?"

9       MR. MARTINEZ:  He doesn't know any of the answers to

10   those.  I don't think those should be asked.

11      THE COURT:  Your objection?

12      MR. PATTERSON:  Again, we asked what position he was

13   when he arrived.  I think that covered it.

14      THE COURT:  Again.

15          Next question, "Was your reconstruction of the

16   events based upon your experience and the evidence found at

17   the scene?"

18      MR. PATTERSON:  He's already done --

19      MR. MARTINEZ:  I think he should be allowed to answer

20   this question.  They're obviously confused as to what

21   happened.  There was cross-examination, redirect, but I think

22   they have a right to ask the question.

23      MR. PATTERSON:  The standard is not if they're

24   confused.  The standard is is it cumulative, if it's a

25   righteous question.

1          THE COURT:  I won't ask the question.

2               Next question, "Did the paramedics try to do

3    CPR when they arrived or were they checking to see if the

4    victim was still alive, paren, had the units on chest to

5    check heart rate, close paren.

6          MR. MARTINEZ:  He doesn't know.

7          MR. PATTERSON:  Someone else will answer that.  The

8    EMTs are here.  They'll testify to that.

9          THE COURT:  Next question, In Photo 38 there's a

10   different pair of shorts on the victim.  Is there some kind

11   of stain?  What is it, if able to answer."

12         MR. MARTINEZ:  What he's talking about is he had

13   green shorts on, then he had boxers on, so, yeah, he could

14   answer that one.

15         MR. PATTERSON:  That's his underwear.

16         THE COURT:  Okay.  I'll ask that then.  "Photo 40,

17   some of the stained area on the carpet is darker than other

18   areas on the carpet.  Why is that and does time have anything

19   to do with this darkness and lightness?"

20         MR. MARTINEZ:  He could answer that.

21         MR. PATTERSON:  Beyond the scope of this guy.  He's

22   not an expert on those kinds of particulars.  He's a blood

23   spatter guy.

24         MR. MARTINEZ:  If he knows.  It has to do with how

25   long the blood was there.

1            MR. PATTERSON:  If he has the requisite credentials

2    to give the answer, not just if he knows.

3            MR. MARTINEZ:  He's a blood spatter expert.

4            THE COURT:  "Is Photo 40 is that of the bloodstain or

5    vomit?  What are -- what is it?"

6            MR. MARTINEZ:  I don't know.

7            MR. PATTERSON:  We would have to pull it.

8                 (Pause in proceedings.)

9            THE COURT:  That's all blood, isn't it?

10           MR. MARTINEZ:  Yeah.  He --

11           THE COURT:  Okay.  I'm going to just say if you know

12   and I'm going to go ahead and ask the question.

13                Next question, "Can we get a demonstration on

14   the floor to get a better idea of as to how the blood was

15   flowing when the cut took place, paren, the way body was

16   laying where most of the blood was, close paren."

17           MR. MARTINEZ:  You could ask them how the body was

18   laying.  I don't know what she's talking about, the floor

19   stuff.

20           MR. PATTERSON:  I don't really understand the

21   question.

22           THE COURT:  I'm not asking that.

23           MR. PATTERSON:  I don't understand what they're

24   looking for.

25           THE COURT:  Next question, "Was there ever a second


             TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    911 call and/or how did it come about that you were called

2    out?"

3            MR. PATTERSON:  I don't think it's within the scope.

4            MR. MARTINEZ:  It isn't.

5            MR. PATTERSON:  Yeah.

6            THE COURT:  Next question, "Exhibit 66, were blood

7    drops under broken glass?  And if so, was any blood on top of

8    glass and what was pattern, cast-off or drops?"

9            MR. MARTINEZ:  He could answer that.  That's the

10   wedding thing in the corner.

11           MR. PATTERSON:  He could answer it.  It's within the

12   scope of his opinion, but, yeah, I don't any problem with

13   that.

14           MR. MARTINEZ:  Yeah.

15           THE COURT:  Okay.  I'll ask that.

16               "Was popcorn or Gatorade found in master

17   bedroom?"

18           MR. PATTERSON:  If he knows, yeah.

19           MR. MARTINEZ:  If he knows.

20           THE COURT:  Next questions, "Was only one empty lamp

21   box found and did lamp box show shade came with it?  Did box

22   come with two lamps if two boxes found?"

23           MR. PATTERSON:  That's fine.  There's only one box

24   found.

25           MR. MARTINEZ:  You could ask.

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1          THE COURT:  Okay.  Next question, "Was any

2     fingerprints lifted from flower pot, family portrait, and cut

3     cell phone car charger?  If yes, who did it trace back to?

4          MR. PATTERSON:  I think you got that one already.

5          MR. MARTINEZ:  And we said "no" on the other one.   If

6     he observed a tech in the neighborhood of the flower pots

7     and things to try to lift, so somebody else will come in

8     later.

9          MR. PATTERSON:  That's fine.

10         THE COURT:  I won't ask that.

11         MR. PATTERSON:  That's fine.

12

13          (The following proceedings were held in open

14     court:)

15

16         THE COURT:  Okay.  Sir, I have additional questions

17     here for you.

18          Ladies and gentlemen of the jury, some of the

19     questions may be answered by other witnesses, okay, so I may

20     not ask the question because they may be answered by other

21     witnesses.  Also, remember, I do apply the same legal

22     standards to your questions as I do to the attorneys.  If I

23     don't ask the question, don't be offended or infer anything

24     from that.  Also, if I do admit exhibits into evidence, that

25     means that the jury may consider that evidence.  If it's an

1    exhibit that has been admitted into evidence, that means it's

2    in evidence, and if I do not allow something to be admitted

3    into evidence, I'm just applying the rules of evidence, and

4    no inference should be made one way or the other with regard

5    to the Court's ruling.  But if I do admit something into

6    evidence, that's something that the jury can consider as

7    evidence.

8                     Okay.  The first question is as follows:  Is

9    the lamp metal or plastic or wood, if you know?

10                    THE WITNESS:  The lamp is metal or a pewter-type

11   metal.

12                    THE COURT:  The next question is as follows:  In what

13   position was Mr. Andriano when you arrived?

14                    THE WITNESS:  He was laying on his back as indicated

15   in the photographs.

16                    THE COURT:  Counsel, is there Exhibit 38 there also?

17   Is Exhibit 38 up there?  Do you see that?

18                    THE WITNESS:  Yes.

19                    THE COURT:  Okay.  I think there's reference to

20   Exhibit 38 here and you could look at that which has been

21   admitted in evidence.  The question is as follows:  If

22   there's a different pair of shorts on the victim, there's

23   some kind of stain.  What is that?  If able to answer.

24                    THE WITNESS:  The shorts in this photograph are his

25   underwear.  We took the green shorts off of him and this is

1    what he was wearing underneath his green shorts.  And on the

2    back is a bloodstain.

3         THE COURT:  Okay.  And the next question refers to

4    Exhibit 40.  Okay.  If you feel you're qualified to answer

5    the question, some -- and if you know, some of the stained

6    area on the carpet is darker than other areas on the carpet.

7    Why is that and does time have anything to do with the

8    darkness and lightness?

9              Do you feel you're qualified to answer that

10   question --

11        THE WITNESS:  Yes.

12        THE COURT:  -- in your experience?  Okay.  Go ahead

13   and answer the question.

14        THE WITNESS:  The dark area and the more dark

15   concentrated area of blood is dried up and dried to a darker

16   color, and the lighter color just means there's not enough

17   blood there.  It's just a bloodstain.

18        THE COURT:  The next question makes reference to

19   Exhibit Number 66.

20             The next question reads as follows.  Were blood

21   drops under broken glass?  And if so, was any blood on top of

22   glass pattern cast-off or drops?

23        THE WITNESS:  The blood drops are on the base.  We

24   didn't see any blood on top of the glass at all, and right in

25   front of this, I think I originally testified that it was

1    just a couple of blood drops.  Actually, in reviewing my

2    report and looking at the other photographs, this is in front

3    of the entertainment center which has the cast-off blood on

4    it, so I'm assuming that's part of the cast-off blood pattern

5    hitting the entertainment center.

6            THE COURT:  Next question reads as follows.  Was

7    popcorn or Gatorade found in master bedroom?

8            THE WITNESS:  Popcorn was, yes.  It was in a bowl by

9    the bed.

10           THE COURT:  Next question reads as follows:  Was only

11   one empty lamp box found and did lamp box show shade came

12   with it?  Did box come with two lamps if two boxes found.

13           THE WITNESS:  No.  The box found on the foot of the

14   bed only contained -- supposed to contain one lamp and

15   there's no lamps inside the box.

16           THE COURT:  And do you know whether the lamp box

17   showed the shade came with it?

18           THE WITNESS:  Yes, the shade came with it.

19           THE COURT:  Mr. Martinez, do you have any other

20   follow-up questions to those specific questions by the jury?

21           MR. MARTINEZ:  No, sir.  Thank you.

22           THE COURT:  Mr. Patterson, do you have any specific

23   follow-up questions to those specific questions by the jury?

24           MR. PATTERSON:  No, Judge.  Thank you.

25           THE COURT:  Are there any further questions of this


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    witness by the jury?

2                    (No response.)

3            THE COURT:  Okay.  No one has raised their hand.

4                    May this witness be excused?

5            MR. MARTINEZ:  Yes, sir.

6            MR. PATTERSON:  Yes, Your Honor.

7            THE COURT:  You are excused.  Thank you.

8                    Okay.  Let me see Counsel here at the bench for

9    just a moment.

10

11                    (The following proceedings were held at the

12   bench:)

13

14            THE COURT:  Do we need another break or can we get

15   right into the witness?

16            MR. MARTINEZ:  I'm okay.

17            MR. PATTERSON:  Are you okay?  You're bringing Mike

18   in now?

19            MR. MARTINEZ:  Uh-huh.

20            MR. PATTERSON:  Can we take a 10 minute break?  Let

21   me get my breath.

22            THE COURT:  Okay.

23            MR. MARTINEZ:  Thing is can we get started at --

24            THE COURT:  We'll take a five minute break.

25            MR. PATTERSON:  That's fine.  We'll get him in here.


                TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1          MR. MARTINEZ:  Right.

2          THE COURT:  Okay.

3

4          (The following proceedings were held in open

5   court:)

6

7          THE COURT:  Okay.  Counsel and ladies and gentlemen

8   of the jury, we'll take about a five minute break here. We

9   just need to make sure everything's in order here.  I'll take

10  5 minutes.

11          Remember, during this break to follow the

12  entire admonition I gave you including the fact you're not to

13  discuss this case with anyone, do not let anyone discuss the

14  case with you.  I'll stay here with Counsel for just a few

15  moments.  This will be about five minutes.  Thank you.

16

17          (Recess.)

18

19          THE COURT:  Please be seated.  This is cause number

20  CR 2000-096032, State of Arizona versus Wendi Elizabeth

21  Andriano.  The record will reflect the presence of the

22  Defendant, Counsel and the jury.

23          Mr. Martinez, State may call its next witness.

24          MR. MARTINEZ:  State calls Benjamin McKinnon.

25          THE COURT:  Sir, if you could step forward right up

1     here.  Give your name to the clerk and she'll swear you in.

2

3                    BENJAMIN MCKINNON,

4          CALLED TO TESTIFY ON BEHALF OF THE STATE,

5     HAVING FIRST BEEN DULY SWORN, TESTIFIES AS FOLLOWS:

6

7              THE COURT:  Sir, please have a seat on the witness

8     stand.  Make yourself comfortable there.  Please pull the

9     microphone close to you.  Please remember to speak loudly and

10    clearly into the microphone --

11             THE WITNESS:  Yes, sir.

12             THE COURT:  -- so everyone can hear you.  Also,

13    please wait until the question is completed before you answer

14    the question.

15             THE WITNESS:  Yes, sir.

16             THE COURT:  Mr. Martinez?

17

18    DIRECT EXAMINATION BY MR. MARTINEZ:

19             Q.    Your name, sir?

20             A.    Benjamin McKinnon.

21             Q.    And who do you work for?

22             A.    Phoenix Fire Department.

23             Q.    How long have you been with the fire

24    department?

25             A.    15 years.

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1          Q.     And what do you do for them?

2          A.     I'm an engineer paramedic technical rescue

3    team.

4          Q.     What does that mean?  What do you do?

5          A.     Engineer handles the pump, drives the truck.

6    Paramed is two people on each apparatus.  The advanced life

7    supports have to be parameds, and I'm on the technical rescue

8    team.

9          Q.     Drawing your attention back to October 8, year

10   2000, sometime after 1:00 o'clock in the morning were you on

11   duty?

12         A.     Yes, sir.

13         Q.     And did you have occasion to respond to the San

14   Riva Apartments that early morning?

15         A.     Yes, sir.

16         Q.     Did you respond once or twice?

17         A.     Twice.

18         Q.     What time did you respond or what time did you

19   receive a call to respond the first time?

20         A.     To be accurate, I'd have to see my

21   documentation, but it was sometime early in the morning.

22         Q.     Sometime around 2:30 in the morning?

23         A.     Yes, sir.

24         Q.     Let me show you your report.  Does that refresh

25   your recollection as to what time you responded?

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1                    (Pause in proceedings.)

2            THE WITNESS:  Do you have my EMS report?  I guess

3     that's what I'm talking about.  Could I look at that?

4     BY MR. MARTINEZ:

5            Q.    This is a summary.

6            A.    That's fine.  It would have been -- I'm not

7     sure if it was 1:00, 2:00.

8            Q.    Sometime in the early morning would be right?

9            A.    Yes, sir.

10           Q.    And when you responded, who responded with you?

11           A.    I was on Engine 46 at that time.  Rich Perrott

12    was the captain, myself, Enyada (phonetic), and I think the

13    fourth person was James Groenveld.

14           Q.    And when you received this first call, were you

15    and the rest of your group responding to another call or were

16    you available for service?

17           A.    We were available for service.

18           Q.    So it wasn't like you were busy with another

19    call?

20           A.    No, sir.

21           Q.    What if you were busy with another call?  Let's

22    say your unit was busy with another call.  What is the

23    procedure for the city of Phoenix, if you know, with regard

24    to other calls that then come in?  Are there people that

25    service --

1          A.      Yes, sir.

2          Q.      Could there be a situation that you know of

3    where somebody is told you're just too busy, you can't go?

4          A.      Not that I know of.  We're an automatic aide

5    situation where the computer tracks all the fire trucks in

6    the metropolitan area and takes the closest unit to the call

7    that comes out.  If you were the closest, no matter what, if

8    you're in Phoenix, Glendale -- it doesn't matter who it is,

9    you get the closest responding unit always.

10         Q.      Okay.  And you responded to this place and do

11   you remember how long it took your unit to get over to the

12   San Riva Apartments?

13         A.      No more than four to five minutes.

14         Q.      When you arrived, do you remember where you

15   parked in relationship to the area you were to visit?

16         A.      We came in the east side.  There's an entrance

17   that's south, there's a south entrance and north entrance.

18   We came in the south, headed west.  There's a parking

19   structure or I should say outside parking with cover.  I

20   pulled up on the side in front of the breezeway headed into

21   the apartment.

22         Q.      Was -- the breezeway, was it north, south,

23   east, west?

24         A.      Northwest.

25         Q.      Did you park on the north side or south side?

1          A.     North side.

2          Q.     When you parked there, tell me, what was the

3    procedure that you followed?

4          A.     We usually, depending on the type of call, we

5    grab our advanced life support equipment or medical

6    equipment, if it came in as a medical call, and then we find

7    the address.

8          Q.     In this particular case while you're staging, I

9    guess, or getting your equipment, did you have contact with

10   anybody?

11         A.     No, sir.

12         Q.     Then what happened?

13         A.     As we all got together, we approached towards

14   where we -- on each call we look up the address, then we find

15   a lot of times plot plans to the apartment complex so we can

16   find where it is and find out where we're going.  We headed

17   toward the breezeway and it was the apartment that would have

18   been on the east side of the breezeway, and we headed there

19   and then we ran into a young woman that was there.

20         Q.     And what did this young woman tell you?

21         A.     She told me that there was a person inside that

22   was very sick and that we needed to check him out and that

23   she had been asked to leave the apartment.

24         Q.     Did she ever indicate to you whether or not the

25   people inside of that apartment were upset with her?

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000006018

1          MR. PATTERSON:  Judge, that calls for hearsay.

2          THE COURT:  Sustained.

3     BY MR. MARTINEZ:

4          Q.    So you had this conversation with her.  Did she

5     indicate who called the paramedics?

6          MR. PATTERSON:  Objection.  That calls for hearsay?

7          THE COURT:  Sustained.

8     BY MR. MARTINEZ:

9          Q.    Okay.  What happened then?

10         A.    Well, at that point then we got information

11    from her as to why we were being called in the first place.

12         Q.    Okay.

13         A.    She said that --

14         THE COURT:  Don't say anything about what anybody

15    else said.

16               Ask your next question.

17    BY MR. MARTINEZ:

18         Q.    With regard to walking down the breezeway, did

19    you ever notice a purse there?

20         A.    I'm sorry, what?

21         Q.    Did you notice a purse there?

22         A.    I can't remember a purse.

23         Q.    Go ahead.  What happened next?

24         A.    We found --

25         Q.    Let me just show you your report and I'll point

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    it out to you?

2              A.    What I remember --

3              Q.    Do you remember the question?

4              A.    Sorry?

5              Q.    Do you remember whether or not there was a

6    purse?

7              A.    Laying on the ground?

8              Q.    Did you see a purse laying there, "yes" or

9    "no"?

10             A.    I can't remember seeing a purse.  She told

11   me --

12             THE COURT:  Hold on a second.  Don't say what

13   somebody told you.

14             THE WITNESS:  Sorry.

15   BY MR. MARTINEZ:

16             Q.    Then what happened?

17             A.    All right.

18             Q.    You talked to her and --

19             A.    We talked to her and she said that she felt --

20             THE COURT:  Hold on a second.  Don't tell me --

21   don't tell us what someone else said.

22   BY MR. MARTINEZ:

23             Q.    Just tell us what you did, okay?  You -- you're

24   walking down there?

25             A.    We asked for information on what happened.


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1      Q.    She gave you --

2      A.    Information on what happened and information on

3  the call.

4      Q.    Did you then go to the door?

5      A.    Correct.

6      Q.    How many people were with you when you went to

7  the door?

8      A     All four of us on the truck and the young

9  woman.

10     Q.    When you got to the door, what happened?

11     A.    The young woman knocked and asked if we could

12  come in, no response.

13     Q.    Okay:

14     A.    I knocked.

15     Q.    Did you ask --

16     A.    I knocked and stated "I'm with the Phoenix Fire

17  Department," "please open the door," and "we just want to

18  help" --  those kinds of things we say normally when we're

19  trying to get somebody to open the door.  No response.

20     Q.    How long were you and the rest of the group

21  standing there before something was done?  Before anything

22  else was done, I mean.

23     A.    We try to give the -- whoever's home that we go

24  to, we give them plenty of time to be able to respond to open

25  the door.  That's usually somewhere around five minutes.  We

1    knock again, ring door bells, we do all those things, and at

2    that point we make contact with our alarm room to use the

3    telephone to contact individuals inside for us so they could

4    let us in.

5            Q.    So how long were you standing there?

6            A.    Approximately 5 to 6 minutes.

7            Q.    And then what happened?

8            A.    The alarm room calls us back and says we made

9    contact with somebody, we'll make contact with you.

10           Q.    Okay.  And as you're standing there, what

11   happens then?

12           A.    At that point we noticed that somebody was

13   coming from the north down the breezeway stairs opening the

14   door.  We were all facing the door this way, and then we

15   noticed somebody was coming to our left.

16           Q.    Did that person come near you?

17           A.    Yes.

18           Q.    Was she close enough for you to see the

19   condition of her hair?

20           A.    Yes.

21           Q.    Did you notice anything about the condition of

22   her hair?

23           A.    She looked cleanly showered at that point.

24           Q.    When you say -- I just want to focus right now

25   on the -- on the hair.  Did it look like it was wet?

1    A.    Yes.

2    Q.    Did it appear to you like she had showered?

3    A.    Yes.

4    Q.    With regard to the outfit that she was wearing,

5  did you -- did you get an impression as to whether or not

6  they were pressed and had just been put on, that sort of

7  thing?

8    A.    I'm sorry, what?

9    Q.    Whether or not they had just been put on, the

10  clothing?

11    A.    The clothing appeared fresh or just put on, and

12  she appeared that she had just cleaned up, so.

13    Q.    What was the color of the shirt that she was

14  wearing?

15    A.    Light color.

16    Q.    Do you remember whether or not anything other

17  than -- anything distinctive about it, anything else more

18  distinctive about it?

19    A.    No.

20    Q.    What happened then?

21    A.    At that point we asked what we could do to

22  assist her.

23    Q.    And as a result of that conversation, were you

24  let into the apartment?

25    A.    No, sir.


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1        Q.      How long did you stand there and talk to this
2    woman?
3        A.      We talked to her for probably 10 minutes.
4        Q.      You're standing out there talking 10 minutes,
5    and as a result of that conversation were you able to go in
6    through the front door?
7        A.      No, sir.
8        Q.      That woman you're talking to, is she in court
9    today?
10       A.      Yes, sir.
11       Q.      Tell us where she's seated and what she's
12   wearing?
13       A.      I can't see her from here.  She's to the right
14   and she has a cream blouse on with a -- a jacket on, I guess.
15   I can't see from here.
16              MR. MARTINEZ:  Okay.  Your Honor, may the record
17   reflect the identification of the defendant?
18              THE COURT:  The record may reflect identification of
19   the defendant by the witness.
20   BY MR. MARTINEZ:
21       Q.      So you had this conversation and you stood
22   there.  Did you go inside the apartment ever that first time?
23       A.      On the first time, no, sir.
24       Q.      What does the woman do?
25       A.      When we -- when we asked what we could do for

```
 1    her, she stated --

 2              Q.    Well, don't tell us what she said.  You've

 3    already told us you had this conversation.   What happened

 4    after you've had this conversation?  Did you go inside there?

 5              A.    No.

 6              Q.    Did she ever go inside while you are there?

 7              A.    No.

 8              Q.    Did she ever leave the four of you?

 9              A.    No.

10              Q.    So she stood there?

11              A.    Yes.

12              Q.    And then what happened?

13              A.    We talked to her.

14              Q.    After you're done talking to her.

15              A.    After we're done talking to her, she refused

16    any further treatment.

17              Q.    Okay.  And then what happened?

18              A.    We never initiated treatment because she

19    refused us getting started.

20              Q.    Right.  I understand that.  Then what happened?

21              A.    We left.

22              Q.    Okay.  Do you know which direction the woman

23    left?

24              A.    No.

25              Q.    Okay.  Did you then go back to your station?
```

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1        A.    Yes, sir.

2        Q.    And did you get another call subsequent to that

3   to go back to that same place you'd been to?

4        A.    We didn't get another call to another facility.

5   We got the next call to come back to the same location.

6        Q.    Okay.   How much time elapsed between the first

7   call and the second call that you got?

8        A.    To be accurate, I would have to see the

9   documentation, but I was -- it was approximately an hour.

10       Q.    Okay.   And who else -- who went with you the

11  second time?

12       A.    Exact same crew on the fire truck.

13       Q.    And when you got there, this woman that you had

14  seen in the corridor with the wet hair, were you able to see

15  her on that second occasion?

16       A.    Yes, sir.

17       Q.    Was she wearing the same clothing she had

18  previously appeared in before?

19       A.    Appeared different.

20       Q.    And did you walk inside the apartment?

21       A.    Yes.

22       Q.    And what did you do with regard to the person

23  that was in there?

24       A.    I don't understand.  Are you talking about the

25  person that came out or anyone that was inside?

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000006026

1        Q.    Well, let's do it this way.  What did you see

2   when you walked inside?

3        A.    We found a patient on the ground deceased.

4        Q.    And describe what you saw for me, the

5   positioning and that sort of thing.

6        A.    Supine on the ground.

7        Q.    Does that mean on his back?

8        A.    Yes.

9        Q.    Okay.  And anything else unusual about it?

10  Just somebody there, not -- no blood, nothing, right?

11       A.    Copious amounts of blood, lethal lacerations to

12  the person's neck.  Absolutely no vital signs.

13       Q.    And you think -- and your group were the ones

14  to check to see whether or not there were vital signs?

15       A.    Yes, sir.

16       Q.    While you were there, was there ever a

17  determination that perhaps there may be some kids inside

18  there?

19       A.    Yes, sir.

20       Q.    And did you do anything with regard to those

21  kids?

22       A.    I spoke to the police officer -- I noticed a

23  baby's carriage outside and I spoke to the one police officer

24  and I said "Do they have kids?"  And he said "Yeah," and I

25  said, "Well, let's get them out of here."

1      Q.     Okay.  Where were the kids in relationship to

2    the body?

3      A.     The body was in the front family room and

4    there's a hallway and it splits off into two bedrooms.  A

5    police officer went to the left bedroom, I went to the right

6    bedroom and both children were asleep.

7      Q.     We have a diagram of the scene.  It's Exhibit

8    294.  This is one bedroom to the right, there's one to the

9    left.  Are these the two bedrooms you're talking about?

10     A.     Yes, sir.

11     Q.     Which bedroom did you go to?  The middle or --

12     A.     The one on the right.  Right there

13   (indicating).

14     Q.     And who did you pick up?  Was it a boy or girl?

15     A.     The baby was very small, maybe a year and a

16   half.

17     Q.     Anything --

18     A.     I think it was a boy.

19     Q.     Anything else unusual about the baby's

20   condition?

21     A.     It was, soaking dripping wet.

22     Q.     Where did you walk out with that baby?

23     A.     I picked up the baby and picked up diapers and

24   stuff because I wanted to make sure he had that, and then I

25   retracked because I didn't want to go out the way I went, so

1    I wanted to go back out the -- the hallway and go to I

2    assumed was a back door, that whoever came out to meet us

3    came out the back door.  So I went through the larger room

4    and it ended up on the back porch, which, actually, we jumped

5    the ledge to get out.

6         Q.    Was there -- this back porch that you're

7    talking about, was there a door or gate that opened up --

8         A.    No.

9         Q.    -- the way you went out?

10        A.    No.

11        Q.    How high would you say that fence was?

12        A.    It's a just a stuccoed wall and it's above my

13   belt level.

14        Q.    Okay.  And you carried the baby out?

15        A.    Yes, sir.  We passed the babies back and forth.

16   A police officer went over and we handed the kids over.  We

17   did it back and forth.

18        Q.    As you got to the -- is this the direction you

19   came --

20        A.    Yes.

21        Q.    -- and went?

22        A.    Yes, sir.  Went right towards the parking lot.

23        Q.    Were you able to meet anybody with regard to

24   these kids?  Did you meet anybody up there?

25        A.    As we came up to the parking lot, got out to

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    the sidewalk, I ran into the parents -- or, actually, that

2    would be the child's grandparent, the grandfather.

3            Q.    In other words, you ran into somebody.  Do you

4    know their name?

5            A.    No.

6            Q.'   And did you give them the child?

7            A.    He identified himself as he met me.

8            Q.    I know he identified himself, but do you know

9    whether or not it was her parents or the victim's?

10           A.    He indicated that he was her parent.

11           Q.    Okay.  And what happened then?

12           A.    And then we gave the children over to what we

13   felt was the responsible party, gave them the diapers, and

14   then he said he would take care of the children.

15           Q.    So it was a man that you gave them to?

16           A.    Yes, sir.

17           Q.    Do you know where he went?

18           A.    No, sir.

19           MR. MARTINEZ:  I don't have any other questions.

20           THE COURT:  Mr. Patterson?

21           MR. PATTERSON:  Thank you, Judge.

22

23   CROSS-EXAMINATION BY MR. PATTERSON:

24           Q.    How you doing, Mr. McKinnon?

25           A.    I'm good, sir.

1    Q.    We've spoken about this case before, haven't

2    we?

3    A.    Yes, sir.

4    Q.    Let's talk about that point in time when you're

5    outside this apartment.  And here's the entryway, correct?

6    A.    Yes, sir.

7    Q.    Okay.  You're standing in close proximity to

8    the door and you're knocking on it, right?

9    A.    Yes, sir.

10    Q.    Okay.  And I suspect you're insistent, knocking

11    loudly?

12    A.    Yes, sir.

13    Q.    Okay.  Do you hear any commotion inside the

14    apartment consistent with perhaps a struggle, a fight,

15    anything like that?

16    A.    No, sir.

17    Q.    Okay.  You identify yourself as EMT, paramedic,

18    fire, whatever?

19    A.    Right.

20    Q.    And loud enough, obviously, for somebody within

21    to be heard?

22    A.    Yes, sir.

23    Q.    That was your intent to be loud enough?

24    A.    Yes, sir.

25    Q.    Okay.  Did you hear any female voice respond to

1    you?

2              A.    No, sir.

3              Q.    Did you hear any male voice respond to you?

4              A.    No, sir.

5              Q.    All right.  Had you ever had any contact with

6    either of these two individuals, either the decedent or Mrs.

7    Andriano prior to October 8, 2000?

8              A.    No, sir.

9              Q.    Okay.  All right.  And you were outside of this

10   entryway approximately 10 minutes total?

11             A.    The first time, yes.

12             Q.    First time?  Okay.  All right.

13             A.    Well, five minutes later, 10 minutes talking to

14   her.

15             Q.    Okay?

16             A.    Approximately 15 minutes total standing out

17   there.

18             Q.    Okay.  Five minutes waiting for somebody to

19   come, and somebody does come from the other entry way?

20             A.    Yes, correct.

21             Q.    You speak with that person ten minutes?

22             A.    Correct.

23             Q.    This is the person you spoke with?

24             A.    Yes, sir.

25             Q.    Okay.  Did anything that she said to you cause

1    you any concern for the welfare of the individual inside this

2    apartment?

3         A.    No.

4         Q.    Because --

5         A.    We believed what she said.

6         Q.    Had you been suspicious about what she was

7    telling you --

8         A.    Correct.

9         Q.    -- you would have insisted on going in, right?

10        A.    Correct.

11        Q.    If it had gotten to that point, you would have

12   waited for the police to arrive and escort you inside.  Would

13   that be correct?

14        A.    Yes, sir.

15        Q.    You didn't do that here?

16        A.    No, sir.

17        Q.    That decision was based upon what she was

18   telling you and also information you were getting from the

19   other woman standing there, right?

20        A.    Yes, sir.

21        Q.    Nothing that other woman said gave you cause

22   for concern for the welfare of any other occupant inside that

23   apartment?

24        A.    When she initially talked to us, we were under

25   the understanding that he was very ill, very sick.


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000006033

1        Q.    Okay.  But she stood by within earshot of your

2   discussion with this lady, right?

3        A.    Yes.

4        Q.    She didn't say anything that -- that would

5   indicate to you her opinion was different than this lady was

6   telling you.

7        A.    Right.

8        Q.    Correct?

9        A.    Yes.

10        Q.    And had she said anything of that nature, you

11   would have insisted on going into the apartment, correct?

12        A.    Yes, uh-huh.

13        Q.    And it would not have been voluntary -- if you

14   were not given voluntary access, you would have gotten the

15   police to escort you into this apartment, correct?

16        A.    Yes.

17        Q.    Okay.  But you didn't do that?

18        A.    No, sir.

19        Q.    You got in your engine, your fire truck, and

20   you went back to the station house, right?

21        A.    Yes, sir.

22        Q.    Okay.  And bear with me a minute here, Mr.

23   McKinnon.  I need to get this marked.

24              MR. PATTERSON:  Would you mark this for

25   identification?


                TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1                    (Pause in proceedings.)

2     BY MR. PATTERSON:

3            Q.    While she's marking that, Mr. McKinnon, did you

4     try the door handle?

5            A.    I can't remember.

6            Q.    Show you what's been marked for identification

7     as Exhibit 325, is this the EMS incident report that you were

8     talking about?  That actually is your report?

9            A.    Yes, sir.

10           Q.    Okay.  And that's for the second visit, right?

11           A.    Yes, sir.

12           Q.    Okay.  Does that show a point in time when a

13    call may have come into the station house requesting your

14    assistance?

15           A.    Yes, sir.

16           Q.    Is that the dispatch time?

17           A.    Yes, sir.

18           Q.    And what time is that?

19           A.    03:39.

20           Q.    And then does it show what time you made

21    contact with the patient?

22           A.    Yes, sir.

23           Q.    And what time is that?

24           A.    03:42.

25           Q.    So if your recollection is that the first

1    contact, first visit was in the 2:00 to 2:30 range, this is

2    about, what, an hour and a half, an hour, 15 minutes later?

3         A.    Yes, sir.

4         Q.    Okay.  Let me see if there's anything else I

5    wanted to talk to you about on this thing.

6               And the patient had deceased at the time of

7    your arrival.  I mean --

8         A.    Prior to our arrival, yes.

9         Q.    Okay.  And your job at that point on the second

10   visit was just to document that he was in fact expired,

11   correct?

12        A.    Yes, sir.

13        Q.    Okay.  You put some things on his chest?

14        A.    Yes, sir.

15        Q.    What was that for?

16        A.    Those are electrodes.  They monitor the heart.

17        Q.    Okay.  And you got what they call asystole in

18   one, two and three leads?

19        A.    Yes, sir.

20        Q.    That means --

21        A.    Asystole is flat lines, means no electrical

22   activity at all.

23        Q.    So he was dead at least as of 03:42 hours?

24        A.    Yes, sir.

25        Q.    Okay.  And is that the second part of this?

1         A.    Yes, sir.

2         Q.    Little document that shows the one, two and

3    three leads?

4         A.    Yes, sir.

5         Q.    Okay.  The first visit over there, she didn't

6    have any visible bloodstaining to the outfit that she had on,

7    correct?

8         A.    No, sir.

9         Q.    Okay.  The second outfit that you saw her in,

10   that did have bloodstaining of any sort that you remember,

11   right?

12        A.    Yes, sir.

13        Q.    Kind of a spattering on the --

14        A.    Yes, sir.

15        Q.    -- front side?

16              Okay.  All right.  And lastly, when you took

17   the children through the covered porch area, you say the

18   stuccoed wall was up to your belt?

19        A.    Pretty much, yeah.

20        Q.    Did you just kind of sit on it?

21        A.    Yep.

22        Q.    Flip the legs over, no big deal?

23        A.    That's what we did.

24        Q.    You didn't have to climb hand over hand,

25   anything like that?

1       A.      No.

2       Q.      Relatively easy to go over that stucco wall?

3       A.      Yeah.

4       MR. PATTERSON:  Okay.  May I have a moment, Your

5  Honor?

6       THE COURT:  Yes.

7            (Pause in proceedings.)

8       MR. PATTERSON:  Thank you, Judge.  I have nothing

9  additional at this time.

10      THE COURT:  Mr. Martinez, any redirect?

11      MR. MARTINEZ:  Yes, sir.

12

13  REDIRECT EXAMINATION BY MR. MARTINEZ:

14      Q.      You indicated I think previously that it was

15  easy for you to go over the wall when you were getting out of

16  that apartment.

17      A.      Uh-huh.

18      Q.      Is that "yes"?

19      A.      Yes.

20      Q.      Is it easier to go over the wall or go -- when

21  leaving the apartment, which is easier to do: To go over that

22  wall or come out the front door?

23      A.      Front door.

24      Q.      In terms of the outfit, you indicated that the

25  first outfit -- that the first time you were out there, the

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000006038

1    woman, the defendant, had one outfit on.   I think you said

2    that, right?

3         A.    Yes, sir.

4         Q.    How did you describe that outfit previously?

5         A.    Fresh, clean.   Looks like she just put it on.

6         Q.    The second outfit that you saw her with, can

7    you describe it for me?

8         A.    It had a more of a print look to it and that's

9    where we saw the bloodstain on the front.

10        Q.    Okay.   If we have photographs of that and the

11   photographs show that it was actually a white shirt, could --

12   would you have any reason to have a -- have a quibble with

13   the photographs if they showed it was a white shirt the

14   second time?

15        A.    No.

16        Q.    Okay.   You were -- you indicated that the woman

17   that met you said that the person inside was very ill and

18   very sick?

19        A.    Yes, sir.

20        Q.    Did she tell you what he was afflicted with?

21        A.    She said he had cancer.

22        Q.    And when you went inside, did you see anything

23   that would indicate to you that this person was dying right

24   shortly before, like, for example, the machines we normally

25   associate with that sort of thing?

```
 1              A.     No, sir.

 2              Q.     Did you -- one of the other things that you

 3    were asked about was whether or not when you stood outside of

 4    the door and knocking, whether or not you heard the sounds of

 5    a struggle or a fight.  Do you remember that?

 6              A.     Yes, sir.

 7              Q.     And you indicated -- what was your answer?

 8              A.     No.

 9              Q.     Did you hear any sounds that can be categorized

10    as those of making love coming from -- emanating from inside

11    there?

12              A.     No, sir.

13              Q.     Did you hear, for example, water running or

14    anything like that?

15              A.     No, sir.

16              MR. MARTINEZ:  I don't have anything else.

17              THE COURT:  Any further questions of this witness by

18    the jury?  If so, please raise your hand.

19                   (Pause in proceedings.)

20              THE COURT:  Okay.  Let me see Counsel here at the

21    bench.

22

23                   (The following proceedings were held at the

24    bench.)

25
```

1      THE COURT:  Question, "If you know, when you met

2  Wendi's dad, was he just arriving or had he been in the

3  apartment already?"

4      MR. MARTINEZ:  He doesn't know that.

5      MR. PATTERSON:  I don't think he knows that.

6      MR. MARTINEZ:  Yeah.

7      THE COURT:  Okay.  I'm not going to ask that.

8      Next question, "How many people were in the

9  apartment when you entered and who were they?"

10      MR. MARTINEZ:  Yeah.

11      MR. PATTERSON:  If he knows, that's fine.

12      THE COURT:  Okay.  Next question, "What is meant by

13  the baby soaking wet.  Wet diaper only?  Were its clothes and

14  entire person wet?  Would this wetness be consistent with

15  heavy sweating or water from another source?"

16      MR. MARTINEZ:  He could answer that.

17      MR. PATTERSON:  It's just a wet diaper.

18      THE COURT:  I'll just ask what is meant by the baby

19  was soaking wet.

20      MR. PATTERSON:  All right.

21      MR. MARTINEZ:  Okay.

22      THE COURT:  Next question, "Do you know if the

23  children were sleeping when you arrived or went into the

24  rooms?  Would you say the baby was dripping wet?  What do you

25  mean, bathed or wet diaper?  Did the older child say anything

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    at all to anyone that you know of?"

2              MR. MARTINEZ:  The older child he didn't have any

3    contact with.  He was taken out by another officer.

4              MR. PATTERSON:  Yeah.

5              MR. MARTINEZ:  I don't know whether we could ask

6    that other question about the wet diaper.  The children

7    didn't make any statements, and they would be recorded as

8    hearsay anyway, so I don't --

9              THE COURT:  Do you want me to ask it?

10             MR. PATTERSON:  You've already answered.

11             MR. MARTINEZ:  I would say no, but I'll leave it up

12   to him, that issue about sleeping.

13             MR. PATTERSON:  Yeah.  He could ask if the child was

14   sleeping when he went into the bedroom, he had to wake it up

15   and remove it.

16             THE COURT:  I'll just ask that portion.

17                  Next question, "Did the defendant have clean

18   hair on the second visit?"

19             MR. PATTERSON:  Clean hair?  Yeah.

20             MR. MARTINEZ:  Condition.

21             MR. PATTERSON:  Condition of hair is fine.

22

23                  (The following proceedings were held in open

24   court.)

25   / / / / /

1          THE COURT:  Sir, I have additional questions here for

2     you.

3          THE WITNESS:  Yes, sir.

4          THE COURT:  Just from your personal observation, do

5     you know if the children were sleeping.

6          THE WITNESS:  Yes, sir.  The child that -- I had to

7     wake the child up and carry her out, him out.

8          THE COURT:  And what is meant by the baby soaking

9     wet?

10         THE WITNESS:  Well, when my kids wet their diaper and

11    it squirted all over that area, that's what I meant by

12    soaking wet.  The diaper was heavy, thick.

13         THE COURT:  You meant only a wet diaper?

14         THE WITNESS:  It was far more than just wet.  It's up

15    and down their backs, it gets out their legs a little bit and

16    on their back a little bit, but the diaper was soaked.

17         THE COURT:  And if you know, how many people were in

18    the apartment when you entered, and, if you know, who were

19    they?

20         THE WITNESS:  Prior to the fire department or

21    associated with my fire crew?

22         THE COURT:  The question is how many people were in

23    the apartment when you entered and who were they, if you

24    know.

25         THE WITNESS:  Rich Perrott and I would have probably

 1     be the first two coming in.  There was a police officer

 2     inside, and as far as I know, that was -- those were the

 3     three, and then the rest of the people were coming in with me

 4     or behind me.

 5          THE COURT:  Okay.  Next question reads as follows:

 6     Did the defendant have clean hair on the second visit.

 7          THE WITNESS:  Did the defendant have clean hair on

 8     the second visit?  Is that what you're asking me, sir?

 9          THE COURT:  That's the question.  Did the defendant

10     have clean hair on the second visit?

11          THE WITNESS:  I noticed it on the first visit, but to

12     tell you the truth, I couldn't verify that on the second

13     visit.

14          THE COURT:  Okay.  Any further questions of this

15     witness by the jury?

16               (No response.)

17          THE COURT:  No one has raised their hand.

18               Any follow-up questions to those specific

19     questions by the jury by Mr. Martinez?

20

21     FOLLOW-UP QUESTIONS BY MR. MARTINEZ:

22          Q.   Just so we could clear this up, she urinated or

23     he urinated or the baby urinated or defecated in the diaper.

24     Is that what you're talking about?

25          A.   Yes, sir.


     TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

```
 1              Q.    Okay.  With regard to the second visit, this is
 2     the same visit that you indicated that you thought her shirt
 3     was striped, right?
 4              MR. PATTERSON:  No, wait, wait, wait.
 5              MR. MARTINEZ:  Well, let me ask --
 6              THE COURT:  Restate the question.
 7     BY MR. MARTINEZ:
 8              Q.    Okay.  With regard to the hair that you saw the
 9     first visit, you remember you told us that it was wet hair?
10              A.    Right, yes.
11              Q.    The second visit was the hair wet?
12              A.    I don't remember it being wet at that point.
13              MR. MARTINEZ:  Okay.
14              THE COURT:  Mr. Patterson, any follow-up questions to
15     those specific questions asked by the jury?
16              MR. PATTERSON:  No, Your Honor.  Thank you.
17              THE COURT:  May this witness be excused?
18              MR. MARTINEZ:  Yes, sir.
19              MR. PATTERSON:  Yes, Your Honor.
20              THE COURT:  Thank you.  You're excused.
21                   Ladies and gentlemen, we'll go ahead and take
22     our evening recess at this point in time.  During this recess
23     remember the entire admonition I gave you including the fact
24     you're not to discuss this case with anyone, do not let
25     anyone discuss the case with you, keep an open mind about the
```

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    case, do not do any investigation or research on your own,

2    and avoid any media coverage of this case.

3               Have a nice evening.   Remember the admonition.

4    And we'll see you tomorrow at 1:00 p.m.   Have a nice

5    evening.

6

7               (Evening recess.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1

2

3                         CERTIFICATE OF REPORTER

4

5      STATE OF ARIZONA      )
                             )
6      COUNTY OF MARICOPA    )

7

8                   I, Traci L. Wheeler, CSR, RPR, an official

9      and certified reporter in the Superior Court of the State

10     of Arizona, in and for the County of Maricopa, hereby

11     certify that I made a shorthand record of the proceedings

12     had in the within case, and that the foregoing transcript

13     is a full, true, and correct transcription of the

14     proceedings in this case.

15                   Dated this 5th day of March, 2005.

16

17

18                                   _____
                                     Traci L. Wheeler, CSR, RPR
19                                   Certified Court Reporter No. 50313
                                     Official Court Reporter
20

21

22

23

24

25


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000006047

# EXHIBIT GG



05-0002   1

DP

1          IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

2              IN AND FOR THE COUNTY OF MARICOPA

3

4    STATE OF ARIZONA,            )
                                  )
5            Plaintiff,           )
                                  )
6    v.                           )      No. CR 05-0005 AP
                                  )      MARICOPA COUNTY
7    WENDI ELIZABETH ANDRIANO,    )      No. CR 2000-096032
                                  )
8            Defendant.           )
     _____)

9

10

11

12                          Mesa, Arizona
                       September 21, 2004
13

14

15

                BEFORE:   The Honorable BRIAN K. ISHIKAWA
16

17

18            REPORTER'S TRANSCRIPT OF PROCEEDINGS

19                      TRIAL DAY 15

20

21

22

23

24   ORIGINAL Prepared for APPEAL by:
     TRACI L. WHEELER, CSR, RPR
25   Certified Court Reporter No. 50313
     Official Court Reporter


        TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

2

```
 1                         A P P E A R A N C E S

 2    FOR THE STATE:       JUAN M. MARTINEZ,
                           Deputy County Attorney
 3
      FOR THE DEFENDANT:   DANIEL B. PATTERSON,
 4                         Deputy Public Defender
                                    and
 5                         G. DAVID DELOZIER,
                           Attorney at Law
 6

 7              I N D E X   O F   E X A M I N A T I O N
```

```
 8    WITNESS                                              PAGE

 9    DEYOUNG, JOHN, Called on behalf of the State
              Direct Examination by Mr. Martinez            74
10
      FLANNES, KATHY, Called on behalf of the State
11            Direct Examination by Mr. Martinez            56
              Cross-examination by Mr. Patterson            64
12
      GALBARI, KATHY, Called on behalf of the State
13            Direct Examination by Mr. Martinez           102
              Voir Dire Examination by Mr. Patterson       104
14            Continued Direct Examination by Mr. Martinez 109
              Voir Dire Examination by Mr. Patterson       122
15            Continued Direct Examination by Mr. Martinez 122
              Voir Dire Examination by Mr. Patterson       125
16            Continued Direct Examination by Mr. Martinez 125
              Follow-up Questions by Mr. Martinez          131
17            Voir Dire Examination by Mr. Patterson       133

18    HODGE, PETE, Called on behalf of the State
              Direct Examination by Mr. Martinez            66
19            Cross-examination by Mr. Patterson            72

20    MENCHACA, DEANNA, Called on behalf of the State
              Direct Examination by Mr. Martinez            78
21
      ORTEGA, RAYMOND, Called on behalf of the State
22            Direct Examination by Mr. Martinez            86

23    SINGELAIS, BARRY, Called on behalf of the State
              Direct Examination by Mr. Martinez             6
24            Voir Dire Examination by Mr. Patterson        15
              Contined Direct Examination by Mr. Martinez   16
25            Follow-up Examination by Mr. Martinez         23
```

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    I N D E X   O F   E X A M I N A T I O N   C O N T I N U E D

2    WITNESS                                              PAGE

3    VOIGT, WADE ALLEN, Called on behalf of the State
         Direct Examination by Mr. Martinez               25

4

5       E X H I B I T S   A D M I T T E D   I N   E V I D E N C E

6    NO.     DESCRIPTION                                     PAGE

7    159     Photograph                                      91
     160     Photograph                                      91
8    219     Envelope containing photographs                128
     219.001 Photograph taken from Exhibit 219             128
9    223     Handwritten note on back of business card      122
     231     Handwritten note                               123
10   233.001 Document dated 02-23-01, Subscriber records    62
     266     Large white envelope with poisonous material   113
11   266.001 Manila envelope                                113
     266.002 San Riva history document                      113
12   266.003 Shipping document                              113
     266.004 Packaging label                                12
13   266.005 Alfa Aesar safety data sheet document          16
     266.006 Alfa Aesar documents                           20
14   266.007 Document dated 03-31-02                        113
     266.008 Laboratory reference manuals                   113
15   266.009 Email dated 09-25-00                           113
     266.010 Email documents and post-its                   113
16   266.011 Voigt Global document                          113
     266.012 City of Phoenix Lic. No. 9002400 document      113
17   266.013 City of Phoenix Lic. No. 9002501 document      113
     266.014 Copy of Exhibit 266.013                        113
18   266.015 Copy of City of Phoenix document               113
     266.016 Arizona Department of Revenue document         113
19   266.017 Almond Extract document                        113
     266.018 Email document dated 03-21-00                  113
20   266.019 Cyanide and Almonds document                   113
     266.020 Document dated 07-31-00                        136
21   266.021 Remit to document                              136
     266.022 Document with partial signature                136
22   267     Fax cover sheet and letter from Voigt Global    32
     281.001 Azcreat@usa.net subscriber records             58
23   286.001 Photocopy of check and money order             50
     287     ABCO Foods money order                          69
24   296     Large Diagram                                   96
     314     Delivery manifest from Airborne Express         80
25   366     Diagram                                         29

4

1        <u>I N D E X   O F   E X H I B I T S   C O N T I N U E D</u>

2    <u>NO.</u>      <u>DESCRIPTION</u>                              <u>PAGE</u>

3    367       Latex glove                            125
     368.001   Note                                   126
4    369       Verizon bill                           127
     370       Manila envelope                        134
5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1              MESA, ARIZONA, TUESDAY, SEPTEMBER 21, 2004

2

3              THE COURT:  Good afternoon.  This is trial in cause

4    number CR 2002-096032, state of Arizona versus Wendi

5    Elizabeth Andriano.   The record will reflect the presence of

6    Defendant, Counsel and the jury.

7                   Mr. Martinez, the State may call its next

8    witness.

9              MR. MARTINEZ:  State calls Barry Singelais.

10

11                   BARRY SINGELAIS,

12        CALLED TO TESTIFY ON BEHALF OF THE STATE,

13    HAVING FIRST BEEN DULY SWORN, TESTIFIES AS FOLLOWS:

14

15              THE COURT:  Please have a seat on the witness stand

16    there.  Please make yourself comfortable there on the witness

17    stand.  Please pull the microphone close to you.  Please

18    remember to speak loudly and clearly into the microphone so

19    everyone can hear you.  Please wait until the question is

20    completed before you answer the question, and please make

21    sure you give a verbal response.  Is that agreeable?

22              THE WITNESS:  Yes, sir.

23              THE COURT:  Mr. Martinez, you may proceed.

24    / / / / /

25    / / / / /
```

1    DIRECT EXAMINATION BY MR. MARTINEZ:

2         Q.    May I have your name, sir?

3         A.    Barry Singelais.

4         Q.    What do you do for a living?

5         A.    I work for Alpha Aesar.

6         Q.    What do you do for them?

7         A.    I'm director of research of chemicals.

8         Q.    How long have you been in that position with

9    Alpha Aesar?

10        A.    Four, five years.

11        Q.    What are your duties in general?

12        A.    I'm the manager of several facilities globally,

13   mostly U.S., France, and Germany.

14        Q.    Tell me a little bit about Alpha Aesar.  First

15   of all, what kind of products does it put out?

16        A.    Yeah.  We sell research chemicals to

17   universities, academic institutions and industrial

18   corporations.  Probably anybody you can name.  We sell a

19   variety of different chemicals, 20,000 perhaps, to use for

20   manufacturing and research.

21        Q.    How is it normal orders are placed with Alpha

22   Aesar?  People call, come in, email thing?  How is it orders

23   are placed?

24        A.    Orders are placed via email via the internet,

25   electronically through distributors, phone calls by

1    distributors, and also direct calls from the outside.

2          Q.    You indicated something about electrically

3    through distributors.  If you could talk about that and

4    explain to us how that would go through the process at Alpha

5    Aesar resulting in an order being shipped?

6          A.    Okay.  We have distributors who represent us in

7    different regions of the world including the United States.

8    Distributors go out and use our catalogue to sell products.

9    If they get an order from the university or a lab, they'll

10   then place the order through us either by calling us on the

11   telephone or we'll get an order electronically.  They'll

12   simply place the order in their system and the order comes

13   through to our system.

14         Q.    Are you familiar with VQR?

15         A.    Yes.

16         Q.    Do you know what those initials stand for?

17         A.    It was Van Waters and Rogers at one time.

18         Q.    What is it now?

19         A.    I'm not sure what it is now, to be honest.

20         Q.    Were they one of the distributors that would

21   place electronic orders with you on occasion?

22         A.    Electronic and via phone calls.

23         Q.    Once the order comes in, let's say that it's

24   placed at your facility.  How is it that it gets to somebody,

25   or if you could walk me through the procedure how it would

1    get to somebody who then in turn fills it?

2         A.    The order is taken at our facility

3    electronically or via phone call.  The order pick tickets are

4    out in our warehouse.  It is repackaged for shipment or

5    already on the shelf in the size the person ordered.  It's

6    picked -- the material safety data sheet is included with the

7    product that prints at the same time as the pick ticket.

8              Someone takes that product and the material

9    safety data sheet to our shipping department.  They then take

10   the product, determine how it's to be ship, package it up

11   properly according to whatever regulations.  They go over

12   that product to make sure it's ready, and the product is

13   given a parcel carrier and airborne UPS or federal fees and

14   sent via whatever method the buyer determined to be used.

15        Q.    Where is the warehouse?  Are they throughout

16   the United States or --

17        A.    Our warehouse is in Ward Hill, Massachusettes.

18        Q.    Is that where you are?

19        A.    One mile away at the office.

20        Q.    I'm going to show you some documents to see if

21   they're familiar to you.

22              (Pause in proceedings.)

23   BY MR. MARTINEZ:

24        Q.    We're having them marked right now.  As soon as

25   we get them, we'll show them to you.

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1          I'm going to show you Exhibit Number 266.002.

2     I want you to take a look at it.  And specifically I will

3     direct your attention to the lower right hand corner of that

4     document.  First of all, have you ever seen that document

5     before?

6          A.     No.

7          Q.     What's the heading of the document, just so we

8     know?

9          A.     San Riva History.

10         Q.     And -- but there is some writing on the lower

11    right hand corner, correct?

12         A.     Right.

13         Q.     There's a name there by the name of Barry, and

14    then there's a telephone number there.  Can you give us the

15    telephone number?

16         A.     It's 978-521-6415.

17         Q.     And your name again is Barry Singelais?

18         A.     Yes.

19         Q.     And that number that's there, do you know whose

20    number that is?

21         A.     That's my direct line.

22         Q.     Did you ever have an indication to have any

23    direct contact with anybody that identified themselves as

24    Wendi Elizabeth Andriano or Wendi Andriano?

25         A.     Not that I recall.

1        Q.    Did you ever have occasion to have contact with

2   anybody by the name of Anne Newton?

3        A.    Not that I recall.

4        Q.    Is that your direct line there?

5        A.    Yes.

6        Q.    I want you to take a look at the woman sitting

7   here with the glasses in the light blue sweater.  Have you

8   ever had any contact with her before?

9        A.    No.

10       Q.    Do you know how your name and number got on the

11   lower righthand corner of that?

12       A.    I have no idea.

13       Q.    Sir, I'm now going to show you Exhibit

14   266.003.  Please take a look at it.  What is it?

15       A.    It's an Airborne Airway bill.

16       Q.    Is it something that was generated by Alpha

17   Aesar?

18       A.    Yes, it is.

19       Q.    And does it have to do with a certain

20   transaction?

21       A.    Yes.

22       Q.    Why don't you go ahead and open it so that you

23   could -- have you seen both sides of it?

24       A.    I think I can see both sides.

25       Q.    Okay.  If I may have it back then.

1            Please take a look at Exhibit 266.04.

2            MR. PATTERSON:  Did you say 266?  Sorry, Judge.

3            THE COURT:  Did you -- I think you said 266.04.  Are

4     you referring to 266.004?

5            MR. MARTINEZ:  Correct.

6            MR. PATTERSON:  So the sequence is the 266 sequence?

7            MR. MARTINEZ:  Right.

8     BY MR. MARTINEZ:

9            Q.    Do you recognize what's there?

10           A.    It's a tracking label that would go on a

11    package.

12           Q.    It's a tracking label from whom to whom?

13           A.    It's from Alpha Aesar, 30 Bond Street?

14    Ward Hill, Massachusettes, to Aztec Creations, Anne Newton,

15    in Phoenix, Arizona.

16           Q.    With regard to the particular address there in

17    Massachusettes, is that an address you're familiar with?

18           A.    That's our warehouse address.

19           Q.    And is this the company that you normally use

20    sometimes or customarily?

21           A.    I don't understand the question.

22           Q.    On occasion, do you use that company to ship

23    items out?

24           A.    Oh, yes.

25           Q.    And on that -- and the person that is sent to

1   is whom again?

2          A.    Aztec Creations, Anne Newton.

3          Q.    Is that what is normally placed on the outside

4   of the packages when they're being sent out.

5          A.    Yes.

6          Q..   But that's not the whole package, is it?

7          A.    No.

8          MR. MARTINEZ:   I move for admission of Exhibit

9   266.004.

10               (Pause in proceedings.)

11         MR. PATTERSON:   No objection, Judge.

12         THE COURT:   Exhibit 266.004 is admitted into

13  evidence.

14  BY MR. MARTINEZ:

15         Q.    Sir, let's just -- if you could see the

16  television from where you are, go ahead and take a look at it

17  so you can see what we're talking about.  And that's where

18  you told us is the person that it was going to right up here,

19  correct, Aztec Creations?

20         A.    Correct.

21         Q.    Then it's got the name and then it says Phoenix

22  Arizona 85034.  Are you able to read the street address for

23  me?

24         A.    2442 South 24th Street.

25         Q.    And then the remitter or person sending it is

1    somebody in Ward Hill, Massachusetts, correct?

2         A.    Right.

3         Q.    There is a shipping number on there, right?

4         A.    Correct.

5         Q.    What number is that?

6         A.    That's a number where you can track the package

7    by.

8         Q.    Okay.  And then that's -- that stays with the

9    package and Airborne Express, correct?

10        A.    Correct.

11        Q.    It does have someone who it's mailed through,

12   right?

13        A.    Yes.

14        Q.    What is that?

15        A.    Airborne Express.

16        Q.    And then it also indicates a shipping date,

17   doesn't it?

18        A.    It does.

19        Q.    If we move this out of the way a little bit,

20   that would be what -- what's the date?

21        A.    It's 9/28.

22        Q.    I want you to go ahead and take a look at

23   Exhibit 266.005.  Open it and take a look at the documents

24   that are in there.

25                    (Pause in proceedings.)


                TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

BY MR. MARTINEZ:

       Q.    What are they?

       A.    This is a material's safety data sheet and a cover sheet.

       Q.    And the cover sheet, what is that?

       A.    A sheet that indicates what product is being shipped and whether or not a materials safety data sheet was shipped along with the product.

       Q.    And the material data sheet, can you hold that up for us so we could see what that looks like.

       A.    (Indicating.)

       Q.    It's got a lot of writing on it.  And the other sheet, the cover sheet, can you hold that up so we could know what you're talking about?

       A.    (Indicating).

       Q.    Does that have like any routing number or anything on the cover sheet?

       A.    It indicates the order number.

       Q.    And what is the order number that is indicated on that?

       A.    5252176.

       Q.    I want you to take a look at Exhibit 266.004, and there on the lower left-hand corner, it's -- is that the same order number, sir?

       A.    It is.

1        Q.     So these documents that you have there

2    correspond to the order where this label came from.  Is that

3    what you're telling me?

4        A.     Yes.

5        Q.     Go ahead and put those back inside the

6    container with the data sheet on top for now.

7        A.     Data sheet on top?

8        Q.     There appeared to have been some yellow

9    post-its on these.  Do you know how those got there?

10       A.     No.

11       Q.     Aside from that though, these are the type of

12   documents or these are the documents that went out with this

13   order as set forth on 266.04?

14       A.     That would be the type of document, yes.

15       MR. MARTINEZ:  I move for admission of Exhibit

16   266.005.

17       MR. PATTERSON:  Voir dire, Judge?

18       THE COURT:  Yes.

19

20   VOIR DIRE EXAMINATION BY MR. PATTERSON:

21       Q.     This material safety data sheet, this

22   particular sheet you did not examine or see before the order

23   went out, correct?

24       A.     Correct.

25       Q.     This is the kind of data sheet that is

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    generally placed in those kinds of deliveries?

2         A.    It's the type of document, yes.

3         Q.    Okay.  And there's a different MSDS or material

4    safety data for each different product that comes out of your

5    warehouse, I assume?

6         A.    Correct.

7         Q.    Okay.  But you didn't actually see this

8    particular document as we speak today?

9         A.    No.

10        MR. PATTERSON:  Okay.  With that understanding,

11   Judge, I have no objection.

12        THE COURT:  Exhibit 266.005 for identification is

13   admitted into evidence.

14

15   CONTINUED DIRECT EXAMINATION BY MR. MARTINEZ:

16        Q.    Sir, I want to talk to you about some of the

17   information that may be contained in this material data --

18   material safety data sheet.

19        Q.    It does indicate under hazard description and

20   hazard identification, it has a T plus and then it has --

21   what does that say?

22        A.    Very toxic.

23        Q.    What does T plus mean?

24        A.    It's just a code that's used to determine

25   whether or not a product's toxic, flammable, whatever.

1      Q.    Okay.

2      A.    In this case it's very toxic.

3      Q.    It also indicates what you are supposed to do

4   in case something happens, first aid measures, that sort of

5   thing, correct?

6      A.    Correct.

7      Q.    On page 4 of 5, it does have something called

8   toxicological information, doesn't it?

9      A.    Correct.

10     Q.    It say Oral LD50:27 MG/KG, correct?

11     A.    Correct.

12     Q.    LD stands for Lethal Dose, doesn't it?

13     A.    Yes.

14     Q.    And MD?

15     A.    Although I'm not a chemist, I believe that's

16   the point it becomes a lethal dose.

17     Q.    It also has 27 milligrams, kilograms, something

18   like that?

19     A.    Milligrams per kilo.

20     Q.    And so with regard to this number right here,

21   this tells you that as I understand -- well, maybe you could

22   tell me.  Does that mean that 50 percent of the people die at

23   that dose?  Is that what that's telling you?

24     A.    I believe so, but I'm not positive.

25     Q.    Okay.

1          MR. PATTERSON:  Judge, could we strike that

2     testimony?  He doesn't have the requisite expertise.

3          THE COURT:  I'll sustain that objection.  That last

4     answer will be stricken.

5     BY MR. MARTINEZ:

6          Q.    It does -- under that same toxicological

7     information, it does have some writing about subacute chronic

8     toxicity.  Do you see that?

9          A.    Yes.

10         Q.    Why don't you go ahead, I'll hand it to you and

11    read that to us, please.

12         A.    If sodium azide is swallowed, symptoms similar

13    to strychnine poisoning will develop.  Effects include

14    violent heart stimulations within minutes, throbbing at the

15    base of the brain, loss of consciousness, and vomiting. If

16    hydrozoic acid is released, death may result due to

17    respiratory arrest.

18         Q.    Thank you.  One of the things the cover sheet

19    indicates is this is sodium azide 99 percent MINS assay.

20    What does 99 percent assay mean?  What does that mean?

21         A.    It means it was analyzed to 99 percent purity.

22         Q.    Let's take a look at Exhibit 266.006.  It

23    contains two articles of paper.  Go ahead and open it and

24    take a look at both of them.  What do they show?

25         A.    They're packing lists indicating what was

1    shipped or to be shipped.

2              Q.    You indicated to be shipped or shipped.   Is one

3    of them to be shipped and the other one is actually what was

4    shipped?

5              A.    No.   It's actually a document that tells you

6    what you are to ship.

7              Q.    Okay.   What is it that was going to be shipped

8    as part of this order?

9              A.    1500 milligram unit of sodium azide.

10             Q.    Does it indicate the date it was shipped or not?

11             A.    I -- it's difficult to see on this.   It

12   indicates the date that it was printed.

13             Q.    What's the date that it printed?

14             A.    Appears to be 9/28/2000.

15             Q.    And what is the order or tracking number you

16   may have on that if you can read it?

17             A.    I can read the last five digits which appear to

18   be 52176.

19             Q.    If we take a look at Exhibit 266.005, which is

20   the one we just talked about, what are the numbers there?

21             A.    5252176.

22             Q.    Is that something that accompanies the product

23   or something that stays behind in your office?

24             A.    Both.

25             Q.    But -- okay.

1          A.     That fit?

2          MR. MARTINEZ:  I move for admission of Exhibit

3     266.006.

4                 (Pause in proceedings.)

5          MR. PATTERSON:  I have no objection, Judge.

6          THE COURT:  Exhibit 266.006 for identification is

7     admitted into evidence.

8     BY MR. MARTINEZ:

9          Q.     I'm going so show you 266.007.  What is it?

10         A.     This is paperwork that's required when you ship

11    a poison and the poison pack.

12         Q.     And what is that paperwork?  What does it

13    indicate or who requires it?

14         A.     The federal government requires a DOT and --

15         Q.     So that's something that goes with something

16    that's poison, right?

17         A.     If there's a poison pack used to ship a

18    product, not all requires a poison pack, but if it's

19    required, yes, it would.

20         Q.     Does that have an order number or routing

21    number on it?

22         A.     No.

23         Q.     Okay.  Based on all the documentation that you

24    seen, sir, and the date that you indicated to us I think was

25    September 28, what was shipped out from Alpha Aesar on

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000006068

1    September 28, year 2000?

2            A.    500 grams of sodium azide.

3            Q.    And who was it shipped to?

4            A.    Aztec Creations.

5            Q.    And somebody by the name of Anne Newton also?

6            A.    Correct.

7    MR. MARTINEZ:  I don't have anything else.

8    THE COURT:  Mr. Patterson?

9    MR. PATTERSON:  Thank you, Judge.  I have no

10   questions for this gentleman.

11   THE COURT:  Are there any questions of this witness

12   by the jury?  If so, please raise your hand.

13            (Pause in proceedings.)

14   THE COURT:  Let me see Counsel here at the bench.

15

16            (The following proceedings were held at the

17   bench:)

18

19   THE COURT:  Question, "Before shipping, don't you do

20   a background check of the company and/or person requesting

21   the product?"

22            Mr. Martinez?

23   MR. MARTINEZ:  I don't have any objection to that.

24   MR. PATTERSON:  No objection.

25   THE COURT:  Okay.

1      MR. PATTERSON:  Judge -- you might want to tell him

2  what you just told me so he could tell the jury.

3      MR. MARTINEZ:  The reason we're wearing gloves is

4  this was treated with chemicals.  These documents were

5  treated by our latent fingerprint examiner.  If you touch

6  them with your fingers, they're toxic and they could cause --

7  they didn't tell me exactly what, but they said don't touch

8  them without gloves.

9      THE COURT:  Okay.

10      MR. PATTERSON:  You might want to tell the jury that.

11      THE COURT:  They may not be allowed to open that

12  document?

13      MR. PATTERSON:  Well --

14      THE COURT:  We'll do that later, okay?

15

16          (The following proceedings were held in open

17  court:)

18

19      THE COURT:  Sir, I have a question here for you.

20  Question reads as follows: Before shipping, don't you do a

21  background check of the company and/or person requesting the

22  product?

23      THE WITNESS:  Certain -- certain chemicals require a

24  background check.  They're on certain federal lists.  This

25  isn't one of those chemicals.  In some cases chemicals that

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    might have certain properties we would do a check anyway, but

2    not for this particular product.  There are no regulations

3    requiring it.

4           THE COURT:  Any further questions of this witness by

5    the jury?

6                  (No response.)

7           THE COURT:  No one has raised their hand.

8                  Any follow-up questions to this specific

9    question by the jury, Mr. Martinez?

10

11   FOLLOW-UP EXAMINATION BY MR. MARTINEZ:

12           Q.    You indicated this order was place bid VWR, I

13   think.  Is that correct?

14           A.    Correct.

15           Q.    Would you normally do a background check on VWR

16   when they place an order?

17           A.    VWR is one of the market leaders as far as

18   distributors of chemicals.  We know who they are.

19           MR. MARTINEZ:  I don't have anything else.  Thank

20   you.

21           THE COURT:  Mr. Patterson?

22           MR. PATTERSON:  No follow up, Judge.  Thank you.

23           THE COURT:  May this witness be excused?

24           MR. MARTINEZ:  Yes, sir.

25           MR. PATTERSON:  No objection.


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1          THE COURT:  Thank you very much.  You're excused.

2               Mr. Martinez, the State may call its next

3     witness.

4          MR. MARTINEZ:  State calls Wade Allen Voigt.

5               (Pause in proceedings.)

6          THE COURT:  Sir, if you could please step forward

7     right up here.  Give the clerk your name and she'll swear you

8     in.

9

10                    WADE ALLEN VOIGT,

11          CALLED TO TESTIFY ON BEHALF OF THE STATE,

12     HAVING FIRST BEEN DULY SWORN, TESTIFIES AS FOLLOWS:

13

14          THE COURT:  Sir, please have a seat on the witness

15     stand.  Please make yourself comfortable there on the witness

16     stand.  Please pull the microphone close to you.  Please

17     remember to speak loudly and clearly in the microphone so

18     everyone can hear you.  Please wait until the question is

19     completed before you answer the question, and please make

20     sure you give a verbal response.  Is that all agreeable to

21     you, sir?

22          THE WITNESS:  Yes.

23          THE COURT:  Mr. Martinez, you may proceed.

24     / / / / /

25     / / / / /

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000006072

1    DIRECT EXAMINATION BY MR. MARTINEZ:

2              Q.    Your name, sir?

3              A.    Wade Allen Voigt.

4              Q.    And who do you work for or are you

5    self-employed?

6              A.    I am self-employed.   My company is

7    incorporated.

8              Q.    And what's the name of your company?

9              A.    Voigt Global Distribution, LLC.

10             Q.    What is Voigt Global Distribution?

11             A.    Work with chemicals, biologicals scientific

12   instrument.

13             Q.    When did you start your company?

14             A.    January 12th, 1998.

15             Q.    Do you have any education -- why don't you give

16   us a little bit of your educational background?

17             A.    BS Biology, BS in Chemistry, minor in Physics.

18             Q.    How is it that your business is run?   In other

19   words, do you advertise or is it word of mouth?   Exactly how

20   is it people order things from you?

21             A.    Currently I have three domains on the

22   internet.   That's the only actual form of advertising that is

23   done for my company.   I do not use printed catalogues.

24             Q.    Drawing your attention back to the summer of

25   the year 2000, how was it that people would get in touch with

1    you to place orders?

2         A.    Both use of the internet, my company's

3    websites, and government orders could be placed through the

4    central contractor's registration database.

5         Q.    Okay.  You indicated that you had degrees in --

6    what again what were your degrees in?

7         A.    BS in Biology, BS in Chemistry, and a minor in

8    Physics.

9         Q.    Are you familiar with a form known as a

10   material safety data sheet?

11        A.    Yes.

12        Q.    What is a material safety data sheet?

13        A.    That document is required by law any time a

14   chemical is sold.  The end user for the company where the end

15   user works has a right by law to have access to all specific

16   information associated with that chemical.

17        Q.    I'm going so show you a page in the material

18   safety data sheet of -- involving some sodium azide.  It's

19   page 4 of 5.  It talks about Oral LD 50, 27 MG, and then

20   hyphen KG.  What is that?

21        A.    That stands for lethal dose, 50 percent of test

22   subjects, first line refers to orals.  Test subjects are

23   usually rats, mice, so forth.  The lethal dose to kill 50

24   percent of those test subjects was 27 milligrams per

25   kilogram.

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000006074

1        Q.      Can we -- if we use a little bit of math, can

2    we work it out if we know the weight of an individual to see

3    how it fits into that formula?

4        A.      Yes.

5        Q.      Can you see Exhibit 366 from where you're

6    seated?  If you want me to move it closer --

7        A.      Now I can.

8        Q.      I want to talk to you about the oral lethal

9    dose 50 27 milligrams, slash, kilograms.  That is on that

10   sheet, right?

11       A.      Yes.

12       Q.      If an individual weighs 170 pounds, how is it

13   that you go about converting that into kilograms?

14       A.      You would divide 170 pounds by 2.2.  There are

15   approximately 2.2 pounds in one kilogram.

16       Q.      If a person weighs 170 pounds, how many

17   kilograms would they weigh?

18       A.      Roughly 77 kilograms roughly.

19       Q.      It says up there 27 kilograms.  What does that

20   mean?

21       A.      27 milligrams of the substance that's being

22   reported on the material safety data sheet that would be

23   required per kilogram to kill 50 percent of the test

24   subjects.

25       Q.      So it would, as I understand it, then it would

1    take 27 milligrams per kilogram to kill 50 percent of the
2    test subjects?
3         A.    Correct.
4         Q.    In this case we know it's sodium azide.  We've
5    already had testimony that's what this refers to.  If you
6    want to find out how much it would take to kill somebody of
7    170 pounds who we now know weighs 77.27 kilograms, how is it
8    you go about ascertaining that?
9         A.    You simply compute the 77.27 kilograms by 27
10   milligrams to get a theoretical lethal dose to kill 50
11   percent of test subjects who weigh 77.27 kilograms.
12        Q.    So in order to kill 50 percent of the subjects
13   who weigh 77.27 kilograms, you would need 2286 milligrams,
14   right?  Sorry 2086 milligrams, correct?
15        A.    Correct.
16        Q.    In terms of grams, what is that?
17        A.    Roughly 2.09 grams.
18        Q.    It was actually rounded up here, right?
19        A.    Correct.
20        Q.    So if a person weighed theoretically 170
21   pounds, it would take approximately 2 grams to kill 50
22   percent of them?
23        A.    Correct.
24             MR. MARTINEZ:  Move for admission of Exhibit 366.
25             MR. PATTERSON:  No objection.


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

```
 1            THE COURT:  Exhibit 366 for identification is

 2   admitted into evidence.

 3   BY MR. MARTINEZ:

 4        Q.    Sir, we were talking about your business, Voigt

 5   Global, and you indicated that most of the time people send

 6   emails to you, I think, and that's how you get your business,

 7   right?

 8        A.    Correct.

 9        Q.    Did there come a time when somebody by the name

10   or with an email name of Anne Newton contacted you?

11        A.    Yes.

12        Q.    Did you know this Anne Newton prior to this

13   contact in their attempt to buy whatever it is they wanted to

14   buy?

15        A.    No.

16        Q.    Do you remember the first time you had contact

17   with this person?  Do you know about when it was?

18        A.    Roughly August of 2000.

19        Q.    Going to show you Exhibit 267.  I want you to

20   take a look at it to see if you recognize what's in this

21   packet.

22              (Pause in proceedings.)

23            THE WITNESS:  Yes.  I recognize all the documents.

24   BY MR. MARTINEZ:

25        Q.    What is in that packet?
```

30

1      A.    A letter that I wrote -- correction, a fax that

2  I had sent to Dave Lucero, some email communications from an

3  individual named Anne Newton.

4      Q.    What is the email they used, the email address

5  or moniker?

6      A.    Anne Newton, email address A-Z-C-R-E-S --

7  correction, A-Z-C-R-E-A-T at U-S-A dot net.

8      Q.    Okay.  Approximately how many messages are

9  there?

10      A.    Three.

11      Q.    And what else is there?

12      A.    A Contract Disclaimer and Indemnity Agreement

13  that my company requires from any entity other than federal,

14  state or educational institutions.

15      Q.    Who is that signed by?

16      A.    Anne Newton.

17      Q.    And what is the address that is given there for

18  Anne Newton?

19      A.    6962 East 1st Avenue, Number 102, Scottsdale

20  Arizona 85251.

21      Q.    And this is something that you had in your

22  records you made a copy and faxed --

23      A.    Correct.

24      Q.    -- over to the Phoenix Police Department?

25      A.    Correct.


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1       Q.    What else is there?

2       A.    A business license issued by the city of

3   Phoenix.

4       Q.    And does it have any writing on it on the side?

5       A.    To Allen.

6       Q.    Let me ask you, what is your full name again?

7       A.    Wade Allen Voigt.

8       Q.    Do you sometimes go by the name of Allen?

9       A.    Frequently.

10      Q.    All right.  And what else?

11      A.    An invoice from my company for 500 grams sodium

12   azide.

13      Q.    Okay.  And this involved this person that you

14   knew as Anne Newton?

15      A.    Correct.

16      Q.    With regard to this particular order, this

17   person sent a request to you.  They wanted something, right?

18   And as a result of that, ultimately there was an order for

19   what?  What was placed?  What kind of order was placed?

20      A.    500 grams sodium azide.

21      Q.    Were you able to provide the sodium azide or

22   were you not able to provide this sodium azide?

23      A.    I was able to facilitate a drop shipment

24   directly from the manufacturer to Aztec Creations.

25      Q.    Who is the manufacturer that made the drop

1    shipment?

2                A.      Alpha Aesar.

3                Q.      Was there a middleman that was involved?

4                A.      VWR International.

5                Q.      And so explain to me how it was that this

6    worked.  You get this request, then what happens?

7                A.      At the time my company was too small to place

8    orders directly with the manufacturer.  I used a larger

9    distributor, VWR International, to place the order with Alpha

10   Aesar.  Aesar then drop shipped the sodium azide directly to

11   Aztec Creations.

12               Q.      When you say "drop shipped," why don't you

13   explain to me what that means?

14               A.      My company never came in possession of the

15   chemical, VWR never came in possession of the chemical. It

16   went directly from Alpha Aesar to Aztec Creations.

17               Q.      And then you presumably paid VWR or Alpha

18   Aesar?

19               A.      Correct.

20               Q.      If I may have those back.

21               MR. MARTINEZ:  I move for admission of Exhibit 267.

22               MR. PATTERSON:  No objection, Judge.

23               THE COURT:  Exhibit 267 for identification is

24   admitted into evidence.

25   / / / / /

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000006080

1        BY MR. MARTINEZ:

2              Q.    Let's go ahead and take a look at some of the

3        documents we have here.   First of all, with what we call

4        page -- what is indicated as page 1 of 5, at the margin it

5        has a fax number.   Whose fax number is that?

6              A.    That was my company's fax number at the time.

7              Q.    And right here on the right?

8              A.    The date that fax was sent.

9              Q.    That you sent, right?

10             A.    Correct.

11             Q.    So did you fax these to somebody?   Who did you

12       fax these to?

13             A.    Those documents I originally faxed to Mr.

14       Lucero.

15             Q.    At the Phoenix Police Department?

16             A.    Correct.

17             Q.    Okay.   This does indicate a date, doesn't it?

18             A.    Yes.

19             Q.    What is it?

20             A.    Friday, September 22nd of 2000.

21             Q.    And it gives a time, doesn't it?

22             A.    11:19 a.m.

23             Q.    Does it tell you what standard time it is?

24             A.    I believe that stands for Mountain Time.

25             Q.    It's MDT in other words, right?

1          A.     Correct.

2          Q.     And it's from sales -- if you -- why don't you

3    go ahead and step down.

4          THE COURT:  You could step down just as long as you

5    remember to speak up as loud as you can when you're away from

6    the microphone.

7          THE WITNESS:  This is one of my company's email

8    addresses, Sales at Voigt Global dot com.

9    BY MR. MARTINEZ:

10         Q.     Who's it to?

11         A.     Anne Newton.

12         Q.     And there's the email address, right?

13         A.     Correct.

14         Q.     It's regarding what?

15         A.     Sodium azide.

16         Q.     Now, there is a text to this message, isn't

17   there?

18         A.     Correct.

19         Q.     Over on the righthand side it says something.

20   What does it say?

21         A.     Please send via overnight.  Thanks.

22         Q.     Did you put that on there?

23         A.     No.

24         Q.     How is it that you came into possession of a

25   copy -- of this document that had please send by overnight?

1        A.    This was sent along with a money order my

2    company received for the purchase of sodium azide.

3        Q.    So this particular page with the -- with the

4    email messages on it was sent to you with that writing on it,

5    right?

6        A.    Correct.

7        Q.    Was it faxed to you or sent to you?

8        A.    By the mail.

9        Q.    By the mail?  Okay.  So its -- let's look at

10    the message that's on top.  And is that a response by you

11    there on top?

12        A.    Correct.

13        Q.    What are you telling the person?

14        A.    "Again, there is no technical grade available.

15    The difference is in level of impurities, not necessarily the

16    potencies."

17        Q.    Okay.  And are you responding to the message

18    that's directly underneath?

19        A.    Correct.

20        Q.    And who is -- that message that's directly

21    underneath, who is that from?

22        A.    Anne Newton.

23        Q.    And when was it sent?

24        A.    Friday, September 22nd of 2000 at 11 25 a.m.

25        Q.    It doesn't indicate if it's, Central, Mountain

1    time, Standard Time, or Eastern Mountain Time.  It doesn't

2    indicate anything like that?

3          A.    No, it does not.

4          Q.    So -- and on it is a message to you, right?

5          A.    Correct.

6          Q.    And what does it say?

7          A.    "Allen, I realize it may not seem like a great

8    bang for the buck, but an acquaintance swears they have used

9    sodium azide or potassium cyanide mixed with specially

10   prepared greens for the rodents placed near the concentrated

11   area of plant life they tend to muck up and it apparently did

12   the job.  Other alternatives have been nearly as costly and

13   as always we understand there are no guarantees, so we're

14   happy to give this route a shot.  What is the pricing for a

15   technical grade strong enough to kill rodents?  Anne."

16         Q.    And then do you respond to that?

17         A.    Yes, I did.

18         Q.    What did you tell her?  You give her the

19   prices, that sort of thing?

20         A.    Correct.

21         Q.    But as I understand it, this sheet of paper

22   that we are working with, that was actually sent over to you

23   with the money requesting the sodium azide?

24         A.    Correct.

25         Q.    So that the writing that we have here is not --

1   is that something you added or is that something that --

2          A.    I did not write that.

3          Q.    Was there an indemnity agreement or an

4   agreement that was sent over to you?

5          A.    Yes.

6          Q.    I'm now showing you what is -- this -- I don't

7   want you to read it, but what about the portion on top? What

8   is that basically indicating?

9          A.    That the customer takes full responsibility or

10  adequate knowledge of handling, storage, of anything ordered

11  from Voigt Global, that it shall not be used for any illegal

12  purpose if that individual that places the purchase --

13         Q.    Okay.

14         A.    -- leaves ownership to someone else that may be

15  employed by that person, that these -- the signature will

16  take responsibility.

17         Q.    All right.  And who is it signed by?

18         A.    Anne Newton.

19         Q.    And it is printed there, right?

20         A.    Correct.

21         Q.    What's the date?

22         A.    August 21st, 2000.

23         Q.    And then it has the listed address that you've

24  already told us about?

25         A.    Correct.


                TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

38

1      Q.     How was it that this document came into your

2   possession?

3      A.     My company requires that for any purchase of

4   chemical unless the individuals placing the order is a

5   federal, state or educational entity.

6      Q.     Okay.  And that would have been faxed in

7   advance or sent by the mail prior to the order of sodium

8   azide?  I mean, either way you would have had to have this

9   before you would have considered even sending anything?

10     A.     Correct.

11     Q.     And at the very bottom it does have a -- it

12   says HTP something something Voigt Global dot com?

13     A.     Correct.

14     Q.     So is this something that was already in the

15   computer pre-printed for people to use?

16     A.     Correct.  They could simply perform a screen

17   print from my company's website.

18     Q.     What are the other documents that you indicated

19   that you had?  Was this -- what's that called?  What's that

20   name?

21     A.     A license from the city of Phoenix, finance

22   department.

23     Q.     And on the side of it, it says?

24     A.     To Allen.

25     Q.     Okay.  Is this the license that was sent to you

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000006086

1    as part of this order?

2            A.    Correct.

3            Q.    Did it come at the same time as the indemnity

4    agreement or at another time?

5            A.    Within a close time frame of one another.

6            Q.    Okay.  And let's see.  Who is this from?

7            A.    Aztec Creations Winstar Enterprises.

8            Q.    What's the address?  Can you read it?

9            A.    2442 South 24th Street, Phoenix, Arizona,

10   85034-6802.

11           Q.    Does it have an expiration date?

12           A.    December 21st, 2000.

13           Q.    There is a number listed there on the bottom

14   there.  Whose number is that?

15           A.    That is Anne Newton's telephone number.

16           Q.    And you were the one that actually placed that

17   on there, right?

18           A.    Yes.  I wrote that telephone number.

19           Q.    Was it based on information that you received

20   from Anne Newton?

21           A.    Correct.

22           Q.    Going to show you now another part of what you

23   brought with you.  It says Voigt LLC.  What is that?

24           A.    Voigt Global Distribution LLC.  LLC stands for

25   Limited Liability Company.  That's the correct legal name of

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1      my business.

2              Q.     Now, if we go over here to the left-hand side

3      what is that telling us?

4              A.     The salesperson, invoice number, invoice date,

5      the terms of sale, the date shipped, shipping method, tax

6      exemption, the OB price, prepaid or collect.

7              Q.     It says prepaid or collect then?

8              A.     Correct.

9              Q.     Has something next to it.   What does that say?

10             A.     Money order.

11             Q.     What does that indicate?

12             A.     Anne Newton, Aztec Creations placed this order

13     by paying in advance with a money order.

14             Q.     And then it also says something about out of

15     state.   What is that?

16             A.     My company does not charge sales tax out of the

17     state that my business is operating in at the time, which was

18     Kansas.

19             Q.     Okay.   And then we go down to the bottom. It

20     says something like sold to?

21             A.     Correct.

22             Q.     Go ahead tell us what the name was of the

23     person you sold it to?

24             A.     Anne Newton, 6962 East First Avenue, Number

25     102, Scottsdale, Arizona, 85251, USA, telephone number

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    602-826-1150.

2            Q.    Would that be the same number that appears on

3    the business license that you put on there?

4            A.    Correct.

5            Q.    And it also does have a company name and the

6    email address, right?

7            A.    Correct.

8            Q.    Now, on the right it tells you the -- it gives

9    you a total at the top, doesn't it?

10           A.    Correct.

11           Q.    And then we go down, you take that same total

12   and then it's exempt from sales tax I think it tells you,

13   right?

14           A.    Correct.

15           Q.    Shipping, handling, insurance -- how much was

16   that?

17           A.    65.25.

18           Q.    Then it talks about payments.   How much was

19   paid?

20           A.    180.

21           Q.    In what form?   Cash?   Check?   Money order?

22           A.    Money order.

23           Q.    What is this credit balance thing?

24           A.    Anne Newton paid an additional 9 dollars over

25   what was quoted to her.


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1        Q.    Has anybody ever requested that 9 dollars be

2   given back to them?

3        A.    No.

4        Q.    Going to show you another one -- another email

5   that you provided, the lower portion of the first page that

6   says "Please send via overnight, thanks" -- it's something

7   about Sales and Voigt Global.  Are you familiar with that?

8        A.    Yes.

9        Q.    First of all, what does it say?  Who is it

10  to -- or it says sales on there.  Then what does it indicate?

11       A.    This chemical will explode when heated.  I then

12  give the chemical name, the CAS Registry Industry Number, and

13  price for a 500 gram unit.

14       Q.    And how much is the price for that?

15       A.    105.75.

16       Q.    Is that the same price that you listed here?

17       A.    Correct.

18       Q.    And then you also have a Hazmat surcharge.

19  What is that?

20       A.    Hazardous materials surcharges are imposed by

21  carriers any time they transport a chemical identified by the

22  United Nations Department of Transportation, FAA, as being

23  hazardous to transport.

24       Q.    Okay.  And then what appears to be the

25  continuation of it is -- what is that?

1       A.     I itemize the total charges.  Poison packaging

2   required by the Department of Transportation is an additional

3   13 dollars.  I had originally requested that the product be

4   shipped by ground, which was 8 dollars, for a total price of

5   141.75.

6       Q.     That price that you quote there, is that

7   different from the price that eventually ended up being paid?

8       A.     Correct.

9       Q.     And why is that?

10      A.     I don't recollect why other than the fact that

11  she wanted it faster --

12      Q.     Okay.

13      A.     -- then ground shipping.

14      Q.     And then it says here something.  What does it

15  say?

16      A.     "I really don't think that you're getting your

17  best return on the money invested with this product.  This

18  purity of sodium azide is used in research laboratories, ie.

19  highly pure analytical reagent.  It not a technical grade for

20  killing rodents."

21      Q.     What are you telling her with regard to this

22  research laboratory thing?  What are you saying there?

23      A.     Industrial applications such as what could be

24  used for as a pesticide.  For example, the acceptable levels

25  of impurities are higher than if someone was to order a

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000006091

44

1    chemical in a laboratory and they wish to use it as a

2    reference standard.

3         Q.    Okay.  And as part of this message, is there a

4    message from Anne Newton to you?

5         A.    Yes.

6         Q.    And the date of that?

7         A.    September 19th, 2000.

8         Q.    What does it say?

9         A.    "Allen, sorry for the delay.  We just got back

10   from Ireland for vacation.  It is a beautiful country.  I

11   sent over a fax yesterday.  Let me know if you need anything

12   else."

13        Q.    That fax that is spoken of, do you know what

14   that is?  Do you remember now or not?

15        A.    It would have been the contract disclaimer and

16   or the city of Phoenix license.

17        Q.    Okay.  Also -- you left off there.

18        A.    "Also, let me know the total price so I could

19   send you a check.  Thanks, Anne."

20        Q.    And then there's some other writing on the

21   bottom of this, right?

22        A.    Correct.

23        Q.    These were the some of the emails that you

24   actually had in your possession, right?

25        A.    Correct.


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1          Q.    But are those all of the emails or could there

2    also be more?

3          A.    There could also be more.

4          Q.    Why don't you go ahead and take a seat.

5                Do you know somebody by the name of Wendi

6    Andriano?

7          A.    I do now.

8          Q.    Back then did you know anybody by the name of

9    Wendi Andriano?

10         A.    No.

11         Q.    Do you know somebody by the name of Anne Newton

12    other than by these documents that we're talking about here?

13         A.    No.

14         Q.    Right now I'm going to show you Exhibit Number

15    266.08 (sic).  Go ahead and take a look at it and -- know

16    what?  Because of the chemicals on it, let me give you some

17    gloves.

18               MR. PATTERSON:   Judge, can we approach?

19               THE COURT:   Yes.

20

21               (The following proceedings were held at the

22    bench:)

23

24               MR. PATTERSON:   I'd like you to explain to the jury

25    what chemical we're worried about touching.  I'm afraid there

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    may be an inference drawn there's azide on it.

2          THE COURT:   I'll allow you to do that during your

3    questioning.

4          MR. MARTINEZ:   I'll do it in the form of a leading

5    question and he'll just answer yes.

6          MR. PATTERSON:   Right.  And if you could follow

7    there's no sodium azide on it.

8          MR. MARTINEZ:   Yes.

9          MR. PATTERSON:   Okay.

10         THE COURT:   Okay.

11         MR. PATTERSON:   Thanks, Judge.

12

13               (The following proceedings were held in open

14    court:)

15

16    BY MR. MARTINEZ:

17         Q.    Sir, before you open it with regard to the

18    chemicals on that particular exhibit, you know that those

19    chemicals are actually put on there by the Phoenix Police

20    Department to try to develop what are called latent

21    fingerprints, correct?

22         A.    Right.

23         Q.    And the sodium azide is not associated with

24    these -- not -- sorry.  There's no sodium azide on these

25    documents.  It's actually something that was put there by the

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000006094

1    Phoenix Police Department.  You know that, right?

2            A.    Correct.

3            Q.    Why don't you go ahead and open that.

4                  (Pause in proceedings.)

5    BY MR. MARTINEZ:

6            Q.    Let's take a look at the large sheets.

7            A.    What is that?

8            A.    The first page is a page from my company's

9    website advertising laboratory reference manuals.

10           Q.    Okay.  What else?

11           A.    An additional page of the same subject matter,

12   an additional page of the same subject matter, an additional

13   page of the same subject matter, partially completed copies

14   of my company's contract disclaimer and indemnity agreement

15   that's available for printing from my company's website.

16           Q.    When you say that they were partially

17   completed, specifically what are you talking about?

18           A.    Someone has partially completed a signature and

19   nothing else.

20           Q.    What is that signature on there?

21           A.    The letters "A" "N."

22           Q.    Okay.

23           A.    The second one has no writing other than my

24   company's business telephone number at the time.

25           Q.    Okay.

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1       A.    The third one has a signature, a name, a date,

2  city, state, and country.

3       Q.    Okay.  And is that -- all the documents there

4  may be a random piece of paper there, but what is that to?

5       A.    It looks to be perhaps a portion of business

6  letterhead from Copperstate Glass and Mirror.

7       Q.    Have you ever had any business deals with

8  Copperstate Glass and Mirror?

9       A.    No.

10      Q.    I don't -- don't you -- go ahead and put

11  everything back.

12         Is there -- from the back of one of those

13  sheets that is completed that you indicated was your

14  indemnity agreement.  First of all, on the front of it, what

15  does it have?

16      A.    Signature Anne Newton, name Anne Newton, date

17  July 31st of 2000, City of Phoenix, State, Arizona, Country,

18  USA.

19      Q.    But there is some writing on the back also,

20  correct?

21      A.    Correct.

22      Q.    Is there Voigt Global written on the back?

23      A.    Correct.

24      Q.    Any other indications of any contact with your

25  company on the back of that document?

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1     A.     My company's email at the time.

2     Q.     Anything else other than those two things?

3     A.     Not as it pertains directly to my company.

4     Q.     Okay.  Sir, as a result of any contact you may

5  have had from the Phoenix Police Department, did you then

6  obtain a copy of the money order that was used by Anne Newton

7  of Aztec Creations, also doing business as Winstar

8  Enterprises to purchase the sodium azide?  Did you cause --

9  did you go and get a copy of that money order?

10    A.     Correct.

11    Q.     I'm going to show you what has been marked for

12  identification as Exhibit 286.  Go ahead and take a look at

13  it.

14           (Pause in proceedings.)

15       THE WITNESS:  I recognize it.

16  BY MR. MARTINEZ:

17    Q.     And what is it?

18    A.     It is a copy of a money order used to purchase

19  the sodium azide, as well as another check from the

20  University of California that was deposited into my company's

21  checking account on the same day.

22    Q.     And this money order, who is it signed by?

23    A.     Anne Newton.

24    Q.     And that was the one that -- what is the amount?

25    A.     $180.

1          Q.    If I may have that back.

2          MR. MARTINEZ:  Move for admission of Exhibit 286.

3               (Pause in proceedings.)

4          MR. PATTERSON:  Judge, there's a letter from this

5     gentleman clearly not part of the exhibit.  I would ask that

6     be taken out and -- I'm sorry.  Voir dire, Judge?

7          THE COURT:  Yes.

8          MR. PATTERSON:  Is this -- this is the envelope you

9     sent to the sheriff, so if we could just delete these two

10    items.  This is the actual exhibit that I think is germane.

11         THE COURT:  Is that agreeable, Mr. Martinez?

12         MR. MARTINEZ:  Yes, Your Honor.  If we could have it

13    marked as 286.001.

14         THE COURT:  You're moving to have 286 --

15         MR. PATTERSON:  Modified.

16         THE COURT:  -- modified?

17         MR. MARTINEZ:  I'm withdrawing the request to move in

18    286 and instead asking 286.001 be admitted.

19         THE COURT:  Exhibit Number 286.001 for identification

20    is admitted into evidence.

21    BY MR. MARTINEZ:

22         Q.    Let's go ahead and take a look at Exhibit 286.

23         THE COURT:  It's 286.001, correct?

24         MR. MARTINEZ:  That's correct.  I'm sorry.

25    / / / / /

```
 1   BY MR. MARTINEZ:

 2              Q.    What's the amount of that money order?

 3              A.    $180.

 4              Q.    And there's a signature on there?

 5              A.    Anne Newton.

 6              Q.    And who is it made out to?

 7              A.    Voigt.

 8              Q.    And you really can't tell any of the dates or

 9   anything on there, can you?  Or can you?

10              A.    September 25th, 2000.

11              Q.    Okay.  Sir, as a result of all of this

12   information you've seen and all of the documents we've

13   received, did you cause or set in motion the wheels to have

14   500 milligrams of sodium azide shipped to somebody?

15              A.    500 grams?

16              Q.    Sorry, 500 grams.

17              A.    Correct.

18              Q.    Okay.  And the person you ostensibly shipped it

19   to, what was his or her name?

20              A.    Anne Newton.

21              Q.    And were they part of a company who represented

22   themselves out as part of a company?

23              A.    Correct.

24              Q.    How much did you charge them?

25              A.    $180 --
```

1          Q.      And --

2          A.      -- was how much was remitted, but that wasn't

3    the original charge.

4          Q.      And as I understand it, you asked the middle

5    man to get involved who then had somebody by the name of

6    Alpha Aesar --

7          A.      Correct.

8          Q.      -- become involved.  As part of this, did you

9    ever receive any telephone calls from somebody named Anne

10   Newton?

11         A.      Correct.

12         Q.      Was this before or after the shipment had taken

13   place?

14         A.      After.

15         Q.      And what did Anne Newton want from you?

16         A.      The courier company and tracking number of the

17   shipment.

18         Q.      Did you give those to her?

19         A.      Yes.

20         Q.      Do you have a copy of it or is it just

21   something you gave to her back then?

22         A.      That is something I verbally gave her over the

23   phone.

24              MR. MARTINEZ:  I don't have any other questions.

25              THE COURT:  Mr. Patterson?


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000006100

1          MR. PATTERSON:  I have no questions for this

2     gentleman.  Thank you.

3          THE COURT:  Any questions from the jury for this

4     witness?

5                    (Pause in proceedings.)

6                    (The following proceedings were held at the

7     bench:)

8

9          THE COURT:  Question, "When the rush was put on the

10    product, didn't that send up a red flag in your mind?  If so,

11    did you do anymore investigating sending the product to this

12    address, paren, given to you, end of paren."

13         MR. MARTINEZ:  I think that's irrelevant, but if

14    they want to ask it, that's fine.

15         THE COURT:  Mr. Patterson?

16         MR. PATTERSON:  I don't think it's relevant, Judge.

17         THE COURT:  I'm not going to ask it.

18              Next question, "Does your company check to see

19    what the product is being used for?"

20              Mr. Martinez?

21         MR. MARTINEZ:  He can -- I mean, he could answer

22    that.  It's not relevant.

23         MR. PATTERSON:  It's -- in the email, they're talking

24    about rodent control.  I think that's cumulative.  It's

25    already been discussed with this gentleman through the course

1    of the emails, so I don't think we need --

2            MR. MARTINEZ:  But does he check?  I mean, I would

3    think --

4            MR. PATTERSON:  Did he verify elements in the email?

5    That's fine.

6            THE COURT:  So how do you want it asked?

7            MR. PATTERSON:  Well, if the question is did he

8    verify the elements claimed in the email correspondence it

9    was going to be used as rodent control, that's fine.  You

10   could ask him that.  But I just don't know why it's relevant.

11           THE COURT:  I'm not going to ask it.  I don't think

12   it's relevant.

13               Next question, "How is it that you, a small

14   company, be able to come in contact with toxic materials?"

15           MR. MARTINEZ:  I don't see how that's relevant.

16           MR. PATTERSON:  I don't see where she's going with

17   these things.

18           THE COURT:  Okay.  I'm not going to ask any questions.

19

20               (The following proceedings were held in open

21   court:)

22

23           THE COURT:  Any further question?  Remember, I apply

24   the same legal standards to your questions as I do to the

25   attorneys questions, so if your question is not asked, don't

```
 1    be offended.
 2              Any other questions of this witness by the
 3    jury?
 4              (No response.)
 5         THE COURT:  No one has raised their hand.
 6              May the witness be excused?
 7         MR. MARTINEZ:  Yes, sir.
 8         MR. PATTERSON:  No objection, Judge.
 9         THE COURT:  Thank you very much.  You're excused.
10              Mr. Martinez, the State may call its next
11    witness.
12         MR. MARTINEZ:  State calls Kathy Flannes.
13              (Pause in proceedings.)
14         THE COURT:  Please step forward right up here.  Give
15    the clerk your name.
16         THE WITNESS:  Sorry.
17         THE COURT:  Right over here.
18         THE WITNESS:  Sorry.
19
20                   KATHY FLANNES,
21         CALLED TO TESTIFY ON BEHALF OF THE STATE,
22      HAVING FIRST BEEN DULY SWORN, TESTIFIES AS FOLLOWS:
23
24         THE COURT:  Please have a seat on the witness stand
25    there.  Please make yourself comfortable there on the witness
```

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    stand.  Please pull the microphone close to you.  Please

2    remember to speak loudly and clearly into the microphone so

3    everyone can hear you.  Also please wait until the question

4    is completed before you answer the question, and please make

5    sure that you give a verbal response.  Is that agreeable to

6    you?

7              THE WITNESS:  Yes.

8              THE COURT:  Mr. Martinez, you may proceed.

9

10   DIRECT EXAMINATION BY MR. MARTINEZ:

11        Q.    May I have your name?

12        A.    Kathy Flannes.

13        Q.    Who do you work for?

14        A.    USA dot net incorporated.

15        Q.    Where -- what down do you work in?

16        A.    Colorado Springs.

17        Q.    And what do you do for USA dot net?

18        A.    I'm custodian of records.

19        Q.    As custodian of records, are these records kept

20   of people who open accounts with you?

21        A.    Yes.

22        Q.    And the information on the opening of the

23   accounts, is that created at the time the person is providing

24   the information?

25        A.    Yes.

1          Q..    How is that done in this case if a person

2    wants -- back in, let's say, July of year 2000, how was that

3    done?

4          A.  .  In July of 2000 the service was a free service.

5    Persons would come to out website, create an email address.

6    If that address was available, they could then proceed with a

7    subscription process.

8          Q.    And as the person is creating that email

9    address, is another portion of your company or another

10   computer keeping track or keeping a record of what is going

11   on by the person who is seeking to create a new email address?

12         A.    Yes.

13         Q.    You're the person in charge of that, correct?

14         A.    Correct.

15         Q.    I'm going to show you what has been marked for

16   identification as Exhibit 281.  Take a look at it, please.

17                (Pause in proceedings.)

18   BY MR. MARTINEZ:

19         Q.    What is it?

20         A.    This is subscriber information for the email

21   address created "azcreat@usa.net."

22         Q.    Who is the person that actually was requesting

23   to do that?

24         A.    It was listed as Anne Newton.

25         Q.    And the date that letter address was sought to

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    be created?

2             A.    July 26th, 2000.

3             Q.    If I may have that back, please.

4                   There is also another document in there, right?

5                   (Pause in proceedings.)

6             THE WITNESS:   Yes.

7    BY MR. MARTINEZ:

8             Q.    Is there -- this a letter?

9             A.    Yes.

10            Q.    Did you author the letter or did someone else?

11            A.    Someone else.

12            Q.    Okay.  If I may have that back.

13            MR. MARTINEZ:   Judge, I'm going to cause one of the

14   documents to be marked 281.001, and I'm showing that document

15   to Mr. Patterson.  I'm going to move that into evidence.

16                  (Pause in proceedings.)

17            MR. PATTERSON:   Your Honor, I have no objection to

18   281.001 being admitted into evidence.

19            THE COURT:   Exhibit 281.001 for identification is

20   admitted into evidence.

21   BY MR. MARTINEZ:

22            Q.    Let's go ahead and just take a look at it

23   briefly.  Okay.  Can you see the TV from there?

24            A.    Yes

25            Q.    Okay.  What is that at the top?


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

```
 1              A.    "azcreat@usa.net."

 2              Q.    Okay.  And then --

 3              A.    That is the email address created.

 4              Q.    There is an account number there, right?

 5              A.    Yes.  That's assigned by "usa.net".

 6              Q.    Then it says "Status Okay."  What does that

 7    mean?

 8              A.    That's means it's an active account.  It hasn't

 9    been cancelled.

10              Q.    And that was as of what date?

11              A.    February 14th, 2001.

12              Q.    And number of filters, what is that?

13              A.    Filters would be forwarding filters to send

14    mail on or junk mail filters.

15              Q.    Destination says Inbox.  What does that mean?

16              A.    That means mail received automatically is

17    delivered to the Inbox instead of a different folder.

18              Q.    Time zone, it says MM.  What is MM?

19              A.    That's just the time zone.  MM is a designation

20    for a table in our data base.

21              Q.    Then it says America Denver?

22              A.    That would be the time zone collected by the

23    subscriber.

24              Q.    So in other words, if I live in California,

25    could I request to have a New York time zone?
```

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

```
 1        A.    Yes, you could.

 2        Q.    And in this particular case Ms. Newton

 3   requested a Denver time zone?

 4        A.    Correct.

 5        Q.    Do you know what the time zone -- what it's

 6   called here in -- if she had requested one for Arizona, would

 7   it say Arizona on there or would it say something else?

 8        A.    It would typically be a city.   Probably

 9   Phoenix.

10        Q.    Okay.  Then it does have another account number

11   up there, correct?

12        A.    Correct.

13        Q.    And that's the same one as --

14        A.    It's the same.

15        Q.    And it talks about the email address, correct?

16        A.    Yes.

17        Q.    Gives you the name of the person?

18        A.    That was the name provided by that subscriber.

19        Q.    And what name is that?

20        A.    Anne Newton.

21        Q.    The address?

22        A.    1722 east 16th.

23        Q.    Phoenix?

24        A.    Phoenix, Arizona, United States, 85044.

25        Q.    And just so that we're clear, that does say
```

1    "E."  That is a small "E," right?

2           A.    That is an "E," yes.

3           Q.    At the bottom of this sheet it says "subscriber

4    information was not verified."  What does that mean?

5           A.    It was a free email service.  You can say any

6    name you wish.  We did not verify that information and there

7    were no billing orders associated with the name.

8           Q.    That's what it says.  There are no billing

9    records associated with that account?

10          A.    Correct.

11          Q.    Why is that?

12          A.    Because it was free.

13          Q.    Okay.  Let's take -- go ahead and take a look

14   at Exhibit Number 233.  Do you recognize what's there?

15          A.    Yes.

16          Q.    What is it?

17          A.    This is a subscriber record with a different

18   email address, "wendi.bbw@usa.net."

19          Q.    And when was that opened?

20          A.    June 27, 2000.

21          Q.    Okay.  If I may have that.  And, again, all the

22   prerequisite questions that I asked you with regard to the

23   other thing, do they apply to this?

24          A.    Yes, they do.

25          Q.    Go ahead and take a look at it.  It does appear

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000006109

1    to be two documents in there, correct?

2            A.    Correct.

3            Q.    And is one of them a letter?

4            A.    One is.

5            Q.    Did you write that letter or not?

6            A.    I did not.

7            MR. MARTINEZ:  Judge, I'm going to move for admission

8    of Exhibit Number 233.001.

9                    (Pause in proceedings.)

10           MR. PATTERSON:  No objection, Judge.

11           THE COURT:  Exhibit Number 233.001 is admitted into

12   evidence.

13   BY MR. MARTINEZ:

14           Q.    Let's go ahead and take a look at this.   It

15   gives us the email address at the top, right?

16           A.    Yes.

17           Q.    What is that?

18           A.    "wendi.bbw@usa.net."

19           Q.    Was that an active account as of February 23rd,

20   2001?

21           A.    Yes, it was.

22           Q.    If we go to the same thing, again, it does talk

23   about the number of filters.   How many are there?

24           A.    Zero.

25           Q.    And the destination, what does it refer to?

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

63

| | | |
|---|---|---|
| 1 | A. | Inbox. |
| 2 | Q. | And the time zone that is signed up, what time |

3       zone is that?

| | | |
|---|---|---|
| 4 | A. | That would be America, Denver. |
| 5 | Q. | Is that the same as the previous exhibit we |

6       discussed which is 281.001?

| | | |
|---|---|---|
| 7 | A. | Yes. |
| 8 | Q. | And the signup date is what? |
| 9 | A. | June 27th, 2000. |
| 10 | Q. | Would that be -- well, let's just look at it. |

11      And the other one was what date again?

| | | |
|---|---|---|
| 12 | A. | July 26, 2000. |
| 13 | Q. | And let's go down to the address.  And what's |

14      the address there?

| | | |
|---|---|---|
| 15 | A. | 2155 E. Liberty Lane, Phoenix, Arizona. |
| 16 | Q. | And, again, is there -- I think you previously |

17      indicated you took it to be an "east," correct?

| | | |
|---|---|---|
| 18 | A. | I assumed "east," yes. |
| 19 | Q. | You look at the other one, that's the same |

20      thing, little "E" there?

| | | |
|---|---|---|
| 21 | A. | Correct. |
| 22 | Q. | Were there billing records for this account? |
| 23 | A. | No.  It was also a free account. |
| 24 | Q. | And was the identity of the person or the |

25      subscriber verified as to this account?

1      A.      No.

2              MR. MARTINEZ:  I don't have any other questions.

3              THE COURT:  Mr. Patterson?

4              MR. PATTERSON:  I just have a few questions, Judge.

5

6      CROSS-EXAMINATION BY MR. PATTERSON:

7              Q.      These accounts are created, there's a field on

8      an internet kind of web page, right?

9              A.      Correct.

10             Q.      Okay.  And there's an opportunity to plug in

11     certain information within the fields, right?

12             A.      Yes, sir.

13             Q.      Okay.  This America, Denver thing, are you

14     certain that doesn't have something to do with the fact

15     Arizona may not go on daylight savings time and has something

16     to do with that timing thing?

17             A.      No, sir.  Every time zone in the world is

18     available.

19             Q.      Okay.

20             A.      It's a drop down menu.  You select which one

21     you want and it plugs it in.

22             Q.      Is there a default drop down or default entry

23     if you don't select something on a drop down?

24             A.      I don't know.

25             Q.      So there may be an internal mechanism within

1    your system.  If a subscriber doesn't fill-in a particular

2    blank, you fill it in for them?

3             A.    I don't know.

4             Q.    Okay.  That exists as a possibility though?

5             A.    Could be.

6             MR. PATTERSON:  Judge, that's all I have.  Thank you.

7             THE COURT:  Any further -- sorry.  Redirect?

8             MR. MARTINEZ:  No.  None.  Thank you.

9             THE COURT:  Are there any further questions of this

10   witness by the jury?  If so, please raise your hand.

11                  (No response.)

12            THE COURT:  No one has raised their hand.

13                  May this witness be excused?

14            MR. MARTINEZ:  Yes, sir.

15            MR. PATTERSON:  No objection.

16            THE COURT:  Thank you very much.  You're excused.

17                  Mr. Martinez, the State may call its next

18   witness.

19            MR. MARTINEZ:  State calls John DeYoung.

20                  (Pause in proceedings.)

21            MR. MARTINEZ:  Judge, the State would call Pete Hodge

22   first.

23                  (Pause in proceedings.)

24            THE COURT:  Sir, please step up here give the clerk

25   your name and she'll swear you in.

1    / / / / /

2    / / / / /

3                          PETE HODGE,

4          CALLED TO TESTIFY ON BEHALF OF THE STATE,

5      HAVING FIRST BEEN DULY SWORN, TESTIFIES AS FOLLOWS:

6

7          THE COURT:  Please have a seat on the witness stand

8    here.

9          THE WITNESS:  Uh-huh.

10         THE COURT:  Please make yourself comfortable there.

11   Please pull the microphone close to you.  Please remember to

12   speak loudly and clearly into the microphone so everyone can

13   hear you.  Also please wait until the question is completed

14   before you answer the question, and please make sure you give

15   a verbal response.  Is that all agreeable to you, sir?

16         THE WITNESS:  That's fine.

17         THE COURT:  Mr. Martinez, you may proceed.

18

19   DIRECT EXAMINATION BY MR. MARTINEZ:

20         Q.    Your name please?

21         A.    Pete Hodge.

22         Q.    Who do you work for?

23         A.    Currently I work for Safeway Company.

24         Q.    Drawing your attention back to the summer of

25   the year 2000, who did you work for then?


                TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

                              000006114

67

1          A.     ABCO Desert Market.

2          Q.     There -- are they still in business, sir?

3          A.     No, they're not.

4          Q.     What were your duties with regard to ABCO back

5     then?

6          A.     Sorry?

7          Q.     Go ahead.

8          A.     I was manager of operational accounting.

9          Q.     What does that mean, you were manager of

10    operational accounting?

11         A.     I handled most of the accounting that went

12    through anything to do with our retail facilities as well as

13    payroll.

14         Q.     Did you have occasion or did that include

15    handling items such as money orders and reconciling the

16    ledgers?

17         A.     Yes, it did.

18         Q.     I'm going to show you what has been marked for

19    identification as Exhibit Number 287 to see if you recognize

20    it.

21         A.     Yes, I do.

22         Q.     What is it?

23         A.     It is a money order.

24         Q.     And is that a money order that you occasion to

25    come in contact with or cause anything to be done with?

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1          A.    Yes, it is.

2          Q.    What is that -- when did you come in contact

3     with it?

4          A.    I was requested to obtain a copy of it.

5          Q.    And was that toward the fall of the year 2000?

6          A.    Yes, it was.

7          Q.    And how it that you went about obtaining this

8     money order?

9          A.    I contacted the vendor who we go through.

10         Q.    Who is the vendor?

11         A.    At that time it was Western Union.

12         Q.    So you went through Western Union?   Okay.

13         A.    And requested a copy of the money order that

14     was asked of me.

15         Q.    Did you get a copy of the money order and

16     return -- in response to the request or did you actually get

17     the original?

18         A.    I got the original.

19         Q.    And that's the money order that you obtained?

20         A.    Yes, it is.

21         Q.    And who is it signed by, if you could tell, if

22     you could read it?

23         A.    Well, there's three signatures on it.

24         Q.    The one that's in ink.

25         A.    I am having a difficult time reading it.   It

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    looks something like Nestore or --

2         Q.    Okay.

3         A.    I can't read it.

4         Q.    How about who is it made out to?

5         A.    Looks like V-o-i-g-t.

6         Q.    Okay.  If I may have that back.

7               Through this paper that it has on there, are

8    you able to make out a date?

9         A.    Well, I know what the date is if I could see it

10   again.

11        Q.    Okay.

12              (Pause in proceedings.)

13   BY MR. MARTINEZ:

14        Q.    Do you want me to --

15        A.    No.  It says 9/25/00.

16        Q.    So that's September 25, 2000?

17        A.    Correct.

18        MR. MARTINEZ:  Move for admission of Exhibit Number

19   287.

20        MR. PATTERSON:  No objection, Judge.

21        THE COURT:  Exhibit Number 287 for identification is

22   admitted into evidence.

23   BY MR. MARTINEZ:

24        Q.    Let's go ahead and take a look at it.

25              Over here to the left, and that's -- the one

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

```
1     that you indicated perhaps went to Voigt, correct or

2     V-o-i-g-t.

3              THE WITNESS:  I --

4              THE COURT:  You could step down if you'd like.

5              THE WITNESS:  Yes.  That's what I saw.

6     BY MR. MARTINEZ:

7          Q.    Now, if you go to the middle of it, why don't

8     you just step down and -- go ahead.  I'm going to zoom in a

9     little bit more.

10         A.    Okay.

11         Q.    And what is -- what is this say right here?

12    Can you read it?

13         A.    Yes.  That's the agent number, which would have

14    been like the account number for that retail location that

15    was assigned to issuing this money order.

16         Q.    Do you know which retail location that came

17    from?

18         A.    In this case it would have been our store,

19    number 435.

20         Q.    That was an ABCO store?

21         A.    Yes, it was.

22         Q.    Where is that or where was that store located?

23         A.    I -- I don't know the address, I believe it was

24    around Chandler Boulevard and 12th Street, somewhere in that

25    neighborhood.
```

1       Q.      All right.  And then it has here, time.   What
2   is that?
3       A.      I -- I can't really read it real clearly, but
4   it would have been the time it would have been purchased.
5       Q.      Okay.  There's like an "02" there and a "54"
6   there.  Can you see that?
7       A.      It's very -- I mean, if what I see -- looks
8   like 145402.  Might have been probably 254 if the -- yeah.
9       Q.      Okay.  And then there's a date up here?
10      A.      Uh-huh.
11      Q.      Is that "yes"?
12      A.      Yes.
13      Q.      And what's the date that you see?
14      A.      September 25th, 2000.
15      Q.      And the amount?
16      A.      180.
17      Q.      Okay.  What does it say there?
18      A.      For the deposit part?
19      Q.      Yeah.  Just read that.
20      A.      For deposit only, Voigt Global Distribution
21   Account 995883-09.
22      Q.      And then it gives -- do you know what this
23   credit union thing would be down there?
24      A.      That, I don't know.  I would guess that would
25   probably be the place where whoever accepted the gift

1    certificate deposited it in their account.

2              Q.    What was the date listed there?

3              A.    September 28, 2000.

4         MR. MARTINEZ:  I don't have any other questions.

5         MR. PATTERSON:  May I have a moment, Judge?

6         THE COURT:  Yes.

7                   (Pause in proceedings.)

8         MR. PATTERSON:  Just a few questions Mr. Hodge.

9

10   CROSS-EXAMINATION BY MR. PATTERSON:

11             Q.    You didn't deal with the -- the selling end of

12   this product, right?

13             A.    That's correct.

14             Q.    Okay.  Do you have a knowledge of in general

15   how these products are created and sold in the ABCO stores?

16             A.    Yes, I do.

17             Q.    Okay.  Could you tell me if I wanted to buy a

18   money order at an ABCO market that you used to work at, how

19   would I go about doing that?

20             A.    You would basically go up to the customer

21   service desk and request to buy a money order.

22             Q.    Okay.

23             A.    And you would give the person the amount that

24   you wanted.  They would also include a service fee, whatever

25   that would happen to be.

1          Q.    Okay.

2          A.    And they actually did it, they were on line

3    when the money was supplied by the money order manufacturer

4    and they would put in the amount that the money order was for

5    and basically run it through and the machine would print it

6    out.

7          Q.    Okay.  Do you have to give your ID to purchase

8    a money order?

9          A.    I don't believe you'd have to, no.

10         Q.    Okay.  There isn't any record made of who

11   actually purchased the money order, right?

12         A.    Not to my knowledge.

13         Q.    Okay.

14         MR. PATTERSON:  Thank you, Judge.  That's all I have.

15         THE COURT:  Redirect?

16         MR. MARTINEZ:  I don't have any other questions.

17         THE COURT:  Are there any further questions of this

18   witness by the jury?  If so, please raise your hand.

19              (No response.)

20         THE COURT:  No one has raised their hand.

21              May this witness be excused?

22         MR. MARTINEZ:  Yes, sir.

23         MR. PATTERSON:  No objection.

24         THE COURT:  Thank you very much.  You're excused.

25              State may call its next witness.


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1       MR. MARTINEZ:  State calls John DeYoung.

2           (Pause in proceedings.)

3       THE COURT:  Sir, if you could please step forward

4  right up here.  Right up here.  Please give the clerk your

5  name and she'll swear you in.

6

7                 JOHN DEYOUNG,

8      CALLED TO TESTIFY ON BEHALF OF THE STATE,

9    HAVING FIRST BEEN DULY SWORN, TESTIFIES AS FOLLOWS:

10

11      THE COURT:  Please have a seat on the witness stand.

12  Please make yourself comfortable there on the witness stand.

13  Please pull the microphone close to you.  Please remember to

14  speak loudly and clearly into the microphone so everyone can

15  hear you.  Also please wait until the question is completed

16  before you answer the question, and please make sure you give

17  a verbal response.  Is that all agreeable to you?

18      THE WITNESS:  Yes, sir.

19      THE COURT:  Mr. Martinez, you may proceed.

20

21  DIRECT EXAMINATION BY MR. MARTINEZ:

22      Q.    May I have your name, sir?

23      A.    John DeYoung.

24      Q.    Who do you work for?

25      A.    City of Phoenix Police Department.

1          Q.     What do you do for them?

2          A.     I'm a patrol officer.

3          Q.     Drawing your attention back to October 10th of

4     the year 2000, did you have -- sometime around 3:30 in the

5     afternoon, did you have occasion to be on duty?

6          A.     Yes, I did.

7          Q.     And where were you on duty?

8          A.     In the area of Ahwatukee, which on that

9     particular time, 2155 East Liberty Lane.

10         Q.     What's the name -- does that location have a

11    name?

12         A.     It's an apartment complex.  I don't remember

13    the name.

14         Q.     Would it be the San Riva apartment complex?

15         A.     That's correct.

16         Q.     Okay.  And while you were there did you have

17    occasion to speak to an individual from the San Riva

18    apartment complex?

19         A.     Yes, I did.

20         Q.     Do you remember his name?

21         A.     Ortega.

22         Q.     And as a result of that conversation or that

23    contact with Mr. Ortega, did you receive something?

24         A.     Yes.  He gave me a packet.

25         Q.     What was that packet in?


                TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    A.    A manila folder.

2    Q.    I'm going to show you what is marked for

3  Exhibit Identification as 266.001.  Does that look like it?

4    A.    That is it.

5    Q.    About what time did this happen?

6    A.    Sometime in the afternoon.

7    Q.    Would it be around 4-ish?

8    A.    That sounds right.

9    Q.    And what did you do once you received it from

10  Mr. Ortega?  What did you do with the envelope?

11    A.    I placed the envelope into my patrol car and

12  then we drove to Apartment 132 where I was advised to stand

13  by for detectives to arrive.

14    Q.    When the detectives arrived, were they male or

15  female?

16    A.    Female.

17    Q.    Do you remember their names?

18    A.    Not their last name, sir, no.

19    Q.    What are their first names?

20    A.    Well, I spoke with Kathy.

21    Q.    Okay.  And did you tell Kathy anything and did

22  you give Kathy anything.

23    A.    Yes.  I just explained to Kathy what was given

24  to me.  I gave her the manilla packet and stood by while they

25  processed the area.

1          MR. MARTINEZ:  I don't have any other questions.

2          MR. PATTERSON:  No questions, Judge.  Thank you.

3          THE COURT:  Any further question of was witness by

4    the jury?

5              (No response.)

6          THE COURT:  No one has raised their hand.

7              May the witness be excused?

8          MR. MARTINEZ:  Yes, sir.

9          MR. PATTERSON:  No objection.

10         THE COURT:  Thank you very much.  You're excused.

11             State may call its next witness.

12         MR. MARTINEZ:  State calls Deanna Menchaca.

13             (Pause in proceedings.)

14         THE COURT:  Please step forward right up here.  Right

15   up here.  Please give the clerk your name.  She'll swear you

16   in.

17

18                  DEANNA MENCHACA,

19         CALLED TO TESTIFY ON BEHALF OF THE STATE,

20    HAVING FIRST BEEN DULY SWORN, TESTIFIES AS FOLLOWS:

21

22         THE COURT:  Please have a seat on the witness stand.

23   Please make yourself comfortable there on the witness stand.

24   Please pull the microphone close to you.  Please remember to

25   speak loudly and clearly into the microphone so everyone can

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    hear you.  Also please wait until the question is completed

2    before you answer the question.  Please make sure you give a

3    verbal response.  Is that agreeable to you?

4            THE WITNESS:  Yes.

5            THE COURT:  Mr. Martinez, you may proceed.

6

7    DIRECT EXAMINATION BY MR. MARTINEZ:

8            Q.    Your name, please?

9            A.    Deanna Kay Menchaca.

10           Q.    Who do you work for?

11           A.    Airborne express DHO.

12           Q.    How long have you worked there?

13           A.    14 and a half years.

14           Q.    Drawing your attention back to October 5 of

15   year 2000, were you employed by that same outfit?

16           A.    Yes.

17           Q.    And what were your duties back then?

18           A.    I -- the same as now.  I'm field service

19   operations agent.

20           Q.    Do you -- are you also sort of the custodian of

21   records for Airborne Express?

22           A.    Yes.

23           Q.    And as a custodian of records what do you do?

24           A.    As far as the records go, we have to keep them

25   on file three years.

1          Q.     And are -- the records we're talking about, are

2     they made with information from the customer as they go

3     through the will call, sort of, if you will, line there?

4          A.     Yes, correct.

5          Q.     Okay.  And the customer provides information,

6     the item is filled out, then you guys keep the records?

7          A.     Correct.

8          Q.     And you're the person that's in charge of that?

9          A.     Yes.

10         Q.     I'm going to show you Exhibit 314.  Please take

11     a look at it.

12                (Pause in proceedings.)

13     BY MR. MARTINEZ:

14         Q.     Do you recognize it?

15         A.     Yes.

16         Q.     Is this something or a document that you

17     provided or caused to be generated so that you could provide

18     it to the police.

19         A.     Yes.

20         Q.     And what is it?

21         A.     It's just -- it's called a manifest.  Any time

22     a driver makes a delivery or somebody comes in the office to

23     sign for a package, there's a signature on file.

24         Q.     And this one, is it somebody came to the office

25     or is it somebody --

1          A.     This is one coming to the office.

2          Q.     And somebody picked it up?

3          A.     Correct.

4          Q.     What is the address where your business used to

5     be where people used to pick it up?

6          A.     1450 East Buckeye in Phoenix.

7          Q.     And the date on this is October 5th, right?

8          A.     Correct.

9          MR. MARTINEZ:  Move for the admission of Exhibit

10    314.

11                (Pause in proceedings.)

12          MR. PATTERSON:  I have no objection, Judge.

13          THE COURT:  Exhibit Number 314 for identification is

14    admitted into evidence.

15    BY MR. MARTINEZ:

16          Q.     Let's go ahead and take a look at it.

17                 The city, what is that?

18          A.     PHX.  That's a station code.

19          Q.     And it says route something?

20          A.     That's "hold it airborne."

21          Q.     What does that mean?

22          A.     It's packages that we hold at the station that

23    either a customer requires to pick up or it's ready to be

24    picked up.

25          Q.     What if you go to deliver to an address that's

1    not there?

2         A.    If a driver goes to a delivery that's not

3    there, it's vacant, then it automatically comes back to the

4    office and we try to call the receiver or call the shipper to

5    get a better address.

6         Q.    What if you get a number for the person that

7    it's addressed to and you contact them, would that -- say

8    they'll come pick it up.  Does that fall under this category?

9         A.    Right.  The package would stay at the station

10   and they would pick it up.

11        Q.    It asks for driver's name?

12        A.    Well, that's Airborne because it's our station.

13        Q.    And the date?

14        A.    Uh-huh.

15        Q.    What's the date?

16        A.    10/5/2000.

17        Q.    And what's this manifest number?

18        A.    Every we have a scanner and every time we scan

19   shipments it creates a manifest for those shipments.

20        Q.    Okay.  I want to go down to this one right

21   here.  First of all, can you see the time on there?

22        A.    Yeah.  It's 14:34.

23        Q.    What time is that?

24        A.    2:34.

25        Q.    And that would be on October 5th?

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000006129

1          A.     Correct.

2          Q.     And there's a person who signed for it.   Can

3     you see who it was?

4          A.     Anne Newton.

5          Q.     Underneath the printed area it does say "UNK."

6     Can you -- first of all, explain to me how the information on

7     the right in the sequencing of things when that comes into

8     play?

9          A.     Yeah.   When we get packages in every morning,

10    there'll be held airborne packages, get out the manifest and

11    we notify the customers to tell them their shipment is

12    available for pick up.

13         A.     And if it has the UNK, that means that there

14    was no phone number on the package and there was no way for

15    us to contact that person.

16         Q.     You indicated previously that in some

17    situations you then called the shipper.   Is that what you

18    said?

19         A.     Correct.   If we couldn't get an address.

20         Q.     So in this case does -- there is no telephone

21    number that you had, but would you have then normally called

22    the shipper to try obtain a number, telephone number?

23         A.     Yeah.   The next procedure would be to call the

24    shipper, try to get more information.   If they don't have it,

25    they would tell us to return it and we would return it.   In

1    this case --

2             Q.    Since it wasn't returned, were you provided

3    information then?

4             A.    Yeah.  Obviously, they called possibly and said

5    we want to pick it up.  That's normally what happens.

6             Q.    What is the procedure when somebody wants to

7    pick it up?  Back then did they have to show a driver's

8    license?

9             A.    Yeah.  We ask for an ID and we didn't make

10   copies of a license or anything, we just had to see the ID,

11   proper identification, and they would sign for it.

12            Q.    What if they didn't have a driver's license?

13   Would there be any circumstances where the package would just

14   be turned over to somebody if they could provide some other

15   identifying information?

16            A.    Yeah.  Back then, if it was -- if they didn't

17   have ID, a lot of times what we'll do is bring in the air

18   bill under an attempted notice tag that our driver would

19   normally leave.  Or if the customer already had an air bill

20   number, more than likely they knew the shipment number, so it

21   was obviously their package.

22            Q.    So in other words, if a person came in

23   with 6802739090, would Airborne Express then turn the

24   package over even though they didn't provide other

25   identification?

1          A.    Back then, yes.

2          Q.    And, again, that's all we're talking about.

3          A.    Right.

4          Q.    So if a person came in and said my package

5     number, you called me, is 6802739090, they walked in, I don't

6     have a driver's license, would the package be turned over?

7          A.    Yes.

8          MR. MARTINEZ:  I don't have any other questions.

9          THE COURT:  Mr. Patterson?

10         MR. PATTERSON:  I have none, Judge.  Thank you.

11         THE COURT:  Any further questions of this witness by

12    the jury?  If so, please raise your hand.

13                   (Pause in proceedings.)

14         THE COURT:  May I see Counsel here at the bench?

15

16                   (The following proceedings were held at the

17    bench:)

18

19         THE COURT:  Question, "Do you know if this package

20    was a Hazmat shipment?  And, if so, would Hazmat require

21    proving person, ID?"

22         MR. PATTERSON:  Fair question.

23         MR. MARTINEZ:  No objection.

24         THE COURT:    Okay.

25

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1          (The following proceedings were held in open

2    court:)

3

4          THE COURT:  I have a question here for you.   That

5    question reads as follows:  Do you know if this package was a

6    Hazmat shipment?  If so, would Hazmat require proving person,

7    ID?"

8          THE WITNESS:  Back then, no, and it wasn't noted on

9    the manifest that it was and -- so no.

10         THE COURT:  Any further questions of this witness by

11   the jury?

12              (Pause in proceedings.)

13         THE COURT:  No one has raised their hand.

14              Any follow-up questions to that specific

15   question by Mr. Martinez on behalf of the State?

16         MR. MARTINEZ:  No.   Thank you.

17         MR. PATTERSON:  No, Your Honor.   Thank you.

18         THE COURT:  May the witness be excused?

19         MR. MARTINEZ:  Yes, sir.

20         MR. PATTERSON:  No objection.

21         THE COURT:  Thank you very much.   You're excused.

22              Mr. Martinez, the State may call its next

23   witness.

24              MR. MARTINEZ:  Judge, let me see if the one that is

25   next is out there.

```
 1                (Pause in proceedings.)

 2         MR. MARTINEZ:  State calls Raymond Ortega.

 3         THE COURT:  Sir, please come up here to the clerk.

 4    Give her your name and she'll swear you in.

 5

 6                    RAYMOND ORTEGA,

 7         CALLED TO TESTIFY ON BEHALF OF THE STATE,

 8    HAVING FIRST BEEN DULY SWORN, TESTIFIES AS FOLLOWS:

 9

10         THE COURT:  Sir, if you could please have a seat on

11    the witness stand there.  Please make yourself comfortable

12    there. Please pull the microphone close to you.  Please

13    remember to speak loudly and clearly in the microphone so

14    everyone can hear you.  Also please wait until the question

15    is completed before you answer the question, and please make

16    sure that you give a verbal response.  Is that all agreeable

17    to you, sir?

18         THE WITNESS:  Yes.

19         THE COURT:  And, Mr. Martinez, you may proceed.

20

21    DIRECT EXAMINATION BY MR. MARTINEZ:

22         Q.    Your name, sir?

23         A.    Raymond Ortega.

24         Q.    Where are you currently employed?

25         A.    I am self-employed right now.
```

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1          Q.      What do you do for a living?

2          A.      I have a small air-conditioning, plumbing and

3     electrical business.

4          Q.      Drawing your attention back to summer of 2000,

5     where were you employed?

6          A.      I was employed for Fairfield Properties.

7          Q.      What did you do for them back then?

8          A.      I was regional maintenance director and

9     trainer.

10          Q.      Did you have somebody by the name of Jerry

11     Sentelle that worked for you?

12          A.      Yes.

13          Q.      When you indicated you worked for Fairfield and

14     that you were a regional trainer, did one of your areas or

15     did one of the properties include the San Riva apartment

16     complex?

17          A.      Yes.

18          Q.      How long did you work for Fairfield?

19          A.      Eight years.

20          Q.      From -- when did you start?

21          A.      I want to say it was '93.

22          Q.      You remember that there was a killing that

23     occurred in October of 2000 out at Fairfield, correct?

24          A.      Yes.

25          Q.      And -- and it occurred on a Sunday.  Do you

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000006135

1    remember?

2              A.      Yes.

3              Q.      The following Monday, did you have occasion to

4    be in Wendi Andriano's office along with other people?

5              A.      Yes.

6              Q.      Who were you in that office with?

7              A.      Janice Linn and some of the other employees

8    that were regular employees that were there.

9              Q.      Did you have occasion to -- prior to that day

10   did you have occasion to know somebody by the name of Wendi

11   Andriano?

12             A.      Yes.

13             Q.      Is she in court today?

14             A.      Yeah.   That looks like her over there.

15             Q.      What is she wearing?

16             A.      A turquoise sweater, glasses.

17             MR. MARTINEZ:   Your Honor, may the record reflect the

18   identification of the defendant?

19             THE COURT:   The record may reflect identification of

20   the defendant by the witness.

21   BY MR. MARTINEZ:

22             Q.      So you indicated you were sitting in the

23   defendant's office.  Again, what was her function with regard

24   to the San Riva apartments?  What was her position?

25             A.      She was one of our managers at San Riva.  She

1    was the manager at San Riva.

2          Q.    And on this particular Monday, you indicated

3    that you're sitting there with a couple other people.  About

4    what time of the day is it?

5          A.    That was probably -- it was in the morning

6    probably like around 10:00 by the time we got into the office

7    and got situated.

8          Q.    And while you're sitting there, who is sitting

9    behind the desk?

10         A.    Janice Lind.

11         Q.    And where are you seated?

12         A.    Across on the other side of the desk.

13         Q.    And as you're sitting there, what happens?

14    Anything unusual happen?

15         A.    We were just, you know, talking about what

16    happened.

17         Q.    All right.

18         A.    We were in shock, and then Janice hit something

19    under the desk with her foot.

20         Q.    So she was actually sitting behind the desk?

21         A.    Right.

22         Q.    And were you able to see what it was that she

23    hit?

24         A.    She pulled it out from the desk and gave it to

25    me.

1           Q.      What was it?

2           A.      It was a manilla envelope.

3           Q.      And that manilla envelope, did it look like

4    this?

5           A.      Uh-huh.

6           THE COURT:  Is that a "yes"?

7           THE WITNESS:  Yes.

8           THE COURT:  Make sure you give a verbal response.

9           THE WITNESS:  Sorry.

10   BY MR. MARTINEZ:

11          Q.      Did you then have occasion to look inside of

12   that manilla envelope?

13          A.      Yes, I did.

14          Q.      Was Janice Lind present when you looked inside

15   that manilla envelope?

16          A.      Yes, she was.

17          Q.      I'm going to show you a couple photographs.

18   They're Exhibits 159 and 160.  Please take a look at them and

19   see if you recognize what's in those pictures.

20          A.      That looks like the office at San Riva.

21          Q.      Is this the office that you and the other

22   individuals were sitting in?

23          A.      Yes.

24          Q.      And is this where this envelope was found?

25          A.      Yes.

1        Q.     And if -- and that's the way the office looked

2    back on that Monday when you found -- or when you guys came

3    across this envelope?

4        A.     Yeah, yes.

5        MR. MARTINEZ:  Move for admission of Exhibits 159 and

6    160.

7               (Pause in proceedings.)

8        MR. PATTERSON:  I have no objection, Judge.

9        THE COURT:  Sorry?

10       MR. PATTERSON:  I have no objection.

11       THE COURT:  Exhibit Number 159 for identification and

12   Exhibit Number 160 for identification are admitted into

13   evidence.

14   BY MR. MARTINEZ:

15       Q.     Let's go ahead and take a look at them.  You

16   indicated that Janice Lind was sitting behind the desk.  Is

17   that correct?

18       A.     Correct, yes.

19       Q.     And this chair here, is that behind the desk,

20   in front of the desk?  Why don't you go ahead and step down.

21       THE COURT:  You can step down.  Just remember when

22   you're away from the microphone to speak up as loudly as you

23   can.

24       THE WITNESS:  Okay.

25               (Pause in proceedings.)


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000006139

1          THE WITNESS:  This -- yeah.  This is where she was

2     sitting and I was sitting here.

3     BY MR. MARTINEZ:

4          Q.    Okay.  If we take a look at Exhibit 160 -- all

5     right.  Why don't you show us where she was seated and where

6     you were seated?

7          A.    She was sitting here and I was sitting here.

8          Q.    And who was -- was anybody else seated over

9     here?

10         A.    Yeah.  Chris was there, sitting there.

11         Q.    So the three of you were talking and you

12     indicated that I think she hit or she found the envelope?

13         A.    She tapped it with her foot.

14         Q.    And did you actually see the envelope come

15     through the bottom -- or how is it that you guys got it?

16         A.    Yeah, she reached under and grabbed it.

17         Q.    Okay.  Go ahead and take a seat.

18              Why don't you go ahead and take a look at the

19     contents of this envelope, see if it looks familiar to you.

20              (Pause in proceedings.)

21         THE WITNESS:  This -- this looks familiar.  This, I

22     know I saw, the UPS package, and then this right here.  This

23     right here too.  And this -- I'm just putting over here what

24     I remember.

25     / / / / /

1    BY MR. MARTINEZ:

2        Q.    Right.

3        A.    What looks familiar to me.

4        Q.    If I may have that?

5        A.    This right here is what I remember seeing.

6    These I -- these I don't remember.

7        Q.    Okay.  Let's take -- go ahead and talk about --

8    the ones that you think were familiar that you remember are

9    266.09, something about cyanide?

10        A.    Yes.

11        Q.    Oh, you remembered that?

12        A.    Yeah.

13        Q.    Let's just name them off.  Some email from an

14    individual named Shawn King.  Do you remember that one?

15        A.    Yeah, yes.

16        Q.    Something about ammonia extract for BFGs,

17    something like that cyanide page?

18        A.    Yes.

19        Q.    There's a bond exemption certificate?

20        A.    Yes.

21        Q.    And there's a couple -- one, two, three, four,

22    business licenses?

23        A.    Yes.

24        Q.    Also something signed by Anne Newton.  Do you

25    remember that?

1      A.      Yes.

2      Q.      And something involving Voigt Global and some

3   emails?

4      A.      Yes.

5      Q.      And then finally something about laboratory

6   reference manuals, and then a shipping manifest.  You

7   remember those?

8      A.      Yes.

9      Q.      The others may have been in there.  You just

10   don't remember them right now, right?

11      A.      Yeah.   They -- they don't stand out in my mind.

12      Q.      Okay.

13      A.      These ones don't.

14      Q.      Did you or Janice Lind or the other individual

15   that was there, did they take anything out of the envelope

16   that you guys came across?

17      A.      No.

18      Q.      Did everything stay inside of that envelope?

19      A.      Yes.

20      Q.      Did you hold it in your possession and then

21   turn it over to somebody?

22      A.      Yes.

23      Q.      And did you turn it over to -- who did you turn

24   it over to?

25      A.      To a Phoenix police officer.

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1          Q.    You indicated that you were aware of the
2   defendant and that her position was that of manager at the
3   San Riva apartment complex?

4          A.    Yes.

5          Q.    Were you familiar with the San Riva apartment
6   complex?

7          A.    Yes.

8          Q.    Did she have one or two or any storage sheds?

9          A.    She had two.

10         Q.    And do you remember their numbers?

11         A.    One was 315, I believe.

12         Q.    And do you remember the other one?

13         A.    329, I think.  I believe the other one was 329.

14         Q.    I'm going to show you -- but for sure you
15   remember one was 315?

16         A.    Yes.

17         Q.    I'm going to show you what has been marked for
18   identification as Exhibit Number 296.  Do you recognize it?

19         A.    Yes.

20         Q.    Is it a partial diagram of the San Riva
21   apartment complex as it existed back in October of the year
22   2000?

23         A.    Yeah.  Yes.

24         Q.    Does it show Apartment 132 as well as storage
25   shed number 315?


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1          A.     Yes, it does.  I see where they're at, yes.

2          MR. MARTINEZ:  Move for admission of Exhibit 296.

3          MR. PATTERSON:  No objection.

4          THE COURT:  Exhibit 296 for identification is

5     admitted into evidence.

6     BY MR. MARTINEZ:

7          Q.     Let's go ahead and take a quick look at it.

8                 This is -- over here it's got 132.  Would that

9     be apartment 132?

10          A.     Yes.

11          Q.     How is it that somebody could get to Apartment

12     132?  Is there more than one way to get there, is there two,

13     is there three?

14          A.     Yes.

15          Q.     How does one get there?

16          A.     There was a back entrance.

17          Q.     Where's that?

18          A.     Right -- it's right there.

19          Q.     Is that right here, the back road here?

20          A.     Uh-huh.

21          THE COURT:  Is that a yes?

22          THE WITNESS:  Yes.

23          THE COURT:  Yes.

24          THE COURT:  Okay.

25          THE WITNESS:  Yes.


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

```
 1     BY MR. MARTINEZ:

 2          Q.     Somebody coming in from that location could

 3     come over this way and park right in front?

 4          A.     Yes.

 5          Q.     These little areas with the crosses on them and

 6     the little lines, what are those?

 7          A.     Those are covered parking spaces.

 8          Q.     And what does this "5" mean here?

 9          A.     That's the building number.

10          Q.     How many -- if you remember, how many buildings

11     are there?  I know we have five at least.  We see nine here.

12     Do you remember how many there were?

13          A.     That was a smaller property.  There probably

14     wasn't much more than nine or probably twelve, maybe.  I

15     don't remember exactly how many there were there.

16          Q.     And right here we have a "T" and then the

17     legend says that's trash.  Were these the smaller or bigger

18     kinds of dumpsters?

19          A.     They were big.

20          Q.     And then finally we have over here to our left

21     315.  Do you see that?

22          A.     Yes.

23          Q.     Is that the defendant's storage shed?

24          A.     Yes.

25          Q.     How far in your estimation is 132 from number
```

1     315?

2             A.     Probably about 300 feet, probably between --

3     between there, somewhere around there.   350 maybe.

4             Q.     Okay.   After you found this documentation, did

5     you have occasion to go over to number 315?

6             A.     Yes.

7             Q.     Did you open it and go on in there?

8             A.     Yes.

9             Q.     And was that the same day that you found these

10    items?

11            A.     Yes.

12            Q.     Did you have a key to go on in there?

13            A.     Yes.

14            Q.     Going to show you some photographs and see if

15    anything looks familiar.   First of all, let's take a look at

16    Exhibit 178.

17                   (Pause in proceedings.)

18    BY MR. MARTINEZ:

19            Q.     Which storage shed does that show us?

20            A.     315.

21            Q.     There appears to be something in front of it,

22    like a crib or something.   When you first opened it, was the

23    crib outside or is this something that happened afterwards?

24            MR. PATTERSON:   Sorry, Mr. Martinez.   What word are

25    you using?   "Crib"?

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1             MR. MARTINEZ:  Crib.

2             MR. PATTERSON:  Thank you, Judge.

3             THE WITNESS:  Afterwards.  There was nothing outside

4    when I opened it.

5    BY MR. MARTINEZ:

6             Q.    I am now showing you Exhibits 179, 180, and

7    181.  Go ahead and take a look at them.

8                  (Pause in proceedings.)

9    BY MR. MARTINEZ:

10            Q.    What do they represent?

11            A.    This box right here is where I saw two rubber

12   gloves sitting on top and a plastic jug inside.

13            Q.    And aside from the rubber gloves, is it in

14   substantially the same condition today -- does it appear to

15   be how it looked back on October 10th of 2000 when you went

16   in there?

17            A.    Yes.

18            Q.    What did the box look like?  Did it have any

19   distinctive markings on it?

20            A.    It had a -- a delivery that stood out to me.

21   It had a delivery UPS shipping label on top.

22            Q.    Okay.  Do you know somebody by the name of -- I

23   guess I may have asked you this -- but did Jerry Sentelle

24   work for you?

25            A.    Yes.


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1          Q.     What was his position with regard to you? In

2    other words, was he beneath you, above you, or I mean --

3          A.     He was beneath.

4          Q      But did he work -- what -- what complex did he

5    work at?

6          A.     He worked at San Riva.

7          Q.     Did there ever come a time when you and Mr.

8    Sentelle ever discussed a desk?

9          A.     No.

10         MR. MARTINEZ:  I don't have anything else.

11         THE COURT:  Let's see, Mr. Patterson?

12         MR. PATTERSON:  No questions.

13         THE COURT:  Are there any further questions of this

14   witness by the jury?

15             (No response.)

16         THE COURT:  No one has raised their hand.

17             May this witness be excused?

18         MR. MARTINEZ:  Yes, sir.

19         THE COURT:  Thank you very much.  You're excused.

20         MR. PATTERSON:  Yes.  No objection, Judge.

21         THE COURT:  We'll go ahead and take our afternoon

22   break at this time.

23             Ladies and gentlemen, during this break

24   remember the entire admonition I gave you including the fact

25   you're not to discuss this case with anyone, do not let

```
 1    anyone discuss the case with you, keep an open mind.  We'll
 2    take a 20 minute break.  Have a nice break.
 3    / / / / /
 4              (Recess.)
 5
 6         THE COURT:  This is CR 2000-090032, State of Arizona
 7    versus Wendi Elizabeth Andriano.  The record will reflect the
 8    presence of Defendant, Counsel and the jury.
 9                State may call its next witness.
10         MR. MARTINEZ:  State calls Kathy Galbari.
11              (Pause in proceedings.)
12         THE COURT:  Please step forward right up here.
13    Please give your name to the clerk and she'll swear you in.
14
15                   KATHY GALBARI,
16         CALLED TO TESTIFY ON BEHALF OF THE STATE,
17    HAVING FIRST BEEN DULY SWORN, TESTIFIES AS FOLLOWS:
18
19         THE COURT:  Please have a seat on the witness
20    stand.  Please make yourself comfortable there on the witness
21    stand.  Please pull the microphone close to you.  Please
22    remember to speak loudly and clearly into the microphone do
23    everyone can hear you.  Please wait until the question is
24    complete before you answer the question, and please make sure
25    you give a verbal response.  Is that agreeable to you?
```

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000006149

```
 1                THE WITNESS:  Yes, sir.

 2                THE COURT:  Mr. Martinez, you may proceed.

 3

 4      DIRECT EXAMINATION BY MR. MARTINEZ:

 5           Q.    May I have your name, please?

 6           A.    Yes, Kathy Galbari.

 7           Q.    And drawing your attention back to October of

 8      2000, who were you employed by?

 9           A.    The city of Phoenix Police Department.

10           Q.    What unit were you assigned to?

11           A.    Homicide.

12           Q.    Are you still currently with the Phoenix Police

13      Department?

14           A.    No, sir.

15           Q.    And what are you doing these days?  Are you

16      retired?

17           A.    I am retired and I'm unemployed.

18           Q.    When did you become retired?

19           A.    Approximately 2 and a half years ago.

20           Q.    Now, going back to October 10th of the year

21      2000, did you have occasion to go over to the San Riva

22      apartment complex sometime around 3:30 or 4:00 in the

23      afternoon?

24           A.    Yes, sir.

25           Q.    Who did you go with?
```

1          A.      Detective Dillian.

2          Q.      And what was the purpose of both of you going

3    down there?

4          A.      We were called to the location to execute a

5    search warrant at an apartment at that complex.

6          Q.      Was that Apartment 132?

7          A.      Yes, sir.

8          Q.      And as you got to that location, Apartment 132,

9    did you come across anybody?

10         A.      Yes.

11         Q.      Who did you guys come across?

12         A.      Patrol -- two patrol officers in a marked

13   Phoenix Police Department patrol car.

14         Q.      Was one of them Officer DeYoung that has been

15   out in the hallway that -- that you've seen today?

16         A.      Yes, sir.

17         Q.      Did he have occasion to go -- did you have

18   occasion to have any -- a transaction with him, if you will,

19   a transfer?

20         A.      Yes.

21         Q.      What is it that happened?

22         A.      He provided me with two envelopes containing

23   some documents that apparently had come from Airborne

24   Express.

25         Q.      He provided you with two envelopes, right?

1          A.    Yes.

2          Q.    Okay.  I'm going to show you what has been

3     marked for identification as Exhibit 266.  And the contents

4     of it we've already taken -- these two came in there.

5                Are these -- take a look at them and --

6                (Pause in proceedings.)

7     BY MR. MARTINEZ:

8          Q.    Are those the envelopes that came -- that were

9     given to you by Officer DeYoung and that you subsequently

10    placed in Exhibit 266?

11         A.    Yes.

12         Q.    And the large envelope, is that labeled

13    266.001?

14         A.    Yes.

15         MR. MARTINEZ:  I move for admission of Exhibit

16    266.001.

17         MR. PATTERSON:  Judge, can I voir dire?

18         THE COURT:  Yes.

19

20    VOIR DIRE EXAMINATION BY MR. PATTERSON:

21         Q.    Did you have a chance to go through the

22    contents of this envelope at some point.

23         A.    Say again?

24         Q.    Did you have occasion to go through the

25    contents of the envelope after you received it from Officer

1    DeYoung?

2         A.    I don't think I went through it at that point,

3    but during the impounding process -- I believe I looked at

4    the contents during the impound process, which would have

5    been like the next day.

6         Q.    Okay.  Have you had a chance subsequent to that

7    time to look through these contents a second time to

8    determine whether all the contents that were originally in

9    the envelope are still in that envelope?

10        A.    Yes.

11        Q.    Okay.  And are these all the contents that were

12   in the envelope on the date Officer DeYoung gave it to you?

13        A.    I don't know.  I didn't specifically count each

14   document in the envelope, so I don't -- I never remembered

15   like the number of papers that were actually inside.

16        Q.    Okay.  How are we to know then these are the

17   same papers that were in that envelope?  Is there some

18   tracking mechanism?

19        A.    The case agent would have copies of the

20   documents in his case file, which is customary to do when

21   there's documents seized at any location.

22        MR. PATTERSON:  Judge, I have reservations about

23   whether this is the same amount of contents that was handed

24   to her on the date on October 10, 2000.

25        THE COURT:  Let me see Counsel here at the bench with

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    the exhibit.

2

3                    (The following proceedings were held at the

4    bench:)

5

6         THE COURT:  Did you have the clerk mark the larger

7    envelope as --

8         MR. MARTINEZ:  Yeah.

9         THE COURT:  -- 266, and then you had items inside

10   marked individually by 00 --

11        MR. MARTINEZ:  I had them -- I caused them to be

12   marked today and I also had the envelope marked 266.01, and

13   then the items in there marked as 02, 03, 04.

14        THE COURT:  Right.  And you're just moving right now

15   for the envelope?

16        MR. MARTINEZ:  And the contents of the envelope.

17        THE COURT:  What -- so you're moving to have all of

18   these exhibits --

19        MR. MARTINEZ:  Right, everything in there, right.

20   Uh-huh.

21        THE COURT:  Do you know what numbers are marked that

22   are in the envelope?

23        MR. MARTINEZ:  No, I don't.  I mean, we marked them,

24   but --

25        THE COURT:  Okay.  I think you need to move to have

1 ·    each individually --

2       MR. MARTINEZ:  What I'm going to do, actually, for

3    me to lay foundation, Judge, I just have to say, "Is this the

4    .envelope?"  "Yes."  "Did you take an envelope?"  "Yes."

5    "Does this appear -- or is this the envelope?"  "Yes."  "Did

6    you put anything in that envelope?"  "No."  "Did you remove

7    anything from that envelope?"  "No."

8       THE COURT:  I know that, but because you had specific

9    items marked for identification under specific numbers,

10    that's fine, you can move to have it all moved into

11    evidence --

12       MR. MARTINEZ:  Right.

13       THE COURT:  -- but you should probably make reference

14    to the specific numbers so on record we know to what you're

15    moving to have admitted.

16       MR. MARTINEZ: I want the whole -- she doesn't

17    remember the specific numbers.  She just remembers this bunch

18    of documents.  I'm going to ask you these are all the

19    exhibits in there.  I'm saying the foundation is laid if I

20    ask her, "Did you have an envelope?"  "Yes."  "Are all of the

21    items in the envelope?"  "Did your remove anything?"  "No."

22    "Did that envelope go into that big envelope?"  "Yeah."  "Did

23    you remove anything?"  "No."

24       THE COURT:  I know.  What I'm saying is this.  You

25    have the envelope right now --

1     MR. MARTINEZ:  right.

2     THE COURT:  -- and you had --

3     MR. MARTINEZ:  266.

4     THE COURT:  -- you had it marked as 266.001.

5     MR. MARTINEZ:  Right, uh-huh.

6     THE COURT:  You have the contents of the envelope.

7     MR. MARTINEZ:  Right.

8     THE COURT:  I don't disagree with what you're saying.

9     MR. MARTINEZ:  Right.

10    THE COURT:  However, each item in the envelope is

11    marked specifically 266 point whatever number.

12    MR. MARTINEZ:  Right.

13    THE COURT:  You're asking basically for the envelope

14    to be moved into evidence even though I know you're asking

15    for the contents of the envelope also, you should be making

16    specific --

17    MR. MARTINEZ:  I see what --

18    THE COURT:  -- just so we have a clear record.

19    MR. MARTINEZ:  I see what you're saying.

20    THE COURT:  In that case I think there's foundation

21    nothing was removed.

22    MR. MARTINEZ:  Right.

23    THE COURT:  That's what I'm trying to say.

24    MR. MARTINEZ:  Okay.

25    MR. PATTERSON:  I would disagree.  There has been

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    sufficient foundation to establish nothing's been removed.

2    She doesn't have specific recollection of that, that's why I

3    asked her those questions on voir dire.  If you can further

4    elucidate that issue, I will be satisfied with the

5    foundation, but I want to make sure all the items in this

6    envelope were all the items seized and handed to Mr. DeYoung

7    and to Ms. Galbari who did the impound and there were no

8    items taken out in the process.

9          THE COURT:  Let me just double check something here.

10              (Pause in proceedings.)

11         THE COURT:  Okay.  Yeah.  I -- lay some more

12   foundation.  I'm looking at my notes here.

13         MR. MARTINEZ:  Okay.

14         THE COURT:  Lay some more foundation to get those

15   specific items done.

16

17              (The following proceedings were held in open

18   court:)

19

20   CONTINUED DIRECT EXAMINATION BY MR. MARTINEZ:

21         Q.   Ma'am, with regard to Item 266 prepared -- you

22   prepared all those items on there?

23         A.   Yes.

24         Q.   Did you put something in Exhibit 266?

25         A.   Yes, I did.

1       Q.      Did you put it in a manilla envelope?

2       A.      In the impound bag, yes.

3       Q.      That's what I'm talking about, the impound bag.

4    Did you put in there a manilla envelope?

5       A.      Yes.

6       Q.      This was taken out during court from that 266

7    and we labeled it 266.01.  Do you see that?

8       A.      Correct.

9       Q.      Is there any reason for you to believe that

10   266.01, the manilla envelope -- take a look at it -- if there

11   is anything other than the items that you put in there.

12      A.      No.  I have no reason to believe it is

13   something else.

14      Q.      All right.  With regard to 266 that you have

15   there in front of you, after Officer DeYoung gave it to you,

16   you may have looked into -- inside, right?

17      A.      Yes.

18      Q.      And you may -- you may have cataloged or not

19   cataloged what was inside, right?

20      A.      Yes.

21      Q.      Did you remove anything from 266.01?

22      A.      I did not remove anything from 266.01.

23      Q.      Did you take 266.01 without removing anything

24   and place it in 266?

25      A.      Yes.

1          Q.    In other words, did you take that manilla

2  envelope without taking anything out and place it inside the

3  big white envelope?

4          A.    Yes, I did.

5          Q.    It was sealed with my initials.

6          Q.    Then what did you do with 266, which is the big

7  white envelope?

8          A.    I impounded that as instructed for evidence at

9  the police department.

10         Q.    The point is, you took it into custody, right?

11         A.    Yes.

12         Q.    And then you sent it to the property room or

13  wherever it is they keep them, right?

14         A.    Yes.

15         Q.    Any reason that you have to believe that

16  somebody has tampered with that, other than we know we opened

17  it here in court, other than that.  Do you have any reason to

18  think it's been tampered with?

19         A.    No.

20         Q.    Now, with regard to these items here, when we

21  were in court, the court staff placed numbers on them.  They

22  go from 266.02 to 266.19.  That would be this whole packet

23  here.

24               With regard to 266.02 to 266.19, what you have

25  in your possession, any indication to you that those are not

1    the items that were inside of that Exhibit 266.01?

2         A.    None.

3         Q.    Any indication that those have been tampered

4    with in any way?

5         A.    No.

6         Q.    I'm sorry.  I keep saying 266.01.

7         THE COURT:  You keep saying 01 or 02.

8         MR. MARTINEZ:  Sorry.

9         THE COURT:  It should be a 002 or 001.

10   BY MR. MARTINEZ:

11        Q.    Okay.  Any indication of anybody -- of those

12   have been tampered with or anybody taken anything based on

13   looking at that documentation you have in front of you?

14        A.    No.

15        MR. MARTINEZ:  I move for admission of Exhibits

16   266.001 through 266.019 along with Exhibit 266.

17        MR. PATTERSON:  No objection.

18        THE COURT:  Okay.  266.004,, 266.005, 266.006 have

19   already been moved into evidence.

20             Basically what you're asking is 266 and then

21   266.001, 002, 003, then 007 through 019, correct?

22        MR. MARTINEZ:  Yes, sir.

23        THE COURT:  Any objection?

24        MR. PATTERSON:  None.

25        THE COURT:  Exhibit 266 for identification and

1    266.001 through 266.003 and 266.007 through 266.019 are

2    admitted into evidence.

3                        (Pause in proceedings.)

4    BY MR. MARTINEZ:

5            Q.    Ma'am, I'm going to ask you to take a look at

6    the television monitor, and our experience has indicated that

7    you would probably have to step down to get a good look at

8    these documents.

9            THE COURT:  You could step down.  If you step down,

10   just remember to speak up as loud as you can so everyone can

11   hear you.

12   BY MR. MARTINEZ:

13           Q.    Take a look at Exhibit 02.  And at the top what

14   does it say?

15           A.    San Riva and history.

16           Q.    If we go down to the lower left-hand corner, it

17   does have -- what is this letter here?

18           A.    An "S" like in "Sam."

19           Q.    Then what's underneath it?

20           A.    16th Street.

21           Q.    Go ahead, keep reading?

22           A.    Right on 263580 1450 East Buckeye.

23           Q.    Would it be right on 1450 East Buckeye 16th

24   Street?

25           A.    Yes, sir.

114

1          Q.     And then if we look over here to the right, do

2    you see a name?

3          A.     Barry.

4          Q.     And then do you see a number?

5          A.     Yes, 9785216415.

6          Q.     All right.  Let's take a look at Exhibit

7    266.010, and there appears to be a Post-it, green in color,

8    correct?

9          A.     Yes.

10         THE COURT:  Why don't you go ahead state which

11   Exhibit number that is again, please?

12         THE WITNESS:  266.010.

13         THE COURT:  Thank you.

14   BY MR. MARTINEZ:

15         Q.     What does it say?

16         A.     Sales@VoigtGlobal.com Reagent ACS grade

17   chemicals inquiry.

18         Q.     Then to the right of it we have -- can you read

19   it?

20         A.     Yes, Voigt Global Distribution LLC, Post Office

21   Box 4455, Topeka, Kansas, 66604-0455.

22         MR. PATTERSON:  Judge, can we approach?

23         THE COURT:  Yes.

24

25              (The following proceedings were held at the

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000006162

1    bench:)

2

3          MR. PATTERSON:  I don't know whether this witness

4    knows the answer to these various questions.  The documents

5    speak for themselves.  She has no specialized expertise, she

6    has no independent recollection of the exhibit.

7          THE COURT:  You're making an objection, right?

8          MR. PATTERSON:  Yes.

9          THE COURT:  I sustain the --

10         MR. MARTINEZ:  She could read the documents, the

11   salient features.  I'm not going through each and every

12   document with her, but the jury is entitled to know what it

13   says.

14         THE COURT:  That's correct, but the documents speak

15   for themselves.  She doesn't know anything about the

16   specifics of those except that she took them --

17         MR. MARTINEZ:  Okay.  Then I'll just show them to

18   her, okay?

19         THE COURT:  Thank you.

20

21              (The following proceedings were held in open

22    court:)

23

24   BY MR. MARTINEZ:

25         Q.    We're still looking at 266.010.  Can you see

1   that clearly there or --

2           A.    Yes.

3           Q.    And if we just go -- are you able to see

4   that portion of it clearly?

5           A.    Yes.

6           MR. PATTERSON:  Judge, I have the same objection.

7           THE COURT:  I'll sustain the objection.  Let's move

8   on, Mr. Martinez.

9           MR. MARTINEZ:  Judge, I would like to have these

10  published to the jury.  And if I may, then I would like to

11  give all of these to the jury for them beginning at the end

12  so that they could take a look at them starting with

13  Exhibit .010.

14          THE COURT:  Let me see Counsel here at the bench.

15

16               (The following proceedings were held at the

17  bench:)

18

19          THE COURT:  You want to publish them -- all these

20  documents right here?

21          MR. MARTINEZ:  I do, because as you can see, some of

22  them have to do with the emails and these are emails that

23  were important to our case.  Additionally, when the computer

24  guys come up for them to know or compare these items that

25  were found in the defendant's desk, it's important to show

1     that the defendant is Anne Newton.

2          THE COURT:  When the computer people come up you

3     could refer to these specific documents.  I think right now

4     if we show them 19 exhibits right now, this's going to kind

5     of disrupt the testimony of these witnesses, so let's move

6     on.  If you need to refer to a specific exhibit when

7     examining your witnesses, that's fine, but really this

8     witness, except for the fact she took possession of the

9     documents, she doesn't know anything about these documents.

10         MR. MARTINEZ:  Would you have any objection to me

11    mentioning 002 is this or 003 is this or whatever?

12         THE COURT:  In your examination of witnesses that's

13    fine, but other than that you would be testifying.  Let's

14    move on.

15         MR. MARTINEZ:  No, but what I'm saying, I want to go

16    over each one and say what is this document, what does it say?

17         THE COURT:  I know, but this witness isn't in a

18    position to answer that.  And you may be able to do it

19    through -- I don't know who else you have as a witness, but

20    you may be able to do that through other witnesses in your

21    examination.  But really, the documents speak for

22    themselves.  If you don't have any witnesses that you may be

23    asking questions about specific portions of the contents of

24    these documents, you could argue in your closing argument

25    this is what this is, this is what that is --

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000006165

1      MR. MARTINEZ:  Okay.

2      THE COURT:  -- because they've already been admitted.

3      MR. MARTINEZ:  I can go through the documents, count

4   the pages, that sort of thing?

5      THE COURT:  That's fine because they've been admitted

6   into evidence.

7      MR. MARTINEZ:  Right.

8      THE COURT:  You could do that in your closing.

9      MR. MARTINEZ:  I can't do that right now?

10      THE COURT:  No, not right now.  Otherwise you will be

11   testifying.  You have witnesses you may be asking specific

12   questions about the contents because of -- I don't know,

13   whatever reason.

14      MR. MARTINEZ:  Right.

15      THE COURT:  And you mentioned some computer people,

16   that's fine, but legally, the documents speak for themselves.

17      MR. MARTINEZ:  Let me get the documents to show you

18   what I want to do.  I understand your ruling, but --

19      THE COURT:  Okay.

20      MR. MARTINEZ:  -- I don't know if you understand my

21   question.

22      THE COURT:  Okay.

23             (Pause in proceedings.)

24             (The following proceedings were held in open

25   court:)

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1

2          THE COURT:  Go ahead and have a seat.  You could have

3     a seat.

4                 (The following proceedings were held at the

5     bench:)

6

7          MR. MARTINEZ:  For example, 266.005 if -- if you

8     won't let me number, what I'm going to do is I'm going to

9     just have them marked as 00 whatever.  That's not the --

10    that's -- it's actually this one, 008266.  These are what I'm

11    calling basically her practice indemnity agreements that were

12    found there.  They just have to be put in this position, so

13    I'm going to ask they be marked as 20, 21 and 22.

14         THE COURT:  Wait.  What is that?  That's already been

15    admitted into evidence, right?

16         MR. PATTERSON:  Uh-huh.

17         MR. MARTINEZ:  Right, but when we have documents

18    that are -- things that are admitted into evidence, we could

19    then breakdown what's in there to highlight it.  There's no

20    prohibition against that, just like we did with the big

21    envelope 266 we took something out.  These I would want

22    marked individually.

23         THE COURT:  That packet, what is it?  It's been

24    admitted into evidence as --

25         MR. MARTINEZ:  266.008.


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000006167

120

1          THE COURT:  Okay.  So you're asking those be marked

2     separately, the contents?

3          MR. MARTINEZ:  And then be admitted into evidence,

4     right.

5          THE COURT:  Well --

6          MR. PATTERSON:  I don't have any problem with that.

7     He doesn't need to discuss it with this witness because this

8     witness just took possession of the whole packet.

9          THE COURT:  That's fine if there's no objection.

10    Let's do it at some other time.

11         MR. MARTINEZ:  Okay.

12         THE COURT:  Because really there's nothing to be

13    asked of this witness further about the contents of these

14    exhibits, right?

15         MR. MARTINEZ:  Okay.  All right.

16         THE COURT:  Right.

17

18               (The following proceedings were held in open

19    court:)

20

21         THE COURT:  Counsel --

22

23               (The following proceedings were held at the

24    bench:)

25

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000006168

121

1          THE COURT:  Are you going to be referring to these

2    with the next witness?

3          MR. MARTINEZ:  No.

4          THE COURT:  Don't worry about it right now then.

5          MR. MARTINEZ:  Okay.  I just --

6          THE COURT:  Okay.

7

8          (The following proceedings were held in open

9    court:)

10

11   BY MR. MARTINEZ:

12        Q.    Did you also assist Detective Sallie Dillian

13   when you went inside Apartment 132?

14        A.    Yes.

15        Q.    What was your function with regard to number

16   132?

17        A.    I was designated as a scribe.

18        Q.    And -- but does -- as a scribe, were you also

19   inside of the apartment?

20        A.    Yes.

21        Q.    And were you watching as Ms. Dillian found

22   something and then gave it to you?

23        A.    Absolutely.

24        Q.    I'm going to show you what has been marked for

25   identification as Exhibit 223.  Please take a look at it.

1              What is it?

2         A.    This is my evidence envelope containing a

3    business card with dates and times on it.

4         Q.    Where did you find it?

5         A.    This was found on the kitchen counter.

6         Q.    Okay.   In Apartment 132?

7         A.    Yes, sir.

8         MR. MARTINEZ:  Move for admission of Exhibit 223.

9         MR. PATTERSON:   Judge, if I could just voir dire?

10

11   VOIR DIRE EXAMINATION BY MR. PATTERSON:

12        Q.    Does it bear an inventory number that you used

13   to track these things that we're discussing?

14        A.    Yes.

15        Q.    What inventory number is it?

16        A.    That is my number 9.

17        MR. PATTERSON:  Thank you.  No -- well, I want to

18   look at it.

19             (Pause in proceedings.)

20        MR. PATTERSON:  I have no objection, Judge.

21        THE COURT:  Exhibit Number 223 for identification is

22   admitted into evidence.

23

24   CONTINUED DIRECT EXAMINATION BY MR. MARTINEZ:

25        Q.    Let's go ahead and take a look at it.   This is

1    the front of the card, right?

2         A.    Yes.

3         Q.    And it has some names on it.  Specifically on

4    the right it has the name Christopher M. Kellogg, MD,

5    correct?

6         A.    Yes.

7         Q.    And then is there writing on the back?

8         A.    Yes.

9         Q.    I want you to take a look at Exhibit Number --

10   let me have this marked as an exhibit.

11              Take a look at Exhibit 231.  What is it?

12        A.    This would be my item Number 132, and it's a --

13   it's a piece of paper with some names on it and other words

14   that are next to the names.

15        Q.    Where was it seized from?

16        A.    This is from the master bedroom of the

17   Apartment 132.

18        MR. MARTINEZ:  Move for admission of Exhibit 231.

19              (Pause in proceedings.)

20        MR. PATTERSON:  May I have a moment, Your Honor?

21        THE COURT:  Yes.

22              (Pause in proceedings.)

23        MR. PATTERSON:  I have no objection, Judge.

24        THE COURT:  Exhibit Number 231 for identification is

25   admitted into evidence.

124

1                    (Pause in proceedings.)

2     BY MR. MARTINEZ:

3          Q.    Go ahead and take a look at it.

4                You indicated it had some numbers and -- right?

5          A.    Yes.

6          Q.    There is a 3 there, right?

7          A.    Yes.

8          Q.    And what does it say after the 3?

9          A.    Rick.

10         Q.    Is that all it says?

11         A.    Dash love.

12         Q.    Where was this found?  I don't remember.

13         A.    In the master bedroom under their -- under a

14    bed.

15         Q.    Under the bed in the master bedroom?

16         A.    Yes, sir.

17         Q.    Show you Exhibit 367.  What is it?

18         A.    This is a latex -- one latex glove.

19         Q.    Where was it found?

20         A.    This was also found on the floor under the foot

21    of the bed in the master bedroom.

22         Q.    Do you have any idea how far away it was found

23    from the previous exhibit, which is Exhibit 231, the one with

24    numbers and phrases after it?

25         A.    I do not.

1          MR. MARTINEZ:  Move for admission of Exhibit 367.

2          MR. PATTERSON:  Again, voir dire, Judge?

3          THE COURT:  Yes.

4

5    VOIR DIRE EXAMINATION BY MR. PATTERSON:

6          Q.    What is your inventory number for this one?

7          A.    This is Number 116.

8          MR. PATTERSON:  No objection, Judge.

9          THE COURT:  Exhibit Number 367 for identification is

10   admitted into evidence.

11

12   CONTINUED DIRECT EXAMINATION BY MR. MARTINEZ:

13         Q.    Take a look at Exhibit Number 368.  What is it?

14         A.    This is my item Number 6.

15         Q.    What is it?

16         A.    It's notes with names and addresses and phone

17   numbers on them.

18         Q.    Where did you find it?

19         A.    This was -- this was found on the kitchen

20   counter.

21         MR. MARTINEZ:  Okay.  I'll move for admission of

22   Exhibit 368.

23              (Pause in proceedings.)

24              (Attorney-attorney discussion.)

25         MR. PATTERSON:  Judge, I believe we're going to


                TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    modify Exhibit 368 to delete two items, number them

2    separately, and then Admit 368.  However you want to do it.

3              MR. MARTINEZ:  Actually, if we could just make what I

4    want 368.01 (sic) and I'll move that in and I'll withdraw

5    368.

6              MR. PATTERSON:  No objection to that procedure, Judge.

7              THE COURT:  Okay.  Exhibit Number 368.001 for

8    identification is admitted into evidence.

9    BY MR. MARTINEZ:

10             Q.    Let's take a look at 368.001.  Where was this

11   found again?

12             A.    On the kitchen counter of the apartment.

13             Q.    Okay.  Let's take a look at Exhibit 369.  What

14   is it?

15             A.    This is a Verizon telephone bill with the

16   account number to the Andrianos.

17             Q.    Which Andriano are we taking about, do you

18   know?  Here.  Let me open it for you.

19             A.    It is open.  I just didn't see it.

20             Q.    Okay.

21             A.    Account name is Jeanette Andriano.

22             Q.    All right.  If I may have that back.  Where did

23   you find it?

24             MR. PATTERSON:  May I have the number?

25             THE WITNESS:  Yes, sir.

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000006174

1        MR. PATTERSON:  Your Number 121?

2        THE WITNESS:  Yes, sir.  This was found on the second

3    shelf on the desk in the child's room of the apartment.

4        MR. MARTINEZ:  Judge, I move for admission of Exhibit

5    369.

6        MR. PATTERSON:  May I have a moment, Your Honor?

7        THE COURT:  Yes.

8            (Pause in proceedings.)

9        MR. PATTERSON:  I have no objection, Judge.

10       THE COURT:  Exhibit Number 369 for identification is

11   admitted into evidence.

12   BY MR. MARTINEZ:

13       Q.    Take a quick look at it.  My finger's right

14   underneath the number.  Can you read that number for me,

15   please?

16       A.    Yes.  602-826-1150.

17       Q.    Please take a look at Exhibit 219, also has

18   another photograph marked as 219.001.  See if you recognize

19   it.

20            (Pause in proceedings.)

21       THE WITNESS:  Yes, I recognize it.

22   BY MR. MARTINEZ:

23       Q.    And what is it?

24       A.    This is my item Number 3, and it's developed

25   colored photographs.


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1          Q.    And where did you get these from?

2          A.    These were also from the kitchen counter in the

3    apartment.

4          Q.    Was 2 -- what's the first three numbers of that

5    exhibit?  219, I think?  It would be on the green tag at the

6    top.

7          A.    219.

8          Q.    219.001, that was part of the packet, correct?

9    I just took it out is what I'm --

10         A.    Yes.  Yes.

11         MR. MARTINEZ:  Move for admission of 219 and

12   219.001.

13              (Pause in proceedings.)

14         MR. PATTERSON:  I have no objection, Judge.

15         THE COURT:  Exhibit Numbers 219 and 219.001 for

16   identification are admitted into evidence.

17              (Pause in proceedings.)

18   BY MR. MARTINEZ:

19         Q.    Let's take a look at Exhibit 219.001.  And this

20   is one of the pictures that you seized from this packet 219?

21         A.    Yes, sir.

22         MR. MARTINEZ:  I don't have any other questions.

23         THE COURT:  Mr. Patterson?

24         MR. PATTERSON:  I don't know that I have any

25   questions.  Let me talk to my colleague, Judge.

1            (Pause in proceedings.)

2        MR. PATTERSON:  Judge, I have no questions for this

3    witness.

4        THE COURT:  Are there any further questions of this

5    witness by the jury?  If so, please raise your hand.

6            (Pause in proceedings.)

7

8            (The following proceedings were held at the

9    bench:)

10

11        THE COURT:  Question, "What, paren, if you know, end

12    of paren, is the process of impounding items from a scene and

13    are records kept at the impound department?"

14        MR. MARTINEZ:  I don't -- I mean, I don't know how

15    relevant that is, but okay.

16        MR. PATTERSON:  That's fine, Judge.

17        THE COURT:  Okay.  Next question, "Was 266.001 sealed

18    when you put it into 266?"

19        MR. MARTINEZ:  No objection.

20        MR. PATTERSON:  No objection.

21        THE COURT:  Next question, "Was there two envelopes

22    that went into 266, paren, confused as to how many envelopes

23    there are, end of paren."

24        MR. MARTINEZ:  No objection.

25        MR. PATTERSON:  She could explain.


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    MR. MARTINEZ:  Yeah.

2    THE COURT:  Next question, "What is a script?"

3    MR. MARTINEZ:  I think she means "scribe."

4    THE COURT:  Okay.

5    MR. PATTERSON:  Okay.

6    THE COURT:  I'll ask as "scribe."

7    MR. MARTINEZ:  Judge, this is the last witness I had

8    for today.  I had eight lined up.

9    THE COURT:  That's fine.  We'll discuss marking of

10   the exhibits you were discussing earlier.

11   MR. PATTERSON:  Okay.

12   MR. MARTINEZ:  Yes.

13

14        (The following proceedings were held in open

15   court:)

16

17   THE COURT:  I have some additional questions here

18   you.  The first one reads as follows.  What, if you know, is

19   the process of impounding evidence items from a scene and are

20   records kept at the impound department?

21   THE WITNESS:  The process of collecting any evidence

22   at the scene is that it's collected in a sanitary manner no

23   matter what the evidence is.  It's logged in on a

24   supplemental police department report by a scribe or a

25   finder, which was my duty at that location on that date.


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1   It's secured and marked in an envelope with report number,

2   the date, the time, and my name and serial number.  It is

3   sealed, and then each particular item of evidence is taken to

4   an impound room where it is then logged in there.

5          THE COURT:  Next questions reads as follows:  Was

6   Exhibit 266.001 sealed when you put it into Exhibit Number

7   266?

8          THE WITNESS:  I believe it was, yes.

9          THE COURT:  Next question, was there -- were there

10  two envelopes that went into Exhibit Number 266?

11         THE WITNESS:  Yes.

12         THE COURT:  And you answered this part earlier just a

13  few moments ago, What is a scribe?

14         THE WITNESS:  A scribe is the detective that actually

15  writes down the police supplemental report, each item and

16  description as it's being collected at a scene or crime scene.

17         THE COURT:  Are there any further questions of this

18  witness by the jury?  If so, please raise your hand.

19             (No response.)

20         THE COURT:  No one has raised their hand.

21             Mr. Martinez, any follow-up questions to those

22  specific questions?

23

24  FOLLOW-UP QUESTIONS BY MR. MARTINEZ:

25         Q.    I'm going to show you a document that has been

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000006179

1    marked as exhibit number --

2                    (Pause in proceedings.)

3    BY MR. MARTINEZ:

4         Q.    -- 370.  Take a look at it.

5                    (Pause in proceedings.)

6         THE WITNESS:  Yes.

7    BY MR. MARTINEZ:

8         Q.    Do you remember being in court yesterday and

9    looking at this big white envelope that we've come to call

10   266?

11        A.    Yes.

12        Q.    Did it contain one or two manilla envelopes in

13   the brown envelopes?

14        A.    It contained one envelope.

15        Q.    Do you remember whether or not we, prior to

16   court starting, we took out 266 while we stood over there.

17   Do you remember that?

18        A.    Oh, yes.  Yes I do, I'm sorry.

19        Q.    Is that the envelope that we took out of

20   Exhibit 266?

21        A.    Yes, it is.

22        Q.    Is it in the -- it is -- is it in the same

23   condition today as when you seized it or it was given to you?

24        A.    Yes, sir.

25        MR. MARTINEZ:  Move for admission of Exhibit 370.

```
 1                    (Pause in proceedings.)
 2          MR. PATTERSON:  Judge, I have some questions on voir
 3   dire with regard to the exhibit.  May I proceed, Judge?
 4          THE COURT:  Yes.
 5
 6   VOIR DIRE EXAMINATION BY MR. PATTERSON:
 7          Q.    Just so my mind is clear on this, Officer
 8   DeYoung gave you one or two envelopes?
 9          A.    I remember him giving me two envelopes.
10          Q.    Okay.  One of the envelopes contained those
11   things that we discussed earlier, correct?  Sorry, that's a
12   bad question.  It was -- it was kind of a thicker one with
13   things in it, and then this one has these things in it.  I
14   mean, is that --
15          THE COURT:  When you say "this one," are you --
16          MR. PATTERSON:  Yeah, it's --
17          THE COURT:  You're referring to Exhibit 370 for
18   Identification?
19          MR. PATTERSON:  Absolutely, Judge.  My mistake.
20   BY MR. PATTERSON:
21          Q.    Exhibit 370 contains a number of things.  Did
22   you have occasion to look into Exhibit 370 when you received
23   it from Officer DeYoung?
24          A.    Yes.
25          Q.    Okay.  Do you recall making a kind of mental
```

134

1     inventory of what was in that envelope?

2          A.    You know, it's been a long time ago.

3          Q.    I understand.

4          A.    I don't know.

5          Q.    Okay.  Do you remember if you took anything out

6     of Exhibit 370?

7          A.    I did not take anything out.

8          Q.    Okay.  You took that Exhibit 370 along with the

9     other, I believe it's 266, and put both of those envelopes

10    into the larger white bag?

11         A.    Yes, sir.

12         Q.    Okay.  And then you impounded those two

13    envelopes in one bag at the Phoenix Police Department?

14         A.    Yes, sir.

15         Q.    Okay.

16                (Pause in proceedings.)

17         MR. PATTERSON:  I have no objection, Judge.

18         THE COURT:  Exhibit Number 370 for identification is

19    admitted into evidence.

20                Did you have any --

21         MR. MARTINEZ:  I don't, no.  I don't have any further

22    questions.

23         THE COURT:  Mr. Patterson, did you have any follow-up

24    questions to the questions asked by the jury?

25         MR. PATTERSON:  No, Your Honor.

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1       THE COURT:  May this witness be excused?

2       MR. MARTINEZ:  Yes, sir.

3       MR. PATTERSON:  Yes.

4       THE COURT:  Thank you very much.  You're excused.

5       THE WITNESS:  Thank you.

6       THE COURT:  Ladies and gentlemen, we'll go ahead and

7   take our evening recess at this point in time.

8              During this recess remember the entire

9   admonition I gave you including the fact you're not to

10  discuss this case with anyone, do not let anyone discuss the

11  case with you, do not do any research or investigation on

12  your own.  Avoid any media coverage of this case, keep an

13  open mind.  I want you to have a nice evening.  We'll see you

14  tomorrow at 1:00.

15             Have a nice evening.  I'll stay here with

16  Counsel.

17

18             (Whereupon, the jury exits the courtroom.)

19

20       THE COURT:  Please be seated.   This is cause number

21  CR 2000-096032, State of Arizona versus Wendi Elizabeth

22  Andriano.  The record will reflect the presence of the

23  Defendant and Counsel.  We're outside the presence of the

24  jury.

25             Mr. Martinez, I believe you wanted to have some

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    items that were already admitted into evidence marked as a

2    subject group of that exhibits.  Is that correct?

3         MR. MARTINEZ:  That's correct.  And the number that

4    we're dealing with is 266, and I believe the next one in

5    sequence would be 020, 021, and 022.

6         THE COURT:  Any objection from Mr. Patterson?

7         MR. PATTERSON:  None.

8         THE COURT:  Okay.  So just so we're clear, there's

9    three items that Counsel has separated from Exhibit 266, some

10   additional three items, and 266 has already been admitted

11   into evidence.  And the parties -- well, the State moved and

12   there's no objection that those three items can be remarked

13   and stay admitted as 266.020, 266.021 and 266.022.  Is that

14   correct, Counsel?

15        MR. MARTINEZ:  Yes, sir.

16        THE COURT:  Okay.  Then it's so ordered.

17             Anything further, Counsel?

18        MR. MARTINEZ:  No.  I have nothing.

19        MR. PATTERSON:  No, Judge.  Thank you.

20        THE COURT:  Okay.  We'll see everyone at 1:00

21   tomorrow.  We'll be in recess.  Thank you.

22

23             (Evening recess.)

24

25

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1

2

3                           CERTIFICATE OF REPORTER

4

5        STATE OF ARIZONA        )
                                 )
6        COUNTY OF MARICOPA      )

7

8                    I, Traci L. Wheeler, CSR, RPR, an official

9        and certified reporter in the Superior Court of the State

10       of Arizona, in and for the County of Maricopa, hereby

11       certify that I made a shorthand record of the proceedings

12       had in the within case, and that the foregoing transcript

13       is a full, true, and correct transcription of the

14       proceedings in this case.

15                    Dated this 5th day of March, 2005.

16

17

18       _____
         Traci L. Wheeler, CSR, RPR
19       Certified Court Reporter No. 50313
         Official Court Reporter
20

21

22

23

24

25

                 TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR