# TABLE OF CONTENTS (INTERACTIVE)

| | |
|---|---|
| NNNNNN Part 7 | Response to Petition |

# EXHIBIT NNNNNN PART 7

EXHIBIT HH

05-0002   1

DP

Braccio



1    IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

2    IN AND FOR THE COUNTY OF MARICOPA

3

4    STATE OF ARIZONA,              )
                                    )
5         Plaintiff,                )
                                    )
6    v.                             )      No. CR 05-0005 AP
                                    )      MARICOPA COUNTY
7    WENDI ELIZABETH ANDRIANO,      )      No. CR 2000-096032
                                    )
8         Defendant.                )
     _____   )

9

10

11

12                    Mesa, Arizona
                   September 22, 2004

13

14

15    BEFORE:   The Honorable BRIAN K. ISHIKAWA

16

17

18    REPORTER'S TRANSCRIPT OF PROCEEDINGS

19                  TRIAL DAY 16

20

21

22

23

24    ORIGINAL Prepared for APPEAL by:
      TRACI L. WHEELER, CSR, RPR
25    Certified Court Reporter No. 50313


      TRACI L. WHEELER, OFFICIAL COURT REPORTER, CSR, RPR, CCR

1                    A P P E A R A N C E S

2    FOR THE STATE:        JUAN M. MARTINEZ,
                           Deputy County Attorney
3
     FOR THE DEFENDANT:    DANIEL B. PATTERSON,
4                          Deputy Public Defender
                              and
5                          G. DAVID DELOZIER,
                           Attorney at Law
6

7            I N D E X   O F   E X A M I N A T I O N

8    WITNESS                                        PAGE

9    ALLINICH, GREG, Called on behalf of the State
          Direct Examination by Mr. Martinez         23
10        Voir Dire Examination by Mr. Patterson      28
          Continued Direct Examination by Mr. Martinez  29
11        Cross-examination by Mr. Patterson          41
          Redirect Examination by Mr. Martinez        46
12        Follow-up Questions by Mr. Martinez         52
          Follow-up Questions by Mr. Patterson        52
13
     BARANOWSKI, EDWARD, Called on behalf of the State
14        Direct Examination by Mr. Martinez          68
          Voir Dire Examination by Mr. Patterson      72
15        Continued Direct Examination by Mr. Martinez  73
          Continued Direct Examination by Mr. Martinez  84
16        Voir Dire Examination by Mr. Patterson      85
          Continued Direct Examination by Mr. Martinez  86
17        Voir Dire Examination by Mr. Patterson      92
          Continued Direct Examination by Mr. Martinez  92
18        Cross-examination by Mr. Patterson          96
          Redirect Examination by Mr. Martinez       106
19        Follow-up Questions by Mr. Martinez        110

20   GUZMAN, JOHN, Called on behalf of the State
          Direct Examination by Mr. Martinez          54
21
     JEWEL, CLIFTON, Called on behalf of the State
22        Direct Examination by Mr. Martinez         111
          Cross-examination by Mr. Patterson         118
23        Redirect Examination by Mr. Martinez       120

24   KNELL, JOHN, Called on behalf of the State
          Direct Examination by Mr. Martinez         124
25        Cross-examination by Mr. Patterson         142

         TRACI L. WHEELER, OFFICIAL COURT REPORTER, CSR, RPR, CCR

3

1      I N D E X   O F   E X A M I N A T I O N   C O N T I N U E D

2   WITNESS                                                      PAGE

3   SENTELLE, JERRY, Called on behalf of the State
             Direct Examination by Mr. Martinez                   6
4            Cross-examination by Mr. Patterson                  12
             Redirect Examination by Mr. Martinez                17

5

6

7      E X H I B I T S   A D M I T T E D   I N   E V I D E N C E

8   NO.      DESCRIPTION                                        PAGE

9   161      Photograph                                          25
    162      Photograph                                          25
10  163      Photograph                                          25
    164      Photograph                                          25
11  165      Photograph                                          25
    166      Photograph                                          25
12  167      Photograph                                          25
    169      Photograph                                          25
13  178      Photograph                                         113
    179      Photograph                                         113
14  180      Photograph                                         113
    181      Photograph                                         113
15  182      Photograph                                         113
    183      Photograph                                         113
16  184      Photograph                                         128
    185      Photograph                                         128
17  186      Photograph                                         128
    187      Photograph                                         128
18  188      Photograph                                         128
    189      Photograph                                         128
19  190      Photograph                                         128
    191      Photograph                                         128
20  192      Photograph                                         128
    193      Photograph                                         128
21  194      Photograph                                         128
    195      Photograph                                         128
22  264      Poison packing materials                           130
    265      Poison silver packing materials                    129
23  269      Plastic fork and baggie containing sodium azide    136
    270      Plastic knife containing sodium azide residue      137
24  271      Tupperware containing sodium azide residue         135
    272      Tupperware containing sodium azide residue         134
25  273      White paper towel and sodium azide residue         134

TRACI L. WHEELER, OFFICIAL COURT REPORTER, CSR, RPR, CCR

000006189

4

E X H I B I T S   A D M I T T E D   C O N T I N U E D

| NO. | DESCRIPTION | PAGE |
|-----|-------------|------|
| 274 | One pair of latex gloves (in plastic) | 138 |
| 275 | Latex gloves (in plastic) | 138 |
| 276 | Two pieces of aluminum packing foil | 132 |
| 277 | Bubble wrap (in plastic) | 133 |
| 278 | Clear plastic bag with black residue | 138 |
| 282 | Handwritten note in sealed plastic | 29 |
| 372 | Document from Anne Newton (dated 08-21-00) | 73 |
| 373 | Correspondence sales document | 75 |
| 374 | Document from Anne Newton (dated 08-23-00) | 76 |
| 375 | Correspondence document - FID # request | 77 |
| 376 | Correspondence document - FID # provided | 78 |
| 377 | Correspondence requesting proof of business | 78 |
| 378 | Document from Anne Newton (dated 09-19-00) | 78 |
| 379 | Correspondence document warning | 78 |
| 380 | Correspondence document (dated 09-22-00) | 78 |
| 381 | Document "Chemical Description Clarification" | 78 |
| 382 | Address "Aztec Creations" document | 78 |
| 383 | Voigt agreement document unsigned | 78 |
| 384 | "Sodium Azide" documents from internet | 86 |
| 385 | Email documents "Lewis dot of Sodium Azide" | 90 |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

TRACI L. WHEELER, OFFICIAL COURT REPORTER, CSR, RPR, CCR

000006190

1          MESA, ARIZONA, WEDNESDAY, SEPTEMBER 22, 2004

2

3          THE COURT:  Good afternoon.  This is trial in cause

4     number CR 2000-096032, State of Arizona versus Wendi

5     Elizabeth Andriano.  The record will reflect the presence of

6     Defendant, Counsel and the jury.

7                  Mr. Martinez, the State may call its next

8     witness.

9          MR. MARTINEZ:  Thank you.  The State would call Jerry

10    Sentelle.

11

12                        JERRY SENTELLE,

13          CALLED TO TESTIFY ON BEHALF OF THE STATE,

14     HAVING FIRST BEEN DULY SWORN, TESTIFIES AS FOLLOWS:

15

16          THE COURT:  Please have a seat on the witness stand.

17     Please make yourself comfortable there on the witness stand.

18     Please pull the microphone close to you.  Please remember to

19     speak loudly and clearly into the microphone so that everyone

20     can hear you.  Also please wait until the question is

21     completed before you answer the question, and please make

22     sure you give a verbal response.  Is that agreeable to you?

23          THE WITNESS:  That's agreeable.

24          THE COURT:  You may proceed, Mr. Martinez.

25     / / / / /

TRACI L. WHEELER, OFFICIAL COURT REPORTER, CSR, RPR, CCR

000006191

1    DIRECT EXAMINATION BY MR. MARTINEZ:

2          Q.    Can you give us your name?

3          A.    William J. Sentelle.

4          Q.    Are you known as "Jerry"?

5          A.    Known as "Jerry."

6          Q.    Where are you currently living?

7          A.    Currently Nebraska.

8          Q.    Drawing your attention back to the year 2000,

9    where were you living?

10          A.    At San Riva.

11          Q.    And were you employed at San Riva?

12          A.    I was.

13          Q.    What did you do for them?

14          A.    I was maintenance supervisor.

15          Q.    What did your duties require you to do on a

16    day-to-day basis as a maintenance supervisor?

17          A.    Day to day, just general maintenance of the

18    property and making ready apartments for renting.

19          Q.    When did you first begin to work for the San

20    Riva apartments?

21          A.    July of 1999.

22          Q.    And when did you leave the San Riva apartments?

23          A.    Would have been November of 2000.

24          Q.    Drawing your attention to the summer of year

25    2000, or even a little bit before that, were you familiar

TRACI L. WHEELER, OFFICIAL COURT REPORTER, CSR, RPR, CCR

```
 1   with the bookkeeper's office there at the office at the San
 2   Riva apartments?
 3           A.    I was.
 4           Q.    And as you walked in, let's say you were a
 5   customer off the street, on what side would it be?  The left
 6   side or the right side?
 7           A.    It would have been the right side --
 8           Q.    Um --
 9           A.    -- from the entrance that we used.
10           Q.    That you would use?
11           A.    That I would use.
12           Q.    Would it be the first office on your right?
13           A.    Yes.
14           Q.    And was there a computer there?
15           A.    Yes, there was.
16           Q.    And sometime prior to July, or maybe during
17   July and a little bit in June, did you have a chance to see
18   whether or not there were a couple individuals that may have
19   been using that computer?
20           A.    I did.
21           Q.    Who did you see?
22           A.    Erik Vaillant -- just everybody in the office
23   used that computer.
24           Q.    Do you remember whether or not somebody by the
25   name of Wendi Andriano also used that computer?
```

TRACI L. WHEELER, OFFICIAL COURT REPORTER, CSR, RPR, CCR

1        A.     Wendi was there at that time.

2        Q.     Was she together with Erik at the time that you

3 saw him using the computer?

4        A.     She was.

5        Q.     How often would you see them together at that

6 computer?

7        A.     I don't recall.

8        Q.     Was it more than once?

9        A.     More than once.

10       Q.     Was it many times?

11       A.     I wouldn't say many.

12       Q.     But it was more than once?

13       A.     More than once.

14       Q.     And who was Wendi Andriano to that company?

15 Did she work there or --

16       A.     She was the property manager.

17       Q.     Is she in court today?

18       A.     She is.

19       Q.     Tell me what she is seated -- where she's

20 seated and what she's wearing.

21       A.     Middle of the table, black blazer.

22       MR. MARTINEZ: Your Honor, may the record reflect the

23 identification of the defendant?

24       THE COURT: The record may reflect identification of

25 the defendant by the witness.

TRACI L. WHEELER, OFFICIAL COURT REPORTER, CSR, RPR, CCR

1    BY MR. MARTINEZ:

2         Q.    Was she your supervisor back then?

3         A.    She was.

4         Q.    You indicated that you may have seen Erik

5    Vaillant using this computer.  Did you have occasion to work

6    on that computer sometime in the summer?

7         A.    I did, in July.

8         Q.    Of what year?

9         A.    2000.

10        Q.    And when you went and you worked on that

11   computer in July of 2000, did you find anything that drew

12   your attention or that you thought was something that should

13   be noted?

14        A.    I did find some internet history that was

15   pretty disturbing to me.

16        Q.    What kind of internet history did you find?

17        A.    Websites about poison and that kind of thing.

18        Q.    And did you -- what did you do with that

19   information?  Did you let it go or make a copy?

20        A.    I took that history and copied it to a floppy

21   disk and gave that to Janice Lind.

22        Q.    You indicated you actually did this in July of

23   2000.  How long after you made the floppy disk did you give

24   it over to Janice Lind?

25        A.    I called her immediately.


TRACI L. WHEELER, OFFICIAL COURT REPORTER, CSR, RPR, CCR

000006195

```
1          Q.    Did you give it to her?

2          A.    I did.

3          Q.    When did you give it to her?

4          A.    Would have been a matter of days.

5          Q.    And did she keep possession of that floppy

6    disk?

7          A.    She did.

8          Q.    I'm going to show you what is marked as Exhibit

9    371.  Take a look at it.  What is it?

10         A.    It's a floppy disk.

11         Q.    Does it look like the disk you turned over to

12   Janice Lind?

13         A.    Looks -- looks like it.

14         Q.    There isn't anything different from the one you

15   turned --

16         A.    It's a floppy disk.

17         Q.    Okay.  Did you have occasion to see or know

18   somebody by the name of Joseph Andriano?

19         A.    I did.

20         Q.    And who was he?

21         A.    Wendi's husband.

22         Q.    Did you have occasion to see Joseph Andriano

23   and the defendant interact on a, you know, on a sort of --

24   well, what basis did you see them together?  How often would

25   you see them together?
```

1          A.    Since I lived on the property, quite -- quite

2    often.

3          Q.    And you would see them together interacting?

4          A.    Yes.

5          Q.    And with regard to that particular

6    relationship, who was the person that was in charge, for lack

7    of a better word?

8          A.    I would say Wendi was --

9          Q.    Would --

10         A.    -- in charge of that relationship.

11         Q.    Would you see them together after work or

12   during work?  When was it that you would see them?

13         A.    Sometimes during work and sometimes after work.

14         Q.    Do you know somebody by the name of Anne Newton?

15         A.    No, I don't.

16         Q.    We were talking about who was in charge in the

17   relationship and you indicated, I think, that the defendant

18   was the boss.  How would you describe Joseph Andriano's

19   demeanor?

20         A.    It was kind of passive, kind of -- seemed to be

21   a relaxed kind of person.

22         MR. MARTINEZ:  I don't have anything else.  Thank you.

23         THE COURT:  Mr. Patterson?

24   / / / / /

25   / / / / /

TRACI L. WHEELER, OFFICIAL COURT REPORTER, CSR, RPR, CCR

000006197

```
1    CROSS-EXAMINATION BY MR. PATTERSON:

2          Q.    How you doing, Mr. Sentelle?  We've spoken

3    before, haven't we?  I think we were on a telephone

4    conference?

5          A.    Okay.

6          Q.    This is probably the first time we met face to

7    face.

8                You came in the rear entrance of the San Riva

9    apartments and the bookkeeper's office is on your immediate

10   right there, right?

11         A.    Right.

12         Q.    Okay.  And it's -- there's a big window, right?

13         A.    Right.

14         Q.    And there's a door --

15         A.    Yes.

16         Q.    -- into the office?

17         A.    Yes.

18         Q.    When you walked by and you saw Erik Vaillant

19   and Ms. Andriano at the computer, the door was open, right?

20         A.    I don't recall.

21         Q.    Okay.  You could see --

22         A.    The window was open.

23         Q.    I'm sorry?

24         A.    The window was always open.

25         Q.    Okay.  What they were doing at that computer
```

TRACI L. WHEELER, OFFICIAL COURT REPORTER, CSR, RPR, CCR

1   was accessible or visible by anybody in the office at that

2   location, right?

3           A.    I guess so.

4           Q.    I mean, anybody that walked down that

5   particular corridor could have looked in and seen Mr.

6   Vaillant and Ms. Andriano sitting at the computer doing the

7   computer work, correct?

8           A.    I guess so.

9           Q.    You saw it, right?

10          A.    No, I did not.  I saw they were there.  What

11  they were actually doing on the computer -- is that what

12  you're asking?

13          Q.    That's not my question.

14          A.    Okay.

15          Q.    You saw them sitting at the computer doing

16  something?

17          A.    Yes.

18          Q.    That's what piqued your curiosity?

19          A.    Not really.

20          Q.    What caused you to run a history, if anything?

21          A.    That happened later when there was a problem

22  with that computer.

23          Q.    Okay.  So you did some intentional actions on

24  that computer in an effort to find out who may have accessed

25  that computer earlier, right?

1          A.    No.

2          Q.    Well, what caused you then to try and do and

3     create this floppy disk in the first place?

4          A.    To look for a cause for the problems this

5     computer was having.

6          Q.    Okay.  And you ran a history?

7          A.    Correct.

8          Q.    And then you saw some items that caused you

9     some concern?

10         A.    Correct.

11         Q.    Okay.  Did you attribute those items to Ms.

12    Andriano?

13         A.    Not at that time.

14         Q.    Okay.  All right.  Did you attribute those

15    items to Mr. Vaillant?

16         A.    Not at the time.

17         Q.    Okay.  So you don't know who accessed the

18    computer and created this particular history that you

19    downloaded to this diskette?

20         A.    No, I don't.

21         Q.    Okay.  All right.  You apparently had an

22    opportunity to observe Mr. And Mrs. Andriano in public,

23    correct?

24         A.    Correct.

25         Q.    Okay.  And was that in -- at the times he would


TRACI L. WHEELER, OFFICIAL COURT REPORTER, CSR, RPR, CCR

1   come over to visit or pick up Ms. Andriano from the

2   workplace?

3         A.    Sometimes.

4         Q.    Okay.  Would you also observe them in public at

5   pool parties?

6         A.    Yes.

7         Q.    Okay.  Did you ever socialize with them, go out

8   to dinner, anything of that nature?

9         A.    Company things.

10        Q.    Okay.  So company interactions, you saw that,

11  right?

12        A.    Yes.

13        Q.    Okay.  These were all public interaction,

14  correct?

15        A.    They were.

16        Q.    All right.  Did you ever see Mr. and Mrs.

17  Andriano interact in the privacy of their own apartment?

18        A.    No, I did not.

19        Q.    Okay.  There were functions at this San Riva

20  complex like pool parties, right?

21        A.    Correct.

22        Q.    And they happened on a semi-regular basis?

23        A.    Correct.

24        Q.    Okay.  And Ms. Andriano, as resident manager of

25  the complex, it was her job to kind of coordinate these

1    things?

2              A.    That's right.

3              Q.    Okay.  Make certain that the tenants were

4    having a good time, correct?

5              A.    Correct.

6              Q.    All right.  And would you see her cleaning up

7    afterwards at the pool parties?

8              A.    I did, yeah.

9              Q.    Okay.  All right.  How long were you with

10   Fairfield Properties?

11             A.    Little over a year.

12             Q.    Okay.  At that time back in the year 2000,

13   Fairfield Properties attempting to sell the San Riva complex,

14   weren't they?

15             A.    Correct.

16             Q.    Okay.  And that's basically what Fairfield

17   does.  They would take a plot of land, put an apartment

18   complex on it, develop it, try to maximize the tenancy, and

19   sell it to investors.  Wasn't that what -- basically what

20   Fairfield did?

21             A.    That's correct.

22             Q.    One of the things they tried to do was maximize

23   the tenant occupancy because that created better value for

24   the property trying to sell it to investors, correct?

25             A.    Yes.

1        Q.      Okay.  This disk that you created, you believe

2    it was created the latter part of July 2000?

3        A.      I believe the latter part of July.

4        Q.      July 28, thereabouts?

5        A.      It's possible.

6        Q.      Ball park?

7        A.      I do remember the end of July because I was on

8    vacation right before this was copied.

9            MR. PATTERSON:  Okay.  Thank you, Judge.  That's all

10   I have.  Thank you, Mr. Sentelle.

11           THE COURT:  Redirect?

12

13   REDIRECT EXAMINATION BY MR. MARTINEZ:

14       Q.      With regard to how it was that you actually

15   came across the information that caused you to create that

16   floppy, what were you doing at the computer?  Were you

17   snooping or doing something else?

18       A.      The bookkeeper asked me to work on this

19   computer because it was locking up, so what I was looking for

20   was a cause for the problems that she was having.

21       Q.      And when you were looking for the cause, what

22   is it that you did?

23       A.      Looked at internet history, looked at any log

24   files that I could find that would indicate what the problem

25   was with this computer.

1       Q.    When was it you came across these items that
2   you considered to be suspicious?

3       A.    It was during that time I looked on the
4   computer.

5       Q.    And in terms of whether or not you saw the
6   defendant and her husband in private, you did see them in
7   social settings.  I think you did say that, right?

8       A.    Uh-huh, yes.

9       Q.    The company functions, I think you mentioned
10  those?

11      A.    Yeah, yes.

12      Q.    And also the pool parties.  I think you said
13  that, right?

14      A.    Yes.

15      Q.    And those functions that you talked about, the
16  pool parties, the company functions, as well as what you saw
17  on a day-to-day basis, did those help you form the basis for
18  your opinion as to who was the person that was in charge?

19      A.    Yes.

20      Q.    And your opinion is?

21      A.    Wendi was in charge.

22      MR. MARTINEZ:  Judge, may we approach before I ask a
23  question?

24      THE COURT:  Yes.

25

1               (The following proceedings were held at the

2    bench:)

3

4        MR. MARTINEZ:  One of the questions asked was whether

5    or not -- or whether Fairfield was asking or hoping to get

6    maximum tenancy occupancy, but they weren't asking that she

7    cheated doing that and that's part of the misconduct.  What

8    was going on amongst other things is that there was a

9    locator -- I don't remember his name, I left that back in the

10   office -- and basically what was happening is that the

11   defendant would try to get people in and then there would be

12   kick-backs on the locators.  Additionally, they would have

13   people living there at less than the full rent and doing

14   these kinds of things.  I'm wondering whether or not I can

15   ask the question.  I understand that, you know, the goal was

16   to have maximum occupancy.  Was that to be done at all costs?

17   That is the question that I want to ask.

18       MR. PATTERSON:  Judge.  That's a 404 (B) issue you

19   agreed he could not go into during the case in chief.  I

20   asked these questions of these witnesses because I'm not

21   certain whether they're going to be brought back for Phase 2,

22   if there is one, or Phase 3, so I just established that

23   proposition through these witnesses in the event he's allowed

24   to bring that information in in the penalty phase, that I can

25   then ask them to recall the testimony during Phase 1 of these

1    people, then we could, you know, dispute that during that

2    phase.  It's not proper in this phase.

3           THE COURT:  Okay.  I'll sustain the objection.  I'm

4    not letting you ask that question.

5           MR. MARTINEZ:  Okay.

6

7                  (The following proceedings were held in open

8    court:)

9

10   BY MR. MARTINEZ:

11          Q.   And in terms of this floppy disk we've been

12   talking about, when was it that you actually think that you

13   were able to obtain it or make it?

14          A.   End of July.

15          Q.   Of 2000?

16          A.   Yes.

17          MR. MARTINEZ:  Thank you.

18          THE COURT:  Are there any further questions of this

19   witness by the jury?  If so, please raise your hand.

20                  (Pause in proceedings.)

21          THE COURT:  May I see Counsel here at the bench?

22

23                  (The following proceedings were held at the

24   bench:)

25   / / / / /


           TRACI L. WHEELER, OFFICIAL COURT REPORTER, CSR, RPR, CCR

1      THE COURT:  Question, "Did you ever see any abuse
2  between the defendant and the victim in public, paren, ie.
3  physical, emotional, mental, end of paren."
4      MR. MARTINEZ:  No objection.
5      MR. PATTERSON:  That's fine.
6      THE COURT:  Okay.
7
8      (The following proceedings were held in open
9  court:)
10
11      THE COURT:  Sir, I have an additional question here
12  for you.  That question reads as follows.  Did you ever see
13  any abuse between the defendant and the victim in public, ie.
14  physical, emotional, mental?
15      THE WITNESS:  I did not.
16      THE COURT:  Any further questions of this witness by
17  the jury?
18      (No response.)
19      THE COURT:  No one has raised their hand.
20      Any follow-up questions to that specific
21  question by the jury from Mr. Martinez?
22      MR. MARTINEZ:  No, sir.
23      THE COURT:  Mr. Patterson?
24      MR. PATTERSON:  No, Your Honor.  Thank you.
25      THE COURT:  May this witness be excused?

1     MR. MARTINEZ:  Yes, sir.

2     MR. PATTERSON:  No objection.

3     THE COURT:  You're excused.

4          State may call its next witness.

5     MR. MARTINEZ:  State calls Greg Allinich.

6          (Pause in proceedings.)

7     THE COURT:  Sir, if you could please step forward

8  right up here.  Give the clerk your name and she'll swear you

9  in.

10

11           GREG ALLINICH,

12      CALLED TO TESTIFY ON BEHALF OF THE STATE,

13   HAVING FIRST BEEN DULY SWORN, TESTIFIES AS FOLLOWS:

14

15     THE COURT:  Please have a seat on the witness stand.

16  Please make yourself comfortable there on the witness stand.

17  Please pull the microphone close to you.  Please remember to

18  speak loudly and clearly into the microphone so everyone can

19  hear you.  Also please wait until the question is completed

20  before you answer the question, and please make sure you give

21  a verbal response.  Is that all agreeable to you?

22     THE WITNESS:  Yes.

23     THE COURT:  Mr. Martinez, you may proceed.

24  / / / / /

25  / / / / /

1    DIRECT EXAMINATION BY MR. MARTINEZ:

2         Q.    Your name?

3         A.    Greg Allinich.

4         Q.    Who do you work for?

5         A.    City of Phoenix Police Department.

6         Q.    What do you do for the city of Phoenix Police

7    Department?

8         A.    I examine computer systems for information and

9    evidence.

10        Q.    How long have you been doing that sort of work?

11        A.    Four years.

12        Q.    Total?  How long have you been with the Phoenix

13   Police Department?

14        A.    15 years.

15        Q.    Drawing your attention back to October 10 of

16   the year 2000, did you have occasion to be on duty or

17   participate in the homicide that occurred at the San Riva

18   apartments?

19        A.    Yes.

20        Q.    Specifically with regard to that investigation,

21   did you have occasion to go over to the San Riva office where

22   the leasing is done?

23        A.    Yes, I did.

24        Q.    And specifically did you have occasion to go

25   over to the manager's office?

24

1          A.     Yes.

2          Q.     I'm going to show you some photographs, it's

3     159, 160, 161, 162, 163, 164, 166, 167 and 169.  Go ahead and

4     take a look at those.

5               (Pause in proceedings.)

6          THE WITNESS:  Okay.

7     BY MR. MARTINEZ:

8          Q.     Sir, are those true and accurate depictions of

9     that office as it existed back on October 10 of the year 2000

10    along with some of the items found in that office?

11         A.     Yes.

12         Q.     And I want you to take a look at Exhibit 294, I

13    think.  Actually, 297.  We've already been told that the

14    office of the manager was this one.  Is that what the

15    photographs -- is that the office that the photographs

16    depict?

17         A.     The front door would be where your left hand

18    is.

19         Q.     Yes, uh-huh.

20         A.     And the manager's office is --

21         Q.     We've also already been told it's this one

22    with -- this is going to be the bookkeeper's office.  Would

23    you have occasion to disagree?

24         A.     No, that's correct.

25         Q.     May I have that back?


TRACI L. WHEELER, OFFICIAL COURT REPORTER, CSR, RPR, CCR

```
1          A.     Sure.

2          MR. MARTINEZ:  I move for admission of Exhibits 161

3   through 169.

4          THE COURT:  Was 168 -- I didn't hear you mention 168

5   when you handed it to me.

6          MR. MARTINEZ:  It is not in there, sorry.  It's with

7   the exception of 168.

8                 (Pause in proceedings.)

9          MR. PATTERSON:  No objection, Judge.

10          THE COURT:  Exhibit numbers 161, 162, 163, 164, 165,

11   166, 167 and 169 for identification are admitted into

12   evidence.

13                 (Pause in proceedings.)

14   BY MR. MARTINEZ:

15          Q.     Sir, let's start out by taking a look at

16   Exhibit 159.  What does that show us, sir?  If you need to

17   step down, let me know.

18          THE COURT:  You could step down.  Just remember when

19   you're away from the microphone to speak up as loud as you

20   can so everyone can hear you.

21   BY MR. MARTINEZ:

22          Q.     What does that show us?

23          A.     This picture shows basically a desk, a

24   credenza, trash can, box, a stereo and out basket.

25          Q.     And would the door be right here where my pen
```

TRACI L. WHEELER, OFFICIAL COURT REPORTER, CSR, RPR, CCR

1    is pointing to?

2           A.    Yes, right back here.

3           Q.    And if we take a look at 160, what does that

4    show us?

5           A.    Same trash can.  Basically, the same office,

6    just the opposite side of the wall with a glass window that

7    looks into the bookkeeper's office.

8           Q.    161, I think you said this was the bookkeeper's

9    office previously.  What does this show us?

10          A.    Basically the same thing, just as -- if you

11   were to enter the door over to the left of this photo, to the

12   right would be the easel and the other portion of the office.

13          Q.    Would the hallway and the door be on this side

14   to the right of the photo?

15          A.    Yes.

16          Q.    162?

17          A.    Same office.

18          Q.    And is the door to the outside right here?

19          A.    Yes.

20          Q.    I want to you take a look at 163.  Do you --

21   and do you see this box that's here?

22          A.    Yes.

23          Q.    And 164.  Is that just a close-up of that box?

24          A.    Yes, it is.

25          Q.    Did you have occasion to look inside that box?

1          A.     Yes.

2          Q.     And I'm showing you Exhibit 165.   Whose hand is

3    that?

4          A.     Mine.

5          Q.     And holding a white sheet of paper, is 166 the

6    white sheet of paper that you were holding?

7          A.     Yes, it is.

8          Q.     So we could complete this, 167, what does that

9    show?

10          A.     A brochure that was in the box.

11          Q.     And whose hand is that?

12          A.     Mine.

13          Q.     Why don't you go ahead and take the stand

14    again.

15                 Please take a look at Exhibit 282.

16                 (Pause in proceedings.)

17    BY MR. MARTINEZ:

18          Q.     Do you recognize it?

19          A.     Yes.

20          Q.     What is it?

21          A.     It's the piece of paper that I was holding in

22    the photograph that you were displaying.

23          Q.     Okay.  If I may have it back.

24                 MR. MARTINEZ:  I move for admission of Exhibit 282.

25                 (Pause in proceedings.)

1          MR. PATTERSON:  Voir dire, Judge?

2          THE COURT:  Yes.

3

4     VOIR DIRE EXAMINATION BY MR. PATTERSON:

5          Q.    Were you holding it over the box to suggest

6     that you found this in the box?

7          A.    Yes.

8          Q.    Okay.  This wasn't given to you by a person

9     employed by the Fairfield Management?

10         A.    It was -- sorry.  It was given to me, yes, by

11     the manager.

12         Q.    By the name of Cheryl Green?

13         A.    Green, yes.

14         Q.    Okay.

15         A.    And the box was next to the desk of the

16     manager's office, and I was just simply holding it up there

17     because she informed me she cleaned out the desk and put all

18     of the personal belongings -- belongings to Wendi Andriano.

19         Q.    Okay.  So just so I understand it, you didn't

20     discover this in the desk?

21         A.    No.  The -- no, I did not.

22         Q.    Okay.  Somebody apparently did?

23         A.    Green, yes.

24         Q.    Okay.  And she placed all of the contents of

25     the desk drawer into that box that was just displayed in the

1    photograph?

2         A.    Yes, except she did leave that there just to

3    show me where she found that in the top center drawer in the

4    desk in that office.

5         Q.    Okay.  So you actually received this from a

6    lady?

7         A.    Yes.

8         Q.    You didn't take it from the box?

9         A.    No, I didn't take it out of the box, I'm sorry.

10        Q.    All right.

11        A.    Okay.

12        Q.    I'm trying to figure out why did you hold it

13   over the box?

14        A.    Oh.  I have no idea other than maybe the

15   position of where the photographer was standing at the time.

16        Q.    Okay.  So it has no relationship whatsoever to

17   the box.  I mean, is that a fair statement?

18        A.    No, just that it's the same owner.

19        Q.    Okay.  All right.

20        MR. PATTERSON:  With that understanding, Judge, I

21   have no objection.

22        THE COURT:  Exhibit 282 for identification is

23   admitted into evidence.

24   CONTINUED DIRECT EXAMINATION BY MR. MARTINEZ:

25        Q.    Let's take a look at it to see what we've been

1     talking about.  Can you see it from there?  What is deleting

2     cookies?  What does that mean in computer vernacular?

3              MR. PATTERSON:  Judge, could we just establish some

4     foundation for this opinion.

5              THE COURT:  Yes.  Lay some more foundation.

6     BY MR. MARTINEZ:

7          Q.    Sir, you've indicated you're in what unit of

8     the Phoenix Police Department?  What unit are you in?

9          A.    In the -- in the forensic unit.

10         Q.    And what do you do or what do you deal with on

11    a day-to-day basis?

12         A.    Computer evidence.

13         Q.    And specifically what is it that you do with

14    this computer evidence?  I mean, what is it that you do?

15         A.    Recover information, recover deleted files,

16    lost or hidden files, that type of information.

17         Q.    And is that what you do everyday -- not

18    everyday, but every week, 40 hours a week?

19         A.    Yes.

20         Q.    Now, did you have any special training that

21    allowed you to go into this field with computers?

22         A.    Yes.

23         Q.    And what -- give me a little bit of your

24    background, a little bit of the training you've had?

25         A.    Well, I'm certified by IACIS, International

1    Association of Computer Investigative Specialists as a

2    forensic examiner.  I've attended about 150 hours of

3    training -- excuse me, about 250 hours of training through

4    them.  I've also attended training through the National White

5    Collar Crime Center, and I've had about three to 400 hours of

6    training through them, plus numerous other classes such as

7    International Association Chiefs of Police, the County

8    Attorney's Office, Attorney General's Office, the Search

9    Group, which is federally funded by the United States

10   Department of Justice in search and seizure and examination

11   of computer evidence.

12           Q.    During the time that you've had this education

13   and during the time you've been examining computers, have you

14   ever had occasion to be trained or come across the term

15   "deleting cookies"?

16           A.    Yes.

17           Q.    And, roughly, how many times would you say

18   you've been either educated or seen this term?

19           A.    Numerous.

20           Q.    And what does it mean, "deleting cookies"?

21           A.    To delete cookies is basically saying to delete

22   a file, and that is a cookie file.  That's what that's making

23   reference to.

24           Q.    So let me see if I understand it.  How is it,

25   first of all, that one creates a file?  I mean, what are we

TRACI L. WHEELER, OFFICIAL COURT REPORTER, CSR, RPR, CCR

000006217

1    talking about when you say creating a file?

2         A.    Can I explain --

3         Q.    Sure.

4         A.    -- cookie file?

5         Q.    Sure.

6         A.    Okay.  A cookie file is basically a file that
7    is placed on your hard drive by remote website, and the
8    purpose is so that when you return to that website, it will
9    recognize you, identify you, and in some way store some of
10   your preferences.

11        Q.    So in other words, let's see if I understand
12   it, and if I don't please correct me, the user of a computer
13   can go to a site.  Let's assume they do that.  The site they
14   go to, let's say it's a commercial site will then have a
15   record as I understand it of you going to their site.  Is
16   that true so far?

17        A.    Correct.

18        Q.    And then that's the file that's created on your
19   preferences based on your earlier contact with them.  Is
20   that correct?

21        A.    Correct.

22        Q.    And they -- these people that you may have
23   contacted, this business then has a file out there, correct?

24        A.    Yes, on your hard drive.

25        Q.    On your hard drive.  And what this refers to is

1  deleting their file from your hard drive?

2          A.    That's correct.

3          Q.    So just so that we could use a concrete

4  example, for example if I went onto a site called Voigt

5  Global, and then Voigt Global knew my preferences, that would

6  be one of the files that would be on my hard drive, right?

7          A.    That's correct.

8          Q.    If I were to go in and delete the cookies

9  associated with Voigt Global, would I then be, and correct me

10  if I'm wrong, would I then be deleting the file that they put

11  on my hard drive based on my preferences?

12         A.    Yes.

13         Q.    Thank you.  When you were out there, sir, did

14  you also have occasion to go to the bookkeeper's office in an

15  effort to get that computer?

16         A.    Yes.

17         Q.    Who did you go with?

18         A.    Detective Guzman.

19         Q.    And who was doing the yeoman's work and who was

20  doing the supervising?

21         A.    Neither.

22         Q.    Okay.

23         A.    He was -- Detective Guzman was doing the

24  seizure.

25         Q.    And what's his first name?

1          A.     John.

2          Q.     When you say he was doing the seizure, was he

3    the person actually taking the computer down?

4          A.     Yes, that's correct.

5          Q.     And you were the one assisting that?

6          A.     Yes.

7          Q.     Was that computer taken that day?

8          A.     Yes.

9          Q.     From the -- from the bookkeeper's office?

10         A.     Correct.

11         Q.     How is it that -- have you done that before in

12   your career with the Phoenix Police Department?

13         A.     Yes.

14         Q.     And in your training have you been taught how

15   to do that?

16         A.     Yes.

17         Q.     How is it that one goes about tearing down or

18   taking a computer so that you could access whatever

19   information may be in there?  How do you do that?

20         A.     Well, in this case I would say you should

21   probably ask Detective Guzman since he seized it and I did

22   not since I was speaking with Ms. Green.

23         Q.     But you were there when he was doing it though,

24   right?

25         A.     I was in another room.


TRACI L. WHEELER, OFFICIAL COURT REPORTER, CSR, RPR, CCR

1          Q.      Okay.  He did that and you were doing other

2    things?

3          A.      Yes.

4          Q.      Did you and he then go somewhere else?

5          A.      Yes.

6          Q.      Where did you guys go?

7          A.      We went to Apartment 132 of the San Riva

8    apartment.

9          Q.      And you and Detective Guzman went there,

10   correct?

11         A.      Yes.

12         Q.      When you went there, what did you and he do?

13         A.      He seized a laptop computer from that apartment

14   complex or office.

15         Q.      Do you remember what -- do you remember what

16   room he took it from or would that be better directed to him?

17         A.      Better directed to him.

18         Q.      After -- so now so far you have, as I

19   understand it, you have a computer from the bookkeeper's

20   office, you have a laptop.  Are you done at the San Riva

21   apartment complex?

22         A.      No.

23         Q.      Where do you go from there?

24         A.      We went to Apartment 382.

25         Q.      And when you went to Apartment 382, what did

1    the two of you do?

2         A.    Seized a computer over there.

3         Q.    And just so that I could get my terms straight,

4    is there a difference between a computer and a laptop?  See

5    what I'm saying?

6         A.    In the way we make reference to them, yes, but

7    are -- they're both still computers and capable of

8    functioning the same way and usually performing the same

9    tasks.

10        Q.    Okay.  What we associate with computers -- I

11   guess I'll ask you to take a look at Exhibit 174.  Do you see

12   what's there?

13        A.    Yes.

14        Q.    What does that show us?

15        A.    This is the actual computer or what we might

16   call a computer midtower.

17        Q.    So it's --

18        A.    It's just the tower.

19        Q.    It's not the monitor, it's the tower, right?

20        A.    Correct.

21        Q.    And with regard to a laptop, does a laptop also

22   have a tower or not?

23        A.    No.

24        Q.    So when you seize a computer, do you take the

25   monitor and the -- and the tower or do you just take the

1    tower?

2         A.    It depends on the situation.  Each situation,

3    each case is different.  In this particular case we did not

4    seize the computer monitor and the keyboard and the mouse and

5    the other peripheral devices.  We just simply took the

6    computer tower.

7         Q.    You indicated that in 132 you took a laptop

8    computer.

9         A.    That's correct.

10        Q.    Does the laptop have one of those towers

11   associated with it?

12        A.    No.  The laptop is self-contained.  The

13   computer and the monitor and keyboard are all built into one

14   unit and it's self-contained, much, much smaller.

15        Q.    So when you seize the laptop, you just take the

16   laptop.  You don't take towers or anything like that?

17        A.    Correct.

18        Q.    So get back to Apartment 382.  I think you

19   indicated you seized what from in there?

20        A.    The computer.

21        Q.    Subsequent to that, did you receive information

22   there may have been a laptop in Apartment 382?

23        A.    Yes.

24        Q.    Did you do anything with regard to the seizure

25   of the laptop in Apartment 382?

1          A.     It was later seized.

2          Q.     Did you have anything to do with taking it into

3     custody and that sort of thing?

4          A.     Yes.

5          Q.     Explain to me what it was that you did with

6     regard to the laptop that came from Apartment 382?

7          A.     Okay.  On October 12th, Detective Lucero called

8     me and informed me that he was --

9          MR. PATTERSON:  Well, Judge, if we could just get to

10    what he did in response to the phone call.

11         THE COURT:  Just say what you did.

12    BY MR. MARTINEZ:

13         Q.     In other words, Officer, you had a conversation

14    with Detective Lucero, correct?

15         A.     Yes.

16         Q.     In response to that conversation, something

17    happened, right?

18         A.     Yes.

19         Q.     Tell me what happened.

20         A.     He gave me a laptop computer.

21         Q.     Okay.  And it was your understanding which

22    lap -- who did this laptop computer belong to?

23         A.     Erik Vaillant.

24         Q.     Okay.  What did you do with the laptop

25    computer?

1          A.     I took it -- took it back to the computer

2     forensic lab and gave it to Detective Baranowski.

3          Q.     Are you familiar with the term "imaging"?

4          A.     Yes.

5          Q.     What does that mean?

6          A.     "Imaging" simply means you're making an exact

7     duplicate.  In terms that we use it, it means we're making an

8     exact duplicate of a hard drive or some type of magnetic

9     media which could be a floppy disk, CD rom, or computer hard

10    drive.

11         Q.     So when you image a computer or a hard drive,

12    does that mean that everything that's in that hard drive is

13    then on the image that you've created?

14         A.     That is correct.

15         Q.     So the image that you've created can then be

16    put into the computer and it will run as before even though

17    it's just the image?

18         A.     That's correct.

19         Q.     Does it lose anything going from the original

20    hard drive during the imaging process to the imaged copy?

21         A.     No.

22         Q.     Back on October 10, 2000, did you have occasion

23    to speak to somebody by the name of Janice Lind?

24         A.     Yes, I did.

25         Q.     And what was the substance of the conversation

TRACI L. WHEELER, OFFICIAL COURT REPORTER, CSR, RPR, CCR

1    that you had with her?  What was the subject?

2            MR. PATTERSON:  Objection.  Calls for hearsay.

3            THE COURT:  Sustained.

4    BY MR. MARTINEZ:

5            Q.    Did you tell her -- what did you tell her?

6            A.    What did I tell her?

7            Q.    Yeah, yes, sir, without telling us what she

8    said.

9                    (Pause in proceedings.)

10   BY MR. MARTINEZ:

11           Q.    Let me put it to you this way.  Did you ever

12   utter the words "floppy disk" or "disk" or anything like that

13   in your conversation with Janice Lind?

14           A.    Yes.  That was the primary topic.

15           Q.    I'm going to show you what has been marked for

16   identification as Exhibit 371.  Do you recognize it?

17           A.    Yes, I do.

18           Q.    What is it?

19           A.    It's a 3.5 inch diskette.

20           Q.    Were you the person who actually put it in that

21   envelope?

22           A.    Yes.

23           Q.    How is it that it came to you?  Who did you

24   receive it from or how did you get it?

25           A.    I received it from Detective Guzman.


TRACI L. WHEELER, OFFICIAL COURT REPORTER, CSR, RPR, CCR

1          Q.    And was it at the Phoenix Police Department

2    that he gave it to you?

3          A.    Yes, it was.

4          Q.    And then you put that diskette in that

5    envelope, right?

6          A.    That's correct.

7          Q.    Did you have anything to do with imaging any

8    computers involved in this investigation or making an image

9    of a floppy disk or anything like that, imaging anything?

10         A.    No, sir.  I did not.

11         MR. MARTINEZ:  I don't have any other questions.

12         THE COURT:  Mr. Patterson?

13         MR. PATTERSON:  Thank you, Judge.

14

15   CROSS-EXAMINATION BY MR. PATTERSON:

16         Q.    How you doing, Detective?

17         A.    Okay.  Thank you.

18         Q.    We've spoken before, haven't we?

19         A.    I don't remember.

20         Q.    Yeah.  Let me see what day it was.  May have

21   been several years ago.  Yeah, May 16, 2002?

22         A.    Okay.  Sorry.

23         Q.    It's hard to remember what we had for lunch

24   last week much less recall an interview that happened over

25   two years ago.

42

1           Let's talk about this deleting cookies

2    proposition.  By going through that process to delete the

3    cookies, you don't disable the computer's ability to receive

4    cookies, do you?

5           A.    Well, no.  No.

6           Q.    Okay.  It will continue to accept cookies the

7    next time you access an internet website, correct?

8           A.    Correct.

9           Q.    Assuming that website generates cookies in the

10   first place, right?

11          A.    That's true.

12          Q.    Not all websites generate cookies?

13          A.    That's very true.

14          Q.    Okay.  And there's a process within the windows

15   operating system that you can disable the cookie receiving

16   function, correct?

17          A.    That's correct.

18          Q.    All right.  By essentially going through the

19   process -- you probably know how to do it probably better

20   than I do -- but hitting a series of functions, you can

21   render your computer or the computer accessing the internet,

22   render it incapable of accepting cookies, correct?

23          A.    Yes, that's correct.

24          Q.    They use the term disable or enable?

25          A.    Yes.


TRACI L. WHEELER, OFFICIAL COURT REPORTER, CSR, RPR, CCR

000006228

43

1      Q.    Okay.  When your computer is disabled, it will

2   not accept cookies from any website, correct?

3      A.    Correct.

4      Q.    All right.  And you're making an effort to

5   avoid cookies.  Disabling the computer is better than just

6   deleting the cookies, correct?

7      MR. MARTINEZ:  Objection.  Speculation.

8      THE COURT:  Overruled.  Go ahead and answer the

9   question if you can.

10      THE WITNESS:  Say it one more time.

11   BY MR. PATTERSON:

12      Q.    In terms of eliminating the possibility of

13   having cookies on your computers, the disabling process is

14   far better than just the deleting process, right?

15      A.    Absolutely.

16      Q.    Okay.

17      A.    Absolutely.

18      Q.    Okay.  And there are security systems like

19   McAfee or Norton that can also be used to eliminate cookies

20   from your system, right?

21      A.    That's true.

22      Q.    Do you know whether the computer you seized

23   from the bookkeeper's office had a McAfee or Norton system in

24   the software component?

25      A.    I'm sorry, I don't, because I didn't examine

1      it.

2              Q.      Okay.

3              A.      I have no idea.

4              Q.      All right.  Same question with regard to the

5      computer seized from the manager's office, you didn't examine

6      it?

7              A.      That's correct.

8              Q.      Okay.  So you don't know whether it has a

9      security system like McAfee or Norton?

10             A.      I do not, no.

11             Q.      And I assume the same thing applies for the

12     other laptops you seized, right?

13             A.      Yes.

14             Q.      Okay.  All right.  Do you know whether these --

15     let's take it incrementally.  Do you know whether the

16     computer -- the tower I guess they call it or the PCU or P --

17     CPU, that's what you seized, right?

18             A.      Yes.

19             Q.      Central processing unit, right?

20             A.      Yes.

21             Q.      Okay.

22             A.      That's what a lot of people refer to it as,

23     yes.

24             Q.      Okay.  The tower, the CPU, everything but the

25     TV screen and the keyboard and the mouse, right?

TRACI L. WHEELER, OFFICIAL COURT REPORTER, CSR, RPR, CCR

1    A.    Yes.

2    Q.    Okay.

3    A.    Sorry.

4    Q.    Do you know whether the computer you ceased

5  from the bookkeeper's office was password protected?

6    A.    I don't, no.

7    Q.    Because you didn't examine the -- the Windows

8  operating system, right?

9    A.    Right.

10    Q.    That's where you find that, right?

11    A.    Uh-huh, yes.

12    Q.    Okay.  And you didn't examine the manager's

13  computer to determine whether it, too, was password

14  protected, correct?

15    A.    Correct.

16    Q.    Did you have occasion to examine the laptops to

17  determine whether or not they were password protected?

18    A.    No.

19    Q.    Okay.  Can you tell me what the intent of

20  password protection is?

21    A.    Password protection is just simply a method to

22  keep the unintended viewer from viewing the contents of your

23  drive or the computer itself.

24    MR. PATTERSON:  Okay.  I believe that's all I have,

25  Judge.  Thank you, Detective.


TRACI L. WHEELER, OFFICIAL COURT REPORTER, CSR, RPR, CCR

1          THE COURT:  Mr. Martinez?

2

3    REDIRECT EXAMINATION BY MR. MARTINEZ:

4          Q.     With regard to this issue of password

5    protection, what if you give somebody your password? Would

6    they then be able to access the computer?

7          A.     Sure, yes.

8          Q.     And what if you gave it to ten people. Would

9    they also be able to access your computer?

10         A.     Yes.

11         Q.     This deleting cookies that you were talking

12   about, when people go on the computer and there are these pop

13   up sort of messages that come up, is that the cookies you're

14   talking about or is it something different?

15         A.     Actually, it's -- it's using two different

16   terms.  Cookies are totally different from what we refer to

17   as popups.  I can give you another example if you'd --

18         Q.     Sure.  Go ahead.

19         A.     An example I'd like to use is like, let's say

20   you order a book through Amazon.com, you order it online

21   using your computer, and let's just say as an example you

22   want to order a computer book.  And let's say that that

23   particular computer book you want to order is a book that has

24   something to do with the internet.  When you go to Amazon.com

25   they will put their cookie on your hard drive, on the user's

1   hard drive.  And as an example, just easier to use myself,

2   the cookie goes on there so the next time I -- I would access

3   Amazon.com with that same computer, with my computer, it will

4   say oh, this is Greg.  The last time he accessed our website

5   was such and such a date.  His preferences are computer books

6   or computer manuals, and the subject topic to that could be

7   the internet.

8           Q.    So what would they do as a result of that?

9   Would they do anything or just keep --

10          A.    Well, that's a good question because when

11  cookies first came out everybody was really scared about, you

12  know, cookies, cookies are a bad thing.  In reality, cookies

13  are a good thing.  And as usual, anything that can be good

14  can also be bad, but basically the natural intention of a

15  cookie is a good thing so that when you go back and access

16  that website again, you do not have to scour any or click on

17  umpteen pages to try and find out where did I find that book

18  the last time.  The website will automatically remember it

19  for me and take me directly there and then give me the choice

20  of browsing around other areas of their website or their

21  business.

22          MR. MARTINEZ:  I don't have any other questions.

23          THE COURT:  Are there any further questions of this

24  witness by the jury?  If so, please raise your hand.

25                  (Pause in proceedings.)


TRACI L. WHEELER, OFFICIAL COURT REPORTER, CSR, RPR, CCR

```
 1              THE COURT:  Let me see Counsel here at the bench.

 2

 3                   (The following proceedings were held at the

 4       bench:)

 5

 6              THE COURT:  Question, "Please define hearsay and

 7       effect on testimony and when it occurs.  Thank you."

 8              MR. MARTINEZ:  I don't think she's entitled to that.

 9              MR. PATTERSON:  No.  It's not going to happen, Judge.

10              THE COURT:  Sorry?

11              MR. PATTERSON:  I don't think you should instruct

12       them on matters of the law.

13              THE COURT:  Okay.  Next question, "What office is

14       shown in photos 159 through 163?  Wendi's office or

15       bookkeeper's office?"

16              THE COURT:  Mr. Martinez?

17              MR. MARTINEZ:  No objection.

18              MR. PATTERSON:  No objection.

19              THE COURT:  Next question, "How many computers were

20       seized?  From where?"

21              MR. MARTINEZ:  No.  No objection.

22              MR. PATTERSON:  It's cumulative.  I wish she'd keep

23       track of the testimony, but you could go over it again.

24              Okay.  Next question, "Would a user know his

25       address is now saved by the site he contacted?"
```

49

1          MR. MARTINEZ:  That's kind of speculative as to "he."

2    Depends on the knowledge of the user.

3          MR. PATTERSON:  Not all websites generate cookies.

4    Cookies are not readily apparent to the user.

5          THE COURT:  I'm not going to ask that.

6                 Next question, "When you do deleting

7    cookies" -- sorry.  "When you do delete cookies, does it also

8    delete the information you send to the company or just the

9    information from the company?"

10         MR. MARTINEZ:  No objection.

11         MR. PATTERSON:  No, that's fine.  That's clarifying.

12         THE COURT:  Next question, "Cookies is a website like

13   ie.  shockwave.com, slash, soapnet.com, or is it some other

14   types of websites?"

15         MR. PATTERSON:  Well --

16         MR. MARTINEZ:  That shows, I think, a lack of

17   understanding in his previous explanation on what that was.

18   It has been explained when we allowed him to go into that

19   narrative, there wouldn't be this kind of question, so I'll

20   leave it to defense counsel if he wants to have it asked.

21         MR. PATTERSON:  I -- it's not -- yeah, shows a

22   complete misunderstanding of the cookies concept.  It's not a

23   website.

24         THE COURT:  Right.

25         MR. PATTERSON:  It is something generated about a

```
 1   website, some websites.  So we'll explain that to them in our

 2   closing argument.  I would object to this.

 3            THE COURT:  You'll object?

 4            MR. PATTERSON:  Yes.

 5            THE COURT:  Okay.  I won't ask it.

 6                 Next question, "How are you able to find out

 7   who belongs to the computer, paren, If you know, end of

 8   paren, and using other passwords?  Does that affect it in any

 9   way?"

10            MR. MARTINEZ:  I don't think he has the knowledge to

11   answer that.  I mean, how does it affect other passwords?  I

12   just -- I'm not quite sure.  I don't know what she's asking.

13            MR. PATTERSON:  I don't understand the question.

14            THE COURT:  I'm not going to ask that.  I don't think

15   it would be something he would be able to answer.

16

17                 (The following proceedings were held in open

18   court:)

19

20            THE COURT:  Do you have the Exhibits 159 through 163

21   there?

22            MR. MARTINEZ:  I do.

23            THE COURT:  Sir, I have a question here for you.  And

24   that question read as follows.  "What office is shown in

25   photos 159 through 163?  Wendi's office or bookkeeper's?
```

1      THE WITNESS:  159 through 163?

2      THE COURT:  Yes.

3      THE WITNESS:  The main focus of the photograph is the

4  manager's office, Wendi Andriano.  But I think I did make

5  reference that in a couple of the pictures there is a window

6  with clear glass that you can -- it's not a solid wall.  You

7  can look from one office to the next.  But the main focus of

8  the photographs would be the manager's office, yes.

9      THE COURT:  Next question read as follows:  "How many

10  computers were seized and from where?"

11      THE WITNESS:  One -- one computer was seized from the

12  bookkeeper's office, which is right next to the manager's.

13  And the next second one that was seized was Apartment 132,

14  and then apartment 382.  So that's three.

15      THE COURT:  Next question reads as follows:  "When

16  you delete cookies, does it also delete the information you

17  send to the company or just the information from the

18  company?"

19      THE WITNESS:  When you delete a cookie, you are

20  deleting it only off of your hard drive so you cannot delete

21  anything from the remote site or the website that put it on

22  there.  So it would only be deleting that information.

23      THE COURT:  Are there any further questions of this

24  witness by the jury?  If so, please raise your hand.

25          (No response.)


TRACI L. WHEELER, OFFICIAL COURT REPORTER, CSR, RPR, CCR

000006237

1          THE COURT:  No one has raised their hand.

2              Mr. Martinez, do you have any questions to

3    those specific questions asked by the jury?

4

5    FOLLOW-UP QUESTIONS BY MR. MARTINEZ:

6          Q.    You indicated, sir, there were three computers

7    seized on October 10, 2000, right?

8          A.    Yes.

9          Q.    You also previously in your testimony mentioned

10   Erik Vaillant's computer.  Do you remember that?

11         A.    Yes.

12         Q.    That was also in Phoenix Police Department

13   possession, right?

14         A.    Correct.

15         Q.    What date did you come into possession of that?

16         A.    On the 12th.

17         Q.    Of October?

18         A.    October 12, 2000.

19         Q.    And was that a tower or was that a laptop?

20         A.    That was a laptop.

21   MR. MARTINEZ:  I don't have anything else.

22   THE COURT:  Mr. Patterson?

23

24   FOLLOW-UP QUESTIONS BY MR. PATTERSON:

25         Q.    On the issue of deleting cookies, when you do

TRACI L. WHEELER, OFFICIAL COURT REPORTER, CSR, RPR, CCR

```
 1    delete cookies you free up additional space on your hard
 2    drive, right?
 3            A.    Yes, absolutely.
 4            Q.    It's one of the reasons to delete cookies in
 5    the first place, to clean up your computer, correct?
 6            A.    Yes, that's correct.
 7            MR. PATTERSON:  Thank you, Judge.
 8            THE COURT:  May this witness be excused?
 9            MR. MARTINEZ:  Yes, sir.
10            MR. PATTERSON:  Yes, thank you.
11            THE COURT:  Thank you very much.  You're excused.
12            THE WITNESS:  Thank you.
13            THE COURT:  State may call its next witness.
14            MR. MARTINEZ:  State calls John Guzman.
15                  (Pause in proceedings.)
16            THE COURT:  Sir, if you could, please step forward
17    right up here.  Give the clerk your name and she'll swear you
18    in.
19
20                        JOHN GUZMAN,
21            CALLED TO TESTIFY ON BEHALF OF THE STATE,
22    HAVING FIRST BEEN DULY SWORN, TESTIFIES AS FOLLOWS:
23
24            THE COURT:  Sir, if you could also please have a seat
25    on the witness stand here.  Please make yourself comfortable
```

TRACI L. WHEELER, OFFICIAL COURT REPORTER, CSR, RPR, CCR

1    there on the witness stand.  Please pull the microphone close

2    to you.  Please remember to speak loudly and clearly into the

3    microphone so everyone can hear you.  Also please wait until

4    the question is completed before you answer the question, and

5    please make sure you give a verbal response.  Is that

6    agreeable with you, sir?

7            THE WITNESS:  Yes, sir.

8            THE COURT:  Mr. Martinez, you may proceed.

9

10   DIRECT EXAMINATION BY MR. MARTINEZ:

11           Q.    Your name, sir?

12           A.    John Guzman.

13           Q.    Who are you employed by?

14           A.    Detective with Phoenix Police Department.

15           Q.    In what unit are you serving now?

16           A.    I'm assigned to the computer forensics unit.

17           Q.    How long have you been in that unit?

18           A.    Approximately four and a half years.

19           Q.    Did you receive any special training that

20   allows you to work in that unit?

21           A.    Yes.

22           Q.    Tell me about it.

23           A.    I've had quite a bit of extensive training

24   since the spring of 2000 on several different agencies or

25   institutions including the National White Collar Crime


TRACI L. WHEELER, OFFICIAL COURT REPORTER, CSR, RPR, CCR

000006240

1   Center, ASSIS, Encase, and a few others primarily on basic

2   and advanced types of computer forensic examination.

3          Q.    And prior to you receiving this training, did

4   you already know something about computers or is it something

5   that you were assigned to do?

6          A.    I had some familiarity with computers several

7   years prior to that.

8          Q.    What kind of familiarity did you have?

9          A.    Actually started with an investigation I was

10  doing that forced me into learning about computers, and for

11  several years in the Organized Crime Bureau, I became the so

12  called resident expert --

13         Q.    When did that investigation start, just so we

14  could have a point of reference the one involving the

15  organized crime?

16         A.    January of '94.

17         Q.    Go ahead.

18         A.    Anyway, I became the resident expert in my

19  unit, so that allowed me to work on computers, take classes,

20  build databases, do some programming, that sort of thing.

21         Q.    And post 1994 when you began working on it,

22  let's say for the next year -- couple of years or so, did

23  your job mainly consist of work with computers or was it

24  computers and something else?

25         A.    I carried the responsibility of troubleshooting

TRACI L. WHEELER, OFFICIAL COURT REPORTER, CSR, RPR, CCR

000006241

1    and assisting the other detectives while I was doing my own

2    investigations.  That included building databases for them

3    and troubleshooting their computers.

4         Q.   And since I think early 2000, have you been

5    solely devoted to dealing with computers and computer crime?

6         A.   Yes, with the exception of one short period of

7    time where I was assigned to another investigation.

8         Q.   When were you assigned to that investigation,

9    the date?

10        A.   October 24, 2000.

11        Q.   As a result of that assignment on October 24th,

12   2000, were you taken off the investigation of the killing of

13   Joseph Andriano?

14        A.   Yes.

15        Q.   But to take you back to October 10 of the year

16   2000, did you have occasion to be in the company of Detective

17   Greg Allinich and go over to the San Riva apartment complex?

18        A.   Yes, I did.

19        Q.   When you went over to the San Riva apartment

20   complex, did you have occasion to go and seize a computer

21   from the manager's -- from the office, the main office, if

22   you will, that's on site?

23        A.   Yes.

24        Q.   And whose or what individual's computer did you

25   seize?

TRACI L. WHEELER, OFFICIAL COURT REPORTER, CSR, RPR, CCR

1        A.     It was the -- as I understood it, it was the

2   office computer in the back office of the San Riva's

3   apartment office.

4        Q.     Let me show you what has been marked for

5   identification as Exhibit Number 297.   If this is the front

6   door, where did you seize the computer from, what office?

7        A.     Would be to the far right on the top corner

8   office.

9        Q.     That would be, if we're looking at this

10  diagram, it would be to the right and then to the upper

11  portion of the diagram?

12       A.     That's correct.

13       Q.     This office here?

14       A.     Yes, sir.

15       Q.     I'm going to show you photographs.   They're

16  Exhibits 172, 173, 174, and 175.

17       A.     Yes.

18       Q.     Do you recognize what's shown in those

19  photographs?

20       A.     Yes, sir.

21       Q.     Are those true and accurate depictions of what

22  may have existed in the subject matter back on October 10th

23  of the year 2000?

24       A.     Yes.

25            MR. MARTINEZ:  Move for admission of Exhibits 172,

1    173, 174 and 175.

2              MR. PATTERSON:  No objection, Judge.

3              THE COURT:  Counsel, I believe they have all been

4    admitted already.  Check the green tag.

5              MR. MARTINEZ:  Okay.

6              THE COURT:  172, 173, 174 and 175 have previously

7    been admitted.

8              MR. MARTINEZ:  Let's take a look at them.

9              THE WITNESS:  Can I step down?

10             MR. MARTINEZ:  Yes.

11             THE COURT:  You could step down.  Just remember to

12   speak up as loud as you can when you're away from the

13   microphone.  Thank you.

14   BY MR. MARTINEZ:

15             Q.    What does that show us, 172?

16             A.    This shows -- can I use this?

17             Q.    Yes.

18             A.    That picture shows this area, this desk area

19   with this back wall where the window is along this back wall

20   here.  The computer in question is on the floor behind that

21   chair, which would be in this approximate area here.

22             Q.    And if you take a look at Exhibit 173, is that

23   a closer view of that area?

24             A.    Yes.

25             Q.    What is this item called down here?


        TRACI L. WHEELER, OFFICIAL COURT REPORTER, CSR, RPR, CCR

1        A.      It's the computer tower.

2        Q.      And this up here?

3        A.      That's the monitor.

4        Q.      And this right here?

5        A.      Keyboard.

6        Q.      And this little white thing to the right?

7        A.      It may be the mouse.  I can't tell from --

8        Q.      Okay.  Exhibit 174?

9        A.      That's the depiction of the backside of the

10   computer tower where all the cables are connected.

11       Q.      And Exhibit 175?

12       A.      That's a close-up of the monitor and the

13   speaker.

14       Q.      What's this little white thing to the right

15   here?

16       A.      That's the mouse.

17       Q.      Go ahead and take a seat please.

18               Sir, in looking at those photographs I notice

19   that at least in Exhibit 172 -- or, actually, Exhibit 174,

20   we're looking at what you called the tower, right?

21       A.      Yes.

22       Q.      We've all seen many towers.  They all seem to

23   look alike.  When you take a tower, do you assign it a

24   certain number or how is it you keep them straight?

25       A.      Any time you seize a computer, we do an

1    examination report.  Any serial numbers, if there are any, we

2    label all the connections, we look inside the tower, we open

3    the box up, we look at all the hardware that's installed, and

4    we make notes and reports based on that.

5            Q.    Did this have an "S" number or any sort of

6    number attached to it?

7            A.    Yes.  I believe that was S16, Item 1, D1.

8            Q.    Okay what was that number again?

9            A.    S16, I1, D1.

10           Q.    This -- looking inside, labeling -- does that

11   happen at the scene or some happen at the scene and rest back

12   at the office?

13           A.    The examination of the exterior of the computer

14   and the photographing takes place at the scene.  We transport

15   the computer to our lab and we do the rest of the examination

16   in the lab.

17           Q.    And in this case were you the person who

18   actually took the tower out of that office there in the back

19   that we've been talking about?

20           A.    Yes.

21           Q.    Did Officer Allinich assist you in taking it or

22   was it all your doing?

23           A.    He was present.  He may have opened the door to

24   the car when I put it in, I don't know.

25           Q.    Then where did you go besides that office?  Did

TRACI L. WHEELER, OFFICIAL COURT REPORTER, CSR, RPR, CCR

1    you go anywhere else or --

2          A.    Yes.  After that, we went to an apartment.  I

3    believe it was Apartment 132.

4          Q.    And what did you do there with regard to the

5    computers?

6          A.    I was directed to a computer laptop --

7          Q.    Okay.

8          A.    -- that was in the bedroom of that apartment on

9    top of a dresser.

10         Q.    All right.

11         A.    And the only cable that was connected to that

12   computer was the power cable into the outlet.

13         Q.    When you say that -- so was it connected to the

14   internet or to the outside world or did it just have power to

15   it?

16         A.    I don't recall.

17         Q.    Okay.  And did you say that was the laptop or a

18   tower?

19         A.    That was a laptop.

20         Q.    And did you give that a number?

21         A.    Yes, we did.  I believe that was -- let me

22   refer to my notes.  I don't want to give you the wrong one.

23               (Pause in proceedings.)

24         THE WITNESS:  That would have been S16, I2, D1.

25   / / / / /

TRACI L. WHEELER, OFFICIAL COURT REPORTER, CSR, RPR, CCR

62

1    BY MR. MARTINEZ:

2         Q.    Where did you go after you left Apartment 132?

3    Did you remain there at the complex continuing your work or

4    did you go back to the office?

5         A.    After removing the laptop from that apartment,

6    we went to a second apartment.  I believe it was 382.

7         Q.    And what did you take there?

8         A.    I was directed to another computer tower that

9    was in the front living room area or kitchen area, I'm not

10   sure.  And I -- I did this, basically, the same thing.  I

11   removed the cables and secured that computer tower from that

12   apartment.

13        Q.    And did you give that a number?

14        A.    Yes.  That was S16 I3 D1 and 2.

15        Q.    Why do you say D1 and 2?

16        A.    It had two hard drives in it.  The other two

17   computers had one hard drive.  That's why the designation of

18   D1.

19        Q.    When you say they have two hard drives, this is

20   for my own edification, does that mean it has two brains or

21   how do two hard drives differ from the computers that have

22   one?

23        A.    Hard drives contain all the data that you save

24   on the monitor when you turn the computer on.  It stores all

25   the data.  It's where data is written to, and it's a small --

1   some hardware drives are installed by cables and others power

2   inside the interior part of the computer.  In the first two

3   computers, there was one only installed.  In this computer in

4   Apartment 382, there were two hard drives installed.

5           Q.     And then you took these items back to the

6   office, correct?

7           A.     Correct.

8           Q.     And you finished your work out at the San Riva

9   complex that day?

10          A.     That's correct.

11          Q.     Did you have occasion on October 11, year 2000,

12  to speak to an individual or come into contact with an

13  individual by the name of Ray Ortega?

14          A.     On the 11th?

15          Q.     Yes, sir.

16          A.     Yes.

17          Q.     Where did you come in contact with him?

18          A.     At my office, 620 West Washington.

19          Q.     When you came in contact with him, did he gave

20  you anything?

21          A.     Yes.  He gave me a floppy diskette.

22          Q.     I'm going to show you what's marked for

23  identification as 371.  I want you to take a look at it.

24          A.     Yes.

25          Q.     Is that the diskette that he gave you?

TRACI L. WHEELER, OFFICIAL COURT REPORTER, CSR, RPR, CCR

000006249

1          A.     Appears to be.

2          Q.     Once he turned it over to you.  Who did he --

3    what did you do with the diskette?

4          A.     I kept it in the office with me until Detective

5    Allinich, when he showed up in the office, I turned it over

6    to him.

7          Q.     Was that that same day?

8          A.     Yes.

9          Q.     How long did you speak with Mr. -- or how long

10   did this investigation take with Mr. Ortega (sic)?  Was it a

11   quick sort of thing or something that you sat and talked to

12   him?

13         A.     I met him up at the front desk.  He gave me the

14   floppy.  Apparently, that was an arrangement that had been

15   made prior to my seeing him.  But the other thing -- the

16   other reason he was there to see me, he brought me another

17   blank hard drive.

18         Q.     And when you say he brought you another blank

19   hard drive, what is it he wanted to you do for him?

20         A.     The first computer that was taken from the

21   office, that was the office computer.  Apparently contained

22   information and programs that assisted them in running their

23   business, so they requested that we restore or somehow return

24   that back to them so they could continue with their business.

25   So what we did, I instructed him to bring a blank hard drive

1    so I could make a copy of the first and put it on his, and

2    then I was able to return that to him.

3        Q.    Is that -- does that process have a name?

4        A.    Yes.

5        Q.    What's that?

6        A.    I made an exact duplicate image of the original

7    hard drive.

8        Q.    Does everything on the original hard drive,

9    when you make an image of it, go on to the duplicate?

10       A.    Yes.

11       Q.    Does the duplicate allow the computer then to

12   then work who ever -- work the same way as it did before?

13       A.    Yes.  We tested it when we installed the second

14   hard drive, and it contained all the information that the

15   first hard drive had.

16       Q.    So as I understand it, and I'm going to call it

17   for lack of better term the bookkeeper's computer, the one

18   you referred to as S16, I think, I1 -- I think something like

19   that?

20       A.    Yes.

21       Q.    You actually did the imaging on that one,

22   right?

23       A.    Yes.

24       Q.    Did you do the imaging on any other computer?

25       A.    The only other computer I imaged was the other

1    tower computer that came out of Apartment 382 with the two

2    drives.

3         Q.    So as I understand it, you did the bookkeeper

4    one?

5         A.    Yes.

6         Q.    And then you also did the one, that 382, that

7    had the two hard drives?

8         A.    Yes.

9         Q.    We've also heard about a computer laptop from

10   Erik Vaillant.  Did you do the imaging on that one?

11        A.    No.

12        Q.    What was the number that was assigned to the

13   Erik Vaillant computer?

14        A.    I believe that was S47, I1, D1.

15        Q.    We just had a document, I guess it was

16   yesterday, where the time was indicated as being Denver

17   time.  Are you familiar with the time that's involved, let's

18   say, in Denver and Arizona in terms of whether or not they're

19   same time?

20        A.    Yes.

21        Q.    Are they the same time?

22        A.    Denver and Arizona are, I believe, both on

23   Rocky Mountain time.  However, Arizona has daylight savings

24   time, so for -- so during a certain part of the year there

25   would be a one hour difference.

67

1      Q.   In other words, at one point Denver is one hour

2  ahead of Arizona at some point?

3      A.   Correct.

4      MR. MARTINEZ:  I don't have any other questions.

5      THE COURT:  Mr. Patterson?

6      MR. PATTERSON:  I have no questions of this

7  gentleman.  Thank you, Judge.

8      THE COURT:  Any further questions of this witness by

9  the jury?  If so, please raise your hand.

10      (No response.)

11      THE COURT:  No one has raised their hand.

12      May this witness excused?

13      MR. MARTINEZ:  Yes, Your Honor.

14      MR. PATTERSON:  Yes.

15      THE COURT:  Thank you very much.  You're excused.

16      THE WITNESS:  Thank you.

17      THE COURT:  State may call its next witness.

18      MR. MARTINEZ:  State calls Edward Baranowski.

19      (Pause in proceedings.)

20      THE COURT:  Sir, if you could please step forward

21  right up here.  Right over here.  Right over here.  Please

22  give the clerk your name and she'll swear you in.

23  / / / / /

24  / / / / /

25  / / / / /

TRACI L. WHEELER, OFFICIAL COURT REPORTER, CSR, RPR, CCR

```
 1                    EDWARD BARANOWSKI,

 2            CALLED TO TESTIFY ON BEHALF OF THE STATE,

 3      HAVING FIRST BEEN DULY SWORN, TESTIFIES AS FOLLOWS:

 4

 5            THE COURT:  Please have a seat on the witness stand

 6      there.  Please make yourself comfortable there on the witness

 7      stand.  Please pull the microphone close to you.  Go ahead

 8      pull that over.  Pull that over.  Remember to speak loudly

 9      and clearly into the microphone so everyone can hear you.

10      Also, please wait until the question is completed before you

11      answer the question, and please make sure you give a verbal

12      response.  Is that agreeable to you?

13            THE WITNESS:  Yes, sir.

14            THE COURT:  Mr. Martinez, you may proceed.

15

16      DIRECT EXAMINATION BY MR. MARTINEZ:

17            Q.    Your name, sir?

18            A.    Edward Baranowski.

19            Q.    Who do you work for?

20            A.    City of Phoenix Police Department.

21            Q.    And how long have you been employed by the city

22      of Phoenix Police Department?

23            A.    20 years.

24            Q.    Are you a detective with them?

25            A.    Yes.
```

1        Q.    Drawing your attention back to October of 2000,

2   maybe the early part of 2001, what area were you

3   investigating -- what areas did you participate in?

4        A.    I was a computer forensic detective.

5        Q.    And did you have any special training such as

6   schooling that allowed you and gave you the -- the requisite

7   knowledge to be in that -- in that field?

8        A.    Yes.

9        Q.    Tell me a little bit about that.

10        A.    In 1998, I went to a two week class in

11   Florida.  It was a class, IACIS, which is International

12   Association of Computer Investigative Specialists.

13        Q.    What else did you do in terms of training, that

14   sort of thing?

15        A.    I went to class in -- a class called Encase and

16   that's the software I use to look at computers.

17        Q.    Total how much training in terms of hours would

18   you estimate that you've had?

19        A.    Probably 200.

20        Q.    And back in 2000, how long had you been in the

21   computer area just working solely with computers?

22        A.    About 2 and a half years.

23        Q.    And for those 2 and a half years, was your

24   40-hour week solely devoted to working with computers?

25        A.    Yes.

1          Q.    I want to talk to you about a computer that you

2   may have worked on, and I'm going to refer to it as the

3   bookkeeper computer.  I think the number they gave to it was

4   S16 1L or something -- I1, D1 are you familiar with that?

5          A.    Yes.

6          Q.    Did you have occasion to work with that

7   computer?

8          A.    Yes.

9          Q.    What is that?  What kind of work did you do

10  with that computer?

11         A.    I looked for evidence -- evidence inside the

12  computer, that computer.

13         Q.    And had you done that on other occasions?  In

14  other words, with regard to other cases, had you gone into

15  computers and attempted to retrieve what may or may not have

16  been on them?

17         A.    Yes.

18         Q.    Are you familiar with the term "unallocated

19  space"?

20         A.    Yes.

21         Q.    What is unallocated space?

22         A.    Unallocated space is the space or area

23  designated by the computer to where new data can be placed.

24         Q.    Well, let's see if I can sort of flesh this out

25  a little bit.  Let's say that somebody goes on a computer and

TRACI L. WHEELER, OFFICIAL COURT REPORTER, CSR, RPR, CCR

1   has some correspondence, hits a delete button.  It goes into

2   the trash and then they delete that.  That information that's

3   been deleted twice, where does it go?

4        A.   Well, the indicators have just been deleted.

5   The actual body of whatever you're talking about, the data,

6   is still on the computer somewhere.

7        Q.   And what is that somewhere that this

8   information may be?  What is that called?

9        A.   Unallocated space.

10        Q.   With regard to this bookkeeper's computer, did

11   you go into this unallocated space and retrieve data?

12        A.   Yes.

13        Q.   Did you retrieve raw data?

14        A.   Yes.

15        Q.   And also from that raw data, did you then also

16   retrieve items that were of interest to you?

17        A.   Yes.

18        Q.   I'm going to show you what has been marked for

19   identification as Exhibit 372.  I want you to take a look at

20   it and see if you recognize what's here.

21             (Pause in proceedings.)

22        THE WITNESS:  Yes.

23   BY MR. MARTINEZ:

24        Q.   Is that something that you retrieved from the

25   unallocated space after viewing the raw data from the

1    bookkeeper's computer?

2           A.    Yes, it is.

3           Q.    If I may have it back.

4           MR. MARTINEZ:   I move for admission of Exhibit 372.

5                 (Pause in proceedings.)

6           MR. PATTERSON:   May I voir dire, Judge?

7           THE COURT:   Yes.

8

9    VOIR DIRE EXAMINATION BY MR. PATTERSON:

10          Q.    Did you generate this particular document in

11   some fashion?

12          A.    I typed it out from raw data that I got from

13   the computer.

14          Q.    Okay.   Is that -- the raw data, is that in a

15   form or using characters that are not generally understood by

16   the general populace?

17          A.    Some of it is and some of it is text.

18          Q.    Okay.   And so you took that text and converted

19   it into this written word?

20          A.    I didn't convert it.   It was plain text.   I

21   just copied it out.

22          Q.    Okay.   All right.   And is there any indication

23   as to when this may have been placed on the unallocated

24   portion of that particular computer?

25          A.    Unless the text has some kind of date or time

73

1    in it, it has no time that we can --

2            Q.    Okay.  If it says sent Monday, August 21, 2000,

3    sent, does that give you an indicator of as to when it may

4    have been placed there?

5            A.    Yes.

6            MR. PATTERSON:  No objection, Judge.

7            THE COURT:  Exhibit 372 is admitted into evidence.

8

9    CONTINUED DIRECT EXAMINATION BY MR. MARTINEZ:

10           Q.    Sir, I want you to take a look at 372.   And

11   tell us what it was that you were able to retrieve from that

12   computer, the bookkeeper's computer?

13           A.    Do you want me to read it?

14           Q.    Yes, sir.

15           A.    Okay.  "Original message, From: Anne Newton,

16   azcreat@usa.net, To: sales@voigtglobal.com.  Sent: Monday,

17   August 21, 2000, 10:36 a.m.  Subject:  Reagent ACS Grade

18   Chemicals Inquiry.  Please forward pricing and availability

19   for Sodium Cyanide, about 10 grams, at your earliest

20   convenience.  Thank you.  The required contract has been

21   signed and faxed.  Anne Newton Aztec Creations.  Get free

22   email and permanent address at http://www.netaddress.com."

23           Q.    Did you then continue with your search and come

24   up with other items that you deemed of interest?

25           A.    Yes.

1          Q.     Going to show you Exhibit 373, and take a look

2     at it and see whether or not this is something that you were

3     able to retrieve from the unallocated space of the

4     bookkeeper's computer.

5          A.     Yes, it is.

6          Q.     And in terms of whether -- when something was

7     placed or deleted or put into or defaulted into unallocated

8     space, can you tell us when it was put there or not?

9          A.     No.  Like I said before, unless it's in the

10    text itself.

11         Q.     But even if it's in the text, you really don't

12    know when it went into uncalculated space, when it was

13    deleted, do you?

14         A.     True, yes.

15         Q.     But the date may give you an indication of when

16    it was written, not when it was put in unallocated space,

17    right?

18         A.     Yes.

19         Q.     Again, with regard to what you have in front of

20    you, 373, is that something you generated with regard to that

21    bookkeeper's computer?

22         A.     It is.

23         Q.     Is it from unallocated space?

24         A.     Yes.

25         Q.     If I may have it back.


TRACI L. WHEELER, OFFICIAL COURT REPORTER, CSR, RPR, CCR

75

1           MR. MARTINEZ:  I move for admission of -- admission

2      of Exhibit 373.

3           MR. PATTERSON:  No objection, Judge.

4           THE COURT:  Exhibit 373 for identification is

5      admitted into evidence.

6                     (Pause in proceedings.)

7      BY MR. MARTINEZ:

8           Q.   Sir, I want you to take a look at it first.

9      Does that have a date on it?

10          A.   No.

11          Q.   And what is it that it says?  What is it that

12     you retrieved?

13          A.     It says, "Sales, sales@voigtglobal.com, wrote:

14     What will this chemical be used for?  This is not a routine

15     chemical and is drop shipped directly from the

16     manufacturer -- we do not keep it in our regular supply

17     inventory.  We need: Business name, given in parentheses,

18     State of Incorporation, State Sales Tax ID or Business ID,

19     Business Telephone Number, Allen.  Ordering instructions:

20     Http://www.VGDLLC.com order underscore page at htm Voigt

21     Global Distribution LLC, http://www.VGDLLC.com.  Your

22     international retailer of scientific instruments, chemicals,

23     biologicals and nutraceuticals.  VOICE 01-785-554-0757, FAX

24     01-785-232-5573."

25          Q.   Did you then continue your search and come up

TRACI L. WHEELER, OFFICIAL COURT REPORTER, CSR, RPR, CCR

1   with another item?

2          A.     Yes.

3          Q.     Going to show you now Exhibit 374.  Did you

4   undertake the same procedure or process and were you then

5   able to obtain this -- this information from the unallocated

6   space of the bookkeeper's computer?

7          A.     Yes.

8          Q.     If I may have it back.

9          MR. MARTINEZ:  I move for admission of Exhibit 374.

10         MR. PATTERSON:  No objection.

11         THE COURT:  Exhibit 374 for identification is

12   admitted into evidence.

13   BY MR. MARTINEZ:

14         Q.     I want to take a look at it, please.  Does that

15   have a date on it?

16         A.     Yes.

17         Q.     What's the date on that one?

18         A.     Wednesday, August 23rd, 2000, 10:46 a.m.

19         Q.     Read to us what you were able to retrieve from

20   the computer?

21         A.     "Original message From: Anne Newton

22   azcreat@usa.net.  To: Sales, sales@voigtglobal.com.  Sent:

23   Wednesday, August 23rd, 2000, 10:46 a.m.  Subject: RE: RE:

24   Reagent ACS Chemical Grade Chemicals Inquiry.  Use: disposal

25   of rodents.  Business: Wyndstar Enterprises dba Aztec

1    Creations.  This is a partnership.  We are not incorporated.

2    State of Arizona.  I'm not sure what the Fed ID # is but here

3    is my SS # 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.  Business phone is 602-826-1150.  We

4    farm several acres in Arizona and Oklahoma.  We are having

5    severe problems with rodents.  An acquaintance suggested

6    sodium cyanide.  We are hoping this will work.  Do you have

7    any suggestions?  Anne."

8         Q.    What is the phone number again?  Can you read

9    it just a bit slower?

10         A.    602-826-1150.

11         Q.    I'm now going to show you Exhibit 375.  Did you

12   obtain this also from the bookkeeper's computer from the

13   unallocated space?

14         A.    Yes.

15         Q.    And did you undergo the same process as you did

16   with regard to the others?

17         A.    Yes.

18         MR. MARTINEZ:  I move for admission of Exhibit 375.

19              (Pause in proceedings.)

20         MR. PATTERSON:  No objection, Judge.

21         THE COURT:  Exhibit Number 375 for identification is

22   admitted into evidence.

23   BY MR. MARTINEZ:

24         Q.    Go ahead and take a look at that.  With regard

25   to the salutation that's on top of it, is it Sales at

TRACI L. WHEELER, OFFICIAL COURT REPORTER, CSR, RPR, CCR

1    Sales@voigtglobal that you've read before?

2         A.    Yes.

3         Q.    Omitting that formal caption, what is the

4    substance of the message?

5         A.    Wrote: FID # equals Federal Identification

6    Number, aka: EIN – Employer Identification Number.  Please

7    fax a copy of your proof of business that you received when

8    registering with the State of Arizona to the fax number

9    below.  Sincerely, Allen.  Ordering instructions" --

10        Q.    Let me stop you there.  Is the text involving

11   ordering -- ordering instructions, the same as in Exhibit

12   373, which is this one that we see throughout these messages?

13        A.    Yes, it is.

14        Q.    If I may have it back.  Let's take a look at

15   Exhibit 376 through 383.  I want you to take a look at these

16   and see whether or not these are items that you generated

17   from the bookkeeper's computer from the unallocated space.

18             (Pause in proceedings.)

19             THE WITNESS:  Yes, they are.

20             MR. MARTINEZ:  Move for admission of Exhibits 376

21   through 383.

22             (Pause in proceedings.)

23             MR. PATTERSON:  No objection, Judge.

24             THE COURT:  Exhibit Numbers 376 through 383 for

25   identification are admitted into evidence.


        TRACI L. WHEELER, OFFICIAL COURT REPORTER, CSR, RPR, CCR

1                    (Pause in proceedings.)

2    BY MR. MARTINEZ:

3         Q.    I want to you take a look at starting with

4    Exhibit 376.  I want you to take a look at that.  Tell us

5    what you retrieved in that portion?

6         A.    "Original message From: Anne Newton

7    azcreat@usa.net.  To: Sales, sales@voigtglobal.com.  Sent:

8    Tuesday, August 29, 2000, 5:43 p.m.  Subject: RE: RE: RE:

9    Reagent AZ -- sorry, ACS Grade Chemicals Inquiry.  Here is my

10   FID #, 86-0834681."

11        Q.    Is that the end of the message?

12        A.    Yes.

13        Q.    Now, what exhibit number is that?

14        A.    376.

15        Q.    Take a look at Exhibit 377.  Tell us what

16   that -- what you were able to retrieve?

17        A.    Sales, sales --

18        Q.    Is that the same as in Exhibit 3 -- the formal

19   caption, Sales at sales@voigtglobal.com?

20        A.    Yes. "Wrote: Again: please fax a copy of your

21   proof of -- proof of business that you received when

22   registering with the State of Arizona to the fax number

23   below.  Simply typing numbers on the screen does not provide

24   proof of business.  Sincerely, Allen.  Ordering

25   instructions" --

1          Q.     And are those the same that have been repeated

2     before?

3          A.     Yes.

4          Q.     What is the next Exhibit Number?

5          A.     378.

6          Q.     What does that tell you?

7          A.     "Original message From: Anne Newton

8     azcreat@usa.net To: Sales at sales@voigtglobal.com.  Sent:

9     Tuesday, September 19th, 2000, 11:19 a.m.  Subject: RE: RE:

10    RE: Reagent ACS Grade Chemicals Inquiry.  Allen, Sorry for

11    the delay.  We just got back from Ireland for vacation.   It

12    is a beautiful country.  I sent over a fax yesterday.  Let me

13    know if you need anything else.  Also let me know the total

14    price so I can send check.  Thanks, Anne."

15         Q.     In reading that I notice that there was how

16    many RE RE's there?

17         A.     Three.

18         Q.     Going to Exhibit 379.  Go ahead.

19         A.     Okay.  "Sales, sales@voigtglobal.com wrote:

20    THIS CHEMICAL WILL EXPLODE WHEN HEATED.  Sodium Azide,

21    Granular, Reagent Grade (No inexpensive technical grades are

22    available)  CAS 26628-22-8 500 -- 500 grams $105.75.  HAZMAT

23    surcharge (UN Hazard Class 6.1) $15.00.  Poison packaging

24    (DOT requirement) $13.00, Regular Ground Shipping Charges

25    $8.00.  Total: 141.75.  THIS CHEMICAL WILL EXPLODE WHEN

TRACI L. WHEELER, OFFICIAL COURT REPORTER, CSR, RPR, CCR

1    HEATED.  I really don't think that you are getting your best

2    return on the money invested with this product.  This purity

3    of Sodium Azide is used in research laboratories (ie: highly

4    pure analytical reagent).  It is not a technical grade for

5    killing rodents.  Sincerely, Allen.  Ordering

6    instructions" --

7              Q.    And does it then repeat the same --

8              A.    Yes.

9              Q.    -- thing we've seen, for example, on 373?

10             A.    Yes.

11             Q.    Go on to the next Exhibit 380.

12             A.    "Original message From: Anne Newton,

13   azcreat@usa.net To: Sales, sales@voigtglobal.com Sent:

14   Friday, September 22nd, 2000, 11:25 a.m.  Subject: RE Sodium

15   Azide.  Allen, I realize it may not seem like a great bang

16   for buck, but an acquaintance swears they have used sodium

17   cyanide or potassium cyanide mixed with specially prepared

18   greens for the rodent's placed near the contaminated" -- I

19   mean, excuse me -- "concentrated area of plant life they tend

20   to muck up, and it apparently did the job.  Other

21   alternatives have seemed nearly as costly, and as always, we

22   understand that -- we understand there are no guarantees.  So

23   we're happy to give this route a shot.  What is the pricing

24   for a technical grade strong enough to kill rodents?  Anne."

25             Q.    What's the number of the next exhibit?


TRACI L. WHEELER, OFFICIAL COURT REPORTER, CSR, RPR, CCR

1       A.      381.

2       Q.      Please read that to us.

3       A.      Friday -- excuse me -- "Friday, 22 September,

4    2000.   11:19 a.m., MDT.   From: Sales, sales@voigtglobal.com.

5    Add to Address Book.   To: Anne Newton, azcreate@usa.net.

6    Subject: RE Sodium Azide.   More Details Again – there is no

7    technical grade available.   The difference is in level of

8    impurities – not necessarily the potencies.   Voigt Global

9    Distribution LLC."

10      Q.      Is that the same thing that repeats itself at

11   the end of the messages?

12      A.      Yes.

13      Q.      Now, what's the number of the next exhibit?

14      A.      382.

15      Q.      And 382 is that sort of an email type of

16   message or something else?

17      A.       It's something else.

18      Q.      First of all, describe what it was that you

19   were able to obtain and then read it for us?

20      A.       It's basically text and numbers.   What it says

21   is AZ Creations Wyndstar Enterprises 2442 S 24th Street,

22   Phoenix, AZ, 85034-6802.   Expirations date 12/31/00.   2442 S.

23   24th Street 220290002501.

24      Q.      Next Exhibit 383, I don't want you to read it

25   to us, but does it have a large amount of text at the top?

TRACI L. WHEELER, OFFICIAL COURT REPORTER, CSR, RPR, CCR

1        A.    Yes, it does.

2        Q.    Then does it have lines at the bottom?

3        A.    Yes.

4        Q.    And starting with the first line, what does

5   that ask for?

6        A.    Signature.

7        Q.    Go on.  What's the second line?

8        A.    Name in parenthesis, legible print only.  Next

9   one is date, and then address, then city, then state or

10  province, and then zip or postal code, and then country.

11       Q.    All right.  If I may have that back.

12             Did you also continue beyond this?  Did you

13  also search the computer for other items?

14       A.    Yes.

15       Q.    We could go ahead and show you some of these

16  items.

17             (Attorney-attorney discussion.)

18       THE COURT:  Would this be a good time to take our

19  afternoon break?

20       MR. MARTINEZ:  Yes, sir.  I'm just going to staple

21  them.

22       THE COURT:  Why don't we take our afternoon break at

23  this time, ladies and gentlemen.

24             During this break, remember the entire

25  admonition I gave you including do not discuss this case with

TRACI L. WHEELER, OFFICIAL COURT REPORTER, CSR, RPR, CCR

84

1    anyone, do not let anyone discuss the case with you, keep an

2    open mind.  We'll take a 20 minute break.  See you in 20

3    minutes.

4

5                    (Recess.)

6

7              THE COURT:  This is cause number CR 2000-096032,

8    State of Arizona versus Wendi Elizabeth Andriano.  Let the

9    record reflect the presence of the Defendant, Counsel and

10   the jury.  Edward Baranowski is on the witness stand, and

11   we'll continue with direct examination by Mr. Martinez.

12              Mr. Martinez?

13

14   CONTINUED DIRECT EXAMINATION BY MR. MARTINEZ:

15        Q.    Sir, in front of you, you have Exhibit 384.  Do

16   you recognize the contents of that exhibit?

17        A.    Yes.

18        Q.    Are these items that you were able to obtain

19   from the so-called unallocated space from the computer that

20   we've designated as belonging to the bookkeeper?

21        A.    Yes, they are.

22        Q.    How many articles or items are in that packet?

23   If you could count them, please.

24                   (Pause in proceedings.)

25              THE WITNESS:  19.


TRACI L. WHEELER, OFFICIAL COURT REPORTER, CSR, RPR, CCR

1          MR. MARTINEZ:  Could you just put the clip back on

2    please?

3                    Move for admission of Exhibit 384.

4          MR. PATTERSON:  Just a couple of voir dire questions,

5    Judge?

6          THE COURT:  Yes.

7

8    VOIR DIRE EXAMINATION BY MR. PATTERSON:

9          Q.    Is there any way we could ascertain when these

10   particular sites were accessed by that computer?

11         A.    No.

12         Q.    Okay.  And you printed out all this stuff.  Do

13   we know about -- is there something in the computer that can

14   tell us whether or not those websites were sent to a printer

15   for printout?

16         A.    No.

17         Q.    Okay.  And lastly as you're generating this

18   data such that it resides in the unallocated space, does it

19   also appear on the monitor?  Is that what's at work here?  Or

20   do we know that?

21         A.    I'm not sure I understand the question.

22         Q.    Well, as I understand what you're telling us

23   here, at some point in time this computer accessed this

24   information, correct?

25         A.    Yes.

TRACI L. WHEELER, OFFICIAL COURT REPORTER, CSR, RPR, CCR

86

1          Q.     All right.  But is there anything about the

2     data that could tell us whether or not it was at one time

3     viewed on a monitor or printed out by a printer or anything

4     of that nature?

5          A.     No.

6          Q.     Okay.  And we, again, don't know when or at

7     what point in time this stuff was accessed?

8          A.     Correct.

9          MR. PATTERSON:  No objection to 384, Your Honor.

10          THE COURT:  Exhibit 384 for identification is

11     admitted into evidence.

12                     (Pause in proceedings.)

13

14     CONTINUED DIRECT EXAMINATION BY MR. MARTINEZ:

15          Q.     Sir, let's just go through this in a brief

16     fashion.  If you could give me the titles of some of these

17     documents that we have here in 384, starting with the first

18     one on top?

19          A.     Found Sodium Azide.

20          Q.     Number two?

21          A.     Found Sodium Azide.

22          Q.     Number three?

23          A.     Found Sodium Azide.

24          Q.     Number four?

25          A.     RE: Sodium Azide, Worth the trouble.


TRACI L. WHEELER, OFFICIAL COURT REPORTER, CSR, RPR, CCR

1      Q.      Number five?

2      A.      Toxicology and Carcinogenesis, Studies of

3   Sodium Azide.

4      Q.      Number six?

5      A.      Published: Journal of Analytical Toxicology.

6   Analytical Findings in a Suicide Involving Sodium Azide.

7      Q.      On the first sentence of that article, is there

8   an amount of Sodium Azide referenced?

9      A.      Yes.

10     Q.      How much?

11     A.      9 grams.

12     Q.      Next?

13     A.      This is a list of links in reference to a

14   conversion table.

15     Q.      Is there a conversion from metric to the

16   English system there?

17     A.      Yes, down at the bottom.

18     Q.      Next?

19     A.      This says Selected EPS pages for Sodium Azide.

20     Q.      The next one?

21     A.      This is a reference, laboratory reference of

22   numerous manuals, chemical manuals.

23     Q.      Next?

24     A.      This states, "How can I purchase Cyanide."

25     Q.      Next?

1    A.    How can I purchase Cyanide.

2    Q.    Next?

3    A.    This says Cyanide at the top and information

4  about it.

5    Q.    Next?

6    A.    Cyanide, information about Cyanide.

7    Q.    Next?

8    A.    This is raw data that has VoigtGlobal.com in

9  it.

10    Q.    Next?

11    A.    This is information that says 300 K State AL

12  and it says select.

13    Q.    So it has State AL next to it, and then it has

14  an amount.  How much are we talking about?

15    A.    300 K.

16    Q.    Okay.  Next?

17    A.    This is information about Adriamycin.  I can

18  spell it for you, I'm not sure --

19    Q.    Go ahead and spell it.

20    A.    A-d-r-i-a-m-i -- m-y-c-i-n.

21    Q.    Okay.  Next, what is that document?  What does

22  it just say on the upper left-hand corner?

23    A.    EPS selected pages search result.

24    Q.    All right.  Next?

25    A.    EPS selected pages for Sodium Azide.

1          Q.     Next?

2          A.     It's a table with chemical information

3     reference Sodium Azide.

4          Q.     I believe that's the last one, correct?

5          A.     Yes.

6          Q.     We've been talking about items that may have

7     been found in unallocated space, correct?

8          A.     Yes.

9          Q.     Did you bring us everything you found in

10    unallocated space or is this just a sampling?

11         A.     Sampling.

12         Q.     Now, were there any active files in the

13    computer that were not in unallocated space?

14         A.     Yes.

15         Q.     And with -- were you able to access those?

16         A.     Yes.

17         Q.     What is the difference between the files that

18    are active and the files that are in unallocated space?

19         A.     Well, when you say "active," those are valid

20    files the computer can see.

21         Q.     When you say those are valid files the computer

22    can see, what does that mean?  How are they different from

23    unallocated space?

24         A.     Well, the computer regular user couldn't see

25    any kind of information in unallocated space.

1          Q.     In other words, you're saying that with

2    unallocated space you have to have a special program to go in

3    and get it?

4          A.     Yes.

5          Q.     How about with these valid files that you're --

6          A.     No, you would not.

7          Q.     I'm going to show you what's been marked for

8    identification as Exhibit 385.  Do you recognize what these

9    are?

10                (Pause in proceedings.)

11         THE WITNESS:  Yes.

12   BY MR. MARTINEZ:

13         Q.     What are they?

14         A.     They're files I found in the temporary internet

15   file on the computer.

16         Q.     Are we talking about the bookkeeper's computer?

17         A.     Yes.

18         MR. MARTINEZ:  I move for admission of Exhibit 385.

19                (Pause in proceedings.)

20         MR. PATTERSON:  No objection, Judge.

21         THE COURT:  Exhibit 385 for identification is

22   admitted into evidence.

23                (Pause in proceedings.)

24   BY MR. MARTINEZ:

25         Q.     I'm going to show it to you again, if you'd

1    just read us the captions of these items.

2          A.    First one is Lewis dot of Sodium Azide.

3          Q.    Next?

4          A.    Lewis dot structure of H2CO.

5          Q.    Next?

6          A.    RE: Sodium Azide, worth the trouble.

7          Q.    Next?

8          A.    Sodium Azide worth the trouble.

9          Q.    The next one?

10          A.    RE: Sodium Azide worth the trouble.

11          Q.    Okay.  Sir, just so that we could get a summary

12    of what you did with regard to the bookkeeper's computer, how

13    many references or how many times was the name "Anne Newton"

14    mentioned?

15          A.    I have to look at my notes.

16          Q.    Go ahead and take a look.

17                (Pause in proceedings.)

18          THE WITNESS:  11 times.

19    BY MR. MARTINEZ:

20          Q.    How about "Sodium Azide."  How much was that

21    mentioned?

22          MR. PATTERSON:  Judge, so I can follow along with the

23    case report --

24          THE COURT:  Yes.

25          MR. PATTERSON:  -- what are you referring to?


TRACI L. WHEELER, OFFICIAL COURT REPORTER, CSR, RPR, CCR

1          THE WITNESS:  That's where I got the information.   I

2     wrote a summary of those notes.

3          MR. PATTERSON:  May I inquire, Judge?

4          THE COURT:  Yes?

5

6     VOIR DIRE EXAMINATION BY MR. PATTERSON:

7          Q.    Is it the Encase report we're talking about?

8          A.    Yes?

9          Q.    And what page --

10         A.    I'd have to check the Encase report.  The

11    Encase report, can I add, it gives a total summary of all the

12    hits on all the devices that were in the case.  The

13    information I was just providing Mr. Martinez is just the

14    hits on this one computer.

15         MR. PATTERSON:  Thank you, Judge.

16              (Pause in proceedings.)

17         MR. PATTERSON:  Again, Judge, if -- is there a number

18    you're reading from?  I'm just trying to follow along with

19    you here.

20         THE WITNESS:  It's the information that was provided

21    back when we had our meeting.

22         MR. PATTERSON:  Okay.  All right.  I got you.  I'll

23    just look over Mr. Martinez's shoulder.

24    CONTINUED DIRECT EXAMINATION BY MR. MARTINEZ:

25         Q.    Cyanide -- how many hits were there for

TRACI L. WHEELER, OFFICIAL COURT REPORTER, CSR, RPR, CCR

1    cyanide?

2          A.    365.

3          Q.    And sodium?   How many hits were there for that?

4          A.    351.

5          Q.    Voigt Global, how many for that?

6          A.    44.

7          Q.    Sodium Cyanide?

8          A.    27.

9          Q.    And Sodium Azide?

10         A.    186.

11         Q.    Did you also have occasion to work with a

12   computer by the number that they have given the number S47,

13   I1, D1?

14         A.    Yes.   That's the one we called the Vaillant

15   computer.

16         Q.    What did you do with regard to the Vaillant

17   computer?

18         A.    I did the same examination by date.

19         Q.    Did you do the Encase examination?

20         A.    Yes.

21         Q.    Did you also look for files?

22         A.    Valid files, yes.

23         Q.    With regard to that computer, how many hits

24   were there for Voigt Global?

25         A.    11.

1          Q.    With regard to a computer that was designated

2    as S16, I2, D1 that we're designating as the computer from

3    Apartment 132, did you also conduct an examination of that?

4          A.    Yes.

5          Q.    And with regard to that, did you get any hits

6    for Sodium Azide, Voigt global, for anything of this interest

7    in this case?

8          A.    I did, but they were from a different source.

9          Q.    In other words, from an encyclopedic source,

10   correct?

11         A.    Yes.

12         Q.    That could not be attributed to the user,

13   correct?

14         A.    Yes.

15         Q.    Now, with regard to the computer number S16 I3

16   D1 and 2, did you also have occasion to work with that?

17         A.    Yes.

18         Q.    And we're going to call those they were from

19   Apartment 382.  And were you able to find any hits to Sodium

20   Azide, cyanide, anything on that computer?

21         A.    Yes, but they were in the same realm of the

22   encyclopedia.

23         Q.    In other words, they were not items that were

24   used for sites that were accessed by the user of that

25   particular computer?


TRACI L. WHEELER, OFFICIAL COURT REPORTER, CSR, RPR, CCR

1          A.      Correct.

2          Q.      Is there a way for you to tell when the user is

3    actually accessing these items and when it's maybe an

4    encyclopedia already put on the computer?

5          A.      Just by the path of where I got the hits on the

6    words.

7          Q.      So the answer is yes, there is a way, right?

8          A.      Yes.

9          Q.      And based on your experience, you know that it

10   is you follow the path and it tells you where it comes from,

11   the encyclopedia or the user is the one that's actually

12   accessing those sites, right?

13         A.      Yes.

14         Q.      I'm going to show you what has been marked for

15   identification as Exhibit Number 371.  Did you have occasion

16   to work with that too?

17         A.      Yes.

18         Q.      And do you follow the same procedure?  Do you

19   do the encase and do you then check the files or how does

20   that work or is that the same?

21         A.      It's the same.

22         Q.      And on that particular floppy, were you able to

23   find any references to cyanide?

24         A.      Yes.

25         Q.      How many hits did you get on that?

TRACI L. WHEELER, OFFICIAL COURT REPORTER, CSR, RPR, CCR

1          A.    111.

2          Q.    Just so that I'm clear about what we've just

3    done, with regard to the bookkeeper's computer, there were

4    all these things that we've just gone over, right?

5          A.    Yes.

6          Q.    With regard to the Vaillant computer, there was

7    a hit on Voigt Global, correct?

8          A.    Yes.

9          Q.    11 of them, I think you said.

10          And with regard to the floppy, there was 111

11    hits to cyanide, right?

12          A.    Yes.

13          Q.    The computer from 132, although it had hits, it

14    could not be attributed to the user, right?

15          A.    Correct.

16          Q.    And the computer from Apartment 382, although

17    that had hits, it could not be attributed to the user either,

18    correct?

19          A.    Correct.

20          MR. MARTINEZ:   I don't have any other questions.

21          THE COURT:   Mr. Patterson?

22          MR. PATTERSON:   Thank you, Judge.

23

24    CROSS-EXAMINATION BY MR. PATTERSON:

25          Q.    How you doing, Detective?  We've spoken before,


TRACI L. WHEELER, OFFICIAL COURT REPORTER, CSR, RPR, CCR

000006282

1    haven't we?

2             A.    Yes.

3             Q.    Let me understand your terms.   This gentleman

4    kept talking about hits.   Are you talking about the number of

5    times that word appeared in that computer?

6             A.    Yes.

7             Q.    Okay.   So if -- if a paragraph talking about

8    cyanide used the word cyanide 47 times, it would be 47 hits,

9    right?

10            A.    Correct.

11            Q.    So it's not 47 separate websites you're talking

12   about when you say "hit," right?

13            A.    Correct.

14            Q.    It's just the time that word is discovered

15   inside that computer, correct?

16            A.    Yes.

17            Q.    All right.   So theoretically, all these hits

18   that you've aggregated for us could have been found in one

19   website assuming that website used that word that many times,

20   correct?

21            A.    Correct.

22            Q.    Okay.   Okay.   You have 385?

23            MR. MARTINEZ:   Right here.

24            MR. PATTERSON:   May I approach the witness, Judge?

25            THE COURT:   Yes.

1    BY MR. PATTERSON:

2         Q.    385 is entitled, and you read us the title, if

3    you will, of the various documents that are in that group

4    exhibit, right?  Could you also go over some of the substance

5    of that so we get a feeling for what these documents are

6    about?  Maybe flip to --

7         A.    Want me to just read it?

8         Q.    -- the third one.  I don't want to go through

9    all of them, but let's go to the third one there.  It's

10   entitled at top Sodium azide worth the trouble, question

11   mark.  And then it appears that it's some scientific

12   discussion.  Is that my accurate reading of that particular

13   paragraph?  Why don't you read that aloud for us, Detective.

14        A.    Okay.  The Sodium Azide route in my opinion, is

15   a good alternative when other simpler pathways are blocked.

16   Sodium azide is a pretty expensive safrole basis, that is you

17   have to buy an expensive azide precursor to create an ameno

18   after reduction.  However, if you insist on using this

19   method, I think the best way to go is to substitute the

20   bromide for an azide in bromosafrole by a solid PTC

21   reaction.  Bromosafrole is in benzene or toluene and powder

22   Sodium Azide Na PTC with heating to react.  After isolating

23   the safrole azide, this will be hell, safrole bromide and

24   azide should have pretty much the same boiling point,

25   solubility characteristics PTC.  The azide can be converted

TRACI L. WHEELER, OFFICIAL COURT REPORTER, CSR, RPR, CCR

000006284

1    to amino by action of Ca or Mg.  It's cheaper in cold

2    methynol.

3          Q.    Sounds like a bunch of scientific mumbo jumbo,

4    doesn't it?

5          A.    Yes.

6          Q.    Doesn't sound like a recipe for poison, does

7    it, or anything of that nature?

8          MR. MARTINEZ:  Objection.  Lack of foundation as to

9    what a recipe is.

10         THE COURT:  I'll sustain the objection.

11   BY MR. PATTERSON:

12         Q.    Let's read page 1 of that group of exhibits.

13   Starting where it says posted by Spiceboy.

14         A.    Posted by Spiceboy on March 26 1998 at

15   10:39:43.  In reply to RE Sodium Azide worth the trouble?

16   Posted by Muki on March 26, 1998, at 7:22:31.  Well, the

17   thought was to get bromosafrole by dehydrating 48 percent HBr

18   with dry HCl gas and then swapping the halogen out for the

19   azide.  Are the mixtures going to be that difficult to

20   separate?

21         Q.    Okay.  And lastly it appears there may be

22   another posting by this Spiceboy?

23         A.    Posted by Spiceboy on March 23rd, 1998, at

24   9:24:51.  Would the bromosafrole yields improve if instead of

25   trying to direct pressure RXW slash NH3 you went through the

TRACI L. WHEELER, OFFICIAL COURT REPORTER, CSR, RPR, CCR

1   additional steps of substituting in azide.  Is the CR

2   reduction scheme feasible?

3          Q.    And then lastly this was posted by Kathy on

4   December 8, 1998.  What does she have to say?

5          A.    Posted by Kathy on December 8, 1998, at

6   16:24:07.  Where would I find a picture of a loose electron

7   dot structure of formaldehyde H2CO.

8          Q.    Okay.  This appears to be a kind of a chat room

9   discussion about Sodium Azide from a scientific perspective,

10  doesn't it?

11         A.    Yes.

12         Q.    Now, these were discovered in the temporary

13  internet files --

14         A.    Yes.

15         Q.    -- of this computer?

16               Okay.  If you delete cookies, do you remove

17  temporary internet files?

18         A.    No.

19         Q.    Okay.  How do you get rid of temporary internet

20  files?

21         A.    Well, there's several ways.  You could manually

22  do it or you could set your browser to eliminate them at

23  certain -- at the end of a certain period of time.

24         Q.    Okay.  When I hit the temporary internet file

25  little logo on my computer, it pops up and says, Do you want

TRACI L. WHEELER, OFFICIAL COURT REPORTER, CSR, RPR, CCR

1    to delete these cookies, right?  Is there a connection, a

2    correlation between these two things?

3            A.    I'm not familiar with that.

4            Q.    One of the things in the packet of group

5    Exhibit 384 is a reference to Adriamycin, correct?

6            A.    Yes.

7            Q.    All right.  Did you retrieve from -- what I

8    understand your focus was, you were given a list of things by

9    Detective Lucero that might be of some interest in this

10   computer, correct?

11           A.    Yes.

12           Q.    Okay.  And with that kind of focus, you

13   retrieved selected items from this computer, correct?

14           A.    Yes.

15           Q.    Okay.  You didn't retrieve all of the things

16   that were retrievable from this particular computer, correct?

17           A.    Yes.

18           Q.    All right.  One of the things you did retrieve

19   was this reference to Adriamycin RDF or Adriamycin PFS,

20   correct?

21           A.    Yes.

22           Q.    All right.  Did you endeavor to retrieve from

23   this computer cancer control drugs or --

24           A.    No.

25           Q.    -- chemotherapy drugs?

1          A.    No.

2          Q.    Okay.  That wasn't one of the focal points that

3     Detective Lucero gave you in terms of items to retrieve from

4     this machine?

5          A.    No, it wasn't.

6          Q.    It was not?

7          A.    No, correct.

8          Q.    All right.  In this group Exhibit 372 -- sorry,

9     it's not a group exhibit.  It's a sequential exhibit 372,

10    373 -- okay, specifically Exhibit 379, one of the things you

11    retrieved from this particular computer was what appears to

12    me to be an email transmission.  Is that fair to categorize

13    that in the nature of an email transmission?

14         A.    It's data.  You could interpret it that way I

15    suppose, but --

16         Q.    That would not be inconsistent with an email

17    transmission type of data?

18         A.    Yes.

19         Q.    Okay.  That email transmission says something

20    about something will explode if heated.  What does it say?

21         A.    This chemical will explode when heated, Sodium

22    Azide.

23         Q.    And is it referenced to two occasions in that

24    particular data?

25         A.    "Chemical will explode when heated" is said


TRACI L. WHEELER, OFFICIAL COURT REPORTER, CSR, RPR, CCR

1    twice.

2              Q.    It is said twice?

3              A.    Yes.

4              Q.    It's in bold?

5              A.    Capital letters.

6              Q.    Capital letters, okay.  Based on your

7    experience, if this were an email transmission, would the

8    data that you show on this document be transmitted in the

9    same information to the email recipient?  Meaning, if it's in

10   bold in the thing you want printed out, would it appear in

11   bold on the email transmission?

12             A.    Yes.

13             Q.    Okay.  You had occasion to look at the computer

14   that was seized from Apartment 132, correct?

15             A.    Yes.

16             Q.    All right.  And there apparently was some

17   software on that computer of an encyclopedic nature, correct?

18             A.    Yes.

19             Q.    Like an Encarta, something along those lines?

20             A.    Yes.

21             Q.    As a resource that may have had some

22   information pertaining to Sodium Azide, sodium cyanide, that

23   kind of thing as most general resource documents do, right?

24             A.    Yes.

25             Q.    Okay.  We don't know who accessed the

104

1    information reference Sodium Azide, sodium cyanide by the

2    user of that particular computer, do we?

3         A.    No.

4         Q.    Okay.  Nor do we know when it was accessed?

5         A.    No, I don't.

6         Q.    Okay.  But that computer -- is there something

7    that would tell you whether or not a computer at some point

8    in time was connected to the internet?

9         A.    Yes.

10        Q.    Okay.  Did you find any information with regard

11   to the computer seized from Apartment 132 that led you to

12   believe or would indicate to you that at any time that

13   computer was connected to an internet source?

14        A.    I didn't look for that, so I don't -- the

15   answer would be no.

16        Q.    Okay.  So you can't tell us.  There's a way you

17   could have figured that out, but you just didn't do it?

18        A.    Right.

19        Q.    Okay.  And is there kind of a supplement that's

20   generated at the time the computer is seized which indicates

21   whether or not there are coaxial cables connected to the

22   computer and also connected to a source in the wall?

23        A.    That kind of information should be noted --

24        Q.    Okay.

25        A.    -- during any seizure.


TRACI L. WHEELER, OFFICIAL COURT REPORTER, CSR, RPR, CCR

1          Q.     Okay.  Do you have any supplement, any

2    knowledge that can tell us whether or not that was noted by

3    law enforcement at some point in time either way?

4          A.     Well, I wasn't at the scene so I -- I don't

5    know anything about that.

6          Q.     Okay.  But in the information that was

7    transmitted to you along with this computer, was there any

8    indication that cables were disconnected from it which would

9    lead to the inference that it was connected to an internet

10   source?

11         A.     I -- I don't know.  I don't have the

12   information for that.

13         Q.     Okay.

14         A.     You'd have to ask the person who ceased it.

15         Q.     Okay.  My question to you though is you

16   received no notification from the persons that seized it that

17   seemed to indicate it was connected to an internet source?

18         A.     No, I didn't.  That's not the information I'm

19   looking for.  I'm looking for information strictly inside the

20   computer.

21         Q.     Okay.  That's fair.

22                The same series of questions with regard to the

23   computer that was evaluated coming out of 382, do you have

24   any information whether or not that was at any time connected

25   to an internet source?


TRACI L. WHEELER, OFFICIAL COURT REPORTER, CSR, RPR, CCR

1   A. No.

2   Q. Okay. Okay. Just so we're certain and clear

3 here, in terms of the concept of hits, the same answer would

4 apply to your evaluation of the floppy diskette as well,

5 correct, when you make reference to hits found on that

6 diskette?

7   A. Correct.

8   Q. That means just the number of times that

9 particular word was found within that diskette, correct?

10   A. Yes.

11   MR. PATTERSON:  Okay.  Judge, I believe that's all I

12 have.  Thank you, Detective.

13   THE COURT:  Redirect?

14

15 REDIRECT EXAMINATION BY MR. MARTINEZ:

16   Q. Sir, with regard to the hard drives and the

17 mirror -- or the imaging that we have, they're still

18 available aren't they?

19   A. Yes.

20   Q. So if somebody wanted to access them and see

21 whether or not something like cancer-curing drugs were asked

22 about, they could -- they could still be looked at, right?

23   A. Yes.

24   Q. You were asked about Exhibit 385, which is the

25 one from the valid files of the bookkeeper's computer.  Do

TRACI L. WHEELER, OFFICIAL COURT REPORTER, CSR, RPR, CCR

1   you remember being asked about that?

2          A.   Yes.

3          Q.   Do we have any way of knowing or do we have any

4   idea what the user was looking for when these things popped

5   up?

6          A.   Just by the content of what's in them.

7          Q.   Right.  But -- but you can't tell what they

8   were looking for, can you?

9          A.   No.

10          Q.   These are search documents, aren't they?

11          A.   Yes.

12          Q.   And in terms of the theory of how many hits you

13   could get in a certain paragraph or a certain term, do you

14   remember being asked about that?

15          A.   Yes.

16          Q.   And you remember being asked theoretically

17   whether or not one computer could contain 111 hits.  Do you

18   remember being asked about that?

19          A.   Yes.

20          Q.   That's in theory, but if we go to the computer

21   involving the bookkeeper, is that the practicality of it?

22          A.   No.

23          Q.   And just to be fair with regard to computer

24   132, which is the computer that was from Apartment 132, I

25   think you indicated that all of those hits had to do with

1    something called Encarta.  Didn't you tell us that?

2           A.    Yes.

3           Q.    It did not have to do with the user of that

4    computer that was found in 132, right?

5           A.    Yes.

6           Q.    In your experience, you were able to see that,

7    just so that we're clear, that that is something that came

8    with the computer, if you will, not accessed by the user,

9    correct?

10          A.    Yes.

11          MR. MARTINEZ:  I don't have any other questions.

12          THE COURT:  Are there any further questions of this

13   witness by the jury?  If so, please raise your hand.

14                (Pause in proceedings.)

15          THE COURT:  Let me see Counsel here at the bench.

16

17                (The following proceedings were held at the

18   bench:)

19

20          THE COURT:  Question, "How can you tell it isn't the

21   user who was get the information and not the dictionary?"

22   This is misspelled, but I'm reading it the way it appears.

23          MR. MARTINEZ:  That's the Encarta we just covered.

24   If he can answer, I think it should be answered.  I don't

25   think he provided a reason as to why.  He mentioned something

TRACI L. WHEELER, OFFICIAL COURT REPORTER, CSR, RPR, CCR

1    about pathways.  I don't know if he was clear.

2        MR. PATTERSON:  No objection.

3        THE COURT:  Next question, paren, "If you know, end

4    of paren, how long is the information on the computer after

5    cookies have been used?"

6        MR. MARTINEZ:  I think she's mixing her things, but

7    we could ask that question.

8        MR. PATTERSON:  It's not a coherent question.

9        THE COURT:  I'm not -- I'm not going to ask that.

10        Next question, "Is it possible for items in

11   unallocated space to be written over like a VHS tape or if

12   once used it always stays there?"

13        MR. MARTINEZ:  No objection.

14        MR. PATTERSON:  That's a fair question.

15

16        (The following proceedings were held in open

17   court:)

18

19        THE COURT:  Sir, I have some additional questions

20   here for you.  First question reads as follows:  How can you

21   tell it isn't the user who was getting the information and

22   not the dictionary?

23        THE WITNESS:  The information that points back to the

24   dictionary, like Encarta, points right to the program files

25   of that program, and the other ones come back as web pages.

1          THE COURT:  Next question reads as follows:  Is it

2    possible for items in unallocated space to be written over

3    like a VHS tape, or if once used, it always stays there?

4          THE WITNESS:  That's exactly right.  Information in

5    unallocated space does get written over and can get written

6    over.

7          THE COURT:  Are there any further questions of this

8    witness by the jury?

9               (No response.)

10         THE COURT:  No one has raised their hand.

11              Are there any follow-up questions to those

12   specific questions by the jury from Mr. Martinez?

13

14   FOLLOW-UP QUESTIONS BY MR. MARTINEZ:

15         Q.    The information in unallocated space, although

16   it can be written over, can you still access it like you did

17   in this case, or in you accessing it, it was not written

18   over?

19         A.    Correct.  If I found something in unallocated

20   space, it hasn't yet been written over.

21         Q.    That's what you printed out?

22         A.    Yes.

23         MR. MARTINEZ:  Okay.  No other questions.

24         THE COURT:  Mr. Patterson?

25         MR. PATTERSON:  None.  Thank you, Judge.


          TRACI L. WHEELER, OFFICIAL COURT REPORTER, CSR, RPR, CCR

1        THE COURT:  May this witness be excused?

2        MR. MARTINEZ:  Yes, sir.

3        MR. PATTERSON:  Yes, Your Honor.

4        THE COURT:  Thank you very much.  You're excused.

5          Mr. Martinez, the State may call its next

6  witness.

7        MR. MARTINEZ:  State calls Clinton Jewel.

8          (Pause in proceedings.)

9

10              CLIFTON JEWEL,

11      CALLED TO TESTIFY ON BEHALF OF THE STATE,

12    HAVING FIRST BEEN DULY SWORN, TESTIFIES AS FOLLOWS:

13

14        THE COURT:  Please have a seat on the witness stand.

15  Please make yourself comfortable there on the witness stand.

16  Please pull the microphone close to you.  Please remember to

17  speak loudly and clearly into the microphone so everyone can

18  hear you.  Also please wait until the question is completed

19  before you answer the question, and please make sure that you

20  give a verbal response.  Is that all agreeable to you, sir?

21        THE WITNESS:  Yes, sir.

22        THE COURT:  Mr. Martinez, you may proceed.

23

24  DIRECT EXAMINATION BY MR. MARTINEZ:

25        Q.    Your name, sir?

1          A.    I'm Detective Clifton Jewel.

2          Q.    Who do you work for?

3          A.    The Phoenix Police Department.

4          Q.    What unit are you in?

5          A.    I'm assigned to the homicide unit.

6          Q.    How long have you been in that unit?

7          A.    Five years.

8          Q.    Drawing your attention back to October 10th of

9     the year 2000, did you have occasion to assist in the

10    investigation of a murder that occurred at the San Riva

11    apartment complex?

12              MR. PATTERSON:   Object to the terminology.

13              THE COURT:   Sustained.   Rephrase the question.

14    BY MR. MARTINEZ:

15         Q.    Did you have occasion to assist in the killing

16    that happened at the San Riva apartment on October 10, year

17    2000?

18         A.    Yes.

19         Q.    And specifically with regard to the

20    investigation into that killing, what did you do?

21         A.    On the 10th of October, I was contacted at home

22    by my supervisor and requested to respond to the office in

23    preparation for serving two search warrants at two storage

24    lockers located at that location.

25         Q.    And what storage lockers did you serve the

TRACI L. WHEELER, OFFICIAL COURT REPORTER, CSR, RPR, CCR

1    warrants on?

2              A.    There were two.  One was -- the number was 323

3    and the other was 315.

4              Q.    With regard to the service of the warrant on

5    315, I'm now going to show you Exhibits 178, 179, 180, 181,

6    182, and 183.  Take a look at them.

7                    (Pause in proceedings.)

8    BY MR. MARTINEZ:

9              Q.    Are those photographs true and accurate

10   depictions of Number 315 as it existed back on October 10 of

11   2000?

12             A.    Yes.

13             Q.    If I may have them back.

14             MR. MARTINEZ:  Judge, I move for admission of

15   Exhibits 178, 179, 180, 181, 182, and 183.

16                   (Pause in proceedings.)

17             MR. PATTERSON:  No objection, Judge.

18             THE COURT:  Exhibit Numbers 178, 179, 180, 181, 182,

19   and 183 for identification are admitted into evidence.

20   BY MR. MARTINEZ:

21             Q.    Sir, I'm going to show you some photographs via

22   the use of this ELMO, and I would prefer it if you step down

23   so we could have you describe what we're looking at.

24             THE COURT:  Just remember to speak up when you're

25   away from the microphone.


TRACI L. WHEELER, OFFICIAL COURT REPORTER, CSR, RPR, CCR

114

1                THE WITNESS:  Yes, sir.

2    BY MR. MARTINEZ:

3         Q.     178, what does that show us?

4         A.     That's a photograph that I directed the

5    evidence technician to take of the -- of the storage locker

6    Number 315, showing the raised door and the interior.

7         Q.     And what is that in the front there?

8         A.     It's a baby crib.

9         Q.     Was the crib found inside or was it outside of

10   the door when the door was open?

11        A.     I believe it was inside and kind of in the way.

12        Q.     Exhibit 179?

13        A.     That's the same storage locker.  It's a

14   photograph moving in a few feet into the storage locker.

15        Q.     And these are -- what color are they, sir?

16        A.     They're kind of a turquoise.

17        Q.     And 180, first of all are these those turquoise

18   items that we were looking at?

19        A.     Yes.  Those were plastic storage bins.

20        Q.     What does that show of interest to us?

21        A.     In this particular photograph it shows a number

22   of boxes that are stacked along the -- if you're standing

23   looking into the storage locker, would be on the left side of

24   the storage locker.  And specifically this box located here

25   that's open.


TRACI L. WHEELER, OFFICIAL COURT REPORTER, CSR, RPR, CCR

1       Q.    Exhibit 181, what is that?

2       A.    That is a cardboard -- double cardboard

3 shipping container that was found on the left side of the

4 storage locker about the mid -- midway point.

5       Q.    What's this on top of it right there?

6       A.    That's, I believe, a portion of a latex glove

7 that's visible.

8       Q.    If we go back to 180 -- I want to make sure we

9 don't miss anything -- what is this item that's up here?

10      A.    That was a foil -- it's actually a vacuum

11 packed bag that that box was shipped in.

12      Q.    Was this the top or was this how it was found,

13 I guess I'm asking, Item 180?

14      A.    Yes.  That was as it was found.

15      Q.    And look to the top of 181.  Just want to make

16 sure, is that the same plastic bag there at the top?

17      A.    Yes, it is.

18      Q.    182 is what?

19      A.    182 is just a close-up view looking down into

20 that particular box.

21      Q.    And if we get closer, maybe you can't see it

22 here, can you read the number if it does come into focus or

23 not?

24      A.    The number --

25      Q.    The lot number on that?

1          A.     The lot number is E --

2          Q.     Oops, sorry.

3          A.     "E" as in "Edward," 19 "K" as in "kick," and

4     either a "Q" or "O" 1.

5          Q.     Okay.  Let's take a look at Exhibit 183?

6     Does that allow you to see the lot number a little bit

7     clearer?

8          A.     Yes.  "E" as in "Edward," 19 "K" as in "king,"

9     01.

10          Q.     Can you read the writing on the top of this

11     right here?

12          A.     Yes.

13          A.     It says Sodium Azide 99 percent MIN assay in

14     parenthesis 500 grams.

15          Q.     Then it also has numbers here down to the left,

16     doesn't it?

17          A.     Yes.

18          Q.     Once you found this box, what did you do with

19     it?  Go ahead and have a seat.

20          A.     Not knowing the hazard that exists with that

21     particular chemical, I placed it in a red biohazard bag.

22          Q.     And then what did you do with it?

23          A.     I sealed the top of the bag as best I could and

24     I seatbelted it to the front seat of my detective car.

25          Q.     What did you do with it after that?

1       A.      It was transported down to the property room
2   and placed in a temporary evidence locker.
3       Q.      Did you do that or somebody else did that?
4       A.      I placed it in the locker.
5       Q.      I'm going to show you what has been marked for
6   identification as Exhibit Number 265.  Please take a look at
7   it.  First of all, what is that red bag?
8       A.      It's a biohazard bag.
9       Q.      Is this the bag you used to pack the items that
10  you found in storage locker 315?
11      A.      It appears to be.
12      Q.      Did you open it or did you put any marks on it
13  to indicate whether or not it was the same bag?
14      A.      No, I did not.
15      Q.      How about the item on the backside?  It appears
16  to be of a shiny consistency or veneer.  Does that look
17  familiar to you?
18      A.      Yes.  It's the outer aluminum packaging that
19  was depicted in the photograph.
20      Q.      And the photograph that we're talking about,
21  180, does that appear to be this packaging material that's
22  right here?
23      A.      Yes, it does.
24      Q.      Did you put the packaging material inside the
25  box, inside of the box of the red bag?

118

1          A.     They were all -- the box and the aluminum foil

2     was placed inside the evidence -- or the biohazard bag.

3          MR. MARTINEZ:  I don't have any other questions.

4          THE COURT:  Mr. Patterson?

5          MR. PATTERSON:  Thank you, Judge.

6               May I use your ELMO?

7          MR. MARTINEZ:  Yes.

8

9     CROSS-EXAMINATION BY MR. PATTERSON:

10         Q.     This crib that's out in front, where was it

11    previously if you recall?

12         A.     I don't recall.  I believe it was in that space

13    between the overstuffed chair.

14         Q.     Okay.  So we just slide this into this area,

15    that's where it was?

16         A.     I believe so.

17         Q.     Okay.  And it was blocking your ingress, I

18    guess is the term of arte, into this storage unit.  That's

19    why you slid it out and walked in?

20         A.     Yes.

21         Q.     Okay.  And were you looking for anything in

22    particular in these storage units?

23         A.     Yes, I was.

24         Q.     Was one of the things you were looking for

25    Sodium Azide?

TRACI L. WHEELER, OFFICIAL COURT REPORTER, CSR, RPR, CCR

000006304

1          A.     Yes, it was.

2          Q.     Okay.  And so you walked into this area -- this

3    is open space here, right? -- and it connects with that open

4    space where the crib was up front here, right?

5          A.     No.  Actually, that's a second open space.

6    It's actually more of a "U."  There were lots of books on the

7    sides, back, and the other side, some stuff in the center, so

8    where the crib was at was actually on the right side.  The

9    box containing the Sodium Azide was on the left.

10.         Q.     I understand that.  But is this open space here

11   open space that continues to the front of the unit?

12         A.     Yes, it does.

13         Q.     Okay.  And at some point within the open space

14   near the door of the unit was the crib, right?

15         A.     Yes.

16         Q.     Okay.  Move the crib out of the way, right?

17         A.     Yes.

18         Q.     Now, you're walking into the unit directly down

19   this open space, correct?

20         A.     That's not how it -- I searched that unit.

21         Q.     Okay.  Maybe you didn't do it that way, but is

22   that possible?

23         A.     Yes, that's possible.

24         Q.     Okay.  You going into the unit right down the

25   open space and you look to your left, right next to a little

1    dinette set, what do you see?

2         A.    The open box.

3         Q.    Okay.  And that open box was not covered with

4    anything when you first observed it, correct?

5         A.    No, it was not.

6         Q.    Okay.  It was in this condition when you first

7    laid eyes on it, right?

8         A.    Yes.

9         Q.    It wasn't sealed up?

10        A.    No.

11        Q.    Nor was it covered by anything?

12        A.    No.

13        Q.    And the packing stuff, this stuff that you

14   talked about earlier, Number 265, was laying to the north of

15   it and in no way obscuring it, correct?

16        A.    Correct.

17        Q.    Okay.  So the chemical itself is easily visible

18   through the top opening in the box, correct?

19        A.    Yes.

20        MR. PATTERSON:  Thank you, Judge.  That's all I have.

21        THE COURT:  Mr. Martinez?

22

23   REDIRECT EXAMINATION BY MR. MARTINEZ:

24        Q.    You were asked whether or not the box was

25   covered or uncovered.  Do you remember that question?


TRACI L. WHEELER, OFFICIAL COURT REPORTER, CSR, RPR, CCR

1     A.     Yes.

2          Q.     And you were asked whether or not it was easily

3     visible.  Do you remember that?

4          A.     Yes.

5          Q.     Was -- that storage shed, was the door open or

6     closed when you got there?

7          A.     It was closed.

8          Q.     Was that door locked or unlocked when you got

9     there?

10         A.     It was locked.

11         Q.     So in the condition that you found that storage

12    locker, with the door closed and locked, was this box easily

13    visible to the outside?

14         A.     No. ·

15         Q.     How about the chemical you were asked, well,

16    about it being on the top.  Do you remember being asked that?

17         A.     Yes.

18         Q.     Again, in the condition that you found the

19    storage shed, in a closed and locked position, was that

20    visible from the outside?

21         A.     No, it was not.

22         MR. MARTINEZ:  I don't have any other questions.

23         THE COURT:  Are there any further questions of this

24    witness by the jury?

25              (Pause in proceedings.)


TRACI L. WHEELER, OFFICIAL COURT REPORTER, CSR, RPR, CCR

000006307

```
 1              THE COURT:  Let me see Counsel here at the bench?

 2

 3              (The following proceedings were held at the

 4     bench:)

 5

 6              THE COURT:  Question, "Had someone told you that box,

 7     paren, shipping box, end of paren, for Sodium Azide was there

 8     before going to storage 315?"

 9                   Mr. Martinez?

10              MR. MARTINEZ:  The answer is yes, but I don't know

11     if --

12              MR. PATTERSON:  Calls for hearsay.

13              MR. MARTINEZ:  Calls for hearsay.

14              THE COURT:  Okay.  I won't ask it.

15

16              (The following proceedings were held in open

17     court:)

18

19              THE COURT:  Any further questions of this witness by

20     the jury?

21                   (No response.)

22              THE COURT:  No one has raised their hand.

23                   May this witness be excused?

24              MR. MARTINEZ:  Yes, sir.

25              MR. PATTERSON:  Yes, Your Honor.
```

TRACI L. WHEELER, OFFICIAL COURT REPORTER, CSR, RPR, CCR

123

```
 1            THE COURT:  Thank you very much.  You're excused.
 2            THE WITNESS:  Thank you.
 3            THE COURT:  Mr. Martinez?
 4            MR. MARTINEZ:  State calls John Knell.
 5                 (Pause in proceedings.)
 6            THE COURT:  Sir, if you could please step forward
 7      right up here.  Give the clerk your name and she'll swear you
 8      in.
 9
10                      JOHN KNELL,
11            CALLED TO TESTIFY ON BEHALF OF THE STATE,
12      HAVING FIRST BEEN DULY SWORN, TESTIFIES AS FOLLOWS:
13
14            THE COURT:  Please have a seat on the witness
15      stand.  Please make yourself comfortable there on the witness
16      stand.  Please pull the microphone close to you.  Please
17      remember to speak loudly and clearly into the microphone so
18      everyone can hear you.  Also, please wait until the question
19      is completed before you answer the question, and please make
20      sure you give a verbal response.  Is that all agreeable to
21      you?
22            THE WITNESS:  Yes, Your Honor.
23            THE COURT:  Mr. Martinez, you may proceed.
24      / / / / /
25      / / / / /
```

TRACI L. WHEELER, OFFICIAL COURT REPORTER, CSR, RPR, CCR

1    DIRECT EXAMINATION BY MR. MARTINEZ:

2         Q.    May I have your name?

3         A.    I'm John Knell.

4         Q.    Who do you work for?

5         A.    Criminalist with the Phoenix Police Department

6    in the crime lab.

7         Q.    What do you do for them there?

8         A.    Assigned to trace evidence section.

9         Q.    And in that section, what is it that you look

10   for or do?

11        A.    The laboratory is broken down into various

12   sections and one is trace.  In that section, I analyze

13   microscopic items of evidence, things you can't see with your

14   naked eye.  You need special instrumentation.  We call that

15   trace evidence as a general term for that type of material.

16        Q.    And do you have any schooling?  In other words,

17   do you have a college degree?

18        A.    I have a bachelor of science degree in

19   chemistry.  I have a Masters degree in chemistry as well.

20   That was 1999 from Arizona State University.

21        Q.    How long have you been working for the city of

22   Phoenix?

23        A.    About 19 and a half years.

24        Q.    Drawing your attention to a substance that

25   later -- or had the indications of Sodium Azide, did you have

TRACI L. WHEELER, OFFICIAL COURT REPORTER, CSR, RPR, CCR

1   occasion to work with the packaging and the substance itself?

2        A.    Yes, I did.

3        Q.    What date?

4        A.    That was done on November 8 and November 7 of

5   the year 2000.

6        Q.    Where did you receive these items so that you

7   could work on them?  Where were they before you retrieved

8   them?

9        A.    The items were recovered from a property

10  management custodian.  Her actual name was Sandy Emery, so

11  they were in police property impound and I received them from

12  the property custodian.

13        Q.    When they're in police property impound, is

14  that a secure facility not accessible to anyone other than

15  authorized police personnel?

16        A.    Yes, it is.

17        Q.    Going to show you Exhibits 184 through 195.

18  Please take a look at this and see if you recognize these

19  things.

20              (Pause in proceedings.)

21        THE WITNESS:  Yes, I do.

22  BY MR. MARTINEZ:

23        Q.    Do these photographs depict the items that --

24  that involved this Sodium Azide?

25        A.    Yes, they do.


TRACI L. WHEELER, OFFICIAL COURT REPORTER, CSR, RPR, CCR

1        Q.    And specifically with regard to that Sodium

2    Azide, what is it that you were asked or what was your

3    assignment?

4        A.    The Sodium Azide, there was a white powder --

5    I didn't know it was Sodium Azide at the time -- but the

6    white powder came in and some packaging and some Tupperware

7    containers inside a bag.  I was asked to separate the powder

8    from the other items, repackage it and weigh it, and that's

9    what I did.

10       Q.    And once you repackaged it, what did you do

11    with it?

12       A.    Once it was repackaged and separated, a new

13    invoice was created and then some items were released back to

14    property, property custody, I don't know, for storage.  Other

15    items were retained in the laboratory for further analysis.

16       Q.    And were any items sent out anywhere?

17       A.    One particular item was released to an outside

18    analytical laboratory, and that was sent out a week or so

19    later.

20       Q.    This item that you say that was packaged up and

21    sent out later, was it just one item or was it one package

22    that included multiple items?

23       A.    That was just one item.  It was Item 7.1 is the

24    item number we have in the laboratory.

25       Q.    What was Item Number 7.1?

TRACI L. WHEELER, OFFICIAL COURT REPORTER, CSR, RPR, CCR

1          A.     Item 7.1 was -- actually, I'll give you the

2     entire invoice.  It's a unique number.  Item is invoice

3     2787725, and it's Item 7.1 from that invoice.  No other item

4     or invoice has that number.  And that was a sample of

5     material from a Tupperware container that I found inside of a

6     cardboard box.

7          Q.     And was this -- where was this sent to, do you

8     know?

9          A.     It was sent to a laboratory called West Coast

10    Analytical.

11         Q.     Is that in California?

12         A.     Yes, it is.

13         Q.     Who was it sent by?

14         A.     Another criminalist in the laboratory.  His

15    name was Mahesh Patel actually, arranged for the transfer

16    sent by Fed-ex to West Coast Analytical.

17         Q.     He arranged for transfer, but he didn't package

18    it or do anything like that.  He just arranged --

19         A.     No, I did the separation and packaging.  Once

20    it was packaged in a manner that could be sent, he did the

21    arrangements to have it sent out.

22         MR. MARTINEZ:  I move for admission of Exhibits 184,

23    185, 186, 187, 188, 189, 190, 191, 192, 193, 194 and 195.

24                        (Pause in proceedings.)

25         MR. PATTERSON:  No objection, Judge.


TRACI L. WHEELER, OFFICIAL COURT REPORTER, CSR, RPR, CCR

000006313

1          THE COURT:  Exhibit Numbers 184 through 195 for

2     identification are admitted into evidence.

3                    (Pause in proceedings.)

4     BY MR. MARTINEZ:

5          Q.    Sir, let's go ahead and take a look at these

6     photographs.  Starting with Exhibit 184, what does that show

7     us?

8          A.    That's a heavy duty red bag.  It's a biohazard

9     bag.  It wasn't used to contain any biohazard other than

10    Sodium Azide or potential Sodium Azide.  That was tagged in a

11    red bag that I received and containing the other items that I

12    looked at.

13         Q.    I'm going to show you Exhibit Number 265.

14    Please take a look at it.

15         A.    I have some notes I'm looking at to refresh my

16    memory that I had of this particular item number.

17         MR. PATTERSON:  Judge, can we just ascertain whose

18    notes he's looking at so I could follow along?

19         THE COURT:  Yes.  What are you referring to?

20         THE WITNESS:  I have some case notes and these are

21    case notes that I originated during my analysis.

22         MR. PATTERSON:  Your Honor, may I show him --

23         THE COURT:  Yes.

24         MR. PATTERSON:  Is that these you're talking about?

25         THE WITNESS:  Yes, they are.

1            MR. PATTERSON:  What page are you referring to?

2            THE WITNESS:  I was looking through and it's on

3     page -- my hand numbered page 5.

4            MR. PATTERSON:  Thank you.

5            THE WITNESS:  Top line says I have a tape sealed

6     marked red biohazard bag.  This particular bag has my

7     initials.  Yes, I've seen the item before.

8     BY MR. MARTINEZ:

9            Q.    How about the item in the back?  Have you also

10    seen that?

11           A.    Yeah.  The silver material is Item Number 14

12    and it's on Page 8 of -- my handwritten page 8 of my notes.

13    I didn't do the particular analysis of this, but I did

14    receive it and then I transferred it to inside the lab for

15    further analysis.

16           MR. MARTINEZ:  Move for admission of Exhibit Number

17    265.

18           MR. PATTERSON:  No objection.

19           THE COURT:  Exhibit 265 for identification is

20    admitted into evidence.

21    BY MR. MARTINEZ:

22           Q.    Let's take a look at the photograph and see

23    what we have here.  We have the red bag that we've talked

24    about, and then what is this right here?

25           A.    That's a cardboard box contained inside of the

TRACI L. WHEELER, OFFICIAL COURT REPORTER, CSR, RPR, CCR

1    red bag.

2           Q.    And was it just one box or two boxes that came

3    in there?

4           A.    I have it described as a double-lined box.   It

5    was a single box with a double liner is the way I described

6    it.

7           Q.    Does it have the puffy stuff we normally

8    associate with these kinds of things or not?

9           A.    It had some foam peanuts that came with the

10   box.

11          Q.    I'm going to show you Exhibit 264.   Please take

12   a look at it.   It's been repackaged, but take a look at it to

13   see if that is the box that is depicted there.

14          A.    Again, on page 5, handwritten notes, item

15   number invoice matches what I analyzed in my notes.

16          Q.    Okay.   Was this box sent over to the California

17   laboratory or was it kept at the Phoenix Police Department?

18          A.    That particular box was kept inside the

19   laboratory.

20          MR. MARTINEZ:   Move for admission of Exhibit 264.

21          MR. PATTERSON:   No objection.

22          THE COURT:   Exhibit 264 is admitted into evidence.

23   BY MR. MARTINEZ:

24          Q.    What is this right here in the front?

25          A.    Those are Q-tips.   I believe there were nine of

TRACI L. WHEELER, OFFICIAL COURT REPORTER, CSR, RPR, CCR

1    those.

2          Q.    Did you --

3          A.    Let me double check.

4          Q.    Go ahead.

5          A.    I have nine cotton swabs.

6          Q.    Did you put those there or did that come from

7    somewhere?

8          A.    They were included inside the box.

9          Q.    And I'm showing you Exhibit 186.  What is that?

10         A.    That's a large blowup of those particular

11   items.

12         Q.    If we take a look again at 184, what is this to

13   the left of it?

14         A.    That's an additional silver mylar-type film or

15   packaging.

16         Q.    And if we look at 185, what does that show us?

17         A.    I believe that's the enlarged version of that

18   same item.

19         Q.    I'm going to show you Exhibit Number 276.

20   Please take a look at it.

21         A.    Page 8 of my notes, I had this item in my

22   possession.  I didn't do any analysis other than package it

23   or transfer it to another person in the laboratory for

24   further analysis, but I do recognize that.

25         Q.    And that's the item we have pictured there,

1    right?

2         A.    Yes.

3         MR. MARTINEZ:  Move for admission of Exhibit 276.

4         MR. PATTERSON:  No objection.

5         THE COURT:  Exhibit 276 for identification is

6    admitted into evidence.

7    BY MR. MARTINEZ:

8         Q.    Let's take a look, again, at 184.  What is this

9    substance that's right here in front?

10        A.    I believe that is some -- can I get off my

11   chair to look a little closer?

12        Q.    Sure.

13        THE COURT:  Just remember to speak up when you're

14   away from the microphone.

15        THE WITNESS:  Okay.

16             (Pause in proceedings.)

17   BY MR. MARTINEZ:

18        Q.    Maybe I could give you a close-up of it?

19        A.    Yeah, would you please?

20        Q.    187.

21        A.    I have as item number two of invoice 2787725

22   some bubble wrap that was included.  Is that it?

23        Q.    Let me show you Exhibit Number 277, see if

24   that's what that is?

25        A.    This item number 2, it's bubble wrap that was

TRACI L. WHEELER, OFFICIAL COURT REPORTER, CSR, RPR, CCR

1   included in the box.  Again, I didn't analyze it other than

2   preserve it and keep it for further analysis in the

3   laboratory.

4           MR. MARTINEZ:  Move for admission of Exhibit 277.

5           MR. PATTERSON:  No objection, Judge.

6           THE COURT:  Exhibit 277 for identification is

7   admitted into evidence.

8   BY MR. MARTINEZ:

9       Q.   Take a look over here to the right.  What is

10  that right there?  And if I show you a close-up of 188, does

11  that tell you what it is?

12      A.   One of the items that I analyzed is a white

13  paper towel.  That appears to be the white paper towel.

14      Q.   Let me show you Exhibit Number 273.  Please

15  take a look at it and see if that's what that is.

16      A.   This is Item Number 4, which I have in my

17  notes as having in my possession.  I did not analyze it, but

18  it was in my possession.  I retained it for further analysis

19  in the laboratory.

20          MR. MARTINEZ:  Move for admission of Exhibit 273.

21              (Pause in proceedings.)

22          MR. PATTERSON:  I'm sorry, Judge.  I was in

23  conference.

24          THE COURT:  Yes.  Mr. Martinez has moved into -- has

25  asked that Exhibit 273 for identification be admitted into

1    evidence.

2            MR. PATTERSON:  I apologize, Judge.  I have no

3    objection.

4            THE COURT:  Exhibit 273 for identification is

5    admitted into evidence.

6    BY MR. MARTINEZ:

7            Q.    Take a look at the -- take a look at this

8    bottle that says Sodium Azide on it.  Is it laying on

9    something?  Does it appear to be on something?

10           A.    The particular -- it's a reagent bottle, is the

11   proper term for it, and it was found inside of the cardboard

12   box in a round Tupperware container.

13           Q.    And Exhibit 189?

14           A.    Also loose white powder in the Tupperware

15   container which is visible in the photograph.

16           Q.    I'm going to show you Exhibit Number 272.

17           A.    Again, the item numbers correspond to items I

18   looked at in my report.

19           MR. MARTINEZ:  Move for admission of Exhibit -- is it

20   272?

21           THE WITNESS:  Yes, sir.

22           MR. PATTERSON:  No objection.

23           THE COURT:  Exhibit 272 for identification is

24   admitted into evidence.

25   / / / / /

1      BY MR. MARTINEZ:

2              Q.    Let's take a look at some of the other items

3      that you may have found there, starting with 194.   Do you

4      recognize what that is?

5              A.    I believe so.  Let me look at my -- I analyzed

6      a square Tupperware container without a lid.   It was Item 13

7      off invoice 2780436.   That appears to be that item.

8              Q.    And if I show you Exhibit Number 271, is that

9      that Tupperware container?

10             A.    Yes, it is.

11             MR. MARTINEZ:  Move for admission of Exhibit 271.

12             MR. PATTERSON:  No objection, Judge.

13             THE COURT:  Exhibit 271 for identification is

14     admitted into evidence.

15     BY MR. MARTINEZ:

16             Q.    Did you also find some -- a fork, for example,

17     in that?

18             A.    There was.

19             Q.    And I'm showing you Exhibit 190?

20             A.    Yes, I did.

21             Q.    Did you find a spoon in there?

22                   (Pause in proceedings.)

23     BY MR. MARTINEZ:

24             Q.    You may not have.  I'm just asking.

25             A.    I'm double checking to make sure.

1          (Pause in proceedings.)

2          THE WITNESS:  I don't have a record of seeing a

3     fork -- I mean, a spoon.

4     BY MR. MARTINEZ:

5          Q.   And you actually cataloged everything that you

6     found there?  You didn't leave anything out, did you?

7          A.   No, I did not.

8          Q.   And I'm showing you Exhibit Number 269.  Take a

9     look at that?

10         A.   I recognize it, yes.

11         Q.   And this is the fork that you dealt with on

12    that day?

13         A.   Yes.

14         MR. MARTINEZ:  Move for admission of Exhibit 269.

15         MR. PATTERSON:  No objection.

16         THE COURT:  Exhibit 269 for identification is

17    admitted into evidence.

18    BY MR. MARTINEZ:

19         Q.   Did you also find a knife there?

20         A.   Yes, I did.

21         Q.   Showing you Exhibit 191, is that a picture of

22    that knife?

23         A.   That's a picture of a knife that appears to be

24    the knife that I examined.

25         Q.   And take a look at Exhibit 270.  Is that the

TRACI L. WHEELER, OFFICIAL COURT REPORTER, CSR, RPR, CCR

1    knife that you found that day?

2             A.    Yes, it is.

3             MR. MARTINEZ:  Okay.  I move for admission of Exhibit

4    270.

5             MR. PATTERSON:  No objection.

6             THE COURT:  Exhibit 270 for identification is

7    admitted into evidence.

8    BY MR. MARTINEZ:

9             Q.    Did you also find some latex gloves?

10            (Pause in proceedings.)

11            THE WITNESS:  Yes, I did.  Sorry.  Took me a while to

12   find my information.

13   BY MR. MARTINEZ:

14            Q.    Would that be items 9 and 10?

15            A.    Yes.

16            Q.    Going to show you Exhibit 192, a pair of latex

17   gloves, right?

18            A.    Appears to be, right.

19            Q.    And 193?

20            A.    Also appears to be a pair.

21            Q.    Take a look at Exhibit 275 and 274.  Take a

22   look at these.

23            A.    Item invoice numbers match my report.

24            MR. MARTINEZ:  Move for admission of Exhibits numbers

25   274 and 275.

1           MR. PATTERSON:  No objection.

2           THE COURT:  Exhibit Number 274 and Exhibit Number 275

3    for identification are admitted into evidence.

4    BY MR. MARTINEZ:

5           Q.   Going to show you another exhibit, it's Exhibit

6    Number 278.  Please take a look at it.  First, do you

7    recognize what that is?

8           A.   Yes.  This is Phoenix Police Inventory

9    2787725-3.  It's a clear plastic bag that I had in my

10   possession.  I remember it.

11          Q.   Did it come from that cardboard box we've been

12   talking about?

13          A.   Yes.

14          MR. MARTINEZ:  I move for admission of Exhibit 278.

15          MR. PATTERSON:  No objection, Judge.

16          THE COURT:  Exhibit 278 for identification is

17   admitted into evidence.

18   BY MR. MARTINEZ:

19          Q.   I now want to show you a picture to see if you

20   recognize what's there, Exhibit 195.  If you need to step

21   down, tell us.

22          A.   I can recognize it.  JEK are my initials.  When

23   I -- I indicated there was powder that was either on the

24   Tupperware or loose in the box.  These are the containers I

25   repackaged the powder in and I marked it with a date,


             TRACI L. WHEELER, OFFICIAL COURT REPORTER, CSR, RPR, CCR

                              000006324

1    November 7, and my initials JEK, and a short description.

2           Q.    What's the item here on the top?  Where did

3    that come from?

4           A.    There's a portion of these samples that a

5    smaller portion was removed for further analysis, sent to

6    West Coast Analytical.  The small vial on top would have been

7    a sample sent to West Coast Analytical.

8           Q.    What was it removed from --

9           A.    It's smaller portion of that powder in the

10   container.  This was found around the reagent and the round

11   Tupperware container it was sitting in.

12          Q.    Here on the top, what is this?

13          A.    That's also a -- that's another small vial

14   containing a portion of the powder that was in the container

15   below it.  That particular item was not sent out for further

16   analysis.

17          Q.    How about the one here on the right?

18          A.    Sorry.

19          Q.    If you want, I could show you the photograph

20   because it actually shows what -- it's a little bit better.

21          A.    Okay.  There was some bubble wrap packaging

22   inside the box that had white powder on it.  That's the

23   powder I scraped and removed from the bubble wrap and

24   repackaged it into a plastic vial.

25          Q.    This right here, where did you remove that

TRACI L. WHEELER, OFFICIAL COURT REPORTER, CSR, RPR, CCR

000006325

1    from?

2           A.    That -- okay.  That -- let me take a look at it

3    a little closer to make sure.

4           Q.    If you need the photograph, let me know.

5           A.    I can read Item Number 8 on the vial on top of

6    it.  That corresponds to my notes.  Item Number 8 was a

7    powder that was found in the plastic Tupperware container

8    underneath the reagent bottle.  Item 7, the larger container

9    to the left of it, was powder that was inside the reagent

10   bottle.

11          Q.    And the one on top I think is the one that you

12   told us was sent over to West Coast Analytical?

13          A.    Yeah.  That would have been 7.1, and that was

14   sent out for further analysis.

15          Q.    Where is the amber-colored jar?  What did you

16   do with that?

17          A.    Once that was emptied of its contents, the jar

18   itself -- sorry, it was Item Number 10 at that point in time

19   and that was retained in the laboratory for further analysis.

20          Q.    What is the invoice number or the --

21          A.    The brown glass bottle in the description is --

22   that's Invoice 2787725 Item Number 10.

23          Q.    I want you to take a look at Exhibit Number

24   268.  Go ahead.  What is that?

25          A.    It's a metal can we have in the laboratory for

TRACI L. WHEELER, OFFICIAL COURT REPORTER, CSR, RPR, CCR

000006326

1   sealing up particular items.  The invoice and item number --

2   I don't believe I've ever looked at this particular item.  So

3   this is something that could have come from somebody else

4   like West Coast Analytical when they returned it or

5   something.

6                    The portion of the invoice description at the

7   bottom, it says Removed from Invoice 2787725 item and I can't

8   tell -- it doesn't continue.  This may have been removed from

9   the item I examined after I looked at it, but I do not know

10  that.

11          Q.    But the invoice number that we're talking about

12  is 2787725, correct?

13          A.    Yes.  And the description for that particular

14  item, bottom of the barcode, says this was removed from that

15  invoice, but I don't have knowledge of that happening.

16          Q.    Okay.

17                (Attorney-attorney discussion.)

18  BY MR. MARTINEZ:

19          Q.    You took a look at the amber container, didn't

20  you?

21          A.    Yes, I did.

22          Q.    And on the outside, it's -- how much was its

23  weight?

24          A.    The packaging of the amber reagent bottle said

25  that it contained 500 grams.


TRACI L. WHEELER, OFFICIAL COURT REPORTER, CSR, RPR, CCR

000006327

1        Q.    Did you weigh all of the amount of white

2    substance you see in 195 to determine how much was left over?

3        A.    Yes, I did.

4        Q.    How much was left over?

5        A.    The total weight of all the white powder I

6    could recover was 479.2, grams.

7        Q.    Which means there was some not there?

8        A.    Correct.

9        Q.    And how much was not there?

10       A.    20.8 grams.

11       Q.    So could you give us a feel of how much is not

12   there?  Could you give us, let's say, the equivalent of that

13   amount, let's say, in Sweet and Low packets?  How many Sweet

14   and Low packets would it take to make 20.8 grams?

15       A.    Individual Sweet and Low packet contains 1

16   gram, so there would be 20.8, almost 21 packets of Sweet and

17   Low.

18       MR. MARTINEZ:  I don't have any other questions.

19       THE COURT:  Mr. Patterson?

20       MR. PATTERSON:  Thank you, Judge.  May I have a

21   moment, Judge?

22       THE COURT:  Yes.

23

24   CROSS-EXAMINATION BY MR. PATTERSON:

25       Q.    We've spoken before, Mr. Knell, haven't we?


TRACI L. WHEELER, OFFICIAL COURT REPORTER, CSR, RPR, CCR

1       A.      Yes, sir.

2       Q.      Just so I understand all the things we went

3   through here, you found two pairs of latex rubber gloves in

4   this box, right?

5       A.      Correct.

6       Q.      Okay.  You found two Tupperware bowls, one

7   square and one round?

8       A.      Yes.

9       Q.      Okay.  The round one serves as kind of the

10  repository, if you will, of the amber reagent bottle that

11  contained most of the Sodium Azide, correct?

12      A.      Yes.

13      Q.      There was no round top found in the box,

14  cardboard box that would have -- could have been affixed on

15  top of that round Tupperware container, was there?

16      A.      No.

17      Q.      Okay.  The Tupperware container, it had a top

18  to it, didn't it?

19      A.      I removed the lid on the square Tupperware

20  container.

21      Q.      Okay.  That's my mistake.  There was no lid for

22  the square one either?

23      A.      That's correct.

24      Q.      Okay.  There were 9 Q-tips discovered, correct?

25      A.      Correct.


TRACI L. WHEELER, OFFICIAL COURT REPORTER, CSR, RPR, CCR

1    Q.    Did you send those Q-tips to West Coast

2  Analytical for evaluation?

3    A.    I do not believe those were sent.

4    Q.    Do you know whether or not those have been

5  evaluated?

6    A.    I don't have that information.

7    Q.    Okay.  So the two things that you did send to

8  West Coast Analytical for evaluation were samples from the

9  Tupperware container and samples from the amber reagent

10  bottle, correct?

11    A.    That's more knowledge than I have, but that's

12  knowledge I'm privy too.  I was involved with just the

13  separation of the material.

14    Q.    All right.  That's my -- my fault then.  I

15  jumped the gun here.  You segregated a portion of the unknown

16  white substance from the amber reagent bottle?

17    A.    Correct.

18    Q.    Okay.  And that was put in a smaller container?

19    A.    Yes.

20    Q.    You don't know where that went, but it would

21  have been something segregated for testing at some lab.

22  That's consistent with your experience, right?

23    A.    That particular item I'm aware was sent to West

24  Coast Analytical, but I wasn't involved in the actual

25  arrangement of that.


TRACI L. WHEELER, OFFICIAL COURT REPORTER, CSR, RPR, CCR

1          Q.    Okay.  As was the sample from the open

2   Tupperware container, correct?

3          A.    That sample was collected.  I don't believe it

4   was sent.

5          Q.    Okay.  So the only sample that was sent, to

6   your knowledge, to West Coast Analytical was that which was

7   taken from the amber reagent bottle itself?

8          A.    Only samples of white powder I'm aware of that

9   were sent, correct.

10         Q.    All right.  And doing the math, if there were

11  500 grams of substance in the amber reagent bottle initially,

12  you were able to keep track of in this box 479.2 grams,

13  right?

14         A.    Correct.

15         Q.    So there's 20.8 grams unaccounted for?

16         A.    Correct.

17         MR. PATTERSON:  Okay.  Thank you, Judge.  That's all

18  I have.

19         THE COURT:  Mr. Martinez?

20

21  REDIRECT EXAMINATION BY MR. MARTINEZ:

22         Q.    Sir, with regard to the 20.8 grams that you

23  were asked about, earlier in court somebody testified as to

24  an amount of -- somebody testified to an amount of 2.09

25  grams.  Just so that we don't get caught up in the math and

1    lose sight of it, would it be say fair to say 2.01 -- that

2    20.8 grams is about 10 times 2.09 grams?

3            A.    Correct.

4        MR. MARTINEZ:  I don't have any other questions.

5        THE COURT:  Are there any further questions of this

6    witness by the jury?  If so, please raise your hand.

7

8            (The following proceedings were held at the

9    bench:)

10

11        THE COURT:  Question, Did you find any caplets in --

12    or let me start over.  "Did you find any caplets in and/or

13    around the box?  If so, were any of them tested?"

14        MR. MARTINEZ:  That's jumping the gun.  He would not

15    have found them.

16        MR. PATTERSON:  That's a fair question.

17        THE COURT:  "Did you find any vitamin" -- I think

18    it's misspelled, but I think they mean vitamin -- "bottle

19    around or in the box?"

20        MR. MARTINEZ:  No objection.

21        MR. PATTERSON:  No objection.

22        THE COURT:  "One, when you use the term, quote,

23    invoice, end of quote, what do you mean?"

24        MR. MARTINEZ:  No objection.

25        MR. PATTERSON:  No objection.


TRACI L. WHEELER, OFFICIAL COURT REPORTER, CSR, RPR, CCR

000006332

1          THE COURT:  Next question, "Two, is Sodium Azide

2     hazardous extremely to the skin or to breathe in?"

3          MR. PATTERSON:  It's beyond the scope.

4          MR. MARTINEZ:  Yeah.

5          MR. PATTERSON:  There are going to be other people

6     coming in.

7          THE COURT:  Okay.  I won't ask that.

8          MR. MARTINEZ:  Judge, with regard to this witness, I

9     know you usually ask if we're going to excuse them.  I don't

10    know where the amber bottle is.  I it thought was in that

11    can.  It still may be, but I'm not sure, so I'm going to

12    check that out.  If need be, I'll bring him back.

13         THE COURT:  Okay.

14         MR. PATTERSON:  That's fine.

15

16              (The following proceedings were held in open

17    court:)

18

19         THE COURT:  Sir, I have some additional questions

20    here for you.  The first question reads as follows:  "Did you

21    find any caplets in and or around the box?  And if so were

22    any of them tested?"

23         THE WITNESS:  I'm reviewing my notes.  I do not

24    recollect seeing any caplets, but I want to make sure before

25    I say so.


TRACI L. WHEELER, OFFICIAL COURT REPORTER, CSR, RPR, CCR

```
 1                    (Pause in proceedings.)

 2          THE WITNESS:  I have no record of describing such an

 3    item.

 4          THE COURT:  Next question read as follows:  "Did you

 5    find any vitamin bottles around or in the box?"

 6          THE WITNESS:  No, I did not.

 7          THE COURT:  Next question reads as follows:  "When

 8    you use the term, quote, invoice, end of quote, who do you

 9    mean?"

10          THE WITNESS:  The Phoenix Police Department receives

11    a lot of property.  In order to track one item, not getting

12    it mixed up with the next, we've developed an invoice item

13    number system.  An invoice is generated, I think it's six or

14    eight digits long, and there's only one of those invoices

15    generated.  On that invoice a number of items can be attached

16    to that, and so an invoice can be generated and this water

17    pot could be given an item number.  There will never be an

18    item number or another invoice that duplicates that.  It's

19    unique to this particular item.  That's how we keep track of

20    items so we know which one we're talking about.

21          THE COURT:  Any further questions of this witness by

22    the jury?

23                    (No response.)

24          THE COURT:  No one has raised their hand.

25          Mr. Martinez, any questions to -- follow-up
```

TRACI L. WHEELER, OFFICIAL COURT REPORTER, CSR, RPR, CCR

1    questions to the specific requests asked by the jury?

2            MR. MARTINEZ:  No, sir.

3            THE COURT:  Mr. Patterson?

4            MR. PATTERSON:  No, Your Honor.  Thank you.

5            THE COURT:  Okay.  You may step down.  Thank you.

6            THE WITNESS:  Thank you, Your Honor.

7                   Ladies and gentlemen, we'll go ahead and take

8    our evening recess at this point in time.  During this

9    recess, remember the entire admonition I have given you,

10   including the fact you're not to discuss this case with

11   anyone, do not let anyone discuss the case with you.  Also,

12   do not do any research, experimentation, investigation or

13   tests on your own, okay?  Avoid any media coverage of the

14   case or the trial.  Keep an open mind.  I want you to have a

15   nice evening.  We'll see you tomorrow at 1:00 p.m.  Have a

16   nice evening.

17

18              (Evening recess.)

19

20

21

22

23

24

25


TRACI L. WHEELER, OFFICIAL COURT REPORTER, CSR, RPR, CCR

000006335

1

2

3                           CERTIFICATE OF REPORTER

4

5    STATE OF ARIZONA      )
                           )
6    COUNTY OF MARICOPA    )

7

8                     I, Traci L. Wheeler, CSR, RPR, an official

9    and certified reporter in the Superior Court of the State

10   of Arizona, in and for the County of Maricopa, hereby

11   certify that I made a shorthand record of the proceedings

12   had in the within case, and that the foregoing transcript

13   is a full, true, and correct transcription of the

14   proceedings in this case.

15                     Dated this 28th day of March, 2005.

16

17

18   _____
     Traci L. Wheeler, CSR, RPR
19   Certified Court Reporter No. 50313
     Official Court Reporter

20

21

22

23

24

25

             TRACI L. WHEELER, OFFICIAL COURT REPORTER, CSR, RPR, CCR

EXHIBIT II

000006337

*DP*   *DS-0002*
*Braccio*

IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

IN AND FOR THE COUNTY OF MARICOPA

STATE OF ARIZONA,                    )
                                     )
                    Plaintiff,       )
                                     )
          vs.                        )        No. CR2000-096032
                                     )            CR05 0005-AP
WENDI ELIZABETH ANDRIANO,            )
                                     )
                    Defendant.       )
_____)

BEFORE:   THE HONORABLE BRIAN K. ISHIKAWA

Mesa, Arizona
November 16, 2004

REPORTER'S TRANSCRIPT OF PROCEEDINGS
(Trial)

COPY                                 SHARON FLORES
(CORRECTED)                     CERTIFIED COURT REPORTER
                                       50374

000006338

2

1

2

3                            A P P E A R A N C E S

4

5

6

7        For the State:

8                            Mr. Juan M. Martinez

9                            Deputy County Attorney

10

11

12

13

14       For the Defense:

15                           Mr. Daniel B. Patterson

16                           Mr. G. David Delozier, Jr.

17                           Office of the Public Defender

18

19

20

21

22

23

24

25

3

1              P R O C E E D I N G S

2

3         THE COURT:  This is the trial Cause Number

4   CR2000-096032, State of Arizona versus Wendi Elizabeth

5   Andriano.

6         The record will reflect the presence of the

7   defendant and counsel.  We're outside the presence of the

8   jury.

9         I have shared with counsel the final jury

10   instructions in this case.

11         Mr. Martinez, was there anything that you would

12   like to put on the record with regard to the final jury

13   instructions?

14         MR. MARTINEZ:  No, sir.

15         THE COURT:  Mr. Patterson?

16         MR. PATTERSON:  Yes, Your Honor.  I previously

17   interposed an objection to the inclusion on page 12 of the,

18   I guess the current status of the draft of the instructions

19   where you now included the threat or use of physical force

20   against another without justified response to verbal

21   provocation alone.

22         My recollection of the trial testimony was that

23   there are no statement of facts that support any inference

24   that the confrontation or the fight, if you will, between

25   Mr. and Mrs. Andriano was the result or at any time was

4

1    precipitated by verbal provocation alone.  I think that's

2    gratuitous and unnecessary and unsupported by the facts of

3    the case.

4           My understanding is that you're making certain

5    adjustments as we speak.  With those in mind, I thereafter

6    need to argue with regard to page 16 where you're defining

7    dangerous offense and including dangerous offense in the

8    form of verdict.

9           Dangerous offense has no application with regard

10   to the verdict of first-degree murder.  It would only be

11   applicable if you were to give lesser included and you've

12   advised me that you're not going to give the lesser

13   included offenses.

14           THE COURT:  You weren't requesting?

15           MR. PATTERSON:  I have not requested lesser

16   included.  My understanding of the law is even if I don't

17   request them and you feel they're justified under the

18   circumstanced you're required to give them.

19           In any event, I think it needlessly confuses the

20   jury.  It asks them to do something that has no application

21   in this particular case and only an application if it were

22   a potential for a manslaughter or negligent homicide

23   verdict.  That not being the case, I think it's unnecessary

24   and confusing and potentially violates my client's right to

25   a fair trial.

5

1    For those reasons, I have asked that they not be

2    included.

3    THE COURT:   Thank you.

4    Mr. Martinez?

5    MR. MARTINEZ:   With regard to the last question

6    first, the one about the dangerous offense that is what we

7    alleged in the indictment.   And we did include it for a

8    reason should there be a conviction in the case and should

9    it be for first-degree murder and dangerous offense later

10   on down the road should the occasion arise that the

11   defendant finds herself entangled, if you will, by the

12   legal system again and charged with another dangerous

13   offense, the State will then not have the burden of having

14   to prove this was a dangerous offense.   I can foresee that

15   there is an argument to say that -- to say, well, it is

16   first-degree murder that's alleged but at the time of trial

17   it was not included and therefore it's not a dangerous

18   offense.   Not that it isn't intrinsically a dangerous

19   offense, it's not a dangerous offense for purposes of being

20   used as a prior felony conviction.

21   With regard to the issue of whether or not there

22   was verbal provocation in the case, the defendant is

23   objecting to the language "the threat or use of physical

24   violence against another is not justified in response to

25   verbal provocation alone."   The reason that that's

1   appropriate in this particular case, we've have the

2   defendant who has indicated that when they came home from

3   Casa Grande, one of the things that happened was that they

4   started arguing with each other.  And that during this

5   argument that, per the defendant, some curse words were

6   exchanged.  I want to make sure the jury understands that

7   no matter what Mr. Andriano may have said, if anything,

8   that the verbal words that he may have used, even though

9   they may have even included cursing, are not sufficient for

10  her do what she did that night, which is to say that she

11  stuck that knife in the side of his neck.   Thank you.

12          THE COURT:  Anything further, Mr. Patterson?

13          MR. PATTERSON:  No additional comment, Judge.

14  Thank you.

15          THE COURT:  The form of verdict that I prepared

16  and shared with counsel reads as follows:  We, the jury,

17  duly empaneled and sworn in the above-entitled action upon

18  our oaths, do find the defendant, Wendi Elizabeth Andriano,

19  as to first-degree murder, blank, not guilty, blank

20  guilty.  If guilty, we, the jury, do further find that the

21  defendant, Wendi Elizabeth Andriano, blank, did not commit

22  a dangerous offense, blank, did commit a dangerous

23  offense.  And then there's a signature line and printed

24  name line for the foreperson to fill out.

25          Anything about that, Mr. Martinez, you'd like to

7

1   place on the record with regard to the form of verdict?

2         MR. MARTINEZ:  No, sir.

3         THE COURT:  Mr. Patterson?

4         MR. PATTERSON:  Your Honor, I have the same

5   argument with regard to the form of verdict that I had with

6   the instruction pertaining to the dangerous nature of the

7   offense.

8         THE COURT:  That's noted for the record.

9         The final thing I wanted to discuss with counsel

10  before we give the closing arguments, I shared the jury

11  exhibit list, which I think everyone is agreeable that can

12  be given to the jury when they begin their deliberations,

13  and there are several biohazardous exhibits which have been

14  admitted into evidence.  And I brought up earlier in this

15  trial the administrative orders for Maricopa County

16  Superior Court relating to biohazardous materials.  And it

17  would be my intent that all exhibits go into the jury

18  room.  However, the jurors will be instructed before they

19  begin their deliberations that they are not to remove

20  biological and potentially hazardous exhibits from the

21  sealed package.  The jury will have to ask for

22  authorization from the Court to view the item outside the

23  packaging.

24        If the jury does request to open a biohazardous

25  or potentially hazardous sealed exhibit, then we will have

1   the jury brought here in open court with everyone present

2   and the exhibit would be opened here in court with counsel,

3   defendant and the jury present.  That will be done by the

4   clerk with the necessary rubber gloves or whatever is

5   necessary.

6           Any objection to that?

7           MR. MARTINEZ:  No, Your Honor.

8           MR. PATTERSON:  No, Your Honor.

9           THE COURT:  Anything further?

10          MR. MARTINEZ:  No, sir.

11          MR. PATTERSON:  I just reviewed the index.  I

12   think you deleted off the thing we found objectionable

13   earlier.

14          THE COURT:  We'll take a five-minute recess and

15   we'll begin the closing arguments with the jury.  We'll be

16   in recess.

17          (Recess taken.)

18          THE COURT:  Good afternoon.  This is the trial in

19   Cause Number CR2000-096032, State of Arizona versus Wendi

20   Elizabeth Andriano.

21          The record will reflect the presence of the

22   defendant, counsel and the jury.

23          Ladies and gentlemen of the jury, the attorneys

24   will now make their closing arguments to tell what you they

25   think the evidence shows and how they think you should

1   decide the case.  The prosecutor has the right to open and

2   close the argument.  Since the State has the burden of

3   proof.  Just as in opening statement, what is said in

4   closing argument is not evidence but it may help you to

5   understand the law and the evidence.

6          Mr. Martinez, would you like to give your opening

7   closing argument at this time?

8          MR. MARTINEZ:  Yes, sir.

9          THE COURT:  You may proceed.

10         MR. MARTINEZ:  Good afternoon, my presentation to

11  you will be broken down into three areas.  The first part

12  of the summation will deal with fact.

13         How was it that this woman to paraphrase Dylan

14  Thomas, made sure that her husband did not go gently into

15  that good night.  She made sure of that by going out and

16  getting some sodium azide.  Then, while he is in extreme

17  distress from that sodium azide and was down on the ground

18  unable to get up, she delivers the coop-de-grais which is

19  hitting him over and over and over again on the head.  And

20  when she's done with that, she hasn't been satiated yet,

21  she goes over to the kitchen, gets a knife and sticks it

22  inside of his neck, making sure that this time he is dead.

23         The second portion of my presentation will deal

24  with the jury instructions.  What is the law that you have

25  indicated and have sworn you will follow.  That is the law

10

1   that the Judge will give you at the close of these

2   summation.  I will not dwell on every single one of the

3   jury instructions.  I will only talk to you about some of

4   the salient portions that I wish or hope you would consider

5   what you go back into the jury room to deliberate in this

6   case.

7          Specifically, of course, one of the jury

8   instructions that I will talk to you about will be the

9   self-defense justification instruction.  And how is it that

10  after you read it, after you take a look at it, the

11  defendant, Wendi Elizabeth Andriano will not be able to

12  avail herself of the protections contained therein.  And

13  the reason that she will not meet the standard that is set

14  forth in the jury instruction is that Joseph Andriano was

15  weak.  He had just had chemotherapy treatment ten days

16  before.  Additionally, he was suffering from the effects of

17  the sodium azide.  Additionally, we know from the hit on

18  the back of the head that he was face down on the ground,

19  his face rubbing up against the carpet with each hit.

20  That's how he got the burns on his face.  And when he was

21  in that condition, he posed absolutely no threat to anybody

22  but yet she had to go get a knife and stick it in his

23  neck.

24          And because of that, she cannot avail herself or

25  in other words, use that as a way for you to excuse what

1   she did on that particular night.  It was not

2   self-defense.  It is not justification.  It was a

3   massacre.  It was a slaughter.  It was blood everywhere.

4   And it was all her doing when her husband was down on the

5   ground, incapacitated.

6            We'll also talk to you about the issue of

7   first-degree murder and the elements that the State has

8   charged or has indicated it will meet in this particular

9   case.

10           Now, first-degree murder is pretty simple,

11  basically.  But first-degree murder requires the State

12  prove that the defendant, with premeditation, killed

13  another human being.  That's what we have to prove to you

14  in this case.  And, in fact, we have already proven it.  We

15  have already proven it to you.  In fact, by the defendant's

16  own testimony she indicated that she purchased the sodium

17  azide to kill Joseph Andriano.  That's premeditation.  That

18  is the will to kill.  Although, she has an excuse for why

19  she's doing it.  But, she indicated and, in fact, confessed

20  to you in court that's what she was doing.

21           We'll also talk about the standard that you are

22  to apply.  Specifically, everybody's heard about it:  The

23  beyond a reasonable doubt standard.  That is the standard

24  that you apply to the facts and the evidence in this case

25  to reach your verdict, to reach your conclusion.

1          And with regard to that, the standard, if you

2    will, the definition that is given to you is that you have

3    to be firmly convinced we have proven to you not only shown

4    you that you should be firmly convinced that she was the

5    one that did it but, in addition to that, we have also

6    shown you that way beyond any doubt that she was the person

7    who actually did commit this crime against Joseph

8    Andriano.

9          The third facet of my presentation will deal with

10   the self-defense that was placed before you for your

11   consideration.  What they did, was they coded it,

12   basically, like a gift to you brought in by Sharon Murphy.

13   However, that gift brought in by Sharon Murphy did not

14   quite live up to its billing.  How it was that she

15   indicated to you, well, the defendant was the victim of

16   domestic violence.  But when we started talking about it,

17   she didn't take into account everything that she brought to

18   you came from the Defendant's mouth.  There is no empirical

19   test.  There's nothing.  And quite frankly, she went in

20   with the idea that this was a case of domestic violence.

21   That's what she did.

22          And all of the tests were geared towards that.

23   But in any event, they were wrapped up, gave it to you,

24   presented it to you like it was some sort of gift.  Of

25   course, not letting you know that it was filled with lies,

1   with omissions, with misrepresentations, with a story that

2   the defendant wanted you to hear before she also took the

3   stand and told you her story.

4         Additionally, one of the factors what we will

5   discuss with regard to this particular defense is what

6   happened at the crime scene.  One of the things I will

7   discuss with you, for example, is how it is that a lamp

8   that was purchased on October 6 or October 7 of the year

9   2000, how it is that her father came out and took a picture

10  of it in the early part of September 2000.  It just can't

11  happen that way.  But she fabricated the defense.  She

12  fabricated and altered the scene.  And that's what they

13  presented for you.  To sit back and say, well, maybe it did

14  happen that way.  Well, I submit to you that there was no

15  defense that was presented to you.  What I submit to you

16  that was presented was nothing but the fabrication, the

17  ruminations of this defendant, who, if it's in her best

18  interest, if it's to her benefit, she will make things up.

19  She will lie.  She will cheat.  She will omit things.  And

20  then she'll misrepresent them.  And that was presented to

21  you.  And that's her defense.  It's based, if you will, in

22  quick sand and just sinks to the bottom.

23        So let's talk a little bit about the facts that

24  were presented in this case.  I know that the trial had

25  been somewhat long and you've heard a lot but let's talk a

14

1   little bit about the facts that were presented to you.  We

2   can't really take a look at October 8th, 2000 and get a

3   full understanding of it without actually taking a look at

4   and seeing what the defendant was like.  Because that's

5   something that they presented to you.

6          I want to take you back to the time when she

7   first met Joseph Andriano to see what person she was, the

8   type of individual that she was.  That she indicated to you

9   over and over that she is a God-fearing, Harvest family

10  church person.  That she was able to memorize Proverbs.

11  That this is a person who, if you will, came in cloaked --

12  it was like a flag that she bought in, waived it around:

13  I'm one with Jesus or something like that.  She wanted you

14  to believe she's this incredibly religious individual who

15  grew up that way.

16         But let's take a look at what this incredibly

17  quote, unquote, religious individual did.  You know that

18  according to her on Saint Patrick's day in 1992 is the day

19  she met Joseph Andriano at a place called Dell's Pizza.

20  And, of course, when she presented it to you, she said, you

21  know, I was out with my friend.  And it was kind of dark

22  but not dark.  It was kind of late when we went to Dell's

23  Pizza.  You know what, it really wasn't my idea to go over

24  there.

25         Again, she's minimizing.  She's shirking her

1   responsibility for being in a place where they drink.

2   Perhaps she thinks that somehow you're going to think less

3   of her that there's a church person that she's out at a

4   bar, drinking.  But she minimizes, she says, "You know

5   what, it wasn't me.  I only went because my friend wanted

6   to go when I met him."  And that's the type of individual

7   that we're dealing with.  Someone who minimizes to present

8   the best light.  Even though we know now that that's not

9   true.

10          Additionally, she tells us, well, you know, I saw

11  Joseph Andriano.  I saw him there and he was one of the

12  farm kids  and I immediately liked him.  He gave me his

13  number and I give him mine.  And one of the things that we

14  know about this individual based on that little encounter

15  is that when he didn't call her, this woman who is

16  subservient, this woman who backed off, this woman who is

17  not assertive, this woman who is not aggressive, according

18  to her, what did she do?  She called him and said, "You

19  know, I want to talk to you.  You know, you gave me your

20  number and I want to talk to you."  But did that stop

21  there?  No.  When he didn't return her call, she was very

22  much focused.  She had a goal.  Because she had learned,

23  according to her, the lessons of the Rocky movie, which was

24  if you have a goal, you'll do just about anything to attain

25  it.

1          The problem is, she really didn't get the theme.

2    She didn't get the lesson that was in the Rocky movie.

3    That lesson in that Rocky movie that she flounced in front

4    of you was that you don't cheat.  You work hard.  You tell

5    the truth.  And, yes, you may achieve your goal.  But for

6    her, she misread it.  She will cheat.  She will

7    misrepresent things.  And she will slight things to make

8    herself look better.

9          So what did she do?  She called Joseph Andriano.

10   She called him one time.  He doesn't return her call.

11   She's not going to be deterred.  She has a goal in mind.

12   What is that goal?  To have him go out with her.  The next

13   thing that happens is that, well, she then calls him

14   again.  He doesn't return her call.  But said it's not that

15   he doesn't want to talk to me, it's that he's in Oklahoma.

16   Really.  Do you really think that's what it is?  Are we

17   sure that's what it is?  Are we going to take her word that

18   that's what was happening?  Or is it that he really doesn't

19   want to talk for her and all of a sudden he keeps getting

20   these calls from this girl that he met in that bar.  And

21   finally decides to call her back.  Because, you see,

22   according to her, Joe was a step up from where she was

23   coming from.  According to her, based on all the

24   descriptions, Joseph Andriano offered a step up.  And being

25   the greedy individual that we now know she was later on in

17

1  life, because according to Erik Vaillant, that's how he

2  described her, that she is somebody that is full of greed,

3  she decided this is my way up.  This is my one step up.

4  And, again, we can now start seeing the full picture of

5  this individual that testified before you and started

6  crying in front of you.  And started crying a river of

7  crocodile tears that in Arizona could have certainly

8  alleviated the drought.  But now, what happens back then is

9  she calls him and then he, of course, then returns her call

10  and then they begin to date.

11         One of the things that happens as a result of the

12  dating relationship is that he decides to move in with

13  her.  And, again, she is at a crossroads because she is,

14  according to her, very religious and you are supposed to

15  obey your father.  But what does she do?  She says, "The

16  heck with it, I'm not going to obey my father.  I'm going

17  to do what I want.  I'm going to carry out my goal.  And my

18  goal is to be with Joseph Andriano for whatever reason."

19  And so she lets him move in contravention of her father's

20  wishes.

21         And the other thing that we know about this woman

22  is that when she wants something, she'll get it.  We know

23  that she was living at the Quail Garden apartments.  We

24  know she rented or was given, if you will, a one-bedroom

25  apartment.  We also know that she told us, "Well, you know,

1  it would be very difficult if not impossible for me to get

2  a two-bedroom apartment.  But I continued to pressure the

3  manager.  I continued to talk to her.  I continued to get

4  after her to give me a two-bedroom apartment."  Does that

5  sound like someone's that's not goal-oriented?  Does that

6  sound like someone who is subservient?  It absolutely does

7  not.  That shows the sign of a woman who is dominate, who

8  is secure and who will get out there and get what it is

9  that she is seeking.  And she was successful.

10         So then she has Joseph Andriano move in.  And one

11  of the things she's quick to tell us, well, it wasn't a

12  sexual relationship to start with.  Again, she's

13  minimizing.  They're living together.  And no, it wasn't a

14  sexual relationship.  I don't want you to think anything

15  bad.  I don't want you to think I'm going against the

16  wishes of my God.  Of course, when they're married, it's

17  all right to go out and have affairs.  But right now, it's

18  against the wishes of my God to do that.  I'm not going to

19  do that.  Plus, my father would be really upset with me

20  even though I am living with this boy Joseph Andriano.

21         Well, it didn't take long, we don't know exactly

22  how long, for the defendant and Joseph Andriano to become

23  intimate.  That's a very telling sort of sordid little

24  story that she told you because according to her and

25  according to Sharon Murphy, what happened after this

19

1   wondrous experience as she put it, she cried.  That's what

2   it is.  And according to Sharon Murphy, the reason that she

3   cried -- and remember this is their expert, this is the

4   person who is coming in here and saying, "Ah, this woman is

5   the victim of domestic violence.  And the reason that I

6   know that is because of some of the things that I'm telling

7   you.  One of the things I'm telling you is that Joseph

8   Andriano was the first individual that she ever slept

9   with."  Because, of course, that increases the power and

10  control.  She was some sort of ingenue.  Some sort of

11  naivete that he took advantage of.  That's why that's

12  important to her.  And you could almost see Joseph Andriano

13  almost glowing as she cried from the glow, if you will, of

14  that first experience.

15          Except, there is a problem.  There is a problem

16  not only for the defendant and there's a problem for Sharon

17  Murphy.  Because, she was asked on the stand, that wasn't

18  the first experience.  Sharon Murphy got it wrong.  It was

19  absolute fabrication.  And it was an absolute omission that

20  the defendant had led Sharon Murphy to believe.  And the

21  reason, of course, that she led her to believe that because

22  it would make her look better in Sharon Murphy's eyes, of

23  course.

24          I mean, you can see what kind of person this is.

25  She lies about things that happened in her past so that you

000006356

20

1  would think better of her.  And the other thing that -- the

2  reason that's important to us is because that shows you

3  Joseph Andriano is in way over his head.  She may be

4  younger than him but she is much more sophisticated then

5  this guy could ever think he could be.  She's got him

6  believing she is Mother Teresa's daughter or something.

7  Somebody that is holier than anything because she cries.

8  It's a first experience for her.  We know that it isn't.

9          We know that Joseph Andriano is in for a rough

10  ride.  We know that because of all of these things that

11  we've been talking about.  And then she says well, you know

12  what, we decided to get married.  Actually, she said it

13  wasn't my decision.  Joseph Andriano just announced it and

14  I decided to go forward with it.  Again, she's minimizing

15  what she's doing.  She is saying I was so not in control

16  that, you know, he forced me to do it.  That's basically

17  what she's saying.  But do you believe that from this woman

18  who we see is very goal-oriented, who really knows what

19  she's about, who will move forward no matter what to obtain

20  the goal?  Absolutely not.  She knew what she wanted.  She

21  wanted to be with Joseph Andriano and enjoy what she

22  considered to be a better life, a life that afforded her a

23  much more comfortable standard of living.  She comes to you

24  and says, "Well, we didn't even get married in my church.

25  But, of course, I don't even remember what church we were

1   married in."  And we went to Las Vegas and, you know, all

2   these things that she tells you about it.  But then she

3   says, "But, you know, right before the wedding I wasn't

4   even sure that I wanted to get married.  But I went a head

5   and did it."  She wants to show you that she's

6   subservient.  Do you really think that's that happened at

7   the wedding?  Do you really think she sat back and said,

8   "No, I don't want to do this?"  The reason that she told

9   you that, given the background that I've shown you, is

10  because she wants you to think that Joseph Andriano took

11  advantage of her.  She wants Sharon Murphy to think that

12  somehow Joseph Andriano took advantage of her.  But it's as

13  we have been seeing and we will see later, everything that

14  she told to a great extent to Sharon Murphy was based on a

15  lie.

16          So what ends up happening is they get together.

17  And this halcyon sort of standard of living she is

18  envisioning is not going to come true.  And part of the

19  reason that it's not going to come true, even though Joseph

20  Andriano is a very good worker and she said that to the

21  police when she was being interviewed, she said, "Yes, he

22  was a hard worker when we first got married."

23          Additionally, she indicated not only was he a

24  hard worker but he was making good money.  But if you

25  remember, Sharon Murphy said well, no, he was a sporadic

1    person who didn't work very often.  But of course, in her

2    statement to the police, she negates that.  She forgets

3    about that.  And, you know, one of the old adages, if you

4    will, from Mark Twain in Huckleberry Finn involves two

5    individuals who were talking, going back and forth about

6    telling the true, about fabrication and about

7    misrepresenting things.  And at one point one character

8    says to the other, "With the truth ya ain't got to remember

9    nothing."  She's got a lot to remember.  That's why it's

10   very difficult for her with so many stories because she's

11   always omitting something, she's always adding something.

12   She's always minimizing.  And  that's what you have in this

13   particular situation.  She wants Mr. Andriano to be this

14   lackey who didn't pull his weight.  And that's the

15   impression that was presented to you by Sharon Murphy.

16   That's the impression that she gave you.

17          But, when she speaks to the police, when she

18   hasn't had time to formulate this defense yet she said he

19   was a very good worker.  He brought in a lot of money.

20   And, in fact, he even paid my car.  Remember that?  He also

21   help me with the rent.  And it was only after 1998 when he

22   was having problems with his cancer and part of his

23   shoulder was taken out that she told the police he couldn't

24   work any more because he didn't have the strength.  And

25   that's what she told the police.  She did not admit it on

1   direct or cross-examination.  But she said he didn't have

2   the strength to do it any more.  I mean, it was before he

3   worked.  And according to her, she tells you after that he

4   could have worked if he wanted to but he just chose not

5   to.

6           It's amazing that the Federal government, who

7   does this for a living, in other words, who provides for

8   people who are unable to work did determine that Joseph

9   Andriano was going to be entitled to a stipend because he

10  could no longer work.  But she turns around and tells

11  Sharon Murphy, oh, sure he could work.  He was this guy,

12  just a bad guy who didn't like to work, liked to go on his

13  boat and likes to do that sort of thing.  And so she turns

14  that around.  She forgets that the Federal government

15  actually sits down, conducts an investigation, sends people

16  to doctors to see whether or not they are malingering,

17  whether or not they're making it up.  And in this case,

18  they determined that as a result of the operation, as a

19  result of the cancer, Joseph Andriano could not work.

20  Which is diametrically opposed to what they've been telling

21  you.

22          The other issues that we have in this particular

23  case are involving that particular period, also.  One of

24  things that I asked the defendant on cross-examination was,

25  "Do you remember this Jerry Robles with whom you had the

1  business arrangement."  " Yeah, I remember him."  Do you

2  remember that it was late 1996 which would make it about a

3  year and half or two years after her marriage, that you

4  wrote to him, "I don't want to be in the same office" or

5  words to that effect, "because I'm sick of being in the

6  same office with my husband."  And, again, that's back at

7  the end of 1996 when she said that.  She turns around and

8  she says that again.  She's very good at just turning

9  around and saying that's when I was going to leave him.

10 But that creates a problem because if you remember, Sharon

11 Murphy told us that was in the summer and Mr. Andriano was

12 at the lake with his friend and he came back early from the

13 lake.  So it couldn't have been the winter of 1996 when it

14 happened as she told us.

15         Additionally, she told us that again when she was

16 going to leave Mr. Andriano she already had Nicholas.

17 Nicholas wasn't born until 1997.  But she was very quick to

18 spout back and say, well, you know it was this time to try

19 and to cover up her tracts.  Because she just can't

20 remember everything that she said.  It's very difficult for

21 her to keep the lies straight.  It's so difficult because

22 it's from the time she was 21 or even earlier up to the

23 time -- she's what, 33 now.  That's a long time.  Maybe if

24 we were talking about getting an award for trying to keep

25 things straight and for a number of misrepresentations,

1    maybe she'd get an award for that.

2           But that's not what we're here to judge.  We are

3    not here to judge whether or not she's a good fabricator or

4    somebody who is good at making things up.  We're here to

5    determine whether or not on October 8th of the year 2000,

6    she premeditated the murder of Joseph Andriano.

7           What happened is in 1998 is that Joseph Andriano

8    is diagnosed with adenoid cystic carcinoma.  Obviously,

9    everybody is devastated for the past four years and then

10   three surgeries he has been misdiagnosis.  Not only has he

11   been misdiagnosed but it's worse than that, it's absolutely

12   worse than that because Joseph Andriano is going to die

13   now.  He is going to die in part because of what doctors

14   may or may not have done.  It's a terrible thing for this

15   33-year-old man with two kids.  It's just a horrible

16   thing.

17          But, you know, there was somebody in that

18   relationship that's not quite too upset about it.  And this

19   is the person who has been described as being greedy, a

20   person who has been described as being cold.  And that's

21   the defendant.  Because, you know, she sees a silver lining

22   in this very dark cloud.  And that silver lining is that

23   Joseph Andriano is now worth millions of dollars in the

24   form of a medical malpractice case.  And that if he dies

25   before it goes to trial it will become a wrongful death

26

1    lawsuit.  And she is quoted as saying, "could be worth up

2    to twenty million dollars."  She said it.  We don't know if

3    Jeffrey Miller told her but she said it and that was her

4    impression.  And it's her state of mind that's important

5    here.  And according to her it will be worth more if it's a

6    wrongful death lawsuit.  It doesn't matter if Jeffrey

7    Miller told her.  It doesn't matter what he told her

8    because she already admitted that's what she believed.

9           So we have the silver lining, if you will, in

10   this very dark cloud.  Actually, for her it's not even a

11   dark cloud because now she can go on doing what she wants.

12   It doesn't really matter.  She's not going to take care of

13   Joseph Andriano during these surgeries.  She's not going to

14   do that at all.  She's got her father and mother to do that

15   for her.  Also, he's just icky.  Also according to Eric

16   Vaillant she said Mr. Andriano is just gross.  Just

17   skinny.  Doesn't want anything to do with him from this

18   point forward.

19           So what we have is a situation where she is going

20   to benefit from something horrible happening to her

21   husband.  And so what does she do immediately in September

22   of 1998, almost as quick as he is diagnosed, because

23   remember according to them, he had that surgery in late

24   August of 1998.  By early September of 1998 she's ringing

25   that phone up at Jeffery Miller's office and she says, "I

1    want to refer this case to you.  I want you to talk to us

2    about this so we can go ahead and get this thing started."

3    And, sure enough, he sees the dollar signs and he goes out

4    there.

5              And one of the things that he does is that he

6    goes out to their house in Casa Grande, Arizona.  What's

7    telling and important about that is that Joseph Andriano is

8    nothing more than an after thought for them.  Because, if

9    you remember, according to Mr. Miller, he wasn't even

10   there.  I mean, we can understand the business reason why

11   he's there.  But we can't understand the cold heartedness

12   of the defendant to not even include him in that

13   conversation.  He comes walking in later.  But isn't this

14   about Joseph Andriano?  Isn't about the misdiagnosis

15   involving Mr. Andriano?  This is not about Wendi Andriano

16   and her loss of consortium because that's not worth

17   anything.  That's not worth anything.

18             The problem here is with the misdiagnosis and the

19   problems that Mr. Andriano is going to have.  And so, she

20   has this conversation and we know that as a result of that,

21   Jeffery Miller writes a confirming letter and sent it to

22   both of them.  And it says, you know -- and the defendant

23   confirmed this on cross-examination -- you know I didn't

24   think that I spoke to Mr. Andriano about the retainer

25   agreement.  You know what the retainer agreement is.  It's

1    what tells the parties how much money is going to be kept

2    by the lawyer and how much money the litigant or the

3    plaintiffs are going to be able to keep.   It's a very

4    important juncture, if you will, in a personal injury

5    case.   That's why it's done at the very beginning.   But,

6    of course, Mr. Andriano is not included in that.   You know,

7    the defendant doesn't care.   It's not about him.   It's

8    about her, right?   All he's got to do is sacrifice that

9    body -- die.   So she can then be made richer -- 20 million

10   dollars richer.

11            THE COURT:   Hold on.   You have a cell phone in

12   here you have to turn it off or I keep the cell phone.

13            You turned it off.

14       OBSERVER:   Yes.

15            THE COURT:   If anyone has a cell phone, turn it

16   off.

17            You may continue on.

18            MR. MARTINEZ:   So, we're at the point now where

19   she has now had these negotiations involving fees with a

20   lawyer outside the presence of Mr. Andriano.   It is such an

21   important deal, that the lawyer feels compelled to write

22   her a letter and say, you know what, I didn't discuss it

23   with Mr. Andriano.   Perhaps you know, if you ever want I'll

24   come out and we'll discuss this fee agreement again.   But

25   you can see, again, who's the dominant person.   You can see

1  the person that's in charge.  She is.  She's the one that's

2  conducting these negotiations.  Joseph Andriano is just

3  somebody there who is going to make her rich.  He's the

4  goose that's going to lay the huge golden egg.  That's all

5  he is.

6          And what happens after is there are negotiations

7  -- not negotiations but there's another conversation

8  between the defendant and Jeffrey Miller.  And that

9  conversation is whether or not they're going to settle this

10  lawsuit.  Because, if they want to settle it earlier, it's

11  going to be less money than if they take their time and go

12  to trial.  And one of the conversations the defendant had

13  with the detective, she tells him Joseph was very

14  frustrated that this thing wasn't settling.  He wanted to

15  settle it early.  She did not want to settle it early.

16  Because, according to her in that tape, this takes time.

17  This is how they have to do their job.  Well, they have to

18  do their job to maximize the return.  But, if they don't

19  want to maximize the return, what they can do is they can

20  settle it for less.  In the conversation about how this

21  lawsuit is going to be guided is between the lawyer and the

22  defendant, Wendi Andriano.  It's not between him and Joseph

23  Andriano.  And, in fact, the letter tells her you need to

24  discuss it with him to see whether or not you want me to

25  settle this early or not.  And, again, she's the one that

1  imposes her will.  She's the one that is the driving

2  force.  What does she care if it's settled early.  She

3  didn't care at all.  And the reason she didn't care at all

4  is because, you know, the longer it goes, the more money

5  she gets to keep.  And if he dies before that, wow, that's

6  going to be a big pay off, twenty million dollars.

7            This is all about greed.  This is all about her

8  having this goal.  And that goal is to make sure that she

9  has a lot money.  And so that's -- we have sort of a feel

10  for what's going on.

11            One of the other things that we know as this is

12  happening is that the defendant is changing jobs.  We also

13  know that she ultimately ends up at the San Riva

14  Apartments.  We also know that one of the things that she

15  is doing is that according to her assisting Mr. Andriano

16  with his treatments, she maintains she went to all of his

17  chemotherapy treatments.  We have Mr. Andriano, Sr. who

18  indicated no, that's not true.  I was the one that was

19  actually there.  He told you exactly what happened with

20  that.

21            But we also know that this issue of money, this

22  issue of greed, isn't only manifested with regard to the

23  lawsuit.  It's also manifested with regard to the contact

24  that the defendant has with the insurance company.  And we

25  know that because one of the things that she does on August

1   10th of the year 2000 she gets on the phone and calls Ed

2   Sandidge.  It seems that Ed Sandidge had a very modest

3   $5000 policy that he had underwritten on the life of Joseph

4   Andriano.  And she calls up -- the wife of Joe Andriano of

5   Ahwatukee -- calls up and speaks to Terry Crispin and says,

6   "You know what, we want to or I want to increase the

7   coverage for Mr. Andriano."  And as a result of that

8   conversation it's increased up to or 500 -- or he creates a

9   proposal, if you will, for life insurance for $500,000.

10          One of the things that she indicates on that is

11  another lie: Mr. Andriano is willing to take an exam.  You

12  see, the thing with that is she figures what the heck,

13  there's already an existing policy, why not just ask him if

14  we can increase it.  Since they're already covering him,

15  there shouldn't have to be an exam that is required.  But

16  if you remember, Terry Crispin said, "well, I was the one

17  that brought up this thing about the exam and she said that

18  Mr. Andriano would take it."

19          The problem is that when Ed Sandidge called her

20  up and said, "I need to talk to Mr. Andriano.  I need to

21  know what he wants to do, you know, take this exam."  What

22  did she do?  That isn't allowed to go forward because

23  Mr. Andriano doesn't know anything about this.  It's not

24  Mr. Andriano'S doing.  It's just the greed inside the

25  defendant that is motivating all this.  She wants more

32

1   money.

2        According to Jimmy Yost he indicates he talked to

3   her.  She talked to him about and in fact at some point

4   indicated she was trying to get a million dollars in life

5   insurance to sort of tie her over until this lawsuit comes

6   and the twenty million dollars would be available to her,

7   whatever amount of money they got.

8        But she didn't stop there.  In September, she

9   figured, well, I can't sort of put this one over on

10  Ed Sandidge.  So what I'll do is I'll open an account in

11  June of 2000 and I'll open it with USA.NET and open it in

12  my name and send out these feeler.

13       And the first one that she contacted was Amica.

14  She spoke with somebody by the name of Caroline Catalano.

15  And one of the things she asked was for a policy worth

16  hundred thousand dollars.  Again, you can see that it's

17  just the money that she's following involving

18  Mr. Andriano.  And when she did that, I mean, she tells

19  them the same blithe lie.  It doesn't matter to her.  She

20  said, "Oh, yeah, he doesn't have cancer."  Maybe she was of

21  the opinion they wouldn't require a medical exam.  I don't

22  know.  We don't know what she thought.  But she definitely

23  lied to them.  She definitely told them he didn't have

24  cancer.

25       This continued on until we get to the next day.

1    There is an e-mail that was sent to ETERM.COM and an

2    individual by the name of Gary Foster who gets assigned the

3    case.

4               One of the things he does is he gets right on it

5    and he decides, well, you know, they want a hundred

6    thousand dollar policy.  The husband doesn't have any

7    cancer, doesn't have any problems.  He decided to make a

8    contact call.  He calls the house and low and behold this

9    is the one and only time that we hear from Joseph

10   Andriano.  And it's significant because if anybody would

11   stand up behind his wife, it would be Joseph Andriano.

12   He's the individual that wrote that birthday card, "I love

13   you.  I love you.  I love you.  Turn it on the inside,

14   happy birthday.  Oh, by the way, have I told you that I

15   love you."  He's the same individual that never cheated on

16   her.  He's the same individual that took care of his kids;

17   took them over to his friend's house, Jake Roberts' house.

18   And took them over and they're eating a milkshake or

19   whatever, cleaning their faces up and was on their way.

20   That's the same individual that we're talking about.  That

21   through their recording device this was captured.

22              And one of the things that happened is that Gary

23   Foster says, "Hello, Mr. Andriano, I'm calling you about

24   this application for life insurance."  You heard the tape.

25   It says, "What?  I don't know about anything about it."

1   That diametrically is opposed to what she told us.   I'm

2   doing all this because Joseph is telling me to do this.

3   No, you're not.   Joseph, himself, is calling you a liar in

4   that tape recording.   No, you're not.   He's saying that's

5   not true.   And then Gary Foster pushes him a bit and says,

6   well, do you have a wife named Wendi Andriano?   I do.   So

7   we know that's he cogent.   We know that he's oriented.   We

8   also know he can barely speak.   We don't know exactly how

9   he is feeling on that particular day but we know that he is

10  oriented.   He knows he has a wife.   He also knows he didn't

11  request any life insurance.

12          And Gary Foster pushes him a little bit.   You

13  were able to listen to that recording when he says, "You

14  know, well, maybe if I call you later you guys can talk

15  about it."   All he says, huh, okay.

16          But even his voice, even her own husband, points

17  her out to be what she really is.   That is a woman who does

18  not know the truth.   That is a woman who fabricated that.

19  That is exactly what Joseph Andriano said in that

20  recording.

21          So we now know that she was involved in this sort

22  of stuff.   We also know that it's the money that she's

23  after.   She's already talked to Jimmy Yost and said, "I

24  have his wallet right here.   Here's his driver's license.

25  You look like him.   Why don't you pose for the medical exam

1   for purposes of the insurance." He says, "No, I'm not

2   going to do it." She says "I'll give you ten thousand

3   dollars." "No, I'm not going to do it. That's fraud,

4   they'll catch you." She said, "No, they want because the

5   coroner will rule it a heart attack."

6           That's what she tells him because she's studied

7   up. She knows what the symptoms are. And he says, "No,

8   I'm still not going to do it." "Well, how about if I give

9   you $20,000, $30,000, $40,000 if you stand in." "No, I'm

10  not going to do it." She's negotiating with him. She

11  needs him. She's desperate. She needs somebody to help

12  her out. But he's not forthcoming. He's honest. He's not

13  going to do it. And so she tops out at $50,000. And

14  finally he says, "I'm not going to do it. I'm just not

15  going to do it. If you want me to do it you've got the

16  wrong guy. I'm not going to do it."

17          He's also the individual who saw them together

18  and will tell you she wore the pants in the family. He saw

19  them continously -- not continously but saw them together

20  on a social basis. So he knows that.

21          The other individual with regard to this

22  insurance issue was Erik Vaillant. He was also

23  approached. And one of the things that Erik Vaillant will

24  tell you is that, well, you know, she came to me and said,

25  "You know, I want you to pose as Joe for the purpose of

1  this examination."  And he said, "I'm not going to do it.

2  You're just money hungry.  Twenty million dollars not

3  enough for you?  That's just being money hungry.  I'm just

4  not going to do it."  And he didn't do it.

5        But they remained friends, though, because we

6  know that what ended up happening is on July 26 of the year

7  2000, which is approximately two or three months before she

8  gave him the poison and before she poisoned him on October

9  8th of the year 2000, she opened an account.  And she

10  didn't open the account in her name.  She opened that

11  account in the name of Anne Newton.  Even though she

12  quibbled with it, that's just another lie.  This woman is,

13  as I told you, is so goal-oriented that she's not going to

14  have a problem with just changing her name.  Ug-huh just

15  make it Anne Newton.  They're not going to know the

16  difference.  She's also used the name of Mrs. Montegomery.

17  Whatever Mrs. Montegomery's first name is.  That was with

18  regards to her student loan.

19        With regards to the student loan, when it is to

20  her benefit to reduce the payment of the garnishment, I'll

21  be Mrs. Montegomery.  I'll submit fictitious documents.

22  I'll wipe things out so they will think I'm actually paying

23  over $500 in rent when I'm not.  But, again, I mean, that's

24  the kind of thing that she does.  She'll change her name.

25  She'll do whatever.

37

1       But we now know that as early as July 26 of the

2   year 2000 there was an idea in her head she was going to

3   poison her husband and going to make him go away.  She gets

4   up there and says, "Yes, it's me but he made me do it."

5   Really.  Is that right.  Everything else that we have seen,

6   you indicate that it was somebody else's fault.  I mean,

7   it's so basic that with regards to the virginity issue,

8   something so private as that.  She said, "Well, you know

9   what, yes, I was chaste but, you know what, I didn't want

10  to be.  So what I did basically is make sort of an

11  agreement with Dido Gomez to get rid of it because it

12  wasn't my fault.  Barbara Mitchell was kidding me about

13  it."

14      You see how nothing is her fault.  Nothing that

15  this woman does is her fault.  Even the most private of

16  things, the most things that happen between a man and

17  woman, even that's not her fault because Barbara Mitchell

18  was teasing her about it.  And she needed to get rid of it

19  like it was some sort of bad thing that was hanging around

20  her neck.  Nothing's her fault, including ordering this

21  poison even though it's in her name.

22      One of the things we know when she's ordering

23  this poison is she makes up a lot of things.  She said that

24  she wants them for rodents.  She indicates that she's been

25  to Ireland.  She indicates that she has a business by the

1   name of Wyndstar doing business as Aztec Creations.  All of

2   it, nothing but a lie.  Nothing but a lie because she wants

3   to make sure that she gets that poison.  She starts out

4   asking for cyanide and it turns into a request for sodium

5   azide.  And so she is able, if you will, to bring that

6   about because she contacts somebody from Copper State Glass

7   and Mirror, gets them to send over their business license.

8   And what did she do?  Like she did previously before when

9   she wanted out.  She did the same thing here.  She pasted

10   something over and created a business license for her under

11   Aztec Creations -- I'm sorry, Wyndstar Enterprises doing

12   business as Aztec Creations.  That's what she did.  You saw

13   what she did.

14          She also filed this indemnity agreement with

15   Voigt Global.  Along the way she asks Erik Vaillant to help

16   her.  He helps her, whether at the computer at the

17   bookkeeper's office.  But, when she's asked about it by

18   Janis Lynn, does it surprise you that she lies and says,

19   "No, I wasn't looking at the poison site.  That wasn't me

20   at all."

21          Again, every time, any time it becomes

22   uncomfortable for her she turns to a lie.  And so she asks

23   Eric Vaillant and, yes, they do determine that there is a

24   Voigt Global.  And she goes about her business and she is

25   able to have the sale consummated.  As part of that sale

39

1   she goes over to ABCO and she gets a money order and she

2   signs for it, name Anne Newton.  Again, a lie.  Sends for

3   it and then it's ultimately dropped shipped, as they say,

4   from Alfa Aesar.

5          When it gets out here, they can't deliver it

6   because the address that she listed doesn't exist.  It's

7   2442 rather than 2424.  She purposely put the numbers

8   wrong.  And the only number they have is her cell number.

9   That's how they get in contact with her.  So she trots on

10  down there on October 5th, which is a Thursday at 2:30 in

11  the afternoon to get it.  And she's the one that signs for

12  it.  She says, "Oh, yeah Joe was with me."

13         I mean, every time that something cannot be

14  corroborated, Joe was with me.  And even when things can be

15  corroborated it's not my fault.  And even then when things

16  get a little worse or a little more dicey she says you know

17  what, it's somebody else's fault not, my fault. Just like

18  that.

19         If Joe was with her that afternoon, why is it

20  that she goes to the office, the leasing office?  Why did

21  she do that?  Why didn't she go directly home?  If Joe was

22  with her, why doesn't she leave the box behind?  Why did

23  she take the label off it if Joe is with her?  What's the

24  big deal?  Why don't we go to the storage shed, number 315

25  which they own, where it ultimately ends up.  Why don't we

1   just go put it there?  No one can have access to it there.

2   The door comes down.  You can put a lock on it.  Where as

3   at the office, there's all the people that have access to

4   it.  Why you do it that way?

5              The reason that she does it that way is because

6   Joseph Andriano has absolutely no idea that this Saturday

7   when he spends his time down at his family's house in Casa

8   Grande, Arizona, is the last night that he'll be alive.

9   That's what going on in this case.  That's why she leaves

10  it down there because she didn't want him to know about

11  it.

12             If she did want him to know about it, she would

13  have taken it right up.  They would have sat down, held

14  hands, cried, sang Kumbaya, whatever it was they were going

15  to do if this really was a suicide attempt.  But, of

16  course, she's always surreptitious about it.  She can never

17  walk down Main Street.  She's always got to go down an

18  alley.  And then she'll turn around and say to you but the

19  alley was dark.  And I'm not responsible for how unlit it

20  was.  That's how she turns things around.  Why not just

21  take it up there.  If Joseph Andriano was part of this, why

22  not do that?  Why for God's sake buy some elderberry.  Why

23  go ahead and buy that.  Why take the laborious time to sit

24  there, get the capsules out, take whatever is inside them,

25  and then put sodium azide in them.  If Joseph Andriano was

41

1   going to commit suicide, why didn't he just put it in some

2   water and chug it?  Why didn't he just put in it in some

3   food and eat it if that's what he was going to do.  Or put

4   it in some Gatorade, as she alleges that he took it with.

5          It makes absolutely no sense that on Friday, the

6   next day, he would sit down say okay put on gloves so we

7   don't get anything on us -- of course, it's only her

8   fingerprints on everything -- filled up the capsules and go

9   ahead and put them back in the elderberry bottle.  Why

10  would he do that?  That makes absolutely no sense under any

11  sort of fact pattern that you've been given that it would

12  make any sense.  It just doesn't.  And then say, well, I

13  then went ahead and put it back in or he put it back in

14  storage shed Number 315.  That doesn't make any sense

15  whatsoever.  She's trying to sell you a bill of goods.

16  She's trying to come at you from the side through the alley

17  without the lights on.  Or perhaps in the dim light of a

18  lie, you will be taken in.  That's what she wants you to

19  do.

20         But we know that on that Thursday she leaves that

21  package behind.  When she leaves, once that she leaves that

22  package behind you can only imagine how happy she was

23  because now it's going to be all over.  Now, Joseph

24  Andriano is going to be out of her life.  She's got this

25  lawsuit that's worth twenty million dollars.  That's what's

1   going on here.

2           And so what happens the next day even though

3   she's not working, she goes into the office.  There's only

4   one reason she has to go down to the office.  And that is,

5   of course, to go pick up this box.  As she's walking out,

6   she's being pestered or asked by the other worker, Shannon

7   Sweeney, "Hey, what you got there?  What is that Wendi?

8   What is it that you have in there?"  She's got this huge

9   smile on her face because she knows that she's going to be

10  through with Joseph Andriano soon enough.  And she says,

11  you know what, it's a gift, a present for a friend.

12          I never have heard, and I'm sure you never have

13  either, that death is referred to as a present for a

14  friend.  How euphemistic of her to say that death is a

15  present for Joseph Andriano.

16          But, then she takes it way.  And according to her

17  in between going to the movies, they fill out these

18  capsules.  The problem with that is you take a look at the

19  receipt for the purchase of the lamp, you'll see what time

20  that Joseph Andriano was actually at Sam's Club, it would

21  not be possible for him to be at Sam's Club and then also

22  for her to tell us that shortly thereafter he was filling

23  capsules with the sodium azide.  Actually, she was doing

24  that while he was at Sam's Club buying the lamp.

25          So, what happens after that is now we get to

43

1   Saturday and they have now purchased one of the lamps
2   that's made of pewter on October 6 of 2000.  October 7th of
3   2000 everything was okay, according to her.  Nothing's
4   going on.  His parents have been on vacation and so, on
5   this particular day his mother comes over sometime around
6   ten o'clock in the morning they do just normal sort of
7   things.  They go over to the swap meet to buy Nicholas a
8   tricycle where he could ride himself and Ashley on that
9   tricycle.  They come back, they go over to Sam's Club, and
10  low and behold, they buy a second lamp.  That's when they
11  buy the second lamp.  So they take it home.  By that time
12  it's getting late.  Her mother is already inside the house,
13  even though on cross-examination she said, no they were
14  just in the parking lot.  According to her and that
15  statement to the police, her mother was inside the house
16  while her father was outside getting cranky because her
17  mother was taking too long inside the house.  Everything
18  was okay.  Of course, everything is okay.  She knows she
19  was going to kill him.  All her problems are going to be
20  done and over with.  And so, what ends up happening, she
21  says at three o'clock that's when Joseph Andriano, Nicholas
22  Andriano and Ashley Andriano, the two kids that are two and
23  three, go down to sleep.  She stays up reading.  And the
24  three of them that have slept, get up at five or 5:30 in
25  the afternoon.  And she also tells the police that by 6:30

1   they're in Casa Grande.

2              So, pray tell, please explain it to me.   Please

3   explain it so that it would make sense to us in that time,

4   if Joseph Andriano gets up at 5:30 and it takes about 40

5   minutes to get to Casa Grande and are there by 6:30, when

6   did he have time to be putting together this lamp that she

7   alleged that he's putting together before they go to Casa

8   Grande?   That lamp that when questioned about it because

9   she let it slip that she went out to the living room where

10  he supposedly was, she didn't see it.   When does he have to

11  time to be putting it together.   When does he have time to

12  be breaking it?   He doesn't.   She's just making it up.   And

13  we know he was actually putting it together sometime after

14  they came back from Casa Grande.   The reason we know that

15  is because the shade is still on the bed.   There was none

16  of this going to sleep because that was still on the bed.

17             And that's how it was left.   But, according to

18  her, they then go to Casa Grand and they're there until

19  about approximately eleven o'clock.   Some football game is

20  over and they get back around midnight.   And now here's

21  where the story becomes problematic for her.   There's times

22  she indicates, well, we did take a shower and made love.

23  Or, no, we didn't take a shower or we took a bath and we

24  argued.   Needless to say, according to her, that's the time

25  that Joseph Andriano is poisoned.

1          So now we know that it's between twelve and one

2     o'clock in the morning that Joseph Andriano is poisoned.

3     It gets into his system.  Whether it's her telling you, I'm

4     not really sure, I'm not really sure if he wanted to die or

5     not.  But, you know, that's when I give him the Gatorade or

6     she put it in the food.  She can't explain that.  Or she

7     gave him the capsules.  We know it was between 12 and 1

8     a.m. that the poison goes into him.

9          We also know that there is a substantial period

10    of time when they're alone, where there's nothing, all we

11    have is her word.  Her word is not quite valid to us

12    because of her prior conduct, if you will, of her prior

13    statements.  So we know that that's the time that the

14    poison is in him.

15         And then what happens is that at some point, they

16    find themselves in the living room.  And according to her

17    in her statement to the police the reason that they're in

18    the living room is because he wants to argue.

19         And so she orders him to go to the living room if

20    they're going to argue.   You can see who wears the pants

21    in that family.  Even when he's upset, he's getting ordered

22    around to go to the living room and according to her at

23    that point things are going bad.  We know that he's

24    vomiting.  We heard from the expert.  That's one of the

25    symptoms.  Additionally, there's cramping, also gets

46

1    tachycardic.  In other words, the heart starts beating very

2    quickly.  The blood pressure goes down and there's a myriad

3    of symptoms that occur.  But we know that it's between

4    twelve and one o'clock, around there.  And we know that the

5    next contact with an independent source that can

6    corroborate what's going on is about 2:30 in the morning,

7    between 2:20 and 2:30 in the morning when the defendant

8    calls Chris Hashisaki to come over.

9         What her motive is in calling her over is

10   unclear.  But we know according to Chris Hashisaki that the

11   apartment was cleaner than she'd ever seen it.  What that

12   means is that she was getting ready for company.  She was

13   getting ready for people to come over and pick up Joseph

14   Andriano's body.  That's why she was calling her over, so

15   she could come view the body.  So she could watch him die.

16   That's why she was calling her over.

17        She says that then she has x-ray vision and can

18   see through buildings and could see all the way through all

19   these buildings and watch Chris Hashisaki come out of her

20   apartment and down to meet her by the breezeway.  And the

21   first thing that she discusses with Chris Hashisaki is the

22   issue about calling the paramedics.  And that's important

23   and it's important that it's the first thing she discusses

24   with Chris Hashisaki because she didn't want Chris

25   Hashisaki to tell Joe that even though she already told

1   Joseph Andriano that she's called the paramedic, she lied

2   to him.

3           Now, why would she lie to Joseph Andriano about

4   calling the paramedics?  Would it be because Joseph

5   Andriano isn't in on the suicide attempt?  Could it be that

6   she made that up?  That's the only logical explanation.

7   And she turns around and said, well, you know, Chris

8   Hashisaki is an absolute liar.  Why would Chris Hashisaki

9   lie?  That's her friend.  That's the person that she

10  called.  That's the individual that she chose to be present

11  there.  It's her friend.  They went out.  They did whatever

12  it is they did.  So why is it that all of a sudden now

13  Chris Hashisaki is a liar.  Chris Hashisaki is a liar

14  because she doesn't like what she's saying, which is the

15  truth.  Chris Hashisaki comes over.  She says, "I lied to

16  my husband.  The paramedics were supposed to be called.  I

17  told him that I did but I didn't."  And Chris says, "You

18  better get over there.  You better call the paramedics

19  because if you don't, you're going to be sorry."

20          Of course, at this point Chris is not operating

21  with full knowledge.  All she's operating with is what the

22  defendant has told her.  What the defendant has told her is

23  that, you know, Joe is not feeling well.  Told her about

24  the sodium azide, has she?  Isn't that something that

25  should be important to talk about?

1          Well, now we have things not going quite the way

2     that they should.  And so Chris Hashisaki makes her way

3     into Apartment 132.  What does she see.  She sees a wasted

4     shell of a man, who is terminally ill with cancer, lying on

5     his left side who has thrown up once.  She does not see a

6     pillow.  She does not see any blood.  She doesn't see any

7     of that.  Because if she would have, she would have

8     immediately called.  She would have told you that she did.

9     She didn't see any of that.  What she sees is this feeble

10     man who cannot get up from the floor.  That's what she

11     sees.

12          And there is no reason to believe that Chris

13     Hashisaki has any bias in this case because she's just

14     somebody who saw something there.  And she goes up to him.

15     And in the meantime, the defendant leaves them alone and

16     goes to make a call, calls nine-one-one.  And when she's

17     there, she talks to him and says, "You know what Joe, even

18     though the defendant says that you may not be focusing

19     right, I'm wearing my glasses.  Do you know who I am?"  "Of

20     course I do, you're Chris.  I recognize you.  I don't have

21     a problem, I'm just sick.   Doesn't mean that I have

22     dementia.  Doesn't mean I'm confused.  I'm just sick." And

23     he starts complaining at that point.  "I've been like this

24     for such a long time.  Where are the paramedics," he asks

25     her.

49

1        I mean he's almost whining.  He's almost like a

2   child at that point.  He obviously is incapacitated at that

3   point.  He can't do anything.  He's down on the ground.  He

4   is at -- this person right here -- he's at her mercy.

5        So what happens is he starts talking to Chris and

6   says, "You know, what" -- he may not have a watch in hand

7   -- but he says, "I've been like this for at least 45

8   minutes.  What's taking the paramedics so long?"

9        If he's been like that for 45 minutes, if he's

10  asking about the paramedics and the defendant confirmed

11  that she's lied to him about calling the paramedics, what

12  does that tell you?  That she's a liar.  When she tells you

13  this is a suicide attempt.  What's it tells you?  You must

14  consider it in light of all the other lies that she's

15  told.  Because this woman would not know the truth if it

16  was staring her in the face.

17       What happens then is that the defendant comes

18  back and she is now on with the dispatcher.  And according

19  to her she tells the dispatch, "Er, well, he's having a

20  heart attack."  Why, if she wants to save him, if this is

21  an aborted suicide attempt and she wants to take the

22  pills -- that's why she has them near the door according to

23  her -- why not tell the person that's going to provide the

24  medical care that it is not a heart attack.  That it is a

25  poisoning with sodium azide.  Why not do that?

1          The reason you don't do that is because you want

2     the person to die.  This is not a suicide attempt as she

3     maintains.  There's nothing about what happened that night

4     that says that.  So she lies again.  She says "heart

5     attack," because she's now been schooled with regard to

6     the symptoms of sodium azide.  And she knows, or what she

7     told Erik Vaillant, it's going to be like a heart attack.

8     So he starts are getting blue.  Are you having trouble

9     breathing and all that stuff.  And Chris says why are you

10    asking me these questions?  Just tell them to get here.

11    He's not feeling well.

12         And so the call is made.  But now there's a huge

13    problem with the defendant because now the plan is starting

14    to go a little bit astray.  Yes, he is going to die.  Yes,

15    he is dying.  He's exhibiting these symptoms.  But now

16    she's got Chris involved.  Chris has made her call the

17    paramedics even though she lied to her about it.  And now

18    Joe is saying, God, why are they taking so long.  And no

19    they're on the way.  So what did she do?  What can she do?

20    Do the thing that comes back to her.  Fall back on another

21    lie and say, "You know what, we better take him to the

22    hospital.  The reason we need to take him to the hospital

23    is that they said, the paramedics, the emergency response

24    team, said they were too busy to come out here.  It's going

25    to take them a long time to get out here so we need to take

1   him to the hospital."  Do you think she really wanted to

2   take him to the hospital or do you think that she wanted to

3   avoid providing treatment to him.  That's exactly what's

4   going on.  She wants the poison to take affect.  That's

5   what she wants to do.  She wants to make sure that he's in

6   that situation where no one can find him, where no one can

7   provide any care for him.  That's what's going on.  So she

8   begins to get a little frustrated.  And this shows, again,

9   this is important because it shows who wears the pants in

10  the family, who is dominant, who is the person who is

11  calling the shots.  The reason that is important is because

12  Sharon Murphy has a problem with that issue.

13              What happens is at that point, the defendant

14  begins to get proactive and she goes up to Mr. Andriano,

15  who is lying down on his left side, tries to lift him up

16  and she's asking him to help her get up.  And he can't.

17  He's too weak.  Whether it because of the chemotherapy

18  treatment, you heard from Dr. Kellogg who indicated between

19  eight and 12 days is when they are weakest.  This was the

20  tenth day.  We also know that he had sodium azide in him.

21  We also know from Dr. Keen that the cancer had spread, not

22  only in his lungs but the kidneys to his head.  And we also

23  know that according to her he was about 220 and we know

24  when he died he was about 165 pounds.  This is an

25  individual who is down for the count.  Can't physically get

1   up. So what does she do?  She tries to lift him and says

2   -- the words you would hear in church since she is such a

3   churchgoing woman -- "Get your ass up."  That does not

4   sound like somebody who loves him, who sat there and cried

5   for you and said, "Oh, he's so cute.  He's such a cute

6   boy.  I just loved his eyes."

7          Well, you know what, it's not what it sounds

8   like.  It sounds like a murderer who's trying to take the

9   victim out so no one could provide treatment.

10          And, then, as if that isn't enough, when he can't

11   get up and to motivate him, she goes a little further and

12   says, you know what she said, "Get your fucking ass up."

13   She didn't get it the first time, now, you're really going

14   to get it.  That, again, shows you who is dominant in the

15   relationship.  Mr. Andriano says, "What is going on here?"

16   And then the two of them start to talk.  And that's what

17   Chris Hashisaki says, "Hey, hold here.  The two of you need

18   to hold on.  We already hear the sirens."  And when she

19   says that, Joseph Andriano hears that.  There is never an

20   indication that he is not coherent.  There's never an

21   indication that he cannot carry on a conversation.  His

22   brain is okay.  So he knows the paramedics were on their

23   way.

24          So Chris Hashisaki decides to go out to show them

25   so they get there a little bit quicker.  But that's a

1  problem for the defendant.  And it's not so much a problem

2  that they're arriving there.  The reason that it's a

3  problem is because now Joseph Andriano knows that there's

4  somebody out there that can help him.  She can no longer

5  tell him that the paramedics are not there.  She can no

6  longer lie to him to keep him inside the apartment.

7  Because, when they come knocking on that door, Joseph

8  Andriano is going to say, "Hey, I'm in here.  Help me,"

9  because he had already told Chris Hashisaki that that's

10  what he wanted.

11        He's not going to just sit back when the door is

12  being knocked on and keep quiet.  And he starts talking

13  about, you know, did you really use that condom?  Are you

14  having an affair?  Do you think that this person who is

15  vomiting and dying is going to be worried about an affair?

16  Is going to having sex with her?  Do you really think

17  that's what's going on?  He's going to be saying as loud as

18  he can, "Come on in, help me."  You know.  "I don't feel

19  well."  That's what's going to happen.  She and he are

20  inside.  That's what we know.

21        As Chris Hashisaki leaves, she turns around.

22  He's now on his left elbow again and throws up again.  That

23  is not the cancer.  That is the sodium azide.  That's the

24  poison.  We did test that and it did not have any sodium

25  azide in it.  What's important to note at this point that

1   is that way sodium azide works.  When it gets into your

2   system, it just doesn't stay there in your stomach, it gets

3   into the highway that delivers it where it's going to do

4   the most harm and that is the tissues in your body.

5           If there's a small amount of sodium azide in your

6   veins that indicates in this case there was a large amount

7   that was consumed a long time ago.  Because the veins are

8   nothing more than conduits.  If there had been a lot in the

9   blood system, that would mean that there had been recent

10  ingestion.  All that the veins do, all that the arteries do

11  is just deliver it to the tissues.  So that's how an

12  individual dies.

13          So the fact that there is only two parts per

14  million indicates there was a large consumption a long time

15  ago.  It means that Joseph Andriano was on his way out.  It

16  means she just didn't wait long enough.  That's what that

17  means.

18          All this argument about whether it's only a small

19  amount, well, that's good.  If you want to kill the guy

20  that's exactly what that means.  And so we know that at

21  that point he's dying.  He didn't have much in his system.

22          We also know that the poison is also on the stove

23  in some food stuff, looks like soup or something.  And we

24  know that she fed it to him.  That's exactly how he

25  ingested it.  And she also gave him the pills.  That's what

1  happened.  You can see in the photograph, right there on

2  burner.  She can't, of course, explain that to you.  Just

3  no way for her to explain that.  Just no way to explain

4  that to you.

5          So what happens is Chris Hashisaki leaves without

6  her purse.  And then she goes to talk to the fire

7  department.  What's important about that is that she is not

8  at the door, near the door when she goes and talks to the

9  fire department when they're staging.  According to her,

10  the staging takes approximately five, six, seven maybe 10

11  minutes.  According to her, they're not moving quick enough

12  for her.

13          So they're taking their time by the fire engine.

14  That's the time that Joseph Andriano is unguarded.  That's

15  the time he's by himself with the defendant.  And that's

16  the time that she uses to kill him.  Plans to kill him.

17          The reason that we know that's what happened is

18  afterwards what she is wearing when she came out.  What we

19  know is that he can't get up.  So what that means is she

20  had to move away from him to get an implement to kill him.

21  We know that she went to the bedroom.  That's a reasonable

22  assumption because that's where the shade for the lamp

23  was.  There's no reason to believe that the lamp was in the

24  leaving room.  We also know that the lamp was not in the

25  living room because Chris Hashisaki said that it wasn't

1  there.  She didn't see it.  So we know it wasn't there.

2  She actually went to the master bedroom, got the lamp, hit

3  him over the head with it.  But it broke.  We have pieces

4  to show you.

5       Then what happened is she got the stool and

6  started hitting him over and over and over again.  What's

7  important about that is that he does have injuries to the

8  right side of his face, nose, mouth, right here in the

9  temple area.  Doctor Keen, the coroner indicated those were

10  actually rug burns.  One way that can be caused is his head

11  is down on the ground, somebody is hitting you in the back

12  of the head, that's how those were caused.  He's down on

13  the ground.  He's unable to resist.  She just keeps hitting

14  him over and over and over.  Twenty-three times.  Eight to

15  ten of those individually would have rendered him

16  unconscious.  So he's now down on the ground, unconscious.

17  He's out.  And besides, he couldn't get up any way.

18       One of the things that we need to take a look at

19  with regard to this injury -- and we have photographs for

20  you -- is that they are in a situation where they are all

21  directed to one place.  What's important about that is that

22  if he was moving around like she said he was, then they

23  wouldn't be quite so centered.  The hits would be to the

24  face.  The hits would be to the side.  They would be all

25  over.  But, they're not.  They're actually only in the back

1  of his head.  That's because he was lying face down.  You

2  understand when she hit him over and over and over and over

3  again, that's what caused in injuries to his face.  See

4  that?  He's lying on his right side when she kept hitting

5  him over and over again.  He wasn't moving.  He wasn't a

6  threat to her.  He wasn't a threat to anyone.  At that

7  point, especially in light of what Chris Hashisaki told

8  you, she said he was just down.

9          And so, she breaks the stool.  He's down.  But

10  she wants to make sure.  What she did is she gets the

11  knife, goes to the kitchen.  That's how the blood got

12  there.  He's already bleeding.  Goes to the kitchen, gets

13  the knife.  Sticks it right here in the left side of his

14  neck.  We also know the knife is punched in all the way

15  back to the spinal column.  Even though the blade is very

16  small, it's a 13-inch knife, not a 13-inch blade, the

17  coroner indicated that the reason the wound was this big

18  was because whoever did this took the knife, stuck it in

19  there and just moved it around.  That somebody wanted

20  somebody to die.  And for her to say that this individual,

21  who's already been beaten up, who's already suffered from

22  cancer, has chemotherapy, cannot get up, is throwing up,

23  has the strength to grab that and stick that in there and

24  twist it around, defies the laws of nature.  It just did

25  not happen that way.

1          It's during this attack that she kills him.   She

2   thought about it.   There's no way the paramedics are going

3   to come in.   For whatever reason, she'll get in trouble.

4   He won't die.   I'll just say it's self-defense.

5          So what she does then is she needs to clean up.

6   She doesn't go to the kitchen to clean up.   The reason we

7   know she didn't go to the kitchen to clean up is because

8   the barrette that's in her hair is full of blood.   We know

9   that she had to wash her hair.   We also know that when

10  Chris Hashisaki was there, she saw the defendant wearing a

11  white T-shirt.   We also know that when Chris Hashisaki

12  left, she says,"Hey, Wendi, where's my purse?"   And the

13  purse comes flying out.   The defendant may call her, may

14  call Chris Hashisaki an absolute liar but that would have

15  to include Rich Perrott of the fire defendant.   That would

16  also have to include Benjamin McKinnon because they both

17  corroborated what Chris said.   According to Rich Perrott,

18  he saw a purse that was thrown down there.   That's what he

19  saw.   Exactly like Chris said.   It wasn't after, like the

20  defendant maintains that she threw it out there.   Not at

21  all.

22         And we also know what happens is that she does

23  some very unusual things.   The first thing that is unusual

24  is she has to be called out.   She won't answer the door.

25  If there really is nothing going on in there, why not come

1   to the front door.    The reason she doesn't come to the

2   front door is because she has already done her deed.

3   Mr. Andriano is now dead.

4            So what she does, according to her statement to

5   the police, is she then goes and she steps into the

6   shower.  She also goes over to the sink, sticks her head

7   down in, cleans her glasses out, cleans her hair out, gets

8   it all wet.  Then gets into the tub, cleans her legs.

9   And, then, what she ends up doing is, she goes over to the

10  patio rather than going to the front door.  She jumps over

11  the patio, going over the north side and comes all the way

12  around.

13            And low and behold, she's not got a striped shirt

14  and it's now about 2:30, 2:40 in the morning.   She's

15  changed clothes.  Why does she need to change clothes?   If

16  she didn't get any blood on it, why do you change clothes?

17  Why do you have to have your hair wet?  She says Chris

18  Hashisaki is an absolute liar when she says that's what

19  happened.

20            Well, then, okay.  How about Rich Perrott?  He

21  said that she had wet hair.  And Trip McKinnon said the

22  clothes she was wearing looked like they had just been put

23  on or like she is going to work is how he described it.

24            So they're all liars.  Everybody who doesn't

25  agree with Wendi Andriano, that is what she's saying,

1    basically.  But, you know, these individuals, the

2    paramedics, they don't have any reason to fabricate.  Chris

3    Hashisaki, what does she care?  She's just here to tell the

4    truth.

5            But she does show up.  She has washed her hair.

6    And the only reason she would need to wash her hair is

7    because it was bloody.  She has changed clothing.  The only

8    reason she would need to do that is because that was

9    bloody.  So what ends up happening is, again, always in

10   control.  Always the master of deception.  Always this

11   misdirection.  She tells them go away, he doesn't want you

12   here.  He doesn't want to you here?  He's the same

13   individual that was complaining that it was taking them too

14   long to get there.  He's the one that was saying, "God, I

15   hope they get here soon.  I'm just so sick.  What's taking

16   them so long."  That's the individual that you're telling

17   us doesn't want you there?  That somehow all of a sudden

18   made a just incredible gigantic recovery against all the

19   laws of medicine?  That's the individual that you're

20   telling us does not want the paramedics there?

21           That individual that you're talking about is no

22   longer on this earth.  That individual that you are

23   attributing those statements to is dead.  That individual

24   is in that apartment, 132, alone with his two kids, his two

25   and three year old.  It's amazing -- it's amazing to think

1   that that happened with those kids in there.  But it's also

2   more amazing she didn't come in here and complain to you,

3   know what, he died when those two kids were in there and I

4   was outside with the paramedics.  I mean, it's surprising

5   she isn't blaming him for dying and leaving those kids

6   alone on this earth.

7            It's just amazing, given the fact that she has

8   blamed him for everything that has ever gone wrong in her

9   life.  Blamed him for the affairs.  Blamed him for having

10  to go out.  Blamed him for wanting to go out dancing.

11  Blamed him for wanting to go out and kiss guys.  Blamed him

12  for sitting between guys' legs.  Blamed him for kissing

13  this guy.  Blames him for everything.  It's amazing she

14  doesn't blame him for dying and leaving the two kids

15  alone.

16            But she goes back inside.  And she doesn't go to

17  the front door.  She's goes in through the back door,

18  again.  What is the need of that?  But before she leaves,

19  one of the things that she says to Chris Hashisaki is,

20   "That's okay.  You know, you don't need to stay.  I've

21  already called my father.  I've already talked to my

22  father."  And remember that's about 2:40 in the morning.

23  Why would she need to talk to her father if Chris Hashisaki

24  is there?  Why would she need to do that?

25            According to her father, this first call was

62

1   placed about two o'clock in the morning.  And he didn't get

2   it, because he was asleep.  According to the defendant, she

3   then called a relative and that relative got in contact

4   with him.  And she was able to talk to him.  But one of the

5   things that her father told us was that when he got on the

6   phone with her -- remember this was immediately before she

7   came to the apartment -- she was telling Chris, "I've just

8   talked to my father."  Her father says that she told him

9   that she stabbed him.  That's what she says.  She stood up

10  there on the witness stand and said, "No, that's not what I

11  said." And then when the tape is played and you saw the

12  tape.  It says, "Yeah, I don't know if it was on the cell

13  phone or the phone from the house, or whatever but she told

14  me that she stabbed him." That's what he testified to.  And

15  that's what he told the police.  So that tells us she's

16  already spoken to him when the paramedics are there, when

17  she talking to the paramedics.  And she changed clothes.

18  And she's showered.  And she tells somebody that she's

19  already stabbed him.  That tells us that Joseph Andriano is

20  now dead.

21          So now that leaves us with an hour and 14 minutes

22  between calls.  Let's be generous, give them an hour.  We

23  already know that Alejo Ochoa, this person who can

24  teletransport himself through time, gives him time to get

25  there, doesn't it?  And what are they doing for that hour?

1    What is it that Wendi Andriano is doing for that hour?

2    What is it about dialing nine-one-one that she has a

3    problem with?  She didn't dial none-one-one when her

4    husband is alive.  She didn't dial nine-one-one when her

5    husband is dead.  What is it about those three digits that

6    are causing her problems?    The problem that she is

7    having -- and the reason she's not dialing those three

8    digits -- is that she's got to come up with a story.  She's

9    got to come up with another lie.  That's what she's got to

10   do.  And so she goes in there and concocts this

11   self-defense thing.  Oh, yeah, you know, I'm going to tell

12   them that I'm really thin, I'm really skinny and show up in

13   court looking marmish with my black hair and glasses, even

14   though I'm wearing contacts all the time.  I'm going to

15   tell them that, you know, I was only about hundred pounds

16   back then so they can think that he took advantage of me.

17   You've seen what she looked like back then, all sassed up

18   in her pink little outfit.  You've seen what she looked

19   like.  She didn't look like somebody who was unhealthy.

20   Didn't look like somebody who couldn't hold her own.  This

21   individual was somebody who was and did kill her husband.

22   Was strong enough to do that.

23          But we also know she's always thinking.  She's

24   just doesn't lose her cool.  She's talking to the

25   paramedics.  She just killed her husband.  You know, go

64

1   away.  He doesn't want you here.  She's already talked to

2   her father.  The father has had classes in police work.

3   And between the two of them, they decide to come up with

4   this plan.  One of the first things that they have to do

5   with regard to this plan is they have to get rid of the

6   lamp.  You see that didn't fit because the lamp wasn't

7   out.  The lamp was inside of the bedroom.

8            So they have to get rid of that.  But, you know,

9   even though they tried to be as thorough as they can, they

10  only have an hour to fix this thing up.  So what they do is

11  they get most of the pieces.  But there is that recliner

12  there.  There's one piece on the recliner, two of them

13  underneath and one by the door.  They miss those three

14  pieces that goes to that lamp.  As much as they want to be

15  thorough, and they were, they missed that.  And, you know,

16  it's just one of those things, you know, the laws of nature

17  just are not subject to change.  They are not subject to

18  lying.  There's no way they can tell those three items are

19  not part of the lamp because they are.  They can't change

20  that.

21           So where is the lamp?  That is the answer, where

22  is the lamp?  We asked her about it.  Did she tell you

23  where the lamp was?  No, she didn't because it wasn't to

24  her benefit to tell you where the lamp was.  She knows

25  where the lamp was.  They got rid of it.  That's what they

1   did with it.

2          And so, now they're beginning the process of

3   making this seem like self-defense.  But one of the other

4   things that they forgot is they forgot about the box.  That

5   the box was there.  They forgot about the receipt.  You

6   know Joseph Andriano has helped us so far as with regards

7   to the recording where he says you know, no, I don't want

8   life insurance.  Now, his wallet is helping us a little bit

9   more.  He's got two receipts, one for October 7 of the year

10  2000 and one for October 6.  Both for the same lamp.  Same

11  stock number.  It's the same lamp.

12         So, according to her, I don't know, there could

13  have been a third lamp, that a burglar, who came in through

14  the side gate of the patio left behind.  Remember, she told

15  you that that's something that could happen.  Yeah, a

16  burglar could have came in, dropped this lamp off for her.

17  That's exactly what he did and forgot about the box.

18         Again, they were in a hurry.  Because, see, they

19  had other things to take care of.  They had that dresser to

20  contend with.  They had to do something with that dresser

21  where the condoms were supposedly contained.  According to

22  her, she reached over and found one.  But you can see

23  they're not readily accessible.  That's another lie.

24         But they had to do something with that dresser.

25  And what they did is, they, unfortunately, left that box

1   right there.  This box that was only purchased on October

2   7th.  It could never have been photographed by Alejo Achoa

3   in the early part for September because they hadn't

4   purchased it yet.  They hadn't bought it.  Unless he can

5   teleport himself.  However, it didn't happen.  It just

6   didn't happen.

7            So, now we're getting a flavor of this

8   individual.  We're getting a flavor of what she is capable

9   of doing.  Well, we also know that that's the situation

10   about the knife.  And also the situation about a belt.  She

11   came in here and told you, well, I don't know about the

12   belt.  But she was a Chatty-Kathy with the detective and

13   said, no, no, no.  The way it worked is that he attacked

14   me.  He came after me with the belt.  Remember that?  And

15   she was able to get away from him with that belt.  That's

16   not what she told you here.  But, you know, maybe because

17   she took an oath she's going to tell you, well, now I will

18   tell you the truth.  But he's got the belt.  According to

19   her, she was able to get out of that.  And in all the while

20   this defendant is chasing her.  I'm sorry.  All the while

21   Mr. Joseph Andriano was chasing her.

22            And then what ends up happening is that he's

23   chasing her with the belt, she able to get away.  But

24   then, according to her, he picks up this cell phone

25   plug-in.  And when he picks up that plug-in, he goes after

1   her with that.  She tells you that, oh, God, I was

2   kneeling.  I was kneeling in the kitchen looking at the

3   photograph of the family when he came up behind me.  That's

4   what she told you.  That's what she told you here in

5   court.

6            Of course, with the police when she doesn't have

7   her story straight, she says, well, the cord, he puts it

8   over me and I went to make a phone call.  I thought it was

9   he put the cord over me and then we went through the living

10  room into the kitchen.  And I had to get near a place where

11  there was a knife.  I asked her was the cord very tight?

12  Yes, it was very tight.  It was making me fear for my

13  life.  I couldn't breathe.  I couldn't breathe.  And then

14  what happened.  When I couldn't breathe I ended up getting

15  near the knife.  So you were able to go over there.  We

16  went over there.  She got the knife.  And than she said

17  with one hand she grabbed the knife, with the other she cut

18  the cord.  The problem is she's going to cut the cord, why

19  doesn't she have a stab wound up in her chin?  Why doesn't

20  she have that?  If it's so tight that it's making her

21  afraid for her life, why is it then that she doesn't have,

22  if you will, any cuts, any marks, anything like that right

23  here in this part.  Because that's where she said it

24  happened.  She doesn't have anything like that.  The reason

25  she doesn't have any of that is because she's making it

1   up.

2            And then she says, oh, you have it wrong,

3   Mr. Martinez.  What I actually did is I pulled it out this

4   far.  What that means, then, is that it wasn't very tight.

5   You can't have it tight and then be able to pull it.  You

6   can't do that.  She says I was able to do that.  I was able

7   to pull it this far and start doing that.   If you can do

8   that, why didn't you just put it over your head and be done

9   with it.  She says, well, I didn't think of that.   The

10  reason she didn't think of it is because it's a lie.   And

11  then what happens is she cuts the cord, puts it down,

12  according to her, and the fight continues.

13           The problem for her is that she then says that

14  she gets the knife.  She has the knife.  He's now in the

15  living room.  He never struggles with her for the knife at

16  all.  Doesn't say a single solitary thing about him having

17  the knife, about him screaming at her saying "I want to

18  commit suicide."  Doesn't say anything like that.  Doesn't

19  say anything at all.  What she does say is that I have the

20  knife in my hand.  And, then, after I have the knife my

21  hand, he's bleeding.  He's down on the ground and he's

22  bleeding.

23           Well, coupled that with the fact you told Alejo

24  Achoa that you stabbed him.  Certainly, it's clear she's

25  the one that did the stabbing of the man who is down on the

1    ground unable to defend himself.  So what does she do after

2    that?  Well, the blood that's in the kitchen, that's on the

3    counter, that's on the refrigerator, the one down on the

4    ground in the picture, that's fabricated evidence.  She

5    just put it there.  She put it there to give credence to

6    this story that she concocted that night.  They only had an

7    hour and they come up with quite a story.  Because

8    according to her when she talked with the police, she

9    immediately, after the attack was done, cleaned up.

10          Well, it doesn't make sense if she's cleaned up

11   and all the blood is here and she tells us that other

12   story.  It just doesn't make sense.  The only thing that

13   makes sense is if you're going to be removing things, like

14   the lamp, if you're going to be saying that you're kneeling

15   or you're somewhere else, you're going to be making up the

16   stories up, the only thing that makes sense is that you

17   made this up with regard to the cord.  And you made it up

18   because you want to have self-defense available to you.

19          The other thing that's impossible for her is that

20   she tells the detective, well, I hit him a couple times and

21   he started bleeding.  What happens is he then comes after

22   me.  He is bleeding.  That's how the blood got in the

23   kitchen.

24          Well, see, that's something that can't be true.

25   Because he never got up.  And we know he never got up

1    because the blood never goes down this way.  The laws of

2    gravity -- Isaac Newton would be surprised to note that

3    Wendi Andriano trumped him -- the laws of gravity does not

4    apply in that apartment.  And it doesn't apply with regard

5    to feet.  Hers have blood on.  His do not.  She claims,

6    well, you know, he got up and came after me.  If he is

7    bleeding, if he has all that blood, then how come he didn't

8    have any on his body?  The only explanation is he never got

9    up.  And all this blood all around the apartment is

10   something that she put.  And then she also says, you know,

11   I didn't let anybody into this apartment.  I cleaned up.

12   And then, I opened the door to let the paramedics in.

13          Then she counters and says, well, when I moved

14   him, that's when I got blood on me and that's why I opened

15   the door.  But in the statement to the police what she

16   actually told them was that I grabbed him by the shorts,

17   the buttocks and the leg.  And then I just turned him

18   over.

19          How about the blood outside?  She claims never to

20   have gone out there.  How did that get there?  Again, maybe

21   providence swooped down and put that down there.  Or maybe

22   it's that she's lying about the way things happened.  And

23   perhaps that's exactly what is going on in this case.

24          We do know then that the police were finally

25   called.  The paramedics are finally called about 3:45 in

1   the morning. There is something to be said about that

2   golden hour. She did take full advantage of it. She did

3   stage the scene. She wants you to believe there was a

4   fight there when, in fact, there was no fight. Because a

5   fight takes two people. There was only one combatant.

6   That's because the defendant, Mr. Andriano, couldn't get

7   up.

8        We've been talking about these facts and I've

9   been telling you about it. But what about some of the

10   things or some people that she talked to? What about some

11   of the people that this defendant's spoken to? And what is

12   it that she's told them? Perhaps I will elucidate and show

13   you what kind of person she is.

14        One of the people that she talked to was Sharon

15   Murphy. Let's talk a little bit about Sharon Murphy and

16   what the defendant told her. And let's do this in the

17   context of one of the jury instructions. And one of the

18   instructions that you'll get is going to read as follows:

19   In determining the evidence you must decide whether or not

20   to believe the witnesses and their testimony. As you do

21   this, you should consider the testimony in light of all the

22   other evidence in the case. This means you may consider

23   such things as the witness' ability and opportunity to

24   observe, their manner and memory while testifying, any

25   motive or prejudice they may have and any inconsistent

1   statements that may have made.

2          It also gives you further guidance and says you

3   must evaluate the defendant's testimony the same as any

4   other witnesses' testimony.

5          So that's the standard you are to apply and the

6   law that you indicated that you would follow with regard to

7   the defendant's testimony.

8          Let's see what it is that she told Sharon

9   Murphy.  We know one of the things that she and Sharon

10  Murphy talked about was this broken window in her car back

11  on November of 1991 when she was living at Quail Garden

12  Apartments.  And that was the time when she had this

13  relationship with Shawn King, if you remember.  It was at

14  that time, according to her, that Mr. King came over and

15  bit her finger or bit the ring -- one of the two things

16  depending on what you to believe -- and then he went out

17  and broke her window.

18         Sharon Murphy laid great weight to the fact she

19  never reported it.  She said there was no police report

20  with regard to that.  You saw the look on Sharon Murphy's

21  face when the State produced a police report from the Casa

22  Grande Police Department saying wait a minute, it involved

23  Wendi and Joe, it involved Shawn King, it involved the

24  incident that she was talking about.

25         All of a sudden, the woman who is the

1    prototypical domestic violence victim is not so

2    prototypical because she has no compulsion about talking to

3    the police.  The defendant can get up on that stand as many

4    times as she wants and yammer and mutter away as long as

5    she wants but she cannot change the fact that there is a

6    report.  And she cannot change the fact that that report

7    does not include any reference to anybody coming to her

8    door, does not include any reference to any security guard,

9    doesn't include any reference to any of that.  I guess that

10   Casa Grande Police Department was out to get her because

11   they too are absolute liars.

12         That's what she's going to tell you.  But that's

13   not what is in the report.  They indicated she had to

14   confirm, there was never any mention of that.  It does

15   indicate, per her admission, that she is the person that

16   they talked to.  She's the person that gave them all of the

17   information.  She's the reason that a citation was issued

18   for Shawn King for the broken window.   All of a sudden,

19   Sharon Murphy's great big opening salvo, if you will, that

20   she has all these relationships and in all these

21   relationships she has been abused and she has learned not

22   to call the police.  All of a sudden -- no pun intended --

23   that's out the window.  That's not part of the inquiry.  So

24   we have a lie.  A huge lie, if we're going to talk in the

25   social worker vernacular of the assessment world.  That's a

1 big lie.  That's a very important issue.  Their expert and

2 also Sharon Murphy said that.  All of a sudden, this woman

3 knows her way to a telephone.  She knows her way to

4 nine-one-one.  She did, in fact, call the police.  There's

5 a report to prove that.

6    The other thing that we have is that Sharon

7 Murphy based her opinion in large part on the fact that the

8 defendant was an ingenue, someone chaste at the time that

9 she came across Joseph Andriano, a big 220 pounds lox of a

10 man that she came across.  Well, she indicated and placed

11 great place weight on the fact that she, the defendant,

12 cried when she had this first sexual experience with Joseph

13 Andriano.  The problem, again, this is the problem with the

14 assessment because there is the issue of secondary gain.

15 If it is to you're benefit to lie, you may do it.  And all

16 we have here is the Defendant's word.

17    And according to their expert, Mindi Mechanic,

18 who has supposedly done all this research, there's nothing

19 out there in the research world done on this issue of

20 secondary gain in a person charged with a crime who is

21 asserting the defense of domestic violence.

22    And what all that tells you is it's up to the

23 evaluator to see what opinion they reach.  The bottom line

24 what's going on here is Mindi Mechanic chose to believe her

25 even though we have the issue here.  Even though she didn't

1   do her job.  She didn't do her job.  Why does she come in

2   here and say I think that was that her first sexual

3   experience.  And she was asked by defense counsel, not even

4   by the State, was that her first sexual experience.  Yes,

5   it is.  She took an oath to tell you the truth, the whole

6   truth and nothing but the truth.

7           What does she tell you?  Half truths.  She tells

8   you about a broken window.  She tells you about a first

9   sexual experience.  Because that's how she feels.  That's

10  how Sharon Murphy feels because she has a bias toward the

11  defendant.  And so she's going to believe everything she

12  tells her and she's going to feel in her heart, nothing

13  with her mind, that that was the first sexual experience.

14  And how does she feel that?  Because the defendant cried.

15  That's something to be expected.

16          Well, what about Dido Gamez.  I mean, he might be

17  a little upset he's not considered the first because the

18  defendant says he was.  I'm sure and Sharon Murphy was

19  quick to point out every time that the defendant has sex

20  with Mr. Andriano, she had to use a lubricant.  I wander if

21  she had to use a lubricant with Dido Gamez.  I wonder if

22  she had to use a lubricant with Vernon Barnes.  These are

23  issues they brought up because they wanted to paint her

24  holier than Thou.  They wanted to paint her white as an

25  angel.  But there is a problem when you lie, it catches up

1   with you.  Just like it did right there.

2          When she talks about this issue of the lubricant,

3   the only thing that I can tell you is that even though she

4   sits up there and cries, she cries her eyes out and says

5   it's a beautiful face and I love him so much.  You may tell

6   us that right now.  But you weren't in love with him

7   because you could not even bring yourself to the point of

8   enjoying the most intimate thing that two people in love

9   do, that's enjoy sexual intercourse.  Couldn't do it.

10          According to her, towards the end he was nothing

11   but gross.  He was skinny.  Certainly wasn't like Rick

12   Freeland, right?  That good looking guy that she really

13   loved from her little statement.  That guy that was her

14   best friend and that would listen to her.  Yeah, he wasn't

15   like that at all.  He was real healthy.  Certainly wasn't

16   like Travis Black who has arms the size of legs that she

17   met one night and had a one-night stand.  But, you know,

18   that's not an affair.

19          And they also talked to you about having sporadic

20   employment.  That's on the part of Mr. Andriano.  That's

21   nothing more than an attempt to smear Mr. Andriano.  Of

22   course, he's not here to talk about it.  So it's real easy

23   to make that particular charge.

24          But the problem with making that charge is that

25   she forgot that she had a conversation with the Phoenix

1  Police Department.  They were the ones that pointed out you

2  didn't know you were being videotaped.  You didn't know you

3  were being recorded.  So what?  What difference did it

4  make.  Does the truth care whether it's being tape

5  recorded?  Does the truth care whether it's being

6  videotaped?  Absolutely not.  What difference does it

7  make?  The law allows it.  Nothing improper about it.

8  She's videotaped.  So what?

9          But, at 8:33 and 31 seconds when she spoke to the

10  police about that issue, David Lucero, the detective there,

11  asked her about his work history.  Did he, meaning Joseph

12  Andriano, make pretty decent money before?  And talking

13  about before the surgery in 1998.  And she said, "Yeah, he

14  did.  He made great money."  How is that sporadic

15  employment?  How is that sporadic employment?  How is he a

16  bad provider that way?  You know what, she just couldn't

17  get her story straight.  And so remember I asked her on

18  cross-examination, well, isn't it the truth that the reason

19  that he had sporadic employment was because he couldn't

20  work any more?

21          What happened is that for whatever reason the

22  fates that drive our lives had decided that Joseph Andriano

23  had a bullseye on his back and we're going to take his life

24  away from him.  And not only that, with the help of the

25  Mayo Clinic and surgery, he no longer, basically, has

1   muscles in his shoulder.  He had a problem with his neck.

2   And the Federal government saw fit, because of that

3   disability to pay him because he couldn't work.  And I

4   asked her, "Isn't it true that he couldn't work?"  Sharon

5   Murphy said, "Oh, no, no, no."  According to Sharon Murphy

6   he could work.  According to the defendant, yeah, he could

7   work.  Let's see what she told the police at 8:28:40 in the

8   morning back on October 8 of the year 2000 he could no

9   longer work because of the Mayo Clinic, when they did that

10  surgery, they removed some muscles -- some muscles here.

11          And he always used to install auto glass.  See,

12  he was a big guy; big strong guy.  And he picked up these

13  windshields and set them in cars.  And, now, after the

14  surgery, he couldn't do it any more.

15          You know, it's that saying, you know.  I said it

16  once before and I won't bore with you it more than one more

17  time: With the truth, you ain't got to remember nothing.

18  You don't.  These kind of things would not be an issue if

19  she was telling the truth.  If she was, in fact, the victim

20  of domestic violence.  She's not.  And these are the things

21  that Sharon Murphy laid great -- or placed great weight

22  on.  Because, now, you know all of a sudden the person is

23  sort of a lacky or a slacker who goes to the lake all the

24  time and doesn't carry his own weight.  Those are the kind

25  of people that we don't like.  That's the kind of guy that

1  takes advantage of women.

2       The problem is that Sharon Murphy didn't do her

3  homework.  She's passing off fable as truth.  She's passing

4  anecdotal information as truth.  How does she know about

5  this sporadic employment?  Why didn't she review the

6  defendant's statement?  Maybe she could have gotten a

7  better look at what the defendant's really about.

8       The reason that she didn't do it because she's

9  got a bias.  She's got a bias for the defendant.  She likes

10  the defendant.

11       And then we have up there this issue of the stone

12  pot.  This stone pot involved the circumstance that

13  happened in the farm house.  That's how they classify it.

14  That's the first mention that Sharon Murphy made of the

15  first incident where the defendant indicates to her that

16  there had been any form of physical violence, if you will,

17  between her and Mr. Andriano.  And she went to great

18  lengths about saying that he threw himself through the

19  door, grabbed her up against the wall, had a pot and hit

20  the wall with that pot.  She then ran hiding somewhere.  He

21  went to sleep.  And that was the end of it.  They never

22  talked about it.

23       There's a problem with that.  That's not what

24  happened.  And at 8:42:36 the defendant talked to the

25  police about it.  One of the things that she and the police

1  talked about was involving this incident.  So, of course,

2  the defendant is saying this, was having a little fit or

3  whatever.  I was mad at him because he was doing whatever

4  he is doing.  These are things that are available for you

5  to look at.  I called my dad and had him pick me up and

6  take me home.  Same thing that she's does all the time.

7  She's got to talk to her dad.  Not her mom.  So when he

8  gets home involving the stone pot, she says, he's drunk as

9  can be and starts to pass out on the bed.  Well, I'm mad.

10  Uh-huh, look out.  The woman with the pants in the family

11  is mad.  So I start arguing with him, you know.  I'm, like,

12  I know, I want to know why you did what you just did.

13  We're just married, remember?  We just got married.  What's

14  going on or whatever.  She never said to Sharon Murphy that

15  she was a participant, as least, initially.  Not that what

16  Mr. Andriano did was right, but she didn't give her the

17  full story.  The reason that's important is because now we

18  have this thing where Mr. Andriano is seen as the bad guy.

19          Well, let's talk about this whole thing.  Let's

20  talk about why this even came about.  The reason this came

21  about is because he was going to sleep, she started bugging

22  him.  And she started going after him.  She's mad.  And

23  because she wears the pants in the family if she can't

24  sleep, nobody else in the house is going to sleep is what

25  she's saying.

1          Then she says, at 8:59:24 that day, in this

2   particular fight that we're having, I know I hit him.  Wait

3   a minute, doesn't that go contra to the person who is a

4   victim of domestic violence?  It sure does indicate, of

5   course, that the person in charge, the defendant, she

6   initiated the fight.  There is a fight.  Again, not

7   excusing what Mr. Andriano may or may not have done.  We

8   also know that she's the one that hit him.  How about for

9   wearing the pants in the family?  All of a sudden this

10  isn't quite the glorious work of art that had been

11  presented to.

12          She also talked about how she used to work with

13  Sharon Murphy at the Courtyard Apartments.  That's one of

14  the things that she said that she did.  And on

15  cross-examination she did admit that she lied to Sharon

16  Murphy and why she left the Courtyard Apartments.  Well,

17  whether she admits it or not it's still a lie.  And not

18  only is it a lie, additionally she indicated, well, it

19  really wasn't a wholehearted lie because it was Sharon

20  Murphy -- now it's her fault -- but Sharon Murphy put down

21  management company.  That the management company had

22  changed.  That's why I was fired.  I just meant that

23  management changed.  It's really Sharon Murphy's fault

24  because I never said that it was the management company.

25          But, of course, when she speaks to the

1    police -- and you have this back there for you -- during

2    the course of all that, we lived in Casa Grande.   The

3    apartment place I was managing switched management

4    companies.   And so they didn't retain me as manager.   I

5    think it was because of a lot of the medical problems.   So

6    that's why I found employment with San Riva.   When she

7    makes these statements, it's not her fault, for God's

8    sake.   How could it be her fault?   It's Joe's fault.   Not

9    only was she untruthful but untruthful as to the reason she

10   was terminated.   That's what she told you.   She finally

11   admitted that she was terminated there.   And so, again,

12   that's another lie.   All of a sudden, this house of bricks

13   that Sharon Murphy has built around the wall of domestic

14   violence is coming down because there is no domestic

15   violence here.   If you show this all to the light of day

16   what you actually have is a woman who is lying to her.

17           But let's talk little bit more about the topic

18   that they covered just to make sure because that is the

19   crux of their case.   Well, they talked about bruising and

20   then abusive observation checklist.   Remember that?   One of

21   the things that she put on the abusive observation

22   checklist is that three to ten times she had been bruised

23   by Mr. Andriano.   The problem with that is that she was

24   asked by the detective did he ever leave any marks.   And

25   she said no.   And then that's when we got into the

1  tete-a-tete, well, marks don't mean bruises.  That's the

2  reason why I said no.  Bruises are different than marks.

3  Well, the whole quote is "Did he ever leave any marks?"

4  The answer, "No, I don't -- I don't mark.  I don't bruise."

5          Either way, all of a sudden, this information

6  that she's providing to the observation checklist shows you

7  the fallacy and the weakness of the approach they took.  It

8  is only as good as the truthful nature of the person who

9  provided it.

10          Let's talk about the affair.  Well, she indicated

11  that she only had one affair.  That's all she had.  That's

12  all she said she had.  Because the intimate moment that she

13  shared with Travis Black, outside of marriage, even though

14  she's a good Christian woman, is not an affair.  You can

15  now all go home, those of you who are married, and say to

16  your significant other, that's okay, I'm going to go a head

17  and do that because that's not an affair.  I was in court

18  and I heard that.

19          Well, you know, that's nothing but hogwash.  She

20  strayed from the marriage with Travis Black.  One of the

21  reasons that's important is when she filled out the abusive

22  observation checklist, she's only listed one.  She listed

23  one because she wanted to make herself seem better.  Either

24  way, she's lying.  It is an affair.  And she said, "No, it

25  isn't.  It is not an affair and I never said that it's an

1   affair."

2              Yet, when she was testifying on October 28 of

3   this year to you, this is what she told you in response to

4   a question, "It's not his fault that I had an affair; that

5   I cheated on him." That was on October 8th of the year

6   2000.

7              So what is it. She can come in here and lie to

8   you and say that it isn't an affair. And say but you know

9   what, I filled that out I was angry. Again, that

10  illustrates the problem with the test. That illustrates

11  that in that particular case Sharon Murphy was in over her

12  head. She's a master liar. She took her in. And Sharon

13  Murphy, you know, to even to the end of the testimony still

14  believes her, even though these things were brought to her

15  attention.

16             Let's talk a little bit about Rick Freeland.

17  Well, the issue with Rick Freeland. One of the things that

18  Sharon Murphy believed was that it wasn't the defendant's

19  fault that she got involved with Rick Freeland. I mean,

20  she has a husband who is dying of cancer. The other thing,

21  she was really stressed out. And not only was she stressed

22  out but, you know, this guy was nice and was really just

23  more like a friend. Why is it that she gets involved with

24  him? Why is it that they engaged in the most intimate acts

25  that two people can engaged in? Well, because, according

1   to her, she didn't want to be a tease.  Wow.  Just because

2   you have a drink with somebody, just because a man is nice

3   to you, you better be careful you're not a tease.  But if

4   you are, then you can have intercourse with him and you

5   know what, it's not your fault.  It really isn't your fault

6   because that's not, according to the defendant, the way

7   women should act.  According to her, it's worse to be a

8   tease than it is to be a cheat.  I guess that's what she's

9   telling us.

10          The other thing that she didn't tell Sharon

11  Murphy was that, well, I stood outside of this door for an

12  hour, telling him to come on out.  I want to talk to you.

13  Because that would make her look pretty bad.  She didn't do

14  that.  Why would she do that?  That's a lie by omission.

15  If we really want the full truth in the assessment to come

16  out, that's one of the things that you should say.

17          The other thing that she didn't tell Sharon

18  Murphy is that she gave him some furniture -- bought him

19  some furniture.  According to Mr. Freeland, he was going to

20  pay her back.  The defendant spends the money for that.  I

21  thought that they had this home.  I thought they had these

22  two kids.  Don't you think that the money would have been

23  better served by using it on these kids, the two and three

24  year old that she cried about when she took the stand?  But

25  that's all right.  Let's take some of the food out of their

86

1   mouths to give to Rick Freeland.  Yeah, he's a much better

2   candidate for that, right?  Let's go a head and give it to

3   him.

4          But, of course, Sharon Murphy knew nothing of

5   that.  Because that would mean that the issue of financial

6   responsibility in this power and control wheel would be

7   problematic.  The power and control which we know is not

8   the norm, which is not a scientific psychiatric approach.

9   All of the tests are nothing but self-reporting.  The

10  reason that I put Travis Black underneath Rick Freeland is

11  because Mr. Black was not mentioned in her report.  Can you

12  imagine?  Okay.

13         I understand that -- I understand that perhaps

14  that was not considered an affair.  Why didn't she tell

15  them about it anyway so that Sharon Murphy could make up

16  her mind?

17         One of the things most telling about Travis Black

18  and the way that came about is that Mr. Andriano was going

19  through the chemotherapy, which indicates he wants to live,

20  he wants to spend more time with his kids.

21         You don't go through this horrible thing that

22  makes you go bald, that kills your kidneys, that makes you

23  feel tired, that makes you feel terrible -- you don't do

24  that unless there's a greater good.

25         The secondary gain is that he's going to have,

1   hopefully, more time because of the tumors are not going to

2   be spreading.  What's galling about that is on September

3   26th of the year 2000, he goes to get the chemotherapy

4   treatment.  His dad is there with him, not the defendant.

5   And there's none of the movie stuff that she said.  Well,

6   when he goes there, he comes out and he's feeling bad.  We

7   knows he's not home.  Where is he.  We're really not sure

8   where he is but he's definitely to not at Apartment 132 the

9   next day, September 27th.

10         And what's galling about that is he is fighting

11  for his life to be with his family, the woman that he's

12  indicated that he loved, the person that he never cheated

13  on.  And what did she do?  She goes to dancing at Rockin'

14  Rodeo.  She's stressed out.  Okay.  Which is worse, one is

15  dying or you're stressed out.

16         What ends up happening is she's so stressed out

17  she's got to get the energy out, get the stress out.  What

18  happens is there's a last dance that they have.  And at

19  this last dance, there's a good-looking guy.  Let me go on

20  over.  And before the song is over, probably before he even

21  knows her name, they're kissing.  And according to him --

22  he has no reason to lie.  Why would he lie?  He doesn't

23  care about this.  The bottom line is she starts kissing him

24  and he returns the favor.  That's what he said.  And when

25  she started to grab him in the various places, he, again,

88

1  responded accordingly.  She's the one that initiated --
2  this demure little lotus blossom we have here -- she's the
3  one that is all that.  Not everybody can be telling a
4  lie.  All these people don't know each other to get
5  together and collude against her.  They're just telling the
6  truth how it happened.
7       So they leave that night club.  Sure he doesn't
8  know anything about this, doesn't talk about it.  They go
9  over with his friend, over to the Denny's off of I10 and
10  Baseline, I believe that's what they said.  When they're
11  there things are happening.  What's happening is that she
12  starts to grope him under the table.  I guess the woman has
13  needs and she's going to do something about it because
14  she's so goal oriented and what ends up happening is he
15  takes her home.  According to him, he didn't think anything
16  was going to happen.  She invited him in.  He does not
17  invite himself in.  Again, she is the aggressor.  They go
18  upstairs, started to hang out, sits on the couch, has a
19  beer and then nature takes its course.  But what is
20  important about that is that he says I was going through a
21  divorce.  And, in fact, when I was at the Rockin' Rodeo my
22  wife, my estranged wife was there and that's one of the
23  reasons we left.  I was drunk.  The defendant was drunk.
24  But I know one thing, I have boxes of condoms at my house.
25  I have bunches of condoms in the truck.  I had a whole

1   bunch of condoms with me.  That was part of the reason that

2   I was there.  And he said, "I have no doubt in my mind that

3   I was the one that supplied the condom."  None of this

4   story about her going to the bedroom in the middle of it

5   and running there and getting it and that's what created

6   the problem.  He categorically told you that he was the one

7   that supplied the condom.

8          But, of course, none of this went to Sharon

9   Murphy.  How complete is her report if all of this was

10  omitted?  How complete is it?  It isn't.  It's incomplete

11  and short shrifted and based on misrepresentation and

12  lies.

13         Let's get to the issue of --

14         THE COURT:  Let's take our afternoon break at

15  this point in time.

16         Ladies and gentlemen, during the break remember

17  the entire admonition I have given you.  During the break

18  do not discuss the case with each other.  Do not let anyone

19  discuss the case with you.  Keep an open mind.  Have a nice

20  break.  We'll see you 20 minutes.

21         (Recess taken.)

22         THE COURT:  This is Cause Number CR2000-096032,

23  State of Arizona versus Wendi Elizabeth Andriano.

24         The record will reflect the presence of

25  defendant, counsel and the jury.

1          We will continue with opening closing argument by

2     Mr. Martinez on behalf of the State.

3          Mr. Martinez.

4          MR. MARTINEZ:   Thank you.

5          We left off immediately before talking about the

6     30th birthday soiree that the defendant took with people at

7     the San Riva apartment complex that included Chris

8     Hashisaki, Shannon Sweeney and Stephanie Koeppen.   The

9     reason that this is significant is because the assessment

10    that was done by Sharon Murphy only mentions three specific

11    incidents of physical violence.   This is the second one.

12    If somebody is so physically abused that results in

13    bruising and everything, it's significant that this 30th

14    birthday is the second one which according to her he grabs

15    her and drags her home.   At least, that's the version that

16    is given to Sharon Murphy.

17          Specifically, if you will remember, this is one

18    where they went out to various bars, they came back

19    according to the defendant in her tail to Ms. Murphy.   When

20    she came home, Mr. Andriano was there when she got out of

21    the car.   He had left the two kids alone in the apartment

22    to spy on her and began screaming at her and grabs her.

23    "Dragging her home" was the term that she used.

24          But, upon further examination and talking to the

25    people who were actually there, not just talking to the

1  defendant but also talking to the people that were there,

2  we now know it was quite a different sort of picture that

3  was presented.  We also know that other things went on.

4          For example, we know that on the way home the

5  defendant had the audacity to say, well, you know it's my

6  30th birthday let's stop and pick up Shawn -- I'm sorry

7  Ryan and Chris.  Let's go a head and pick them up.  Ryan

8  being Shannon's boyfriend; Chris being Ryan's roommate.  It

9  was her request.  It wasn't a situation where either of the

10  other women said let's go and stop and get them.

11  Specifically, it wasn't Shannon Sweeney.

12          So, on they're way back they stop in Tempe and

13  they picked them up.  And one of the things we know is that

14  the defendant, never missing an opportunity, starts to make

15  out, kiss, whatever term you want to use.  Starts doing

16  this with this individual by the name of Chris.  Her

17  justification was, "There was no other place to sit so I

18  had to sit between his legs.  And so we were just

19  flirting.  It wasn't a big deal.  I didn't mean any

20  disrespect."

21          Really.  That's exactly what you think of the

22  situation?  That shows you that no matter what happens,

23  it's not her fault.  She tries to justify it and minimize

24  it and say, well, it really isn't my fault.  It's really

25  not something that I can be held responsible for.  Don't

1   think any worse of that.  Don't think I'm less religious

2   because I am this religious woman.  And, you know, don't

3   think any less of me.

4           Additionally, with regards to the issue of

5   Mr. Andriano being there and the kids being left alone in

6   the apartment, we now know that is a lie.  There is no two

7   ways for her to get around that.  It's an absolute lie.

8   It's just a lie.  She made it up.  And she made it up to

9   Sharon Murphy because she wants to make herself seem

10  better.  Just wants to change the whole panorama of life to

11  make it seem that she is this victim of domestic violence

12  even though it isn't true.

13          One way to do it is get someone like Sharon

14  Murphy, lie to her, and try to paint the other person as

15  badly as possible, to make Joseph Andriano as an uncaring

16  rube who leaves his kids like some sort of sort trailer

17  trash locked up in the apartment.  That's just not what

18  happened.  They had a baby-sitter and she admitted she

19  lied.

20          Of course, it's always about Joseph Andriano,

21  isn't it?  Then what ends up happening, according to the

22  people that were there, is that Mr. Andriano sees what's

23  happening.  And what's happening is that perhaps the

24  defendant is heading to Shannon Sweeney's, to her

25  apartment, that direction to her apartment rather than

1  going home.  Perhaps she's going to experience another one

2  of these dalliances that is not an affair.  We don't know.

3  But she was certainly headed with another man to another

4  apartment at 1:30 or 2:00 in the morning, when, by her own

5  account she was blasted, she was drunk.  This is the woman

6  who kisses men on the way home.

7          If we talk to Chris, perhaps his view of things

8  may be a little bit different than the defendant's.  That

9  he's not such a big brother, which is what she told us.

10          We know, according to her, according to the other

11  people that were there, yes, Mr. Andriano threw a phone.

12  But he didn't throw it at her.  He just threw it down on

13  the ground and said,"Wendi, what are you doing?"

14          Now, those words certainly are provocative,

15  aren't they?  Boy, that is a case of domestic violence if

16  you've ever seen it because you are experts now.  We spent

17  three or four days talking with Sharon Murphy about what it

18  was and what the history was.  You know that, boy, what a

19  horrific event of domestic violence.  Right?  You know

20  that's not true.  You know that what happened after that is

21  the defendant started walking after Mr. Andriano, "Joe, let

22  me explain.  Let me explain what's going on."  What is it

23  that she was trying to explain?  That those kisses were not

24  meant to be disrespectful?  That sitting between this young

25  man's legs was not meant to be disrespectful?  Exactly what

1   is she trying to explain?  Or was she trying to explain to

2   him that she is a victim of domestic violence.  Exactly

3   what was it that she was trying to explain?  But, again,

4   her version to Sharon Murphy was that, no, no, he grabs me,

5   physically grabs me.  Which nobody there saw.

6          The other thing is that he screamed at me.  Well,

7   nobody else heard it, either.  Basically, the only thing he

8   said is, "Wendi, what are you doing?" And then he walked

9   back.

10          But when she's been in court one of the things

11  that had happened is that she has received a bolt of

12  lightening that has delivered her the truth.  And the

13  reason that I say that is that she now remembers that on

14  the way home Joseph was very upset and he fortuitously

15  brought the keys and took her to the Yukon and held on to

16  the steering wheel and just screamed at her.  Remember

17  that?  That is just his way, because he was so angry at

18  what was happening.  And the reason he was so angry is

19  because she violated her curfew.  That's what she told

20  you.

21          And he did that.  And he was just so mad and

22  walks out and went in.  But she didn't tell that to Sharon

23  Murphy.  If that's the truth and that was such a traumatic

24  event when that happened at the end of August of the year

25  2000, don't you think she would have remembered?  And the

1   way that she talks, don't you think she would have told it

2   if that actually happened?  No, but she got to tell it.

3   She got to tell it with you.

4          And she just realizes that this is only the

5   second event.  Oh, my God, there really isn't anything that

6   Mr. Andriano is doing to me.  There's nothing I can point

7   to.  Yet, she brings in her brother to come and say, oh,

8   yes, there was the other slap.  Do you remember this other

9   slap that she didn't tell Sharon Murphy about?  And that

10  happened down at the town house, remember?  All these

11  things, you know, are coming back to her.  Somehow this is

12  a process whereby she's remembering all these things.

13  Well, you know that's not how it happened.

14         Then what happens, according to her, remember,

15  her dress is red.  It was down, all past her knees.  And

16  one of the things she tells us is that they don't use the

17  front door, they go in through the patio.  The reason that

18  she wants to tell you that is because she wants to make

19  what happened on the morning of October 8th of the year

20  2000 seem plausible.  We use the back entrance all the

21  time.  We climb over the fence.  It will seem plausible to

22  you that she used it for a very innocent reason on October

23  8th of the year 2000.  But that's not it.

24         Picture this, if you will, according to her, that

25  wall is about up to here (demonstrating).  We have

96

1  something similar to that.  Can you imagine hiking this

2  dress up all the way up to here, like this trying to get

3  over that wall?  You think that's how she did it?  You

4  think that's how she got into that apartment?  It's not as

5  hard as you think.   Why go in through the back door when

6  you go in through the alley when the main street will do

7  just fine?  The reason that she does that, the reason she

8  uses side entrances, the reason she's looking for back

9  doors is because she not telling the truth.  She's somebody

10  who is not used to the light of day.  She is someone that

11  is not used to being forthright.

12         That's an absolute a lie.  They didn't go through

13  the back.  She walks in through the front door.  But she's

14  got to make the story seem a little bit more believable, if

15  you will, with regards to what happened on the night that

16  she killed her husband.  And she did kill her husband.

17  Make no mistake about that.

18         The other thing that Sharon Murphy laid great

19  store in is the fact she is demure and subservient.  That

20  under the power and control wheel she was subservient to

21  her father.  Remember, she learned to be a good Christian

22  girl.  The Bible tells you to do everything that your

23  husband tells.   You do everything your father tells you.

24  Of course, we see many examples where she basically told

25  her father that, no, I'm going to do whatever I want.

1   Additionally, we see many incidences where she told her

2   husband that.

3          And so, one of the first incidents that she told

4   her father no that she was going to go to the family

5   reunion when she was 17 years old.  If you remember, she

6   testified that there was a family reunion.  And she said

7   she wanted to go.  Her father told her no but she went

8   anyway.  Her father didn't talk to her for about two or

9   three weeks or two or three months.  That was at the age of

10  17.  That was when she was living under his roof.  She

11  can't use the excuse, well, I was over the age of 18.  She

12  was still living with him and what did she do, she stood

13  up.  She's goal-oriented and by God, she's going to do

14  whatever she wants.  It doesn't matter if it's her father

15  that's telling her not to do something or if it's her

16  husband that's counseling her not to do this or asking her

17  not to do it or if it's her God that's telling you you

18  shall not go out and cheat with other men.  She doesn't

19  care.  She's going to do whatever she wants.  What does she

20  care about the Ten Commandants.  Those are just words to

21  her.  They're just words that are written down that tell

22  her how to act and she didn't care.  She's going to violate

23  them at every turn.  The reason we know that is because she

24  did it.

25          We'll also talked about Saint Patrick's Day.

98

1   Remember how demure Ms. Murphy made her seem?   How when

2   they went to Dell just this individual who was just sort of

3   hanging out there.  She found he was attractive and how she

4   really didn't call him, that he called her and that's how

5   they got together.  When she took the stand, that's not

6   what she said.  When she took the stand she said that she

7   actually had to make the calls herself.

8          Again, Sharon Murphy just doesn't get the

9   picture.  It may be she's not getting the picture or maybe

10  she's slanting it just to be favorable to the defendant

11  because in her mind, no matter what happens, she went in

12  with the preconceived notion that this was nothing more

13  than a situation of domestic violence.

14          We also have the situation involving the Quail

15  Garden Apartments.  We've already discussed that situation

16  where, again, Sharon Murphy didn't lay great store in the

17  fact that when she was at the Quail Garden Apartments they

18  had a one-bedroom apartment.  She wanted two bedrooms.  She

19  didn't have any compunction about brooking authority and

20  saying give me a two bedroom so I can live here with

21  Mr. Andriano.  They're living together.

22          We already discussed the fact that Sharon Murphy

23  didn't lay any great store in the fact that she's standing

24  up to authority, her boss.  She's standing up to her father

25  and she's standing up, in a sense, to her religion.  So

1   none of those things that are very important play any great

2   weight.  It shows you that she's not demure.  That she's

3   not subservient to anybody.

4           That other thing we have is the Las Vegas trip.

5   Initially, she told us there isn't any way I could come

6   back from Las Vegas in May of 2000.  I had to come back at

7   a certain time.  She tried to tell us, well, it was for

8   this reason, it was for that reason.  Finally, when I

9   pointed out to her that when she went to Memphis in

10  September, she had no problem changing those tickets.  And

11  she finally admitted, well, you know, Sharon Murphy was

12  wrong.  The reason I didn't come back from the Las Vegas

13  trip early is because I didn't want to.  She stood up to

14  him.  And, again, it shows she's not the subservient person

15  that they pointed her out to be.  But, of course, she's got

16  to embellish it.  She's got to say, well, you know, when we

17  came back, Joseph was cursing all the time.  That's Donna

18  Ochoa that was said that.  He was cursing at the store, he

19  was driving really fast.  He pulled up in the lane,

20  squealed the tires, threw the items into the Yukon and then

21  we drove away real fast.  What they don't tell you is

22  perhaps he was in the wrong lane just trying to get in the

23  Yukon.  I don't for a minute excuse the fact he was cursing

24  and asking, "Where have you been?"  He did curse at them.

25  But that in and of itself is not domestic violence.

1   Speeding is not domestic violence.   When you're angry and

2   speeding is not domestic violence.   They tried to prove

3   that point with Barbara Mitchell when they asked her have

4   you ever sped and have you ever been angry?   Well, yeah, I

5   have.

6           Well, what does that prove?   That she is someone

7   who is prone to domestic violence?   That just proves she

8   sped.   Mr. Andriano didn't said say a word driving home.

9   Didn't say a word.   Just walked into the apartment when

10  they left.

11          Another point to be made is that Donna Ochoa says

12  the reason that we took two cars that night that the

13  defendant killed Joseph Andriano was that the Mazda had a

14  problem with the trunk.   Remember she told you that?   Well,

15  Barbara Mitchell said, no, there was no problem with it.   I

16  also asked Alejo Achoa, there was no problem with it.   Turn

17  the key, you get right on in there.

18          They're having a problem there with the stories

19  that are presented.   The only reason that I talked about

20  them is because Sharon Murphy used them as the paradyme of

21  truth who corroborated the defendant.   So if they can come

22  into court and they can raise their hand and swear to tell

23  the truth and then come up with inconsistencies like that,

24  can you imagine what they're capable of doing when they're

25  talking to Sharon Murphy?   Of course, they're going to

101

1   slant the truth.

2          One of the most noticeable items that Sharon

3   Murphy placed value on was this cursing that Mr. Andriano

4   was always cursing and that he used, according to her, the

5   eff word.  And that made the defendant very uncomfortable.

6          Well, you know, in the most crucial time of

7   Joseph Andriano's life, when he was dying, which makes it a

8   very crucial time for the defendant, in that crucial time

9   what is it that the defendant does?  She resorts to

10  cursing.  She resorts to cursing at him.  I thought she

11  didn't like it.  That's something that Sharon Murphy didn't

12  know about.  That's something that, you know, all of these

13  things are just adding up.

14          The two times a week they're referring to the

15  time she was married to Mr. Andriano, the last couple two

16  or three months of his life that for two or three months,

17  two times a week, minimum, the defendant was going out;

18  Tuesdays and Saturday or Fridays.  Remember that?  Rockin'

19  Rodeo on the weekends and Tijuana Country Club in the

20  middle of the week.  What kind of marriage is that?  Who is

21  wearing the pants in that family?  Husband is dying.

22  Terminally ill with cancer.  Rather than spending time with

23  him, what do you do?  Let's go out and look for the young

24  bucks we have out here on the dance floor.  Maybe we can

25  take one home.  That's exactly what's going on.

1    According to Shannon Sweeney and Chris Hashisaki,

2  the defendant always wanted to be the center of attention

3  and was always kissing men.  In and of itself there's

4  nothing wrong with that.  But please don't turn around and

5  bring her up as some sort of vestal virgin.  Don't do

6  that.  Just be honest with us and tell us we didn't know

7  about that.  And you know what, that might have changed my

8  opinion.  But Sharon Murphy is not like that.  She didn't

9  change her opinion even in the face of all of these

10  inconsistencies which are outright lies.

11    Well, the other one that's probably the more

12  telling of all of them is that they're having a fight,

13  according to the defendant, when they come back from Casa

14  Grande.  When they come back from Casa Grande, one of the

15  things that happens is that she doesn't want to have a

16  fight in the bedroom.

17    Now, if there is a fight and you have an

18  individual such as Joseph Andriano who has been described

19  as completely mad and out of control, throwing things

20  against the door, comes at you, and does that sort of

21  thing, you would expect that if there is an argument in the

22  bedroom you want it to be there and keep it there.

23    But according to the defendant's statement, on

24  this particular night she tells the detective at 9:12 in

25  the morning, "So then we go out to the living room because

1    I'm like, you know what, if you're going to start arguing,

2    I don't want the kids to hear it.  Go to the living room."

3    You saw that tape.  She's pointing with her finger.  "Go

4    to the living room.  I don't want the upstairs neighbors to

5    hear it."  You're in the bedroom, they'll hear everything.

6    It's, you know, it's part of apartments.  It's something we

7    know.  That shows you who's wearing the pants in the

8    family.  That shows you that even when they're angry, even

9    when they're not in a controlled state, if you will, of

10   their emotions, the person who rules the roost is the

11   defendant.  That's what it tells you.  There's no doubt

12   about it.  So, of course, that's a contraindication to the

13   domestic violence indication that Sharon Murphy pointed us

14   to.

15            But the bottom line is it's something she didn't

16   consider.  It's something that you should consider when you

17   go back when you debate whether or not Sharon Murphy's

18   report is really worth the paper that it's printed on.

19            Additionally, along the same lines, Shannon

20   Sweeney, Erik Vaillant and Chris Hashisaki indicated that

21   the person who wore the pants in the family was the

22   defendant.

23            Additionally, they indicated that she was the

24   dominant one.  That she was the one that made things go.

25   The question was asked, well, you saw them in a social

1   setting.  You didn't see them behind closed doors.  By the

2   defendant's own admission, behind closed doors she was the

3   one that ruled the roost.  So for them to say, no, she

4   wasn't the person who was in charge is just not true.

5          So we now know that with regards to Sharon

6   Murphy, she lied to Sharon Murphy, she withheld things and

7   she misstated things that we know were very crucial in

8   Sharon Murphy's report.  Perhaps the prosecutor is being

9   unduly harsh with the defendant when he pointed that out.

10  After all, it was 20 hours that Sharon Murphy spent with

11  her.  And there might be a situation where perhaps there

12  might be some inconsistencies there and perhaps that would

13  satisfy the jury instruction that I just read to you.

14         So let's take a look at all of the other people

15  that she's dealt with during that period of time to see

16  whether or not, in fact, she was more honest with them.

17         The other people she dealt with, and there are

18  three of them, that's the insurance companies.  One of them

19  was Ed Sandidge of Massachusetts Mutual.  The other one was

20  Amica, Carolyn Catalano.  And ETERM.COM and that was Gary

21  Foster.

22         Was she truthful with Ed Sandidge?  No, she

23  called on behalf of her husband who says he's willing to

24  take an exam.  That is a lie.  Because Ed Sandidge, when he

25  took the stand said, "No, I spoke to her.  She left that

1   number.  I spoke to her within a day or so.  I prepared a

2   proposal for insurance coverage of $500,000.  And when I

3   talked to her, she refused to let me talk to him."  So,

4   that's a lie.  That's a lie that Mr. Andriano was willing

5   to take that examination, that physical examination.  So we

6   have that problem.  So she wasn't honest with him.

7           How about with Carolyn Catalano?  Well, she fills

8   out this application and she says that her husband doesn't

9   have any cancer.  And it isn't Joseph Andriano that's

10  filling this out.  According to her, he's not computer

11  literate.  He's not the one that's poking on the keys and

12  sending out that message over the Internet.  That's not

13  him.  It's her.  And she sends it out and guess what?  It's

14  a lie.  An absolute lie.

15          Well, how about when she does have a conversation

16  with her over the telephone.  She calls and says this is

17  really strange, she says that she doesn't live with her

18  husband.  It's just a strange conversation.  Did she not

19  live with her husband?  Well, she did live with her

20  husband.  And she, again, was trying to make sure there

21  wasn't the contact between the insurance companies and her

22  husband because she was the moving party.  She was the one

23  that was moving things ahead.

24          Now, with regard to Mr. Foster, one of the things

25  that we know about ETERM.COM is that they're very

1  persnickety, if you will, or very fastidious about making

2  sure every telephone call they have is recorded.  This is

3  the one where we see or hear Mr. Andriano.  And

4  Mr. Andriano disputes what she says without even knowing it

5  and pointing a finger at her even from where he may be, if

6  anywhere, and says you're a liar because I never asked you

7  to do that.  He, himself, said that.  And Gary Foster

8  contacted her and spoke with Mr. Andriano and he said, "I

9  don't want any insurance."  That was on September 6th of

10  the year 2000.  And then on September 11th there's an

11  e-mail, that anonymous e-mail, contact my wife, Wendi go a

12  head and deal with her.

13       Of course, she's lies to him and you know what

14  there's no cancer here.  Well, okay.  So she lied to them,

15  too.  She talked to Sharon Murphy and we know what she said

16  to her and how we characterized it.  So she lied to the

17  insurance company.

18       How about her employers.  We talked about that.

19  Well, her employer, one of the things that we do know is

20  she submitted a resume, filled out an application.  This is

21  the important part of the process.  That's how they're

22  going to determine whether or not they want you to work for

23  them.  What does she do?  She lies.

24       One of the things that she indicates because she

25  wants more money is that she has a BA or BS from the

1   University of Phoenix.  That's an absolute untruth.  It's

2   not true.  She doesn't have a degree.  But she puts it down

3   in the resume that she presents to Janis Lind of San Riva

4   Apartments.  She lists it in the application for the

5   Courtyard Apartments.  She doesn't tell the truth.  She

6   also didn't tell San Riva the reason that she left the

7   Courtyard Apartments.  She lied.  She indicates that she

8   wanted to work with her husband.  That's not true.  The

9   reason she left the Courtyard Apartments was that she was

10  disinvited.  They said we don't want you to work here

11  anymore.  You're fired.  That's what they told her.  But

12  she didn't disclose that.  Then she goes on and talks about

13  how much she was making.  She indicates that she was making

14  up to $54,000, I think, I'm sorry, $50,400 as a maximum.

15  And when confronted with that, she says no, no that's

16  actually no accurate.  That's not true.  That includes the

17  value of the apartment.  I see.  Even when it's to her

18  benefit, even though the apartment complex is providing it,

19  it's to her benefit, she lists the amount.  But when it's

20  not to her benefit, such as the IRS, she lists that amount

21  of money.  Of course, she didn't.

22          So, we're trying to be fair to her to see whether

23  or not she's telling the truth.  And we now know that she

24  began lying to Sharon Murphy.  She lies to the insurance

25  company.  We know she lied to the employer.  We also know

108

1   in that application for the student loan, she lied.  Not

2   only did she lie, she fabricated documents.  She did the

3   exact same thing in this case that she did with the

4   business license in this case.  So you can see that she

5   already has a track record, if you will, of doing this sort

6   of thing.  Nothing is going to stop her from this goal that

7   she has, whatever, the goal may be.  She's learned the

8   lesson from that Rocky movie.  If you have a goal, you do

9   almost anything to achieve it.  But, again, she missed the

10  theme of it.  The theme of it is that you don't cheat and

11  you don't lie.

12          Well, was she honest with USA.NET?  She was in

13  June of the year 2000 when she originally opened the

14  account in her name.  So she knows to tell the truth.  But

15  was she honest on July 26 of the year 2000 when she opened

16  it in the name of Anne Newton?  Nope.

17          All these people, everybody that she's come in

18  contact with throughout her life through the period is

19  nothing but lies.  Absolutely nothing but lies.  Are we

20  going to believe her now?  Because she's entered into a

21  courtroom and raised her right hand somehow she's been

22  imbued with the power to only tell the truth.  Is that how

23  you think it works?  It absolutely does not work that

24  way.  She has lied to everyone and it is something for you

25  to consider in debating whether or not she told you the

1    truth.

2            Voigt Global, perhaps she told them the truth.

3    We know her initial e-mail was August 21st of the year

4    2000.  But she lied to them about her identity.  And that's

5    crucial because she didn't want them to know what they

6    are.  Doesn't want to leave a trail.  Doesn't want to be

7    associated with this poison.  The reason she doesn't want

8    to be associated with the poison is she is premeditating

9    the murder of her husband.  That's the reason why she

10   doesn't want people to know who she is.  That's the reason

11   why she lies to the police about it.  And in the e-mail she

12   knows a number of subjects: Rodents.  There are no rodents

13   at San Riva.  We brought Bud Ellis to tell you he's treated

14   that.  There are no rodents there.  So they can't come

15   forward and say that's what that's about.  She doesn't own

16   any property in Arkansas.  She doesn't own any property in

17   Casa Grande.  She's never treated rodents.  It's just a

18   lie.

19           The social security number.  It's interesting how

20   it's only a couple of numbers off but it's a lie,

21   nonetheless.

22           The business name, Wyndstar Enterprises doing

23   business as Aztec Creations.  It's something that came from

24   her mind.  It's just a lie.  Because she has a goal:  Get

25   poison to kill her husband.

1    Did she go to Ireland?  No.  She didn't go to

2  Ireland but she did go to Memphis.  I mean, it's part of a

3  visit -- I don't know if that's what she was referring to.

4  Never any indication she ever went to Ireland.  That's a

5  lie and that's just a way of her trying to ingratiate

6  herself, make her seem more human, if you will, and to let

7  Voigt Global know I haven't forgotten about you.  But she

8  doesn't want him to turn her down.

9    The indemnity agreement.  You saw how she worked

10  on it, one, two and finally she got the third one right and

11  faxed it over.  But she listed someone else's address on

12  it.  A guy by the name of Walker.  That's a lie.

13    The business license she was so assiduous about

14  going about it, making sure everything was just right.

15  First making sure that she got the name right.  Than she

16  forgot and then had to go back and white out the number.

17    All of these things, it wasn't Joseph Andriano

18  that did it.  It was her.  And she's lying.  She's making

19  up falsifying documents.  That qualifies as a lie.

20    She says Joseph Andriano bought the money order.

21  Really.  Then how come you signed it?  If he bought it, why

22  didn't he sign it?  What difference does it make?  Does it

23  make any difference who signed it?  It doesn't at all.  She

24  signed it, presented herself as Joseph Andriano.  And

25  that's a lie.

111

1          How about the people that she was most intimate
2   with, her paramours.  I'm talking about Rick Freeland and
3   Travis Black.  Was she honest with them?  Well, we know
4   with regard to Rick Freeland she didn't tell him the
5   truth.  She told him that she was not married.  Did not
6   have a husband.  And, in fact, that's what created the big
7   rift between them because once he found out she was
8   married, he didn't want anything to do with her.  And on
9   July 21st she sent him that e-mail saying you know what, I
10  don't know why I keep pushing it.  We know why you keep
11  pushing it because that's your nature.  You have a goal,
12  you want to be with him.  That's why you stand outside of
13  the door for an hour on the cell phone saying I'm not
14  leaving, I'll get the pass key unless you let me in.  But
15  she says, no, it's because he was my friend.  But the
16  bottom line is she lied to him, too.  Someone that she
17  supposedly loved and, you know, wanted to be his friend.
18          How about Travis Black.  What did she tell him?
19  Well, she lied to him too.  Didn't tell him she was
20  married.  In fact, she went a step further and says you
21  know what, my husband died of cancer.  Maybe that was a
22  precursor to what she was thinking.  Maybe she knew that
23  soon he would be dead, not from cancer but from poison.
24  But she lied to him, too.  So she's not telling the truth
25  to anybody.

112

1        And it's not one isolated instance.  It's over

2    and over and over again.

3        Airborne Express.  Well, she has a driver's

4    license, but or maybe she doesn't to go pick this up.  But

5    it's in the name of Anne Newton.  So what did she do?  She

6    gets the air bill number.  She contacts Voigt Global, gets

7    the air bill number from them.  Has a conversation that he

8    ask to Airborne Express, gives them the number.  And you

9    know what, without identification she can feel free to be

10   an imposter using the aka, Anne Newton.  Perhaps she's more

11   comfortable with that.  At least she was in that situation

12   and that's what she signed for.  It isn't Joseph Andriano's

13   signing it, it was her.  So she lied to them.

14       You know, things have progressed to the point

15   where things are not -- things are just bad.  And it gets

16   to the point where she's down at the police station.  The

17   police tell her you're not under arrest now but you're not

18   free to leave because we are investigating this.  We want

19   to know what happened.

20       You would think if there was ever a time to tell

21   the truth, that would be it.  But what does she do?  Well,

22   instead of telling the truth, she decides to fall back to

23   what she's most comfortable with, lies.  Does she tell the

24   police about the sodium azide?  No, she doesn't.  That is

25   a lie.

000006449

113

1    They can stand up here or sit up here or

2    pontificate about it up here and say, you know what, she

3    admitted it in court that she didn't tell them about the

4    sodium azide.  Okay, so what.  Does that make it any less

5    of a lie when it most mattered that she didn't tell them

6    that it was sodium azide?  Of course not.  They want to

7    take away the stain or stench, whatever is associated with

8    the lie, by saying but we told you about it here.  Does

9    that make it any less of a lie?  Absolutely not.  So we

10   have her lying to the police about the sodium azide.

11   Does she tell the police that she's been

12   attempting to get the insurance fraudulently?  She doesn't

13   do that either.  I mean, the police have to dig this up

14   themselves.  I mean, the fact that she admits that she did

15   it now, does that make it any less of a lie then?  No.

16   This thing about the suicide.  You know, do you

17   think that that's something very salient, or important that

18   that's something for them to consider?  Did she do that?

19   She didn't do that, either.  She's just absolutely is not

20   forthcoming with regard to anything.

21   Her injuries.  One of the things that's

22   interesting about it -- and you have the stills on it --

23   she did not know that she was being taped.  So when she was

24   left alone in the room, she has a totally different

25   demeanor with regard to the injuries than she does when the

114

1  officer is there.  Take a look at it when they begin

2  photographing the injuries.  At certain times when she

3  doesn't know that she's being observed, she has no problem

4  putting her left hand like this.  If you look at it, that's

5  what the still shows.  Has no problem doing that.  Has no

6  problem going to her hair constantly.  Has no problem

7  playing with her nails; playing with her glasses.  Has no

8  problem at all.  She doesn't know that she's being

9  videotaped.  But, again, the truth shouldn't know

10  videotape.  The truth shouldn't depend on videotape.

11        But as soon as -- what happens as soon as they go

12  to take a picture of her so that they can, if you will,

13  capture it in that form, what happens?  She goes up like

14  this (demonstrating).  And people with injuries notice that

15  sort of thing.  Right away that's what she does.  Why did

16  she do that?  Because she wants to lie to them about the

17  severity of the injury.  So she talks about her finger, how

18  bad it is.  She talks about all these injuries that she

19  received.

20        Let's be clear about it.  You have photographs

21  that show the only injuries that she has are the scratches

22  to the side that were done by her nails.  It certainly

23  wasn't done by any cord.  It certainly wasn't done by

24  Joseph Andriano because she never said that that's what he

25  did.  So those injuries right there are nothing but nail

1   scratches that she put on her neck.  The cord that we're

2   talking about doesn't not leave that kind of imprint

3   because it just stretches out to a single line, if you

4   will.

5           With regard to her hand, yes, one nail is gone on

6   each hand.  She did that to herself.  I mean, you know, if

7   this woman can stab somebody with a knife in the neck, what

8   are a couple little injuries?  Maybe she did those to

9   herself when she was using the bar stool.  Maybe she did

10  those to herself whenever she was doing whatever she was

11  doing.  We know that those injuries are not substantial.

12          She complains about the lump in the back of her

13  head because she wants to substantiate the fact he pushed

14  her against the wall.  Detective Dillian checked and, "Said

15  you know what, I don't feel anything back there.  I don't

16  see any redness at all.  I didn't feel a bump at all."

17  Whenever anything is subject to corroboration, it turns out

18  it's not true.

19          If you take a look at her leg, there's nothing

20  there.  She claims that she has bruising here and that it

21  hurts right here on her midsection.  You have photographs

22  of that.  There is nothing there because it didn't happen.

23  She's just making herself this poor victim, this individual

24  who's a victim of domestic violence.  That's what she wants

25  the police to believe.

116

1          And what's probably the most telling thing about

2     that conversation with the police is that after she is

3     transferred to the room where she has the conference with

4     Detective Lucero, she picks up the telephone.  You know,

5     this is a woman who is really, really very cool under

6     pressure.  Not only does she have the wherewithal to stage

7     the scene after all these horrific things happen but she's

8     been questioned by police, what does she do?  Does she

9     call, for example, Mr. and Mrs. Andriano and say, "Oh, I'm

10    so sorry that this happened.  I'm so sorry that I did

11    this?"  No.  What does she do?  She picks up the phone

12    sometime around 11:30 in the morning, noon.  You can see

13    her thinking, I've got to cover up.  Got to cover up.  She

14    calls Shannon Sweeney, her friend, and says, you know what,

15    I want you to look in the credenza.  And she begins to tell

16    her to take things out and get them out of there and hide

17    them from the police.  That's what kind of individual we

18    have.  Cold.  Calculating.

19          All of a sudden, Donna DeAngelis, her hair

20    dresser, is not so far off base when she called her a cold

21    individual.  She's just not.  And this was based on

22    interaction between them and the defendant saying, you

23    know, I'm over it.  I just wish Joe would die so I can get

24    on with my life.  So she calls Shannon.  What does she call

25    Shannon to do?  To do away with the evidence.  She didn't

1   want to get caught.

2          And, again, that shows you how cold and collating

3   she may be.  So all of the people you've seen that she's

4   dealt with, she's lied to everybody.  She lied to every one

5   of the individuals.  The most important one, Sharon Murphy,

6   the insurance people.  She lied to Airborne Express, Voigt

7   Global.  Anybody that had anything to do with this case she

8   lied to them.

9          So that brings us to here.  And that brings us to

10  you, the jury.  And that brings us to what she told you.

11  Let's talk a little bit about what it is that she told

12  you.

13          Well, one of the things she told you that, well,

14  when -- we did go over to Casa Grande.  She indicates that

15  they come back to the house at about three o'clock.  Joe

16  Andriano and the kids go to sleep.  She stays up reading

17  until about 5:30.  They leave to go to Casa Grande and they

18  arrived there at 6:30.  So far that pretty much is

19  corroborated by what she tells the police.  Then she says

20  they come back around midnight.  They come back and what

21  happens, according to her, is that's when Mr. Andriano

22  decides to take the poison around midnight.

23          But before that happens one of the things they

24  decide to do is take a bath.  And according to her, this is

25  a precious moment to be coveted in his life.  Because they

118

1   do it about once a month and they do this bit with the

2   shower, I mean bath.  They take a shower and sit there,

3   according to her.  She uses some of her squeegees or

4   whatever, sponges, and she sort of bathes him.  And then

5   they made love.  She told you that it was of a long

6   duration.  The problem with that story is that it's not

7   what she told the police.

8           One of the things that she told the police when

9   she was asked about that, is, well, when we got back we

10  went to our room and put my jammies on and he crawled into

11  bed.  And I turned the light on and he turned the TV on

12  which is normal.  In your bedroom?  Yeah.  He starts

13  flipping the channels.  I start reading my book.  He starts

14  questioning me again about my birthday day night, just

15  can't stop.  All of a sudden, this wonderful, halcyon sort

16  of thing that she's presented to you, this bucolic thing

17  that she has for you, is starting to shatter and fray.

18  Because all of a sudden, according to her, when they get

19  home they're arguing and they're arguing about the birthday

20  thing.

21          So which is true?  Which is it?  One of them is

22  not true.  Which one is it?  I submit to you that she would

23  say anything to anybody if it's to her benefit.  So that's

24  something that you have to consider.

25          Additionally, she then is asked about this

1   situation again.  And the detective says, "He was upset

2   because?"  She answered, "Well --"  And the detective

3   interrupted and says, "You guys weren't sexually as active

4   as you had been?"  She answered, "Active, exactly, you

5   know.  Once every two days is still pretty active to me.

6   You know what I mean?  And that's what started the argument

7   tonight."

8            So, which is it?  Even internally she's being

9   inconsistent.  She's saying they're having an argument

10  about the 30th when she went out or they're having an

11  argument about sex.  She just wants to make this guy seem

12  to be the worse guy in the world.  And, specifically, she

13  even addresses the issue of sex, once every two days.

14  This is the individual who is going through chemotherapy.

15  Who's hair is falling out.  Who is being told you got to

16  get up because if you don't get up, you're not going to be

17  able to urinate.  He's going through this all the while he

18  was dying.  It's not a situation where it's an individual

19  who is healthy.  It's just an absolute fabrication on her

20  part.  Either way.  So which is it?  Did have a fight about

21  the 30th or did they have a fight about sex?  What is it

22  with her that she can't tell the truth?  What is it with

23  her is that she's caught.  What is it with her is that she

24  killed him and she's looking for excuses.  Okay.

25            And so, we know that according to her they did

1   get into the bath tub.  She tells the detective that was

2   about one o'clock in the morning.  Well, that's roughly

3   about the same time she indicated that they got into the

4   bath tub before.

5        But the reason that she's saying that they got

6   into the bath tub is because she's got to account for the

7   fact that she's got wet hair when paramedics arrive.

8   That's what's important.  She knows she has wet hair.  But,

9   according to her own statement, that was either between at

10  midnight or that was one o'clock in the morning.  She must

11  have very special hair that in an hour and a half does not

12  dry.  Two hours that it takes for very short hair to dry.

13  You saw that.  And so that's why she's making this thing up

14  about the time that she went into the bath tub.

15       Well, she told you that she, yes, they did have

16  sex.  But in speaking with the detective she said, well, so

17  I lit the candles, filled up the bath tub, put the bubble

18  bath in the tub and we sit there and start to talk again.

19  And that's when it just -- and the detective interrupted

20  and said, "You're sitting in the bath tub, talking?"

21  "Uh-huh, that's kind of what we do.  And we just got into

22  this huge argument and it was just like, you know what,

23  this is so ridiculous.  So I get out of the bath tub and

24  he's sitting there and I dry off and put my clothes on."

25       There was no love-making, according to her that

1   night when she spoke to the detective.  Is it perhaps that

2   we're missing something?  That the truth depends on the

3   time that you say it?  In other words, does it depend on

4   the fact that it was morning and she testified in the

5   afternoon?  Is that what determines what the truth is?  Do

6   you really -- or is it perhaps what you're wearing that

7   determines the truth?  Because this woman does not tell the

8   same story every time.  It's in direct contradiction.

9          When she was asked here in court, how long was

10  the time that you spent in the bath tub?  It was of long

11  duration.  That's what she said.  So the detective asked

12  her how long were you in the bath tub before you got out.

13  Not too long.  Maybe ten minutes.  So now she's out of the

14  bath tub after ten minutes.  According to her, now she's

15  dressed.  She's upset now.  They've been arguing and she's

16  upset.  But according to her, when she came in and told you

17  this story, this is when it gets absolutely much more

18  romantic.  This is when we get closer.  She's helping him

19  out.

20          According to her, by her own admission, she's

21  killing him.  She went and got the sodium azide.  That's

22  what she's doing.  But she, of course, doesn't talk to the

23  defendant about that.  But, you know, again, with her it's

24  a different story.  She goes and gets the Gatorade.  That's

25  about one o'clock in the morning and then gives him the

1   sodium azide.

2          So they're trying to put a time on it.  We know

3   that he ingested -- he being Mr. Andriano -- ingested the

4   sodium azide about one o'clock.  When the paramedics

5   arrived about an hour and a half later, the poison had that

6   chance to it work on his body.

7          But, let's get back to the narrative.  According

8   to her, what ended up happening after that is she just

9   didn't get dressed -- she did get dressed.  What she did is

10  she put shorts on, put some T-shirt on and grabbed them off

11  the floor.  She remembers that.  She threw all my dirty

12  clothes on the floor in the closet and I grabbed the

13  clothes and I stuck them.  And she wasn't wearing any

14  shoes.  Those are the clothes that Chris Hashisaki saw her

15  in, white shirt, black pants or the shorts that she was

16  wearing.

17          According to her then one of the things that

18  happened is that Mr. Andriano starts to feel bad.  And he's

19  in their bedroom now.  Well, according to her, this story,

20  they were already in the bedroom now because they think

21  they're going to go to the hospital.  That's why they go in

22  the living room.  Whereas before the reason she told you

23  they went into the living room was because they were going

24  to argue.  I'll leave it to you to decide which one is the

25  truth.

1      But what ends up happening there is they start to

2   get scared.  That is one of the most unbelievable things

3   that somebody has ever said.  If you are poisoning

4   yourself, if you're going to commit suicide, why are you

5   afraid that you're dying?  Why are you afraid of the

6   symptoms.  It makes absolutely no sense on the one hand

7   with that breath saying, you know what, I'm going to die.

8   And then on the other side of your mouth talk and say, but

9   we were scared.  And then at this point she says, well, you

10  know, we called Shawn King.  That's one of the things that

11  she indicated, that they called Shawn King at that point

12  and, in fact, in the transcript she indicated that she

13  indicated that, "I need to walk you back because I

14  neglected to ask you one issue at one point on that date

15  when Joe is on the carpet after the EMT left, did you make

16  another phone call?"

17      She answered, "I did."

18      "To whom was that phone call made?"

19      She said, "I called Shawn."

20      "Shawn?"

21      She said, "Yeah, King."

22      "Whose direction was that?"

23      "Joe's."

24      "What did Joe say to you was the reason for

25  calling Shawn King?"

1          She said, "To find out what the hell happened."

2          But, one of the things she tells the detective

3    about Shawn King, you know, he's asking her about all these

4    men that she knows.  One of the people that she mentions is

5    Eric and she also mentions they sponsor a softball team.

6    And then the detective says, "Okay, anybody else?  You said

7    there were a couple of them."

8          They're talking about men.  She says, "Shawn."

9          The detective asks, "What's Shawn's last name?"

10          She answers, "Shawn King."

11          The detective says, "Okay."

12          And she says, "And he actually got in an accident

13    a year ago and had both of his legs chopped off.  And they

14    put them back on and he's going through rehabilitation

15    now.  And I know Joe gets really upset when I talk with

16    him.  I talk with him a lot because I was raised with him.

17    We're, like, best friends."

18          That's important for two reasons, she's lying

19    about who they called that night.  She says on the one hand

20    she called Shawn King at Joe's direction.  But Joe hates

21    him and doesn't want me to talk to him.  It's also

22    important because whatever Joe asks her to do, she's not

23    going to do it.  He asked her not to talk to Shawn King,

24    she'll do it anyway.  That goes against what Sharon Murphy

25    says.

125

1    Well, we now have a situation where, according to
2    her, he's now falling down in the bedroom.  None of this is
3    disclosed to the detective.  He's exhibiting these
4    symptoms.  And according to her, they then decide, well,
5    he's got to go to the living room and put the shorts on.
6    The reason they do that is because they're going to go to
7    the hospital.  Why do you go to the hospital if what's
8    happening is supposed to happen?  It just doesn't make any
9    sense.  So she's making that up.

10    And then what happens, according to her, is that
11    there's this situation with Chris Hashisaki.  That is
12    somewhat consistent.  Chris Hashisaki does come over.
13    That's where things deviate.  Because according to what she
14    told the police, she had already beat up Mr. Andriano when
15    the paramedics and Chris Hashisaki came over.

16    According to the statement that she gave the
17    police, he was already bleeding profusely when Chris came
18    over.  Chris Hashisaki said nothing about that.  But, of
19    course, according to her, Chris Hashisaki is an absolute
20    liar.  She tells the police -- and this is before Chris
21    Hashisaki came over -- and he bends over to pick up the
22    belt.  I conked him in the head.  See, now she's even
23    changed the item she's picking up.  Now, he's picking up
24    the belt.  Not a knife.  He's picks up a belt.  And then
25    the detectives asked with what?  The bar stool.  And he

000006462

1  bellows, oh, my God.  Remember they're living in an

2  apartment.  There's no witnesses that were brought forth

3  that heard any bellowing, any noises, anything whatever.

4  Because the reason they didn't is because she took that

5  pillow, stuck it in his mouth so he couldn't scream.  So he

6  wouldn't be making any noises.  She went crazy on him.

7  According to Chris Hashisaki, there's was no pillow there

8  when she went there.

9          Well, then what happens according to her he leans

10  over to pick up that thing.  Again, referring to the belt

11  and I pop him again.  So she admits to hitting him twice.

12  Just because he's picking up a belt, not a knife, a belt.

13  Which is it?  Is he picking up a knife as she's out in the

14  kitchen or what?  And then, she says as he's stands up and

15  has the belt, and there's blood and I'm freaking out but

16  I'm going -- I didn't mean to make him bleed.  I just

17  meant -- he's bleeding at this point.

18          So now he's bleeding before Chris Hashisaki come

19  over.  And then there's this interlude, if you will, with

20  the paramedics.  And then the detective asks her, "Do you

21  go back inside outside?"  And she says, "I go back inside

22  the house and he's up off the floor standing there just

23  mad.  Why did you hit me?  You made me bleed."

24          And there's a problem with that narration.

25  Number one is it doesn't correspond or corroborate with

1   what she told you.

2          Number two, if a person is bleeding and they're

3   standing there, it's going to follow the laws of gravity

4   and go down.  And according to witness's testimony, that's

5   not corroborated.   When Chris Hashisaki came over he

6   wasn't bleeding.  So for her to say that now is a true

7   inconsistency.  It's an absolute inconsistency.  And given

8   what we've seen with her, an absolute lie.

9          But, she's now saying he's picking up a belt.  A

10  belt she can't account for now.  So the detective follows

11  up on that and says, "You didn't tell me he choked you with

12  a belt.  When did that happen?"

13         "Oh, yeah, that happened before the kitchen

14  thing.  Before I even -- that was when I ran.  As soon as I

15  got away to get something to stop him."

16         "You're losing me there," he says.

17         "Oh, I'm sorry," she says.  "He's choking me with

18  the belt.  I get out of that.  Start running for the

19  kitchen and that's where he grabs me again.  And must have

20  grabbed the cell phone thing.  And then that's when I he

21  grabbed the knife."

22         And the detective says, "Where is the cell phone

23  at?"

24         "I have no idea.  I didn't see any."

25         "Where does he plug it in?"

1        "I don't know, just wherever."

2        And then she goes on and says, "Then he grabs the

3  cell phone thing like he's going to call somebody and it

4  has the charger hooked up for it.  And that's when he

5  wrapped that thing about my neck."

6        "What's that?"

7        "The cord to the cell phone.  He wrapped it

8  around my neck and, oh, my God, we had been standing by

9  where he keep this thing charged or whatever.  I don't even

10  know.  I haven't noticed it.  If I would have, I would have

11  thought something different."

12        And then they talk again.  "He grabs, he's like,

13  he has that around my neck.  But that was kind of

14  stretching so I could pull it.  And he kept trying to

15  squeeze it tighter and tighter.  And I started moving my

16  way into the kitchen.  And that's when I thought I needed

17  to get a knife.  I got to cut this.  I got to cut it.  Oh,

18  my God.  I remember reaching into the drawer, trying,

19  getting, grabbing a knife.  I remember and he's trying to

20  pull me away from the knife.  And I think I try to grab on

21  to the refrigerator.  Anything I could do."

22        "How did you get from being in the kitchen,

23  getting the knife out of the drawer back into the living

24  room?"

25        "I have no idea."

1          Then she's asked, "How did he get cut?"

2          She says, "I don't know.  That's what-- I don't

3  know.  I don't know what happened.  All I know is all of a

4  sudden there is blood everywhere.  And I'm like, what just

5  happened?  I don't know."

6          "But you've got the knife in your hand at that

7  time?"

8          She answers, "I had the knife in my hand."

9          "Where were you, in the living room or the

10  kitchen?"

11          "The living room."

12          And she's asked, "What is he doing when you stab

13  him?  What's he doing?"

14          "Bleeding. There's blood everywhere."

15          And then, this is also very telling given what

16  she told you.  She says, "Well, I get slpat -- oh, how do I

17  explain to you.  I felt like I just got drenched in blood.

18  It's in my hair.  I mean, it's on my face.  It's all over

19  my glasses.  I go to the bathroom.  And my hands.  I'm like

20  what in the world has happened.  It's like something, I

21  don't know, I felt like it just squirt -- Oh, Jesus, help

22  me.  I think -- I think blood squirted on me."

23          She wasn't upset that she stabbed him.  She's

24  upset because the blood squirted on her.

25          "I don't know.  All I know is I run for the

1  bathroom, the kitchen.  I got to get it off of my glasses.

2  That was my first -- I got to see.  I got to see what's

3  going on.  I turn on the bathroom sink.  I dump my glasses

4  in the sink.  I'm running water over them.  I'm looking at

5  my hands.  I'm like, oh, my God, this is just so

6  horrendous."

7        The fact she has blood on her is horrendous.  Not

8  the fact that she has stabbed him.

9        "Can't -- you know.  It's blood like -- a crazy

10  whatever.  I don't know.  I'm trying to remember.  So I'm

11  cleaning.  I'm like, oh, my God.  Oh, my God.  I was not

12  thinking about what was going on with him in the living

13  room."

14        She doesn't care about him.  All she cares is

15  about herself.

16        "I'm just freaking out.  I'm like, oh, my God

17  what am I doing?  I looked down.  I had blood all over my

18  legs.  I'm like, oh shit.  I stepped into the bathroom.

19  I'm rinsing of my legs.  That's when I'm like --"

20        The detective said, "You got into the bath?"

21        "I got into the bath tub."

22        He says, "okay."

23        "It's, oh, my God it was just so absolutely

24  gross."

25        She's not worried about the fact that she killed

131

1   him.  All she's worried about is her well-being.

2            "Did you turn on the shower head?"

3            "No, because I know I dunked my head into the

4   bathroom sink with my glasses because I smashed my

5   glasses.  I don't remember.  I don't think I turned on the

6   shower head."

7            "Do you remember if you washed your hair out?"

8            She answered, "Oh, I tried to rinse it out right

9   here.  I probably still have it in my hair.  I don't know.

10  Totally disgusting.  Oh, that would be sick if I had blood

11  in my hair."

12           That's what she said.  She doesn't care about

13  him.  That's totally different from the story she told you

14  about how she's kneeling down in front of the portrait, how

15  she grabs the knife, talks about cutting him and then

16  tosses the knife at him.  It just doesn't make any sense

17  that way.

18           According to her, she beats him up.  He fell on

19  the ground.  And somehow she goes into the master bedroom

20  and decides to come back out.  And then, this is what we

21  have, the cherry, if you will, on top of the sundae, this

22  is the real coop-de-grais of all the things she told you.

23  Because at this point -- and please keep in mind this

24  individual we know what his health is.  I hate to belabor

25  it but it's important.  This individual is terminally ill

1   with cancer.

2          According to her, from the time they met with

3   Dr. Kellogg he has about a year left.  According to the

4   coroner, it has spread to his head, cancer.  It's in his

5   lungs.  Keeps growing.  He had it in his mouth at one

6   point, cancerous tumor.  Also has it in his kidneys, also

7   lungs.  Then he's undergoing chemotherapy treatment.  And

8   he is, according to Dr. Kellogg, at his weakest.

9          Additionally, he has been poisoned.  On top of

10  all that, he has had a pillow shoved in his mouth to keep

11  him quiet so he doesn't call for help.  He's been hit in

12  his head with a lamp and broken.  He has been hit in the

13  head with a bar stool and that's broken.  A total of 23

14  hits.  Eight to ten of those independent of each other

15  would have rendered him unconscious.  That's the individual

16  that we have now.

17          And according to Dr. Keen, the stab wound was the

18  last thing that happened.

19          According to her, he comes back to life, if you

20  will.  She takes that knife and they began to fight for

21  it?  Where as she tells her husband -- she tells her father

22  that she stabbed him.  And, according to her, they fight

23  for it and he has superhuman strength and it's all because

24  she told him of an affair.  You think he's concerned about

25  an affair after being hit like that?  He had the knife,

1   according to her, in his hands.  And according to her, he

2   wants to commit suicide by stabbing himself.

3           How poetic that he wants to stab himself in the

4   area where the cancer grew.  It's so poetic that you would

5   think it was staged.  Wait a minute, it was staged, wasn't

6   it.  I don't think it was staged, we know it was.  The

7   scene was staged.  He didn't stab himself.  She stabbed him

8   because he was going to talk to the paramedics about what

9   happened in this case.  Then she washed her hair right

10  before they came around.

11          So having looked at that, having looked at the

12  jury instructions for credibility of witnesses, the State

13  submits to you that the defendant is not someone who is to

14  be believed.  Or if she is to be believed, it must be

15  corroborated by everything that you look at, must be looked

16  at as, if you will, with a single eye.  Because she's the

17  type of individual that if it's to her benefit she will

18  lie.

19          Let's talk about the count of first-degree

20  murder, the crime she committed back on October 8th.  It

21  indicates that first-degree murder, the crime of

22  first-degree murder requires the proof of the following

23  three things:  The defendant caused the death of another

24  person.  And number two, the defendant intended or knew

25  that she would cause the death of another person and the

1  defendant acted with premeditation.

2          In this case, did the defendant cause the death

3  of Joseph Andriano?  Absolutely.  She absolutely did know

4  that.

5          Did the defendant intend or know that this would

6  cause the death of any person?  Yeah, if you hit someone

7  that has his medical problems and you just poisoned and you

8  hit over the head, and you stick a knife in his neck all

9  the way back to the spine, yeah, you know that you're going

10  to kill him.

11          This knife is not designed for that.  The knife

12  was designed to be a kitchen utensil.  She used it in a

13  bastardized fashion, very effectively.  There was no way he

14  could have survived that.

15          The defendant acted with premeditation.

16  Premeditation is defined as meaning that the defendant

17  intended to kill another human being or knew that she would

18  kill another human.

19          Well, that part of the previous definition, yes,

20  she knew she would kill another human being.  There's two

21  ways that we know that.  Number one was poison.  She

22  admitted that on the stand.  She knew that was poison.

23  That's why she was getting it.  And she would kill another

24  human being.

25          We know that hitting him over the head with a

1   stool -- at the age of 30 you have to have certain

2   knowledge that reasonable persons in the community would

3   have -- if you start hitting people over the head with

4   stools, you start hitting them on the head with lamps that

5   gives you the knowledge you're going to kill another human

6   being.

7          Additionally, on top of that, you had the fact

8   that you go into the kitchen once this person is down and

9   you grab a knife and you grab that knife and place it in

10  somebody's neck, yeah, you will know that you're going to

11  kill that human being.

12         And it says that after forming this intent or

13  knowledge or knowing that you're going to kill somebody

14  that you reflected on the decision before killing them.

15         This is something that is going to be raised by

16  the defense, this reflection issue.

17         What is reflection?  It says right here.

18  Reflection, regardless of the length of time in which it

19  occurred.  That's such an important concept that I'll put

20  it on there on the easel so that you can see.  It is this

21  reflection, regardless of the length of time in which it

22  occurs, is what distinguishes first-degree murder from

23  second-degree murder.

24         Well, in this particular case, it tells you that

25  the length of time can be very short.  For example, in this

1   case we have premeditation since July 26 that we can point

2   to.  That's when she started her effort to buy the poison.

3   We have that length of time in the premeditation.  There's

4   no other reason why you're going to buy poison.  There are

5   no rats.  There is nothing like that.  So she is going to

6   buy poison to kill him.

7          Additionally, let's say the argument is, well,

8   the poison didn't kill him.  Right.  Absolutely right.  She

9   jumped the gun.  Absolutely.  Just like she couldn't wait

10  for the cancer to have him shuffle off this mortal soil.

11  Just like she couldn't wait for that, she couldn't wait for

12  the poison to act.  Maybe it was because of circumstances

13  were beyond her control but she couldn't wait for that to

14  happen.

15         Then why don't we talk about the situation that

16  happened while the paramedics are out there.  We know that

17  in that case, one of the things that happened is she hit

18  him over the head with the lamp.  Why would you hit someone

19  over the head with a lamp unless you want to cause him

20  injury.

21         You have to consider what his circumstances were,

22  what his mental health was, the fact that he's down on the

23  ground and he can't get up, will not get up because he

24  can't.  You have to consider that.

25         Additionally, she starts hitting him over the

137

1  head 22 other times, if you will, with the stool.  A total

2  of 23.

3            What do you think that person is thinking because

4  it can be as short as a second because this tells you that

5  premeditation can be a very short period of time.  It is

6  this reflection regardless of the length of time in which

7  it occurred.  It can be very short.  It can be a second,

8  two seconds.  It can be three seconds.  It can be five

9  seconds, whatever it can be.  How long does it take to

10  strike somebody on the back of the head 23 times?  Figure

11  it out for yourself.  It's during that time that she's

12  reflecting.  She's thinking.  And that's what this is

13  talking about.

14            So if we take it that, well, you know, it isn't

15  the poison that killed him, it's this incident that

16  happened, if you will.  You know he's not getting up.  He's

17  not going after her.  He's not doing anything.  So it's

18  one, two, three, four, five, six, seven -- I'm doing this

19  quick -- eight, nine, ten.

20            There's a period between each one of these hits.

21  That's premeditation.  There's a thought.  It isn't a

22  situation where she's mentally retarded.  And that's why we

23  did the Shipley.  That she doesn't know the count.  She

24  doesn't know what's going to happen.  She knows what's

25  going to happen.

138

1          The other thing that is important is that it's

2    very directed to the back of his head.  It's not a

3    situation where it's all over.  It's to the head.  She

4    wants a maximum effect from that bar stool in the head.  If

5    she didn't, why not hit him in the body.  Why not hit him

6    on the arm.  Why not hit him in the buttocks.  No, it's the

7    head.  Number one, because he can't move.  And number two

8    because you want to do the most damage.  And so she knew

9    that if you do that, you're going to kill somebody.

10         Then, and again, he is not getting up.  You would

11   have to believe Chris Hashisaki and everything else and

12   just the defendant in order to assume that he got up.  In

13   this case, given all the evidence, he never got up.

14   Couldn't get up.

15         So when he's down after being beat, she has to

16   get the knife.  Chris Hashisaki did not see any knife when

17   she came over this night.  Didn't see any pillow, either.

18   Didn't see any blood.

19         So, after beating him, she has to go get the

20   knife.  Or, think about it, why does she need to get the

21   knife?  He's not going to cut steaks.  She's more like a

22   butcher in what she's going to do.  She butchers Joseph

23   Andriano, a defenseless individual who is down on his luck

24   because of the health issues, who is down on his luck

25   because of the consequences of that.  No money.  He has two

1   kids, two and three years old.  And that he is going

2   through horrendous chemotherapy treatment and all the side

3   effects.  No luck at all.  And then to have this woman come

4   over in the same living room, in the same sofa where on

5   September 27th she enjoyed the spoils, if you will, with

6   Travis Black in the same place.

7            Maybe there is something poetic there.  I don't

8   know.  But what ends up happening is she gets up.  She has

9   to go get the knife.  She's thinking about it.  So there's

10  your time she's thinking about it.  So when they get up and

11  start talking to you, well, this isn't premeditation with

12  the poison.  It's doesn't mean anything.  It absolutely

13  does.  It shows her frame of mind that night she wanted him

14  dead.

15           The law says that you are going to be given,

16  doesn't say, well, she has to start with poison she has to

17  continue with poison.  So if she starts with a knife, you

18  finish with a knife.  You have to intend to kill.  That's

19  what she did.  She just used a variety of means because she

20  wanted him dead.  She's goal-oriented.  She'll do it under

21  any circumstance.

22           But for that you have this justification for

23  self-defense.  It tells you that a defendant is justified

24  in using or threatening physical force in self-defense if

25  the following two conditions exist.  There has to be two

140

1   conditions that exist.  A reasonable person.  We are not

2   talking about Wendi Andriano.  We are talking about a

3   reasonable person in the community.  A reasonable person in

4   the defendant's situation would have believed that physical

5   force was immediately necessary to protect against

6   another's use or attempted use of unlawful physical force.

7           In other words, what that is saying is that the

8   individual can use physical force.  It doesn't say lethal

9   force.  That's different.  It doesn't say gun.  It doesn't

10  say knife.  You can use force against someone else if the

11  other individual is using force against you.

12          What kind of force was Joseph Andriano using

13  against her?  Was it the force of his buttocks against the

14  carpet?  No, that couldn't be it.  Was it the force of the

15  elbows on the carpet?  Was it the force of the guilt that

16  she felt or was it the force of the fact that she wanted

17  money.  That she wanted him dead so she could get all the

18  money.  Be free to do whatever she wanted.  Is that what

19  was the force that she felt?  Well, he never used any

20  physical force on her.  We know that.  In fact, the only

21  thing that he did is he put his hands up trying to cover

22  himself.  Per Dr. Keen, these were defensive wounds.  He

23  never got up.

24          Forensically speaking, all the blood spatter

25  indicates that he was down when he was hit.  There was no

141

1   blood on the soles of his feet.   There was blood right here

2   on his ankles.   But that blood was put there by the

3   defendant.   There's no blood on the legs.   No blood on

4   upper part of his body.   He never got up.   He just never

5   got up.   He was resting on the ground.   And per Chris

6   Hashisaki, he never got up.   So, what kind of physical

7   force did he use again her?   Nothing.   So she doesn't meet

8   that.   So, she doesn't deserve protection of this law

9   because she doesn't meet its requirement.

10          But if you think that she does, there is a second

11   requirement.   The defendant used or threatened to use no

12   more physical force than would have appeared necessary to a

13   reasonable person in the defendant's situation.   The

14   defendant knows about the victim's mental health.

15   She knows about the chemotherapy treatment.   And more

16   importantly she knows about the sodium azide.   So she knew

17   that he was weak.

18          So she knows all that.   She knows that he's

19   throwing up.   She knows that he's on the ground.   And the

20   other thing that she knows is what she tells him, "Get your

21   fucking ass up," she knows that even that isn't getting him

22   up because he can't.   She physically tries to get him up

23   and can't do it.

24          So, would a reason person think that a knife was

25   necessary to go after somebody who can't get up?   No.

1   There is no justification here.  This is a massacre.  A

2   slaughter.  He's like a pig, he bled out right in the

3   neck.  That's how they slaughter pigs.  That's what she did

4   to him.

5           Then it also tells you that the threat or use of

6   physical force against another is not justified in response

7   to verbal provocation alone.  He could have been screaming

8   the filthiest of obscenities at her from that situation

9   that he was in.  According to her, he did use some

10  obscenities.  But you know what, that's not enough.  The

11  law says stay away from him.  Do whatever.  Call

12  nine-one-one.  Make sure that you know your way to a

13  telephone.  There's no -- again, words are not enough.

14          And there's a restriction.  A defendant may use

15  deadly force in self-defense only to protect against

16  another's use or apparent attempted or threatened use of

17  deadly physical force.

18          In other words, that's different from what you

19  have before.  This is deadly physical force.  That is

20  talking about the knife.  The previous section that I read

21  to you just involved force, hitting, that sort of thing.

22  Here's, it's deadly physical force.

23          You are only entitled to use deadly physical

24  force if the other person is using deadly physical force.

25          Again, same inquiry.  What deadly physical force

1  could Joseph Andriano available himself of when he's

2  throwing up on the carpet, he's down on -- and he's being

3  poisoned.  He's had it in his system for an hour and a

4  half.  It has already gone through the highway, the

5  transportation, the blood system into his tissues.  The

6  sodium azide is now working its magic.  That's what it's

7  doing.  It's killing him.  That's what it's doing.  It's

8  already in his tissues.  That's why we get a reading for

9  two parts per million in the blood system.  What can he

10  do.

11        Not only that, he's got the chemotherapy to deal

12  with.  He's got the cancer.  He's got the weight loss.

13  There isn't any use or apparent attempted or threatened

14  physical force.  He couldn't get up to get the knife.  He

15  couldn't get up to get the belt.  He couldn't get up to get

16  the phone.  Just couldn't.  I mean, what does she want you

17  to believe?  That somehow, he's levitating or something?

18  It just doesn't make sense.

19        Then it says a person is justified in using or

20  threatening to use deadly physical force against another if

21  such person would be justified in threatening or using

22  physical force against the other as described above.  In

23  other words, the same thing as described above.  I don't

24  need to go through that.  And when a reasonable person

25  would believe that deadly force is immediately necessary to

1  protect against another's use or attempted use of unlawful

2  deadly physical force.

3       It's the same thing as above only this applies to

4  deadly physical force.  In other words, you can't use

5  force, you can't use deadly physical force unless you feel,

6  as a reason person, not as Wendi Andriano, but as a reason

7  person, that in this particular case she felt her life was

8  in danger.  How could her life possibly have been in any

9  danger when he's down on the ground unable to get up, when

10 according to Chris Hashisaki, throwing up.

11      We know from her own account she fed him the

12 poison around midnight.  It's about 2:30 in the morning

13 now.  That's two and a half hours, that's between one and a

14 half and two and a half hours.  That's the period of time.

15 And, again, he's the subject of this chemotherapy.

16      And it tells you self-defense justifies the use

17 or threat of use of physical force or deadly physical force

18 only while the apparent danger continues and ends when the

19 apparent danger ends.  He never was a danger for her.  He

20 was always down on the ground.  And, again, this cautions

21 you, the force used cannot be greater than is reasonably

22 necessary to defend against the apparent danger.  It tells

23 you the use of physical force or deadly physical force is

24 justified if a reasonable person in this situation would

25 have reasonably believed that immediate physical danger is

145

1   present.  The same scenario.  He's on the ground.  He can't

2   get up.  Actual danger is not necessary to justify the use

3   of physical force or deadly physical force.

4            In other words, if it appears to the reasonable

5   person that he could somehow get up and get a knife, even

6   if he's not using it, then that's when it becomes an

7   issue.  In this case, no reasonable person, knowing what

8   she knows, would think that she was in any kind of danger.

9   Was Chris Hashisaki in any kind of danger?  Could he have

10  gotten up -- and she didn't even know about anything that

11  was going on -- could he have gotten up and stabbed her?

12  Could he have gotten up and done anything to her, put a

13  cord around her neck, could he have put the belt around her

14  neck?  No.  Because she went down to him and she tried to

15  lift him, tried to help him.  He couldn't even get up with

16  her.

17           Does that mean for whatever reason the defendant

18  has curative powers?  That she could revive him and make

19  him get up?  No.  In this case, the reasonable person is

20  Chris Hashisaki even though she didn't know some of the

21  things that the defendant knew.

22           And then it tells you you must decide whether a

23  reasonable person in a similar situation would believe that

24  physical force or deadly physical force was immediately

25  necessary to protect against another's use of unlawful

146

1  physical force.

2  And then it tells you that the defendant's

3  believe was honest is immaterial.  The reasonable person is

4  Chris Hashisaki.  You must measure the defendant's belief

5  against what a reasonable person in this situation would

6  have believed.  She didn't even have a full panoply of

7  ailments that Mr. Andriano was suffering.  But, she knew he

8  couldn't get up.  She knew he wasn't a danger to her.  He

9  wasn't angry.  He wasn't upset.  He couldn't get up.  He

10  was just sick.  He only wanted the paramedics to save him.

11  And then it tells tell you find that there have

12  been past acts of domestic violence as defined below

13  against the defendant by another person, the state of mind

14  of a reasonable person for the purposes of the above

15  instruction of self-defense shall be determined from the

16  perspective of a reasonable person who has been the victim

17  of past acts of domestic violence.

18  In other words, what that's telling you is you

19  look at the situation.  If they have been the victim of

20  domestic violence, if they are, do they have the

21  characteristics?  Then you look at what a person who has

22  been the victim of domestic violence would think.  I, for

23  not one minute, think this is a woman who suffered from

24  domestic violence.  You saw, she's in control.  She's the

25  dominant one.  She wears the pants.  There are no acts of

1  domestic violence here.

2         There are only three incidents that Sharon Murphy

3  testified to involved, the one on her 30th birthday, the

4  one involving the pot and the one involving when she went

5  out to the softball game where the defendant was watching

6  Rick Freeland play.  Those are the only times that Sharon

7  Murphy referenced anything like that.  So, she is not a

8  victim of domestic violence.

9         The defendant has the burden of proving any

10  self-defense justification by a preponderance of the

11  evidence which is a lesser burden than proof beyond a

12  reasonable doubt.

13         As stated earlier, the State's always has the

14  burden of proving the crime charged beyond a reasonable

15  doubt and this burden never shifts throughout the trial.

16         Proof by a preponderance of the evidence is

17  defined as follows:  It means that a fact is more probably

18  true than not.

19         If you find the defendant has proved self-defense

20  justification by a preponderance of the evidence then you

21  must find the defendant not guilty of the crime charged.

22         In other words, if you think that she was

23  defending herself from this man who was dying on the

24  ground, then that's more probably true than not.  It tells

25  you to acquit.  Based on the assessment that was presented,

1    she is not the victim of domestic violence.

2            And the last jury instruction I want to cover is

3    the standard that you are to make that you are to apply to

4    this particular case.  That is the burden of proof.  That

5    tells you that the charge against the defendant is not

6    evidence against her.  And also tells you that in civil

7    cases it is only necessary to prove that a fact is more

8    likely true than not or that its truth is highly probable.

9            That's the preponderance of the evidence

10   standard.  It states that in criminal cases such as this,

11   the State's proof must be more powerful than that.  It must

12   be beyond a reasonable doubt.  Proof beyond a reasonable

13   doubt is proof that leaves you firmly convinced of the

14   defendant's guilt.

15           Are you firmly convinced that Joseph Andriano

16   didn't get up?  Is there any doubt?  Is there any doubt

17   she's the one who got the poison?  Is there any doubt she's

18   the one that stabbed him?  Is there any doubt that she's

19   the one that hit him in the head?  Is there any doubt

20   Joseph Andriano is dead?  No.  Is there any doubt that

21   anybody would know that if you hit somebody over the head

22   that you're going to cause serious physical injury and

23   could cause death?

24           It goes on to say there are very few things in

25   this world that we know with absolute certainty.  And in

149

1   criminal cases, the law does not require proof that

2   overcomes every doubt.  If, based on your consideration of

3   the evidence, you are firmly convinced that the defendant

4   is guilty of the crime charged, you must find the defendant

5   guilty.

6           That's the end of your inquiry.  And you need to

7   do no more, no less.  And that's what you indicated that

8   you would do when you were questioned on this issue.  If,

9   on the other hand, you think there's a real possibility

10  that the defendant is not guilty you must give the

11  defendant the benefit of the doubt and find the defendant

12  not guilty.

13          It doesn't say that you start out and say, I'm

14  going to give the defendant the benefit of the doubt with

15  regard to Sharon Murphy.  I'm going to give the defendant

16  the benefit of the doubt with regard to the insurance

17  company even though she lied.  I'm going to give her the

18  benefit of the doubt about why she lied.  Doesn't say

19  that.  It says if, based on your consideration of the

20  evidence, you are firmly convinced that the defendant is

21  guilty of the crime charged you must find her guilty.

22  That's all you need to do.

23          So those are the jury instructions that you are

24  going to take back with you.  There are a number of others

25  that I have not covered and the Judge will read with you.

150

1    So that leads to the final portion of my

2  presentation which is the defense that was presented in

3  this case.  And, basically, the situation that we have here

4  is a situation where they wanted to you to sort of feel

5  sorry for the defendant.  That's sort of the gist of it.

6  They want you to feel sorry for the defendant because,

7  according to them, she's in a domestic violence situation

8  with an individual who is suffering from cancer.

9    Well, the way they do it, we know that it's a

10  situation where they staged it for you.  They brought it in

11  for you with half truths, omissions and lies.  They brought

12  it in through assessment and they brought it in through the

13  defendant, an individual who really has a difficult time of

14  being candid with you.

15    But, let me put it to you in this sort of

16  perspective, if you will.  It's with regard to a work of

17  literature.  It's an individual from Spain back in the 16th

18  century who was a reader of books.   Much like the

19  defendant professes to be.  And he reads many, many books.

20  He was an older gentleman and one of the things that

21  happened with regard to him reading these books is that he

22  came to believe in fantasy.  He began to, if you will, the

23  line between imagination and the line between reality

24  merged for him.  So he began to feel that what was not

25  true, was actually true.

1       And that's what we have in this case.  We have

2   the situation where the defendant thinks that what is not

3   true, i.e. that she's a victim of domestic violence, that

4   she believes that that's true.  Of course, by any standard,

5   she is not.  Because the assessment is flawed.  Because the

6   assessment does not take into account secondary gain; does

7   not take into account the defendant is a liar.

8       But she's in a fantasy world.  That's what they

9   presented to you.  This fantasy world is just like this

10  elderly gentleman.  But this elderly gentleman is undaunted

11  and he's read stories about being a knight and that's

12  something he wants to do.  Just like this defendant.  Wants

13  to be out on the dance floor.  Want's to be out kissing

14  guys.  Wants to be out in this fantasy world that seems so

15  real to her with the strobe lights going on.  That's where

16  she wants to be.

17      Well, one of the things that she does in order to

18  do this, well, I can't go out there with my own name.  I'm

19  going to change it.  I'm going go to have a different

20  name.  That's what the defendant does.  She's Anne Newton

21  now.  Or maybe she Ms. Montegomery.  I don't know.

22  Whatever name she wants to be.  That's the name.

23      He also takes a name.  His name is actually

24  Lorenzo Quiano and he changes it to Don Quixote.  That's

25  like she wants to do.

152

1           But before he does that, he's got to get the

2     suit, the armor.  If he's going to be a knight out there,

3     that's what he's got to do.  So he finds one up in the

4     attic and starts cleaning it, getting it all shiny and

5     everything.  Just like they did with the defendant.  They

6     dressed her up for you.  The hair is different.  They got

7     different clothing.  You've seen it, how she's all sassed

8     up over there by the pool.  And you know how she's out,

9     changing clothing from Rustler's Roost according to

10    Mrs. Green.  Going over to the dance floor.  Doesn't want

11    anyone to know that she's doing that.  I mean, she changes

12    clothes.  I mean, she's somebody who's out there.  That's

13    what they did.  They brought in somebody who is very

14    marmish, very different than the person that's out there in

15    October of the year 2000.

16          Well, the other thing that he does is that he

17    doesn't have a helmet or hood.  So what he did is that he

18    makes one out of paper mache.  Took him a long time.  Just

19    like it took the defendant a long time to get the domestic

20    violence assessment done, 20 hours.  Well, he does the same

21    thing, takes a lot of time.  Very, very laborious but he

22    doesn't mind.  It's a labor of love.  Look's just like the

23    outfit.  And says I've got test it.  Takes the swore and

24    sheaths it, goes over to the paper mache, cuts it right in

25    half.  Undaunted, he continues on.  And goes through the

1   same process again.  He puts it together and this time

2   thinks, you know what, I'm going to go get that sword

3   because I know what's going to happen.  I'm go to have

4   faith that it's going to stand up.

5          And that's what they want you to do.  They want

6   you to have faith in the defendant's word.  That's exactly

7   what they want you to have.  Don't worry that it's been

8   proven over and over untrustworthy.  It doesn't matter to

9   Don Quixote De La Mancha he's already hacked it in half.

10  He has faith.

11         So that's what they want you to have.  And these

12  misrepresentations from Sharon Murphy to everybody but

13  that's okay, you should believe her.  Each and every one of

14  you should have faith and believe her.  Right?  That's what

15  they want you to believe.

16         One of the other things that they do is that, if

17  he's going to be a knight-errant, he's got to have a

18  horse.  There's a nag out there in the stable and he gives

19  it very, very flowery name, Rosianta (phonetic).  And then

20  he sees a young lady walking down the street, someone he

21  doesn't even know.  Every knight has to have a lady for

22  whom these good works he's going to do.  So what does he

23  call her?  Dulcinea del Toboso.

24         Just like in that case we have this great love

25  affair by the defendant that's only one way.  It's not

1   reciprocated by Rick Freeland.  But, you know what, they,

2   between themselves, pick out names for each other.  But

3   they've got different names for each other.

4        So what happens is that he decides to go out

5   there and he decides to go out and try to do these good

6   deeds and be a knight-errant.  Well, the problem is, that

7   when he gets out there that he needs somebody to help him

8   out.  This is not a situation where he can go out there and

9   do whatever he wants by himself.  So he needs someone to

10  help him.  And the situation is that somewhere he finds an

11  individual riding a donkey, an individual name Sancho

12  Ponca.  And Sancho Ponca is the kind of individual that

13  really wants to avoid responsibility and he goes along with

14  him.

15        We also have a Sancho Ponca here.  His name is

16  Alejo Ochoa.  According to her, every time something goes

17  wrong she calls him.  Remember?  Initially, right after

18  being married, she called him and said, hey, why don't you

19  come over here.  Why don't you help me out.  And that's

20  when a fight takes place.

21        Additionally, in this case, when something

22  happens, she called him.  She called her father, calls

23  Mr. Achoa and says to her mother who picks up the phone and

24  says, "I don't want to talk to you.  I want to talk to my

25  dad because he's the one that can help me."

1    And the reason that that's important is because

2  Mr. Ochoa then rushes over to help her, just like Sancho

3  Ponca who is there to help Don Quixote.

4    What ends up happening is that when he goes out

5  there and this is the traditional one that most of us

6  associate with that novel is that he goes out there but

7  what he sees is not reality.  So when he speaks, he speaks

8  of things that are not real.

9    I do not need to belabor all of the things that

10  she has already said.  We spent many, many minutes talking

11  about the fact that she has lied to everybody.

12    Just for an example, we'll pick Travis Black.

13  One of the things she said is that, no, I got the condom.

14  He's absolutely wrong, I did.  According to him he's on the

15  dance floor by himself and she comes up to him and starts

16  kissing him.  Her reality is, no, I was introduced to him.

17  And I wasn't kissing him, he kissed me.  And I wasn't

18  grabbing him, he was grabbing me.

19    Again, it's a situation where she doesn't see

20  reality.  Because everybody else would have to be wrong,

21  everybody else in the world would have to be wrong for

22  Wendi Andriano to be right.

23    Just like in the mystical, magical made-up world

24  everybody would have to be wrong in order for Don Quixote

25  to be right.  And that's just not the way it is.

156

1           For example, the traditional one most people
2    think of is the one where he sees these windmills.  What is
3    actually happening is that he thinks these are dragons and
4    he wants to slay them for Dulcinea Del Toboso.  Of course,
5    that would be a way for him to achieve aggrandizement,
6    someone to be reckoned with.  So Sancho Ponca, the voice of
7    reason, is telling him no, no, that's just a windmill.
8    You're going to get hurt.  Don't do it.  So he kicks that
9    nag into gear and he charges.  He's very good with his aim
10   and hits on a blade, hits it and he gets hurt.  Can't get
11   up for a couple days.  But he has justification.  He has a
12   reason why he did not succeed.  He is minimizing why he
13   didn't succeed.  And he's pointing the blame at somebody
14   else for why he didn't succeed.  He is minimizing why he
15   did succeed.  He said it's necromancers, sorcerers,
16   magicians who want to take away my glory that I have and
17   have attempted to achieve for Dulcinea del Toboso.  They've
18   taken it away from me.  That's what they've done.  It's not
19   that I haven't vanquished the dragon.  It's that they
20   changed it to a windmill.  And that's why it looked like
21   that to you, Sancho Ponca.  You, Sancho are really not
22   seeing reality as it is.
23           And that's what we have with this defendant in
24   order for domestic violence defense to work.  Everything
25   that is out there would have to be changed.  The report of

1   Sharon Murphy would have to be accurate.  Her tale to

2   Sharon Murphy would have to be truths.  Her omissions to

3   Sharon Murphy would have to be included.  The misstatements

4   that she made would have to be made complete.  The whole

5   report of 20 hours would have to be changed.  And the tests

6   she administered would have to be changed.  Brad Bayless

7   would have to be wrong in his use of the MMPI.  Everybody

8   would have to be wrong in order for her to be a victim of

9   domestic violence and for it to work in this particular

10  case.

11        THE COURT:  Ladies and gentlemen, we'll go ahead

12  and take our evening recess at this point in time.  During

13  the recess, please remember the entire admonition I have

14  given you, including the fact you are not to discuss the

15  case with anyone or let anyone discuss the case with you.

16  Do not do any research about the case or research,

17  investigation or experimentation about the case.  Avoid any

18  and all media coverage of the case.

19        We'll see everyone tomorrow at 1:00 p.m.

20        Have a nice evening.

21        (Proceedings adjourned.)

22

23

24

25

1

2

3

4

5

6                        C E R T I F I C A T E

7

8

9

10              I, SHARON FLORES, do hereby certify that the

11      foregoing pages constitute a full, true, and accurate

12      transcript of all the proceedings had in the above matter,

13      all done to the best of my skill and ability.

14              DATED this _28_ day of _April_____, 2006.

15

16

17              _Sharon Flores_____

18              SHARON FLORES

19              Certified Reporter

20              50374

21

22

23

24

25

000006495

EXHIBIT JJ

000006496

05-0002

IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

IN AND FOR THE COUNTY OF MARICOPA

|  |  |  |
|---|---|---|
| STATE OF ARIZONA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | No. CR2000-096032 |
| | ) | CR05 0005-AP |
| WENDI ELIZABETH ANDRIANO, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

BEFORE: THE HONORABLE BRIAN K. ISHIKAWA

Mesa, Arizona
November 17, 2004

REPORTER'S TRANSCRIPT OF PROCEEDINGS
(Trial)

COPY

SHARON FLORES
CERTIFIED COURT REPORTER
50374

2

1

2

A P P E A R A N C E S

3

4

5

6

7     For the State:

8                     Mr. Juan M. Martinez

9                     Deputy County Attorney

10

11

12

13

14     For the Defense:

15                     Mr. Daniel B. Patterson

16                     Mr. G. David Delozier, Jr.

17                     Office of the Public Defender

18

19

20

21

22

23

24

25

3

```
1                    P R O C E E D I N G S

2

3           THE COURT:  Good afternoon.  This is Cause Number

4    CR2000-096032, State of Arizona versus Wendi Elizabeth

5    Andriano.

6           The record will reflect the presence of the

7    defendant, counsel and the jury.

8           We'll continue with the closing arguments by

9    Mr. Martinez on behalf of the State.

10          Mr. Martinez.

11          MR. MARTINEZ:  Thank you.

12          Where we left off yesterday, we were talking

13   about just this fanciful world of Don Quixote where

14   anything was possible, even though we know that it wasn't

15   true.  A man could go out and become a knight by doing good

16   deeds for somebody that he really didn't know; take on some

17   windmills.  And after attacking the windmills, realizing

18   that they weren't what he thought they were, they weren't

19   dragons, they weren't monsters or anything like that, he

20   said, "Well, it was a magician or sorcerer or necromancer

21   who interposed himself between myself and the good deed to

22   take the glory away from me."

23          That's sort of the position that the defendant

24   finds herself in.  On the one hand, she tells us, "Well,

25   you know, I was under a lot of stress.  I was having to
```

4

1   care for Joseph Andriano.  I, every now and then, needed to

2   do something for myself."  And on the other hand, she tells

3   us, well, it's okay to be unfaithful.  It's okay to cheat

4   on your husband.  It's okay to go to bars and kiss other

5   men as long as in this fantasy world of hers, you don't

6   tease the men.  Because, that's an unforgivable sin to her;

7   that's the teasing of men.

8          That's the rationalization she gave you for Rick

9   Freeland and that's the rationalization she gave you for

10  Travis Black.

11         Additionally, this is the world of hers that she

12  wants you to partake of.  This is the world that she wants

13  you to be a part of, if you are to believe the defense that

14  they have posited for you.  One of the things we know is

15  that every time, it seems, that the name of Joseph Andriano

16  was mentioned on the stand when she was on direct

17  examination, it was all that her answers came through a

18  tissue of tears because immediately she would break down

19  and cry; in this world of hers that she has created or

20  attempted to create for you.

21         But the problem with that is that you were able

22  to see that back about four hours after the murder, about

23  7:30 in the morning, you saw what her demeanor was.  You

24  saw that tape.  Was there ever any tears there?  Not an

25  absolute single one.  The only time that she showed any

1  emotion was when she thought that she'd gotten his blood on

2  her.  That was the thing that she found, if you will,

3  horrendous.  It wasn't the fact that she stuck the knife in

4  his neck and almost severed his head off.  No.  No.  It was

5  the fact his blood had gotten on her.

6           Additionally, she was very animated with the

7  police officer.  Very cogent.  Never displaying any

8  emotion.  And, in fact, she even laughed back and forth

9  with him.  That's what the tape shows us.  The fact that

10  she didn't know that she was being videotaped doesn't mean

11  anything because the truth does not know whether it's being

12  videotaped or not.  It doesn't matter.

13           Even at some point, it appears she went almost as

14  far as to attempt to flirt with Detective David Lucero, the

15  person that was questioning her.  Is that, again, is that

16  the sort of the demeanor of somebody who is so broken up on

17  the stand they can hardly stand it when the name of Joseph

18  Andriano was brought up?

19           And part of that world and part of that defense,

20  also involves some photographs that they brought for your

21  consideration.  And these photographs that they brought for

22  you to consider are very troubling.  And the reason that

23  they're very troubling is because they point, and they

24  show, that what we had in this case, what was presented to

25  you by the defense or the defendant, actually was

1   fabricated evidence.  Made it up.

2           I'm talking about an exhibit that referred to

3   Number 440, when you go back to deliberate.  It's the

4   dresser.  You take a look at the dresser.  This is the one

5   that they took very close-up photographs of.

6           And, in fact, all of the photographs that you

7   have of this particular dresser are close ups so you can't

8   see anything around it except in this one, Exhibit 440.

9   You can see to the right there is this box, the box with

10  the lamp in it.  And that box with that lamp was purchased

11  on October 7th of the year 2000.

12          However, when her Sancho Ponca took the stand,

13  when Aleje Ochoa took the stand and said, "I actually took

14  the photograph back in the early part of September,"

15  unless he could teletransport himself in time, which in

16  their fanciful world he could, in their imaginary world he

17  could, but not in our world.  Not, just, it goes against

18  the laws of nature to be able to take a photograph of

19  something that didn't exist back on September of the year

20  2000.

21          Additionally, if you take a look at those strikes

22  that are on that dresser, the defendant told you, "Well,

23  those strikes were caused by Joseph Andriano's fists

24  striking that dresser."  If you take a look very closely,

25  you'll be able to see they are actually, what appear to be,

7

1   hammer strikes.  Not a situation where you could take his

2   fists and do that kind of damage.

3            This is the evidence that was fabricated.  This

4   is the evidence they want you to consider in support of a

5   claim of self-defense.  That's want they want you to base

6   it on, things like this.

7            What's even more galling about this evidence and

8   what makes it even more difficult to swallow is that this

9   photograph had to have been taken after the murder when her

10  father drove up here; while Joseph Andriano is on the

11  living room floor, during that golden hour that I've been

12  talking about.  They don't care about him, Joseph

13  Andriano.  They don't care about anything.  All they care

14  about is Wendi Andriano.

15           What do they do while all of that is going on?

16  They're taking photographs.  Doing this sort of thing.

17  They allege, well, this was actually taken in the first

18  part of September.  If that's so, what were they doing back

19  then?  Were they actually documenting this domestic

20  violence because in the future they thought she was going

21  to kill him?  Is that what was going on?

22           In either scenario, it doesn't make sense.

23  They're in this fanciful world were you can travel through

24  time.  But in this courtroom, that's just not possible and

25  as a defense, that should not be given any merit because of

1   things like that.

2          Additionally, we have the issue of the knife over

3   the blood.  I'm sorry, the belt over the knife.  One of the

4   things we know about that is Exhibit 439 -- I'm sorry 139.

5   We see there's a belt and we see there's a knife directly

6   underneath it.  One of the things that was advanced to you

7   was that, well, Mr. Andriano actually held the knife in

8   either hand when he attempted to choke her.  In fact,

9   that's what she told the police initially.  That he was

10  bleeding, grabbed the knife and went after her.

11         If you take a look at that knife and if you take

12  a look where the knife is standing, it's right in the line

13  of the arterial spurt.  So that if it had been there when

14  she says that it was, it would have been dripping with

15  blood.  And it isn't.  You've seen the belt.  It isn't.

16  Additionally, how did the knife get there?

17         Again, what is going on with regard to this

18  particular scene is that the defendant is staging it so she

19  can advance her claim of self-defense.  And she's staging

20  it while the cadaver, her husband, is right there.  The man

21  that she cried about all the time when she was asked about

22  it on direct examination.  Because she certainly didn't cry

23  during cross-examination about it.  So while that body is

24  there, she's creating the scene.  She wants to make sure

25  that whoever reviews the evidence or whoever sees the scene

1  goes, yeah, this is domestic violence.

2           The other thing that's just as important is the

3  telephone cord.  Remember the telephone cord that was found

4  in the kitchen, Exhibit 104, is cut.  You also see the

5  smudges of blood on the lower right-hand corner.  Again, to

6  go along with her story that she gave police initially was

7  that Joseph Andriano was bleeding because she had hit him

8  over the head, to use her words, she had conked him over

9  the head.  And what happens after she conked him over the

10  head was that he started to bleed.  And when she returned

11  back from sending the paramedics away, she put this cord

12  around her neck when he was bleeding.  Again, that would

13  defy the laws of nature because if somebody is bleeding,

14  they would necessarily get it on their chest, they would

15  get it on their legs, they would get it on their back,

16  their buttocks, their shorts, whatever it is they're

17  wearing.

18           Joseph Andriano is pristine with regards to

19  that.  He doesn't have any blood on him.  Which means he

20  wasn't standing up at any time while somebody was conking

21  him on the head, while the defendant was hitting him.  So

22  what that means is, again, while the body is there, while

23  she has just killed her husband, she goes and cuts this

24  cord and places it there.

25           She also places the blood around the

1    refrigerator, on the other areas that are there, on the

2    area where the knife is on the counter.  She does all that

3    so you will believe that she was doing all this in

4    self-defense.  But the laws of nature tug against that and

5    say the only way you are going to be able to believe that

6    is if you deny the laws of gravity and say, "No.  No.

7    Gravity doesn't apply in Apartment 132."  That's the San

8    Riva apartment complex.  But it does.  It really does.

9            The other thing that's important to note in this

10   case is the blood that was found outside of the apartment.

11   That's the blood that we're talking about on the wall.

12           MR. PATTERSON:  Judge, I object in categorizing

13   this as blood.  There has been no testimony with regard to

14   what this is.

15           THE COURT:  Overruled.  The jury can rely upon

16   their collective memories of the evidence presented at

17   trial.

18           MR. MARTINEZ:  This is right outside of Apartment

19   132.  And according to her testimony, she never left the

20   inside of the apartment with any blood on her hand.  But

21   this shows us she actually did.  And the reason she stepped

22   out was to go out and get rid of that lamp with which she

23   hit her husband over the head.  So she is, again, staging

24   the scene.

25           The most elaborate of all of the staging that she

1   did is this involving her shirt.  We know when Chris

2   Hashisaki arrived she was wearing a white T-shirt with some

3   shorts.  Chris Hashisaki did not remember the color of the

4   shorts.  We do know that sometime later when she came in

5   through the back, came from the north side, approached the

6   paramedics, that she was wearing a striped shirt.  You've

7   already seen that photograph.  And that is different than

8   what Chris Hashisaki had seen earlier.  And paramedics were

9   sure -- Rich Parrott told you she was wearing a striped

10   shirt.  "I remember that.  I also remember she had wet

11   hair.  I also remember the purse being strewn out on the

12   breezeway."

13                The other thing that he tells you is that, "You

14   know, I went back there at 3:48 in the morning when we got

15   the second call.  We were still on duty.  And one of the

16   things that struck me was that she had changed her shirt

17   again."  Now, she was back to the white shirt.

18                So for this individual who just doesn't like

19   blood, specifically doesn't like Joe Andriano's blood on

20   her, it must have taken quite a sacrifice for her to take

21   off that striped shirt and go ahead and don, again, that

22   white shirt in which she killed him.  Because that's

23   exactly what happened.  She was wearing the white shirt

24   when she killed him, changing, bathes or cleans up, puts

25   the striped shirt on and then turns around and puts the

1   white shirt on.  All fabricating, all put together so that

2   you then turn and say, well, you know, this is maybe

3   self-defense.

4          But you now know that it isn't.  That it can't

5   be.  That you would have to go against the laws of physics,

6   the laws of nature in order for you to believe that.

7          Well, to get back to our story, one of the things

8   that happens with Don Quixote is that he regains his sanity

9   and says this knight-errantry is not true.  This is nothing

10  more than fanciful, if you will, thought in my mind.  This

11  is something that I made up in my mind.  That's what he

12  ultimately comes to believe.

13         And I want to take you to that place.  And the

14  reason I want to take you to that place is because, yes, in

15  a sense we do agree, if we take a look at things the way

16  they really are without having added this fanciful

17  ingredient to it.  And we do know, if we take a look at it

18  with logical eyes, and we take a look at all the evidence

19  that there was a victim of domestic violence in this case.

20  And, in fact, the individual who is the victim of domestic

21  violence is this one right here.  There was domestic

22  violence in that apartment complex.  There was.  We don't

23  deny it.  But it wasn't that person, Wendi Andriano.  This

24  is him, right there.  She's the one that took the stool and

25  beat him up.  She's the one that took the knife, stuck it

1   in his neck.  She's the one that hit him over the head with

2   the lamp.  She's the one that took the pillow and stuffed

3   it in his mouth so others would not hear his crying for

4   help.  So, yes, in this world, in this trial, there really

5   was domestic violence.  But it was not perpetuated on the

6   defendant.  It was perpetuated on Joseph Andriano.

7         We know he's the one that wasn't abusive.  We

8   know he's the one that was isolated.  We know he's the one

9   that loved her immensely.  We also know he's the one that

10  cared for the kids.  We also know she was the one that goes

11  out.  We also know that at the time of his greatest need,

12  when he was being poisoned.  When his body was being taken

13  over by the sodium azide, we know that the words of solace

14  that she offered were, "Get your fucking ass up."

15        So, yes, there is domestic violence.  And the

16  person who perpetuated it is right there.  The one who

17  cried to you on direct examination, that's the one who

18  perpetuated this horrific act of domestic violence.

19        So in this world that we have here in this case,

20  there are two people, not literally but just figuratively

21  we have one who is the victim of domestic violence and we

22  have another, his wife, the defendant, Wendi Elizabeth

23  Andriano.  And she's guilty of first-degree murder.

24        I ask you to take a look at the evidence.  I ask

25  you to take a look at the jury instructions.  I ask you to

1   apply the jury instructions to the facts.  And I ask that

2   you do your duty and that is to return a verdict of

3   first-degree murder.

4           I'll leave you with this thought because each one

5   of you has a duty to go forward with the case, a word by a

6   poet by the name of John Dunn, who is a Victorian poet, or

7   was, who indicated that "Every man's death diminishes.

8   Therefore, send no one to find for whom the bell tolls.  It

9   tolls for thee."  And it tolls for each and every one of

10  you to take a look at the evidence, to get out of that

11  fanciful world, take a look at that evidence, apply it to

12  the facts, and even if somebody stands in front of you like

13  this, it shouldn't defer you.

14          MR. PATTERSON:  Objection, Your Honor.  May we

15  approach the bench, please?

16          (Bench conference was held outside the hearing of

17  the jury.)

18          MR. PATTERSON:  This is an attempt on the part of

19  the declarant to call for justice with the John Dunn

20  quotation that they need to somehow vindicate the death of

21  the deceased with the right verdict.  So I object to that

22  course of argument.  And I ask for a mistrial at this

23  time.

24          MR. MARTINEZ:  I versed it very carefully.  I

25  indicated that they take a look at the facts, look at all

1   of the evidence and apply it to the jury instructions given

2   by the Court.  They are to do their duty.  I was careful to

3   say that.

4          MR. PATTERSON:  The death of one man diminishes

5   us is clearly a call for them to do justice is

6   inappropriate and I call for a mistrial.

7          THE COURT:  Your objection is noted for the

8   record.  I listened carefully to what Mr. Martinez said and

9   I'm going to deny the motion for a mistrial.

10          (Bench conference concluded.)

11          THE COURT:  MR. MARTINEZ:

12          MR. MARTINEZ:  So I ask when you go back there

13   again to take look at the jury instructions, apply them to

14   the facts in the evidence, take a look at the photographs

15   and then examine the story of self-defense, see if you are

16   willing to follow her into this fanciful world where up is

17   down, black is white and nothing makes sense.  The only

18   things that makes sense if you are to follow her down that

19   road is that the defendant is somehow empowered, that we

20   are all wrong and she's the only one that's right.

21          In this case, she was the aggressor.  And she

22   killed Joseph Andriano by premeditation.  I ask you, based

23   on everything that you heard, to return a verdict of

24   guilty.  Thank you.

25          THE COURT:  Mr. Patterson.

1      MR. PATTERSON:  If I could prepare, Judge?

2      THE COURT:  Yes.

3      MR. PATTERSON:  Judge Ishikawa, Counsel, Wendi,

4  ladies and gentlemen of the jury.  Over the last couple of

5  days I sat in that chair for about four hours.  I listened

6  to the prosecutor attack Wendi and attack Dr. Sharon Murphy

7  over and over again.  It brought to me a sense of

8  overwhelming de-ja-vu because that's essentially the same

9  conduct that I witnessed during the days she was subject to

10  cross-examination by this gentleman when Dr. Murphy was

11  testifying.  That approach is consistent in his summation.

12  It's consistent in his cross-examination.

13  You had an opportunity to witness Wendi Andriano

14  testify.  You had an opportunity to watch Dr. Sharon Murphy

15  testify.  You heard Dr. Murphy tell us about her expertise

16  in domestic violence and about her opinions with regard to

17  whether or not Wendi was, in fact, a victim of domestic

18  violence.  You heard Wendi tell us about the events in her

19  life.  You heard her tell us about the events of October 8,

20  2000.

21      Ask yourself these questions:  When Wendi stepped

22  down from that witness stand, did you have in your heart,

23  in your sense, that she was a credible witness?  Did her

24  tears, her emotions, did they appear genuine?  Did they

25  come at the appropriate times in her testimony or did they

1   appear feigned and forced?  Was Dr. Murphy competent to do

2   an assessment?  Did you have that sense when she walked off

3   the witness stand that you just heard a competent woman

4   testify in an area of expertise that she possessed?  Did

5   she employ the right approach?  Did you have a sense that

6   her opinion makes sense in light of all the facts that are

7   now known to you in this case?  Did you have the same sense

8   of Wendi when she stepped down from the stand?  That what

9   she told you made sense in the context of everything you

10  now know about this case?

11          Those are the questions that are important.

12          I sat there for almost four hours in the last

13  couple of days and I didn't hear the prosecutor discuss his

14  case at all.  I didn't hear him discuss Dr. Bayless'

15  opinion.  I didn't hear him go over the blood spatter

16  analysis of his detective, Detective Olson.  Detective

17  Olson is the gentleman who sat next to him for the first

18  week in this proceeding.  I didn't hear him discuss that

19  testimony.  I didn't hear him discuss the DNA testimony of

20  his expert, Kathleen Sartor.  Her expert testimony

21  pertaining to the fact that Wendi's hairs were found in

22  Joe's hands.  I didn't hear him discuss that with you

23  folks.  I didn't hear him argue the validity of

24  Dr. French's testimony, his expert in pharmacology.  Or

25  discuss with you Mr. Richmond's testimony, his expert from

1 West Cost Analytical Services who tested the materials in

2 this case.  I didn't hear him talk to you about Dr. Keen's

3 testimony.  No, all I ever heard from him was a relentless

4 attack on Wendi Andriano and Dr. Sharon Murphy.

5           Well, the fact of the matter is, ladies and

6 gentlemen, that Wendi Andriano is on trial for her life in

7 a capital murder case because she made a promise to her

8 husband.  She promised him she would never tell a sole that

9 he tried to commit suicide.  She knew and he knew that

10 would preclude his burial on hallowed ground based on his

11 belief in Catholicy.  That would destroy his parents who

12 are also Catholics.

13           Because of that promise, the promise she made to

14 Joseph Andriano, she wouldn't tell about his suicide

15 attempt.  She didn't tell Chris Hashisaki or the paramedics

16 the real reason why her husband was lying on the living

17 room floor on October 8, 2000.  Because of that promise,

18 she omitted a significant part of the chronology of events

19 she related to Detective Lucero; an omission that caused

20 Detective Lucero to have doubts about the legitimacy of her

21 claim of self-defense.  And once a police detective begins

22 to doubt you, then you wind up in criminal court.

23           Had she told Chris Hashisaki that that evening's

24 events were the result of Joe's attempted suicide, Wendi

25 would not be on trial for capital murder.  Had Wendi told

1   the paramedics at both visits, or either visit, about the

2   suicide attempt, Wendi would not be on trial today for

3   capital murder.  Had Wendi told Detective Lucero about the

4   attempted suicide of Joseph Andriano that morning, Wendi

5   would not be on trial for capital murder.  Had she

6   disclosed the attempted suicide, none of us would be here

7   today.

8           So why, then, would Wendi Andriano keep this fact

9   secret?  Why would a woman keep the promise that she made

10  to her husband about an important topic like suicide?

11  Well, that's why we, on the defense, made a significant

12  effort to explain to you who Wendi Andriano is.  We are all

13  a sum, if you will, of our life's experiences.  We make

14  daily decisions based upon our past.  And we are who we are

15  because of our life up to that point.  That's why it is

16  important for you folks to get to know Wendi Andriano and

17  why we painted for you her life's history.  It wasn't to

18  endear us with you that she was some how better than this

19  because she was a Christian fundamentalist.  That's not the

20  reason we discussed that with you.

21          You need to understand that belief system, that

22  belief structure that she held, guided her in her

23  decision-making process on October 8th, 2000 and the months

24  before and in the immediate time afterwards.

25          Wendi was brought up in a fundamentalist

1    environment.  Her role models were male pastors and fathers

2    and husbands.  She was taught at a early age the wishes and

3    dictates of those male authority figures were to be

4    followed without question.  That was her instruction.  That

5    was her belief system.  Those were the belief systems of

6    those that she was surrounded by.

7            She believed that happiness and personal

8    salvation were assured by honoring the wishes of her

9    father, her pastor and her husband and following the rules

10   of God.  Again, this information was not submitted for your

11   consideration because somehow we felt that she was above

12   everything because of her belief in God.  The fact that she

13   had a belief in God is what guided her decision-making

14   process.

15           She learned early on that a woman's place in the

16   world was by her husband's side, raising children, managing

17   a home for her family, working hard, earning income for her

18   family.  She was focused toward her family.  She was

19   focused toward her husband.  This is the Wendi Andriano

20   that we presented to you and it is founded in fact.

21           She had one family model to pattern herself

22   after, Donna and Alejo and Brother Brandon.  But because

23   she -- and she grew up with other families that shared her

24   fundamentalist Christian beliefs.  She observed other

25   families that behaved exactly like her own family where

1   Father was king.  This is her world.  This is the life

2   experiences that she is developing at an early age and she

3   will carry with her when she comes upon October 8th or

4   September of 2000, June of 2000.  These are the things that

5   motivate her, that drive her, that cause her to make

6   certain decisions.

7          Granted, she made several feeble attempts to

8   break out of this pattern of belief and behavior.  Most

9   children do make some effort at resisting parental

10  control.  That's just normal growing up.  We all did it.

11  Regardless if you grew up fundamental Christian or Catholic

12  or Islamic, or in my case, not with a significant religious

13  background.  You will make efforts growing up to resist

14  what your pop tells you.  My father was a Republican.  I

15  grew up a Democrat.  That's the same kind of logic here.

16  She made those attempts to break away from the parental

17  control.  But she always returned to that belief system

18  that provided comfort and security for her.  That too is

19  common sense.  That is that we do as human beings.

20          She began to realize at some point that other

21  people in this world were not evil.  And she talks about

22  the time when there was a change in the administration at

23  the school she went to and allowed her to -- they had a

24  swim team, track team, that kind of thing.  She actually

25  went to other locations for swim practice.  And she met

1   other kids her age from different backgrounds and she found

2   out that they weren't necessarily evil because they didn't

3   believe in God in the same fashion that she did.  That's

4   the dogma that she grew up with; the other side of the

5   track people are different and, therefore, they are to be

6   shunned and to be avoided.

7          She experienced life on her own while being a

8   missionary in Mexico.  First opportunity to get away from

9   the daily influence of her father.  She challenged the

10  teaching of her father by associating with that other crowd

11  from Casa Grande.  You heard from her that that was a kind

12  of important point in her life.  She'd come back from a

13  missionary assignment in Mexico.  She had had some sort of

14  somewhat -- she's on her own.  She's independent.  She's

15  making her own decisions.  She's independent.  And it's

16  something she enjoys.

17          So, she began to go with the folks from the other

18  side of the town in Casa Grande, the other group.  She met

19  Joe Andriano who was a member of the other group.  And she

20  was immediately smitten by his boyish good looks and the

21  twinkle in his eye.  This is the first person that she has

22  a romantic interest in.  The other two individuals in her

23  past were not romantic interests.  They were done for

24  certain reasons.

25          But Joseph Andriano was the first person she met

1   that she became romantically involved with.  She was warned

2   early on that Joe had a penchant for fighting and had a

3   hair-trigger temper.  But she disregarded that because her

4   perspectives at this time were not objective.  Very

5   subjective, very romantic.  She perceived of this gentleman

6   in a very romantic perspective.  She had no true life

7   experiences up to this point.  Nothing in her life to help

8   guide her or assist her in making the right choices.  She

9   had lived a sheltered life.

10        She married Joe.  Was essentially the first man

11  she ever became romantically involved with.  And she

12  believed her life thereafter, having nothing to compare it

13  to in of married life, she believed that her life with Joe

14  was normal.  That the husband had the right to demand

15  certain things from a wife.  That her job was to honor him,

16  comfort him and obey him.  Traditional religious

17  instruction.  And to her, completely normal and completely

18  happy initially in that context because she was doing the

19  things that she had been instructed to by all the authority

20  figures in her life that would provide the true road to

21  salvation.  She believed all was normal when he would yell

22  at her, belittle her, smack her, push her, or go into

23  rages, breaking furniture and damaging the walls.  She had

24  nothing to contrast that life experience with.  It was

25  perfectly normal to her because that's what men do.  That's

1   what men are capable of doing.

2          You didn't tell on husbands because telling on

3   husbands is not what good Christian wives do to their

4   husbands.  Good Christian wives also keep their promises to

5   their husbands.  And she promised that she wouldn't tell a

6   sole about his attempted suicide.  That's why we tell you

7   about the background of Wendi Andriano.  It explains why

8   she is capable of keeping a secret that she made to her

9   husband.

10         Now, because of that promise, we are about to

11  conclude almost eleven weeks of trial.  It's only at this

12  trial, some four years after the event, that Wendi Andriano

13  has told a sole about the attempted suicide.  She's finally

14  told the complete truth about what happened in her life and

15  what happened on October 8, 2000.

16         Now, Dr. Sharon Murphy was asked to meet with

17  Wendi pretrial and speak with her and assess whether or not

18  Wendi Andriano was a victim of domestic violence.  As an

19  aside, we heard Dr. Murphy constantly referred to by the

20  prosecution as Sharon Murphy, I submit, to diminish her

21  credentials.  This woman worked long and hard and achieved

22  a doctorate in Sociology.  She is Dr. Sharon Murphy and is

23  entitled to that respect.  He didn't call Mike Bayless,

24  Mike Bayless.  He called him Dr. Bayless.  And that's an

25  effort on the part of the Government to disparage the

1  credentials of our expert.  Don't fall for that.

2           The issue of domestic violence is important in

3  this case for two reasons.  First, the victim of domestic

4  violence is afforded additional consideration under the law

5  of self-defense in the state of Arizona.  The prosecutor

6  read you a portion of the instructions.  I will, obviously,

7  allow you to read them on your own.  I won't burden you

8  with reading them in their entirety.  But, in general, it's

9  the rule of reasonableness with regard to self-defense

10  justification.  If a person is killed in self-defense, the

11  death of that person is justified.  And if it's justified,

12  then the verdict that needs to be returned is not guilty.

13  That's the premise of law that we're dealing with here.

14  The additional consideration that a domestic violence

15  victim receives under the law of self-defense and why it's

16  important to determine whether or not a person is the

17  victim of domestic violence is that if -- I'm reading this

18  verbatim -- that if you find there have been past acts of

19  domestic violence as defined below, against the defendant

20  by the other person, meaning the decedent, the state of

21  mind of a reasonable person for the purposes of the above

22  instruction of self-defense slash justification shall be

23  determined from the perspective of a reasonable person who

24  has been a victim of those past acts of domestic violence.

25           What that means is having grown or having lived

1    with a person who has committed acts of domestic violence

2    upon you, you're allowed to take what he's capable of doing

3    into consideration when you're devising your reasonable

4    response to a provocation.  That's legalese.  So many

5    words.

6            That person sitting in the back of the courtroom

7    is a stranger to me.  I don't know what that person's

8    capable of doing.  So if he comes at me with a knife, I can

9    respond in kind with a knife.  Okay.

10           In domestic violence situations, the parties know

11   each other.  And they know what the abuser is capable of

12   doing based on their past history.  So that when Wendi

13   testified that she saw that look in his eye, that the rage

14   that he had was greater than she'd ever experienced, "that

15   I knew if he got that knife he was capable of killing me,"

16   that's the perspective of a person who has had years of

17   experience with a domestic violence abuser.

18           And so the rule of reasonableness in that context

19   is what she perceived he was capable of doing to her at

20   that time based upon their history.  That's the

21   difference.  That's why domestic violence is important in

22   this particular case.

23           It's also important for a secondary

24   consideration.  And that's an appreciation of her status as

25   the victim of domestic violence also allows you to

1  understand and make decisions about other incident issues

2  in this case.

3         Knowing that she's a victim of domestic violence

4  when called upon to resolve conflict in the evidence who is

5  the more likely to be in control of the relationship behind

6  closed doors.  You can draw upon the opinion of Dr. Murphy

7  that she was a victim of domestic violence and was less

8  likely she was the one in charge of things -- that she was

9  less likely to be the one in control of the decision-making

10  process of that relationship.

11        You can also understand that there are two

12  parties here and she's a domestic violence victim.  She's

13  an abused or battered spouse.  There is also an abuser or

14  batterer.  So we get a feel for the state of mind of that

15  person when you come to the point in time when you have to

16  make conclusions and draw inferences about who is in

17  control in that particular relationship.

18        Dr. Murphy testified that Wendi Andriano is a

19  victim of domestic violence.  Now, in our law there are

20  definitions.  And on page 14 of the instructions, it

21  defines domestic violence.  And it says:  Domestic violence

22  includes acts of endangerment, threatening or intimidating,

23  assault, aggravated assault and disorderly conduct between

24  husband and wife.

25        Doesn't require a conviction.  Just says these

1  are acts that the abuser visited upon the victim.

2  Dr. Murphy sat with Wendi, interviewed her and discovered

3  during the course of the interview these acts had occurred

4  in the relationship between Joe Andriano and Wendi

5  Andriano.  And among other things, other things that she

6  considered, she comes to the conclusion that Wendi Andriano

7  is the victim of domestic violence.

8        Dr. Murphy's experience in domestic violence is

9  considerable.  She has worked with victims of domestic

10  violence.  She has taught courses at the college level on

11  domestic violence.  She has completed numerous assessments

12  of persons found to have been victims of domestic

13  violence.  She authored a 24-page report in this case.  And

14  it was the work product, the result of a 20-hour investment

15  of time, talking with Wendi and other witnesses in this

16  case.  Her credentials are impeccable, her methodology is

17  sound.  Dr. Murphy's opinion is valid and should be given

18  considerable weight during the course of your

19  deliberations.

20        The prosecutor finds fault with Dr. Murphy's

21  report.  Well, let me ask you a few questions.  Why doesn't

22  he talk about the strength of his expert's report?  Why

23  don't we have a battle of the experts here?  He mentioned

24  nothing about Dr. Bayless' report in his summation.

25        You know from Dr. Bayless that Wendi cooperated

1   with an interview with Dr. Bayless for the purpose of

2   determining whether or not she was a domestic violence

3   victim.  She was available.  Why didn't they hire somebody

4   with the credentials of Dr. Murphy or Dr. Mechanic to do an

5   assessment of Wendi Andriano?  Why did they hire somebody

6   like Dr. Bayless, who has an utter lack of credentials?

7   Seems like the answer to that question is quite simple.  I

8   think they were afraid what their expert, an expert that

9   had actual credentials, would find in this case.  I think

10  he was afraid that a credentialed expert would corroborate

11  Dr. Murphy's opinion; to come to the same conclusion that

12  Dr. Murphy came to had a credentialed expert been hired and

13  evaluated or assessed Wendi Andriano in the manner that a

14  true domestic violence assessment needs to be done.

15          The prosecutor quibbles with information in

16  Dr. Murphy's report.  Let me go through the issues.  The

17  Shawn King incident.  Wendi told Dr. Murphy that she didn't

18  report it.  That's what the police report corroborates.

19  The police showed up after the fact.  She didn't report

20  it.  The police came to her and asked her questions about

21  this damage to the vehicle that she was unaware of until it

22  was pointed out by the persons who reported it at the

23  apartment complex.  That's what's important in this issue.

24  She said she didn't report it.  But she talked to law

25  enforcement after they arrived.  What else was she supposed

1   to do?

2           Her sexual history prior to becoming romantically

3   involved with Joseph Andriano.  She had two sexual

4   partners.  She told you about those relationships.  She

5   lost her virginity to one.  Had a very short-term

6   relationship with another.  That terminated when she found

7   out he actually had a girlfriend.

8           Her first romantic sexual relationship was with

9   Joseph Andriano.  That's the point that Dr. Murphy was

10  making.  That's why it was significant in her development.

11  That first one she lost her virginity.  The second one was

12  a short-term involvement with a farmer boy.  The first

13  romantic relationship she had was with Joseph Andriano.

14          Joe's sporadic employment history.  Joe had a

15  sporadic employment history throughout the relationship,

16  period.  There's no ifs, ands and buts about that.  You

17  heard the testimony here.  Two of his businesses went belly

18  up.  And you never heard from anybody in this trial that he

19  ever was a nine-to-five guy.  That he ever had a real job.

20  He worked part-time for some folks down in Tucson in the

21  boat business.  But the money generated there went back

22  into his boats.  He became disabled at some point in the

23  relationship but that was well into the relationship, near

24  the end of the relationship.  And it doesn't change the

25  fact that during the period of the relationship she was the

1    principle wage earner.  She brought the money into the

2    family.  And he had difficulty finding and keeping work.

3    That's a fact.

4            Talk about the stone pot incident in the

5    converted garage on his parents' farm.  Do you think that

6    episode didn't happen?  Do you think that Joe's conduct was

7    somehow justified in that episode because Wendi may have

8    been bugging him?  That's what he suggested in his

9    summation.  That somehow what she told Dr. Sharon Murphy

10   was not true.  Or she didn't tell Dr. Murphy the whole

11   truth.  Or that somehow she should have acknowledge that it

12   was her fault that Joe threw the stone pot at her.

13           Now, granted, she minimized her reason for being

14   terminated at Courtyard.  Every person who has ever lost a

15   job for whatever reason minimizes that because they're

16   trying to find another job.  That's human conduct and has

17   absolutely nothing to do with domestic violence.  She

18   ultimately found subsequent employment at the San Riva so

19   how bad could her reasons for discharge have been?

20           Talked about the want or lack of bruising.  Do

21   you really believe, knowing everything that you know about

22   this case, that Joseph Andriano never touched Wendi for the

23   30th birthday party?  We talked about that.  This is a

24   classic case of blaming the domestic violence victim.  You

25   heard the prosecutor make a big deal during the course of

1   the witnesses descriptions of that particular coming home

2   for somehow she may have been in close proximity to another

3   man and that's why he threw the cell phone.  Just don't

4   understand domestic violence if you think it's okay to

5   throw a cell phone because your wife is in close proximity

6   to another man.  And, again, we see classic domestic

7   violence victim behavior in this episode.  When he throws

8   the cell phone, instead of getting indignant and say "Why

9   the heck did you throw the cell phone," she immediately

10  begins to apologize to Joe.  And somehow it's her fault he

11  just threw the cell phone.

12          With regard to that episode, he attacks Wendi

13  because she comes up with additional details to that

14  particular night when on the stand in a trial for capital

15  murder.  Somehow she's not allowed to come up with

16  additional details she didn't tell Dr. Murphy.

17          Well, domestic violence victims are like a

18  soldier in a war zone.  That first day in that war zone you

19  may remember that first bullet that whistled by your ear

20  because it's a new experience for you.  The violence, after

21  time in a war zone, becomes normal, becomes second nature,

22  becomes second hand.  So you don't recall, as a domestic

23  violence victim, the details of daily life with an abuser.

24  It only becomes significant when the acts of violence, the

25  acts of domestic violence are so extreme that they become

1  noteworthy.  Those are the things she was able to recall

2  with some detail with Dr. Murphy.

3            When you're on trial and you're forced to recall

4  episodes in your life that you have otherwise set aside

5  because the recollection of those events is too painful.

6  When you're asked to dredge up those memories, then, in

7  fact, you do have revelation, you do come upon details in

8  events in your life and it's, "He did do that.  I remember

9  that now."

10           The prosecutor went through 26 years of Wendi's

11  life and eight years of a relationship with Joe and found

12  several times when she actually stood up to her father and

13  actually stood up to her husband.  Big deal.

14           It's true she went out with her girlfriends in

15  the later part of her relationship with Joe, when the life

16  became even more hellish and more unbearable than it was

17  earlier.  The frequency of her going out did increase.  The

18  frequency of her drinking increased.  She told you that.

19  But Joe would go out on weekends to the lake with his

20  boat.  And where earlier in the relationship he would

21  invite Wendi to go along, towards the end there, he began

22  to isolate himself.  He wouldn't invite Wendi to these

23  weekend junkets.

24           So Wendi went out.  Who did she go do with?  She

25  went out with her colleagues.  She went out with persons

1    she worked with in the office.  She had no extended group

2    of girlfriends.  She had no extended group of male

3    friends.  This is classic domestic violence scenario.

4              And, in fact, Joe had a motive for letting her go

5    out on the weekdays.  Because she would get liquored up and

6    she would lose her inhibitions.  And if she made it home by

7    curfew, there was a benefit to Joe.  She told you what that

8    benefit was.  So he had reason to encourage her or allow

9    her to go out during the weekdays.

10             The observations of the witnesses in this trial

11   that the Government presented to you for your

12   consideration, all of those observations of Wendi and Joe

13   were made in public.  I ask you, knowing everything you

14   know about this case, who do you think made the decisions

15   in private?  That's Dr. Murphy's opinion.  That's

16   Dr. Murphy's report.  I invite you, contrast her competency

17   and her opinion and her report with that of Dr. Bayless'.

18   I think it's quite easy.

19             Without equivocation, I submit his opinion should

20   be completely disregarded.  His opinion is without merit.

21   He has no applicable experience in domestic violence.  He

22   has no -- his evaluation was inadequate, based upon tests

23   and methodology that have no application in domestic

24   violence assessment by his own admission.

25             To that end, because it is our obligation under

1   the law to convince you the legal terms of the

2   preponderance of the evidence but it just means it's more

3   likely than not, more probable than not, that Wendi

4   Andriano was a victim of domestic violence.  That's why I

5   got two shots at the proposition.  That's why I was allowed

6   to put Dr. Murphy on to give her opinion.  Then the

7   Government was allowed to put their expert on and then I

8   was allowed what's called "surrebuttal."  So that I could

9   put a person on to let you know whether or not Dr. Bayless'

10  opinion had merit.  That's because I have the

11  responsibility of proving to your satisfaction it's more

12  probable than not that Wendi was the victim of domestic

13  violence.

14          Dr. Mechanic, again, she's referred to as

15  Ms. Mechanic by the prosecutor, she too has earned a degree

16  and she merits the accolades that a person who has taken

17  the time to develop that educational expertise and those

18  credentials is deserving.  She's a highly credentialed

19  expert in domestic violence.  She explained why

20  Dr. Bayless' opinion has no validity in this case.  Her

21  opinion, too, along with Dr. Murphy's opinion, must be

22  given considerable weight during the course of your

23  deliberation.

24          She explained why the tests employed by

25  Dr. Bayless were either just wrong or inappropriate.  An IQ

1   test has no validity, whatsoever, in an assessment of

2   domestic violence.  Persons that are smart are victims of

3   domestic violence.  Persons that are not so smart are

4   victims of domestic violence.  There is no correlation

5   between IQ and domestic violence victim status.  The

6   Williamson Sentence Projection test, she couldn't even find

7   in her index of tests.  And that's what she does for a

8   living.  She gives tests.  She instructs on giving tests.

9   She doesn't know where he got this particular test.

10          The one test that he did give, the MMPI, there

11   are no set of symptoms that can be developed using the MMPI

12   that are consistent or uniform for DV victims.  And there

13   is no test designed specifically to determine DV status,

14   domestic violence status.  The test has some application

15   after you determine that you have, in fact, a domestic

16   violence victim who may have developed some personality or

17   emotional or psychological difficulties.  You identify them

18   with the MMPI II and you treat them.  Or, wherein the MMPI

19   II there are certain validity scales that tend to give an

20   overall picture whether or not this person is trying his or

21   her best to cooperate with the exam.  That's it.  That's

22   it.  You can't use it to determine whether or not a person

23   is a domestic violence victim.

24          So I submit to you we have established by a

25   preponderance of the evidence that it is more likely than

1  not that Wendi was a victim of domestic violence.  You can

2  use that in your consideration of whether or not, when we

3  get the issue of self-defense, the reasonableness of her

4  conduct.  And when you get to the point, you have to

5  determine what facts, if it's contested by the Government

6  and the defense, are more likely to be true if the issue is

7  who is making that decision, or who is involved in that

8  decision-making process.

9        Well, let's go on now to Wendi Andriano's

10  testimony concerning the events of October 8th, 2000 and

11  before.  Wendi, in effect, testified twice in this trial.

12  She testified in person for almost nine days on the witness

13  stand.  And her statement to Detective Lucero was played in

14  its entirety for you by us so that you could consider her

15  statements in their proper context.  We didn't chop it up

16  and give you snippets of her statement.  When it was our

17  turn to present the evidence to you, we played the whole

18  tape for you.

19        That's important because context is essential

20  when you determine whether a statement makes any sense,

21  whether it's truthful, whether it has any relevance of

22  application to the issue that you need to decide.

23        Her statement to Detective Lucero was somewhat

24  disjointed because she omits the attempted suicide.  Again,

25  the promise she made to Joe was that she wouldn't talk

1   about his attempted suicide.  Necessarily, she can't talk

2   about the attempted suicide.  She can't talk about the

3   sodium azide.  Those two issues are inextricably interwoven

4   in this case.

5            Also, somewhat disjointed and somewhat difficult

6   to follow because she's just, if you look at the time frame

7   here, she's just three for four hours removed from what had

8   to be the most traumatic experience in her life.

9   Regardless of which theory you subscribe to, his theory or

10  our theory, it had to have been a very emotional

11  experience, very shocking experience, very traumatic

12  experience for Wendi Andriano.  Three or four hours later

13  she's called upon to give a recitation of facts to a police

14  detective in a police station house when she's every reason

15  to believe she is under arrest here.  She keeps asking, you

16  know, "Am I under arrest here?  Do I need an attorney?"

17  "Can't tell you that."  That's what Detective Lucero tells

18  her.  So it has to be an unnerving, unsettling situation

19  three to four hours after what had to be the most traumatic

20  experience in her life.  The first officers on the scene

21  describe that trauma.  That she was seated up against the

22  wall in the apartment there.  That she was staring off

23  into --

24           MR. MARTINEZ:  I'm going to object.  This

25  evidence has not come in, Your Honor.

1          THE COURT:  The jury may rely on its collective

2  memory of the evidence presented at trial.

3          MR. PATTERSON:  Recall the testimony of the

4  officers that she sat there staring off into space, forward

5  into space.  This is also at the time that she is still

6  trying to protect Joe's memory.  So during the course of

7  the videotape, you'll see she minimizes the bad Joe.  He's

8  a good Joe.  He has his issues.  He has his problems.  We

9  fight.  But, a lot of the time it's my fault.  That's the

10  kind of typical, apologetic behavior for domestic violence

11  victims that's given to the detective shortly after this

12  incident.

13          If you include the attempted suicide of Joseph

14  Andriano and the sodium azide as the reason that Joe is

15  initially on the carpet in the living room, not that he was

16  bonked on the head.  You recall the statement she gave to

17  Detective Lucero, the reason he was on the carpet initially

18  when Chris Hashisaki and the paramedics arrive is because

19  she bonked him on the head.  Well, substitute he just

20  attempted suicide for bonking on the head, the rest of the

21  statement makes sense.

22          And I invite you to look at the statement and

23  note the following things:  She described her abusive

24  history with Joe.  She described that for us in trial.  She

25  described her history -- excuse me -- his history of

1   cancer.  She talked to us about that during trial.  She

2   describes his treatment history.  She told us about that at

3   trial.  She describes their economic difficulty.  She told

4   us about that at trial.  She describes his boating

5   activities.  She told us about that at trial.  She

6   describes their sexual difficulties.  She told us about

7   that at trial.  She describes why she didn't report

8   previously the abusive history she had with Joe.  She told

9   us why in trial.  She described Joe's prior rages.  She

10  described, again, she told us that at trial.  She described

11  the day's events, the shopping, the trip to Casa Grande.

12  She told us about that at trial.  She describes how the

13  fight started.  Granted, it's a little different but look

14  at the words she used.  The fight started with the accusing

15  questions.  That's what she told Detective Lucero.  That's

16  what she told us in trial.  That she was comforting him and

17  he begins to accuse her of infidelity.  That's what

18  precipitated the fight; accusing questions.  She described

19  his hurt heart.  That's as close as she came to talking

20  about the attempted suicide.  That he had a hurting heart.

21          Again, we know that from the testimony here and

22  from the testimony of the experts, Mr. Collier, Dr. French,

23  Mr. Richmond, Dr. Keen, that sodium azide would cause you

24  to have tachycardia or a hurting heart.  She described the

25  broken wedding display case to Detective Lucero.  She also

1   told us about that here at trial.  She admits to hitting

2   him with the bar stool.  She told us that here in trial.

3   She described the charger cord strangling attempt to

4   Detective Lucero.  She told us about that here, as well.

5           She describe grabbing the knife and cutting the

6   cord.  Again, she told us that in trial.  She told

7   Detective Lucero, she describes struggling with Joe in the

8   living room and then being covered in blood.  It's the same

9   sequence of events she described for us here in trial.  She

10  told Detective Lucero about calling her dad.  She told us

11  that here at trial.  She describes the nine-one-one call to

12  Detective Lucero.  She told us about that here.  She told

13  Detective Lucero about the operator asking her to roll Joe

14  over.  She told us that here in trial.  She tells

15  Detective Lucero that she did not stab him.  Again, she

16  said here she didn't stab him.  He was attempting to stab

17  himself, she grabbed the knife, it slipped, he stabbed

18  himself.  That's what she told Detective Lucero.  She

19  didn't stab him.  She tells Detective Lucero about seeking

20  sanctuary in the bathroom.  She told us here about that.

21  She told us that there was a break in the fight in the

22  sequence of events, there was a point in time where the

23  fighting was of this nature, there was a break, there was

24  time out and then there was another portion of the fight.

25  In addition to that videotape statement, Wendi testified in

1  trial over nine days.

2        Her overall testimony, her demeanor, her manner

3  and memory was that of a credible, believable witness.  Why

4  is that?  Her testimony makes sense.  The first basis for

5  the evaluation of a person's testimony is does it make

6  common or general sense.  Wendi's testimony does.  It

7  counts for almost everything known in this case.

8        Let's talk about it.  She described at trial the

9  events of the morning of October 8, 2000.  Told us about

10  the trip to Casa Grande.  She said how Joe wasn't feeling

11  too good that day.  He was depressed and despondent and not

12  himself while at his parents' house.

13        But those almost exact words were used by Joe's

14  father when he testified in this case.  He said that Joe

15  was not himself.  That Joe didn't play outside with the

16  kids.  That he was despondent.  What's significant, ladies

17  and gentlemen, is that Joe's father told us that he went to

18  bed -- it was his custom to go to bed early.  He went to

19  bed that night while Joe was still there.  Joe Andriano

20  made an effort to wake up his dad.  This is what Joe

21  Andriano, Sr. told us.  And that Joe gave him a hug.  That

22  Joe made a concerted effort to say good-bye.  That's

23  significant conduct, ladies and gentlemen, because it's

24  consistent with what Joe is thinking; what Joe is

25  contemplating at this point.

1          In this context, Joe has made an effort for the

2   last couple of weeks prior to October 8th, 2000 to visit

3   his kin folks.  He's gone to Oklahoma.  He's gone to

4   Memphis.  And he's gone to the family outing for his

5   brother down in Casa Grande.  And he said good-bye in the

6   process to all of his closest relations.  That's

7   significant.  That's conduct that Joe manifested near the

8   end.

9          Wendi described how Joe made his decision on the

10  way home that he was going to do it.  You heard a lot about

11  Joe in the last three months.  We heard about Joe's

12  condition in September or in the months before October 8,

13  2000.  The significant shortness of breath that he was

14  experiencing.  The troubled breathing.  The miserable

15  experience associated with chemotherapy.  This hopelessness

16  and terminal nature of this cancer.  He'd been told by

17  Dr. Kellogg about six months earlier that he had about a

18  year left.  We all know from common experience that was an

19  option that every person similarly situated with Joseph

20  Andriano would contemplate and consider.  It was an option

21  that everybody in that circumstance would have considered.

22          Wendi described the events immediately before the

23  ingestion of the capsules, a bath they took together.  The

24  love-making they engaged in.  The shower they took.  She

25  describes that Joe ingested the capsules.

1          Now, again, a handful of capsules is the only way

2    you could commit suicide with sodium azide because, you

3    heard testimony from the experts in this case that because

4    of the significant low PH that it's highly acidic.  This is

5    not the kind of circumstance where you can take a small

6    amount of this stuff in a conventional fashion, either

7    dilute in some drink or dilute in some food stuff because

8    the taste would be extremely acidic.

9          So that's why the capsule system was employed by

10   Joe Andriano and Wendi Andriano because they had read, had

11   seen the package inserts.  They knew that a certain amount

12   was necessary to do the job and the only way to get it in

13   your belly was to make the capsules.  That's why they

14   created the capsules with the elderberry.

15         Wendi described the symptoms that began to take

16   effect thereafter.  And symptoms that you would expect to

17   see, according to the testimony of all of the medical and

18   scientific experts in this case; Joe Collier, the chemist,

19   Dr. Keen, the medical examiner, Dr. French, pharmacology

20   dean from the University of Arizona, Mr. Richmond, the

21   gentleman from West Coast Analytical Systems, all them

22   described if somebody ingested this stuff, sodium azide,

23   the symptoms that you would experience.  Sodium azide, as

24   one expert told us, is stuff used in air bags.  The reason

25   they use this in air bags is because once it gets wet or

1    electrical impulse is charged through it, it immediately

2    discharges nitrogen gas.  Nitrogen gas, in and of itself,

3    doesn't really harm us.  That's why you can use it in air

4    bags, it explodes, catches your face in the steering wheel,

5    then it dissipates.  The nitrogen gas has dissipated.  It's

6    not going to harm you.

7            The same phenomenon occurs when this chemical

8    hits your stomach.  These are symptoms that Wendi

9    described.  She said that he immediately became nauseous.

10   That he had tachycardia.  He had a hurting heart.  That the

11   symptoms were such that it scared him and he agreed to go

12   to the hospital.  That that's why they went out to the

13   living room, that he collapsed on the carpet, that he

14   vomited.  All the experts agree that it would cause

15   nausea.  The evidence in this case confirms that Wendi

16   describes the symptoms of taking sodium azide.

17           The experts also uniformly told us that you can

18   draw no conclusions about how much aside is in a person's

19   system based upon the test results from the gastric content

20   or the blood stream.  You don't know how much was ever in

21   his system.

22           The prosecutor suggests that it was odd that he

23   could attempt suicide with these capsules and then change

24   his mind and want to go to the hospital.  Well, that's just

25   foolish.  It seems to me there are a lot of persons in this

1  community that attempt suicide and then change their mind.

2  They have suicide buyer's remorse.  That's why we have the

3  concept of attempted suicide.  That persons who have

4  decided to end their lives when they realize that the

5  process they have chosen is not as pleasant as they

6  anticipated, they change their minds.  They have suicide

7  remorse.

8         What happened in this case is they had an

9  expectation that taking the capsules would quietly and

10  comfortably put him out of his misery.  Didn't happen like

11  that.  The symptoms were worse than the disease and it

12  scared him.  It shocked him.  It wasn't like on TV where

13  you just pass out gently.  That's when the plan initially

14  changed and it was a plan, then, to take him to the

15  hospital.

16         Wendi described, thereafter, the abatement of

17  these symptoms.  This process of abatement of symptoms

18  makes sense based upon the testimony, again, of the

19  experts; Joe Collier, Dr. Keen, Dr. French.  They all said

20  that once you vomit the stuff out, it no longer is

21  continuing to get into the system.  And with the passage of

22  time, the symptoms would abate.  And, additionally,

23  obviously, no additional sodium azide is getting into your

24  system because the capsules are now on the carpet.  He

25  vomited twice, according to the testimony of Chris

1    Hashisaki and the I-Teck evaluation of the stuff they found

2    at the scene, two patches or pools of vomit.  So he vomited

3    enough to evaluate all the capsules from his system.

4            Wendi describes then how he began to feel

5    better.  He's no longer having the nausea, no longer having

6    a hurting heart.  Things are getting better and he

7    continues now with the plan of suicide because it seems to

8    be working and it can be working now in a manner or fashion

9    that he anticipates.  So he changes his mind about going to

10   the hospital.  That makes sense.  That's what Wendi

11   testified to.

12           She tells us that she's comforting him.  She got

13   a pillow for him.  She's trying to be a dutiful wife in his

14   final hours.  She's doing the things that Wendi has always

15   done for Joe throughout their relationship.  She is acting

16   in character.

17           Unfortunately, Joe also remains in character

18   because his entire focus during the relationship with his

19   wife is that of a possessor of Wendi Andriano.  That he

20   acts like a typical characteristic domestic violence abuser

21   and is fixated on her infidelity; on her perceived

22   infidelity.  Of course, it's a topic on his mind at the

23   time.  He is on the ground.  He's ready to meet his Maker.

24   And he wants to know have you been true to me.  That makes

25   sense.  That's what she describes.  That's is Joe being

1  Joe.  She tells us that's what precipitated the fight when

2  she was truthful with him and said she had a sexual or

3  sexual incident with Travis Black.

4          The sequence of the events and fight she

5  describes thereafter are corroborated by the physical

6  evidence that was found at the scene.  The broken family

7  picture with the flower pot on top.  She describes how that

8  happened.  That he is now angry with her.  He's fixated on

9  her.  He grabs the one thing that depicts her and her

10 children and he smashes it.  Okay.

11         She now knows that it's significant because he is

12 now personalizing his rage.  He is engaged in conduct that

13 she hasn't seen to this extent, to this extreme before in

14 their relationship.  She tells you about the cut telephone

15 cord.  It's there in the kitchen.  She tells you about the

16 broken bar stool.  And you had a chance to look at the wood

17 screws projecting out of the top.  She describes how the

18 wedding display case got broken.

19         Again, he is personalizing his rage.  At this

20 point, he is breaking items of personalty rather than the

21 coffee table as he has done in the past.  So he is engaging

22 in behavior a far greater, far escalated more so than she

23 has ever anticipated with him in her life.  There are

24 things knocked from the counter on to the floor.

25 Corroborates her version of the events.  She has broken

1   fingernails and a scraped neck. Well, the county attorney,

2   the prosecutor, diminishes the significance of those

3   injuries.

4       All I can tell you is look at that videotape.

5   The police technician took almost two hours total recording

6   and documenting these injuries. If they were so

7   insignificant at the time, how is it that the police

8   department, at a time early in the investigation when they

9   had no reason to disbelieve her, they took her at face

10   value she had injuries. They documented those injuries the

11   first section was about 40 minutes to an hour. And I think

12   the second was also an hour. That's a lot of photographs

13   taken, of a lot of portion of Wendi's body. That seems to

14   suggest that the technicians saw something there. That

15   Detective Lucero saw something there. That Detective

16   Dillian saw something there. Because they went to great

17   pains to document it.

18       She asked Detective Lucero to open the bottle of

19   water for her. She can't open it with her hand. She

20   didn't use her injured left hand to drink the water except

21   only one occasion during the entire videotape.

22       There is significant evidence in that apartment

23   of mutual combat. Dennis Olson, he was the detective who

24   did the blood spatter evaluation in this case. It

25   corroborates that the two combatants were moving around.

1   If you recall his testimony, there is cast off in all four

2   corners in that apartment.  That suggests that both parties

3   were moving.  That she was moving to avoid him.  That he

4   continued to approach her.  Otherwise, as the Government

5   suggests, if she just nailed him while he is passed out on

6   the floor you would expect to see one consistent pattern of

7   blood cast off.  That's not what we have in this case.

8          The contact with Joe's head is all in the same

9   area.  So if the blood spatter is going to the four

10  corners, that suggests that he is maintaining his

11  relationship with Wendi at all times during the fight.

12  That she is trying to move away from him, he continues to

13  get up and come to her.  She never testified that he stood

14  up, that he came after her.  She always said he was in a

15  crouch, he was down on all fours.  That he continued to try

16  to get up.  That he continued to try to get to her.  That

17  was her testimony.  That's consistent with the blood

18  pattern spatter evidence that Detective Olson described for

19  you.  She continued to hit him, she said, because he just

20  wouldn't stay down.  That, again, is consistent with that

21  scientific or physical evidence that was discovered in

22  Apartment 132.

23          Wendi testified or described why and how she

24  assisted her husband with his plans.  Again, she described

25  or testified why and how she assisted her husband with his

1   plan to leave the earth on his terms.  Joe didn't want to

2   be hooked to some ventilator, struggling for his last

3   breath.  And he still needed a plan to provide financially

4   for his wife and children and preserve a medical

5   malpractice lawsuit.

6          Again, you heard from Mr. Miller that there

7   needed to be a relationship between the cause of death and

8   the med mal.  That explanation, that information, was given

9   to Joe as well as Wendi.  He knew about it.  Why, then,

10  would Wendi involve herself in that process?

11         Well, the first proposition is kind of general,

12  she did everything for Joe anyway.  That's why she did

13  that.  That was her function in this relationship.  She was

14  the one with access to the Internet at work.  They didn't

15  have Internet connection access at home.

16         Initially, the search was for cyanide.  In that

17  regard, she enlisted Shawn King.  She brought another

18  person into the proposition.  If it were highly secretive

19  and designed to clandestinely murder her husband, why is

20  she bringing this Shawn King into the proposition?  Shawn

21  tells us that cyanide is unavailable.  You can't get it.

22  So they changed to a different chemical.  That chemical was

23  sodium azide.

24         She, again, continues to try and access sodium

25  azide in a public fashion.  She's using the public computer

1   in the business office.  During the course of trying to

2   acquire the sodium azide, obstacles developed.  So she was

3   required to create phony business licenses.  You see the

4   series of e-mails, let me have it here, no, you need to do

5   this, you need to do this, you need to do that.  You need

6   to do this.  It's not of her doing.  It's her job.  Her

7   task.

8           Her assignment from Joe was to access the sodium

9   azide and it becomes increasingly -- more obstacles in the

10  process.  And that's why she creates the business licenses

11  to get the stuff.  Again, that's done in public.  It's done

12  in front of witnesses.  You have people come in and say we

13  saw her doing this.  On the paperwork she used her own cell

14  phone number.  This secretive nature of this only to keep

15  it from the lawyers, if you will.  The insurance lawyers.

16  The persons that are defending the malpractice doctors.

17  That's the persons they don't want to discover that they're

18  accessing sodium azide.  All of these efforts was done in

19  public.  The paperwork that was created to access the

20  license was saved.  It was in her office.  It wasn't

21  destroyed.

22          Again, if this is a clandestine effort to poison

23  her husband, why do you retain the documents that you use,

24  that you created to access the stuff in the first place.

25  Look at the e-mails.  There is a reference to rodents on

1   the farm.  Again, that's information she got from Joe.

2   Joe's a farm boy.  Joe knows these things.  This is not

3   something she came up with.  The box, once it was acquired

4   from the Airborne Express, was taken into the office, left

5   out in the open.  It was thereafter taken -- the sodium

6   azide box and stuff -- you saw the photograph -- it was in

7   the storage shed.  It wasn't discarded, it wasn't thrown

8   away.  If this chemical had been used to clandestinely

9   poison her husband, once she created the capsules, why

10   don't she discard the rest of the evidence?  It doesn't

11   make sense.  It's wide open in that storage area.

12          She described how they made the capsules and

13   buying the money order.  Again, the capsules were generated

14   to provide a means where you could ingest sufficient stuff

15   to cause lethality.  You couldn't do it just by sneaking it

16   in the soup.

17          Again, you need to ask yourself all the things

18   you know about this particular case.  Do you really think

19   that Joe didn't know about the effort to access the sodium

20   azide?  All of the things that we know about this case.

21   And if you agree that Joe knew about this, it doesn't

22   matter, then, that there was some sort of secretiveness or

23   some misstatement done in the process of acquiring the

24   stuff because it was acquired to assist Joe.  Joe was aware

25   of it.  And that it was done for the benefit of Joe.

1          Wendi described why and how she explored the

2    topic of life insurance.  Again, I invite you, I ask you to

3    listen to this tape from Mr. Foster.  Joe answered the

4    phone and he's asked, I want to talk about or know anything

5    about that application for life insurance he made.  He

6    says, "I didn't make it."  That's all he says.  He says,

7    "Talk to my wife about it."  You need to listen to that

8    tape.  It certainly doesn't suggest that he was in the dark

9    about any life insurance application.  He basically says,

10   "I didn't make it.  You need to talk to my wife."  And

11   that's what Gary Foster says, "Can I talk to your wife?"

12   "Yeah, talk to my wife."

13          It is expected that a person dying of cancer

14   would be concerned about the financial welfare of his

15   kids.  Again, she does everything in this family.  She does

16   the leg work.  So it's not unusual that she's the one that

17   fills out the pre-app.  She's also the one that's computer

18   savvy.  She's also the one that's Internet savvy.

19          In the pre-app, she gives her home phone number

20   to the insurance companies.  And as a result of that,

21   Mr. Foster called, and if you recall his testimony, he

22   called and left messages on the home message machine

23   numerous times.  Joe was at home a lot.  Do you really

24   think Joe didn't know about the insurance preapplications?

25   He had to have known.  He had to have known.

1          And then, again, if he knew about what was going

2     on, why, then, is the fact she made misstatements on the

3     application relevant to anything in this case?  She did it

4     for him.  She did it with his knowledge.  And she made some

5     misstatements in the process that she had to know had to be

6     made because he knew he was dying of cancer.

7          This whole issue of posing, is, again, a

8     non-issue.  The one person that Wendi says she did ask to

9     pose for Joe was Erik Vaillant.  Erik was Joe's friend.

10    Look at those photographs; photographs taken of Joe and he

11    at the lake, at the pool party.  Erik's phone number was in

12    Joe's address book.  If this was a clandestine effort to,

13    in some fashion, get a life insurance policy on Joe's life

14    without his knowledge, why do you use one of Joe's friends

15    to pose.  Do you really think Joe didn't know that she

16    approached Erik Vaillant with this opportunity for Erik?

17    Makes no sense.

18         The note pad and Ed Sandidge, the Andriano family

19    agency.  Why would a person who is clandestinely seeking to

20    get an insurance policy without the knowledge of her

21    husband call the life insurance agent of the family to whom

22    she's married?  Look at that note pad.  It's Joe's cell

23    phone that's given to the receptionist.  It's not Wendi's

24    cell phone number.  We know Wendi used his phone number on

25    other situations, on other things.  Who did she expect that

1   he would call, having given Joe's cell phone number to the

2   insurance agent?

3           All this insurance stuff came to a halt when

4   Alejo had a conversation with both Joe and Wendi that what

5   they were doing was fraudulent.  "Stop doing it," he told

6   them.  And they stopped.  Do you really think Joe didn't

7   know what Wendi was doing here?

8           Wendi told us why she developed a relationship

9   with Rick Freeland.  It was a relationship of five to six

10  weeks duration.  Do you really believe during the course of

11  this relationship, with all the time Rick Freeland spent

12  with all of the other persons working at that office, that

13  all the other persons that knew that Wendi was married, all

14  the friends like Erik Vaillant, friends that would go out

15  with these folks, that knew Wendi was married, he didn't

16  know Wendi was married?  She had photographs of her husband

17  and family in her office and he didn't know she was

18  married?

19          What I think happened here was that Rick Freeland

20  didn't mind initially he was having a friendship with a

21  married woman.  But that relationship developed into

22  something he couldn't handle.  And then when he would see

23  Joe at the pool, he would see Joe at the complex, that's

24  what he couldn't deal with; seeing Joe and knowing that he

25  had a friendship, a relationship with Joe's wife.  I think

1  that's why he terminated the relationship.  Than he did

2  what men generally do, that he, rather than confront the

3  issue with Wendi, he avoids her.  He dodges her.  He sees

4  her coming down the walkway in the complex, he turns

5  right.  And that's what frustrates Wendi.  Because, after

6  all, the relationship she had with Andriano (sic) was

7  fundamentally a relationship of friendship.

8        She could be friends with Rick Freeland because

9  he had a special empathy for her situation.  That he, too,

10  had lost a fiancee.  He, too, had lost a brother early on.

11  And he knew about the topic, the subject of loved ones

12  lost.

13        He was the kind of person that she could talk

14  to.  She couldn't talk to Joe.  He was the kind of person

15  that would hug her and express warmth with her.  And these

16  are emotions and feelings and conduct that she was not

17  receiving from Joe.  This was someone she could talk to and

18  help her through the hardships.  Sex was not an important

19  integral part of the relationship for Wendi.

20        I mean, there is really no reason to bring in

21  Rick Freeland to this trial except as an effort on the part

22  of the Government to just kind of disparage Wendi's

23  character.  I don't think that I heard the Government

24  suggest the reason that Wendi plotted to clandestinely

25  poison her husband was she wanted to run off with Rick

58

1  Freeland or she wanted to run off with Travis Black.  I

2  think the only one reason that that topic was brought

3  forward for your consideration was just to paint her as a

4  trollop, some kind of unfaithful wife that is capable of

5  plotting to kill her husband.

6          And if this relationship with Rick Freeland was

7  so bad, why didn't anybody bring it to Joe's attention?  It

8  just seems to me that everyone knew Joe in the complex.

9  Everyone apparently was aware that Wendi was seeing Rick

10  Freeland.  If those people thought that it was so bad what

11  she was doing with Rick Freeland, how come nobody brought

12  it to the attention of Joseph Andriano?

13          Wendi told us about her situation with Travis

14  Black.  It was a one-night stand.  It was after a trip to a

15  bar.  It was at a time when both he and she were extremely

16  drunk.  Again, does this have anything to do with the

17  case?  Is this just, again, an effort on the part of the

18  Government to disparage the character of Wendi Andriano, to

19  portray her as somehow deserving of prosecution because she

20  had sex with another man?  This trying to equate the

21  relationship she had with Rick Freeland and this one-night

22  stand with Travis Black as both being affairs is just not

23  good language.  Affair does not describe the relationship

24  she had with Travis Black.  It wasn't.  Nobody would call

25  it that.

 1          Wendi testified, told us about her knowledge of
 2  the malpractice lawsuit.  Again, as is usual in this
 3  relationship with Joseph Andriano, she did most of the leg
 4  work.  But Joe was involved.  Joe was aware.  Do you think
 5  for a moment a man who has an interest in a significant
 6  lawsuit would not pay attention to the details?  Would not
 7  follow its progress?  Sure, he might let Wendi make the
 8  phone calls but at some point he's going to make certain
 9  he's up to speed on the progress of this lawsuit.
10          In Joe's wallet was Jeffrey Miller's business
11  card.  He had in his wallet the phone number of his lawyer
12  so he could get ahold of his lawyer on a daily basis.
13  Somehow there was some suggestion that Wendi committed
14  misconduct by trying to get ahold of Leon Thikoll.
15  Leon Thikoll has a card in Joe's wallet.  Joe had
16  accessibility to Leon Thikoll on a daily basis.  Somehow
17  trying to portray something sinister, that's just not
18  sinister.
19          Jeffrey Miller came in.  Harvard graduate.  Told
20  us about the med mal or medical malpractice lawsuit.  He
21  told us with no uncertain equivocation that he never
22  mentioned a dollar amount to Wendi.  He never mentioned a
23  dollar amount to Joe.  It's the kind of thing that torte
24  lawyers, civil lawyers, those kinds of lawyers, don't tell
25  the client the potential for recovery because it creates

1   unreasonable expectation in the client.  And he didn't do

2   it.  He wouldn't have done it.  He also told us there was

3   no way to determine if the lawsuit was worth more if Joe

4   was dead or alive.  He said you can't tell that.

5        There are two kinds of lawsuits involved here.

6   One is a medical malpractice lawsuit that persists as long

7   as the person to whom the malpractice was committed upon

8   continues to live.  At some point, if that person dies,

9   it's converted to what's called a wrongful death suit.  But

10   at that time, other persons develop an interest in the

11   lawsuit.  Mothers and fathers and kids, they all become

12   co-plaintiffs.

13        So it's impossible to determine what value this

14   lawsuit will have depending on what it's called.  He said,

15   "I can't tell you.  And I certainly wouldn't have told

16   Wendi or Joe the lawsuit is worth more as a medical mal

17   suit or worth more as a wrongful death suit because I just

18   don't know."

19        He told us that he told -- that she told Jeff

20   Miller about Joe's suicidal rumination.  That Jeff Miller

21   called Joe about that and talked to him about it.  I mean,

22   again, ask yourselves do you really think that Joe was in

23   the dark about this?  I mean, this gentleman liked to spend

24   money on his boats.  And the fact was that he was

25   potentially a party to a significant lawsuit.  I

 1  think -- what we know about Joe as the result of this

 2  trial, that he would have maintained an active interest in

 3  that lawsuit.

 4          And, finally, do you think -- you saw Jeffrey

 5  Miller -- do you think that at any time as a lawyer of his

 6  standing, that he would have secretively or dealt solely

 7  with Wendi Andriano when the person with the injury was

 8  Joseph Andriano?  He wouldn't do that.  Any suggestion by

 9  the State that somehow she surreptitiously tried to fenagle

10  this lawsuit to her own benefit is just specious.

11          Wendi's testimony in this case is consistent and

12  credible.  But by contrast, the Government's theories in

13  this case are unproven and disproven by the known facts in

14  this case.  The Government suggests, the theory is, that

15  she's a greedy woman and Wendi did it for the money.  Well,

16  that's just preposterous.

17          Wendi lived with Joe for almost eight years,

18  struggling financially as a couple.  It's impossible to

19  believe that now, all of a sudden, in the year 2000, money

20  becomes paramount, the paramount concern in her life.  It's

21  enough to cause her to plot to kill her husband.  That's

22  what they're suggesting.

23          Wendi received no life insurance proceeds in this

24  case.  The malpractice lawsuit was dismissed soon after her

25  arrest.  And it's a fatally flawed theory because if greed

1  motivated Wendi and she had this plot to clandestinely

2  poison her husband to preserve the viability of the med mal

3  lawsuit, why did she hit him with the bar stool?  Joe dying

4  as a result of being struck by a bar stool or cut with a

5  knife, completely eliminated any possibility of recovery of

6  any monies for Wendi.

7         The Government tells you that Wendi secretly

8  poisoned him.  That's just preposterous.  The prosecutor

9  completely glosses over the scientific impossibility of

10 being able to secretly poison your husband with sodium

11 azide.

12        Again, you heard the experts in this case.  One

13 of the questions that was posed by you guys to Mr. Richmond

14 was how would you tell how it tasted.  And he came back and

15 said you need to know the PH.  The PH would be significant

16 in determining what the taste is.  Well, we had Joe Collier

17 come in.  That's why he focused in great part upon the

18 concept of the PH.  This stuff has an acidic PH.  And you

19 can't ingest it without knowing you're ingesting it.  It's

20 not like Arsenic and Old Lace, the play, the movie where

21 the landlady secretly dumped arsenic into the tea of the

22 residents.  Over time they died.

23        This can't happen with sodium azide.  You have to

24 know it's there because according to Joe Collier, it has

25 teeth-etching acidity.  It creates a distinctive odor.

1    It's impossible to sneak the stuff into your system.

2           The bowl issue, there are two bowls.  Why is

3    it -- if the plan as the Government suggests was she snuck

4    it in the bowl of his soup -- why is it found in two bowls

5    of the soup?  That makes no sense.

6           You heard her testimony concerning that

7    particular food stuff.  That it was leftovers.  That the

8    parcel arrived on that Thursday.  That it was in the office

9    all day Thursday.  So it couldn't have been used to

10   clandestinely do anything Thursday night.  On Friday, they

11   didn't make dinner.  On Saturday they had dinner at Joe's

12   mother and father's house.

13          Again, when did the stuff get into the soup?

14   Wendi didn't know.  Wendi didn't try to come up with an

15   explanation for that.  Wendi didn't fabricate an

16   explanation for that.  She doesn't know how it got there.

17   But it certainly wasn't the means or mechanism by which

18   Joseph Andriano received the substance.

19          Wendi told you Joe wouldn't eat leftovers.  All

20   the witnesses you saw in this case -- if that proposition

21   was challengeable, you wouldn't have had at least one or

22   two witnesses come in and say "Joe loved leftovers.  Joe

23   ate them all the time."  It didn't happen.  Those kind of

24   witnesses are accessible.  That proposition is untrue.

25   It's not true.  Joe wouldn't eat leftovers.  That's why

1  they gathered in the refrigerator.  Why Wendi, on her day

2  off, would clean out the refrigerator.  That's common

3  sense.  That's what is done.  That's why those things were

4  on the counter.  That's why the sink is half full of dishes

5  soaking.  She was cleaning that day.

6          The Government claims that Wendi stabbed him.

7  Why?  Their theory is she tried to poison him.  That didn't

8  work.  Then she whacked him with the bar stool 23 times.

9  That didn't work.  And then for some reason, she went and

10  got a knife and stuck it in his throat.  That makes

11  absolutely no sense.  Why bring a knife into that

12  situation.  The only explanation that makes sense is the

13  knife was introduced into the fracas earlier on.  That it

14  was there.  That it was available.  That it was on the

15  ground.  That it was brought in for the purpose of cutting

16  the cord.  It makes no common sense having stuck him 23

17  times with the bar stool she would feel the need to go into

18  the kitchen and bring a knife and stick it in his neck.

19          Recall the circumstances of his throat based upon

20  the operations he had had for the cancer.  We're talking

21  about paper-thin skin.  The muscle has been removed from

22  the neck and from the shoulder.  That cutting to the bone

23  in Joe's situation is not the same as it is in persons who

24  have normal neck areas.  That getting to the bone was

25  easy.

1          And Dr. Keen testified that he observed on the

2    perimeter of the cut what he described as hesitation

3    marks.  He said that hesitation marks are seen in attempted

4    suicide.  Corroborates Wendi's story that he tried to

5    commit suicide.  That the physical evidence on his neck is

6    consistent with the attempted suicide.

7          The Government suggests that Alejo Ochoa, her

8    father, assisted her in creating or fabricating the

9    evidence at the scene.  The Government apparently sees evil

10   in everybody that knows Wendi Andriano, in everybody that

11   loves Wendi Andriano.

12         The only thing he purportedly took, according to

13   the Government's theory here, is just the lamp.  The lamp

14   that was used one time to strike Mr. Andriano according to

15   the Government's theory in the case.   Well, it makes

16   absolutely no sense why he would just take the lamp and get

17   rid of it.  There were pieces of the lamp on the floor that

18   were not taken along with it.  The box was not taken along

19   with it.  The thing that's on top -- the shade was not

20   taken with it.  Why would Alejo Ochoa drive all the way to

21   the San Riva apartments and just pick up the lamp and

22   leave?  That makes no sense.

23         If you look at the evidence in this case, the

24   first batch of EMTs were dispatched at 2:25.  They arrived

25   at the scene at 2:33.  We know that Chris Hashisaki is on

1   the scene about 2:20.  Detective Kulesa was in the bedroom

2   and saw this message machine flashing "Sunday, 3:24," and

3   it was Wendi's father who said, "Wendi, it's your dad.

4   Pick up."  And then we see the final group of EMTs are

5   dispatched at 3:39 and they're on the scene at 3:42.  So

6   it's clear from the sequence of events that Poppa was on

7   his cell phone trying to get ahold of Wendi on his trip up

8   from Casa Grande or shortly before his departure in the car

9   to come up to San Riva at 3:24.

10          His testimony is he arrived on the scene after

11  the paramedics were already there.  That's consistent with

12  the evidence that we have in this case.  And inconsistent

13  is the Government's theory that somehow he conspired with

14  his daughter to recreate a scene.

15          The techs scrutinized this apartment, this 132.

16  If he's helping move things around to recreate a scene,

17  wouldn't you expect to find at least one set of Alejo

18  Ochoa's prints on the stuff he purportedly rearranged for

19  the benefit of his daughter?

20          This damage to the dresser, again, that's a red

21  herring.  Detective Kulesa testified that he observed

22  damage to that dresser.  That it was documented.  The

23  photographs he observed confirmed what he had seen earlier

24  when he was there.  And in those photographs, there's no

25  lamp box next to the dresser.  By the Government's theory

1  Alejo must have put the lamp box next to the dresser, taken

2  that photograph and then moved the lamp box back toward the

3  end of the bed.  Why would he do that?  It makes no sense.

4  That box contained a lamp similar to what was in that house

5  at some point.  But we don't know when it was bought.

6  There are two receipts for two lamps.  But one lamp is

7  missing.  We don't know which one it is.  We don't know

8  where it went.  Why is that germane to anything in this

9  particular case?

10          Ask yourselves some general questions.  If Wendi

11  had somehow secretly gotten the sodium azide into Joe's

12  bloodstream so that it caused him to collapse on the floor

13  of the living room, as the Government suggests that's her

14  plan, that's her plot, and under that scenario, up to that

15  point she succeeded.  She snuck it into his system in some

16  fashion.  It appears to be doing the job.  It appears to

17  have knocked him out and he's on the carpet.  Why doesn't

18  she, if she's so smart, if she's so good at plotting and

19  scheming and planning, why didn't she just pick up her

20  husband and take him back into the bedroom and tuck him

21  into bed and say, "Honey, it must be the chemotherapy.  It

22  must be the flu.  I can't account for your sickness.  But

23  all the things that we've been going through, it's probably

24  something like that."  He apparently doesn't know and

25  couldn't know that she had just poisoned him.  So why tell

68

1  him that?  Take him back into bed.  You've got a bottle of

2  the snuff the storage area.  You've got more capsules in

3  the interior of your apartment.  Go get him another glass

4  of Kool-Aid.  If that's how easy it is to sneak it into his

5  system by using the food stuffs say, "Honey  you need a

6  little more Gatorade.  Your fluid level is down.  Here,

7  take some more."  And dump some more sodium azide in the

8  Gatorade and give it to him.

9          If that's her plot, if that's her plan, why

10  doesn't she do that?  No, the plan at this point is to take

11  him to the hospital.  And the plan gets further confusing.

12  She calls in a witness, Chris Hashisaki, to the scene of

13  the crime that she's just purportedly committed, attempted

14  poisoning of her husband.

15          Why does she bring Chris Hashisaki into the mix

16  here?  But Chris Hashisaki shows up.  She's now a witness

17  to the events that she's supposed to have tried to keep

18  secret from the world and from her husband.  Why, then, now

19  should she -- has one witness invited to the scene -- why,

20  then, does she invite additional witnesses to the scene,

21  the EMTs?  Why did she then have to make a plan to get rid

22  of the witness she just included plus the EMTs that have

23  arrived?  And once they're gone, while he's on the floor,

24  proceed to strike him over the head with a bar stool?  It

25  makes absolutely no sense.  Absolutely no sense if you

1   agree with the Government that her theory is to

2   clandestinely poison him to collect on the malpractice

3   lawsuit.  As soon as he dies from anything other than this

4   cancer, that money is gone.

5           So why did this clever, creative, smart, you

6   know, woman that the Government has portrayed for you, this

7   sneaky woman, why all of a sudden does the plan change and

8   she needs to whack him over the head with the bar stool?

9   And then, further, after doing that, she needs to stick a

10   knife in his throat?  That makes absolutely no sense.

11          The sequence of events that the Government

12   describes also makes no sense in this case.  Chris

13   Hashisaki is there, she is beside Joseph Andriano and Joe

14   did nothing to advise Chris that there is a problem.  Why?

15   Because he's in on the suicide and he doesn't want anybody

16   to know.  He didn't respond to the knocks at the door.  If

17   he's in distress, if he was having a problem, if he had

18   suspicions about the conduct of his wife, he made no effort

19   to contact anybody outside.

20          The persons are standing in that breezeway.  We

21   have at least two EMTs, we probably have a captain, we have

22   Chris Hashisaki, they're all in that breezeway on the

23   outside of an apartment door, outside apartment walls, and

24   they don't hear anything going on inside there.

25          The government, that's when the Government says

1  he's getting the stuffing beaten out of him.  That's his

2  theory.  That's when she is whacking him upside the head

3  with the bar stool and when she stuck the knife in his

4  throat.  Because that's why she had to change her clothes

5  and come out and meet the EMTs.

6            So all of this misconduct he attributes to Wendi

7  Andriano occurred at a time when four witnesses, at least

8  four witnesses, are standing outside a wall, a door in an

9  apartment complex.

10           We've all been in apartment complexes.  Those

11 aren't the thickest walls.  Those aren't the thickest

12 doors.  There's no yelling.  There's no impact sounds.

13 Twenty-three times.  You saw him stand here and do that.

14 Nobody heard anything outside that door.

15           The State uses this curse or swear word, this eff

16 word to describe Wendi at the time she was with her

17 husband.  That she's telling him to get his effing butt

18 up.  Chris Hashisaki never told that to the police

19 department.  Chris Hashisaki never told me that.  Something

20 as significant as that you'd think that she would have

21 recalled and told law enforcement or told me in the course

22 of our interview.  First time we heard that was when she

23 took the stand.

24           The suggestion that somehow she changed her

25 clothes, that she took a shower before -- after the episode

1   there where she hit him with the bar stool and stuck a

2   knife in his throat.  He says that it's on, it's off and

3   it's back on again.  That makes no sense.  That makes

4   absolutely no sense.

5           Chris Hashisaki observed no blood evidence at the

6   time she was there in close proximity to Joe Andriano.  And

7   she claims that the house was as clean as she'd ever seen

8   it.  Well, look at the photographs, folks.  This house was

9   unkempt.  It's disordered.  It wasn't cleaned up because

10  she was inviting people over to the scene of her dead

11  husband.  That's ludicrous.

12          The lack of blood evidence confirms that the

13  fight had not started prior to the arrival of the EMTs.

14  That her telling that to law enforcement, to Detective

15  Lucero during the course of this videotaped statement was

16  just her way of explaining how Joe happened to be on the

17  carpet without having to explain the fact he attempted

18  suicide.

19          The Government suggests that Joe was too weak to

20  fight that night.  Well, he went to the weekend -- he went

21  to the lake the weekend before.  You saw a photograph of

22  him pulling his children in a buggy or in -- what are those

23  things.  In Memphis, Tennessee where there are hills.

24  Wendi described there are hills he had taken the children

25  up and down in a wagon.  In a wagon.

1      You need to understand that this chemotherapy

2    affected his endurance.  That's what Wendi told us.  That

3    he couldn't do physical things as long as he used to.  But

4    it certainly didn't affect his ability to do things on a

5    short-term proposition, in bursts.

6      His weight loss.  That it happened earlier as a

7    result of the homeopathic diet that he was on in Colorado.

8    Not as a result of the chemotherapy.  But there was still a

9    significant disparity in weight and height between Joe

10   Andriano and Wendi Andriano.  Joe was a blue-collar

11   worker.  He worked with his hands.  He had a high pain

12   tolerance.  You heard Brandon Ochoa testify to that fact.

13   This person, albeit in the midst of a chemotherapy regimen,

14   was certainly capable of doing things that Wendi described

15   in the confrontation that morning in her apartment.

16      Finally, the Government suggests that Wendi was

17   in control and that just cannot be true based upon the

18   facts as we know them in this particular case.  And somehow

19   Joe was this peaceful guy that never engaged in any kind of

20   behaviors that Wendi described.

21      A person came in and testified that he was Joe's

22   best friend but it was developed during the course of

23   cross-examination he hadn't seen him in the last couple of

24   years, really, before his death.  And the only circumstance

25   that he actually saw him in was when Joe brought the kids

1   over and had ice cream on their face and gave them a towel

2   to wipe it off.  He said that, in his opinion he thought

3   Joe was peaceful.

4        But the witness called immediately thereafter was

5   Joe's dad.  And what is interesting is the contrast in the

6   testimony.  He had Joe's dad on that stand.  He never asked

7   him about his dad's opinion with regard to his boy's

8   reputation for peacefulness and that speak volumes.

9        Finally, ladies and gentlemen, this is a case of

10  justification.  You need to read, please, the instructions

11  and apply the evidence in this case to those instructions.

12       As I told you earlier, the reasonableness of

13  Wendi's response is measured through the eyes of a domestic

14  violence victim when she describes the rage, the look in

15  his eyes, the fact that that look was different that night

16  than any other night when he'd attacked her before, that

17  she knew that if he got to that knife, he would kill her.

18       His attempt to get that knife is all that's

19  required by the law.  It's the apparent ability to inflict

20  mortal wounds that's the base line here.  It's not that he

21  actually got the knife.  It's not that he actually

22  threatened to kill her.  It's not that he actually pointed

23  it at her.  It's the fact he's attempting to access that

24  knife and in her belief, in her reasonable belief that she

25  knew he would kill her if he got the knife that she then

1    hit him to prevent him from getting that knife which is

2    justified under the instructions that you'll receive.

3    Justified under the law.  That she hit him only because he

4    refused to stay down.  That he continued to get up.  And

5    with each effort to get up, she knew that if he was

6    successful and got the knife, he would kill her.  The

7    number of hits alone suggests a great deal of fear, a great

8    deal of concern about her safety in this case.  She had to

9    keep hitting him because he kept trying to get up.

10          The blood spatter evidence, as I described

11   earlier from Detective Olson, indicates that they were

12   moving around in this living area.  That he was facing

13   her.  By facing her and attempting to get up that he

14   presented a consistent and continuous danger to her.  And a

15   danger that she reasonably perceived to require a response

16   with deadly physical force.

17          Ladies and gentlemen, Wendi Andriano's conduct is

18   justified as a matter of law in this case.  And if you find

19   that to be true, the only verdict you can return is a

20   verdict of not guilty.  I ask you to so do.  Thank you.

21          THE COURT:  We'll go ahead and take our afternoon

22   break at this point.

23          Remember the entire admonition I have given you.

24   Do not discuss the case with anyone.  Do not let anyone

25   discuss the case with you.  Keep an open mind.

1          Have a nice break.  And I'll see after the

2   break.

3          (Recess taken.)

4          THE COURT:  Good afternoon.  This is Cause Number

5   CR2000-096032, State of Arizona versus Wendi Elizabeth

6   Andriano.

7          The record will reflect the presence of the

8   defendant, counsel and the jury.

9          Mr. Martinez, would you like to give your

10  concluding closing argument at this time?

11         MR. MARTINEZ:  Yes.

12         THE COURT:  You may proceed.

13         MR. MARTINEZ:  When the law is on your side what

14  you do is you argue the law.  When the facts are on your

15  side, that's when you argue the facts.  But when nothing is

16  on your side, what you do is you argue.

17         Let me give you some examples.  One of the things

18  that was pointed out was that Chris Hashisaki, in her

19  testimony to you, brought up this statement by the

20  defendant to Joseph Andriano as he lay there poisoned on

21  the carpet.  And the statement was made, "Well, you know

22  you never told that to me when we had our interview in this

23  restaurant."  But the problem with that is that if you

24  remember in the testimony -- perhaps they hope that you

25  forget -- Chris Hashisaki was confronted with that issue

1   and she said, "Yes, I did tell you that."  She said, "I

2   told you everything that happened inside that apartment."

3   And then he said, "Why don't you find it in this transcript

4   that I gave you, which is a transcript of our

5   conversation?"  She looked through it.  She took maybe 10,

6   15, 20 minutes.  She went through all the pages in the

7   transcript.  And she looked up and said, "But there is

8   nothing in here about what I told you that happened

9   inside.  You didn't give me that part of the transcript."

10          So, you see, you just make arguments.  Also,

11   additionally, she was asked, "Well, you didn't tell this to

12   the police.  You didn't tell it to the officer that

13   interviewed you."  And she said, "Yes, I did.  Just like I

14   told you."  Notice that he never confronted her.  Notice

15   that no police officer was ever brought forth to say, "Yes,

16   she did."

17          And that's the kind of argument that you have

18   here.  That's all it is.  It's not founded on the facts.

19   They said the prosecutor just presented certain parts of

20   her testimony or statement to the police.  That's all they

21   brought for you to consider.  Those were the only parts

22   that were used during cross-examination.

23          But if you remember, it was the prosecutor who

24   moved the whole tape in.  What's the sense of playing the

25   whole tape for you if you can take it back there and take a

1  look at it yourself.  But it was the prosecutor that

2  presented you both the whole story as well as the whole

3  statement.

4        Then they said to you, well, when she was there

5  in the apartment when the police arrived she was in a

6  daze.  She couldn't look around.  And she was startled when

7  the police officer came in.  Take a look at your notes.  I

8  invite you, I defy you to find in there any statement from

9  a police officer that said that.

10       There were two police officers that were there at

11  the scene that were called, a sergeant and one of the

12  police officers.  The sergeant stated, "I wasn't paying

13  attention to that.  I just stepped in a little bit, saw the

14  body and stepped back out."

15       The other officer said, "I wasn't paying

16  attention to her.  I didn't even see her there.  I don't

17  have any idea."

18       So, again, they keep adding these things because

19  it's just argument.  It's not founded on the facts.  It's

20  just argument.

21       The other thing they tell you is, well, this

22  thing with Rick Freeland, it's not so bad.  Everybody knew

23  about it there in the complex.  If it was so bad, why

24  didn't all of his friends tell him about it?  Why is it

25  that they didn't tell him about it?

1          The point with that is, really, so all of a

2    sudden Chris Hashisaki is part of the moral patrol.  All of

3    a sudden, Shannon Sweeney has a duty, whether it's moral or

4    whether it's legal, to go and talk to Joseph Andriano and

5    tell him, "Hey, you know, this is what's happening with

6    Chris (sic)."  All of a sudden it's Stephanie Koeppen's

7    position to go and talk to Joseph Andriano and tell him

8    about the affair.  No, it isn't.  It's just part of the

9    argument.

10         The other thing that they tell you because they

11   try to minimize and justify what she told you and what she

12   told Sharon Murphy, yes, she did have an affair with Rick

13   Freeland, they said.  But you know what, that's different

14   than the tryst, that one-night stand, she had with Travis

15   Black.  Nobody would call that an affair.  That's what they

16   told you.  Except, the defendant might.  And the defendant,

17   on October 28, told you, "It's not his fault that I had an

18   affair, that I cheated on him."

19         So you just come up here and make arguments when

20   that's all they are.  It's not founded on anything that was

21   ever presented in court.

22         A lot was made, additionally, about with regard

23   to Sharon Murphy and how the prosecutor addressed her and

24   whether or not she and Brad Bayless, and whether or

25   not -- how come we didn't discuss their testimony during

1   the first portion of the closing argument.  Why is there a

2   need to discuss it if you have somebody that is totally

3   discredited?  Who has proposed a report based on lies,

4   omissions and misrepresentations?  Why do I need to tell

5   you the person that I brought in -- you heard him -- he

6   indicated that, in his opinion, the defendant does not have

7   the characteristics consistent with that of a woman

8   involved in domestic violence.

9         Additionally, when their expert came in, Mindy

10   Mechanic, what did she did tell you?  "Well, you know what,

11   I did sort of the similar things that Brad Bayless did.

12   What I ended up doing is I gave the MMPI II.  I always do

13   that.   I've given it in every one of the six ones that

14   I've done."  And that's what Brad Bayless did.

15         Additionally, with regard to this interview that

16   we have, well, you know mine would have been longer, his

17   was only three hours but we do the same thing.  He should

18   have talked to her longer.  He should have gone to her, try

19   to draw it out.  Even though she doesn't remember that she

20   was hit, he should try to make it up for her.  That's what

21   Mindy Mechanic was saying.

22         The problem with that approach, if you keep

23   asking people those kinds of things, what ends up happening

24   is they start mimicking.  They start echoing what you say.

25         The bottom line with Sharon Murphy's report is

80

1  it's not worth the paper that it's printed on.  It's

2  nothing more than the defendant's self-serving statements

3  without any corroboration whatsoever.  So, if that's what

4  they presented, the prosecutor is allowed to comment on

5  them.

6          One of the things they told you with regard to

7  the interview by the police of the defendant, one of the

8  things they said to you, "Well, you know, she had horrible

9  injuries.  And the reason we know she had horrible injuries

10 is because the officer spent two hours taking photographs

11 of them."

12         Well, you have that tape in front of you.  You

13 saw it.  Do you think that it really was two hours of

14 that?  You can take it back there.  I invite you to do

15 that.  Go ahead.  Take a look at it and you will see there

16 was not two hours spent on taking a look at her injuries.

17 It just wasn't.  But it sounds good when they present it to

18 you.  So they make the argument.

19         They also make the argument with regard to Dennis

20 Olson.  They said, "Why is it that Dennis Olson said there

21 was this cast off in a round, circular pattern?  It was his

22 opinion that Mr. Andriano was moving around."  That's not

23 his opinion.  Take a look at your notes.  In his opinion,

24 Mr. Andriano was already down on the ground.  He was face

25 down every time that he was hit.

1         The question was posed to him, "Is it possible

2  that he could have been moving around?  The answer was,

3  "Well, in this universe, anything is possible."  And then

4  they seized upon that and say, "Well, you said it was

5  possible."  "Well, yeah, the word "possible" was used."

6         But the way the question was phrased is what's

7  important.  And, again, the point is they just come out

8  here, make these statements that are not backed up by the

9  evidence.

10         The other thing they said is, well, why isn't it

11  that Shawn King isn't here.  He was involved in this.  I

12  mean, this is somebody else they should have brought in

13  here.  Do we need Shawn King with regard to this particular

14  case?  If he were brought in, he may be somebody who's an

15  accomplice, who may be charged with it.  But that's for

16  another day.  That's not an issue for here.

17         What they're attempting to do is try to defray

18  the blame.  You always minimize it.  You always say it was

19  somebody's else's fault.  And in this case, when they talk

20  about Shawn King, they want you to start thinking about

21  Shawn King rather than focusing on the defendant.  They

22  want you to say, well, it could have been Shawn King's

23  fault because he helped her out.  Really.  We're not here

24  to judge his conduct.  If he were to be judged, he would be

25  judged as an accomplice.  But we're here to judge the

1   person who did the actual killing, who took the poison and

2   fed it to her husband.

3          One of the things they told you was, well, you

4   know she was so open about it.  When she put together this

5   business license, she did it in front of everybody.  When

6   she picked up the package, she went to the office.  There

7   was nothing clandestine about it.  If fact, she left the

8   paperwork behind.  Well, don't you think that it's

9   clandestine when you've just been questioned by the police

10  for over three hours?  They put you in a room by yourself

11  with a telephone.  And then you pick up that telephone and

12  you call Shannon Sweeney and say, "I want you to hide those

13  papers."  Isn't that clandestine?  Of course, that's the

14  other part that they keep out.  They don't tell you about

15  it.  But, you know what, they want you to consider it.

16  They want you to start looking at this and say, well, you

17  know, maybe what she did wasn't so bad.  You know, the

18  affairs weren't so bad.  Maybe her conduct in front of the

19  police wasn't so bad.  And then they say, let me explain to

20  you verbatim what she said.  You know, it's totally

21  consistent.  And, basically, they stand up here and they

22  vouch for the defendant by saying, well, you know it makes

23  sense.  The way she explained it, it makes sense.

24          If you take this word "conk" to mean that she

25  took -- that she gave him the suicide pills, that's exactly

1   what the word "conk" means, that she took the suicide

2   pills.  The words speak for themselves.  You all speak

3   English.  You do not need a translator.  You can go back

4   and you listen to what she said.  And if she said "conk"

5   you know what that means.  You don't need me to tell you

6   that that means I took a cyanide pill.  I took a sodium

7   azide pill.  You can do that for yourselves.  But, again,

8   it's just argument.

9           Additionally, they say to you, you know what, why

10  did she go to Sandidge?  Why did she attempt to go and get

11  insurance from him when, in fact, he was the Andriano's

12  insurance agent.  Well, the reason she went is because she

13  thought it would be easier.  You already have an existing

14  policy.  The physical has already been taken.  So what

15  would be easier?  Just call him up, increase it to

16  $500,000.  So that makes sense.

17          Now, we also get to the position where everybody

18  but the defendant is lying.  They say Rick Freeland, oh, he

19  was not telling you the truth when he said that he didn't

20  know that she was married.

21          Well, and then additionally, Chris Hashisaki

22  wasn't telling you the truth.  Shannon Sweeney.  All these

23  people.  None of them are telling you the truth except the

24  defendant.  But the bottom line what it comes down to is

25  what I told you before.  In order for you to believe the

1   defendant, you would have to disbelieve everybody that

2   testified.  Not just one.  Not just two.  Everybody.  You

3   have to disbelieve her friend, the people that she

4   socialized with, the paramedics, the police department.

5   Everybody.

6            The other thing that they said, well, this really

7   didn't have anything to do with money.  I mean, Jeffrey

8   Miller didn't discuss this issue with her.  And if he did,

9   well, he discussed it with both of them.  The fact of the

10  matter remains that the letters are there.  The memos are

11  there.  That indicates the defendant was the moving party.

12  She's the one that called him initially for the

13  consultation.  She's the one that discussed the retainer

14  agreement.  Joseph Andriano didn't do that.  In fact,

15  Mr. Miller felt compelled to confirm it in writing because

16  he had dropped the ball.  Additionally, he also felt

17  compelled to discuss the settlement issue in a letter

18  because he had not discussed it with the person who was

19  actually injured.  Those speak for themselves and the

20  defendant admitted to them on cross-examination.

21           The other thing that they talked to you about was

22  the testimony of Joe Collier who indicated, according to

23  them, that you can't secretly poison someone because of the

24  taste.  If you remember what the expert from the U of A

25  said.  Mr. French, indicated, "Well, all it does is it

1    tastes salty.  That's my opinion based on working with the

2    chemical and teaching medical school.  That it tastes

3    salty."  But you bring in Joe Collier, who, if anybody

4    disagrees with him, turns around and says, well, you're a

5    fool if you disagree with him.  And, in fact, those were

6    his terms when he was testifying.  So, according to him, it

7    would be impossible to poison somebody without them knowing

8    about it.

9           And then that brings us to the question of the

10   leftovers.  Jose never eats leftovers.  So, that leads us

11   to the question, well, then, who put the poison in the

12   kettle?  Who put the poison in the bowl?  They're saying we

13   can't tell you how that happened.

14          The only person who has been in control of the

15   poison was the defendant.  She went down to Airborne

16   Express to pick it up.  She was seen at the office with

17   it.  Joseph Andriano is not seen with it.  There is no

18   evidence that he ever went to Airborne Express.

19          Additionally, there's a money order for the

20   purchase that's got the defendant's handwriting on it.  We

21   have e-mails from the Internet that indicates she was the

22   one, under the name of Anne Newton that ordered it.  So we

23   have her there at the apartment complex leasing office.

24   She leaves it there.  It's still within her control.

25   Always within her control.  Then it finally ends up in

1    Number 132.  In between there is when the damage is done.

2            And so they say to you, well, how did it get in

3    the leftovers?  Wendi was the only one that had control

4    that we know and the evidence indicates that's why with the

5    fingerprints and the actual witnesses' testimony is her.

6    No one ever saw Joseph Andriano with that box.  His

7    fingerprints are no where to be found on this box.  The

8    only person's fingerprints are hers.  They're on the

9    knife.  They're on the packaging materials.

10           So when they tell you we don't know how it got

11   into that kettle, yes, you do.  She put it there.  And

12   they're saying, well, there's two bowls that have it in

13   there.  One of them -- there's two bowls that have it in

14   there plus the crockpot.  So she's just being thorough.

15   She wanted to make sure that he had enough.

16           They also tell you about the hesitation marks by

17   Dr. Keen.  Dr. Keen says, "Yeah, I used that terminology

18   but I never said that was consistent with suicide.  The

19   reason I used those is because there are cuts that are not

20   as deep.  There's a huge gap on the left side of his face.

21   It's just a description term.  It doesn't have anything to

22   do with whether or not I thought it was suicide.  In my

23   opinion, it was not a suicide."

24           But, again, they leave that out there.  They talk

25   about the lamp and they talk about how nonsensical it would

1  be for Alejo Ochoa to leave the pieces of the lamp and then

2  leave the box behind and move everything around.  You have

3  to remember, this a time of high stress.

4         With regard to the pieces of the lamp, do you

5  think they're going to have time to be looking under the

6  recliner to see if pieces of the lamp are down there?  No,

7  they're not.  Are they going to be looking for all the

8  pieces in all the other places they were found?  No,

9  they're not.  They're in a hurry.  They take the biggest

10  piece, they take it out, they get rid of it.  They're under

11  a little bit of a time crunch.  An hour is what we have

12  here.

13         They also indicate he called her at 3:24 in the

14  morning and said, "Where are you?"  That's by the clock on

15  the receiver.  That doesn't mean that was the actual time

16  that the call was made.

17         They also tell you, well, you know, Mr. Andriano

18  was in on this.  He was the one that said, "Well, no, I'm

19  not sure" or something like it when Gary Foster called from

20  E-Term and said, "Hey, do you want this insurance or not?"

21  You heard the tape for yourself.  He knows what he was

22  doing putting a little bit of a spin on it.

23         The tape speaks for itself.  There's no sense

24  even arguing about it.  But, again, the bottom line is when

25  the law is on your side, you argue the law.  When the facts

1  are on your side, you argue the facts.  When nothing is on

2  your side, you just argue.

3        They talked to you about Alejo Ochoa's

4  fingerprints not being at the scene.  Did you ever hear any

5  of the witnesses indicate that those fingerprints were

6  compared to Alejo Ochoa's fingerprints?  Of course, not.

7  They weren't done.

8        This evidence, if you will, that was produced

9  here in court, if you remember, from Alejo Ochoa, the

10  photographs.  He said that he just had them recently and

11  turned them over recently.  So he doesn't introduce himself

12  into this picture until recently.  So would why they back

13  then try to make this comparison when he didn't provided,

14  if you will, the doctored photograph until later?

15        The last issue I want to discuss and the last

16  issue they discussed with you is the reasonable standard.

17  Whether or not her conduct was reasonable.  They said,

18  "Well, there is a little bit of extra that you give her, a

19  bit of extra benefit, if you will, that you give her

20  because this is a case of domestic violence.  That you look

21  at it from the point of view of a woman involved in

22  domestic violence."

23        Fine, go ahead and do it that way.  But you would

24  have to also, just because you look at it that way, that

25  doesn't mean that you negate all the other facts that are

1   in this world.  The one thing that even if it is a question

2   of domestic violence, you have to attribute to her the

3   knowledge of the cancer and that he has lost all of that

4   weight.  They keep saying, well, his strength is still

5   there.  He lifted up a 250-pound drum full of gasoline.

6   He's still a strong guy.  But we know that's not true.

7   But, he lost all that weight.  He's was 165 pounds from

8   220.  So that, to anyone, would indicate that's a loss in

9   strength.

10            Additionally, not only is he doing that, he wants

11   to live so bad he's going through chemotherapy.  Anybody

12   that knows anything about chemotherapy knows that's not a

13   pleasant experience.  It zaps you.  It makes you tired.  It

14   makes you vomit.  They give you all kinds of pills for it.

15   They tell you to rest.  All the things that Dr. Kellogg

16   told us.  It's not a thing that is geared to make you

17   strong.

18            Additionally what Dr. Kellogg told us was that

19   this murder happened on the tenth day, a time when

20   Mr. Andriano was weakest.  And so when they say to you,

21   well, he went on the tenth day to visit his parents in Casa

22   Grande and he was quiet and he wasn't his usual self,

23   that's because he was so tired.  That's because of the

24   chemotherapy.

25            They make this great big deal about him saying

1   that he loved his father.  Well, that's true.  And he did

2   do that.   But according to his father -- they didn't tell

3   you that part -- but he did it every time he left.  So it

4   wasn't unusual for him to do that.

5          So we have that.  We have the chemotherapy.  We

6   have the cancer.  And we have also this, if you will, the

7   wildcard out there.  He's got this sodium azide in him.

8   He's had this sodium azide in him for about an hour and a

9   half.

10          And according to them, Mr. Andriano wasn't

11   complaining.  Yes, he was.  Chris Hashisaki said he said,

12   "What is taking them so long?  Why haven't they gotten

13   here, the paramedics?"  That doesn't sound like an

14   individual who wants to commit suicide, does it?  But they

15   want to discount that Chris Hashisaki said.  So they call

16   her an absolute liar.  They say she didn't tell us that

17   when, in fact, she did when they gave her a partial

18   transcript.

19          So, all of those things are something they should

20   consider under this reasonableness standard.  He's in a

21   fetal position.  He's had all these ailments.  He's also

22   had chemotherapy, which is a sort of restorative-type

23   treatment.  He's down on the ground.  He can't get up.  And

24   he's vomiting.

25          Even if you are a person who has been the subject

1   of domestic violence, you know that when you try to pick

2   this individual up and you can't, then you don't have

3   self-defense available to you.  This individual was in a

4   fetal position.  Could only prop himself on his left

5   elbow.  What possible danger could he have caused her?

6   What possible danger could he be to her?  Absolutely none.

7   And for them to come in and say that he was a danger to her

8   is just argument.  It's just something that is not based on

9   the facts.  It's just argument.  They want to draw you into

10  this sort of imaginary, fanciful world that the defendant

11  has created through Sharon Murphy and through her

12  statements so that you can be drawn in, feel sorry for her,

13  look at her at how she's dressed and say, well, yeah, it

14  could be possible.  I'm just asking you to take a look at

15  the facts.

16         And earlier when we talked -- so we can sort of

17  put into perspective this argument that was made to you by

18  the defense counsel -- I didn't actually tell you the rest

19  of the story involving Don Quixote de la Mancha.

20         I did tell you he was restored in the sense that

21  he realized that what he originally thought was reality was

22  actually nothing more than a fancy of his mind brought

23  about by maybe all of the books he read.

24         But what happens is Sancho Ponca comes to him.

25  And Sancho, who was actually, originally, the voice of

1   reason could see reality because he had been with him for

2   so long.  Which is what has been happening in this case.

3   We've been together a long time and she was on the stand

4   for nine days, trying to tell you her story.

5            And, in fact, one of the things they talked about

6   was the Stockholm Syndrome.  And the Stockholm Syndrome is

7   that if you're with someone long enough, you begin to

8   identify with them.  The hostages begin to identify with

9   the abductor.

10           That's sort of an analogy of what we have here.

11   That was part of the reason we have her up there for nine

12   day so you can identify with her.

13           But to get back to the story, Sancho Ponca did

14   begin to identify with Don Quixote and one of the things

15   that happened is he begins to believe that there is this

16   world of knight-errantry and they should go out about

17   this.

18           And so I'm asking you to not be, if you will, the

19   hostages of the Stockholm Syndrome.  Do not be a Sancho

20   Ponca.  What I'm asking you is to take a look at the

21   evidence.  Take a look at the jury instructions and return

22   back a guilty verdict.

23           And the reason that I ask that of you is because

24   you are not Sancho Ponca, you are not riding around on a

25   donkey.  You are here to decide this case on the facts and

1   the evidence.  Not on some fanciful story that was told to

2   you that has absolutely no basis in fact.  And when they

3   are tested in this courtroom, you look at them and you say,

4   "What an absolutely, total unmitigated fabrication."  She

5   is guilty of first-degree murder and I ask you to

6   deliberate and return that verdict.  Thank you.

7         THE COURT:  Ladies and gentlemen, I'm going to

8   take a five-minute break here.  I need to speak with

9   counsel about a matter and then after the break you'll hear

10  the final instructions in this case.  Should only be about

11  five minutes.

12         (Jurors exited.)

13         THE COURT:  Please be seated.  This is Cause

14  Number CR2000-096032, State of Arizona versus Wendi

15  Elizabeth Andriano.

16         The record will reflect the presence of the

17  defendant and counsel.  We are outside the presence of the

18  jury.

19         Counsel, what I'm going to do at this time if you

20  can recall, Juror Number 6 wrote us a note I believe last

21  week indicating that her husband took a job in Tucson and

22  starts work on November 29.  And that they will be leaving

23  the Phoenix area Thanksgiving Day to be moving to Tucson.

24  And she indicated that if the trial was not over by then

25  she may have to be excused.

1            What I'm going to do is I'm going to have Juror

2    Number 6 step into the courtroom.  I'm going to ask her

3    some more questions about that situation and I'll allow

4    counsel to ask questions and we'll discuss that further.

5            Any objection to that procedure from the State?

6            MR. MARTINEZ:  I don't have any.

7            THE COURT:  Mr. Patterson.

8            MR. PATTERSON:  No, Your Honor.

9            THE COURT:  Let's just have Juror Number 6, then,

10   step into the courtroom.

11           (Juror Number 6 entered the courtroom.)

12           THE COURT:  Please be seated.  This is Cause

13   Number CR2000-096032, State of Arizona versus Wendi

14   Elizabeth Andriano.

15           The record will reflect the presence of the

16   defendant and counsel.  We are outside the presence of the

17   jury except for Juror Number 6.

18           Juror Number 6, you wrote us a note, I believe

19   last week, indicating that your husband took a job in

20   Tucson and starts work November 29th and that you plan on

21   leaving the Phoenix area to move to Tucson on Thanksgiving

22   day.  Is that still your plan?

23           JUROR NUMBER 6:  I can still be available.

24           THE COURT:  Let me ask you this: Depending on how

25   things go, this trial may last some time longer.  And it

1   may go past the time frame we're talking about,

2   Thanksgiving and into December.  Is that going to be a

3   situation where you would be asking to be excused from

4   service on this jury?  Or does that time frame take into

5   consideration your moving plans?  Is that something you

6   would be able to still participate in this trial?

7          JUROR NUMBER 6:  We still have our house here.  I

8   can still stay and my husband can go to the job.

9          THE COURT:  In other words, depending on how the

10   case goes, if it goes further for a few more weeks or

11   whatever it may be, if it goes past Thanksgiving and the

12   time frame that you notified us in your note, you would

13   still be able to participate in this trial?

14          JUROR NUMBER 6:  I don't have a job so I can stay

15   here.

16          THE COURT:  And you wouldn't be distracted by the

17   fact your husband might be in Tucson with you here?

18          JUROR NUMBER 6:  No, I have a lot of family.

19          THE COURT:  Any questions from Mr. Martinez on

20   behalf of the State?

21          MR. MARTINEZ:  No, sir.  Thank you.

22          THE COURT:  Any questions?

23          MR. PATTERSON:  No, Your Honor.

24          THE COURT:  Juror Number 6, just keep this

25   between us.  Do not discuss what we discussed here in the

1  courtroom with the other jurors, okay?  Thank you very

2  much.

3           (Juror Number 6 exited the courtroom.)

4           THE COURT:  Let the record reflect the presence

5  of the defendant and counsel.  We are outside the presence

6  of the jury.

7           Anything further that we need to discuss about

8  Juror Number 6?

9           MR. MARTINEZ:  No, sir.  Thank you.

10          MR. PATTERSON:  No, Your Honor.  Thank you.

11          THE COURT:  So, we'll bring the jury in, in just

12 a few moments and I'll read the final jury instructions.

13 Three jurors will be selected by lot to be the

14 alternate jurors.  I'll tell them that they are able to

15 leave physically but they are not excused because they may

16 be called for further participation in this trial,

17 depending on how things go.

18          Also, I'll notify them of the fact that we have a

19 jury exhibit list which they will have.  And I'll notify

20 them that on the list there are certain items, certain

21 exhibits which are marked BH, for biohazardous.  All the

22 exhibits will be in the jury room with them.  I'm going to

23 instruct them that they are not to remove any of the

24 exhibits which are biological or has been marked.  And if

25 they do wish to open up any of those exhibits, then they

1   will have to write a note seeking authorization from the

2   Court to view the item outside the packaging.  If they do

3   that, we'll do that here in court with everyone present.

4   Okay.  Let me make sure we have everything in order here.

5            The other thing I'm going to tell the jury after

6   I've given the final instructions because there are so many

7   exhibits, I'm going to tell them to go into the jury room,

8   select a foreperson, and then decide what the schedule is

9   going to be for deliberations.  And then send a note out

10  about their deliberations schedule.

11           I'll tell them that they will not actually begin

12  their deliberations today.  But they'll begin whenever they

13  decide to return by schedule.  And the reason I'm going to

14  do that is because there are so many exhibits, we want to

15  make sure we have everything in the jury room ready for

16  them to view them or whatever they need to do with

17  exhibits.  Along with the fact there are some items I've

18  already discussed with counsel informally, we need to

19  double check to make sure they are resealed properly

20           So I'll instruct them to pick a jury (sic), give

21  the schedule and return the exhibits in the jury room.

22           Are we ready for the jury?

23           MR. MARTINEZ:  Yes.

24           MR. PATTERSON:  Yes.

25           (Jurors entered.)

1          THE COURT:  Please be seated.  This is Cause

2     Number CR2000-096032, State of Arizona versus Wendi

3     Elizabeth Andriano.

4          The record will reflect the presence of the

5     defendant, counsel and the jury.

6          At this time, I'm going to ask the bailiff to

7     pass out to each of you a copy of the final jury

8     instructions in this case for Phase I.

9          I'll ask you to follow along as I read the final

10    instructions.

11         State versus Wendi Elizabeth Andriano,

12    CR2000-096032.  Final instructions, Phase I.  Then we'll go

13    to, actually to page 3.  We'll pass up the index and go to

14    page 3.

15         Duty of jury.  It is your duty as a juror to

16    decide this case by applying these jury instructions to the

17    facts as you determine them.  You must follow these jury

18    instructions.  They are the rules you should use to decide

19    this case.  It is your duty to determine what the facts are

20    in the case in determining what actually happened.

21    Determine the facts only from the evidence produced in

22    court.

23         When I say "evidence" I mean the testimony of

24    witnesses, any exhibits received in evidence and any facts

25    to which the parties stipulated or that I instructed you to

1   accept.  You must not speculate or guess about any fact.

2   You must not consult outside sources for information such

3   as a dictionary, a newspaper or Internet.

4          You must not be influenced by sympathy or

5   prejudice.  You must not be concerned with any opinion you

6   feel I may have about the facts.  And you, as jurors, are

7   the sole judges of what happened.  You must consider all

8   these instructions.  Do not pick out one instruction or

9   part of one and ignore the others.

10         As you determined the facts, however, you may

11  find some instructions no longer apply.  You must then

12  consider the instructions that do apply together with the

13  facts as you have determined them.

14         Lawyer comments are not evidence.  In their

15  opening statements and closing arguments, the lawyers have

16  talked to you about the law and the evidence.  What the

17  lawyers said is not evidence but it may help you to

18  understand the law and the evidence.

19         Objections and stricken testimony.  If the Court

20  sustained an objection to a lawyer's question, you must

21  disregard it and any answer given.

22         Any testimony stricken from the court record must

23  not be considered by you for any purpose.

24         Presumption of innocence, burden of proof.  The

25  charge against the defendant is not evidence against her.

1  You must not think the defendant is guilty just because she

2  has been accused of a crime.  The defendant has pled not

3  guilty.  The law does not require a defendant to prove

4  innocence.  Every defendant is presumed by law to be

5  innocent.  You must start with the presumption that the

6  defendant is innocent.

7         The State has the burden of proving the defendant

8  guilty beyond a reasonable doubt.  This means that the

9  State must prove each element of the charge beyond a

10 reasonable doubt.

11        In civil cases, it is only necessary to prove

12 that a fact is more likely true than not or that its truth

13 is highly probable.

14        In criminal cases, such as this, this State's

15 proof must be more powerful than that.  It must be beyond a

16 reasonable doubt.  Proof beyond a reasonable doubt is proof

17 that leaves you firmly convinced of the defendant's guilt.

18        There are very few things in this world that we

19 know with absolute certainty.  And in criminal cases, the

20 law does not require proof that overcomes every doubt.

21        If, based on your consideration of the evidence,

22 you are firmly convinced that the defendant is guilty of

23 the crime charged, you must find the defendant guilty.  If,

24 on the other hand, you think there is a real possibility

25 that the defendant is not guilty, you must give the

1   defendant the benefit of the doubt and find the defendant

2   not guilty.

3            Voluntariness of defendant's statement.  You must

4   not consider any statements made by the defendant to a law

5   enforcement officer unless you determine beyond a

6   reasonable doubt that the defendant made the statements

7   voluntarily.  A defendant's statement was not voluntary if

8   it resulted from the defendant's will being overcome by a

9   law enforcement officer's use of any sort of violence,

10  coercion or threats or by any direct or implied promise,

11  however slight.  You must give such weight to the

12  defendant's statement as you feel it deserves under all the

13  circumstances.

14           Jury not to consider penalty.  You must decide

15  whether the defendant is guilty or not guilty by

16  determining what the facts in the case are and applying

17  these jury instructions.  You must not consider the

18  possible punishment.

19           The charge is not evidence.  The State has

20  charged the defendant with a crime.  A charge is not

21  evidence against the defendant.  You must not think the

22  defendant is guilty just because of a charge.

23           The defendant has pled not guilty.  The plea of

24  not guilty means that the State must prove each element of

25  the charge beyond a reasonable doubt.

1          Direct and circumstantial evidence.  Evidence may

2   be direct or circumstantial.  Direct evidence is the

3   testimony of a witness who saw, heard or otherwise observed

4   an event.  Circumstantial evidence is the proof of a fact

5   or facts from which you may find another fact.  The law

6   makes no distinction between direct and circumstantial

7   evidence.  It is for you to determine the importance to be

8   given to the evidence regardless of whether it is direct or

9   circumstantial.

10          Intent inference.  Intent may be inferred from

11  all the facts and circumstances disclosed by the evidence.

12  It need not be established exclusively by direct sensory

13  proof.  The existence of intent is one of the questions of

14  fact for your determination.

15          Credibility of witnesses.  In determining the

16  evidence, you must decide whether or not to believe the

17  witnesses and their testimony.  As you do this, you should

18  consider the testimony in light of all the other evidence

19  in the case.  This means you may consider such things as

20  the witness' ability and opportunity to observe, their

21  manner and memory while testifying, any motive or prejudice

22  they might have and any inconsistent statements they may

23  have made.

24          The defendant's testimony.  You must evaluate the

25  defendant's testimony the same as any witness's testimony.

1    Expert testimony.  A witness may give an opinion

2  on a subject upon which a witness has become an expert

3  because of education, study or experience.  You should

4  consider the opinion of an expert witness and the reason,

5  if any, given for it.  However, you are not bound by any

6  expert opinion.  Give the expert opinion the importance

7  that you believe it deserves.

8    Testimony of law enforcement officers.  The

9  testimony of a law enforcement officer is not entitled to

10  any greater or lesser importance or believability merely

11  because of the fact that the witness is a law enforcement

12  officer.  You are to consider the testimony of a police

13  officer just as you would the testimony of any other

14  witness.

15    Character and reputation of the defendant.  You

16  have heard evidence of the defendant's character for

17  peacefulness.  In deciding this case, you should consider

18  that evidence together with and in the same manner as all

19  the other evidence in the case.

20    First-degree murder.  The crime of first-degree

21  murder requires proof of the following three things:  One,

22  the defendant caused the death of another person.  And,

23  two, the defendant intended or knew that she would cause

24  the death of another person.  And, three, the defendant

25  acted with premeditation.

1        "Person" means a human being.

2        "Intended" means that a defendant's objective is

3   to cause that result or to engage in that conduct.

4        "Knew"  means that a defendant acted with

5   awareness of or belief in the existence of the conduct or

6   circumstances constituting an offense.  It does not mean a

7   defendant must have known the conduct was forbidden by

8   law.

9        "Premeditation" means that a defendant intended

10  to kill another human being or she or -- I'm sorry.

11       "Premeditation" means that a defendant intended

12  to kill another human being or knew she would kill another

13  human being.  And after forming that intent or knowledge,

14  reflected on the decision before killing.  It is this

15  reflection, regardless of the length of time in which it

16  occurs that distinguishes first-degree murder from

17  second-degree murder.  An act is not done with

18  premeditation if it is the instance effect of sudden

19  quarrel or heat of passion.

20       Justification for self-defense.  A defendant is

21  justified in using or threatening physical force in

22  self-defense if the following two conditions existed:  One,

23  a reasonable person in the defendant's situation would have

24  believed that physical force was immediately necessary to

25  protect against another's use or attempted use of unlawful

1  physical force.  And two, the defendant used or threatened

2  no more physical force than would have appeared necessary

3  to a reasonable person in the defendant's position.

4        The threat or use of physical force against

5  another is not justified in response to verbal provocation

6  alone.  A defendant may use deadly physical force in

7  self-defense only to protect against another's use from

8  apparent attempted or threatened use of deadly physical

9  force.

10        A person is justified in threatening or using

11  deadly physical force against another, one, if such person

12  would be justified in threatening or using physical force

13  against another as described above.  And, two, when and to

14  the degree a reasonable person would believe that deadly

15  physical force was immediately necessary to protect against

16  the other's use or attempted use of unlawful deadly

17  physical force.

18        Self-defense justifies the use or threat of

19  physical force or deadly physical force only while the

20  apparent danger continues and ends when the apparent danger

21  ends.  The force used may not be greater than reasonably

22  necessary to defend against the apparent danger.

23        The use of physical force or deadly physical

24  force is justified if a reasonable person in the situation

25  would have reasonably believed that immediate physical

1  danger appeared to be present.  Actual danger is not
2  necessary to justify the use of physical force or deadly
3  physical force in self-defense.  You must decide whether a
4  reasonable person in a similar situation would believe that
5  physical force or deadly physical force was immediately
6  necessary to protect against another's use of unlawful
7  physical force.  That the defendant's belief was honest is
8  immaterial.  You must measure the defendant's belief
9  against what a reasonable person in the situation would
10 have believed.
11         If you find that there had been past acts of
12 domestic violence as defined below against the defendant by
13 the other person, the state of mind of a reasonable person
14 for the purposes of the above instruction of self-defense
15 justification shall be determined from the perspective of a
16 reasonable person who has been a victim of those past acts
17 of domestic violence.
18         The defendant has the burden of proving any
19 self-defense justification defense by a preponderance of
20 the evidence which is a lesser burden than proof beyond a
21 reasonable doubt.
22         As stated earlier, the State always has the
23 burden of proving the crime charged beyond a reasonable
24 doubt.  And this burden never shifts during the trial.
25 Proof by a preponderance of the evidence means that a fact

1  is more probably true than not.  If you find that the

2  defendant has proved a self-defense justification defense

3  by a preponderance of the evidence, then you must find the

4  defendant not guilty of the crime charged.

5          "Physical force" means force used upon or

6  directed toward the body of another person, that includes

7  confinement but does not include deadly physical force.

8          "Deadly physical force" means force which is

9  used with a purpose of causing death or serious physical

10  injury or in the manner of its use or intended use is

11  capable of creating a substantial risk of causing death or

12  serious physical injury.

13          Serious physical injury includes physical injury

14  which creates a reasonable risk of death or which causes

15  serious and permanent disfigurement, serious impairment of

16  health or loss or protracted impairment of the function of

17  any bodily organ or limb.

18          Domestic violence includes acts of endangerment,

19  threatening or intimidating, assault, aggravated assault,

20  or disorderly conduct between husband and wife.

21          "Endangerment" is defined as a person commits

22  endangerment by recklessly endangering another person with

23  a substantial risk of imminent death or physical injury.

24  To be endangerment, a person must disregard a substantial

25  risk that their conduct would cause imminent death or

1   physical injury to the victim and this conduct must impact,

2   create such a substantial risk or either imminent death or

3   physical injury to the victim.

4          THE COURT:  That word should be "of"?

5          MARTINEZ:  Yes.

6          THE COURT:  Just make a note where it says:

7   Create a substantial risk instead of "or" it should be

8   "of." So it should be creates a substantial risk of either

9   imminent death or physical injury to the victim.

10          "Threatening" or "intimidating" is defined as a

11   person commits threatening or intimidating if such person

12   threatens or intimidates by word or conduct to cause

13   physical injury to another person or serious damage to the

14   property of another.

15          "Assault" is defined as intentionally, knowingly

16   or recklessly causing any physical injury to another person

17   or intentionally placing another person in reasonable

18   apprehension of imminent physical injury or knowingly

19   touching another person with the intent to injure insult or

20   provoke such person.

21          Aggravated assault is defined as a person commits

22   aggravated assault if the person commits assault under any

23   of the following circumstances:  Causing serious physical

24   injury to another or a person uses a deadly weapon or

25   dangerous instrument or the person commits assault by any

1   means of force which causes temporary but substantial

2   disfigurement, temporary but substantial loss or impairment

3   of any body organ or part or a fracture of any body part.

4          "Disorderly conduct" is defined as a person

5   commits disorderly conduct, if, with the intent to disturb

6   the peace or quiet of a neighborhood, family or person or

7   with knowledge of doing so, such person engages in

8   fighting, violence or seriously disruptive behavior or

9   makes unreasonable noise or uses abusive or offensive

10  language or gestures in a manner likely to provoke

11  immediate physical retaliation by such person or recklessly

12  handles, displays or discharges a deadly weapon or

13  dangerous instrument.

14         Dangerous offense.  If you find the defendant

15  guilty of first-degree murder, you must determine whether

16  or not the offense was a dangerous offense.  The offense

17  was a dangerous offense if it involves the discharge, use

18  or threatened exhibition of a deadly weapon or dangerous

19  instrument and/or the intentional or knowing infliction of

20  serious physical injury.

21         "Deadly weapon" means anything designed for

22  illegal use.

23         "Dangerous instrument" means anything that under

24  the circumstances in which it is used, attempted to be

25  used, or threatened to be used is readily capable of

1  causing death or serious physical injury.

2          "Serious physical injury" includes physical

3  injury which creates a reasonable risk of death, which

4  causes serious permanent disfigurement, serious impairment

5  of health or loss or protracted impairment of the function

6  of any bodily organ or limb.

7          "Physical injury" means impairment of physical

8  condition.

9          Deliberation schedule and breaks.  After you have

10 selected foreperson you should next discuss and then set

11 your deliberation schedule.  You may agree to deliberate

12 Monday through Friday, in the morning and afternoon or only

13 half days.  You are in charge of your schedule and may set

14 and vary it by agreement and with the approval of the

15 court.

16         After you have decided on a schedule, send it to

17 me by a note through the bailiff for my review and

18 approval.  You are to discuss the case only when all jurors

19 are together in the jury room.  You are not to discuss the

20 case with each other or anyone else during breaks or

21 recesses.

22         The admonition I have given you during the trial

23 remains in effect when you're not deliberating.

24         Review of instructions.  After setting your

25 schedule, I suggest that you next review the written jury

1  instructions and verdict form.  It may be helpful for you

2  to discuss the instructions and form to make sure that you

3  understand them.  Again, during your deliberations, you

4  must follow the instructions and refer to them to answer

5  any questions about applicable law, procedure and

6  definitions.

7       Questions and messages.  Should any of you or the

8  jury as a whole have a question for the Court during your

9  deliberations, or you wish to communicate with me on any

10  other matter, please utilize the jury question form we will

11  provide you.  Your question or message must be communicated

12  to the Court in writing and must be signed by you or the

13  foreperson.

14       The Court will consider your question or note and

15  if necessary will consult with counsel before answering it

16  in writing.  The Court will answer it as quickly as

17  possible.  No member of the jury should ever attempt to

18  communicate with me except by a signed writing.  I will

19  communicate with you on anything concerning the case only

20  in writing or orally on the record.  Remember that you are

21  not to tell anyone, including me, how you stand numerically

22  or otherwise until you have reached a verdict or have been

23  discharged.

24       Verdict.  The case is now submitted to you for

25  decision.  When you go to the jury room you will choose a

1   foreperson.  He or she will preside over your deliberations

2   and sign any verdict.

3           To return a verdict of guilty or not guilty, your

4   verdict must be unanimous.  You will be given one form of

5   verdict.  It reads as follows -- you don't have copies of

6   the form of verdict.  I have the form of verdict here in

7   front of me and it reads as follows:  We, the jury, duly

8   empaneled and sworn in the above-entitled action, upon our

9   oaths do find the defendant, Wendi Elizabeth Andriano, as

10  to first-degree murder, blank not guilty, blank guilty.  If

11  guilty, we, the jury, do further find the defendant, Wendi

12  Elizabeth Andriano blank did not commit a dangerous

13  offense, blank did commit a dangerous offense.

14          Then there's a signature line and a printed name

15  line for the foreperson to fill out.

16          Do either counsel have any additions or

17  corrections to the final instructions for Phase I as read?

18          MR. MARTINEZ:  No, sir.

19          MR. PATTERSON:  No, Your Honor.  Thank you.

20          THE COURT:  Do either counsel have any additions

21  or corrections to the form of verdict for Phase I as read?

22          MR. MARTINEZ:  No, sir.

23          MR. PATTERSON:  Nothing further, Judge.  Thank

24  you.

25          THE COURT:  Ladies and gentlemen, what we're

1  going to do at this time is we're going to select the three

2  alternate jurors at this time.  It will be done by lot by

3  the clerk at this time.  So she will, at this time, by lot,

4  select the alternates jurors in this case.

5          THE CLERK:  Juror number 3.  Juror Number 9,

6  Juror Number 14.

7          THE COURT:  Juror Number 3, Juror Number 9 and

8  Juror Number 14, as you just heard, the clerk selected the

9  three of you, by lot, as the alternate jurors in this

10  case.  What this mean is this:  In a few moments, I'm going

11  to allow you to physically leave, okay, but you're not

12  excused.  Okay.  You are going to be allowed to physically

13  leave.  And the admonition that I gave you will continue to

14  apply.

15          Now, depending on how things go, sometime in the

16  future you may be contacted.  But until you're contacted

17  and notified that the admonition no longer applies, the

18  admonition that I gave you will continue to apply.  In

19  other words, you're not to discuss this case or anything

20  connected with the case among yourselves or with anyone

21  else.  Do not do any investigation or research on your

22  own.  And remember all the other admonitions I have given

23  you.

24          So in just a few moments I'm going to allow you

25  to leave physically.  What I want you to do is I want to

1   make sure you give the bailiff your telephone number and

2   all the information that may be necessary to make sure that

3   if we need to reach you in a moment's notice, we can reach

4   you.  Okay.

5           Now, if I don't see you again, I do thank you for

6   the service on this jury.  You're not excused but I will

7   allow you to physically leave.  But in case I do not see

8   you again I do thank you for your service on this jury

9   these many weeks.  On behalf the parties and behalf of

10  everyone and on behalf of the community, I do thank you for

11  your service in this case.

12          The clerk will now swear in the bailiff.

13          (Bailiff sworn.)

14          THE COURT:  Ladies and gentlemen, before you

15  retire to the jury room, let me just go over a few things

16  here with you.  When you go to the jury room, because the

17  hour is late, what I'm going to have you do is select your

18  foreperson and then decide on what your deliberation

19  schedule will be.  Then go ahead and have the foreperson

20  write it out in a note.  And there is a buzzer for you to

21  buzz and the bailiff will come and get the note and I will

22  discuss with counsel your deliberation schedule.  Okay.

23          So when you go to the jury room the first thing

24  you do is select a jury foreperson and decide what type of

25  schedule that you would like to have for your

1    deliberation.

2           Remember what I said to the jury in the final

3    jury instructions, you're not limited to the Monday through

4    Thursday, one o'clock to five o'clock.  You can deliberate

5    Monday through Friday in the morning, just in the morning

6    or just in the afternoon or both morning and afternoon.

7    You're not limited to Monday to Thursday.

8           So when you go to the jury room select a

9    foreperson and decide what your deliberations is going to

10   be and write it out in a note.

11          The other thing is this:  When you go to the jury

12   room, you're going to have all the exhibits in the jury

13   room when you return for your deliberations.

14          You will also be given a jury exhibit list and it

15   has all the numbers of the exhibits and it also notifies

16   you what numbers have been admitted into evidence and what

17   have not been admitted into evidence.  You can refer to

18   this jury exhibit list.

19          Now, one of the important things that you need to

20   be aware of is the fact that on this list there are certain

21   exhibits which we have marked as biohazardous, B H.  Okay.

22   So, by those that are biohazardous materials or are

23   potentially biohazardous materials.  We have next to the

24   exhibit BH and that tells you that that's biohazardous or

25   potentially biohazardous.

1          And that's important for this reason, jurors

2    shall not remove biological or potentially hazardous

3    exhibits from the sealed packages.  You're not to remove

4    them from sealed packages.  If you would like to look at

5    items that are biohazardous that are in sealed packages,

6    you're to write a note to us that you would like to see

7    something that is marked as potentially biohazardous

8    material in the exhibit.  And write a note indicating to us

9    that you would like to open that sealed package.  Okay.

10   And we'll do that in the jury room.  When I receive that

11   note, what I'm going to do is I'm going to have everyone

12   gather here in the courtroom.  We'll open it together if

13   that's what you would like to do.  Do not open any of the

14   items that are marked biohazardous materials that are in

15   sealed packages in the jury room.  If you would like to do

16   that, write a note and notify us and we'll do that together

17   in the courtroom.

18          So what we're going do, then, is let you retire

19   to the jury room at this time.  Select a foreperson, decide

20   on your deliberation schedule.  We'll come back into court

21   and discuss that deliberation schedule after you write the

22   note and then we'll recess for the evening.

23          Juror Number 3, 9, and 14, you are physically

24   allowed to leave but remember you're not excused.  Make

25   sure you give the bailiff your telephone number.  Make sure

1   he has everything correct before you leave in case you're

2   required to return in the future.   Okay.

3            We'll be in recess.   And the jury may retire to

4   the jury room.

5            (Jurors exited.)

6            THE COURT:   Please be seated.   This is Cause

7   Number CR2000-096032, State of Arizona versus Wendi

8   Elizabeth Andriano.

9            The record will reflect the presence of the

10   defendant and counsel.   We're outside the presence of the

11   jury.

12            Anything further we need to discuss at this point

13   in time?

14            MR. MARTINEZ:   Not at this point.

15            MR. PATTERSON:   No, Your Honor.   Thank you.

16            THE COURT:   We're going to stay here and once we

17   receive the note from jury regarding their deliberation

18   schedule, then we'll bring them here in court and verify

19   that with everyone and we will recess for the evening.

20            Then, again, Mr. Martinez and Mr. Patterson, if

21   you just make sure we have you coordinate with the clerk to

22   make sure they have everything needed.   We'll be in recess.

23            (Recess taken.):

24            THE COURT:   Please be seated.   This is

25   CR2000-096032, State of Arizona versus Wendi Elizabeth

1   Andriano.

2              The record will reflect the presence of the

3   defendant and counsel.  We're outside the presence of the

4   jury.

5              Counsel, we have received a note here.  Message,

6   our deliberation schedule will be 12:30 to 5:00 p.m.,

7   Monday through Thursday.  Break schedule will be 2:15 to

8   approximately 2:30 p.m. and 4:00 p.m.  Thank you.  And it's

9   signed by Juror Number 4.

10             So, we'll bring the jury in and we'll go ahead

11  and recess for the evening and we'll verify that their

12  deliberation schedule is Monday through Thursday from 12:30

13  to 5:00 p.m.

14             Ready for the jury?

15             MR. MARTINEZ:  Yes, sir.

16             MR. PATTERSON:  Yes, Your Honor.

17             (Jurors entered.)

18             THE COURT:  Please be seated.  This is Cause

19  Number CR2000-096032, State of Arizona versus Wendi

20  Elizabeth Andriano.

21             The record will reflect the presence of the

22  defendant, counsel and the jury.

23             Ladies and gentlemen, I have received a note here

24  from the foreperson which indicates that the deliberation

25  schedule will be 12:30 to 5:00 p.m. Monday through Thursday

1 and anticipated break schedule would be two 15-minute

2 breaks, approximately 2:30 p.m. and 4:00 p.m.

3         Does anyone on the jury disagree with that

4 deliberation schedule?  Okay.  And no one has raised their

5 hand to show anyone disagrees with that schedule.

6         So we'll verify the fact that your deliberation

7 schedule from 12:30 to 5:00 p.m., Monday through Thursday.

8 And I would go ahead and take the evening recess at this

9 time.

10         Now, remember that during the recess, unless all

11 of you are in the jury room together the admonition

12 applies.  You're not to discuss this case with anyone.  If

13 you're on break or whatever, you're not to discuss the case

14 unless everyone of you are together in the jury room.  So

15 you're not to discuss the case with anyone.  Don't let

16 anyone discuss the case with you.  Do not do any research,

17 or investigation or experimentation or testing on your

18 own.  Avoid any media coverage of this trial.  And keep an

19 open mind.

20         I want you to have a nice evening and you'll

21 return tomorrow to begin your deliberations at 12:30 p.m.

22         Have a nice evening.  I'll stay here with

23 counsel.

24         (Jurors exited.)

25         THE COURT:  Please be seated.  CR2000-096032,

120

1  State of Arizona versus Wendi Elizabeth Andriano.

2          The record will reflect the presence of the

3  defendant and counsel.  We're outside the presence of the

4  jury.

5          Counsel, then, the jury will return tomorrow to

6  begin their deliberation at 12:30.  As I indicated to

7  counsel earlier we'll have all exhibits in the jury room

8  along with a television set and VCR.

9          If there is no objection, I will have the bailiff

10  show them how to operate the VCR so there are no mechanical

11  problems in case they do want to view the exhibits which

12  have been admitted that are VCR tapes.

13          The other thing I discussed with counsel earlier

14  some exhibits that we want to make sure are properly

15  resealed.  So knowing the fact the jury is coming back at

16  12:30 and I want representatives from both sides to

17  coordinate time tomorrow, I prefer earlier than later, with

18  the clerk to make sure all the exhibits have been marked

19  and sealed correctly.

20          The other thing I want to discuss with counsel, I

21  think we discussed it previously, when they're deliberating

22  I assume counsel are going to be close by in case there's a

23  question or something comes up.  Am I correct?

24          MR. PATTERSON:  Well, define close by.  I can be

25  here from the downtown office in 20 minutes.

1         THE COURT:  You're optimistic, Mr. Patterson.

2         MR. PATTERSON:  Well. . .

3         THE COURT:  Okay.  Well, in case there's a jury

4    question, I don't want them to wait an hour or 40 minutes

5    or whatever.  Do you want to be available telephonically

6    for jury questions?

7         MR. PATTERSON:  For jury questions, I agree to be

8    available telephonically.  My client would not necessarily

9    have to be brought up for questions unless you insist.

10        THE COURT:  I think she should be here for any

11   jury questions.

12        MR. PATTERSON:  She's on site.

13        THE COURT:  We'll have her here.  And then, let

14   me ask you, I mean, I guess we need to know if you're going

15   to appear telephonically --

16        MR. PATTERSON:  Yes.

17        THE COURT:  We'll have her here in the courtroom

18   and I have an apparatus we can put you on the speaker

19   phone.

20        Mr. Delozier, if you could be available also?

21        MR. PATTERSON:  We can conference him in.

22        THE COURT:  We can but we need to make sure we

23   know where you're at each moment because anything could

24   happen.

25        MR. PATTERSON:  That's fine.  The only thing that

122

1    presents a difficulty is if they desire to look at the

2    biohazardous material and that can't be done

3    telephonically.   In that case I can be here in 20, 25.

4              MR. DELOZIER:   If I happen to be in the office,

5    I'm about 45.

6              THE COURT:   Counsel, let me ask you something.

7    Can I make a suggestion?   I would like for you to be close

8    by.   If that means maybe borrowing an office from the

9    Public Defender's Office or someone's office or bringing

10   work.   Because, I know you say you're going to be here in

11   20 minutes, but it doesn't happen that way.   From my

12   experience I've had people coming from downtown, it takes

13   45 minutes 50 minutes, especially nowadays.   I don't want

14   the jury to wait any more than necessary.   I know it's an

15   inconvenience.

16             But, what I would like for you Mr. Delozier to be

17   present close by here in the Mesa area.   And perhaps the

18   Public Defender's Office here or across the street can have

19   an empty office maybe either a conference room for you to

20   work at.

21             MR. PATTERSON:   It just presents a difficulty for

22   me to do things that need to be done in other cases.

23             THE COURT:   Right.

24             MR. PATTERSON:   I can't just bring stuff here.   I

25   will essentially be sitting in a conference room reading a

1   good book, basically.  That's all I can do because I need

2   access to my computer.  I need access to my assistants that

3   are on six floors downtown to help me with the issues that

4   need to be done.  I will abide by whatever the Court

5   direction you give us.

6           THE COURT:  Well, at least for tomorrow I want

7   you close by.  Mr. Delozier, close by tomorrow.

8           MR. PATTERSON:  Starting at 12:30?

9           THE COURT:  That is right, 12:30.  I ask

10  Mr. Martinez to do the same.

11          In the light of -- in courtesy to the jurors.

12  Okay.

13          MR. PATTERSON:  I'll abide by what directive you

14  give us.

15          THE COURT:  Okay.  Have we covered everything,

16  counsel?

17          MR. MARTINEZ:  I believe so.

18          MR. PATTERSON:  Yes.

19          (Proceedings adjourned.)

20

21

22

23

24

25

1
2
3
4
5
6                         C E R T I F I C A T E
7
8
9
10            I, SHARON FLORES, do hereby certify that the
11   foregoing pages constitute a full, true, and accurate
12   transcript of all the proceedings had in the above matter,
13   all done to the best of my skill and ability.
14            DATED this ___9___ day of _October___, 2005.
15
16
17                         _Sharon Flores_____
18                         SHARON FLORES
19                         Certified Reporter
20                         50374
21
22
23
24
25

EXHIBIT KK

05-0002  1
Braccio

DP


COPY

1      IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

2          IN AND FOR THE COUNTY OF MARICOPA

3

4   STATE OF ARIZONA,            )
                                 )
5           Plaintiff,           )
                                 )
6   v.                           )        No. 1 CR 05-0005 AP
                                 )        MARICOPA COUNTY
7   WENDI ELIZABETH ANDRIANO,    )        No. CR 2000-096032
                                 )
8           Defendant.           )
    _____)

9

10

11

12                      Mesa, Arizona
                        October 4, 2004
13

14

15

                BEFORE:   The Honorable BRIAN K. ISHIKAWA
16

17

18          REPORTER'S TRANSCRIPT OF PROCEEDINGS

19                      TRIAL DAY 22

20

21

22

23

24   ORIGINAL Prepared for APPEAL by:
     TRACI L. WHEELER, CSR, RPR
25   Certified Court Reporter No. 50313


      TRACI L. WHEELER, OFFICIAL COURT REPORTER, CSR, RPR, CCR

2

1                    A P P E A R A N C E S

2   FOR THE STATE:        JUAN M. MARTINEZ,
                          Deputy County Attorney
3
    FOR THE DEFENDANT:    DANIEL B. PATTERSON,
4                         Deputy Public Defender
                                  and
5                         G. DAVID DELOZIER,
                          Attorney at Law
6

7          I N D E X   O F   E X A M I N A T I O N

8   WITNESS                                            PAGE

9   OCHOA, DONNA, Called on behalf of the Defendant
           Direct Examination by Mr. DeLozier           5
10   Voir Dire Examination by Mr. Martinez             28
     Continued Direct Examination by Mr. DeLozier      29
11   Voir Dire Examination by Mr. Martinez             30
     Continued Direct Examination by Mr. DeLozier      31
12   Continued Direct Examination by Mr. DeLozier      90

13

14   E X H I B I T S   A D M I T T E D   I N   E V I D E N C E

15   NO.     DESCRIPTION                               PAGE

16   406     Photograph                                 30
     407     Photograph                                 27
17   408     Photograph                                 29
     420     Photograph                                 63
18   421     Photograph                                 63
     422     Photograph                                135
19   423     Photograph                                135
     430     Photograph                                114
20   431     Photograph                                110

21

22

23

24

25

     TRACI L. WHEELER, OFFICIAL COURT REPORTER, CSR, RPR, CCR

3

```
 1                MESA, ARIZONA, MONDAY, OCTOBER 4, 2004

 2

 3          THE COURT:  Good afternoon.  This is trial in cause

 4    number CR 2000-096032, State of Arizona versus Wendi

 5    Elizabeth Andriano.  The record will reflect the presence of

 6    the Defendant, Counsel, and the jury.

 7                Mr. DeLozier?

 8          MR. DELOZIER:  Thank you, Your Honor.  First off,

 9    I'd like to withdraw some of the exhibits that we had marked

10    we don't plan to use.

11          MR. MARTINEZ:  Judge, if we could approach if he'll

12    be making this kind of record?

13          THE COURT:  Let me see Counsel at the bench.

14

15                (The following proceedings were held at the

16    bench:)

17

18          THE COURT:  You don't have to withdraw.  Just move

19    not to have them admitted into evidence.

20          MR. MARTINEZ:  That's right.  They stay there.  If I

21    need to use them, they're there.

22          THE COURT:  Right.

23          MR. DELOZIER:  We were going to withdraw them just

24    to get them out of the clerk's office and I wanted to give

25    them back to the family.
```

1          MR. MARTINEZ:  They've been marked for identification
2     and should stay as part of the record even though they are or
3     aren't going to be admitted into evidence.
4          MR. DELOZIER:  Okay.
5          THE COURT:  Right.
6
7          (The following proceedings were held in open
8     court:)
9
10         THE COURT:  Mr. DeLozier?
11         MR. DELOZIER:  Call Donna Ochoa, please.
12
13                 DONNA OCHOA,
14     CALLED TO TESTIFY ON BEHALF OF THE DEFENDANT,
15     HAVING FIRST BEEN DULY SWORN, TESTIFIES AS FOLLOWS:
16
17         THE COURT:  Please have a seat on the witness stand.
18     Please make yourself comfortable there on the witness stand.
19     Please pull the microphone close to you.  Please remember to
20     speak loudly and clearly into the microphone so everyone can
21     hear you.  Please wait until the question is completed before
22     you answer the question, and please make sure you give a
23     verbal response.  Is that agreeable to you?
24         THE WITNESS:  Yes, it is.
25         THE COURT:  Mr. DeLozier, you may proceed.

1            MR. DELOZIER:  Thank you, Your Honor.

2

3      DIRECT EXAMINATION BY MR. DELOZIER:

4            Q.    Would you please state your full name?

5            A.    My name is Donna Elizabeth Ochoa.

6            Q.    And who's your husband?

7            A.    My husband is Alejo Ochoa.

8            Q.    And do you have any children?

9            A.    Yes, I do.  I have two children, Wendi -- Wendi

10     Elizabeth Andriano and Brandon Henry Ochoa.

11           Q.    Okay.  How long have you lived in Casa Grande?

12           A.    I've lived in Casa Grande probably about total

13     around 31 years minus a couple years.

14           Q.    Can you give us a little bit of your

15     educational background?

16           A.    I graduated from high school in Tucson,

17     Arizona.  I have attended Eastern Arizona College.  Also

18     University of Phoenix, Phoenix College.  I have an Associates

19     degree.

20           Q.    In what?

21           A.    Actually, it's in respiratory therapy.

22           Q.    Okay.  What is your career?

23           A.    Right now I work in human resources as a senior

24     human resource analyst.

25           Q.    Where is that?

1          A.     Casa Grande Medical Center, Casa Grande,

2    Arizona.

3          Q.     Had you been previously married?

4          A.     Yes, I was.

5          Q.     And when was that marriage?

6          A.     I was married from 1968 to I believe 1974 to

7    Shelby Wayne Robertson.

8          Q.     Okay.  What happened to that marriage?

9          A.     We were divorced.

10         Q.     Okay.  And did you two have any children?

11         A.     Shelby and I had one child.  That is Wendi

12   Elizabeth who is sitting at the table.

13         Q.     Very good.  Can you tell me a little bit how

14   Mr. Shelby --

15              MR. MARTINEZ:  Objection.  Relevance.

16              THE COURT:  I didn't hear the question.  Did you

17   complete the question?

18              MR. DELOZIER:  Yes.

19              THE COURT:  What was the question again?

20              MR. DELOZIER:  Tell me about Shelby.  What kind of

21   man was he?

22              THE COURT:  Overruled.

23              THE WITNESS:  Shelby was -- well, let's put it this

24   way.  We got divorced because of two reasons.

25              MR. MARTINEZ:  Objection.  Relevance.

1           THE WITNESS:  Okay.

2           THE COURT:  I'll sustain the objection.  Why don't

3  you be a little more specific in your question.  Go ahead.

4  I'll have you restate the question.

5  BY MR. DELOZIER:

6           Q.   All right.  Can you tell me any character

7  traits that Shelby had?

8           MR. MARTINEZ:  Objection.  Relevance.

9           THE COURT:  I'll sustain the objection.

10           THE COURT:  Hold on a second.  Ask your next

11  question.

12  BY MR. DELOZIER:

13           Q.   How did he treat you?

14           MR. MARTINEZ:  Objection.  Relevance.

15           THE WITNESS:  He did not --

16           THE COURT:  I'll sustain the objection.

17  BY MR. DELOZIER:

18           Q.   Did he know Wendi?

19           A.   Yes, he did.

20           Q.   And how?

21           A.   Shelby -- Shelby knew Wendi.  She was

22  approximately, I believe, 3 years old one of the last times

23  she saw him.  I think she saw him another time after that

24  when she was young, 7 or 8.

25           Q.   When you saw them together, how did he treat

1    her?

2              MR. MARTINEZ:  Objection.  Relevance.

3              THE COURT:  Overruled.  Go ahead and answer the

4    question if you can.

5              THE WITNESS:  He treated her strictly.  I didn't like

6    how he treated her.  I felt it wasn't like a father-daughter

7    relationship.

8              MR. MARTINEZ:  Objection.  Beyond the scope.

9              THE COURT:  Ask your next question.

10   BY MR. DELOZIER:

11        Q.    What do you mean you didn't like how he treated

12   her?

13             MR. MARTINEZ:  Same objection, Your Honor.

14             THE COURT:  I'll sustain the objection.

15   BY MR. DELOZIER:

16        Q.    When did you meet Alejo?

17        A.    I met Alejo in, I believe, December of '74.

18        Q.    Where were you at the time you met him?

19        A.    I was in Casa Grande.  I was working for a drug

20   abuse center.

21        Q.    Where was he working?

22        A.    He was on the board of directors for the drug

23   abuse center in Casa Grande.

24        Q.    What was Alejo like when you met him?

25        A.    Very nice man.  Stable.  Good with children,

1    friendly.  He was quiet, but very -- I liked him.

2            Q.    Did he have any children?

3            A.    No, he did not.

4            Q.    How did your romance begin?

5            A.    We started going -- actually, we started going

6    to some church meetings together and progressed from there.

7            Q.    Okay.  And when were you married?

8            A.    We were married 6/6 of 1975.

9            Q.    Were you working at that time?

10           A.    Yes, I was.

11           Q.    Where were you working?

12           A.    I was working for Pinal Alcohol and Drug Abuse

13   Center, it was called PADAC, as a counselor and grant writer.

14           Q.    Okay.  How did you and Alejo make decisions?

15           A.    After --

16   MR. MARTINEZ:  Objection.  Relevance as to how.

17   THE COURT:  I'll sustain the objection.

18   BY MR. DELOZIER:

19           Q.    Was there either -- were either of you

20   domineering over the other?

21           MR. MARTINEZ:  Objection.  Relevance.

22           THE COURT:  Let me see Counsel here at the bench.

23

24                 (The following proceedings were held at the

25   bench:)

1

2          THE COURT:  Mr. DeLozier, I think it might be

3    relevant if you're able to tie it in to what maybe your

4    client observed, but just saying, you know -- you know,

5    basically these types of general questions, I don't find it

6    relevant.  Do you understand what I'm saying?

7          MR. DELOZIER:  Yeah, role models.

8          THE COURT:  Lay some foundation and relate it to

9    something that's relevant to the case, okay?

10          MR. DELOZIER:  Role model is what I'm doing.

11          THE COURT:  Well, but lay some foundation to show

12    that maybe when your client lived with them or what she

13    observed --

14          MR. DELOZIER:  Okay.

15          THE COURT:  -- as far as when she lived with him.

16    Lay some foundation.

17          MR. DELOZIER:  Okay.

18

19               (The following proceedings were held in open

20    court:)

21

22          THE COURT:  Mr. DeLozier?

23    BY MR. DELOZIER:

24          Q.    Thank you, Your Honor.  When did Wendi meet

25    Alejo?

1           A.    Wendi would have met Alejo in 1975.

2           Q.    Okay.  How did he treat her?

3           A.    He treated her very well.

4           Q.    Okay.

5           A.    They used to go to the store together.

6           MR. MARTINEZ:  Objection.  Narrative.

7           THE COURT:  Sustained.  Just answer the question

8     that's asked.

9     BY MR. DELOZIER:

10          Q.    Can you give some illustrations of the kinds of

11    things they did together?

12          MR. MARTINEZ:  Objection.  Lack of foundation, date

13    and time they're talking about.

14          THE COURT:  Overruled.  Answer the question if you

15    can.

16          THE WITNESS:  They would go to -- walk to the store

17    together with the dogs.  He had two really pretty dogs.  They

18    would -- sometimes Alejo babysat her and the other child that

19    was living at my apartment while I worked and while the other

20    mother went to school.  We --

21    BY MR. DELOZIER:

22          Q.    Excuse me.  This is the time period you're

23    talking about when you first met each other.  And how old was

24    she?

25          A.    She would have been 4 years old and this would

1     have been in the spring of 1975.

2             Q.   Okay.  Did -- you're referring to things that

3     took place up until the time she went to school?

4             A.   Yes.

5             Q.   Okay.  Anything else you wanted to add to your

6     illustrations?

7             A.   Yes.  He used to play tea party with the

8     girls.  Actually dug them out a little fort, and we were

9     building a house at the time and he would be out there,

10    playing tea party in the middle of the desert while the

11    construction people were watching them, kind of giggling with

12    them.

13            Q.   Uh-huh.  And when did you get married again?

14    I'm sorry.

15            A.   We got married June 6, 1975 in Florence,

16    Arizona.

17            Q.   And did the relationship between Alejo and

18    Wendi change at some point?

19            A.   Wendi and Alejo just got closer and closer.  As

20    far as Wendi was concerned, that was her dad.

21            Q.   Did he adopt her?

22            A.   Yes, he did.

23            Q.   When was that?

24            A.   He adopted her -- it would have been 2 years

25    because we had to wait.  The rule is that you have to be

1    married two years before you could adopt, and so as soon as

2    we were able we were down -- down there into the judge's

3    office adopting her.

4         Q.    Okay.  During this period of time, did Wendi go

5    to church?

6         A.    Church as in that we had church meetings at the

7    local Christian bookstore and in home.

8         Q.    Okay.  This is still prior to age 6?

9         A.    Yes, it is.

10         Q.    Okay.  Did she go to school?

11         A.    Yes, she did.  She went to kindergarten and

12    first grade at Evergreen Public Schools in Casa Grande,

13    Arizona.

14         Q.    All right.  What was -- what was she like at

15    that time?

16         MR. MARTINEZ:  Objection.  Relevance.

17         THE COURT:  Sustained.

18    BY MR. DELOZIER:

19         Q.    Did Wendi get the opportunity to see you and

20    Alejo interact?

21         A.    Yes, she did.

22         Q.    Okay.  During that -- I'm talking about the

23    period of time when she first met Alejo until she finished

24    her first year of -- of elementary school.

25         A.    How did that -- how did that interaction

1    between you and Alejo appear to Wendi?

2         A.    On occasion there would be an argument and

3    Wendi would see that and Alejo would -- would be upset and

4    Wendi and I would usually run -- not run, but go into the

5    bedroom or the bathroom and get away from any harsh words.

6         Q.    Tell me what -- what happened after first

7    grade?  What did Wendi do next?

8         A.    After first grade, we made the -- after first

9    grade, the decision was made to join up with a ministry

10   called Fishers of Men, and we went with them to travel to

11   different churches to preach in different churches, and Wendi

12   was with us.

13        Q.    How long did that last?

14        A.    It lasted approximately three years.

15        Q.    What did you do about her education at that

16   time?

17        A.    We taught her, we homeschooled her through a

18   program in Las -- I believe it was Las Cruces New Mexico.  It

19   was New Mexico.

20        Q.    How many people are you talking about going on

21   this traveling missionary group?

22        A.    There was -- let's see.  At minimum there were

23   nine of us, and the number increased, I think, one time up to

24   12.

25        Q.    How many children?

1          A.     One.

2          Q.     And that's Wendi?

3          A.     That was Wendi.  Wendi was the only child.

4          Q.     After you left -- well, let's talk a little bit

5     more about that.  Who was in charge of that group?

6          A.     Rick.

7          Q.     And when I say "in charge," he made all the

8     decisions?

9          A.     Pretty much.  It was a partnership with Rick

10    and with Alejo and -- but basically, yes, Rick made the

11    decisions.

12         Q.     Okay.  And what living conditions did you have

13    for Wendi while she was traveling?

14         A.     We had a bus and a fifth wheel.

15         Q.     Where did she sleep?

16         A.     Wendi actually slept in the fifth wheel with

17    two of the -- the young women, Rosalie and Rebecca.

18         Q.     And where did she take her home study classes?

19         A.     In the fifth wheel.  We had it set up.  There

20    was a little drop down desk where we took turns instructing

21    her using materials that were provided by Tucson Public

22    School District.

23         Q.     Do you -- do you consider that three year

24    period, four-year period a wholesome experience for Wendi?

25         MR. MARTINEZ:  Objection.  Relevance as to what she

1   considers.

2       THE COURT:  Sustained

3  BY MR. DELOZIER:

4       Q.    Did you know of any negative things that

5  occurred during that three, four-year period?

6       A.    Well, I remember one time that we couldn't -- I

7  couldn't buy Wendi shoes.  She outgrew her shoes and --

8       MR. MARTINEZ:  Objection.  Relevance.

9       THE COURT:  Overruled.  Go ahead and complete your

10  answer.

11  BY MR. DELOZIER:

12       Q.    Do you need me to repeat it?

13       (Pause in proceedings.)

14       MR. DELOZIER:  You need to take a minute?

15       THE WITNESS:  (No audible reponse.)

16       MR. DELOZIER:  Just a moment, Your Honor.

17       (Pause in proceedings.)

18       THE WITNESS:  There was one time that we couldn't buy

19  shoes because we weren't allowed to have money to buy her

20  shoes.  She didn't get to play with other children, of

21  course.  And, I mean, we couldn't even go to the -- like to

22  little laundromat or anything without Rick or Alejo and going

23  with us.  It wasn't the most normal situation.

24  BY MR. DELOZIER:

25       Q.    How did you decide to leave him?

1       A.    After -- after a period of time, Alejo said

2  that we needed to leave, and so we took our -- our van and we

3  left.

4       Q.    What -- what happened to Wendi after the

5  Fishers of Men?

6       A.    We -- we came back to Arizona and were stopping

7  in Casa Grande first and then went down to Tucson.  And were

8  there for about a month or so with her father, and then we

9  came back to Casa Grande.  But Alejo went off on some

10  training and I still homeschooled Wendi until January.  After

11  we got back in, like, September and I still homeschooled her

12  until January, and then we put her into a Christian school in

13  Casa Grande, 91st Palm Ministries.

14       Q.    Who was involved in 91st Psalm school?

15       A.    Cal Lords (phonetic) and Cal Lords was a friend

16  of mine and my husband.  Cal Lords and my husband were the

17  ones that began the drug program in Casa Grande.

18       Q.    Was he affiliated with any church group?

19       A.    No.  It's -- it's a nondenominational.

20       Q.    Was the school affiliated with a church?

21       A.    Yes.  The school was an ACE school, Accelerated

22  Christian Education school, which is affiliated with the

23  Baptist convention out of Texas.

24       Q.    Did you folks attend a church at this time?

25       A.    Yes, we did.  We attended 91st Psalm Ministries

1   and Wendi went to school there and I did volunteer work

2   there.

3         Q.    How many students was there -- were there in

4   the school at the time?

5         A.    When Wendi started school there were 24.   The

6   school was kindergarten through 12th grade.

7         Q.    Okay.  What kind of activities besides

8   education did they have at the school?

9         A.    None really.  It was more academic.  She didn't

10  have sports or extracurricular activities anything like that.

11        Q.    So no band?

12        A.    No band, no -- no other activities.

13        Q.    When you enrolled her at the school, did --

14  what was her academic rankings like?

15        A.    I'm not sure if this is what you mean, but the

16  children --

17        Q.    Based on her education at this time?

18        A.    (No audible response.)

19        Q    She went to public school two years, I think,

20  kindergarten, first grade.  Then homeschooling three or four

21  years.  Now she's moving into another school.  So was there

22  any kind of a --

23        A.    Okay.  What happens when you start the ACE

24  program is the child is tested to see what grade level that

25  they would be in or what -- actually, it's not so much grade

1    level as where they are like in math, social studies,

2    science.  So if they have missed any areas, then they kind of

3    do gaps, is what they're called, and Wendi was two to three

4    years above grade level when they tested her.

5           Q.    All right.  Thank you.  Where did you folks

6    live in relationship to the school?  It's you, Alejo and

7    Wendi at this time, right?

8           A.    Yes.  We lived probably a couple of miles away

9    from the school in a little house with a little tin roof.

10          Q.    All right.  Was the -- was Alejo -- what was

11   Alejo doing during this period of time?

12          A.    At that time Alejo went to -- he was going to

13   school for the labor union at first.

14          Q.    And were you working?

15          A.    No.

16          Q.    Okay.  How would you describe Wendi's

17   personality at this time?

18          A.    Wendi was very quiet.  She didn't interact with

19   the other children very much because she hadn't been around

20   children.  She knew how to visit with adults, but children

21   she didn't, so that was a whole new experience so she was

22   quiet.  She tried to make friends by doing -- you know, doing

23   stuff -- she's the kind of kid that was generous, I guess you

24   would say, to a fault.  If she had something somebody else

25   needed, she gave it to them.  She was just a very quiet,

1    compliant-type child.

2         Q.    Okay.

3         A.    She wanted to -- she wanted to get approval

4    from other people.  If I expected her to get As in school,

5    she got As in school.

6         Q.    A few moments ago, you talked about things that

7    might go on in your home between you, Alejo and Wendi.  Up

8    until now, she's what -- what grade are we now?  If you can

9    convert it to grade.  I know --

10        A.    Yeah.

11        Q.    -- it's difficult.

12        A.    Yeah, it's difficult, but it -- it wasn't

13   really graded.  She probably would have been, in the normal

14   system, around fourth grade, fourth, 5th grade.

15        Q.    All right.  Did she continue to stay in that

16   school --

17        A.    Yes, she did.

18        Q.    -- through what we would consider 8th grade?

19        A.    The system's different there because they work

20   at their own speed.  It's like having a one-room school house

21   and they -- they work towards goals and things like that.

22   She went all the way through and she graduated from -- from

23   there.

24        Q.    Okay.  Did -- how many friends did she have

25   during those years, friends her own age?

```
 1          A.    Friends her own age?

 2          Q.    Yeah.

 3          A.    Probably three at the most, four.

 4          Q.    Okay.  How about -- we're now talking about

 5    teen years and we're all the way up to almost graduation.

 6          A.    Uh-huh, right.  Right

 7          Q.    She stayed in that school all the way through?

 8          A.    Yes, she did.

 9          Q.    How many people in her graduating class?

10          A.    There was one.

11          Q.    Okay.  During that period of time up until age

12    18, what contacts did she have?  What --

13          MR. MARTINEZ:  Objection.  Lack of foundation how she

14    knows the contacts

15          THE COURT:  Sustained.  Lay some foundation.

16    BY MR. DELOZIER:

17          Q.    Let me ask it this way.  Did you permit her to

18    see people outside the school and church?

19          A.    Outside of the church realm?

20          Q.    Yes.

21          A.    Our -- no.  No, we did not.  She had two

22    friends, Laura and Jerry Lynn, that she was very close with

23    her, like, say, 13 to 14, but one of them moved away, her

24    parents moved away, and the other one was basically forced

25    out of school.  So Wendi didn't have anyone else after that.
```

1    I think she had maybe one or two friends after that left at

2    school --

3             Q.    And who --

4             A.    -- that were her age.

5             Q.    And who was that?

6             A.    That would have been, I believe, Kim and Shawn.

7             Q.    Who is Shawn?

8             A.    Shawn King, our pastor's son.

9             Q.    Okay.  What was their relationship like?

10            A.    At -- they were both in the same grade.  They

11   played together from the times that they were little --

12   little children because when we would work at the -- Alejo

13   and I were working or volunteering at the church, and, of

14   course, you know, we didn't send them to daycare or anything,

15   so the pastor's kids and Wendi, being the youth pastor's

16   child, played together, so basically she played with their

17   children.

18            Q.    Did you allow her to date?

19            A.    No, we did not.  We did not allow her to date.

20   We were going to let her date at 16, and because her and --

21   we just -- we just decided to wait until she graduated from

22   high school.  Actually, Alejo decided.

23            Q.    I'm sorry?

24            A.    Alejo decided.

25            Q.    Okay.  Did you ever see Wendi get angry?

1      A.      There's only one time that I could say I saw

2  Wendi upset, and that was at school when Brandon was little.

3  I think he was in -- in kindergarten in the reading program.

4  And one of the monitors -- those are what we called the

5  teachers or the helpers -- started to --

6          MR. MARTINEZ:  Objection.  Lack of foundation how she

7  knows that.

8          THE COURT:  Sustained.  Lay some foundation.  Ask

9  your question again, lay some foundation.

10  BY MR. DELOZIER:

11      Q.      Were you there?

12      A.      No.  I was told about it afterwards.

13      Q.      By?

14      A.      By Wendi and by several other people in the

15  school that saw it.

16      Q.      Okay.  And what were you told by Wendi?

17          MR. MARTINEZ:  Objection.  Hearsay.

18          THE COURT:  I'll sustain the objection.

19  BY MR. DELOZIER:

20      Q.      So you didn't have any instances where you

21  actually saw her angry yourself?

22      A.      No, I did not.

23      Q.      Okay.  What happened to Jerry Lynn?  You said

24  she left?

25      A.      Yes.  Jerry Lynn's father went to work in

1    the -- the church basically split off and her father went to

2    work in the -- the church that they -- that we started up in

3    Phoenix, in Ahwatukee, 91st Psalm, and we stayed in Casa

4    Grande and eventually changed the name from 91st Psalm to

5    Harvest Family Church.

6             Q.    All right.  During her high school years, did

7    she do anything other than go to school?

8             A.    She went to school at Harvest and she also went

9    to school at Central Arizona College at the same time in high

10   school.  Other things that she would have done would have

11   been in -- in group activities.  We would have, because my

12   husband was the youth minister, we would have the youth come

13   to our house and, you know, we'd play games or watch a movie

14   or something like that.  Or if they went to the movies in

15   town, an adult always supervised.

16            Q.    She had a number of awards from school, didn't

17   she?

18            A.    Yes, she did.  Yes.

19            Q.    Can you tell us about some of those?

20            A.    In ACE we have state conventions and

21   national -- actually, international conventions where they

22   compete in academics, arts, platform arts, things like --

23   things like that.  Wendi competed in singing, solos, duets,

24   she competed in sewing, and one sport.  I think she competed

25   one year in table tennis.  She also did writing.  She wrote

1   poetry she wrote short stories.

2          Q.    Did she win any awards for these kinds of

3   activities?

4          A.    Yes, she did.  She won awards.  I believe she

5   went five years to States and she won awards in States every

6   time that she went, especially with singing and piano.

7   Essays, she won national awards in inter -- in the

8   international convention.  One of the biggest ones that she

9   worked for was the Golden Apple Award and that's where the

10   student recites the entire book of Proverbs.  They do it a

11   chapter at a time within a certain time limit, and that was

12   an award she won at States and also International because it

13   wasn't something that very many people did.

14          Q.    What specifically -- what kind of award did she

15   win in the piano area?

16          A.    For playing the piano.  She -- actually, she

17   was self taught and --

18          MR. MARTINEZ:  Objection.  Nonresponsive.

19          THE COURT:  Sustained.  Repeat the question.  Listen

20   to the question.

21   BY MR. DELOZIER:

22          Q.    Yeah.  What was the award she won?

23          A.    She won awards for her piano playing, playing

24   the piano.

25          Q.    Did she come in first or last --

1          A.     Actually, I think she came in sixth in

2    Internationals, which is quite an honor because there's

3    several thousands of people -- of children that attend from

4    all over the world.

5          Q.     Okay.

6          MR. DELOZIER:  If I could approach, Your Honor?

7          THE COURT:  Yes.

8    BY MR. DELOZIER:

9          Q.     Showing you what's been marked for

10   identification as 407.  Do you recognize that?

11         A.     Yes, I do.

12         A.     That's one of the pictures that I took at one

13   of the competitions when Wendi was playing the piano.

14         Q.     Okay.  And you took that?

15         A.     Yes, I did.

16         Q.     Could you tell me about when?

17         A.     This probably would have been probably 1987, I

18   think, right around there.

19         Q.     When did she graduate high school?

20         A.     She graduated high school in 1989.

21                (Pause in proceedings.)

22         MR. MARTINEZ:  You need to turn the television on.

23                (Pause in proceedings.)

24         MR. DELOZIER:  Your Honor, move for admission of

25   407.

1          MR. MARTINEZ:  Object on the grounds of relevance and

2     Rule 403.

3          MR. DELOZIER:  May I approach?

4          THE COURT:  Yes.

5               (Pause in proceedings.)

6          THE COURT:  Exhibit 407 is admitted into evidence.

7     BY MR. DELOZIER:

8          Q.    Let's take a look.  Is that the photograph we

9     were discussing?

10         A.    Yes, it is.

11         Q.    Is this the time she won the award or are you

12    sure --

13         A.    Yes, she -- she was actually playing and they

14    allowed us to take pictures while they were performing.

15         Q.    Very good.

16         A.    Thank you.  What about her -- did you say

17    something about her sewing being a seamstress?

18         A.    Yes, I did.  One year she designed a dress and

19    she had to make a pattern and put the dress together and had

20    to sit -- fit into certain categories that were set up by the

21    school, the Accelerated Christian Education schools, and she

22    actually had one of the physician's wives in Casa Grande --

23         MR. MARTINEZ:  Objection.  Nonresponsive.  Narrative.

24         THE COURT:  Sustained.  Just answer the question

25    that's asked.

1    BY MR. DELOZIER:

2         Q.    Did she win an award for any of her seamstress

3    work?

4         A.    Yes, she did.  She won first in states and she

5    won in the top 12.  I don't recall which one.  It was in the

6    international convention for that dress.

7         Q.    I'm going to show you what's been marked for

8    identification as Exhibit 408.  Do you recognize that photo?

9         A.    Yes, I do.

10        Q.    Did you take it?

11        A.    Yes, I did.

12        Q.    Is that the dress you're referring to?

13        A.    Yes, it is.

14        MR. DELOZIER:  Move Exhibit 408 into evidence, Your

15   Honor?

16        MR. MARTINEZ:  Judge, may I voir dire the witness on

17   that?

18        THE COURT:  Yes.

19

20   VOIR DIRE EXAMINATION BY MR. MARTINEZ:

21        Q.    Ma'am, how old was she when this photograph was

22   taken?

23        A.    15 or 16 -- 16, I think.

24        Q.    That was when she was still in high school,

25   correct?

```
1           A.    Yes.

2           Q.    And her hair in this photograph is definitely

3    blond, isn't it?

4           A.    Yes.

5           MR. MARTINEZ:  I don't have anything else.  No

6    objection.

7           THE COURT:  Exhibit 408 for identification is

8    admitted into evidence.

9

10   CONTINUED DIRECT EXAMINATION BY MR. DELOZIER:

11          Q.    Is that the dress you're referring to?

12          A.    Yes, it is.

13          Q.    And she made that herself?

14          A.    Yes, she did.

15          MR. DELOZIER:  Excuse me a second, Your Honor.

16               (Pause in proceedings.)

17   BY MR. DELOZIER:

18          Q.    I'm going to show you what's been marked as

19   Exhibit 406 and see if you can identify it for us.

20          A.    Yes.  That's a picture of Wendi and her best

21   friend Laura Bell.

22          Q.    What --

23          A.    That was at state convention in Flagstaff.

24          Q.    Had they won something?

25          A.    Yes, she did.  They won -- they won first or
```

1    second in the State for a duet that they sang together.

2              Q.    And did you take that photograph?

3              A.    Yes, I did.

4              Q.    And approximately when?

5              A.    I believe it was 1987.

6              Q.    Thank you.

7         MR. MARTINEZ:  If I may voir dire her on this, Your

8    Honor?

9         THE COURT:  Yes.

10

11   VOIR DIRE EXAMINATION BY MR. MARTINEZ:

12             Q.    If this was taken in 1987, that would make her

13   17 years old, correct?

14             A.    No.  She would have just been 16 at the time.

15             Q.    Her date of birth is August 26 1970, isn't it?

16             A.    Yes, it is.

17             Q.    And this picture here, number 406, you

18   indicated was taken in '87?

19             A.    Yes.

20             Q.    And, again, her hair is blond in this

21   photograph, isn't it?

22             A.    Yes.

23        MR. MARTINEZ:  I don't have any objection to 406.

24        THE COURT:  Exhibit 406 for identification is

25   admitted into evidence.

1    CONTINUED DIRECT EXAMINATION BY MR. DELOZIER:

2         Q.    Is this the photo you're referring to?

3         A.    Yes, it is.

4         Q.    Who are the two people?

5         A.    Wendi would be -- on the screen, would be to

6    the -- to the left, and Laura, her friend, is to the right in

7    Flagstaff.

8         Q.    Thank you.  Do you know what year Laura left

9    school?

10        A.    Well, it would have been after '87 or at least

11   it might have been around -- it was after that convention.  I

12   don't recall the exact date.

13        Q.    Well, I'm trying to be more specific about when

14   you might have -- when you took the picture on -- how old was

15   Wendi when she graduated high school?

16        A.    Wendi was 18, just shy of being 19.

17        Q.    All right.  Does that help you?

18        A.    I believe that Laura left sometime when Wendi

19   was in the year that she was 16.

20        Q.    So it would have been equivalent of the

21   sophomore year?

22             MR. MARTINEZ:  Objection.  Leading.

23             MR. DELOZIER:  Is that right?

24             THE COURT:  Sustained.  Don't lead.  Restate your

25   question.

```
 1      BY MR. DELOZIER:
 2              Q.      Can you tell me, based on that, what -- what
 3      year you would normally call if there were kids not in this
 4      kind of a school, what grade level that would have been?
 5              A.      Okay.  Again, that's hard.  I'd have to relate
 6      it, but probably around sophomore, maybe going into junior.
 7              Q.      Okay.  You talked about some of the things
 8      that -- that Wendi grew up with as rules to her conduct,
 9      right, a few moments ago?
10              A.      Yes.
11              Q.      Remember those?  How about going to dances?
12              A.      No.  We didn't allow Wendi to go to dances.
13              Q.      We're still talking about prior to age 18?
14              A.      That's correct.
15              Q.      Okay.  How about did school have a program?
16              A.      No, we didn't have -- we didn't do dances,
17      didn't do programs, didn't have anything like that.
18              Q.      How about wearing makeup?
19              A.      Not to school.  They weren't allowed to wear
20      makeup to school.
21              Q.      How about going hanging out at the mall?
22              A.      Only if there were adults.
23              Q.      So did she ever go to a movie?
24              A.      If they went to movies, they went with a group
25      of kids and usually there was adult supervision.
```

1        Q.     How about cheerleading and volleyball,

2    basketball, baseball?

3        A.     No cheerleading.  And if they played

4    volleyball, it would be a girl's team and she had to wear

5    shorts -- shorts past -- actually, they weren't shorts, they

6    were culottes past their knees.

7        Q.     Sorry, past their what?

8        A.     Knees.

9        Q.     Okay.  She's now graduated, okay?  What does

10   she do next?

11       A.     She -- actually, she helped in the school for a

12   while.  Then she -- in Harvest Family, Harvest Christian

13   Academy School, and then she went -- the church paid for her

14   to go to a Berlitz Spanish class because she wanted to go on

15   a mission to Mexico.

16       Q.     And did she?

17       A.     Yes, she did.

18       Q.     Where did she go?

19       A.     They had -- she was going to go to Guadalejara,

20   but there was civil unrest, so the decision was made for her

21   to go to Mexicali because it was closer.

22       Q.     So was that sponsored by your church?

23       A.     It was encouraged by our church.

24       Q.     Okay.  Well, did she get paid for going?

25       A.     No, she did not.

1          Q.     How long did she stay?

2          A.     She stayed six months.

3          Q.     Okay.  And besides her time, what else did

4     she --

5          A.     When she -- prior to going down to Mexicali to

6     work in the church down there, she purchased on her own,

7     materials to take with her to work with children.

8          Q.     So at this point in time she's graduated and

9     she's 19 and she takes this Berlitz school, right?

10         A.     Correct.

11         Q.     And sometime after she's 19, she spends six

12    months in Mexico.  How old is she when she comes back to

13    Mexico?

14         A.     She's just right around 20.

15         Q.     Okay.  And what did she do next?

16         A.     I believe that she -- I know she took -- I

17    think she worked for a little while.  I believe she started

18    class at CAC.  She'd already taken classes at CAC prior to

19    that time, like I mentioned before, in high school.  Because

20    we didn't have like Biology and things like that in the high

21    school, so she was -- she took, I think, Chemistry at CAC and

22    other classes.  So she sort of had a head start, so she was

23    continuing on with classes at CAC.

24         Q.     How long did she keep doing that?

25         A.     I'm not sure.  Several semesters because she's

1    in the honor curriculum at CAC.  I do recall that because

2    that was pretty special.

3              Q.    Was she employed during this time?

4              A.    She -- I think, I believe right around that

5    time she took a position at an apartment complex.

6              Q.    Okay.  So she had stopped living with you and

7    Alejo?

8              A.    Yes.  Probably in her 20s, sometime in the year

9    that she was 20, almost 21.

10             Q.    Okay.  So except for the six months in Mexico

11   until she got her first apartment, she continued to live with

12   you and Alejo?

13             A.    That's correct.

14             Q.    Okay.  Was there somebody else that came to

15   live with you and Alejo?

16             A.    Brandon came to live with Alejo and I and

17   Wendi.

18             Q.    And how did that happen?

19             MR. MARTINEZ:  Objection.  Relevance.

20             THE COURT:  Sustained.

21   BY MR. DELOZIER:

22             Q.    Did you and Alejo adopt Brandon?

23             MR. MARTINEZ:  Objection.  Relevance.

24             THE COURT:  Overruled.  Go ahead and answer the

25   question "yes" or "no."

1              THE WITNESS:  Yes.

2      BY MR. DELOZIER:

3              Q.    Thank you.  What age did Brandon come to live

4      with you and Alejo and Wendi?

5              A.    Two and a half.

6              Q.    Okay.  So he had 15 and a half or so years with

7      Wendi.  He continued to live with her until she finished high

8      school and went to Mexico?

9              A.    Yes, he did.

10             Q.    Okay.  You mentioned a moment ago during that

11     period of time, early -- early period of time, that Alejo

12     would often lose his temper.  Did that continue on until she

13     moved out into her own apartment?

14             A.    Yes, it did.

15             Q.    Did she continue to witness it?

16             A.    Yes, she did.

17             Q.    What was your -- what was Wendi's reaction?

18             MR. MARTINEZ:  Objection.  Lack of foundation.

19             THE COURT:  Sustained.  Lay some foundation.

20     BY MR. DELOZIER:

21             Q.    Did she see him when he lost his temper?

22             A.    Yes, she did.  She would be in the house.

23             MR. MARTINEZ:  Objection.  Nonresponsive and lack of

24     foundation, date and time.

25             THE COURT:  Lay some foundation.

1    BY MR. DELOZIER:

2         Q.    Prior to the time she left and got her own

3    apartment and after the time we've already talked about,

4    which was when I think she was 9, okay, so we got years 9 to

5    18, did there -- were there episodes where Alejo would lose

6    his temper?

7         A.    Yes, there were numerous episodes of Alejo

8    losing his temper throughout those years.

9         Q.    Did Wendi see them?

10        A.    Yes, she did.  She was witness to them.

11        Q.    What was her response?

12        MR. MARTINEZ:  Objection.  Lack of foundation, how

13   old was she?

14        THE COURT:  Sustained.

15        MR. DELOZIER:  We've already discussed the ages from

16   9 to 18.

17        THE COURT:  I sustained the objection.  Restate your

18   question.

19   BY MR. DELOZIER:

20        Q.    How old was she at each episode?

21        A.    9, 10, 11, 12, then, 15 through 20

22        Q.    Okay?

23        A.    And we haven't gone past that yet, so --.

24        Q.    Very well.  Did she witness these episodes?

25        A.    Yes, she did.

1        Q.    What was her response?

2        A.    Wendi's response would be to to go into either

3  her room or my room or the bathroom along with me.

4        Q.    And do what?

5        A.    We would just sit and wait until Alejo either

6  left or he calmed down and then we'd go out and see if he was

7  still there.  We'd just sort of make nice, I guess, is the

8  right word, would be passive, you know, and sort of ignore

9  everything that happened and try to make sure that dad was

10  happy.

11       Q.    So she's now attending college whenever she

12  could work it into her schedule and living in her own

13  apartment, did you say?

14       A.    Yes.

15       Q.    Okay.  And has a job working for that apartment

16  complex?

17       A.    That's correct.

18       Q.    She's about 20, 21?

19       A.    Yes.

20       Q.    Okay.  Did you notice any changes in her

21  behavior patterns when she started living and working in that

22  manner at that age?

23       A.    Well, obviously, you know, she wasn't at the

24  house as much.  She was still going to church, still doing,

25  you know -- we'd do short missionary trips, like a weekend

1  trip or toys for kids, you know, with the church, and she

2  would still be involved in that.  Our Harvest Track Classic,

3  which is something we've done since, I believe, 1980.  She

4  was still always involved in those, but I do know that she

5  was spending more time with her cousin, Barbara, and some of

6  her friends, and they were -- they were a little bit younger

7  than she was.

8       Q.   Notice any change in her dress?

9       A.   Yes.

10      Q.   What did you notice?

11      A.   I -- well, I noticed that she, you know, that

12  she was dressing a little -- little bit not quite as

13  conservative as what we always made her dress.

14      Q.   Okay.

15      A.   In other words, instead of having something

16  long and frilly and wearing a dress, she might be wearing

17  pants, something like that, shorts or something.

18      Q.   During this period of time were you giving her

19  any advice on how to conduct herself?

20      A.   Basically, the advice that we were giving her

21  then was the same advice we gave to her when she was younger,

22  that you don't date people that don't go to church, you

23  know, don't be, you know, out running around or doing things

24  that you know we don't approve of.

25      Q.   Did she ever express resentment for the way you

1    had raised her?  I'm talking about 20, 21.  Now it's 1990.

2           A.    No, she never expressed resentment.  In fact

3    when she -- well --.

4           Q.    Okay.  Did you feel like you had -- you were

5    getting closer together as a family or was there more

6    distance?

7           A.    Well, I know that she still, you know, came and

8    would talk to us.  But no, of course, there was, you know,

9    more distance.

10           Q.    You mentioned Shawn.  Was Shawn a part of her

11    life at this time?

12           A.    Yes, he was.  They were going out together.  By

13    then both of them had graduated and that was okay that they

14    could, you know, date.

15           Q.    And did -- how did that relationship go?

16           A.    They were seeing each other.  He was -- for a

17    long time he was up in Prescott and she was in Mexico and

18    then in Casa Grande.  They would see each other and then they

19    -- I was told they had a fight.

20           MR. MARTINEZ:  Objection.  Hearsay.

21           THE COURT:  Sustained.  Don't say what someone else

22    said.

23           THE WITNESS:  Okay.

24           THE COURT:  Restate your question.

25    / / / / /

```
 1    BY MR. DELOZIER:
 2            Q.    Did the relationship end?
 3            A.    Yes, it did.
 4            Q.    Did it end smoothly?
 5            MR. MARTINEZ:  Objection.  Hearsay.
 6            THE COURT:  Sustained.
 7    BY MR. DELOZIER:
 8            Q.    If you know.  Did you witness anything about
 9    their breakup?
10            A.    They weren't going out with each other anymore
11    and her car had two broken windows.
12            Q.    Do you know what age Wendi was when she first
13    met Joe?
14            A.    She would have been 21.
15            Q.    Okay.  And would that have been just after
16    reaching 21 or just before becoming 22?
17            A.    It would have been before -- it would have been
18    21 and a half because she -- she met him on St. Patrick's
19    Day.
20            Q.    Okay.  And was she employed at that time?
21            A.    Yes, she was.  She was working at the apartment
22    complex.
23            Q.    And is that the same apartment complex that you
24    just discussed a moment ago?
25            A.    Yes, it is.
```

1          Q.     And she had her own -- she had her own

2     apartment?

3          A     Yes.

4          Q.     Did she have her own car?

5          A.     Yes, she did.

6          Q.     What was the state of her finances at that

7     time?

8          A.     She was doing fine.  She had her own place.

9     She had her own Lumina.  She was doing pretty well for, you

10    know, a young kid.

11         Q.     Okay.  Do you recall the first time you met

12    Joe?

13         A.     I recall it was in I believe the summer of

14    1992.  I don't recall the exact incident or circumstance.

15         Q.     Summer of '92?  So it would have been four,

16    five, six months after Wendi met him?

17         A.     Yes.

18         Q.     Okay.  And do you remember the occasion that

19    you met him on?

20         A.     I believe that they had come back from a lake

21    trip and she introduced me to him because I think I was over

22    at the apartment.

23         Q.     Okay.  You didn't go to the lake though?

24         A.     No, not at that time.

25         Q.     They had come back from a lake trip?

1      A.    They came back from a lake trip.

2      Q.    They were attired in the normal attire you go

3  to the lake in when you met him?

4      A.    He had like shorts or swimsuits on.

5      Q.    Okay.  Uh-huh, okay.  Now, at that point in

6  time had you -- had you and Wendi had any discussions about

7  Joe prior to your first meeting him?

8      A.    Wendi had told me that she --

9      MR. MARTINEZ:  Objection.  Hearsay and nonresponsive.

10     THE COURT:  Sustained.  Just answer the question

11  "yes" or "no."

12  BY MR. DELOZIER:

13     Q.    Had you and Wendi had discussions?

14     A.    Yes.

15     Q.    Okay.  Now, had you learned or did you know

16  what Joe's reputation in the community was for violence and

17  anger?

18     MR. MARTINEZ:  Objection.  Lack of foundation, when

19  she learned this, when did she aquire this knowledge?

20     THE COURT:  Sustained.  Lay the foundation.

21  BY MR. DELOZIER:

22     Q.    We're talking about the times you first learned

23  she was seeing him and right after St. Patrick's Day.  You

24  said it was 1992?

25     A.    Yes.

1      Q.    First time you met him was sometime in the

2   summer of 1992, so prior to that time you had learned?

3      A.    I had learned that he was --

4      MR. MARTINEZ:   I'm going to object.

5      THE COURT:   The question was a "yes" or "no"

6   question, I believe.   Why don't you restate the question.

7   Answer the question "yes" or "no." I believe it was a "yes"

8   or "no" question, then Mr. DeLozier can follow-up.

9   BY MR. DELOZIER:

10     Q.    Prior to that time period, February, whatever

11  St. Patrick's Day is, and sometime in July or August of

12  2000 -- I mean 1992, had you learned what Joe's reputation

13  was in the community?

14     A.    Yes.

15     Q.    Okay.   What was his reputation that you learned

16  for violence and anger, things of that nature?

17     A.    That he drank a lot and that he had a temper on

18  him.

19     Q.    Did you and Wendi discuss that prior to your

20  meeting him?

21     A.    Yes.

22     Q.    When you met him, what was your impression?

23     A.    When I met him, like I said, she just came back

24  from somewhere, I believe it was the lake, and he had -- he

25  had a twinkle in his eye, which I later discovered was --

1          MR. MARTINEZ:  Objection.  Hearsay as to the --

2          THE COURT:  Sustained.  Go ahead, Mr. DeLozier.

3    BY MR. DELOZIER:

4          Q.    What was your impression as far as --

5          A.    I thought he was a cute young -- a cute young

6    kid.

7          Q.    Okay.  Did you have an occasion to see them as

8    a couple prior to their marriage?

9          A.    Yes, I did.

10         Q.    What occasions were those and when?

11         A.    Actually, I saw them lots of times before.

12   When they would come to the house or --

13         Q.    We're talking about your house with Alejo and

14   Brandon?

15         A.    Yes.

16         Q.    Okay.

17         A.    Also, you know, I had seen him over at the

18   apartments, Wendi's apartment.  And out to dinner, things

19   like that.

20         Q.    Did you actually go out to dinner with them?

21         A.    Yes.

22         Q.    Did you -- did they come to your house for

23   dinner?

24         A.    Before they were married?

25         Q.    Yes, before they were married.

1          A.    Yes, they would come to our house for dinner.

2    In fact one of the things we always did was, and we followed

3    through in the years, was that they would come to our house

4    on Christmas Eve and they were there on Christmas Eve in

5    1992.

6              MR. MARTINEZ:  Objection.  Nonresponsive.

7              THE COURT:  Overruled.  Go ahead and ask your next

8    question.

9    BY MR. DELOZIER:

10          Q.    Did you have dinner in their home or Wendi's

11   apartment, I should say?

12          A.    I don't recall having dinner at the apartment.

13          Q.    You went out socially though to have --

14          A.    Yes.

15          Q.    Okay.  And they would come over to your house

16   you say on special occasions too?

17          A.    That's correct.

18          Q.    Okay.  Now, this is from the time you first met

19   him and before they got married?

20          A.    Correct.

21          Q.    Did you witness any physical abuse of Wendi by

22   Joe?

23          A.    On Christmas Eve in 1993 --

24              MR. MARTINEZ:  Objection.  It's a yes or no.

25              THE WITNESS:  Yes.

1          THE COURT:  Just answer the question that's asked and

2     Mr. DeLozier can ask you additional questions.

3     BY MR. DELOZIER:

4          Q.    You did?

5          A.    Yes, I did.

6          Q.    All right.  Give us -- tell us the date and

7     time and place of that and what happened.

8          A.    Okay.  It was Christmas Eve of 1993 and they

9     were in the living room, Wendi and Joe were in the living

10    room as well as Alejo and I believe Brandon.  And Joe was

11    roughhousing around with Wendi and pinned her down.  And

12    first he let the dog lick all over her and she was trying to

13    get away because it's a huge dog, a big Rottweiler.  I'm

14    sorry -- it's a German Shepherd, but -- and then the next

15    thing, he had her down there and he grabbed her like this

16    (indicating) around the neck and Alejo came in and said, "I

17    think you're getting a little rough," or something to that

18    effect, and he just sort of laughed it off and let her up.

19         Q.    Is that the only time prior to marriage?

20         A.    No.  I saw bruises on her knee and she just

21    tried to laugh it off and said that she fell.

22         MR. MARTINEZ:  Objection.  Lack of foundation.

23         THE COURT:  Sustained.  That last sentence will be

24    stricken.  Ask your next question.

25     / / / / /

1    BY MR. DELOZIER:

2         Q.    Prior to the time they were married and after

3    the first time that you met him, did you see any other

4    episodes of violence?

5         A.    You know, depends on what your definition of

6    violence is.  I did see her grab her arm or something like

7    that, you know.

8         Q.    I'm talking about slapping, hitting, bruising?

9         A.    No.

10        Q.    Hurting?

11        A.    Not --

12        Q.    Kicking?

13        A.    No.

14        Q.    Okay.  Where did -- was she still living in the

15   apartment at the time they were married?

16        A.    No.

17        Q.    Okay.  At what point after you met Joe until

18   they were married did they move or did she move?

19        A.    After she met Joe she was living in an upstairs

20   apartment at the -- where she was working.  And then when Joe

21   moved in with her, she moved to a downstairs apartment.  Then

22   they moved to, like, a town house on Pepper prior to their

23   marriage, and they moved from Pepper into a house on -- I'm

24   not sure, but I believe it was Park.  It was a cul-de-sac

25   down the street from the Jiffy Lube, and that's where they

1    were living when they were married.

2           Q.    Now, why did she move out of the apartment, do

3    you know?

4           A.    When I -- I had --

5           MR. MARTINEZ:  Objection.  Nonresponsive.  It's "does

6    she know."

7           THE WITNESS:  I know, yes.

8           THE COURT:  Just answer the question that's asked.

9    BY MR. DELOZIER:

10          Q.    Why did she move?

11          MR. MARTINEZ:  Objection.  Hearsay.

12          THE COURT:  Sustained.

13   BY MR. DELOZIER:

14          Q.    Do you know why she moved?

15          MR. MARTINEZ:  Objection.  Asked and answered.

16          THE COURT:  It's a "yes" or "no" question.  Go ahead

17   and answer the question.

18   BY MR. DELOZIER:

19          Q.    Did -- did she move?

20          MR. MARTINEZ:  Objection.  Hearsay.

21          THE COURT:  Sustained.

22   BY MR. DELOZIR:

23          Q.    Was she still employed by the apartment complex

24   when she moved from the apartment complex?

25          A.    No.

1       Q.      Do you know what job she took next?

2       A.      She took a position at Casa Grande Regional

3    Medical Center in the accounting department.

4       Q.      Okay.  Do you know the date that the -- of the

5    marriage?

6       A.      January 21st, 1994.

7       Q.      Okay.  January 20 --

8       A.      21st.

9       Q.      -- 21st, 1994.  So we've gone up to her being

10   what age at this point?

11      A.      In '94 in January she would have been 23.

12      Q.      Okay.  Did you say that Joe moved in with her?

13      A.      Yes, I did.

14      Q.      Okay.  And what was your reaction to that?

15      A.      I was not happy.

16      Q.      Did you have a discussion with Wendi about your

17   not being happy?

18      A.      Yes, I did.

19      Q.      What did you tell her?

20      MR. MARTINEZ:  Objection.  Hearsay.

21      THE COURT:  Sustained.

22      MR. DELOZIER:  Your Honor, I'm asking what she told

23   her.

24      THE COURT:  Sustained.  Ask your next question.

25      MR. DELOZIER:  Could we approach?

1          THE COURT:  Continue on.  Continue on.

2     / / / / /

3               (The following proceedings were held at the

4     bench:)

5

6          THE COURT:  Go ahead.

7          MR. DELOZIER:  I'm not asking what Wendi told her

8     mother.  I'm asking when her mother told her.

9          THE COURT:  I understand.

10         MR. MARTINEZ:  And the way to phrase it is "why were

11    you unhappy?"  Just ask her that.

12         THE COURT:  It's -- if you termed your question in

13    the manner that Mr. Martinez --

14         MR. DELOZIER:  Okay.

15         THE COURT:  -- is stating, I'll allow the question.

16         MR. DELOZIER:  Okay.

17

18              (The following proceedings were held in open

19    court:)

20

21         THE COURT:  Mr. DeLozier?

22    BY MR. DELOZIER:

23         Q.  Why were you unhappy?

24         A.  I was unhappy because that's totally against

25    how we raised her was that have -- to have somebody -- you

1   don't move -- you don't live together unless you're married,

2   so that was totally against what we taught.

3          Q.   Do you know if Joe was employed during the time

4   that they -- before they got married?  Just "yes" or "no."

5          A.   Do I know?  Yes.

6          Q.   Yes.  What was he employed at?

7          A.   He was employed at doing welding for different

8   farmers.

9          Q.   During the time prior to their marriage, did

10  you see Wendi and Joe as a couple?

11         A.   Yes, I did.

12         Q.   And what did you see?

13         MR. MARTINEZ:  Objection.  Lack of foundation.  Later

14  on in the marriage, early on?

15         THE COURT:  I'll sustain the objection.  Lay some

16  foundation.

17         MR. DELOZIER:  Prior to the marriage, after you met

18  him.  I thought I said it.  I apologize if I didn't.

19         THE COURT:  Okay.  Go ahead.

20         THE WITNESS:  Yes, I did.

21  BY MR. DELOZIER:

22         Q.   Prior to the marriage after you met, did you

23  see them together as a couple?

24         A.   Yes, I did.

25         Q.   And what did you see?

1          A.    A young -- nice looking young couple that

2    actually looked like brother and sister.

3          Q.    How did they behave?

4          A.    A lot like brother and sister.

5          Q.    Well, let me ask you more specifically, did you

6    see them hugging and kissing?

7          A.    No.  I never saw them romantically as far as

8    kissing or hugging or holding hands.

9          Q.    How about moving -- did you know if -- well,

10   let me rephrase that.  Let's just move on to the marriage.

11               Was it a big wedding?

12         A.    It was a nice wedding.

13         Q.    Okay.  Was -- everything go okay?

14         A.    Some of the flowers didn't get -- no.

15         Q.    What happened?

16         A.    Some of the flowers didn't get there, and I

17   know that there was an issue about following through with the

18   wedding.

19         Q.    I'm sorry?

20         A.    There was an issue about following through with

21   the wedding.

22         Q.    I don't know what you mean by "following

23   through"?

24         A.    There was one point where I didn't know if

25   Wendi was going to follow through.

1     Q.    Okay.  But there weren't any episodes at the

2  wedding?

3     A.    No.

4     Q.    Nobody got angry, nobody got mad?

5     A.    No.  Lost a little bridesmaid to getting sick,

6  I believe, but that was --

7     Q.    Did they have any type of party after the

8  wedding?

9     A.    Yes.

10    Q.    Okay.  Did Joe and Wendi get to dance?

11    A.    I believe they danced the first dance.  I don't

12  recall any other dance.

13    Q.    Okay.  Now, you said they were living in a

14  small house by this time.  She was working in Casa Grande?

15    A.    Yes.

16    Q.    The hospital?

17    A.    Yes.

18    Q.    Okay.  And was he still doing the welding

19  trade?

20    A.    No.

21    Q.    What was he doing now?

22    A.    I -- he was trying to start a glass repair

23  business.

24    Q.    What was the name of it?

25    A.    I believe it was Joe's Windshield Repair.

```
 1          Q.    I'm sorry?

 2          A.    Joe's Windshield Repair.

 3          Q.    Okay.  And what was it supposed to do?

 4          A.    Make money.

 5          Q.    No, I mean, what actually did you do in that

 6    business?

 7          A.    He would replace windshields or repair stars,

 8    little cracks in the windshields.

 9          Q.    We're now into what year?

10          A.    It would be '94.

11          Q.    '94?  Did you have discussions with Wendi

12    about the state of their financial afairs at this time?

13          A.    No, I did not.

14          Q.    Okay.  Were you having to give them any

15    assistance financially at this time?

16          A.    No, we were not, other than paying for a

17    wedding.

18          Q.    How about did you supply them any modes of

19    transportation?

20          A.    Yes, we did.

21          Q.    What was that?

22          A.    It was a an old Dodge that belonged to my

23    mother.  We let Wendi use it because she didn't have a

24    vehicle.

25          Q.    Did you and Alejo loan any money to them for
```

1    Joe's windshield business?

2          A.    Not for Joe's windshield business.

3          Q.    Okay.  Do you know whether the windshield

4    business survived, or what happened?

5          A.    No.  No, it didn't.  More competition came into

6    town and Joe wasn't -- he didn't go out and --

7          MR. MARTINEZ:  Objection.  Speculation, lack of

8    foundation.  How she knows?

9          THE COURT:  Overruled.

10         MR. DELOZIER:  If you're familiar with that, go

11   ahead.

12         THE WITNESS:  I'm sorry?

13   BY MR. DELOZIER:

14         Q.    Go ahead.

15         A.    Okay.  No, because Joe didn't really go out and

16   work at business.  In fact, sometimes we'd -- Alejo and I, we

17   would tell him people who needed windshields and say hey, you

18   know, if you call so and so, she said she'd let you replace a

19   windshield, but he wouldn't follow-up on it.

20         Q.    So Wendi is still at the hospital --

21         A.    Wendi is still at the hospital.

22         Q.    -- in 1994?

23         A.    Yes.

24         Q.    Okay.  And the windshield, Joe's windshield

25   business is going down?

```
 1          A.    Well, it -- it wasn't really going up and

 2    Alejo -- like I said, Alejo and I at that time, she's

 3    married, we're trying to help, you know, help him, but --

 4          Q.    What did he do next as far as business

 5    ventures?

 6          A.    After Joe's windshield business, he worked

 7    for -- and he still kind of had his business on the side, you

 8    know, do one or two windshields a month, something like

 9    that.  He went to work in, I guess it's Chandler, for Accu

10    Glass.  He went to work as a repair person there.

11          Q.    Did he continue working for them for some

12    period of time or did that relationship change?

13          A.    He worked for that and whenever he wanted --

14    basically, he worked for them whenever he felt like working,

15    and then --

16          MR. MARTINEZ:  Objection.  Speculation.

17          THE COURT:  Sustained.

18          THE WITNESS:  Okay.  He worked for them whenever he

19    didn't want to go to the lake.

20          MR. MARTINEZ:  Objection.  Speculation.

21          THE COURT:  Sustained.

22    BY MR. DELOZIER:

23          Q.    Did he eventually try to buy the business?

24          A.    Yes, he did.

25          Q.    Okay.  And was he successful in purchasing the
```

```
 1   business?
 2            A.     With a partner, yes.
 3            Q.     Okay.  And how did that business work out?
 4            A.     That business did not work out.
 5            Q.     He have a problem with his partner?
 6            MR. MARTINEZ:  Objection.  Hearsay.
 7            THE COURT:  Sustained.
 8   BY MR. DELOZIER:
 9            Q.     During that period of time when the business
10   didn't work out, was there some dispute with the partner that
11   you're aware of?
12            A.     Yes.
13            Q.     And do you know what that was?
14            MR. MARTINEZ:  Objection.  Hearsay.
15            THE COURT:  Sustained.
16   BY MR. DELOZIER:
17            Q.     Can you -- were you party to any discussions
18   with Joe and Wendi and his partner about that, about the
19   business?
20            A.     Not that included the partner.
21            Q.     Okay.  Did you help him, try to help him, start
22   any other businesses?
23            A.     Yes, we did, besides putting money and time
24   into helping him get Accu Glass started, after he had his
25   third surgery, he wanted some help with starting some other
```

1    businesses.  What we did, what Alejo and I did, we purchased

2    a hot dog cart and purchased the licenses and everything for

3    Wendi and Joe because Joe wanted to do that.

4            Q.    Did that -- was that successful?

5            A.    No, it was not.  They were told about one --

6            MR. MARTINEZ:  Objection.  Hearsay.

7            THE COURT:  Sustained.

8            THE WITNESS:  They --

9    BY MR. DELOZIER:

10           Q.    Did Joe have any income after the hot dog cart

11   that you're aware of?

12           A.    No.

13           Q.    Okay.  At what point was there a surgery?  You

14   mentioned a surgery a minute ago.  Do you know approximately

15   what date that was?

16           A.    Joe had four surgeries.  Which one?

17           Q.    Can you tell me when the first one was?

18           A.    The first one was in 1994.

19           Q.    Was that spring, fall, or --

20           A.    August or September.

21           Q.    So Wendi is, what, 24?

22           A.    She would have been 24.

23           Q.    Okay.  How did that go?

24           A.    Apparently, it seemed to go well.

25           Q.    Do you know -- do you know why he needed the

1    surgery?

2           A.    Because he had a lump down here by his salivary

3    glands.

4           Q.    Did you get to see him after he had the

5    surgery?

6           A.    Yes, I did.

7           Q.    What was his physical appearance like?

8           A.    He just had a small scar which he, you know, he

9    showed to me, and other than that he was fine.  It was an

10   outpatient surgery, I believe.

11          Q.    What was the diagnosis?

12          A.    That it was a benign tumor.

13          Q.    Did you notice any changes in Joe after this

14   surgery?

15          A.    Not really after the first surgery, no.

16          Q.    Okay.  Did you notice him treating Wendi any

17   differently?

18          A.    No.

19          Q.    We're in August or so of '94, right?

20          A.    Correct.

21          Q.    Okay.  And we've covered the business

22   activities during that period, in fact, all the way up to the

23   hot dog cart, right?  When was that?  Do you remember the

24   approximate date you got the golf -- hot dog cart?

25          A.    The hot dog cart I believe would have been in

1       '97.

2              Q.     Okay.   From the time that you had Christmas Eve

3       '93, the physical abuse, until the first surgery, did you

4       witness any episodes of physical violence?

5              A.     No.

6              Q.     Okay.   During that period of time, Wendi was

7       working at the hospital and he was still in the welding

8       business?  Or had he started the windshield business?

9              A.     I believe when she was working at the hospital

10      that he was in the Joe's windshield business.

11             Q.     Okay.   How was the cost of the first surgery

12      paid for?

13             A.     That was paid through insurance through Wendi's

14      work.

15             Q.     Okay.   Now, how long between that surgery and

16      the next one?

17             A.     I believe it was 11 months.   I don't even think

18      it was a year, that second surgery.

19             Q.     So we're looking at July or so of '95?

20             A.     I belive that one was in August of '95.

21             Q.     Okay.   So the other one might have been

22      September, right?

23             A.     Correct.

24             Q.     So this is August of '95 and Wendi is now 25?

25             A.     She would have been 25.

1          Q.      And Joe's 28?

2          A.      Three years older.

3          Q.      Okay.  How did that surgery go?

4          A.      That surgery apparently went fine.  He was

5    supposed to have outpatient and go home, and he -- the doctor

6    asked him to stay in town -- it was in Tucson at the

7    University Medical Center, and the physician asked him to

8    stay in town that night because they had to do a little bit

9    more surgery than he expected.  The next morning, Wendi and

10   Joe and I went to the physician's office, the physician

11   showed me how to change his dressing, and he okayed him to go

12   ahead and come back to Casa Grande.

13         Q.      Why did he show you how the change the

14   dressing?

15         A.      Because I worked in the hospital and I

16   volunteered and I could do it.

17         Q.      Did he show Wendi how to do it?

18         A.      No.  Wendi couldn't stand blood.

19         MR.DELOZIER:  If I could approach again, Your Honor?

20         THE COURT:  Yes.

21   BY MR. DELOZIER:

22         Q.      Showing you what's been marked as Exhibits 420

23   and 421, do you recognize those?

24         A.      Yes.  Those are pictures that I took after the

25   second surgery.

1          Q.     So those are photographs that you took?

2          A.     Yes, I did.

3          Q.     And they're photographs of whom?

4          A.     They're photographs of my son-in-law, Joe.

5          Q.     And that's his -- a point in time after the

6    second surgery?

7          A.     Yes.

8          Q.     Can you tell me how many weeks, days after?

9          A.     From the looks of the scar, I'd probably say a

10   week or two because the stitches are still in.

11         Q.     Okay.  Thank you.

12         MR. DELOZIER:  Move for admission of 420 and 421,

13   Your Honor?

14         MR. MARTINEZ:  No objection.

15         THE COURT:  Exhibits 420 and 421 are admitted into

16   evidence.

17   BY MR. DELOZIER:

18         Q.     Okay.  Take a look at the TV screen.  If you

19   need to move down, you can so you can see them.

20                Oops.  I mess that up every time.

21                Is that a photograph you took?

22         A.     Yes, it is.

23         Q.     It's 420, and that's of Joe and that's the scar

24   from the second surgery, did you say?

25         A.     Yes.

```
 1          Q.    Okay.  And this same picture, just a little
 2    different.  What --
 3              MR. MARTINEZ:  What exhibit?
 4    BY MR. DELOZIER:
 5          Q.    This is 421, correct?
 6          A.    Yes.
 7          Q.    And that one you took as well?
 8          A.    Yes.
 9          Q.    Took them both on the same day?
10          A.    Yes.
11          Q.    Okay.  So we're August of 1995.  Joe's been
12    trying to do the windshield business, and has that stopped
13    yet or has he gone to work at Accu Glass yet?
14          A.    I don't believe he's gone to work at Accu Glass
15    yet.
16          Q.    Okay.
17          A.    So he's still working on Joe's Windshield
18    Repair?
19          A.    Yes.
20          Q.    And what's Wendi doing?  Still at the hospital?
21          A.    Yes.
22          Q.    Okay.  You had a grandson born sometime along
23    here.  Am I ahead of him yet or is --
24          A.    Yes.
25          Q.    We getting close?
```

```
 1          A.     He was born in 1997.
 2          Q.     Okay.  So we're a couple years away from --
 3    from that young man, right?
 4          A.     Yes.
 5          Q.     Okay.  During this period of time, I'm talking
 6    about after the second surgery, was there a long
 7    recuperation?
 8          A.     Not so much -- no.  It took him a little bit
 9    longer than -- than the first one.
10          Q.     Do you know what the diagnosis was?
11          A.     Benign tumors.
12          Q.     Did she have to treat -- did Joe have to be
13    treated differently after this one than the first one by --
14    you said you had to learn how to do something.  What did you
15    have to learn how to do, put it that way?
16          A.     To clean the incision and, you know, put
17    medicine on it.  He had a larger dressing, of course, because
18    it was a larger incision on the second one.
19          Q.     How often did somebody have to attend to that?
20          A.     Usually twice a day, change it -- change it,
21    clean it, clean it and change it in the morning, in the
22    evening.
23          Q.     Okay.  Were you living fairly close to each
24    other at that time?
25          A.     Yes, I think we were only -- we were only maybe
```

```
 1    a mile and a half away.

 2            Q.    Okay.  And they'd been married now, what, year

 3    and a half?

 4            A.    Year and a half, yeah.

 5            Q.    Okay.  The first one was only six months or so

 6    after the marriage, wasn't it?

 7            A.    Yes, about eight, nine months after they were

 8    married.

 9            Q.    Okay.  So now we're eighteen months later --

10            A.    Yes.

11            Q.    -- and we've had two.  Did you notice any

12    change in the way Joe behaved?

13            A.    After -- I know after the second surgery he was

14    -- he was moodier.

15            Q.    Did you -- were there any episodes where he

16    treated Wendi differently?

17            A.    Not that I know of.

18            Q.    Okay.  Just for the sake of trying to

19    understand the time flow, okay, at what point was the Accu

20    Glass business acquired?  Do you have a recollection?

21            A.    1996, August or September.

22            Q.    Okay.  Well, when was the third surgery then?

23            A.    The third surgery, I believe, was in February

24    of '97.

25            Q.    Okay.  So he tried the Accu Glass business for
```

1    about a year?

2           A.    No.   They were only in the Accu Glass -- as far

3    as owning the Accu Glass business, being in partnership with

4    the Accu Glass business --

5           Q.    Uh-huh.

6           A.    -- that was four or five months.

7           Q.    So sometime in early '96 to maybe early summer,

8    '96.  Is that what you're saying?

9           A.    It was August or September '96 until December

10   of '96.

11          Q.    I see.

12          A.    January of 97.

13          Q.    Okay.  So we're in the Fall after the second

14   surgery.  Is that what you're saying?

15          A.    Yes.

16          Q.    Okay.  While they were married, are you

17   familiar with nicknames that Joe had for Wendi?

18          A.    Yes.

19          Q.    And what were they?

20          MR. MARTINEZ:  Objection.  Relevance.

21          THE COURT:  Sustained.

22          MR. DELOZIER:  Can we approach?

23

24               (The following proceedings were held at the

25   bench:)

```
 1
 2          THE COURT:  This -- does this go to the domestic
 3   violence?
 4          MR. DELOZIER:  Uh-huh.
 5          THE COURT:  What -- in what way?
 6          MR. DELOZIER:  Well, he had negative nicknames for
 7   her.
 8          THE COURT:  What were they?
 9          MR. DELOZIER:  Shit eyes, called her fat.
10          THE COURT:  Mr. Martinez?
11          MR. MARTINEZ:  Well, I'd like some foundation laid,
12   if she ever heard him call her that.
13          THE COURT:  Yeah, if you lay some foundation I'll let
14   that in --
15          MR. DELOZIER:  Okay.
16          THE COURT:  -- based upon what you just told me.
17          MR. DELOZIER:  Yes.
18          THE COURT:  Okay.
19
20             (The following proceedings were held in open
21   court:)
22
23          THE COURT:  Mr. DeLozier?
24          MR. DELOZIER:  Thank you.
25   / / / / /
```

```
 1   BY MR. DELOZIER:

 2          Q.    Did you ever hear Joe use any nicknames or

 3   refer to her other than "Wendi"?

 4          A.    Yes.

 5          Q.    And what were some of those names?

 6          A.    The one most common was "shit brown eyes".  He

 7   also would, especially when he was upset and sometimes when

 8   he wasn't, he -- he would say -- you said I didn't have to

 9   say this word -- but he'd call her --

10          MR. MARTINEZ:  Objection.  Beyond the scope of the

11   question.  Those are not nicknames.

12          THE COURT:  Overruled.  Go ahead and answer the

13   question if you can.

14          THE WITNESS:  He would call her an F-ing bitch or GD

15   stupid blonde, and this wasn't necessarily in the context of

16   being angry.

17          MR. MARTINEZ:  Objection.  Narrative.

18          THE WITNESS:  He would do it any time.

19          THE COURT:  Sustained.  Ask your next question.

20   BY MR. DELOZIER:

21          Q.    Were there other names he used?

22          A.    Yes.

23          Q.    What were they?

24          A.    F-ing whore.  Stupid.  He would tell her

25   that --
```

1           MR. MARTINEZ:  Objection.  Lack of foundation.

2           THE COURT:  Sustained.  Ask your next question.

3    BY MR. DELOZIER:

4           Q.    Any additional names?

5           A.    Yes.

6           Q.    What were they?

7           MR. MARTINEZ:  Objection.  Hearsay, lack of

8    foundation.

9           THE COURT:  Overruled.  Go ahead and answer the

10   question if you can.

11          THE WITNESS:  Fat F-ing bitch.  He --

12   BY MR. DELOZIER:

13          Q.    Okay.  Now, did they move from this little

14   house at some point during -- in between these surgeries,

15   second and third, that they had while she was working at the

16   hospital?

17          A.    Yes.

18          Q.    When did they move?

19          A.    They were only in that -- that home for maybe

20   six months and then they moved out to some -- a property that

21   Joe's parents owned.  It was like a -- it had been a shop on

22   a back end of a -- a shop office on the back end of a house

23   that had been converted.

24          Q.    Sorry.

25          A.    A home office on the back end, a shop that had

1    been converted.

2         Q.    Did you tell us when that was?

3         A.    That would have been in 9 -- I believe that was

4    in '94.

5         Q.    Did you think they moved to the little

6    farmhouse in '94?

7         A.    I believe so.  I know they didn't live in the

8    nice house very long.  They only lived there six, seven

9    months at the most.

10         Q.    All right.  So when they moved there, where was

11    Wendi working?

12         A.    At the hospital.

13         Q.    Okay.  They moved to the farmhouse while she

14    was there at the hospital?

15         A.    Yes.

16         Q.    When did she stop working at at the hospital?

17         A.    I believe in 1996.

18         Q.    All right.  So '96 is when they bought Accu

19    Glass business with the partner, right?

20         A.    Correct.

21         Q.    So did she work in that business?

22         A.    Yes, she did.

23         Q.    Okay.  So he was working in it, Wendi was

24    working in it.  Was the partner working in it too?

25         A.    No, he was more of a silent partner.

```
 1          Q.    Okay.  Do you know how long they lived at that
 2    little -- little farmhouse, I guess I'll call it?
 3          A.    I believe sometime in '94 until May of 1998.
 4          Q.    May of '98?  Okay.  So that's fairly, what,
 5    three, four years?
 6          A.    Yes.
 7          Q.    Okay.  Did you ever go to that apartment --
 8    that little farmhouse?
 9          A.    Yes.
10          Q.    Did you have meals with them at that farmhouse?
11          A.    Yes.
12          Q.    Did you see any episodes of physical violence
13    while you were with them at that house?
14          A.    Just pushing around and things like that.
15          Q.    And name calling?
16          A.    Name calling, definitely.
17          Q.    Did you see any evidence of any violence that
18    might have taken place when you weren't there?
19          MR. MARTINEZ:  Objection.  Lack of foundation, how
20    she --
21          THE COURT:  Sustained.
22    BY MR. DELOZIER:
23          Q.    Did you see any holes in the walls?
24          A.    I saw a hole in the door.
25          Q.    Okay.
```

```
 1              MR. DELOZIER:  Excuse me, Your Honor.
 2     BY MR. DELOZIER:
 3         Q.    Can you please describe the damage you saw to
 4     the door?
 5         A.    It was an indention in the door about the size
 6     of a fist or a -- about the size of a fist.
 7         Q.    Wendi still driving the old Dodge by this time?
 8         A.    She was still -- yes.
 9         Q.    Okay.  And at what point did she stop using --
10     driving the Dodge?
11         A.    At some point they bought a new car.  Joe was
12     driving a truck that they had, I believe, had traded Wendi's
13     car in, the Lumina that I mentioned earlier and --
14              MR. MARTINEZ:  Objection.  Narrative.
15              THE COURT:  Sustained.  Go ahead.  Ask your next
16     question.
17     BY MR. DELOZIER:
18         Q.    You mentioned that she had a Lumina?
19         A.    Yes.
20         Q.    What happened to it?
21         A.    It was traded in for a full size pickup.
22         Q.    Okay.  And what was Wendi driving after she
23     traded in the Lumina?
24         A.    Joe would take her to work until we gave them
25     the Dodge to use.
```

```
 1              MR. MARTINEZ:  Objection.  Nonresponsive.
 2              THE COURT:  Sustained.  Restate the question
 3    BY MR. DELOZIER:
 4         Q.    Do you know how he got from place to place
 5    after she traded in the Lumina?
 6         A.    Yes.
 7         Q.    What was that?
 8         A.    Joe would take her back and forth to work.
 9         Q.    Okay.  At what point in time did she get
10    another vehicle or go back to using the old Dodge?
11         A.    They bought a new car.  Wendi and Joe bought a
12    new car.
13         Q.    This is what year?
14         A.    I'm not sure.
15         Q.    How long had they been married?
16         A.    They'd been married a couple years.
17         Q.    He's doing the windshield business and she's
18    working at the hospital?
19         A.    Yes.
20         Q.    Am -- are my facts right?
21         A.    Yes.
22         Q.    All right.  So they now have two new cars?
23         A.    Yes.
24         Q.    Okay.  What happened -- do you know if they
25    kept both of them?
```

1          A.     No.

2          Q.     What -- when did one of them leave or what did

3     they do with it?

4          A.     One of them --

5          MR. MARTINEZ:  Objection.  Narrative, hearsay.

6          THE COURT:  Sustained.  Rephrase the question.

7     BY MR. DELOZIER:

8          Q.     Do you know if they traded either one of them

9     in for another vehicle?

10         A.     Yes.

11         Q.     What happened to it then?

12         MR. MARTINEZ:  Objection.  Hearsay.

13         THE COURT:  Overruled.  Go ahead and answer the

14    question if you can.

15         THE WITNESS:  It was stolen.

16         MR. MARTINEZ:  Objection.  Hearsay.  She wasn't

17    there, Your Honor.  She doesn't know.

18         THE COURT:  Overruled.  Go ahead.  Ask your next

19    question.

20    BY MR. DELOZIER:

21         Q.     Now, we're up to '96, I think.  The third

22    surgery is when?

23         A.     The third surgery was in February of '97.

24         Q.     February of '97?  Okay.  What did they do in

25    '96?  What was Wendi's life like in '96?  Where was she

1    working?

2         A.    In '96 she was trying to help Joe with his

3    business, the windshield business, and then she was helping

4    him in the Accu Glass business.

5         Q.    Okay.  So most 'of 96 they were both in that

6    business?

7         A.    Yes.

8         Q.    Okay.  All right.  And they were living at the

9    farmhouse?

10        A.    Yes.

11        Q.    Okay.  Why don't we -- since you mentioned

12   Christmas a little bit ago, why don't we discuss if you know

13   up to this point in '96, what Christmas was like, holidays

14   were like at Joe and Wendi's home?

15        A.    They -- they would spend Christmas Eve with us

16   and usually would go, except one year when they were in

17   Florida, but they would normally go with Alejo, Brandon and I

18   to Christmas service at the church early in the morning and

19   come back and spend some time with us and then go over to his

20   parents.  They -- Wendi would -- you asked me what it was

21   like or --

22        Q.    Uh-huh.

23        A.    Wendi would put up Christmas things.  She loved

24   Christmas because we didn't have Christmas for a lot of

25   times, but they never put up a tree, a Christmas tree.  Alejo

1    and I would volunteer to by them a tree, but --

2                MR. MARTINEZ:  Objection.  Narrative, relevance.

3                THE COURT:  Sustained.

4    BY MR. DELOZIER:

5         Q.    Are there things that one normally associates

6    with Christmas that were not present?

7         A.    Yes.

8         Q.    And what were they?

9         A.    Christmas tree.

10        Q.    Okay.  Do you know why they didn't have one?

11               MR. MARTINEZ:  Objection.

12               THE WITNESS:  No.

13    BY MR. DELOZIER:

14        Q.    Up to this point in time did -- had Joe ever

15    done anything in your presence that threatened you, talking

16    up to '96?

17        A.    I -- yes.

18        Q.    What was it?

19        A.    I went to the lake a number of times with Joe

20    and Wendi and some of their friends, and one of the things

21    that would frighten me would be like on the way up there and

22    how he drove because it was scary driving up to Apache lake

23    and -- and we'd have these great big barrels of fuel and

24    stuff on the back and cans of nitrous oxide, and it was just

25    kind of scary all that stuff flying around.  And normally he

```
 1    was drinking.  Joe was actually a lot of fun when he was

 2    drinking, but he was scary.

 3              MR. MARTINEZ:  Judge, I'm going to ask the previous

 4    comment be stricken based on what she said earlier about him

 5    being fun, drinking, that sort of stuff.

 6              THE COURT:  I'll sustain the objection.  That last

 7    portion will be stricken.

 8    BY MR. DELOZIER:

 9         Q.    Okay.  So up to 1996, right, those are the

10    that's only thing you recall that he did was driving fast?

11         A.    Driving fast and -- yeah.

12         Q.    Okay.  Were you able to observe Joe around

13    animals?

14         A.    Yes.

15         Q.    What did you observe?

16         A.    I saw him --

17              MR. MARTINEZ:  Objection.  Lack of foundation, date

18    and time.

19              THE COURT:  Sustained.  Lay some foundation.

20    BY MR. DELOZIER:

21         Q.    Okay.  When did you -- when did you observe

22    what you were -- an episode regarding an animal that you were

23    going to relate?

24         A.    Okay.  Sometime in 1996 I observed Joe shoot

25    Max, Wendi's dog, with a BB gun.
```

```
1           Q.    Anything else?  Any other episode?

2           A.    I've also seen him kick dogs.

3           MR. MARTINEZ:  Objection.  Lack of foundation as to

4     time.

5           THE COURT:  Lay some foundation.

6     BY MR. DELOZIER:

7           Q.    When was that?

8           A.    In 1996 I observed him kick Max, and later on

9     in '98, I believe it was, I observed him kicking Chewy, his

10    dog.

11          Q.    Up to 1996, right, and is it in early part of

12    '96 that was the third surgery.  Do I have my years right?

13          A.    '94, '95, then February of '97.

14          Q.    February '97?  Okay.

15          A.    Yes.

16          Q.    So we finished '96, trying to run the Accu

17    Glass business, Joe's windshield business, working together,

18    and living in the farmhouse, correct.

19          A.    Yes.

20          Q.    Okay.  So by February 1997 -- yeah 1997, where

21    are they living?

22          A.    The house attached to the shop.

23          Q.    Farmhouse?

24          A.    Farmhouse.

25          Q.    Okay.  So did I ask you who paid for the second
```

1    surgery?

2         MR. MARTINEZ:  Objection.  Relevance.

3         THE WITNESS:  No.

4         THE COURT:  The question was whether he asked you

5    that question.  It was a "yes" or "no" question.  Can you

6    answer that question?

7         THE WITNESS:  No.

8    BY MR. DELOZIER:

9         Q.    Do you know how it was paid for?

10        MR. MARTINEZ:  Objection.  Relevance.

11        THE COURT:  Overruled.  You can answer the question

12   if you know.

13        THE WITNESS:  Again, that was paid through Wendi's

14   insurance through her work.

15   BY MR. DELOZIER:

16        Q.    Okay.  We're up to February of 1997 and Nicolas

17   is still on the way?

18        A.    Yes.

19        Q.    Okay.  Just so we don't get confused, where did

20   this surgery take place?

21        A.    The third surgery took place at Tucson General.

22        Q.    Tucson General, same people involved in the

23   operations, same doctors?

24        A.    I believe that -- I'm not sure, but I believe

25   the same doctor from the second surgery was involved.

```
 1              Q.      Okay.  And how did that one go?

 2              A.      That one was more intensive.

 3              Q.      What does that mean?

 4              A.      He was under the knife longer.  He was in

 5      surgery longer.

 6              Q.      Uh-huh.

 7              A.      He had a longer recovery.

 8              Q.      Did he require more extensive treatment after?

 9              A.      Not so much on -- no.  Pretty much the same,

10      you know, cleaning the -- cleaning the site and changing the

11      dressings.

12              Q.      Okay.  And what was the diagnosis after the

13      third, if you know?

14              A.      They kept saying it was benign.

15              Q.      Okay.  You saw the photographs a moment ago

16      that we showed, Exhibit 420 and 421.

17              A.      Yes.

18              Q.      I don't have any exhibits of the third -- after

19      the third surgery, but can you give us a description of what

20      he looked like after the third?

21              A.      The doctor tried to follow along the same scar

22      as the second surgery so that it -- it wouldn't be so bad,

23      but you could definitely see more of an indentation, you

24      know, in his -- in his chin or in this area right here.

25              Q.      Uh-huh.  Now, so you come away from the third
```

1    surgery and the doctor is still saying benign?

2         A.    Yes.

3         Q.    So any changes in Joe or Wendi's behavior?

4         A.    Joe was in a lot of pain and his language was a

5    lot more abusive towards anybody.  He was angry.

6         Q.    So did he treat you differently?

7         A.    He -- he would be a little bit more short, but

8    I -- I'd say no, not really, because we were -- we were

9    close.  I had a lot of good times with him.

10        Q.    You guys took vacations together?

11        A.    Yes.

12        Q.    What were some of the places you went, would

13   go?

14        A.    We went to Sedona and we also went to Lake

15   Tahoe for a vacation.  I had been to New Mexico with him.  It

16   was a racing trip and we would do weekends, you know, go to

17   boat races or go to Apache Lake.  And also fourth of July to

18   Laughlin for the fireworks and to take the boats.

19        Q.    You say boats.  Was there more than one?

20        A.    Well, Joe had two boats and some of his friends

21   had boats.

22        Q.    Okay.  So it's sort of a group outing?

23        A.    Yes.

24        Q.    And of your family who would go?

25        A.    It would depend.

1          A.      Sometimes it would be Brandon and I, sometimes

2     it would be Alejo and Brandon, sometimes it would be all

3     three of us, depending you know, what was going on and what

4     time of year it was, you know, for work.

5          Q.      Up to this point, Wendi and Joe didn't have any

6     children, so it's just the two of them?

7          A.      Correct.  Well, when we went to Sedona they had

8     Nicolas and that's where Ashley was started.  Then when we

9     went to Lake Tahoe we had -- they had Nicolas and Ashley.

10         Q.      Okay.  So about how often would you folks make

11    these trips?

12         A.      Well, as far as like going to the lake or that,

13    maybe a couple times of year we would go up to the lake with

14    them.

15         Q.      Okay. How about the extended trips to Sedona

16    and so forth?

17         A.      Those weren't -- let's see.  The one to Sedona

18    was in '97 and one to Tahoe was '99.

19         Q.      And Laughlin?

20         A.      Laughlin, to be honest, I can't remember which

21    years, but it was several years that we went on the fourth of

22    July.

23         Q.      More than one?

24         A.      More than one.

25         Q.      Okay.  Now we're in '97, this is early '97,

```
 1    though, right?  And Joe had a lot of pain and took a longer
 2    time to recover --
 3            A.    Yes.
 4            Q.    -- I think you said.  By this time Accu Glass
 5    is history?
 6            A.    That's correct.
 7            Q.    Okay.  And they're living in the farmhouse?
 8            A.    Yes.
 9            Q.    How are they supporting themselves?
10            A.    Alejo and I were paying a number of Wendi and
11    Joe's bills.  They'd bring me the utility bills, things like
12    that, different things, and I would pay for them.  I also put
13    money until they were -- I put down like 2500 for Nicolas for
14    the doctor because the doctor wouldn't --
15            MR. MARTINEZ:  Objection.  Narrative.
16            THE COURT:  Sustained.
17    BY MR. DELOZIER:
18            Q.    We're talking about the expenses and I'm asking
19    you specific examples of the kinds of things that you
20    assisted with?
21            A.    Okay.
22            Q.    Okay.  And, for example, how was the third
23    surgery paid for?  And they were out of the Accu Glass
24    business, and how did that get paid for?
25            A.    That was paid for through AHCCCS and I believe
```

1    that we -- my husband and I gave them money for the hospital

2    so they could get in because they wouldn't take just AHCCCS.

3    They needed cash, too.

4         Q.    Okay.  So after the surgery then we have a

5    period of convalescence where Joe's unable to work?

6         A.    Correct.

7         Q.    Wendi is not working because she's been working

8    in the glass business?

9         A.    And she was very pregnant.

10        Q.    Okay.  Thank you.  When -- when was Nicolas

11   born?

12        A.    Nicolas was born on June 20th, 1997.

13        Q.    Okay.  Were you able to observe the

14   relationship between Nicolas and Joe?

15        A.    Yes.

16        Q.    And how was it -- let's talk about birth the

17   first year, age 1?

18        A.    Okay.  Joe was -- well, he didn't like to

19   change -- he wouldn't change diapers in that first year

20   because it was messy.  If you would ask Joe to hold the baby,

21   you know, he would hold the baby, but he didn't want to take

22   him anywhere by himself.  He was proud of him, he had a

23   little boy.

24        Q.    So did he play with him?  Read books to him,

25   play toys with him, any of those kinds of activities --

1          A.     Not in the first --

2          Q.     -- that you saw?

3          A.     Not in the first year.

4          Q.     Okay.  So the change you saw, after the third

5     surgery was it, that he was more angry?

6          A.     He was more angry.

7          Q.     Did you see any acts of physical violence

8     toward Wendi during that period of time after the third

9     surgery?

10         A.     Just verbal abuse was more so -- he would be

11    yelling at her to do things for him and -- and, you know, she

12    already was doing lots of things for him, but he was a lot

13    more demanding --

14         Q.     Okay.

15         A.     -- of everyone.

16         Q.     At some point in time Wendi took a job?

17         A.     Wendi -- are you talking outside?

18         Q.     From the time Accu Glass was over and Joe had

19    his third surgery, at some point in time she was employed

20    again, wasn't she?

21         A.     Yes.  Well, she tried to do some at home-type

22    businesses to bring money in, sales, you know, type things.

23         Q.     What was her next job outside the home then?

24         A.     She took a job in May of 1998 at Courtyard

25    Apartments.

```
 1            Q.    That's approximately a year after Nicolas is
 2      born?
 3            A.    That was a year after Nicolas was born and she
 4      was pregnant with Ashley.  And the -- she needed a job
 5      because they needed insurance to cover the birth.
 6            Q.    And you said a moment ago you had to assist
 7      with the cost of Nicolas's birth?
 8            A.    Yes.
 9            Q.    Did you have an agreement with Wendi after
10      Nicolas was born?
11            A.    From the -- yes.
12            Q.    What was it?
13            A.    It was that we told them that, you know, Wendi
14      would stay home whenever they had their first child, if she
15      could stay home for a year we would help them, you know, with
16      bills.
17            Q.    Okay.  And did you?
18            A.    Yes.
19            Q.    What were they driving at this point in time?
20            A.    When Nicolas was born, it was a -- a blue or
21      green pickup truck, fairly new, Chevy.
22            Q.    That same one they bought in '94?
23            A.    I believe so.
24            Q.    Okay.  So they had one pickup truck?
25            A.    Yes.
```

1      Q.      Okay.  Was there a point in time after this

2   third surgery that Joe became employed again?

3      A.      I think he might have been like -- not really.

4   He might have been doing like windshields on the side or I

5   think he would go to -- I don't remember, but I think he

6   would go to Tucson and work for a friend of his that was

7   painting on the side.

8      Q.      Okay.  Now, how old was Nicolas when Ashley was

9   born?

10     A.      They're 15 months apart.  He's 15 months.

11     Q.      So that would put us into '98?

12     A.      Yes.

13     Q.      In what, September?

14     A.      September 16th of 1998 is when Ashley was born.

15     Q.      Okay.  Nicolas birth again was?

16     A.      June 20th, 1997.

17     Q.      Okay.  So between age 1 and 2 for Nicolas, did

18  you have -- were you able to visit with Joe and Wendi when

19  Nicolas was present?

20     A.      Yes.

21     Q.      And did you -- were you able to notice the

22  relationship between Joe and Nicolas during that period of

23  time?

24     A.      Yes.

25     Q.      And what did you notice?

```
 1              MR. MARTINEZ:  Objection.  Asked and answered.
 2              THE COURT:  Overruled.
 3    BY MR. DELOZIER:
 4         Q.    This is between age 1 and 2.
 5         A.    Right.
 6         Q.    Between age 1 and 2.
 7         A.    Okay.  Between age 1 and 2 as -- as Nicolas got
 8    older and was walking, he would follow his dad around and
 9    he -- he would go out into the shop by the area where Joe
10    would be working on boats or whatever like that.
11              One of the things that I observed was that Joe
12    thought it was real funny when Nicolas would slap his mom,
13    and I didn't think that was appropriate and mentioned that.
14    But he still wasn't really taking him too many places yet
15    because of the diaper situation, you know.  As long as he was
16    in diapers, he didn't really want to have to do that.
17         Q.    He was really proud of him though, wasn't he?
18         A.    Oh, he was so proud of him.  And --
19              (Pause in proceedings.)
20    BY MR. DELOZIER:
21         Q.    Take your time.
22         A.    And Nicolas looks like him, like his dad.
23         THE COURT:  This will be a good time to take our
24    afternoon break.  We'll take our break at this time.
25              During this break remember the entire
```

1   admonition I gave you including the fact you're not to

2   discuss this case with anyone, do not let anyone discuss the

3   case with you, keep an open mind during the break.  We'll see

4   you in 20 minutes.

5

6                    (Recess.)

7

8            THE COURT:  This is CR 2000-096032, State of Arizona

9   versus Wendi Elizabeth Andriano.  The record will reflect the

10  presence of the Defendant, Counsel and the jury.  Donna Ochoa

11  is on the witness stand.  And we'll continue with the

12  redirect -- sorry, direct examination by Mr. DeLozier.

13           MR. DELOZIER:  Thank you, Your Honor.

14

15  CONTINUED DIRECT EXAMINATION BY MR. DELOZIER:

16           Q.    Now, Donna, you've known Joe now for, what, was

17  it early '92?

18           A.    Middle of '92.

19           Q.    Okay.  Middle of '92, so we're in the middle of

20  '97, so it's five years or so.

21           A.    Yes.

22           Q.    Right?

23           A.    Yes.

24           Q.    You had an opinion when you first met him about

25  what his reputation was in the community.  Has that changed?

1    It's a yes or no.

2              A.    Yes.

3              Q.    Okay.  On what basis?

4              A.    On the basis of our conversation that I had

5    with my son-in-law.  We were going up to Phoenix.  This would

6    have been after his --

7              MR. MARTINEZ:  I'm going to object on the grounds of

8    hearsay.

9              THE COURT:  Let me see Counsel here at the bench.

10

11             (The following proceedings were held at the

12   bench:)

13

14             THE COURT:  Where she's going isn't proper.

15   Reputation --

16             MR. DELOZIER:  Yes, it is.  Is that your --

17             THE COURT:  -- isn't proper.

18             MR. DELOZIER:  It's proper, yes.  Oh, sorry.  I

19   thought you were asking.

20             THE COURT:  It's not proper.

21             MR. DELOZIER:  Something she witnessed.

22             THE COURT:  Are you going into specific --

23             MR. DELOZIER:  Yes.

24             THE COURT:  -- conduct?  Okay.  Because sounds like

25   you asked her about reputation and now she was going to go

1    into something he said --

2          MR. DELOZIER:  Okay.

3          THE COURT:  -- which I don't think is appropriate.

4          MR. DELOZIER:  Okay

5          THE COURT:  Are you going into some specific conduct

6    as far as showing --

7                (Attorney-attorney discussion.)

8          MR. DELOZIER:  Yes.  Yes, it's -- it's conduct.

9    That's what I was -- what I was going to say and the offer

10   that I'll make is she's going to say he threatened to kill

11   somebody.

12         MR. MARTINEZ:  But that's not a reputation.  That's

13   an instance.  I mean, he's asking her about the reputation.

14   That's something that you hear about in the community.  If he

15   wants to ask her about a time when he may or may not have

16   threatened to kill somebody and she communicated that to the

17   defendant, then it comes in, but other than that, it does

18   not.

19         THE COURT:  Because the way you asked it.  You

20   asked --  you said something to the effect did you have --

21   did your opinion of his reputation in the community change.

22         MR. DELOZIER:  Right.

23         THE COURT:  Okay.  Then she said yes, then you said,

24   well, how did it change?  Now she's going into that specific

25   instant, okay?  That has nothing to do with reputation.

```
 1              MR. DELOZIER:  I understand.
 2              THE COURT:  Sounds like you're going into a specific
 3    instance where he made a threat and this -- I guess you're
 4    going to tie it up to some other time that your client was
 5    aware of this threat.
 6              MR. DELOZIER:  Uh-huh.
 7              THE COURT:  Okay, then.  That's fine.
 8              MR. DELOZIER:  Okay.
 9              THE COURT:  Make it clear it's not --
10              MR. MARTINEZ:  Judge, just so we're clear, and he
11    doesn't have to do it this way, but I would ask whatever the
12    predicate question is, do you remember an instance of conduct
13    and then did you relay that to the defendant, rather than
14    having her go right into it and have her say no, I didn't.
15              MR. DELOZIER:  Okay.  No problem.
16              THE COURT:  Yeah.  If you're going, like we discussed
17    previously, if you go into the reputation, it should be
18    something to the effect of have you heard the reputation --
19              MR. DELOZIER: Um-hmm.
20              THE COURT:  -- and then what the opinion, do you have
21    an opinion concerning whether Mr. Andriano or whatever.
22              MR. DELOZIER:  Okay.
23              THE COURT:  Ask it in that fashion --
24              MR. DELIZIER: okay.
25              THE COURT:  -- so it's clear.
```

```
 1              MR. DELOZIER:  Very good.  Thank you.

 2

 3              (The following proceedings were held in open

 4      court:)

 5

 6              THE COURT:  Mr. DeLozier?

 7      BY MR. DELOZIER:

 8         Q.    Was there a specific instance that you were

 9      with Mr. Andriano and that you -- and you relayed that

10      instance to his wife, Wendi, that bothered you?

11         A.    Yes.

12         Q.    And about when was that?

13         A.    That would have been in the Spring of 1997.

14         Q.    And what was that instance?

15         A.    It was -- I relayed the fact that I'd had a

16      conversation where --

17         Q.    What was the instance?  What did he --

18         A.    Joe was very angry, upset.  He appeared to be

19      highly agitated and said that he was going to kill someone.

20         Q.    And you related that to Wendi?

21         A.    Yes, I did.

22         Q.    And who was he threatening to kill?

23         A.    His ex-partner, Jerry.

24         Q.    That's Jerry from the Accu Glass business?

25         A.    That was Jerry from the Accu Glass.
```

```
 1           Q.   Now, you've watched this family, if you will,
 2      Wendi and Joe now, for 5 years, as a mother and a
 3      mother-in-law, right?
 4           A.   Yes.
 5           Q.   And then you knew them before they were
 6      married, or knew Joe before he was married?
 7           A.   Yes.
 8           Q.   Do you have an opinion about who was in control
 9      in that family?
10           A.   Joe was in control of the family.  There's no
11      doubt about that.  He's the one that made the decisions.  He
12      even made the decision about where to have their reception
13      and things like that.  He made the decisions what cars to buy
14      and --
15           Q.   How about people that could be in the wedding?
16           MR. MARTINEZ:  Objection.  Hearsay.
17           THE COURT:  Sustained.
18      BY MR. DELOZIER:
19           Q.   Do you know if he made a decision or choice or
20      about who could actually participate in the wedding?
21           A.   Yes, he did.
22           Q.   And -- okay.  The -- in '97 Nicolas was born.
23      Am I right again?
24           A.   That's correct.
25           Q.   Okay.  And that was in which month?
```

1           A.      That was in June.

2           Q.      Okay.  And we talked about that was after the

3     third surgery, right?

4           A.      Correct.

5           Q.      Okay.  And we -- we had seen -- let me rephrase

6     that.  Did you see changes in Joe after the third surgery?

7           MR. MARTINEZ:  Objection.  Asked and answered.

8           THE COURT:  Sustained.

9     BY MR. DELOZIER:

10          Q.      You answered that one.  I apologize.  Did he

11    treat Wendi any differently after the third surgery?

12          MR. MARTINEZ:  Objection.  Asked and answered.

13          THE COURT:  Sustained.

14    BY MR. DELOZIER:

15          Q.      At some point in time there was a fourth

16    surgery?

17          A.      Yes, there was.

18          Q.      Okay.  When was that?

19          A.      That was in 1998.

20          Q.      Do you remember what month?

21          A.      August.

22          Q.      What led Joe to believe that he needed another

23    surgery in -- in August of 1998, if you know?

24          A.      Yes, I do.

25          Q.      What is it?

1          A.     Well, he was told that he needed to have

2     surgery.

3          Q.     Are these the same people that had done the

4     first three?

5          A.     No.

6          Q.     So he went to someone different?

7          A.     Yes, he did.  He went to a physician to have it

8     checked out because he was in pain again and he could -- he

9     could feel the bumps, lumps, whatever you want to -- however

10    it was described, but he could feel the growth coming back

11    and he was in a lot of pain.  So he went to a physician in

12    Tucson and he was -- the doctor, you know, took x-rays of him

13    and discovered that he had spots on his lungs as well as the

14    growth again.

15         Q.     Okay.  And that -- that led to the surgery in

16    August of '98?

17         A.     Yes.

18         Q.     Now, Wendi's working now?

19         A.     Yes.

20         Q.     Have they moved out of, and I probably misnamed

21    it when I said "farmhouse."  Tell me a little bit more about

22    what that place looked like?

23         A.     It was -- well, if you went down a dirt road,

24    got out on the field and when you first saw it, you'd see

25    this great big huge like tall shed with the metal, you know,

1   that equipment like columbines or something could fit under.

2   And then along the, I believe it's the west length which

3   would be like the long side of the rectangle was what had

4   been a building -- it was a building I guess, -- that had

5   been part of the shop, like an office and stuff, and I

6   believe part of it had been converted for Joe's younger

7   brother.  So it had a kitchen and a bathroom and a living

8   room, and there was another room that at the time had been

9   filled with stuff and -- and my husband actually helped them

10  move things and he laid carpet down and there was a bed

11  room.  So it was like -- almost like a trailer where it was

12  one long length --

13          Q.    Okay.

14          A.    -- attached to the shop.

15          Q.    Okay.  Now, from the third surgery to the

16  fourth surgery was anybody working in the family?

17          A.    After this third surgery, Joe pretty much

18  stayed home with Wendi while, you know, she was pregnant then

19  had the baby and that's when we were helping them out

20  financially.  Like I said, I believe he may have gone and

21  done some work for a couple of his friends in Tucson, but

22  that was usually under the table where he was paid.  He

23  wasn't drawing a paycheck or anything.  And then --

24          MR. MARTINEZ:  Objection.  Hearsay.  Lack of

25  foundation how she knows.

```
 1              THE COURT:  Ask your next question.
 2   BY MR. DELOZIER:
 3         Q.    So was Wendi working?
 4         A.    Wendi began working in May, the end of May of
 5   1998.
 6         Q.    May 1998.  Is that before Ashley's born?
 7         A.    That was before Ashley was born.
 8         Q.    And Nicolas is now, what, 8, 9 months?
 9         A.    He's about 11 months old.
10         Q.    11 months old?  And where did she go to work?
11         A.    She went to work as a manager at Courtyard
12   Apartments in Casa Grande.
13         Q.    And did they provide an apartment for them to
14   live in?
15         A.    Yes, they did.  They provided them with a
16   two-bedroom apartment.
17         Q.    So they were able to move out of the --
18         A.    Yes.
19         Q.    -- okay, the farm property?
20               Do you know about when they moved into that
21   facility?
22         A.    Probably right after Memorial day, right around
23   the first of June.
24         Q.    '98?
25         A.    '98.
```

1          Q.    Okay.  During this five, six-year period, are

2     there still lake activities going on?

3          A.    Oh, yes.

4          Q.    Did you --

5          A.    Joe loved the lake.  He loved boats.  He wanted

6     to be a professional boat race driver, so second best -- he

7     had his boats.  At the time, I think, Nicolas was born, there

8     were two boats and -- beautiful race boats.  They both ran on

9     nitrous, which makes them go really, really fast.

10         Q.    Well --

11         A.    Also fuel, but he would add a nitrous oxide

12    bottle to it and --

13         Q.    So when you say really, really fast, I'm not a

14    boater so I don't know.  What do you mean?

15              MR. MARTINEZ:  Objection.  Relevance.

16              THE COURT:  Sustained.

17    BY MR. DELOZIER:

18         Q.    Well, it took -- when he's driving the boat,

19    okay, it's not like you're cruising around in a little

20    fishing boat, right?

21              MR. MARTINEZ:  Objection.  Relevance.

22              THE COURT:  Sustained.

23              MR. DELOZIER:  Can we approach?

24

25              (The following proceedings were held at the

```
 1    bench:)

 2

 3           MR. DELOZIER:  They've raised the issue that he was

 4    very weak at the end.  What I'm trying to demonstrate is he

 5    was not.  These boats went over 100 miles an hour and it took

 6    a great deal of strength to control them.  He was up there

 7    quite often.

 8           THE COURT:  Mr. Martinez?

 9           MR. MARTINEZ:  He was weak at the time.  Before that

10    he could be boating around, wherever.

11           MR. DELOZIER:  What we're doing is the same

12    foundational stuff.

13           THE COURT:  I don't think it's relevant.  You were

14    talking about the time frame of --

15           MR. DELOZIER:  Before the fourth surgery.

16           THE COURT:  I don't think it's relevant, okay?  I

17    wasn't sure where you were going.  I don't think it's

18    relevant.  Let's move on.

19

20           (The following proceedings were held in open

21    court:)

22

23           THE COURT:  Ask your next question.

24    BY MR. DELOZIER:

25           Q.    After the third surgery, did you notice any
```

1    decrease in Joe's physical abilities?

2         A.    No.

3         Q.    And so he was still going to the boat -- I

4    mean, to the lake frequently?

5         A.    He was -- oh, yes.  He was still going to the

6    lake frequently.  And one of the things he had to do was take

7    a --

8         MR. MARTINEZ:  Objection.  Nonresponsive.

9         THE COURT:  Just answer the question that's asked.

10   Ask your next question.

11   BY MR. DELOZIER:

12        Q.    How many times a month would he be going to the

13   lake, if you know?

14        A.    In the summertime, three or four times a month.

15        Q.    Okay.  Now, this is '97 after the third surgery

16   or '98?

17        A.    Yes.

18        Q.    Okay.  Did Wendi go with him?

19        A.    On occasion.

20        Q.    How about Nicolas?  He was a little baby at

21   this point.  Did he get to go?

22        A.    Yes.

23        Q.    So when she went, he went.  Is that what you

24   mean?

25        A.    Yes.

1          Q.     Okay.  And you went how many times a year?

2          A.     Depending on how many times I could get off

3     because Joe would leave on a Friday and not come back until

4     Sunday and I would have to work.  Quite a bit at the time.  I

5     went quite a few times.

6          Q.     Uh-huh.  Can you tell us a little about how the

7     weekend would go.  Where did you sleep?  What did you do?

8          MR. MARTINEZ:  Objection.  Relevance.

9          THE COURT:  Sustained.

10    BY MR. DELOZIER:

11         Q.     Did you stay out all weekend?

12         A.     Yes.

13         Q.     Okay.  Was there any alcohol consumed?

14         MR. MARTINEZ:  Objection.  Relevance.

15         THE COURT:  Sustained.

16    BY MR. DELOZIER:

17         Q.     During these outings, did you have an occasion

18    to see Joe drunk?

19         A.     Yes, I did.

20         MR. MARTINEZ:  Objection.  Relevance.

21         THE COURT:  I'll sustain the objection.

22    BY MR. DELOZIER:

23         Q.     Did you have any occasion to see any violence

24    on any of these occasions?

25         A.     Yes.

1          Q.    What did you see?

2          A.    One time --

3          MR. MARTINEZ:  Objection.  Lack of foundation, days

4     and time.

5          THE COURT:  I'll sustain the time.  Lay some

6     foundation.

7     BY MR. DELOZIER:

8          Q.    We're talking about the year 1997, the fourth

9     surgery, so it's -- the period we're referring to is from

10    third surgery to when?  Before the fourth surgery?

11         MR. MARTINEZ:  Objection.  Leading.

12         THE COURT:  Overruled.

13         MR. DELOZIER:  Trying --

14         THE COURT:  Go ahead and answer the question.

15         THE WITNESS:  Okay.  During the summer.

16    BY MR. DELOZIER:

17         Q.    So during that period of time prior to the

18    fourth surgery, after the third surgery, did you see any acts

19    of violence during these trips to the boat -- the boating --?

20         A.    Yes, I did.

21         Q.    What did you see?

22         A.    New Mexico, in the summer, I believe it was

23    August 1997, we were at a boat race.  I went, Wendi went, the

24    baby was there.  The baby was only a couple months old.  We

25    were going to sleep outside and I said I just did not think

1    that was appropriate for the baby, so I rented a room and was

2    yelled at about renting the room to get the baby inside.

3           And then later that night, at boat races people

4    drink and Joe had been drinking, and someone made a comment

5    to him and he started to go after him and Frank had to hold

6    him back.

7        Q.    Was that the only time that you saw anything

8    during that one year period of time?

9        A.    I --

10       Q.    I'm talking about specifically boating

11   activities?

12       A.    Specifically boating activities?

13       Q.    That's it.

14       A.    I would see him get angry at other people if

15   they got into his way when he was, like, pulling the boat out

16   or anything.  He yelled a lot.  Yelled a lot at people.

17       Q.    Now, they're back living at the Courtyard,

18   right?

19       A.    Yes.

20       Q.    Okay.  And Nicolas is approaching one year?

21       A.    Correct.

22       Q.    Wendi's working at that location --

23       A.    Correct.

24       Q.    -- in the apartment there, right?

25       A.    Yes.

```
 1          Q.    And what's Joe doing?
 2          A.    Again, when he was working, he was doing side
 3    jobs, odd jobs.
 4          Q.    Okay.  So coming to the fourth surgery, and
 5    this is August of 1998, I think you testified, correct?
 6          A.    Yes.
 7          Q.    And he had gone to some different doctors.  Do
 8    you know who they were?
 9          A.    I don't recall the doctor's name, but I believe
10    he was on Ironwood or Orange Grove in Tucson --
11          Q.    Okay.
12          A.    -- because I went there.
13          Q.    All right.  Do you know how this surgery was
14    paid for?
15          MR. MARTINEZ:  Objection.  Relevance.
16          THE COURT:  Overruled.  Go ahead and answer the
17    question if you can.
18          THE WITNESS:  This surgery was paid for several
19    different ways.  I need to explain that a little bit better
20    in that I -- I fought for Joe to go to the Mayo Clinic and
21    had to -- because his insurance company, which was Pacificare
22    at the time, did not want to pay for Mayo Clinic the first
23    time he went to the Mayo clinic.  They were told they had to
24    put $500 up front before the doctors would even see him.
25    Wendi and Joe looked over, and it was myself and Alejo, Joe
```

```
 1    and Joe's parents, Mr. And Mrs. Andriano, and Joe said --

 2              MR. MARTINEZ:  Objection.  Relevance.

 3              THE COURT:  Let me see Counsel here at the bench.

 4

 5              (The following proceedings were held at the

 6    bench:)

 7

 8              THE COURT:  Let me ask you something.  I don't have

 9    any problem with her telling us that, hey, this surgery was

10    paid by X persons or whoever insurance company, whatever,

11    because it -- it sounds like you're getting to there was some

12    financial considerations that were brought up as far as their

13    financial situation that might be, I guess, remotely related

14    to what the State's alleging, okay?  But does it matter as

15    far as getting into specifics of all this that she's getting

16    into?

17              MR. DELOZIER:  Well, when --

18              THE COURT:  Do you understand what I'm saying?

19              MR. DELOZIER:  When I ask the question, she's trying

20    to answer it.  I'm not trying to make her draw it out.

21              THE COURT:  I know, but is it something -- what she's

22    going to say, is it something relevant?

23              MR. DELOZIER:  These people had significant financial

24    problems that enhanced their hopelessness.  That's what I'm

25    trying to do.
```

```
 1          THE COURT:  I understand.  That's why I'm allowing
 2   you to go into that, but don't get into every minute detail.
 3          MR. DELOZIER:  Maybe I could say who paid for the --
 4          THE COURT:  Right.  Just ask her.
 5          MR. DELOZIER:  Rather than open ended.
 6          THE COURT:  I'll --
 7          MR. MARTINEZ:  Judge, he's just intending to smear
 8   the mother and father because the whole story they tell to
 9   me, according to them, of course, they were asked or told you
10   have to put up this money -- I think I heard 800 last time
11   during the interview, and they said the Andrianos did
12   nothing.
13          MR. DELOZIER:  I'm not asking that.
14          MR. MARTINEZ:  I'm just telling the Judge,
15          MR. DELOZIER:  That's not what I'm asking.
16          MR. MARTINEZ:  He doesn't know how she's going to
17   answer that and I don't see how that's relevant.
18          MR. DELOZIER:  I agree.  I'm not asking that.
19          THE COURT:  You can get into the amount and where it
20   came from, but leave it at that.  Don't get into the minute
21   details.
22          MR. DELOZIER:  I understand.  Thank you.
23
24              (The following proceedings were held in open
25   court:)
```

1

2          THE COURT:  Mr. DeLozier.

3          MR. DELOZIER: Thank you, Your Honor.

4    BY MR. DELOZIER:

5          Q.    Donna, so and you Alejo put up the money?

6          A.    Yes, we did.

7          Q.    Did Pacificare put -- pay for some of it?

8          A.    Yes, they did.

9          Q.    There was additional funds from Pacificare and

10   there was what you made?

11         A.    Yes, there was.

12         Q.    Did you try to raise the money through benefits

13   or what did you do?

14         A.    There was --

15         MR. MARTINEZ:  Objection.  Nonresponsive, what did

16   she do?

17         THE COURT:  Go ahead and answer the question that he

18   asked you, the specific question he asked you.

19         THE WITNESS:  I was party to some friends that had

20   asked to do a benefit for Joe to raise money.

21   BY MR. DELOZIER:

22         Q.    Showing you what's been marked for

23   identification as Exhibit 431, did you take that photo?

24         A.    Yes, I did.

25         Q.    What is it?

 1          A.     It's a sign outside of the lodge that said "Joe

 2    Andriano Benefit Dinner and Dance, October 30th," and it was

 3    in 1998.

 4          Q.     Okay.

 5          A.     In fact, that was the place they had their

 6    reception.

 7          Q.     Thank you.

 8          MR. MARTINEZ:  I think he's offering that exhibit,

 9    Your Honor.  He hasn't said it.

10          MR. DELOZIER:  I was showing it to you.

11          THE COURT:  Are you offering the exhibit?

12          MR. DELOZIER:  Offer 431 into evidence.

13          THE COURT:  Any objection?

14          MR. MARTINEZ:  Yes, sir.  Relevance.

15          THE COURT:  Exhibit 431 for identification is

16    admitted into evidence.

17    BY MR. DELOZIER:

18          Q.     That's the photograph of Exhibit 431, correct?

19          A.     Correct.

20          Q.     Okay.  That's the photograph that you took?

21          A.     Yes, it is.

22          Q.     That's the benefit that you're referring to?

23          A.     Yes, it is.

24          Q.     Thank you.  Okay.  So now we've financed the

25    surgery, he's had it.  Is that correct?

```
 1          A.     Yes.

 2          Q.     Okay.  And how did it go?

 3          A.     Sadly, it went -- it went sadly.   The

 4   physicians did the best that they could, but the cancer had

 5   already metastisized at Stage IV, which means as -- which

 6   means it had already spread into other organs in his body.

 7          Q.     Okay.  Now, was there any kind of special

 8   things that had to be done for him after this surgery?

 9          A.     Yes.  Very much so.

10          Q.     What were they?

11          A.     During this surgery, they did what's called a

12   radical where they actually take out muscle and -- and tissue

13   and everything all through here, so basically it was just

14   like, just bones.  They went up, took part of his tongue out,

15   up into the roof of his mouth, and the scar went like -- like

16   this way down this far and then far down into the shoulder a

17   little bit.  It had to be dressed -- started out four times a

18   day because you had, to explain it, there was a little bottle

19   that had gauze in it that was like a long string, and it had

20   to be shoved up into his -- the area, now, through an open

21   hole.  They couldn't close it because they needed it to heal

22   from the inside out.  Also, he had to have a trach, which

23   means they had to, you know, put him on the ventilator, they

24   had to put the hole right here so he could breathe.  He went

25   home with -- after they took him off, they took him off
```

1    before they let him go home, and that area had to be taken
2    care of as well.  Joe went home with a feeding tube that
3    entered through his nose and down into his stomach, so he
4    also had to be fed.
5              I didn't have any problem at all taking care of
6    the trach site because that's part of what I do as a
7    respiratory therapist.  The -- I also would feed Joe through
8    the feeding tube three times a day, and my sister, who is an
9    RN, had volunteered to come out, you know, after the surgery
10   and stuff, but she wasn't able to get there for a couple
11   weeks.  I tried to do the -- where you put the gauze in
12   and -- and I couldn't do it, so my husband Alejo did.  And
13   he -- Joe asked him to go -- my husband was taught by the
14   physicians how to do that.  They even gave us equipment from
15   the hospital from the Mayo Clinic to do that because
16   insurance companies unfortunately let people out of the
17   hospital too soon.  I would go over at the beginning four
18   times a day to take care of the trach site and feed Joe
19   through the tube, and my husband was going four times a day
20   to repack the site, and packing the site probably went on for
21   a good six weeks, maybe longer.
22            Q.    Where -- I'm sorry.
23            A.    That's okay.
24            Q.    You finished?
25            A.    Just to say that, you know, my husband and I

1   would both have to leave work, you know, to be able to do

2   those things, but that's something that we wanted to do.

3        Q.    Where did you live in relation to the

4   Courtyard?

5        A.    Maybe two miles.  I worked maybe three miles,

6   four miles from the apartment.

7        Q.    So this Courtyard's in Casa Grande?

8        A.    The Courtyard's in Casa Grande.

9        Q.    Okay.  Because you worked there, and what was

10  Alejo doing as work in those days?

11       A.    Alejo was running the -- the family tortilla

12  shop.  He's the manager at Ochoa's tortillas.

13       Q.    Okay.  Wasn't he also a pastor or something?

14       A.    Yes.  He was also at the same time involved

15  in -- still involved in a church as a youth pastor and

16  performing functions on Wednesdays and Sundays, and then any

17  other times that they would do things with the youth.

18       Q.    Let me show you what's been marked for

19  identification as Exhibit 430 and see if you could tell me

20  what this is.  Did you take that photograph?

21       A.    Yes, I did.  It's a photograph of Joe and

22  Nicolas' godfather, some of the other children.  It was at

23  Nicolas's birthday party at Peter Piper's Pizza and it shows

24  in the picture where you could see the scar on Joe's neck

25  from the fourth surgery.

1          MR. DELOZIER:  Thank you.  Move for admission of

2     Exhibit 430.

3          THE COURT:  Any objection?

4          MR. MARTINEZ:  No, sir.

5          THE COURT:  Exhibit 430 is admitted into evidence.

6          MR. DELOZIER:  Thank you.

7     BY MR. DELOZIER:

8          Q.    Is that the photograph you just identified?

9          A.    Yes, it is.

10         Q.    Okay.  Is that Joe?

11         A.    Yes, it is.  And you can see from the picture

12    how the scar is.

13         Q.    It's hard to tell what angle is the best.  So

14    you're looking at the left shoulder?

15         A.    Looking at the left shoulder --

16         Q.    Left neck?

17         A.    -- and left side of his neck.  You could see

18    there's no longer muscle or -- or fatty tissue there.  And

19    that was approximately -- his surgery was in August of 1998.

20    That would have been June of 1999.

21         Q.    This would have been June 1999?

22         A.    Yes.

23         Q.    Okay.  So we're looking at eight, what, ten

24    months later?

25         A.    Correct.

1        Q.    Okay.   Now, you mentioned that this went --
2   this was -- this one went bad.   Obviously, it was much more
3   radical, but, I mean, what else did you mean when you said it
4   went bad?
5        A.    Because there was no way of knowing if all of
6   the cancer was gotten.   They just -- what they just tried to
7   do was get as much as they could at that time.   They were
8   still concerned that it had traveled up his head because that
9   type of cancer doesn't just always -- it goes from place to
10  place.   In fact, Dr. Green was practically crying when he
11  came out and talked to him.
12       MR. MARTINEZ:   Objection.   Relevance.
13       THE COURT:   Sustained.   Let's move on.
14  BY MR. DELOZIER:
15       Q.    Up to this point in time I thought you told us
16  everyone told you it was benign.   Are you telling me now
17  you're being told something different?
18       A.    Yes.
19       Q.    What were you being told?
20       A.    That it was, again, it was adenoid cystic
21  carcinoma, that it was Stage IV.   After the doctor in Tucson
22  has taken pictures and x-rays and found out there were spots,
23  they did biopsies of the spots.   They were asked to provide
24  slides of the tissue from each of the prior three surgerys,
25  and they were sent to -- Joe's uncle knew somebody who worked

```
 1     for the government, I believe, and they was sent to I believe

 2     Bethesda, Maryland, and the experts there looked at the three

 3     slides and determined that it had been malignant from the

 4     very beginning.

 5            Q.    Okay.  How long after the surgery did you --

 6     did you learn that?

 7            A.    We learned that before the final surgery.

 8            Q.    Oh, you knew it before?

 9            A.    Yes.

10            Q.    Okay.  Did you notice any changes in Joe after

11     this surgery?

12            MR. MARTINEZ:  Objection.  Lack of foundation.  We

13     now have him at the pizza parlor immediately after or two

14     years after.

15            THE COURT:  Why don't you provide more foundation?

16     BY MR. DELOZIER:

17            Q.    Within -- did you say Wendi was pregnant with

18     Ashley --

19            A.    Wendi was pregnant with Ashley, yes.

20            Q.    -- at the time of the fourth surgery?

21            A.    At the time of the fourth surgery, she was

22     pregnant with Ashley, yes.

23            Q.    That was in August, and Ashley was born --

24            A.    September 16.

25            Q.    -- just a month or so later?
```

1          A.     Yes, less than a month.

2          Q.     Right.

3          A.     Yes.

4          Q.     So now we have two babies?

5          A.     Now, we have two babies 15 months apart, a

6    husband who just had major surgery.

7          MR. MARTINEZ:  Objection.  Nonresponsive.

8          THE COURT:  Overruled.  Go ahead and ask the next

9    question.

10   BY MR. DELOZIER:

11         Q.     So we have two babies?

12         A.     Two babies.

13         Q.     Okay.  They're still living at the apartment at

14   the Courtyard?

15         A.     Yes, they are.

16         Q.     Okay.  And you and Alejo are going over several

17   times a day to take care of it, right?

18         A.     Correct.

19         Q.     So let's -- take us up from that period of time

20   until Christmas of 1998.  Did you notice any changes in Joe's

21   behavior during that period of time?

22         A.     Of course he was very depressed because he felt

23   like he was never going to be able to see his children grow

24   up, which basically was a fact, a true fact.  He wanted to,

25   you know, spend time with them.  He took money from the

```
 1    benefit and went to an alternative treatment --
 2              MR. MARTINEZ:  Objection.  Nonresponsive.
 3              THE COURT:  Sustained.
 4    BY MR. DELOZIER:
 5         Q.   What we're talking about now was the things he
 6    did differently.
 7         A.   Okay.
 8         Q.   We'll get into alternative -- what you're
 9    alluding to, what you're addressing a little later.
10         A.   Okay.
11         Q.   We're still in Fall and early winter, if you
12    will, of 1998, and we're asking specifically for changes in
13    his behavior patterns that you had seen over the last five,
14    six years that you're now seeing after the fourth surgery.
15         A.   Okay.  He was very -- he was depressed.  He was
16    upset.  Everything -- you know, in his life, of course,
17    everything, you know, focused on him because that was the big
18    thing going on, so much so that even when Wendi went into
19    labor, Joe insisted that we -- that we redo his bandages and
20    everything and -- and take a shower and everything before we
21    drove Wendi to the hospital.  And because of that, Ashley was
22    almost born in the car.
23              MR. MARTINEZ:  Objection.  Relevance.
24              THE COURT:  Sustained.  Let's move on.
25              THE WITNESS:  Okay.
```

1    BY MR. DELOZIER:

2         Q.    Was that a behavior change that you saw?

3    That's what my question was.

4         A.    Yes, it was.  Yes, it was because in the past,

5    like with Nicolas, you know, we were going to go, you know,

6    the baby's coming, you know, or it's, you know, time for

7    the -- for the baby to be induced as it was with Nicolas,

8    but, you know, he would have been more, you know, let's hurry

9    and go and he wasn't.

10        Q.    Very good.  Did you notice any difference in

11   the way he treated Wendi?

12        A.    He -- he was treating Wendi more like she was

13   there to do everything for him even more so than she had in

14   the past.  She not only -- she went back to work about a week

15   and a half after Ashley was born, but yet he was still

16   consistently saying "I want this, I want that," you -- you

17   know, "You're not doing things right, You can't ever do

18   anything right."

19        MR. MARTINEZ:  Objection.  Lack of foundation.

20        THE COURT:  Sustained.  Ask your next question.

21   BY MR. DELOZIER:

22        Q.    My question for you is did he treat you any

23   differently?  Did he treat your daughter, Wendi, any

24   differently?

25        A.    Yes.  He was a lot harder to please.

1          Q.     And he was more demanding?

2          MR. MARTINEZ:  Objection.  Leading, lack of

3   foundation.

4          THE COURT:  Sustained.  Don't lead

5   BY MR. DELOZIER:

6          Q.     Can you give me characteristics that you saw

7   that were changes?  Now are you clear?

8          A.     Okay.  Changes.

9          Q.     It could be changes that became more pronounced

10   that were already there.

11          A.     Correct.  There was an incident in the Fall of

12   1998 where Nicolas pulled down a crockpot and landed on his

13   head.  And instead of, you know, trying to take care of

14   Nicolas, all of a sudden Joe just blew up and started

15   screaming at Wendi, you know, like Wendi had done it, yet

16   both of them were, you know, in the room.  He was just a lot

17   shorter.  I -- I was seeing a different Joe and -- because,

18   I'm sure, because of everything that he was going through.

19   And he -- his -- he changed.  He changed.

20   BY MR. DELOZIER:

21          Q.     Okay.

22          A.     He was under a lot of stress.

23          Q.     Was he nicer to Wendi?

24          A.     No, he wasn't.

25          Q.     How about to you?

1          A.     No.   He -- he wasn't even -- he was different.

2     He was a lot different just how he behaved towards anyone.

3     He -- he didn't want to talk to anybody about his cancer.

4     Things were brought up, he would just brush people off.

5          Q.     Any additional -- how about -- how did he treat

6     Nicolas?  Now, Nicolas is two years old, right?

7          A.     Nicolas is two years old.  And, like I said,

8     you know, Joe was real proud of that little boy.  He would

9     have Nicolas with him, you know, on occasion.  Actually, the

10    children were at a babysitter that lived upstairs.

11         MR. MARTINEZ:  Objection.  Lack of foundation how she

12    knows this.

13         THE COURT:  Sustained.

14    BY MR. DELOZIER:

15         Q.     We're talking about how he treated the children.

16    Do you have specific illustrations?  And we're talking about

17    when Nicolas was two years old.

18         A.     When Nicolas was two years old, there was an

19    occasion where Nicolas cut his -- his --

20         MR. MARTINEZ:  Objection.  Lack of foundation how she

21    knows.

22         THE COURT:  Sustained.

23    BY MR. DELOZIER:

24         Q.     Was there a time when Nicolas cut his -- cut

25    himself on something?

```
 1              MR. MARTINEZ:  Objection.  Same -- same reason.

 2              THE COURT:  Sustained.

 3   BY MR. DELOZIER:

 4         Q.   Were you present when Nicolas cut himself?

 5         A.   No, I wasn't.

 6         Q.   Okay.  So you don't have any -- any comments on

 7   how he -- how he treated the children at the time Nicolas was

 8   2?

 9         A.   Yes, I do.

10         Q.   Well, tell me.  That's what I've asked.

11              MR. MARTINEZ:  Objection.  Relevance, hearsay.

12              THE COURT:  Sustained.

13   BY MR. DELOZIER:

14         Q.   How did you know?  Did you see how they were

15   treated?

16         A.   Yes.

17         Q.   You were present?

18         A.   I was present at their apartment several times

19   a week.

20         Q.   This is when Nicolas is 2, so we're still in

21   '98, '99?

22         A.   Yes.

23         Q.   All right.  What did you see?

24         A.   I saw that, whereas before the surgery, Joe, he

25   was yelling at Nicolas a whole lot more.  He was where he
```

1  didn't want to hear the kids, you know, crying or anything,

2  and he would demand that Wendi make them be quiet.  He would

3  still take Nicolas on occasion, you know, to different

4  places.

5       Q.    Okay.  Now, you've talked about the -- Wendi

6  and Joe's relationship for the last six years, now, right?

7       A.    Yes.

8       Q.    Did you have her suggest that they go to

9  counseling?

10       A.    Yes, I did.

11       Q.    When did you do that?

12       A.    Right after the surgery.

13       Q.    Which surgery?

14       A.    The fourth surgery in August of 1998 I

15  suggested that.  I picked up brochures at the clinic in the

16  hospital that talk about for people for -- that have terminal

17  cancer, support groups, suggested them, you know, speaking

18  with, you know, a pastor or counselor.

19       Q.    If you know, did they go?

20       A.    As far as I know, no.

21       Q.    Okay.  How about you? Did you provide any

22  counseling to them yourself to them as a mother,

23  mother-in-law?

24       A.    Yes, I did.  As far as you know, like, spending

25  time together and the children and doing the best, you know,

1    that they could with what they had left.

2         Q.    Okay.  So you mentioned that after the fourth

3    surgery that the verbal abuse got worse?

4         A.    Yes, it did.

5         MR. MARTINEZ:  I'm going to object to the

6    mischaracterization.  She said he yelled a lot more.  Maybe

7    it was because he was in pain.

8         THE COURT:  Sustained.

9    BY MR. DELOZIER:

10        Q.    Tell us the kinds of things you classified as

11   verbal abuse that occurred after the fourth surgery that you

12   mentioned?

13        A.    What I witnessed was the demeanor of Joe being

14   angry, that he would belittle Wendi a lot more and in front

15   of people.  It -- it was a lot different.  People would be at

16   the house and he would go --

17        MR. MARTINEZ:  Objection.  Lack of foundation.

18        THE COURT:  I'll sustain the objection.

19   BY MR. DELOZIER:

20        Q.    So you were at the house and somebody else was

21   there.  Is that what you're saying?  Is this happening after

22   the fourth --

23        A.    Yes.

24        Q.    Okay.  After the fourth surgery you saw things?

25        A.    After the fourth surgery, yes, I did see things

1   where --

2         Q.    What you considered to be mistreatment of one

3   of the guests in the house.  Is that correct?

4         A.    Correct, yes.

5         Q.    Okay.  Do you have any other illustrations?

6   We're talking about what's being classified as verbal abuse

7   or --

8         A.    Uh-huh.

9         Q.    -- that you say got worse?

10        A.    It got worsse, yes.

11        Q.    Well, these --

12        A.    The language got worse.

13        Q.    And you're talking about the words you don't

14   want to say?

15        A.    The words I don't want to say, yes, thank you.

16   The profanity.

17        Q.    Okay.  In fact, didn't you encourage Wendi to

18   leave him?

19        A.    Yes, I did.

20        Q.    Okay.  When was that?

21        A.    That was in May of 2000.

22        Q.    Okay.

23        A.    I asked -- I asked her because -- because of

24   the verbal abuse, I asked her, "Why don't you leave," and she

25   told me --

```
 1              MR. MARTINEZ:  Objection.  Hearsay.

 2              THE COURT:  Sustained.  Ask your next question.

 3   BY MR. DELOZIER:

 4         Q.    Did you -- you said earlier that he was in

 5   control.  Did that escalate?

 6         A.    Yes.

 7         Q.    In what way?

 8         A.    He would ask me, you know, where was she,

 9   what's she doing,

10              MR. MARTINEZ:  Objection.  Lack of foundation.  Are

11   we talking May 2000 or August of '98?

12              THE COURT:  Sustained.

13              MR. DELOZIER:  That's a good question.  I apologize,

14   Your Honor.

15   BY MR. DELOZIER:

16         Q.    What we're talking about again is after the

17   fourth surgery when we're going from August of 1998 and we're

18   going to, say, August of 1999.  Talking about that period of

19   time where you're saying that things escalated after the

20   surgery.  Obviously, it took him, what, three, four months to

21   get over this and stop having to have treatments?

22         A.    Yes.  It took a couple of months.

23         Q.    Okay.  So then after that period of time, and

24   we're moving into, you know, early summer of -- midsummer of

25   '99 --
```

1          A.      Okay, mid --

2          Q.      -- illustrations of control?

3          A.      Midsummer of '99 would -- examples would be

4     Wendi was working at the apartment and we would -- Joe would

5     want to go to the lake and she would --

6          MR. MARTINEZ:  Objection

7          THE WITNESS:  And I was there.

8          MR. MARTINEZ:  Objection.  Lack of foundation.  Did

9     she see this or was she --

10         THE COURT:  Is this from your personal observation?

11         THE WITNESS:  Yes.

12         THE COURT:  You saw it?

13         THE WITNESS:  Yes.

14         THE COURT:  You may continue.

15         THE WITNESS:  He wanted to go to the -- it was on a

16    Thursday evening.  He wanted to go to -- leave for the lake

17    on Friday and he was demanding that she not go to work and

18    that we leave, all of us, on Friday.  Because she was the

19    only breadwinner at the time, Wendi said no, and I offered to

20    drive Wendi and I and the children on Friday evening as soon

21    as she got off work, but he was upset because he wanted her

22    to leave then.

23    BY MR. DELOZIER:

24         Q.      Okay.  At some point in time after the fourth

25    surgery, there were various kinds of alternative treatments

```
 1      that Joe attempted.  Was that correct?

 2              A.      That's correct.

 3              Q.      And can you tell me what -- if you know, what

 4      the first one after the surgery -- he's now two or three

 5      months past it and we're looking at what came next basically?

 6              A.      Right.  In the Fall of --

 7              MR. MARTINEZ:  Objection.  Hearsay, lack of

 8      foundation.

 9      BY MR. DELOZIER:

10              Q.      If you know.

11              THE COURT:  Sustained.  Just from your personal --

12              MR. DELOZIER:  Personal experience.

13              THE COURT:  -- observation.

14              THE WITNESS:  Joe went to an alternative week-long

15      place in Colorado and to learn --

16              MR. MARTINEZ:  Again, objection.  Lack of foundation.

17              THE COURT:  Sustained.

18      BY MR. DELOZIER:

19              Q.      Were you aware that he went there by your

20      personal experience of seeing that he was gone?

21              A.      Yes.

22              Q.      Okay.  And what kind of program was it?

23              MR. MARTINEZ:  Objection.  Hearsay.

24              THE COURT:  Sustained.

25      / / / / /
```

```
 1   BY MR. DELOZIER:
 2          Q.    Do you know what kind of program it was?
 3          A.    Yes.
 4          Q.    And what kind of program was it?
 5          MR. MARTINEZ:  Objection.  Hearsay.
 6          THE COURT:  Sustained.
 7   BY MR. DELOZIER:
 8          Q.    Would we refer to that program they offered as
 9   alternative?
10          MR. MARTINEZ:  Observation.  Hearsay.
11          THE COURT:  Sustained.
12   BY MR. DELOZIER:
13          Q.    Do you know if that one -- what he did when he
14   was taking whatever he took?  Did it help?
15          MR. MARTINEZ:  Objection.  Lack of foundation,
16   hearsay.
17          THE COURT:  Sustained.
18   BY MR. DELOZIER:
19          Q.    Do you know if it helped?
20          A.    Yes.
21          Q.    And did it help?
22          A.    No.
23          Q.    What was attempted next, if you know.  Let me
24   rephrase it.  Was he offered chemo right after the surgery?
25          A.    Yes, he was.
```

1          Q.   Did he take it?

2          A.   No, he did not.

3          Q.   Okay.  After he tried alternative, did he go to

4     the dentist?  Do you know anything about him going to a

5     dentist?

6          A.   I know that --

7          MR. MARTINEZ:  Objection.  Hearsay.

8          THE COURT:  Sustained.

9     BY MR. DELOZIER:

10         Q.   Did you go with him to the dentist?

11         A.   No.

12         Q.   Okay.  Did you -- what about any other kinds of

13    treatments that Joe tried after the fourth surgery in August

14    of 98?

15         A.   I know that --

16         MR. MARTINEZ:  Objection.  Hearsay.

17         THE WITNESS:  Yes.

18         THE COURT:  Sustained.

19         MR. DELOZIER:  I guess we ought to approach.  I don't

20    understand, Your Honor.

21

22              (The following proceedings were held at the

23    bench:)

24

25         THE COURT:  Go ahead, Mr. DeLozier.

1    MR. DELOZIER:  Just trying to find out what she knows

2    about what kind of treatments he took.  Seemed like a

3    pretty --

4    MR. MARTINEZ:  All based on what the defendant told

5    her the victim did.

6    MR. DELOZIER:  I said if you know.  Do you know?

7    THE COURT:  Right, but that's the reason I kept

8    sustaining the objection is she was going to go beyond that

9    at this point.  I know you asked a yes or no question, but

10   she started answering it with more than yes or no, and that's

11   why I sustained the objection at that point.

12        But if you have a situation where she had -- in

13   her personal observation she went with him to those places,

14   she was able to see certain things, I don't have any problem

15   with you asking that.  But the way you're asking it, I'm

16   sustaining the objection.

17   MR. DELOZIER:  Okay.

18

19        (The following proceedings were held in open

20   court:)

21

22   THE COURT:  Mr. DeLozier?

23   MR. DELOZIER:  Thank you, Your Honor.

24   BY MR. DELOZIER:

25   Q.    Did you go with Mr. Andriano -- Joe, I'm

```
1    talking about, of course -- any time after August of 1998 to
2    seek any kinds of treatment?
3         A.    Yes, I did.
4         Q.    And what did you --
5         A.    I went --
6         Q.    Name one.
7         A.    Okay.  I went with him to the Mayo Clinic to
8    discuss chemotherapy and radiation.
9         Q.    Okay.  You mentioned that earlier.  Did you go
10   with him on another -- any other kind of --
11        A.    I went with him to the stores and bought him a
12   book on herbal remedies and herbs.
13        Q.    And he was with you?
14        A.    Yes.
15        Q.    Okay.  Did you do anything else?
16        A.    I had purchased some stuff for them.
17        Q.    How about going to church?
18        A.    Oh, yes.  I went to church with them and Joe
19   asked for prayer for healing.
20        Q.    At some point in time did he change his mind
21   about the chemo?
22        A.    Yes, he did.
23        Q.    Do you know when?
24        MR. MARTINEZ:  Objection.  Hearsay.
25        THE COURT:  Sustained.
```

1    BY MR. DELOZIER:

2            Q.    Did you go with Joe to get any chemo

3    treatments?

4            A.    No, I did not.

5            Q.    You were aware that he took some?

6            A.    Yes, I was.

7            Q.    Okay.  Do you know how many?

8            A.    I believe he took four.

9            Q.    Okay.  Were you around him after he took the

10   first one?

11           A.    Yes.  After the first?

12           Q.    Yes.

13           A.    Yes.

14           Q.    Okay.  Now, I'm going to ask the same

15   questions.  Did you notice any demeanor change, behavior

16   changes after the first chemo?  And the answer is "yes" or

17   "no" again.

18           A.    Yes.

19           Q.    And what were they?

20           A.    Extremely moody, extremely anxious.  Again, the

21   anger was just escalating.  Then despair hit and a drawing

22   into himself.  He wasn't as outgoing as he had been before.

23   He was drawing into himself.

24           Q.    How did he treat Wendi based on what you saw?

25           A.    Based on what I saw?  Based on what I saw, I

1    saw him increasingly, again, with the profanity, with telling

2    her she was fat, she was stupid -- and this is a 100-pound

3    woman -- and you're dumb, you're stupid, and with all the

4    profanty in there also.

5            Q.    Are we still at the Courtyard or when did that

6    change?

7            A.    No.   She took a position up in Ahwatukee, I

8    believe, in November of '99 working as the manager at San

9    Riva.

10           Q.    Now, the chemo's after --

11           A.    Chemo's after.

12           Q.    -- the move to Ahwatukee, right?

13           A.    Yes, it is.

14           Q.    Okay.   And how old is Nicolas at this point?

15           A.    Nicolas is just --

16           Q.    Talking about November of '99, sorry?

17           A.    November of '99, Nicolas was 2 and a half.

18           Q.    How old is Ashley?

19           A.    Ashly would have just been a little over a

20   year.

21           Q.    Okay.

22           A.    14, 15 months.

23           Q.    Okay.   Let me show you what's been marked as

24   Exhibits 422 and 423.   See if you could give us time frames

25   on those, if you know.   Did you take those photographs?

1       A.      Yes, I did.

2       Q.      And when did you do that?

3       A.      On the one that's labeled 422, would have been

4    in September of 1998 which shows Wendi and Ashley and Joe and

5    that was Wendi leaving the hospital after having Nicolas.

6       Q.      After having whom?

7       A.      Nicolas -- no, I'm sorry.  After having Ashley,

8    I'm sorry.

9       Q.      It's all right.

10      A.      And the second picture, 423, is in the foyer of

11   Harvest Family Church with Joe and Wendi.  Wendi's holding

12   Ashley, Pastor Tom King is holding Nicolas.

13      Q.      This is approximately when?

14      A.      That would have been just -- probably just a

15   couple months -- no, maybe three months or so after Joe's

16   surgery because the bandage is off.

17      Q.      And you took both of those?

18      A.      Yes, I did.

19          MR. DELOZIER:  Okay.  Move for admission of Exhibits

20   422 and 423, Your Honor.

21          MR. MARTINEZ:  I would object on grounds of relevancy

22   and Rule 403.

23          THE COURT:  Exhibit 422 and 423 for identification

24   are admitted into evidence.

25   / / / / /

1   BY MR. DELOZIER:

2          Q.    This is Exhibit 422.  And can you tell us what

3   we have here?

4          A.    That's at the Chandler Regional Medical Center

5   with Wendi in the back of the Yukon and that's baby Ashley

6   after she was born.  And there's Joe, and you could see the

7   bandages that he still had.  That would have been around

8   September 17 of 1998.

9          Q.    So he had surgery only maybe a month earlier?

10         A.    Yes.

11         Q.    And he's still got those bandages and this is

12   from the fourth surgery, correct?

13         A.    That's correct.  That's from the fourth

14   surgery.

15         Q.    All right.  That's 422.

16                Then I have 423.  Tell me what we have here?

17         A.    Okay.  Again, that's in the foyer of Harvest

18   Family Church in Casa Grande .  Nicolas is being held by

19   Pastor Tom King, Wendi is holding --

20         Q.    He's on the left?

21         A.    Yes, with the white hair.

22         Q.    Okay.

23         A.    Wendi is holding baby Ashley, and Joe is

24   standing next to Wendi and I'm taking the picture.

25         Q.    Okay.  And --

1          A.    So the baby would have been a couple months.

2          Q.    Over here on the right -- now, how many months

3     is this after surgery?

4          A.    It would have to be three or four months after

5     surgery, I believe.

6          Q.    So the bandages are off by now?

7          A.    Yes, they are.

8          Q.    Okay.  So is Joe able to work now?

9          THE COURT:  What period of time are you asking about?

10         MR. DELOZIER:  Ones related to the picture.  This is

11    fall of '99, sorry.

12                Thank you, Your Honor.

13         THE WITNESS:  In the fall of '99, Joe probably would

14    have been doing windshields, you know, here and there still.

15    BY MR. DELOZIER:

16         Q.    Okay.  And Wendi's working where?

17         A.    Wendi's working at -- she would have been at

18    Courtyard in '98.

19         Q.    Okay.  What time did --

20         MR. MARTINEZ:  Judge, I thought we were talking '99?

21         THE COURT:  I think Mr. DeLozier asked about Fall of

22    '99.

23         THE WITNESS:  Fall of '99, Wendi was working at San

24    Riva apartment.

25    BY MR. DELOZIER:

```
 1            Q.    When did she start there?

 2            A.    I believe in November of '99.

 3            Q.    And, sorry, did she leave Courtyard to go

 4      there?

 5            A.    Actually, she left Courtyard and she went to

 6      another property off of Camelback, but she stopped working

 7      there because Joe didn't want her to --

 8            MR. MARTINEZ:  Objection.  Hearsay, relevance.

 9            THE COURT:  Sustained.  That last portion will be

10      stricken.

11      BY MR. DELOZIER:

12            Q.    So she was at a place on Camelback down in

13      central Phoenix --

14            A.    Yes.

15            Q.    -- for a while?  How long did that --

16            A.    That was like a month or so.  That was it.

17            Q.    Okay.  And then she was unemployed for a little

18      while, or went straight from that place to San Riva?

19            A.    She pretty much went straight from there to San

20      Riva.

21            Q.    Okay.  That was in December of '99 you're

22      saying?

23            A.    November.

24            Q.    November, December?  Okay.

25                  Now, did they provide a place for them to live
```

1     at San Riva?

2          A.     Yes, they did.  A nice two-bedroom --

3     three-bedroom, excuse me, apartment.

4          Q.     Okay.  So each of the children had their own

5     room?

6          A.     Yes.  Each child had their own room.  Ashley

7     had one, Nicolas had one, and Joe and Wendi had one.

8          Q.     Okay.  Were you able to visit them at that

9     location?

10         A.     Yes, I was.

11         Q.     Talk about the subject of insurance for a

12    minute.  Were you aware of the coverage that Joe and Wendi

13    had at any time during their marriage?  Life insurance.

14         A.     Life insurance?  I do know that.

15         MR. MARTINEZ:  Objection.  Nonresponsive, hearsay.

16         THE COURT:  Just answer the question that's asked.

17         THE WITNESS:  Yes.

18    BY MR. DELOZIER:

19         Q.     How did you come into that knowledge?

20         A.     Because they had told me.  In fact, they tried

21    to get me to get some insurance from the first --

22         MR. MARTINEZ:  Objection.  Hearsay.

23         THE COURT:  Sustained.

24    BY MR. DELOZIER:

25         Q.     Did you make any payments on any life insurance

1    for them?

2            A.    No, I did not.

3            Q.    Okay.  Did you have any discussions -- do you

4    know if they were covered by life insurance during '98, '99

5    either one of them?

6            A.    I believe she would have been with wherever she

7    worked.

8            Q.    You don't know though?

9            A.    I don't know for sure.

10           Q.    Okay.  Do you know if they had insurance at one

11   time and they lost it?

12           A.    I do know they had insurance at one time.

13           Q.    Okay.  So do you know approximately when the

14   chemo treatments began?

15           A.    July of 2000.

16           Q.    Okay.  And that was -- how did -- do you know

17   how he came to start it, the chemo?

18           MR. MARTINEZ:  Objection.  Hearsay.

19           THE COURT:  It's a "yes" or "no" question.  Just

20   answer the question "yes" or "no."

21           THE WITNESS:  Yes.

22   BY MR. DELOZIER:

23           Q.    How did you come to that knowledge?

24           A.    Because I was told that --

25           MR. MARTINEZ:  Objection.  Hearsay.

 1          THE COURT:  Hold on.  Ask your next question.
 2     BY MR. DELOZIER:
 3          Q.    The second one was when, if you know?
 4          A.    I believe on August 1st, 2000.
 5          Q.    Okay.  Each time what I'm asking -- what I want
 6     you to tell me is did you notice any changes in, let's say,
 7     strength?
 8          A.    Yes.
 9          Q.    And what changes did you notice?
10          A.    I noticed on the --
11          MR. MARTINEZ:  Objection.  Lack of foundation as to
12     days.
13          THE COURT:  Sustained.  Lay some foundation about the
14     time period after the treatment you're talking about.
15     BY MR. DELOZIER:
16          Q.    Talking about after the second chemo.
17          A.    Okay.
18          Q.    Did you notice any strength-related issues that
19     changed just a moment ago?  You said he was strong?
20          A.    Yes.
21          Q.    I'm trying to ask if you -- did you notice a
22     change in that?
23          A.    I just noticed like on the day that he would
24     have surgery -- that he would have chemo because I would be
25     at the house after he had chemo, at their house, that he

1   wasn't feeling well, and I would, you know, hold his hand

2   and, you know, wipe his face --

3        MR. MARTINEZ:  Objection.  Nonresponsive.

4        THE WITNESS:  -- that type of stuff.

5        THE COURT:  Overruled.  Ask your next question.

6   BY MR. DELOZIER:

7        Q.   Was he more verbally abusive?

8        A.   Yes.

9        MR. MARTINEZ:  Objection.  Lack of foundation.  Which

10  day and time?

11       THE COURT:  Lay some foundation.

12       MR. DELOZIER:  Same foundation, Your Honor.  I'm

13  talking about between the -- after the second chemo, she said

14  was August is her observation of 2000.

15       THE COURT:  You're saying before the second chemo or

16  the third chemo?

17     · THE WITNESS:  Third one.

18       THE COURT:  Go ahead and answer the question.

19       MR. MARTINEZ:  Judge, I'm objecting on the -- based

20  on what Dr. Kellogg told is the progression.  Is it the

21  beginning?  I mean --

22       THE COURT:  You know what?  I'll have you lay some

23  more foundation, Mr. DeLozier, as far as what specific time

24  during that period of time.

25       MR. DELOZIER:  Okay.  Thank you, Your Honor.

1      BY MR. DELOZIER:

2            Q.   On the day that he took the second chemo, were

3      you at his home?

4            A.   Yes.

5            Q.   Okay.  Did you notice any difference in his

6      strength that day?

7            A.   I just noticed that he was, you know, feeling

8      nauseous.  As far as strength, you know, he was, you know,

9      rested in bed on those days.

10           Q.   He didn't go boating on that day, did he?

11           A.   No.

12           Q.   Did he go boating the second day?

13           A.   No.

14           Q.   How about the third day after the second

15     surgery or chemo?

16           A.   It's possible.  I don't know that.

17           Q.   All right.

18           A.   As far as --

19           Q.   After the second chemo, did he go boating at

20     all before the third?

21           A.   Yes.

22           Q.   Okay.  Do you know about when?

23           A.   On the weekend, but I don't know if it was like

24     a week or so after, or if it was two weeks.

25           Q.   All right.  Between the second and third chemo,

1    did he go boating more than once to your knowledge?

2         A.    To my knowledge, yes.

3         Q.    Yes?

4         A.    Yes.

5         MR. MARTINEZ:  Objection.  Hearsay, how they came to

6    that knowledge.

7         THE COURT:  Do you have personal -- were you there?

8         THE WITNESS:  No.

9         THE COURT:  I'll sustain the objection.

10   BY MR. DELOZIER:

11        Q.    Did you notice any changes in -- in what we

12   have referred to as verbal abuse on the day of the second

13   chemo?

14        A.    He was -- yes.

15        Q.    What did you -- what -- you were there, right?

16        A.    Yes.

17        Q.    And what did you witness?

18        A.    I witnessed Nicolas climbing up on the bed with

19   Joe, with his daddy, and Joe getting upset and telling him to

20   get the hell out of there.

21        Q.    Okay.

22        A.    Anything else that day?

23        A.    Wendi had come in and asked if he wanted --

24        MR. MARTINEZ:  Objection.  Hearsay.

25        THE COURT:  Sustained.

```
 1    BY MR. DELOZIER:

 2            Q.    I'm asking what you saw.

 3            Q.    What I saw?  I saw him yell at his wife when

 4    she came in to offer him something to drink.       .

 5            Q.    Anything else that you saw that first day when

 6    he gets home after the second chemo?

 7            A.    As far as behavior, those were the two big

 8    things.

 9            Q.    I'm just asking if there was anything else?

10            A.    Not to my recollection.

11            Q.    Was there any physical violence --

12            A.    No.

13            Q.    -- on the first day?

14            A.    No.

15            Q.    Were you there the second day after the second

16    chemo?

17            A.    No, I was not.

18            Q.    How about the third day?

19            A.    No, I was not.

20            Q.    How about the fourth day after?

21            A.    I don't know how many days after it was, but

22    whatever date he had the chemo, I was there that weekend.

23            Q.    You were there the following weekend?

24            A.    Yes.

25            Q.    And who all was in the home?
```

1     A.     Myself, Wendi, Joe, and the children.

2     Q.     When did you arrive?

3     A.     Saturday morning.

4     Q.     What time?

5     A.     Approximately 8:00, 9:00.

6     Q.     How long did you stay?

7     A.     I stayed long enough to pick up the children,

8     take them back to Casa Grande with me?

9     Q.     Well, is this 5 minutes or an hour?

10    A.     Probably anywhere from 45 minutes to an hour.

11    Q.     Okay.  What did you observe while you were

12    there?  What did you see?

13    A.     What did I see?  I saw Joe being irritable and

14    irritated and wanted me to hurry up and get the kids.

15    Q.     Anything else that you saw?

16    A.     I just saw him or heard him, again, extremely

17    derrogatory to Wendi.

18    Q.     Okay.  Now, you were there that weekend, you

19    can't tell us for sure how many days it was from the second

20    chemo, but now we move into the time after that weekend.  So

21    you had the kids how long that weekend?

22    A.     I normally kept them Saturday morning till

23    Sunday evening.

24    Q.     All right.  So you brought them back sometime

25    Sunday evening approximately?

```
 1          A.    I -- usually around 4:00 or 5:00 after they
 2   woke up from naps.
 3          Q.    4:00 or 5:00?
 4          A.    Yes.
 5          Q.    Do you know of your own knowledge what Wendi
 6   and Joe did that weekend?  I just want to know if you know.
 7          A.    No.
 8          Q.    They weren't with you?
 9          A.    Not with me.
10          Q.    Okay.  When you brought them back on Sunday
11   night, 4 or 5:00, how long did you stay?
12          A.    5 or 10 minutes.  I did not stay long.
13          Q.    Anything happen during that 5 or 10 minutes?
14          A.    Not that I recall.
15          Q.    Were you there on Monday after that?
16          A.    No.
17          Q.    How about Tuesday?
18          A.    No.
19          Q.    How about Wednesday?
20          A.    No.
21          Q.    When was the next time you were back at the
22   apartment after this second chemo after that weekend,
23   whenever that weekend was?
24          A.    To be honest, I'm not sure if -- if I was back
25   the next weekend or the weekend after, but I know that during
```

1    July and August I would take the children down to the house

2    in Casa Grande quite a bit on the weekend.

3         Q.    I'm sorry.  We're not in July and August.

4         A.    Okay.

5         Q.    We're in November, December, January of '99 and

6    the early part of 2000.  I apologize.  You're right.  We're

7    in 2000, August, right?  I'm sorry.

8         A.    I got lost.

9         Q.    So you're in August of 2000.  So at that time

10   you had at a pattern of doing some things with the children,

11   right?

12        A.    Correct.

13        Q.    Okay.  And that was typically every other

14   weekend or so?

15        A.    Yeah, yes.  We would bring them down to the

16   house.

17        Q.    Do you --

18        A.    That gave Wendi and Joe time to be by

19   theirselves and spend some time together.

20        Q.    All right.  During that period of time, summer

21   of 2000, did you ever see Wendi injured, any bruises?

22        A.    I saw bruises on her in the summer of 2000.

23        Q.    Okay.  Do you know when the third chemo was?

24        A.    Before I came up on the stand I knew when all

25   of them were.  I can't remember right now, I'm sorry.

1          Q.    All right.  It was sometime after the second

2     one, probably.  How long?  Can you --

3          A.    Probably around three weeks.

4          Q.    About three weeks?

5          A.    Uh-huh.

6          THE COURT:  Is that a "yes"?

7          THE WITNESS:  Yes, sorry.

8          MR. DELOZIER:  Thank you, Your Honor.

9     BY MR. DELOZIER:

10         Q.    So this was probably, your best guess, is

11    somewhere near the end of August?

12         A.    I believe so.

13         Q.    Okay.  During August were there any trips that

14    were made by Joe or Wendi outside of the Phoenix area that

15    you know of?

16         A.    That I actually saw?

17         Q.    Yeah, you know of?

18         A.    Oh, I know that he was going to the lake.

19         Q.    Okay.  Do you have a period of time where you

20    were watching the children during -- during August or did --

21    or were they -- were they not in town during August or do you

22    remember?

23         A.    I don't remember August.

24         Q.    Okay.  So, anyway, he had a third chemo

25    treatment sometime during, you think, the latter part of

1    August?

2           A.    Yes.

3           Q.    Were you at their apartment when he came home

4    from the third chemo?

5           A.    I went to the apartment after he got home.

6           Q.    After when?

7           A.    After he got home from the chemo.

8           Q.    Same day?

9           A.    Yes.

10          Q.    Okay.  How were things that night?

11          A.    Again, the same.  He'd be feeling nauseous and

12   I'd give him support, mental support, hold his hand, wipe his

13   face type of things while Wendi fixed dinner.

14          Q.    Were there any episodes of verbal abuse while

15   you were there?

16          A.    That one, I don't recollect.

17          Q.    How about physical violence?

18          A.    No.

19          Q.    Were the children there?

20          A.    Yes.

21          Q.    So we didn't have any issues about the children

22   that night?

23          A.    No.

24          Q.    Or that day?

25          A.    I don't believe so.

```
1          Q.    Were you back the next day after?

2          A.    No, I was not.

3          Q.    How long -- when was your next visit back to

4    Joe and Wendi's apartment after the third chemo?

5          A.    I believe it was right around Labor Day.  I

6    went up to pick up Nicolas, I believe, and bring him back

7    down to the house.

8          Q.    Anything happen that day?

9          A.    No.  I -- I don't -- I don't even recall seeing

10   Joe there because Wendi was going to come and stay at our

11   house over the weekend because Joe was going to be at the

12   lake.

13         Q.    Okay.  Now, from the time chemo started until

14   he finished the fourth chemo, did you go to the lake?

15         A.    No, I did not.

16         Q.    Okay.  Let's back up just a little bit.  We've

17   talked a lot about Joe and so forth and his changes, but

18   starting around the time that Ashley was born, did you start

19   noticing any changes in Wendi?  And what were they if you

20   did?

21         A.    Yes, I did notice changes in Wendi.  She was

22   obviously more stressed and overworked because she was -- she

23   was working full time right there on the site at the

24   apartments and she also had two children.

25         MR. MARTINEZ:  Objection.  Hearsay if she's going to
```

```
 1    tell us --
 2            MR. DELOZIER:  This is what you observed from the
 3    time --
 4            THE COURT:  Overruled.
 5            MR. DELOZIER:  -- Ashly was born.
 6            THE WITNESS:  Yes.
 7    BY MR. DELOZIER:
 8            Q.    You could go ahead.
 9            A.    Okay.
10            Q.    Until third or fourth chemo, so we're talking
11    about almost a two year period of time.
12            A.    Okay.  I saw Wendi losing weight, definitely
13    losing weight.  Overworked.  She -- she wasn't sleeping
14    well.  She --
15            MR. MARTINEZ:  Objection.  Lack of foundation.
16            THE COURT:  Sustained.
17    BY MR. DELOZIER:
18            Q.    You saw her go back to work how long after
19    Ashley's birth?
20            A.    Went about a week and a half, two weeks after
21    Ashley was born.
22            Q.    At that time where was she working?
23            A.    She was working at the Courtyard Apartments?
24            Q.    Okay.  And what other changes did you notice?
25    I'm talking about what you saw --
```

1          A.      I saw --

2          Q.      -- in her behavior?

3          A.      She was a lot more withdrawn also.  She -- she

4    was -- it was obvious she was tired.  She had black circles

5    under her eyes and stuff sometimes, and just looked like --

6    just haggard.

7          Q.      Mm-hmm.  Let's move on to 2000.  Any further

8    changes or that about cover it?

9          A.      That about covers it.  She was -- it was a

10   rough time for all of them.

11         Q.      Okay.  Now, we've had -- we had the fourth one

12   sometime in when?  Fourth chemo, I'm talking about.

13         A.      I believe that was in September sometime.

14         Q.      Okay.  Not sure when?

15         A.      I'm not sure of the exact date, but it was in

16   September.

17         Q.      Were you there the day that he came home from

18   the fourth chemo?

19         A.      No, I wasn't.

20         Q.      Okay.  Do you recall when you were present in

21   their home after the fourth chemo?

22         A.      No, I -- I was present in their home around

23   the -- sometime in the week of the 20th, I believe, but Joe

24   wasn't there.  Just Ashley and Wendi were there.

25         Q.      Let's do it this way.  After October -- after

1   the fourth chemo and up until October 7, did you -- were you

2   present when he and Wendi were both together?

3          A.    On October 7, I was.

4          Q.    I'm talking about between those dates.  We'll

5   get to the 7th in a minute.  I should have said the 6th, I

6   guess.

7          A.    I would imagine I was because I used to go up

8   there.  I would try to go up, you know, once a week, every

9   two weeks.  I just don't recall.

10          Q.    Any specific --

11          A.    No.

12          Q.    Okay.

13          THE COURT;  Would this be a good time to break for

14   the day?

15          MR. DELOZIER:  Sure.

16          THE COURT:  Okay.  We'll go ahead and take our

17   evening recess at this point in time, ladies and gentlemen.

18              During this evening recess, remember the entire

19   admonition I gave you including the fact you're not to

20   discuss this case with anyone.  Do not let anyone discuss the

21   case with you.  Do not do any research, investigations,

22   experimentation or testing on your own.  Avoid any media

23   coverage of the case.  Keep an open mind.

24              I want you to have a nice evening.  We'll see

25   you tomorrow at 1:00 p.m.  Have a nice evening.  We'll be in

1    recess.

2

3               (Evening recess.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1

2

3                        CERTIFICATE OF REPORTER

4

5    STATE OF ARIZONA      )
                           )
6    COUNTY OF MARICOPA    )

7

8               I, Traci L. Wheeler, CSR, RPR, an official

9    and certified reporter in the Superior Court of the State

10   of Arizona, in and for the County of Maricopa, hereby

11   certify that I made a shorthand record of the proceedings

12   had in the within case, and that the foregoing transcript

13   is a full, true, and correct transcription of the

14   proceedings in this case.

15               Dated this 28th day of March, 2005.

16

17

18
                        Traci L. Wheeler, CSR, RPR
19                      Certified Court Reporter No. 50313
                        Official Court Reporter
20

21

22

23

24

25
```

EXHIBIT LL



05-0002 1
Braccio



1    IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

2    IN AND FOR THE COUNTY OF MARICOPA

3

4    STATE OF ARIZONA,                )
                                       )
5              Plaintiff,             )
                                       )
6    v.                               )    No. CR 05-0005 AP
                                       )    MARICOPA COUNTY
7    WENDI ELIZABETH ANDRIANO,        )    No. CR 2000-096032
                                       )
8              Defendant.             )
     _____)

9

10

11

12                        Mesa, Arizona
                         October 5, 2004
13

14

15

16        BEFORE:  The Honorable BRIAN K. ISHIKAWA

17

18        REPORTER'S TRANSCRIPT OF PROCEEDINGS

19                    TRIAL DAY 23

20

21

22

23

24   ORIGINAL Prepared for APPEAL by:
     TRACI L. WHEELER, CSR, RPR
25   Certified Court Reporter No. 50313

2

1                         A P P E A R A N C E S

2    FOR THE STATE:        JUAN M. MARTINEZ,
                           Deputy County Attorney
3
     FOR THE DEFENDANT:    DANIEL B. PATTERSON,
4                          Deputy Public Defender
                                    and
5                          G. DAVID DELOZIER,
                           Attorney at Law
6

7              I N D E X   O F   E X A M I N A T I O N

8.   WITNESS                                              PAGE

9    OCHOA, DONNA, Called on behalf of the Defendant
              Continued Direct Examination by Mr. DeLozier      3
10            Voir Dire Examination by Mr. Martinez            10
              Continued Direct Examination by Mr. DeLozier     10
11            Cross-examination by Mr. Martinez                30
              Continued Cross-examination by Mr. Martinez     120
12            Redirect Examination by Mr. DeLozier            156
              Follow-up Questions by Mr. Martinez             189
13            Follow-up Questions by Mr. DeLozier             190

14

15           E X H I B I T S   A D M I T T E D   I N   E V I D E N C E

16   NO.     DESCRIPTION                                  PAGE

17   410     Photograph                                     47
     412     Photograph in brown paper frame                45
18   433     Photograph                                     10
     445     Photocopy of photograph                        48
19

20

21

22

23

24

25

1           MESA, ARIZONA, TUESDAY, OCTOBER 5, 2004

2

3           THE COURT:  Good afternoon.  This is trial in cause

4    number CR 2000-096032, State of Arizona versus Wendi

5    Elizabeth Andriano.  The record will reflect the presence of

6    Defendant, Counsel and the jury.  The record will also

7    reflect that Donna Ochoa is on the witness stand, and we'll

8    continue with the direct examination by Mr. DeLozier.

9                Mr. DeLozier?

10          MR. DELOZIER:  Good afternoon, Your Honor.  Thank you.

11

12                DONNA OCHOA,

13    CALLED TO TESTIFY ON BEHALF OF THE DEFENDANT,

14    HAVING PREVIOUSLY BEEN SWORN, FURTHER TESTIFIES AS FOLLOWS:

15

16    CONTINUED DIRECT EXAMINATION BY MR. DELOZIER:

17          Q.    You talked about -- is this on?  Can you hear

18    me?

19          THE COURT:  Why don't you pull it up?

20          MR. DELOZIER:  That's great.  Thank you.

21    BY MR. DELOZIER:

22          Q.    You talked yesterday about changes that you saw

23    in Wendi --

24          A.    Yes.

25          Q.    -- during the last year or so.

```
 1          A.    Yes.

 2          Q.    I think that's how we sort of ended up with

 3   yesterday's discussions, just kind of bringing you back to

 4   where we were.  You described her physical appearance and so

 5   forth.  Do you remember that?

 6          A.    Yes, I do.

 7          Q.    All right.  During that year 2000, did you see

 8   a change in how she confided in you?

 9          A.    Yes.

10          Q.    And what change did you see?

11          A.    Throughout -- she -- she changed by not -- she

12   wasn't sharing as much.  She -- we didn't visit a whole lot

13   or she didn't tell me, just share things.

14          Q.    Uh-huh.

15          A.    She had closed up.

16          Q.    I'm sorry?

17          A.    She closed up.  She just wasn't talking.

18          Q.    Well, did she ever tell you about how Joe was

19   treating her?

20          A.    The --

21          THE COURT:  That's a "yes" or "no" question.

22          THE WITNESS:  Yes.

23   BY MR. DELOZIER:

24          Q.    Okay.  Did you understand --

25          THE COURT:  Hold on.  What was the answer?  Did you
```

```
 1      answer the question?

 2                THE WITNESS:  Not yet, sorry.

 3                THE COURT:  She hasn't answered the question.  I

 4      thought she had.  She wasn't responding to you.  Go ahead.

 5                THE WITNESS:  Okay.  Yes, she --

 6                MR. MARTINEZ:  Objection.  Narrative.

 7                THE COURT:  Ask your next question.

 8      BY MR. DELOZIER:

 9           Q.    Did that change?

10           A.    Yes.

11           Q.    And how did that change?

12           A.    She finally just closed up and wasn't talking.

13           Q.    You had a mistake yesterday in one part of your

14      testimony.  Is that correct?

15           A.    Yes.

16                MR. MARTINEZ:  Objection.  Leading.

17                THE COURT:  Overruled.  Go ahead ask your next

18      question

19      BY MR. DELOZIER:

20           Q.    What did you want to correct?

21           A.    I just wanted to correct Wendi and Joe's -- the

22      date they got married was January 22nd of 1994, and that was

23      a continual mistake of mine.  I would always call them on the

24      21st and go "Happy Anniversary" and she'd go, "No, it's

25      tomorrow," so I just wanted to clear that up.
```

```
 1          Q.     You mentioned yesterday that Joe was in control
 2    in your opinion?
 3          A.     Yes.
 4          Q.     Did that change during the year 2000?
 5          A.     No.
 6          Q.     Did it change at all?
 7          A.     No.
 8          Q.     Okay.  He was still in control?
 9          A.     Yes, he was.
10          Q.     We talked a lot about Nicolas yesterday and I
11    think I forgot to ask you about Ashley, so let's talk a
12    little bit about Ashley.  From -- she was born shortly after
13    the fourth surgery.  Is that correct?
14          A.     Yes, she was born --
15          Q.     That was -- I'm sorry.
16          A.     Yes.
17          Q.     When was she born?
18          A.     September 16 of 1998.
19          Q.     And that fourth surgery was in August of 1998?
20          A.     Yes.
21          Q.     Okay.  So from her birth through maybe her
22    first year, can you tell us what you saw as Joe's treatment
23    of her?
24          A.     Joe and Ashley, it -- it appeared they never
25    really bonded because he didn't spend much time with her at
```

1     all.  He was -- he was focused, you know, on his condition

2     with the cancer and -- and that's where he -- that's where he

3     was focused, not on Ashley.  Ashley was kind of the little

4     one that sort of didn't get any attention from dad.  Nicolas

5     did because, again, like I said, you know, Joe was pretty

6     proud of Nicolas and Nicolas looked like his daddy.

7              Q.    Well, what was Ashley's physical appearance.

8     What color hair, what color eyes?

9              A.    Ashley had brown -- brown hair and brown eyes.

10    And in fact, I even made the comment --

11              MR. MARTINEZ:  Objection.  Narrative.

12              THE COURT:  Sustained.

13    BY MR. DELOZIER:

14              Q.    She had brown hair and brown eyes?

15              A.    Yes.

16              Q.    Okay.  Was there any disparaging remarks made

17    about her eyes or hair?

18              A.    Yes.

19              Q.    What were they?

20              A.    "Oh, no, I have another kid with shit brown

21    eyes."

22              Q.    Okay.  How about age 1 to 2?  She would have

23    been just over 2 at the date of her dad's death.  Is that

24    correct?

25              A.    That's correct.

1          Q.     Any particular changes in the way Joe treated

2     her during that second year of her life?

3          A.     Yes.

4          Q.     What were they?  I'm talking about things you

5     saw now.

6          A.     Correct.  On one occasion in July of 2000 I was

7     at the apartment, Joe and Wendi's apartment, and Wendi was

8     cooking and Joe was sitting in his chair I was sitting on the

9     floor playing with Nicolas, and Ashley crawled up onto Joe's

10    lap and proceeded to vomit all over him and he -- he picked

11    her up and threw her on the floor.  I mean, he didn't just

12    set her on the floor; he literally pushed her down hard on

13    the floor.  And she started wailing and I picked her up and

14    he was cursing, and then he started cursing at Wendi for

15    letting Ashley throw up on him.

16         Q.     Did you see any other episodes?

17         A.     There was an episode when I was watching the

18    children during one of the -- the pool parties that San Riva

19    had.  I had come up there again to watch the children.  And I

20    was --

21         Q.     When was that?

22         A.     It was around the first of June, end of May,

23    first of June of 2000.  And I had -- I had told them that I

24    needed to leave by 8:00, I could only watch the children

25    until 8:00.  And I was told that --

```
 1              MR. MARTINEZ:  Objection.  Hearsay.
 2              THE COURT:  Sustained.
 3              THE WITNESS:  So at 8:00 no one showed up and 9:00,
 4     10:00, and I was pretty upset.  And --
 5     BY MR. DELOZIER:
 6         Q.    Did Joe do anything?
 7         A.    Pardon?
 8         Q.    Did Joe do anything that night?
 9         A.    Yes, he did.
10         Q.    What did he do?
11         A.    Well, he didn't return to watch the children
12     and he told me to just leave them there.
13              MR. MARTINEZ:  Objection.  Hearsay.
14              THE COURT:  Sustained.
15     BY MR. DELOZIER:
16         Q.    Okay.  While we're on pool parties, let me show
17     you what's been marked for identification as Exhibit 433.
18     Did you take that picture?
19         A.    Yes, I did.
20         Q.    And what does it show?
21         A.    It's a picture.
22         Q.    Pardon me.  About when did you do that?
23         A.    This was in 2000, June, July, around there.
24         Q.    Okay.  What does it show?
25         A.    It shows -- it's a picture of San Riva at the
```

```
 1    pool -- during one of the pool parties that the San Riva had

 2    for them.  Wendi was hosting it.  There's a --

 3              Q.    Okay.  Thank you.

 4              MR. MARTINEZ:  Judge, may I voir dire?

 5              THE COURT:  Yes.

 6

 7    VOIR DIRE EXAMINATION BY MR. MARTINEZ:

 8              Q.    You did say you took this picture, right?

 9              A.    Yes, I did.

10              MR. MARTINEZ:  No other questions.  No objection.

11              MR. DELOZIER:  Move for Exhibit 433 into evidence,

12    Your Honor.

13              THE COURT:  Exhibit 433 for identification is

14    admitted into evidence.

15                    (Pause in proceedings.)

16              MR. DELOZIER:  Can you help us?

17

18    CONTINUED DIRECT EXAMINATION BY MR. DELOZIER:

19              Q.    There we go.  Can you identify the person on

20    the left, looks like he's holding a phone?

21              A.    Yes.  That's -- that's my son-in-law, Joseph.

22              Q.    Did -- can you identify the person in the

23    foreground on the right?

24              A.    Yes.  That's one of the tenants, Erik Vaillant.

25              Q.    And how about in the background?
```

 1          A.    Okay.  I don't know who that -- the name of the

 2    gentleman that's back there.  I believe that was a tenant

 3    also, and then my daughter, Wendi.

 4          Q.    Very good.  You were at several parties?

 5          A.    Yes, I was.

 6          Q.    Okay.  Who was in charge at those parties?

 7          A.    Wendi and her co-workers, the people that

 8    worked under her.

 9          Q.    Did you ever see Joe try to take over?

10          A.    Yes.

11          Q.    You said yesterday you had counseled Joe and

12    Wendi at various times, correct?

13          A.    That's correct.

14          Q.    Did you counsel them regarding children?

15          A.    Yes, I did.

16          Q.    And what did you counsel them about children?

17          MR. MARTINEZ:  Objection.  Relevance.

18          THE COURT:  Sustained.

19          MR. DELOZIER:  Can we approach, Your Honor?

20

21               (The following proceedings were held at the

22    bench:)

23

24          MR. DELOZIER:  There's a large segment of our -- our

25    country that believes abortion is a form of abuse, and

```
 1    when -- what I'm -- what she was going to respond was she had
 2    counseled them against abortion.  Obviously, being strict
 3    fundamentalist, she's certainly greatly opposed to that.
 4              THE COURT:  I don't think it's relevant.  I sustained
 5    the objection.  Let's move on.
 6
 7              (The following proceedings were held in open
 8    court:)
 9
10              THE COURT:  Objection sustained.  Let's move on.
11              MR. DELOZIER:  Yes, sir.  Thank you.
12    BY MR. DELOZIER:
13         Q.    We talked about his -- Joe's reputation for
14    anger.
15         A.    Yes.
16         Q.    Did you actually see him get angry with people?
17         A.    Yes.
18         Q.    Okay.  How did he treat those people from what
19    you saw after when he would get mad at them?
20              MR. MARTINEZ:  Objection.  Lack of foundation.  When
21    are we talking about?
22              THE COURT:  Sustained lay some foundation
23    BY MR. DELOZIER:
24         Q.    All right.  You -- can you relate anything you
25    saw during '94 in how he treated people once he got angry
```

```
 1    with them?
 2          A.    In an incident where -- not '94.
 3          Q.    '95?
 4          A.    '95.
 5          Q.    The summer, how he treated those people?
 6          A.    There would be an incident where he got mad at
 7    a certain gentleman involved with boat racing and after that
 8    he would just totally avoid them.  He -- he didn't mumble and
 9    complain and, you know, fuss and cuss and stuff to everyone
10    else, but he would avoid that person and not confront the
11    issue.
12          Q.    How about '96?
13          A.    Yes.
14          Q.    What would Joe do in '96?
15          A.    If he got mad at somebody, he would just avoid
16    them after that.
17          Q.    '97?
18          A.    Same.
19          Q.    '98?
20          A.    Same.
21          Q.    '99?
22          A.    Same.
23          Q.    2000?
24          A.    Same.
25          Q.    Did you confront him when he was angry?
```

14

```
 1          A.    No.

 2          Q.    Why not?

 3          A.    Because I was afraid to because I didn't want

 4    to be cutoff from my daughter and my children -- my

 5    grandchildren.

 6          Q.    Well, he was your grandson.  You liked him,

 7    didn't you?

 8          A.    My son-in-law?

 9          Q.    Sorry.

10          A.    Yes, I did.

11          Q.    Son-in-law, sorry.

12          A.    Yes, I did like him, but I also know that if he

13    was angry, he would avoid them from then on.  Sometimes it

14    would take a couple years because he'd eventually get things

15    back to where they were close friends again.

16          Q.    In fact is it fair to say you were actually

17    fond of him?

18          A.    Yes, I was.  I loved him like a son, otherwise

19    we wouldn't have done all those things we did for him.

20          Q.    During the -- during the year 2000, did you and

21    just the girls go somewhere?

22          A.    Yes, we did.

23          Q.    Where was that?

24          A.    We went to a -- to the -- to a time share in

25    Las Vegas.
```

1       Q.      What time frame are we talking about in 2000?

2       A.      May of 2000.

3       Q.      Who went with you?

4       A.      I went and Wendi went, and Barbara Mitchell,

5    Wendi's -- went and she came a day later.

6       Q.      What about the kids?

7       A.      No.   The children stayed home with their

8    fathers and babysitters.

9       Q.      Okay.   Anything unusual about that trip?

10       A.      Yes.

11       Q.      What was that?

12       A.      When we were there, we were getting phone calls

13    on my cell phone and also on Wendi's, you know, continually

14    from Joe saying, "When are you coming home, when are you

15    coming home?"

16              MR. MARTINEZ:   Objection.   Hearsay.

17              THE COURT:   Sustained.

18    BY MR. DELOZIER:

19       Q.      Okay.   Go ahead, but just what happened?

20       A.      Okay.   And so on Sunday our flight was delayed

21    because of weather and so we called and let the families know

22    that we were going to be late.   Joe was to pick up -- was to

23    pick us up at the airport.   When we boarded -- as we boarded

24    the plane, we called to let him know because there -- it's

25    just, you know, a so-many minute trip from Las Vegas, and

1    when we got there, we already had messages on our phones, you
2    know, saying where were we.
3           MR. MARTINEZ:  Objection.  Hearsay.  She's also
4    talking about numerous phones.
5           THE COURT:  Sustained.  Ask your next question.
6    BY MR. DELOZIER:
7           Q.    Once you got to the airport in Phoenix -- are
8    you referring to Phoenix?
9           A.    Yes, I am.
10          Q.    Okay.  What happened then?
11          A.    Okay.  Wendi and Barbara and I gathered our
12   luggage and we called and let our ride know that we were
13   walking outside.  And we got outside and at the time, you
14   know, at Phoenix airport, there is always construction.  And
15   the lane closest where normally you would park was closed
16   off, and then the second lane over was one where you were
17   supposed to pull in to pick up people, and the third one was
18   a continue-through lane.
19                And as we walked out the door and we were
20   waiting, you could hear this loud noise coming from a
21   vehicle, and up drives Joe and slams on the brakes in that
22   third lane where you're supposed to continue.  And either
23   airport security guard or police, I don't recall which, Joe
24   jumped out of the Yukon and the security -- the officers
25   started yelling at him, you know, "You have to continue

1    going, you can't just stop there, sir," and Joe said, "Fuck

2    off," and he started yelling.  He grabbed our bags, just

3    threw them into the Yukon.  Barbara and I were -- just kind

4    of looked at each other.  We didn't say anything, and we got

5    into the Yukon.  Wendi got into the front seat, and all this

6    time Joe's mouth was just running again with the curse -- he

7    was very angry.  His face was very red.  We got into the car,

8    into the Yukon, and he -- he screeched off, squealed the

9    tires and -- and squealed off.  I -- I don't recall what

10   number that freeway is, but we left the airport and went on

11   that -- the little one that hooks up to Interstate 10 going

12   east.  And he had -- it was, again, a Sunday night and he had

13   the Yukon cranked up.  And from where I was sitting behind

14   Wendi in the second seat, I looked over, I could tell that we

15   were going over 100 miles an hour and I was scared to death.

16   Didn't dare say anything to him because he was -- he was

17   raging and, you know, why hadn't we gotten there sooner, et

18   cetera, et cetera, which was not anything that we had control

19   over.  And he didn't -- when we got off onto Chandler, and

20   then the way that you had to go to catch Pecos and over to

21   San Rivas.  He was just hauling -- I mean, I expected to be

22   stopped or run into somebody or -- it was just very, very

23   frightening.  I had never -- that was horrible.  It was

24   horrible.

25                   And we pulled up to the apartment and didn't --

1    again, you know, Barbara and I had never said a word during

2    the trip, and got out and told -- got our stuff out of the

3    van, and Barbara and I headed home to Casa Grande and never

4    said a word.

5             Q.    Did you and Joe talk on the phone quite a bit?

6             A.    Yes, we did.

7             Q.    During the time then that they were married?

8             A.    Yes.

9             Q.    Did any of those conversations change as we got

10   into -- in the year 2000?

11            A.    Yes, they did.

12            Q.    How did they change?

13            A.    They changed from, you know, being more, you

14   know, fun and casual -- how are you, the kids are this, that

15   and the other -- into being yelled at, being told to run

16   errands and pay for things, and -- and running to "Go find

17   Wendi, I need her right now."  Things like that.

18            Q.    During any of your counseling sessions with

19   Joe, did you ever discuss suicide?

20            MR. MARTINEZ:  Objection.  Relevance, hearsay.

21            THE COURT:  Sustained.

22            MR. DELOZIER:  Could we approach, Your Honor?

23

24                 (The following proceedings were held at the

25   bench:)

1

2          MR. DELOZIER:  We've established that she had

3    counseling sessions with them.  I'm now going to ask her what

4    she discussed.  I'm not asking anything about what he said,

5    but I think it's a relevant part of the case and it calls for

6    a "yes" or "no."

7          THE COURT:  Okay.  But the way you said it, did you

8    have counseling sessions with Joe about suicide, so basically

9    you're telling us what they were talking about and what Joe

10   probably said.  If you ask the question, "Did you have

11   counseling sessions with Joe?" period, then I'll allow the

12   question.

13         MR. DELOZIER:  Okay.

14         MR. MARTINEZ:  And I would note this issue of suicide

15   is irrelevant in this case.  As the Court is aware, even if

16   it's assisted suicide, that is not a lesser included offense

17   of first degree murder.  So even if she was assisting him

18   with suicide -- excuse me -- that was and that would be

19   irrelevant to this inquiry, and so any talk about suicide is

20   irrelevant.

21         THE COURT:  Right, but I sustained the objection.

22   You can restate the question.

23         MR. PATTERSON:  Judge, we need to clarify this.

24

25              (Attorney-attorney discussion.)

1      / / / / /

2           THE COURT:  Mr. DeLozier?

3           MR. DELOZIER:  I believe I'm allowed to elicit from

4      her from what she said to him.

5           MR. MARTINEZ:  First of all, it's hearsay.  Second

6      of all, it's irrelevant, as I said to him, because assisted

7      suicide is not a lesser included offense of first degree

8      murder, so why not begin talking about theft or why not begin

9      talking about fraudulent schemes?  None of those are relevant

10     here.  The only reason I mention those is because we wouldn't

11     talk about those, and so I would ask her to not go into that

12     area.

13          MR. DELOZIER:  Her whole defense is he told her about

14     this stuff so he could kill himself.

15          THE COURT:  I sustained the objection.  Let's move on.

16          MR. DELOZIER:  Reword the way you said?

17          THE COURT:  I indicated to you basically you asked a

18     yes or no question, and I said I will allow the question if

19     the question was "Did you counsel Joe" and she would answer

20     "yes" or "no."

21          MR. DELOZIER:  Okay.

22          THE COURT:  Okay.

23

24          (The following proceedings were held in open

25     court:)

```
 1
 2    BY MR. DELOZIER:
 3           Q.    Talked about your counseling Joe about
 4    children, right?
 5           A.    Yes.
 6           Q.    And did you have other subjects that you
 7    counseled Joe on?
 8           A.    Yes.
 9           Q.    And what were they?
10           MR. MARTINEZ:  Objection.  Hearsay.
11           THE COURT:  I'll sustain the objection.  Ask your
12    next question.
13                 (Attorney-attorney discussion.)
14           MR. DELOZIER:  Approach again, Your Honor?
15
16                 (The following proceedings were held at the
17    bench:)
18
19           MR. DELOZIER:  I think we need to have a private
20    session with you off -- outside of the jury on this subject.
21           THE COURT:  We could talk about it here, go ahead.
22           MR. DELOZIER:  Well, I just don't think we could do
23    it adequately, so I --
24           THE COURT:  Why is that?
25           MR. DELOZIER:  Well, you're cutting me off from
```

```
 1    asking her about counseling in general.  I don't know what
 2    she's going to say.  I worded it Do you believe, that was
 3    appropriate a moment ago, and obviously that's on everybody's
 4    mind in the jury box here, but a substantial piece of her
 5    defense is he told her to order this stuff and he went
 6    through the whole process of trying to kill himself that
 7    night.
 8              THE COURT:  Mr. Martinez.
 9              MR. MARTINEZ:  Basically, what he wants to do is put
10    a defense that's not amenable to him before the jury and look
11    into the areas and perhaps seek to get jury nullification in
12    this case.  As I already said before, this assisted suicide
13    is not a lesser included offense.  Even if it were all true,
14    we're not going to instruct them on that, we're not going to
15    talk about it.  It's irrelevant and anything that he said
16    about it has nothing to do with domestic violence, it doesn't
17    have anything to do with whether he was angry or not, so I
18    just don't see --
19              MR. PATTERSON:  The whole subject was brought up by
20    the prosecution.  The whole subject -- we had pretrial
21    motions on that, okay?  And we -- we didn't want to include
22    it.  It got included at their request.  They have done that
23    to trash her.
24              THE COURT:  Okay.  Both sides have made their record.
25    I made my ruling.  Let's move on.
```

1

2                    (The following proceedings were held in open

3        court:)

4

5                    THE COURT:  Mr. DeLozier?

6                    MR. DELOZIER:  Thank you, Your Honor.  Just one

7        second, Your Honor.

8        BY MR. DELOZIER:

9             Q.    At some point in time, and you'll have to help

10       me with this because I'm not sure exactly the date, did

11       you -- you adopted Brandon.  Talk about him for a second.

12            A.    Yes.

13            Q.    All right. And when was that?

14            A.    Brandon came to live with us in 1988 and we

15       adopted him in '89.

16            Q.    '89?  So Wendi is 19, 18?

17            A.    When the official adoption went through she

18       would be 18.

19            Q.    And he came to live with you when?

20            A.    He came to live with us in '88, 1988.

21            Q.    So about 16, 17 --

22            A.    Yes, that's correct.

23            Q.    -- Wendi's age?  Did he live with you and Alejo

24       continuously?

25            A.    No.

1          Q.     At some point in time, did he -- what did he

2     do?

3          A.     Actually, one summer he lived with Wendi and

4     Joe at the shop.  It was the summer that Nicolas was born,

5     that would be 1997.  During the entire summer when school was

6     out, he stayed with them and lived with them.

7          Q.     Okay.  He was very fond of both of them?

8          A.     He loved them both dearly.

9          Q.     October 7.  Where were you October 7, 2000?

10          A.     October 7 of 2000, in the morning I was in Los

11     Angeles, Los Angeles, California.  We flew in -- my husband

12     and I had been on vacation and we flew in to Phoenix.

13          Q.     I'm sorry flew in where?

14          A.     We flew in to Phoenix.

15          Q.     About what time?

16          A.     We landed, I think, around noon, sometime

17     around there, and got our car.

18          Q.     How long had you been out of down?

19          A.     We'd been out of town nine or ten days.

20          Q.     Okay.  Did you see Wendi and Joe that day?

21          A.     Yes, we did -- I did.

22          Q.     Where was that?

23          A.     I saw them at their apartment at San Rivas.

24          Q.     Approximately what time was that?

25          A.     Between 1:00 and 2:00, somewhere around there.

1          Q.    Did you stay very long?

2          A.    No.  Actually, we arrived there before they

3    did.  I had phoned them and said we were at the airport, and

4    I was told to wait and they would be there shortly.

5          Q.    Okay.  Did she arrive -- who was with Joe and

6    Wendi when she got there?

7          A.    Joe and Wendi and Nicolas and Ashley and Joe's

8    mom, Jeanette Andriano.

9          Q.    Did you stay at the apartment any length of

10   time or how long did you stay?

11         A.    Alejo and I stayed maybe 10, 15 minutes.  That

12   was about all.

13         Q.    Anything special happen that day?

14         A.    No.  I just -- they showed me some things they

15   had gotten from the swap meet.

16         A.    Joe took out of the trunk of the Buick a

17   bicycle for the kids.  It was kind of -- both of them can sit

18   on it and ride together.  Nicolas could ride, Ashley could

19   sit.  And then groceries and things like that that he took

20   out of the car.  I had gone into the house before they got

21   there to write a note, then we didn't go back into the

22   apartment.  We just kind of just stood out.

23         Q.    And what did you do next?

24         A.    And then Alejo and I, you know, told them all

25   goodbye.  We were on our way home because we had a bunch of

```
 1      film in the car that we needed to get refrigerated, some

 2      photography my husband had done.  It was real sensitive film.

 3              Q.    Okay.  And what happened next with Joe and

 4      Wendi as far as you know?

 5              A.    As far as I know, they -- they had said they

 6      were going take a nap and go to Casa Grande for dinner at the

 7      Andrianos.

 8              Q.    Let me rephrase that.  At some point during the

 9      night of October 7 or morning of October 8, were you awake?

10              A.    Yes, I was.

11              Q.    Do you know approximately what time that was?

12              A.    No, I don't because I didn't go to bed until

13      almost midnight.  And all I know is there was -- that Alejo's

14      cousin came and knocked at our door and then at our window to

15      wake us up.

16              Q.    And what did you do?

17              A.    I got up and -- pretty disoriented, you know,

18      because, again, I spent the night at the LAX airport the

19      night before and went to bed late.  So the next thing that I

20      would have done was get dressed and talk to -- I did talk

21      with my daughter on the phone and I headed up to the

22      apartments.

23              Q.    Okay.  When you got there, what -- well, let me

24      ask it this way.  What did you drive, what vehicle did you

25      drive to get there?
```

```
 1              A.      I drove my 19 -- my Mazda to get there.
 2              Q.      Okay.  And who was at the apartment when you
 3       arrived?
 4              A.      When I arrived, I parked over to the side
 5       because there was an ambulance or EMS vehicle in front of the
 6       apartment.  Police were all around the apartment.  There were
 7       neighbors and stuff around the apartment, so I pulled up kind
 8       of around the corner where I could see the apartment, but it
 9       was -- it was quite a distance.
10              Q.      So who was there?
11              A.      The EMS people, police were there, and just all
12       kinds of people.
13              Q.      What did you do after you parked?
14              A.      I started to get out of my vehicle and then
15       Alejo approached me with the children, with Nicolas and
16       Ashley, and so what I did was he handed me the children and I
17       sat in the back seat of my Mazda with the children.
18              Q.      What was the children's condition?
19              A.      They had -- they appeared to have just woken up
20       and/or, you know, been sleeping.  They had their pajamas on.
21       Nicolas had a wet diaper on and I asked if I could -- you
22       know, if Alejo could find a diaper for me.
23              Q.      Did you change him?
24              A.      Yes, I did.  A policemen brought over a bag of
25       clothes that he said they had taken out of the house, of the
```

```
 1    apartment, and I guess he had just kind of grabbed
 2    everything -- you know, just things, and there were diapers
 3    in there so I changed his -- his diaper and his clothes and
 4    changed Ashley's diaper also.
 5              Q.   Now, did you ever go into the apartment itself?
 6              A.   No, I did not.
 7              Q.   Did you speak to Wendi there?
 8              A.   No, I did not.
 9              Q.   About how long did you stay?
10              A.   I think I was there about an hour, an hour and
11    a half, somewhere like that.  I know that by the time that
12    the police gave me permission to leave, it was just you know,
13    dawn breaking, the sky was turning pink.
14              Q.   All right.  What did you drive from the
15    apartment back to  your home?
16              A.   I drove the Yukon home.
17              Q.   That's the one you leased to the kids?
18              A.   That's the one I leased that was in our name.
19              Q.   Okay.
20              A.   I made the payment.
21              Q.   Why did you drive it home?
22              A.   Pardon?
23              Q.   Why did you drive that one home?
24              A.   I drove that one home because when we had
25    returned from vacation on Saturday, I had not yet put our car
```

```
 1    seats, baby seats back into the Mazda and there were car
 2    seats in the Yukon.
 3            Q.    When you left in the Yukon, what did you take
 4    with you?
 5            A.    My grandchildren and the bag of clothes the
 6    policeman gave to me.
 7            Q.    Nothing else?
 8            A.    No, just -- nothing else.  I didn't take
 9    anything.
10            Q.    All right.  Sometime after October the 8th, did
11    you take things from the apartment?
12            A.    Only after the police had been through the
13    apartment.
14            Q.    What did you take and when?
15            A.    I'm -- I'm not sure of the dates and stuff.
16            Q.    Well, approximately, week, two weeks?
17            A.    Seemed like it was a couple weeks before they
18    let us back in.  I'm not really sure.  I'm not sure.
19            Q.    Do you recall what you took?
20            A.    We -- we took some of -- we had to clean out
21    the apartment.
22            Q.    Okay.
23            A.    And we took some things -- the Andrianos took
24    some things, and basically we cleaned out the apartment and
25    cleaned out the stuff like that.
```

1          Q.     Uh-huh.  Any furniture?

2          A.     Yes.  I took the bedroom furniture from Wendi

3    and Joe's bedroom and my jewelry case that I had let Wendi

4    use.  I had the children's bedroom furniture.

5          Q.     Okay.  What was the condition of the master

6    bedroom furniture?

7          A.     The master bedroom furniture was -- it wasn't

8    in real good shape.  My reason for taking it was to return it

9    to the -- to the store because it wasn't paid for yet.  And

10   I -- I had taken, like, the frame and that.  The Andrianos

11   asked for the mattress.  We let them have the mattress.  But,

12   like, the footboard was basically destroyed.  It had -- it

13   needed to be fixed.  There were great big -- I don't know --

14   it's not really dents, it's gashes out of the -- the tall

15   dresser.

16         MR. DELOZIER:  Nothing further at this time, Your

17   Honor.

18         THE COURT:  Mr. Martinez?

19

20   CROSS-EXAMINATION BY MR. MARTINEZ:

21         Q.     Ma'am, this trial started back on October --

22   on August 23rd of the year 2000 -- 2004, and you were here,

23   weren't you, during jury selection?

24         A.     During jury selection, yes.

25         Q.     Yeah.  And you were here every day, weren't

1    you?

2              A.    Almost.   Not every day.

3              Q.    And you came in and the jury was selected, and

4    for those two weeks you were sort of in and out all the time,

5    weren't you?

6              A.    Yes.

7              Q.    However, when the actual proceedings started,

8    you were not allowed to stay in court, right?

9              A.    That's correct.

10             Q.    Like all the other witnesses, the Court didn't

11   want you to be able to compare what was going on with your

12   story.   In other words, you were not allowed to hear what

13   other people were saying, right?

14             A.    That's correct.

15             Q.    Just like the other witnesses you saw them

16   standing out there, right?

17             A.    That's correct.

18             Q.    But you were able to get around not being able

19   to find out what other witnesses were saying, weren't you?

20             A.    I don't understand what were you're saying.

21             MR. DELOZIER:   Your Honor, object.   Relevance.

22             THE COURT:   Overruled.

23   BY MR. MARTINEZ:

24             Q.    You know somebody by the name of Alice Elsey,

25   don't you?

1          A.     Yes, I do.

2          Q.     In fact, she's the woman right back there with

3    the blond hair, second from the end, isn't she?

4          A.     Yes, she is.

5          Q.     In fact, on September 13 of the year 2000

6    (sic), you were talking to her about what was going on, "yes"

7    or "no."  Do you remember that?

8          A.     I don't remember the actual day.

9          Q.     Do you remember talking to her when Shannon

10   Sweeney was testifying?

11         A.     I remember that Alice -- if the -- this is the

12   incident that you're talking about.

13         Q.     Ma'am, let me put it, "yes" or "no," did you

14   and she talk about any things that were going on in the

15   courtroom?

16         A.     Did her and I --

17         Q.     Yes

18         A.     -- talk?

19         Q.     Yes, uh-huh?

20         A.     As a straight answer, I -- yes.

21         Q.     Okay.  And it happened downstairs when?  During

22   the break, didn't it?

23         A.     Yes.

24         Q.     Now, the other thing, you were here during the

25   days that there were opening statements, which was September

1       2nd -- sorry, September 7 of 2004.  You were here that day

2       also, correct?

3               A.      Yes.

4               Q.      During that day you actually had to sit

5       outside, didn't you?

6               A.      Yes.

7               Q.      And during that day Alice Elsey was also here,

8       wasn't she?

9               A.      I believe so.

10              Q.      And you and she had a tape recorder that day.

11      Do you remember that?

12              A.      No, I did not have a tape recorder that day,

13      excuse me.

14              Q.      How about the next day after that?  You and she

15      had a tape recorder, didn't you?

16              A.      I did not have a tape recorder.

17              Q.      You were not walking out of this courtroom or

18      walking out of this courthouse with a tape recorder after the

19      proceedings on either September 7 of the year 2004 or

20      September 8, 2004?

21              A.      I carried the paralegal's tape recorder.

22              Q.      So you did carry a tape recorder, correct?

23              A.      Yes.  We were all helping her carry her stuff

24      out.

25              Q.      You don't know whether or not that tape

1    recorder was ever used by the defense in this case, do you?

2         A.    No, I did not.

3         Q.    But it is a fact that you --

4         MR. DELOZIER:  Your Honor, could we approach?

5

6              (The following proceedings were held at the

7    bench:)

8

9         MR. DELOZIER:  Move for mistrial.

10             (Attorney-attorney discussion.)

11        THE COURT:  Mr. Patterson, since Mr. DeLozier is the

12   one that's handling the examination of this witness, you're

13   whispering, but I think the court reporter can hear what

14   you're saying.  She's not taking down what you're saying.

15        MR. PATTERSON:  My understanding is I have to

16   communicate my position through Mr. DeLozier because he is

17   the lead counsel at this moment.

18        THE COURT:  Go ahead, Mr. DeLozier.

19        MR. DELOZIER:  We have already gone over this.

20   You -- we talked to that witness back there, okay?  And this

21   was cleared.  He's obviously using this as a -- as a tactic

22   to undermine her testimony and there's no good faith basis

23   for it.

24        THE COURT:  Mr. Martinez.

25        MR. MARTINEZ:  I think he's having selective memory.

```
 1    If memory serves me right, and the record will prove me out,
 2    Joseph Andriano indicated that he heard the conversation go
 3    as follows, And then what did she say, And then what did she
 4    say, so they're forgeting that portion of it, so I do have a
 5    good faith basis for asking it.
 6                Additionally, I do believe that I saw her
 7    walking out with a tape recorder, and she admitted she was
 8    walking out with a tape recorder.  Throughout this whole
 9    proceeding, the defense has never used a tape recorder.  In
10    fact, if we all remember, on the record they indicated We
11    don't know anything about a tape recorder, so I do have a
12    good faith basis.
13          MR. DELOZIER:  Your Honor, the paralegal is here.
14    She could tell you it was her tape recorder, we were all
15    helping her carry stuff out that day.  This needs to stop.
16          THE COURT:  Mr. DeLozier, you can follow-up on
17    redirect, okay, to clarify anything.
18          MR. DELOZIER:  To have -- so I need to call my
19    paralegal to tell her -- tell what happened that day?
20          THE COURT:  No.
21          MR. DELOZIER:  That's what this is doing.
22          THE COURT:  No.  You can ask her whether that was the
23    paralegal's tape recorder that she was carrying.  You could
24    do that on redirect.
25                (Attorney-attorney conversation.)
```

```
 1          MR. DELOZIER:  The issue we've got is he knows
 2    that's not true that -- we've never tape recorded anything.
 3    He's making the inference that we are, okay, and I should be
 4    able to call the paralegal to say it was hers.
 5          THE COURT:  I may allow you to do that, but let's
 6    move on right now, okay?
 7
 8               (The following proceedings were held in open
 9    court:)
10
11          THE COURT:  Mr. Martinez.
12    BY MR. MARTINEZ:
13          Q.    And, ma'am, this issue with Shannon Sweeney,
14    and you just told us yes, there was some discussion, that's
15    not the first time that you've actually tried to go behind a
16    court's order, is it?  It's the second time that we know
17    about, isn't it?
18          A.    I don't know what -- you're going to have to
19    give me more information.
20          Q.    You're familiar with a civil lawsuit involving
21    Ashley and Nicolas, aren't you?
22          MR. DELOZIER:  Objection.  Relevance, Your Honor.
23          THE COURT:  Sustained.
24          MR. MARTINEZ:  Judge, may I make a record on it?
25
```

1               (The following proceedings were held at the

2       bench:)

3

4               MR. MARTINEZ:   Judge, under Rule 608 I'm entitled to

5       ask about instances of dishonesty.   In this particular case,

6       what they did is there was a lawsuit involving Ashley and

7       Nicolas in Maricopa County Superior Court.   What happened is

8       that they received a ruling that they did not like, and so

9       what they did is they surreptitiously, because they did not

10      like the result, went over to Pinal County.   And in Pinal

11      County what they did is, even though they knew the order was

12      set, even though they knew the order said they couldn't do

13      certain things, they, without giving notice to Maricopa

14      County Superior Court, without giving notice to the parties

15      that were interested, sought to adopt the kids underneath the

16      Maricopa County -- away from the Maricopa County Superior

17      Court order.   I have the minute entries from that.   They

18      indicate that the court found specifically that they

19      surreptitiously, in violation of a court order, in a

20      dishonest fashion, filed that lawsuit and as a sanction

21      sanctioned them $9000 and sanctioned Mr. DeLozier $6000 for

22      surreptitiously doing it.

23               MR. DELOZIER:   That's --

24               MR. MARTINEZ: I'm not asking about Mr. DeLozier, but

25      acts of dishonesty I can ask about.

1          MR. DELOZIER:  That's absolutely not true.  That case

2     was filed long before there was any ruling, okay?  That case

3     down there, we were told -- well, the statute says you do --

4     there are certain people that are entitled to notice.  We

5     gave notice to everybody that was supposed to receive

6     notice.  Pinal County judge said they believed the guardians

7     should ahave notice as well.  He allowed the case to be

8     dismissed down in Pinal County.

9          THE COURT:  Anything further, Mr. Martinez?

10          MR. MARTINEZ:  I have the minute entrys indicating

11     otherwise.

12          THE COURT:  Let's move on.  I'll sustain the

13     objection.  Let's move on.

14

15          (The following proceedigns were held in open

16     court:)

17

18          THE COURT:  Mr. Martinez?

19     BY MR. MARTINEZ:

20          Q.   I want to talk with you about your daughter and

21     growing up.  One of the things that you told us was she had

22     this sort of idyllic life growing up.  You were talking us

23     about that, right, very religious?

24          A.   Religious.  I didn't say idyllic.

25          Q.   One of the things you told us, and you started

1    to cry when you told us about the shoes issue.  Do you

2    remember that?

3              A.    Yes.

4              Q.    There wasn't anything that forced you to stay

5    in this -- in this band of travelling like gypsies from place

6    to place, was there?

7              A.    As -- no, because we thought we were doing the

8    right thing.

9              Q.    Right.  You could have left at any time, right?

10             A.    No.  We didn't have money to leave at any time.

11             Q.    You mean you were servants?  Is that what

12   you're telling me?

13             A.    Servants to whom?

14             Q.    To the person that you said was in charge?

15             A.    We worked under him.

16             Q.    Did that mean that you were slaves and couldn't

17   go out and find your own job at any time that you wanted?

18             A.    No.

19             Q.    You could have, couldn't you?

20             A.    Yes.

21             Q.    And in fact subsequent to that you did, right?

22             A.    Yes.

23             Q.    So the point about her not having shoes, that

24   was a choice you made, not anything else.  You chose not to

25   go out and get a job to buy her shoes, right?

1          A.     My husband and the other men would work on

2    occasion, and all the money went to Rick and he -- he made

3    the decision on what to do.

4          Q.     Right.  But you didn't have to stay there is

5    the point, right?

6          A.     I guess you could say no.

7          Q.     No.  I don't want what I can say.  What would

8    you say?  Was there was some sort of way that he kept you

9    locked up at night so you couldn't go out and work?

10         A.     No.

11         Q.     Was there anything during those circumstances

12   that forced your husband to stay locked up so he couldn't go

13   out and buy something?

14         A.     No.  Like I said, they did have jobs and all

15   the money went into a pot.

16         Q.     That's what you told us before, but you're not

17   answering my question.  My question is your husband could

18   have left at any time, right?

19         A.     He -- he could have.

20         Q.     And he could have gotten a job, right?

21         A.     I already explained that.  You know, they do do

22   other jobs and work.

23         Q.     I'm not saying within the confines of this

24   troop.  I'm saying he could have left the troop at any time

25   he wanted to, right?

1          A.     Yes, but we believe we were where we were

2    supposed to to be.

3          Q.     So it was both of your choice not to buy her

4    the shoes then, right?

5          A.     No.  I wanted to buy her shoes.

6          Q.     But you didn't go out and do the work to get

7    the money to buy the shoes though, right?

8          A.     No because I wouldn't have ever been allowed to

9    go out and work.

10         Q.     You keep saying you wouldn't be allowed.

11         A.     Right.

12         Q.     My question to you is this.  Was -- did they

13   have you in a jail of some sort so that you couldn't walk

14   away?

15         A.     No.

16         Q.     They didn't have you chained down to anything,

17   did they?

18         A.     No.

19         Q.     This was America, wasn't it?

20         A.     Yes.

21         Q.     So you could have, if you wanted to, walked

22   away at any time?

23         A.     Yes.

24         Q.     Now, the other thing that I wanted to talk to

25   you about, you indicated that she had a very good, not

1   childhood, but she had a good childhood growing up in the

2   school, right?  You told us about that, right?  No problems?

3           A.    No, I didn't say there was no problems.

4           Q.    Well, there were problems with her growing up,

5   wasn't there?

6           A.    Everybody has problems.

7           Q.    Is that "yes" or "no"?

8           A.    Yes, everyday problems.

9           Q.    But you didn't tell us about when she ran away,

10  did you?

11          A.    No.

12          Q.    And she did run away when she was 16 years old,

13  didn't she?

14          A.    I don't remember how -- no, she was probably

15  around 12, and her and the pastor's daughter ran off and they

16  were -- probably got about a mile away.

17          Q.    Ma'am, the question is did you tell us -- first

18  of all, how old was she in your memory of when she ran away?

19          A.    They were probably, like, 11 or 12.

20          Q.    So you don't remember the time she was 15 or 16

21  when she ran away?

22          A.    No.

23          Q.    You don't remember that she ran away four times?

24          A.    I -- I know she ran away two or three times.

25          Q.    Is that "yes" or "no"?

1          A.    No.

2          Q.    And you do know who Sharon Murphy is, right?

3          A.    Yes.

4          Q.    And you do know that the defendant has spoken

5    to Sharon Murphy, right?

6          A.    I've been told.

7          Q.    Have you read the report --

8          A.    On Sharon --

9          Q.    -- prepared by Sharon Murphy?

10         A.    You have to tell me what it looks like if --

11         Q.    Well, no, ma'am. I'm asking you whether or not

12   you read the report prepared by Sharon Murphy.  That's pretty

13   straight forward.

14         A.    No.

15         Q.    Okay.  Haven't even seen it at all?

16         A.    I may have seen it with the attorney.  I don't

17   recall.

18         Q.    Okay.  So you don't know whether or not you

19   read it.  Is that what you're telling me?

20         A.    Right.

21         Q.    How is it that something that is prepared by an

22   expert that you don't remember whether or not you read it --

23   and my question is this.  Have you read everything that's

24   involved in the case and it's just you don't remember what

25   else you've read?

```
 1         A.     No, I've not read everything involved in the

 2    case.

 3         Q.     But you've read parts involved with the case,

 4    haven't you?

 5         A.     As far as like I -- I've seen -- I have a list

 6    they gave me from the car.  I've seen newspapers.  I've seen

 7    some items from the original police report, yes.

 8         Q.     In other words, what you're telling me is you

 9    read part of the police report, right?

10         A.     Right.

11         Q.     You've seen some of the items that were seized?

12         A.     Right, yes.

13         Q.     And as part of this, you may or may not have

14    read Sharon Murphy's report, right?

15         A.     Correct.

16         Q.     And now, when you're talking about your

17    daughter and when she was going through high school -- there

18    was a picture that was taken at graduation, wasn't there?

19         A.     A number of pictures, yes.

20         Q.     Well, there's one specifically, and I'll show

21    it to you and see if this is one of the pictures that was

22    taken for her graduation or in anticipation or about the time

23    that she graduated.  This is -- this is Exhibit 412.  Let's

24    take a look at it.

25         A.     Okay.
```

1          Q.     Is that a picture that was taken on the

2     occasion of her graduation?

3          A.     No.   That was her senior picture.

4          Q.     Okay.   She was going to graduate in 1989,

5     right?

6          A.     Correct.

7          Q.     And she graduated May 18th, 1989, right?

8          A.     I don't recall the exact date.

9          Q.     Well, she -- she graduated in '89 according to

10    you?

11         A.     Yes, she did.

12         Q.     And if the record's indicate May 18th, 1989,

13    you have no reason to doubt that?

14         A.     Correct.

15         Q.     This, according to you, is her senior picture,

16    right?

17         A.     That's correct.

18         Q.     That would make her 18 years of age, right?

19         A.     She would have -- yes, 18.

20         Q.     All right.   If I may have it back please.

21                MR. MARTINEZ:   Move for admission of Exhibit Number

22    412.

23                MR. DELOZIER:   No objection, Your Honor.

24                THE COURT:   Exhibit 412 for identification is

25    admitted into evidence.

1    BY MR. MARTINEZ:

2         Q.    Let's take a look at it.  When we look at this,

3    her -- the color of her hair is blond, isn't it?

4         A.    It's blond with dark -- dark at the root.

5         Q.    Is it blond, "yes" or "no," ma'am?

6         A.    It's partly blond, yes.

7         MR. MARTINEZ:  Your Honor, may I just sort of walk

8    this in front of the jury so they may take a look at it --

9         THE COURT:  Yes.

10         MR. MARTINEZ:  -- so there's no dispute?

11              (Pause in proceedings.)

12    BY MR. MARTINEZ:

13         Q.    And, ma'am, that was before she met Joe

14    Andriano, wasn't it?

15         A.    Yes, it is.

16         Q.    Now, there are other pictures that were taken

17    of her when she was about 19 or 20, isn't there -- aren't

18    there, ma'am?

19         A.    If you have them.

20         Q.    Well, let me show you a couple other pictures

21    then, okay?  Let's take a look at Exhibit 410.

22         A.    Okay.

23         Q.    Do you recognize your daughter in those

24    pictures?

25         A.    Yes.  That's my daughter and her friend Laura.

1          Q.     How old was she in that picture?

2          A.     This one, probably 17 -- 16 or 17.

3          MR. MARTINEZ:  Okay.  I move for admission of Exhibit

4    410.

5          MR. DELOZIER:  No objection, Your Honor.

6          THE COURT:  Exhibit 410 for identification is

7    admitted into evidence.

8    BY MR. MARTINEZ:

9          Q.     Let's go ahead and take a look at that.

10                Her hair color there is, what, blond?

11         A.     Yes, it is.

12         Q.     Are you also going to tell me this one has the

13   dark roots?

14         A.     It probably does.  If you notice, she was --

15   that's from the summer and her hair lightens up in the

16   summer.  She was a towhead when she was born.

17         Q.     The point is she didn't lighten it up or

18   anything.  This was her natural color?

19         A.     That was in the sun.  In the winter, it wasn't

20   like that.

21         Q.     Ma'am, is that the natural color?

22         A.     No, it's sun.

23         Q.     The point is, did she put any additive on it to

24   make it turn blond?

25         A.     At that point, I don't think so.  I don't

1    recall.

2           Q.    Well, she was living with you, right?

3           A.    Right.

4           Q.    Did she ever bleach her hair blonde when she

5    was living with you?

6           A.    No.

7           Q.    Exhibit Number 445.  First of all, who is that?

8           A.    That's Wendi.

9           Q.    And where was it taken?

10          A.    That was taken in Sedona.

11          Q.    And how old was she?

12          A.    I believe that she was -- I'm not sure.   In

13   that picture, she was already married.

14          Q.    Okay.  If I may have that back.

15          MR. MARTINEZ:  I move for admission of Exhibit 445.

16          MR. DELOZIER:  No objection, Your Honor.

17          THE COURT:  Exhibit 445 for identification is

18   admitted into evidence.

19   BY MR. MARTINEZ:

20          Q.    Take a look at that one.

21          A.    Yes.

22          Q.    Also has blonde hair there, correct?

23          A.    Yes.

24          Q.    Now, ma'am, you know your daughter, her voice,

25   pretty well.  Do you know her voice pretty well?

1          A.     Yes.

2          Q.     I'm going to play a tape for you, okay?  I want

3     you to listen to it.

4          THE COURT:  Let me see Counsel --

5          MR. DELOZIER:  Approach, Your Honor?

6          THE COURT:  -- at the bench.

7

8               (The following proceedings were held at the

9     bench:)

10

11          THE COURT:  Is this something that's already been

12    admitted?

13          MR. MARTINEZ:  Yeah, Exhibit 210.

14          THE COURT:  Okay.  I just wanted to make sure it was

15    something that's been admitted into evidence.

16          MR. DELOZIER:  What is it?

17          THE COURT:  You wanted to approach?

18          MR. DELOZIER:  Yes.  I just wanted to know what it

19    was.

20          MR. MARTINEZ:  Exhibit 210.

21          MR. DELOZIER:  What is it?

22          MR. MARTINEZ:  It's a tape that you heard in court.

23    I mean --

24          THE COURT:  Is this the one that we've already played

25    in court?

```
 1              MR. MARTINEZ:  Uh-huh.

 2              THE COURT:  Okay.

 3              MR. DELOZIER:  Cumulative, redundant, no reason to

 4    play it.

 5              THE COURT:  You're not going to play the whole tape?

 6              MR. MARTINEZ:  No, just a part of it to see if she

 7    recognizes the voice on it.

 8              THE COURT:  Okay.  I'll allow you to do it in that

 9    sense.

10              Counsel, just one more thing.  The court

11    reporter is not going to take down this portion.

12              MR. MARTINEZ:  Right.

13              THE COURT:  Okay.

14

15              (The following proceedings were held in open

16    court:)

17

18              THE COURT:  Mr. Martinez?

19    BY MR. MARTINEZ:

20         Q.    This is Exhibit Number 210.  I want you to

21    listen to it, okay?

22

23              (Whereupon, the tape was played.)

24

25              THE WITNESS:  I can't hear -- I can't hear it.
```

```
 1              MR. MARTINEZ:  Okay.  Let's back it up and I'll play
 2      it up here close to you.
 3
 4                    (Whereupon, the tape was played.)
 5
 6              THE WITNESS:  I think that's her.
 7      BY MR. MARTINEZ:
 8         Q.    Now, ma'am, you heard that, right?  You heard
 9      that tape, part of 210, right?
10         A.    (No audible answer.)
11         Q.    Is that "yes"?
12         A.    Yes.
13         Q.    And that's your daughter on there, right?
14         A.    I believe so.
15         Q.    And it was talking about tickets and talking
16      about moving traffic violations.  Did you hear that part?
17         A.    I was listening.  To say if it was her voice, I
18      can't tell you that.
19         Q.    We've played it and in it she says she has
20      moving violations -- traffic violations.
21              MR. DELOZIER:  Your Honor, beyond the scope of what
22      you have allowed him to get into.
23              THE COURT:  Sustained.  Let's move on.
24      / / / /  /
25      BY MR. MARTINEZ:
```

1        Q.    Ma'am, one of the things we've heard in this

2  court is your daughter had moving traffic violation.  It's

3  actually more than that.  Isn't it true she had her license

4  suspended back on December 28 of 1999?

5        A.    That I do not know.

6        Q.    Well, I thought you were -- I thought you were

7  pretty close to her in 1998 and 1999.  Didn't you tell us

8  that on direct examination?

9        A.    Yes, but I don't know about that.

10       Q.    So she just -- you don't if that's true.  They

11  didn't tell you about it, right?

12       A.    Not that I recall.

13       Q.    They did have a couple cars.  They had a Yukon,

14  right?

15       A.    They had the Yukon I leased for them, yes.

16       Q.    The answer is yes, right?  They had a Yukon,

17  right?

18       A.    Yes, they had a Yukon.

19       Q.    And you wanted to tell me you were the person

20  that actually paid for that, right?

21       A.    Yes.

22       Q.    They also had another car, right?

23       A.    They were using his parent's car.

24       Q.    So the answer is "yes," right?

25       A.    Yes.

1        Q.    And your daughter, in the year 2000, was

2   driving around, wasn't she?

3        A.    Yes.

4        Q.    And you'd see her drive both cars, the Yukon

5   and the other car, right?

6        A.    Yes.

7        Q.    And she would drive with the kids in it, right?

8        A.    Yes.

9        Q.    Now, one of the other things that we were

10  talking about yesterday, you told us about the Courtyard

11  Apartments and that she worked there.

12       A.    Do you remember that?

13       A.    Yes.

14       Q.    And she left there about, I don't know, you

15  said November of 1999 I believe, right?

16       A.    No.   I said that she started a new job in

17  November of 1999.

18       Q.    And that would have been the San Riva

19  apartments, right?

20       A.    That's correct.

21       Q.    But before that she worked at the Courtyard,

22  right?

23       A.    She worked one other place in between, yes.

24       Q.    But before that she worked at the Courtyard,

25  right?

1          A.      That's correct.

2          Q.      She worked at the Courtyard somewhere around, I

3     don't know.   When was it that she worked there?

4          A.      She worked at the Courtyard from May, June of

5     '98 to September, October of '99.   September, I think.

6          Q.      And one of the kids was born while she was

7     under their employ.   Ashley, right?

8          A.      That's correct.

9          Q.      One of the things you told us during that time

10    was she worked really, really hard, right?

11         A.      Yes, she did.

12         Q.      You told us that she took care of the kids,

13    right?

14         A.      That's correct.

15         Q.      You also told us that she took care of Mr.

16    Andriano, right?

17         A.      That's correct.

18         Q.      Because by that time he'd already had his

19    fourth surgery, right?

20         A.      Correct.

21         Q.      And she was doing everything, right?

22         A.      Yes.

23         Q.      And she was looking tired, right?

24         A.      Yes.

25         Q.      But you didn't tell us about the times that she

1    would go to the tanning booth.  Did you tell us about that?

2          A.    I don't know about that.

3          Q.    Well, let me show you a document from there and

4    see if that -- remember, you were the one that -- she told

5    you everything prior to the year 2000?

6          A.    I said we talked and we had a good

7    relationship.  I didn't say she told me everything.  She

8    didn't tell me everything.

9          Q.    She didn't tell you about going tanning when

10   she was working there at the Courtyard?

11         A.    No.

12         Q.    She didn't tell you she was held accountable

13   for that by the management and wrote up for going tanning

14   during work hours?

15         A.    I don't have any knowledge of that.

16         Q.    The other thing you told us was she worked

17   really hard around the house, right?

18         A.    I said she worked really hard taking care of

19   the children, taking care of Joe, working.

20         Q.    Which means she was also taking care of the

21   house back in 1998?

22         A.    I did not say that specifically.

23         Q.    She didn't clean up around the house in 1998?

24   She left it all for Joe to do?

25         A.    No, not all.  Joe wouldn't have done it.

 1          Q.    Right.  That's the point you were trying to

 2    make, right?

 3          A.    Uh-huh.

 4          THE COURT:  Is that "yes"?

 5          THE WITNESS:  He's getting me confused.

 6          THE COURT:  Hold on.  Don't say "uh-huh," "huh-uh."

 7    Make sure you give a verbal response.  Ask your question.

 8    BY MR. MARTINEZ:

 9          Q.    Okay.  Back -- is there anything confusing

10    about 1998 that you don't understand?

11          A.    No.

12          Q.    That's the year we're talking about?

13          A.    Okay, 1998.

14          Q.    Is there anything confusing about when she

15    worked at the Courtyard Apartments?  You understand that's

16    the date, right?

17          A.    Correct.

18          Q.    And we're talking about -- you spent hours

19    going over it with Mr. DeLozier.  I just want to flesh it out

20    a little bit more.  You said yesterday that she worked very

21    hard when she was at the Courtyard Apartments, right?

22          A.    Yes, she did.

23          Q.    That she took care of the kids, right?

24          A.    That's correct.

25          Q.    Joseph Andriano did not lift a hand to help

1    her, right?

2              A.    I did not say that.

3              Q.    He didn't help her, right?  Wouldn't change

4    diapers?

5              A.    He didn't want to change --

6              Q.    You said he didn't?

7              A.    -- diapers.

8              Q.    That's what you said.  The other thing we

9    need --

10             A.    In my sight.  Does that help?

11             Q.    No, ma'am, it doesn't.  And you also told us,

12   ma'am, that she was responsible for the household in the

13   sense that he was sick and he couldn't do any of the

14   household chores, right?

15             A.    I did not say he was sick and couldn't do the

16   household chores.

17             Q.    But he didn't do the household chores.  Is that

18   what you told us?

19             A.    That's correct.

20             Q.    You didn't do the household chores, right?

21             A.    No.

22             Q.    Your husband, Alejo, didn't do the household

23   chores, did he?

24             A.    Not at that house.

25             Q.    Actually, somebody by the name of "Anna" who

 1    was working at the Courtyard Apartments did their cleaning,

 2    didn't she?

 3         A.    I don't know that.

 4         Q.    They had a personal -- a person who worked for

 5    the apartments who she actually had come and do her cleaning,

 6    didn't she?

 7         A.    I don't know.

 8         Q.    She worked -- well, I thought you were there?

 9         MR. DELOZIER:  Your Honor, could we apreach?

10

11              (The following proceedings were held at the

12    bench:)

13

14         THE COURT:  She said she didn't know about Anna.

15    Let's move on.

16         MR. DELOZIER:  My objection is he's testifying though.

17         THE COURT:  Okay.  Let's move on.

18         MR. MARTINEZ:  I'll move on, but I could ask the

19    question if she knows because she was there every day.

20         THE COURT:  Go ahead and ask the --

21         MR. DELOZIER:  He needs to back off though, Your

22    Honor.  He's badgering.  He's close to badgering her.

23         THE COURT:  Just one at a time.  Ask the question.

24         MR. MARTINEZ:  Okay.

25         THE COURT:  Let her answer, and let's move on.

1

2                    (The following proceedings were held in open

3       court:)

4

5       BY MR. MARTINEZ:

6            Q.    Now, with regard to this Anna, she was the one

7       who did the babysitting, didn't she?

8            A.    No, she -- I don't know who Anna is, but that

9       wasn't the babysitter.

10           Q.    Now, ma'am, one of the other things that you

11      told us yesterday was that -- that they were having family

12      difficulties back then, right?

13           A.    Correct.

14           Q.    How is it that the defendant was then able to

15      buy you a whole set of chairs and stuff that were delivered

16      to Alejo when she was working at the Courtyard Apartments if

17      they didn't have any money?

18           A.    What chairs?  I --

19           Q.    Do you remember ever a gift of furniture from

20      the defendant to you while she worked at the Courtyard

21      Apartments?

22           A.    We received a couch and a chair that had

23      been -- that weren't being used at the apartments anymore,

24      yes.

25           Q.    You did receive some furniture from that

```
 1    apartment then, didn't you?
 2           A.    Yes.
 3           Q.    Now, the other thing that you were telling us
 4    was that she did everything for him.  Do you remember telling
 5    us that she did everything for him, that if he wanted to, she
 6    would, I guess, clip his toenails?  I think you had mentioned
 7    that.  Do you remember saying that?
 8           A.    Yes.  Yes, she used to clip his toenails,
 9    fingernails.
10           Q.    She did everything for him like that, right?
11           A.    Yes.
12           Q.    One of the other things that you told us was
13    that during -- after the second operation, the incision
14    required some management after he went home, right?
15           A.    Yes.
16           Q.    And in fact the way you described it is the
17    doctor kept him over one day to take a look, for whatever
18    reason he stayed over one day after the second surgery,
19    right?
20           A.    Yes.
21           Q.    And for that second surgery, after they let him
22    go home, the person who actually ended up taking care of him
23    was you, right?
24           A.    Uh --
25           Q.    "Yes" or "no"?  Was it you?  Did you tell us
```

1      that yesterday?

2              A.    Yes.

3              Q.    It wasn't the defendant, the person who you

4      said cut his toenails and did all of that, right?

5              A.    She -- she did also.  She --

6              Q.    Well, wait a minnute.  Didn't you tell us

7      yesterday that it grossed her out because there was blood

8      associated with it and she wouldn't do it?  That's what you

9      told us yesterday, right?

10             A.    No, I did not.  I did not say it grossed her

11     out.  I said she was never able to handle blood.

12             Q.    You left us then with the impression, ma'am,

13     that the person who actually took care of him was you, right?

14             A.    Yes.

15             Q.    With regard to his third surgery -- or the

16     fourth, the one done at the Mayo Clinic, the one that took

17     all his muscles and took a lot of the left side.  Do you

18     remember that?

19             A.    The fourth surgery?

20             Q.    Right.  That was in 1998, remember that?

21             A.    That's correct.

22             Q.    And you told us that after that Mr. Andriano

23     was able to work.  You told us that, right?

24             A.    I did, yes.

25             Q.    You told us he was able to work, right?

1          A.    Yes.

2          Q.    And one of the things that you didn't tell us

3    was that all of his muscles of his shoulder were actually

4    taken out as part of that operation, wasn't it?

5          A.    I believe I said that they took out all of

6    this.

7          Q.    Right.  What that means is he didn't have the

8    strength to be able to left those windshields anymore.  Isn't

9    that true, ma'am?

10         A.    No, that's not true.

11         Q.    He was -- you were able to test him out to see

12   the strength in his arm?

13         A.    I saw him pick up 50 gallon drums of fuel.  I

14   saw him change windshields, yeah.

15         Q.    So the answer is yeah, you think he still could

16   work then, right?

17         A.    Oh, yes.

18         Q.    He could also work while he was having

19   chemotherapy too, right?

20         A.    I don't know about that.

21         Q.    You don't know what?

22         A.    If he could work while he had chemotherapy.

23         Q.    Well, according to you, the only job he had

24   after that was the one where -- the one after the 1998

25   surgery.  Isn't that true?

1       A.     No.  I said he also did work on the side with

2   his windshield business, replacing windshields whenever, you

3   know, he did, you know.  And no one ever asked me, but he

4   also worked for an air-conditioning place in Spring of 2000.

5       Q.     So after the fourth surgery, the thing that you

6   told us though was that he came home after a stay in the

7   hospital, right?

8       A.     Correct.

9       Q.     And that the care for him was a little bit more

10  than it was after the third surgery?

11      A.     Definitely, yes.

12      Q.     And the other thing you told us was that you

13  came home four times a day to take care of him, right?

14      A.     That's correct.

15      Q.     Not the defendant.  You took care of him,

16  right?

17      A.     Correct.  I --

18      Q.     And -- sorry.

19      A.     As far as the feeding tube and the trach.

20      Q.     Right.  And the other -- the other person who

21  took care of him, that you told us, was your husband, Alejo

22  Ochoa?

23      A.     As far as repacking, yes, he did that.

24      Q.     You -- even though at that time the defendant

25  was working at the Courtyard Apartments, right?

1          A.    Yes.

2          Q.    And she was within walking distance of him,

3    right?

4          A.    Yes.

5          Q.    One of the things that you also told us was

6    that, well, you know, he would force her to drive home, to

7    come home and change the diapers.  Do you remember telling us

8    about that incident?

9          A.    Yes.  He -- he'd even bring the children to me

10   at work for me to change them.

11         Q.    I understand that.  But the point I'm trying to

12   make, he wouldn't walk down there.  He'd drive down there

13   according to you, right, even though they lived in the same

14   complex?

15         A.    I -- I -- say it again, please?

16         MR. MARTINEZ:  Could you read that back?

17

18         (Whereupon, the question was read:

19         Q.    I understand that.  But the point I'm

20         trying to make, he wouldn't walk down there.  He'd

21         drive down there according to you, right, even though

22         they lived in the same complex?)

23

24         THE WITNESS:  He would take them to her if I wasn't

25   there.  I don't know on occasion if he walked or drove.

```
 1    BY MR. MARTINEZ:
 2           Q.    Well, you told us he would drive down there.
 3    That's what your words were yesterday.  Do you remember that?
 4           A.    Okay.
 5           Q.    So you're -- now you're telling us perhaps you
 6    misspoke yesterday?
 7           A.    I'm human.
 8           Q.    Ma'am, is that the question before you?  No
 9    one's accusing you of not being human, but is that the
10    question before you?  The question before you is you made a
11    mistake yesterday, right?
12           A.    I may not have said it the exact way that I
13    should have.
14           Q.    The bottomline is you didn't see it is the
15    point I'm trying to get at.  Somebody told you?
16           A.    Oh, no.  I saw him bring the kids over to the
17    office before when I was in the office for her and he'd bring
18    them to her to change them.
19           Q.    And he would walk over.  He wouldn't drive
20    over, would he?
21           A.    Actually, I think he drove over.
22           Q.    Now, you indicated that you and she were pretty
23    close.  She's your only child.
24           A.    She's my only child --
25           Q.    Right.
```

1          A.     -- except for Brandon.  She's not my only
2     child.  She was the only child for a long time.
3          Q.     She's your only biological child, right?
4          A.     Yes.
5          Q.     You indicated you were pretty close with her,
6     weren't you?
7          A.     Pretty close.  She was closer with her father,
8     actually.
9          Q.     Okay.  She was closer to her father, even
10    though her father was the same guy that, according to you,
11    would scream at you, right?
12         A.     Yes.
13         Q.     And he's the guy that would scream at you so
14    much it would force you to run into the bathroom, right?
15         A.     I would go into the bathroom or to the bedroom,
16    correct.
17         Q.     And you would lock the door, right?
18         A.     Yes.
19         Q.     And then as part of going into there, you would
20    take your child with you, right?
21         A.     Yes.
22         Q.     That's the man that she loves more than -- or
23    has a better affinity with than you, right?
24         A.     Yes.
25         Q.     And then the other thing that strikes me about

1    that is that he was being violent to you then, right, because

2    he was screaming at you, right?

3          A.    He was screaming.  There was never any cursing

4    or physical.

5          Q.    He was screaming to the point where he made you

6    afraid, right?

7          A.    He was screaming to the point where I just

8    didn't want to hear it.

9          Q.    So you weren't afraid when you would go into

10    the bedroom or the bathroom and lock the door?

11          A.    Not afraid.  Just wanted to get away from it.

12          Q.    So if you -- why are you locking the door if

13    you're not afraid?

14          A.    So that I -- that he wouldn't follow in and

15    keep yelling.

16          Q.    Well, and he would never come to the door then.

17    He would never check the lock?

18          A.    I don't recall.

19          Q.    So then you locking it had nothing to do with

20    it because he would never come check the door then?

21          A.    I don't recall.

22          Q.    You don't recall him checking the door.  That's

23    what you're saying?

24          A.    That's true.

25          Q.    So he could not -- in other words, it could be

1    he never checked the door, right?

2         A.    It could be.

3         Q.    You said this happened every year when she was

4    growing up, right?

5         A.    Yes.

6         Q.    You gave us a litany of all of the years.

7    This would include when she was growing up and also when she

8    was in high school, right?

9         A.    Correct.

10        Q.    You never called the police on him, right?

11        A.    No.

12        Q.    It was just a fight between you and him, right?

13        A.    Not necessarily a fight.  It could be where he

14   was just yelling about something.  It could have been he was

15   yelling about something that happened to him somewhere, so

16   you can't say a fight every time no.

17        Q.    Well, he was yelling?

18        A.    Yes.

19        Q.    And you were the object of his yelling, right?

20        A.    I may not have been what he was yelling about,

21   but if he was yelling, I -- and I was there, he would be

22   yelling and then I would leave.  I would take Wendi and go

23   into the bedroom.

24        Q.    Just so I understand, he'd start yelling the

25   way you pictured it to me?

1          A.      Uh-huh.

2          Q.      On occasion he'd be yelling like a crazy man.

3    Like Don Quixote screaming at the the windmills?

4          A.      No.

5          Q.      Well, you --

6          A.      No, I didn't say --

7          Q.      Ma'am, the point I'm trying to make, when the

8    yelling was going on, the voice was directed towards you,

9    wasn't it?

10         A.      He was yelling -- it could have been towards --

11   towards a book.  I don't know.  Directed towards me or in my

12   presence, yes, in my presence.

13         Q.      So what you're saying is he yelled in your

14   presence -- it could be he would just start yelling for no

15   reason, not to you but in your presence, and then that would

16   cause you, when he started letting loose like the crazy man,

17   to go into the bedroom or bathroom?

18         A.      He didn't yell like a crazy man.

19         Q.      Well, he yelled at nothing according to you?

20         A.      He would be yelling about a situation.

21         Q.      So he -- just so I'm clear, he wouldn't yell at

22   you.  On occasion he'd just start yelling?

23         A.      He would yell at me on occasion or Wendi on

24   occasion or a situation on occasion, yes.

25         Q.      And when those situations arose, you would then

```
1    take off and go into either the bedroom or the bathroom?
2          A.    Yes.
3          Q.    And according to you, that's no reason to leave
4    him, right?  That's -- you weren't an abused woman, were you?
5    You didn't feel abused, did you?
6          A.    On occasion I did because of verbal abuse, but,
7    no, I was not going to leave him because that's --
8          Q.    The question is --
9          A.    -- against --
10         Q.    The question is did you feel abused?
11         A.    On occasions, yes.
12         Q.    Did you feel abused when he started to scream
13   at a book?
14         A.    No.
15         Q.    Did you feel abused when he started to scream
16   at Wendi, according to you?  Wasn't screaming at you, but
17   screaming at her.  Did you feel abused?
18         A.    I would feel upset, not abused.
19         Q.    so the answer is no, you would not feel abused,
20   right?
21         A.    Okay.
22         Q.    The only time you would feel abuse was when he
23   screamed at you?
24         A.    I'm going to retract that and say yeah,
25   probably so when he would scream at Wendi or Brandon, yes.
```

1          Q.    Well, I'm asking -- now that you've retracted

2     that, you would feel abused when he would scream at Wendi?

3          A.    I would feel we were being abused.

4          Q.    No, no.  I'm asking you -- he's screaming at

5     Wendi.  Did you feel abused when he screamed at Wendi?

6          A.    Not every time.

7          Q.    Just sometimes, right?

8          A.    Yes.

9          Q.    And sometimes when you felt abused that was

10    because he was screaming probably louder and harsher, right?

11         A.    Possibly.

12         Q.    Well, I wasn't there.  You're going to have to

13    help me out.  Is that when you felt abused?

14         A.    On occasion.

15         Q.    And on this occasion when you felt you were

16    being abused, that would also mean that you felt that he was

17    abusing Wendi, right?

18         A.    That he was being loud and abusive as far as

19    being loud.

20         Q.    But my point is you felt abused on certain

21    situations when he screamed at Wendi, right?

22         A.    Uh-huh.

23         Q.    Is that "yes"?

24         A.    Yes.

25         Q.    And so what I'm saying is then if that's the

1    case and if you felt, abused then you also felt he was

2    abusing Wendi then, right?

3            A.    I never -- abusing us.

4            Q.    Okay.  So if he was abusing the "us," which

5    would include Wendi, you never called Child Protective

6    Service when he was to take care of this child that he was

7    abusing, right?

8            A.    No.

9            Q.    Okay.  Because it wasn't that serious, was it?

10           A.    No, because I would just forget about it.

11           Q.    Right.  Because it didn't even -- you didn't

12   need to call the police?

13           A.    No.  I never would have called the police.

14           Q.    It wasn't that serious, right?  He never laid a

15   hand on you, did he?

16           A.    No, he did not.

17           Q.    He never laid hand on her?

18           A.    No, he did not.

19           Q.    All he did was scream, right?

20           A.    Scream.

21           Q.    And frighten you?

22           A.    Yes.

23           Q.    But you never, throughout all of those years

24   that he was doing this screaming, felt like he would ever hit

25   you, right?

```
 1          A.    I never felt like he would hit me.  Plus, I
 2   would never divorce him.
 3          Q.    I'm asking you --
 4          A.    I would have never left him, which would have
 5   proceeded to a divorce.
 6          Q.    I'm not asking about divorce.  I'm asking about
 7   him hitting you, if you ever felt like he was going to hit
 8   you?
 9          A.    No.
10          Q.    Did you ever feel like he was going to hit her?
11          A.    No.
12          Q.    All it was was just talk?
13          A.    Yelling.
14          Q.    Yelling.  I want to talk to you a little bit
15   about October 8, 2000.  Do you know what day that is?
16          A.    That was a Sunday.
17          Q.    And that was the date that --
18          A.    My son-in-law died.
19          Q.    That your daughter killed him?
20          A.    No.  I did not say that, you did.
21          Q.    I know.  I want to talk to you about it.
22                My understanding is that you had just arrived
23   back from California then the previous day, the Saturday,
24   right?
25          A.    Yes.
```

74

```
 1          Q.     And what car did you drive back from the

 2    airport to your home in Casa Grande when you drove back?

 3          A.     The Mazda.

 4          Q.     The Mazda?

 5          A.     Yes.

 6          Q.     Okay.  But you didn't drive the Mazda all the

 7    way to California, did you?

 8          A.     No.

 9          Q.     You just left it at the airport, right?

10          A.     Correct.

11          Q.     So it wasn't a situation where you had to pack

12    everything in there and drive all the way to California.  It

13    was a situation where it was parked there and then you drove

14    on home, right?

15          A.     At the airport, yes.

16          Q.     And there was a concern about some -- some

17    rolls of film, right?

18          A.     Correct.

19          Q.     So that's when you stopped over at the

20    Andrianos.  You were only there about 10 or 15 minutes, and

21    then you went home, right?

22          A.     Correct.

23          Q.     And then what happened was that you went to

24    sleep, but albeit until about midnight, which would now make

25    it October 8 of the year 2000, right?
```

1          A.     Okay.

2          Q.     Well, no, I was --

3          A.     Correct.

4          Q.     One of the things that happened is later on

5     after you went to sleep, you couldn't tell us the time, you

6     guys were woken up, right?

7          A.     Yes.

8          Q.     You were woken up by somebody who came over and

9     woke you up, right?

10         A.     Yes, Alejo's cousin.

11         Q.     Right.  And you did see your husband get on the

12    telephone, right?

13         A.     I saw my husband on the telephone, yes.

14         Q.     And you heard him -- I'm not asking you what he

15    said, but you heard him talking, didn't you?

16         A.     No, I did not.  He went into the bathroom.

17         Q.     So there's -- you get a call very late at

18    night, right?  And that -- didn't that cause a little bit of

19    concern that you're getting this call really late at night?

20         A.     Yes.

21         Q.     And yet you didn't ask him what it was about,

22    did you?

23         A.     I said --

24         Q.     No, ma'am, "yes" or "no," you didn't ask him,

25    right?

1      A.    Yes.

2      Q.    Well, ma'am, do you remember that you and I had

3 a conversation back on May 7 of the year 2004?

4      A.    Yes.

5      Q.    And do you remember that I asked you

6 specifically about whether or not you asked him about this

7 and whether or not he told you.  Do you remember that?

8      A.    I know we had a conversation.  I don't remember

9 everything that we talked about.

10      Q.    Well, and do you remember telling me that he

11 left town without telling you why he was leaving?  Do you

12 remember telling me that?

13      A.    Yes.

14      Q.    So as I understand it today then, he's on the

15 telephone, right?

16      A.    Yes.

17      Q.    You're in bed still, right?

18      A.    No.

19      Q.    You got up?

20      A.    I got up.

21      Q.    He goes into the bathroom to -- for the call,

22 right?

23      A.    Yes.  Well, he was on --

24      Q.    You said he went to the bathroom, right?

25      A.    Yes, he went to the bathroom.  I know he went

1   to the bathroom because by then I was up.

2          Q.     Right, the point being he went to another room,

3   right?

4          A.     Yes.

5          Q.     And in a -- it's a room where you didn't hear

6   the conversation.  Is what you're telling us, right?

7          A.     That's correct.

8          Q.     And as a result -- well, you didn't follow him

9   into the bathroom, right?

10         A.     No.

11         Q.     Okay.  And the point is he wanted some privacy,

12  or for whatever reason, he wanted to be away from you, right?

13         A.     You'd to have ask him that.

14      MR. MARTINEZ:  That's right.

15      MR. DELOZIER:  Objection, Your Honor.  Speculation.

16      THE COURT:  Sustained.

17  BY MR. MARTINEZ:

18         Q.     I'm not asking you to tell me why he went over

19  there.  I'm just asking you it was spatially apart.  You and

20  he were spatially apart, right --

21         A.     Yes.

22         Q.     -- when he was over there.  He cames out of

23  that bathroom, right?

24         A.     Correct.

25         Q.     He starts getting dressed, right?

1       A.    I think he already started getting dressed in
2   the bathroom.
3       Q.    Okay.  But you weren't in the bathroom?
4       A.    No.
5       Q.    Well, you weren't in the bathroom with him,
6   right?
7       A.    No, I was not.
8       Q.    So you don't know if he was getting dressed in
9   the bathroom or not?
10      A.    No.
11      Q.    So he comes out and starting to get dressed,
12  right?
13      A.    Yes.
14      Q.    And without telling you anything, he up and
15  leaves, right?
16      A.    Basically, I said what's going on, and he said,
17  I'll tell you later, or something to that effect.  But, no,
18  he did not tell me what was going on.
19      Q.    Right.  And you just let him go, right?
20      A.    I'm going to Wendi's.
21      Q.    You let him go, right?
22      A.    Yeah.
23      Q.    Okay.  And you just added something about him
24  saying he was going over to Wendi's, something like that?
25      A.    I think, yeah, he said something about he was

```
 1    going to Wendi's or something.

 2              Q.    And so --

 3              A.    God, that whole night was --

 4              Q.    I understand all that.  I'm not asking you

 5    about the whole night.  I'm just trying to talk about the

 6    first part.  He has a Chevy truck, right?

 7              A.    Yes, he does.

 8              Q.    He takes off in this Chevrolet truck, doesn't

 9    he?

10              A.    That's correct.

11              Q.    It takes about 30 minutes on a normal Sunday to

12    drive from where you live to the San Riva apartments, right?

13              A.    I don't -- I've never -- I don't know.  Depends

14    on who's driving, I guess.

15              Q.    Ma'am, let me put it this way.

16              A.    It takes me about --

17              Q.    Let's do it this way, okay?

18              A.    Okay.

19              Q.    You indicated to us previously that they moved

20    into that apartment complex in November of 1999, right?

21              A.    Yes, that's correct.

22              Q.    And you told us that from November of 1999 all

23    the way up to the year -- to October 6 of the year 2000, that

24    you visit them -- visited them --

25              A.    Yes.
```

```
 1          Q.      -- many times, right?

 2          A.      That's correct.

 3          Q.      You didn't fly over there, right?  You didn't

 4    fly over to their house, right?

 5          A.      I didn't fly.

 6          Q.      You didn't take a bus as well, right?

 7          A.      No.

 8          Q.      You drove from your house each and every time,

 9    right?

10          A.      No.

11          Q.      You would walk?

12          A.      No.  Sometimes I would in be in Phoenix and

13    drive from Phoenix.

14          Q.      I'm talking about from the trip from your house

15    to their apartment, whenever you made it.  You indicated you

16    made that many times, right?

17          A.      That's correct.

18          Q.      Sometimes you would drive it yourself right?

19          A.      That's correct.

20          Q.      And sometimes your husband would drive it with

21    you, right?

22          A.      That's correct.

23          Q.      And in all of those times, how many would you

24    estimate that from November of 1999 to October of year 2000,

25    which is approximately 11 months, how many times would you
```

1    estimate that you drove over there --

2            A.    I can't --

3            Q.    -- from your house?

4            A.    Give me a calculator.  I mean -- I don't know.

5    I mean, sometimes it might be several times a week, sometimes

6    once a week, sometimes maybe not for a couple weeks.  I don't

7    know how to answer that.

8            Q.    Would it be fair to say it was a lot of times?

9            A.    It was a lot of times.

10           Q.    And in those lots of times, you never formed an

11   impression of how long it takes to drive from your house all

12   the way over to the San Riva apartments?

13           A.    It could take anywhere from 40 minutes to an

14   hour and a half depending on traffic.

15           Q.    And you -- it never has taken you 30 to 35

16   minutes?

17           A.    It may have.  It's possible.

18           Q.    In any of the times that you have driven when

19   there was no traffic and it was light, it -- it takes 30 to

20   35 minutes, doesn't it?

21           A.    It's possible.

22           Q.    Isn't that the norm?

23           A.    It usually takes me 45 minutes.

24           Q.    Okay.  Now, you're saying that when you'd

25   drive, it would take you 45 minutes?

```
 1            A.    Yes, sir.

 2            Q.    And when somebody else drove, it would be

 3   quicker for them?

 4            A.    It's possible.

 5            Q.    Now, he leaves in the truck, right?

 6            A.    Yes.

 7            Q.    You can't tell us the time that he leaves,

 8   right?

 9            A.    No.   I don't -- I don't know.

10            Q.    You're sitting back there and you begin to get

11   dressed, right?

12            A.    Sometime in that -- in that time.

13            Q.    Sure. He's already gone, isn't he?

14            A.    Yes.

15            Q.    And you're still back at the house, right?

16            A.    Yes.

17            Q.    You don't talk to Ms. Andriano, do you?

18            A.    Yes.

19            Q.    You do make a call then, right?

20            A.    Yes.

21            Q.    And you speak briefly with her, right?

22            A.    Briefly.

23            Q.    And after speaking briefly with her, you decide

24   to do something, don't you?

25            A.    Yes.
```

```
 1          Q.    You decide to leave, right?

 2          A.    I got dressed and left.

 3          Q.    But you were going to leave anyway, weren't

 4    you?

 5          A.    Maybe.

 6          Q.    Well, ma'am, your daughter calls in the dead of

 7    night?

 8          A.    Yes.

 9          Q.    Obviously, there's a problem?

10          A.    Obviously.

11          Q.    Husband takes off.

12          A.    Yes.

13          Q.    Right?

14          A.    Yes.

15          Q.    You're getting dressed, right? That's what you

16    told me?

17          A.    I told you that I got dressed around that time,

18    yes.

19          Q.    When he was in the bathroom getting dressed,

20    coming out and getting dressed, you're getting dressed.

21    That's what you --

22          A.    Not yet.  Sometime in that time I got dressed.

23    I did get dressed.

24          Q.    If you're getting dressed, if you -- if you're

25    not going to go, why are you getting dressed as soon as Alejo
```

```
 1     leaves?  Why are you getting dressed?

 2              A.    Because he would -- that's what you do.

 3              Q.    So you were --

 4              A.    Get dressed.

 5              Q.    You were going to stay up?

 6              A.    I was getting -- I was going to stay up until I

 7     knew what was going on.

 8              Q.    But you didn't think it was important enough to

 9     immediately go with him, did you?

10              A.    He was out the door before I was dressed.

11              Q.    I understand that.  But you didn't think it

12     important enough to hurry up and put whatever you had on to

13     get into that truck with him, did you?

14              A.    I'm not -- I can't answer that as far as I

15     didn't think it was important enough.  There was no time for

16     me to get in to leave with him.

17              Q.    And he left -- so he leaves way before you then

18     because now you've got to take time to get dressed?

19              A.    It only took about five minutes.  I didn't put

20     make up or anything else on.

21              Q.    He couldn't wait five minutes for you.  Is that

22     what you're --

23              A.    You'd have to ask him that.

24              Q.    Well --

25              A.    He didn't wait five minutes.
```

```
 1          Q.    Did you ask him to wait for you?

 2          A.    No.  He was gone.

 3          Q.    The point is you didn't ask him to wait for

 4    you?

 5          A.    No, I don't believe I did.

 6          Q.    So you then get ready to go and you get in your

 7    car to leave then, right?

 8          A.    That's correct.

 9          Q.    But before that, you spoke to your daughter,

10    right?

11          A.    I'm trying to find out what's going on.

12          Q.    Yes, you have a conversation, very short

13    conversation with her?

14          A.    I don't know if I'd call it a conversation, but

15    I spoke with her, yes.

16          Q.    Let me back you up a little bit.  When your

17    husband says, "I'm leaving, I've got to go see Wendi,"

18    whatever words were said, you were still in your house when

19    he uttered those words, weren't you?

20          A.    Yes.

21          Q.    You never thought to call the police at that

22    point, did you?

23          A.    No, because I didn't know what was --

24          Q.    Ma'am, the answer is "yes" or "no"?

25          A.    No.
```

```
 1              Q.    And the reason you didn't think to call the
 2    police at that time was because you knew that Joseph Andriano
 3    had never laid a hand on Wendi Andriano.  Isn't that true?
 4              A.    No.
 5              Q.    Well, you just stated yesterday when you were
 6    testifying that you never ever saw him touch her, right?
 7              A.    No, that's not --
 8              MR. DELOZIER:  Your Honor, that's mistating.
 9              THE COURT:  Overruled.
10    BY MR. MARTINEZ:
11              Q.    Okay.  Let's talk about the Christmas of 1993.
12    Joseph was laughing when he was holding her down, wasn't he?
13              A.    Yes.
14              Q.    It wasn't like he was mad, was he?
15              A.    No.
16              Q.    And in fact what was happening was he just
17    wanted the dog to lick her face, right?
18              A.    Then he --
19              Q.    The answer --
20              A.    He held her down so the dog could lick her
21    face.
22              Q.    Right.
23              A.    And then he had his hands around her throat.
24              Q.    But he was laughing throughout the whole thing,
25    right?
```

```
 1          A.    Yes.

 2          Q.    It wasn't like he was screaming, cursing at

 3    her, right?

 4          A.    No.  She was crying and he was laughing.

 5          Q.    And then when your husband came into the room,

 6    remember, he made some sort of comment, right?

 7          A.    Yes.

 8          Q.    And that was the end of the roughhousing,

 9    wasn't it?

10          A.    Yes

11          Q.    It wasn't like he said, No, I'm going to

12    continue with it.  He stopped immediately, right?

13          A.    Yes.

14          Q.    And you didn't think about calling the police

15    on that incident, did you?

16          A.    No.

17          Q.    It wasn't that big of a deal, was it?

18          A.    I thought it was a big deal, but you don't call

19    the police for something like that.

20          Q.    Okay.  You thought it was a big deal, yet you

21    didn't --

22          A.    No, I did not call the police.

23          Q.    Okay.  So the point now takes us back to what

24    we're talking about.  When your husband left, you didn't call

25    the police, right?
```

```
 1            A.    No, I did not call the police.
 2            Q.    You didn't think she was being harmed at that
 3    point, did you?
 4            A.    I did not know what was going on.
 5            Q.    But the point is that if you would have thought
 6    that she was being harmed, don't you think that the police
 7    would get there quicker than your 45 minutes?
 8            A.    I did not know what was going on until I --.
 9            Q.    Ma'am --
10            A.    I didn't know what was going on.
11            Q.    -- are you familiar with the 911 system?
12            A.    Yes.
13            Q.    Do you know they respond in -- well, we don't
14    know how many minutes, but very quickly?
15            A.    Yes.
16            Q.    Would you agree they would have arrived there
17    quicker than you driving all the way from Casa Grande?
18            A.    Yes.
19            Q.    Would you agree that they would arrive there
20    quicker than, as far as your husband was driving, they would
21    have beaten him there, too?
22            A.    Yes.
23            Q.    You never called 911 right?
24            A.    No.
25            Q.    But you did get into your car, Mazda, and then
```

```
 1    you began to drive over, right?

 2              A.    After I talked to Wendi.

 3              Q.    Right.  And so you take off, right?

 4              A.    Yes.

 5              Q.    What year is your Mazda?

 6              A.    It's 1995.

 7              Q.    Has a clock in it, doesn't it?

 8              A.    Yes, I believe so

 9              Q.    What time was it when you got into that car,

10    ma'am?

11              A.    Didn't look.

12              Q.    You didn't put your watch on?

13              A.    I don't wear a watch.

14              Q.    But it was at night?

15              A.    Yes, it was dark.

16              Q.    It was a Sunday morning, wasn't it?

17              A.    Yes.

18              Q.    There were not many cars on the freeway, right?

19              A.    I don't recall.

20              Q.    In your experience, have you ever driven the

21    freeways of Maricopa County very early on a Sunday morning?

22              A.    No.

23              Q.    You've never driven them?

24              A.    No.

25              Q.    Is that -- that's an absolute "no," just like
```

```
 1    it was absolute in your mind that you've never seen the

 2    defendant angry?

 3            A.    I don't recall if --

 4            MR. DELOZIER:  Argumentative.  I object.

 5            THE COURT:  What's the objection?

 6            MR. DELOZIER:  Argumentative.  I object.

 7            THE COURT:  I'll sustain the objection.  Move on.

 8    BY MR. MARTINEZ:

 9            Q.    You indicated on your direct examination you

10    never said you've seen the defendant angry?

11            A.    The defendant -- okay.  I'm --

12            Q.    Ms. Andriano.  You told us that you never --

13            A.    I -- I heard about her being angry.

14            Q.    I'm not asking you about what you heard.  I'm

15    asking about what you saw with your two eyes.  I was clear

16    about that, right?

17            A.    Yes.

18            Q.    It's true that you testified yesterday that

19    you'd never ever seen her angry, right?

20            A.    Yes.  I don't recall ever seeing her angry.

21            Q.    All right.  Now go back to the freeway.  You

22    never ever recall driving those freeways in the early morning

23    hours on a Sunday?

24            A.    No, I'm sorry.  No.

25            Q.    And the trip -- you don't know how long it took
```

1    that day, right?

2         A.    I would say around 45 minutes, 40, 45 minutes.

3         Q.    Just like it does during the day?

4         A.    No.   Actually I was probably speeding.  I don't

5    know.

6         Q.    That was my next point.  You thought -- wern't

7    you worried?

8         A.    Yeah, I was worried, yes.

9         Q.    Are you saying you did or did not maintain the

10   35 miles an hour that it is around your house or 65 miles an

11   hour speed limit on the freeway?  Did you maintain --

12        A.    I'm sure I was going 75 because that's the

13   speed limit on the freeway, but I was probably going faster.

14        Q.    And --

15        A.    And then I told you that everything -- every

16   just -- just -- it was a blur.

17        Q.    Well, you do remember arriving at the San Riva

18   apartments, right?

19        A.    Yes, I do.

20        Q.    And when you arrived at the San Riva apartment

21   complex, the -- the emergency personnel were already there,

22   right?

23        A.    Yes.   There was a big, red truck in front of

24   the apartment, which is why I couldn't pull up and park in

25   front of the apartment.

1          Q.     So as I understand it --

2          A.     And police.

3          Q.     -- it takes you about 45 minutes generally

4      speaking.  That's what you've been telling us, right?

5          A.     Uh-huh.

6          Q.     Yes?

7          A.     Yes.

8          Q.     And he left about 5 minutes before you.  "Him"

9      being your husband, right?

10         A.     Yes.

11         Q.     And could it have been 10 minutes since you

12     don't have a watch?

13         A.     It's possible.

14         Q.     All right.  Let's go with the outside safe

15     figure of 10 minutes.  That would mean you arrived at San

16     Riva 55 minutes after you got the call that night, right?

17         A.     That's possible.

18         Q.     And when you arrived there, there were already

19     the emergency personnel there, right?

20         A.     That's correct.

21         Q.     You never saw Wendi Andriano there, right?

22         A.     I could see her at the -- in front of the

23     apartment.

24         Q.     All right.  But you didn't go up to talk to

25     her, right?

1          A.     No, I did not.

2          Q.     And so that means that your husband was already

3    there by the time that you arrived, right?

4          A.     Correct.

5          Q.     And if he says it took him 15 minutes to get

6    there, and let's just assume that for the sake of

7    hypothetical it takes you 45 minutes to leave plus the 10

8    extra, that would mean that he got there about 30 minutes

9    before you then, right?

10         A.     That's possible.

11         Q.     Because you don't know the time frame, so --

12         A.     Right.

13         Q.     And as I understand it then the kids were

14   brought over to you, not by the police but by your --

15         A.     Husband.

16         Q.     -- husband, right?

17         A.     Yes.

18         Q.     And just so I'm clear about the car

19   situation --

20         A.     Uh-huh.

21         Q.     -- you were inside the Mazda, right?

22         A.     Correct.

23         Q.     According to you, you had already taken the

24   child seats out of there?

25         A.     We took them out before the vacation.

```
 1            Q.     And you did that because, according to you, you
 2      were going to leave it at the apartment, right?
 3            A.     We left it at the airport because we needed
 4      room to put our stuff in --
 5            Q.     Well --
 6            A.     -- to take to the airport.
 7            Q.     You have a trunk, right?
 8            A.     My trunk doesn't work.
 9            Q.     What does that mean?  You can't open it?
10            A.     You can open it.  Can't close it.
11            Q.     So you can open it.  Is that true?
12            A.     You can open it.  Can't close it.
13            Q.     So does that mean that as you drive down the
14      freeway it's unopened then, right?
15            A.     Once you close it, you leave it closed because
16      it takes a long time to ever get it to shut again.
17            Q.     So you don't want to use that to put items in
18      there, right?  Is that what you're telling me?
19            A.     That's correct.
20            Q.     So -- but in this particular case, you then
21      decide to take the Yukon, right?
22            A.     I drove my car from --
23            Q.     Ma'am --
24            A.     Ask me again.
25            Q.     You were there, you have two kids in the back,
```

```
 1      and you decide to take the Yukon, right?

 2              A.      Yes.

 3              Q.      But before you do that, you change the diapers

 4      in the back seat of the Yukon, right?

 5              A.      No, in the back seat of my Mazda.  That's where

 6      I was sitting with the children.

 7              Q.      Okay.  My mistake.  You were in the back of the

 8      Mazda and you change the diapers in the back of the Mazda,

 9      right?

10              A.      That's correct.

11              Q.      You get out, you go over to the Yukon?

12              A.      No.  I didn't go over there until they told me

13      I could, the police.

14              Q.      After some point after changing the diapers,

15      you go over to the Yukon, right?

16              A.      Yes, about an hour later.

17              Q.      Okay.

18              A.      I'm not leaving.

19              Q.      And you told me that -- that what happened is

20      that you were not able to speak to the defendant?

21              A.      That's correct.

22              Q.      You weren't able to speak with her?

23              A.      No, I did not speak with her.

24              Q.      She didn't give you anything, right?

25              A.      No, she did not.
```

1          Q.    One of the things -- well, all they gave you

2     were the two --

3          A.    Alejo gave me the two babies and the police

4     gave me a bag with the diapers and clothes.

5          Q.    Right.  And then you got into -- after an hour

6     and permission, you got into the Yukon and you left, right?

7          A.    After I had to sign for the children and the

8     Yukon.

9          Q.    Right.  And the, bottomline, police didn't give

10    you any keys either, did they?

11         A.    I -- I believe I had my own set of keys.  I

12    don't --

13         Q.    Ma'am --

14         A.    You know, I don't recall.  I don't know what to

15    tell you on that.

16         Q.    Ma'am, how is it that you're so prepared when

17    you're worried about your daughter and driving down the

18    freeway and you have this terrible phone call and driving by

19    yourself that you could be so prepared to take the extra set

20    of keys to the Yukon?

21         A.    Because I would carry them.

22         MR. DELOZIER:  Your Honor, objection.  Argument.

23         THE COURT:  Overruled.  Go ahead and --

24         THE WITNESS:  Because I carry all the keys in my

25    purse.

```
 1    BY MR. MARTINEZ:

 2          Q.   Including the Yukon, right?

 3          A.   I would, yes.  I carry all of them, my office

 4    keys, everything.

 5          Q.   So the answer is yes, you had the keys to the

 6    Yukon then

 7          MR. DELOZIER:  Asked and answered.

 8          THE COURT:  Overruled.  Go ahead and answer the

 9    question if you can.

10          THE WITNESS:  I believe that I had them.  I -- to be

11    honest, I can't -- I don't remember if they gave them to me

12    or if I had a set.

13    BY MR. MARTINEZ:

14          Q.   We were talking earlier about the incident at

15    Christmas.  Remember when you indicated that you felt that

16    was inappropriate touching?  Do you remember what I'm talking

17    about?

18          A.   No.

19          Q.   The dog, the licking of the face?

20          A.   1993?  Yes.

21          Q.   Yes.  And it's fair to say that in -- when did

22    they first meet?

23          A.   I was --

24          Q.   No.

25          A.   Well, That's hearsay.
```

```
 1          Q.    Well, you --

 2          A.    I was told in --

 3          Q.    You testified, okay?

 4          A.    I was told St. Patrick's Day in 1992.

 5          Q.    When did you first meet him?

 6          A.    Sometime in that summer, and I just found --

 7          Q.    1992?

 8          A.    Yes.

 9          Q.    And from 1992 until year 2000, you described

10    for us one -- wasn't it Christmas or Christmas Eve where

11    there was what you believed to be inappropriate touching,

12    right?

13          A.    Yes.

14          Q.    Then we did have an interview, and in fairness

15    to you and we did have another incident that you described of

16    inappropriate touching or something like that.  What was

17    that?  You want to tell me what that was?

18          A.    Can you give me a little --

19          Q.    No.  No, ma'am.  It's your memory.  If you

20    can't remember, just say --

21          A.    You'd have to --

22          Q.    You can't remember it, can you?

23          A.    I remember I told about -- about the bruises I

24    saw --

25          Q.    No --
```

```
 1          A.     -- in 2000.

 2          Q.     But you don't know he did that. For all you

 3   know, somebody named Rick Freeland did that while they were

 4   making love.  You don't know it wasn't him, do you?

 5          MR. DELOZIER:  Objection.  Argumentative, Your Honor.

 6          THE COURT:  Sustained.

 7   BY MR. MARTINEZ:

 8          Q.     Do you know who made those bruises?

 9          A.     No, sir.

10          Q.     Okay.  Then -- all right.  You can't even think

11   of any other times of inappropriate touching, can you?

12          A.     I can think of times like if he was dragging

13   her somewhere, you know, would grab her arm, drag her, say

14   come on, let's go, especially at the lake.

15          Q.     So you're taking about two incidents, or one at

16   Christmas Eve, and you're talking about another situation

17   where he led her away from the -- with the arm, right?

18          A.     I've seen him grab her arm and lead her away.

19          Q.     You're saying he's grabbing and saying "Come

20   on," words to that effect?

21          A.     Right.

22          Q.     You're calling that inappropriate touching,

23   right?

24          A.     Correct.

25          Q.     And in all of the time from, I guess it was
```

1       1992 or whatever they met until the year 2000, those are the

2       only two instances that you witnessed of inappropriate

3       touching, right?

4               A.      That I witnessed the inappropriate touching?

5               Q.      Right?

6               A.      That I could think of right now.

7               Q.      Right.  You indicated that he had a reputation

8       for being aggressive, right?

9               A.      Yes.

10              Q.      And who is it that you spoke to to get this

11      idea that he was aggressive?  Who did you speak to?

12              A.      His friends had told me that.

13              Q.      Ma'am, give me a name of somebody that you

14      spoke to that you base that reputation on?

15              A.      Okay.  Do I need to have last names too?

16              Q.      Ma'am, I would like any information that you

17      could provide for me, please.

18              A.      There were several people at work that had told

19      me.

20              Q.      Ma'am --

21              A.      One of them would be -- I'm getting there.

22              Q.      -- I just want a name, okay?

23              A.      That's -- okay.

24              Q.      That's what I'm looking for here.

25              A.      Okay.  Okay.  Actually, some of the people that

```
 1    told me that he --
 2            Q.    Ma'am --
 3            A.    -- was aggressive were --
 4            Q.    Ma'am --
 5            A.    -- some of his friends.
 6            Q.    Ma'am -- please.  There's no question before
 7    you.  I just want you to give me a name, please, of somebody
 8    that -- upon which you relied to render the opinion that
 9    you've given us in court yesterday and today.  Just a name.
10    One name.
11            A.    Jerry.
12            Q.    And where does Jerry work?
13            A.    Jerry was Joe's partner.
14            Q.    Okay.  You're talking about the Accu Glass
15    business, right?
16            A.    Yes.
17            Q.    And what you're talking about is a situation
18    much later than when you met him though?
19            A.    Okay.
20            Q.    No, no, no.  Let me go over the question.  That
21    is much later than when you met him, right?
22            A.    Yes.
23            Q.    Yet you opined in court that you had met him --
24    you knew that he had a reputation for being aggressive and
25    violent when you met him.  Who told you that?
```

```
 1            MR. DELOZIER:  Your Honor, could we approach?

 2

 3            (The following proceedings were held at the

 4    bench:)

 5

 6            MR. DELOZIER:  Our problem isn't that she doesn't

 7    know.  Our problem is that it's part of his own family that

 8    told him and she doesn't want to say anything negative.  She

 9    has this religious problem of saying negative things about

10    people, and it's also people she works with.  She doesn't

11    want to expose them to possible issues, so he's asking her to

12    name -- I would at least ask you to -- to --

13            THE COURT:  Well --

14            MR. DELOZIER:  -- be cognizant of that issue.

15            THE COURT:  He has the right to ask the questions.

16    If you want to follow up on redirect --

17            MR. DELOZIER:  I understand that, but that's what I

18    wanted to explain.

19            THE COURT:  Okay.

20

21            (The following proceedings were held in open

22    court:)

23

24            THE COURT:  Mr. Martinez.

25    BY MR. MARTINEZ:
```

```
 1         Q.    Okay.  Ma'am, give me a name, please.

 2         A.    Okay.  As as far as with the reputation and

 3   stuff, a lot of that was based on his -- his friends.  I

 4   don't remember the first friend that I met.  He worked for

 5   their -- back for them in Oklahoma and they were based on

 6   stories that his friends like Brandon, Dale, and some of

 7   those fellows told me.

 8         Q.    So as soon as you met him, you sat around and

 9   you started to, if you will, exchange stories with -- with

10   these young men?

11         A.    No, not with those young men until I had met

12   them.  It was just, you know, like if you just talked to

13   somebody in the community -- it's a small community.  Say,

14   you know, my daughter's going out with so and so, and they'd

15   say Oh, yeah, I know about them.

16         Q.    Let me ask you about this Brandon?

17         A.    Yes.

18         Q.    You have a son by the name of Brandon.  Is that

19   who we're talking about?

20         A.    No.

21         Q.    It's somebody else named Brandon, right?

22         A.    Correct.

23         Q.    And what is Brandon's relationship or what was

24   his relationship to the victim?

25         A.    Brandon is a -- was a friend of Joe.
```

1          Q.     Okay.

2          A.     And did they go to high school together?  Who

3    is -- what is his last name?

4          A.     I know this.  This is -- his wife does the HR

5    stuff with me.  I'm sorry.  I'm just -- I can give you Dale's

6    name.  It's Dale Hartman.

7          Q.     Sorry, I didn't understand what you said.  I

8    didn't hear you.

9          A.     I said I can't -- I'm sorry, I can't think of

10   Brandon's.  I know --

11         Q.     All right.  We'll move on.  Later on as you

12   began to know him more --

13         A.     Uh-huh.

14         Q.     -- you indicated that he still had this

15   reputation.  Are you still talking to these same friends as

16   before or are you getting --

17         A.     Friends that we would go to the lake with Joe

18   with.

19         Q.     Okay.  And you indicated that he would drive

20   very fast around the lake, right?

21         A.     Up to the lake, yes.

22         Q.     He was never cited for that, was he?

23         A.     Not -- not to my knowledge.

24         Q.     Ma'am --

25         A.     I do not know.

1          Q.     Ma'am, if you don't know he was driving fast --

2     you're telling us if you don't know he was driver cited, you

3     don't know if he was driving fast then, right?

4          A.     On the speedometer he was driving fast.

5          Q.     Okay.  All right.  So you were in the car and

6     he was driving fast, right?

7          A.     That's correct.

8          Q.     And while you were in that car and he was

9     driving fast, he was never stopped for speeding, was he?

10         A.     Not when I was in the car, no.

11         Q.     That's all I'm asking --

12         A.     Okay.

13         Q.     -- about, what you know, not what you think.

14    You may know based on what somebody else tells you.  I think

15    you told us you were going twice a month with him, right?

16         A.     No.  I said he -- no, that was the question

17    when he said how many times he was going.  I would go several

18    times during the summer with them.  You know, if I could ever

19    get off work, depending on when they went.

20         Q.     None of those times when you -- while you were

21    driving with him in the summer was he ever stopped, right?

22         A.     No, not while I was there, no.

23         Q.     That's all I'm asking, right?

24         A.     Uh-huh.

25              THE COURT:  Is that "yes"?

```
 1              THE WITNESS:  Yes.
 2   BY MR. MARTINEZ:
 3         Q.   Yes?
 4         A.   Yes, that's what you're asking me.
 5         Q.   Now, you also told us there were circumstances
 6   that happened at the airport.  Do you remember telling us
 7   about that?
 8         A.   Yes, I do.
 9         Q.   That also involved driving, didn't it?
10         A.   That did.
11         Q.   When you got to the airport you indicated he
12   pulled up and screeched his tires, right?
13         A.   Yes.
14         Q.   Was that pre or post 911, before the attack on
15   the towers?
16         A.   That was pre because that was in 2000.
17         Q.   And one of the things that happened, according
18   to you, was that he pulled in really quick and there was a
19   security guard there, right?
20         A.   Yes.
21         Q.   And he and the security guard may have
22   exchanged words, right?
23         A.   Correct.
24         Q.   Was he ticketed at that time, ma'am?
25         A.   No.
```

```
 1            Q.    Was the police called that time?

 2            A.    I -- I don't know because I don't remember if

 3    that was a policeman or a security officer.

 4            Q.    Well, the point is as you're driving through

 5    out of Sky Harbor Airport --

 6            A.    Uh-huh.

 7            Q.    -- there's nobody behind you, is there, with a

 8    police car with lights going on?

 9            A.    Not a police car with lights, no.

10            Q.    You flew what airline again?

11            A.    I don't recall.

12            Q.    Well --

13            A.    Um, I don't recall.  I don't recall.

14            Q.    Was it Terminal 3 that you flew into, was it

15    Terminal 2?

16            A.    It's the big one.

17            Q.    What number is it?  Do you know?

18            A.    No.

19            Q.    And so you flew into this terminal, which

20    number you don't know, and he pulls up, has these words, and

21    then the luggage is put in the Yukon, right?

22            A.    He threw the luggage in the Yukon, yes.

23            Q.    He's how far away when he threw it?  That's

24    your characterization, but how far did he throw it?  Two

25    feet, four feet, five feet?
```

1          A.     Several feet.

2          Q.     So he was several feet away.  And which door

3    did he throw it in, ma'am?

4          A.     The back door.

5          Q.     So he opened it up and he threw it -- threw the

6    stuff in, right?

7          A.     Yes.

8          Q.     Your luggage too?

9          A.     Yes.

10         Q.     Everybody's luggage?

11         A.     Everybody's.

12         Q.     He was throwing it in there, so did any of it

13   make it into the back seat?

14         A.     Just what I carried into the back seat.

15         Q.     What year was that again, ma'am?

16         A.     It was -- the Yukon or when he --

17         Q.     When he's in there throwing stuff into the

18   back.

19         A.     May of 2000.

20         Q.     Okay.  And that was after his fourth surgery,

21   wasn't it?

22         A.     That's correct.

23         Q.     And this was after he had not had any

24   treatment, right?  Having treatment for his illness at that

25   time?

1         A.    Just alternative --

2         Q.    Right.

3         A.    -- methods.

4         Q.    He'd had no traditional what we call

5    traditional from a medical doctor or anything, right?

6         A.    Correct.  He had not had chemo yet.

7         Q.    This was when his disease as you said was

8    continuing to grow?

9         A.    Correct.

10        Q.    This is when he was out of control and throwing

11   all of this in there, right?

12        A.    Correct.

13        Q.    This is the same person who has this problem

14   with the shoulder muscles all gone and there's a problem with

15   the salivary glands, all of that, right?

16        A.    Yes.

17        Q.    Okay.  That's him, right?

18        A.    Yes.

19        Q.    And so then he gets behind the wheel, right?

20        A.    Correct.

21        Q.    The defendant gets in the passenger right side?

22        A.    Yes.

23        Q.    And then --

24              THE COURT:  Hold on.  You said "defendant."

25              MR. MARTINEZ:  I mean -- yeah, I mean Wendi.

```
 1    BY MR. MARTINEZ:

 2            Q.   She gets in on the passenger side, right?

 3            A.   Yes.

 4            Q.   And you and -- this Barbara Whitehead I think

 5    is her name?

 6            A.   No, Mitchell.

 7            Q.   -- Barbara Mitchell get in the back, right?

 8            A.   Correct.

 9            Q.   And he takes off, right?

10            A.   Yes.

11            Q.   Takes off this small freeway as you call it?

12            A.   Yeah, took off from the airport onto that.  I

13    don't know what number it is.  I just know how to get there.

14            Q.   And as he's driving down that freeway and

15    nobody stops him, right?

16            A.   No.

17            Q.   There isn't a policeman in sight to give him a

18    ticket, right?

19            A.   Right.

20            Q.   Then he gets to the I-10?

21            A.   Yes, right.

22            Q.   He's also speeding according to you?

23            A.   Yes.

24            Q.   Nobody stops him, right --

25            A.   No.
```

1          Q.      -- to your knowledge?  And this is -- to your
2    knowledge, in all the time that you saw him, did he ever get
3    a speeding ticket?
4          A.      I -- I believe he did on the river.
5          Q.      Other than that, did he ever get another
6    speeding ticket?  You're not even sure, right?  You're not --
7          A.      I don't know if it was a speeding ticket.   I
8    know -- no, it wasn't.
9          Q.      It wasn't that at all, was it?
10         A.      I wasn't with him.
11         Q.      Okay.  Bottomline is you drove with him other
12   times too, didn't you?
13         A.      Yes.
14         Q.      In any of those times did you ever get stopped
15   by police?
16         A.      Not when I was with him, no.
17         Q.      That's what I'm asking.
18         A.      Right.
19         Q.      Whenever you were with him?
20         A.      Right.
21         Q.      The other thing I want to talk to you about is
22   we had an interview and we talked about whether or not you
23   had ever seen any instance of hitting between the two of
24   them.  Do you remember we talked about that?
25         A.      Yes.

```
 1            Q.    And you never ever saw him hitting her, did
 2    you?
 3            A.    No.
 4            Q.    You never ever saw him bruise her?
 5            A.    I did not see him bruise her.
 6            Q.    All right.  You talked about this farmhouse
 7    that may have been out there in Casa Grande.  Remember you
 8    told us about that?
 9            A.    Uh-huh
10            Q.    Is that "yes"?
11            A.    Yes.
12            Q.    This farmhouse back in Casa Grande, it did have
13    running water, right?
14            A.    Yes.
15            Q.    It had a toilet, right?
16            A.    Yes.
17            Q.    It had all the amenities one associates with a
18    home, didn't it?
19            A.    Yes.
20            Q.    In fact, you indicated one of the rooms had
21    carpet in it?
22            A.    Yes.  My husband helped put it in.
23            Q.    Right.  So it even had carpet, right, in one of
24    the rooms?
25            A.    Correct.
```

```
 1          Q.    And you did indicate that one of the items on
 2    one of the doors or something like that may have had a knock
 3    in it or a -- or something?
 4          A.    A hole.
 5          Q.    Hole in it, right?
 6          A.    Yes.
 7          Q.    You have no idea how that got there because you
 8    weren't there?
 9          A.    I did not see when the hole was put there, no.
10          Q.    So you don't know, right?
11          A.    No.
12          Q.    Any other damage around the house that, aside
13    from that hole, but that's the only thing you mentioned.  You
14    don't know how that got there, right?
15          A.    No.
16          Q.    You indicated that one of the things that
17    happened was that you had this husband -- I forget his
18    name -- Shelly, I think.  What was your husband's -- first
19    husband's name?
20          A.    Shelby.
21          Q.    Shelly or Shelby?
22          A.    Shelby.
23          Q.    Shelby?
24          A.    Yes.
25          Q.    One of the things you told us about, you were a
```

```
 1      bit critical of him because he was too -- too strict with the

 2      defendant, right?

 3              A.     Correct.

 4              Q.     And he left when she was, what, two years old?

 5              A.     No, I think she was 3.

 6              Q.     Okay.  She was very young when he left, right?

 7              A.     Yes.

 8              Q.     But you indicated that he was a bit too strict

 9      with her, right?

10              A.     Yes.

11              Q.     And according to you, after that he only may

12      have seen her two times, right?

13              A.     After -- after two or three -- two or three

14      times, yeah, from the time when -- maybe even a couple more

15      times.  I'm -- I'm -- from the time what -- tell me from what

16      time.  You're saying from the time that we divorced or from

17      the time that he left?

18              Q.     How about from the time that you divorced?

19              A.     From the time we divorced, he probably saw her

20      two or three times.

21              Q.     How about from the time that he left?

22              A.     More than that because we were separated for a

23      while before.

24              Q.     And you indicated that he did treat her

25      strictly, right?
```

1        A.    Yes.

2        Q.    And she was at a point where she didn't --

3    doesn't remember him very well, right?

4        A.    I -- you'd have to ask her.

5        Q.    Okay. The point I'm trying to make, ma'am, is

6    even if he did treat her strictly, it's not like he scarred

7    her for life, is it?

8        A.    They say the first five years make all the

9    difference in a child's life, so, you know, I'm not -- I'm

10   not qualified to answer that question.

11       Q.    You're not qualified to answer that, but you're

12   qualified to opine about the previous testimony you just gave

13   us?

14       A.    I don't --

15       Q.    Let's do it this way.  He was there about three

16   years, right?

17       A.    Yes.

18       Q.    Those three years, he never hit her, right?

19       A.    He spanked her.

20       Q.    He spanked her.  Other than that, he didn't hit

21   her so hard that it was inappropriate, was it?

22       A.    I don't -- well, he spanked her hard.

23       Q.    Did you think it was inappropriate hitting?

24       A.    Yes.

25       Q.    You never called CPS on him, did you?

```
1        A.    No.

2        Q.    Never called the police even though you thought

3   it was inappropriate, did you?

4        A.    No.

5        Q.    Okay. So then he leaves and what ends up

6   happening next is that you indicated that you met Mr. Ochoa

7   in about 1975, right?

8        A.    Yes.

9        Q.    And then you gave us all these wonderful

10  qualities about him, right?

11       A.    Yes.

12       Q.    You told us that he was stable, right?

13       A.    Yes.

14       Q.    He was funny.  What else did you tell us about

15  him?

16       A.    That he was real nice.  He was compassionate.

17  He was pretty quiet.

18       Q.    So basically what you're telling us is he was a

19  good man, right?

20       A.    Yes.  Still is.

21       Q.    Wouldn't you agree that's conducive to bringing

22  up a child that's being nurtured so that -- in other words,

23  that -- that child is being provided just about anything that

24  you guys could provide?

25       A.    Yes.
```

```
 1          Q.    It was a good home environment, wasn't it?

 2          A.    Yes.

 3          Q.    It wasn't like it was a bad home environment,

 4   right?

 5          A.    You -- you're talking aobut after we were

 6   married?

 7          Q.    Yes, ma'am.

 8          A.    Yes.

 9          Q.    You didn't teach her to lie, did you?

10          A.    No.

11          Q.    You didn't teach her to cheat or anything like

12   that?

13          A.    No.

14          Q.    Just the opposite, right?

15          A.    Yes.

16          Q.    That's when you guys went with this group of

17   other people and you started roaming around. You were -- you

18   were people of religion, weren't you?

19          A.    Roaming around, that's not -- that's not what

20   we did.  We were invited to churches to minister in church.

21          Q.    You went from place to place?

22          A.    Yes.

23          Q.    Are you comfortable with that?

24          A.    Yes.

25          Q.    And so the point being that she was brought up
```

1      in a religious sort of way, right?

2              A.      Right.

3              Q.      That's a good thing?

4              A.      Correct.  I believe that's correct.

5              Q.      And you still do as you sit here today, right?

6              A.      Yes.

7              Q.      And even though she may not have had shoes, she

8      had the spiritual and internal kind of thing that she would

9      need for later on in life?

10             A.      That's what I believe, yes.

11             Q.      Do you believe that now?

12             A.      I probably things -- I probably wouldn't have

13     done them the same.

14             Q.      Do you believe those were wrong or bad?

15             A.      The things I taught her as far as the word of

16     God, I believe that was correct.

17             Q.      In fact you guys talked about the Bible and

18     whatever is associated with it, right?

19             A.      Correct.

20             Q.      And you also indicated that Mr. Ochoa, in

21     response to one of the questions, was a pastor.  You told us

22     that, right?

23             A.      Correct.

24             Q.      Well, wasn't he just sort of appointed to that

25     post by Mr. King who was the head of that church you guys

1    attended?

2           A.    No.  He got his license through the internet.

3    Shoot, I can't remember.

4           Q.    Did you say the internet?

5           A.    No, no, no.  International -- no, not the

6    internet.  I don't think the internet was around then.  But

7    it wasn't with Tom King.  It was Calvin Lords.

8           Q.    There's --

9           MR. DELOZIER:  Your Honor, it's 3:00.  Appropriate to

10   take a break now?

11          THE COURT:  We'll go ahead and take our afternoon

12   break at this point in time.  During this break remember the

13   entire admonition I gave you including the fact you're not to

14   discuss the case with anyone, do not let anyone discuss the

15   case with you, keep an open mind.  Have a nice break.  We'll

16   see you in 20 minutes.

17

18                   (Recess.)

19

20          THE COURT:  This is CR 2000-096032, State of Arizona

21   versus Wendi Elizabeth Andriano.  The record will reflect the

22   presence of Defendant, Counsel and the jury.  Brandon Ochoa

23   is on the witness stand.  We'll continue with the

24   cross-examination by Mr. Martinez.

25   CONTINUED CROSS-EXAMINATION BY MR. MARTINEZ:

120

```
 1          Q.    Ma'am, when we left off last time we were
 2    talking about Alejo Ochoa, your husband, do you remember
 3    that?
 4          A.    No.  Please refresh my --
 5          Q.    We were talking about him whether or not he was
 6    a pastor.  Do you remember that line of questioning?
 7          A.    Yes.
 8          Q.    And one of the things that you were telling me
 9    is that somebody actually allowed him to be a pastor.  I
10    think you gave me a name.  What was the name of that person?
11          A.    Well, it was through an organization that Alejo
12    worked under Calvin Lords.
13          Q.    Is Calvin Lords the person that you traveled
14    around with?
15          A.    No.
16          Q.    It's somebody else, right?
17          A.    Yes.
18          Q.    Now, with regard to Mr. Ochoa and him being a
19    pastor, he didn't attend seminary school that you know?
20          A.    No, not that I know.
21          Q.    He didn't attend college, did he?
22          A.    Yes, he did.
23          Q.    And did he go and get a degree in theology?
24          A.    No.
25          Q.    In other words, his degree, if he has it, is --
```

```
 1      does he have a degree?

 2              A.      I -- I do not believe so.

 3              Q.      But his emphasis wasn't theology or religion or

 4      anything like that, right?

 5              A.      No, it was -- no.

 6              Q.      And so this being a pastor happened much later

 7      in life, didn't it?

 8              A.      It --

 9              Q.      Other than when he was going to college?

10              A.      Yes.

11              Q.      It happened how much after -- long after going

12      to college?

13              A.      I believe in 1980.

14              Q.      And this was basically the type of situation

15      where somebody recommends you and you become a pastor, wasn't

16      it?

17              A.      To be honest, I don't know the procedure.

18              Q.      And he didn't -- there were, I guess, services

19      every Sunday at the Desert Harvest Church or -- right?

20              A.      It's 91st Psalm then Harvest Family Church.

21              Q.      He didn't officiate there at the 91st Psalm,

22      did he?

23              A.      He was in charge of children's church, so he

24      had church on Sunday morning with children and he had church

25      on Wednesday evening.
```

1          Q.     And as I understand it, it's a small

2     congregation, approximately, today, about 150 members, right?

3          A.     I don't -- I wouldn't know how many members

4     there are.

5          Q.     Do you still attend that church or not?

6          A.     Yes.

7          Q.     But just so I'm clear about it, you never saw

8     him actually leave Arizona to attend a school to get --

9          A.     No.

10         Q.     -- a degree that would allow him to be a

11    pastor, right?

12         A.     No.

13         Q.     One of the other things you told me or that you

14    told me that you talked to defense attorney about was back in

15    February of '97, Mr. Andriano had another surgery, a third

16    surgery?

17         A.     Yes.

18         Q.     And during that -- and at that third surgery

19    you indicated that -- that your daughter was not working,

20    right?

21         A.     No.   They had lost the business.

22         Q.     And what -- didn't you also indicate that she

23    was working at the Casa Grande Medical Center or whatever

24    it's called out there?

25         A.     Not '97.

```
 1          Q.    When was she working there?

 2          A.    I -- I believe -- I know she was working

 3    there when they got married, so that would be '94.  I don't

 4    know.  I think she started in '93.  I don't know the exact

 5    dates.

 6          Q.    And, again, in '97, that was one of the

 7    procedures that began to be little bit more dicey for Mr.

 8    Andriano in the sense that this time the incision was even

 9    bigger and recovery was even longer, right?

10          A.    Yeah.  It was a tiny bit bigger.

11          Q.    She wasn't working at the time, right?

12          A.    No.  She was at home.

13          Q.    But yet you would take care of the wound for

14    him, right?

15          A.    Just for a couple days.  It wasn't lengthy.

16          Q.    But it needed to be taken care of.  My point is

17    you took care of it, not her?

18          A.    I did it or Joe changed his own.

19          Q.    Right.  It wasn't her that did it to your

20    knowledge, right?

21          A.    To my knowledge.

22          Q.    I want to talk to you a little bit about all

23    the surgeries that he had.  You talked about it in length.

24    I think the first one was in '95, right?

25          A.    No.  I believe it was '94.
```

```
 1          Q.    September of '94?

 2          A.    I believe so.

 3          Q.    After that surgery the incision wasn't very

 4   long and didn't require too long of a recuperation period,

 5   right?

 6          A.    I don't believe it did.

 7          Q.    It wasn't the occasions where you needed to go

 8   over there and help them, right?

 9          A.    No.

10          Q.    He didn't experience a lot of pain

11   associated -- there wasn't a lot of pain that you saw

12   associated with that, right?

13          A.    Well, I wouldn't have seen him on a daily

14   basis, so --.

15          Q.    So back then you didn't see them on a daily

16   basis, right?

17          A.    Right.

18          Q.    But you did tell us in the time that you did

19   see him, about that time, he was still a pretty good guy.  He

20   wasn't this violent person that subsequent to that you began

21   to know who was abusive to your daughter, right?

22          A.    He had -- he -- anger, now.  He, Joe, had

23   tendancies for anger the whole time.

24          Q.    In your mind he was somebody who was angry all

25   the time --
```

1          A.     No.

2          Q.     -- that you knew him?

3          A.     No, he was not angry all the time.

4          Q.     In other words, he had those tendancies toward

5    anger since you first met him?

6          A.     Yes.

7          Q.     Okay.  And those tendencies didn't increase or

8    decrease after the first surgery is what you told us, right?

9          A.     I didn't see a significant increase.

10         Q.     There was no change in the way that he treated

11   you, right?

12         A.     No.

13         Q.     There was no way no change in the way he

14   treated your husband?

15         A.     Not that I know of.

16         Q.     Well, you saw them interact, didn't you?

17         A.     Yes, but there would be times my husband would

18   be with Joe and I wasn't there.

19         Q.     I'm asking you what you know, not what anybody

20   else knows.  What you know is there wasn't a significant

21   change in the way he treated your husband, right?

22         A.     From what I know --

23         Q.     Everything is from what you know.  If I asked

24   you your name, you could answer from what you know.  Your

25   name is Donna, couldn't you?

1          A.    Yes.

2          Q.    Now, with regard to his dealing with the

3    defendant, that didn't change either after the first surgery,

4    right?

5          A.    I don't believe so.

6          Q.    According to you, he still continued to call

7    her these names, right?

8          A.    Yes.

9          Q.    Wasn't in anger sometimes?

10         A.    Sometimes, yes, it was.

11         Q.    Sometimes not though, right?

12         A.    Right.

13         Q.    Sometimes it could be somewhat of a pet name?

14         A.    Oh, no.

15         Q.    No?

16         A.    Not -- no.

17         Q.    Not to you it wasn't?

18         A.    No.

19         Q.    But sometimes it wasn't in anger?

20         A.    Not that I was aware of.

21         Q.    Subsequent to that, there was a second surgery,

22    right?

23         A.    Yes.

24         Q.    One that's become a little bit more --

25         A.    Yes.

```
 1              Q.    -- difficult --

 2              A.    Thank you.

 3              Q.    -- right?

 4              A.    Uh-huh.

 5              THE COURT:  Is that "yes"?

 6              MR. MARTINEZ:  Yes.

 7              THE WITNESS:  Yes.

 8              THE COURT:  Make sure you give a verbal response.

 9    BY MR. MARTINEZ:

10              Q.    That one actually required some after care,

11    right?

12              A.    For a few days, yes.

13              Q.    Right.  And during that you also indicated to

14    us there was really no change in his demeanor after that,

15    right?  You told us that, right?

16              A.    That's correct.

17              Q.    So everything remained the same.  He sort of

18    treated you the same way that he treated you before, right?

19              A.    Correct.

20              Q.    He never touched you, right?

21              A.    Just -- only when he was drunk -- drinking and

22    he would hug me.

23              Q.    Right.  But he never reached out to strike you

24    in anger ever, did he?

25              A.    No.
```

128

1          Q.    He never reached out to strike Alejo in anger

2    either, did he?

3          A.    I don't know.

4          Q.    In the times you saw him together, he never --

5          A.    In the times I saw them together, he did not.

6          Q.    You did mention something about a trip to New

7    Mexico.  Do you remember telling -- not New Mexico, but the

8    lake.  Do you remember that?

9          A.    I know that we discussed several trips to the

10   lake, yes.

11         Q.    One of them was where Mr. Andriano apparently

12   got involved in some sort of discussion with somebody at a

13   bar.  Do you remember telling us about that?

14         A.    Yes.

15         Q.    And when was that in terms of the surgeries?

16         A.    It could have been around the second or third

17   surgery.

18         Q.    The second or third surgery?  If it was after

19   the third surgery -- when was that?

20         A.    The third surgery was in '97.

21         Q.    Had they already had one child?

22         A.    Not yet.

23         Q.    Not yet.  So you were there, right?

24         A.    Yes.

25         Q.    And you saw what went on, right?

```
 1        A.      Yes.
 2        Q.      There was a confrontation between Joe and
 3   another man, right?
 4        A.      Correct.
 5        Q.      It didn't take much to hold him back, did it.
 6   In other words, it didn't proceed to fisticuffs, did it?
 7        A.      No, it did not.
 8        Q.      Somebody pulled them apart and they went their
 9   own separate ways, right?
10        A.      I believe so.
11        Q.      Let's get back now to the third surgery, the
12   one you indicated he's now becoming a little more
13   problematic, right?
14        A.      Correct.
15        Q.      The first -- the second surgery required a
16   couple of days taking care of the wound.  The third surgery
17   is now requiring a little bit more, isn't it?
18        A.      Yes, because they went along the same line they
19   went before.
20        Q.      But they took more out, right?
21        A.      Correct.
22        Q.      This is the one that you indicated that
23   required you to start doing some of the care, right?
24        A.      Correct.  The doctors showed me how to change
25   his dressing and --
```

1        Q.    And the other thing that acompanied this, you

2   told us, he was in substantial -- in a lot more pain.  Do you

3   remember telling us that?

4        A.    He was in more pain.

5        Q.    And he was less friendly at that point, right?

6   Started to --

7        A.    You mean when he was in pain right after --

8        Q.    Right.

9        A.    -- after his surgery?

10        Q.    Right.

11        A.    He -- I don't know how to explain it.

12        Q.    He started to change.  Is what you told us

13   before?

14        A.    He started to change a little bit then and

15   greatly so after the '98 surgery.

16        Q.    Right.  But he started to change after that,

17   right?

18        A.    Yes.

19        Q.    The point I'm trying to make with you, ma'am,

20   is he started to change because he was in a lot more pain,

21   not that he was angry with you, right?

22        A.    I don't know that.

23        Q.    Well, did he ever demonstrate any anger at you

24   afterwards and say you did this or did that to me?

25        A.    That wasn't how he did it.  He would tell

1    Wendi, not me.

2        Q.    All right. Well, the point is if he told your

3    daughter, you weren't there, right?

4        A.    Correct.

5        Q.    So you don't know how they interacted when they

6    were alone, do you?

7        A.    No.

8        Q.    In other words, you told us, well, you know, he

9    was the boss. Do you remember telling us that?

10        A.    Yes.

11        Q.    You don't know what would happen when those

12    doors would close between you, do you?

13        A.    No one does.

14        Q.    Did -- that's true. And you don't know whether

15    or not she was the boss when they were alone, right?

16        A.    No.

17        Q.    And you don't know if she was the one that told

18    him, you know, you need to do this or you need to do that, or

19    I'm going to get a job or whatever. The bottomline is no one

20    knows what was inside of their marriage, the intimacy of

21    their marriage, right?

22        A.    Correct.

23        Q.    But after that he did have a fourth surgery,

24    right?

25        A.    Correct.

1       Q.      This is the one that actually was a very

2   radical one, the one at the Mayo Clinic, right?

3       A.      Through the doctors at the Mayo Clinic.   It was

4   at Scottsdale Memorial.

5       Q.      And after that, this is when he was in even

6   more pain, right?

7       A.      Correct.

8       Q.      He was in pain because of what they had done to

9   him physically, right?

10      A.      Correct.

11      Q.      And because of the news emotionally, he was not

12  in the best way he could be, right?

13      A.      Correct.

14      Q.      And do you think it's unreasonable for him to

15  be a little cranky if he's just received news that he's going

16  to die?

17      A.      No.   Actually, I mentioned that.

18      Q.      So the answer is "no"?

19      A.      No.

20      Q.      And so do you think it's unreasonable for a

21  person to be cranky or maybe request a little bit more if

22  they're in a lot of pain?   Do you think that's unreasonable?

23      A.      No.

24      Q.      And that's exactly what was happening in this

25  case and in their marriage, right?

1          A.     He was in a lot of pain.

2          Q.     And just found out that, you know, he was going

3     to die, right?

4          A.     Correct.

5          Q.     But there was a silver lining in all of this,

6     wasn't there, and you knew about that, didn't you?

7          A.     I don't know what you're talking about.

8          Q.     Well, you were present when Jeffrey Miller made

9     a trip out to their house and talked about the personal

10    injury lawsuit, weren't you?

11         A.     I don't see that as a silver lining.

12         Q.     The point is you were there, weren't you?

13         A.     Joe asked me to be there.

14         Q.     Ma'am, you were there, right?

15         A.     Yes.

16         Q.     What time of the day did this conversation take

17    case place?

18         A.     I don't recall.

19         Q.     Where did this conversation take place?

20         A.     I believe it was in the courthouse in -- not

21    courthouse, Courtyard Apartments in the club room.

22         Q.     So it was at their home?

23         A.     Not -- no.

24         Q.     The Courtyard --

25         A.     It wasn't at their home.  It was in the

```
 1    clubhouse.

 2         Q.    Of the Courtyard?

 3         A.    Yes.

 4         Q.    She was the manager of the Courtyard?

 5         A.    Yes.

 6         Q.    And it -- what time of the day was it?

 7         A.    I don't recall.

 8         Q.    Was it in the morning?

 9         A.    I don't recall.

10         Q.    Was it at night?

11         A.    I don't recall.

12         Q.    But you were there?

13         A.    Yes.

14         Q.    Who else was there besides you?

15         A.    I was there and Joe and Wendi were there and

16    Mr. Miller.

17         Q.    Was Mr. Ochoa there?

18         A.    No.

19         Q.    So it was just you, the defendant and Jeffrey

20    Miller to begin with, right?  Three people?

21         A.    I remember four.

22         Q.    Who else do you remember being there?

23         A.    Joe.

24         Q.    Are you sure Joe was there when the meeting

25    started?
```

1       A.    I don't recall.  I don't recall.  That's a long

2  time ago.

3       Q.    You recall things that were way before that

4  back in 1994.  This happened in 1998.

5       A.    That wasn't important to me.

6       Q.    I know it wasn't important to you, but you were

7  there?

8       A.    Yes.

9       Q.    And you remember -- to the best of your

10  recollection, you remember whether or not Mr. Andriano was

11  present at that first meeting when the meeting first started?

12       A.    To the best of my recollection, I don't

13  remember.

14       Q.    You did see him there though?

15       A.    Yes.

16       Q.    He could have arrived later?

17       A.    He could have.

18       Q.    And the conversation actually could have been

19  between -- initially between the lawyer and your daughter?

20       A.    I don't recall that.

21       Q.    So if you don't recall that the conversation

22  was between Mr. Miller and your daughter, then Mr. Andriano

23  must have been there when this whole thing started, right?

24       A.    I don't remember.

25       Q.    The bottomline, from what you saw, isn't it

1    true, that the only person that was really interested in that

2    lawsuit was your daughter?

3        A.    No.

4        Q.    Well, she was there that day, right?

5        A.    So was Joe.

6        Q.    So now you're sure that Joe was there at the

7    beginning?

8        A.    I didn't say that.  I said Joe was there.

9        Q.    Okay.  And after this conversation, when this

10   conversation started, isn't it true that as the parties are

11   sitting there talking and as the lawyer is talking, Mr.

12   Andriano actually got up and left, didn't he?

13       A.    I don't recall that.

14       Q.    He didn't even stay through the whole meeting,

15   did he?

16       A.    I do not recall that.

17       Q.    He wasn't feeling very well back then, was he?

18       A.    I don't recall how he was feeling that day.

19       Q.    Well, the point is --

20       A.    I can't answer that, I'm sorry.

21       Q.    Is -- the point is, he just got his surgery in

22   1998, August of 1998?

23       A.    Yes, he did.

24       Q.    That was real difficult for him, right?

25       A.    That's correct.

1      Q.    That's the one that was sort of the end of it

2  all, if you will, for the surgeries, right?

3      A.    That was the last.

4      Q.    Right.  And it was shortly thereafter that this

5  meeting took place, right?

6      A.    I know it was after.  I don't remember when.

7      Q.    Was it a long time after or shortly after?

8      A.    I don't remember.

9      Q.    Could it have a year after that?

10      A.    I don't believe it was that long.

11      Q.    Okay.  Anyway, the point is he wasn't very

12  comfortable during that meeting, right?

13      A.    I don't recall that.

14      Q.    After the 19 -- after that meeting that you

15  guys had, you indicated that's when his demeanor really

16  did start to change, right?

17      A.    From 1998, yes.

18      Q.    And from then on you indicated that he became

19  more demanding?

20      A.    Yes.

21      Q.    That's not being abusive, is it, to be

22  demanding?

23      A.    I didn't say that.

24      Q.    No, I'm asking you.  I'm asking you, being --

25      A.    It depends on the circumstance, I would

1   believe.

2           Q.    Well, if you ask somebody to bring you a cheese

3   crisp from a restaurant while you're out at a ball game, do

4   you think that's demanding?

5           A.    It would depend on what time it was.  I don't

6   know.

7           Q.    Well, then I'll give you the circumstances.

8   Let's assume it's about 9:00 or 10:00.  You've been at a

9   ballgame, your husband calls you up and says "Honey, on the

10  way home can you get a cheese crisp?"  Do you think that --

11          MR. DELOZIER:  Mistates the evidence.  Objection.

12          THE COURT:  Overruled.  Go ahead and answer the

13  question if you can.

14          THE WITNESS:  Yes.

15  BY MR. MARTINEZ:

16          Q.    You think your husband would be demanding then

17  if he asks you to stop by and get a cheese crisp?

18          A.    Yes.

19          Q.    That's kind of inconsiderate?

20          A.    Yes.

21          Q.    Is that abuse?

22          A.    I don't know if that would be labeled abuse.

23          Q.    I'm asking what you think right now because you

24  have been sort of the victim of it.  Is that abuse to call

25  and ask somebody to do something for you?

```
 1         A.     Inconsiderate maybe, not abusive.

 2         Q.     Okay.  How about --

 3         A.     -- if that happened to me.

 4         Q.     And I'm asking if it happened to you?

 5         A.     Correct.

 6         Q.     And what about the situation where you asked

 7  somebody to do the laundry for you?  And, again, this is

 8  after you've just been told you have cancer, you're in pain,

 9  you're there and you ask somebody to do the laundry for you.

10  Do you think that's being abusive?

11         A.     I don't necessarily think that's being abusive,

12  but I need a little bit more information.

13         Q.     Just --

14         A.     I don't know, if that somebody was in pain --

15         Q.     I just told you that he was.

16         A.     -- from your example.

17         Q.     I just told you he was.  He was in pain, it was

18  after he just learned he was -- had cancer, wants somebody to

19  do his laundry for him?

20         A.     Okay.  So this is just an example?

21         Q.     Yes, just an example, right.

22         A.     Again, it would depend on the circumstances.

23  You know, are you asking me to -- you're in pain and ask --

24  you're asking me to do the laundry, I mean, is it 3:00 at

25  night or -- you --
```

1          Q.      I'm not -- I'm asking you to do the laundry.

2    You could put whatever limitations on it and tell me if

3    you think it's abusive or not?

4          A.      It -- in a general situation, no, that is not

5    abusive to ask for some laundry.

6          Q.      You also told us sometime after that Mr.

7    Andriano started receiving chemotherapy treatments, right?

8          A.      I assume he did.  I was not there.

9          Q.      Right.  You wanted to tell us about it earlier

10   and I'm asking you about it now.  Did you know he was having

11   chemotherapy treatments, "yes" or "no"?

12         A.      Yes.

13         Q.      The first chemotherapy treatment -- you talked

14   to us about it, didn't you?

15         A.      I talked to you about after the chemo.

16         Q.      Right.  You told us about the day after.

17         A.      Correct, the evening of -- right.

18         Q.      Right.  How long did those chemotherapy

19   treatments last?

20         A.      I don't know.

21         Q.      Okay.  You don't know if he was there all day

22   or anything like that, right?

23         A.      No, I couldn't tell you because I don't know

24   how long he went in, what time they left, how long the chemo

25   lasted.

```
 1          Q.    And you never went with him?

 2          A.    Right.

 3          Q.    And neither did your husband.  He never went to

 4     the treatments, right?

 5          A.    I don't know that.

 6          Q.    Okay.  But you did go over to the house, right?

 7          A.    Yes.

 8          Q.    What time did you get over there?

 9          A.    It would depend.

10          Q.    First time?

11          A.    One time -- the first time -- I believe the

12     first time I had been at a seminar in Phoenix and I was on my

13     way home and Joe called and asked if I would stop by, and I

14     turned around and went back.

15          Q.    So what time --

16          A.    Probably about 6:30.

17          Q.    And when you were -- why did he want you to

18     stop by?

19          A.    He wanted me to listen to his heartbeat.

20          Q.    In other words, when he was turning for help,

21     he was turning to you, not somebody else, right?

22          A.    Because I had --

23          Q.    No --

24          A.    -- the medical --

25          Q.    No, ma'am.  The question is --
```

142

```
 1        A.    Did he turn to me?

 2        Q.    Yes.

 3        A.    Yes, he did.

 4        Q.    Okay.  You went over there and saw him, right?

 5        A.    Yes, I did.

 6        Q.    He was tired?

 7        A.    Yes, he was in bed.

 8        Q.    He was laying down, right?

 9        A.    He was laying down.

10        Q.    He didn't look all that spry or anything like

11   that, right?

12        A.    He didn't look as bad as I thought he was going

13   to look, to be honest.

14        Q.    You thought he was looking pretty good?

15        A.    I'm not saying pretty good.  He didn't look as

16   rough as I expected him to.

17        Q.    With regard to him there, do you think he

18   looked well enough to, I don't know, do any sort of physical

19   exertion --

20        A.    Not that evening, no.

21        Q.    -- like making love?  Do you think he was up to

22   that?

23        A.    That's -- I'm not -- I'm -- I don't know that.

24        Q.    Okay.  So you think he's up to doing some

25   physical exertion then?
```

1          A.     I don't know that.  I know he was in bed and

2     he'd had the treatment, I was told.

3          Q.     Okay.  Did you ever go over there when he was

4     vomiting?

5          A.     He did not vomit when I was there, no.

6          Q.     Not the first night, but at any time during

7     this chemotherapy treatment, did you ever go over there when

8     he was vomiting?

9          A.     I believe the second time he -- second and --

10     second time, he did one time.

11          Q.     Bottomline, after each --

12          A.     It was more like spit.

13          Q.     So it wasn't too bad at all then, right,

14     because it was just like spit?

15          A.     I'm an RT.  Suctioning somebody's lungs doesn't

16     look too bad to me, but I am the -- sorry.

17          Q.     The point is to you it wasn't that bad,

18     whatever he was throwing up wasn't too bad?

19          A.     No.

20          Q.     Okay.  After each one of those times, he looked

21     sort of the same.  He was sort of just laying around, didn't

22     look too strong, but it wasn't as bad as you thought it was

23     going to be?

24          A.     The first time wasn't.

25          Q.     How about the second time?  Was the second time

1   bad?

2           A.      The second time was a little bit rougher.

3           Q.      Why do you say the second time was rougher than

4   the first time?

5           A.      Because the second time he was in -- in

6   laymen's terms,  he was sweating profusely which he had not

7   been the first time and --

8           Q.      How about the third time?

9           A.      The third time actually seemed similar to the

10  second time, and I said one of those two times, you know, he

11  had thrown up.

12          Q.      Okay.  How about the fourth time?  Did you see

13  him afterwards?

14          A.      No, I did not.

15          Q.      Would you agree or disagree given your limited

16  medical knowledge as a respiratory therapist, a person

17  undergoing this sort of thing is going to need a little more

18  care than if they're not undergoing this sort of?

19          A.      It depends on the person.

20          Q.      So people who are terminally ill who have had

21  all of these operations and undergoing chemotherapy

22  treatment, some of them don't require anybody to drive them

23  home.  Is what you're saying?

24          A.      I didn't say that.

25          Q.      You said some people don't receive any care?

1        A.     I said some people don't require as much care.

2    Some people don't -- maybe to take them them or something

3    like that, but depending on how -- different people react to

4    the drugs differently.

5        Q.     But he did require some care, didn't he?

6        A.     Yes.   I held his hand and wiped his face.

7        Q.     Was he being abusive to you when you were

8    holding his hand?

9        A.     No.

10       Q.     One of the other things that you were telling

11   us was that this started to take its toll on the defendant.

12   Do you remember telling us that that she became really

13   haggard, she was tired, that sort of thing?  Do you remember

14   telling us that?

15       A.     Beginning around '98, 1998, yeah.

16       Q.     So that would mean beginning of '98 it started

17   taking a toll all the way through '98?

18       A.     No, no.   Like starting when they found out.

19   She was six months pregnant when she found out about Joe and

20   that it was cancer.   In fact, she delivered a little early.

21       Q.     Right.

22       A.     And her OB was concerned about her and the

23   baby.

24       Q.     I understand all that.  But what I'm talking

25   about is whether or not she looked haggard and tired and this

1    was taking a toll according to you, right?

2              A.    Yes, physically, and --

3              Q.    And it was --

4              A.    -- emotionally.

5              Q.    It's taking a toll on her the next year because

6    nothing had changed, right?

7              A.    On both of them.

8              Q.    I'm not asking about him, ma'am.  I'm asking

9    about her.

10             A.    Yes.

11             Q.    Was it taking a toll on her?

12             A.    Yes.

13             Q.    And one of the ways it manifested itself, she

14   looked haggard and tired, right?

15             A.    Yes.

16             Q.    It continued into the year 2000, right?

17             A.    Yes.

18             Q.    I mean, it was taking a toll on her.  She was

19   working, right?

20             A.    Yes.

21             Q.    She had to take care of him, right?

22             A.    On -- yeah, you know, laundry, take care of --

23   yeah.

24             Q.    She had two kids to deal with?

25             A.    She had two children in '98, yes.

```
 1          Q.    She had employment?

 2          A.    Yes.

 3          Q.    She had these parties that she had to give?

 4          A.    Those were only a couple.

 5          Q.    But she still had to go according to you,

 6    right?

 7          A.    Yes.

 8          Q.    She was doing all these things that left her

 9    really pretty tired and haggard?

10          A.    Yes, on occasion.  I'm not going to say

11    everyday, but yes, she was.

12          Q.    No, no --

13          A.    She was having a hard time.

14          Q.    Let me see if I got it.  I thought you

15    described it sort of a process, that, according to you he got

16    to be more abusive, and this began to take more and more of a

17    toll on her.  Isn't that what you're telling us?

18          A.    Yes.

19          Q.    Okay.  So if it's taking a toll on her

20    physically, it's also manifesting itself, right?

21          A.    Yes, because she was losing weight --

22          Q.    She --

23          A.    -- and appearing more tired.

24          Q.    More tired and you would see her on an ongoing

25    basis, right?
```

1        A.      Correct.

2        Q.      Could her looking more tired be because she was

3   going out two nights a week and staying out until maybe 1:00

4   or 2:00 in the morning?

5        A.      I have no idea.

6        Q.      Could it --

7        A.      I don't know about that.

8        Q.      If a person stays out until 1:00 or 2:00 in the

9   morning, do you think that's going to affect how they look?

10       A.      Not necessarily.  I know people at work that do

11  that and they look fine.

12       Q.      Okay.  But in this case it's a possibility for

13  you then that they can look tired?

14       A.      It's possible, a possibility.

15       Q.      Let me show you Exhibit 313.  I want you to

16  take a look at it, all right?  It's a photograph, they've

17  already had the foundation laid for this one, that it was

18  during the defendant's birthday in the year 2000.  I want you

19  to take a look at it.  And you may need to step down, okay?

20       A.      Okay.

21       Q.      See it?

22       A.      Yes.

23       Q.      And then I'm going to show it to you.  Take a

24  good look at it.

25       A.      Okay.

1        Q.    All right.  Have you looked at it?

2        A.    Yes.

3        Q.    Okay.  May I have it back?

4        A.    Yes.

5        Q.    She's smiling in that picture, isn't she?

6        A.    Yes.

7        Q.    Doesn't look too tired there?

8        A.    Her eyes are kind of sunken a little bit and

9  she's definitely lost weight.

10       Q.    So she looks like it's an unpleasant place for

11  her to be there?

12       A    No.

13       Q.    Looks like she's smiling?

14       A.    She is smiling.

15       Q.    Now, the other thing that you told us was that

16  she is your only daughter, right?

17       A.    Yes.

18       Q.    And I'm curious about how close your

19  relationship was in the year 2000.  And specifically you

20  indicated that you would go there two, three times a week,

21  sometimes, over to her apartment at the San Riva complex,

22  right?

23       A.    Yes, like if I was picking up the children.

24       Q.    For whatever reason, you would go over

25  sometimes as much as two or three times a week, right?  Back

1    in the year 2000?

2         A.    Right.

3         Q.    Part of it was because you felt sorry that Mr.

4    Andriano had this thing going on, right?

5         A.    Of course I did.

6         Q.    And part of it was to help your daughter

7    because she looked too tired and haggard given her schedule,

8    right?

9         A.    To help with the children.

10        Q.    Sure.  That was part of what you were doing,

11   right?  And in fact you helped them out financially, right?

12        A.    Correct.

13        Q.    Did you help her to go out to bars and pay for

14   the drinks there too?

15        A.    No, sir.

16        Q.    Now, you helped her pay for the car though,

17   right?

18        A.    Yes.

19        Q.    You sometimes helped her pay some of the other

20   bills, right?

21        A.    Correct.

22        Q.    You helped her pay utilities, right?

23        A.    On occasion, yes.

24        Q.    Ma'am, would it surprise you when Wendi lived

25   at San Riva, the utilities were covered and they didn't have

1      to pay them?

2              A.      No.   When I told you about utilities, that was

3      back in 1997 when Nicolas was born.

4              Q.      But, anyway, you -- you maintain, what appears

5      from outwardly, it was somewhat of a closer relationship

6      because you were seeing her so often, two or three days a

7      week sometimes, right?

8              A.      I was picking up the children and you already

9      asked me about -- somebody asked me about how long.

10             Q.      Additionally, you would also call her?

11             A.      On occasion.

12             Q.      Right.  How many times a week would you call

13     her?

14             A.      The -- I would call, she would call sometimes,

15     maybe once a week, maybe twice a week.  Sometimes maybe not

16     at all that week.

17             Q.      And that would be in addition to the visits

18     that you would have, right?

19             A.      The visits that were close, like we're talking

20     two times a week, was after the chemo started.

21             Q.      Okay.  And, ma'am, did she ever confide in you

22     and ever say to you, you know, "I'm having this religious

23     epiphany, I'm being unfaithful."  Did she ever come to you

24     with that?

25             A.      No.

152

1        Q.    Did she ever come to you and say, you know,

2    "I'm just going out all the time every -- you know, twice a

3    week."  Did she ever come and tell you about that?

4        A.    No.

5        Q.    Did she ever come to you and say, "You know

6    what?  In addition to staying out late at night, I go and

7    stand outside my boyfriend's door for up to an hour until I

8    get him to answer the door.  Can you help me?"  Did she ever

9    ask you for any help like that?

10       A.    No.

11       Q.    So the bottom line is you didn't --

12       A.    I didn't know.

13       Q.    The bottom --

14       A.    I don't have any knowledge about that.

15       Q.    You didn't know your daughter in the year 2000,

16   did you?

17       A.    I believe I did.

18       Q.    Well, you told us before that she stopped

19   talking to you?

20       A.    She stopped talking as much to me, yes.

21       Q.    Right.  And she didn't tell you all these other

22   things that you, as a religious person, consider very

23   significant, right?

24       A.    Talking about what you just mentioned?

25       Q.    Yes.

1        A.    No.

2        Q.    You don't consider those significant?

3        A.    No, no.  She -- I -- no, she did not talk to me

4   about that.

5        Q.    And, I mean, you indicated that she was raised

6   in the religious background and stuff, right?

7        A.    Correct.

8        Q.    Never discussed those with you, right?  Never

9   discussed these problems with you, right?

10       A.    No.

11       Q.    Never asked for help?

12       A.    Not in that area.

13       Q.    Well, I'm asking about that area, so did she

14   ask you for help?

15       A.    Like about money to buy drinks or something?

16       Q.    Yes, ma'am.

17       A.    No.

18       Q.    I'm asking about, you know, "I'm having issues

19   with other men, I want to leave him, I think that Joseph is

20   icky and gross and I don't want to be with him."  Did she

21   ever tell you that?

22       A.    No.  She told me --

23       Q.    The answer is "yes" or "no," ma'am.

24       A.    No, she --

25       Q.    The -- "yes" or "no"?

```
 1          A.    No.

 2          Q.    Did she ever tell you "I'm done with this

 3   cancer, I'm done with it, I wish he would just die"?

 4          A.    No.

 5          Q.    So you really, really didn't know her very

 6   well?

 7          A.    Yes, I -- I did know her --

 8          Q.    But she didn't --

 9          A.    -- but I didn't --

10          Q.    She didn't confide in you, did she?

11          A.    Obviously not everything, no.  No daughter

12   would.

13          Q.    And she didn't confide in you things that were

14   negative, did she?

15          A.    One time.

16          Q.    Well --

17          A.    I could tell you she said --

18          Q.    What I'm asking is did she tell you about the

19   affairs?

20          A.    No.

21          Q.    Ma'am, while we're still talking about it, you

22   indicated that she broke up with Shawn King.  Do you know why

23   she broke up with Shawn King?

24          A.    I -- only what she told me.

25          Q.    So you didn't see anything with your eyes,
```

1    right?

2           A.    I saw the windshields and the window.

3           Q.    But you didn't see what led up to it, did you?

4           A.    No.

5           Q.    You didn't see perhaps she was caught in a

6    compromising activity in skimpy clothing on with a Hispanic

7    male by Mr. King.  You didn't see that, did you?

8           A.    I don't know that happened.

9           Q.    You didn't see it though is the point, right?

10          A.    Of course not.

11          Q.    And so my last question to you is in this area.

12   It's really pretty much -- it's pretty clear that she wasn't

13   telling you everything that was going on in her life in the

14   year 2000 as October approached, right?

15          A.    I'm sure she was not telling me everything that

16   happened in her life every day.

17          Q.    So she wasn't -- you just indicated previously

18   on direct examination that she was clamming up.  Are you

19   backing away from that now?

20          A.    No, but I just said --

21          Q.    She was clamming up then, right?

22          A.    -- she was shutting down.

23          Q.    Shutting down.  And she told you less and less,

24   right?

25          A.    So did Joe, yes.

1        Q.    I'm not interested in Joe right now.  We're

2    talking about your daughter.

3        A.    Okay.

4        Q.    All right.  And she shut down, right, and told

5    you less and less, right?

6        A.    Yes.

7        Q.    Which means that you knew less and less of what

8    was going on with her, right?

9        A.    Correct.

10        Q.    Do you know Anne Newton?

11        A.    No.

12    MR. MARTINEZ:  I don't have anything else for you.

13    THE COURT:  Mr. DeLozier, redirect?

14    MR. DELOZIER:  Thank you, Your Honor.

15

16    REDIRECT EXAMINATION BY MR. DELOZIER:

17        Q.    The Fishers of Men group, what were they all

18    about?

19        A.    We were about --

20        Q.    Was it a Christian organization?

21        A.    Yes.

22        Q.    Were you missionaries?

23        A.    Yes.

24        Q.    And you stayed in it because --

25        A.    Because in our heart that's what we felt was

```
 1    the right thing to do.

 2              Q.    And your group had rules?

 3              MR. MARTINEZ:  Objection.  Leading.

 4              THE WITNESS:  Yes.

 5              THE COURT:  Don't lead.

 6    BY MR. DELOZIER:

 7              Q.    Did you follow the rules?

 8              A.    Yes, yes.

 9              Q.    What were some of the rules they had?

10              A.    Some of the rules would be we got up early in

11    the morning, got into the Word, we -- if any of the men there

12    worked, the money all went into the pot that Rick took care

13    of.  We had -- we -- we would go -- like we would go to the

14    different churches and minister.  The men would minister, the

15    women didn't.  You know, we kind of had our own roles.  The

16    woman were -- you know, we'd keep the house, things like

17    that.

18              Q.    Would you define that as a patriarchal group?

19              A.    Yes.

20              Q.    What were the women's roles in that group?

21              A.    Subservient.

22              Q.    Okay.  There came a time though when you

23    decided -- I think you told us Alejo decided, right?

24              A.    Correct.

25              Q.    That's correct?
```

1          A.     That we were going to leave?

2          Q.     That you were going to leave.

3          A.     Correct.

4          Q.     Did there -- was there any single event that

5    brought about Alejo's decision?

6          A.     Not that I know of.  It was just a culmination

7    of what was happening.

8          Q.     Okay.  So it's fair to say it didn't turn out

9    the way you thought it would?

10         A.     Exactly, yes.

11         Q.     Okay.  Another thing you were asked about was

12   something about Wendi running away from home.  What -- what

13   happened?

14         A.     Her and --

15         MR. MARTINEZ:  Objection.  Lack of foundation.

16   There's approximately four times.

17         THE COURT:  Sustained.  Lay some foundation.

18         MR. DELOZIER: Well, I don't think she testified to

19   four times, Your Honor.

20   BY MR. DELOZIER:

21         Q.     So let's -- do you have a first time that you

22   can tell us about?

23         A.     A first time, yes.  First time would be that

24   Wendi and Carly Lords, who was a daughter of Calvin, the head

25   pastor at the time at 91st Psalm, decided that they were

1    going to run away. And after school, they took off. And

2    they got down, I don't know, probably three quarters of a

3    mile, maybe a mile to Foxworth, and stopped there to get some

4    water because it was hot. And then they -- I don't remember

5    if they called us to come get them or if -- if Alejo and

6    Calvin went looking for them.

7            Q.    And -- so that was the first time. What did

8    they take with them on this jaunt?

9            A.    Absolutely nothing. You know children.

10           Q.    How old?

11           A.    Around 10 or 11. Carly was probably 9.

12           Q.    Okay. Was there another time?

13           A.    I think they did it a couple more times that

14   year, and I think the next time they actually took water with

15   them.

16           Q.    How far did she get that time?

17           A.    Not much farther. The second and third times I

18   know they turned around and came back.

19           Q.    So there wasn't a fourth time?

20           A.    Not that I recall.

21           Q.    There were issues about hair color. You were

22   talking about that. Was Wendi on a swim team?

23           A.    Yes, she was.

24           Q.    And how about lifeguarding?

25           A.    Yes she did do lifeguarding.

1          Q.      Did that have an effect on the hair?

2          A.      Definitely.  Like I tried to say, she was a

3     towhead when she was born, and as she got older her hair

4     darkened just like her biological father's hair.  And when

5     Wendi goes in the sun, and mine does the same thing, it

6     lightens up from the sun and chlorine in the pools.

7     That's -- I could see that it's a little bit darker in some

8     of the pictures -- that one picture that Mr. Martinez showed

9     me with Wendi and Laurabell.  You could see how dark Wendi

10    was because she had been swimming out in the swimming pool

11    and stuff that summer and she -- she tans very easily from

12    hereditary on her biological father's side.

13         Q.      Did I understand you to say on one of the

14    photos you could see the dark rooting?  What do you mean?

15         A.      In her graduation picture you could see -- it's

16    a little darker down here and lighter at the top.  It's

17    sun-bleached.

18         Q.      Okay.  There was some mention of cleaning the

19    house.  Did you ever see Joe clean the house?

20         A.      No, I did not.

21         Q.      So in the 10 years or 9 years or so you knew

22    him, you never saw him do any housework?

23         A.      Oh, no.  No.

24         Q.      Talk a little bit about Alejo for a minute.  If

25    I understood your testimony, he might be mad at something

1    that he read?

2              A.    That he -- I --

3              Q.    Like a newspaper you mean?

4              A.    I think I just used an illustration meaning an

5    inanimate object, you know, like maybe if he read something

6    and if didn't agree with it, maybe a newspaper article,

7    something like that.  What I was trying to relate that

8    wasn't -- it wasn't -- he wasn't always yelling at myself or

9    our children.

10             Q.    All right.  How about throwing things?

11             A.    No, he did not throw things.

12             Q.    Okay.  You had several questions about why you

13   didn't call 911.  Can you tell us why?

14             MR. MARTINEZ:  Objection.  Lack of foundation, which

15   time?

16             THE COURT:  Sustained.

17   BY MR. DELOZIER:

18             Q.    We're talking about Alejo right now.  That's

19   when we're talking before.  I'm continuing to ask you about

20   Alejo during these times.  He would yell and so forth?

21             A.    No, I wouldn't call 911 because that's a family

22   issue and that's something that we would have dealt with at

23   home.  I would not have called 911, that wasn't an option in

24   my mind to ever call 911.

25             Q.    Well, it wasn't --

1        A.    It's a -- you know, it's a family thing.  It's

2    a family afair.  It's not --

3        Q.    There's no violence though?

4        A.    No.

5        Q.    Just a -- just noise?

6        A.    Just noise, just yelling, just like -- just

7    like when Mr. Martinez got louder.  You know, it's louder to

8    me.  It's yelling.

9        Q.    So when this happened, you get a little

10   confused?

11            MR. MARTINEZ:  Objection.  Leading.

12            THE COURT:  Sustained.  Don't lead.

13   BY MR. DELOZIER:

14       Q.    What happens to you when people yell at you?

15       A.    This or I -- I run away from it.

16       Q.    Pardon me?

17       A.    I'll start crying or I want to get away.  I

18   don't want to be around the yelling.

19       Q.    So did it ever get so bad that you thought

20   about leaving Alejo?

21       A.    No.

22       Q.    Why wouldn't you?

23       A.    He's my husband.  I love him.  I had one

24   divorce which was a -- a whole different situation.  And I

25   just -- I wouldn't leave my husband.  It's against what I

```
 1    believe in.

 2              Q.    It's a religious decision, you mean?

 3              A.    Yes.

 4              Q.    You were asked about your -- what you did the

 5    morning of October 8.  Do you remember that?

 6              A.    Yes.

 7              Q.    And you did not leave with your husband?

 8              A.    No, I did not.

 9              Q.    Is there any -- was there any sinister reason

10    in that?

11              A.    No.  No, there wasn't.

12              Q.    Is that a personality trait of Alejo's?

13              MR. MARTINEZ:  Objection.  Speculation, leading.

14              THE COURT:  Sustained.

15    BY MR. DELOZIER:

16              Q.    Have you seen him leave you before?

17              A.    Oh, yes.

18              Q.    Yes?

19              A.    Before in the past, if Wendi, you know -- there

20    was times that Wendi or somebody else --

21              MR. MARTINEZ:  Objection.  Nonrepetitive.

22              THE COURT:  Hold on a second.  It was a "yes" or "no"

23    question.  What was your answer?

24              THE WITNESS:  Yes.

25    BY MR. DELOZIER:
```

```
1          Q.    When have you seen that?

2          A.    There would be times like maybe if there was a

3    ministry issue, somebody called they needed help, or it could

4    be Wendi calling it, could be somebody in the church family,

5    it could be another family member.  Alejo was always very

6    quick to go and help.

7          Q.    And you may not --

8          A.    That's his nature?

9          Q.    You may not know why he left?

10         A.    No, no.  I -- no.

11         Q.    But that night you, on the telephone, called

12   Wendi, right?

13         A.    I'm sorry.

14         Q.    That -- that morning you got to the phone and

15   talked to Wendi?

16         A.    Yes.

17         Q.    And what did you two talk about?

18         MR. MARTINEZ:  Objection.  Hearsay.

19         THE COURT:  Sustained.

20         MR. DELOZIER:  Approach, Your Honor?

21

22              (The following proceedings were held at the

23   bench:)

24

25         MR. DELOZIER:  He opened this wide open, Your Honor,
```

1   with his questioning with her and insinuating there was

2   something sinister about this whole -- about why they left 15

3   minutes later and why she didn't get there until 30 minutes

4   after he did and so forth.  It's got to be explained.

5           MR. MARTINEZ:  I never asked her the content of the

6   conversation.  That's the essence of hearsay.  I didn't open

7   any door whatsoever.

8           THE COURT:  I'm going to sustain the objection.

9   Let's move on.

10

11           (The following proceedings were held in open

12   court:)

13

14   BY MR. DELOZIER:

15           Q.   You were asked about how you formed your

16   opinion about the reputation that Joe had.  Do you remember

17   that?

18           A.   Yes.

19           Q.   And you had some difficulty giving Mr. Martinez

20   any names.  Is that correct?

21           A.   Yes, yes.

22           Q.   Can you explain why you had difficulty giving

23   names?

24           A.   The reason I have difficulty giving names is

25   because I don't want to bring in a bunch of negative stuff

```
 1     and tell negative stuff on other people because of any

 2     beliefs or -- I don't want any retribution against anyone.

 3            Q.    In other words, you --

 4            A.    I don't want somebody else mad at me.

 5            Q.    You do have some specifics that you've been

 6     reluctant to provide?

 7            A.    Yes.

 8            MR. MARTINEZ:  Objection.  Leading.

 9            THE COURT:  Don't lead.

10     BY MR. DELOZIER:

11            Q.    I'm sorry.  What was the answer?

12            A.    Yes.

13            Q.    You asked about your first husband.  Do you

14     remember that?

15            A.    Yes.

16            Q.    And specifically you were asked how many times

17     he saw Wendi after --

18            A.    That's correct.

19            Q.    Okay.  Was there a reason why they didn't see

20     each other?

21            A.    The reason that Wendi didn't see him any longer

22     is --

23            MR. MARTINEZ:  Objection.

24            THE WITNESS:  -- because he was in prison for

25     child --
```

1          THE COURT:  Hold a second.  What is the objection?

2          MR. MARTINEZ:  Relevance as to why.

3          THE COURT:  Overruled.

4          THE WITNESS:  Wendi could no longer see him because

5     he's in prison for child --

6          MR. MARTINEZ:  I'm going to object as to the reason

7     he's in prison.

8          THE COURT:  Let me see Counsel here.

9

10          (The following proceeding were held at the

11     bench:)

12

13          THE COURT:  Hold on a second.  I allowed the question

14     because Mr. Martinez asked about the times he had seen her,

15     but she's already said that the guy's in prison.  Let's move

16     on.

17          (Attorney-attorney discussion.)

18          THE COURT:  I'll allow you to restate the question,

19     but just -- I'll let you lead at this point.  It's because

20     he's in prison, correct, period, and let's move on.

21

22          (The following proceedings were held in open

23     court:)

24

25          THE COURT:  Mr. DeLozier?

1           MR. DELOZIER:  Thank you, Your Honor.

2    BY MR. DELOZIER:

3           Q.    She didn't have an opportunity to see him any

4    more because he was in prison.  Is that correct?

5           A.    That's correct.

6           Q.    Okay.  I'm -- sorry, but I've got to get into

7    this tape recorder business.  Would you explain to me what

8    you did and why you did it, who you did it for on this tape

9    recorder?

10          A.    Yes.  I seem to be getting in trouble whenever

11   I try to --

12          MR. MARTINEZ:  I'm going to object as nonrepetitive.

13          THE COURT:  Answer the question that's asked.

14          THE WITNESS:  Okay.

15          THE COURT:  Repeat the question.

16   BY MR. DELOZIER:

17          Q.    Tell me who asked you to handle a tape recorder?

18          A.    The paralegal asked some of us if we would help

19   her take her stuff back down to the car.

20          Q.    Okay.

21          A.    It just -- and that's when I was just given the

22   tape recorder.  Other people were given other items to carry

23   down.

24          Q.    And that's the paralegal sitting behind the

25   counsel desk?

```
 1          A.      That's correct, Patty.

 2          Q.      Okay.  Do you know how it got here?

 3          A.      No, I do not.  Well, I -- I assume Patty

 4     brought it in.

 5          Q.      You're assuming?

 6          A.      I'm pretty sure I saw her carry all that stuff

 7     in because she --

 8          Q.      You never touched it until she give it to you?

 9          A.      No, I did not.

10          Q.      She gave it to you where?

11          A.      Behind the gate.

12          Q.      Okay.  And you carried it from the gate to

13     where?

14          A.      Down to her car, to the elevator, to the lobby,

15     down to her car and --

16          Q.      Okay.

17          A.      -- gave it to her.

18          Q.      Let's talk about Alice next.

19          A.      Okay.

20          Q.      You guys had a conversation, didn't you?

21          A.      Yes.

22          Q.      Okay.  Well, tell me what the conversation was?

23          A.      Okay.  We were out in the smoking area.  Alice

24     was having a cigarette and I asked her if she wanted any food

25     or anything.  She said "No, thank you," and we started
```

1    talking and she made the comment that Shannon had been on the

2    stand and that she could see the difference in her attitude

3    when she responded to Dan or when she responded to Juan.   And

4    then we proceeded to talk about painting my bathroom the next

5    week when Alice came back, and we just discussed the

6    different colors of painting the bathroom.

7         Q.   That's it?

8         A.   That's it.

9         Q.   Okay.  You talked about seeing physical

10   violence by Joe with Wendi.  What you were not asked, I don't

11   think, to the point where I understood your responses anyway,

12   is how many times you saw him angry?

13        A.   I saw Joe angry a lot of times.

14        Q.   How many times a month?

15        A.   I'd say several times a month.

16        Q.   So several times during the eight, nine years

17   they were together?

18        A.   Yes.

19        Q.   Hundreds?

20        A.   Yes.

21        Q.   And this would be the words that you described?

22        A.   Yeah, the swearing and -- and yelling and --

23   and throwing things.

24        Q.   You were asked about the number of times Wendi

25   called you and talked to you about various things.  Did --

1      how many times would Joe call you on a given evening?

2              A.     Sometimes I'd have two or three calls from Joe,

3      if he was upset, if he was looking for something, if he

4      wanted me to do something the next day, if he wanted me to do

5      something then.

6              Q.     Two or three?

7              A.     Two or three, yes.

8              Q.     How about --

9              A.     Sometimes it would be one, you know, and not

10     every evening.  You're just talking especially towards the

11     end.

12             Q.     When you're talking about the calls, I think

13     one of the calls you talked about was coming from when he was

14     on the road with Nicolas?

15             A.     Correct.

16             MR. MARTINEZ:  Objection.  Beyond the scope.

17             THE COURT:  Overruled.  Go ahead.  Answer the

18     question if you can.

19             THE WITNESS:  That was in May of 2000.  He was on the

20     road.  He was on his way back from Oklahoma.

21             MR. MARTINEZ:  Objection.  Beyond the scope.

22             THE COURT:  Overruled.

23             MR. MARTINEZ:  I didn't ask her about that.

24             THE WITNESS:  He called and --

25     BY MR. DELOZIER:

1       Q.    How many times?

2       A.    Once or twice that night.  He called and --

3       MR. MARTINEZ:  Objection.  Hearsay if she's going to

4  say what he said.

5       THE COURT:  Sustained.  Ask your next question.

6  BY MR. DELOZIER:

7       Q.    So you -- your recollection is two or three

8  times.  So how many days a week would you get two, three,

9  four call at night from Joe?

10       A.    I could go two or three weeks without, you

11  know, that many calls a night.  I got called -- I didn't just

12  get calls at night.  I got calls at the office --

13       Q.    Well, okay.

14       A.    -- from Joe.

15       Q.    During the day, a 24-hour period?

16       A.    Maybe once or twice a week that he would call.

17  And sometimes, like I said, it would be several alls.

18       Q.    Okay.  You were asked that -- my recollection

19  is correct that Wendi didn't confide in you.  Is that what

20  you're saying?  She did not --

21       A.    She did not confide in me as much as her

22  father.  She confided in me less as the time went on.

23       Q.    And you covered specific areas that you did

24  not -- she did not confide in you assuming those were

25  accurate depictions of things, right?

```
1              A.    Correct.

2              Q.    You don't have any idea whether those things

3    happened or not?

4              A.    No.

5              Q.    Okay. What did she confide in you about?

6              MR. MARTINEZ:  Objection.  Hearsay.

7              THE COURT:  Sustained.

8              MR. DELOZIER:  We need to approach, Your Honor.

9

10                   (The following proceedings were held at the

11   bench:)

12

13             MR. DELOZIER:  We got the same problem.  He keeps

14   opening the door and doesn't want me to walk in it.  And this

15   is the third or fourth area we've tried to cover.  I really

16   think this is closing us out of being able to rebut the stuff

17   that he brings up during his cross-examination.

18             THE COURT:  Mr. Martinez?

19             MR. MARTINEZ:  I don't know what door he's talking

20   about.  He's not being specific enough.

21                   (Private discussion between Mr. Patterson and

22   Mr. DeLozier.)

23             MR. DELOZIER:  All I'm trying to do is complete the

24   story.  There were some areas that he brought out that she

25   did not confide in her, so obviously there are certain areas
```

174

1      that I need to complete the story.

2                  THE COURT:  Mr. Martinez?

3            MR. MARTINEZ:  If you do allow --

4            THE REPORTER:  I can't hear you.

5            THE COURT:  Speak into the --

6            MR. MARTINEZ:  Sorry. If you do allow it, it has to

7      do with the year 2000.  I didn't ask about anything --

8            MR. DELOZIER:  I --

9            MR. MARTINEZ:  Let me finish.  I asked about certain

10     areas.  He can only rebut those areas.  He can't start asking

11     about everything under the sun.

12                 THE COURT:  The questions dealt with certain things

13     as far as the affairs, alleged affairs, whatnot, and so I'm

14     going to allow you to go into that because he asked about

15     that.  She basically said she didn't know about those, okay?

16     I'll allow you to ask, "Well, did she confide about other

17     things," okay, but I'm not going to let you get into those,

18     okay?

19           MR. DELOZIER:  Okay.

20

21                 (The following proceedings were held in open

22     court:)

23

24                 THE COURT:  Mr. DeLozier?

25           MR. DELOZIER:  Thank you, Your Honor.

```
 1    BY MR. DELOZIER:

 2         Q.    You had said you didn't know about some of the

 3    questions, most of the things, that Mr. Martinez asked you

 4    about, correct?

 5         A.    That's correct.

 6         Q.    And obviously you had no knowledge of them so

 7    there was nothing she discussed with you about those?

 8         A.    That's correct.

 9         Q.    Okay.  But there were other areas that you did

10    discuss with her?

11         A.    Correct.

12         Q.    Okay.  And you felt then that you were still

13    having a good relationship with your daughter, right?

14         A.    Yes.

15         Q.    Okay.  We talked a lot, and it's been

16    cross-examined, about religion and so forth.  You chose to

17    raise Wendi and -- you and Alejo chose to raise Wendi the way

18    you did.  Is that correct?

19         A.    That's correct.

20         Q.    Okay.  And if you were doing it over, would you

21    do the same thing?

22         A.    I believe I -- no, I would not do the same

23    thing.

24         Q.    What would you do different today?

25         A.    I would --
```

```
 1            MR. MARTINEZ:  Objection.  Relevance.
 2            THE COURT:  Sustained.
 3   BY MR. DELOZIER:
 4        Q.    You don't have any children her age -- under
 5   teenagers today, do you?
 6        A.    I have Brandon.
 7        Q.    How old is he?
 8        A.    Brandon is -- will be 19 in a few days.
 9        Q.    Okay.  Have you raised Brandon the same way you
10   did Wendi?
11        A.    We started to and then we changed our -- our
12   way of childrearing so that Brandon would not be so
13   sheltered.
14        Q.    Objection.  Nonresponsive.
15            THE COURT:  Sustained.
16   BY MR. DELOZIER:
17        Q.    You said not being sheltered?
18            MR. MARTINEZ:  Objection.  Relevance.
19            THE COURT:  Sustained.
20   BY MR. DELOZIER:
21        Q.    What did you do different with Brandon?
22            MR. MARTINEZ:  Objection.  Relevance.
23            THE COURT:  Sustained.
24            MR. DELOZIER:  Need to approach, Your Honor.
25
```

```
 1              (The following proceedings were held at the

 2      bench:)

 3

 4              MR. DELOZIER:  This same problem.  He trashed their

 5      religion during his cross-examination and all I'm trying to

 6      do is show who she was and what she would do differently.

 7              THE COURT:  He asked questions about some of the

 8      things you asked her on direct examination, okay, on his

 9      cross.

10              MR. DELOZIER:  Uh-huh.

11              THE COURT:  Brandon doesn't matter in this trial.

12      It's not relevant.

13              MR. DELOZIER:  He's a family member.  He's going to

14      testify.

15              THE COURT:  But how he was raised is not relevant,

16      okay?  I think that's where you're going.  Let's move on,

17      okay?

18

19              (The following proceedings were held in open

20      court:)

21

22              THE COURT:  Mr. DeLozier?

23              MR. DELOZIER:  Just one moment, please.

24              (Pause in proceedings.)

25              MR. DELOZIER:  All right.  Nothing further, Your
```

TRACI L. WHEELER, OFFICIAL COURT REPORTER, CSR, RPR, CCR

1    Honor.

2              THE COURT:  Any further questions of this witness by

3    the jury?  If so, please raise your hand.

4                   (Pause in proceedings.)

5              THE COURT:  Let me see Counsel here at the bench.

6

7                   (The following proceedings were held at the

8    bench:)

9

10             THE COURT:  Question, "Where are Nicolas and Ashley

11   today?"

12             MR. DELOZIER:  Not relevant.

13             THE COURT:  "Have they had contact with their

14   mother?"

15             MR. MARTINEZ:  Irrelevant.

16             THE COURT:  Mr. DeLozier?

17             MR. DELOZIER:  Not relevant.

18             THE COURT:  Next question, "Was Joe left or right

19   handed, paren, if you know, end of paren.

20                   Mr. Martinez?

21             MR. MARTINEZ:  That's fine.

22             MR. DELOZIER:  Fine.

23             THE COURT:  Next question, "2, where were the bruises

24   you saw on Wendi during 2000?"

25                   Mr. Martinez?

1          MR. MARTINEZ:  Irrelevant because we haven't hooked

2    them up to -- to Joe or anybody.  It could be Rick Freeland.

3          THE COURT:  Well, we don't know whether Mr.

4    DeLozier --

5          MR. MARTINEZ:  Right.

6          THE COURT:  -- is going to or not but --

7          MR. MARTINEZ:  Okay.

8          THE COURT:  -- any objection?

9          MR. MARTINEZ:  No.

10         THE COURT:  Mr. DeLozier?

11         MR. DELOZIER:  Fine.

12         THE COURT:  Okay.  Next question, "3, Did you

13   consider calling 911 after speaking with Wendi on 10/8/2000?

14   Why not?"

15         MR. MARTINEZ:  No objection.

16         MR. DELOZIER:  That's fine.

17         THE COURT:  What did you say?

18         MR. MARTINEZ:  I said no objection.

19         THE COURT:  Any objection?

20         MR. DELOZIER:  No.

21         THE COURT:  Okay.  Next question, "4, During 2000,

22   did Wendi ask for help or assistance?  If so, when did --

23   what did she ask assistance for?"

24                        Mr. Martinez?

25         MR. MARTINEZ:  First part is okay.  The second part

1    is hearsay.

2                    (Attorney-attorney discussion.)

3             MR. DELOZIER:  Not hearsay, party -- admission by

4    party opponent.

5             MR. MARTINEZ:  They're going to have --

6             MR. DELOZIER:  She's saying what she asked for.

7             MR. MARTINEZ:  They're going to have go back and read

8    the rule.  The only person that can present a party opponent

9    statement is the State, not the jury -- not the defense.

10            THE COURT:  What is the -- what are you saying is the

11   admission?

12            MR. DELOZIER:  Pardon me?

13            THE COURT:  What are you saying is the admission?

14            MR. DELOZIER:  Well, until she answers the question,

15   I don't know.

16            MR. MARTINEZ:  And, Judge, just for the record, there

17   is case law.  If you want I could give you a case on this.

18   It doesn't have to be an admission at all.  It can just be a

19   statement even if it isn't an admission for it to qualify as

20   quote, unquote, party opponent, and I will avow to the facts

21   of law as to that.  In other words, even if she says she

22   asked me to help with the laundry, it doesn't matter.  It's a

23   statment by a party opponent.  It doesn't come in even if

24   it's a quote, unquote admission.

25            THE COURT:  Anything else you want to put on the

1    record?

2              MR. DELOZIER:  (No audible response.)

3              THE COURT:  I'm not asking that question.

4              MR. DELOZIER:  The first half is okay.

5              MR. MARTINEZ:  Yeah, that one is okay.  Did she ask

6    for assistance, yes or no.

7              THE COURT:  Okay.  Neither one has an objection to

8    that first part?

9              MR. DELOZIER:  Right.

10              THE COURT:  Next question, "In the Fall of 2000, did

11   Joe call you in the evenings looking for Wendi?  If so, how

12   often?"

13              MR. MARTINEZ:  No objection.

14              MR. DELOZIER:  Fine.

15              MR. PATTERSON:  It calls for --

16              THE COURT:  Talk to him if you want to say something.

17              (Private discussion between Mr. Patterson and

18   Mr. DeLozier.)

19              THE COURT:  You have any objection?

20              MR. DELOZIER:  It looks like hearsay to us.

21              THE COURT:  Okay.  So you object?

22              MR. DELOZIER:  Yes.

23              THE COURT:  I won't ask it.

24              Next question, "Did you think your life was in

25   danger when you rode in the car with Joe and he was

```
1    speeding?"

2                  Mr. Martinez?

3              MR. MARTINEZ:  No objection.  Well, relevance.  How

4    relevant is that?  I would object on the grounds of

5    relevance.

6              MR. DELOZIER:  I don't have any problem with that.

7    Looks perfectly appropriate.  She's danced all around it.

8              THE COURT:  I'm going to go ahead and ask it.

9                  "If so, why did you continue to ride with him

10   after each time instead of taking your own car or aranging

11   other transportation?"

12             MR. MARTINEZ:  No objection.  It's follow-up.

13             THE COURT:  Mr. DeLozier, any objection?

14             MR. DELOZIER:  Fine.

15             THE COURT:  Next question, "Did you receive a call --

16   wait.  Sorry.

17                 "Did you receive a phone call from Joe on

18   October 7 or October 8?  If so, did he express concern or

19   fear?"

20             MR. MARTINEZ:  No objection to first part, and then

21   second part calls for hearsay.

22             THE COURT:  Mr. DeLozier?

23                 (Attorney-attorney discussion.)

24             MR. DELOZIER:  That's fine, both of them.

25             THE COURT:  Okay.  I'll ask the first one.  I'm not
```

1    asking the second one.

2              Next question, "Were you aware before Joe's

3    death of any plan between Wendi and Joe to end Joe's life

4    prematurely?"

5         MR. MARTINEZ:  That would be based on hearsay, so I

6    would object to that.

7         THE COURT:  Mr. DeLozier?

8         MR. DELOZIER:  That's exactly what she says they did

9    and that's what she's going to testify to, so whether she

10   knew about it -- it's fair game looks to me in this

11   circumstance.

12        THE COURT:  Okay.  I'm not going ask it.

13             Next question, "Through your conversation with

14   Wendi on the night of October 7, slash, October 8, were you

15   aware that Joe was dead?"

16        MR. MARTINEZ:  That calls for hearsay because of what

17   she told her.

18        THE COURT:  Mr. DeLozier?

19        MR. DELOZIER:  Well, I think he opened the door for

20   that to be brought in, but you've already ruled against it so

21   I guess that has to be included in that same ruling.

22        THE COURT:  I won't ask that question.

23             Next question, "If you know, was Joe

24   right-handed or left-handed?"

25        MR. MARTINEZ:  That's already been asked and

```
1    answered.

2              MR. DELOZIER:  Yeah, one of those earlier ones, I

3    think.

4              THE COURT:  Okay.  Thank you.

5              MR. DELOZIER:  Thank you.

6

7              (The following proceedings were held in open

8    court:)

9

10             THE COURT:  Ma'am, I have some additional questions

11   here for you.

12             First question reads as follows.  "If you know,

13   was Joe right-handed or left-handed?"  If you know?

14             THE WITNESS:  He was right-handed.

15             THE COURT:  Next question reads as follows.  "Where

16   were the bruises you said -- sorry.  "Where were the bruises

17   you saw on Wendi during 2000?"

18             THE WITNESS:  During 2000 I saw bruises on her arm,

19   on the upper portion of her arm, and I also saw bruises after

20   she was in jail on her neck.

21             THE COURT:  Hold on a second.  Where -- the question

22   is just where were the bruises.

23             THE WITNESS:  Arm.

24             MR. MARTINEZ:  Judge, may we approach on that issue?

25             THE COURT:  Yes.
```

1

2                    (The following proceedings were held at the

3       bench:)

4

5           MR. MARTINEZ:  It's irrelevant the bruising in the

6       jail, and I ask that it be striken.  Additionally, under 403,

7       it's just too much.

8           MR. DELOZIER:  What's the question?

9           THE COURT:  Well, the question was where were the

10      bruises you saw on Wendi during the 2000.

11          MR. DELOZIER:  She answered it correctly.

12          THE COURT:  I know, but she went on about the --

13          MR. DELOZIER:  That's also --

14          MR. PATTERSON:  That's also 2000.

15          THE COURT:  But the question was not where your

16      client was when she saw the bruises.  The question was where

17      were the bruises on your client during 2000?

18                    (Private discussion between Mr. Patterson and

19      Mr. DeLozier.)

20          MR. DELOZIER:  Fine.

21          THE COURT:  Okay.

22          MR. MARTINEZ:  I ask it be re-asked and during the

23      time of up to October 7.

24          THE COURT:  You're asking what?

25          MR. MARTINEZ:  The question be asked where were the

1    bruises that you saw between January 1 of 2000 to October 7

2    of 2000.

3            MR. DELOZIER:  That's not the juror's question.

4            THE COURT:  I'm leaving it as written.  I think it's

5    best.

6                   Hold a second.  Now, this question that we've

7    referred to, I wasn't sure -- were the two of you -- I forgot

8    whether the two of you agreed to this one.  She has a

9    tendency of saying things beyond what the question is, and

10   I'm wondering if we're going into areas, "Did you consider

11   calling 911 after speaking with Wendi on 10/8/2000."

12           MR. MARTINEZ:  It should be said "yes" or "no."

13           THE COURT:  Right.  I'm not going to ask why not.

14           MR. DELOZIER:  She's already covered that.

15                   (Private discussion between Mr. Patterson and

16   Mr. DeLozier.)

17           MR. DELOZIER:  I agree.  Don't ask it at all.

18           THE COURT:  Don't ask --

19           MR. DELOZIER:  The whole thing.

20           THE COURT:  Do you have any objection?

21           MR. MARTINEZ:  I would ask it to be asked, but I

22   don't know what the question is.

23           THE COURT:  I won't ask it at all.

24           MR. DELOZIER:  Okay.

25           THE COURT:  Hold on a second.  Okay.  That's fine.

1     / / / / /

2                     (The following proceedings were held in open

3     court:)

4

5          THE COURT:  Okay.  My next question reads as

6     follows.  Did you feel your life was in danger when you rode

7     in the car with Joe when he was speeding?

8          THE WITNESS:  Yes.

9          THE COURT:  If so, why did you continue to ride with

10    him after each time instead of taking your own car and

11    arranging other transportation?

12         THE WITNESS:  Did I?

13         THE COURT:  Yes.

14         THE WITNESS:  Okay.  The time that I was in fear of

15    my life was that -- was in May of 2000 the times I know that

16    he was driving exceptionally fast.  But I didn't -- you know,

17    I continued to ride with him.

18         THE COURT:  This is a "yes" or "no" question.  Just

19    answer the question "yes" or "no."  Did you receive a call --

20    sorry.  "Did you receive a phone call from Joe on October 7

21    or October 8?"  "Yes" or "no."

22         THE WITNESS:  Yes.

23         THE COURT:  Are there any further questions of this

24    witness by the jury?  If so, please raise your hand.

25                     Let me see Counsel here at the bench.

```
 1
 2              (The following proceedings were held at the
 3   bench:)
 4
 5        THE COURT:  Question, "Would you have continued to
 6   give Wendi money if you would have known she spent money at
 7   bars with friends, boyfriends, twice a week?  Is it okay to
 8   have affairs in your religion?  Was Wendi brought up as
 9   such?"
10        MR. MARTINEZ:  I -- I just.  Sure, I have no
11   objection.
12              (Private discussion between Mr. Patterson and
13   Mr. Delozier.)
14        MR. DELOZIER:  Too far afield.  It's speculation.
15        THE COURT:  I'm not going to ask either question.
16
17              (The following proceedings were held in open
18   court:)
19
20        THE COURT:  Okay.  Any further questions of this
21   witness by the jury?
22              (No response.)
23        THE COURT:  No one has raised their hand.
24        Mr. Martinez, did you have any questions --
25   follow-up questions to those specific questions by the jury?
```

1      MR. MARTINEZ:  Yes.  Thank you.

2

3  FOLLOW-UP QUESTIONS BY MR. MARTINEZ:

4      Q.   After May 2000 when you indicated that you were

5  in fear for your life, you did continue to ride with Joe in

6  the car after that?

7      A.   I believe so.

8      Q.   How many times would you say that you did?

9      A.   If I did, it was once or twice.

10      Q.   Well, I thought you told us that --

11      A.   I believe once or twice.

12      Q.   Ma'am, I told -- you told us that it was at

13  least once or twice that you went to the lake with them.

14      A.   I did not go to the lake in the summer of 2000.

15      Q.   So it would be just around town or what?

16      A.   You --

17      Q.   Where did you ride around?  Where did you go

18  with him subsequent to May of 2000?

19      A.   After May 2000?

20      Q.   Yes.  That was the question.

21      A.   I can't recall a specific time when I was

22  actually riding with him.  I -- I'm just assuming I would

23  have ridden with him.

24      Q.   And that experience didn't leave you such that

25  you thought he was out to kill you by the way he drove or

1    anything like that.  In other words, you felt comfortable

2    enough to ride with him afterwards?

3           A.    Again, I'm trying to recall a specific instance

4    that I did ride with him after May of 2000.

5           MR. MARTINEZ:  Okay.  I don't have anything else.

6           THE COURT:  Mr. DeLozier, did you have any follow-up

7    questions to the specific questions by the jury?

8           MR. DELOZIER:  Yes.  Thank you, Your Honor.

9

10   FOLLOW-UP QUESTIONS BY MR. DELOZIER:

11          Q.    There were two elements on that night if I'm

12   following your testimony correctly.  One was speed and the

13   other one was anger?

14          A.    Correct.

15          Q.    Okay.  So the times you're speeding to the --

16   that you refered to earlier, was he angry then?

17          A.    No.  This was the night in May of 2000.  It was

18   a night that he was extremely angry, to me would have been

19   like raging, and driving in excess speeds of at least 100

20   from what I saw.  I have never ridden in a vehicle with Joe

21   when he had gone that fast.

22          Q.    And that angry?

23          A.    And was that angry.

24          Q.    Did you ever confront him about this situation?

25          A.    No.

1          Q.    Do you remember -- did I hear you say that --

2     did you get a call from either Joe or Wendi on October 7 or

3     8?

4          A.    Yes.

5          Q.    And do you remember when it was?

6          A.    It -- it was in the afternoon.  We came home

7     from the airport.

8          MR. MARTINEZ:  Objection.  Beyond the scope.

9          THE COURT:  Ask your next question.

10    BY MR. DELOZIER:

11         Q.    When was it and where were you at the time?

12         A.    I was -- Alejo and I were in my Mazda.  We had

13    left the airport.  We had left a couple -- I had left a

14    couple messages on the cell phone, and Joe called me back.

15         Q.    Now, you're saying that was in the afternoon --

16         A.    That was in the afternoon.

17         Q.    -- of October 7?

18         A.    Yes.

19         MR. DELOZIER:  Thank you, Your Honor.

20         THE COURT:  May this witness be excused?

21         MR. MARTINEZ:  No, sir.  I'd like to have her remain

22    under subpoena until later.

23         THE COURT: You're not excused at this point in time.

24    You may step down from the witness stand.

25               Okay.  We'll go ahead and take our evening

```
1    recess at this point in time, ladies and gentlemen.  During
2    the recess, remember the entire admonition I have given you
3    including the fact you're not to discuss this case with
4    anyone, do not let anyone discuss the case with you, do not
5    do any research experimentation testing on your own.  Avoid
6    any media coverage of this case.  Keep an open mind.  We'll
7    see you tomorrow at 1:00.  Have a nice evening.  We'll be in
8    recess until 1:00 p.m. tomorrow.
9
10                   (Evening recess.)
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

1

2

3                              CERTIFICATE OF REPORTER

4

5       STATE OF ARIZONA        )
                                )
6       COUNTY OF MARICOPA      )

7

8                    I, Traci L. Wheeler, CSR, RPR, an official

9       and certified reporter in the Superior Court of the State

10      of Arizona, in and for the County of Maricopa, hereby

11      certify that I made a shorthand record of the proceedings

12      had in the within case, and that the foregoing transcript

13      is a full, true, and correct transcription of the

14      proceedings in this case.

15                    Dated this 28th day of March, 2005.

16

17

18                    _____
                      Traci L. Wheeler, CSR, RPR
19                    Certified Court Reporter No. 50313
                      Official Court Reporter
20

21

22

23

24

25

TRACI L. WHEELER, OFFICIAL COURT REPORTER, CSR, RPR, CCR