# TABLE OF CONTENTS (INTERACTIVE)

| | |
|---|---|
| OOOOOO Part 1 | Motion to Exceed Page Limit |

# EXHIBIT OOOOOO PART 1

Michael K. Jeanes, Clerk of Court
*** Electronically Filed ***
Belva Nasingoetewa
Filing ID 1370884
7/24/2012 4:20:46 PM

1 THOMAS C. HORNE
ATTORNEY GENERAL
2 (FIRM STATE BAR NO. 14000)

3 LACEY STOVER GARD
ASSISTANT ATTORNEY GENERAL
CAPITAL LITIGATION SECTION
4 400 WEST CONGRESS, BLDG. S–315
TUCSON, ARIZONA 85701–1367
5 TELEPHONE: (520) 628–6520
Lacey.Gard@azag.gov
6 CADOCKET@AZAG.GOV
(STATE BAR NUMBER 22714)

7

8 ATTORNEYS FOR PLAINTIFF/RESPONDENT

# SUPERIOR COURT OF ARIZONA
## COUNTY OF MARICOPA

| | |
|---|---|
| State of Arizona,<br><br>Plaintiff,<br><br>-vs-<br><br>Wendi Andriano,<br><br>Defendant. | CR2000-096032-A<br><br>MOTION TO ACCEPT DAY-LATE FILING OF EXHIBITS MM-EEE TO RESPONSE TO PETITION FOR POST-CONVICTION RELIEF.<br><br>Assigned to the Honorable Douglas Rayes |

The State respectfully requests that this Court accept the day-late filing of Exhibits MM through EEE to their response to Defendant's post-conviction relief petition, which consist of various trial transcripts. The response and the majority of the exhibits were timely filed on July 23, 2012. Despite diligent efforts, the State was unable to complete scanning the attached exhibits to file them electronically by the deadline. The State therefore respectfully requests that this Court accept the day-late filing of Exhibits MM through EEE, attached.

1    DATED this 19th day of June, 2012.

2

3                              RESPECTFULLY SUBMITTED,

4                              THOMAS C. HORNE
                               ATTORNEY GENERAL
5

6
                               /S/LACEY STOVER GARD
7                              ASSISTANT ATTORNEY GENERAL
                               ATTORNEYS FOR PLAINTIFF
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1  Copy of the foregoing mailed
2  this 19th day of June, 2012, to:

3  Scott M. Bennett
4  Coppersmith Schermer & Brockelman PLC
   2800 N. Central Ave., Suite 1200
5  Phoenix, Arizona 85004

6
7  James J. Belanger
   Coppersmith Schermer & Brockelman PLC
8  2800 North Central Avenue, Suite 1200
   Phoenix, AZ 85004
9

10 Allen A. Arntsen
   Foley & Lardner LLP
11 150 East Gilman Street
12 P.O. Box 1497
   Madison, WI   53701-1497
13

14 Stephen J. Nickels
   Foley & Lardner LLP
15 150 East Gilman Street
16 P.O. Box 1497
   Madison, WI   53701-1497
17

18 Matthew R. Lynch
   Foley & Lardner LLP
19 150 East Gilman Street
20 P.O. Box 1497
   Madison, WI   53701-1497
21

22 Attorneys for Defendant

23

24 /s/Linda Yrrizarry

25
   #2804007
26

27

28

3

EXHIBIT MM

DP

05.00021
Braccio



1           IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

2               IN AND FOR THE COUNTY OF MARICOPA

3

4    STATE OF ARIZONA,                )
                                      )
5              Plaintiff,             )
                                      )
6    v.                               )        No. 1 CA-CR 04-0731
                                      )        MARICOPA COUNTY
7    WENDI ELIZABETH ANDRIANO,        )        No. CR 2000-096032
                                      )
8              Defendant.             )
     _____    )

9

10

11

12                          Mesa, Arizona
                          October 6, 2004
13

14

15

              BEFORE:  The Honorable BRIAN K. ISHIKAWA
16

17

18            REPORTER'S TRANSCRIPT OF PROCEEDINGS

19                         TRIAL DAY 24

20

21

22

23

24   ORIGINAL Prepared for APPEAL by:
     TRACI L. WHEELER, CSR, RPR
25   Certified Court Reporter No. 50313



        TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

                          000006973

1               A P P E A R A N C E S

2   FOR THE STATE:        JUAN M. MARTINEZ,
                          Deputy County Attorney
3
    FOR THE DEFENDANT:    DANIEL B. PATTERSON,
4                         Deputy Public Defender
                                and
5                         G. DAVID DELOZIER,
                          Attorney at Law
6

7          I N D E X   O F   E X A M I N A T I O N

8   WITNESS                                        PAGE

9   OCHOA, ALEJO, Called to testify by the Defense
            Direct Examination by Mr. DeLozier        16
10          Voir Dire Examination by Mr. Martinez     70
            Continued Direct Examination by Mr. DeLozier  72
11          Cross-examination by Mr. Martinez         80
            Continued Cross-examination by Mr. Martinez  100
12          Continued Cross-examination by Mr. Martinez  114
            Redirect Examination by Mr. DeLozier     167
13          Follow-up Questions by Mr. Martinez      182
            Follow-up Questions by Mr. DeLozier      183
14
    RUBIO, PATTY, Called to testify by the Defense
15          Direct Examination by Mr. Patterson        4
            Cross-examination by Mr. Martinez         10
16          Redirect Examination by Mr. Patterson     14

17     E X H I B I T S   A D M I T T E D   I N   E V I D E N C E

18   NO.     DESCRIPTION                           PAGE

19   424     Photograph                             61
     425     Photograph                             61
20   427     Photograph                             61
     428     Photograph                             61
21   436     Photograph                             72
     437     Photograph                             72
22   438     Photograph                             72
     439     Photograph                             72
23   440     Photograph                             72
     441     Photograph                             72
24   442     Photograph                             72
     443     Photograph                             72
25   444     Photograph                             72

        TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

```
 1              MESA, ARIZONA, WEDNESDAY, OCTOBER 6, 2004

 2

 3              THE COURT:  Good afternoon.  This is trial in CR

 4       2000-096032, State of Arizona versus Wendi Elizabeth

 5       Andriano.  The record will reflect the presence of Defendant,

 6       Counsel and the jury.

 7                    Mr. Patterson?

 8              MR. PATTERSON:  Thank you, Judge.  We would ask Ms.

 9       Rubio to testify.

10              THE COURT:  Please step forward right up here.

11

12                         PATTY RUBIO,

13              CALLED ON BEHALF OF THE DEFENDANT,

14       HAVING FIRST BEEN DULY SWORN, TESTIFIES AS FOLLOWS:

15

16              THE COURT:  Please have a seat on the witness stand.

17       Please pull the microphone close to you.  Please remember to

18       speak loudly and clearly into the microphone so everybody can

19       hear you.  Please wait until the question is completed before

20       you answer the question.  Is that agreeable?

21              THE WITNESS:  Yes.

22              THE COURT:  Mr. Patterson?

23              MR. PATTERSON:  Thank you, Judge.

24       / / / / /

25       / / / / /
```

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

4

1    DIRECT EXAMINATION BY MR. PATTERSON:

2         Q.    Would you give us your name, please?

3         A.    My name is Patty Rubio.

4         Q.    By whom are you employed?

5         A.    I work for Maricopa County Public Defender's

6    Office.

7         Q.    What is your job description or title with that

8    office?

9         A.    Paralegal.

10        Q.    Okay.  What essentially does a paralegal do for

11   the Office of the Public Defender?

12        A.    We basically help with litigation, organize --

13   coordinate interviews, organize trials, assist in trials.

14        Q.    How long have you served in that capacity with

15   the Office of the Public Defender?

16        A.    Since September of 2000.

17        Q.    Okay.  So essentially four years?

18        A.    Uh-huh.

19        Q.    Little over four years?

20        A.    Yes.

21        Q.    Okay.  Were you the paralegal in the case of

22   State of Arizona versus Wendi Andriano?

23        A.    Yes.

24        Q.    Okay.  Have you served in that capacity from

25   the inception of the case with the office?

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1        A.    Yes.

2            Q.    Okay.  Drawing your attention to September 7 of

3    the year 2004, were you assisting the trial in that

4    particular case at that time?

5        A.    Yes.

6            Q.    Okay.  And that was what day in terms of the

7    trial?  Was that --

8        A.    That was the first day of opening statement.

9            Q.    Okay.  And to assist Mr. -- do you recognize

10   Mr. DeLozier?

11       A.    Yes.

12           Q.    Okay.  Were you aware that he had intended to

13   present the opening statement?

14       A.    Yes.

15           Q.    Okay.  And were you asked to assist him in some

16   capacity in presenting his opening statement?

17       A.    Yes.

18           Q.    Okay.  To that end did you bring some equipment

19   to court that day?

20       A.    Yes, I did.

21           Q.    Okay.  What did you bring with you?

22       A.    I brought a projector in it's briefcase, a

23   laptop in its briefcase.  I brought a little boombox.  I

24   brought two three-inch notebook binders.  I brought in a tool

25   chest, which I use for office supplies, and I brought a

1    little cart.

2             Q.    Okay.  And are some of those items back --

3             A.    Yes.

4             Q.    -- in the back of the courtroom here?

5                   What This one of the things you brought on

6    September 7?

7             A.    That's the projector with the briefcase.

8             Q.    Okay.  And what -- was this item one of the

9    items you brought?

10            A.    Yes.  That's the laptop.

11            Q.    Laptop computer?

12            A.    Yes.

13            Q.    And what is -- was this one of the items you

14   brought on September 7?

15            A.    Yes.  That's my toolbox I use for office

16   supplies.

17            Q.    You say in addition there were other items that

18   aren't on display today?

19            A.    Correct.

20            Q.    What were those items?

21            A.    Those were the two 3-inch notebook binders and

22   the boombox.

23            Q.    Were the binders filled with documents?

24            A.    Yes.

25            Q.    Okay.  And the boombox, did you bring any blank

1    tapes with that boombox?

2            A.    No.

3            Q.    Okay.  And do you recall what was the purpose

4    of bringing the boombox on that first day of trial, the day

5    of opening statements?

6            A.    It was my understanding there was --

7            MR. MARTINEZ:  Objection.  Hearsay.

8            THE COURT:  Overruled.  Go ahead and answer the

9    question.

10           THE WITNESS:  I was told to bring it in because they

11   might use it for purposes of playing a 911 tape.

12   BY MR. PATTERSON:

13           Q.    Playing a 911 tape?

14           A.    Yes.

15           MR. MARTINEZ:  Objection.  Hearsay.

16           THE COURT:  Overruled.

17   BY MR. PATTERSON:

18           Q.    Did you ever plug in that boombox that day?

19           A.    No.

20           Q.    Do you know whether or not it had batteries?

21           A.    It did not have batteries.

22           Q.    Okay.  Was there ever a blank tape placed in

23   that boombox on that date?

24           A.    No.

25           Q.    Okay.  Did you ever place the 911 tape in that

1    particular boombox?

2         A.    No.

3         Q.    Okay.  During the course of the proceedings

4    that day in open court, did you ever record anything --

5         A.    No.

6         Q.    -- using that boombox?

7         A.    No.

8         Q.    Okay.  At the close of the day's proceedings,

9    what did you do?

10        A.    At the close of the proceedings, I packed up my

11   stuff, my belongings, and after everyone had left we -- I

12   proceeded to take my items with me.  Steve and Cindy and

13   Donna were still in the courtroom.

14        Q.    Okay.  You mentioned three names.  Are those

15   persons with -- I guess Mrs. Ochoa is not here.  With the

16   exception of Mrs. Ochoa, are the other two individuals who

17   were present that day also present in today's court?

18        A.    Yes, they are.

19        Q.    Would you point them out for us?

20        A.    It's the gentleman in the burgundy-colored

21   shirt and lady sitting next to him.

22        Q.    Would you please stand up?

23              These two individuals?

24        A.    Yes.

25        Q.    Okay.  What did they do for you at the close of

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1   proceedings that day?

2          A.     They helped me carry items back out to my

3   vehicle.

4          Q.     Okay.  Do you know who carried what?

5          A.     I think if I remember correctly Steve carried

6   out the projector.

7          Q.     That would be this thing?

8          A.     Yes.

9          Q.     Okay.  And --

10         A.     And Cindy carried out the laptop.

11         Q.     That would be this item?

12         A.     Uh-huh.

13         THE COURT:  Is that a "yes"?

14         THE WITNESS:  Yes.

15  BY MR. PATTERSON:

16         Q.     Okay.

17         A.     And Donna --

18         Q.     Donna Ochoa is not present currently in court?

19         A.     Right.

20         Q.     She was the woman that testified yesterday?

21         A.     Yes.

22         Q.     Okay.  What -- did she assist you in some

23  capacity at the close of the proceedings that day?

24         A.     Yes, she did.

25         Q.     What did she carry for you?

1        A.    She carried the little boombox for me.

2        Q.    Was there any tape in the boombox when you

3   handed it to her?

4        A.    There was never a tape in there.

5        Q.    With the assistance of these three folks, where

6   did you go with all these items?

7        A.    Down to my vehicle.

8        Q.    Okay.  That was parked in --

9        A.    In the parking lot.

10       Q.    Let me get my bearings -- the north parking lot

11   or south parking --

12       A.    North parking lot.

13       Q.    Okay.  Did they carry those items out of the

14   court building to your car?

15       A.    Yes.

16       Q.    Okay.  And did they hand them to you at the car

17   and assist you in loading them into the car?

18       A.    Yes.  They actually handed it to me and I went

19   ahead and loaded them into my vehicle.

20            MR. PATTERSON:  Okay.  Thank you.

21            Judge, that's all I have with this witness.

22            THE COURT:  Mr. Martinez?

23

24   CROSS-EXAMINATION BY MR. MARTINEZ:

25       Q.    You have been working on the Andriano case for

1    some time, haven't you?

2         A.    Yes, I have.

3         Q.    And part of your duties include keeping the

4    departmental reports that may be prepared in -- in this case,

5    right?

6         A.    Yes.

7         Q.    Additionally, apart from the departmental

8    reports, you also have a report from Sharon Murphy who is a

9    Ph.D.?

10             THE WITNESS:  Yes.

11             MR. PATTERSON:  Judge, objection.

12             THE COURT:  Hold a second.  Let me see Counsel.

13

14                  (The following proceedings were held at the

15        bench:)

16

17             THE COURT:  Where are you going with this?

18             MR. MARTINEZ:  I'm just -- first of all, Donna is not

19    a client of theirs, so any communication between them and

20    Donna is not protected by the attorney-client privilege.

21             THE COURT:  Well --

22             MR. MARTINEZ:  I'm going to ask her when did Donna

23    review those reports.  She indicated she reviewed them and I

24    want to know what were the circumstances.

25             THE COURT:  I'm only going to allow you to go into

1    what was asked by Mr. Patterson today.

2            MR. PATTERSON:  Thank you.

3            THE COURT:  That's the only purpose she's being

4    called today.  Let's move on.

5            MR. MARTINEZ:  Well, he just --

6            THE COURT:  Hold on a second.  Just ask questions

7    related to what Mr. Patterson asked here today.

8            MR. MARTINEZ:  I --

9            THE COURT:  Do not go into where you're going.  Do

10   you understand that?

11           MR. MARTINEZ:  I do understand that, but I just want

12   the record to note that the rules indicate that I'm -- it's

13   wide open cross-examination.  I'm not restricted to the area

14   that he called her for.  There is no attorney-client

15   privilege between this person and Donna Ochoa, and that's

16   what I want to say for the record.

17           THE COURT:  Okay.

18

19               (The following proceedings were held in open

20   court:)

21

22           THE COURT:  Mr. Martinez?

23   BY MR. MARTINEZ:

24       Q.   You were the one that brought the tape

25   recorder, right?

1          A.     Yes.

2          Q.     And you brought the tape recorder and you laid

3     it up here on the desk, correct?

4          A.     I laid it on the side of the desk.

5          Q.     While Mr. Patterson was giving his opening

6     statement, there were clicking sounds.  Do you remember that?

7          A.     No, I don't.

8          Q.     Do you know where those clicking sounds were

9     coming from?

10          A.     I didn't hear any clicking sounds.  I don't

11     know where they came from.

12          Q.     And where were you seated back --

13          A.     I was seated on the side, I believe, of Mr.

14     DeLozier.

15          Q.     And the other question here, is that there was

16     never a 911 tape that was played that day, was there?

17          A.     No.

18          Q.     There wasn't any need for the tape recorder

19     during Mr. Martinez's opening statement was there?

20          A.     We believed that we might be using -- doing

21     opening statements on that day.  That's why I brought it in.

22          Q.     You didn't use it the next day either, did you,

23     on September 8, 2004?

24          A.     No.

25          Q.     The bottomline is there was a tape -- tape

1    recorder that was here and it wasn't needed?

2         A.    It was decided it wasn't going to be used.

3         Q.    So the answer is no?

4         A.    No.

5         Q.    You -- another thing you indicated is you

6    brought a number of items here today?

7         A.    Yes.

8         Q.    You brought them up.  You?

9         A.    Yes.

10         Q.    No one assisted you, correct?

11         A.    No.

12         MR. MARTINEZ:  I don't have anything else.

13         THE COURT:  Redirect?

14

15    REDIRECT EXAMINATION BY MR. PATTERSON:

16         Q.    Anybody offer you any assistance to bring stuff

17    up to the courtroom?

18         A.    No.  I came in by myself.

19         Q.    Could you have used some assistance --

20         A.    Yes.

21         Q.    -- in bringing stuff up?

22         A.    Yes.

23         MR. PATTERSON:  Thank you, Judge.  That's all I have.

24         THE COURT:  Any further questions of this witness by

25    the jury?

1               (No audible response.)

2          THE COURT:  No one has raised their hand.

3               Can this witness be excused?

4          MR. PATTERSON:  She's still able to remain --

5          THE COURT:  Right.

6          MR. PATTERSON:  -- in the courtroom, but no longer

7     serving as a witness.

8          THE COURT:  Excused as a witness.

9          MR. MARTINEZ:  I don't have any objection.

10          THE COURT:  You're excused as a witness.  You may

11     remain in the courtroom.

12          THE WITNESS:  Thank you.

13          THE COURT:  Mr. DeLozier?

14          MR. DELOZIER:  Thank you, Your Honor.  Call Alejo

15     Ochoa.

16               (Pause in proceedings.)

17          THE COURT:  Sir, if you could please step forward

18     right up here.  Right up here.  Please give your name to the

19     clerk and she'll swear you in.

20

21                    ALEJO OCHOA,

22     CALLED TO TESTIFY ON BEHALF OF THE DEFENDANT,

23     HAVING FIRST BEEN DULY SWORN, TESTIFIES AS FOLLOWS:

24

25          THE COURT:  Sir, please have a seat on the witness

1    stand.  Please make yourself comfortable there.  Please pull

2    the microphone close to you.  Please remember to speak loudly

3    and clearly into the microphone so everyone can hear you.

4    Also please wait until the question is completed before you

5    answer the question and please make sure you give a verbal

6    response.  Is that agreeable to you, sir?

7              THE WITNESS:  Yes.

8              THE COURT:  Mr. DeLozier, you may proceed.

9              MR. DELOZIER:  Thank you, Your Honor.

10

11   DIRECT EXAMINATION BY MR. DELOZIER:

12        Q.   Please state your name?

13        A.   Alejo Ochoa.

14        Q.   Where were you born?

15        A.   Torrence, California.  Grew up in Casa Grande.

16        Q.   Sorry?

17        A.   I grew up here in Casa Grande, Arizona.

18        Q.   How long has your family been in Casa Grande

19   area?

20        A.   My grandfather started the business there in

21   1949 and we've been there ever since.  I left the state a

22   couple of times for two, three years at a time.  That's about

23   it.

24        Q.   Tell us about your education.

25        A.   Finished high school, started community college

1    in law enforcement.  Dropped out to run the family business.

2          Q.    What is your current career?

3          A.    I manage Ochoas Tortillas down in Casa Grande.

4    I've got a little photo business that I do that I have. I'm

5    also youth pastor at Harvest Family Church.

6          Q.    How long have you been a youth pastor?

7          A.    Since 1980.

8          Q.    Were you ordained as a minister?

9          A.    I'm licensed through -- yes.  I'm licensed.

10   I'm not ordained, but I am licensed.

11         Q.    Through what?

12         A.    I forget the name of the organization.

13         Q.    Okay.  Are you married?

14         A.    Yes.

15         Q.    How many -- who are you married to?

16         A.    Donna Ochoa.  I'll be married 30 years this

17   coming June.

18         Q.    Okay.  Do you have any children?

19         A.    I have Wendi Andriano and Brandon Ochoa.  I

20   adopted both of them.  Wendi when she was 4 and Brandon when

21   he was 2 and a half.

22         Q.    And how did you meet Donna?

23         A.    I was part of a group that started a drug

24   counseling and alcohol counseling program down in Casa Grande

25   and I was on the board of directors.  We were looking for

1   somebody to help with the counseling down in Casa Grande.

2   We -- several people knew of Donna working up there at a drug

3   treatment program here up in the Phoenix area -- Terros, I

4   believe was the name, if I remember right.  I liked her

5   qualifications on paper.  They interviewed her, told me what

6   they felt, so we hired her.  She came up the following week

7   or two weeks later, something like that, and that's how I

8   actually met her.

9          Q.    Okay.  Did you and Donna have any children

10  together?

11         A.    No.

12         Q.    Okay.  How did your romance begin?

13         A.    There wasn't anything there at first.

14  Didn't care for her, she didn't care for me.  We just got to

15  know each other and just started dating.

16         Q.    Okay.  What was her personality like when you

17  first met her?

18         A.    Donna --

19         MR. MARTINEZ:  Objection.  Relevance.

20         THE COURT:  Sustained.

21         MR. DELOZIER:  Can we approach, Your Honor?

22         THE COURT:  Let's move on, Mr. DeLozier.  Let's move

23  on.

24  BY MR. DELOZIER:

25         Q.    Was she spiritual like you?

1          A.     No.

2          Q.     Okay.  Who was in charge in your relationship?

3          A.     I'm the one basically in charge.  I'm the one

4     that basically controls everything.

5          Q.     So what type of husband were you?

6          A.     What kind of husband am I?

7          Q.     Or are you?

8          A.     I'd say I'm a good husband, I believe.  I -- I

9     can be pretty controlling.  I have lost my -- I have gotten

10    angry and thrown things before.  I've never struck her, never

11    struck my wife at any time, but I have been angry.  I've

12    never cussed.

13         Q.     What would Wendi and Donna do when you would

14    start one of these?

15         A.     They'd go in the bedrooms, lock the door, or I

16    would leave, just go outside, maybe get a car, drive out into

17    the desert, something.

18         Q.     What was Wendi like during the early years with

19    you?

20         A.     Very outgoing.  Very, very outgoing.  Very

21    enthusiastic about everything, made friends easily, no

22    problem with relationships at all.

23         Q.     Did she obey you?

24         A.     Yeah.  Not at first.  At first she told me

25    "You're not my boss," but she changed.


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1        Q.     Okay.  During her early years, did she go to

2   school?

3        A.     She started school in elementary school in Casa

4   Grande, and then we -- we joined a group and we were invited

5   to go from church to church and minister in different areas,

6   small churches and big churches.  And at that time she was

7   homeschooled on the road.

8        Q.     Okay.  What was the name of that group?

9        A.     Fishers of Men.

10        Q.     Who was in charge of it?

11        A.     Rick Miller, and Al Farmer were the ones that

12   actually started it.

13        Q.     Who controlled the group?

14        A.     Rick Miller was actually in charge of it.

15        Q.     Okay.  And you say you were invited to

16   different places?

17        A.     Yes.  There could have been a church of 10

18   people or could have been a church of 5000-like.  We speak or

19   minister to the teams.  That's who we ministered to.

20        Q.     About what age was Wendi when you joined the

21   group?

22        A.     She was about 6 years old.

23        Q.     And did you -- how long did you stay?

24        A.     Until she was about 9, and I just felt that it

25   was time to settle down again because I was concerned about

1    her schooling, so we came back to Casa Grande and eventually

2    we enrolled her into, at the time it was called, 91st Psalm,

3    a Christian school.

4            Q.    Would you -- how would you characterize this

5    group?  Religious, missionary?

6            A.    Fishers of Men?

7            Q.    Yeah.

8            A.    It would be a missionary group here in the

9    states.

10           Q.    Okay.  And you said something about 91st Psalm?

11           A.    Yes.

12           Q.    What was that?

13           A.    That's the church that a friend of mine started

14   years ago.  I actually went on staff there in 1980.  Since

15   then he has moved and another pastor has taken over.  And it's

16   called Harvest Family Church.

17           Q.    Okay.  It also had a school?

18           A.    Yes, it has a school.  And the school

19   fluctuates depending on -- it could be the attendance or

20   people moving in or out of the community.

21           Q.    Okay.  Tell us a little bit about the school.

22           A.    Small school.  When we first enrolled Wendi,

23   I'm thinking it could have been between 25 and 30 kids.

24   Just -- just a church school, very strict Baptist doctrine in

25   the curriculum.  It's called AC -- ACE.  It's Accelerated

1   Christian Education.   It's a private -- largest private

2   school and schooling system in the world.

3            The longer we stayed there, the -- we started

4   adding things like a swim team, track team.   We're going over

5   20 years now.   We have a track meet every year for kids from

6   ages of 3 to 18.   We do that every year.

7       Q.   What grades are included in the school?

8       A.   From first grade or kindergarten all the way

9   through high school.

10      Q.   Did Wendi graduate from that high school?

11      A.   She graduated from high school.   She was the

12   only graduate of her class.

13      Q.   How did she do in high school?

14      A.   She did very good.   When we came back, like I

15   said I was concerned about her education, she was tested and

16   I believe she was two years ahead of herself, where she

17   should have been, so we didn't do too bad on her education.

18   I felt she did real good on her education.

19      Q.   Can you describe her social life up until 18?

20      A.   Very, very limited.   Mainly social life was

21   just school and church.

22      Q.   Any dates?

23      A.   Just school and church, no.

24      Q.   How about programs?

25      A.   She wasn't allowed to date, no prom.

1        Q.      Dancing?

2        A.      No dances.

3        Q.      Makeup?

4        A.      Only if I approved of it, and that's later

5    years.

6        Q.      Okay.  Were there any outings at all to the

7    rest of the community?

8        A.      Not until they started getting into their late

9    teens.  We -- when we started having the swim team and  the

10   track team then, we had hired a different principal and he

11   started doing more of an outreach, and then there was more

12   contact with the outside --

13       Q.      Okay.

14       A.      -- of school.

15       Q.      Was she able to date after she was 18?

16       A.      After she was 18, yes.

17       Q.      Okay.  And can you tell us about her first date?

18       A.      Me and the wife actually took her and -- and

19   her date on the first date.

20       Q.      Where did you go?

21       A.      Took them to a restaurant, had dinner.  They

22   sat at one table.  We sat at another table.

23       Q.      While she was at high school, did she do

24   anything other than what you mentioned?

25       A.      The swim team, little bit of track, did

1    outreaches.  She would go to -- they have outreaches over to

2    Mexico during Christmas.  She would go with them then.  She

3    started going to the community college and taking classes out

4    there --

5            Q.    Okay.

6            A.    -- when she was in high school.

7            Q.    Who did she have her first date with?

8            A.    Shawn King.

9            Q.    Was he a student at the school?

10           A.    Yes.

11           Q.    And was he related to anybody?

12           A.    He was the pastor's son.

13           Q.    Okay.  How did that go?

14           A.    They had a good relationship.  They grew up

15   knowing each other from the time Wendi moved back to Casa

16   Grande and enrolled in school, so they were pretty good

17   friends.  They -- there was a break up there and there was a

18   few problems, but I talked -- I had conversations with both

19   of them afterwards and I told them --

20           MR. MARTINEZ:  Objection.  Hearsay.

21           THE WITNESS:  -- no matter what your dating life is

22   like --

23           THE COURT:  Sustained.  Ask your next question.

24   BY MR. DELOZIER:

25           Q.    Okay.  So there was a breakup?

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1          A.     Yes, there was a breakup.

2          Q.     Was this a smooth breakup?

3          A.     Not really, no.

4          Q.     Okay.  After -- you say she went to college?

5          A.     Community college.

6          Q.     What's it called?  Central --

7          A.     Central Arizona College.

8          Q.     Okay.  Did she continue doing good after high

9    school?

10         A.     Yes.

11         Q.     For how long?

12         A.     For about a year.  I'm thinking.  I don't

13   remember exactly.

14         Q.     Okay.  What did she do after that?

15         A.     She got hired on at an apartment complex and it

16   was a situation where she was assistant manager.

17         Q.     Before she --

18         A.     She had to move on.

19         Q.     I think -- sorry, I'm -- not I didn't mean to

20   interrupt you, but I think there was something else in

21   between community college and --

22         A.     Oh, okay.

23         Q.     -- her first job.

24         A.     She went to Mexico for a while.

25         Q.     How long did she stay?

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1        A.    Few, six months.  Worked with a church over

2    there, came back here and volunteered the rest of the year

3    working in the school she graduated from.

4        Q.    So she assisted in the school at 91st Psalm --

5        A.    Yes.

6        Q.    -- after --

7        A.    It was actually the Harvest Family Church.

8        Q.    -- after she worked in Mexico?

9        A.    Yes.

10       Q.    Besides her time, did she donate anything else

11   to the Mexican ministry group?

12       A.    Time, money, clothes.  She donated her car.

13       Q.    Okay.  When did you first meet Joe?

14       A.    I can't tell you the exact time.  We were

15   having work done in our house and we moved into that

16   apartment complex that Wendi was assistant manager at.

17       Q.    Now --

18       A.    And she brought him over and we met him there.

19       Q.    Sorry.  I interrupted you earlier when you were

20   telling me she was taking her first job at the apartment

21   complex.  Did you want to go back to that now?

22       A.    Yeah.  When she took that first job, it was a

23   live-in job.  She had to live on the premises.  When the

24   manager wasn't there, she had to be there.  One of them had

25   to be there all the time.  So an apartment came with the job

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1      she had to be there.

2           Q.    All right.  And --

3           A.    It was a living situation.

4           Q.    -- were you saying that you -- you moved there

5      yourself?

6           A.    Yeah.  We were having work done in our house,

7      in our home, and we couldn't live in it while they were

8      working on it, so we stayed there about a month.  Maybe just

9      under a month, something --

10          Q.    It was during that time you met Joe?

11          A.    That's when I met Joe, yes.

12          Q.    What were your first impressions?

13          A.    I felt that -- he wasn't working at the time

14     and I asked if he had a full time job and he said he had his

15     own business.

16          MR. MARTINEZ:  Objection.  Hearsay.

17          THE COURT:  Sustained.  Ask your next question.

18     BY MR. DELOZIER:

19          Q.    Without telling us what he said, what were your

20     first impressions is what I asked.  I mean, did you like him,

21     was he friendly?

22          A.    He was very friendly.  I didn't -- I didn't

23     dislike him, I didn't like him.  It was just somebody that

24     she introduced me to.

25          Q.    Okay.  Did she tell you they were dating?

1          A.     Yes.   Yes, she did.

2          Q.     Okay.  Did Joe and Wendi eventually get

3    married?

4          A.     Yes, they did.

5          Q.     Okay.  Did you have a discussion with Wendi

6    before they were married?

7          A.     Yes.  I asked her to wait, asked him to get a

8    job, work for a year and let their relationship go a little

9    bit longer, not to rush into it.

10          Q.     Okay.  How would you describe what you saw,

11    Wendi and Joe as a couple, when you saw them together prior

12    to their marriage?

13          A.     When they were together, you really couldn't

14    tell -- I couldn't really tell they were a couple.  They

15    didn't hold hands, they didn't hug each other.  There wasn't

16    any -- anything there that I saw.

17          Q.     Okay.  Did you witness any physical violence

18    before they were married?

19          A.     Before they were married, I saw one incident

20    when they were at our house.  Joe ended up grabbing Wendi,

21    holding her down, and she was trying to get up and he held

22    her down by the neck.

23          Q.     Did you ever see her with any bruises or

24    injuries at any time during the time after she met Joe?

25          A.     After she met Joe, I saw her with bruises on

1    her arms.

2            Q.    Which arm?  Both arms?

3            A.    Yeah, mainly on the left arm.

4            Q.    Left arm?

5            A.    But on the right also.

6            Q.    Yes?

7            A.    Yes.

8            Q.    And that's between the shoulder and the elbow?

9            A.    Yes, right in this area.

10           Q.    Okay.  After they were married, did you see any

11   physical violence?

12           A.    One time at our house when they were leaving,

13   he was in a hurry to get her and the baby in the truck and

14   he -- he tried to slap her and ended up slapping her on the

15   neck.

16           Q.    About when was that do you recall?

17           A.    About '97, somewhere around there.

18           Q.    Okay.  How about --

19           A.    It was a -- on a weekend.

20           Q.    Did Joe ever have any demonstration of anger in

21   your presence?

22           A.    Yeah.

23           Q.    Could you give us an approximation of the

24   number?  I'm talking about the entire eight years?

25           A.    The whole eight years?

1        Q.    Yeah.

2        A.    He had quite a few.  Working on his boat, he'd

3  get angry if something snapped or something broke, or he'd

4  throw tools.  One time I was helping him move -- I think it

5  was an entertainment center, I don't remember.  I think

6  that's what it was -- at one of the apartments --

7        MR. MARTINEZ:  If we could have a little more

8  foundation?

9        THE COURT:  Hold on a second.  Lay some foundation.

10  BY MR. DELOZIER:

11        Q.    Can you tell us approximately when you saw the

12  episodes with the boats or -- was it more than one?

13        A.    More than one.  There was -- it was several of

14  the boats.  One time it was at our house.  He had parked one

15  of the boats at his -- at our house because he didn't want

16  his dad to know he bought it yet.

17        Q.    And what happened?

18        MR. MARTINEZ:  I still didn't get the foundation.

19  Objection.

20        THE COURT:  I'll sustain the objection.  Lay some

21  foundation.

22  BY MR. DELOZIER:

23        Q.    Can you tell us approximately when that was?

24  You said it was at your house.  Could you tell us maybe a

25  year?

1    A.    You want to know the years of all this?

2    Q.    If you could.  Let's do it this way.  Was it

3  after they were married?

4    A.    Yes.

5    Q.    Okay.  Was it the first year after they are

6  married?

7    A.    No.  It was a couple, three years afterwards.

8    Q.    '97 maybe?

9    A.    About '97, 1998, somewhere throughout there.

10    Q.    Okay.  The boat was at your home?

11    A.    Yes.  He was working on his boat.  They had

12  just rebuilt the engine.  He just got that boat.  He just

13  rebuilt it.  He snapped one of the -- one of the bolts that

14  holds down the engine, and he just started throwing things

15  around.

16    Q.    Did he do anything besides throw things?

17    A.    One time -- at that incident?

18    Q.    Yes.

19    A.    That incident, no.

20    Q.    Okay.  Was there another occasion over the

21  boats?

22    A.    Over the boats, yes.  Over when he lived in the

23  farmhouse.

24    Q.    That would have been about '95, '96?

25    A.    '95 -- no.  It would have been '96.

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    Q.    Okay.  What happened that day?

2    A.    Working on the engine there.

3    Q.    You were there?

4    A.    Yes, I was there.  They had a little engine

5    hoist and he almost dropped the engine, hit the boat, didn't

6    hurt it, but hit the boat.  He got mad, pulled the engine up

7    and started throwing things around, tools.

8    Q.    Any words?

9    A.    Yeah, cussing.

10    Q.    Okay.  Did you ever see him angry when he was

11    with his wife, Wendi?

12    A.    One incident stands out.

13    Q.    Tell me when that was.

14    A.    That would have been '98.  I believe '98.

15    Q.    What happened?

16    A.    That's another -- over at their apartment

17    complex or at their apartment, I was helping him move

18    something.  I picked up Nicolas, put them to the side to get

19    him out of the way and he started crying because he's only a

20    little guy.  Joe came out of the room, mad about the crying I

21    guess, and he was going to hit me, and Wendi got between us

22    and not -- I thought we were going to have it out there, but

23    we didn't.  He cooled down, turned around and he and Wendi

24    went back into the bedroom.

25    Q.    How did you know he was angry?

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1       A.      Facial expressions and his tone of voice when

2    he came out.

3       Q.      Words?

4       A.      Words, lot of words, why was Nicolas being made

5    to cry, so forth.

6       Q.      Okay.

7       A.      Nicolas, we -- we love Nicolas.  Nicolas --

8       Q.      I understand.  Other episodes when you saw

9    anger when Wendi was present and you were there?

10      A.      At the San Riva apartments, would have been

11   in -- in 2000.  He was watching a movie in the bedroom before

12   they had gone for dinner.  Nicolas had gone in to be with his

13   dad, and I heard a commotion in the bedroom.  Nicolas came

14   out crying, holding -- I believe he was holding his head.

15   Joe didn't want him in there because he was watching a movie

16   and he was disturbing him.  He came out and there was a

17   heated argument.

18      Q.      Between who?

19      A.      We -- we had a couple words and Wendi had a

20   couple words with him.  He came out and then they had dinner.

21      Q.      Anything else happen that day?

22      A.      Not that day.

23      Q.      Okay.  Any other occasions when you saw him

24   angry with Wendi or angry when he was with Wendi, either one?

25      A.      That I personally saw?

1          Q.     Yes.

2          A.     I can't think of any.

3          Q.     Okay.  How about when he was -- when you were

4   with Donna and you were present and he was there and Wendi

5   wasn't.  Any episodes during that --

6          A.     Sorry, I can't --

7          Q.     Okay.  You went boating with him, didn't you?

8          A.     Yes, quite a few times.

9          Q.     Any episodes of anger displayed while you were

10  out boating?

11         A.     Not a whole lot of anger while he was boating.

12  He loved the water.

13         Q.     Okay.  How did he treat animals?

14         A.     He had a -- Wendi had a puppy that she had

15  gotten and he didn't treat her too good.  Kicked it a couple

16  times.  I saw him kick it a couple times.

17         Q.     Were you ever in his presence when he got angry

18  at some third party, not family members?

19         A.     Yes.  Yes, I have seen him angry at other --

20  other people.

21         Q.     Okay.  And can you give us an illustration and

22  tell us when?

23         A.     Elephant Butte.

24         Q.     Where is Elephant Butte?

25         A.     Elephant Butte is in New Mexico.

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000007006

1          Q.     Okay.

2          A.     It's a lake.  The little community is called

3    Truth or Consequences.

4          Q.     Okay.

5          A.     A bunch of the crowd went up there for some

6    boat races and we discussed about him racing boats and he was

7    very interested in that.  He also got into it a couple times

8    with people he didn't know over boats, different things like

9    that.

10          Q.     What did you see?

11          A.     I seen him get in his face, get in a couple

12    individuals face, just screaming having a --

13          Q.     Words?

14          A.     Yes, lot of words, cussing.

15          Q.     Fists?

16          A.     No.  I never saw him hit anybody.

17          Q.     Okay.  Did you see him when he had been

18    drinking?

19          A.     Saw him a couple times when he was drinking.

20    He -- sometimes he went overboard.  He might get on the table

21    and moon you, drop his pants.

22          MR. MARTINEZ:  Objection.  Relevance.

23          THE COURT:  Sustained.

24    BY MR. DELOZIER:

25          Q.     Did he ever do anything that frightened you?

1        A.    His driving.

2        Q.    Did you ride with him?

3        A.    Yes.  I rode with him a couple of times.  After

4   that I really didn't want to ride with him.  Driving his boat

5   at times he would take too many chances with it.  I quit

6   going on the boat with him after that.

7        Q.    Anything else that frightened you?

8        A.    The way he talked to Wendi, not knowing what he

9   was going to be doing.  I was very concerned.  Went to visit

10  him one day at their home when they lived on the farm.

11       Q.    That would be '95, '96 time?

12       A.    Yes, early in the marriage.  And there was

13  holes in the bathroom door and holes on the wall that weren't

14  there before, and he was trying to patch some of them up with

15  some spackling, and I knew something happened.  I had

16  conversations about it with them and --

17            MR. MARTINEZ:  Objection.  Hearsay if he's going to

18  go into them.

19            THE COURT:  Sustained.

20  BY MR. DELOZIER:

21       Q.    You can't say what they said to you.  What did

22  you say to them?

23       A.    Yeah.  I had conversations with them and

24  mentioned if they were having problems maybe they needed to

25  separate or get some kind of counseling.

1        Q.    Anything else that he ever did that frightened

2  you?

3        A.    That's -- that's probably it.

4        Q.    Okay.

5        A.    A --

6        Q.    Sorry?  Go ahead.

7        A.    He had some guns, some rifles that he would

8  leave where the kids could get to AK-47, AR-47.

9        MR. MARTINEZ:  Objection.  Relevance.

10       THE COURT:  Sustained.

11  BY MR. DELOZIER:

12       Q.    Anything else that you --

13       A.    (No audible answer.)

14       Q.    No?  Okay.  Were you around Joe when he didn't

15  get his way?

16       A.    Yes.

17       Q.    And what did -- give me an illustration and

18  give me the date and how he responded?

19       A.    I'll give you an instance in 2000.  He asked me

20  for some money to rebuild another boat engine.  I wouldn't

21  give it to him.  I felt the need was to help pay the bills

22  and children.

23       MR. MARTINEZ:  Objection.  Nonresponsive.

24       THE COURT:  Sustained.

25  / / / / /

1    BY MR. DELOZIER:

2         Q.    That was when?

3         A.    In 2000.

4         Q.    Okay.  And how did he act?

5         A.    He wouldn't talk to me after that for quite a

6    while.

7         Q.    Okay.  And did you see that kind of behavior

8    when he got mad at others?

9         A.    Yes.  That -- that was his normal thing to

10   where if he had an argument with somebody and then didn't

11   feel like he got his way, he would put up a fence, wouldn't

12   communicate with them, break relations. I saw that he did

13   that with some of his friends.  I seen him do it with some of

14   his family.

15        Q.    Did you ever confront him about his behavior?

16        A.    Yes.

17        Q.    Tell me when.

18        A.    Back in '95 I started confronting him about

19   that.

20        Q.    What was the occasion that day?

21        A.    Anger.

22        Q.    And --

23        A.    Anger.

24        Q.    About what?

25        A.    He -- he had been a little angry with Wendi and

1   turned around wouldn't talk to her anymore.  That's where I

2   saw a lot of me in him with the anger, and I felt that he

3   could break that now instead of having to go through a lot of

4   stuff that I'd gone through.  So that's when I started

5   talking with him and explained to him --

6               MR. MARTINEZ:  Objection.  Nonresponsive.

7               THE WITNESS:  -- he doesn't have to go --

8               THE COURT:  Sustained.  Ask your next question.

9               MR. DELOZIER:  Just a minute, Your Honor.

10                   (Pause in proceedings.)

11  BY MR. DELOZIER:

12          Q.   You've indicated there were certain kinds of

13  behavior patterns between Joe and Wendi.  Who was in control

14  in that family unit in your opinion?

15          A.   Joe.

16          Q.   And what was the basis for your opinion?

17          A.   He controlled everything.  He controlled

18  finances, he controlled --

19               MR. MARTINEZ:  Objection.  Nonresponsive, basis.

20               THE COURT:  Sustained.  Rephrase your question.

21  BY MR. DELOZIER:

22          Q.   What was the basis for forming that opinion?

23  What did you see?

24          A.    Wendi could no longer wear some of the

25  things --

1        MR. MARTINEZ:  I'm going to object again.  He hasn't

2   given us a basis.

3        THE COURT:  Sustained.  Rephrase your question.

4   BY MR. DELOZIER:

5        Q.    What kind of things did you observe, okay, that

6   formed your opinion?

7        A.    My opinion is that Wendi could no longer have

8   her friends.  She was told what to wear, how much she

9   could --

10       MR. MARTINEZ:  I'm going to object if he actually saw

11  this.  I don't know if he --

12       THE COURT:  I'll sustain --

13  BY MR. DELOZIER:

14       Q.    Did you see --

15       A.    Yes, I did.

16       Q.    -- these things occurring?

17       A.    Yes.

18       Q.    Okay.  And what did you see?

19       A.    One instance --

20       MR. MARTINEZ:  Objection.  Lack of foundation.

21       THE COURT:  Hold a second.  Let me see Counsel at the

22  bench.

23

24            (The following proceedings were held at the

25  bench:)

1

2          THE COURT:  Let me hear your objection.

3          MR. MARTINEZ:  Judge, he's telling us all these

4    things that the victim was in control and he's been asked

5    twice about the basis.  All I'm asking is for him to say in

6    1995 I saw him do this and saw him do that, but he wants to

7    just go on.

8          THE COURT:  Okay.  I'll sustain the objection.

9          MR. DELOZIER:  Okay.

10

11          (The following proceedings were held in open

12    court:)

13

14          THE COURT:  Mr. DeLozier.

15          MR. DELOZIER:  Thank you, Your Honor.

16    BY MR. DELOZIER:

17          Q.    In 1995, did you see any evidence of control,

18    him being in charge, that you could relate to us?

19          A.    Yes.

20          Q.    And what did you see?

21          A.    Making sure -- hold on a second.  Let me make

22    sure I get this right.

23          (Pause in proceedings.)

24          THE WITNESS:  Let me go back to the lake.

25    / / / / /

1    BY MR. DELOZIER:

2          Q.    Okay. And you're at the lake in the summer of

3    1995?

4          A.    Yes.  It would be in the summertime.

5          Q.    Okay.  What did you see?

6          A.    She couldn't invite her friends.  She could

7    only invite --

8          MR. MARTINEZ:  Objection.  Hearsay.

9          THE COURT:  I'll sustain the objection.

10         THE WITNESS:  I'm not sure how I can answer.

11         THE COURT:  Mr. DeLozier.

12   BY MR. DELOZIER:

13         Q.    The people that were able to be with you at the

14   boats and the lake --

15         A.    Yes.

16         Q.    -- were those people that Wendi chose?

17         A.    No.

18         MR. MARTINEZ:  Objection.  Hearsay.

19         THE COURT:  Sustained.

20   BY MR. DELOZIER:

21         Q.    Were those people Joe chose?

22         A.    Yes.

23         MR. MARTINEZ:  Objection.  Hearsay.

24         THE COURT:  Sustained.

25         THE WITNESS:  They were friends of Joe's.

1          THE COURT:  Hold a second.  Ask your next question.

2     BY MR. DELOZIER:

3          Q.    Who was able to go with you on the trips?

4          A.    When I went to photograph the boats, it was --

5     I would go, sometimes Donna would go, and Joe would have his

6     friends and their wives there.

7          Q.    Anybody else?

8          A.    No.

9          Q.    Any of your friends get to go?

10         A.    No.

11         Q.    Any of Wendi's friends get to go?

12         A.    No.

13         Q.    Okay.  That's '95.  Anything else in '95 that

14    helped you to form the basis of the opinion that you just

15    gave us that Joe was in control?

16         A.    I bought her -- I bought her a black dress and

17    she couldn't wear it because Joe didn't like black.

18         Q.    Anything else in '95?

19         A.    No.

20         Q.    How about '96?

21         A.    It continued, same thing.

22         Q.    Was there a reduction in the number of people

23    that Wendi formally knew?

24         A.    Yes.

25         Q.    And how did you notice that?

1     A.     Some of her friends would not go to her house

2     anymore.

3           MR. MARTINEZ:  Objection.  Hearsay.  How does he

4     know?  Foundation.

5           THE COURT:  Overruled.  Continue on.

6           MR. DELOZIER:  Thank you, Your Honor.

7     BY MR. DELOZIER:

8     Q.     How about '97?

9     A.     Trend continued, same friends, same situations,

10    going to the lake with same people.

11    Q.     You were in the home too, right?

12    A.     Yes, I'd been in the home.

13    Q.     What kind of things did you see in the home in

14    '97?

15    A.     That would be when they were in the farmhouse.

16    That's when I saw the holes in the walls.  I -- I was doing

17    carpeting for them, laying carpet.  That's when I actually

18    saw all that stuff.  I was doing repairs in the home for

19    them.

20    Q.     What did you see while you were doing the

21    carpet in, what, '97 did you say?

22    A.     Yeah.  I believe it was '97.  Holes in the

23    wall, holes in the bathroom door, broken -- broken window.

24    That was mainly what my concern was inside the home.

25    Q.     So you mentioned a moment ago about clothing.

1    Was that continuing also?

2          A.    Yes.  Same thing.  I had to be careful what I

3    tried to buy Wendi as far as clothing goes.

4          Q.    Did Joe approve what you bought or didn't

5    approve?

6          A.    Wendi used to tell me --

7          MR. MARTINEZ:  Objection.  Hearsay.

8          THE COURT:  Sustained.

9    BY MR. DELOZIER:

10         Q.    Don't say what people told you.

11         A.    Oh, that's right.  I had to ask what she could

12   wear before I brought it.

13         Q.    Who did you ask?

14         A.    Wendi.

15         Q.    Did you ask Joe?

16         A.    I never asked Joe.

17         Q.    Okay.  How about '98?  You formed the basis of

18   the opinion he was in control.  I'm looking for

19   illustrations --

20         A.    Right.

21         Q.    -- that happened in '98.

22         A.    He wasn't working much, but he was -- he was

23   always pressuring to get finances.  He was always asking me

24   for -- well, I don't know if I could say that.  Finances for

25   the boats, for trips to the lake, so forth.  Medical

1      expenses.

2            Q.      Are those things related in your opinion to

3      regarding control?

4            A.      Yes.

5            Q.      How?

6            A.      He was the one that controlled all the finances.

7            Q.      How about '99?

8            A.      Same thing.  He was the one in control of all

9      the finances.

10           Q.      Illustrations?

11           A.      He made sure Wendi was working.

12           Q.      At this time we've got two children?

13           A.      Yes.

14           Q.      '99?

15           A.      '99, two children.

16           Q.      Two grandchildren?

17           A.      Yes.

18           Q.      Nicolas and Ashley?

19           A.      Yes.

20           Q.      Okay.  Did you see any escalation of the

21     control in the year 2000?

22           A.      Yeah.  There was a -- actually, back in '99,

23     '98, Joe would frequent the lake quite a bit and he was

24     always calling my house or trying to find out where Wendi was

25     at.

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1            MR. MARTINEZ:  Objection.  Hearsay.

2            THE COURT:  Sustained.

3    BY MR. DELOZIER:

4            Q.    So he -- let me ask it this way.  Were there

5    frequent calls to your home?

6            A.    Yes.

7            Q.    Did you talk to him?

8            A.    Yes.

9            Q.    Okay.  How frequent were these calls?

10           A.    Could be twice a day, could be ten times a day.

11           Q.    Was this different than '97, '96?

12           A.    Oh, definitely.

13           Q.    Okay.

14           A.    It just escalated.

15           Q.    Okay.  Were these calls asking you to do things?

16           A.    Wanted me --

17           MR. MARTINEZ:  Objection.  Nonresponsive, hearsay.

18           THE COURT:  Sustained.

19    BY MR. DELOZIER:

20           Q.    The answer is "yes" or "no"?

21           A.    Yes.

22           Q.    Okay.  Were you able to do those thing for him?

23           A.    Some things.

24           Q.    Okay.  What would -- what was his reaction if

25    you wouldn't do it or told him you weren't going to?

1          A.      Anywhere from slamming the phone to yelling in

2     the phone.

3          Q.      Anything besides yelling?

4          A.      No, just cussing or yelling into the phone.

5          Q.      Okay.  Were there names Joe had for Wendi?

6          A.      I was taking a class through CAC, black and

7     white photography class, and one of the assignments was --

8          MR. MARTINEZ:  I'm going to object as nonresponsive.

9          THE COURT:  Just answer the question that was asked.

10    Re-ask the question.

11         THE WITNESS:  What were the names?

12    BY MR. DELOZIER:

13         Q.      Yes.  What were they?

14         A.      Fatso, flat chested.  That's a couple of names.

15         Q.      Think of anything else?

16         A.      No.

17         Q.      Okay.  When he was angry, would he use other

18    words?

19         A.      With Wendi?

20         Q.      Yes.

21         A.      Called her a bitch a couple times that I heard.

22         Q.      Was he satisfied with the money she was making?

23         A.      Was Joe satisfied with the amount of money she

24    was making, Wendi was making?

25         MR. MARTINEZ:  Objection.  Speculation.

1          MR. DELOZIER:  If you know.

2          THE COURT:  Sustained.

3          MR. DELOZIER:  If you know.

4          MR. MARTINEZ:  Objection.  Speculation.

5          THE COURT:  Sustained.

6    BY MR. DELOZIER:

7          Q.    Tell me about Christmas.  How was that

8    celebrated in Joe and Wendi's home?

9          A.    We did the whole thing.  Put up Christmas

10   lights, had a Christmas tree, had the ornaments, had Santa

11   Claus and reindeer, and donkey and nativity scene, went all

12   out, bought presents for everybody.  I did try to buy the

13   kids a Christmas tree three times, and I couldn't do that so

14   they would come over to our home on Christmas Eve and

15   celebrate Christmas with us.

16         Q.    You mentioned that you -- earlier when you

17   first met Joe -- that you had counseled them about -- or at

18   least when they were married you counseled them on delaying

19   marriage.  Is that correct?

20         A.    Yes.

21         Q.    And that was regarding his employment?

22         A.    His employment at the time, yes.

23         Q.    Okay.

24         A.    Or lack of employment.

25         Q.    What was he doing at that time?  Do you know?

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1         MR. MARTINEZ:  Objection.  Relevance.

2         THE COURT:  Overruled.  Go ahead and answer the

3  question.

4         THE WITNESS:  Well, Wendi was working.  He was in the

5  apartment.  I don't know what he would be doing.

6  BY MR. DELOZIER:

7         Q.    Was there a welding business he was involved

8  in?

9         A.    Yes.  He had a welding business.  He was a good

10  welder, very good welder.  Some of the -- I had him do some

11  work for me at the tortilla shop because he was good.  But as

12  anybody knows, if you have your own business, you have to go

13  out and there hustle business.

14         MR. MARTINEZ:  Objection.  Nonresponsive.

15         THE COURT:  Sustained.  Ask your next question.

16  BY MR. DELOZIER:

17         Q.    What was his next business, if you know?

18         A.    Windshield repairs, Joe's Windshields.

19         Q.    Okay.  And after that?

20         A.    I know he got into Accu-Glass Windshield and

21  Repair.

22         Q.    Did anybody -- anybody partner in that

23  business?

24         A.    A friend of mine was a partner in the business.

25         Q.    How did that business go?

1        A.    Right now the third partner has the business

2    and it's still going good.

3        Q.    Did Wendi and Joe stay involved in it?

4        A.    No, they didn't stay involved in it.    They

5    actually lost the business.

6        Q.    Okay.    What happened during that loss of the

7    business?

8        MR. MARTINEZ:    Objection.    Speculation, hearsay.

9        MR. DELOZIER:    If you know.

10       THE COURT:    Sustained.    Ask your next question.

11   BY MR. DELOZIER:

12       Q.    Was there any disputes among the partners?

13       A.    Yes, there was.

14       Q.    Do you know what the dispute was over?

15       MR. MARTINEZ:    Objection.    Speculation, hearsay.

16       THE COURT:    Sustained.

17   BY MR. DELOZIER:

18       Q.    Did you have a discussion with Joe about his

19   partner?

20       A.    Yes.

21       Q.    What did you say?

22       A.    At the time, he had more -- more payments than

23   he had money coming in and funds were starting to go missing

24   from the business.    They were missing.    So Joe ended up

25   losing the business over that.

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1          Q.     So you told him to go ahead and let it go?

2          A.     Yes.

3          Q.     Okay.  After that do you have any idea what

4     business he was involved in?

5          A.     He was very upset that he lost that business.

6     He wanted it back.  He still had the Joe's windshield

7     business, but he would do a windshield on occasion.  He had

8     Ace Welders -- that's when I was asking him to try to help

9     the kids out, I had -- at the tortilla shop, it's all

10    machinery, things break, so I was paying him between $30 and

11    $40 an hour to fix equipment for me and welding.  And that --

12    that kept them going for a while until I ended up in

13    Oklahoma.  For some reason the welders wouldn't weld anymore,

14    but he would still do a windshield on occasion.

15         Q.     Okay.  What was the state of Wendi's finances

16    before she met Joe, if you know?

17         A.     She was doing good.

18         Q.     Okay.

19         A.     She was a woman on her own.  She had bills but

20    she was doing pretty good.

21         Q.     How were their finances during the first couple

22    years after they were married?

23         MR. MARTINEZ:  Objection.  Hearsay.

24         MR. DELOZIER:  If you know.

25         THE COURT:  Overruled.  Go ahead and answer the

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    question.

2         THE WITNESS:  Not too bad.  Joe was still -- still

3    welding and he was doing windshields here and there.  In fact

4    I helped him with a couple windshields.  Big trucks and a

5    motor home.

6    BY MR. DELOZIER:

7         Q.    You're strong enough to lift those big

8    windshields?

9         A.    Well, those great big motorhome ones, he needed

10   help with those.  Big, big windshields.  He was capable of

11   doing all that, yes.

12        Q.    Okay.  Did their finances change, if you know,

13   after a period of time?

14        A.    Yes.  They started changing when he started

15   getting sick.

16        Q.    Okay.

17        A.    So I know they started changing because they

18   needed help with the bills.  Their credit wasn't any good.

19   Ended up leasing a brand new Yukon for them to use.

20        Q.    That was --

21        A.    They had a pickup and more or less got rid of

22   the pickup for the Yukon because they had kids.  And can't

23   haul everything with -- with a pickup.

24        Q.    Did you provide additional financial assistance

25   besides vehicles?

1      A.    Yes, we did.  We ended up getting credit cards

2  and helping them out with electric bill, food, gas, water

3  bills, just the bills just to keep them afloat.

4      Q.    Did you --

5      A.    He was working less and less.  They needed

6  help.

7      Q.    Did you keep up with how much money you put in?

8      A.    I know it was in the thousands, but I didn't

9  keep it up.  I didn't realize how much it was until we

10  actually filed bankruptcy when --

11      MR. MARTINEZ:  Objection.  Unresponsive.

12      THE COURT:  Sustained.

13  BY MR. DELOZIER:

14      Q.    You didn't keep it up but it was several

15  thousand --

16      A.    It was in the thousands, yes.

17      Q.    Okay.  Did you ever get any collateral?

18      A.    No.  Never asked for any.  I was approached by

19  the kids and they gave me the guns, the rifles that he had as

20  a gift because of all the money we put into them and he ended

21  up taking those back.

22      Q.    You -- did you ever discuss life insurance with

23  Joe and Wendi?

24      A.    I had conversations with --

25      Q.    That's a "yes" or "no."

```
1          A.    Yes.

2          Q.    And when did do you that?

3          A.    In Elephant Butte.

4          Q.    That's the --

5          A.    Was the first time back in '95.

6          Q.    That's the New Mexico trip you're talking about

7    a minute ago?

8          A.    New Mexico.

9          Q.    Why did that come up during that?

10         A.    Talking about having caution about racing

11   boats.

12         Q.    With what?

13         A.    Racing boats.

14         Q.    So the boats were more than just pleasure.  He

15   wanted to do it competitively?

16         A.    He wanted to race boats, yes.

17         Q.    Was that competitively?

18         A.    Yes.  He wanted to race them competitively.  We

19   had discussions about getting sponsors and we talked about

20   big life insurance policies back then.  Another time was when

21   he was with his friends at Apache Lake.

22         Q.    When was that?

23         A.    That would have been in 9 -- I think it was

24   '98.

25         Q.    Okay.
```

1          A.     I can't remember the exact year, but they were

2   racing boats and his boat went airborne and he was pretty

3   shook up about that.   I asked him if he had any big life

4   insurance policy yet and he said no.

5                    Another time was when we went to Firebird Lake

6   and one of his friends was racing boats and the kind of boat

7   he wanted to race was the kind that if he basically hits a

8   bubble and if for some reason the boat crashes and it sinks,

9   you still got -- you have more of a chance of surviving.

10  That happened to Rick that day at the Firebird Lake and we

11  were discussing insurance and sponsors again and about the

12  racing.

13                   Another time we about insurance was after he

14  was sick.

15          Q.     Give us the date, approximate day?

16          A.     Okay.   That would have been in '99.   In '99 we

17  discussed it.   We had a discussion about insurance --

18          Q.     What was the last time --

19          A.     -- and the lack of.

20          Q.     What was the last time you discussed insurance?

21          A.     Last time would have been in 2000.   It was

22  September of 2000.

23                   MR. MARTINEZ:   Objection.   Hearsay if he's going

24  to --

25                   THE COURT:   Ask your next question.


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    BY MR. DELOZIER:

2         Q.    What did you tell him?

3         MR. MARTINEZ:  Objection.   Hearsay.

4         THE COURT:  Sustained.

5         MR. DELOZIER:  Need to approach, Your Honor.

6

7              (The following proceedings were held at the

8    bench:)

9

10             (Attorney-attorney discussion.)

11        MR. DELOZIER:  I would request, again, yesterday,

12   that we excuse the jury on the subject we have a problem with

13   the hearsay issue.

14        THE COURT:  Go ahead and bring up what you want to

15   bring up here.   Did you want to state more fully your

16   objection and have a discussion?

17        MR. MARTINEZ:  Specifically what I suspect -- I don't

18   know the area they're going into, but I suspect they want to

19   buttress some of the claims made by the defendant that she

20   was trying to get the insurance at Mr. Andriano's behest.

21   That's just rank hearsay and I would object to it coming in.

22        MR. MARTINEZ:  I didn't object earlier on the issues

23   about hearsay, but he didn't go into any discussion about

24   what happened before.   But asked what happened close to the

25   time of death, I think that's hearsay and it shouldn't come

1    in.

2         THE COURT:  Okay.  Mr. DeLozier.

3         MR. DELOZIER:  Number 1, I'm not asking what they

4    told him, either Joe or Wendi told him.  He made a statement

5    and they were both present.  I want him to be able to say

6    what he said and that is not hearsay.

7         THE COURT:  Okay.  Mr. Martinez.

8         MR. MARTINEZ:  When we had the same situation with

9    Janice Lind, and I was attempting to have her tell me what

10   she said with regard to the floppy disk.  And at that time

11   the objection was sustained, and I believe I did abide by

12   that ruling.  Same thing here.  He wants to get into that

13   subject of the conversation.  This is offered for the truth

14   of matter asserted and I would object to it.

15        THE COURT:  Okay.  I sustained the objection.  Let's

16   move on.

17

18             (The following proceedings were held in open

19   court:)

20

21   BY MR. DELOZIER:

22        Q.    We've talked around about this subject, but

23   let's talk about it directly.  Would you describe your

24   relationship with Joe.  I'm talking about --

25        A.    Relationship with Joe?

1        Q.    Yeah, talking about from the first time you met

2    him right on through the last time you saw him.

3        A.    First time I met him, I didn't think anything

4    of him.  When they got serious about marriage, I didn't like

5    him, and then I ended up loving him.  Loved him like a son.

6    Do anything for him.  He just -- I loved the guy.

7        Q.    Okay.

8        A.    Just got real -- real close.  There was

9    relations -- relationships that he had that needed mending

10   and I encouraged him to mend those relationships.

11            I feel that any time you break a

12   relationship --

13       MR. MARTINEZ:  Objection.  Nonresponsive.

14       THE COURT:  Sustained.  Ask your next question.

15   BY MR. DELOZIER:

16       Q.    Did he ever come to you and cry over anything?

17       A.    Yes.

18       Q.    And when was that?

19       A.    He -- a situation where he owed money.

20       MR. MARTINEZ:  I'm going to object.  Again, he was

21   asked the date.

22       THE COURT:  Sustained.

23   BY MR. DELOZIER:

24       Q.    When -- approximately when?  First couple of

25   years after they were married?

1      A.   No.

2      Q.   Before?  After?

3      A.   It was after they were married.

4      Q.   When they were living in the farmhouse?

5      A.   Yes.

6      Q.   '95, '96, '97 period?

7      A.   Would have been '97.

8      Q.   '97?  Okay.  What was the problem?

9           MR. MARTINEZ:  Objection.  Relevance and hearsay.

10          THE COURT:  Sustained.

11   BY MR. DELOZIER:

12          Q.   You mentioned earlier that you had gone to the

13   lake with Joe.  That was part of your relationship as well,

14   wasn't it?

15          A.   Yes.  He liked me taking photographs of him and

16   his friends.

17          Q.   Show you what's been marked as exhibits for

18   identification as Exhibits 424, 425, 427, and 428.  Take a

19   look at them.

20               (Pause in proceedings.)

21          THE WITNESS:  Okay.

22   BY MR. DELOZIER:

23          Q.   Do you recognize them?

24          A.   Yes.

25          Q.   Did you take those photographs?

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1       A.    Yes, I did.

2       Q.    Can you tell me when you took those photographs?

3       A.    Which trip?  No, I couldn't tell you.

4       Q.    Which year?

5       A.    That would have been '96, '97.

6       Q.    All of them, same -- on the same trip?

7       A.    I believe so.

8       Q.    Okay.  Thank you.

9       MR. MARTINEZ:  I don't have any objection.

10      MR. DELOZIER:  Move for admission of Exhibit 424,

11  425, 427, 428.

12      THE COURT:  Exhibits 424, 425, 427, 428 for

13  identification are admitted into evidence.

14  BY MR. DELOZIER:

15      Q.    There's a TV to your left there.  If you can't

16  see, you could stand up.

17            This is Exhibit 424.  Do you understand who's

18  driving --

19      A.    Joseph.

20      Q.    Can you tell --

21      A.    Joe.

22      Q.    Can you -- pardon me?

23      A.    Joe Andriano.

24      Q.    Could you tell who else is in the boat?

25      A.    Not really.

1          Q.    Okay.  Is this one of Joe's boats?

2          A.    Yes.  That's the first boat that he had when I

3    first met him.

4          Q.    Very well.  Showing you what's been marked in

5    evidence as Exhibit 425.  Can you tell whose boat this is?

6          A.    That's the other one he picked up, that he got.

7          Q.    Okay.  Is Joe in that picture, photo?

8          A.    I can't tell if that's Joe or not.

9          Q.    Okay.

10         A.    I can't tell if that's Joe or --

11         Q.    You can't tell who anybody else is in the

12   photo?

13         A.    No.

14         Q.    How about to the far left in your --?

15         A.    Well --

16         THE COURT:  You could step away from the microphone

17   if you need to look.  Just remember to speak up when you're

18   away from the microphone.

19         THE WITNESS:  I can see.  I just can't recognize who

20   that is.

21   BY MR. DELOZIER:

22         Q.    Okay.  But you're sure that's Joe's boat?

23         A.    Yes.  That's one he bought.

24         Q.    Okay.  That is Exhibit 425.  Now I'm showing

25   you Exhibit 428.  Is that the same as the first boat?  Is

1     there any way to tell who's in that boat or is it the same

2     people?

3              A.     It's the same people.

4              Q.     Okay.  Now, we have 427.  Is that the second

5     boat?

6              A.     The one on the bottom.

7              Q.     That was -- is the first one there too?

8              A.     No.  I can't tell if that's the first one there

9     or not.

10             Q.     Okay.  Thank you.  You said you had been in --

11    ridden in the boats?

12             A.     Yes.

13             Q.     Okay.  Are they difficult to control?

14             MR. MARTINEZ:  Objection.  Relevance.

15             THE COURT:  Sustained.

16    BY MR. DELOZIER:

17             Q.     You indicated that he almost took it airborne

18    once?

19             A.     Yes.  He had -- I don't know the technical

20    term, but basically it hit some air and it went airborne.

21             Q.     Were you frightened?

22             A.     No.  I -- I wasn't in the boat with him.

23             Q.     Okay.  Have you ever been in the boat when you

24    were frightened?

25             A.     Yes, when we were --

1          Q.     When was that?

2          A.     Taking me across the lake so I could

3    photograph -- photograph the guys racing.  He got a little

4    reckless and wasn't paying attention.

5          MR. MARTINEZ:  Objection.  Relevance.

6          THE COURT:  Sustained.

7    BY MR. DELOZIER:

8          Q.     So did you ride with him anymore?

9          A.     I rode with him another time.

10         Q.     Okay.  And you stopped?

11         A.     Yes.

12         Q.     Okay.  When was the last time you were at the

13   lake with him?

14         A.     That would be in '99, I believe.

15         Q.     '99?

16         A.     '98, '99.

17         Q.     After the fourth surgery?

18         A.     Yes.  It was after the fourth surgery.

19         Q.     Okay.

20         A.     I didn't go on the boat with him, but I went to

21   the lake with him.

22         Q.     Okay.  And was he still driving?

23         A.     Yes.  He was still -- he was still capable of

24   putting it in the water, fueling it and driving it.

25         Q.     Fueling it?  What kind of containers did he

1   have to fill it?

2   　　　　A.   He had big 55-gallon drums.  I think they were

3   55.  It could have been 50 gallon drums of fuel.

4   　　　　Q.   How did he get them from one place to another?

5   　　　　A.   He'd put them in the back of one of the trucks.

6   　　　　Q.   And then how --

7   　　　　A.   Excuse me?

8   　　　　Q.   How would he --

9   　　　　A.   Take them (indicating).

10   　　　　Q.   What do you mean "take them"?

11   　　　　A.   Pick them up and (indicating).

12   　　　　Q.   He did that after the fourth surgery?

13   　　　　A.   Yeah.

14   　　　　Q.   Okay.  I think you already mentioned this, but

15   did you ever discuss that Joe and Wendi maybe should

16   separate?

17   　　　　A.   Yes.

18   　　　　Q.   Okay.

19   　　　　A.   Several times.

20   　　　　Q.   Did she ask you for money one time so she could

21   leave?

22   　　　　A.   Yes.

23   　　　　Q.   When was that?

24   　　　　A.   That would have been in '99.

25   　　　　Q.   Okay.  You mentioned earlier you had two

1    grandchildren?

2            A.    Yes.

3            Q.    That's Nicolas and Ashley?

4            A.    Nicolas and Ashley.

5            Q.    Tell me about Joe's relationship with Nicolas?

6            A.    Thought the world of him, loved him.  He was

7    the center of his universe.

8            Q.    Okay.

9            A.    Just really attached to him.

10           Q.    Any -- anything negative that you ever saw?

11   You would have to tell me when and you have to tell me where.

12           A.    Negative towards Nicolas?

13           Q.    Yeah, toward Nicolas.

14           A.    At the San Riva apartment, year 2000.

15           Q.    Could you speak up?

16           A.    2000 at the San Riva apartment.  He pushed

17   Nicolas off the bed.  He didn't throw him, but he pushed him

18   off.

19           Q.    Anything else?

20           A.    No.

21           Q.    How about Ashley?  When was she born?

22           A.    '97.

23           Q.    What was their --

24           A.    '98?  I'm trying to remember.

25           Q.    What was their relationship like?

1          A.     They were close.  He wasn't as close with

2     Ashley as he was with Nicolas.

3          Q.     Okay.

4          A.     That -- that bond wasn't there with Ashley like

5     there was with Nicolas.

6          Q.     Did you see anything negative from him toward

7     her after her birth?

8          A.     Yeah.  Nicolas was always his favorite --

9          Q.     When --

10          A.     -- so Nicolas always came first in everything.

11          Q.     You consider that negative?

12          A.     Yes, I do.

13          Q.     We talked and you mentioned that he had four

14     surgeries, I think, right?

15          A.     Yes.

16          Q.     And after the last one, did you notice any

17     change in his verbal abuse toward you or Donna or Wendi?

18          A.     Right after the surgery I went with him to the

19     Mayo Clinic and the doctors showed me how to dress the

20     surgery.

21          Q.     Yes.

22          A.     And I was over at his home three times a day to

23     clean it out, change it three times a day.  And I started

24     noticing a difference, little bit more of a -- little bit

25     more of a command or a -- he really didn't ask for things.


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    He told us to get things.

2           Q.    Okay.  So he became more controlling in your

3    opinion?

4           A.    Definitely more controlling.

5           Q.    Were his anger displays worsening?

6           A.    Yes, definitely.

7           Q.    Are you aware of any treatment that Joe took

8    after the fourth surgery?  I'm talking about things you know

9    about, not that you've heard about.

10          A.    I know he went to Colorado for a natural --

11          MR. MARTINEZ:  Objection.  Hearsay.

12          THE COURT:  Sustained.

13   BY MR. DELOZIER:

14          Q.    What else?

15          A.    He went to Colorado, he went to -- he had

16   people pray for him.  He --

17          Q.    You were there?

18          A.    Yes.

19          Q.    Okay.  What else?

20          A.    He started chemo.

21          Q.    Okay.  Do you know how many chemo treatments he

22   took?

23          A.    Four that I know of.

24          Q.    Okay.  Was there any change in his -- any of

25   the character traits you've been describing, control, anger,

1    et cetera?

2           A.    No.   I know that the day of chemo --

3           MR. MARTINEZ:   Objection.   Nonresponsive.   Yes or no

4    to that.

5           THE COURT:   Sustained.

6    BY MR. DELOZIER:

7           Q.    Was there something specific about the day that

8    he took the chemo that you wanted to say?

9           A.    Yeah.   I was just going to say I didn't go

10   around him.   I tried to stay away as much as possible because

11   of infections.   We didn't want there to be any kind of

12   infection that we might have anything that could hurt him in

13   any way.

14          Q.    Where were the children?

15          A.    We -- either we took them or Mr. and Mrs.

16   Andriano took them.   Somebody took care of them, that way

17   Wendi more or less cleaned the house, sterilized it, and we

18   wouldn't go around him that way.

19          Q.    Was there an occasion that you, during 2000,

20   that you were at Joe and Wendi's apartment and saw damage to

21   any of the furniture?

22          A.    Yes.

23          MR. DELOZIER:   Approach, Your Honor?

24          THE COURT:   Yes.

25   / / / / /

1    BY MR. DELOZIER:

2            Q.    Showing you what's been marked for

3    identification as Exhibits 436, 437, 438, 439, 440, 441, 442,

4    and 444.  Do you recognize those photographs?

5                    (Pause in proceedings.)

6            THE WITNESS:  Yes. Yes, I do.

7    BY MR. DELOZIER:

8            Q.    Did you take those photographs?

9            A.    Yes, I did.

10           Q.    Approximately when did you take them?

11           A.    It was in September.

12           Q.    What year?

13           A.    2000.

14           Q.    I'm sorry?

15           A.    September 2000.

16           MR. DELOZIER:  Okay.  Move for admission of Exhibits

17    436, 437, 438, 439, 440, 441, 442, 444.

18           MR. MARTINEZ:  May I voir dire the witness, Your

19    Honor?

20           THE COURT:  Yes.

21

22    VOIR DIRE EXAMINATION BY MR. MARTINEZ:

23           Q.    You took these photographs in the early part of

24    September, right?  Not the late part of September, right?

25           A.    Yes.


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000007042

1        Q.    And the photographs that were taken were taken

2    as I understand it in the apartment at the San Riva?

3        A.    Yes.

4        Q.    And what time of the day was it that you took

5    them?

6        A.    It was the evening time.

7        Q.    And who else was present when you took those

8    photographs?

9        A.    Wendi and Joe.

10       Q.    Was Donna Ochoa present?

11       A.    No.

12       Q.    And when did you have them developed?

13       A.    I'm not sure of that.  I couldn't tell you.  I

14   don't know when I had them developed.

15       Q.    Have you had these photographs for some period

16   of time?

17       A.    Yeah.  I've had them.

18       MR. MARTINEZ:  I don't have any objection to the

19   photographs.

20       THE COURT:  Mr. DeLozier?

21       MR. DELOZIER:  Yes, sir.

22       THE COURT:  Let me see Counsel for just a moment.

23

24            (The following proceedings were held at the

25   bench:)


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1

2          THE COURT:  I just want to make sure.  I didn't hear

3    you say 443, but I have 443 here.

4          MR. DELOZIER:  Sorry if I didn't, but yes.

5          MR. MARTINEZ:  No objection to that one either.

6          THE COURT:  Okay.

7

8          (The following proceedings were held in open

9    court:)

10

11          THE COURT;  Exhibits 436, 437, 438, 439, 440, 441,

12    442, 443 and 444 for identification are admitted into

13    evidence.

14    CONTINUED DIRECT EXAMINATION BY MR. DELOZIER:

15          Q.    Okay.  Let's take a look at these.  The first

16    one is -- what it is -- it would be 436.  Can you tell what

17    that is?  Can you tell us what that is?

18          A.    That's the chest of drawers.

19          Q.    And where do you see damage?  You want to stand

20    up and point it out?

21          A.    Here, here, here, and here.

22          Q.    Okay.  Any others on that photo?

23          A.    Not on that photo, no.

24          Q.    Okay.  I'm showing you this one marked as

25    Exhibit 440.  That's just a different view of the same area?

1          A.     Different view of the same area, yes.

2          Q.     Okay.  And 444, different view of the same

3    area?

4          A.     Same thing.

5          Q.     Just -- okay.  Okay.  I'm showing you next

6    439.  What is that?

7          A.     That's the base -- the frame of the bed.

8          Q.     Is that --

9          A.     That's the hammer that was holding it up and he

10   had nailed it to try to keep it together.

11         MR. MARTINEZ:  Objection.  Speculation.

12         THE COURT:  Sustained.  That last portion will be

13   stricken.

14         THE WITNESS:  Okay.  These are nails right here.

15   BY MR. DELOZIER:

16         Q.     Do you know what part of the bed this is?

17         A.     The foot of the bed, the frame.

18         Q.     So you might call it the footboard?

19         A.     Yeah, footboard.

20         Q.     Okay.  Another -- 438 is this one.

21         A.     Same thing.

22         Q.     Different -- different view?

23         A.     Right.

24         Q.     Okay.  442?

25         A.     Same thing.

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1        Q.      And 443?

2        A.      Same thing.

3        Q.      And 441?

4        A.      Same thing.

5        Q.      Okay.  And 437?

6        A.      Same thing.

7        Q.      Okay.  Why were you taking these photos?

8        A.      I had learned how to refinish furniture, how to

9   repair furniture.

10        Q.      Okay.  So -- are you a photographer?  I think

11   you said that earlier?

12        A.      I'm a photographer, yes.

13        Q.      You do that commercially?

14        A.      Yes.

15        Q.      And is it a fairly common practice then for you

16   to carry your camera regularly?

17        A.      Yes.  Yes, it is.

18        Q.      Okay.  Now, during after the fourth surgery and

19   continuing on to September 2000, did you notice -- begin

20   to notice changes in Wendi's behavior?

21        A.      She became more withdrawn from us.  Wouldn't

22   call as much, wouldn't talk to us as much.  We felt she was

23   regressing into some kind a shell.

24        Q.      Did you notice any physical appearance changes?

25        A.      She lost a lot of weight.  You know, from what

1    I saw she lost weight.  She looked tired all the time.

2              Q.    How was her color?

3              A.    Pale.

4              Q.    And did this get progressively worse?

5              A.    Right, just got worse.

6              Q.    Okay.  Let's move on to October 7.  Were you --

7    were you in town on the morning of October 7?

8              A.    That would have been --

9              Q.    7th, a Saturday?

10             A.    Yes.  We were in California.  We flew in that

11   afternoon.  I couldn't tell you what time it is, what it

12   was.  We picked up the car at the airport, drove by the kids'

13   house.

14             Q.    I'm sorry?

15             A.    Picked up our car at the airport, drove by the

16   apartment.  Said hi to them.  I saw Mrs. Andriano there and

17   said hi to Wendi and Joe.  We were there about 5 minutes,

18   maybe 10 at the max.

19             Q.    Okay.  See them anymore that day?

20             A.    No.  We went home.

21             Q.    Okay.  Early morning of October 8, Sunday

22   morning.

23             A.    Uh-huh.

24             Q.    Do you remember that?

25             A.    Yes.


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1       Q.      Okay.  Tell me what happened?

2       A.      I was awakened.  Somebody banging on my window

3   saying that Wendi was trying to get a hold of me.

4       Q.      Okay.

5       A.      So I got up, tried to call her and couldn't get

6   through right away.  She finally got a hold of me and it was

7   like 2:00 in the morning, somewhere like that.  Somewhere

8   through there.

9       Q.      What did you do next?

10      A.      Trying to find out what was going on.  She --

11      MR. MARTINEZ:  Objection.  Hearsay.

12      THE COURT:  Sustained.

13  BY MR. DELOZIER:

14      Q.      Well, don't tell us anything she told you.

15  What did you do next?

16      A.      Okay.  I spoke with her, told her to call the

17  police, I would be right there.  I threw my clothes on and

18  took off and told Donna to follow me.

19      Q.      Okay.  And what time did you leave

20  approximately, if you know?

21      A.      I have no idea.

22      Q.      Okay.

23      A.      I just threw my clothes on, took off.

24      Q.      Okay.  And you drove to the San Riva

25  apartments?

1      A.    Yes.

2      Q.    How long did it take you?

3      A.    I'm guessing around 20, 25 minutes.

4      Q.    Okay.

5      A.    Speeding.

6      Q.    What did you drive?

7      A.    The pickup.

8      Q.    Your pickup?

9      A.    Yes.

10      Q.    When you got to the San Riva apartments, was

11   anyone there?

12      A.    Police were there, ambulance was there,

13   paramedics were there, yeah.  Quite a few people were there.

14      Q.    Okay.  Where -- where was Wendi?

15      A.    At that time she was sitting on the sidewalk.

16      Q.    Where were your grandchildren?

17      A.    Paramedics were holding the -- Ashley and

18   Nicolas.  They were -- they were waking up when I drove up.

19      Q.    Did you get them?

20      A.    Yes.  I went in and held them.  A few minutes

21   later Donna drove up and they were released to Donna's care.

22   She had to sign papers saying that -- who she was and show

23   her ID and all, and then I went and sat next to Wendi and

24   just held her.

25      Q.    Did you talk to any of the police officers?

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000007049

78

1          A.    I asked a couple police officers if I could sit

2     down with her and she -- they said yes.

3          Q.    They were there with you?

4          A.    Yes.   They were standing there.

5          Q.    Uh-huh.   Okay.   Did you speak to her?

6          A.    I asked her how she was.

7          MR. MARTINEZ:   Objection.   Nonresponsive.

8          THE COURT:   Just answer the question that's asked.

9     BY MR. DELOZIER:

10         Q.    It's a "yes" or "no" question.

11         A.    Yes.

12         Q.    Did you speak with her?

13         A.    Yes.

14         Q.    What did you say?

15         MR. MARTINEZ:   Objection.   Hearsay.

16         THE COURT:   Sustained.

17    BY MR. DELOZIER:

18         Q.    Did you ever go into the apartment?

19         A.    That night, no.

20         Q.    Okay.   And how long did you stay?

21         A.    I don't remember the detective's name, but I

22    was told to go to, I think, Madison Street Jail for an

23    interview.   I stayed there until he told me to leave, which

24    would have been, I'm thinking, around 8:00 or 9:00.   I'm just

25    guessing.   I have no idea.


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

```
 1        Q.    You stayed at the jail until 8:00 or 9:00?

 2        A.    No.

 3        Q.    Or you stayed at the apartments?

 4        A.    I stayed at the apartment complex right there

 5   until I was told to go for the interview.

 6        Q.    Okay.  When your wife left with the children,

 7   why did she -- what vehicle did she leave in?

 8        A.    I told her to take the Yukon because we didn't

 9   have any car seats for the kids in the Mazda that she took up

10   there.  We had taken them out to be able to get our luggage

11   in the automobile and I knew there were car seats in the

12   Yukon, so I told her to take that.

13        Q.    Do you know if the police had cleared the car

14   to leave?

15        A.    I asked one of the policemen and they said

16   yeah, no problem.

17        Q.    Okay.  Do you know if -- do you know what Donna

18   took with her when she left?

19        A.    One of -- one of the policemen went in and got

20   some clothes out of the kids' rooms and gave her clothes,

21   some diapers for the kids, and that's all they -- and her

22   purse.

23        Q.    So she had the two grandchildren?

24        A.    Two children.

25        Q.    Bag of clothes?
```

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1        A.      Bag of clothes and diapers, and just a purse

2    that she brought.

3        Q.      Okay.  Did you search that vehicle to make sure

4    there was nothing else in the car?

5        A.      In the Yukon?  (No audible answer.)

6        Q.      No?

7        A.      No.

8        Q.      Okay.  But the police cleared it for her to

9    leave?

10       A.      Yes.  They said she could take it.

11       Q.      When you went to the police station, they sent

12    you to you think somewhere downtown like Madison Jail?

13       A.      I think that's what you call it.  I'm not sure.

14       Q.      Did you take anything with you?

15       A.      No.

16       Q.      You never went in the apartment?

17       A.      No, no, no.  I never went into the apartment.

18            MR. DELOZIER:  Have nothing further at this time,

19    Your Honor.

20            THE COURT:  Mr. Martinez.

21

22    CROSS-EXAMINATION BY MR. MARTINEZ:

23       Q.      First thing, sir, that I want to talk to you

24    about is those photographs, if I may.  You stated that you

25    took those in the first part of September, correct?

81

1        A.      It was in September, but I couldn't remember

2    exactly when.

3             Q.      You did indicate earlier that it was the first

4    part of September, didn't you?

5        A.      Okay.

6             Q.      Is that "yes"?

7        A.      Yeah, I guess, yes.

8             Q.      So you haven't changed your mind.  It isn't

9    later --

10       A.      No, no.

11            Q.      -- in September, correct?

12       A.      No.

13            Q.      Okay.  And you also indicated previously that

14   the reason that you took them was because apparently they had

15   something to do with your refinishing items, right?

16       A.      They wanted me to repair it, yes.

17            Q.      So you felt it necessary, before you even

18   decided to repair these things, to go ahead and just take

19   pictures of them, right?

20       A.      Yes.

21            Q.      There was no other reason you took pictures

22   of -- well, these photographs, right?

23       A.      No.  I was going to discuss it with a friend of

24   mine --

25            Q.      So --

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000007053

1          A.      -- show him and ask him for help on how to

2    finish, what I needed to do as far as making a mold and how

3    to fix it.

4          Q.      So there was no other reason is the answer?

5          A.      No.

6          Q.      Okay.  And with regard to these photographs,

7    you said you've had them since that time, right?

8          A.      Yeah.

9          Q.      You developed them shortly thereafter, right?

10         A.      I'm not sure when I developed them.

11         Q.      Well, you developed them months after, was it

12   years after?

13         A.      No, it wasn't years.  It could have been -- it

14   could have been a month or two afterwards.  I don't remember.

15         Q.      So it wasn't a year afterwards.  It was less

16   than a year, correct?

17         A.      Yeah.

18         Q.      And you've had these in your possession all the

19   time, right?

20         A.      Yes.

21         Q.      And you've never shown them to anybody, have

22   you?

23         A.      I never got -- with Allen, no, and I think

24   David

25         Q.      So is the answer no, you haven't shown them to

83

1    anybody --

2         A.    No.

3         Q.    -- until recently?

4         A.    Yes.

5         Q.    Okay.  And one of the photographs I want to

6    talk to you about --

7              MR. MARTINEZ:  Judge, may I take the Exhibit tag 440

8    off or maybe perhaps have it moved to the other side?

9              THE COURT:  Yes.  Let's have the clerk do that.

10              (Pause in proceedings.)

11   BY MR. MARTINEZ:

12        Q.    Sir, I'd ask to you step down so you get a good

13   view of what I'm attempting to show you, please.

14              THE COURT:  What exhibit number is this?

15              MR. MARTINEZ:  Exhibit 440.

16   BY MR. MARTINEZ:

17        Q.    I want you to take a look at the corner on the

18   righthand side.

19        A.    Right here?

20        Q.    Yes, sir.  Can you tell me what that is, sir?

21   It's going to come into focus in a minute?

22        A.    I have no idea.

23        Q.    You have no idea whether or not that is a box

24   that has a picture of a lamp shade on it?  You don't think

25   that's a lamp shade?


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000007055

1        A.     Oh, right here?

2        Q.     Yes.

3        A.     Yes.

4        Q.     Looks like a lamp shade?

5        A.     Yeah.

6        Q.     Looks like a box too, doesn't it?

7        A.     A box?

8        Q.     For a lamp shade, yes, uh-huh.

9        A.     I don't see -- you're talking about this box?

10       Q.     That's exactly what I'm talking about.

11       A.     Okay.

12       Q.     It does look like a box, doesn't it?

13       A.     Yes.

14       Q.     Additionally, there does appear to be something

15   white sticking out of this box, doesn't it?

16       A.     Yeah.

17       Q.     Okay.  The other thing I want you to notice for

18   me is do you see how that's cut like this unevenly?

19       A.     Okay.

20       Q.     It appears that somebody actually tried to open

21   that and tear that lid off, didn't they?

22       A.     I have no idea.

23       Q.     Well, that's what it appears like, doesn't it?

24       A.     I don't know.

25       Q.     Sir, have you ever had occasion to deal with

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

85

1    boxes in which items come in?

2         A.    Yes.

3         Q.    Have you had occasion to see their lids that go
4    over them?

5         A.    Yes.

6         Q.    Have you ever noticed a lid to be in a jagged
7    disposition like that?

8         A.    No.

9         Q.    They are straight and they are, if you will, a
10   square, aren't they?

11        A.    Right.

12        Q.    And if -- this lid that we have here at the
13   top, is that in a square or does it have sort of like a
14   jagged kind of edging to it?

15        A.    Yeah, it -- it does look jagged.

16        Q.    And the color of that box, what color would you
17   say that was?

18        A.    Brown.

19        Q.    Okay.  And if we go -- this looks to be like,
20   what, a lamp shade?

21        A.    Yeah, looks like it.

22        Q.    And right up here looks to be the stand of that
23   lamp shade, doesn't it?

24        A.    Yeah.

25        Q.    Okay.  Stand there for me if you don't mind and

1    we'll take a look at another exhibit.  This time I'm showing

2    you Exhibit 132.  You see that?

3            A.    Yeah.

4            Q.    Looks like the same lamp, doesn't it?

5            A.    No.

6            Q.    Doesn't look like the same lamp to you?

7            A.    Huh-uh.

8            Q.    Is that a "no," sir?

9            THE COURT:  Is that a "no" or "yes"?

10           THE WITNESS:  Looks like the color is different.

11   BY MR. MARTINEZ:

12           Q.    Okay.  There is a lamp shade there, right?

13           A.    Yes.

14           Q.    I'm showing you Exhibit 440.  See that lamp

15   shade there?

16           A.    Okay.

17           Q.    Looks like the same lamp shade, doesn't it?

18           A.    Yeah.

19           Q.    Okay.  And you see the top of this box up here?

20   You see that up here?

21           A.    Uh-huh.

22           THE COURT:  Is that a yes?

23           THE WITNESS:  Yes, sir.

24           THE COURT:  Make sure you give a verbal response.

25           THE WITNESS:  Sorry.


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1       BY MR. MARTINEZ:

2               Q.      That's a jagged edge or looks like it's been

3       opened -- somebody was opening it, didn't get the whole lid

4       open, right?

5               A.      Okay.

6               Q.      Is that "yes" or "no"?

7               A.      Yes.  Sorry, yes.

8               Q.      Do you agree or disagree?

9               A.      Looks like it got opened, yes.

10              Q.      Because of your previous experience we've

11      talked about, these kind of things come in sort of squares,

12      right, the tops?

13              A.      Yes.

14              Q.      You also see on the side here there is another

15      picture of that lamp, right?

16              A.      Yes.

17              Q.      You see the stand on that?  Almost --

18              A.      Yes.

19              Q.      -- looks a little bit -- kind of silverish,

20      doesn't it?

21              A.      Yes.

22              Q.      We don't have some kind -- a real good exposure

23      on this one, but it does seem a little bit -- and I'm talking

24      about 440 -- it does seem to be the same sort of silverish

25      stand, doesn't it?

1          A.    Yeah, little bit darker.  That's why I said it
2     looked a little different.

3          Q.    Right.  But you're familiar with cameras,
4     aren't you?

5          A.    Yeah.

6          Q.    That could be due to the exposure there, right?

7          A.    Right.

8          Q.    In other words, what you were focusing on was
9     not what was to the side?

10         A.    I was focusing on that.

11         Q.    Your primary interest when you took Exhibit 440
12    was the chest of drawers, right?

13         A.    Right.

14         Q.    You were not focusing on this box that was on
15    the right.

16         A.    Right.

17         Q.    And so as a result, the lighting is not very
18    good, right?

19         A.    Right.

20         Q.    But it's good enough to show the shade and
21    color of the box?

22         A.    Okay.  Yes.

23         Q.    And if you look at 132, what's the color of
24    that box?

25         A.    Multi-colored.

1          Q.    Well, we see some items that go up and down

2     here.  You see that?

3          A.    Yes.

4          Q.    Looks like the box, right?

5          A.    Yes.

6          Q.    We go over to Exhibit 440, you see it's got the

7     same kind of area there in front, books in front of it -- you

8     see that?

9          A.    Yes.

10         Q.    Looks like it's the same box, doesn't it?

11         A.    Oh, yeah.  It sure does.

12         Q.    Okay.  And this box is -- can you tell from

13    that exposure, can you tell me what this box is on?

14         A.    It's leaning on the bed.

15         Q.    Right.  Whose bed, sir?

16         A.    The kids' bed.

17         Q.    The kids being the Defendant and --

18         A.    Wendi and Joe.

19         Q.    Okay.  Let's go over here to the left.  See

20    that?  What's that there on the left?  Do you recognize that?

21         A.    Yes.  That's the chest of drawers.

22         Q.    And is that the shame chest of drawers that you

23    took a photograph of in Exhibit 440, which is this one right

24    here.  Is that the same chest of drawers?

25         A.    Looks like it.  It's darker in that other

1     image, but looks like it.

2            Q.     Well, you've --

3            A.     Yeah.

4            Q.     You've already indicated you're an expert on

5     cameras --

6            A.     Yeah.

7            Q.     -- or you at least told us you have familiarity

8     with cameras?

9            A.     Right.

10           Q.     Can you bring it up a little bit?

11           A.     Bring it --

12           Q.     Let's do it this way.  Here you would agree

13    they are focusing in on the box, right?

14           A.     Yes, they're focusing on the box.

15           Q.     Just' like we talked before with regard to 440,

16    the focus of this photograph is not really the chest of

17    drawers, right?

18           A.     Right.

19           Q.     So not being the focus of the chest of drawers,

20    it means that the chest of drawers is, because of the way

21    this is done, is darker, right?

22           A.     Right.

23           Q.     There's not enough light?

24           A.     Right.

25           Q.     But just from what you see, and I'll bring it

1    in a little bit closer -- let me bring it into focus.

2                   Taking into account that this is the

3    defendant's bedroom along with her husband, taking into

4    account that's the bed, and you, of course, were familiar

5    with that chest of drawers when you first took the picture of

6    it in 440, that seems to be the same chest of drawers, right?

7           A.    Yes.

8           Q.    And to the right of it is the chair, isn't it?

9           A.    Yes.

10          Q.    And so I guess if we take a look at Exhibit 440

11   again, this box is sitting in that -- on that chair, right?

12          A.    Yeah.  Well, it's sitting there beside the

13   chest of drawers.

14          Q.    Right.  Well, it's sitting there -- and before

15   we saw a chair, right?

16          A.    Yes.

17          Q.    Okay.  My point to you, sir, is you indicated

18   to us just recently that you took those photographs in early

19   September 2000.  Do you remember telling me that?

20          A.    It was in September, yes.

21          Q.    Well, no, you indicated it was early September.

22   Do you remember telling me that on two occasions?

23          A.    I believe so, yes.

24          Q.    So you told me that this was taken in the early

25   part of September, 2000.  So you're telling me that this box

1    was sitting around for a whole month in that condition?

2         A.    I don't know.

3         Q.    Well, if our analysis is correct, that box sat

4    around for a month at least, right?

5         A.    Okay.

6         Q.    Well, no, not okay.  I'm telling you, sir, this

7    Exhibit 132 was taken on October 8 of the year 2000.

8         A.    Okay.

9         Q.    You're telling me that Exhibit 440 was taken in

10   the first part of September.  Do you remember telling me

11   that, 2000?

12        A.    I remember telling you that, but I also

13   remember telling you I wasn't sure exactly when I took them,

14   but I know it was in September.

15        Q.    Sir, do you remember when Mr. DeLozier was

16   showing you the photograph for the first time?

17        A.    Yes.

18        Q.    Do you remember that I asked, and I used the

19   term, may I voir dire the witness?

20        A.    Yes.

21        Q.    Do you remember I got a chance to question you?

22        A.    Yes.  And I agreed with you the beginning of

23   September.

24        Q.    No, no.  Let me do it this way.  Do you

25   remember at that time you told me it was the first part of

1     September?

2          A.     Yes.

3          Q.     And then after that when we started talking

4     about this again, I asked you again and you told me it was

5     the early part of September. Do you remember that?

6          A.     Yes, I remember that.

7          Q.     So if you told -- if it was the first part of

8     September that you took Exhibit 440, and then Exhibit 132 was

9     taken October 8 of the year 2000, that would mean that that

10    box in that condition was opened for a whole month and just

11    laying around, right?

12         A.     If I took it in the beginning of September, yes.

13         Q.     And it would be in the same condition as when

14    the police found it on October 8 because of the jagged edge

15    and everything, right?

16         A.     Yes.

17         Q.     Did you ever look in that box, sir?

18         A.     No.

19         Q.     Well, you were the one that -- that was able to

20    take all of the furnitures and items that were in that

21    apartment, weren't you?

22         A.     No.

23         Q.     You didn't take --

24         A.     I took --

25         Q.     Go ahead.


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1          A.    I took the bed and the chest of drawers.  Mr.

2     and Mrs. Andriano took whatever -- the other furniture. I

3     didn't take all the furniture.  I took the crib, Ashley's

4     crib, and Nicolas's little bed because Donna's mom bought it

5     for the kids and she liked to keep that in the family.  I

6     didn't take all the furniture, no.  I didn't take all the

7     things, no.

8          Q.    What time did you take Exhibit 440, sir?

9          A.    Time of day?

10         Q.    Yeah.

11         A.    It would have been evening time.

12         Q.    And if you took it in the early part of

13    September, then Joe Andriano was there, wasn't he?

14         A.    Yes.

15         Q.    And what was he doing when you were taking this

16    photograph?

17         A.    What do you mean what was he doing?

18         Q.    Was he there watching?

19         A.    Yes.

20         Q.    Was he in a different room?

21         A.    Yes.

22         Q.    Nicolas was also there?

23         A.    Yes.

24         Q.    What time of the day would it have been?

25         A.    It was in the evening time.

1        Q.    About what time?

2        A.    I couldn't tell you what time.  I knew -- all I

3    knew, it was in the evening time because a lot of times I

4    would be up in Phoenix area and I'd stop by to see Wendi and

5    Joe, see how Joe was doing.  Would have been anywhere from

6    5:00 to 9:00 at night.

7        Q.    What are --

8        A.    I can't narrow you down a time of day when it

9    was.

10       Q.    It was the evening, though, is what you're

11   telling me?

12       A.    It was in evening time when I took those

13   photographs, yes.

14       Q.    One of the things you told us was that you're a

15   pastor, right?

16       A.    Youth pastor.

17       Q.    So that's a pastor, right?

18       A.    Youth pastor, yeah.  I work with kids.

19       Q.    Okay.  And you're not ordained, correct?

20       A.    Correct, no.

21       Q.    But you do have a license, right?

22       A.    Yes.

23       Q.    You don't know where you got that license from,

24   right?

25       A.    I don't remember the name of the organization.

96

```
 1          Q.    So the answer is you don't remember, right?

 2          A.    Yes.  I don't remember.

 3          Q.    You did tell us about your son, Brandon Ochoa,

 4    correct?

 5          A.    Yes.

 6          Q.    You told us he's adopted, right?

 7          A.    Yes.

 8          Q.    But that -- isn't it true that when he was 15,

 9    which was about four years ago, he went back to live with his

10    mother?

11          A.    Yes.

12          Q.    And in fact he didn't want to stay with you,

13    and actually is living in Tucson with his mother, right?

14          A.    Living in Tucson, yes.

15          Q.    With his mother?

16          A.    Yes.

17          Q.    Sir, you also have indicated to us that you're

18    a pastor, right?  That's what you told us before, right?

19          A.    Youth pastor.

20          Q.    That means you've read the Bible and all that

21    stuff?

22          A.    Yes.

23          Q.    You're, I'm sure, familiar with Exodus, aren't

24    you?

25          A.    Some -- yeah.  I don't know everything by
```

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    heart, but --

2         Q.    Well, no, I'm going to ask are the ten

3    commandments in Exodus?

4         A.    Yes.

5         Q.    And one of them is thou shall not commit

6    adultery.  In other words, it tells you not to commit

7    adultery?

8         A.    Right.

9         MR. DELOZIER:  Objection, Your Honor.

10        THE COURT:  Sustained.  Let's move on.

11   BY MR. MARTINEZ:

12        Q.    Sir, another thing this Bible talks about --

13   because one of the things we've been told was that she was

14   very God-fearing and believed in the Bible.  One of the other

15   things that the Bible talks about is lying, doesn't it?

16        MR. DELOZIER:  Objection.  Relevance, Your Honor.

17        THE COURT:  You could answer that question yes or no.

18        THE WITNESS:  Yes.

19   BY MR. MARTINEZ:

20        Q.    Does it also, one of the other topics that it

21   talks about, is being loyal?

22        A.    In the ten commandments?

23        Q.    No, just in the Bible overall?

24        A.    Yes.

25        Q.    It does do that, doesn't it?

```
 1          A.    Yes.

 2          Q.    Sir, the other thing that you told us was that

 3    when you were asked, you indicated that -- that you saw

 4    bruises on the Defendant.  Do you remember telling us that?

 5          A.    On her arm.

 6          Q.    Do you remember telling us that?

 7          A.    Yes.

 8          Q.    And -- but do you remember that you were at an

 9    interview with a detective from the Phoenix Police Department

10    back on October 8 of the year 2000 sometime around 11:00 in

11    the morning?

12          A.    Yes.

13          Q.    And do you remember that he asked you

14    specifically, "Did you ever see any injuries on her?"  And

15    your response was, "I never saw any bruises, no.  I never saw

16    bruises."  Do you remember telling him that?

17          A.    No, I don't remember.

18          Q.    Well, let me go ahead and play the tape for

19    you.  Maybe that will refresh your recollection, okay?

20          THE COURT:  Why don't we go ahead and -- let me see

21    Counsel here.

22

23                (The following proceedings were held at the

24    bench:)

25
```

1          THE COURT:  We'll go ahead and take our afternoon

2     break.  You could play what you want to play to him and then

3     you could resume the questioning after that.

4          MR. MARTINEZ:  Okay.

5          MR. DELOZIER:  Thank you.

6          THE COURT:  Okay.

7

8               (The following proceedings were held in open

9     court:)

10

11         THE COURT:  Okay.  We'll take our afternoon break at

12    this point in time.  During this break remember the entire

13    admonition I gave you including not to discuss the case among

14    yourselves, do not let anyone discuss the case with you, keep

15    an open mind about the case.  Have a nice break.

16         MR. MARTINEZ:  Judge, if you could remain in the

17    courtroom?

18         THE COURT:  Yes.  I'll just remain one moment.  I'll

19    stay here with Counsel for just a moment.  Have a nice

20    break.

21

22              (Whereupon, the jury exits the courtroom.)

23

24         THE COURT:  Please be seated.  This is cause number

25    CR 2000-096032, State of Arizona versus Wendi Elizabeth

1    Andriano.  The record will reflect the presence of the

2    Defendant and Counsel.  We're outside the presence of the

3    jury.

4              Mr. Ochoa, Mr. Martinez is going to play some

5    portions of a tape to you.  We'll go ahead and take a recess.

6    After the recess when the jury returns, I expect he'll be

7    asking you some questions about that.

8              We'll be in recess.

9

10             (Recess.)

11

12             THE COURT:  This is CR 2000-096032, State of Arizona

13   versus Wendi Elizabeth Andriano.  The record will reflect the

14   presence of the Defendant, Counsel and the jury.  Alejo Ochoa

15   is on the witness stand, and we'll continue with the

16   cross-examination by Mr. Martinez.

17             MR. MARTINEZ:  Sir, go ahead have a seat again

18   please.  Thank you.

19

20   CONTINUED CROSS-EXAMINATION BY MR. MARTINEZ:

21        Q.   When we took a break and you took a look at

22   Exhibit 446, didn't you?  You took a look at a video tape,

23   exhibit -- Exhibit 446?

24        A.   Yes.

25        Q.   And oh it was you, right?


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1        A.    Yes.

2        Q.    And that was you at the police station being

3   interviewed by a detective, right?

4        A.    Yes.

5        Q.    And that was back on October 8 of the year

6   2000, wasn't it?

7        A.    Yes.

8        Q.    You looked pretty much the same except you had

9   a ponytail back then.   But you looked pretty much the same,

10   didn't you?

11        A.    Yes.

12        Q.    In it you were asked about any injuries you may

13   have seen on the defendant.   Do you remember that question?

14        A.    Yes.

15        Q.    Do you remember saying I never saw any bruises

16        A.    I never saw bruises, yes.

17        Q.    You did say that back then on October 8 of year

18   2000?

19        A.    Yes.

20        Q.    Now, sir, one of the things that you also told

21   us was that you believed that you were closer to or that the

22   defendant was closer to you than she was to her mother.

23        MR. DELOZIER:   Objection, Your Honor.   Misstating the

24   evidence.

25        THE COURT:   Overruled.   Go ahead and answer that if

1    you can.

2              THE WITNESS:   What now?

3    BY MR. MARTINEZ:

4         Q.   Do you remember telling us that you said that

5    the defendant was closer to you than she was to Donna Ochoa,

6    her mother?

7         A.   I said -- yes.  Yes, she was.

8         Q.   She is closer to you?

9         A.   Yes.  I believe so, yes.

10        Q.   Okay.  And that doesn't mean that Donna Ochoa

11   loves her less, does it, just because she's closer to you?

12        A.   No.

13        Q.   So just by the same reasoning, one of the

14   things you were telling us was that, well, you know, Joe

15   loved Nicolas, right?

16        A.   Yes.

17        Q.   Do you remember telling us that on direct?

18        A.   Yes.

19        Q.   And then by the same token you were asked to

20   compare whether or not he loved Ashley or how he treated

21   Ashley.  Do you remember that?

22        A.   Yes.

23        Q.   And do you remember that you said, Well, he

24   wasn't -- these are my words -- he wasn't as partial to

25   Ashley as he was to Nicolas.  Do you remember telling us

1     something to that effect?

2              A.     Yes.

3              Q.     That doesn't mean he didn't love her, does it?

4              A.     No.

5              Q.     That's not what you were testifying to, that he

6     didn't love her, right?

7              A.     Right.

8              Q.     You're not saying he was mistreating her?

9              A.     That Joe was mistreating Ashley?

10             Q.     Right.

11             A.     No.

12             Q.     Just because he, according to you, treated her

13    better or treated Nicolas better, it was just he treated

14    Nicolas a little bit better in your view, right?

15             A.     Yes.

16             Q.     Just like you and the defendant have a closer,

17    if you will, affection than she does with her -- with her

18    mother, right?

19             A.     Yes.

20             Q.     Now, the -- you were mistaken about what you

21    said with regard to the detective.  Just like that, could you

22    have been mistaken then as to Exhibit 440 as to when you took

23    this photograph?

24             A.     Yes.  It could have been --

25             Q.     So the answer is "yes"?

1          A.    Yes.

2          Q.    Is it?

3          A.    Yes.

4          Q.    So it could have been that you may have taken

5     this photograph sometime after the killing of Joe Andriano,

6     right?

7          A.    No.

8          Q.    But you were just being helpful when you took

9     those photographs, right?

10          A.    Oh, yes.  I was being helpful when I took those

11     photographs.

12          Q.    You were -- just like today, you're being

13     helpful by trying to tell us to the best of your ability what

14     you remember back then, right?

15          A.    Yes.

16          Q.    You also told us prior to the break during your

17     direct examination that one of the things you remember back

18     in 1997 was that you saw Joseph Andriano slap Wendi

19     Andriano.  Do you remember telling us that?

20          A.    Slap her on the ground?

21          Q.    Or slap her.  That was the term that you used,

22     slapped her?

23          A.    Slap her?

24          Q.    Do you remember telling us that?

25          A.    Yes, when they were at my home --

105

```
 1          Q.    And you're --

 2          A.    -- in the driveway.

 3          Q.    You're sure of that?

 4          A.    Yes.

 5          Q.    Do you remember again being interviewed by a

 6    detective with the Phoenix Police Department back on October

 7    8 of the year 2000?

 8          A.    I remember being interviewed, yes.

 9          Q.    And do you remember that you sat in a little

10    room, that there was a desk and chairs?

11          A.    Yes, I remember that.

12          Q.    And that you voluntarily went there to talk to

13    him, right?

14          A.    Yes.

15          Q.    And he didn't put any pressure on you to answer

16    any questions.  He just posed the questions to you and you

17    answered them, right?

18          A.    I answered a lot of questions.  I don't

19    remember a lot.

20          Q.    The answer is "yes"?

21          A.    Yes.

22          Q.    Did he put any pressure on you?

23          A.    No.

24          Q.    Did he force you to answer those questions?

25          A.    No.
```

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

```
 1          Q.    He didn't have -- did he even have a gun on him
 2    when he was questioning you?
 3          A.    I don't know.
 4          Q.    And nobody came in and forced you to answer
 5    questions or scared you in any way, shape or form, right?
 6          A.    No.
 7          Q.    You just sat there and you had a conversation
 8    with the detective, right?
 9          A.    I answered questions.
10          Q.    Voluntarily?
11          A.    Well, he told me I had to go downtown, so.
12          Q.    Well --
13          A.    I guess that's called voluntarily.
14          Q.    No, no.  Do you remember that when Mr. DeLozier
15    was asking you questions that you said, Well, I didn't leave
16    the apartment.  They told me they wanted to talk to me.  Do
17    you remember telling us that?
18          A.    Yes.  They told me to stay and told me to go to
19    Madison.
20          Q.    So you do remember that?
21          A.    Yes.
22          Q.    One of the things you did, you drove yourself
23    down to the police station?
24          A.    Yes.  He told me to go down to --
25          Q.    The answer is "yes," isn't it?
```

1          A.    Yes.

2          Q.    You drove your Chevy truck over to the police

3     station, right?

4          A.    Yes.

5          Q.    You weren't taken -- you weren't taken in a

6     police car, right?

7          A.    No.

8          Q.    You weren't taken in handcuffs, right?

9          A.    No.

10         Q.    You went in through the front door, didn't you?

11         A.    Yes.

12         Q.    That's voluntarily, isn't it?

13         A.    Yes.

14         Q.    And then he walked you up to this room.   You

15    were not in handcuffs, were you?

16         A.    No.

17         Q     And when you sat there, you were not in

18    handcuffs and you were free to leave, weren't you?

19         A.    I didn't feel I was free to leave, no, but I

20    wasn't in handcuffs.

21         Q.    But you walked up there on your own, right?

22         A.    I was told to go there, yes.

23         Q.    You drove yourself down there?

24         A.    Yes.

25         Q.    You would agree that's a voluntary act?

1    A.    As far as driving myself, yes, but not being
2    told to go down there for an interview.
3         Q.    Why -- why did you think that it was
4    involuntary?  Let me put it this way.  Could you have driven
5    all the way to Casa Grande that morning since no police
6    officer was with you rather than go down to the police
7    station?
8         A.    I feel -- I feel I couldn't have, no.
9         Q.    You felt that you couldn't have, but you
10   physically could have, couldn't you?  In other words --
11        A.    Physically?
12        Q.    -- there wasn't a police with a gun -- with a
13   gun pointed at your head saying "Drive," was there?
14        A.    No, there wasn't a gun pointed at me.
15        Q.    There wasn't a police officer in your truck,
16   right?
17        A.    No, there wasn't.
18        Q.    You didn't take your wife's Mazda down to the
19   police station?
20        A.    The --
21        Q.    Your wife's Mazda?
22        A.    No.
23        Q.    She took the kids in the Yukon, right?
24        A.    Yes.
25        Q.    You took the Chevy automobile or truck --

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    A.   Yes.

2    Q.   -- over to the police station.

3         Now, during that time that you're in there, the

4    police officer also asked you whether or not you had ever

5    seen Mr. Andriano hit Wendi Andriano.  Do you remember that

6    question?

7    A.   No.  I --

8    Q.   The answer is "no" then, right?

9    A.   Wait a minute.  See, I don't remember a lot of

10   that morning.  I only had two hours of sleep the night

11   before.  I might have to think about that.  I don't remember.

12   Q.   Okay.  Let's just --

13   A.   I don't remember.  He asked a lot of

14   questions.  I don't remember.

15   Q.   I understand.  Then you would agree what the

16   video tape says is accurate?

17   A.   Yeah.  Yeah, I saw --

18   Q.   You don't disagree with that?

19   A.   Yeah, I don't disagree.

20   Q.   It's not a transcript.  In other words, it's

21   not me writing something down to paper?

22   A.   Yes.

23   Q.   You physically see yourself, right?

24   A.   Yes.

25   Q.   You heard the words coming out of your mouth?

1          A.     Yes.

2          Q.     You heard your own voice and recognized it,

3    right?

4          A.     Yes.

5          Q.     Isn't it true that you were asked, "Did she

6    ever tell you about any violence between them?"  And your

7    answer was, "As far as him hitting her or her hitting --" and

8    the detective then said "Him doing anything to her, her doing

9    anything to him."  And your answer was, "No."  Do you

10   remember that exchange?

11         A.     No, I don't.  I'm sorry.

12         Q.     Let me play it for you.  Maybe that will

13   refresh your recollection.

14         A.     Okay.

15         Q.     This will be Exhibit 447.

16         THE COURT:  Let me see Counsel here at the bench.

17

18              (The following proceedings were held at the

19   bench:)

20

21         THE COURT:  Are you at that portion where you're

22   asking?

23         MR. MARTINEZ:  Actually, these are excerpts.

24         THE COURT:  I'm going to have the jury step out of

25   the courtroom and let you play it outside of the presence of

1    the jury.

2            MR. MARTINEZ:  Right.  It will be a matter of a

3    minute, less than.

4

5                (The following proceedings were held in open

6    court:)

7

8            THE COURT:  Ladies and gentlemen of the jury, I'll

9    ask you return to the jury room just a couple minutes here.

10   During the time, remember the entire admonition I gave you.

11   This should only take about two or three minutes.  Remember

12   the admonition I gave you.

13

14               (Whereupon, the jury exits the courtroom.)

15

16           THE COURT:  You can be seated.  The record will

17   reflect that the Defendant and Counsel are present.  We're

18   outside the presence of the jury.

19

20               (Whereupon, the videotape is played.)

21

22           MR. DELOZIER:  Approach, Your Honor?

23

24               (The following proceedings were held at the

25   bench:)

 1

 2          MR. DELOZIER:  Problem I have with the tape is it's

 3    different than the question that he asked what the detective

 4    asked him related to did she -- did she, his daughter, tell

 5    him and the question he asked was did you tell the officer.

 6          THE COURT:  Right.  I expect that he'll be consistent

 7    when he asks the question.

 8          MR. MARTINEZ:  I won't ask him how it is on the

 9    transcript.

10          MR. DELOZIER:  You already have.

11          MR. MARTINEZ:  It's consistent with the transcript.

12          MR. DELOZIER:  No, it isn't.  It's a different

13    question.

14          THE COURT:  Hold a second.  Restate the question that

15    you asked him --

16          MR. MARTINEZ:  Okay.

17          THE COURT:  -- okay?  And then --

18          MR. MARTINEZ:  Different word like violence or --

19          MR. DELOZIER:  That's --

20          THE COURT:  That's the part you're going to play?

21          MR. DELOZIER:  No.  The question is the basis of the

22    origin.  That's the issue.  The detective asked him if Wendi

23    ever told him.  That's rank hearsay.

24          THE COURT:  And the question that he asked was

25    whether he was aware of any violence inflicted upon --

1            MR. DELOZIER:  Did he --

2            THE COURT:  -- your client by Mr. Andriano.  Is that

3    correct?  Was that the question you asked him?

4            MR. MARTINEZ:  I --

5            MR. DELOZIER:  Let's read it back.

6

7            (Whereupon, the record was read back as

8    follows:

9            Q.    Isn't it true that you were asked, "Did

10           she ever tell you about any violence between them?"

11           And your answer was, "As far as him hitting her or

12           her hitting --" and the detective then said "Him

13           doing anything to her, her doing anything to him."

14           And your answer was, "No."  Do you remember that

15           exchange?)

16

17           THE COURT:  Mr. DeLozier?

18           MR. DELOZIER:  If Juan asks that question of Mr.

19   Ochoa, it wouldn't be admitted, so it can't be admitted that

20   what's on the tape is asked by a police officer.  It's

21   hearsay.

22           THE COURT:  Mr. Martinez?

23           MR. MARTINEZ:  It's an inconsistent statement and

24   does come in.  The police officer's question, just like the

25   questions here in court, are only meant to give context to

1   the answer, so I think it's admissible.

2              THE COURT:  I'm going to sustain the objection.

3   Let's move on.

4

5              (The following proceedings were held in open

6   court:)

7

8              THE COURT:  We ready for the jury?

9

10             (Whereupon, the jury enters the courtroom.)

11

12             THE COURT:  Please be seated.  This is cause number

13  CR 2000-096032, State of Arizona versus Wendi Elizabeth

14  Andriano. The record will reflect the presence of the

15  Defendant, Counsel and the jury.  Alejo Ochoa is on the

16  witness stand, and we'll continue with Mr. Martinez's

17  questioning.

18

19  CONTINUED CROSS-EXAMINATION BY MR. MARTINEZ:

20         Q.    Isn't it true you never told the detective

21  about this incident that you told us in the courtroom, what

22  happened in 1997?

23         A.    I don't remember if I told him or not.

24         Q.    Do you want to review the full videotape, sir,

25  to see whether or not that --

1       A.      As far as the tape that we saw right now, I

2    didn't say it, no.  I didn't tell him about it.

3       Q.      All right.  Now, and again it was fresher in

4    your mind back then than it is now.  Isn't that true?

5       A.      I wouldn't say so.

6       Q.      So you remember everything as well today as you

7    did back on October 8 of the year 2000?

8       A.      At that time --

9       Q.      Is that "yes" or "no"?

10      A.      -- no.

11      Q.      So you remember things better then than you do

12   now or better now than then?  Which of the two is it?

13      A.      Better than at that time in the morning.

14      Q.      So 11:00 in the morning when this happened,

15   that's too early for you?

16      A.      That just a "yes" or "no" answer?

17      Q.      Yeah.

18      A.      Yes.

19      Q.      Sir, you work at a Tortilla factory, right?

20      A.      Yes.

21      Q.      What are your hours?

22      A.      Depending on the season.

23      Q.      Back in October of the year 2000, what were

24   your hours?

25      A.      Usually go in about 4:00, 4:30.

116

1      Q.    And you would be done when?

2      A.    Depending on what the sales are.   There's no

3  set time.

4      Q.    What's the latest?

5      A.    I could be done at 9:00 in the morning, I could

6  be done at 9:00 at night.

7      Q.    So my question to you then is at the tortilla

8  factory in October, there wasn't anything that clicked in at

9  11:00 in the morning then that made you sleepy or anything?

10      A.    I wasn't working at the time.   We just came

11  back from California.

12      Q.    I understand that, but you were working at the

13  tortilla factory as a manager at some point in October,

14  weren't you?

15      A.    In October, yes.

16      Q.    There wasn't anything that clicked in at 11:00

17  that made you sleepy or anything like that or unable to

18  comprehend things, right?

19      A.    No.

20      Q.    The other question is one of the things Mrs.

21  Ochoa was telling us, your wife, you would -- like at a

22  newspaper or book -- that you would start screaming.   Is that

23  your character at home, that for no reason you would begin

24  screaming?

25      A.    In what context was that?

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1          Q.    That's what she told us, the jury.  Maybe a

2    situation when you were looking at a book where you got very

3    angry and started screaming.

4          MR. DELOZIER:  Objection, Your Honor.  Misstates the

5    evidence.

6          THE COURT:  Overruled.  Go ahead and answer the

7    question if you can.

8          THE WITNESS:  When I would just start screaming?

9    BY MR. MARTINEZ:

10         Q.    Yes, just like that.

11         A.    In anger?

12         Q.    In anger.

13         A.    I'd have to think about it.  I don't know.  I

14   can't say "yes" or "no" on that.  I don't know.

15         Q.    Well, I thought that you just told me that your

16   memory was pretty fresh, better now than as to past events

17   than it was back then, so --

18         A.    It's fresher now?

19         Q.    Right.

20         A.    -- than at that morning under the

21   circumstances.

22         Q.    Right.

23         A.    The sleep deprivation that I had.

24         Q.    But the point I'm trying to make is you could

25   remember things very clearly now.  Why can't you remember

1   whether or not you did something like that?

2          A.    I may have.

3          Q.    I'm --

4          A.    It's possible I may have.  I'm not denying it,

5   but I can't tell you when I did it.

6          Q.    Do you have any problems with any mental --

7   I'm trying to be as sensitive as I can with this.

8          A.    Mental problems.

9          Q.    No.  Do you have any mental health issues that

10  inhibit your memory?

11         A.    Mental health issues?  No.

12         Q.    That inhibit your memory?

13         A.    No.

14         Q.    In other words, you don't have any problems

15  remembering things that happened, you know, years ago, do

16  you?

17         A.    I -- I had an incident a few years ago.  I got

18  hit with ground lightning where my memory was -- was messed

19  up there for a while, but it's improved over the years.

20         Q.    Does -- did that -- does that affect how you

21  remember the events of October 8, 2000?

22         A.    No, the lack of sleep.

23         Q.    So the answer is "no," right?

24         A.    No.

25         Q.    Now, you wanted to say something about the lack

1    of sleep.  Are you saying that the lack of sleep inhibits

2    your ability to remember what you did back on October 8 of

3    the year 2000?  Yes or no?

4           A.    It -- it inhibits -- can you rephrase that

5    again?

6           Q.    The lack of sleep that you've been complaining

7    of, does that inhibit your memory of what happened back on

8    October 8 of 2000?

9           A.    The lack of sleep?

10          Q.    That you mentioned, yes.

11          A.    That morning, yes.

12          Q.    So you don't remember clearly today because you

13   were sleepy what happened back October 8, 2000.  Is that what

14   you're telling us?

15          A.    I don't -- no.

16          Q.    Excuse me?

17          A.    I'm trying to figure this out.  I'm getting

18   mixed up here.  At that time, October 8th, I don't remember

19   if anything went on, no.

20          Q.    Okay.

21          A.    I remember more now than I did then.

22          Q.    So as time went on, you've regained your memory

23   of the events of October 8, 2000.  Is that what we're telling

24   me?

25          A.    I remember more, yes.

1      Q.   So your answer is "yes"?

2      A.   Yes.

3      Q.   So, again, with regard to October 8, year 2000,

4   you indicated that you received a call and -- you received a

5   call from the Defendant, right?

6      A.   I was --

7      Q.   Is that "yes" or "no"?  Either you did or

8   didn't.

9      A.   Yeah.  Yeah, I did.

10      Q.   And when you, in response to that call, you

11   spoke to her, right?

12      A.   Yes, tried to speak with her.

13      Q.   You heard her voice, yes?

14      A.   Yes.

15      Q.   You knew it was the Defendant, right?

16      A.   Yes.

17      Q.   It was this person that you were very close to,

18   right?

19      A.   Yes.

20      Q.   It was this woman that you love, right?

21      A.   Yes.

22      Q.   And it's this woman that you were closer to

23   than she is to her mother, right?

24      A.   I -- I think so.

25      Q.   And so you got on the phone and you realized

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    something was up.  And where did you take that telephone

2    call?  Where were you when you actually got her on the line?

3            A.    In the living room.

4            Q.    In the living room?

5            A.    Dining room somewhere.

6            Q.    Excuse me?

7            A.    Somewhere in the house, dining room or living

8    room.

9            Q.    And it was one of the two, the dining room or

10   living room, right?

11           A.    Yes.

12           Q.    And do you sleep in pajamas, sir?

13           A.    Yes, most of the time.

14           Q.    That night, did you sleep in some pajamas?

15           A.    Yes.

16           Q.    And you went from the living room or to the

17   dining -- and the dining room after talking to her, and then

18   you went to the bedroom to get dressed, right?

19           A.    Yeah.

20           Q.    And you took -- if you had pajamas on, you took

21   them off and started to put your clothing in the bedroom,

22   right?

23           A.    I don't remember where I changed.  I don't

24   remember.

25           Q.    Well, where do you normally keep clothing that

1    you wear outside?  Don't you keep it in the bedroom closet?

2        A.    No.  Sometimes I have it in another place ready

3    to get dressed in the morning, so that way I don't have to

4    wake up the wife in the morning.

5        Q.    Well, given the fact your memory has improved

6    today, is there any way you could tell us where you started

7    to get dressed on that October 8 morning?

8        MR. DELOZIER:  Your Honor, object.  It's

9    argumentative and no relevance to it.

10        THE COURT:  Overruled.  Go ahead and answer the

11    question if you can.

12        THE WITNESS:  I don't remember.  It could have been

13    the bedroom.  Could have been the bathroom.

14    BY MR. MARTINEZ:

15        Q.    Okay.  Do you normally keep clothing in the

16    bedroom?

17        A.    Yes.

18        Q.    How about do you normally keep clothing in the

19    living room?

20        A.    Not normally.  Well, if I'm working outside,

21    then I take off my dirty boots or if I've got grass all over

22    my socks or something, I'll leave them in, you know, the

23    dining room area.

24        Q.    Sir, the point is this:  Didn't you just tell

25    me, if you don't want to wake your wife, you leave clothes

1    near the door so you could walk out and don't wake her?

2           A.    I usually leave them in the bathroom.

3           Q.    Those -- that's when you're expecting to go

4    out?

5           A.    That's if I'm expecting to go out.

6           Q.    You did not expect to go out that night, right?

7           A.    No.

8           Q.    So you would not expect then to have clothes in

9    the bathroom, right, ready to go, right?

10          A.    Not unless I took them off the night before and

11   that's what I put on.

12          Q.    But the expectation is customarily you would

13   not leave them there, right?

14          A.    In the bathroom?

15          Q.    Right.

16          A.    Most of the time that's where I leave them.

17          Q.    Is that --

18          A.    I'm sorry, so I -- I get my clothes, get them

19   in the bathroom so I don't have to wake her up in the

20   morning.  She goes in later than I do.  That's where I get

21   dressed, in the bathroom, when I go out.

22          Q.    Okay.

23          A.    Yeah.  That morning I don't know if I got fresh

24   clothes or if I threw on the same clothes I had on the day

25   before.  I do not remember that.


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

124

1          Q.    You're sure the call was not taken in the

2     bedroom, right?

3          A.    Yes.  I am sure.

4          Q.    Right.  Because you don't have a telephone in

5     the bedroom, right?

6          A.    Right.

7          Q.    You have one in the living room, right?

8          A.    Yes.

9          Q.    That's where you went to take the call, right?

10         A.    Yes.

11         Q.    And your wife was not standing there while you

12    were speaking on the telephone in the living room, right?

13         A.    I don't remember if she was or not.

14         Q.    So you then talked to the person on the other

15    end, which you have -- you've now identified as your

16    daughter?

17         A.    It's my daughter.

18         Q.    And you make a decision at that point, right?

19         A.    As to what?

20         Q.    To leave, don't you?

21         A.    Oh, yes.  Yes, I did make a decision to leave.

22         Q.    You decided you needed to go, right?

23         A.    Yes.

24         Q.    And then you get into your Chevrolet truck

25    after getting dressed, right?

1        A.    Yes.

2        Q.    How long does it take you to get dressed?

3        A.    10, 15 minutes, maybe.  5 minutes.  I don't

4    know.  Never timed myself.

5        Q.    Okay.  Well, give it your best guess.  How old

6    are you, sir?

7        A.    52.

8        Q.    And for 52 -- let's say for, I don't know, 50

9    years of your life, you've been dressing yourself, haven't

10   you?

11       A.    Yeah.

12       Q.    You pretty much know how long it takes to get

13   dressed?

14       A.    Yeah, 10 minutes.

15       Q.    10 minutes?  So 10 minutes you stand there

16   dressing.  At no time in those 10 minutes -- well, do you --

17   do you tell your wife what's going on?

18       A.    I don't remember.

19       Q.    You don't remember if you did tell her or you

20   didn't tell her?

21       A.    I don't remember if I did or didn't.

22       Q.    I thought you just told us earlier that you did

23   tell her I'm going to Phoenix?

24       A.    I did tell her that.

25       Q.    But you didn't tell her any reason why you were

1    going to Phoenix.  You can't remember if you did or not,

2    right?

3           A.    I remember telling her.

4           Q.    No, no, no.  That's not the question.

5           A.    Okay.

6           Q.    I'm not asking you what you told her.  I'm

7    asking you whether or not you remember telling her why you

8    went to Phoenix?

9           A.    No.  I don't remember telling her why.

10          Q.    Okay.

11          A.    I don't remember if I did.

12          Q.    So it could be that you never did then, that

13   you never told her you were going to Phoenix, right?

14          A.    I'm sure I did.

15          Q.    Well, no --

16          A.    Because they -- she came and followed me and

17   ended up getting the kids.

18          Q.    Sir, the point is you don't remember, right?

19          A.    No.

20          Q.    And if you don't remember, it could be you

21   didn't tell her, right?

22          A.    The reason I went to Phoenix?

23          Q.    Right.

24          A.    It's possible.

25          Q.    Okay.  And so now it's 10 minutes after you

1    received this call and now you're getting ready to go and get

2    in your truck.  How long does it take to get to the freeway

3    from Park, where you live, to the freeway?  How long does it

4    take on a Sunday morning, something like that?

5           A.    On a Sunday morning?

6           Q.    Uh-huh.

7           A.    15 minutes.

8           Q.    So now we have 10, 15 -- so you now have 25

9    minute, right?

10          A.    Okay.

11          Q.    Okay.  Before when you were answering questions

12   for Mr. DeLozier, didn't you tell us that it took 20 minutes

13   to get to --

14          A.    I think the --

15          Q.    -- the apartment?

16          A.    I think I drove 20, 25 minutes.  I believe

17   that's what my answer was to get over there.

18          Q.    Do you remember when you spoke to the detective

19   at the Phoenix Police Department?

20          A.    Yes.

21          Q.    And do you remember that he asked you, Well,

22   how long did it take you to get to the apartment complex?

23          A.    I remember answering a lot of questions.  I

24   have no idea how long I told him, but I do remember.

25          Q.    Do you remember you told him it took you 15?

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1           A.      15 minutes?  I may have told him that.  I'm not

2     disagreeing.

3           Q.      Because you were speeding, right?

4           A.      I was definitely speeding.

5           Q.      So if it takes up to 25 minutes to get to the

6     freeway, and I guess my question here is it's not adding up.

7     So can you tell me from your doorstep to the San Riva

8     apartment complex if we already have 25 minutes, how much

9     total time did it take you?

10          A.      I don't remember.  I don't remember.

11          Q.      Could it have been 30 minutes on the freeway?

12          A.      Normal driving would have taken about 40

13    minutes --

14          Q.      Okay.

15          A.      -- from our house to the San Riva apartment.

16          Q.      Okay.

17          A.      That's driving the speed limit.  And that's --

18    we've driven it a bunch.  I know it takes about 40 minutes.

19          Q.      But how long --

20          A.      That morning, I have no idea how long it took.

21    I may have told the detective 15 minutes.  I don't remember.

22    I -- I told you --

23          Q.      All right.

24          A.      -- maybe 20, 25 minutes.

25          Q.      Okay.  Let's say it takes 15 minutes on the

1    freeway.

2          A.    I don't look at my clock in emergencies like

3    that.

4          Q.    Let's that say it took 15 minutes on the

5    freeway.

6          A.    It might take less if I was going on one

7    freeway -- well, it would take longer than 15 minutes just on

8    the freeway.

9          Q.    Okay.  Well, then 20 minutes on the freeway, 25

10   minutes on the freeway?

11         A.    I'd say about 25 minutes or so.

12         Q.    So if you add 25 minutes on the freeway and you

13   add 25 minutes to the time it takes to get to the freeway,

14   we're talking about 50 minutes, right?

15         A.    I guess so.

16         Q.    Right?  That's the math that goes into it.  You

17   would agree that's the math.  The math is correct, right?

18         A.    Yes.

19         Q.    So if you leave at 2:00 in the morning, which

20   is your house, which is when you -- you don't leave at 2:00

21   but you get the call at --

22         A.    The phone call was around 2:00 or a little bit

23   before.

24         Q.    Or a little before, right?

25         A.    Somewhere around 2:00.


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1        Q.    And you factor in the 50 minutes that you

2   drive.

3        A.    Okay.

4        Q.    That gets you to San Riva at 2:50 or roughly a

5   little bit before 3:00 in the morning, right?

6        A.    Okay.

7        Q.    If the math is correct?

8        A.    Yes.

9        Q.    Okay.  Now, with regard to your travel there

10  and with regard to the phone call that you received, at no

11  time from your house did you ever call 911, did you?

12       A.    No.  I --

13       Q.    The answer is "no"?

14       A.    No.

15       Q.    On the way as you were driving, you had a cell

16  phone, didn't you?

17       A.    Yes.

18       Q.    If you could -- if you would have wanted to,

19  you could have called the police, 911, on your cell phone,

20  couldn't you?

21       A.    Yes.

22       Q.    You didn't do that either, right?

23       A.    No.

24       Q.    And the reason you didn't do it is that you

25  weren't worried or concerned enough to call them, right?

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1          A.     That's not true.

2          Q.     Well, would you agree with me that if you

3     called the police, 911, they will arrive at the San Riva

4     apartment complex quicker than the 50 minutes it took you to

5     arrive there?

6          A.     If I had called from --

7          Q.     Yes.

8          A.     -- the home at 2:00 in the morning?  Oh, yeah,

9     definitely.

10         Q.     So that means that you weren't worried enough

11    to call the police.  In other words, you weren't worried

12    enough for her safety, right?

13         A.     That's not true.

14         Q.     Well, you weren't worried enough to call the

15    police, right?

16         A.     I can't answer yes or no on that.

17         Q.     Okay.  Well, and you weren't worried enough to

18    call the police because Joseph Andriano had never done

19    anything to Wendi Andriano, right?

20         A.     That's not true.

21         Q.     Well, you told us before that she didn't have

22    any bruises that you ever saw, right?

23         A.     Yes.

24         Q.     You never told the detective that you ever saw

25    him hit her, right?

```
 1              A.    I believe you asked me --

 2              Q.    The answer is --

 3              A.    -- did they ever tell you --

 4         MR. DELOZIER:  Objection, Your Honor.

 5         THE COURT:  Sustained.  Restate the question.

 6   BY MR. MARTINEZ:

 7              Q.    And you went through this whole history with us

 8   of the -- of seeing them together.  Do you remember telling

 9   us it was this laborious length of time '95, '96, '97, '98,

10   '99, through all of that time, and you could only come up

11   with one instance where you say he slapped her, right?

12              A.    Yes, that I actually saw, yes.

13              Q.    That you actually saw and yet you never told

14   the police about it, right?

15         MR. DELOZIER:  Objection, Your Honor.

16         THE COURT:  Overruled.  Go ahead and answer the

17   question.

18   BY MR. MARTINEZ:

19              Q.    That's why when you're driving in, you have no

20   concern for her safety, right?

21              A.    That's not the reason why I didn't have concern

22   for her safety.

23              Q.    One of the other things you were telling us was

24   that he, Joe, was in control of the family?

25              A.    Yes.
```

133

1          Q.    That may not have been the exact words, but it

2    was something like that, right?

3          A.    Yes.

4          Q.    With regard to this control issue, isn't it

5    true that the only person working in that relationship was

6    Wendi Andriano?

7          A.    No.  She was -- she was the one that had a

8    steady job.  He also did work.

9          Q.    But let me --

10         A.    He also -- he also did jobs with his welding.

11   I did mention that.

12         Q.    Okay.  I want to restrict myself then to the

13   year 2000.

14         A.    Okay.

15         Q.    Okay.  In the year 2000, he wasn't working, was

16   he?

17         A.    I know he did a couple windshields.  I know

18   that he worked.

19         Q.    In the year 2000, sir?

20         A.    Yes.

21         Q.    Was it between the chemotherapy treatments?

22         A.    It was --

23              THE COURT:  Wait, wait, wait.  Wait until the

24   question is completed before you answer the question.

25              THE WITNESS:  It was the --

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000007105

1          THE COURT:  Hold on a second.  Restate the question.

2     BY MR. MARTINEZ:

3          Q.    Did he do the changing of windshields between

4     chemotherapy treatments, sir?

5          A.    Not between -- not between the treatments but

6     he was doing windshields.

7          Q.    Okay, sir.  Then the answer's "no" then, right?

8          A.    Not between the treatments, no.

9          Q.    He was very weak during the chemotherapy

10    treatments, wasn't he?

11         A.    Only the day after he took the chemo.

12    Afterwards he was okay.

13         Q.    With regard to the day that it happened, and by

14    it happening, I mean the chemotherapy treatment.  On the day

15    of the chemotherapy treatments it is your testimony, if I

16    remember direct correctly, that you guys took or the kids

17    were taken away because they didn't want to infect or give

18    any germs to Joe, right?

19         A.    Right.

20         Q.    So that, according to you, the apartment was

21    really clean, right?

22         A.    Yes.

23         Q.    So the kids weren't allowed to vomit on him

24    when he came back from chemotherapy treatment or anything

25    like that?

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1        A.    Right.  We tried to keep it as clean as

2   possible.

3        Q.    Right.  So the kids would go to either yours or

4   his parents' house, right?

5        A.    Yes.

6        Q.    And on those days, you would agree he was not

7   allowed or told not to change diapers, right, the day of the

8   chemotherapy, right?

9        A.    Yeah.  The kids wouldn't be around.

10       Q.    Right?

11       A.    Right.

12       Q.    So -- and how long did this period last where

13   you believe he shouldn't have people around where he was

14   susceptible to infection?

15       A.    I understood it was just that day that he did

16   the chemo.

17       Q.    And then the kids would be returned?

18       A.    Right.

19       Q.    Is that how it happened?

20       A.    Or if they stayed longer, I'm not sure how long

21   they stayed at the Andrianos' house, but they would, you

22   know, visit.

23       Q.    Sir, I want to talk to you about some time

24   limits, if I may.  Can you see that from there?  If you

25   can't --

136

1        A.      Yeah.

2        Q.      -- go ahead and --

3        A.      No, I can see it.

4        Q.      You told us sir, that you received the call at

5   roughly 2:00 in the morning.  Do you remember telling us

6   that?

7        A.      Yeah.  That's what was on the ID.

8        Q.      All right.  And --

9        A.      Now, may I interject something on that?

10       Q.      No, sir.  Thank you.  Then you also told us,

11   sir, that it took you approximately 50 minutes to get there.

12   Do you remember telling us that?

13       A.      That's what you came up with, 50 minutes.

14       Q.      Well, all right.  We added it up and said that

15   it took you about 10 minutes to get dressed.  Do you remember

16   that?

17       A.      Yes.

18       Q.      15 minutes to get to the freeway?

19       A.      Yes.

20       Q.      And then you also gave us 25 minutes of travel

21   time?

22       A.      Okay.

23       Q.      That equals 50 minutes, doesn't it?

24       A.      That equals 50 minutes.  I don't know if it

25   took 10 minutes to get dressed, I don't know if it took me

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    15 minutes to drive to the freeway.  I was speeding, so I

2    don't know if it took me 25 minutes to get to the freeway.

3              Q.    Are you done?

4              A.    Yes.

5              Q.    All right.  I would like to go on to my next

6    question, thank you.

7                    That would mean then that you arrived there, if

8    the math is correct, at 250 a.m.

9              A.    Okay.

10             Q.    If we're following that, right?

11             A.    Uh-huh.

12             THE COURT:  Is that a "yes"?

13             THE WITNESS:  Yes, I'm sorry.

14   BY MR. MARTINEZ:

15             Q.    The testimony that we've previously introduced

16   in court, sir, was that the paramedics actually were out

17   there one time and they actually left the apartment at 2:40

18   in the morning.

19             A.    Okay.

20             Q.    They'd been out there, they actually left at

21   2:40 in the morning.  If, sir, you get there at 2:50 in the

22   morning, we also know that the paramedics weren't called back

23   again until 3:42 or 3:41 in the morning.

24             A.    Okay.

25             Q.    But just to be rounding it off, we'll put 3:40

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    a.m.

2                     First of all, you would agree that there's 50

3    minutes between 2:50 in the morning 3:40 in the morning.

4    Wouldn't you agree to that, sir, if we're just talking about

5    math right now?

6              A.    Yes.

7              Q.    If you arrived there at 2:50 in the morning,

8    and the paramedics don't arrive until 3:40 in the morning,

9    what were you doing for 50 minutes there, sir?

10             A.    Well, I was getting the children from the

11   police.

12             Q.    Well, no, no.  The police haven't arrived

13   because the police didn't arrive until 3:40 in the morning,

14   sir.

15             A.    Well, if that's what time they arrived.  But

16   when I got there, they were there.  The police were there,

17   paramedics were there.  I got the children from the

18   paramedics and then not too long afterwards, my wife showed

19   up.

20             Q.    Sir, you would agree it doesn't take you an

21   hour and 40 minutes to get from your house over to San Riva.

22   You would agree to that, right?

23             A.    Yes.

24             Q.    And it -- let's even assume that you were

25   driving really slow and it takes you an hour.  That would get

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000007110

1   you there at 3:00 in the morning, right?

2          A.   Right.   Yes.

3          Q.   So if we even assume you get there at 3:00 in

4   the morning, now the question is different.   What were you

5   doing, instead of 50 minutes, what were you doing for 40

6   minutes there?   Were you just sitting out in your car waiting

7   for the police?

8          A.   Can we go back to 2:00?

9          Q.   No, we cannot.   I'm asking you a direct

10  question.   Were you waiting there for the police?

11         A.   No.   The police were already there when I got

12  there.

13         Q.   Did you go inside of that apartment, sir --

14         A.   No.

15         Q.   -- before the police arrived?

16         A.   No.   The police were there when I arrived.

17         Q.   Did you do these marks here on Exhibit 440

18  before the police arrived, sir?

19         A.   The police were there when I arrived.

20         Q.   You would agree though, sir, there seems to be

21  some time there that's unaccounted for by you, isn't there?

22         A.   We could go back to 2:00 if you wish and

23  discuss that 2:00.

24         Q.   Sir, did you go into the apartment, yes or no,

25  that evening unescorted?

1        A.    No.   The police would not let me go in there.

2   They were already there when I arrived.

3        Q.    I'm going to show you Exhibit 57.   You may need

4   to step down.

5        MR. DELOZIER:   Sorry.   What number?

6        MR. MARTINEZ:   57.

7   BY MR. MARTINEZ:

8        Q.    This is the inside of the apartment door.

9        A.    Okay.

10        Q.    And it has a substance that is consistent with

11   an appearance and color with blood.

12        A.    Okay.

13        Q.    This was taken by a Phoenix Police Department

14   Technician back on October 8 of the year 2000.   Those items

15   there that are on the door, did you put those there, sir?

16        A.    What?   The lock?

17        Q.    No, no, no.   We're talking about these things,

18   what appears to be blood?

19        A.    No.

20        Q.    You didn't have any cuts on your hand that day,

21   right?

22        A.    No.

23        Q.    You didn't have any blood on you, right?

24        A.    No.

25        Q.    When you saw the defendant there that day, she

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000007112

1    was sitting there on the sidewalk, right?

2            A.    When I got there she was with the policemen.

3            Q.    The first time that you saw her, sir, yes or

4    no, was she sitting on the sidewalk?

5            A.    You're talking about that morning?

6            Q.    What other morning are we talking about, sir?

7            A.    Yes.  She was outside with the police sitting

8    beside them.

9            Q.    She didn't have any blood on her hands, did

10   she?

11           A.    I really didn't know.  All I know is that I

12   hugged her.

13           Q.    You didn't look at her hands, but you know for

14   a fact you didn't put that there, right, on Exhibit 57?

15           A.    Right.

16           Q.    Right?

17           A.    Right.

18           Q.    Going to show you now Exhibit 357.  Do you

19   recognize that?

20           A.    What that?

21           Q.    What's -- do you know what's in that picture?

22           A.    Door, got some --

23           Q.    Why don't you step down so you could get a

24   better view of it

25                 THE COURT:  For the record, what exhibit number,


                 TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1      again, is this?

2                  MR. MARTINEZ:   357.

3      BY MR. MARTINEZ:

4            Q.    Do you recognize what's depicted there?

5            A.    I'm -- I'm sorry, I don't.

6            Q.    How many times had you been over to the -- you

7      could have a seat now, sir.

8                  You did have a full opportunity to see Exhibit

9      357, right?

10           A.    Yeah, but I'm not sure what you're trying to

11     point out.

12           Q.    So is the answer --

13           A.    I'm not sure what you're trying to point out.

14           Q.    I'm not pointing anything out.  I'm asking you

15     a question.  Did you get a good look at what's in 357?

16           A.    Yes.  Something, blood, in the bottom,

17     police --

18           Q.    No, no --

19           A.    Yes.

20           Q.    Yes?  I -- I didn't rush you in any way,

21     obscure your view or put something in your way.  You got a

22     chance to look at that, right?

23           A.    Yes, uh-huh.

24           Q.    And you told us before you'd been over to the

25     Andrianos --

```
 1          A.    Joe and Wendi's?

 2          Q.    Yes.

 3          A.    Yes.

 4          Q.    If you take a look at this one, there's a 132

 5   over there on the right.  Do you see that?

 6          A.    Yes.

 7          Q.    You were able to see it before?

 8          A.    Yes.

 9          Q.    How is it then there's that big 132 on there?

10          A.    I'm sorry.  I didn't know what you were

11   pointing to.  I didn't know what you wanted me to look at.

12   I -- I apologize.  I'm sorry.  I don't mean to laugh.  It's

13   not a laughing matter.  I just don't know what you're trying

14   to point out to me.

15          Q.    Is that the front of the apartment 132, sir?

16          A.    I see the door, but I can't even tell if it's

17   open or what it is.  I see a police tape on there.

18          Q.    Did I ask you whether or not the door was open

19   or not, sir?

20          A.    I can't tell if it's opened or closed.

21          Q.    I didn't ask you that, did I?  I asked you to

22   take a look at it and see if you recognize it.  That's all I

23   asked you.

24          A.    You asked me if I recognize what's in the

25   photograph.
```

1      Q.      Does that look like the front door of the

2  apartment of 132, the apartment where Joseph Andriano and

3  Wendi Andriano resided?

4      A.      I couldn't really see the door.  I'm sorry.

5      Q.      But you can see the numbers, right?

6      A.      I could see the number, yes.

7      Q.      Okay.  Let's go ahead then and take a look at

8  something a little closer that may be on the wall.  Do you

9  see right there by the wall there?

10     A.      Oh, that red stuff there.

11     Q.      Yeah, the red stuff.

12     A.      Yeah, okay.

13     Q.      That has a consistency and color of blood.

14  And I'll give you a close up view of it, okay?

15          THE COURT:  What exhibit number are you referring to

16  at this time?

17          MR. MARTINEZ:  357, and now I'm going to show you

18  358.

19              (Pause in proceedings.)

20  BY MR. MARTINEZ:

21     Q.      See that?  That's the close up view of it.

22     A.      Okay.

23     Q.      You didn't put that there, did you, sir?

24     A.      No.

25     Q.      You have no idea how that got there, right?

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1   A. No, sir.

2   Q. I'm going to show you Exhibit 445.  Do you

3 recognize that?

4   A. That's Wendi?

5   Q. That's right.  That's when she was 19 years

6 old, isn't it?

7   A. Okay.

8   Q. Pardon?

9   A. Yes.  Well, I'm not sure how old she was, but

10 that's Wendi when she was younger.

11   Q. Okay.  It isn't like when she was married or

12 anything because she's still pretty young, isn't she?

13   A. I'm not sure how old she is there.

14   Q. How much did she weigh there?

15   A. I don't know.

16   Q. Well, earlier before when you were --

17   A. I know she -- she's gone up and down, you know.

18 I -- I've never known what her weight was.  I've never asked

19 her.  I don't ask her "How much do you weigh."

20   Q. All right.  That's --

21   A. I don't do that to women.

22   Q. You've seen women walking down the street or

23 people walking down the street, you can look at them and get

24 a guess as to their weight, can't you?

25   A. I really don't do this.

1          Q.    All right.  Let's do this another way.  One of

2     the things you said was in the year 2000 she was dropping in

3     weight.

4          A.    Yes, she looked like she dropped some weight.

5          Q.    Right.  That's what you said, right?

6          A.    Yes.

7          Q.    In the year 2000, was she thinner than that,

8     heavier than that?  What was she?

9          A.    I would say she was thinner.

10         Q.    Okay.  Let's take a look at Exhibit 313.  Do

11    you recognize her there?

12         A.    Yeah.

13         Q.    Which one is she?

14         A.    I think she's the one in red.  The one in red.

15         Q.    Is that with how much she weighed in the year

16    2000?

17         A.    Well, that was 2000.

18         Q.    Is that about how much she weighed in the year

19    2000?

20         A.    I believe that was in 2000.

21         Q.    So then that's how much she weighed in October

22    of 2000?

23         A.    Well, yeah, that was in 2000.

24         Q.    I know that was in 2000, sir.

25         A.    That may not have been in October of 2000.


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1          Q.     I'm asking you about October of 2000.

2          A.     Looks like September, about the same.

3          Q.     About the same?

4          A.     Yeah, maybe.   Yeah.

5          Q.     The other thing I want to talk to you about is

6     this Yukon.   My understanding is you and your wife were

7     actually the leaseholders on that Yukon?

8          A.     Yes.   We leased it for the kids to use.

9          Q.     Right.   And they had another car that the

10    Andrianos also used, right?

11         A.     Yes, otherwise they just had a van that he

12    would use for the windshield business.

13         Q.     Right.   And with regard to the keys to that

14    Yukon, you didn't have them on your key chain, did you?

15         A.     I think -- I think we had an extra set of keys.

16         Q.     I'm not asking if you had --

17         A.     It would be Donna and myself, yes.

18         Q.     Okay.

19         A.     We did have an extra set of keys.

20         Q.     Okay.   You had it over at the house, right?

21         A.     Yes.

22         Q.     So you now have an extra set of keys at the

23    house, right?

24         A.     Yes.

25         Q.     It's not something that you carry around all

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    the time.  You just have it at the house in case you need it

2    for that night, right?

3             A.    Right.

4             Q.    How is it, sir, then that if you have this

5    extra set of keys and it's just kept around in the house, how

6    is it, sir, that you have the foresight that night or your

7    wife had the foresight --

8             A.    We didn't know --

9             Q.    -- to carry those keys to get the Yukon that

10   night?

11            A.    Excuse me.  I believe we got the keys from

12   Wendi's keys.

13            Q.    From Wendi's what?

14            A.    Wendi.  From Wendi.

15            Q.    You believe that you actually received the keys

16   from the defendant that night?

17            A.    Oh, yeah.

18            Q.    Okay.  It isn't that your wife had the keys

19   then.  It's that you got them from the defendant?

20            A.    No.  I'm saying its possible we could have

21   gotten them from Wendi.

22            Q.    Let's go back and see if maybe you did.  I just

23   want to explore that, all right?

24            A.    Okay.

25            Q.    You told me that the first time that you saw

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000007120

149

1    the defendant was when she was sitting there on the sidewalk,

2    right?

3         A.    Right.

4         Q.    She's sitting there on the sidewalk and you go

5    up to her and look at her hands.  Or didn't look at her hands

6    is what you told me, right?

7         A.    No.  I went sat down, gave her a hug, told her

8    I loved her.

9         Q.    If you didn't look at her hands you wouldn't

10   know whether or not she had the keys in there, right?

11        A.    I know she didn't have the keys on her.

12        Q.    Okay.  She didn't have the keys then, right --

13        A.    No.

14        Q.    -- to give to you then, right?

15        A.    No.

16        Q.    So if the keys were given to you, they were

17   given to you by the police?

18        A.    No.  She gave them to me.  It would have been

19   Wendi.

20        Q.    So Wendi -- in other words, either Wendi gave

21   you the keys, the defendant gave you the keys, or your wife

22   brought them, right?  That's the only way --

23        A.    One of the two, yes.

24        Q.    All right.  And if -- if your wife brought

25   them, she brought the extra set that you guys have laying

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    around there, right?

2            A.    Um.

3            Q.    Or hangs?

4            A.    We don't have them hanging.  Usually one of

5    those keys to all the vehicles -- like when I came today,

6    I've got one keychain with her car and my truck and I've got

7    another key chain with my truck, one of the work trucks and

8    her car, so we -- we've always got all the keys with us.

9            Q.    So now you're telling me that it isn't hanging

10   around in the house?

11           A.    We don't -- we don't just hang our keys in the

12   house.  We usually have car keys with us.

13           Q.    Well, just to be fair, that's a little bit of a

14   change of position from what you told me earlier because

15   earlier you told me that, yes, you did have an extra set --

16           A.    Yes.

17           Q.    -- laying around the house, right?

18           A.    Well --

19           Q.    Right?  That's what you said, right?

20           A.    Yeah, that's what I said.

21           Q.    Now, when you got there, isn't it a fact, sir,

22   that at some point, and, you know, given the facts that we

23   have up there, we don't know exactly when, but at some point

24   the keys were -- kids were given to you, right?

25           A.    Yes.

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1        Q.    They were given to you while you were right in

2   front of the apartment, right?

3        A.    We -- when I drove up, the paramedics had the

4   children.  I parked the truck, walked over to them, told them

5   who I was, and they let me hold the kids.  Then when the wife

6   got there, we had to sign paperwork to release the kids to

7   us.

8        Q.    All right.  Sir, my -- my question to you is

9   then paramedics already had the kids out when you arrived

10  there?  That's what you're telling me, right?

11       A.    Yes.

12       Q.    It wasn't a situation where you were already

13  standing there and a firefighter, for example, came up to you

14  and just handed you the kids.  It didn't work that way,

15  right?

16       A.    No.  When I drove up, I saw them.  They had

17  just taken the kids out and I went up to them.

18       Q.    All right.  The scene was not secured.  In

19  other words, police weren't telling them to play, things like

20  that.  You were actually able to go up to the police officer,

21  right?

22       A.    They weren't near the apartment.

23       Q.    Oh, so when you got the kids they weren't like

24  right near the wall or near the back against --

25       A.    Oh, no.  No.

152

1          Q.    Where were the kids when you got them?

2          A.    The apartment -- there's like a driveway in

3     front of the apartment.

4          Q.    Okay.

5          A.    The paramedics were across the driveway.

6          Q.    They were north --

7          A.    That's true.

8          Q.    -- of there?

9          A.    Off a little way.

10         Q.    Right.

11         A.    Couple, two, three apartments away.

12         Q.    Right.

13         A.    They weren't right next to the apartment.

14         Q.    And my understanding is your wife has a Mazda,

15    right?

16         A.    Yes.

17         Q.    And you had taken the car seats out because you

18    were out on a trip, right?

19         A.    Yes.

20         Q.    You didn't want to leave them in the car

21    because, I guess, the heat destroys them or what?

22         A.    No.  We needed room for the luggage.

23         Q.    Some of the luggage went where?  In the back

24    and in the trunk?

25         A.    Right.  I just threw it in the back seat and in

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000007124

153

1      the trunk because -- not only packs or luggage, I took I

2      think three bags of photo equipment.

3              Q.    Okay.

4              A.    And we just needed the room.

5              Q.    You needed the room because the photo equipment

6      actually requires a special kind of container, right?

7              A.    I -- I put them in the -- on the padding --

8              Q.    Right.

9              A.    -- and carry on luggage for me.

10             Q.    Right.  And so some of the luggage went in the

11     truck, right?

12             A.    Right.

13             Q.    How many pieces of luggage went in the trunk?

14             A.    Probably just one because she -- she packs

15     great big pieces of luggage.  I think we just threw one in

16     there, another big one in the trunk, and then my photo stuff,

17     and then what she was going to carry on.

18             Q.    You didn't take her car there?

19             A.    Right.  We left it in one of those places that

20     are $5 a day for parking.

21             Q.    Right.  And how long were you gone again?

22             A.    Total of ten days.

23             Q.    And then --

24             A.    Nine days?  I don't remember.  Nine or ten

25     days.


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1          Q.    So to get back to that night, she shows up in
2    her car, right?
3          A.    In the Mazda, yeah.
4          Q.    How much time after -- well, let me put it this
5    way.  When she arrived, were the police there or not?
6          A.    Yes.  Everybody was there.
7          Q.    Okay.  The paramedics and the police and
8    everybody was there?
9          A.    Yes.
10          Q.    Did she go up to speak to Wendi or did she --?
11          A.    No.
12          Q.    She stayed in the car?
13          A.    No.  She did get out.  I told her, "Here are
14    the kids," and that's when we signed papers for the kids to
15    be released to us.
16          Q.    Right.  But my question is she pulls up
17    immediately and sees you immediately.  Is that how that
18    works?  She pulls in, comes up to you and then --
19          A.    No.  She -- she stayed at the car.  I saw her.
20    I didn't know how long she'd been sitting there.  I didn't
21    ask her when I went over there and gave her the kids.
22          Q.    You already had the kids with you?
23          A.    Yes.  I was already holding the kids.
24          Q.    Okay.  And then there's this -- there's this
25    process that takes place and after the process takes place,

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000007126

1    she's allowed to leave with the kids, right?

2           A.    Yeah.  We asked one of the policemen if -- no,

3    I told her to take the Yukon because it had the car seats in

4    it and I told the policeman and was told there would be no

5    problem with that.  But I don't remember -- what I don't

6    remember -- here's -- here's the thing about the keys.  At

7    one point Wendi said she had to use the restroom.

8           Q.    All right.

9           A.    I asked --

10          Q.    All right.  Sir, you're going a little bit far

11   afield or --

12          A.    Well, that's -- the keys for the --

13          THE COURT:  Hold on a second.  Ask your next question.

14   BY MR. MARTINEZ:

15          Q.    With regard to the Yukon, when do the kids get

16   transferred from the Mazda over to the Yukon?  In other words

17   how long were they at the Mazda?

18          A.    They were just sitting in the Mazda.  I don't

19   know.

20          Q.    How long?

21          A.    I'm guessing anywhere from 5 to 20 minutes.

22          Q.    Where were the -- where was the Mazda parked in

23   relationship to the Yukon?  Was it parked right next to it,

24   was it parked a ways away?

25          A.    No, it was parked away.


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1          Q.     Okay.  Where was it parked, sir?

2          A.     There was --

3          Q.     Well, you knew that apartment complex?

4          A.     The Yukon would be parked here and she parked

5    her Mazda back over here.

6          Q.     All right?

7          A.     There's a driveway that goes this way, driveway

8    that goes this way.

9          Q.     Let me get directions rather than just hand

10   gestures.  You came in to the apartment complex from the east

11   and go west, right?

12         A.     We would come in from the east to the back part

13   because that's where they lived at.

14         Q.     And you would end up facing west, right?

15         A.     You would -- to go into her apartment?

16         Q.     No, no.

17         A.     You mean --

18         Q.     To park the vehicles, you drive in like this.

19   That would be west, wouldn't it?

20         A.     The -- the Yukon was facing west.

21         Q.     Sir, I'm just asking you what direction you

22   came in, okay?  We'll get to the Yukon in a minute.  When you

23   drive in, you're facing west, right?

24         A.     Yes, you're facing west.

25         Q.     Where was you're -- driving in like this.


         TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

157

1    Where was the Mazda parked if the apartment complex or the

2    where the apartment is is on the south side and then there's

3    parking over here to the right?  Where would it be?  To the

4    north?  To the west?  To the east?  Where was --

5            A.    It was -- she parked the Mazda to the east.

6            Q.    Okay.  To the east of the apartment, okay?

7            A.    It would be the -- they were staggered, so, you

8    know, it's just --

9            Q.    Let's do it with the photograph, sir.

10           A.    Oh, geez.  I could tell you a thing on the

11   paper if you want.

12           Q.    That's okay.

13                 (Pause in proceedings.)

14   BY MR. MARTINEZ:

15           Q.    All right, sir.  I have some photographs here.

16           A.    Okay.

17           Q.    Let's take a look at Exhibit 144.  Let me point

18   some of those features out for you, okay?  Right here is the

19   apartment?

20           A.    Where?  I'm sorry.  The building --

21           Q.    Right.  Where apartment 132 would be and

22   apartment 132 would be over here to the left of this

23   diagram.  The way in --

24           A.    No the Yukon was parked over here.

25           Q.    Parked underneath here?

1          A.    Parked in one of these parking spots.

2          Q.    Okay.  Where was the Mazda parked in

3    relationship to the Yukon?

4          A.    When she came, she was parked back over here --

5          Q.    Okay.

6          A.    -- if I remember right.

7          Q.    Where were you parked?

8          A.    I think I just parked right off the side.

9          Q.    Like right in front, right here?

10         A.    No.  It -- no.  All that was -- nobody could go

11   in there.  I was parked back over here.  The driveway's right

12   there.  I think I just parked right there.

13         Q.    All right.

14         A.    You know, right across from the vehicles there.

15         Q.    Okay.  Go ahead have a seat, thank you.

16               So it was a very short distance to go from the

17   Mazda to the Yukon though?

18         A.    Yeah, it was.

19         Q.    And did you ever go into that Yukon, sir, that

20   night?

21         A.    That night?  No, huh-uh.

22         Q.    Did you ever look inside that Yukon that night?

23         A.    No.

24         Q.    Subsequent to that, did you ever look inside

25   that Yukon?

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1        A.    Before that night?

2        Q.    After that night?

3        A.    After that night?

4        Q.    Right.

5        A.    Yeah.  I drove it.

6        Q.    And you had occasion to look in it, right?

7        A.    Well, yeah.  I drove it around.

8        Q.    Okay.  Um --

9        A.    I drove it until the detectives told me they

10  needed to impound it to -- to check for something.

11        Q.    But -- but the point is, sir, you had the --

12  you had the Yukon a lot -- sometime before you actually

13  turned it over to the detectives, right?

14        A.    Oh, definitely.  I drove it a lot.

15        Q.    And with regard to this particular lamp we've

16  been talking about, the one that's in this photograph -- let

17  me show you Exhibit 133, the box.  Remember that?

18        A.    Yes.  Yes, I do.

19        Q.    Okay.  And actually there was a lamp that

20  resembled that to the left of the bed and it -- the stand

21  looked a little bit like that, didn't it?

22        A.    Yeah.

23        Q.    And you actually took photographs of this.  So

24  I guess I'm going to ask you, since we've -- already we know

25  you took photographs of that, there's the jagged edges we've

1   been talking about?

2           A.      Okay.

3           Q.      Whatever happened to that box, sir?

4           A.      I have no idea.  We may have thrown it away

5   when we cleaned out the apartment.

6           Q.      And if there was one lamp to the left and there

7   was a box there, did you find another lamp that looked just

8   like that in the apartment anywhere?

9           A.      I don't remember seeing one like that, no.

10          Q.      There was only one lamp in the apartment that

11  looked like that, right?

12          A.      I don't know.  I don't remember.  I don't even

13  remember seeing one.

14          Q.      You did talk about the incident that happened

15  when Mr. Andriano was holding your daughter down.  Do you

16  remember, that was either Christmas or Christmas Eve?

17          A.      Yes.  That would have been -- yes.

18          Q.      And he wasn't angry when he was doing it. He

19  was playing around with her, wasn't he?

20          A.      No.  When he was holding her down by the neck,

21  he was angry.

22          Q.      So you're saying that he wasn't laughing or

23  anything like that?

24          A.      No.  He wasn't laughing then.

25          Q.      It was for sure Christmas, right?

```
 1          A.    It was one of the holidays.

 2          Q.    So you're not even certain it was Christmas?

 3          A.    Maybe it was Christmas, Christmas Eve.  It was

 4    one of the holidays.

 5          Q.    And Donna Ochoa, your wife, was also present

 6    there, right?

 7          A.    Yes.

 8          Q.    And she saw everything, the same thing you did?

 9          A.    I don't know if she saw everything or not.  I

10    don't -- I don't know.  I haven't discussed it with her.

11          Q.    Right.  But both of you were there in the room

12    with your family and you don't know what she saw?

13          A.    Yes.

14          Q.    Back then there was a dog you guys had?

15          A.    We've had several dogs.

16          Q.    Do you remember ever having a Rottweiler?

17          A.    Oh, Jethro.

18          Q.    Well --

19          A.    Yeah.

20          Q.    Was he one of the -- did he lick her face that

21    day?

22          A.    I imagine so.  He was always doing that.

23          Q.    No, no.  I mean with -- when Mr. Andriano was

24    holding her down, did he, the dog, lick her face?

25          A.    Possibly, yes.
```

```
1          Q.     And is it true that as soon as you told him,
2    hey, whatever, stop roughhousing, he stopped it, didn't he?
3          A.     He did stop.
4          Q.     Mr. Andriano never struck you, did he?
5          A.     No.
6          Q.     In terms of buying things for your daughter,
7    Mr. Andriano did not control your pursestrings, did he?  In
8    other words, he didn't tell you what to do, right?
9          A.     Did he control my pursestrings?
10         Q.     Right.
11         A.     No, he didn't.
12         Q.     And to get back to the point we were making
13   earlier, it was Wendi Andriano who was working back then,
14   right?
15         A.     She was working back then, yes.
16         Q.     He wasn't bringing in very much money, was he?
17         A.     No.  He wasn't bringing very much in.  You're
18   talking about 2000?
19         Q.     Yes.  In fact, he was on welfare, federal
20   welfare, wasn't he?
21         A.     He was getting some kind of -- I don't know
22   what it was.
23         Q.     So were the kids, right?
24         A.     Some kind -- they were getting a little bit.
25         Q.     Would it be fair to say she was the major bread
```

1      winner in the family?

2              A.    That Wendi was?

3              Q.    Yeah.

4              A.    I would say so, yes.

5              Q.    And would it also be fair to say when he was

6      not working, he would be at home with the kids, whether he

7      was sick or whether or not there was a babysitter there, but

8      he was staying home, correct?

9              MR. DELOZIER:  Objection.  Compound question.

10             THE COURT:  Sustained.  Rephrase the question.

11     BY MR. MARTINEZ:

12             Q.    In the year 2000, would it be fair to say he

13     was staying there while she worked?

14             A.    At home?  That he stays at home?

15             Q.    Yeah?

16             A.    Yes.  I'd say most of the time, yes.

17             Q.    And did you ever attend these parties that San

18     Riva had?

19             A.    I attended some functions that Wendi was in

20     charge of doing for the club, for the club members or the

21     residents.

22             Q.    These were the pool things, right?

23             A.    Yeah.  One of the things -- one of the days was

24     for Mother's Day and --

25             Q.    I don't -- my question is were these the pool

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    parties where there were young men and women drinking or is

2    this a different party we're talking --

3            A.    I don't know if there was.  Yeah, probably

4    some.

5            Q.    Was this at the clubhouse or was this at the

6    pool, the parties that you mentioned?

7            A.    Clubhouse, all right there.

8            Q.    It wasn't at the pool area?

9            A.    Yeah.  We have clubhouse and pool area all

10   right there.

11           Q.    Okay.

12           A.    It's together.

13           Q.    You also talked about the chemotherapy.  And

14   one of the things you told us was that, well, there was no

15   change in his demeanor once he started the chemotherapy.  Do

16   you remember telling us that?

17           A.    What do you mean his demeanor?

18           Q.    Well, that's what you said.  There was no

19   change in the way he dealt with things?

20           A.    In the way he dealt with things.

21           Q.    Uh-huh.

22           A.    Rephrase that a little bit.

23           Q.    Defense counsel asked you that question and you

24   said there was really no change in the way he acted after his

25   therapy?

165

1          A.    You're talking about personality.

2          Q.    I'm talking about what you were talking about?

3          A.    I'm not sure what you're talking about.   Are

4     you talking about personality, physically --

5          Q.    No, I'm talking about personality.

6          A.    Personality?   He got moodier.

7          Q.    Right.

8          A.    Seemed like he got more -- he would get

9     depressed easier.   When he lost his temper, he would get

10    angry easier.

11         Q.    But he was in bed, though, when he would lose

12    his temper because that's when he would come back after the

13    chemo and he would be tired?

14         A.    When he was in bed?

15         Q.    No, no, no.   The day after.   We're talking

16    about after the chemotherapy treatments?

17         A.    I never saw him that day -- the day -- that

18    day.   I would never see him, so I can't say if he had gotten

19    angry or said anything or did things on those days when he

20    was there by himself.   I never saw him.   But after when he

21    was out running around and doing, you know, doing what he

22    does, yes, that's when I saw him.

23         Q.    Your wife is not a faster driver than you or is

24    she?

25         A.    My wife?


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1          Q.     Yes.

2          A.     My wife probably -- I probably drive faster

3    than her most of the time.   If it took her -- would have

4    taken me 15 minutes to make it, that might -- it would have

5    taken her a little longer.   I know it didn't take her 15

6    minutes.

7          Q.     Not 15 or 50 minutes?

8          A.     I know it did not take me 50 minutes to get

9    there.   I don't know exactly how long, but it would have

10   taken her probably that long.

11         Q.     We know you didn't call 911 from the house.

12   You already told us that?

13         A.     Right.

14         Q.     We know you didn't call 911 on the street

15   getting to the freeway, and you didn't call 911 when you were

16   on the freeway, did you?

17         A.     No.

18         Q.     And that was because you knew that they weren't

19   needed or in your mind they weren't needed, right?

20         A.     No, that's not why I didn't call.

21         Q.     And while you were on the -- you were going

22   over there because you were going to help Wendi, weren't you?

23         A.     Well, she needed my support --

24         Q.     Right.

25         A.     -- you know, if I had to talk to -- with her,

1    Joe, or what the situation was.

2         Q.   Sir, the question is this.  You were going over

3    there to help, right?

4         A.   Help what?

5         Q.   Well, what were you going to --

6         A.   I'm trying to explain to you what I was going

7    to help with.

8         Q.   I'm not --

9         A.   She needed my support.

10        Q.   Sir --

11        A.   If there was problems with the two, she needed

12   help, yes.

13        Q.   Sir, and you were going to help, right?

14        A.   Yes.

15        Q.   And for the 50 or so minutes you were there

16   when the police weren't there, you were helping, weren't you?

17        A.   I wasn't there when the police weren't there.

18        MR. MARTINEZ:  I don't have anything else.

19        THE WITNESS:  You're saying that on your own and --

20        THE COURT:  Hold on a second.  Mr. DeLozier?

21        MR. DELOZIER:  Thank you, Your Honor.

22

23   REDIRECT EXAMINATION BY MR. DELOZIER:

24        Q.   Let's talk about 2:00.  You wanted to clarify

25   that?

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1          A.     Yes.

2          Q.     What did you want to say?

3          A.     The -- the first call that I received was about

4   2:00 in the morning.  It was a little before, little after, I

5   do not remember.  I remember the detective asking me about

6   it.  I told him I didn't know.  Apparently Wendi had called.

7   I didn't hear the phone.  She got a hold of my cousin.  My

8   cousin came banging on the window at -- after Wendi had tried

9   to reach me.  She couldn't reach me.  That's what that 2:00

10  call was when she couldn't reach me.  She proceeded to call

11  Carmen.  Carmen came banging on the window saying Wendi

12  needed to talk to me, okay?  That's when I started -- I got

13  up.  After I woke up, I got up, tried to call Wendi, no

14  answer.  I tried to call her.  We were trying to reach each

15  other.  She finally -- I don't know if I finally reached her

16  or if she reached me.  She -- we --

17          MR. MARTINEZ:  Objection.  Nonresponsive now.

18          THE COURT:  Ask your next question.

19  BY MR. DELOZIER:

20          Q.     What makes you think it was the 2:00 time

21  frame?

22          A.     Because afterwards we -- the detective asked

23  me, I remember him asking me that morning, what time she

24  called and I said I didn't know.  And I remember asking Donna

25  about it and she didn't know, and I looked on the caller ID.

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    That's how we know she called the first time about 2:00 in

2    the morning.  So there was a space there from the time she

3    called to the time Carmen got to the house and woke me up and

4    I called Wendi.

5              Q.    I'm sorry.  Let me -- let me clarify.  So

6    you're reviewing on the caller ID?

7              A.    Yes.

8              Q.    Now, was there a subsequent call also on the --

9    that was recorded there?

10             A.    There was a bunch of calls that night.

11             Q.    Okay.

12             A.    But I -- all I --

13             Q.    Now, did you --

14             A.    That stuck in my mind because that's what the

15   detective asked me.

16             Q.    I understand.

17             A.    And that's --

18             Q.    Did you look at your watch when you got up?

19             A.    No.

20             Q.    Carmen woke you up?

21             A.    No.

22             Q.    No?

23             A.    No I don't wear a -- no.

24             Q.    Did you have a clock in your car that told you

25   what time it was?

1        A.      We do, but I didn't pay attention.

2        Q.      So when you got in your vehicle, you didn't

3   notice what time it was either?

4        A.      No.

5        Q.      Okay.  You heard Mr. Martinez say that the

6   paramedics didn't get there until around 3:40?

7        A.      Yes, I heard him say that.

8        Q.      Okay.  So are you saying then that it may have

9   been later when Carmen woke you up?

10       MR. MARTINEZ:  Objection leading.

11       THE WITNESS:  What it was --

12       THE COURT:  Hold on a second.  What was the question

13   again?  Repeat the question.

14       MR. DELOZIER:  I will.  Thank you, Your Honor.

15   BY MR. DELOZIER:

16       Q.      You don't know what time Carmen woke you up

17   then, do you?

18       A.      I have no idea what time she woke me up.

19       Q.      There were lots of calls from Wendi on the

20   caller ID?

21       A.      Yes, because we were trying to reach each

22   other.  She called numerous.  From what I understand --

23       THE COURT:  Hold on a second.  Ask your next

24   question.

25   / / / / /

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

```
 1    BY MR. DELOZIER:

 2            Q.    Numerous calls?

 3            A.    Yes.

 4            Q.    All that morning?

 5            A.    And we -- I finally connected with her and I

 6    told her to call the police.

 7            MR. MARTINEZ:  Objection.  Hearsay.

 8            THE COURT:  Sustained.  Ask your next question.

 9    BY MR. DELOZIER:

10            Q.    There -- speaking of talking to the police, do

11    you remember telling the detective --

12            MR. MARTINEZ:  Objection.  Improper impeachment.

13            THE COURT:  I'll sustain the objection.

14            MR. DELOZIER:  Can we approach?

15            THE COURT:  Yes.

16

17                 (The following proceedings were held at the

18    bench:)

19

20            MR. DELOZIER:  He elicited from him something about

21    slapping.  He told the detective he witnessed slapping, okay?

22            THE COURT:  Is that what --

23            MR. DELOZIER:  That's what it says.

24            THE COURT:  Mr. Martinez?

25            MR. MARTINEZ:  He can ask him did you tell the
```

1   detective there was slapping.  I will say that I reviewed the

2   tape and that is wrong, so I'll -- that's fine --

3            MR. DELOZIER:  It's right here.

4            MR. MARTINEZ:  -- I'm not going to argue about it,

5   but the point is he's leading him and the question should be

6   did you tell the detective anything else about slapping, can

7   he explain that.

8            THE COURT:  Are you saying it's in the police report

9   but not on the video?

10           MR. DELOZIER:  I don't know.  I haven't seen the

11  video recently.

12           THE COURT:  Okay.  I'll let you ask the question.

13  Just basically come out and ask him what he stated to the

14  police officer on that date.

15

16                (The following proceedings were held in open

17  court:)

18

19           THE COURT:  Mr. DeLozier, restate the question.

20           MR. DELOZIER:  Thank you, Your Honor.

21  BY MR. DELOZIER:

22           Q.   You remember you were being interviewed by

23  Detective Lucero, don't you?

24           A.   Yes, sir.

25           Q.   That was on --

1          A.     That was on Sunday morning on the 8th.

2          Q.     Okay.  Actually, the report date says 11-07.

3          MR. MARTINEZ:  Judge, I'm going to object.

4          THE COURT:  Hold on a second.  Let me see Counsel

5     here at the bench.

6

7                 (The following proceedings were held at the

8     bench:)

9

10         THE COURT:  Are we talking about October 8, 2000, or

11    when are we talking about?  Why don't -- look.  Why don't we

12    take our evening recess and figure it out.

13         MR. DELOZIER:  It's right here.  Report date was --

14    was what confused me, 10-08.

15         THE COURT:  Okay.  I just wanted to clear that up.

16

17                (The following proceedings were held in open

18    court:)

19

20         THE COURT:  Mr. DeLozier, continue on.

21         MR. DELOZIER:  Thank you.

22    BY MR. DELOZIER:

23         Q.     You remember talking to Detective Lucero on

24    October 8, year 2000, don't you?

25         A.     Yes.

1        Q.    And do you remember telling him that you had

2    witnessed --

3            MR. MARTINEZ:  Objection.  Leading.

4            THE COURT:  Overruled.  Go ahead and answer -- or go

5    ahead and ask the question.

6    BY MR. DELOZIER:

7        Q.    Do you remember telling him that you had

8    witnessed Joe slapping Wendi in the past?

9        A.    I -- that I had seen Joe slap Wendi?  Yes.

10       Q.    Okay.  Now, on these photos, when did you take

11   them?  Do you remember?  Photos of the bed, the chest of

12   drawers.  When do you do that?

13       A.    September.  I don't remember when.

14       Q.    Okay.  You didn't make them the night of --

15   morning of October 8 though?

16       A.    No.  No, I didn't.

17       Q.    Okay.  You made them sometime before your

18   vacation?

19       A.    Yes.

20           MR. MARTINEZ:  Objection.  Leading.

21           THE COURT:  Don't lead.

22   BY MR. DELOZIER:

23       Q.    Did you make them sometime before your

24   vacation?

25       A.    Yes.

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

```
 1              MR. MARTINEZ:  Objection.  Leading.
 2              THE COURT:  Overruled.
 3   BY MR. DELOZIER:
 4        Q.    Now, you were -- mentioned sleep deprivation.
 5   How much sleep did you get Friday night?
 6              THE COURT:  Why don't you state more specifically
 7   what Friday night you are talking about.
 8              MR. DELOZIER:  Sorry, Friday night, October 6th.
 9              THE WITNESS:  October 6?  About two hours.  Before
10   that I had only slept two or three hours in the LA airport
11   because the bed was the most uncomfortable thing I ever tried
12   to sleep on, so for two days I hadn't had much sleep at all.
13   BY MR. DELOZIER:
14        Q.    How about the night of October 7, October 8?
15        A.    Maybe two hours.  I went to bed around
16   midnight, then I was woken up by my cousin.
17        Q.    Okay.  So when you were interviewed by
18   Detective Lucero that morning --
19        A.    I don't remember -- I could not remember much
20   of anything.
21        Q.    Okay.
22        A.    I was at the police station falling asleep.
23              MR. MARTINEZ:  Objection.  Nonresponsive.
24              THE COURT:  Sustained.  Answer the question that's
25   asked.
```

```
 1            THE WITNESS:  Yes, sir.
 2   BY MR. DELOZIER:
 3       Q.    You were talking about the days of chemo and
 4   Joe those days, weren't you?
 5       A.    After the days of the chemo?
 6       Q.    After he started the chemo, was he still doing
 7   windshields?
 8       A.    Not that day of the chemo, no.  And I don't
 9   think the following day, but he did work after that.  Still
10   had strength to do that.
11       Q.    Still racing boats?
12       A.    Still went to the lake.
13       Q.    Still carrying the 55 gallon drums?
14       A.    Yes.  Last time I saw him, he had three in the
15   boat, going to the lake.
16       Q.    You mentioned that you put items in the Mazda
17   trunk.  Are you sure about that?
18       A.    When I went on vacation?
19       Q.    (No audible response.)
20       A.    Suitcase.
21       Q.    Okay.  Was there some problem with the trunk?
22       MR. MARTINEZ:  Objection.  Leading.
23       THE COURT:  Sustained.
24       THE WITNESS:  Sometimes it didn't go -- sometimes it
25   didn't close.
```

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

```
1           THE COURT:  Hold on a second.  Ask your next

2    question.

3    BY MR. DELOZIER:

4           Q.    You testified that you -- Joe had never struck

5    you, but earlier testified he came after you once, right?

6           A.    Came after me once and Wendi jumped between us.

7           Q.    Okay.  Now, the State seemed to imply that Joe

8    was at home all the time in the bed.  Is that correct?

9           A.    No.  Just during that first day of chemo he

10   would be in bed, and I believe the following day he would be

11   real weak, so he would just sit at home.  But, no, he wasn't

12   home in bed all the time.

13          MR. DELOZIER:  Just one second, Your Honor.

14               (Pause in proceedings.)

15          MR. DELOZIER:  Nothing further.  Thank you, Your

16   Honor.

17          THE COURT:  Any further questions of this witness by

18   the jury?  If so, please raise your hand.

19

20               (The following proceedings were held at the

21   bench.)

22

23          THE COURT:  Question, "Did you actually witness Joe

24   picking up and carrying 50 or 55 gallon drums?"

25          MR. MARTINEZ:  No objection.
```

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1        MR. PATTERSON:  Yeah, that's a fair question.

2        MR. DELOZIER:  That's fine.  It -- it's been asked

3   and answered, but you know.

4        THE COURT:  Next question, "Why didn't you wait for

5   Donna to go with you to the apartment on October 8?"

6        MR. MARTINEZ:  No objection.

7        THE COURT:  Mr. DeLozier?

8        MR. DELOZIER:  No objection.

9        THE COURT:  Next question, "Did Joe or Wendi explain

10   the damage to the furniture?"

11        MR. MARTINEZ:  Hearsay.

12        THE COURT:  Mr. DeLozier?

13        MR. DELOZIER:  Yeah, hearsay.

14        THE COURT:  Next question, "What was the last time

15   you saw Joe going to the lake --"

16        MR. MARTINEZ:  With the boats.

17        MR. DELOZIER:  With the --

18        THE COURT:  -- with the boats?"

19        MR. MARTINEZ:  No objection.

20        MR. DELOZIER:  That's fine.

21        THE COURT:  Next question, "What was your reply to

22   Wendi when she asked for money to leave Joe?"

23        MR. MARTINEZ:  I would object on the grounds of

24   hearsay to all that.

25        MR. DELOZIER:  It's her asking what did he say.


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    THE COURT:  Yeah.  It would still be hearsay.  I'm

2   not going to ask it.

3        Next question, "Was the Christian school that

4   Wendi attended a certified school by the state of Arizona?"

5        MR. MARTINEZ:  No objection.

6        MR. DELOZIER:  No.

7        THE COURT:  Wait.  Hold on a second.

8        Next question, "Only if you know, on your home

9   caller ID when a duplicate call comes in, does it only show

10   the last time came in rather than all the calls from the same

11   number?"

12       MR. MARTINEZ:  No objection.

13       MR. DELOZIER:  If he knows.

14       THE COURT:  Any objection?

15       MR. PATTERSON:  I don't think he knows.

16       THE COURT:  No objection?

17       MR. DELOZIER:  No objection.

18       THE COURT:  How far did person -- hold on a second.

19   Okay.  "How far did person who woke you up live from your

20   house?"

21       MR. MARTINEZ:  No objection.

22       MR. PATTERSON:  Yeah, that's fine.

23       THE COURT:  Okay.

24

25        (The following proceedings were held in open

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

```
1    court:)

2

3            THE COURT:  Sir, I have some additional questions

4    here for you.

5            THE WITNESS:  Okay.

6            THE COURT:  The first question reads as follows.

7    "Did you actually witness Joe picking up and carrying 50 or

8    55 gallon cans of fuel?"

9            THE WITNESS:  Yes.

10           THE COURT:  Next question reads as follows.  "Why

11   didn't you wait for Donna to go with you to the apartment on

12   October 8?"

13           THE WITNESS:  The way Wendi was in --

14           THE COURT:  Hold on a second.  Don't tell me what

15   anyone said or anything.  Just tell me why you didn't wait.

16           THE WITNESS:  The way Wendi was -- was in hysterics

17   over the phone, I felt it was important to get over there to

18   see what the argument was about.

19           THE COURT:  Okay.  Next question read as follows.

20   "When was the last time you saw Joe going to the lake with

21   the boats?"

22           THE WITNESS:  That would have been -- it was

23   September.  I want to say late September, early October.

24           THE COURT:  What year?

25           THE WITNESS:  2000.  I can't remember the exact date.
```

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1          THE COURT:  Next question reads as follows.  "Was the
2     christian school Wendi attained a certified school by the
3     State of Arizona?"  If you know.
4          THE WITNESS:  Certified?  No.  We don't -- we don't
5     get funds from the State.
6          THE COURT:  Next question reads as follows.  "If you
7     know, on your home caller ID when a duplicate call comes in,
8     does it only show the last time the call came in rather than
9     all the calls from the same number?"  If you know.
10         THE WITNESS:  It will -- it would show all the calls
11    and have them numbered in the order they came.  Each call has
12    its own time.
13         THE COURT:  Next question reads as follows.  "How far
14    did the person who woke you up live from your house?"
15         THE WITNESS:  About a mile, mile and a half.
16    Somewhere around there.
17         THE COURT:  Okay.  Any further questions of this
18    witness by the jury?
19              (No audible response.)
20         THE COURT:  No one has raised their hand.
21              Mr. Martinez, did you have any follow-up
22    questions to those specific jury questions that were asked?
23         MR. MARTINEZ:  Yes.
24     / / / / /
25     / / / / /


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    FOLLOW-UP QUESTIONS BY MR. MARTINEZ:

2        Q.    You told us that you saw Mr. Andriano lift a 55

3    gallon can of fuel, drum of fuel, right?

4        A.    Well, I mean, not just pick it up and throw it

5    like that, but, yeah, he moved them around.

6        Q.    You're familiar with what a gallon of milk is,

7    aren't you?

8        A.    Yes.

9        Q.    So you're saying that he was able to just up

10   and lift 55 gallons just like that?

11       A.    No.  That's what I just -- he didn't pick them

12   up.  I don't know how he got them up there, but he moved them

13   around when he would go to the lake.

14       Q.    What you're saying --

15       A.    When he had --

16       Q.    Sir, let me ask the --

17       A.    Sure.

18       Q.    Are you saying he slid them?  Is that what

19   you're saying?  Or did he lift them from the back of the

20   truck all the way into the boat, walking with them?

21       A.    He didn't carry them, if that's what you're

22   saying.

23       Q.    He just pushed them around or what?

24       A.    Yeah.  Normally when you move those containers

25   like that, what you do is rotate them and then lean them up

1    against stuff and hoist them up.

2            Q.    So it wasn't like he was --

3            A.    I -- I can still do that even though I'm an old

4    man.

5            Q.    It doesn't take much strength to do that?

6            A.    Well, it takes some strength to --

7            Q.    You just said an old man --

8            A.    Yeah.  I said even I could do that.  I'm an old

9    man and I could still do that.

10           MR. MARTINEZ:  I don't have any other questions.

11           THE COURT:  Mr. DeLozier?

12

13   FOLLOW-UP QUESTIONS BY MR. DELOZIER:

14           Q.    I want to clarify your answer on the school.

15   It was accredited?

16           A.    Yes, it's -- it's Accelerated Christian

17   Education is what it is.

18           Q.    But the State of Arizona recognizes that a

19   person who graduates from there is a graduate of a high

20   school, right?

21           A.    Oh, yes.  Yes, yes.

22           MR. DELOZIER:  Thank you.

23           THE COURT:  May the witness be excused?

24           MR. MARTINEZ:  No, sir.

25           THE COURT:  You're not excused.


         TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1          THE WITNESS:  Just sit here overnight?

2          THE COURT:  No.  You're not excused as a witness.

3          THE WITNESS:  Do I come here tomorrow?

4          THE COURT:  Speak to Mr. DeLozier.

5              We'll go ahead and take our evening recess at

6    this time.  Ladies and gentlemen, remember -- during the

7    recess remember the entire admonition I gave you including

8    the fact you're not to do any research, investigation

9    experimentation or testing on your own, avoid any media

10   coverage of this case.  Keep an open mind.  I want you to

11   have a nice evening.  We'll see you tomorrow at 1:00 p.m.

12   Have a nice recess.

13

14              (Evening recess.)

15

16

17

18

19

20

21

22

23

24

25

1

2

3                          CERTIFICATE OF REPORTER

4

5     STATE OF ARIZONA        )
                              )
6     COUNTY OF MARICOPA      )

7

8                    I, Traci L. Wheeler, CSR, RPR, an official

9     and certified reporter in the Superior Court of the State

10    of Arizona, in and for the County of Maricopa, hereby certify

11    that I made a shorthand record of the proceedings had in the

12    within case, and that the foregoing transcript is a full,

13    true, and correct transcription of the proceedings in this

14    case.

15                    Dated this 12th day of May, 2005.

16

17

18                                _____
                                  Traci L. Wheeler, CSR, RPR
19                                Certified Court Reporter No. 50313
                                  Official Court Reporter
20

21

22

23

24

25


              TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

EXHIBIT NN

000007158

DP

05-0002
Braccio



1       IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

2          IN AND FOR THE COUNTY OF MARICOPA

3

4   STATE OF ARIZONA,                    )

5          Plaintiff,                    )
                                         )
6   v.                                   )     No. 1 CA-CR 04-0731
                                         )     MARICOPA COUNTY
7   WENDI ELIZABETH ANDRIANO,            )     No. CR 2000-096032
                                         )
8          Defendant.                    )
    _____ )

9

10

11

12                          Mesa, Arizona
                            October 7, 2004
13

14

15

16          BEFORE:  The Honorable BRIAN K. ISHIKAWA

17

18          REPORTER'S TRANSCRIPT OF PROCEEDINGS

19                       TRIAL DAY 25

20

21

22

23

24   ORIGINAL Prepared for APPEAL by:
     TRACI L. WHEELER, CSR, RPR
25   Certified Court Reporter No. 50313


        TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

2

1                          A P P E A R A N C E S

2    FOR THE STATE:        JUAN M. MARTINEZ,
                           Deputy County Attorney
3
     FOR THE DEFENDANT:    DANIEL B. PATTERSON,
4                          Deputy Public Defender
                                      and
5                          G. DAVID DELOZIER,
                           Attorney at Law
6

7              I N D E X   O F   E X A M I N A T I O N

8    WITNESS                                              PAGE

9    MURPHY, SHARON, Called to testify by the Defense
             Questions by the Court                       11
10           Questions by Mr. Patterson                   13
             Direct Examination by Mr. Patterson          25
11           Continued Direct Examination by Mr. Patterson  58
             Continued Direct Examination by Mr. Patterson  78
12

13

14

15

16

17

18

19

20

21

22

23

24

25

            TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

3

1          MESA, ARIZONA, THURSDAY, OCTOBER 7, 2004

2

3          THE COURT:  This is cause number CR 2000-096032,

4     State of Arizona versus Wendi Elizabeth Andriano.  The record

5     will reflect the presence of Defendant and Counsel.  We're

6     outside the presence of the jury.

7                    There were some matters Counsel wished to bring

8     up.  Mr. Martinez?

9          MR. MARTINEZ:  That's correct.  First, I informed the

10    Court, as I was walking to court today --

11         THE COURT:  And let me just make sure we're clear on

12    the record.  We had an informal meeting in chambers and

13    Counsel indicated to the Court they wanted to bring up issues

14    on the record.

15         MR. PATTERSON:  Which I waived my client's presence.

16         THE COURT:  Right.  Go ahead.

17         MR. MARTINEZ:  When I was coming to court this

18    morning, I was on the second floor stairs at the elevator and

19    it opened up and three female jurors were there.  They're in

20    the upper row towards the left.  I just don't remember which

21    ones they are.  And I stood there and the elevator door

22    opened and one of them indicated, I don't know which one it

23    was, "come on in" or "come in," words to that effect.  So I

24    did get in and one of them -- again, I don't know which

25    one -- said what happened to your arm, something like that.

1    And I said I broke my elbow.  And that was the extent of that

2    conversation.

3                The other issues that I presented for the

4    Court's consideration today are the following:  They involve

5    the testimony of Sharon Murphy.  Specifically, I requested a

6    little bit more direction with regard to the Court's ruling.

7    It was my understanding that anything that happened that

8    night or anything that has to do with the defendant's thought

9    process involving the actual murder itself were precluded

10   pursuant to State versus Christiansen.  Specifically, it was

11   my concern that Dr. Murphy might again render an opinion

12   based on some of the statements the defendant may have made

13   regarding Mr. Andriano being suicidal.  I know that that's

14   sort of been out there, but my concern is that we have a

15   situation where the defendant, through opening statement, has

16   indicated, well, he was suicidal and this is what we did.  We

17   actually opened the Elderberry caplets and replaced it.

18        MR. PATTERSON:  I hate to interrupt your

19   presentation, but is it okay the witness is here or should

20   she be outside?

21        THE COURT:  Mr. Martinez, do you have any objection?

22        MR. MARTINEZ:  It's probably a good idea she sit out

23   outside.

24        THE COURT:  I'll have her outside.

25        MR. PATTERSON:  I apologize.  I didn't even think

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1          about that.

2                    THE COURT:  Okay.

3                    MR. PATTERSON:  Thank you, Judge.

4                    (Dr. Sharon Murphy exits the courtroom.)

5          MR. MARTINEZ:  There was a presentation involving

6     the -- by the defense counsel during opening statement about

7     the two parties, the husband and wife, opening the Elderberry

8     caplets and replacing them with sodium azide because it was

9     their position that Mr. Andriano wanted to commit suicide.

10    So the point is that State versus Christiansen is pretty

11    clear, anything that has to do with that negates or speaks to

12    or somehow enhances or the -- or talks about the mens rea of

13    the defendant at the time of whatever the crime is, in this

14    case the murder, is not appropriate subject matter for an

15    expert to give an opinion on.

16                   So I'm asking the Court to direct Ms. Murphy

17    not to bring up anything to do with the night of the murder,

18    not to bring up anything with regard to this issue about

19    suicide.  Because as the Court knows, with first degree

20    murder we're talking about premeditation, which requires some

21    thought preceding the actual killing.  It doesn't say it has

22    to be one day, one hour, or one second.  It says just a

23    thought process preceding the murder.  In this case, the fact

24    that she may have been assisting him in suicide is part of

25    that thought process.

1           As I said before, assisted suicide is not a
2      lesser included defense of first degree murder, and so we
3      have a situation where maybe she was, maybe he did say to
4      her, you know, help me kill myself, and maybe she did.  But
5      it's on a continuum, so any mention of that I think would be
6      inappropriate pursuant to State versus Christiansen.
7           Additionally, we have in the report it
8      indicates that Shawn King was the individual who helped the
9      defendant procure the sodium azide or may have given her
10     information regarding the sodium azide.  Anything having to
11     do with a meeting involving Shawn King I think is irrelevant
12     for the purposes of determining whether or not she is the
13     victim of domestic violence.  Similarly, anything having to
14     do with picking up the sodium azide, which she alleged,
15     according to the opening statement, went with her husband to
16     pick it up and also, I believe, in the report by Ms. Murphy,
17     is irrelevant to these proceedings.  And, again, for the
18     previous reasons I've mentioned, whether or not he wants to
19     commit suicide is not subject for her to opine on.
20          The other thing that I indicated to the Court
21     was that there's also this issue about life insurance.  I did
22     not intend to get into that with her because I believe for
23     the same reasons as before, that's irrelevant and that also
24     goes to premeditation.
25          THE COURT:  Did you say the life insurance?


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1          MR. MARTINEZ:  Life insurance, yes, sir.

2          THE COURT:  Okay.

3          MR. MARTINEZ:  Then the last point I made, we have

4    not been provided any notes she may have been relying on.

5    Additionally, there's a psychiatric evaluation and some sort

6    of assessment.  I can't think of the name of the two

7    individuals.

8          THE COURT:  This went to the Court's previous ruling

9    with Dr. R. Rosengard and --

10         MR. MARTINEZ:  And any notes she used to prepare for

11   her report.  Since we didn't have just calls, she cannot rely

12   upon them when she gives testimony.  That's what I had to

13   present.

14         THE COURT:  Mr. Patterson.

15         MR. PATTERSON:  Well, let me start with the topic of

16   suicide.  It's, I submit, the State kind of mixing up issues

17   here.  If you recall Dr. Keen's testimony, the cause of death

18   in this case is not suicide.  So that as an issue is

19   certainly not something that is relevant to the cause of

20   death in this particular case.  The suicide issue is relevant

21   and I've spoken with Dr. Murphy about it.  It is consistent,

22   controlling behavior that the decedent manifested towards his

23   wife throughout their relationship, both from the dating

24   phase through the actual married phase.  It is consistent

25   with his practices of making decisions jointly for the couple

1    and then directing her or compelling her to perform his

2    bidding.  And it is -- she's going to discuss any number of

3    categories of conduct where that's the consistent theme.

4              It becomes even more relevant in our particular

5    case because of the -- my suspicion that the general

6    resistance of the public, or in this case the jury, of the

7    notion that a woman would help her husband kill himself.

8    That's the kind of thing that doesn't generally happen in our

9    community.  But it does happen and Dr. Murphy will tell you

10   it's not inconsistent with the behaviors of battered and

11   abused spouses.  They are completely controlled by their

12   husbands.  They completely do their bidding.  And at the end

13   of this relationship, she is the quintessential battered

14   woman.

15             To that end, the topic of suicide needs to be

16   discussed and I will advise the Court, if you want, to talk

17   with her directly about what about that behavior in September

18   and October of 2000 is consistent with the abusive behavior

19   that was visited upon Ms. Andriano throughout their dating

20   relationship and throughout their married relationship.

21             I will concede certain points that Mr. Martinez

22   raises.  The actual particulars as to why or how she went

23   about picking it up at a certain place or with the assistance

24   of Mr. King, that's probably not relevant at least through

25   this expert.  It's certainly going to be discussed should the

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    client take the stand.  But with -- I don't believe that is

2    an essential basis upon which Dr. Murphy bases her opinion.

3              With regard to the other items that

4    Mr. Martinez has some concern with, I will direct her not to

5    bring to the stand the notes of Ms. Rohde, the report of Dr.

6    Rosengard, nor any handwritten notes that she generated

7    during the course of her evaluation here, because she advised

8    me, and I avow to the Court, that she thereafter incorporated

9    all those notes into her final work product such that she

10   will have with her the report I've disclosed to Mr. Martinez

11   previously.  I think that covers the life insurance issue.

12   Again, I think I could go into that but because she didn't

13   specifically discuss that in the course of her report.  I

14   will back off on discussing that, but, again, that too is

15   consistent with the controlling behavior and will be

16   explained more thoroughly by my client should she take the

17   stand.

18             THE COURT:  Let me make sure I understand.  You're

19   agreeable then Dr. Murphy cannot get into what might have

20   been discussed between defendant and Dr. Murphy about that

21   night in the events of October 7, October 8?

22             MR. PATTERSON:  Correct.  Because I think that's what

23   Mott and Christiansen is all about.  The issue in this case

24   is did she behave reasonably?  Was she involved in doing what

25   she did?  That's true it's not an area the expert can opine

1    on.

2              THE COURT:   You're agreeable with regard to the issue

3    of life insurance?

4              MR. PATTERSON:   Not because I don't believe it's

5    relevant.

6              THE COURT:   Right.

7              MR. PATTERSON:   Because it's relevant to suicide.   It

8    was not discussed in her report, so therefore I think there's

9    a Rule 15 there.

10             THE COURT:   Right.   And what did you say about the

11   Shawn King issue and poison?

12             MR. PATTERSON:   The particulars of accessing the

13   poison did not serve as the basis of Dr. Murphy's opinion as

14   far as I could tell, so I agree I won't elicit through her

15   those particulars.   But the fact that it was the decedent's

16   plan and decedent's direction, that certainly is germane.

17             THE COURT:   Why don't we bring in Dr. Murphy.   I want

18   to ask her some questions with regard to this issue of

19   suicide.

20                  (Pause in proceedings.)

21             MR. PATTERSON:   Would you have the witness sworn,

22   Your Honor?

23             THE COURT:   Yes.   Please step forward.   Please give

24   your name to the clerk and she will swear you in.   Right up

25   here.   Why don't you come on up here.   Please give the clerk

1      your name.

2

3                          SHARON MURPHY,

4          CALLED TO TESTIFY ON BEHALF OF THE DEFENDANT,

5        HAVING FIRST BEEN DULY SWORN, TESTIFIES AS FOLLOWS:

6

7              THE COURT:  Go ahead.  Please take the witness

8      stand.  Oops.  You okay?

9              THE WITNESS:  Yeah.

10             THE COURT:  You are Sharon B. Murphy?

11             THE WITNESS:  Yes.

12             THE COURT:  And you have a PhD, correct?

13             THE WITNESS:  Correct.

14             THE COURT:  I'll refer to you as Dr. Murphy.

15                  Dr. Murphy, in your report on page 16, you make

16     reference to -- well, it's second to last paragraph on page

17     16.  You make reference to during early Fall of 2000 Joe

18     began talking about wanting to end it all.  Wendi reports he

19     talked about suicide a lot and wanted her to get to the

20     internet to find a way to purchase cyanide.  Just from my

21     review of your report, that appeared to be the only area in

22     your report that there was any mention of any suicide.  Am I

23     correct or am I incorrect?

24             THE WITNESS:  About his thinking about suicide?

25             THE COURT:  Right.  And Counsel can correct me

1    whether my review of that report is incorrect.

2         THE WITNESS:  Well, that is certainly the beginning

3    of it.  I think the report goes on and there's some more

4    detail about the suicide.

5         THE COURT:  About the events of October 7 and 8.

6         THE WITNESS:  Right.

7         THE COURT:  That portion where you indicated that he

8    began talking about wanting to end it all, did that in any

9    way form the basis of any of the opinions that you'll be

10   giving here in court today?

11        THE WITNESS:  Let me answer the question this way and

12   tell me if I'm answering what you're asking me for.  That

13   information as I reported it fits in with the report fits in

14   with the findings.

15        THE COURT:  In what way?

16        THE WITNESS:  The way it played out.  It -- it

17   appears to me that it was a piece of the control that Wendi

18   reported Joe exhibiting throughout their relationship, so it

19   was just one more example.

20        THE COURT:  Did that information form the basis of

21   your opinion?

22        THE WITNESS:  The issue of control?

23        THE COURT:  Any of your opinions you'll be expressing

24   here today.  Did that opinion form the basis for the basis of

25   any opinions you'll be expressing here today?

1            THE WITNESS:  The basis of my opinion is based on the

2       dynamics of domestic violence, which is the control or is

3       rather a major component.  So, for me, that was one more

4       example.

5            THE COURT:  So it was or was not a basis one of the

6       bases of your opinions that you'll be expressing here today?

7            THE WITNESS:  The control is the basis of my opinion.

8            THE COURT:  No, but that specific information.

9            THE WITNESS:  I guess I'm struggling with what

10      exactly that means.

11           THE COURT:  Well, I assume you'll be giving some

12      opinions here in court --

13           THE WITNESS:  Right.

14           THE COURT:  -- based upon things you have reviewed

15      and what you've done --

16           THE WITNESS:  Right.

17           THE COURT:  -- and reports and whatnot.  And I assume

18      that Mr. Patterson will be asking you if you have any

19      opinions in this case, and he'll be asking you what those

20      opinions are and you'll be stating those opinions.

21           THE WITNESS:  Correct.

22           THE COURT:  My question for you is this specific

23      information about Mr. Andriano perhaps talking about wanting

24      to end it all, that information in any way, form one of the

25      bases of your -- any of the opinions that you'll be giving


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    here today?

2           THE WITNESS:  I don't think it forms the basis.  I

3    think the basis is my understanding of the relationship and

4    how that relates to domestic violence.  Control is the major

5    issue in the violence, and this, I saw, was an example of

6    that control.

7           THE COURT:  Mr. Martinez and Mr. Patterson, do you

8    have any questions?

9           MR. MARTINEZ:  I do not.

10          THE COURT:  Mr. Patterson?

11          MR. PATTERSON:  That's certainly something that you

12   integrated into your ultimate opinion in this case?

13          THE WITNESS:  Yes.

14          MR. PATTERSON:  Okay.  That's all I have, Judge.

15          THE COURT:  So it was part of a bases.

16          THE WITNESS:  It's a part, yes.

17          THE COURT:  Okay.  You may step down.  Thank you.

18          MR. MARTINEZ:  Judge, I do have some comments to

19   make.

20          THE COURT:  Let me hear from Mr. Martinez.

21          MR. MARTINEZ:  When she steps outside.

22                 (Witness exits the courtroom.)

23          MR. MARTINEZ:  Judge, she did indicate it formed

24   part of the basis -- it did not form the basis of her

25   opinion, she did say that, and then she fleshed it out a

1    little bit.  But one of the things that's not subject tin

2    interpretation is on page 16 was that in the Fall, early Fall

3    2000, is when this conversation took place.  We can't ignore

4    the fact that in July and in May is when she was attempting

5    to go on the internet to get these items.  So it couldn't be,

6    the point I'm trying to make, is then we start talking to her

7    about well, the mens rea, when was she thinking about killing

8    him, which falls under State versus Christiansen, if we allow

9    her to opine in the Fall of the year 2000, that's when she

10   asked her, that's when I say do you know about a meeting in

11   May of 2000 with Shawn King in which she requested she find

12   the poison, and then I could push around and ask did you know

13   she opened an account in July, which is not early Fall,

14   asking for the poison.  And, again, we are now allowing her

15   to get into an area that Christiansen says you cannot, which

16   is the premeditation.  And so I am asking that -- that that

17   be an area that be left out.  According to her, it didn't

18   form the basis of the opinion.  Of course, it's an example,

19   according to her, of control, but it did not form the basis

20   of the opinion.  So for that reason, I don't think it's

21   proper.

22          THE COURT:  Anything further from Mr. --

23          MR. PATTERSON:  Yeah.

24          THE COURT:  -- Patterson?

25          MR. PATTERSON:  I heard something completely

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    different from this woman, that it was -- see, fundamentally

2    domestic violence is not about violence.  It's about control.

3    It's about getting people to do your bidding using a myriad

4    of techniques.  What this doctor testified is that this is

5    one further example that is consistent with the other

6    examples that leads her to believe that there is control in

7    this relationship, and therefore it, under the definitions

8    accepted in her discipline, is domestic violence.

9         THE COURT:  Okay.  Let me just take a short recess.

10   I just want to double check something in the Christiansen

11   case and then I'll make a ruling, okay?  We'll take a short

12   recess.

13

14        (Recess.)

15

16        THE COURT:  This is cause number CR 2000-096032,

17   State of Arizona versus Wendi Elizabeth Andriano.  The record

18   will reflect the presence of the Defendant and Counsel.

19   We're outside the presence of the jury.

20        Counsel, my ruling is as follows.  With regard

21   to Dr. Sharon Murphy, testimony may not be elicited regarding

22   the following:  The Defendant's thought process or the events

23   of October 2nd -- October 8 relating to the alleged offense;

24   the issue of Shawn King in obtaining poison; the issue of

25   life insurance; and any reference to Dr. R. Rosengard and H.

1    Rohde, R-o-h-d-e.  I am going to allow testimony that, if

2    elicited by the defense that Mr. Andriano allegedly talked

3    about wanting to end it all in early Fall of 2000 as set

4    forth in the report by Dr. Murphy, but not specifically the

5    October 7 or 8 allegation, okay?  If there are any

6    allegations with regard to that.  However, pursuant to Rule

7    105, Arizona Rules of Evidence, the State may request from

8    the Court an instruction that this information is not

9    admitted as substantive evidence, but only for the purpose of

10   showing the bases for the opinion.

11          Any questions with regard to the Court's

12   ruling?

13       MR. MARTINEZ:  I would like leave to the Court to

14   then inquire specifically about that issue involving the Fall

15   of 2000.  We have documentation in the court in the form of

16   the opening of an email account with usa.net which indicates

17   that it was in July of the year 2000 that this account was

18   opened whereby the poison was ordered.

19          Additionally, prior to that, according to Mr.

20   King when I spoke to him, he indicated that it was actually

21   in the spring that she talked to him about obtaining the

22   poison.  I would like leave to ask those about those two

23   areas since we're now, I believe, opening the door to that

24   type of inquiry.

25       THE COURT:  Mr. Patterson?

1      MR. PATTERSON: Well, if that's the case, then I"m

2   going to open that door wide open and we'll talk about a

3   whole lot of other things that I don't think need to be

4   talked about, and I'm concerned about the limiting

5   instruction.

6      THE COURT:  I'm just saying I'll entertain a limiting

7   instruction if the State requests that.  And Counsel -- go

8   ahead.  I'll let you finish.

9      MR. PATTERSON:  I think it's commentary from the

10  Court and I'd like to research it a little more thoroughly,

11  because we've all used experts in our trials in our history,

12  and this is the first time I've ever had a judge suggest that

13  the opinion of the expert can be limited in some fashion, and

14  I just think it's commentary uncalled for in this

15  circumstance.

16     MR. MARTINEZ:  Judge, if I may, if we don't give an

17  instruction of that sort, what we're doing is having her

18  vouch for what happened on October 7 and October 8 by her

19  saying she was a victim of domestic violence.  When she gets

20  up there, she's obviously going to not say it, but the

21  implication there is that she believes what she was told or

22  else she wouldn't say she was the victim of domestic violence

23  and I believe her because what she's told me is true, and one

24  of the parts of the truth is that he wanted to commit

25  suicide.  So I just have a problem with that.

1          THE COURT:  Well, I think we discussed this the last

2    time we were here, and I understood from Mr. Patterson that

3    there was not going to be any questions relating to whether

4    Dr. Murphy believes the defendant or whether the defendant is

5    credible, and the case law is clear on that as to the fact

6    that's the province of the jury.  She could say that this is

7    what she considered in rendering these opinions, but she

8    can't say that -- that the defendant is credible or that she

9    believed the defendant, and I understood that was not going

10   to be an area that was going to be asked.

11         MR. PATTERSON:  Absolutely not.  We resolved that

12   issue last week or earlier this week.

13         MR. MARTINEZ:  Judge, I am obviously requesting a

14   limiting instruction with regard to that specific issue.

15         THE COURT:  Okay.  Anything further from Mr.

16   Patterson?

17         MR. PATTERSON:  May I have a moment, Judge?

18         THE COURT:  Yes.

19              (Pause in proceedings.)

20         MR. PATTERSON:  In the chronology, and we're not

21   getting started obviously until an hour later than usual, I

22   don't expect to get there anyway, so we'll expect that issue

23   next week.

24         THE COURT:  Why don't we have Dr. Murphy step into

25   the courtroom and you can discuss with her the Court's

1   ruling.

2          MR. PATTERSON:  Okay.

3          THE COURT:  The other thing, with regard to the other

4   issue that -- that Mr. Martinez brought up about the contact

5   in the elevator with the jurors, was there anything you

6   wanted to state on the record with regard to that?

7          MR. PATTERSON:  I don't think it raises to the level

8   of misconduct.

9          THE COURT:  Okay.  What I'm going to do is remind the

10  jurors when we make the admonition at the end of today I'll

11  include the fact that remember you're not to have any contact

12  with anyone associated with this trial.  That's another thing

13  I'm going to warn everyone in this courtroom.  I assume there

14  are family and friends involved here.  Stay away from jurors.

15  We don't want even the appearance of impropriety.  That's

16  just the same thing, keep away from the jurors.  If that

17  means not getting in the same elevator with them, it's not

18  being rude.  It's just being careful.  I just want to remind

19  everyone here in the courtroom that may be associated with

20  the parties.  Just avoid jurors, period.  Okay?

21         MR. PATTERSON:  Judge, may I have a minute with Mr.

22  Martinez?

23         THE COURT:  Yes.

24                  (Pause in proceedings.)

25         MR. PATTERSON:  Thank you, Judge.


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1           THE COURT:  The record will reflect that Dr. Murphy

2    is present in the courtroom.  The record will reflect the

3    presence of Defendant and Counsel.  We're outside the

4    presence of the jury.

5                Dr. Murphy, I've made rulings here.  I just

6    wanted to alert you to these rulings.  You will not be

7    allowed to testify about Ms. Andriano's thought process on

8    the events of October 7 and October 8 relating to the alleged

9    offense, okay?  Is that understood?

10           THE WITNESS:  Yes.

11           THE COURT:  Also, you will not be able to testify

12    with regard to the issue of Shawn King in obtaining poison.

13    Is that understood?

14           THE WITNESS:  Yes.

15           THE COURT:  And, also, you're not to testify about

16    the issue of life insurance.  Is that understood?

17           THE WITNESS:  Yes.

18           THE COURT:  And then also I've made the ruling that

19    you're not to -- you're to omit from referring to Dr. R.

20    Rosengard and H. Rand Rohde because Mr. Patterson previously

21    avowed you did not rely upon anything they provided you.

22                Also, I've allowed -- what I anticipate Mr.

23    Patterson will be asking you about what you did review, you

24    could omit referring to the fact you received those two

25    materials, okay?

1          THE WITNESS:  Yes.

2          THE COURT:  Okay.  And I did make the ruling that

3    there may be testimony and you may testify about what you

4    stated in your report on Page 16, that specific portion that

5    during early Fall of 2000, Mr. Andriano talked about wanting

6    to end it all, period, and not about anything that might have

7    related to that on October 7 or October 8 of 2000.  Okay?

8          THE WITNESS:  Yes.

9          THE COURT:  Have I covered everything, Counsel?

10         MR. MARTINEZ:  I think so.

11         MR. PATTERSON:  Well, except, Your Honor, to the

12   extent that we could go into specific acts relating to the

13   suicide.

14         THE COURT:  Right.  We're not getting to that today.

15         MR. PATTERSON:  Correct.  Exactly.

16         THE COURT:  Okay.  So I'll make a ruling at the end

17   of the day then because you're not going to finish today.

18   We're not going to get to that.

19         MR. PATTERSON:  We won't get to that today.

20         THE COURT:  And I'll hear more about that from

21   Counsel on Tuesday.

22         MR. PATTERSON:  Okay.

23         THE COURT:  Anything else we need to discuss?

24         MR. MARTINEZ:  No.

25         MR. PATTERSON:  No, Your Honor.

1          THE COURT:  We ready for the jury?  Let's have the

2     jury.

3          MR. PATTERSON:  I'd like to also allow her to be

4     resworn.

5

6               (Whereupon, the jury enters the courtroom.)

7

8          THE COURT:  Please be seated.  This is cause number

9     CR 2000-096032, State of Arizona versus Wendi Elizabeth

10    Andriano.  The record will reflect the presence of the

11    Defendant, Counsel and the jury.

12              Ladies and gentlemen of the jury, I do

13    apologize for the delay.  There were issues that I needed to

14    discuss with Counsel outside the presence of the jury, and I

15    just want to emphasize to you when there is a delay like

16    that, it's just to make sure we do things properly, and I

17    have the obligation to preside over this trial to make sure

18    it's done properly and fairly, so I need to take the time

19    sometimes outside your presence with Counsel to resolve some

20    issues.  And I don't want you to think we're just sitting

21    back here not aware of the fact that your time is important.

22    Your time is very important, so I just want you to know that,

23    so I apologize for the delay.

24              Mr. Patterson?

25         MR. PATTERSON:  May we approach, Judge?

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1          THE COURT:  Yes.

2

3               (The following proceedings were held at the

4     bench:)

5

6          MR. PATTERSON:  Did you want to reiterate no contact

7     with --

8          THE COURT:  I was going to say that at the end of

9     today.

10         MR. PATTERSON:  Okay.

11         THE COURT:  Okay.

12

13              (The following proceedings were held in open

14    court:)

15

16         MR. PATTERSON:  Judge, if we may, we call Dr. Sharon

17    Murphy.

18         THE COURT:  Yes.  Ma'am, if you could please step

19    forward right up here.  Please give your name to the clerk

20    and she'll swear you in.

21

22              (Whereupon, the witness was duly resworn.)

23

24         THE COURT:  Please have a seat on the witness

25    stand.  Make yourself comfortable there on the witness

1    stand.  Please pull the microphone close to you.  Please

2    speak loudly and clearly into the microphone so everyone can

3    hear you.  Also please make sure the question is completed

4    before you answer the question, and please make sure you give

5    a verbal response.

6              THE WITNESS:  Yes.

7              THE COURT:  Is that agreeable to you?

8              THE WITNESS:  Yes.

9.             THE COURT:  Mr. Patterson, you may begin.

10             MR. PATTERSON:  Thank you, Judge.

11

12    DIRECT EXAMINATION BY MR. PATTERSON:

13        Q.    Would you introduce yourself to the jury?

14        A.    I'm Sharon B. Murphy.

15        Q.    And what do you do for a living?

16        A.    I'm an assistant professor at the University of

17    New Hampshire in the Department of Social Work.

18        Q.    Okay.  Are you married?

19        A.    Yes.

20        Q.    Have any children?

21        A.    Yes.

22        Q.    How many children have you?

23        A.    Three sons.

24             MR. MARTINEZ:  Objection.  Relevance.

25             THE COURT:  Overruled.


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000007183

1          THE WITNESS:  Three sons.

2    BY MR. PATTERSON:

3          Q.    Okay.  And where do you currently reside?

4          A.    In New Hampton -- New London, New Hampshire.

5          Q.    You're a professor -- assistant professor at

6    the University of New Hampshire?

7          A.    Correct.

8          Q.    What does an assistant professor do for -- at

9    the University of New Hampshire?

10          A.    Teach, mostly.  Community service, research and

11    publications, serve on boards, that sort of thing.

12          Q.    Okay.  How long have you been employed with the

13    University of New Hampshire?

14          A.    This is my first semester.

15          Q.    Okay.  Do you teach classes at the university?

16          A.    Yes.

17          Q.    Okay.  And which -- what -- well, let's start

18    with what discipline are those courses in?

19          A.    They are in the master of social work program.

20          Q.    Okay.  And what essentially is social work?  I

21    mean, in 25 words or less?

22          A.    Social work is one of the oldest helping

23    professions.  It's very similar to psychology.  It looks at

24    the person and their environment.

25          Q.    Okay.  And masters, I, assume is the next level

1       up beyond BA or BS, a bachelor degree?

2               A.      That's correct.

3               Q.      Okay.  How -- of what years duration is the

4       masters degree program at the University of New Hampshire?

5               A.      Two years full time.

6               Q.      What are the names of the courses that you're

7       instructing in this current semester?

8               A.      Field seminar and human behavior and the social

9       environment.

10              Q.      Okay.  What essentially is that -- those

11      courses about.  Are they core courses or --

12              A.      They're both core courses in the curriculum.

13      Field seminar directs the students that are doing their

14      internship.  We talk about things like ethical standards, how

15      to write case notes, things like that.  Human behavior is

16      also part of the core curriculum.  Every student is required

17      to take it in their first semester, and I teach two sections

18      of that one.

19              Q.      Okay.  And explain for me the difference

20      between an assistant professor, an associate professor, a

21      full professor.  What's the pecking order here?

22              A.      Assistant professor is the lowest.  It precedes

23      receiving your tenure.

24              Q.      Once you're tenured the title changes to --

25              A.      Associate.

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1        Q.    Okay.  You tell us this is your first semester

2    at New Hampshire.  Did you teach previously?

3        A.    Yes.

4        Q.    Which university?

5        A.    The most recent was Arizona State University.

6        Q.    Okay.  When did you start there and when did

7    you conclude?

8        A.    I began as an adjunct instructor in the Spring

9    of '94 while I was working on my PhD.  I became a 60 percent

10   time professor Fall of 1999, which was right after getting my

11   PhD.

12       Q.    All right.  And then you continued '99 through

13   2003?

14       A.    Correct.

15       Q.    And went on to New Hampshire?

16       A.    Correct.

17       Q.    Okay.  Any teaching done by you prior to, what

18   was it, '99?

19       A.    Yes.  Before coming to Arizona to pursue my

20   PhD, I was an assistant professor at the College of St.

21   Joseph, which is located in Vermont.

22       Q.    Okay.  And you're -- any other teaching

23   positions prior to the College of St. Joseph?

24       A.    No.

25       Q.    Okay.  How is it that you're qualified to serve

1    in either an assistant professor capacity, associate

2    professor capacity?  What's your educational background?

3            A.    Well, you have to have a PhD, which I received

4    in 1998 from Arizona State University.  I also have to have

5    some record, although it may be small, of publications,

6    community service -- there's sort of a combination of things

7    but that's generally what they're looking for.

8            Q.    Okay.  And the PhD that you receive, is it in a

9    specialized area?

10           A.    Well, it's presented from the school of social

11   work.

12           Q.    Okay.

13           A.    But within the school, when you're getting a

14   PhD, you get a specialty area, so, yes, I had a specialty

15   area.

16           Q.    Okay.  And what is that?

17           A.    Domestic violence.

18           Q.    Okay.  Give me a bit of the educational history

19   of Dr. Sharon Murphy, PhD.  We've talked about at the Arizona

20   State.  What educational things did you do prior to receiving

21   your PhD?

22           A.    I have a Bachelor of Arts in English from State

23   University of New York at Plattsburgh and a Master of Social

24   Work from Adelphi University, which is located in Garden

25   City, New York.

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1      Q.    Did you attend the Garden City campus or was it

2   an outlying campus?

3      A.    At the time I was enrolled it was a program

4   hosted by the University of Vermont, so I was at that campus.

5      Q.    But the degree was rendered by Adelphi?

6      A.    Right.

7      Q.    Okay.  When you're not teaching issues of

8   domestic violence or social work, do you also have a kind of

9   a consulting business, if you will?

10     A.    Yes.

11     Q.    Okay.  How long have you been in the consulting

12  end of the domestic violence situation?

13     A.    I think I started fairly soon after arriving in

14  the valley.  We moved here in the Fall or the Summer of '93.

15  I think I started it, although minimally probably, in '94, so

16  I've been doing it since then.

17     Q.    All right.  Can you tell me a bit about your

18  professional experience that led you into this particular

19  area of -- of expertise?

20     A.    Yes.  Well, that goes back to graduate school

21  for my master's degree.  Most people set out with a

22  particular goal, and my goal at the time of entering my

23  masters program was to do clinical practice following

24  graduation.  In order to do that in social work, you have to

25  have two years practice experience and take a national exam.

1    So also to get that masters, just like my students now, I had

2    to do two full year internships and it was in the context of

3    those internships and working with clients that my interests

4    began to evolve.

5         Q.    Okay.  Tell me a bit about the internships that

6    you went through that led you into this particular area of

7    social work?

8         A.    Both of the internships were at a community

9    mental health center.  One was working with developmentally

10   disabled adults.  That was the first year.  And second year

11   was as a crisis team specialist.  The first year working with

12   mentally disabled adults was when I first spoke with a victim

13   of domestic violence.  It was not partner intimate abuse, but

14   it was childhood sexual abuse that they were now reliving

15   into their adult years.  Had several clients that seemed to

16   be the focus of the work.  That was the first year.

17             The second year as a crisis team specialist, I

18   often was called to the emergency room or to the police

19   department or whatever, and just became pretty clear that so

20   many of those people that I was seeing had issues around

21   either domestic or family abuse.

22             In addition to seeing people on a 24 hour

23   crisis basis, we also carried a caseload.  I think I had

24   eight clients in brief therapy; and, again, it seemed to me

25   that the overwhelming number of my clients had these same

1    issues.  This was the very early '80s and not much was known,

2    so it was very difficult to know what to do and how to do it,

3    and I'm sure I must have made mistakes.  Did that until I got

4    the first teaching job.

5            Q.    Okay.  So what time span are we talking about,

6    early '80s until --

7            A.    I graduated with my masters in 1985.  I did

8    this work, the crisis work, until June of 1986, had a baby,

9    and started the teaching job in January of 1987.

10           Q.    Okay.  So we're talking about a six or seven

11   year period.

12           A.    Uh-huh.

13           THE COURT:  Is that a "yes"?

14           THE WITNESS:  Yes.

15           THE COURT:  Make sure you give a verbal response.

16   Thank you.

17   BY MR. PATTERSON:

18           Q.    Separate and apart from the educational

19   experiences you may have had that led you into this field,

20   were there professional or work-related experiences that

21   brought you into this particularized field?

22           A.    In those days, there were no educational

23   programs in the masters program, so there wasn't any such

24   thing as a family violence class.  They hadn't actually been

25   evolved yet, so my interest really came from the clients

1    themselves.

2            Q.      Okay.  Let's then follow up on that.

3            A.      In the early '80s there was no discipline known

4    as family violence.

5            Q.      Since that time has it developed?

6            A.      Yes.

7            Q.      Okay.

8            A.      It developed in the research community before

9    it developed in the practice community because usually

10   research precedes the development of clinical treatment.  So

11   it had started in the mid-70s, but by the time it was written

12   about as treatment or intervention, it was probably -- maybe

13   the first pieces came out in the mid-80s, first pieces

14   perhaps, and that was about how to conduct treatment with

15   couples in a couples -- working with them as a couple instead

16   of individually.

17           Q.      Okay.  Is it now a recognized discipline in the

18   universities?

19           A.      I don't know if I'd call it a discipline.  It's

20   a subject area.

21           Q.      Subject area?  Okay.

22           A.      Yeah, content area.

23           Q.      All right.  Are degrees awarded in those areas

24   of family violence, that kind of thing, or is it more you get

25   the degree in social work and then you devote that to another

1    particularized area?

2         A.    You would be going into one of the helping

3    professions, so you'd get your degree in social work or

4    psychology, counseling, something like that, but you could

5    focus your studies within that area.

6         Q.    Okay.    What kind of research then -- tell me

7    about the research that has been done in this particularized

8    area that allowed you to render opinions, come to conclusions

9    in your field?

10        A.    There were two articles that were written in

11   the late 1960s.   They were based on very small caseloads.   I

12   think one article had 10 -- 10 subjects, the other one may

13   have had 13.   There were enormous methodological problems and

14   they were swept under the rug until the 1990s, when it really

15   flourished.   And I believe it was commensurate with the woman

16   movement.   The time was right and people were ready to

17   listen.   The battered woman's movement was a subset of the

18   larger women's movement.   Once domestic violence sort of hit

19   the news, then the academics became involved because it was a

20   new area for them to look at.

21              So the very first people were actually

22   presenting at the University of New Hampshire and they're

23   still there.   They did a study with 2000 couples and they had

24   designed a questionnaire that has, I think, 26 items, so it

25   was administered to one member of those 2000 couples and a

1    lot of information was gathered from it.  However, there were

2    so many methodological flaws that enabled more researchers

3    and academics to become involved, you know, because we had to

4    tear up what something somebody else had done on the research

5    started in the late 1970's.

6              That's the same time all these things happened

7    kind of together,  Woman's Movement, Battered Woman's

8    Movement, which led to the development or building the first

9    domestic violence shelter, which was about 1973, '74.  That

10   was actually located here in Phoenix.

11             Then the proliferation of research articles and

12   from there the greater number of shelters being opened and

13   more people becoming interested in treatment intervention.

14   So now we start to have models, mid-80s into the late 80s.

15   Now, there's a phenomenal amount of literature.  There are

16   journals purely devoted to the subject area.

17        Q.    And I gather probably still evolving as we

18   speak today?

19        A.    Absolutely.

20        Q.    We discussed your educational background and

21   the academic positions that you've held in the past.  Have

22   you received any awards in your field?

23        A.    Yes.

24        Q.    Could you tell me about those?  And we won't

25   call it bragging, but you just need to tell us what your

36

1    awards are.

2         A.    Okay.  The most recent one was the 2002, 2003

3    academic year at Arizona State University when I got the

4    Field Instructor of the Year award.  Then in 1998 --

5         Q.    Wait.  I think we need to stop you there.  We

6    need to explain why you went to New Hampshire.  It wasn't

7    because you got kicked out of ASU.

8         A.    No.

9         Q.    Why did you leave ASU and go to New Hampshire?

10        A.    My husband's job.

11        Q.    So you got the 2003 Field Instructor of the

12   Year award.  Any other awards?  Well, tell me what that is,

13   what is that all about.

14        A.    Okay.  In my 60 percent time position at

15   Arizona State University, besides teaching, I was responsible

16   for providing clinical supervision to five social work

17   masters students at their internship.  All five were placed

18   at an organization called Prehab of Arizona.  It's been

19   around for a long time.  It's a mental health placement.  So

20   I provided weekly supervision one hour a week to each of

21   those five students, and at the end of every year, you know,

22   the field office asks students to nominate somebody, and I

23   got nominated and won.

24        Q.    All right.  What's the 1998 award?

25        A.    The Arizona Government held a summit on

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000007194

1    domestic violence and I had written a curriculum for one of

2    the agencies that I was working at as a domestic violence

3    consultant, a curriculum to be used in group work with Native

4    American women, survivors of domestic violence, and that

5    curriculum was given an award by the governor.

6             Q.    The curriculum you developed?

7             A.    Yes.

8             Q.    Okay.   1995, there were two awards?

9             A.    Yes.   They actually go hand in hand with the

10   research methodology that I wanted to pursue for my

11   dissertation and is called the Heideggerian Herma --

12            THE REPORTER:   Excuse me --

13            THE COURT:   Would you spell that for the reporter,

14   please?

15            THE WITNESS:   H-e-i-t-e-g-g-e-r-i-a-n

16   H-e-r-m-e-n-e-u-t-i-c Scholarship.

17            MR. PATTERSON:   Thank you, Judge.

18   BY MR. PATTERSON:

19            Q.    And, again, what is that award?

20            A.    There were two awards that were attached to my

21   being able to pursue a particular method that I wanted to

22   follow in order to study my subjects, and the methodology is

23   called Heideggerian after C. Martin Heideggerian, who is a

24   German philosopher.   So I got money, a scholarship, in order

25   to go to the University of Wisconsin at Madison to

1    specifically study that method because there wasn't anybody

2    at ASU that was well versed enough to direct my study.  So

3    that was one award.

4              And then the second award comes from the Fort

5    McDowell Mohave Apache Indian Community because my

6    dissertation involved studying Native American Women

7    survivors of domestic violence.  They were happy to promote

8    that research and gave me a small stipend.

9         Q.    Okay.  Two other awards, outstanding faculty of

10   the year, 1990, 1991.  What was that?

11        A.    Again, that was a student vote at the college

12   of St. Joseph in Vermont.

13        Q.    Okay.  And same thing in 1989, 1990.  Again,

14   outstanding faculty of the year, college of St. Joseph?

15        A.    Right.  Same thing.

16        Q.    You mentioned that you'd done some work in

17   Native American communities.  Was that a significant portion

18   of your work?

19        A.    That's actually why I moved here.  I wanted to

20   go to Arizona State University because of its proximity to

21   Native people.  So the consulting practice that I began and

22   all of my studies, as much as you can gear your studies in a

23   PhD program, were about studying native people.

24        Q.    And are there commonalities with the native

25   people, evaluations with the more mainstream communities?

1        A.    Yes.  Domestic violence is the same.

2        Q.    Okay.

3        A.    How people respond and what's available to them

4   for resources is what's considerably different.

5        Q.    Okay.  I don't know that we discussed, and I

6   apologize for jumping around a bit.  Did we discuss the

7   courses you taught at Arizona State University?

8        A.    No.

9        Q.    Okay.  Tell us a bit about that?

10       A.    Okay.  I only taught one class in the

11  undergraduate program the bachelor of social work.  All of my

12  teaching was in the masters program.  And because I was

13  60-percent time, it's geared a little differently, so I had

14  those students that, like I described, that I provided the

15  clinical supervision with.  But in addition to that, I taught

16  a course called Family Violence every year, every Spring, and

17  I did that also at the College of St. Joseph for a total of

18  17 years.  And I taught Diversity and Oppression and also

19  Direct Practice I, which means the first semester of Direct

20  Practice for first year, first semester master of social work

21  students.

22       Q.    And those programs repeated each year when you

23  were at Arizona State University?

24       A.    Yes, same schedule every semester.

25       Q.    All right.  Let's talk about academic issues

1    that may not necessarily be confined to the campus.  Were you

2    involved in other academic areas of service in 1988, 1989 at

3    the college of St. Joseph?

4          A.    Helping to establish a women's issue club,

5    participation in women's history month, and I helped found a

6    nontraditional student sport group.

7          Q.    What was that?

8          A.    That was for adult students, folks returning

9    back to college falling out of the water and having a support

10   group for them.

11         Q.    Not the 19-year old recent graduate of high

12   school?

13         A.    No.

14         Q.    Older persons who may return to the academic

15   environment?

16         A.    Correct.

17         Q.    Mid course correction, that sort of thing.

18         A.    Uh-huh.

19         THE COURT:  Is that a "yes"?

20         THE WITNESS:  Yes.

21         THE COURT:  Make sure you give a verbal response.

22         THE WITNESS:  Thank you.

23   BY MR. PATTERSON:

24         Q.    Let's talk about have you ever been involved in

25   research projects -- what's the term of arte?  Research --

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1   research?

2          A.   You could just say "research."

3          Q.   Research?  Okay.

4          A.   Yes.

5          Q.   Can we do it in reverse from present, your most

6   recent research projects going backward?

7          A.   Sure.  My most recent one is not listed on

8   here.  It's a project I'm involved in with some of the

9   faculty at ASU in the school of social work, looking at

10  issues of resiliency.

11         Q.   Resiliency?  What's that.

12         A.   A person's ability to pull themselves out of

13  prior difficult living situations and kind of shore up their

14  resources and be able to move forward.

15         Q.   That's ongoing as we speak?

16         A.   That is ongoing, correct.

17         Q.   These research projects.  Do they involve

18  professors, students or both, a little of each?

19         A.   Little of each.  The one that I just described

20  now has five graduate students and three professors, myself

21  and two from ASU.

22         Q.   Okay.  Are you doing this over the telephone or

23  do you have to come back periodically because --

24         A.   Well, we're going to do it now while I'm here.

25  I have to come back periodically.

1       Q.    Okay.  Again, can we walk back then through

2   your various research projects?

3       A.    2002, 2003, Battered Mothers Testimony Project

4   I did with the Arizona Coalition Against Domestic Violence.

5   I actually had a very small part in that.  I only helped

6   develop a questionnaire and I helped train people who were

7   going to do the interviews with battered moms.

8       Q.    And this is what year?

9       A.    This was 2002, 2003.

10      Q.    Okay.  And what was the thrust of that

11  particular project?  What was its purpose?

12      A.    It had come to the attention of Arizona

13  Coalition that there were a number of mothers who saw

14  themselves as formerly battered women and who were losing

15  custody of their children to their batterer.  So the

16  coalition wanted to know was this in fact reality or was this

17  just a figment of the imagination.  And the state of

18  Massachusetts had already embarked on a project, and so

19  Arizona sort of just piggy-backed, repeated, sort of

20  replicated that project.

21      Q.    Okay.  Next one, walking backwards in time.

22      A.    I was a member of the Arizona Attorney

23  General's Task Force on Domestic Violence and Child

24  Maltreatment.

25      Q.    What did you do in that regard?

1          A.      That was a very large task force, probably 25

2     people at least on that.  Lots of different people, shelters,

3     victims that came about because, again, there was a lot of

4     talk at the time about the overlap of child maltreatment with

5     domestic violence, whether or not they were recurring

6     factors.  So the attorney general wanted to get to the bottom

7     of that in our state and set up this task force, and we

8     studied that.

9          Q.      What did you do particularly in that research

10    project?

11         A.      I helped find out what other states were doing

12    and pulled together some of those models and brought those to

13    the committee to look at.  Massachusetts was one of the

14    foremost leaders and so we looked at a number of different

15    models and then a pilot was actually developed. I did not

16    have a very big part in that, but the information that I

17    brought in helped.

18         Q.      Okay.  And it says here facilitated focus

19    groups for the evaluation of pilot programs.

20         A.      Right.

21         Q.      What does that mean?

22         A.      Just the pilot has been in effect for six

23    months.  I believe we need to evaluate it and see whether or

24    not what we thought we were doing, we were doing, and how

25    well we were doing it.  So we decided to do focus groups, or

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    the task force decided we should do focus groups, and it was

2    my job to lead the evaluation of those focus groups.

3            Q.    Okay.  This took or occurred through 2002,

4    2003?

5            A.    Right.

6            Q.    All right.  Again, walking back, what's the

7    next research project you involved yourself in?

8            A.    2002 to 2003 I was a consultant to the Salt

9    River Pima-Maricopa County Indian Community.

10            Q.    What did you do in that capacity?

11            A.    They had developed a number of domestic

12    violence programs over the years and wanted to know how well

13    they were doing, so they basically wanted program

14    evaluation.  So I went in and conducted many, many

15    interviews -- I think over 100 interviews -- with members of

16    the community who would have been consumers of the service as

17    well as with the people who were actually running those

18    programs, so mental health people, drugs or alcohol people,

19    tribal counsel, basically, as many of the organizations that

20    I could elicit and wrote a report.

21            Q.    Okay.  Were changes made in the delivery system

22    on the -- of the tribe based upon your recommendations?

23            A.    There were some changes made to actual

24    delivery.  The biggest change is in their domestic violence

25    law.

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1          Q.     So the statutes --

2          A.     Have changed.

3          Q.     - have changed?  Okay.  How about 2001?

4          A.     Consultant to domestic violence shelter in Casa

5     Grande called Against Abuse.  They got money to train law

6     enforcement in Pinal County and I was hired to do some of

7     those trainings.

8          Q.     Okay.

9          A.     I was one of the people.  There were two of us.

10         Q.     Give us a for instance.  What did you do on a

11    regular basis in that context?

12         A.     We did full day training.  There were about 30

13    officers of Pinal County Sheriff's Department each day until

14    we finished the whole department.

15         Q.     Okay.

16         A.     So it was DV 101.

17         Q.     What were you trying to train these law

18    enforcement people about?

19         A.     Specifically about what constitutes domestic

20    violence, what are the academics of domestic violence, how to

21    recognize it, how to respond and write a report

22    appropriately.

23         Q.     Year 2000 through the present.  So this is

24    another ongoing one it appears?

25         A.     Right.  This is with the American Indian

1    students.  Actually, I'm looking, again, at patterns of

2    resiliency.

3              Q.    Okay.  And what are the manifestations of this

4    particular project?  You periodically go on the reservation

5    or --

6              A.    These are actually students at ASU.

7              Q.    Okay.

8              A.    That are participants.

9              Q.    Okay.  So you're their instructor in that

10   regard?

11             A.    I was -- I was just one of the researchers who

12   interviewed them.

13             Q.    Okay.  In 2000 you apparently were a consultant

14   to House of Refuge?

15             A.    Right.

16             Q.    What was that?

17             A.    House of Refuge is actually a HUD project.

18   It's in East Mesa.  They provide housing to homeless folk,

19   many of whom are victims of domestic violence and their

20   children.  And this agency was actually not looking so much

21   for that kind of help.  They were looking for data analysis

22   kind of help, so I subcontracted some of that out so that

23   somebody could build us a database and start a retrieval

24   system for them.

25             Q.    Okay.  So essentially you're improving the

1       services provided by this particular shelter?

2               A.      Right.

3               Q.      Okay.  Again, in the year 2000, a consultant to

4       Chrysalis Domestic Violence Shelter?

5               A.      Correct.  They were just looking for more

6       management style assistance in figuring out ways to staff

7       their program, do some trimming for the budget, those kinds

8       of things.

9               Q.      Okay.  Project Evaluation Consultant Institute

10      for Law and Justice in the year 2000.  What is that about?

11              A.      That was a very large federal grant out of the

12      Violence Against Women Act, and Eloy, Arizona, was one of the

13      recipients.  And so I was part of a team that went to Eloy

14      and conducted interviews basically to eval the work of the

15      Eloy Police Department in terms of domestic violence.

16              Q.      Okay.  And just so I get an understanding of

17      what you're doing on kind of a weekly basis, you're teaching,

18      that doesn't occupy your entire day, right?

19              A.      Right.

20              Q.      It gives you some free time to go do these

21      other things?

22              A.      Exactly.

23              Q.      It's with the expressed approval of the powers

24      that be at ASU?

25              A.      Sure, as long as I did my job correctly.

48

1      Q.    All right.  And it's what many professors do?

2      A.    Absolutely.

3      Q.    Okay.  Again, in the year 2000, Program

4  Evaluation Governor's Office for Domestic Violence

5  Prevention.  What is that about?

6      A.    The Governor's office had established

7  coordinated community response teams in 15 counties.  That

8  was a community response team to domestic violence in each

9  county.  My job was to evaluate each county's coordinated

10  community response team to see if in fact they had done what

11  they had received money to do.

12          MR. PATTERSON:  Judge, could we approach please?

13          THE COURT:  Yes.

14

15          (The following proceedings were held at the

16  bench:)

17

18          MR. PATTERSON:  This is a recurring phenomenon I've

19  not brought to the attention of the Court previously, but the

20  gentleman on the front row to the far right periodically

21  throughout this trial, regardless of who the witness is, has

22  closed his eyes and appears to be dozing, and then he shakes

23  himself out of it and sits upright.  He is constantly laying

24  his head on his hands.  This phenomenon's been observed by my

25  staff, and I just observed it as Dr. Murphy was testifying.

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000007206

1    I don't know what to do about it, but this is not the first

2    time I've seen it happen.

3         THE COURT:  Tell me what you're requesting.  I notice

4    that it -- that he had his eyes closed yesterday during part

5    of the testimony.  I was watching him and it looks like he

6    was listening with his eyes closed.

7         MR. PATTERSON:  I've been reluctant to say anything I

8    couldn't discern which of the two phenomenons I was observing

9    today.  It appears he dozed off and shook himself awake.

10        THE COURT:  Okay.  I saw him yesterday, as I

11   indicated, for a very brief period with his eyes closed, but

12   I was watching him carefully.  Looks like he was listening to

13   the testimony with his eyes closed, and then he opened up his

14   eyes.  But looks like to me he was concentrating, but I

15   haven't been watching him today.  What do you want me to do?

16        MR. PATTERSON:  If we could maybe instruct your

17   bailiff to observe him and just --

18        THE COURT:  Do you want me to take a recess and have

19   him come in here and ask him if he's having any problems?

20        MR. PATTERSON:  Yes.  I think that's prudent.

21        THE COURT:  Okay.  Mr. Martinez?

22        MR. MARTINEZ:  I don't think having the bailiff watch

23   him is --

24        MR. PATTERSON:  Well, right.  I was just trying to

25   figure out something.

50

1            MR. MARTINEZ:  If he has an issue with it, I think we

2    have to bring him in here and ask him.

3            MR. PATTERSON:  I agree.  Let's take care of it that

4    way.

5            THE COURT:  Let's do that right now.

6            MR. PATTERSON:  Please.

7

8                (The following proceedings were held in open

9    court:)

10

11            THE COURT:  Okay.  I'm going to take a short recess

12    to handle another matter.  I'll just ask the jury to step

13    into the jury room for just a few minutes here.

14                Remember the admonition I gave you including

15    the fact you're not to discuss this case with anyone, do not

16    let anyone discuss the case with you.  This should only take

17    a couple minutes here, so just be patient.

18

19                (Whereupon, the jury exits the courtroom.)

20

21            THE COURT:  Please be seated.  There is cause number

22    CR 2000-096032, State of Arizona versus Wendi Elizabeth

23    Andriano.  The record will reflect the presence of the

24    Defendant and Counsel.  We're outside the presence of the

25    jury.

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1          I believe -- well, the juror that you were

2     speaking about is the juror in seat number 9?

3          MR. PATTERSON:  Yes, Your Honor.

4          THE COURT:  On my far left in the front, correct?

5          MR. PATTERSON:  Male, tall gentleman the far seat in

6     the front row.

7          THE COURT:  Okay.  And what do you want me to do

8     then, Mr. Patterson?  Did you want me to have the juror come

9     in here?

10          MR. PATTERSON:  Well, if I could reiterate what I

11     said at side bar.

12          THE COURT:  Go ahead.

13          MR. PATTERSON:  My staff advised me earlier this

14     gentleman's been periodically dozing off.  I watched that

15     phenomenon and observed it myself in days proceeding today,

16     and I couldn't discern in my own mind whether he was

17     listening with his eyes closed or dozing and then awakening

18     and then obviously missing things in that process.

19          Today as Dr. Murphy was testifying, I looked

20     over and his eyes were clearly closed and he shook himself,

21     as we all do after we doze, and obviously he missed something

22     in that process.  I've also observed him with his head in his

23     hands throughout the testimony previously, and, again, my

24     staff has noticed and he is apparently dozing off.

25          I think we need to inquire whether there's a

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    medical or health problem here, whether he has in fact dozed

2    off previously.  If he has we'll deal with that on the

3    record.

4              THE COURT:  Mr. Martinez?

5              MR. MARTINEZ:  First, I would ask that Dr. Murphy

6    step outside.  I don't think that --

7                   (Witness exits the courtroom.)

8              MR. MARTINEZ:  Let's do whatever he asks.  I don't

9    have any objection to that.

10             THE COURT:  So I just want to make sure, Mr.

11   Patterson, I'll have the juror step into the courtroom here

12   and I'll just ask -- I'll just tell the juror, if there's no

13   objection, that -- I'll bring up the fact that I've noticed

14   that he closes his eyes on occasion and I'll ask is there a

15   problem or medical problem, and I'll allow Counsel to ask the

16   questions.  Is that agreeable to everybody?

17             MR. MARTINEZ:  It is to me.

18             MR. PATTERSON:  If you just inquire whether he does

19   doze off periodically, it's better coming from you than it is

20   from us.

21             THE COURT:  I'll term the question as far as you've

22   observed.

23             MR. PATTERSON:  Okay.

24             THE COURT:  Okay.  We ready for -- this is Original

25   Juror 60, who is sitting in seat 9.

1

2              (Whereupon, the juror enters the courtroom.)

3

4         THE COURT:  Sir, why don't you go ahead and have a

5    seat in the jury box right there.

6              This is cause number CR 2000-096032, State of

7    Arizona versus Wendi Elizabeth Andriano.  The record will

8    reflect the presence of Defendant and Counsel.  The jury is

9    not present except for Juror Number 9.

10             Sir, I've noticed on occasion you've had your

11   eyes closed, and sometimes it appears to me perhaps you may

12   be dozing off or may be sleeping.  Have you been sleeping?

13        JUROR NO. 9:  No.  I got like a heat flash because

14   it's real stuffy on this side of the room.

15        THE COURT:  Okay.

16        JUROR NO. 9:  That's why I went to the bathroom now

17   to wash my face.  But it's real stuffy over here.  I don't

18   know if it's just this side because other jurors told me

19   it's over there too, but when I get hot --

20        THE COURT:  Okay.

21        JUROR NO. 9:  -- it goes to my head.  I didn't fall

22   asleep or anything, but I got like real stuffy.

23        THE COURT:  I've noticed on occasion you've had your

24   eyes closed for --

25        JUROR NO. 9:  I was just kind of like -- just like

1   stuffy because of -- of the heat.

2             THE COURT:  Okay.

3             JUROR NO. 9:  That's all it was.

4             THE COURT:  Do you have any medical condition that we

5   should be aware of?

6             JUROR NO. 9:  No, I don't have -- no.

7             THE COURT:  Basically, what you're sayings is it gets

8   a little warm in the area where you're sitting?

9             JUROR NO. 9:  Yeah.  It's pretty stuffy over here.

10            THE COURT:  Okay.  Have you been able to listen

11   to all the testimony --

12            JUROR NO. 9:  Uh-huh.

13            THE COURT:  -- without any problem?

14            JUROR NO. 9:  No problem.

15            THE COURT:  Okay.  And basically you -- have you been

16   sleeping?  You haven't been sleeping.

17            JUROR NO. 9:  I haven't been sleeping.

18            THE COURT:  You've had your eyes closed.

19            JUROR NO. 9:  I've had my eyes closed just trying to

20   overcome the heat.  That's all it is.  I didn't fall asleep.

21            THE COURT:  Okay.  Any time you you're in distress or

22   have a problem, raise your hand and let me know.

23            JUROR NO. 9:  Okay.

24            THE COURT:  I'm try to check on the temperature for

25   you.

1          JUROR NO. 9:  To be honest with you, it's just been

2     this past week or so.  I don't know, maybe because the

3     temperature dropped and you lowered the AC?  I don't know.

4          THE COURT:  Just the last week or so?

5          JUROR NO. 9:  Yeah.

6          THE COURT:  Mr. Martinez, do you have any questions

7     you would like to ask Juror 9?

8          MR. MARTINEZ:  No, sir.

9          MR. PATTERSON:  If we could just relocate him, maybe

10    a cooler part of the jury box?  Right.  There's some people

11    that might get a little bit cold on this end.

12         JUROR NO. 9:  They had -- on that side they told me

13    it's cold.  I don't know, but it's -- mostly people over

14    there, they always think it's cold.  I don't want to assume

15    why they're cold, but then again, they told me today it did

16    seem kind of stuffy over there, so maybe if you just put the

17    AC back down.

18         THE COURT:  Okay.  I will note for the record, just

19    from my experience, as the seasons change and get into

20    October, there is a difficulty with regard to temperature

21    and, you know, the temperature change in regulating the

22    temperature in the courtroom and my office.  I do notice

23    that.

24              Are you okay right now?  Would you rather try

25    to sit --

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1          JUROR NO. 9:  No, I'm fine.  I'm fine.  Just like I

2   said, it was, like, real stuffy on this side.

3          THE COURT:  Right.  Would you be embarrassed or would

4   -- would it be okay if I asked one of the other jurors if

5   maybe they would switch places with you if they don't get

6   as --

7          JUROR NO. 9:  They complained it was kind of stuffy

8   over there too, so I don't think --

9          THE COURT:  Okay.

10          JUROR NO. 9:  -- me changing is going to prevent the

11   stuffiness.

12          THE COURT:  Okay.  Are you okay right now?

13          JUROR NO. 9:  I'm fine.  I just went and washed my

14   face because I got a heat flash.

15          THE COURT:  Okay.  At any time you feel that you

16   can't follow the testimony or you're having some kind of

17   distress, raise your hand and --

18          JUROR NO. 9:  I will.  That's fine.

19          THE COURT:  -- we'll try to accommodate you.  In the

20   meantime, I'll ask my judicial assistant to try to contact --

21          JUROR NO. 9:  Maintenance or something?

22          THE COURT:  -- maintenance to see if we could have

23   the AC lowered or temperature lowered.  Is it stuffy in

24   here?  Okay.  Everyone's shaking their head?  I have the

25   benefit of a fan up here.

1          JUROR NO. 9:  I saw that.

2          THE COURT:  Okay.  We'll see what we can do.  I'll

3     have you step back into the jury room right now.  Don't

4     discuss with them what we discussed in here.

5          JUROR NO. 9:  That's fine.

6          THE COURT:  Leave that in the courtroom right now.

7     Okay?  Thank you.

8

9               (Whereupon, the juror exits the courtroom.)

10

11         THE COURT:  Counsel -- the record will reflect the

12    presence of Defendant and Counsel.  We're outside the

13    presence of the jury.

14              I'm going to have my clerk step out and ask my

15    judicial assistant to contact maintenance and see whether we

16    could have the temperature lowered here.  One of the reasons

17    might be also we do have a full courtroom.

18         MR. PATTERSON:  May I inquire of your court reporter

19    where we stopped?

20         THE COURT:  We'll go off the record.

21              (Pause in proceedings.)

22         THE COURT:  Okay.  My judicial assistant is making

23    the phone call.

24              We ready to continue here?

25         MR. PATTERSON:  Yes, Your Honor.

58

1          THE COURT:  Wait a second.  Why don't we have Dr.

2     Murphy step back in and have a seat on the witness stand.

3               (Pause in proceedings.)

4          THE COURT:  Just for the record, just because the

5     Judge requests something, he doesn't always get it.  Just for

6     the record.  I've had this problem before and try my best,

7     but I guess it doesn't always come about as requested.

8               Okay.  We ready for the jury?

9          MR. PATTERSON:  Yes, Your Honor.

10

11               (Whereupon, the jury enters the courtroom.)

12

13          THE COURT:  Please be seated.  This is cause number

14     CR 2000-096032, State of Arizona versus Wendi Elizabeth

15     Andriano.  The record will reflect the presence of the

16     Defendant, Counsel and the jury.  Sharon Murphy is on the

17     witness stand.  We'll continue with the direct examination by

18     Mr. Patterson.

19               Mr. Patterson?

20          MR. PATTERSON:  Thank you, Judge.

21

22     CONTINUED DIRECT EXAMINATION BY MR. PATTERSON:

23          Q.    You are Dr. Murphy?

24          A.    Yes.

25          Q.    You're the same Dr. Murphy that was testifying

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    before the break?

2         A.    Yes.

3         Q.    You realize you're still under oath?

4         A.    Yes.

5         Q.    Okay.  We had gone through 2000.  How about in

6    '98, Doctoral Research School of Social Work ASU dissertation

7    chairperson Dr. Karen Gerdes.  What's that about?

8         A.    That's actually dissertation research.

9         Q.    Okay.  What is a dissertation?

10        A.    It is typically a book length research study

11   about some area that you've previously defined in your

12   program of study that you wish to dig deeper into.  It needs

13   to be something that's not already been done before.  There

14   can be elements in it that, of course, you're building on

15   previous research, but your research is to be new research.

16        Q.    Okay.  And is it a requirement or condition,

17   prerequisite to receiving one's doctorate?

18        A.    Yes.

19        Q.    How do you go about determining what your

20   particular dissertation's going to be?

21        A.    All the time that you've spent studying and/or

22   practicing, usually helps the student to more clearly define

23   or elucidate a particular area that they are most interested

24   in learning more about.  Always the purpose is, especially in

25   social work, the purpose would be to not only learn something

1   more, but learn something that has a practical basis,

2   something that you can do, something with your study.

3         Q.    Okay.  And you assisted in the selection

4   process by the professors.  Do they help coordinate what

5   topics you're going to use in your dissertation?

6         A.    They wouldn't help determine a topic.  They

7   very well may guide your research into particular avenues.

8   They're there as mentors.

9         Q.    Okay.  What was your area of dissertation?

10        A.    Domestic violence as it occurs among Native

11  American women survivors.

12        Q.    Okay.  In that regard, what did you do in terms

13  of research for that particular issue?

14        A.    The first thing that you have to do is define

15  the problem to be studied.  And I knew that there was no

16  research yet on the experience of domestic violence from the

17  American Indian woman's perspective, so I wanted to learn

18  about that.  Once I knew that, then the methodology sort of

19  fell into place because you have to know what your question

20  is normed to determine how you're going to study it.  That's

21  how I decided to study the Hermeneutic Heideggerian

22  Phenomenology, so then I went to learn that.

23        Q.    Okay.  When it was all said and done, what did

24  you do?

25        A.    I interviewed Native American women who defined

61

1    themselves to be victims of domestic violence.

2         Q.    And how many women did you interview in that

3    process?

4         A.    I had -- I started with 14 and I ended with 13.

5    One had to be -- one transcript had to be left out because

6    the machine didn't work properly.

7         Q.    Okay.

8         A.    They were in depth, sometimes up to four-hour

9    interviews, and the purpose was truly just to clarify what

10   their experience with domestic violence had been.

11        Q.    Okay.  And did you employ methods in that

12   interview process that you still use today?

13        A.    Yes.

14        Q.    Okay.  So is there a consistency or

15   repetitiveness to the process that's used to determine

16   whether or not a person is in fact a victim of domestic

17   violence?

18        A.    Yes.  Very much so.  The interview process,

19   other things obviously have to be done before that for court

20   that weren't done for dissertation.

21        Q.    Okay.  Finally, does somebody have to approve

22   or grade or put a rubber stamp, if you will, on this

23   dissertation before you get your PhD?

24        A.    You have a dissertation chair and committee

25   members and they are the ones who oversee each chapter as

1     it's written, give you many rewrites that you have to do

2     until you have completed it to their satisfaction.  But prior

3     to doing that, you have to get permission from the university

4     itself through the Institutional Review Board.  They have to

5     oversee all human subject projects and give permission for

6     you to do the research.

7          Q.    Okay.  And prior to receiving your doctorate,

8     do you have to defend the dissertation?

9          A.    Right.

10         Q.    What's that all about?

11         A.    It's an open defense to anybody in the

12    community.  It's almost like teaching a class where you

13    discuss your methodology and your findings.

14         Q.    '97, Research Consultant to Mesa, Arizona,

15    Police Department.  What was that all about?

16         A.    That was shortly after Mesa had built and

17    developed their Center Against Family Violence, which is sort

18    of the one-stop shopping idea where adult victims and child

19    victims can go and police are stationed there and CPS is

20    there, there's therapists there, et cetera.  And Mesa PD had

21    been able to figure out that there were particular

22    neighborhoods in the City of Mesa that had higher than

23    average numbers of domestic violence incidents, and they

24    wanted to know why.  And so they hired somebody to do that

25    work, and then that person hired me to help conduct the

63

1    actual research piece of it.

2         Q.    What did you do in that context?

3         A.    I just guided how they went about gathering

4    their information.  I created the research framework for

5    them.

6         Q.    Okay.  Gave them some questions, standards?

7         A.    Who to do it with, how to do it.

8         Q.    Okay.

9         A.    How to analyze it.

10        Q.    Okay.  In '95 you were the primary investigator

11   to Native American Connections Inc.  What was that all about?

12        A.    This goes back to the beginning, basically.  We

13   moved here in '93, as I said earlier, and I think I began

14   consulting in '94, and I believe it was with this agency that

15   I got started.  It was either '94 or '95 that I started.  I

16   knew that this was a site where I could gather information

17   down the road for possible dissertation research, and at this

18   point in time, this agency -- it was the substance abuse

19   treatment facility, it did not have a domestic violence

20   component in their treatment program, and I volunteered my

21   time to conduct a study using their files to help them see

22   that in fact the overwhelming majority of their clients were

23   in fact either victims or perpetrators of domestic violence.

24        Q.    Hand in hand with the drug issues they had as

25   well?

1        A.      Correct.

2        Q.      Okay.  And then in '92, you were -- did some

3    investigation or were an investigator at the College of St.

4    Joseph in Vermont?

5        A.      There was another faculty member from another

6    college in Vermont, and I worked together to develop a

7    mentoring model for social work interns.

8        Q.      Okay.  In that context, what did you actually

9    do?

10        A.      We surveyed practicing social workers

11    throughout the State and tried to gather information about

12    how they had developed mentor or mentee relationships and how

13    that helped or not.

14        Q.      Let's talk a bit about your social work

15    practice experience.  You've given me kind of a little

16    insight.  Starting, perhaps, in 2003 and working backwards,

17    tell me a bit about your practical hands-on experience in

18    this area.

19        A.      Well, from 2000 to 2003 I was providing

20    basically supervision.  I wasn't conducting.  I was not

21    acting as a clinical social worker as a therapist.  I was

22    supervising those who were doing the practice.  I did have a

23    small private practice for a while, emphasis on small.  I did

24    not have an office.  The people that I worked with were

25    Native American women survivors and the counseling service

1     that I provided needed to be in a safe place that they

2     defined.  So I didn't have an office.  We met in parks, went

3     wherever they felt the safest.  That's the kind of practice I

4     had.  It was very small.

5             Q.    This is what year now?

6             A.    This is '94 to '98.

7             Q.    Other practical experience in this area -- in,

8     let's see, '94, did you already discuss with me about what

9     you did in that context back then?  Domestic Violence

10    Consultant to Native American Connections Inc.

11            A.    Right.  That's the substance abuse treatment

12    facility where I did that research for them, proved there was

13    a domestic violence problem among their lives, and they hired

14    me as their consultant and I worked for them in a consulting

15    capacity for five years.  I created manuals, curriculum, I

16    ran groups, I trained people to run groups.  I did individual

17    counseling.  Whatever they needed.

18            Q.    Okay.  Was that a 9 to 5 proposition or was

19    that --

20            A.    It was, like, two days a week.

21            Q.    Okay.  '96, same, Native American Connections

22    Inc.?

23            A.    Clinical supervision.  I supervised a master

24    of social work student.

25            Q.    Okay.  And in years '87 through '93 at the

1    College of St. Joseph in Rutland, Vermont, you did hands-on

2    practical things too?

3          A.    Right.

4          Q.    What did you do?

5          A.    Besides teaching, my job was to carry a

6    caseload of 10 to 15 students, students of the college that

7    were seeking counseling services.

8          Q.    Do you meaning services in any particular area?

9          A.    I was just asked to provide a counseling

10   service.

11         Q.    Okay.

12         A.    So it was generic.

13         Q.    All right.  In that context then, did you do

14   domestic violence counseling to students at Rutland College?

15         A.    Right.  The overwhelming majority, again, were

16   either child victims dating violence victims.  We had older

17   women and men also as students and they were, you know, would

18   be actively involved in a violent relationship.  So, again,

19   my caseload seemed to be really heavily loaded with those

20   same kinds of issues.

21         Q.    Okay.  Now, you tell us you have a consulting

22   business on the side?

23         A.    Uh-huh.

24         Q.    Right, currently?

25         A.    Yes.

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000007224

1      Q.    How long have you been involved in determining

2   whether or not a person is a victim of domestic violence for

3   court purposes?

4      A.    The Kenton case was my first one.  I think I

5   was hired in '96 on that case.  I think it went to court in

6   '97 perhaps.

7      Q.    Let's see.  Do I have a date on that?

8      A.    Yeah.  '97 it went to trial.

9      Q.    Okay.  And these -- let's talk about total

10   numbers of domestic violence cases where you've been called

11   in to testify in court on the threshold issue of whether or

12   not a person is a victim of domestic violence.

13      A.    Okay.  I have a new case right now that I'm

14   doing while I'm here.

15      Q.    Okay.

16      A.    I just completed that assessment.  Counting

17   that one -- obviously, I haven't testified yet -- there's a

18   total of 14 cases.  However, of the 14, 4 were civil.  So

19   that leaves us 10 criminal.

20      Q.    Okay.  Let's talk about the civil cases.  What

21   was the context of that domestic violence assessment?  What

22   were the issues in those civil cases?

23      A.    They were all -- let's see.  Three out of the

24   four were child custody --

25      Q.    Okay.

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000007225

1       A.      -- where the woman was saying she was a victim

2   and trying to obtain full custody.

3       Q.      Okay.

4       A.      One of them was a divorce.  The woman was

5   saying she was a victim and was trying to get more than 50

6   percent of the wealth of the couple.

7       Q.      Okay.  So in those civil cases you were called

8   upon to determine whether or not a person was a domestic

9   violence victim in a childcare custody contest or dissolution

10  of property context?

11      A.      Exactly.

12      Q.      In those situations you were retained by the

13  attorneys for -- for whom?

14      A.      For the woman.

15      Q.      Okay.  Ten cases were criminal cases, right?

16      A.      Correct.

17      Q.      Can you break that down further in terms of

18  whether the defense retained you or prosecution retained you?

19      A.      2 of the 10 I worked for the prosecution.

20      Q.      Okay.  In that context was the person that was

21  being prosecuted, was that the person where the issue was

22  whether or not that person was a domestic violence victim?

23      A.      The person -- yes.  The person who was being

24  prosecuted we were saying was the batterer.

25      Q.      Okay.  All right.  So it wasn't the abuse

1    victim?

2              A.    Right.  Sorry, that's correct.

3              Q.   .Let's run that back again.

4              A.    Okay.

5              Q.    In that context you were asked by the

6    prosecution to render what kinds of opinions?

7              A.    I was asked to render an opinion about why a

8    victim would recant.

9              Q.    What is recantation?

10             A.    It's the phenomenon --

11         MR. MARTINEZ:  Objection.  Relevance.

12         THE COURT:  Sustained.  Let's move on.

13         MR. PATTERSON:  Judge --

14

15             (The following proceedings were held at the

16    bench:)

17

18         MR. PATTERSON:  I need to be able to explain what I'm

19    certain is coming on cross-examination that she's retained by

20    the defense.  She's also retained by the prosecution on the

21    narrow issue of recantation.  It's not a completely

22    understood term for a jury.  I think we need to explain what

23    that term is.

24         THE COURT:  I don't think recantation is really

25    relevant.  I think the point is she's been hired by both

1    sides, and you've made that point.  What specifically --

2         MR. PATTERSON:  Yeah.

3         THE COURT:  -- about recantation --

4         MR. PATTERSON:  She used a word, a concept, that's

5    not readily understoodable by the jury.  If she's allowed to

6    testify to that, she's allowed to explain what that word

7    means, seems to me.

8         THE COURT:  Mr. Martinez?

9         MR. MARTINEZ:  The point here is whether or not she

10   has been hired by either side.  She's made that clear,

11   however, now they want to explain to them what each case is,

12   and I don't see the relevance.

13        THE COURT:  I don't really see it as being relevant.

14   If it is relevant just because of the fact because she's used

15   this word and probably most people don't know what the word

16   is, I'll allow to you go in, but you've made your point.

17        MR. PATTERSON:  I'll move on.

18        THE COURT:  Don't go into the specific cases.

19

20             (The following proceedings were held in open

21   court:)

22

23        THE COURT:  Okay.  I'll overrule the objection. Go

24   ahead and repeat the question.

25   / / / / /

1     BY MR. PATTERSON:

2          Q.     Just explain briefly what recantation is

3     conceptually?

4          A.     It is a phenomenon by which a victim takes back

5     her story.

6          Q.     Okay.

7          A.     Says it didn't happen.

8          Q.     All right.  So the other 8 cases that you've

9     been involved with in the criminal justice system, you were

10    retained by the defense?

11         A.     Correct.

12         Q.     And of those 8, how many actually involved

13    coming into court and testifying?

14         A.     5.

15         Q.     Okay.  And were there kinds of -- was there a

16    generalized purpose or opinion that you were asked to render

17    in those cases?

18         A.     I was asked, first, to determine whether or not

19    the person was in fact a victim.  If the finding was yes,

20    then I needed to be able to determine the level of severity

21    of the violence.

22         Q.     And that was -- that was the same for each of

23    the 5 cases that you -- actually, 7 -- testified?

24         A.     Exactly.

25         Q.     Okay.  The three cases that you didn't testify

1  in --

2          A.     Yes.

3          Q.     -- actually, in open court, did you render an

4  opinion, a report, in those cases?

5          A.     Yes, I did.

6          Q.     Okay.  And if you know, why weren't you called

7  to testify in those other three cases?

8          MR. MARTINEZ:  Objection.  Relevance.

9          THE COURT:  Sustained.

10  BY MR. PATTERSON:

11          Q.     There's one more area of experience we need to

12  talk about.  Have you actually published articles relating to

13  domestic violence that have been disseminated or distributed

14  amongst the community?

15          A.     Yes, I have.

16          Q.     Okay.  Let's talk about those, starting perhaps

17  from the most recent going backwards in time?

18          A.     This year an article appeared in a journal

19  called Human Behavior in the Social Environment, which is a

20  social work journal.  That was written basically from the

21  data off of my dissertation.

22                 Prior to that I also have an article that was

23  published on-line through something called E-Research

24  Newsletter.  That was in the year 2000.  And in 1998 --

25          Q.     What was the topic there?

1          A.    Sorry.  Again, it was about American Indian

2    women's experiences with domestic violence.

3          Q.    Okay.

4          A.    And then in 1998, again, published.  Again,

5    that was in the Journal of Poverty, and that also was about

6    Native American women in domestic violence.

7          Q.    Okay.  How about chapters in books?

8          A.    There are three chapters appearing in books.

9    One book is called Women and Girls in the Social Environment:

10   Behavioral Perspectives.  Another one is an introductory,

11   Social Work, An Introduction to the Profession.

12              And then the last one is in a book -- edited

13   book called Pressing Issues of Inequality and American Indian

14   Communities.

15         Q.    Okay.  Do you have books that you're doing but

16   haven't gotten to publication yet?

17         A.    Not books, but journal articles.

18         Q.    Okay.

19         A.    There are two of those right now being worked

20   on.

21         Q.    Talk to us about that.

22         A.    One that I'm here for now, that's the one

23   that's called Backyard Dog: Women of Color Speak Out.  And

24   the other one is the Beyond Survival:  Stories of Resilience

25   Among First Nations Women that I think I mentioned earlier.

1        Q.     Okay.  How about unpublished work?  What is

2    that?

3        A.     I did not publish my dissertation.  A lot of

4    people could.  There's no requirement to.  I chose not to, so

5    that's unpublished work.  The two group manuals I wrote for

6    Native American Connections, I did not publish.  The agency

7    owns those.

8        Q.     The proprietary work --

9        A.     Correct.

10       Q.     -- of the person who hired you?

11       A.     Uh-huh.

12       Q.     How about presentations at workshops, these

13   kinds of things?

14       A.     I didn't count them.

15       Q.     Why don't you take the time and just kind of

16   quickly count the number of presentations that you've made.

17   We won't go into them with extreme particularity?

18       A.     There is one international one and 25 that

19   happened within the United States.

20       Q.     Okay.  And what essentially is a workshop or

21   presentation?

22       A.     Can be anywhere from an hour to all day or

23   multiple days.  Do trainings about some facet of domestic

24   violence.

25       Q.     Okay.  And let's talk briefly about the

1    international presentation.  Where was that?

2         A.   I was hired to do a two-day training in

3    London.  That was several years ago, 2002.  That I presented

4    about domestic violence and children.

5         Q.   Let's see.  Are you involved in any

6    professional agencies or associations?

7         A.   As a social worker, I'm a member of the

8    National Association of Social Workers, so now I belong to

9    the New Hampshire chapter.

10        Q.   Okay.

11        A.   I've been on numerous boards.  All of the

12   organizations that I have worked for or with are domestic

13   violence related.

14        Q.   Okay.  Let's just go through some of them.

15   2004 to the present, you mentioned, a member of the New

16   Hampshire Chapter with the National Association of Social

17   Workers, Women's Addiction Task Force?

18        A.   Right.  That's in New Hampshire also.

19        Q.   Kearsarge New Hampshire Domestic Violence Task

20   Force?

21        A.   Right.  That's a client and task force there.

22        Q.   What does the task force do?

23        A.   Look at the problem of domestic violence within

24   that community concerned with police about the number of

25   incidents.

1      Q.     Okay.  Co-chair Women of Color, Economy of the

2   Arizona Coalition Against Domestic Violence.  That's --

3   what's that?

4      A.     I think I did that for four or five years.

5   It's a standing committee that reports to the board of

6   director's coalition, and we work specifically with women of

7   color who are victims.

8      Q.     Okay.  Let's see, legislative committee member

9   Arizona Coalition Against Domestic Violence?

10     A.     We looked at the legal issues involving

11  domestic violence and worked to help effect change.

12     Q.     Ethics consultant for the Vermont Chapter of

13  National Association of Social Workers?

14     A.     I was the ethics consultant to the Vermont

15  Board for two years.

16     Q.     Okay.

17     A.     When someone brought a charge against a social

18  worker, I became involved in the case.

19     Q.     Okay.  So there are codified ethical standards

20  for members of your profession?

21     A.     Yes.

22     Q.     Are you kind of self-policing?  Complaint is

23  made and you try to take care of it within your association?

24     A.     Within the state, and then if the client is

25  unhappy with the decision, there is a national board that

1    they can appeal to.

2          Q.    Okay.  How about, again, current professional

3    memberships and certifications?

4          A.    I'm on a New Hampshire Branch National

5    Association of Social Workers.  I'm on the New Hampshire

6    Governor's Task Force on Domestic and Sexual Violence.  I'm a

7    member of the Kearsarge Domestic Violence Task Force,

8    member of the legal Committee of the Arizona Coalition

9    Against Domestic Violence.  I'm certified by the Arizona post

10   as a trainer for law enforcement in Arizona.  I'm a member of

11   the NASW New Hampshire chapter. I'm a member of the American

12   Professional Society of the Abuse of Children.  I'm a

13   licensed clinical social worker.  And I belong to the Academy

14   of Certified Workers, which is the national recognition, and

15   I'm a member of the National Human Service Honors Society.

16         Q.    That's Alpha Delta Omega?

17         A.    Yes.

18         Q.    Okay.  All right.  We've explored your

19   credentials.  I need to understand now what is domestic

20   violence, okay?  And to that end, you've put together a power

21   point presentation for us?

22         A.    Correct.

23         Q.    Okay.  Would you like to -- we need a moment.

24               THE COURT:  Is this a good time to take the

25   afternoon break?

1          MR. PATTERSON:  Let's do that Judge, please.

2          THE COURT:  During this break, remember the entire

3    admonition I gave you including the fact you're not to

4    discuss this case with anyone, do not let anyone discuss this

5    case with you.  Keep an open mind.  We'll see you in 20

6    minutes.

7               (Recess.)

8

9          THE COURT:  There is CR 2000-096032, State of

10   Arizona versus Wendi Elizabeth Andriano.  The record will

11   reflect the presence of the Defendant, Counsel and the jury.

12   The record will also reflect Sharon Murphy is on the witness

13   stand, and we'll continue with the direct examination by Mr.

14   Patterson.

15               Mr. Patterson?

16        MR. PATTERSON:  Thank you, Your Honor.

17

18   CONTINUED DIRECT EXAMINATION BY MR. PATTERSON:

19        Q.    You are Dr. Sharon Murphy who was testifying

20   earlier?

21        A.    Yes.

22        Q.    You realize you're still under oath?

23        A.    Yes.

24        Q.    One of the things you do is you instruct on

25   domestic violence in college, correct?

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000007236

1    A.    Yes.

2         Q.    And have you developed kind of a short form

3    program to explain better what domestic violence is?

4         A.    Yes.

5         Q.    Okay.  And is that -- at one time it was a

6    power point presentation, but because of technical problems,

7    we've kind of low-teched it to the ELMO.  Can you use the

8    ELMO to present it?

9         A.    Yes.

10        Q.    Where would you feel most comfortable talking

11   about the concepts --

12        A.    I'd like to be down there so I could see the

13   TV.

14        MR. PATTERSON:  Judge?

15        THE COURT:  That's fine.  Perhaps we could move one

16   of the microphones.  If you could speak up as loud as you

17   can, I just want to make sure everyone can hear.

18   BY MR. PATTERSON:

19        Q.    All right.  First, I guess we call these

20   slides.  First slide, what is this slide about?

21        A.    This is -- this is a definition of domestic

22   violence.  Basically it says it's a pattern of assaultive and

23   coercive behaviors often including physical, sexual and

24   psychological attacks as well as economic coercion that

25   adults and adolescents use against their intimate partner.

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000007237

1      Q.    This is the working definition you guys in your

2  business use in trying to determine whether or not a person

3  is in fact a victim of domestic violence?

4      A.    There are numerous definitions.  What I look

5  for in any definition are a couple of things, however.  One

6  would be pattern; one would be assaultive and coercive

7  behaviors; and then usually the list of the types of like

8  physical, sexual, psychological, economic use against

9  intimate partners.  So if those components are there, then it

10  would be fine.

11     Q.    Okay.  Let's talk about each of the components

12  of the definition.  What is a pattern assaultive behavior?

13     A.    It means if there was one strike, it would not

14  be domestic violence.  You need to see it repetitious over

15  time.

16     Q.    Any particular time period?

17     A.    No.

18     Q.    Okay.  All right.  And what is a coercive

19  behavior?

20     A.    That generally means when one person is forcing

21  another person to do something against their will.

22     Q.    Okay.  And the next ways that can be assaultive

23  or coercive, are those exclusive of any others or just by way

24  of example?

25     A.    These are by way of example.  There's a whole

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    list we'll go through later.

2         Q.    Okay.  And they are -- there also has to be a

3    relationship, apparently, between the two victims?

4         A.    Correct.  Intimate relationship.

5         Q.    And give me some definitions of kinds of

6    intimate relationships.

7         A.    Cohabiting.

8         Q.    Living together?

9         A.    Living together, dating, husband and wife.  It

10   can occur also in gay relationships, gay/lesbian.  Those are

11   the general ones.

12        Q.    Okay.  Have we exhausted this particular slide?

13        A.    Yes.

14        Q.    Okay.  What is the import of this particular

15   slide?

16        A.    This slide gives us sort of a look at history

17   and to see where we were in the beginning from the first

18   known records and brings us up with, the next slides, up to

19   the present time.

20        Q.    Okay.  So has it been an evolving kind of

21   standard of acceptability or legality with regard to domestic

22   violence?

23        A.    Yes.

24        Q.    Okay.  Is that what this displays?

25        A.    Yes.

1        Q.    Okay.  Talk to me about then 753 B.C.?

2        A.    Okay.

3        Q.    Why is that important?

4        A.    Okay.  We believe that is the first law of

5    marriage, at least in westernization that we know about, and

6    it was written by Romulus who's credited as being the founder

7    of the city of Rome.  And basically the law of marriage talks

8    about man's right and entitlement to beating his wife.

9        Q.    Okay.  1400s, rules of marriage?

10       A.    Those were written by a catholic friar and,

11   actually, a quote from the rules is interesting.  It says,

12   "When you see your wife commit an offense, don't rush at her

13   with insults and violent blows.  Scold her harshly, bully and

14   terrify her, and if this doesn't work, take up a stick and

15   beat her soundly, for it is better to punish the body and

16   correct the soul than to damage the soul and spare the body.

17   Then readily beat her not out of rage, but out of charity and

18   concern for her soul."  So that tells us a lot about what

19   things were like then.

20       Q.    Okay.  The attitudes with regard to society

21   towards the relationship of husband and wife?

22       A.    Correct.

23       Q.    Okay.  How about the 1700s, quote, the Rule of

24   Thumb.  How is that germane?

25       A.    Right.  This comes to us from -- it's a facet

1    of English common law.  And basically, the rules said though

2    a man could beat his wife with a stick no larger around than

3    his thumb.  That was actually supposed to be a good thing

4    because that eliminated larger objects.

5           Q.    Okay.  So we're getting better as time

6    progresses?

7           A.    Getting better.

8           Q.    Okay.  All right.  1824, courts uphold man's

9    right to beat wife?

10          A.    Yes.  Unfortunately, English common law, it's

11   unfortunate, it came over to the colonies because that rule

12   applied here as well.  That's what that refers to.

13          Q.    This is the rule in the United States in 1824?

14          A.    Yes.  It was still the rule of thumb, yes.

15          Q.    That refers back to the rule of thumb?

16          A.    Yes, right.

17          Q.    Okay.  19th and early 20th century, women fight

18   for right to divorce.  How is that relevant?

19          A.    Right.  It was one of the early feminist

20   movements really.  What they were trying to do was win the

21   right to divorce because of physical violence.  But the early

22   feminists believed they couldn't possibly win that way, so

23   the fight was about the ability to divorce the drunken

24   husband.

25          Q.    Okay.  And we've exhausted this particular

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    slide?

2              A.    Yes.

3              Q.    Okay.  This, apparently, is an excerpt from a

4    case, State v. Oliver.  Was that the rule of thumb case you

5    referred to?

6              A.    No.

7              Q.    Sorry.  This is --

8              A.    This is '74.

9              Q.    1874?  Why is this slide relevant?

10             MR. MARTINEZ:  Your Honor, I'm going to object on the

11   grounds of relevance as to citing case law.

12             THE COURT:  I'll sustain the objection as to this.

13             MR. PATTERSON:  Well --

14             THE COURT:  Let's move on.

15   BY MR. PATTERSON:

16             Q.    All right.  Let's withdraw this one, then.

17             Okay.  Late 19th century, first child abuse

18   case?  Why is this relevant?

19             A.    It's all part of the picture of family

20   violence.  The first child abuse case we know about was in

21   the 1880s.  It was the case of Mary Ellen.  It happened in

22   New York City.  At that point in time in history there was no

23   agency that handled things like that and so when it came into

24   public gaze, the group that published it up was the Society

25   for Prevention of Cruelty to Animals.

1        Q.      ASPCA?

2        A.      Right.

3        Q.      Okay.  This is late 19th century, so it would

4   be 1800s?

5        A.      Right, late 1800s.

6        Q.      Right.  Next bullet is 1974, first federal

7   legislation re child abuse.  Why is this relevant?

8        A.      Kind of speaks to the issue.  It took almost

9   100 years from that first case of child abuse.  The fact that

10   federal legislation and the legislation was passed in '74 was

11   the Child Abuse Prevent and Treatment Act, which we still

12   work under today.

13        Q.      Child abuse is a subset of --

14        A.      Family violence.

15        Q.      Okay.  Mid 1990s, Battered Womens movement?

16        A.      We talked about that earlier, so that was the

17   beginning of the shelter movement in 1973, the first shelter,

18   which was in Phoenix.

19        Q.      1980s, police response changes.  What do you

20   mean by that?

21        A.      Well, up until the 1980s, the typical police

22   response to what I guess may be still called a domestic,

23   responding to a domestic was just to separate the parties,

24   have them go separate ways, and not really even write a

25   report or become a charge until there was a case in

1    Tritorington, Kentucky.  The woman's name was Tracy Thornton.

2    It hit national news.  She was being badly battered while

3    police stayed away.  The charges were filed.  The city and

4    police department were both sued and she won.

5              Q.    This shows evolving a police response

6    legislative response to issue violence?

7              A.    Right.

8              Q.    1984?

9              A.    That's the one we're currently working under.

10    It's reauthorized every four to five years.  It allows monies

11    to be spent in certain ways, but it's offered to victims in

12    terms of law enforcement training, money for shelters, money

13    to train folks that work in the field.  It's not for

14    batterers.  It's not money that can be spent in that way.

15    It's all victim focused.

16              Q.    This is a funding mechanism that you described

17    that often resulted in consulting jobs for you?

18              A.    It can, yes.

19              Q.    In the various applications that we discussed

20    earlier?

21              A.    Right.

22              Q.    Okay.  Next page?  Okay.  I think we know what

23    a myth is, but what is your working definition of a myth.

24              A.    A myth would be something that's a belief

25    that's clearly held by some people that's often erroneous

1    making it therefore a myth.

2          Q.    Are there in your experience myths that are

3    evident in the public perception of domestic violence?

4          A.    Yes.  And there actually are numerous myths.  I

5    only chose five.  I chose the five that I think are the ones

6    that are most dearly held onto by society.

7          Q.    Okay.  Let's go through them then.

8          A.    Okay.

9          Q.    First one is domestic violence affects only

10   minorities and low income groups?

11         A.    Right.  All the research has shown us that is

12   false.  It affects all socio-economic levels, all groups of

13   people in all different countries.

14         Q.    Okay.  That would be all races?

15         A.    All races, right.

16         Q.    Okay.  Myth number 2, alcohol causes domestic

17   violence?

18         A.    That's a really big one.  What we do know is

19   that there is a fairly large correlation between alcohol and

20   domestic violence, but that it is not causal.

21         Q.    Okay.  You used a lot of terms here.  It's not

22   causal -- can you explain it to me in a little more elemental

23   fashion?

24         A.    Uh-huh.

25         Q.    You're saying that abuse of alcohol does not

1    create the abuser?

2              A.    Correct.

3              Q.    Okay.

4              A.    You could take the alcohol away from an abuser

5    and he could still be an abuser or she could be an abuser.

6              Q.    Alcohol often times --

7              A.    Exacerbates and exaggerates the problem.

8              Q.    Okay.  So the problem is already there.  The

9    use of alcohol causes the symptoms or manifestations to be

10   more easily apparent?

11             A.    Exactly.

12             Q.    Okay.  Victims deserve to be abused if they

13   stay in a situation.  How is that a myth?

14             A.    Nobody deserves to be abused under any

15   conditions.  And this one has actually been used against

16   victims for -- forever, I suppose, and it's part of the

17   victim blaming thing that we see throughout society.

18             Q.    Okay.  Tell me about how the victim blaming

19   correlates to this particular myth?

20             A.    Well, if she stays, then she must like it and

21   that's victim blaming.

22             Q.    Okay.

23             A.    It's false.

24             Q.    And in your evaluation of these kinds of cases,

25   are there any circumstances where you believe the victim

1    deserves the abuse?

2         A.    Never.

3         Q.    Okay.  Myth number 4, abusers are violent in

4    all of their relationships?

5         A.    Right.  That's not true.  Often times, we see

6    people who abuse their partners only abuse their partners and

7    not anybody else.  It -- these are so individually oriented

8    problems that you can't make a blanket statement.

9         Q.    Okay.  How about the abuser in the context

10   outside the privacy of his home?  Can the abuser, he or she,

11   be a charming, personable person otherwise?

12        A.    Certainly.

13        Q.    Okay.  And you've seen that in your clinical

14   practice?

15        A.    Yes.

16        Q.    Okay.  Last myth on this particular page,

17   domestic violence is anger-based?

18        A.    That's a really common myth because what we see

19   and what we hear about domestic violence are angry sounding

20   outbursts, whether they're yelling and screaming or breaking

21   things or hitting, we see that as anger.  But unfortunately

22   it is not anger-based.  It's control-based.

23        Q.    Okay.  And I think we need to expand upon that

24   conceptually.  You're not suggesting there is no anger

25   manifested in these relationships?

1          A.     Correct.

2          Q.     Okay.  But are you -- what are you saying about

3     the purpose of the anger, or is there a purpose to the anger?

4          A.     It's very controlled.  In other words -- I

5     could give you just a very brief example?

6          Q.     Okay.

7          A.     Man gets fired at his job, manages to finish

8     out the day, doesn't erupt, blowup at his boss, gets in his

9     car, drives the speed limit, goes home, and one thing sets

10    him off and he takes it out, beats or whatever, his wife.  He

11    was able to control that feeling for possibly hours.  So

12    there was a very specific purpose and very specific person

13    that he chose to take it out on.

14         Q.     Okay.

15         A.     That can't be anger.

16         Q.     Okay.  All right.  So what then would that

17    purpose be if it's not just a manifestation of anger?

18         MR. MARTINEZ:  Objection.  Asked and answered.

19         THE COURT:  Overruled.  Go ahead, answer the question

20    if you can.

21         THE WITNESS:  It's control-based.  I'm choosing who I

22    take it out on.

23    BY MR. PATTERSON:

24         Q.     To what end, I guess, is my question?

25         A.     Don't know what you mean?


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1      Q.      Control the what of the whom?

2      A.      Controlling the person with whom I'm in that

3   intimate relationship with.

4      Q.      Okay.   The abused victim?

5      A.      Right.

6      Q.      Okay.   Types of abuse.   Let's go through that.

7   What is -- why is isolation a type of abuse?

8      A.      Isolation is one of the most common types.   The

9   purpose of which, again, and you'll see as we talked through

10   all of this, is control of the victim.   If a person can keep

11   his or her victim away from others who may be supportive, who

12   may try to get him or her out of that relationship, then

13   that's to that person's advantage.   So typically you do find

14   isolation in domestic violence relationships it can take many

15   different forms.   Not letting the person work, not letting

16   the person go to school.   Not letting the person have access

17   to his or her cell phone, checking on their whereabouts all

18   the time.   Those are all different ways of isolating and

19   intimidating.

20      Q.      Okay.   Eliminating a close knit group of

21   friends?

22      A.      Right.

23      Q.      Okay.

24      A.      Sure.

25      Q.      Okay.   Choosing friends for that person?

1         A.    Yes.

2         Q.    Okay.   Financial abuse.   What's that all about?

3         A.    A way of controlling the resources of the

4    family.

5         Q.    Okay.   And how does that manifest itself?

6         A.    Well, most often the way I see it is that the

7    person who is the abuser is doling out the money in very

8    small amounts for specific reasons and the victim has to

9    account for every penny, those kinds of things.

10        Q.    And would that depend upon the amount of money

11   that was in the community there or the relationship in that

12   regard?

13        A.    I think it really depends upon the abuser's

14   thought process at the moment.

15        Q.    Okay.   Verbal abuse?

16        A.    Very common.   That's swearing at, using foul

17   language, things that would be hurtful.

18        Q.    Okay.   In that context is there a subset of

19   raising one's voice?

20        A.    Raising your voice, right.

21        Q.    Manifesting the largeness of being --

22        A.    Sure.

23        Q.    -- through the voice?

24        A.    Exactly.

25        Q.    All right.   Physical abuse, obviously.   That's

1    almost self-explanatory.

2         A.   Well, actually, the next slide has the list of

3    physical, so if you want, we could ask the paralegal to go --

4         Q.   Okay.  Let's go to the next one and then go

5    back.

6         A.   These are the common abuses, pushing, choking,

7    kicking, punching, holding down, retraining, slapping, using

8    a weapon, throwing objects, pulling hair.  We could come up

9    with probably another dozen or so.

10         Q.   Okay.

11         A.   But those are the common ones.

12         Q.   Let me give you one.  How about  tickling when

13    tickling's not desired?

14         A.   If tickling is not what the person is asking

15    for and they're saying stop and making that clear, then that

16    would be abusive.

17         Q.   Okay.  And this is not exclusive.  There are

18    other things that can be included in that list?

19         A.   Right.

20         Q.   Okay.  And this is conduct that an abuser does

21    to the abused victim?

22         A.   Correct.

23         Q.   All right.  And you expect to see these kinds

24    of behaviors in an evaluation or assessment with another

25    person who's a victim of domestic violence?

1          A.    Right, these or others.

2          Q.    Right.  Let's go back to the main list.  Mental

3    abuse?

4          A.    Actually, the next slide also has those listed.

5          Q.    Okay.  Let's go --

6          A.    Mental and emotional, both.

7          Q.    Let's walk through these then.  Intimidation?

8          A.    Instilling fear in the person.

9          Q.    Okay.  And how can that be done?

10         A.    Oh, a look, a gesture, words, "Don't you dare

11   or I'll," things of that nature.  Anything to scare.

12         Q.    Okay.  Yelling.  Is that pretty much

13   self-explanatory?

14         A.    Yes.

15         Q.    Criticizing.  What is that about?

16         A.    Criticizing in abusive relationships often

17   includes things like comments about the victim's size,

18   because that's generally considered hurtful --

19         Q.    Okay.

20         A.    -- to a woman, if we're considering a woman as

21   the victim.  So any kinds of critical comment -- stupid, fat,

22   slut -- all of these kinds of things.  It's verbal abuse and

23   is just another way of looking at it.

24         Q.    What constitutes demeaning remarks?

25         A.    That's basically, again, a similar phenomenon.


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    All these are all forms of verbal abuse that affect us

2    emotionally and psychologically.

3         Q.    How are the children used in emotional and

4    psychological abuse?

5         A.    Well, they certainly can be used in custody

6    battles, or more simply than that they could be used -- oh,

7    the abuser might say to the children, "Look what your mother

8    did to me" or "Look what your mother has done," "Your

9    mother's no good" or "I'm going to have to tell the cops

10   about what your mother did to you" or something like that.

11   It's some way they're bringing the children into the

12   situation.

13        Q.    Okay.  We've discussed isolation, right?

14        A.    Yes.

15        Q.    Threats?

16        A.    All different forms, from threatening to turn

17   her into welfare to threatening her life and anything in

18   between.

19        Q.    Humiliation?

20        A.    Making her feel so badly about herself.  It's

21   often done in front of other people, but not always.  It can

22   also just be done in the privacy of the home.

23        Q.    Okay.  And is there a relationship perhaps

24   between humiliation and demeaning remarks and criticizing?

25        A.    Sure, yep.

1  Q. Okay.  Ignoring?

2  A. Not stopping -- or stop speaking to.

3 Pretending you're not there, making all kinds of decisions

4 without your input.  That kind of thing.

5  Q. Okay.  Where do we go now?

6  A. Well, the slide before had sexual listed on it,

7 but the following slide has sexual abuse, so we could go

8 right to the next slide.

9  Q. Okay.  Now, this is a working definition for

10 folks in your business, right?

11  A. Right, right, right.

12  Q. Unwanted touching.  What constitutes unwanted

13 touching?

14  A. Letting the other person know that what they

15 are doing to you at this moment is not wanted by you.

16  Q. Okay.  And does it cover the complete range of

17 touching?

18  A. Well, in this context we're talking about

19 sexual touching.

20  Q. Okay.  The breast, the vaginal area, that kind

21 of thing?

22  A. Right, exactly.

23  Q. All right.  Compulsory sex.  What does that

24 mean?

25  A. Sort of forcing the person to perform without

1  their permission.

2    Q. False accusations?

3    A. Common.  It's very common in abusive

4 relationships where there seems to be a high level of

5 jealousy.  So falsely accusing someone of sleeping with

6 another person or even just looking at another person.

7    Q. Okay.  Sexual name calling?

8    A. Words like slut, whore, bitch, those kinds of

9 words in particular.

10    Q. Unfaithfulness?

11    A. Having affairs, being involved with another

12 person.

13    Q. Okay.  Hurtful sex?

14    A. Basically sex that violates you in a way that

15 is harmful or hurtful to your body.

16    Q. Okay.  Performing sex acts that are unwanted

17 and maybe physically damaging?

18    A. They can be, yes.

19    Q. Okay.  All right.  Where do we go now?

20    A. The next -- next slide.

21    Q. Okay.  Let's speak in general about control.

22 How does the concept of control relate to domestic violence?

23    A. I think that it might make more sense if we

24 went to the next slide --

25    Q. Okay.

1          A.     With the wheel on it.   Yes.   Instead of this

2     one.

3          MR. MCCLOUD:   You want me to retain this one?

4          THE WITNESS:   Yes, retain it.

5          MR. PATTERSON:   Okay.   Is that readable?

6          MR. MCCLOUD:   Want to go ahead to --

7          THE WITNESS:   Yes.

8          MR. PATTERSON:   Let's start with the isolation,

9     Scott, and then we'll move around.   Focus that a little

10    better.

11         THE WITNESS:   I could read it if we need to read it.

12         MR. PATTERSON:   I think we could adjust the focus on

13    it.

14         MR. MCCLOUD:   I'm having trouble with that.

15         MR. PATTERSON:   Okay.

16         MR. MCCLOUD:   That's about as good as it'll get.

17    BY MR. PATTERSON:

18         Q.     All right.   Again, discuss for me generally,

19    domestic violence connotes violent acts against an abused

20    person?

21         A.     Correct.

22         Q.     Is that what domestic violence is all about or

23    is there a -- a different reason for the existence of

24    domestic violence in the first place, a motivation for the

25    abuser?

1      A.      Because of the word "violence" in the phrase,

2  we tend to think about domestic violence as solely physical

3  violent acts.   Earlier today you asked me a question about

4  the research, and one of the things that's come out of the

5  research since 1974, '73, whenever that first started, that

6  first survey, is that domestic violence is a lot bigger than

7  just hitting, punching, kicking, slapping.   That's what makes

8  the news.   In my experience, however, the overwhelming

9  majority of domestic violence victims suffer from various

10  levels, degrees and types of emotional abuse.   There is often

11  physical violence too, but there's almost always emotional

12  abuse.

13      This wheel -- I know we can't see it as a

14  complete wheel because of our technical difficulties, but

15  that wheel was designed, I think it was 1986, by the Duluth

16  Minnesota Domestic Abuse Intervention Project.   It is

17  extraordinarily well known in -- by people who work in the

18  field of domestic violence.   It's used by advocates, it's

19  used by clinicians in a counseling way, it's used in

20  assessment processes because it was created with the

21  knowledge of the voices of the women who were battered, so

22  this came from them.

23      Q.      Back to my original question, does the research

24  show that the abuser is intending to harm his loved one or

25  that the harm is kind of collateral?   Is the intent of the

100

1    abuser to exert dominance or control over the abused person?

2          A.    I think that the intent is the dominance and

3    the power and the control and all of these other issues that

4    are described inside the wheel are the tactics that an abuser

5    uses in order to control his or her partner.

6          Q.    Okay.  All right.  Let's start then with

7    isolation?

8          A.    Okay.

9          Q.    And if you could read that for us?

10         A.    It says controlling what she does, who she sees

11   and talks to, and where she goes.

12         Q.    Okay.  And can you explain that to us

13   conceptually?

14         A.    Well, we talked about it just a few minutes

15   ago.  A really clear example is not allowing her to see her

16   friends or cutting her off from her family, and usually it's

17   done in a way that's also derogatory such as "What do you

18   want to go see your mother for, she's nothing but a fat bitch

19   and she just hurts you anyway."

20         Q.    Okay.

21         A.    So there's a combination of factors.

22         Q.    So isolation is the goal but the abusive

23   behaviors can be multiple and vary to achieve that end?

24         A.    Right, right.

25         Q.    Okay.  Emotional abuse?

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1       A.    Okay.  It says putting her down or making her

2   feel bad about herself, calling her names, making her think

3   she's crazy, playing mind games.

4       Q.    Okay.

5       A.    An example of making her think she's crazy or

6   the mind games would be a person, the batterer, moves the car

7   keys, she goes looking for them, says "I know I put them

8   there," and he says "no, of course you didn't," and she looks

9   and looks and looks and looks and looks, and after a couple

10  hours thoroughly frustrated, he slips them back where they

11  were originally, she doesn't know it and makes her crazy.

12      Q.    Aside from this point away from the power

13  control wheel, you keep using the term "she" as the abused

14  person and "he" as a batterer.  Does this phenomenon occur

15  where the male is the abused person and female is the

16  batterer?

17      A.    Yes, it does.

18      Q.    In terms of statistical frequency or your

19  ability to see it in your clinical practice, that's commonly

20  found, let's talk about the research statistical frequency of

21  where the male is the battered person?

22      A.    Well, let me answer it in reverse to get there.

23      Q.    Okay.

24      A.    The Bureau of Justice statistics, the last

25  numbers I read, said that 88 percent of the time the victim

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000007259

1     was female.

2          Q.    Okay.

3          A.    So that tells us 12 percent.

4          Q.    Right.

5          A.    I've also seen 85 percent and 90 percent, so

6     it's somewhere probably between 85 and 90 percent of the time

7     the victim is a woman.

8          Q.    Okay.  And do these statistics cover reported

9     cases or estimated cases or --

10         A.    Well, the Bureau of Justice statistics is only

11    giving us reported cases.

12         Q.    Is there a phenomenon in your review of the

13    research of under-reporting or over-reporting in terms of

14    male abuse victims?

15         A.    The articles that are out there, and there's

16    not a tremendous amount that's written about that, basically

17    do say that it's thought that male victims are a lot less

18    likely to come forward.  So we hear more about the female

19    victim.

20         Q.    Okay.  And in our discussion today, technically

21    you will be saying he, she, but out of convenience we're

22    discussing "she" as the abused victim and the "he" as the

23    abuser?

24         A.    Right.

25         Q.    Okay.  All right.  Economic abuse.  What's that

1    about?

2         A.    Trying to keep her from getting or keeping a

3    job, making her ask for money, giving her an allowance,

4    taking her money.

5         Q.    Okay.  In that context, how about a

6    circumstance where the woman is expected to be the wage

7    earner and pay the bills and that kind of thing.  Is there

8    some kind of a -- a converse proposition here that is maybe

9    economically abusive?

10        A.    Well, there certainly could be because, again,

11   it's about controlling.  So controlling that person's purpose

12   in life, I guess, to be able to continue to go out and earn

13   the money and then take that money and use it.

14        Q.    Okay.  In that context, can the spending

15   proclivities or characteristics of the abuser also serve as a

16   form of economic abuse in the relationship?

17        A.    Sure, if that person is taking the money away

18   from the family and using it in a self-serving manner, sure.

19        Q.    Okay.  Sexual abuse?

20        A.    Making her do sexual things against her will.

21   Physically attacking sexual parts of her body, treating her

22   as a sex object.

23        Q.    If can you give me examples?

24        A.    The insertion of objects into a woman's body.

25        Q.    How about compulsory or constant sex?

1          A.     Forcing her again to participate in a sexual

2     act against her will or wish.

3          Q.     Okay.  And -- all right.  And I guess we need

4     to talk also in the context of the married couple.  That's

5     kind of a blurred line in terms of consensual, nonconsensual.

6     Can you tell me about that?

7          A.     Among some women there is the belief that being

8     married means that you perform whenever your husband says you

9     need to.  Some women do that and never say "I don't want it."

10    Some women never say "I don't want it" because they're

11    afraid of the ramifications of saying "I don't want it" and

12    that it is often easier to kind of lay there and take it

13    because it will be over.  "If I fight it, it might take

14    longer."

15         Q.     So you can confuse doing it with the consensual

16    nature of the -- of the intercourse?

17         A.     Right.

18         Q.     Okay.  Using children?

19         A.     Making her feel guilty about the children,

20    using the children to give messages, using visitation as a

21    way too harass her, threats being made or carried out,

22    threaten to take the children, commit suicide, report her to

23    welfare.  There's a lot of different examples of threats, but

24    those were some of the common ones.

25         Q.     Okay.  This list in the power control wheel is

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000007262

1    not exclusive.  There are other manifestations of that.

2    That -- obviously, the space doesn't allow for everything.

3         A.    Right.

4         Q.    Male privilege, using male privilege.  What's

5    that concept?

6         A.    Treating her like a servant, make all the big

7    decisions, acting like the master of the castle.  This is

8    almost like going back historically to our social history

9    roots.

10        Q.    Okay.  I'm the man and I get to make these

11   decisions?

12        A.    Right.

13        Q.    Okay.  Intimidation?

14        A.    Putting her in fear by using looks, gestures,

15   loud voices, smashing things, destroying her property.

16        Q.    Again, could you give me -- give me examples,

17   other examples, that obviously you put on the wheel here?

18        A.    Well, the ones that I have heard so often are

19   "He didn't even have to say anything, I just knew by the look

20   on his face and I knew I was in trouble," and so I did X, Y,

21   Z.

22        Q.    Okay.  How about displays of physicality that

23   don't result in collision with the abused person's body, but

24   punching out walls, punching out doors, those kind of things?

25        A.    Right.  Certainly those are forms of

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1   intimidation.

2          Q.    All right.  So we've gone around the wheel?

3          A.    Yes.

4          Q.    And, again, is this one of the instruments

5   that's used in your profession to come to certain conclusions

6   about whether a person is a victim of domestic violence?

7          A.    It informs my decision, it informs the

8   decisions of other people who do similar work as I.

9          Q.    Okay.  Where do we go now?

10         A.    The one that we skipped.  Yeah.  Want to just

11  put that on for a second?

12               It's actually -- it's very similar to what we

13  just saw.  It's just showing all those different tactics

14  which are the things inside the wheel and how these are

15  control tactics and how that leads to an achievement of

16  power.

17         Q.    Okay.  On the part of whom?

18         A.    The batterer.

19         Q.    Okay.  And, again, does the literature suggest

20  that that is the goal of the batterer to achieve power?

21         A.    Yes, it is.

22         Q.    And power specifically in the relationship with

23  the intimate other?

24         A.    Yes.

25         Q.    Okay.  You wouldn't -- this really has no

1    relevance or application in determining whether the abuser

2    wants to achieve power in his work or, you know, with his

3    buddies, that kind of thing, right?

4         A.    Well, we're talking about domestic violence, so

5    this is only about the power within the relationship.   That

6    doesn't mean that person doesn't also do that in other

7    relationships.

8         Q.    All right.

9         A.    May or may not.

10        Q.    Okay.  Let's go back to that just one time.   I

11   think there was one category we didn't discuss in the context

12   of the wheel.  Denying and blaming.  What is that about?

13        A.    Oh, common -- common tactics used by a person

14   who is abusive who always denies, minimizes and blames the

15   other person for whatever is wrong in his or her life or in

16   the world or with the dinner or whatever.

17        Q.    Okay.  You see that in these relationships?

18        A.    Yes.

19        Q.    Okay.  All right.  Okay.  Again, this relates

20   back to the myth --

21        A.    Correct.

22        Q.    -- that if the person doesn't leave, sometimes

23   it's their fault or they're not a victim of domestic

24   violence?

25        A.    Right.

1          Q.    Tell me then -- talk to me about why victims

2    stay in these relationships?

3          A.    Okay.   There are -- we have two slides on this

4    so there's one, two, three, four, five -- I think I have 12

5    reasons.

6          Q.    Again, this list is nonexclusive of all other

7    reasons, but these are the generally seen reasons --

8          A.    Right.

9          Q.    -- that come from research in your clinical

10   practice?

11         A.    Exactly.

12         Q.    Okay.

13         A.    I'm wondering if we could just look at this

14   first slide in its totality?  And the reason I want to do

15   that is because they not only go together, but one doesn't

16   generally happen without another.

17         Q.    Okay.

18         A.    I'm not sure if I'm being clear.

19         Q.    How do you want to set this up?

20         A.    Well, I want to leave it there, but I just want

21   everybody to hear that.

22         Q.    Okay.

23         A.    That fear and love, when you first look at

24   those two words, you would say to yourself how could that

25   possibly go together in one person's life?  But they do all

1    the time --

2         Q.    Okay.

3         A.    -- to a person who loves another human but can

4    also be terrified at the same time and all they want is for

5    the bad stuff to stop.  That doesn't mean they want the

6    relationship to end.  So you can be afraid and still love and

7    stay because of that, so the fear could be "I'm too afraid to

8    leave because he's threatened me if I do," so I stay.

9              That may not make sense if you don't understand

10   what domestic violence is about.  You may look at the word

11   "fear" and think that makes absolutely no sense.  If you're

12   afraid, of course, you're going to get out.  But we're

13   talking about a level of fear that goes to the heart, that

14   makes you fearful or maybe you've tried to get out and

15   something bad has happened, or you just listen to those

16   threats on and on and on and everything else that's happening

17   inside that relationship where your self esteem is being

18   lowered and all the other things we talk about in domestic

19   violence and you think "there's no way I'm in fear."  So

20   that's the fear I'm talking about.

21             Love, yeah.  The love doesn't stop unless

22   something big happens, you know, and you can't predict

23   whether that's ever going to happen, but people I work with

24   that stay, stay in love.

25        Q.    Is there a phenomenon in the research or your

1    clinical experience that the victim of the abuse forgives a

2    host of bad acts when the there's a demonstration of love

3    periodically?

4            A.    Absolutely.

5            Q.    Explain that to us.

6            A.    I didn't create a slide on this, but I can talk

7    about it briefly, and I didn't create a slide for the very

8    expressed reason that people have a hard time with it, but

9    I'll talk about it anyway.  And maybe I could make it clear,

10   it's called the Cycle Theory of Violence.  It was created by

11   a person by the name of Eleanor Walker in 1979 based on 400

12   women that she studied as part of her research project.  And

13   basically it says the cycle -- there are three prongs to the

14   cycle.  There's the verbal, the angry outburst that

15   eventually at some point is going to lead to a physical

16   contact -- beating, hitting, slapping -- which eventually

17   leads to the honeymoon phase -- "I love you, I love you, I

18   love you; I'm sorry, I don't know why I did that; if you

19   didn't do this, I wouldn't do that" -- that's the cycle you

20   go from Stage 1 to Stage 2 to Stage 3.

21            The reason I didn't make a slide of it is

22   because still in the year 2004, even though it was designed

23   in 1979, it's never been proven empirically.  It's really a

24   conceptual framework.  It's not even a theory, but people

25   call it a theory because I think it's been around for so long

1    we just accept it.  But in reality, we know it doesn't fit

2    all human experiences that we would call domestic violence,

3    so that's why I left it out.  But now I'm having to talk

4    about it.

5            Q.    All right.  But there are circumstances when

6    one good act absolves a host of bad acts?

7            A.    Of course.

8            Q.    Okay.  Economic dependency, why victims stay.

9            A.    Often types it's the woman who's economically

10   dependent on the man.  I mean, that's the more common way of

11   seeing this.  So if she's dependent on him for her livelihood

12   and putting food on the table for children, she's not going

13   to risk not having a home and not having food for the kids.

14           Q.    Okay.  Is there a converse to that as well

15   where the woman is the -- the mommy, if you will, and

16   provides for the -- the abuser and feeling that if she

17   leaves, this person can't take care of himself?

18           A.    Sure.

19           Q.    Okay.

20           A.    It's the same phenomenon.

21           Q.    Okay.

22           A.    Just reversed role.

23           Q.    All right.  Why victims stay, belief abuser

24   will change.

25           A.    Right.  That's always the hope.  It's not that

1    the victim wants the relationship to end.  It's really about

2    wanting that person to stop doing whatever it is that he or

3    she is doing that is so harmful or hurtful.  They just want

4    that person to get fixed.  They don't want an -- you know,

5    the relationship to dissolve.

6            Q.    Okay.  How realistic in your experience or in

7    the literature is this expectation that the abuse slash

8    abuser will change the bad components of this personality?

9            A.    I do have to say that the research on that, on

10   battering and the efficacy of treatment is very poor.  The

11   research that's out there makes it look like batterers don't

12   ever change.  I don't know if that's true or not.

13           Q.    Why victims stay, isolation.

14           A.    Again, if you -- if you're keeping your victim

15   away from sources of support, then by the time you're into

16   this relationship for any length of time, you've lost

17   everybody and it makes you feel it's one more reason why

18   you're going to say to yourself "there's no way I can get out

19   of here."

20           Q.    Okay.  Explain that to me in terms of an

21   example using -- I mean, you talked about in the beginning

22   eliminating close personal friends for the abused person by

23   the abuser.

24           A.    Uh-huh.

25           Q.    That works from what you're saying to keep the

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1   relationships because they have no support outside of that

2   relationship --

3       A.   Right.

4       Q.   -- nobody to run to, nobody to turn to?

5       A.   Right.

6       Q.   Okay.   Why victims stay, situation not taken

7   seriously by others.

8       A.   Well, you know, if we live in a society where

9   domestic violence is just sort of routine, and if we all know

10  somebody in which this is a part of their life, then we tend

11  to take it less seriously.

12      Q.   So that has to do with relationship of other

13  people like moms and dads of the abused victim?

14      A.   Right.   Especially if it's in that person's

15  experience.

16      Q.   Okay.

17      A.   So if mom and dad don't take it very seriously,

18  maybe it was part of their life too and they got by it or

19  lived through it, whatever.

20      Q.   So there's a generational content here.   If the

21  mom was abused and didn't leave, that's a role model for

22  subsequent generations?

23      A.   Right.

24      Q.   Okay.

25      A.   Can be.

1         Q.     Can be.  Okay.  And, again, what you're talking

2    about are in general here?

3         A.     Right.

4         Q.     These elements and concepts are seen in some,

5    not in other relationships?

6         A.     Right.  And in some relationships you may only

7    have two, in others you have all twelve.  Just depends.

8         Q.     Let's go over the topic, at least with regard

9    to the ELMO presentation, how is it you could come to

10   conclusions about whether or not persons are victims of

11   domestic violence?  Are you looking for a number of elements?

12   How do we -- what's the methodology to come to your solution?

13        A.     Are you asking me to talk about the assessment

14   process?

15        Q.     Well, we'll get to that more in particular --

16        A.     Okay.

17        Q.     -- but, again, how are you coming to these

18   conclusions in general?

19        A.     Domestic violence has to be seen.  We know a

20   context.  You can't take one act or one night.  So in order

21   for me to make a decision about whether or not a person is

22   involved in a domestic violence relationship, I need to know

23   the totality of that person's relationship, at least with the

24   abuser.  But more than that I want to be able to do a very

25   thorough -- in my business it's called a psychosocial

1    assessment.  So I'm looking at everything from childhood up

2    until the moment I'm seeing her or him.

3         Q.    Okay.  Last factor why victims stay, social and

4    cultural factors?

5         A.    This goes back to the social history we talked

6    about a little while ago, but also talks about certain

7    cultures or ethnic groups who may still sustain firmly

8    entrenched gender roles.  And you may be a party to that

9    religiously and culturally.  You may belong to a religion

10   that has as its dictate or edict that you must remain and if

11   you can't fix that violence then maybe there's something

12   wrong with you that you're not able to fix it.

13        Q.    So you could also include in that category

14   social, cultural, and religious factors?

15        A.    Actually, religion is on the next page.

16        Q.    Okay.  All right.  Why victims stay, religion.

17   Talk to me about that.

18        A.    There's been a concerted effort on the part of

19   domestic violence educators and advocates, I would say in at

20   least the last five years, maybe longer than that, to do

21   trainings with members of the clergy of all different faiths

22   because a lot of victims are also religious people.  And

23   so --.

24              And that doesn't mean that's good or bad.  It's

25   just a fact that in society there's a large group who are

1    religious so that she may be more likely to use their clergy

2    person as a support person as opposed to going to a social

3    worker, psychologist or battered women's shelter, therefore,

4    if that's what people are going to do, we obviously need to

5    have them trained as well.  So there's been this concerted

6    effort to have that happen.

7        Q.   Okay.  And these religious counselors like

8    priests and rabbis, they're advice obviously may be

9    scripturally based --

10       A.   Right.

11       Q.   -- and maybe giving advice to the abused person

12   different or contrary --

13       A.   Right.

14       Q.   -- to what you may advise?

15       A.   Right, right, right.  Telling them to stay and

16   work on the issues.  Or seeing them jointly as a couple,

17   which the literature that I read would point to the fact that

18   would be very dangerous.

19       Q.   Okay.  All right.  Why victims stay, low self

20   esteem.  What's that about?

21       A.   That's just a phenomenon that seems to occur in

22   every violent relationship that I've had experience with

23   where over time.  All these different things that have

24   happened that we've been talking about all afternoon, they

25   wear you down, wear you down to the point where you really

1    believe you've got no worth.

2          Q.    Are there other adjectives to explain low self

3    esteem?

4          A.    Feeling incompetent either as a wife, a mother,

5    employee, feeling that my opinion is useless or worthless.

6    Anything I do is wrong.  Those kinds of things.

7          Q.    Why victims stay, self explanatory, for the

8    children.

9          A.    Well, it may and may not be because some people

10   might say, well, for the children you need to get out.  But a

11   woman who's caught up in this may be staying because in her

12   mind the most important thing is having two parents in the

13   household and so better to stay, have a dad for my children,

14   have a roof, have food and have the presentation of family

15   than to leave and not know what might happen.

16         Q.    Okay.  And then maybe some relationship to that

17   category to the religious category?

18         A.    There could but it -- religion doesn't have to

19   play a part in that.

20         Q.    It can though?

21         A.    It can, right.

22         Q.    Okay.  Why victims stay, failure of the system.

23         A.    Well, the research is replete with that,

24   meaning it is filled with the idea that until as a society we

25   all come together and we have a coordinated community

118

1    response to domestic violence, we're just never going to end

2    this problem.

3                  We have too many people coming at it from

4    different perspectives.  We still have law enforcement in

5    some parts of this country that still turn their backs and

6    just tell the abuser to take a walk and never even write a

7    report.

8         Q.    So there's no consequences?

9         A.    There's no consequences.  That happens multiple

10   times, I'm sure, in multiple places in this country, so the

11   idea is we have to get everybody on the same page if we

12   really want to make a dent.

13        Q.    Okay.  So there needs to be a culture of --

14        A.    No tolerance.

15        Q.    Exactly.  And allowing the abused person to

16   leave without the stigma of leaving?

17        A.    Right.

18        Q.    Okay.  Why victims stay, social.

19        A.    That can be more related to culture or status.

20   If I see myself as a woman as needing to be in a

21   relationship, then I may not see divorce or separation as an

22   option because to be a woman alone puts me down a peg, and so

23   I need to maintain that image of wife, mother, intact family

24   as opposed to separated or divorced.

25        Q.    Okay.  So it's better to be a married abused

1    person than a divorced person free of abuse?

2         A.    To some people, yes.

3         Q.    Okay.  Why victims stay, spousal loyalty.

4         A.    As we said just a few minutes ago, love is

5    still a very important component in these relationships.  And

6    so, you know, you've been with this person a number of years,

7    we've had kids together, and I want to do what I can for this

8    other person.

9                   There are good times in any domestic violence

10   relationship.  There are good times.  In fact, I've read in a

11   myriad of places where the -- you know, it ranges anywhere

12   from the battering abusive stuff is anywhere from 30 to 40

13   percent of the time.  That means there's a large portion in

14   which things are good.  So I am loyal.  I just want this

15   fixed.

16        Q.    Okay.  How about conceptually I can't leave him

17   because he can't -- can't do without me?

18        A.    Right.

19        Q.    Can't take care of himself?

20        A.    Right.

21        Q.    He needs me?

22        A.    Right.

23        Q.    Okay.  Is that part of spousal loyalty?

24        A.    Sure, sure.  There's lots of dependency both

25   ways.

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1     Q.     All right how about circumstances where the

2     batterer may have his own set of problems like disease.

3     Would that influence that particular component?

4     A.     I imagine that it would influence it pretty

5     dramatically.

6     Q.     All right.  Where do we go now?  Okay.  This

7     one's entitled Common Characteristics of Battered Women.  And

8     are these things derived from both the literature and your

9     clinical experiences?

10     A.     Yes.

11     Q.     Okay.  Again, low self esteem.  Can you give me

12     a nutshell explanation of what that means?

13     A.     Could we go back to the title?

14     Q.     Okay.

15     A.     When I -- when I created this slide, I

16     struggled with the use of the word "common" as opposed to

17     saying characteristics of some battered women.  Because what

18     I would want people to hear is that there's no one profile.

19     We keep trying to create that profile, you know, with these

20     lists.  I'm adding to that problem by doing it this way.  But

21     in trying to make things clearer, I think we need to be able

22     to list things.  But what's important is that not every

23     battered woman looks the same, acts the same, feels the same.

24     We're all individuals.  All women are individuals whether

25     they're battered or not.  So I've created this list but I

1   just want it clear that not every battered woman has all of

2   these.  Many battered women may have two, three, four,

3   whatever, and that it's really a very individualized

4   phenomenon.

5          Q.    Okay.

6          A.    Low self esteem we've talked quite a lot about

7   because it's so pervasive.

8          Q.    All right.  Believes in family unit.

9          A.    Keeping the family together at all costs.

10         Q.    That's a commonality you've seen in your

11  clinical practice and in the research?

12         A.    Right.

13         Q.    Accepts responsibility for abuser actions.

14         A.    Right.  There has to be an explanation and he's

15  not accepting it, so she accepts it.  Because at this point

16  in time, she's whatever he said, that's she's fat, she can't

17  do this right, can't do that right, so when he comes home and

18  blows up, it must have been my fault.  Because he's telling

19  her and she's already, you know, been emotionally beaten up

20  so she believes it.

21         Q.    Okay.  Suffers from guilt yet denies feelings

22  of terror and anger.

23         A.    Uh-huh.  If, for a moment, we could imagine

24  what it must be like to be a victim and to stay in that

25  relationship.  I think if we can put ourselves in those shoes

1    and think about the fact that it happens over and over and

2    over again, and over years sometimes, I think it's pretty

3    clear that maybe what we do is we'd have to stop thinking

4    about it.  Because we can't survive mentally intact thinking

5    about not knowing when the next thing's going to happen,

6    because no matter how good I make this rice pudding, it just

7    might not be good enough today.  So I can't deal with that,

8    and instead I'm going to just block it out.  So, yeah, you

9    ask me if I'm scared or angry, I'm going to say no,

10   everything's fine, yet feel terrible at the same time because

11   by now I really do believe that it's my fault.

12            Q.    Okay.  Common descriptions of women, has severe

13   stress reactions.

14            A.    That goes perfectly with what I just talked

15   about.  Even though she's shutting down and not allowing

16   herself to feel those things, your mind may shut it out but

17   your body will still feel it.  So there's often times at

18   least in the literature you see cases where people start

19   having somatic kinds of problems, stomach ulcers, headaches,

20   things like that.  Again, that's not everybody's experience.

21            Q.    Okay.  How about self medicative.

22            A.    Well, yes.  Unfortunately, we find that

23   there's -- and I can't tell you the percentage because I

24   haven't looked recently, but I know that in the literature it

25   talks about a certain percentage of woman who will self

1    medicate to kind of numb out.  I can tell you that when I was

2    working at Native American Connections, which is the

3    substance abuse treatment facility, I'll never forget a woman

4    who said she knew if her husband wasn't home by 10:00, that

5    meant he'd be out drinking that night and come home and drunk

6    and want to have sex with her.  So at night she would set her

7    alarm to get her up so she would start drinking enough to

8    pass out so she would be passed out when her husband came

9    home, and in that process she became an alcoholic.

10        Q.    So resort to alcohol, drugs, pharmaceuticals,

11   those kinds of things?

12        A.    As a way of numbing, yes.

13        Q.    Okay.  Next page, common characteristics

14   continued.  Believes in -- believes no one can help, places

15   responsibility on themselves for, quote, fixing it?

16        A.    Mm-hmm.

17        Q.    What's that about?

18        A.    You have to remember that at this point in time

19   she's probably been isolated, so her support system is gone.

20   She may not even know that there are outside services.  Most

21   of the women I've dealt with don't even know about shelters.

22   It's like they never heard the term even.

23        Q.    Okay.  And does that relate to the phenomenon

24   that they don't consider themselves abused victims therefore

25   they don't seek out resources?

1       A.      Right.  Most of the time when I ask women if

2   they have experienced domestic violence, they say no.  And it

3   isn't until you get halfway through the interview they start

4   saying oh, yeah, because they start hearing themselves tell

5   their story.

6       Q.      And they approach it with a very narrow

7   definition of domestic violence?

8       A.      Right, with the beating, hitting.

9       Q.      If my husband's not hitting me, I can't be a

10  victim of domestic violence?

11      A.      Right.  Or if the hits are not that bad, I

12  can't be a --

13      Q.      Tolerable?

14      A.      -- victim, yes.

15      Q.      To that end, not knowing they're in fact

16  abused, the resources -- they don't seek out resources that

17  may be there.

18      A.      And the second places responsibility on them,

19  they can fix it.  Because that's what they've been told

20  repeatedly, This is your fault, this is what you've done, et

21  cetera, et cetera, et cetera.  So they do believe they are

22  responsible and that if they can't fix it, nobody can.

23      Q.      All right.  Next bullet is history of family

24  violence has a common characteristic?

25      A.      They've seen it in their parents or siblings.

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1   Again, this may or may not be true.  It's just another

2   characteristic.

3           Q.    Okay.  Has unrealistic hope that change is

4   imminent, believes in abuser's promises.  Again, as a common

5   characteristic, what's that all about?

6           A.    Wanting to believe that he does love me, he

7   wants this relationship as much as I do, and we're going to

8   get through this because we had a good day yesterday and

9   we're going to build on that good day.

10          Q.    Okay.  So if there's any process at all towards

11  resolving the problem, the abused person gives the abuser

12  credit?

13          A.    Right, right.

14          Q.    Okay.  All right. May suffer from depression as

15  a common characteristic?

16          A.    Right.  Well, and that makes sense.  When you

17  think about what we're talking about here, why somebody might

18  become depressed, based on these kinds of living conditions

19  it makes sense that doesn't necessarily mean it meets the

20  criteria of clinical depression.

21          Q.    Okay.  All right.  Now, depression not in a

22  clinical DSM IV kind of thing?

23          A.    Right.

24          Q.    The commonly accepted definition?

25          A.    Right, like looses energy, starts overeating,

1    those kind of things.

2            Q.    Okay.  Common characteristics, last one on that

3    page, is isolated from others.

4            A.    Yeah, and we've talked about that quite a lot.

5            Q.    Okay.

6            A.    They are in fact isolated from their loved ones

7    because of his tactics.

8            Q.    Okay.  Let me ask you one thing about the

9    concept of isolation.  Is it in the research from your

10   clinical experience the abuser will allow the abused person

11   to run with a certain group of people but exclude other

12   groups of people?

13           A.    Right.  That's just another ramification of

14   isolation.  Isolating her from the people that she would

15   choose to have as her support like mother, sister, cousin,

16   whatever.

17           Q.    All right.  Best friends from high school?

18           A.    Right, right.

19           Q.    All right.  This slide focuses on the other end

20   of the proposition?

21           A.    Right.

22           Q.    The common characteristics of -- common's not

23   there, but --

24           A.    But should be.

25           Q.    Often seen characteristics in the abuser?

1      A.    Right.

2      Q.    Again, this is not exclusive.  There are other

3  characteristics that we just haven't talked about.

4      A.    Correct.

5      Q.    Okay.  Abuser characteristics, low impulse

6  control.

7      A.    Knows what he wants and wants it now, can't

8  wait for it.  You know, needs immediate gratification.

9      Q.    Okay.  Impulse buying?

10     A.    Impulse buying, right.  Needing to do whatever

11  it is, he needs to do it now.

12     Q.    Okay.  Limited tolerance for change?

13     A.    Status quo, things need to be status quo,

14  things at peace, don't change anything.

15     Q.    Okay.  So abused -- give me a concrete example

16  of limited tolerance for change?

17     A.    Doesn't want her doing anything that she hasn't

18  been doing for the last ten years.

19     Q.    Okay.

20     A.    So this is what we do on Friday nights, this is

21  how you act, this is how you dress, don't upset the apple

22  cart.

23     Q.    Okay.  Bullet number 3, do not -- my eyes are

24  going -- do not cope well with stress.  Abuser should be --?

25     A.    Right.

```
 1          Q.    Does not cope with stress?

 2          A.    Right.

 3          Q.    Okay.  Tell me about that?

 4          A.    Just a low tolerance for stress.  Just like

 5   that immediate gratification, they want everything on an even

 6   keel.  If things are an even keel, he feels he's got control.

 7          Q.    Okay.  Concrete examples, what, flares up,

 8   angers easily --

 9          A.    Right.

10          Q.    -- throws things on a moments notice?

11          A.    Right.  Is quick -- quick to flare and

12   oftentimes you don't know why.

13          Q.    Okay.  Bullet number 4, dependent insecure and

14   fear of abandonment?

15          A.    Uh-huh.

16          Q.    Tell me about that.

17          A.    Well, and that's something that may not be as

18   clear initially, but because of the word "dependent" you

19   would think that someone who abuses his or her partner would

20   be tough and strong and independent, but in fact it's usually

21   the opposite.  That's where the "dependent" comes from.

22   Really that is due to wanting control and power.  It's all

23   about insecurity and the fear she's going to just take off.

24   So to get ride of that fear, I have to really close in the

25   circle.  I can't allow her to do that so, by closing the
```

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

129

1    circle, I'm going to isolate her.  I'm going to make a lot of

2    rules she's got to abide by them.  I'll make it hard for her

3    to get out because I'm really terrified of being abandoned or

4    left.

5            Q.    And that's a significant motivator for the

6    abuser?

7            A.    Yes.

8            Q.    The fear of being abandoned?

9            A.    . Uh-huh. ·

10           THE COURT:  Is that a "yes"?

11           THE WITNESS:  Yes.

12   BY MR. PATTERSON:

13           Q.    Bullet number 5, little tolerance for delayed

14   reinforcement.  What does that mean?

15           A.    Well, that actually really goes with the low

16   impulse control, those kinds of things, but just can't wait

17   for the next thing to happen.  I need for it to happen now.

18   I want to buy this, I don't have the money, we've got to get

19   the money so we could go get it.  That's just one example.

20           Q.    And lastly there appears to be commonality with

21   the abused victim, low self esteem.  Exactly what's that

22   about?

23           A.    Well, when you think about the abuser's need to

24   have total power and control over his or her partner, the

25   reason for that or one reason for that is because I, as the


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    abuser, feel so empty.  I don't feel like I'm worth much

2    either.  And the way I derive my worth is by controlling you

3    and your actions and making you do things for me, that's what

4    makes me important.

5         Q.   Next slide.  How many more do we have here?

6         MR. MCCLOUD:  Five more characteristics.

7         MR. PATTERSON:  Judge, we're getting near the end here.

8    We have two more slides.  Should I just wrap this up or --

9         THE COURT:  You tell me.

10        MR. PATTERSON:  -- finish on Tuesday?

11        THE COURT:  You want to take a recess right now?  Is

12   this a good time to take a recess?

13        MR. PATTERSON:  Yeah.  We could take it now, Judge.

14        THE COURT:  Okay.  Let's go ahead and take our

15   evening recess at this point in time.  Also, this is our

16   sustained weekend recess.  There's some of us fortunate

17   enough here in Superior Court and county that get Monday off

18   for Columbus Day.  I hope all of you are so lucky, but we

19   have Monday off for Columbus Day so the courthouse will be

20   closed on Monday, so some of us are fortunate because of that

21   to have Monday off.  We won't have trial again until Tuesday,

22   October 12, so remember, don't come here on Monday because

23   courthouse will be closed.  You could come down here, but it

24   will be closed.

25             But I just don't want you to forget that and

1    have you make a trip here on Monday for no reason, so

2    remember we won't have trial on Monday.  We'll have it on

3    Tuesday beginning at 1:00 p.m. again.

4              During this extended weekend recess remember

5    the entire admonition I gave you, and I do want to add

6    another thing to be careful about.  Avoid speaking with or

7    having any contact with any of the parties or witnesses or

8    attorneys in this case or any of the witnesses or spectators.

9    They've been instructed not to have any contact with you, so

10   they're avoiding you.  They're not being rude.  We just want

11   to avoid even the appearance, even the appearance of

12   impropriety, so just avoid them.  And remember that they're

13   not being rude.  They've just been instructed by the Court

14   not to have any contact with you because we want to avoid

15   even the appearance of impropriety.

16             Also, remember the entire admonition I gave you

17   including the fact do not discuss the case with anyone, do

18   not let anyone discuss the case with you, do not do any

19   research, experimentation or testing on your own.  Avoid any

20   media coverage on this case.  Have a nice weekend.  We'll see

21   you on Tuesday at 1:00 p.m.  Have a nice weekend.  I'll stay

22   here with Counsel.

23

24             (Whereupon, the jury exits the courtroom.)

25

1          THE COURT:  Please be seated.  This is cause number

2     CR 2000-096032, State of Arizona versus Wendi Elizabeth

3     Andriano.  The record will reflect the presence of Defendant,

4     Counsel, and we're outside the presence of the jury.

5               Mr. Patterson, you wanted to bring up an issue

6     about hearsay?

7          MR. PATTERSON:  Yes.

8          THE COURT:  What I would like for you to do is this,

9     okay, because we're short of time --

10         MR. PATTERSON:  Yes.

11         THE COURT:  Why don't you go ahead and state what you

12    feel or what you're requesting, and I'll have both you and

13    Mr. Martinez fax the Court or email the Court tomorrow legal

14    memoranda on that issue.  State what that issue is so Mr.

15    Martinez knows what the issue is, and I'll allow both sides

16    the opportunity to brief it and fax or email a brief, a very

17    short brief on that.

18         MR. PATTERSON:  Judge, before we start on that,

19    perhaps we could excuse the witness?

20         THE COURT:  Yes.  I keep forgetting to go do that.

21    Sorry.

22         MR. PATTERSON:  Specific issue I want to raise with

23    the Court, we had Mr. Ochoa on the stand the other day and

24    Mr. DeLozier had gone through a series of meetings, if you

25    will, or contacts, if you will, between him or among him and

1    the decedent and my client pertaining to the issue of life

2    insurance.  There was no objection to the -- the sequence as

3    it progressed up to about May or September --

4          MR. DELOZIER:  September.

5          MR. PATTERSON:  September of 2000.  Then Mr. DeLozier

6    referenced a conversation that they had.  There was an

7    objection interposed based upon hearsay and Your Honor

8    sustained it, and we had a brief side bar conference and you

9    didn't change your position.

10         My position is that just because there's an out

11   of court statement made by the person, it is not always

12   hearsay, particularly when it's not offered for the truth of

13   the matter asserted but rather what conduct it precipitated.

14         THE COURT:  What specifically did you want to bring

15   out through the testimony of Mr. Ochoa?

16         MR. PATTERSON:  Okay.  Mr. Ochoa will tell the Court,

17   if allowed to testify on this issue, that the meeting he had

18   with Mr. Andriano and Mrs. Andriano pertained to life

19   insurance, pertained to a specific instance of having

20   somebody pose as Mr. Andriano and in an effort to fraudulent

21   -- my lips are running out of gas here, Judge -- fraudulently

22   obtain a life insurance policy.  The topic was defrauding an

23   insurance company.  Mr. Ochoa told them specifically that it

24   was criminal, that in no uncertain terms they shouldn't do

25   it, and that was his advice.  And we're not offering what he

1    said as truth, okay, because what he could be saying is

2    complete poppycock, but what he said caused my client to

3    terminate her efforts to acquire these policies.  That's why

4    you'll see as an explanation for what we've already heard

5    testimony he made at the initial preappointment and never

6    really followed up on.

7         THE COURT:  Let me ask you, who made the statement

8    you're referring to or what specific -- say what statement

9    are you referring to and who made that statement.

10        MR. PATTERSON:  The statement you excluded or

11   precluded would be Mr. Ochoa's statement I told these kids

12   not to engage in this practice because it's fraudulent and

13   it's a crime and you shouldn't be doing it.

14            And it's, like I say, important for two

15   propositions:  A, that it explains the abrupt cessation of

16   the efforts to acquire the life insurance, and also it shows

17   that the decedent, Mr. Andriano, was present when those

18   things were happening and therefore could have had knowledge

19   in that regard, okay?

20            But the -- the principle reason it's not

21   hearsay is because it shows my client's conduct.  And she

22   will, if she takes the stand, will testify "that's why we

23   stopped seeking these insurance policies.  My dad said I

24   could get in trouble so I quit doing it."  So, again, it's

25   not offered for the truth of what Mr. Ochoa is relating to

```
 1    us, it's offered to show my client's response and why she
 2    did what she did thereafter.  It's not offered for the truth
 3    of the matter asserted, therefore it's not a hearsay
 4    declaration.
 5         THE COURT:  But the specific statement that you want
 6    to bring in through Mr. Ochoa is specifically that Mr. Ochoa
 7    told the defendant and Joe Andriano not to engage in the
 8    conduct of having someone pose as Mr. Andriano in order
 9    obtain an insurance policy because that's criminal.
10         MR. PATTERSON:  Yes.  That's the --
11         THE COURT:  That's the statement, right?
12         MR. PATTERSON:  Yes.  That's the substance of Mr.
13    Ochoa's statement.
14         THE COURT:  But that's what you want to bring in?
15    You don't want to --
16         MR. DELOZIER:  No.
17         MR. PATTERSON:  No.
18         THE COURT:  -- say what Mr. Andriano might say?
19              Do you understand what Mr. Patterson is saying?
20         MR. MARTINEZ:  Yes.  He wants to bring in rank
21    hearsay, specifically I told those two not to engage in this
22    practice of having someone pose as Mr. Andriano.
23         THE COURT:  Okay.  I'll allow both sides to brief
24    that issue for me.  Go ahead and fax it over to the Court.  I
25    think one of you -- I think Mr. Martinez usually emails it to
```

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000007293

1    my judicial assistant, and you, I think your office actually

2    emails it to me.  The normal practice would be to go ahead

3    and email it to my judicial assistant --

4             MR. PATTERSON:  Okay.

5             THE COURT:  -- But --

6             MR. PATTERSON:  I --

7             THE COURT:  -- He may not be here tomorrow afternoon,

8    so just go ahead and email it to me, although that's not the

9    normal practice, if that's agreeable, and email it to

10   opposing Counsel.

11            MR. PATTERSON:  I'm --

12            THE COURT:  Or fax it.

13            MR. PATTERSON:  -- not conversant with that.  Why

14   don't we put you and Jim on the email, that way we're sure

15   everybody gets it.

16            THE COURT:  Just make sure I'm on it because his

17   computer may be shut down.  He may not be here.

18            MR. PATTERSON:  All right.

19            THE COURT:  Or you could fax it and make sure -- we

20   have the same fax number, right?  Or fax it to me.  But if

21   you could do it by 3:00 p.m.  The other thing I'm allowing

22   Counsel to do is this.  Since I haven't gotten to that point,

23   I want to make sure I make the right decision with regard to

24   that issue of the defendant telling Dr. Murphy about Mr.

25   Andriano contemplating suicide in early Fall of 2000.  I'll

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    allow you to explore that a little bit further.  And going

2    past that, go to where what Mr. Martinez was requesting in

3    the event I don't allow that, okay?

4         MR. PATTERSON:  About Shawn King and picking up

5    poison?  Isn't that what you mentioned?

6         MR. MARTINEZ:  I did, yes.

7         THE COURT:  Okay.  Go ahead and brief that for me

8    further --

9         MR. PATTERSON:  Okay.

10         THE COURT:  -- since we haven't gotten to that --

11         MR. PATTERSON:  All right, Judge.

12         THE COURT:  -- point yet.  So get it to me by 3:00

13    p.m. tomorrow.

14         MR. PATTERSON:  You want the limiting instruction

15    issue too?

16         THE COURT:  Right.  And the limiting instruction

17    also.  Look at Rule 105, okay?

18         MR. PATTERSON:  I will.

19         THE COURT:  Anything further from either Counsel?

20         MR. MARTINEZ:  No, sir.

21         MR. PATTERSON:  No, Judge.  Thank you.

22         THE COURT:  Okay.  Have a nice weekend.  We'll be in

23    recess.

24

25                    (Evening recess.)


        TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

138

1

2

3                    CERTIFICATE OF REPORTER

4

5    STATE OF ARIZONA      )
                           )
6    COUNTY OF MARICOPA    )

7

8               I, Traci L. Wheeler, CSR, RPR, an official

9    and certified reporter in the Superior Court of the State

10   of Arizona, in and for the County of Maricopa, hereby

11   certify that I made a shorthand record of the proceedings

12   had in the within case, and that the foregoing transcript

13   is a full, true, and correct transcription of the

14   proceedings in this case.

15               Dated this 12th day of May, 2005.

16

17

18               _____
                 Traci L. Wheeler, CSR, RPR
19               Certified Court Reporter No. 50313
                 Official Court Reporter
20

21

22

23

24

25



        TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

EXHIBIT OO

000007297

DP

05-0007₁
Braccio



1              IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

2                  IN AND FOR THE COUNTY OF MARICOPA

3

4       STATE OF ARIZONA,              )
                                       )
5                Plaintiff,            )
                                       )
6       v.                             )        No. 1 CA-CR 04-0731
                                       )        MARICOPA COUNTY
7       WENDI ELIZABETH ANDRIANO,      )        No. CR 2000-096032
                                       )
8                Defendant.            )
        _____)

9

10

11

12                              Mesa, Arizona
                             October 12, 2004
13

14

15

                  BEFORE:   The Honorable BRIAN K. ISHIKAWA
16

17

18             REPORTER'S TRANSCRIPT OF PROCEEDINGS

19                          TRIAL DAY 26

20

21

22

23

24      ORIGINAL Prepared for APPEAL by:
        TRACI L. WHEELER, CSR, RPR
25      Certified Court Reporter No. 50313


            TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

2

1                          A P P E A R A N C E S

2      FOR THE STATE:          JUAN M. MARTINEZ,
                               Deputy County Attorney
3
       FOR THE DEFENDANT:      DANIEL B. PATTERSON,
4                              Deputy Public Defender
                                       and
5                              G. DAVID DELOZIER,
                               Attorney at Law
6

7           I N D E X   O F   E X A M I N A T I O N

8      WITNESS                                           PAGE

9      MURPHY, SHARON, Called to testify by the Defense
               Continued Direct Examination by Mr. Patterson    3
10             Continued Direct Examination by Mr. Patterson   31
               Continued Direct Examination by Mr. Patterson   81
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

3

1                    MESA, ARIZONA, TUESDAY, OCTOBER 12, 2004

2

3          THE COURT:  Good afternoon.  This is trial in cause

4     number CR 2000-096032, State of Arizona versus Wendi

5     Elizabeth Andriano.  The record will reflect the presence of

6     the Defendant, Counsel and the jury.  Sharon Murphy is on the

7     witness stand, and we'll continue with the direct examination

8     by Mr. Patterson.

9                    Mr. Patterson?

10

11                    SHARON MURPHY,

12          CALLED TO TESTIFY ON BEHALF OF THE DEFENDANT,

13      HAVING PREVIOUSLY BEEN DULY SWORN, TESTIFIES FURTHER:

14

15     CONTINUED DIRECT EXAMINATION BY MR. PATTERSON:

16          Q.    You are Dr. Sharon Murphy?

17          A.    Yes.

18          Q.    You are the same witness who was testifying

19     last time before our break?

20          A.    Yes.

21          Q.    You realize you're still under oath?

22          A.    Yes.

23          Q.    Would you please come down to the podium and

24     we'll wrap up the slide presentation.  I think we have two

25     more slides?

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

4

1        A.     Yes.

2        Q.     If you could stand on this side.

3               Okay.  We were talking about common

4   characteristics seen in abusive spouses, and we've gotten

5   midway through it.  This next common characteristic is the

6   abuser is generally from a dysfunctional family and may have

7   witnessed abuse between parents.  Would you explain that in

8   greater detail?

9        A.     Yes.  I said also on Thursday, when we were

10  talking about characteristics in general, that these are a

11  list and they are the common ones, but you don't find them

12  necessarily in all cases.  This particular bullet implies

13  that there are some abusers who come from families in which

14  they may have witnessed domestic violence or have been,

15  perhaps, victims of child abuse in their own family.

16       Q.     Does this seem to suggest this is learned

17  behavior rather than genetic imprinted behavior?

18       A.     Right.  That's one of the theories that's most

19  commonly accepted.

20       Q.     Okay.  Next bullet reads, avoids responsibility

21  by rationalizing and blaming others.  Again, could you give

22  us more detail?

23       A.     Typically found in most individuals who abuse

24  their partners, you see minimalization, denial and blaming,

25  in effect not accepting responsibility for any abusive

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    behavior.

2         Q.    Could you give us an example?

3         A.    A common example might be after an abusive

4    incident, he may say to her, "Look what you made me do, if

5    you hadn't done such and such, I wouldn't have had to do this

6    to you."

7         Q.    Third bullet reads Avoids facts, quote, I think

8    it is this way so it is, closed quote.  Again, what do you

9    mean by this?

10        A.    Not accepting her opinion on anything.

11   Whatever he says goes.

12        Q.    Okay.  Does that relate then to the male

13   privilege doctrine that you talked about earlier?

14        A.    Exactly.

15        Q.    Okay.  And let's see, fourth one is believes

16   they are better and different than others.  Again, could you

17   explain that for us?

18        A.    Often times people who batter feel entitled,

19   feel like they have a right to do something because of who

20   they are, however they came about that understanding, and so

21   they stand out, they have a right, they're entitled, they're

22   privileged.

23        Q.    And the last bullet on this slide reads uses

24   anger to intimidate and control others.  What do you mean by

25   that?  Self explanatory?

1          A.    It is with one caveat.  I had said on Thursday

2    that domestic violence was not based in anger.  I said that

3    it was based on control, so I just want to add to this bullet

4    that what you see is anger, thinking, because you see the

5    violence or the abusive acts or abusive language, so anger is

6    used to intimidate and control others.  It's just not --

7    that's not the whole story.

8          Q.    Okay.  And can you differentiate for us kind of

9    for a better term anger that non abusers manifest, okay,

10   being angry over things which is kind of a common human

11   experience as compared to the anger that you see manifested

12   by an abuser.  What's the difference there?

13         A.    Well, typical anger is what we're all very used

14   to.  That's just maybe blowing up, being a little loud at

15   times and expressing an opinion that something terrible has

16   happened or whatever.  This kind of anger is very different.

17   There's a purpose to this anger and the purpose is to either

18   control the actions or the thoughts of another person or to

19   intimidate in such a way so that the other person is afraid

20   to do anything different than what the batterer has asked or

21   demanded.

22         Q.    All right.  So there's a significant difference

23   then between the anger of an abuser and the anger that we

24   experience in our normal lives?

25         A.    Correct.

1    Q.    I think we're onto the next slide here.  First

2   one, holds traditional views on women and family.  What do

3   you mean by that?

4    A.    On Thursday we spent a lot of time going over

5   the history.  One of the things we've learned about the

6   history is that there is sort of a sense societally that

7   there are gender roles that are very well defined, and often

8   you see in people who abuse their intimate partner that they

9   hold those kinds of traditional views on women and family,

10  meaning that women and children are typically seen as their

11  property so they could do what they want to do or do with

12  whatever they choose.

13   Q.    Next bullet, can't express or acknowledge

14  feelings?

15   A.    Typically those who abuse their intimate

16  partners are not very much in touch with their feelings.

17  They're not a touchy-feely kind of person, they may be under

18  the influence of alcohol or drugs, but not so much when the

19  alcohol or drugs are not present.

20   Q.    Okay.  So they are isolating kinds of

21  personalities who tend to remain isolated as well?

22   A.    Yes.  And that's not to be confused, however,

23  with not appearing to be happy.  They can still appear happy

24  but not really in touch with what's going on inside them in

25  terms of their rage.

1      Q.    And the last bullet on this slide is views

2   family in terms of ownership.  Is that basically an extension

3   of the first bullet?

4      A.    Yes, it is.

5      Q.    All right.  Does that conclude your

6   presentation on kind of an overview on domestic violence?

7      A.    Yes, it does.

8      Q.    Okay.  Why then -- let's see.  Why don't you

9   take a seat for a minute and let's ask some questions in some

10  other areas.

11            Okay.  Doctor, you kind of broke it down into

12  the common characteristics of abused, common characteristics

13  of abuser.  Is there, in a sense, common characteristics of

14  the relationship between an abuser and an abused person?

15      A.    Well, most commonly the abusive person is the

16  one who has the power and control we talked about and usually

17  is the one who uses violence.

18      Q.    The abuser?

19      A.    The abuser.

20      Q.    Okay.

21      A.    The abused may act in a defensive manner to try

22  to stop whatever the blows are, or sometimes victims don't

23  fight back in any way, just kind of curl up into a ball and

24  sort of, what we say is, take it, not try to fight back in

25  any way.  That's probably the most common thing you'd hear.

1        Q.    Okay.  In the research in your clinical

2    practice, is it your experience that it's common for the

3    abused person to -- to strike back in a violent fashion in

4    terms of dealing with abuse that's existed in a relationship?

5        A.    For the abused person to strike back?

6        Q.    Right.

7        A.    No.

8        Q.    Okay.  What is common in terms of the research

9    in your clinical practice response of the abused person in

10   trying to get out of or avoid that abusive relationship?

11       A.    There's a lot of different things that an

12   abused person might do.  The typical ones that we think about

13   that aren't necessarily demeanor, but the ones that we think

14   as a society we believe in, we think that a victim of

15   domestic violence is going to call the police.  In reality,

16   that's a very small percentage of women that do that.  We

17   think that they're going to pack their bag and pack the kids

18   up and haul off in the middle of the night.  That's also not

19   so often done.  We think that they're going to call their

20   mother or best friend and tell this large tale and have

21   people come and rescue them.  That's not so often done.  We

22   think they're going to call a shelter and seek refuge.  Some

23   people do, of course, but commonly, at least in the -- with

24   the women that I have worked with, what I see is women who

25   try to negotiate.  They want to talk it through.  They want

1    to talk it out.  They don't want this relationship to end.

2    They still love the person.  I know I said that on Thursday

3    also.  They're trying to maintain what they thought they had

4    in the beginning.

5          Q.    I contacted you in an effort to allow you to

6    assist us in this particular case?

7          A.    Correct.

8          Q.    How do you start participating in a domestic

9    violence assessment?

10         A.    It actually begins in the initial meeting with

11   the attorney --

12         Q.    Okay.

13         A.    -- because I'm listening to what the attorney

14   is telling me --

15         Q.    Okay.

16         A.    -- making some decisions up front about whether

17   or not this is even going to be a case that is appropriate.

18         Q.    Okay.  So did you receive an overview of the

19   circumstances --

20         A.    Yes.

21         Q.    -- in Wendi -- Wendi Andriano's circumstance

22   and the nature of this particular proceeding?

23         A.    Yes, I did.

24         Q.    Okay.  What exactly is a domestic violence

25   assessment?  I think you may have to step down, Doctor.

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1       A.      Okay.

2       Q.      And the prospective is not conducive to

3   reading.  Why don't you take the podium?

4       A.      Okay.

5       Q.      Okay?

6       A.      Okay.

7       Q.      How do you start -- well, what is a domestic

8   violence assessment?  Let's start there.

9       A.      Well, an assessment in any way, shape or form,

10  whether it's a clinical assessment or assessment for court,

11  always starts with trying to gather the information to the

12  best of your ability.  So in court cases, you know, it's

13  going to start with -- sometimes it starts with reviewing of

14  the records.  That depends on the attorney and how fast the

15  material comes.

16              But in addition to the reviewing of the

17  records, there's two other main components to an assessment.

18  And they are both the unstructured interview and then the

19  structured interview.

20      Q.      Okay.  And what are you -- are you -- with this

21  domestic violence assessment, striving to answer any kind of

22  questions or -- what is the purpose of this domestic violence

23  assessment?

24      A.      Well, the purpose for court reasons is to

25  determine, first of all, whether or not the person that I'm

1    assessing is in fact a victim of domestic violence.   That's

2    number 1.   And then secondly, what's the level of severity,

3    both physical and nonphysical.   And then number 3, making   a

4    determination based on the -- the assessment tools and the

5    clinical interview and their records all together, whether --

6    you know, whether or not she's met that threshold and making

7    the determination as to the level of abuse.

8              Q.    Okay.   So one of the things that's part and

9    parcel of a domestic violence assessment is review of the

10   records.   What records are relevant to you in this assessment

11   process?

12             A.    In general?

13             Q.    In general.

14             A.    Okay.   Well, any police records.   I would look

15   for any medical records, meaning did the victim, you know,

16   have to go to the emergency room or see the medical room for

17   any injury.   Dental records, because sometimes there's blows

18   to the mouth and she might have needed to seek dental

19   treatment.   Any kind of police records on either side, his or

20   hers.   If there's mental health records, I might ask to see

21   those.   Basically -- well, in some cases, I need to see a

22   medical examiner's report.   If there's a psychiatric or

23   psychological report, I'd ask to see those.   Things that

24   would help me get as much information as I could.

25             Q.    Next entry, unstructured interview.   What

1    exactly Qs that Okay.   Second entry is education?

2         A.    Basically, want to... whether, that would be

3    passed completed elementary and secondary schooling to gather

4    when information about the life experience, how they did.

5    Were there ... of childhood ... as they appear to the present

6    one hand ... of ... the same intelligence?   This is not

7    an intelligence test, but there ... some assumptions there are

8    ... quite a few from high school ... that ... the normal

9    intelligence. I could have added employment, but I think I

10   might have included that ... Why is it ... employment

11   is included in the ... report that ... the ... becomes

12   separate ... because often times there's predecessors to

13   the violence in the ... and ... them ... current and add

14   looking at ... by way of explanation.

15        Q.    Okay.  So ... seeking childhood history,

16   and ... what I said or what I would ask is what's your

17   earliest memory of ... me ... you ... of being up,

18   when ... you ... something ... you ... in school, what

19   kind of ... and ... up ... maybe who they ... back to

20   family, what did you do for social activities, that kind of

21   thing.  Q.    Okay.  Fourth entry is history of relationship

22   with Joseph Andkagno. And why is that relevant?

23        A.    So, in general of ... looking at

24   family ... the ... how ... the ... the person was most

25   recent ... family, how they saw family, how they saw life.

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1          Q.    Okay.  So in general we would delete Joseph
2     Andriano's name and add the spouse?
3          A.    Right.
4          Q.    Okay.
5          A.    Correct.
6          Q.    All right.  Next entry is what's called the
7     structured interview.  Now, why do you categorize one as an
8     unstructured interview and contrast that with what you call
9     a structured interview?
10         A.    The unstructured interview is what a lot of
11    people would call the clinical interview.  That's the time
12    where you gather really the most information.  So the most
13    hours on my part are spent doing that.  I want to give the
14    person to be assessed the opportunity to tell me whatever she
15    thinks is important about her life, open-ended, so that I'm
16    not feeding questions and leading or, you know, anything like
17    that.  I basically say, "Tell me your life story and I want
18    you to begin at the beginning and what you're earliest memory
19    is," and I may have to ask clarifying questions or prod a
20    little bit in certain areas, but it's pretty open.  That's
21    why it's called unstructured.
22         Q.    In that context you do mostly listening --
23         A.    Right.
24         Q.    -- and note taking?
25         A.    Exactly.

1      Q.    All right.  Now contrast that with the

2  structured interview.  What's that about?

3      A.    Okay.  The structured interview follows the

4  completion of the clinical interview, so that can be days

5  later depending upon how long all of this is taking.  But

6  these are the tools that I typically would use in a

7  structured interview.  There's a number of tools that are

8  available on the market.  These are the ones that I chose.

9      Q.    Okay.  These are instruments that are generally

10  accepted in your discipline?

11      A.    Yes.

12      Q.    Okay.  Tell us then about each one of those

13  instruments.  What's number 1?  Is that the thing we saw

14  earlier on the slide?

15      A.    Yes.  We saw it on Thursday.  It wasn't very

16  good, we couldn't see the whole wheel, we had to go through

17  parts of it, but that's the power and control wheel that we

18  saw on Thursday.

19      Q.    All right.  How do you use that mechanically?

20      A.    Okay.  By the time in which you're doing the

21  structured part of the interview, you know, whether or not

22  the woman that you're assessing has used any social service

23  kinds of things, because that's one of the things you're

24  asking for.

25      Q.    The record review?

1        A.    The record review and in the clinical interview.

2        Q.    Okay.

3        A.    So I know if she's used a shelter or whether or

4    not she's sought counseling services for the domestic

5    violence.  Once I know that, then I can make a pretty good

6    judgment as to whether or not she's ever seen this before

7    because people who go to shelters, probably 99.9 percent of

8    them, have been shown the power and control wheel.

9        Q.    Okay.

10        A.    If she's never been shown it, then it's a good

11    tool for me to use.  If she has some information about it, I

12    may not use it.  So it's just a piece of paper with that

13    power and control wheel just like we saw on Thursday.  And I

14    simply put it down in front of her and say have you ever seen

15    this before?  Most of the cases I have have not seen it

16    before, so then I just say I'd like you to read the eight

17    little pieces of the pie, and if those represent something

18    that has happened to you in this relationship, could you

19    please write an example in the margin.  And I sit there while

20    she does it.

21        Q.    Okay.  Do you tell the person that you're

22    examining what answers are expected?

23        A.    No.

24        Q.    Or correct answers?

25        A.    No.

1        Q.      Incorrect answers?

2        A.      No.

3        Q.      Anything along that line?

4        A.      No.

5        Q.      The next entry is partner abuse scale

6   nonphysical, and then there's a publisher of the instrument

7   in parenthesis?

8        A.      She's the author, mm-hmm.

9        Q.      Okay.  All right.  Let's go back then in the

10  previous entry, Duluth Domestic Abuse Intervention Project.

11  Were they inventor of the power and control wheel?

12       A.      Yes.

13       Q.      Okay.

14       A.      Yes.

15       Q.      And what -- who are they?

16       A.      On Thursday when we were talking about the

17  history, and there was a bullet that said 1980s police

18  response, I think was how I think it was worded, and I told

19  the story about a woman in Torington Connecticut, who then

20  sued the police, okay?  Sorry to have to repeat that, but it

21  makes sense when you hear the whole piece.

22               There was a lot happening during the 1980s in

23  terms of domestic violence, a lot of information was being

24  generated, and the particular group of social service

25  providers in the city of Duluth, Minnesota, in conjunction

19

1   with law enforcement, kept finding that it was the same

2   people who were coming back over and over and over again with

3   repeat domestic violence.  It was the same men coming back

4   through they system over and over again, so they said what

5   the heck are we going to do with this situation?  We have to

6   come up with something.

7           So the people who were working in this project

8   decided that one good way to maybe once and for all get a

9   better handle on the problem was to go to the people with

10  whom it affected so they went to a shelter and they

11  interviewed, I don't know how many, but many, many, many,

12  many women over time.  And from the experiences that they

13  drew from those women victims living in shelter and from

14  other women who were the partners of those going through the

15  criminal justice system not in shelter, they designed this

16  wheel.

17          Q.   All right.  Is it in the same form today as

18  back in the 80s or has it evolved?

19          A.   Well, there's a number of new wheels, but the

20  wheel that I use is the original wheel.  I think it was

21  developed in '86, somewhere around that period of time.

22          Q.   All right.  The partner abuse scale, you were

23  about to explain that to us.

24          A.   Yes.  You can see that there's two up there by

25  Hudson, the non physical and the physical.  I choose to use

1    the nonphysical first.

2           Q.    Why is that?

3           A.    Because these are difficult questions to

4    answer, difficult in terms of emotional response to the

5    questions, because this is about sexual abuse and all kinds

6    of different kinds of violence that nobody really wants to

7    talk about.  So I think it's easier to start with the

8    nonphysical.  It appears less threatening to have to answer.

9                 So I, again, give her this piece of paper.

10   It's one page and I think it's 26 items, and I just ask her

11   to read the directions.  They're very self explanatory.

12   There's a scale from 1 to 7 that you're asking the person to

13   respond to the question with the 1 to 7 answer.  It's brief.

14   It's -- was written to be used by anyone with at least a

15   sixth grade education, and it takes very little time, maybe

16   15 or 20 minutes.  It's just 26 items so it's quick.  It's

17   not too threatening at this point and she's able usually to

18   answer those questions fairly rapidly.

19          Q.    All right.  And in the parenthesis a person

20   named Hudson is reflected?

21          A.    Right.

22          Q.    Who is this person?

23          A.    The author of this is Walter Hudson.  He was a

24   professor, a full professor at Arizona State University, the

25   social work program.  I studied under him.  He was a mentor

1  to many PhD students.  He has since passed away, but he is to

2  social work what someone else may might be to psychology in

3  terms of the generation of assessment tools.  He's very well

4  known in the social work community for that.

5         Q.  So how does the nonphysical abuse scale differ

6  from the physical abuse scale?

7         A.  Well, simply in the questions, of course, that

8  it's asking because the physical one is really focusing just

9  on physical, although it does contain some items about sexual

10  abuse, because most people believe that sexual abuse,

11  although a category is really a subject category of the

12  physical abuse.

13         Q.  Fourth entry is abusive observation checklist.

14  Let's start with the creator of that instrument, a person by

15  the name of Dutton?

16         A.  A woman by the name of Marian Dutton designed

17  this.  She has numerous articles and books.  She is a

18  forensic psychologist.  I believe she's still is an adjunct

19  faculty member at Georgetown Law University or Georgetown Law

20  School at the university.  She has private practice and has

21  done multiple forensic assessments.

22         Q.  And what exactly is in that abusive observation

23  checklist?

24         A.  This is quite lengthy.  It asks the person

25  assessed to read long lists of abusive acts of all different

1    kinds.  It basically makes use of the power and control wheel

2    and goes through each component and asks them did this ever

3    happen with this partner and how many times.  And there's

4    numbers at the top of each column, so the person being

5    assessed gets to choose 0 to 3 or 3 to 10, 10 to 49 or

6    greater than 50.  I believe those are the headings.  And

7    they're making checkmarks in the appropriate column, whether

8    it did happen and if so how many times.  And that's -- it's

9    about five or six pages.

10        Q.    Okay.  Fifth entry is response to violence

11   inventory, again the name "Dutton" is reflected

12   parenthetically.  That same person created this instrument as

13   well?

14        A.    Yes.  Actually, both the abusive objection

15   checklist and response to violence inventory appear as

16   appendices in one of Marian Dutton's books, and she has the

17   norm data in the back of the book also, if anybody wants to

18   know that.  But the response to violence inventory came about

19   because of a need to know what -- in what ways does the

20   victim actually respond.  So it asks questions like did you

21   ever call the police?  If you did, how many times?  And then

22   was it helpful or not helpful?  And it gives you a little

23   scale to rate helpfulness or not helpful by.  So it's how did

24   you escape, survive, and respond.  Those are the three things

25   we're looking for in that just because it helps to round out

1       what we really want to know, which is what happened, what was

2       the experience of the victim.

3               Q.      Last entry is the lethality check, Arizona

4       Coalition Against Domestic Violence.  Let's start with the

5       parenthetical first.  What is that?

6               A.      The Arizona Coalition Against Domestic Violence

7       is the Arizona State Coalition.  They have some oversight

8       around the whole issue of domestic violence in the state.

9       They collect data, they do many many trainings a year on

10      domestic violence.  They've put together packets of

11      information that they give out.  They do presentations to

12      every conceivable group that you could think of from clergy

13      to law enforcement and everybody in between.

14              Q.      Okay.  They created an instrument in some

15      fashion at some time?

16              A.      Yes.

17              Q.      What is that and when was it created?

18              A.      I don't have the date of when this particular

19      one was created.  There are many different lethality

20      checklists.  None of them give you a score or rating.  They

21      all ask anywhere from maybe 10 to 20 questions and you're

22      supposed to make a checkmark.  Typically, a lethality

23      checklist, if you're looking at a person who's still in the

24      relationship and you want to be able to show them how serious

25      or how lethal this relationship has become, that's when you

1    would use it.

2           Q.    Okay.   Is that it for this slide?

3           A.    Yes.

4           Q.    Okay.   Why don't you retake your seat then.

5                 All right.  Let's talk specifics.   Did you

6    agree to serve as an expert in this particular case?

7           A.    Yes, I did.

8           Q.    Okay.   And was there a fee involved for your

9    services?

10          A.    Yes.

11          Q.    Okay.   And what exactly was that fee?

12          A.    The hourly fee is $125 an hour.

13          Q.    Okay.   And do you have records that indicate

14   how many hours you've invested in this assessment not

15   including this point forward in terms of your testimony?

16          A.    If we could divide it.

17          Q.    Okay.   Tell me --

18          A.    I have the total dollar amount.

19          Q.    Let's start there and work backwards how much

20   are you going to bill us?

21                MR. MARTINEZ:   I'm going to object on the grounds of

22   relevance.   Additionally, I've not received that

23   documentation.

24                THE COURT:   Let me see Counsel here at the bench.

25   / / / / /

1          (The following proceedings were held at the

2    bench:)

3

4          THE COURT:  What's the general range?  Have you

5    talked about --

6          MR. PATTERSON:  General range or amount?

7          THE COURT:  Yeah.

8          MR. PATTERSON:  I asked her to do the computation to

9    make it current up to today, so I don't know exactly what

10   number she's going to give.

11         You've had an opportunity --

12         MR. MARTINEZ:  I did and she couldn't tell me because

13   it was in her notes, so she couldn't tell me.  I didn't get

14   those notes.

15         THE COURT:  You know, you talked to the interviewer.

16   You probably should have asked Mr. Patterson before today,

17   "Hey, did she come up with a figure," and you didn't, so I'm

18   going to overrule the objection.

19

20         (The following proceedings were held in open

21   court:)

22

23         THE COURT:  The objection is overruled.

24   BY MR. PATTERSON:

25         Q.    Okay.  Start with how much you're going to bill

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    us.

2            A.    Okay.  This includes everything, including the

3    air fare, all of that.

4            Q.    Okay.

5            A.    The total as of through Thursday was $8133.54.

6            Q.    Okay.  And let's break that down.  How many

7    hours did you invest in the unstructured interview?  Did you

8    have it broken down in that fashion?

9            A.    I know how many hours I spent on the

10   assessment.

11           Q.    Okay.  Tell me how many hours you spent on the

12   assessment?

13           A.    That was 20.

14           Q.    That's the use of the instruments you just

15   talked about?

16           A.    And the unstructured interview, right.

17           Q.    Okay.  What other hours did you invest in this

18   particular case?

19           A.    I did collateral interviews, so there was an

20   additional five hours of collateral, and since I finished the

21   assessment, I have come back to Phoenix several other times

22   just to do other clients or whatever, and so on some of those

23   occasions I interviewed Wendi again to answer whatever

24   questions were still in my mind that I hadn't come up with

25   earlier.

27

1          Q.    Let's talk about the specifics in this case.

2    What did you first do in trying to come to some conclusions

3    in this case?

4          A.    What did I do?

5          Q.    First let's take it chronologically in terms of

6    how you've come to certain opinions in this case.

7          A.    I don't remember if I had received from your

8    office all of the records at the time that I started the

9    interview.  I just -- I can't remember that so I may have

10   received records before and then during, which is usually how

11   it happens.  But in any case, I would have reviewed all of

12   the records and then sat down with Wendi in Estrella and

13   started the actual assessment process, which began on March

14   25 of 2003.

15         Q.    Okay.  So your first meeting with Wendi was

16   3/25/03?

17         A.    Right.

18         Q.    And do you recall how much time you spent with

19   her initially?

20         A.    Well, actually, I might have that.

21         MR. MARTINEZ:  Judge, I'm going to object.  She's

22   referring to her notes.

23         THE COURT:  Do you need refer to your notes to

24   refresh your recollection?

25         THE WITNESS:  Yes, I do.

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000007323

1          THE COURT: Let us know that and Mr. Patterson can

2     ask the questions appropriately at that time.

3     BY MR. PATTERSON:

4          Q.    Do you need to look at your notes to determine

5     how many hours you've spent with Ms. Andriano initially?

6          A.    Yes, I do.

7          Q.    Okay, please.

8          MR. MARTINEZ: Judge, may we approach?

9

10          (The following proceedings were held at the

11     bench:)

12

13          MR. MARTINEZ: These are the items that I requested

14     be disclosed pursuant to Rule 15. Defense counsel indicated

15     that he would not disclose them and that everything that was

16     in those notes is already in the report. As I indicated

17     previously, I foresaw this was going to happen. She's going

18     to keep going through those notes and I've not had a chance

19     to review them. I know we had an avowal from Counsel

20     indicating she wasn't going to use those notes, but it's

21     clear she's already started and will continue. So I enter an

22     objection to these questions.

23          MR. PATTERSON: Judge, these are administerial notes.

24     They talk in terms of time invested in certain things. It's

25     not work product notes. Those are the ones we indicated were

1   incorporated in the report that was disclosed to this

2   gentleman fully and fairly.  These are just referring to

3   session times that she met with certain people.  It's dates,

4   it's hours.  It's not work product.  It's not the same, it's

5   apples and oranges.

6        MR. MARTINEZ:  If it isn't, why didn't he give them

7   to me?

8        THE COURT:  Okay.  The objection is noted.  I'll

9   allow Mr. Patterson to continue.  Hey, but has she been

10  instructed not to say she was in jail?

11       MR. PATTERSON:  Well, no, not specifically, but I

12  won't -- I'll take great effort to make certain that doesn't

13  happen.

14       THE COURT:  Is it a situation whether we need to

15  take a break and remind her of that fact?

16       MR. PATTERSON:  Okay.  Let's do that.

17       THE COURT:  Okay.

18

19            (The following proceedings were held in open

20  court:)

21

22       THE COURT:  Okay.  I need to speak with Counsel

23  outside the presence of the jury.  This should only take a

24  few minutes, five minutes at the most.  I'll have the jury

25  step into the jury room.

1          Remember the admonition I gave you, do not

2     discuss the case, do not let anyone discuss the case with

3     you, keep an open mind about the case.  This should only take

4     a few minutes here.

5

6          (Whereupon, the jury exits the courtroom.)

7

8          THE COURT:  Please be seated.  The record will

9     reflect the presence of Defendant and Counsel.  We're outside

10    the presence of the jury.

11         While we're waiting here, I've noticed a

12    couple things.  There's a gentleman in the back there reading

13    a book, okay?  If you're going to be reading a book -- this

14    is not a library.  If you're going to be reading a book, step

15    outside and read your book.

16         Other thing is a gentleman drinking a soda pop

17    in here.  Food and soda pop is not allowed in the courtroom.

18    While you're in the courtroom, maintain the dignity of the

19    courtroom.

20         MR. PATTERSON:  Judge, at this time I'll make a copy

21    of the actual bill.

22         MR. MARTINEZ:  Judge, I don't want disclosure on the

23    day of trial.  It does me no good.  He might as well keep it.

24         MR. PATTERSON:  Very well.  I made an effort, Judge.

25         (Pause in proceedings.)

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

31

1          MR. PATTERSON:  Witness has been instructed pursuant

2     to the Court's directive.

3          THE COURT:  Okay.  We ready for the jury?

4          MR. PATTERSON:  Yes, Your Honor.

5          MR. MARTINEZ:  Yes.

6

7               (Whereupon, the jury enters the courtroom.)

8

9          THE COURT:  Please be seated.  This is cause number

10    CR 2000-096032, State of Arizona versus Wendi Elizabeth

11    Andriano.  The record will reflect the presence of Defendant,

12    Counsel and the jury.  Sharon Murphy is on the witness stand.

13               And we'll continue with the examination by Mr.

14    Patterson.

15          MR. PATTERSON:  Thank you, Judge.

16

17    CONTINUED DIRECT EXAMINATION BY MR. PATTERSON:

18          Q.    You are Dr. Murphy?

19          A.    Yes.

20          Q.    You're the same Dr. Murphy that was testifying

21    earlier?

22          A.    Yes.

23          Q.    You realize you're still under oath?

24          A.    Yes.

25          Q.    You met with Ms. Andriano on March 25 of '03.

32

1      How many hours did you spend with her the first meeting?

2            A.    Two.

3            Q.    Okay.  You then met with her the following date?

4            A.    Yes.

5            Q.    Was that 3/26/03?

6            A.    Yes.

7            Q.    How much time did you spend with her on that

8      occasion?

9            A.    Two.

10           Q.    Two hours?

11           A.    Yes.

12           Q.    Okay.  When was your next meeting with her?

13           A.    March 29, 2003.

14           Q.    Okay.  And, again, how many hours did you spend

15     with her on that occasion?

16           A.    Three.

17           Q.    Okay.  Did you meet with her again?

18           A.    March 30th, 2003.

19           Q.    Okay.  And these meetings are within the

20     context of the original assessment, correct?

21           A.    Correct.

22           Q.    Okay.  On March 30th, 2003, how many hours did

23     you spend with her?

24           A.    Three.

25           Q.    Okay.  When was your next meeting with her?

1          A.     April 8, 2003.

2          Q.     And --

3          MR. MARTINEZ:  Judge, she seems to be reading

4     something.  Are we still just -- is she just reading from

5     that document that we discussed previously?

6          THE COURT:  If you need to refresh your recollection

7     on something, just notify us if you need do that and Mr.

8     Patterson will ask you.

9     BY MR. PATTERSON:

10         Q.     Are you reviewing the bill --

11         A.     Yes.

12         Q.     -- that you submitted at some point?

13                Again, was this the day of April 8, 2003?

14         A.     Yes.

15         Q.     And how many hours did you spend with Ms.

16    Andriano on that occasion?

17         A.     Four.

18         Q.     Okay.  When was your next meeting?

19         A.     April 11, 2003.

20         Q.     And, again, is that from your billing

21    statement?

22         A.     Yes, it is.

23         Q.     Okay.  And how many hours did you spend with

24    the client on that occasion?

25         A.     Two.

1      Q.    Was there another meeting with the client in

2  the context of doing the initial assessment?

3      A.    Yes.

4      Q.    Okay.  What date was that?

5      A.    April 22nd, 2003.

6      Q.    Again, are you reviewing the bill in this case?

7      A.    Yes, I am.

8      Q.    Okay.  How many hours did you spend with Ms.

9  Andriano on that day?

10     A.    Two.

11     Q.    Okay.  Was there a -- an additional meeting

12  with the client?

13     A.    Yes.

14     Q.    Okay. And what date was that?

15     A.    June 4, 2003.

16     Q.    Again, are you reviewing something to assist

17  you there?

18     A.    I am.

19     Q.    What is that?

20     A.    It is a bill I sent your office.

21     Q.    Okay.  And how many hours or minutes did you

22  spend with Ms. Andriano on that occasion?

23     A.    Two hours.

24     Q.    So the total time with regard to the initial

25  assessment was how many hours?

35

1          A.     20 hours.

2          Q.     Do you feel you had sufficient time with the

3    client in order to come to a valid opinion in this case in

4    terms of the hours spent in the interview process?

5          A.     Yes, I do.

6          Q.     Okay.  All right.  So you reviewed records.

7    When did you do the collateral interviews?

8          A.     I need to review my notes.  Is that all right?

9          Q.     Is that, again, from the bill?

10         A.     Same bill.

11         Q.     Okay.  Please.

12         A.     5/20/03 -- do you want to know who they were

13   with.

14         Q.     Yeah.  Who did you meet with?

15         MR. MARTINEZ:  I'm going to object.  That was not

16   included in the original report and now she's going beyond

17   that.

18         THE COURT:  Overruled.

19         THE WITNESS:  Barbara Mitchell.

20   BY MR. PATTERSON:

21         Q.     Okay.  Do you have an amount of time that you

22   spent talking with Ms. Mitchell?

23         A.     Yes, I do.

24         Q.     How many hours?

25         A.     One half hour.

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

```
 1          Q.    30 minutes?

 2          A.    Yes.

 3          Q.    Okay.  Who else did you speak with?

 4          A.    Donna Ochoa.

 5          Q.    Okay.  And how much time did you spend?

 6          A.    3 quarters of an hour.

 7          Q.    Okay.  On what date?

 8          A.    5/20/03.

 9          Q.    Again, is this information reflected in your

10    billing statement?

11          A.    Yes.

12          Q.    Okay.  Who else did you speak with?

13          A.    I met again with Donna Ochoa --

14          Q.    Okay.

15          A.    -- on 5/21/03 for one hour.

16          Q.    Anybody else?

17          A.    I met with Alejo Ochoa on 5/21/03 for 1.75

18    hours.

19          Q.    Okay.  And with whom else did you speak?

20          A.    Francis Arculetta?

21          Q.    On what date?

22          A.    That was on 5/20/03 also.

23          Q.    How many hours?

24          A.    That was one hour.

25          Q.    Okay.  So you've begun meeting with the
```

1      client, talked to collateral -- what else did you do --

2            A.    Reviewed the records.

3            Q.    -- in this case?

4            A.    Wrote the report.

5            Q.    Okay.  Let's talk about the particulars then of

6      the unstructured interview.  Do you have a copy of your

7      report?

8            A.    I do.

9            Q.    Okay.  Would that assist you in some fashion

10     your recollection of the specifics of things that may have

11     occurred in your interview with Ms. Andriano?

12           A.    Yes, it would.

13           Q.    Okay.  And did you breakdown your report in

14     terms of categories?

15           A.    Yes, I did.

16           Q.    Okay.  Let's talk then about category two and

17     that report.  What is the date of your report?

18           A.    9/22/03.

19           Q.    On page 2, is that where the unstructured

20     interview with Wendi Andriano commences?

21           A.    Yes.

22           Q.    Okay.  Tell me a bit about what Ms. Andriano

23     related to you with regard to childhood history?

24           A.    Well, I asked her, as I typically do, what's

25     her earliest memory and she talked about remembers a life

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    with mom and grandmother, and actually most of her memories

2    are about grandmother because mother was working and a single

3    parent.  Talked a lot about -- or talked I should say very

4    little about the biological father and then a lot about her

5    adopted father.  Apparently, according to Wendi, she has very

6    little recollection of being around biological dad.

7           Q.    Okay.  Let's get the names down here.  Who is

8    the adoptive father?

9           A.    Adoptive father is Alejo Ochoa.

10          Q.    Okay.  And who was the biological father?

11          A.    I only have a first name, and that was Skip.

12          Q.    Okay.  Did she relate to you circumstances of

13   her relationship with her adoptive father?

14          A.    Yes.  She talked at great length about the

15   relationship between she and her adoptive father.

16          Q.    And what did she relate to you in that regard?

17          A.    Well, do you want me to specify just her

18   relationship with him or as part of the family?

19          Q.    Well, again, whatever you think is germane to

20   your conclusions in this case, so if they're both germane,

21   talk about them separately.

22          A.    Okay.  Because really Donna and Alejo are

23   related together because they were a family of three.  So

24   their stories are usually about the three of them together.

25   Talked a lot about her spiritual and religious background.

1          Q.    Okay.  And how is that germane or relative --

2     relevant to the domestic violence issue?

3          A.    Well, it helps me to understand the situation

4     and the life experience that this particular woman came from.

5          Q.    Okay.

6          A.    It's important to know whether or not a person

7     has a religious belief and what that belief is particularly

8     as it ties into perhaps gender roles and beliefs about them

9     through religion.

10          Q.    Okay.  And what did she tell you specifically

11     about her religious upbringing?

12          A.    Well, the earliest memories, I think, are about

13     the ministry that her parents belonged to and how they

14     traveled.  I believe it was in California for the particular

15     church group, and I think there were one or two other men

16     that did this traveling with them.  One of those early

17     memories was of one of those two men, not Alejo, but one of

18     these two men, who exposed himself --

19          MR. MARTINEZ:  Objection.  Relevance.

20          THE COURT:  Overruled.

21          THE WITNESS:  -- exposed himself to her.

22     BY MR. PATTERSON:

23          Q.    Okay.  How is that relevant to the formation of

24     attitudes and development later on in life?

25          A.    Well, for anybody, I believe that that would be

```
 1    traumatic and so that's a traumatic experience from one of

 2    her very early years.

 3              Q.    Okay.  And she related that to you?

 4              A.    Yes.

 5              Q.    Okay.

 6              A.    Yes.  She also told me that her mother had told

 7    her that there was a question as to whether or not her

 8    biological father may have sexually molested her.

 9              MR. MARTINEZ:  Objection.  Hearsay, lack of

10    foundation.  She doesn't know if it happened.

11              THE COURT:  Overruled.

12              THE WITNESS:  Whether or not that may have happened.

13    So we don't know.  There's just some conjecture.  We do know

14    that he is currently serving a prison sentence for sexual

15    molestation of a -- a mentally retarded young woman, I

16    believe.

17    BY MR. PATTERSON:

18              Q.    This would be Wendi's biological father?

19              A.    Biological father, that's correct.

20              Q.    Did she tell you about growing up with Alejo

21    and Donna and whether or not her adoptive father had a

22    temper?

23              A.    Yes.

24              Q.    Okay.  What did she relate to you in that

25    regard?
```

1          A.     The temper seems to be around yelling and

2     screaming.  She did not at any time indicate that he had

3     acted out physically or sexually.  It was about yelling and

4     screaming.

5          Q.     Okay.  And did she relate to you her response

6     to this yelling and screaming?

7          A.     Yes, she did.

8          Q.     What did she tell you?

9          A.     She reported that she would run into the

10    bedroom and close the door as did mother.

11         Q.     All right.  And then was there a time

12    thereafter when the yelling would abate or subside and they

13    would do something jointly?

14         A.     Yes.

15         Q.     What would they do?

16         A.     According to Wendi's report, mother would try

17    to placate her husband and kind of soothe him.  What she

18    relayed was an action by which mother would stroke father's

19    head sort of in a soothing way and that Wendi often

20    participated in that to try to calm dad down.

21         Q.     Is that relevant in your estimation with regard

22    to future behaviors?

23         A.     It certainly could be, yes.

24         Q.     And how would it be relevant?

25         A.     Looked -- I'd look for similar behaviors in

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    adulthood.

2         Q.    Okay.  Are you stating that children model

3    themselves after their parents or is there that in the

4    literature?

5         A.    There is that in the literature.  This does not

6    mean that it, you know, happens 100 percent of the time.

7    Just like we talked about common or same characteristics,

8    it's the same thing here.  There certainly is theory grounded

9    in the belief of learned behavior.  That's very well

10   documented.

11        Q.    And did Wendi explain to you why mother and

12   child engaged in the nurturing or soothing behavior with the

13   the angry father, Alejo?

14        A.    What I recall from Wendi's report was that it

15   was done to calm him down and keep the peace.

16        Q.    All right.  And your report said "so the

17   screaming would not begin again"?

18        A.    Yes, correct.

19        Q.    Okay.  Did Wendi relate to you the specifics of

20   her education?

21        A.    Yes, she did.

22        Q.    Okay.  And, again, is that relevant to the

23   formulation of your opinion with regard to whether or not

24   she's a domestic violence victim?

25        A.    It's relevant to understanding how that could

1    have happened.

2         Q.    Okay.  What did she relate to you then with

3    regard to her educational background?

4         A.    She was homeschooled for a while by her mom,

5    and then I believe after the church ministry ended and they

6    settled back in Casa Grande, I believe that she went to a --

7    a school that was owned and operated by the church that they

8    belonged to.

9         Q.    Okay.  Did she give you a name in your report?

10   Page 3.

11        A.    Yes, the Evergreen School.

12        Q.    Okay.  That's the public school.

13        A.    That's the public school?  Sorry.

14        Q.    Right.

15        A.    Let me just read through this to find it.  The

16   church was 91st Psalms, now known as Harvest Family.

17        Q.    Kind of midway down in section B?

18        A.    I'm glad you could find it.  Yes.  She was

19   enrolled in a church affiliated school called 91st Psalm.

20        Q.    Okay.  Did she describe the structure of that

21   particular church-based school?

22        A.    What she described was that the school was very

23   strict and had some extreme kinds of foundations to it.

24        Q.    Okay.  Did she indicate to you a -- a

25   rebellious kind of response to some of the restrictions

44

1    there?

2              A.    At times.

3              Q.    Okay.  What did she say in that regard?

4              A.    She said she actually ran away on four

5    different occasions.

6              Q.    Okay.  And did she connect the strictness, if

7    you will, of the school with her running away?

8              A.    I -- as I recall her report, the running away

9    it seemed to me she was saying had more to do with the

10   strictness at home and the home as affiliated with the

11   church, and that's what she was running away from.

12             Q.    All right.  So as I understand, she had a very

13   strict school experience and then that was reinforced when

14   she got home?

15             A.    Yes.

16             Q.    Okay.  Did she indicate with whom she ran away

17   with on several occasions?

18             A.    Well, on one occasion at least it was with the

19   pastor's daughter.

20             Q.    Okay.  Did she explain her reasoning why?

21             A.    What she said was she just wanted to be allowed

22   to play in the park.

23             Q.    Like other kids do?

24             A.    Like other kids.

25             Q.    Okay.  Did she report to you how well she did

1    in school?

2         A.    Yes.  She apparently did well in school,

3    received a number of honors, graduated with honors.

4         Q.    Okay.  Is that based upon her self report or

5    were you able to look at other records?

6         A.    That is based upon self report.

7         Q.    Okay.  Did she take her educational experience

8    beyond high school?

9         A.    Yes.  She completed all but five or six courses

10   leading up to what would have been a bachelor's in business.

11        Q.    Okay.  In general, based on what she told you

12   about her educational background, how does that impact her

13   later life in your estimation?

14        A.    Well, she had success in school and she was

15   able to get jobs that helped then to support the family.  I'm

16   not sure if I'm answering your question.

17        Q.    No.  No, that's one aspect.  How about the

18   rigidity of the school experience?  Do you think that has any

19   impact in her later life choices, later life conduct?

20        A.    Rigidity in the elementary and high school

21   years, yes.

22        Q.    Okay.  How does that affect her later life

23   choices, that kind of thing?

24        A.    The way Wendi reported to me about her life

25   experience within the family and within the church, it

1    clearly defines a very rigid strict family rules and roles.

2    And given later life circumstances by report from Wendi, it

3    appears that those rigid expectations seemed to follow her.

4            Q.    Okay.  And in the -- the common characteristics

5    -- common characteristics of abused persons is one of them a

6    sense of traditional family values, those kinds of things?

7            A.    Yes.

8            Q.    Could you explain that as it relates to Wendi's

9    religious school upbringing?

10           A.    It appears based on Wendi's telling of her life

11   story that she followed very strict guidelines or edicts

12   about woman's role in the family.  That was one of nurturing

13   compassion, loving, caring for.  That kind of defined what a

14   woman was and it appears that she took that knowledge with

15   her then into adulthood.

16           Q.    Okay.  The next category in your report is

17   described as dating history.  What did Wendi relate to you in

18   that regard?

19           A.    Wendi did not date up through high school.  A

20   lot of the activities were group activities and they often

21   took place at her parent's home.  Her father was a youth

22   minister and so kids would come over to the house and they

23   would do, you know, games or go bowling or go to Metro Center

24   to skate, whatever was typical of the high school years not

25   dating a single person.

47

1          Q.    Okay.  Again, does that impact, in your

2     opinion, future conduct?

3          A.    Well, there wasn't a lot of dating history or

4     knowledge about dating by which she entered a future

5     relationship.

6          Q.    Okay.  And did she relate to you who her first

7     boyfriend was and only boyfriend prior to Mr. Andriano?

8          A.    Yes.  He was the pastor's son.

9          Q.    Again, is that significant in your opinion?

10         A.    Well, it -- what it says to me is that the

11    whole world was around church and family.

12         Q.    Did she relate to you some volunteer work that

13    she performed after her completion of high school?

14         A.    She did some missionary work in a period of

15    time for her church.

16         Q.    Why again is that noteworthy in the context of

17    why we're here?

18         A.    Certainly her life experiences are very clearly

19    religiously oriented.

20         Q.    Okay.  Did she report whether or not her

21    relationship with the pastor's son ended at some point?

22         A.    Yes, she did report that.

23         Q.    Okay.  And what were the circumstances of that

24    breakup?

25         A.    When she returned from her missionary work in

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    Mexico she decided she wanted to live a little bit and see

2    the world and she felt that in order to do that she needed to

3    break off a serious commitment made with the pastor's son.

4           Q.    And that commitment was represented by some

5    jewelry?

6           A.    He had given her a ring.  I don't know what

7    type.  I don't think it was a diamond.  She didn't say that,

8    but he gave her some type of ring.

9           Q.    Okay.  Did the circumstances of the breakup

10   become violent?

11          A.    Yes.

12          Q.    Tell me about that?

13          A.    When she told him that she wanted to break it

14   off, he did two things:  He smashed the windows of her car

15   with rocks, river rocks I think is the word that she used to

16   describe them.  And he also bit the stone out of the ring and

17   twisted her finger in the process.

18          Q.    Okay.  Did she relate to you whether or not she

19   reported that incident to law enforcement?

20          A.    She did not report it.

21          Q.    Okay.  Again, the same question, that

22   experience breaking up with her first boyfriend in that

23   fashion, does that play a part in your assessment in this

24   case?

25          A.    It seems to me that all of these life

1    experiences become cumulative, so yes, it does.

2         Q.    Okay.  All right.  Did she relate to you how

3    she become involved with Joe Andriano?

4         A.    Yes, she did.

5         Q.    Okay.  What did she tell you in that regard?

6         A.    She went to a pizza place in Casa Grande on St.

7    Patrick's Day 1992.  That's where she met him.  She relayed

8    that he was a member of what she referred to as the "in

9    crowd" and she was not a member of that group.  She described

10   the "in crowd" as being members of farm families, and she

11   was -- her dad was not a farmer.

12        Q.    Okay.  So just so I understand it, there seemed

13   to be a -- some kind of clannishness or cliqueishness with

14   the families in Casa Grande with the ins and not ins, in that

15   sort of terminology?

16        A.    That's her interpretation, yes.

17        Q.    So how did that relate then to her feelings

18   when Mr. Andriano began to pay attention to her?

19        A.    Well, I believe she was flattered because she

20   was not a part of that group.  She found him attractive.  And

21   he appeared to her to be sort of the life of the party kind

22   of guy, you know, jovial, fun to be around, and he paid

23   attention to her.

24        Q.    All right.  Do you have a date for when this

25   relationship began?

1          A.    I have written down St. Patrick's Day, 1992,

2     which I think is March 17.

3          Q.    Okay.  So we're talking March of '92 is the

4     point in time when Wendi and Joe first met?

5          A.    Correct.

6          Q.    Okay.  Did she relate to you certain

7     inadequacies about her feelings or being at that time?

8          A.    She certainly felt inadequate as compared to

9     Joe's group.  She saw them as having more on a social ladder

10    than what she had and felt like she would have a hard time

11    competing.

12         Q.    Okay.  Did she describe and categorize the

13    beginning part of her relationship with Joe?

14         A.    She describes it as a friendship, that they

15    liked hanging out together.

16         Q.    Okay.  Did Wendi relate to you Joe's attitudes

17    towards her initially, his perception of their relationship

18    initially?

19         A.    One of the things that Wendi reported was that

20    Joe had said to her that she was the only one who really

21    understood him.

22         Q.    Did Joe relate to her any dysfunction in his

23    own home life --

24         A.    Yes, he did.

25         Q.    -- with his family?

1          A.     Yes.

2          Q.     What did he say?

3          A.     He talked about his dad having alcohol problems

4     during his -- during Joe's youth and that it was hard

5     sometimes to be around family.

6          Q.     Okay.  Did Joe relate to Wendi feelings that

7     his family was not supportive of things that he wanted to do,

8     that kind of thing?

9          A.     Yes, he did report that.

10          Q.     Okay.  And can you elaborate in that regard?

11          A.     What I recall from Wendi's report really

12     focussed more on Joe's relationship with his dad and not so

13     much on the relationship with mother when he talked about

14     things not being good.

15          Q.     Okay.  And are we seeing a moment at the

16     beginning that this was a problematic relationship?

17     Obviously, it's too soon to tell, but are there symptoms

18     you're seeing?

19          A.     There are red flags at this point.

20          Q.     Okay.  Elaborate on that for me.

21          A.     It's so much easier to look back --

22          Q.     Sure.

23          A.     -- and see things, but it looks like there's

24     almost a set up here for things going bad.  And by that I

25     mean we have on one hand a person who has very strict almost

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000007347

1    severe sounding rigid guidelines to live by.  Sometimes those

2    guidelines can be impossible to live up to.

3            Q.    You're talking about Wendi?

4            A.    Wendi now, yes.

5            Q.    Okay.

6            A.    And we have a young man who appears to be

7    dissatisfied part of the time with his own family life and

8    appears to be sad because she talked to me about when she

9    would say that Joe had a hard time expressing emotion except

10   when he drank too much.  And when he drank too much, which he

11   seemed to have done quite often early on in the relationship,

12   then he would get very sad.  He sometimes would cry, he would

13   talk about the sadness about his relationship with his dad,

14   and also about his grandfather's death by suicide.

15           Q.    Okay.  Let me just back you up a little bit.

16   In terms of threshold questions that you advanced to Ms.

17   Andriano when you first met her, did you tell her why you

18   were there?

19           A.    Actually, she already knew.

20           Q.    Okay.  And what did you explain to her about

21   your function in this particular case?

22           A.    I told her that you and your office had hired

23   me to conduct a domestic violence assessment, that I would

24   need to ask her questions, that I'd give her a number of

25   assessment tools to complete in her own writing, that I'd be

1    present while she was doing those, that I'd be asking

2    questions that would be emotionally difficult perhaps to

3    answer, and that I could not then offer her anything.

4         Q.    Okay.  Did she express to you initially whether

5    or not she believed she was a victim of domestic violence?

6         A.    She clearly did not believe she was a victim of

7    domestic violence.

8         Q.    All right.  Let's get back then to the

9    beginning of the relationship between Joe and Wendi.

10        A.    Okay.

11        Q.    Midway down in paragraph D you begin to tell us

12   about Wendi reporting that she felt that she was needed by

13   Joe?

14        A.    Yes.

15        Q.    Okay.  How is that concept integral to this

16   domestic violence issue?

17        A.    According to Wendi's report, she was struck by

18   the need and her ability to care for another person.  And

19   here was someone that she enjoyed spending time with, who

20   evidently enjoyed spending time with her, who professed that

21   need and who professed things saying things like you're the

22   only one who really understands me and I'm having a really

23   tough time at home and she's listening and she's nurturing to

24   him.

25        Q.    Okay.  And that could be a good thing, right?

1      A.     Yes, sure.

2      Q.     But in the domestic violence context, can it

3   also be a problematic thing?

4      A.     Well, it could be a setup.  You don't know

5   early on usually, but it certainly can be a set up for that

6   caretaking role and doing whatever it takes to care for.

7      Q.     Initially, apparently Wendi had financial

8   issues Joe assisted her with.  What was that about?

9      A.     Wendi was, I believe, negligent in making two

10  car payments and Joe was very helpful and I believe made

11  those payments for her.

12     Q.     Okay.  Again, does that potentially have

13  ramifications in the future in terms of economic relationship

14  between the parties?

15     A.     Well, one of the things that it does is it

16  cements in her mind he's a good guy, you know, he's helping

17  me, he's -- he's sad, he's lonely, he's had a tough time.  He

18  likes being with me, I can take care of him, I can help him

19  and look what he's just done for me.

20     Q.     At some point in time does the friendship

21  relationship become a sexual relationship?

22     A.     Several months after they first met I believe

23  from Wendi's report that Joe suggested that he move in with

24  her.

25     Q.     Okay.

1          A.     When they first started living together, there

2    was not a sexual relationship.  I believe according to Wendi

3    that that developed one to two months after Joe moved in.

4          Q.     Okay.  So in your report you state the fourth

5    or fifth month of dating, that squares with your

6    recollection?

7          A.     Yes.

8          Q.     Okay.  Were there problems in the initial part

9    of the relationship with excessive drinking on the part of

10   Mr. Andriano?

11         A.     Early on, yes.

12         Q.     Okay.

13         A.     She reported 10 to 12 beers when they would be

14   out at the bar.

15         Q.     Okay.  In terms of frequency was this a daily

16   thing, a weekly thing?

17         A.     I -- I don't remember how often it was.  I

18   mean, part of -- the bar scene was certainly part of their

19   early months together.

20         Q.     Okay.  And I think you told us that Joe

21   Andriano became more emotional and more emotionally

22   acceptable after drinking?

23         A.     Yes.

24         Q.     Okay.  And can you describe in terms of Wendi's

25   report the range, if you will, of range here?  I mean,

1    contrast it to the point when he wasn't drinking.

2         A.    According to her report, when he wasn't

3    drinking he was not emotionally available in any way.  But

4    when he drank too much, he would get tearful and cry, and it

5    would -- the tears according to her report always seemed to

6    focus around two key areas that was what he described as a

7    failed relationship with his father and then the death by

8    suicide of grandfather.

9         Q.    Okay.  In contrast to other issues with regard

10   to economics, did Joe have certain expectations in terms

11   of -- of toys or property that he would have and possess?

12        A.    Well, if I look at the report in it's entirety.

13        Q.    Okay.  Let's talk about an entirety then and go

14   back to specifics.

15        A.    Yeah.  I remember three things in particular.

16   One was the need for a new truck every year.  The second was

17   the racing boats.  He, I believe, owned two of those, didn't

18   want dad to know about the second one because he owed money

19   to dad.  Put a lot of money into them, into their engines.  I

20   think he was into the rebuilding and the racing scene.  And

21   just needing to have nice things, nice clothing, those kinds

22   of things.

23        Q.    All right.  What did Wendi do in response?

24   Let's take it chronologically.  I think the first vehicle

25   that he really had to have was a full size pickup truck?

57

1      A.     Right.  He did not have one of those but his

2   buddies did and she wanted to help and she didn't have the

3   money to do that for him.  So instead she gave him her

4   vehicle to use as a trade in which left her then with no

5   vehicle.

6      Q.     Okay.  And, again, does this kind of portend

7   for future difficulties in terms of ties between the parties?

8      A.     It certainly appears that we have the woman of

9   the couple giving, giving, giving, giving, giving.

10      Q.     Okay.  And seems like a subset of that

11   particular issue, a result of her not having her vehicle to

12   whom she then becomes reliant upon to get to and from places?

13      A.     She had to call Joe to get to and from work or

14   join him after work at the bars, wherever they were.

15      Q.     Does that integrate with the control issues

16   we're beginning to see here in this relationship?

17      A.     Yes, it does.

18      Q.     Is it about this time in the relationship, four

19   or five months in, that she begins to perceive temper issues

20   with Joe?

21      A.     Yes.  This would have been perhaps the Fall now

22   of '93.  She reported a lot of screaming on his part, anger,

23   but at this point in time it was not against her.  It was

24   against other people raging about business gone bad or things

25   of that nature.

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000007353

1      Q.    All right.  And did she express to you how it

2  impacted her?

3      A.    Well, this was also about the same time that he

4  said "Let's get married."

5      Q.    Okay.

6      A.    So she saw the screaming and the yelling but

7  made the decision to go ahead and get married, so there was

8  some vision, I would think, about what he might be like

9  although it's pretty foggy.

10     Q.    Okay.  Up to this point she had reports from

11  Joe's friends or other persons who gave her kind of an

12  assessment of Joe's potential for temper and anger?

13     A.    There were reports by his friends about some of

14  the things that he had done.

15     Q.    Okay.

16     A.    Like for example she said that he had a

17  reputation in town or something about spinning out his truck

18  tires in the gravel in a parking lot in front of a Circle K

19  and so the windows were broken.  And evidently this was done

20  on more than one occasion because he had a sort of a credit

21  line with the local windshield replacement people to replace

22  the glass at the Circle K.

23     Q.    Okay.  And it was her understanding that

24  conduct was in response to something that had angered him or

25  upset him?

1      A.     Yeah.

2      Q.     Okay.  All right.  In October of '93, again,

3   there were some economic issues.  And what did Wendi report

4   to you in that regard about failed businesses, new ventures,

5   that kind of thing?

6      A.     Well, I think it was at that point in time he

7   wanted to start his own business.  He had been in a glass

8   business I think before that, had gotten hurt somehow, so now

9   wanted to start his own business.  That's also the same time

10  they talked about getting married.  And, again, the marriage

11  plans seemed to take hold at that point in time.

12     Q.     Okay.  Were there important things related to

13  you by Wendi that, pertaining to the wedding, she had some

14  reservations, some hesitation?

15     A.     The way I recall the -- her telling that part

16  of the story, was that mom did make all the plans, that Wendi

17  was really not very much involved in the wedding plans as you

18  might expect a bride to be.  She explained that however in

19  terms of she's working full time, going to school nights to

20  finish up that business degree and just didn't have time to

21  do it.

22     Q.     Okay.  Did she also express that her parents

23  were desirous of seeing them married to perfect that living

24  in sin relationship they currently had together?

25     A.     I don't remember her saying that Donna said

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1      that.   I do remember her saying that Alejo somehow let her

2      know, and I don't know if it was in words or actions or just

3      that Wendi would have known based on his strict religious

4      beliefs, that living in sin, so-called, was not okay.

5              Q.    Again, did she have any reservations in going

6      forward with the plans to marry Joe?

7              A.    She did have some reservations, but I think

8      according to the report it was like a done deal, you know.

9      She had already, you know, gotten into a relationship with

10     him and mom seemed to really like him.   Dad is the one who

11     had the reservations and right down to the time that the

12     wedding was supposed to take place.   Dad was saying you don't

13     need to do this.   You can back out of this now.   That's as

14     he's walking her down the aisle.

15             Q.    Did you sense from Wendi whether or not she

16     felt she had any free will in this whole process?

17             A.    Yeah, I -- I didn't sense any free will.   It

18     was like she, you know, she had to.

19             Q.    Okay.   Things were being done for her and her

20     opinion or desires really were of no consequence?

21             A.    Yes, but this is -- it's complicated I think

22     because this does not mean -- I never got the sense from

23     Wendi that she wasn't attracted to him, that she didn't care

24     a great deal about him.   That was never there.   I think the

25     question of getting married, this clearly was what was in her

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1      mind, not I never want to marry this man, no.

2              Q.    Okay.

3              A.    That was not the picture.

4              Q.    All right.  Were there economic difficulties at

5      this time as well in terms -- with the parties in terms of

6      ability to buy engagement rings, that kind of thing?

7              A.    Yes.  Joe was unable to buy the typical

8      diamond --  diamond engagement ring, so he put on a gold band

9      and had a fake stone set inside and said, you know, when

10     we're better off, you know, we'll replace this.

11             Q.    And apparently their honeymoon was funded by

12     some other matter?

13             A.    One of Joe's sisters paid for them to have a

14     three day honeymoon to Vegas.

15             Q.    Okay.  Did she relate to you the beginnings of

16     a sexual relationship with Mr. Andriano?

17             A.    Yes.

18             Q.    Okay.  What did she describe in that regard?

19             A.    Well, from the earliest time in the sexual

20     relationship, she told me that at least the first time that

21     she recalled having sex with him that she cried.

22             Q.    Okay.

23             A.    And that she didn't know why.

24             Q.    Did that occur at a time prior to the wedding?

25             A.    Yes.

1      Q.     Okay.  She was crying in a -- in what sense?
2    Did you gather --
3      A.     Sadness.
4      Q.     Okay.
5      A.     There was something wrong but she didn't know
6    what it was.  All she knew was, first of all, that it was
7    painful, but secondly, this wasn't what she thought it was
8    supposed to be.
9      Q.     Okay.  And did she relate to you that was the
10   first sexual experience she had with any male?
11     A.     I believe that it was the first time.  I
12   know -- I recall nothing about having sex with the pastor's
13   son.  If she did, I don't know that.
14     Q.     Okay.  Anything else that she related to you
15   about that first sexual experience with Joe Andriano that was
16   noteworthy?
17     A.     Well, that her belief from the beginning was
18   that this was sort of women's place in life, that part of
19   being a woman was succumbing to what your husband wanted, and
20   if he wanted sex, you needed to do that.
21     Q.     Okay.  And did she describe to you what she
22   wanted out of the intimacy with Joe Andriano at that time?
23     A.     She was consistent about what she wanted and
24   that was love, affection, hugs, those forms of intimacy as
25   opposed to sex.

1        Q.    Okay.  And did she indicate whether or not Joe

2   Andriano was capable of performing in that regard in terms of

3   affection, hugging, emotional commitment, that kind of thing?

4        A.    According to Wendi's report, he was not able to

5   do it during the sexual encounter, that that emotional

6   spending was related to other -- you know, related to alcohol

7   or later on as when he was very ill.

8        Q.    Okay.  In terms of the actual physical act of

9   intercourse, did she describe what it was like, not in terms

10   of pain and that kind of thing, but in terms of the

11   mechanics, if you will, duration, that kind of thing?

12       A.    Yes.

13       Q.    What did she tell you?

14       A.    Very quick because of her -- I don't know if

15   it's -- if there's a medical reason or just displeasure or

16   what the meaning of this is, but that because of whatever

17   that is, they needed to use a lubricant.

18       Q.    Okay.  And the duration of the experience?

19       A.    Very short.

20       Q.    Okay. And did this description of the sexual

21   relationship that she had with Mr. Andriano, is that

22   consistent throughout the period of their marriage?

23       A.    Yes.

24       Q.    Early on in the relationship did the topic of

25   infidelity become a topic of discussion between Joe Andriano

1    and Wendi Andriano?

2              A.    Yes, it did.

3              Q.    That was reported by Wendi Andriano to you?

4              A.    Yes, it was.

5              Q.    Okay.  Give me the facts and circumstances of

6    that issue.

7              A.    Evidently, Joe had been engaged prior to Wendi

8    to another woman and discovered at some point that that other

9    woman had been unfaithful to him, and so the relationship

10   ended abruptly upon his discovery.  According to her report

11   he became so enraged that his parents became concerned about

12   what he might do with that rage and so sent him to California

13   as a cooling off period.

14             Q.    Okay.  And those facts were known to Wendi?

15             A.    Yes.

16             Q.    Okay.  And she reported them to you?

17             A.    Yes, she did.

18             Q.    Again, does that circumstance portend, if you

19   will, towards future response, if you will, on the part of

20   Wendi Andriano towards Mr. Andriano?

21             A.    It does in a very important way.  On Thursday I

22   talked about the -- about the importance of understanding the

23   context in which domestic violence takes place, so this would

24   be an example.  When a woman gets this kind of information,

25   initially she may just file it away and say --

1          MR. MARTINEZ:  I'm going to object as beyond the

2    scope of the original question and what women think.

3          THE COURT:  Overruled.

4          THE WITNESS:  They may say he didn't really do that,

5    he's just trying to scare me, and just sort of, you know,

6    shelve it.  Then later on in the relationship if the violence

7    does in fact begin or begins in a myriad of ways, that

8    information comes back.  It comes back in a lot of different

9    forms to the woman.  And one thing that happens is he may not

10   have to do a great deal to her for her to be afraid because

11   she's already got the history that maybe she pushed aside

12   when it was being told to her.

13          Another thing that happens is he's -- she's

14   gotten some information from his friends who tried to warn

15   her about him, that she thought was about "I'm not part of

16   their crowd, they're just trying to keep me away from him."

17   And she's got this information about family, the hemisphere

18   of his rage, so later on down the road it doesn't take a

19   whole lot for her to become overwhelmed with fear.

20          Q.    Is there a kind of a conditioning at work here,

21   a --

22          A.    That's actually a really good word to use to

23   describe it.

24          Q.    Okay.  And, again, in your experience in the

25   clinical research, at these beginning times with the

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    relationship, is it the abused person's objective in terms of

2    the evaluation that he or she is making on the conduct of the

3    abuser or is it the honeymoon period, if you will, when you

4    tend to disregard objective facts?

5         A.    I've never known a woman to be objective during

6    that period in time because she's not really been so much the

7    target yet.  She says she may see developing rages but so

8    far, you know, she's not the target.  And if you couple that

9    with a person who believes that her job is to solve all

10   problems for her partner, she's just going to work harder at

11   fixing whatever's wrong.

12        Q.    All right.  And did Wendi relate to you at that

13   time that Joe issued to her a specific warning with regard to

14   infidelity?

15        A.    What Wendi told me in terms of this report at

16   this time during the assessment was that he warned her not to

17   cheat on him.  "Don't do to me what Shelly did."

18        Q.    All right.  In your report did Wendi reflect or

19   relate to you other violent episodes that she was aware of

20   that Joe's friends had informed her of?

21        A.    Joe's friends warned Wendi about a time when a

22   man kicked Joe's truck tire and Joe ran him over.  According

23   to his friends, the man was taken to the hospital following

24   that incident.

25              His friends also told her about a party that

1    had taken place at Joe's family's home when Joe became

2    enraged at his father over something, I don't know what that

3    was, and that it took two men to pull Joe off his father.

4                    His friends also told Wendi that he chased his

5    sisters' boyfriends with a baseball bat, that he had broken

6    windows when he was mad, and then about the -- the earlier

7    incident that I reported about the charge account with the

8    local glass store that he would replace the windows that he

9    would spin out.

10        Q.    Were -- okay.  Were you also advised his anger

11   would manifest against his parent as well?

12        A.    Well, against his father.  I don't remember

13   anger against his mother.

14        Q.    Okay.  What specifically with regard to his

15   father did Wendi relate to you that she was aware of in terms

16   of manifestation of Joe's anger?

17        A.    Actually becoming involved in a family

18   altercation.

19        Q.    Okay.  And that he -- okay, about his parents?

20        A.    Right, right, right.

21        Q.    Okay.  Did Wendi relate to you whether or not

22   she felt she could deal and assist Joe in dealing with this

23   particular anger?

24        A.    Wendi reported repeatedly about her belief that

25   all Joe needed was her love and caretaking and nurturing and

1    that that would help Joe to overcome all of this anger and

2    rage that he seemed to have and express periodically.

3         Q.    Okay.  In your experience and does the research

4    support that is kind of a common characteristic of abused

5    spouses?

6         A.    The belief that we could make them change

7    and --

8         Q.    Okay.

9         A.    -- be okay, the partner.

10         Q.    Okay.  All right.  Did at some point in time

11   Joe develop a disease in the jaw area, in the throat area?

12         A.    Yes.

13         Q.    And did Wendi relate to you how that impacted

14   their relationship?

15         A.    Yes.  And it -- it happened at an early point

16   in their relationship and also at the same time they had a

17   financially difficult portion in their relationship.  It

18   seemed that the disease came at the early onset of marriage

19   and tough economic times all went together.

20         Q.    And, again, are these common characteristics

21   that you see in terms of these kind of relationships,

22   domestic violence relationships, the economic component,

23   perhaps a medical component?

24         A.    The economic, yes.  I don't recall anything

25   like this type of medical problem --

1          Q.    Okay.

2          A.    -- in my background.

3          Q.    All right.  Well, let me ask you, does the

4    research support a conclusion that a disease process turning

5    an otherwise normal person into an abuser?

6          A.    No.

7          Q.    Okay.  Is there some relationship perhaps that

8    the disease may -- may make the person more irritable or more

9    likely to be more explosive perhaps but not change his

10   fundamental personality?

11         MR. MARTINEZ:  Objection.  Calls for speculation.

12         THE COURT:  Sustained.  Rephrase the question.

13   BY MR. PATTERSON:

14         Q.    Is there research in what causes a person to

15   become an abuser?

16         A.    Most of the research literature rests on the

17   theory called the Social Learning Theory by Bantorra from

18   about 30 to 40 years ago.

19         Q.    Okay.  And in a nut shell, as I understand it,

20   that behavior is learned behavior through time?

21         A.    Right.

22         Q.    Okay.  So there's nothing in the research

23   literature that would tend to support the position that

24   disease and disease alone creates an abusive personality?

25         A.    I've never read anything that said that.

1        Q.    All right.  One of the concepts that you

2    discuss in kind of general was the characteristic that an

3    abuser tends to try to isolate the victim.  And did that

4    happen to you as -- or did that happen to Wendi as related by

5    her to you?

6        A.    Yes.

7        Q.    What were some of the incidents that she

8    described for you?

9        A.    From the early days of their relationship, he

10   began to isolate Wendi in a variety of ways.  You know,

11   she -- she worked and went to school and cared for him in

12   extraordinary ways. That in and of itself doesn't allow much

13   time for social relationships.  But she learned as long as

14   she did that, things would go along a lot more smoothly.

15   Whenever friends would try to come over, he would have

16   something to say about that, so the beginnings of isolation

17   sort of took a good hold early on.

18       Q.    Okay.  Give me some for instances.  What kind

19   of behaviors would he engage in that tended to isolate Wendi

20   from her circle of friends?

21       A.    Well, one of the earliest ones that I recall

22   was actually around the wedding, and that was when Wendi had

23   already asked a young woman, I don't know who she was, to be

24   her maid of honor.  I believe and that was already sort of

25   set.

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1      Q.     This was a close childhood, personal friend?

2      A.     Close female friend of Wendi's.

3      Q.     Okay.

4      A.     And Joe wouldn't allow that to happen and made

5   Wendi call her and say I'm sorry, but I can't use you as my

6   maid of honor.  And instead had one of his sisters, I

7   believe, become the maid of honor.

8      Q.     Okay.  Other instances of -- of behaviors on

9   the part of Mr. Andriano that were designed, if you will, to

10  isolate Wendi Andriano from her circle of friends?

11     A.     One of the other things that stands out for me

12  this is not early on, but what comes to my mind when one of

13  the babies was born and -- it must have been the first baby.

14     Q.     Nicolas?

15     A.     Nicolas.

16     Q.     Uh-huh.

17     A.     People would come to the house and want to see

18  the baby and talk to the mother about the baby and all of

19  that, and when one particular old school chum came to do

20  that, he just, I think she said, pitched a fit and swore at

21  her about "what the fuck are you doing here, where's my blue

22  shirt, it's not even ironed yet."  So the effect of that on

23  the friend who was visiting would be "this is uncomfortable,

24  this is shaming, I don't want to be in this.  I don't want to

25  see it."  So then what happens, of course, is people start to

1      drop away.

2           Q.    All right.  Let me give you examples that have

3      come up during the course of the trial here.  It appears she

4      went out, if at all, with her circle of business associates.

5           A.    Right.

6           Q.    Again, how is that isolating in your

7      estimation?

8           A.    Well, that he narrowly has defined who she can

9      be with.

10          Q.    Okay.  And then it appears even when she was

11     allowed to do those things, there were phone calls.  How does

12     that relate to the concept of isolating?

13          A.    Well, the phone calls are about intimidation,

14     of course.  If I call your cell phone five or six times in

15     the course of an evening telling you to come home, whether

16     it's about changing a diaper or just, you know, you shouldn't

17     be out this late or whatever -- you know, whatever the

18     reasons are, that certainly tends to create a world in which

19     you have to live in, I'm not -- if I'm going to not have to

20     hear this anymore, I need to do exactly what he says, so, of

21     course, that's isolating and it's controlling.

22          Q.    Okay.  All right.  It appears during the course

23     of the trial testimony one of the few times that they would

24     go out jointly was in the context of going to the lake and

25     doing his boating hobby.  Again, how is that isolating in

1    your opinion?

2        A.    Well, he's choosing the entertainment and

3    doesn't give you -- doesn't give her the choice about what

4    she wants to do, where they're going, or how long they're

5    doing it for or who they'll do it with.

6        Q.    Okay.  Again, did she relate to you in this

7    context that in general things were okay?  I mean, this is

8    early in -- what time frame are we talking about here?  Early

9    days of marriage, so --

10       A.    They were married in '94.

11       Q.    Yeah.  January of '94, so we're talking about

12   year of '94.  In general did she describe her perception of

13   the relationship?

14       A.    Yes, she did.  Wendi reported that things were

15   okay.  You know, he'd have these temper tantrums almost and

16   she saw him as a spoiled child in many ways because she was

17   being required to care for him in certain ways such as

18   besides the cooking and the cleaning.  It was more than

19   that.  It was clipping his toe nails.  It was trimming his

20   hair.  It was laying out his clothing everyday.  That's more

21   than --

22       Q.    Okay, but yeah.  And -- those activities

23   though in a loving relationship can be innocuous, right?  I

24   mean --

25       A.    Sure.

1        Q.      -- how can they be problematic in a

2   relationship that's not well grounded or solid relationship?

3        A.      Depends on what's behind it.  What's behind

4   that behavior?  Do I feel like I have to do this?  If I don't

5   do it, what happens?  Do I have to contend with the rage if

6   I'm not constantly doing all the things that he thinks I'm

7   supposed to be doing?  What's the trade off for me?  And for

8   Wendi, the trade off was keeping the peace because that's

9   what she wanted to do, keep peace to keep his anger and rage

10  at bay.  When she did that, when she was successful at doing

11  it, and that doesn't mean she was a successful battered

12  woman.  I don't mean that.  What I mean is when she did what

13  he wanted and then he would be okay, then there was peace.

14  And when there was peace, times were fine.

15       Q.      I think you mentioned in your overview that

16  there are perceptible differences between the abuser in

17  public and the abuser in private, okay?  Did Wendi relate

18  that concept to you?  And if so, what did she tell you?

19       A.      One way to describe that would be public versus

20  private life.

21       Q.      Yes.  Joe's perception -- the perception of

22  others about Joe in public?

23       A.      Right.  What -- what Wendi relayed to me was

24  that she really saw him as the fun guy to have at a party.

25  He was just a lot of fun and a pleasure to be around.  That's

1    a different person than the one behind closed doors.

2         Q.    Okay.  And, again, your literature in you

3    clinical experience, is that something that is seen in these

4    relationships?

5         A.    It's quite typical.  There are cases -- let me

6    step back a minute from that statement.  Maybe four or five

7    years ago there was some initial research conducted on what

8    was called or is called Typologies of Battering.  And the

9    researchers, I think they were out of Seattle, were looking

10   to see if there were differences among men who batter.  And

11   this made the news, the media grabbed ahold of it, and what

12   they were looking at was, were some men violent in many of

13   their relationships or were they violent just within this

14   particular intimate relationship?  That research still is not

15   well defined.  There's a lot of different people that are

16   looking at it right now so they don't know a whole lot about

17   personalities of people who are only abusive within intimate

18   relationships.  But what we do know for sure is that there

19   are people who are only abusive within the context of that

20   one intimate relationship or in the context of many intimate

21   relationships and not, say, within friendship, friendships or

22   as batterer or whatever.

23        Q.    Okay.  And when you use that, when you say that

24   conceptually, you mean those persons don't endeavor to

25   control the conduct of other people.  They're -- the

1   controlling person's conduct is restricted or reserved for

2   the intimate partner?

3           A.      Correct.

4           Q.      Okay.  All right.  Up to this time there's been

5   no information relayed to you by Wendi concerning any

6   physical misconduct?

7           A.      Correct.

8           Q.      Okay.  And in your opinion up to this point in

9   time what are the potential abusive behaviors she related to

10  you that she attributes to Mr. Andriano?

11          A.      Well, what she's experienced up to date would

12  be the -- the name calling, the types of names that a lot of

13  women would find very hurtful like bitch, whore, those kinds

14  of names.  In the context of screaming or yelling, in the

15  context of being told that, you know, her job is to do this,

16  this, and this, whatever those things are.  She's been told

17  about acts of violence that had been done to other people,

18  not to her.  He told her himself according to Wendi about

19  what happened when his ex-fiance cheated on him, so she's got

20  that.  So what we're seeing is sort of a peeking of the

21  beginnings of violence, other forms of violence.

22          Q.      Does she relate to you what she believes to be

23  the first incidents of physical violence that Mr. Andriano

24  visited upon her?

25          A.      Yes.

1          Q.     When did this occur?

2          A.     May I look at this again?

3          Q.     Page 7 of your report, a category described as

4     First Physical Assault.

5          A.     It was in 1994 and it was about 8 to 9 months

6     after the marriage.

7          Q.     Okay.

8          A.     He was angry and yelling, so she went and hid

9     in the bedroom, I believe.

10          Q.     Okay.  Do you have a sense of where this may

11     have occurred, what living area?

12          A.     I know early on they didn't have enough money

13     to continue to live in their first apartment, which I believe

14     she called a townhouse.  When they could no longer afford

15     that, I think they moved to Joe's family's farm, and there

16     was a -- some sort of structure on that farm.  She described

17     it as small.  I think it had just a couple of rooms, and one

18     of them may have had farm machinery or something of that

19     nature in it.  I think that's where this particular scene

20     came from.

21          Q.     Okay.  Describe to me what she related to you

22     concerning the facts and circumstances of that assault?

23          A.     Okay.  I don't know what it was that he was

24     yelling and screaming about.  I just know that he was.  And

25     when he did that, she ran for cover, which was her common way

1    of taking care of herself, in the bedroom and closed the

2    door.  And so he tried to gain entrance into the bedroom

3    by -- in order to do that, he somehow threw his body up

4    against the door, and so -- I think it was a wooden door.  So

5    he had scratches on his arm from the wood and on his

6    shoulders.  I believe that he also destroyed the door or

7    shattered it in some way by putting -- throwing his weight

8    against it.  He -- that enabled him to get inside the bedroom

9    and to Wendi.  He grabbed her by the neck, pinned her up

10   against the wall, and grabbed a -- some kind of pot.  And

11   rather than hit her with the pot, he smashed the pot into the

12   wall, thereby creating a hole in the wall.  He then went out

13   and smashed an additional piece of furniture.  I think it was

14   a coffee table.  At some point he was -- became, I assume,

15   physically drained from that activity and laid down and went

16   to sleep.

17        Q.    Okay.  Aside from the obvious differences of

18   the physical assault, breaking bones and bruises that kind of

19   thing, is there a significant impact in these kinds of

20   silence on the attitudes and behaviors in the abused person?

21        MR. MARTINEZ:  Objection.  Improper foundation.  He

22   indicated breaking bones.

23        MR. PATTERSON:  No.

24        THE COURT:  Sustained.  Rephrase the question.

25        MR. PATTERSON:  No.

1    BY MR. PATTERSON:

2           Q.    Obviously, this is not a circumstance where

3    bones were broken or bruises inflicted, right?

4           A.    Correct.

5           Q.    But it is clearly an act of violence visited

6    upon Ms. Andriano?

7           A.    Yes.

8           Q.    Okay.   Are these acts of violence that don't

9    result in broken bones and bruising as significant in your

10   estimation in assessing whether or not a person is a victim

11   of domestic violence?

12          A.    Yes.

13          Q.    Okay.   And how is that?

14          A.    Well, clearly the intimidation of that act,

15   smashing something next to a person's head, that's clearly

16   fear provoking, but there was physical violence because he

17   did grab her by the neck and pin her up against the wall.

18   There is an act of physical violence and also all of the

19   intimidating behaviors and smashing furniture.   That's

20   clearly intimidation instilling fear in the eyes of the

21   victim.

22          Q.    Okay.   And do we go back to a term we used

23   earlier, conditioning the victim for future behaviors?

24          A.    Yes.

25          Q.    How is that?

1          A.    These are cumulative.  Every time something

2    happens, whether it's a story told, whether it's screaming

3    and yelling and name calling, or whether it's an act of

4    physical violence against the person or violence within the

5    home, breaking and smashing things, those are cumulative.

6    You don't forget those.

7          Q.    And -- okay.  And how about just the randomness

8    and utter unpredictability of the abuser's behavior?  How

9    does that impact the abused person?

10         A.    The literature talks about women, victims of

11   domestic violence, believing for at least some period of time

12   that they can control their partner's violence.  That if I

13   just do this, then he won't do that.  If I'm a better wife, a

14   better lover, a better cook, whatever, then I can in some way

15   stop this.  And this is -- all battered women want is for

16   this to stop.  So when you get random acts that she can't fix

17   or can't change or doesn't know when they're going to happen,

18   that little piece of comfort in the belief system that I can

19   change this by just being better begins to disappear.

20         MR. PATTERSON:  Judge, this might be a good moment to

21   take a break.

22         THE COURT:  We'll go ahead take our afternoon break

23   at this point in time, ladies and gentlemen.  During this

24   break, remember the entire admonition I've given you,

25   including the fact you're not to discuss this case with

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    anyone, do not let anyone discuss with the case with you,

2    keep an open mind.  Have a nice break.  We'll see you in 20

3    minutes.

4

5                      (Recess.)

6

7         THE COURT:  This is CR 2000-096032, State of Arizona

8    versus Wendi Elizabeth Andriano.  The record will reflect the

9    presence of the Defendant, Counsel and the jury.  Sharon

10   Murphy is on the witness stand, and we'll continue with the

11   direct examination by Mr. Patterson.

12        MR. PATTERSON:  Thank you, Judge.

13

14   CONTINUED DIRECT EXAMINATION BY MR. PATTERSON:

15        Q.    You are Dr. Sharon Murphy?

16        A.    Yes.

17        Q.    The same witness who was testifying before the

18   break?

19        A.    Yes.

20        Q.    Do you realize you're still under oath?

21        A.    Yes.

22        Q.    We were talking about the first assault and it

23   apparently occurred eight to nine months into the marriage

24   and about, what, year and three or four months from the

25   inception of the relationship?

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000007377

1          A.     Relationship, correct.

2          Q.     Okay.  In your clinical experience and in the

3     literature, is this seen in these relationships, a honeymoon

4     period passes and then the behaviors become escalated?

5          A.     That's the phenomenon that I talked about on

6     Thursday that I actually didn't have a slide for because of

7     my own reticence to use it.  Excuse me.  It's called the

8     Cycle Theory of Violence.  My reticence is about -- it's

9     really a conceptual framework.  It's never been empirically

10    researched, so therefore it doesn't have the status of

11    theory, although people have come to know it as a theory, but

12    yes, that's what that talks about.  That would be a period of

13    sort of verbal assault sort of stuff leading to the physical

14    violence and leading to the honeymoon.

15         Q.     Okay.  Did Wendi relate to you whether or not

16    she reported this assault to law enforcement?

17         A.     She related that she did not.

18         Q.     Okay.  And, again, is that typical with

19    behaviors that you observed either in your clinical practice

20    or in the research?

21         A.     It's very typical.

22         Q.     Okay.  How did the couple deal with that

23    particular incident thereafter?

24         A.     There was never any conversation or

25    discussion.  Joe fixed the things that he had broken and she

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1 never talked to him about it.  She said to me that she didn't

2 bring it up because she was afraid of what would happen if

3 she did, so therefore there was no conversation.

4     Q.    Okay.  And that's important for a number of

5 things.  Did Joe sustain any consequences as a result of his

6 behavior?

7     A.    None.

8     Q.    Okay.  And, secondly, this pattern of dealing

9 with violence by avoiding it, is this one of the common

10 characteristics that you described in general that abused

11 persons engage in?

12     A.    Yes.  They're part of the -- what the partner

13 uses in terms of minimizing blame, sort of what the victim

14 does in shutting out the bad acts.

15     Q.    Okay.  At this time did Wendi relate to you

16 rationalizing behaviors that Joe would engage in in terms of

17 whose fault the problem was?

18     A.    The way I recall what she reported was that he

19 blamed her for lots of things that were going wrong in their

20 lives, whether it was money, jobs, things of that nature,

21 that she was -- she needed to be the one to fix things.

22     Q.    Okay.  And did Wendi relate to you that he used

23 the "F" word in describing fault in this particular

24 relationship?

25     A.    Yes.

1      Q.    What did she say he accused her of?

2      A.    He would scream at her that things were her, in

3   quotes, fucking fault.

4      Q.    Okay.  And, again, is the use of swear words,

5   cuss words, one of the tools that an abuser uses?

6      A.    Yes, particularly words that an individual

7   victim might find particularly offensive.

8      Q.    Okay.  And did you find this to be the case in

9   their relationship?

10      A.    Yes, I did.

11      Q.    All right.  Moving again through your report,

12   you have an entry on page 7 called Joe's health in general,

13   how does Joe's health impact your opinion in this particular

14   case?

15      A.    Well, it impacts Wendi's thinking and decisions

16   about what to do.

17      Q.    Okay.  Enlarge upon that for me?

18      A.    Well, her husband's been at this point

19   diagnosed with some sort of tumor, although I believe early

20   on, those early diagnoses were they were benign.  However,

21   even a benign tumor must cause distress.  And so according to

22   Wendi's telling of the story, that leads just to more and

23   more time that needs to be invested in caring for him because

24   that's what she needs to do.

25      Q.    Okay.  And she was inclined to do it any way,

1   but now she's dealing with a potentially sickly person. Does

2   that kind of just -- what's the word I want -- make her feel

3   in her own mind more needed than otherwise?

4       A.   Correct.

5       Q.   All right.  Explain that to me.

6       A.   Well, from her perception of a woman's role,

7   this certainly fits into the caretaking and the nurturing

8   role that she's already had since they first became involved

9   with one another, firmly cements her in that relationship,

10  not that she ever reported at this point in time a desire to

11  leave.  However, this would impact any decision making.

12      Q.   Okay.  And does she relate at any time period

13  in the relationship an inability to leave him?

14      A.   Much later, yes.

15      Q.   What did she say in that regard?

16      A.   That there was no way she could leave him at

17  this point in time when he was terribly ill and really

18  dependent in some cases

19      Q.   Okay.  What I'm trying to determine here, from

20  what you told me, I sense there's a great deal of reluctance

21  to leave anyway in -- in relationships that don't involve a

22  disease component.

23      A.   Exactly.

24      Q.   In the cases that disease component does exist,

25  it makes that process --

1      A.    It's compounded, yes.

2      Q.    Okay.  All right.  And I also understand that

3   the disease creates additional financial hardships for the

4   couple?

5      A.    There were times they didn't have health

6   insurance.  And I believe it was her parents, although I need

7   to go back and read that specifically as to who it was, but

8   some sort of parents were providing financial support.  One

9   of the doctors needed money up front, I recall, and so they

10  needed money right away.  Of course, it was lost time from

11  work, but there were a lot of medical costs involved.

12     Q.    All right.  It was the need to spend money on

13  the health care.  Did Wendi report to you as a result of that

14  Joe cut back in his spending habits in other areas to

15  accommodate that problem?

16     A.    No.

17     Q.    Okay.  What did she tell you in that regard?

18     A.    That even when he wasn't working, he was

19  spending a great deal of money on his boat, which she

20  referred to as a very expensive toy.  Whenever she would try

21  to offer any kind of what she would call constructive

22  criticism about those expenses and look at where we're at

23  financially, he would get very, very angry.  Wendi reports

24  that she learned early on in life that you just weren't

25  supposed to engage in arguing or fighting or yelling or

1    screaming, and so she would back off whenever that happened.

2    It seemed that Joe just expected that she would have the

3    money to pay for whatever expenses they had.

4         Q.    Okay.  At about this time, were counseling

5    services offered to Joe and Wendi?

6         A.    They were offered to Wendi.  I don't recall

7    that they were offered to Joe and --

8         Q.    Okay.

9         A.    -- that was through her work.

10        Q.    All right.  Did Wendi avail herself of those

11   counseling opportunities?

12        A.    She did, but very briefly.  She went -- you

13   know, I can't recall if she went several times or just a few,

14   but I know it wasn't for very long.

15        Q.    Okay.  Are you certain it wasn't -- well, Joe

16   may not have been present, but did Wendi indicate a reason

17   why she ceased going to these counseling sessions?

18        A.    Yes.

19        Q.    What did she say?

20        A.    She stopped going because the counselor was

21   blaming Joe for the problems and she did not want to hear

22   anybody blaming her husband for anything.

23        Q.    Okay.  Again, is that behavior that you observe

24   in an abused person the result of her relationship with an

25   abuser?

1   A. Yes.

2   Q. Okay.  And which of the criteria are we talking

3 about in terms of that kind of conduct, not wanting to hear

4 about things said about the person she loves?

5   A. She was very protective of him.  She did not

6 so-call badmouth him to her parents, who would have been the

7 likely people because she had access to them.  They were not

8 people that he had, as far as I can recall, that he had ever

9 tried to isolate her from, so they would have been the

10 logical people for her to do that with and she chose not to

11 do that.

12   Q. Okay.  And, again, is that typical behavior

13 that you see --

14   A. Yes.

15   Q. -- in abused persons?

16   A. Yes.

17   Q. A refusal to think badly or speak badly about

18 the person they love?

19   A. Yes.

20   Q. Okay.  So do you find it unusual there is no

21 badmouthing of Joe to either Alejo Ochoa or Donna Ochoa?

22   A. Unusual?  No.

23   Q. All right.  Let's talk about a particular

24 occurrence in the life of Wendi and Joe that related to an

25 inability to get this glass business either going or

1    sustaining the glass business.  At some point in time, the

2    glass business had need for an infusion of cash, correct?

3         A.    Yes.

4         Q.    Okay.  Did Wendi relate the facts and

5    circumstances of that infusion of cash into the business?

6         A.    Yes.

7         Q.    Okay.  What did she tell you in that regard?

8         A.    I assume that you are referring to the

9    borrowing -- I don't know if borrowing is the right word.

10   There was a business partner that came into the picture that

11   infused quite a lot of money into the business to keep it

12   going, and it worked for a while and then it stopped working

13   so well.

14        Q.    All right.  This infusion of cash in your

15   report was in the neighborhood of $75,000?

16        A.    Yes.

17        Q.    Okay.  And as a result of that, Joe acquired a

18   silent partner, if you will?

19        A.    Right.

20        Q.    Okay.  The business -- did it succeed at that

21   point with the infusion of cash or did it continue to spiral

22   downward?

23        A.    I think for a while it was doing okay and then

24   it began to spiral downward.

25        Q.    Okay.  Did Joe do some things in relationship

1    to that business failure that Wendi observed and related to

2    you that are relevant to this domestic violence issue?

3         A.    Yes.

4         Q.    What did she tell you?

5         A.    Well, the way I recall her report is that the

6    silent partner, when the business started to go bad, the

7    silent partner wanted to have much more of a say in the

8    operation to fix it.  Joe did not want any part of that and

9    became intensely angry about it and threatened to have the

10   silent partner killed.  He told that to Wendi.  Wendi became

11   frightened, tried to talk him out of it, told her father.

12   Her father tried to talk to Joe or just warn him not to do

13   that.

14              Joe was a gun owner.  He had numerous guns.  I

15   think Wendi said 20.  She had enough reason to think that he

16   could possibly attempt to kill this man.  He -- she, I think,

17   told him that she was going to let the man know and he warned

18   her not to do that by holding a handgun in his hand pointing

19   it at her -- I believe he was across the room at the time --

20   and basically warned her to never do that with the gun

21   pointed at her.

22         Q.    Okay.  And did you attribute a quote to Ms.

23   Andriano in your report?

24         A.    Yes.

25         Q.    Okay.  And what was that quote that Wendi

1  related to you that Joe said to her?

2          A.   He, according to Wendi, said, if you even think

3  about doing that, I'll use this on you instead of him.

4          Q.   Despite the threat, what did -- what did Wendi

5  do in response to the threat?

6          A.   She told the man anyway.

7          Q.   Okay.

8          A.   And he then hid or disappeared somehow.

9          Q.   All right.  In your assessment of that factor

10  in coming to conclusions in this case, the fact that she went

11  and did it anyway, how does that integrate into your

12  assessment?

13          A.   The ante's now been upped.  There's now a gun

14  that's been pointed at her with a threat that she believed

15  was viable.  Add that to her knowledge that there were

16  approximately 20 guns in the house, in the closet, one of

17  them was kept either in the nightstand or under the mattress,

18  so she lived with a gun next to her partner.  All of those

19  things added together are cumulative.  I think the fear

20  continues to rise, but even at this point her decision to

21  tell the intended victim says one of two things to me in

22  understanding her behavior.  Either she doesn't believe he's

23  going to use it, or things are so bad that she's willing to

24  take the risk.  I don't know which it is.

25          Q.   This does appear to be the first time, at least

1    as related to you by Wendi, that she contradicted an

2    expressed dictate of Mr. Andriano?

3         A.    Yes, I think so.

4         Q.    How is that significant?  I mean, I guess in

5    general, do abused people follow the dictates of the abuser

6    100 percent of the time?

7         A.    I wouldn't say 100 percent of the time, no.

8    That probably would be impossible.

9         Q.    All right.  So there are times the abused

10   person shows a little resistance to the order, the control,

11   and acts independently?

12        A.    Yes.

13        Q.    Okay.  But how frequently in the scheme of

14   things does that phenomenon occur?

15        A.    I think that's dependent upon the cumula --

16   accumulation of experiences with the violent person and

17   accumulation of experiences with life and her own personal,

18   the only phrase that comes to mind, cognitive scheme.  Where

19   do her thoughts, beliefs, and ethics come from, all combined.

20        Q.    All right.  That's what I'm driving at.

21   Abused people still have a moral or ethical limitation to

22   their conduct, right?

23        A.    Yes.

24        Q.    Okay.  And in this sense then could that be one

25   of the factors that caused her to warn the guy that she

1    believed was in jeopardy of dying because it -- her morals

2    compelled her to warn this person?

3          A.    I believe so.

4          Q.    Okay.  All right.  Wendi described to you in

5    this context kind of accelerating debt and increasing

6    economic problems in the family?

7          A.    Uh-huh.

8          Q.    Did she express to you how that impacted Joe?

9          A.    Well, in a variety of ways.  Joe watched the

10   business go down the tubes.  He watched their personal

11   finances floundering, and watched on a very concrete level

12   his vehicle becoming repossessed because of failure to pay,

13   the inability to pay the car payment.

14         Q.    Okay.  Did she explain or relate to you that it

15   was emotionally depressing for him?

16         A.    Depressing and increased his rage.

17         Q.    Okay.  And did she give you concrete examples

18   of those manifestations of the rage at this time --

19         A.    Yes.

20         Q.    -- period?

21               What did she tell you?

22         A.    In her relating the story about the man who

23   came to repossess the van, she said that Joe always kept a

24   gun in the van, and when the man came and hooked up the van

25   to tow it, Joe ran after the vehicle, grabbed the gun out of

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    the van, and held it up to the driver's head.  And so the

2    driver stopped and Joe got the van back.

3          Q.    Moving on through the report here, did Wendi

4    relate to you any difficulties that Joe may have had at this

5    time in not being able to work as a result of his medical

6    condition?

7          A.    There were times that it seems to me that there

8    were periods of time in which he did work and he didn't

9    work.  Related to the illness but also sometimes not related

10   to the illness, like times when he really seemed to be

11   healthier but still choosing to not work.

12         Q.    Okay.  Is this consistent with what she related

13   to you in the early moments of their relationship that his

14   work history before the disease was discovered was kind of --

15   kind of inconsistent?

16         A.    Seemed to be very sporadic.

17         Q.    Okay.  Did she relate to you that they were

18   compelled to borrow money from relatives?

19         A.    Yes.

20         Q.    Okay.  At some point Wendi became pregnant with

21   their first child and delivered, obviously, at some point.

22   Did she relate to you how the birth of the first child

23   affected Joe?

24         A.    I remember that Joe's mother gave her a baby

25   shower and everybody was excited about the birth, and I think

1    it was either right around that time or shortly after that

2    that he went to work in Tucson at a boat business for friends

3    of his.  But because of his interest in boats, I guess, he

4    started buying more things for the boats that he already

5    owned.

6              Q.    Okay.

7              A.    I don't know at that point if he owned one or

8    two.  And so in order to get payment, the boat owners

9    deducted the amount that he was, you know, buying from his

10   salary, and so the salary was inadequate at that point

11   because of his purchases.

12             Q.    Okay.  After the birth of the first child, did

13   Wendi relate to you whether or not it was Joe's idea that she

14   go back to work or remain at home and take care of the child?

15             A.    At that time I think they were borrowing or

16   being given, I'm not sure which, money to help offset their

17   expenses by I think it was her parents at that point.  And

18   so, yes, he was very anxious for her to be able to get back

19   to work and help support the family.

20             Q.    Okay.  Was Joe resistant to Wendi's friends

21   coming over and admiring or playing with the child?

22             A.    Yes.  And that was the incident that I relayed

23   earlier today about screaming at her, about his fucking blue

24   shirt wasn't ironed or something.  That was in front of a

25   friend that had come to visit the baby.


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1     Q.     Okay.  Were there other incidents that Wendi

2   related to you where Joe exhibited behavior that led Wendi to

3   believe that her friends were not welcome to come see the

4   child?

5     A.     Yes.  I mean, he would yell things at her about

6   her needing to do other things at that time, letting the

7   visitor know they were not welcome.  He at one point even

8   yelled "What are you doing?"  At that point he needed her to

9   do whatever it was that he needed her to do.  So certainly

10  not making anyone feel welcome in the home.

11    Q.     How about with regard to their sexual

12  relationship after the birth of the child, Nicolas?  Was that

13  problematic as related to you by Wendi?

14    A.     Yes.

15    Q.     In what regard?

16    A.     It's a particular incident that stands out in

17  my mind.  Wendi was just a couple of weeks post partum.

18    Q.     You mean after birth?

19    A.     After birth, so before that six-week period

20  that the doctor says that you can engage in sex.  And Joe let

21  her know that he wanted to have sex and she said no, not

22  yet.  And he started to pull her arm.  She was sitting, I

23  think, on the couch and he was pulling her arm and they had a

24  dog, and the dog obviously witnessed Joe doing this to Wendi

25  and so the dog began to growl at Joe.

1        Q.     Okay.   This dog have a name?

2        A.     Max.

3        Q.     Okay.

4        A.     Joe became enraged at the fact that the dog was

5   now growling at him and his wife is saying no, and so he

6   grabbed the dog and pinned him to the floor with one hand and

7   with the other hand held his mouth shut so that he couldn't

8   bark or growl.  And there's a quotation --

9        Q.     Okay.  What did Wendi relate to you that he

10  said at the time that he had the dog pinned to the floor at a

11  time when he was demanding that Wendi perform sex for him?

12       A.     Well, what Wendi said was, "If you don't start

13  doing what I'm telling you to do, I'm going to kill this

14  fucking dog."

15       Q.     Did Wendi relate to you she had an emotional

16  response to this situation?

17       A.     That she was crying.  At the same time the baby

18  started to cry.  She nursed the baby -- she stopped, nursed

19  the baby to soothe him, put him back down, and then went with

20  Joe into the bedroom and engaged in sex.

21       Q.     Okay.  And, again, did they relate to you what

22  she said or did you quote it in your report?

23       A.     She said "Please stop, I'll do whatever you

24  want, please stop."

25       Q.     And did she relate to you the sum and substance

1    of the sex act that was done at that time?

2          A.    She did.

3          Q.    What did she say?

4          A.    She reported crying because of the discomfort.

5    Reports that it was very quick, no affection, no foreplay,

6    just quick.

7          Q.    All right.  At or near this time, did Wendi --

8    did Wendi relate to you facts at or near this time that

9    evidenced her desire to maybe leave Joe at this time?

10         A.    Yes.

11         Q.    What did she say?

12         A.    She made a call to the man who had been Joe's

13   silent partner in the glass business because she knew that he

14   had money and because he was, I believe, a friend of her

15   father's.  So there was a relationship.  So she called and

16   told him about her plan to leave and he gave her a small sum

17   of money to enable her to do that.

18         Q.    Okay.

19         A.    So she -- so she planned to do it, and in the

20   planning, Joe, I think, was away for a couple of days and was

21   going to leave -- she was going to leave the next morning,

22   Joe was still away.  She wrote a note to him, left it out,

23   was going to leave in the morning, but he came home

24   unexpectedly, read the note, woke her up and --

25         Q.    What did she say was his response to

1    discovering that she was about to leave him?

2         A.    He was shaking her and screaming at her, "Why

3    are you doing this to me?"  But he was also crying and she

4    felt badly for him and his upsettedness and believed that she

5    should not leave.

6         Q.    Okay.  And, again, in research, in your

7    clinical experience, is this typical behavior for abuse

8    victims?

9         A.    It's very typical.  The numbers change with the

10   research that comes out so I've read different things, but

11   the research says somewhere between five to eight times it

12   takes for a woman to actually leave for good.  So there are

13   many attempts generally before she really leaves.

14        Q.    Okay.  Did Wendi relate to you exactly where

15   she had expected to go?  Let's talk about the particulars.

16   Your report indicates she told you how much money she

17   received from this gentleman?

18        A.    I think it was $1000.

19        Q.    And this gentleman's name was Jerry Robles?

20        A.    Yes.

21        Q.    Did she tell you where she intended to go with

22   this thousand dollar opportunity, where she would go?

23        A.    There was a friend she was going to visit.  I

24   don't remember where it was, but I know it was in another

25   state.

1       Q.    After that did Wendi report to you -- strike

2   that.

3             Did Wendi report to you there was a change in

4   perceived behavior and perceived relationship after that

5   particular episode?

6       A.    Yes.  It would be like that honeymoon phase we

7   talked about a little bit earlier.  I think it was nice, he

8   did more things for her for a short period of time.

9       Q.    Okay.  And how does that in the research, in

10   your clinical experience, impact the abused person, all of a

11   sudden this abuser is now doing nice things?

12       A.    Uh-huh, yes.  The research calls that

13   intermittent episodes of violence, meaning that the violence

14   in many cases is not constant.  There's often periods of good

15   times, which has a couple of effects.  One is okay, things

16   are going to get better now.  I just have to work harder at

17   it.  He's come around, things are going to be okay.  That's

18   one way the person could look at it.

19       Q.    Which is kind of a self-fulfilling prophecy on

20   the part of the abused, right?

21       A.    Right.  But the other way is "Oh, my God, I'm

22   losing my mind.  I don't know what's happening here.  One

23   minute he's like this, other minute he's like that, and this

24   control that I think I have over him, I can't -- I can't wrap

25   my head around it anymore.  I don't know which way any

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    particular moment he's going to go."

2           Q.    All right.  I understand at about this time

3    Wendi relates that she and Joe moved into a different

4    apartment?

5           A.    Yes.

6           Q.    Okay.  And in general their economic

7    circumstance, did it stabilize briefly?

8           A.    Things got better.

9           Q.    Okay.  But, again, is there something that

10   causes problems for this relationship as related to you by

11   Wendi?

12          A.    Well, they were able -- they were able to leave

13   the little building on the farm and move into the apartment

14   that went with her new job.  But Joe was concerned about dad,

15   not knowing that things were getting better, that the -- he

16   just didn't want him to know a lot at this point.  So they

17   actually left in the middle of the night instead of packing

18   up in the daytime and moving out because of that.  And then

19   Joe started really experiencing neck pain again after a short

20   period of time.

21          Q.    All right.  And was it about this time that

22   they had sent the slides, if you will, of the biopsies to an

23   independent source to determine whether or not the original

24   problem had been misdiagnosed by other physicians?

25          A.    I know he got the diagnosis of cancer at this

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    time.

2              Q.    Okay.

3              A.    And I know that she was pregnant with the

4    second child at this time.

5              Q.    All right.  So just when things are starting to

6    get normal, so to speak, he has the setback because it's

7    actually now that he knows it's cancer?

8              A.    Correct.

9              Q.    Okay.

10             A.    Correct.

11             Q.    There's apparently another child on the way?

12             A.    Yes.

13             Q.    Okay.  Did Wendi relate to you that at about

14   this time they began searching for other treatments of

15   whatever type and kind in order to deal with his cancer?

16             A.    I believe that is this period of time -- I know

17   that when the cancer was diagnosed, Joe was given a very

18   dismal prognosis by the doctor.  And I believe that's what

19   led to looking for alternative treatment.

20             Q.    Okay.  And what did Wendi relate to you that

21   they explored in terms of alternative treatments?

22             A.    I think it may have been called, like, a

23   holistic treatment.  They -- I don't know who found it, but

24   somebody found it and it was located in Colorado and his

25   sister helped to raise money to help pay for those expenses

1    by holding a dinner dance, and that helped pay those expenses

2    so that he could avail himself of that particular treatment.

3         Q.    Okay.  Did they also resort to faith healing?

4         A.    They did.

5         Q.    Tell me about that.

6         A.    Wendi's church in faith healing and laying of

7    hands, and one of the things they tried was to have this done

8    for him.  And actually what happened was he was having pain

9    and they went to church and someone did this and the pain

10   stopped, so it helped Joe to believe that this could be a

11   viable option.

12        Q.    Okay.  It reinforced his belief that maybe this

13   was a way to go?

14        A.    Right.

15        Q.    Okay.  Did Wendi relate to you though at some

16   point Joe came to the conclusion that the faith healing was

17   not working and he blamed that, too, on Wendi?

18        A.    Yes.  That's right.

19        Q.    What did she tell you about that?

20        A.    Well, that when it stopped that it was her

21   fault that it was -- that she was the one who had introduced

22   him to God or her God, I'm not sure exactly how he said that,

23   and that this was all her fault.  So now she was being blamed

24   for the cancer.

25        Q.    All right.  Did Wendi relate to you that Joe

104

1    was offered the opportunity in order to deal with the cancer

2    either by radiation or radiation and chemotherapy as a

3    treatment mode?

4          A.    Yes.

5          Q.    And what did Wendi relate to you that Joe

6    decided in that regard?

7          A.    He chose not to use radiation, but I believe he

8    chose to use chemotherapy.

9          Q.    Okay.  And initially was there an initial

10   reluctance on Joe's part as reported by Wendi to not do

11   either radiation or chemotherapy?

12         A.    Initially, yes.

13         Q.    Okay.  Was that because of the chances of

14   success?

15         A.    Yes.  He still believed that he was going to

16   have a 30 percent chance of living regardless and there were

17   terrible side effects, of course, associated with either

18   treatment.

19         Q.    Okay.  Had there been during this time a

20   cessation, if you will, of the -- the sexual frequency

21   between the two parties?

22         A.    There was a period in time I -- I remember that

23   she said that he -- when they returned from Colorado that the

24   daily sex resumed.  So I'm assuming that it had stopped for a

25   period of time, but I don't know how long it stopped for.

1       Q.    Okay.  In any event, after the cessation did it

2    pick up and resume?

3       A.    Correct.

4       Q.    Is it a more normal sense of frequency, is

5    it -- what was that frequency?

6       A.    Daily.

7       Q.    Is daily sexual intercourse in and of itself

8    evidence of abusive behavior?

9       A.    No.

10       Q.    Okay.  In what context would that be abusive?

11       A.    It's abusive if one person is choosing to not

12    participate but is either being forced or feels like they're

13    being forced.  You know, like there's a ramification for not

14    participating.

15       Q.    Okay.  And in the marital relationship that

16    becomes very problematic because you can't really say no,

17    those kinds of things.  You were telling me something about

18    how in the context of marriage it's a little more difficult

19    to determine true consent.  It's -- it's not like a dating

20    relationship where there's questions, answers, those kinds

21    of --

22       MR. MARTINEZ:  Objection.  Leading.

23       THE COURT:  Sustained.

24       MR. PATTERSON:  Sorry.  I need to get at that issue

25    / / / / /

1   BY MR. PATTERSON:

2         Q.   Can you tell me about that issue?

3         A.   I'm not sure what you're asking me.

4         Q.   Okay.  All right.  Let me go back then to what

5   you told me, that it is problematic if it is daily and

6   unwanted by one of the parties?

7         A.   Right.

8         Q.   Okay.  In the marital context is there often

9   times difficulty in establishing whether or not one of the

10  participants wants it or doesn't want to engage in that

11  behavior?

12        A.   Well, you're referring to a wife's decision to

13  not specifically say no because of ramifications?  Sure.

14        Q.   Okay.  That's what I'm driving at.

15        A.   Okay.

16        Q.   In that context, is there a different dynamic

17  at work here?

18        A.   Yeah, fear.

19        Q.   Okay.  Did Wendi relate to you an incident in

20  the hospital where Joe manifested some rage and some temper,

21  dissatisfaction with the nursing staff there at the hospital?

22        A.   It was after one of the surgeries when he had a

23  tracheotomy.

24             MR. MARTINEZ:  I'm going to object.  Lack of

25  foundation.  Which one?

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000007402

1           THE COURT:  Sustained.

2    BY MR. PATTERSON:

3           Q.    Page 11 of your report, next to last paragraph,

4    does that help you recall specifics?

5           A.    Yes.

6           Q.    Okay.  What surgery was it?

7           A.    This was surgery number 4.

8           Q.    Okay.  And on what date was that performed.

9           A.    August of 1998.

10          Q.    Which coincidentally was?

11          A.    She was -- oh, her birthday.

12          Q.    Wendi's birthday?

13          A.    Right.

14          Q.    Okay.  Tell me about that incident?

15          A.    Well, she was eight months pregnant and they

16    had done the surgery, and part of the surgical procedure was

17    to do a tracheotomy.  He was angry, angry about what had --

18    what was happening to his body, became enraged at the nurse

19    and threw a clipboard at her.

20          Q.    Okay.  This was observed by Wendi?

21          A.    Yes.

22          Q.    Okay.  And she related that to you?

23          A.    Yes.

24          Q.    Did Wendi relate to you Joe's reticence or

25    reluctance to engage in the radiation and chemotherapy

1    treatment for his cancer?

2            A.    Yes.

3            Q.    What did she tell you in that regard what the

4    side effects would be?

5            A.    Oh, his salivary glands would become burned,

6    his teeth would become badly decayed and most likely be

7    extracted.  He would lose a lot of weight and most likely

8    become very nauseous.

9            Q.    After the fourth surgery did Wendi relate to

10   you that she acquired a new job?

11           A.    Yes.  And in my report I did not put where that

12   job was located.

13           Q.    Okay.

14           A.    But I recall that it was on Camelback Road

15   or -- it was quite far from where they had been.  I remember

16   that.

17           Q.    Okay.  Do you recall the facts and

18   circumstances related to you by Wendi as to why that job was

19   a brief duration and they moved on to another job?

20           A.    Yes, because that job, for whatever reason, did

21   not include an apartment for them to live.

22           Q.    It was a resident manager job at an apartment

23   complex?

24           A.    Yes.

25           Q.    But it did not include as one of the

1   benefits --

2           A.   An apartment for the family to live in.

3           Q.   Okay.  So that particular job was --

4           A.   Shortlived.

5           Q.   -- shortlived?

6                Okay.  What was the next position that she took

7   in terms of employment as related to you by Wendi Andriano?

8           A.   I believe it was San Riva.

9           Q.   Okay.

10          A.   Yes, San Riva.

11          Q.   At or about this time, did Wendi indicate that

12  she and Joe talked to a lawyer about possible malpractice

13  lawsuits?

14          A.   Yes, because of the misdiagnosis.

15          Q.   Okay.  Did she relate to you that was a joint

16  effort on the part of both she and Mr. Andriano?

17          A.   Yes.

18          Q.   Okay.  All right.  At or about what time did

19  Wendi and Joe move into the San Riva apartment complex?

20          A.   September or October of '99.

21          Q.   Okay.  Was there, as related by Wendi, a change

22  in Joe's conduct in general after they moved into that

23  apartment complex?

24          A.   Yes.

25          Q.   What did she relate to you in that regard?

110

1      A.     He -- prior to that time he was taking pretty

2    good care of himself, following the Colorado sort of

3    homeopathic regimen.  He was eating healthy, doing those

4    sorts of things, and at this point in time he stopped that

5    and sort of resumed old ways and the partying and the

6    drinking stuff again.

7      Q.     Okay.  So once again we see a period of time

8    where there's kind of a cessation of the battering behavior

9    kind of a honeymoon between two parties?

10     A.     Yes.

11     Q.     Okay.  But that ended apparently with Joe

12   changing in that regard to his eating habits?

13     A.     And becoming demanding again --

14     Q.     Okay.

15     A.     -- about picking out his clothes.  She had two

16   little ones, very little ones, and working full time.  If she

17   didn't have time in the morning to lay out his clothes for

18   him, that was enough reason for him to become really angry

19   again.

20     Q.     Okay.  Did Wendi relate to you on top of the

21   clothing that Joe had a preference as to what she would wear?

22     A.     I don't remember if there was a preference for

23   something, but I know what he didn't want.

24     Q.     Okay.  A prohibition?

25     A.     Prohibition was against wearing black.

1       Q.    Okay.  And, again, did she give you his

2    sentiments in that regard and cause you to quote them in your

3    report?

4       A.    Well, she was required, I guess to wear black

5    suits for business reasons, whatever, and she told me that he

6    said Those fucking bastards making you wear that shit, so

7    expressing anger at the establishment for making her wear

8    something that he otherwise would not have allowed her to

9    wear.

10      Q.    And, again, going back to the research and

11   clinical experience here, is that a manifestation of

12   controlling behavior?

13      A.    Yes, it is.

14      Q.    Okay.  At or near this time, and, again, the

15   precise chronology is not -- I don't know exactly at this

16   point, but during the course of trial we heard about an

17   incident involving a return from a Las Vegas trip that Wendi

18   had participated in with her mom and her friend.  Did Wendi

19   relate the sum and substance of that incident to you?

20      A.    Yes.

21      Q.    Okay.  Tell me about that incident?

22      A.    I believe it was she was with her mother and

23   her cousin, Barbara.  She had gone to Vegas.  I don't

24   remember what the reason was.  I think it was to relax and

25   have a good time.  I don't remember anything else about

1    that.  They were going to be gone a couple days.  They had a

2    return flight and the day before they were scheduled to fly

3    home, so I think this would have been a Saturday, he started

4    calling and called numerous times telling her she really

5    needed to come home that day and she refused.  So they flew

6    home on Sunday.

7               The flight was delayed.  I don't remember by

8    how long, but when Joe arrived to pick the three women up, he

9    parked in the lane in which you don't normally park in, so

10   there was still moving traffic.  He was very angry, got out

11   of the truck, took their bags, threw them -- I don't know if

12   it was a truck -- took their bags, threw them inside the

13   vehicle and sped off.

14               On their way home, both the mom and the cousin,

15   as reported to me through the interview, collateral

16   interviews, said that he drove about 100 to 110 miles per

17   hour.  They had they could see the speedometer from where

18   they were sitting inside the truck.

19        Q.     Okay.  How is that incident relevant to your

20   determination and assessment in this particular case?

21        A.     Well, it certainly is another way to instill

22   tremendous fear.  Both the mother and the cousin relayed

23   their fear.  They were only going to be passengers for the

24   period of time it took to get there.  Wendi was a passenger

25   frequently.  Driving out of control or at -- I don't know if

1    it's out of control, but driving at an excessive speed can

2    certainly be frightening and intimidating.  So that's just

3    one more piece of information.

4          Q.    Is it also an example of random and erratic

5    behaviors that are controlling to the person that's

6    observing?

7          A.    Right.

8          Q.    Okay.  During the period of time that they're

9    at San Riva in the early months there, did Wendi relate to

10   you that Joe became more critical of her performance in terms

11   of keeping the house, taking care of the kids, cooking

12   dinner, that kind of thing?

13         A.    Are you referring -- tell me exactly what time

14   you're talking about.  This would be fall of '99?

15         Q.    I'm sorry, Spring of 2000.

16         A.    Okay.

17         Q.    Let me walk you back a little bit.

18         A.    Okay.

19         Q.    Did Wendi relate to you that Joe received a

20   report concerning the condition of his cancer that caused Joe

21   to react in a certain fashion?

22         A.    Yes.

23         Q.    Okay.  What was that about?

24         A.    As I recall her story, he was experiencing

25   mouth pain, went to the dentist, dentist did an x-ray, so it

1   was actually the dentist that discovered there was another

2   tumor.  So this then prompted another round of medical

3   intervention leading up to him being more tense and angry and

4   rageful and choosing whatever she was doing, it was the wrong

5   thing, and a lot of yelling and things like that.

6           Q.    Okay.  Did Wendi describe to you what would

7   happen when she would come home, make dinner for him and he

8   didn't care much for what she created for him?

9           A.    He'd throw it out, complain about it, whatever.

10  It was at this point that she was becoming extremely

11  careful -- some people call this hypervigilance.  Your

12  victim's -- the victim gets very good at scanning their

13  environment.  So she never knew which Joe was going to be

14  inside when she opened the door.  So she took great pains to

15  try to figure out what it was that he would want to give them

16  happy time or make him happy.  So she'd ask him repeatedly

17  what do you want for whatever, thinking if she asked him

18  enough, he would finally tell her what he really wants and

19  then she could help with that.

20          Q.    Did she relate to you he was critical of her

21  mothering skills with the children and overall perception of

22  his change in personality?

23          A.    If she had been a better mother she would have

24  been able to keep the kids quiet.  Any kind of noise was

25  disruptive and disturbing to him so that she ended up running

1   the washing machine in the middle of the night after he'd go

2   to bed so that it didn't give him another reason to become

3   rageful.

4           Q.    Did she relate to you her perception of Joe

5   because of his condition?

6           A.    He had officially given up, given up on her as

7   well, so the rages became more frequent.

8           Q.    What was Wendi's response to this behavior on

9   or about that time at least as related to you by Wendi?

10          A.    That in order to be a good Christian wife, she

11  needed to make things better.  In order to make things better

12  for Joe, she needed to do whatever he would need or want to

13  be that good Christian woman.

14          Q.    So she related to you a willingness to do

15  whatever he thought was appropriate at that time?

16          A.    Uh-huh.

17          Q.    Okay.  On or about this time -- let me back

18  up.  Did Wendi relate to you that on or about this time she

19  developed a relationship with a tenant at the San Riva

20  apartments?

21          A.    Yes, she did.

22          Q.    Okay.  Did she name that man for you?

23          A.    Yes, she did.

24          Q.    What was his name?

25          A.    It was Rick Freeland.

1      Q.     Okay.  Did she explain to you at what point in

2   her life she was when she met this gentleman?

3      A.     Well, chronologically, this is now Spring of

4   2000, things are pretty bad.  Joe's ill.  His rages are more

5   and more frequent.  She's lived through the gun incident,

6   gun being held out against her from across the room, the

7   threat of his killing the man that was his silent partner.

8   She's had quite a long history now with Joe.

9      Q.     Okay.  Was it as it related to her as related

10   by her to you, was that moment in her life a low point?

11      A.     Very low.

12      Q.     Okay.  Did she relate to you that her

13   colleagues at work were encouraging her to do any particular

14   thing with regard to Joe?

15      A.     One in particular was really encouraging her to

16   give Joe an ultimatum in order to get through this difficult

17   time.  Her last name is rather -- it was a long name and it

18   began with an "H"?

19      Q.     Hashisaki?

20      A.     Yes.

21      Q.     Okay.  So they met the gentleman, Rick

22   Freeland.  He was a tenant apparently at San Riva?

23      A.     I believe so.

24      Q.     Did Wendi relate to you how that relationship

25   started?

1     A.    Started as sort of a friendship.  He was a nice

2   guy.  She told him what was happening in her own life.  I

3   believe he told her that he had recently lost his fiancee to

4   death, and so they shared, sort of, an emotional attachment.

5          Q.    Did she relate to you what she was seeking in

6   terms of a relationship with this gentleman?

7          A.    Companionship, support, somebody to just talk

8   to.

9          Q.    Okay.  Did she have desires or need with regard

10  to sex with this particular gentleman?

11         A.    I don't believe she had any desire to have sex

12  with him.

13         Q.    Okay.  Did she indicate at some point she did

14  engage in sexual activity with him?

15         A.    She did.

16         Q.    Did she give you an explanation or reason for

17  that?

18         A.    Well, yes.  The explanation was that's what's

19  expected and that's what you do.

20         Q.    Okay.  And what did she expect in return?

21         A.    Hugging, affection, somebody who would listen,

22  somebody who would express care and support for what she was

23  living with.  Somebody she could have sort of an escape to

24  from what was going on at home.

25         Q.    Did she describe any particular activity she

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1   attributed to doing with Rick that Joe wouldn't do with her?

2          A.      Dancing.

3          Q.      Did she describe for her feelings about this

4   gentleman in terms of his emotional components, what kind of

5   characteristics did she describe of this Mr. Freeland?

6          A.      Warm, caring, sharing.  He shared his own

7   personal story with her.

8          Q.      Okay.  And compassionate?

9          A.      Compassion, mm-hmm.

10          Q.      And did she counterpose his characteristics

11   with what she was experiencing from Joe at home?

12          A.      Yes, correct.

13          Q.      Okay.  Did you go over this quickly?

14          A.      Well, this is at time in which I said a few

15   minutes ago when she -- when she opened up the apartment door

16   to go home, she wouldn't know which Joe was going to greet

17   her.  This was very different from what she was getting with

18   Rick.

19          Q.      And describing the fact she did have sex with

20   this gentleman, did you attribute to her a statement in

21   quotes in the report?

22          A.      Yes.

23          Q.      What did Wendi relate to you and cause you to

24   quote?

25          A.      "Knowing men, you know, that's what they want.

1   If he hadn't wanted to have intercourse, I would have been

2   okay with that.  For me it was an exchange for what I really

3   wanted, someone who really listened and cared about me and

4   showed me affection."

5        Q.    Okay.  Did she indicate to you that Rick

6   Freeland helped her deal with her own problems in some

7   fashion?

8        A.    I think by supporting her, yes.

9        Q.    He helped her in two capacities, mentally and

10  emotionally?

11       MR. MARTINEZ:  Objection.  Leading.

12       MR. PATTERSON:  I'm sorry.

13       THE COURT:  Sustained.

14  BY MR. PATTERSON:

15       Q.    In what fashion did she relate to you that this

16  gentleman helped her out?

17       A.    The way in which she described their

18  relationship was that he was warm and compassionate and

19  supportive, so in terms of being mentally and emotionally

20  helped by this gentleman, it was an important relationship

21  for her for the duration of that relationship.  I believe it

22  was six months.

23       Q.    Did she relate to you what she felt after that

24  relationship was over?

25       A.    Intense sadness.

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1       Q.      In your report you describe it in a certain

2    fashion.

3       A.      She reported feeling like she'd lost her best

4    friend.

5       Q.      Okay.  Okay.  On or about this time did Wendi

6    relate to you that Joe began another course of treatment --

7       A.      Yes.

8       Q.      -- for his cancer?  What was that?

9       A.      Chemotherapy.

10      Q.      Okay.  And did she describe for you how the

11   chemotherapy seemed to affect Joe?

12      A.      When he would blowup and have a rage, it was

13   followed at least -- at least on one occasion it was followed

14   up by remorse, gift giving.  I think he brought home

15   balloons, and I don't remember if there was a stuffed animal

16   or something like that.  That would be reminiscent of that

17   honeymoon phase that we talked about earlier.

18      Q.      Okay.  Did the chemotherapy -- did Wendi

19   relate to you the chemotherapy made Joe nauseous?

20      A.      What I -- I don't remember about the nausea.

21      Q.      Okay.  Illness of any sort?

22      A.      I remember the crying over what was happening

23   to both of them over this.

24      Q.      Tell me about that.

25      A.      Well, according to Wendi it would appear that

1   Joe was aware of the eruptions and then his attempt at

2   reconciling. And it was like what is happening here and so,

3   they would just together be just incredibly sad about what is

4   happening here.

5           Q.   Okay. So there's a little change, adjustment

6   if you will, in Joe's behavior in the -- in the latter months

7   here. Is that --

8           A.   At least at this particular point in time. I

9   don't remember Wendi going on into the final months of the

10  relationship talking about him being kind in this way that

11  she did at this point.

12          Q.   Okay. All right.

13          A.   I'm not sure it was long lasting.

14          Q.   All right. Did Wendi relate to you about this

15  time that it was a stressful period in both of their lives?

16          A.   Certainly.

17          Q.   Okay. Did the subject come up in your

18  discussions with Wendi about whether other people had advised

19  her to leave the relationship?

20          A.   Yes.

21          Q.   What did she tell you in that regard?

22          A.   I believe the persons that were sort of

23  encouraging her to leave were women that she worked with. I

24  imagine they must have been people that she supervised, but

25  they were encouraging her to get on with life.

122

1      Q.     Did Wendi relate to you whether or not she ever

2   inquired of her mother why she didn't leave?

3      A.     Yes, she did.

4      Q.     What did she tell you in that regard?

5      A.     Her mom said something about not wanting to

6   make -- to fail another marriage because the first one had

7   ended in disaster, that she had been divorced and didn't want

8   to make it a habit of failing marriages.

9      Q.     Okay.  Did she also articulate any religious

10  reasons for not leaving Joe?

11     A.     You're talking about Wendi now?

12     Q.     Wendi, yes.

13     A.     That based on what it means to be a good

14  Christian wife that her job would certainly not to have been

15  to leave.  It would have been to stay and do what she could

16  to be helpful.

17     Q.     We talked about this hypervigilance where she

18  doesn't know what she's going to experience when she comes

19  home.  Did Wendi relate to you that the chemotherapy had an

20  adverse effect on Joe's hair and thus an emotional -- a

21  vanity complex?

22     A.     Yes.

23     Q.     What did she say about that?

24     A.     With that second round of chemotherapy he began

25  to lose his hair and so he asked her to, I guess, shave his

1    head so it would all be the same.  And I guess Nicolas came

2    in and said something like, "Daddy, what happened to your

3    hair?"  And he said, "This is what your mommy did to me."

4          Q.    Okay.  Did Wendi relate that to you in kind of

5    a jesting sense or was it --

6          A.    No.  She was very tearful.

7          Q.    Okay.  And what did you take this to mean?

8          A.    That Joe made an angry statement to the child,

9    gave the child reason to think that his mommy had done

10   something bad to his daddy.

11         Q.    Okay.  All right.  Was there a time at or near

12   this time that Wendi perceived Joe in the midst of a serious

13   physical problem and was inclined to call 911 or some medical

14   problem at that point?

15         A.    Joe evidently had some kind of a -- a feeling

16   like he might have been having like a heart attack --

17         MR. MARTINEZ:  Objection.  Lack of foundation.

18         THE COURT:  Sustained.  Lay some foundation.

19   BY MR. PATTERSON:

20         Q.    Well, did Wendi relate this incident to you?

21         A.    Yes.

22         Q.    It was related to you in the course of the

23   preparation of your assessment?

24         A.    Yes.

25         Q.    Did she tell you what time or date or month it

124

1    was?

2          A.    It was at some point in time in close proximity

3    to the hair issue.

4          MR. MARTINEZ:  Objection.  Leading.

5          MR. PATTERSON:  I'm trying to lay some foundation.

6          THE COURT:  Go ahead restate your question.

7    BY MR. PATTERSON:

8          Q.    In your report do you peg it to a certain point

9    in time either with regard to the chemotherapy treatment, the

10   loss of hair, that kind of thing?

11         A.    Yes.

12         Q.    Okay.

13         A.    What she said was that it must have been around

14   the summer of 2000.

15         Q.    Okay.

16         A.    Because all those incidents seem to go together

17   quite -- quite well.

18         Q.    Okay.

19         A.    The chemotherapy leads to hair loss, leads to

20   the comment, leads to then at some point in time this feeling

21   of I don't know if it was palpitations or something that he

22   was experiencing that frightened him and frightened her.

23         Q.    Okay.  And what did she do in response to that?

24         A.    She told him she was going to call 911 and he

25   wouldn't let her.

1       Q.      Okay.

2       A.      So she called her parents.

3       Q.      All right.  What did she do in the manner of

4   assisting Joe at that time?

5       A.      Well, her parents came and I think it was her

6   dad that kind of did some sort of massaging and he -- I think

7   Joe was lying down and over the course of time, I don't know

8   how long, that pain subsided.

9       Q.      Okay.  And how did this impact at least as

10  reported by Wendi, Wendi's emotional condition?

11      A.      Well, I think for Wendi it was the very first

12  time that she came face-to-face with Joe's mortality.  She

13  knew it, of course, because all that information from the

14  doctors was given to the two of them, but now it's right

15  there, it's visible.

16      Q.      Okay.  Coming to grips with his mortality, did

17  she relate to you she now might become a single mother of two

18  people?

19      A.      Single --

20      Q.      Was it in context related to you?

21      A.      Single mom of two very young children.

22      Q.      Did Wendi relate to you that at or near this

23  time Joe became more agitated about his suspicions that she

24  was being unfaithful to him?

25      A.      Yes.

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1        Q.      What did she relate to you in that regard?

2        A.      That on a regular or daily basis he was asking

3    her who she was sleeping with.

4        Q.      Okay.  And was this after she had had this

5    relationship with Rick Freeland?

6        A.      Yes, it was.

7        Q.      Okay.  Did Wendi relate to you whether or not

8    up to this time she had relationships with any other

9    individuals?

10       A.      I do not believe at this point in time that she

11   had had relationships with anybody other than Rick Freeland.

12       Q.      Okay.  And does Wendi relate to you that Joe --

13   at this time his behaviors became even more gross, more

14   Exaggerated?

15       A.      Yes.

16       Q.      Okay.  What did she say to you in that regard?

17       A.      Well, she gave an example of what happened on

18   her birthday.

19       Q.      Okay.  What did she tell you in that regard?

20       A.      Well, typically, they would do something.

21       Q.      Let's back up a little bit.  Did Wendi relate

22   to you that she welcomed the opportunity to go out and get a

23   break from her home life?

24       A.      Going out with her female friends, yes.

25       Q.      Okay.  And did she tell you whether or not the

1    frequency of that increased or decreased?

2         A.    I believe that it increased.

3         Q.    Okay.  All right.  Specifically then on her

4    birthday, how did it come about that she wound up going with

5    her friends rather than with Joe?

6         A.    Joe refused to go.

7         Q.    Okay.  Refused to take her out on her birthday?

8         A.    Correct.

9         Q.    All right.  So in response to that, what

10   happened?  What did she do?

11        A.    Okay.

12        Q.    And what did she relate to you in that regard?

13        A.    She went out with her friends, was according to

14   Wendi, about 10 minutes late coming home and he was waiting

15   for her.  He had left the kids alone and asleep in the

16   apartment so he could wait for her in her office.  She had in

17   her hands a cell phone and a wine cooler.  He grabbed the

18   wine cooler and smashed it while screaming in her face and

19   then smashed her phone on the ground with his foot, and

20   basically had her by the arm and was pulling her home.  This

21   was done in front of her friends, who were not just friends

22   but they, I believe, were also the people who worked for her.

23        Q.    Well, and were you aware that there was a

24   superior-subordinate relationship between Wendi and the

25   colleagues there?

1          A.     Yes.

2          Q.     Okay.  So it was done in front of persons that

3    she supervised?

4          A.     Supervised, correct.

5          Q.     Okay.  Did that cause her any additional --

6          A.     Shame and embarrassment.

7          Q.     Okay.

8          A.     Sure.

9          Q.     All right.  And was this according as to Wendi

10   kind of the first public display that she could recall?

11         A.     Public in that manner.  There had been a time,

12   would have been quite a few years before this, that her

13   father had seen a little bit.  So public in front of him on

14   one occasion.

15         Q.     Okay.  But is there a distinction to be drawn

16   from acts of the batterer that are done truly in public as

17   opposed to done in the context of family --

18         A.     Sure.

19         Q.     -- or friends?

20         A.     Sure, sure.

21         Q.     Okay.  Tell me about that.

22         A.     Well, in front of public and in front of your

23   subordinates, that's -- you derive a sense of shame that's

24   quite different from just having your dad maybe know a little

25   bit.

1        Q.    Okay?

2        A.    But this was quite clear because of his actions

3  with the bottle and the phone and the stomping and the

4  yelling.  That's very visible.

5        Q.    All right.  Now, did Wendi relate to you on

6  that occasion did Joe physically harm her?

7        A.    He grabbed her I think by the arm and pulled

8  her home.  I don't -- I don't think he did anything else.

9        Q.    Okay.  How then is that behavior relevant to

10  your assessment diagnosis and opinion in this case?

11        A.    The controlling, the intimidation, just another

12  example.  It's ongoing.  The ante has been upped because it's

13  now in a public display.

14        Q.   Okay.  Did Wendi relate to you in terms of this

15  escalating public behavior that Joe now would do things

16  outside of her office he may not have done previously?

17        A.    There were a couple things.  One actually is

18  inside the office, I guess, because it was constantly calling

19  her on the phone, making sure she was there, making sure he

20  knew where she was.  The certain thing would be laying on the

21  horn, getting in the car, driving it around to the office and

22  just honking the horn until she'd come out.

23        Q.    Okay.  Did Wendi describe to you a change in

24  the tension in the family environment at or near this time?

25        A.    There were a couple of things I think that were

130

1    going on at the same time.  I think that the way she reported

2    it to me it sounded like he was aware, you know, she -- he

3    was at her but she was somehow able to hold on enough to work

4    full time and manage to take care of kids, take care of the

5    house, and do whatever he needed, so she had not shriveled

6    up.

7            Q.    Okay.

8            A.    At the same time she reports seeing or thinking

9    that he was pulling away from her and the children, spending

10   less time there, going without her to the lake which

11   previously he would not have done.  He always wanted her with

12   him, so she sensed that he was starting to pull away from

13   them, from her and the kids.

14           Q.    Okay.  Did she relate to you whether or not Joe

15   took trips to the other states to visit relatives?

16           A.    He may have gone to Oklahoma.  I know that he

17   had gone there in the past and I don't know if that was at

18   this point in time that he did that.

19           Q.    Okay.  During the summer of 2000 did they still

20   have economic issues as a couple?

21           A.    Yes.  He -- he was continuing to buy things for

22   the boats, I believe, and had incurred additional debt that

23   she did not have the wherewithal to pay for.

24           Q.    Okay.  Did Wendi relate to you that at that

25   time Joe directed her to borrow additional funds and the

1    response at this time was a little different?

2        A.    I know at one time he wanted her to borrow

3    money -- to get money, I should say, but this time she

4    refused.

5        Q.    Okay.  And how did that differ from the

6    previous circumstances here?

7        A.    I think it was the first time that she refused.

8        Q.    Okay.  And how did that impact Joe?

9        A.    Well, I -- I cannot recall what she said

10   specifically about his reaction to that.  I can respond to it

11   as another common reaction because this would be an example

12   of fighting the control --

13       Q.    Okay.

14       A.    -- which generally incenses and rages the

15   person who now sees they're losing control.

16       Q.    Okay.

17       A.    But that was, again, only an isolated incident.

18       Q.    Were there other manifestations of Wendi's

19   resisting a control issue related to you?

20       A.    Well, she was going out more.

21       Q.    Okay.

22       A.    So that's an indication of maybe developing a

23   sense of self.  I don't recall more than that.

24       Q.    All right.  Let me take your attention to about

25   September or so of 2000.  Did Wendi relate to you an episode

```
 1    where she was out with her colleagues and she got a call from
 2    Joe?
 3              A.    I think this is the softball game?
 4              Q.    Uh-huh.
 5              A.    Okay.  She had gone to a softball game with her
 6    friend, Chris, and he called her on her cell phone.  And I
 7    think she was en route to the game at the time that he called
 8    her and asked her to go to the store.  Maybe she was already
 9    there, I don't remember.  He wanted her to stop --
10              Q.    Page 16 --
11              A.    -- what she was doing.
12              Q.    -- you reflect on that incident.  Would that
13    assist you in getting the details?
14              A.    Yeah.  I'm still not sure the way I wrote this
15    whether or not she was there or en route, but in any event
16    what he was asking her to do was stop what she was doing and
17    go to the store and buy a cheese crisp and bring it home to
18    him and she said no.
19              Q.    In and of itself is that problematic, absent
20    some kind of long term relationship where there are problems?
21              A.    No.
22              Q.    Okay.  But how is it problematic in the context
23    of Joe and Wendi?
24              A.    Well, if he feels like she's pulling away and
25    she's exerting independence, although minisculely, that's
```

1    just one more sign to him that she's becoming her own person,

2    independent, able to assert herself to some small degree.

3        Q.    Okay.  And what did she relate to transpire

4    that further?

5        A.    Because she refused.  He kept calling her cell

6    phone repeatedly and screaming at her to come home.

7    Eventually she did and he started screaming at her about why

8    did it take you so long and accused her of having slept with

9    someone.

10        Q.    Okay.  Again, that infidelity issue?

11        A.    Infidelity, right.

12        Q.    Okay.  Was there a confrontation when she got

13    home?

14        A.    Yes.

15        Q.    What happened?

16        A.    She, as I've stated repeatedly, she went into

17    the bedroom to get away and he followed her, screaming at her

18    the accusations about her having slept with somebody and her

19    way of pacifying him in the long term had always been tell me

20    what you need, tell me what you want, I'll give you what you

21    need, I'll give you what you want, and while she's doing this

22    she's also climbing into bed.  And he went out into the

23    kitchen, got a pitcher of Kool Aid, poured it on her and

24    started smashing things and broke, I believe, a couple

25    dresser drawers, broke, I think it was, the foot board of the

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    bed, and somehow -- whatever he had done to the bed, the bed

2    crashed to the floor with her still in it.

3         Q.    What did Wendi relate to you was her response?

4         A.    She was terrified.  She picked up the phone to

5    call Joe's sister, I don't know which sister, and he grabbed

6    the phone away from her and said to the sister in a very calm

7    voice "She's tripping, she's just tripping."

8         Q.    Did he hang up the phone?

9         A.    I -- let's -- he was calm and I don't remember

10   if he hung it up, but I know that as soon as he was finished

11   he began screaming at her again.

12        Q.    Okay.  So Wendi related to you that he

13   terminated the phone call between --

14        A.    I believe --

15        Q.    -- he and the sister?

16        A.    -- that is the case, yes.

17        Q.    Okay.  Did he then -- after the phone call was

18   terminated, did Wendi relate to you what he did?

19        A.    Just that he started screaming at her all over

20   again.

21        Q.    Does this constitute, in terms of what Wendi

22   related to you, the one time and only time that she ever

23   reported to some other person in Joe's presence the fact that

24   there was a violent act occurring?

25        A.    In Joe's presence?

1          Q.     Uh-huh.  Well, in general did she report any of

2     this conduct that you described for us to law enforcement?

3          A.     No, not to law enforcement, no.

4          Q.     Okay.  Did she ever report this conduct to

5     friends and family, at least as related to you by Wendi?

6          A.     Well, that's what I'm thinking about right now,

7     because her girlfriends at work, the people who were her

8     subordinates, obviously knew something because they were

9     encouraging her to, you know, be able to live.

10         Q.     Okay.  But Wendi didn't report to you the

11    detail of those discussions?

12         A.     No.

13         Q.     Okay.

14         A.     No.

15         Q.     Okay.  So in terms of actual knowledge of

16    reporting something to a third party while it was ongoing,

17    this appears to be the first time?

18         A.     While it was ongoing?  I'm struggling with this

19    because I remember that there was a time I think it was in

20    her parent's driveway that -- I think it was her father who

21    saw Joe push her.  I think he tried to intercede.  He talked

22    to her the next day, tried to talk her into leaving him.  At

23    some point he saw some bruising.  I don't think it was a lot.

24    I think he saw --

25              MR. MARTINEZ:  I'm going to object.  None of this has

1    been disclosed to the State.

2              THE COURT:  Sustained.  Let's move on.

3    BY MR. PATTERSON:

4         Q.    My question just relates to one issue, that she

5    actually reported the problem to some other person in some

6    fashion?

7         A.    Yes.

8         Q.    Okay.

9              MR. PATTERSON:  Judge, would this be a good time to

10   quit?

11             THE COURT:  Okay.  We'll go ahead and take our

12   evening recess at this point in time.  During this recess

13   remember the entire admonition I've given you, including the

14   fact you're not to discuss this case with anyone, do not let

15   anyone discuss the case with you.  Do not do any research,

16   investigation experimentation or testing on your own, avoid

17   any media coverage of the case, Keep an open mind.  And have

18   a nice evening.  We'll see you tomorrow at 1 p.m.  Have a

19   nice evening.  We'll be in recess.

20

21             (Evening recess.)

22

23

24

25


          TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1

2

3                    CERTIFICATE OF REPORTER

4

5     STATE OF ARIZONA      )
                            )
6     COUNTY OF MARICOPA    )

7

8              I, Traci L. Wheeler, CSR, RPR, an official

9     and certified reporter in the Superior Court of the State

10    of Arizona, in and for the County of Maricopa, hereby

11    certify that I made a shorthand record of the proceedings

12    had in the within case, and that the foregoing transcript

13    is a full, true, and correct transcription of the

14    proceedings in this case.

15              Dated this 5th day of May, 2005.

16

17

18    _____
      Traci L. Wheeler, CSR, RPR
19    Certified Court Reporter No. 50313
      Official Court Reporter
20

21

22

23

24

25

              TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

EXHIBIT PP

000007434

DP

DS-0002 1
Braccio



1     IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

2     IN AND FOR THE COUNTY OF MARICOPA

3

4   STATE OF ARIZONA,          )

5         Plaintiff,      )

6   v.                 )    No. 1 CA-CR 04-0731

7   WENDI ELIZABETH ANDRIANO,  )    MARICOPA COUNTY
                            )    No. CR 2000-096032

8       Defendant.      )

9   _____)

10

11

12                   Mesa, Arizona
                   October 13, 2004

13

14

15

16       BEFORE:  The Honorable BRIAN K. ISHIKAWA

17

18       REPORTER'S TRANSCRIPT OF PROCEEDINGS

19               TRIAL DAY 27

20

21

22

23

24   ORIGINAL Prepared for APPEAL by:
     TRACI L. WHEELER, CSR, RPR
25   Certified Court Reporter, No. 50313

2

```
 1                    A P P E A R A N C E S

 2    FOR THE STATE:        JUAN M. MARTINEZ,
                            Deputy County Attorney
 3
      FOR THE DEFENDANT:    DANIEL B. PATTERSON,
 4                          Deputy Public Defender
                                    and
 5                          G. DAVID DELOZIER,
                            Attorney at Law
 6

 7           I N D E X   O F   E X A M I N A T I O N

 8    WITNESS                                           PAGE

 9    MURPHY, SHARON, Called to testify by the Defense
              Continued Direct Examination by Mr. Patterson   3
10            Cross-examination by Mr. Martinez               44
              Continued Cross-examination by Mr. Martinez     92
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

3

1           MESA, ARIZONA, WEDNESDAY, OCTOBER 13, 2004

2

3           THE COURT:  Good afternoon.  This is cause number CR

4      2000-096032, State of Arizona versus Wendi Elizabeth

5      Andriano.  The record will reflect the presence of the

6      Defendant, Counsel and the jury.  Sharon Murphy is on the

7      witness stand.  And we'll continue with the examination by

8      Mr. Patterson.

9                   Mr. Patterson?

10          MR. PATTERSON:  Thank you, Judge.

11

12     CONTINUED DIRECT EXAMINATION BY MR. PATTERSON:

13          Q.    You are Dr. Sharon Murphy?

14          A.    Yes.

15          Q.    You are the same Dr. Murphy that was testifying

16     yesterday?

17          A.    Yes.

18          Q.    You realize you're still under oath?

19          A.    Yes.

20          Q.    Let's try to pick up where we left off

21     yesterday.  Did Wendi relate to you what life was like in the

22     summer, late summer of 2000?

23          A.    Yes.  The months prior to the death of Joe?

24     She described life as a pressure cooker, full of pins and

25     needles, walking on egg shells, not knowing when his rage

4

1    would erupt, not knowing which Joe would be there when she

2    opened the door.  Those kinds of things.

3         Q.    Okay.  Did she relate to you whether she began

4    to feel she didn't know how to make him happy any longer?

5         A.    Yes.

6         Q.    Okay.  Now, also during the summer at some

7    point there were continuing economic difficulties, correct?

8         A.    Correct.

9         Q.    All right.  And one specifically we touched on

10   yesterday had to do with Joe's boats?

11        A.    Yes.

12        Q.    And there was a significant need for income to

13   pay for parts?

14        A.    Correct.

15        Q.    Tell me a bit about that?

16        A.    There was a $6000 bill that had been incurred

17   through the use of credit cards.  I believe to pay for parts

18   for one of the boats, and he had asked her to get the money,

19   to find the money, whatever, to help pay that credit card

20   bill.

21        Q.    Okay.  And did Wendi relate to you what her

22   response was?

23        A.    She -- she said no, that she was not going to

24   do it.

25        Q.    Okay.  Now, this was kind of an atypical

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

5

1    response?

2         A.    Very atypical.

3         Q.    Okay.  But in the research, in your clinical

4    experience, do abused persons periodically say "no" to their

5    abuser?

6         A.    Yes.

7         Q.    Okay.  And she had done this in the past on

8    other occasions, specifically the -- she was informed not to

9    tell the gentleman that his life was at risk?

10        A.    Correct.

11        MR. MARTINEZ:  Objection.  Leading.

12        MR. PATTERSON:  Trying to refer her to --

13        THE COURT:  Sustained.  Don't lead.

14        MR. PATTERSON:  -- that particular incident.

15        THE WITNESS:  With Jerry Robles, yes.

16   BY MR. PATTERSON:

17        Q.    All right.  Did anything told to you by Wendi

18   lead you to believe there was any significant change in the

19   status or her personality in the summer of 2000?

20        A.    The only thing that I remember her saying about

21   that was that up to this time when Joe's eruptions became

22   more frequent, she had always felt that she could handle

23   things, that she could do whatever to appease him, and at

24   this point in time she was unable to do that.  She couldn't

25   make him happy.

6

1        Q.    Okay.  We touched on -- I think we explored

2   thoroughly yesterday the incident involving the Kool Aid and

3   the broken bed, right?

4        A.    Yes.

5        Q.    Was there anything else you needed to relate to

6   us in terms of the substance of that incident?

7        A.    I don't believe so.

8        Q.    Okay.  Again, does that incident enter into

9   your assessment in your opinion in this regard?

10       A.    Yes.

11       Q.    Okay.  Next category we need to talk about is

12  what you described as ongoing sexual abuse.  We're still

13  talking, what, in the summer of 2000, late summer 2000?

14       A.    Yes.

15       Q.    Okay.  There -- it was reported to you by Wendi

16  that the sexual abuse continued at that time?

17       A.    Correct.

18       Q.    Describe the particulars of that particular

19  period of time between the parties.

20       A.    Well, the ongoing part of that was Joe's demand

21  for daily sex.  That continued, so she was still dealing with

22  that.  But the additional piece that occurred was Joe

23  bringing sex toys into their marriage which he had not

24  previously done.  So now there were objects that he was

25  purchasing which he used to engage in sexual acts by putting

7

1    them inside of her.

2         Q.    Okay.  So in that context then, were these

3    objects that were designed to assist the pleasure of the

4    female or the male?  What kind of objects are we talking

5    about?

6         A.    I don't know the names of them.  I only know

7    that Wendi reported them as sex toys.

8         Q.    Okay.  Did Wendi report to you whether or not

9    she initiated that conduct or requested that conduct?

10        A.    She reported that that was what Joe purchased

11   and he used them for that end and that she did not want that

12   to happen.

13        Q.    Okay.  And did she relate to you a situation

14   where there was some give and in return for some -- allowing

15   him to do and engage in activities with those toys?

16        A.    There was an incident in which some of her

17   female friends had asked her to go out with them on a

18   particular evening, and so she told Joe that she wanted to do

19   this and he didn't want her to and she asked again.  And he

20   basically made a deal that she could go if she would return

21   in three hours and he would have a surprise for her.

22        Q.    Okay.  And what was that surprise?

23        A.    The surprise was the use of the 130 -- he

24   purchased $130 worth of sex toys.

25        Q.    And did he then use them of a fashion with

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    Wendi?

2            A.    Yes.

3            Q.    Okay.  And was it with the consent of Wendi?

4            A.    No.

5            Q.    Have we essentially concluded the unstructured

6    interview portion of your assessment process?

7            A.    I believe so, yes.

8            Q.    Let's turn then to the structured interview.

9    And, again, give me an overview of what the structured

10   interview entails?

11           A.    The structured interview follows the

12   unstructured interview, and it's basically the use of a

13   variety of assessment tools that help clarify and define the

14   nature of the relationship.

15           Q.    Okay.  Now, was the structured interview given

16   upon the completion of the unstructured, or was there -- why

17   don't you explain to me the chronology and how the

18   structured, unstructured relate in terms of times given?

19           A.    Okay.  The structured part of the interview was

20   actually interwoven in with the unstructured.  So I began the

21   interviewing process.  I believe that first interview was two

22   hours.  Then on my second visit I introduced the first tool,

23   which was the power and control wheel.

24           Q.    Okay.  Would that be a good place to start in

25   terms of the unstructured interview?

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000007442

1      A.    Sure.

2      Q.    Again, the power and control wheel was

3  displayed on the ELMO and it wasn't wholly visible to me, so

4  why don't you tell us what you did with this particular

5  instrument and how you go about testing an individual using

6  it?

7      A.    I have a paper copy of it.  I don't know if you

8  want to put it up there.

9      Q.    See if we could get it --

10           (Pause in proceedings.)

11  BY MR. PATTERSON:

12     Q.    All right.  Does it start at any particular

13  point, 12:00 o'clock and go around or just in general?

14     A.    You go around, right.

15     Q.    Okay.  This is the -- is this a verbatim copy,

16  if you will, of the instrument that you gave to the client?

17     A.    The one that you have there does not have

18  around the outside of the circle the names of the physically

19  violent act --

20     Q.    Okay.

21     A.    -- that other power and control wheels have.

22     Q.    Okay.

23     A.    But other than that I don't believe there is

24  any difference, what's written inside is the same.

25     Q.    Okay.  And do you hand this instrument to the

1    client?

2          A.    Yes.

3          Q.    Okay.  And then you, what, leave them alone and

4    allow them time to look through it and respond to it?

5          A.    Basically.  I don't say anything about it.  I

6    just say -- I hand it to them and say have you ever seen this

7    before?

8          Q.    Okay.

9          A.    In Wendi's case she hadn't.  I asked her if she

10   would take her time and read each of the pieces inside those

11   eight pieces of pie, and if anything sounded like it

12   reflected or referred to something that happened in her

13   relationship with Joe, I asked her to write an example

14   outside of the wheel.  Or sometimes I give the person paper.

15   And I don't remember now which -- I think she actually wrote

16   on the wheel.

17         Q.    Do you actually have her wheel or leave that

18   back in the office?

19         A.    Yeah, I don't have it here.

20         Q.    Okay.  But did you incorporate her responses

21   into your report?

22         A.    Yes.

23         Q.    Okay.  How would you go about discussing this?

24   Let's start with a piece of the pie and then you tell me how

25   she responded and what kind of scores she generated as a

1    result of that?

2          A.    There are no scores with this.

3          Q.    Okay.

4          A.    It's really just getting examples from her.

5          Q.    Okay.  Let's talk about using coercion and

6    threats.  How did she respond to that particular piece of the

7    pie?

8          A.    She described the incident that I spoke about

9    yesterday where Joe had the gun in his hand when she said

10   that she was going to tell Jerry about his plan to kill him

11   and he held the gun to her and threatened her life.  That was

12   an example.

13         Q.    Okay.  Did she give other examples?

14         A.    There isn't a lot of space.  It's an

15   8-and-a-half by 11 sheet of paper.  So what she did was she

16   wrote one example next to the pieces that fit her experience.

17         Q.    Okay.  And what are you looking for by using

18   this particular instrument?

19         A.    Well, basically I need to know whether or not

20   this relationship is overshadowed to a great extent by the

21   very issue of power and control.  So these -- these pieces

22   outside of the inside of the big circle are the tactics of

23   control that an individual can use against his or her

24   intimate partner, so I'm looking to see did this exist in her

25   relationship.

1          Q.     All right.  Using intimidation?

2          A.     Intimidation, one example was his telling her

3    the story about what his previous girlfriend or fiance did

4    and his warning to her not to do the same, and that was that

5    she had cheated on him.

6          Q.     Okay.  All right.  In your report you said

7    there were seven of eight tactics --

8          A.     Correct.

9          Q.     -- related or answered in the affirmative?

10         A.     Correct.

11         Q.     Which one of the eight was not part of their

12   relationship?

13         A.     Using the children was not.

14         Q.     Okay.  And that's down -- down here at the

15   bottom, this piece here?

16         A.     Correct.

17         Q.     Okay.  So Wendi -- what did she relate to you

18   in that regard so we could eliminate that as one of the

19   issues in this case?

20         A.     About using the children, she just said he did

21   not do that.

22         Q.     Okay.  All right.  Let's talk about the other

23   ones that were existent in their relationship.  We've done

24   the first two on the top.  How about using emotional abuse?

25         A.     Emotional abuse to Wendi was what happened to

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000007446

1    her through the use of his language.  The language that he

2    talked to her in, the name calling, the words such as "bitch"

3    and "fuck" and things like that that she found very hurtful.

4           Q.    Okay.  Were there other examples of emotional

5    abuse?

6           A.    Overall I believe that she referred to just his

7    general treatment of her.

8           Q.    Okay.  Using isolation?

9           A.    The example that she wrote on the wheel was the

10   one that I talked about yesterday where she had picked out a

11   female friend to be in her bridal party, and Joe made her

12   change that and put a sister in that person's place.

13          Q.    Minimizing, denying and blaming?

14          A.    What she talked about there was his general

15   attitude towards everything he did.  She couldn't even talk

16   about it because in fact he didn't do anything, meaning you

17   know, breaking the door, punching the holes in the walls,

18   those kinds of things.  It was a constant lack of

19   responsibility for any of those actions.

20          Q.    Okay.  Using male privilege?

21          A.    That was the demands that Joe would make on

22   her, the cooking, the cutting of his toe nails, the laying

23   out of his clothing, those kinds of things.

24          Q.    Okay.  Using economy abuse -- or economic

25   abuse?

1        A.    In this case, which is different from other

2    cases, typically it's the man who's earning the income and

3    then, you know, doles it out in a very piecemeal fashion to

4    the woman.  In this case Wendi was actually the one who was

5    earning the majority of the income, but he still controlled

6    it in that such a portion of the income she was earning was

7    going to pay for the expensive boats and the expensive trucks

8    and things like that that they couldn't actually afford.

9        Q.    All right!  This particular instrument is not

10   scaled.  It doesn't give you a score --

11       A.    Right.

12       Q.    -- in that sense.

13             Do you basically use this integrated with your

14   experiences, your background, your educational background.

15   Is that how this is best utilized?

16       A.    Yes.

17       Q.    Okay.  This -- is this in a sense a screening

18   device to see if there's any needing --

19             MR. MARTINEZ:  Objection.  Leading.

20             THE COURT:  Don't lead.

21   BY MR. PATTERSON:

22       Q.    What kind of device is this in the scheme of

23   things?

24       A.    I refer to it in my own thinking as sort of the

25   first cut.  It's like the litmus paper test.  You know, if

1   you don't pass this one, there probably isn't much reason to

2   continue.  Depends on the answers to this as to where I'm

3   going to go next.

4          Q.    Okay.  Have we exhausted the relevancy of this

5   particular instrument?

6          A.    I believe so.

7          MR. MARTINEZ:  Judge, may we have it marked as an

8   exhibit?

9          THE COURT:  Any objection?

10         MR. PATTERSON:  None.

11  BY MR. PATTERSON:

12         Q.    And this has been marked as Exhibit 448 for

13  identification.  Where do we go now?  Partner abuse scale?

14         A.    We could do the nonphysical.  That was the

15  way -- you want to go through them the way I did them?

16         Q.    That's right.  What's -- what we were going

17  to --

18         A.    Go through them --

19         Q.    -- do is go through them chronologically.

20         A.    Yes.

21         Q.    You did the measure of the unstructured

22  interview, then you did the structured power and control

23  wheel.  What did you do next in the context of the structured

24  interview?

25         A.    Okay.  That was the partner abuse scale,

1    nonphysical.

2          Q.    Okay.  Again, what is that all about?

3          A.    It's a one-page test assessment tool.  I

4    believe this has 26 items.  You -- the person who's taking

5    the test just reads the very simple directions.  This is one

6    of two tests that I described yesterday as having a sixth

7    grade reading level.  And basically it instructs the

8    participant to score each question on a scale of 1 to 7, with

9    1 meaning rarely and 7 meaning most of the time.  I think

10   "most of the time" is the words they use.

11         Q.    Do you have an example of that test with you

12   today?

13         A.    No.

14         Q.    Okay.  Can you give me your recollection of one

15   of the kinds of questions that are presented on that

16   particular instrument?

17         A.    Well, this -- this particular one is looking to

18   measure verbal abuse, nonphysical violence, emotional abuse,

19   and there are a couple of questions about sexual abuse on it

20   also.

21         Q.    Okay.  Is this test capable of being scored?

22         A.    Yes.

23         Q.    Okay.  And how is it scored?

24         A.    There's a scoring manual that comes with it or

25   there's also a computer assisted software package that you

1    can purchase.

2          Q.    Okay.  Which scoring mechanism did you use?

3          A.    I hand score because I'm only given two.

4          Q.    Okay.  Tell me about the results of this

5    particular test in terms of raw score?

6          A.    She -- the raw score on it was 60.

7          Q.    Okay.  And what's the range here from, say, non

8    abused to significantly abused.  Is there a range here?

9          A.    Yes.  If -- if the person scores under 15, then

10   that tells me that there's a nonsignificant finding.

11         Q.    Okay.  With regard to nonphysical?

12         A.    Nonphysical violence, correct.

13         Q.    Okay.  And what is the top end, worst case

14   scenario?

15         A.    I don't know that the creator of the test gave

16   that and I never tried to figure it out myself --

17         Q.    Okay.

18         A.    -- what the top end might be.

19         Q.    In any event, what was Wendi's score in this

20   one?

21         A.    60.

22         Q.    Okay.  What does that indicate to you?

23         A.    That would indicate a severe level of

24   nonphysical violence.

25         Q.    Okay.  And, again, what -- what falls within

1    that context?

2              A.    What kinds of items?

3              Q.    Yes, constitutes nonphysical abuse?

4              A.    Okay.  Any of the forms of emotional or

5    psychological abuse.  I can read a couple of them because

6    they're part of my report.

7              Q.    Okay.

8              A.    Well, she scored high in -- on two of the

9    questions.  One was my partner demands obedience to his

10   whims, and high means a 7.

11             Q.    Okay.

12             A.    And the second one that she marked 7 was my

13   partner demands that I perform sex acts that I do not enjoy

14   or like.

15             Q.    And that too was a 7?

16             A.    That too was a 7.

17             Q.    Okay.  Just below the 7, did she score sixes on

18   other issues?

19             A.    Yes.  And 6 on this test is equal to "most of

20   the time."

21             Q.    Okay.

22             A.    And the response to the questions she's marked

23   6 were my partner belittles me; my partner does not want me

24   to have any male friends; my partner acts like I am his

25   personal servant; my partner does not want me to socialize

1   with my female friends; and lastly, my partner demands sex

2   whether I want it or not.

3        Q.    All right.  That last entry is somewhat

4   different than the 7, although it does relate to sex.  Is it

5   somewhat different?

6        A.    It is a little bit different and often

7   researchers when they're crafting their tool, they're trying

8   to get at similar information in a variety of ways.

9        Q.    Okay.  Does that exhaust all that was relevant

10  about the partner abuse scale nonphysical?

11       A.    Yes.

12       Q.    Okay.  In terms of chronology then, which of

13  the instruments did you use in the structured portion of the

14  interview?

15       A.    Okay.  So the next test then was the partner

16  abuse scale physical, also by the same author.

17       Q.    Okay.  And, again, can you give me an overview

18  of that particular instrument?

19       A.    This one is clearly looking at acts of physical

20  violence.  Again, this test creator included a couple of

21  questions about sexual abuse.

22       Q.    All right.  And, again, is there a scale or a

23  scorable --

24       A.    Yes.

25       Q.    -- measure here?

1            Okay.  And, again, is it scored in what

2    fashion?  How do you score it?

3            A.    The same exact way you could use either, a

4    computer assisted or there's a scoring manual that you

5    purchase when you purchase packets of the tests themselves.

6    And I have -- I have the scoring manual.

7            Q.    Okay.  And so you scored this one in what

8    fashion?

9            A.    Her -- her raw score was 16.66.

10           Q.    And that was done by hand as you said earlier?

11           A.    Yes.

12           Q.    Again, what does that indicate?

13           A.    The threshold number is 15, so it indicates a

14   significant finding of physical abuse.  However, as compared

15   to the nonphysical abuse scale, she obviously has scored a

16   lot lower.

17           Q.    Okay.  And is this circumstance consistent with

18   research or your clinical experience?

19           A.    My experience says women are all over on these

20   tests.  You can have somebody with a very elevated

21   nonphysical scale score and someone with a fairly low one as

22   this case is.  There's -- if you find -- if there is a

23   finding of physical abuse, then there's always a finding of

24   the nonphysical.  You can't have physical without the

25   nonphysical.

1      Q.    Okay.

2      A.    But you can have nonphysical without a high

3   level of physical.

4      Q.    Okay.  And how does that relate, if you will,

5   to the relationship between the abuser and the abused.  Are

6   there different mechanisms for control, different means or --

7      A.    Well, the way this particular test was crafted,

8   because I've used it so many times, I know from a person's

9   story almost when I give it to them where they'll fall.

10  Because of the way this test was created, the only way you

11  can score high is to have a high number of actual physically

12  violent incidents.  And Wendi's story, although the acts are

13  severe, we're not talking about, you know, 100 acts.  We're

14  talking about a much smaller number, so I had a sense.

15     Q.    Okay.  So this result in the partner abuse

16  scale physical, is it consistent or inconsistent with the

17  unstructured interview that you had?

18     A.    I was somewhat surprised, not terribly, but

19  somewhat surprised, not at this point when I gave it to her

20  but at the end after I had given her all of the assessment

21  tools and after I had completed all the, you know, 20 hours

22  of interviewing.  I would have anticipated that the score

23  even higher than it is, but it is what it is.

24     Q.    Okay.  Does the concept of denial on the part

25  of the abused person enter into the taking of these tests?

1           A.     Sure.   If -- if at the present time the

2      person's taking a test and they're still minimizing what that

3      abuse was like, they're going to answer that way so they're

4      not going to have a lot of 7s.   They may have a lot of 4s.

5           Q.     All right.   In any event, do you have any

6      reason to believe that she overstated her responses to the

7      partner abuse scale physical?

8           MR. MARTINEZ:   Objection.   Vouching.

9           THE COURT:   Sustained.

10     BY MR. PATTERSON:

11          Q.     All right.   Were the specific responses that

12     you could talk about -- well, again, let's talk about what

13     constitutes physical abuse used in the sale?

14          A.     Okay.   This scale talks about forcing sex,

15     hitting, punching, kicking, breaking bones, using

16     intimidation to the point of making a person fear for their

17     life and also injuring sexual parts of the body.

18          Q.     Okay.   Do we use the same score high to low?

19          A.     Right, 1 to 7.

20          Q.     Okay.   And 1 being --

21          A.     Rare, the lowest.

22          Q.     Okay.   And 7 being --

23          A.     The high, most of the time.

24          Q.     Okay.   Or all the time?

25          A.     All the time, sorry.

1    Q.    Okay.  What was the high  score that Wendi put

2    down on this particular test to any given answer?

3    A.    A 4, which is equal to "some of the time."

4    Q.    All right.  And in that regard she indicated

5    that Joe some of the time did what to her?

6    A.    My partner pushes and shoves me around

7    violently; my partner physically throws me around the room;

8    my partner twists my fingers, arms or legs; my partner tries

9    to suffocate me with pillows, towels or other object.

10    Q.    And then there were other items that you denote

11    in your report that she assigned a 3 to.  Now, what does a 3

12    mean?

13    A.    A little of the time.

14    Q.    Okay.  And what then were those responses?

15    A.    My partner makes me afraid for my life; my

16    partner tries to choke or strangle me; my partner badly hurts

17    me when we're having sex; my partner injures my breasts or

18    genitals.

19    Q.    Okay.  Have we exhausted that particular

20    instrument?

21    A.    We have if you think that it's clear what those

22    numbers mean.

23    Q.    Okay.  Again, please explain to me what the

24    numbers mean?

25    A.    Well, I think it can be confusing.  I don't

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    know if that's true, but I think it can be because when

2    someone writes "a little of the time," in my mind that could

3    almost be interpreted as this wasn't so bad as opposed to

4    what it really is -- what the test is asking for, did this

5    happen a lot.  So her response to a little of the time means

6    these things happened, but they didn't happen --

7              MR. MARTINEZ:  Objection.  Vouching.  Speculation.

8              THE COURT:  Sustained.

9    BY MR. PATTERSON:

10             Q.    Well, let me ask you, are the definitions on

11   the front side of the test explain what some of the time, all

12   the time, part of the time mean?

13             A.    No.

14             Q.    Okay.  All right.  In terms of chronology, what

15   instrument did you next give to Wendi?

16             A.    The response to violence inventory strategies

17   to escape, avoid and survive abuse by Marian Dutton.

18             Q.    Okay.  And at what point was this particular

19   test administered?

20             A.    This was much later.  This was, I think, April

21   11 and the earlier one, the power and control wheel, and the

22   nonphysical and physical abuse scales were administered, I

23   believe it was, either the 26th or the 27th of March.

24             Q.    Okay.  So how much time elapsed between your

25   first meeting and the presentation of this particular

1    instrument?

2          A.    That would be three weeks.

3          Q.    Okay.  In that intervening three weeks, what

4    transpired in terms of the assessment?

5          A.    Just more of the clinical interview.

6          Q.    Okay.  All right.  Again, what is this in

7    general?

8          A.    This is -- this assessment tool is based on the

9    researcher's understanding that battered women often times

10   use multiple ways of surviving.  And the reason it's

11   important to even know that is because there are so many

12   myths about the fact that, you know, she stays because she

13   likes it or she deserves it, or whatever those myths are.  So

14   what we're trying to do here is elicit that information, how

15   did an individual person work at surviving, escaping the

16   abuse.

17         Q.    Okay.  Is it a pencil and paper test --

18         A.    Yes.

19         Q.    -- as well?

20         A.    Yes.

21         Q.    Okay.  And in general what kind of questions

22   are stated and in what format?

23         A.    They are -- there's a column on the left, a

24   column on the right and a statement in between.  So the

25   statement might say have you ever called the police.  On the

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000007459

1   left you're supposed to write down the frequency, how many

2   times you've called the police.  On the right you're

3   supposed to answer in a positive or negative fashion.

4   There's numbers listed that you choose from, how helpful that

5   was because the assumption is calling the police should be

6   helpful.

7           Q.    Okay.  And are there definitions or

8   descriptions as to what constitutes the frequency of those

9   responses?

10          A.    There's a very short paragraph at the top.

11          Q.    What does that say?

12          A.    Basically, it's just directing the abused

13  person to respond with their best memory or recall to each of

14  the items.  There aren't -- really aren't definitions for how

15  to do this.

16          Q.    All right.  And does the client just pick a

17  number and plug it into the right side?

18          A.    There's a range --

19          Q.    Okay.

20          A.    -- above that, so there's that.

21          Q.    Okay.  Are the ranges defined or described?

22          A.    Yeah.  That's fairly clear.  Actually, you

23  know, when they're asking about how many times, that's a

24  count.

25          Q.    Right.

1      A.    When they're asking about how helpful was this,

2   there's a range at the top, and I think it goes plus 1, plus

3   2 or minus 1, minus 2.

4      Q.    Okay.

5      A.    So it's a regulative response and a

6   significantly relative response you would choose a regulative

7   2.

8      Q.    Okay.  On the other side of the column where it

9   has the ranges, can you describe the actual ranges described

10  there?

11     A.    That range is not described because that's how

12  many times are you putting down an exact count.

13     Q.    Okay.  How did you score this particular

14  instrument?

15     A.    This is not scored.  There's --

16     Q     Okay.  What is it useful for in terms of what

17  is ultimately concluded upon your evaluation of this

18  particular test?

19     A.    Well, it tells me what she did or what any

20  victim did in order to survive the situation that they had

21  previously described to me.

22           So I want to know did you call the police; did

23  you get an order of protection; do you have a restraining

24  order; have you gotten mental health counseling; did you go

25  to a shelter; if you did, how long did you stay; did you seek

1    to help prosecution.  Those are the types of questions.  So

2    all this is doing is rounding out my knowledge about a

3    particular person and how they lived through this period of

4    time.

5         Q.    All right.  That being the focus of this

6    instrument, what was -- what were your findings as a result

7    of it?

8         A.    Basically that Wendi said that she used three

9    different ways to survive.  And she -- or, actually, I'm

10   sorry, four.  They were escaping, threatening, violent

11   situations.  She wrote down that she tried to do that 11 to

12   20 times.  And she wrote I would hide in the bathroom until

13   my husband's temper cooled, so that was the hiding piece.

14   She also wrote under hiding and disguising, she did that 11

15   to 20 times.  And she wrote as long as I wasn't in his view

16   he would destroy furniture instead of putting his hands on

17   me.  In compliance with demands anticipation of the times,

18   she wrote more than 20 times as long as I did everything he

19   wanted, including sex, he wouldn't get upset.  And then I

20   think this is the last one -- yes.  When asked if there were

21   any other strategies she used to escape avoid and protect

22   herself, she wrote I would also try to pacify him and keep

23   him calm.  I would do my best to come up with a solution to

24   whatever was bothering him.

25        Q.    Again, have we exhausted that particular

1    instrument?

2         A.    Yes.

3         Q.    Okay.  Were there other instruments employed in

4    your assessment?

5         A.    Yes.  There were two more.

6         Q.    Okay.  In terms of chronology, what was the

7    next one?

8         A.    Abusive observation checklist, again, by

9    Dutton, the same author as the previous one.

10        Q.    Again, give me an overview of what this

11   particular test does.

12        A.    This test was in part designed by using the

13   power and control wheel.  Now, what I mean by that is the

14   author, Marian Dutton took a variety of tactics of control

15   that one person could use against another and created

16   examples for just about anything that you can think of that

17   would be considered an abusive act, so it's quite lengthy.

18        Q.    All right.  And that's presented in its

19   totality on the client?

20        A.    Right.

21        Q.    Okay.  And then what is she expected to do?

22        A.    It -- it simply states across the top that

23   you're supposed to fill this out to the best of my

24   recollection and it asks -- there are columns and you're

25   supposed to place a check mark in the appropriate column next

1    to the act.  So, for example, if an -- if an act is my

2    partner punches, kicks or beats me, you -- if that's an issue

3    or experience you'd follow it over to the column that has the

4    correct number of times and make a check mark.

5              Q.    Okay.

6              A.    And those column readings are one -- well,

7    there's a 0 and then 1 to 3 times, 3 to 10, I think it's 10

8    to 49, and then anything greater -- 50 plus I think is how

9    it's worded.

10             Q.    And based upon that client's experience, they

11   would place a check mark in the appropriate column alongside

12   the conduct?

13             A.    Right.

14             Q.    Okay.  With this particular case did you

15   explain to Wendi there were any right answers, wrong answers,

16   anything of that nature?

17             A.    Usually, I don't give any explanation at all.

18   I just give the paper -- in this case there's several

19   pages -- and I say I'd just like to you to read the

20   description at the top and fill it out to the best of your

21   ability and the person fills it out.

22             Q.    Is that consistent with the instructions you

23   made with all the other instruments in this case?

24             A.    Yes.

25             Q.    What were the findings of the result -- well, I

1    guess is this scored in the -- is it hand scored or a

2    computer program?

3              A.    No.

4              Q.    What, do you just aggregate the responses?

5              A.    Exactly.

6              Q.    What did this particular instrument disclose

7    with regard to the conduct of Joe and Wendi?

8              A.    The first category of the test is physical

9    abuse, and so I reported the things that she checked on that

10   test, so what I have here is the one category.  Now, I've

11   copied them exactly as they were on the test so the first one

12   said pushed, grabbed or shoved, and you -- she checked the

13   box 10 to 49 times.  Second one, punched you somewhere on the

14   body, not the face, 10 to 49 times.  Pulled your hair, 10 to

15   49 times.  Physically restrained you by holding, 10 to 49

16   times.  Dragged you or pulled you, 10 to 49 times.  Threw

17   something at you, 3 to 10 times.  Slapped you, 3 to 10 times.

18   Hit or tried to hit you with something, 3 to 10 times.

19   Wrestled you, 3 to 10 times.  Attempted to smother,

20   strangle, or hang with you an object, 3 to 10 times.  Minor

21   bruises, 3 to 10 times.

22             Q.    Is this for the time period throughout the

23   relationship from first time to taking of the test?

24             A.    Correct.

25             Q.    Okay.  What other significant findings were

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000007465

1  made?

2      A.    The next category was sexual abuse, and the

3  first item in the test is vaginal intercourse and the

4  response that she checked was more than 50 times.

5      Q.    Okay.  Now explain to me was there some

6  distinction made between willing or wanted vaginal

7  intercourse and unwanted vaginal intercourse?

8      A.    Right, because at the time of the test, the

9  instructions about recalling abusive acts, so many -- the

10  test taker knows that what they're responding to are acts

11  that were unwanted.

12     Q.    Okay.

13     A.    The second one was unwanted objects were

14  inserted into your vagina or rectum.  She wrote or checked

15  the box 3 to 10 times.  The next one is threaten negative

16  consequence other than physical, 10 to 49 times.

17     Q.    And what does that mean?

18     A.    That if you don't comply something, something

19  bad will happen.

20     Q.    Okay.  And, again, her response there?

21     A.    10 to 49 times.  The last one, he used social

22  pressure to comply sexually, and she checked the box more

23  than 50 times.

24     Q.    What does that mean?

25     A.    She felt she didn't have a choice and the

1    socially here, by upping the way she explained it to me his

2    -- if you were any kind of wife, that signed her social

3    pressure then you would want to.

4            Q.    Okay.  Next category of entries entitled

5    psychological abuse, describe that for me.

6            A.    If you recall for a minute the power and

7    control wheels of psychological abuse is really part of the

8    broader category that a lot of other things subsumed or

9    subsumes, rather, and so the first category is coercion and

10   threats.  So underneath this was an exit that says attempted

11   to get you to engage in illegal activities.

12           Q.    She checked the box 3 to 10 times?

13           A.    Correct.  Again, this is still under

14   psychological abuse and activity, instilled fear in you by

15   looks, gestures, actions, she checked the box 10 to 49 times;

16   abused family pets, 1 to 3 times; displayed weapons, one to

17   3 times.

18                 Emotional abuse, insulted you or used put

19   downs, 10 to 49 times; humiliated you with words or gestures,

20   10 to the 49 times; attempted to make you feel guilty, 10 to

21   49 times; verbally raged at you, 10 to 14 times; called you

22   names, 3 to 10 times; attempted to make you feel crazy, 3 to

23   10 times.

24           Q.    Okay.  Next category?

25           A.    Isolation, attempted to control you, 10 to 49

1    times; attempted to limit involvement with others, 10 to 49

2    times; restricted your use of the phone, 3 to 10 times;

3    restricted your leaving the house, 10 to 49 times.

4         Q.    Next category?

5         A.    Minimization, Denial and Blaming.

6    Shifted responsibility for abusive behavior onto someone

7    else, 10 to 49 times.

8         Q.    Okay.  And next category is use of male

9    privilege.  What's that?

10        A.    Treated you like a servant, 10 to 49 times;

11   made major decisions without your equal participation, 10 to

12   49 times; acted like the master of the castle, 10 to 49

13   times; unilaterally defined male slash female roles, 10 to 49

14   times.

15        Q.    Okay.  And the next category?

16        A.    Economic, resource abuse.  Took money from you,

17   10 to 49 times; controlled your use of money, 10 to 49 times;

18   restricted your access to transportation, 10 to 49 times;

19   locked you out of the house, 10 to 49 times.

20        Q.    Does that cover that particular instrument?

21        A.    Yes.

22        Q.    Okay.  Was there a final test or instrument

23   that you employed in your evaluation and assessment here?

24        A.    Yes.

25        Q.    Okay.  What test is this?

1          A.     That's the lethality assessment the Arizona

2     Coalition of Domestic Violence designed.

3          Q.     Okay.   And what is that structured to inquire

4     into?

5          A.     I believe yesterday I said that typically you

6     give this when the person is still in the relationship and

7     you're trying to elicit the level of dangerousness.

8     Obviously that was not the case here.   What I was trying to

9     elicit and to understand was how dangerous had the situation

10    become up until the final time.

11         Q.     Okay.   Give me the overall structure of this

12    particular test.

13         A.     Just 14 statements, and you write yes or no,

14    you know, next to each one of them.

15         Q.     Okay.

16         A.     So, again, there's not a score.

17         Q.     Okay.   14 questions?

18         A.     Yes.

19         Q.     Okay.   And no way to score it, but you're

20    looking for what?

21         A.     I'm looking to see how many of these are

22    present in their life.

23         Q.     In the --

24         A.     Or were in their life.

25         Q.     Let's go through each of the questions one by

1    one.   Number 1, first question?

2            A.    What I wrote in the right were the ones she

3    said "yes" to.

4            Q.    Okay.   So there are how many of those?

5            A.    10.

6            Q.    Did she have the four she didn't respond to --

7            A.    No.

8            Q.    These are the ten that she responded "yes" to?

9            A.    Correct.

10           Q.    Do you give us to this?

11           A.    "Does the abuser seem preoccupied or obsessed

12   with the victim?"   And in parentheses it says for an example

13   "following, monitoring her whereabouts, stalking or very

14   jealous."   That was answered in the affirmative.   "Does the

15   abuser own, carry or have ready access to a gun?"   The answer

16   was yes.   The next one is "Have the abuser's assaults become

17   more violent, brutal and/or dangerous?"   And the answer was

18   yes.   "Has the abuse ever choked the victim?"   And the answer

19   is yes.   "Has the abuser ever injured or killed a pet?"   The

20   answer, response was yes.   "Does the victim believe the

21   abuser may seriously injure or kill her?"   "Is the victim

22   extremely protective of the abuse, trying to change or

23   withdraw statement to police, reduce bail charges, etc."   She

24   responded yes.   "Has the victim separated or tried to

25   separate from the abuser in the past 12 months?"   And she

1    wrote only one time about three years prior to Joe's death.

2         Q.    Okay.  So she answered yes but clarified?

3         A.    She clarified that one, yes.

4         Q.    Okay.  And the time frame that she listed in

5    her response was outside the 12-month period?

6         A.    Correct.

7         Q.    Okay.

8         A.    The next one was "Does the abuser drink

9    excessively?"  She answered yes.  And the last one that she

10   answered affirmatively to is "Has the abuser ever threatened

11   to kill the victim?"

12        Q.    Was that the last of the instruments used in

13   the structured portion of the interview?

14        A.    Correct.

15        Q.    Okay.  Let's go back then over them and let me

16   ask you one question pertaining to each of them.  Did the

17   power and control wheel, the responses thereto, serve as, in

18   some part, the basis of your opinion in this case?

19        A.    Yes.

20        Q.    Did the partner abuse scale nonphysical, did

21   that instrument, the results to that instrument, lay a part

22   in your opinion in this case?

23        A.    Yes.

24        Q.    Okay.  The partner abuse scale physical, that

25   test, did that play a part in your opinion in this case?

1         A.    Yes.

2         Q.    Response to violence inventory, that

3    instrument?  Did that serve as basis of part of your opinion

4    in this case?

5         A.    Yes.

6         Q.    The acute observations checklist, the answers

7    derived from that particular test, did they serve in part as

8    the basis for your opinion in this case?

9         A.    Yes.

10        Q.    And the lethality assessment, that too, did

11   that play a part in your opinion in this case?

12        A.    Yes.

13        Q.    Okay.  Did the answers that you received in the

14   unstructured interview, did they serve as part of the basis

15   of your opinion in this case?

16        A.    Yes.

17        Q.    Okay.  Earlier when you --

18        MR. PATTERSON:  Judge, I'm going to have these

19   marked.

20             (Pause in proceedings.)

21   BY MR. PATTERSON:

22        Q.    When you gave us an overview of domestic

23   violence, these were some of the slides that you showed us

24   earlier.  Show you 450 marked for identification.  These are

25   common abuser characteristics.  Based upon the unstructured

1    interview and structured interview in this case, did you find

2    these characteristics to be true with regard to Joseph

3    Andriano?  And we'll go through each one.  Low impulse

4    control?

5         A.    Yes.

6         Q.    Okay.  Can you recall a specific instance of

7    low impulse control?

8              MR. MARTINEZ:  Objection.  Asked and answered.

9              THE COURT:  Sustained.

10   BY MR. PATTERSON:

11        Q.    Okay.  In general, limited tolerance for

12   change?

13        A.    Yes.

14        Q.    Did not cope well with stress?

15        A.    Yes.

16        Q.    Again, with regard to Joseph Andriano, did you

17   find the characteristics described here independent, insecure

18   and fear of abandonment?

19        A.    Yes.

20        Q.    Little tolerance for delayed reinforcement?

21        A.    Yes.

22        Q.    Low self esteem?

23        A.    Yes.

24        Q.    Did it appear that he was from a dysfunctional

25   family?

1          A.     I have to qualify that.

2          Q.     Okay.

3          A.     This also adds violence between parents and I

4     don't have any knowledge about that.   The dysfunctional

5     family, the only thing I know is according to Wendi that

6     there seemed to be a serious alcohol --

7               MR. MARTINEZ:  Objection.  Asked and answered.

8               THE COURT:  Overruled.  Go ahead answer the question.

9               THE WITNESS:  That there was a serious alcohol

10    problem on the part of the dad.

11    BY MR. PATTERSON:

12         Q.     Okay.  And that caused consequences to Joseph

13    Andriano as reported by Wendi?

14         A.     Correct.

15         Q.     Okay.  Avoids responsibility by rationalizing

16    and blaming others.  Did you see that characteristic in the

17    information supplied to you in either the structured or

18    unstructured interview?

19         A.     Yes.

20         Q.     With regard to Joe Andriano, avoids facts, I

21    think it is this way so it is?

22         A.     I can't -- this one I don't have a clear

23    example in my mind for.

24         Q.     Okay.  With regard to Joe Andriano, believes

25    they're better or different than others?

1          A.    Yes.

2          Q.    Uses anger to intimidate, control others?

3          A.    Yes.

4          Q.    Okay.  With regard to Joe Andriano, holds

5     traditional views on women, and I believe that's family?

6          A.    Yes.

7          Q.    Families?

8          A.    Yes.

9          Q.    Cannot express or acknowledge feelings?

10         A.    The knowledge that I have about that is

11    dependent upon Wendi's telling me about the only time that he

12    could was when he was drinking.

13         Q.    Okay.  And finally abuse of family in terms of

14    ownership?

15         A.    Yes.

16         Q.    Okay.  Referring back to one of the slides you

17    showed us earlier, this is Exhibit for identification 449.

18    It's entitled common characteristics of battered women.

19    Based upon your structured and unstructured interviews,

20    assessment in this case with regard to Wendi Andriano, did

21    you find evidence of low self esteem?

22         A.    Yes.

23         Q.    Did you find that she was a believer in family

24    unit?

25         A.    Yes.

1          Q.     Did you find that she accepts responsibility

2     for the abuser's actions?

3          A.     Yes.

4          Q.     Did you find that she suffers from guilt yet

5     denies feelings of terror and anger?

6          A.     Yes.

7          Q.     Did you note any severe stress reactions?

8          A.     I don't have a clear example in my mind about

9     how she did that.

10         Q.     Did you find with regard to Wendi Andriano that

11    she believed no one can help, places responsibility on

12    herself for fixing it?

13         A.     Yes.

14         Q.     Did you find that she too had a history of

15    family violence?

16         A.     Yes, although I qualified that because, again,

17    I don't know that there was physical.  What she reported was

18    verbal.

19         Q.     Okay.  That -- the father, Alejo, yelling, that

20    kind of thing?

21         A.     Right.

22         Q.     Okay.  Did you find with regard to Wendi

23    Andriano that she had unrealistic hope that change was

24    imminent that she believed in Joe Andriano's promises?

25         A.     Yes.

1        Q.    Okay.  Was there any evidence that she suffered

2    from depression?

3        A.    You know, I'm seeing her so much after the

4    fact.

5        Q.    Okay.

6        A.    In my questions of her on the face of it, I

7    want to be clear, on the face of it, she was certainly able

8    to do what she needed to do to take care of her family.  That

9    doesn't mean that there was depression, but she was able to

10    work, take care of the kids, and do everything that Joe

11    needed.

12        Q.    Okay.  Are there circumstances where depression

13    is in existence but not totally disabling?

14        A.    Sure.

15        Q.    Okay.  Did you find with regard to Wendi

16    Andriano that she had in fact, by virtue of the conduct of

17    Joe Andriano, been isolated from others?

18        A.    Yes.

19        Q.    And, again, just in general, these

20    characteristics are not -- these aren't all the

21    characteristics?

22        A.    Correct.

23        Q.    These are some of the characteristics?

24        A.    Correct.

25        Q.    Earlier in your overview one of the slides now

1    described as Exhibit 451 for identification, and this is the

2    one definition for domestic violence, okay?  Is this the one

3    that you use in order to come to certain conclusions with

4    regard to certain issues in this case?

5         A.    Yes.

6         Q.    Okay.  Once again, what is this definition of

7    domestic violence?

8         A.    Domestic violence is a pattern of assaultive

9    and coercive behaviors often including physical, sexual and

10   psychological attacks as well as economic coercion that

11   adults and adolescents use against their intimate partners.

12        Q.    Okay.  Using that as the definition and

13   based -- your assessment in this case, do you have an opinion

14   with regard to the issue of whether or not Wendi Andriano was

15   the victim of domestic violence?

16        A.    Yes, I have an opinion.

17        Q.    And what is that opinion?

18        A.    That Wendi Andriano was in fact a victim of

19   domestic violence at the hands of Joseph Andriano.

20        MR. PATTERSON:  That's all I have at this point,

21   Judge.  Thank you.

22        THE COURT:  Mr. Martinez?

23

24   CROSS-EXAMINATION BY MR. MARTINEZ:

25        Q.    Ma'am, as part of your job in this case you


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000007478

1    spent 20 hours with the defendant, Wendi Andriano, correct?

2              A.    Correct.

3              Q.    And additionally you also spent 5 hours with

4    other people, right?

5              A.    Right.

6              Q.    Some of them being Donna Ochoa, right?

7              A.    Yes.

8              Q.    Alejo Ochoa, correct?

9              A.    Yes.

10             Q.    Somebody named Archuletta, correct?

11             A.    Yes.

12             Q.    And then Barbara Mitchell, correct?

13             A.    Yes.

14             Q.    And the bottomline with regard to this

15   particular test is that what you did is she talked to you and

16   you listened, right?

17             A.    Yes.

18             Q.    You took notes, right?

19             A.    Yes.

20             Q.    And then you also administered some tests,

21   right?

22             A.    Not to the collaterals, but --

23             Q.    Right.

24             A.    -- to Wendi.

25             Q.    Right.

1        A.    Yes.

2        Q.    You administered some tests and basically what

3   that required was for her to fill paperwork out?

4        A.    Fill out the test.

5        Q.    Right.

6        A.    Yes.

7        Q.    You took all of that and you put together a

8   report, right?

9        A.    Yes.

10       Q.    And that's what you've sort of been providing

11  to us throughout the course of your testimony, right?

12       A.    Right.

13       Q.    Your conclusions that are in the report, right?

14       A.    Yes.

15       Q.    And one of the things that you did in your

16  report that I noticed was that you highlighted certain

17  things.  You bolded them, right?

18       A.    Yes.

19       Q.    And then others you didn't bold, right?

20       A.    Uh-huh.

21       THE COURT:  Is that a "yes"?

22       THE WITNESS:  Yes, sorry.

23  BY MR. MARTINEZ:

24       Q.    And there's a reason for that, isn't there?

25       A.    Yes.

1       Q.     And the reason that you bold some things and

2    you don't bold others, you consider some to be more important

3    than the others, right?

4       A.     Yes.

5       Q.     And one of the things that you bolded, one of

6    the things that you bolded was the issue involving Shawn

7    King.  You bolded that, didn't you?

8       A.     Yes.

9       Q.     And you indicated that, well, she had not filed

10   a police report with regard to Shawn King coming over and

11   breaking out the windows of her car.  Do you remember that?

12   Your report reflects that, right?

13      A.     Yes.

14      Q.     And that was very important that there was no

15   report filed, right?

16      A.     Yes.

17      Q.     And the reason it was important -- why don't

18   you tell us why you think it was so important that you bolded

19   it in your report that no report was filed?

20      A.     Well, what's important is more than just no

21   report being filed.  What's important is that's the first

22   time that there was any violence that was physical that she

23   could see.

24      Q.     But you bolded no report filed, didn't you?

25      A.     I'm going to check.

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000007481

1          Q.     All right.  You go ahead and check.  If you
2    need a reference I'll tell you where it is.
3                 (Pause in proceedings.)
4    BY MR. MARTINEZ:
5          Q.     How about page 4 at the top?
6          A.     I see that, but actually there's --
7          Q.     Ma'am, does that, page 4 at the top, does it
8    say she did not report this incident to the police?
9          A.     It does say that.
10         Q.     Okay.
11         A.     More than that is bolded however.
12         Q.     Right.  Right above it and we'll get to that?
13         A.     Okay.
14         Q.     But it does say she did not report this
15   incident to the police, right?
16         A.     Yes.
17         Q.     And that's very important to you and that's why
18   you bolded it, right?
19         A.     Yes.
20         Q.     And you obtained the information and then you
21   went ahead and you wrote it in your report, right?
22         A.     Correct.
23         Q.     And the report, that's what you used to form
24   some of the opinions that you've been giving us today, right?
25         A.     Yes.

1          Q.    And -- but what if I told you the Casa Grande

2    Police Department does have a report of that incident?

3          A.    Then I don't know that.

4          Q.    And wouldn't that have a tendency to upset the

5    apple cart at least a little bit with regard to that

6    particular aspect?

7          A.    It upsets the apple cart in one way and that

8    is --

9          Q.    The answer is yes or no, does it or doesn't it?

10         A.    Yes.

11         Q.    Would you like to see the report?

12         A.    Certainly.

13         Q.    Okay.  Let me go ahead and mark it as an

14   exhibit so you could take a look at it.

15               (Pause in proceedings.)

16   BY MR. MARTINEZ:

17         Q.    Go ahead and take your time.  This is exhibit

18   452.

19         MR. PATTERSON:  Judge, I need to see it, please.

20         THE COURT:  Can you show that to --

21         MR. MARTINEZ:  Sure I will.  There's another copy.

22               (Pause in proceedings.)

23         THE WITNESS:  I have finished.

24   BY MR. MARTINEZ:

25         Q.    It does reference this break of the windows by

1     Shawn King, doesn't it?

2          A.     Yes, it does.

3          Q.     It does reference Wendi and Joe, correct?

4          A.     Correct.

5          Q.     That is, Wendi Andriano prior to their being

6     married, correct?

7          A.     Yes.

8          Q.     So we now know there was a report filed, wasn't

9     there?

10         A.     Yes.

11         Q.     The other thing that you wanted to talk to us

12    about was the statements that are above there that are also

13    bolded, right?

14         A.     Right.

15         Q.     She indicated according to you that during the

16    meeting -- this was during the meeting in which she told him

17    she wanted more freedom to date others and then he took off

18    the --

19         A.     Right.

20         Q.     Right.  Well, ma'am, did you know that actually

21    when she was dating the pastor's son, she was also having sex

22    with other individuals?

23         A.     No.  I did not know that.

24         Q.     Did you know that it was more than one?

25         A.     No.

1      Q.    Did you know that it was more than two?

2      A.    No.

3      Q.    Did you know that part of the reason that Mr.

4 King actually broke up with her was because he came over to

5 the apartments, which were the Quail Apartments, and he

6 caught her in front of the television in a state of undress

7 with another male.  Did you know that?

8      A.    No.

9      Q.    But to you it's very important and so you

10 bolded that, right?

11      A.    Correct.

12      Q.    But that's an error also, isn't it?

13      A.    As you are now telling me, yes.

14      Q.    The point being you didn't get that information

15 from anywhere else.  You just got some information and you

16 put it down in your report, didn't you?

17      A.    Correct.

18      Q.    And the bottom line, ma'am, with regard to what

19 I'm going through with you, that illustrates the weakness of

20 the approach that you took in this case, doesn't it?

21      A.    Well, I don't agree.

22      Q.    Well, you are reliant in reaching your opinion

23 on what others are telling you, right?

24      A.    Yes.

25      Q.    And if they don't tell you the truth, wouldn't

1    you agree that perhaps there may be a problem with the

2    opinion that you are rendering if they don't tell you the

3    truth?

4         A.    There's more than just the person telling the

5    story that goes into this though.

6         Q.    Right.  But the person telling the story is a

7    very integral part, wouldn't you agree?

8         A.    Yes.

9         Q.    They're the ones in the intimacy of the home,

10   aren't they?

11        A.    Yes.

12        Q.    They're the ones suffering if there any sexual

13   acts perpetrated upon them, correct?

14        A.    Yes.

15        Q.    They're the ones saying whether or not Max, the

16   dog, is being kicked, right?

17        A.    Yes.

18        Q.    So that is a very important part of your report

19   right?

20        A.    Yes.

21        Q.    In fact if we were to throw that out of your

22   report you would have a very difficult time, wouldn't you, if

23   you threw out the defendant's statement.  You'd have a very

24   difficult time reaching a decision in this case, wouldn't

25   you?

1          A.     If you threw out the entire statement?

2          Q.     Yes.

3          A.     Yes.

4          Q.     Right. We're just talking about some of the

5    things she told you right now.

6          A.     We talked about Shawn King.

7          Q.     While we're talking about Shawn King, one of

8    the things that you answered with regard to this issue was

9    that, well, she had never had sex with Shawn King the

10   pastor's son, right?  You told us that right?

11         A.     To the best of my knowledge she hadn't.

12         Q.     Well, ma'am, everything that you tell us is to

13   the best of your knowledge, isn't it?

14         A.     Yes, it is.

15         Q.     You're not coming up here and saying, well,

16   this is halfway to the best of my knowledge.  Everything's to

17   the best of your knowledge, right?

18         A.     Right.

19         Q.     And so you indicated to us previously that you

20   thought that when she married or not -- when she had sexual

21   relations with Joseph Andriano, you thought that she was a

22   person that was chaste, that hadn't had relations before,

23   correct?

24         A.     Correct.

25         Q.     At that time when you thought that, that added

1    to your opinion because what we have then is a woman who's

2    naive to the ways of men, right?

3        A.    I don't know if having or not having sex

4    determines whether or not a woman is naive.

5        Q.    Well, here's the point.  If a woman hasn't had

6    sexual intercourse with a man, wouldn't you say she has less

7    experience than a person who has sex with men five, six,

8    seven, eight times?  Would you say she knows less?

9        A.    Knows less sexually.

10       Q.    Yes.

11       A.    Yes.

12       Q.    That's what we're talking about here.  Wouldn't

13   you agree they have less experience, they're probably more

14   impressionable than somebody who has had a wide range of

15   experiences?

16           MR. PATTERSON:  Judge, can we approach please?

17

18              (The following proceedings were held at the

19   bench:)

20

21           MR. PATTERSON:  I don't know where he's getting all

22   of this information from.  I guess it's from a gentleman by

23   the name of Shawn King.  I interviewed this gentleman and he

24   didn't tell me any of these things.  So my objection is that

25   this gentleman needs to be certain he's making a good faith

55

1    representation of what he believes Mr. King is going to say,

2    and there's a wide range of sexual experiences that he just

3    alluded to.   It better be demonstrable through testimony of

4    some witnesses, otherwise we have grounds for mistrial here.

5            THE COURT:  Mr. Martinez?

6            MR. MARTINEZ:  I absolutely do.  I absolutely do.   If

7    he wants, I could go back and get the names.   One of them is

8    a person named Dido, is the first name.   The last name I

9    think is Gamez.  Mr. Muros also indicated he had intercourse

10   with her.  And I have names of another -- I have the name

11   written down.  I spoke with him and he indicated that he had

12   intercourse with her, so these are three people I know for a

13   fact have had intercourse with her.  Mr. King, I spoke with

14   him.  He indicated did not have intercourse with her and I've

15   never indicated that.

16           MR. PATTERSON:  Well, and that's why there's a

17   problem because he's used Shawn King as the predicate for one

18   of the questions that he posed, and now my information is

19   that Shawn King never had sex with my client.

20                       Secondly, one of those people that he

21   purports to have as witnesses have never been listed in the

22   State's case in chief or rebuttal, and I object to him using

23   information derived from witnesses who have not been

24   disclosed as the predicate for questions to this witness.

25           MR. MARTINEZ:  It's clear with regard to issues of


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    rebuttal the State does not have to list them in advance.

2    They don't know what we're going to say.  If she had been

3    honest, it wouldn't have been an issue.

4          THE COURT:  What I hear from Mr. Martinez is he

5    indicates he has a good faith belief in going into these

6    areas.  Let's move on.

7          MR. MARTINEZ:  Okay.

8          THE COURT:  You've made your record.  Let's move on.

9

10          (The following proceedings were held in open

11    court:)

12

13    BY MR. MARTINEZ:

14          Q.    The point being with regard to this is she was

15    not, if you will, as inexperienced as you painted her out to

16    be.

17          A.    Inexperienced sexually, correct.

18          Q.    Let's talk a little bit about a couple more

19    items that you indicated about in your report.  You indicated

20    that Mr. Andriano contacted or hired an attorney by the name

21    of Jeff Miller on July of 2000.  That's what your report

22    indicates, right?

23          A.    Do you know what page that is?

24          Q.    Yes, ma'am.  Page 15.

25          A.    Correct.

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000007490

1          Q.     So according to you, Mr. Andriano initially

2     spoke in July 2000 with Mr. Miller, right?

3          A.     Yes.

4          Q.     And you obtained that information from --

5          A.     Wendi.

6          Q.     Right.  But we've -- do you know we've had Mr.

7     Miller here in court?  Did you know that?

8          A.     No.

9          Q.     Did you know he told us it was actually 1998

10    when he was actually contacted?

11         A.     No.

12         Q.     Did you know that one of the ways that the

13    relationship worked, according to Mr. Miller, was that if he

14    had a problem he would call up and ask to speak to Mr.

15    Andriano, and that when he would ask him some questions or

16    have something to do with the lawsuit, that Mr. Andriano

17    would say no, just talk to Wendi about that.  Did you know

18    that?

19         A.     No.

20         Q.     That indicates that Ms. Andriano was the person

21    that was in charge if anything, at least of the lawsuit,

22    right?

23         A.     I don't know that's what that indicates.

24         Q.     Well, according to Mr. Miller, anything having

25    to do with the lawsuit he would turn the phone over and she

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    would deal with it.  Doesn't that indicate that she's at

2    least a caretaker to some degree because she's now dealing

3    with Mr. Miller?

4            A.    Well, she was a caretaker for a lot of -- lot

5    of things about Joe, so okay, yeah.

6            Q.    So she is -- okay.  The other thing that -- so

7    it wasn't like -- the point being, it wasn't like she

8    couldn't think for herself.  It wasn't like she wasn't

9    functioning in that relationship, was she?  I mean, she was

10   functioning in that relationship, wasn't she?

11           A.    Functioning, going to work?  Is that what you

12   mean?

13           Q.    Going to work.

14           A.    Functioning with life.

15           Q.    Dealing with Mr. Miller, Those sorts of things,

16   right?

17           A.    Um-hmm.

18           Q.    The normal day-to-day things, right?

19           A.    Yes.

20           Q.    She did go to work?

21           A.    Yes.

22           Q.    She did socialize, right?

23           A.    Yes.

24           Q.    She, according to you, may have cooked on

25   occasion, right?

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1          A.    Yes.

2          Q.    You didn't tell us how often she cooked, but

3    you indicated that she cooked on occasion, right?

4          A.    Yes.

5          Q.    But we do know some things.  For example, did

6    you know she refused to take care of his wounds, dress them

7    after surgeries?  Did you know that?

8          A.    I -- what I recall is that she elicited the

9    help of her parents to come and do that.

10          Q.    Ma'am, actually, we've had Ms. Ochoa, Donna

11    Ochoa, here who indicated she would leave work four times a

12    day to change the dressing because Ms. Andriano wouldn't do

13    it for whatever reason.  Did you know that?

14          A.    I did know that, but you're putting a different

15    spin on it.

16          Q.    So the answer is you did know it?

17          A.    I knew that Donna was coming to do that.

18          Q.    Did you also know that Mr. Alejo Ochoa was also

19    helping out?

20          A.    Yes.

21          Q.    Okay.  But it wasn't the defendant who was

22    being the caregiver with regard to at least those -- that

23    incidence, right?

24          A.    That's correct.

25          Q.    Now, the other thing that you indicate in your

1    report was that in May 2000 is when Mr. Andriano began

2    chemotherapy.  That's what you indicate in your report,

3    right?

4          A.    Yes.

5          Q.    Well, we actually had the doctor who conducted

6    this chemotherapy, and he actually indicated it was on July

7    11 of the year 2000 when the chemotherapy actually started.

8    So your report is wrong about that too, isn't it?

9          A.    Yes, it is.

10         Q.    And you got that information from the

11   defendant, right?

12         A.    Wendi, yes.

13         Q.    And one way of looking at it is that if he is

14   going from May to October with chemotherapy, it could mean

15   that's actually having five months of terrible time, right?

16         A.    It could mean that, yes.

17         Q.    During the time in which you've indicated when

18   he was receiving his chemotherapy where things were just

19   getting worse and worse and worse, right?

20         A.    Yes.

21         Q.    And what that could indicate, if you move this

22   up a couple of months, was that according, from your

23   perspective, she was suffering two months longer because the

24   chemotherapy then stretched out five months, right?

25         A.    Yes.

1      Q.     But actually it -- if it only started in

2   September -- in July, then what that means is if there was

3   any suffering, if there was any problems, it was of a much

4   lesser duration, correct?

5      A.     Yes.

6      Q.     Now, what that also tells us, and these are

7   just examples, and we'll talk a little bit more about what's

8   in your report, but what that also tells us is that with

9   regard to your opinion, and if we just take these three items

10  here, you took them as true when you rendered your opinion in

11  the report, didn't you?

12     A.     Yes.

13     Q.     These clearly indicate that they -- that you

14  were wrong, right?

15     A.     That's not the whole story.

16     Q.     I know that's not the whole story, but I'm just

17  taking about these three?

18     A.     Yes.

19     Q.     They show your -- you were wrong?

20     A.     Correct.

21     Q.     And in addition under number A you even bolded

22  that in your report because it was very important to you?

23     A.     Yes.

24     Q.     So even with that, you still stay with your

25  opinion?

1           A.    Yes.

2           Q.    Okay.  Let's talk a little bit more about your

3    report even though those facts we now know are inaccuracies,

4    right?  Let's --

5           MR. PATTERSON:  Judge, that question is

6    argumentative.  It's been asked three times.

7           THE COURT:  I'll sustain the objection.

8    BY MR. MARTINEZ:

9           Q.    We have some more facts I want to talk to you

10   about the report, okay?  One of the things you tell us in

11   your report was that the defendant reported to you, and also

12   some of the tests that you gave her, something to the effect

13   of "I'm not one who likes arguments, I just let it go"?

14          A.    Yes.

15          Q.    I mean, if you want a reference, that's page 8

16   of your report.

17                Well, we heard from an individual by the name

18   of Rick Freeland.  Are you familiar with him?

19          A.    I know the name and I know the story.

20          Q.    Well, then you also know, you know, part of the

21   story, do you know that she would stand outside of his house,

22   according to Mr. Freeland, for at least an hour making noise,

23   knocking, wanting to get into his apartment.  Did you know

24   that?

25          A.    Not that specifically.


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1          Q.    Didn't make it to your report, did it?

2          A.    No.

3          Q.    When you say "not that specifically," it means

4    that you might know that generally?

5          A.    What I know is that she was upset about the

6    break -- breaking off that relationship.  That's the part

7    that I really know.

8          Q.    Okay.  So that means that specifically, just so

9    we're clear, you don't know that she would stand outside his

10   door on more than one occasion and stand out there at least

11   on one occasion for at least an hour asking to be let in?

12         MR. PATTERSON:  Judge, I'm going to object to the

13   form of that question.  Misstates the evidence.  It was

14   clarified, but I would ask him to be directed to restate it

15   so it's certain.

16         THE COURT:  I'll sustain the objection.  Restate the

17   question.

18   BY MR. MARTINEZ:

19         Q.    Did you know she stood outside of Rick

20   Freeland's apartment after they broke up for an hour on the

21   phone asking him to let her in?

22         A.    No, I do not know that.

23         Q.    And did you know that this occasion when she

24   was doing it was in the early morning hours?

25         A.    No.  Of course, I don't know that.

1       Q.    And did you know that -- well, you now know she

2   wasn't taking care of her kids.  Did you know that at that

3   time?

4       A.    No.

5       Q.    That would mean that Mr. Andriano, if those

6   facts are true, was the caretaker on that date and time,

7   right?

8       MR. PATTERSON:  Judge, objection.  That assumes facts

9   not in evidence.  Calls for speculation.

10      THE COURT:  Sustained.  Let's move on.

11  BY MR. MARTINEZ:

12      Q.    The other thing we know about that, did you

13  know that she threatened to use the pass key to get inside

14  his apartment?  Did you know that?

15      A.    No.

16      Q.    Did you know that this was after having gone

17  out to a bar called the Sanctuary where Mr. Freeland actually

18  left because she wouldn't leave him alone?

19      A.    Are you asking me if I know that?

20      Q.    Yes.

21      A.    No, I don't know that.

22      Q.    This woman that you've been presenting to us is

23  this woman who is nonaggressive.  You've told us that, right?

24      A.    Correct.

25      Q.    Nonargumentative, right?

1          A.      Correct.

2          Q.      Avoiding confrontation, right?

3          A.      Yes.

4          Q.      That's not the picture of her as I -- I've just

5    painted to you, is it?

6          A.      Correct.

7          Q.      Now, you also said that, well, you know, it was

8    a sad day for her when she broke up with Mr. Freeland because

9    it was as if -- as if she'd lost a friend, right?

10         A.      Right.

11         Q.      Wouldn't you agree that this conduct that we're

12   talking about is not one that friends do amongst each other

13   when they obsess over them, they want to be with them?

14         A.      I think you're asking me about friendship and

15   how one person might effect a person.  Is that what your

16   question is?

17         Q.      I'm asking you whether or not friends go and

18   stand in front of each other's door and, the whole thing I

19   laid out for you, wanting to get together with them and have

20   sex?

21         MR. PATTERSON:  Judge, again, that's assuming facts

22   not in evidence.

23         THE COURT:  Sustained.

24         MR. PATTERSON:  That was never testified to.

25         THE COURT:  Sustained.  Ask your next question.

1   BY MR. MARTINEZ:

2          Q.   Did you know she would, according to Mr.

3   Freeland, she would not take no for an answer?

4          MR. PATTERSON:  Again, objection.  That's not within

5   the context that she not take no for --

6          THE COURT:  Sustained.  Rephrase your question.

7   BY MR. MARTINEZ:

8          Q.   Did you know that she wouldn't take no for an

9   answer with regard to the relationship being over?

10         A.   No.

11         Q.   And that -- doesn't that depict a woman who's

12  very aggressive and assertive?

13         A.   In the example that you are giving me, it

14  sounds like she was actively pursuing Rick Freeland.  I'm not

15  sure I'd use your definition.  I wouldn't say she was

16  actively pursuing him the way you're describing it.

17         Q.   But in your report you did not include that

18  factor as part of the equation of what you made the

19  determination or made your opinion that she was a victim of

20  domestic violence, right?

21         A.   That's correct.

22         Q.   And that would have been helpful to know,

23  wouldn't it?

24         A.   You're asking -- I'm supposed to answer that

25  question?

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1          Q.     You're not supposed to answer anything, only if

2     you know.

3          A.     Excuse me?

4          Q.     Do you know?

5          A.     Do I know what?

6          Q.     Whether or not having a better picture, a more

7     well rounded picture of the person you are assessing is

8     better than having a very narrow, straight sort of picture.

9     Which one is better?

10         A.     The obvious well-rounded picture.

11         Q.     And from what we're talking about so far, it's

12    clear that there are certain things that you missed, right?

13         A.     Correct.

14         Q.     We were talking about how, and you indicated

15    that -- that there were these issues that she had with sex

16    involving Mr. Andriano, do you remember that?

17         A.     Yes.

18         Q.     And you indicated, you became very graphic, and

19    you indicated she even had to use lubricant with him.  Do you

20    remember telling us that?

21         A.     Yes.

22         Q.     That's nowhere in your report, is it?

23         A.     I don't remember.

24         Q.     It is your report, right?

25         A.     This?  Yes.

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1      Q.    You are familiar with it, right?

2      A.    Yes.  But I don't remember if I put lubricant

3   in it.

4      Q.    Do you want to take time to read it to see it

5   doesn't include it or we could do that at the break and --

6      A.    We could do that at the break, sure.

7      Q.    Now, did you know that the reason that she had

8   to use this lubricant was because according to something that

9   she told to Erik Vaillant.  According to Erik Vaillant who

10   had a conversation with her, the reason she had to use

11   lubricant was she thought Mr. Andriano was gross and skinny.

12   Did you know that?

13      A.    No.

14      Q.    That had nothing to do with any domestic

15   violence if in fact what she told Mr. Vaillant is true,

16   right?

17      A.    That's correct, if it's true.

18      Q.    Right.  The fact that I -- somebody may have a

19   predilection for tall women has nothing -- or short women,

20   whatever, that has nothing to do with domestic violence,

21   right?

22      A.    Right.

23      Q.    Do you know whether or not she had to use any

24   lubricant with regard to Rick Freeland?

25      A.    I don't know.


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1      Q.    Don't you think it would have been important to

2   this inquiry to see whether or not she actually needed

3   lubricant with Rick Freeland to determine whether or not it

4   was just sex that she indicated or it was just sex with an

5   icky, gross guy?

6      A.    As I recall, the purpose of my questioning her

7   and interviewing her was to get a picture, and I didn't ask

8   specifics about the nature of the sex acts with Rick

9   Freeland.

10     Q.    But you did get specifics of the nature of the

11  sex acts with Joe Andriano, right?

12     A.    Yes, I did.

13     Q.    Okay.  While we're talking about sex and the

14  defendant, did you know that when she went out to bars that

15  she was constantly kissing on men?

16     A.    No.

17     Q.    Did you know that according to the women that

18  she went out with that they almost became embarrassed

19  because, according to them, Wendi had to be the center of

20  attention, and if she wasn't, then she was coming on to men?

21     MR. PATTERSON:  Judge, these questions incorporate a

22  host of things that have happened during the course of this

23  trial.

24     THE COURT:  Sustained.  Sustained.

25  / / / / /

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1      BY MR. MARTINEZ:

2          Q.    The point is, you didn't know how she was

3      socially then, right?

4          A.    I did not interview the people that you

5      interviewed.

6          Q.    You interviewed the defendant and she was

7      there, wasn't she?

8          A.    Yes.

9          Q.    And presumably she would have told you

10     everything that was important to this case, right?

11         A.    Presumably, yes.

12         Q.    And she didn't tell you any of that, did she?

13         A.    I did not know that.  You are correct.

14         Q.    Okay.  Did she also tell you that on September

15     27 of the year 2000 she met somebody by the name of Travis

16     Black?

17         A.    Yes.

18         Q.    It's in your report, is it?

19         A.    It's in the addendum.

20         Q.    Well, ma'am, the State didn't receive that

21     addendum so it's not in your report, is it?

22         A.    Do you want me to look at my report?  This will

23     take time.

24         Q.    Go ahead, take a look at it, and see if it's

25     there.


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000007504

```
 1                    (Pause in proceedings.)

 2          THE WITNESS:  It is not here.

 3   BY MR. MARTINEZ:

 4          Q.    But you indicated that you now know or that

 5   along the way you knew about Rick -- of Travis Black, right?

 6          A.    Because of my addendum, yes.

 7          Q.    Right.  The one that wasn't provided to the

 8   State or isn't part of that report, right?

 9          A.    I guess that's correct.

10          Q.    Now, with regard to Mr. Black, when did she

11   have intercourse with him?

12          A.    Can I read the addendum?

13          Q.    Just read it to yourself.  If you could tell

14   me -- I don't want you to read it.  I want you to take a look

15   at it and then tell me.

16          A.    Okay.

17                    (Pause in proceedings.)

18          THE WITNESS:  I have during a weekend --

19   BY MR. MARTINEZ:

20          Q.    Ma'am, don't read it.  Read it to yourself.

21   Once you've read it, if it says the date, tell me.  If it

22   doesn't, tell me that also.

23          A.    The only date it says is September 2000.

24          Q.    We've had testimony from Mr. Black that it was

25   actually September 27, 2000, okay, ma'am?
```

1      A.      Okay.

2           Q.      Added to this set of circumstances that I want

3      to talk to you about, we also know that Mr. Andriano,

4      according to Dr. Kellogg, had chemotherapy on September 26,

5      2000, the day before.  You have described for us a woman who

6      was overboard in caring for her husband, haven't you?

7           A.      Yes.

8           Q.      That she would come home and be worried about

9      what dinner she was going to prepare, right?

10          A.      Yes.

11          Q.      That she would need to walk on eggshells around

12     him?

13          A.      Yes.

14          Q.      That he would fly off the handle and she

15     wouldn't know what the reason was?

16          A.      Yes.

17          Q.      That doesn't sound like a woman that goes out

18     and does this.  That's really subserviant to him, does it?

19          A.      I think she could have been subserviant in a

20     lot of ways.

21          Q.      But just not that way, right?

22          A.      In which way?

23          Q.      In other words, you indicated that she was a

24     Christian woman, right?  Her Christian beliefs were very

25     important to her, right?

1      A.     Yes.

2      Q.     And one of the things you also indicated in the

3  power and control wheel, she would do anything because that's

4  what the Bible tells her to do?

5      A.     Yes.

6      Q.     But it's clear, ma'am, if she's doing what

7  she's doing with Mr. Black, she's not taking care of him in a

8  Christian sense as she defined it to you, is she?

9      A.     That's correct.

10     Q.     One of the other things that I want to talk to

11 you about is page 12 of your report, and it talks about the

12 defendant in August of 1999, doesn't it?

13     A.     Yes.

14     Q.     And in it, your report indicates that according

15 to the defendant she went on vacation with -- with

16 Mr. Andriano's family, right?

17     A.     I think it was Wendi's parents.

18     Q.     All right.  She went on vacation with

19 somebody's parents, right?

20     A.     Yes.

21     Q.     And when she returned she discovered that her

22 job was gone, right?

23     A.     Right.

24     Q.     Because of new management, right?

25     A.     Right.

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

74

1          Q.     And that was the Courtyard Apartments, wasn't

2     it?

3          A.     Yes.

4          Q.     And after that is when you told us that she

5     took at least what appeared to be a one-month job at some

6     apartments on Camelback, right?

7          A.     Yes.

8          Q.     And then after that is when she went to the San

9     Riva apartment, right?

10         A.     Right.

11         Q.     The reason that she gave you for leaving the

12    Courtyard Apartments in 1999 was that there was a change in

13    management, right?

14         A.     Right.

15         Q.     That's not true, is it?

16         A.     I don't know that it's not true.

17         Q.     Did you know --

18              MR. PATTERSON:  Judge, could we approach?

19

20              (The following proceedings were held at the

21    bench:)

22

23              MR. PATTERSON:  I think he's going into 404 (B) areas

24    and you told him he couldn't go there, and I didn't open this

25    door.  I glossed over this particular issue.


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1          MR. MARTINEZ:  Judge, it's part of the report.  She

2     used it to base her opinion.  I can't -- you know, the Rules

3     of Evidence are clear.  I can go into any area I want to if

4     it's in that report.  Just because he doesn't go it doesn't

5     mean I don't have the right to go into it.  She discussed

6     that as part of her opinion specifically, and he said, if the

7     Court remembers, she said with regard to that month that she

8     was at Camelback, she took that because she was the one that

9     was forced to leave.

10          THE COURT:  What was the reason why she left

11     Camelback?

12          MR. MARTINEZ:  The reason that she left was --

13          THE COURT:  Whisper.

14          MR. MARTINEZ:  The reason she left was, there were

15     discrepancies, she was using some of the caretakers there,

16     her personal assistants, to do extra work and all that stuff.

17          THE COURT:  What I'm going to do, I'm going allow you

18     to ask the question in this fashion, if that was not the

19     reason that she left, would that be important in the basis of

20     your opinion, and let's move on.

21

22               (The following proceedings were held in open

23     court:)

24     / / / / /

25     / / / / /


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    BY MR. MARTINEZ:

2         Q.    Ma'am, if that wasn't the reason that she left,

3    the fact there was a change in management, wouldn't that be

4    important in this whole picture that we're trying to get of

5    this person?

6         A.    I suppose it depends on what the reason is.

7         Q.    Well, let's assume that what you have there is

8    not the truth.  If it isn't the truth and we're just trying

9    to get a picture of this individual, wouldn't that be

10   something that you would consider?  Wouldn't that be?

11        A.    Yes.

12        Q.    Okay.  You indicated, and I'm trying to get a

13   feel for this, you indicated that Mr. Andriano required daily

14   sex.  You said that on more than one occasion.  Do you

15   remember that?

16        A.    Yes, I do.

17        Q.    And just so that we get a sense of it,

18   according to you, I know what daily mean, but when in the

19   relationship did he want daily sex?

20        A.    My recollection from Wendi is that it was

21   pretty -- a pretty significant period of time across the

22   relationship.  I know that there was a period of time when he

23   was ill that that wasn't happening.  I remember distinctly

24   that she told me it resumed on a daily basis after she

25   returned from Colorado.  That's a particular point in time.

1          Q.    How about when she was having sex from Rick

2    Freeland?  Did he also ask for sex on a daily basis then?

3          A.    I don't believe I asked her for dates of

4    when -- when it was daily and when it wasn't.

5          Q.    Wouldn't it be important to know if she was

6    having sex, for example, with Rick Freeland today and her

7    Husband was then asking for sex in the evening because maybe

8    she didn't want to have sex with her husband because she'd

9    already had it.  Wouldn't that be important to know?

10         A.    Yes.

11         Q.    Because it wouldn't be -- then it wouldn't be

12   domestic violence.  It would then be that she'd already had

13   her fill, right, one of the reasons, right?

14         A.    It's just the way you said that.

15         Q.    Ma'am, why don't you go ahead and answer the

16   question for me.

17         A.    That she may not want to engage in sex for a

18   second time in a day, yes.

19         Q.    Okay.  And you indicated that you didn't like

20   the way that I said it.  Ma'am, the bottomline is, let's be

21   open about this.  She was having sex with Rick Freeland,

22   wasn't she?

23         A.    Yes.

24         Q.    And you did say that Mr. Andriano did want sex

25   on a daily basis, right?

1        A.    Yes.

2            Q.    You did indicate that was one of the important

3    -- or one of the issues that indicated to you that there was

4    domestic violence, right?

5        A.    Yes.

6            Q.    So the reason why she doesn't have sex with Mr.

7    Andriano is very relevant.   Isn't it is very important?

8        A.    If that's the period of time that we're talking

9    about.

10            Q.    Well, you're  -- you're the one, ma'am, that

11    said he wanted sex on a daily basis, and you made it seem

12    like he wanted sex on a daily basis throughout the marriage.

13    Are you backing away from that position?

14        A.    No, sir.

15        MR. PATTERSON:   Objection.   Misstating her response.

16    She said there was a period of time.

17        THE COURT:   Sustained.

18        MR. PATTERSON:   Thank you.

19        THE COURT:   Rephrase the question.

20    BY MR. MARTINEZ:

21            Q.    Okay.   You said he came back from Colorado.   Do

22    you remember --

23        A.    Yes.

24            Q.    And that he resumed sex on a daily basis?

25        A.    Yes.

1       Q.    Rick Freeland and her had an affair after she

2   turned from Colorado, right?

3       MR. PATTERSON:  Judge, this also misstates the time

4   frame with which the testimony has been that she had a

5   relationship with Mr. Freeland.

6       THE COURT:  She could answer that if that's -- if you

7   know, go ahead and try to answer the question if you know.

8       THE WITNESS:  The only way I'm going to know is to go

9   back to my notes because I don't remember dates.  Like I

10  can't tell you when she was in the affair with Rick and when

11  he was in Colorado.

12  BY MR. MARTINEZ:

13      Q.    With regard to notes are you talking about your

14  report?

15      A.    Yes.

16      Q.    Why don't you look at your report then?

17      A.    Do you have a page number I could start at?

18      Q.    Why don't you look through your report.  It's

19  your report because I don't know when she had sex on a daily

20  basis.

21           (Pause in proceedings.)

22      THE WITNESS:  I found one part of the answer.

23  BY MR. MARTINEZ:

24      Q.    What's that?

25      A.    That they returned from Colorado, excuse me, it


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000007513

1       would have been late 1998.

2               Q.      Okay.   That's in '98 that he wants sex on a

3       daily basis.   Any other references there?

4               A.      I'm looking for the part in which she engaged

5       in the relationship with Rick Freeland.   Okay.   That's spring

6       of 2000.   So those are different periods of time.

7               Q.      Sure.

8               A.      I don't know for a fact that the daily sex went

9       from 1998 through Spring of 2000.   I assumed it did.

10              Q.      Wait a minute, ma'am.   If you're assuming

11      things, you didn't get that from anybody, did you? It came

12      from your head, right?   When you assume things, it comes from

13      your head, doesn't it?

14              A.      Assumed based on the word "daily."

15              Q.      Right.   But it doesn't say daily for years,

16      does it?

17              A.      No.   It just says "daily."

18              Q.      Right.   But nowhere in that report does it say

19      that he wanted daily sex toward the end of the relationship,

20      does it?

21                      (Pause in proceedings.)

22              THE WITNESS:   What I found is one month prior to

23      Joe's death was the incident with the softball game and the

24      violence that followed that evening.

25      / / / / /

EXHIBIT PP

000007515

1      BY MR. MARTINEZ:

2           Q.    But that doesn't say --

3           A.    It does not say.

4           Q.    So the point here is you've come out and you've

5      told us that you believe that this requiring of sex on a

6      daily basis was one of the factors you considered in deciding

7      whether or not there had been domestic violence in this

8      relationship, right?

9           A.    Yes.

10          Q.    But you can't tell us if at the end Mr.

11     Andriano was requesting sex on a daily basis, right?

12          A.    Right.

13          Q.    You can only tell us that he was requesting sex

14     on a daily basis back in '98, right?

15          A.    That's the -- the factual information that I

16     have, correct.

17          Q.    Now, you indicated something, I assumed that --

18     that he wanted sex on a daily basis.  Do you remember telling

19     me that?

20          A.    Yes, because the word "daily" was said to me.

21          Q.    Right.  Sure.  One of the other things you told

22     us on direct examination was that even though you could find

23     nothing to support it, you still sat up there and told us,

24     well, the defendant may have been sexually abused by her

25     biological father.  Do you remember telling us that?

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1        A.    Yes, I certainly do.

2        Q.    But you have absolutely nothing of any concrete

3   basis?

4        A.    I think I said that that was just reported to

5   me through the mom telling Wendi.

6        Q.    So then if it means nothing to you, why do you

7   hold it out to us and say, oh, she may have been, if it has

8   nothing to do with this?

9        A.    It's just part and parcel trying to get as much

10  information as I can from the beginning of Wendi's life.

11       Q.    Do you filter any of this information out?   If

12  they'd have told you she was attacked by Bigfoot, would you

13  also have told us that?

14       MR. PATTERSON:   Objection.   Argumentative.

15       THE COURT:   Sustained.

16  BY MR. MARTINEZ:

17       Q.    Do you filter any of this information out and

18  say, well, no, that's not something I'm going to consider?

19       A.    Actually, the filter many times becomes the

20  collateral interviews, the reading of the record, the 20

21  hours, that's the filter.

22       Q.    And in this case you chose not to filter that

23  out, right?

24       A.    No, that's not correct.

25       Q.    Well, you put it in your report, didn't you?

1        A.    Yes.

2        Q.    And you put it very early on in the report,

3   right?

4        A.    Because it was something that would have

5   happened early on.   It's chronological.

6        Q.    You don't fill this report with useless

7   matters, do you?

8        A.    No.

9        Q.    You put things here that you think are

10   important, don't you?

11       A.    Yes.

12       Q.    So you consider that to be important even

13   though you could find no basis for it, right?

14       A.    I considered it as important information from

15   mom to daughter that was then reported to me.   But it's clear

16   in there that I don't know that to be fact.

17       Q.    And, bottomline, if it even happened, it

18   happened when she was about one year old, right?   If it even

19   happened?

20       A.    She would have been young.   I don't know how

21   young.

22       Q.    Throughout this report that you're talking to

23   us about you also talk about these financial issues, and

24   basically they were in trouble throughout the marriage,

25   right?

1      A.    Yes.

2      Q.    And the other thing in your assessment of it,

3    it's all Mr. Andriano's fault, right?

4      A.    Yes.

5      Q.    He's the one that needed money from her for the

6    boat, right?

7      A.    Right.

8      Q.    He was the one that acted like a child and

9    couldn't hold back, right?

10      A.    Right.

11      Q.    He's the one that needed these silly cancer

12    operations.

13      THE WITNESS:  No.

14      MR. PATTERSON:  Again, form of the question.

15      THE COURT:  Sustained.

16      MR. PATTERSON:  Highly argumentative --

17      THE COURT:  Sustained.

18      MR. PATTERSON:  -- and inappropriate.

19      THE COURT:  Sustained.

20    BY MR. MARTINEZ:

21      Q.    He's the one that required money for cancer

22    operations, right?

23      A.    Yes.

24      Q.    He's the one that didn't work, right?

25      A.    Yes.

1        Q.    Or worked intermittently.

2        A.    Right.

3        Q.    But wasn't she also a little bit guilty of that

4    spending too when she shouldn't have spent?

5        A.    I don't know what you're referring to.

6        Q.    Well, did you know that in the summer of the

7    year 2000 she was involved with somebody by the name of Rick

8    Freeland?

9        A.    Yes.

10       Q.    Did you know that she used the money from the

11   community or money that she earned to furnish his apartment?

12       MR. PATTERSON:   Judge, we don't know that to be true.

13   Mr. Freeland was uncertain as to the source of that

14   particular furniture.

15       THE COURT:   Sustained.

16   BY MR. MARTINEZ:

17       Q.    Did you know that Chris Hashisaki was a witness

18   in this case who indicated that Ms. Andriano paid for that

19   furniture that she gave to Rick Freeland?  Did you know that?

20       MR. PATTERSON:   Again, that misstates the testimony.

21       THE COURT:   Overruled.  Go ahead, answer the question

22   if you can.

23       THE WITNESS:   I have no information about what that

24   woman said on the stand.

25   / / / / /

1   BY MR. MARTINEZ:

2       Q.   But the point being, if we assume, because

3  everybody comes in here and swears to tell the truth, if we

4  assume that's true, that's something you didn't know about,

5  right?

6       A.   If we assume that's true, you are correct.  I

7  didn't know it.

8       Q.   And that would be important to at least get a

9  glimpse of how the money was being handled in that

10  relationship, wasn't it -- wouldn't it be?

11      A.   Yes.

12      Q.   You've told us Mr. Andriano was jealous per her

13  report, right?

14      A.   Yes.

15      Q.   You've indicated that she was the one that was

16  doing the work, right?

17      A.   Yes.

18      Q.   You've indicated that Mr. Andriano was

19  receiving some sort of welfare from the federal government,

20  supplemental security income?

21      A.   No, never said that.  I don't know that.

22      Q.   You don't know that?  Okay.  But you do know

23  that she was working, right?

24      A.   Yes.

25      Q.   You don't think that he would say it's okay for

1    her to go out and give Rick Freeland money, would you?

2         MR. PATTERSON: Wait, wait, wait.  Asking this

3    question --

4         THE COURT:  Sustained.

5         MR. PATTERSON: -- or that question --

6         THE COURT:  Sustained.

7         MR. PATTERSON:  -- calls for speculation.

8         THE COURT:  Sustained.

9    BY MR. MARTINEZ:

10        Q.    Given the fact that you've now labeled Mr.

11   Andriano as somebody who suffers from domestic violence and

12   is the batterer, and you went over all of those

13   characteristics that was in those exhibits.  Do you remember

14   that?

15        A.    Yes.

16        Q.    Do you think that that person that you

17   described to the jury would have said to the defendant,

18   That's all right, go ahead and give Mr. Freeland the

19   furniture with the money you bought.

20        MR. PATTERSON: Objection.  Calls for speculation,

21   beyond the scope of this witness.

22        THE COURT:  Sustained.

23   BY MR. MARTINEZ:

24        Q.    Well, ma'am, you give us a lot of

25   characteristics about Mr. Andriano, right?


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000007522

1          A.     Yes.

2          Q.     And all of them were that he was jealous, he

3     didn't want her hanging around with guys, all that stuff,

4     right?

5          A.     Yes.

6          Q.     And you've also indicated that she wouldn't

7     stand up to him, that she was just trying to, if you will,

8     pacify the situation, right?

9          A.     Yes.

10         Q.     If in fact she gave him furniture and bought

11    and gave some furniture to somebody else, do you think that's

12    a way to pacify the situation in the relationship?

13         A.     I don't know how the two go together.

14         Q.     Well, you said that she would try to obey him

15    the best that she could?

16         A.     Yes.

17         Q.     Disobeying him with regard to something like

18    that, don't you think that that has a tendency to incinerate

19    the situation rather than pacify it in a domestic violence

20    situation?

21         MR. PATTERSON:  Judge, that hypothetical has no --

22         THE COURT:  Sustained.

23         MR. PATTERSON:  -- basis in facts in this case.

24         THE COURT:  Sustained.  Let's move on.

25     / / / / /

1    BY MR. MARTINEZ:

2         Q.    All right.  Doing what she was doing, having an

3    affair, do you think that would incinerate a situation or

4    have a tendency to calm it?

5         A.    Incinerate.

6         Q.    Did you know that -- you indicated that you did

7    know about Mr. Black, right?

8         A.    Yes.

9         Q.    Did you know that one of the things that the

10   defendant told Mr. Black was that her husband had already

11   died of cancer.  Did you know that?

12        A.    I don't believe I know that.

13        Q.    But if in fact that were true, wouldn't that

14   show you that she wasn't this person who was subserviant to

15   Mr. Andriano because she's going out there now and just

16   thinking things out for herself, doesn't that show that?

17        A.    You raised the issue a little while ago about

18   good Christian woman and sexual affairs outside of the

19   marriage.

20        Q.    Okay.

21        A.    And I think what we're talking about now is --

22        Q.    Statements.

23        A.    Excuse me?

24        Q.    Statements?

25        A.    Statements are related to that earlier

1    conversation.

2         Q.    Okay.  But I'm just talking about statements,

3    not physical acts right now.

4         A.    Okay.  Then I have to ask you to repeat your

5    question.

6         Q.    With regard to statements that a person makes,

7    isn't it true that's indicative of what they're thinking most

8    of the time?

9         A.    Yes.

10        Q.    And in fact in this case that's what you're

11   telling us, because she made statements to you and that's

12   what she was thinking, right --

13        A.    Yes.

14        Q.    -- when she made those statements.

15             Making the statement per Mr. Travis Black that

16   her husband had already died of cancer, isn't that an

17   indication of a woman who's free thinking and not going to be

18   subjugated or dominated by somebody?

19        A.    That information came to you from Mr. Black?

20        Q.    Yes.

21        A.    Okay.

22        Q.    In court, actually.

23        A.    Again, I wouldn't know that.

24        Q.    Don't you think that would be important for

25   your report to know then?


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1          A.     What I meant was I don't know what he said in

2    the courtroom.

3          Q.     Well, what I'm saying is that's what he said.

4    Wouldn't that information be important for your report in

5    forming your opinion?

6          A.     Yes.

7          THE COURT:  Why don't we go ahead and take our

8    afternoon break at this point in time.

9               Ladies and gentlemen, we'll go ahead and take

10   our afternoon break at this point in time.  During this break

11   remember the entire admonition I have given you including the

12   fact you're not to discuss this case with anyone, do not let

13   anyone discuss this case with you, keep an open mind.  And

14   we'll see you in -- in about 20 minutes.  We'll be in

15   recess.

16

17               (Recess.)

18

19         THE COURT:  This is cause number CR 2000-096032,

20   State of Arizona versus Wendi Elizabeth Andriano.  The record

21   will reflect presence of the Defendant, Counsel and the jury.

22   Ms. Sharon Murphy is on the witness stand.  We'll continue

23   with the examination by Mr. Martinez.

24               Mr. Martinez?

25         MR. MARTINEZ:  Thank you.


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

```
 1    CONTINUED CROSS-EXAMINATION BY MR. MARTINEZ:

 2         Q.    Ma'am, I just want to get a feel for the

 3    process on which you undertook in reaching your opinion.  My

 4    understanding is you spent a substantial amount of time with

 5    the defendant, correct?

 6         A.    Correct.

 7         Q.    And that it was a total of 20 hours as

 8    reflected by your report, correct?

 9         A.    Correct.

10         Q.    Then you spent another five hours talking to

11    various other people for a total of 25 hours, correct?

12         A.    Correct.

13         Q.    And that as part of your 50 hours that you

14    spent with the defendant, that included filling out the

15    various tests that you administered to her, correct?

16         A.    Correct.

17         Q.    And as I understand it, you do have a PhD, but

18    it's a PhD in social work.  Is that correct?

19         A.    Correct.

20         Q.    You do have a masters, but that's also a

21    masters in social work, correct?

22         A.    Correct.

23         Q.    And your undergraduate degree, I assume, is

24    also in social work?

25         A.    English.
```

1          Q.     English?  And you're not a psychologist,

2     correct?

3          A.     Correct.

4          Q.     You're not a psychiatrist, correct?

5          A.     Correct.

6          Q.     And in fact you, as part of your practice, you

7     do not administer tests to individuals, do you?  For example,

8     the MMPI-2.  You don't administer that, do you?

9          A.     Correct.

10         Q.     What is the MMPI-2?

11         A.     It's a psychological inventory.

12         Q.     Okay.  What do the initials MMPI --

13         A.     Minnesota Multiphasic Inventory.

14         Q.     Okay.  You don't do any of those kinds of

15    tests.  You do other sorts of things, correct?

16         A.     That's correct.

17         Q.     And the test that you administered, for

18    example, we were talking about the wheel and -- power and

19    control wheel, require the person that's being talked to to

20    sit down and actually just write something down on the power

21    and control wheel, right?

22         A.     Right.

23         Q.     In the other tests, the Lethality Test, for

24    example, requires them to answer yes or no, right?

25         A.     Yes.

1       Q.    All the other tests you have, one requires her

2  to put a check mark, correct?

3       A.    Right.

4       Q.    So the bottomline, what I'm seeing, and correct

5  me if I'm wrong, is you're getting a lot of information in

6  this case from Wendi Andriano?

7       A.    Yes.

8       Q.    And is Wendi Andriano here in court today?

9       A.    Yes.

10      Q.    Can you point her out for me?  What's --

11      A.    Sitting next to Mr. Patterson.

12      Q.    What's the color of her top?

13      A.    I can't see it.

14      Q.    Okay.  Why don't you stand up and look at it

15  for me, please?

16      A.    She has a beige top on and I can't tell if

17  that's a brown -- some sort of sweater.

18      MR. MARTINEZ:  Your Honor, may the record reflect the

19  identification of the defendant?

20      THE COURT:  The record may reflect identification of

21  the defendant by the witness.

22  BY MR. MARTINEZ:

23      Q.    And, ma'am, with regard to Ms. Andriano, one of

24  the things that your report doesn't indicate is that Mr.

25  Andriano ever forced her to wear her hair any -- in any

1    fashion, does it?

2              A.    Yes, it does.

3              Q.    What part of the report?  Show me that.

4              A.    I have to think about where that would be.

5              Q.    Show it to me.

6                    (Pause in proceedings.)

7              THE WITNESS:  I don't see it in the report.  It must

8    have been in the collateral interview.

9    BY MR. MARTINEZ:

10             Q.    Bottomline is it's not in the report, right?

11             A.    I didn't see it when I just tried to review it

12   quickly.

13             Q.    So my question is, after reviewing the report,

14   it's not in there, is it?

15             A.    I did not find it.

16             Q.    And since we know that you couldn't find it

17   right now, don't you think that would be an important thing

18   that you would stick in the report because that would show

19   that Mr. Andriano had a lot of control over her?

20             A.    Somehow I have that information, so it must

21   have come to me through a collateral source because I have

22   it.  I know what the information is.

23             Q.    It may have come from a collateral source, but

24   you're fighting my question.  The question is this.  That's

25   such an important thing that the husband can make a woman

1    wear her hair the way he wants because that's a way of

2    control, correct?

3            A.    Yes.

4            Q.    So wouldn't you think you would stick it in

5    your report in bolded letters saying not only was he a person

6    in control, but forced her to wear her hair a certain way?

7            A.    There are a lot of pieces of information that

8    come out in 20 hours.

9            Q.    I understand that.  But you're the expert,

10   right?

11           A.    Yes.

12           Q.    You're the one that has all this education,

13   right?

14           A.    Yes.

15           Q.    You're the one that can enlighten us about the

16   characteristics of domestic violence, correct?

17           A.    Yes.

18           Q.    And you, who are this expert, wouldn't you

19   agree with me that's an important piece to stick in your

20   report?

21           A.    Yes, it's important.

22           Q.    And you didn't find it as you reviewed it

23   today?

24           A.    That is correct.

25           Q.    Now, we were talking about how you conducted

1    your -- your evaluation in this case, and we talked about

2    that you interviewed the defendant and that you interviewed

3    the collateral sources, and we talked a little bit, just to

4    bring you up to speed, we talked about the fact you're not a

5    psychologist or psychiatrist.  It seems to me that in this

6    particular case what you did basically is you spent the

7    majority of your time, 20 hours, with the defendant.  Isn't

8    that true?

9         A.    Yes.

10        Q.    And in that majority of the time, you got her

11   side of the story, right?

12        A.    Yes.

13        Q.    And then it appears in the report, correct?

14        A.    Yes.

15        Q.    Most of it, right?

16        A.    Yes.

17        Q.    Now, I was struck because you were asked to

18   give the characteristics in Exhibit 450 of the abuser.  Do

19   you remember that?

20        A.    Uh-huh.

21        THE COURT:  Is that "yes"?

22        THE WITNESS:  Yes, sorry.

23   BY MR. MARTINEZ:

24        Q.    You went through a lot of them, didn't you?

25        A.    Yes.

1        Q.    And you talked about low impulse control, those

2   sorts of things, right?

3        A.    Yes.

4        Q.    By the way, which book does this come from,

5   these abuser characteristics?  Where do they come from?

6        A.    Many different texts.

7        Q.    In other words, what you're telling us is you

8   put this together based on your education and experience?

9        A.    Yes.

10        Q.    And with regard to the common characteristics

11   of a battered woman, you also put those together based on

12   your experience and education, correct?

13        A.    Correct.

14        Q.    They're not in any one book, right?

15        A.    They're in lots of different books.

16        Q.    With regard again now to how you put this

17   together, one of the things that -- and, again, you gave us

18   the characteristics of the abuser, it begs the question

19   though, ma'am, you never spoke, in your lifetime, while he

20   was alive, to Mr. Andriano, right?

21        A.    Correct.

22        Q.    You don't know what his responses might have

23   been to some of the things that you were told by the

24   defendant?

25        A.    Correct.

1        Q.     You don't know what he might have told you at

2   all, correct?

3        A.     Correct.

4        Q.     And wouldn't you agree that's probably

5   something that's important?

6        A.     It rarely happens that I'm able to do that.

7        Q.     Ma'am, we're having trouble communicating.  Did

8   I ask you whether or not you would do that?

9        A.     It would be important, yes.

10        Q.     So, for example, if you asked him something

11   about the financial aspects of it, he may, for example,

12   dispute that, right?

13        A.     He could.

14        Q.     He could dispute who takes care of the kids,

15   right?

16        A.     Right.

17        Q.     Who cooks him dinner, right?

18        A.     Right.

19        Q.     Who takes care of them when she's out at night

20   two times a week.  He might dispute some of that stuff,

21   right?

22        A.     He might.

23        Q.     Now, getting back to some of the questions that

24   I was asking you and some of the statements that you may or

25   may not be familiar with, one of the things that the -- the

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    feeling that you gave us was that the defendant was very

2    caring for Mr. Andriano as he was going through this battle

3    with  this terminal illness.  That's what you told us, right?

4          A.    Yes.

5          Q.    Did you know, for example, that Donna DeAngelis

6    was her hair dresser?  Did you know that?

7          A.    No.

8          Q.    Did you know that she told her, the defendant

9    told her when asked about this, well, quote, I'm over it.  I

10    wish he would just die so I could get on with my life.  Did

11    you know about that statement?

12          A.    No, I don't.

13          Q.    That, of course, would be important because it

14    would affect what you've just been told about how caring this

15    person is, right?

16          A.    Yes.

17          Q.    We also had somebody by the name of Shannon

18    Sweeney who testified, and she indicated words to the effect

19    that when she began to work at the San Riva apartments, she

20    approached the defendant and the defendant just giggled and

21    said, "You know what?  It's no big deal."  That would be

22    important to consider, wouldn't it?

23          A.    What's no big deal?

24          Q.    The cancer.

25          A.    Oh, yes.  That would be important.

1          Q.     Because that shows she's not the caring person

2    that sort of hovers over him like a -- to take care of his

3    needs, right?

4          A.     If those statements are true, you are correct.

5          Q.     Now, some of the -- again, some of the other

6    things you told us was that she was the individual that was

7    sort of at his -- at his whim.   It was his caprice that

8    counted, right?

9          A.     Yes.

10         Q.     And we have had people, for example, like Jimmy

11   Yost that came in and they've indicated that in their view

12   the defendant wore the pants in the family.   Did you know

13   that?

14         A.     No.

15         Q.     Did you know that Shannon Sweeney described the

16   defendant as being dominant?

17         A.     No.

18         Q.     Did you know that Chris Hashisaki, who she

19   worked with also at the San Riva, described her as being in

20   charge?

21         A.     No.

22         Q.     And that Mr. Andriano's demeanor was sort of

23   always quiet.   Did you know that?

24         A.     No.

25         Q.     That would be important to know as part of your

1  report, wouldn't it?

2          MR. PATTERSON:  Judge, he needs to complete that

3  question the way those statements were made, were these

4  people in public?

5          MR. MARTINEZ:  That's something for redirect, Your

6  Honor.

7          MR. PATTERSON:  It's a misleading question.

8          THE COURT:  I'll sustain the objection.  Restate the

9  question.

10  BY MR. MARTINEZ:

11          Q.   All of those statements were made here in

12  court, they were made in public, these were people she knew.

13  Wouldn't that be something for to you consider, you think?

14          MR. PATTERSON:  Judge, I'm sorry.  Apparently he

15  didn't understand my objection, that they observed her

16  conduct in public.

17          THE COURT:  Sustained.  Restate the question.

18  BY MR. MARTINEZ:

19          Q.   Ma'am, these were observations made in public.

20  Would that be important for you to know that that's how she

21  acted in public?

22          A.   I wouldn't have had access to those people to

23  interview.

24          Q.   I know you didn't have access.  I'm asking you

25  would that be something you would want to know?

1          A.    Sure.

2          Q.    Wouldn't -- it would be important because it

3     shows the dynamics of the relationship, doesn't it?

4          A.    Yes.

5          Q.    It might affect what you ultimately conclude,

6     correct?

7          A.    Yes.

8          Q.    You talked to us a little bit about this

9     birthday incident, the one where this woman made out on

10    the -- the defendant went out for her birthday.  Do you

11    remember talking to us about that?

12         A.    Yes.

13         Q.    And let me see if I've got it right, just so

14    there's no misunderstanding.  You indicated in your report

15    per the defendant that it was actually Mr. Andriano who

16    refused to take her out so she went out with her friends from

17    work?

18         A.    Yes.

19         Q.    Did you know that's been disputed in court by

20    witnesses?

21         A.    No.  I would have no idea about that.

22         Q.    According to you, she was 10 minutes late

23    returning to the apartment and found Joe waiting for her in

24    the office.  That's according to what she told you, right?

25         A.    Right.

1          Q.     Did you know that on the way home that the

2     defendant actually stopped and picked up another man?

3          A.     No.

4          Q.     Per the other witnesses, did you know that on

5     the way home that she was kissing this other man?

6          A.     No.

7          Q.     Now, you also indicate that he had left the

8     children alone and asleep in the apartment so he could wait

9     for her in the office.  You wrote that in your report, didn't

10    you?

11         A.     Yes.

12         Q.     Did you know that there was actually a

13    babysitter in the apartment?

14         A.     No.

15         Q.     And all of this is coming from the defendant,

16    correct?

17         A.     Correct.

18         Q.     You also indicated that Wendi has a cell phone

19    and a wine cooler in her hands.  And then, according to you,

20    he grabbed the phone and smashed it while screaming in her

21    face.  We've had other people who were there, ma'am, who

22    dispute that account.  Would -- would that surprise you?

23         A.     Would it surprise me?

24         Q.     Yes.

25         A.     Yes.

1        Q.    And it surprises you because you've already had

2    a focus, you had your mind set up when you started to do this

3    report, didn't you?

4        A.    No, sir.

5        Q.    Well, we had, for example, Shannon Sweeney who

6    was right there who indicated that there was no screaming.

7    Would that make a difference to your assessment if you knew

8    he wasn't screaming?

9        A.    If I had the information prior to writing the

10   report?  Is that what you're asking me?

11       Q.    Right, Uh-huh.

12       A.    Yes.

13       Q.    And that in fact what happened is he didn't

14   throw the phone at anybody.  He threw it down on the

15   ground -- "he" being Mr. Andriano -- and walked away.

16   That's what the witnesses that were there said.  Did you know

17   that?

18       A.    No.

19       Q.    And that all that he said was "Wendi, what are

20   you doing?"  Did you know that?

21       A.    No, I did not.

22       Q.    And that he walked back to the apartment --

23   according to the witnesses, did you know that he walked back

24   to the apartment and it was she that ran after him saying,

25   "Let me explain, let me explain."  Did you know that?

1        A.    I don't think I know that.

2        Q.    And since you didn't know that, don't you think

3    that would be important since you do place some importance on

4    that event by placing it in your report?

5        A.    Yes.

6        Q.    And it's something that could ultimately or

7    conceivably have even a miniscule effect in how you view the

8    facts?

9        A.    Yes.

10       Q.    You also say that after he smashed the phone

11   with his foot, he then dragged her home.  That's what you

12   wrote, right?

13       A.    Yes, it is.

14       Q.    That's not what you told us yesterday though,

15   right?

16       A.    I don't know.  What are you saying that I said?

17       Q.    Yesterday you said that he took her home.  Do

18   you remember telling us that yesterday?

19       A.    No.  I don't remember that word.

20       Q.    And you were asked -- do you remember being

21   asked specifically, well, was there any physical touching,

22   and you said I remember that he may have grabbed her arm.  Do

23   you remember telling us that late yesterday?

24       A.    I am sorry, but I do not remember that specific

25   comment.

1    Q.    You don't back away from the fact that in your

2    opinion this story, as it was related to you, he dragged her

3    away?

4    A.    Correct.

5    Q.    Now, one of the other times that in addition to

6    her going out, that one of the other times that you reference

7    was the softball game. Do you remember that?

8    A.    Yes.

9    Q.    And with regard to the softball game, it

10   appears the reason the parties got upset with each other was

11   because she said to him, you know, "no, I'm not going to get

12   you a cheese crisp," according to you, right?

13   A.    Yes.

14   Q.    According to your report, she was sick of

15   changing her routine for him and she was going to stand up to

16   him at least on this occasion, right?

17   MR. PATTERSON:  That is not what she testified to.

18   THE COURT:  Overruled.  She could answer the

19   question.  Go ahead, answer the question if you can.

20   THE WITNESS:  I remember asking that and talking

21   about sort of the cheese crisp and the call and Wendi saying

22   "no, I'm not going to stop and change my schedule and go and

23   buy you a cheese crisp."  I remember that.

24   BY MR. MARTINEZ:

25   Q.    Okay.  Well, your report indicates, just so

1    we're clear about the cheese crisp, that, quote, "she asked

2    him to get it himself because he was always interrupting her

3    own schedule to do what he wanted."  Isn't that what your

4    report says?

5              A.    Yes, it does.

6              Q.    That was based on what she told you, right?

7              A.    Correct.

8              Q.    She stood up to him on that occasion, right?

9              A.    Yes.

10             Q.    Wouldn't you agree asking somebody to get you a

11   cheese crisp is a real minor sort of thing?

12             A.    Not necessarily in the context.

13             Q.    So in this context, is it your view that, in

14   this context, it was a big deal?

15             A.    It could have been.

16             Q.    Well, no, no, no.  I'm asking you for your

17   opinion because you did write that?

18             A.    Yes, I did right that.

19             Q.    Right.  And the point of this is that you can't

20   look at discrete acts or events.  We have to look at the

21   whole picture, but this forms a part of the whole picture,

22   right?

23             A.    Yes, it does.

24             Q.    So in looking at this as part of the big

25   picture, that's no big deal.  Is that --

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1     A.    I can't agree with you on that.

2     Q.    So if you can't agree, it is a big deal?

3     A.    It can be a big deal dependent upon the full

4 picture.

5     Q.    So you have the full picture here, don't you?

6     A.    Yes, I do.

7     Q.    So in light of the whole picture, isn't this a

8 big deal that --

9     A.    I'm struggling with my answer, not because I'm

10 choosing to not answer you.  But because I understand

11 domestic violence to mean that, I must look at everything

12 within the context.  This particular incident may or may not

13 have been crucial in her standing up.

14     Q.    Let me put it this way.  One of the things you

15 told us was they paid you a bunch of money for you to come

16 down here and explain to us everything you've done in this

17 case, right?

18     A.    Yes.

19     Q.    You've told us you spent a lot of time,

20 whatever time it is, right?

21     A.    Yes.

22     Q.    And you've also spent a lot of time giving us

23 your qualifications, right?

24     A.    Yes.

25     Q.    And giving us the definition of domestic

1    violence, right?

2            A.    Yes.

3            Q.    So in that world of yours that you now have and

4    that you -- you know about because you're the expert, was

5    that a big deal or was that nothing -- I mean, that's what

6    you're here for, to give us opinions.

7            A.    I would say that it was an important event.

8            Q.    And if it is an important event, ma'am, it was

9    really important that she stood up to him, right?

10           A.    Yes.

11           Q.    So now we have somebody who about a month

12   before his death is standing up to him with regard to

13   important event, right?

14           A.    On this occasion, that is correct.

15           Q.    Now, on this occasion you also indicated that

16   there was a -- a problem when she came home and there was a

17   fight, right?

18           A.    Yes.

19           Q.    And one of the things that you indicated to us

20   was that there was some screaming, accusations about her

21   being with other guys, that sort of thing, right?

22           A.    Yes.

23           Q.    And according to her, according to your report,

24   she tried to pacify him, and rather than pacify him, he

25   dumped some Kool Aid on her, right?

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1        A.    That was one of the things he did, right.

2        Q.    Right.  I'm going on.  And according to you

3    then after the Kool Aid, quote, "he began pounding on the

4    dresser with his fists."  That's what it says, right?

5        A.    Yes.

6        Q.    And punched holes in it, right?  That's what it

7    says, right?

8        A.    Yes.

9        Q.    So according to you, based on what she told

10   you, he started pounding on the dresser with his fist, right?

11       A.    Right.

12       Q.    Let's take a look at that dresser.  I'm going

13   to show you Exhibit 436, and I -- I'd like you to step down

14   so you could just take a look at these.

15       A.    Okay.

16       Q.    You're saying per your report that these gashes

17   here, my characterization, were done with fists, right?

18       A.    I can't see the whole dresser, so I don't know

19   if there's more than this.

20       Q.    Ma'am, these were taken by the defendant's

21   father and these are his pictures and so that's all I have

22   to show you.  But --

23       A.    Okay.

24       Q.    -- based on that, you're saying that this is

25   the dresser and these are the -- you're saying those were

1  fist strikes?

2         A.   If those are the only marks on that dresser,

3  yes, I'm saying that.

4         Q.   Those are the only marks on the dresser, ma'am,

5  and you are saying that, right?

6         A.   Okay.

7         Q.   You also talked to us about a -- a trip that

8  may or may not have taken place to Las Vegas, Nevada.  Do you

9  remember telling us about that yesterday?

10        A.   Yes.

11        Q.   Ma'am, that also isn't in your report, is it?

12        A.   It must have been in a collateral interview

13  because I have the information.

14        Q.   Well, go ahead and take a look at it because

15  we'll proceed after you've had a chance to take a look

16  through your report.

17             (Pause in proceedings.)

18        THE WITNESS:  It's in the collateral interviews.

19  BY MR. MARTINEZ:

20        Q.   Ma'am, so the point is it's not in your report,

21  right?

22        A.   That's correct.

23        Q.   And, again, no one rushed you in the

24  preparation of this report, right?

25        A.   Correct.


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1          Q.     I mean, this was done on September 22nd of

2     2003, correct?

3          A.     Yes.

4          Q.     And the interviews that you did started on

5     March 25, 2003, and went all the way to June 4 of 2003,

6     right?

7          A.     Right.

8          Q.     So looks like it's about three months worth of

9     work, right?

10         A.     Right.

11         Q.     And so the point is is that you weren't

12    restricted in the number of pages that you could write, were

13    you?

14         A.     There was no restriction.

15         Q.     There was no restriction in the information

16    that you could put in there, right?

17         A.     Right.

18         Q.     Yet you -- you took the stand and you told us

19    about this Las Vegas trip and it's not in your report.  Is it

20    because you didn't consider it important enough to put in the

21    report?

22         A.     No, sir.

23         Q.     But it didn't make it to the report, right?

24         A.     I didn't know it then.

25         Q.     So this is other information you've been

1   gathering?

2        A.    This is the collateral interviews that I

3   conducted.

4        Q.    So you prepared your report even though you

5   didn't have all of the information ready to go then.  Is that

6   what you're telling me?

7        A.    No, sir.

8        Q.    This report is premature in its -- it's not

9   well thought out.  Is that what your telling me?

10       MR. PATTERSON:  Judge, objection.  Argumentative.

11       THE COURT:  Overruled.  You can answer the question

12   if you can.

13       THE WITNESS:  I engaged in collateral interviews.

14   The information that I gathered was written up per the

15   collateral interview with that particular person.  So the

16   information is there, but it's in the interview with that

17   person.

18   BY MR. MARTINEZ:

19       Q.    But this report is -- is the complete, if you

20   will, presentation of what you think is important to the

21   answers as to whether or not there was domestic violence

22   here, right?

23       A.    If that were the whole story, I wouldn't have

24   bothered doing collaterals.

25       Q.    Well, ma'am, you wrote a report and it's dated

1    September 22nd, 2003, right?

2         A.    Right.

3         Q.    At the very end on page 22 you give you a

4    summary, don't you?  Don't tell us what the summary is, but

5    you do give us a summary, don't you?

6         A.    Yes.

7         Q.    And on it you basically indicate the same

8    things you told us today, that the defendant is a victim of

9    domestic violence by Joseph Andriano, the same thing you told

10   us today, right?

11        A.    Yes.

12        Q.    So you had already reached that conclusion

13   before you went out and did all these other interviews,

14   right?

15        A.    I had --

16        Q.    The answer is "yes" or "no"?

17        A.    I had ample information.

18        Q.    But you're not answering my question.  My

19   question is you had already reached your conclusion, if you

20   will, in the form of a summary before you did this other

21   collateral interview stuff, right?

22        A.    Actually, the collaterals were before the

23   completion.

24        Q.    Okay.  If they were before the completion,

25   wouldn't you think -- well, they were important, right?

1          A.      Right.

2          Q.      And they were so important that you wrote some

3    of the stuff down, right?

4          A.      Correct.

5          Q.      But it wasn't important enough to be included

6    in the report, right?

7          A.      No, that's not right.

8          Q.      Well, it isn't in the report is it?

9          A.      Perhaps my understanding about what's important

10   and yours is different.

11         Q.      Well, let me tell you what's important.

12   Determination of whether or not there's been domestic

13   violence in this case.  Is it your understanding that's

14   important?

15         A.      That is important.

16         Q.      And one of the things that you indicated to us

17   yesterday that was important to you in reaching that

18   determination was this trip to Las Vegas and the return?

19         A.      Correct.

20         Q.      It didn't make it to this report that includes

21   your conclusion, did it?

22         A.      That is correct.

23         Q.      You also indicated to us that, well, it got to

24   the point where the defendant didn't even choose her own

25   entertainment.  Do you remember telling us that?

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000007551

117

1        A.    I'm sorry.  Can you repeat it?

2        Q.    You told us before it got to the point where

3   the defendant didn't even choose her own entertainment.  The

4   victim chose it or Mr. Andriano chose it?

5        A.    Yes.

6        Q.    You gave us an example, the trips to the lake,

7   right?

8        A.    Yes.

9        Q.    But when you made that statement, you were

10  already aware that the months proceeding all of this she was

11  going out two nights a week to bars.  Didn't you know that?

12       A.    I don't remember writing in my report two

13  nights a week.  I knew she was going out, yes.

14       Q.    He wasn't choosing that for her, was he?

15       A.    No.

16       Q.    In fact he was resistant to that pursuant to

17  the reports that you reviewed, right?

18       A.    Yes.

19       Q.    So when is it that you think that he was

20  choosing her entertainment?

21       A.    Well, the trips to the lake that she had, that

22  was just part of what she needed to do.

23       Q.    Right.  But those were maybe one time a month.

24  Did you know that?

25       A.    I -- no, I don't know that.  I don't know how

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    often they were.

2           Q.    And yet we know that on a weekly basis she

3    would go out at least two times a week?

4           MR. PATTERSON:  What time frame, Judge?

5           THE COURT:  Sustained.

6    BY MR. MARTINEZ:

7           Q.    Right before her -- right in the months before

8    his death, she would go out two times a week.  Did you know

9    that?

10          A.    I don't know that it's two times a week.  I do

11   know that it was the latter part of the relationship, so not

12   the whole relationship.

13          Q.    The people that have come in to testify, and

14   I'm speaking specifically about Shannon Sweeney, Chris

15   Hashisaki, Stephanie Koeppen, the people that went out on

16   with her, indicated it was at least two times a week.  Now,

17   having said that, doesn't that sort of argue against him

18   picking her entertainment?

19          A.    Not for the eight years.

20          Q.    Not asking about the eight years because what's

21   important, partly important, is what was happening there at

22   the end.  Don't you agree that that's important there to --

23          A.    Yes.

24          Q.    Okay.  You just told us she told him no to the

25   cheese crisp.  You told me that, right?

1    A.    I said that was important.

2    Q.    Right.  So you have things important towards

3    the end of his life so they're not entitled to any less

4    weight or any more weight just because they happened months

5    before he passed away, are they?

6    A.    Except you're making it sound like it was the

7    whole eight years she was going out twice a month or week.

8    Q.    No.  I said in the summer, summer preceding his

9    death --

10    A.    Okay.

11    Q.    -- she was going out twice a week?

12    A.    Okay.

13    Q.    Couple that with the fact that this cheese

14    crisp incident, doesn't that indicate she's sort of asserting

15    herself?

16    A.    To some degree, yes.

17    Q.    Okay.  He also indicated that he used the word

18    "fucking" and that he cursed.  Do you remember telling us

19    that?

20    A.    Yes.

21    Q.    And that she found it particularly offensive,

22    correct?

23    A.    Yes.

24    Q.    And I guess what you're telling us is that's

25    not a word that she would use, correct?

1          A.     I think it's the way it's used.

2          Q.     So she has no problem with the word, it's just

3     the way he was using it.   Is that what you're telling us?

4          A.     I have to tell you, I never asked her if she

5     had a problem with the word itself or the way it was being

6     used at her.

7          Q.     So she has -- you don't know if she has a

8     problem with the word.   Is that what you're saying?

9          A.     That's right.

10          Q.     If she did have a problem with just the word,

11     that would mean she didn't use it, right, because she had a

12     problem with it, right?

13          A.     Right.

14          Q.     Okay.  One of the other things that you told us

15     was also in addition to these, this word that she never

16     badmouthed him to people.   Remember telling us that?

17          A.     Yes.

18          Q.     She went to counseling and didn't badmouth him

19     there, right?

20          A.     Correct.

21          Q.     Didn't badmouth him to his -- her parents,

22     right?

23          A.     Right.

24          Q.     Didn't badmouth him to anybody, right?

25          A.     I don't know what transpired between her and

1    Chris because it seemed from her story that Chris knew

2    something, but I don't know if she badmouthed him or not.   I

3    just know that Chris knew something.

4         Q.   Generally speaking, she didn't badmouth him in

5    a public way, right?

6         A.   Right.

7         Q.   There could be a number of explanations for

8    that, right, why she didn't do it, right?

9         A.   Yes.

10        Q.   One of them could be as you asserted was that

11   she was a victim of domestic violence and victims don't

12   badmouth their batterers, right?

13        A.   Often they do not.

14        Q.   That was one of the things you told us or the

15   explanation could be that there was no reason for her to

16   badmouth him, right?

17        A.   That's a possibility.

18        Q.   Just like yours is a possibility, right?

19        A.   Correct.

20        Q.   One of the things you told us was that she

21   didn't stand up to him very much and never told him no very

22   much, right?   You told us that, right?

23        A.   Right.

24        Q.   With regard to that issue, in your report alone

25   there are five or six instances where she does tell him "no,"

1    aren't there?

2           A.    Did you count them?  Because I don't know.

3           Q.    Well, ma'am, no, I'm asking you if you know.   I

4    mean --

5           A.    I don't know if there's five or six.   I'm

6    thinking about the ones you just mentioned.

7           Q.    Well, okay.   The cheese crisp she told him no.

8           A.    Right.

9           Q.    In a sense her refusal was saying I'm standing

10   up to him, right?   That's the same thing as saying no?

11          A.    I don't think that's standing up.

12          Q.    So you think that that sort of behavior means

13   that she is still subserviant and dominant to him?

14          A.    No, sir.  That's not what I meant.

15          Q.    Well, the reason I ask it that way is because

16   you brought out the fact that Mr. Andriano had a -- a girl

17   friend by the name of Shelly.  Do you remember telling us

18   that?

19          A.    Yes.

20          Q.    And that he discussed with Ms. Andriano the

21   fact she had been unfaithful to him?

22          A.    Correct.

23          Q.    And one of the things he added, and you put it

24   in bold in your report, was that, well, never do that to me,

25   right?

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1          A.      Right.

2          Q.      In other words he's dictating to her, he's

3     telling her, don't do that, right?

4          A.      Right.

5          Q.      And if you are a Christian, subservient

6     Christian, whatever term you want to use, person that is

7     underneath him, you won't do it?

8          A.      That's what you would see, yes.

9          Q.      And if you do do it, that's in a sense

10    repudiating him or saying no, you're not going to tell me to

11    do this, this or this.  I'm going to do it my way and this is

12    what I'm going to do?

13         A.      Yes.

14         Q.      And you -- you have two examples of where she

15    had sexual intercourse with men, right?

16         A.      Correct.

17         Q.      And there are many examples of her kissing men

18    on dance floors.  You knew about that, right?

19         A.      I'm not sure I know that.

20         Q.      And you don't know anything about the limo of

21    her kissing anybody in the limo, right?

22         A.      No, sir.

23         Q.      So we have those two examples, and you also

24    told us he asked her to borrow money and she refused.  Do you

25    remember telling us that?

124

1        A.     Are you referring to the time when he asked her

2   to borrow money from his sister and that was over the

3   telephone perhaps?

4        Q.     I'm talking about page 12 of your report. Why

5   don't you take a look at it?

6              I'm sorry. Did I say 12? I meant 16, sorry.

7              (Pause in proceedings.)

8        MR. MARTINEZ:  It's in the middle.

9        THE WITNESS:  Yes, I see it.

10  BY MR. MARTINEZ:

11       Q.     Okay. So that's a third time that she's told

12  him no, right?

13       A.     Yes.

14       Q.     With regard to the Las Vegas trip, do you

15  remember what you told us about that?

16       A.     Yes.

17       Q.     You told us that he called a day early and said

18  come hone and she said, "No, I'm not changing my plans,"

19  right?

20       A.     Yes.

21       Q.     That's another example, right?

22       A.     Yes.

23       Q.     That was in May of 2000, right?

24       A.     I believe that is the right date.

25       Q.     How about the borrowing money? When was that?

1      A.     The borrowing money?

2      Q.     Right.

3      A.     Which time?

4      Q.     Page 16, ma'am.

5      A.     The summer of 2000?  Is that the one?

6      Q.     Okay.

7      A.     Is that the one you're looking at?

8      Q.     That's the one that indicates it, doesn't it?

9      A.     Okay.

10     Q.     And this cheese crisp incident, is that in the

11 Summer of 2000?

12     A.     It was.  I have down one month prior to his

13 death.  That would have been September, right?

14     Q.     Okay.  And then we also have the infidelity

15 that you said was in the Spring of 2000, right?

16     A.     I believe that's true.

17     Q.     And then we also have the infidelity with

18 Travis Black which you indicated we know was in September of

19 2000, right?

20     A.     Yes.

21     Q.     All right.  Then you -- that's at least right

22 or shortly before his death during the summertime, right?

23     A.     Yes.

24     Q.     But even before that, she had been able to tell

25 him no, hadn't she?

1      A.    Yes.

2      Q.    This issue about him and the gun, do you

3  remember that?

4      A.    Which time?

5      Q.    The one where, according to her, he threatened

6  to kill the silent partner?

7      A.    Yes.

8      Q.    And according to your narration as presented to

9  you by her, he even pointed the gun at her, right?

10     A.    Yes.

11     Q.    And for whatever reason, she said I'm -- even

12  though you tell me no, I'm still doing it, right?

13     A.    Yes.

14     Q.    And then you said well, there could be three

15  reasons why or two reasons why she did that, right?

16     A.    Yes.

17     Q.    Do you remember that?

18     A.    Yes.

19     Q.    One of them was a moral issue, right?

20     A.    Yes.

21     Q.    The other one she didn't care or --

22     A.    She didn't believe him.

23     Q.    There's a third reason though, right, which

24  could be she wasn't scared of him, right?

25     A.    That's what I meant by didn't believe him,

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000007561

1    didn't believe he would do it.

2         Q.    That's different than not being scared of him,

3    right?  You can believe they're going to do it, but you're

4    just not scared of them, right?

5         A.    Okay.  Yes.

6         Q.    That's a sign of strength, isn't it?

7         A.    Yes.

8         Q.    And what date did that occur?

9         A.    I don't know.

10        Q.    Why don't you take a look at it and let me know

11   so we could get the dates.

12              (Pause in proceedings.)

13        THE WITNESS:  It's on page 9 and it's -- I don't

14   have a clear date.

15   BY MR. MARTINEZ:

16        Q.    Let's go to page 8 and let me see if that works

17   for you, where it says, we're at July 1996, Joe required

18   angioplasty?

19        A.    Right.

20        Q.    Would that have been 1996 because that's when

21   we're talking about?

22        A.    Yeah.  I don't -- I don't know if that was

23   still '96.  That's my only question and I don't see another

24   date.

25        Q.    So it could be '97, right?

1        A.      Could be.

2        Q.      And so even in '97 up to right before his

3   death, she was telling him "no," right?

4        A.      She told him "no" then, yes.

5        Q.      The other question that I have for you is, and

6   you -- this involves the gun.  There was no police report

7   filed with regard to that, was there?

8        A.      When he pointed the gun at her?

9        Q.      Right.

10       A.      Right, there was no police report.

11       Q.      Also, you told us about the situation that she

12  relayed to you about this person who was going to repossess

13  the van.  Do you remember about that?

14       A.      Yes, I do.

15       Q.      And one of the things you told us was that he,

16  Mr. Andriano, ran after the person while he was driving away

17  from the van, right?

18       A.      Yes.

19       Q.      And he was able to catch up to the driver,

20  right?

21       A.      Yes.

22       Q.      And when he caught up to him, he pointed a gun

23  at him, right?

24       A.      Yes.

25       Q.      The person was already driving away, right?

1      A.   Yes.

2      Q.   Even though the person was in a car and could

3   easily outrun or outbeat Mr. Andriano, he still, it's your

4   understanding, that he stopped the car?

5      A.   That is my understanding.

6      Q.   And were you able to find any police report as

7   to that incident?

8      A.   No, sir.

9      Q.   How about the incident where Mr. Andriano

10   supposedly or allegedly ran over another individual and

11   caused great bodily harm with his truck?

12      A.   That was an incident that was reported to Wendi

13   as I recall.

14      Q.   Right.  And then she related it to you?

15      A.   Correct.

16      Q.   Were you able to find a police report with

17   regard to that incident?

18      A.   No.

19      Q.   It's fair to say, ma'am, there were no police

20   reports that you were able to come up with -- for any of Mr.

21   Andriano's behaviors?

22      A.   Correct.

23      Q.   And this thing about him spinning his tires and

24   causing rocks to strike windows, you seem to place some

25   importance on that, didn't you?

1  A. It was important enough to get into the report.

2  Q. Right. And to you it was important because

3 apparently the rocks went flying into the Circle K window,

4 right?

5  A. Right.

6  Q. How does that have anything to do with domestic

7 violence? If she's not there, you know, we don't -- it's

8 anecdotal, isn't it actually?

9  A. Yes. A lot of those things were anecdotal.

10 They were told to Wendi at the onset, I believe, of the

11 relationship probably to scare her, to keep her afraid.

12  Q. The point is this. You're indicating they had

13 motives to ask her to stay away, right?

14  A. It seems that way, right.

15  Q. There was malevolent purpose out there that

16 didn't want her to be with Mr. Andriano?

17  A. Right.

18  Q. But there were no reports of windows being

19 broken by Mr. Andriano, are there?

20  A. True.

21  Q. There's no similar reports of him chasing

22 boyfriends with a bat, is there?

23  A. True.

24  Q. Ma'am, I want to talk to you how important you

25 think this religion is to her because you indicated part of

1    your report that the way a person is raised is very

2.   important, right?

3           A.    Correct.

4           Q.    You indicated to us early on she went to 91st

5    Psalm school, not initially, but after she was getting older,

6    right?

7           A.    Yes.

8           Q.    You also indicated she ran away when she was 15

9    years of age.

10          A.    Right.

11          Q.    Who did she run away with?

12          A.    A girlfriend.  I don't know who.

13          Q.    Isn't it true she actually stayed at that

14   girlfriend's house?

15          A.    Yes.

16          Q.    How long did she stay away for?

17          A.    I'd have to look back.

18          Q.    Go ahead --

19          A.    I don't know.

20          Q.    -- please.  It's toward the beginning of your

21   report.

22                    (Pause in proceedings.)

23          THE WITNESS:  You -- are you referring to page 3

24   about the middle, fourth and fifth line?

25   BY MR. MARTINEZ:

1      Q.    Yes.

2      A.    Doesn't say how long.  It just says that she

3  was 15 and she recalls staying at a friend's home.

4      Q.    But she actually stayed away at the friend's

5  house.  It wasn't like she was walking down the road, her mom

6  saw her and said come on back.  That's not what she related,

7  right?

8      A.    My recollection is only what I have written

9  here that she recalled staying at the friend's home.

10     Q.    Okay.  And she did go to this religious school

11 until she graduated at the age of 18 in 1987, correct?

12     A.    Right.

13     Q.    So she was embued with her learning in her,

14 correct?  That's something very important to her, right?

15     A.    Right.

16     Q.    Being a good Christian woman, right?

17     A.    Right.

18     Q.    Being whatever that entails.  I mean, being a

19 good mother, I guess, right?

20     A.    That would be part of it.

21     Q.    Okay.  Being a good wife, right?

22     A.    Right.

23     Q.    Being a good, I don't know, person generally in

24 society and not lying and cheating, right?

25     A.    Right.

1          Q.    Ma'am, how is it that you square that fact that

2     here we have a situation where we have somebody that was

3     brought up that way, okay, and then we have somebody who is

4     doing some of the things that we've described?  Wouldn't you

5     agree that's not consistent?

6          A.    You've described a lot of things that I don't

7     have knowledge about.

8          Q.    Well, let's do some of the things you do have

9     knowledge about.

10         A.    Okay.

11         Q.    You know about Rick Freeland, right?

12         A.    Yes, I do.

13         Q.    That's infidelity?

14         A.    Yes.

15         Q.    According to her father, that comes from

16    Exodus.  It's one of the ten commandments, okay?

17         A.    Okay.

18         Q.    She was brought up in a religious home, right?

19         A.    Yes.

20         Q.    There should be no doubt she knew that one,

21    right?

22         A.    Yes.

23         Q.    How could you square that then?  Is she just

24    using religion as a crutch when it benefits her?

25         A.    That is not how I saw or heard her story at

1    all.

2         Q.    Well, you would agree that infidelity is

3    something that is not sanctioned by the Christian religion?

4         A.    I would agree with that, yes.

5         Q.    Saying there is a police report when there

6    isn't, basically being untruthful, that is something not

7    sanctioned by the Christian faith?  If you know.

8         MR. PATTERSON:  Judge, again, that's not based upon

9    any testimony --

10        THE COURT:  Sustained.

11        MR. PATTERSON:  -- we have in this --

12        THE COURT:  Sustained.  Ask your next question.

13   BY MR. MARTINEZ:

14        Q.    Well, Mr. Ochoa indicated in the Bible one of

15   the things they don't condone is lying and cheating.  That's

16   what he told us.  You told us she was raised on the Bible.

17   Even you agree that having that as a precept, that just

18   doesn't square?

19        A.    Hard to comprehend.

20        Q.    But it does show that it is a woman who can

21   stand up to authority, doesn't it, right?

22        A.    When you talk about the affairs, my

23   understanding of both of them is that they were done in

24   secret.  If she had wanted to stand up to her husband, she

25   might have let him know that she was doing it.


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    Q.    But I thought in the Christian faith God knows

2    everything, ma'am.  Isn't that what the Christian faith

3    holds?

4    A.    I'm sorry.  I was talking about Joe.

5    Q.    I'm talking about her selective use of the

6    Christian faith.  Isn't that what we have here?

7    A.    She did it, you're right.

8    Q.    One of the things that you showed to us earlier

9    was this power and control wheel.  This is Exhibit 448.

10    A.    Yes.

11    Q.    And you asked her to complete it, didn't you?

12    A.    Yes.

13    Q.    And she wrote some things on it, didn't she?

14    A.    Yes.

15    Q.    How come the copy that I have is different than

16    yours?  Is the power and control wheel something you just

17    could put whatever you want on it?

18    A.    No.  When I handed that out, I said that the

19    one that we had on the screen --

20    Q.    Uh-huh.

21    A.    -- had, first of all, was blank --

22    Q.    Right.

23    A.    -- and it had the different examples of

24    violence around the outside.

25    Q.    Right.

1      A.    But that the interior --

2      Q.    Right.

3      A.    -- was the same, intimidation, those eight

4   takes.

5      Q.    Are you sure the interior is -- are you as

6   positive of that as you are of your opinion today that this

7   is a domestic violence situation?

8      MR. PATTERSON:  Objection.  Argumentative, compound,

9   multiple questions.

10      THE COURT:  Sustained.  Restate the question.

11   BY MR. MARTINEZ:

12      Q.    Are you as positive of that conclusion about

13   the power and control wheel as you are about your conclusion

14   involving domestic violence in this case?

15      A.    Would you like to show it to me?

16      Q.    No.  I'm asking you a question about how

17   positive you are of your -- or how strong you are in favor of

18   your conviction?

19      A.    The power and control wheel that we tried to

20   show was very unclear.  I knew that it was unclear and I

21   wanted to have another copy so I found another copy that had

22   the white background rather than the black.  Did I check to

23   see if it was the same exact internal consistency?  No,

24   because I assumed the power and control wheel was the same

25   power and control wheel, just like this.  I do know there's

1    multiple variations.

2          Q.    Ma'am, you're the expert.  We don't know

3    anything.  We're trying --

4          A.    I know that.

5          Q.    The point is this.  You gave us a power and

6    control wheel in Exhibit Number 448, right?

7          A.    Uh-huh.

8          THE COURT:  Is that a "yes"?

9          THE WITNESS:  Yes.

10   BY MR. MARTINEZ:

11         Q.    And you talked about all of the factors that

12   were inside there.  You went over them with Mr. Patterson,

13   didn't you?

14         A.    Right.

15         Q.    And you said that's what applied to this case,

16   right?

17         A.    Yeah.

18         Q.    And in fact this -- one of the things that was

19   used -- that is used, because women who have been victims of

20   domestic violence help police or social workers put it

21   together, right?

22         A.    Correct.

23         Q.    Right.  But you're not sure as you sit there

24   that the same power and control wheel that I have that she

25   filled out is the same internally, are you?

138

1          A.     No, because I can't see it.

2          Q.     But the point is, if this is going to be a

3     valid test, ma'am, shouldn't you think that the power and

4     control wheel should stay the same so that you could go from

5     one to the other case so that you could compare and say, you

6     know what, yeah, this does fit the power and control or no,

7     this doesn't?

8          A.     But you have the real one that was used with

9     her.

10         Q.     Ma'am, I'm asking -- the point I'm trying to

11    make with you is that it appears that the power and control

12    wheel changes with whatever you want to put in the slices of

13    the pie, doesn't it?

14         MR. PATTERSON:  Judge, it appears fair.  He needs to

15    show her what he is talking about and let her make a

16    comparison.

17         THE COURT:  Overruled.  Go ahead, answer the question

18    if you can.

19         THE WITNESS:  There's multiple versions of the power

20    and control wheel, but they're all very basically the same.

21    They were all designed by that group in Duluth.  You have the

22    one that she filled out on your table.

23    BY MR. MARTINEZ:

24         Q.     And this power and control wheel that you have

25    in front of us is not normed then, Exhibit 448, is it?

1      A.    I don't know because I don't know how it's

2   different.

3      Q.    Well, no, I'm asking you.  You presented this

4   for the jury's consideration.  Exhibit 448, is that a normed

5   power and control wheel?  Is that something that's been

6   normed?  Is there a standard?

7      A.    Do you have -- I know you have it.  May I see

8   the one that she filled out?

9      Q.    Ma'am, I'm just asking you if the one you

10  presented to the jury is normed.  That's all I'm asking.

11      MR. PATTERSON:  Judge --

12      THE WITNESS:  These are all the same things.

13      THE COURT:  Hold on a second.  Go ahead, answer the

14  question.

15      THE WITNESS:  It's the same.

16      THE COURT:  Ask your next question.

17  BY MR. MARTINEZ:

18      Q.    I take that to be a "yes"?

19      A.    Yes.

20      Q.    Okay.  And how can it be normed then if they

21  are different?  I will now show you the other one.

22              Okay.  I'll read the pieces of the pie for

23  you, okay?

24      A.    All right.

25      Q.    Emotional abuse.  Is it on there?

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1       A.      Using emotional abuse is on here.

2       Q.      So the answer is "yes"?

3       A.      Correct.

4       Q.      Isolation, is that on there?

5       A.      Using isolation is on here, correct.

6       Q.      Intimidation?

7       A.      Yes.

8       Q.      Using male privilege?

9       A.      Yes.

10      Q.      Threats?

11      A.      No.

12      Q.      Using children?

13      A.      Yes.

14      Q.      Sexual abuse?

15      A.      No.

16      Q.      Economic abuse?

17      A.      Yes.

18      Q.      And I don't know if I asked you emotional

19  abuse.  I think you said yes?

20      A.      Yes, I did.

21      Q.      Okay.  If I may have that back so you could

22  take a look at it.  This is Exhibit Number 453.

23              (Pause in proceedings.)

24      THE WITNESS:  So the parts that are missing from

25  this one are threats and sexual abuse.

1    BY MR. MARTINEZ:

2         Q.    Okay.  And you administered others that were

3    substituted onto Exhibit Number -- what's the Exhibit Number?

4    448?  What are they -- what is there that weren't here in

5    Exhibit 453?

6         A.    I don't know.  Can I read them out to you?

7         Q.    Why don't you make a comparison, please.

8              (Pause in proceedings.)

9         THE WITNESS:  On the one today there is one called

10   minimizing, denying and blaming.

11   BY MR. MARTINEZ:

12        Q.    Okay.

13        A.    And using coercion and threats.

14        Q.    Okay.  Let me go ahead and have those back,

15   please.

16              I want to talk to you a little bit about this

17   power and control wheel, and then we'll talk about each of

18   these aspects to see what is met and what is not met.  I'm

19   going to use Exhibit Number 453 as my guide because it

20   appears that has some writing on it.  You would agree that

21   the defendant wrote those, right?

22        A.    Yes.

23        Q.    And let's go up here to this.  It's called

24   emotional abuse.  And if you need to take a look at it, let

25   me know, okay?

1        A.    Are you asking me for her answer?

2        Q.    No.  I'm asking you whether or not that piece

3   of the pie as set out in Exhibit 453 is emotional abuse?

4        A.    I -- obviously, I have to see it.

5        Q.    Okay.

6        A.    Correct.

7        Q.    And what does it say that emotional abuse is?

8        A.    Putting her down or making her feel bad about

9   herself, calling her names, making her think she's crazy,

10   mind games.

11        Q.    I'm going so show you what's already been in

12   evidence as Exhibit Number 226.  You may want to step down

13   and look at this.  The outside of the envelope says -- can

14   you see that?

15        A.    Yes.

16        Q.    What does it say, ma'am?

17        A.    Wendi.

18        Q.    The inside says -- I want you to read the whole

19   thing to me, okay?

20        MR. PATTERSON:  Judge, the exhibit speaks for itself.

21        THE COURT:  Just read it silently and then ask your

22   question.

23             (Pause in proceedings.)

24   BY MR. MARTINEZ:

25        Q.    Have you read that part, ma'am?

143

1          A.    Yes.

2          Q.    Is -- this was based on what we're going to see

3    on the inside, the birthday card that was given by Mr.

4    Andriano to Mrs. Andriano that was found in her closet,

5    okay?

6                (Pause in proceedings.)

7    BY MR. MARTINEZ:

8          Q.    All right.

9          A.    Okay.

10         Q.    Why don't you go ahead and have a seat.  If I

11   may have the power and control wheel.

12              MR. PATTERSON:  What was that exhibit number again,

13   Judge?

14              THE COURT:  That was Exhibit 226.

15              MR. MARTINEZ:  That is correct.

16              MR. PATTERSON:  Thank you, sir.

17   BY MR. MARTINEZ:

18         Q.    Do you think that card is putting the defendant

19   down?

20         A.    At the moment in time it was written, no.

21         Q.    Do you think that's a form of emotional abuse?

22         A.    No.

23         Q.    Wouldn't you agree that what people do in

24   moments in time is an indication of what they think?

25         A.    In that moment of time, yes.

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1      Q.    But it is an indication, right?

2      A.    Yes.

3      Q.    It could be an indication of what they were

4    thinking for months previously too, couldn't it?

5      A.    I have no idea.

6      Q.    It could though, right?

7      A.    It could, yes.

8      Q.    It could also be what we're thinking months

9    later, right?

10     A.    It could.

11     Q.    And just so that we're fair to you, it does say

12   it's from Joe, right?

13     A.    Yes.

14     Q.    So then let's go up here to that power and

15   control wheel.  And on top of emotional abuse, since it

16   doesn't seem to fit the definition of putting her down, why

17   don't we put it up here and say -- call it the I love you

18   card.

19     A.    But it does say putting her down or making her

20   feel bad about herself.

21     Q.    Ma'am, you would agree, and I think you told

22   us, 15 percent of the people that are victims of domestic

23   violence are men, aren't they?

24     A.    Approximately, yes.

25     Q.    Well, do you think that having an affair is

1    akin to putting him down or making him feel bad about

2    himself?  Feeling inadequate?

3         A.    Could.

4         Q.    Okay.  Okay.  So how about we put that in here

5    for Mr. Andriano.  And -- but the wife is having not one but

6    two affairs.

7              Let's also talk about some of her descriptions

8    of him, things like "he's gross and icky," and "I don't want

9    to have sex with him."  Do you think that's something that

10   would put him down or make him feel really bad about himself?

11             MR. PATTERSON:  Judge, there's no evidence that she

12   stated that to the decedent.  It misstates the evidence.

13             THE COURT:  Sustained.

14   BY MR. MARTINEZ:

15        Q.    Well, ma'am, one of the things that we have in

16   this particular case, you told us this, was that she didn't

17   want to have sex with him, right?

18        A.    Correct.

19        Q.    And one of the reasons that you previously

20   agreed that she wouldn't want to have sex with him was that

21   he was gross or icky?

22        A.    No, sir.  I never said that.  I don't know that

23   information.

24        Q.    Okay.  How about if we go back to putting

25   her -- him down or making him feel bad about himself.  How

1    about her turning him down a constant basis.  You think that

2    made him feel good?

3              MR. PATTERSON:  Judge, again, there's no evidence --

4              THE COURT:  Sustained.

5              MR. PATTERSON:  -- of that.

6              THE COURT:  Sustained.  Let's move on.

7              MR. MARTINEZ:  I'm going to put that right here,

8    refuse another --

9              MR. PATTERSON:  I'm going to object because it's not

10   related from this witness.

11             MR. MARTINEZ:  There was a refusal on her part to

12   have sex with him.

13             MR. PATTERSON:  There's no evidence of that, Judge.

14             THE COURT:  Wait.  She could answer the question.

15   Answer the question if you can.

16             THE WITNESS:  I know there was at least one refusal,

17   the incident with Max the dog.

18   BY MR. MARTINEZ:

19        Q.    You -- let's take a look at your report,

20   ma'am.  Page 17, just so we could get it straight, ongoing

21   sexual abuse.  I want you to read with me.  Ready?  Ready?

22        A.    Are you talking about out loud?

23        Q.    I'm going to read it.  It says Joe insisted on

24   daily sex even though --

25             THE COURT:  Hold on a second.

1          MR. PATTERSON:  Objection.  This is improper

2     impeachment.

3          THE COURT:  Sustained.

4     BY MR. MARTINEZ:

5          Q.    Part of your report says that he insisted on

6     daily sex even though Wendi let him know she did not want to

7     participate.  That's what it says, right?

8          A.    That's correct.

9          Q.    If we put that in here, did not want to

10    participate in sex, okay?

11               Let's continue on with this power and control

12    wheel that we have here.  The upper left says isolation.  Why

13    don't we go ahead and take a look at it.

14         A.    Do you want me to read it?

15         Q.    Does it say that?

16         A.    Yes.

17         Q.    And what the controlling -- what does she --

18    who she sees and talks to, where she goes.  If I may have

19    that back?

20               We've already talked about in controlling, what

21    she does.  We've already talked that she went out, at least

22    in the summer right before his death, she went out twice a

23    week to bars.  We've talked about that?

24         A.    Yes.

25         Q.    So we have that up there.  That's not him

1    controlling her, right?

2         A.    Correct.

3         Q.    And also says controlling, what she does, who

4    she sees.  He couldn't control her seeing these men could

5    she?

6         A.    No.

7         MR. PATTERSON:  Objection.  Move to strike.  There

8    was no evidence introduced that he was aware --

9         THE COURT:  Sustained.

10        MR. PATTERSON:  -- of the contact with Mr. Freeland

11   and Mr. Black.

12        THE COURT:  Sustained.

13   BY MR. MARTINEZ:

14        Q.    You would agree based on your discussions with

15   her that's what happened?

16        A.    Say it again to me.

17        Q.    That she had affairs with Rick Freeland and

18   Travis?

19        A.    Yes.

20        Q.    Okay.  Let's call it seeing other men.  Social

21   contact.

22        MR. PATTERSON:  Again, it takes it out of context,

23   Judge.  This was never communicated to the decedent, and

24   that's a critical basis for her opinion.

25        THE COURT:  Let me see Counsel here at the bench.

1            (The following proceedings were held at the

2   bench:)

3

4            THE COURT:  Go ahead.

5            MR. MARTINEZ:  It doesn't matter if it was

6   communicated to him.  She's given an opinion that this is

7   domestic violence because in Exhibit 453 she meets all of

8   those prongs.  I can show that --

9            THE COURT:  I think you're talking about the issue of

10  isolation and if in fact she was having these relationships I

11  think is the point she's not being isolated.  Isn't that the

12  point you're trying to --

13           MR. MARTINEZ:  That's what --

14           MR. PATTERSON:  That's not what I'm getting from this

15  line of questioning.

16           THE COURT:  That's the way I take it.

17           MR. PATTERSON:  If that's where it's going.  It's my

18  belief he's suggesting somehow that he's the victim because

19  of this conduct.

20           MR. DELOZIER:  Not --

21           MR. PATTERSON:  That's exactly where he's going.

22           THE COURT:  Hold a second.  If it's just what I just

23  discussed, I'll allow you to state the question.  I don't

24  want to go into the area that Mr. Patterson --

25           MR. MARTINEZ:  Right.

1          THE COURT:  -- is discussing here, okay?  If it's

2    going to the issue of the fact she was having these

3    relationships that's fine, but I don't want it to converge on

4    whether he knew or --

5          MR. MARTINEZ:  I'm not going ask her whether he knew

6    or not.  What I'm doing, as the Court has probably already

7    figured out, I'm showing she doesn't meet this power and

8    control wheel.

9          THE COURT:  Right.

10          MR. MARTINEZ:  And second of all what I'm saying is

11    that he does, but not because of what I'm putting outside but

12    because of what I'm putting inside.  And that's just to say

13    that the test is invalid, it's not normed.

14          THE COURT:  Go ahead.

15          MR. PATTERSON:  That's why he's confusing apples and

16    peaches here.  He needs to go one way, only one way, and he

17    couldn't make these inferences that are not supportable by

18    the evidence adduced at this trial.

19          THE COURT:  Okay.  Let's continue along the lines

20    I've discussed.

21          MR. MARTINEZ:  Right.  But I -- you're going to allow

22    me, I don't want to, you know, seem I'm not following your

23    order, what I'm saying is I want to still continue talking

24    about some of the things that are in her report about him as

25    told her by Ms. Andriano.  And I can stick them anywhere I

1    want to, she could agree or disagree to show how valid that

2    test is.

3              THE COURT:  I know, but the way you're asking that

4    question at times is mixing apples and things the way Mr.

5    Patterson suggested.

6              MR. MARTINEZ:  I see what you're saying.

7              THE COURT:  Make it clear and you can ask it.

8              MR. MARTINEZ:  I'll do that.

9

10             (The following proceedings were held in open

11    court:)

12

13             THE COURT:  Mr. Martinez.

14    BY MR. MARTINEZ:

15        Q.    What we're trying to do is see whether or not

16    she meets this power and control wheel.  She was, according

17    to her own admission, seeing other men, right?

18        A.    Yes.

19        Q.    And when she would go out to these bars, he did

20    not tell her which friends to take, did he?

21        A.    No.

22        Q.    Okay.  So she was free to choose whatever

23    friends who would go.

24             One of the other things --

25             MR. PATTERSON:  Judge, is that a question or a

1    statement?

2          THE COURT:  Is that a question?

3          MR. MARTINEZ:  She answered it, so I'll leave it

4    there.

5          MR. PATTERSON:  Well, the statement she was free to

6    see -- choose whom she went out with --

7          THE COURT:  Is that a question?

8          MR. MARTINEZ:  It is a question.

9          THE COURT:  What is the answer if you could answer

10    it?

11          THE WITNESS:  Could you -- could I get it as a

12    question?

13          THE COURT:  Why don't you restate the question.

14    BY MR. MARTINEZ:

15        Q.  With regard to going out two times a week, did

16    he dictate to her who she could go with, which women she

17    could go with?

18        A.  There were a couple things in there.  I don't

19    know that she went out two times a week.

20        Q.  Assume that for a hypothetical that's what's

21    been testified to in court.

22        A.  Okay.  Did he tell her who she could go with?

23    You know, I don't know the answer to that.

24        Q.  It could be, I want you to go out with Shannon

25    Sweeney?

1    A.    He could very well have dictated that employee

2  group as her group.

3    Q.    Right.  But since you don't know if he dictated

4  that group, you can't use it as part of the power and control

5  wheel to say that he isolated her and said these are the

6  friends that you need to go out with, right?

7    A.    Right.  There's other examples.

8    Q.    Right?

9    A.    I'm -- I'm just talking about these people that

10  she used to go out with.

11    Q.    All right.  Now, with regard to isolation, it

12  does say controlling what she does, who she sees and talks to

13  and where she goes.  When you testified yesterday, you

14  indicated to us that Mr. Andriano was dependent.  Do you

15  remember telling us that?

16    A.    Yes.

17    Q.    Okay.  So if somebody is dependent, that means

18  that -- well, what is your definition of dependent?

19    A.    He needed her.

20    Q.    He needed her?

21    A.    For a variety of reasons.

22    Q.    He didn't need other women, didn't need

23  anything else.  He needed her?

24    A.    I don't know if he needed anything else.  I

25  know he needed her.

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

154

1        Q.      Okay.  So it was your term that he was

2   dependent.  Additionally, we know that he wasn't working,

3   right?

4        A.      Right.

5        Q.      Didn't have a job for most of the time, right?

6        A.      Right.

7        Q.      We know that he went to the lake maybe once a

8   month, right?

9        A.      I know he went to the lake.

10       Q.      You don't have any examples of him later on as

11  death approaches of him going out, do you?

12       A.      He went out the weekend that she had the one

13  night affair with Travis.

14       Q.      So you think that the night that she had the

15  affair with Travis, he was out?

16       A.      Yes.  It may have been at the lake, but he

17  wasn't home.  He was out.

18       Q.      And he was out doing whatever it is that he

19  does, right?

20       A.      Right.

21       Q.      Ma'am, do you know that he had just had

22  chemotherapy that day and that he probably -- that he was

23  probably --

24       MR. PATTERSON:  Judge, misstates the evidence.

25  There's no testimony that that day he had chemotherapy.

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

155

1          THE COURT:  The jury can rely upon their collective

2    memory.  Go ahead, finish the question.

3    BY MR. MARTINEZ:

4          Q.    You're telling me even though he had

5    chemotherapy that day, he was out doing something.  That's

6    what you're telling me, right?

7          MR. PATTERSON:  Judge, how could she answer that

8    question?

9          THE COURT:  I'll sustain the question -- or I'll

10   sustain the objection.  Let's move on.

11   BY MR. MARTINEZ:

12         Q.    Did you know he had chemotherapy that day, yes

13   or no?

14         MR. PATTERSON:  Judge, there's no evidence in that

15   regard.

16         THE COURT:  The jury can rely upon their collective

17   memories.  You can answer the question if you can.

18         THE WITNESS:  No, I did not know he had chemotherapy

19   that day.

20   BY MR. MARTINEZ:

21         Q.    And you do know though he was terminally ill

22   though, right?

23         A.    Correct.

24         Q.    So we have an individual who is not employed,

25   right?

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000007590

1           A.      Right.

2           Q.      Working or -- chemotherapy or is ill -- how

3    about that, ill?

4           A.      Okay.

5           Q.      And you did talk to the defendant.  He didn't

6    have any other women that he had sex with, did he?

7           MR. PATTERSON:  Objection.

8           THE COURT:  Restate the question.

9    BY MR. MARTINEZ:

10          Q.      Was he having an affair?

11          THE COURT:  Wait.  Who are you talking about?

12          MR. MARTINEZ:  Mr. Andriano.

13          THE WITNESS:  To my knowledge he was not having an

14   affair.

15   BY MR. MARTINEZ:

16          Q.      Well, you asked her in one of your tests,

17   didn't you?

18          A.      If he was?

19          Q.      Yes, uh-huh.

20          A.      I could have.

21          Q.      Well, in one of the tests she filled out, isn't

22   that one of the questions you asked her in one of the tests

23   she filled out?

24          A.      I don't remember.

25          Q.      Let's take a look at it then.  Just -- this is

1    what you labeled Abusive Observation Checklist?

2         A.    Right.

3         Q.    I'm going to refer you to the bottom of page

4    161.  It says engaged in extra marital affairs.  There's a

5    number there for her, right?

6         A.    Yes.

7         Q.    You ask about the partner there too, for him?

8         A.    Right.

9         Q.    And for him he did not engage in any

10   extramarital affairs, right?

11        A.    Correct.

12        Q.    According to her she did, right?

13        A.    Right.

14        Q.    She didn't tell you she had two extra marital

15   affairs, did she?

16        A.    She told me about Rick Freeland, and in the

17   addendum she told me about Travis.

18        Q.    Right.  I -- you know, I'm not talking about

19   the addendum.  I'm just showing you the abusive objection

20   checklist which she filled out, according to you, in April.

21   Take a look.  It says that engaged in nondangerous extra

22   marital affairs, there's a number there right by that for

23   her?

24        A.    Yes.

25        Q.    Okay.  If I may have that back.  How many did

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    she answer that she had?

2         A.    One.

3         Q.    That's not true based on your subsequent

4    conversations with her, right?

5         A.    Right.

6         Q.    And, again, that illustrates the point that

7    I've been trying to make to you, that these tests, if you

8    will, that you gave to her are only as valid or only as good

9    as the person who's answering them, right?

10        A.    Yes.

11        Q.    In other words, there's even a term for it in

12   the scientific -- in your community, isn't there, for this

13   sort of type of test that we're talking about, this

14   phenomenon I'm talking about, isn't there?

15        A.    I don't know what you're talking about.

16        Q.    Are you familiar with the term called secondary

17   gain?

18        A.    Yes.

19        Q.    What is secondary gain?

20        A.    She has something to gain by lying.

21        Q.    In this particular case, we do have her not

22   being totally truthful about the number of affairs.

23             MR. PATTERSON:  Objection, Judge.  It depends on the

24   definition of affair.

25             THE COURT:  Sustained.

1    BY MR. MARTINEZ:

2         Q.    Nowhere in any of the documentation that you

3    provided to me, including this, does it ever say she had

4    sexual intercourse with two men out of marriage, does it?

5         A.    That is correct.

6         Q.    Let's keep on with the power and control wheel

7    to see whether or not she matches up under economic abuse.

8    And that's Exhibit 453.  What is that definition?

9         A.    Trying to keep her from getting a job, give her

10   allowance, taking her money.

11        Q.    Okay.  In this case trying to get her -- trying

12   to keep her from getting a job, isn't it just the opposite?

13   You told us he always wanted her to have a job, didn't he?

14        A.    Right.  There was one occasion where I believe

15   he interfered with her keeping a job.

16        Q.    And which circumstance was that, ma'am?

17        A.    That was one where their apartment didn't come

18   along with the management position.

19        Q.    That was right before she transferred to San

20   Riva, right?

21        A.    Yes.

22        Q.    But other than that one isolated incident, he

23   always wanted her to have a job, right?

24        A.    Yes.

25        Q.    All right.  Okay.  She was also the person that

1    was the bread winner, wasn't she?

2         A.    Yes.

3         Q.    Even though he may have been employed, it was

4    sporadic according to you, right?

5         A.    Yes.

6         Q.    Additionally, did you know that he was

7    receiving supplemental security income because of his

8    condition?

9         A.    No, sir.

10        Q.    Did anybody tell you that?

11        A.    No.

12        Q.    So as far as you know, he wasn't getting any

13   money from anybody though, right?

14        A.    Except for the sporadic employment.

15        Q.    Right.  So it's fair to say that she was the

16   one that from all outward appearances since she brought the

17   check home she controlled the economic strings didn't she?

18        A.    That's not necessarily true because I think

19   controlling the economic strings and earning the income could

20   be very different.

21        Q.    Did you ever check their checking account to

22   see who wrote the majority of the checks?

23        A.    No, sir.

24        Q.    Did you ever check to see when she went out on

25   those twice a week things, who paid for the drinks?

1          A.     No.

2          Q.     Did you ever check, on her birthday, whether or

3     not it was her who paid for the limousine?  Did you check

4     that out?

5          A.     No.

6          Q.     So what you're saying to us is that he

7     controlled the purse strings because that's what you were

8     told, right?

9          A.     I was told that he spent a lot of money on

10    things not related to the household.

11         Q.     Right.  The point is that's what somebody told

12    you, right?  You didn't check it out yourself, right?

13         A.     You are absolutely correct.

14         Q.     And we have seen that there are some errors

15    in your report, haven't we?

16         A.     Which ones are you referring to?

17         Q.     Well, do you think that it was correct that she

18    did not report the Shawn King incident to the police?  Did

19    you think that was correct?

20         A.     You are correct that I did not know that.

21         Q.     So in other words, what I'm saying is your

22    report contains what she told you and what your collateral

23    sources may have told you, correct?

24         A.     That's true.

25         Q.     Now, if we're talking about economics and

1    somebody being reliant on somebody else, if we look at it --

2    and just to be fair to you, he was receiving supplemental

3    security income -- the person that wasn't getting any money

4    and that needed help, if you will, was him, wasn't it?

5         A.    I don't know what you mean.

6         Q.    Well, the apartment that they lived in was

7    free, right?

8         A.    Yes.

9         Q.    The reason the apartment was free was because

10   she worked there, right?

11        A.    Right.

12        Q.    It wasn't because of him, right?

13        A.    Right.

14        Q.    If she didn't work there, he'd be out, right?

15        A.    Right.

16        Q.    So everything in his life, economically

17   speaking, was dependent on her, wasn't it?

18        A.    Other than the --

19        Q.    Borrowing.

20        A.    -- borrowing and the supplemental security

21   income that you're telling me about.

22        Q.    Right.  You didn't know that, but aside from

23   all that, he was dependent on her, right?

24        A.    Yes.

25        MR. MARTINEZ:  Judge, I have quite a ways to go.


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000007597

1          THE COURT:  Let's go ahead and take our evening

2     recess at this point in time.

3                Ladies and gentlemen, we'll go ahead and take

4     our evening recess at this point in time.  During this

5     recess, remember the entire admonition I have given you

6     including the fact you're not to discuss this case with

7     anyone, do not let anyone discuss the case with you.  Do not

8     do any testing on your own.  Avoid any coverage about the

9     case.  Keep an open mind.  I want to you have a nice evening.

10    We'll see everyone tomorrow at 1:00 p.m.

11               We'll be in recess until that time.

12

13               (Evening recess.)

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3                        CERTIFICATE OF REPORTER

4

5    STATE OF ARIZONA      )
                           )
6    COUNTY OF MARICOPA    )

7

8              I, Traci L. Wheeler, CSR, RPR, an official

9    and certified reporter in the Superior Court of the State

10   of Arizona, in and for the County of Maricopa, hereby

11   certify that I made a shorthand record of the proceedings

12   had in the within case, and that the foregoing transcript

13   is a full, true, and correct transcription of the

14   proceedings in this case.

15             Dated this 12th day of May, 2005.

16

17

18             _____
               Traci L. Wheeler, CSR, RPR
19             Certified Court Reporter No. 50313
               Official Court Reporter
20

21

22

23

24

25


          TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

EXHIBIT QQ

000007600

05-0002
Bracco



DP

IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

IN AND FOR THE COUNTY OF MARICOPA

STATE OF ARIZONA,        )
                         )
            Plaintiff,   )
                         )        No. 1 CA-CR 04-0731
    v.                   )        MARICOPA COUNTY
                         )        No. CR 2000-096032
WENDI ELIZABETH ANDRIANO, )
                         )
            Defendant.   )
_____  )


Mesa, Arizona
October 14, 2004


BEFORE:   The Honorable BRIAN K. ISHIKAWA


REPORTER'S TRANSCRIPT OF PROCEEDINGS

TRIAL DAY 28


ORIGINAL Prepared for APPEAL by:
TRACI L. WHEELER, CSR, RPR
Certified Court Reporter No. 50313


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

2

1                    A P P E A R A N C E S

2    FOR THE STATE:        JUAN M. MARTINEZ,
                           Deputy County Attorney
3
     FOR THE DEFENDANT:    DANIEL B. PATTERSON,
4                          Deputy Public Defender
                                   and
5                          G. DAVID DELOZIER,
                           Attorney at Law
6

7          I N D E X   O F   E X A M I N A T I O N

8    WITNESS                                        PAGE

9    MURPHY, SHARON, Called to testify by the Defense
              Continued Cross-examination by Mr. Martinez      3
10            Redirect Examination by Mr. Patterson           76
              Continued Redirect Examination by Mr. Patterson 108
11            Follow-up Questions by Mr. Patterson            128
              Follow-up Questions by Mr. Martinez             130

12

13

14

15

16

17

18

19

20

21

22

23

24

25


        TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1          MESA, ARIZONA, THURSDAY, OCTOBER 14, 2004

2

3          THE COURT:  Good afternoon.  This is trial in cause

4    number CR 2000-096032, State of Arizona versus Wendi

5    Elizabeth Andriano.  The record will reflect the presence of

6    the Defendant, Counsel and the Jury.  Sharon Murphy is on the

7    witness stand, and we'll continue with the examination by Mr.

8    Martinez.

9                    Mr. Martinez?

10

11                    SHARON MURPHY,

12            CALLED TO TESTIFY BY THE DEFENSE,

13    HAVING PREVIOUSLY BEEN DULY SWORN, TESTIFIES FURTHER:

14

15    CONTINUED CROSS-EXAMINATION BY MR. MARTINEZ:

16          Q.    Ma'am, you're Sharon Murphy?

17          A.    Yes.

18          Q.    You're the same individual who was testifying

19    yesterday?

20          A.    Yes.

21          Q.    One of the things we discussed yesterday was

22    whether or not your report that's dated September 22nd, 2003,

23    whether or not that report included any mention of the

24    defendant's hair and how she had to wear it.  Do you remember

25    that line of questioning yesterday?

1          A.    I do.

2          Q.    And yesterday you indicated to me that you made

3     a very quick sort of review of the report to determine

4     whether or not there was any mention of any wearing of hair,

5     correct?

6          A.    Correct.

7          Q.    And you didn't find any yesterday, correct?

8          A.    Correct.

9          Q.    Have you had a chance to review it since last

10    night?

11         A.    Yes.

12         Q.    And there is no mention of hair in there, is

13    there?

14         A.    There is no mention, correct.

15         Q.    Now, the other thing we were talking about

16    yesterday, and this will be at the top of page 17 of your

17    report, we were talking also yesterday a little bit about the

18    limousine date, if you will, where the defendant went out

19    with her friends in a limousine.  Do you remember talking

20    about that?

21         A.    Yes.

22         Q.    And, additionally, one of the things we talked

23    about was that she came home a little bit late, but the point

24    was that he, Mr. Andriano, began pounding on the dresser with

25    his fists.  Do you remember that?

1      A.    Yes.

2      Q.    The rest of that, though, indicates that he

3   punched holes in it.  And by punching holes in it, that means

4   he punched holes in the dresser drawer or what?

5      A.    Well, it says "punched holes in it, breaking

6   some of the drawers."

7      Q.    But definitely it does say he punched some

8   holes, right?

9      A.    Yes, it does.

10     Q.    I'm going to show you Exhibit Number 436.  I

11  think we may have looked at it yesterday, and can you see

12  that 436?

13     A.    Yes.  It's the one you showed me yesterday.

14     Q.    Right.  It's clear there are no holes punched

15  in it, correct?

16     A.    I have no idea if those are punched hole marks

17  from that photograph.

18     Q.    Right.  The point being, though, in your report

19  it does say that he began pounding on the dresser.  That's a

20  dresser, right?

21     A.    It appears to be a dresser.

22     Q.    Okay.

23     A.    It's kind of hard to tell.

24     Q.    Let's take a look at Exhibit 440.  Same item,

25  holds the characteristics of a dresser, correct?

6

1      A.    Yes.

2      Q.    Doesn't look like that dresser, as you look at

3  it from here, that it has any holes in it, does it?

4      A.    It has some markings.

5      Q.    Right, but they don't appear to be holes.

6  Holes are something that goes from one end past whatever item

7  it is to the other side, correct?

8      A.    Right.

9      Q.    And that doesn't seem to have it, does it?

10     A.    It doesn't have the markings that you are

11  defining for me.  It has some kind of markings.

12     Q.    And the markings that I am defining for you are

13  coming straight out of page 17 of your report, correct?

14     A.    Yes.

15     Q.    And it also indicates that there was the

16  breaking of some drawers, right?

17     A.    Yes.

18     Q.    Okay.  And we can't tell, but everything

19  seems -- Exhibit 440, everything seems to be lined up,

20  doesn't it?

21     A.    It appears that way.

22     Q.    The other thing that your report indicates on

23  page 17 is that there was a post that was broken on the bed,

24  right?

25     A.    Right.

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1      Q.    And you also indicated that he also broke the

2   foot board in half causing the bed to crash down to the

3   floor, right?

4      A.    Right.

5      Q.    Is that also with his fist?  How did he do it?

6      A.    I don't know.

7      Q.    Were you told what happened that night, whether

8   it was fixed, what happened, or they just slept on a bed that

9   was broken, or what?

10      A.    I don't remember asking what happened after

11   that.

12      Q.    Okay.  And you weren't told, for example, that

13   she had to sleep on the couch and he had to sleep in the

14   baby's room, anything like that?

15      A.    Right.  I wasn't told any of that.

16      Q.    One of the other things we were talking about

17   yesterday was this power and control wheel, and that's

18   Exhibit Number 453.  And let me just show it to you so that

19   you could see what I'm talking about.

20      A.    Yes.

21      Q.    Ma'am, as I went up there to show you this, it

22   appears you have some notes.  Could you tell me what those

23   notes are?

24      A.    My power and control wheel is the same one you

25   have.

1          Q.     Are there notes on the back of it or in your --

2     no, no, no.  In your pad.  You were looking at some notes.

3     These notes.

4          A.     Oh, that's what I wrote in my report.

5          Q.     So those are the notes reflected in your

6     report?

7          A.     Yeah, what I've done in preparation for trial.

8          Q.     Is that a "yes"?  Is that a "yes"?

9          MR. PATTERSON:  Judge, she's explaining what he

10    asked.

11         THE COURT:  Repeat the question.

12    BY MR. MARTINEZ:

13         Q.     Are those the notes that are incorporated into

14    the report?

15         A.     These are notes that I have made in the margin

16    to remind me of things that are in my report.

17         Q.     When did you create those notes, ma'am?

18         A.     Probably within the last two weeks in

19    preparation for trial.

20         Q.     Okay.  But there are other notes besides those,

21    correct?  In other words, did you use any notes to prepare

22    your report?

23         A.     Oh, when I -- when I was doing the

24    interviewing?

25         Q.     Right.

1          A.     Oh, yes.

2          Q.     Okay.  Let's talk about then about -- why don't

3    we go down here in this area right here called "threats."

4    And it now appears that you have a power and control wheel

5    that is identical to the one you used for testing, correct?

6          A.     Correct.

7          Q.     How did you acquire it?  Did you make a copy of

8    mine or get it faxed from your office?

9          A.     No.  This is the actual one that she filled

10   out.

11         Q.     I think that you indicated to us yesterday that

12   you didn't have it with you, right?

13         A.     That is correct.  I didn't have it in my bag.

14         Q.     Okay.  So you had it with you on the trip, but

15   didn't have it with you on the stand?

16         A.     Correct.

17         Q.     All right.  Now, with regard to threats then,

18   it says making or carrying out threats to do something to

19   hurt her and we could include him there, "her" or "him"

20   emotionally.  It does say that, right?

21         A.     Yes.

22         Q.     Would you agree if somebody says to you "I am

23   going to leave you," that's a threat to hurt somebody

24   emotionally?  Don't you agree?

25         A.     Not necessarily a threat.  It's a statement.


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000007609

1      Q.    So if -- in this particular case, isn't that

2   what the defendant told her husband, Mr. Andriano?

3      A.    That she was going to leave him?

4      Q.    Right, mm-hmm.

5      A.    That I believe is written in a note.

6      Q.    Which is the same thing.  It's, communication

7   isn't it?

8      A.    Yes.

9      Q.    He knew she was going to leave him, right?

10     A.    Yes.

11     Q.    And he started to cry, right?

12     A.    Yes.

13     Q.    And he begged her not to go, right?

14     A.    Correct.

15     Q.    So that is something that is going to hurt him

16   emotionally based on what the defendant reported, right?

17     A.    All right.

18     Q.    Is that "yes" or "no"?

19     A.    Yes.

20     Q.    One of the other things that you noted for us

21   on various occasions yesterday was that he was very jealous.

22   Do you remember telling us that?

23     A.    ,Yes.

24     Q.    And that he was jealous and he constantly asked

25   her about men and whether or not she was seeing other men and

1    things like that, right?

2         A.   Yes.

3         Q.   And in fact this thing with the bed may have

4    happened because he was worried that she was out at this

5    baseball or softball game with a man, right?

6         A.   He had been worried about that.

7         Q.   Well, isn't that what your report indicates

8    that he was worried about?

9         A.   Well, what I recall is that she was late and so

10   he was angry that she was late.

11        Q.   All right.   Well, why don't you go to page 16,

12   the second to last sentence down there, all right?   Are you

13   there?

14        A.   Yes.

15        Q.   It says "She returned home and he started

16   screaming at her about why did it take so long for her to get

17   home and accused her of being with a man."   That's true,

18   right?

19        A.   Yes.

20        Q.   So this fight you're talking about, was he was

21   worried about her being with a man, right?

22        A.   Yes.

23        Q.   And one of the things that we know is that she

24   was at a softball game where an individual by the name of

25   Rick Freeland was the captain of the softball team.   Did you

1    know that?

2         A.    No, I didn't know that.

3         Q.    Well, he's accusing her of being with another

4    man.  Don't you think that's an emotional issue for him?  In

5    other words, that's hurting him believing that she may be

6    with another man at this softball game?

7         A.    He at this point in time would have had no

8    knowledge of her relationship with Rick Freeland.

9         Q.    That is correct, but he had some knowledge that

10   she was with another man.  He may not have known the name,

11   right?

12        A.    No.  I don't know that.

13        Q.    Well, your report does say, though, we need to

14   read it again, it says "accused her of being with a man,"

15   right?

16        A.    Are you still on page 16?

17        Q.    That's correct.

18        A.    Okay.

19        Q.    He did accuse her of being with a man?

20        A.    Right, but that's a sign of jealousy.  We have

21   no way of knowing that he knew about Rick Freeland.  In fact,

22   I don't think he did.

23        Q.    But the point is he was suffering some angst

24   with regard to her fidelity, wasn't he?

25        A.    Yes, he was.

1      Q.    Okay.  On the other hand, there's never any

2   indication that he ever threatened to leave her, correct?

3      A.    Correct.

4      Q.    There's never any indication that he threatened

5   to take the children, right?

6      A.    Right.

7      Q.    And according to her own report there's no

8   indication that he was ever unfaithful, correct?

9      A.    I don't have any information about that.  Wendi

10   never reported that.

11      Q.    In other words, she indicated that he was not

12   unfaithful to her, correct?

13      A.    She would -- yes, she reported that he was not

14   unfaithful.

15      Q.    Right.  The other one that we have there is

16   using male privilege.  That's right here, correct?

17      A.    Correct.

18      Q.    So let's use using male, female privilege.  And

19   one of the things that tells us is that treating him or her

20   like a servant, and I think servant is misspelled, but making

21   all the big decisions, acts like the master of the castle.

22   That's what it says, right?

23      A.    Right.

24      Q.    Well, in this particular situation, she made

25   the decisions for him with regard to the lawsuit, didn't she?

1          MR. PATTERSON:  Misstates the evidence, Judge.

2          THE COURT:  Sustained.  Rephrase the question.

3     BY MR. MARTINEZ:

4          Q.   Ma'am, one of the people that testified for us

5     is an individual by the name of Jeff Miller, the lawyer in

6     the medical malpractice suit.  He indicated to us that when

7     he would call and want to speak with Mr. Andriano about

8     making decisions about something, that he would say talk to

9     Wendi about it and then it would be taken care of.  Would you

10    agree or disagree that that is an indication of her making

11    decisions in that relationship?

12         A.   I would say that Joe Andriano expected and

13    demanded that Wendi Andriano make a lot of decisions.

14         Q.   You're not answering my question.  I'm not

15    asking about those other questions.  I'm asking you

16    specifically about the Jeff Miller incident or the Jeff

17    Miller circumstance.  Can we focus on that?

18         A.   I will do my very best.

19         Q.   Good.  So with regard to that, would you agree

20    or disagree that if he says Wendi will take care of it or

21    words to that effect, because we don't have the exact words,

22    and he would hand the phone over to her, she would speak to

23    Mr. Miller and he would let her know what was needed with

24    regard to the lawsuit.  Wouldn't you agree that was some

25    decision making on her part?

1          A.     I cannot agree to that.  I can agree that she

2     would have been the filter.

3          Q.     Okay.  And so you wouldn't agree that she was

4     making decisions for him?

5          A.     Right.  Based on that, I cannot agree to that.

6          Q.     Okay.  The other thing that we know was that

7     she, according to other people, and we've mentioned this

8     yesterday, Chris Hashisaki, Shannon Sweeney, James Yost, they

9     all indicated that she was the person that was the dominant

10    one, that she was the one that -- what was the term?  She

11    wore the pants in the family, that sort of the thing.

12               Would you agree then that somebody who is

13    seeming -- and I understand that it wasn't inside their

14    bedroom, it was only in public -- but that's an indication,

15    wouldn't you agree, that's an indication of being the

16    mistress of the castle?

17         A.     I would say that those three people that you

18    just told me about saw her in that light.

19         Q.     Right.

20         A.     There's a public and private self.

21         Q.     So it's public.  I'll put that up here,

22    mistress of the castle.

23               Additionally, we talked a little bit about the

24    sex.  And one of the things that your report indicates,

25    toward the end of it, that even though she may not be having

1    sex with him daily, you believed that she did, but according

2    to your report page 17 "Joe insisted on daily sex even though

3    Wendi let him know she did not want to participate," right?

4           A.    Correct.

5           Q.    So that's somebody who knows her body and

6    letting the other person know what they want, right?

7           A.    When she felt strong enough to do so, yes.

8           Q.    Well, ma'am, take a look at that sentence.

9    Read it to yourself, and once you've read it, tell me if it

10   says when he felt strong enough?

11          A.    It does not say that.

12          Q.    That's something you added, right?

13          A.    Yes.

14          Q.    Did you also assume that just like you assumed

15   the fact they had sex on a daily basis up until the time he

16   died?

17          MR. PATTERSON:   Judge, that misstates her testimony.

18          THE COURT:  Hold on.

19          MR. PATTERSON:  Her testimony is he demanded, not

20   that they performed, on a daily basis.

21          THE COURT:  Overruled.

22          MR. PATTERSON:  That's a distinctive question.

23          THE COURT:  Overruled.  Answer the question if you

24   can.

25          THE WITNESS:  Okay.  Can you repeat it?


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    BY MR. MARTINEZ:

2              Q.    Did you assume as to what you just told us on,

3    dangling participle on that sentence, did you assume that

4    just like you assumed you told us yesterday that they had sex

5    on a daily basis until His death?

6              A.    I believe that what I said was that we knew for

7    certain that the daily sex resumed after they returned from

8    Colorado.  I can't say that they had sex every day for eight

9    years because I think that was the length of the entire

10   relationship.

11             Q.    Yesterday you told us that from 1998 until he

12   died she had to deal with the fact that he wanted sex on a

13   daily basis and that she submitted to it?

14             A.    That is true.

15             Q.    But I'm asking you now, the question is the

16   sentence says "Joe insisted on daily sex even though Wendi

17   let him know she did not want to participate."  She was

18   strong enough to let him know I do not want to participate,

19   right?

20             A.    That doesn't mean that she didn't.

21             Q.    Is that right or not, that's what it says?

22             A.    Yes.

23             Q.    You're saying that it doesn't mean that she

24   didn't.  That's what you just told me, right?

25             A.    Right.

1      Q.    Doesn't mean she did either, right?

2      A.    Okay.

3      Q.    So you're telling me based on what you're  --

4 what I'm hearing you say, and I don't want to be too

5 indelicate, that even in that time of the month according to

6 you the way you're interpreting it, they had sex during that

7 too.  That's what you're telling me?

8      A.    I did not ask Wendi specifically about the time

9 of the month when she was menstruating whether or not she had

10 sex.

11     Q.    I'm not asking you if you asked her or not.

12 I'm asking you what you're telling me, which is something

13 different, okay?  Are you telling me that as you sit there

14 today, it is your opinion as an expert that they had sex on a

15 daily basis from 1998 until the date of his death?

16     A.    I am telling you that what was reported to me

17 by Wendi Andriano is that Joe demanded sex on a daily basis.

18     Q.    Even until his death, right?

19     A.    Correct.

20     Q.    But now, to get to my question, she let him

21 know that she didn't want it, right?

22     A.    Right.

23     Q.    And so that would mean that basically that she

24 was in charge of her body or her mind enough to let him know

25 that she didn't want sex, right?  Right?

1      A.    I'm struggling with the -- with the response to

2  this for a very particular reason.  You are creating a person

3  that appears on the face of it to be strong.

4      Q.    I'm not creating anything.  Am I not taking

5  everything from this report of yours that you prepared back

6  on September 22nd, 2003?

7      A.    You are out of context, however, and that's

8  what makes it so difficult for me to respond to specific

9  sentences.

10     Q.    Right.  But, ma'am, it is from your report,

11 right?

12     A.    Yes, it is.

13     Q.    Is it something that you wrote?

14     A.    Yes, I did.

15     Q.    And you don't think it's unfair for me to ask

16 you questions about what's in your report?

17     A.    No, sir, except when you take them out of

18 context.

19     Q.    You know what?  There's redirect.  I don't know

20 if you know that.

21         MR. PATTERSON:  Judge, he's being --

22         THE COURT:  Hold a second.

23         MR. PATTERSON:  -- argumentative with this witness.

24         THE COURT:  Hold a second.  Continue on.

25  / / / / /

1    BY MR. MARTINEZ:

2            Q.    Now, one of the other things that we know is

3    that Mr. Andriano, as we know before, was not employed, and

4    if he was, it was sporadic.  We know about that, right?

5            A.    Yes.

6            Q.    And basically what we also know about him and

7    that the apartment that he was living in was being provided

8    through defendant's employment, correct?

9            A.    Correct.

10           Q.    So that he, again, we talked a little bit about

11   this yesterday, so that if he -- if they broke up or

12   whatever, it's clear that she would stay and he would be out

13   because he would had no connection to San Riva, correct?

14           A.    Correct.

15           Q.    And so that being the case, that place that he

16   was living in, really, if we look at it that way, was only

17   his castle by marriage.  Wouldn't you agree?

18           A.    Okay.

19           Q.    Sexual abuse.  Let's talk about that.  You've

20   described for us a situation and I'm going to page 17, again,

21   where there's an indication given to you by the defendant

22   that Mr. Andriano demanded sex on a daily basis, right?

23           A.    Yes.

24           Q.    And one of the things that your report

25   indicates in a sentence is that she let him know she did not

1    want to participate, correct?

2           A.    Correct.

3           Q.    And as you sit here today, you cannot tell us

4    that either he forced himself on her or not because you

5    really don't know, right?

6           A.    Physically forced himself.  Is that what you

7    mean?

8           Q.    Yeah, uh-huh.

9           A.    I don't believe he physically forced himself.

10          Q.    And then we're going to go over to

11   emotionally.  You don't know each and every -- that each and

12   every time because she didn't tell you that each and every

13   time that he demanded sex that he got his way, do you?

14          A.    That's correct.

15          Q.    Okay.  Question mark.  We don't know.  But we

16   do know that if there was anybody in the relationship that

17   did want to have sex with the other partner, it was him with

18   her, correct?

19          A.    Correct.

20          Q.    But the same is true, even though you've

21   described him as a spoiled child, we don't know that every

22   time that he wanted to have sex, we don't know because the

23   same is true if he -- if she allowed him to every time or if

24   she submitted every time, right?

25          A.    Right.

1      Q.    With regard to the other prong of this wheel,

2    there is something called "using children," right?

3      A.    Right.

4      Q.    You previously indicated to us that there's no

5    indication that he ever did that with her, correct?

6      A.    That's right.

7      Q.    On the other hand, you have told us that there

8    were complaints about his parenting skills, correct?

9      A.    Yes.

10     Q.    One of the things that you told us was that he

11   wouldn't change the diapers, right?

12     A.    That he would call her to come home, yes.

13     Q.    The other thing that -- the other thing that

14   you told us was that, or at least your report indicates that,

15   was that Joe never helped with the baby, right?

16     A.    Right.

17     Q.    So if there's really anybody sort of -- that is

18   being communicated to about the children, it's him because

19   he's not pulling his weight.  That's sort of the

20   understanding, right?

21     A.    Right.

22     Q.    And the other prong that we have left is

23   "intimidation," correct?

24     A.    Correct.

25     Q.    And before we get into what that actually

1    means, intimidation is not the same thing as fear, correct?

2         A.    If there's intimidation, I believe there is

3    fear, but you can have fear without intimidation.

4         Q.    You can have fear without intimidation but you

5    can't have intimidation without fear?

6         A.    Right.

7         Q.    Let's give you an example.  We have a hockey

8    team and psychologically they're defeated before they even

9    take the floor.  They're intimidated, aren't they?

10        A.    They could be.

11        Q.    It doesn't mean they're afraid of them.

12   Nothing is going to happen to them, right?

13        A.    It could mean that.

14        Q.    It could.  That's the point I'm trying to make,

15   that you can have intimidation without fear, right?

16        A.    I don't know if using an example of a hockey

17   team is the same as using an example of domestic violence.

18        Q.    But what I'm saying is you can have

19   intimidation without having fear.  In other words, a person

20   can be intimidated by the presence of somebody else like,

21   let's say, a courtroom.  I mean, a judge can be very

22   intimidating to lawyers, but that doesn't mean they're afraid

23   of him.  It's just a respect thing, isn't it?

24        A.    I don't agree with you.

25        Q.    Okay.  So you are saying that intimidation

1    always equals fear?

2            A.     I think intimidation always provokes some kind

3    of emotional response.

4            Q.     Yeah, but an emotional response is different

5    than fear, wouldn't you agree?

6            A.     Fear is the emotion that comes to mind for me

7    when I think of intimidation.

8            Q.     Right, but it could be I don't to play the game

9    or be in that courtroom, right?

10           A.     That's a logical thought and not an emotional.

11           Q.     Right.  That may be so, but what we're talking

12   about here is what intimidation means, right?  And let's do

13   it this way.  Are you going to agree or disagree that you

14   could have intimidation without fear.  And you may choose not

15   to agree to that, it's up to you.

16           MR. PATTERSON:  Judge, I believe she's answered that

17   question already.

18           THE COURT:  Go ahead.  I'll overrule the objection.

19   Go ahead and answer it if you can.

20           THE WITNESS:  I believe there is fear associated with

21   intimidation.

22   BY MR. MARTINEZ:

23           Q.     And so in this case when it says putting her in

24   fear by using looks, actions, gestures, loud voices, smashing

25   things, destroying her property, you're indicating that every

1    time that he looks at her, for example, if they're at a dance

2    and he looks at her, then I guess if they have that sort of

3    relationship that she's going to be in fear?

4         A.    In the context of domestic violence there is a

5    look, not just any look, but there's a look that the woman

6    learns.

7         Q.    Okay.  And in this case you believe that he had

8    the look that would put her in fear?

9         A.    Yes, I do.

10        Q.    And this is in the private setting, isn't it?

11        A.    Not necessarily.

12        Q.    Well, no, I'm talking about private setting

13   right now.

14        A.    Okay.

15        Q.    And he had that in the private setting, right?

16        A.    I would assume so, yes.

17        Q.    Well, I don't want you to assume things because

18   I want you to go by what you know.  It was never described to

19   you by the defendant as him having that look in a private

20   setting?

21        A.    I am trying to recall if that was one of the

22   items on the abusive behavior checklist.

23        Q.    Okay.  And --

24        A.    Can I refer to it?

25        Q.    Sure.  Go ahead.

1          A.    All right.  I'm looking at that form right now.

2    It's -- the pages are marked sideways.  It's on 161.

3          Q.    Okay.

4          A.    And there is a category called "intimidation."

5          Q.    Okay.

6          A.    And the very first one item says "instilled

7    fear in him/her by looking, gestures, actions," and she's

8    marked under 10 to 49 times.

9          Q.    Okay.

10         A.    So I can't say whether it's in the bedroom or

11   not.  I can say that he did it 10 to 49 times.

12         Q.    Right.  But you can't say it was in private?

13         A.    I can't.

14         Q.    And by the same token you can't say if it was

15   in public either?

16         A.    Right.  I could just say it happened.

17         Q.    But that same page 161 is the same page as the

18   category "engaged in extra marital affairs," right?

19         A.    Yes.

20         Q.    And it says one not two?

21         A.    Yes, it does.

22         Q.    Now, with regard to that particular look, we've

23   received information from other people in a public setting he

24   was the quiet one, wouldn't say anything, and that basically

25   she was the one that was in charge.  So is this look

1   something that other people could pick up or just something

2   that the person that's perceiving the look would pick up?

3       A.   The way it's been described to me by other

4   battered women, it's something the battered woman knows, not

5   something anybody else would see.  That's what a battered

6   woman would tell you.

7       Q.   I'm interested in what the defendant told you.

8       A.   About the look?

9       Q.   Right, uh-huh.

10      A.   I just -- I don't recall having that specific a

11  conversation with her about the look.

12      Q.   And in fact in your report there's no

13  indication other than in what you call the abusive

14  observation checklist, other than that, that she describes

15  the look in any of your report, right?

16      A.   Right.

17      Q.   One of the things you did tell us about this

18  power and control wheel, that it was sort of something that

19  you used to see what other tests you might use, correct?

20      A.   Right.

21      Q.   This is just an indication of whether or not

22  there is domestic violence, right?

23      A.   It's a really good indication, but yes, it is

24  an indication.

25      Q.   Right.  And this is done after you've already

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    done what you called the clinical interview, right?

2         A.    Not in this -- well, in this case I only saw

3    her for two hours prior to administering this one.

4         Q.    But this was shown after you've done part of

5    the clinical interview, right?

6         A.    Very brief part.

7         Q.    And the clinical interview, as I understand it,

8    she sits across from you, you set across from her, and you

9    guys talk and you take notes, right?

10        A.    Right.

11        Q.    That is what the clinical interview is, a

12   series of asking questions, right?

13        A.    Getting answers.

14        Q.    Right.

15        A.    Yes.

16        Q.    All right.  And then you have had 2 hours of

17   that, and then you gave the power and control wheel?

18        A.    On the next visit, right.

19        Q.    So that would be the fifth hour or, really, the

20   third hour?

21        A.    Third hour, right.

22        Q.    So you believed there was some indication of

23   domestic violence based on --

24        A.    Well, I also had when I said yes, this sounds

25   like it, I'll go check.

1       Q.    In other words, you took not the word, but you

2  already had information from another source that wasn't there

3  that you -- you considered and said, yeah, you know, that's

4  valid, and it affected your opinion going into talking to

5  her, didn't it?

6       A.    It didn't affect my opinion.

7       Q.    Well, then why move so quickly?  Why don't you

8  go two hours and right away start with a power and control

9  wheel, which is basically a filtering device, to determine

10  what other tests you're going to give?

11       A.    Why not?

12       Q.    Well, because that means you've already made up

13  your mind going in that she is somebody who is the victim of

14  domestic violence.

15       A.    No, sir.  It doesn't mean that at all.

16       Q.    You didn't make that determination early on?

17       A.    No, sir.  I did not.

18       Q.    In the range of all of these interviews that

19  you had with her, when did you make the determination that

20  she was the victim of domestic violence?

21       A.    What date?

22       Q.    Generally.

23       A.    I can't tell you the date.

24       Q.    Generally?

25       A.    Well, I gave her -- I gave her two or three

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    tests during that third and fourth hour.

2          Q.    Okay.

3          A.    That was the first one.

4          Q.    What was the second one?

5          A.    I'm going to have to check my notes.

6          Q.    Please.

7          A.    The same day that I did the power and control

8    wheel, which is March 26, 2003.  I also administered the

9    partner abuse nonphysical and the partner abuse physical

10   scales.

11         Q.    Okay.  Those tests that you are talking about

12   here are given to somebody who is perceived by you to be

13   suffering from domestic violence, aren't they?  Why give it

14   to them and ask them?  Why give it to them and say did he

15   physically abuse you or does he just emotionally abuse you?

16         A.    The answer is no and the explanation is this.

17   One of the reasons that I really like those two tests in

18   particular is because they have a very high discriminate

19   validity rate.  What I mean by that is the whole purpose of

20   the researchers designing it was to find out can we

21   discriminate abused from non abused.  So really those two tests

22   just add to my knowledge about whether or not she is or she

23   isn't, so they go really well giving them the same day as the

24   power and control wheel.

25         Q.    And, again, just so we're clear, the person

1    who's filling out those numbers and we'll talk about that in

2    a little bit, is the person who's being studied, right?

3         A.    Absolutely.

4         Q.    In this case the person scoring without any

5    help from you is the defendant, right?

6         A.    Yes.

7         Q.    So she's the one in her mind tells you and puts

8    a number down there.  You don't help her with that, do you?

9         A.    That's correct.

10        Q.    With regard to this power and control wheel,

11   you also indicated to us that the person who is the victim of

12   domestic violence does not have to meet all of the prongs?

13        A.    Right.

14        Q.    So in this case I have Mr. Andriano, meeting

15   one, two, three, four, five, six -- perhaps meeting seven or

16   eight, don't I?  I do up there, don't I?

17        A.    You do up there.

18        Q.    And we also have, as we take a look at it, we

19   don't have her meeting any of them other than perhaps the

20   sexual abuse and maybe perhaps the intimidation if it equals

21   fear?

22        A.    On your wheel, that's correct.

23        Q.    And this is a wheel you and I discussed

24   yesterday and it's a wheel we've discussed today, right?

25        A.    Correct.

1      Q.    So on this wheel, if we take a look at it, it

2   doesn't look like she is a person who has -- is suffering

3   from domestic violence, wouldn't you agree?

4      A.    On your wheel, that's correct.

5      Q.    But, again, this is the wheel that you and I

6   constructed together here in court, correct?

7      A.    I have another one in my hand.

8      Q.    I know you do and we'll discuss that in a

9   minute.  But that's the one that you and I constructed here

10   in court, right?

11      A.    Yes.

12      Q.    Now, the one that you have in your hand, I want

13   to talk a little bit about it and if we, as I understand it,

14   the way that you presented it to her was, it was a blank

15   power and control wheel.  It is -- the gender of it is geared

16   to her.  In other words, it says "putting her in fear,"

17   "controlling what she does."  In other words, it's not suited

18   for a male, right?

19      A.    Right.  I would have to do something with this

20   if it were going to be given to a male.

21      Q.    Right.  And what it does do is it puts out for

22   her to consider certain things, doesn't it?

23      A.    Yes.

24      Q.    In other words with regard to sexual abuse, it

25   says making her, or you, do sexual things against her will,

1    right?

2         A.    Right.

3         Q.    And if she didn't have that in her mind or if

4    she had never even described it before or thought about it

5    before, she sees that and she can say yeah, that did or

6    didn't happen to me, right?

7         A.    Yes.

8         Q.    In other words, this scenario is suggested to

9    her in this power and control wheel, isn't it?

10        A.    Yes.   These are examples.

11        Q.    Right.  And in this particular case what she

12   did is that she wrote certain things, right?

13        A.    Correct.

14        Q.    And, for example, with regard to sexual abuse,

15   she wrote "I never liked to have sex," right?

16        A.    Right.

17        Q.    She doesn't describe how many partners she had

18   before him or anything like that.  She just tells you she

19   doesn't like sex, right?

20        A.    Right.

21        Q.    That would presumably include sex with Travis

22   Black and Rick Freeland, right?

23        A.    Right.

24        Q.    "But I could not deny him."  She's talking

25   about Joe Andriano in that, right?

1          A.     Right.

2          Q.     I was -- I can't read it very well.  I believe

3     it says, "I was trained from the age of 4 to obey your

4     husband no matter what" is what it says, right?

5          A.     That's right.

6          Q.     Of course that doesn't take into account the

7     fact she disobeyed him with regard to a number of some of the

8     things we discussed yesterday.  When she told him now about

9     the cheese crisp, she disagreed with him there, right?

10         A.     Yes.

11         Q.     She disagreed with him with regard to not

12    having an affair.  Those guys there were some examples.

13         A      I think there were five or six that you went

14    over.

15         Q.     Okay.  And it also says "I also was taught to

16    never be angry."  Let me ask you about that.  Do you think

17    it's possible that a person will never show their anger ever

18    in their life?

19         A.     Well, this says "taught."

20         Q.     Right.

21         A.     It doesn't say she never did it but she was

22    taught to not express anger.

23         Q.     Right.  You're taught to never show your anger.

24    Do you think it's possible to go through life without ever

25    expressing your anger?  In other words, like raising your

1    voice or cursing or anything?

2         A.   I don't think it's possible to never feel

3    anger.  I don't know about expressing anger.

4         Q.   Do you think that she's, if you can answer

5    this, or it may be beyond the scope of your -- of your

6    knowledge of her, that she's gone through her whole life

7    without ever expressing anger vocally?

8         A.   I do not know that.

9         Q.   Okay.  It does say "I also was taught to never

10   be angry, never argue."  That's what it says, right?

11        A.   Yes.

12        Q.   We did talk about a situation involving Rick

13   Freeland where she did want to confront him and argue?

14        A.   She wanted to confront who?

15        Q.   Rick Freeland.

16        A.   Confront him?

17        Q.   Right, argue with him, standing outside his

18   door for an hour?

19        A.   Oh, that's what you say someone had reported

20   evidently.

21        Q.   Right.  That goes against never arguing,

22   doesn't it?

23        A.   If that's true, yes.

24        Q.   Always love and be nice.  I think is what it

25   says, right?

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    A.    Yes.

2    Q.    Unconditionally, right?

3    A.    Yes.

4    Q.    And then it says "In the Bible it states

5    specifically to never say no to your husband's request for

6    sex," right?

7    A.    Yes.

8    Q.    But we do know that on page 17 of your report

9    it does say Joe insisted on daily sex even though Wendi let

10   him know she did not want to participate, right?

11   A.    Yes, it does.

12   Q.    And with regard to economic abuse she indicated

13   that for her the abuse was always he wanted me to have a good

14   job?

15   A.    Right.

16   Q.    That's not really a bad thing, is it?

17   A.    You're taking it out of context.

18   Q.    Ma'am, we've gone over the power and control

19   wheel, haven't we?

20   A.    Yes.

21   Q.    We've defined what economic abuse was.  We read

22   it, didn't we?

23   A.    Yes.

24   Q.    And we've now read her comment to the side,

25   right?

1        A.      Yes, we have.

2        Q.      Then it says emotional abuse.  It says "In any

3    argument I would start out knowing my husband was in the

4    wrong.  By the time he finished he had me convinced I was

5    wrong.  I would be the one apologizing," right?

6        A.      Right.

7        Q.      But we don't know what the arguments were

8    about, do we?

9        , A.     I think we probably only know about a couple

10   that are in my report.

11       Q.      Even if we know about the ones in your report,

12   we don't know what she's referring to here, which arguments

13   she's referencing?

14       A.      That's correct.  We don't know that.

15       Q.      It could be he was right, couldn't it?

16       A.      It could be.

17       Q.      Then we have isolation.  It says, "Every time I

18   get close to a girl he would start complaining about them."

19   What girls in your report did he complain about, other than

20   the bridesmaid, according to her?

21       A.      The only example that comes to mind are of the

22   females friends that came to visit when she had a baby.

23       Q.      Other than that?

24       A.      I don't recall other than that.

25       Q.      The first one, if we're going to take this at

1    face value, the first one was at her wedding which was on

2    January 22nd, 1994, right?

3         A.    Right.

4         Q.    And the other one was after Nicolas was born,

5    which was in sometime in 19 -- what, '97?

6         A.    '97, I think.

7         Q.    Okay.  So after '97 or '98, there are no

8    examples that she provided to you about him complaining about

9    any girls that were close friends of hers, right?

10        A.    I will agree with you.

11        Q.    And additionally he even knew about a close

12   friend that was living out of state with whom she planned to

13   go stay with after she left him, right?  He knew about that?

14        A.    I don't know that he knew that.

15        Q.    Okay.  In the note, she may or may not ever

16   have said that.  Is that what you're saying?

17        A.    Right.

18        Q.    Okay.  Then it also says, "He'd find reasons to

19   not like them, refuse to allow me to see them."  There really

20   is no example you could give me of anybody that he refused to

21   allow her to see, is there?

22        A.    The issue of controlling her was pervasive, so

23   I don't know that he had to do much more than that.

24        Q.    The point is -- that's not the question.  The

25   question is can you give me an example of a situation where

1    he refused to allow her to see any girlfriends?

2         A.    No, I cannot.

3         Q.    And it does indicate the situation involving

4    the bridesmaid, right?

5         A.    Right.

6         Q.    That was back in 1994, right?

7         A.    Right.

8         Q.    And according to her she's the one that -- that

9    was forced out of the wedding per his request, right?

10        A.    Right.

11        Q.    And then we have intimidation and she

12   indicated, "He always threw things, broke furniture smashed

13   doors," and then she says, "Even while working on his own

14   stuff, he would throw tools," right?

15        A.    Right.

16        Q.    And presumably if he's -- I think you may have

17   given the example of him working on the boat where he would

18   get frustrated and he would throw a wrench.   Something like

19   that, right?

20        A.    Yes.

21        Q.    That's the example that she was intimidated by

22   and that put her in fear?   Sorry.

23        A.    Well, the -- it's that whole sentence.

24        Q.    Well, no.   I mean, if we take a look at it,

25   throwing your tools is something different than throwing

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    furniture and breaking furniture, isn't it?

2         A.    Yes.

3         Q.    So one of them is mostly outside.   I mean, the

4    one we're talking about was outside?

5         A.    The tools?

6         Q.    Yes.

7         A.    Yes.

8         Q.    He's working on his boat, right?

9         A.    Yes.

10         Q.    Something doesn't come out right with the boat,

11    right?

12         A.    Right.

13         Q.    It breaks, he gets frustrated?

14         A.    Could be.   That's the scenario.

15         Q.    Right.   That's what the report says, right?

16         A.    Right.

17         Q.    And he gets upsets and throws the tools, right?

18         A.    Right.

19         Q.    That puts her in fear according to you?

20         A.    What about the first part of the sentence?

21         Q.    What about my question?

22         A.    What about your question?

23         Q.    Answer it, please.

24         A.    I am really trying so hard to do that.

25         THE COURT:   Just answer the question if you can.


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1          MR. PATTERSON: Well, you're free to say "I can't

2     answer the question" if you don't understand it.

3          THE WITNESS: I don't understand your question.

4     BY MR. MARTINEZ:

5          Q.    Okay.  Well, then, let's go over it a little

6     bit more slowly.  You indicated to me that intimidation

7     always includes fear, correct?

8          A.    Yes.  I did say that.

9          Q.    They're synonymous for --

10         A.    One indicates the other, yes.

11         Q.    So instead of saying "intimidation," let's say

12    "fear," all right?

13         A.    Okay.

14         Q.    One of the things she wrote, "He always threw

15    things, broke furniture, smashed doors," right?

16         A.    Yes.

17         Q.    Those were events that happened, not at the

18    same time, right?

19         A.    Right.

20         Q.    According to her, she doesn't tell you what

21    things, "He always threw things."  We don't know a time frame

22    for that when he threw those things, right?

23         A.    Right at this time --

24         Q.    Right.

25         A.    -- when she's filling this out, right.


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1          Q.    We don't know what things he threw?

2          A.    Right.

3          Q.    Then she says, "He broke furniture."  We know

4     what that means?

5          A.    Yes.

6          Q.    So the breaking of the furniture caused her

7     fear, right?

8          A.    Yes.

9          Q.    And smashing doors caused her fear, right?

10         A.    Right.

11         Q.    So then we get to "While working on his own

12    stuff, he would throw tools."  That caused her fear too,

13    right?

14         A.    I think it's the whole sentence.

15         Q.    Well, let -- ma'am, you had no problem saying

16    "yes" to breaking furniture, right?

17         A.    Right.

18         Q.    You have no problem to fear, her being in fear

19    when doors were smashed, right?

20         A.    Right.

21         Q.    But you do have a problem saying that she was

22    in fear when he threw tools while working on his boat

23    outside?

24         A.    I see it as a sentence, as a full sentence.  To

25    take one piece of it doesn't make any sense to me.


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1      Q.    I -- it may not make any sense to you, but

2    would you agree or disagree with me, as we were going through

3    this earlier, that what you said was breaking furniture did

4    cause her fear.  You did tell me that earlier, right?

5      A.    Yes, I did.

6      Q.    Smashing doors.  You told me that did cause her

7    fear, right?

8      A.    Yes.

9      Q.    And then I come to the third part of the

10    sentence, "Throwing tools while he's working on the engine,"

11    you can't tell me if that caused her fear.  Is that what

12    you're saying?

13      A.    I will say that it caused her fear because it's

14    part of the sentence that describes more heinous kinds of

15    things.

16      Q.    Let's go over to using male privilege now.  It

17    says, "On Sundays I had to work for five hours."  That's what

18    it says, right?

19      A.    Yes.

20      Q.    That really has -- does that have to -- does

21    that have anything to do with using male privilege?

22      A.    No.  It's a sentence that precedes the rest of

23    the paragraph.

24      Q.    Right.  But that sentence itself doesn't have

25    anything to do with male privilege, right?

1          A.     That's correct.

2          Q.     Then it says, "Sometimes Joe had to watch the

3     babies," right?

4          A.     Right.

5          Q.     I think it then says, "He would do this

6     grudgingly"?

7          A.     Right.

8          Q.     So she's complaining a little bit with him

9     there?

10         A.     About his grudgingly wanting to watch the baby,

11    yes.

12         Q.     So the answer is "yes," right?

13         A.     Yes.

14         Q.     "Whenever they would need their diapers

15    changed, he would" -- I think it says -- "call me at work"?

16         A.     That's what it says.

17         Q.     So whenever they would need their diapers

18    changed, he would call her at work, right?

19         A.     Right.

20         Q.     Did it say how many occasions he did that?

21         A.     No, it doesn't.

22         Q.     It could be one time, right?

23         A.     I suppose it could be one time.

24         Q.     Or a whole bunch of times, right?

25         A.     Correct.

1          Q.     And we know it only happened on Sunday, if

2     we're going to take the first sentence into account?

3          A.     That's the way she's written it, correct.

4          Q.     So for the rest of the week when she was

5     working, whether it be Monday through Thursday or Monday

6     through Friday, whatever it was, he wouldn't do it, right?

7     Because she specifically mentioned Sundays, right?

8          A.     She did specifically mention Sundays.

9          Q.     Then it says, "I would" -- I believe it says --

10    "have" --

11         A.     Right.

12         Q.     -- "to drive home, change them, then sneak out

13    of the" -- you're going to have -- it's cut off --

14         A.     House.

15         Q.     " -- out of the house to get back to work,"

16    correct?

17         A.     Correct.

18         Q.     It specifically references a house, right?

19         A.     Yes, it does.

20         Q.     So this changing of diapers that she's talking

21    about did not occur at the San Riva apartment complex, did

22    it?

23         A.     I suspect she's using "house" to refer to

24    "home," meaning wherever you're living.

25         Q.     Ma'am, what you're doing when you suspect

1    things is when you suspect things, agree or disagree, is the

2    same thing as when you assume things, isn't it?  You really

3    don't know?

4           A.    Should we look at when the children were born

5    and where they were --

6           Q.    Ma'am, that wasn't my question.  The question

7    is when you say "I suspect," it means that you really don't

8    know.

9           A.    You're right.

10          Q.    And the point is they did live in a house at

11   one point and that was when they lived in Casa Grande, right?

12          A.    That's right.

13          Q.    And after that they moved into the apartment,

14   right?

15          A.    Right.

16          Q.    And then from then on they lived in an

17   apartment, right?

18          A.    Right.  We'd have to go back and check the date

19   of when they lived in the house.

20          Q.    I understand that, but I'm trying to get the

21   basics here.

22          A.    Okay.

23          Q.    And when they were at the San Riva apartment

24   complex, they lived in Apartment 132, we know that.  Will you

25   accept that?

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1          A.     Yes.

2          Q.     And will you accept that their apartment was

3     within walking distance of the office, of the leasing office

4     as most apartment complexes go?

5          A.     I don't believe I ever saw a layout.  I don't

6     know where that apartment was in connection to the leasing

7     office.

8          Q.     But you would agree it is part of the San Riva

9     complex?

10          A.     Yes.

11          Q.     Okay.  And what she -- what she's telling you,

12     if we take your interpretation of it, is that she would get

13     in her car that was parked, I guess, and I would assume she

14     would have to drive from her apartment number 132 to her

15     office, right?

16          A.     If that's where they were living at the time

17     that she's referring to.

18          Q.     Right.  And then if it was lunch time she

19     wanted to go home, she would get in her car and drive what

20     appears to be a short distance, from what we've seen before,

21     a short distance away to her apartment.

22          A.     I suppose she could have.

23          Q.     But does that make sense that somebody would,

24     if it's within, you know, walking distance, there's a couple

25     buildings there, they would take the car every time to go to

1    work?  It's just easier to get up and walk to work?

2              A.    You know, I just don't know.

3              Q.    Just like you don't know that "house" actually

4    means "apartment"?

5              A.    Right.

6              Q.    But they did once live in a house, right?

7              A.    Right.

8              Q.    And that was back in the '90s, right?

9              A.    Right.

10             Q.    So if we then get back to the apartment living

11   for a minute and go back to your report, it does say that he

12   would come drive to her apartment and lay on the horn, right?

13             A.    Drive to her office --

14             Q.    To her --

15             A.    -- and lay on the horn?

16             Q.    Sorry, to the office and lay on the horn,

17   right?

18             A.    Right.

19             Q.    If we're using this as the basis, it would mean

20   this action happened back in the '90s, if it happened at all,

21   right?

22             A.    Help me go through that one again.  I think you

23   lost me.

24             Q.    Well, one of the things that we know is that

25   they lived very close, in apartment 132, to where she worked

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1     her office.  We know that.

2            A.     I'll accept it if you're telling me that.

3            Q.     Right.

4            A.     Okay.

5            Q.     Also, it's more convenient to walk to her

6     work.  That's -- that's part of why they give her the

7     apartment.

8            MR. PATTERSON:  Well, wait, wait, wait.  That's an

9     assumption.

10           THE COURT:  Sustained.

11           MR. PATTERSON:  Not founded in any testimony.

12           THE COURT:  I'll sustain the objection.  Let's move

13     on.

14     BY MR. MARTINEZ:

15           Q.     Having said that, that is within a short

16     distance to walk?

17           A.     Okay.

18           Q.     And having indicated here that it says "house"

19     not "apartment," then we can say that, look at this, and one

20     of the things that's consistent with this is that it happened

21     while they lived in Casa Grande, right, not at the apartment?

22           A.     Because of the word "house"?  Is that why

23     you're saying that?

24           Q.     And because of the distance.

25           A.     I don't have any way to know which -- it makes

```
1     sense to me, people often refer to where they're living at
2     their house or their home, whether they're in an apartment or
3     condo or whatever, so I would have to guess that's what she's
4     referring to here.
5            Q.    Okay.  So the bottomline is you can't -- you
6     can't do that, right?
7            A.    Right.
8            Q.    So you can't tell me that this laying of the
9     horn occurred at the San Riva apartments, can you?
10           A.    I can do that if I can go back and read where I
11    wrote that.
12           Q.    Why don't you go ahead and review your report,
13    okay, and tell me where it says it.
14                 (Pause in proceedings.)
15    BY MR. MARTINEZ:
16           Q.    Why don't you just try page 16, second
17    paragraph from the top?
18           A.    Okay.  On page 12 I found when they moved into
19    San Riva.
20           Q.    Okay.  You already told us previously that was
21    in the Fall of 1999.  I think you may have referenced October
22    or September of 1999, correct?
23           A.    Correct.
24           Q.    So go to page 16?
25           A.    Okay.
```

1      Q.     Second paragraph from the top.  It follows the
2  issue of the birthday, the limousine, and the birthday,
3  right?
4      A.     Correct.  So that's San Riva.
5      Q.     So pursuant to your notes, this laying on the
6  horn occurred at the San Riva apartment complex?
7      A.     That is correct.
8      Q.     Then the threats.  We may have discussed this,
9  but I don't think so, it indicates "He told me if I ever had
10  an affair, he would never forgive me and he would make sure I
11  couldn't do it again."  That's what that says, right?
12      A.     Yes.
13      Q.     That was one of the threats he made to her,
14  right?
15      A.     Right.
16      Q.     And I guess that is something that she did not
17  feel intimidated by, right, not afraid of that, right?
18      A.     That would be correct.
19      Q.     "And if he was drinking and I made him angry, I
20  knew he would break things, push me around and cuss me out,"
21  right?
22      A.     Right.
23      Q.     "Seems like every time he would drink he would
24  engage in that conduct," correct?
25      A.     I would assume that from what she has written.


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1        Q.     But that may not be the case though, correct?

2        A.     I think people make statements all the time

3    that are kind of global when they really might not mean

4    global.  I don't know what was in her mind when she wrote

5    that.

6        Q.     Then it says I know -- "I knew he'd break

7    things, push me around, and cuss me out, so I did my best

8    never to make him upset," right?

9        A.     That's what it says.

10       Q.     In other words, what it says throughout their

11   marriage -- "never" is an all encompassing word isn't it?

12       A.     Yes.

13       Q.     And throughout the whole marriage, in

14   everything she did, she tried to never to make him upset.

15   That's what she's telling you, right?

16       A.     That is what she's telling me.

17       Q.     That paints a pretty rosy picture of somebody

18   who's very, very honest, faithful, there all the time,

19   willing to get him cheese crisps, all that sort of thing,

20   right?

21       A.     It paints the picture of an idealized

22   relationship, I suppose.

23       Q.     One of the things that you presented for us

24   during direct examination was the abusive observation

25   checklist, right?

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1          A.    That's right.

2          Q.    And that was something that was administered

3     back on April 11 of 2003, correct?

4          A.    Yes.

5          Q.    And I'm just going to mark it as an exhibit

6     because I want to talk to you about some of the things on

7     it.  Well, actually we could just look at it.  Then I'll mark

8     it.

9                At the bottom of it is page 164 --

10               THE COURT:  Let's have it marked for identification.

11               MR. MARTINEZ:  Okay.

12               (Pause in proceedings.)

13     BY MR. MARTINEZ:

14          Q.    Take a look at this test that you

15     administered.  This is one of the ones that's not scored,

16     correct?

17          A.    Correct.

18          Q.    It does say 164 on the side, doesn't it?

19          A.    Right.

20          Q.    Okay.  And basically there's a topic on the

21     left, right?

22          A.    Correct.

23          Q.    And then it says "You did to your partner" at

24     the top and then it says "Partner did to you," and then it

25     says "Previous partner," correct?

```
1           A.    Correct.
2           Q.    And just for -- I'm going over this for
3     illustrative purposes.  Then it says "You did to your
4     partner" and it has zero, 1 to 3, 3 to 10, 10 to 49, more
5     than 50, right?
6           A.    Right.
7           Q.    And then it says "Partner did to you," and it's
8     the same sort of thing, right?
9           A.    Right.
10          Q.    It's zero, 1 to 3, 3 to 10, 10 to 49, and then
11    more than 50, right?
12          A.    Right.
13          Q.    And then it says "Previous partner did to you
14    ever," right?
15          A.    Right.
16          Q.    And it says "yes" or "no," right?
17          A.    Correct.
18          Q.    And basically what happened in this case is you
19    gave this to her and then it has a number of items that are
20    there and they actually trail some of the items that are in
21    the power and control wheel, right?
22          A.    Right.
23          Q.    And she went ahead and she answered some of
24    them, right?
25          A.    Right.
```

1          Q.     Answered all of them, right?

2          A.     Yes.

3          Q.     Let's just, without looking at the topics, I

4    just want you to take a look, for example, at Page 156, and

5    we'll make it wider.  This is basically what she did.  If it

6    was zero, she went all the way down and did all the arrows,

7    right?

8          A.     Right.

9          Q.     And then whatever it was on the right side,

10   that's what she did, and then one, five, seven, we have the

11   same sort of structure, right?

12         A.     Correct.

13         Q.     If we go to page 158, again, I'm looking at the

14   checks and arrows, you see that they're all checked right

15   here on the left, you did to your partner, partner did to you

16   on the right, right?

17         A.     Correct.

18         Q.     The one concern that I have, and my question is

19   this, when "previous partner did to you ever," there's no

20   checkmarks.  They're just to the side.  Did you put those in

21   there?

22         A.     Me?

23         Q.     Yes, you.

24         A.     No, sir.

25         Q.     So she changed from straight checkmarks here

1    and then under "Previous partner did to you ever," started

2    going to the side, right?

3         A.    I guess so, yeah.

4         Q.    And then if we go over to 160, we see all the

5    checkmarks here on the left, right, and then on the right?

6         A.    Right.

7         Q.    And now instead of going over to the side, the

8    line comes straight down.  Did you do that line?

9         A.    No, sir.

10        Q.    Okay.  Let's go to page 161.  See all the

11   checkmarks there on the left?

12        A.    Yes.

13        Q.    And this is the one where I engage in extra

14   marital affairs.  There's the one, right?

15        A.    Right.

16        Q.    Then it says "Partner did it to you," there's

17   the checkmarks, then there's a line all the way down here,

18   right?

19        A.    Right.

20        Q.    And then the checkmark there is much larger

21   and have a different consistency if you will.  Did you put

22   that there?

23        A.    No, sir.

24        Q.    And just so that we can complete the picture,

25   162, all the checkmarks there then a line straight down and


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1     that changes from the going side to side we saw before, same

2     page, with regard to page 163, right?

3          A.    Right.

4          Q.    How long did it take her to complete this?

5          A.    I don't think I know -- well, let me see.

6     Wendi filled out this one, the response to violence inventory

7     and lethality assessment all on the same day.

8          Q.    Okay.

9          A.    That's 4-11, and what I have marked on my

10    invoice is that I was with her for two hours.  So I can't

11    tell you.  All I know it was two hours, she did those three.

12    They rarely take two hours to do --

13         Q.    Okay.

14         A.    -- so --.

15         Q.    But she does tell you on page 158 that she

16    never required medical treatment, outpatient or clinic,

17    right?

18         A.    Correct.

19         Q.    She also told you that she never -- it says,

20    "You required medical treatment but received none."  That

21    never happened to her right?

22         A.    Right.

23         Q.    And then it says that she required no medical

24    treatment and all the time, right?  That's what it says,

25    right?

1          A.     Right.

2          Q.     And there was never permanent injury and it

3     defines it as blindness, loss of hearing, disfigurement

4     chronic pain, none of that, right?

5          A.     Right.

6          Q.     No internal injuries, no contusions, right?

7          A.     Right.

8          Q.     No broken bones, right?

9          A.     Right.

10         Q.     No broken nose or jaw.  Then it goes on, right?

11         A.     Yes.

12         Q.     No black eyes, right?

13         A.     Right.

14         Q.     No severe bruises, right?

15         A.     Correct.

16         Q.     No severe cuts, no minor burns.  She does

17    indicate that she did bruise on occasion, right?

18         A.     3 to 10 times, yes.

19         Q.     She does indicate that, right?

20         A.     Right.

21         Q.     But this isn't subject to scoring, right?

22         A.     That's right.

23         Q.     One of the ones you did say was subject to

24    scoring was the partner abuse scale, right?

25         A.     Yes.

1          Q.      Nonphysical?

2          A.      Yes.

3          Q.      And basically what that does under the -- I'm

4     going to mark this as an exhibit.

5                  (Pause in proceedings.)

6     BY MR. MARTINEZ:

7          Q.      It doesn't give us any of the information

8     provided on there, just shows the head, right?

9          A.      Yes.

10         Q.      It says this questionnaire is designed and

11    tells them what it's designed to do, and 1, none of the time,

12    and lays it out there basically 7, all of the time, correct?

13         A.      Right.

14         Q.      And you indicated that with regard to Exhibit

15    1 -- 456, the abuse scale nonphysical, that she scored a 60,

16    right?

17         A.      Correct.

18         Q.      I notice in the scoring there's a figure of

19    9000.  What does that mean?

20         A.      9000?

21         Q.      Yes, ma'am.

22         A.      Oh, down towards the bottom?

23         Q.      Uh-huh.

24         A.      Well the scores manual gives you instructions

25    about how to score this, and I'm trying to remember how you

1    add them all up.  You subtract any that are not completed --

2    I'd have to go back to the scoring manual.  You divide --

3    there's four or five steps in the scoring.  9000 was some

4    number that I was following in the directions that got

5    divided by 150 to get the 60.

6           Q.    And those are directions that you followed,

7    right?

8           A.    In the manual, right.

9           Q.    Right.  And in part that requires your

10   interpretation, doesn't it?

11          A.    Well, it's just adding, subtracting,

12   dividing -- that's all.  It's just simple math.

13          Q.    And with regard to this particular 456 that we

14   have, that's the one that actually puts the numbers --

15          THE COURT:  Mr. Martinez, actually it's been

16   mismarked.  It should be 455 for identification.

17          MR. MARTINEZ:  Okay.

18          THE COURT:  Hold on a second.  Hold on a second.

19   We'll have the clerk do that.  So when you or the witness has

20   made reference to Exhibit 456 for identification, you're

21   referring to 455 for identification.  Thank you.

22   BY MR. MARTINEZ:

23          Q.    And the numbers, it's like there's 1 to 25

24   questions on it, right?

25          A.    Correct.


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1        Q.    And numbers are put on there, right?

2        A.    Her answers you mean?

3        Q.    Right.

4        A.    Yes.

5        Q.    You didn't put those there, right?

6        A.    No.

7        Q.    She's the one that provided all the information

8   on that, right?

9        A.    Right.

10       Q.    She's the same person on whom the report was

11   based, right?

12       A.    Right.

13       Q.    Okay.  And the same thing is true with regard

14   to the partner abuse scale physical, right?

15       A.    Right.

16       Q.    Same sort of thing, she puts the numbers down,

17   then you go through the computation, right?

18       A.    Right.

19       Q.    Then the other one that you have is the

20   response to violence inventory, right?

21       A.    Right.

22       Q.    And basically on the left-hand side you have

23   the frequency, right?

24       A.    Right.

25       Q.    And you put numbers there, right?

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000007661

```
 1          A.    She did, right.

 2          Q.    Right.  And, for example, calling the police,

 3   it asks you the frequency.  In her case she answered zero,

 4   right?

 5          A.    Right.

 6          Q.    Then it gives her the effectiveness ratings of

 7   whatever happened, right?

 8          A.    Right.

 9          Q.    And you do not score this, right?

10          A.    Correct.

11          Q.    But in this one it does say, on the second page

12   of the notes that you provided me, that "fighting back" she

13   indicated zero, "I don't like confrontation," right?

14          A.    Where are you reading from now?

15          Q.    I'm reading from the second page --

16          A.    Yes.

17          Q.    -- of the --

18          A.    Yes.

19          Q.    "I don't like confrontation," right?

20          A.    Right.

21          Q.    And the assessing dangerousness questions

22   basically is just a form like this, right?

23          A.    Right.

24          Q.    It has a question, for example number 1, "Has

25   the abuser ever injured the victim so badly she needed
```

1    medical attention," and she says no, yes, or whatever, right?

2         A.    Yes.   This is my handwriting.   This is not

3    hers.

4         Q.    Okay.

5         A.    It's the only one that's my handwriting.

6         Q.    And why did you fill this out instead of her?

7         A.    I don't recall what was happening as to

8    whether -- why I did it.

9         Q.    Could it be that you filled it out from

10   information that she had already previously given you?

11        A.    No, sir.   I was sitting with her when I

12   administered all of these.   She did all of those and I filled

13   this one out, but I can't -- I just don't recall.

14        ·Q.    One of the things that -- well, we'll leave it

15   at that.   In other words, she told you and you filled it out,

16   right?

17        A.    Right.   I read the questions.   As I recall, I

18   read the questions, she answered, and I wrote it down.

19        Q.    Now, in the power control wheel we had here

20   yesterday, Exhibit 448, the one that differs from my -- or

21   one you used in this case which is Exhibit 453, and it

22   doesn't even look the same, where did you get this one, this

23   power and control wheel?

24        A.    When I -- when that black one didn't show up

25   very well, I remember that I got on the internet.   I got a

1    bunch of power point slides from previous presentations that

2    I had done, and what I did was I downloaded that on to a disk

3    and printed it because it was better quality.

4            Q.    Do you then -- that means you were the one that

5    created the pieces of the pie or labelled the piece of the

6    pie, right?

7            A.    No.   That was -- that was a slide that I

8    already had.   I didn't create -- I didn't create the wheel.

9            Q.    Right.   I know you didn't create the wheel, but

10   you created the pieces of the pie.   I'm asking you whether or

11   not you created the pieces of the pie?

12           A.    You mean, put things inside it?

13           Q.    Right.   For example, one of them here,

14   minimizing, denying and blaming, right?   That's on Exhibit

15   448?

16           A.    Right.

17           Q.    On Exhibit 453 that is not included, correct?

18           A.    That's correct.

19           Q.    On 453 it says on the lower right hand corner,

20   "Originated by the Domestic Abuse Intervention Project,"

21   right?

22           A.    Right.

23           Q.    This doesn't have any of that.   So my question

24   is did you create this from your experience?

25           A.    No, I did not create that from my experience.


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1        Q.     Where -- then where does it come from?

2        A.     I don't -- I don't remember the origination of

3    it.  I -- I used it in a power point presentation in a

4    workshop that I did at some point in time.  I have some notes

5    on my hard drive and I was looking for a new power and

6    control wheel because the other one was so poor.

7        Q.     But does that mean that in order for it to be

8    an effective power and control wheel you could just sort of,

9    given your experience and education, you could start creating

10   these different sorts of pieces of the pie?

11       A.     Could I?

12       Q.     Yeah.

13       A.     Sure, I could.  I suppose I could.  I didn't.

14       Q.     But what I'm saying and the test would then be

15   valid then still?

16       A.     If I created it?

17       Q.     Yeah.

18       A.     If it was different, then no.

19       Q.     Well, this --

20       A.     That's at any time one that got administered.

21       Q.     This one, Exhibit 448.  I think what you're

22   telling us is you could have always used that in this case,

23   right?

24       A.     I wouldn't have.

25       Q.     I know you wouldn't have, but I brought it into

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    court.  Could you have used it?

2            A.    Is it possible, yes.  Would I have?  No.

3            Q.    So if you could have used it, then go between

4    that one and Exhibit Number 453, the things that are in

5    common, 448 and 453, there's "intimidation," right?

6            A.    Right.

7            Q.    There's also "emotional abuse."  We've got

8    those, right?

9            A.    Uh-huh.

10           THE COURT:  Is that a "yes"?

11           THE WITNESS:  Yes, sorry.

12   BY MR. MARTINEZ:

13           Q.    We've got "male privilege," right?

14           A.    Yes.

15           Q.    We've got "using children," right?

16           A.    Yes.

17           Q.    And we have "economic abuse," right?

18           A.    Correct.

19           Q.    The only two that -- and given what you told us

20   before that you don't have to meet all of the pieces of the

21   pie, that could mean that this could be just as effective,

22   Number 448, as Number 453, right?

23           A.    When you say "effective," what are you meaning?

24   Effective in eliciting the information?

25           Q.    Effective in your assessment as you did with

1    regard to Exhibit 453?

2         A.    I suppose it could be.  I didn't do that, but

3    it could be.

4         Q.    No one's accusing you of doing that.  I'm

5    asking you as an expert, is that what could happen?  Would

6    Number 448 be an effective tool just like Exhibit Number 453

7    in determining whether or not there was domestic violence

8    perpetuated on the defendant?

9         A.    It could be used as effectively.

10        Q.    So then it really doesn't -- these have not

11   been normed.  Do you know what I mean when I say "normed"?

12        A.    I'm quite well aware of research terminology,

13   sir.

14        Q.    Okay.  I know that yesterday we talked about

15   secondary gain and what I was thinking.  That's the reason I

16   phrased it that way, so I apologize.  But have any of these

17   been normed, these wheels?

18        A.    If you -- if you want to use the term "norm" in

19   a very specific research way.

20        Q.    Right.

21        A.    I would say no.

22        Q.    Okay.  And when you say that in a research way,

23   what do you mean by that?

24        A.    I mean that scientific empirical testing would

25   have been done probably with a control group, probably with a

1    research group, a group that had been identified as battered

2    women already, and testing would have been done and we would

3    have gotten norms.

4          Q.    And that -- that hasn't been done in this?

5          A.    I don't believe so.

6          Q.    One of the things or flavor I got from reading

7    from your report was when it came to the affair, when it came

8    to the relationship with Mr. Andriano and those sorts of

9    things, that none of this was the defendant's fault.  That's

10   the flavor that your report gives me.  Would you agree or

11   disagree with that?

12         A.    Are you referring to a particular passage?

13         Q.    I'm referring to the overall feel of the report

14   that nothing the defendant did in this case is really her

15   fault because she's the victim of domestic violence.  And I'm

16   talking about saying in this case, I'm talking about the

17   relationship with Rick Freeland and the relationship with Joe

18   Andriano.  And I'm talking about the relationship with her

19   co-workers and employment, all of that stuff up to, let's

20   say, you know, the first part of October, October 1 to the

21   present.

22         A.    Fault, that's the operative word here.

23         Q.    Well, that she was a victim of circumstance

24   then?

25         A.    The process that I use focuses around whether

1    or not a person is a victim of domestic violence.  Then looks

2    for levels of severity and then uses that as an explanation

3    for the court --

4           Q.    Okay.  Well --

5           A.    -- for behaviors, so I'm struggling with how

6    you're using "fault."

7           Q.    Well, then let's go with specifics.  On page 6

8    it talks a little bit about the financial quandary that the

9    Andrianos found themselves in.  Talks about the beginning of

10   the marriage?

11          A.    Yes.

12          Q.    And one of the things that you said was, "Joe

13   liked keeping up with the Joneses by trading in his truck

14   every year for a new model," right?

15          A.    Right.

16          Q.    Since he wasn't working at a very good job, she

17   had her job but it didn't pay probably as much has they

18   needed, this was creating financial hardship on the marriage,

19   right?

20          A.    Right.

21          Q.    So it was his fault?

22          A.    That he wanted to keep up with the Joneses.

23          Q.    No.  It was his fault for creating this

24   financial quandary that's what you say there, right?

25          A.    Yes.

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1          Q.     And it was because he wanted to keep up with

2     the Joneses, right?

3          A.     Right.

4          Q.     The other thing that you say is on page six of

5     the report you also say, "Even from the beginning or early

6     parts of the marriage, he," being Joseph Andriano, "began to

7     isolate Wendi Andriano from her friends," right?

8          A.     Right.

9          Q.     Even though earlier you couldn't tell me the

10    name of any friend whatsoever, right?

11         A.     A particular friend, correct.

12         Q.     Right.  And if he is beginning to isolate her,

13    then it really isn't her fault how she's beginning to feel

14    about him because he's isolating her, right?  These -- this

15    is the start of the domestic violence trail, right?

16         A.     I suppose that's true, that would be the

17    beginning.

18         Q.     Okay.  And so she's in a situation, he's doing

19    this to her, so whatever comes what may, it won't be her

20    fault because he put her there, right?

21         A.     I don't think I ever said that.

22         Q.     No.  I'm asking you isn't that what that's

23    indicating?

24         A.     It doesn't say that.

25         Q.     It does say, ma'am, from the early days of

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000007670

1      their marriage Joe began to isolate Wendi from her friends.

2      Doesn't it say that?

3           A.    Yes, it does.

4           Q.    And we -- you've indicated that's -- that's one

5      of the ways that a batterer gains control over the other

6      person, right?

7           A.    Right.

8           Q.    Okay.  So it's his doing, isn't it?

9           A.    Yes.  The isolation is his doing, right.

10          Q.    Right.  So it's -- so he has to not accept the

11     consequences, but it's something that he's embarked on,

12     right?

13          A.    Right.

14          Q.    Okay.  Also there you tell us, next paragraph,

15     was that Wendi states that "Joe was often like a spoiled

16     child who expected her to take care of him no matter what the

17     cost," right?

18          A.    Right.

19          Q.    So if it meant she lost her job, got in trouble

20     at work, whatever, it was his fault because he was demanding

21     it, right?

22          MR. PATTERSON:  Judge, could we approach please?

23          THE COURT:  Yes.

24

25               (The following proceedings were held at the

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    bench:)

2

3         MR. PATTERSON: The county attorney continually

4    misstates the report. The report describes conduct or facts,

5    not --

6         THE COURT: Not so loud. Whisper.

7         MR. PATTERSON: It doesn't describe fault, which is

8    an issue for the jury, and it's kind of a moral condemnation

9    not present in this particular report. So I object. I

10   object to this continued line of questioning that seems like

11   she's describing fault to either party.

12        THE COURT: Mr. Martinez, let's move on. You can

13   make your record, but let's move on.

14        MR. MARTINEZ: Okay.

15        THE COURT: You're beating a dead horse.

16        MR. MARTINEZ: The bottomline is this person is

17   biased and that's the point I'm trying to drive home. She's

18   biased and it indicated in her report nothing the defendant

19   ever did no matter, how heinous, how terrible, specifically

20   having an affair, no matter what she did, it's okay, so she's

21   biased.

22        THE COURT: You're beating a dead horse. Let's move

23   on.

24        MR. MARTINEZ: Okay.

25   / / / / /

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1                    (The following proceedings were held in open

2       court:)

3

4       BY MR. MARTINEZ:

5              Q.    With regard to the working, it was Mr. Andriano

6       that wasn't working, right?

7              A.    Right.

8              Q.    Or if he did it was sporadic, not her, right?

9              A.    Right.

10             Q.    The debt began to mount because of his spending

11      money on the boats, not her, right?

12             A.    I believe that's true.

13             Q.    With regard to when she met Rick Freeland part

14      of it, the reason she went with him, according to her, was

15      because -- was because Joe provided the opportunity when he

16      took the children to his parents' home, right?  And Rick

17      invited her to a barbecue, right?

18             A.    Provided her with the opportunity meaning he

19      was not home?

20             Q.    Right.

21             A.    Is that what you mean?

22             Q.    Right.

23             A.    Right, he was not home.

24             Q.    Okay.  And according to Wendi, or the

25      defendant, it was always Rick who found a reason to talk

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    to -- with her, either in the office or he would call her at

2    work, right?

3              A.    That's what I've written, correct.

4              Q.    And initially she didn't agree.  She didn't

5    want to go out, but then she finally agreed to go out with

6    Rick, right?

7              A.    Right.

8              Q.    And then she did, that same day after the

9    barbecue, she went with Rick to Rockin' Rodeo, right?

10             A.    Right.

11             Q.    And she recalls dancing and that's something

12   Joe wouldn't do with her but Rick would, right?

13             A.    Right.

14             Q.    So the bottomline, the tenor of this whole

15   thing, is that in your opinion she is a victim of domestic

16   violence, right?

17             A.    Yes.

18             Q.    And all of these -- all of this conduct that

19   we've been talking about is -- is really as a result of

20   something Mr. Andriano did, right?

21             A.    Domestic violence is the act of aggression.  It

22   sets up an experience for the victim.

23             Q.    But she is a victim of domestic violence at the

24   hands of Mr. Andriano and that's why she did the things she

25   did, right?

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1          A.     Basically, yes.

2          Q.     And she continued -- she continued to be a

3    victim of domestic violence.  And in fact when you talked to

4    her about the report, for example, the reason she didn't tell

5    you about reporting the incident to the Casa Grande Police

6    Department was because she was a victim of domestic violence,

7    right?

8          A.     I never had a conversation with her about why

9    she didn't.  I didn't know there was a report.

10         Q.     The point is there's no reason why she didn't

11   tell you about the report to the police in Casa Grande,

12   right?

13         MR. PATTERSON:  Judge, I'm sorry.  I've lost track

14   here.  What incident are we talking about?

15         MR. MARTINEZ:  The one involving Mr. King, Shawn

16   King.

17         MR. PATTERSON:  Okay.  Objection.  She wasn't called

18   upon to evaluate the relationship between Mr. King and my

19   client.

20         THE COURT:  I'll sustain the objection.  Let's move

21   on.

22   BY MR. MARTINEZ:

23         Q.     With regard to the relationship with Mr. King,

24   you found that important for your report, right?

25         A.     In the beginning?

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1          Q.    Right.

2          A.    Yes.

3          Q.    So she didn't tell you that she did report what

4    Mr. King did to the police, did she?

5          A.    She did not tell me that, correct.

6          MR. MARTINEZ:  Nothing further.

7          THE COURT:  Mr. Patterson?

8

9    REDIRECT EXAMINATION BY MR. PATTERSON:

10         Q.    Dr. Murphy, in the course of the Government's

11   cross-examination of you, they talked a lot about domestic

12   violence, so I think we need to start all over again of a

13   fashion here.  I'm not going to try to redo everything here,

14   but I think we need to go back to the definition that you use

15   as the working definition for your analysis in this case,

16   okay?

17         A.    Right.

18         Q.    Again, what is that domestic violence

19   definition that you used as kind of the baseline for your

20   evaluations in this case?  Thank you.  There we go.  It's on

21   the ELMO now.  Is that it?

22         A.    Yes, that's it.

23         Q.    What does it say?

24         A.    Domestic violence is a pattern of assaultive

25   and coercive behaviors often including physical, sexual and

1    psychological attacks as well as economic coercion that

2    adults and adolescents use against their intimate partners.

3           Q.    What is there in the parentheses?

4           A.    This definition was adopted in 1998 by the

5    National Counsel of Juvenile and Family Court judges.

6           Q.    Okay.  So is it a social worker definition or a

7    judicial definition?

8           A.    I would say this is judicial.

9           Q.    Okay.  And that's the definition that you use

10   as the foundation for your evaluation in this case?

11          A.    Right.

12          Q.    Okay.  Now, let's talk about the first part of

13   the definition, pattern of assaultive and coercive

14   behaviors.  What exactly does that involve?

15          A.    Well, "pattern" means I can't call it domestic

16   violence if it's once.  I'm looking for a series.

17          Q.    Okay.

18          A.    "Assaultive" is a physical attack of some sort.

19   "coercive," control.  These are behaviors that I'm looking

20   at.

21          Q.    Okay.  Now, these are behaviors found in the

22   abuser?

23          A.    In what the abuser has done too, yes.

24          Q.    Okay.  Now, let me ask you, in your experience

25   and research are these behaviors most often manifested by the

1    abuser on the abused in a public or private context?

2            A.      Private.

3            Q.      Okay.  All right.  Is that one of the reasons

4    that domestic violence has a great deal of myth about it and

5    a great deal of --

6            MR. MARTINEZ:  Objection.  Leading.

7            THE COURT:  Don't lead.

8    BY MR. PATTERSON:

9            Q.      Okay.  Does that result in certain

10   misapprehensions about domestic violence?

11           A.      Yes.

12           Q.      Okay.  And what are they or why is that so?

13           A.      Because domestic violence for the most part

14   occurs behind closed doors.  We don't have witnesses like you

15   might to a robbery.  So trying to elicit information about

16   what's gone on behind those closed doors necessarily comes

17   from the victim.  Sometimes we get lucky, and by that I mean

18   she's told one or two people or somebody happens to see

19   something.  I don't often have victims that are fortunate in

20   that way.

21           Q.      Okay.  And certainly there's a range of

22   behaviors that you're assessing here, right?

23           A.      Right.

24           Q.      On the part of the abused -- abuser?

25           A.      Right.


             TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1          Q.     In your research in your clinical experience,

2    do you find that the more extreme behaviors like violent

3    behavior are manifested in a public setting or in a private

4    setting?

5          A.     In my experience it's private.

6          Q.     Okay.  For instance, actual physical violence,

7    does that often or frequently happen in the public sector in

8    view of other witnesses?

9          A.     No, it does not.

10         Q.     Okay.  Where does that generally occur?

11         A.     Inside the home.

12         Q.     All right.  In your experience, according to

13    the research, is there a difference, if you will, between the

14    behavior of the abused person in the presence of the

15    controlling person or abuser as opposed to being in the

16    presence of persons who are not the abuser in the

17    relationship?

18         A.     Yes, there's a difference.

19         Q.     Okay.  In your research and in your clinical

20    practice, based upon what you know about this issue, would

21    you expect to see the abuser resort to the controlling

22    behaviors in the public sector in the presence of other

23    witnesses?

24              MR. MARTINEZ:  Objection.  Asked and answered.

25              THE COURT:  Overruled.  Go ahead, answer the

1    question.

2            THE WITNESS:  Can you repeat it?

3    BY MR. PATTERSON:

4            Q.    Okay.  In your -- in the research in your

5    clinical experience, would you expect to see the controlling

6    behavior of the abuser obviously manifest itself in the

7    public context in front of other witnesses?

8            A.    Okay.  The answer is sometimes.

9            Q.    Okay.

10           A.    And there's a specific reason for an abuser to

11   do that in the public setting.

12           Q.    Okay.  And what is that reason?

13           A.    One way of controlling a victim in public is by

14   the use of a look.  He doesn't have to say anything.  He

15   gives her the look.  The only person who knows that look for

16   sure usually is the victim unless somebody else has seen that

17   happen to her.  So that is a method of control that's often

18   used in a public place.

19           Q.    Okay.  That look then would not be appreciated

20   by the general public that was observing them together?

21           A.    Correct.

22           MR. MARTINEZ:  Objection.  Leading.

23           THE COURT:  Don't lead.

24   BY MR. PATTERSON:

25           Q.    Okay.  Would you find it unusual in your

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    experience or in the research that co-workers of Ms.

2    Andriano, in fact her subordinates, if you will, did not

3    observe Joe Andriano, the abuser in this case, publicly abuse

4    his wife in their view?

5           MR. MARTINEZ:  Objection.  Lack of foundation.  She

6    doesn't have how they observed her.

7           THE COURT:  Overruled.  Answer the question if you

8    can.

9           THE WITNESS:  I would not expect Wendi's subordinates

10   to see that.

11   BY MR. PATTERSON:

12          Q.    Okay.  In your experience, according to the

13   research, it would be unusual for colleagues to witness the

14   abuser abusing the person?

15          MR. MARTINEZ:  Objection.  Leading.  Asked and

16   answered.

17          THE COURT:  Sustained.  Don't lead.

18   BY MR. PATTERSON:

19          Q.    Okay.  According to the research, what would be

20   unusual in that context?

21          A.    I got lost with all of that.  Can you repeat

22   it?

23          Q.    Okay.  I'm just trying to ascertain from you

24   according to the research, in your clinical experience, we

25   posed as a -- as a fact in this case that persons working

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1   with Wendi called her the person in charge, the person who

2   wore the pants.  Those are his words, okay?  Do you find that

3   observation by subordinate co-workers to be unusual in the

4   context of domestic relations or domestic violence?

5        A.   I'm actually not surprised to hear they might

6   see it that way because that actually appears, from her

7   report, she was the one who was taking care of everything.

8   Joe was pretty dependent upon her for income and livelihood

9   and household and all of that, so that could appear on the

10  surface of things, without knowing what's going on behind

11  closed doors, she could appear to be a strong woman.

12       Q.   Okay.  In your experience according to the

13  research are there differences in characteristics or conduct

14  of the abused woman in the public sector when she's away from

15  the controlling person?

16       A.   There would be.  I would expect to find

17  differences in the public versus private.

18       Q.   Okay.  Let's talk specifically about the Rick

19  Freeland circumstance.  Did you find any evidence based upon

20  what was told to you or what you read in this case that Rick

21  Freeland was an abusive personality or abuser in the

22  relationship that he had with Wendi?

23            MR. MARTINEZ:  Objection.  Relevance.

24            THE COURT:  Sustained.

25            MR. PATTERSON:  No, no.


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1          THE COURT:  Let me see Counsel here.

2

3               (The following proceedings were held at the

4      bench:)

5

6          THE COURT:  Go ahead.

7          MR. PATTERSON:  He made many, many times the point

8      that she stood outside and pounded on his door and stood up

9      to him.  It's a completely different circumstance when a

10     person stands up to a nonabusive personality.  She would

11     never do this to Joe and --

12         THE COURT:  Hold on a second.

13         MR. PATTERSON:  -- that's going to be the follow-up

14     questions.

15         THE COURT:  Hold on a second.  Repeat your question

16     for me again.

17         MR. PATTERSON:  Can you find any evidence of abusive

18     relationship between Rick Freeland and Wendi.

19         THE COURT:  Okay.  Mr. Maritnez?

20         MR. MARTINEZ:  How is that relevant?  He could

21     certainly --

22         THE REPORTER:  Step closer to the mic, Counsel.

23         THE COURT:  Come up here.

24         MR. MARTINEZ:  Sorry.  How is that relevant whether

25     or not he was a batterer or not?

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1          MR. PATTERSON:  Because he's not a batterer she could

2     stand up to him.  The batterer is who she couldn't stand up

3     to.

4          THE COURT:  Okay.  I understand what you're asking.

5     I'll overrule the objection.

6

7               (The following proceedings were held in open

8     court:)

9

10          THE COURT:  The objection is overruled.

11               Mr. Patterson, can you repeat the question?

12     BY MR. PATTERSON:

13          Q.    In your evaluation of this case did you find

14     any evidence to conclude that the relationship Wendi had with

15     Rick Freeland was an abuser-abused victim relationship?

16          A.    No evidence.

17          Q.    Okay.  Is there a difference then between the

18     relationships that an abused person has with other

19     individuals as opposed to the relationship she has with the

20     abuser?

21          A.    Certainly.

22          Q.    Okay.  Do you find it unusual then that Wendi

23     on one occasion stood outside Mr. Freeland's door and

24     insisted that he come out and speak with her about certain

25     issues that they had concerning the relationship in light of

1    the fact that Mr. Freeland was not an abuser of her?

2          A.    In light of the fact that the relationship she

3    had with Rick Freeland appears to be quite different from

4    because of the lack of abusiveness and violence, I would

5    anticipate that she would act differently in a relationship

6    with a nonabuser, so am I struck by her banging on the door

7    or whatever it was that we've heard that she has done?  I

8    think there's a wide range of behaviors she could engage in,

9    and that is one that she's now free to do.

10         Q.    All right.  Would you expect to see that same

11    kind of behavior with Joe Andriano?

12         A.    No.

13         Q.    Okay.  Let's talk about those five or six times

14    that the Government attorney suggested that, I think his

15    words were signs of strength where she actually disobeyed an

16    order, if you will, of Mr. Andriano.  Of what duration did

17    you examine this relationship?  What length is this

18    relationship?

19         A.    Eight years.

20         Q.    Okay.  If as he suggests it's five or six times

21    that she displayed some sign of strength, do you find that

22    unusually or extremely frequent in the eight year period

23    you're evaluating?

24         A.    Five or six times out of eight years is

25    infinitesimal, I would think.

1        Q.     Is there any way to calculate what percentage

2    that is in terms of their interpersonal relationship?

3        A.     I wouldn't know how to do that.

4        Q.     All right.  Let's talk about the specifics then

5    of these particular incidents where he, quote, showed signs

6    of strength, closed quote.  The cheese crisp incident.  In

7    your report, page 16, you reflect that Wendi told you that

8    Wendi's friend Chris picked her up to take her to the game?

9        A.     Right.

10       Q.     Okay.  What did she mean by that?  What did --

11   what was the fact that was delivered to you by Ms. Andriano

12   in that regard?

13       A.     That she must have ridden with her.

14       Q.     Okay.  Knowing then that it may have presented

15   an inconvenience to the driver, is that something that needs

16   to be factored in here in terms of whether or not she

17   actually stood up to Mr. Andriano?

18            MR. MARTINEZ:  Objection.  Speculation as to whether

19   or not it was inconvenient to Ms. Hashisaki.

20            THE COURT:  Overruled.  Go ahead, answer the question

21   if you can.

22            THE WITNESS:  There's an assumption then she would

23   have to say to her friend, "Can you turn around, take me to

24   the restaurant or store," whatever, "drive me back home and

25   then we'll go to the game."


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1      BY MR. PATTERSON:

2          Q.    Okay.  And what was the response apparently of

3      Mr. Andriano when she declined to do as he instructed?

4          A.    He kept calling her cell phone and started

5      screaming at her to come home.

6          Q.    When she ultimately arrived home, what

7      happened?

8          A.    He screamed at her about why it took her so

9      long and accused her of being with a man.

10         Q.    Okay.  Did the violence escalate?

11         A.    Violence escalated as they went into the

12     bedroom.

13         Q.    And what happened?

14         A.    He followed her in screaming accusations, she's

15     trying to pacify him -- I'm sorry, what do you want me to

16     do -- keep the peace while she's getting into bed.  And it

17     was at that point somewhere in that time period that he

18     poured the pitcher of Kool Aid over her while yelling at her,

19     pounding on the dresser punching holes in it, breaking some

20     of the drawers, breaking the post on the bed, et cetera.

21         Q.    Okay.  Now, in your evaluation and assessment,

22     do you look at the whole pattern of behavior in terms of

23     determining whether or not there's a problem here?

24         A.    Yes.

25         Q.    Okay.  Is that why you cited this particular

1  instance?  Did you use it to show his response?

2          MR. MARTINEZ:  Objection.  Leading.

3          THE COURT:  Don't lead.

4  BY MR. PATTERSON:

5          Q.    Okay.  Talk to me about why it's important when

6  she did do one thing, okay, decline to go get him the cheese

7  crisp and then the resulting behavior, why that's important

8  in your assessment in this case?

9          A.    I have to operate while doing an assessment

10  from the knowledge that I have about domestic violence in

11  general, about what the research says, based on my clinical

12  experience in addition to the research, et cetera.  So I

13  know that what I'm looking for is how do women or a

14  particular woman respond to the violence.  I'm looking for

15  first assault, worst assault, sometimes worst and last are

16  the same.  I'm looking at how she's responding to that, what

17  has she learned about that violence and abuse.

18          Q.    Okay.  And what lesson did she learn as a

19  result of this particular behavior on the part of Mr.

20  Andriano?

21          A.    That I better do what I'm told.

22          Q.    Okay.

23          A.    Don't be late.

24          Q.    Okay.  All right.  Let's talk about the Las

25  Vegas trip.  She went to Las Vegas with her mother, okay, and

1    then at a later time her girlfriend, Barbara showed up, okay?

2    These were prepaid tickets, okay, over and back.  Knowing

3    that, does that play into your assessment here as to whether

4    or not this was a time that she showed a sign of strength and

5    said no to Mr. Andriano?

6         MR. MARTINEZ:  Objection.  Assuming facts not in

7    evidence.

8         MR. PATTERSON:  Good faith basis, Judge.

9         THE COURT:  Overruled.  Go ahead, answer the

10   question.

11        THE WITNESS:  Okay.  She already had the ticket.

12   She's with mom and Barbara, who I think is a cousin.

13   BY MR. PATTERSON:

14        Q.    Right.

15        A.    She's on the trip.  He knows when she's coming

16   home.  He's asking her to come home a day early.  Am I

17   surprised she said no?  I'm not surprised she said no.

18        Q.    Okay.  In your estimation was there a sign of

19   strength where she actually stood up to Joe Andriano?

20        A.    I don't know that "strength" is the right word.

21        Q.    Okay.  There may have been other factors that

22   played into this decision?

23        A.    Yeah.  She's got two support people with her.

24        Q.    All right.  In any event, as a result of that

25   decision were there adverse consequences at least in terms of

1    the behavior of Mr. Andriano?

2         A.    Yes.

3         Q.    What happened?

4         A.    He pulled up into the airport, stopped the

5    vehicle in a lane in which there was moving traffic, grabbed

6    their suitcases, threw them into the vehicle, and then drove

7    home at somewhere around 100 to 110 miles per hour on the

8    freeway.

9         Q.    Okay.  Again, that behavior on the part of Mr.

10   Andriano, does that factor into your assessment in this

11   particular case?

12        A.    Yes.

13        Q.    And why is that?

14        A.    Well, number one, it's abusive and violent

15   behavior.  Number two, there's an intended victim, only in

16   this case there were three intended victims because there

17   were three people in the vehicle besides himself.  There's no

18   thought about consequences.  Those are all -- that's part of

19   the picture.

20        Q.    Okay.  Do we see a recurrent pattern in these

21   episodes?  When Mr. Andriano doesn't get his way, there are

22   consequences to Mrs. Andriano.

23        MR. MARTINEZ:  Objection.  Leading.

24        THE WITNESS:  Yes.

25        THE COURT:  Overruled.

```
 1    BY MR. PATTERSON:

 2          Q.    All right.  We talked about the concept of

 3    isolation.  Is that -- is there an ongoing kind of dynamic

 4    here in terms of isolation over the course of the

 5    relationship?

 6          A.    Yes.

 7          MR. MARTINEZ:  Objection.  Leading.

 8          THE COURT:  Overruled.

 9          THE WITNESS:  Yes.

10    BY MR. PATTERSON:

11          Q.    Tell me about that?

12          A.    Well, from the -- from Wendi's words, it

13    started at the time of the planning for the wedding.

14          Q.    Okay.

15          A.    So that's pretty early on in the relationship.

16    And he allowed certain people in --

17          Q.    Okay.

18          A.    -- her life, her parents in particular, and he

19    disallowed other people so that her circle was her parents,

20    sometimes his parents, because they were apart, sometimes his

21    sisters.  Because they were apart at different periods in

22    their history, the -- he allowed in the people she worked

23    with, but it -- nowhere did she ever talk about any other

24    relationships.

25          Q.    Okay.  Would you expect to see a continuous
```

1    pattern of the abuser saying to the abused victim no, you

2    can't this person and next week no, you can't this person and

3    then -- I mean, or is there a point in time when the abused

4    victim says Okay, I know he ain't going to let me do it

5    anyway, I quit?

6         A.    In my experience it doesn't take a real long

7    time for a woman to learn what she can and cannot do, so

8    oftentimes women just give up in that process.

9         Q.    Okay.  According to the information you've been

10   able to uncover in this case, the reports of Wendi, did she

11   have any significant male friends that were known by Mr.

12   Andriano and approved by Mr. Andriano?

13        A.    I don't remember her mentioning any men in her

14   employ.

15        Q.    Correct.  Any other social friends that were

16   known to Mr. Andriano and approved by Mr. Andriano?

17        A.    You know, Joe had male friends and so when they

18   would go to the lake there must have been a lot of males

19   there.  They were Joe's friends.  I don't remember Wendi ever

20   talking about them as her friends.  Other males?  I don't

21   recall any other males.

22        Q.    Okay.  Is that something of significance in the

23   concept of isolation?

24        A.   Certainly.

25        Q.    Okay.  All right.  On those times where she

1    would go out with her female colleagues, okay, is the fact

2    that he would call her cell phone constantly during those

3    times when she was away from him significant?

4         A.    Yes.

5         Q.    Okay.  And why is that?

6         A.    Well, it's another form of control.  When the

7    person's not near you, you've got to find another way to

8    control them.  Cell phones today are a great way to control

9    your victim.

10        Q.    Okay.  Let's talk about the economic abuse.

11   Mr. Andriano's employment history was sporadic at best,

12   correct?

13        A.    Correct.

14        Q.    Okay.  Is the fact that she apparently was

15   allowed to write checks to APS or to the supermarket for

16   groceries, as Mr. Martinez described, controlling the

17   checkbook?  Is that -- if those checks were used for those

18   purposes, is that significant in terms of not finding her to

19   be subject to economic abuse in this case?

20        A.    There are several parts to your question.

21        Q.    It was a poorly drafted question.  If you want

22   me to do it again, I will.

23        A.    Yes, please.

24        Q.    Talk to me again about economic abuse?

25        A.    The way it's generally used in our society, the

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    man is the bread winner and controls the money and doles it

2    out.  In an abusive relationship typically money is given to

3    the woman to do the things she has to do like go to the

4    grocery store, and there's a million case histories about

5    having to account for each penny when she comes home.  In

6    this relationship, the money is a little bit different

7    because it appears Wendi is the bread winner.

8         Q.    When that money comes into the family --

9         A.    Right.

10         Q.    -- for discretionary expenditure?

11               Okay.  Who apparently was making those

12    decisions?

13         A.    Joe Andriano.

14         Q.    Okay.  And towards what end was he making those

15    expenditures?

16         A.    To the toys, the boats, the parts, those kinds

17    of things.

18         Q.    Okay.  And how is that in this case abusive of

19    Wendi Andriano?

20         A.    Well, if it's benefitting only one party, that

21    money is being taken away from the household expenses and

22    paying bills.

23         Q.    Okay.  Is that essentially the same thing that

24    happens when the man is the bread winner in terms of making

25    the discretionary expenditure decisions?

1          A.    Right.

2          Q.    When he makes it, he spends it in a manner that

3     he wants?

4          A.    Right.

5          Q.    Okay.  And we're saying the same thing in this

6     case?

7          A.    Right.

8          Q.    All right.  You did a number of things in this

9     case.  The things you did in this case, were they generally

10    accepted in your profession in order to come to conclusions

11    about whether or not domestic violence exists in a particular

12    relationship?

13         A.    Yes, in two ways.

14         Q.    Okay.  How's that?

15         A.    Well, first of all, I am a social worker and I

16    have to abide by that particular code of ethics.  That's one

17    arena, but I'm also conducting a domestic violence assessment

18    for the Court.

19               There is no license for a domestic violence

20    expert.  You know, you can get a license for social work and

21    license for psychology, but as far as I know there's no

22    license for domestic violence assessment.  So my job is to

23    know the literature, to understand the research, to have a

24    good strong background in clinical practice, to understand

25    what women are saying when they say it, to learn how to put

1    things in context, to understand the nature of the

2    relationship.  To that end, I need to use the best tools that

3    I know of.

4              What we have isn't perfect.  Neither are any

5    psychological tests perfect.  I have to look for tools. When

6    they are scored instruments, I've got to look to make sure

7    they are valid and reliable, that's number 1.  Then, number

8    2, are they doing what they set out to do.  That's one

9    piece.  I don't put phenomenal stock in things just because

10   they get a score.  26 items cannot possibly tell in full the

11   story of physical abuse or nonphysical abuse.  It's

12   impossible.  That's why I have to use multiple tools.  I

13   can't imagine if you asked every domestic violence expert --

14              MR. MARTINEZ:  Objection.  Narrative.

15              THE COURT:  Sustained.  Ask your next question.

16   BY MR. PATTERSON:

17        Q.    Why is it important to do it in the fashion

18   that you're doing it this way?

19        A.    To the very best of my knowledge, people who do

20   this work put a tremendous stock in the clinical interview.

21   That's where the story unfolds.  That's what dictates what

22   tools I use, where I go, how I do it, how long I need to do

23   it for.

24        Q.    Okay.  Let me ask you then, there's some

25   suggestion you didn't use the MMPI?

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1        A.      Correct.

2        Q.      Minnesota Multiphasic Personality Inventory.

3    Is that an instrument that's generally accepted in your

4    industry?

5        A.      Well, first of all, I couldn't use it because

6    the only people allowed to use it are licensed psychologists

7    and I am not.

8        Q.      Okay.

9        A.      So that would rule it out for me anyway.

10       Q.      All right?

11       A.      But besides that, there's a tremendous amount

12   of material written about the MMPI-I or II, whichever one we

13   want to talk about, that clearly indicates that it's not the

14   tool of choice.  However, having said that, there is a

15   subscale that does look at PTSD.

16       Q.      Okay.  You -- that's an acronym.  Tell us what

17   that means?

18       A.      Post Traumatic Stress Disorder.

19       Q.      Okay.  So it has a narrow application in PTSD

20   evaluation?

21       A.      Right.

22       MR. MARTINEZ:  Objection.  Leading.

23       MR. PATTERSON:  I'm just reiterating what she said.

24       THE COURT:  Overruled.

25       THE WITNESS:  There may or may not be information.

1          MR. MARTINEZ:  Objection.  Lack of foundation that

2    she knows about these type of tests.

3    BY MR. PATTERSON:

4          Q.    Have you researched this issue in this

5    particular?

6          A.    I have.

7          Q.    Are there articles pertaining to this

8    particular --

9          A.    There are.

10         Q.    Based on the articles, what is your opinion in

11   that regard?

12         A.    My opinion is the MMPI --

13         MR. MARTINEZ:  Objection.  She's not an expert in

14   that area.

15         THE COURT:  Overruled.

16         THE WITNESS:  My opinion is that the MMPI-II,

17   although a wonderful instrument for many other reasons,

18   cannot possibly give you information about a domestic

19   violence history.  It wasn't created to do that.  It wasn't

20   normed in that way.

21   BY MR. PATTERSON:

22         Q.    Okay.  Using that term again, "normed."  What

23   do you mean by that?

24         A.    Would have to be tested with a group of people

25   who are known to not be victims of domestic violence and a

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    group who are known to be.  Then you look at the result.

2    There's a number of statistical analytical formalities you

3    have to go through and come up with a norm, meaning a score.

4         Q.    Okay.  Any other information in the MMPI that's

5    relevant to our circumstances here?

6         A.    What I would say is that the MMPI-II can

7    certainly be used in doing an assessment for domestic

8    violence if it is used in conjunction with a good solid

9    clinical interview and other appropriate tools directly

10   relevant to domestic violence, which the MMPI-II is not.

11        Q.    Okay.  Now, the county attorney suggested the

12   concept of secondary gain, and in fact a client may lie to

13   you for other purposes?

14        A.    Right.

15        Q.    Were you mindful of that concept before you

16   engaged in your discussions with Wendi Andriano?

17        MR. MARTINEZ:  Objection.  Vouching.

18        MR. PATTERSON:  Opened the door.

19        THE COURT:  Let me see Counsel at the bench.

20

21             (The following proceedings were held at the

22   bench:)

23

24        THE COURT:  Go ahead.

25        MR. MARTINEZ:  She's now going to say she was mindful

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    which means she is now a lie detector.  I specifically asked

2    her in your report it says this, in your report it says that.

3    I never asked her if she believed it or not believed it.  We

4    just went over what the statement was and whether or not

5    there were any inconsistencies.  I never asked her if she

6    believed or not.  If we are allowed to get into this

7    particular area, she, of course, is going to, per her

8    interview, say that she spends too much time because she

9    could then get a feel for the person and because of that she

10   could then turn around and say they're being truthful or not.

11        THE COURT:  Mr. Patterson?

12        MR. PATTERSON:  I told you this was coming, Judge.

13   He suggested that the only reason she came to these

14   conclusions is based upon the information supplied by my

15   client and that my client was lying to her.  Her opinions are

16   invalid.  I told you that was going to happen.  He did do

17   that.  He opened the door wide open.  I'm not -- she's not

18   going to say "I think she was telling me the truth."  She's

19   going to say I asked for the sorry -- or asked for the story

20   in several different manners and I reasked questions.  I go

21   over certain areas and I do that to determine whether or not

22   there is lying in the case.  That's not vouching for the

23   client in any fashion.  It's the methodology of her work that

24   he's already attacked.

25        THE COURT:  Go ahead.

1        MR. MARTINEZ:  I never asked her whether or not her

2   client was lying.  I asked her about specific instances in

3   the report and then I tested them against other evidence that

4   had already been produced in court.  I never indicated to

5   her, well, how was -- weren't you -- in other words, I didn't

6   say to her, are you sure she was telling you the truth, and

7   then the door would have been open.  I never did do that.

8        THE COURT:  I'll give you the final word.

9        MR. PATTERSON:  He doesn't have to ask expressly was

10  she telling the truth or not.  He said in one of his

11  questions, one of his questions, you're whole report is based

12  upon the validity of what she told you, isn't it?  And that's

13  what I need to be allowed to ask her.  She's going through

14  different methodology to eliminate it.

15       THE COURT:  Okay.  I'm going to let you -- I'm going

16  to let you ask the question you just asked, which was

17  basically whether if she was mindful of the possibility of

18  second --

19       MR. MARTINEZ:  Secondary gain.

20       THE COURT:  Secondary gain, period.

21       MR. MARTINEZ:  Yes or no.

22       THE COURT:  Don't go any further than that.

23       MR. PATTERSON:  I need to be allowed to ask her

24  whether she -- when she conducted her unstructured interview

25  in a fashion to minimize that possibility.


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1           MR. DELOZIER:  And what it is.

2           THE COURT:  I'll let you ask the previous question

3      that you asked and that question.  Don't go beyond that.

4           MR. PATTERSON:  Okay.

5           MR. MARTINEZ:  And, Judge, the first question calls

6      for a yes or no answer.  I don't want her to go --

7           THE COURT:  I'm going to let you lead.  Just have her

8      answer yes or no.

9           MR. DELOZIER:  To the first one?

10          THE COURT:  To both.

11          MR. PATTERSON:  Well, I'm allowed in this context to

12     explain or have her explain what the concept of secondary

13     gain is and then follow-up with the efforts she made to

14     minimize that possibility.

15          THE COURT:  She already explained it yesterday.

16          MR. PATTERSON:  Well, we've been up here for 20

17     minutes.

18          THE COURT:  She didn't know what it was yesterday

19     basically until he pressed her on it.

20          MR. PATTERSON:  She acknowledged that.

21          THE COURT:  So it's already out there.  Just ask the

22     two questions that we just discussed.

23          MR. PATTERSON:  All right.

24          THE COURT:  Lead.

25      / / / / /

1              (The following proceedings were held in open

2     court:)

3

4              THE COURT:   Mr. Patterson.

5     BY MR. PATTERSON:

6              Q.    You stated yesterday in response to the county

7     attorney's question that the possibility exists when a

8     client's telling you the story, okay, that there will be the

9     potential for secondary gain and they may be fabricating,

10    correct?

11             A.    Yes.

12             Q.    Okay.  Do you employ efforts or techniques in

13    your unstructured interview process to minimize the potential

14    or probability of that phenomenon occurring?

15             A.    Yes.

16             Q.    Okay.  Do you employ efforts in the process of

17    the assessment of collateral interviews?

18             A.    Yes.

19             Q.    Okay.  And what are they?

20             A.    Those are interviews with outside persons that

21    may have witnessed or had some knowledge of, in this case,

22    domestic abuse.

23             Q.    Okay.  And why do you do that collateral

24    interviewing process?

25             A.    To see if there's corroboration.

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1          Q.     Let's talk about this power and control wheel.

2     What part does that play in the totality of the assessment?

3          A.     It's just the beginning.  It helps me to make

4     some initial thoughts about am I going to find what I'm going

5     to find here or, you know, do we end now or is there enough

6     information that I need to proceed.  It's -- it's how I

7     start.  You know, we do a couple hours of clinical interview

8     when we do that.

9          Q.     Okay.  Have there been circumstances -- how

10    many assessments have you done?

11         A.     I'd have to go back to my notes.

12         Q.     I'm not talking about the ones in court but the

13    ones in general?

14         A.     Oh.  Over 1000.

15         Q.     Okay.  Were there objections in those other

16    sessions or assessment situations where using the power

17    control wheel you stopped and determined that there was no

18    need to go any further based upon the results of the power

19    and control wheel?

20         A.     Yes.

21         Q.     And typically what kind of responses would you

22    see to the power and control wheel that led you to believe

23    there was no need to go any further?

24              MR. MARTINEZ:  Objection.  Relevance.

25              THE COURT:  Overruled.  Go ahead, answer the question

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1  if you can.

2        THE WITNESS:  Well, I'm looking to see if there's

3  examples.  If there's no examples to those items or at least

4  the majority of them, it doesn't look like I'm going to find

5  domestic violence.

6  BY MR. PATTERSON:

7        Q.    Okay.  So similar to what we have here, you

8  give the power and control wheel to these other individuals

9  and they didn't cite to you specific concrete examples of

10 circumstances that the client fit into the wheel?

11       A.    Right.

12       Q.    Okay.  In this case with Wendi, was that the

13 case or is there something different at work here?

14       A.    Well, no, because she had examples for seven

15 out of eight.

16       Q.    Okay.  And is it important they give you any

17 number of specific examples for each portion of the pie?

18       A.    Actually, I directed her to just give me one.

19       Q.    Okay.  So what could you do if you find that

20 there are a number of responses to the various portions of

21 the pie?

22       A.    Well, sometimes the person will actually say

23 that you just want one?  Because there's an indication there

24 must be more than one.  And it depends, if I'm doing an

25 assessment for court then I'm probably going to want more

1    than one, but I don't need more than one right now at this

2    moment to make a decision.  If you didn't have -- you've  got

3    examples for 7 out of 8, let's say, then that gives me

4    information.  I'm going to go forward.  I'm going to get that

5    information in the context of the story.

6              Q.    Okay.  Now, in those circumstances where you

7    gave the power control wheel and based upon the responses

8    included therein, you determined there was no need to go any

9    further?

10             A.    Right.

11             Q.    Did you call the attorney in that regard if

12   there was one?

13             A.    Yeah.

14             Q.    And essentially did you tell them there's no --

15             A.    That he didn't have a domestic violence case.

16             Q.    Okay.  All right.  Let's talk about --

17             THE COURT:  Let me see Counsel here at the bench for

18   just a moment.

19

20                   (The following proceedings were held at the

21   bench:)

22

23             THE COURT:  Sounds like you're going to be a little

24   bit more.

25             MR. PATTERSON:  Yeah, it's --


          TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1          THE COURT:  We'll take our afternoon break at this

2     point in time.

3          MR. PATTERSON:  Okay.

4

5               (The following proceedings were held in open

6     court:)

7

8          THE COURT:  Let's take our afternoon break at this

9     point in time.  Remember this entire admonition including the

10    fact you're not to discuss this case with anyone, do not let

11    anyone discuss the case with you, keep an open mind about the

12    case.  We'll see you in about 20 minutes.  We'll be in

13    recess.

14

15               (Recess.)

16

17         THE COURT:  This CR 2000-096032, State of Arizona

18    versus Wendi Elizabeth Andriano.  The record will reflect the

19    presence of the Defendant, Counsel and the jury.  Sharon

20    Murphy is on the witness stand.  We'll continue with the

21    examination by Mr. Patterson.

22              Mr. Patterson?

23         MR. PATTERSON:  Thank you, Judge.

24    / / / / /

25    / / / / /

1    CONTINUED REDIRECT EXAMINATION BY MR. PATTERSON:

2         Q.    You are Dr. Murphy?

3         A.    Yes.

4         Q.    And you're the same Dr. Murphy that was

5    testifying before the break?

6         A.    Yes.

7         Q.    You realize you're still under oath?

8         A.    Yes.

9         Q.    Before we move to Shawn King, let me ask you a

10   follow-up question to what we were discussing earlier.  I

11   said on some cases at the point in time when you got to the

12   power and control wheel you decided nothing was there, you

13   called the attorney and backed off.  Were there other cases

14   when you went farther into the process and discovered there

15   was no domestic violence issue in that case and informed the

16   responsible attorney in those regards?

17        A.    Yes.

18        Q.    Okay.  Was there a time when you actually got

19   to the end and completed the process and told that attorney

20   what you had found?

21        A.    Yes.

22        Q.    Okay.  So in your discipline, are you free

23   to -- to render whatever opinion you feel is appropriate at

24   all parts of the assessment?

25        A.    Yes.

1        Q.    Okay.  Shawn King was the pastor's son and

2    apparently Wendi reported that he was her first real

3    boyfriend, right?

4        A.    Yes.

5        Q.    She never reported to you that it was a sexual

6    relationship with him, did she?

7        A.    She never reported that.

8        MR. MARTINEZ:  Objection.  Leading.

9        THE COURT:  Overruled.

10       MR. PATTERSON:  Did she ever --

11       THE COURT:  Overruled.  Go ahead and answer.

12       THE WITNESS:  She never reported that.

13   BY MR. PATTERSON:

14       Q.    Okay.  There was a time when there was a break

15   up of that relationship?

16       A.    Correct.

17       Q.    What were the circumstances as reported to you

18   by Wendi?  Page 4, I believe, of your report.  Actually, 3

19   going into 4.

20       A.    She came home from Mexico from the missionary

21   work.  She had made a decision about not being a couple with

22   him again.  Evidently told him about that.  She told him she

23   wanted to date other people.  He pulled the ring he had given

24   her off her finger.  He bit the ring causing the stone in her

25   ring to fall out, then smashed two of her car windows with a

1     rock.

2            Q.     All right.  How is that episode in the context

3     of a domestic violence assessment important?

4            A.     It's actually the first story that I have about

5     domestic violence.

6            Q.     Okay.  And is it something that -- you talked

7     about the term "conditioning".  Would it have some

8     relationship to that concept of conditioning?  First time she

9     breaks up with a boy, he breaks her windshield?

10           A.     Yes.  I remember mentioning, several days ago I

11    think, about the cumulative so this was the first of many and

12    most people learn about responses and it's something you tuck

13    away.

14           Q.     Okay.  And just so we understand the precise

15    verbiage that you provided in your report, would you read us

16    that last line relating to that incident?

17           A.     She did not report this incident to the police.

18           Q.     Okay.  Did she tell you that it was not

19    reported or that she did not report the incident?

20           A.     She did not report the incident.

21           Q.     Okay.  There were some errors in terms of dates

22    in your report, specifically in terms of times that may have

23    occurred.  Are there -- are there errors of that import in

24    your report?  He brought to your attention certain dates that

25    were inaccurate.  Are there any dates that you wish to

1    change?

2         A.    I don't remember dates that were inaccurate.

3         Q.    Okay.  There was a time when you relate that

4    Joe hired an attorney, and that's on page 12 of the report?

5         A.    Yes.

6         Q.    Okay.  At what point in time was that decision

7    made to retain an attorney according to your report?

8         A.    Well, the only thing I have to go by is the

9    preceding paragraph.  I have written Fall of 1998.  Then the

10   next paragraph goes into resuming life, fairly positive about

11   recovery, he hired an attorney to assist, et cetera.  Then a

12   couple sentences down from that, at this point, and I have

13   1999 or August of 1999, things began getting crazy again.

14        Q.    In the context of your report when do you

15   think that occurred?

16        A.    Between late '98 and the summer of '99.

17        Q.    Okay.  And Mr. Martinez talked to you about Mr.

18   Miller trying to get a hold of the parties, getting Mr.

19   Andriano on the phone and Mr. Andriano would pass the phone

20   then on to Wendi.  You said that there were a couple of

21   decisions being made in this process.  What did you mean by

22   that?

23        A.    Decisions.

24        Q.    Well, he suggested the decisions were being

25   made by Wendi and you resisted that ability to agree with

1    him.  Why do you resist?

2         A.    Because it fit the pattern that I had been

3    seeing that things that Joe didn't really want to have to

4    deal with he gave to Wendi to deal with, like getting more

5    money, going to work, those kinds of issues, so I wasn't

6    surprised to hear that he handed the thing -- the he wanted

7    the doctor to speak to Wendi.

8         Q.    And is there is a decision in that process

9    being made by Joe as to what things Wendi should be doing?

10        A.    Absolutely.

11        Q.    Okay.  Okay.  And there was some issue with

12   regard to the term "house" used in the power and control

13   wheel.  Please explain to us why the term "house" caused you

14   no -- no concern, it's not a big issue here?

15        A.    Okay.  This was an example of the statement

16   that she wrote outside of the piece using male privilege.  And

17   I think that's the one we're talking about.  Is that correct?

18        Q.    Uh-huh.

19        A.    Have to drive home -- is that the one you're

20   referring to?

21        Q.    Leave the house secretly?

22        A.    To change diapers.

23        Q.    Right.

24        A.    Yeah, okay.  So the question is why was I --

25        Q.    The term "house," why do you -- why does that

1  lead you to believe it was at the San Riva and not at the

2  farm setup?

3         A.    Oh, you know, this is being said, she's writing

4  it and then gives it to me and then I give her the next

5  assessment tool.  I read that and I didn't think anything of

6  it because I know people use the word "home" to mean wherever

7  it is they're living.

8         Q.    Okay.

9         MR. MARTINEZ:  Objection.  Lack of foundation, how

10 she knows "house" and "home."

11        THE COURT:  Overruled.

12        MR. PATTERSON:  Go -- please continue your answer.

13        THE WITNESS:  So I wasn't thinking about which exact

14 location she was talking about, whether it was an apartment

15 or whether it was the house on the farm.

16        Q.    Okay.  But it was some information with regard

17 to the fact there were babies involved that led you to

18 conclude that it must have been at a certain location?

19        A.    That happened later.

20        Q.    Because according to the information supplied

21 to you by Ms. Andriano, where were they living after the

22 babies were born?

23        A.    I know they couldn't have been at the farm.

24        Q.    Okay.

25        A.    So they were at one of the apartments.


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1        MR. PATTERSON:  Okay.  Judge, that's all I have.

2    Thank you.

3        THE COURT:  Are there any further questions of this

4    witness by the jury?  If so, please raise your hand.

5

6            (The following proceedings were held at the

7    bench:)

8

9        MR. PATTERSON:  I'll stand on this side because it's

10    my witness.

11        THE COURT:  Question, "Based on information presented

12    to you in court, does your picture, analysis of Wendi

13    change?"

14        MR. PATTERSON:  Fair question.

15        THE COURT:  No objection?

16        MR. MARTINEZ:  I'm not -- I'm not clear as to -- is

17    it the stuff that happened in court, if it's based on the

18    information presented in court, okay, yeah, I have no

19    objection.

20        THE COURT:  Okay.  Next question, "In your opinion is

21    it possible that Joe was a victim of domestic violence at the

22    hands of Wendi?"

23        MR. MARTINEZ:  No objection.

24        MR. PATTERSON:  No objection.  I think I'm supposed

25    to go first.

1        MR. MARTINEZ: Oh, I'm sorry.

2        THE COURT: Question, "What percentage of the

3  population of the United States, Arizona, would you expect to

4  be victims of domestic violence?"

5        MR. MARTINEZ: I don't know how that's relevant in

6  this case. Let's assume it's one percent. How is that

7  relevant?

8        MR. PATTERSON: I oppose it.

9        THE COURT: What?

10       MR. PATTERSON: I object.

11       THE COURT: Okay. I'm not going to ask that

12  question.

13         Next question, "How many persons, clients,

14  victims of domestic violence have you worked with as part of

15  your clinical practice?"

16       MR. PATTERSON: Fair question.

17       MR. MARTINEZ: Yeah, I agree.

18       THE COURT: Next question, "Is it typical for victims

19  of domestic violence to go out or be allowed to go out with

20  friends socially on a weekly or more frequent basis?"

21       MR. MARTINEZ: No objection.

22       MR. PATTERSON: No objection.

23       MR. MARTINEZ: Sorry.

24       THE COURT: Next question, "Is it typical for victims

25  domestic violence to work full time outside the home?"

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1          MR. PATTERSON:  No objection.

2          THE COURT:  Next question, "Do you consider yourself

3     to have a good strong clinical background?"

4          MR. PATTERSON:  No objection.

5          MR. MARTINEZ:  No objection.

6          THE COURT:  Next question, "Can a person give false

7     answers, give answers to make themselves look, quote, abused,

8     end of quote?"

9          MR. PATTERSON:  It's a fair question.

10         MR. MARTINEZ:  No objection as long as it's a yes or

11     no answer.

12         THE COURT:  Next question, "In domestic violence

13     assessment is the -- in the domestic -- in domestic violence

14     assessment is the unstructured interview a sworn statement?"

15         MR. PATTERSON:  That's a fair question.

16         MR. MARTINEZ:  No objection.

17         THE COURT:  Next question, "Can the, quote, abused,

18     end of quote, also become the, quote, abuser, end of quote?"

19         MR. PATTERSON:  I have no objection.

20         MR. MARTINEZ:  No objection.

21         THE COURT:  Next question, "In your opinion is,

22     quote, abuse, end of quote, ever an excuse, end of quote?"

23         MR. PATTERSON:  Well, that's a legal question.  I

24     object to that.

25         MR. MARTINEZ:  An excuse for what?

1          MR. DELOZIER:  What?

2          MR. MARTINEZ:  Know what I mean?  I object on the

3     grounds it's not clear.  As an excuse for what?

4          THE COURT:  I'm not asking that question.

5               Next question, "Is it common for women who are

6     victims of domestic violence to have affairs even though they

7     are fearful of their abuser?  If yes, in general why?"

8          MR. PATTERSON:  I don't know if that's a common

9     knowledge kind of knowledge she would have an answer to, so I

10    object to it.

11         MR. MARTINEZ:  If she knows.  That's the kind of

12    thing we've talked about.  If she knows.

13         THE COURT:  Do you object?

14         MR. MARTINEZ:  No objection.

15         THE COURT:  Next question, "1. You put a list of

16    behaviors that you" -- what is that word?

17         MR. MARTINEZ:  Termed.

18         MR. PATTERSON:  Termed.

19         THE COURT:  Termed?  Okay.  "You put a list of

20    behaviors that you termed abusive, paren, ie. anger, silence,

21    raise your voice, et cetera, end of paren, yet these

22    behaviors are used by all people.  How do you determine when

23    is" -- when -- it says "when is."

24         MR. MARTINEZ:  When it becomes?

25         THE COURT:  It says "is".

1          MR. MARTINEZ:  Right.

2          THE COURT:  Or looks like "is."  "How do you

3    determine when it becomes domestic violence?"

4          MR. PATTERSON:  No objection.

5          MR. MARTINEZ:  No objection.

6          THE COURT:  Next question, doesn't the one-sidedness

7    of the test of characteristics of victim and abuser raise a

8    question, ie. all of Wendi's --

9          MR. MARTINEZ:  Looks like "were".

10         THE COURT:  Were?  No.

11         MR. MARTINEZ:  Use?

12         THE COURT:  Sorry, Wendi's use no cases except of

13   adult -- adultery -- except one of adultery.

14                 Doesn't the one-sidedness of the test of

15   characteristics of victim and abuser raise a question, ie.

16   all of Wendi's use --

17         MR. MARTINEZ:  She's saying all of Wendi's, no cases

18   except of adult -- one of adultery --

19         THE COURT:  And must -- mostly all infringements

20   where the husband's --

21         MR. MARTINEZ:  Only.

22         MR. PATTERSON:  I have no idea.  What is that? It's

23   unintelligible.

24         THE COURT:  I'm not asking that question.  I don't

25   understand it.

1              Next question, Did Wendi indicate --

2         MR. MARTINEZ:  How.

3         THE COURT:  Oh, man.  My eyes are bad.  "Did Wendi

4    indicate how the relationship with Rick Freeland ended?"

5         MR. PATTERSON:  That's fine.

6         MR. MARTINEZ:  No objection.

7         THE COURT:  Next question, "If so, who initiated the

8    breakup and why did it end, if you know?"

9         MR. PATTERSON:  Same, no objection.

10        MR. MARTINEZ:  No objection.

11        THE COURT:  Next question, "In your opinion do you

12   feel Wendi acted more independently at the end of her

13   relationship with Joe, ie. 2000?"

14        MR. PATTERSON:  No objection.

15        MR. MARTINEZ:  No.

16        MR. PATTERSON:  There's a "thank you" on there.

17        MR. MARTINEZ:  There's a "thank you" on there.  The

18   only one.

19        THE COURT:  Oh.  Thank you?  That juror's polite.

20             Next question, "How can Joe have felt better or

21   superior to others and have" --

22        MR. MARTINEZ:  Low self esteem.

23        THE COURT:  -- low self esteem?  "How could Joe have

24   felt better or superior to others and have low self esteem?"

25        MR. PATTERSON:  No objection.

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1          MR. MARTINEZ:  No objection.

2          THE COURT:  Next question, "Can both partners in a

3     marriage abuse each other?"

4          MR. PATTERSON:  No objection.

5          MR. MARTINEZ:  No.

6          THE COURT:  Next question, "In your opinion was Joe a

7     victim of domestic violence?"

8          MR. PATTERSON:  Objection.  It's --

9          MR. MARTINEZ:  Yeah.

10         MR. PATTERSON:  It's duplicative.

11         THE COURT:  "Was there a reason why you did not

12    interview either of Joe Andriano's parents or other family

13    members?"

14         MR. PATTERSON:  Well, that brings in victim's bill of

15    rights and I don't think they would have agreed to an

16    interview, so I -- I don't think she could answer that.

17         MR. MARTINEZ:  There was no request, so I don't

18    know.

19         THE COURT:  I'm not going to ask that question. As

20    long as everyone's up here, we're going to recess after this?

21         MR. PATTERSON:  Right.

22         MR. MARTINEZ:  Right.

23         THE COURT:  Okay.

24

25              (The following proceedings were held in open

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1      court:)

2

3           THE COURT:  I have some additional question here for

4      you from the jury.  First question reads as follows.  "Based

5      on information provided to you in court, does your overall

6      picture analysis of Wendi change?"

7           THE WITNESS:  No, it does not.

8           THE COURT:  "In your opinion is it possible that Joe

9      was a victim of domestic violence at the hands of Wendi?"

10          THE WITNESS:  No, I believe that's not possible.

11          THE COURT:  Next question reads as follows.  "How

12     many patients, clients, victims of domestic violence have you

13     worked with as part of your clinical practice?"

14          THE WITNESS:  At some point during the testimony I

15     said over 1000.  That's -- that number comes predominantly

16     from clinical practice.  I've only done 14 actual cases that

17     were within the criminal or civil court system.

18          THE COURT:  Next question reads as follows.  "Is it

19     typical for victims of domestic violence to go out or be

20     allowed to go out with friends socially on a weekly or more

21     frequent basis?"

22          THE WITNESS:  I think it's important to remember that

23     we're talking about human beings.  And although we create

24     lists, "we" meaning people who work in the field or

25     researchers, create these lists of characteristics that you

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    saw, they're not all inclusive and they don't tell the entire

2    picture.  Every person who batters and every person who's a

3    victim is an individual first.  And so we have these

4    amorphous lists that don't necessarily pertain to every

5    single person.  That's why not every characteristic fits.  So

6    is it possible for one batterer to allow what might look like

7    a lot of freedom?  Yes, of course that's possible.  There

8    might be controls in other areas.

9         THE COURT:  Next question reads as follows.  "Is it

10   typical of victims of domestic violence to work full time

11   outside the home?"

12        THE WITNESS:  Whoever wrote that question might be

13   thinking about the traditional family values and mom stays

14   home and dad works.  And in this case it, of course, was

15   different because dad didn't work a portion of the time so

16   mom needed to work, and he in fact wanted Wendi to do the

17   work.  Is that different?  If I had to make an estimate of

18   the number of cases that I've had and looked at home in terms

19   of traditional family roles, I would say that the majority of

20   them fit the traditional role, meaning dad works, mom stays

21   home.  However, that doesn't mean they all do.  There was a

22   sizeable portion and now as we're in the 2000s and more women

23   are actually working anyway, I expect to see that, in the

24   future research, to be quite a significant change over 20

25   years ago.

1       THE COURT:  Next question reads as follows.  "Do you

2  consider yourself to have a good strong clinical background?"

3       THE WITNESS:  Yes, I do.

4       THE COURT:  Next question reads as follows.  "Can a

5  person give false answers, give answers to make themselves

6  look, quote, abused, end of quote."  And that's a "yes" or

7  "no" question.

8       THE WITNESS:  Yes.

9       THE COURT:  Next question reads as follows.  "In

10  domestic violence assessment is the unstructured interview a

11  sworn statement?"

12       THE WITNESS:  No, it is not.

13       THE COURT:  Next question read as follows.  "Can the,

14  quote, abused, end of quote, also become the, quote, abuser,

15  end of quote."

16       THE WITNESS:  It can or they can.  There's a very

17  small percentage of women in particular that turn around and

18  become the abuser, but there is a small percentage.

19       THE COURT:  Next question reads as follows.  "Is it

20  common for women who are victims of domestic violence to have

21  affairs even though they're fearful of their abuser?  If yes,

22  in general, why."

23       THE WITNESS:  Is it common?  It's not common in my

24  experience.  Have I seen it?  Yes.  The question about fear,

25  if fear is really there why would they take that risk, I

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    assume that's where the fear comes from.  I think that

2    because of the overriding, overarching issue of power and

3    control where the abuser is trying to control the life of the

4    victim, I have seen victims who -- who might act out in that

5    way by having an affair as a way to provide some semblance of

6    what they might find normal, meaning engage in a relationship

7    in which they're seen as having some worth because they're

8    not seen that way in the primary relationship.

9              THE COURT:  Next question reads as follows:  "You put

10   a list of behaviors that you termed as abusive, ie., anger,

11   silence, raising your voice, et cetera, yet these behaviors

12   are used by all people.  How do you determine -- how do you

13   determine when it becomes domestic violence?"

14             THE WITNESS:  If it's domestic violence, the issue of

15   power and control must be present.  I have never seen a case

16   of domestic violence in which that wasn't one of the primary

17   issues, so there's a big difference between somebody giving

18   her husband or wife the silent treatment today and somebody

19   else who tries to dominate and control their partner's life.

20   Very different.  Both people might use the silent treatment,

21   but if there's no issue of power and control, it's not going

22   to probably be domestic violence.

23             THE COURT:  Next question reads as follows.  "Did

24   Wendi indicate how the relationship with Rick Freeland

25   ended?"


          TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1          THE WITNESS:  Can I go back to my notes?

2          THE COURT:  Yes.

3          MR. MARTINEZ:  I'm going to object, Your Honor, with

4   regard to the issue that we talked about.

5          THE COURT:  I'll allow you to --

6          MR. PATTERSON:  Do you need to use your report?

7          THE WITNESS:  Yes, I used notes.

8          THE COURT:  You're going to review your report?

9          THE WITNESS:  Correct.

10         THE COURT:  I'll allow you to review your report.

11  After you review your report, let me know when you've

12  finished and I'll repeat the question for you to answer.

13          (Pause in proceedings.)

14         THE WITNESS:  I'm finished.

15         THE COURT:  And let me repeat the question here.

16  "Did Wendi indicate how the relationship with Rick Freeland

17  ended?"  Were your notes able to refresh your recollection?

18         THE WITNESS:  All I have in the report is that the

19  affair lasted approximately 6 weeks and she reported feeling

20  like she lost her best friend.  I didn't write in the report

21  and I don't remember what Wendi might have said to me about

22  how it ended.

23         THE COURT:  So you're unable to say what she said as

24  far as who initiated the breakup and why it ended?

25         THE WITNESS:  Right, I'm unable to answer that.


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1      THE COURT:  Next question reads as follows.  "In your

2   opinion do you feel Wendi acted more independently at the end

3   of her relationship with Joe ie., 2000?"

4      THE WITNESS:  I think on the face of it it might

5   appear that way because she was going out, able to go out

6   with her girlfriends, and so that looks like it could easily

7   look like she was stronger or empowered somehow, but in

8   reality, she was still being controlled in every other aspect

9   of her life.  And in fact that going out on at least one

10   occasion that was reported to me there was a very serious

11   trade off for her.  In order for her to go out, she had to be

12   back in three hours and he told her he would have a surprise

13   for her, and that surprise was the purchase, while she was

14   out, of $130 worth of sex toys and then she had to succumb to

15   his using those on her.

16      THE COURT:  Next question reads as follows.  "How can

17   Joe have felt better or superior to others and have low self

18   esteem?"  Let me repeat that.  "How could Joe have felt

19   better or superior to others and have low self esteem?"

20      THE WITNESS:  I'm assuming that the phrase feeling

21   superior to others is one of the ones that you remember from

22   the list.  How did he have low self esteem and feel

23   superior.  Low self esteem is something that's quite

24   internal.  It's how I feel about myself.  Somebody can have a

25   real sense of loss internally and act on the surface as

1       though everything is just fine.  In fact there's probably

2       many of us in the world that walk around like that everyday.

3       So feeling superior, you know, to me from her story comes

4       from a sense of being owed something.  And by being owed

5       something, that set him apart.  So I would use superior as --

6       as Joe seeing himself as being set apart from others.

7               THE COURT:  Next question reads as follows.  "Can

8       both partners in a marriage abuse each other?"

9               THE WITNESS:  Right now there are numerous police

10      districts that are collecting data that we request as

11      citizens in the last 10 years since a policy called mandatory

12      arrest was adopted, meaning the victim no longer has the bear

13      the onus of making the report, some -- if the police show up,

14      whether she calls them or a neighbor calls, if she doesn't

15      want to press charges, if the police have a significant

16      reason to believe that there was domestic violence there, the

17      police charge the person.  She doesn't have to.

18               Since that's happened, in many communities

19      across the country, we now have arrest statistics on dual

20      arrests, meaning both parties being arrested.  Police often

21      will say that they can't make the distinction about who's at

22      fault because she has marks and he has marks, and so rather

23      than make a decision, standing in the household, about who

24      did it, often times both parties get arrested.  So we do have

25      statistics on duel arrest.  They're a small portion of the

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    overall domestic violence arrest statistics generally.

2                    Can both people truly be battering one

3    another?  Yes.

4                    THE COURT:  Are there any further questions of this

5    witness by the jury?  If so, please raise your hand.

6                    (No audible response.)

7                    THE COURT:  No one has raised their hand.

8                    Mr. Martinez, do you have any follow-up

9    questions to those jury questions?

10                   MR. MARTINEZ:  It's his witness.

11                   THE COURT:  Sorry, Mr. Patterson.

12                   MR. PATTERSON:  That's okay.

13                   THE COURT:  Mr. Patterson, do you have any specific

14   follow-up questions?

15                   MR. PATTERSON:  Yes, I do.

16

17   FOLLOW-UP QUESTIONS BY MR. PATTERSON:

18           Q.    One of the questions just said can the

19   abuser -- can -- yeah, the abuser turn into the abused in

20   certain circumstances.  Remember that question?

21           A.    Yes.

22           Q.    Do you have any evidence in this particular

23   case that Joe Andriano became the abused at some point in

24   this process?

25           A.    No.


                 TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1        Q.      One of the questions pertained to behaviors of

2   human beings that under certain circumstances can be

3   innocuous -- yelling, screaming.  Again, is the concern as I

4   understand it between domestic violence and use of those

5   behaviors and otherwise innocuous contacts is, that the

6   abuser uses those things to control or dictate the conduct of

7   the abused victim?

8        A.      Yes, and that's a significant difference.

9        Q.      Is that what we have in this case?

10       A.      Yes.

11       Q.      Can you give me a for instance.  Using anger,

12   how is Joe's use of anger in his relationship with Wendi

13   different than if I go home and yell at my wife today --

14       MR. MARTINEZ:  I'm going to object.  We don't know

15   that he abuses his wife.

16       THE COURT:  We don't want to assume that fact in

17   evidence, Mr. Patterson.

18   BY MR. PATTERSON:

19       Q.      Okay.  That a certain person who has a history

20   of abusive behavior towards his spouse goes home and yells at

21   his wife.

22       A.      Sorry to ask you this, but because of the talk

23   I -- I lose the focus.

24       Q.      Yeah.

25       A.      Can you just repeat it?

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1          Q.     How is Joe's use of anger in his relationship

2    with Wendi different than a person who has no history of

3    spousal abuse, that person goes home and yells at his

4    other --  significant other?

5          A.     Okay.  The important piece here is that there's

6    a history and so the victim learns from the first abusive act

7    or assault, what to look for and learns a response.  So if

8    the victim learns that by yelling back, I'm going to get him

9    to stop, she might continue that pattern.  If she learns by

10   yelling back things are going to get worse, she stops.  So

11   anger to a domestic violence victim is one of the facets of

12   how that person controls her.  That's different from any of

13   us going home and just yelling at our spouse if that power

14   and control is not present and there's not be a pattern of

15   abusive and assaultive behaviors.

16         Q.     Okay.  One of the questions posed kind of

17   mutual abuse and you talked about some statistics.  Any

18   evidence in this case of mutual abuse where Wendi abused Joe?

19         A.     No.

20         MR. PATTERSON:  Okay.  Thank you, Judge.  That's all

21   I have.

22         THE COURT:  Mr. Martinez?

23

24   FOLLOW-UP QUESTIONS BY MR. MARTINEZ:

25         Q.     With regard to whether or not Mr. Andriano was

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1   the victim of domestic abuse, you were asked a couple of

2   questions about that.  We did go through the power and

3   control wheel, didn't we?

4           A.    Yes.

5           Q.    And there were indications on that that he was

6   a victim of domestic violence as set out in that power and

7   control wheel, weren't there?

8           A.    You and I bantered quite a lot.

9           Q.    No, ma'am.  Was there, yes or no?

10          A.    Not in my perception.

11          Q.    So even though he fit those parts of the pie,

12  you are indicating that not in your perception was he a

13  victim of domestic abuse, right?

14          A.    You are turning the pieces of the pie --

15          Q.    That's not my question.  Even though he met

16  those pieces of the pie, in your opinion as an expert, he did

17  not meet the guidelines and so he was not a victim of

18  domestic violence?

19          A.    I did not find that he met the pieces of the

20  pie.

21          Q.    All right.  Even though they -- we went over

22  them, you and I, right?

23          A.    Yes.

24          Q.    You also were asked about whether it's possible

25  to be a victim of domestic violence and still go out once or

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    twice a week.  You were asked about that and you said well,

2    you talked about other cases that it could happen.  I'm

3    specifically asking, in this case, is it possible in your

4    opinion that she was a victim and not under his power and

5    control and still able to go out twice a week with people

6    that he didn't know she was going out with?

7            MR. PATTERSON:  Objection.

8            THE COURT:  I'll sustain the objection.  Restate the

9    question.

10   BY MR. MARTINEZ:

11           Q.    Is it possible for her to go out twice a week

12   and still be the victim of domestic violence in this case?

13   Not in theory, but in this case.

14           A.    Yes.

15           Q.    Why is that?

16           A.    Because he chose what he controlled, so if he

17   didn't choose to control that she could go out during the

18   week, then that was an area that he was letting her go on.

19           Q.    But isn't it true that nowhere in the report

20   does it indicate that he chose to let her go out?

21           A.    That's true.

22           MR. MARTINEZ:  I don't have anything else.  Thank you.

23           THE COURT:  May this witness be excused?

24           MR. MARTINEZ:  Yes, sir.

25           MR. PATTERSON:  Yes, Your Honor.


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1          THE COURT:  Thank you very much.  You're excused.

2               Ladies and gentlemen, we're going to go ahead

3   and take our evening and weekend recess at this point.

4   Remember we don't have trial on Friday, tomorrow.  And we'll

5   resume the trial on Monday, which is October 18, at 1:00 p.m.

6               During this extended weekend recess remember

7   the entire admonition I have given you including the fact

8   you're not to discuss this case with anyone, do not let

9   anyone discuss the case with you, do not do any research,

10  investigation, experimentation or testing on our own, avoid

11  any media coverage of this case, keep an open mind.  I want

12  you to have a nice weekend.  We'll see you at 1:00 p.m. on

13  Monday.  Have a nice weekend.  We'll be in recess.

14

15               (Evening recess.)

16

17

18

19

20

21

22

23

24

25

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

134

1

2

3                    CERTIFICATE OF REPORTER

4

5    STATE OF ARIZONA      )
                           )
6    COUNTY OF MARICOPA    )

7

8              I, Traci L. Wheeler, CSR, RPR, an official

9    and certified reporter in the Superior Court of the State

10   of Arizona, in and for the County of Maricopa, hereby

11   certify that I made a shorthand record of the proceedings

12   had in the within case, and that the foregoing transcript

13   is a full, true, and correct transcription of the

14   proceedings in this case.

15             Dated this 12th day of May, 2005.

16

17

18             _____
               Traci L. Wheeler, CSR, RPR
19             Certified Court Reporter No. 50313
               Official Court Reporter
20

21

22

23

24

25



         TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR