# TABLE OF CONTENTS (INTERACTIVE)

| | |
|---|---|
| OOOOOO Part 2 | Motion to Exceed Page Limit |

# EXHIBIT OOOOOO PART 2

EXHIBIT RR



05-0002
Braccio

COPY

1

1      IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

2         IN AND FOR THE COUNTY OF MARICOPA

3

4   STATE OF ARIZONA,                )
                                     )
5          Plaintiff,                )
                                     )
6   v.                               )      No. 1 CA-CR 04-0731
                                     )      MARICOPA COUNTY
7   WENDI ELIZABETH ANDRIANO,        )      No. CR 2000-096032
                                     )
8          Defendant.                )
    ─────────────────────────────────)

9

10

11

12                        Mesa, Arizona
                        October 20, 2004
13

14

15

16           BEFORE:  The Honorable BRIAN K. ISHIKAWA

17

18         REPORTER'S TRANSCRIPT OF PROCEEDINGS

19                       TRIAL DAY 29

20

21

22

23

24   ORIGINAL Prepared for APPEAL by:
     TRACI L. WHEELER, CSR, RPR
25   Certified Court Reporter No. 50313


       TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

2

1                     A P P E A R A N C E S

2     FOR THE STATE:        JUAN M. MARTINEZ,
                            Deputy County Attorney
3
      FOR THE DEFENDANT:   DANIEL B. PATTERSON,
4                           Deputy Public Defender
                                   and
5                           G. DAVID DELOZIER,
                            Attorney at Law
6

7              I N D E X   O F   E X A M I N A T I O N

8     WITNESS                                               PAGE

9     COLLIER, WILLIAM JOE, Called on behalf of the Defendant
              Direct Examination by Mr. DeLozier             4
10            Cross-examination by Mr. Martinez             38
              Continued Cross-examination by Mr. Martinez   43
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25


              TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

                            000007737

1          MESA, ARIZONA, WEDNESDAY, OCTOBER 20, 2004

2

3          THE COURT:  Good afternoon.  This is cause number CR

4     2000-096032, State of Arizona versus Wendi Elizabeth

5     Andriano.  The record will reflect the presence of the

6     defendant, Counsel and the Jury.

7                    Mr. DeLozier?

8          MR. DELOZIER:  Good afternoon, Your Honor.  Thank

9     you.  Defense calls Joseph Collier.

10

11                    WILLIAM JOE COLLIER,

12          CALLED TO TESTIFY ON BEHALF OF THE DEFENDANT,

13       HAVING FIRST BEEN DULY SWORN, TESTIFIES AS FOLLOWS:

14

15         THE COURT:  Please have a seat on the witness stand.

16    Please make yourself comfortable there on the witness stand.

17    Please pull the microphone close to you.  Please remember to

18    speak loudly and clearly in the microphone so everyone can

19    hear you.  Also please wait until the question is completed

20    before you answer the question.  And please make sure you

21    give a verbal response.

22         THE WITNESS:  Yes, sir.

23         THE COURT:  Mr. DeLozier, you may proceed.

24         MR. DELOZIER:  Thank you, Your Honor.

25    / / / / /


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1   DIRECT EXAMINATION BY MR. DELOZIER:

2          Q.    Please state your full name for the record?

3          A.    William Joe Collier.

4          Q.    And where do you reside?

5          A.    In Phoenix.

6          Q.    Okay.  Tell us a little bit about your

7   background.  Where'd you go to school?

8          A.    I have a bachelor of science degree in

9   Chemistry from Baylor University and I've attended Arizona

10  State University.  After getting my -- those academic

11  credentials, I subsequently trained at a number of other

12  places including the Los Angeles Crime Lab and the FBI

13  academy.

14         Q.    And while you were in school at Baylor, what

15  was your major field of study?

16         A.    Chemistry in general.

17         Q.    Okay.  What are you currently involved with?

18  What are your activities?

19         A.    Currently, I'm a consulting forensic scientist,

20  specializing in areas like criminalistics and toxicology,

21  mostly in Arizona.

22         Q.    All right.  There are other states though?

23         A.    Yes.  Yes.  I practice in California, Colorado,

24  Utah, Florida, Texas.

25         Q.    For whom have you done this consulting work?

1          A.     For the United States Army and the Army Court

2     Marshall System, United States Air Force, both prosecutor and

3     defense cases, criminal in nature, and then civil cases.

4          Q.     All right.  During this part of your career --

5     strike that.

6                 How long have you been involved in this field?

7          A.     Since 1962.

8          Q.     And how would you describe the field?

9          A.     Well, the -- the field of forensic science

10    involves just about everything we've seen on CSI except

11    autopsies, I don't do autopsies.  But just about everything

12    else you've seen at one time or another, I've done that.  I

13    began working at the Phoenix Crime Lab in 1962.  I worked

14    there continuously until my retirement in 1994.  And since

15    1994, I've been doing consulting work in the forensic science

16    field.

17                And forensic sciences involves everything from

18    drunk driving cases to comparing bullets in a murder case,

19    blood stains, and then toxicology, the study of poisons and

20    their effects on the human body.

21         Q.     Is that how you define toxicology?

22         A.     Yes.

23         Q.     Are you a nationally recognized expert?

24         A.     Sir?

25         Q.     Do you consider yourself to be a nationally

1    recognized expert?

2         A.    Well, yeah.  I've qualified in governmental

3    capacity and all the way through United States District

4    Court.  Sometimes we call it Federal Court.

5         Q.    Including state -- state courts?

6         A.    Including, yeah, municipal, justice and

7    superior courts in Arizona.

8         Q.    All right.  What position did you hold while

9    you were at the Phoenix crime lab?

10        A.    For about 29 years I was the director of the

11   Phoenix Police Crime Laboratory.

12        Q.    Is there anyone above you in that?

13        A.    Not scientifically.

14        Q.    Okay.

15        A.    But there's always a boss.

16        Q.    Okay.  During that time you testified in court?

17        A.    Yes, I did.

18        Q.    During that time did you testify for one side

19   or the other?

20        A.    During my government service, about 99-some

21   percent was for the Government.  There were only a couple of

22   occasions where a superior court judge ordered me to work for

23   the court and do work for the defense also.  But during time

24   because of my government position, it was almost exclusive

25   for the prosecution, the County Attorney's Office and the

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    State's Attorney General's Office.

2         Q.    Do you have an estimate of the number of times

3    you've testified?

4         A.    Yeah.   It's going to be over 1000 times.

5         Q.    Over your career, have you also taught?

6         A.    Yes, I have.

7         Q.    Where?

8         A.    Well, certainly I've taught at the police

9    academies, teaching policemen and investigators.   I've also

10   taught at the Maricopa County Junior College system, taught

11   college, both in Phoenix and Glendale, and I've been a guest

12   lecturer at ASU.

13        Q.    Are you a member of any professional

14   organizations?

15        A.    Yes.

16        Q.    Which ones?

17        A.    I'm a senior member in the American Chemical

18   Society, member of the California Association of

19   criminalists, and I've been elected as a fellow in the

20   American Academy of Forensic Science.

21        Q.    All right.   Thank you.   What was the purpose

22   for which you were retained in this case?

23        A.    To review the chemical and toxicological facts

24   that have to do with a particular poison, in this case sodium

25   azide, and to communicate that to the attorneys in the case.

1      Q.    And you were to be paid a fee?

2      A.    Yes.

3      Q.    And do you know how much that was?

4      A.    After my court appearance today, the total fee

5    will be right at $1550.

6      Q.    Thank you.  You mentioned sodium azide.  What

7    is it?

8      A.    It's a chemical substance that's used in

9    industry a lot.  For example, air bags have azides in them,

10   and when your car is colliding, it releases an instant volume

11   of gas.  That's sodium azide.  It's also used to make primers

12   in ammunition or artillery shells.  Lead azide is a very

13   explosive compound and it's shock sensitive.  So if you are

14   manufacturing cartridges or military ordinates, this is one

15   of the ingredients that's in the primer, the thing that sets

16   it off.  So there are a number of uses for it.

17           Years ago there was a lot of research on using

18   it to lower your blood pressure, using it as a medicine.

19   Unfortunately, there were a lot of bad side effects too, so

20   that didn't last very long.

21      Q.    What were those side effects?

22      A.    Oh, everything from weakness, heart

23   palpitations, such a rapid fall in blood pressure, that the

24   individual's passed out, that type of thing.

25      Q.    All right.  You mentioned air bags.  Why don't

1    we have a problem when the air bag goes off in your vehicle

2    then?

3            A.    Everything stays in what we call a containment

4    system.  It doesn't get out into the atmosphere until after

5    it's gone off sometime, but while it's going off it's

6    completely sealed and enclosed.

7            Q.    You mentioned that you were involved in

8    toxicology.  Is there a toxicity?  And tell us what that word

9    means?

10           A.    Okay.  Toxicology has to do with poisons, and

11   poisons are substances that cause both a reversible and

12   irreversible destruction on human tissue.  So you could have

13   something that's reversible, that might be like an anesthetic

14   gas in surgery in a doctor's operation, but you go to sleep,

15   you're totally unconscious, and then they can actually bring

16   you back.  An anethesiologist's job is to wake you up as well

17   as put you to sleep.  So a toxicology deals with the

18   hazardous properties of all sorts of substances, everything

19   from cyanide and strychnine, it includes sodium azide, on

20   down to something as commonplace as alcohol and driving.

21   Blood alcohol or alcohol in your system causes various types

22   of impairments and toxicologists are conversant with that.

23           Q.    All right.  You mentioned sodium cyanide.  Can

24   you give us a comparison between it and the sodium azide?

25           A.    Yes.  Sodium cyanide is about three times as

1    toxic or poisonous as sodium azide.   In other words, to get

2    the same effect, it takes one-third of the amount.

3          Q.    What is -- does sodium azide have a chemical

4    symbol?

5          A.    Yeah.   Yeah.   It's -- would you like for me to

6    put it on the board there?

7          Q.    Please?

8          A.    For those of you who have had high school or

9    college chemistry, this might mean something.

10          Q.    The only thing you'll need to do is make sure

11    you speak loud because I don't have a microphone.

12          THE COURT:   Just remember to speak up.

13          THE WITNESS:   All right.   I need a --

14          MR. DELOZIER:   Sorry.   You need a marker?   See if

15    this one will work.

16          THE WITNESS:   Okay.   What this tells us is that in

17    every sodium azide molecule there's one atom of nitrogen and

18    three of hydrogen.   So -- you know, I'm getting old.   There's

19    several different compounds and --

20    BY MR. DELOZIER:

21          Q.    What's the symbol you have up there now?

22          A.    That's for a gas.   Na -- sodium azide -- Na

23    with Nitrogen.   Sodium and nitrogen, so one molecule of

24    sodium and one -- and molecules of nitrogen make it up.

25                Now, in this particular case, Counsel, could

1    you put a "3" just blow the "N"?

2              Q.    This "N" or this "N?"

3              A.    No, that "N" down there to the right.

4              Q.    This one here?

5              A.    Yeah, uh-huh.

6              Q.    Okay.

7              A.    That's sodium azide.

8              MR. MARTINEZ:  Judge, he seems to be referring to

9    some notes.  That's why he's having a problem up there.  If

10   we could just know what's looking at.

11             THE WITNESS:  Yeah, sure.  I think Counsel should

12   have been provided with one sheet.

13             MR. MARTINEZ:  No question, just want to know what it

14   is.

15             THE WITNESS:  That's fine.

16             MR. DELOZIER:  Let me share it with Counsel.

17             MR. MARTINEZ:  And I guess the point is, if he

18   doesn't know, if he could just tell us he's referring to his

19   notes.

20             THE COURT:  If you refer to your notes --

21             THE WITNESS:  Okay.  All throughout my testimony I'm

22   going to be referring to notes so I don't make an error and

23   everything is very accurate and precise.

24                  So the NaN3 is sodium azide.  There may be some

25   other names for it.  And the upper formula --

1        Q.      Referring to NH3 now?

2        A.      Yeah.  Actually, take the 3 off of the "H" and

3    put it on the "N."  There's so many different combinations.

4            MR. MARTINEZ:  I'm going to object.  There's no

5    question.

6            THE WITNESS:  Okay.  So that's --

7            MR. MARTINEZ:  Judge, there's an objection.

8            THE COURT:  Hold on.  Ask your next question, Mr.

9    DeLozier.

10   BY MR. DELOZIER:

11       Q.      You have another symbol up here.  It's N3H?

12       A.      Right.  That's --

13       Q.      Explain that, please.

14       A.      That's a gas that occurs when water reacts with

15   sodium azide.

16       Q.      What's that gas called?

17       A.      Well, it's called hydrozoic acid -- and I

18   apologize to the court reporter, common spelling -- sometimes

19   also called hydronitric acid.  And hydronitric acid or

20   hydrozoic acid is a very pungent, eye-irritating, offensive

21   gas that is formed whenever any moisture or water comes in

22   contact with sodium azide.

23       Q.      Very well.  You've given us a symbol now.  Is

24   there -- we've heard other testimony about pH.

25       A.      Yes.


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1        Q.      What does that mean?

2        A.      If the Court please, I'd like to draw that.

3        THE COURT:   Yes.

4        THE WITNESS:   In chemistry, there's a concept called

5   pH, fancy word or fancy abbreviation.  But it's a scale we

6   use in chemistry to tell whether something is acid or

7   alkaline or neutral.  What we use for neutral is a pH of 7.

8   That's neutral.  Would we find pH 7 in the water in Mesa?  I

9   would guess it would be pretty close to it.  Over here is a

10  pH of 14 and that's very alkaline.

11  BY MR. DELOZIER:

12       Q.      What's that word mean?

13       A.      That means it's like lye or caustic soda.

14  Sodium hydroxide is very alkaline.  Then over on this side we

15  have a pH of 1, and that's acid.  Matter of fact, it's very

16  acid, and that would be things like sulfuric acid that

17  plumbers use for cleaning pipes, muriatic acid that you use

18  as a swimming pool acid.  That's a pretty strong acid.  That

19  stuff will dissolve iron, it will dissolve most all metals

20  except for a few, so the pH then of whether something is acid

21  or alkaline based on a number.  So baking soda would be right

22  here, little bit alkaline.  Right about here would be vinegar

23  or acetic acid as it's called.  So depending on what the

24  substances are, they're either acid, alkaline or neutral.

25       Q.      Very good.  What's -- what's the pH of sodium

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    azide?

2          A.    Sodium azide is in the 4-point something.  Have

3    to look at my notes again, because I'm not very good at

4    remembering notes like that.  Sodium azide -- let's see.

5    Vinegar is 4.72, 4. -- 4.72 is -- is actually this compound,

6    hydrozoic acid, which comes from sodium azide.  Remember,

7    with water, it makes this acid, and so just slightly less

8    than vinegar, if you add a -- you know, tablespoon full of

9    vinegar you may not even be able to tell the difference

10   between that and the azide.

11         Q.    Okay.  Am I understanding you correctly that

12   would be -- in order to get to determine the pH of something,

13   you have to have it in liquid form?

14         A.    Yes, you do.

15         Q.    Okay.  So the pH you're saying here, 4.72, is

16   when sodium azide has been mixed with some other substance?

17         A.    Right.  Anything from stomach acid, food,

18   anything that has water in it will cause that to convert.

19         Q.    All right.  Thank you.  Do you have an opinion

20   regarding what sodium azide would taste like to a person if

21   they took it in the powder form?

22         A.    Well, as soon as it hits your mouth it's going

23   to absorb the water and convert within a matter of seconds.

24   It's going to taste like a mouth full of vinegar, nasty

25   tasting stuff.

1       Q.    Okay.  You touched briefly, there were various

2   strengths of acids.  Given the strength of 4.72 of pH of

3   sodium azide, what would happen to a person if they had some

4   in their mouth or vomited?

5       A.    If you had more than just a trace amount or

6   something like that, if you had a good bit in your mouth,

7   maybe you dissolved it in water and threw it down, it would

8   etch your teeth just like vinegar would.  If you start

9   swishing pure concentrated vinegar around in your mouth, it's

10  going to dissolve your teeth.

11      Q.    We have vinegar in common salad dressings.  Is

12  it something like that?

13      A.    Right.  There it's mixed with a whole bunch of

14  other things and the vinegar is quite diluted.  In a salad

15  dressing we don't use half a cup of pure vinegar.  We-we

16  don't use that for salad dressing.  And of course it's also

17  mixed with various other things which dilute the overall

18  effect.  One of the things you'll notice when you use

19  vinegar, too, it has the effect of pulling all the water out

20  of the salad so that you get a diluted vinegar at the bottom

21  even if you don't use it at the beginning.

22      Q.    All right.  You mentioned what happens when you

23  mix sodium azide with a liquid.  Would you tell me step by

24  step how that process happens and what -- what we end up

25  with?

1       A.    Yeah.

2       Q.    Do you need this sheet or another one?

3       A.    No, that's fine.  I think we can -- make an

4 equation like this with water.  Any time the sodium azide

5 comes in contact with water, it immediately produces the

6 hydronitric or the hydrozoic acid.  And this is sodium

7 azide.  It doesn't matter if it's humid in a room or if it's

8 a liquid from any other source.  Once you put it in there, it

9 begins to convert to hydrozoic acid.

10      Q.    Does hydrozoic acid have an odor?

11      A.    Oh, yeah.  It's very unpleasant.

12      Q.    What did -- can you be more specific about that

13 than very unpleasant?

14      A.    Since it's poisonous, not many people breathe

15 much of it, but it's very offensive and pungent.  Since it's

16 an acid, I would have to -- I've never smelled it, but it

17 would be something similar to sniffing pool acid real close

18 to your nose.  I would guess it would burn like heck.

19      Q.    So you would -- would a person have that odor

20 if they put some in their mouth?

21      A.    Oh, yeah.  Yeah, it would be very nasty.

22      Q.    If it was added on a food stance?

23      A.    You'd know it.

24      Q.    How -- why would you know it?

25      A.    Two ways, the odor and the taste, having the

1    vinegar in your mouth.

2         Q.    You mentioned earlier that there had been some

3    studies on the use of it as medical -- for medical

4    treatments?

5         A.    Yes, sir.

6         Q.    Can you explain what some of the things that

7    happened then?

8         A.    In chemicals we're always looking for things

9    that will lower blood pressure, for example.  And the people

10   that were working in the industrial area may notice that

11   their blood pressure, which was normally about 80, the lower

12   level would drop down to 60, 50, they would pass out from

13   time to time, so the pharmacologist decided, well, this has

14   got to be a good medicine to lower blood pressure.  Well,

15   unfortunately the side effects of it were too unpleasant, so

16   it didn't last for very long, although they did try it for a

17   while.

18        Q.    We touched on toxicity level a few moments ago,

19   but is there a toxicity level that's been established for

20   humans?

21        A.    Yes, but only indirectly?

22        Q.    You want to use the chart again?

23        A.    Yeah.  I could -- I could use another picture

24   there, I think.

25        Q.    All right.


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1          A.     But just suffice it to say that the work was

2     done on rats, and it takes 45 milligrams for a 2.2 pound

3     rat.   I don't know how many 2.2 pound rats there are, but

4     that's the way it reads, 45 milligrams per kilogram.

5               So we could change that into human equivalents,

6     but it may not be exactly accurate, but you're going -- it's

7     going to take quite a few grams.   In other words, not just

8     one gram is going to work.   It's going to take quite a few

9     grams of sodium azide to be lethal to half the people.

10         Q.     Would you like do the chart and see what it

11    looks like?

12         A.     Yeah.   I could -- let's see.   I almost need a

13    calculator to do this.   You remember a kilogram is 2.2

14    pounds, so the first thing we do for what we call an LD 50 --

15    that's the number that kills half the rats -- is figure

16    out what the weight of the person is because it's weight

17    dependent.   Is there any weight you'd like for me to use?

18         Q.     Yes.   Let's assume 170 pounds.

19         A.     170 pounds.   Man's weight then is 77.27

20    kilograms.   Now, if we want to know how many milligrams it

21    took, we just multiply 45 times 77.27 and we get 3477.27

22    milligrams and that's an LD, 50.   Where half the people would

23    die.   The other half wouldn't take a lot more, but half the

24    people would die with that level.

25               Now, how much that is depends on how you take

1     it.  Remember that 1000 milligrams equals 1 gram.  And I did

2     bring a little artificial sweetener packet that weighs

3     exactly a gram so the Court could see just about what a gram

4     is in terms of a powder, if that's the sort of thing that

5     someone would like to look at.

6               Q.    That's like a substitute for sugar?

7               A.    Yeah.  It's synthetic sugar.

8               Q.    All right.  There are different volumes though

9     and --

10              A.    Right.

11              Q.    -- depending on what kind the material is?

12              A.    Exactly.  It's called bulk density.  There are

13    some powders real fluffy and light like face powder.  So get

14    a gram of face powder, you might have to get a bag three,

15    four, five times as big as that one.  Then there's things

16    more dense, like some of the salt, sodium chloride, anything

17    like that.  Salt's a lot heavier than face powder, so that's

18    true too.

19              Q.    Is that true of sodium azide?

20              A.    Yes.

21              Q.    It's heavier?

22              A.    It's heavier than face powder.

23              Q.    Okay.  Let me show you what's been marked as

24    Exhibit 387.  Have you seen that before?

25              A.    Yes, here in court today.


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1          Q.     Okay.  Does it provide you information about

2     how many grams are in that bottle or were in the bottle?

3          A.     Yes.  It's a 500 gram bottle of sodium azide,

4     which is 99 percent.

5          Q.     All right.

6          A.     That's at the time it's packaged, not after

7     it's been opened.  Because remember about the moisture in the

8     air causes it to deteriorate.

9          Q.     Moisture in the air causes what to deteriorate?

10    The volume or --

11         A.     The sodium azide.

12         Q.     What happens to it?

13         A.     If you test it, it will lose, in a short period

14    of time, maybe 30 percent of its effectiveness as azide.  So

15    it's the ability of it to form that gas we looked at earlier.

16         Q.     So then it's labelled it's 99.9, what you're

17    saying, according to the label --

18         A.     Right.

19         Q.     -- if the bottle had been open and left opened

20    for, what, half an hour, an hour?

21         A.     Well, depends on what the humidity is, if

22    you're pouring it or doing something with it, it's going to

23    be degrading all the time.

24         Q.     What does it degrade to?

25         A.     Well, primarily hydrozoic acid.  That's

1    probably the significant thing.

2           Q.    All right.  We had testimony from a Joseph

3    Richmond of West Coast Analytical Surveillance earlier, and

4    he said that there was approximately 20 grams missing from

5    what was collected by the science lab, and what we found out

6    also was that he testified that there was this 3.8 parts per

7    million in Mr. Andriano's gastric juices at the time they

8    received the sample of gastric juices from the crime lab here

9    in Phoenix.

10          A.    Uh-huh.

11          Q.    Do you have an opinion regarding that test

12   result?

13          MR. MARTINEZ:  Judge, I'm going object.  Mr. Richmond

14   never testified there was anything missing.  He just said he

15   tested the items.

16          THE COURT:  I'll sustain the objection.  Rephrase the

17   question.

18   BY MR. PATTERSON:

19          Q.    He testified there was 3.8 parts per million in

20   the gastric juices at the time he tested it in his lab in

21   California.  Do you have an opinion regarding that test

22   result?

23          A.    Sure.  Test results of sodium azide are only

24   good for a very, very short time after death because the

25   moisture in the blood continues to cause the gas to be formed

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    and the azide to disappear.  So blood, for example, every

2    four days or so, every four and a half days, half of it is

3    gone.  After a period of time, there's only 25 percent of it

4    left.  That's in blood.

5                Now, in gastric consents, which has hydrozoic

6    acid, or if there's a sample that also has another liquid,

7    such as water, it goes much faster.  How fast, I'm not too

8    sure, but we do know that every hour that goes by, this is a

9    more weakened sample to the point it would almost disappear

10   given enough time.

11        Q.    Do you run separate tests for this hydrozoic

12   acid?

13        A.    You can, but once it's reacted, it's so

14   volatile that it goes out into the atmosphere.  But you can

15   run a test for it, if you wish.

16        Q.    You mentioned blood.  Mr. Richmond also

17   testified they found 2 parts per million of sodium azide in

18   the blood.  What's your opinion about that?

19        A.    We know -- I don't know how long the time was

20   from the time of the collection of the sample or the death in

21   this case until the time he actually analyzed it, but that's

22   also going to be decreasing.  Every four and a half days,

23   half of its going to be gone.  So if we knew the number of

24   days, we could predict pretty much what the blood sample was

25   at the time of death.


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000007757

1    Q.    Very well.  They were also -- West Coast

2    Analytical Services was also asked to test some food

3    samples.  One food sample was a kettle of stew, soups like

4    that, that was sitting on the stove.  He testified of the

5    presence of 20 to 25 parts per million in this kettle?

6    A.    Okay.

7    Q.    Okay.  Do you have an opinion about that?

8    A.    Right.  Well, the reason there were trace

9    amounts or small amounts is two-fold.  If it was something on

10   the stove that would have been heated, this reaction of

11   converting the azide to that volatile acid goes very fast.

12   So the fact there were only parts per million left doesn't

13   surprise me at all.  If you -- if you were to look this

14   particular precipitation up, the acid disappears from the

15   original quantity immediately.  It gets distilled after -- if

16   you cook it for a while.  Very much like steam coming off a

17   stew or something.

18   Q.    Do you have an opinion about how the stew or

19   soup would have tasted if one did try eat it?

20   A.    Yeah.  Pretty unpleasant, pretty unpleasant.

21   It wouldn't be like a green salad with a few drops of vinegar

22   dressing.  It would be dissipating from a stew, I'm sure.

23   Q.    So the Vinegar taste would be there for what

24   period of time?

25   A.    Oh, within a certain number of minutes.  I'm

24

1    not sure what time it would be.  But if you were mixing it up

2    and trying to eat a spoonful or taste a spoonful of it, it

3    would be very unpleasant.

4            Q.    How long would this vinegar taste remain?

5            A.    Well, again, depending on how fast and how long

6    it cooked or even whether it cooked off, but I would think

7    maybe half of it is gone.  You have it cooking, and I don't

8    know the temperature and I don't know the volume, and so it's

9    very, very hard to get a definitive answer on these kinds of

10   cases.  I would say it will never be known the answer for

11   that question.

12           Q.    There were also a couple soup bowls that had

13   some food in it, apparently from that kettle, and they tested

14   those and one was 22 -- 22 parts per million.  And I think

15   the other one was 11 parts per million.  And the pot on the

16   stove is -- 20, 25, pot on the stove.  One of the soup bowls

17   tested at 22 and one at 11.

18           A.    Okay.  So one -- one possibility it was ladled

19   out before all traces of sodium azide had dissolved.  And the

20   other bowl was ladled out the same time as the trace in the

21   kettle or as it's cooking in the pot on the stove.  One bowl

22   is the same, the other one is a lot less, so that one was

23   ladled out before all of it had dissolved.

24           Q.    Now, you're using the word "trace."  Explain

25   that word.

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000007759

1       A.    Well, since we have what we call a minimum

2   detectable amount, that's the amount that we can detect with

3   many tests and scientific instruments, obviously.  When we're

4   talking about milligrams per liter or -- that sort of thing,

5   parts per -- parts per million is like the chlorine they use

6   to chlorinate water you drink.  Per million is a very, very

7   small amount.  If you take a look at a cup of water, the

8   parts per million in that cup of water is a very, very small

9   amount.

10      Q.    Very well.  Thank you. Showing you what's been

11  admitted into evidence as Exhibit 279, I'll ask you a

12  question in a minute.  Just take a look at the bottle or the

13  exhibit.

14            Mr. Richmond also testified that his lab also

15  tested gelatin-like capsules that came from that bottle.

16      A.    Yes.

17      Q.    And the bottle reads what?

18      A.    It's an Elderberry herbal supplement bottle

19  and, as far as the Elderberry, it contains about 480

20  milligrams or a little less than half a gram per capsule.

21      Q.    Half gram per capsule, but that's again by

22  weight --

23      A.    Yes.

24      Q.    -- of the Elderberry?

25      A.    Yes.

1          Q.     Do you know what the weight of Elderberry is

2     compared to sodium azide?

3          A.     No.

4          Q.     Okay.

5          A.     Sure don't.

6          Q.     Mr. Richmond's testimony was the sodium azide

7     in those capsules was 68 percent sodium azide.  Do you have

8     any opinion for that since we saw 99.9 on the bottle?

9          A.     We talked about that probably about a couple

10    takes back.  If you're taking the sodium azide -- does that

11    have an exhibit number -- State's exhibit number?

12         Q.     Yes.  That's 387.

13         A.     If you take the sodium azide from Exhibit 387

14    and you put it in capsules from Exhibit 279, it's going to be

15    exposed during the transfer period to the humidity in the

16    room, and that's going to cause a deterioration of the sodium

17    azide.  It's going to be giving off some gas, that kind of

18    thing.  It's going to be degrading because of the humidity.

19         Q.     I have ask this.  Do you know what color sodium

20    azide is?

21         A.     It's a white crystalline substance.

22         Q.     Would it have the same consistency as something

23    we use everyday?

24         A.     It may not depending on the crystal choice,

25    that sort of thing.  It may be a powder, like sugar or salt.

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000007761

```
 1          Q.     Very well.  Do you know the color of
 2   Elderberry?
 3          A.     No.
 4          Q.     So you don't know whether there's any color or
 5   not?
 6          A.     No.  But since it's a plant material, I would
 7   be surprised if there wasn't.  This says from flowers and
 8   berries, and there are probably not a lot of berries that are
 9   white.
10          MR. MARTINEZ:  I'm going to object.  He's
11   speculating.  He doesn't know.
12          THE COURT:  I'll sustain the objection.
13          MR. DELOZIER:  Excuse me.  Just a minute, Your Honor.
14          THE COURT:  Yes.
15                 (Pause in proceedings.)
16   BY MR. DELOZIER:
17          Q.     Let's assume for a moment that a person were to
18   take these capsules that were filled, according to the lab,
19   with sodium azide.  Assume he took a handful of them and
20   washed it down with liquid.  Tell me what would happen?
21          A.     An air bag would be created in the stomach and
22   if you would almost instantly, as soon as the capsules hit
23   the moisture, they would create this large volume of gas and
24   you'd throw up.  If you swallowed a couple times you might
25   have it delayed.  One of them would cause you to throw up.
```

1   And then pretty much as it dissolved, you would have a second

2   explosive reaction of vomiting.

3          Q.   How long would the initial reactions take?

4          A.   Just as soon as the water or moisture from the

5   stomach gets into the gelatin capsule.  Pretty rapidly,

6   really.  These are not sealed capsules.  On some medicines,

7   the capsule has a sealing band where the top and bottom go

8   together.  This type of capsule -- you can take them apart,

9   put them back together.  They don't have a seal.  Of course,

10  once a little bit of water gets into a capsule like this,

11  what happens, the capsule blows apart because of the case.

12  So you just get a teeny bit of moisture in there and the

13  capsule blows apart and you get an instant gas in the stomach

14  and then nausea or vomiting.

15         Q.   How long would it take for my body to vomit

16  from the time I took a handful of those?

17         A.   Pardon?

18         Q.   How long would it take for me to vomit the way

19  you just described?

20         A.   It's going to be within minutes, I'm sure.

21         Q.   What other things happen to a person?  Let's

22  say I'm watching them.  What would I see?

23         A.   At some point in time you might see them appear

24  dizzy, they appear sick.  They might have a pallor because,

25  remember it's going to cause vomiting or nausea, so they

1    would have all of those symptoms.  If there's a high enough

2    level, they would be collapsing around the time that they

3    would be throwing up.

4         Q.    Okay.  Let's assume that a person is vomiting

5    and trying to get up, okay?  How long would it take that

6    person to be able to get up and walk around again?

7         A.    Well, it's -- vomiting is designed for the body

8    to get things that are bad out of the system.  So if you do

9    vomit a couple of times and you get all but a trace amount,

10   in a case like that, then you'll recover very fast.  Again,

11   if you're vomiting you are not going to feel 100 percent, but

12   you are going to feel like running somewhere.

13        Q.    Going to feel like what?

14        A.    Running somewhere.  You'll be able to get up

15   and move around.  Your legs will feel probably rubbery and

16   weak, but you'll still be able to move around.

17        Q.    How long would it take for the rubbery and so

18   on, so forth to dissipate?

19        A.    Not very long.  Again, you're talking about

20   minutes.  The person is going to pretty much quantitatively

21   be recovered with enough oxygen.  The mechanism of death has

22   to do with lack of oxygen, that type of thing, and if there

23   isn't enough to cause irreversible death, the individual is

24   going to recover quite quickly.  It's a lot like being

25   exposed to maybe a room full of smoke and your lungs may feel

1    depressed and your breathing hard and so forth, but when you

2    immediately walk out into the fresh air, you feel -- in a

3    moment you feel much better because you're getting more

4    oxygen.

5            Q.    Is that one of the symptoms that you have, a

6    loss of oxygen?

7            A.    Yes.

8            Q.    Okay.  And after you vomited once more, one or

9    more times, then it would take just a few minutes to feel

10   better?

11           A.    Yes.  You're going to be clumsy, you're going

12   to have difficulty moving around, that type of thing.

13           Q.    I'm showing you, again, what's been marked and

14   admitted into evidence as 279.  What's the size of those

15   capsules, Elderberry capsules?

16           A.    Well, it gives a weight per capsule of 480

17   milligrams.  There seems to be some in there.

18           Q.    Yes.

19           A.    So we could actually look at it if you wish.

20           Q.    Okay.

21           MR. MARTINEZ:  Judge, they may have sodium azide in

22   them.  We did not test those so if he wants to look at them,

23   that's fine.

24           MR. PATTERSON:  Have some rubber gloves?

25           THE COURT:  Let me see Counsel just a moment.


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000007765

1     / / / / /

2               (The following proceedings were held at the

3     bench:)

4

5          THE COURT:  I don't want to expose anyone to any

6     biohazard material.  He could look at them, but I don't want

7     him opening up the capsules.

8          MR. PATTERSON:  No.

9          MR. DELOZIER:  Oh, no, no.

10         THE COURT:  It's okay to open the bottle and have the

11    capsule in your hand.

12

13               (The following proceedings were held in open

14    court:)

15

16         THE COURT:  Mr. Patterson, could you hand me the

17    exhibit?  Thank you.

18

19               (The following proceedings were held at the

20    bench:)

21

22         MR. MARTINEZ:  By his own definition, according to

23    him, if you open it, with a little bit of air and little bit

24    of water, it could cause some problems.

25         MR. DELOZIER:  I'm not --

1           MR. MARTINEZ:  That's what he said.

2           MR. DELOZIER:  I'm not talking about opening the

3      capsule.

4           MR. MARTINEZ:  He also talked about, on opening the

5      bottle, he said if these were unsealed, any air or

6      moisture --

7           THE COURT:  We don't know exactly what's in the

8      bottle.

9           MR. PATTERSON:  I need to avow to the Court because I

10     actually picked these up from police impound with Detective

11     Lucero.  I opened the bottle, examined the contents, touched

12     them with rubber gloves.  I'm here today and this was months

13     ago, so there's no toxic possibility in my estimation by just

14     opening the -- the plastic container.  I would not recommend

15     opening individual capsules, however.

16          THE COURT:  Ask him some questions about what may

17     happen if he opens up the bottle.  Depending on what he says,

18     I may allow you to do that, but not the capsules themselves.

19          MR. DELOZIER:  I understand.  Thank you.

20

21               (The following proceedings were held in open

22     court:)

23

24          THE COURT:  Mr. DeLozier?

25          MR. DELOZIER:  Thank you, Your Honor.

1    BY MR. DELOZIER:

2         Q.    We have a bottle that says Elderberry on it,

3    which is Exhibit 279 as you're aware.  If you open the bottle

4    itself, would you be concerned about exposure?

5         A.    No.  I would be pleased to do it.  If I were to

6    handle the capsules themselves, I'd want to have a rubber

7    glove on.

8         Q.    Okay.

9         A.    But otherwise no problem.

10        Q.    And you wouldn't want to open the capsule

11   itself, would you?

12        A.    No, I don't think we would do that, even with

13   rubber gloves on.

14        Q.    Okay.  We have some gloves for you.

15        A.    We may need some scissors in a second.

16        Q.    Try those on while I get the scissors.

17             (Pause in proceedings.)

18        THE WITNESS:  For the record, they appear to have

19   been emptied out, at least the one I'm looking at.  It has a

20   white powdery residue and it's been wrapped with a piece of

21   cellophane tape like scotch tape.  And this one is marked

22   Number 3 and has -- Number 3 has white on the inside and

23   appears to be about two-thirds or three-quarters full.

24             Your Honor, permission to publish this to the

25   jury?


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000007768

1           THE COURT:  Yes.

2                 (Pause in proceedings.)

3           THE WITNESS:  So this one that's marked number 3

4    does have a white crystalline material in it.  It has, again,

5    a little kind of a cloth tag on it with some cellophane on

6    it.  The other two in here are substantially the same.

7    They're labeled numbers 1 and 2.  They have the same type of

8    configuration with a numbering system on the capsule.

9                 (Pause in proceedings.)

10   BY MR. DELOZIER:

11          Q.    Before you put that back, let me ask you a

12   question.

13          A.    Uh-huh.

14          Q.    There says it's 100 capsules of 40 -- 480 mg

15   per capsule.  You said that was based on weight.  Is that

16   correct?

17          A.    Yes.  Yes, weight.  And these are like about

18   half to two-thirds depending on which one you look at full.

19   They're not completely full.

20          Q.    All right.  Would you have an opinion of what

21   kind of weight you could get in one of those capsules of

22   Elderberry?

23          A.    Again depends on the substance.

24          Q.    I'm talking about sodium azide?

25          A.    Sodium azide gets anywhere from maybe 3 --

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    loaded like that, probably -- probably 4 -- 4 to 5 per gram.

2          Q.    I'm sorry?

3          A.    Anywhere from 4 to 5 per gram.

4          Q.    To 5 capsules?

5          A.    Loaded as those are.

6          Q.    4 to 5 capsules?

7          A.    Yeah, per gram.

8          Q.    Per gram? Okay.

9          A.    And that's based on that particular

10   configuration.

11         Q.    Yes, sir.  I guess what I'm wanting to ask you

12   next, this chart you put up for me, how many of those

13   capsules would it take to get to, say, 10 grams or 20 grams.

14   You might need your calculator again.

15         A.    You know, those gloves have nice powder on

16   them.  When I was walking, I got that powder all over me.

17         Q.    How many capsules would that make?

18         A.    Well, 17 capsules at the high end.

19         Q.    High end meaning what?

20         A.    The most capsules that you would expect.  And

21   13.6 at the low end.  So anywhere between say 13 or 14 all

22   the way up to 17.  And again since you're doing this not with

23   by measuring, you know, some are going to be like that

24   variety we saw there.  Some have full, some two-thirds.

25         Q.    Do you have an opinion as to whether a person

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000007770

1    could involuntarily take 10 to 12 of these?

2         MR. MARTINEZ:  Objection.  Calls for speculation as

3    to what a person can do.

4         THE COURT:  Sustained.

5         MR. DELOZIER:  Need to approach, Your Honor.

6              (Private discussion between Mr. Patterson and

7    Mr. DeLozier.)

8              (Pause in proceedings.)

9         THE COURT:  Mr. DeLozier?

10   BY MR. DELOZIER:

11        Q.    What kind of chemical reactions would occur if

12   a person chose to take some of these capsules voluntarily,

13   say, half a dozen or so—

14        MR. MARTINEZ:  Objection.  Lack of foundation, any

15   tests he may have performed or others he may --

16        THE COURT:  Lay some foundation.  I'll sustain the

17   objection.  Lay some foundation.

18   BY MR. DELOZIER:

19        Q.    Based on what you told us today, your research

20   in the field, your knowledge of toxicity levels, odors, humid

21   day, what would happen if a person took six or eight of those

22   capsules and washed it down with a liquid?

23        MR. MARTINEZ:  Same objection, same basis.

24        THE COURT:  Overruled.  Answer the question if you

25   can.

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1          THE WITNESS:  Pretty much as we described earlier.

2     Moisture will get into the capsule, the capsule will spread,

3     you'll have, depending if were they all taken at once, then

4     you'll have one kind of eruption where you're throwing up.

5     If they were taken subsequently, you might have a couple, but

6     you are going to have significant gastric distress.

7     BY MR. DELOZIER:

8          Q.    Would it be possible for one to put this

9     substance on or in a food, like say mashed potatoes, and the

10    person eating those not know about it?

11         A.    No.

12         MR. MARTINEZ:  Objection.  Speculation.

13         THE COURT:  Overruled.

14    BY MR. DELOZIER:

15         Q.    What was your answer?

16         A.    No, it would not.

17         Q.    Why not?

18         A.    The taste would be very disagreeable.

19         Q.    What about, say, sprinkling it like salt on

20    popcorn, popped popcorn?

21         A.    Same thing, very disagreeable.

22         MR. DELOZIER:  Just one second, Your Honor.

23         THE COURT:  Yes.

24              (Pause in proceedings.)

25     / / / / /

1  BY MR. DELOZIER:

2         Q.    The trace amounts that we've discussed both in

3  the kettle of food -- and by the way, I meant to ask you

4  about the kettle.  If we did in fact cook stew or soup in

5  that kettle and there was sodium azide in it, would it affect

6  the pot?

7         A.    It depends on what the pot's made out of.

8         Q.    All right.  For example?

9         A.    If it was lined with Teflon, the answer is no.

10  If it's an aluminum pot, the answer is yes.

11         Q.    And what would that do to aluminum?

12         A.    It would etch it.

13         Q.    I think you called the amounts were two parts

14  per million in blood, 3.8 in gastric, 20.25 in the kettle, 22

15  or so in one soup bowl, and 20 -- 11 in another soup bowl.

16  Would you characterize all of those as trace amounts?

17         A.    Yes, pretty much.

18         Q.    And those meet the level of toxicity for human?

19         A.    No.

20         MR. DELOZIER:  Thank you.  Nothing further at this

21  time, Your Honor.

22         THE COURT:  Mr. Martinez?

23

24  CROSS-EXAMINATION BY MR. MARTINEZ:

25         Q.    Sir, one of the things you told us when you

1    started your testimony was that you are a nationally

2    recognized expert, right?

3         A.    Yes.

4         Q.    And in fact in other court proceedings you've

5    described yourself as a "superman" of forensic experts,

6    haven't you?

7         A.    Maybe someone else has, but I don't think I've

8    said that.

9         Q.    Well, let's go ahead and take a look -- well,

10   do you remember testifying in the case of State versus Pablo

11   Martinez?

12        A.    Not particularly.

13        Q.    Do you remember that that was the case where

14   the prosecutor was also Mr. Martinez, Juan Martinez.  Do you

15   remember that?

16        A.    No, not really.

17        Q.    Do you remember that in that case that you got

18   so upset at the questioning that we had to stop the

19   questioning so that you could compose yourself?  Do you

20   remember that?

21        A.    No, I sure don't.

22        MR. DELOZIER:  Objection, Your Honor.  Relevance.

23        THE COURT:  Overruled.

24   BY MR. MARTINEZ:

25        Q.    Now, sir, isn't it true that you testified back

1   on June 16th, 2003, in that case about the issue of whether

2   or not you were the "superman" of experts?

3           A.    I don't ever recall using that term --

4           Q.    Okay.

5           A.    -- in terms of my being an expert --

6           Q.    All right.

7           A.    -- or my being a super man.

8           Q.    Okay.  Let's go ahead and take a look at a

9   transcript from that.  I'm going to have it marked so you

10  could take a look at it.

11                  (Pause in proceedings.)

12  BY MR. MARTINEZ:

13          Q.    Okay.  Let's go ahead -- isn't it true that the

14  question was asked of you, "In reviewing this case, did you

15  have any special sort of superman knowledge of forensics to

16  be able to make that conclusion that other people couldn't

17  make?"  And isn't it true that you responded, "I think so."

18  Did you ever make that statement?

19          A.    I don't know.

20          THE WITNESS:  I'd have to read the transcript, Your

21  Honor.

22  BY MR. MARTINEZ:

23          Q.    Take a look at Exhibit 456 and I refer you to

24  Page 66, the highlighted portion.

25                  (Pause in proceedings.)


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1          THE WITNESS:  If the Court, please --

2    BY MR. MARTINEZ:

3          Q.    No, there's no question --

4          A.    There is when I'm talking to the Judge,

5    Counsel.

6          THE COURT:  Hold on --

7          THE WITNESS:  Your Honor --

8          THE COURT:  Hold on a second.  There's no question

9    before you.  Go ahead and review -- let's do this.  Let's

10   take a short recess from the jury right now.

11          This should just take a few moments.  Remember

12   the entire admonition I've given you including the fact

13   you're not to discuss the case with anyone, do not let anyone

14   discuss with case with you, keep an open mind.  This should

15   only take a few minutes here.

16

17          (Whereupon, the jury exits the courtroom.)

18

19          THE COURT:  Please be seated.  This is cause number

20   CR 2000-096032, State of Arizona versus Wendi Elizabeth

21   Andriano.  The record will reflect the presence of the

22   Defendant and Counsel.  Mr. Collier is on the witness stand.

23   We're outside the presence of the jury.

24          Yes, Mr. Collier?

25          THE WITNESS:  If the Court please, the ethics of my

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    profession call for not to read anything that's misleading to

2    the jury, and the second paragraph explains the first

3    paragraph.

4              THE COURT:  Okay.

5              THE WITNESS:  So it would be unethical for me to

6    answer that question without reading the follow up.

7              THE COURT:  Well, Mr. DeLozier will be able to ask

8    you some questions on redirect.

9                   Is there a transcript that you shared with Mr.

10   DeLozier?

11             MR. MARTINEZ:  He's got a copy, Your Honor.

12             THE COURT:  You have a copy, Mr. DeLozier?

13             MR. DELOZIER:  We just got it a moment ago.

14             THE COURT:  Have you had an opportunity to review

15   that?

16             THE WITNESS:  Yes, sir.

17             MR. DELOZIER:  I have one question, Your Honor.

18             THE COURT:  Yes.

19             MR. DELOZIER:  I don't know who's asking the --

20             MR. MARTINEZ:  It's irrelevant who's asking the

21   question, but it's actually his counselor -- it's Gary

22   Bevilacqua, the defense attorney, who's asking the question

23   of the expert, and he indicated that, whatever the transcript

24   says.

25             MR. DELOZIER:  Okay.  Thank you.


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1          THE COURT:  We ready for the jury?

2          MR. DELOZIER:  Yes.

3          MR. MARTINEZ:  We are.

4          THE COURT:  Okay.  Let's have the jury in.

5          MR. MARTINEZ:  Sir, if I may have it back?  Sir?

6

7          (Whereupon, the jury enters the courtroom.)

8

9          THE COURT:  Please be seated.  This is cause number

10   CR 2000-096032, State of Arizona versus Wendi Elizabeth

11   Andriano.  The record will reflect the presence of the

12   Defendant, Counsel and the jury.  William Joe Collier is on

13   the witness stand.

14          We'll continue with the examination by Mr.

15   Martinez.

16          Mr. Martinez?

17

18   CONTINUED CROSS-EXAMINATION BY MR. MARTINEZ:

19          Q.    Sir, while the jury was out you had a chance to

20   examine Exhibit 456, correct?

21          A.    I did.

22          Q.    In a question by Gary Bevilacqua, the person

23   representing the defendant in that case, it was -- it went as

24   follows, didn't it, "In reviewing this case, did you have any

25   special sort of superman knowledge of forensics to be able to

1    make that conclusion that other people couldn't make?"  And

2    then your answer was, "I think so," period.  Doesn't it say

3    that?

4              A.    In part, that was my answer.

5              Q.    It started with an "I" and it ended with "so,"

6    didn't it?  There's more that goes before it and more after

7    it, but that's what you said?

8              A.    Well, again, I don't have any personal

9    recollection, but I don't disagree with the transcript at

10   all.

11             Q.    Okay.  If the transcript says that, you don't

12   have any reason to disagree?

13             A.    Not a bit.

14             Q.    You were also, again, to go on this thing, you

15   indicated that you are nationally known and we now know the

16   word "superman" has been used with regard to you, you did a

17   little bit of math for us up here, didn't you?

18             A.    Yes.

19             Q.    And let me go ahead and mark it as an exhibit

20   so we'll know what we're talking about.

21             THE COURT:  This will be marked as Exhibit 457 for

22   identification purposes.

23   BY MR. MARTINEZ:

24             Q.    And on Exhibit Number 457 you told us that 45

25   times 77.27 was 3477.27 milligrams, right?

1        A.      I did.

2        Q.      Let's do the math the long way just to see if

3    that's true, okay?  77.27 -- and I realize I don't have a

4    calculator, but let's do it the old fashioned way.

5                5 times 7 is 35.  Would you agree to that?

6        A.      Well, you know, if you want --

7        Q.      Sir, would you --

8        A.      -- multiplication tables --

9        Q.      Would you agree with me 5 times 7 is --

10               THE WITNESS:  If the Court please, this is a rounded

11   off number, so it's not going to be the same.

12               THE COURT:  Go ahead.

13   BY MR. MARTINEZ:

14       Q.      5 times 7 is 35.

15       A.      Yes.

16       Q.      5 times 2 is 10 plus the 3, which makes it 13,

17   right?

18       A.      Yes.

19       Q.      Carry the 1.  5 times 7 is 35 and the 1 is 36,

20   right?

21       A.      Yes.

22       Q.      5 times 7 is, again, 35, plus the 3 is 38,

23   right?

24       A.      Yes.

25       Q.      We go 4 times 7, which is 28.  You carry the 2.

1    4 times 2 is 8 plus 2 is 10.  Carry the 1.  7 times 4 and 1,

2    carry the 2, 4 times 7 is 28, 29, 30.

3              Would you agree so far that my math is correct?

4         A.   No.

5         Q.   Where am I wrong?

6         A.   You're using a rounded off number.

7         Q.   Sir, I'm asking you if my math is correct.  I'm

8    not --

9         A.   Counselor --

10         THE COURT:  Hold on a second.  Hold on a second.

11   Just ask the question.  Answer the question.

12         THE WITNESS:  -- you are --

13         THE COURT:  Hold on a second.  Listen to me a

14   second.  I don't want any arguments.  Ask the question, wait

15   until the question is completed, and answer the question if

16   you can.

17              Ask the question again.

18   BY MR. MARTINEZ:

19         Q.   Is my math correct, "yes" or "no"?

20         A.   I don't know.

21         Q.   We were doing this and as we went along I was

22   asking you with regard to every digit, wasn't I, with regard

23   to every application?

24         A.   You were asking me for every multiplication,

25   yes, sir.

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000007781

```
 1          Q.    You have a BS, a Bachelor of Science in
 2   Chemistry, right?
 3          A.    Yes.
 4          Q.    One of the fundamentals of that is mathematics,
 5   isn't it?
 6          A.    It is, sir.
 7          Q.    And so is the math as we went through it
 8   correct, "yes" or "no"?
 9          A.    I don't have any idea.
10          Q.    Okay.  You don't have any idea.
11                Let's do a little addition.  5 and 0 is how
12   much, sir?
13          A.    5.
14          Q.    8 and 3 is how much?
15          A.    12 --
16          Q.    Uh --
17          A.    11.
18          Q.    Carry the one.  6 and 1 is how much?
19          A.    7.
20          Q.    8 and 9 is how many?
21          A.    17.
22          Q.    3 and 1 is how many?
23          A.    3 and 1 is -- is 4.
24          Q.    The number that we come up with here is
25   3477.15, right?
```

1          A.    Yes.

2          Q.    That's different than your number, 3477.27,

3     right?

4          A.    Yes, it is different.

5          Q.    There is no need to round off anything, is

6     there?  When you were telling us about that --

7          A.    Counselor, you're a fool.

8          THE COURT:  Hold on a second.  Hold on a second.

9     Just answer the question that's asked.

10          THE WITNESS:  I don't know what the question is, Your

11     Honor.

12          THE COURT:  Ask your question.

13     BY MR. MARTINEZ:

14          Q.    You were talking about rounding off.  I'm

15     telling you that the figure that you put up there for the

16     jury to see, 3477.27, is not mathematically accurate, is it?

17          A.    It is.

18          Q.    Okay.

19          A.    It's very precise.

20          Q.    All right.

21          A.    And if you'd like to use a calculator, you'll

22     find it is.

23          Q.    Let's continue on, sir, with what you're an

24     expert in.  We now know you're an expert, a nationally

25     recognized expert, we know that the word "superman" has been

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    used with regard to you, and we know you're also an expert

2    with regard to mathematics, right?

3            A.    That's not true, Counselor.

4            Q.    Let's --

5            A.    That's misleading.

6            Q.    Let's talk a little bit about what else you're

7    an expert in, okay?  You are an expert in burglary, aren't

8    you?

9            A.    I've qualified in that, yes, sir.

10           Q.    In fact you qualified in that in the case State

11   versus Pablo Martinez, correct?

12           A.    I don't recall.

13           Q.    It was a case where Juan Martinez was the

14   prosecutor for the State.  Is that true?

15           A.    I have no memory.

16           Q.    And in fact, sir, in that particular case when

17   you were asked about the elements of burglary, and even

18   though you gave an opinion of what you thought was burglary,

19   you didn't even know what the elements were.  Isn't that

20   true?

21           A.    Perhaps that's true.

22           Q.    If you'll read the transcript --

23           MR. DELOZIER:  Your Honor, I object.  This whole line

24   of questioning has nothing to do what we're here for.

25           THE COURT:  I'll sustain the objection.  Let's move

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    on.

2    BY MR. MARTINEZ:

3          Q.    Sir, the point here is you're an expert in lots

4    of other fields, not just sodium azide, right?

5          A.    Yes.

6          Q.    You're an expert in looking at a scene, for

7    example, and saying whether or not the killer, whatever it

8    may be, just by looking at it, you could give an opinion as

9    to whether or not there was premeditation, right?

10         MR. DELOZIER:   Your Honor, again, beyond the scope

11   of this trial.

12         THE COURT:   Overruled.   If you can answer the

13   question, go ahead.

14         THE WITNESS:   Sometimes there are indicia that will

15   tell you whether there is premeditation or not.

16   BY MR. MARTINEZ:

17         Q.    But you could make that call without even

18   knowing what the person was thinking, without even talking to

19   the person, right?

20         A.    That's correct.

21         Q.    Okay.   The other thing that you are an expert

22   in is looking at a scene and knowing whether or not a robbery

23   has occurred.   Isn't that true?

24         A.    I don't know about a robbery.   I can't recall

25   any cases, but there are certain things that are, you know,

1      consistent with robbery.

2              Q.    Do you remember testifying back on June 12,

3      2003, in the case of State versus Pablo Martinez?

4                      (Pause in proceedings.)

5          MR. DELOZIER:  Your Honor, I'm going to object. He's

6      been asked and answered that question.

7          THE COURT:  I'll sustain the objection.

8      BY MR. MARTINEZ:

9              Q.    Sir, isn't it true in that case that you

10     have -- you testified you were an expert in robbery?

11             A.    I don't remember the case.

12             Q.    If I show it to you, sir, the transcript, would

13     that refresh your recollection?

14             A.    I don't know.

15             Q.    Go ahead and mark it as an exhibit.

16                     (Pause in proceedings.)

17     BY MR. MARTINEZ:

18             Q.    Take a look at the highlighted portion, please.

19         MR. DELOZIER:  What's the number, please?

20         MR. MARTINEZ:  Exhibit 458.

21                     (Pause in proceedings.)

22         MR. DELOZIER:  What page are we on?

23         THE COURT:  Mr. Martinez, could you make reference so

24     Mr. DeLozier can follow along?

25         MR. MARTINEZ:  If I could have it back.  I don't know


            TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

 1     what --

 2              THE COURT:  Sir, what page is that?

 3              THE WITNESS:  This is 91.

 4              MR. MARTINEZ:  Okay.  Sir, can I have it back,

 5     please?

 6              THE WITNESS:  I'm not finished, Counsel.

 7              MR. MARTINEZ:  Your Honor, I've asked him to look at

 8     the highlighted portion.

 9              THE COURT:  Hold on a second.  I --

10              MR. DELOZIER:  Which line are you looking --

11              THE WITNESS:  I have looked only at the highlighted

12     portion.

13              MR. MARTINEZ:  It's page 91, lines 20, 21.

14     BY MR. MARTINEZ:

15              Q.    Isn't it true that in response to a question,

16     you answered "That was one of the things I was interested in,

17     was whether or not this was part of a robbery or a burglary."

18     Do you remember saying that?

19              A.    No, sir.  That's not highlighted.  I think

20     there are only four words highlighted.

21              Q.    But isn't that what you said on -- okay.

22     You're playing a little bit of a game with me.

23              A.    You are --

24              THE COURT:  Hold on a --

25              MR. MARTINEZ:  All right, sir.


                TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

```
 1              THE COURT:  Hold on a second.

 2              I'm going to ask the jury to step into the jury

 3    room for just a moment.  Remember the admonition I've given

 4    you.

 5

 6              (Whereupon, the jury exits the courtroom.)

 7

 8              THE COURT:  Please be seated.  This is cause number

 9    CR 2000-096032, State of Arizona versus Wendi Elizabeth

10    Andriano.  The record will reflect the presence of the

11    Defendant, Counsel.  We're outside the presence of the jury.

12    William Joe Collier is on the witness stand.

13              I'm going to tell Mr. Martinez and I'm going to

14    tell Mr. Collier just one time.  Mr. Martinez, ask the

15    question.  Mr. Collier, if you can answer the question, you

16    answer the question.  I don't want any verbal fisticuffs

17    between the two of you.  The two of you have -- basically,

18    you're starting to get unprofessional, okay?  And there's no

19    need for that here in the courtroom.

20              So Mr. Martinez will ask the question.  If you

21    can answer the question, just answer the question.  Mr.

22    DeLozier will have the opportunity to ask redirect questions.

23              Is that clear, Mr. Martinez?

24         MR. MARTINEZ:  Yes, sir.

25         THE COURT:  Is that clear, Mr. Collier?
```

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1            THE WITNESS:  Absolutely.

2            THE COURT:  Any questions from either one of you

3     about that?

4            MR. MARTINEZ:  I don't have any questions.

5            THE COURT:  Mr. Collier?

6            THE WITNESS:  Yes, sir.

7            THE COURT:  Okay.  Let's have the jury back.

8            MR. PATTERSON:  Judge, we need another -- may we

9     approach?

10            THE COURT:  Hold on a second.

11

12            (The following proceedings were held at the

13     bench:)

14

15            MR. PATTERSON:  I know it's his direct, but I need to

16     make this point.  Mr. Martinez is using the transcript from

17     one of his previous trials.  At some point in time it may be

18     necessary to read in, in order to balance out the

19     presentation, things that he has said which in my estimation

20     subjects him into this trial as a witness.

21            And -- for instance, let me show you.  On page

22     91 of the transcript, a question is pronounced to Mr.

23     Collier, "And what was your conclusion based upon your

24     examination of the photographs?"  This gentleman, Mr.

25     Martinez, "Objection.  Speculation."  And he says "Not an

1    expert on burglary."

2         MR. MARTINEZ:  But the judge found him to be an

3    expert, Judge.

4         THE COURT:  Okay.  You know what, Mr. Martinez?

5    You've made your point.  Let's just move on.  This is getting

6    to be collateral.

7         MR. MARTINEZ:  Right, but Judge, he is an expert on

8    everything and he'll say anything for money and --

9         THE COURT:  Okay.

10        MR. MARTINEZ:  -- I need to show that.

11        THE COURT:  You could bring that out in certain ways.

12   He's already said he couldn't remember this case, okay?

13   Let's move on.

14        MR. MARTINEZ:  That's his tact.  He always says that.

15        THE COURT:  Well, you can --

16        MR. MARTINEZ:  If he says he doesn't, at this point

17   I'd ask the Court to have a hearing to determine whether or

18   not he's feigning or whether or not he clearly can't

19   remember.  If he clearly can't remember, that's one thing.

20   If he's feigning memory loss, then the statement comes in.

21        THE COURT:  Let's move on.

22

23             (The following proceedings were held in open

24   court:)

25

1           THE COURT:  We ready for the jury?

2           MR. MARTINEZ:  Yes, sir.

3           THE COURT:  Let's have the jury.

4

5                (Whereupon, the jury enters the courtroom.)

6

7           THE COURT:  Please be seated.  This is cause number

8    CR 2000-096032, State of Arizona versus Wendi Elizabeth

9    Andriano.  The record will reflect the presence of the

10   Defendant, Counsel and the jury.  William Joe Collier is on

11   the witness stand.  We'll continue with the cross-examination

12   by Mr. Martinez.

13                Mr. Martinez?

14   BY MR. MARTINEZ:

15        Q.   Sir, Exhibit 458, Page 91, Lines 9 through 21,

16   please read those to yourself.

17                (Pause in proceedings.)

18           THE WITNESS:  Yes, sir.

19   BY MR. MARTINEZ:

20        Q.   And they do say "Yes, that was one of the

21   things I was interested in, was whether or not there was part

22   of a robbery or a burglary," right?

23        A.   Yes, sir.

24        Q.   Now, the other thing that you're an expert in

25   is determining how many assailants actually stab somebody

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    just by looking at a photograph, correct?

2         A.    Sometimes that's possible.

3         Q.    And in the Pablo Martinez case, that's what you

4    opined, didn't you?  "I reached the conclusion as to how many

5    people were stabbing that victim based on the photograph,"

6    didn't you?

7         A.    Again, I don't recall that testimony,

8    Counselor.

9         Q.    Okay.  Sir, I want you to take a look at page

10   82, Lines 3 through 5, and read those to yourself.

11        MR. DELOZIER:  Which exhibit are you --

12        MR. MARTINEZ:  It is Exhibit Number 458.

13        THE WITNESS:  What numbers should I read?  What

14   lines?

15        MR. MARTINEZ:  3 through 5.

16        THE WITNESS:  3 through 5?

17             (Pause in proceedings.)

18        THE WITNESS:  Yes, sir.

19   BY MR. MARTINEZ:

20        Q.    And isn't it true that in that case you

21   indicated, "It is my opinion with reasonable forensic

22   probability that there was only one person involved in the

23   stabbing of the victim."  Do you remember saying that?

24        A.    That's correct.

25        Q.    You're also an expert in blood spatter, aren't

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1      you?

2              A.      Yes.

3              Q.      What is blood spatter?

4              A.      It has to do with reconstructing a crime based

5      on the types of wounding that an individual has and the --

6      the blood droplets that are left at a crime scene whether

7      they're on the wall or the floor, you could tell whether a

8      person is walking, running, whether the blood is from an arm

9      that moves outward that's called cast-off blood.

10             There are a lot of things you could tell from

11     blood spatter whether it's a smear, whether somebody walked

12     through the room after the blood was shed or before, so the

13     answer to that is "yes."

14             Q.      Sir, I think -- did you say that that was the

15     science, or that may not have been the term that you used,

16     was that the science or study of blood splatter?

17             A.      I think spatter is the word, s-p-a-t-t-e-r.

18             Q.      That's what I thought.

19             You're also an expert in bullets, aren't you?

20     You know how to compare one bullet to another to see whether

21     or not they've been fired from the same gun, right?

22             A.      Yes, sir.

23             Q.      You're also an expert to determine whether or

24     not one bullet has gone through clothing or the body of

25     another individual, right?

1      A.    Yes, I've done that.

2      Q.    And you're also an expert in elicit drugs,

3   correct, and analyzing them?

4      A.    Yes, sir.

5      Q.    In this particular case, sir -- well, let me do

6   it this way.  You indicated that you'd been with the Phoenix

7   Police Department for 29 years, right?

8      A.    I was the director for 29 years.  I worked

9   there 32.

10      Q.    So you were with the City of Phoenix Police

11   Department for 32 years, correct?

12      A.    Yes.

13      Q.    29 of those as director, correct?

14      A.    Yes, sir.

15      Q.    And isn't it true that, let's say within the

16   last ten years, of your ten years there as director, you did

17   minimal field work?

18      A.    Once a month I went to a crime scene, usually a

19   murder, and supervised some of my subordinates at the murder

20   scene.

21      Q.    The question is isn't it true you didn't do the

22   work yourself?  Your work for the last ten years at PPD was

23   in a supervisory capacity, not going out there and actually

24   doing the grunt work?

25      A.    That's true.  Most of the work was supervisory.

1    I did work on cases myself that involved a number of

2    different things.

3              Q.    But the bulk of your work was supervisory?

4              A.    Absolutely.

5              Q.    And if -- when you talked about the comparisons

6    that you did toward the end there, it would be -- if you

7    did -- if you did any work at all, was when one of your

8    underlings would come to you and say, "Take a look at this,

9    did I do okay, or did I not do okay," whatever.

10             A.    No.

11             Q.    They didn't come to you for a second opinion

12   after they've done the work?

13             A.    That's not what's done.

14             Q.    Didn't they come to you if they had done work

15   for your review?

16             A.    Yes.    "Verification" it's called.    I would --

17   in matters as serious as a murder case, it requires two

18   experts to confirm a bullet make, and so I verified people

19   that worked for me.    I verified their matching of bullets and

20   other things.

21             Q.    But you didn't do the work yourself is what

22   I'm -- the point I'm trying to make?

23             A.    I did a verification, and believe me, it's

24   work.

25             Q.    Sir, how many tests in the last, I don't know,

```
 1    since 1994, have you done on sodium azide?

 2            A.    I haven't analyzed any sodium azide.

 3            Q.    How many -- did the City of Phoenix Police

 4    Department even analyze for that drug during all of the years

 5    that you worked for them?

 6            A.    First of all, it's not a drug.  It's a poison.

 7            Q.    Toxicologist -- toxic substance.

 8            A.    And I can recall only consulting on it a couple

 9    of times.  I don't recall analyzing it.

10            Q.    During all of the time that you were at the

11    City of Phoenix Police Department, did you ever analyze

12    sodium azide?

13            A.    I didn't, no.

14            Q.    Did they even have the capacity to analyze

15    sodium azide while you were there?

16            A.    It would depend on what the form was.  If it

17    was in the solid form, like it was purchased in the bottle,

18    the answer is yes, any chemist could do that.  If it's an

19    amount in the blood that's in parts per million, that would

20    depend on the scientific instruments that were available at

21    that particular time because those instruments developed over

22    the years.  But analyzing the sodium azide itself, you know,

23    the powder material is not a problem.

24            Q.    You indicated that you never analyzed it while

25    you were at the City of Phoenix Police Department.  Did any
```

1    of the people that worked for you ever analyze it and ask for

2    any verification of their work?

3        A.    Well, first of all, we don't verify that type

4    of thing.  We verify bullet makes.  And so no one would have

5    come to me with that for verification if they had.

6        Q.    To your knowledge, did anybody in your -- all

7    the time that you were the director, to your knowledge as you

8    were the director or while you were there, ever analyze

9    sodium azide while at the Phoenix Police Department?

10       A.    I don't know of any.

11       Q.    What is the test that the person at West Coast

12   Analytical used for analysis in this case?

13       A.    I wasn't there.  I don't know.

14       Q.    You don't even know what test he used then,

15   right?

16       A.    I don't know what they used.

17       Q.    And did you know that -- well, you indicated

18   previously that with regard to the Elderberry capsules, which

19   is Exhibit Number 279, that, well, this wasn't really pure.

20   Do you remember saying that it wasn't pure sodium azide?  Do

21   you remember telling us that previously?

22       A.    I believe someone did test it and I believe it

23   was 60 some percent versus 90 some percent.

24       Q.    Sure.  Right.  That's what you said earlier,

25   right?

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1          A.     Well, that's what was told to me and I assumed

2     it.

3          Q.     Sir, did you know that the process that Mr.

4     Richmond undertook to analyze this, he actually diluted it so

5     it got to that amount when he tested it.  Did you know that?

6          A.     I wasn't present.  I didn't watch him do the

7     test.

8          Q.     The point is, sir, you didn't know that, so

9     you're indicating that the reason there's only 60 percent

10    purity here is because of loss due to humidity.  Didn't you

11    say that earlier?

12         A.     That's one of the explanations, yes.

13         Q.     The other explanation is, sir, the test that

14    was analyzed would have been diluted for purposes of testing,

15    right?

16         A.     Again, I don't know how the other chemist did

17    it.  I didn't watch him did do it.  I don't know about his

18    credentials.  I would assume he would use certain standards,

19    but I don't really know what those standards were.

20         Q.     You also indicated during your direct

21    examination, well, if somebody takes this sodium azide, one

22    of the first things that's going to happen is there's an

23    explosion.  That's what you said, right?

24         A.     Can I hear that again?

25         Q.     One of the things that you said on direct

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    examination is if anybody takes this poison, and we're

2    talking the capsule form, that when they take it, there will

3    be this explosion and there will be some vomiting?

4            A.    Yes.  It's an explosive release of gases that

5    causes the vomiting.

6            Q.    You're not telling us, sir, that that -- that

7    it would be impossible for somebody to die from sodium azide

8    poisoning, are you?

9            A.    No.  As a matter of fact, there are cases.

10           Q.    So even though you have this "explosion," to

11   use your word, people actually die from ingesting sodium

12   azide, right?

13           A.    They do.

14           Q.    With regard to the taste of it in water, have

15   you ever tasted it?

16           A.    No, sir.

17           Q.    Do you know anybody that has ever tasted it?

18           A.    There are people in the literature that have

19   drank it in liquid form, but they don't report anything.

20   They're dead.

21           Q.    What you're saying -- what you're telling us is

22   that those people who may have drank it in the literature

23   can't tell us what the taste was because they died from the

24   ingestion, right?

25           A.    Yes, sir.


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1      Q.      So how do you know what the taste is like?

2      A.      From the basic science that we've talked about,

3    whether something is acid.  If it's, acid it tastes sour.

4    Lemon juice, vinegar, things like that, sour, acid material.

5    If it's neutral, water.  If it's slightly alkaline, tastes

6    like baking soda a little bit.

7      Q.      The --

8      A.      And the higher numbers give you more

9    alkalinity.

10      Q.      The point is, sir, there's nothing in the

11    literature that you have presented to us today that indicates

12    that it would have the taste like vinegar that you just told

13    us about?

14      A.      Well, I said it would be acid like vinegar.  It

15    wouldn't taste like vinegar, believe me, but it would be of

16    the same or similar acidity.

17      Q.      Something being acidic is different than

18    tasting like vinegar, would you agree?

19      A.      I don't understand the question.

20      Q.      Well, something tastes like vinegar, that's

21    different than something being acidic because acid just

22    chews, if it's strong enough, chews through whatever it's

23    going through?

24      A.      I'm afraid I don't understand that one either,

25    Counselor.

1        Q.      Well, we were talking about your little

2    continuum here.  Let's talk a little bit about that.  And you

3    said right here "very acid."  Do you remember telling us

4    that?

5        A.      Certainly.

6        Q.      And I think you mentioned sulfuric acid as

7    being there, right?

8        A.      Yes.

9        Q.      And that chews through things, doesn't it?

10        A.      The pure stuff will turn your shoe leather to

11    carbon, to black.

12        Q.      And you also mentioned the pool acid, didn't

13    you?

14        A.      Yes, I did.

15        Q.      Muriatic acid I think that's called, right?

16        A.      Yes.

17        Q.      That will chew through things, wouldn't it?

18        A.      Well, it's not quite as powerful as sulfuric

19    acid, but it will eat holes in your Levis.

20        Q.      So the point is when you're talking about

21    tastes like vinegar, that's a different concept than saying

22    it's acidic, isn't it?

23        A.      Not really.  Vinegar is merely an analogy that

24    it's sour or acid like.  You get a little bit of an acid

25    taste when you throw up and that's from the stomach acid, but

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    it's only an analogy to let people have a feel for what this

2    would taste like.

3          Q.    You indicated that if somebody added sodium

4    azide to food you would know about it.  Do you remember

5    saying that?

6          A.    Yeah.  If I sprinkled some on mashed potatoes

7    and you took a bite of it, you would recognize there's

8    something not right with those.

9          Q.    Let's go over to soup, stews.  Let's talk about

10   soup.  Is your answer the same for soup?

11         A.    Depends on how much is there, and I don't know

12   how much was there in this case.

13         Q.    So you're saying that if there's little amounts

14   of it, you wouldn't taste it?

15         A.    If there's a small trace amount, you would --

16   it would taste different, but it wouldn't be as bad as a

17   mouthful of vinegar.

18         Q.    And every time -- you're saying if it was a

19   higher amount, you certainly would taste it no matter what

20   other spices were there in the soup, whatever was in there,

21   right?

22         A.    Well, I don't know as though I would go that

23   far because I'm aware of some chili spices that would

24   probably do almost as much damage to your tongue as this acid

25   would.


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR


000007802

1      Q.     And -- but you indicated that there is a

2   definite taste that somebody would be able to taste if they

3   had it in their food, right?

4      A.     Yes.

5      Q.     And you said that's in every case, right, if

6   the amount is large enough?

7      A.     Absolutely.

8      Q.     How about if the person who's taking it has a

9   cold?  Wouldn't they not be able to taste it?

10      A.     I never read any tests with vinegar and a cold

11   but, I have a feeling that you would know that there was

12   vinegar in your mouth.

13      Q.     You're saying that you have a feeling.  There's

14   nothing in the literature there to backup your emotion, is

15   there?

16      A.     It's not an emotion.  It's just a scientific

17   evaluation.  Since I don't know of an article where somebody

18   gets a cold and people pour them a cup of vinegar and say

19   hold this in your mouth and what does it taste like, I

20   don't -- that doesn't really have an answer.

21      Q.     So when you said -- I'm curious about what you

22   meant when you said "feeling."  Was that something that was a

23   visceral response or something that was from your experience

24   and education?

25      A.     All -- all of my testimony here today has been

1    in substance based on scientific facts.  Trying to convert

2    them and evaluate them so they're reasonably easy to

3    understand.

4            Q.    But you haven't been able to cite us to any

5    article that would indicate or set out what you just talked

6    about, right?

7            A.    Well, what Counsel's talking about now with the

8    cold, I'm sure I don't.

9            Q.    With regard to your education I think you

10   indicated you went to Baylor, right?

11           A.    Yes.

12           Q.    You have a BS, which is a bachelor of science?

13           A.    I do.

14           Q.    You don't have a Masters of science?

15           A.    That's correct.

16           Q.    And you don't have a PhD either, do you?

17           A.    That's correct.

18           Q.    You also talked about the mold and you talked

19   about the amount that was in there of sodium azide.  And do

20   you remember telling us that the taste would be pretty

21   unpleasant?

22           A.    Yes.

23           Q.    Again, there are no tests that would tell us

24   that, is there?

25           A.    No, I'm afraid we'll never know what the

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    concentration or strength was right at the time of this

2    incident because it degrades rather quickly.  And so we're

3    never going to be able to reconstruct exactly the occasion or

4    event in this case.

5         Q.   You indicated that it degrades.  That means the

6    substance gets lost, whether it's natural or by some other

7    means, right?

8         A.   Yes.

9         Q.   And in this particular case are you telling us

10   that the substance or that the sodium azide began -- begins

11   to degrade immediately upon death is that what you're telling

12   us?

13        A.   I don't believe that's been discussed.

14        Q.   Well, I'm asking you then.

15        A.   It begins to degrade as soon as it hits

16   moisture or water and continues on even past death, both in

17   the blood and in the stomach contents.

18        Q.   And in this case do you have any evidence to

19   suggest that the way it was preserved, this sodium azide,

20   that it ever hit water or moisture or humidity?

21        A.   If it was a bowl of food, soup, stew, whatever,

22   I'm not aware of any that doesn't have water in it.  In the

23   case of the human body, it's like 80 percent water, the body

24   itself is, and in the case of stomach contents, it produces a

25   dilute solution in water of a number of things in the

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000007805

1    stomach, and then you have saliva and things like that that

2    also have enzymes and a number of other things that produce

3    the water necessary to cause the azide to decompose.

4         Q.    Let's talk about some of the things you just

5    mentioned.  Gastric content, there was some items from

6    gastric contents that were seized in this case.  Did you know

7    that?

8         A.    I don't remember if they were seized or they

9    were part of the autopsy.  I'd have to read the report again.

10        Q.    Well, by seized I mean in the custody of the

11   Phoenix Police Department.  Did you know that?

12        A.    Again, I don't know if the gastric contents

13   were tested by the medical examiner's office or by a crime

14   lab.  I don't recall that.

15        Q.    I'm not asking you who they were tested by,

16   sir.  I'm asking you whether or not you know that the gastric

17   contents was seized, taken, obtained, preserved by the city

18   of Phoenix Police Department.  Did you know that?

19        A.    The word "preserved" is something that you

20   don't do with sodium azide if it's in liquid.  It just -- it

21   doesn't get preserved.

22        Q.    So -- okay.  We'll go over it again.  Were you

23   aware that the city of Phoenix Police Department came into

24   possession and collected, if those terms are okay with you,

25   the gastric -- part of the gastric contents in this case?


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000007806

1        A.      Again, that's kind of vague.  I do recall

2    something about gastric contents, but I'd have to reread the

3    report.

4        Q.      What's so vague about the question?  You either

5    know or you don't, sir.  Did they --

6        A.      I don't recall specifically who did what, when

7    in the case.

8        Q.      Did you even read the police report, sir?

9        A.      I did.

10        Q.      Did you look at the pictures?

11        A.      I believe I did.

12        Q.      With regard to the gastric contents, let's

13    assume it was sent over to West Coast Analytical to be

14    analyzed and it was sent over in the manner that they -- the

15    way they do things down there.  Are you saying that as soon

16    as that gastric content hits the vial or the item in which it

17    is sent over to somebody else, that it begins to degrade or

18    continues to degrade?  Is that what you're saying?

19        A.      No, sir.  That's not true.

20        Q.      The same thing with the blood, are you saying

21    that as soon as the city of Phoenix Police Department takes

22    that blood from Mr. Andriano and then puts it in a vial, that

23    that sodium azide that's in that vial begins to degrade?

24        A.      That's not true.

25        Q.      And how about the items that are taken from,

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    let's say, the soup bowls and then put in the vials by the

2    city of Phoenix Police Department and sent over to be

3    analyzed.  Does that begin or continue to degrade after they

4    put those in those vials to be sent over for analysis?

5          A.    That's not true also.

6          Q.    You indicated that some of the effects of this

7    are that the person begins to feel dizzy, right?

8          A.    Yes.  That's correct.

9          Q.    They begin to be sick, right?

10         A.    Yes.

11         Q.    Sir, in your notes you indicated that something

12   was BS.  Are you talking about a bachelor of science degree

13   or what were you talking about when your notes refer to that?

14         A.    That was another expert in this case, I don't

15   know if he testified, but that lists pages in his transcript

16   which are not glue.

17         Q.    And what does BS stand for?

18         A.    The common word BS.

19         Q.    We want to make sure there's no

20   misunderstanding.  What is it?

21         A.    Bull blank.

22         Q.    Are you saying it stands for bull shit?

23         A.    Yes.  Things that grow flowers.

24         Q.    You also indicated, sir, that once upon

25   ingestion of the -- of the sodium azide the person begins to

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    get sick, right?

2              A.    Yes.

3              Q.    Their pallor changes, right?

4              A.    Yes.

5              Q.    They're collapsing, right?

6              A.    Yes.  Collapsing, convulsions, one of the two.

7    Depends on how much is in --

8              Q.    And then you said, well, but, you know, what?

9    It -- they recover very fast from that.  That's what you

10   said.  You agree with that?

11             A.    When they throw up and get rid of the large

12   amount of sodium azide that's available, biologically, yes,

13   they do recover pretty fast.

14             Q.    But that's assuming they --

15             MR. PATTERSON:  Judge --

16   BY MR. MARTINEZ:

17             Q.    -- get rid of the large amount that's inside,

18   right?

19             MR. PATTERSON:  Excuse me, Mr. Martinez.

20                   Could we approach, please?

21

22                   (The following proceedings were held at the

23   bench:)

24

25             MR. PATTERSON:  Mr. DeLozier just informed me he's

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000007809

1    feeling ill.  May we take the recess at this point?

2              THE COURT:  All right.

3         MR. DELOZIER:  Thank you.

4

5              (The following proceedings were held in open

6    court:)

7

8              THE COURT:  Let's go ahead and take our afternoon

9    break at this point in time, ladies and gentlemen.  During

10   the recess remember the entire admonition I gave you

11   including the fact you're not to discuss this case with

12   anyone, do not let anyone discuss the case with you, keep an

13   open mind.

14             Have a nice break.  We'll see you in 20

15   minutes.

16

17             (Recess.)

18

19        THE COURT:  This is cause number CR 2000-096032,

20   State of Arizona versus Wendi Elizabeth Andriano.  The record

21   will reflect the presence of the Defendant, Counsel and the

22   jury.

23             Ladies and gentlemen of the jury we're going to

24   go ahead and take our evening recess at this point in time.

25   I want you to know we're keeping this case on schedule, but

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    there's some matters that Counsel and I need to discuss and

2    we're not going to waste your time.  You need to understand

3    what I told you at the beginning of this case.  I'm very much

4    aware that your time is precious, but also I need to make

5    sure I conduct this trial in the proper manner, so I want you

6    to know that.  I don't want you to think we're wasting your

7    time.

8           We're taking our evening recess at this point

9    in time.  Remember the entire admonition I have given you,

10   including the fact you're not to discuss this case with

11   anyone, do not let anyone discuss this case with you, do not

12   do any research or experimentation, avoid any media coverage

13   of this case, keep an open mind.

14           I want you to have a nice evening.  We'll see

15   you tomorrow at 1:00 p.m.  Have a nice evening.  I'll stay

16   here with Counsel.

17

18           (Whereupon, the jury exits the courtroom.)

19

20   THE COURT:  This is cause number CR 2000-096032,

21   State of Arizona versus Wendi Elizabeth Andriano.  The record

22   will reflect the presence of Defendant and Counsel.  We're

23   outside the presence of the jury.

24           For the record, I had a meeting in chambers

25   with Counsel and Mr. DeLozier is feeling ill, so we're going

 1    to -- that's why we're taking this evening recess.  So we'll

 2    put that on the record.

 3              The other thing, Counsel, is that Exhibit

 4    Number 279 was opened in the examination of Mr. Collier and

 5    I'm going to go ahead and have the clerk reseal that exhibit

 6    since it was opened.

 7              Any objection from either Counsel?

 8              MR. MARTINEZ:  No, sir.

 9              MR. PATTERSON:  No, sir.

10              THE COURT:  Anything else we need to discuss at this

11    time?

12              MR. MARTINEZ:  Yes, sir.  With regard to Mr.

13    DeLozier's condition, I'm just sort of want the Court to make

14    a finding, I guess, before we go, or inquire of Mr. DeLozier

15    that starting today until the time that we've broke that he

16    was effectively assisting his client up to that point, and

17    that when he felt, or at least in conference with Mr.

18    Patterson, when he felt that perhaps he was not effectively

19    assisting the client, that's when we took the break.  Because

20    if he wasn't feeling so well and perhaps not as effective as

21    he could have been earlier, then we could go ahead and redo

22    it again as opposed to maybe worry about it later on down the

23    line.

24              THE COURT:  Mr. DeLozier?

25              MR. DELOZIER:  Your Honor, the point in time that I'

```
 1    handed the transcripts to Mr. Patterson that were being used

 2    as Exhibits 456 and 458 by Mr. Martinez and I asked him at

 3    that point to follow along, I knew that I was not following

 4    what I needed to for the purposes of redirect regarding those

 5    and I asked his assistance in clarifying if he would while we

 6    were continuing.  At that point is when he asked you to take

 7    the recess.

 8              THE COURT:  Right.

 9              MR. DELOZIER:  How much earlier did I feel that

10    way?  I'm not sure I could tell you --

11              THE COURT:  Okay.

12              MR. DELOZIER:  -- how much earlier, but at that point

13    I certainly did.

14              THE COURT:  And that's when Mr. Patterson alerted

15    us --

16              MR. DELOZIER:  Yes.

17              THE COURT:  -- we should take a break.  I didn't see

18    anything from my observation of what was happening here in

19    court any problem that you were having or -- nor with regard

20    to any objections, that type of thing, that you were going to

21    be -- you would be making during the examination of Mr.

22    Collier by Mr. Martinez.

23                   Do you feel that you were properly representing

24    Ms. Andriano up to that point where Mr. Patterson asked us to

25    take a break because you were feeling ill?  If not then Mr.
```

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

```
 1    Martinez can repeat some of the matters with regard to the
 2    transcripts.
 3              MR. PATTERSON:  May I have a moment, Your Honor?
 4              THE COURT:  Yes.
 5
 6                (Pause in proceedings.)
 7
 8              MR. DELOZIER:  Your Honor, Mr. Patterson and I had a
 9    brief discussion about could I detect any inability and
10    toward the end of my direct was when I started feeling that
11    there was something -- something wrong.
12              THE COURT:  You feel that --
13              MR. DELOZIER:  I wasn't as sharp as I felt like I
14    normally was.  I sort of trailed off at the end.
15              THE COURT:  Do you feel that you need additional time
16    with your direct examination or did you get in everything
17    that you wanted --
18              MR. DELOZIER:  I covered that adequately, I think.
19              THE COURT:  Okay.  And you feel that what you did was
20    without any problems as far as getting in what you wanted to
21    ask --
22              MR. DELOZIER:  Yes, sir.
23              THE COURT:   -- on direct examination.
24                And then with regard to the questions asked by
25    Mr. Martinez, there were some questions that he asked Mr.
```

 1    Collier relating to, I believe, Exhibit Number 456 for

 2    identification and Exhibit 458 for identification regarding

 3    the transcripts, and I think that you had copies of the

 4    transcripts.  And then I think at that point in time maybe

 5    you and Mr. Patterson had some discussion about the

 6    transcripts.

 7                    Is that at the point where Mr. Patterson -- Mr.

 8    Patterson, that you alerted us we needed to take a break?

 9         MR. PATTERSON:  I brought it to the attention of the

10    Court immediately.  I had a brief conversation with my client

11    and at that point I asked for the recess.

12         THE COURT:  Let me ask both Mr. DeLozier and Mr.

13    Patterson, is there anything that you feel under the

14    circumstances that Mr. Martinez should repeat as far as

15    questioning of Mr. Collier that perhaps Mr. DeLozier missed?

16         MR. PATTERSON:  No, Your Honor.  I think having taken

17    the break and continuing tomorrow when I assume Mr. Martinez

18    will have additional questions, over the evening we could

19    think about what transpired today.  I don't think, in my

20    estimation, any ineffective assistance of Counsel was

21    committed in today's proceedings either in the direct

22    examination or while listening to the cross-examination.

23         THE COURT:  Right.

24         MR. PATTERSON:  So I don't see it to be an issue.

25    Obviously, the facts are going to be have to be determined by


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000007815

```
 1    some other tribunal to determine that.  My opinion is

 2    probably not dispositive of that issue, but I think we have

 3    abundant opportunity tomorrow to correct what, if anything,

 4    happened was problematic today.

 5              (Attorney-client discussion.)

 6         MR. PATTERSON:  Is it possible to generate a

 7    transcript of the cross for tomorrow's proceedings?

 8         THE COURT:  Why don't you discuss that privately

 9    with the court reporter.

10         MR. PATTERSON:  Okay.

11         THE COURT:  Mr. DeLozier, do you agree with what Mr.

12    Patterson just said as far as assistance of Counsel here?

13         MR. DELOZIER:  Yes, sir.

14         THE COURT:  Okay.

15              Anything further from Mr. Martinez?

16         MR. MARTINEZ:  No.  I don't have anything.  Thank you.

17         THE COURT:  Okay.  We'll go ahead and take the recess

18    then and we'll see everyone tomorrow at 1:00 p.m.  Have a

19    nice evening.

20         MR. DELOZIER:  Thank you, Your Honor.

21         THE COURT:  Thank you.

22

23              (Evening recess.)

24

25
```

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

```
 1

 2

 3                    CERTIFICATE OF REPORTER

 4

 5   STATE OF ARIZONA     )
                          )
 6   COUNTY OF MARICOPA   )

 7

 8               I, Traci L. Wheeler, CSR, RPR, an official and

 9   certified reporter in the Superior Court of the State of

10   Arizona, in and for the County of Maricopa, hereby certify

11   that I made a shorthand record of the proceedings had in the

12   within case, and that the foregoing transcript is a full,

13   true, and correct transcription of the proceedings in this

14   case.

15               Dated this 5th day of June, 2005.

16

17

18                              _____
                                Traci L. Wheeler, CSR, RPR
19                              Certified Court Reporter No. 50313
                                Official Court Reporter
20

21

22

23

24

25
```

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

EXHIBIT SS

000007818

05-0002   1
Braocio
COPY

DP

1          IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

2              IN AND FOR THE COUNTY OF MARICOPA

3

4    STATE OF ARIZONA,              )
                                    )
5              Plaintiff,           )
                                    )
6    v.                             )     No. 1 CA-CR 04-0731
                                    )     MARICOPA COUNTY
7    WENDI ELIZABETH ANDRIANO,      )     No. CR 2000-096032
                                    )
8              Defendant.           )
     _____)

9

10

11

12                    Mesa, Arizona
                   October 21, 2004
13

14

15

16        BEFORE:  The Honorable BRIAN K. ISHIKAWA

17

18        REPORTER'S TRANSCRIPT OF PROCEEDINGS

19                   TRIAL DAY 30

20

21

22

23

24    ORIGINAL Prepared for APPEAL by:
      TRACI L. WHEELER, CSR, RPR
25    Certified Court Reporter No. 50313


        TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

2

```
1                    A P P E A R A N C E S

2   FOR THE STATE:        JUAN M. MARTINEZ,
                          Deputy County Attorney
3
    FOR THE DEFENDANT:    DANIEL B. PATTERSON,
4                         Deputy Public Defender
                                   and
5                         G. DAVID DELOZIER,
                          Attorney at Law
6

7            I N D E X   O F   E X A M I N A T I O N

8   WITNESS                                          PAGE
```

```
9   COLLIER, WILLIAM JOE, Called on Defendant's behalf
           Continued Cross-examination by Mr. Martinez    3
10         Redirect Examination by Mr. DeLozier          23
           Follow-up Questions by Mr. Martinez           49
11
    MITCHELL, BARBARA, Called on Defendant's behalf
12         Direct Examination by Mr. Patterson          147
           Cross-examination by Mr. Martinez            174
13         Redirect Examination by Mr. Patterson        184

14  OCHOA, BRANDON, Called on Defendant's behalf
           Direct Examination by Mr. Patterson           51
15         Cross-examination by Mr. Martinez             89
           Redirect Examination by Mr. Patterson        141
```

```
16

17

18

19

20

21

22

23

24

25
```

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

```
 1                MESA, ARIZONA, THURSDAY, OCTOBER 21, 2004

 2

 3          THE COURT:  Good afternoon.  This is trial in CR

 4    2000-096032, State of Arizona versus Wendi Elizabeth

 5    Andriano.  The record will reflect the presence of Defendant,

 6    Counsel and the jury.  William Joe Collier is on the witness

 7    stand, and we'll continue with the cross-examination by Mr.

 8    Martinez.

 9                Mr. Martinez?

10          MR. MARTINEZ:  Thank you.

11

12                     WILLIAM JOE COLLIER,

13    ----CALLED-TO-TESTIFY-ON-BEHALF-OF-THE-DEFENDANT,----

14       HAVING PREVIOUSLY BEEN DULY SWORN, TESTIFIES FURTHER:

15

16    CONTINUED CROSS-EXAMINATION BY MR. MARTINEZ:

17          Q.    Sir, I want to talk to you about this NaN3,

18    which is sodium azide, correct?

19          A.    Yes, that's correct.

20          MR. MARTINEZ:  If I may have an exhibit so I can mark

21    that?

22          THE CLERK:  Tag?

23          MR. MARTINEZ:  Tag, yes.

24                (Pause in proceedings.)

25    / / / / /
```

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1     BY MR. MARTINEZ:

2          Q.    This is now Exhibit 459.  Can you see it from

3     where you sit, sir?

4          A.    Yes, sir.

5          Q.    And one of the things you told us was that if

6     you added water, which is H20, you would get another

7     substance which is known as N3H, right?

8          A.    Yes, sir.

9          Q.    What is the 3, sir?

10         A.    It's call hydrazoic acid or sometimes

11    hydronitric acid.

12         Q.    I know what hydrazoic acid is, sir, but what is

13    in 3H?

14         A.    Oh, it's 3 atoms of nitrogen and one of

15    hydrogen in each molecule.

16         Q.    But, sir, there is no such compound as N3H, is

17    there?

18         A.    No such compound?  Well, it's in the science

19    books that I study.

20         Q.    So you're telling me that this N3H is hydrazoic

21    acid?

22         A.    Yes.  That's correct.

23         Q.    All right.

24         A.    Let me have another exhibit marked.

25               (Pause in proceedings.)

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1      BY MR. MARTINEZ:

2              Q.    Sir, are you familiar with the Merck Index?

3              A.    Yes, I am.

4              Q.    And you're telling us that this right here is

5      the symbol for hydrazoic acid, right?

6              A.    The upper one, yes, sir.

7              Q.    Why don't you take a look at Exhibit 460 to see

8      whether or not you're correct or not, and I've

9      highlighted it for you.  It's down here.

10             A.    Oh, I see, Counselor.  In chemistry --

11             Q.    No, no.  Go ahead, just review it, and then

12     I'll have some questions for you.

13             A.    Yeah, it's the same as the upper one.

14             Q.    You think that that says N3H?  You think that's

15     what it says?

16             A.    To a chemist it says -- yeah, N3H.

17             Q.    So I'm talking about the Merck Index.  Isn't it

18     true in the Merck Index it indicates that this hydrazoic acid

19     is actually HN3.  Doesn't that say that?

20             A.    Sure, it's a different arrangement, HN3.

21             Q.    Right.  And to -- according to you, we could

22     make sodium azide as N3Na, right?  We could make them around

23     like that?

24             A.    You could, but it's -- generally when you have

25     sodium, generally as a matter of custom to do the sodium

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000007823

1    before.  That's kind of why there are different names for

2    things in chemistry.

3         Q.    So you're -- as you sit there today, you can

4    tell us that in terms of the sodium azide you could make

5    it N3Na and people would know what it was, "yes" or

6    "no"?

7         A.    Well, that's not correct.

8         Q.    All right.  It could --

9         A.    You can read it either way.

10        Q.    Well, then why --

11        A.    But the custom is to put the sodium first.

12        Q.    So you're saying that the Merck Index, which is

13   the leading authority in the field, isn't it?

14        A.    It's very accurate.  In this case it is

15   accurate.  I agree completely with it.

16        Q.    Isn't it the authority in the field, sir?

17        A.    Well, it depends on what field we're talking

18   about.  There are a lot of scientific texts.

19        Q.    I'm talking --

20        A.    But it's certainly authoritative talking about

21   this.

22        Q.    It's more authoritative than you.  Wouldn't you

23   say that?

24        A.    Sure.  Any encyclopedia or textbook has a lot

25   better memory than I do.

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1          Q.    So it's more than memory, sir.  It's how to do
2     with the accuratness of how you write something out.
3     Wouldn't you agree?
4          A.    Well, in chemistry you can write things
5     differently and they are -- they mean the same, so in some
6     things the order is in custom.  Sometimes we don't even write
7     it the way in -- the way I've wrote it.  Sometimes it's
8     written in three dimensions with hydrogen sticking out at
9     various angles or nitrogen depending on what the substance
10    is.
11         Q.    Are you willing to agree that in the Merck
12    Index that I showed you, Exhibit Number 460, they do not list
13    hydrazoic acid as N3H?
14         MR. DELOZIER:  Objection, Your Honor.  Asked and
15    answered.
16         THE COURT:  Overruled.  Go ahead, answer the question
17    if you can.
18         THE WITNESS:  Yes.  It is written differently in the
19    Merck Index.
20    BY MR. MARTINEZ:
21         Q     And it is written HN3?
22         A.    It is written HN3, yes.
23         Q.    Sir --
24         MR. MARTINEZ:  Can we have the other exhibit that was
25    big like this from yesterday, please?

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

```
 1                    (Pause in proceedings.)

 2    BY MR. MARTINEZ:

 3          Q.     Sir, I want to you take a look at Exhibit

 4    Number 457.

 5          MR. MARTINEZ:  Can I have some tape real quick,

 6    please?

 7                    (Pause in proceedings.)

 8    BY MR. MARTINEZ:

 9          Q.     Can you see it from there, sir?

10          A.     Yes, I can.

11          Q.     And you did indicate that the -- the lethal

12    dose for sodium azide is 45 milligrams per kilogram,

13    correct?

14          A.     No, sir.

15          Q.     Well, you're -- the lethal dose is not 45

16    milligrams per kilogram?  That's not what you've written

17    there?

18          A.     That's what's written there, but that's not the

19    lethal dose.

20          Q.     That's not the lethal dose for mice?

21          A.     That's correct.

22          Q.     You didn't indicate that's for mice so -- but

23    that is the lethal dose that you indicated was for mice

24    yesterday, right?

25          A.     No, sir.
```

1          Q.    Then what does that number mean sir?

2          A     It's a number where half, 50 percent of the

3     mice die that ingest that amount.

4          Q.    And that's 45 --

5          A.    It's called an LD 50.

6          Q.    All right.  LD 50 that you wrote down yesterday

7     for sodium azide is 45 milligrams per kilogram, correct?

8          A.    Yes, sir.

9          Q.    Sir, I'm going show you an exhibit that's

10    already been admitted into evidence.

11          MR. MARTINEZ:  Can I have some gloves, please?

12               (Pause in proceedings.)

13    BY MR. MARTINEZ:

14          Q.    Going to show you part of Exhibit 266.005.

15          MR. PATTERSON:  Judge, could we approach?

16          THE COURT:  Yes.

17

18               (The following proceedings were held at the

19    bench:)

20

21          MR. PATTERSON:  It's been awhile since we addressed

22    the issue of rubber gloves and handling these exhibits.

23    It's not because of the azide, it's because of the

24    fingerprinting powder.  Could you reiterate that for the

25    jury at this time as to why these things are necessary?

1          MR. MARTINEZ:  I don't think it's necessary.  We've

2     done it once.

3          MR. PATTERSON:  Three weeks ago, four weeks ago.

4          THE COURT:  What exactly do you want me to say?

5          MR. PATTERSON:  The reason for gloves being used in

6     the handling of certain exhibits is because they've been

7     examined for fingerprints and the fingerprint powder or

8     technique is potentially toxic.

9          THE COURT:  Okay.

10

11          (The following proceedings were held in open

12     court:)

13

14          THE COURT:  Ladies and gentlemen, when we use gloves

15     like this sometimes it's because the packet has been examined

16     for fingerprints and there might be powder or other

17     substances on there because of the examination, and we're

18     using the rubber gloves to be on the safe side.

19     BY MR. MARTINEZ:

20          Q.   Sir, I'm going to show you part of Exhibit

21     266.05.  And I want you to take a look at it, if you can

22     see it.  If not, please step down so you can see it.

23          We've already been told this is what was sent

24     out with the sodium azide by the shipper, Alpha Aesar,

25     and it talks about the lethality dose.  Can you read

1    that, sir?

2              A.    Yes.

3              Q.    Would you agree it says oral LD50 27 milligrams

4    per kilogram MUS, which is mouse or mice?

5              A.    MUS is mice.

6              Q.    Yes.  Doesn't it?

7              A.    It does say that, yes.

8              Q.    And it also adds LD50 27 milligrams per

9    kilogram rat, right?

10             A.    It does.

11             Q.    Go ahead, have a seat, please.

12                   That's not in agreement with what you wrote up

13   there, is it?

14             A.    That's different than what I wrote up there,

15   yes.

16             Q.    Are you familiar with the Journal of Analytical

17   Toxicology Volume 20, March and April of 1996, sir?

18             A.    No, sir.

19             Q.    Well, sir, in it they also indicate that the

20   LD50 by the oral route in white mice of sodium azide is

21   27 milligrams per kilograms.  Why don't you go ahead and

22   take a look at that to see whether or not I'm accurate

23   or not.

24                   (Pause in proceedings.)

25             THE WITNESS:  Yes, sir.  That's exactly what it

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    says.

2    BY MR. MARTINEZ:

3        Q.    They also don't agree with your 45 milligrams

4    per kilogram, right?

5        A.    I -- I don't know if they disagree with it.

6    The number that they used there is the 27.

7        Q.    And that's not the same as 45.  That's half as

8    much, isn't it?  About, approximately?

9        A.    Sure.  It's little more than half.

10       Q.    Are you familiar with the book Prudent

11   Practices in the Laboratory?

12       A.    No, sir.

13       Q.    Would it surprise you if they also indicated

14   that the LD 50 oral for a rat involving sodium azide was

15   27 milligrams per kilogram?

16       A.    Not really.

17       Q.    Well, let's go ahead and take a look at it just

18   so you could see that's what it says.

19              (Pause in proceedings.)

20         THE WITNESS:  Exactly what it says, it says LD 50

21   for rat is 27 milligrams per kilogram.

22   BY MR. MARTINEZ:

23       Q.    Okay.  Again, roughly half of your 45

24   milligrams, right?  Correct?

25       A.    I've already answered that.  That's over half.

1    Q.    Okay.  Roughly half?

2    A.    Roughly half.

3    Q.    Didn't I say roughly half, sir?

4    A.    Well -- let's move on.

5    Q.    Are you familiar with the Medical Toxicology,

6  Adverse Medical Experience Journal from 1989 which indicates,

7  again, that the LD 50 for sodium azide is 27 milligrams per

8  kilogram.  Are you familiar with that?

9    A.    No, sir.

10    Q.    Well, then let me show it to you.

11          (Pause in proceedings.)

12    THE WITNESS:  Yes, sir.  That's exactly what it says.

13  BY MR. MARTINEZ:

14    Q.    Okay.  And so if we take your numbers, sir, and

15  if we take the 27 -- and just for the purposes of this

16  hypothetical I know how much it is, but it's roughly

17  half of what you have up there, 27 and a half would be

18  half, the effect of making this 45 milligrams, what that

19  does is that increases or requires more of the sodium

20  azide to kill 50 percent of the rats, doesn't it, when

21  this number goes up?

22    A.    Sure.  The higher number you use, the more of

23  that particular chemical substance is necessary to kill

24  half the rats.

25    Q.    And in this case, since it is about half you

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1   added, if you will, we're looking at 100 percent more.

2   In other words, another 27 and a half, actually 28, to

3   make that 45 milligrams per kilogram, right?

4           A.    No.

5           Q.    Well, in this particular case, we agree roughly

6   speaking that 27 is half of 45, right?

7           A.    I don't think we ever agreed to that,

8   Counselor.

9           Q.    Okay.  You would agree that it is -- roughly

10  half of 45 is 27, wouldn't you agree?

11              (Pause in proceedings.)

12          THE WITNESS:  For the record, it's 60 percent.

13  BY MR. MARTINEZ:

14          Q.    Okay.  And so that would mean it would take 60

15  percent more of sodium azide to kill the rats under that 45

16  milligrams per kilogram equation you have up there, correct?

17          A.    That's not what it means at all.

18          Q.    Okay.  Sir, you gave us some indications

19  yesterday of what some of the symptoms would be when

20  people would ingest the sodium azide.  Do you remember

21  that?

22          A.    Yes, sir.

23          Q.    Where did you get that, sir?

24          A.    That's found in a number of places.  Medical

25  Toxicology by Allan, Horn and Barslow is a textbook

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

 1      used in medical schools.  It's in there.

 2              Q.    Sir, what are you reading?

 3              A.    Well, this is from the Merck, the thing you

 4      were just reading.  I thought I'd pull it out and I have

 5      a copy of -- of the article that -- or the particular

 6      page in the Merck that you were reading from.

 7              Q.    Sir, the only Merck that I provided to you,

 8      sir, was the one involving the -- the acid.  Isn't that what

 9      we talked about earlier?  Didn't we talk about hydrazoic

10      acid?  Isn't that what I talked to you about?

11              A.    Right.  And I have that here, and if you'll

12      look under -- on page -- I have page 4700 --

13              Q.    Sir -- sir, hold on.  Hold on.  I am -- are you

14      looking at the one that talks about hydrazoic acid or not?

15              A.    Yes.

16              Q.    May I take a look at it, please?  I haven't

17      seen it.

18              A.    Sure.

19                    (Pause in proceedings.)

20      BY MR. MARTINEZ:

21              Q.    Okay.  And yours says HN3.  Is that what you're

22      telling me?

23              A.    The question didn't have anything to do with

24      HN3.  It had to do with the symptoms and signs.

25              Q.    Sir, may I have that?


                TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1          A.     Yes.

2          Q.     This is something that you used to arrive at

3     your -- at your opinion today, correct?

4          A.     Did I use it to arrive at my opinion?  I had my

5     opinion long before I looked at that particular thing,

6     but that turns out to be the same document you were

7     using, so if you want to know the symptoms and signs, I

8     can read it right off that.

9          Q.     I'm going to go ahead and have this marked as

10    an exhibit.

11                 (Pause in proceedings.)

12    BY MR. MARTINEZ:

13         Q.     Sir, you wanted to read from it.  To your own

14    knowledge, without reading it, what are the symptoms?

15         A.     Well, things like coughing, just general

16    malaise, tachycardia is one of the symptoms and signs,

17    which is irregular sometimes fatal heart beats when you

18    get into tachycardia.  So there are just a number of

19    them.  Lowered blood pressure is one of them.

20                 MR. MARTINEZ:  Judge, I move for admission of Exhibit

21    461.

22                 THE COURT:  Any objection?

23                 MR. DELOZIER:  Take a look, just a second, Your

24    Honor.

25                 (Pause in proceedings.)

1          MR. DELOZIER:  No objection, Your Honor.

2          THE COURT:  Exhibit Number 461 for identification is

3    admitted into evidence.

4                    (Pause in proceedings.)

5    BY MR. MARTINEZ:

6          Q.    Let's go ahead and take a look at it.   4697,

7    and that does say hydrazoic acid, doesn't it?

8          A.    Yes, it does.

9          Q.    And then immediately underneath it under the

10   second line it does give out HN3, doesn't it?

11         A.    Yes.

12         Q.    And that is not what is on Exhibit 459,

13   correct?

14         MR. DELOZIER:  Your Honor, it's been asked and

15   answered about half a dozen times.

16         THE COURT:  Sustained.

17   BY MR. MARTINEZ:

18         Q.    You also -- go ahead and have a seat, sir.

19         A.    Okay.

20         Q.    You were telling us some of the symptoms of

21   it.  Sir, have you ever testified in superior court

22   involving sodium azide before?

23         A.    I don't believe I have.

24         Q.    Have you ever testified in the city of -- not

25   the city, but State of Arizona ever with regard to

1   sodium azide?

2          A.    I can't recall.

3          Q.    How about in California, have you ever

4   testified with regard to sodium azide, sir?

5          A.    No, sir.

6          Q.    How about --

7          A.    Although it was discussed, it wasn't in the

8   context of this.

9          Q.    Have you ever testified in the federal circuit

10  with regard to sodium azide, sir?

11         A.    No, sir.

12         Q.    So as you sit here today, sir, how many deaths

13  are out there in the literature that have talked about

14  sodium azide poisoning that resulted in death?  Do you

15  know what the literature might say about that?

16         A.    I really don't know.  I'm aware of some

17  articles that talk about maybe three or four deaths,

18  something like that.

19         Q.    Could it be a little higher than that?

20         A.    Well that's one article which was talking about

21  the specific cases.  If you're talking about a review

22  article, which would be adding up all the sodium azide

23  deaths from every medical examiner in the United States,

24  I would have no way of knowing that.

25         Q.    Sir, you indicated that sodium azide is how

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

```
1    much -- how much more toxic than cyanide?  How much did

2    you tell us?

3              A.    About three times.

4              Q.    Sir, are you familiar --

5              A.    Three times less toxic.  Cyanide is three times

6    more toxic.

7              Q.    Are you familiar with the Disposition of Toxic

8    Drugs and Chemicals in Man, Sixth Edition by Randall

9    Bisette, copyrighted 2002?

10             A.    I believe I have that in my I library, yes,

11   sir.

12             Q.    Let's go ahead and take a look at what it says

13   about toxicity.  Read the first line, first sentence.

14             A.    I've read it.

15             Q.    May I have it back?

16             A.    Yes.

17   BY MR. MARTINEZ:

18             Q.    He doesn't agree with you with your assessment

19   on -- that cyanide is approximately three times as toxic

20   as sodium azide, does he?

21             A.    He doesn't address that question.

22             Q.    He does say azide is considered to have a

23   degree of toxicity similar to that of cyanide, doesn't

24   he?

25             A.    That's correct.  He does say similar.
```

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1       Q.     Now, you indicated yesterday, and this is where

2    we left off, that an individual who receives a dose of

3    sodium azide may exhibit some symptoms very quickly

4    after ingestion I think is what you said?

5       A.     Yes, sir.

6       Q.     And you gave us a whole sort of range of things

7    that may up to and include unconsciousness, right?

8       A.     Yes, convulsions, unconsciousness, before you

9    get to that your vision would be blurred, just a lot of

10   things happen.

11      Q.     And then you gave the opinion, well, that may

12   happen but the person recovers very quickly after that.

13   I think that was your assessment, right?

14      A.     If -- I think the caveat was if it's pretty

15   much quantitatively removed from the stomach where it's being

16   absorbed from when an individual throws up once or twice and

17   gets the material out of their system, then the oxygen in the

18   air or oxygen in an emergency room reverses it very rapidly.

19      Q.     So you're saying that as long as the individual

20   vomits, then he's going to recover from that, right?  That's

21   what you're saying, unqualified?

22      A.     No.  It depends on when he vomits.  If he

23   vomits before a large amount of it goes into the blood

24   stream, the answer is yes.  If he vomits after a large amount

25   has gone into the blood stream, then he throws up, recovery

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    can take several days or he may die three days later, you

2    know.

3         Q.    The bottom line with regard to this, it

4    depends, first of all, on the amount he takes, right?

5    That he ingests, right?

6         A.    Yes, sir.

7         Q.    And it depends on how long it stays in his

8    system before and if in fact he vomits, right?

9         A.    Correct.

10         Q.    It doesn't have to be that every case that you

11    have the person vomit, right?

12         A.    That's correct.  There are some cases where

13    they do not vomit.

14         Q.    And if they do vomit, you don't really know how

15    much is actually -- we don't know how much is coming

16    out, right?

17         A.    That's true.  We don't.

18         Q.    So it could be the majority of it stays inside

19    the person's -- the person's stomach, right?

20         A.    Again, that depends on the form and condition

21    of the poison.  In this case we have capsules.  If it were

22    liquid, if they dissolved it into liquid first and you drank

23    the liquid, that would tend to do exactly what you're

24    suggesting, go into the blood stream rather rapidly and you'd

25    have sustained long term toxic insult to the body.  Capsules

1    on the other hand, I think we talked about them, they're

2    going to be rupturing and a lot of gas is being formed and

3    that's going to contribute to -- and as well as the pure

4    sodium azide is going to be in contact with the stomach

5    lining.  And so all of those things together are going to

6    cause you to throw up.

7         Q.    Unless of course you have soup sort of lining

8    your stomach, right?

9         A.    Unless you have what?

10         Q.    Soup or something like that to line your

11    stomach?

12         A.    Not really.  Obviously, the more food you have

13    in your stomach, there's going to be a little longer delay in

14    it getting into your blood stream.  Actually, probably the

15    best thing would be to have a lot of salad in your stomach to

16    get it into your blood stream very fast.  But suffice it to

17    say, it has to be in liquid form not to be absorbed into the

18    blood stream.

19         Q.    Sir, what is the minimum amount that you read

20    about that has caused somebody to die in the literature

21    when they ingested sodium azide?

22         A.    I think -- I think there are deaths of a gram

23    or two.

24         Q.    So one to two grams?

25         A.    I don't really recall.  Obviously, it's weight

1    dependent and I'm not aware of -- certainly, children

2    can get ahold of this --

3         Q.    I'm talking adults, sir.

4         A.    Well, again, it depends on the weight and so I

5    don't have that all categorized, but, in some individuals, I

6    believe a couple grams, one gram can certainly cause death,

7    maybe in people who were very weakened and debilitated.

8         Q.    If a person is weakened and debilitated,

9    wouldn't you agree the fact of the sodium azide would be more

10   pronounced?

11        A.    The death would occur much quicker than in a

12   healthy, well nourished individual.

13             MR. MARTINEZ:  I don't have anything else.

14             THE COURT:  Mr. DeLozier?

15             MR. DELOZIER:  Thank you, Your Honor.  Excuse me a

16   second, Your Honor.

17                  (Pause in proceedings.)

18

19   REDIRECT EXAMINATION BY MR. DELOZIER:

20        Q.    Now, Mr. Collier, I want to show you what's

21   been admitted into evidence as Exhibit 456.

22             MR. MARTINEZ:  Objection.  Improper impeachment.  He

23   hasn't indicated he doesn't recall.

24             THE COURT:  Let me see 456.  Let me see Counsel here

25   with the exhibit.


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000007841

```
 1                    (The following proceedings were held at the
 2      bench:)
 3
 4                    MR. DELOZIER:  That's what my next question was.
 5                    THE COURT:  Well, the problem is that he testified
 6      yesterday he didn't remember this.
 7                    MR. DELOZIER:  He remembered the exhibit.  That's
 8      what I'm asking for.  Remember the exhibit.
 9                    THE COURT:  No, but he didn't remember the case.  I
10      believe that's what he testified.
11                    MR. DELOZIER:  Mr. Martinez had him read from the
12      text.  That's what I'm going to do, same thing.
13                    THE COURT:  I know, but if he testified that he
14      doesn't even remember the case, I don't think it's relevant.
15                    MR. DELOZIER:  It's relevant because Mr. Martinez had
16      referred to him as "superman."  It's out of context.  The
17      context needs to be clarified.
18                    THE COURT:  Mr. Martinez?
19                    MR. MARTINEZ:  He said he couldn't remember it.  How
20      could he clarify if he doesn't remember it?
21                    MR. DELOZIER:  By reading the transcript because
22      it's -- right now it's a false presentation of that
23      transcript.
24                    THE COURT:  Well, lay some foundation.  Really, if he
25      can say he remembers testifying at that trial, I'll let
```

1    you ask the question, but basically he said he didn't

2    remember it.

3

4              (The following proceedings were held in open

5    court:)

6

7    BY MR. DELOZIER:

8         Q.    In State versus Pablo -- I can't pronounce his

9    middle name.  I'm looking at transcript of -- reporter's

10   transcript of the proceedings for Day 23 dated June 17,

11   2003.  The question is do you recommend -- do you remember

12   testifying in that case?

13        A.    I do now, yeah.  I recall Mr. Martinez --

14             MR. MARTINEZ:  Objection.

15             THE COURT:  Hold on a second.

16             MR. MARTINEZ:  Beyond the form of the question.

17             THE COURT:  Just answer the question that's asked.

18             THE WITNESS:  Yes, somewhat.  Not word for word.

19   BY MR. DELOZIER:

20        Q.    All right.  And Mr. Martinez showed you page 66

21   from that transcript.  Do you remember that?

22        A.    Yes, uh-huh.

23        Q.    Okay.

24             MR. DELOZIER:  I'd like to approach, Your Honor?

25             THE COURT:  Yes.

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    BY MR. DELOZIER:

2         Q.    I'd like for you to take a look at page 66 and

3    there are some highlighted areas and then there's an

4    area where the highlight stops.  Could you read the

5    highlighted areas and the balance of the paragraph where

6    the highlight stops?

7         MR. MARTINEZ:  Judge, I'm going to ask he read it to

8    himself.  I don't know what the purpose is here, if he's

9    refreshing his recollection or what.

10        THE COURT:  Read it to yourself first and then I'll

11   have Mr. DeLozier ask the next question.

12             (Pause in proceedings.)

13        THE WITNESS:  Yes, I've read it.

14   BY MR. DELOZIER:

15        Q.    Okay.  Yesterday you indicated that the

16   questioning and the statements that Mr. Martinez elicited of

17   you were taken out of context, correct?

18        A.    Yes.  I said he read them out of context.

19        Q.    And --

20        A.    And he quoted them out of context.

21        Q.    Well --

22        A.    And misquoted them.  All three.

23        Q.    Well, the highlighted portion says, "In review

24   of this case did you have any sort of superman knowledge of

25   forensics to be able to make a conclusion that other people

1    couldn't make?"  Do you remember that question?

2         A.    Yes.  That was done by Mr. Bevilacqua, who's an

3    attorney who asked me that question.  He used the word

4    "superman."  I never used that word.

5         MR. MARTINEZ:  Objection.  Beyond the scope of the

6    question, Your Honor.

7         THE COURT:  Overruled.

8         MR. DELOZIER:  Go ahead, finish.

9         THE WITNESS:  I never used the word "superman" as Mr.

10   Martinez suggested.  Mr. Bevilacqua, the attorney in the

11   case, asked me if I had that kind of knowledge.

12   BY MR. DELOZIER:

13        Q.    What he was really asking you was to be able to

14   make a conclusion that other people couldn't make?

15        MR. MARTINEZ:  Objection.  Speculation as to what he

16   was really asking.

17        THE COURT:  Sustained.

18        MR. DELOZIER:  I'm reading from the text.

19        THE COURT:  Sustained.  Rephrase the question.

20   BY MR. DELOZIER:

21        Q.    Does the text say able to make a conclusion

22   other people couldn't make?

23        A.    Yes, it does, ordinary people that don't have

24   training in the forensic sciences.

25        Q.    Now, the portion that was not underlined, do

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    you have a recollection of what you testified to there?

2           A.    Yes.

3           Q.    What did you say?

4           A.    I'd have to read it to be -- you know.

5           Q.    Bring it back to let you refresh your

6    recollection.

7           A.    In answer --

8           THE COURT:  Hold on.

9           MR. DELOZIER:  No, don't read it out loud.

10          THE WITNESS:  Okay.

11          THE COURT:  Read it but don't say anything.

12          MR. DELOZIER:  Read it to yourself, then I'll --

13          THE WITNESS:  Okay.  I've read it.

14   BY MR. DELOZIER:

15          Q.    All right.  Does that refresh your

16   recollection?

17          A.    Yes.  I -- I understand that.  That's what I

18   remember saying.

19          Q.    All right.  What does it say?

20          A.    Again, I can't memorize a 10-line paragraph,

21   Counselor, in 30 seconds.

22          Q.    I understand.  I'm talking about the essence of

23   it.  Can you give us --

24          A.    The essence of it?

25          MR. MARTINEZ:  I'm going to object, Your Honor.

1           THE WITNESS:  A --

2           THE COURT:  Hold on a second.  What's the objection?

3           MR. MARTINEZ:  I'm going to object.  The "essence of

4    it" is putting a spin on it.

5           THE COURT:  I'm sustaining the objection.

6           MR. DELOZIER:  I'll ask him to read it, Your Honor.

7           THE COURT:  Go ahead and ask your next question.

8    BY MR. DELOZIER:

9           Q.    From the end of the sentence, the highlighted

10   parts, to the next line.

11          A.    Okay.  In answer to the question if I have any

12   superman knowledge?

13          Q.    No.  Go ahead.

14          A.    In forensics I say my answer to the lawyers

15   question, I have a data bank.

16          MR. MARTINEZ:  Objection, Your Honor.  That's not

17   what it says.  That's not the full answer.  He's leaving out

18   the first part.

19          THE COURT:  Let me see the exhibit.

20              (Pause in proceedings.)

21          THE COURT:  Okay.  I'll allow the witness pursuant

22   to Rule 106 to go ahead and read line 15 through 20.

23          MR. DELOZIER:  Thank you, Your Honor.

24   BY MR. DELOZIER:

25          Q.    Line 15 through 20, sir.


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000007847

1          A.     "I think so.  I have a data bank of hundreds

2    and hundreds of homicides and I can draw upon my experiences

3    and the mindset of the individuals that did the killings

4    whether it was drug induced or whether it was a mental

5    illness.  I've had experience with all of those things."

6          Q.     Okay.  Thank you.  Average person doesn't have

7    that kind of experience, correct?

8          A.     That's correct.

9          Q.     He also had you read portions of Exhibit 458,

10   which involves the same case, the date of the transcript

11   on this one is June 12, 2003.  You've already testified

12   that you now remember it, correct?

13         A.     Yes.

14         Q.     And this had to do with page 82, so I'll have

15   you take a look.

16         MR. MARTINEZ:  I'm going to object to him showing it

17   to him.  If he remembers, he doesn't need to show it to

18   him.

19         THE COURT:  Go ahead --

20         MR. DELOZIER:  To refresh.

21         THE COURT:  -- and rephrase the question as to what

22   specifically the witness remembers, Mr. DeLozier.

23   BY MR. DELOZIER:

24         Q.     Do you remember testifying in this case?

25         A.     I do.


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

Q. Okay.
A. I remember the lawyers, I remember the case itself, but I can't quote you what's in a transcript that's hundreds of pages.
Q. Well, who were the lawyers?
A. Mr. Gary Bevilacqua and the gentleman seated there prosecuting this case, Mr. Martinez.
Q. Okay. Do you need to look at page 82 to refresh your recollection about what Mr. Martinez was referring to yesterday?
A. Yes.
MR. DELOZIER: I'd like to approach, Your Honor.
THE COURT: Yes.
MR. MARTINEZ: Objection. Lack of foundation. I've referred to a lot of things.
THE COURT: Overruled. You may proceed.
(Pause in proceedings.)
THE WITNESS: Yes, I've read page 82.
BY MR. DELOZIER:
Q. Okay. This involved a case in which included a stabbing?
A. It was a stabbing case, yes.
Q. And what did you base your opinion on?
A. On the --
MR. MARTINEZ: Objection. Lack of foundation what

1    opinion he gave.

2         THE COURT:   I'll sustain the objection.

3    BY MR. DELOZIER:

4         Q.    The question asked of you for an opinion was

5    whether there was only one person involved in the stabbing of

6    the victim, correct?

7         A.    Yes.

8         Q.    Tell the Court what you based your opinion on.

9         MR. MARTINEZ:   Objection.   Relevance as to the

10   collateral matter.

11        THE COURT:   Sustained.

12        MR. DELOZIER:   If I could approach, Your Honor?

13        THE COURT:   Yes.

14

15             (The following proceedings were held at the

16   bench:)

17

18        MR. DELOZIER:   The whole purpose for this yesterday

19   was to try to undermine the credibility of my witness.

20   I think we need to clarify the record.   That's all I'm

21   trying to do.

22        MR. MARTINEZ:   The problem with that is I should be

23   allowed to reopen and say even though you said that, the

24   guy was convicted of first degree murder.   That's a

25   problem because he's going to say this is what I said,

1    this is what I said, and this is what I said.  And the

2    jury is entitled to say he didn't there wasn't any

3    conviction that's a collateral matter.  We don't want to

4    be trying yes they could say he opined as to that, but

5    his reasons for that are not part of this.

6                (Private discussion between Mr. Patterson and

7    Mr. DeLozier.)

8         THE COURT:  Stand away from the microphone if you're

9    going to speak to him privately.

10         MR. DELOZIER:  The problem is -- the problem is that

11   he opened the door to how many stabbings there was and

12   trying to undermine this man's credibility.  All I'm

13   trying to do is show what in fact he relied on and not

14   now what he's referring to.

15         THE COURT:  I'm going to sustain the objection.

16   Let's move on.

17

18                (The following proceedings were held in open

19   court:)

20

21         THE COURT:  The objection is sustained.

22                Mr. DeLozier, you may ask your next question.

23         MR. DELOZIER:  Could we approach again?

24

25                (The following proceedings were held at the

1    bench:)

2

3         MR. DELOZIER:  Just want the Court to see the

4    document.  There was an independent witness that said this

5    guy didn't have any blood on him.  That was part of his

6    opinion.  It formed the basis for part of his opinion.

7         THE COURT:  Mr. Martinez?

8         MR. MARTINEZ:  So?  Anybody that is not an expert can

9    then read a report and say that --

10        MR. DELOZIER:  Well, no --

11        MR. MARTINEZ:  -- I read this and, again, this is

12   going to --

13        MR. DELOZIER:  He relied on many things.

14        THE COURT:  Mr. DeLozier, what he based his opinion

15   on doesn't matter in this case, okay?  The point he

16   brought up was that he claims to be an expert in all

17   these areas.  That's the point on the cross-examination.

18        MR. MARTINEZ:  Right.

19        THE COURT:  This is different than the questioning on

20   the superman ability, okay?

21        MR. DELOZIER:  Well, he's the one that brought this

22   up.  I didn't.

23        THE COURT:  No.  He just brought up the fact that in

24   these different areas he's expressed an expert opinion. It

25   doesn't matter what he based this opinion on.  That's not

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000007852

1    relevant.

2          MR. DELOZIER:   Okay.

3

4          (The following proceedings were held in open

5    court:)

6

7          THE COURT:   Mr. DeLozier, you may ask your next

8    question.

9          MR. DELOZIER:   Excuse me a second, Your Honor.

10         (Pause in proceedings.)

11   BY MR. DELOZIER:

12         Q.   You used the word "vinegar" a few times

13   yesterday.

14         A.   Yes.

15         Q.   And for some of us, we use a fairly healthy

16   sampling of that on our salads.

17         A.   Yes.

18         Q.   Okay.  So your -- I need to have you -- I

19   believe I need to have you clarify what you meant or

20   wanted to show by your illustration of vinegar.

21         A.   Sure.  The use of the word "vinegar" was just

22   to give you an example of an acid taste where the acid

23   alone, not the taste of the vinegar, but the acid would

24   be similar to the acid created by sodium azide.  So I

25   might have used something like citric acid or I might

1    have used a cup full of lemon juice to let you think

2    about the acidity only, and so it was just to give

3    everyone a feel for this.  It's very unpleasant.  People

4    don't take a third, fourth and fifth sip of this type of

5    chemical after it's once assaulted their taste buds.

6              Q.    All right.  Do you recall this math exercise?

7              A.    Yes.

8              Q.    Okay.  What difference does it make?

9              A.    It doesn't really make any -- any difference.

10             THE COURT:  Just for the record --

11             MR. DELOZIER:  Sorry.  Referring to --

12             THE COURT:  -- give us the exhibit number.

13             MR. DELOZIER:  457.

14             THE WITNESS:  Exhibit 457.  What we do is we convert

15    it into grams, multiply that times the number of

16    capsules or so that might have been used, and we get the

17    total number of capsules in the case.  So in this case

18    it would be 3.47.  And the other numbers --

19             MR. MARTINEZ:  I'm going to object, Judge.  That was

20    beyond the scope of anything I asked.

21             THE COURT:  Overruled.  Go ahead.

22             THE WITNESS:  3.47 grams, so that's called a

23    significant number.  If we deal with that number, we can

24    multiply it and using the -- the other numbers and the

25    numbers behind the decimal place has no meaning

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1   scientifically, so --

2   BY MR. DELOZIER:

3          Q.    Excuse me.  Why does it have no meaning

4   scientifically?

5          A.    Well, because you'd be talking about a

6   hundredth of a capsule or less.

7          Q.    All right.

8          A.    So 3.47 times 3 or -- let's see.

9          Q.    What are you doing?

10         A.    If we said -- I think one of the things we said

11  it might be four capsules or -- let's see.  Oh, 4 grams.

12  I think we said 4 grams, so --.

13         Q.    What would be 4 grams?

14         A.    The amount that we would want to distribute.

15  So that would be 13 capsules.  That would be the lower

16  number, and the higher one I think we figured out 16 or 17

17  capsules, so it could be somewhere over 13.  Could it be less

18  than 13?  Absolutely.

19         Q.    Okay.

20         A.    And the 45 milligrams is also a contentious

21  thing, and the reason I used it --

22         MR. MARTINEZ:  I'm going to object.  Beyond the

23  scope.

24         THE COURT:  Overruled.

25         THE WITNESS:  The reason I used it, it's found in the

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    same Merck Index, the Merck index that Mr. Martinez uses

2    under sodium azide, and it does give the LD 50 at 45.   And

3    Mr. Martinez has only marked hydrazoic acid and I brought

4    along the sodium azide page, which is companioned.

5         MR. DELOZIER:  If I could approach, Your Honor?

6         THE COURT:  Yes.

7    BY MR. DELOZIER:

8         Q.    What is this?

9         A.    That's the sodium azide.  And if you'll look at

10   the sodium azide, you'll notice that the --

11        MR. DELOZIER:  Let's just have it marked.

12             (Pause in proceedings.)

13   BY MR. DELOZIER:

14        Q.    It's now been marked as Exhibit 462, so I'll

15   show you that.

16        A.    Right.

17        Q.    Show me where you're talking about?

18        A.    Right.   Page 13.

19        Q.    I'll put it on the --

20        A.    Yeah.

21        Q.    Okay.

22        MR. MARTINEZ:  Judge, that's not in evidence if he's

23   going to publish it to the jury.

24        THE COURT:  Are you moving to have that admitted?

25        MR. DELOZIER:  Yes.  I would like to have it

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000007856

1    admitted.

2              MR. MARTINEZ:  Objection.  Hearsay.  He could testify

3    to what it's said.  And it's beyond the scope.  I never

4    asked him about that document, Judge.

5              THE COURT:  Exhibit 462 is admitted in evidence.

6    BY MR. DELOZIER:

7              Q.    Okay.  I'm not sure what part you want --

8              A.    Okay.  I'll be glad to --

9              Q.    -- if you could help me.  426 --

10             (Pause in proceedings.)

11             THE WITNESS:  Get it in focus.

12             (Pause in proceedings.)

13             MR. DELOZIER:  There we are.

14             MR. DELOZIER:  Is that what you want?

15             THE WITNESS:  Right here, right.  See the tip of my

16   finger?  This is the milligrams per kilogram, the LD 50

17   in rats listed in the Merck index as 45 milligrams per

18   kilogram, and I think I did mention for purposes of the

19   azide that this is an authoritative text in the field.

20   BY MR. DELOZIER:

21             Q.    Let's move on here.  Right there?

22             A.    Sodium azide, yes, sir.

23             Q.    8526.  Aren't there some symptomologies listed

24   here too?

25             A.    Yes, there are.  However, there are more on the

1     other exhibit, I believe, because the symptomology comes

2     mostly from the hydrazoic acid.

3          Q.     Why don't we take a look at that one then,

4     thank you.   You're referring to Exhibit 461?

5          A.     Yes.

6          Q.     Okay.   I think we need to do this to it, huh?

7                 (Pause in proceedings.)

8     BY MR. DELOZIER:

9          Q.     Down further.   There you go.

10         A.     This is the hydrazoic acid.   The symptomology

11    is on the next column.

12         Q.     Okay.

13         A.     We use this -- right at the top.

14         Q.     Okay.

15         A.     And we need to zoom out.

16         Q.     How's that?

17         A.     Yes.   This is the symptomology that we've been

18    talking about, eye irritation, coughing, fallen blood

19    pressure, weakness, collapse, palpitations -- that's the

20    heart -- and that's the tachycardia, which is a fatal heart

21    rhythm that eventually involves death, that sort of thing.

22    These are the symptomologies I testified to earlier.

23         Q.     I got a headache -- I couldn't see there a

24    minute ago -- cough, headache --

25         A.     Yeah, cough, headache.


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1   Q. Blood pressure?

2   A. Blood pressure, weakness, collapse.  So

3 depending on -- again, depending on the individual's

4 condition, you'll see more or less of those.

5   Q. So your point is Merck agrees with your 45?

6   A. Absolutely.  That's -- that's the learned

7 treatise that it came from.

8   Q. Sorry to have to do this, but so what?

9   A. Right.  If I might have another --

10   Q. I'm talking about Exhibit 457.

11   A. Yeah.

12   Q. And -- or 9, excuse me.

13   A. What I'd like to do is explain chemical

14 nomenclature --

15   Q. Sure.  Come down.

16   A. -- and you'll see --

17   THE COURT:  Remember to speak up so the jury can hear

18 you.

19   THE WITNESS:  We'll start off with H2O, water.

20   MR. MARTINEZ:  I'm going to object.  There really

21 isn't a question before him.

22   THE COURT:  Sustained.  Ask the question.

23 BY MR. DELOZIER:

24   Q. What we're trying to explain, here's the

25 question, you were asked questions regarding this

1    compound --

2            A.     Hydrazoic acid.

3            Q.     Hydrazoic?

4            A.     And the rearrangement of the chemical.

5            Q.     I'm asking -- I'm asking you to explain --

6            A.     How that happens.

7            Q.     -- how that happens.

8            A.     All right.  That's also water.

9            Q.     Can everybody see?

10           A.     That's also water.  I'm writing formulas, for

11   the transcript, where I'm writing it out linearly.  I'm

12   writing it this way.  This is also water written reverse.

13   All of those things are in three dimensions from here down.

14   H2O can be written all of those ways, and that's why chemists

15   kind of have a lock up on the job because we know this, and

16   just like lawyers learn fancy words, chemists learn fancy

17   ways of naming things and drawing them out so they make sense

18   to us.  So it doesn't make any difference to a scientist how

19   you write it, it's water.

20           Q.     Same thing's true of hydrazoic acid?

21           A.     Yes, exactly the same thing is true with

22   hydrochloric, hydrazoic, sulfuric, any type of acid.  You can

23   write them different ways.

24           Q.     Okay.  At what point does sodium azide

25   start -- start becoming, I guess is the right word, or

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000007860

1    degrades to hydrazoic acid?

2         A.    As soon as moisture hits it.  As soon as

3    humidity in the air or water or digestive fluids, saliva,

4    anything like that.  As soon as it hits the sodium azide, it

5    begins to degrade.

6         Q.    We talked about the capsules a moment ago.

7         A.    Yes.

8         Q.    Is there -- when would those capsules start to

9    erupt and degrade into hydrazoic acid?  What is the

10   materials?

11        A.    Hydrazoic would be formed within a few minutes.

12        Q.    Of what?

13        A.    Of ingestion, getting them down into the

14   stomach.

15        Q.    Okay.  Does it happen in the mouth is what I'm

16   asking.

17        A.    No, no.  It doesn't happen in the mouth.

18   That's too fast.

19        Q.    So at what point does it stop degrading?

20        A.    When there is no more hydrazoic acid to be

21   produced, when it's all what we call the completion of a

22   chemical reaction.  When it's all gone, that's it.

23        Q.    So?

24        A.    You wouldn't detect a trace, you wouldn't

25   detect anything.

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1          Q.     Let me walk you through the steps then.   In the

2     mouth, into the stomach, you start to get the symptoms once

3     the capsules are dissolved or dissolving?

4          A.     As soon as the capsules are dissolved the

5     vascular lining of the stomach, the blood vessels in the

6     stomach, the hydrazoic acid is directly absorbed into those

7     blood vessels, pumped up to the brain.   They immediately

8     begin to feel light-headed, weak, that sort of thing, very

9     rapid.

10         Q.     All right.   And at a point in time you were

11    asked a question about the gastric juices.   When those were

12    collected --

13         A.     Oh, yes.

14         Q.     -- by whomever collected them, was it still

15    degrading?

16         A.     The vomit?

17         Q.     Right.

18         A.     Yes.   From the time it hit the stomach it was

19    produced and degraded.   When there's a throwing up process,

20    gastric contents coming up out of the stomach, out of the

21    mouth, that's -- as long as there's moisture, that's going to

22    continue to degrade right up until it's analyzed.   Obviously

23    the higher level would be the sooner it's analyzed.   The

24    longer it's analyzed, the more traces you would find.

25         Q.     The sooner it's analyzed the more traces you'd

1       find?

2              A.     Yes.  The sooner it's analyzed would be the

3       higher concentration.

4              Q.     Of what?

5              A.     If you analyze it sometimes -- sometime later,

6       you're going to be getting traces that are smaller in amount

7       than the ones that would have been there if you tested it

8       right away.

9              Q.     Okay.  You indicated that you were the

10      director, supervisor?

11             A.     Yes, of the Phoenix crime lab.

12             Q.     And does it take more knowledge to be a

13      supervisor than it is to be a person working on the bench?

14             A.     It does.

15             Q.     How do you explain that?

16             A.     Well, as a technical director or scientific

17      person, my job was not only to do tests, but to train other

18      people to do the tests and then to monitor their process or

19      evaluate that they were doing them correctly.  And then in

20      the case of some of them as Mr. Martinez asked, I would later

21      on, even after this person had had maybe 13 years experience,

22      I would still verify the bullets because in matters as

23      serious as a homicide you can't take too great a care.  So we

24      had a policy that you had to verify things like that.

25             Q.     So you had to be knowledgeable in several

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000007863

1    areas?

2            A.    Yes, absolutely.

3            Q.    Many areas?

4            A.    All of the areas that I -- that I supervised, I

5    once did them as a chemist, as a criminalist, and later on as

6    a supervisor, I trained and taught other scientists to do

7    those procedures.

8            Q.    So when you were asked about blood spatter,

9    you've done blood spatter work?

10           A.    Yes.  I've done blood spatter two ways.  I've

11   done it at the college level where I've taught classes and

12   the students made the spatter, and I've also done it at

13   murder scenes where I've evaluated what actually happened.

14           Q.    And then you supervise folks that actually did

15   the work?

16           A.    Absolutely.

17           Q.    All right.  Same thing for guns?

18           A.    Same thing for firearms examinations, pistols,

19   bullets.  Just -- just about everything you could think of,

20   poisons -- everything that's done in a crime lab.

21           Q.    Have you ever failed to qualify as an expert in

22   any court?

23           A.    No.  All the way up to United States District

24   Court Federal Court, I've never failed to be recognized as an

25   expert and testify.


                TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1     Q.    Tell me how many years you've been doing the
2   kind of work we're discussing today?
3     A.    42 years.
4     Q.    And how many years were working for the
5   prosecution?
6     A.    32.
7     Q.    And since that time you've worked for both?
8     A.    Yes.  Since that time I've worked for both.
9     Q.    Would your testimony have been any different
10  today or yesterday if you'd been testifying for the
11  prosecution than it is for the defense?
12    A.    No.  My testimony has been the same for 42
13  years regardless of which side needs help with scientific
14  information.
15          MR. DELOZIER:  Nothing further, Your Honor.
16          THE COURT:  Are there any further questions of this
17  witness by the jury?  If so, please raise your hand.
18
19          (The following proceedings were held at the
20  bench:)
21
22          THE COURT:  Question, "With only a BS in Chemistry,
23  does that qualify you to speak as a chemist?"
24              Mr. DeLozier?
25          MR. DELOZIER:  That's fine.


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000007865

1            MR. MARTINEZ:  No objection.

2            THE COURT:  I'm sorry?

3            MR. MARTINEZ:  I have no objection.

4

5            (The following proceedings were held in open

6    court:)

7

8            THE COURT:  Sir, I have a question here for you.   The

9    question reads as follows.  With only a BS in chemistry

10   does that qualify you to speak as a, quote, chemist, end

11   of quote?

12           THE WITNESS:  Yes.  I've been a professional chemist

13   for 42 years doing chemical tests and analysis.  Advanced

14   degrees in chemistry generally qualify you as a specialist.

15   PhD generally has a very great knowledge but in a very narrow

16   field.

17           As a general chemist, I work in the field of

18   organic chemistry, inorganic chemistry, and analytical

19   chemistry, so I do tests on drugs, poisons, all sorts of

20   items including blood and other body fluids.  But I'm -- am I

21   qualified to do a blood test that would tell if you came --

22   if you came down with some exotic disease?  No, I'm not.  I'm

23   qualified to tell if it's human blood, which animal it might

24   have come from, that sort of thing.

25           THE COURT:  Any further questions of this witness by

1     the jury?

2                    (No response.)

3            THE COURT:  No one has raised their hand.

4                    Mr. DeLozier, did you have any follow up

5     questions to that specific question by the jury?

6            MR. DELOZIER:  No, sir.

7            THE COURT:  Mr. Martinez?

8

9     FOLLOW-UP QUESTIONS BY MR. MARTINEZ:

10           Q.    I guess what you're telling us, sir, is that

11    you're a jack of all trades and a master of none?

12           A.    It's called a general criminalist and I -- I'm

13    a master of none implies that I don't know enough information

14    in order to thoroughly develop the forensic information, and

15    I don't testify about anything that I can't back up with

16    scientific fact.

17           THE COURT:  May this witness be excused?

18           MR. MARTINEZ:  Yes, sir.

19           MR. DELOZIER:  Yes, sir.

20           THE COURT:  Thank you very much.  You're excused.

21           THE WITNESS:  Thank you.

22           THE COURT:  Mr. Patterson?

23           MR. PATTERSON:  Yes, Your Honor.  I need to go out

24    and get our next witness.

25           THE COURT:  Yes.


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

```
 1                    (Pause in proceedings.)

 2           MR. PATTERSON:  Judge, could we break for five

 3      minutes?  I've lost my witness.

 4           THE COURT:  We'll take a five minute break at this

 5      time.  Remember the admonition I gave you.  Do not discuss

 6      this case with anyone, do not let anyone discuss the case

 7      with you, keep an open mind.  This should only take five

 8      minutes.

 9

10                    (Recess.)

11

12           THE COURT:  This is CR 2000-096032, State of Arizona

13      versus Wendi Elizabeth Andriano.  The record will reflect

14      presence of the Defendant, Counsel and the jury.

15                    Mr. Patterson?

16           MR. PATTERSON:  Thank you, Your Honor.  We would ask

17      Brandon Ochoa to testify.

18           THE COURT:  Please step forward right up here.  Give

19      the clerk your name and she'll swear you in.

20

21                    BRANDON OCHOA,

22           CALLED TO TESTIFY ON BEHALF OF THE DEFENDANT,

23        HAVING FIRST BEEN DULY SWORN, TESTIFIES AS FOLLOWS:

24

25           THE COURT:  Please have a seat on the witness
```

1    stand.  Please make yourself comfortable there on the witness

2    stand.  Please pull the microphone close to you.  Please

3    remember to speak loudly and clearly in the microphone so

4    everyone can hear you.  Also please wait until question is

5    completed before you answer the question, and give -- please

6    make sure you give a verbal response.  Is that agreeable?

7              THE WITNESS:  Yes.

8              THE COURT:  Mr. Patterson?

9              MR. PATTERSON:  Thank you, Judge.

10

11   DIRECT EXAMINATION BY MR. PATTERSON:

12             Q.    Please give us your name, sir?

13             A.    Brandon Ochoa.

14             Q.    Okay.  And are you related in some manner to

15   Wendi Andriano?

16             A.    Yes, I am.

17             Q.    Okay.  And what is that relationship?

18             A.    Biologically, I believe she's my cousin.

19             Q.    Okay.  What is your mother's name?

20             A.    Kathy Worship (phonetic).

21             Q.    Okay.  And what is her relationship to Donna

22   Ochoa, Wendi's biological mother?

23             A.    Sister.

24             Q.    Sister, okay.  How are -- how old are you, sir?

25             A.    I'm 19.

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

```
 1          Q.    Are you currently employed?

 2          A.    Yes, I am.

 3          Q.    What are you?

 4          A.    I'm a car lot sales attendant.

 5          Q.    Okay.  In what city?

 6          A.    Tucson, Arizona.

 7          Q.    All right.  At some point in time did you live

 8   with Joe Andriano and Wendi Andriano?

 9          A.    Yes, I did.

10          Q.    Okay.  And what year did you first move in with

11   them?

12          A.    '97.

13          Q.    Okay.  Do you recall a particular month?

14          A.    No, sir.

15          Q.    Okay.  And for what period of time did you live

16   with Joe and Wendi Andriano?

17          A.    Ninety days.

18          Q.    Okay.  Approximately three months?

19          A.    Yes, sir.

20          Q.    Okay.  And this being 2004, you were

21   approximately how old when you moved in with Joe and

22   Wendi Andriano?

23          A.    I believe 10, 11.

24          Q.    Okay.  Seven years earlier -- 12 maybe?

25          A.    Yeah.
```

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000007870

1          Q.     Okay.  Doing the math here.

2          A.     Yeah.

3          Q.     Okay.  All right.  And at some point in time

4     after that 90-day period expired, did you move out to

5     another residence?

6          A.     I moved back in with Donna and Alejo.

7          Q.     Okay.  And how far distant were you when you

8     moved out to your new location from the home of Joe and

9     Wendi Andriano?

10         A.     No more than three miles.

11         Q.     Okay.  After the 90-day period expired, did you

12    return to their house on a regular basis?

13         A.     Yes, sir.

14         Q.     And how regular was that?

15         A.     Every day.

16         Q.     Okay.  And was there a purpose why you returned

17    on a daily basis?

18         A.     My nephew.

19         Q.     Okay.  And the nephew's name is?

20         A.     Nicolas Andriano.

21         Q.     And what did you do for Joe and Wendi Andriano

22    with regard to Nicolas?

23         A.     Babysitter.

24         Q.     Okay.  So -- and how long then did you continue

25    this daily visit to the home of Joe and Wendi Andriano

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000007871

1    back at this time?

2            A.    Constantly.

3            Q.    Okay.  And from -- for what duration, what

4    length?

5            A.    Say about 2000, 2001.

6            Q.    Okay.  So year and a half, thereafter?

7            A.    Longer than that.

8            Q.    Okay.  All right.  Let's take you back further

9    than that point in time.  What elementary school did you

10   attend and in what city?

11           A.    Harvest Christian Academy in Casa Grande,

12   Arizona.

13           Q.    What grades did you attend at that particular

14   educational facility?

15           A.    From 1st till, I want to say, 7, 8.

16           Q.    Okay.  Can you describe the school for me?

17   Let's start with student class size.  How big were your

18   classes each year?

19           A.    Anywhere from 15 to 20 students.

20           Q.    50 to --

21           A.    15.

22           Q.    Oh, 15, sorry.

23           A.    To 20 students.

24           Q.    Did that perpetuate each year, the same number

25   of students per --

1          A.    It changed, varied.

2          Q.    Okay.  Smallest class you attended?  Give me

3      that range.

4          A.    7 students to 35.

5          Q.    Okay.  And is this the same educational

6      facility that Wendi Andriano attended?

7          A.    Yes, sir.

8          Q.    Okay.  And there's been another witness out

9      here, lady by the name of Barbara Mitchell.  She too attended

10     that school.

11         A.    Okay.

12         Q.    Can you tell me a bit about the educational --

13     the curriculum I think they call it at that particular

14     school?

15         A.    It was work at your own pace.

16         Q.    Okay.  And what kind of topics did you cover?

17         A.    English, basic mathematics, word building,

18     vocabulary skills -- basic school.

19         Q.    Okay.  Was there a religious component to the

20     education that you received there?

21         A.    Yes, there was.

22         Q.    How significant was that component?

23         A.    Very.

24         Q.    Okay.  Who was the school run by?

25         A.    Pastor Tom King.

1          Q.    Okay.  And was he what we call the principal in

2     a public school setting?

3          A.    Yes and no.

4          Q.    Okay.  Tell me how did he differ from a

5     conventional kind of principal at a public school.

6          A.    He wasn't really directly involved with the

7     school.  He ran the church more than anything else, but his

8     wife ran the school and he still monitored most of the

9     disciplinary activity.

10         Q.    Okay.  And was corporal punishment used as a

11    discipline at that school?

12         MR. MARTINEZ:  Objection.  Relevance.

13         MR. PATTERSON:  It's absolutely relevant, Judge.

14         THE COURT:  Overruled.

15    BY MR. PATTERSON:

16         Q.    Was that used?

17         A.    Yes, sir.

18         Q.    Okay.  We're talking about corporal punishment,

19    we're talking about?

20         A.    Yes.

21         Q.    Was this a daily occurrence amongst the

22    students or those who misbehaved at that school?

23         A.    I wouldn't say daily because most learned, but

24    it could be.

25         Q.    Okay.  Did you graduate from that school?

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

```
1          A.    No, I did not.

2          Q.    Okay.  What grade did you leave?

3          A.    8.

4          Q.    And did you complete your schooling at some

5    other location?

6          A.    No, I did not.

7          Q.    Okay.  Looking back kind of hindsight, was it a

8    good educational experience for you?

9          A.    Yes, it was.

10         Q.    Okay.  At the time what was your feeling about

11   the nature of the educational experience?

12         A.    I hated it.

13         Q.    Okay.  And why did you hate it?

14         A.    I thought they were holding me down.

15         Q.    And what exactly was holding you down?

16         A.    Being involved in the school pretty much meant

17   that your life was with the church and school.

18         Q.    Okay.  And as a result of that did it fail to

19   teach you how to deal with the society at large?

20         A.    Yes.

21         Q.    Okay.  And can you explain that conceptually

22   for me, how difficult has it been for you to kind of

23   assimilate into greater society?

24         A.    Difficult.

25         Q.    Okay.
```

1     A.     It's -- they did do a really good job teaching

2    academics and religion, but they didn't cover any social

3    basis at all, I guess you could say.

4         Q.     All right.  Let's jump forward to the 90-day

5    period you actually lived with Joe and Wendi Andriano.   What

6    residence are we talking about here?

7         A.     I'm not sure of the address, but it was the one

8    with the machine shop.

9         Q.     The machine shop?  Was it on --

10        A.     Yes.

11        Q.     -- a particular greater parcel of property?

12        A.     Yes.

13        Q.     Okay.  What was the greater parcel?

14        A.     Farm land.

15        Q.     Okay.  And do you know who owned the farm, if

16   you will?

17        A.     The Andrianos, I believe.

18        Q.     Joe's parents?

19        A.     Yes, sir.

20        Q.     Okay.  And on this farm land there was, what

21   you described, was a machine shop?

22        A.     Yes, sir.

23        Q.     Okay.  Describe it for me with more

24   particularity.  How many rooms was -- was involved here?

25        A.     One large almost square house-sized building,

1    just no walls.

2          Q.    Okay.  Was it divided up into the rooms within

3    the interior?

4          A.    No, sir.

5          Q.    Okay.  What rooms then were inside that

6    particular machine shop?

7          A.    It was a single room with lots of tools and

8    equipment.

9          Q.    Okay.  Was there a bathroom?

10         A.    No, sir.  That was in the house.

11         Q.    Okay.  Well, I'm a little confused here.  I'm

12   talking about specifically where you resided with Joe and

13   Wendi Andriano?

14         A.    The house directly beside it.

15         Q.    Okay.  All right.  I apologize.  The machine

16   shop is one big building with tools in it?

17         A.    Yes.

18         Q.    Okay.  Next door to that machine shop was a --

19   a building that had been converted into a residence.  Is

20   that correct?

21         A.    Yes, sir.

22         Q.    Okay.  That building -- that's what I'm

23   interested in.  That building was converted into said

24   residence.  Describe that interior for me of that building?

25         A.    You walk in the front door, you're in the

1    kitchen and dining room.  Pretty much the bathroom is

2    directly in front of you.  Walk into the hallway, five steps

3    the hallway, then you're in the living room.

4            Q.    Was --

5            A.    Twenty steps across the living room, you're in

6    the bedroom.  That's it.

7            Q.    Is it as big as this courtroom?

8            A.    Maybe if you cut it in half and extended it --

9            Q.    Okay.

10           A.    -- long way.

11           Q.    Okay.  So after the -- half down the middle and

12   add a little bit on the back end?

13           A.    Yes, sir.

14           Q.    All right.  And did you have your own room or

15   did you sleep in a kind of common area?

16           A.    I resided in the living room.

17           Q.    Sleep on the couch basically?

18           A.    Yes.

19           Q.    Okay.  And where was Joe and Wendi's room,

20   sleeping room within this arrangement?

21           A.    In the master bedroom beyond the living room.

22           Q.    Okay.  And was this -- could you get some

23   privacy by closing off a door when you were back in that

24   room?

25           A.    Yeah.


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1        Q.      Okay.  So it was a -- an actual room with a

2    door and --

3        A.      There was a pair of doors because there was a

4    walk-in closet right before the master bedroom.

5        Q.      All right.  Now, during the period of time that

6    you were actually there, did you ever witness verbal

7    altercations between Joe and Wendi Andriano?

8        A.      Yes, sir.

9        Q.      How frequently did the verbal altercations

10   happen, occur?

11       A.      Every other day maybe.

12       Q.      Okay.  So three to four times a week?

13       A.      Two to three.

14       Q.      Okay.  And are we talking about just kind of

15   minor disagreements or are those significant verbal

16   altercations?

17       A.      I'd say both.

18       Q.      Okay.  So little of each?

19       A.      Yes.

20       Q.      Okay.  Do you recall what topics these verbal

21   altercations would arise out of?

22       A.      There were many.

23       Q.      Okay.  Give me some examples.

24       A.      Anything between fighting over the businesses

25   to worrying about financing, things like that.


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

```
 1          Q.    Okay.  Any other topics?  Was Nicolas around at
 2    this time?
 3          A.    Yes, sir.
 4          Q.    Okay.  Was there childcare issues?
 5          A.    Not at that stage.
 6          Q.    Okay.
 7          A.    Not really.
 8          Q.    All right.  Any other topics that you recall
 9    that would precipitate verbal arguments between Joe and
10    Wendi Andriano?
11          A.    Sometimes drinking, but hardly ever.
12          Q.    His drinking or her drinking?
13          A.    His.
14          Q.    Okay.  Do you have a -- a recollection as to
15    who initiated these verbal altercations primarily?
16          A.    On average it was Joseph.
17          Q.    Okay.  And typically how would they -- they
18    transpire?  I mean topic would come up, verbal altercation
19    would begin, tell me about the typical verbal altercation
20    that you witnessed in that environment.
21          A.    Had argument, period of time to just kind of
22    cool down, and then they would be fine.
23          Q.    Okay.  Did you ever see Wendi strike Joe as a
24    result of those verbal altercations?
25          A.    No, sir.
```

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1      Q.    Okay.  Did you ever observe in Joe any

2  demonstration of rage or extreme anger during the course

3  of these verbal altercations?

4      A.    Yes, sir.

5      Q.    How frequently or typically would that occur?

6      A.    Once a week --

7      Q.    Okay.

8      A.    -- maybe.

9      Q.    All right.  Did he have certain pet areas or

10  pet peeve areas that would set him off more so than others?

11      A.    Yes, sir.

12      Q.    Give me examples of that.

13      A.    Wendi's whereabouts, being unaware of what's

14  going on, sometimes he was jealous.

15      Q.    Okay.  And in circumstances wherein he

16  manifested this jealous aspect of his personality, would

17  that tend to make him more angry or more rageful if you

18  will?

19      A.    When he was unaware of her presence, that's

20  when he'd get worst.

21      Q.    Okay.  Were there occasions when these verbal

22  altercations escalated into physical fights between Wendi and

23  Joe Andriano?

24      A.    Yes, sir.

25      Q.    Okay.  And in that 90-day period that you were

1     there in that residence, how many times did you see Joe

2     strike Wendi?

3            A.    Once.

4            Q.    Okay.  And describe it for me.

5            A.    Open hand strike to the face, the cheek.

6            Q.    Okay.  And he used -- which hand?

7            A.    Right.

8            Q.    Okay. It impacted what part of Wendi's body?

9            A.    Jaw line.

10           Q.    Okay.  Of the left or right side?

11           A.    Left, I believe.  I'm not sure.

12           Q.    Okay.  All right.  And how significant was the

13    slap?  Was it significant?

14           A.    Hand print.

15           Q.    Hand print?

16           A.    Slight bruise the next day.

17           Q.    Okay.  This was done in your presence?

18           A.    Yes.

19           Q.    Okay.  Was there another occasion where you saw

20    what appeared to be physical striking of Wendi by Joe

21    Andriano?

22           A.    Yes, sir.

23           Q.    Okay.  What was the circumstance of that

24    incident?

25           A.    I believe an altercation had happened where it

1    started off like a joke.  Wendi had washed one of the dishes

2    and then she made dinner, and the corn she put the dish in

3    still tasted like bleach.  And it started off more like just

4    a joke and Joe was playing around, "Oh, yeah, she's trying to

5    poison us."  It was a laughing matter.  And a little bit

6    later that evening, they started arguing and I was still in

7    the living room.  From his backside, I just saw a motion of a

8    swing.

9           Q.    Okay.  What motion did you observe from the

10   rear?

11          A.    Closed fist and looked like he punched.

12          Q.    Okay.  Was Wendi in close proximity to him at

13   the time?

14          A.    As far as I'm aware, yes.

15          Q.    Okay.  And where was your vantage point when

16   you observed this conduct?

17          A.    From Joe's backside.

18          Q.    How far distant were you?

19          A.    15 yards, maybe.

20          Q.    Forty-five feet?

21          A.    About.

22          Q.    Okay.  Were there occasions where you saw Joe

23   Andriano break or destroy things within that residence

24   during the period of time that you were there?

25          A.    Yes, sir, a couple times.

1          Q.    Couple times?  Okay.  Describe for me the first

2     time that you recall seeing this?

3          A.    The first time was they were arguing, I was

4     doing the dishes Wendi went into the bathroom, I believe she

5     was crying and Joe was screaming at the door, ended up losing

6     his temper, striking the wall and the door.

7          Q.    Okay.  And you observed this?

8          A.    Yeah.

9          Q.    What was your vantage point?

10         A.    Five feet away from the sink.

11         Q.    Okay.  Did you see him strike the door?

12         A.    Yes.

13         Q.    What did he use to strike door?

14         A.    Open fist or closed fist.

15         Q.    Was there damage on the door as a result of his

16    contact with it?

17         A.    Large hole.

18         Q.    Did it have surrounding damage in addition to

19    the hole?

20         A.    You could see where the fist impacted as well

21    as like it kind of collapsed.

22         Q.    Okay.  And where was Wendi in relationship to

23    the point where the door was where the damage was occasioned

24    when it was occasioned?

25              MR. MARTINEZ:  Objection.  Speculation.  He indicated

1    she was inside.

2              THE COURT:  Sustained.

3    BY MR. PATTERSON:

4         Q.    Okay.  Then I just need to clarify that.  Where

5    was Wendi when this happened?

6         A.    Inside the bathroom.

7         Q.    Okay.  And that was the door to that bathroom?

8         A.    Behind the locked door, yeah.

9         Q.    Okay.  Was there any other damage occasioned to

10   the building on that day by Mr. Andriano?

11        A.    Aside from the hole in the wall, no.

12        Q.    Okay.  Was there another incident where you

13   observed him damage the interior of this particular

14   residence?

15        A.    One other time he threw a remote against the

16   wall and left a little hole.

17        Q.    Remote to the television?

18        A.    Yes.

19        Q.    He tossed it?

20        A.    Tossed would be the -- not be the word I used.

21        Q.    Okay.  What would be the word you used?

22        A.    Flung.

23        Q.    Flung?  Okay.  Was it the result of being upset

24   at something?

25        A.    Yes.

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1.  Q.    What was he upset at?

2.  A.    If I remember correctly, I think Wendi was

3.  going out.

4.  Q.    Wendi was going out with friends?

5.  A.    With Barbara.

6.  Q.    Okay.  Last name is Mitchell?

7.  A.    Mitchell, yes.

8.  Q.    All right.  During the period of time that you

9.  were on site there so to speak did Wendi have girlfriends

10. that came over to visit?

11. A.    They weren't allowed.

12. Q.    Okay.  And who made that decision?

13. A.    Joseph.

14. Q.    What kinds of recreational things did you do if

15. any with Joe and Wendi Andriano during the period of time

16. that you were living with them?

17. A.    Boat racing, window tinting, and repair, some

18. other things.

19. Q.    Okay.  Did Joe teach you a number of positive

20. things?

21. A.    Yes, sir.

22. Q.    As you speak today, did you like Joe?

23. A.    I loved him.

24. Q.    Okay.  Tell us about going up to the lake.

25. What would you do at the lake with him?


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1          A.     Play grease boy.

2          Q.     Okay.  What's a grease boy?

3          A.     It's -- sorry.  It's pretty much run around.  I

4    would grab parts, tools, oil.

5          Q.     Gopher?

6          A.     They needed a hand, yeah.

7          Q.     And you said Joe would race boats up there.

8    Were these kind of organized regatta kinds of races he

9    was involved in?

10         A.     Organized and unorganized.  He was really into

11   his boats.

12         Q.     Okay.  And was that his primary passion, if you

13   will?

14         A.     That and guns.

15         Q.     Okay.  All right.  Let's talk about the guns

16   then.  How did he -- how did he like his guns?

17         MR. MARTINEZ:  Objection.  Relevance.

18         THE COURT:  Sustained.

19   BY MR. PATTERSON:

20         Q.     Well, did he have guns?

21         A.     Yes, sir.

22         Q.     Okay.  How often while you were there did you

23   observe those?

24         MR. MARTINEZ:  Objection.  Relevance.

25         THE COURT:  Sustained.

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1              MR. PATTERSON:  Judge, we need to talk.

2

3                   (The following proceedings were held at the

4         bench:)

5

6              MR. PATTERSON:  Dr. Murphy testified the presence of

7         guns in the home is one of the criteria that she considers in

8         determining the existence of domestic violence and I'm just

9         establishing the presence of the guns in the home.

10             THE COURT:  Mr. Martinez?

11             MR. MARTINEZ:  The guns that I remember that Dr.

12        Murphy testified about was that repossession where the

13        individual was driving away and he ran out and got the gun

14        from inside the car.  There was never any indication that the

15        defendant ever was shot at or anything about the guns.  I do

16        remember that there was an incident that somebody mentioned

17        about shooting a dog with a BB gun, but that's not what we're

18        talking about.

19             THE COURT:  I'll overrule the objection in light of

20        Ms. Murphy or Dr. Murphy's testimony.

21             MR. PATTERSON:  Thank you.

22

23                  (The following proceedings were held in open

24        court:)

25

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

```
 1              THE COURT:  The objection is overruled.
 2                   Mr. Patterson, repeat the question.
 3              MR. PATTERSON:  Yes, sir.
 4    BY MR. PATTERSON:
 5         Q.    Were there guns in the residence during the
 6    period of time you stayed with Joe and Wendi Andriano?
 7         A.    Yes, sir.
 8         Q.    How many guns?
 9         A.    About 20.
10         Q.    More than --
11         A.    More than 20?  I'm not aware.
12         Q.    Okay.  What kind of jobs did you observe Joe
13    doing during the period of time that you knew him?
14         A.    Freelance boat work like I said before.  Window
15    tinting, window repair.  Those were the two main things
16    involved there.
17         Q.    Okay.  Can we categorize these kind of jobs as
18    blue collar or physical labor kinds of jobs?
19         A.    Physical labor.
20         Q.    Okay.  Do you recall his physical strength back
21    when you were living with him?
22         A.    Yes, sir.
23         Q.    How strong of a or robust a man was he?
24         A.    I wouldn't want to meet him in a dark alley.
25         Q.    Okay.
```

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1          A.     He was --

2          MR. MARTINEZ:  Objection.  Relevance.

3          THE COURT:  Sustained.  That last portion will be

4   stricken.  Rephrase the question.

5   BY MR. PATTERSON:

6          Q.     Okay.  Just tell me about his physical

7   capabilities, his strengths.  For instance, lifting things,

8   carrying things?

9          A.     He wasn't well defined, but he was strong.  He

10  was capable of moving large engine blocks, big chunks of the

11  boat.  He was a strong man.

12         Q.     All right.  Did he have a pain tolerance?

13         A.     Yes, sir.

14         Q.     Okay.  Tell me how you know that to be true?

15         A.     I witnessed him drill himself in the hand and

16  he started laughing.

17         Q.     Okay.  Describe with a little more

18  particularity, Brandon.

19         A.     Power drill with a 16-bit drill head about four

20  inches long.  He put two inches of that drill into his hand,

21  thought it was kind of funny.

22         Q.     What was his response?

23         A.     He laughed.

24         Q.     Okay.  Did you ever see him move the

25  50-pound -- well, is there a certain kind of fuel that was

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000007890

1    used in these jet boats?

2            A.    Aside from like nitrous oxide, yeah, I believe

3    the primary fuel was, I believe, a diesel fuel.

4            Q.    Okay.  And what canisters, if you will, or

5    drums did this fuel come in?

6            A.    Originally they came in 250-pound blue

7    canisters.  From there we'd syphon them into about 50 to

8    55-pound gas tanks.

9            Q.    Okay.  Did you see him move these drums?

10           A.    Yes, sir.

11           Q.    How would he move them?

12           A.    Bear hug, lift up, set them in.

13           Q.    Okay.  And then after a portion of it was

14   syphoned off, into what kind of containers would it be

15   syphoned off into?

16           A.    Same kind of gas can you'd use on your car.

17           Q.    Okay.  How would --

18           A.    Around two, three in a hand.

19           Q.    Okay.  Are the cement blocks often involved in

20   the boating?  Do you recall those?

21           A.    We usually used lifts, but, yes, we did use

22   them occasionally.

23           Q.    Okay.  Did you see him tote these cement blocks

24   away?

25                 MR. MARTINEZ:  Objection.  Lack of foundation.  When?

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    Late in life?

2              MR. PATTERSON:  Talking about --

3              THE COURT:  Sustained.  Lay some foundation.

4    BY MR. PATTERSON:

5         Q.    -- the period of time you lived with them or

6    period of time when you were with them on a daily basis.  Did

7    you observe him lifting these cement blocks?

8         A.    Yes, sir.

9         Q.    Okay.  Did he have any difficulty with them?

10        A.    No, sir.

11        Q.    Okay.  Did you observe Joe Andriano in the

12   period of time you were living with him or the year and a

13   half thereafter or two years that you told us that you went

14   over there on a daily basis, did you observe Joe making

15   decisions for Wendi?

16        A.    Yes, sir.

17        Q.    Okay.  In what categories would he make

18   decisions for her?

19        A.    She would have to lay her clothes out for his

20   approval.

21        Q.    What kinds of clothes?

22        A.    Anything from kick-back clothes to actual dress

23   clothes for whatever work.

24        Q.    Okay.  So the whole range of her wardrobe?

25        A.    Yes, sir.


                TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

```
 1          Q.    Okay.  And he would make decisions in what
 2   regard?  What would he do?
 3          A.    She wasn't allowed to wear block.  Certain
 4   things were considered too attractive.
 5          MR. MARTINEZ:  Objection.  Lack of foundation.
 6   Hearsay.  How does he know?
 7          THE COURT:  Sustained.
 8   BY MR. PATTERSON:
 9          Q.    During the period of time that you observed him
10   doing these things, did he make decisions for Wendi with
11   regard on her wardrobe?
12          A.    Yes, sir.
13          Q.    What did he do in that regard?
14          MR. MARTINEZ:  Objection.  Hearsay.  Lack of
15   foundation.
16          MR. PATTERSON:  It's not hearsay.  It's conduct,
17   Judge.
18          THE COURT:  Sustained.  Ask your next question.
19   BY MR. PATTERSON:
20          Q.    Was he making the decisions with regard to what
21   Wendi could or could not wear to work?
22          A.    Yes, sir.
23          MR. MARTINEZ:  Objection.  Lack of foundation how he
24   knows.
25   / / / / /
```

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

```
 1      BY MR. PATTERSON:

 2              Q.    Were you present --

 3              THE COURT:  Hold on.  Sustained.  Ask your next

 4      question.

 5      BY MR. PATTERSON:

 6              Q.    Were you present when he was making decisions

 7      with regard to her wardrobe?

 8              A.    Constantly.

 9              Q.    Would he make some decisions in that regard?

10              MR. MARTINEZ:  Again, lack of foundation, hearsay.

11              THE COURT:  Sustained.

12              MR. PATTERSON:  Judge --

13              THE COURT:  Ask your next question.

14              MR. PATTERSON:  I need to make a record on this.

15

16                    (The following proceedings were held at the

17      bench:)

18

19              MR. PATTERSON:  It is not hearsay.  I'm not -- it's

20      not offered for the truth of the matter asserted, one, and

21      second, it's conduct.  He's making decisions here.  Just

22      because it's verbal doesn't render it excludable hearsay.  He

23      was present when these edicts were made, and it's admissible

24      because it's conduct and --

25              THE COURT:  Okay.  What are you --
```

1        MR. PATTERSON:  -- what she does in response to that.

2        THE COURT:  I know.  What are you bringing it up for?

3   What is the purpose for bringing it out?

4        MR. PATTERSON:  Referring back to Dr. Murphy,

5   domestic violence is not only about violence and about

6   hurting your spouse.  It's about controlling your spouse.

7   And making decisions for your spouse with regard to her

8   apparel, both from what she wears informally and formally, is

9   a significant controlling conduct on the part of this

10  gentleman and it corroborates and supports Dr. Murphy's

11  position.

12       THE COURT:  Mr. Martinez?

13       MR. MARTINEZ:  It's offered for the truth of the

14  matter asserted and the only way that he knows is by what was

15  said.  How does he know that Mr. Andriano did not want Mrs.

16  Andriano to wear black other than by her telling him or Mr.

17  Andriano saying it?

18       THE COURT:  I'll sustain the objection.

19

20            (The following proceedings were held in open

21  court:)

22

23       THE COURT:  Mr. Patterson?

24       MR. PATTERSON:  Thank you, Judge.

25  / / / / /


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000007895

1    BY MR. PATTERSON:

2         Q.    Were there other circumstances where you

3    observed Joe Andriano demonstrating control over Wendi's

4    conduct?

5         A.    Yes, sir.

6         Q.    What other circumstances?

7         A.    She was required to check in.

8         MR. MARTINEZ:  Objection.  Hearsay.

9         THE COURT:  Overruled.  Go ahead, answer the

10   question.  Answer the question.

11        THE WITNESS:  Via phone call or come by the house.

12   As I said before, he was very protective.  He didn't like the

13   thought of her being around and him not knowing about it.

14   BY MR. PATTERSON:

15        Q.    Were there control issues with regard to her

16   hairstyle that you observed?

17        A.    Yes, sir.

18        Q.    What happened there?

19        MR. MARTINEZ:  Objection.  Hearsay.  Lack of

20   foundation how he knows.

21        THE COURT:  Let me see Counsel here at the bench.

22

23             (The following proceedings were held at the

24   bench:)

25

1           THE COURT:  Is he going to say he saw her with a

2    specific hairstyle or is he going to say Joe told her how to

3    wear her hair?

4           MR. PATTERSON:  That he made the decision with regard

5    to what hairstyle she was allowed to wear.

6           THE COURT:  Okay.  Mr. Martinez?

7           MR. MARTINEZ:  The only way that he knows that's what

8    Joe allowed is by hearing Joe tell him or by having the

9    defendant tell him.  There's not a way for him to know.

10          THE COURT:  Right.  I'll sustain the objection.

11

12          (The following proceedings were held in open

13    court:)

14

15          THE COURT:  The objection is sustained.  Ask your

16    next question.

17    BY MR. PATTERSON:

18          Q.   Other areas where Joe manifested control with

19    regard to Wendi's daily life?

20          A.   As with the hair styling?

21          MR. MARTINEZ:  Objection.  That's already been

22    sustained.

23          MR. PATTERSON:  Move away from the hairstyle.

24          THE COURT:  Move on.

25          THE WITNESS:  Okay.  Actions.

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    BY MR. PATTERSON:

2           Q.    For instance?

3           A.    If it so happened Wendi wanted to go to lunch

4    with me and someone, it had to be approved.

5           MR. MARTINEZ:  Objection.  Hearsay.  Lack of

6    foundation how he knows.

7           THE COURT:  Overruled.  Go ahead, ask your next

8    question.

9           THE WITNESS:  I really don't know how to describe it

10   except for lock down.  Everything she did had to be

11   approved by him or else he questioned it.

12   BY MR. PATTERSON:

13          Q.    Okay.  Were there instances of behavior conduct

14   that you observed involving animal cruelty?

15          A.    Yes, sir.

16          Q.    Okay.  Tell me about those?

17          A.    Shot the dog with a BB gun.

18          Q.    Okay.  What were the specifics of that conduct?

19          A.    We were in the machine shop working.  I guess

20   he had a couple beers under his belt and thought it would be

21   entertainment.

22          Q.    Okay.  What did he do?

23          A.    Shot the dog.

24          Q.    Whose dog was it?

25          A.    It was Wendi and Joe's.

1          Q.     What was the dog's name?

2          A.     I'm unaware.

3          Q.     Okay.  Any other instances that you can recall

4     involving animal cruelty?

5          A.     I know he was fond of hunting and whatever

6     birds would come around, he would shoot them out of the

7     sky, things like that.

8          Q.     Okay.  Using the shotgun?

9          A.     Yes, sir.

10         Q.     Okay.  During these verbal altercations that

11    you observed, did you observe Joe demonstrate any kind of

12    physical presence in the context of his verbal altercations?

13         A.     If Joe wanted to get a point across, he would,

14    I guess you would say, shoulder check --

15         Q.     Okay.

16         A.     -- Wendi or himself.

17         Q.     Can you describe that?  What he would do?

18         A.     Wasn't really necessarily physical attack, but

19    if he was upset and we were talking to him, he'd walk past

20    you and just kind of bump you.

21         Q.     Okay.

22         A.     Things like that.  Just body language to

23    express that he was upset.

24         Q.     Okay.  Would he get close to Wendi?

25         A.     Very.

1          Q.     Okay.  How close would he get to her during the

2    course of these verbal altercations?

3          A.     Inches from, face-to-face.

4          Q.     Okay.  And during the course of these verbal

5    altercations what kind of language would he use directed

6    towards Wendi?

7          A.     Vulgar, unnecessary.

8          Q.     Okay.  Do you recall specific terms that he may

9    have used?

10         A.     Yes.

11         MR. MARTINEZ:  Objection.  Foundation.  Which time?

12         MR. PATTERSON:  Well, again, during this --

13         THE COURT:  Overruled.  Go ahead, answer the

14   question.

15         THE WITNESS:  I'm not sure if I could say it in

16   court.

17   BY MR. PATTERSON:

18         Q.     Well, yeah.  Everybody else has, Brandon, so

19   why don't you tell us?

20         A.     "Fuck you" was a big one.  "You're a whore,"

21   "why do you do this to me."  Just nasty things, things

22   to throw in someone's face to feel pretty much like shit

23   about themselves.

24         Q.     Okay.  All right.  And this general kind of

25   conduct that you've reported to us, would it change if he had

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1      been doing certain things?

2            A.    I'm unaware.

3            Q.    Okay.  How about would it be affected by his

4      use of intoxicants?

5            A.    I don't believe beer had anything to do with

6      it.  He could be sober, he could be intoxicated and it didn't

7      change his temperament.  If anything, the beer made it worse.

8            Q.    Okay.  All right.  At some point in time it was

9      reported to the family, to you folks, Joe actually had

10     cancer.  Do you recall that particular circumstance?

11           A.    Yes, sir.

12           Q.    Okay.  How did it come to your attention that

13     Joe was suffering from cancer?

14           A.    We got a phone call at Friday night prayer

15     service and they told us that he had found cancer growing in

16     his neck.

17           Q.    Okay.  Did the cancer affect his conduct over

18     the passage of time?

19           A.    Yes, sir.

20           Q.    Okay.  How did that change in his health affect

21     his conduct?

22           A.    He became a little bit more agitated just in

23     general.  In the beginning he actually got a lot better.  He

24     started going to church and he just was trying really hard I

25     guess to be a really good father and nice person, but seemed

1    as it got worse and they found more things wrong --

2          Q.    Okay.

3          A.    -- it -- it ate his personality up.  He just

4    slowly kind of crept into a dark hole and never came back

5    out.

6          Q.    All right.  Did he have the -- he have personal

7    possessions during the period of time that you lived with

8    him?

9          A.    Yes, sir.

10         Q.    Give me examples of his personal possessions?

11         A.    Clothing, firearms, jewelry.

12         Q.    Boats?

13         A.    Boats, yes.  Two.

14         Q.    Okay.  How was he about his conduct with regard

15   to those personal possessions?

16         A.    They were his pride and joy.

17         Q.    Okay.  Was he possessive of his possessions?

18         A.    Very.

19         Q.    Okay.  All right.  Do you recall specific

20   instances where -- well, Nicolas had been born by this time.

21   How old was Nicolas during the period of time that you lived

22   with the them or in the two-year period thereafter when you

23   babysat Nicolas?

24         A.    Two months up until two and a half years ago.

25         Q.    Okay.  So at some point he began walking?

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000007902

1          A.     Yes, sir.

2          Q.     Okay.  Were there specific incidents involving

3      Nicolas that as a result of Nicolas' conduct you observed

4      conduct in Joe?

5          A.     Yes, sir.

6          Q.     Okay.  Was there one incident involving one

7      time that Nicolas got his leg cut?

8          A.     Yes, sir.

9          Q.     Tell us about that.

10         A.     I wasn't directly at the scene when it

11     happened, but as I was told --

12         Q.     Okay.  Well --

13              MR. MARTINEZ:  Objection.  Hearsay.

14              MR. PATTERSON:  -- forget what you were told.

15              THE COURT:  Sustained.

16     BY MR. PATTERSON:

17         Q.     When you got there, what did you see?

18         A.     I saw a large cut on the lower right-hand calf

19     of Nicolas.  He was bleeding somewhat profusely.

20         Q.     Okay.  We're talking about this area back here?

21         A.     Yes, sir.

22         Q.     Okay.  And how big a gash was it?

23         A.     Four inches by about half an inch wide.

24         Q.     Okay.  And he was bleeding significantly?

25         A.     They had wrapped it up, but you could see

1    blood --

2              Q.    Okay.

3              A.    -- slowly seeping through.

4              Q.    Okay.  Did Joe Andriano become angry as a

5    result of this?

6              A.    Yes and no.

7              Q.    Okay.  Explain -- explain to me what you saw,

8    what you observed.

9              A.    At first he was scared when he had brought her

10   in or brought him in, but when Wendi started to show concern,

11   he became very self-defensive and I guess he couldn't really

12   take responsibility for it.  He became aggressive when she

13   started questioning him as to how it happened.

14             Q.    Okay.  Was Wendi -- well, I guess you weren't

15   there when it happened so you don't know who was present,

16   right?

17             A.    Yes, sir.

18             Q.    Okay.  What conduct did you observe as

19   apparently Joe became more agitated?

20             A.    He became really unconcerned and kind of just

21   stormed off.

22             Q.    Okay.  Was there any physical contact between

23   Joe and Wendi?

24             A.    If my memory serves me correctly, he grabbed

25   her by the arm and pulled her into the back room and had

1      a brief argument.

2              Q.      Okay.   Could you hear elevated voices from

3      inside?

4              A.      Yes, sir.

5              Q.      Okay.   Let me just take you back.   During the

6      period of time you were there, were there occasions where

7      arguments transpired in the master bedroom behind closed

8      doors?

9              A.      Often.

10             Q.      Okay.   And you could hear the -- the argument,

11     if you will, outside?

12             A.      Yeah.

13             Q.      Okay.   Was there another incident involving

14     Nicolas and a crock pot?

15             A.      Yes, sir.

16             Q.      Okay.   Tell me about that.

17             A.      Nicolas grabbed the crock pot by its cord as it

18     was on the counter, and I guess he was playing with it and I

19     guess he tugged a little too hard and the crock pot fell on

20     his head.

21             Q.      Okay.   What conduct did you observe in Joe

22     Andriano and when did you observe that?

23             A.      He lashed out at Wendi because I guess she was

24     in the kitchen at the time and questions such as, "Why aren't

25     you paying the fuck attention," stuff like that.


                TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

88

```
 1            Q.     What was Wendi doing at the time Nicolas pulled
 2      the crock pot on his head?
 3            A.     Preparing dinner for Joe.
 4            MR. PATTERSON:  Okay.  Judge, if I could have a
 5      minute to check my notes.
 6            THE COURT:  Yes.
 7                (Pause in proceedings.)
 8            MR. PATTERSON:  Judge, that's all I have at this
 9      time.  Thank you.
10            THE COURT:  We'll take our afternoon break at this
11      time.  During this break remember the entire admonition I've
12      given you, including the fact you're not to discuss this case
13      with anyone, do not let anyone discuss the case with you,
14      keep an open mind.
15                Have a nice break.  We'll see you in 20
16      minutes.
17
18                (Recess.)
19
20            THE COURT:  Please be seated.  This is cause number
21      CR 2000-096032, State of Arizona versus Wendi Elizabeth
22      Andriano.  The record will reflect the presence of the
23      Defendant, Counsel and the jury.  Brandon Ochoa is on the
24      witness stand, and we'll begin the cross-examination by Mr.
25      Martinez.
```

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000007906

```
 1              Mr. Martinez?

 2

 3   CROSS-EXAMINATION BY MR. MARTINEZ:

 4         Q.    Sir, you indicated that you were the

 5   defendant's cousin, correct?

 6         A.    Yes, sir.

 7         Q.    You're a little bit more than that, aren't you?

 8   Aren't you her brother also?

 9         A.    As far as our relationship goes, yes.

10         Q.    My understanding is that you were adopted by

11   Donna and Alejo Ochoa.  Isn't that true?

12         A.    Yes, sir.

13         Q.    And that at some point, even though you were

14   living with them and they were your adoptive parents, you

15   decided to go ahead and leave, right?

16         A.    Yes, sir.

17         Q.    And in fact you went to live with your mother

18   in Tucson, correct?

19         A.    Yes, sir.

20         Q.    That occurred when you were 14 years of age,

21   correct?

22         A.    Yes, sir.

23         Q.    And that was at the same time, about the same

24   time that you stopped going to the Desert Harvest or

25   Desert -- sorry, whatever it's called, the church, correct?
```

EXHIBIT SS

000007908

1          A.     Yes.

2          Q.     And that's when you stopped going to school,

3    right?

4          A.     No, sir.

5          Q.     When did you -- when did you go -- when did you

6    stop going to school?

7          A.     During 10th grade in Tucson.

8          Q.     So you actually went -- what was the last year

9    that you completed down here in Casa Grande?

10          A.     7th grade.

11          Q.     And then you went to Tucson and then completed

12    school there?

13          A.     I didn't complete it, but I continued.

14          Q.     All right.  So in 7th grade how old were you?

15          A.     12, I believe.

16          Q.     Okay.  So from the time that you were 12 years

17    old until the time you were 14 years old, you were still

18    living with Donna and Alejo Ochoa, correct?

19          A.     Yes, sir.

20          Q.     And during that time you didn't attend school,

21    right?

22          A.     No, sir.

23          Q.     And what were you doing during that time?

24          A.     Physical labor.

25          Q.     So basically what they were doing is they

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000007909

1    were -- you were doing -- you were just working

2    basically and not going to school, correct?

3            A.    Yes, sir.

4            Q.    And this was with the knowledge, if you will,

5    of your parents, Donna and Alejo Ochoa, correct?

6            A.    Yes, sir.

7            Q.    When in relationship to this time that you're

8    doing this physical labor and not attending school did you go

9    live out in Casa Grande with the defendant and Joseph

10   Andriano?

11           A.    I never lived with them during that point in

12   time.

13           Q.    So that would -- how old were you again when

14   you stopped school?  When you quit school?

15           A.    12 going on 13.

16           Q.    And so when you were 14 you left to go to

17   Tucson, right?

18           A.    Yes, sir.

19           Q.    When before that did you begin living with the

20   Andrianos?

21           A.    I believe 10.

22           Q.    Excuse me?

23           A.    10 years old.

24           Q.    When you were -- when you were 10 years old?

25           A.    Yeah.


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1        Q.    What year would that have been when you were 10

2  years old?

3        A.    '95.

4        Q.    In 1995?

5        A.    I believe so.

6        Q.    So when you went to live with them in 19 -- you

7  stayed with them in 1995, right?

8        A.    Yes, sir.

9        Q.    And you stayed with them for 90 days, right?

10       A.    Yes, sir.

11       Q.    And then you were there for, what, another half

12  year or another year?

13       A.    Past that?  I -- I was babysitting for Wendi up

14  until the point when I left.

15       Q.    But I'm trying to get the chronology straight

16  here.  If you -- the last grade that you actually attended

17  was -- what grade was it?

18       A.    9th grade in Tucson.

19       Q.    No, no, no.

20       A.    Down here?

21       Q.    Yeah.  Previously you told me 10th grade.

22  Which is it, 9th or 10th?

23       A.    I know I finished my 10th grade year.

24       Q.    When you were at 91st Psalm School what was

25  the last grade that you completed?

1        A.      That's hard to say because they didn't go by

2    grades.  You worked at your own pace.

3        Q.      Okay.  So how old were you when you last

4    attended?

5        A.      10 going on 11 -- no, 12 going on 13, my

6    apologies.

7        Q.      So you were 12 going on 13?

8        A.      Yes, sir.

9        Q.      And what year was that again?

10       A.      '97 to '98.

11       Q.      '97?  Okay.  I thought you told me something

12   different before.  I think you did, didn't you?

13       A.      I believe I told you '97.

14       Q.      Okay.  So in 1997 -- in 1997 is when you

15   stopped going to school, right?

16       A.      Yes.

17       Q.      Then for two years you didn't do anything,

18   right?

19       A.      No, not true.

20       Q.      Well, I didn't -- you didn't go to school,

21   right?

22       A.      During the point in time between 13 and 14,

23   right, when I left they re-enrolled me and I was continuing

24   school.

25       Q.      And, again, you can't tell me what grade you

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000007912

1    were re-enrolled because you go at your own pace, right?

2         A.    Yes, sir.

3         Q.    I really -- you know what?  I really still

4    don't have it.  It's probably my problem, not yours.  You

5    indicated that you stopped attending school.  Was it the

6    summer?

7         A.    No, sir.  It was during the school year.

8         Q.    Okay.  And what month was it?

9         A.    I'm unaware.

10        Q.    Could it have been around Christmas time,

11   anything like that, or --

12        A.    It was earlier than that.  It was still warm

13   outside.  That's what I remember.

14        Q.    Okay.  So it could have been like during the

15   Summer?

16        A.    I'd say Spring.

17        Q.    Of what year?

18        A.    Of '97.

19        Q.    So it was Spring of '97 you stopped going,

20   right?

21        A.    Yes, sir.

22        Q.    And then for two years after that until 1999

23   you did not attend school, right?

24        A.    Yes, sir.

25        Q.    And then in 1999 you went to Tucson, right?

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1          A.     I believe so, yes.  Yes, sir.

2          Q.     And then you enrolled in school there, right?

3          A.     Yes, sir.

4          Q.     And when you enrolled in school in -- how old

5     were you in 1999?

6          A.     I was 14 years old.

7          Q.     When you enrolled in school in '99 in Tucson,

8     you enrolled as a 9th grader or 10th grader?

9          A.     I enrolled in school as a 8th grader because

10    they were unaware of my standings just as you are.

11         Q.     So in 1999 you were enrolled in Tucson as an

12    8th grader, right?

13         A.     Yes, sir.

14         Q.     Okay.  When you were in Tucson did you have

15    occasion to come back and do some of the things we talked

16    about or was that sort of removed from what was going on with

17    the Andrianos?

18         A.     I did not return.

19         Q.     So you stayed down there, right?

20         A.     Yes, sir.

21         Q.     And you had -- the decision to quit school was

22    yours, right?

23         A.     Yes, sir.

24         Q.     It wasn't anybody else's but yours, right?

25         A.     Circumstance had a lot to do with it, but it

1    was my decision.

2          Q.    Right.  And it was with the -- with I guess

3    it's with the permission of your parents, Donna and Alejo

4    Ochoa, correct?

5          A.    During that point in time, they were the ones

6    that withdrew me from school.

7          Q.    They're the ones that withdrew you from

8    school.  You didn't make the decision to withdraw yourself

9    from school then?

10         A.    Not during that point in time.

11         Q.    So for two years it was their decision to keep

12   you out of school for whatever reason?

13         A.    As I told you before, it wasn't a full two

14   years.  I re-enrolled.

15         Q.    All right.  How about a year and a half?  Would

16   that be fair?

17         A.    I'd say 13 months.  That's about it.

18         Q.    So 13 months you're not in school because Donna

19   and Alejo Ochoa did not allow you to attend school, right?

20         A.    Pretty much, yes, sir.

21         Q.    Okay.  Now, one of the things that happened

22   that you told us about earlier was this incident involving

23   Nicolas, right?

24         A.    Yes, sir.

25         Q.    Do you remember telling us that some of -- was

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000007915

```
 1      that during the time you were enrolled in school, not
 2      enrolled in school?  When was that?
 3              A.    That was during the period of time I was not
 4      enrolled in school.
 5              Q.    So that would have been what year, '97
 6      through --
 7              A.    It was during '98.
 8              Q.    It was 1998?
 9              A.    Yes, sir.
10              Q.    Okay.  And so you're -- and what time of the
11      year was it?
12              A.    I'd like to say Fall.  Yes, Fall.
13              Q.    So it was Fall.  By Fall here in Arizona that
14      would be October, November, something like that, right?
15              A.    Previous to that.
16              Q.    September?  You think it was September?
17              A.    Yes, about.
18              Q.    So let's say this was September of 1998, right?
19              A.    Sure, yes.
20              Q.    Okay.  And this happened, according to you, at
21      about maybe 5:00 or 6:00 in the afternoon, right?
22              A.    Not that late.
23              Q.    Well, do you remember that we had a
24      conversation yesterday and that's what you told me?
25              A.    Yes, sir.
```

1          Q.     So is it between 5:00 and 6:00 or did you tell

2     me something different yesterday?

3          A.     I believe I overshot the time.  It was a little

4     bit earlier than that.

5          Q.     So now you've had time think about it

6     overnight.  You've -- your mind has become clearer?

7          A.     You could say that, yeah.

8          Q.     And so how much did you overshoot it by?

9          A.     Maybe an hour.

10         Q.     So now we're talking about 4:00 or 5:00?

11         A.     About that.

12         Q.     And you also told me that was when you came

13     home from school.  Do you remember telling me that?

14         A.     Yes, sir.

15         Q.     But -- but based on what you're telling me, you

16     weren't in school, right?

17         A.     I still worked on the grounds of the school.

18         Q.     That's true that you worked on the grounds of

19     the school, but that's not the same as telling me that you

20     were enrolled in school, right?

21         MR. PATTERSON:  Wait, wait, wait, wait, wait.

22     Misstates his testimony.

23         THE COURT:  Sustained.  Rephrase the question.

24     BY MR. MARTINEZ:

25         Q.     Sir, isn't it true that yesterday you told me

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

```
1     that you were enrolled or coming home from school --
2            A.    Come --
3            Q.    -- when this incident happened?
4     MR. PATTERSON:   Compound question.
5     THE COURT:  Sustained.  Rephrase the question.
6   BY MR. MARTINEZ:
7            Q.    Did you speak to me yesterday about this issue?
8            A.    Yes, sir.
9            Q.    Did we talk about the time frame then?
10           A.    Yes, sir.
11           Q.    You told me between 5:00 and 6:00, right?
12           A.    Yes, sir.
13           Q.    We also mentioned school during that
14    conversation, didn't we?
15           A.    Yes, but you never directly asked me if I was
16    enrolled.
17           Q.    Sir, let me ask the questions, okay?
18           A.    Sorry.
19           Q.    Isn't it true that's what you told me?  You
20    arrived home from school, right?
21           A.    Yes, sir.
22           Q.    The bottom line here is that you didn't leave
23    school at the same time as the other students.  You left at a
24    different time because you were working there, not being
25    taught, right?
```

```
 1          A.    No, sir.  I left at the exact same time.

 2          Q.    And what time was that?

 3          A.    3:30.

 4          Q.    So you left at 3:30, then you walked home,

 5    right?

 6          A.    I did not walk home.  I walked towards --

 7          Q.    You walked to their home, right?

 8          A.    Yes, sir.

 9          Q.    You told me you walked over to their home which

10    was the Quail Apartment, right?

11          A.    Yes, sir.

12          Q.    Sir, the problem that I have with you telling

13    me that you went to the Quail Apartments is that the

14    defendant lived at the Quail Apartments in 1991.  Did you

15    know that?

16          A.    I was unaware of that.

17          Q.    Well, let me show you an exhibit that we

18    previously discussed.  It's a police report regarding some

19    broken windows that was filed back on the date we probably

20    been -- the date has previously been indicated as November

21    18th of '91.  Take a look at that, sir.  First and second

22    page.

23          THE COURT:  What exhibit number again is this?

24          MR. MARTINEZ:  Sorry, Your Honor.

25                Can I take a look at the green tag?
```

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

```
 1                    452.

 2            THE WITNESS:  This was not during the time when she

 3   was with Joe.

 4            MR. MARTINEZ:  I'm not asking you that.

 5                 Go ahead and take a look at it at the first

 6   page and second page because then I'll ask you some

 7   questions.

 8                 (Pause in proceedings.)

 9            THE WITNESS:  Okay.

10   BY MR. MARTINEZ:

11            Q.    All right.  May I have it back, please?  In

12   fact when she lived at the Quail Apartments, she didn't

13   even -- Nicolas wasn't even born, right?

14            A.    That's true.

15            Q.    So when you told me that yesterday, you were in

16   error, weren't you?

17            A.    Not that I would say, sir.  I believe she was

18   still living there when Nicolas was born.

19            Q.    So in other words you believe back in 1998 she

20   was living in the Quail Apartments, right?

21            A.    If I remember the apartment complex correctly,

22   yes, sir.

23            Q.    Okay.  Are you aware that they actually lived

24   at the Courtyard Apartments?  Did you know that?

25            A.    As I said, I was thinking different title to an
```

1    apartment complex.

2           Q.    But you did -- do admit you did tell me it was

3    the --

4           A.    Yes, sir.

5           Q.    Okay.  Now, the other thing that you told me,

6    if we could just focus in a little bit on the time, you did

7    say that you overshot it a little bit but after school got to

8    their apartment at about 4:00, right?

9           A.    Anywhere between 4:00, 4:30.  It was a good

10   walk.

11          Q.    Okay.  How far was it for you to walk?

12          A.    Maybe a mile to mile and a half.

13          Q.    And it was according to you in the Fall, which

14   is September, right?

15          A.    I believe so.

16          Q.    And you get home and one of the things that

17   happen -- has just happened is that Nicolas is hurt, right?

18          A.    Yes, sir.

19          Q.    Just happened, right?

20          A.    Yes, sir.

21          Q.    And they're arguing about it rather than taking

22   him to the hospital, right?

23          A.    For a brief moment.

24          Q.    Isn't it true that this incident did happen,

25   but it actually happened between noon and 1:00 in the

1    afternoon?   Isn't that true?

2             A.    As I said, I didn't witness the event.

3             Q.    But you told us it just happened now, didn't

4    you?

5             A.    That's what I understood when I walked in.

6             Q.    No, sir.   You -- that's -- you indicated that

7    you saw the wound, that you saw it was still bleeding and

8    they were still arguing, right?

9             A.    I was under the impression we were talking

10   about the crockpot incident.

11            Q.    No, no, no, sir.   The crockpot didn't result in

12   a wound, did it?

13            A.    No.

14            Q.    The crockpot didn't result in any blood, did

15   it?

16            A.    No, sir.

17            Q.    And the crockpot did not result in a gash to

18   the calf, did it?

19            A.    No, sir.

20            Q.    We're talking about the gash to the calf.

21            A.    I apologize.

22            Q.    And you indicated that you got home at about

23   4:30 and the wound was still fresh, right?

24            A.    To my knowledge, yes, sir.

25            Q.    And in fact you, if we could get back to the

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    crockpot for a minute, you saw that one so you know when that

2    one happened, right?

3            A.    Yes, sir.

4            Q.    What time did that one happen?

5            A.    In the afternoon.

6            Q.    What time?

7            A.    I just told you 4:30 to 5:00 because I was

8    standing there waiting for dinner.

9            Q.    That also happened at the same time as this

10   previous incident?

11           A.    No, sir.  As I said before, I was

12   misunderstanding you.  I believe we were talking about a

13   different incident.

14           Q.    Okay.  So now, if you don't understand

15   something, please -- please -- so now when do you think --

16   okay.  When did you arrive home and there was a gash to

17   Nicolas' leg?

18           A.    During that point in time I was not in school

19   and Wendi would come and pick me up.

20           Q.    So she came and picked you up that day?

21           A.    Yes, sir.

22           Q.    You didn't tell me that yesterday or --

23           A.    You didn't ask.

24           Q.    Pardon?

25           A.    You did not ask.


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000007923

1        Q.     Okay.  So I didn't ask and you didn't feel like

2   telling me how, but I did ask how you got there, didn't I?

3        A.     I told you --

4        Q.     You didn't tell me she gave you a ride?

5        A.     Actually, yes, sir, I did not tell you.

6        Q.     And so if she's working, how is it that she's

7   able to give you a ride?

8        A.     During that point in time when I was working at

9   Harvest, she would come and pick me up.

10       Q.     Sir --

11       A.     I can't answer that.  I don't know.

12       Q.     Now I'm confused.  You're telling me you're

13   working, where right -- a couple minutes ago, you told me you

14   were enrolled in school.  Which one is it?

15       A.     As I said before --

16       Q.     Hold on.  Which one is it?  Are you enrolled in

17   school or working at school on the day of this injury to

18   Nicolas' calf?

19       A.     To my memory I believe I was working.

20       Q.     So that would mean that you would get home,

21   according to you, about 4:30 in the afternoon, right?

22       A.     If I left the school and was not picked up.

23       Q.     If you were picked up, then you got home at

24   4:15, right?

25       A.     Yes, sir.  There's points in time when she'd

1     come anywhere between 12:00 to 3:00.

2          Q.   So now in your mind you're telling us you would

3     have gotten there at 12:00, right?

4          A.   I didn't say that directly.

5          Q.   I know you didn't say it directly, but I want

6     to flesh it out a little bit more.  Are you telling me now

7     that you don't remember and on that date you actually got a

8     ride and got there about noon?

9          A.   I believe so, yes, sir.

10         Q.   So now you got there at noon and the thing had

11    just happened and they were arguing about it, right?

12         A.   I didn't show up at noon.  I believe it was

13    after the incident.

14         Q.   Right.  After the incident that just happened,

15    right?

16         A.   Yes, sir.

17         Q.   And so in fact what happens is her child,

18    Nicolas, is bleeding there, so she decides to go pick you up

19    rather than tend to him.  Is that what you're telling us?

20         A.   If I remember correctly, on that date I didn't

21    get a ride from her that day.

22         Q.   So now you didn't get a day -- didn't get a

23    ride from her on that day, right?

24         A.   No, sir.

25         Q.   That would mean that you walked home, right?

```
 1          A.    No, sir.

 2          Q.    Somebody else give you a ride?

 3          A.    Yes, sir.

 4          Q.    Now you remember that somebody else gave you a

 5    right, right?

 6          A.    Yes, sir.

 7          Q.    So whereas yesterday you told me that she gave

 8    you a ride, now you're telling us somebody else gave you a

 9    ride.  Who gave you --

10          MR. PATTERSON:  Wait, wait, wait.  That misstates

11    what I believe is the testimony.  In this case, he didn't

12    recall.

13          THE COURT:  Hold on a second.  I'll sustain the

14    objection.  Restate the question.

15    BY MR. MARTINEZ:

16          Q.    Who else gave you a ride?

17          A.    Alejo Ochoa.

18          Q.    So Alejo gave you a ride and he was present

19    when all of this happened then, right?

20          A.    I don't believe so.  I -- if my memory serves

21    me correctly, he dropped me off.

22          Q.    Well, he wasn't working that day?

23          A.    Yes, sir, but --

24          Q.    So he took time at 12:30, 1:00, 2:00, whatever

25    time it was, to go pick you up, even though you'd been
```

1  walking, and dropped you off at the Andrianos?

2       A.    During that point in time he was working at the

3  church.  He didn't have to pick me up.

4       Q.    He wasn't working at the tortilla factory then?

5       A.    As I said, if my memory serves me correctly.

6       Q.    Are you sure he wasn't working at the tortilla

7  factory?

8       A.    I can't say I'm sure.

9       Q.    Now, I'm still with this incident here.  You

10  indicated that she was the one, "she" being the defendant,

11  was the one that was concerned for Nicolas' welfare, about

12  that injury, right?  That's what you said?

13       A.    If that's how you take it.  I did not mean it

14  that way.  They both were very concerned.

15       Q.    And then at some point it escalated to the

16  point where all Joe cared about was himself.  That's the way

17  you put it?

18       A.    When she began to ask him a little bit more

19  aggressively as to what happened, he -- yes.

20       Q.    So she became aggressive then?  She started

21  being aggressive with him then, right?

22       A.    I believe a mother's concern would do that to

23  you, yes, sir.

24       Q.    Would that be "yes"?

25       A.    Yes, sir.


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    Q.   When she became aggressive that's -- when she
2  became aggressive, that's when he became defensive?
3         A.   Defensive isn't the proper word for it.
4         Q.   That's when he became angry?
5         A.   Yes, sir.
6         Q.   When she became aggressive with him?
7         A.   Yes, sir.
8         Q.   And then it escalated into an argument, right?
9         A.   Yes, sir.
10        Q.   And this is the one that you characterized when
11  he was being self-centered, right?
12        A.   I did not mean to characterize it that way.
13        Q.   That's what you said.  He became self-centered
14  and involved, only worried about himself.
15        A.   When your son is sitting there bleeding and you
16  take your spouse to the other room, I consider that
17  self-centered, yes, sir.
18        Q.   Okay.  And you were there to see it, right?
19        A.   The fight, not the actual cut.
20        Q.   Right.  We know you weren't there.
21        A.   Yes, sir.
22        Q.   So now you get there -- what time do you think
23  you were there?  Was it late in the afternoon or around noon,
24  which one was it?
25        A.   Midday to early afternoon.


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

```
 1        Q.    So would that be as late as 3:00?

 2        A.    2:00, 2:30, not 3:00.

 3        Q.    Do you know who Timothy Lee is, sir?

 4        A.    Timothy?

 5        Q.    Yes, sir.

 6        A.    No, sir.

 7        Q.    Do you understand he was the defendant's boss

 8   at the Courtyard Apartments where this happened back in,

 9   according to you, September of 19 -- when did you -- what

10   year did you think it happened?

11        A.    '97 or '98, I believe.

12        Q.    Well, she was -- she wasn't working there in

13   1997, so it wouldn't be that, could it?

14        A.    Obviously not.

15        Q.    And so did you know that Timothy Lee was her

16   boss?

17        A.    No, sir.

18        Q.    Did you know that he was actually there when

19   this happened?  Did you know that?

20        A.    No, sir.

21        Q.    Did you know that actually the way it

22   happened, Mr. Andriano actually called the defendant and

23   said, you know, "Nicolas hurt his leg."  Did you know that?

24        A.    Yes, sir.

25        Q.    And did you know at that point Mr. Lee urged
```

1    her to go home.  Did you know that?

2         A.    No, sir.

3         MR. PATTERSON:  Judge, this is all predicated on

4    hearsay declaration.

5         THE COURT:  Sustained.  Let's move on.

6    BY MR. MARTINEZ:

7         Q.    Sir, isn't it true that she's the one that

8    refused to leave the office and would not go take care of her

9    child?  Did you know that?

10        MR. PATTERSON:  Objection.  Foundation, basis of

11   knowledge, hearsay.

12        THE COURT:  Sustained.

13   BY MR. MARTINEZ:

14        Q.    You don't know anything about what Mr. Lee has

15   to say, do you?

16        A.    No, sir.

17        Q.    And if I tell you that he was there, you

18   wouldn't have any reason to dispute that, right?

19        A.    No, sir.

20        Q.    And since he was there, his rendition would be

21   more accurate than yours because -- well, by virtue of the

22   fact he was there?

23        MR. PATTERSON:  Objection.  Argumentative.

24        THE COURT:  Sustained.

25   / / / / /

1    BY MR. MARTINEZ:

2          Q.    You wouldn't have any reason as you sit there

3    to, for whatever reason, say to me later, well, no, Mr. Lee

4    was there later on when we talked about this.  Do you have

5    any way you'll be able to tell me that later?

6          A.    No, sir.

7          MR. PATTERSON:  Objection.  Asked and answered.

8          THE COURT:  Overruled.

9    BY MR. MARTINEZ:

10         Q.    What was your answer?

11         A.    No, sir.

12         Q.    Now, with regard to this other issue that we're

13    talking about, about the crockpot, are you as sure about the

14    incident involving the crockpot as you are about the other

15    incident involving the cut?

16         MR. PATTERSON:  Objection.  Argumentative, calls for

17    comparing answers.

18         THE COURT:  Overruled.  Go ahead, answer the question

19    if you can.

20         THE WITNESS:  I had witnessed the event with the

21    crockpot, so I would say my recollection of that account

22    would be a lot more accurate.

23    BY MR. MARTINEZ:

24         Q.    Didn't you also tell me that you witnessed the

25    cut on Nicolas' leg?


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1          A.     No, sir.

2          Q.     You didn't tell me that you saw the cut and you

3    saw --

4          A.     I saw the cut.  I did not witness it happen.

5          Q.     I didn't ask you if you saw it happening.  I

6    asked you whether or not you saw the cut.

7          A.     Yes, sir.

8          Q.     Okay.  That's the same thing, viewing, as

9    watching the incident with the crockpot, right?

10         MR. PATTERSON:  Wait, wait, wait, wait, wait.

11    Judge, that's not a fair --

12         THE COURT:  Sustained.

13         MR. PATTERSON:  -- question

14         THE COURT:  Sustained.  Rephrase that question.

15    BY MR. MARTINEZ:

16         Q.     You viewed both incidents?

17         A.     Not the cut, just the crockpot incident.

18         Q.     You viewed the cut on the leg, didn't you?

19         A.     Yes, sir.

20         Q.     It was really pretty traumatic, wasn't it?

21         A.     That's one way of putting it.

22         Q.     He was bleeding, wasn't he?

23         A.     Yes.

24         Q.     He wasn't bleeding or anything when the

25    crockpot hit him, was he?

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000007932

1          A.    No, sir.

2          Q.    Was -- it was a situation when he didn't

3    require any medical care with the crockpot, right?

4          A.    No, sir.

5          Q.    So in terms of severity of injury, wouldn't you

6    agree the injury to the leg was more severe than the injury

7    with the crockpot?

8          A.    Yes, sir.

9          Q.    And it would sort of tend to lend credence to

10   the fact that perhaps you might remember that a little bit

11   more?

12         A.    No, sir, because it was the blood that got me

13   really worried.

14         Q.    It was because you were worried that you didn't

15   know --

16         A.    No, I was referring to the crockpot incident.

17   That's why I remember it clearly because it was a very trying

18   time, if you will.

19         Q.    But I think you said you were worried at the

20   time of the crockpot.  Didn't you say --

21         A.    Yes, sir.

22         Q.    Weren't you more worried with the cut on the

23   leg?

24         A.    Yes, but as I said before I was not fully aware

25   of the entire incident, so I was kind of more of an observer.


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    Q.    I understand that.  But we've just talked about

2    this wouldn't, if we're going to use the term "worried,"

3    weren't you more worried, if you will, over the leg, be much

4    more pronounced than the worry over the crockpot?

5    A.    Of course.

6    Q.    The crockpot incident, was it also at the Quail

7    Tree Apartments?

8    A.    No.  It was at Courtyard.

9    Q.    And this knowledge of the Courtyard Apartments,

10   the name of it, you acquired it today, didn't you?

11   A.    As you said it, sir.

12   Q.    So it could have been a different apartment.

13   You're just saying it because I said it, right?

14   A.    No, sir.  I remember exactly the exact same

15   apartment.

16   Q.    So now you remember whereas you didn't before

17   that it was the Courtyard Apartments.

18   MR. PATTERSON:  Judge, is he arguing with this

19   witness?

20   THE COURT:  Overruled.  Go ahead, answer the question

21   if you can.

22   THE WITNESS:  Can you restate the question?

23   MR. MARTINEZ:  Could you --

24

25   (Whereupon, the record was read:

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000007934

1          Q.     So now you remember whereas you

2          didn't before that it was the Courtyard

3          Apartments.)

4

5          THE WITNESS:  Due to the knowledge you've given me,

6     yes, sir.

7     BY MR. MARTINEZ:

8          Q.     With regard to the crockpot incident, were you

9     only working or were you enrolled in school?

10         A.     I believe I was enrolled in school, sir.

11         Q.     So when if I remember correctly, you indicated

12    that you were enrolled in school until 1997, right?

13         A.     Yes, sir.

14         Q.     And then after that in 1999 you may have been

15    reenrolled, but subsequent to that you moved to Tucson?

16         A.     No, sir.  In -- no, I apologize, you're

17    correct.  I believe so.

18         Q.     So now the crockpot incident in '97, did that

19    occur before or after the thing to the leg?

20         A.     My memory serves me correctly, it was after.

21         Q.     So that would have been -- well, what month?

22    We now have Fall for the incident involving the leg.  What --

23    what month would you give for the crockpot?

24         A.     I can't give anything more than an educated

25    guess.  I don't know.

```
 1            Q.     What season?

 2            A..    Late summer, early spring -- no, late summer,

 3     early Fall.

 4            Q.     Sir, when you talked with Mr. Patterson you

 5     really had no difficulty remembering about the fights they

 6     had.  Do you remember talking about those?

 7            MR. PATTERSON:  Judge, that is argumentative.

 8            THE COURT:  Sustained.  Repeat the question.

 9            THE WITNESS:  Yes, I do.

10     BY MR. MARTINEZ:

11            Q.     Do you remember talking to Mr. Patterson about

12     the incidents involving the wall and that sort of thing?

13            A.     Yes, sir.

14            Q.     And you remember telling him in full detail how

15     it was -- how Mr. Andriano acted.  Do you remember telling

16     him that?

17            A.     Yes, sir.

18            Q.     And specifically the one involving the

19     bathroom, you -- you went ahead and you told him about the

20     hitting of the wall and that sort of thing, right?

21            A.     What I witnessed, yes, sir.

22            Q.     Yeah.  What date was that?

23            A.     I'm unaware.

24            Q.     Would it have been --

25            A.     '96?  I'm not sure of the month.  I believe it
```

1    was in that area, '96.

2         Q.   Could have been '95 since you don't really

3    remember, right?

4         A.   Yes, sir.

5         Q.   Could have been even later after that?

6         A.   It's a possibility.

7         Q.   And then you indicated that what you do

8    remember thinking was that the -- was the incident itself,

9    right?

10        A.   Yes, sir.

11        Q.   What time of day was it?

12        A.   Evening.

13        Q.   What time?

14        A.   5:30, 6:00.

15        Q.   Were they going to bed?

16        A.   For the day?

17        Q.   Yes.

18        A.   Not that I'm aware of.

19        Q.   On -- if it was around 5:30 or 6:00, what were

20    they arguing about?

21        A.   I'm unaware, sir.

22        Q.   You were there though, right?

23        A.   Yes, sir.

24        Q.   You were privy to see him hitting the wall or

25    the door, I think you said, with his fist, right?

1          A.     Yes, sir.

2          Q.     You also said he hit the wall, right?

3          A.     Yes, sir.

4          Q.     Did he also hit that with his fist?

5          A.     Yes, sir.

6          Q.     And you indicated that with regard to the door,

7     I think you said there was a hole that he created?

8          A.     Not all the way through the door, just in the

9     first layer.

10         Q.     Okay.  And then also with the wall there was

11    also a hole he created, right?

12         A.     Yes, sir.

13         Q.     You never told us he didn't suffer any injury

14    though, did you?

15         A.     No, sir.

16         Q.     It just -- the door was kind of flimsy and it

17    allowed him to punch it, but he suffered no injury to his

18    hand?

19         A.     I'm sure there was some form of pain, but

20    physical cut or bruising?

21         Q.     There was no physical cuts or bruising, right?

22         A.     Not that I'm aware of.

23         Q.     Now, there was another incident that you talked

24    to us about and this was the one I think you said from about

25    15 yards away you saw Mr. Andriano and Mrs. Andriano in the

1    bedroom if I remember correctly, right?

2              A.    Yes, sir.

3              Q.    And in this particular one you told us that you

4    really didn't know what Mr. Andriano did, right?

5              A.    Yes, sir.

6              Q.    In other words, you don't know when -- whatever

7    he was doing with his hands, you don't know what he was doing

8    with that, do you?

9              A.    No, sir.

10             Q.    You don't know if it was opened up, right?

11             A.    No idea, sir.

12             Q.    Well, didn't --

13             A.    Actually --

14             Q.    -- you tell us before he had a closed fist?

15             A.    That's what I was about to say.  When he raised

16   his hand, it was closed.  That's the only justification I

17   have for that.

18             Q.    He had a closed first here but when he went

19   this way, you don't know if it was open or anything, right?

20             A.    No, sir.

21             Q.    And you don't know if he struck anything,

22   right?

23             A.    No, sir.

24             Q.    And in fact the defendant's about 5 foot 4,

25   right?

```
 1        A.    I believe so, yes, sir.

 2        Q.    And he was about 5 foot 10, wasn't he?

 3        A.    Yeah.  He seemed bigger.

 4        Q.    Was he 6 foot?

 5        A.    Yeah, he -- he was tall, about 6 feet, I'd say.

 6        Q.    Okay.

 7        A.    5'10".

 8        Q.    Okay.  He in fact towered over her, right?

 9        A.    That's a form of expression you could use, yes,

10   sir.

11        Q.    He was a bigger guy I think you said, right?

12        A.    Not in the gesture you just made.  He wasn't

13   fat or anything like that.  He was just well built.

14        Q.    And she wasn't fat either, was she?

15        A.    No, sir.

16        Q.    She was about 110, 120 pounds, right?

17        A.    If that.

18        Q.    He weighed much more than that?

19        A.    Yes, sir.

20        Q.    180 maybe?

21        A.    Anywhere from 180 to about 200, I would say.

22        Q.    Right.  So if he weighs that much and that tall

23   and she's the size and proportion I described and he's

24   standing in front of her, how do you know she's standing

25   there?
```

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1  A. Because I could see her legs between his feet.

2  Q. So you were looking down there and you were

3 able to see her legs, right?

4  A. Right.

5  Q. But you weren't able to see her upper torso,

6 right?

7  A. No, sir.

8  Q. Do you remember we had a conversation yesterday?

9  A. Yes, sir.

10  Q. Do you remember we had a discussion about this

11 incident?

12  A. Yes, sir.

13  Q. Do you remember that yesterday you told me that

14 he punched her in the stomach?

15  A. I believe the words I used was in my

16 observation that would have been the area, if he had swung

17 and actually connected and hit her, that would have been --

18 it was a downward motion.

19  Q. No, sir.  You were much more positive than

20 that.  Don't you remember --

21  A. No, sir.

22  Q. Just so I'm clear, you're now -- you're not

23 contending at all then today that he even touched her that

24 day, right?

25  A. If you're asking me if I saw him directly touch

```
1    her, no, sir, I did not.
2         Q.   And you didn't hear any scream at all, did you?
3         A.   No, sir.
4         Q.   In other words, if somebody gets hit, you
5    didn't see any yelling or however it is people react when
6    people get hit did you?
7         A.   May I point something out?
8         Q.   No, sir.  Did you hear anything like that?
9         A.   Not that I'm aware of.
10        Q.   Well, you were there.  You keep telling me
11   you're not aware of things.  You were there within hearing
12   distance, weren't you?
13        A.   I turned around and walked out of the room.
14        Q.   If you turned around and walked out of the
15   room, does that mean your ears don't hear anymore?
16        A.   Not really, no, sir.
17        Q.   Well, the ears still function, don't they?
18        A.   Yes, sir.
19        Q.   That's what you're trying to tell me, you
20   couldn't see, right?  That's what you're telling me because
21   you turned around, right?
22        A.   Yes, sir.
23        Q.   But you didn't tell me that yesterday either
24   though?
25        A.   No, sir.
```

```
 1          Q.    When exactly was it in the course of these
 2   events that you turned around?
 3          A.    After the swing.
 4          Q.    After the swing?
 5          A.    Yes.
 6          Q.    But the swing was pretty quick, right?
 7          A.    Yes.
 8          Q.    And it's the kind of thing that draws a
 9   person's attention, isn't it?
10          A.    Not mine.
11          Q.    So whatever they want to do, if he's going to
12   hit her, that's all right, you're going to turn your back,
13   right?
14          A.    Yes, sir.
15          Q.    And that is your sister?
16          A.    Yes, sir.
17          Q.    You also talked a little bit about this dog
18   that supposed -- that was involved in some sort of
19   altercation with Mr. Andriano.  Do you remember telling us
20   that?
21          A.    Yes, sir.
22          Q.    How old were you when this happened?
23          A.    9 to 10.
24          Q.    So what year would that have been?
25          A.    '95, '96.
```

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1     Q.    And where did it happen?

2     A.    In the backyard of the house out on the farm

3  there.

4     Q.    And apparently you guys were in the machine

5  shop someplace?

6     A.    Yes, sir.

7     Q.    And that dog had been around there for quite

8  sometime, right?

9     A.    As far as I remember, yes, sir.

10     Q.    What color was the dog?

11     A.    Tannish brown.

12     Q.    How big was the dog?

13     A.    Average.

14     Q.    How big is an average-sized dog to you, sir?

15     A.    I'd say 2 and a half to 3 feet tall, maybe 3 to

16  3 and a half feet long.

17     Q.    And how much did it weigh?

18     A.    I have no way of possibly telling you that.

19     Q.    And this particular dog, you'd seen it around

20  there all the time, right?

21     A.    Yes, sir.

22     Q.    Had they had it as a puppy or just acquired it

23  sometime after it was full grown?

24     A.    My memory serves me correct, it was a puppy

25  when they acquired it.

1     Q.    Okay.  And you'd seen the puppy, right?

2     A.    Yes, sir.

3     Q.    And you'd been over when the puppy was there,

4  right?

5     A.    Yes, sir.

6     Q.    And you would go over there -- in fact, you

7  spent 90 days with them living there, right?

8     A.    Yes, sir.

9     Q.    And it was during these 90 days that the dog

10  was there too, right?

11     A.    Yes, sir.

12     Q.    And so you had occasion to see them play with

13  the dog or do whatever it is that people do with dogs, right?

14     A.    Yes, sir.

15     Q.    You don't remember his name though, do you?

16     A.    No, sir.

17     Q.    No idea what the dog's name is, right?

18     A.    No, sir.

19     Q.    You indicated that this was the same apartment

20  where Nicolas got his leg cut that the crockpot happened,

21  right?

22     A.    No, sir.

23     Q.    It was a different apartment?

24     A.    No.  It was the house not the apartment.  Oh,

25  the crockpot happened, yes, sir, I'm sorry.


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1      Q.    So the crockpot happened at the --

2      A.    Courtyard Apartments.

3      Q.    Right.

4      A.    If I remember correctly.

5      Q.    And this is where you did babysitting, right?

6      A.    When it was necessary, yes, sir.  They had a

7 professional babysitter.

8      Q.    Right.  Her name was Anna, wasn't it?

9      A.    Yes, sir.

10      Q.    And Anna would stay until about 10:00 at night

11 sometimes, wouldn't she?

12      A.    I'm unaware of that.  I'm not sure.

13      Q.    Why is it that you were required to babysit if

14 Anna was the professional babysitter?

15      A.    No one ever gave me that information.  I would

16 go upstairs, get the kids, take them downstairs and unlock

17 the apartment.

18      Q.    And Anna would just sort of sit around?

19      A.    She was in the apartment above us.  She had her

20 own home.

21      Q.    But she would babysit for them, wouldn't she?

22      A.    Yes, sir.

23      Q.    She would clean her house, right?

24      A.    Yes, sir.

25      Q.    And do you know who she worked for other than

1    the Andrianos?

2         A.    No, sir.

3         Q.    Did you know she worked for the Courtyard

4    Apartments?

5         A.    No, sir.

6         Q.    She was a woman that didn't speak English,

7    right?

8         A.    Yes, sir.

9         Q.    How old was she?

10        A.    Mid to late '30s.

11        Q.    Sir, in -- you indicated that you left and went

12    to Tucson in 1999, right?

13        A.    Yes, sir.

14        Q.    And you didn't come back, right?

15        A.    No, sir.

16        Q.    You don't have any opinion whatsoever then as

17    to how Mr. Andriano's demeanor was in the year late 1999, do

18    you?

19        MR. PATTERSON:  Judge, he's rendered no opinion in

20    this case.  He's made objections of conduct.

21        THE COURT:  I'll sustain the objection.  Ask your

22    next question.

23    BY MR. MARTINEZ:

24        Q.    You didn't see Joe Andriano fighting with Wendi

25    Andriano in 1999 after you left, right?

1       A.      No, sir.

2       Q.      And you didn't see him shooting any dogs,

3   anything like that, in 1999, right, after you left?

4       A.      Not that I'm aware of, sir.

5       Q.      And you didn't see how he acted towards Mrs.

6   Andriano because you weren't there in 1999, right?

7       A.      Yes, sir.

8       Q.      This time, the slapping, according to you the

9   slapping of the defendant, you saw that, right?

10      A.      Yes, sir.

11      Q.      And of all the time that you spent with them,

12  that was the only incident that you could tell us where he

13  actually struck her, right?

14      A.      Yes, sir.

15      Q.      And according to you there was no -- there was

16  no bruising that was left?

17      A.      As I said there was slight bruising.

18      Q.      So she had it the next day, right?

19      A.      My memory serves me correct, yes, sir.

20      Q.      How old were you?

21      A.      8, 9.

22      Q.      And so what year would that make that?

23      A.      '94.  I believe '93.  Maybe it was in a

24  townhouse.

25      Q.      So they were living in the townhouse when this

1    happened?

2         A.    Yes, sir.

3         Q.    They weren't living out next to the machine

4    shop?

5         A.    No, sir.

6         Q.    Where was this townhouse, sir?

7         A.    I'm unaware of the apartment complex.

8         Q.    Was it in Casa Grande?

9         A.    Yes, sir.

10        Q.    Was it near Courtyard Apartments?

11        A.    I don't believe so, no.

12        Q.    And did they live by themselves in this

13    townhouse?

14        A.    Aside from my occasional visit, yes, sir.

15        Q.    And did they have Nicolas in this townhouse?

16        A.    No, sir.

17        Q.    So it happened in a townhouse -- any idea what

18    road this is on?

19        A.    I'm unaware of the roads in Casa Grande.  It's

20    been a while.

21        Q.    What is it near where this townhouse is?

22        A.    It's -- I don't know the name of the buildings

23    around it, sir.

24        Q.    And what year do you think this was?

25        A.    If I remember correctly, '94, '95.

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1        Q.    You may --

2        A.    Yeah, right, '94.

3        Q.    '94?

4        A.    Yes, sir.

5        Q.    Do you know if Nicolas had been born yet or no?

6        A.    I don't believe so.

7        Q.    And what -- what when in '94?  Was it early

8   '94, late '94?  When was it?

9        A.    If my memory serves me correct, early '94.

10       Q.    How early in '94 would it be?

11       A.    I can't give a specific answer.  I'm unaware.

12       Q.    Would it be January?  I mean, that's really

13   early in '94.

14       A.    It's a possibility.

15       Q.    So it's in January of --

16       MR. PATTERSON:  Judge, that's not what he's saying.

17       THE COURT:  Sustained.

18       MR. PATTERSON:  He's saying --

19       THE COURT:  Sustained.

20       MR. PATTERSON:  -- he doesn't recall.

21       THE COURT:  Ask your next question.  Sustained.

22   BY MR. MARTINEZ:

23       Q.    Could be means it might be, right?

24       A.    Yes, sir.

25       Q.    In January of '94, right?

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1          A.    Yes, sir.

2          Q.    And where did this happen?  What -- what part

3     of the townhouse?

4          A.    Upstairs bedroom, I believe.

5          Q.    And is that where all the bedrooms were?

6          A.    Excuse me?

7          Q.    Is that where all of the bedrooms were?

8          A.    I'm unaware if there was more than one bedroom.

9          Q.    So he was up there, right?

10          A.    Yes, sir.

11          Q.    And you weren't staying with them back then,

12     were you?

13          A.    Not actually living with them, but I spent the

14     night there frequently.

15          Q.    Didn't you just tell us on direct examination

16     that during the 90-day period that you stayed with them when

17     they were living out next to the machine shop?  Didn't you

18     tell us that earlier?

19          A.    If that's the impression I gave you, I did not

20     mean to.

21          Q.    So you didn't tell us that it was during this

22     90-day period that you stayed with them, right?

23          A.    I don't believe so, no, sir.

24          Q.    So the only thing that you saw then during the

25     90-day period that you stayed with them was him having his

1    back to you, right?

2            A.    Yes, sir.

3            Q.    So you never saw any time during that 90-day

4    period when Mr. Andriano ever touched Mrs. Andriano?

5            A.    Touched?  That's completely different from

6    strikes.

7            Q.    Okay.  Strike?

8            A.    I've seen him touch her many times.  Striking

9    no, sir.

10           Q.    Okay.  I want to talk to you about throwing the

11   remote thing.  That also happened while they were at the --

12           A.    Yes, sir.

13           Q.    -- out at the house that's next to the machine

14   shop, right?

15           A.    Yes, sir.

16           Q.    And the defendant was upset according to you,

17   right?

18           A.    Yes, sir.

19           Q.    What time of the day was it?

20           A.    I'm unaware.  I was inside watching television.

21           Q.    Are you saying that just because you were

22   inside you didn't know what time it was?

23           A.    When you're a child, you really don't pay

24   attention.

25           Q.    Was it daytime or night time?

1       A.      Daytime, evening time.

2       Q.      Were you getting ready for dinner or had you

3  eaten lunch?

4       A.      I had eaten lunch.  I believe it was before

5  dinner.

6       Q.      Were you in school?

7       A.      Yes, sir.

8       Q.      Was this after school?

9       A.      This was during summer vacation.

10       Q.      So it was during the summer then, right?

11       A.      Yes, sir.

12       Q.      And according to you there was this argument.

13  What was the argument about?

14       A.      I believe Wendi had wanted to go out with her

15  cousin and a couple friends.

16       Q.      So it wasn't just Barbara Mitchell she was

17  wanting to go out with.  Now it's Barbara Mitchell and other

18  people, right?

19       A.      Yes.

20       Q.      But you can't give names?

21       A.      I don't know them.

22       Q.      And what kind of car did Mrs. Andriano drive

23  back then?

24       A.      I'm unaware.

25           THE COURT:  Mr. Ochoa, why don't you go ahead pull

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

 1    that microphone a little bit closer.  Speak right into that

 2    microphone.

 3              THE WITNESS:  Yes, sir.

 4              THE COURT:  Thank you.

 5    BY MR. MARTINEZ:

 6         Q.    A little bit about the employment thing, you

 7    indicated that Mr. Andriano was employed doing a variety of

 8    things, right?

 9         A.    Yes, sir.

10         Q.    And that he was a pretty strong guy, right?

11         A.    Yes, sir.

12         Q.    You also indicated that he could pick up some

13    drums and hold them bear-hug style, right?

14         A.    Yes, sir.

15         Q.    Are those the 50-gallon drums?

16         A.    They were heavier than that.  I believe they

17    were 250 gallons or --

18         Q.    250 gallons?

19         A.    Large, blue gallons -- large blue drums.  I'm

20    not sure of their exact weight.

21         Q.    But you think they were 250?

22         A.    If I remember correctly I believe that's the

23    weight.

24         Q.    Okay.  You indicated that Mr. Andriano also

25    asked or required that Mrs. Andriano lay out his clothes

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    right?

2        A.    Yes, sir.

3        Q.    Was this at the townhouse?

4        A.    No, sir.

5        Q.    Was this at the Courtyard Apartments?

6        A.    No, sir.

7        Q.    So it wouldn't have been when they were out --

8        A.    It was also during that point of time.

9    THE COURT:  Speak right in that microphone.   Go

10    ahead, pull it closer to you.

11    BY MR. MARTINEZ:

12        Q.    So if he was going to work out in welding, that

13    sort of thing, he would require her to put out his overalls?

14        A.    No, sir.  I believe you misunderstood me. She

15    had to it with her clothing, not his.

16        Q.    No, sir.  You indicated that she laid out his

17    clothing for him to wear.

18        MR. PATTERSON:  Misstates prior testimony, Judge.

19        THE COURT:  Sustained.

20        MR. PATTERSON:  Not what he said.

21        THE COURT:  Sustained.

22    BY MR. MARTINEZ:

23        Q.    Didn't you say she would -- quote, she would

24    have to lay out his clothing?  Didn't you say that?

25        A.    Her clothing.

1        Q.    She didn't have to lay out his clothing?

2        A.    He was quite capable of dressing himself.

3        Q.    Okay.  So -- okay, then I misunderstood.  It

4    wasn't she had to lay out his clothes, but it was her?

5        A.    She had to show him what she was wearing.

6        Q.    Okay.  I understand that now.  When did this

7    happen?

8        A.    The times I witnessed these kinds of events was

9    all the way from the house at the farm up to --

10       Q.    You know, you're -- because you are a bit too

11   close to the microphone, can you restate --

12       A.    I said the times this was happening was from

13   the house out at the farmlands up until the point I left I

14   would see these events.

15       Q.    Okay.  And these cement blocks you talked about

16   that he would lift, how much would you estimate that they

17   weighed?

18       A.    I believe they're anywhere from 30 to 50 pounds

19   a piece.

20       Q.    How old was Nicolas when he got his leg cut?

21       A.    If my memory serves me correctly, two.

22       Q.    And you indicated, sir, that you were with the

23   Andrianos or visiting with them on a regular basis from the

24   time he was two months until he was 2 and a half years old,

25   right?

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000007956

1        A.    Past 2 and a half.

2        Q.    So --

3        A.    But, yes, that's what I said.

4        Q.    Right.  So just so I could get a time period,

5    it's approximately 2 and a half years?

6        A.    No, not probably 2 and a half.  I don't believe

7    so.

8        Q.    It was more than that?

9        A.    I did say up until about 4, I believe.  I

10   misstated that last time.

11       Q.    Well, okay.  Go ahead and then tell me, from

12   when to when did you have contact with the Andrianos?  And if

13   you could give it to me in terms of Nicolas' age?

14        , A.    From newborn to, as I said, anywhere from 3 and

15   a half and 4 years.

16       Q.    When was he born?

17       A.    July of I'd really like to say '96.  I'm

18   unaware though.  I can't give you an answer, sorry.

19       Q.    Okay.  From July of '96?

20       A.    Till --

21       Q.    And you said you stayed with them for three

22   years or four years, something like that.  That was the

23   figure that you gave us?

24       A.    I didn't stay with them.  I did visit and

25   babysit frequently.  The only point in time I was living with

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    them was the 90-day period.

2           Q.    So if you said before that it was from 2 months

3    to 2 and a half years old, that would have been incorrect?

4           MR. PATTERSON:  Judge, this ground has been plowed

5    many, many times.

6           THE COURT:  Overruled.  Go ahead, answer that last

7    question.

8           THE WITNESS:  Yes, sir.  I was incorrect in that

9    statement.

10   BY MR. MARTINEZ:

11          Q.    Were you also present here in the Casa Grande

12   area when Ashley was born?

13          A.    Yes, sir.

14          Q.    And did you also have occasion to babysit for

15   her?

16          A.    Not often, but there was a few times.

17          Q.    Sir, I just want to make sure that I understand

18   what you're telling us.  In terms of the times, you're not

19   sure, right --

20          A.    Yes, sir.

21          Q.    -- of when these things happened?

22          A.    Yes.

23          Q.    And in terms of the farms where it might have

24   happened, you're not sure of the times, right?

25          MR. PATTERSON:  Judge, he's regurgitating prior


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1   testimony.

2          THE COURT:  Sustained.

3   BY MR. MARTINEZ:

4          Q.    With regard to the crockpot, when was that --

5          MR. PATTERSON:  Objection.  Asked and answered

6   numerous times.

7          THE COURT:  Let's move on.

8   BY MR. MARTINEZ:

9          Q.    Well, you indicated to defense counsel the

10  defendant was making dinner when this thing happened with the

11  crockpot.

12         MR. PATTERSON:  Judge, this whole episode has been

13  gone over meticulously.

14         THE COURT:  Sustained.  Move on, Mr. Martinez.

15  BY MR. MARTINEZ:

16         Q.    The bottomline is you've changed your mind or

17  your story a number of ways from what you told me yesterday,

18  correct?

19         MR. PATTERSON:  Objection.  That's argumentative.

20         THE COURT:  Sustained.  Let's move on.

21         MR. MARTINEZ:  I don't have anything else.

22         THE COURT:  Redirect?

23         MR. PATTERSON:  Thank you, Judge.

24  / / / / /

25  / / / / /


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1  REDIRECT EXAMINATION BY MR. PATTERSON:

2      Q.   All right.  You spent -- did you spend a period

3  of time with Joe and Wendi Andriano where you actually lived

4  with them?

5      A.   Yes, sir.

6      Q.   Okay.  And was that at a time before or after

7  Nicolas was born?

8      A.   After.

9      Q.   Okay.  And in point of time, how old was

10  Nicolas at the time you moved in with them?

11      A.   I'd like to say three weeks to a month old.

12      Q.   Okay.  You moved out as you tell us 90 days

13  after living with them.  For what period of time did you

14  continue to come back and visit with the family on a daily

15  basis?

16      A.   Any chance I could up until the point I left.

17      Q.   Okay.  When did you finally leave for Tucson?

18      A.   October 18th of 1999.

19      Q.   Okay.  The things you've testified to today,

20  did you observe them with your own eyes?

21      A.   Yes, sir.

22      Q.   Okay.  Have you made some mistakes with regards

23  to the names of the apartments?

24      A.   Yes, sir.

25      Q.   All right.  You mentioned these oil drums or

1    fuel drums.  Can you show us in terms of with your hands

2    height and width?

3              A.    The drum --

4              Q.    You could stand up if you want.

5              A.    Ground level, it would have been about that

6    tall and about that wide in a circle.

7              Q.    All right.  And for the record you showed about

8    this high?

9              A.    Yes, sir.

10             Q.    Which is about 5 feet -- 4 feet off the ground?

11             A.    I'd say about four feet and about 2 and a half

12   feet wide in diameter.

13             Q.    Width, 2 and a half feet?  Okay.  These are the

14   drums that he was capable of hoisting around, moving them,

15   that type of thing, during the period of his good health?

16             A.    Yes, sir.

17             Q.    Okay.  All right.  Was there a -- a person who

18   served as a sitter periodically when they lived in the

19   Courtyard Apartments?

20             A.    Yes, sir.

21             Q.    Where did this person reside?

22             A.    Directly above them.

23             Q.    Okay.  And what was her job from your

24   observation?  What did she do in terms of taking care of the

25   children?

1          A.    My personal observation, I was never there

2    unless I was picking them up.  But as far as I'm aware,

3    babysit --

4          MR. MARTINEZ:  Objection.  Hearsay.  If he wasn't --

5          THE COURT:  Sustained.  You didn't see what she did?

6          THE WITNESS:  Yes, sir.

7    BY MR. PATTERSON:

8          Q.    What was your task when you were over there?

9    What did you do with the children?

10         A.    When I showed up at the apartment complex, I'd

11   usually hang out with Wendi a little while in the main

12   office, and after a while she'd give the keys to the

13   apartment.  I would pick Ashley and Nicolas up, take them

14   down to the lower apartment, turn some cartoons or Teletubby

15   on.

16         Q.    Okay.

17         A.    Entertainment.

18         Q.    So in terms of the time the care provider

19   was the lady upstairs was during the day, and when you got

20   off school you would pick them up and take them down to

21   Wendi's apartment?

22         A.    Yes, sir.

23         Q.    Okay.  Now, you told us that you only observed

24   one incident of slapping?

25         A.    Yes, sir.

1        Q.     Okay.  Again, where did that occur?  The best

2   of your recollection.

3        A.     The townhouse.  I don't have the name for it.

4        Q.     Okay.  That was Casa Grande?

5        A.     Yes, sir.

6        Q.     And did you ever see Joe touch Wendi roughly

7   during the period of time that you observed them together?

8        A.     Yes, sir.

9        Q.     Okay.  When and -- let's talk about the

10  townhouse.  Did you see Joe touch Wendi roughly?

11       MR. MARTINEZ:  Objection.  Beyond the scope.  I never

12  asked that.

13       THE COURT:  Overruled.  Go ahead, answer the

14  question.

15       THE WITNESS:  Restate that one more time, please.

16  BY MR. PATTERSON:

17       Q.     You said you saw some rough touching.  Did you

18  see it at the townhouse?

19       A.     Occasionally.  Not often.

20       Q.     Okay.  Describe for me what you describe as

21  rough touching?

22       A.     Shoving.  As I --

23       MR. MARTINEZ:  Objection.  Beyond the scope, Your

24  Honor.  No one asked him about that.

25       THE COURT:  Overruled.  Go ahead.


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1         THE WITNESS:  Shoving, shoulder checking, grabbing by

2    the arm, pulling into the other room.

3    BY MR. PATTERSON:

4         Q.    Okay.  Did you see that behavior when you

5    resided with them at the building next to the machine shop?

6         A.    Yes, sir.  It seemed to have escalated.

7         Q.    Okay.  Tell me about the nature of the rough

8    touching that you observed there?

9         A.    Same kind of nature, just more correct.

10        Q.    Okay.  Did you see it thereafter at the

11   Courtyard Apartments?

12        A.    A few opportunities, I did.  I could say I saw

13   it occasionally.

14        MR. PATTERSON:  Okay.  Thank you, Judge.  Nothing

15   additional.

16        THE COURT:  Any further questions of this witness by

17   the jury?  If so, please raise your hand.

18             (No response.)

19        THE COURT:  No one has raised their hand.

20             May this witness be excused?

21        MR. PATTERSON:  No objection.

22        MR. MARTINEZ:  Yes, sir.

23        THE COURT:  Thank you very much.  You're excused.

24             Mr. Patterson?

25        MR. PATTERSON:  Yes, Your Honor.

1    MR. MARTINEZ:  Actually, Judge, he may not depending

2  on what may happen later.

3    THE COURT:  Okay.  You're not excused, but you may

4  leave.

5    THE WITNESS:  Okay.

6    MR. PATTERSON:  Judge, we would ask Barbara Mitchell

7  to testify.

8    (Pause in proceedings.)

9    THE COURT:  Please step forward.  Please step

10  forward right up here.  Give your name to the clerk.  Go

11  ahead, step right up here.  Right up here.  Give your name to

12  the clerk and she'll swear you in.

13

14    BARBARA MITCHELL,

15    CALLED TO TESTIFY ON BEHALF OF THE DEFENDANT,

16    HAVING FIRST BEEN DULY SWORN, TESTIFIES AS FOLLOWS:

17

18    THE COURT:  Please have a seat on the witness

19  stand.  Please make yourself comfortable there on the witness

20  stand.  Please pull the microphone close to you.  Please

21  remember to speak loudly and clearly into the microphone so

22  everyone can hear you.  Also, please wait until the question

23  is completed before you answer the question.  And please make

24  sure that you give a verbal response.  Is that all agreeable

25  to you?

1          THE WITNESS:  Yes.

2          THE COURT:  Mr. Patterson, you may proceed.

3          MR. PATTERSON:  Thank you, Judge.

4

5   DIRECT EXAMINATION BY MR. PATTERSON:

6          Q.   Would you give us your name please, ma'am?

7          A.   Barbara Mitchell.

8          Q.   Are you employed?

9          A.   Yes, I am.

10          Q.   What do you do?

11          A.   I'm a human resource analyst.

12          Q.   For which employer?

13          A.   Casa Grande Regional Medical Center.

14          Q.   Okay.  That's a hospital down in Casa Grande?

15          A.   Yes.

16          Q.   You are related in some fashion to Wendi Ochoa,

17   correct?

18          A.   Yes, I am.

19          Q.   Describe for me that relationship?

20          A.   She is my cousin.

21          Q.   Okay.

22          A.   Which is my uncle's -- my mother's brother.

23          Q.   All right.

24          A.   Alejo.

25          Q.   Your mom's name?

1       A.   Delia Alvarez.

2       Q.   Okay.  Who is her brother?

3       A.   Alejo Ochoa.

4       Q.   Okay.  So the adoptive father of Wendi Andriano

5   is your mom's brother?

6       A.   That's correct.

7       Q.   Okay.  So no biological connection with Wendi?

8       A.   No.

9       Q.   It's -- it's by marriage, I guess?

10      A.   Yes.

11      Q.   Okay.  And adoption?

12      A.   Yes.

13      Q.   Okay.  Where did you grow up?

14      A.   In Casa Grande.

15      Q.   Okay.  And were you friends with Wendi growing

16   up?

17      A.   Yes, I was.

18      Q.   Okay.  When did you first meet her?

19      A.   Probably when I was about 5 years old.

20      Q.   Okay.  So life-long acquaintance and friends?

21      A.   Yes.

22      Q.   Okay.  Did you go to the same school that Wendi

23   went to?

24      A.   Yes, I did.

25      Q.   What school was that?

1        A.    It was 91st Psalms.

2        Q.    All right.  Has it changed its name at some

3    point?

4        A.    Yes, it has, to Harvest Family Church.

5        Q.    Okay.  Tell me a little bit about that school?

6        A.    It was a private school, a Christian academy.

7    It's very small, not a big school at all.

8        Q.    All right.

9        A.    Few children.

10        Q.    Were you in the same level or grade with Wendi?

11        A.    No.  She's about two years ahead of me.

12        Q.    Okay.  Did they use conventional grading kind

13    of structure as public schools use or is there different

14    grouping used, if you will?

15        A.    Actually, it was very long time ago.  I don't

16    remember how it was.

17        Q.    All right.  Did you progress at your own pace?

18        A.    Yes.

19        Q.    Okay.

20        A.    Yes.

21        Q.    And can you tell me about the class sizes?

22    Each kind of calendar year, they ranged from what to what?

23        A.    Class sizes normally were, depending on --

24    could be 1 to 5 children, just depending on how many kids

25    were in the actual school.


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1        Q.    Okay.  Who was the -- was there a principal?

2        A.    I guess you could call him a principal.

3        Q.    What was his name?

4        A.    Pastor King.

5        Q.    Okay.  Was he also the pastor of the church

6   that was affiliated with this particular school?

7        A.    Yes.

8        Q.    Okay.  What kind of subjects were you taught in

9   that environment?

10       A.    All of the subjects normally in a public

11   school.

12       Q.    Okay.  And were there -- was there an

13   additional emphasis upon religious teaching?

14       A.    Yes.

15       Q.    Okay.  Was that a significant part of the

16   curriculum?

17       A.    Yes, it was.

18       Q.    Okay.  How much religious instruction would you

19   get on an average day as opposed to the other academic

20   practice?

21       A.    Academic subjects I'd have to say about an

22   hour.

23       Q.    Okay.  Was there a corporal punishment imposed?

24       A.    Yes.

25       Q.    Spanking --

1          A.      Swats.

2          Q.      -- for misbehavior?

3          A.      Yes.

4          Q.      Swats?

5          A.      Uh-huh.

6          Q.      Okay.  As you speak with me today, what was

7      your perception -- what is your perception or feeling about

8      that educational experience?

9              MR. MARTINEZ:  Objection.  Relevance.

10             THE COURT:  Sustained.

11     BY MR. PATTERSON:

12         Q.      Back then what was your feeling about that

13     particular educational experience?

14             MR. MARTINEZ:  Objection.  Relevance.

15             THE COURT:  I'll sustain the objection.  Let's move

16     on.

17     BY MR. PATTERSON:

18         Q.      All right.  Let me ask you then, did it -- did

19     it enable you to deal with the outside world?  Was it kind of

20     an insular -- an isolated experience cut off from the rest of

21     the world?

22         A.      It was very isolated.

23         Q.      Okay.  Tell me about that.  How were you ill

24     prepared, if you will, to deal with the real world as a

25     result of these experiences?


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1          MR. MARTINEZ:  Objection.  Leading.  Ill prepared?

2    She never said that.

3          THE COURT:  Overruled.  Go ahead, answer the

4    question.

5          THE WITNESS:  Because going to school there, seeing

6    the same children, going to church there you hung out with

7    those same children day in day out.  You didn't get to do

8    outside activities as far as, you know, sports, that kind of

9    thing.

10   BY MR. PATTERSON:

11         Q.    Okay.  And were you dealing with people who

12   shared the same kind of fundamental moral and religious

13   values?

14         A.    Yes.

15         Q.    Okay.  Were you instructed with regard to the

16   role of a woman and family?

17         A.    Yes.

18         Q.    What was that instruction?

19         A.    To take care of the family.

20         Q.    Okay.  And the role of the woman with regard to

21   her husband, was there specific teachings in that regard?

22         A.    Take care of your spouse, your husband.

23         Q.    Okay.  And were there specific teachings with

24   regard to who was in charge, who made the decisions, those

25   kinds of things?

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000007971

1          A.     Yes, the father.

2          Q.     Okay.  All right.  And did you graduate from

3     that school?

4          A.     No, I did not.

5          Q.     Okay.  Did you there after go to a public

6     school?

7          A.     Yes, I did.

8          Q.     Which public school did you go to?

9          A.     I enrolled at Stanfield Public School.

10         Q.     Okay.  And graduated what year?

11         A.     '92.

12         Q.     Okay.  Did you maintain a relationship with

13    Wendi even though you had left the 91st Psalm or Harvest

14    Christian School?

15         A.     Yes, I did.

16         Q.     Okay.  And how did you maintain that

17    relationship with her?  What would you guys do?

18         A.     Saw her on a daily basis at times, sometimes on

19    holidays, weekends, church, that type of thing.

20         Q.     Okay.  So even though you quit going to the

21    school, you maintained your relationship with the church?

22         A.     Yes.

23         Q.     Okay.  And would you categorize the quality of

24    your friendship with Wendi at that time?

25         A.     It was awesome.

1     Q.   Okay.

2     A.   I looked up to her.

3     Q.   All right.  Did you have a best friend back

4 then at that time?

5     A.   That was Wendi.

6     Q.   Okay.  And, again, I may have missed this, how

7 frequently during the week would you two get together?

8     A.   At least three times a week.

9     Q.   Okay.  All right.  At some point in time did --

10 was Wendi introduced to a person by the name of Joe Andriano?

11    A.   Yes.

12    Q.   Were you present or familiar with the

13 circumstances of that meeting?

14    A.   Yes, I was.

15    Q.   Okay.  How did that happen?

16    MR. MARTINEZ:  I'm going to object.  I don't know if

17 she was present or familiar.

18    THE WITNESS:  I'm sorry.

19    THE COURT:  Sustained.  Rephrase the question.

20 BY MR. PATTERSON:

21    Q.   Were you present during the initial meeting?

22    A.   No.

23    Q.   Okay.  Had she met him previous to that time

24 and you at some point then saw them together?

25    MR. MARTINEZ:  Objection.  Hearsay.

1           THE COURT:  Overruled.  Go ahead, answer the question

2      if you can.

3           THE WITNESS:  Could you repeat it?

4      BY MR. PATTERSON:

5           Q.    Sorry.  It's a bad question.  At some point in

6      time did you become aware that Joe and Wendi were dating?

7           A.    Yes.

8           Q.    Okay.  What point in time did you become aware

9      of that?

10          A.    It was right around the same week or week after

11     she had mentioned that she met Joe.

12          MR. MARTINEZ:  Objection.  Hearsay.

13          MR. PATTERSON:  Not offered for the truth.

14          THE COURT:  Okay.  Overruled.  Complete your answer.

15          THE WITNESS:  It was a week after that she happened

16     to meet this gentlemen.

17     BY MR. PATTERSON:

18          Q.    Okay.  Where were you when you saw them

19     together for the first time?

20          A.    Probably at the apartment.

21          Q.    Okay.  Did she appear to like this gentleman?

22          A.    Absolutely.

23          Q.    Okay.  In terms of her experiences that you

24     were aware of, had she dated other people prior to that time?

25          A.    Yes.

1    Q.    Who had she dated?

2    A.    Shawn King.

3    Q.    Okay.  And who, again, is Shawn King?

4    A.    Her high school sweetheart.

5    Q.    Okay.  Was he the son of any particular person

6  in town there?

7    A.    Pastor Tom King.

8    Q.    That's the pastor running the school and the

9  church?

10    A.    Yes.

11    Q.    Can you describe her demeanor when she was

12  around Joe for the first time that you saw them together?

13    A.    Smitten, very smitten.

14    Q.    She was taken by him?

15    A.    Very taken by him.  She was in awe of him.

16    Q.    Okay.  And did you go out with them at least at

17  the beginning on a kind of a regular basis?

18    A.    Yes.

19    Q.    Where would you guys go?

20    A.    We went to a bar in town.  It was a small bar.

21  One time we went to -- I hung out with them at the lake.  One

22  time at their apartment.  Those kinds of things.

23    Q.    All right.  And how old were you at this time?

24    A.    19.

25    Q.    All right.  Hanging out at bars, was there a

1    little problem with hanging out at bars at age 19?

2        A.    It was in town, it was at lunch time.  It was a

3    small bar in Casa Grande.

4        Q.    Okay.  Were you guys drinking at lunch time?

5        A.    I wasn't.  They were playing pool.

6        Q.    Okay.  What year are we talking about to the

7    best of your recollection?

8        A.    1992 or '93.

9        Q.    Okay.  Do you recall when Wendi and Joe got

10    married?

11        A.    Yes.

12        Q.    What year was that?

13        A.    1994.

14        Q.    Okay.  Were you able to associate with Wendi

15    and Joe from the period of time that they first met up to

16    their marriage?

17        A.    Yes, that's correct.

18        Q.    Okay.  And how frequently were you allowed to

19    go out -- did you go out with Joe and Wendi?

20        A.    Not very much.

21        Q.    Okay.  Once a --

22        A.    Once every six months.

23        Q.    Okay.  And was that less frequent or more

24    frequent than the time you spent with Wendi before she met

25    Joe?

1       A.    Less frequent.

2       Q.    Okay.  Was there a change in that circumstance?

3       A.    Yes.

4       Q.    Tell me about that?

5       A.    She basically just withdrew from -- from

6 hanging out with me, just totally stopped.  You know, we'd go

7 to lunch.  She wouldn't -- either wouldn't go with me or --

8 well, she just pulled away.

9       Q.    Okay.  She began spending more time with whom,

10 if you know?

11      A.    With Joe.

12      Q.    Okay.  It came to your attention in what, early

13 '94, they were about to be married.  When did you become

14 aware of that?

15      A.    Probably end of '93.

16      Q.    Okay.  Did you indicate to Wendi a willingness

17 to participate in the wedding?

18      A.    Yes.

19      Q.    What did you tell her?

20      A.    She asked if I wanted to be a bridesmaid and I

21 said yes.

22      Q.    Okay.  Had you made plans to buy a dress or

23 whatever bridesmaids need --

24      A.    Yes.

25      Q.    -- for the ceremony?

1     A.   Yes.

2     Q.   Had you actually secured the dress?

3     A.   Yes.

4     Q.   Okay.  Where did you buy the dress?

5     A.   It was actually made in Oklahoma.

6     Q.   Did you make it or a seamstress involved with

7 the wedding?

8     A.   Donna made the dress.

9     Q.   Wendi's mom?

10    A.   Yes.

11    Q.   Okay.  Did it come to your attention at some

12 point that you were no longer going to be a bridesmaid in the

13 wedding?

14    A.   It was actually --

15    MR. MARTINEZ:  Objection.  Calls for yes or no answer.

16    THE COURT:  Just answer the question.

17    THE WITNESS:  Could you repeat the question?

18 BY MR. PATTERSON:

19    Q.   Did you at some point become aware that you

20 were no longer going to be a bridesmaid in the wedding?

21    A.   No.

22    Q.   Well, if -- nobody made you aware of that?

23    A.   No.

24    Q.   Okay.  Was there a time then when a change was

25 made and somebody else was a bridesmaid rather than you?

1       A.    No.

2       Q.    Okay.  Did you actually involve yourself in the

3   wedding?

4       A.    Yes.

5       Q.    And were you a bridesmaid?

6       A.    Yes.

7       Q.    Okay.  And tell me about that experience. What

8   did do you?

9       A.    I just participated in the wedding as a

10  bridesmaid, not a matron.

11      Q.    Okay.  Talking about wedding terminology, now.

12      A.    I'm sorry.

13      Q.    Let's go back.  At some point in time had you

14  intended or expected to be the maid of honor or matron of

15  honor?

16      A.    In my heart I thought I would be the matron of

17  honor.

18      Q.    Okay.  Was that decision ever communicated to

19  you that you would in fact be that person?

20      A.    No.

21      Q.    Okay.  The wedding happened, were you the maid

22  of honor or matron of honor?

23      A.    No.

24      Q.    Who was?

25      A.    Joe's sister Janay.

1        Q.    Okay.  You also participated in the wedding but

2   as a bridesmaid?

3        A.    That's correct.

4        Q.    Okay.  That's my mistake.

5              After the wedding did you have occasion to

6   socialize with Joe and Wendi?

7        A.    Yes.

8        Q.    Okay.  How frequently did that occur?

9        A.    Once.  I think it was once or twice during that

10  night.

11       Q.    Okay.  That was actually at the wedding?

12       A.    At the wedding, correct.

13       Q.    Talking about after the wedding, when they

14  moved into their home or townhome or apartment, did you

15  continue to socialize of a fashion with Joe and Wendi in

16  public?

17       A.    No.

18       Q.    Okay.  Were you eliminated or cutoff

19  completely?

20       A.    Yes.

21       Q.    Okay.  And why did you no longer socialize with

22  them?

23       MR. MARTINEZ:  Objection.  Speculation.

24       MR. PATTERSON:  I'm asking what her reasoning is.

25       THE COURT:  Overruled.  Go ahead, answer the

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000007980

 1    question.

 2         THE WITNESS:  I had -- I felt that she was, again,

 3    withdrawn, did not want me to be you know part of that family

 4    portion.

 5    BY MR. PATTERSON:

 6         Q.    Okay.  You didn't feel welcome in that

 7    environment?

 8         MR. MARTINEZ:  Objection.  Leading.

 9         THE COURT:  Sustained.  Don't lead.

10    BY MR. PATTERSON:

11         Q.    Did you feel welcomed in that environment?

12         A.    No.

13         Q.    Okay.  And that -- was that from Joe and Wendi

14    or just one or the other?

15         A.    Just Joe.

16         Q.    Okay.  Would Joe talk with you at times?  Did

17    you have occasion to be with both of them?

18         A.    No.

19         Q.    Okay.  Would he avoid you or socialize with you

20    in any fashion?

21         A.    It was as if I was not there.

22         Q.    Okay.  Did you nevertheless try to maintain

23    some kind of relationship with Wendi?

24         A.    Yes.

25         Q.    When would you go over to see Wendi?

1      A.    During my lunch hour.  Mostly that would be the

2  time.

3      Q.    Okay.

4      A.    My lunch hour.

5      Q.    Did you try to choose a time when Wendi would

6  be alone?

7      A.    Yes.

8      Q.    Okay.  And why did you do that?

9      A.    To avoid Joe.  I felt like he didn't want me

10  there.

11      Q.    Okay.  Did in fact the one time that you were

12  there, did Joe come home unexpectedly?

13      A.    Yes.

14      Q.    Okay.  And when did -- we did signify early

15  '94.  The relationship up to that point in time, when did

16  this -- this happen?

17      A.    This happened at the shop.

18      Q.    Okay.  So when they were living in the -- in

19  the resident next to the machine shop?

20      A.    That's correct.

21      Q.    Okay.  Do you recall the year of that

22  occurrence?

23      A.    It was probably '96.

24      Q.    Okay.  Had Nicolas been born at this point?

25      A.    Yes, he had.

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1          Q.    Do you know Nicolas' birthday?

2          A.    6/20.

3          Q.    Of?

4          A.    It's either '96 or '97.

5          Q.    Okay.  So it's subsequent to Nicolas' birth.

6   You could use his birthdate as the point in time when you

7   were witnessing this?

8          A.    Yes.

9          Q.    Okay.  What did you see Joe do?

10         A.    Storm in the room and basically say "Where the

11  fuck is my -- "

12         MR. MARTINEZ:  Objection.  Hearsay.

13         MR. PATTERSON:  Judge --

14         THE COURT:  Overruled.  Go ahead.

15         THE WITNESS:  "Where the fuck is my blue shirt? Why

16  don't you iron my fucking blue shirt?"

17  BY MR. PATTERSON:

18         Q.    Was Wendi present when he made those

19  statements?

20         A.    Yes.

21         Q.    Okay.  What did she do?

22         A.    She spun off out of the chair and followed him.

23         Q.    Okay.  Did the discussion or -- yeah,

24  discussion, dialogue between the two parties continue in the

25  back room there?


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1        A.    Yes.

2        Q.    Okay.  And you could hear that continuing from

3   your vantage point?

4        A.    Yes.

5        Q.    Okay.  At some point in time did Joe come out

6   wearing any particular item of apparel?

7        A.    Yes.

8        Q.    What was he wearing?

9        A.    A blue shirt.

10        Q.    Okay.  And did he remain there at that point in

11   time or did he leave?

12        A.    He left.

13        Q.    Okay.  Did Wendi come back out?

14        A.    She did.

15        Q.    What was her demeanor when she came back out?

16        A.    She was -- she had been crying.

17        Q.    Okay.  Was there another time when you went to

18   Las Vegas with Donna and Wendi?

19        A.    Yes.

20        Q.    Okay.  And what point in time was this?

21        A.    It was May of 2000.

22        Q.    Okay.  So it's about three years thereafter?

23        A.    Yes.

24        Q.    Okay.  In the intervening three years did you

25   have any significant contact on a social basis with Joe and

1    Wendi Andriano?

2             A.    No.   The only thing we had was my grandfather

3    was ill and in passing at the hospital.   That was it.

4             Q.    Okay.   Would you see Wendi periodically in that

5    intervening three-year period?

6             A.    No.

7             Q.    Okay.   So you'd been kind of -- you were no

8    longer associating with Joe and Wendi Andriano?

9             A.    Correct.

10            Q.    Okay.   At some point in time though you do go

11   to Las Vegas.   How did that happen that you were involved in

12   that?

13            A.    I was invited.   It was a girl's weekend out.

14            Q.    Who invited you?

15            A.    Donna and Wendi.

16            Q.    Okay.   Did you go over -- how did you get to

17   Las Vegas?

18            A.    They were already there and I flew in on Friday

19   night.

20            Q.    Okay.   So you met them after they'd already

21   arrived?

22            A.    Correct.

23            Q.    Okay.   And vacationed in Las Vegas?

24            A.    Yes.

25            Q.    Okay.   How long -- what duration was your stay

1    in Las Vegas?

2              A.    Two nights.

3              Q.    Okay.  During that period of time that you were

4    there, did you observe Wendi answering the phone

5    periodically?

6              A.    Yes.

7              Q.    How frequently would she be called to answer

8    the phone?

9              MR. MARTINEZ:  Objection.  Lack of foundation.  Which

10   day are we talking about?

11             THE COURT:  Overruled.  Answer the question.

12   BY MR. PATTERSON:

13             Q.    During the period of time you were in Las

14   Vegas?

15             A.    Mostly on Saturday and it was during the day

16   and it was the telephone in the hotel.

17             Q.    Okay.  How many calls did she receive that day?

18             A.    At least three.

19             Q.    Okay.  And the substance of the call, what did

20   Wendi do in response to those calls?

21             A.    She was angry after hanging up with him and

22   saying --

23             MR. MARTINEZ:  Objection.  Hearsay.

24             THE COURT:  Sustained.

25   / / / / /

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    BY MR. PATTERSON:

2            Q.    Well, what did she do in response to those

3    calls?

4            A.    She was angry that he was calling --

5            MR. MARTINEZ:  Objection.  Hearsay.

6            THE COURT:  Sustained.  Just answer question that's

7    asked for.

8    BY MR. PATTERSON:

9            Q.    She was upset by the --

10           MR. MARTINEZ:  Objection.  Leading.

11           THE COURT:  Sustained.

12           MR. MARTINEZ:  She said she was angry.

13           THE COURT:  Sustained.  Rephrase the question.

14   BY MR. PATTERSON:

15           Q.    Was she upset by the call?

16           A.    Yes.

17           Q.    Did she throw anything as a result of those

18   calls?

19           MR. MARTINEZ:  Objection.  Leading.

20           THE COURT:  Overruled.

21           THE WITNESS:  No.

22   BY MR. PATTERSON:

23           Q.    Okay.  Did you cut short your trip in Las

24   Vegas?

25           A.    No.

```
 1          Q.    Okay.  Did you change your travel plans in any

 2   fashion?

 3          A.    No.

 4          Q.    Did you return to Phoenix, Arizona, consistent

 5   with the plans that had been made prior to your departure?

 6          A.    Yes.

 7          Q.    And who came back with you to Phoenix?

 8          A.    Both Donna and Wendi.

 9          Q.    All right.  Was there a problem with the return

10   flight in some fashion?

11          A.    Yes.  We were 30 minutes late.

12          Q.    30 minutes late?

13          A.    Arriving 30 minutes late.

14          Q.    Did Wendi receive any telephone calls during

15   the period of time that you were driving back from Las Vegas?

16          A.    Not that I recall.

17          Q.    Okay.  When -- you got to Phoenix Sky Harbor by

18   airplane, right?

19          A.    Yes.

20          Q.    Okay.  What did you do when you first landed?

21          A.    She was on the phone.  Sorry, what did I do?

22          Q.    What did you do, yeah?

23          A.    We grabbed our luggage --

24          Q.    Okay.

25          A.    -- and went out to look for Joe.  He was
```

1    picking us up.

2          Q.    Okay.  Did Wendi use the phone to try to

3    contact anybody?

4          A.    Yes.

5          Q.    Okay.  Who was she intending to contact?

6          A.    She was trying to call Joe.

7          Q.    Okay.  Was she successful in getting hold of

8    Joe?  Did you see her involved in a conversation with

9    somebody?

10         A.    No.

11         Q.    Okay.  Got your bags, what did you do at that

12   point?

13         A.    Went to the curb and -- and was waiting for Joe

14   to pick us up.

15         Q.    Okay.  At some point did Joe arrive?

16         A.    Yes.

17         Q.    What was he driving?

18         A.    Tahoe.

19         Q.    Okay.  Tell me how he drove that vehicle in

20   your vicinity where you were standing with package -- with

21   your luggage?

22         A.    All I heard was wheels screeching, and when I

23   looked up it was Joe.

24         Q.    Okay.  And where had he -- had the vehicle come

25   to a stop?

1  A. Yes.

2  Q. In what lane?

3  A. It was the middle lane.

4  Q. The lane used for passing through travel?

5  A. Through travel.

6  Q. Okay.  What did he do at that point?

7  A. He got out of the truck.

8  Q. Okay.  And what did he do?

9  A. He approached us and said "Where the fuck have

10 you guys been?"

11  Q. Okay.  Was Wendi present when he was saying

12 these things?

13  A. Yes.

14  Q. Okay.  What was his demeanor?  What was his

15 tone?

16  A. He was pissed.

17  Q. Okay.

18  A. He was very angry, just wouldn't hear it.

19  Q. Okay.  What did he do at that point?

20  A. Grabbed something out of her hand, the luggage

21 and then proceeded to grab our stuff and pitch it into the

22 Tahoe.

23  Q. All right.  Were you frightened by his conduct

24 at that point?

25  A. Yes.

1         Q.      Okay.  Was all the luggage at some point put

2    into the Tahoe?

3         A.      Yes.

4         Q.      Okay.  And did you get into the vehicle?

5         A.      Yes, I did.

6         Q.      Where did you sit relative to the other people?

7         A.      Joe was driving, I sat behind him.

8         Q.      Okay.  And who was in the front seat?

9         A.      Wendi.

10        Q.      And who was in the back seat --

11        A.      Donna.

12        Q.      -- passenger side?

13                Okay.  Where did you go?

14        A.      To the apartment, Wendi's apartment, Wendi and

15   Joe's apartment.

16        Q.      Describe the trip up to that point where you

17   put the -- or he's put the luggage -- well, how did he put

18   the luggage in the vehicle?

19        A.      He threw them.

20        Q.      Okay.  Describe for me the trip from that point

21   in time, where you all ended up in the vehicle until you get

22   to the apartment.  Is it the San Riva apartments?

23        A.      Yes.

24        Q.      Okay.  Describe that trip for me?

25        A.      Dead silence in the truck and he was speeding

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    and cutting -- you know, weaving in and out of lanes.

2        Q.    Okay.  Were you frightened by his conduct?

3        A.    Yeah.

4        Q.    Okay.  Did he appear to be emotionally upset,

5    disturbed in any fashion?

6        A.    He was angry.

7        Q.    Okay.  What did you see that led you to that

8    conclusion?

9        A.    He wouldn't make any kind of conversation with

10   Wendi at all or us.

11       Q.    Okay.

12       A.    Just kept driving, looking straight ahead.

13       Q.    Okay.  Did you get a chance to examine the

14   speedometer at some point?

15       A.    Yeah.  I looked around the corner and he was

16   going about 110.

17       Q.    Okay.  Was there traffic on -- what route are

18   you taking, do you remember?

19       A.    I don't recall.

20       Q.    Was it freeway, travel surface --

21       A.    Interstate.

22       Q.    Okay.  Did he drop you off at some location?

23       A.    No.  We went to the apartment in the parking

24   lot.

25       Q.    Okay.  Did anything happen in the parking lot

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    that indicated he was still upset, still angry?

2            A.    Nothing.  He didn't say a word to us.

3            Q.    Okay.  Did somebody come and take you home at

4    some point?

5            A.    He and Donna loaded our stuff into the car.

6            Q.    And then you guys drove to Casa Grande?

7            A.    Yes.

8            Q.    Okay.  Okay.  Did you --

9            MR. PATTERSON:  Judge, that's all I have.  Thank you.

10           THE COURT:  Mr. Martinez?

11

12   CROSS-EXAMINATION BY MR. MARTINEZ:

13           Q.    You indicated that after you were dropped off

14   that you and the defendant's mother got into a car and left

15   to go to Casa Grande, right?

16           A.    Yes.

17           Q.    Got into the mother's Mazda, didn't you?

18           A.    Yes.

19           Q.    And you put your luggage in the trunk, right?

20           A.    Yes.

21           Q.    There was no problem opening that trunk, was

22   there?

23           A.    Not that I'm aware.

24           Q.    You were there, weren't you?

25           A.    Yes.

```
 1        Q.    So you saw her put the key in the trunk, right?

 2        A.    Yes.

 3        Q.    You saw her open the trunk, right?

 4        A.    Yes.

 5        Q.    And you put your luggage in it, right?

 6        A.    Yes.

 7        Q.    And she put her luggage in it, right?

 8        A.    Yes.

 9        Q.    There were no baby seats in there, were there,

10   in the car?

11        A.    There may have been babyseats in the car.

12        Q.    So even though you were -- you're not sure

13   whether there was or wasn't?

14        A.    No, I'm not sure.

15        Q.    Okay.  And then the two of you got into that

16   car and went to Casa Grande, right?

17        A.    Yes.

18        Q.    Did she drop you off at your house or did she

19   go to her house first?

20        A.    Dropped me off at my -- at her house.  My car

21   was there.

22        Q.    In other words, you drove from your house over

23   to Donna Ochoa's house, right?

24        A.    That's correct.

25        Q.    That's on Park, right?
```

1          A.    Correct.

2          Q.    The whole trip took you no more than about 35

3    or 40 minutes?

4          A.    From Casa -- from Phoenix to Casa Grande?

5          Q.    From the San Riva apartment complex, right.

6          A.    Yes.

7          Q.    So it took 35 to 40 minutes, right?

8          A.    Yes.

9          Q.    And she was driving the speed limit, wasn't

10   she?

11         A.    Yes.

12         Q.    It wasn't like she was speeding or anything

13   like that?

14         A.    No.

15         Q.    With regard to the Las Vegas excursion, you

16   indicated that while you guys were in Las Vegas, the

17   defendant received a total of three calls, right?

18         A.    Yes.

19         Q.    And it was a total of three calls including

20   calls to the hotel room and to her cell phone, right?

21         A.    Yes.

22         Q.    And that was for the full Friday through

23   Sunday, right?

24         MR. PATTERSON:  That misstates her testimony, Judge.

25   What she observed.

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

000007995

```
 1              THE COURT:  Right.  Just what you observed.

 2              THE WITNESS:  That's what I observed.

 3              MR. MARTINEZ:  Right.  That's all I'm asking about.

 4    BY MR. MARTINEZ:

 5         Q.   From Friday to Sunday when you got back, there

 6    were only a total of three calls, right?

 7              MR. PATTERSON:  That she observed, Your Honor.

 8              THE COURT:  That you observed.  Is that correct?

 9              THE WITNESS:  That I observed.

10    BY MR. MARTINEZ:

11         Q.   Everything I'm asking you is what you observed,

12    okay?  If I ask your name or ask you what courtroom this is,

13    it's what you observed.  Do you understand?

14         A.   Yes.

15              MR. PATTERSON:  Objection.  Argumentative.

16              THE COURT:  Let's move on.

17    BY MR. MARTINEZ:

18         Q.   So there were only three calls, right?

19              MR. PATTERSON:  Asked and answered.

20              THE COURT:  Sustained.

21              MR. PATTERSON:  As she observed.

22              THE COURT:  Move on.

23    BY MR. MARTINEZ:

24         Q.   With regard to those three calls, were they

25    bunched together or were they spread out?  When were they?
```

1       A.      They were sporadic.

2       Q.      Okay.  When was the first one?

3       A.      Saturday morning.

4       Q.      Okay.  When was the next one?

5       A.      It would have to be late afternoon.

6       Q.      Saturday?

7       A.      Saturday.

8       Q.      And then the third one?

9       A.      Evening.

10      Q.      Saturday evening?

11      A.      Saturday evening.

12      Q.      And there were no calls on Sunday, right?

13      A.      Not that I recall.

14      Q.      I'm only asking what you recall.  And there

15  were no calls on Friday, right?

16      A.      No.

17      Q.      And after the first call on Saturday morning,

18  you indicated that after getting off the phone the defendant

19  was angry, right?

20      A.      Yes.

21      Q.      And how long was she speaking on the phone?

22      A.      No more than 10 minutes.

23      Q.      Okay.  And after that, was that when she was in

24  the hotel room or walking around?  Or where were you guys?

25      A.      Hotel.

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1          Q.     Okay.  And after that you did notice that she
2     was angry, right?
3          A.     Yes.
4          Q.     And after the one in the afternoon, how long
5     did that last?
6          A.     Like two, three minutes.
7          Q.     Very quick?
8          A.     Yes.
9          Q.     And she was angry after that one, too?
10         A.     Yes.
11         Q.     And finally there's the one at night, right?
12         A.     Yes.
13         Q.     And the one at night, how long did that last?
14         A.     That was very quick.  It was like two, three
15     minutes.
16         Q.     Just like the previous one?
17         A.     Yes.
18         Q.     And she was also angry after that one, right?
19         A.     Yes.
20         Q.     You indicated that you and she used to hang out
21     in a small bar that's out in Casa Grande, right?
22         A.     Yes.
23         Q.     And is that Spirits?
24         A.     No.
25         Q.     Which bar is it?

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1          A.     The one in Casa Grande?

2          Q.     The one that you and she used to hang out when

3     you were 19 years old.

4          A.     Spirit.

5          Q.     So that was Spirits?

6          A.     Yes, I'm sorry.

7          Q.     Right.

8          A.     Sorry.

9          Q.     And although -- was it a bar or was it like a

10    pizza place?

11         A.     It was both.  It has a restaurant in the front.

12         Q.     And you guys would go there for lunch during --

13    this was before she was married, right?

14         A.     That's correct.

15         Q.     You guys would go there for lunch, right?

16         A.     No.  The first -- when I talked about the lunch

17    was a different bar in Casa Grande.

18         Q.     Okay.  What bar was that?

19         A.     I don't remember the name.

20         Q.     Okay.  But then you and she would go to Spirits

21    then, right?

22         A.     Yes.

23         Q.     When you guys went to Spirits, would that be at

24    night?

25         A.     Yes.

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1    Q.    And there was alcohol that was being --

2    A.    Yes.

3    Q.    And you partook of that, right?

4    A.    Yes.

5    Q.    Were you driving also?

6    A.    Not always.

7    Q.    But sometimes you were, right?

8    A.    Yes.

9    Q.    And was the defendant drinking?

10   A.    Yes.

11   Q.    And how many times would you say that you and

12   she went to Spirits bar?

13   A.    In a nine-month period, every other weekend.

14   Q.    You indicated that when she was dating you were

15   familiar with her dating somebody by the name of Shawn King,

16   right?

17   A.    Yes.

18   Q.    And you indicated that you guys were pretty

19   close, right?

20   A.    Yes.

21   Q.    And did you know her to ever go out with

22   somebody by the name of Didos Gamez?

23   A.    Yes.

24   Q.    How about Pete Munoz.  She also went out with

25   him too, didn't she?

1      A.    No.  I don't recall him.

2      Q.    How about Vernon Barnes.  She also went out

3   with him?

4      A.    No.

5      Q.    Not that you know?

6      A.    Not that I know.

7      Q.    The only one you know of was Didos Gamez,

8   right?

9      A.    Yes.

10      Q.    Okay.  Have you ever sped on the freeway

11   before?

12      A.    Yes.

13      Q.    And how fast have you driven?

14      A.    About 85.

15      Q.    Okay.  And the defendant is your best friend,

16   right?

17      A.    Yes.

18      Q.    And at least she was back then, right?

19      A.    Yes.

20      Q.    And in terms of this being the maid of honor,

21   all that stuff, that was never actually -- that honor was

22   never actually requested of you, was it?

23      A.    No.

24      Q.    It was something you felt probably would be a

25   good thing, right?

1     A.    Yeah.

2     Q.    And you also told us a little bit about the

3   trip home from Las Vegas.  He didn't -- Mr. Andriano didn't

4   say a word, right?

5     A.    No.

6     Q.    Except for the comment that he made when you

7   guys got there, he didn't continuously curse on the way home,

8   did he?

9     A.    No, not that I recall.

10    Q.    He didn't -- according to you previously, he

11  didn't say a thing, right?

12    A.    No.

13    Q.    When he got to the apartments, he didn't say a

14  thing to her either, right?

15    A.    To --

16    Q.    Mrs. Andriano.

17    A.    No.

18    Q.    In fact he just got the luggage and went on

19  inside, right?

20    A.    Yes.

21    Q.    They weren't fighting as they walked in, right?

22    A.    Not that I saw.

23    Q.    He wasn't saying anything, right?

24    A.    Right.

25    Q.    You did indicate to us that he -- one of the

1    things that you learned when you were at the 91st Psalm or

2    Harvest Family Church was that the woman's role was to take

3    care of the spouse, right?

4            A.    Yes.

5            Q.    That would not include having affairs, right?

6            A.    No.

7            MR. MARTINEZ:  Thank you.  Nothing further.

8            THE COURT:  Mr. Patterson?

9            MR. PATTERSON:  Thank you, Judge.

10

11    REDIRECT EXAMINATION BY MR. PATTERSON:

12           Q.    Did you indicate to us that you've actually

13    sped or speeded on the highway before?

14           A.    Yes.

15           Q.    Have you ever gone 110 miles per hour and

16    jeopardizing the welfare of passengers with you?

17           MR. MARTINEZ:  Objection.  That's assuming he was

18    jeopardizing the welfare.

19           THE COURT:  Sustained.  Rephrase the question.

20    BY MR. PATTERSON:

21           Q.    Did you ever go 110 miles an hour?

22           A.    No.

23           Q.    Did you ever go 110 with three other people in

24    your vehicle?

25           A.    No.


TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1        Q.    Okay.  Did you ever drive or speed in your car

2  because you were angry?

3        A.    Yes.

4        Q.    Okay.  And is this what you observed apparently

5  on that night when you came back from Las Vegas?

6        A.    Yes.

7        MR. PATTERSON:  Thank you, Judge.  That's all I have.

8        THE COURT:  Any further questions of this witness by

9  the jury?  If so, please raise your hand.

10        (No response.)

11        THE COURT:  No one has raised their hand.

12        May this witness be excused?

13        MR. MARTINEZ:  Yes, sir.

14        MR. PATTERSON:  No objection.

15        THE COURT:  You're excused.  Thank you very much.

16        Okay.  We'll go ahead and take our evening and

17  weekend recess at this point in time, ladies and gentlemen.

18  During the weekend recess remember the entire admonition I've

19  given you including the fact you're not to discuss this case

20  with anyone, do not let anyone discuss the case with you.  Do

21  not do any research, experimentation or testing on your own.

22  Avoid any media coverage on this case.  Keep an open mind.

23        I want to you have a nice weekend.  We'll see

24  everyone on Monday at 1:00.  Have a nice weekend.  We'll be

25  in recess.

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

1
2      (Evening recess.)
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

```
 1

 2

 3                    CERTIFICATE OF REPORTER

 4

 5    STATE OF ARIZONA     )
                           )
 6    COUNTY OF MARICOPA   )

 7

 8                    I, Traci L. Wheeler, CSR, RPR, an official

 9    and certified reporter in the Superior Court of the State

10    of Arizona, in and for the County of Maricopa, hereby

11    certify that I made a shorthand record of the proceedings

12    had in the within case, and that the foregoing transcript

13    is a full, true, and correct transcription of the

14    proceedings in this case.

15                    Dated this 5th day of June, 2005.

16

17

18                    _____
                      Traci L. Wheeler, CSR, RPR
19                    Certified Court Reporter No. 50313
                      Official Court Reporter
20

21

22

23

24

25
```

TRACI L. WHEELER, CERTIFIED COURT REPORTER, CSR, RPR

# EXHIBIT TT





IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

IN AND FOR THE COUNTY OF MARICOPA

STATE OF ARIZONA,         )
                            )
            Plaintiff,    )
                            )    No. CR2000-096032
     vs.                    )        CR05 0005-AP
                            )
WENDI ELIZABETH ANDRIANO,     )
                            )
           Defendant.   )
_____)

BEFORE:  THE HONORABLE BRIAN K. ISHIKAWA

Mesa, Arizona
November 10, 2004

REPORTER'S TRANSCRIPT OF PROCEEDINGS
(Trial)

COPY

SHARON FLORES
CERTIFIED COURT REPORTER
50374

2

```
1
2
3                    A P P E A R A N C E S
4
5
6
7      For the State:
8                         Mr. Juan M. Martinez
9                         Deputy County Attorney
10
11
12
13
14      For the Defense:
15                         Mr. Daniel B. Patterson
16                         Mr. G. David Delozier, Jr.
17                         Office of the Public Defender
18
19
20
21
22
23
24
25
```

3

1

2

3                              I N D E X

4    WITNESSES:                                          PAGE

5

6    MICHAEL BRADLEY BAYLESS, Ph.D

7       Direct Examination by Mr. Martinez             9

8       Cross-Examination by Mr. Patterson            41

9       Redirect Examination by Mr. Martinez          86

10      Examination by the Court                     103

11      Further Redirect Examination by Mr. Martinez  107

12      Recross Examination by Mr. Patterson         109

13

14   JUSTIN ROBERTS

15      Direct Examination by Mr. Martinez           113

16      Cross-Examination by Mr. Delozier            125

17      Redirect Examination by Mr. Martinez         131

18

19   JOSEPH C. ANDRIANO, SR.

20      Direct Examination by Mr. Martinez           133

21

22

23

24

25

4

1
2                          E X H I B I T S
3
4          (Exhibits were marked prior to trial unless
5    indicated.)
6
7    NUMBER:          DESCRIPTION          MARKED    ADMITTED
8    471              Document                         112
9    472              Document                         112
10   473              Document                         112
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

1                    P R O C E E D I N G S

2

3            THE COURT:  This is trial in Cause Number

4    CR2000-096032, State of Arizona versus Wendi Elizabeth

5    Andriano.

6            The record will reflect the presence of the

7    defendant and counsel.  We're outside the presence of the

8    jury.  Also, Dr. Michael Bayless is present.

9            For the record, I heard argument yesterday with

10   regard to the defendant's motion to preclude the testimony

11   of Dr. Bayless.  I took it under advisement.  I indicated

12   to counsel I would notify counsel first thing this morning

13   about the Court's ruling so that counsel could prepare for

14   this afternoon.

15           And in light of that, I had my judicial assistant

16   call Mr. Patterson and Mr. Martinez.  This is informally.

17   This morning I had a telephonic conference with counsel, I

18   believe it was close to 8:30 this morning, before my

19   morning calendar, and I notified them of my ruling so they

20   could prepare for this afternoon.  And then right now in

21   chambers we had another informal conference to make sure

22   everyone understood what the Court's ruling is.  Both sides

23   agreed.

24           So I'll go ahead and place the ruling on the

25   record at this time with Dr. Bayless present.

6

1          It is ordered denying the defendant's motion to

2     preclude testimony of Dr. Michael Bayless.

3          It is ordered that the State may elicit testimony

4     from Dr. Bayless in the following areas:  His opinion on

5     whether the defendant's characteristics are consistent with

6     those of domestic violence victims.

7          What the characteristics of a person who has been

8     the victim of domestic violence are, secondary gain and the

9     tests conducted by both Dr. Bayless and Dr. Murphy.

10          It is ordered precluding the State from eliciting

11     testimony from Dr. Bayless relating to, one, whether

12     Dr. Bayless believes the defendant or whether he has an

13     opinion as to whether the defendant is credible or

14     truthful.  And I note page 7 of his report in that regard.

15          Also, Dr. Bayless is precluded from basically

16     repeating the information that he has set forth in his

17     report related to police reports that he reviewed.

18          Also, it is ordered precluding the State from

19     eliciting testimony from Dr. Bayless with regard to the

20     allegation of the defendant committing a theft from her

21     employer.  And I reference page 4 of the report on that.

22          Also, it is ordered the State is precluded from

23     eliciting testimony from Dr. Bayless regarding the fact

24     that the defendant is in jail.

25          Also, the issue of the children, severance of

1   parental rights, both of those issues, the jail and the

2   parental rights are noted on page 3 of the report.

3            Also, the State would be precluded from eliciting

4   testimony from Dr. Bayless related to the defendant's

5   alleged suicidal thoughts and alleged suicide attempt which

6   is referenced on page 3 of the report.

7            And also, the State is precluded from eliciting

8   from Dr. Bayless relating to a general discussion on the

9   bottom of page 7 and the top of page 8 about a profile of

10  this type characterized by poorly controlled anger and

11  hostility and violent outbursts and the fact they would

12  have to be incarcerated, something to that effect.  But

13  that general discussion on the bottom of the page 7 and

14  page 8.

15           Any questions from Mr. Martinez?

16           MR. MARTINEZ:  No, sir.

17           THE COURT:  From Mr. Patterson?

18           MR. PATTERSON:  No, Your Honor.  Thank you.

19           THE COURT:  Dr. Bayless is present.  Do you have

20  any questions about the Court's ruling, Dr. Bayless?

21           DR. BAYLESS:  No, sir.

22           THE COURT:  Then I would just urge everyone, so

23  we can keep this case moving efficiently, if we just have

24  the question and then we have Dr. Bayless answer the

25  question that's asked.  Okay.

1       Ready for the jury?

2       MR. PATTERSON:  Yes sir.

3       MR. MARTINEZ:  Yes.

4       (Juror entered.)

5       THE COURT:  Please be seated.  Good afternoon,

6   ladies and gentlemen.  This is the trial in Cause Number

7   CR2000-096032, State of Arizona versus Wendi Elizabeth

8   Andriano.

9       The record will reflect the presence of the

10  defendant, counsel and the jury.

11      Mr. Martinez.

12      MR. MARTINEZ:  State calls Michael Bradley

13  Bayless.

14      THE COURT:  Sir, please see the clerk.  Give your

15  name to the clerk and she will swear you in.

16      (Witness sworn.)

17      THE COURT:  Sir, please have a seat on the

18  witness stand.  Sir, if you would please make yourself

19  comfortable there on the witness stand.  Pull the

20  microphone close to you.  Please remember to speak loudly

21  and clearly into the microphone so everyone can hear.

22  Please wait until the question is completed before you

23  answer the question.  And please make sure you give a

24  verbal response.

25      Is that agreeable to you, sir?

1          THE WITNESS:  Yes, sir.

2          THE COURT:  Mr. Martinez, you may proceed.

3

4              MICHAEL BRADLEY BAYLESS, Ph.D,

5    called as a witness herein, having been first duly sworn,

6    was examined and testified as follows:

7

8                    DIRECT EXAMINATION

9    BY MR. MARTINEZ:

10     Q.   May I have your name, sir?

11     A.   Michael Brad Bayless.

12     Q.   And where is it that you work or what is your

13   area of expertise?

14     A.   I'm a psychologist.  I have an office at 3620

15   North Third Street in Phoenix, Arizona.

16     Q.   And how long have you been a psychologist?

17     A.   Well, I started out in practice in 1978, that's

18   28 years.

19     Q.   Do you have a Bachelor of Science or Bachelor of

20   Arts?

21     A.   A Bachelor of Science degree.

22     Q.   What year did you receive that?

23     A.   1970.

24     Q.   What institution granted you that degree?

25     A.   From Northern Arizona University.

1     Q.    In what field?

2     A.    Psychology.

3     Q.    Do you have a master's?

4     A.    Yes, I do.

5     Q.    In what area?

6     A.    In Psychology.

7     Q.    What year did you receive that?

8     A.    1972.

9     Q.    From what college or institution did you receive

10    that?

11    A.    That was also from Northern Arizona University.

12    Q.    Additionally, do you have a Ph.D.?

13    A.    Yes.

14    Q.    What is your Ph.D. in?

15    A.    Psychology.

16    Q.    What year did you receive that?

17    A.    It was conferred in 1977.  I actually graduated

18    in '76 but conferred in '77.

19    Q.    From where?

20    A.    Arizona State University.

21    Q.    We've heard the terms "psychologist" and

22    "psychiatrist."  What is the difference between a

23    psychologist and a psychiatrist?

24    A.    A psychologist -- well, let me back up.  A

25    psychologist has a Ph.D.  A psychiatrist is an M. D.  A

1  psychiatrist goes to school four years and pre-med.  Then

2  they do another four years in medical school and become an

3  M.D.  Then they don't typically, I think now, three years

4  of residency in psychology and go in the field of

5  psychiatry.  They can prescribe medication.

6          A psychologist goes to school four years, an

7  undergraduate in psychology about two years for their

8  master's degree in psychology.  Another four years for

9  their doctoral degree in psychology, a year internship and

10  typically a year residency.  Then they sit for the boards.

11  They also may do a fellowship or post-doctorate.

12      Q.  You indicated that you -- that your Ph.D degree

13  was conferred in 1977?

14      A.  Yes.

15      Q.  And after 1977, what areas did you begin to

16  practice in?

17      A.  Initially, I was -- my mentor in one of my

18  clinical directors was Myer Tuckler and Otto Binheim who

19  were two forensic psychiatrists.  I studied with Myer post

20  doctorate.  I went into private practice initially and

21  worked with Myer also for a couple years.  I studied in the

22  area of forensic psychology.  From that point forward, I

23  was in private practice in psychology.

24      Q.  You indicated that your area, the majority area

25  for 27 or 28 years has been forensic psychology, correct?

1      A.   Yes.

2      Q.   What does "forensic psychology" mean?  What is

3  that area that you trained and practice in?

4      A.   Forensic psychology is a marriage between

5  psychology and law.   Forensic -- when most people hear

6  "forensic" they think Quincy on TV because he was a

7  forensic pathologist.   He was a coroner, basically.

8         A forensic psychologist, "forensic" actually

9  means investigative.   The marriage between psychology and

10  law.  What a forensic psychologist does, there's a number

11  of different areas of expertise.   One would be to provide

12  information to the court pursuant to whether or not an

13  individual, for example, is competent to stand trial or

14  not.

15         A psychologist also, for example, a forensic

16  psychologist may also provide information to the Court in

17  regards to mitigation or aggravation hearings which is Rule

18  26.5.

19         They may also do insanity trials as to whether or

20  not what was the mental status of the individual at the

21  time they committed an offense.

22         They may also work with the police and law

23  enforcement officials.   They may do profiling.   They may do

24  psychological autopsies as to, typically with insurance

25  companies, whether or not an individual committed suicide

1   or not or had the potential to do so.

2        We also do personal injury cases in which an

3   individual claims they have an injury or psychological

4   injury secondary to some type of accident or employment

5   issue or whatever.   A person gets hurt on the job or gets

6   hurt in a car accident and now has psychological problems

7   secondary to that depression or whatever.   We make a

8   determination as to whether or not that is, in fact, true.

9        The psychologist is basically, for example, a

10  forensic psychologist is basically a friend to the court,

11  persons who provide information to the court to allow the

12  court to better make an informed decision.

13      Q.   Now, I take it that you own your own business?

14      A.   Yes.   I've owned my own business since '77, yes.

15      Q.   How many people work for you in that business?

16      A.   I just did payroll today.   I have 23 employees.

17      Q.   Do any of them have a Ph.D.?

18      A.   Yes.

19      Q.   How many of your employees have Ph.D.s?

20      A.   Four.

21      Q.   Do you, as part of your business, also have a

22  clinic that you run?

23      A.   Yes.

24      Q.   And describe a little bit for me about that

25  clinic?

1      A.    We have a child and adolescent and adult clinic

2   that provides psychological services to families within the

3   Phoenix metropolitan area.   Currently we have approximately

4   600 families in my clinic that we provide services to.

5           We have -- I have two psychiatrists that work for

6   me that provide medication and also treatment, four

7   psychologists and a number of master's level therapists who

8   have expertise in certain areas.   We provide a wide range

9   of services to, again, to children, adolescents and adults

10  stemming from attention hyperactivity disorder, kids who

11  have developmental disorders or DDD kids, to adults who

12  suffer from a variety of problems.

13      Q.    And those adults that your clinic treats, do they

14  include women who have been the subject of domestic

15  violence and are dealing with the problems associated with

16  that?

17      A.    Yes, that happens.

18      Q.    And how long have you had this clinic where these

19  adults who have been treated for this affliction have been

20  seen?

21           MR. PATTERSON:   Wait, wait.   Object to the form

22  of the question.

23           THE COURT:   Sustained.

24           Rephrase the question.

25      Q.    BY MR. MARTINEZ:   How long have you had this

1   clinic where women -- where women that have been the

2   subject of domestic violence have been attending?

3      A.   Wow.  Well, I've had a clinic since '77.  I can't

4   say when the first client came through that had, that

5   domestic violence was an issue.  We've done a lot of cases

6   in which -- I used to do a number of cases in domestic

7   relations in which there were a number of cases that I was

8   involved with.

9      Q.   Just in regard to these women that have been

10   involved with domestic violence, have you worked with some

11   of them directly?

12      A.   Yes.

13      Q.   With regard to those women that have been

14   involved in domestic violence, have some of your

15   psychologists also worked with them?

16      A.   Yes.

17      Q.   And those psychologists that have worked with

18   them, did they discuss the treatment plan and symptoms and

19   what is going on with that particular patient?

20      A.   With me?

21      Q.   Yes.

22      A.   Yes.  Every case that comes through our office we

23   have a staffing every morning.  We staff every case that

24   comes through our office and attempt to provide support and

25   supervision with all of the cases that's at the office.

1      Q.   However, do you also have some on-hand (sic)

2   approach with regard to some, not all, of the women that

3   may be involved or have issues involving domestic violence?

4      A.   Yes.

5      Q.   And this is a clinic that you've had since 1977,

6   correct?

7      A.   Yes.

8      Q.   One of the things that you told us was that,

9   again, since 1977, you've been involved in your field and

10   the court, correct?

11      A.   Yes, sir.

12      Q.   And one of the things, have you had occasion to

13   interview many defendants associated with the court system?

14      A.   Yes, sir.

15      Q.   And are you familiar with the term "secondary

16   gain?"

17      A.   Yes.

18      Q.   By the way, have you ever testified in Superior

19   Court?

20      A.   I believe --

21          MR. PATTERSON:  Calls for yes or no.

22          THE WITNESS:  Yes, I have.

23      Q.   BY MR. MARTINEZ:  How many times can you estimate

24   that you testified in Superior Court?

25      A.   That's what I was trying to figure out.  Hundreds

1  of times.

2      Q.   And to get back to the point that we were

3  making.  "Secondary gain," are you familiar with that term?

4      A.   Yes.

5      Q.   What does that mean?

6      A.   Secondary gain is when there is some type of

7  reward, a secondary reward behind some type of behavior

8  that you do.  I mean, there's all kinds of secondary gain.

9           We go to work and we get paid.  The getting paid

10  is secondary gain.  You go to work for a particular

11  purpose.  You know, we all love our jobs and everything but

12  we also work to get paid.  And so, as part of us going to

13  work, the secondary gain factor there would be simply

14  getting a pay check.

15           In a criminal setting or in a personal injury

16  setting, individuals may say something is going on with

17  them for the purpose of secondary gain, either monetary

18  gain, sympathy, can be a number of different reasons why

19  people do things.

20      Q.   And that's with regard to the interviews that you

21  may have with the individuals involved vis-a-vis the court

22  system?

23      A.   Yes.

24      Q.   Now, in this particular case --

25           THE WITNESS:  Can I turn my phone off?

1          THE COURT:  Yes.

2          THE WITNESS:  I didn't want to do it while we

3    were talking.  I apologize, Your Honor.

4          Q.   BY MR. MARTINEZ:  In this particular case, were

5    you contacted with regard to an individual by the name of

6    Wendi Elizabeth Andriano?

7          A.   Did I?

8          Q.   Were you contacted on or asked to do something

9    with regard to an individual by the name of Wendi Elizabeth

10   Andriano?

11         A.   Yes.

12         Q.   Is she in court today?

13         A.   Yes.

14         Q.   Tell me where she's seated, what she is wearing?

15         A.   To my right, Mr. Martinez.  She's wearing a

16   white, look's like a white sweater with a pink blouse

17   underneath with white pearls.

18         MR. MARTINEZ:  May the record reflect the witness

19   identified the defendant?

20         THE COURT:  The record may reflect identification

21   of the defendant by the witness.

22         Q.   BY MR. MARTINEZ:  And with regard to whatever it

23   was that you were asked to do, you were provided certain

24   materials that you reviewed, correct?

25         A.   That is correct.

1   Q.   You reviewed police reports, right?

2   A.   Yes, sir.

3   Q.   You also reviewed some photographs, right?

4   A.   Yes, sir.

5   Q.   You also reviewed a report from the medical

6   examiners office?

7   A.   Yes, sir.

8   Q.   And you reviewed a report from somebody by the

9   name of Sharon Murphy; is that correct?

10   A.   Yes.

11   Q.   You also reviewed the tests that Sharon Murphy

12   administered to Wendi Elizabeth Andriano, correct?

13   A.   I reviewed her evaluation and the information

14   which she put in that evaluation, yes.

15   Q.   And with regard to, again, this defendant, there

16   were certain things that you did, correct?

17   A.   That's correct.

18   Q.   You had a meeting with her, right?

19   A.   Yes, sir.

20   Q.   And --

21   A.   Twice.

22   Q.   How long total, how long did the meetings take?

23   A.   My first meeting with her was on 4/20 and it was

24   for approximately two hours.  And the second meeting I had

25   with her was on 5/20 and it was about three hours.

1      Q.   As part of this meeting with her on two

2  occasions, did you conduct a so-called clinical interview?

3      A.   Yes, sir.

4      Q.   What is a clinical interview?  My understanding

5  is that's just a fancy word for you sitting there talking

6  and asking questions of the individual?

7      A.   Well, it's a structured interview format.  But,

8  basically, that's true.  I sit there and ask specific

9  questions concerning the various areas of her history,

10  background, medical history and psychological history and

11  so forth.

12      Q.   With regard to this particular case and the

13  defendant, your clinical interview, I believe, lasted from

14  two to three hours?

15      A.   That's correct.

16      Q.   But you also had Sharon Murphy's report that had

17  20 hours of clinical interview, right?

18      A.   Yes, that's correct.

19      Q.   Additionally, did you administer any tests to the

20  defendant that are accepted in the psychological field in

21  this type of a situation?

22      A.   Yes, sir.

23      Q.   And what tests were those that you administered?

24      A.   I administered the Shipley Institute of Living

25  Scale, Williamson Sentence Completion Test and the

1   Minnesota Multiphasic Personality Inventory, Second

2   Edition.

3       Q.   Let's start with the last one first.   That's also

4   known as the MMPI II, correct?

5       A.   That's correct.

6       Q.   And how many questions are associated with the

7   MMPI II?

8       A.   567.

9       Q.   With regard to these questions, are they the kind

10  of questions that the answer is clearly obvious or is it

11  some other sort of test?

12      A.   It's an objective personality test.   The answers

13  are not obvious.   As a matter of fact, many of the

14  questions may seem very silly and out of context.   People

15  may say, "What does this have to do with anything."   You

16  cannot anticipate or -- it's a very difficult test to

17  anticipate what direction you want to answer questions, so

18  this is the reason it's an objective test.

19      Q.   Are you familiar with the term "norm?"

20      A.   Yes.

21      Q.   What does that mean?

22      A.   The norm is when you have a control group and the

23  information is normed on a certain particular control group

24  or it's validated on a particular control group.

25      Q.   And is the MMPI II normed?

1     A.   Oh, yeah.   Yes.

2     Q.   Just as an example, are you familiar with the

3  Power and Control Wheel?

4     A.   Yes.

5     Q.   Has that Power and Control Wheel ever been

6  normed?

7     A.   No, not as a test.

8     Q.   And so to get back to the MMPI, what are the

9  things that the MMPI does?   I mean, what is it supposed to

10  do?   What does it tell you?

11     A.   The MMPI is, again, one of the most widely used,

12  probably one of the most highly researched of all

13  psychological instruments psychologists have in their war

14  chest of tests.

15          The MMPI is to measure and to give information

16  about an individual's personality and emotional

17  functioning.   There are basically other validity indicators

18  but basically three validity scales on the MMPI.   We have

19  some new ones which are consistency indicators as well as

20  what we called FB and also PS which is two other validity

21  indicators indicating whether or not an individual tried to

22  fake the test.

23          The LFK stands for lying, faking, defensiveness.

24  Tells whether or not an individual is trying to make

25  themselves look unusually virtuous, whether or not they're

1   trying to fake good or fake bad on the test, or whether or

2   not they're trying to be overly defensive and did not

3   answer in a forthright manner.

4           From there you have ten clinical scales on the

5   MMPI ranging from one, Hypochondriasis; two, Depression;

6   three, Hysteria; four, Psychopathic Deviancy; five,

7   Masculine-Feminine behavior; six, Paranoia; seven,

8   Psychiasthemia; eight is Schizophrenia; nine is Hypomania;

9   and ten is Social Introversion, Extraversion.

10          Those ten clinical scales along with a bunch of

11  supplemental scales, subjective scales underneath that will

12  tell you a little bit about why an individual acts in the

13  way they're acting.

14      Q.   With regard to this particular test that you've

15  been talking about and now specifically as applied to a

16  case where you were asked to consult on, do you go into

17  that case, for example, or into that request to review

18  materials and an individual, do you go into that case

19  already with a predisposition, for example, and say, "Well,

20  I'm going to look for domestic violence," or "I'm going to

21  look for paranoia or schizophrenia?"  Is that what you do

22  with regard to a case that has been referred to you?

23      A.   No.

24      Q.   And is that an acceptable procedure to go in with

25  a preconceived notion?

24

1     A.   No, that's very bad.

2     Q.   We talked about the MMPI and the number of items

3   that it talks about.  Is that a test, again, the MMPI is

4   that specifically geared to, for example, a schizophrenic?

5   Is that something that it's geared for?  Is it geared for

6   somebody who is depressed?  I mean, does that test -- is

7   that what its function is?

8     A.   No.

9     Q.   What is the function of the test?

10     A.   The function of the test is to, again, give

11   information about the personality and emotional function of

12   an individual.  If they have --

13     Q.   Whatever that may be?

14     A.   Right, whatever that may be, yeah.

15     Q.   Now, you also indicated that was an objective

16   test.  I'm going to talk to you about some of the tests

17   we've been privy to in this trial.  Exhibit 535, it's

18   called Assessing Dangerousness Questions.  I think it was

19   also called the Lethality Test.  Why don't you take a look

20   at it and see if you recognize it and whether or not you

21   reviewed it in connection with this case.

22            THE COURT:  What exhibit number was it?

23            THE WITNESS:  535.

24            THE COURT:  Thank you.

25            THE WITNESS:  Yes, I have seen it and I have

1   reviewed it.

2       Q.    BY MR. MARTINEZ:  Now, in terms, again, if we

3   compare it to the MMPI, this particular test, if you will,

4   that you have in front of you, is that one that suggests

5   answers, Exhibit Number 535?

6       A.    Yes.

7       Q.    Now, with regard to the MMPI, does that suggest

8   answers?

9       A.    No.

10      Q.    Give us the first question that may be on 535 and

11  then we'll discuss it without giving us the answer as to

12  why you think that that test suggests answers.

13      A.    The first question is:  Has the abuser ever

14  injured the victim so badly she needed medical attention.

15          Well, there's a lot of problems with that

16  question.

17      Q.    Tell me why?

18      A.    Well, one, you have to take into consideration,

19  again, secondary gain which we talked about earlier.  It

20  tells you exactly which direction, if you wanted to push it

21  in one direction or the other, you can skew that very

22  easily by simply saying yes or no.

23          Also, there was an assumption here that has the

24  abuser ever injured the victim so badly.  And then it's a

25  gender biased problem here, "she" needed medical

1  attention.  How do you know that the victim was a male or

2  female?

3          This is a face, what we call in psychology a

4  face-valid instrument.  This is not a test.  And to say

5  that this is a test is really inaccurate.  This is a

6  treatment form.  That's what this is.

7      Q.   When you say this is a treatment form, are you

8  telling us that this type of inquiry that you have in front

9  of you, or this type of -- it is an inquiry, with regard to

10  this type of inquiry, is this the inquiry that is made

11  after you already made the assessment, for example, that

12  the individual may or may not suffer from domestic

13  violence?

14      A.   Right.  You've already -- that's a foregone

15  conclusion.  You've already concluded or substantiated the

16  person is a victim.  And this would be an instrument that

17  would be used to gather further information from the

18  individual to develop treatment planning.

19      Q.   What is the second question, just so we can get,

20  on 535, so we can determine later what that's about?

21      A.   The second question says:  Does the abuser seem

22  preoccupied or obsessed with the victim, parenthesis,

23  following, monitoring her whereabouts, comma, stalking,

24  comma, very jealous, comma, et cetera, end of parenthesis,

25  question mark.

1        Q.    The rest of the questions that you have there,

2   are they along the same sort of gist where they seem to be

3   suggesting a general area and seem to, perhaps, be

4   suggesting the direction to go?

5        A.    Yes.

6        Q.    I want you to take a look at Exhibit 536, which

7   is called the Response to Violence Inventory.  I want you

8   to take a look at it.  Is that generally the same type of

9   test as Exhibit Number 535, which is the lethality index or

10  the assessing dangerousness questions?

11       A.    Yes.

12       Q.    Pick a question there and just read it to us

13  without reading us the answer to see what kinds of

14  questions are asked.

15       A.    "Seek protective injunction order" is number 3.

16  Number 4, "Seek divorce action."  It says here, "What

17  happened?  If not used, why not." Number 5, "Go to shelter.

18  What happened.  If not used, why not.  Seek help of a

19  mental health professional.  What happened.  If not used,

20  why not."

21       Q.    So, basically, that's, again, suggesting -- not

22  suggesting -- but it asks questions that seem to be pretty

23  obvious what direction you can go depending on the answer,

24  right?

25       A.    Correct.

1      Q.   And, again, is that type of test in Exhibit 535

2   one that is used to make the diagnosis or is that something

3   that is used as part of a treatment plan, perhaps for an

4   individual who already has been diagnosed with that

5   ailment?

6      A.   It clearly is one that's a treatment modality

7   instrument.  Even in the instructions it tells us, asks the

8   victim the frequency.  So there's an assumption of

9   victimology here.  So, the conclusion is that the person's

10   already a victim.

11          And so, this a treatment instrument.  This is not

12   a test.  This is not an objective -- it's not even a

13   suggestive test.  It's not a testing instrument.  It's a

14   treatment instrument.

15      Q.   Let me have you take a look at Exhibit 537, which

16   we've come to know as the Power and Control Wheel.  Please

17   took at it.

18      A.   (Witness complies.)

19      Q.   Are you familiar with what the Power and Control

20   wheel is?

21      A.   I am.

22      Q.   And, again, with regard to it, basically give us

23   one of the pieces of the pie -- we've already determined

24   that that's what it looks like -- and tell us what it says

25   there?

Case 2:16-cv-01159-SRB   Document 29-3   Filed 08/28/17   Page 304 of 828.

29

1       A.   "Treating her like a servant, making all the big

2   decisions, acting like a master of the castle."

3       Q.   Again, can you tell us why, in your opinion, that

4   is not a test that can be used to determine whether or not

5   a man or a woman is the victim of domestic violence?

6       A.   Well, again, treating her like a servant is a --

7   there is an assumption that the gender victim here is

8   female, number one.

9            Number two, again, this is very face valid.  I

10  mean, this is not a test.  This is information gathering.

11  This is something that you use to formulate after the fact,

12  after you've made a decision that there has been a victim

13  in this situation or a person of domestic violence.  And

14  you use this to gain information so that you can better,

15  again, provide a treatment approach that would be most

16  effective for the individual.

17      Q.   So, in other words, the diagnosis has already

18  been made and these are used so that the next course or

19  whatever the path may be that is appropriate for the person

20  is taken?

21      A.   Exactly.

22      Q.   Let's take a look at Exhibit 538.  That's called

23  Partner Abuse Scale, Non-physical.  Have you seen before

24  that type of printout?

25      A.   Yes.

1      Q.   And why don't you read so that we can note

2   basically what we have there.  Just read one of the entries

3   there without providing us the answer.

4      A.   "My partner belittles me.  My partner demands

5   obedience to his or her whims.  My partner becomes surly or

6   angry if I say he or she is drinking too much."

7      Q.   And with regard to those entries, do you see a

8   problem in determining whether or not a person, making

9   initial, if you will, making the initial opinion or

10   diagnosis, do you see a problem with that as a tool?

11      A.   Again, it's very face valid.  If an individual

12   wants to make themselves appear one way or the other, they

13   simply would just endorse the area as much as they could.

14   I mean, they would sit up and say, "Okay, yeah, this

15   happens most of the time."  And then the scale they have

16   here is one through seven.  None of the time is one and all

17   of the time is seven.  So the person would then give a

18   number of each one of these.  And so they can make

19   themselves look as though they've been abused when they

20   have not been.  Or they may make themselves look not abused

21   when they have been.  So either way.

22      Q.   There is a scale or a number that goes with it.

23   And we see it there.  What do you make of that?  I mean,

24   you can actually get a number out of that?

25      A.   Yes.

1     Q.   Does that lend any more validity to it as a test

2   to determine whether or not a person is a victim of

3   domestic violence?

4     A.   No, it doesn't.  And I thought --

5          MR. PATTERSON:  Judge, calls for yes or no.

6          THE COURT:  Ask your next question.

7     Q.   BY MR. MARTINEZ:  And the reason that it's no is

8   because, as you told us before, the person decides what

9   number they pick for the particular responses, right?

10    A.   That is correct.

11    Q.   I want you to take a look now at Exhibit 539,

12   it's the Partner Abuse Scale, Physical.  See if you're

13   familiar with that.

14    A.   Yes, I am.

15    Q.   And that's basically the same thing as the

16   Partner Abuse Scale, Non-physical, only that one is

17   physical, right?

18    A.   That's correct.

19    Q.   Everything you told us before with regard to the

20   non-physical applies to the physical, correct?

21    A.   That's correct.  That's true.

22    Q.   Specifically, a face-valid test, I think you

23   said, right?

24    A.   Right.

25    Q.   A person picks a number and they put it down next

32

1    to whatever one of the questions may be?

2        A.    Right.

3        Q.    Go ahead and pick a couple of questions and read

4    them to us so we know what sort of things they are being

5    asked?

6        A.    "My partner pushes and shoves me around violently.

7    My partner hits and punches my arms and body.   My partner

8    threatens me with a weapon."

9        Q.    And they pick a number from one to seven, right?

10       A.    Correct.

11       Q.    Now, with regards to Exhibit 540, this is known

12   as the Abusive Observation Checklist.   Take a look at

13   that.   It's Exhibit Number 540.

14             Are you familiar with that?

15       A.    Yes.

16       Q.    And what does it call for the person who is

17   filling it out to do?

18       A.    It calls for the person to fill out what, in

19   terms of physical abuse, for example, it says you "did to

20   you partner" and then the second box is "your partner did

21   to you"  and in the third box is "previous partner did to

22   you ever".

23       Q.    And, again, this test has sort of the same issues

24   that we talked about with the previous exhibits, correct?

25       A.    That's correct.

1    Q.   And that, again, it's a face-valid test, right?

2    A.   Yes.

3    Q.   Is that the same as saying it has a component of

4    secondary gain that must be considered?

5    A.   Well, it doesn't consider secondary gain.  What

6    should be understood here is that when a --

7         MR. PATTERSON:  Judge, this is volunteer.

8         THE COURT:  Overruled.

9         You can answer, complete your answer.

10        THE WITNESS:  When a clinical specialist utilizes

11   this type of instrument, what they're doing is in a

12   treatment modality.  What they're doing is attempting to --

13   they've come to a conclusion that the person is there for

14   treatment purposes.  When a person's in a clinical setting

15   and not a forensic setting we assume that a patient is

16   telling us the truth because they're there to get help.

17   Q.   BY MR. MARTINEZ:  So, okay, now I understand what

18   you're saying.

19   A.   And so --

20        MR. PATTERSON:  Judge, there isn't a question.

21        THE COURT:  Ask your next question.

22   Q.   BY MR. MARTINEZ:  I'll go ahead and move on.

23        You indicated that you, instead of these tests,

24   that you administered others, correct?

25   A.   That is correct.

1      Q.   And we discussed the MMPI II and you told us what

2   that did, right?

3      A.   Yes, sir.

4      Q.   Then I think you also talked about the Williamson

5   Sentence Completion Test?

6      A.   Yes, sir.

7      Q.   What is that test?  What does it seek to find?

8      A.   The Williamson Sentence Completion Test is what

9   we call a subjective test.   It is not an objective

10  instrument.   It is a subjective instrument.

11     Q.   Let me stop you there.   What's the difference

12  between an objective test and as part of that question is

13  the MMPI an objective test?  Go ahead.

14     A.   An objective test is a test in which there is

15  norms and validity scales which the test has been measuring

16  what it is purported to measure.   The MMPI is an objective

17  test.   The Williamson Sentence Completion test is a

18  projective test.

19          Most people have heard of the famous Rorschach

20  Ink blot Test where people look at ink blots and tell what

21  they see in the ink blots.   People have heard of that

22  before.   The sentence completion test is kind of that type

23  of test.   It's a projective test.

24          The reason why we would use that test is as a

25  corollary to objective testing, number one.   But number

1   two, to see what the individual will say in a open-end

2   format.  In other words, we give part of a sentence and we

3   see what they bring forth after that.  It is subjective.

4   It is not objective.  It's clinical judgment plays a role

5   in the interpretation of the projective test.  And it is

6   very useful when it's used in combination with an objective

7   instrument.

8       Q.   Such as the MMPI?

9       A.   Such as the MMPI, yes.

10      Q.   How does the Williamson Sentence Completion test,

11  is it the same or does it differ from, for example, some of

12  the exhibits that I've been showing you, Exhibits 535 to

13  540, which are the items that were administered by somebody

14  named Sharon Murphy.  Is it the same thing or is it

15  different?

16      A.   It's different.  The Williamson Sentence

17  Completion Test is an actual diagnostic instrument in which

18  there is no obvious answers.  You give a sentence probe and

19  the individual then responds to the sentence probe.  There

20  is no obvious directionality of the question.

21      Q.   For example, can you give us one of the sentences

22  that may be presented as part of this test?

23      A.   The worse thing that ever happened to me was.

24      Q.   Then the person needs to fill that out, right?

25      A.   Then the person needs to answer.

1    Q.   So what you're telling us there is really no

2  answer that is suggested by the question other than

3  whatever the person tells you?

4    A.   Exactly.

5    Q.   Whereas if you compare it to Exhibits 535 to 540,

6  you're telling us that the intent of the question is

7  obvious?

8    A.   Exactly.

9    Q.   What other tests did you administer?   The

10  Thematic and Perspective test?

11    A.   No, I didn't do that.  I used the -- we also gave

12  her the Shipley Institute of Living Scale.

13    Q.   What is that?

14    A.   The Shipley Institute of Living Scale is actually

15  a very brief IQ scan.  And it's a test that measures an

16  individual's vocabulary, which is one of the most stable

17  aspects of intelligence, and also abstract reasoning

18  ability.

19    Q.   And what was the defendant's, Wendi Andriano's,

20  IQ as measured by the Shipley test?

21    A.   I believe it was 110.

22    Q.   And then, as part of this evaluation, you also

23  did a clinical interview, correct?

24    A.   That's correct.

25    Q.   And I think that you indicated that you did two

1    or three hours of that, correct?

2        A.   That's correct.

3        Q.   Why is it that you didn't spend, let's say, 10,

4    15 more hours than the two or three in this case?

5        A.   It wasn't necessary.

6        Q.   Why is that?

7        A.   Well, I already had the interview of Ms. Murphy,

8    or Dr. Murphy, where she has spent 20 hours of, in her

9    rendition of what the defendant had told her.  Also, in

10   order for me to do my analysis, I didn't need to spend 20

11   hours with her.

12       Q.   Are you -- I know that you've given us some of

13   your experience that you have in this clinic for women that

14   are subjects of domestic violence.

15            MR. PATTERSON:  Wait.  Wait.  Wait.  That

16   misstates his testimony.  He doesn't have a clinic.

17            MR. MARTINEZ:  I'm not --

18            THE COURT:  Wait.  Let me see counsel here at the

19   bench.

20            (Bench conference was held outside the hearing of

21   the jury.)

22            THE COURT:  Just a reminder, Mr. Patterson, state

23   the objection briefly.

24            MR. PATTERSON:  Judge, I'm asking him to ask the

25   questions properly.  He never testified he has a clinic

```
 1    that is devoted to the treatment of battered women.

 2              THE COURT:  I'm going to sustain your objection.

 3              Just state the objection briefly.

 4         MR. PATTERSON:  Yes, sir.

 5              (Bench conference concluded.)

 6              THE COURT:  Sustain the objection.

 7              Mr. Martinez, please rephrase your question.

 8         Q.   BY MR. MARTINEZ:  With regard to this issue of

 9    the clinic, didn't you tell us previously that you had

10    women that were being treated for domestic violence?

11              MR. PATTERSON:  Objection, Your Honor.  That

12    misstates his testimony.  They were never treated for

13    domestic violence.  They were treated for psychological or

14    emotional issues.

15              THE COURT:  Overruled.  Go ahead and answer the

16    question if you can.

17         Q.   BY MR. MARTINEZ:  Is that correct, what I asked

18    you?

19         A.   I guess they're both correct.  I have women that

20    have been treated at my clinic that have been victims of

21    domestic violence and have psychological and emotional

22    issues.

23         Q.   With regard to that, you have experience in that,

24    right?

25         A.   Yes.
```

39

1      Q.    Based on that -- additionally, have you ever

2  testified -- I've ask you this before -- in Maricopa County

3  Superior Court involving the issue of domestic violence?

4      A.    Yes.

5      Q.    And, in addition to that, have you done research

6  in that area?

7      A.    Yes.

8      Q.    Now, what if any, are there any certain sets of

9  characteristics that are endemic or that are particular or

10  that are required with regard to domestic violence?

11      A.    Wow.  No.

12      Q.    In other words, what I'm asking you is does every

13  person who has been the subject of domestic violence

14  manifest, let's say symptom A, whatever they may be?

15      A.    Different people --

16            MR. PATTERSON:  Calls for a yes or no answer,

17  Judge.

18            THE COURT:  Sustained.

19            Answer the question yes or no.

20            THE WITNESS:  Can you repeat the questions?

21      Q.    BY MR. MARTINEZ:  Does everybody that suffers

22  from domestic violence, do they all exhibit the same

23  symptoms?

24      A.    No.

25      Q.    Explain your answer to me, please?

1      A.    Different people -- people respond differently to

2    different stimuli and sometimes respond differently to the

3    same stimuli.  What may cause anxiety or fear or depression

4    in me may not cause anxiety, fear or depression in you.

5          We do not see -- people are unique.  People come

6    from different backgrounds.  They have different ego

7    strengths.  They have different resources which to draw

8    from.

9          The answer to your question is that people

10   respond different to different stimuli and they do not

11   respond exactly the same way in a domestic violence case or

12   any other case.

13     Q.    In this particular case, after having reviewed

14   Dr. Sharon Murphy's report, after having reviewed all the

15   materials that you indicated that you reviewed,

16   specifically, I think that you told us that you reviewed

17   the photographs of the crime scene, right?

18     A.    Yes.

19     Q.    The Phoenix police departmental reports?

20     A.    Yes.

21     Q.    The autopsy report, right?

22     A.    Yes.

23     Q.    The results for the Shipley Institute of Living

24   Scale Test, you reviewed the results, right?

25     A.    Yes.

1      Q.   You also reviewed the Williamson Sentence

2  Completion Test results, right?

3      A.   Yes.

4      Q.   And then the MMPI II results?

5      A.   That's correct.

6      Q.   And then you did your own clinical interview,

7  right?

8      A.   Correct.

9      Q.   And that's with regards to this defendant, Wendi

10  Andriano, correct?

11      A.   That is correct.

12      Q.   After having reviewed that and your experience

13  and knowing what you know about this area, did the

14  defendant, in your opinion, was it consistent in your mind

15  that she was suffering from domestic violence?

16      A.   No.

17           MR. MARTINEZ:  I don't have anything else.

18           THE COURT:  Mr. Patterson.

19           MR. PATTERSON:  Yes, Judge.  May I have a minute

20  get set up here?

21           THE COURT:  Yes.

22

23                      CROSS-EXAMINATION

24  BY MR. PATTERSON:

25      Q.   Dr. Bayless, we discussed this case before,

1   haven't we?

2        A.   You and I?

3        Q.   Yes, with Mr. Martinez present?

4        A.   Yes.

5        Q.   You have a Ph.D., correct?

6        A.   That is correct.

7        Q.   And in order to get a Ph.D, you have to prepare

8   what's either called a dissertation or a thesis, correct?

9        A.   That's correct.

10       Q.   And your thesis which --

11       A.   My dissertation.

12       Q.   -- dissertation which would serve as the basis

13   for your doctorate in Psychology was on juvenile

14   bed-wetting, correct?

15       A.   That did not serve as the basis for my doctorate,

16   no.  I chose to -- I was doing my internship at Jane

17   Wayland Child Center at the time.

18       Q.   So that's a no, is that what you're saying?

19       A.   That is a no.

20       Q.   Your doctoral thesis was --

21       A.   Doctoral dissertation.

22       Q.   Well, I'm looking at your C.V. that you provided

23   to me, Doc, and it says 1974 research for doctoral thesis,

24   quote, A Clinical Study of Specific Personality Traits of

25   Enuretic Children and Their Parents.  Was that your

1  doctoral thesis?

2      A.   Yes.

3      Q.   Enuretic means bed-wetter, right?

4      A.   Yes.

5      Q.   So your doctoral thesis was on children who bed

6  wet and their parents, correct?

7      A.   That's correct.

8      Q.   That has nothing to do with an assessment of

9  whether or not the individual is a victim of domestic

10  violence, correct?

11      A.   Absolutely not.

12      Q.   You also received a B.S. in Psychology?

13      A.   Yes.

14      Q.   Nothing in that B.S. was particularly addressing

15  the issue of whether or not a person is a victim of

16  domestic violence, correct?

17      A.   Not as a student at the university.

18      Q.   You didn't take any specific courses on the

19  diagnosing or assessing whether or not a person is a victim

20  of domestic violence, correct?

21      A.   No.

22      Q.   You M.A. that too was in Psychology?

23      A.   Correct.

24      Q.   And there was no particular citation or part of

25  that M.A. that you received that focused on diagnosing or

1   assessing whether or not a person is a victim of domestic

2   violence, correct?

3        A.   That's correct.

4        Q.   In 1975 through 1976 you served as an intern at

5   the Jane Wayland Center, correct?

6        A.   That's correct.

7        Q.   That dealt primarily with juveniles?

8        A.   Children, juveniles and adults, because we had

9   families there.

10       Q.   You received no practical experience in that

11   internship in assessing whether or not a person was a

12   victim of domestic violence, correct?

13       A.   No.

14       Q.   In 1972 through 1974, you were a counselor at the

15   Phoenix Psychological Center, correct?

16       A.   Yes.

17       Q.   And that involved individual therapy with adults?

18       A.   Yes.

19       Q.   That gave you no practical experience with regard

20   to assessing whether or not an individual was a victim of

21   domestic violence, did it?

22       A.   No.

23       Q.   In 1974 through 1977, you were an instructor at

24   Scottsdale Community College, correct?

25       A.   Yes.

1    Q.    You never taught any courses at Scottsdale

2    Community College that pertained to assessing whether or

3    not a person was a victim of domestic violence, correct?

4    A.    No.

5    Q.    In your C.V. you have a section entitled Research

6    and Paper Presentations.  That's where I found research for

7    the doctoral thesis.  You already told us that that has

8    nothing to do with assessing whether or not a person is the

9    victim of domestic violence, correct?

10         MR. MARTINEZ:  Objection.

11         THE COURT:  Overruled.  Go ahead and answer.

12         THE WITNESS:  That's correct.

13    Q.  BY MR. PATTERSON:  Next entry, a paper

14    presentation quote, Neurosis-Fact and Fiction closed

15    quotes.  The paper was presented at Scottsdale Community

16    College.

17         Again, that presentation has absolutely nothing

18    do with assessing a person as to whether or not she is a

19    victim of domestic violence, correct?

20    A.    That's true.

21    Q.    In 1977, a paper presentation quote, "Therapy

22    With Sickle-Cell Patients, end quote.  That paper was

23    presented at the Bureau of Health Education in Phoenix,

24    Arizona.

25         Again, that paper presentation had absolutely

1    nothing to do with assessing a person for victimization and

2    domestic violence, correct?

3        A.    Correct.

4        Q.    1978, paper presentation, quote, Stress

5    Management in the Work Place, close quote.  The paper was

6    presented at the Arizona Children's Hospital.

7            Again, that paper presentation has absolutely

8    nothing to do with domestic violence, did it?

9        A.    No, it did not.

10       Q.    1979 seminar, quote, Integrated Relaxation

11   Training, closed quotes.  The seminar was presented at the

12   O.I.C. Regional Conference in Portland, Oregon

13           Again, that seminar had absolutely nothing to do

14   with domestic violence, did it?

15       A.    No.

16       Q.    1979 seminar, quote, Holistic Fitness, closed

17   quote.  The seminar was presented at the O.I.C. Regional

18   Conference in Portland, Oregon.

19           Again, that seminar had nothing to do with

20   domestic violence, did it?

21       A.    No.

22       Q.    1980 paper presentation, quote, Elimination of

23   Self-Defeating Behavior, close quotes.  The paper was

24   presented at the N.A.A.C.P. State Conference.

25           Again, that paper presentation has absolutely

1   nothing to do with domestic violence, did it?

2       A.   That's correct.

3       Q.   1990 paper presentation, quote, Parent-Child

4   Relationships, An African-American Perspective, close

5   quotes.  This paper was presented at the Black Women's Task

6   Force, Phoenix, Arizona.

7           Again, that has absolutely nothing to do with

8   domestic violence, did it?

9       A.   No, it did not.

10      Q.   1991 seminar, quote, Experts on Experts:

11  Preparing, Qualifying and Attacking the Expert Witness,

12  close quotes.  The seminar was sponsored by the Arizona

13  State Bar Association, Phoenix, Arizona.

14          That seminar had absolutely nothing to with

15  domestic violence, did it?

16      A.   No, it did not.

17      Q.   1992 paper presentation, quote, Blacks in

18  Juvenile Justice System, close quotes.  The paper was

19  presented for the Maricopa County Office of the Public

20  Defender.

21          Again, that presentation had absolutely nothing

22  do with domestic violence, did it?

23      A.   Nope.

24      Q.   1992 paper presentation, quote, Criminal Justice

25  and the Black Child, closed quotes.  The paper was

1    presented at the National Association of Blacks in Criminal

2    Justice.

3           Again, that paper presentation had absolutely

4    nothing to do with domestic violence, did it?

5       A.    Nope.

6       Q.    1992 publication quote, Mitigation and the

7    Forensic Expert, closed quotes.  The Defender, July 1992.

8           Again, that has nothing to do with domestic

9    violence, did it?

10      A.    No.

11      Q.    1993 paper presentation, quote, Sex and Dating:

12   Teenage Relationship, close quotes.  The paper was

13   presented at the Arizona Youth Conference in Phoenix,

14   Arizona.

15          Again, that has absolutely nothing to do with

16   domestic violence?

17      A.    No, it did not.

18      Q.    1993 paper presentation, quote, Family Dynamics

19   close quotes.  This paper was presented at the Black

20   Woman's Task Force in Phoenix, Arizona.

21          This paper presentation has absolutely nothing to

22   do with domestic violence, did it?

23      A.    Nope.

24      Q.    1995 paper presentation, quote, Skill of

25   Ethnographic Interviewing, closed quotes.  This paper was

1   presented at the National Association of Blacks in Criminal

2   Justice Conference in Phoenix, Arizona.

3          Again, that paper has absolutely nothing to do

4   with domestic violence, did it?

5      A.   No.

6      Q.   1995 paper presentation, quote, Expert Witness

7   Testimony, closed quotes.  The paper presented at the

8   Arizona State Bar Conference in Phoenix, Arizona.

9          Again, that had nothing to do with domestic

10  violence, did it?

11     A.   No.

12     Q.   1995 paper presentation, quote, Child Abuse, It's

13  Relationship to Substance Abuse, closed quotes.  The paper

14  was presented at the 14th Annual CASA Conference in

15  Phoenix, Arizona.

16         Again, that paper has absolutely nothing to do

17  with domestic violence, did it?

18     A.   No.

19     Q.   1996 paper presentation, quote, Reclaiming our

20  Families, closed quotes, presented at the Black Youth

21  Recognition Conference in Phoenix, Arizona.

22         Again, that paper has absolutely nothing to do

23  with domestic violence, did it?

24     A.   No.

25     Q.   1998 paper presentation, quote, Issues for at

1   Risk Minority Families, closed quotes.  Presented at the

2   Colorblind Justice Minority Youth Over Representation in

3   Arizona's Juvenile Justice System Conference in Phoenix,

4   Arizona.

5           That, too, had nothing to do with domestic

6   violence, did it?

7       A.   No, it did not.

8       Q.   1999 paper presentation, quote, Psychological

9   Assessment of the Impaired Attorney, closed quotes,

10  presented at the National Organization of Bar Counsel

11  Conference in Los Angeles, California.

12          That had nothing to do with domestic violence,

13  did it?

14      A.   Well, no, it did not.

15      Q.   1999 publication, quote, Guilty but Insane Versus

16  Diminished Responsibility, closed quotes.  The Defender,

17  Arizona Attorneys for Criminal Justice, January 1999.

18          That, too, had nothing to do with domestic

19  violence, did it?

20      A.   No, it did not.

21      Q.   The last entry on the C.V. is 1999.  This is the

22  year 2004.  Have you published any papers, made any

23  presentations about domestic violence in the five-year

24  period intervening?

25      A.   No.

1      Q.   Your C.V. also reflects that you're associated

2  with certain professional organizations.

3           The Arizona State Psychological Association.   Is

4  there a focus on domestic violence issues at the Arizona

5  State Psychological Association?

6      A.   No.

7      Q.   American Psychological Association.   Any focus on

8  domestic violence issues that you can tell me about?

9      A.   No.

10     Q.   You reflect appointments.   In 1980 you were

11 appointed to the Governor's appointment to the Arizona

12 Board of Psychologist Examiners.

13           Did that have anything to do with domestic

14 violence?

15     A.   No.  That was had to do with licensing

16 psychologists in the state of Arizona.

17     Q.   That didn't focus on the issue of domestic

18 violence, did it?

19     A.   No.

20     Q.   1981, elected Secretary of the Arizona State

21 Board of Psychologist Examiners.   Does that have anything

22 to do with domestic violence?

23     A.   No.

24     Q.   1982 appointed to the Board of Arizona Lung

25 Association.   Does that have anything to do with domestic

1  violence?

2       A.   No.

3       Q.   1995, Arizona Supreme Court Commission on

4  Minorities.  Did that have anything to do with domestic

5  violence?

6       A.   No.

7       Q.   1999, Homebase Youth Services, Board of

8  Directors.  Did you deal with any domestic violence issues

9  there?

10       A.   Some of the kids had run away from home.  The

11  Homebase Youth Services is an organization that helped kids

12  who have been -- who are homeless and on the streets,

13  teenage kids who are homeless and on the streets and some

14  were victims of domestic violence themselves and which was

15  a reason why they ran away from home.

16       Q.   In your capacity as a member of the Board of

17  Directors of that facility, were you ever called upon to

18  assess whether or not the parents of the juveniles were, in

19  fact, victims of domestic violence?

20       A.   The parents?

21       Q.   Yes.

22       A.   Never saw the parents.  The kids were runaways.

23  They were homeless.

24       Q.   So you didn't assess the parents who may have

25  been victims of domestic violence or visit this domestic

1   violence upon the juveniles causing them to run away?

2        A.   No.

3        Q.   You list social organizations.  N.A.A.C.P.  Are

4   you involved in domestic violence in the context of the

5   National Association for the Advancement of Colored People?

6        A.   No.

7        Q.   Kappa Alpha Psi Fraternity, does that have

8   anything to do with domestic violence?

9        A.   No, it's a social fraternity.

10       Q.   Sigma Pi Phi Fraternity.  Does that have anything

11   to do with domestic violence?

12       A.   It's a business fraternity, no.

13       Q.   Phoenix Urban League.  Any focus on domestic

14   violence in the Phoenix Urban League?

15       A.   No.

16       Q.   Phoenix Medical Society.  Any issues of domestic

17   violence discussed in the context of the Phoenix Medical

18   Society?

19       A.   No.

20       Q.   Are there any social organizations that are

21   devoted to the issue of domestic violence that you are a

22   member of and have not listed in this C.V.?

23       A.   No.

24       Q.   Have you volunteered to work in a homeless or

25   battered woman's shelter?

54

1      A.   No.

2      Q.   You do have a clinical practice currently,

3  correct?

4      A.   Yes.

5      Q.   A clinical practice is a practice where you treat

6  persons who have, I assume, psychological or emotional

7  symptoms and problems.  Is that a fair statement?

8      A.   Yes.

9      Q.   And you have told us that some of those persons

10  are victims of domestic violence?

11      A.   Yes.

12      Q.   And that is, I assume, self-reported, correct?

13      A.   Yes.

14      Q.   Because you did not engage in any kind of

15  assessment process to determine whether or not they were,

16  in fact, victims of domestic violence, correct?

17      A.   It's a treatment facility, not a forensic

18  facility.

19      Q.   My questions is --

20      A.   No.

21      Q.   -- you did not engage in any assessment to

22  determine whether or not they were, in fact, victims of

23  domestic violence?

24      A.   No.

25      Q.   They reported that they were, you took it at face

1  value?

2      A.   Yes.

3      Q.   Because your purpose in the clinical setting is

4  to treat these people?

5      A.   That is correct.

6      Q.   You are treating a defined set of symptoms of

7  psychological or emotional dysfunction?

8      A.   Well, no.  Let me back up here.  They may -- we

9  do not question the reason for them coming in for

10  treatment.  But we do run a complete diagnostic evaluation

11  on them to gather more information concerning how we should

12  design a treatment plan.  As we gather information, if that

13  information is inconsistent with reported symptoms, then,

14  obviously, we ask more questions.

15      Q.   But you focus on the treatment end?

16      A.   It's on the treatment end, yes.

17      Q.   And you don't have any break down of your case

18  load to tell us how many of those six hundred or so

19  patients that you have are victims of domestic violence?

20      A.   No.

21      Q.   You apparently have done some research into the

22  issue of domestic violence, correct?

23      A.   Some.

24      Q.   And most of that information was derived from the

25  Internet, correct?

1      A.   And I have psychologists on my staff, who we have

2   a complete research file.  We try to keep abreast on all

3   the research, current research on topics that we choose.

4      Q.   But the articles that you showed me during the

5   course of the interview were derived from the Internet

6   about the year 2000, correct?

7      A.   The Internet's a very nice place.

8      Q.   Well, is that --

9      A.   Yes.

10     Q.   Thank you.  So having done some reading about the

11  issue of domestic violence, you would agree that it is

12  defined as a pattern of coercive control characterized by

13  the use of physical, sexual and psychological abusive

14  behaviors?

15     A.   That's one definition.

16     Q.   That's your definition, isn't it?

17     A.   Yeah.

18     Q.   You don't disagree with that?

19     A.   No.

20     Q.   And you tell us that you have testified in court

21  before?

22     A.   Yes.

23     Q.   But, it is true that you only testified in one

24  court proceeding where you were asked to determine whether

25  or not a person was, in fact, the victim of domestic

1    violence?

2        A.   From my memory right now, that is correct.

3        Q.   That's the case of State of Arizona versus

4    Elizabeth de la Riva Vogel, correct?

5        A.   Yes.

6        Q.   And you gave testimony in that case on January

7    22nd, 2002, correct?

8        A.   Yes.

9        Q.   And you have not been asked to assess whether or

10   not a person is a victim of domestic violence since that

11   date, with the exception of this particular case, correct?

12       A.   In a forensic setting?

13       Q.   Yes.  Never been called to assess and testify in

14   court on that issue whether or not a person was the victim

15   of domestic violence?

16       A.   No, that was not your original question.  In the

17   courtroom, yes, that is true.  For assessment in the

18   courtroom, I have not.

19       Q.   Nor had you ever done that prior to the year 2002

20   in your entire history here in the City of Phoenix, State

21   of Arizona, correct?

22       A.   No, that's not correct.

23       Q.   Give me another case that you testified where you

24   were asked to determine whether or not a person was the

25   victim of domestic violence?

1      A.   Actually, it was the case that my colleague, Gina

2   Lange, worked on that.  I was involved where she did the

3   testifying in which I assisted her in doing the analysis of

4   the case.

5      Q.   And when did this happen?

6      A.   That was two years ago.

7      Q.   What was the case name?

8      A.   I don't remember the name of the case.

9      Q.   And did you tell me about that on Friday when we

10   had our discussion?

11     A.   I attempted to but you didn't want to hear it.

12     Q.   In any event, you can't recall the client's name?

13     A.   No.

14     Q.   And you, in fact, did not testify in open court

15   on this issue?

16     A.   No, I did not.

17     Q.   Any other ones that you recall?

18     A.   No.

19     Q.   So we have two.  And how long have you been

20   practicing in the State of Arizona?

21     A.   Twenty-eight years.

22     Q.   Now, you would agree that the issue of domestic

23   violence is often cloaked in secrecy, correct?

24     A.   I'm not sure if I understand what you mean.

25     Q.   That the occurrence of domestic violence happens

59

1   behind closed doors, cloaked in secrecy, under reported?

2        A.   As a researcher and as a scientist, you know,

3   when people say "it's under reported" that means we don't

4   know it happened or it didn't happen.  It's like they're

5   saying there is more assault out there than what's being

6   reported.  Well, we can only hypothesize that is true.

7        Q.   My question is --

8             MR. MARTINEZ:  Judge, he's not allowing him to

9   finish the answer.

10            THE COURT:  One at a time.

11       Q.   BY MR. PATTERSON:  My question is:  In your

12   opinion, is it something that is cloaked in secrecy?

13       A.   It happens behind closed door as a general rule.

14   Whether it's cloaked in secrecy or not, that's one way of

15   looking at it, I guess.  But I don't know the answer to

16   that.

17       Q.   Well, remember your testimony, page 106, starting

18   line 5.

19            "Question:  Doctor, compared to victims of street

20   crime, is there a difference between how domestic violence

21   victims report the violence as opposed to street crime

22   victims reporting violence?

23            "Answer:  Yes.

24            "Question:  And tell the jury what that is?

25            "Answer:  Well, typically, if they report usually

1    it's cloaked in secrecy because there is embarrassment.

2              "Question:  Are you saying they don't report?

3              "Answer:  Often times they don't report.  They

4    don't tell anyone but they'll lie to law enforcement.

5    There's many times where there is domestic violence, a

6    neighbor will call because of the commotion, the noise and

7    people are being hurt."

8              Did you say that on June 22, 2002 in case of

9    State of Arizona versus Elizabeth de la Riva Vogel before

10   the Honorable Pamela Franks in CR2001-003390?

11        A.    Yes.

12        Q.    Would you agree that it's a myth that women,

13   everybody believes that women should just leave if they're

14   a victim of domestic violence?  Would you agree that's one

15   of the myths or perception of domestic violence?

16        A.    Yes.

17        Q.    And would you agree that there are a number of

18   reasons why women stay in these abusive situations?

19        A.    Yes.

20        Q.    Would you agree that one of the reasons they stay

21   is from an overall sense of powerlessness?

22        A.    Could be.

23        Q.    Okay.  Would you agree they stay out of a sense

24   of embarrassment?

25        A.    Possibly.

1      Q.    Would you agree that they stay out of a sense of

2  guilt?

3      A.    Could happen, yes.

4      Q.    Would you agree that there are reasons why they

5  don't tell their families about the existence of domestic

6  violence or domestically violent abusive relationship?

7      A.    Is there a reason why they don't -- I'm sorry.

8      Q.    Would you agree that there are a number of

9  reasons why victims of domestic violence don't tell their

10  families the fact they're being abused?

11      A.    Yes.

12      Q.    Okay.  Would you agree that one of the reasons

13  they don't tell their families is embarrassment?

14            MR. MARTINEZ:  Objection.  Asked and answered.

15            THE COURT:  Overruled.

16            Go ahead and answer the question.

17            THE WITNESS:  That could be.

18      Q.    BY MR. PATTERSON:  Guilt?

19      A.    Could be.

20      Q.    One of the reasons is feeling ashamed?

21      A.    Possibly.

22      Q.    Do you agree there may be some concern that other

23  family members may take issue with it?

24      A.    In terms of retaliation, you mean?  That's

25  possible.

1    Q.    Other family members may get involved in the

2    context of retaliation?

3    A.    That's possible.

4    Q.    May, in fact, hurt the abuser?

5    A.    That could happen.

6    Q.    There are religious issues involved here as to

7    why women don't tell their families that they're, in fact,

8    in an abusive relationship?

9    A.    Yes, that could come into play.

10   Q.    Would you agree there are cultural issues that

11   cause women not to tell their families or extended families

12   about the abusive relationship?

13   A.    Depending on the culture, certainly.

14   Q.    Would you agree that there is a psychological

15   attachment that develops between the batterer and the

16   batteree?

17   A.    That can happen.  It's called "hostile

18   dependency."

19   Q.    Would you agree there is what's often described

20   as the Stockholm Syndrome, sympathy for the abuser?

21   A.    That can happen also.

22   Q.    Okay, now you mentioned the Power and Control

23   wheel.  That is an instrument that has a place in the

24   domestic violence field, correct?

25   A.    Yes.

1      Q.    In fact, in your testimony, back in January of

2   2002, you used a Power and Control Wheel to explain to the

3   jury some of the concepts in domestic violence, correct?

4      A.    I may have.

5      Q.    Reading from the transcript, page 101, line 14:

6            "Question:  Doctor, I'm going to put up on the

7   board exhibit 107.  Is that something you prepared?"

8            Do you recall that being the Power and Control

9   wheel?

10     A.    I don't recall my testimony.  If you say that's

11  in the transcript, I'm assuming that you're reading within

12  context and accurately.

13     Q.    I am reading it accurately and within context.

14           Did you prepare an exhibit or Mr. Dubus prepared

15  an exhibit that is, in fact, the Power and Control wheel?

16     A.    I'm sure I did.

17     Q.    And the Court said, "Mr. Dubus, why don't you

18  show it to Mr. Vercauteren who is the prosecutor."  And

19  then there's a bench conference and some objection from

20  Mr. Vercauteren?

21           MR. MARTINEZ:  Objection.  He's reading.

22           THE COURT:  Let's move on, Mr. Patterson.

23           MR. PATTERSON:  I'm sorry, Judge.

24     Q.    BY MR. PATTERSON:  Then page 102, line 17:

25           "Question by Mr. DeBus:  -- Mr. Debus, is he the

1  lawyer who hired you to evaluate Ms. Vogel?

2      A.  He did.

3      Q.  "Dr. Bayless, would you explain the cycle of

4  violence to the jury and tell them first where this comes

5  from, what the history and research is on it?

6          "Answer:  This comes out of the -- the Wheel of

7  Power and Control;  Women's Rural Advocacy program -- comes

8  out of research we've done on domestic violence.  And

9  basically what you see here -- kind of go with me here a

10  little bit.  You see physical violence, sexual violence.

11  This is on the outside of the wheel.  You can see the

12  wheel, and that's really the -- if you notice here that

13  other spokes of the wheel all intersect where it says

14  "power and control."

15          That's Exhibit 537.  Seems to me you're talking

16  about the Power and Control Wheel.  Is that accurate?

17      A.  Yes.

18      Q.  "Now, off the spokes you have various areas.  Now

19  notice here that these areas are -- of which are

20  psychological controls.  Now, you see sexual violence and

21  physical violence as the maintainer of the wheel,

22  and so that physical violence and sexual violence will be

23  there or a thread will be there continuously."

24          We're talking about the Wheel of Power and

25  Control?

65

1     A.   Yes.

2     Q.   Okay "Now inside of that we have use of

3   intimidation, if you start with that one, and this makes

4   the individual afraid by using looks.  And these are

5   triggers I was talking about before, by using looks,

6   actions, gestures, smashing things, destroying property,

7   abusing pets possibly, displaying weapons, as a process of

8   the intimidation factor."

9          Are you still talking about the Power and Control

10  wheel?

11    A.   Yes.

12    Q.   "Then you have the emotional abuse.  The

13  putting down, making the individual feel bad about

14  themselves, calling them names, making them think that

15  they're crazy, playing mind games quote, you really didn't

16  say that, did you?, closed quote, humiliating them in front

17  of themselves or in front of other people, making them feel

18  guilty about their behavior, even though there's nothing to

19  feel guilty about."

20         Are you still talking about the Power and Control

21  Wheel?

22    A.   Yes, sir.

23    Q.   "Then the process of using isolation, controlling

24  what an individual does, who they talk to, where they go,

25  what they do, what they read, limiting their outside

1  involvement, control monetary involvement process, using

2  jealousy to justify -- and no matter how hard you try, you

3  never seem to overcome that."

4          Again, are you still talking about the Power and

5  Control Wheel?

6      A.   Yes.

7      Q.   "Minimizing, denying, and blaming.  It's kind of

8  interesting.  'I really didn't mean to hit you that hard.

9  I won't ever do it again.'"

10          Still talking about the Power and Control Wheel?

11     A.   Yes.

12     Q.   "Making light of the abuse.  Not taking the other

13  person's concerns as serious, or you know, 'Yeah, I

14  understand that.'"

15          Again, Power and Control Wheel?

16     A.   Yes, sir.

17     Q.   "'And Honey, I see what you mean and I'm going to

18  do better and it really wasn't that bad.  Now we can work

19  together on this, can't we?'  Or even like saying the abuse

20  didn't happen. 'It wasn't me.  You fell down because if it

21  wasn't for you doing things to me, I wouldn't have pushed

22  you and you fell and hit your own head.'"

23          Power and Control Wheel?

24     A.   Yes, sir.

25     Q.   Is this your testimony?

1      A.   Yes, sir.

2      Q.   And in this case, you were hired by the defense?

3      A.   Yes, sir.

4      Q.   "Shifting responsibility for the abusive behavior,

5  saying that the other person caused it.  If it wasn't for

6  what they did, he wouldn't have did what did and,

7  therefore, it's their fault."

8           Again, Power and Control Wheel?

9      A.   Yes, sir.

10     Q.   "They often use children and make them feel guilty

11  about the children, using the children to relay messages,

12  using visitation to harass, threatening to take children

13  away.  And you see this in custody evaluations mostly."

14          Again, Power and Control Wheel?

15     A.   Yes, sir.

16     Q.   "And then using -- this is one I think that

17  happens a lot and I think it's been going on for many, many

18  years and what we call 'using the male privilege, treating

19  the female as a servant, making all the big decisions,

20  acting like the master of the castle, being the one that

21  defines men and women's roles.  And this is something

22  that's been going on for a long time.  This is not new.

23  Gender bias and gender problems have been going on probably

24  since caveman days."

25          Again, are we talking about the Power and Control

1   Wheel?

2       A.   Absolutely.

3       Q.   "Until recently -- my God, it one point in time we

4   as men thought that women shouldn't vote.  I mean, how

5   ridiculous is that?  Women's roles today have changed

6   dramatically and, thank you, God, we're waking up to this

7   whole process."

8           Is that in reference to the Power and Control

9   Wheel?

10      A.   That's in reference to gender bias.

11      Q.   Which is part of the Power and Control Wheel?

12      A.   Well, since it was developed by a feminist

13   group.  In terms of the Power and Control Wheel, it is

14   gender bias.

15      Q.   But you brought that up, that comment up in the

16   context of the wheel section that refers to using the male

17   privilege, right?

18      A.   Yes.

19      Q.   "But men who are in an abuse cycle will often use

20   that and often very effectively use economic abuse, keeping

21   the person from getting a job, keep them at home.  If they

22   do make money, that the money and give them an allowance,

23   letting them know they don't have access to certain things,

24   will keep financial controls away from them."

25           Again, is that stuff that you derived from the

1   Power and Control Wheel?

2       A.   Yes.

3       Q.   "Then the last but not least is using force and

4   threats, making or carries out threats to hurt the

5   individual; threatening to leave, threatening to get

6   another partner, threatening to commit suicide, threatening

7   to report them to welfare or other agencies, especially if

8   there are children involved.  Whenever they file charges,

9   making them drop charges.  If you don't drop the charge,

10  quote, I'm not going anywhere.  They won't keep me forever

11  close quotes.  They oftentimes in coercion, you'll see; and

12  we see this oftentimes.  And I did a case where they used

13  coercion to get the individual to do things that are

14  illegal to avoid the violence."

15          Again, Power and Control?

16      A.   Yes.

17      Q.   And you were talking about triggers at some

18  point.  Triggers involves conditioning the abuse victim to

19  respond in a fashion that the abuser wants without having

20  to, perhaps, beat the person, correct?

21      A.   A trigger, if you're familiar with stimulus

22  response psychology, is a condition stimulus.  Yes, it's

23  one that has been conditioned and person then will issue a

24  conditioned response.

25      Q.   So you agree that in a public setting an abuser

1   can merely look sometimes at the abuse victim and get that

2   abuse victim to do things that he wants or she wants he or

3   she to do?

4        A.   Yes, that's possible.

5        Q.   And conditioning is a significant issue in

6   domestic violence, isn't it?

7        A.   It is part of it, yes.

8        Q.   Okay.  And with Elizabeth Vogel, whom the case

9   that the defense hired you to come up to an opinion or come

10  up with an opinion, you spent 12 to 14 hours with her,

11  didn't you?

12       A.   Yes.

13       Q.   And you'd sourced out collateral information?

14       A.   Yes.

15       Q.   And you spoke with the three sons of the

16  purported abuse victim?

17       A.   Yes.

18       Q.   And you also spoke with the two spouses of two of

19  the sons, correct?

20       A.   That is correct.

21       Q.   So you derived collateral information from five

22  witnesses close to the abused victim?

23       A.   Correct.

24       Q.   Did you speak with Donna Ochoa in this case?

25       A.   No.

1   Q.   Did you speak with Alejo Ochoa in this case?

2   A.   No.

3   Q.   Did you speak with Brandon Ochoa in this case?

4   A.   No.

5   Q.   Did you speak with Barbara Mitchell in this case?

6   A.   No.

7   Q.   In fact, did you do any personal interviews with

8   anybody in this case other than Ms. Andriano?

9   A.   No.

10   Q.   Did you speak with any of the relatives of

11   Mr. Andriano, the decedent?

12   A.   No.

13   Q.   Did you speak with any of the friends of

14   Mr. Andriano?

15   A.   No.

16   Q.   I assume you're getting paid for your opinion in

17   this case?

18   A.   Absolutely.

19   Q.   At the rate of $200 an hour?

20   A.   For testifying?

21   Q.   Well, I know in the Vogel case you charged $200

22   an hour.  You said that that was reflective of the rate for

23   both prosecution and defense?

24   A.   At the time.

25   Q.   Have your rates gone up?

1      A.   Yes.

2      Q.   What are your current rates?

3      A.   $350 an hour.

4      Q.   And how many hours are you going to bill the

5   prosecution in this case?

6      A.   I don't know, depends on how many hours you keep

7   me up here on the stand.

8      Q.   I assume you have a separate rate for testimony?

9      A.   A separate rate for whom?

10     Q.   For testimony?

11     A.   That's $350 an hour.

12     Q.   So the longer I talk with you, the more you're

13   billing the Government, is that what you're telling me?

14     A.   Yes.

15     Q.   As of this point in time, 2:33, how many hours

16   have you invested -- are you going to bill the county?

17     A.   Well, I've been here more than an hour.

18     Q.   And then did, by my computation, on 4/20 you were

19   there for two hours, on 5/20 you were there with the client

20   for three hours.  So five hours there, right?

21     A.   That's correct.

22     Q.   And then you and I spoke for about three or four

23   hours on Friday?

24     A.   I'm going to bill you for that.

25     Q.   I will take care of that for you.

1              MR. MARTINEZ:  Objection.  Gratuitous comments of

2    Counsel.

3              THE COURT:  Sustained.

4              Move on.

5        Q.   BY MR. PATTERSON:  Talking about your bill to the

6    State, Mr. Martinez' office, that's five hours plus an hour

7    today?

8        A.   At this present time?

9        Q.   Yes, sir.  It's 2:35 now.

10       A.   The total bill for today or total bill total?

11       Q.   Total bill total.

12       A.   I don't know.  I don't know.  There is document

13   review time.  There is preparation time.  There is a lot of

14   other time in there.  I have no clue.

15       Q.   Concerning time, you invested only two to three

16   hours with regard to face-to-face discussion with

17   Ms. Andriano about the facts and circumstances of her

18   background and relationship with Mr. Andriano, correct?

19       A.   That's correct.

20       Q.   The other hours that you spent with her were in

21   administering these tests you told us about?

22       A.   That's correct.

23       Q.   And you basically just sit by and monitor the

24   test while she puts pencil to paper, correct?

25       A.   Except the sentence completion test.

1      Q.   That's where you actually ask her the probe

2  question, you called it, and then you fill in --

3      A.   That's correct.

4      Q.   -- what she tells you?

5      A.   That's correct.

6      Q.   Now, the purpose of the MMPI II is to determine

7  personality and emotional functioning of an individual,

8  correct?

9      A.   That's correct.

10     Q.   And this test was administered on April, excuse

11 me, May 20, 2004, correct?

12     A.   Yes.

13     Q.   So you have an assessment of her personality and

14 mental functioning as of May 20, 2004, correct?

15     A.   That is correct.

16     Q.   Were you able to locate an MMPI II which was

17 administered at or near, say, September, October of 2000?

18     A.   Was I able to locate it?

19     Q.   Yes.

20     A.   I wouldn't want to locate that.

21     Q.   Well, my question is, did you locate one?

22     A.   No, it's invalid.  It's too old.

23     Q.   Okay.  So these things change with the passage of

24 time?

25     A.   A test would only be objective --

1       Q.    My question is --

2       A.    Yes.   The answer is yes.

3             THE COURT:   One at a time.

4       Q.    BY MR. PATTERSON:   Do you have access to a

5   Shipley Institute of Living Scale administered at or near,

6   say, September or October 2000?

7       A.    No.

8       Q.    Do those change with time, too?

9       A.    That shouldn't change that much.   Intellect,

10  unless there was something that happened neurologically.

11      Q.    Auto accident, banging your head?

12      A.    Yeah, something neurological.   That should be

13  fairly consistent over time up until a certain age.

14      Q.    Did you have access to a Williamson Sentence

15  Completion Test administered at or near September or

16  October, 2000?

17      A.    No.

18      Q.    Would that change with the passage of time?

19      A.    Possibly.

20      Q.    Now, you told us that there are no certain set of

21  psychological symptoms for a victim of domestic violence.

22  Is that an accurate statement?

23      A.    Yes.

24      Q.    The MMPI II is a test designed to elicit sets of

25  psychological symptoms, isn't it?

1      A.    Yes.

2      Q.    You told us that every person does not exhibit --

3   well, every person who is a victim of domestic violence

4   does not exhibit the same symptoms.   Is that accurate?

5      A.    That's accurate.

6      Q.    Again, the MMPI II is a test designed to

7   determine for an individual a certain set of psychological

8   symptoms, correct?

9      A.    I don't know a certain set.   It's designed to

10   assess personality and emotional functioning.

11      Q.    Correct.   Composed of defineable or ascertainable

12   psychological symptoms, correct?

13      A.    Yes.

14      Q.    You told us that people respond differently to

15   the same stimulus?

16      A.    Sometimes.

17      Q.    You told us -- I assume that corollary is also

18   the right word -- people respond differently to different

19   stimulus, correct?

20      A.    Yeah.

21      Q.    And all persons do not respond in the same way,

22   correct?

23      A.    Correct.

24      Q.    So the MMPI II is an instrument that is used in

25   the treatment of psychological symptomatology, isn't it,

1  because it allows you to define what the problem is so that

2  you can administer a therapeutic response?

3      A.   Yeah, we use it in assessment and treatment,

4  that's correct.

5      Q.   Assessment of psychological symptoms?

6      A.   Assessment of psychological and emotional

7  function, personality and emotional functioning.  Unless we

8  know what the problem is, then we can design a treatment

9  plan around it.  It's an assessment tool.

10      Q.   Is it fair to state that some domestic violence

11  victims manifest or demonstrate no psychological problems?

12      A.   Only if you're dead.

13      Q.   Well, that didn't answer my question.

14      A.   The answer is --

15      Q.   Is there research on the issue --

16      A.   I have never seen any research that says they do

17  not exhibit no psychological symptoms if they're a victim

18  of trauma.  A victim of trauma would have certain patterns

19  of psychological symptoms.

20      Q.   I'm not talking about trauma.  I'm talking about

21  domestic violence victims, persons with that status?

22      A.   A domestic violence victim is a victim of

23  trauma.  If there's violence, there's trauma.  If there's

24  trauma, you're going to have symptomatology.  I've never

25  seen anybody have trauma that did not have symptomatology.

1      Q.    Would you agree that not all domestic violence

2   victims are involved in violence?

3      A.    The control factor is fear.

4      Q.    But you said violence, not all domestic violence

5   victims are victims of violence.   Is that accurate?

6      A.    No, that's not totally accurate.   What's accurate

7   is that not all domestic violence, not at domestic control

8   or domestic violence is physical violence.

9      Q.    All right.   Let's talk about your diagnosis in

10  Ms. Vogel's case.   You found certain things evident in her

11  case?

12     A.    I don't remember.

13     Q.    Let's talk about that.   Page 111, line 9,

14  Question:  Tell us what your diagnosis was with Elizabeth

15  Vogel?

16            MR. MARTINEZ:   Objection.   Relevance.

17            THE COURT:   Sustained.

18            MR. PATTERSON:   Please --

19            THE COURT:   Sustained.

20            MR. MARTINEZ:   Can we approach?

21            (Bench conference was held outside the hearing of

22  the jury.)

23            MR. PATTERSON:   His diagnosis in the one case

24  where he found domestic violence victim status, depression

25  okay.   And he also found that in my client's case.   He

1    claims that my client is not a victim of domestic violence

2    yet he claims that Ms. Vogel was.  And so I'm comparing,

3    contrasting the two diagnosis allowing him to say what her

4    psychological symptoms were consistent with.  That's the

5    problem, there is no consistency here.

6            MR. MARTINEZ:  So just because a woman,

7    Ms. Vogel, has some symptoms doesn't mean that Defendant

8    Andriano is or is not going to be a victim of domestic

9    violence.  I can start talking about the other people that

10   he's treated and the Court would, I think, would just allow

11   it in, compare and contrast and say she had this, she had

12   that.  It's irrelevant.

13           MR. PATTERSON:  The folly of what he's done here,

14   Judge, there is no constant set of symptoms that one can

15   factor back and say that's a victim of domestic violence.

16           THE COURT:  Okay.  I'll allow -- I'm going to

17   overrule the objection.  But keep it specifically to what

18   you're asking, what you just indicated to the Court right

19   here.

20           MR. PATTERSON:  I will.

21           MR. MARTINEZ:  Is he going to then go on to each

22   and every aspect on what he's doing?

23           MR. PATTERSON:  Diagnosis of Axis I, depression

24   in both cases.  I'd like to go into this because you

25   brought up depression in this case.

EXHIBIT TT

000008087

1          (Bench conference concluded.)

2          THE COURT:  I'm going to overrule the objection.

3          Repeat the question, again, Mr. Patterson, if you

4    can.

5     Q.    BY MR. PATTERSON:  Let me get my report out

6    here.

7          Back in January of 2002, you testified on behalf

8    of a client by the name of Elizabeth Vogel.  And your

9    question, page 111, line 9, "Tell us what your diagnosis

10   was of Elizabeth Vogel."

11         "ANSWER:  When I saw Ms. Vogel, I felt that she

12   had Axis I.  We have five axises to make a diagnosis.

13         "QUESTION:  Is that out of the DSM IV?"

14         MR. MARTINEZ:  Objection, improper.

15         THE COURT:  Let me see counsel.

16         (Bench conference was held outside the hearing of

17   the jury.)

18         THE COURT:  Mr. Patterson, are you just going to

19   read?

20         MR. PATTERSON:  This is not heard prior regarding

21   the statement under oath.  I just thought I'd lay a

22   predicate.

23         THE COURT:  That's fine but don't just read.  You

24   can ask did you say this and let him answer.  Don't read

25   it.  Just ask the question.

1          MR. PATTERSON:  But I can read it.  It's not

2    hearsay.  It's prior testimony under oath.  That comes in.

3    It's right in the rules.  So I can read the whole thing.

4          THE COURT:  Mr. Martinez?

5          MR. PATTERSON:  It's in another court, makes it

6    out of court statement, not in court offered for the

7    truth.

8          THE COURT:  Just ask.  I don't want you to read.

9          MR. MARTINEZ:  Thank you, Judge.

10          THE COURT:  Just ask the question.

11          (Bench conference concluded.)

12     Q.   BY MR. PATTERSON:  Was your Axis I diagnosis

13    mayor depression?

14     A.   Counsel, I've made a lot of diagnoses in a lot of

15    patients.  If you say it was, that's what I testified to,

16    that that was what my diagnosis was, I do not have that

17    file in front of me.  I have no clue what my diagnosis was.

18     Q.   "QUESTION:  Is that out of the DSM IV?

19          "ANSWER:  That is out of the DSM IV.  Axis I is

20    primary diagnosis.  Axis II is personality disorder

21    diagnosis.  I diagnosed her with major depression.

22    Underneath that I had dysthymia, which is chronic

23    depression.  And also I believe that she had PTSD

24    symptoms."

25          MR. MARTINEZ:  Objection.  Relevance, this is a

1   diagnosis of the other woman.

2           MR. MARTINEZ:  Sustained.

3       Q.  BY MR. PATTERSON:  The next diagnosis for.

4           MR. MARTINEZ:  Same objection.

5           THE COURT:  Sustained.

6           MR. PATTERSON:  You just said, Judge.

7           THE COURT  Counsel approach.

8           (Bench conference was held outside the hearing of

9   the jury.)

10          THE COURT:  Where are you going with that?  Let

11  me understand that you're doing.

12          MR. PATTERSON:  I bringing in Axis I from the

13  client depressive disorder.

14          THE COURT:  Just ask him did you make a diagnosis

15  of depressive or depression and what was the basis for your

16  opinion in Vogel.  Have you made the same thing here.

17          MR. MARTINEZ:  But hold on, but on the other hand

18  what about Axis II?

19          MR. PATTERSON:  I won't do that.

20          MR. MARTINEZ:  Wait a minute, his diagnosis of

21  PTSD, he's saying she was a victim of domestic violence

22  that's he's saying that she not.

23          THE COURT:  You can follow up on redirect.

24      Q.  BY MR.  PATTERSON:  In your report in this case,

25  was your Axis I diagnosis for Ms. Andriano depressive

 1  disorder, NOS?

 2      A.   Yes.

 3      Q.   All right.  Are there specific objective tests

 4  that you would recommend other than the MMPI II and the

 5  Williamson -- well, the MMPI II.  Are there any other tests

 6  other than that that you would recommend in the evaluation

 7  of whether or not a person is a victim of domestic

 8  violence?

 9      A.   First of all, domestic violence   --

10      Q.   My question is, are there --

11      A.   The answer to the question is there are multiple

12  psychological tests that could be utilized to determine

13  what an individual's personality and emotional functioning

14  is.

15      Q.   My question -- Doctor, excuse me.  You're not

16  responding to my question.

17           Are there other objective tests that you would

18  use to determine whether or not a person is, in fact, a

19  victim of domestic violence?

20      A.   There is no test to determine whether or not a

21  person is a victim of domestic violence.

22      Q.   Okay.  It's because the determination of that

23  issue is a subjective opinion, isn't it?

24      A.   No.

25      Q.   It's a function of one's experience in that

1  particular discipline in order to come to that kind of

2  conclusion?

3       A.   No, you're absolutely wrong.

4       Q.   There are no objective tests that can actually

5  define whether or not a person is the victim of domestic

6  violence; isn't that true?

7       A.   That's because -- you didn't say violence.  You

8  said domestic violence.  That is because domestic violence

9  is not even in the DSM, number one --

10      Q.   -- a psychological disorder?

11           MR. MARTINEZ:  He's not allowing him to answer.

12           THE COURT:  Hold on.  Listen to me for just a

13  moment.  We're going to be courteous to the court reporter

14  here today.  We're go one at a time.

15           THE WITNESS:  If I may answer your question,

16  counsel?

17      Q.   BY MR. PATTERSON:  My questions is --

18           MR. MARTINEZ:  Judge --

19           THE COURT:  Go ahead and repeat the question and

20  then Dr. Bayless will answer the question.

21      Q.   BY MR. PATTERSON:  My question is:  The

22  determination of whether or not a person is a victim of

23  domestic violence is more of a subjective opinion based on

24  one's experience in the field; isn't that accurate?

25      A.   No, that's not accurate at all.  And to say that

1   is really misleading.

2        Q.   Your answer then is no?

3        A.   No.

4        Q.   The Williamson test is a subjective test, right?

5        A.   It's a projective test.

6        Q.   I use the term subjective interchangeable with

7   projective, correct?

8        A.   Subjective meaning that it is not objective.

9   Meaning -- projective meaning that it is a test that is

10  utilized to project, to have the individual project into a

11  certain format.

12       Q.   You told us it then draws upon the clinical

13  experience of the examiner to evaluate that particular

14  test, correct?

15       A.   Yes.

16       Q.   So the clinical experience of an examiner is an

17  important issue in cases involving either psychological

18  assessment or domestic violence assessment, correct?

19       A.   Clinical experience is always important.  I mean,

20  why else would you have a psychologist?  Why wouldn't you

21  let the bartender do it.

22       Q.   Is that yes?

23       A.   Yes.

24            MR. PATTERSON:  Judge, if I ask just check my

25  notes?

```
1              THE COURT:  Yes.

2              MR. PATTERSON:  Judge, have I no further

3    question.  Thank you.

4              THE COURT:  Mr. Martinez.

5

6                    REDIRECT EXAMINATION

7    BY MR. MARTINEZ:

8         Q.   Sir, one of the things you were asked about was

9    the Vogel case.  Do you remember being asked about that?

10        A.   Yes, sir.

11        Q.   I thought you told us on direct examination that

12   every case stands on its own merits?

13        A.   It does.

14        Q.   So, how important was the Vogel case in your

15   diagnosis of Wendi Elizabeth Andriano?

16        A.   It had no bearing whatsoever.

17        Q.   The fact that you may have looked at some aspects

18   with regard to the Vogel case, does that have any

19   applicability to whether or not the defendant is a victim

20   of domestic violence?

21        A.   No.

22        Q.   And you were asked about the Power and Control

23   Wheel and there were many questions you were asked about

24   that.  Do you remember that?

25        A.   Yes.
```

1      Q.   And you weren't asked whether or not you use the

2   Power and Control Wheel to make a threshold assessment as

3   to whether or not there was any domestic violence, did you

4   -- were you?

5      A.   No, I was not.

6      Q.   And the discussion that you had, if I remember

7   correctly, involving domestic (sic) and Control Wheel went

8   something like this, just so that we know that we're

9   talking about.  In it you were asked:  Dr. Bayless, would

10   you explain the cycle of violence to the jury?

11           Is that when you started to discuss the Power and

12   Control Wheel?

13      A.   Yes.

14      Q.   Now, with regard to the discussion of the Power

15   and Control Wheel that you had in the Vogel case, was that

16   to make a determination as to whether or not there was a

17   diagnosis of domestic violence?

18      A.   No.  That diagnosis had already been made through

19   clinical assessment and through utilization of objective

20   personality instruments prior to we making that decision

21   that she, in fact, was a victim of domestic violence.

22      Q.   So how worthwhile was it to your inquiry today to

23   be asked all these things that you said about another woman

24   in an unrelated cause of action?

25      A.   It's confusing, to some people.

1      Q.    So it had nothing to do with the threshold

2   question as to whether or not the defendant was a victim of

3   domestic violence?

4      A.    Absolutely nothing.

5      Q.    It talked about the cycle of violence, which is

6   something different, isn't it?

7      A.    Yes.

8      Q.    One of the things that you were also asked -- let

9   me put it this way:  Do you do charity?  Is that what your

10   main goal in life is?  Is that what it is?

11      A.    No.

12      Q.    Do you expect to get paid for your time?

13      A.    Yes.  And I'm pleased that people think of me

14   highly enough to pay me my rate.

15      Q.    Is there any phycologist that you know of, Sharon

16   Murphy or anybody else included, that does it for free,

17   sir?

18      A.    No.

19      Q.    So, they're not into charity either, are they?

20      A.    Not that I'm aware of.

21      Q.    Have you read any articles where any phycologist,

22   any social worker, comes in and does work for free?

23            MR. PATTERSON:  Judge, this is irrelevant.

24            THE WITNESS:  No.

25            THE COURT:  Sustained.  Let's move on.

1      Q.   BY MR. MARTINEZ:   You indicated -- You were

2  asked, well, you only interviewed her for two or three

3  hours.  Do you remember that?

4      A.   Yes.

5      Q.   Did you need more than two or three hours in

6  light of Dr. Murphy's report?

7      A.   No.

8      Q.   Did you need anything more than the

9  inconsistencies that were in Dr. Murphy's report to make an

10  assessment?

11           MR. PATTERSON:   Judge, wait, wait, wait.

12           THE COURT:   Rephrase the question.

13      Q.   BY MR. MARTINEZ:   You took a look at

14  Dr. Murphy's report, right?

15      A.   Yes.

16      Q.   Did you note the inconsistencies related to that

17  report?

18      A.   Yes.

19      Q.   Did you use them in your assessment as to whether

20  or not the defendant was a victim of domestic violence?

21      A.   Yes.

22      Q.   Did you need to go and repeat that same inquiry

23  again?

24      A.   No.

25           MR. PATTERSON:   Objection.  Can we approach?

1               THE COURT:  Yes.

2               (Bench conference was held outside the hearing of

3       the jury.)

4               MR. PATTERSON:  I know you allowed him a little

5       leading but he's running rough shod here.  I'm objecting to

6       this amount of leading.

7               MR. MARTINEZ:  No, it's not leading.  The court

8       reporter could read the question:  Did you need anything

9       else.

10              THE COURT:  It was not leading but the fact that

11      Mr. Patterson is concerned, just be careful.

12              (Bench conference concluded.)

13              THE COURT:  MR. MARTINEZ:

14         Q.   BY MR. MARTINEZ:  To make a full and complete

15      assessment in this particular case, did you need to repeat

16      Sharon Murphy's work?

17         A.   No.

18         Q.   Did you review her report?

19         A.   Yes.

20         Q.   Did that, what was contained in that, plus

21      everything else that you knew, did that form part of the

22      basis for your opinion in this case?

23         A.   Yes.

24         Q.   You were asked about Axis I and DSM IV.  First of

25      all, what is the DSM IV?

1      A.    The DSM IV is the Diagnostic Statistical Manual

2  of mental disorders, volume IV.

3      Q.    Is that the one that's used by psychologists?

4      A.    Yes.

5      Q.    And with regard to that particular manual, with

6  regard to that, is there even, if you will, a diagnosis of

7  domestic violence that's included in the DSM IV?

8      A.    No.

9      Q.    And with regard to, again, to this diagnosis of

10  domestic violence, with regard to the results that you

11  received on those tests, is that something that you can

12  then turn around and use to determine whether or not a

13  person is or is not involved in domestic violence?

14      A.    No.  Only the symptoms that come out of the

15  diagnostic picture give you hints as to -- give you

16  direction as to what's going on with an individual.

17      Q.    You were asked about Axis I as it applied to the

18  defendant, do you remember that?

19      A.    Yes.

20      Q.    With regard to that, what did you find?

21      A.    According to this defendant?

22      Q.    Yes.

23      A.    Axis I, what found was that she suffered from a

24  depressive disorder, NOS.

25      Q.    With regard to that depressive disorder, NOS --

1   NOS stands for "not otherwise specified," correct?

2        A.   That's correct.

3        Q.   With regard to that particular disorder, did you

4   just, in a vacuum, look at that and say because of this,

5   then she is or is not a victim of domestic violence or did

6   you do something else?

7             MR. PATTERSON:   Judge, objection.

8             (Bench conference was held outside the hearing of

9   the jury.)

10            MR. PATTERSON:   You limit him to psychological

11  testimony.   That violates your ruling in this regard.

12            MR. MARTINEZ:   He talked about Axis I and he used

13  it to indicate, to show that there was no way that just

14  with that there could be a diagnosis.   He opened the door.

15            THE COURT:   You brought up Axis I.

16            MR. PATTERSON:   As a psychological concept.   I

17  asked about whether he found psychological issues with

18  Ms. Andriano.

19            THE COURT:   You brought up the depressive

20  disorder.

21            MR. PATTERSON:   Correct.   I asked did he find the

22  same kind of thing in regards to Ms. Vogel and he said he

23  did.

24            THE COURT:   Right.

25            MR. PATTERSON:   And he went beyond that, Judge.

93

1          MR. MARTINEZ:  Question, how did that relate to

2     this case?

3          THE COURT:  Go ahead and ask that question and

4     then just move on after that.

5          MR. MARTINEZ:  Sure.

6          (Bench conference concluded.)

7          THE COURT:  Mr. Martinez, would you repeat the

8     question?

9          Q.   BY MR. MARTINEZ:  With regard to this Axis I

10    disorder, how does that relate to the defendant, Wendi

11    Elizabeth Andriano?

12         A.   Other than the fact that she had symptoms that

13    are correlated to that particular diagnosis.

14         Q.   In other words, you said it correlated to that

15    particular diagnosis?

16         A.   That's correct.  She meets the diagnostic

17    criteria for that particular diagnosis, that's all.

18         Q.   You were also asked a lot about your experience.

19    You were asked about items that you may or may not have

20    published.  Do you remember being asked about that?

21         A.   Yes.

22         Q.   Just because you didn't publish something on

23    domestic violence, does that mean you know nothing about

24    it?

25         A.   No.

1    Q.    With regard to what you do know about domestic

2  violence, please, in terms of your experience, why don't

3  you start there and tell us what your experience is with

4  people and domestic violence?

5    A.    Wow.  Over the last 28 years I've evaluated

6  numerous of individuals, especially in the domestic

7  relations court that have had issues with domestic

8  violence.  I've also, in my clinic, have had, have been

9  involved, intimately involved with numerous cases which we

10  have treat children and women who were victims of domestic

11  violence.

12          I think the people should understand that

13  domestic violence is like any

14          MR. PATTERSON:  Judge, volunteering.

15          THE COURT:  Sustained.

16          Ask your next question.

17    Q.    BY MR. MARTINEZ:  You were trying to indicate to

18  us how it was, to give us an understanding of domestic

19  violence and how it applies to your experience.  Can you

20  tell us that, please?

21    A.    Domestic violence is, and I think people need to

22  understand that when I say "domestic," it simply means "in

23  the home."  That's what domestic typically means.  Violence

24  is violence, people.  Trauma is trauma.  The symptom

25  picture that exists within the traumatic experience in an

1   in-home, inside the house, does not mean that the symptom

2   picture that you'll see clinically is going to change, be

3   different if it happened outside the house.  You still are

4   going to have the same sort of trauma given the fact that

5   an individual has that type of control in your life.

6            What we see, oftentimes, is -- and I think the

7   research says it very clearly -- that we see symptom

8   pictures that are very similar to posttraumatic stress

9   disorders with domestic violence individuals, obviously

10   acute anxiety disorder-type of symptom picture.

11        Q.   Let me stop you there.  Did you find those two

12   things in this case?

13        A.   No, we did not.

14        Q.   Go ahead.

15        A.   You see some disassociation with individuals who

16   are victims of violence and trauma.  We saw none of that in

17   this case, either.

18        Q.   You also indicated that you testified with regard

19   to cases involving domestic disputes.  In other words,

20   divorce and that sort of thing?

21        A.   Yes, I have.

22        Q.   Have you testified in court involving the issue

23   of domestic violence related to divorce proceedings?

24            MR. PATTERSON:  Irrelevant, Judge.

25            THE COURT:  Overruled.

1          Go ahead and answer the question.

2          THE WITNESS:  Yes.

3     Q.   BY MR. MARTINEZ:  Can you put a number on the

4     number of times you've done that?  If you can't --

5     A.   I really couldn't say but numerous times.  Many,

6     many times.

7     Q.   You were asked a little bit about the Stockholm

8     Syndrome.  Do you remember being asked about that?

9     A.   Yes.

10    Q.   What is the Stockholm Syndrome?

11    A.   That's when an individual is in a -- Stockholm is

12    really jail, when a individual in a. . .

13    Q.   It's a hostage situation?

14    A.   Hostage situate where they begin to feel sorry

15    for those who are their abusers or captors, so to speak.

16    Q.   And that's because they've had a of lot of time

17    to talk with them, right?

18    A.   There is a relationship that happens.  And there

19    is a transference, sometimes counter-transference of

20    feelings that happen toward the abuser.

21    Q.   Did you see anything of that in this case?

22    A.   No.

23    Q.   Now, you talked about the cycle of violence with

24    regard to another case.  That cycle of violence that we're

25    talking about is that threshold question is something

1   that's down the road after the original diagnosis has been

2   made?

3       A.   That is something down the road after the

4   original diagnosis is made and you look at what's been,

5   what has happened in this individual in each and every

6   individual case.  I found none of that present in this

7   particular case.

8       Q.   And in terms of the Vogel situation, would you

9   look at the result of whatever happened in that case and

10   use it to make a determination about whether or not there

11   was domestic violence in this case?

12       A.   Absolutely not.

13       Q.   And with regard to this case, is your opinion

14   unchanged even though you were asked about your experience,

15   even though you were asked about all these other cases that

16   you may have been involved, was the defendant Wendi

17   Andriano the victim of domestic violence in this case?

18           MR. PATTERSON:  Wait, Judge.

19           THE COURT:  Let me --

20           MR. MARTINEZ:  Just, or wait, wait.

21           THE COURT:  Rephrase the question, please.

22       Q.   BY MR. MARTINEZ:  With regard to everything that

23   you've been asked, you've been asked about publishing,

24   you've been asked about your experiences; even though

25   you've been asked all of that stuff, all of the questions,

1   and, additionally, asked about the Vogel case, has your

2   opinion changed in this case as to whether or not the

3   defendant has any characteristics that are consistent with

4   domestic violence?

5       A.   My opinion has not change.

6       Q.   What is that opinion?

7       A.   She does not have any characteristics.

8       Q.   That are consistent with domestic violence?

9       A.   That is correct.

10          MR. MARTINEZ:  I don't have anything else.

11          THE COURT:  Are there questions of the witness by

12   the jury?  If so, please raise your hand.

13          (Bench conference was held outside the hearing of

14   the jury.)

15          THE COURT:  Jury question: Can you read the whole

16   results from the MMPI II, paren, the report, paren.  Was

17   the MMPI II machine scored or scored by hand.

18          MR. MARTINEZ:  I have no objection.

19          MR. PATTERSON:  Talking about reading the whole

20   report?  I object to that.  I don't have any objection to

21   whether or not they're inquiring whether it's machine

22   scored or scored by hand.

23          THE COURT:  I'm not going to ask about having him

24   read the result.  But I'll ask the question how the MMPI II

25   was scored.

1         MR. PATTERSON:  No objection, then.

2         THE COURT:  Next question:  Can you explain how

3 you came to your conclusion that Wendi was not the victim

4 of domestic violence?

5         I'm not going to ask the question.  He's already

6 stated his basis.  I'm not going to go into that.

7         MR. MARTINEZ:  Judge, you know, I mean, he can

8 tell us that.  It should be asked.  We can lead, say he

9 considered all of the other materials, based on that, he

10 reach that conclusion.

11         MR. PATTERSON:  I object.

12         THE COURT:  You made your record.  I'm not going

13 to ask that question.

14         Next question:  What exactly were you asked to

15 determine in this case?

16         MR. MARTINEZ:  No objection.

17         MR. PATTERSON:  No, objection.

18         THE COURT:  Next question:  If there is quote

19 unquote, no, test to determine domestic violence, how can

20 you say Wendi was not a victim of domestic violence?

21         MR. MARTINEZ:  I have no objection.

22         MR. PATTERSON:  No objection.

23         THE COURT:  Next question:  Did you consider any

24 of Dr. Murphy's tests unbiased or adequate --

25         MR. PATTERSON:  What is supposed to adequate?

1        THE COURT:  I'll reread it:  Did you consider any

2   of Dr. Murphy's tests unbiased or adequate to determine the

3   existence of domestic violence?

4        MR. MARTINEZ:  No objection.

5        MR. PATTERSON:  No objection.

6        THE COURT:  Next question:  Did Wendi show signs

7   of any personality trait or characteristic which would

8   indicate problems in her marriage?

9        MR. MARTINEZ:  No objection.

10       MR. PATTERSON:  No objection.

11       THE COURT:  Next question:  Is a five-hour

12  face-to-face interview time enough to fully complete all

13  the tests you administered?

14       MR. MARTINEZ:  No objection.

15       MR. PATTERSON:  two to three hours, face to face

16  entire, probably two hours of proctoring.  So, I mean,

17  that I don't understand the question.

18       THE COURT:  So you have an objection?

19       MR. PATTERSON:  I object.

20       THE COURT:  I believe -- do you have a problem

21  with asking how long did your interview take and how long

22  did it take for you to administer the test?

23       MR. PATTERSON:  Yeah, it's been asked.

24       THE COURT:  If I would re-ask that question in

25  that fashion, you don't have any problem with that?

1        MR. PATTERSON:  No.

2        THE COURT:  I'll ask it in that fashion then.

3        Next question:  Were any of the tests you

4   administered verbal or were they all written?

5        MR. MARTINEZ:  No objection.

6        MR. PATTERSON:  No objection.

7        THE COURT:  Next question:  How did you come to

8   the conclusion that Wendi did not suffer from domestic

9   violence?

10        MR. MARTINEZ:  I have no objection.  I mean, that

11   is the issue here.

12        MR. PATTERSON:  He's already told us how.

13        MR. DELOZIER:  I think that's redundant, so I

14   object.

15        MR. MARTINEZ:  The second question, they clearly

16   didn't get it.

17        THE COURT:  Well, I'm not going to ask this

18   question because I'm not sure what we're going to get

19   into.  You can argue what he said in your closing argument.

20        MR. MARTINEZ:  The only thing I want to say we

21   allowed Sharon Murphy to go on for three days even though

22   it was restricted by your order.  I mean, if we allowed

23   that expert unfettered time, I just think he should be

24   allowed to answer that question, what it was that he

25   considered.

1          THE COURT:  You made your objection, or your
2     record.

3          Next question:  Why do you believe the defendant,
4     Wendi Elizabeth Andriano, is not a victim of domestic
5     violence?

6          MR. MARTINEZ:  Obviously, he needs to answer
7     that.

8          MR. PATTERSON:  I have the same objections.

9          THE COURT:  I'm not going to ask that question.
10    He stated on direct and he stated on redirect.

11         Next question:  What were the results slash
12    impression of the MMPI II given to the defendant?

13         MR. MARTINEZ:  No objection.

14         MR. PATTERSON:  No objection.  I don't want him
15    to go through the whole MMPI, the scales that are
16    relevant.  I have no objection to him talking about those.

17         THE COURT:  Okay.  Do you mean specifically
18    regarding the scales?

19         MR. PATTERSON:  I guess object to it.  I think
20    he'd have to go over the entire MMPI to fairly answer the
21    question.

22         THE COURT:  Mr. Martinez?

23         MR. MARTINEZ:  I think that these question are
24    relevant and should be asked.

25         THE COURT:  I'm not going to ask that question.

1      Next question.  What was the interpretation of

2  the Williamson Sentence Completion Test?

3      MR. MARTINEZ:  Same objection.  If we can't ask

4  about the MMPI, I don't think we should give incomplete

5  responses.

6      MR. PATTERSON:  I join his objection.

7      THE COURT:  I'm not going to ask any of those

8  questions.

9      Next question.  Would Wendi's lack of anger stem

10  from her religious background?

11      MR. MARTINEZ:  That is beyond the scope.

12      MR. PATTERSON:  Yes, that's beyond his

13  expertise.

14      (Bench conference concluded.)

15

16                  EXAMINATION

17  BY THE COURT:

18      Q.  Dr. Bayless, I have some questions for you here

19  from the jury.

20      The first reads as follows:  Was the MMPI II

21  machine scored or scored by hand?

22      A.  Machine scored.

23      Q.  Next question:  What exactly were you asked to

24  determine in this case?

25      A.  I was asked to determine whether the defendant

1    suffered from any mental disease or defect that would play

2    a role in her overall defense.  Whether or not, if she did

3    suffer from a mental disease or defect, what effect would

4    that have on her in terms of mental status at the time of

5    the offense.  And was there, in terms of domestic violence,

6    whether or not there was an issue of domestic violence

7    involved in this case.

8         Q.   Next question reads as follows:  If there is,

9    quote, no, end of quote, test to determine domestic

10   violence, how can you say Wendi was not a victim of

11   domestic violence?

12        A.   Research indicates that domestic violence is

13   defined by a pattern of coercive control that's

14   characterized by physical, sexual and psychologically

15   abusive behaviors.  The term "domestic violence" is kind of

16   a very broad term.  What we want to look at is the presence

17   of physical, sexual and psychologically abusive behaviors.

18             When we look at Ms. Andriano's behavior pattern

19   prior to before, during, and after the alleged offense --

20             MR. PATTERSON:  Judge, can we approach?

21             THE COURT:  Yes.

22             (Bench conference was held outside the hearing of

23   the jury.)

24             MR. PATTERSON:  This is -- I know the Government

25   is allow to lead but he's going to pontificate.  I would

1   assume the same rules apply.  He is now going to

2   pontificate.

3            THE COURT:  Well, I don't know what he's going to

4   say.

5            MR. PATTERSON:  I object then.  I object now

6   because he's going into an area prohibited by your pretrial

7   rulings.

8            MR. MARTINEZ:  There is nothing here in your

9   pretrial ruling that indicates he cannot opine whether or

10  not she was or was not suffering from domestic violence.

11  We can't change the Court's ruling because we don't like

12  the answer.

13           THE COURT:  But, that's why I asked whether there

14  are any other objections.  We don't know what he's going to

15  say.

16           MR. MARTINEZ:  I ask he be allowed to answer.

17           THE COURT:  I'm not sure where he's going to go

18  with that and so I'm going to go ahead and ask the next

19  question.

20           (Bench conference concluded.)

21      Q.   BY THE COURT:  Dr. Bayless, the next question is

22  as follows:  Did you consider any of Dr. Murphy's tests

23  unbias or adequate to determine the existence of domestic

24  violence?  Yes or no.  If you can answer that yes or no?

25      A.   I can explain it, Your Honor?

1    Q.   Are you able to say yes or no to that question?

2    A.   Did I find any of her tests unbiased?

3    Q.   The question reads:  Did you consider any of

4 Dr. Murphy's tests unbiased or adequate to determine the

5 existence of domestic violence?

6    A.   No, I did not.

7    Q.   Next question reads as follows:  Did Wendi show

8 signs of any personality traits or characteristics which

9 would indicate problems in her marriage?

10    A.   Wow.  I'm not sure if I understand that question

11 specifically if the person asked that question is asking

12 did the --

13    Q.   You don't understand the question?  You're not

14 able to answer the question as you heard it?

15    A.   Read it back to me again.

16    Q.   The question reads as follows:  Did Wendi show

17 signs of any personality traits that or -- I'm sorry.

18         Did Wendi show signs or any personality traits or

19 characteristics which would indicate problems in her

20 marriage?

21    A.   I guess the answer to that question would be

22 often individuals who have personality traits such as hers,

23 do, in fact, have problems in relationships.  I cannot say

24 that her personality problems are difficulties -- are

25 characteristics that would specifically cause problems with

1    her husband mainly because I haven't talked to him.

2        Q.    The next question reads as follows:  How much

3    time did you spend in a face-to-face interview with the

4    defendant?

5        A.    Two to three hours.

6        Q.    How much time did you spend with her completing

7    all the tests that you administered?

8        A.    Again, that's two to three hours.

9        Q.    Total, all together?

10       A.    No, no.  One, two to three hours in one session,

11   two to three hours in another session.

12       Q.    Thank you.  Were any of the tests that you

13   administered verbal?

14       A.    Yes.

15       Q.    So they were not all written, correct?

16       A.    Correct.

17            THE COURT:  Are there any further questions of

18   this witness by the jury?  If so, please raise your hand?

19   No one has raised their hand.

20            Are there any follow-up questions to the

21   questions that I asked by Mr. Martinez?

22

23                    FURTHER REDIRECT EXAMINATION

24   BY MR. MARTINEZ:

25       Q.    In this particular case, you indicated that the

1    tests that were run or administered by Sharon Murphy were

2    biased, is that what you said on direct?

3        A.   Well, you know, they are not tests.   First of

4    all, I think the misleading problem here is that they are

5    making the assumptions that these are tests.   These are not

6    tests.   These are interview questionnaires.   They're not

7    tests.   A test is something you don't know the answer to.

8        Q.   And as a result of the interview questionnaires

9    that you were asked about and as a result of the report

10    that you read, do you find her opinion to be valid?

11        A.   No, I do not find her opinion to be valid.

12        Q.   You were asked about the time that you spent face

13    to face with the defendant.   If you needed more time, would

14    you have taken it?

15        A.   Absolutely.

16        Q.   Did you also already have the 20-hour report that

17    was caused by the 20 hours spent by Sharon Murphy before

18    you went to speak with the defendant?

19        A.   Yes.

20        Q.   In terms of the test that was verbal, were they

21    all verbal or were all where she sat down.   Which ones were

22    verbal?

23        A.   The sentence completion test is verbal.

24        Q.   And the others were not?

25        A.   That's correct.

1        Q.    One of the issues that was presented to you in

2   this case, I think you indicated, was whether or not she

3   suffered or had the characteristic -- well, whether or not

4   she was the victim of domestic violence?   You were

5   presented with that question, weren't you?

6        A.    Yes.

7              MR. PATTERSON:   Objection, Judge, that's not the

8   question.

9              THE COURT:   Let's move on.

10       Q.    BY MR. MARTINEZ:   What was your answer?

11             MR. PATTERSON:   I object to the question.

12             MR. MARTINEZ:   It's based on the question.   I'm

13   not going to go into it.

14             THE COURT:   I'll sustain the objection.   The

15   answer stands.   Okay.

16             MR. MARTINEZ:   I don't have anything else.

17             MR. PATTERSON:   Mr. Patterson.

18

19                        RECROSS-EXAMINATION

20   BY MR. PATTERSON:

21       Q.    In your report dated, August 4, 2004, does it

22   state the reason for referral, quote, the purpose of this

23   evaluation --

24             MR. MARTINEZ:   I'm going to object, beyond the

25   scope.

1              THE COURT:  Overruled.

2        Q.   BY MR. PATTERSON:  Again, in the first paragraph

3    of your August 4, 2004 report where it says reason for

4    referral, does it state, "The purpose of this evaluation is

5    to examine Wendi Andriano's intellect, personality and

6    overall emotional stability?

7        A.   Yes.

8              MR. PATTERSON:  Thank you, Judge.  I have nothing

9    additional.

10             THE COURT:  May this witness be excused?

11             MR. MARTINEZ:  I don't have anything else.

12             MR. PATTERSON:  Yes, Judge.

13             THE COURT:  Thank you.  You are excused.

14             Ladies and gentlemen, we're going to take our

15   afternoon break at this point in time.  During the break

16   remember the entire admonition I have given you including

17   the fact do not discuss this case with anyone.  Do not let

18   anyone discuss this case with you.  Keep an open mind.

19             We'll take about a 20-minute break.  Have a nice

20   break.

21             (Recess taken.)

22             THE COURT:  This is Cause Number CR2000-096032,

23   State of Arizona versus Wendi Elizabeth Andriano.

24             The record will reflect the presence of the

25   defendant, counsel and the jury.

1          Mr. Martinez.

2          MR. MARTINEZ:  State moves admission of Exhibit

3   471, 472 and 473.

4          MR. PATTERSON:  These are hearsay declarations,

5   Judge.  I object.

6          THE COURT:  Let me see the exhibits.

7          (Bench conference was held outside the hearing of

8   the jury.)

9          THE COURT:  Just what is 471?

10          MR. MARTINEZ:  One of the things that defendant

11   testified to was that the victim never purchased any

12   jewelry or anything other than the pearl necklace.  There

13   was a purchase on August 30th that we asked her about it.

14   She indicated well, August 30, it's made out to Wendi

15   Andriano.  It wasn't purchased by him.  It was a purchased

16   by her to herself.  She's already authenticated the

17   receipt.

18          THE COURT:  What is exhibit number 472 for

19   identification?

20          MR. MARTINEZ:  472 is a statement of financial

21   status.  Basically it's not true that her wages had already

22   been garnished.  What happened is she fraudulently

23   completed this in an attempt to get the amount of

24   garnishment reduced.  The reason we know that is that

25   document was prepared by Jeff Miller, the attorney in which

1  he references this stuff.  That's how I was able to come

2  across that.  It does indicate that she paid $585 in rent.

3  When I asked her about it, she indicated that that was the

4  benefit she received.  However, that was a fraudulent

5  statement.  Discussed on redirect she tried to explain that

6  away saying, well, you know that's the benefit of the

7  apartment to me.  That is not hearsay.

8          Regarding 473 that's a fraudulent receipt that

9  she submitted in support of the 585.35.

10         MR. PATTERSON:  This one, I don't think you gave

11  her the whole receipt.

12         MR. MARTINEZ:  I know I gave all the receipts.

13         THE COURT:  Okay.  I'll take the matter of these

14  exhibits under advisement at this time.

15         (Bench conference concluded.)

16         MR. MARTINEZ:  State calls Justin Roberts.

17         MR. PATTERSON:  Judge, I've revisited my

18  position?  I have no objection to those exhibits.

19         THE COURT:  Exhibits 471, 472 and 473 for

20  identification are admitted into evidence.

21         THE COURT:  Sir, please step forward right up

22  here.  Please give the clerk your name and she will swear

23  you in.

24         (Witness sworn.)

25         THE COURT:  Please have a seat on the witness

1    stand here.  Sir, please make yourself comfortable on the

2    witness stand.  Please pull the microphone close to you.

3    Please remember to speak loudly and clearly into microphone

4    so everyone can hear you.  Also, please wait until the

5    question is complete before you answer the question.  And

6    please make sure that you give a verbal response.

7              Is that agreeable to you, sir?

8              THE WITNESS:  Yes, sir.

9              THE COURT:  And Mr. Martinez, you may proceed.

10

11                        JUSTIN ROBERTS,

12   called as a witness herein, having been first duly sworn,

13   was examined and testified as follows:

14

15                     DIRECT EXAMINATION

16   BY MR. MARTINEZ:

17        Q.   What is your name, sir?

18        A.   Justin Roberts.

19        Q.   And where do you work?

20        A.   I'm a cotton farmer in Coolidge.

21        Q.   Did you know somebody named Joseph Andriano?

22        A.   Yes, sir.

23        Q.   How long did you know him?

24        A.   Since I was about ten years old.

25        Q.   How old would Joe Andriano be when you were ten

1   yours old?

2        A.   He was about three years older than me.

3        Q.   And since then until his death, did you keep in

4   contact with him?

5        A.   Yes.

6        Q.   And back when you were ten years old, where did

7   you live?

8        A.   In Casa Grande, 11 Mile Corner.

9        Q.   What?

10       A.   Casa Grande.

11       Q.   Is Casa Grande a very large community or small

12  community?

13       A.   It's pretty small.

14       Q.   And was it even smaller back when you first met

15  Joseph Andriano?

16       A.   Yes.

17       Q.   Did you and he become friends when you were

18  younger?

19       A.   Yes.

20       Q.   Did you remain friends until his death?

21       A.   Yes.

22       Q.   And with regard to this friendship that you may

23  have had, did that encompass spending time with him on a

24  social basis?

25       A.   Yes, it did.

1    Q.   Did that also encompass spending time with him as

2  he grew older?

3    A.   Yes.

4    Q.   Did you and he, for example, socialize by going

5  to the lake?

6    A.   Yes.

7    Q.   How many times did you estimate that you and he

8  went to the lake?

9    A.   Oh, more than probably 50 or 60 times.  We'd go

10  at lease probably ten times in the summer.

11    Q.   And how about the winter, would you guys go in

12  the winter?

13    A.   No, we'd go to the sand dunes.

14    Q.   And, additionally, with regard to that,

15  essentially, did you and he also go out and go to a bar,

16  that sort of thing?

17    A.   Yes.

18    Q.   Did you do that, also, many times?

19    A.   Yes.

20    Q.   Was there occasions that you went to these bars

21  and Mr. Andriano was accompanied by somebody by the name of

22  Wendi Ochoa?

23    A.   Yes.

24    Q.   Did you see them interact frequently or not?

25    A.   Interact, like hanging out you mean?

1    Q.   Yeah, hang out?

2    A.   Yes.

3    Q.   Would this be solely restricted to bars or other

4    situations?

5    A.   Other situations.

6         MR. DELOZIER:  What time is he referring to, Your

7    Honor?

8         THE COURT:  Lay some foundation as to time frame.

9    Q.   BY MR. MARTINEZ:  Sir, we know that they met in

10   1992.  It was, I believe it was Saint Patrick's Day.  After

11   Saint Patrick's day of 1992, restrict your comments after

12   that, okay?

13   A.   Okay.

14   Q.   And until the time they were married, all right?

15   Did you seen them interact?

16   A.   Yes.

17   Q.   And you were telling us about did you see them

18   interact both in and outside of bars, right?

19   A.   Yes.

20   Q.   You indicated that you knew Mr. Andriano growing

21   up, right?

22   A.   Yes, sir.

23   Q.   And did you know his reputation in the Casa

24   Grande area for peacefulness or violence in that area,

25   let's say from the time you were 16 until he died?

1      A.   Yes, he was peaceful.

2      Q.   And, specifically, did you have occasion in and

3    -- you did say you spent a lot of time with him, right?

4      A.   Yes, I did.

5      Q.   Did you have occasion to see him in a bar get in

6    a fight with anyone?

7      A.   No.

8      Q.   Did you see him when you were out socially with

9    the defendant, did you ever see him pick a fight with any

10   other guy or anything like that?

11     A.   No.

12     Q.   Did you ever see him at any time pick a fight or

13   become engaged in a fight with the defendant, Wendi

14   Elizabeth Andriano?

15     A.   No.

16     Q.   Did you ever, at any time, all the time that you

17   knew him, see him engaged in any fist-de-cuffs or fighting

18   with anybody?

19     A.   No.

20     Q.   Did you attend his wedding?

21     A.   Yes, I was in it.

22     Q.   And were you a part of that wedding?

23     A.   I was a groomsman.

24     Q.   Back when he was, let's say 16, 17, 18, in that

25   area, did he own a vehicle?

1    A.    Yes.

2    Q.    What kind was it?

3    A.    Chevy pickup, four-wheel drive.

4    Q.    And in all the time that you knew him, again,

5    since the time, let's say 1992, when he may have met the

6    defendant or at any time during his lifetime, did you ever

7    know or hear of him spinning his tires in gravel to break

8    windows at a Circle K?

9    A.    No.

10    Q.    Did you know or ever hear of a rumor even if it

11    was just a joke, that he had a contract with a glass

12    company to replace windows because he may have spun the

13    tires of this car or truck in gravel?

14    A.    No, I never heard that.

15    Q.    And you did live in Casa Grande during that time,

16    right?

17    A.    Yes, sir.

18    Q.    Where do you live now?

19    A.    In Chandler.

20    Q.    When did you move to Chandler?

21    A.    March of this year.

22    Q.    And you indicated you went to the sand dunes.

23    You also went to bars with him.  You also indicated you

24    went to the lake.  Are there any other activities you and

25    he enjoyed?

1      A.   We'd go skiing and stuff in the winter time, too.

2      Q.   How about toward the end, right about the time or

3   shortly before he was killed, did you know about his

4   cancer?

5      A.   Yes, I did.

6      Q.   And how did you find out about it?

7      A.   I believe he told me.

8      Q.   And do you remember his demeanor when he told you

9   this, where you were or when it was?

10     A.   Not really.  I don't remember when he told me or

11  where I was at the time.

12     Q.   Was it face to face or over the telephone?

13     A.   It was face to face.

14     Q.   And did you continue socializing with him after

15  he informed you that he had this cancer?

16     A.   Yes.

17     Q.   And did his demeanor change?  In other words, did

18  the reputation that he had for peacefulness change after

19  the diagnosis of his terminal illness?

20     A.   No, I think he became more timid.

21     Q.   Why do you say he became more timid?

22     A.   He was -- I don't know how to explain it.  He was

23  just -- just wanted -- he was just happy to be alive,

24  pretty much.

25     Q.   Did you -- were you one of his closest friends?

1      A.    I would think so.

2      Q.    Did he ever indicate to you that he was tired of

3  living or anything like that?

4      A.    No.

5      Q.    And when was the last time you saw him before he

6  was killed?

7      A.    Probably, maybe two months before that.

8      Q.    Did you have occasion to see him while he was

9  undergoing chemotherapy treatment?

10      A.    Yes.

11      Q.    Can you tell us about his demeanor, his strength,

12  that sort of thing.  How was he looking when he was going

13  through this chemotherapy?

14      A.    Real skinny and kind of weak.  He wasn't like the

15  old Joe.

16      Q.    You had known him when he was much bigger, right?

17      A.    Yes.

18      Q.    When you say he was kind of skinny and kind of

19  weak, how is it you know he was kind of weak?

20      A.    Well, he just looked from his appearance.

21      Q.    Would you --

22      A.    Just kind of drawn.

23      Q.    Would you, even though he was going

24  through -- when he was going through chemotherapy, we know

25  it was in the summer, we know it was between July 11 and

1   September 26th of the year 2000.  During that time, did you

2   and he go to the lake?

3       A.   I didn't.

4       Q.   Did you go to the lake with him at all during

5   that time period?

6       A.   No, I didn't.

7       Q.   Was it because he didn't ask you or because you

8   didn't ask him?  Why is it that you and he didn't go to the

9   lake during that period?

10       A.   I sold my boat and I hadn't gone back to the lake

11   since then.

12       Q.   When did you sell your boat?

13       A.   I believe it was in '99, '98 or '99.

14       Q.   Even though you sold your boat in '98 or '99, did

15   you and Mr. Andriano go out to the lake in his boat?

16       A.   No, I hadn't been to the lake.  The last time I

17   was at the lake was when I sold my boat.

18       Q.   Now, are you familiar with the tanks that are

19   used to fill the boats up with, whatever it is they run on,

20   on gasoline or diesel or whatever?

21       A.   The tanks that we would take to the lake?

22       Q.   Right.

23       A.   Yes.

24       Q.   Do you know whether or not there is such a thing

25   as a 250-gallon drum that you would use to take on a boat?

1          A.    No.

2          Q.    What is the highest amount that you ever saw

3    Mr. Andriano -- how would he take the fuel to get out there

4    when you went with him?

5          A.    Well, we had -- I believe they were maybe

6    25-gallon plastic tanks, about this high (demonstrating).

7    The same ones we would go to the sand dunes with.

8          Q.    And were those light or heavy?

9          A.    They were heavy.

10         Q.    And would you -- apparently you are

11   healthy -- would you be able to just pick those up?  Did

12   you say they were 25 gallons?

13         A.    Yes.  They might have been a little bit more.

14   They weren't quite 55-gallon drums.  They're plastic ones.

15         Q.    Were you just able to put your arms around them

16   and pick them up and put them on top of the truck?  Were

17   you ever able to do that?

18         A.    No, I wasn't.

19         Q.    Was Joseph ever able to do that?

20         A.    I don't believe so.

21         Q.    Were they -- How much, if you know, how much did

22   those things weigh?

23         A.    I don't know what a gallon of gas weighs.

24         Q.    So, how would you get it on to the truck to

25   transport it out there?

1   A.   We put it in the truck empty and then fill it

2   up.  And then we would put the boat on the trailer and take

3   the boat or the truck off the trailer and back the trailer

4   up and the siphon it from the back of the truck into the

5   boat.

6   Q.   Would it be a situation that Joseph or you or

7   anybody would actually pick up that drum, whatever it was,

8   and place it on top of the boat that you guys had to go out

9   on the lake?  In other words, would you take that 25- or

10  50-gallon drum and put it on the boat and go out on the

11  lake?

12  A.   The only time it would be sitting on the boat is

13  if it was about three quarters empty, move it on there and

14  siphon it straight in.  But we would never the drum out on

15  the water.

16  Q.   Why wouldn't you do that?

17  A.   There is no reason for that.  I imagine it would

18  be illegal.

19  Q.   But, so there was never a situation where this

20  drum that had the gasoline in it would ever be lifted up

21  and placed inside the boat and driven around the lake,

22  right?

23  A.   No, it would be the boat would still be on the

24  trailer and we just be filling it up.

25  Q.   Prior to this killing, when was the last time you

124

1   saw Joseph Andriano?

2       A.   Maybe a month or two before that.

3       Q.   And how did he look to you a month or two before

4   that?

5       A.   Skinny.

6       Q.   Do you whether or not he had hair on his head?

7       A.   I believe he still did.

8       Q.   And you said that you were one of his best

9   friends, right?

10      A.   Yes.

11      Q.   Did you attend his funeral?

12      A.   No, I did not.

13      Q.   Why not?

14      A.   I had broken my leg about two or three days

15  before that and I couldn't move.  I had to keep my leg

16  elevated.

17      Q.   So it wasn't a situation that you didn't want to

18  go?

19      A.   I wasn't physically able.

20           MR. MARTINEZ:  I don't have any other questions.

21           THE COURT:  Mr. Delozier.

22           MR. DELOZIER:  Thank you, Your Honor.

23

24

25

CROSS-EXAMINATION

BY MR. DELOZIER:

1

2

3    Q.    How old are you, Justin?

4    A.    How old am I?

5    Q.    Uh-huh?

6    A.    Thirty-three.

7    Q.    So you were probably, what, two, three, four

8  years behind Joe in high school?

9    A.    Yes, about three or four.

10    Q.    So when he was a junior, you were in eighth

11  grade, maybe?

12    A.    Yes, sir.

13    Q.    Is that about right?  So you didn't really know

14  him during his high school days, did you?

15    A.    I knew him -- I knew him when he was in high

16  school but I didn't, you know, hang out in high school.

17    Q.    You weren't hanging out with him while he was in

18  high school, were you, with him?

19    A.    No, I'd get rides from him there but not on a

20  regular basis.

21    Q.    When you were in high school, were you hanging out

22  with him then?

23    A.    Yes.

24    Q.    So he was already out of high school?

25    A.    Yes.

1     Q.    And was that the Chevy you were talking about

2   that he had?

3     A.    He always had Chevys.

4     Q.    That was in high school that you were referring

5   to when Mr. Martinez asked you questions about his vehicle?

6     A.    Yes.

7     Q.    He was in high school, you were in elementary

8   school?

9     A.    Yes.  He's always had a Chevy pickup ever since

10   I've known him.

11     Q.    So it wouldn't have mattered what period we're

12   talking about on that, would it?

13     A.    Not really.

14     Q.    I'm trying to get an understanding when you guys

15   became drinking buddies because he's three or four years

16   ahead of you.  So you were 18.  What's the drinking age in

17   Casa Grande?

18     A.    Twenty-one.

19     Q.    So, did you wait until 21 to start being a

20   drinking buddy with him?

21     A.    No, I was always drinking beer.

22     Q.    Okay.

23     A.    But, I mean, not necessarily with him.

24     Q.    Okay.  All right.  So these occasions that you

25   were at the bars, when did that happen?

1    A.   After I was 21.

2    Q.   So, you're 21, he's 25, right?

3    A.   Yes, sir.

4    Q.   And he's already married?

5    A.   I believe so.

6    Q.   Yeah.  Okay.  So, the bar scenes that you saw

7  were when Wendi was there?

8    A.   Yes.

9    Q.   All right.  And you didn't see any bar scenes

10  before he was with Wendi, right?

11    A.   No.

12    Q.   Okay.  So during that period of time you didn't

13  know of anything like glass breaking or whatever?

14    A.   No.

15    Q.   Okay.  When did you start going to the lake with

16  Joe?

17    A.   Well, the first time I went when we were little

18  kids was the Father and Son, the Elks Club would take us up

19  there.

20    Q.   When did you get your own boat?  Let's do it that

21  way?

22    A.   When I was probably about 19.

23    Q.   Okay.  So Joe was already what 23, 24?

24    A.   Something like that.

25    Q.   Okay, were there occasions when you went to the

1   lake before Joe was married?

2       A.    Yes.

3       Q.    So both of you had a boat during that period of

4   time?

5       A.    Yes.

6       Q.    Okay.  So, when you went to the lake with Joe,

7   who else would go with you before he was married?

8       A.    Brandon Clark, myself, Chris Barnes, Danny Sheds

9   whoever we called at the time.

10      Q.    Was there any girls going with you?

11      A.    Yeah, there were girls.

12      Q.    When did you first know that Wendi started going

13  to the lake with you?

14      A.    When Joe brought her.

15      Q.    Do you remember about when that was?

16      A.    Whey they first started dating.

17      Q.    So in '92, summer of '92, something like that?

18      A.    I would say so.

19      Q.    How old are you in the summer of '92?

20      A.    Probably 19.

21      Q.    So he's 23, 24?

22      A.    Yes, sir.

23      Q.    So are we running on the right track, now?

24  Okay.

25           And you sold your boat in '98 so you didn't go

1  back to the lake after that, did I understand that

2  correctly?

3      A.   I had two boats in between there.  The first one

4  I had and the last one I sold in '98.  I had three boats in

5  between that time period.

6      Q.   Well, you sold your last boat then?

7      A.   Yes.

8      Q.   Was that in the summer of '98?  What time of year

9  did you sell it?

10     A.   It was -- I believe in the beginning of the

11 summer.

12     Q.   So you didn't really spend ten or 12 trips to the

13 summer (sic), I mean, to the lake that summer, did you?

14     A.   No.

15     Q.   So we're talking about '97 was really the last

16 active boating time you had with Joe and Wendi, right?

17     A.   Well, I had a boat and then I quit going.  I sold

18 it and then I didn't go for a while.  Then I bought another

19 one and then I started going again.  There was lapses in

20 there when we were going a lot.  It was probably about ten

21 times over the summer.

22     Q.   So early summer of '98 would be the last time, is

23 that fair?

24     A.   Yes.

25     Q.   And from that point forward, what kind of contact

1   did you have with Joe until October, 2000?

2       A.    Run into him here and there at the store.   He'd

3   come out and see me at my house every now and then.

4       Q.    You didn't do any bar scenes?

5       A.    No.

6       Q.    And you didn't do any boating?

7       A.    I didn't do any boating with him.

8       Q.    So from say, what, June of 1998 until October of

9   2000, how many times do you think you saw him where you

10  spent any time other than wave as you go by in the car?

11      A.    We would talk on the phone for little a bit or

12  just when I'd see him out, like I'd see him at the store,

13  you know, the parts house or whatever.

14      Q.    He had the children with him part of the time,

15  didn't he?

16      A.    Yes.

17      Q.    So you didn't really hang out after that period?

18      A.    Not much.   When he had his kids, I didn't see --

19  I saw him, you know, he was with them.

20      Q.    So let's say in '99, do you remember how many

21  times you might have had occasion to see him in '99?

22      A.    Any specific reason or?

23      Q.    No, just other than "hi" as you drive by --

24      A.    No.

25      Q.    -- did you have any other contact with him during

1   '99?

2   A.   No.

3   Q.   And in 2000?

4   A.   Just, you know, same thing.

5   Q.   Same thing?

6   A.   Yeah.

7   Q.   Okay.  So when you saw him a couple months before

8   October of 2000, as you testified to a moment ago, it was

9   one of those same kind of things, "hello, how you doing?"

10  A.   Yeah, he stopped by my house.  He had milk

11  shakes, Dairy Qween milk shakes with his kids, I brought

12  him some wet paper towels because they had it all over

13  their faces at my house.

14       MR. DELOZIER:  That's all.  Thank you, Your

15  Honor.

16       THE COURT:  Mr. Martinez.

17

18                REDIRECT EXAMINATION

19  BY MR. MARTINEZ:

20  Q.   You indicated that you didn't see him much in '99

21  and 2000.  Do you remember telling us that?

22  A.   Yes.

23  Q.   Just because you didn't see him in 1999 and 2000,

24  did that change the reputation that you knew of him in Casa

25  Grande for being peaceful?

1    A.   Yes, it was the same.

2    Q.   Stayed the same?

3    A.   Yes.

4    Q.   You indicated that, in terms of the bar scene,

5   and you talked a little bit about seeing Mr. Andriano and

6   the defendant there.  Prior to them going out, did you ever

7   see the defendant at any bars without Mr. Andriano present?

8    A.   Not before they got married.

9    Q.   And then it was -- did you know her even before

10   they got together?

11    A.   I knew of her, not personally.

12    Q.   You heard things but you never met her, right?

13    A.   Yes.

14         MR. MARTINEZ:  I don't have anything else.

15         THE COURT:  Are there any further questions of

16   this witness by the jury?  If so, please raise your hand.

17   No one has raised their hand.

18         May this witness be excused?

19         MR. MARTINEZ:  Yes, sir.

20         MR. DELOZIER:  Yes, Judge.

21         THE COURT:  Thank you.  You are excused.

22         MR. MARTINEZ:  State calls Joseph Andriano.

23         THE COURT:  Step forward and give your name to

24   the clerk.  She will swear you in.

25              (Witness sworn.)

1      THE COURT:  Please have a seat on the witness

2   stand.  Please make yourself comfortable on the witness

3   stand.  And please pull the microphone close to you.

4   Please remember to speak loudly and clearly so everyone can

5   hear you.  Also please wait until you the question is

6   complete before you answer the question.  Please make sure

7   that you give a verbal response.

8          Is that all agreeable to you, sir?

9      THE WITNESS:  Yes.

10     THE COURT:  Mr. Martinez, you may proceed.

11

12              JOSEPH ANDRIANO,

13   called as a witness herein, having been first duly sworn,

14   was examined and testified as follows:

15

16              DIRECT EXAMINATION

17   BY MR. MARTINEZ:

18     Q.   Your name, sir?

19     A.   Joe C. Andriano.

20     Q.   And, sir, before -- are you retired or are you

21   still working?

22     A.   Semi.

23     Q.   And what did you do before you became

24   semi-retired?

25     A.   The majority of my life I was an ag chemical

1  consultant and a commercial applicator.

2      Q.  So you dealt with chemicals, correct?

3      A.  Yes.

4      Q.  Do you have a business license?

5      A.  Yes.

6      Q.  What was the name on the business license?

7      A.  Andriano Chemical Sales.

8      Q.  Also have the name Joseph Andriano on it?

9      A.  Yes.

10     Q.  Did it have a middle initial on it?

11     A.  One of them did and three of them didn't, to my

12  recollection.

13     Q.  So you had business licenses that did not have a

14  middle initial, your middle initial on it, right?

15     A.  Yes.

16     Q.  And did you have a son by the name of Joseph

17  Andriano?

18     A.  Yes.

19     Q.  And as he was growing up and as he got close to

20  getting married, did you ever have occasion to see

21  what -- how many daughters do you have?

22     A.  I have two daughters and two sons.

23     Q.  As they were growing up, did they have

24  boyfriends?

25     A.  In the high school years, yes.

1    Q.   And were the boyfriends ever -- did they ever

2  come over to your house?

3    A.   Yes.

4    Q.   When they came over to your house was there ever

5  any occasion when your son, Joseph Andriano, took a bat to

6  chase any of them away?

7    A.   No.

8    Q.   Was there ever any occasion when Joseph Andriano,

9  your son, beat you up or you and he beat each other up?

10    A.   No.

11    Q.   That's not to say there weren't disagreements,

12  however, correct?

13    A.   That's correct.

14    Q.   Now, you were aware that he was terminally ill

15  with cancer, correct?

16    A.   Yes, sir.

17    Q.   And did you see a change in his physical

18  appearance once he was diagnosed?

19    A.   In the later years, yes, after the fourth

20  surgery.

21    Q.   And the forth surgery we've been told was August

22  of '98. In August of '98, did you notice a change in his

23  physical appearance?

24    A.   Not immediately but as time went on he was

25  weightless, he was losing some weight.

1    Q.   How did his face look?  Did it remain the same or

2  start looking --

3    A.   It began to start drawing in some.

4    Q.   How about his strength, how about that?

5    A.   He was beginning to get weaker.

6    Q.   One of the things that we were told about early

7  on in his life there was a break up with a girl named

8  Shelly and supposedly as a result of that break up that you

9  may have sent him somewhere in California or Oklahoma.  Is

10  there any truth to that?

11    A.   No, sir.

12    Q.   Did he ever travel to -- well, do you have a

13  business connection to Oklahoma?

14    A.   Yes.

15    Q.   What is that?

16    A.   We have a farm there.

17    Q.   And what's the size of the farm?

18    A.   Twenty-two hundred acres.

19    Q.   Did you also, at some point, have a farm here in

20  Casa Grande?

21    A.   Yes.

22    Q.   Now, so, did Mr. Andriano ever, your son, ever

23  have occasion to travel to Oklahoma at your request to do

24  whatever was necessary there?

25    A.   Yes.

1    Q.  Was there ever any situation where you sent him

2  there because he may have broken up with a girl?

3    A.  No.

4    Q.  Did you ever send him away to California because

5  he may have broken up with a girl?

6    A.  No.

7    Q.  Now, again in his later -- right before he was

8  killed, did you have occasion to know whether or not he was

9  undergoing chemotherapy treatment?

10    A.  Yes.

11    Q.  Of your own knowledge, did you ever take him to

12  chemotherapy treatment?

13    A.  Yes.

14    Q.  How many times did you take him to chemotherapy

15  treatment?

16    A.  The best I can remember three.  Jeanette was with

17  me on one occasion.

18    Q.  So you took him three out of four times?

19    A.  I was with him, yeah.

20    Q.  Of those three of the four times that you took

21  him to chemotherapy treatment was the defendant, Wendi

22  Andriano, with him?

23    A.  She brought him over and I met them at the clinic

24  for the first treatment.

25    Q.  Is that the only time that she went?

1      A.   She had dropped him at the door on other

2  occasions.

3      Q.   Did she stay for the treatment?

4      A.   No.

5      Q.   So, just so that I understand it, on the three

6  that you actually were there, he was brought over by the

7  defendant?

8      A.   As far as -- yes.

9      Q.   And you stayed with him throughout the treatment?

10     A.   Yes, sir.

11     Q.   After the treatment was done, who would take him

12 home?

13     A.   I took him home.

14     Q.   Did you stop at a place to get movies or things

15 like that so he could watch them?

16     A.   No, sir.

17     Q.   What was the routine after the chemotherapy

18 treatment?

19     A.   Most of time if he was hungry we'd stop and get

20 something he could eat later.  The last time I took

21 him, or the second time I took him, we stopped -- no, it

22 was the last time I took him we stopped at the Native New

23 Yorker and he ate.  He said it wasn't bothering his stomach

24 so he wanted to stop and eat.  I asked him if he was sure

25 and he said yes.

1    Q.   So, the last time that you took him to

2  chemotherapy treatment, the last time you went was when you

3  stopped at the Native New Yorker?

4    A.   Yes.

5    Q.   After that, were did you take him?

6    A.   We would go back to their apartment.

7    Q.   Did you stop anywhere to get movies or anything?

8    A.   No, no movies.

9    Q.   About what time would you get him home?

10    A.   It seems to me after we stopped to get groceries

11  or anything, it was usually probably after six before we

12  got back.

13    Q.   How long would the treatments last?

14    A.   They were eight-hour treatments.

15    Q.   And on the last occasion where you stopped at the

16  Native New Yorker, was the defendant waiting for him at

17  home?

18    A.   Not that I remember.  Her mother was there on one

19  or two occasions.

20    Q.   But the defendant wasn't?

21    A.   No, sir.

22    Q.   Now, with regard to movies and that sort of thing

23  did you stop anywhere to get movies before you went home on

24  the last occasion?

25    A.   No, sir.

1     Q.   How about on the previous occasion, did you stop

2   anywhere to get movies?

3     A.   No, sir.

4     Q.   How about the first occasion that you took him,

5   did you stop anywhere?

6     A.   No, sir.

7     Q.   You indicated that the treatment would last

8   approximately eight hours.  That's what you said, right?

9     A.   Yes.  It seemed like we'd get there about eight.

10  The nurse would usually come out.  And the first time when

11  Wendi was there she stayed and we met with the nurse.  Then

12  the doctor came out and talked to him on each occasion

13  before he started the treatment.

14    Q.   So, it wasn't -- so you're saying that every time

15  that you went with him for treatment, the doctor actually

16  came by?

17    A.   And talked to him briefly before he went in for

18  the treatment, yes.

19    Q.   And after the first time when she left -- I'm

20  talking about the defendant leaving -- how long was she

21  there the first time?

22    A.   Around 11 o'clock or so because --

23    Q.   So it was around 11 o'clock?

24    A.   Around 11 o'clock and we went to dinner and she

25  went back to work.

1      Q.   Let me ask you a question.  You indicated that

2   she stayed the first time, she stayed from about eight to

3   11 o'clock?

4      A.   Yes, sir.

5      Q.   And then you took him home?

6      A.   Yes, sir.

7      Q.   Did she ever come back during that period?

8      A.   No.

9      Q.   How about, I think the second time that you

10   actually took him, did she ever stay at any time during the

11   time that he was having these treatments?

12      A.   She dropped him off in the parking lot.  I met

13   him out in front of the building.

14      Q.   Did she ever stop at any time to check on him or

15   anything like that?

16      A.   No.

17      Q.   How about the last time, did she ever come in at

18   any time and check on him or anything like that?

19      A.   No, sir.

20      Q.   With regard to his condition, did you see -- when

21   was the last time you saw him?  Was it Friday, Saturday or

22   Sunday?

23      A.   The last time for treatment or?

24      Q.   No, the last you saw Joseph Andriano alive?

25      A.   It was Saturday evening at our home, October 7.

1      Q.    What was the purpose of that?

2      A.    James was getting ready to go back to the farm.

3   We usually have a family get-together.  But he was getting

4   ready to leave and we had the family get-together, had a

5   barbecue.

6      Q.    Did see your son?  What time did your son arrive

7   there?

8      A.    Probably 5:30 to 6:30 range.  I'm not exactly

9   sure.  We were trying to get things ready to cook.

10     Q.    And did you see him throughout the evening?

11     A.    Yes, sir.

12     Q.    What was his strength like that day?

13     A.    He was pretty weak.

14     Q.    When you say he was pretty weak.  How was it --

15   tell me how that manifested?

16     A.    Normally, when we would get together he was out

17   in the yard playing with the kids for the whole length of

18   time and helping cook.  That evening he didn't.  He came

19   out for a while and then he was in the house.  I was

20   outside cooking most of the time so I don't know what he

21   did in there.  But, he would come out occasionally, check

22   on the kids and stay a short time, take pictures and go

23   back in.

24     Q.    And did you see him eat that night?

25     A.    Yes.

143

1    Q.   Did he eat the normal amount that he ate or was

2  there a change in that?

3    A.   No.  I don't know if he lost his appetite.  He

4  was not eating like I remember him as a young man.

5    Q.   And, that was -- what time did they leave?

6    A.   What time did they leave?

7    Q.   Right.

8    A.   I had gone to bed.  We were probably -- I go to

9  bed pretty early, nine, 9:30.  I heard him come down the

10  hall saying, "I'm going to tell Dad good night."  And I got

11  up and met him in the hall, he give me a hug and we said we

12  loved each other.  I'd say that's probably close to 11:00,

13  10:30 or 11:00.

14         MR. MARTINEZ:  I don't have any other questions.

15         THE COURT:  Mr. Delozier.

16         MR. DELOZIER:  Thank you, Your Honor, I have no

17  questions.

18         THE COURT:  Are there any questions of this

19  witness by the jury?  If so, please raise your hand.  No

20  one has raised their hand.

21         May this witness be excused?

22         MR. MARTINEZ:  Yes, sir.

23         MR. DELOZIER:  Yes.

24         THE COURT:  Thank you very much.  You're excused.

25         MR. MARTINEZ:  State rests.

1    THE COURT:  Ladies and gentlemen, we're going to

2    take our weekend recess.  Today is Wednesday, tomorrow is

3    Veteran's Day, the Court is closed.  So we don't have trial

4    Fridays.  The jury will return on Monday, at 1 p.m.

5    As I indicated to the jury yesterday, it's

6    anticipated that we'll have closing arguments and the case

7    will be presented, be given to the jury sometime next week,

8    perhaps early to midweek.  So, that's pretty much a road

9    map of where we at at this point in time.

10    So, remember that we don't have trial tomorrow,

11    we don't have trial on Friday.  The jury is to return on

12    Monday, November 15, at 1 p.m.

13    During the recess, remember the entire admonition

14    that I've given you including the fact you are not to

15    discuss the case with anyone.  Do not let anyone discuss

16    the case with you.  Don't not do any research,

17    investigation, experimentation, or testing on your own.

18    Avoid any and all media coverage on the case.  Keep an open

19    mind.  And I want you to have a nice weekend.  I'll see

20    everyone at 1 p.m. on Monday.  Have a nice weekend.

21    I'll stay here with counsel.

22    (Jurors exited.)

23    THE COURT:  This is Cause Number CR2000-096032,

24    State of Arizona versus Wendi Elizabeth Andriano.

25    The record will reflect the presence of the

145

1   defendant and counsel.  We're outside the presence of the

2   jury.

3        Counsel, again, we've been working on the jury

4   instructions in this matter.  I've given counsel copies of

5   the rough draft that I've prepared.  So I've asked counsel

6   to forward to the Court any further requests with regard to

7   jury instructions by the end of Friday, the 12th, this

8   week.

9        Anything else we need to discuss at this point in

10  time?

11       MR. MARTINEZ:  No, sir.

12       MR. PATTERSON:  Did Your Honor receive the Vogel

13  file.  Your bailiff was looking for it.

14       THE COURT:  It's my understanding we might have

15  just received it.  We've been looking for it.  We may have

16  just have received it.

17       MR. PATTERSON:  I'd be interested in looking at

18  the instructions in that case.

19       THE COURT:  What I'll do, if it's agreeable to

20  everyone, I'll go ahead and have copies of the instructions

21  made for both counsel.  And I'll give them to you before

22  you leave here today.

23       MR. PATTERSON:  Please.

24       THE COURT:  If we have the file.  Okay.  Anything

25  else before we recess?

146

1        MR. MARTINEZ:  No.

2        MR. PATTERSON:  No, Judge.  Thank you very much.

3        THE COURT:  We'll be in recess.

4        (Proceedings adjourned.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

EXHIBIT UU





IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

IN AND FOR THE COUNTY OF MARICOPA

STATE OF ARIZONA,                    )
                                     )
                Plaintiff,           )
                                     )
        vs.                          )    No. CR2000-096032
                                     )        CR05 0005-AP
WENDI ELIZABETH ANDRIANO,            )
                                     )
                Defendant.           )
_____)


BEFORE:  THE HONORABLE BRIAN K. ISHIKAWA


Mesa, Arizona
November 15, 2004


REPORTER'S TRANSCRIPT OF PROCEEDINGS
(Trial)


COPY                                    SHARON FLORES
                                    CERTIFIED COURT REPORTER
                                           50374

2

1

2

3                          A P P E A R A N C E S

4

5

6

7        For the State:

8                          Mr. Juan M. Martinez

9                          Deputy County Attorney

10

11

12

13

14        For the Defense:

15                          Mr. Daniel B. Patterson

16                          Mr. G. David Delozier, Jr.

17                          Office of the Public Defender

18

19

20

21

22

23

24

25

3

1

2

3

4                              I N D E X

5    WITNESSES:                                              PAGE

6

7     MINDY MECHANIC, Ph.D

8        Direct Examination by  Mr. Patterson          5

9        Cross-Examination by Mr. Martinez            50

10       Redirect Examination by Mr. Patterson        69

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

000008158

4

1               P R O C E E D I N G S

2

3          THE COURT:  This is Cause Number CR2000-096032,

4  State of Arizona versus Wendi Elizabeth Andriano.

5          The record will reflect the presence of the

6  defendant, counsel and the jury.

7          Mr. Patterson.

8          MR. PATTERSON:  Thank you, Judge.  We ask

9  Dr. Mindy Mechanic to testify.

10          (Witness sworn.)

11          THE COURT:  Please have a seat on the witness

12  stand.  Please make yourself comfortable on the witness

13  stand.  Please put the microphone close to you.  Please

14  remember to speak loudly and clearly into the microphone so

15  that everyone can hear you.  Please wait until the question

16  is completed before you answer the question.  And please

17  make sure that you give a verbal response.  Is that all

18  agreeable to you?

19          THE WITNESS:  Yes.

20          THE COURT:  You may proceed.

21          MR. PATTERSON:  Thank you, Judge.

22

23

24

25

5

1                    MINDY MECHANIC, Ph.D,

2    called as a witness herein, having been first duly sworn,

3    was examined and testified as follows:

4

5                    DIRECT EXAMINATION

6    BY MR. PATTERSON:

7        Q.   Would you give us your name, please?

8        A.   Yes.  Mindy Mechanic.

9        Q.   And the last name is spelled?

10       A.   M-e-c-h-a-n-i-c.

11       Q.   And what is your current occupation?

12       A.   I'm an assistant professor at California State

13   University in Fullerton.

14       Q.   That's in Fullerton, California?

15       A.   Yes, Fullerton, California.

16       Q.   How long have you been an assistant professor at

17   that institute?

18       A.   This is going on my third year.

19       Q.   What educational background have you that

20   qualifies you to be a professor at Fullerton?

21       A.   I have a Ph.D in clinical psychology from the

22   University of Illinois.

23       Q.   And is a dissertation required to achieve that

24   degree?

25       A.   Yes, it is.

000008160

1    Q.    And what was your dissertation on?

2    A.    I did a study on juror -- expert testimony in a

3   simulated battered woman's homicide case, looking at how

4   jurors made decisions and whether or not expert testimony

5   was useful in the process.

6    Q.    Do you have other degrees other than your

7   doctorate?

8    A.    Yes.

9    Q.    And what degrees are they?

10   A.    I also have a master's in Psychology and

11   bachelor's in Psychology.

12   Q.    Tell me about your licensure.  Are you licensed

13   to practice in the states, here in the United States?

14   A.    Yes.  I'm currently licensed in the State of

15   California to practice psychology.  I'm also licensed in

16   the State of Missouri to practice psychology.  I'm licensed

17   in the State of Illinois but I recently put it on inactive

18   status.

19   Q.    What course do you teach at Fullerton?

20   A.    I teach an undergraduate course on psychology

21   personality and I teach two graduate courses.  One is on

22   legal, ethical and professional issues and clinical

23   psychology and the other is on psychological and clinical

24   assessment.

25   Q.    Have you taught courses in the past on domestic

1   violence?

2       A.   Yes.   I've taught classes on victimization and

3   trauma several times at my last position.   And I taught a

4   course on women and mental health with victimization is

5   also covered as part of the issue.

6       Q.   And you anticipate teaching a course next

7   semester on victimization?

8       A.   Fall semester.

9       Q.   Fall semester?

10      A.   Yes.

11      Q.   Do you have a background in the investigation of

12  and assessment of domestic violence?

13      A.   Yes, I do.

14      Q.   And how did that develop?

15      A.   Well, it started out when I was a graduate

16  student I became interested in the issue of domestic

17  violence and started learning about it.   And at that time

18  there was no formal course work on domestic violence in

19  graduate school.   But I started reading the research

20  literature and developing my dissertation.   That started

21  the expertise and it just flowed from there.

22      Q.   So did you serve a period of time as an assistant

23  research professor at the University of Missouri, Saint

24  Louis?

25      A.   Yes, I did.

1      Q.   Did that have a relationship to domestic

2  violence?

3      A.   Yes.  I spent ten years at the University of

4  Missouri, Saint Louis where we have a specialized trauma

5  center.  And the goal of the trauma center is basically to

6  focus on education, training, research and clinical

7  practice in the area of trauma.  And we do see lots of

8  different types of trauma survivors.  Most of the

9  population we served were battered women and sexual assault

10  survivors.

11      Q.   Not much further in terms of credentials.  Why

12  are you involved in the case of Wendi Andriano?

13      A.   I was asked to review the report of Dr. Bayless

14  for adequacy.

15      Q.   And render an opinion with regards to his

16  opinion, essentially?

17      A.   Yes.

18      Q.   Okay.  Did we ask you to evaluate or assess Wendi

19  Andriano such as Dr. Murphy did?

20      A.   No, you did not.

21      Q.   So you're not here to tell us that you have, in

22  fact, assessed Wendi?  You're here to talk about

23  Dr. Bayless?

24      A.   Correct.

25      Q.   Did you receive any Federal grants to research

1   the topic of intimate partner abuse domestic violence?

2       A.   Yes, one large Federal grant that I was the

3   co-investigator on for several colleges back in Saint

4   Louis.  We had a four and a half year study where we

5   interviewed 425 battered women from the community and were

6   looking at how they coped with the violence, their mental

7   health and physical health, injury and a number of other

8   issues.

9       Q.   Okay.  And were you what was called a principal

10  investigator?

11      A.   No, a co-principal.

12      Q.   Were you also a principal investigator for any

13  other cases involving partner abuse?

14      A.   I was also a co-principal investigator on another

15  study on a federally funded study where we were looking at

16  domestic violence before and after the flood in 1993 in the

17  Midwest.

18      Q.   "Intimate Partner Abuse: Affects On Parenting?"

19      A.   That was a small study, a small funded project

20  from my current job.  It's not a big federally funded

21  study.

22      Q.   How about the recipient of internal grants to

23  research and investigate domestic violence?

24      A.   Yes.

25      Q.   Talk to me about those, please?

1     A.   Yes.   I've gotten several small grants at my

2  current institution to be able to do some research looking

3  at how domestic violence influences battered women

4  parenting.

5     Q.   Publications.  Have you printed or published

6  journal articles on the issue of domestic violence?

7     A.   Yes, I have.

8     Q.   Approximately how many?  Do you have your C.V. in

9  front of you?

10    A.   I do.  Do you mean only for domestic violence?

11    Q.   Let's start with those.

12    A.   At least eight here.

13    Q.   Let's talk about some titles of those journal

14  articles.  Let's see. "Assessment of Posttraumatic Stress

15  Disorder in Domestic Violence Survivors: Comparison of an

16  Interviewer-based Versus the Self-report Measure."

17  Was that one of the articles?

18    A.   Yes.

19    Q.   Where was that published?

20    A.   Journal of Traumatic Stress.

21    Q.   Is that a publication within your industry of

22  psychology?

23    A.   It's a peer-reviewed psychology journal in the

24  field of trauma.

25    Q.   What does "peer-review" mean?

1      A.   "Peer-review" means that all the articles under

2 went scientific review by a minimum of three, possibly four

3 researchers or scientists to make sure that the paper in it

4 is solid.  That it's based on adequate methods and

5 statistics and the findings are valid based on its methods.

6      Q.   Okay.  Another entry here, "Mental health

7 Consequences of Violence Against Women: A Response to

8 Briere and Jordan."  Published in the Journal of

9 Interpersonal Violence.

10          Is that journal in your business?

11     A.   Yes, it is.

12     Q.   Was that too peer-reviewed?

13     A.   It is.

14     Q.   Is that so the same standards apply for

15 publication of the particular article?

16     A.   Yes.

17     Q.   We have some sexual abuse here, "Reactions To

18 Participation in Trauma Research:  Is There Evidence of

19 Harm?"

20          Is that one of the articles that had to do with

21 domestic violence?

22     A.   It did.  That actually -- that study included a

23 number of different trauma populations, including battered

24 women, physical assault survivors, too.

25     Q.   And that was published in the Journal of

1    Traumatic Stress?

2        A.    Yes.

3        Q.    That is a journal in your business that's

4    generally accepted?

5        A.    Correct.

6        Q.    And that, too, was peer-reviewed?

7        A.    Yes.

8        Q.    "The Relative Effects of Intimate Partner,

9    Physical and Sexual Violence on Posttraumatic Stress

10   Disorder Symptomatology."  That was published in Violence

11   and Victims.

12            That's, too, was peer-reviewed?

13       A.    Yes, it is.

14       Q.    And that's a journal that's generally accepted in

15   your industry?

16       A.    It's a speciality journal focusing on violence

17   and victimization.

18       Q.    "Intimate Partner Violence and Women of Color: A

19   Call for Innovation."   American Journal of Public Health.

20            That, too, was peer-reviewed?

21       A.    Yes.  That's a top-notch journal for the public

22   health industry.

23       Q.    And that was a publication on domestic violence?

24       A.    Yes.

25       Q.    "Intimate Partner Violence and Stalking Behavior:

1    Exploration of Patterns and Correlates in a Sample of

2    Acutely Battered Women."

3            That was a peer-reviewed publication?

4    A.   Yes, it was.

5    Q.   And was that published in  Violence and Victims?

6    A.   Yes.

7    Q.   And is that a journal accepted in your industry?

8    A.   It is.

9    Q.   "Stalking and Obsessive Behavior: Perspectives on

10   Victims and Perpetrators."  Springer Publications.

11          Is that a peer-reviewed article?

12   A.   Actually, it was that same article that was

13   reprinted in another book.

14   Q.   So it's a reprint.  Okay.

15   A.   Yes.

16   Q.   "The Impact of Severe Stalking Experienced by

17   Acutely Battered Women: An Examination of Violence,

18   Psychological Symptoms and Strategic Responding."

19          Is that a peer-reviewed article?

20   A.   Yes, it is.

21   Q.   And was that published in  Violence and Victims?

22   A.   Yes, it was.

23   Q.   And that's a journal that's generally accepted in

24   your industry?

25   A.   Yes.

1    Q.   That was reprinted, apparently -- that, too, was

2    reprinted, correct?

3    A.   Yes.

4    Q.   Okay.  There were chapters that you wrote that

5    were incorporated into larger volumes, correct?

6    A.   Yes.

7    Q.   How many of those have you participated in?

8    A.   Five.  I'm working on two that aren't on here.

9    Q.   And, again, of those five that are before me, how

10   many pertain to domestic violence?

11   A.   I think all of them except for one -- four.

12   Q.   And which one wouldn't?

13   A.   There was a chapter I co-wrote with someone else

14   looking at therapy for sexual assault survivors.

15   Q.   Rape victims?

16   A.   Uh-huh.

17   Q.   And you engaged in other areas of publication.  I

18   assume, this is a category of publications that weren't

19   peer-reviewed, correct?

20   A.   Yes.

21   Q.   How many of those are included in your C.V.?

22   A.   Six.

23   Q.   Okay.  And let's talk about the titles of those.

24        "Intimate Partner Abuse Experienced by Latinas."

25   Domestic Violence Report.

1          Is that one of your publications?

2     A.    Yeah, that's a series of reviews that I've been

3   doing on recent social science articles that I helped

4   summarize and write on domestic violence report,

5   practitioners, law enforcement, clinicians, front line

6   people that need social science but don't want to spend

7   time chugging through all the statistics and mumbo-jumbo

8   that make it hard to get to the gist.

9     Q.    "Autonomous Intimacy: Oxymoron or Necessary

10   Precondition?"  Psychology of Women Quarterly.  Does that

11   pertain to sexual assault?

12     A.    That's a book review.

13     Q.    Manuscripts under review.  Are those submittals

14   that you've prepared but not yet been published?

15     A.    That's correct.

16     Q.    How many of those do we have that pertain to

17   domestic violence?

18     A.    Four.

19     Q.    Again, could you just read me some of the titles

20   the proposed manuscripts cover?

21     A.    One is "Mental Health Consequences of Intimate

22   Partner Abuse: A Multidimensional Assessment of Four

23   Different Forms of Abuse."  And that was submitted to

24   Journal of Family Violence.

25          Another paper is called, "The Effects of Intimate

1   Partner Abuse on Women's Psychological Adjustment to a

2   Major Disaster." That was submitted to the Journal of

3   Traumatic Stress.

4           Another paper is called, "Physical Health Among

5   Help Seeking Battered Women: Relationships With Intimate

6   Partner Abuse, Posttraumatic Stress Disorder, and Negative

7   Affect Variables."  And that was to the Journal of Abnormal

8   Psychology.

9           And then the final one is, "An Exploration of

10  Marital Sexual Coercion and Machismo Among Latino Women."

11          That paper was worked on with a graduate

12  student.

13      Q.   Technical reports.  How do they differ from

14  publications or chapters and volumes?

15      A.   Well, they're not peer-reviewed and they're not

16  published as a book by a publisher but they might be

17  published by a professional organization.  The government

18  produces a lot of technical reports.

19      Q.   Are there titles or topics that pertain to

20  domestic violence?

21      A.   Yes.  I did one that was related to a survey that

22  we did across the country of different agencies to find out

23  what kind of prevention programs they were using for

24  victimization.  That report summarizes that research.

25          There is another one were the basis of the

1   project was trying to help researchers and practitioner who

2   work with victims of sexual assault and domestic violence

3   to be able to collaborate a little bit better.  So we did a

4   series of focus groups across the country to find out how

5   to get two different groups to work together more

6   effectively.  I got a technical report on that.  Another

7   report similarly, on a similar topic but silently

8   different.

9          And then one final report with a grant on

10  domestic violence at the flood of 1993.

11      Q.   And are you currently in the midst of research

12  projects that have not been finalized or submitted for

13  publication or approval?

14      A.   Yes.

15      Q.   That would be the category: Manuscripts in

16  preparation?

17      A.   Yes.

18      Q.   Are there titles or research projects that you

19  are currently involved in that pertain to domestic

20  violence?

21      A.   Yes.  One is related to domestic violence and one

22  parenting.  Another one is focusing entirely on the role of

23  emotional abuse and how that affects battered women

24  functions.

25          Another is looking at coping and belief systems

18

1   as they affect battered women, specifically depression.

2   And others related to domestic violence behaviors in people

3   ordered to participate in mandatory mediation, actually

4   with a colleague at the University of Arizona in Tucson.

5        Q.   Let's see, let's skip to professional

6   presentations.  Are these times when you've been called

7   upon to attend conferences and present on certain issues

8   involving domestic violence?

9        A.   Well, this first category is peer-reviewed

10  professional presentations.  So these are presentations

11  where I would write up something I proposed to present and

12  submit it.  And it would be reviewed by a panel and the

13  submissions are competitive.  So, the conference planners

14  set up a scientific review committee that review all the

15  proposals and decide which ones have merit.

16       Q.   Okay.  And these are separate from the

17  publications that you've already told us about?

18       A.   Yes.

19       Q.   Let's talk about this, then.  Peer-reviewed

20  professional presentations.

21            In October of 2004, the title is "An Exploration

22  of Marital Sexual Coercion and Machismo Among Latino

23  Women."

24            Is that one of your peer-reviewed professional

25  presentations?

1     A.    Yes.  I worked on that with a undergraduate

2  student.

3     Q.    To whom did you present that?

4     A.    That was at a multicultural seminar held in Los

5  Angeles.

6     Q.    November of 2004, "PTSD and Physical Health Among

7  Help-Seeking Battered Women." Presented to the

8  International Society of Traumatic Stress Studies in New

9  Orleans?

10     A.    It's actually going on now and I'm here instead.

11  So someone else is presenting the paper.

12     Q.    Okay.  Is that reflected by Mr. Taft?

13     A.    Dr. Taft.  It says to be presented.

14     Q.    April of 2004, did you present "Patterns of

15  Stalking in Battered Women" at the Western Phycological

16  Association in Phoenix?

17     A.    Yes.

18     Q.    That was peer-reviewed?

19     A.    Yes.

20     Q.    In 2004, did you present "Domestic violence in

21  Couples Mandated to Attend Divorce Mediation" presented at

22  Arizona Governor Janet Napolitano's "Ending Domestic

23  Violence Statewide Training Conference" in Scottsdale?

24     A.    Yes.  I'm not the person who actually presented

25  it.  I'm a co-author of the paper.  For some of them I

1   presented. Depends on what author is first. The first

2   name, the first position.

3       Q.   So you did the research and you assisted in the

4   preparation of the presentation but somebody else may have

5   actually done the speaking?

6       A.   Yes.

7       Q.   Let's do one here on the front. "The Functional

8   Role of Cognitive Distortions Among Battered Women,"

9   presented March 2004 at the Symposium of the American

10  Psychology Law Society in Scottsdale, Arizona?

11      A.   Yes.

12      Q.   Did you present that one?

13      A.   I did.

14      Q.   March 2004, "Assessment of Stalking as a Risk

15  Factor for Escalated Violence Among Battered Women,"

16  presented to the American Psychology Law Society in

17  Scottsdale, Arizona?

18      A.   I presented that, yes.

19      Q.   And that was peer-reviewed, as well?

20      A.   Uh-huh, yes.

21      Q.   Here's one, October 2003, "Cognitive Distortion

22  Index: A Measure of Survival-based Alterations in

23  Cognitions Among Battered Women," presented at the

24  University of Kentucky, Center for Research on Violence

25  Against Women in Lexington, Kentucky?

1    A.    Yes.

2    Q.    You presented that one?

3    A.    I did.

4    Q.    October of 2003, "Mental Health Effects of

5    Victimization, Current Research Directions," again,

6    presented at the University of Kentucky, Center for

7    Research on Violence Against Women in Lexington, Kentucky?

8    A.    Yes.

9    Q.    And so that's kind of what appears to me to be

10   one, two, three, four, five, six, seven, eight, nine, ten,

11   11, 12 -- I've got three pages left and I've got at least

12   18 presentations?

13   A.    I probably have between 40 and 50.

14   Q.    Okay.  And in all, in general they all pertain to

15   the issues of domestic violence?

16   A.    Some of them might have focused a little bit more

17   on sexual assault but most of them probably are on domestic

18   violence.

19   Q.    And break down in terms of percentage, domestic

20   violence, sexual assault, greater on the domestic violence

21   side, lesser?

22   A.    Oh, probably 80 to 90 percent on domestic

23   violence.

24   Q.    Okay.  We've got another category of presentation

25   called invited professional presentation and workshops.

1    That's on page 13 of your resume.

2              What do those things entail?

3         A.    Those are usually when a professional

4    organizations would like me to come speak to their group

5    about a topic that's related to domestic violence and do a

6    training for their staff or agencies.

7         Q.    We've got about three and a half pages of those

8    kinds of things.  Approximately how many times have you

9    been invited to talk with groups about this topic of

10   domestic violence?

11        A.    I'd have to guess.  There is about 12 on each

12   page, so 30 to 40, something like that.

13        Q.    Okay.  Have you ever been asked to perform a

14   domestic violence assessment?

15        A.    Yes.

16        Q.    How many times have you been asked to do that and

17   we'll go into it by whom?

18        A.    We're talking about the context of legal cases,

19   not like the research interview?

20        Q.    Yes, in the context of a legal case?

21        A.    Yes.  I've done about six.

22        Q.    And can you break those down in terms of who

23   asked you to do the assessment?

24        A.    Yes.  Actually, all of these were defense

25   requests.

1        Q.    Okay.  Of those six assessments that you did

2   forensic context, how many times did you actually testify

3   in a contested matter, at the trial phase, if you will?

4        A.    In none of them.

5        Q.    But did you testify?

6              MR. MARTINEZ:  I'm sorry, I didn't hear what she

7   said.

8              THE WITNESS:  I said none of them.

9        Q.    BY MR. PATTERSON:  But did you testify at some

10   point in those cases?

11        A.    I'm sorry.  Okay.  Yeah, I didn't testify in the

12   main part of the trial to determine guilt or innocence in

13   those cases but I did testify in some other context.

14        Q.    Tell me about the other context, having done the

15   domestic violence assessment, you were asked to testify

16   either to a judge or to a jury about the issue that you

17   investigated.

18              MR. MARTINEZ:  Objection.  Lack of foundation.

19   Was it a judge or to the jury that she's testifying to.

20              THE COURT:  Overruled.

21              You can answer the question.  And be more

22   specific.

23              THE WITNESS:  Okay.  In one case I testified at

24   the sentencing hearing.  And also there had been a

25   competency hearing that had been put forth.  I testified in

1    that as well.

2              Another case, we -- a report that we wrote was

3    used to negotiate a plea.  I think it was my first case.

4    My supervisor actually did testify in the sentencing.

5         Q.   BY MR. PATTERSON:  That's why you used the word

6    "we?"

7         A.   Yes, it is my first case when I was still

8    training.  I testified in a sentencing hearing in another

9    case.  And in one of the other cases, I wrote -- it's a

10   fairly recent case -- I wrote a 45-page report.  It was a

11   Federal case.

12             MR. MARTINEZ:  Objection.  Nonresponsive.

13             THE COURT:  I'll sustain the objection.

14        Q.   BY MR. PATTERSON:  Would you tell me the number

15   and explain the context in which you did this domestic

16   violence assessment?

17        A.   Sorry.  Which one?

18        Q.   You did a number of six, right?

19        A.   Yes.

20        Q.   And you'd gone through how many prior to the

21   objection?

22        A.   I think I got four.

23        Q.   Okay.  Of the next two, in what context were

24   those assessments used?

25        A.   In one of the cases it was a civil trial.  The

1   battered woman was not charged by the prosecutor

2   criminally.  But, a civil suit was brought against her so

3   that she wouldn't inherit the assets of the former

4   husband.  So I testified in that case.  That was like a

5   battered woman defense in civil court.

6        Q.   Okay.  And the last one?

7        A.   Sentencing.  You know what, actually, I messed

8   up.  The other one, the last one was used to negotiate a

9   plea as well.

10       Q.   Were there other times when you were asked to

11  draw upon your expertise in domestic violence to critique

12  other reports or assessments that were done by other

13  individuals?

14       A.   Yes, one other time.

15       Q.   Tell me about that?

16       A.   I was hired by the prosecutor in a small town in

17  Illinois to evaluate the defense evaluation of the battered

18  woman defense.

19       Q.   What kind of credentials, in your opinion, does

20  one need to possess in order to do a valid domestic

21  violence assessment?

22       A.   It seems the most important to me that someone

23  has extensive background and training in the topic of

24  domestic violence and that could take place in a number of

25  different ways.  It could be formal education, the

1   graduate program, it could be workshops, continuing

2   education programs that are offered for many kinds of

3   professionals to take.  So there is education and training.

4         Somebody who does this work should also be

5   familiar with the current research, literature which are

6   emerging all the time and old theories outdated and current

7   methods are replacing older approaches.

8         So it's important for somebody to be really

9   up-to-date and familiar with the current literature for

10  what's going on in the field.  That could be attending

11  conferences like the ones I've presented.  And it could be

12  reading articles, reading journal articles, that sort of

13  thing.

14        And the final thing is that somebody ought to

15  have had a fair amount of direct exposure, one-on-one

16  working with battered women in a context where you get to

17  understand what their experiences are like.  The struggles

18  they have with deciding whether to stay, whether to go.

19  The stress they experience.  The different types of

20  victimization they may be enduring.

21        Q.   Okay.  Is it essential to have a degree in

22  psychology in order to do a domestic violence assessment?

23        A.   No.

24        Q.   What do you expect to see in a person who doesn't

25  have a degree in psychology who does a domestic violence

1  assessment?

2      A.   Well, someone could have a agree in social work

3  or possibly in psychology.  So it doesn't matter so much

4  about their formal training, what kind of degree they have

5  as long as they have the right set of experiences.  That

6  they've worked with battered women, they understood those

7  issues from direct face-to-face clinical contact.  That

8  they read and understand the literature and they've gotten

9  some kind of training.  So, you could get to that through a

10 number of different professional venues.

11     Q.   So you used the term "face-to-face contact."  How

12 does that differ perhaps with either being a supervisor of

13 a clinic or a person who participates in staffing where

14 there may be an issue of domestic violence?

15     A.   Well, whenever you're doing more supervisory

16 work, your role is a lot more limited.  You hear just

17 little snap shots of what might be going on in a particular

18 client or particular case.  The goal might be to find an

19 appropriate therapist and therapeutic technique, the

20 treatment plan for a list of clients.  So you quickly run

21 down the list and talk about what each person's needs are

22 as opposed to having a lot of opportunity in-depth to work

23 one-on-one with a person over several weeks or months to

24 really getting a feel for what goes on with them.

25     Q.   Okay.  In your history, did you have a clinical

1  practice, so to speak, or participate in a clinical

2  setting?

3      A.   Yes, I have it in a different way.

4      Q.   Tell me about those?

5      A.   Well, when I was working on -- at least since

6  I've had my degree, I had to work on collecting

7  post-doctoral hours for licensure.  And I did that through

8  trauma clinics where I worked.  So most of the cases that I

9  worked on were people who survived trauma.  Many of them

10  were battered women.

11      Q.   How is it that you had face-to-face contact with

12  those women who were victims of domestic violence?

13      A.   Well, I'd be doing therapy with them.

14      Q.   What does that entail?  Never having done that,

15  what do you do with a typical patient to deal with the

16  issue of domestic violence?

17      A.   It depends on what each person's needs are, what

18  they're coming to therapy for.  It's really a different

19  situation for someone if they're in the middle of a

20  domestic relationship and they're trying to figure out what

21  they should do.  That type of case might involve exploring

22  their options and helping them figure out what some

23  possible strategies are, strategies for coping, strategies

24  for leaving, ways of assessing their current situation so

25  that I can help them see the danger even if they don't

1   really see it as dangerous.

2       Q.   How does that differ from if you were involved in

3   the staffing for there patients?

4       A.   We used to do staffing in the trauma clinic where

5   I worked.  Even after I was no longer a trainee, I was a

6   supervisor, we would staff the cases and somebody would

7   present the list of cases and we would try to match the

8   therapist to that person.  And you heard like ten minutes

9   about each person and then move on.  So you don't have the

10   same kind of exclusive exposure all the time to working

11   with them.  It's really feeling the frustration of what

12   happens when battered women don't always recognize what

13   these issues are, being in the thick of it with them.

14   There's no substitute for that.

15       Q.   Okay.  And I sense that's the developing, the

16   experience function that you talked about in terms of being

17   qualified to do these domestic violence assessments?

18       A.   Yes, that's the experience.

19       Q.   Are there standards for competency in your

20   industry in terms that guide or govern a phycologist's

21   conduct in accepting patients or accepting referral issues?

22       A.   Well, the American Psychological Association has

23   a set of ethical guidelines phycologist are expected to

24   adhere to on all of their forms of practice, including when

25   they teach, what they conduct research and when they work

1   with clients.

2       Q.   Okay.  And what are those standards of

3   competency?

4       A.   Well, one of the most important ones is that the

5   ethical guidelines stipulate that you need to practice only

6   within your area of competency.  Now, the guidelines have

7   some wiggle room.  If you want to develop a specialized

8   area or work in a different area, treat different kinds of

9   clients or develop a new part of your practice or research,

10  that's perfectly acceptable.  But the idea is that in order

11  to do that, you need to get additional training or

12  education experience to be able to have sufficient

13  expertise.  And before you actually go out and do any of

14  the work, you should get some supervision or consultation

15  as you develop the new skills.

16      Q.   Okay.  And without that, you shouldn't even be

17  dabbling in those areas that you don't have competency?

18      A.   That's correct.

19      Q.   Have you had occasion to examine the C.V. or

20  resume, if you will, of Dr. Michael Bayless?

21      A.   I did.

22      Q.   Looking at the C.V., what do you find in your

23  opinion that Dr. Bayless lacks and should preclude him from

24  rendering a domestic violence assessment?

25          MR. MARTINEZ:  Objection.  Vouching.

1        THE COURT:  Overruled.  Answer the question.

2        THE WITNESS:  From reviewing his resume, I didn't

3 see any evidence that he had any relevant background,

4 training or experience in the topic of domestic violence.

5 I didn't see any presentations or any publications or any

6 evidence of training from either course work or continuing

7 workshops.

8     Q.  BY MR. PATTERSON:  Okay.  And according to the

9 APA standards, then, should that lack of experience

10 precluded him from participating in this case?

11     A.  I believe so.

12        MR. MARTINEZ:  Objection.  Calls for legal

13 conclusion.

14        THE COURT:  I'll sustain the objection on the

15 last question.  That last answer will be stricken.

16     Q.  BY MR. PATTERSON:  We talked about the concept of

17 staffing.  It's Dr. Bayless' position because he

18 participates in staffing at his clinic that that's an

19 adequate opportunity for experience.

20        Do you have an opinion with regard to that

21 position?

22        MR. MARTINEZ:  Objection.  Misstates the sum and

23 substance of Dr. Bayless's testimony.

24        THE COURT:  Overruled.

25        You can answer the question.

1          THE WITNESS:  I don't believe staffing is ever a

2    substitute for clinical experience.

3          Q.   BY MR. PATTERSON:  Is there a person who has kind

4    of given a conceptual frame work for the domestic violence

5    assessment in your industry?

6          A.   Yes.  Dr. Mary Ann Dutton has been one of the

7    leading scholars, clinicians and researchers in this area.

8          Q.   And when did she publish her, either research or

9    have a schematic or systematic approach of assessment of

10   domestic violence?

11         A.   She's published quite a lot over time.  I'd say

12   mid '90s is when her most influential work on battered

13   women became known.

14         Q.   And did she have a structure for assessments that

15   are generally accepted by you folks?

16         A.   She sets out a --

17              MR. MARTINEZ:  I'm going to object as to these

18   folks.

19              THE COURT:  Sustained.  Rephrase the question.

20         Q.   BY MR. PATTERSON:  You are a psychologist, right,

21   and you're an assessor of domestic violence issues,

22   correct?

23         A.   Yes.

24         Q.   Okay.  In that context, what does Dr. Dutton

25   prescribe in terms of structure and a system for evaluating

1  or assessment of domestic violence?

2      A.   She would have --

3      MR. MARTINEZ:  I'm going to object on vouching.

4      THE COURT:  Overruled.

5      Answer the question.

6      THE WITNESS:  She would advocate a very broad and

7  comprehensive assessment that includes what's called a

8  psycho-social interview.

9      Q.   BY MR. PATTERSON:  What is a psycho-social

10  interview?

11     A.   That's usually like a autobiography of a person's

12  life.  You get an overview of who they are, where they came

13  from, their family background, their educational background

14  employment background, their medical history, any legal

15  history they might have had, any mental health issues they

16  might have had.  So you get to find out who this person is

17  for their whole life.

18     Q.   What else does she advocate?

19     A.   The next really critical thing is to get a very,

20  very detailed and extensive history about domestic

21  violence.  Particularly if there's a particular

22  relationship we're talking about in that relationship but

23  if there's others you might need to go there as well.  But

24  to find out what kinds of abusive experiences a woman

25  endured.  That would include getting information on a whole

1  range of different sort of abuse experiences.  That

2  includes the physical violence but not limited to physical

3  violence since sexual coercion, stalking, emotional abuse,

4  psychological abuse, financial control are often a part of

5  the picture that you need to get a very, very detailed

6  picture of what it looked like in her situation and

7  information about how she dealt with it.  Did she drink or

8  self-medicate?  Did she try to leave?  If she did, what

9  happened?  Did he beat her worse?  What did she do, what

10  did he do and what did she do next.  So how did his

11  reactions to her shape her subsequent responses.  So you

12  get a very detailed picture pattern of what her abuse

13  history looked like, what she did in response, how it

14  changed over time, how the abuser responded to efforts to

15  protect herself and how she ultimately survived in it.

16       Q.   How is that information generally derived or

17  obtained by persons that are doing a domestic violence

18  assessment?

19       A.   The only way you could do it, get all of this

20  detailed information is by spending a fair amount of time,

21  one-on-one, with the woman, using structured interviews,

22  possibly supplemented by questionnaires that give you a

23  structure to be able to not miss particular domains or

24  questions or not free form, going from one topic to the

25  next but systematically cover a range of different abuse

35

1  experiences, a range of different coping behavior, et

2  cetera.

3       Q.   And is that kind of information primarily

4  self-reported?

5       A.   Yes, it is.

6       Q.   And is that problematic for the person who is

7  doing the domestic violence assessment?

8       A.   I'm not sure I understand.

9       Q.   Well, do you take -- you factor in that fact that

10  it's self-reported and find it be an important

11  consideration in your domestic violence assessment?

12            MR. MARTINEZ:  Objection.  Leading.

13            THE COURT:  Overruled.

14            Go a head and answer the question if you can.

15            THE WITNESS:  Well, there's really no other way

16  to do it.  So, while self-reporting has some limitation

17  compared to other standarized measures that psychologists

18  might use in testing situations, there is no analog, there

19  is no standarized objective nonself-reporting method to

20  obtain this information.

21            So what you do is you sort of try to bootstrap a

22  little bit and you talk to the woman at great lengths.

23  When I do it, I spend from 15 to 20 hours with her to find

24  out that information.  And then I will look at the

25  additional sources of information to see do they fit, do

1  they not fit or are they consistent or inconsistent.

2      Q.   BY MR. PATTERSON:   Okay.   Are there assessment

3  tools that are generally accepted in your domestic violence

4  assessment?

5      A.   There's a variety of different things we might

6  use.  Mary Ann Dutton, herself, has published a couple.

7      Q.   Okay.  You talked to us about that.  How about

8  the power and control wheel?

9      A.   That's used as well.  That's not Dutton's so I

10  don't use it.  But that's a very, very widely used tool.

11  You see it probably in every state, domestic violence

12  coalition training where it's a conceptual tool to be able

13  to look at different forms of abuse and understand how

14  the thing that units all of these disparate types of abuse

15  is control, so if you're talking about stalking or talking

16  about sexual violence you might think these are unrelated

17  but it helps you see that the underlying dynamic is one

18  person trying to dominate and control another through the

19  use of abusive tactics.

20      Q.   Is it an assessment tool that assists in opening

21  up, if you will, the person that's being interviewed?

22      A.   Yeah, it can be great way to establishing a

23  dialogue because women don't often sit there and say, "I'm

24  battered."  They often say, "No, I haven't."  Or "I haven't

25  been beaten up.  I'm not a battered woman."  And

1  systematically we go through behaviors, well, did this

2  happen, did this happen, this happen and they say yes.  So

3  it can be very structured, useful structured approach to a

4  dialogue and find out information that you can't get from

5  direct conclusive types of questions.

6       Q.   You testified, is there a misconception among

7  battered women that if you haven't been hit, you haven't

8  been battered?

9       A.   Sometimes if you haven't had bones broken.  I had

10  a woman say to me once that she was slammed against the

11  wall but she didn't think that was physical violence.  She

12  thought it was emotional abuse because that's how it

13  registered to her.

14       Q.   Okay.  Can the power and control wheel assist in

15  breaking down that kind of stereotypes or misconceptions a

16  person might have?

17       A.   Yeah.  That's one tool.  There are a number of

18  different tools.

19       Q.   How about the partnership abuse scale, the

20  physical and nonphysical?

21       A.   Yeah, again asking questions about different

22  forms of abuse based on experience.  And it helps the

23  examiner so they don't miss anything to have systematic

24  lists so you're not just shooting from the hip, asking and

25  leaving things out.

1    Q.    Okay.  And is there a reason why these assessment

2  tools are formatted the way they are to both assist the

3  examiner and examinee?

4    A.    Both, right.  Provides structure.

5    Q.    Response to violence inventory.  Again, is that a

6  generally accepted assessment tool within the domestic

7  violence assessment business?

8    A.    I think that's Mary Ann Dutton's.  And that came

9  out of her book in 1992.  Where she developed a number of

10  different tools that are helpful for people, assessors to

11  use in working with battered women to find out about how

12  she might have responded.

13    Q.    Okay.  Abusive observation checklist?

14    A.    I think that's Mary Ann Dutton's as well.  Again

15  a descriptive measure to try to find out about the

16  particular type of abuse.

17    Q.    As structure, does it help both examiner and

18  examinee?

19    A.    Yes.

20    Q.    And lethality checklist?

21    A.    There's a couple different lethality checklists

22  and danger assessment scales that are used.  Usually in the

23  clinical setting.  These are used to get a feel for how

24  much lethal violence a woman either is exposed to or might

25  have been exposed to in the past so you can understand the

1   climate of violence she's living with and what kind of

2   potential it might have had for endangering her well-being

3   or those of her children.

4        Q.   Okay.  Is that generally accepted within your

5   industry?

6        A.   It's a generally accepted clinical tool for

7   gaining that type of information.

8        Q.   Are you familiar with the tests that were well

9   let me -- before I get there.  Is there one test that you

10  could administer to a person and determine the threshold

11  issue of whether or not that person is a victim of domestic

12  violence?

13       A.   No.

14       Q.   That instrument doesn't exist?

15       A.   No such entity.

16       Q.   Okay.  Were you familiar with -- well, the

17  assessment then, it seems to me that it would be a function

18  of your experience in the field, correct?

19       A.   That would be a big part of it.

20       Q.   You read Dr. Bayless' report?

21       A.   I did.

22       Q.   What tests did he administer in the case?

23       A.   He administered the Shipley Institute of Living

24  Scale, which was an abbreviated intelligence assessment and

25  the Williamson Incomplete Sentences Test, which I'm led to

1   understand is a projective technique that's supposed to get

2   at somebody's inner psyche but I tried to do a little

3   research of the instrument and couldn't find it in any of

4   the sources that documents standardized tests.

5      Q.   Is all of your domestic violence assessments,

6   have you ever used the Williamson Incomplete Sentence test?

7      A.   I teach an assessment course and I've never even

8   heard of it and couldn't find it, so, no.

9      Q.   Intelligence tests, are they relevant, generally

10  speaking, to the determination of the issue of whether or

11  not a person is a domestic violence victim?

12     A.   I don't believe so.

13     Q.   Why not?

14     A.   Because a person of any intelligence level could

15  be the victim of domestic violence.  Very high

16  intelligence, average as well as low intelligence but that

17  doesn't speak to the issue of victimization.

18     Q.   Okay.  Stated another way, smart women are

19  battered, not so smart women are battered?  Is there any

20  correlation between intelligence and victimization?

21     A.   No.  The only correlation could be after the

22  woman had enough head injuries it could actually impair her

23  intelligence.  Other than that, there is no association

24  between intelligence and being the victim of domestic

25  violence.

1      Q.    In general, are there a set of characteristics

2  that are found in all victims of domestic violence?

3      A.    There is no set of symptoms, there is no

4  particular personality type that would characterize all

5  battered victims.

6      Q.    What other tests did Dr. Bayless also administer

7  to Ms. Andriano?

8      A.    He gave the MMPI II.

9      Q.    What, in general, is the MMPI II?

10     A.    The MMPI II is a general standarized objective

11  measure of personality functioning that you can also get

12  like a little bit of someone's symptoms and stress level.

13  But it's really meant to get their overall level of

14  personality functioning.

15     Q.    At what point in time does it measure the

16  personality functioning?

17     A.    You would hope that a personality measure, since

18  we think of personality as a stable thing, it would measure

19  it in an irrefutable way.  But because our assessments are

20  influenced by our current states, if you're very distressed

21  or you're very sleep deprived or very hung over or anything

22  that would affect your current state, or very nervous, it's

23  likely to have some impact on the way your profile looks.

24  So from time to time there could be some variabilities in

25  what it looks like.

1    Q.   Does it present what you call "symptom picture"

2   and if it does, what do you mean by that?

3    A.   Well, you can look at the MMPI and get a sense

4   for how much distress somebody else is experiencing and

5   what types of symptoms specifically are they having.  You

6   know, a lot of depression, are they exhibiting a lot of

7   anxiety, do they seem to be having problems seeing things

8   that are not there, are they worried other people are out

9   to get them, experiencing paranoia.

10    Q.   A symptom picture that's presented as a result of

11   administration of an MMPI in April or May of 2004, might

12   that differ from the symptom picture presented in say an

13   MMPI that's administered in September or October of 2000?

14    A.   It easily could, depending on the particular

15   circumstances of the person at each of the administrations.

16    Q.   So, the one administered in 2004 may not give an

17   accurate profile of the personality, symptom picture, in

18   say August or September or October of 2000?

19    A.   That's true.  I'd say that's even more true if

20   someone's had any kind of acute distress the first time, if

21   they're recently traumatized or recently very distraught

22   that that's going to create a lot of elevation that

23   wouldn't necessarily be there several years later.

24    Q.   Now, can the use of the MMPI II, diagnosis, if

25   you will, status as a domestic violence victim?

1     A.    Absolutely not.   There is no way you can use a

2  tool like that to determine if somebody's been the victim

3  of anything, not domestic violence, not a car accident, not

4  a flood or earthquake or anything else.

5     Q.    Does it have some application in the forensic

6  context?

7     A.    Yes, it does.

8     Q.    Okay.   And what context would you use it after

9  having done, perhaps, other things?   Talk to me about what

10  you would have done before?

11     A.    Well, I typically do use MMPI II to evaluate

12  battered women cases but I think of it as a two-tiered

13  process.   I would use the information from the MMPI once

14  I've already discerned that the woman has indeed been

15  battered.   It gives give me a sense for a given time frame

16  that it's being administer about how much distress she's

17  experiencing.   It also can be helpful in looking at some

18  personality characteristics that might help understand how

19  she coped with inescapable, unendurable violence.   So

20  that's one piece of it.

21         The other piece is that the MMPI had this thing

22  called a "validity scale."   And validity scales are just

23  sort of psycho-babble for a series of questions that help

24  get at a person's approach to taking the test.   So by

25  reviewing the responses on the validity scales you get a

1  sense of is the person approaching the test with candor.

2  Are they being honest and open and acknowledging

3  difficulties?  Are they acknowledging way too many

4  difficulties that would make you think maybe something

5  fishy is going on here.  Are they trying to act like they

6  have no problems in the world and everything is

7  honkey-dorey.

8         So it gives you a flavor for how a person's

9  approaching that situation.  It helps either give you

10  confidence that they're being above board with you as an

11  evaluator or it makes you a little bit concerned and having

12  to explore further.

13         You can see really high elevations on one of the

14  validity scales if someone's in a lot of distress but not

15  because they're trying to fake it, then you have to sort

16  things out.  But I find it helpful to do these things.

17         Q.   All right.  If you have had to eliminate the MMPI

18  from your assessment, would it invalidate your assessment?

19         A.   No.  If I had a limited amount of time I had to

20  go in and do an evaluation and I was told I could only do

21  it in ten hours or 12 hours, the  MMPI takes a couple hours

22  to administer, I would favor the clinical psycho-social

23  interviews and the use of some of the structured abuse

24  assessments over the MMPI for sure.

25         Q.   Were you provided the raw data that was generated

1   by Ms. Andriano's result of the administration of the MMPI

2   II by Dr. Bayless?

3       A.   Yes, I was.

4       Q.   Were there certain scales that were elevated?

5            MR. MARTINEZ:  I'm going to object.  Now she's

6   getting into the evaluation of Ms. Andriano.

7            THE COURT:  Sustained.

8            MR. PATTERSON:  I'd like to make a record.

9            That's fine, I'll just move on, Judge.

10      Q.   BY MR. PATTERSON:  Without talking to the

11  particulars of the data, did you find in the results of the

12  MMPI II, generalized characteristics that you've seen in

13  other victims of domestic violence?

14           MR. MARTINEZ:  Objection, she's now going to

15  opine.

16           THE COURT:  Sustained.

17           MR. PATTERSON:  I do need to make a record on

18  this, Judge.

19           (Bench conference was held outside the hearing of

20  the jury.)

21           MR. PATTERSON:  He's allowed to ask Dr. Bayless

22  whether or not he found generalized characteristics found

23  in domestic violence victims.  He said I did not.  She is

24  critiquing his report by saying she did find those

25  generalized characteristics.  It's to rebut his position

1   that he found nothing.

2          MR. MARTINEZ:  But she is vouching for the

3   defendant.  He's saying something truthful.  And that she

4   suffers from domestic violence.  That's what she's doing.

5          MR. PATTERSON:  That's right on point to his

6   general question that you allowed him to testify to.  That

7   I didn't see any of generalized characteristics that are

8   found in domestic violence victims.  It's a fallacious

9   position to take because there are no generalized uniform

10  symptoms that are found in domestic violence victims but he

11  is allowed to opine.  He said no, I didn't see any.  She

12  looked at the same data.  She will say I have seen

13  generalized characteristics of domestic violence victims.

14         MR. MARTINEZ:  She's vouching.

15         THE COURT:  The objection is sustained.  But you

16  made your record.

17         (Bench conference concluded.)

18         THE COURT:  Mr. Patterson.

19         MR. PATTERSON:  Thank you, Judge.

20     Q.   BY MR. PATTERSON:  Let's talk in general about

21  the concept of secondary gain.  What is that in general?

22     A.   It's just the idea that somebody might have

23  another motive for trying to fake abuse or other symptoms

24  in order to avoid negative punishment like going to

25  prison.  So, whenever you're doing a forensic evaluation

1   for a court-related issue, it's really important to try to

2   consider whether or not they're saying, well, I was abused

3   or I'm crazy, as another motive for escaping the penalties

4   of going to prison that's really not true and they're just

5   engaging in those tales, basically to avoid penalty.  So

6   you want to consider that that's a possibility all the

7   time.

8       Q.   Okay.  Is that something that a competent

9   evaluator takes into consideration when rendering an

10  opinion?

11      A.   Yes.

12      Q.   Are you charging us for your expertise in this

13  case?

14      A.   I'm charging for my time.

15      Q.   Okay.  And what rate are you billing us?

16      A.   My fees are $150 per hour.

17      Q.   How many hours have you invested in this project?

18      A.   Before today, slightly under 17.

19      Q.   Okay.  Do you have an opinion regarding the

20  amount of time that Dr. Bayless invested in his contact

21  with Wendi in this case?

22      A.   Yes.  It seems that he spent about two to three

23  hours with her face-to-face.  And that seems inadequate to

24  me.

25      Q.   So how much time would you invest in your

1  assessment process, dealing face-to-face with the client?

2      A.   It really depends on the nature of the case.

3  But, it could be -- I've tended to average 15 or 20 hours

4  where there's a lot of complex domestic violence history.

5  With a less complex history, I probably could do it, you

6  know, eight, maybe ten.  But, it's hard for me to imagine

7  doing it with less than seven or eight hours.

8      Q.   In context with your colleagues that are involved

9  in this, what is their general amount that's invested in a

10  face-to-face with the client?

11         MR. MARTINEZ:  Objection.  Lack of foundation.

12         THE COURT:  Overruled.

13         Go a head and answer.

14         THE WITNESS:  Yes.  The colleagues that I know

15  who do this kind of work said that they tend to put in

16  about 8 to 15 hours, more if need be with an average of 8

17  to 15.

18      Q.   Is, in your opinion, reviewing Mr. Murphy's

19  report an adequate substitute for face-to-face contact with

20  the client?

21      A.   Absolutely not.

22      Q.   Why not?

23      A.   You can never vouch for the credibility of

24  someone else's work.  The only person's work that I would

25  take without redoing it myself is somebody working for me

1   that I trained and maybe had this team do a piece of the

2   interview.  But I never rely on someone else's work because

3   I can't assess the credibility of it.

4        Q.   Okay.  All right.  Do you have an opinion with

5   regard to the validity of Dr. Bayless' opinion in this

6   case?

7        A.   Yes.

8        Q.   What is that opinion?

9        A.   I don't think that he had the competence and

10  training to be able to conduct the evaluation.  And

11  probably because he didn't have the competence, it led him

12  not to use the right tools and to fail to systematically

13  evaluate whether or not abuse, in its many forms, was

14  present.  And, therefore, there was no basis for a

15  conclusion that domestic violence wasn't present.

16       Q.   And is that opinion, does it depend upon for whom

17  he's testifying?  So is it your opinion that he's

18  incompetent to render an opinion for either the defense or

19  prosecution?

20       A.   Oh, either way.

21            MR. PATTERSON:  Judge, that's all I have at this

22  point.

23            THE COURT:  Thank you.

24            Mr. Martinez.

25

50

1

2                              CROSS-EXAMINATION

3    BY MR. MARTINEZ:

4        Q.   What did you say -- you rendered an opinion about

5    Dr. Bayless' opinion.   What was that opinion that he

6    rendered, what was it?

7        A.   That Ms. Andriano was not a victim of domestic

8    violence.

9        Q.   One of the things that you told us was with

10   regard to relying on Sharon Murphy's report that you

11   wouldn't do that as part of an assessment, correct?

12       A.   That I wouldn't rely on Sharon Murphy's report?

13       Q.   Or the report of another individual?

14       A.   I wouldn't rely -- I might read it.   I might use

15   it as part of my opinion but --

16       Q.   So, is the answer no, you wouldn't rely on the

17   report of somebody else?

18            MR. PATTERSON:   Wait, wait wait, in the context

19   that she gave the statement, Judge, is a substitute as a

20   face-to-face --

21            THE COURT:   Overruled.   She can answer the

22   question.

23            THE WITNESS:   I would not use it as a substitute

24   for asking those questions myself, but routinely I would

25   review --

000008205

1        Q.   BY MR. MARTINEZ:  So is the answer no, you would

2   not rely on the report of someone else in making your

3   assessment?

4             MR. PATTERSON:  Objection.

5             THE COURT:  Overruled.

6             Answer the question if you can.

7             THE WITNESS:  I would not rely on somebody else's

8   report as a substitute for asking the questions myself.

9        Q.   BY MR. MARTINEZ:  And the reason you indicated

10  was that you can never vouch for the credibility of anybody

11  else's work, correct?

12       A.   Yes.

13       Q.   You can't -- according to you, you can't assess

14  the credibility of the report, correct?

15       A.   Correct.

16       Q.   And so, what you're telling us is that that

17  report may have misstatements in it, right?

18       A.   Possibly.

19       Q.   It could have errors in it, right?

20       A.   Any report could.

21       Q.   Sure.  But I'm talking about this particular

22  area.  Okay.  It could have, for example, areas where you

23  would consider that they didn't go far enough, right?

24       A.   Conceivably.

25       Q.   It could be areas where you thought they maybe

52

1   went too far, right?

2        A.   That's possible.

3        Q.   And it could be that you would reach a different

4   conclusion than what is in that report, right?

5        A.   There is a difference between the conclusion and

6   the method.

7        Q.   There is a difference, but it could be that after

8   reading that report that you would reach a different

9   conclusion than what is in a report that may have already

10  been presented to you, correct?

11       A.   The problem with someone else's report is not

12  knowing what method that they used to gain that

13  information.

14       Q.   So is the answer yes or no, which one is it?

15            MR. PATTERSON:  She doesn't have to answer --

16            THE COURT:  State your legal objection.

17            MR. PATTERSON:  Objection.  She doesn't have to

18  answer yes or no.

19            THE COURT:  Sustained.

20       Q.   BY MR. MARTINEZ:  Ma'am, do you rely 100 percent

21  every time on someone else's assessment?

22       A.   I don't rely on other people's assessment.

23       Q.   That's 100 percent of the time, right?

24       A.   I would consider it as one source of information.

25       Q.   Right.  But the question is:  You don't rely on

1  somebody's else's report, you, 100 percent of the time, you

2  don't?

3      A.  I do not rely on someone else's.

4      Q.  You read it, right?

5      A.  I will read it.

6      Q.  And you consider it, right?

7      A.  Yes.

8      Q.  And you incorporate it into part of your work,

9  right?

10      A.  No, not necessarily.

11      Q.  So, whatever somebody else has done even though

12  they've taken an assessment from them, they've taken a

13  history of domestic violence, you're going to disregard all

14  that and just do it yourself, right?

15      A.  Depending on the case, if I was going to court,

16  yes, I'd do it myself.

17      Q.  Now, with regard to this issue about going to

18  court, you indicated that there had been six occasions

19  where you have done an assessment, right?

20      A.  Six battered women criminal cases.

21      Q.  Well, one of them was a civil case, wasn't it?

22      A.  Okay.  That was still a battered women context to

23  me.

24      Q.  Well, you've done six assessments, right?

25      A.  In the battered women context.  I've done other

1   types of cases.

2        Q.   Right.   And with regard to one of them, the first

3   one, you indicated that that was at a sentencing, right?

4        A.   One of them was at a sentencing.

5        Q.   The first one was at a sentencing, right?

6        A.   Not -- I don't know the order exactly but not the

7   first in my career.   So I'm might not have reported them in

8   the correct order.

9        Q.   Okay.   Then, we'll go in the order that you

10  reported them to us.   The first one that you reported to us

11  was a sentencing.   Do you recall telling us that?

12       A.   There was two sentencings that I testified in.

13       Q.   And neither of them involved a jury, correct?

14       A.   That's correct.

15       Q.   You testified at a competency hearing also,

16  right?

17       A.   Correct.

18       Q.   That did not involved a jury, either?

19       A.   That did not.

20       Q.   And you were involved in a civil trial, right?

21       A.   Yes.

22       Q.   That didn't involve a jury, either?

23       A.   That was a jury trial.

24       Q.   But that is in a civil context, not a criminal

25  context, right?

1      A.    It was civil, right.

2      Q.    You also indicated that there were two pleas that

3  were involved and that you were a part of, right?

4      A.    Yes.

5      Q.    One of them your cohort or your companion

6  testified at that, right?

7      A.    Correct.

8      Q.    That was not a jury, right?

9      A.    Correct.

10     Q.    And then the last one involving the plea, you

11  didn't testify on that; you just completed the assessment,

12  correct?

13     A.    Correct.

14     Q.    Now, one of the things that you talked to us

15  about was this individual by the name of Mary Ann -- let me

16  get the name correct -- Mary Ann Dudley.  Do you remember

17  talking to us about that?

18     A.    Mary Ann Dutton?

19     Q.    I'm sorry?

20     A.    D-u-t-t-o-n.

21     Q.    You talked to us about her and you indicated that

22  she's the one that sort of set out the norm for these

23  assessments, right?

24     A.    She's written some material on the topic, yes.

25     Q.    You referenced it when you testified, didn't you?

56

1    A.    Yes.

2    Q.    You held it up as the paradyme that you follow,

3  right?

4    A.    Yes.

5    Q.    So, in your opinion, she's the expert in this

6  area or else you wouldn't follow her, right?

7    A.    She's an expert whose work I rely on.   I don't

8  know that I rely on it to a T exactly but I do use her

9  model.

10    Q.    And her model includes getting an autobiography,

11  right?

12    A.    Yes.

13    Q.    Getting an extensive history, correct?

14    A.    Yes, pretty much.

15    Q.    Just sitting down, basically, and talking to the

16  individual, correct?

17    A.    That's just part of it.

18    Q.    Well, according to you, and according to Mary Ann

19  Dutton, there are no tests that can be given to determine

20  whether or not a person is the victim of domestic violence,

21  right?

22    A.    I didn't say there weren't tests that would be

23  useful to be given in looking at the impact.   Neither, I

24  believe Dr. Dutton or myself would say they aren't useful

25  in assessing the impact of abuse.   However, there are no

57

1  tests to determine whether someone is the victim of

2  domestic violence.

3      Q.   Right.  The threshold question of whether a

4  person is the victim of domestic violence, there are no

5  tests, right?

6      A.   To determine that, no.

7      Q.   That is left to the person's experience, if you

8  will, right?

9      A.   Your -- Well, partly experience in terms of

10  getting information from the witness that you're

11  interviewing as well as collateral interviews and reports

12  that would provide evidence that there is convergence or

13  there's lack of convergence in the data sources.

14      Q.   The bottom line, what you do is you sit down and

15  you talk to the person that has that issue, right?

16      A.   That's only one piece of it.

17      Q.   Right.  And one of the other pieces that you do

18  is you give them something called a lethality index,

19  right?  You give them some of these documents out there,

20  right?

21      A.   You may use some standardized or structured

22  approaches to direct the inquiry.

23      Q.   Well, they're structured, they're not

24  standarized?

25      A.   Separate.

1    Q.    And standardized is different, isn't it?

2    A.    It is.

3    Q.    And these tests that you give them, basically

4  suggests answers, the ones you're talking about, don't

5  they?

6    A.    Do they to you?  They don't to me.

7    Q.    No, ma'am, I'm not testifying, you are.  You're

8  the expert, aren't you?

9    A.    Well, I'm not --

10        MR. PATTERSON:  Objective.  Argumentive.

11        THE COURT:  No.  Don't argue.  Ask a question.

12    Q.    BY MR. MARTINEZ:  Ma'am, do these questions not

13  suggest an answer?  Do these questions -- don't the

14  questions in these tests suggests an answer?

15    A.    No.

16    Q.    How many times has he hit you, zero to three,

17  three to ten, ten to 30.  Doesn't that suggest an answer?

18    A.    A person could equally say none.

19    Q.    They could say none but doesn't it suggest what

20  you're looking for?

21    A.    I don't believe so.

22    Q.    Okay.  About how many times has he threatened you

23  with a gun?  All of these, don't they suggest an answer?

24  Isn't the answer obvious to a person who is answering them?

25    A.    Well, what you do is you take this information

1   and you look for --

2       Q.   Ma'am, that's not my question.

3            MR. MARTINEZ:  Judge, I ask --

4            THE COURT:  Repeat the question.

5       Q.   BY MR. MARTINEZ:  Don't these questions suggest

6   what you're looking for?

7       A.   They're self-reporting.

8       Q.   That's right.  And by self-reporting, there is --

9   you can't sit there and tell us that in a situation that is

10  self-reporting that you can be a human lie detector and

11  tell whether or not the information is true, right?

12      A.   Of course.

13      Q.   And that is whether it's you or whether Mary Ann

14  Dutton, right?

15      A.   Absolutely.

16      Q.   And, in fact, Mary Ann Dutton doesn't talk about

17  her approach, if you will, in a forensic setting, does she?

18      A.   She does.

19      Q.   She does talk about it in a forensic setting?

20      A.   Yeah.

21      Q.   So she talks about it in a court setting, right?

22      A.   Yes.

23      Q.   As she talks about it in a court setting, she

24  does not hold herself out as being a person who is a lie

25  detector, to being able to tell whether or not the person

1   that's reporting this is telling the truth or not.  She

2   doesn't say that, does she?

3            MR. PATTERSON:  Objection to the form of the

4   question, using the term "lie detector."

5            THE COURT:  Overruled.

6            Go a head and ask the question again.

7            THE WITNESS:  She --

8        Q.  BY MR. MARTINEZ:  Is that, yes or no, ma'am?

9        A.  She does not.

10           THE COURT:  One at a time.

11       Q.  BY MR. MARTINEZ:  Thank you.  You did indicate in

12   your direct examination that self-reporting, the approach

13   has limitations, right?

14       A.  Yes.

15       Q.  And the big limitation and the weakness with that

16   approach is that it relies on the honesty of the person who

17   is reporting, right?

18       A.  True.

19       Q.  And, in fact, you even used the term "bootstrap"

20   right?

21       A.  Correct.

22       Q.  You did talk about the MMPI, right?

23       A.  I did.

24       Q.  And with regard to the six assessments that

25   you've done, you used it in each one, haven't you?

1    A.   I believe so, yes.

2    Q.   So it's of some value or else you wouldn't have

3  used it to start with.  You're not just running up fees,

4  are you?

5    A.   I use it because it is valuable.  But it's not

6  valuable in determining whether or not someone is a victim

7  of domestic violence.  It doesn't speak to that question.

8    Q.   Just like the interviewing doesn't determine

9  whether a person is the victim of domestic violence, does

10  it?

11    A.   It's one piece of it.

12    Q.   Right.  So is the MMPI, right?

13    A.   It can be useful to use the MMPI to understand

14  the impact of domestic violence once you concluded it

15  occurred from other sources.

16    Q.   Ma'am, you indicated that in the six assessments

17  that you did you used the MMPI, correct?

18    A.   I did.

19    Q.   And it was useful to you, right?

20    A.   Not to determine domestic violence.

21    Q.   So, in the assessments that you have for the

22  purposes of the sentencing and pleas and all that, you did

23  the MMPI just to run up fees?

24       MR. PATTERSON:  Objection.

25       THE WITNESS:  I didn't say that.

62

1          THE COURT:   Sustained.

2     Q.   BY MR. MARTINEZ:   You indicated that you are

3 getting paid for this, right?

4     A.   Yes.

5     Q.   And when you did the MMPI, you did charge for

6 that, didn't you?

7     A.   Not for the time while the person was taking the

8 test.

9     Q.   So, while you were sitting, while you could be

10 doing other things, you don't charge for your time sitting

11 there?

12    A.   No, because the person's taking the MMPI.   I'm

13 doing something else.   I only charge for the

14 interpretation.

15    Q.   So you never charge for the MMPI?

16    A.   No, not while they're taking the test.

17    Q.   Right now you are a professor or assistant

18 professor at Cal State Fullerton; is that right?

19    A.   Yes.

20    Q.   You are not tenured, correct?

21    A.   Not yet.

22    Q.   What that means is that they can let you go at

23 any time, right?

24    A.   That's true.

25    Q.   And there's nothing in the workings of this that

1  assures you that you are, in fact, going to be tenured, is

2  there?

3       A.   I just had my first review, very favorably

4  evaluated.

5       Q.   But that doesn't mean that something can't up and

6  they can't tell you good-bye, right?

7       A.   Absolutely.

8       Q.   The other thing that you told us -- well, what

9  you do is you teach, right?

10       A.   And do research.

11       Q.   You don't have a clinical case load, do you?

12       A.   Not currently.

13       Q.   Do you have a case lead, ma'am?

14       A.   Not now.

15       Q.   And so the answer is no?

16       A.   No.

17       Q.   And you don't see women that are victims of

18  domestic violence on a day-to-day basis, do you?

19       A.   Not right now.

20       Q.   The answer is no, isn't it?

21       A.   No.

22       Q.   And what you actually see are students who come

23  and listen to your lecture, correct?

24       A.   Yes.

25       Q.   And what you do is you pick out an area that you

1    think is interesting and you go out and do research on it,

2    right?

3        A.    Yes.

4        Q.    There is no literature out there, is there, that

5    has been done and has been normed or has got peer-reviewed

6    about the secondary gain involving people who are facing

7    charges and raise the defense of domestic violence, is

8    there?

9        A.    If there is, I haven't come across it.

10       Q.    But you're the expert, right?  You're from Cal

11   State Fullerton, right?

12       A.    I've haven't seen anything --

13       Q.    You have this huge C.V., right?  If it was out

14   there you would know if there was any research with regard

15   to secondary gain by a person who was facing charges and

16   then raises domestic violence as a defense, right?

17       A.    Well, there are some literature that talks about,

18   again, doing a forensic assessment with validity scales and

19   make that consideration.  Whether there are articles on

20   secondary gain, not specifically.

21       Q.    Well, you've already told us about the MMPI which

22   has the validity scales in it, right?

23       A.    Right.

24       Q.    You told us it has no application, right?

25       A.    I didn't say that.

1     Q.   Well, didn't you just say that with regard to the

2   threshold question the MMPI is not helpful?

3     A.   It's not helpful to determine if somebody was the

4   victim of domestic violence.  Having determined that, it's

5   useful to assess their level of distress and the

6   psychological impact.

7     Q.   So, with regard to the threshold question, the

8   MMPI II is not useful in your opinion, right?

9     A.   Yes.

10     Q.   So when you tell us that there is some literature

11   out there that talks about the MMPI II and the secondary

12   gain, that really has no applicability to the threshold

13   question as to whether or not an individual is the victim

14   of domestic violence, right?

15     A.   The useful piece of the validity scales.

16     Q.   Right.  But, you keep fighting me on that.  Well,

17   let me do it this way.

18         You keep telling me that, about the validity

19   scales, right?

20     A.   Yes.

21     Q.   You told me that if you were going to do an

22   assessment, the MMPI is the one thing that you would cut

23   out, right?

24     A.   If I had to be short of time, I'd cut that out.

25     Q.   Right.  And you've also indicated to me with

1   regard to the threshold question, the MMPI is not the one

2   that you would use, right?

3       A.   To determine if she's a victim of domestic

4   violence, no.

5       Q.   You keep saying "She's a victim of domestic

6   violence."  What about a man, can he be a victim of

7   domestic violence?

8       A.   Absolutely.  I haven't had occasion to evaluate

9   one.

10      Q.   You never had occasion to evaluate one?

11      A.   No.

12      Q.   Are you saying they don't exist?

13      A.   No, I'd be happy to evaluate one.

14      Q.   Did I ask you whether or not you'd be happy to

15   evaluate one?

16      A.   I believe they exist.

17      Q.   Have you read literature on it?

18      A.   Yes, I have.

19      Q.   So, with regard to the MMPI -- just so that I'm

20   clear with regard to it -- even though you use it, it does

21   not assist in the threshold question?

22          MR. PATTERSON:  Judge, this is asked and

23   answered.

24          THE COURT:  Sustained.

25      Q.   BY MR. MARTINEZ:  You mentioned all these

67

1   publications that you have out there.  And we've seen them

2   in your Curriculum Vitae.  But even though you may have

3   published 20, 30, 40 or 50 articles, that, in and of

4   itself, is not something that you can say because I

5   published all of these articles, I can now find out when

6   somebody's telling me the truth in assessment, is it?

7        A.   Of course not.

8        Q.   It is just your experience, right?  They just

9   show a little bit about your experience, right, the

10  articles?

11       A.   The articles just speak to my research

12  experience.

13       Q.   And all these other things that you have here,

14  the federal grants, again, they don't speak directly to the

15  issue of whether or not you're better or worse at

16  determining whether or not somebody's telling you the truth

17  to conclude that domestic violence is what's happening, do

18  they?

19       A.   No.

20       Q.   The same can be said with regard to the other

21  publications, right?

22       A.   Right.

23       Q.   The same could be said with regard to your

24  manuscripts?

25       A.   Right.

68

1        Q.    Same could be said with regard to your other

2    published instruments, correct?

3        A.    Correct.

4        Q.    Same could be said with regard to your

5    professional presentations, right?

6        A.    Correct.

7        Q.    And the bottom line with regard to you being here

8    today, you are not giving us an opinion as to whether or

9    not it could be yes or no, there is any domestic violence

10   involved in this case, are you?

11       A.    No, I'm not.

12       Q.    You mentioned the Shipley Scale and you indicated

13   that that doesn't speak to victimization, right?

14       A.    It's an intelligence, abbreviated intelligence

15   measure.

16       Q.    Isn't there a correlation between somebody who

17   is, let's say more intelligent than let's say somebody who

18   is borderline mentally retarded.  Does that show up on the

19   Shipley scale?

20       A.    Yes.

21       Q.    Wouldn't you agree that if somebody is borderline

22   mentally retarded it might be a little bit easier to assess

23   them in terms of what they provide to you than somebody who

24   is much more intelligent and does have the issue of

25   secondary gain?

1      A.   I don't understand the question.

2      Q.   With regard to the issue of secondary gain, is it

3   more prevalent among the mentally retarded or those that

4   are not mentally retarded?

5      A.   I don't know.

6      Q.   And last but not least, with regard to any report

7   that may have been provided in this case for assessment,

8   you are not here to vouch for its validity, are you?

9           MR. PATTERSON:  Objection.  Any report?  She did

10   render an opinion.

11           THE COURT:  Sustained.

12           Rephrase the question.

13      Q.   BY MR. MARTINEZ:  You are not here to render or

14   vouch for the validity of the approach taken by someone

15   like Sharon Murphy, are you?

16      A.   No, I'm not.

17      Q.   You're not here to vouch for the validity of the

18   tests used by Sharon Murphy, are you?

19      A.   No, I'm not.

20           MR. MARTINEZ:  I don't have anything else.

21           THE COURT:  Redirect.

22

23                    REDIRECT EXAMINATION

24   BY MR. PATTERSON:

25      Q.   Now, you told Mr. Martinez that you have done six

1    assessments and those were specific for women in homicide

2    cases?

3         A.   They were battered women homicide cases.

4         Q.   Okay.  And you did the assessment.  Did you

5    render a report in those cases?

6         A.   On some of them I wrote a written report.  And on

7    others a verbal report if the attorney didn't necessarily

8    want a written document.

9         Q.   And then, what was done with that report that you

10   rendered with regard to the written reports, did you have

11   any further decision-making process in determining how that

12   report was ultimately to be used?

13              MR. MARTINEZ:  Objection.  Relevance.  Lack of

14   foundation.

15              THE COURT:  Overruled.

16              Answer the question.

17              THE WITNESS:  I write a report.  I give it to the

18   attorney.  And then what they do with it is up to them.  I

19   don't have any role in that.

20        Q.   BY MR. PATTERSON:  At some point in time, at

21   least in two of those occasions, they asked you to come

22   back in --

23              MR. MARTINEZ:  Objection.  Leading.

24              THE COURT:  Finish the question.

25        Q.   -- and testify at the sentencing hearing?

1          THE COURT:  Overruled.

2          Go a head and answer the question.

3          THE WITNESS:  In two of the cases I testified at

4    sentencing, one I did write a written report and the others

5    there was no written report.

6      Q.   BY MR. PATTERSON:  Was that at the request of the

7    attorney to whom you had given the report or --

8      A.   The oral.

9      Q.   -- verbally report to him earlier?

10     A.   Yes.

11     Q.   And then, you said two of those reports were used

12   in the context of plea negotiations.  Was that the lawyer's

13   decision or your decision?

14     A.   The lawyer's.

15     Q.   All right.  Mr. Martinez asked you about the

16   function of experience in the preparation of domestic

17   violence assessment.  How is experience utilized in the

18   determination of the truth telling process of the

19   declarant?

20     A.   There is no way to give an opinion as to whether

21   somebody ultimately is truthful or not.  Like anything

22   else, it's a matter of amassing evidence that supports

23   various hypotheses.  I approach it like a research.  You've

24   got multiple hypotheses and you're collecting lots of data

25   that's supporting or not supporting various hypotheses.

1          So you might -- I might give the MMPI, look at

2     how they respond on those validity indexes.  Give me a

3     sense for how they're responding to the whole evaluation,

4     not just the MMPI.  And it would give me confidence in the

5     self-reporting material that I get from the other sources,

6     if a person is not over reacting, showing way much more

7     distress than would be expected in this situation.

8          I also interview other people.  People who may

9     have witnessed the abuse and talk to them and see what they

10    have to say about it.  I may review police records or if

11    there are service records or medical records or counseling

12    records.  I review those if they are available.  I look at

13    the totality

14         Q.  All right.  Is there some reservation about using

15    outside sources in terms of collateral sources because of

16    the concept of under reporting in this particular problem?

17         A.  Yeah.  Battered women are notorious for under

18    reporting.  If anything, they don't tend in general to

19    exaggerate, they tend to minimize.  Usually, you miss

20    things as opposed to give flavored accounts of things that

21    don't exist.

22         Q.  So, the failure to be able to find police reports

23    on a battering incidents, is that of significant

24    consequence to you?

25         MR. MARTINEZ:  Objection.  Beyond the scope.

1          THE COURT:  Overruled.

2          Go a head and answer question.

3          THE WITNESS:  That's typical.  Most battered

4    women in the data on this do not report incidents to

5    police.

6      Q.    BY MR. PATTERSON:  Failure to find another

7    witness to corroborate things, is that in and of itself

8    significant in the truth telling evaluation that you're

9    doing here?

10     A.    Well, battering often takes place in private and

11   by definition it's often secretive so it's not that unusual

12   to have no other people who have been witnesses to the

13   actual events.

14     Q.    So, is it because of that consideration is there

15   something about the structured interview process that the

16   reason they use it is to determine an effort to get from

17   the declarant true statements about the abuse history?

18     A.    To elicit details.  You want information about

19   those kinds of things that somebody might have experienced,

20   exactly.

21     Q.    Simply, if a person just said, "I'm a battered

22   woman" would you then render an opinion based upon that

23   declaration?

24     A.    Oh, my goodness, no.

25     Q.    Okay.  And you were called upon to render a

1  opinion regarding the validity of at least one report in

2  this case, correct?

3      A.   Yes.

4      Q.   What is your opinion in regard to the validity of

5  Dr. Bayless' opinion that there is no domestic violence at

6  issue in this case?

7      A.   I believe that opinion, again, has no validity

8  because it wasn't properly assessed.

9          MR. PATTERSON:  Thank you, Judge.  That's all I

10  have.

11          THE COURT:  Are there any further questions of

12  this witness by the jurors?  If so, please raise your

13  hand.

14          No one has raised their hand.

15          May this witness be excused?

16          MR. PATTERSON:  Yes.

17          MR. MARTINEZ:  Yes, your Honor.

18          THE COURT:  Thank you very much.  You are

19  excused.

20          Mr. Patterson?

21          MR. PATTERSON:  That concludes my surrebuttal,

22  Judge.

23          The defense rests.

24          THE COURT:  Ladies and gentlemen, what we're

25  going to do is, the attorneys and I have been working very

1   hard in finalizing the final jury instructions in this

2   matter.  There are some things we need to tie down a little

3   bit more so we're not going to be wasting your time.

4          What's going to happen is I'm going to go ahead

5   and we'll take the recess for the evening you're to return

6   tomorrow at 1 p.m..  When you return tomorrow at 1 p.m.,

7   you'll hear the closing arguments of counsel.

8          Once the closing arguments of counsel have been

9   presented to the jury, I will give you the final jury

10  instructions in this case.  Again, because of the fact we

11  need to basically finalize and formalize the jury

12  instructions, although we've been working on them very hard

13  since the last time you were here, I don't want to waste

14  your time, so we're going to take the rest of the afternoon

15  to do that.

16          During the recess, remember the entire admonition

17  that I've given you including the fact not to discuss the

18  case with anyone.  Do not let anyone discuss the case with

19  you.  Do not do any research, investigation,

20  experimentation or testing on your own.  Avoid any and all

21  media coverage of this case.  Keep an open mind.  I want

22  you to have a nice evening and we'll see you tomorrow.

23          I'll stay here with counsel.

24          (Jurors exited the courtroom.).

25          THE COURT:  This is Cause Number CR2000-096032,

1   State of Arizona versus Wendi Elizabeth Andriano.

2           The record will reflect the presence of the

3   defendant and counsel.  We are outside the presence of the

4   jury.

5           Counsel, I've given to you the jury instructions

6   that I've prepared subsequent to receiving your requests.

7   I know that you haven't had the opportunity to go over

8   those very carefully so I'm going to go ahead and take a

9   recess so you can go over those carefully.

10          Also, I've given you a jury exhibit list which

11  has been prepared by the clerk.  What I want you to do is

12  go over that carefully and she'll give you the latest

13  exhibit list.  And she has marked on there the items that

14  are biohazard materials.  And what I would like for you to

15  do is, if it's agreeable to counsel, is go through each one

16  of those items on the list and see whether you're agreeable

17  to how it's described and how we're going to handle the

18  biohazardous materials.

19          So go ahead and take your recess at this point in

20  time so that you can look at the items and when you're

21  ready we'll reconvene.

22          Mr. Patterson provided the Court a memo regarding

23  the definition of domestic violence that was used in the

24  Vogel case.  I'll have a copy made for Mr. Martinez and for

25  the court because Mr. Patterson gave us his only copy

77

```
 1   okay.   We'll be at recess.
 2                (Proceedings adjourned.)
 3
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

EXHIBIT V V



05-0002
Braccio

IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

IN AND FOR THE COUNTY OF MARICOPA

STATE OF ARIZONA,                )
                                 )
                 Plaintiff,      )
                                 )
        vs.                      )      No. CR2000-096032
                                 )          CR05 0005-AP
WENDI ELIZABETH ANDRIANO,        )
                                 )
                 Defendant.      )
_____   )

BEFORE:  THE HONORABLE BRIAN K. ISHIKAWA

Mesa, Arizona
November 30, 2004

REPORTER'S TRANSCRIPT OF PROCEEDINGS
(Trial)

COPY

SHARON FLORES
CERTIFIED COURT REPORTER
50374

2

1

2

3                    A P P E A R A N C E S

4

5

6

7     For the State:

8                      Mr. Juan M. Martinez

9                      Deputy County Attorney

10

11

12

13

14     For the Defense:

15                      Mr. Daniel B. Patterson

16                      Mr. G. David Delozier, Jr.

17                      Office of the Public Defender

18

19

20

21

22

23

24

25

3

1

2

3                                I N D E X

4    WITNESSES:                                              PAGE

5

6       DENNIS OLSON

7          Direct Examination by Mr. Martinez               40

8          Cross-Examination by Mr. Patterson               41

9          Redirect Examination by Mr. Martinez             42

10

11      PHILIP KEEN (Hearing outside of Jury)

12         Direct Examination by Mr. Martinez               44

13         Cross-Examination by Mr. Patterson               46

14         Redirect Examination by Mr. Martinez             46

15         Recross-Examination by Mr. Patterson             47

16         Further Redirect-Exmaination  by Mr. Martinez    48

17

18      PHILIP KEEN

19         Direct Examination by Mr. Martinez               53

20         Cross-Examination by Mr. Patterson               63

21         Redirect Examination by Mr. Martinez             70

22

23

24

25

4

1                P R O C E E D I N G S

2

3         THE COURT:  Good afternoon.  This is Cause Number

4    CR2000-096032, State of Arizona versus Wendi Elizabeth

5    Andriano.

6         The record will reflect the presence of the

7    defendant and counsel.  We're outside the presence of the

8    jury.

9         The first order of business is the fact that I

10   did give counsel last week the preliminary jury

11   instructions for Phase II.  And I've indicated to them I

12   made some typographical corrections to the instructions.

13   Is there anything further that either side would

14   like to say with regard to the preliminary jury

15   instructions, Phase II?

16        MR. MARTINEZ:  No, sir.  Thank you.

17        MR. PATTERSON:  No, Your Honor.  I've already

18   expressed my desire to change certain language and that was

19   denied.  So that's all I have.

20        THE COURT:  Okay.  And then, with regard to the

21   notice of aggravating factors filed by the State, do the

22   parties waive the reading of that notice?

23        MR. MARTINEZ:  Yes.

24        MR. PATTERSON:  Yes, Your Honor.

25        THE COURT:  Counsel, what we're going to do then,

1  we'll bring the jury in and then we'll have the bailiff

2  hand out the preliminary jury instructions for Phase II.

3  I'm also going to have the bailiff hand out to them the

4  preliminary jury instructions that we gave them for Phase I

5  because we make reference in the Phase II preliminary

6  instructions to certain portions that they are to rely upon

7  and which are in the preliminary jury instructions

8  concerning jury conduct, bench conferences and preliminary

9  instructions concerning the law.  So they'll have those,

10  again, since they are referenced in the preliminary

11  instructions of Phase II.  And we'll get into the opening

12  statements.

13              Anything else we need to discuss outside the

14  presence of the jury?

15              MR. MARTINEZ:  No, sir.

16              MR. PATTERSON:  Judge, did you expect

17  Detective Olson to testify and the jury will be released

18  and we'll go over the foundation issues of Dr. Keen?  Or,

19  the foundational issues would be resolved during the course

20  of his testimony?

21              THE COURT:  We'll do that outside the presence of

22  the jury.

23              MR. PATTERSON:  Thank you.

24              THE COURT:  Are we ready for the jury?

25              MR. MARTINEZ:  Yes, sir.

1          MR. PATTERSON:  Yes, Your Honor.

2          (Jurors entered.)

3          THE COURT:  Please be seated.  This is Cause

4     Number CR2000-096032, State of Arizona versus Wendi

5     Elizabeth Andriano.

6          The record will reflect the presence of the

7     defendant, counsel and the jury.

8          At this time, I'm going to ask the bailiff to

9     pass to each juror the preliminary instructions for Phase

10    II and also the original preliminary instructions that were

11    given to the jurors.

12         I ask each of you to please follow along as I

13    read the preliminary instructions for Phase II.

14         Preliminary instructions, Phase II.  We'll go

15    past the index and go to page 3.

16         A.  Introduction.  If you remember during the

17    jury selection in this case, both in the questionnaire and

18    during the oral questioning by the Court and counsel, you

19    were given a description of the procedure to be used if the

20    jury finds the defendant guilty of first-degree murder.  In

21    light of your verdict of guilty of first-degree murder, we

22    are about to begin the next phase of the trial.

23         The State has alleged the existence of certain

24    aggravating factors.  It is during this phase that the

25    State will attempt to prove the alleged aggravating

7

1   factors.

2         The directions in the preliminary instructions in

3   the first phase of the trial regarding the following topics

4   remain in full force and effect.   Preliminary instructions

5   concerning juror conduct, bench conferences and preliminary

6   instructions concerning the law.

7         B.   Order of this phase.   This phase generally

8   proceeds in the following order:   First, the prosecutor

9   will make an opening statement.   The defense attorney may

10  make an opening statement after the prosecutor or it maybe

11  postponed until after the State's case.   What is said in

12  opening statement is not evidence.

13        Second, the State may present additional evidence

14  or the State may rest on the evidence already adduced at

15  the guilt, not guilty phase.   After the State finishes, the

16  defendant may present evidence.   The defendant is not

17  required to present evidence.   If the defendant does

18  present evidence, the State may present rebuttal evidence.

19        Third, the attorneys will make closing arguments

20  to tell you what they think the evidence shows and how they

21  think you should decide this phase of the trial.   Just as

22  in opening statements, what is said in closing arguments is

23  not evidence.

24        Fourth, I will read the final instructions

25  regarding this phase and explain to you the form of

1   verdict.

2            Fifth, you will deliberate and decide upon a

3   verdict.  Once you agree upon a verdict, it will be read in

4   court with you and the parties present.

5            C.  Evidence to consider.  In making your

6   decision regarding this phase of the trial, you are to

7   consider the evidence presented in both the guilty, not

8   guilty phase at this phase of the trial.

9            D.  Alleged aggravating factors.  The State has

10  alleged the following aggravating factors:  One, the

11  defendant committed the offense in consideration of the

12  receipt or in expectation of anything of pecuniary value.

13  Two, the defendant committed the offense in an especially

14  heinous, cruel or depraved manner.

15           The question to be presented to you at the end of

16  this phase of the trial will be whether the State has

17  proved the alleged aggravating factors.  The State has the

18  burden of proving the alleged aggravating factors beyond a

19  reasonable doubt.

20           Any verdict returned in this phase of the trial

21  must be unanimous.  You may find the State has proved all,

22  some or none of the aggravating factors.

23           At this time, the attorneys will be permitted to

24  make their opening statements for Phase II.  Again, what

25  the attorneys say in their opening statements is not

1   evidence.  It is simply an outline of what the attorney

2   believes the evidence will be and it's offered to help you

3   understand and following the evidence during the trial.

4           Mr. Martinez, would you like to make an opening

5   statement on behalf of the State?

6           MR. MARTINEZ:  Yes.  Thank you.

7           THE COURT:  You may proceed.

8           MR. MARTINEZ:  Good afternoon.  Most of the

9   evidence for your consideration during this second phase of

10  the proceedings has already been presented to you in the

11  trial that was just completed.  But even though the

12  evidence, most of the evidence, was presented during that

13  first phase, if you will, it would be remiss not to discuss

14  the salient factors that apply to the two allegations that

15  were made by the State.  Specifically, that, number one,

16  this killing, this murder, was done in the expectation of

17  anything of pecuniary value.  Anything of pecuniary value.

18          Second of all, the State has alleged that this

19  killing was done in an especially cruel, heinous or

20  depraved fashion.

21          With regard to the first aggravating factor for

22  your consideration, we know from the evidence that was

23  already presented that this defendant -- to this defendant,

24  Joe was worth more dead than alive to her.  That's sort of

25  the conundrum, if you will, the umbrella, that covers

1   everything that she did.  We know that she made that

2   statement, along with other statements, to various other

3   individuals.

4         And just in summary sort of fashion, we know that

5   the reason that Joe was worth more dead than alive was that

6   in 1998, in August of 1998, he was told that he was

7   suffering from cancer, an incurable form of cancer, adenoid

8   cystic carcinoma.  And he was told they couldn't tell him

9   how long he was going to live but that he was going to die

10  as a result of this cancer.

11        We know that almost immediately thereafter, in

12  the early part of September of 1998, the defendant got on

13  the telephone to somebody by the name of Jeffrey Miller, a

14  lawyer, and asked to retain his services.  And, again, it

15  wasn't like Joseph Andriano was on the phone calling him,

16  it was the defendant.  So you can see the first signs of

17  greed coming out at that point.

18        Additionally, after she makes that call to the

19  lawyer, she sort of takes over, if you will, the way the

20  lawsuit is going to follow because after that, they make an

21  appointment for this lawyer, Jeffrey Miller, to go to Casa

22  Grande to visit with them to discuss, if you will, the

23  retainer agreement or who's going to get what.  And

24  basically, it's a contractual agreement to tell them who is

25  going to get what money should there be any money that

1   comes from the lawsuit.

2            During that part of the conversation, we know

3   that Joseph Andriano was not present.  And we know that he

4   wasn't present because the defendant received, the

5   defendant and Mr. Andriano, get a letter from Mr. Miller

6   saying, "I don't know if I discussed the retainer agreement

7   with you when I was out in Casa Grande, but this is the way

8   it's going to work."  And then the retainer agreement is

9   provided for the parties.

10           Again, that shows that, at least to Mr. Miller,

11  the person that was stirring the drink, if you will, the

12  individual that was in charge, was the defendant.  She was

13  the one that was making all of the moves, all of the

14  advances.  It wasn't her injury.  She wasn't the one that

15  had been misdiagnosed.  She wasn't the reason why this

16  lawsuit was worth so much but she was the one that, if you

17  will, showed the most avarice, showed the most greed.  She

18  was the one that moved forward with it.

19           And so, what happened after that is that the

20  lawyer, in the State's view, makes a mistake and begins to

21  talk to her about what is the best way to conduct this

22  lawsuit.  Should we settle it now and take a lesser amount

23  of money so that you can enjoy the rest of your life, the

24  very few days that you have left, with your family, your

25  kids?  Or, do we wait and go to trial with the expectation

1   that you will get more money.  He discussed that with the

2   person who wasn't injured.  He discussed it with the

3   misses.  He didn't discuss it with Joseph Andriano.  But

4   what he did do is he covered his back and he sent a letter

5   saying, you know, with regard to the settlement issue, why

6   don't you discuss it with Mr. Andriano, to see if he wants

7   to settle this lawsuit now or if he wants to wait and get

8   more money if it goes to trial.

9          We know that Joseph Andriano wanted to settle the

10  lawsuit now.  We know that because that's what she told the

11  police when she was being interviewed on October 8th of the

12  year 2000.  She said Mr. Andriano was upset and he was

13  upset because it was taking too long for this lawsuit to

14  get done.  He wanted this lawsuit done.  He wanted it over

15  and done with so, presumably, he could take the money and

16  do with it what he will, enjoy the rest of his life.  The

17  short life he had left.

18         But that decision whether or not to go forward

19  and take it to trial or settle it now was discussed with

20  the defendant.  And, again, you can see the greed.  You can

21  see the avarice in her actions because we don't have any

22  evidence that it was ever discussed with Mr. Andriano.  And

23  the bottom line is, this case then began to proceed on

24  track to go to trial.  Even though, according to her, he

25  said, "I want it done now."  And again, it's because she

1  wants money.  She's just a little money hungry.  That's

2  what's going on here.

3         Well, a couple years go by until we get to the

4  summer of the year 2000.  And during that time period, she

5  begins to get busy with regards to the money issue.  And

6  she begins to get busy because one of the things she does

7  is she goes up to a young fellow by the name of James Yost,

8  somebody she works with and she says to him, "I want to get

9  at least a million dollars in life insurance to tied me

10  over from right now until the lawsuit settles."  Even

11  though she's working, even though she's got an apartment

12  that is provided to her free of charge as part of her

13  employment, even though she would have one person less to

14  feed once he passes away, she wants a million dollars to

15  hold her over from the time that Mr. Andriano dies until

16  the time the lawsuit goes to trial.

17         Again, there is nothing but avarice that's

18  glittering there.  It's just fool's gold that she is

19  chasing at that point.  Because it isn't her life.  It

20  really isn't her money.  It's something that Joseph

21  Andriano, for whatever reason, is going to have to go

22  through and that people are going to have to pay.

23         So, what ends up happening is she then continues

24  this conversation with Mr. Yost.  And after telling him

25  that she needs this million dollars and he says, "Well,

1    that's, you know, if you try to get insurance they're going

2    to know he has cancer."  And she's not to be deterred

3    because she is a woman in pursuit of this treasure.  She's

4    a woman who wants to get this money.  And what she says to

5    him is, "You can stand in for him."  You saw Jimmy Yost.

6    And you saw the photograph of the victim, Joseph Andriano,

7    in the driver's license.  They look alike.  They're about

8    the same height.

9            And so what she says to him, "Here's his wallet.

10   Here's his driver's license, why don't you go ahead and

11   pose for him."  And then she begins to really get down to

12   the nitty-gritty and begins the negotiations with

13   Mr. Yost so that she can end up with a million dollars, or

14   end up with money.

15           And so what ends up happening is Mr. Yost

16   initially says, "No, I don't want to do this.  You know,

17   they're going to find out that he has cancer."  And she

18   says, "No, no.  The medical examiner is not going to look

19   for that."  And that's true.  This medical examiner didn't

20   even test for sodium azide, even though they knew that's

21   what may be in play.  In fact, they had to send the samples

22   out.  That's not what they test for.  She said, "It's just

23   going to be as if it were a heart attack, they will never

24   know."  But still, Jimmy Yost, for whatever reason says,

25    "No, I'm not going to get involved in this thing."

1      Then she sort of ups the ante a little bit.
2  Tries to play on his greed to see if he will take a bite
3  and accept ten thousand dollar to stand in.  Because if you
4  look at it, ten thousand dollars for a million dollars,
5  that's quite the deal.  That's quite a return on her
6  investment.  But he won't bite on it.
7      She begins to negotiations further.  She
8  continues the negotiations because it's important to her to
9  get money.  Because it's clear that that's what this is all
10  about to her.  Her husband really doesn't matter any more.
11  He's gross.  He's skinny.  She doesn't want to be with
12  him.  Might as well make some money out of this bad thing
13  that happened to him.
14      And so, she then ups the price, it keeps going
15  up.  We don't know exactly if it's ten, twenty, thirty.  We
16  know she offers him up to fifty thousand dollars.  She
17  wants to bait him, if you will.  Here take fifty thousand
18  dollars in exchange for him doing this thing that she wants
19  him to do, stand in and take this medical examination so
20  that she can then profit to the tune of a million dollars.
21  Well, he doesn't do.
22      Undeterred, she then goes over to Eric Vaillant.
23  And, again, this is during the summer of 2000 because she
24  does want money, she wants this million dollars.  And
25  during this conversation with Eric Vaillant, he asks, "How

1   much money do you expect to get from this lawsuit, that

2   medical malpractice?"  She tells him, "If Joe dies, I've

3   been told that I'm going to get up to twenty million

4   dollars."

5           Again, there's this avarice creeping in there.

6   It's Joe is worth more dead than alive to her.  Because if

7   he is dead, the jury, at the time of the civil trial,

8   according to Jeffrey Miller, may give them a little bit

9   more money.  And whether or not he told her in those terms

10  and whether or not he gave her the amount, that's what the

11  defendant believed.  That's what's important.  She believed

12  it and that's why she was saying it.  So twenty million

13  dollars, it is a substantial amount of money.  We don't

14  know how much it was valued.  If it was just a medical

15  malpractice claim, but we know the value was as high as

16  twenty million dollars if he died before the case went to

17  trial because there would be more sympathy.  There would be

18  a man who was gone, with kids left alone in the word.

19  Grieving widow, if you will.  That makes a much more

20  compelling case for a jury.

21          Well, she talks to this individual, Eric

22  Vaillant, and then says to him, "Would you stand in?  Would

23  you stand in for a physical examination as part of the life

24  insurance policy that I'm looking to get?"  And he says to

25  her, "No, I'm not going to do it.  You're going to get

1   twenty million dollars.  You're just money hungry."  This

2   is an individual who had been described as "money hungry"

3   when she indicated that Joe was worth more dead than alive

4   to her.

5           Well, but she was not deterred at this point

6   because what she does is on August 8th, I'm sorry, August

7   10th of 2000, she then makes a telephone call to the life

8   insurance agent to see if they already have a policy in

9   place.  Five thousand dollars.  It's a small amount.  They

10  already have a life insurance policy in place.  Perhaps

11  they can then up it to five hundred thousand dollars

12  perhaps without the need of a medical examination.  So she

13  places a call and one of the things that she indicates

14  during the call is that, well, yeah, Mr. Andriano will be

15  willing to take this physical examination.

16          The problem with that statement is that when Ed

17  Sandidge, who makes up this proposal for a

18  five-hundred-thousand-dollar life insurance policy, when he

19  makes the proposal he needs to talk to Joseph Andriano.

20  And she won't let him.  Has a conversation with her and she

21  becomes obstreperous and won't let him do that.  Of course,

22  that will spoil her plan because then Joseph Andriano will

23  start asking questions about why are you asking that.  Why

24  are we doing this.  Why aren't we going forward with this.

25          What's important is on August 10th of 2000 is

1   that almost contemporaneously with her making this call to

2   the insurance company, that she opens this account with

3   USA.net under the name of Anne Newton. And that account

4   was open on July 26th, 2000.

5           So almost contemporaneously with that, she is now

6   seeking more life insurance. And the reason that's

7   important is that you now see that she is forming the

8   intent. She now has in her mind she is going to kill him.

9   That the only reason why she opened the account was to get

10  the poison so she could kill him. At the same time, she's

11  also trying to get some money. Even during the summer

12  she's asking people to pose as her husband for purposes of

13  life insurance.

14          Then, if you will, that same month of August

15  28th, 2000, she makes a telephone, not a telephone call,

16  she goes with the sort of back street kind of approach to

17  this thing where you don't have to do a face-to-face call.

18  She gets on the Internet and she sends an application to

19  Amica. And the person that is in charge of that is Carolyn

20  Catalano. She, of course, lies and says "My husband

21  doesn't have any cancer." She's banking, if you will, on

22  the fact that she's going to get somebody to stand in for

23  him. That's why she makes the statements.

24          And so, what happened with that is that doesn't

25  go anywhere because, again, she can't get anybody to stand

1   in.  But it isn't like she isn't trying.  The key here is

2   that we look at that to take a look at her mental state.

3   Why she is doing what she is doing.  And in this case, it's

4   clear she is doing all of this for money.  She wants him to

5   die and she wants to be rich as a result of him dying.

6           The next day on August 29th of 2000, she then

7   gets on the Internet again, goes to Eterm.com and makes the

8   application.  Lies about whether or not there's any cancer

9   involved.  And then with this one, they tape record their

10  calls -- most of their calls it seems.  And one of the

11  important things about this application is that this is the

12  only time that you hear Joseph Andriano in this case.  And

13  you can tell from his voice that he has no part in the

14  making of this application.  He's not the one that's the

15  greedy one.  He's not the one that's trying to make money

16  out of this.  To him, he wants to settle it, according to

17  her.  To him, he doesn't want to get this extra life

18  insurance.  He's dying.  He's basically doing what he can

19  to survive through the use of chemotherapy.  That's why

20  he's going through chemotherapy.  That's why he's going

21  through the pain because he wants to survive.  From all of

22  the evidence, there is never any indication that he's the

23  greedy one.  That he's the one that's going out on a limb,

24  if you will, and lying to people in order to try to get

25  money.  The only person that is lying to get money, the

1   only person that is trying to get people to help her lie to

2   get money, is the defendant.

3          So we know that, in her view, this world that

4   she's in has money in it.  It's like a mine, if you will,

5   that has a little bit of a pocket of gold in it.  She wants

6   to mine that gold and she's attempting to do that.

7   Whether it's by the life insurance or by killing her

8   husband so that the value of his claim sky rockets up to

9   twenty million dollars.  She does all that.   And the only

10   reason that she's doing all of this is because she wants

11   the money.  That's why she did all this.  She did it in

12   expectation of pecuniary gain.  Other than that, she

13   wouldn't, of course, have gone and made the applications

14   for the life insurance.  She wouldn't have said Joe is

15   worth more dead than alive to her.

16          And contemporaneous with those statements, that's

17   when she opens this account to kill him.  There is no other

18   motive in this case other than that.  That is the

19   overriding motive.  Even though she wanted to go out with

20   other men, it wasn't like they were the love of her life in

21   the sense she was with one individual now and later she

22   hooked up with an another individual.  So that really

23   wasn't the main motivation.  The motivation in this case

24   for her to get rid of him is that he was worth more dead

25   than alive.

1      So, that's why she did it.  She did it in the

2   expectation of gaining something of pecuniary value.  It

3   doesn't mean that she actually has to get that in order for

4   this to be the motive.

5      In other words, it doesn't have to be a

6   completed, if you will, garnering of the gold.  All she has

7   to do is do this and the motive being that she wants to get

8   something of value, pecuniary gain, pecuniary value.  And

9   she did that in this case.  Most of this, all of it

10  actually was presented during the trial.

11     So we now know that the motive for all of this

12  suffering that is to come is because of nothing more than

13  avarice, nothing more than being greedy, nothing more than

14  being money hungry.  That's why she took this father away

15  from his kids, away from his parents.  That's why she did

16  it.

17     MR. PATTERSON:  Judge, objection.  This is

18  verging on argument.

19     THE COURT:  No argument.  Just continue on.

20     MR. MARTINEZ:  Let's now talk about the cruel,

21  heinous or depraved portion of the proceedings.  One of the

22  things that we need to examine during this portion of the

23  proceedings is we look at Mr. Andriano's mind, if you will,

24  what is the state of mind.  We look at whether or not there

25  was any physical pain or whether there was any emotional

1    harm to him, if you will.  What he was feeling inside.  And

2    with regard to that, we need to just sort of step back and

3    review a little bit of the facts that we have here.  One of

4    the things that we know with, and again this is from

5    Mr. Andriano's viewpoint, in other words did he experience

6    any physical pain, did he experience emotional distress.

7           MR. PATTERSON:  Objection to the characterization

8    of "any physical pain."  That's not the standard in this

9    case.

10          THE COURT:  Okay.  The jury will follow the

11   instructions given by the Court.

12          MR. MARTINEZ:  Let's look at what Mr. Andriano

13   endured.  We know that they came back from Casa Grande.  We

14   know he was able to walk.  He was ambulatory.  We know that

15   he was able to eat.  Perhaps he was a little bit tired.

16   But according to Dr. Kellogg, that was the time when he

17   would be most tired from the chemotherapy treatment.  But

18   it wasn't like through the day he was out at the swap

19   meet.  It wasn't like he was doing the run-of-the-mill

20   chores.

21          During that time he was able to walk.  He was

22   able to care for himself.  Again, it wasn't like he was

23   down on the ground in a fetal position.

24          He got home that night, October 7th, 2000, and it

25   was around 11:30, a little bit before midnight.  Depending

1   on her story, as early as 12:30 in the morning of the next

2   day which would be Sunday, October 8th, 2000, Mr. Andriano

3   was given this poison.  And we know the amount of poison

4   that is unaccounted for is approximately 21 grams which is

5   the equivalent on 21 packets of Sweet and Low.  That's sort

6   of what you can get a feel to what's missing.

7           We also know that that's ten times what they call

8   the lethal doze in 50 percent of the people that may take

9   it and weigh that much.  So we know she gave him at least

10   ten times the amount that was necessary to kill him.  And

11   that was around 12:30 or one o'clock.  We know that this

12   story next picks up about an hour and a half, two hours

13   later, at about 2:30.  So if she gives it to him at 12:30

14   then it's two hours to 2:30.  If she gives it to him at one

15   o'clock then it's about an hour and a half.

16           So from between an hour and a half to two hours,

17   Joseph Andriano is suffering.  He is feeling pain.  From

18   the information we have, he is in the living room in a

19   fetal position throwing up.  So from his eyes, he is

20   feeling the physical effects of the poison and it hurts.

21   Any of you who have ever vomited know how this feels.

22   Well, not only is he vomiting but now that poison has been

23   delivered throughout his system, through the tissues.  So

24   it can work its magic and hurry him off to death.  That's

25   what's going on for at least an hour and a half to two

24

1   hours, he's in pain.  He's hurting while she's standing by,

2   watching.  She gave him the poison. She knows that's what's

3   going on with him.

4           We know that one of the things that he wants to

5   do is for her to call the paramedics.  And she lies to him

6   and says, "Yes, I've called the paramedics." All the while

7   knowing that's a lie.  All the while he's down on the

8   ground thinking I wish the paramedics would get here.  It's

9   been a long time.  Why aren't they here.  But she doesn't

10  stand idly by, minutes after minutes.  Hour and a half at

11  the minimum he's down on the ground.  We know that he was

12  given a large dose because according to Dr. French from the

13  University of Arizona, one of the things that we know is

14  that he couldn't tell us if he had taken a small doze

15  immediately before his death or a large doze a while back.

16  According to the defendant's own admission, we know that

17  was the doze around 12:30, one o'clock.  If that's true,

18  then Dr. French's statement means that he took a large dose

19  at 12:30 or one o'clock.  Which means that it then got into

20  his tissues.  And the fact that there's two parts per

21  million in the bloodstream just means that it's already

22  gotten to whereever it needs to go to kill him.  And he's

23  going to die from it because he had taken approximately ten

24  times the lethal dose.  But he's down on the ground and

25  he's hurting.  He is feeling physical pain in Apartment

1  132, with his kids right in the next room.

2          And what we have then is this hour and a half of

3  pure pain.  That's the physical pain we have up to that

4  point.  And we know that she knows why he is experiencing

5  the physical pain.  We know that he doesn't know.

6          In terms of the mental anguish he's experiencing,

7  because that goes hand in hand with the physical pain.  The

8  reason I say that is with regard to the mental anguish you

9  then have to factor in the fact that he knows that he has

10  terminal cancer.  He knows that the nodules or lumps,

11  however you want to characterize them, in his body have

12  grown.  He knows that.  He also knows that he was told that

13  he is going to die from this.  So, that's what he's

14  thinking is happening.

15          The mental anguish associated with knowing that

16  you're dying is indescribable.  It is not something that

17  human beings can describe because it's not something that

18  human beings have been privy to.  But it is clear that one

19  of the things that is going through his mind, of course, is

20  that he's dying.

21          Additionally, he's very weak from the

22  chemotherapy treatment while he's down there.  His

23  feelings, at that point, can only be described as

24  excruciating.  Absolutely excruciating because he is now

25  leaving his father that he said that he loved, if you

1   remember.  He is leaving his mother.  Leaving his brother.

2          MR. PATTERSON:  Objection.  May we make a record,

3   please?

4          (Bench conference was held outside the hearing of

5   the jury.)

6          MR. PATTERSON:  He's making a protracted record.

7          There is no evidence that he was aware that he

8   was being poisoned or there was any anguish or pain that he

9   felt during that period of time and cannot be used to

10  satisfy the especially cruel, heinous or depraved

11  aggravating factors.  It has to be his knowledge has to be

12  such that that person who is going to commit the murder is

13  doing these things with the intent to harm this person or

14  cause him to suffer cruelty.  Okay.  There is no evidence,

15  certainly no nexus, between the poisoning and the cause of

16  death in this case.  The cause of death was blunt trauma.

17  The sodium azide has had absolutely no part, played no part

18  in the cause of death in the case.

19          You heard Dr. Keen's testimony.  This cannot

20  serve as a basis for any finding of cruelty in this case

21  because on the Government's theory to the case he was

22  unaware that he was being poisoned.  He was unaware he was

23  dying as a result of the poison.  So all these arguments

24  he's making at this time are inappropriate and does not

25  serve a basis for that particular aggravating factor.

1      MR. MARTINEZ: The cruelty factor looks at the

2  victim's state of mind and the physical pain and the mental

3  anguish that he is suffering. The fact that he didn't know

4  that he was being poisoned doesn't mean that he wasn't

5  experiencing any mental anguish. She doesn't get a free

6  ride because he didn't know he was being poisoned. He

7  still suffered the cruelty factor. Because he didn't know

8  it was a poison doesn't mean he wasn't feeling physical

9  pain. He was. She doesn't get a free ride just because he

10  didn't know he's dying from this. It's like, again,

11  saying, "Well, I shot him with a .45 rather than a .22 so

12  the pain would be have been different." It doesn't matter

13  that he doesn't know what type of gun he was shot with. He

14  just knows he's hurting. He experienced physical pain as a

15  result of what she did and mental anguish as a result of

16  what she did.

17      MR. PATTERSON: I move for a mistrial based upon

18  this improper statement.

19      THE COURT: Your objection is overruled. I'm

20  going to deny your motion for mistrial.

21      You may continue, Mr. Martinez, but you've got to

22  phrase it in terms of what the evidence will show.

23      (Bench conference concluded.)

24      THE COURT: Objection overruled.

25      Mr. Martinez.

1          MR. MARTINEZ:  We were talking about the mental

2  anguish.  There certainly was mental anguish at that time.

3  And that mental anguish also lasted from the time he became

4  ill until the time that Chris Hashisaki was called in.

5  We're talking, again, about an hour and a half of that

6  mental anguish.  What he was feeling at that time certainly

7  wasn't a pleasant feeling.

8          Chris Hashisaki was a ray of hope.  And the

9  reason she was a ray of hope was because when she came in,

10  she forced, if you will, the defendant to call the

11  paramedics.  And, in fact, one of the things that the

12  paramedics told us was that the woman there, Chris

13  Hashisaki, told him, well, she's upset with me because I

14  made her call the paramedics.  So it was her idea to call

15  the paramedics.

16          We know when the defendant did get on the

17  telephone to call nine-one-one she indicated that it was a

18  heart attack.  Same thing that she told Jimmy Yost what

19  would happen when Mr. Andriano would die.

20          So, during that time, there is hope for

21  Mr. Andriano in the sense that the paramedics are just

22  outside or are going to be there shortly.  We know that

23  during that time, the defendant inflicted more mental

24  anguish on him in the form of the words that she used.  You

25  heard them, "Get your ass up."  And then whatever followed

1   after when she cursed at him in front of somebody.  Rather

2   than trying kindness, rather than trying to help him

3   because that wasn't her goal, she just cursed at him trying

4   to get him up away from the help that was just right

5   outside the door.  Because she didn't want, of course,

6   there to be an attending person to Mr. Andriano.

7        And I said that this was a ray of hope for

8   Mr. Andriano because they heard the sirens, according to

9   Chris Hashisaki.  Mr. Andriano said, "I've been this way

10  for such a long time," which indicates the mental anguish

11  and physical pain that he felt.  I've been this way

12  approximately forty five minutes was his guess.

13       And we know that at some point, when they were

14  the defendant was trying lift him up, there were sirens

15  that were heard and Chris Hashisaki walked out.  And when

16  Chris Hashisaki walked out and went to get the fire

17  department that Mr. Andriano had hope because he was

18  expecting them.  These were people that were going to help

19  him.  And that hope was snatched away when she hit him over

20  the head with either the lamp or with the bar stool.  And

21  that's in and of itself very cruel because you have

22  somebody who now has an expectation.  And to them, instead

23  of having the paramedics to help you, instead you feel

24  something in the back of your head that hits you --

25       MR. PATTERSON: Judge, objection.  Argument and

1   misstates the law.

2           THE COURT:  Sustained.  No argument.

3           MR. MARTINEZ:  He is at that point hit with the

4   bar stool.  He's at that point either hit with the bar

5   stool or the lamp.  That had to hurt.  Not only did it have

6   to hurt, but because of what he expected to happen, that

7   came as a surprise.  Which, again, produced this mental

8   anguish for him.

9           So now he's down on the ground.  He's in a fetal

10  position.  He's just thrown up.  He can't stand up.  He

11  can't move.  He can't defend himself and the blows are

12  raining down.  Twenty-three in all.  Eight to ten of them

13  would have rendered him unconscious.

14          We know that he was, if you will, conscious

15  during part of it because he has what are called "defensive

16  wounds" on his hands.  We know from what Chris Hashisaki

17  tells us that he can't get up.  So not only is he down in a

18  fetal position, not only can he not get up, but all that's

19  left for him is to put his arms up.  And that means that

20  he's feeling the blows, whether they be stinging, whether

21  they be knocking him unconscious.  And he also knows who

22  the person is that's doing this:  The woman that he has the

23  intimate relationship with, the one that he was going to go

24  through his life with, the mother of his two children who

25  are in the apartment is the one that's hitting him.  And

1  she continues to him hit him over and over again.

2            We don't know when he loses consciousness and

3  when he comes back.  But we do know that he was awake, if

4  you will, for part of that attack.  His hands tell us

5  that.  And she continues to do that and he never gets up.

6  We know that he's down on the ground.  The fact that there

7  is no blood on the soles of his feet, the fact there is no

8  blood on his body tells us that he never got up.  And the

9  fact that on the right side of his nose there are rug burns

10  tells us that he's down on the ground, face into the carpet

11  while she's hacking away at him 23 times.

12            And according to the coroner, those blows

13  themselves could have caused his death.  But she's not

14  satisfied with that so she continues on.  That's when she

15  stabs him.  We do not know if he was aware, conscious or

16  not but we do know that she then grabs the knife;.

17            Which take us then to another portion of this and

18  something we can talk about and that is the point that

19  needs to be made here is that she engaged in gratuitous

20  violence.  There was overkill here, if you will.

21            Number one, he's dying of cancer.  She doesn't

22  need to kill him in the first place.  But, she decides to

23  get the poison.  Gets the poison but she can't wait.  Just

24  like she can't wait for the cancer to take its effect, she

25  can't wait however long it takes for the poison to take its

1   effect.

2           So she has to call Chris Hashisaki.  We don't

3   know exactly why she called Chris Hashisaki but we do know

4   that she called her.  And we know at this point, what ends

5   up happening is that this would have killed him and the

6   poison would have killed him.  We know that from

7   Dr. French, there's ten times the amount of lethal dose

8   missing.  So it's in his body, that's where it is.  So he

9   would have died from it anyway.  Now we have two ways that

10  he was going to die.

11          But beyond that, she even went further and she

12  began to kill him using the bar stool and the lamp.  That's

13  the third way she tried to kill.  That's overkill.  That's

14  gratuitous.  That's on top of everything she needed to do.

15  So she continues with that.

16          But to make sure, she then takes, if you will, a

17  knife just to make sure because he's probably still

18  sighing, he's probably still moaning, probably still trying

19  to cry out, making noises, according to her.  And so, the

20  pillow that she used to stuffed down his mouth is not

21  muffling all the noises.  So what happens is she then goes

22  and gets the knife to kill him.  So you can see there is a

23  progression.  Not only is there a progression, there is

24  gratuitous overkill going on here.

25          The other thing that we know with regard to this

1  particular case is that this was absolutely senseless.  The

2  reason that I say this was absolutely senseless is because

3  she didn't need to do it.  According to Dr. Keen, the

4  disease, the cancer, had already spread to his head, spread

5  to his kidneys, in his lungs certainly.  And according to

6  her, it was in his mouth at some point.  She didn't need to

7  kill him.  He was going to die anyway.  And according to

8  her own statement, at that time she believed he had less

9  than a year to live.

10          MR. PATTERSON:  Judge, again he's arguing.

11  Objection.

12          THE COURT:  No argument.  Let's move on.

13          MR. MARTINEZ:  It was senseless.  There was no

14  reason for her to do it.  There was no reason whatsoever.

15  It was a senseless act.

16          Now, the other thing that you need to consider is

17  whether or not he was helpless.  Was his ability to resist

18  there?  We know that it wasn't.  We know that he was down

19  on the ground in a fetal position.  Just down there on the

20  ground, unable to get up.  Didn't have the strength.  He

21  was like a child who couldn't walk.  A baby who couldn't

22  speak because he had a pillow stuck in his mouth.  He was

23  helpless because he couldn't even help himself.  Did not

24  have the strength to get up.  So, yes, he was totally

25  helpless.

1       So in summary, what we here is a situation where

2  this woman, for the sake of avarice, for money, saw her

3  husband as a blank check with an amount that was not

4  written on it.  And she just couldn't wait to cash that

5  check.  So she bought the poison in order to make sure that

6  she could get the money earlier.  And then, when that

7  process starts going on, she then can't control herself.

8  Can't just kill him one way, has to go to two and three

9  steps beyond that to an individual who was absolutely

10  helpless, down on the ground.

11       And for those reasons I ask that you find that

12  that killing was done in the expectation of anything of

13  pecuniary value as well as the fact that it was done in a

14  cruel, heinous or depraved fashion.  Thank you.

15       THE COURT:  Defense want to give an opening

16  statement at this time?

17       MR. PATTERSON:  Please, Judge.

18       THE COURT:  You may proceed.

19       MR. PATTERSON:  Judge Ishikawa, Counsel, Wendi,

20  ladies and gentlemen of the jury.  Today marks the

21  beginning of the process by which we begin to answer the

22  question as to what the appropriate punishment is for Wendi

23  Andriano.

24       By your verdict, you rejected the contention that

25  what she did on October 8, 2000 was justified as a matter

1   of law.  And that's all you've done up to this point.  By

2   returning a first-degree murder verdict, you have

3   determined that she will be punished severely in this

4   case.  The law expects that she will be given a sentence of

5   live.

6              MR. MARTINEZ:  Objection, argument, Your Honor.

7              THE COURT:  No argument.

8              MR. PATTERSON:  I'm not arguing, Judge.  Thank

9   you.

10              Expects that she will be given a life in prison

11   punishment unless you find there is something particular

12   about the facts and circumstances of this first-degree

13   murder that sets it apart from the norm.  Those are called

14   aggravating factors or eligibility factors.  That's why

15   we're in Phase II here.

16              The Government is required to bring forward

17   evidence.  They rely upon the evidence that was given to

18   you during the course of Phase I and they can also bring in

19   additional evidence.  But it's incumbent upon them to

20   convince each and every one of you that there are factors

21   in this case that set this first-degree murder apart from

22   the normal first-degree murder.

23              I know that's a difficult concept.  Because you

24   folks, this is obviously your first effort at trying to

25   differentiate amongst various types of first-degree

1    murder.  That's why we go into Phase II.  That's why the

2    Government is required to demonstrate why this one is

3    different than all the other first-degree murders.

4              Now, again, you don't have a reservoir of life

5    experiences that you can draw upon to make that

6    determination.

7              MR. MARTINEZ:  I object.  He's making a

8    proportionality argument.

9              THE COURT:  Sustained.  Let's move on.

10             MR. PATTERSON:  Back to your lack of life

11   experiences.

12             MR. MARTINEZ:  Same objection.

13             THE COURT:  Continue on.

14             MR. PATTERSON:  You're going to have to rely in

15   large part upon the instructions that you're going to get

16   in this case.  The instructions are an effort on the part

17   of the Court and counsel to give you some legal frame work

18   within which you should examine the facts of this

19   particular case.

20             The Government alleges that there are, in fact,

21   there are four separate things about this first-degree

22   murder case that sets it apart from the norm of

23   first-degree murder cases, that makes it more significant.

24             The first one is pecuniary gain.  Pecuniary gain

25   is a situation where the motive or the impetus for the

1  murder is the expectation of recovery of something of

2  pecuniary gain.  Pecuniary gain is a fancy word for

3  expectation of something of worth, of value.  Money, for

4  instance.

5          You need to examine the facts of this case and

6  the facts have shown you, in my estimation thus far, that

7  the sodium azide was acquired in an effort to make the

8  cause of death appear to be that of natural causes, which

9  were precipitated by the cancer.

10          If you go back to Jeffrey Miller, his testimony

11  in the Phase I of the case, he told you that he told both

12  parties, Joe and Wendi, that it was essential in order for

13  them to recover under the med malpractice lawsuit that

14  there be a connection between the cause of death and the

15  cancer.  And to that end, that's why the plan was made to

16  acquire a substance that would render him or cause him to

17  die as a result of a heart attack.

18          Joe didn't die of a heart attack in this case.

19  Joe died -- and you heard Dr. Keen's testimony.  Again, I'm

20  asking you to revisit that.  The cause of death was blunt

21  force trauma.  So you need to bear in mind even though at

22  some point in time -- the instructions will tell you there

23  may have been some economic motive at some point in time

24  there has to be a connection between the expectation of

25  pecuniary gain and actual cause of death.  That's something

1    you need to bear in mind.

2         I'm asking you to look at the instructions and

3    apply the instructions to the facts that have been brought

4    up previous in this case and in addition what may be

5    testified to in the next day or so.

6         The other factor the Government has alleged that

7    sets this case apart is what's described as especially

8    cruel, especially heinous or especially depraved.  That

9    really, again, that's three separate allegations.  The

10   instructions will tell you needn't find all three.  You can

11   fine one.  You can find two.  And you can find three.  Or

12   you can find none.

13        But bear in mind, there's a qualifier here,

14   especially cruel, especially heinous or especially

15   depraved.  And you will be instructed that all first-degree

16   murders, to a certain extent, involve cruelty, heinousness

17   or depravity.  That's, again, the norm of first-degree

18   murders.  That's part and parcel of the killing death of

19   another human being.

20        What your task is is to find out whether there

21   are specific factors in this case that set this case apart

22   from other first-degree murders because it's an especially

23   cruel, especially heinous, especially depraved.

24        Again, I'm asking you to bear in mind that you

25   will be instructed with regard specifically to each of

1   those factors.  And because it's important that you use

2   this legal frame work that Judge Ishikawa is going to give

3   you to make your determination, I ask you to pay strict

4   attention to and strict scrutiny to the instructions in

5   this case.

6          This is opening statement.  We are not expected

7   or required as the defense to produce any testimony.  I

8   tell you right now we're not going to produce any

9   witnesses.  But at the close of the Government's

10  presentation, I will be given the opportunity to argue why

11  I believe and why I submit to you the evidence in this case

12  does not support the finding, by a standard of proof beyond

13  a reasonable doubt, that there are any aggravating or

14  eligibility factors in this particular case.

15          I appreciate your attention.  Thank you.

16          THE COURT:  Mr. Martinez.

17          MR. MARTINEZ:  State calls Detective Dennis

18  Olson.

19          THE COURT:  Please step forward to the clerk

20  here.  Give her your name and she will swear you in.

21          (Witness sworn.)

22          THE COURT:  Remember to speak up so that everyone

23  can hear you.  Please pull the mike close to you.  Please

24  wait until the question is completed before you answer the

25  question.  Please make sure you give a verbal response.

40

1        Is that agreeable to you?

2        THE WITNESS:  Yes.

3        THE COURT:  Mr. Martinez, you may proceed.

4

5                    DENNIS OLSON,

6   called as a witness herein, having been first duly sworn,

7   was examined and testified as follows:

8

9                    DIRECT EXAMINATION

10  BY MR. MARTINEZ:

11       Q.   Your name, sir?

12       A.   Dennis Olson.

13       Q.   And are you the previous Dennis Olson who

14  testified in this case?

15       A.   Yes, I am.

16       Q.   And are you the scene agent, or one of the scene

17  agents, with regards to the homicide that occurred back on

18  October 8th of the year 2000 at the San Riva Apartment

19  complex?

20       A.   Yes, I am.

21       Q.   I'm showing you a photograph which is Exhibit

22  Number 541.  Go ahead and take a look at it.

23       A.   (Witness complies.)

24       Q.   Is that a true and accurate depiction of

25  Mr. Andriano's face back when you conducted the scene

41

1    investigation back on October 8th of the year 2000?

2         A.    Yes, it is.

3              MR. MARTINEZ:  I don't have any other questions.

4              THE COURT:  Mr. Patterson.

5

6                        CROSS-EXAMINATION

7    BY MR. PATTERSON:

8         Q.    What time was it that you examined the scene on

9    this particular day?

10        A.    I believe I started about ten o'clock a.m. and

11   concluded sometime after midnight.

12        Q.    Okay.  Do you know at what point in that

13   investigation this photograph was taken?

14        A.    Just be an estimation.  Probably be about within

15   three or four hours after ten o'clock.  So maybe about two

16   o'clock or so.

17        Q.    Two in the afternoon?

18        A.    Yes, sir.

19        Q.    Of October 8?

20        A.    Yes, sir.

21        Q.    Thank you, sir.

22             MR. PATTERSON:  I have no questions, Judge.

23             THE COURT:  Let me see counsel at the bench.

24             (Bench conference was held outside the hearing of

25   the jury.)

1          THE COURT:  I'm not sure I'm going to actually

2   allow the photograph, depends upon what Dr. Keen says and

3   the argument of counsel.  So you may want to ask him about

4   Mr. Andriano.

5          MR. MARTINEZ:  Well, the photograph speaks for

6   itself.

7          THE COURT:  I may not allow the photograph.  Do

8   you understand what I'm saying?

9          MR. MARTINEZ:  Okay.

10         THE COURT:  All right.

11         (Bench conference concluded.)

12         THE COURT:  Mr. Martinez.

13         MR. MARTINEZ:  Thank you.

14

15                    REDIRECT EXAMINATION

16   BY MR. MARTINEZ:

17     Q.   Sir, with regard to this particular photograph

18   and the way that Mr. Andriano was found, can you tell us

19   the condition of his eyes, whether they were open or closed

20   when you were there processing the scene?

21     A.   They were open.

22     Q.   And the fact that they were open, was that

23   something that that's how you found his eyes or would it be

24   a situation where somebody on the police department or

25   someone else would open them for him?

1         MR. PATTERSON:  If he knows.

2         THE COURT:  If you know.

3         THE WITNESS:  What we would do, we would open

4    their eyes to examine them but that's the way he was found

5    when I arrived at the scene at ten o'clock.

6         MR. MARTINEZ:  I don't have any other questions,

7    Judge.

8         Are there any further questions of this witness

9    by the jury?  If so, please, raise your hand.  No one has

10   raised their hand.

11        May this witness be excused?

12        MR. MARTINEZ:  Yes, Judge.

13        MR. PATTERSON:  No objection.

14        THE COURT:  You're excused.

15        We're going to take a short break, about five to

16   ten minutes.  I need to discuss something with counsel

17   outside the presence of the jury.

18        Remember the entire admonition I have given you,

19   including the fact you're not to discuss the case with

20   anyone.  Do not let anybody discuss the case with you.

21   Keep an open mind.

22        We'll be about five to ten minutes.

23        (Jurors exited.)

24        THE COURT:  Please be seated.  This is Cause

25   Number CR2000-096032, State of Arizona versus Wendi

1   Elizabeth Andriano.

2           The record will reflect the presence of the

3   defendant and counsel.  We are outside the presence of the

4   jury.

5           Mr. Martinez?

6           MR. MARTINEZ:  Your Honor, for purposes of this

7   hearing the State will call Philip Keen.

8           THE COURT:  Please step forward.  Give your name

9   to the clerk and she will swear you in.

10          (Witness sworn.)

11          THE COURT:  Please have a seat on the witness

12   stand.

13   Mr. Martinez, you may proceed.

14

15                      PHILIP KEEN, M.D.,

16   called as a witness herein, having been first duly sworn,

17   was examined and testified as follows:

18

19                      DIRECT EXAMINATION

20   BY MR. MARTINEZ:

21       Q.   Sir, your name?

22       A.   I'm Dr. Philip Keen, M.D.

23       Q.   And you are the individual that conducted the

24   autopsy of Joseph Andriano, correct?

25       A.   I did.

1          Q.    And one of the things that we have is Exhibit 541

2     that was taken at the scene on October 8th, 2000.   Is that

3     a photograph of the head of Joseph Andriano with his eyes

4     open?

5          A.    Yes.

6          Q.    With regard to the eyes being open, would that be

7     consistent with an individual being able to perceive what

8     is going?

9          A.    It would be consistent with that, yes.

10         Q.    Of course, if the person lapsed into

11    unconsciousness, we know that this may have happened

12    according to your testimony, it could just be that the eyes

13    remained open after he lapsed into unconsciousness,

14    correct?

15         A.    It's also consistent with that, yes.

16         Q.    Consistent with him perceiving and consistent

17    with his lapse into unconsciousness, correct?

18         A.    You can't really say whether he was or was not

19    conscious just from the photos here.   But if conscious,

20    with the eyes open, certainly could see, perceive.

21              MR. MARTINEZ:   That's all I have.

22              THE COURT:   Thank you.

23              Mr. Patterson?

24              MR. PATTERSON:   Yes.

25

46

1

2                          CROSS-EXAMINATION

3    BY MR. PATTERSON:

4        Q.    The fact that the eyes are open or closed gives

5    us no insight as to whether or not this gentleman was

6    conscious or unconscious at the time?

7        A.    Correct.

8        Q.    That's what you just told us?

9        A.    Yes, sir.

10

11              MR. PATTERSON:  Thank you, Judge.

12              THE COURT:   Redirect?

13

14                          REDIRECT EXAMINATION

15    BY MR. MARTINEZ:

16        Q.    Even though it doesn't tell us if he was

17    conscious or unconscious in the abstract, in this case you

18    conducted the autopsy, correct?

19        A.    I did.

20        Q.    And according to you, eight to ten of those blows

21    could have rendered him unconscious, correct?

22        A.    Yes, sir.

23        Q.    But there was a remainder of 13 to 15 which would

24    not have rendered him unconscious, correct?

25        A.    Yes, sir.

1       Q.   If he were not unconscious and his eyes were

2   open, would that be consistent with his ability to be able

3   to perceive what's going on around him?

4       A.   That would.

5            MR. MARTINEZ:  I don't have anything else.

6            MR. PATTERSON:  He went into another area.

7            THE COURT:  I'll allow it.

8

9                       RECROSS-EXAMINATION

10  BY MR. PATTERSON:

11      Q.   Most of the blows were sustained at the back of

12  this gentleman's head, correct?

13      A.   Yes, sir.

14      Q.   The back of the head and neck.  It suggests he

15  was face down at the time or was looking downward at the

16  time he was hit with the bar stool?

17           MR. MARTINEZ:  I object.  He wouldn't know the

18  position of the body.

19           THE COURT:  Overruled.  Go ahead and answer the

20  question if you can.

21           THE WITNESS:  Actually, you can.  A little bit of

22  the photo itself gives some insight into this.  This photo

23  has some dried blood stains on it, which were consistent

24  with sometime when he's dying and the blood is coagulating

25  and he's face down.  So there was a lot of time when he was

1    face down.

2        Q.    So the fact of the matter, if his eyes were open

3    or not, if he was face down on the carpet he wouldn't be

4    perceiving things that were going on around him, correct?

5        A.    Would not be visually perceiving.  He might be

6    perceiving them in terms of feelings if he was not

7    unconscious.

8        Q.    As far as visual?

9        A.    Visual.

10            MR. PATTERSON:  Thank you.

11            THE COURT:  Mr. Martinez.

12

13                    FURTHER REDIRECT EXAMINATION

14   BY MR. MARTINEZ:

15        Q.    But, sir, If he was found lying with his head

16   like this, in this position, with his eyes exposed in this

17   direction, if his eyes were open, he would be able to see

18   then, wouldn't he?

19        A.    Until he loses consciousness and his vision is

20   still unimpeded, yes, sir.

21            MR. MARTINEZ:  I don't have anything else.

22            THE COURT:  Sir, you may step down.  If you would

23   just step out of the courtroom for just a moment.

24            (Dr. Keen exited the courtroom.)

25            THE COURT:  Okay.  Mr. Patterson.

1           MR. PATTERSON:  Judge, pursuant to Rule 403 I

2    move to preclude the Government from introduction of --

3           THE COURT:  Exhibit 541 for identification.

4           MR. PATTERSON:  I have looked at all the photos

5    in this case and in my opinion in this case, this

6    photograph is the most emotional, the most visually

7    gruesome or graphic photograph of the entire collection

8    that the Government created in this case.

9           The Government proposes to admit it because

10   somehow the open eyes make the proposition more probable

11   that he was perceiving the injuries that he was sustaining

12   during the course of the fight.  That's just not borne out

13   by Dr. Keen's testimony.

14           All of the blows were sustained to the rear.  He

15   was, in all probably, face down at the time.  And the fact

16   of open eyelids or closed eyelids, did not tell whether or

17   not he was conscious at the time.

18           His testimony from prior proceedings in this case

19   was that eight to ten blows that he sustained during the

20   course of the fight were sufficient to render him

21   unconscious.  So the open eyelids are not dispositive of

22   this particular issue.

23           Secondly, you suggested to the Government they

24   adduce through Detective Olson the fact that he perceived

25   his eyes to be open when he walked in thereby rendering

1    unnecessary this particular gruesome photograph because the

2    proposition that he believes supports his position that the

3    eyes were open, therefore, his suffering is especially

4    cruelty or mental anguish can be argued by virtue of

5    Detective Olson's testimony.

6              THE COURT:  Mr. Martinez.

7              MR. MARTINEZ:  One of the things that the jury

8    has just heard is that the State has to prove in order to

9    carry its burden that this killing was especially cruel.

10   Additionally, he asked them to remember that the State has

11   to prove that the killing was especially heinous or

12   especially depraved.

13   That being the case, we have to go beyond just

14   saying, well, he's lying there and his eyes are open.  We

15   have to show them.  We have to prove to them beyond a

16   reasonable doubt that we are talking about cruelty, he was

17   able to see what was going on.  And according to

18   Dr. Keen, the fact that the eyes are open is consistent

19   with that.   The fact that there may be some blood there is

20   just indicative of the violence, the gratuitous violence,

21   that is necessary for a finding of heinous or depraved.

22              In other words, we also indicated that there was

23   this overkill.  The only way to show that overkill is by

24   looking at the photograph.  He makes the argument well,

25   yeah, this is unduly prejudicial and then, on the other

1    hand, trying to hold the State to the burden of proving

2    this as being especially cruel.  I do agree that we have to

3    prove the element that it is especially cruel, especially

4    heinous or especially deprave.  To that end, that's why I

5    brought the photograph in, to show what she did and the

6    fact that Mr. Andriano's eyes were open which was

7    consistent with him viewing what was going on which would

8    enhance or increase the mental anguish that he felt when

9    the blows are coming and he sees them coming.

10            The fact that he indicates that it's unnecessary

11   now that we've received that testimony from doctor -- from

12   Dennis Olson I think is just bootstrapping.  I think what

13   we're doing is just in an abundance of caution -- well, it

14   speaks for itself why we did that.  So I don't think that

15   that argument has any merit.

16            THE COURT:  Mr. Patterson, anything further?

17            MR. PATTERSON:  That photograph is just unduly

18   prejudicial.  It's gruesome and it should not be allowed

19   in.  It's offered for one purpose and that's to incite the

20   passions of the jury.

21            THE COURT:  In light of Detective Olson's

22   testimony that Mr. Andriano's eyes were open when he was

23   present at the scene, the Court does find that Exhibit 541

24   for identification is relevant.  But in light of

25   everything, applying Rule 403, I'm going to find the

1   probative value of the exhibit is substantially outweighed

2   by an unfair prejudice.  Detective Olson was able to

3   testify that the eyes were open so I'm going to make that

4   ruling at this time.

5            Ready for the jury?

6            MR. MARTINEZ:  Sure.

7            (Jurors entered.)

8            THE COURT:  Please be seated.  This is Cause

9   Number CR2000-096032, State of Arizona versus Wendi

10  Elizabeth Andriano.

11           Let the record reflect the presence of the

12  defendant, counsel and the jury.

13           Mr. Martinez, the State may call its next

14  witness.

15           MR. MARTINEZ:  State cause Philip Keen.

16           THE COURT:  Sir, please step forward to the clerk

17  and she will swear you in.

18           (Witness sworn.)

19           THE COURT:  Please have a seat on the witness

20  stand.  Please make yourself comfortable on the witness

21  stand.  Please pull the microphone close to you.  Please

22  speak loudly and clearly so everyone can hear you.  Wait

23  until the question is completed before you answer the

24  question.

25           Is that agreeable to you, sir?

1        THE WITNESS:  Yes, sir.

2        THE COURT:  Mr. Martinez, you may proceed.

3

4                    PHILIP KEEN, M.D.,

5   called as a witness herein, having been first duly sworn,

6   was examined and testified as follows:

7

8                    DIRECT EXAMINATION

9   BY MR. MARTINEZ:

10       Q.   Your name, sir?

11       A.   Philip Keen, M.D.

12       Q.   And you are the same individual that testified

13   previously in this case?

14       A.   Yes, sir.

15       Q.   You are the coroner who conducted the medical

16   examination autopsy of Joseph Andriano, correct?

17       A.   I'm the medical examiner who conducted the

18   examination of Mr. Andriano.

19       Q.   One of the things that you told us before was

20   that there were some wounds or injuries to Mr. Andriano's

21   hands.  Do you remember telling us that?

22       A.   Yes, sir.

23       Q.   With regard to those injuries, you also indicated

24   that they were defensive wounds.  Can you explain to us

25   what defensive wounds are?

1    A.    Defensive wounds are any wounds that occur during

2    the course of the conflict in which the posturing of the

3    individual who is assaulted defends himself.  And they

4    place objects or portions of your body in the path of the

5    assault or you grab or grasp at or otherwise try to fend

6    off the instruments that are wielded against you.

7          In this case, we have an incise wound on the back

8    of the right hand, distal to wrist.  We have superficial

9    lacerations on the knuckle of the hand which may also be

10   incise.  We also have bruising in locations that are

11   consistent with the person placing the hands in those

12   positions to defend himself.

13   Q.    Previously you were asked to take a look at

14   the - in a previous portion of these proceedings -- you

15   were asked to take a look at a stool.  Do you remember

16   that?

17   A.    Yes, sir.

18   Q.    And at the end, or the top of the stool, there

19   was sort of like wood screws.  Do you remember that?

20   A.    Yes, sir.

21   Q.    The wood screw, if that bar stool was swung at a

22   particular individual, would the injury on his hand be

23   consistent with the wood screw, if you will, scraping or

24   incising the hand?

25   A.    Yes, sir.

1      Q.    If an individual has what you characterize as

2  defensive wounds, does that mean he was conscious of what's

3  going on?

4      A.    Yes, sir.

5      Q.    So it's not a situation where at this point in

6  time they are unconscious or not feeling, right?

7      A.    No, to purposefully place portions of your body

8  into a line of attack requires that you are conscious.

9      Q.    Additionally, one of the things that you've been

10  presented with and viewed was Exhibit 541.  Do you remember

11  that?

12      A.    What's the exhibit?

13      Q.    It is a photograph that you looked at?

14      A.    Yes, sir.

15      Q.    The eyes of Mr. Andriano are open, correct?

16      A.    Yes, sir.

17      Q.    One of the things that we know is that in the

18  medical examiner's office photograph his eyes are closed.

19  Is that something that the medical examiner's office does

20  or how does that work?

21      A.    It's pretty much routine.  In my office, in

22  presenting identification photos, if the eyes are open, we

23  close them.  I don't have a particular preference

24  photograph but some people are offended by seeing staring

25  eyes so we close them.

1     Q.   If, in this case, for example, Mr. Joseph

2  Andriano's eyes were open -- and you've seen the photograph

3  and they were, right?

4     A.   Yes, sir.

5     Q.   An individual, if he is not unconscious and he

6  has his eyes open, are they able to see?

7     A.   Yes, sir.

8     Q.   And is that consistent with perceiving what is

9  going on and seeing what is going on?

10     A.   Seeing what's going on, yes, sir.

11     Q.   Is there any indication that his -- that the

12  hearing of Mr. Andriano was affected during this struggle?

13     A.   No, sir.

14     Q.   One of the things that we have here is that you

15  indicated previously that eight -- I think it is eight to

16  ten blows would have rendered him unconscious.  Do you

17  remember that?

18     A.   Yes.  There was a series of eight to ten blows.

19  Any one of which or a combination of which could have

20  rendered him unconscious.

21     Q.   Your opinion, again, based on what you saw, did

22  he remain unconscious throughout this whole involvement or

23  was there, perhaps, a progression of events?

24     A.   He was not -- he was not conscious through the

25  whole sequence of injuries that he sustained.  I don't know

1    at what point he became unconscious.  But he was certainly

2    conscious at some point during this.

3        Q.   We just don't know how long he was conscious but

4    he was conscious?

5        A.   Yes, sir.

6        Q.   One of the things that happened in this case and

7    one of the things we know was there was a number of hits to

8    the back of the head.  Do you remember that?

9        A.   Yes, sir.

10       Q.   Now, would those be the blows that would render

11   him unconscious?

12       A.   Those would be the blows that would be most

13   likely to render him unconscious and would also be most

14   likely responsible for impairing vision.

15       Q.   And do you know whether or not what was used to

16   cause those blows?

17       A.   Well, they're lacerations, they're blunt force

18   injuries.  Certainly the thing that would have been

19   presented, the broken stool, is a likely object to have

20   been used to inflict those injuries.

21       Q.   One of the things that your report indicates is

22   that the manner of death was blunt force trauma in

23   combination with something else?

24       A.   It's the cause, yes, sir.

25       Q.   Why don't you explain to me a little bit about

1   what you mean by "blunt force trauma" and why you listed

2   that?

3       A.   Blunt force injuries are impacts that result in

4   characteristic kinds of injuries, some bruising, fractures

5   tears, lacerations.  And he has multiple lacerations.  The

6   skin of the scalp is torn from the impact.  The locations

7   of these injuries are most heavily concentrated over the

8   scalp and the back of his head in particular.

9            Those are the blunt force injuries.  That was not

10  the only injuries I listed.  I listed incised injuries.  He

11  has some cuts and some of those are on the back of the

12  shoulder as well as on the neck.

13      Q.   The cuts that are on the back of the shoulders

14  and the neck, with the exception of the large one, could

15  those have been caused by the bar stool with the wood screw

16  sticking out?

17      A.   Some could.  One or two of those look, appeared

18  to be more like just a cut.  But certainly the sharp edge

19  of metal or screw will produce a cutting injury as opposed

20  to just a tearing injury.

21      Q.   So it appears that there are some that, in

22  addition to the larger one, appears that some of them were

23  also caused by a knife, correct?

24      A.   Yes, sir.

25      Q.   When somebody gets hit in the head are there

1    studies that show whether or not they experience pain?

2        A.   I don't know if you need studies, but, yes,

3    people experience pain when you're struck in the head.

4        Q.   And I know in this case that you indicated that

5    perhaps he may have lapsed into unconsciousness.  When you

6    regain consciousness would he experience pain and what kind

7    of pain would he have experienced?

8        A.   Depends on what injury you would have sustained.

9    You may lose consciousness.  If you regain consciousness,

10   the sensations that you may have may be minimal.  They may

11   be those of orientation or disorientation or confusion.

12   They may also ache, particularly if you received blows to

13   the head which you may have a headache.

14       Q.   With regards to blows to the back of the head,

15   could those have caused him to die, Mr. Andriano?

16       A.   They could have, yes.

17       Q.   Why do you say that?

18       A.   The blows to the back of head can cause enough

19   electrical disturbance in the brain to cause essentially a

20   seizure-like activity.  They can also cause enough damage

21   so over time as a consequence, not immediate death, but

22   delayed death.  You could have swelling on the brain

23   secondary to the impacts.

24       Q.   One of the other things that you talked about

25   last time you were here was this pillow.  Do you remember

1   taking a look at that photograph of the pillow?

2        A.   Yes, the pillow.

3        Q.   If the pillow was stuffed down his mouth --

4             MR. PATTERSON:  Judge, objection.  No basis for

5   this particular question.

6             THE COURT:  Overruled.

7        Q.   BY MR. MARTINEZ:  If a pillow is stuck down his

8   mouth, would that impede his ability to breathe?

9        A.   Not necessarily.

10       Q.   Why is that?

11       A.   Still got a nose.  Most of the time you're going

12   to be breathing from the nose.  Unless you have excessive

13   stuffiness or bleeding around the nose you could still

14   breathe through the nose.

15       Q.   Could you take a look at Exhibit 541, doesn't

16   Mr. Andriano have bleeding or blood coming from his nose?

17       A.   But I don't know the timing of that versus the

18   pillow.

19       Q.   But, the pillow has blood on it, too.  We just

20   don't know if the pillow was first or when the pillow was

21   put on there, right?

22       A.   I have no way of telling that.

23       Q.   But, if the pillow is there -- let's assume the

24   pillow is put on -- you've now looked at the nose and it

25   does look like it has some blood.  Would that provide or

EXHIBIT V V

1   cause some difficulty in breathing?

2       A.   It has the potential to impede the breathing,

3   yes, sir.

4       Q.   The other thing that you listed as the cause of

5   death was the wound on the left side of the neck, correct?

6       A.   Yes, sir.

7       Q.   Again, describe it for me, how it was?

8       A.   I'd have to refer to my notes.  It's in excess of

9   three inches in length and two issues in width.  But let me

10  find it.

11          Three and three quarter inches up to two inches

12  max gaping width to the left side of the neck.

13      Q.   Can you show us with your hand how that is?

14      A.   Well, in horse hands and hands on a horse is

15  about four inches, so the width across your hand.  Just

16  visualize the width of your hand across the side of the

17  neck.

18          You have a wound about this long (demonstrating),

19  with gaping, goes through the muscle that comes from the

20  clavicle, the sternum and along side of the neck.  It goes

21  deep through the muscle and goes through the carotid artery

22  and reaches inside the surface of the vertebra of the spine

23  of the neck but does not go into the spinal canal.

24      Q.   How far in did the knife blade go?

25      A.   Well, it goes to the spine.  And depending how

1    thick your neck is, but you're talking about an inch and a

2    half, to two inches of soft tissue.

3        Q.    We've seen the knife.  The knife is about, maybe

4    an inch, the blade has an inch width.  How could that

5    injury be caused, the one you just described with the blade

6    being so much smaller?

7        A.    This is a slashing-type wound which has at least

8    four kinds of cut lines across the top.

9        Q.    So, it's jabbed in and cut across?

10       A.    Yes, sir.

11       Q.    And that also is one of the mortal wounds in the

12   case, correct?

13       A.    Yes, sir.

14       Q.    One of the things that we saw was that there was

15   arterial spurt as a result of this.  What is happening when

16   we have that spurting?

17       A.    The first thing we know it is arterial was

18   finding the artery is severed.  The spurting is indicative

19   that the cardiac activity was still going on.  The heart

20   was beating at the time that this vessel was disrupted.  So

21   that with the contraction of the heart under the pressure,

22   you're going to have blood spurt.

23       Q.    Do we know if he was conscious or unconscious?

24       A.    No.

25       Q.    And how long would this spurting action take

1  before it would stop or the heart would cease to eject

2  blood?

3      A.   The heart would stop essentially when it loses

4  its prime, when you've lost enough blood that you don't

5  have enough pressure to continue to spurt.

6      Q.   Any idea how long that would be?

7      A.   It's variable because you can shut down the heart

8  just because of loss of fluid or you can shut down the

9  heart because of loss of oxygenated blood getting to the

10  brain and having a neurologic shut down for the heart.

11          MR. MARTINEZ:  I don't have any other questions.

12          THE COURT:  Mr. Patterson.

13          MR. PATTERSON:  Thank you, Judge.

14

15                    CROSS-EXAMINATION

16  BY MR. PATTERSON:

17      Q.   Good afternoon, Dr. Keen.

18      A.   Good afternoon.

19      Q.   It is your previous testimony and today's

20  testimony that there were at least eight to ten blows to

21  Joe's head that would have been sufficient to render him

22  unconscious?

23      A.   Right, yes, sir.

24      Q.   And we don't know by examining the injuries that

25  he sustained when those blows occurred during the course of

64

1   the trauma to his head, correct?

2       A.   That is correct.

3       Q.   So the first blow that he sustained could have

4   been a blow sufficient to render him unconscious?

5       A.   Yes, sir.

6       Q.   Okay.  You indicated that there were some wounds

7   to his hands, correct?

8       A.   Yes.

9       Q.   What you describe are wounds that are sustained

10  as a result of being struck on the hands, right?

11      A.   Yes, sir.

12      Q.   We don't know where his hands were at the time he

13  was struck on the hands, do we?

14      A.   I don't know.

15      Q.   It could be that he was in a defensive posture at

16  that time when his hands were struck, correct?

17      A.   Yes.

18      Q.   Or his hands could have been struck while lying

19  on the ground?

20      A.   It's possible, although it's less likely.

21      Q.   Okay.  But, again, what you do for a living, what

22  you discern and deduce, that is a possibility?

23      A.   The difficulty with giving much probability to

24  that possibility, though, if the hands and wrist, if

25  they're just on the ground, you expect to see more forearm

1   injury which you just don't have any.

2       Q.   So it's not --

3       A.   It's not impossible.

4       Q.   And we don't know whether or not perhaps the

5   second blow that he sustained was the one that caused him

6   -- excuse me -- he sustained one blow which didn't render

7   him unconscious which caused him to engage in defensive

8   posture and it was the second blow that struck his hands

9   and in that process could have rendered him unconscious,

10  correct?

11      A.   I think we -- I don't know that we can know the

12  definitive answer.  That is a possible scenario, yes, sir.

13      Q.   There are a number of possibilities or scenarios

14  that can account for the damage to Joseph Andriano that you

15  observed?

16      A.   Yes, sir.

17      Q.   But we do know at the time that he sustained the

18  injury to his neck he was still alive, correct?

19      A.   He is still alive, yes.

20      Q.   He hadn't sustained a mortal blow up to the point

21  where his neck was cut, correct?

22      A.   Correct.

23      Q.   Because of the arterial spurt, right?

24      A.   Yes, sir.

25      Q.   If the heart is still pumping, he is technically

1  still alive, correct?

2      A.   He is cardiovascularly alive.   The distinction

3  here being whether he is brain dead and we have no way of

4  telling that.

5      Q.   He didn't - it's not an EKG?

6      A.   EEG.

7      Q.   There's no EEG evidence in this case so we don't

8  know what his brain activity was at the time his throat was

9  cut, correct?

10      A.   Correct.   Our best interpretation is at the point

11  in time when he sustained his neck injury he was alive.

12      Q.   Okay.   And you also observed -- derived

13  information from examining Joe's body that led you to

14  believe he was alive during the time he was being struck

15  about the head, correct?

16      A.   Yes, sir.

17      Q.   The subarachnoid hemorrhaging?

18      A.   Yes.

19      Q.   Tell me about that.

20      A.   That's the bleeding that occurs in the coverings

21  over the brain.   And in this case, the result of the blunt

22  force impact to the head.

23      Q.   And we don't know whether he was conscious at the

24  time that this hemorrhaging is occurring, correct?

25      A.   Typically, you would not remain conscious as it

1   continues.  But as it begins he could have been conscious

2   or unconscious, either way.

3       Q.   Once this hemorrhaging occurs, he was more than

4   likely unconscious?

5       A.   Yes, sir.

6       Q.   You examined Joseph in his entirety and the

7   injuries were focused in a certain location weren't they?

8   Is that a fair statement?

9       A.   Yes, sir.

10      Q.   And that was in the back of the head?

11      A.   Pretty much on the back of his head and in the

12   immediate radius around it.

13      Q.   And there was some injury to his shoulder blades?

14      A.   Yes, sir, shoulders.

15      Q.   You didn't see any gratuitous cutting on the feet

16   or the knees or that kind of thing?

17          MR. MARTINEZ:  Objection.  Lack of foundation.

18          THE COURT:  Overruled.

19          Go ahead and answer the question if you can.

20          THE WITNESS:  I didn't find any injuries to,

21   other injuries to the extremities except those previously

22   described at the wrists and hands.  I also didn't find any

23   injuries on the front of the torso.

24      Q.   BY MR. PATTERSON:  The injuries you found were on

25   the back of the head, and the shoulders and the hands?

1    A.   Yes, sir.

2    Q.   No significant injuries on the lower torso?

3    A.   No.

4    Q.   Buttocks, anything like that?

5    A.   No, sir.

6    Q.   All right.  You indicated that at some point in

7  time, Joseph's eyes were open when his body was actually in

8  the medical examiner's office?

9    A.   Yes, sir.

10   Q.   Okay.  But he was deceased at that point, right?

11   A.   Yes.

12   Q.   So open eyes -- certainly you can be deceased and

13  still have open eyes, right?

14   A.   Yes, sir.

15   Q.   And open eyes don't tell us whether or not you're

16  deceased or not, correct?

17   A.   No.

18   Q.   By the same token, open eyes don't tell us

19  whether or not you're conscious or not, correct?

20   A.   That's also true.

21   Q.   You can be unconscious yet still have open eyes

22  or eyelids open, correct?

23   A.   Yes, sir.

24   Q.   And, again, at the time of the arterial spurt, we

25  don't know whether or not Joe was conscious or unconscious,

1   correct?

2       A.   No way to tell.

3       Q.   The dying process, from what you observed, how

4   long do you think it would have taken in light of the

5   injuries that he sustained from the point in time that it

6   started, assuming it was continuous, until the point in

7   time he passes away?

8       A.   Minutes.  I don't know how many but it would be

9   minutes.  It wouldn't be a long protracted period of time

10  at all.

11      Q.   You mentioned the concept of pain.  Pain is a

12  phenomenon that's experienced by humans when he's

13  conscious, right?

14      A.   Yes, sir.

15      Q.   And pain is, again, also a relative concept?

16  What is painful to you may not be painful to me?

17      A.   Or vice versa.

18      Q.   Or vice versa?

19      A.   Yes, sir.

20      Q.   So you can't tell us within a reasonable degree

21  of medical certainty what kind of pain Joseph sustained

22  that night, right?

23      A.   No, I can't tell you.  I can, however, say, that

24  the magnitude of his injuries were such that I would be

25  surprised if he didn't experience some pain if he was

1   conscious.

2       Q.   If he's conscious?

3       A.   Yes, sir.

4       Q.   And from what I understand from reading your

5   report, it was your opinion it was a combination of blows

6   to the head and the cut to the neck that contributed to

7   Joseph's death?

8       A.   Yes, sir.

9       Q.   Resulted in Joe's death?

10      A.   Yes, sir.

11           MR. PATTERSON:  Thank you, Judge.  That's all I

12   have.

13           THE COURT:  Mr. Martinez.

14

15                    REDIRECT EXAMINATION

16   BY MR. MARTINEZ:

17      Q.   Sir, one of the things that you indicated was

18   that the dying process took minutes.  Do you remember

19   telling us that?

20      A.   Yes, sir.

21      Q.   What if we take out the fact that -- let's not

22   talk about the stab wound right now.  I thought that you

23   told me earlier that from the head wound, it wouldn't be a

24   situation where it would just take minutes, that it could

25   even be days.  Is that something that you mentioned?

1      A.    It's possible to be a progressive period of

2    time.  But I don't know how accurately we could say that he

3    would survive from head injuries, blunt force head injuries

4    alone because we don't have that in this case.

5      Q.    But, in order for the head injury to kill him,

6    would he die from bleeding out?  I know that it's a

7    vascular area.  Or would he die from the fact that he's got

8    bleeding inside the head?

9      A.    Both possibilities.  You have a lot of cardiac

10   output going to the head and neck area.  And got a lot of

11   big wounds from the lacerations.  So without compression

12   and pressure to stop the bleeding you will eventually bleed

13   to death.

14             If you don't go into shock from the loss of

15   circulating volume, then death would occur as a consequence

16   of the swelling in reaction to the bleeding on the surface

17   of the brain and just from the injury to the brain itself.

18     Q.    The bleeding out process, for lack of a better

19   term, how long would that take?

20     A.    That would take several minutes.

21     Q.    And the swelling, if he survived that and the

22   swelling, how long would that take?

23     A.    That can take hours.

24     Q.    And in terms, you indicated that there were

25   gaping areas where he was hit in the back of the head.

1   Explain to me what you're talking about?

2       A.   Well, virtually the full thickness lacerations so

3   you go down to near the facia covering the bone.   Once you

4   made that deep a break in the skin or the scalp it

5   separates and its edges pull apart, then you don't have

6   much to impede bleeding.   That will bleed fairly freely as

7   opposed to if it were a non-gaping wound.   You have a

8   little bit of just the pressure of the tissue themselves to

9   retard some of the bleeding.   But once they're pulled apart

10  they bleed freely.

11      Q.   While he's bleeding out, if that's what were to

12  happen, can we tell whether or not he's conscious or

13  unconscious?

14      A.   Initially, no, you can't.   If he's conscious

15  initially he would eventually lapse into unconsciousness.

16      Q.   How long would it take before he lapses into

17  unconsciousness?

18      A.   Again, either because of blood loss or the

19  commotion inside the brain, the swelling inside the brain,

20  it could be almost instantaneous.   It could be minutes.

21      Q.   You also indicated that open eyes were not an

22  indication a person was perceiving or was conscious, right?

23      A.   Just if you're conscious and your eyes are open,

24  you can see.

25      Q.   In other words, the converse is also true if

1    they're open you may be seeing, right?

2        A.   Yes.

3        Q.   One of the things you talked about was where most

4    of the injuries were.  It appears that most of the injuries

5    were either to the back of the head and shoulder area and

6    the left part of the neck?

7        A.   Yes, sir.

8        Q.   And the one exception to that would be the injury

9    to the hand, right?

10       A.   Yes, sir.

11       Q.   And the injuries to the hand you were asked many

12   questions about whether or not they could be holding his

13   head, you're not saying that's what happened, are you?

14       A.   No, I'm just saying that the location of the

15   injuries on the hand are such that they could be

16   purposefully placed in the line of assault.

17       Q.   Or they could be placed in the line of the

18   assault to protect oneself, right?

19       A.   Yes.

20       Q.   One of the things you were asked about was

21   whether or not he was alive at the time that the knife was

22   plunged into his neck.  Do you remember that?  And that you

23   said that cardiovascularly speaking he was?

24       A.   Yes, sir.

25       Q.   What do you mean by that?

1        A.    Well, most of the time people recognize death by

2    the stoppage of the heart.   It's the easiest way to say the

3    person is dead when the heart stops.   And in this case, you

4    have spurting from the beating heart, the heart hasn't

5    stopped. That's not the only way for a person to be dead.

6    I was just covering the whole realm of how we might cover

7    the definition of alive or dead.

8        Q.    Now, one of the other things you were asked about

9    was, well, if the first blow rendered him unconscious, then

10   he obviously wouldn't feel what was happening after that,

11   right?

12       A.    Yes, sir.

13       Q.    But in this particular case, you don't know if

14   the first blow was the one that rendered him unconscious,

15   correct?

16       A.    I do not know that.

17       Q.    In fact, you have indications that are

18   inconsistent with that first blow rendering him

19   unconscious, don't you?

20       A.    The placement of the hands in that area to

21   receive further injury suggests that he was not unconscious

22   for some blows.

23       Q.    So to remove the negative, what you're saying is

24   that it suggests that he was conscious to receive some

25   blows?

1    A.   Yes, sir.

2    Q.   And, again, it was eight to ten blows that could

3  have rendered him unconscious, a total of 23 blows,

4  correct?

5    A.   Something like that yes.

6         MR. MARTINEZ:  I don't have anything else.

7         THE COURT:  Are there any further questions from

8  the members of the jury?  If so please raise your hand.

9         (Bench conference was held outside the hearing of

10 the jury.)

11        THE COURT:  Question:  Would you consider Joe's

12 injuries to be exceptionally heinous or cruel in light of

13 your experience as a medical examiner?

14        MR. MARTINEZ:  Your Honor, I think that that

15 calls for a legal conclusion.  It's not something that's

16 for the jury to decide.  It's clear they're having trouble

17 understanding the injury.  And I again would move the

18 admission of Exhibit 541 because it's clear that just by

19 telling them they are not getting this picture.

20        And as the argument was made previously, defense

21 counsel has indicated that we have to prove that this is

22 especially cruel, especially heinous, especially depraved

23 and let them judge for themselves, look at the evidence.

24 At this time, move admission of Exhibit 541.

25        MR. PATTERSON:  I object to -- we object to his

1    effort to bring that gruesome photograph back in.

2            THE COURT:  Okay.  I'm not going to read the

3    question to the jury.  And I'm going to deny the State's

4    position for reconsideration of the admission of Exhibit

5    541.

6            That's it, right?

7            MR. MARTINEZ:  Right.

8            THE COURT:  What I'll do is I'll go ahead and

9    after the witness and jury leave, you can make your

10   motion.  And then you can rest formally.

11           MR. PATTERSON:  That's fine.

12           (Bench conference concluded.)

13           THE COURT:  Are there further questions of this

14   witness by the jury?  If so, please raise your hand.  No

15   one has raised their hand.

16           May this witness be excused?

17           MR. MARTINEZ:  Yes.

18           MR. PATTERSON:  No objection.

19           THE COURT:  Thank you, you are excused.

20           Ladies and gentlemen, we're going to take our

21   afternoon break a little bit early.  There are some issues

22   that need to be resolved outside your presence.  And it's

23   going to take some time.  So we're going to recess at this

24   point in time.

25           You are to return tomorrow a 1 p.m.  We're moving

1   along efficiently but I need some time with counsel outside

2   your presence to resolve some legal issues.

3            We'll take our afternoon recess.  During this

4   time remember the entire admonition I have given you

5   including the fact you are not to discuss the case with

6   anyone, don't let anyone discuss the case with you.  Keep

7   an open mind.  Do not do any research, investigation or

8   experimentation or testing on your own.  Avoid any and all

9   media coverage in this case.

10           See you tomorrow at 1 p.m. Have a nice evening.

11           (Jurors exited.)

12           THE COURT:  Please be seated.  This is Cause

13   Number CR2000-096032, State of Arizona versus Wendi

14   Elizabeth Andriano.

15           The record will reflect the presence of the

16   defendant and counsel.  We're outside the presence of the

17   jury.

18           Mr. Patterson.

19           MR. PATTERSON:  Your Honor, pursuant to Rule 20 I

20   make a motion at this time to dismiss the aggravators.

21   There is no guidance, at least from the case law, what the

22   standard of proof is at this juncture in order to avoid a

23   motion to dismiss.  Obviously, in the guilt/innocence phase

24   the Rule 20 motion is substantial evidence.  No substantial

25   evidence is adduced by the Government.

1          I don't know if that same standard applies here

2     at this stage of the proceedings.  I would submit it's a

3     higher standard than just no substantial evidence because

4     we are in a capital case and we are at that point in time

5     where the Government has to show why this first-degree

6     murder case is above the norm or differs from

7     run-of-the-mill first-degree murder cases.

8          So, I submit that the Government has to provide,

9     at least by a preponderance of the evidence standard,

10    evidence to support its notice of aggravating factors.  I'm

11    going to make a general and Constitutional argument with

12    regard to dismissing the especially cruel, heinous and

13    depraved aggravator.  And I filed a written motion in that

14    regard earlier in this case.

15         THE COURT:  For the record, let me place on the

16    record that I have reviewed the motion to dismiss,

17    13-703(G)(6) aggravating factor which was originally filed

18    be Mr. Patterson when Judge Akers was on the case and then

19    the response that was filed by the State.

20         And I did receive the motion to dismiss,

21    13-703(F)(5) aggravator pecuniary gain filed by

22    Mr. Patterson on behalf of Ms. Andriano when Judge Akers

23    was on this case and the State's response.  I'm sorry.

24         MR. PATTERSON:  Thank you, Judge.  The

25    Constitution infirmity with regard to especially cruel,

1   heinous and depraved aggravators has to do with the

2   vagueness and over breath of that particular aggravator.

3          In Walton, they find that this particular

4   aggravator in Arizona is overly broad and it's vague.  But

5   because judges, at the time Walton was decided, were those

6   individuals who were deciding whether to impose the death

7   penalty despite the fact it was facially overly broad and

8   vague, it was saved, if you will, because folks like you

9   had become familiar with the cases like Gretzler and all

10  the other cases that gave you guidance in differentiating

11  amongst first-degree murder cases and finding in your

12  experience what are truly especially cruel, heinous and

13  depraved.

14          They also suggested that you could save it if you

15  were able to instruct the jury properly as to what

16  essentially constitutes especially cruel, heinous and

17  depraved.  But what the fallacy of that argument is is that

18  you can't instruct the jury about life experiences.  You

19  can't give them the same number of cases that a Superior

20  Court judge experiences in his or her lifetime and expect

21  that you can substitute for that life experience a set of

22  rules or instructions.  It just doesn't work.

23          In Valerio v Crawford, the case that I give you,

24  bears upon that particular issue.  It's a Ninth Circuit

25  case obviously hasn't wended its way up through the Supreme

1    Court.  We don't have any Arizona Supreme Court decisions

2    on whether post Ring we can properly instruct a jury on the

3    particular aggravator.  So I make this record at the time.

4         You need to go back a little bit in terms of

5    Constitutional history here.  Herman (phonetic) said the

6    death penalty is okay if you can narrow it, if you can

7    narrow it down and only give it in certain circumstances,

8    certain extreme circumstances.

9         That's the function of aggravating circumstance

10   allegations.  They must genuinely narrow the class of

11   persons eligible for the death penalty.  Genuine narrowing

12   reduces the opportunity to the freakish or wanton

13   imposition of the death penalty.  And ensures it is only

14   given for the most severe or most deserving offenders.

15        Especially cruel, heinous or depraved is overly

16   broad.  And one of the reasons it's overly broad, it's

17   applied to just about any set of circumstances.

18        If Your Honor is familiar with the cases here,

19   there are a myriad of examples in reported case history

20   that of similar sets of circumstances where it was given,

21   the death penalty was given and under exactly the same

22   circumstances another judge found it not giveable or not

23   appropriate under the circumstances.

24        So, the Arizona Supreme Court decisions have

25   failed to provide sentencing judges with a consistent or

1    rational narrowing construction of this particular factor.

2         The Arizona Supreme Court, through its limitless

3    extension of especially cruel or heinous or depraved

4    factors, Arizona violates the Constitutional requirement

5    the death penalty be reserved for limited circumstances

6    where there is an elevated justification for sentencing

7    some persons to death as opposed to life in prison.

8         It's a catch-all provision, Judge.  The words

9    cannot be adequately defined and it's used basically to

10   justify the imposition of the death penalty in a myriad of

11   circumstances.

12        So for those Constitutional reasons, Judge, this

13   particular aggravating factor needs to be dismissed because

14   it does not generally narrow the kinds of cases for which

15   the death penalty is appropriate.

16        With regard to particulars.  The facts that were

17   adduced in this case as to the aggravator for pecuniary

18   gain, if you take everything that the deputy county

19   attorney said in his opening statement, that my client is

20   greedy, that she's avaricious, that she, her purpose in

21   this case was to better her position financially with the

22   result of the death of Joe Andriano, all that goes out the

23   window the moment a bar stool, or as the Government

24   suggests, a lamp and that he died from blunt force trauma

25   as opposed to surreptitious poison.

1          You heard the evidence in this case, the reason

2     the sodium azide was used in the first place was to ensure

3     that the cause of his death was not discovered and that it

4     was related to the cancer which was undiagnosed and

5     undiscovered by the doctors, thereby resulting in a cause

6     of action for the medical malpractice.

7          Had Mr. Andriano died of sodium azide poisoning

8     in this case, then I think the pecuniary gain aggravator

9     can be sustained.  It cannot be sustained because there was

10    a break in the causation, there is a break in the

11    continuity of conduct on the part of Ms. Andriano.

12         Once she chooses to cause the death of

13    Mr. Andriano by blunt force trauma, she necessarily has

14    abandoned the plan to generated income from his death as a

15    result of the medical malpractice claim.

16         In fact, that's exactly what happened in this

17    case.  Jeff Miller, her attorney, found out about the facts

18    and circumstance of Joe's death, immediately sent a letter

19    to her and dismissed the lawsuit because there was no

20    longer any nexus between the medical mall and the cause of

21    death.

22         Once she chose that manner of death for

23    Mr. Andriano, she eliminated any pecuniary gain expectation

24    or possibility in this case, Judge.  And as you've heard

25    there were no other resources by which she could have

1   recovered had he just died in general.   There was no life

2   insurance policies in her name and there was no other

3   theory of recovery that the Government has other than the

4   life insurance and the med malpractice claim.   The med

5   malpractice claim goes out the window as soon as the cause

6   of death is no longer referable to the medical

7   malpractice.

8          So the Government, by any standard of proof, it

9   seems to me Judge, fails in its burden with regard to

10   proving the pecuniary gain aggravating factor.

11          With regard to the facts that were adduced and

12   played then to the first part of the next aggravator, the

13   especially cruel, you heard Dr. Keen testify that there is

14   an uncertainty as to the consciousness in this case.   There

15   were eight blows sufficiently substantial to cause loss of

16   consciousness.   And he doesn't know the sequence of

17   events.   His only exception to that is that his belief his

18   hands were placed by Mr. Andriano in an effort to block one

19   of the blows.   We don't know at what sequence or what point

20   in time that happened.   It could have happened at the first

21   because he could have appreciated the fact she was coming

22   at him.   That she struck him at that time rendering the

23   hands, the injury to the hands at the same time causing one

24   of the blows that could have rendered him unconscious.   We

25   don't know exactly where the hands were at the time these

1    blows were sustained.

2          There is no evidence that was adduced during the

3    course of the trial or in this particular phase that

4    Wendi's intent was to cause pain.  That's one of the things

5    we need to flesh out in the instructions.

6          There is a case and I cited in it in my request

7    for supplemental instructions, State v Carlson, which says

8    in order to constitute especial cruelty, it must be the

9    defendant's intent to cause pain and/or anguish before the

10   mortal blow.  The plan of the defendant must be such that

11   suffering before death must be inherently and reasonably

12   certain to occur.

13         There's nothing in this case, Judge, that

14   suggests that the Government has satisfied that burden.

15   And it's taken right from the case and it's essential to

16   the hole in that case.  It is an instruction that needs to

17   be given in this particular case.

18         There's nothing in this case that suggests that

19   she resorted to the bar stool or the lamp in order to cause

20   additional pain to Joseph Andriano.  There is nothing in

21   this plot or plan that the Government suggests she engaged

22   in prior to the event of October 8th that showed an intent

23   to cause him pain.  There is nothing in the literature with

24   regard to sodium azide that would suggest there was a

25   problem in terms of especial pain or especial anguish that

1 would be caused by this particular plan of action.  And,

2 again, that was not the cause of death.

3          So in looking at the cause of death in this case,

4 there's nothing to indicate that she resorted to the bar

5 stool or the lamp in order to precipitate suffering before

6 death.  That's the standard in Carlson.

7          With regard to the facts adduced in this case and

8 applied to the allegations of especially heinous or

9 especially depraved, all of the violence visited was on

10 Mr. Andriano, it was focused.  It is localized.  And it was

11 intended to effectuate the purpose of killing.  He wasn't

12 struck on locations that weren't, didn't lend themselves,

13 if you will, to causing his death.  It wasn't gratuitous.

14 The arterial spurt indicates Joe was still alive at the

15 time his was cut.  And so, all of the blows that he

16 sustained were part and parcel of the intent to kill and

17 not gratuitously visited upon his person.

18          It's not senseless by any stretch of the

19 imagination if you believe the Government's theory that her

20 purpose was to accomplish other objectives.

21          Senselessness, to a certain extent all murders

22 are senseless in the abstract but senselessness as a legal

23 concept means that it was done in addition to what is the

24 original objective of the plan.

25          For instance, a felony murder.  The plan is to

1   effectuate your get-away.  You've taken from the Circle K

2   and to effectuate a get-away, if you effectuated your

3   get-away and you turn then and shoot the clerk, that's

4   senseless killing because there was no need for you to

5   shoot that man because you had already gotten away.  That's

6   the concept senselessness has in this case or for

7   first-degree murder cases in general and doesn't have any

8   application in this case.

9           The helplessness concept, again, senseless and

10  helplessness in and of themselves are not sufficient to

11  establish heinousness or depravity.  But as an issue in

12  this case, there's no indication that after the witnesses

13  left that he did not regain his ambulatory abilities and

14  that he was in a position that created a situation that

15  Wendi believed she needed to defend.  The only thing that

16  the jury rejected in terms of the first-degree murder is

17  that her conduct in its totality was not justified on this

18  particular evening.

19          So for all those reasons, Judge, I ask that you

20  dismiss the aggravating factors in this case for

21  Constitutional reasons and for insufficiency of evidence

22  reasons.

23          THE COURT:  Mr. Martinez.

24          MR. MARTINEZ:  With regard to the standard that

25  he indicates should be applied in this particular case,

1    just because we have a death penalty case involving a jury

2    doesn't mean we change the standard.  He advocates changing

3    to a preponderance of the evidence and he advocated making

4    the change without any legal foundation.

5          If his argument were taken to its logical

6    conclusion, we could then say in the guilt phase, because

7    it is a death penalty case, that should also change to the

8    preponderance of the evidence.  Without any, if you will,

9    legal precedence that supports that there is nothing that

10   would advocate on his behalf.  So I would suggest to the

11   Court that the standard to be applied is still substantial

12   evidence.  That is something that will apply here as well

13   as the guilt phase, which just went by.  Both of them

14   involved a death penalty allegation.

15         But even if the Court is inclined to want to

16   examine it under preponderance of the evidence, the State

17   has met that.

18         There is a motion that is filed involving both

19   aggravating factors indicating that the term of cruel,

20   heinous or depraved is over broad.  The State had filed a

21   response and we stand on that.  But I would note that his

22   argument is that, well, it is such a difficult concept that

23   even judges have difficulty applying it.  However, he

24   ignores the fact that court decisions do indicate that as

25   long as it is sufficiently well defined then that is

1   something that can go to the jury.

2         I've taken a look at the jury instructions we

3   have provided.  I believe that they do define it

4   appropriately.  They're not overly broad and overly vague.

5   And so I think that that particular, if you will,

6   challenge, this Constitutional challenge, is without

7   merit.

8         The other thing that he mentions is that this is

9   just a catch-all phrase somehow, any murder can be this

10  way.  I disagree.  That's why we have the language that

11  indicates that if you tailor it, if you provide the

12  definitions to the jury, that they will be able to apply

13  it.  His argument can be made with regard to anything.  We

14  can make this argument with regard to pecuniary gain.  We

15  can make his argument with regard to any factor.  As long

16  as you define them appropriately and specifically, it is

17  not something that can be thrown out because it has

18  Constitutional issues.

19        Again, I would emphasize all of this is covered

20  in my response.

21        With regard to the issue of pecuniary gain, the

22  point that he made there was, well, the causation between

23  her motive and the beating over the head and the stabbing.

24  However, he makes that argument without any evidence to

25  support it.  He didn't provide any witnesses that indicated

1   what her mental thoughts were at the time.

2           In other words, she never admitted that the sole,

3   that it was her idea to do the killing.  In fact, when she

4   took the stand she indicated it was Mr. Andriano's idea

5   that the killing go forward.  So, for her -- for him to now

6   say that, well, she did have that intent now.  The position

7   is changed.  She had that intent but that intent changed

8   somehow without providing any evidence from the witness

9   stand.

10          In other words, he is saying there is no evidence

11  to show that that was the motive for the beating.  There is

12  no evidence to show that was the motive for stabbing.

13          But we have to back up a little bit.  There is no

14  doubt that the reason she got the sodium azide is because

15  she wanted to kill him so that she could gain financially.

16  We know that.  When we get to the point that this is

17  happening at her house, and we get to the point where she

18  starts hitting him in the head, he wants you to believe

19  that she stepped back and said, I'm now thinking about what

20  Jeffrey Miller told me and I have better -- I had better

21  think about this very hard so when I hit him on the head I

22  no longer will be able to recover the money.  That's not

23  what the evidence showed.  That's not what she said on the

24  stand.

25          And I point the Court to the law in this case

1   which indicates that pecuniary gain, the jury must find

2   that the defendant's expectation of pecuniary gain was a

3   motive, cause or impetus of the murder and not merely a

4   result of the murder in this particular case.

5          In this particular case, that was the motive,

6   that was the cause, that was the impetus, that was the

7   reason why she gives him the poison.  That's the reason why

8   it was there.  There was never any indication she renounced

9   that motive, that she renounced that impetus or that she

10  renounced that cause.

11         Additionally, it indicates that you need not find

12  pecuniary gain was the sole motivation or cause of the

13  murder in order to find this factor exists.  In this

14  particular case, what we have is an individual who has

15  motive to kill.  And that motive is she wants money.

16         We go through this analysis and we get to the

17  point where she has given him a large dose of sodium

18  azide.  At some point, the paramedics are called.  There is

19  no indication she sat back and said, well, now I'm thinking

20  about what Jeffrey Miller told me and so now my motive for

21  killing him is not pecuniary gain.  The motive doesn't

22  change because the method of dying is different.  She can

23  be wrong, in this case she's still going to recover.  I

24  mean, there's nothing that precludes the fact that she

25  still hasn't changed her mind and is thinking she is going

1   to recover that money.  She may be wrong about it but she's

2   still thinking that way.  And there's nothing that has been

3   presented to indicate that she ever changed her mind.  So

4   for that reason, I think that that argument should fall by

5   the wayside.

6         Additionally, he makes the point, well, she never

7   received anything of pecuniary value.  That's untrue.

8   There was a five thousand dollar life insurance policy.

9   And the pecuniary gain allegation indicates that the

10   defendant committed the offense in consideration of the

11   receipt or in expectation of receipt of anything of

12   pecuniary value.

13         In this particular case, she knew that there was

14   this five thousand dollar policy.  She told us about it.

15   Additionally, she contacted them to raise this amount.  So

16   she knew that when Mr. Andriano died, there was the five

17   thousand dollars that was going to be given.  Whether it's

18   give to the parents or the kids, I believe it's actually

19   going to the parents.  But that's receipt of something of

20   pecuniary value.  It doesn't have to come directly to her.

21   It can go to someone else.  But there is expectation of

22   receipt of anything of pecuniary value.  Perhaps it would

23   be whatever they used the five thousand dollars for, to

24   bury him or whatever.  But, there is some pecuniary value

25   that is being given to her as a result of the killing.

1        The other specific complaint is to the cruel,

2    heinous or depraved allegation.  Defense argues that it is

3    uncertain as to whether -- as to when Mr. Andriano lost

4    consciousness.  And they indicate to you, well, it wasn't

5    her intent to cause this pain or to -- in other words,

6    they're indicating to you she has to have caused this pain

7    in order for the State to meet this.  And but that's not

8    the state of the law.  Specifically cruelty refers to the

9    physical pain or mental anguish on the victim before

10   death.  And it indicates a crime is committed in an

11   especially cruel manner when the defendant either knew or

12   should have known.

13        We're not talking about intent.  He keeps

14   confusing intent with the standard.  And the standard is

15   she should have known that that's what was happening.  In

16   this case it's absolutely without a shadow of a doubt she

17   knew that.  The reason -- that's why State versus Carlson

18   doesn't apply here.

19        He didn't tell you about the facts in Carlson.

20   In Carlson what happened was a woman wanted to kill

21   someone, I don't know if it was her mother but it involved

22   a trust, that sort of thing.  She hired two individuals to

23   go do it.  She wasn't present.  She didn't know how they

24   were going to go out and kill her.  In other words, they

25   could have taken a gun, they could have taken a knife, they

1   could have done it any number of ways.  She wasn't present

2   to know how it was going to happen.  So she didn't know

3   that there was going to be this pain that was going to be

4   inflicted.

5          In this case, she knew about the sodium azide.

6   According to her, we know she also did some research.  So

7   we know she knew about the effects of sodium azide.

8          Additionally, she knew if you hit somebody on the

9   head with a bar stool, it's going to hurt and cause pain.

10  Especially if the guy is looking at you, he is also going

11  to experience some mental anguish.  So for them to cite a

12  case that the facts don't apply, I think renders their

13  argument useless.

14         State versus Carlson does not apply.  It's not a

15  situation where the killer was not present.  In that case

16  she wasn't present.  The Supreme Court over turned that

17  case.  In this case, she is present.  She either knew or

18  should have known that the way she committed this crime

19  would cause him to experience physical pain and mental

20  anguish.  Everyone knows if you hit someone on the head

21  that's going to cause some pain.  Especially if they're

22  looking right at you and they're down on the ground.

23         Additionally, she knew he was in pain because she

24  tried to lift him up and she couldn't.  He was in a fetal

25  position wanting to go to the hospital.  He didn't want to

1   go to the hospital because he feels good.  He wants to go

2   to the hospital because he's feeling horrible.

3           So, clearly in this case, we have met that prong

4   of their -- we have dealt with their complaint.

5           There is also a complaint as to the heinous and

6   depraved.  And they indicated that well, this was not

7   heinous or depraved because, again, they sort of make this

8   argument that this violence was not gratuitous.

9           We have to take a look at the facts of this

10  case.  We know that she had given him roughly ten times the

11  dose that you need to kill somebody.  So she knew that she

12  had given him all of this poison.  She knew he was going to

13  die for whatever reason.  And we don't have to justify or

14  give you a reason why she decided to, no, I'm going to do

15  it now.  So she just can't wait.  So then she started

16  beating him over the head.  But he was going to die

17  anyway.

18          And so then Dr. Keen says, well, beating him over

19  the head would have rendered him unconscious.  Beating him

20  over the head would have caused him to bleed out in two

21  minutes.  So, the point here is that he was already then

22  going to die from the head hit to the head.

23          But she then even goes further and uses the third

24  method to kill him.  I would also argue that if we take a

25  look at the photographs with the blood spatter on it that

1   she tried to suffocate him.  And he would have probably

2   eventually had, if the pillow got in the nasal airway, he

3   eventually would have died from asphyxiation.

4            So we have this gratuitous violence.  He's

5   already going to die, why do you need to hit him over the

6   head.  He's already going to die from both the poison and

7   the hit over the head, why do you need to stick a knife in

8   his neck and then wrench it.  That's just gratuitous

9   violence.

10           Much was made of the argument that well, all

11  murders are senseless and that you were given the example

12  of a felony murder rule where an individual was doing an

13  armed robbery turned and shoots the clerk.  Well, in that

14  case that is not a felony murder case.  That is a

15  premeditated case.  After the robbery is done, then turns

16  around with premeditation, turns around and shoots them.

17  That doesn't apply to their analysis.

18           This was senseless.  We need to take a look at

19  the facts here that he was already dying.  According to her

20  own narration, she thought it was going to be less than a

21  year from the first time they went to visit Dr. Kellogg,

22  which was the early part of June.  So, if that's the case,

23  you have June, July, August, September.  You have four

24  months that go by.  So by her own estimation, he only had

25  about eight months to live.  So is it senseless to go out

1    and try to poison and kill somebody who is already going to

2    die?  It absolutely is.

3              Was he helpless?  Well, they tell you go against

4    everything you've heard.  Go against the fact that he had

5    the poison in his system an hour and a half.  Go against

6    all of that.  Go against the fact he's throwing up and

7    Chris Hashisaki said that they couldn't even lift him.

8              Somehow, as soon as the door closed, they want

9    you to think that he develops superhuman powers.  He

10   didn't.  And I understand that senselessness and

11   helplessness is just something that, standing alone, will

12   not support the finding.  However, it will support a

13   finding if we take a look at it in the contest of

14   gratuitous violence in this case.

15             And for those reasons I ask the Court to deny the

16   request for the Rule 20 motion.

17             THE COURT:  Mr. Patterson.

18             MR. PATTERSON:  Well, Judge, please read the

19   Medina case regarding the issue of pecuniary gain.  The

20   Court describes that one motive of Medina could have been

21   pecuniary gain.  But it was a motive amongst many other

22   possibilities.  And it's only one possibility, then it is

23   not the kind of fact that sustains that particular

24   aggravator.

25             And I can't help but comment on the Government's

1   arguments.  They support the notion it's impossible to

2   define especially cruel and heinous and depraved.  He cites

3   facts that he believes sustains those allegations and I

4   suspect he could probably find a case, that supports a

5   finding on those particular facts.  But I can find any

6   number of cases that don't support that finding.  That's

7   the nature of the problem here.  It is so nebulous.  It is

8   such a catch-all it applies to all first-degree murder

9   cases.  It is overly broad and needs to be dismissed as a

10  matter of Constitutional law.

11        For example, the senselessness issue.  The

12  Government claims over and over again that the motive for

13  the killing was economic, pecuniary gain that my client was

14  going to encounter once this gentleman died.  So, they use

15  that to support that there wasn't any senselessness.  There

16  was a great deal of sense to the plan in order to gain

17  economically.  But then they use that same set of facts, to

18  say, well, he's going to die anyway, therefore, it's

19  senseless.  And, again, that comes back to the central

20  proposition in these kinds of cases you just can't define

21  what is especially cruel, heinous and depraved.  You don't

22  know what it is.  I don't know what it is.  Mr. Martinez

23  doesn't know what it is.  And we certainly can't except 12

24  persons off the street who have never done this before to

25  understand that legal concept.

1          For all those reasons, Judge, I ask that this

2     aggravator be dismissed.

3          THE COURT:  Let me take a break and then after

4     the break I'll announce my decision and we'll discuss more

5     fully the final jury instructions.

6          (Recess taken.)

7          THE COURT:  This is Cause Number CR2000-096032,

8     State of Arizona versus Wendi Elizabeth Andriano.

9          The record will reflect the presence of the

10    defendant and counsel.  We are outside the presence of the

11    jury.

12         Just a housekeeping measure before I announce my

13    decision here with regards to the motion filed relating to

14    the aggravator for especially cruel, heinous or depraved, I

15    think there was a typographical it says: G 6 but it should

16    be F 6.

17         The Court has considered the defendant's motion

18    to dismiss the aggravator for pecuniary gain, also the

19    defendant's motion to dismiss the aggravator committed the

20    offense in an especially heinous, cruel or depraved

21    manner.  I've also considered the State's position, the

22    evidence presented and argument of counsel.

23         The Court finds that there is substantial

24    evidence to warrant a verdict that the defendant committed

25    the offense in consideration for the receipt of or in

1  expectation of receipt of anything of pecuniary value.

2        The Court also finds that there is substantial

3  evidence to warrant a verdict that the defendant committed

4  the offense in an especially heinous, cruel or depraved

5  manner.

6        Therefore, it is ordered denying the defendant's

7  motion to dismiss the aggravator factor related to

8  pecuniary gain.

9        It is further ordered denying the defendant's

10  motion to dismiss the aggravator factor related to the

11  offense of committed in an especially heinous, cruel or

12  depraved manner.

13        With regard to the final jury instructions on

14  Phase II, I gave counsel last week a draft version of the

15  final instructions relating to Phase II and since that time

16  I had counsel check that draft and I did find some

17  typographical errors on page ten, towards the bottom where

18  it says:  If the murder is especially depraved.  Do you see

19  that?  So I corrected that.  And then, on page 11.

20        MR. PATTERSON:  Well, Judge, but now it's

21  capitalized, at least in my version.  It shouldn't

22  capitalized.

23        THE COURT:  It shouldn't be capitalized.  I'll

24  make sure that it's not capitalized.  And then an page 11,

25  at the top there where it talks about gratuitous violence.

1   It says "omitted" rather than "committed."   There's a C

2   missing.   We're going to correct it so that's committed

3   rather than omitted.

4          And those were the typographical errors that I

5   found.

6          I received from Mr. Patterson the supplemental

7   jury instruction Phase II.   There were three requested jury

8   instructions here.

9          I'll hear from Mr. Patterson as to each one at

10  this time.

11          MR. PATTERSON:  Well, Judge, I'd proposed an

12  addition to those that you propose and I cited authority

13  for the additions.  Number one I think is an accurate

14  description of the law on pecuniary gain coming from the

15  Medina case.  And it requires the Government to prove the

16  existence of economic motive at some point during the event

17  surrounding the murder.  It is not enough to establish

18  pecuniary gain as a motive.  It's a broader proposition

19  that the economic motive has to have some nexus, if you

20  will, to the actual homicide.  The fact that there may have

21  been a reason to kill somebody for economic gain at some

22  point in the relationship between the parties is not

23  sufficient to establish this as having an aggravator unless

24  there also establishes a relationship between that economic

25  motive and the acts that are intrinsic to the homicide.  So

1  that's what this is.  And it needs to be added because,

2  you've told them that the defendant committed the offense

3  and the defendant's expectation of money, pecuniary gain

4  was a motive that was contemplated eight years ago when

5  they first met.  She thought that maybe if he died

6  prematurely she could acquire some pecuniary gain down the

7  road.

8          There are no cases that I found, Judge, that are

9  factually square with our situation.  There are a lot of

10  situations that are described in the cases that a homicide

11  occurs and on the way out somebody takes something of

12  pecuniary value.  That's what it's talking about, that a

13  guy takes something and on the way out of the Circle K

14  kills the clerk.  That homicide is not sufficient as an

15  aggravating factor.  The motivation for the homicide has to

16  be such that I kill somebody and as a result of killing

17  that person I am going to acquire something of pecuniary

18  benefit.  In this case, you need to tell them there has to

19  be a correlation.  So that's why that proposal.

20          Mr. Martinez?

21          MR. MARTINEZ:  The instruction reads that the

22  existence of economic motive, it says that the existence of

23  economic motive at some point during the events surrounding

24  the murder is not enough to establish pecuniary gain as a

25  motive.  He makes a comment on the evidence.  He is

102

1   basically trying to have them take a look at one fact and

2   just commenting on it which was an argument on opening

3   statement.  The Court has what I believe is the law.  I

4   read the cases and that's the law.

5   　　　　　And, so number one, comments on the evidence.

6   And, two, your proposed instruction covers everything that

7   is required by the law.  So I would ask that the Court not

8   give this instruction.

9   　　　　　THE COURT:  Let's move to instruction Number 2.

10   　　　　　MR. PATTERSON:  Judge, the reason I proposed this

11   one is that you make reference to this concept in the

12   context of the especially cruel, heinous and depraved when

13   you say all first-degree murders are to some extent

14   heinous, cruel and depraved.  What I'd like to see is this

15   concept also placed in the pecuniary gain sector because it

16   is the law as a generalized proposition which covers both

17   pecuniary gain and especially cruel, heinous and

18   depraved.  It accurately describes for the jury their

19   obligation in this case to only apply the death penalty in

20   cases that are above the normal first-degree murder.

21   That's why I suggest this one.

22   　　　　　THE COURT:  So you're asking that this requested

23   instruction to be placed under pecuniary gain?

24   　　　　　MR. PATTERSON:  At a bare minimum.  Also

25   incorporate it in the opening.  Let's see, as a paragraph

1    before allegation of aggravating factors whatever title

2    it's not particularly important, difference amongst

3    first-degree murder cases or standard of first-degree

4    murder cases, and then put that in there.  Death penalty is

5    not to be imposed in every capital murder case.

6           THE COURT:  What you're asking is that this

7    requested instruction, Number 2 be set forth as a separate

8    paragraph perhaps before that paragraph which is titled

9    allegation of aggravating factors?

10          MR. PATTERSON:  Yes, sir, to give them some

11   insight that the cases where the death penalty is

12   appropriate are above the norm.

13          THE COURT:  Mr. Martinez?

14          MR. MARTINEZ:  I disagree with his request

15   because it's a misstatement of the law.  It says that the

16   death penalty should not be imposed in every capital murder

17   case.  I could change that to say a life sentence should

18   not be imposed in every capital case.  For him to go ahead

19   and request that I think it's a misstatement of the law.

20   It sort of, not sort of, it absolutely argues against the

21   death penalty but that is not what the law says.  The law

22   they are to consider, the aggravating factors and he is

23   requesting -- what he is asking you to do or asking the

24   jury to do is to engage in proportionality.

25          I would object, number one, that it be in this

1   particular -- at this particular juncture because, they are

2   not imposing the death penalty right now.  They aren't.

3   What they're doing is finding aggravating factors.   It

4   should be reserved in cases where the manner and commission

5   of the crime are above the norm of first-degree murder.   I

6   say who cares.  Who cares to any of that.   That's not what

7   their decision is.  Number one, it isn't relevant to this

8   stage.

9          Number two, once we get to the second page, he's

10  encouraging them to engage in proportionality.

11          In addition, if you do consider giving it, it

12  should read the death penalty or a life sentence should not

13  be imposed in every capital case.  But the jury instruction

14  should just not be given.

15          MR. PATTERSON:  Judge, this is verbatim track

16  from these cases on the law.  And it is essential that

17  these folks know even at this phase that they need to begin

18  to differentiate in their own minds as to what cases are

19  appropriate for capital treatment.  And so that is the

20  reason I ask that you instruct them in that regard.

21          THE COURT:  Let's go to requested instruction

22  Number 3, Mr. Patterson.

23          MR. PATTERSON:  Judge, this is taken from the

24  Carlson case and the Carlson case is a case of accomplice

25  liability.  But I cannot believe that our Supreme Court

1   establishes different standards for aggravating factors

2   whether or not it involves the use of accomplices or not.

3   In fact, that's the holding in this case, that there needs

4   to be one consistent standard.  And because Ms. Carlson has

5   hired someone to kill her mother-in-law botched it because

6   they used a butcher knife that she couldn't have reasonably

7   expected that they would have imposed especial cruelty upon

8   her mother-in-law.  The standard then is established that a

9   person has to -- it has to be they intend to cause pain or

10  anguish before the mortal blow.

11          The plan of the defendant that the suffering

12  before death must be inherently and reasonably certain to

13  occur.  The fact that it just happened to inflict pain is

14  not the standard.  The fact that the defendant might have a

15  reason to know that may be painful is not the standard.

16  And, again, it just manifests and evidences the difficulty

17  we have in defining what cases are especially cruel,

18  heinous and depraved because inability of our courts to

19  accurately describe what circumstances call for capital

20  treatment in cases involving cruelty, the cases are all

21  over the page.  Carlson establishes an attempt to narrow

22  what is required.  If you look at the cases like Gillis

23  (phonetic) where they kidnapped a lady and threw her down

24  the ravine.  They killed her in a fashion that was

25  reasonably certain to inflict maximum pain.  And this is

1    the standard by which we need to hold the defendant

2    accountable. In this case, the plan of the defendant must

3    be such that the suffering before death must be inherently

4    and reasonably certain to occur.

5          THE COURT: Mr. Martinez.

6          MR. MARTINEZ: The facts of the Carlson case just

7    don't apply to this case. And his recitation of the facts

8    makes that clear. That's a case where a woman hired two

9    individuals to kill somebody else. She was not present

10   when this happened. And so, that's why whatever language

11   they have in there it doesn't apply to this case. In our

12   case the defendant is the actor, or actress. She's the one

13   that inflicted the pain. And so the standard in that case

14   is not her intent, because that's sort of, if you will,

15   double decking the mens rea. Not only does she have to

16   know but she has to intend. So I would ask that the Court

17   not give that. It does indicate the plan of the defendant

18   must be such that suffering before death must be inherently

19   and reasonably certain to occur. Again, that doesn't apply

20   in this case because what they're talking about is the

21   accomplice liability situation. They're not talking about

22   somebody who is actually doing this killing, who's actually

23   there inflicting whatever pain or non-pain may be

24   available. So for those reasons, I ask that this not be

25   given.

1      THE COURT:  At this point in time I'm not

2  inclined to grant the request to give these additional

3  supplemental jury instructions.  I'm going to double check

4  the case law and keep an open mind.  Then I'll make a final

5  decision.  And I'll make available for Mr. Martinez to pick

6  up or e-mail to counsel the final version.

7      MR. PATTERSON:  One other oral request, Judge?

8      THE COURT:  Okay.

9      MR. PATTERSON:  I'm asking for a definition of

10  pecuniary gain.  It is a concept that is not used in usual

11  language, in conversation.  I think we need to make an

12  effort to define what pecuniary gain is.

13      THE COURT:  Do you have any suggestions?

14      MR. PATTERSON:  I don't have a suggestion at this

15  point, Judge.  I haven't looked in Websters.  I looked at

16  the packet of information supplied by Mr. Martinez.  They

17  don't define it either.  So there is no insight to be given

18  from that packet.  It's such a loose concept.

19      During the course of Mr. Martinez' argument today

20  he suggested that pecuniary gain can be the benefit of the

21  something directly or that indirectly at some point gives

22  rise to benefit to the defendant.  And, you know, if

23  there's a case that supports that proposition, that would

24  amaze me.

25      THE COURT:  I've looked everywhere.  There is no

1  definition that I've been able to find with regard to any

2  case defining pecuniary.

3          MR. PATTERSON:  I think that's the problem,

4  Judge.  I think that we need to make an effort.

5          THE COURT:  Did you look into Black's law

6  dictionary?  They talk about monetary, relating to money.

7          MR. PATTERSON:  I think at a bare minimum we need

8  something like that.

9          THE COURT:  Mr. Martinez?

10          MR. MARTINEZ:  I disagree it hasn't been

11  defined.  We don't need to create a problem where there is

12  none.  I see a situation where if we define pecuniary gain

13  and it goes up, if there is a conviction, and they say,

14  well, now you defined it wrong but you shouldn't have

15  defined it in the first place, we're just asking for

16  trouble.

17          THE COURT:  Let me give it some additional

18  consideration as requested by Mr. Patterson.

19          Mr. Martinez, will you be available tomorrow

20  morning?

21          MR. MARTINEZ:  Yes, I'll pick it up.

22          THE COURT:  Mr. Patterson, you want us to e-mail

23  it to you?

24          MR. PATTERSON:  Please, Your Honor.

25          THE COURT:  We'll do that first thing in the

1   morning.

2           The other thing I want to share with counsel is

3   the proposed form of verdict.  Let me show this to counsel

4   at this time and see whether that would be an appropriate

5   form of verdict for Phase II.

6           MR. PATTERSON:  This is the one Mr. Martinez

7   suggested?

8           THE COURT:  Similar to what he suggested.

9           MR. PATTERSON:  That's appropriate, Judge.

10          THE COURT:  Okay.  Anything further we need to

11  discuss at this time?

12          MR. MARTINEZ:  No, sir.

13          MR. PATTERSON:  No, Your Honor.

14          THE COURT:  We'll be in recess.  Thank you.

15          (Proceedings adjourned.)

16

17

18

19

20

21

22

23

24

25

EXHIBIT WW

000008344





IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

IN AND FOR THE COUNTY OF MARICOPA

| | | |
|---|---|---|
| STATE OF ARIZONA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | No. CR2000-096032 |
| | ) | CR05 0005-AP |
| WENDI ELIZABETH ANDRIANO, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

BEFORE:  THE HONORABLE BRIAN K. ISHIKAWA

Mesa, Arizona
December 1, 2004

REPORTER'S TRANSCRIPT OF PROCEEDINGS
(Trial)

COPY

SHARON FLORES
CERTIFIED COURT REPORTER
50374

2

1

2

3                     A P P E A R A N C E S

4

5

6

7     For the State:

8                     Mr. Juan M. Martinez

9                     Deputy County Attorney

10

11

12

13

14     For the Defense:

15                     Mr. Daniel B. Patterson

16                     Mr. G. David Delozier, Jr.

17                     Office of the Public Defender

18

19

20

21

22

23

24

25

3

```
1                    P R O C E E D I N G S

 2

 3          THE COURT:  This is Cause Number CR2000-096032,

 4   State of Arizona versus Wendi Elizabeth Andriano.

 5          The record will reflect the presence of the

 6   defendant and counsel.  We're outside the presence of the

 7   jury.

 8          Counsel, is there anything else you wanted to put

 9   on the record with regard to the final jury instructions?

10          MR. MARTINEZ:  No, sir.  Thank you.

11          MR. PATTERSON:  No additions or corrections,

12   Judge.

13          But I have to put on the record that I persist

14   with my argument with regard to the aggravator of

15   especially cruel, heinous and depraved.  I don't think it's

16   possible, legally, to instruct this jury with regards to

17   the law of that aggravator.  So I cannot approve or agree

18   that the ones you propose are appropriate.

19          THE COURT:  All right.  And any objection, any

20   further matters with regard to the final form of verdict

21   for this Phase II?

22          MR. MARTINEZ:  No, sir.

23          MR. PATTERSON:  No, Your Honor.  Form of verdict

24   is acceptable.

25          THE COURT:  In just a few moments we'll bring the
```

4

1   jury in and allow the State to rest formally and defense to

2   rest formally.  Then we'll have the closing arguments of

3   counsel.  And then we'll have the alternate jurors that

4   were selected during Phase I informed they will be allowed

5   to leave physically.

6           With regard to the exhibits, the same exhibits

7   that were given to the jury during the Phase I will be

8   placed in the jury room along with the exhibit list that

9   was given to the jury in Phase I.  Also, they will be

10  advised about the biohazardous matters.

11          And, also, what I'll do is after we read the

12  final jury instructions, I'll have the jury go into the

13  jury room, select a foreperson and write out their

14  deliberation schedule to give back to us.  And then I'll

15  tell them at that point in time once they do that they'll

16  take a break and then during the break, we'll have all the

17  exhibits placed in the jury room along with the exhibit

18  list.

19          I think we've covered everything, is that

20  correct.  Counsel?

21          MR. MARTINEZ:  Yes, sir.

22          MR. PATTERSON:  Yes, Your Honor.

23          THE COURT:  Are we ready for the jury?

24          MR. MARTINEZ:  Yes.

25          MR. PATTERSON:  We are.

5

1          (Jurors entered.)

2          THE COURT:  Please be seated.

3          This is Cause Number CR2000-096032, State of

4     Arizona versus Wendi Elizabeth Andriano.

5          The record will reflect the presence of the

6     defendant, counsel and the jury.

7          First thing, ladies and gentlemen of the jury,

8     and I want to apologize.  I know it's hot in here.  It was

9     hot yesterday.  I'm very much aware of that because I'm

10    wearing a robe here.  We've been working very hard to get

11    the temperature at a more comfortable level in here.  They

12    tell me that it's cold downstairs and hot up here.  We're

13    doing the best we can.  I want you to know I'm not ignoring

14    the situation.  We've been working on it since yesterday.

15    But, sometimes it's not very easy.  So, I thank you for

16    your patience.

17         Mr. Martinez.

18         MR. MARTINEZ:  The State rests, Your Honor.

19         THE COURT:  Mr. Patterson.

20         MR. PATTERSON:  Your Honor, the defense also

21    rests for Phase II.

22         THE COURT:  Ladies and gentlemen of the jury, the

23    attorneys will now make their closing arguments to tell you

24    what they think the evident shows and how they think you

25    should decide Phase II.

6

1          The prosecutor has the right to open and close

2   the argument since the State has the burden of proof.   Just

3   as in opening statements, what is said in closing arguments

4   is not evidence.   But it may help you to understand the law

5   and the evidence.

6          Mr. Martinez.

7          MR. MARTINEZ:   Thank you.   My remarks to you this

8   afternoon will be restricted to talking about the jury

9   instructions as they apply to the two alleged aggravating

10  factors.   Specifically, the factor of pecuniary gain that

11  if it weren't for the defendant's greed, if it weren't for

12  her avarice, if it weren't for the fact she was money

13  hungry, we wouldn't be here.

14         The second factor that I'll talk to you about is

15  the cruel, heinous or depraved.   This one deals with the

16  fact that this was a case of overkill.   Where the defendant

17  massacred an individual who was held literally hostage in

18  Apartment 132 because he couldn't get up.   He couldn't

19  move.   He couldn't do anything.   He's hostage there.   She

20  takes advantage of it and she massacred him until he's

21  dead, not once, not twice, but three times over.

22         So, let's talk about the jury instructions that

23  apply to this particular juncture and that apply to the

24  first alleged aggravating factor.

25         The Court will instruct you once we're done with

1   the closing arguments that in terms of the first

2   aggravating factor, pecuniary gain factor, the law is as

3   follows:  To find that the defendant committed the offense

4   of the consideration for pecuniary gain, you must find that

5   the defendant's expectation of pecuniary gain.

6           I'll stopped there to point out that it doesn't

7   mean that she actually has to get any money.  The end

8   result doesn't have to be that you have a pot of gold at

9   the end of the murder.  All that is required that you

10  expect or want to gain money.

11          So, the defendant's expectation of pecuniary gain

12  was a motive, cause or impetus for the murder and not

13  merely a result of the murder.

14          In other words, what this is telling you is that

15  the ability to have money or the need to have money wasn't

16  as a result or didn't come about after the murder.

17          In other words, what this is telling you is that

18  the motive, cause or impetus for the murder has to have

19  come before.  The situation that you can compare this to is

20  a individual who commits a burglary.  Goes inside just

21  because he doesn't like the person.  And after the murder,

22  looks around, sees a TV set that he likes and then walks

23  away with it.  The impetus for that murder was that he

24  didn't like the person and then he just decided as an after

25  thought to take the money.

1          That is not what is covered here.  It tells you

2   that the expectation must be pecuniary gain was the motive,

3   cause or impetus for murder.

4          As I told you when I started my conversation with

5   you today, we really wouldn't be here if the defendant

6   wasn't money hungry.  What we're talking about is a

7   situation where the defendant, in her mind, felt, knew, had

8   the knowledge of, that if Joseph Andriano was dead before

9   the civil trial came about, it would be worth more money.

10         I notice there was evidence presented through the

11  lawyer Jeffrey Miller that he said, "Well, I did tell them

12  there was a possibility that there would be more money but

13  I didn't guarantee it."

14         His thoughts at this point are irrelevant.  It's

15  what she thought that's important for purposes of this

16  instruction.  And what did she think?  Well, we know what

17  she thought.  Because she went Jimmy Yost and said, "You

18  know, Joe is worth more dead than alive to me."

19         Additionally, one of the other things that she

20  was doing as this was going about is attempting to cash in

21  on his death through life insurance.  So, part of the

22  reason that that was brought in was to show you that it was

23  just a motivation throughout this whole thing.

24         And, in fact, she even thought, she even

25  mentioned an amount; twenty million dollars.  She also

1   mentioned that it would be less if he were alive.  And

2   during that summer when all of this was happening, that's

3   when she started to talk to people, that's when she started

4   to make applications and that's when she obtained the

5   poison.  The impetus to buy the poison or to get the

6   poison, the reason that she did it was because he was worth

7   more dead than alive to her.  That's the bottom line

8   there.

9            We don't need to go over it two, three, four,

10  five times.  You've already heard it many times over.  But

11  the bottom line is, we wouldn't be here.  We wouldn't be

12  standing here talking.  We wouldn't be talking about Joseph

13  Andriano.  We wouldn't be doing any of that except that the

14  defendant is a money-hungry woman who saw her husband as

15  nothing more than a pot of gold.  And it was this pot of

16  gold, if you will, that was in the bank that she could not

17  get access to.  That she was precluded from getting.  That

18  she just couldn't quite write the check for until he died.

19  And once he was dead, once she was free of that

20  interference, then the value goes up, perhaps settlement

21  offer comes in.  But, in any event, if it goes to trial,

22  she's got herself twenty million dollars.

23           At least, that's what she thinks.  And that's

24  what's important here, what she thinks.  The bottom lime

25  is, as I told you before, it is nothing more than a check

1   to her.  It was just that the amount hadn't been written.

2          The instruction also tells you that you do not or

3   you need not find that pecuniary gain was the sole

4   motivation or cause of the murder in order to find that

5   this factor exists.  What that's telling you is this:   In

6   this case we have allegations that were proven that the

7   defendant engaged in some tryst with people, for example,

8   like Rick Freeland.

9          And some of you may go back there and, say, well,

10  perhaps the motive for this was that she wanted to be with

11  Rick Freeland.  You, Mr. Martinez, you presented us with

12  e-mails dated as late as July -- I'm sorry, September where

13  she's asking him to join her for a drink.  And,

14  additionally, we also have the issue of Mr. Travis Black, a

15  one-night stand, that she engaged in where perhaps that's

16  what she wanted to do.

17         The point -- there are two points to be made with

18  regard to that.  Number one, the attraction or the love or

19  whatever emotion she had, will, the friendship, whatever

20  she wants to call it with Rick Freeland, wasn't so strong

21  that it prevented her from finding other men.  So that

22  really couldn't be the motive.

23         But if she really wanted to go out there and be a

24  free girl, go out there every night and dance the night

25  away or do whatever it is she wanted to do without

1   restriction, perhaps that may be something that was in her

2   mind, that doesn't preclude you when you go back there in

3   your deliberations from finding that the motive here was

4   pecuniary gain.

5        Because even though those things are peripherally

6   out there, they are playing out there, that doesn't mean

7   the main reason, the real reason she wanted him dead is

8   because she wanted money.  The real reason that she wanted

9   him dead is because once he was gone, she could have all

10  this money and she could do whatever she wanted to do.

11  Because of the money.  The bottom line here is that this

12  all happened because of the money.  Greed.  That's all this

13  is about for her.

14        There is another sentence that is appended to

15  that particular instruction.  It tells you:  However, you

16  may not find this factor if it is merely shown that the

17  defendant took property or money after a murder occurred.

18        Well, that's part of the law.  And that is the

19  law in this case.  But it doesn't apply.  There's

20  no -- there was never any indication in this case that she

21  took property or money after the murder occurred.

22        The point that also needs to be made before I

23  leave this particular jury instruction is that she does not

24  have to gain money.  She does not have to actually come

25  into possession of the money.  That is not what is required

1   by this jury instruction.  It's just that her motive has to

2   be the attainment of something of value, of pecuniary

3   value.

4          The other point to be made here before I move on

5   is that, well, you'll say, yeah, but she had the poison and

6   he didn't die from the poison.  What ended up happening is

7   that the paramedics showed up and then she started beating

8   him.  How does that relate to the motive of pecuniary

9   gain?

10         One of the things there is no evidence of is that

11  she sat back, immediately before hitting him multiple times

12  over the head, and then stabbing him and then asphyxiating

13  him, she stood back and said, well, I need to think about

14  what Jeffrey Miller told me.  I need to think about that

15  before I hit him in the head this one time.  I need to

16  think about it before I hit a second or third time.

17         In other words, there is no indication whatsoever

18  that she didn't continue in this thought process.  We get

19  to October 8 of 2000, at midnight or 12:30 or one o'clock

20  when she actually feeds him the poison with her idea that

21  the motive here is that he's going to die of a heart attack

22  or what is perceived to be a heart attack.  And then she is

23  going to get money back for his death.  If we proceed on

24  for the other hour that it goes on or for the other 30

25  minutes, the motive is still the same.  It continues on.

1  She wants him to die because of money.

2          We get then to 2:30 in the morning, right before

3  Chris Hashisaki comes over.  The motive is still the same.

4  It hasn't changed.  She still wants him to die because of

5  the money.

6          In the time that she is in there, the five, ten,

7  15 minutes that she's in there, alone with him, however

8  long that period of time is, there is no evidence

9  whatsoever that she then decided, you know what, I don't

10  want the money any more.  This is not about money any

11  more.  So this pecuniary gain motive that I had before,

12  that goes out the window.  The motive continues on.

13          There is no requirement, either, that if you

14  start by poisoning somebody, the requirement isn't that he

15  has to die from that in order for there to be pecuniary

16  gain.  The manner of death doesn't really matter.  What is

17  important here is that he died and he died by her actions,

18  whether it be that she poisoned him or whether it be she

19  hit him over the head with the stool, or whether it be she

20  stuck this knife in his neck or whether it be that she

21  asphyxiated him.  That does not make a difference.  That

22  does not change the pecuniary gain motive in this case.

23          Then we get to the second alleged aggravating

24  factor.  You will also get a jury instruction and it reads

25  as follows:  All first-degree murders are, to some extent,

1   heinous, cruel or depraved.  However, this aggravating

2   circumstance cannot be found to exit unless the murder is

3   especially heinous, cruel or depraved.  That is, where the

4   circumstances of the murder raise it above the norm of

5   other first-degree murders.

6        In other words, it's shockingly evil.  It kind of

7   sort of just shocks you when you first hear the facts.

8   It's worth reviewing them for this purpose now.

9        You have a situation where you have a man who is

10   terminally ill.  Per his wife, he has about less than a

11   year to live.  He's weak.  He's undergoing chemotherapy.

12   Whenever he gets a chance he takes his kids over to his

13   best friend's house so they can sit around and have a milk

14   shake and then he wipes their faces down.  He's the one

15   that takes care of the kids while she works.  He's the one

16   that is faithful, that loves her, gives her cards that say,

17   "I love you.  I love you.  I love you.  And, oh, by the

18   way, did I forget happy birthday?  Did I tell you that I

19   love you."  That is part of it all.

20        In addition to that, there is a situation here

21   where not only is he going to die, not only that, but he's

22   doing something to stay alive.  He's taking chemotherapy

23   even though he knows that that's going to result in pain.

24   That's going to result in an incredible amount of

25   discomfort.  He's not going to feel good.  It's going to

1  disfigure him in the sense that his hair is going to fall

2  out.  He's doing all of that just because he wants to live

3  a little bit longer to spend some time on this earth.

4          That's sort of the backdrop that we have.  An

5  individual who is totally faithful to this woman.  The

6  woman that he loves.  And as a backdrop to that, we have a

7  woman who thinks that this individual is ugly, who thinks

8  this individual is skinny.  But she didn't leave him

9  because she wants his money.  Because if she leaves him,

10  this loss of consortium claim goes out the window and all

11  the money goes to his kid and his family.  So she doesn't

12  want to leave him.

13          But, according to her own admission, he allows

14  her to go out twice a week.  Stay out, according to her,

15  until midnight.  We know that, of course, that curfew was

16  violated constantly.  We also know that during the curfew

17  she was kissing other men.  And, in fact, she has one

18  affair of some duration; one she admits to.

19          Additionally, the day after he has chemotherapy,

20  she has intercourse with a guy by the name of Travis

21  Black.  At one point she says, "Well, that's no big deal.

22  It's not an affair.  There wasn't the emotional

23  attachment."  But we do know she does classify it as an

24  affair.

25          So we have that as a backdrop.  Once you have

1   that as a backdrop, you have the situation where she's in a

2   coldhearted, thinking, calculated fashion, she gets on the

3   Internet, not via her own name, opens an account in the

4   name of Anna Newton.  The only reason she opens that

5   account is because she's trying to get poison to kill him.

6   That's why she opens that account.

7          She's going to through whatever it takes, forging

8   business licenses, lying to people, lying about everything

9   that she possibly can in order to get this wonderful

10  miracle to her for whatever her problems are in this

11  marriage.  And they will all be solved by killing her

12  husband.

13         So you have that as a backdrop, that there's this

14  period of time where she wants to get rid of him.

15         Additionally, during that time she's making life

16  miserable for him by going out, by having affairs, by being

17  with other people and embarrassing him in front of other

18  people.  Going to the pool, hanging out there while he

19  takes care of the kids.

20         All of that, you sit back and you think about

21  that.  So how does she repay this man who has given her

22  nothing but love?  How does she repay this man that has

23  been nothing but faithful to her?  How does she repay this

24  man who has given her two kids, three and two years old who

25  he cares for.  How does she repay this man who takes them

1   out to visit with his friend, who carries them -- drives

2   around with them in his truck.  And as you saw in the

3   photograph, sits there with a stupid hat and holding his

4   kids.  How does she thank this guy?  Well, she thanks him

5   by poisoning him.

6           And so we get to the point where we need to take

7   a look at that situation.  Is that something that shocks

8   you?  Is that something that is just, you say, boy, that is

9   just something.  You know, it's so totally different than

10  two drug dealers killing each other.  It's just so

11  different from shooting somebody and killing them.  Or the

12  random things that you see on the freeway.

13          Is it something that when you think about it, you

14  say, that really is rotten.  That really is bad.  And in

15  this case, that's what you have.  And so, then, you know,

16  that you have that kind of crime, just to start off with.

17          But you then look further to see what she did to

18  bring about his death.  And before you get to that, the

19  instructions tell you that the terms "cruel," "heinous" or

20  "depraved" are to be considered separately or in the

21  disjunctive.

22          What that means is you may find proof or you may

23  find cruelty has been proved, heinous or depravity has been

24  proven, or the whole factor has been proven.  That's what

25  that tells you there.  The terms "cruel," "heinous" or

1  "depraved" are to be considered separately but proof of

2  any one of these factors is sufficient to establish this

3  aggravating circumstance.  That's what that tells you.  If

4  you find one of the three, you found the aggravating

5  circumstance.

6  　　　　　So, let's talk a little bit about the cruelty.

7  As I told you in opening statement, that involves looking

8  at what, if you will, being in Mr. Andriano's body and

9  looking through his eyes and hearing through his ears and

10 sensing, if you will, through his body.

11 　　　　　And it tells you that cruelty involves the

12 infliction of physical pain and/or mental anguish on a

13 victim before death.  A crime is committed in an especially

14 cruel manner when a defendant either knew or should have

15 known that the manner in which the crime is committed would

16 cause the victim to experience physical pain and/or mental

17 anguish before death.

18 　　　　　So with regard to that, let's start out at about

19 12:30 at night which is about the time she gives him the

20 poison, between 12:30 and one o'clock in the morning.  She

21 knows that she gives him approximately ten times the

22 requisite lethal doze.  She knows that he is going to die

23 from that.  So as a result of that, what happens to Joseph

24 Andriano?  He finds himself in the living room in a fetal

25 position.  And he's hurting.  It's not something that is

1  pleasant.  It's not something that, you know, any one of us

2  or anybody would want to happen to them.  So he's down on

3  the ground and he's feeling pain.  There's no doubt about

4  it.

5          As part of that pain, we also know that he throws

6  up.  He vomits right there on the carpet.  That is also

7  very -- not painful and not uncomfortable -- but sort of a

8  terrible kind of thing to go through.

9          Additionally, we know that he is in pain because

10  according to Chris Hashisaki, he's in fetal position.  So

11  we have that established.  And, again, you just don't take

12  that separately without considering everything that has

13  happened in their relationship, the affair, the fact that

14  he takes care of the kids, and all of that, the fact that

15  he's dying from cancer, the fact that he has been in pain

16  before.  You take all of that and you take a look at it and

17  you say, oh, my god, now he's down there on the ground.

18  And he's on the ground and he's hurting.  And he's down

19  there on the ground and he's throwing up and he knows about

20  it.

21          Additionally, what we have is she knows about it,

22  too.  But what does she do?  Does she call the paramedics

23  during that one and a half to two hours that this is

24  happening?  No.  According to Chris Hashisaki, when she

25  came over, the apartment was cleaner than she had ever seen

1    it before.

2           What is she doing while this is happening?  Well,

3    if you take that statement, one of the things that we can

4    draw, one of the inferences that we can reasonably draw

5    from that is that she's sitting back watching him.  She's

6    just sitting back doing nothing.  She's sitting back

7    watching him die like some sort of dog.  That's what she's

8    doing.  Watching him.  Is she cleaning up?  Yeah,

9    probably.  She's cleaning up so that when the people come

10   over, they won't think that the grieving widow is such a

11   messy housekeeper.  That's how mundane, how inhumane her

12   thoughts are.  He's dying.  And what she's doing, an hour

13   and a half watching an individual that you are supposed to

14   love suffer, writhe, wait for the paramedics because that's

15   what he's doing, according to her.  She told him, "Honey,

16   I've call the paramedics but they're too busy.  They are

17   just too busy to come.  They have other calls."

18          She lied to him, which has been sort of her

19   trademark.  Not only is she money hungry but she lies to

20   him.  So he lays there an hour and a half.

21          I've talk about it for approximately, maybe, two

22   minutes, about him lying down there.  Think about it.

23   Think about how shocking, how horrible that is to know that

24   one human being is watching another one on the ground, in a

25   fetal position holding his stomach, dying.  Doesn't matter

1    to her.  That's okay.  Let him do that.

2              At some point, it has to occur to Joseph Andriano

3    that he's dying.  And we know that it has to occur to him

4    that he's dying because according to the defendant's own

5    statement on a previous occasion he had an attack where his

6    heart was racing, where he thought he was going to die.

7    Remember, she told you about that.

8              Do you think that he didn't associate it with

9    that first attack, if you will, that he had that she

10   described to you.  And if he did at that time and he was

11   able to recover, we know that that was associated with the

12   cancer.  We know that he knows he has cancer.  We know that

13   he has been having chemotherapy.  He knows the tumors are

14   not shrinking.  So what is he thinking during that one and

15   a half hours; I'm dying.  And if that's not mental anguish,

16   I don't know what is.

17             There are no words because no one has come back

18   from the dead to tell us this, but there are no words to

19   describe how he felt.  It's just so beyond the pale that

20   she would allow him to think that.  But, he's down there

21   thinking, I'm going to die.  I'm not going to see my kids

22   any more.  I'm not going to see my parents any more.  I'm

23   not going to see the woman I love any more, my wife.

24   That's what he's thinking for that hour and a half.

25             And, oh, by the way -- and this is also mental

1    anguish also -- where are the paramedics?  Why aren't they

2    here to help me?  I know I got over it the first time.

3    Maybe, if they come over, I can cheat death again.  Maybe

4    this is like it was before.  Why aren't they here?  Why am

5    I still hurting so badly.  And, by the way, Wendi, why are

6    you cleaning.  Why are you just sitting there.  Why aren't

7    you doing something?  Why aren't you calling the

8    paramedics?

9            The mental anguish he felt is indescribable.

10   That, in and of itself, is shocking.  Not only the pain

11   that he felt by her conduct and his mental anguish.  We

12   know that is what's happening.  There's no dispute about

13   that.

14           But, one of the cruelest things that she did in

15   this case, beyond everything I've described, is that she

16   gave him false hope because she called Chris Hashisaki.

17   She tried to enlist Chris Hashisaki's help by telling her,

18   "You know, I told him that I called the paramedics but I

19   really didn't."  Of course, Chris is shocked and says,

20   "Well, you better do it."  We know that she ended up

21   calling them and told them he was suffering from a heart

22   attack.

23           The reason I say she gave him false hope is

24   because that is applicable or germane to this issue of the

25   mental anguish that he must have suffered.  It is a

23

1   situation like a dream, if you will, where you're late for
2   something.  I mean, that's a much more minor kind of
3   thing.  But it's like a dream where you're supposed to be
4   somewhere on time.  And every time you're going to get
5   there, something happens so that you fear that you are
6   going to be there late.  So, it's like you're never going
7   to achieve it.
8          That's the position he was in.  It was a
9   nightmare in the sense what once Chris Hashisaki arrived,
10  he has hope.  He has hope that he is now going to receive
11  some help.  He can't help himself because he's down there
12  on the ground.  He can't walk.  He can't lift himself up.
13  The only thing he can do is he can speak at that time.  But
14  he can't even pull himself down to the phone.
15         What she does is gives him false hope saying,
16  "I've called the paramedics."  Chris is there and sees
17  that.  And then, right before the paramedics arrive, she
18  does another thing that I'm sure didn't make him feel very
19  good, and that's going down, trying to lift him up and get
20  him out of there so she can hide the evidence.
21         That's what she's trying to do.  He can't get
22  up.  Tries again.  He can't get up.  And then as if to
23  write his epitaph on his head stone she says, "Get your
24  fucking ass up."  That's important to show her frame of
25  mind there.  She doesn't care who is there.  She doesn't

1    care if anybody is around.  She doesn't care about his

2    feelings.  She doesn't care he may be dying from cancer.

3    She knows he's being poisoned.  So, what does she care.

4    The only person that matters in this world is this ego

5    centric individual named Wendi Elizabeth Andriano.  That's

6    the only person that matters for her.  That's why she can

7    sit there and watch him die.  That's why when the

8    paramedics are coming, she can then attempt to left him up

9    to get him out of there.

10        But as I told you, probably the cruelest thing

11   she did was this calling the paramedics.  Because when she

12   called the paramedics Joseph Andriano was cogent.  He also

13   saw Chris Hashisaki, recognized her.  Wasn't like he didn't

14   know what was going on around him.  He knew everything that

15   was going on around him.  And what does he do?  He hears.

16   He is able to perceive that the paramedics are coming.

17        Additionally, he hears Chris Hashisaki say,

18    "They're on the way, you two.  I'm going to go outside to

19   show them in."  Now, Joseph Andriano has hope because the

20   medical personnel has arrived.  And he is now going to get

21   some help.  Whether or not he is going to avoid death is

22   another issue.  But that makes him feel good.  You know

23   that would make him feel good.  There is no doubt about

24   it.

25        So what does the defendant do?  Locks the door

1   throws somebody's purse out so that she can hold him

2   hostage.  Because he is hostage.  You don't have to put up

3   bars.  You don't have to have a gun to hold somebody

4   hostage.  You can just make it impossible for them to

5   remove themselves from that situation.  Joseph Andriano

6   could not have gotten up.  There was no way that he could

7   have left.  There was no way that he could have gotten to a

8   phone.  There was no way he could have protected himself.

9   He was at her mercy.

10          But he's got this little hope, because right

11   outside the door, right out in the parking lot, just barely

12   yards away, maybe a hundred yards away, are the people that

13   are finally going to put an end to the physical pain.  And

14   maybe put an end to the mental anguish that he feels by

15   telling him he's okay, it's just one of those episodes.

16          What does the defendant do?  She snatches away

17   that last bit of hope that he has.  And the way that she

18   snatches that last bit of hope away is by hitting him in

19   the head with either a bar stool or a lamp.  That's what

20   she does.

21          He then knows after the first hit, if you put it

22   together with what has happened before, where she's trying

23   to get him up, he's not going to make it.  The woman with

24   which he has had two children -- two children that are in

25   the other rooms, by the way -- the woman that he has loved,

1    the woman that he has never cheated on, the woman that is

2    clearly part of the reason for his being, is now just

3    hitting him over the head with a bar stool for no reason.

4           Well, actually, there is a reason.  Because he

5    still has a voice.  And if she doesn't do that, the

6    paramedics will hear him.  He's saying, "Help me, please,

7    I'm in here.  You can break down the door, please.  She

8    won't let you in.  But help me, please."

9           She takes away that hope from him so she hits

10   him.  She hits him either with the lamp or the bar stool.

11   Hits him.  Hits him again.  And hits him again.

12          And to make sure that the people outside, the

13   kids, or maybe the upstairs neighbors don't hear what's

14   going on in there, so that she can maintain this persona of

15   being the dutiful wife, so she can maintain the persona of

16   being a victim domestic violence, what she does is, she

17   takes a pillow -- because remember Chris Hashisaki said

18   there was no pillow there when she is there first.  So

19   where did that pillow come from in the five minutes or six

20   minutes, whatever it was.  She went to get it.  And she

21   went to get it because Mr. Andriano was moaning.  Sighing.

22   Perhaps even crying.  That's why she got the pillow.

23          So, she sticks it in his mouth.  And when she

24   sticks it in his mouth, the blood that's coming out from up

25   his nose -- there are photographs of that.  You heard

1  Dr. Keen tell us that yesterday.  There is blood in his

2  mouth.  He's not being hit in the mouth.  He's being hit in

3  back of the head.  So that's being caused by the hits in

4  the back of the head.

5       We also know that he is conscious through that.

6  And the reason that we know that he is conscious through

7  all this is because we have photographic evidence that

8  shows us that.  Here is the right hand, Exhibit 206.  You

9  can tell there are bruises there.  That's because he lifted

10  his hand up so that he wouldn't be hit in more.  Didn't

11  want to be hit any more.  Not only did he not want to be

12  hilt any more, he didn't want to be hit by the woman who

13  proposed to love him.

14       Let's take a look at the outer part or the upper

15  part of the right arm.  You can see the fresh wounds there

16  when she is attempting to cover up, while he was trying to

17  stop this attack.  There wasn't anything else he could do.

18  He was powerless.  He was helpless.  He was down on the

19  ground.  The only thing he could do was to raise up his

20  arms.

21       And it isn't restricted to his right arm.  Take a

22  look at his left arm.  That also indicates that he was

23  putting his hand up.  Because, again, he couldn't get up.

24  So the only thing he could do was use both arms to try to

25  protect himself.  The bruise to his left arm.

1        And we know that while this was going on --

2        THE COURT:  Just one moment.

3        Do you need to take a break.

4        JUROR:  Yes, I do.

5        THE COURT:  Why don't we take a five-minute break

6   right now.  During the break remember the entire admonition

7   I have given you.  You are not to discuss the case with

8   anyone.  Do not let anyone discuss the case with you.  Keep

9   an open mind.

10       We'll take a five-minute break.

11       (Recess taken.)

12       THE COURT:  This is Cause Number CR2000-096032,

13  State of Arizona versus Wendi Elizabeth Andriano.

14       The record will reflect the presence of the

15  defendant, counsel and jury.

16       Ladies and gentlemen of the jury, again, I

17  apologize.  I've done everything but to check it out

18  myself.  We've gotten every fan we possibly can in the

19  courthouse.  Any time you feel you need to take a break,

20  let me know.  I think it's better that we have the air

21  circulating.  I just don't want you to think I'm ignoring

22  the problem.  I know there's a problem with it getting

23  stuffy.

24       We'll continue with Mr. Martinez' closing.

25       MR. MARTINEZ:  When we left off we were talking

1   about Exhibit Number 209 which is the left hand of Joseph
2   Andriano.  We know the coroner described it as defensive
3   wounds.  The reason those are important is because it shows
4   that Mr. Andriano was conscious and that he knew what was
5   happening.  That's important for two reasons, now.  One,
6   that if somebody is conscious, they are feeling physical
7   pain.  And, number two, they are also experiencing mental
8   anguish.  The jury instructions tell you the victim must be
9   conscious for at least some portion of the time when the
10  pain and/or anguish was inflicted.
11          These four photographs I've just shown you
12  indicate he's trying to defend himself.  And, yes, he's
13  feeling pain.  But probably the more daunting thing that he
14  is feeling was the mental anguish, the horrible feeling
15  that the woman that he's been with all of this time is now
16  hitting him, beating him up.  In addition to the fact that
17  the people that are going to save him, the people that are
18  going to help him are just right outside the door.  Just if
19  he could just get up, he would be okay.  If he could just
20  take that pillow out of his mouth and speak, it would be
21  okay.  He could get some help.  That's the mental anguish
22  that we're talking about.  That's why the photographs are
23  important because they do show that without a doubt he was
24  conscious during the beating at some portion.
25          We also know that there was eight to ten blows

1   that would render him unconscious.  Even though he was

2   unconscious, that did not stop the defendant from beating

3   him.  The reason why that is is because the coroner

4   indicated to us that, looking at Exhibit 198, he was down

5   on the carpet when she continually kept hitting him.  The

6   reason that I point that out now, to show that to you,

7   because isn't that overkill?  Isn't that shocking?  Isn't

8   it terrible that not only has he gone through all of this,

9   but now when he had been down there on the ground, perhaps

10   making moaning noises, perhaps sighing, perhaps crying

11   noises that he is making when he's down on the ground or

12   perhaps the blood gurgling from his mouth, what does she

13   do?  She continues to beat him.  She continues hitting him

14   with the lamp or bar stool over and over again.  So it

15   causes his head to go back and forth on the carpet to cause

16   that damage right there to the right cheek, the upper part

17   of his head.  She is grinding his head into the carpet

18   every time she hits him.  Isn't that what was shocking?

19   Isn't that shocking?

20          Additionally, it isn't restricted to hitting him

21   and driving him into the carpet.  But we also have an

22   indication that he was at least face down at one point.

23   And right in the mouth.  That's because, again, she

24   indicated she never hit him in the mouth.  He was down on

25   the ground and she continues to hit him over and over

1   again.  And we do know that during the hour and a half that

2   he was with the poison in him, we do know that she wasn't

3   crying then.  We also know that when she finally exited,

4   like the specter of death, went to greet the paramedics

5   after all of this was done, she wasn't crying.  She was a

6   woman in control.  She controlled all of the situation.

7   This is what she's doing.  She's just taking care of him,

8   making sure that he didn't make any noise so that no one

9   would find out.

10          Additionally, she also hits him in the nose when

11   he's down on the ground.  But she never hits him in the

12   face.  That just shows you he never got up.  And his face

13   is down on the ground, getting pummeled over and over and

14   over again.  And if at some point he regains consciousness

15   then there's mental anguish.  If he doesn't regain

16   consciousness, it's shocking to continue to beat somebody.

17   Either way, it's not a very good thing what she is doing.

18   Either way it's an absolutely horrific thing she is doing.

19   Because if he's awake then she should really stop and let

20   him at least cry out.  And if he's not then she continually

21   keeps beating him.

22          Remember Dr. Keen told you because of the beating

23   that she gave him, it would have only taken two minutes for

24   him to bleed out in the back of the head because it is just

25   such a horrific set of hits that he took to the back of the

1    head.

2            In terms of cruel, if it's there, it's absolutely

3    there because he has suffered the hour and a half to two

4    hours.  Physical pain in addition to mental anguish.

5    Additionally, even though the paramedics arrive, the mental

6    anguish that he felt because he probably thought he was

7    dying from cancer exacerbated the situation when he has

8    this hope and goes to grasp on to the hope and she just

9    tears it way, striking him over the head.  And the anguish

10   of that is immeasurable.  It's insurmountable.  Nothing

11   that we can even quantify.  It's cruel.  And she did it.

12   She did that to him.  Nobody else did it to him.

13            So we do have a cruelty factor.  But you know at

14   some point, she continued with her task.  We know that that

15   task included hitting him continually over and over again

16   until she broke the bar stool.  Until she broke the lamp.

17   Keep in mind, she has her wits about her to the point she

18   was staging the scene after this horrible thing she had

19   done.  Able to take the lamp out, place the knife there,

20   walk around and place blood here to make it seem like he

21   did something he did not do.  To make it seem like she was

22   the person that was being the victim here.

23            So let's talk a little bit about the next two

24   items that you will be asked to decide on.  And they are

25   "heinous" or "depraved."  These are defined for you.  The

1   term "heinous" or "deprave" focuses on a defendant's state

2   of mind at the time of the offense as reflected by her

3   words and acts.

4          In other words, we can't go into her mind to know

5   exactly what she was thinking but we take a look at what

6   she did before, months before, however long, and what she

7   did after.

8          So, for that purpose we take a look at what she

9   did immediately after she does all this to her husband,

10   after she has done this to the person that she's been with

11   for this period of time.

12         What does she do?  Washing up because she never

13   looses control.  And she goes and sends them away.  What

14   does she do after that?  She stages the scene.  Again,

15   always thinking.  Never emotional.

16         What did she do before that happened?  Always

17   thinking.  Ordering the poison in somebody else's name

18   ordering the poison so that will mimic some of the side

19   effects of chemotherapy, like a heart attack.  Always

20   thinking.  So you take a look at that.

21         And then you apply what you know about her to

22   what happened inside.  We know that she hits him in the

23   back of the head.  We know that he is down and she's

24   continuing to hit him until he basically goes unconscious.

25   So what then happens?  Well, the jury instruction tells you

1   that a murder is especially heinous if it is hatefully or

2   shockingly evil; grossly bad.

3          Well, let's see what else she did to see if it is

4   shockingly evil or grossly bad.  Let's take a look at

5   Exhibit 201.  Just look at what she does to the back of his

6   head.  She just absolutely made it nothing more than a

7   pulpy piece of matter.

8          That's what she did.  What's shocking about that,

9   what's evil about that is that he was unable to resist.   He

10  did nothing to deserve this other than love her and get

11  sick.  And the reason she did this was for money.   The

12  reason that she did this was because he didn't die quick

13  enough.  And I mean he didn't die quick enough from the

14  cancer.  I mean, he didn't die quick enough from the

15  poison.  You see she couldn't wait for the cancer to take

16  him over.  She couldn't wait for the poison to take over.

17  And so this is what she did.  Is that shockingly evil?  Is

18  that grossly bad?  Yes, it is.  Especially since he can't

19  get up.  There is nothing he can do about it.  And she did

20  it while their two kids are in this apartment.  But I guess

21  we really should give her credit for placing the pillow in

22  his mouth so his crying couldn't be heard by his children.

23  Perhaps that's one of the credits we can give her.

24          It also indicates a murder is especially depraved

25  if it's marked by debasement, corruption, perversion or

1  deterioration. In this case, that's what that is all

2  about. In order to find heinous or depraved you must find

3  the defendant has such a mental statement as exhibited by

4  engaging in at least one of the following actions: You

5  have to find another factor in order to find that. In

6  other words not only does it have to be shocking, not only

7  does it have to be evil, but you have to find one of the

8  other factors; the infliction of gratuitous violence upon

9  the victim. Was there infliction of gratuitous violence on

10  the victim? Absolutely. We know that he was going to die

11  from the poison because he had ten times the lethal dose.

12  She could have just left it at that. She didn't need to

13  make this a massacre. Because that's what it really was.

14  You've seen the picture of the apartment. There's blood

15  everywhere. She just kept hitting him, even though he's

16  bleeding from the head and it was going in all directions.

17  Even though he's vomiting. Even though all of that is

18  going on, she continues to hit him.

19       So you need to find the next issue is whether or

20  not there was infliction of gratuitous violence on the

21  victim.

22       Well, the reason there was gratuitous violence on

23  the victim is everything that happened after Chris

24  Hashisaki left is gratuitous. She didn't need to do it. I

25  would even argue to you the fact that he's going to die

1   from cancer means that anything that she did is

2   gratuitous.  But for the legal reasons, I'll stop with the

3   poison and tell you that he was going to die anyway.  So if

4   he's going to die anyway why then should she continue to

5   beat him about the back of the head?  Why then does she

6   continue to hit him 23 times, even though he has already

7   lapsed into unconsciousness.  Why should she continue doing

8   that?  Why should she stuff a pillow down his mouth so

9   blood pools there so that it goes up in his nose?  So that

10  he didn't even have the dignity of a normal respiration.

11  He didn't even have that because he has something in his

12  mouth so he can't breathe.

13           You also then have something else which she then

14  does is that she takes a knife and she does something with

15  it.  According to Dr. Keen when she stuck the knife there

16  and pulled it.  According to him, the width and the size of

17  it was the size of a palm, like this.  That's how big the

18  gash was.  That's how big the last blow was, if you will.

19           And in this context, the reason we're talking

20  about it is because gratuitous violence refers to violence

21  committed upon the victim beyond what's necessary to kill.

22  Was it necessary for her to kill him three or four times

23  over? Was it really necessary?  No, that's shocking.  Was

24  it necessary for her to know he's going to die from the

25  poison?  Is it necessary for her to then beat him over the

1   head and kill them that way?  Well, no.  Was it necessary

2   for her to stuff a pillow so he might perhaps asphyxiate?

3   No.  Was it necessary for her to then turn around and stick

4   a knife and do this to him? That's what she did to him.

5   Was it necessary to her to do that?  It absolutely was

6   not.  He was never going to get up.  And part of the reason

7   that it was unnecessary is that if she just wanted to keep

8   him quiet so that he couldn't be heard from outside she

9   could have stuffed something in his mouth and held him

10  there.  She didn't need to hit him over and over.  He did

11  try to get up and couldn't.  So, while they were out there,

12  she could have just stuffed something in his throat to keep

13  him quiet.

14          She didn't need to do any of this.  Was it

15  necessary?  No, it wasn't.  So, there is that element that

16  is also met.  So now you have this depravity and you have

17  the heinous element met.

18          It does tell you then to assist you in and help

19  you while you're back there in determining whether or not

20  this murder is heinous or depraved, you can consider

21  certain factors.  And the first one is whether or not the

22  murder was senseless.  And one of the things that we can

23  all agree that there was no reason for her to kill him.

24  There just wasn't any reason.  The money, that was

25  important.  Is money something that justifies that sort of

1    thing?  It doesn't.  And even, let's say that she gets to

2    the point where she is giving him the poison.   Isn't it

3    senseless to then continue killing him over and over

4    again.   Isn't it a totally and absolutely senseless

5    murder?  Yes.  Every crime is senseless.   Every single

6    crime out there.  All murder is senseless.   But this one

7    goes way beyond that.  Of course.

8            Not only is she out there being the bell of the

9    ball, not only is he being a house husband, if you will,

10   not only is she having total freedom, having affairs doing

11   whatever she wants, going out with her friends, not only is

12   she doing all of that, and not only is he going to give her

13   lots of money once he dies, but does she need to kill him?

14   Can't she wait a couple of months?  That's what makes this

15   so senseless.

16           Finally, the other element that will assist you

17   in determining if the murder was heinous or depraved is

18   whether or not the victim was helpless.   It does tell you

19   that helplessness is proven when the victim is unable to

20   resist.  He wasn't able to resist.   And then it also tells

21   you that neither senselessness or helplessness standing

22   alone are sufficient to prove that this murder was heinous

23   or depraved.

24           As previously stated, the terms especially

25   "cruel," "heinous" or "depraved" are to be considered

1   separately, but proof of any one of these factors is

2   sufficient to establish this aggravating circumstance.

3          In this case, you have all four elements met.

4   There was pecuniary gain and there was cruel and heinous

5   and depraved.

6          That last item I wanted to leave you with is to

7   take you back to the apartment. We know that after beating

8   him, after poisoning him, after taking a pillow and

9   stuffing it in his mouth, for the purposes he wouldn't make

10  any noise, they wouldn't hear any crying she then

11  administers the coop-de-grais, that is a knife wound right

12  here to the left. And if you're back there, after he's

13  just absolutely down, and if you step back, you say to

14  yourself, oh, my god, this is so terrible. This is just

15  beyond anything that a human being should, one human being

16  should do to another. That's what this murder is about.

17  That's what she did. And all the tears in the world are

18  not going to wash away what she did that night. Nothing

19  can wash it away. That's what she did. And, in fact, when

20  she stuck the knife in there and then he's bleeding out

21  this last portions of his life, as he's going, as he's

22  dying, that you could almost hear the angel of death

23  whispering, you almost hear the angel of death which, per

24  the poet: Ungently I took that which ungently came. And

25  what that's telling you here is that Joseph Andriano, only

1  achieved peace in death because it was so horrific, what

2  happened on his way to death.  He had to endure a poisoning

3  that was ungentle.  He had to endure a beating with a lamp

4  and bar stool.  That was certainly incredibly ungentle.

5  And he's bleeding out in the living room of the place that

6  he's supposed to be the most secure place in the world for

7  him, his own home with his kids there.  That's certainly

8  ungentle.

9          And finally, if that weren't enough she has to

10  disfigure him.  She has to mutilate him in the area where

11  all of this started; where the cancer started.

12          I ask you when you go back to deliberate, to take

13  all of this into account.  I ask that you find that this

14  defendant, because of greed, because she was money hungry,

15  did the shockingly, horrible mutilating kind of murder.

16          I ask that you return a verdict and find that

17  there was motive, there was pecuniary gain and this was

18  cruel and this was heinous and this was depraved.  Thank

19  you.

20          THE COURT:  Mr. Patterson.

21          MR. PATTERSON:  Judge, if I could have a moment

22  to set up?

23          THE COURT:  Yes.

24          MR. PATTERSON:  Thank you, Judge Ishikawa,

25  Counsel, Wendi, ladies and gentlemen of the jury, this is

1   not a death penalty case.  This is not a death penalty

2   case.

3              MR. MARTINEZ:  I'm objecting as to improper

4   argument.

5              THE COURT:  Overruled.  Continue on.

6              MR. PATTERSON:  This is not a death penalty

7   case.  It is not a death penalty case based on that the

8   State has not proven beyond a reasonable doubt that there

9   are aggravating factors in this case.

10             Aggravating factors are those things that

11  differentiate first-degree murders from other first-degree

12  murders because the death penalty is not intended to be

13  given in all first-degree murder cases.

14             So we have a Phase II.  That's why it's incumbent

15  upon the Government to prove beyond a reasonable doubt the

16  existence of aggravating factors.  Now, proof beyond a

17  reasonable doubt is proof that leaves you firmly convinced

18  of an issue.  Of course, you're familiar with that concept

19  because it is the same concept you used to determine guilt

20  or innocence in Phase I.

21             You were all firmly convinced that Wendi's

22  conduct on October 8, 2000 was not justified as a matter of

23  law.  You were firmly convinced that what she did that day

24  was not self-defense.  That's why you rendered the verdict

25  that you did.

1          Now, it's somewhat hard for me because I don't

2    know what else you believed to be true during the course of

3    Phase I because, obviously, we haven't had a chance to

4    discuss the substance, the circumstances, the facts of

5    Phase I.  But I'm confident that you will also conclude

6    that the facts and circumstances of this woman's life with

7    her husband in the years prior to October 8, 2000, are not

8    so cut and dried.  That there is no doubt there are things

9    that were testified to during the course of this trial that

10   would cause you to believe that life was not so simple with

11   Joe Andriano as that gentleman would have you believe.

12          I'm also confident that you understand that the

13   circumstances of Joe's death on October 8, 2000 are also

14   not so cut and dried.  That there are things that happened

15   that evening that she testified to that are, in fact,

16   true.  That maybe her conduct was such that it's not

17   justified as a matter of law but she described to you the

18   facts and circumstances of that evening.  And she described

19   to you the facts and circumstances that led up to that

20   particular incident on that particular morning.  The facts

21   and circumstances of Joe's death are not or have not been

22   established by the government beyond a reasonable doubt.

23   Because that was testified to by the only expert in this

24   case that was during Phase II, that was Dr. Philip Keen.

25          The reason he was called, because it's incumbent,

1    the rules require the Government to prove especially cruel,

2    especially heinous and especially depraved.  And the way he

3    is required to do that is have medical testimony that

4    refers to the facts and circumstances of Joe's death.

5         All of these other things, this stuff he

6    described, this conjecture, this speculation as to what

7    Joseph went through that morning, is just that; it's

8    conjecture.  It's speculation.  And it's not based upon the

9    medical testimony of Dr. Philip Keen.

10        That whole scenario that he conjured up for you

11   about Joe lying on the carpet enduring incredible pain and

12   anguish is based upon the evidence that Chris Hashisaki

13   provided.  That she is with Joe, what, five to ten minutes

14   and conjured up the entire scenario based solely upon the

15   information that Chris Hashisaki supplied about the brief

16   time she was in the apartment.

17        I'm asking you to focus on facts and focus on the

18   law that's included in these final instructions.  And not

19   rely upon conjecture or scenarios conjured up for you by

20   this gentleman not based in fact.  If there's reasonable

21   doubt for Wendi Andriano, you have to give her the benefit

22   of the doubt.

23        Now let's talk about pecuniary gain.  That's

24   economic benefit.  That acquiring something of value as a

25   result of killing another human being.  Now, you heard

1    about the kind of woman that Wendi was, what, seven or

2    eight years prior to October 8, 2000.  Did they present to

3    you the kind of woman that was motivated by economic gain

4    in her daily life?  She endured a series of economic

5    hardships while married to Joe Andriano and she didn't

6    leave him.  She endured the failure of at least two

7    businesses.  She endured a life with Joe and times when he

8    could not work and then she was the principal sole wage

9    earner for the family.  She did not leave Joe Andriano when

10   economic times were hard.  And I suggest to you that that

11   shows that the character of the woman was far more than the

12   events in these six or eight months in anticipation or

13   advance of October 8, 2000.

14        You get a better feel for what Wendi Andriano is

15   actually like when you look at the totality of her life

16   with Joe Andriano and not focus solely upon the last six or

17   eight months of this relationship.  Now, we know that it's

18   a fact that there was no life insurance policy ever issued,

19   at least in existence at the time of his death that named

20   Wendi Andriano as beneficiary.  The only life insurance

21   policy was for the benefit of Joe's mother and father.  So,

22   the death of Joe Andriano could not, in any fashion, have

23   been done to acquire any proceeds of any life insurance

24   policy.  They did not exist.  And that whole body of

25   evidence, if you will, pertaining to her trying to acquire

1   life insurance policies is of no moment, whatsoever in this

2   phase of the proceedings, because the fact of the matter is

3   killing Joe would in no way ensure to her this economic

4   benefit in terms of a life insurance policy.  That is

5   completely a non-issue in this phase of the proceeding.

6   The only source of economic gain that's available to Wendi,

7   that's related to Joe, was a medical malpractice lawsuit.

8        Now, you heard what Attorney Miller had to say

9   about that particular lawsuit.  That there was no certainty

10  in terms of recovery, either an amount or, in fact, that

11  money would be recovered.  There is always risk to pursue a

12  lawsuit.

13       Now, she stood to recover economically if she

14  just did nothing.  If she just had sat back and did

15  absolutely nothing with regard to Joe Andriano, she would

16  ultimately recover from the lawsuit.  So how can it be that

17  that lawsuit was a motive to kill Joe because if she didn't

18  kill Joe, if she just sat back and let the cancer run its

19  course, she stood to get that pot of gold that that

20  gentleman describes.

21       So, it begs the question to suggest that she

22  killed him to get the money.  She would have gotten the

23  money anyway.

24       So there must have been another fact that we need

25  to consider here in terms of assessing the recovery and

1   lawsuit and her motivation for killing.  Now, what the

2   Government has suggested a principal theme and theory in

3   this case is that she accessed the sodium azide so she

4   could surreptitiously and clandestinely poison Mr. Andriano

5   and ensure then she would recover from that lawsuit.  And

6   he ascribes to her with that theory a great deal of

7   sophistication.  She's not a boob.  She is not an idiot.

8   She's plotting and theorizing and planning to acquire

9   something that would ultimately fool the authorities in

10   terms of cause of death of Joe Andriano.  And to that end,

11   she purportedly acquired sodium azide for this purpose.  If

12   there's a person of sophistication, is it seems to me wise

13   enough to realize that the only way she can recover on the

14   medical mal lawsuit is if she kills him over a fashion that

15   fools the authorities, fools them into believing it's a

16   heart attack or something attributed to the cancer.  Does

17   she absolutely, on October 8, 2000, become a blooming

18   idiot?  He is suggesting that she is so smart over here but

19   when it actually came to that moment in time when she had

20   to make this critical decision, she became a stark raving

21   idiot.  Because as soon as she picked up that bar stool and

22   struck Joe Andriano in the head, no longer is it possible

23   that he died from the cancer.

24          So from that point in time she when she made that

25   decision to use the bar stool, for whatever purpose, she'll

1   tell us it was in self-defense, you may have rejected that,

2   but, the fact that she used that bar stool immediately

3   caused her to loose any and all recovery on the medical

4   malpractice lawsuit.  All she had to do is be so smart as

5   he suggests, just let him lay there.  If the poison that

6   she had administered to him without his knowledge was

7   sufficient to do the job, just let him lay there and go and

8   get more Kool-Aid, get another dose.

9           What she did is persist in the master plan to

10  have him die as a result of sodium azide poisoning.  The

11  experts would not be able to discern that he had not died

12  as a result of the cancer.  This should become clear when

13  this gentleman suggests she's a complete idiot on the

14  point.

15          If economic motive is what causes her to kill Joe

16  that morning, she could pass on it, pick him up, put him in

17  bed and try another day.  If economic motivation was the

18  motivation for killing Joe October 8, 2000, those are the

19  things she would have done if she was as smart, as

20  sophisticated like the gentleman suggests.

21          Now, it's obvious that what motivated Wendi at

22  that point in time when she elected to use the bar stool

23  was not economic well-being.  It's not her economic

24  well-being that motivated her to strike her husband

25  multiple times.  Maybe it was anger.  Maybe it was rage.

1   Maybe it was hatred.  Maybe it was the result, if you will,

2   of seven years of marriage with this gentleman.  But it

3   certainly wasn't economic self-interest.  And that's the

4   aggravator that they have selected to try and differentiate

5   this case from the norm of first-degree murders that we

6   have in our community.  And they need to differentiate this

7   particular case from the other cases because not all

8   first-degree murder cases result in the death penalty.

9           Now, it's clear that the chemical did not kill

10  Joe Andriano.  He didn't die of a heart attack.  And as a

11  result of the events that happened October 8, 2000, the

12  lawsuit was dismissed.  If she is as sophisticated as he

13  suggests, that eventually she would have anticipated what

14  would invariably happen the moment she touched that bar

15  stool.  It was not an economic motive that caused her to

16  kill Joe Andriano.  That has not been proven beyond a

17  reasonable doubt.  It has not been proven by evidence that

18  leaves you firmly convinced that that was the impetus, the

19  motivation, for the death of Joe Andriano.

20          Well, there are three other factors that have

21  been alleged by the Government as aggravating factors in

22  this case, aggravating factors that cause this case to rise

23  above the norm of first-degree murders, that cause this

24  case to potentially be a death penalty case.  He made some

25  generalized declaration about the others.  The nature of

1   the case is shockingly evil.  I'm certain that you can

2   conceive of a case and other facts that are truly,

3   shockingly evil and are far more significant, far more evil

4   than the facts and circumstance of this case.  The World

5   Trade Center, the Federal Building in Oklahoma, those are

6   the kind of truly shockingly evil.

7           This is a case of domestic violence that is in

8   terms of domestic violence kind of thing that happens in

9   our community unfortunately all too frequently.  This is

10  not a case that in general is shockingly evil.  But, by

11  generalizing and focusing your attention away from the

12  particulars that you need to assess it the Government or

13  the State's expectation is you won't focus on the law and

14  you won't focus on the facts that are germane in the case.

15  That's why I'm asking you to focus on the facts, focus on

16  the instructions.

17          Let's break it down here.  The three factors that

18  remain, especially -- I use this adjective, drop the

19  adjective and it's just cruel and heinous or depraved.

20  You'll be instructed that all first-degree murder cases are

21  cruel.  That all first-degree murder cases are heinous.

22  That all first-degree murder cases are a measure of

23  depraved.  That's not the standard.  The modifier, the

24  adjective is especially cruel, especially heinous,

25  especially depraved.  That's why you need to focus on the

1    facts and focus on the law.

2           Now, all three of these factors in some fashion

3    bear upon medical testimony.  That's why the State brought

4    Dr. Keen back.  When he first testified in the guilty

5    phase, it is more, if you will, on the medical exam of Joe

6    Andriano.  When he came back, he focused his questions with

7    or my questions were more focused -- we need to understand

8    that concept of cruelty.

9           Now, what did Dr. Keen tell us as a result of his

10   examination of Joseph Andriano?  Well, he cannot tell you,

11   based on his examination, the sequence of the wounds or the

12   sequence of events that gave rise to those wounds.  He does

13   know that once the fight started, Joe passed away in

14   several minutes.  It was not a long, protracted, of great

15   duration experience that Joe went through on October 8,

16   2000.

17          According to Dr. Keen, he would have died in

18   several minutes.  He does know that he was alive at the

19   time the carotid artery was severed.  We know that because

20   there was evidence of arterial spurt which means the

21   carotid artery was active.  Which is one of the criteria

22   for living.  So we know that Joe was alive at the time his

23   throat was cut.  He does know that in order to experience

24   pain, a person has to be conscious.  A person who is

25   unconscious does not experience pain.  And this experience

1  of pain is an essential prerequisite for the Government to

2  establish beyond a reasonable doubt for the aggravator of

3  especially cruel.  He doesn't know at what point in time

4  Joe lost consciousness.  But he does know that at least

5  eight to ten of the total blows were sufficient to render

6  him unconscious.  So there is a distinct possibility,

7  statistically, that the first blow could have rendered Joe

8  unconscious.

9         And it could have been that blow that Joe

10  anticipated, placed his hands in a defensive posture when

11  he was struck by the bar stool.  We don't know that not to

12  be the fact.  And anything other than that is pure

13  conjecture on your part.  And it's pure conjecture on his

14  part.  And when it's medical uncertainty, there is

15  reasonable doubt.  And when there's reasonable doubt, the

16  benefit of that doubt goes to Wendi Andriano.  She gets the

17  benefit of the doubt.

18         You heard Dr. Keen testify there is no way he can

19  tell you with proof, if you will, beyond a reasonable

20  doubt, at what point in time Joe Andriano lost

21  consciousness.  What else did Dr. Keen tell us?  He told us

22  that the injuries that he observed, the contusions were

23  localized in the rear of his head, on the top of the

24  shoulder.  There were no gratuitous injury inflicted on Joe

25  Andriano.

1          All the injuries that he sustained was inflicted

2     with one purpose in mind, that was to kill Joe Andriano.

3     There was no gratuitous violence visited upon him.  They

4     keep use the term "overkill."  If you look in your

5     instructions, you won't find the word "overkill."  You

6     won't find the concept "overkill."

7          What you'll find is the definition of gratuitous

8     violence is violence committed upon the victim beyond that

9     necessary to kill.  And you heard Dr. Keen testify that

10    every blow that he sustained to the head and to the throat

11    collectively resulted or caused the death of Joe Andriano.

12    But there were no blows inflicted upon him of significance

13    that were not calculated and did not collectively result in

14    the death of Joe Andriano.

15         The cutting of the throat was not gratuitous

16    violence because Joe was still alive at the time that

17    occurred.  And that contributed to his death.  Gratuitous

18    violence refers to violence committed upon the victim

19    beyond that necessary to kill.  It is apparent from

20    Dr. Keen's testimony that cutting the throat was necessary

21    to kill.  The blows inflicted on the back of the head were

22    necessary to kill.  That was not gratuitous violence.  And

23    his argument is not grounded in the law, because he didn't

24    die of the cancer and he didn't die of the chemical and he

25    did die of the blows to the head and didn't died of the

1   knife slashing, that somehow that's overkill and somehow

2   that's gratuitous violence that is contrary to the law.

3   I'm asking you to focus on the facts and focus on the law.

4       The force she used that evening may have been

5   more than necessary to repel the threat.  And hence, or

6   because of that, that was not justified and it was not

7   self-defense.  And, therefore, we have a first-degree

8   murder victim (sic) -- verdict.  But that's a separate

9   issue.  The force that she used was not gratuitous because

10  it's not more than necessary to kill.  And that's the focus

11  of today's phase.

12      We're talking about the concept of pain in the

13  context of especial cruelty.  In every murder there is a

14  measure of pain.  That's unavoidable because of the things

15  that need to be done in order to affect a homicide.

16      What we're talking about is especial cruelty.

17  We're talking about pain that was intended or pain that was

18  reasonably known to have occurred or probable to occur as a

19  result of the mechanism imposed.

20      Let's talk about the chemical sodium azide.  If

21  there's one thing we know about sodium azide, is that we

22  don't know a whole lot about sodium azide.  We had experts

23  that testified, Dr. French from the Medical Center in

24  Tucson, Dr. Collier, Dr. Keen.  All of these folks had to

25  go to the resource books to access information about sodium

EXHIBIT WW

1   azide.  It's not a commonly known, commonly accepted,

2   commonly used chemical.  So because of that, we cannot

3   believe, we cannot suggest that she was aware of how this

4   particular chemical would work its way on Joe Andriano.

5            Obviously, if you pull a gun on somebody and

6   shoot them, you're aware how that's probably going to

7   effect them.  If you subscribe to the Government's theory,

8   she clandestinely poisoned him.  You also have to believe

9   she didn't really know what she was doing.  That obviously

10  she's never done this before.  That there wasn't a

11  prescription or recipe to how to do this.  That the results

12  or consequences of ingesting this stuff were so well known

13  that she, as a citizen, would be aware of how this

14  mechanism of death would occur with her husband if she

15  gives it to him.  And the standard in this case is that she

16  had to know that the method that she imposed would

17  necessarily result in especial cruelty.

18           There is no way she could have known this.  In

19  fact, the only testimony you have is just to the contrary.

20  Her testimony is that they did it jointly.  Her testimony

21  is they had this kind of TV-land notion of what would

22  happen if you ingested this kind of substance.  That it

23  could cause you to have a heart attack.  You would go

24  peacefully in your sleep.  You recall the testimony.  This

25  is what she envisioned if you subscribe to the Government's

1    theory that she intentionally poisoned him.  She couldn't

2    have anticipated he would be on the floor, that he would

3    have been laying there for Chris Hashisaki to come visit.

4    These are things she couldn't have anticipated.

5             Further, there is no evidence, whatsoever, that

6    Joe was aware of the fact, as the Government suggests, she

7    was trying to poison him.  So, this period of time that he

8    conjures up where he's writhing on the floor, there's no

9    way he could have attributed to his problem at that point

10   to the conduct of Wendi Andriano.

11            According to the Government's theory, he did not

12   know what happening to him.  So that particular evening

13   could not have been any worse than the days that he had

14   with the chemotherapy or the cancer, because that was the

15   things in his mind that were causing him the nausea and the

16   vomiting in the weeks proceeding October 8, 2000.

17            You can't ascribe that to Wendi, because the

18   Government tells you he didn't know he was being poisoned.

19   And if you believe Wendi's version that it was a joint

20   suicide attempt, you certainly can't ascribe anything he

21   experienced at that point, after ingesting the sodium

22   azide, to Wendi.

23            The only thing we know for certain, ladies and

24   gentlemen, is that the sodium azide caused him to be

25   nauseous and caused him to vomit.  That's all we know in

1   this case.  And we don't know what measure of pain or what

2   measure of anguish the nausea and vomiting caused Joe.

3   Again, we're talking about medical uncertainty.  We are

4   talking about uncertainty that is reasonable doubt.  And if

5   there's reasonable doubt, Wendi gets the benefit of that

6   doubt.

7           The last two factors are usually taken in

8   together.  They are separate, in fact, but they are usually

9   kind of defined and described and talked about in death

10  penalty cases together.  Again, they have to be proven

11  beyond a reasonable doubt and they have to be proven to be

12  especially heinous and especially depraved.

13          One thing you need to find -- I'll read the

14  instructions on page 10:  In order to find heinousness or

15  depravity, you must find that the defendant had such a

16  mental state as exhibited by engaging in at least one of

17  the following actions:  One, infliction of gratuitous

18  violence on the victim.  Two, needless mutilation of the

19  victim's body after death.

20          These two concepts are further defined in the

21  instructions.  Again, I read this to you earlier but,

22  again, I need to repeat it:  In this context, gratuitous

23  violence refers to violence committed upon the victim

24  beyond that necessary to kill.  And in this context,

25  needless mutilation means the defendant in an act separate

1 from the killing itself, committed other acts with the

2 intent to mutilate the victim's corpse.

3         There is absolutely no evidence to support either

4 of those two concepts or support either of those two

5 definitions. We talked about the testimony of Dr. Keen

6 that all of the blows that Joe sustained were necessary

7 collectively in order to kill Joe Andriano.

8         We heard Dr. Keen testify that there were no

9 other marks on Joe that were mutilations in the sense

10 that's described in this particular instruction. All of

11 the blows were localized. All of the blows were in one

12 generalized location which would have been the result of

13 the conduct or the actions that were necessary to kill Joe

14 for whatever reason Wendy had that particular morning.

15         Because of my argument or belief that there is no

16 proof beyond a reasonable doubt to support either of those

17 two propositions, you don't even get to the concept of

18 senselessness or helplessness because you can't go

19 backwards. You can't say it was helplessness, it was

20 senseless, therefore it was heinousness and depraved. You

21 don't even get to the concept of senselessness or

22 helplessness unless you find infliction of gratuitous

23 violence of the victim or needless mutilation of the

24 victim's body after death.

25         In terms of senselessness, it seems to me the

1   Government is talking out of both sides of its mouth.   They

2   are suggesting that there was an economic motive for the

3   killing, which, certainly is not senseless.   There was a

4   rationale or reason for doing what she did, which is

5   senseless -- or not senselessness.   And to that end, they

6   can't have it both ways.   They can't argue over here that

7   it's especially for pecuniary gain and there's some sense

8   to it or some rationale for it and then argue over here

9   that it's senseless.   That's doesn't make sense and it's

10   not intellectually consistent or logically consistent.

11         Now, again, we've discussed the concept that all

12   first-degree murders are to some extent heinous, cruel or

13   depraved.   And in order to find that this case qualifies

14   potentially for the death penalty, you need to determine

15   whether the State has proven beyond a reasonable doubt that

16   there are factors that set it apart from the norm of

17   first-degree murders.

18         We're aware that this is your first experience

19   with death penalty issues.   But, and because of that, you

20   need to go back in the back room and discuss thoroughly all

21   of the relevant facts in this particular case.   That it

22   cannot be decided eviscerally.   You cannot decide it by

23   your gut.   It needs to be decided rationally with the

24   application of facts to the instructions that will be read

25   to you and given for your consideration back in that jury

1    room.

2             I ask you not to engage in speculation, not to

3    engage in surmise and hold the Government to its burden of

4    proof beyond a reasonable doubt on these particular

5    issues.

6             I don't want anything to -- I don't want any of

7    you to believe that anything I have said in this case, in

8    Phase I or Phase II, was meant to minimize the death of Joe

9    Andriano.  It was a horrible tragedy that impacted at least

10   two families significantly.  Nothing I've said, nothing

11   I've argued was intended to minimize Joe Andriano.  I

12   brought forward information that I thought was necessary

13   for your consideration in coming to a proper verdict in

14   this case.  Again, I repeat that this is not a death

15   penalty case because the State has not proven beyond a

16   reasonable doubt that aggravating factors exist.

17            So I ask you to let this case end at this stage.

18   I ask that you find that there are no aggravating factors.

19   I ask that you let Judge Ishikawa sentence Wendi to life in

20   prison.  Thank you for your time.

21            THE COURT:  Mr. Martinez.

22            MR. MARTINEZ:  In this particular argument you

23   saw another technique that is a little bit more common in

24   debate.  That is something called ad homonym.  Basically

25   what happens is rather than addressing the issues, what you

1    do is you attack the person that is delivering the other

2    argument for your consideration.  Rather than talk about

3    the facts, rather than talk about the law, what you do is

4    you just focus on the other individual so that you can

5    discredit them and hopefully in that way you will believe

6    what the speaker is saying.

7            For example, one of the things that he told you

8    over and over, "well, that gentleman" or "the State

9    conjured up the evidence" or "conjured up a scenario" over

10   and over again.  They want you to believe somehow the State

11   made it all up.  Now, the State made up these injuries.

12   Somehow they made up the fact of the poison.  They want you

13   to disbelieve the speaker because they don't want you to

14   focus on the facts.

15           Additionally, they say, well, not only did he

16   conjure these things up, but he talked out of both sides of

17   his mouth.  He said one thing on this end and said another

18   thing on the other end.  But they gave you no examples to

19   follow that up.

20           It's easy to make a claim.  It's really easy to

21   stand up here and say somebody is talking out of both sides

22   of their mouth.  It's really very easy to say somebody

23   conjured something up.  But you have sat through 11 weeks

24   of trial, maybe close to 12 weeks.  You know what the

25   evidence is.  You saw the photographs.  You heard the

61

1  witnesses come in.  If there's anybody that's conjuring

2  anything up, if there is anybody here that can be labeled a

3  conjurerer or a liar, it isn't the prosecutor.  It

4  certainly isn't.  He's not the one that's the liar here.

5  It maybe someone else here in this courtroom, the one who

6  can't keep her story straight, Sharon Murphy.  The one who

7  can't, when questioned about things and say, yeah, I lied

8  over and over again.  Perhaps it's somebody who submits

9  false documents in connection with their student loan.

10  Perhaps it's somebody who submits false documents to obtain

11  poison.

12          Additionally, they tell you this is not a death

13  penalty case.  Again, this is just the individual talking.

14  This is a case where you should allow Judge Ishikawa to

15  sentence the individual to prison.

16          Well, the problem with that argument is that

17  there is a jury instruction that deals directly with it.

18  And it tells you that the jury is not to consider the

19  penalty.  That's not what you're going to do now.  Let's

20  make sure you understand when you get back to the jury room

21  to deliberate that you are not considering the penalty.

22  That is being forbidden by the rules and the Judge will

23  tell you that.  He will give you the law that you swore to

24  follow.  It is your duty to follow the law.  And the law

25  with regard to that issue, whether or not you are to

62

1   consider the penalty, whether or not you are supposed to

2   think this is a death penalty case, tells you, you must

3   decide whether or not the State has proved one or more of

4   the aggravating factors.  In reaching your verdict on the

5   issue of aggravating factors, you are not to consider the

6   possible punishment.

7          So then why are we filling up space?  Why are we

8   taking up time talking about a life sentence?  Why are we

9   doing that?  Perhaps is it that we don't want to talk about

10  the facts.  Perhaps it is that the facts are so shockingly

11  evil.  Perhaps what she did was so horrible that they don't

12  want to talk about it.

13         So let's do what they've done in this whole case,

14  let's minimize.  Let's sort of move the attention away from

15  what the real issue here is.  Let's make no mistake about

16  it.  The issue here is whether or not the State has proven

17  aggravating factors.  Not whether or not Judge Ishikawa is

18  going to impose a life sentence.  That's not what this is

19  about.  The law will tell you that and I'm telling you that

20  now, too.  Don't make it a much more burdensome, onerous

21  task at this juncture than it has to be.  Because other

22  arguments will follow if you do find these aggravating

23  factors that will address the issues that were presented by

24  counsel with regard to what will happen.

25         Additionally, the other thing that they told you

1    was you have to give her the benefit of the doubt.  You

2    resort to sympathy when the facts are not on your side.

3    What you do is, you start saying things that, well, saying

4    things such as the law is this when actually it's something

5    else.  And then you say things, well, you give her the

6    benefit of the doubt.

7           Over and over again they told you you should give

8    her the benefit of the doubt.  But that's not what the jury

9    instructions tell you to do.  You've read them before.  The

10   Judge has read them to you before with regard to the

11   previous trial.  And they haven't changed.  I'll read them

12   to you so that you can tell that what he wants you to do or

13   the defendant wants you to do is to focus on something that

14   is not the issue here.

15          The central issue here is not whether or not you

16   give her the benefit of the doubt.  The central issue here

17   is that you apply the law and decide whether or not the

18   State has proven the aggravating factors beyond a

19   reasonable doubt.

20          It's says, I'll read it for you to make sure

21   there's no misunderstanding:  The State has the burden of

22   proving beyond a reasonable doubt that the defendant is

23   eligible for a death sentence under the law.  And this

24   burden remains on the State throughout the aggravation

25   phase.  The defendant is not required to present any

1    evidence or proof that she is ineligible for a death

2    sentence.

3          Then it talks about in civil cases:  In civil

4    cases it is only necessary to prove that a fact is more

5    likely true than not or that its truth is highly probable.

6    In criminal cases such as this, the State's proof must be

7    more powerful than that, it must be beyond a reasonable

8    doubt.

9          Proof beyond a reasonable doubt is proof that

10   leaves you firmly convinced of the aggravating factors.

11         There are very few things in this world that we

12   know with absolute certainty.  And in criminal cases, the

13   law does not require proof that overcomes every doubt.

14         If, based or your consideration of the evidence,

15   you are firmly convinced that an alleged aggravating factor

16   has been proved then you must so find.

17         That is the law.  If the State hasn't proven the

18   aggravating factors that's when the other sentence comes

19   in.  But you don't start out and say, you know what, just

20   because she happens be on this side of the room, you give

21   them the benefit of the doubt.  Just because they are way

22   in the back of the room or because they took the witness

23   stand or whether they did all that, they get the benefit of

24   the doubt.  You don't do that.  That's not what the

25   instruction tells you.  It tells you to take a look at the

1  evidence.

2        And if you look at the evidence and you are

3  firmly convinced of whatever issue is presented to you,

4  then the inquiry is over. You do not start out by giving

5  anybody the benefit of the doubt.

6        So let's talk about some of the things that he

7  did raise. The first thing that he did was that he tried

8  to restrict you when you go back to the jury room in the

9  way that you are to approach this case.

10       He told you -- and the reason that he does that

11  is because, he wants to -- of course it's to his benefit.

12  He tells you when you get back there, you need to take a

13  look at all of the evidence. And then he went on and

14  started to tell you how you should do it and do it this way

15  or do it that way. He's trying to restrict you. The way

16  you deliberate is up to you. No one can tell you how to

17  deliberate with regard to this issue. And you know that

18  already.

19       Additionally, he tried to, if you will, narrow

20  the playing field by saying, well, the only person's

21  testimony that really bears on whether or not there was

22  this pain and mental anguish is Dr. Keen's. That's

23  absolutely not true. You have all of what happened in the

24  previous trial to consider. And you take that into account

25  with whatever new evidence was presented by Dr. Keen.

1          Dr. Keen never said that he knew the sequence of

2    events.  He just posited or tried to give possible

3    scenarios.  And there were points during his presentation

4    where he's asked, "Isn't it possible, for example, that the

5    first blow happened like this.  And that his hands were up

6    there and that's what happened and then he lapsed into

7    unconsciousness?"  He said, "That's possible but in the

8    realm of probability, I don't think so."

9          The bottom line is that they're trying to

10   restrict the field because anything is possible.  But is it

11   probable?  Is it consistent with the rest of the evidence?

12   Of courses, it isn't.  In terms of that one issue alone, do

13   you think that he got all the injuries to both hands with

14   one strike of a bar stool that hadn't been broken yet?  So

15   that it only has one edge in which to strike?  No, it

16   isn't.  But, is it possible?  Well, anything is possible.

17   Is it possible that -- you have seen the lamp -- that the

18   lamp on one hit caused all that damage to both hands?  No,

19   it isn't.  I mean it is possible but is it probable?  No,

20   it isn't.

21         Let's talk a little bit more about some of the

22   other things he raised for you.  One of the things they

23   said was, well, you know, they want you to give the

24   defendant the benefit of the doubt.  They want you to

25   somehow see her in a positive light.  They say to you, you

1   know, she stood with him through thick and thin through all

2   the failed businesses and then, something happened and I

3   think they used the term eight or six months before this

4   happened.  Don't use any of that against her.

5          In other words, don't let the most reliable

6   indicator of what she really was or how she was really

7   thinking, don't let that affect your deliberations.   Don't

8   worry about the last six to eight months.  No.  No.  Worry

9   about what happened before.

10         I see.  I understand.  Now I understand.  You get

11   a free hit on the head.  She can go ahead and bonk him on

12   the head, or conk, I think is the word that she used, conk

13   him on the head just because she stayed with him?  So does

14   every year that you stay with him, does that give you the

15   right to hit him once over the head?  It does not.

16         The fact that she, in the beginning -- and I

17   would point out that pursuant to her own admission, she

18   really didn't want to marry this guy.  So she had these

19   doubts in the beginning.  So it's not like she went into

20   this willingly.  She did it voluntarily but perhaps the

21   willingness was not there.

22         The point with all of this is they want you to

23   give her credit for things that really aren't relevant to

24   what happened.  You don't look at the last six to eight

25   months.  Of course, you do.  Those are the most relevant

1  indicators of what happened in this particular case.  They

2  show what kind of person she was.  They show what kind of

3  mentality she had.  And show what she was capable of.

4       They said, well, in terms of this case, there

5  wasn't any policy whatsoever that named the defendant as

6  beneficiary.  So, who cares?  Who absolutely cares?  She

7  sure gave it the good old college try, didn't she, to try

8  to do that.  It wasn't through no effort of hers that there

9  wasn't any.

10       Additionally, when she says there wasn't a person

11   -- that she wasn't the beneficiary, there was a life

12  insurance policy out there.  And with this life insurance

13  policy that could have been used to bury him, of course

14  there was a benefit there.  It doesn't say that you have to

15  be named a beneficiary in order for you to receive a

16  benefit.  It says that any benefit, whatever.

17       So the bottom line here is it doesn't matter that

18  she wasn't named as a person on the life insurance policy

19  in order for this to be pecuniary gain.  It doesn't have to

20  do that at all.  We also have the lawsuit.  But the life

21  insurance just shows what her mental state was.

22       They tell you that, well, you know, with regard

23  to the medical malpractice claim, one of the things that we

24  want you to know is that the State wants you to believe on

25  the one hand she was totally sophisticated and on the other

1    hand she was not so sophisticated.  And that, what happened

2    that night would have made her, to use their words, "a

3    blooming idiot."

4            The problem with that analysis is they want you

5    to then get into her head and then have you speculate or

6    think for her.  Is there anybody -- is there any doubt in

7    anybody's mind that the real reason that all of this

8    happened is because she wanted money?  Shouldn't be.  She

9    was the individual that knew that if he died before this

10   lawsuit, if he predeceased the trial, he would be worth

11   twenty million dollars.

12           Did that thought change on October 7?  No.  There

13   is no indication that there was any change in that

14   thought.  And as midnight arrived, about the time that she

15   gave him the poison around 12:30, is there anything

16   indication that that thought pattern changes?  No, there

17   isn't.  Is there any indication that at one o'clock there

18   was a change in that thought pattern?

19           Now, that he has the poison inside him, is there

20   any evidence to suggest that her thought pattern changed?

21   No, none, whatsoever.  So for an hour and a half she has

22   this thought, I'm killing him, and also reason, motive, the

23   cause, impetus, remains the same.

24           So what happens afterwards is she wants to

25   silence him.  She wants to silence him because of the

1   poison.  Because she was poisoning him.  She doesn't want

2   the paramedics to find out.

3          Do you think that in that time, while she's

4   thinking, that she says, you know what, let me step back

5   for a minute.  I know I've been sitting here for about an

6   hour and a half or two hours and I've been sitting here

7   doing whatever I'm doing.  Now that the paramedics are out

8   there I'm going to start thinking about what Jeffrey Miller

9   told me.  He's a really a nice guy.  He's really doing me a

10  big favor by talking to me about settlement.  He's doing me

11  a big favor by talking about retainer agreements.  He's

12  doing me a great big favor by keeping my husband out of

13  here so maybe we can get a little bit more money out of

14  this.  Well, who cares if Mr. Andriano is gone.  Yeah, let

15  me keep thinking about that.  You know what, even though he

16  told me that this is going to happen, that I wouldn't get

17  as much recovery, I'm going to go ahead and hit him in the

18  head.

19         Do you think that's what happened?  The motive

20  issue was never touched by the conscious or subconscious.

21  There was never any debate.  The impetus remained the

22  same.  At that point the only thing that happened is she

23  changed the modality.  What happened is she figured

24  somebody out there was going to hear him so I'm going to

25  shut him up.  It didn't change the motive.

1          And the jury instructions, which is the law that

2    you're going to follow tells you to find that the defendant

3    committed the offense as consideration for pecuniary gain,

4    you must find the defendant's expectation of pecuniary gain

5    was a motive, cause or impetus for the murder and not

6    merely the result of the murder.  You need not find that

7    pecuniary gain was a sole motivation or cause of the murder

8    in order to find that the factor exists.

9          It doesn't have to be right when you're hitting

10   him on the head.  I want, you know, I want this for the

11   money.

12         The other thing that they choose to ignore

13   throughout their whole argument is they say, well, it

14   wasn't the -- it wasn't poison that killed him.  It was

15   actually hits to the head and it was actually the knife.

16   That may be true but the poison would eventually have

17   killed him.  It's just that she couldn't wait.  So the

18   motivation is still there and it is attached to the

19   poison.

20         The other thing that he indicated, was, well, you

21   know, with regard to this particular jury instruction, the

22   prosecutor, and again, this is ad homonym attack, never

23   mentioned the terms "cruel," "heinous" or "depraved" have

24   to be especially "heinous", "cruel" or "depraved."

25         Well, the problem with that argument is you're

1   going to go back into the jury room -- mine is page 10.   I

2   don't know if that's what your page is going to be.   The

3   jury instruction reads as follows -- perhaps the chiding

4   should go towards the Judge and not the prosecutor or

5   somebody who prepared this but it says:   The terms "cruel,"

6   "heinous" and "depraved" to be considered separately --

7   oops, they didn't include "especially" -- but proof of any

8   one of these factors is sufficient to establish this

9   aggravating circumstance.

10         And then the new paragraph starts:   It's cruelty

11    -- oops, again somebody didn't say "especially".   The

12   prosecutor is just reading the law that you are going to

13   take back there.   It says:   Cruelty involves the infliction

14   of physical pain or mental anguish.

15         And then, the second paragraph on page 10 last

16   paragraph says:   The terms "heinous" or "depraved" focus on

17   the defendant.   It doesn't say "especially".

18         The point is we all understand what it is.   The

19   State is not sliding away from its obligation to make this

20   especially.   We know that.   But that's the way the

21   instructions read.   Are we supposed to insert words?

22         But, again, it's just a fatuous argument that is

23   being made to you so that you focus on something else

24   rather than what the real issue is.

25         So that brings us to the issue of gratuitous

1   violence.  They say there was no gratuitous violence.

2   According to Dr. Keen, the blows to the head and the stab

3   wounds were the ones that actually killed him.  That's

4   true.  That's absolutely true.

5          But the point that is missing here is that they

6   forget to tell you about the poison.  They forget about the

7   one and a half to two hours that he suffered.  And they

8   forget about the lethal doze that she gave him.

9          According to our experts, they told you that they

10  don't know how long it was going to take for the individual

11  to die.  But, they do know that he'll eventually die.

12         Just because she relented on one form of death,

13  doesn't mean that these others weren't excessive.  If she

14  would have just left everything alone and she just poisoned

15  him and he died, you wouldn't have had all these other

16  things.

17         In other words, the gratuitous part comes in

18  because she can't wait.  The gratuitous part is she's

19  already made him suffer one and a half to two hours.  Now

20  she wants to just kill him, again.  He is going to die one

21  way.  Then she wants to kill him a second way and a third

22  way and a forth way.

23         With regard to that particular issue, don't get

24  confused and say, well, let's throw out the fact he didn't

25  die from the poison.  That's important because it shows the

1   motive, why she did it.  Additionally, it shows if she

2   would have just waited, this gratuitous violence would not

3   have been necessary to kill him.

4          It's says in this context gratuitous violence

5   refers to violence committed upon the victim beyond that

6   necessary to kill.  Was it necessary to use all of this

7   violence to kill him?  No, it wasn't.  The poison was going

8   to take care of it.

9          One of the other things and, again, it's the jury

10  instructions where you attack the person, he says, well, he

11  keeps using the term "overkill."  You won't find that

12  anywhere in the jury instructions.  You won't find

13  conjecture, either.  There are many words you don't find in

14  the jury instructions.  But the point is that there is an

15  indication in the jury instructions that what the lawyers

16  say may help you understand and help you during your

17  deliberations.

18         So the fact that one lawyer may use the word

19  "overkill" and it's not in the jury instructions, doesn't

20  mean that the lawyer is going to put one over on you.

21  Again, you see, he's attacking the presentor, not the

22  evidence itself.

23         The other thing that he tells you is that in

24  every first-degree murder case there is a measure of pain.

25         And somehow you are expected to believe that.  Is

1   there really a measure of pain if somebody takes a gun and

2   shoots somebody in the back of the head and they

3   immediately lapse into unconsciousness, is there really a

4   measure of pain in every one of those cases?  There isn't.

5        Again, what they are trying to do is argue things

6   that are not part of this case so that you can then be

7   confused.  They ask you to engage in what's called

8   proportionality analysis.

9        What they want you to do is go out and say, well,

10   maybe, there are other cases that are proportionally

11   speaking worse than this one.  They cite you to the

12   Oklahoma City bombing and also cite you to the Twin Towers

13   killing.  They want you to start thinking about other

14   cases.

15        I'm looking at you right now and saying who cares

16   about those cases.  You don't know all of the facts

17   regarding those cases.  And if you're going to use that, I

18   would point out that you probably know what happened to the

19   person that instigated that thing in Oklahoma City.

20        The point about all that is, is it doesn't matter

21   about all the other cases.  All that matters is what the

22   facts are in this case.

23        And in this case, what she did in light of

24   everything, is it absolutely, horribly and terribly

25   shocking?  Yes, it is.  It absolutely is if you take a look

1    at everything that she did.  They want her to hide behind

2    the veil of ignorance by saying, well, she didn't know how

3    the poison was going to make him feel.  So you can't hold

4    her responsible for that.

5           The first point to be made with regard to that

6    is, yes, you do.  You accept the consequences of what you

7    did.

8           The second point is, she did after, let's say 30

9    minutes -- because he was like that for about an hour and a

10   half to two hours -- she did after 35 minute because he was

11   down on the floor in a fetal position, throwing up.  If you

12   remember, every expert said that's one of the first things

13   that would happen.

14          So for them to hide behind this veil of ignorance

15   saying please don't hold her responsible for all the pain

16   he suffered from the poison because she didn't know the

17   effects.  Even if she didn't know them to start with, she's

18   responsible for them.  And once he's down on the ground,

19   how much notice do we have to give her?  We give her a half

20   an hour.  It's one and a half hours that she knows he's in

21   pain.  What if we give her another hour to just really,

22   really get this down pat that, you know what, that really

23   hurts.  That guy is down there on the ground holding his

24   stomach, maybe you should call the paramedics, causing him

25   a lot of mental anguish.  How much time do you give her

1  because even if you give her an hour and a half or an hour,

2  she still had an hour or an hour and a half to know that.

3         So, again, they want to hide behind this, if you

4  will, this veil of ignorance.

5         They indicate there's no way she could have known

6  or could have anticipated that.  That's not what the jury

7  instructions tells you.  The jury instruction tells you

8  that cruelty -- I'm sorry they didn't include this

9  "especially" but now you know that it's in there -- but

10  cruelty involves the infliction of physical pain and/or

11  mental anguish on a victim before death.  The crime is

12  committed in an especially cruel manner when the defendant

13  either knew or should have known.

14         And in this case, she did know based on the

15  experience of seeing him down there on the ground or should

16  have known.  She researched it on the Internet.  So don't

17  give her that benefit of the doubt.  Don't allow that to be

18  something that clouds your judgement or your deliberations

19  when you go there to deliberate.

20         One of the other things that they tell you is,

21  well, we don't know if the victim was attributing his pain

22  to the chemotherapy.  In other words, the cancer and the

23  chemotherapy.  So if you can attribute it to the

24  chemotherapy or the cancer, then she's not responsible.

25  That is absolutely insane logic.

1       Does that mean he's not feeling any pain?  The

2    key here is, is he feeling pain?  Not whether he knows what

3    the source of it is.  Just because he doesn't know that

4    he's being poisoned, that doesn't mean she gets a free

5    ride.

6       Just because he doesn't know the caliber of the

7    gun that's going to kill him in a different case, doesn't

8    mean he's not going to perceive it and say, "Oh, my God."

9       In this case, they want you to give her another

10   break because he didn't know he was being poisoned.  That

11   just doesn't make any sense.  Does that take away from the

12   fact that he suffered?  Does that take away from the mental

13   anguish?  It absolutely does not.

14       And so that's sort of how they want you to go

15   about this whole thing.  That's what they want you to do.

16   They want you to set aside your common sense.  They want

17   you to give her the benefit of the doubt.  They want you to

18   take a look at the prosecutor's presentation.  And then

19   they come up with a sort of an apology and say, you know,

20   it affected both families.

21       But, again, none of that addresses what happened

22   that night.  And what happened that night -- they did talk

23   about it generally -- but what happened that night was that

24   a very motivated woman who had been able to get some poison

25   and gave it to her terminally ill husband.  And then she

1   gives it to him and for about an hour and a half to two

2   hours watched him die.  And when she thought that he was

3   about to die, that's when she called her friend over.  And

4   then the event unfolded, the bloodiness started, the

5   massacre started, the gratuitous violence took over.

6          The bottom line is, there is no benefit of the

7   doubt to give here.  The only thing that we are asking you

8   to do is to go back into the jury room, take a look at the

9   evidence.  And the evidence will show you that Mr. Andriano

10  suffered immense, mental anguish at her hands; the woman

11  that he was married to.  There was a special relationship.

12  That makes it even worse.  And not only that, he suffered

13  physically when he was down on the ground.  And he suffered

14  physically some more when he was hit on the head.

15         I ask you to go back, take a look at the evidence

16  and I ask you to return a verdict indicating that the State

17  has proven beyond a reasonable doubt both of these

18  aggravating factors.

19         MR. PATTERSON:  Judge, can we approach?

20         THE COURT:  Yes.

21         (Bench conference was held outside the hearing of

22  the jury.)

23         MR. PATTERSON:  I object to the argument with

24  regard to special relationship as an aggravator.  That's

25  been specifically repudiated by the Supreme Court in the

1    Carlson case.  I move for a mistrial based upon that.  And

2    if you don't grant a mistrial, I ask that the jury be

3    instructed that a special relationship between the victim

4    and the defendant can serve in no fashion as a basis for a

5    determination of an aggravation factor.

6           THE COURT:  Mr. Martinez?

7           MR. MARTINEZ:  During closing arguments, both

8    sides are allowed to articulate, argue, emphasize.  In this

9    particular case the Court is aware of the relationship

10    between the parties.  They were husband and wife.  And if a

11    husband is getting hit by a wife, that's mental anguish.

12    It is a special relationship.  It's a fact they're

13    married.  That a husband is being hit by a wife, somebody

14    that he loved, had kids with, is more of a mental anguish.

15           THE COURT:  Let's excuse the jury.

16           (Bench conference concluded.)

17           THE COURT:  At this point, ladies and gentlemen,

18    we'll take the afternoon break.  After you return from the

19    break, I will be giving you the final instructions with

20    regards to Phase II.

21           During the break, remember the admonition I have

22    given you.  Do not talk about the case with anyone.  Do not

23    let anyone talk about the case with you.  Keep an open mind

24    and have a nice break.

25           We'll take a 20-minute break.

1       (Jurors exited.)

2       THE COURT:  Please be seated.  This is Cause

3  Number CR2000-096032, State of Arizona versus Wendi

4  Elizabeth Andriano.

5       The record will reflect the presence of the

6  defendant and counsel.  We're outside the presence of the

7  jury.

8       Mr. Patterson, you brought up a matter here at

9  the bench.  Why don't you go ahead and is there anything

10  else you wanted to add?

11      MR. PATTERSON:  No, Your Honor.  Except to say

12  that the problem with especially heinous and depraved as an

13  aggravator is that the Government just goes far afield in

14  suggesting what can be considered in terms of aggravation.

15  They use the term "special relationship between the victim

16  and the defendant, husband and wife"  and argue that that

17  is somehow to be used by this jury to determine the issues

18  of mental anguish or special cruelty.  That's just not the

19  law.

20      That concept first found its way in the Milkey

21  case, some dicta that said that because she was the mother

22  and the victim was the son, that that somehow made it

23  especially cruel and heinous and depraved.  They backed off

24  on that in the Carlson case.  If you read the Carlson case,

25  it states unequivocally they're not going to expand this

1   particular aggravator, especially cruel, heinous or

2   depraved, by talking about the special relationships.

3         It was an issue in the Carlson case because the

4   defendant was the daughter-in-law of the victim.  And

5   quite, frankly, he crossed that line, which, unfortunately

6   it's not really his fault, because there's really no fine

7   line established with this aggravator that reins the State

8   in.

9         And so, to that end, I ask for a mistrial.

10   Absent granting a mistrial, a jury instruction is necessary

11   at this time.  The jury needs to be told they cannot, in

12   any fashion, consider special relationships between

13   defendant and victim as evidence or something they can base

14   a finding of especially cruel, heinous or depraved upon.

15         THE COURT:  Mr. Martinez?

16         MR. MARTINEZ:  He misapplies the standing in the

17   Carlson case.  The reason that I say that is that in that

18   case, they did talk about a special relationship and the

19   reason that that was repudiated was because the two people

20   that actually did the stabbing in that case were the ones

21   that were in the room with the victim.  The mother or the

22   woman that requested the killing of her mother was not in

23   the room.  However, in that case, the issue was brought up

24   by, I believe it was the State, who said, well, there is a

25   special relationship and you should use that to aggravate

1   the situation.

2          But the reason that it's different in this case

3   is that we actually have the person who did the killing in

4   the room with the person who is ultimately the victim.   So

5   that that language, if you will, that you have in the

6   Carlson case doesn't apply to us.

7          I can understand why they would say in the

8   Carlson case, well, in this particular case the fact that

9   there was a special relationship, perhaps we don't want to

10  use it because the victim didn't perceive it.   In this case

11  the victim did perceive who it was and knew that it was his

12  wife that was doing this.

13          So, for those reasons, number one, I don't think

14  that a mistrial is appropriate.   Second of all, I don't

15  think a jury instruction is appropriate, either.

16          THE COURT:  Mr. Patterson?

17          MR. PATTERSON:  I made my record, Judge.   Thank

18  you.

19          THE COURT:  I'm denying the defendant's motion

20  for a mistrial.

21          With regard to a jury instruction at this point,

22  I'm going to deny that, also.

23          We'll take a break and then when we return I'll

24  give the final jury instructions to the jury.   And,

25  counsel, as I've indicated, once we've given the

1    instructions to the jury, I'll remind them of the fact of

2    biohazardous exhibits and the rule that we have for that.

3    And then I'll indicate to them that they will go to the

4    jury room select a foreperson and give us a note with

5    regard to their schedule.

6         Once they give us that, we'll reconvene in here

7    with the jury and verify that's the schedule that everyone

8    has agreed upon.  Then I'll have the jury take a break

9    while we put all the exhibits in the jury room.  Is that

10   agreeable to everyone?

11        MR. MARTINEZ:  Yes.

12        MR. PATTERSON:  Yes, Your Honor.

13        THE COURT:  We'll take a recess.

14        (Recess taken.)

15        THE COURT:  Please be seated.  This is Cause

16   Number CR2000-096032, State of Arizona versus Wendi

17   Elizabeth Andriano.  The record will reflect the presence

18   of the defendant, counsel and the jury.

19        Ladies and gentlemen of the jury, the bailiff

20   will pass out each major a copy of the final jury

21   instructions with regard to Phase II.  I ask everyone to

22   please follow along as I read the final instructions for

23   Phase II.  And we'll go past the index to page 3.

24        Duty of jury.  As you have been previously

25   instructed, in the guilt phase of this trial, the defendant

1   was found guilty of first-degree murder.   In this

2   aggravation phase, you are not to retry the issue of the

3   defendant's guilt.   Your sole duty is to determine whether

4   the State has proved beyond a reasonable doubt that the

5   first-degree murder of which the defendant has been

6   convicted was committed with the existence of one or more

7   aggravating factors alleged.

8          It is your duty as a juror to decide this case by

9   applying these jury instructions to the facts as you

10  determine them.   You must follow these jury instructions.

11  They are the rules you should use to decide this case.

12         It is your duty to determine what the facts are

13  in the case by determining what actually happened.

14  Determine the facts only from the evidence produced in

15  court.   When I say "evidence", I mean the testimony of

16  witnesses, any exhibits received in evidence, and any facts

17  to which the parties stipulated or that I instructed you to

18  accept.   You must not speculate or guess about any fact.

19  You must not consult outside sources for information, such

20  a dictionary, a newspaper, or the Internet.   You must not

21  be influenced by sympathy or prejudice.   You must not be

22  concerned with any opinion you feel I may have about the

23  facts.   You, as jurors, are the sole judges of what

24  happened.

25         You must consider all these instructions, do not

1   pick out one instruction or part of one and ignore the

2   others.  As you determine the facts, however, you may find

3   some instructions no longer apply.  You must then consider

4   the instructions that do apply together with the facts as

5   you have determined them.

6            Lawyer's comments are not evidence.  In their

7   opening statements and closing arguments, the lawyer have

8   talked to you about the law and the evidence.  What the

9   lawyers said is not evidence but it may help you to

10  understand the law and the evidence.

11           Objections and stricken testimony.  If the Court

12  sustained an objection to a lawyer's question, you must

13  disregard it and any answer given.  Any testimony stricken

14  from the court record must not be considered by you for any

15  purpose.

16           Presumption of innocence, burden of proof. The

17  mere allegation of aggravating factors against the

18  defendant and the fact that the State is seeking the death

19  penalty is not evidence against her.  You must not think

20  the allegations are true just because they have been made.

21           The defendant is presumed not to be eligible for

22  a death sentence under the law.  The presumption remains

23  with her throughout every stage of the aggravation phase

24  and during your deliberations on the verdict.  It is not

25  overcome and the defendant is not eligible for a death

1   sentence unless from all the evidence, you unanimously find

2   beyond a reasonable doubt that one or more of the alleged

3   aggravating factors has been proved.  The State has the

4   burden of proving each aggravating factor beyond a

5   reasonable doubt and must prove it with its own evidence.

6   Proof of one factor is not evidence that any other

7   aggravating factor exists.

8            The State has the burden of proving beyond a

9   reasonable doubt that the defendant is eligible for a death

10  sentence under the law and this burden remains on the State

11  throughout the aggravation phase.  The defendant is not

12  required to present any evidence or prove she is ineligible

13  for a death sentence.

14           In civil cases, it is only necessary to prove

15  that a fact is more likely true than not or that its truth

16  is highly probable.  In criminal cases, such as this, the

17  State's proof must be more powerful than that.  It must be

18  beyond a reasonable doubt.

19           Proof beyond a reasonable doubt is proof that

20  leaves you firmly convinced of the aggravating factors.

21  There are very few things in this world that we know with

22  absolute certainty.  And in criminal cases, the law does

23  not require proof that overcomes every doubt.  If, based on

24  your consideration of the evidence, you are firmly

25  convinced that an alleged aggravating factor has been

1  proved, then you must so find.  If, on the other hand, you

2  think there is a real possibility that the alleged

3  aggravating factor has not been proved, then you must give

4  the defendant the benefit of the doubt and find the factor

5  not proven.

6          The State must prove one or more of the

7  allegations beyond a reasonable doubt with its own

8  evidence.  The defendant is not required to testify or

9  produce evidence of any kind.  The decision on whether to

10  testify or produce evidence is left to the defendant acting

11  with the advice of an attorney.  The defendant's decision

12  not to testify or produce evidence is not evidence against

13  her.  You must not conclude that the defendant is eligible

14  for a death sentence because the defendant does not testify

15  or produce evidence.  You must not let this choice affect

16  your deliberations in any way.

17          Jury not to consider penalty.  You must decide

18  whether the State has proven one or more of the alleged

19  aggravating factors.  In reaching your verdict on the issue

20  of aggravating factors, you are not to consider the

21  possible punishment.

22          Direct or circumstantial evidence.  Evidence may

23  be direct or circumstantial.  Direct evidence is the

24  testimony of a witness who saw, heard or otherwise observed

25  an event.  Circumstantial evidence is the proof of a fact

1   or facts from which you may find another fact.   The law

2   makes no distinction between direct and circumstantial

3   evidence.   It is for you to determine the importance to be

4   given to the evidence, regardless of whether it is direct

5   or circumstance.

6          Credibility of witnesses.   In determining the

7   evidence, you must decide whether or not to believe the

8   witnesses and their testimony.   As you do this, you should

9   consider the testimony in light of all the other evidence

10  in the case.   This means you may consider such things as

11  the witnesses' ability and opportunity to observe; their

12  manner and memory while testifying; any motive or prejudice

13  they might have and any inconsistent statements they may

14  have made.

15         Expert testimony.   A witness may give an opinion

16  on a subject upon which the witness has become an expert

17  because of education, study or experience.   You should

18  consider the opinion of an expert and the reasons, if any,

19  given for it.   However, you are not bound by any expert

20  opinion.   Give the expert opinion the importance that you

21  believe it deserves.

22         Testimony of law enforcement officers.   The

23  testimony of a law enforcement officer is not entitled to

24  any greater or lesser importance or believability merely

25  because of the fact that a witness is a law enforcement

1    officer.  You are to consider the testimony of a police

2    officer just as you would the testimony of any other

3    witness.

4              Allegation of aggravating factors.  Aggravating

5    factors are those which increase the guilt or enormity of

6    the offense.  In determining whether the defendant is

7    eligible for a death sentence you may consider only the

8    statutory aggravating factors listed below.

9              The defendant, is eligible for a death sentence

10   only if one or more of the following two aggravating

11   factors are unanimously found to exist beyond a reasonable

12   doubt:  One, the defendant committed the first-degree

13   murder in expectation of the receipt of anything of

14   pecuniary value.

15             Two, the defendant committed the first-degree

16   murder in an especially heinous, cruel or depraved manner.

17             The law requires that you are reduce your

18   findings on the aggravating circumstances to writing.

19   Please mark your findings by checking the box next to each

20   aggravating factor on the verdict form provided.  The

21   verdict form must then be signed by your foreperson.

22             Pecuniary gain.  The State alleges that the

23   defendant committed the first-degree murder in expectation

24   of receipt of anything of pecuniary value.

25             To find that the defendant committed the offense

1    as consideration for pecuniary gain, you must find that the

2    defendant's expectation of pecuniary gain was a motive,

3    cause or impetus for murder and not merely a result of the

4    murder.  You need not find that pecuniary gain was the sole

5    motivation or cause of the murder in order to find that

6    this factor exists.  However, you may not find this factor

7    if it is merely shown that the defendant took property or

8    money after a murder occurred.

9              Aggravating factor, especially heinous, cruel or

10   depraved.  Ail first-degree murders are to some extent

11   heinous, cruel or depraved.  However, this aggravating

12   circumstance cannot be found to exist unless the murder is

13   especially heinous, cruel or depraved.  That is where the

14   circumstances of the murder raise it above the norm of

15   other first-degree murders.

16             The terms "cruel," "heinous" or "depraved" are to

17   be considered separately, but proof of any one of these

18   factors is sufficient to establish this aggravating

19   circumstance.

20             "Cruelty" involves the infliction of physical

21   pain and/or mental anguish on a victim before death.  A

22   crime is committed in an especially cruel manner when a

23   defendant either knew or should have known that the manner

24   in which the crime is committed would cause the victim to

25   experience physical pain and/or mental anguish before

1  death.  The victim must be conscious for at least some

2  portion of the time when the pain and/or anguish was

3  inflicted.

4        The terms "heinous" or "depraved" focus upon a

5  defendant's state of mind at the time of the offense, as

6  reflected by her words and acts.  A murder is especially

7  heinous if it is hatefully or shockingly evil; grossly

8  bad.  A murder is especially depraved if it is marked by

9  debasement, corruption, perversion or deterioration.

10        In order to find heinousness or depravity, you

11  must find that the defendant had such a mental state as

12  exhibited by engaging in at least one of the following

13  actions: One, infliction of gratuitous violence on the

14  victim.  Two, needless mutilation of the victim's body

15  after death.

16        In this context, "gratuitous violence" refers to

17  violence committed upon the victim beyond that necessary to

18  kill.

19        In this context, "needless mutilation" means that

20  the defendant, in an act separate from the killing itself,

21  committed other acts with the intent to mutilate the

22  victim's corpse.

23        To assist you in determining whether the murder

24  is heinous or depraved, you may consider whether, one, the

25  murder was senseless.  Or, two, the victim was helpless.

1          All murders are senseless because of their

2    brutality and finality.  Yet, not all are senseless as the

3    term is used to distinguish those first-degree murders that

4    warrant a death sentence from those that do not.  Rather, a

5    senseless murder is one that is unnecessary to achieve the

6    defendant's criminal purpose.

7          "Helplessness" is proven when the victim is

8    unable to resist.

9          Neither senselessness or helplessness, standing

10   alone, are sufficient to prove this murder was heinous or

11   depraved.

12         As previously stated the terms especially

13   "cruel", "heinous" or "depraved" are considered

14   separately.  Therefore, the presence of any one of these

15   factors or a combination of factors is sufficient to

16   establish the aggravating circumstance.

17         Deliberation schedule and breaks.  After you have

18   selected a foreperson, you should next discuss and set your

19   deliberation schedule.  You may agree to deliberate Monday

20   through Friday, in the morning and afternoon, or only half

21   days.  You are in charge of your schedule and may set and

22   vary it by agreement and with the approval of the Court.

23         After you decided on a schedule, please send it

24   to me by note through the bailiff for my review and

25   approval.

1        You are to discuss this case and deliberate only

2   when all jurors are together in the jury room.  You are not

3   to discuss the case with each other or anyone else during

4   breaks or recesses.

5        The admonition I have given you during the trial

6   remains in effect when you're not deliberating.

7        Review of instructions.  After setting your

8   schedule, I suggest that you next review the written jury

9   instructions and verdict form.  It may be helpful for you

10  to discuss the instructions and form to make sure that you

11  understand them.  Again, during your deliberations you must

12  follow the instructions and refer to them to answer any

13  questions about applicable law, procedures and

14  definitions.

15       Questions and message.  Should any of you or the

16  jury as a whole have a question for the Court during your

17  deliberations or wish to communicate with me on any other

18  matter, please utilize the jury question form that we will

19  provide you.  Your questions or messages must be

20  communicated to the Court in writing and must be signed by

21  you or the foreperson.

22       The Court will consider your question or note and

23  if necessary consult with counsel before answering it in

24  writing.  The court will answer it as quickly as possible.

25       No member of the jury should ever attempt to

1   communicate with me except by a signed writing and I will

2   communicate with you on anything concerning the case only

3   in writing or orally on the record.

4          Remember that you are not to tell anyone,

5   including me, how you stand, numerically or otherwise until

6   after you have reached a verdict or have been discharged.

7          Verdict.  The allegation of aggravating factors

8   is now submitted to you for decision.  When you go to the

9   jury room, you will chose a foreperson.  He or she will

10  preside over your deliberations and sign any verdict.

11         To return a verdict, your verdict must be

12  unanimous.  Please mark your decision as to each

13  aggravating circumstance on the verdict form provided.  You

14  will be given one form of verdict and it will read as

15  follows.  You don't have copies of the verdict form.  I

16  have the verdict form here in front of me.

17         The verdict reads as follows:  Aggravating

18  factors.  Verdict.  CR2000-096032.  We, the jury, duly

19  empaneled and sworn in the above-entitled cause, upon our

20  oaths, do find as to the alleged aggravating factors by the

21  x marked below.

22         And on one side the alleged aggravating factors

23  are listed.

24         The defendant committed the offense in

25  expectation of receipt of anything of pecuniary value.  And

1    then there is box here, unanimously proven beyond a

2    reasonable doubt, unanimously not proven, unable to reach a

3    decision.

4              And then there is an allegation the defendant

5    committed the offense in an especially cruel manner.   There

6    is a box, unanimously proved beyond a reasonable doubt,

7    unanimously not proven, unable to reach a decision.

8              And it says the defendant committed the offense

9    in an especially heinous manner.   There's a box here

10   unanimously proven beyond a reasonable doubt.   A box for

11   unanimously not proven.   And a box unable to reach a

12   decision.

13             And then, the last aggravating factor listed, the

14   defendant committed the offense in an especially depraved

15   manner.   There's a box, unanimously proved beyond a

16   reasonable doubt.   And a box unanimously not proven.   And a

17   box unable to reach a unanimous decision.

18             There's a signature line and printed name line

19   for the foreperson to fill out.

20             Do either counsel have any questions or additions

21   or corrections to the final instructions with regard to

22   Phase II?

23             MR. MARTINEZ:  No, sir.   Thank you.

24             MR. PATTERSON:  No, Your Honor.   Thank you.

25             THE COURT:  Does either counsel have and

1  additions or corrections to the final form of verdict with

2  regard to Phase II as read?

3      MR. MARTINEZ:  No, sir.

4      MR. PATTERSON:  No, Your Honor.  Thank you.

5      THE COURT:  Ladies and gentlemen, during the

6  first phase of this trial, we selected by lot the three

7  alternate jurors in this case.  Juror Number 3, Juror

8  Number 9, and Juror Number 14.

9      At this time you are still the alternate jurors

10  in this case.  And at this time, I'm going to allow you to

11  physically leave.  The admonition that I gave you will

12  continue to apply until you are notified otherwise by the

13  Court.

14      So, in just a few moments, I'm going to allow you

15  to physically leave.  Juror Number 3, Juror Number 9, and

16  Juror Number 14.  You are not excused.  You're allowed

17  physically leave.  The admonition I have given you will

18  continue to apply to.  Remember the entire admonition I

19  gave you.  Including the fact you're not to discuss the

20  case with anyone.  Do not let anyone discuss the case with

21  you.  Do not do any research or investigation

22  experimentation and testing on your own.  Avoid any and all

23  media coverage on the case.  And keep an open mind.  Son

24  remember follow the admonition until you're advised by the

25  Court to do otherwise.

1          Again, if I don't see you any more, on behalf of

2     the parties and behalf of everyone involved in this case

3     and behalf of the community, thank you for your service on

4     the jury.

5          (Alternate jurors exited.)

6          THE COURT:  I'm going to have the bailiff sworn

7     in by the clerk at the time.

8          (Bailiff sworn.)

9          THE COURT:  Ladies and gentlemen of the jury,

10    what I'm going to have you do is go to the jury room.

11    Select a foreperson and fill out in the note signed by the

12    foreperson what you want your deliberation schedule to be.

13    Once that's done, we'll have everyone come back into court

14    and verify that.  Then, depending on what you say then,

15    we'll address it at that time.

16         So I'll ask the jury to go to the jury room,

17    select a foreperson and give us a note on what your

18    deliberation schedule will be.  And we'll return to court

19    and verify that.  I'll ask everyone to please stand.

20         (Jurors exited.)

21         THE COURT:  Please be seated.  This is Cause

22    Number CR2000-096032, State of Arizona versus Wendi

23    Elizabeth Andriano.

24         The record will reflect the presence of the

25    defendant and counsel.  We're outside the presence of the

1   jury.

2          We'll take a short recess and then jury will give

3   us a note as far as their deliberation schedule is

4   concerned and we'll convene and verify that.  And depending

5   upon what the schedule is, we may be recessing for the

6   evening at this point in time.  So, we take a short recess

7   at this time.

8          (Recess taken.)

9          COURT:  This is Cause Number CR2000-096032, State

10  of Arizona versus Wendi Elizabeth Andriano.

11         The record will reflect the presence of the

12  defendant and counsel.  We're outside the presence of the

13  jury.

14         I'll share with counsel two notes we received

15  from the jury.

16         The first note reads:  Deliberation for Phase II

17  will be Monday through Thursday, 1 p.m. to 5 p.m.  Signed

18  by the foreperson.

19         And the second note reads as follows:   Please

20  define pecuniary.  Signed by the juror and also signed by

21  the foreperson.

22         With regard to the scheduling by the jury, I'll

23  just go ahead and verify that with the jury.  We'll tell

24  them we'll go ahead and recess for the evening since it's

25  so close to 5 p.m.  And then I'll have them return tomorrow

1   at 1 p.m.  Also I'll tell them we will not formally each

2   day reconvene in court with counsel and everyone present.

3   And we will not do that either when they return or when

4   they leave for the day or for any break.

5           And then with regard to this jury question of

6   pecuniary, I'm going to give counsel the opportunity to

7   give the Court any input by way of e-mail tomorrow to my

8   judicial assistant and we'll set up a telephonic conference

9   here at court.  As I understand it Mr. Martinez will be

10  present.  The defendant will be present here in court.  As

11  I understand it, because of other commitments, Mr.

12  Patterson and Mr. Delozier will be available

13  telephonically.  We'll address this question before the

14  jury reconvenes tomorrow.

15          MR. PATTERSON:  Let me okay that with my client.

16          Yeah, that practice is approved by my client.

17          THE COURT:  Is that agreeable to you,

18  Ms. Andriano?

19          THE DEFENDANT:  Yes, Your Honor.

20          THE COURT:  Ready for the jury?

21          MR. PATTERSON:  Yes.

22          (Jurors entered.)

23          THE COURT:  Please be seated.  This is Cause

24  Number CR2000-096032, State of Arizona versus Wendi

25  Elizabeth Andriano.

1          The record will reflect the presence of the

2    defendant and counsel and the jury.

3          Ladies and gentlemen of the jury, I received a

4    note here from the foreperson you have decided that the

5    jury deliberations for Phase II will be Monday through

6    Thursday 1 p.m. to 5 p.m.

7          Is there anyone on the jury that disagrees with

8    that schedule?  No one has raised their hand.  So that will

9    be the schedule for the jury.

10          Also, I received another note here.  And I'll be

11    discussing it further with counsel and depending upon that

12    discussion with counsel I'll be responding to that before

13    your deliberations tomorrow.

14          So, it's close to 5 p.m., we'll recess for the

15    evening.  Okay.  And just a few things I want to remind you

16    of before we recess.  Remember, tomorrow when you return to

17    begin your deliberations we'll have all the exhibits in the

18    jury room for you.  Okay.  That's one of the reasons we're

19    going to take the recess at this point in time because it's

20    so close to 5 p.m.  But we'll have all the exhibits for

21    your consideration.

22          Remember, that you have the jury exhibit list

23    with the biohazard designation on some of the exhibits.

24    Remember, the rule is that you're not to remove any

25    biohazardous or potentially hazardous exhibits from the

1    sealed package.  You need to receive authorization from the

2    Court if you want that done.  We will do that in open court

3    if that is requested.  So just remember that rule with

4    regard to biohazardous or potentially hazardous exhibits

5    that are marked on the exhibit list.

6              Now, when you return tomorrow and when you leave

7    for your breaks or for the evening, we're not going to meet

8    here in court formally.  So, you can do that on your time.

9    But remember that when you do return to deliberate, you're

10   not to begin your deliberations after a break or recess

11   until all the jurors are present.  All the jurors need to

12   be present.  When all the jurors are present in the jury

13   room you need to notify the bailiff and when everyone is

14   present in the jury room and then you can deliberate.

15             So we'll take our evening recess with the

16   understanding the schedule is Monday through Thursday, 1 to

17   5 p.m. for jury deliberation on Phase II.

18             Remember the entire admonition I have given you

19   including the fact you're not to discuss the case with

20   anyone.  Do not let anyone to discuss the case with you.

21   Do not do any research, investigation, experimentation or

22   testing on your own.  Avoid any and all media coverage of

23   this case.  Keep an open mind I want you to have a nice

24   evening and the jury will return tomorrow at 1 p.m. to

25   begin their deliberations.

1          We'll be in recess at this time.  I'll ask

2    everyone to please stand.

3          (Jurors exited.)

4          THE COURT:  Please be seated this is Cause Number

5    CR2000-096032, State of Arizona versus Wendy Elizabeth

6    Andriano.

7          The record will reflect the presence of the

8    defendant and counsel.  We're outside the presence of the

9    jury.

10         Anything further we need to discuss?

11         MR. MARTINEZ:  No, sir.

12         MR. PATTERSON:  No, Your Honor thank you.

13         THE COURT:  Have a nice evening.  If you have

14   anything you want to present to the Court as far as what we

15   discussed on that note e-mail it to my judicial assistant

16   and we'll discuss it at 12:45 tomorrow.

17         Have a nice evening.

18         (Proceedings adjourned.)

19

20

21

22

23

24

25

EXHIBIT XX



IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

IN AND FOR THE COUNTY OF MARICOPA

STATE OF ARIZONA,               )
                                )
                Plaintiff,      )
                                )
        vs.                     )     No. CR2000-096032
                                )         CR05 0005AP
WENDY ELIZABETH ANDRIANO,       )
                                )
                Defendant.      )
_____ )

BEFORE:  THE HONORABLE BRIAN K. ISHIKAWA

Mesa, Arizona
December 7, 2004

REPORTER'S TRANSCRIPT OF PROCEEDINGS
(Trial)

COPY                                SHARON FLORES
                              CERTIFIED COURT REPORTER
                                      50374

2

1

2

3                     A P P E A R A N C E S

4

5

6

7        For the State:

8                          Mr. Juan M. Martinez

9                          Deputy County Attorney

10

11

12

13

14        For the Defense:

15                          Mr. Daniel B. Patterson

16                          Mr. G. David Delozier, Jr.

17                          Office of the Public Defender

18

19

20

21

22

23

24

25

1                    P R O C E E D I N G S

2

3          THE COURT:  This is Cause Number CR2000-096032,

4   State of Arizona versus Wendy Elizabeth Andriano.  The

5   record will reflect the presence of the defendant and

6   counsel.  We are outside the presence of the jury.

7               I've shared with counsel a note that we received

8   from one of the jurors yesterday, Juror Number 1.  That

9   note reads as follows: I have company coming on Wednesday,

10   12 noon and staying until the following Wednesday, the

11   15th.  Is it possible to me to be excused from jury duty?

12   It's signed by Juror Number 1.

13               Mr. Martinez, what is the State's position?

14          MR. MARTINEZ:  Your Honor, I think with the way

15   the trial is proceeding and the amount of time we are

16   requesting of them -- I do understand that it's been a long

17   haul -- but I think perhaps the Court should inquire of her

18   if this is truly a hardship, something extraordinary.  If

19   not, then my position would be that she should not be

20   excused.

21          THE COURT:  Mr. Patterson?

22          MR. PATTERSON:  For the first time in this trial,

23   I concur completely with Mr. Martinez.

24          THE COURT:  I don't think that's the first time

25   but we'll note that the parties concur with regard to Juror

1    Number 1.

2         What I'll do tomorrow is before we bring the jury

3    in here, I'll have Juror Number 1 come in here individually

4    and we'll ask some additional questions.  But it would be

5    the court's inclination not to excuse her from service on

6    this jury.

7         THE COURT:  With regard the scheduling, I brought

8    up informally with counsel the fact that we've been in

9    trial for 15 weeks and I have a general idea of what may be

10   presented by the parties during Phase 3.  I've asked

11   counsel informally whether they would be opposed to perhaps

12   lengthening the days to starting at 12:00 and going until

13   5:00 and then even having court on Fridays.

14        Mr. Martinez?

15        MR. MARTINEZ:  I don't have any objection to

16   that.  Of course, I want to say we did discuss the caveat

17   if that would be appropriate for the jurors.

18        THE COURT:  Mr. Patterson.

19        MR. PATTERSON:  My position is the same as

20   Mr. Martinez, again.

21        THE COURT:  Okay.  What I'm going to do tomorrow

22   is I'm going to ask the jury whether any of them would be

23   opposed or unable to have a trial schedule of 12:00 until

24   5:00 p.m. Monday through Friday.

25        I've given to each counsel a copy of the draft

1   preliminary instructions for Phase 3.

2         Mr. Martinez, was there anything you wanted to

3   bring up with regard the Phase 3, preliminary

4   instructions?

5         MR. MARTINEZ:  No, sir, I don't have any

6   objection to them.  The only thing we need to do is plug in

7   the factors that are listed by defense counsel in its

8   pleading dated December 7th, 2004.

9         I do, however, have an issue with regard to one

10  of the factors.  That's Number 25, that's residual doubt.

11  I think we've already briefed that for the Court.  I'm

12  going back in my memory.  I don't think that's one of the

13  factors that we can ask them to consider.  And like I said,

14  I think there was perhaps a motion that was filed with the

15  Court.  I think you may already have ruled on it.

16        THE COURT:  Mr. Patterson.

17        MR. PATTERSON:  We did brief this issue.  You

18  didn't rule on it.  I reurge it at this time that it be

19  included.  I make no additional argument.  I believe it's

20  that space between beyond a reasonable doubt and beyond all

21  doubt is an area we can go into in terms of mitigation.

22  I'd like it to be included at this time.

23        THE COURT:  Let me make sure I understand,

24  Mr. Martinez.  You don't have any objection to listing all

25  of the mitigating factors for Mr. Patterson set forth in

1    the list of mitigating factors filed on this date.  Your

2    only objection would be Number 25 related to residual

3    doubt, correct?

4            MR. MARTINEZ:  Let me take a look very quickly

5    just to make sure.

6            I'm not sure that mercy can be included.  I'd

7    have to research that.  I know that one that stood out was

8    residual doubt.  I'm going to call and ask and I'll let you

9    know because I'm not sure that can be included.  That

10   appeals to that.  In other words, we tell them they're

11   going to decide this without, you know, resorting to

12   sympathy or bias and this is sort of what that's appealing

13   to.

14           THE COURT:  Mr. Patterson, did you want to

15   address those any further?

16           MR. PATTERSON:  No.  If he interposes a case,

17   that's something I'll address at that time.  But mercy is

18   synonymous with leniency.  That's what we're talking about

19   at this juncture.  There is a case out there that says

20   mercy alone is not sufficient to support a life sentence.

21   But, mercy coupled with any one mitigating factor, is

22   sufficient.  So I think it needs to be included.

23           Judge, with regard to preliminary instructions, I

24   have some suggested changes.

25           THE COURT:  Go ahead.

1          MR. PATTERSON:  And the logic for my request is

2    based on the fact that now being in Phase 3 the

3    U.S.  Constitutional law is that the sentencing decision of

4    the jurors can be an individualized decision.  They're

5    under no obligation to deliberate and reach a collective

6    position with regard to sentence.  What is individually

7    appropriate with regard to conscience of each

8    individualized juror is the sentence that that person is

9    entitled to return.

10         So, up to this time, we've used the term "you" in

11   a collective fashion.  What I'd like to do at this point

12   when you use the term "you," last line, page 3, that you

13   add the term individually after each "you," such that it

14   would read: Third, the attorneys will make closing

15   arguments to tell you, individually, what they think the

16   evidence shows.

17         Continue on to page 4:  And how they think you,

18   individually, should decide the case.

19         In paragraph C, there is a similar situation.

20   And I would ask that it be changed to read:  In making your

21   decision regarding Phase 3 of the trial you, individually,

22   are to consider the evidence presented in all three phases

23   of the trial.

24         I would also suggest a correction in paragraph D,

25   beginning in the third sentence of that paragraph:  A

1   mitigating circumstance is any factor relevant in

2   determining the appropriate sentence.

3           Deleting whether to impose a sentence less than

4   death.  And reading on:  Including any aspect, et cetera.

5           And then, on the last page, page 5, the second

6   paragraph should read, in my estimation:  The possible

7   sentences on first-degree murder are the death penalty or

8   life imprisonment.  The question to ultimately be decided

9   by each juror, instead of the jury, at the end of the

10  penalty phase, Phase 3, is whether there is a mitigating

11  circumstance sufficient to call for a life sentence.

12  Deleting necessarily the words "that are mitigating

13  circumstances sufficiently substantial to call for

14  leniency."

15          Those are corrections I propose.  And like I say,

16  the authority for those corrections are the

17  U.S.  Constitution and the Supreme Court decision.  We

18  don't have any decisions here in Arizona post Ring that

19  give us any guidance whatsoever on the appropriate language

20  at this stage of the proceedings because there's been no

21  reported cases post ring dealing with jury sentencing.

22          THE COURT:  Mr. Martinez.

23          MR. MARTINEZ:  It is true that there is no law

24  that would warrant making the changes that he proposed

25  specifically that we change "you" to "you, individually."

1 So I would object to that.  What is happening there is a

2 veiled request for a hung jury.

3          In other words, don't sit back there and

4 deliberate with the rest of the folks as you've already

5 instructed them during their deliberations.  But, be

6 intransigent and come back with a hung jury.

7          I would note that that sort of language troubles

8 me, but it troubles me for a reason that probably is not

9 that evident.  And the reason that that troubles me is,

10 let's say we have a juror who, for whatever reason, refuses

11 to deliberate because he believes that the death penalty is

12 appropriate.  Then we have a situation where it's the other

13 side of the coin.  And I don't think that the courts are

14 going to look favorably on a situation where we encourage a

15 juror who is pro-death penalty to say I'm not going to look

16 at the facts. I'm just going to decide the death penalty is

17 appropriate and then I'm going to go forward with it.

18 That's the other side of the coin on his proposal.

19          Additionally, there is no legal precedent for

20 it.  And I think we're venturing into areas that are

21 problematic and are of fundamental fairness.  I request

22 that that change not be made.

23          Additionally, he mentioned paragraph D and

24 something about the appropriate sentence -- I don't have

25 the specific language in front of me -- but, with regard to

1   this phase of the proceeding, they are not determining the
2   appropriate sentence.  What they are deciding is whether or
3   not death is appropriate.  They are not deciding whether or
4   not the appropriate sentence is life or life with the
5   possibility of parole or death.  There is only one decision
6   for them and that is whether or not the death penalty is
7   appropriate.  So I would object to that change.
8          And the other change that he mentioned is
9   indicating that whether or not one mitigating circumstance
10  is sufficient to call for a life sentence.  I'm not sure
11  that's the state of the law.  I think that in light of all
12  these mitigating circumstances that we are advising them
13  on, I think that if we're restricted to say there is one
14  exclude everything but only concern one, that can be read
15  to say, well, for whatever reason I think you should only
16  consider one.  I just think it's confusing.  I think the
17  way you have it is much better.  That does reflect the
18  state of the law as opposed to making it more narrow.
19         Basically, what's going on is he is trying to
20  make it a shorter field for them to work with by saying,
21  well, you know, of all of these 20 -- it's probably going
22  to turn out to be 25 -- of these 25, you only have to find
23  one.  Well, that's the argument and that's the comment but
24  that's not the state of the law.
25         So, for those reasons, I would ask that the

1    proposed changes not be made.

2            THE COURT:  Anything further from Mr. Patterson

3    on the proposed preliminary jury instructions?

4            MR. PATTERSON:  No, Your Honor.  I've made my

5    record.  Thank you.

6            THE COURT:  What I'm going to do, I'll think very

7    carefully what the two of you said.  What I'll do is make

8    any changes I feel are appropriate, if any.  And then, I'll

9    have Jim e-mail or make available for you to pick up the

10   final preliminary instructions.

11           And then, I guess, this afternoon, why don't you,

12   Mr. Martinez, you wanted to look at the issue further on

13   mercy?

14           MR. MARTINEZ:  Right.

15           THE COURT:  I'll give you the opportunity.  But,

16   get something by e-mail, I guess, to Mr. Patterson and to

17   the Court before the end of the day, okay?

18           MR. MARTINEZ:  Okay.

19           THE COURT:  Mr. Patterson, was there something

20   you wanted to bring up?

21           MR. PATTERSON:  In terms of the order of

22   presentation, I think Rule 19 does govern.  So I think

23   that's the process we should employ.

24           MR. MARTINEZ:  It's 19.1.

25           THE COURT:  Right.  In looking at Rule 19.1 of

1  the Rules of Arizona, Rules of Criminal Procedure under

2  19.1 (D), the order will be as follows:  The defense may

3  make opening statement.

4        The State may then make an opening statement or

5  may defer such opening statement until the close of the

6  defendant's evidence.

7        Then, the victim's survivors may make a statement

8  related to the characteristics of the victim and the impact

9  of the crime on the victim's family but may not offer any

10  opinion regarding the appropriate sentence to be imposed.

11  I want to emphasize that.

12        MR. MARTINEZ:  Judge, I think that binds

13  everybody including Mr. and Mrs. Ochoa and all other

14  witnesses.  I think that's best.

15        MR. PATTERSON:  I don't know of a case that shows

16  that my witnesses are not allowed to ask for or specify a

17  sentence.  I've never heard of that before.

18        THE COURT:  At this point in time, I won't make a

19  ruling as far as the Ochoas are concerned.  But if you can

20  give me some case law or authority I'll address it before

21  they testify.

22        MR. PATTERSON:  Okay.

23        THE COURT:  But at this point in time, as far as

24  the victim's survivors, they may not offer any opinion

25  regarding the appropriate sentence to be imposed but may

1  make a statement relating to characteristics of the victim

2  and the impact of the crime on the victim's family.  Okay.

3          And in --

4          MR. PATTERSON:  May I may talk to Mr. Martinez

5  for a minute?

6          THE COURT:  Yes.

7          MR. PATTERSON:  Thank you, judge.

8          THE COURT:  And then, following that, the defense

9  shall offer evidence in support of mitigation.  And then

10  the State may then make an opening statement if it was

11  deferred and offer any relevant evidence relevant to

12  mitigation.

13          The defense may offer evidence in rebuttal unless

14  the Court, upon a showing of good cause, allows the case in

15  chief to be reopened.

16          The defendant may present statements, elocution

17  to the jury.

18          The parties may present argument.  The defendant

19  having the opening and the closing.

20          And then the Judge shall charge the jury with

21  final jury instructions.  Okay.

22          We'll follow the procedure under Rule 19 of the

23  Arizona Rules of Criminal Procedure unless by stipulation

24  the Court allows otherwise.  Okay?

25          Anything else we need to discuss?

1        MR. MARTINEZ:  We also talked about Rule 703 (C)

2   which is A.R.S. 13-703 (C), appears to be -- well, I'll

3   just read the statement:  At the penalty phase of the

4   sentencing proceeding that is held pursuant to 13-703.01,

5   the prosecution or the defendant may present any

6   information that is relevant to any of the mitigating

7   circumstances, included in subsection G of this section

8   regardless of its admissiblity under the rules governing

9   admission of evidence at trials.

10        Additionally, there's a case, State versus Labors

11   from 1991, 168 Arizona 376, and that court indicated as

12   follows: The transcript revealed that the defendant had

13   beaten his wife a dozen times and pointed a gun at her and

14   had affairs.  Relying on 13-703 (C) we held that any

15   relevant evidence may be used to rebut the defendant's

16   mitigating circumstance regardless of its admissibility at

17   trial.

18        So, that seems to be the law here in the state of

19   Arizona and has been for quite some time.

20        Additionally, the other issue we addressed, sort

21   of part and parcel with this it's under 13-703 (B),

22   basically any relevant evidence is admissible.  Where the

23   fact that the State intended to introduce evidence that the

24   Court previously had ruled was inadmissible, specifically

25   where the defendant is a thief and she has been fired and

1   she has stole from every one of the employers she worked

2   at.

3          Additionally, when she has been in custody, the

4   defendant was involved with a pastor, a female pastor, who

5   had come to visit her.  And the defendant and this pastor

6   somehow got together in a fraudulent scheme and were able

7   to pass checks -- and it was the defendant's idea -- in the

8   amount of $40,800.

9          THE COURT:  How much?

10         MR. MARTINEZ:  $40,800.  This was while the

11  defendant was in custody.

12         The other issue that I presented for the court's

13  consideration was that I know that the Court had already

14  indicated that during the previous guilt proceedings that I

15  should not question Donna and Alejo Ochoa with regard to

16  the proceedings in the Pinal County Superior Court and date

17  of those issues was on or about October 15 of 2002.

18         Basically, what happened with regard to that is

19  that Donna and Alejo Ochoa were unhappy with the ruling of

20  the Maricopa County Superior Court.  What they did,

21  basically, is they lied.  They went to the Pinal County

22  Superior Court indicating that there was no other action

23  pending just because they didn't like the ruling of the

24  Maricopa County Superior Court when -- and then they filed

25  an action for adoption indicating that there was

1   nothing -- there was nothing that was pending in another

2   jurisdiction. Which was a lie. And as a result of that,

3   they were fined $9000.

4          And so I now ask leave of the Court in the light

5   of Rule 703 (C) and (D), that I be allowed to question them

6   about that when they take the stand. Their credibility is

7   now centrally at issue. We have an individual, the father,

8   who the State, I believe, has proven beyond a reasonable

9   doubt helped the defendant stage the scene.

10         We also have an individual who took the stand and

11   perjured himself. I think it would be relevant to that.

12         Especially, the defendant's mother also perjured

13   herself on the scene. That was with regard to the Mazda

14   and when the call was received.

15         So, I believe this is relevant to show that to

16   them it doesn't matter if they hold their hand up in the

17   courtroom and swear to tell the truth because they've

18   already been proven that means nothing. They will lie to

19   try to get their way. And that's with regard to that. I

20   have other issues but if we want to restrict it to that.

21         THE COURT: Mr. Patterson.

22         MR. PATTERSON: We're going to have to have

23   full-blown hearings on those issues. The avowals are

24   simply not enough. The facts are so complex in both

25   issues.

1          Mr. Delozier was counsel for the mother and

2     father, the grandparents, in that proceeding.  There are

3     pleadings that you need to review.  Avowals are not

4     enough.  So if he wants to go into those collateral issues,

5     we're are going to have to have full-blown, factual

6     hearings with witnesses and testimony.

7          With regard to his allegation she was involved in

8     misconduct in the jail, I have the presentence report he

9     was kind of enough to give to me.  Again, she was an

10    investigative lead.  She was never a defendant in that

11    proceeding.

12         THE COURT:  The presentence report is on who?

13         MR. PATTERSON:  On a person who was convicted of

14    that misconduct in passing the checks.  And she implicates

15    Ms. Andriano.  But, again, it's fact intensive.  She was

16    never charged with the crime.  She's noted as an

17    investigative lead in the sheriff's department's

18    investigation of the case.

19         This person, in order to minimize her

20    culpability, attributes things to Ms. Andriano that just

21    aren't true.

22         Again, in order to get into that area, we're

23    going to have to have a full-blown hearing.  We'll have to

24    bring in the investigator from the sheriff's department.

25    He's going to have to testify.  You just can't make

1    decisions, Judge, on these issues on avowals because they

2    are very complex, factually.

3            THE COURT:  Mr. Martinez?

4            MR. MARTINEZ:  I disagree with that.  What's so

5    complex about it?  We don't need a hearing.  He indicates,

6    for example, that we need to call the investigator to sort

7    this out.  He can call him in his case in chief.  He can

8    take care of it that way.

9            What we have is a situation where Cynthia

10   Edwards, in written form, indicates that it was the

11   defendant's idea to get the checks cashed.  What's so

12   complex about that?  There is nothing complex about it.

13   They can cross-examine her about it, about her bias and say

14   well, you're a defendant.  You were the one that was

15   charged.

16           He claims that his client has never been

17   charged.  Not yet.  That doesn't mean she's not going to be

18   charged later.  I harken back to State versus Labor which

19   is what I just read to the Court.  It indicates that the

20   State introduced a transcript of the defendant's wife's

21   testimony to rebut his mitigation testimony that he was of

22   good character, had been a good father and had no prior

23   criminal record.  It doesn't say that there has to be a

24   charge filed.  It doesn't say that there has to be any

25   proceeding instituted.  It's not complex.

1    The bottom line, somebody is saying that she did

2  something and they can cross-examine her.  So I would

3  disagree we need to have a hearing.  It isn't just the

4  presentence report.  It's a letter that was written and

5  signed by this defendant, her last name is Edwards, who

6  indicated that that's how this happened.  So, I don't see

7  that at all.  And that is relevant because as the Court has

8  noted, you're going to conclude she has no prior felony

9  convictions, no prior misdemeanor convictions and no prior

10  criminal charges.  That's all relevant to that.  And,

11  again, that's relevant and admissible pursuant to Rule 703

12  (C) and (D).  That indicates that that's the kind of

13  evidence that you get in.  You don't need a hearing.  You

14  don't need these safeguards where you're worried about what

15  the jury is going to hear because they're going to hear

16  anything anyway.  That's what the rules say.

17    With regards to the issue in the Pinal County

18  Superior Court, the same logic I already indicated to the

19  Court applies.  If they disagree, they can bring in the

20  rest of the file because the rules of evidence don't apply

21  any more.  So what they can do is they can bring in all of

22  that file, show it to the jury and say what Mr. Martinez

23  asked is not true.

24    Additionally, they can be asked about it when

25  they are up on the stand.  We don't need a hearing.  Again,

1  Rule 703 (C) and Rule 703 (D) says that's the kind of stuff

2  that comes in at these hearings because we didn't want to

3  not have the jury make this very weighty decision by

4  pooling up stuff that could be very relevant.  I disagree.

5       The other thing that I did indicate was that

6  Mr. Delozier was fined $6,000.  I did indicate in that case

7  because he was the attorney that filed it, I indicated that

8  I was not going to mention him and I was not going to bring

9  it up.

10       Probably, the more cautious approach is for them

11  to instruct Mr. And Mrs. Ochoa they are not to mention who

12  the lawyer was.  I don't have any problem with that because

13  it's not about him.  It's about what they did and how they

14  go about lying to people.

15       So for those reasons, I don't think that defense

16  counsel's request is well taken.

17       MR. PATTERSON:  Judge, the threshold is

18  relevancy.  I think that's where your intervention is

19  required to determine whether or not this

20  throw-everything-on-the-wall approach is relevant to the

21  issues in this case.

22       THE COURT:  The other person that you mentioned,

23  was that Cynthia Edwards?

24       MR. MARTINEZ:  Yes.  That's the person that was

25  charged.  That's the pastor.

1      THE COURT:  What do you have?  You have the

2  presentence report and you mentioned some type of letter?

3      MR. MARTINEZ:  What happened was she was being

4  sentenced and she wrote a letter to the presentence

5  writer.

6      MR. PATTERSON:  It's appended, Judge.

7      THE COURT:  It's part of the presentence report?

8      MR. MARTINEZ:  Yes, it is.

9      THE COURT:  Let's do this -- and copies have been

10  provide or made available to Mr. Patterson -- let's do

11  this:  Before you leave today, why don't you make a copy of

12  that for, well, make a copy of all of that for the Court.

13      MR. MARTINEZ:  I also have the minute entry you

14  indicated you wanted a copy of.  I can make a copy for you

15  as well as one for me as well as for defense counsel.

16      THE COURT:  Okay.  What else do we need to

17  discuss here?

18      MR. MARTINEZ:  Judge, under --

19      MR. PATTERSON:  Before we go to something else,

20  will you give me until 10 o'clock tomorrow to address the

21  change?  Because it's clearly a change in Arizona 13-703.

22  The pre-Ring standard was that the Rule of Evidence

23  governed the presentation of evidence by the government.

24  It did not cover presentation by the defense.  I've read

25  the statute.  It's clearly changed.  I need to talk to

1   folks in my office and find out whether there's a case that

2   bears upon that.   I can't believe Labor is dispositive of

3   the issue.   That's a '91 case when the law was that Rules

4   of Evidence governed the presentation of evidence by the

5   State.

6           So, if you'll give me until 10:00 tomorrow to

7   come up with some input on that.

8           THE COURT:  Email that to Mr. Martinez.

9           MR. PATTERSON:  Yes, sir.

10          THE COURT:  Go ahead.

11          MR. MARTINEZ:  Judge, with regards to 13-703.01

12  (S)(2) that indicates that victim means the murdered

13  person's spouse, parent, child, other lawful representative

14  except a spouse, parent, child or lawful representative is

15  in custody for an offense previously accused.

16          The reason that I cite that is that restricts me

17  in terms of the victim impact statement to the jury.  It

18  indicates -- it's very narrow.  It says that the parents

19  can address the jury and that is the only people that are

20  going to address the jury with regard to the victim impact

21  statement.

22          But under Rule 39 of the Arizona Rules of

23  Criminal Procedure, the victim is defined a bit more

24  expansively.  And that is defined to mean the following --

25  that indicates that -- as used under Rule 39 (A)(1), as

1    used in this rule, a victim is defined as a person against

2    whom a criminal offense as defined by 13-4401 has allegedly

3    been committed.  And then it goes on.

4            And if we take a look at the definition, if you

5    will, under 13-4401.  That's 13-4401 (19), it says "victim"

6    means a person against whom the criminal offense has been

7    committed or if a person is killed or incapacitated, the

8    person's immediate family or other lawful representative

9    except if the person is in custody.

10           The only reason I'm citing that is I wanted to

11   give notice I intend to call on Jana Clayton, who is the

12   victim, Joseph Andriano's sister, as well as Jeanea

13   Lambeth, who is also the defendant's sister as witnesses.

14   Normally, that's not something that I should bring to this

15   Court's attention but for some or part or maybe all they

16   have been present for the proceedings.  And as the victims,

17   they are not excludable and can remain in the courtroom and

18   then provide testimony.  So, I believe that given the

19   expansive definition of "victim" they can testify at this

20   particular hearing.  But, of course, because of the

21   narrowed scope under 13-703.01 I believe they cannot give a

22   statement, the victim impact statement, but they can

23   testify even though they have been in the courtroom.  I'm

24   asking the Court's permission to do so.

25           THE COURT:  Why don't you spell their full names

24

1  for the court reporter.

2          MR. MARTINEZ:  Jana is J-a-n-a.  Clayton is

3  C-l-a-y-t-o-n.  Jeanea is J-e-a-n-e-a.  And Lambeth is

4  L-a-m-b-e-t-h.

5          THE COURT:  Thank you.  And for what purpose do

6  you intend to call them?  Is this rebuttal?

7          MR. MARTINEZ:  They may.  But the ones that jump

8  to mind is one of the things that she indicated is to that

9  of being a good mother to her children.  Actually, that's

10 not true.  There have been many occasions where the

11 defendant, a least with regard to Ashley, has indicated, "I

12 don't want to have this kid.  It just makes me fat.  And I

13 just hate the fact that he got me pregnant.  He's the one

14 who wants the kid.  I don't want the kid."

15         Additionally, whenever a diaper needed to be

16 changed it was always, "Joe, you need to do it.  I'm not

17 going to do it.  I'm not going to get myself dirty.  Those

18 poopy diapers are yours." Things to that effect.

19         There are other factors that, for example, the

20 night that the defendant came back from her limousine ride,

21 one of the things she indicated was that Jana was taking

22 care of the kids.  Actually, her parents were taking care

23 of the kids.

24         Additionally, the reason that Mr. Andriano was

25 not with her was because she refused to allow him to go as

1   opposed to her saying that he didn't want to take her out.

2   These are all the things that now have become relevant or I

3   see as relevant because she's going to posit herself as

4   this, according to her married for eight years, a good

5   wife.

6            Additionally, during the three days that Jana

7   Clayton was in town, the defendant went out two of those

8   nights, two out of three nights she was out.  And the night

9   of the defendant's birthday she refused to go to dinner

10   with them instead of just saying, "I don't want to go with

11   you guys."  Basically, she just hates this guy.  Doesn't

12   want to be around him.  She claims that she loves him.  She

13   claims they had this marriage, all that stuff.  So I think

14   that's relevant to all that.

15            THE COURT:  Mr. Patterson?

16            MR. PATTERSON:  Well, the timing is

17   extraordinary.  This is the kind of issue that should have

18   been fleshed before we started the trial so you could have

19   decided whether or not she was allowed to stay in the

20   courtroom and listen to all the testimony.  At this

21   juncture, I think that it's untimely and it's an effort to

22   circumvent the Rule of Exclusion of Witnesses.  For that

23   reason, I would ask that they not be allowed to testify.

24            THE COURT:  Mr. Martinez.

25            MR. MARTINEZ:  Quite frankly, no disrespect to

1    the bench, but the law is the law.  And the law says you

2    can't exclude them.  And whether I make the argument now or

3    made the argument earlier, I mean, we have pretty strong

4    law when it comes to victims and it's there for a reason so

5    that they can see the events as they unfold and then not be

6    precluded from testifying later.  The law couldn't be more

7    clear on this issue, whether I raise it now or later.  In

8    fact, I wasn't even going to raise it.  I just wanted to

9    make sure we're all on the same page.  We've come a long

10   way.  I just don't want to create any issue whatsoever

11   without discussing it with all parties.

12            THE COURT:  Any other discussion as far as any

13   other issues that need to be brought up before tomorrow?

14            MR. MARTINEZ:  No, sir.

15            MR. PATTERSON:  No, Your Honor.

16            THE COURT:  Okay.  I'll think about the issues

17   presented to the Court.  I've given each side an

18   opportunity to give the Court additional information for

19   its consideration of these issues.

20            What I'll do, I've given Mr. Patterson until

21   10:00 tomorrow on the issue relating to Rule 703 (C) and

22   (D) and given Mr. Martinez an opportunity to look at the

23   issue of mercy.

24            Anything further?

25            MR. MARTINEZ:  Is that the only issue that you

1   wanted me to look at?  It seems there may be something

2   else.  I can't remember what it is.

3          THE COURT:  That's what it is.

4          Go ahead and make sure that Mr. Martinez gets

5   what you send to me and vice versa.  Okay?

6          MR. PATTERSON:  Okay.

7          THE COURT:  We'll have the bailiff make copies

8   for Counsel and Court.

9          (Proceedings adjourned.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

EXHIBIT YY



05-0202
Braccio

IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

IN AND FOR THE COUNTY OF MARICOPA

| | | |
|---|---|---|
| STATE OF ARIZONA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | No. CR2000-096032 |
| | ) | CR05 0005-AP |
| WENDI ELIZABETH ANDRIANO, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

BEFORE:  THE HONORABLE BRIAN K. ISHIKAWA

Mesa, Arizona
December 8, 2004

REPORTER'S TRANSCRIPT OF PROCEEDINGS
(Trial)

COPY

SHARON FLORES
CERTIFIED COURT REPORTER
50374

000008478

2

```
 1
 2
 3                    A P P E A R A N C E S
 4
 5
 6
 7    For the State:
 8                        Mr. Juan M. Martinez
 9                        Deputy County Attorney
10
11
12
13
14    For the Defense:
15                        Mr. Daniel B. Patterson
16                        Mr. G. David Delozier, Jr.
17                        Office of the Public Defender
18
19
20
21
22
23
24
25
```

000008479

3

1

2                           I N D E X

3   WITNESSES:                                          PAGE

4

5      LAURA KING

6         Direct Examination by Mr. Patterson          64

7         Cross-Examination by Mr. Martinez            89

8         Redirect Examination by Mr. Patterson        114

9

10     GERALD PERRY

11        Direct Examination by Mr. Patterson          118

12        Cross-Examination by Mr. Martinez            130

13

14     JOYCE VAN EVERY

15        Direct Examination by Mr. Patterson          137

16        Cross-Examination by Mr. Martinez            144

17

18

19

20

21

22

23

24

25

4

1

2

3                       E X H I B I T S

4

5          (Exhibits were marked prior to trial unless

6   indicated.)

7

8   NUMBER:          DESCRIPTION                    ADMITTED

9     542            Photograph                       52

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

000008481

1                    P R O C E E D I N G S

2

3            THE COURT:  This is Cause Number CR2000-096032,

4   State of Arizona versus Wendi Elizabeth Andriano.

5            The record will reflect the presence of the

6   defendant and counsel.  We're outside the presence of the

7   jury.

8            Counsel, let me go ahead and announce my

9   decisions on the issues that were argued yesterday.

10           With regard to the State's -- the issue of the

11  State calling Jana Clayton and Jeanea Lambeth as

12  witnesses.  The Court finds pursuant to A.R.S. Section

13  13-4420, a victim has a right to be present in court

14  proceedings in which the defendant is present.

15           Under A.R.S. Section 13-4401(19), that section

16  defines a victim as including a murder victim's immediate

17  family.

18           And A.R.S. Section 13-4401(11) defines immediate

19  family as including a victim's siblings.

20           Therefore, it is ordered denying the defendant's

21  motion to preclude the testimony of Jana, J-a-n-a, Clayton

22  and Jeanea, J-e-a-n-e-a, Lambeth because of the rule of

23  exclusion of witnesses.

24           With regard to the defendant's motion for

25  reconsideration on the issue of residual doubt, it is

1   ordered denying the defendant's motion for reconsideration

2   of the Court's ruling on the issue of residual doubt.

3          It is ordered affirming the Court's previous,

4   July 31, 2004, ruling granting the State's motion to

5   preclude evidence regarding residual doubt.  The defendant

6   is precluded from presenting evidence or arguing residual

7   doubt in the penalty phase.

8          With regard to the issue of mercy and witness

9   statements pertaining the appropriate sentence, with regard

10   to this issue, it is ordered that no witness, whether

11   called by the defense or by the State shall be asked about

12   nor are they to offer any opinion regarding the appropriate

13   sentence to be imposed in this case or make any request for

14   a specific sentence in this case.

15          Defense witnesses, however, may testify as to the

16   loss or impact that will result from the defendant's

17   execution.

18          With regard to the defendant's motion to preclude

19   the Pinal County matter involving Donna Ochoa and Alejo

20   Ochoa, the Court finds the issue involving Donna Ochoa and

21   Alejo Ochoa involving Pinal County Cause Number AD200100058

22   is not relevant to any of the mitigating circumstances

23   relating to this proceeding.

24          It is therefore ordered granting the defendant's

25   motion to preclude the State from arguing and/or presenting

1   evidence relating to Donna Ochoa and Alejo Ochoa and Pinal

2   County Cause Number AD200100058 and the minute entry dated

3   October 15, 2002 by the Honorable William J. O'Neil in

4   Pinal County Superior Court.

5          With regard to the issue of the defendant's

6   motion to preclude the presentation of evidence involving

7   the defendant's activities involving Cynthia Edwards, the

8   Court finds that the disclosure of these allegations

9   against the defendant relating to her activities with

10  Cynthia Edwards is untimely and the disclosure requirements

11  under Rule 15.1 is untimely under the disclosure

12  requirements under Rule 15.1 of the Arizona Rules of

13  Criminal Procedure.

14          It is ordered granting the defendant's motion to

15  preclude the State from arguing or presenting evidence

16  related to the defendant's activities with Cynthia Edwards

17  as referenced by the State in oral argument yesterday.

18          Now, with regard to the State's allegations that

19  the defendant committed thefts while employed at Casa

20  Grande Medical Center, Courtyard Apartments and San Riva

21  Apartments, it is ordered allowing the State to present

22  rebuttal evidence relating to these alleged thefts, if the

23  defendant asserts or presents evidence of its listed

24  mitigating factors of no criminal charges and good

25  employment history, or of the unlisted mitigating factor of

1  the defendant's honesty.

2          In light of the Court's ruling on this issue,

3  Mr. Patterson, do you have a request at this time?

4          MR. PATTERSON:  Yes, Your Honor.  I move to

5  delete the listed mitigated factors that were asked to be

6  incorporated into your preliminary instructions for Phase

7  3.  My recollection is they were Number 3 and Number 5, no

8  criminal charges and good employment history.  I would

9  request that they be removed from the preliminary

10  instructions.  We will not advance any arguments in support

11  of those mitigating factors.

12          THE COURT:  It is ordered granting the

13  defendant's request.  And the listed mitigating factors, no

14  prior criminal charge and good employment history, are

15  deleted from the jury instructions.

16          I've given counsel each a copy of the preliminary

17  jury instructions for Phase 3.

18          Is there anything further that the State would

19  like to put on the record with regard to those preliminary

20  jury instructions for Phase 3?

21          MR. MARTINEZ:  Yes, sir.  With regard to your

22  last issue about the thefts and the one involving Cynthia

23  Edwards, you did indicate the disclosure was untimely under

24  Rule 15.1.

25          I would move to preclude all of the witnesses

1  that were noticed by defendant approximately a week ago

2  including some people at the jail.  And, basically,

3  everybody for this hearing because they were not noticed

4  until approximately a week or two ago.  Additionally, by

5  pleading date of December 2nd and delivered to me on

6  December 3, two individuals, Mike Rochon and Jack Smith,

7  were noticed as witnesses.  I've never heard of them.  I

8  don't know who they are.  So I would move to preclude those

9  as untimely.

10        THE COURT:  What are those names?

11        MR. MARTINEZ:  Mike Rochon, R-o-c-h-o-n.  And

12  then the second one is Jack Smith.  They were noticed by

13  the pleading dated December 2nd.  I received it December

14  3rd.

15        Additionally, the Court indicated that the State

16  would not be allowed to present any evidence about the

17  thefts if no prior criminal charges or prior employment

18  history were deleted.  I would also ask that the Court then

19  delete no prior felony convictions and no prior misdemeanor

20  convictions.

21        And the reason I ask that is under State versus

22  Labor, in that particular case, there was an argument that

23  the Court improperly discounted mitigating circumstances of

24  lack of prior criminal or felony record by considering his

25  two prior arrests involving domestic violence situations.

1       What we have in this case is the same thing.   We

2  don't have any charges.   And we don't have any

3  convictions.   The same as it was in the Labor case.   In

4  that case, the Supreme Court disagreed and noted that the

5  prosecution and the defendant shall be permitted to rebut

6  any information received at the aggravation/mitigation

7  hearing and shall be given fair opportunity to present

8  argument.

9       In that case, the State introduced testimony by a

10  transcript that the defendant -- and that was to rebut his

11  mitigation of good character which is what they're

12  presenting in this case, it's not listed but that's

13  generally what's going on here, good character -- has been

14  a good father.   They indicate here under Number 4 she's

15  been a good mother and has no prior criminal record.

16       In that case, the Court indicated that the fact

17  that the defendant had beaten his wife a dozen times,

18  pointed a gun on her, and had an affair were relevant and

19  that would be admitted.

20       So for those reasons, I would ask that those two

21  be knocked out.

22       Additionally, I ask Number 3, good candidate for

23  rehabilitation be stricken because any individual that

24  commits these thefts, because she did steal from Casa Grand

25  Regional Medical Center, she did steal from the Courtyard

1  Apartments and she did steal from the San Riva Apartment

2  Complex.  And then while in the custody of the Maricopa

3  County jail, in May of 2000 is when they were finally

4  caught, the defendant was running a fraudulent scheme

5  involving checks where they were able to steal

6  approximately, not approximately, steal $40,800.  She was

7  the ring leader of that.  Anybody who has that prior record

8  and then also does that is not a good candidate for

9  rehabilitation.

10      Additionally, I do believe that she is not a good

11  mother.  And that's talking about her character.  In other

12  words, she's saying, "I'm of such good character that I'm a

13  good mother."  For that reason, I would ask that I would be

14  allowed to inquire into those or that that be stricken.

15      One of the things she also indicates is she has

16  strong religious beliefs.  I ask that that be stricken.

17  The reason that I ask that that be stricken is one of the

18  Ten Commandments or not the Ten Commandments, but one of

19  the tenants of a good strong religious conviction is that

20  you not steal and you not lie.  And that's one of the

21  things that we know that the defendant was doing when she

22  was running this fraudulent scheme.  By definition, by

23  legal definition, we know that stealing money from somebody

24  is considered a crime of dishonesty.  And so she's going

25  against her strong religious convictions by stealing from

1   the three enumerated employers.

2        Clearly, Number 10 should be stricken because she

3   never a good inmate in that jail.  Anybody who is able to

4   run an enterprise from the jail and able to steal $40,800

5   -- and we have the letters indicating that she was the one

6   that was actually directing that enterprise -- is certainly

7   not a good inmate.

8        They also indicate that she is no further threat

9   to the community.  I would disagree.  And the reason I

10  would disagree is that she was a threat to the community

11  before, whether she's a thief or whether she's a killer.

12        Additionally, once she is in custody even when

13  her movements are restricted, when you would think that she

14  would not do this sort of thing, she's goes and continues

15  to do that.  If she's ever allowed out into in the

16  community, she is definitely going to be a threat.

17        So, for those reasons, I would ask that those

18  mitigating factors be stricken.

19        On the other side, or the other side of the coin,

20  if that's not going to be allowed then I would ask that the

21  Court allow me to inquire as to those thefts as well as the

22  issue involving Cynthia Edwards.

23        I would note the issue of Cynthia Edwards did not

24  come to the State's attention until the Wednesday before

25  Thanksgiving.  On that same day we obtained -- and there

 1  was never any referral by any agency to the Maricopa County

 2  Attorney's Office to let us know of this connection, if you

 3  will, between Cynthia Edwards and the defendant.  When it

 4  did come to our attention on the Wednesday before

 5  Thanksgiving, we obtained a presentence report along with a

 6  letter implicating the defendant, those were turned over to

 7  the defendant that same day.  There is no prejudice to the

 8  defendant with regard to that disclosure.  They've had all

 9  this time to review those documents and see what they stand

10  for.  Additionally, the reason there is no prejudice is

11  that it's the defendant who allegedly committed these acts

12  and who better to know about what happened.

13              I could understand if it involved some sort of

14  action not pertaining to her.  But, since she is the one

15  that's involved in this, I think that there is no

16  prejudice.

17              So, for those reasons I would ask, number one,

18  their witnesses be precluded.  Number two, should you allow

19  that, I would ask that these factors that I've enumerated

20  be stricken since they do all relate to honesty, they all

21  relate to the fact that she in fact stole from people and

22  that location is one that involves both being in jail and

23  also out of jail.  Thank you.

24              THE COURT:  Mr. Patterson.

25              MR. PATTERSON:  I don't need to make additional

1   record unless you're inclined to change your ruling.

2            THE COURT:  Anything you'd like to put on the

3   record?

4            MR. PATTERSON:  The fundamental problem we have

5   with the Cynthia Edwards issue is the Government was aware

6   of the potential problem when the county attorney was

7   advised by his case agent Detective Lucero there was

8   something going on in the jail that may involve

9   Ms. Andriano.  You've read the presentence report of

10  Ms. Edwards.  There were five or six people indicted as a

11  result of the conduct.  Ms. Andriano was not indicted.  All

12  of the statements that she was the ring leader, if that

13  were the case, then obviously why wasn't she indicted.  She

14  wasn't.

15           To force us to scramble at this point to try to

16  determine the voracity or legitimacy of the claims is an

17  undue burden.  Particularly when he was aware or at least

18  the Government was aware of this conduct in the jail that

19  potentially involved Ms. Andriano.

20           I don't -- I ask you not to delete any further

21  mitigating circumstances.  What we are dealing with here is

22  the Government's need to directly rebut specific points.

23  They can't just call a certain point or characterize it as

24  involving dishonesty or involving something and then,

25  therefore, this is rebuttal.  That's not the rule.  That's

1    not the process we should employ at this time.

2          We've articulated that she is a good mother to

3    two children.  They are allowed to bring rebuttal evidence

4    that tends to show she's not a good mother, not that she's

5    a person of bad character.  That's not what we're providing

6    when we say one of the mitigating factors or circumstances

7    that the jury should take into account is that she has, in

8    fact, been a good mother to two children.

9          I ask that you not delete any additional

10   mitigating factors.  And I think that we understand the

11   rules at this point.

12          My only question is that you preclude the

13   Government from talking about the Pinal County case

14   involving the Ochoas.  I assume that also involves

15   reference to a Maricopa County case as well because it's

16   all tied in, it's all part of the same collateral issue

17   with regard to the credibility of those two individuals,

18   and not necessarily the credibility or believability of

19   them with regard to one case in Pinal County.

20          So I think they're both tied together and I ask

21   you to flesh that ruling out a little further.

22          With regard to disclosure, I had a transition

23   from one mitigation specialist to another.  Patrick

24   Linderman was the original mitigation specialist.  Scott

25   McCloud is now the current mitigation specialist.  He's

1   been scrambling to get up to speed, if you will, in this

2   case.  When the guilty verdict came down we immediately

3   went over what we believed was germane to the penalty

4   phase.  We became aware of persons at the jail and we

5   concluded her conduct in the jail is now germane.

6   As soon as I was aware of the those witnesses,

7   Laura King, Dr. Perry and a nurse by the name of Van Every,

8   I think is her name, we immediately disclosed them.  Told

9   the county attorney that they were locatable in the jail,

10  Durango jail facility.  And the one person who had moved on

11  to Albuquerque, we gave them a phone number.  He's had

12  ample time to address any issues that these additional

13  witnesses have.

14  And preclusion at this point is an extraordinary

15  sanction in light of the issues in this particular case, a

16  capital case issues.  So I ask we be allowed to elicit

17  testimony from those persons.

18  To that end, we also got a court order from this

19  court trying to get a complete set of medical records.  I

20  now have that.  I will photocopy that for

21  Mr. Martinez and give it to him immediately.  I ask that

22  those witnesses not be precluded.

23  THE COURT:  With regard to testimony Court's

24  order relating to the issues involving Donna Ochoa and

25  Alejo Ochoa that ruling will include the related Maricopa

1  County cause.  That's to clarify the Court's ruling not

2  only the Pinal County cause, but the related Maricopa

3  County cause.

4         As to the State's motion to delete the mitigating

5  circumstances of no prior felony convictions, no

6  misdemeanor convictions, good candidate for rehabilitation

7  strong religious convictions, no further threat to the

8  community, I'm going to order denying the State's motion.

9         I'm also going to deny the State's motion

10  precluding witnesses, Mike Rochon, R-o-c-h-o-n, and Jack

11  Smith.

12         I discussed with counsel yesterday the issue

13  involving Juror Number 1.  As I indicated yesterday, what

14  we'll do is before we bring the entire jury in, we'll have

15  Juror Number 1 brought in and we'll ask her some additional

16  questions about her note and her schedule.

17         Then what I'm going to do after that is I'm going

18  to have the jury brought in here and the first thing I'm

19  going to do is, I'm going to ask the jury whether they will

20  be available to have trial on Fridays from 1:00 to 5:00

21  p.m.

22         And, counsel, based upon the Court' ruling and

23  everything that I've heard related to the presentation of

24  page 3, it appears that if we have trial on Friday from

25  1:00 to 5:00, that the case can go to the jury by probably

1   Wednesday.

2              Does that sound relistic?

3              MR. MARTINEZ:  We'll do our best.  I know we

4   discussed that in chambers.  I know I also indicated that

5   perhaps Monday or Tuesday would be our best.

6              THE COURT:  I want to keep the case moving along

7   in an efficient manner.

8              And Mr. Delozier is going to be presenting the

9   opening statement on behalf of the defendant.

10             How long do you expect your opening statement to

11  take, Mr. Delozier?

12             MR. DELOZIER:  Your Honor, I estimate 15 to 20

13  minutes.

14             THE COURT:  Mr. Martinez?

15             MR. MARTINEZ:  As I previously indicated, it

16  would be no more than the hour but that means at the

17  outside.  I expect it will be approximately 30 minutes.

18             THE COURT:  In light of all the circumstances and

19  what I feel is realistic and appropriate time restraints,

20  I'm going to limit each side to 30 minutes with regard to

21  the opening statements for Phase 3.

22             I thought there is one other matter we need to

23  discuss.  Just give me a moment.  Oh, with regard to the

24  victim impact statement, it's my understanding that

25  Mr. and Mrs. Andriano will be giving a victim impact

1   statement.  What is the State's position with regard to

2   having the victim impact statement made under oath?

3           MR. MARTINEZ:  I don't think that it's required.

4           THE COURT:  Mr. Patterson?

5           MR. PATTERSON:  Nor do I, Your Honor.

6           THE COURT:  Okay.  Then I'm not going to have

7   either Mr. Andriano or Mrs. Andriano sworn.  I'm going to

8   have them make the victim impact statement from the witness

9   stand.  And I will tell the jury that the victim's

10  survivors may make a statement relating to the

11  characteristics of the victim and the impact of the crime

12  on the victim's family but may not have any opinion

13  regarding the appropriate sentence to be imposed.

14          Is there anything else we need to discuss before

15  we bring in Juror Number 1 in to discuss the note she

16  provided with regard to her schedule?

17          MR. MARTINEZ:  No, sir.

18          MR. PATTERSON:  No, Your Honor.  I can think of

19  no other loose ends.

20          THE COURT:  We'll have Juror Number 1 brought

21  into the courtroom.

22          (Juror Number 1 enters the courtroom.)

23          THE COURT:  Please be seated.  This is Cause

24  Number CR2000-096032, State of Arizona versus Wendi

25  Elizabeth Andriano.  The record will reflect the presence

1   of the defendant and counsel and Juror Number 1.

2            Good afternoon, Juror Number 1.  We received a

3   note from you on Monday and I've had the opportunity to

4   discuss this note with counsel.  In the note you indicated:

5   I have company coming on Wednesday 12 noon and staying

6   until the following Wednesday, the 15th.  Is it possible

7   for me to be excused from jury duty.

8            Is there anything further that you'd like to add

9   to that note?

10           JUROR NUMBER 1:  Well, you can forget that

11   because I called my nephew last night and they're getting

12   here Wednesday.  Friday morning they're going to Silver

13   City, the three of them, and they won't be back until

14   Monday.

15           THE COURT:  Okay:

16           JUROR NUMBER 1:  If that's not a problem then

17   I'll just stay on.

18           THE COURT:  Okay, then we won't make any further

19   inquiry then.

20           Any anything further from either counsel with

21   regard to Juror Number 1?

22           MR. MARTINEZ:  No.

23           MR. PATTERSON:  No.

24           THE COURT:  Why don't we go ahead and have the

25   rest of the jury brought in at this time.

1          (The remaining juror entered the courtroom.)

2          THE COURT:  Please be seated.  This is Cause

3  Number CR2000-096032, State of Arizona versus Wendi

4  Elizabeth Andriano.

5          The record will reflect the presence of the

6  defendant, counsel and the jury.

7          Ladies and gentlemen of the jury, let me make

8  inquiry of you at this time.  We're going to begin the

9  Penalty, Phase 3, here today.  Is there anyone who would be

10  unable to be here on Friday from 1:00 to 5:00?  Is there

11  anyone who would object to having trial even on Friday from

12  1:00 to 5:00?  No one has raised their hand to the

13  question.

14          What we're going to do then is we're going to

15  have trial this Friday from 1:00 to 5:00.

16          Let me give you the anticipated idea how we're

17  going to go about the schedule.  In speaking with counsel,

18  it's anticipated that if we have trial on Friday from 1:00

19  to 5:00 also, this case can be given to the jury for a

20  decision perhaps Wednesday of next week.  Okay.  But we

21  would, in light of everything, we will meet on Friday so we

22  can continue with the trial in a timely manner.

23          I'm aware of the fact we're coming upon the

24  holidays.  I'm sure you have some shopping to do just like

25  I do but is there anyone who would disagree or object to

1   having Friday from 1:00 to 5:00 added to the schedule?

2            Yes?  This is Juror Number 9.

3            JUROR NUMBER 9:  It would just be this Friday?

4   It won't be next week?

5            THE COURT:  Once the case is presented to the

6   jury for decision, okay, once the case is presented to the

7   jury for decision, the jury can decide what their

8   deliberation schedule will be with the approval of the

9   Court.  But if we have trial this Friday, it's anticipated

10  that the case will be given to you for decision Wednesday,

11  perhaps Thursday at the latest, based upon what the

12  attorneys have told me.

13           No other hands to have any problems with the

14  schedule.  Thank you.

15           At this time, I'm going to have the bailiff pass

16  out to each of juror a copy of the preliminary instructions

17  for Phase 3.

18           I'm going to ask everyone to follow along as I

19  read the preliminary instructions for Phase 3.

20           Preliminary instructions for Phase 3.  Let's go

21  past the index for your reference.

22           Introduction to preliminary instructions.  We are

23  about to begin the third phase of the trial.  It is called

24  the "penalty phase".  The directions in the preliminary

25  instructions for the first phase of the trial regarding the

1  following topics remain in full force and effect unless

2  changed by these instructions:  Preliminary instructions

3  concerning juror contact, bench conferences, preliminary

4  instructions concerning the law.  You are allowed to

5  discuss the case among yourselves during deliberations.

6  Effective immediately, permission for you to discuss the

7  case is suspended.  Do not discuss the case among

8  yourselves or with anyone else during the penalty phase.

9  Follow all the admonitions I have given you previously.

10         Order of penalty phase.  The penalty phase,

11  unless otherwise directed by the Court, will proceed as

12  follows:  One, the defense may make an opening statement.

13  The State may then make an opening statement or may defer

14  it until the close of the defense case.

15         Again, what the attorneys say in opening

16  statement is not evidence.

17         Two, the victim's survivors may, if they wish,

18  make a statement relating to the characteristics of the

19  victim and the impact of his murder on the victim's

20  family.  They're not allowed to offer any opinion or

21  recommendation regarding an appropriate sentence.

22         Three, the defendant will offer evidence in

23  support of mitigation.

24         Four, the State may then make an opening

25  statement if it was deferred and may then offer evidence in

1  rebuttal to the defendant's mitigation evidence.

2          Five, the defendant may offer evidence in

3  rebuttal or other evidence if the Court allows such to be

4  presented.

5          Six, the defendant may make a statement to you

6  but she is not required to do so.  You cannot hold this

7  against her if she chooses to not make a statement.

8          Seven, the parties will present final arguments

9  with the defense having the opportunity to make an opening

10  and closing argument.

11          Eight, the Court would then give you the final

12  instructions on the law.

13          Nine, you will then deliberate to decide on a

14  verdict.

15          Once you agree upon a verdict, it will be read in

16  court with all parties present.

17          Evidence to consider.  In deciding the issues in

18  the penalty phase, you are to consider all the evidence

19  presented in this phases as well as the evidence presented

20  in both proceeding phases.

21          Overview of penalty phase.  In the penalty phase

22  we will address the sentence to be imposed.  During the

23  penalty phase, the parties may present information relevant

24  to any mitigation circumstances.

25          A mitigating circumstance is any factor relevant

1  in determining whether to impose a sentence less than death

2  including any aspect of the defendant's character,

3  propensity or record, or any of the circumstances of the

4  offense including but not limited to the following:

5          One, no prior felony convictions.

6          Two, no prior misdemeanor convictions.

7          Three, good candidate for rehabilitation.

8          Four, good mother to two children.

9          Five, married for eight years.

10         Six, good student at school, awards.

11         Seven, good student in school, grades.

12         Eight, missionary work for church in Mexico.

13         Nine, strong religious convictions.

14         Ten, good inmate in jail.

15         Eleven, helpful to staff and other inmates in

16  jail.

17         Twelve, cooperative with authorities after

18  arrest.

19         Thirteen, domestic violence victim.

20         Fourteen, emotional abuse victim.

21         Fifteen, sexual abuse victim.

22         Sixteen, stress of husband's cancer.

23         Seventeen, stress of misdiagnosis of husband's

24  cancer.

25         Eighteen, stress of terminal illness.

26

1          Nineteen, stress of economic difficulties.

2          Twenty, no future threat to community.

3          Twenty-one, remorse.

4          Twenty-two, impact on defendant's family members

5    and friends.

6          Twenty-three, age.

7          Burden of proof in penalty phase.  As to the

8    existence of mitigating circumstances, the defendant bears

9    the burden of proof.  The defendant must prove the

10   existence of the mitigating circumstances by a

11   preponderance of the evidence.

12         Proof by a preponderance of the evidence means

13   that a fact is more likely true than not.  This is a lesser

14   burden than proof by clear and convincing evidence and

15   proof beyond a reasonable doubt.

16         In the guilt phase of the trial, the jury

17   unanimously found beyond a reasonable doubt that the

18   defendant committed first-degree murder.  In the

19   aggravation phase, the jury unanimously found beyond a

20   reasonable doubt that one aggravating factor was proven.

21   These issues have been finally decided and you're not to

22   consider these verdicts.

23         In addition, you cannot consider any victim's

24   statements or victim impact evidence as a new aggravating

25   factor.  However, it is something you may consider in

1   assessing the mitigation presented.

2          The jurors do not have to agree unanimously that

3   a mitigating circumstance has been proven to exist.   Each

4   juror may consider any mitigating circumstance found by

5   that juror in determining the appropriate penalty.

6          The possible sentences on first-degree murder are

7   the death penalty or life imprisonment.   The question to

8   ultimately to be decided by the jury at the end of penalty

9   phase, Phase 3 is:   Should the defendant be sentenced to

10  death or life imprisonment for her conviction of the

11  first-degree murder of Joseph Andriano, Jr.

12          In answering the question, you must individually

13  decide whether there is mitigation and whether it is

14  sufficiently substantial to call for the imposition of a

15  life sentence rather than a sentence of death.   Any verdict

16  imposing the sentence of life or death must be unanimous.

17          Defendant need not testify.   The defendant is not

18  required to testify or make any statement and you are

19  precluded from drawing any inferences against the defendant

20  should she decide not to testify or make a statement.   The

21  decision on whether or not to testify or make a statement

22  is left to the defendant acting with the advise of her

23  attorney.   You must not let this choice affect your

24  deliberations in any way.

25          Conclusion.   The rules of law I have just shared

1  with you are preliminary only.  At the end of this phase, I

2  will give you final and more detailed instructions that

3  must be applied.  In deciding the case, you must be guided

4  by the final instructions.

5          At this time, the attorneys will be permitted to

6  make their opening statements if they wish.  What the

7  attorneys say in their opening statements is not evidence.

8  It is simply an outline of what the attorney thinks the

9  evidence will be.  And it's offered to help you to

10  understand and follow anticipated evidence during Phase 3.

11          Mr. Delozier.

12          MR. DELOZIER:  Thank you, Your Honor.

13  Good afternoon.  What we've done is reproduced

14  the list that's in your preliminary instructions, what the

15  Judge just read for you.  That's what this chart is

16          Obviously, at this point as you've just been

17  told, we've reached the third and final stage.  And what we

18  have now is Wendi's life hangs in the balance.

19          In this stage, you'll be asked to determine

20  whether this young woman has lived a life that's worthy of

21  death or whether she deserves to continue living, albeit in

22  a prison cell.

23          Throughout the trial what we have worked to do is

24  present to you evidence not only of what happened that

25  dreadful morning of October 8th, but also of the life that

1   preceded that.

2          I'm not going to go into all the things we talked

3   about during that time nor am I going to repeat all the

4   things that I told you in my opening statement.  But I am

5   going to give a thumb nail sketch of some of those things.

6          We described to you her religious training and

7   religious experiences.  We told of a little girl who grew

8   up in what most of us would consider unusual circumstances,

9   including traveling with her parents for several years as a

10  vagabond, I guess is the right word, street preacher.

11         She attended this strict, isolated religious

12  school.  And, of course, living with a stepfather who was

13  loving but yet oppressive and sometimes abusive.

14         Her first job as you might remember right out of

15  high school was serving as a teacher's aide at that same

16  religious school.  After that, she gave up six months of

17  her life to be a missionary in Mexico.  She attended the

18  local community college.  And from what we see, there was

19  no problems there.  She made good grades.  She worked at a

20  hospital.  And then, of course, she did what most of us do,

21  started finding out about the rest of the world.  She met

22  Joe and found him to be fun and attractive and quite

23  different from the folks she'd been associating with up to

24  that time.  He was part of the Casa Grande in-crowd and had

25  a lot of fascination for this, what we consider to be an

1   innocent young girl at the time, who lived a sheltered

2   life.

3          He became, what we describe and she described, as

4   the love of her life.  Wendi did find Joe to be someone who

5   she thought needed her love.  He needed her to help wash

6   away, as she described it, the isolation he felt from some

7   of the people that he was close to or normally would be

8   close to.  He appeared to be happy-go-lucky in public but

9   in private she tells us and others that he cried and had a

10  deep sense of sadness within.  She then decided to marry

11  him.  She believed that if she loved him enough, everything

12  would get better for both of them.

13          She continued to believe that loving him would be

14  enough when he became verbally and physically abusive

15  toward her.  She continued to believe loving him enough

16  would be good enough when his businesses failed, and

17  remember we described several of those.  She continued to

18  believe that loving him would be enough when she was placed

19  in the role of sole wage earner, when Joe couldn't or

20  wouldn't hold a steady job.

21          She believed that loving him enough would be good

22  enough when he got the cancer.  You might remember even

23  going to the church as an exercise.  If she could just love

24  him enough maybe he'd get well.  These are thoughts that

25  she believed.

1        She believed loving him would be enough when he

2   made the decision to end his own life.  Loving him, that

3   meant doing what he wished and supporting him in that

4   decision, as well.  Perhaps her biggest failing is she

5   loved him too much.  She loved enough to keep the secret

6   about the abusive nature of her husband.

7        Wendi was not alone in that category of people

8   who love their family members afflicted with cancer so much

9   they feel compelled to assist in their suicide plan.  We

10  hear about that regularly.

11       As many loved ones do, she loved enough to go

12  along with this elaborate plan which was devised by him for

13  him to commit suicide so he did not suffer a long and

14  agonizing death of cancer.  Through her husband, Joe, she

15  understood that Catholics believe that anyone who commits

16  suicide would not be with the Lord.  Even after Joe's

17  death, she loved him enough to keep her promise about

18  keeping his suicide a secret, even when she was arrested.

19       She did not profit from his death.  There is no

20  life insurance that she is named a beneficiary.  And, of

21  course, as you heard, the malpractice case did not go

22  anywhere.  In fact, she lost everything when he died.  She

23  lost her husband and her future.  She lost her freedom.

24  She lost her children, Nicholas and Ashley, who she hasn't

25  seen now in over four years and she will likely never see

1   or talk to them again.

2        In this phase we will also present testimony

3   about who Wendi has become while she's been in jail these

4   last four-plus years.  You will hear how she has been

5   helpful and supportive to those people who have been

6   overseers of her.  How, in fact, those overseers have come

7   to depend on her.  She's helps them manage those within the

8   jail who need special care.

9        Again, this is Wendi hoping to help someone

10  simply through her loving and caring.  She has no secondary

11  gain from any of these acts of kindness.  You heard about

12  secondary gain through part of the first phase.  There's no

13  secondary gain here.  You might consider commissary

14  benefits, but those are not anything you'll hear she took

15  advantage of either.  It's simply that she's a person who

16  is caring and wanted to help.

17        Wendi has begun, through counselors -- and she's

18  had quite a bit of counseling while she's in the facility,

19  not only from the facility itself but from outside folks --

20  to understand what happened to her during the eight years

21  of marriage.  And we believe -- she believes she's

22  returning to the woman she once was, before she was faced

23  with a life filled with, what I would call, desperation.

24        On October 8, she was a young woman pushed to an

25  act of desperation out of very pitiful circumstances.  She

33

1   was working long hours.  She worked hard to support her

2   family.  She carried the financial burden alone.  She

3   raised two growing babies.  And, of course, she was caring

4   for Joe who was dying of cancer.

5          All those things happening right before her eyes,

6   essentially.  And she was essentially helpless to change

7   any of it.  No matter what she tried, nothing worked.  She

8   sought other friendships during this later period to

9   somehow help her cope.  That's how she saw it anyway.  And

10  not all of those friendships obviously were appropriate.

11  Sometimes she drank too much as you heard.

12         Without a doubt, she made some bad choices,

13  especially on the morning of October 8.  She is now working

14  to accept those choices that she made through her marriage

15  and understand better why she made those choices.  We

16  worked to present to you evidence not only of October 8 but

17  also of her life before that night.

18         As you consider her fate, we ask that you

19  consider the whole person, to look at her whole life.  Who

20  she once was.  Who she became during the years of marriage

21  with Joe.  And who she has been while sitting in jail for

22  the last four years.  Actually, over four years now, four

23  years and two months.

24         She is not a career criminal.  She has no history

25  of being in and out of jail.  She has no history of

1   initiating violence either before or since that terrible

2   night with Joe. She's simply a mortal being. A woman who

3   has made mistakes, errors in judgement, as, I suspect, we

4   all have.

5           But should she be condemned to death for those

6   choices or those decisions? I hope that you will see a

7   desperate and defenseless woman who acted wrongfully at the

8   time and made bad choices but hopefully that a person who

9   should be condemned to death for those choices and

10  decisions.

11          I beg you that you find that death is not an

12  appropriate choice to make for her. She has no choice

13  about her future. Only you do. Grant her the ability to

14  make choices that lead to life and not death.

15          Mr. Martinez wants you to believe that she

16  believed by killing Joe she would be able to acquire

17  millions which we know that theory has no basis. She lost

18  everything. She gained nothing. So obviously that theory

19  has no basis.

20          He also told you of fictional characters that

21  also had no meaning in this case, saying that Wendi was

22  living in an unreal world. The choices she made during the

23  time she was living with Joe did not show you a person who

24  was seeking gain for herself. She only made these choices

25  to support her family due to the will of her husband. The

1   world she occupied was a very real world.  A world filled

2   with desperation and never-ending, yet escalating, one of

3   desperation.  It's not one of fictional characters but one

4   of a world of endless and continued real characters in a

5   very real-life drama.  Continually filled with an ever

6   increasing dilemma that none of us would wish on anyone.

7   She lived it and she saw it.  And her efforts, all of her

8   efforts, ended in frustration and failure.  Actually, her

9   expenses at the county jail for the last four years have

10  largely been a source of refuge and peace for her.

11         Finally, she did not have to perform for Joe's

12  benefit.  His brutality could harm her no more.  And she

13  was safe from all those wrong choices and did not have to

14  make any more for him.  She found peace in a very unusual

15  place: In jail.  She began, through the help of

16  counselors, to understand what happened, as I said a moment

17  ago, in those years.  She began to understand what happened

18  to her and admitted the wrongs she has done that were

19  basically out of character.  She's not the same person she

20  was when the police arrested her on October 8th.  She

21  believes she's learned to be in character.  Some may even

22  say she's been reformed.  She never intended to harm

23  anyone, especially the love of her life.  She has not

24  harmed anyone while she's been in jail the last four

25  years.  It's unlikely she'll ever harm anyone in the

1   future.  I urge you to vote for life for her.

2          As a whole, and individually, you have held Wendi

3   responsible to those few moments that resulted in Joe's

4   death by finding her guilty of first-degree murder.  She's

5   already paid a great price for the losses that she has

6   suffered.  In the final analysis, we should be judged for

7   our whole life, not judged for a few moments of very bad

8   choices.  I beg you to find that death is not the choice

9   that you make.  She has no choice as I said about her

10  future, only you do.  Grant her the opportunity to make

11  choices from this day forward that can be redemptive for

12  her.

13          Now, my purpose in doing the summary, as I told

14  about the chart, I tried to touch on those without pointing

15  to them but there are specific ones that obviously are

16  enumerated there.  I believe that we felt, we've hit the

17  majority of them.

18          We obviously talked about the stress of the

19  husband's cancer.  We stressed -- you heard of the

20  misdiagnosis and the stressed that caused.  The euphoria

21  that it had to bring when they found it is not malignant.

22  Obviously, the despair that had to come when they found it

23  was terminal illness.

24          You heard of the stress of the economic

25  difficulties.  You heard of the first counseling that

1   occurred in 1996 that involved Wendi getting counseling on

2   her own for stress that she had for a family situation.

3        We'll show you in due course the grades.  They

4   are very good grades, 3.76 is what you'll see when we show

5   you that.  You're also going to hear from Laura King and

6   Dr. Perry and I think one other person from the jail about

7   how helpful she's been while she's been in there with some

8   of the things that needed assistance.

9        I appreciate your listening to us and urge you to

10  give her a chance to live out her natural life.  Thank

11  you.

12        MR. MARTINEZ:  May we approach?

13        THE COURT:  Yes.

14        (Bench conference was held outside the hearing of

15  the jury.)

16        MR. MARTINEZ:  One of the things that

17  Mr. Delozier alluded to was that she is quote, unquote not

18  at career criminal.  I suggest that he has now opened the

19  door.  I should be allowed to ask about the issues

20  involving the thefts and issue involving Cynthia Edwards.

21  They were forewarned in advance.  I should be allowed to

22  rebut those issues in my opening statement.

23        THE COURT:  I'm going to deny the State's

24  motion.  It's a lack of felony convictions.

25        (Bench conference concluded.)

1            THE COURT:  Mr. Martinez.

2            MR. MARTINEZ:  Good afternoon.  In the first

3   phase of these proceedings, you were presented with a set

4   of facts.  You were presented with a lot of evidence that

5   came from that witness stand.  And to aid you or to lead

6   you or guide you during your deliberations you were

7   provided with a set of jury instructions which was the law

8   that you were to follow with regard to that first phase of

9   the proceedings.

10           And after some deliberation and after a

11  consideration of the evidence and the law that was given to

12  you, you came back with a decision.  And that decision was

13  that Wendi Elizabeth Andriano was guilty of premeditated

14  murder, first-degree murder of her husband Joseph

15  Andriano.

16           Shortly after that, you were asked to sit through

17  a second phase.  And that second phase and, in that second

18  phase, you were also presented evidence that came from the

19  witness stand.  You were also told that you could consider

20  the other evidence that had been presented to you during

21  the first part of these proceedings during the guilt

22  phase.

23           Additionally, before you went back to deliberate,

24  you were given another set of instructions, the law for you

25  to follow.  And you went back there and you did just that,

39

1   you followed the law.  You applied it to the facts and you

2   came back with a decision indicating that this particular

3   murder of Joseph Andriano was cruel.  That it was beyond

4   the norm.  That was your decision and that was after

5   applying the facts to the evidence that was presented to

6   you.

7           And now we come to the last, the final, the third

8   phase.  And, again, you will be given evidence, just like

9   you did in the previous two.  And just like in the previous

10  two, you will also be given the law that you indicated that

11  you would follow regardless of your personal feelings.  And

12  that is the law that you will take back with you to

13  deliberate and talk about Wendi Elizabeth Andriano.  The

14  procedure is no different.  The law is given to you, the

15  facts are presented to you and you are asked to

16  deliberate.  You are, each and everyone one of you, as

17  before, is asked to apply the law to the facts.  And that

18  you would do that, you indicated that you would do that and

19  that you would apply the law to the facts regardless of

20  what your feelings were.

21          So in this particular case, one of the factors,

22  there are certain factors that the defense want you to

23  consider.  And in considering those factors, I want you to

24  keep in mind that everything that has been presented up to

25  this point is not to be disregarded.  It's something that

1   you take back with you.  It's something that you have

2   already assimilated and it is something that is there for

3   your consideration.

4           One of the things that speaks to you when you go

5   back to the deliberation room or when you consider this

6   case, is the defendant's character.  That was pointed out

7   to you as part of the instructions.  One of the things that

8   you cannot forget about this case, and one of the things

9   you cannot put aside, is that when it's to the defendant's

10  benefit she always tried to find a way out of it.  She's

11  trying to find a way out of things now.

12          If it's to her benefit, she will stop at

13  nothing.  Perhaps, that may happen here.  She will resort

14  to lying.  She will resort to violating the tenants of her

15  religion.  She will do anything earthly that is available

16  to her, including taking a knife and sticking it in her ill

17  husband's neck.

18          That is something that you need to consider and

19  that is sort of, if you will, the overall conundrum for you

20  to take back with you in considering the so-called

21  mitigating circumstances.  Because, after all, you are

22  going to be asked to consider whether or not they are

23  sufficiently substantial, these mitigating factors, in

24  order to warrant leniency; in order, if you will, that the

25  death penalty not be imposed.

1       But, again, when you are making that

2  consideration, please consider everything that has been

3  said.  Please consider the type of person that you are

4  dealing with and the type of person that you are dealing

5  with before.  Because just because you happen to be in a

6  jail, you just don't change overnight or you don't change

7  at all.

8       And in this case, we have somebody who was taught

9  between right and wrong, who was taught about the Bible.

10 According to her, was taught about Christian values and

11 knew right from wrong, knew you shouldn't kill, knew you

12 shouldn't lie, knew you shouldn't cheat.  Knew all of

13 that.  Yet, chose to disregard all of that.

14      So, again, when you go back to consider these

15 mitigating, so-called mitigating circumstances -- which the

16 State maintains they are not -- take a look at that and

17 keep that in mind.

18      Let's talk about the first three that they

19 presented to you; no prior felony convictions, no prior

20 misdemeanor convictions, good candidate for

21 rehabilitation.  Those can be taken as a group.  The reason

22 I say that they can be taken as a group is because they're

23 telling you, well, up to this point, when this happened,

24 she had not been convicted or gone through the process of

25 the law before.

1        But that doesn't take into account as I told you

2   before, all the other misdeeds she has committed.   For

3   example, the infidelity.   We talked about it so much that

4   you perhaps are a little bit calloused about Joseph

5   Andriano's condition.   We talked about it over and over so

6   that it gets to the point where it becomes somewhat

7   callous.   But to him it wasn't callous.   To him, losing his

8   life, it wasn't callous.   To him, it was a situation where

9   he is fighting for his life.

10       So, again, you go back there and you take a look

11  at that.   And you take a look at this individual that says,

12  well, I hadn't committed anything that's a violation of the

13  law.

14       Well, but does that make it okay?   Does that mean

15  that just because you have no prior felony convictions

16  everything's okay in light of everything that you've done?

17  For example, she lied on her federal student loan.   Well,

18  they didn't choose to prosecute her.   Does that mean it's

19  not a prior felony conviction?   The other thing we know is

20  that --

21       MR. DELOZIER:   Your Honor, no argument.   He's

22  been venturing into argument.

23       THE COURT:   Don't argue, Mr. Martinez.   Just give

24  the jury a presentation of what you feel that the evidence

25  will be presented here at the penalty phase and the

1   previous phases.  No argument.

2            MR. MARTINEZ:  The evidence is that she did lie

3   to the federal government.  You have that document that

4   indicates that.  Lying is a crime.  Of course, she doesn't

5   have a felony conviction.

6            Additionally, the other thing that you know about

7   her is that when push came to shove, she chose to drive

8   without a license because her license was suspended.  In

9   and of themselves, that indicates, well, those aren't that

10  big of a deal.  But they want you to come in and believe

11  that this person is white as the driven snow when, in fact,

12  she really isn't.

13           Again, we go back to the morning of October 8th

14  of 2000.  The reason that's important when we take a look

15  at where it says no prior felony convictions, that's

16  absolutely wrong.  And you know that that's absolutely

17  wrong.  Because she does have, as she sits before you, one

18  felony conviction.  And it is the worst of the worst.

19  There is nothing worse that an individual can do.  And that

20  is to commit first-degree murder.  And beyond that, to make

21  it unusually cruel in the way that she committed that

22  first-degree murder.

23           So you look at the felony -- no felony

24  convictions, but you also have to look at what she did.

25  When she did, if you will, come to attention of law

1    enforcement in the sense of being arrested, she went

2    straight to the top.  So do you give her the benefit of the

3    doubt?  Does that mean that the crime is any less cruel?

4    Does it mean that Joseph Andriano suffered any less?  It

5    does not.  It just means that up to that point there was no

6    prior felony convictions.

7              Is she a good candidate for rehabilitation?

8    Well, we know that she now has a prior felony conviction.

9    We also know that, again, when it's to her advantage, when

10   push comes to shove, even as to the most important matter,

11   as to the most important decision that an individual can

12   make in this life, whether or not someone lives or dies,

13   what does she do?

14             MR. DELOZIER:  Your Honor, he's continuing to

15   argue.

16             THE COURT:  No arguments, Mr. Martinez.  Let's

17   get straight to what the anticipated evidence is.

18             MR. MARTINEZ:  There is no -- can't be

19   rehabilitated.  Because as I told you before, she will take

20   the low road and you know that.  You saw evidence of that

21   in the guilt phase.

22             MR. DELOZIER:  Same thing, Your Honor.

23             THE COURT:  Continued objection.  No argument,

24   Mr. Martinez.

25             MR. MARTINEZ:  So they also talk about the other

1   factors.  Well, they claim that she's been a good mother to

2   two children.  That's what they say.  Good mother to two

3   children.  How good of a mother is she to two children when

4   she takes away their father from them.

5          Additionally, how good of a mother is she if when

6   Ashley is about to be born she says, "You know, I can't

7   stand the fact that I'm pregnant.  I just hate the fact

8   that I'm pregnant.  Because you see it's going to ruin my

9   body.  I'm going to get fat."

10         How good of a mother is she if she has a special

11   paddle for Nicholas that has a Bible verse on it.  So that

12   when he is two years old and says continuously to her no,

13   no, as babies are wont to do, she takes that paddle to

14   him.  Is that being a good mother?  And how good of a

15   mother is she when at least twice a week she's out with

16   other people, with other men.  How good of a mother is

17   she?

18         We also know that the individual who actually

19   took care of these two children was Mr. Andriano.  It

20   wasn't her.  So how is it that she can be a good mother?

21   She was not a good mother.  We know that.  Because it was

22   Mr. Andriano who actually took care of those kids.

23         They claim she's been married for eight years.

24   That's absolutely untrue.  You know that the marriage was

25   on January 22nd of 1994, the mathematics proves out that on

1   October 8th of the year 2000 it was only six years and nine

2   months.  They want to make it longer.  They want to stretch

3   it out, make it seem better.

4         They do claim she was a good student in school

5   and received awards and grades.  That's true.  But, rather

6   than calling for leniency, that calls for otherwise because

7   she knew better.

8         MR. DELOZIER:  Your Honor, I'm --

9         THE COURT:  Let me see counsel at the bench.

10         (The following conference was held outside the

11   hearing of the jury:)

12         THE COURT:  Mr. Martinez, I said three times to

13   state what the evidence will show.  You're asking questions

14   that are basically argument.  I want you to stop or I will

15   stop you right now.  So you just tell the jury what the

16   anticipated evidence is, what the evidence will present.

17   No argument.  No questioning.  That's argument, okay?

18         MR. MARTINEZ:  All right, Judge.

19         THE COURT:  You hear me?

20         MR. MARTINEZ:  All right.

21         (Bench conference concluded.)

22         THE COURT:  Mr. Martinez.

23         MR. MARTINEZ:  The evidence will show that she

24   did receive good grades.  She did receive awards.  She

25   received good schooling.  That she received the knowledge

1   that tells her right from wrong from when she was a little

2   girl.  Even from back then, she knew right from wrong.

3          The other factor they want you to consider is the

4   fact that she did some missionary work for her church in

5   Mexico.  And that can be put together with a strong

6   religious conviction they want you to consider.  Those were

7   strong religious convictions that she was taught indicated

8   that thou shall not kill, indicated that thou shall not

9   lie, indicated that you are not to cheat.  Before you, you

10  have a killer.  You have somebody who lied.  And you have

11  somebody who would cheat.

12         You have information that she's a good inmate in

13  the jail.  You will also hear about the conditions in the

14  jail.  There is no other recourse.  If you are not a good

15  inmate, there are things that can be done to you.

16         They have additionally she's helpful to the staff

17  and other inmates in the jail.  That may be true but

18  they're not convicted of murder.

19         Then, they indicated she was cooperative with the

20  authorities after arrest.  She had no option but to be

21  cooperative.  The people that arrested her had guns.  The

22  people that arrested her can arrest people and take them

23  where they need to take them.  You did see a three and a

24  half hour tape in which she spoke with the police about

25  this issue.  And during that conversation with the police,

48

1  you could see that she was not cooperative.  She was a

2  liar.

3         Additionally, the next three are domestic

4  violence victim, emotional abuse victim and a sexual abuse

5  victim.  The truth is that actually it was Joseph Andriano

6  that was the victim of domestic violence.  You will hear

7  whenever any member of his family would ask him, "Joe,

8  let's do this" or "let's do that" or "let's go here" or

9  "let's go there" or "let's do this thing" or "let's do

10  that thing," he would answer, "You know what, let me check

11  with Wendi because I don't want her to get mad at me."

12         You will hear that on Saturday, October 7th,

13  2000, when they were having that steak fry over at his

14  parents' house that he was, in fact, on the couch, and he

15  was lying there on the couch and at some point somebody

16  wanted to hook a trailer up to one of the trucks or one of

17  the cars that was there.  And Joseph Andriano was still

18  lying down on the couch when Wendi Andriano screamed from

19  across the room and said, "Get up, Joe.  You need to go out

20  there and help them."  His sister said, "No, you just had

21  chemotherapy.  You're feeling bad.  Go ahead and lay

22  back."  Well, he said, "No, I better get up.  I better get

23  up because I don't want her to get mad at me."

24         So the only individual here that was the subject

25  of any domestic violence was Joseph Andriano.  And he paid

1   the ultimate price.

2          She claims to have stress from her husband's

3   cancer.  Stress from the misdiagnosis of the cancer.

4   Stress of terminal illness.  And stress of economic

5   difficulty.  All of them are tied together.  But the facts

6   will show otherwise.  As you've already seen, she was able

7   to go out at least twice a week.  She was able to go out

8   with her friends and she was able to have affairs.  So that

9   will not be borne out.

10         They also indicate that she is no future threat

11  to the community.  With regard to that particular factor,

12  all you need to look to is what she already did.  And in

13  this case, what did she already do, well, when push came to

14  shove, she was going to be caught by the police, she

15  resorted to the knife, she resorted to the stool and lamp.

16  She staged the scene.  And when the police took her down

17  for questioning, she lied to them.

18         And then, they also talk about remorse.  There is

19  no remorse in this case.  She continues to maintain, even

20  through opening statement, that Mr. Andriano wanted to

21  commit suicide.  So, again, how can you be remorseful if

22  you don't think that you did anything wrong.  And she

23  doesn't think that she did anything wrong.  That's what

24  they just told you.  So you cannot have any remorse here

25  and you cannot find it.

1              Impact on the defendant's family.  Well, there

2    are certain consequences that one must accept as a result

3    of the actions.  And one of those is the impact on her

4    family.

5              MR. DELOZIER:  Your Honor, approach?

6              THE COURT:  Overruled.

7              Continue on.

8              MR. MARTINEZ:  And finally, the last factor that

9    they want you to consider is her age.  Her age at the time,

10   she was born on August 26, 1970, is 30 years old.  An

11   individual as her, who has had this schooling, according to

12   them she had a 3.7 average.  According to them she

13   graduated at the top of her class and has had the benefit

14   of experience.  It isn't like she was 17, she was 30 years

15   old.  At 30 years old, she had already had schooling.  At

16   30 years old she had already been married.  At 30 years old

17   she had already had kids.  At 30 years old she had already

18   been working.  She was sophisticated.  She knew right from

19   wrong.

20             So those are the factors they want you to

21   consider as mitigating circumstances.  The State would

22   submit to you that we want you to do the same thing that

23   you did with regard to the previous phases:  Take a look at

24   the law that the Judge gives you, take a look at the facts

25   that are presented and apply them.  And once you do that

1   and once you consider the cruel way in which Joseph

2   Andriano was killed --

3            MR. DELOZIER:  Objection, Your Honor.

4            THE COURT:  Overruled.

5            MR. MARTINEZ:  Mr. Andriano laid there for at

6   least an hour and a half, suffering while she sat and

7   watched.  Mr. Andriano was down on the ground, face down,

8   when she struck him with that bar stool and lamp.  And

9   Mr. Andriano was down on the ground when she stuck that

10  pillow in his mouth so people outside wouldn't hear.  And

11  he was defenseless when she stuck that knife in his neck.

12           A person of the age of 30 is now asking that you

13  find that there are mitigating circumstances sufficiently

14  substantial to warrant leniency.  In light of all that, the

15  State submits to you now that, and we will discuss it again

16  later, that an appropriate sanction is the ultimate

17  sanction, one she extracted, the death penalty.  Thank

18  you.

19           THE COURT:  Ladies and gentlemen, turn to the

20  preliminary jury instructions on page 3 there is a

21  typographical error.  On page 3, paragraph 2, it talks

22  about preliminary instructions concerning juror it says

23  "contact" but it should be "conduct."  So go ahead and

24  correct that on the preliminary jury instructions.

25           Is that agreeable to counsel?

52

1    MR. MARTINEZ:  Yes, sir.

2    MR. PATTERSON:  Yes, Your Honor.

3    THE COURT:  Thank you.

4    At this time, the victim's survivors will make a

5  statement related to the characteristics of the victim and

6  the impact of the crime on the victim's family but may not

7  offer any opinion regarding the appropriate sentence to be

8  imposed.

9    Mr. Martinez?

10   MR. MARTINEZ:  Before we start, I would like to

11 move into evidence Exhibit Number 542.

12   THE COURT:  Counsel, approach.

13   (Bench conference was held outside the hearing of

14 the jury.)

15   MR. DELOZIER:  I have no objection to the

16 introduction of this exhibit.  But I'm going to ask how

17 it's going to be used in the context of the victim impact

18 statement.

19   THE COURT:  Are you going to hold the

20 photograph?

21   MR. MARTINEZ:  At the end, not during.

22   MR. DELOZIER:  That's fine.

23   (Bench conference concluded.)

24   THE COURT:  Exhibit 542 for identification is

25 admitted into evidence.

1          MR. MARTINEZ:  The State calls Jeanette Andriano

2   to the stand.

3          THE COURT:  Please make yourself comfortable on

4   the witness stand.  Please speak right into the microphone

5   there in front of you.  Also please remember to speak

6   loudly and clearly so everybody can hear you.

7          Why don't you go ahead and state your full name

8   for the record.

9          MRS. ANDRIANO:  My name is Jeanette Andriano.

10          THE COURT:  You may proceed.

11          MRS. ANDRIANO:  Ladies and gentlemen of the jury,

12   I know that you will be making your decision on the facts

13   of this case and the laws that you are given.  However, I

14   would like you to consider some of the following things.

15   Nothing in my background has prepared me for the purpose of

16   speaking to you today in this courtroom about the shocking

17   and cruel murder of my son, Joe.

18          I have been in court every day listening to the

19   facts of this case and I just still have problems believing

20   that this horrible crime happened.  I still can't believe

21   all that he had to endure.

22          It was four long years ago when two members of

23   the Phoenix Police Department came to our home in Casa

24   Grande to tell us of the horrible tragedy at San Riva

25   Apartments.  It has changed our family's life forever.

54

1        It was October 8th, 2000.  It was a Sunday

2    evening.  My husband Joe and I were having a very quiet

3    dinner.  It was the first and the last time that the police

4    have had to come to our home.  Immediately, I knew that it

5    had to be bad news.  Mother's instinct.  I just quickly

6    reviewed our children's whereabouts.  Jeanea was with her

7    husband in Gilbert.  Jana and her husband live in Memphis.

8    James had gone to a friend's home in Casa Grande.  And, of

9    course, Joe was with Wendi, his wife, in Ahwatukee.

10       As the policeman proceeded I heard him say that

11    my son Joseph had been murdered and that this wife did it.

12    My heart stopped for an eternity.  I could not believe

13    something this horrible could happen.  And I have to tell

14    you it's true.  A mother should not have to bury her eldest

15    son.

16       Later, after time has passed, I felt betrayed

17    that his wife could have done this horrible thing.  Joe

18    brought her into our family and we accepted her.  This kind

19    of horrible, terrible tragedy happens to other families.

20    And now it's happened to mine.

21       Our son, Joe, suffered terribly with cancer.  He

22    did not share his pain with us.  He tried to shield us from

23    seeing him in pain.  That, in itself, was painful to

24    watch.  He told me once that it didn't help to complain

25    about the pain.  So he would suffer in silence.  Even

1  though he had a twinkle in his eyes, he was still

2  suffering.  And as his mother, I knew he was suffering.

3          During the chemotherapy treatment that I

4  attended, he would encourage others and would joke with the

5  patients that he had met there previously.  There was a

6  camaraderie with the nurses and the patients.  And I could

7  see that twinkle in his eyes and that little smile that was

8  mischievous.  And I'll never see that again.

9          During that time he lost his hair.  His body was

10 giving out.  He lost a lot of weight.  His strength was

11 gone but he had not lost his spirit.  Because of the

12 cancer, he tried to live each day to the fullest.

13 The cruel and brutal way that he died is just

14 very hard for our family to accept.

15          I heard testimony in court that he was ashamed of

16 his bald head.  Nothing is further from the truth.  Joe was

17 to have been in his friend's wedding in November of 2000.

18 Unfortunately, he never made it.  But he joked about buying

19 a wig to wear to the wedding.  We encouraged him to go like

20 he was because he was so handsome.  We also joked that

21 everyone would be looking at the bride and groom and that

22 they wouldn't really notice him.  It was all just good

23 fun.  And she took that from us.

24          When I think of the horrific and painful way that

25 his last minutes were spent, it just makes me cry.  I would

1   just never ever be able to accept it.  And I've seen the

2   pictures, just like you.  The back of his head and things

3   over and over.  How I wish he had not suffered so.

4        I heard the defendant tell how she was ashamed of

5   Joe because he was gross and skinny.  And, on the other

6   hand, he just loved her so much.  He was grateful that he

7   was alive and he could spend some time with her and his

8   children.  He always took pride in his demeanor.  He kept

9   himself looking good.  He was always looking for the

10  brighter side of life.

11       And as these holidays approach, because Christmas

12  is difficult for our family now, it's always been a special

13  time for us.  I have special ornaments that I got for each

14  of the children as they were growing up.  And each year Joe

15  would jokingly check to make sure that I hadn't lost any or

16  forgotten any.  Especially his boat, his Snoopy and his

17  skis.

18       I set the tree up this weekend.  And I've added

19  an angel holding a blue flower to remember him.  But I

20  still put the other ornaments up, too.

21       As a child, Joseph was mechanically minded and he

22  liked to take things apart.  He would change parts around

23  to make things go faster.  I recall Joe as a little boy

24  when he received his first bicycle early in the morning.

25  By afternoon he had it taken apart because he was going to

1  improve something.  I always found it funny and ironic that

2  his father had spent most of the evening before trying to

3  put the bike together and amazingly Joseph had no parts

4  left over.

5          I have many things that remind me of Joe.  When

6  Joe had just gotten out of high school he and some friends

7  reroofed our house after a storm.  It was interesting to

8  watch them to do this job.  And they really did an

9  excellent job.  Now, almost 20 years later, we've had to

10  replace the roof.  And that's another thing that reminds me

11  of Joe that is now gone.

12          Joe was a good welder.  He made gates and

13  security covers for our windows to be sure that we were

14  safe.  Too bad I couldn't do the same for him.  We still

15  have the covered trailer that he made for the four

16  wheelers, remembering the joy that he had in going to the

17  dunes.

18          When I go to Oklahoma to our family farm, I see

19  several pieces of equipment that he repaired or welded

20  together.  It breaks my heart.  I should probably get rid

21  of them but I just can't.  He loved going to the farm in

22  Oklahoma.

23          One of these trips he took Nicholas and Ashley

24  with him.  He was so proud to take the children and show

25  them the things and the people that he loved.  He wanted

1   his children to be a part of the farm.  That's impossible

2   now.  She took the last months on earth from him.

3        Saturday, October the 7th, 2000, was the last day

4   that I spent with Joe.  I was trying to remember everything

5   that he said or we did.  When this date rolls around, I

6   ponder and I sift through all the "what ifs."  I know I

7   cannot change things that happened that night but I sure

8   wish I could.

9        That day, Joe wanted to go to the swap meet to

10  pick up a tricycle that had two seats so Nicholas could

11  peddle and Ashley could ride on the back.  It brought him

12  such joy to see both children riding together.  The

13  children have out-grown it now.  But I've kept the bike

14  anyway.  Makes me feel close to him.  The children

15  sometimes dig it out of the storage room and play with it.

16  It just eats at me that Joseph didn't get to help these

17  children to learn to ride their first bike or to

18  skateboard.  It makes no sense to me that the children have

19  missed the opportunity to have him guide them on all the

20  toys that he loved.  At least, he would have had a few

21  months more.

22       That Saturday evening we had a family steak fry.

23  The grandchildren played outside while the adults enjoyed a

24  football game on TV.  Joe had brought his favorite German

25  chocolate pie from Marie Calendar's for all of us to

1   enjoy.  He had the same little twinkle in his eye that told

2   me he was really enjoying eating the pie with all of us

3   around him.

4          I really miss having these get-togethers with all

5   the families.  It's just not the same.  One family is

6   missing.

7          Before he left that evening, I shared with him

8   that there was a possibility that the school district would

9   close the school that I had taught in for 20 years and I

10  shared my reluctance to my retiring.  Joseph spoke right up

11  saying that he was sure that I would continue to work with

12  children, teaching them to read and sharing a love of books

13  with others.  He knew where my heart was.  I really miss

14  his encouraging words.

15         I have sat in this courtroom these many weeks

16  listening to witnesses describe the murder scene.  I saw

17  pictures of him lying on the floor in a pool of blood.  I

18  saw pictures of my son's head that had been struck 23 times

19  with a bar stool and the parts of the lamp.  I saw the

20  vomit on the floor.  I saw the wound to his neck.  This is

21  the kind of things that mothers should not have to see.  It

22  was my flesh and blood that had been savagely brutalized.

23         All this has been painful and hurtful for me to

24  see.  But I cannot imagine the hurt, the pain, the betrayal

25  Joe must have felt as his blood was squirting everywhere,

1   as he was losing consciousness, to see that his attacker

2   was his wife.  This woman he had vowed to love until death

3   do us part.  As he was being struck on his head, he must

4   have lifted his arms to protect himself from the blows.

5   The arms that he had held her in tender embrace.  I just

6   can't image the feeling of betrayal that he felt.  I can't

7   even imagine.

8          I know that my boy isn't the one on the floor

9   covered in blood or the one on the coroner's table.  This

10  is my boy.  This is how I will remember my boy.  And he's

11  going to be my boy forever.  Thank you.

12          MR. MARTINEZ:  The State calls Joseph Andriano.

13          THE COURT:  Sir, please step forward and take the

14  witness stand.  Remember to speak loudly and clearly into

15  the microphone so everyone can hear you.

16          MR. ANDRIANO:  Ladies and gentlemen of the jury,

17  I can't tell you how angry and hurt I am about my son's

18  murder.  Instead, I'll tell you about, only about the pain

19  and the emptiness that I'll live with for the rest of my

20  life.

21          It's painful every time that I go out in town,

22  eating and shopping and seeing young fathers and families

23  interact with each other, husbands and wives.  The

24  modern-day dads are really involved in raising their kids.

25  It's rough every time I go out.  It's difficult to go to

1  town.

2         Every weekend in the spring, as his friends and

3  others drive through town to the gas stations and on the

4  way to the lake, I notice a crew and a boat missing, and

5  it's Joe's.  One Father's Day, Joe and I went to the lake

6  and he'd asked me earlier in the week, he said, "Dad, I

7  don't know what to get you.  Would you like just the two of

8  us to go to the lake together?"  And we did and that was

9  one of the best Father's Days I probably ever had.  He'd

10 given up time with his friends and buddies to spend the

11 day, the weekend with me.  That will never be again.

12        The days at home on the farm are constant

13 remainders of Joseph.  The things he did.  His mother

14 mentioned the security windows.  I can see things in the

15 shop and things that he built.  And I find myself, if

16 something is broken or something, wanting to call him.

17 That's tough.  I'll never be able to talk to him again.

18        When Joe was last coming in from out of town

19 sometimes he'd give me a call and once in a while he'd have

20 Nicholas with him.  When he was in the area we'd go to

21 lunch and spend a little time in between jobs.  The time we

22 had time together was special and that no longer will be.

23        When I see his children, especially Nicholas,

24 which is the spitting image of Joseph when he was that age,

25 it's just a huge void in my life.  Joe was a loving father

1  who really loved his family and enjoyed giving them

2  undivided affection.  He was proud to show them off, always

3  come and visit me at work.

4        Shortly before she killed him, I remember Joe

5  talking about taking a trip to Disneyland with his kids so

6  he could see their eyes light up when they saw the magic

7  world of Disney.  He also spoke about how honored and

8  anxious he was to being in Brandon's wedding, bald or not.

9  He was looking forward to that in November.  Neither of

10  these events included Joe.

11        So now I have to go through the motions of living

12  without Joe.  His children will no longer be able to see

13  him.  They don't get to play and splash with him when he

14  gives them their baths in the tub, which he did so often.

15        Saturday, October 7th, we had a steak fry at the

16  house with Joe and his family, Jeanea and Brandon and their

17  family.  Joe wasn't able to get out in the yard and play

18  with them like he normally did.  He just wasn't up to it

19  but he come out and watched a while and then he goes back

20  in the house and rest.  And but he would check on them.  He

21  came out and took pictures of the kids playing.

22        I know that last night when he left was the last

23  hug and "I love you" that I'll ever hear from him.  He came

24  in, woke me up because I usually go to bed a little earlier

25  than the rest of them.  Those days are gone forever.

1          Since he was murdered, Thursdays are the most

2   difficult days of the week.  He used to come down, we'd go

3   to lunch on Thursday and I'd spend time with him and most

4   of the time he'd bring the kids with him and we'd go eat

5   and then ride around and visit.  Thursdays are hell.  They

6   are filled with emptiness and pain, four Thursdays a

7   month.  We only had too few of those Thursdays left.  And

8   those were taken away from me, to be gone forever.

9          On October 8 of 2000, my life changed for the

10  worse.  And Wendi Andriano is responsible for that.

11  Because he stayed with her, even though he should have left

12  her, that cost him his life.

13          THE COURT:  Mr. Patterson, you may call your

14  first witness.

15          MR. PATTERSON:  Thank you, Judge.  Defense calls

16  Laura King.

17          (Witness sworn.)

18          THE COURT:  Please make yourself comfortable in

19  the witness stand.  Please speak clearly and loudly so

20  everyone can hear you.  Wait until the question is

21  completed before you answer the question.  And please make

22  sure you give a verbal response.

23          Is that agreeable to you?

24          THE WITNESS:  Yes.

25

1                    LAURA KING,

2  called as a witness herein, having been first duly sworn,

3  was examined and testified as follows:

4

5                 DIRECT EXAMINATION

6  BY MR. PATTERSON:

7        Q.   Would you give us your name, ma'am?

8        A.   Laura King.

9        Q.   And by whom are you currently employed?

10       A.   At the time I am not currently employed but I'm

11  going to work for the State of New Mexico, correction's

12  department.

13       Q.   When do you anticipate commencing that particular

14  job?

15       A.   20th of December.

16       Q.   And what will that job entail?

17       A.   I will be performing counseling services and

18  assessment services for inmates at the central New Mexico

19  correctional facility.

20       Q.   And prior to taking the job, where were you

21  employed?

22       A.   I was employed with Correctional Health Services

23  at the Durango jail, psychiatry unit, at Maricopa County,

24  official employer.

25       Q.   And did you work on site at the Durango

1  psychiatric facility?

2      A.   I did.

3      Q.   And what was your job description or title at

4  that particular location?

5      A.   My title there was counselor.  And you want me to

6  tell you what I did?

7      Q.   What were your job description activities as a

8  counselor there at Durango?

9      A.    My activities are assessment of inmate patients

10  coming on to our unit, development of treatment plans,

11  one-to-one counseling, group counseling, crisis

12  intervention, discharge planning.

13      Q.   And how long were you employed in that capacity

14  with Correctional Health Services?

15      A.   For three years.

16      Q.   What educational background or experience do you

17  have that allows you to participate in that kind of job?

18      A.   I have a master's in Social Work from Arizona

19  State University.

20      Q.   And a bachelor's from where?

21      A.    I have a bachelor's in Fine Arts from New York

22  University.  And then following that I took a number of

23  hours in postgraduate psychology classes.  And through the

24  master's program I worked an internship with a federal

25  public defender's office on the habeas corpus unit doing

1   interviewing, research and review.

2       Q.   Okay.  Was one of the client's that was on your

3   case load during the time that you worked at the Durango

4   psychiatric unit Wendi Andriano?

5       A.   Yes, she was.

6       Q.   And when did she first become part of your case

7   load?

8       A.   She became part of my case load at the end of

9   September in 2003.

10      Q.   Okay.  And describe the unit for me.  I assume

11  there are various jails in the county, correct?

12      A.   Yes.

13      Q.   Approximately how many jails are there?

14      A.   There's Durango, Towers, Estrella, Madison and

15  Estrella tents.  Those are the adult facilities.

16          In Durango we have a unit dedicated to inpatient

17  psychiatry.  We house both men and women there.  And we are

18  the only inpatient psychiatric unit for females within the

19  county jail system.  We have, at any given time, in terms

20  of women patients there, we have probably between 20 and 40

21  people.

22      Q.   Okay.  Once again, refresh my recollection, what

23  date did you acquire Wendi?

24      A.   On the 28th of September, 2003.

25      Q.   And to your knowledge, Wendi had been in the

1  system, the jail system, since approximately October 8th of

2  the year 2000?

3      A.   Yes, she had been in custody approximately three

4  years.

5      Q.   During that three year period, what facility was

6  she detained in?

7      A.   She was held in Estrella, the women's facility.

8      Q.   And did she have a different counselor during

9  that period of time she was in that facility?

10     A.   In the Estrella facility, contact with

11  psychiatric staff is provided on an as needed basis.  There

12  is no routine -- there is no routine encounters unless

13  someone is taking medication and periodically the

14  prescriber of the medication will have to meet with the

15  client.  Or, if the client is having some kind of crisis,

16  they can self refer and a counselor will meet with them.

17  Or oftentimes detention will notify psych that that person

18  is having a rough time and a counselor will come and see

19  that person.

20     Q.   Okay.  But there aren't counselors assigned full

21  time at that facility?

22     A.   They are but not to particular individuals.

23     Q.   Assigned to the facility but not a client case

24  load?

25     A.   Correct.

1     Q.   Tell me about the Estrella facility, what kind of

2   inmate population is housed there?

3     A.   At the Estrella facility there would be all of

4   the female inmates who would be there, both sentenced and

5   unsentenced, for any variety of things, all the way from

6   unpaid parking tickets to the most significant felonies.

7   The way they would be housed at Estrella would be according

8   to their security classifications.

9            And then, of course, there is our unit which is

10  another, the only other place where women are routinely

11  housed, the inpatient psych unit.

12    Q.   How is it that Wendi was transferred from

13  Estrella to the psych unit in September of 2003?

14    A.   Wendi made a suicide attempt which was actually

15  quite significant.  She was -- there was a lot of concern

16  that she might continue to be a danger to herself.  And so,

17  she was sent to our unit for evaluation and assessment and

18  stabilization.

19    Q.   What was the manner or method of the suicide

20  attempt?

21    A.   I believe that she inserted a pencil into a vain

22  in her arm.

23    Q.   So, that is one of the reasons or basis that a

24  person is taken from general population environment and

25  placed in the Durango psychiatric unit?

1    A.   That is one of the circumstances that would lead

2  to that, correct.

3    Q.  All right.  And upon arrival at your location,

4  you told us about one of your tasks is to do assessments.

5  What, essentially, is a social worker assessment of the

6  client?

7    A.   We would talk to the client about their

8  background issues and currently what they're experiencing.

9  We would try and ascertain whether the person was an

10  immediate risk to themselves still.  We would try and find

11  out if there were any significant symptoms that indicated

12  mental illness.  We would look at a full sort of

13  psychosocial background, where they come from, what the

14  stressors were that they were involved with right now.

15       In Wendi's case, because of the seriousness of

16  the charge, there were a number of things which we couldn't

17  speak to her about because it would be -- it would be

18  contrary to our mission.  We don't want our clients -- we

19  don't talk about anything related to the case or the thing

20  they're focused on because that's just not our purpose and

21  it's considered detrimental to the client.

22    Q.  So you didn't discuss with Wendi the facts and

23  circumstances of Joe's death?

24    A.   No.

25    Q.  Did you discuss or formulate treatment plans,

1  group facilitation plans, those kinds of things?

2      A.   Yes.

3      Q.   What are those all about?

4      A.   It's about identifying for the client while

5  they're on our unit what kind of things we can work on with

6  them to help increase coping skills, to ensure that there

7  is not another suicide attempt, to identify if there might

8  be ways to mitigate some of the more significant stressors

9  for someone.  So those are the kinds of things we would

10  have done.

11      Q.   Did you find in the context of your assessment

12  that the facility, Estrella facility, had created part of

13  the problem for Wendi?

14      A.   I believe that that's -- I believe that's the

15  case.

16      Q.   Well, tell me about that.

17      A.   Well, Wendi was classified as a maximum security

18  inmate, not because her of behavior, but because of the

19  severity of her charge.  So, when she went into Estrella,

20  when she was placed in Estrella, she was housed with the

21  other maximum security inmates.

22      Q.   In general, what kinds of folks are those people?

23      A.   They are people that either have significant and

24  ongoing behavioral problems while in custody for any number

25  of reasons.  And they tend to be people who have engaged in

1  a lot of sort of ongoing habitual criminal behavior.

2          A lot of times we see people who have significant

3  personality disorders.  People who are oftentimes

4  predators.  People who are facing very serious charges.  So

5  you'll have, it's sort of -- it's the toughest place in the

6  women's jail.

7     Q.   Okay.  Contrast that, if you will, to the

8  population of Estrella with the population for Durango,

9  your psych unit?

10     A.   On our unit we provide services for the people

11  who are chronically mentally ill, acutely mentally ill who

12  experience some kind of various severe stressors that lead

13  us to believe that they would have difficulty coping in the

14  general population.

15          Sometimes, as in Wendi's case, in combination

16  with that we will keep people on the unit if they're

17  particularly supportive or helpful with other patients or

18  inmates of the unit.  Those kinds of people not only are

19  struggling with tremendous stressors for a number of

20  reasons but are also helpful with other patients and

21  provide a stabilizing force in the unit.  So we'll have

22  people remain there for that reason.

23     Q.   Okay.  During the course of your assessment or

24  discussion with Wendi, was she ever diagnosed with any

25  serious mental illness?

1      A.   No.

2      Q.   Okay.  What was her principle issue during the

3  period of time she was in the Durango psychiatric unit?

4      A.   Wendi has a couple of issues that were, that we

5  were -- there are issues that are sort of two separate

6  things.  In terms of diagnosis, she had issues with

7  depression and with severe anxiety.  With regards to

8  treatment planning, the things that we wanted to work on

9  with her while she was there were learning to define

10  boundaries with other people, learning skills and

11  assertiveness.  This takes increments.

12      Q.   Defining boundaries for other people.  What was

13  the principle difficulty in that skill, if you will?

14      A.   My experience with Wendi, she has a very

15  difficult time saying no to anyone who is in distress.

16  Anyone who has a need, whether it be real and immediate or

17  sometimes even when it's feigned by people -- we have

18  people there that do that, too -- Wendi will immediately

19  step in and try and resolved or assist that person in

20  resolving that.  Sometimes it's to her detriment where she

21  became, in a number of cases, very overwhelmed by the

22  demands that certain peers were making on her in terms of

23  providing them support.  You have people who would talk for

24  12 hours straight about suicide.  And Wendi seemed to have

25  very little capacity to say, "Please stop talking.  I can't

1  listen to this any more." And so, in terms of boundaries,

2  those were the kinds of things we are trying to help her

3  learn to establish in a way that it would be positive.

4       Q.   Let me understand what's also related to that.

5  If someone would ask for her assistance and she would try

6  to give them her assistance but fail in the process, how

7  would she act in that situation?

8       A.   The cases in which I would say she failed in the

9  process are people who had chronic problems with inability

10 to calm themselves from the inside. They were people who

11 had significant personality disorders. So the failure

12 would be not in that Wendi failed but in that there was

13 nothing that, for these folks, would have altered that

14 circumstance. And, in fact, probably having someone who

15 listened as attentively as Wendi did might have even

16 magnified that for them.

17      Q.   But if she felt that she couldn't help this

18 person, did she have some --

19      A.   She would come to staff. There were times when

20 she came to me -- I can't say about other staff -- but she

21 came to me and she was deeply upset by the fact that she

22 couldn't help these people. There were several times where

23 she was openly weeping. She said, "I can't, I don't know

24 what to do. I can't stop. I can't help this person but I

25 can't stop myself from trying to help them. And I don't

1   want to but I can't.  I just can't stop trying to help

2   someone when they're in need."  And she was extremely

3   distressed in those cases.

4       Q.   You indicated to me previously that she was

5   easily manipulated by the other inmates?

6       A.   Wendi is a smart gal, so when -- I don't want to

7   set it -- I don't want to -- I don't want to insinuate

8   that, you know, that she is sort of a shrinking flower,

9   that she is completely naive to everything around her.  But

10  there are -- when people would express a need, for me

11  whenever someone gives me information, I'm skeptical

12  because I'm in a jail setting because people lie to me all

13  the time.  So I want to find out, even if someone's crying

14  to the degree to which they're actually in need or are they

15  trying to get me to do something for them.

16           With Wendi, she accepted most of those people at

17  face value.  And so, there were a couple of times when gals

18  were there and said they were pregnant and they weren't

19  pregnant.  And Wendi gave them extra food and made sure

20  they were taken care of and advocated with us to get them

21  extra medical attention.  And, you know, she would then

22  discover that these people weren't who they said they

23  were.  And this happened probably, you know, it happened a

24  number of times.

25           So, she wasn't -- when someone presented

1 themselves as being in need, she didn't have that cynicism

2 or skepticism, even though she'd been in jail a number of

3 years, she was -- her immediate response was to be of

4 assistance.

5    Q.   Was she helpful to the staff?  If so, in what

6 regard?

7    A.   She was with the detention officers.  Wendi did a

8 lot of janitorial work.

9    Q.   For instance?

10    A.   For instance, she was on the higher functioning

11 ladies pod, C pod.  There's a lower functioning pod, D pod,

12 in which we have women who are very, very psychotic, very

13 unwell.  People would plug the toilets all the time, the

14 toilets would overflow and fill the pod.  Wendi cleaned

15 that up.  If someone had been sick, she would clean that

16 up.  She would clean the day room.  She would do trash.

17 She would do windows.  She would assist officers if there

18 were females that had a fear or distrust of officers

19 because they were in uniform.  Wendi would help to get them

20 dressed out in the jail clothing with the officer present.

21 So those were some of the things with the officers, with

22 guards.

23        The psych staff, Wendi routinely would tell us if

24 someone hadn't been taking their medication, which means

25 they would likely decompensate and get sick, show signs of

EXHIBIT YY

000008553

1   illness.  People who were, may be had conditions that they

2   were ashamed to talk about.  We had a couple older ladies

3   who were incontinent and didn't want to tell us they needed

4   extra assistance and Wendi let us know so we could help

5   those people.

6            If people were crying and didn't want to talk to

7   staff, if they were feeling suicidal, if they had any means

8   to harm themselves, she would let us know.  She routinely,

9   you know, engaged in activities in the pod that included

10  other people, board games, letter writing.  She would help

11  people contact, you know, legal people.

12           She would -- just she is kind of, in a way

13  without being -- I mean she wasn't short of a goody two

14  shoes who was reporting everything everyone did, but she

15  would report things that because we weren't there all the

16  time on the pod that we couldn't see, she would let us know

17  about them so that we could provide those people with

18  assistance so we would intervene before something became

19  problematic.

20           There was a gal who was going to make a plea

21  bargain and she completely did not understand what was

22  going on and had been embarrassed to tell her attorney she

23  didn't know what was happening.  Wendi let us know about

24  that so we could pass that on to that patient's attorney.

25  So that patient didn't end up signing a plea bargain and

1   having no idea what they were signing.  So things like

2   that.

3       Q.   The information that she supplied to staff about

4   the other inmates was not supplied for her benefit but

5   rather for the benefit of that inmate?

6       A.   Yeah.  And with regards to the officers, too, I

7   mean, a lot of times inmates would work for extra food,

8   work for things and Wendi routinely had commissary.  So

9   those things, those benefits that you could consider a

10  benefit in the jail if you didn't have access to other

11  resources, Wendi already had those resources so there is

12  really nothing in it for her in terms of gain.

13      Q.   Are you talking about altruistic behavior?

14      A.   I think it helped keep her mind off things

15  because she certainly didn't have to do those things, you

16  know.  And the rewards that she would get were not rewards

17  -- they were not anything that she didn't already have.

18           So I would say that the behavior was more to

19  benefit and participate in being a positive influence in

20  that small community of the psychiatric unit.

21      Q.   Okay.  She remained and still to this day is in

22  that particular unit, correct?

23      A.   Yes.

24      Q.   And were you able to deal with the attempted

25  suicide and kind of move her away from that ideation?

1    A.   Yes.

2    Q.   Tell me about that.

3    A.   With regards to the suicide, as I said before, in

4  the Estrella jail there is a very limited space that the

5  gals who have maximum security designation can be housed.

6  Oftentimes, especially when you've been in custody for a

7  while, people pick on people, people get into arguments and

8  it's nothing that you get really in trouble for but you

9  have to sort of move your population around.  And sometimes

10  there is not enough space for people.  So, Wendi ended up

11  being placed involuntarily in a segregation room.  It was

12  merely a housing issue.  It had nothing to do with her

13  having done anything wrong.  And she had been told that she

14  was going to be there temporarily.  She thought her trial

15  was coming up immediately at that time and she was going to

16  be in isolation during the course of her trial and she

17  panicked.  She didn't have anyone to talk to.  She didn't

18  have anyone to do any reality testing, didn't have anyone

19  to look towards the future with.  And so she panicked and

20  tried to suicide.  So when she came to us.  We knew that

21  there were, and from talking with her, that there were,

22  that Wendi was someone who was extremely social, really

23  needed a lot of routine feedback from people.  She needed

24  to check things out with people that she could trust and

25  knew weren't trying to exploit her very regularly.

1          So, after she had been on the unit for a month,

2    two months, she started to, I don't know how else to say it

3    other than sort of decompress.  She started recognizing

4    that she felt more like herself.  That the experiences she

5    had over at Estrella were actually -- she had actually sort

6    of been in a vigilant, guarded mode for most of the time

7    she was over there to survive.

8          When she came to us, she started being able to,

9    because of the support and the situation, be more

10   vulnerable and more open so we could start talking about

11   the issues that she was having with regards to the

12   boundaries, with regards to the assertiveness, with regards

13   to the passivity and, you know, doing anything to be

14   liked.  Those kinds of things we were able to talk to her

15   about.  And that moved her away from the suicidal thinking

16   which was something that was a stress response because she

17   had no coping skills to survive in that circumstance.

18        Q.   And in the year since she's been in the psych

19   unit, there has been no effort at suicide, any problems of

20   that nature?

21        A.   No.

22        Q.   Was she on medications while at the Estrella

23   facility?

24        A.   Yes.

25        Q.   Were those adjusted somewhat once she became a

1   resident of the psych unit?

2       A.   I believe that they were.

3       Q.   Do you know currently what medications have been

4   prescribed for her while on the psych unit?

5       A.   At this point in time that I'm sitting here,

6   because I've been gone since September, I can't tell you.

7       Q.   At the time you were back with her?

8       A.   Yes.

9       Q.   What would the medications be?

10      A.   I believe that she was on some Seroquel.

11      Q.   What is that?

12      A.   Seroquel is an antipsychotic.  But it's also used

13   for depression.  We use it for sleep.  It's something

14   that's kind of used to stabilize moods.

15           THE COURT:  Would you spell that?

16           THE WITNESS:  S-e-r-o-q-u-e-l.

17      Q.   BY MR. PATTERSON:  Other medication?

18      A.   I believe that she was on an antidepressant,

19   though, I'm not sure which one.

20      Q.   Was she was on Ativan?

21      A.   She was on Ativan.

22      Q.   What is that?

23      A.   Ativan is an antianxiety medication.

24      Q.   Would you spell that for the court reporter?

25      A.   A-t-i-v-a-n.

1    Q.   And any other medications?

2    A.   Other than the Seroquel, the antidepressant and

3 the antianxiety, no.

4    Q.   All right.  While she was at the psychiatric unit

5 there at Durango, were there beds available for other

6 persons who were seriously mentally ill?

7    A.   Yes.

8    Q.   What was the setup there?

9    A.   The setup there, there is a lower functioning

10 women's pod and a higher functioning women's pod.  For the

11 majority of the time Wendi was there, she was on the higher

12 functioning women's pod, which was never full.  So, she was

13 never taking up a bed for someone else that needed it

14 because most of the time when we get people in and we're

15 short of beds, it's in the more acutely ill D pod.

16    Q.   Okay.  While she was in the Durango facility, she

17 did receive a write-up for contraband?

18    A.   Yes.

19    Q.   What was that about?

20    A.   The officers, in doing a routine search of the

21 cells, came across some, I think lipstick and eye shadow

22 and a pen.

23    Q.   And why is that stuff, in your unit, considered

24 contraband?

25    A.   Well, it's considered contraband because we have

1   people that tend to be more impulsive, that have a history

2   of harming themselves.  And things that are, like a pen

3   which is longer or things like eye shadow which may have

4   some material in it that could be used to make a sharp edge

5   are considered -- they're considered dangerous if someone

6   were to get ahold of them.

7          But, I understand that those things are -- a

8   certain degree of flexibility and discretion is exercised

9   in the general population which we do not have on our unit.

10      Q.   Okay.  And G.P. would be or general population

11  would be the circumstances --

12      A.   Estrella.

13      Q.   she found herself in in Estrella?

14      A.   Yes.

15      Q.   So, a little stricter scrutiny of those items in

16  your unit because of the suicidal problems?

17      A.   Yes.

18      Q.   Was there also a write-up for having a Seroquel

19  pill?

20      A.   Wendi and some other inmates were going through

21  one of the pods.  They had their bedding with them and a

22  Seroquel pill rolled out.  The officers claimed that it was

23  Wendi's pill but we don't know if it was Wendi's pill or

24  not.  But the officers were very angry about the contraband

25  issue.  So they wrote Wendi up for the Seroquel.  Without